# APPENDIX 10: CALCULATION OF CERTAIN INCREASES IN RISK APPETITE LIMITS

> **To:** Lehman Examiner
> **From:** Duff & Phelps
> **Subject:** Increase in Risk Appetite Limits from 2006 to 2007 and from 2007 to 2008
> **Date:** February 1, 2010

This Appendix describes the ways in which Lehman's methodology for calculating the Risk Appetite ("RA") limits changed from 2006 to 2007 and from 2007 to 2008. It analyzes the quantitative impact of those changes on the final limit amounts.

## I. Setting the 2007 RA limit

a) **Lehman performed numerous calculations of potential RA limits for 2007. Despite using various methodologies, it recommended approximately the same $3.3 billion limit each time.**

A November 20, 2006 proposal considered four potential 2007 RA limits, recommending a $3.3 billion limit, "The risk appetite limit for 2007 could be set as high as $3.9 billion. However, in view of historically low volatility levels … we recommend setting the limit 15% lower – i.e., at $3.3 billion." (i p.5) Two days later, a November 22, 2006 proposal considered a different methodology for calculating the RA limit and concluded, "We recommend setting the Risk Appetite limit at $3.2 billion for 2007." (ii p.2)

On January 11, 2007 another round of revisions in the 2007 RA limit calculation methodology was performed by Robert Azerad at Antoncic's request. He prepared two calculations using different methodologies, one reaching a $3.793 billion limit, and another reaching a $2.973 billion limit. (iii p.3; iv p. 3) The $2.973 billion limit was actually the same calculation as used for the final limit of $3.273 billion, however it contained a proposed $300 million haircut for market conditions and principal investments, which was not used for the final limit.

Ultimately, a final limit was presented to the board of directors: the January 30, 2007 Financial Plan stated, "We propose to establish a 2007 risk appetite limit of $3.3 billion … the minimum performance hurdle is set at a 10.0% ROE." The limit is based on a calculation that differed from all the computations seen in prior drafts of the 2007 limit calculation. (v p.21; vi p.2-5)

**b) Review of the impact of various methodologies and assumptions considered in calculation of the 2007 RA Limit:**

- <u>Applying a maximum cap of 10%</u> on the haircuts on the underwriting and client revenues in a stress scenario. By limiting the haircuts to only 10%, a higher RA limit is achieved. (i p.2) The final RA limit calculation on January 30, 2007 does not use this 10% cap on haircuts. (vi p.5)

- <u>Revisions of haircuts</u> on revenues in a stress scenario. The haircuts applied to budgeted divisional revenues in a stress scenario varied across presentations. The November 20, 2006, November 22, 2006 and the final RA limit calculation of January 30, 2007 all assumed different haircuts in a stress scenario. (i p.4; ii p.6; v p.21) These different haircuts are analyzed, despite an October 10, 2007 email from Azerad that includes wording that implies that haircuts in a stress scenario are determined using historical modeling, i.e., they should have been consistent across analyses performed on the same or nearby dates. (vii p.1)

- <u>Applying a haircut to the Principal and Proprietary revenues</u> in a stress scenario. Both the November 20, 2006 and November 22, 2006 presentations discuss the exclusion of Principal and Proprietary revenues from the stress scenario. (i p.1; ii p.1) The removal of the haircuts on Principal and Proprietary revenues would result in higher projected total revenues in a stress scenario, which would lead to a higher RA limit. The final RA limit calculation on January 30, 2007 does not apply haircuts to the Principal and Proprietary revenues, with the justification that the budgeted revenues would be achievable even in a downturn scenario. (vi p.5)

- <u>Using ROE as a performance metric versus a C&B ratio.</u> Two different metrics are discussed to determine the minimum level of revenues that would be required in a downturn scenario. The C&B ratio (an abbreviation for Compensation and Bonus, or Compensation and Benefits) is the total compensation expense as a percentage of revenues, in a stress scenario. The C&B ratio target methodology was considered to determine the minimum revenues required to be able to compensate and retain personnel, even during a downturn

2

in the market. The alternative methodology initially used a predetermined desired ROTE (return on tangible equity) as the target, and calculated the minimum amount of revenues that would be required to achieve this return in a downturn. The targets considered for the 2007 methodology were a 55% C&B ratio, or a 10% ROTE. Of the two, the 55% C&B ratio yielded a substantially lower RA limit. The 55% C&B ratio was not used, and the resulting limit calculations are stamped "unacceptable result." (i p.2, 8, 10) Further, the ROTE target ultimately was not used. Instead the final January 30, 2007 RA limit calculation used a 10% ROE target, the impact of which was a lower RA limit than a 10% ROTE target, and a higher RA limit than a 55% C&B target. (vi p.4)

- <u>Applying a 15% buffer to the RA limit.</u> Both the November 20, 2006 and November 22, 2006 presentations suggested adding a 15% reduction to the calculated RA limit as an extra precaution, in view of historically low volatility levels observed in capital markets in 2006. (i p.5; ii p.2) The final RA limit calculation of January 30, 2007 did not include this 15% buffer, resulting in a higher limit. (v p.22)

- <u>Applying a $300 million buffer to the RA limit.</u> Similar to the 15% buffer discussed above, two different reductions to the total limit were suggested in the January 11, 2007 RA limit calculation. One was a $150 million "Market Environment Haircut," and the other was a $150 million haircut "Earmarked for Additional Principal/Strategic Investments." (iv p.3) The final RA limit calculation on January 30, 2007 does not include either of these haircuts. (v p.22)

c) **The Final 2007 RA limit was higher than the 2006 RA Limit, partly as a result of applying a more aggressive methodology than that which was used to calculate the RA limit for 2006. Two major differences were the move to a 10% ROE performance target for 2007 and the apparent elimination of any haircuts to the Principal and Proprietary revenues for 2007.**

II. **Setting the 2008 RA limit**

a) **The final 2008 Risk Appetite limit used methodologies and assumptions different from those used in calculating the 2007 limit, which in aggregate resulted in a higher RA limit than for 2007.**

- <u>The 2008 RA limit used 10% ROTE as the performance standard</u> (viii p.17) as opposed to the 10% ROE performance standard used for the 2007 RA limit calculation. Achieving a 10% of ROTE instead of 10% ROE requires a lower net

income, as tangible equity is a subset of total equity. To achieve a lower net income, less revenue is required. This allows for a lower minimum revenue level to achieve target performance, which leads to a higher RA limit. (ix p.3,4 please note that this is an excel file prepared by Lehman to calculate the 2008 RA limit.) If 10% ROE had been used as the performance standard, the 2008 RA limit might have been ~$649 million lower (x, p.2,4 please note that the impact of this change is dependent on the impact of other changes, and may be calculated differently depending on the order of other adjustments.)

- The 2008 RA limit used, overall, lower haircuts on budgeted revenues in a stress scenario than the 2007 RA limit. (vi p.5; ix p.5 column J) The most significant reduction was from a 20% to a 15% haircut on the client revenues, which accounted for $12.8 billion of the $21.0 billion in the 2008 budget. If the 2007 haircuts had been used, the 2008 RA limit would have been ~$676 million lower. (xi, p.2,5)

- The 2008 RA limit used a modified calculation to calculate the fixed and variable compensation expense in a downturn scenario. The 2007 RA calculation assumed that the fixed compensation expense in a stress scenario would be reduced by 6% versus budgeted fixed compensation expense, and that the variable compensation expense would be discounted by 40%. (vi p.4) The 2008 RA calculation assumed instead that the fixed expense would be the same in a stress scenario, but the budgeted variable compensation expense was discounted by 58.33% (35% divided by .6). (ix p.4 cell H8) If the 2007 compensation expense calculation had been used, the 2008 RA limit would have been ~$603 million lower. (xii p.2,4)

- The 2008 RA limit used a modified calculation to calculate the fixed non-personnel expense in a downturn scenario. Fixed non-personnel expense, in a stressed scenario, was reduced by 17% from the budgeted amount in the 2007 limit calculation. (vi p.4) The 2008 RA calculation discounted fixed non-personnel expense by 10%. (ix p.4 cell H11) If the 2007 fixed non-personnel discount had been used, the RA limit would have been ~$236 million higher. (xiii p.2,4)

- The 2008 RA limit used very high revenue projections for the coming year.

  - Lehman's 2008 revenue budget of $21 billion contrasted with analyst estimates. Reuters' consensus revenue report shows a median 2008 revenue estimate (for 13 analysts) of $19.1 billion for Lehman in December

2008. (xv p.1)  While numerous analyst reports cited Lehman earnings calls, two reports specifically cited meetings with Lehman's then-CFO Erin Callan as a basis for their estimates of 2008 revenues, ranging from $19.0 to $19.2 billion (xvi p.5; xvii p.1 – the two analyst reports that cite meetings with Callan).  Also, see Section III of this report, "Analyst Earnings Estimates."

**b)  No apparent compensating measures were taken**

Despite the changes to a more aggressive calculation described above, more conservative compensating methodologies which had been discussed in 2007, but not applied in the final 2007 RA calculation, were also not applied in 2008:

▪ The 55% C&B ratio was not used as a performance standard.  Instead the C&B ratio for the final RA calculation was 58.2%. (ix p.4 cell H24)  If a 55% C&B ratio had been used, instead of the 10% ROTE target, the 2008 RA limit would have been ~$818 million lower.  (xviii p.2,4)

▪ The budgeted Principal and Proprietary revenues were not haircut in the stress scenario.  If the Principal and Proprietary revenues had been discounted by 100%, as was apparently the case in 2006, the 2008 RA limit would have been ~$1,955 million lower. Alternatively, any haircut assumed would have a dollar for dollar impact on the RA limit.  For example, if a 10% haircut had been used (the lowest of all haircuts suggested in the in the 2008 RA calculation spreadsheet, see ix p.5), the RA limit would have been ~$196 million lower.

▪ Neither the 15% buffer, nor the $300 million dollar haircuts were used. (ix p.2)  If the 15% "volatility" buffer had been applied, the 2008 RA limit would have been ~$600 million lower ($4 billion x 15%).  If the $300 million dollar haircut ($150 million for "Market Environment Haircut" and $150 million for "Earmarked for Additional Principal/Strategic Investments") had been applied, the limit would have been that much lower.

**c)  Recalculation of the 2008 RA limit using the 2007 methodology results in a lower RA limit.**

We recalculated the 2008 RA limit, using the exact methodology used for the calculation in 2007, and arrived at a limit of $2.457 billion.  This is in contrast to the $4 billion limit actually used in 2008.  The methodological changes that contributed to the ~$1.5 billion reduction in the limit as we have recalculated,

were (as described above): a change from ROTE (2008) back to ROE (2007), increases in stress haircuts in a downturn scenario (higher haircuts were used in 2007), and adjustments to the compensation and non personnel expense calculations in a downturn scenario (2007 used more conservative assumptions in aggregate). Please note that many of the calculations work in tandem, and the impacts of each change in isolation are not simply additive. (xx p.2,4,5)

**d) What changed between 2007 and 2008 that impacted the RA limit, outside the methodology changes?**

As stated above, if Lehman had maintained a consistent methodology between 2007 and 2008, the RA limit for 2008 would have actually been lowered to $2.457 billion. This number would have been lower than the limit of $3.3 billion which was in place throughout 2007. This decrease was the result of the following factors.

- Budgeted revenue increased. The increase in budgeted revenue, from $19.65 billion in 2007 to $21 billion in 2008, in isolation, would have allowed for a higher RA limit by $1.35 billion.

- Revenue loss in a downturn scenario increased. Because budgeted revenue was increased, and revenue loss in a stress scenario is calculated as a percentage of budgeted revenue broken out by type, the revenue loss in the downturn scenario (using 2007 haircuts) also increased. The higher the expected revenue loss, the lower the limit.

- Expected average common equity increased. The 2007 calculation assumed common equity of $17.413 billion, while the 2008 calculation assumed $20.795 billion. As the RA limit was based off of 10% return on equity, the increased equity led to higher required revenues, and lower limits.

- Increase in budgeted compensation expense. Budgeted compensation expense increased from $9.6 billion in 2007 to $10.9 billion in 2008. The increased expense required higher revenues to achieve the performance target (i.e. 10% ROE), which resulted in a lower limit. The distribution of fixed vs. variable compensation expense also changed from 56% fixed in 2007 to 54% fixed in 2008. The variable expense is discounted at a higher rate for the stress scenario, which leads to a higher RA limit.

- <u>Increase in budgeted non personnel expense</u>.  Budgeted non personnel expense increased from $3.4 billion in 2007 to $4.2 billion in 2008, leading to a decrease in the RA limit.

- <u>Decrease in tax rates assumed in a stress scenario</u>.  The tax rates used in a stress scenario decreased from 30% in 2007 to 26% in 2008.  A lower tax expense led to a higher RA limit.

- <u>Decrease in dividends</u>.  Dividends in stress scenario were lowered from $66 million in 2007 to $49 million in 2008, leading to a higher RA limit.

Overall, the reason why the $2.457 billion 2008 limit we have projected (using 2008 financial projections and the actual 2007 methodology) would have been lower than the 2007 limit of $3.3 billion is that projections for overhead and equity grew between 2007 and 2008, overriding the growth in projected revenues.

## III.    Analyst Earnings Estimates

**Analyst Report Summary - 2008 Earnings Estimates**

| Analyst | Date | 2008 Projected Revenue ($mm) | Reason for issuing Equity Report | Source |
|---|---|---|---|---|
| CIBC | 12/13/2007 | $ 18,953.0 | following an earnings call and "Outlook 2008: Crunch Time" | Meredith Whitney; Kaimon Chung, CFA "4Q07 Results Highlight Difficult Credit Market Conditions" CIBC World Markets (December 13, 2007) |
| Credit Suisse | 12/13/2007 | 18,972.0 | following earnings call | Susan Katzke; Ross Seiden "Lehman Brothers Earnings First Impressions" Credit Suisse (December 13, 2007) |
| Wachovia | 12/13/2007 | 19,159.0 | following earnings call | Douglas Sipkin, CFA; Warren Gardiner "LEH: Survive…..And Thrive Later, Solid All Things Considered" Wachovia Capital Markets, LLC (December 13, 2007) |
| JPM | 12/13/2008 | 18,186.0 | following earnings call | Kenneth Worthington, CFA; Funda Akarsu "Lehman Delivers, but Earnings Quality Remains Key Concern" JPMorgan (December 13, 2007) |
| Buckingham Research | 12/14/2007 | 21,850.0 | following earnings call | James Mitchell; John Grassano "Solid Results in Tough Environment; Undervalued Franchise" The Bunkingham Research Group (December 14, 2007) |
| HSBC | 1/3/2008 | 19,757.0 | Based on sharper than assumed economic slow-down | Matthew Czepliewicz "A relative winner…in subdued credit markets" HSBC Global Research (January 3, 2008) |
| Credit Suisse | 1/11/2008 | 18,980.0 | Based on achievement of this forecast relies on healthy global GDP growth and a recovery in the capital markets | Susan Katzke; Ross Seiden "Lehman Brothers Company Update Establishig 2009E" Credit Suisse (January 11, 2008) |
| Wachovia | 1/15/2008 | 19,159.0 | Based on recently held client meeting with Erin Callan, overall tone was cautious given the challenging operating environment.  Still believe LEH is well positioned | Douglas Sipkin, CFA; Herman Chan; Warren Gardiner "LEH: Tough Year Ahead--Sowing Seeds For Share Gains" Wachovia Capital Markets, LLC (January 15, 2008) |
| Oppenheimer | 1/28/2008 | 18,953.0 | Based on first meeting with Erin Callan, leaving estimates as is | Meredith Whitney; Kaimon Chung, CFA "Take-aways From Meeting With LEH's New CFO Erin Callan"  Oppenheimer (January 28, 2008) |

Sources:

i.      "2007 Risk Appetite Limit Revised Proposal," November 20, 2006. LBEX-DOCID 2125724

ii.     "2007 Risk Appetite Limit," November 22, 2006. LBEX-DOCID 2125734

iii.    2007 $3.8 billion RA Limit Calculation. LBEX-DOCID 145687

iv.     2007 $3.0 billion RA Limit Calculation. LBEX-DOCID 145663

v.      "2007 Financial Plan," January 30, 2007. LBH_SEC07940_752429

vi.     "2007 Revised Risk Appetite Limit," January 7, 2007. LBEX-DOCID 159838

vii.    "FW: Revised Risk Appetite Limit," January 4, 2008. LBEX-WGM 1056629

viii.   "2008 Financial Plan," January 29, 2008. LBHI_SEC07940_068559

ix.     2008 $4 billion RA Limit Calculation. LBEX-DOCID 1305768

x.      Impact on RA limit of change from ROTE to ROE – analysis performed by D&P.

xi.     Impact on RA limit of change in Stress Haircuts – analysis performed by D&P.

xii.    Impact on RA limit of change in Compensation Expense – analysis performed by D&P.

xiii.   Impact on RA limit of change in NPE – analysis performed by D&P.

xiv.    "2008 Budget" October 4, 2007. EC000042

xv.     Reuters Estimates: Custom Consensus Report for Lehman Brothers Inc.

xvi.    Oppenheimer Rating, January 28, 2008.

xvii.   Wachovia Rating, January 15, 2008.

xviii.  Impact on RA limit of change from 55% C&B Ratio – analysis performed by D&P.

xix.    "2008 Financial Plan, Draft" January 29, 2008. LBHI_SEC07940_045973

xx.     2008 $2.4 billion RA Limit Calculation – analysis performed by D&P.

# APPENDIX 11: COMPENSATION

To determine, as the Examiner was directed to do, whether the officers and directors of Lehman breached their fiduciary duties, the Examiner investigated whether Lehman's compensation practices may have improperly motivated conduct, as discussed more fully in Section III.A.1 of this Report.

## I.      EXECUTIVE SUMMARY

Specifically, the Examiner reviewed: (1) how Lehman determined the amount of overall compensation and divided that compensation pool among divisions, business lines and employees; (2) the extent to which risk was considered in Lehman's assessment of performance for compensation purposes; and (3) Lehman's policies and practices in comparison to those of peer firms.

Lehman allocated compensation based primarily on net revenue. Revenue not yet recognized but recorded based on mark-to-market valuations was included in net revenue and, therefore, impacted compensation decisions. This inclusion naturally created incentives to value investments highly, avoid writedowns and otherwise seek to maximize short-term profits so as to generate higher net revenue leading to higher compensation. The Examiner has not found evidence that Lehman personnel deliberately engaged in misconduct designed to exploit these incentives.

Although risk-based metrics and similar criteria did play some role in compensation decisions, it was a minor, not central, role.  Compensation decisions were driven largely by net revenue, market comparisons and employee attrition concerns.

Lehman's compensation practices were similar to those of its Wall Street peers.  While Lehman's vesting and delivery periods for its stock awards were notably longer than its peer firms, Lehman's compensation practices were similar to those used by the other major investment banks.[1]

## II.    THE COMPENSATION AND BENEFITS COMMITTEE OF THE BOARD

The first step of Lehman's annual compensation process began with meetings of the Compensation and Benefits Committee ("Compensation Committee") of the Board of Directors, which in 2007 and 2008 consisted of John F. Akers, Marsha "Marty" Johnson Evans, Sir Christopher Gent and John D. Macomber.  Tracy Binkley, Lehman's Head of Human Resources, served as Secretary for meetings, while Richard S. Fuld, Jr., Lehman's Chief Executive Officer and Chairman of the Board, and others (Joseph M. Gregory, President and Chief Operating Officer ("COO"), Anthony J. Collerton,  COO of Human

---

[1] The Examiner did not examine or reach a conclusion regarding whether the compensation practices of the industry as a whole during the period leading up to Lehman's collapse were in hindsight reasonable; that issue has been the subject of much public debate, and is beyond the scope of this examination.

Relations, and Thomas A. Russo, Chief Legal Officer, among others) regularly attended Compensation Committee meetings by invitation.[2] These meetings generally took place on a monthly or near-monthly basis.[3]

The Compensation Committee's primary role was to set the firm's compensation ratio (defined below) and to supervise the allocation of available compensation derived from the ratio into compensation pools for each division.[4] In addition, the Compensation Committee determined the mix of cash compensation and equity compensation (awarded as restricted stock units

---

[2] Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Jan. 30, 2007), at p. 1 [LBHI_SEC07940_025526]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Apr. 11, 2007), at p. 1 [LBHI_SEC07940_025940]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Oct. 15, 2007), at p. 1 [LBHI_SEC07940_026503]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Dec. 7, 2007), at p. 1 [LBHI_SEC07940_027100]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Jan. 28, 2008), at p. 1 [LBHI_SEC07940_027212]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Mar. 4, 2008), at p. 1 [LBEX-AM 003552]; Lehman Brothers Holdings Inc, Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Mar. 12, 2008), at p. 1 [LBEX-AM 003580]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Apr. 14, 2008), at p. 1 [LBEX-AM 003646]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (June 19, 2008), at p. 1 [LBEX-AM 003769]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (July 1, 2008), at p. 1 [LBEX-AM 003812]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Sep. 3, 2008), at p. 1 [LBEX-AM 003902]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Sep. 12, 2008), at p. 1 [LBEX-AM 003922].
[3] *Id.*
[4] Examiner's Interview of Anthony J. Collerton, May 14, 2009 at pp. 2-3; Examiner's Interview of Mary Pat Archer, Aug. 20, 2009, at p. 2; Examiner's Interview of Marsha Johnson Evans, May 22, 2009, at p. 6.

("RSUs") or options), as well as set the deferred component of total compensation.[5]

## A. Determining Lehman's Compensation Ratio

Each year, the Compensation Committee determined Lehman's aggregate compensation expense (consisting of both fixed compensation expenses and discretionary, performance-based bonus expenses) by calculating a ratio of total compensation and benefits expense to net revenue (the "compensation ratio").[6] In addition to net revenue, the Compensation Committee considered factors such as: the need to maximize returns to shareholders; investments of the firm in

---

[5] Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Jan. 30, 2007), at p. 1 [LBHI_SEC07940_025526]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Apr. 11, 2007), at pp. 1-11 [LBHI_SEC07940_025940]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Oct. 15, 2007), at pp. 1-4 [LBHI_SEC07940_026503]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Dec. 7, 2007), at pp. 1-10 [LBHI_SEC07940_027100]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Jan. 28, 2008), at pp. 1-7 [LBHI_SEC07940_027212]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Mar. 4, 2008), at p. 1-5 [LBEX-AM 003552]; Lehman Brothers Holdings Inc, Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Mar. 12, 2008), at p. 1 [LBEX-AM 003580]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Apr. 14, 2008), at pp. 1-5 [LBEX-AM 003646]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (June 19, 2008), at p. 1 [LBEX-AM 003769]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (July 1, 2008), at p. 1 [LBEX-AM 003812]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Sep. 3, 2008), at pp. 1-6 [LBEX-AM 003902]; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (Sep. 12, 2008), at pp. 1-3 [LBEX-AM 003922].

[6] Examiner's Interview of Anthony J. Collerton, May 14, 2009 at p. 2; Examiner's Interview of Marsha Johnson Evans, May 22, 2009, at p. 6; Lehman, Compensation Overview (July 30, 2008), at p. 3 [LBEX-WGM 727244].

strategic hiring; and rewarding performance in a competitive manner in light of current market conditions.[7]  Throughout the year, the Compensation Committee consulted quarterly revenue projections and real-time results provided by the Finance Department to estimate and forecast the firm's compensation ratio.[8]

The quarterly revenue projections included analysis of the impact of slightly different compensation ratio levels on pre-tax margin, return on equity ("ROE"), earnings per share ("EPS"), discretionary bonuses and total compensation for non-guaranteed non-new hire ("NGNNH") employees.[9]

The "compensation pool" was finalized in the fourth quarter of each Lehman fiscal year (September through November), when Lehman was able to accurately predict its annual net revenues based on Finance Department accruals and to compare its compensation estimates to the estimates of its competitors.[10] As Lehman's fiscal year-end approached, the compensation ratio fluctuated based on what Lehman learned from outside consultants regarding the

---

[7] Lehman, Compensation Overview (July 30, 2008), at p. 3 [LBEX-WGM 727244]; Examiner's Interview of Marsha Johnson Evans, May 22, 2009, at p. 6.
[8] Examiner's Interview of Anthony J. Collerton, May 14, 2009, at pp. 2-3; Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (March 12, 2008), at p. 1 [LBEX-AM 003580].
[9] Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee of Lehman Board of Directors (March 12, 2008), at p. 1 [LBEX-AM 003580].
[10] Examiner's Interview of Anthony J. Collerton, May 14, 2009, at p. 3.

compensation ratios used by competitors such as Goldman Sachs, Bear Stearns, Morgan Stanley and Merrill Lynch.[11]

Lehman's compensation ratio typically ranged between 48% and 50% of net revenue, and was 49.3% of net revenue in each of fiscal years 2005, 2006 and 2007.[12] The chart below demonstrates Lehman's compensation ratio as compared to four competitors between 2003 and 2007:[13]

---

[11] Lehman, Presentation to the Compensation Committee of the Board of Directors (Jan. 23, 2008), at p. 2 [LBHI_SEC07940_027204].

[12] Examiner's Interview of Anthony J. Collerton, May 14, 2009, at p. 2; Lehman, Presentation to Compensation and Benefits Committee of Lehman Board of Directors (Jan. 23, 2008), at p. 5 [LBHI_SEC07940_027204].

[13] Lehman Brothers Holdings Inc., Annual Report for 2005 as of Nov. 30, 2005 (Form 10-K) (filed on Feb. 13, 2006), at p. 26 ("LBHI 2005 10-K"); Lehman Brothers Holdings Inc., Annual Report for 2006 as of Nov. 30, 2006 (Form 10-K) (filed on Feb. 13, 2007), at p. 28 ("LBHI 2006 10-K"); Lehman Brothers Holdings Inc., Annual Report for 2007 as of Nov. 30, 2007 (Form 10-K) (filed on Jan. 29, 2008), at p. 29 ("LBHI 2007 10-K"); The Bear Stearns Companies Inc., Annual Report for 2005 as of Nov. 30, 2005 (Form 10-K) (filed on Feb. 13, 2006), at p. 49 ("Bears Stearns 2005 10-K"); The Bear Stearns Companies Inc., Annual Report for 2006 as of Nov. 30, 2006 (Form 10-K) (filed on Feb. 13, 2007), at p. 50 ("Bears Stearns 2006 10-K"); The Bear Stearns Companies Inc., Annual Report for 2007 as of Nov. 30, 2007 (Form 10-K) (filed on Jan. 29, 2008), at p. 81 ("Bears Stearns 2007 10-K"); The Goldman Sachs Group Inc., Annual Report for 2005 as of Nov. 25, 2005 (Form 10-K) (filed on Feb. 7, 2006), at p. 152 ("Goldman Sachs 2005 10-K"); The Goldman Sachs Group Inc., Annual Report for 2006 as of Nov. 24, 2006 (Form 10-K) (filed on Feb. 5, 2007), at p. 166 ("Goldman Sachs 2006 10-K"); The Goldman Sachs Group Inc., Annual Report for 2007 as of Nov. 30, 2007 (Form 10-K) (filed on Jan. 28, 2008), at p. 174 ("Goldman Sachs 2007 10-K"); Morgan Stanley, Annual Report for 2007 as of Nov. 30, 2007 (Form 10-K) (filed on Jan. 29, 2008), at p. 28 ("Morgan Stanley 2007 10-K"); Merrill Lynch & Co., Inc., Annual Report for 2007 as of Dec. 28, 2007 (Form 10-K) (filed on Feb. 25, 2008), at p. 32 ("Merrill Lynch 2007 10-K").

| ($000,000) | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| **Lehman Brothers** | | | | | |
| Net Revenue | $19,257 | $17,583 | $14,630 | $11,576 | $8,647 |
| Compensation & Benefits Expense | 9,494 | 8,669 | 7,213 | 5,730 | 4,318 |
| *Compensation Ratio* | *49.3%* | *49.3%* | *49.3%* | *49.5%* | *49.9%* |
| **Bear Stearns** | | | | | |
| Net Revenue | 5,945 | 9,227 | 7,411 | 6,813 | 5,994 |
| Compensation & Benefits Expense | 3,425 | 4,343 | 3,553 | 3,254 | 2,881 |
| *Compensation Ratio* | *57.6%* | *47.1%* | *47.9%* | *47.8%* | *48.1%* |
| **Goldman Sachs** | | | | | |
| Net Revenue | 45,987 | 37,665 | 25,238 | 20,951 | 16,012 |
| Compensation & Benefits Expense | 20,190 | 16,457 | 11,758 | 9,681 | 7,515 |
| *Compensation Ratio* | *43.9%* | *43.7%* | *46.6%* | *46.2%* | *46.9%* |
| **Morgan Stanley** | | | | | |
| Net Revenue | 28,026 | 29,839 | 23,525 | 20,319 | 17,621 |
| Compensation & Benefits Expense | 16,552 | 13,986 | 10,749 | 9,320 | 7,892 |
| *Compensation Ratio* | *59.1%* | *46.9%* | *45.7%* | *45.9%* | *44.8%* |
| **Merrill Lynch** | | | | | |
| Net Revenue | 11,250 | 33,781 | 25,277 | 22,059 | 19,900 |
| Compensation & Benefits Expense | 15,903 | 16,867 | 12,314 | 10,663 | 9,886 |
| *Compensation Ratio* | *141.4%[14]* | *49.9%* | *48.7%* | *48.3%* | *49.7%* |

Excluding Merrill Lynch, the 2007 average of competitors' compensation ratios was 53.5%;[15] the 2006 average of competitors' compensation ratios was 46.9%.[16] Lehman attempted to maintain or reduce its compensation ratio on a year-to-year basis as a signal to the market that it was committed to controlling

---

[14] In 2007, Merrill reported a net loss from continuing operations of $8.6 billion, resulting in compensation expenses exceeding net revenue, and a compensation ratio of 141.4%. Merrill Lynch 2007 10-K, at pp. 10, 69.

[15] If Merrill was included, the ratio would be 70.35.

[16] LBHI 2005 10-K at p. 26; LBHI 2006 10-K at p. 28; LBHI 2007 10-K at p. 29; Bear Stearns 2005 10-K at p. 49; Bear Stearns 2006 10-K at p. 50; Bear Stearns 2007 10-K at p. 81; Goldman Sachs 2005

compensation expenses – while salaries of individual employees and executives might increase, Lehman was maintaining and/or decreasing its compensation expenses as an overall percentage of firm expenses.[17]

Early in 2008, Lehman projected declining revenue due to market conditions.[18] To maintain total compensation at a dollar level comparable to past levels despite declining revenues, and thus avoid potential employee exodus to competitors, Lehman projected an increase in the firm's compensation ratio during the first quarter of 2008.[19] The chart below demonstrates that trend:

|  | 2007 | | | | 2008 |
| --- | --- | --- | --- | --- | --- |
| ($000,000) | Q1 | Q2 | Q3 | Q4 | Q1 |
| Net Revenue | 5,047 | 5,512 | 4,308 | 4,390 | 3,507 |
| Compensation | 2,488 | 2,718 | 2,124 | 2,164 | 1,841 |
| % of Revenue | 49.30% | 49.31% | 49.30% | 49.29% | 52.50% |

At a March 12, 2008 Compensation Committee meeting, Fuld recommended, and the Board adopted, an increased compensation ratio of 52.5% for the first quarter of 2008.[20] First quarter 2008 net revenue decreased by

10-K at p. 152; Goldman Sachs 2006 10-K at p. 166; Goldman Sachs 2007 10-K at p. 174; Morgan Stanley 2007 10-K at p. 28; Merrill Lynch 2007 10-K at p. 32.

[17] Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at pp. 2, 8-11; Examiner's Interview of James Emmert, Oct. 9, 2009, at p. 2.

[18] Lehman, Presentation to Compensation and Benefits Committee of Lehman Board of Directors (Jan. 23, 2008), at p. 1 [LBHI_SEC07940_027204].

[19] Id. at p. 2.

[20] Lehman Brothers Holdings Inc., Compensation and Benefits Committee Meeting Minutes of Lehman Board of Directors (Mar. 12, 2008), at p. 1 [LBEX-AM 003580].

approximately 30.5% from first quarter 2007 net revenue and approximately 20.1% from fourth quarter 2007 net revenue.[21]

Beginning second quarter 2008, the compensation ratio method of determining total compensation was no longer viable, as firm-wide net revenue was negative $668 million.[22]  Despite having firm-wide negative net revenue for second quarter 2008, certain Lehman divisions, *i.e.*, Investment Management and Investment Banking, had performed well during that period.[23]  Consequently, Lehman management determined that employees in those better performing divisions should be paid compensation commensurate with compensation paid to employees in similar divisions at Lehman's peer firms, in order to protect the Lehman franchise.[24]  Preliminary market indications following second quarter 2008 suggested that pay for the lead investment banks was likely to be down approximately 25% to 30% overall from 2007.[25]  Consistent with these indications, the Compensation Committee also planned to target a 30% reduction in pay for

---

[21] Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 28, 2007 (Form 10-Q) (filed on Apr. 9, 2007), at p. 3 ("LBHI 10-Q (filed Apr. 9, 2007)"); Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2007 (Form 10-Q) (filed on July 10, 2007), at p. 3 ("LBHI 10-Q (filed July 10, 2007)"); Lehman Brothers Holdings Inc., Quarterly Report as of Aug. 31, 2007 (Form 10-Q), at p. 3 (filed on Oct. 10, 2007) ("LBHI 10-Q (filed Oct. 10, 2007)"); LBHI 2007 10-K at p. 29; Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 29, 2008 (Form 10-Q) (filed on Apr. 9, 2008), at p. 4 ("LBHI 10-Q (filed Apr. 9, 2008)"); Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed on July 10, 2008), at p. 4 ("LBHI 10-Q (filed July 10, 2008)").
[22] LBHI 10-Q (filed July 10, 2008).
[23] Lehman, Second Quarter 2008 Compensation Expense Presentation to Compensation and Benefits Committee of Lehman Board of Directors (July 11, 2008), at p. 1 [LBHI_SEC07940_851433].
[24] *Id.*

NGNNH employees for 2008; the Compensation Committee determined it would be difficult to both maintain the franchise and initiate any pay cuts of over 30%.[26] In addition, beginning in January 2008, the Compensation Committee began exploring alternative long-term compensation models, including changes to its equity award plan, which would lower overall compensation costs.[27]

### B. Cash-Equity Mix of Compensation and Vesting

In addition to setting the firm's compensation ratio, the Compensation Committee also determined the cash-equity mix (the percentage of compensation paid in cash versus that portion paid in equity) and the deferred component of total compensation for all Lehman employees.[28] As an individual's total compensation increased, the deferred component increased correspondingly.[29] In Lehman's view, individuals with significant portions of their total compensation in the form of deferred compensation had an incentive to promote the firm's long-term success.[30]

---

[25] *Id.* at p. 3.
[26] *Id.*
[27] Lehman, Presentation to Compensation and Benefits Committee of Lehman Board of Directors (Jan. 23, 2008), at p. 2 [LBHI_SEC07940_027204]; Lehman, Compensation Overview (July 30, 2008), at pp. 1-32 [LBEX-WGM 727244].
[28] Lehman, Compensation Overview (July 30, 2008), at pp. 15-19 [LBEX-WGM 727244].
[29] *Id.*
[30] *Id.*

The chart below shows the amount of total compensation comprised of equity-based awards in 2008:[31]

| 2008 Total Compensation Range | Amount of Total Compensation in Equity-Based Awards |
|---|---|
| $0 - $74,999 | 1% of 2008 TC |
| 75,000 - 99,999 | 2% of 2008 TC |
| 100,000 - 299,999 | $2,000 plus 14% of 2008 TC above $100,000 |
| 300,000 - 499,999 | $30,000 plus 35% of 2008 TC above $300,000 |
| 500,000 - 749,999 | $100,000 plus 35% of 2008 TC above $500,000 |
| 750,000 - 999,999 | $187,500 plus 65% of 2008 TC above $750,000 |
| 1,000,000 - 1,499,999 | $350,000 plus 65% of 2008 TC above $1,000,000 |
| 1,500,000 - 1,999,999 | $675,000 plus 85% of 2008 TC above $1,500,000 |
| 2,000,000 - 2,499,999 | $1,100,000 plus 80% of 2008 TC above $2,000,000 |
| 2,500,000 and above | $1,500,000 plus 90% of 2008 TC above $2,500,000 up to a maximum of 65% of 2008 TC |

Thus, employees receiving compensation greater than $750,000 received a significant portion of their total compensation (65%) in equity.

The firm's cash-equity mix of compensation in 2007 was 32% cash to 68% equity.[32]  Lehman's mix was consistent with that of its peer group, which ranged from a low of 11% cash compensation at Goldman Sachs to a high of 39% cash compensation at Bear Stearns, as detailed in the following chart:[33]

| | Compensation Mix | | |
|---|---|---|---|
| | Equity | vs. | Cash |
| **Lehman Brothers** | 68.00% | | 32.00% |
| Bear Stearns | 61.00% | | 39.00% |
| Goldman Sachs | 89.00% | | 11.00% |
| JP Morgan Chase | 69.00% | | 31.00% |

---

[31] *Id.* at p. 26.
[32] Lehman, Annual Compensation Review Presentation to Compensation and Benefits Committee of Lehman Board of Directors (Apr. 14, 2008), at p. 5 [LBHI_SEC07940_027870].
[33] *Id.*

| | | |
|---|---|---|
| Merrill Lynch | 71.00% | 29.00% |
| Morgan Stanley | 72.00% | 28.00% |
| **2007 Average** | 73.00% | 27.00% |

Since 2005, Lehman's equity compensation component consisted exclusively of RSUs, and each RSU grant entitled an employee to one share of Lehman stock after a period of years.[34] The following chart depicts Lehman's equity vesting and delivery schedule.[35] The vesting schedule refers to the time period before an employee received his or her RSUs. The delivery schedule refers to the time period before the RSUs converted into unrestricted stock.

---

[34] Lehman, Compensation Overview (July 30, 2008), at p. 14 [LBEX-WGM 727244].
[35] *Id.* at p. 27.

| Firm | | Discount | Vesting Schedule | | | | | | Delivery Schedule | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | at grant | year 1 | year 2 | year 3 | year 4 | year 5 | at grant | year 1 | year 2 | year 3 | year 4 | year 5 |
| Citigroup [1] | | 25.00% | | 25.00% | 25.00% | 25.00% | 25.00% | | | 25.00% | 25.00% | 25.00% | 25.00% | |
| Credit Suisse [2] ISUs (in lieu of discount) | | n/a | | 33.00% | 33.00% | 33.00% | | | | 33.00% | 33.00% | 33.00% | | |
| discount | | | | | | 100.00% | | | | | | 100.00% | | |
| Deutsche Bank | | 9.00% | | | 50.00% | 25.00% | 25.00% | | | | 50.00% | 25.00% | 25.00% | |
| Goldman Sachs | | 0.00% | 40.00% | | | 60.00% | | | | | | 100.00% | | |
| JP Morgan | | 0.00% | | | 50.00% | 50.00% | | | | | 50.00% | 50.00% | | |
| Merrill Lynch | | 0.00% | | 25.00% | 25.00% | 25.00% | 25.00% | | | 25.00% | 25.00% | 25.00% | 25.00% | |
| Morgan Stanley | | 0.00% | | | 50.00% | 50.00% | | | | | 50.00% | 50.00% | | |
| UBS | | 0.00% | | 33.00% | 33.00% | 33.00% | | | | 33.00% | 33.00% | 33.00% | | |
| **Lehman Brothers** | | | | | | | | | | | | | | |
| 2007 MD | Principal | | | | | 50.00% | | 50.00% | | | | | | 100.00% |
| | Discount | 30.00% | | | | | | 100.00% | | | | | | 100.00% |
| 2007 SVP and below | Principal | | | | 100.00% | | | | | | | | | 100.00% |
| | Discount | 25.00% | | | | | | 100.00% | | | | | | 100.00% |
| *2008 Proposed* | | *0.00%* | | *33.00%* | *33.00%* | *33.00%* | | | | | | *100.00%* | | |

[1] Discount provided on deferral levels up to $500k in bonus only. Discretionary supplemental awards in 2007.

[2] Equity discounts replaced in 2006 by a new performance-based Incentive Stock Unit ("ISU") program; ISUs were communicated as equivalent to RSUs with a 20% discount. Deferral % of 100% above $4 million in bonus.

In 2007, as in all prior years, RSUs were issued to employees at a discount to market price.[36] Therefore, the total value of the RSUs an employee received consisted of two components: a portion of the value was attributable to his or her actual RSU award (principal portion), and a portion was attributable to the

---

[36] *Id.*

discount to market price (discount portion).[37]  Managing directors received RSUs at a discount of 30% to market price, and Senior Vice Presidents and other lower-ranking employees received RSUs at a discount of 25% to market price.[38]  In 2007, 50% of a Managing director's principal portion RSUs vested after three years, and the remaining 50% vested after five years.  The discount portion of RSUs granted to a Managing director also vested after five years.[39]  Similarly, the principal portion of the RSUs granted to Senior Vice Presidents and lower-ranking employees vested after two years, and the discount portion of the RSUs vested after five years.[40]

Lehman's RSU vesting and delivery schedules were longer than those of its peer firms.  Lehman Managing directors experienced equity vesting after as long as five years (50% of the principal portion, and 100% of the discount portion), and Lehman postponed share delivery until after five years,[41] whereas the vesting and delivery periods of Lehman's peer firms concluded after three or four years.[42]

Annual limits were imposed on Executive Committee members, limiting the amount of equity they were permitted to liquidate based on the market value

---

[37] *Id.*
[38] *Id.* at p. 15.
[39] *Id.* at p. 27.
[40] *Id.*
[41] *Id.*
[42] *Id.*

of their equity holdings at the beginning of each year.[43]  For 2008, the annual

liquidation limit was 20%, which was calculated using a pre-tax equity value that

included RSUs, option gains and the pre-tax equivalent of shares owned.[44]

According to Lehman witnesses, longer vesting and delivery, as well as

restrictions on the amount of equity Executive Committee members could

liquidate annually, helped to align executive interests with the long-term goals of

the firm and its shareholders.[45]  A forthcoming article in the *Yale Journal on*

*Regulation* by Harvard Law School Professors Lucian A. Bebchuk, Alma Cohen

and Holger Spamman calls that assumption into question, noting that the top

five executives at Lehman received cash bonuses and proceeds from stock sales

totaling $1 billion between 2000 and 2008 and that Lehman top executives had

regular short-term incentives to attempt to increase the stock price on the shares

that they were selling as they became vested and delivered.[46]  Indeed, although

Lehman's vesting and delivery schedules were longer than peers' vesting and

delivery schedules, Lehman's schedules were still focused on short-term firm

performance (five years or less).

---

[43] *Id.* at p. 21.
[44] *Id.* at p. 21.
[45] Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at pp. 2, 8-11; Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 17.
[46] Lucian A. Bebchuk, *et al., The Wages of Failure: Executive Compensation at Bear Stearns and Lehman 2000-2008* (Yale J. on Reg., Working Draft, Nov. 22, 2009), http://www.law.harvard.edu/faculty/bebchuk/pdfs/BCS-Wages-of-Failure-Nov09.pdf (last visited Jan. 27, 2010), at pp. 2,9.

Lehman's extended vesting schedule also had an impact on employee severance. Firm policies and procedures addressed the manner in which non-vested shares would be treated for departing employees who had achieved full-career status at Lehman.[47] For departing employees who had yet to achieve full-career status, the Compensation Committee and/or the Executive Committee had discretion to award severance packages and to determine how non-vested shares would be treated; Fuld would generally make recommendations, which the Compensation Committee would, for the most part, approve.[48]

### C. Dividing Compensation Between Lehman Divisions

After determining the firm's compensation ratio and the cash-equity mix, the Compensation Committee turned to the next step in the annual compensation process – dividing the compensation pool among Lehman's divisions.[49] Once the Compensation Committee finalized the total firm-wide compensation pool in the fourth quarter of each fiscal year and Lehman could accurately predict annual revenues based on Finance Department estimates, and after Lehman compared its predicted compensation to the compensation

---

[47] Lehman, Summary of Select Material Terms for the 2007 Equity Award Program for Bonus-Eligible and Production-Based Employees (2007), at p. 1 [LW 00896].

[48] Lehman, Jeremy M. Isaacs Separation Plan (Sep. 8, 2009) [LBEX-DOCID 827786], attached to e-mail from Hilary McNamara, Lehman, to Tracy A. Binkley, Lehman, *et al.* (Sept. 8, 2008) [LBEX-DOCID 962552].

[49] Lehman, Compensation Overview (July 30, 2008), at pp. 5-8 [LBEX-WGM 727244].

estimates of its Wall Street competitors, the Compensation Committee divided the compensation pool among Lehman divisions.[50]

A portion of the firm's total compensation pool was fixed, representing compensation or benefit obligations that the firm had committed to honor, such as compensation agreements or contracted-for salaries for current and former employees, health care costs, retirement benefits, contractual severance packages and amortization of equity awards that had been given to employees in past years (normally amortized over five years).[51] These fixed obligations were satisfied first, with all remaining funds in the compensation pool then allocated to divisions for employee bonuses.[52]

Rather than applying the firm's compensation ratio to determine divisional compensation allocations, the Committee employed a discretionary process that analyzed a number of factors.[53] The compensation ratio for Investment Banking was greater than the firm-wide compensation ratio of 49.3%, while the compensation ratio for Capital Markets was lower than the firm-wide compensation ratio.[54] The compensation ratio for Investment Management

---

[50] Examiner's Interview of Anthony J. Collerton, May 14, 2009 at p. 3.

[51] *Id.* at pp. 2-3.

[52] *Id.* at p. 3.

[53] Lehman, Compensation Overview (July 30, 2008), at pp. 5-7 [LBEX-WGM 727244].

[54] Lehman, Q1 2008 Final Greenbook Detailed Version (Mar. 12, 2008), at p. 14 [LBHI_SEC07940_042145]; Lehman, Q2 2008 Greenbook Final Version (June 12, 2008), at pp. 9-10 [LBHI_SEC07940_042474]; Lehman, Q3 2008 Greenbook (Sept. 11, 2008), at pp. 2-3 [LBHI_SEC07940_042656].

fluctuated above and below the firm-wide compensation ratio.[55]  The chart below demonstrates this variation, showing segment revenue and compensation for the Investment Banking, Capital Markets and Investment Management divisions for the third, second, and first quarters of 2008 and the fourth, second, and first quarters of 2007:

| ($000,000) | Investment Banking | | | | | | Capital Markets | | | | | | Investment Management | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | | | 2007 | | | 2008 | | | 2007 | | | 2008 | | | 2007 | | |
| | Q3 | Q2 | Q1 | Q4 | Q2 | Q1 | Q3 | Q2 | Q1 | Q4 | Q2 | Q1 | Q3 | Q2 | Q1 | Q4 | Q2 | Q1 |
| Segment Revenue | 266 | 858 | 867 | 831 | 1,150 | 850 | (4,321) | (2,374) | 1,672 | 2,727 | 3,594 | 3,502 | 76 | 848 | 968 | 832 | 768 | 695 |
| Compensation Expense | 313 | 352 | 217 | 442 | 529 | 367 | 819 | 834 | 536 | 821 | 1,129 | 970 | 304 | 339 | 307 | 357 | 393 | 381 |
| Compensation Allocation | 71 | 83 | 97 | 112 | 105 | 95 | 521 | 594 | 630 | 617 | 848 | 578 | (43) | 91 | 26 | (27) | (81) | (56) |
| Segment Expense Adjustments | | 64 | 228 | (31) | 44 | 82 | | (23) | (460) | (173) | (340) | 1 | | (35) | 260 | 47 | 90 | 72 |
| Total Compensation | 384 | 500 | 542 | 523 | 679 | 543 | 1,341 | 1,406 | 706 | 1,266 | 1,638 | 1,550 | 261 | 395 | 593 | 377 | 402 | 397 |
| *Compensation Ratio* | *144.4%* | *58.2%* | *62.5%* | *62.9%* | *59.0%* | *63.9%* | *-31.0%* | *-59.2%* | *42.3%* | *46.4%* | *45.6%* | *44.3%* | *344.4%* | *46.6%* | *61.2%* | *45.3%* | *52.3%* | *57.2%* |

The Compensation Committee apportioned draft pools of compensation to each division based primarily on each division's net revenue and the prevailing practices in the market.[56]  This process had a stated rationale "to provide a level of transparency in the determination of compensation at the divisional level in order to more clearly demonstrate the tie between financial performance and compensation, providing strong incentives for divisional performance," and "to encourage revenue maximization" and "aggressive management of non-personnel expenses."[57]

---

[55] *Id.*

[56] Lehman, Compensation Overview (July 30, 2008), at pp. 5-7 [LBEX-WGM 727244].

[57] *Id.* at p. 5.

The Compensation Committee used performance-based metrics as well as more subjective criteria to allocate pools of compensation to each division. From the revenue projections provided by the Finance Department, Lehman would calculate pre-compensation profits before taxes ("PCPBT"), and then input that figure into the compensation model.[58] Beginning in 2003, Lehman supplemented its PCPBT-based compensation model by also considering an Economic Value Added ("EVA") metric, which included a risk component based on a "use of equity" charge.[59] Lehman viewed its PCPBT-based compensation model as a competitive advantage because it aligned pay with performance, provided more accountability and allowed management to take steps to optimize performance.[60]

The Compensation Control Group within the Finance Department provided the Compensation Committee, Chief Financial Officer and Chief Accounting Officer with a presentation of data on six or seven performance statistics for each division in any given year versus the division's previous year's performance.[61] These included: net revenues, changes in headcount, PCPBT, EVA and ROE.[62] The Compensation Committee also received a presentation during the fourth quarter detailing compensation expenses (expressed in terms

---

[58] *Id.* at pp. 5-8.
[59] *Id.* at p. 6; Examiner's Interview of James Emmert, Oct. 9, 2009, at p. 2.
[60] Lehman, 2008 Compensation Update (July 2008), at p. 4 [LBHI_SEC07940_741779].
[61] Examiner's Interview of James Emmert, Oct. 9, 2009, at p. 2.
[62] *Id.*

of NGNNH compensation), and the Compensation Committee was presented with alternatives for distributing compensation to divisions.[63] The Compensation Committee used outside consultants (including Johnson & Associates, Inc. and MGMC, Inc.), to analyze competitive gaps and market indicators.[64]

The Compensation Committee used these performance results as a baseline for allocating compensation to each Lehman division, followed by a review of subjective criteria to determine divisional compensation allocations. These criteria and considerations included:

- New businesses that were in early stages of their growth that had not yet generated sufficient compensation to pay employees competitively;

- Significant market pressures in business sectors, reflecting market premiums paid by new entrants into that sector;

- Lehman's decision to grow a business sector in accordance with the firm's long term strategic plan;

- Franchise preservation issues driven by the market cycle, where Lehman paid a division/business at higher levels in order to protect its investment in key employees; and

- Reward for "One Firm" behaviors such as cross selling or client management activities where the revenue benefit accrued to another business unit.[65]

No formal or written guidelines existed as to the weight assigned to either the divisional performance results or the subjective criteria.[66] The compensation

---

[63] *Id.*
[64] *Id.*

pool for a division did not increase or decrease in a directly proportional manner to that division's net revenue performance.[67] Divisions that Lehman wanted to grow, for example, were generally allocated compensation pools larger than their net revenue performance might have dictated.[68] Similarly, a higher share of compensation was paid out to divisions such as Investment Banking, which did not pose a significant risk to Lehman's balance sheet assets, than to riskier businesses such as Real Estate, which exposed Lehman's balance sheet to potential losses.[69]

In fiscal year 2007, for example, Lehman's Fixed Income Division ("FID") generated $3.4 billion less PCPBT as compared to fiscal year 2006, but nevertheless, FID employees received similar compensation to what they had received in 2006.[70] Specifically, while the compensation model indicated that for 2007 FID compensation should be reduced by $888 million from 2006 compensation, senior management and the Compensation Committee reduced FID compensation by only $80 million.[71] Similarly, in 2007, model results indicated that the Equities Division should have received a $477 million increase

---

[65] Lehman, Compensation Overview (July 30, 2008), at p. 7 [LBEX-WGM 727244].
[66] Examiner's Interview of Mary Pat Archer, August 20, 2009, at p. 4.
[67] *Id.*; e-mail from Kentaro Umezaki, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov. 8, 2007) [LBEX-DOCID 175489].
[68] Lehman, Compensation Overview (July 30, 2008), at p. 7 [LBEX-WGM 727244].
[69] Lehman, 2007 Year-End Comp Process Model Pre Round 2 NGNNH Adjustor (Nov. 28, 2007) [LBEX DOCID 147440]; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 19.
[70] Lehman, Compensation Overview (July 30, 2008), at pp. 6-8 [LBEX-WGM 727244].

in compensation from 2006, based on an approximately $1.8 billion increase in PCPBT and improved profitability. However, following senior management and Compensation Committee adjustments, the division received an increase of only $229 million.[72]

The Compensation Committee applied a similar process to determine compensation allocations to individual business lines within divisions. For example, within FID's Rates and Products subdivision, the Commodities segment's 2006 net revenues and compensation ratio were $27.8 million and 195%, respectively.[73] The segment's 2007 net revenue and compensation ratio were $231 million and 48.9%, respectively.[74] These ratios are consistent with witness interviews stating that the segment was a start-up in 2006 from which Lehman did not expect high net revenues, yet determined that it was appropriate to compensate employees commensurate with their market peers in order to attract and retain them to further grow the business.[75] The segment saw substantial growth by 2007, and therefore, the 2007 segment ratio was more

---

[71] *Id.*

[72] *Id.*

[73] Lehman, 2007 Year-End Comp Process Model Pre Round 2 NGNNH Adjustor (Nov. 28, 2007) [LBEX DOCID 147440].

[74] *Id.*

[75] Examiner's Interview of Mary Pat Archer, Aug. 20, 2009, at p. 4; Examiner's Interview of Roger Nagioff, Sep. 30, 2009, at p. 20.

consistent with the firm's overall compensation ratio.[76]  Finally, compensation decisions made by Lehman's competitors in regard to their comparative divisions played a role in Lehman's allocations, as Lehman attempted to prevent attrition by matching the compensation of its competitors.[77]  There is also some indication that the Compensation Committee retained a "holdback" pool of compensation that could be paid to certain divisions for adjustment purposes.[78]

## III.    DETERMINING INDIVIDUAL EMPLOYEE COMPENSATION

After divisional and business line compensation was allocated, each division head would allocate the pool of compensation to be received by its executives and employees.  Division heads had autonomy regarding individual compensation decisions, and the specific performance metrics they relied upon to apportion compensation to their executives and employees varied based on market practices in each division's business line.[79]  Compensation decisions for individual employees depended on that specific employee's functions, but all

---

[76] Lehman, 2007 Year-End Comp Process Model Pre Round 2 NGNNH Adjustor (Nov. 28, 2007) [LBEX DOCID 147440]; Examiner's Interview of Mary Pat Archer, Aug. 20, 2009, at p. 4.

[77] E-mail from Kentaro Umezaki, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov. 8, 2007) [LBEX-DOCID 175489]; Lehman Brothers Holdings Inc., Compensation Overview (July 30, 2008), at pp. 3, 5, 8 [LBEX-WGM 727244].

[78] E-mail from Roger Nagioff, Lehman, to Mary Pat Archer, Lehman (Dec. 4, 2007) [LBEX-DOCID 175004].

[79] Lehman, Compensation Overview (July 30, 2008), at p. 11 [LBEX-WGM 727244]; Examiner's Interview of Mary Pat Archer, Aug. 20, 2009, at pp. 2-4; Examiner's Interview of Michael Gelband, Aug. 12, 2009, at pp. 22-24; Examiner's Interview of Anthony J. Collerton, May 14, 2009, at p. 3.

performance indicators were net-revenue-based.[80]  Lehman's Compensation and Control Group met monthly with each division's Chief Administrative Officer ("CAO") to review the division's compensation models.[81]

While each division and business unit had autonomy and discretion over its own compensation process, each division reported its compensation allocation results (including its list of top compensated employees) to the Executive Committee.[82]  An illustrative example of how FID carried out the compensation process in 2007 was described as follows:[83]

Once FID received the bonus pool package from the Finance Department in early November 2007,[84] a "round one" meeting followed involving a large, representative group of FID Managing Directors, including Mary Pat Archer, Roger Nagioff, Thomas Humphrey, Alex Kirk, Andrew J. Morton, Kentaro Umezaki and Ravi Mattu.[85]  Nagioff, with assistance from Archer, outlined for the group the firm-wide approach for that year's compensation.[86]  Nagioff explained the process and made recommendations on how round one would

---

[80] Lehman, Compensation Overview (July 30, 2008), at p. 11 [LBEX-WGM 727244].

[81] Lehman, 2008 Compensation Update (July 2008), at p. 6 [LBHI_SEC07940_741779].

[82] Examiner's Interview of Michael Gelband, Aug. 12, 2009, at pp. 22-23; Examiner's Interview of Anthony J. Collerton, May 14, 2009, at p. 3; Lehman, Compensation Overview (July 30, 2008), at p. 11 [LBEX-WGM 727244].

[83] Examiner's Interview of Mary Pat Archer, Aug. 20, 2009, at p. 2.

[84] Archer stated that Andrew J. Morton and Alex Kirk spent time prior to the first cut or round one meeting trying to create a preliminary split based on the prior year's final compensation decisions. Examiner's Interview of Mary Pat Archer, Aug. 20, 2009, at p. 2.

[85] *Id.*

work in terms of dividing compensation between business units and employees.[87] Additionally, he would set targets for FID in terms of fitting the division's total compensation decisions within Lehman's overall annual targets (expressed as a percentage change from the previous year in terms of NGNNH compensation).[88] The group reviewed relative performance, historic compensation, efficiencies with regard to headcount, headcount and performance of the business on a year-over-year basis. The group then made a preliminary allocation of divisional compensation pool funds among its business units following a bottom-up review (ensuring everyone in the division received the bonus they deserved to retain key employees) and a top-down review (ensuring guarantees for new hires were paid).[89] Nagioff was the final decision-maker if conflicts within the group could not be resolved.[90]

Following round one, the heads of each business unit had another week to allocate compensation to employees using an online bonus system.[91] Individual employee compensation allocation was a discretionary process and decisions

[86] E-mail from Kentaro Umezaki, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov. 6, 2007) [LBEX-DOCID 175483].

[87] *Id.*

[88] *Id.*

[89] Examiner's Interview of Mary Pat Archer, Aug. 20, 2009, at p. 2; e-mail from Mary Pat Archer, Lehman, to Roger Nagioff, Lehman (Sept. 10, 2007) [LBEX-DOCID 175480]; e-mail from Kentaro Umezaki, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov. 6, 2007) [LBEX-DOCID 175483].

[90] E-mail from Kentaro Umezaki, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov. 6, 2007) [LBEX-DOCID 175483].

[91] Examiner's Interview of Mary Pat Archer, Aug. 20, 2009, at p. 2.

appear to have been made primarily by a series of performance criteria that varied by class of professional rather than by division. FID business unit heads ranked their employees in quartiles, designating the top 25% of performers as "1"s on down to the bottom 25% of employees (who performed below expectations) as "4"s; while the 1-4 ranking was not strictly determinative of compensation, the expectation was that employees at higher levels (1-2) would receive higher bonus compensation than those at lower levels (3-4).[92] After making preliminary allocations to employees, the business heads reported to Nagioff, Archer and the larger group on how they had allocated bonuses within their business unit, and they prepared rosters listing each employee's compensation from high to low that year, as well as, a history of each employee's compensation from previous years.[93] Some adjustments would be made at this time to conform compensation within the division amongst employee groups (so that, for example, administrative assistants in one business unit were not disproportionately compensated compared to administrative assistants in another business unit).[94] These adjustments concluded round one.

---

[92] E-mail from Kentaro Umezaki, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov. 8, 2007) [LBEX-DOCID 175489]; Lehman, Rules of Engagement - Bonus Workbook Quick Guide [LBEX-DOCID 282667].
[93] Examiner's Interview of Mary Pat Archer, Aug. 20, 2009, at pp. 2-3.
[94] *Id.* at p. 3.

Nagioff then met with Gregory so that compensation decisions could be reviewed by the Compensation Committee. The Compensation Committee reviewed the details of the top 200 to 250 earners in each division as well as of any employees whose compensation had drastically increased or decreased from the previous year.[95] Once the Compensation Committee had finalized the firm-wide net revenues at the end of November, round two would begin whereby FID would reallocate compensation as necessary based on any increase or decrease in its final compensation pool from the Compensation Committee.[96] FID occasionally would retain a small pool of compensation in a reserve for adjustments or to fix any misallocations from the previous rounds.[97]

Once round two was over, the direct managers of each business line would communicate the bonuses to their employees as part of the employees' performance reviews, normally finishing that part of the process by late December.[98]

Final approval of all compensation decisions was vested in the Compensation Committee.[99] Indeed, on one occasion, management was reprimanded for awarding a compensation package without prior Board

[95] *Id.*
[96] *Id.*; e-mail from Kentaro Umezaki, Lehman, to Mary Pat Archer, Lehman (July 10, 2007) [LBEX-DOCID 1677802];
[97] Examiner's Interview of Mary Pat Archer, Aug. 20, 2009, at p. 3.
[98] *Id.*; e-mail from Kentaro Umezaki, Lehman, to Mary Pat Archer, Lehman (July 10, 2007) [LBEX-DOCID 1677802].

approval.[100]  While the Board ultimately approved the package, it informed Fuld and management that all such decisions were required to be approved by the Board.[101]

## IV.  CONSIDERATION OF RISK IN LEHMAN'S COMPENSATION PRACTICES

While Lehman's compensation practices were predominately driven by net revenue-based metrics, risk did play some role in compensation decisions. For example, at the firm-wide level, although the EVA compensation metric was net revenue-based, the metric also considered balance sheet risk necessary to achieve net revenues.[102]   Additionally, Lehman divisions with fee-based net revenues (such as Investment Banking) generally received higher compensation allocations on a percentage-of-net-revenue basis than divisions that undertook significant balance sheet risk, such as real estate.[103]

Risk also played a role in compensation through balance sheet limits. Businesses that exceeded balance sheet limits theoretically faced penalties that

---

[99] Examiner's Interview of Anthony J. Collerton, May 14, 2009, at p. 3.
[100] Examiner's Interview of John F. Akers, Apr. 22, 2009, at p. 7.
[101] *Id*.
[102] Examiner's Interview of James Emmert, Oct. 9, 2009, at p. 2; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 4, 19-20.
[103] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 4, 19-20; Examiner's Interview of James Emmert, Oct. 9, 2009, at p. 2; Examiner's Interview of Andrew J. Morton, Sept. 21, 2009, at p. 4.

could include the diminution of their compensation pool.[104]  As Umezaki noted, balance sheet usage and limit breaches triggered penalties in the net-revenue metrics used by Lehman, thereby affecting divisional compensation in a negative manner.[105]

As recently as 2004, FID used a "Compensation Scorecard" that included risk-weighted metrics such as "return on risk equity" and "return on net balance sheet" to determine business unit compensation pool allocations.[106]  Similarly, divisional compensation metrics, year-over-year divisional performance data and internal divisional performance tracking documents submitted to the Compensation Committee by the Compensation Control Group assessed divisional performance relative to Value at Risk ("VaR"), balance sheet usage and risk appetite.[107]  The Compensation Committee's review of these documents indicates at least some consideration of risk in making compensation decisions.[108]

Beginning in the first quarter of 2008, Lehman adopted a new competency measure for the Equities Sales force that addressed risk appreciation.[109]  This competency measure consisted of four criteria: (1) awareness (the employee's

---

[104] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at pp. 8-9; Lehman, Global Consolidated Balance Sheet (May 31, 2007) [LBEX-DOCID 276740]; e-mail from Kentaro Umezaki, Lehman, to Kaushik Amin, Lehman, *et al.* (July 10, 2007) [LBEX-DOCID 252873].
[105] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at pp. 8-9.
[106] Lehman, 2004 Fixed Income Division Compensation Scorecard [LBEX-DOCID 1748807].
[107] Lehman, COMPMETRICS Excel Spreadsheet, at pp. 1-9 [LBEX-LL 1054327]; Lehman, 2007 FID Forecast Budget Support Excel Spreadsheet, at pp. 1-11 [LBEX-BARCMP 0000001].
[108] *Id.*

understanding of the risks inherent in the market and transactions); (2) communication (the employee's ability to share and highlight key risks to partners in trading and control areas); (3) client skills (negotiating transaction terms for optimum risk-reward profile); and (4) shareholder/manager behavior (deploying capital efficiently and in consideration of clients' historical trading impact with awareness of ownership of the risks and rewards of transactions).[109]

Witnesses offered differing opinions concerning the weight given to risk factors in making compensation decisions. Archer, FID Chief Accounting Officer, did not recall any discussion of VaR during FID's 2007 bonus pool meetings.[111] Archer noted that while business heads were responsible for the risk component of FID, if a risky trade had been made successfully, then the trade would have been completed and the risk aspect would not have been discussed as part of the group's assessment of an employee for compensation purposes.[112]

Umezaki, Global Head of FID - Business Strategy in 2007, expressed concern regarding the weight (or lack thereof) that risk factors were given in regard to compensation decision-making. Specifically, in an April 19, 2007 e-mail, Umezaki offered feedback on balance sheet issues, and noted:

---

[109] Lehman, LB Equities Risk Appreciation Overview (June 2, 2009), at pp. 1-4 [LBEX-LL 605596].
[110] Id.
[111] Examiner's Interview of Mary Pat Archer, Aug. 20, 2009, at p. 4.
[112] Id.

Incentives and motivation: the majority of the trading businesses focus is on revenues, with balance sheet, risk limit, capital or cost implications being a secondary concern. The fact that [traders] haven't heard that those items matter [in] public forums from senior management recently reinforces this revenue oriented behavior implicitly. In my opinion, this group is not behaving "badly": they are just getting conflicting messages that go unreconciled ("grow revenues" from FID; "manage balance sheet" from Finance, if you will). We also don't have a strong enough mechanism to reinforce "better" behavior around these non-revenue metrics, as comp is tied to revenues at the divisional level. Tough problem to solve given the way we incent today. We've been debating this for a good decade now….[113]

Gelband, former head of FID, indicated that he made an effort to adjust compensation decisions to reflect the amount of risk that the business unit or that the individual had taken.[114] Nagioff similarly stated that risk-based metrics were considered in dividing FID's compensation pool to FID's business lines, but not in any specific mathematical way.[115]

According to Gregory, the focus of the Executive Committee in making adjustments to divisional compensation was less on the amount of risk a division had taken, and more on general fairness and equity, with the Executive Committee considering the full interests of the firm when considering how much balance sheet certain divisions used as compared to others.[116] Gregory disagreed with other witnesses in this regard, stating that employees in risk-taking

---

[113] E-mail from Kentaro Umezaki, Lehman, to Scott J Freidheim, Lehman, *et al.* (Apr. 19, 2007) [LBEX-DOCID 318475].

[114] Examiner's Interview of Michael Gelband, Aug. 12, 2009, at pp. 3, 22-24.

businesses could be paid compensation based on a similar or even larger share of their revenues than employees in fee-based businesses.[117]  Gregory provided the example of Investment Banking, where he stated that the business and employees received a larger share of compensation than their revenues would otherwise indicate because Investment Banking created substantial ancillary profits through other revenue streams.[118]

Finally, Lehman witnesses noted that product controllers' compensation was not tied to the division or to the performance of the product, and therefore, there was no compensation-based incentive for these employees to miss-mark positions or avoid write-downs.[119]

## V.    COMPENSATION BASED ON UNREALIZED MARK-TO-MARKET PROFITS

In calculating net revenue, Lehman included revenue not yet recognized but recorded based on mark-to-market positions, and such revenue was considered in determining divisional and employee net revenue contributions for compensation purposes.[120]  The compensation pool would, therefore, have increased or decreased (and a division's and/or individual's compensation

---

[115] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 20.
[116] Examiner's Interview of Joseph M. Gregory, Nov. 5 & 13, 2009, at pp. 12-13.
[117] *Id.* at p. 13.
[118] *Id.*
[119] Examiner's Interview of Herbert H. McDade, III, Sept. 16, 2009, at p. 5.
[120] Examiner's Interview of John D. Macomber, Sept. 25, 2009, at pp. 5, 22; Examiner's Interview of James Emmert, Oct. 9, 2009, at pp. 2-3.

would have been affected) by the amount of unrealized mark-to-market gain or loss. With the exception of the compensation process for proprietary traders,[121] no mechanism existed by which Lehman could "claw-back" compensation paid to employees based on mark-to-market revenues that were recorded but never realized.[122]

In discussing the proper approach for paying compensation on the KSK Energy transaction, for which the firm booked a large mark-to-market profit, Henry Klein, Chris O'Meara, and David Goldfarb engaged in an e-mail exchange and noted that booking the transaction as an unrealized gain and paying compensation based on that methodology "is not different" from how Lehman's Global Trading Strategies ("GTS") group was compensated on other deals:

> GTS is paid on the basis of the market value of its portfolio at year end as reflected on Lehman's books. The Firm is always at risk that we have a very profitable year, it pays out a lot of compensation, and then we lose money and never make profits again. Any compensation paid by Lehman to GTS employees is based on the assumption that GTS continues to exist and continues to be profitable over time (there is no clawback). . . . KSK is mark to fair market value defined as the value that we believe we could sell the position for. Last year, the mark was included in GTS P&L for compensation purposes, last year and this year it is included in the P&L of the Firm and is also included in the P&L for the leveraged partnership. Choosing to exclude the mark for compensation

---

[121] Proprietary traders could have up to 25% of their compensation withheld until the following year, thereby allowing Lehman to factor in and subtract eventual losses on investments before remitting the remaining compensation to the trader. Examiner's Interview of James Emmert, Sept. 25, 2009, at p. 2.
[122] Examiner's Interview of James Emmert, Oct. 9, 2009, at p. 2.

> purposes when it is included for every other purpose seems
> arbitrary to me.[123]

This e-mail suggests that for Lehman's GTS group, Lehman's practice was to include unrealized mark-to-market profits in net revenue and compensation decisions and that there was concern, given the size of the KSK transaction, that the policy should possibly be reconsidered with respect to the particular transaction.[124]

Given that compensation was impacted by mark-to-market valuations, incentives existed for traders and business units to value investments highly so as to generate higher net revenues and thus higher compensation. Similarly, given that the net revenue-based compensation model was employed firm-wide, write-downs on positions also had a negative effect on compensation, creating incentive for employees and divisions to avoid such writedowns, and/or retain unprofitable investments solely to avoid revenue decreasing (and thus compensation-decreasing) write-downs.[125]

The Examiner reviewed thousands of electronic and hard copy materials authored by Lehman employees which related to compensation decisions, and also conducted dozens of interviews of personnel involved in the compensation

---

[123] E-mail from Henry Klein, Lehman, to David Goldfarb, Lehman (Apr. 20, 2008) [LBHI_SEC07940_770016].
[124] Lehman commenced bankruptcy proceedings before a compensation decision was made with respect to this transaction.
[125] Examiner's Interview of Eileen Sullivan, July 24, 2009, at pp. 2-3.

process.  The Examiner found no evidence that Lehman personnel deliberately engaged in misconduct designed to exploit Lehman's compensation system. However, Lehman's net revenue-driven compensation structure – a structure used by most of Lehman's peers, and which structure is the subject of an ongoing national debate – naturally created incentives for the maximization of short-term profits.

# APPENDIX 12: VALUATION - ARCHSTONE

This Appendix has been prepared by Duff & Phelps, the Examiner's financial advisor, in connection with the Examiner's analysis of the reasonableness of Lehman's valuations of its Archstone positions, set forth in Section III.A.2.f of the Report. This Appendix has three parts — Illustrative Example of a DCF/IRR Analysis, Archstone Purchase Price Allocation, and Archstone Cost of Going Private.

## I.      ILLUSTRATIVE EXAMPLE OF A DCF/IRR ANALYSIS

A DCF valuation uses a discount rate to convert future expected cash flows to a present value.[1] This concept has been summarized succinctly as: "When you discount [a] project's expected cash flows at its opportunity cost of capital, the resulting present value is the amount investors would be willing to pay for the project."[2]

An illustrative example is instructive to demonstrate how a DCF valuation is calculated. Assume Lehman owned an investment that was expected to receive cash flows of $100 at the end of Year 1, $100 at the end of Year 2, and $100 at the end of Year 3. In this example, Lehman would expect to receive $300 over the course of three years. The fair value of this investment is not $300, however. Rather, the $300 in future expected cash flows must be converted into present value in order to arrive at the value of the investment as of today. A discount rate converts future expected cash flows to their present value, because the time value of money and risk associated with the

---

[1] Shannon Pratt & Roger Grabowski, *Cost of Capital: Applications and Examples* 10 (3d ed. 2008).
[2] *Id*.; Franklin Allen, Richard Brealey, & Stewart Myers, *Principles of Corporate Finance* 20 (8th ed. 2006).

investment means that a dollar that is expected to be received in the future is worth less than a dollar as of today.[3]  In this example, assume the discount rate is 10%.  The application of a 10% discount rate converts the $300 of future expected cash flows into a present value of $249 today.  The table below sets forth the calculations used in this illustrative example.

**Present Value Formula Used for DCF Analysis**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Step 1 | $\dfrac{\text{Net Cash Flow in Year 1}}{(1 + \text{Discount Rate})^1}$ | $+$ | $\dfrac{\text{Net Cash Flow in Year 2}}{(1 + \text{Discount Rate})^2}$ | $+$ | $\dfrac{\text{Net Cash Flow in Year 3}}{(1 + \text{Discount Rate})^3}$ | $=$ | Present Value |
| Step 2 | $\dfrac{100}{(1 + 10\%)^1}$ | $+$ | $\dfrac{100}{(1 + 10\%)^2}$ | $+$ | $\dfrac{100}{(1 + 10\%)^3}$ | $=$ | Present Value |
| Step 3 | $\dfrac{100}{1.1}$ | $+$ | $\dfrac{100}{1.21}$ | $+$ | $\dfrac{100}{1.331}$ | $=$ | Present Value |
| Step 4 | 91 | $+$ | 83 | $+$ | 75 | $=$ | 249 |

As shown in the table above, while the net cash flow is the same for each year ($100), the present value decreases over time (i.e., $91 in Year 1, $82 in Year 2, and $75 in Year 3).  The present value of the investment is equal to the sum of the present value of cash flows in Years 1 through 3, which is $249.

Lehman's Archstone DCF analysis followed a similar approach as described above with one difference — Lehman solved for the discount rate instead of present value.  That is, Lehman's DCF analysis stipulated a present value, made determinations regarding future expected cash flows, and then used the formula in the table above to

---

[3] Shannon Pratt & Roger Grabowski, *Cost of Capital: Applications and Examples* 39 (3d ed. 2008).

solve for the discount rate.[4]   Lehman referred to this as an Internal Rate of Return

("IRR") analysis.[5]   As shown in the table below, use of the same formulas and

determinations (i.e., $100 cash flows in Years 1 through 3 and a present value of $249)

results in the same discount rate (10%).[6]

**Present Value Formula Used for IRR Analysis**

| | | | | | | |
|---|---|---|---|---|---|---|
| Step 1 | $\dfrac{\text{Net Cash Flow in Year 1}}{(1 + \text{Discount Rate})^{1}}$ | $+$ | $\dfrac{\text{Net Cash Flow in Year 2}}{(1 + \text{Discount Rate})^{2}}$ | $+$ | $\dfrac{\text{Net Cash Flow in Year 3}}{(1 + \text{Discount Rate})^{3}}$ $=$ | Present Value |
| Step 2 | $\dfrac{100}{(1 + \text{Discount Rate})^{1}}$ | $+$ | $\dfrac{100}{(1 + \text{Discount Rate})^{2}}$ | $+$ | $\dfrac{100}{(1 + \text{Discount Rate})^{3}}$ $=$ | 249 |
| Step 3 | $\dfrac{100}{(1 + 10\%)^{1}}$ | $+$ | $\dfrac{100}{(1 + 10\%)^{2}}$ | $+$ | $\dfrac{100}{(1 + 10\%)^{3}}$ $=$ | 249 |
| Step 4 | 91 | $+$ | 83 | $+$ | 75  $=$ | 249 |

In this manner, the DCF and IRR analyses result in the same valuation when they

are based on the same determinations for future expected cash flows and discount rate.

## II.   ARCHSTONE PURCHASE PRICE ALLOCATION

This Section provides additional background regarding Lehman's analysis of the

appropriate allocation of the Archstone purchase price to Archstone's individual assets.

---

[4] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (spreadsheet) (Mar. 17, 2008), at Tab "Discounting Sens" [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008), at Tab "Intro" [LBEX-DOCID 4456413].

[5] Memorandum from Keith Cyrus, Lehman, *et al.*, to Donald E. Petrow, Lehman, *et al.*,  Archstone Update (May 16, 2008), at p. 3 [LBEX-DOCID 1416761].

[6] In practice, IRR analysis is performed by assuming the present value (in this case $249) is a cash outflow and the future expected cash flows are cash inflows.  As shown above, the sum of the cash inflows is greater than cash outflow.  The discount rate is computed by reducing the cash inflows to the value of the cash outflow, which results in a combined value of zero.

The value of Archstone's assets in the aggregate based on the acquisition price is relatively easy to calculate: the value of assets is equal to the value of consideration paid in order to obtain the assets. The consideration paid for the assets in the aggregate can be calculated by adding the value of the shares acquired (number of shares multiplied by $60.75 per share), the value of liabilities assumed (*e.g.*, mortgage debt) and the value of expenses that were incurred as a result of the transaction (*e.g.*, advisor fees). While it is a relatively simple matter to calculate the aggregate value of the assets, it is considerably more difficult to impute the value of the individual assets, as there is no standardized method for directly observing what is implicit in the valuation of the assets as a whole.[7] For financial reporting purposes, the value of the assets in the aggregate must be allocated to the underlying individual tangible and intangible assets in accordance with Statement of Financial Accounting Standards No. 141, "Business Combinations."[8]

Keith Cyrus, a vice president in the Bridge Equity unit, explained the ramifications of Lehman's decisions regarding Archstone's purchase price allocation. In an e-mail sent to multiple colleagues on December 14, 2007, Cyrus wrote:

> The relevance of this analysis comes in to play as we evaluate asset sales bids. If [Tishman Speyer] allocates $500 million to platform value, but the market clearing sales price implies a $1.0 billion platform value and we draw the sale / no sale line at allocated [budgeted] value, then assuming pro forma allocation, we would never sell anything. The real time

---

[7] FASB, SFAS No. 141, *Business Combinations* (June 2001), ¶ 7.
[8] *Id.* at ¶ 35.

examples are Monterrey Grove: We are holding out for $58 million – the allocated purchase price. The high bid is $56 million (re-traded from $58 million) and CBRE's spot value is $53.8 million. Should we be holding out?..Fox Plaza – current high bid is $103.5 million. We are holding out for $110 – CBRE value is $86 million, allocated PP [purchase price] is $108 million.[9]

Cyrus's analysis compared the "CBRE broker spot values prepared in May to the preliminary purchase price allocations."[10] He wrote that "[w]e all agree, that the broker values are to some degree 'low balled' to give the brokers room to execute."[11] Cyrus attached a sensitivity analysis (which is produced in its entirety in the chart below)[12] "of the overall value variance and implied platform value given various assumptions of this low-ball factor, ranging from 0% to the full 11.6%. For instance, if you believe the brokers underestimated true value by 5%, the platform value allocation would need to be $1.76 billion for the allocated purchase price to equal market value; 10% = $810 million. Assuming the broker variance is not extrapolated to the rest of the portfolio, the corresponding platform values would be $1.416 billion and $725 million."[13] In this manner, Cyrus is explaining that based on broker values for Archstone's underlying tangible assets, either 1) Lehman and its partners overpaid for Archstone's tangible

---

[9] E-mail from Keith Cyrus, Lehman, to Paul A. Hughson, Lehman, *et al.* (Dec. 13, 2007) [LBEX-DOC ID 1861553].

[10] *Id.*

[11] *Id.*

[12] Lehman, CBRE Broker Spot Values vs. Allocated Purchase Price (spreadsheet) (Dec. 13, 2007), at Tab "Summary" [LBEX-DOCID 1971263], attached to e-mail from Keith Cyrus, Lehman, to Coburn J. Packard, Lehman, *et al.* (Dec. 14, 2007) [LBEX-DOCID 1861543].

[13] E-mail from Keith Cyrus, Lehman, to Paul A. Hughson, Lehman, *et al.* (Dec. 13, 2007) [LBEX-DOC ID 1861553].

assets or 2) Lehman and its partners acquired an intangible asset (the platform) that wasn't valued by the brokers.

**Assumes Variance is Extrapolated to Non-Broker Valued Assets**

|  | Allocated Purchase Price | Assumed Broker "Lowball" Factor | | | | | |
|---|---|---|---|---|---|---|---|
|  |  | 0.0% | 2.5% | 5.0% | 7.5% | 10.0% | 11.6% |
| 165 Broker Valued Assets | $15,424 | $13,817 | $14,163 | $14,508 | $14,853 | $15,199 | $15,424 |
| 38 Remaining Core Assets | 3,089 | 2,768 | 2,837 | 2,906 | 2,975 | 3,044 | 3,089 |
| Development & Other Assets | 2,724 | 2,441 | 2,502 | 2,563 | 2,624 | 2,685 | 2,724 |
| **Total Real Estate** | $21,238 | $19,025 | $19,501 | $19,977 | $20,452 | $20,928 | $21,238 |
| **Variance to Broker Values:** |  |  |  |  |  |  |  |
| 165 Broker Valued Assets |  | $1,607 | $1,261 | $916 | $570 | $225 | $0 |
| 38 Remaining Core Assets |  | 322 | 253 | 183 | 114 | 45 | - |
| Development & Other Assets |  | 284 | 223 | 162 | 101 | 40 | - |
| **Total Real Estate** |  | $2,212 | $1,737 | $1,261 | $785 | $310 | $0 |
| Current Platform Value |  | 500 | 500 | 500 | 500 | 500 | 500 |
| Total Implied Platform Value |  | $2,712 | $2,237 | $1,761 | $1,285 | $810 | $500 |

**Assumes No Variance on Non-Broker Valued Assets**

|  | Allocated Purchase Price | Assumed Broker "Lowball" Factor | | | | | |
|---|---|---|---|---|---|---|---|
|  |  | 0.0% | 2.5% | 5.0% | 7.5% | 10.0% | 11.6% |
| 165 Broker Valued Assets | $15,424 | $13,817 | $14,163 | $14,508 | $14,853 | $15,199 | $15,424 |
| 38 Remaining Core Assets | 3,089 | 3,089 | 3,089 | 3,089 | 3,089 | 3,089 | 3,089 |
| Development & Other Assets | 2,724 | 2,724 | 2,724 | 2,724 | 2,724 | 2,724 | 2,724 |
| **Total Real Estate** | $21,238 | $19,631 | $19,976 | $20,322 | $20,667 | $21,013 | $21,238 |
| **Variance to Broker Values:** |  |  |  |  |  |  |  |
| 165 Broker Valued Assets |  | $1,607 | $1,261 | $916 | $570 | $225 | $0 |
| 38 Remaining Core Assets |  | - | - | - | - | - | - |
| Development & Other Assets |  | - | - | - | - | - | - |
| **Total Real Estate** |  | $1,607 | $1,261 | $916 | $570 | $225 | $0 |
| Current Platform Value |  | 500 | 500 | 500 | 500 | 500 | 500 |
| Total Implied Platform Value |  | $2,107 | $1,761 | $1,416 | $1,070 | $725 | $500 |

Cyrus sent an updated e-mail on December 19, 2007: "TS [Tishman Speyer] reallocated purchase price resulting in $1.0 billion of platform value. This implies a 7.65% variance ($1.06 billion on assets valued, $1.47 billion if extrapolated) to the CBRE

broker spot values."[14]  See the chart below for the revised analysis that was attached to

Cyrus' e-mail.[15]

**CBRE Broker Spot Values vs. Allocated Purchase Price**

**Assumes Variance is Extrapolated to Non-Broker Valued Assets**

| | Allocated Purchase Price | Assumed Broker "Lowball" Factor | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 0.0% | 2.5% | 5.0% | 7.65% | 10.0% | 12.8% |
| 165 Broker Valued Assets | $14,874 | $13,817 | $14,163 | $14,508 | $14,874 | $15,199 | $15,591 |
| 38 Remaining Core Assets | 3,082 | 2,863 | 2,935 | 3,007 | 3,082 | 3,150 | 3,231 |
| Development & Other Assets | 2,782 | 2,584 | 2,649 | 2,713 | 2,782 | 2,842 | 2,916 |
| **Total Real Estate** | $20,738 | $19,265 | $19,746 | $20,228 | $20,738 | $21,191 | $21,738 |
| **Variance to Broker Values:** | | | | | | | |
| 165 Broker Valued Assets | | $1,057 | $711 | $366 | $0 | ($325) | ($717) |
| 38 Remaining Core Assets | | 219 | 147 | 76 | - | (67) | (149) |
| Development & Other Assets | | 198 | 133 | 68 | - | (61) | (134) |
| **Total Real Estate** | | $1,473 | $992 | $510 | $0 | ($453) | ($1,000) |
| Current Platform Value | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Total Implied Platform Value | | $2,473 | $1,992 | $1,510 | $1,000 | $547 | ($0) |

**Assumes No Variance on Non-Broker Valued Assets**

| | Allocated Purchase Price | Assumed Broker "Lowball" Factor | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 0.0% | 2.5% | 5.0% | 7.65% | 10.0% | 14.9% |
| 165 Broker Valued Assets | $14,874 | $13,817 | $14,163 | $14,508 | $14,874 | $15,199 | $15,874 |
| 38 Remaining Core Assets | 3,082 | 3,082 | 3,082 | 3,082 | 3,082 | 3,082 | 3,082 |
| Development & Other Assets | 2,782 | 2,782 | 2,782 | 2,782 | 2,782 | 2,782 | 2,782 |
| **Total Real Estate** | $20,738 | $19,681 | $20,027 | $20,372 | $20,738 | $21,063 | $21,738 |
| **Variance to Broker Values:** | | | | | | | |
| 165 Broker Valued Assets | | $1,057 | $711 | $366 | $0 | ($325) | ($1,000) |
| 38 Remaining Core Assets | | - | - | - | - | - | - |
| Development & Other Assets | | - | - | - | - | - | - |
| **Total Real Estate** | | $1,057 | $711 | $366 | $0 | ($325) | ($1,000) |
| Current Platform Value | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Total Implied Platform Value | | $2,057 | $1,711 | $1,366 | $1,000 | $675 | ($0) |

## III.    ARCHSTONE'S COST OF GOING PRIVATE

Archstone's acquistion price of $60.75 per share included a premium above

Archstone's publicly traded stock price.  Morgan Stanley, Archstone's financial advisor

---

[14] Id.

[15] Lehman, Spreadsheet titled "CBRE Broker Spot Values vs. Allocated Purchase Price" (Dec. 19, 2007), at Summary tab [LBEX-DOCID 1971359], attached to e-mail from Keith Cyrus, Lehman, to Paul A. Hughson, Lehman, *et al.* (Dec. 19, 2007) [LBEX-DOCID 1861553].   Highlighted columns were in the original.

for the acquisition, provided an analysis of the premium in percentage terms that was disclosed in an Archstone 8-K.[16]  The Archstone 8-K stated as follows:

*Historical Share Price Analysis*

Morgan Stanley performed a historical share price analysis to provide background and perspective in comparison to the price per share of our common shares to be received pursuant to the merger agreement. Morgan Stanley reviewed the historical price performance and average closing prices of our common shares for various periods ending on May 25, 2007. Morgan Stanley observed the following:

|  | Price | Implied Premium |
|---|---|---|
| Closing Price on 5/25/07 | $ 55.23 | 10.0% |
| Pre-Market Rumor Price (last trade prior to published reports regarding a potential transaction) | $ 49.51 | 22.7% |
| Unaffected Share Price (average closing price during the ten trading-day period from May 8-21, 2007) | $ 52.45 | 15.8% |
| 30-Days Prior Trading Average | $ 52.64 | 15.4% |
| Twelve Months Prior Trading Average | $ 55.06 | 10.3% |
| 52-Week Intra-day High / All-Time Intra-day High | $ 64.77 | (6.2)% |
| 52-Week Intra-day Low | $ 45.63 | 33.1% |

Based upon the foregoing, Morgan Stanley noted a trading range for the 12 month period preceding May 25, 2007 for our common shares of $45.63 to $64.77 per share.

As this table set forth the implied premium on a percentage basis, the Examiner's financial advisor computed the dollar value of the premium based on Morgan Stanley's analysis.  The Examiner's financial advisor did this by multiplying the premium per share by the number of shares outstanding, as set forth in the table below.  These calculations demonstrate, employing the Morgan Stanley analysis, that the premium was over $2 billion applying the Pre-Market Rumor Price, Unaffected Share Price and 30-Day Prior Trading Average.

---

[16] Archstone, Exhibit 99.1 Proxy Statement Supplement, p. 17, attached to Archstone, Current Report as of Aug. 17, 2007 (Form 8-K) (filed on Aug. 20, 2007) ("Archstone 8-K (Aug. 17, 2007)").

**Premium Paid to Acquire Archstone**

| | Purchase Price per Share | - | Observation | = | Premium per Share | X | Share Outstanding (millions) | = | $ Value (in millions) of Premium |
|---|---|---|---|---|---|---|---|---|---|
| Closing Price 5/25/2007 | 60.75 | - | 55.23 | = | 5.52 | X | 257 | = | 1419 |
| Pre-Market Rumor Price | 60.75 | - | 49.51 | = | 11.24 | X | 257 | = | 2889 |
| Unaffected Share Price | 60.75 | - | 52.45 | = | 8.30 | X | 257 | = | 2133 |
| 30-Days Prior Trading Average | 60.75 | - | 52.64 | = | 8.11 | X | 257 | = | 2084 |
| Twelve Month Prior Trading Average | 60.75 | - | 55.06 | = | 5.69 | X | 257 | = | 1462 |
| 52 Week Intra-Day High/All-Time Intra-day High | 60.75 | - | 64.77 | = | (4.02) | X | 257 | = | (1033) |
| 52-Week Intra-Day Low | 60.75 | - | 45.63 | = | 15.12 | X | 257 | = | 3886 |

Transaction costs for the Archstone acquisition were $1.1 billion. [17] The Examiner's financial advisors added the $1.1 billion in transaction costs to the dollar value of the premium to compute the total costs incurred to take Archstone private. Pursuant to this analysis, the Examiner's financial advisor determined that the cost of taking Archstone private exceeded $3 billion applying the Pre-Market Rumor Price, Unaffected Share Price and 30-Day Prior Trading Average, as set forth in the following table:

---

[17] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (spreadsheet) (Mar. 17, 2008), at Tab "S&U" [LBEX-DOCID 1626080] (the Q1 model).

## Total Cost of Going Private

| | $ in millions | | | | |
|---|---|---|---|---|---|
| | Premium | + | Transaction Expenses | = | Cost of Taking Archstone Private |
| Closing Price 5/25/2007 | 1,419 | + | 1,134 | = | 2,553 |
| Pre-Market Rumor Price | 2,889 | + | 1,134 | = | 4,023 |
| Unaffected Share Price | 2,133 | + | 1,134 | = | 3,267 |
| 30-Days Prior Trading Average | 2,084 | + | 1,134 | = | 3,218 |
| Twelve Month Prior Trading Average | 1,462 | + | 1,134 | = | 2,596 |
| 52 Week Intra-Day High/All-Time Intra-day High | (1,033) | + | 1,134 | = | 101 |
| 52-Week Intra-Day Low | 3,886 | + | 1,134 | = | 5,020 |

The Examiner's financial advisor compared the calculated cost of taking Archstone private to the $5.1 billion equity investment in connection with the Archstone acquisition, and such comparison is set forth in the table below:

## Cost of Going Private Relative to Equity Investment

| | $ in millions | | | | |
|---|---|---|---|---|---|
| | Cost of Taking Archstone Private | / | Equity Investment | = | % of Equity Investment |
| Closing Price 5/25/2007 | 2,553 | / | 5,100 | = | 50% |
| Pre-Market Rumor Price | 4,023 | / | 5,100 | = | 79% |
| Unaffected Share Price | 3,267 | / | 5,100 | = | 64% |
| 30-Days Prior Trading Average | 3,218 | / | 5,100 | = | 63% |
| Twelve Month Prior Trading Average | 2,596 | / | 5,100 | = | 51% |
| 52 Week Intra-Day High/All-Time Intra-day High | 101 | / | 5,100 | = | 2% |
| 52-Week Intra-Day Low | 5,020 | / | 5,100 | = | 98% |

# APPENDIX 13: SURVIVAL STRATEGIES SUPPLEMENT

Appendix 13 includes additional background and detail with respect to six separate topics discussed in Report § III.A.3. Each of the subsections of this Appendix addresses one of those topics.

I.  Rating agencies ........................................................................................... 3

   A.  Background ........................................................................................... 3

   B.  March 2008 Outlook Revisions ......................................................... 5

   C.  June 2008 Warnings ........................................................................... 7

   D.  September 2008 Warnings ................................................................ 10

II.  Bank holding company proposal ............................................................ 12

III. June 12, 2008 ............................................................................................. 15

   A.  Replacement of Officers ................................................................... 15

   B.  Lehman Closes a $6 Billion Offering ............................................. 18

IV. Lazard's CVS proposal ............................................................................ 21

V.  The chronological development of SpinCo ............................................ 25

   A.  March-April 2008: Early Versions of SpinCo ............................... 25

   B.  June-July 2008: SpinCo as Survival Strategy ............................... 27

   C.  August 2008: Steps to SpinCo's Execution .................................. 35

   D.  Early September 2008: Preparing to Announce "REI Global" .... 49

VI. Discussions with potential strategic partners ...................................... 51

   A.  AIG ...................................................................................................... 51

   B.  UBS ..................................................................................................... 52

**C. GE** .................................................................................................................... 53

**D. Carlos Slim** ...................................................................................................... 54

**E. Morgan Stanley** ............................................................................................... 55

**F. CITIC** ................................................................................................................ 57

**G. Sumitomo Mitsui Banking Corporation** ..................................................... 59

**H. Standard Chartered Bank** ............................................................................. 61

**I. HSBC** ................................................................................................................. 62

**J. BNP Paribas** ..................................................................................................... 62

**K. Royal Bank of Canada** .................................................................................... 63

**L. Societe Generale** ............................................................................................. 63

**M. Lloyds** .............................................................................................................. 64

**N. Mitsubishi UFJ Financial Group** .................................................................. 64

**O. Nomura** ............................................................................................................ 65

**P. Potential Partners Approached by Lehman** ............................................... 65

# I.  RATING AGENCIES

## A.  Background

Rating agencies, including the three major agencies, Moody's, Fitch and Standard & Poor's, rated Lehman's debt and securities, as they did for all major investment banks.[1]  Those agencies provide long-term debt ratings, which reflect each agency's estimation of the probability that the debtor will default on its debt, and accordingly the likelihood investors in that debt will receive payment when due.  The three major agencies all rated Lehman's long-term debt over a time horizon of two to three years or longer.[2]

In assessing the likelihood of default, rating agencies consider all aspects of a company's financial condition, including its liquidity, capital, risk assumption, diversity of product lines, equity, credit default swap prices, return on equity, return on assets, less liquid and illiquid commercial real estate positions and market share.[3]  In addition

---

[1] *See* Lehman, Credit Ratings Strategy (Mar. 1, 2007), at pp. 1-5 [LBEX-DOCID 618355] (summarizing Lehman credit ratings since the mid-1990s, in comparison with credit ratings of Goldman Sachs, Merrill Lynch, JPMorgan, and Bear Stearns), attached to e-mail from Kentaro Umezaki, Lehman, to Gary Mandleblatt, Lehman, *et al.* (Mar. 6, 2007) [LBEX-DOCID 740168].

[2] Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 2; Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 2; *see also* Carol Ann Frost, *Credit Rating Agencies in Capital Markets: A Review of Research Evidence on Selected Criticisms of the Agencies*, 22 J. ACCT., AUDITING & FIN, 469, 474 (Summer 2007) (explaining that ratings are an agency's assessment of the credit quality of a debt issuer based on the relative probability of default); Amadou N.R. Sy, The Systemic Regulation of Credit Rating Agencies and Rated Markets, Int'l Monetary Fund, Working Paper (2009), at p. 9 (noting that broker-dealers often obtain ratings as issuers of long-term debt),

[3] Examiner's Interview with Eileen A. Fahey, Sept. 17, 2009, at pp. 2-3; Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 7; *see also* Richard Cantor & Frank Packer, *The Credit Rating Industry*, FRBNY QUARTERLY REVIEW, at p. 5 (Summer-Fall 1994) (noting that rating agencies base their ratings on an assessment of the qualitative and quantitative aspects of a company's borrowing condition); Carol Ann

to issuing, changing or affirming a company's rating, a rating agency also may revise a

company's credit rating "outlook" in anticipation of a possible future ratings upgrade

or downgrade.[4]

A downgrade in an issuer's credit rating has a significant negative impact on the

financial position of a company like Lehman.[5]  Although a credit rating relates directly

to the issuer's debt, a lower rating impacts the attractiveness of an issuer's equity, or

stock, as well.[6]  Moreover, counterparties may respond to a downgrade by demanding

that the issuer post additional cash collateral to secure its obligation.[7]  Some of

Lehman's derivative contracts had built-in "triggers" permitting counterparties to

require additional cash collateral in the event of a downgrade.[8]  Lehman's Chief

---

Frost, *Credit Rating Agencies in Capital Markets: A Review of Research Evidence on Selected Criticisms of the Agencies*, 22 J. ACCT. AUDITING & FIN., 469, 476 (Summer 2007) (explaining that the rating process involves analysis of both business risk and financial risk).

[4] *See* Carol Ann Frost, *Credit Rating Agencies in Capital Markets: A Review of Research Evidence on Selected Criticisms of the Agencies*, 22 J. ACCT., AUDITING & FIN, 469, 475 (Summer 2007)  (noting that a credit rating may consist of both a letter rating and commentary, which can include a "credit watch" or "credit outlook" modifier).

[5] *See, e.g.*, e-mail from Ian T. Lowitt, Lehman, to Herbert H. McDade, III, Lehman (June 30, 2008) [LBHI_SEC07940_643543] ("One notch downgrade requires 1.7 bn; and 2 notch requires 3.4 bn of additional margin posting.").

[6] *See* Dror Parnes, *Why Do Bond and Stock Prices and Trading Volumes Change around Credit Rating Announcements*, 9 J. BEHAV. FIN. 224, 224-26 (2008); Lars A. Norden, *Information Efficiency of Credit Default Swaps and Stock Markets: The Impact of Credit Rating Announcements*, 28 J. BANKING & FIN. 2845, 2845-46 (Nov. 2004).

[7] *See* Amadou N.R. Sy, *The Systemic Regulation of Credit Rating Agencies and Rated Markets*,  Int'l Monetary Fund, Working Paper (2009) at pp. 8-9 (noting that broker-dealers may use credit ratings to determine acceptable counterparties, as well as collateral levels for outstanding credit exposure); e-mail from Ian T. Lowitt, Lehman, to Eric Felder, Lehman (July 5, 2008) [LBEX-DOCID 071263] (stating that a downgrade "will affect lines and willingness of counterparties to fund secured.").

[8] Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed on July 10, 2008) ("LBHI 10-Q (July 10, 2008)"); *see also* Lehman, Global Treasury Downgrade Effect on Cash Capital

Executive Officer ("CEO"), Richard S. Fuld, Jr., told the Examiner that one of the motivations behind his desire to reduce net leverage was the rating agencies' focus on that number.[9] That concern about net leverage related directly to Lehman's use of Repo 105 transactions.[10] Lehman's Board understood the general impact a rating downgrade would have on Lehman.[11]

### B. March and April 2008 Outlook Revisions

On March 17, 2008, Moody's revised its outlook on Lehman's long-term senior debt rating from "positive" to "stable," explaining, "the firm's current exposure to commercial and residential real estate, and to a lesser degree leveraged loans, will likely pose a not-insignificant burden on profitability for at least the next several quarters."[12] On March 22, 2008, Standard & Poor's revised its outlook on Lehman's senior debt rating from "stable" to "negative."[13]

At the beginning of April 2008, Fitch also revised Lehman's outlook to "negative," stating that the action was due to "increased earnings pressure and leverage as inventory expanded in residential and commercial real estate related securities and

---

Facilities 3-Jun-08 (June 2008) [LBHI_SEC07940_513314], attached to e-mail from Amberish Ratanghayra, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (June 3, 2008) [LBHI_SEC07940_513312].

[9] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 8.

[10] See Section III.A.4.d and e of the Report, which discusses Repo 105 in greater detail.

[11] Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 15.

[12] Moody's, Press Release, *Moody's affirms Lehman's A1 rating; outlook now stable* (Mar. 17, 2008), at p. 1 [LBEX-DOCID 187704].

[13] Jed Horowitz, *Credit Crisis: S&P Red Flags Goldman, Lehman*, Wall. St. J., Mar. 22, 2008.

loans and corporate loans and commitments."[14]  Fitch noted that Lehman "has managed

its liquidity particularly well" and "manages its market risk well."[15]  In an April 3, 2008

ratings summary, Standard & Poor's explained its new negative outlook.[16]  Standard &

Poor's stated that while Lehman's "excess liquidity position is among the largest

proportionately of the U.S. broker-dealers . . . we cannot ignore the possibility that the

firm could suffer severely if there is an adverse change in market perception, however

ill-founded."[17]

Lehman paid significant attention to its credit rating.[18]  In an April 2008 internal

strategy document, Lehman concluded that its ability to avert a rating downgrade

depended on maintaining the rating agencies' positive view of Lehman's risk

management and avoiding "catastrophic asset writedowns."[19]  Lehman identified two

key dangers to its credit rating: further write-downs and liquidity issues.[20]  Continuing

write-downs were a "sore spot" for rating agencies, in part because of a perception that

Lehman was "hiding something."[21]  Lehman recognized that even "incremental

---

[14] Fitch Ratings, Press Release, *Fitch Revises Outlook On Lehman Brothers to Negative; Affirms 'AA-/F1+' IDRs*, Business Wire (Apr. 1, 2008).

[15] *Id*.

[16] Standard & Poor's, Standard & Poor's RatingsDirect Summary: LBHI (Apr. 3, 2008), at p. 2 [S&P-Examiner 000894].

[17] *Id*.

[18] *See, e.g.,* Lehman, LEH Ratings Strategy in '08: Ratings Advisory Group Discussion (Apr. 29, 2008), at p. 1 [LBHI_SEC07940_490429], attached to e-mail from Kevin Thatcher, Lehman, to Paolo R. Tonucci, Lehman, *et al*. (Apr. 29, 2008) [LBHI_SEC07940_490428].

[19] *Id*.

[20] *Id*.

[21] *Id*.

concerns" about Lehman's liquidity would trigger a downgrade.[22]  Foreshadowing Lehman's later survival strategies, including efforts to seek a strategic partner as well as SpinCo, the internal strategy document recommends that Lehman could ameliorate those threats to its ratings via a strategic transaction with a "strong deposit-based franchise," coupled with a restructuring transaction that would transfer the risk of Lehman's "troubled" assets to another entity.[23]

### C.  June 2008 Warnings

On June 2, 2008, Standard & Poor's downgraded Lehman from an A+ rating to A.[24]  Following the Standard & Poor's downgrade, press reports noted that "[a]nother downgrade . . . for Lehman" could force Lehman to post $5.2 billion in additional collateral.[25]  Moody's privately informed Lehman that its concern was "how much worse can it get, even if Lehman raises common equity."[26]

On June 9, 2008, the day of Lehman's pre-announcement of its second quarter earnings, Fitch downgraded Lehman from AA- to A+.[27]  Fitch's press release noted that "Fitch is concerned that [sales of riskier real estate assets] may remove the most attractive assets, leaving a concentrated level of least desirable or more problematic

---

[22] *Id.*

[23]  *Id.* at p. 2.

[24] Sarah O'Connor, *S&P Cuts Its Ratings for Merrill, Morgan Stanley and Lehman*, Financial Times, June 4, 2008, at p. 31.

[25] *Id.*

[26]  E-mail from Blaine A. Frantz, Moody's, to Paolo R. Tonucci, Lehman (June 5, 2008) [MOODY'S 1171].

[27] Fitch, Press Release, *Fitch Downgrades Lehman Brothers' L-T & S-T IDRs to 'A+/F1;' Outlook Negative*, Business Wire, June 9, 2008.

assets on the balance sheet," and that "maximum equity credit of [hybrid-preferred equity] has been reached in Fitch calculated leverage ratios."[28]  Lehman asked Fitch to reconsider the downgrade, citing Lehman's successful June 12, 2008 closing of a $6 billion capital raise, reductions in its commercial real estate exposure, and improving market conditions.[29]  Lehman also asserted that it was holding its "best" assets in expectation of a market recovery.[30]  Notwithstanding those arguments and an effort by Fuld to intervene personally, Lehman's appeal to Fitch was unsuccessful.[31]

On June 10, 2008, Moody's lowered its rating outlook for Lehman from "stable" to "negative."[32]  Moody's explained its lowered rating by stating that "[t]he rating action . . . reflects Moody's concerns over risk management decisions that resulted in elevated real estate exposures and the subsequent ineffectiveness of hedges to mitigate these exposures in the recent quarter."[33]  On Friday, June 13, 2008, Moody's announced that it was placing the long-term credit rating of Lehman and its subsidiaries on review for possible downgrade, citing Lehman's June 12, 2008, senior management upheaval as potentially "exacerbat[ing] erosion in investor confidence" and "increas[ing] the risk of

---

[28] *Id.*

[29] Lehman, Presentation to Fitch Ratings - Rating Appeal (June 9, 2008), at p. 1 [LBHI_SEC07940_339202], attached to e-mail from Paolo R. Tonucci, Lehman, to Ian T. Lowitt, Lehman (June 9, 2008) [LBHI_SEC07940_339201].

[30] *Id.*

[31] *See* e-mail from Paolo R. Tonucci, Lehman, to Eileen A. Fahey, Fitch, *et al.* (June 9, 2008) [FITCH-LEH BK 00002457].

[32] *Moody's Changes Lehman's Rating Outlook to Negative*, Financial Times, June 10, 2008.

[33] *Id.*

franchise impairment."[34]  Prior to the announcement, Lehman senior managers called Moody's, seeking to "soften" Moody's "extreme" press release.  During the call, they asked Moody's to delete, among other things, a reference stating that ongoing losses would raise "serious concerns about the effectiveness of Lehman's risk management."[35]

Just over a month later, on July 17, 2008, Moody's lowered its rating of Lehman's long-term senior debt to A2 from A1, with its rating outlook remaining negative.[36] Moody's press release cited "expectations for additional mark-to-market losses on Lehman's residential and commercial mortgage portfolios, which continue to pose a significant challenge," and observed that "Lehman has very limited capacity for additional preferred securities in its capital structure, and the difficult market environment for Lehman in raising common equity capital . . . limits its ability to respond to further unexpected losses."[37]

Following the June and July downgrades, Lehman's management discussed the impact of ratings on collateral requirements in materials prepared for Lehman's July 22,

---

[34] Moody's, Press Release [Draft], *Moody's places Lehman A1 rating on review for downgrade* (June 13, 2008), at p. 2 [LBHI_SEC07940_659482], attached to e-mail from Blaine A. Frantz, Moody's, to Paolo R. Tonucci, Lehman, *et al.* (June 13, 2008) [LBHI_SEC07940_659481].
[35] *Compare* Lehman, Moody's Press Release [Draft], *Moody's places Lehman's A1 rating on review for downgrade*  (June 12, 2008), at p. 2 [LBHI_SEC07940_339759], attached to e-mail from Paolo R. Tonucci, Lehman, to Blaine A. Frantz, Moody's, *et al.* (June 12, 2008) [LBHI_SEC07940_339758] *with* Moody's, Press Release [Draft] (June 12, 2008), at p. 2 [LBHI_SEC07940_339751], attached to e-mail from Blaine A. Frantz, Moody's, to Paolo R. Tonucci, Lehman, *et al.* (June 12, 2008) [LBHI_SEC7940_339750]; *see also* e-mail from Paolo R. Tonucci, Lehman, to Blaine A. Frantz, Moody's (June 12, 2008) [MOODY'S 1547] (requesting appeal of what Lehman viewed as "extreme" press release).
[36] E-mail from Paolo R. Tonucci, Lehman, to Christian Wait, Lehman (July 17, 2008) [LBHI_SEC07940_529261] (quoting Moody's Press Release).
[37] *Id.*

9

2008 Board Meeting.[38]    The Board presentation calculated the impact of further

downgrades of one and two notches on the amount of collateral that Lehman would

have to post to secure its margin accounts, estimating the additional requirement to be

between $1.1 billion and $3.9 billion.[39]

### D.  September 2008 Warnings

On September 9, 2008, both Standard & Poor's and Fitch placed Lehman's rating

on a negative watch.[40]   Standard & Poor's cited Lehman's intent to raise capital and the

"precipitous" decline in Lehman's share price.[41]    Fitch's action was triggered by

Lehman's decision to move up the date of its third quarter earnings call to announce

SpinCo as well as Lehman's intent to raise capital at the same time.[42]  Fitch believed the

capital raise would not be possible and wanted to convey that message to the market.[43]

On the late afternoon of September 10, 2008, Moody's announced that it had

placed Lehman's A2 rating on review with "direction uncertain."[44]    Moody's Senior

Vice President, Blaine A. Frantz, issued a statement stating: "A key ratings factor will be

Lehman's ability to turn around market sentiment. . . . A strategic transaction with a

---

[38]  Lehman, Presentation to the Board of Directors, Liquidity Update (July 22, 2008), at p. 18 [LBHI_SEC07940_028503].

[39]  *Id*.

[40]  E-mail from Stephen Lax, Lehman, to Kevin Thatcher, Lehman, *et al.* (Sept. 9, 2008) [LBHI_SEC07940_557829] (quoting Fitch, Press Release, *Fitch Places Lehman Brothers on Rating Watch Negative* (Sept. 9, 2008)); *S&P Places Lehman on Negative Ratings Watch*, Associated Press, Sept. 9, 2008.

[41]  *S&P Places Lehman on Negative Ratings Watch*, Associated Press, Sept. 9, 2008.

[42]  Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 7.

[43]  *Id*.

[44]  E-mail from Paolo R. Tonucci, Lehman, to Carlo Pellerani, Lehman (Sept. 10, 2008) [LBHI_SEC07940_558653] (forwarding Moody's, Press Release, *Moody's Places Lehman's A2 Rating On Review With Direction Uncertain*) (Sept. 10, 2008)).

stronger financial partner would likely add support to the ratings and result in a positive rating action."[45]

Thomas A. Russo, Lehman's Chief Legal Officer, told the Examiner that Moody's announcement, which he believed arrived before the market had time to digest Lehman's earnings pre-announcement, represented the final turning point when Lehman's situation began to deteriorate.[46] Lehman's management perceived Moody's statement that Lehman needed to reach a strategic transaction with a stronger partner as an ultimatum that cast doubt on Lehman's ability to raise additional capital and thus "put [Lehman] in a very tight box for possible next steps."[47] Fuld told the Examiner that Lehman's Chief Financial Officer ("CFO") Ian T. Lowitt told him that the rating agencies expected Lehman to reach a deal within the next week or face a likely downgrade.[48] Lehman began to revise its "Gameplan" for an impending downgrade and the consequent loss of Lehman's ability to issue long-term debt.[49]

---

[45] *Id.*

[46] Examiner's Interview of Thomas A. Russo, May 11, 2009, at pp. 7-8.

[47] E-mail from Jeffrey Goodman, Lehman, to Vincent DiMassimo, Lehman (Sept. 10, 2008) [LBEX-DOCID 618607]; *see* e-mail from Larry Wieseneck, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (Sept. 10, 2008) [LBEX-DOCID 349235].

[48] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 6.

[49] Lehman, The Gameplan - Downgrade Scenario (Sept. 11, 2008) [LBEX-DOCID 2727669] attached to e-mail from Matthew Blake, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Sept. 11, 2008) [LBEX-DOCID 2744462].

## II. BANK HOLDING COMPANY PROPOSAL

During the spring of 2008, Lehman began to consider applying to the FRBNY to become a bank holding company.[50]  In July 2008, Lehman first raised that idea with the FRBNY.[51]  Lehman's proposal to the FRBNY did not reach the level of a formal submission, but senior representatives of Lehman and the FRBNY, including Fuld and FRBNY President Timothy F. Geithner, had discussions regarding the proposal.[52] Geithner told the Examiner that he had considered Lehman's bank holding company proposal to be "gimmicky."[53]  The FRBNY expressed concern that the move would be perceived negatively in the marketplace and trigger a run on the bank.[54]  Thomas C. Baxter, Jr., General Counsel to the FRBNY, told the Examiner that Lehman eventually came around to the FRBNY's view and decided not to go forward with the proposal.[55] However, Russo told the Examiner that the proposal never fully came off the table as an option for Lehman, although the proposal was not a priority during the final weeks.[56]

During the same period, Lehman also pursued an exemption to Section 23A of the Federal Reserve Act with the FRBNY and FDIC.[57]  Section 23A of the Federal

---

[50] Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 8.

[51] Examiner's Interview of William L. Rutledge, Aug. 27, 2009, at p. 4.

[52] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 8; Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 8; Examiner's Interview of William L. Rutledge, Aug. 27, 2009, at pp. 3-4.

[53] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 6.

[54] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 8

[55] *Id.*

[56] Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 9.

[57] Examiner's Interview of William L. Rutledge, Aug. 27, 2009, at p. 2; *see also* e-mail from Arthur G. Angulo, FRBNY, to Jan Voigts, FRBNY, *et al.* (July 14, 2008) [FRBNY to Exam. 026357].

Reserve Act limits the transactions that a bank may engage in with its affiliates, including its parent company.[58]  If the FRBNY had granted a Section 23A exemption, Lehman would have been able to transfer assets to one of its Industrial Loan Company ("ILC") subsidiaries so that Lehman could access funds from Lehman Brothers Commercial Bank.[59]  Industrial loan companies are financial institutions that may be owned by non-financial institutions and are subject to Section 23A of the Federal Reserve Act.[60]

Although the FRBNY had the legal authority to approve Lehman's request on its own, the FDIC had *de facto* veto power because the FDIC would be the primary federal supervisor of the bank.[61]  Lehman submitted a series of term sheets to the FRBNY detailing the assets that would be transferred to the ILC.[62]  At the request of the FRBNY,

---

[58] 12 U.S.C. § 371(c) (2009).

[59] Examiner's Interview of William L. Rutledge, Aug. 27, 2009, at p. 2.

[60] Federal Deposit Insurance Corporation, Supervisory Insights: The FDIC's Supervision of Industrial Loan Companies: A Historical Perspective, *available at* http://www.fdic.gov/regulations/examinations/supervisory/insights/sisum04/industrial_loans.html.

[61] *Id.*

[62] Sullivan & Cromwell, Term Sheet for 23A Exemption for Lehman Brothers Commercial Bank ("Bank") [Draft], (July 13, 2008) [LBEX-DOCID 018382], attached to e-mail from Andrew S. Baer, Sullivan & Cromwell, to William L. Rutledge, FRBNY, *et al.* (July 14, 2008) [LBEX-DOCID 071857]; Sullivan & Cromwell, Term Sheet for 23A Exemption for Lehman Brothers Commercial Bank ("Bank") [Draft], (July 15, 2008) [LBEX-DOCID 018385], attached to e-mail from Andrew S. Baer, Sullivan & Cromwell, to William L. Rutledge, FRBNY, *et al.* (July 15, 2008) [LBEX-DOCID 071859]; Sullivan & Cromwell, Term Sheet for 23A Exemption for Lehman Brothers Commercial Bank ("Bank") [Draft], (July 20, 2008) [LBEX-DOCID 1013221], attached to e-mail from Jackie Frommer, Lehman, to William L. Rutledge, FRBNY, *et al.* (July 21, 2008) [LBEX-DOCID 1063411].

Lehman removed several categories of assets from its proposal, including those with low ratings as well as some land loans.[63]

During early August, the FRBNY told Lehman that it had received sufficient information, and the process then moved into the hands of the FDIC.[64] In middle to late August, Lehman representatives had a series of conversations and a meeting with FDIC officials. They responded negatively to the proposal, in part because the FDIC had concerns that the transaction would negatively affect the bank.[65] Lehman then attempted to convince the FRBNY to persuade the FDIC to grant the exemption.[66]

On September 21, 2008, following Lehman's bankruptcy, the FRBNY granted applications by Goldman Sachs and Morgan Stanley to become bank holding companies.[67] Public reports at the time indicated that Goldman Sachs and Morgan Stanley were motivated to convert to bank holding companies in order to increase

---

[63] Sullivan & Cromwell, Term Sheet for 23A Exemption for Lehman Brothers Commercial Bank ("Bank") [Draft], (July 20, 2008) [LBEX-DOCID 1013221], attached to e-mail from Jackie Frommer, Lehman, to William L. Rutledge, FRBNY, *et al.* (July 21, 2008) [LBEX-DOCID 1063411]. *Accord* Examiner's Interview of William L. Rutledge, Aug. 27, 2009, at p. 3.

[64] Examiner's Interview of William L. Rutledge, Aug. 27, 2009, at p. 3.

[65] *Id.*; *see* e-mail from Timothy F. Geithner, FRBNY, to William L. Rutledge, FRBNY (Aug. 19, 2008) [FRBNY to Exam. 033361]; e-mail from William L. Rutledge, FRBNY, to Timothy F. Geithner, FRBNY, *et al.* (Aug. 29, 2008) [FRBNY to Exam. 032939]. *Accord* Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 9.

[66] Richard S. Fuld, Jr., Lehman, Call Logs (Aug. 27, 2008) [LBHI_SEC07940_016973]; Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 9.

[67] Federal Reserve System, Orders Approving Formation of Bank Holding Companies (Sept. 21, 2008), *available at*
http://www.federalreserve.gov/newsevents/press/orders/orders20080922a1.pdf;
http://www.federalreserve.gov/newsevents/press/orders/orders20080922a2.pdf.

confidence in their strength and access to funding.[68]  Baxter told the Examiner that

Goldman and Morgan Stanley "decided to hold hands and jump together" into bank

holding company status, as the last two independent banks remaining.[69]  They hoped

that by taking the same action at the same time, they might avoid incurring any stigma

or negative perceptions from the conversion.[70]  Baxter said that one of the reasons the

Government opposed Lehman's application was the Government's concern that

converting to bank holding company status would create negative perceptions about

Lehman's funding strength.[71]

## III.   JUNE 12, 2008

On June 12, 2008, Lehman took two important but very different steps: (1)

replacing two senior officers; and (2) closing a major equity offering.

### A.   Replacement of Officers

On the morning of June 12, 2008, Lehman publicly announced the replacement of

two of its officers.  Herbert H. McDade, III replaced President Joseph M. Gregory and

---

[68] *See* Michael J. de la Merced, *et al.*, *As Goldman and Morgan Shift, a Wall St. Era Ends*, N.Y. Times, Sept. 21, 2008.

[69] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 8.

[70] *Id.*

[71] *Id.*

Ian T. Lowitt replaced CFO Erin M. Callan.[72]  On the evening of June 11, 2008, Fuld had previewed the executive shake-up to the Board during a telephonic meeting.[73]

Several of Lehman's directors attributed the replacement of Gregory and Callan to a loss of confidence in them.[74]  On June 9, 2008, Lehman's second quarter pre-announcement of earnings reported Lehman's first loss as a public company.  That same day, Callan offered to Fuld to resign.[75]  She acknowledged to Fuld that she had lost credibility with the public as a result of Lehman's poor performance.[76]  That was especially true in light of upbeat statements during the second quarter.[77]  Callan told the Examiner that she thought it would be hard for her to continue to "tell Lehman's story."[78]  Although Fuld initially rejected her resignation, on June 12, 2008, Fuld accepted it and informed the Executive Committee of her replacement.[79]

Some of Lehman's executives had lost confidence in Gregory by the spring, when complaints regarding Gregory percolated up to at least one director.[80]  Following Lehman's announcement of second quarter losses, the Head of Lehman's Investment

[72] *See* David Ellis, *Shakeup at Lehman Brothers*, CNNMoney.com, June 12, 2008, *available at* http://money.cnn.com/2008/06/12/news/companies/lehman_brothers/index.htm?postversion=2008061213.
[73] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (June 11, 2008), at p. 1 [LBEX-AM 003755].
[74] Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 9; Examiner's Interview of Sir Christopher C. Gent, Oct. 21, 2009, at pp. 17-18; Examiner's Interview of John F. Akers, Apr. 22, 2009, at p. 8; Examiner's Interview of Thomas H. Cruikshank, Oct. 8, 2009, at p. 6. See Section III.A.3.c. of the Report, which discusses Callan's public fight with David Einhorn in greater detail.
[75] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at p. 8.
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.* at pp. 8-9.
[80] Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at pp. 17-18.

Banking Division, Hugh "Skip" E. McGee III, privately told Fuld that a change in senior management was necessary and that Gregory had to go.[81] McGee told the Examiner that Fuld responded by asking him to state his view to the Executive Committee.[82] Gregory told the Examiner that the possibility of his departure arose in early June 2008 as a result of media pressure for "heads to roll."[83] Gregory said that after McGee raised the issue, Gregory told the Executive Committee that he should be the one to leave, not Fuld, as Gregory's job was "to protect the office of the Chairman."[84]

Lehman intended the shake-up to signal to the market that Lehman was taking proactive steps to repair market confidence. Nonetheless, Lehman's stock lost 7.4% of its value on June 12 and closed at $22.70.[85] The Secretary of the Treasury, Henry M. Paulson, Jr., told the Examiner that Fuld told him that Fuld believed firing Callan would bolster market confidence.[86] However, Paulson thought that the markets might view Callan's replacement as more alarming, not less.[87]

By the afternoon of June 12, 2008, one of Lehman's clearing banks, Citibank, received a number of novation requests, from trading partners such as Putnam, GSAM, Bank of America, King Street, Elliot and Citadel indicating a lack of confidence in

---

[81] Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 26.
[82] *Id.*
[83] Examiner's Interview of Joseph M. Gregory, Nov. 13, 2009, at p. 13.
[84] *Id.*
[85] *See* Yahoo! Finance, LEH stock chart, June 12, 2008, *available at* http://finance.yahoo.com/q?s=LEHMQ.PK (last visited Jan. 20, 2010).
[86] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 14.
[87] *Id.*

Lehman.[88]    According to an internal Citibank e-mail, the "[m]arket is saying Lehman can not make it alone. Loss of confidence here is huge at the moment."[89]  That same day, in connection with the novation requests and its earnings loss, Lehman posted a $2 billion deposit to Citibank to induce Citibank to continue its clearing activities for Lehman.[90]  Lehman informed the FRBNY of the deposit as part of daily reports Lehman made to the FRBNY.[91]

### B.   Lehman Closes a $6 Billion Offering

On June 12, 2008, Lehman closed its $6 billion equity offering.[92]  On June 6, 2008, Lehman's management had presented the stock offering to its Board, and the Board authorized the offering.[93]  On June 12, 2008, LBHI sold 2 million shares of convertible preferred stock for $2 billion.[94]  That same day, LBHI sold 143 million shares of common stock at a price of $28 per share, totaling $4 billion.[95]

---

[88] *See* e-mail from Thomas Fontana, Citibank, to Brian Leach, Citibank, *et al.* (June 16, 2008) [CITI-LBHI-EXAM 00113017] (relating the counterparties that requested novations the previous week.)

[89] E-mail from Thomas Fontana, Citibank, to Christopher M. Foskett, Citibank, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00081606].

[90] *See* e-mail from Daniel J. Fleming, Lehman, to Ian T. Lowitt, Lehman, *et al.* (June 12, 2008) [LBEX-AM 008608].

[91] FRBNY, Lehman IB Update (June 25, 2008), at pp. 10-11 [FRBNY to Exam. 008224] (data produced on June 19, 2008).  See Section III.A.5.c. of the Report, which discusses the novation requests and deposit in greater detail.

[92] Lehman Brothers Holdings Inc., Current Report as of June 9, 2008 (Form 8-K) (filed on June 12, 2008) ("LBHI 8-K (June 12, 2008)").

[93] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (June 6, 2008), at p. 3 [LBEX-AM 003709].

[94] LBHI 8-K (June 12, 2008).

[95] *Id.*

However, even with the injection of additional equity, the Federal Reserve remained skeptical.[96]  In the weeks prior to Lehman's June 12 offering,  Lehman had met with the Federal Reserve and sketched out an "Apocalypse Now" liquidity scenario, which was intended to reflect circumstances that were far more severe than what Lehman thought could happen.[97]  By mid-June 2008, however, the FRBNY was aware of the novation requests and their potential impact on Lehman's liquidity.[98]

On the evening of June 12, 2008, the Vice Chairman of the Federal Reserve, Donald L. Kohn, wrote Chairman of the Federal Reserve Ben S. Bernanke regarding Kohn's concern that Lehman's $6 billion capital infusion may not cure Lehman's problems.[99]  Kohn thought that the "possibility" existed that "this is Thursday of [Bear Stearns] weekend, and equity holders could wake up Monday morning with no value."[100] According to Kohn's e-mail, "[Fuld] really [had] no alternative plan at this point.  Lining up [sovereign wealth fund] investors is a slow process and there is nobody is [sic] interested in buying them."[101]  Kohn went on to discuss what would

---

[96] *See* e-mail from Donald L. Kohn, Federal Reserve, to Ben S. Bernanke, Federal Reserve, *et al.* (June 12, 2008) [FRB to LEH Examiner 000073].
[97] *See* Lehman, Presentation to the Federal Reserve, Update on Capital Leverage & Liquidity (May 28, 2008) [LBEX-WGM 718569].  *Accord* Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 3.
[98] *See* FRBNY, Lehman IB Update (June 25, 2008), at pp. 10-11 [FRBNY to Exam. 008224] (data produced on June 19, 2008).
[99] E-mail from Donald L. Kohn, Federal Reserve, to Ben S. Bernanke, Federal Reserve (June 13, 2008) [FRB to LEH Examiner 000073].
[100] *Id*.
[101] *Id*.

become Lehman's strategic alternatives.[102]   He stated that while "[p]rivate equity

partners are a possibility," Lehman's proposed bank or financial holding company

"with Fed consolidated regulation would take time to get regulatory approvals and

provide uncertain relief unless they acquired a lot of deposits very fast."[103]   Kohn also

previewed what would become SpinCo, suggesting that Lehman might "creat[e] a bad

bank, on the UBS model, [but] with the lousy mortgages they hold [, it] would require

interest from equity investors to buy into the bad bank."[104]   Finally, Kohn noted that

"using our balance sheet to facilitate an orderly wind down with the discount window

or by assuming the liabilities a la JPM is hard because we don't have the authorities of

the fdic (as well as for policy reasons)."[105] Early the next morning, Kohn concluded the

e-mail exchange with Bernanke by telling Bernanke that institutional investors believed

that it was not a question of whether Lehman would fail, but when the failure would

occur.[106]

Halfway across the world, in Hong Kong, a rumor circulated that Lehman would

be gone that night, taken out by the Federal Reserve.[107]

---

[102] *Id*.

[103] *Id*.

[104] *Id*.

[105] *Id*.

[106] E-mail from Donald L. Kohn, Federal Reserve, to Ben S. Bernanke, Federal Reserve (June 13, 2008) [FRB to LEH Examiner 000781].

[107] *See* Bloomberg chat from James Archibald, ABN AMRO Asia Ltd., to Ben Suttie, ABN AMRO Australia, *et al.* (June 12, 2008), at pp. 1-2 [ABN AMRO 000002].

## IV. LAZARD'S CVS PROPOSAL

During the summer of 2008, Lehman worked with Lazard, Frères & Co. ("Lazard") as a strategic advisor.[108]  Lehman formally engaged Lazard in September 2008.[109]  Gary Parr, the engagement partner for Lazard, told the Examiner that the scope of Lazard's work for Lehman was to be available for a fairness opinion.[110]  Parr said that Fuld asked Lazard to "tell us if we're missing anything."[111]  Lazard addressed and evaluated an array of options provided by Lehman.[112]  Beyond that, Lazard proposed an alternative to SpinCo, which was known as contingent value stock ("CVS").

Lazard's CVS alternative would have meant segregating Lehman's commercial real estate assets on the balance sheet and tracking those assets' value using a contingent value stock.[113]  The CVS concept was intended to permit Lehman to achieve a "segmentation of risk" similar to SpinCo, while enabling Lehman to finance the commercial real estate assets by raising money at the "cleaner" parent company level, rather than trying to raise money for an entity composed entirely of bad assets.[114]  Parr told the Examiner that there was a "pretty good chance" that he was the person who came up with the CVS concept.[115]

---

[108] Examiner's Interview of Gary Parr, Sept. 14, 2009, at p. 6.
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.* at p. 7.
[113] *Id.* at pp. 10-11.
[114] *Id.* at p. 11.
[115] *Id.*

On July 28, 2008, Lazard prepared a presentation that explained the CVS proposal and compared it to SpinCo.[116]  The presentation described CVS as a new class of Lehman stock, qualifying as Tier 1 capital and rating agency equity capital.[117]  Each share of CVS would represent a participation in the economics of the commercial real estate portfolio, where each dollar of loss attributed to commercial real estate would result in a reduction of the face value of the share of CVS.[118]  Lazard anticipated that the CVS would be registered and tradable, to the extent there was a market for the shares.[119]

Lazard's CVS proposal also involved a capital raise.[120]  The Lazard presentation described the potential recapitalization through the creation of CVS as a four-step process.[121]  First, LBHI would create a new share class.[122]  Second, LBHI would distribute the new shares to Lehman shareholders in a tax-free manner.[123]  Third, LBHI would issue $4 billion in common equity.[124]  Finally, LBHI would issue new restricted stock to Lehman's employees.[125]

Lazard described the CVS proposal as advantageous to Lehman.[126]  Lazard listed what it saw as several advantages of the CVS proposal, including: separate reporting of

[116] Lazard, Project Green Discussion Materials [Draft] (July 28, 2008) [LAZ-A-00000131].
[117] *Id.* at p. 1.
[118] *Id.*
[119] *Id.*
[120] *Id.* at p. 2.
[121] *Id.*
[122] *Id.*
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] *Id.*

Lehman's results and the commercial real estate portfolio's results; no change in the consolidated financials of Lehman as a result of the CVS issuance; the ability to maintain the equity associated with the commercial real estate portfolio; separation of the commercial real estate exposure into a different security might allow for an additional LBHI equity raise; and the option to redeem CVS for cash or LBHI common equity.[127]

Lazard's CVS proposal was not without flaws. First, the issuance of CVS would not remove any assets from Lehman's balance sheet.[128] Second, there would be an execution delay due to the time required to register the CVS, publish the required financial statements and proxy and receive the results of the required shareholder vote.[129] Finally, Lazard noted that it was unclear how the CVS would trade.[130]

On Saturday, August 9, 2008, Lehman senior management, including Fuld, Russo, Jeffrey L. Weiss (Lehman's co-Head of Global Finance), Larry Wieseneck (Lehman's Global Head of Finance) and Les Gorman (Lehman Managing Director) held a "Project Green" meeting and conference call at Fuld's home in Connecticut.[131] Parr also attended a portion of the meeting, and he listed the alternatives then under review: SpinCo; the CVS proposal; a sale of 100% of IMD; sale of 51% or 49% of IMD; or, a going

---

[127] *Id.*
[128] *Id.*
[129] *Id.*
[130] *Id.*
[131] Examiner's Interview of Gary Parr, Sept. 14, 2009, at p. 12.

private transaction.[132]    The Lazard presentation rated the CVS proposal as more desirable for Lehman's balance sheet than SpinCo, even while acknowledging that the CVS would not reduce the balance sheet.[133]

Wieseneck summarized the meeting for McGee, who was unable to attend. Wieseneck reported that Parr pushed the CVS idea as "better than spin co" but Lehman managers rejected the idea:[134]

> After discussing the economic benefits (tax shield at corporate) and potential timing, it was the consensus that the firm does not have enough credibility to have the CVS or tracker as the answer[.]  If we can't do spin co it would be a fall back but that we would be accused of financial engineering if we rolled out tracker now.  Dick ended by saying go full speed ahead on Spin Co with an attempt to ring fence real estate now until spin.  Real issue is how much equity do we need to sell by Sept. 15 and do we need some mezz pre-placed so that equity buyers believe we can get spin co done.[135]

Weiss added that "Parr was pushing his agenda.  People saw through it."[136]

Parr's summary of the meeting noted that the "[c]onclusion [was] to continue focused on spin with capital raise.  Primary concern with cvs is perception.  Meeting [was] not too confrontational.  Dick liked our work and the full discussion.  [There is] [n]othing

---

[132] Lazard, Project Green Discussion Materials [Draft] (Aug. 7, 2008), at p. 1 [LBHI_SEC07940_647930], attached to e-mail from Angela Judd, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (Aug. 8, 2008) [LBHI_SEC07940_647929].

[133] *Id.* at 5.

[134] E-mail from Larry Wieseneck, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (Aug. 9, 2008) [LBHI_SEC07940_406661].

[135] *Id.*

[136] *Id.*

else to do for now."[137]  Parr told the Examiner that he did not push any single idea as the best idea.[138]

Lehman did not pursue the CVS proposal further.

## V.    THE CHRONOLOGICAL DEVELOPMENT OF SPINCO

### A.   March-April 2008: Early Versions of SpinCo

Lehman's officers began to contemplate shifting Lehman's troubled and illiquid real estate assets to an off-balance sheet entity in early March 2008.[139]  Callan sent an e-mail to Mark A. Walsh, the Head of Lehman's Global Real Estate Group, suggesting the possibility of putting some of Lehman's commercial mortgage assets into a new real estate investment trust and "spinning" it (*i.e.*, transferring equity ownership of the new entity) to Lehman's shareholders.[140]  Walsh brought Steve R. Hash, Lehman's Global Head of Real Estate Investment Banking, into the discussion.[141]  In those initial discussions, Lehman's management identified major obstacles to executing the spinoff, including the need to fund the new company's assets and the need to attract third-party investors.[142]

During April 2008, some of Lehman's senior management (including Callan, Walsh, Hash, Larry Wieseneck, Kenneth Cohen, Head of U.S. Originations, Paul A.

---

[137] E-mail from Gary Parr, Lazard, to Di Wu, Lazard, *et al*. (Aug. 9, 2008) [LAZ-C-00020061].
[138] Examiner's Interview of Gary Parr, Sept. 14, 2009, at p. 11.
[139] *See* e-mail from Erin M. Callan, Lehman, to Mark A. Walsh, Lehman (Mar. 12, 2008) [LBHI_SEC07940_116854].
[140] *Id.*
[141] *Id.*
[142] *Id.*

Hughson, Head of Credit Distribution, Daniel Kerstein, Head of Global Finance Solutions, Paolo R. Tonucci, Global Treasurer and David Goldfarb, Global Head of Strategic Partnership) continued to discuss variations on a mortgage asset spin-off.[143] Those discussions coalesced around the idea of spinning most or all of Lehman's commercial real estate holdings into a separate entity that would be owned by Lehman's shareholders.[144] They believed that the spin-off eventually could be sold publicly, while in the meantime it would remove the risk of commercial real estate mark-downs from Lehman's balance sheet.[145] Lehman executives referred to the spin-off entity as "SpinCo."[146]

Lehman's senior management recognized that critical challenges might make the SpinCo plan impractical.[147] In particular, Lehman's management acknowledged the difficulty of finding independent financing for SpinCo, and also acknowledged that the

---

[143] *See* e-mail from Steven R. Hash, Lehman, to Daniel Kerstein, Lehman, *et al.* (Apr. 11, 2008) [LBHI_SEC07940_089122]; e-mail from Erin M. Callan, Lehman, to Steven R. Hash, Lehman, *et al.* (Apr. 17, 2008) [LBHI_SEC07940_274912]; Lehman, Managing to a "Bad Asset" Solution (Apr. 23, 2008) [LBEX-DOCID 1400312], attached to e-mail from David Baron, Lehman, to David Goldfarb, Lehman, *et al.* (Apr. 23, 2008) [LBEX-DOCID 1558959].

[144] *Id.*

[145] *See*, *e.g.*, Lehman, Managing to a "Bad Asset" Solution (Apr. 23, 2008), at p. 2 [LBEX-DOCID 1400312] (identifying "pros" of REIT spin-off as, *inter alia*, "Segregate the bad assets" and "Equity upside participation").

[146] *Id.*

[147] E-mail from Erin M. Callan, Lehman, to Steven R. Hash, Lehman, *et al.* (Apr. 17, 2008) [LBHI_SEC07940_274912].

new entity would require a large infusion of equity from Lehman, leaving a hole in

Lehman's capital structure.[148]

### B. June-July 2008: SpinCo as Survival Strategy

As the market for commercial real estate assets continued to deteriorate in mid-

2008,[149] Lehman's shareholders, creditors, and the market "expressed increasing concern

about the size and concentration of [Lehman's] positions and their impact on overall

creditworthiness, and they have put increasing pressure on the firm to reduce

exposure[.]"[150]  Although Lehman managed to sell more than $6 billion in commercial

real estate assets during the second and third quarters of 2008 at prices within 60 basis

points of those assets' marks, Lehman faced further write-downs of its remaining real

estate assets.[151]  At the same time, Lehman hoped to avoid the need for a massive sell-off

of its more liquid commercial real estate assets, which Lehman saw as a "fire sale for the

---

[148] *See id.* ("I thought we had decided the [mortgage REIT] structure would not work because independent financing is not available.  There were other issues but this seemed the biggest."); e-mail from Daniel Kerstein, Lehman, to Steven R. Hash, Lehman, *et al.* (Apr. 11, 2008) [LBHI_SEC07940_089122] ("[E]quity comes from either us or IPO equity investors"); Lehman, Managing to a "Bad Asset" Solution (Apr. 23, 2008) [LBEX-DOCID 1400312] ("Bad Asset Solution" slides describes "cons" of REIT spin-off as "Material reduction in Parent equity" and "Financing required at SpinCo").

[149] *See* e-mail from Steven R. Hash, Lehman, to David Erickson, Lehman, *et al.* (June 10, 2008) [LBEX-DOCID 1475677] ("[T]here is really no independent financing for [CRE] assets in the market today."). *Accord* Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at pp. 22-23; Examiner's Interview of Thomas A. Russo, Dec. 1, 2009, at pp. 14-15.

[150] Lehman, The Gameplan (Sept. 2008) [LBEX-DOCID 2727665]; *see also m*emorandum from Timothy Lyons, Lehman, to David Goldfarb, Lehman, re: Strategic Imperatives for the Firm (July 3, 2008), at p. 1 [LBEX-DOCID 1377945] ("We have a large overhang of illiquid, devaluing assets which are dragging down our earnings, threatening our capital base and undermining the confidence of investors, counterparties and employees.").

[151] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 6; *see also* Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at pp. 11, 14; Examiner's Interview of Paul A. Hughson, Oct. 28, 2008, at p. 5; Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at p. 12.

vultures."[152]  Lehman recognized that it needed to find a remedy for its "outsized"

exposure to commercial real estate assets before they "[took] down the mother ship."[153]

In early June 2008, McGee revisited the CRE spin-off idea, suggesting to a group

of Lehman investment bankers: "[W]e create a vehicle (trust) to dump a bunch of this

[real estate exposure] into and give it to our shareholders.  They get upside and we get

out of the 'are we marked' correctly game.  A bit like good bank/ bad bank."[154]

Recalling discussions of a similar idea in March and April 2008, McGee's investment

banking team initially voiced reservations about the spin-off idea,[155] but McGee pushed

ahead, forming an investment banking "team" to explore the idea.[156]

Despite the initial doubts, at McGee's instigation the SpinCo plan soon became a

critical component of Lehman's post-Bear Stearns survival strategy.[157]  In preliminary

planning documents from early July 2008, Project Green included other possible

---

[152] *Id.*

[153] Lehman, Lehman Commercial Mortgage Exposure is Outsized Relative to Peers (June 10, 2008) [LBHI_SEC07940_339455], attached to e-mail from Kevin Thatcher, Lehman, to Ian T. Lowitt, Lehman, *et al.* (June 10, 2008) [LBHI_SEC07940_339451]; e-mail from Hugh E. McGee, III, Lehman, to Mark A. Walsh, Lehman (June 13, 2008) [LBHI_SEC07940_123660].

[154] E-mail from Hugh E. McGee, III, Lehman, to Larry Wieseneck, Lehman, *et al.* (June 11, 2008) [LBHI_SEC07940_398653].

[155] *See* e-mail from Larry Wieseneck, Lehman, to Hugh E. McGee, III, Lehman (June 11, 2008) [LBHI_SEC07940_398653] ("Kerstein proposed this 3 months ago.  Combo of Goldfarb and parts of RE rejected it. . . . I believe because it required too much equity beneath it"); *see also* e-mail from Steven R. Hash, Lehman, to David Erickson, Lehman, *et al.* (June 10, 2008) [LBEX-DOCID 1475677] ("[P]roblem is financing and the assets that greg owns.  [T]here is really no independent financing for these assets in the market today.  No financing means no actual business plan.  And just dumping problem assets to shareholders is a bad idea, in my humble opinion.").

[156] *See* e-mail from Hugh E. McGee, III, Lehman, to Mark A. Walsh, Lehman (June 13, 2008) [LBHI_SEC07940_123660] ("I have a team of bankers looking at 'enterprise solutions' for real estate-i.e. how to separate out most or all of it so that it doesn't take down the mother ship.").

[157] *See, e.g.,* Lehman, Project Green Acres Preliminary Game Plan (July 4, 2008) [LBHI_SEC07940_124809].

alternatives for disposing of Lehman's commercial real estate assets, such as strategic asset sales or a joint venture.[158] However, Lehman viewed the SpinCo plan as "unique," in part because SpinCo's planners believed it could be developed *without* third party assistance.[159] Another perceived advantage of the spin-off plan was that Lehman could announce it well in advance of actual distribution — contemporaneous planning documents targeted the third quarter 2008 earnings announcement for the plan's announcement.[160] McGee continued to take the lead on "Project Green Acres," Lehman's code name for the branch of Lehman's survival plan focused on the strategic imperative of solving Lehman's commercial real estate "overhang."[161]

SpinCo became a centerpiece of Lehman's survival strategy.[162] A July 11, 2008 Lehman internal accounting analysis concluded that Lehman could accomplish the

---

[158] *Id.*; e-mail from Brad Whitman, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (July 9, 2008) [LBHI_SEC07940_212942].

[159] Lehman, Project Green Acres Preliminary Game Plan (July 4, 2008) [LBHI_SEC07940_124809] ("Understand that spin-off is unique in that [it can] be executed without third party involvement"); e-mail from Larry Wieseneck, Lehman, to Brad Whitman, Lehman (July 5, 2008) [LBHI_SEC07940_401266] ("[CRE spin-off] does not require negotiations with someone who will feel they have leverage against us and demand a lower price."); *but see* Lehman, Green Acres - Summary of Structural Alternatives (July 3, 2008), at p. 1 [LBHI_SEC07940_008342] ("Spin-Off . . . [p]ossibly with third party sponsor"), attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (July 3, 2008) [LBHI_SEC07940_008341]; Lehman, Key Execution Considerations for Spin-Off [Draft] (July 11, 2008) [LBHI_SEC07940_401591] ("Likely that SpinCo will need at least a portion of third party financing.").

[160] *See* Lehman, Project Green Acres Preliminary Game Plan (July 4, 2008) [LBHI_SEC07940_124809] ("If spin-off checks out, focus on making announcement regarding plan to spin with 3Q earning."); e-mail from Brad Whitman, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (July 9, 2008) [LBHI_SEC07940_212942].

[161] Lehman Green Acres - Working Group (July 23, 2008) [LBHI_SEC07940_125904] (showing McGee as head); memorandum from Timothy Lyons, Lehman, to David Goldfarb, Lehman, re: Strategic Imperatives for the Firm (July 3, 2008), at p. 1 [LBEX-DOCID 1377945].

[162] E-mail from Richard S. Fuld, Jr., Lehman, to David Goldfarb, Lehman (July 19, 2008) [LBHI_SEC07940_213011] ("The key to our success is the viability of the spinco.").

spin-off and achieve a complete divestiture of the spun-off assets, so long as Lehman's

seller-financing for SpinCo was on market terms and Lehman found some third-party

financing.[163]   Lehman also believed that it could structure SpinCo to achieve tax-free

status for the distribution to its shareholders, which Lehman regarded as a "key

consideration" in deciding whether to adopt the plan.[164]   Lehman also began preparing

detailed cash flow summaries of its commercial real estate assets, and looking at which

assets it would contribute to SpinCo, including Lehman's Archstone assets.[165]   Goldfarb

met with Parr to discuss "SpinCo financing ideas," which included possibly getting

Lehman's seller-financing loan to SpinCo "wrapped" by Berkshire Hathaway.[166]

 During July 2008, Lehman's managers involved in the project were aware that

launching SpinCo would require a significant transfer of equity capital from Lehman to

the new entity.[167]   To establish SpinCo as a viable independent entity and to avoid

---

[163] E-mail from Daniel Kashdin, Lehman, to Daniel Kerstein, Lehman, *et al.* (July 11, 2008) [LBHI_SEC07940_401374].

[164] *See* Lehman, Key Execution Considerations for Spin-Off [Draft] (July 11, 2008) [LBHI_SEC07940_401591]; *see also* Lehman, Discussion Materials for the Board of Directors [Draft] (July 19, 2008), at p. 10 [LBHI_SEC07940_404357].

[165] Lehman, Commercial Real Estate Portfolio - Cash Flow Projections [Draft] (July 15, 2008) [LBEX-DOCID 1400411], attached to e-mail from David O'Reilly, Lehman, to Steven R. Hash, Lehman, *et al.* (July 14, 2008) [LBEX-DOCID 1400234]; e-mail from Daniel Kerstein, Lehman, to Brad Whitman, Lehman, *et al.* (July 16, 2008) [LBHI_SEC07940_403931]; e-mail from Timothy Sullivan, Lehman, to Larry Wieseneck, Lehman, *et al.* (July 18, 2008) [LBHI_SEC07940_404086].

[166] E-mail from Hugh E. McGee, III, Lehman, to Jeffrey L. Weiss, Lehman (July 18, 2008) [LBEX-DOCID 741841]; e-mail from Lee Einbinder, Lehman, to Larry Wieseneck, Lehman, *et al.* (July 18, 2008) [LBHI_SEC07940_404298].

[167] *See, e.g.,* e-mail from Daniel Kashdin, Lehman, to Daniel Kerstein, Lehman, *et al.* (July 11, 2008) [LBHI_SEC07940_401374] ("To preclude consolidation, there will need to be a substantial amount of equity in the deal."); e-mail from David Goldfarb, Lehman, to Richard S. Fuld, Jr., Lehman (July 21, 2008) [LBEX-DOCID 1224222] ("There is a minimum of capital needed to de-consolidate which is approx $6

consolidation with Lehman, Lehman's management believed it would have to capitalize SpinCo with sufficient equity — at least 20 to 25% of SpinCo's net asset value.[168]    In mid-July 2008, Lehman estimated that capitalizing $35 billion of SpinCo assets would require a minimum of $6 billion in equity, and possibly as much as $14 billion.[169] Some of Lehman's management concluded that SpinCo was not a viable plan because it would have left Lehman with too little capital to survive,[170] especially because Lehman's capital already had been depleted by write-downs and losses.[171]

### a) Sale of IMD

In the summer of 2008, Lehman also began developing plans to sell all or part of its "crown jewel" asset, the Investment Management Division ("IMD"), and in particular IMD's private asset management arm, Neuberger Berman ("NB").[172] Lehman senior management had contemplated the possibility of selling all or part of IMD since

---

billion and obviously we would like to raise much more to reduce our ongoing financing of Spinco."). *Accord* Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 23.

[168] *Id.;* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 7.

[169] E-mail from David Goldfarb, Lehman, to Richard S. Fuld, Jr., Lehman (July 21, 2008) [LBEX-DOCID 1224222]; e-mail from Gerard Reilly, Lehman, to Martin Kelly, Lehman (July 19, 2008) [LBEX-DOCID 2117905].

[170] *See, e.g.,* e-mail from Daniel Kerstein, Lehman, to Larry Wieseneck, Lehman (July 22, 2008) [LBHI_SEC07940_404505]; e-mail from Timothy Lyons, Lehman, to Alex Kirk, Lehman (July 22, 2008) [LBHI_SEC07940_174554] ("Given your views on the likelihood of spinco, I think we need to move hard down the path of Plan B."); e-mail from Eric Felder, Lehman, to Paolo  R. Tonucci, Lehman (Aug. 10, 2008) [LBEX-DOCID 1297372].

[171] *See, e.g.,* e-mail from Paolo R. Tonucci, Lehman, to Christian Wait, Lehman (July 17, 2008) [LBHI_SEC07940_529261] (forwarding Moody's Investors Service, Press Release, *Moody's lowers Lehman Brothers rating to A2; outlook negative* (July 17, 2008)); Lehman, Discussion Materials for the Board of Directors (July 19, 2008) [LBHI_SEC07940_404357].

[172] Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 18; Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 9-11; Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at pp. 23-24; Examiner's Interview of Gary Parr, Sept. 14, 2009, at pp. 9-10.

2007.[173]  By mid-July 2008, Lehman's management linked the idea of selling IMD with the SpinCo concept.[174]  They believed that proceeds from the sale of IMD could be used to fill the "equity hole" left by SpinCo.[175]

Although some of Lehman's management were concerned that a sale of IMD combined with a significant asset spin-off could reduce Lehman's capital levels enough to trigger a rating downgrade,[176] Lehman senior management pushed ahead with the two-pronged plan.  In materials prepared for the July 21, 2008 meeting of the Executive Committee, SpinCo and a sale of IMD were central components of Lehman's survival plans, which also included significant asset sales and write-downs, headcount reductions, and a $4 billion capital raise by the fourth quarter of 2008.[177]

---

[173] David S. Erickson, Project Hercules (May 18, 2007) [LBEX-DOCID 727278], attached to e-mail from Carol Welter, Lehman, to Angela Judd, Lehman, *et al*. (May 29, 2007) [LBEX-DOCID 760067]; memorandum from Hugh E. McGee, III, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.*, re: Project Hercules (May 29, 2007) [LBEX-DOCID 711211], attached to e-mail from Carol Welter, Lehman, to Angela Judd, Lehman, *et al.* (May 29, 2007) [LBEX-DOCID 760067].

[174] *See* e-mail from Herbert H. McDade, III, Lehman, to George H. Walker, Lehman (July 9, 2008) [LBHI_SEC07940_644297]; e-mail from Brad Whitman, Lehman, to Jeffrey L. Weiss, Lehman, *et al.* (July 17, 2008) [LBHI_SEC07940_403935].

[175] E-mail from Brad Whitman, Lehman, to Jeffrey L. Weiss, Lehman, *et al.* (July 17, 2008) [LBHI_SEC07940_403935] ("Spin-off CRE w/ plan to fill equity hole would be optimal. . . . Fill with proceeds from sale of IMD, which means either . . . [s]ell all of IMD for cash [or sell] large stake in IMD for cash. . . . Note that if CRE spin is not implemented, IMD does not need to be sold to fill capital hole.").

[176] *See* e-mail from Lee Einbinder, Lehman, to Jason Trock, Lehman, *et al.* (July 20, 2008) [LBHI_SEC07940_404396] ("Need to think about rating agency implications of CRE spin, NB carveout, writeoffs-if some combination of this results in downgrade to BBB+, does the plan hold together?").

[177] Lehman, Game Plan - Preliminary Draft for Discussion (July 20, 2008) [LBEX-DOCID 767208], attached to e-mail from Hugh E. McGee, III, Lehman, to Jeffrey L. Weiss, Lehman, *et al.* (July 21, 2008) [LBEX-DOCID 741717] (noting that presentation was "for tomorrow's Executive Committee meeting"). Presentation outlines plans for spinning off $36 billion of commercial real estate assets along with $11 billion equity, and for selling nearly 100% of IMD for up to $7 billion, to generate $3.2 billion after-tax gain (including reduced goodwill).  *Id.*

### b) July 22, 2008 Board Meeting

At the July 22, 2008 Board of Directors meeting, McGee presented SpinCo and the sale of IMD together as key "strategic alternatives."[178]  McGee explained that the plan was to "distribute the commercial real estate business to stockholders as a special dividend," and stated that "the proposed spin-off, as currently contemplated, would be tax-free to the Firm and its stockholders."[179]  McGee then described the "potential sale of all or part of IMD" and provided an overview of the business.[180]  At the same meeting, Parr told the Board that SpinCo was "a great idea" that Lehman should pursue "aggressively."[181]

Also on July 22, Lehman's management internally circulated a Lazard presentation analyzing valuation issues and monetization alternatives for IMD.[182]  That evening, Goldfarb reported to McDade that the cash flows and other accounting projections for SpinCo looked better than expected.[183]  On July 31, 2008, Fuld reported to the Board that Lehman management was pursuing a "three-part transaction" involving

---

[178]  Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 22, 2008), at p. 6 [LBEX-AM 003866].

[179]  *Id.*

[180]  *Id.*

[181]  *Id.*

[182]  Lazard, Project Green - Discussion Materials [Draft] (July 2008) [LBEX-DOCID 767209], attached to e-mail from Kelsey Surbaugh, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (July 22, 2008) [LBEX-DOCID 717004].

[183]  E-mail from David Goldfarb, Lehman, to Herbert H. McDade, III, Lehman (July 22, 2008) [LBHI_SEC07940_645762].

the spin-out of commercial real estate assets, a sale of IMD and raising additional capital."[184]

While Lehman senior management continued to develop a plan to sell IMD to fill the SpinCo "equity hole," management was aware that the need for SpinCo to be adequately financed was another major obstacle to the SpinCo plan.[185] In order to gain accounting recognition as a separate entity from Lehman, SpinCo would have to show that it would not entirely rely entirely on Lehman.[186] Lehman senior management believed that the plan would work if Lehman could sell $2 to 6 billion of the highest-risk, highest-return "mezzanine" tranches of SpinCo debt, and then syndicate part of the senior debt financing at two to three percent above LIBOR.[187] In addition, Lehman management hoped that syndicating at least some of the SpinCo debt structure would provide market confirmation on the interest rate spreads for that debt, enabling Lehman

---

[184] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 31, 2008), at p. 2 [LBEX-AM 003875].

[185] *See, e.g.,* e-mail from Erin M. Callan, Lehman, to Mark A. Walsh, Lehman (Mar. 12, 2008) [LBHI_SEC07940_116854] ("[C]learly have to address financing of the assets which we would primarily have to provide to Newco from outset."); e-mail from Steven R. Hash, Lehman, to Erin M. Callan, Lehman, *et al.* (Apr. 14, 2008) [LBHI_SEC07940_274912] ("I thought we had decided the structure would not work because independent financing is not available."); e-mail from Steven R. Hash, Lehman, to David Erickson, Lehman, *et al.* (June 10, 2008) [LBEX-DOCID 1475677].

[186] *See, e.g.,* e-mail from Daniel Kashdin, Lehman, to Daniel Kerstein, Lehman, *et al.* (July 11, 2008) [LBHI_SEC07940_401374]; e-mail from Richard S. Fuld, Jr., Lehman, to David Goldfarb, Lehman (July 19, 2008) [LBHI_SEC07940_213011] ("We need to get others to finance [SpinCo] so it doesn't sit on our balance sheet.").

[187] E-mail from Martin Kelly, Lehman, to David Goldfarb, Lehman, *et al.* (July 16, 2008) [LBHI_SEC07940_213013]; e-mail from David Goldfarb, Lehman, to Martin Kelly, Lehman, *et al.* (July 21, 2008) [LBEX-DOCID 2997880]. *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 6-7.

to classify the SpinCo notes as Level II assets rather than Level III.[188]   Unless Lehman could attract third-party financing for SpinCo, there would be no meaningful separation of risk.[189]

### C.   August 2008: Steps to SpinCo's Execution

In early August 2008, the "Green Acres Working Group," headed by McGee,[190] focused on addressing SpinCo's central challenges: the "equity hole" and the need to attract outside financing for SpinCo.[191]   The Green Acres "teams" met daily in the first weeks of August.[192]   Lehman also continued to explore alternative spin-off scenarios, including "Project Greenland" (a spin-off of commercial and residential real estate assets with up to $20 billion in outside funding) and "Green Acres Light" (a smaller version of SpinCo involving roughly $15 billion in commercial real estate assets,

---

[188] *See* e-mail from Ian T. Lowitt, Lehman, to David Goldfarb, Lehman, *et al.* (July 22, 2008) [LBEX-DOCID 2997880].  Gerard Reilly, Lehman, replies: "On L3 issue for [senior debt], selling mezz certainly helps as it supports validity of capital structure.  If we can find other [senior] debt in market and gain some comfort on our spread then we could call it L2.  Placing some S[enior debt] is best.".  *Id.*

[189] E-mail from Christopher M. O'Meara, Lehman, to David Goldfarb, Lehman (July 16, 2008) [LBEX-DOCID 213344]; e-mail from Larry Wieseneck, Lehman, to Brad Whitman, Lehman, *et al.* (July 21, 2008) [LBHI_SEC07940_404451].

[190] *See* Lehman, Green Acres - Working Group (July 23, 2008) [LBHI_SEC07940_125904] (showing McGee as head); e-mail from Hugh E. McGee, III, Lehman, to Richard S. Fuld, Jr., Lehman (Aug. 3, 2008) [LBHI_SEC07940_213093] (McGee sends Fuld a Project Green "status report").

[191] *See, e.g.,* e-mail from Hugh E, McGee, III, Lehman, to Larry Wieseneck, Lehman (Aug. 5, 2008); e-mail from Hugh E. McGee, III, Lehman, to Brad Whitman, Lehman (Aug. 10, 2008) [LBHI_SEC07940_538200] ("We have already raised a lot of capital.  Can we use some of what we already raised to bridge us here.  Then we raise capital at time of diversion of equity to spinco.").

[192] *See, e.g.,* Lehman, Project Green Acres - Daily Update (Aug. 7, 2008) [LBEX-DOCID 2253476]; Lehman, Project Green Acres - Daily Update (Aug. 8, 2008) [LBEX-DOCID 2253477].

including Archstone).[193]   The "Green Acres" team reached out to selected investors, mostly private equity groups, about SpinCo's mezzanine debt.[194]   Lehman hoped to attract potential investors by bundling SpinCo mezzanine securities with options to purchase a significant stake in post-spin Lehman.[195]

### 1.   "Full Speed Ahead"

On August 9, 2008, Lehman's senior management held a "Project Green" meeting at Fuld's home in Connecticut.[196]   Parr attended the meeting and presented alternatives to the SpinCo/IMD sale plan.[197]   One of those alternatives involved issuing a contingent value stock ("CVS") that would track the value of Lehman's commercial real estate assets separately from Lehman's share value, without actually removing those assets from Lehman's balance sheet.[198]   Lehman's senior management rejected Parr's

---

[193]   Lehman, Project Greenland [Draft] (Aug. 2008) [LBEX-DOCID 249386], and Lehman, Green Acres - 'Light' Alternative (Aug. 2, 2008) [LBEX-DOCID 363594], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (Aug. 3, 2008) [LBEX-DOCID 306887].

[194]   *See* Lehman, Project Green Acres - Daily Update (Aug. 8, 2008) [LBEX-DOCID 2253477]; e-mail from Alex Kirk, Lehman, to Mark A. Walsh, Lehman, *et al.* (Aug. 9, 2008) [LBEX-DOCID 544666] (listing potential investors including Apollo, Blackstone, Cerberus, Colony, Fortress, J.E. Roberts, Lone Star, Och-Ziff, Vornado, and Walton Street).

[195]   Lehman, Project Green - Talking Points for Potential Investors (Aug. 6, 2008) [LBEX-DOCID 363782], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (Aug. 6, 2008) [LBEX-DOCID 388296].

[196]   E-mail from Jeffrey L. Weiss, Lehman, to Larry Wieseneck, Lehman, *et al.* (Aug. 9, 2008) [LBHI_SEC07940_406657]; Examiner's Interview of Gary Parr, Sept. 14, 2009, at p. 12.

[197]   *Id.*

[198]   *Id.*; *see also* Lazard, Project Green - Discussion Materials [Draft] (Aug. 9, 2008) [LBHI_SEC07940_126975]; Lazard, Project Green - Supplementary Materials [Draft] (Aug. 9, 2008) [LBHI_SEC07940_126983].   See *infra* Appendix 13 § IV to the Report, which discusses Lazard's CVS proposal in greater detail.

CVS proposal as less feasible than the spin-off in the current market environment.[199]

Fuld ended the meeting by saying "go full speed ahead on SpinCo."[200]

Concurrently with SpinCo planning in early August 2009, Lehman's management continued to implement the plan to sell all or part of IMD.[201] In late July 2009, Lehman had begun initial discussions with potential buyers, mostly private equity firms.[202] Rumors began to circulate in the marketplace that Lehman might be looking to sell some part of IMD.[203] At the same time, Lehman's management began exploring alternative scenarios for IMD, including an initial public offering for Neuberger Berman or a portion of IMD, or a carve-out of IMD shares into a separate entity modeled on a private equity fund.[204] In mid-August, Lehman received initial bids for all or part of

---

[199] E-mail from Jeffrey L. Weiss, Lehman, to Larry Wieseneck, Lehman, *et al*. (Aug. 9, 2008) [LBHI_SEC07940_406657]; Examiner's Interview of Gary Parr, Sept. 14, 2009, at p. 12.

[200] E-mail from Larry Wieseneck, Lehman, to Hugh E. McGee, III, Lehman, *et al*. (Aug. 9, 2008) [LBHI_SEC07940_406657].

[201] Lehman, Project Hercules - Project Status Summary (July 27, 2008) [LBEX-DOCID 460035], attached to e-mail from Brian Reilly, Lehman, to Hugh E. McGee, III, Lehman, *et al*. [LBEX-DOCID 456422]; Lehman, Lehman Brothers Investment Management (July 30, 2008) [LBEX-DOCID 317782], attached to e-mail from Brian Reilly, Lehman, to Hugh E. McGee, III, Lehman, *et al*. (July 30, 2008) [LBEX-DOCID 364820] (describing IMD presentation for strategic investors as "Hercules Overview").

[202] *Id.*; e-mail from George H. Walker, Lehman, to Mark G. Shafir, Lehman, *et al*. (July 24, 2008) [LBEX-DOCID 296276].

[203] *See* e-mail from Wai Lee, Lehman, to Kentaro Umezaki, Lehman (Aug. 6, 2008) [LBEX-DOCID 387080].

[204] *See, e.g.,* e-mail from Daniel Kerstein, Lehman, to David Erickson, Lehman, *et al*. (Aug. 7, 2008) [LBHI_SEC07940_406415]; Lehman, LBPE vs. NYSE IPO Announcement (Aug. 11, 2008) [LBHI_SEC07940_648035], attached to e-mail from George H. Walker, Lehman, to Richard S. Fuld, Jr., Lehman, *et al*. (Aug. 11, 2008) [LBHI_SEC07940_648034]; e-mail from Kentaro Umezaki, Lehman, to Heather Zuckerman, Lehman, *et al*. (Aug. 13, 2008) [LBEX-DOCID 295904]; Lehman, Project Hercules (Aug. 2008) [LBHI_SEC07940_649454], attached to e-mail from George H. Walker, Lehman, to Herbert H. McDade, III, Lehman (Aug. 19, 2008) [LBHI_SEC07940_649453].

IMD from nine firms, including Blackstone, Hellman & Friedman and Bain Capital.[205]

Those bids reflected a valuation range of $7 to $8 billion for all of IMD, including

Neuberger Berman.[206]

### 2. Presentations to Rating Agencies

During the second week of August 2008, Lehman presented its SpinCo plan to

Fitch, Moody's and Standard & Poor's.[207]   Lehman told the agencies that spinning off

Lehman's commercial real estate assets would eliminate the need for a fire sale at

distressed prices and preserve the intrinsic value of those assets for its shareholders.[208]

Meanwhile, post-spin "clean" Lehman would be in a better position to avoid future

write-downs, stabilize its earnings and raise capital.[209]   None of Lehman's presentations

to the rating agencies discussed Lehman's plans to sell all or part of IMD in order to fill

the "equity hole."[210]

---

[205] E-mail from Mark G. Shafir, Lehman, to Brian Reilly, Lehman, *et al.* (Aug. 14, 2008) [LBEX-DOCID 350609]; Lehman, Project Hercules - Discussion Materials (Aug. 15, 2008) [LBEX-DOCID 616611], attached to e-mail from Hugh E. McGee, III, Lehman, to Carol Welter, Lehman (Aug. 15, 2008) [LBEX-DOCID 741172].

[206] *Id.*

[207] Lehman, Fitch Ratings - Discussion of Spin-Off of CRE Portfolio (Aug. 12, 2008) [LBEX-DOCID 011904]; Lehman, Moody's Investors Service - Discussion of Spin-Off of CRE Portfolio (Aug. 13, 2008) [LBHI_SEC07940_406813]; Lehman, Standard & Poor's - Discussion of Spin-Off of CRE Portfolio (Aug. 13, 2008) [LBHI_SEC07940_406905].

[208] *Id.* at p. 1.

[209] *Id.* at p. 2.

[210] *Id.*

After meeting with the rating agencies, Tonucci reported that the agencies expressed concern about the impact of the spin-off on Lehman's equity levels.[211]  On August 20, 2008, Standard & Poor's contacted Lowitt and Tonucci regarding "rumors" of a planned sale of IMD.[212]  Standard & Poor's warned that such a sale would be "an unmitigated negative for credit."[213]

During the meetings, the rating agencies also stressed the importance to Lehman of syndicating some of SpinCo's senior debt.[214]  Eileen A. Fahey, managing director of Fitch, told the Examiner that her preliminary conclusion from those meetings was that Lehman would be left financing SpinCo's assets and would still "be on the hook" for any SpinCo losses.[215]  Lehman's senior management recognized that convincing the rating agencies and potential funders of SpinCo's viability was critical[216] and Lehman continued to pursue potential mezzanine and equity investors throughout August

---

[211] E-mail from Paolo R. Tonucci, Lehman, to Stephen Lax, Lehman, *et al*. (Aug. 12, 2008) [LBHI_SEC07940_406811]; *see also* e-mail from Ian T. Lowitt, Lehman, to Hugh E. McGee, III, Lehman (Aug. 13, 2008) [LBHI_SEC07940_364012]; e-mail from Paolo R. Tonucci, Lehman, to Larry Wieseneck, Lehman, *et al*. (Aug. 18, 2008) [LBHI_SEC07940_305707] (forwarding e-mail from Blaine A. Frantz, Moody's (Aug. 15, 2008): "[A] key concern of the transaction is equity, and Lehman's need to replace any equity deficit created by allocating capital to the spinco, and how exactly you will raise the capital, when and how much.").

[212] E-mail from Hugh E. McGee, III, Lehman, to Herbert H. McDade, III, Lehman (Aug. 20, 2008) [LBHI_SEC07940_649823].

[213] *Id.*

[214] *See, e.g.,* e-mail from Paolo R. Tonucci, Lehman, to Stephen Lax, Lehman, *et al*. (Aug. 12, 2008) [LBHI_SEC07940_406811] ("[S]elling the senior debt - ability to do so seemed important in [Fitch's] assessment of what had been accomplished."); e-mail from Ian T. Lowitt, Lehman, to Hugh E. McGee, III, Lehman (Aug. 13, 2008) [LBHI_SEC07940_364012].

[215] Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 6.

[216] E-mail from Ian T. Lowitt, Lehman, to Hugh E. McGee, III, Lehman (Aug. 13, 2008) [LBHI_SEC07940_364012].

2008.[217]   Some potential capital providers told Lehman that they were enticed by the prospect of 20 to 25% returns but were not willing to risk significant amounts of cash up front.[218]   Others could not meet Lehman's timing needs, as they demanded 4 to 6 weeks of additional due diligence.[219]

During August 2008, Lehman used the SpinCo plan as part of its efforts to attract three major strategic investors.   In early August 2008, Lehman presented the SpinCo plan to Korea Development Bank ("KDB").[220]   During negotiations with Lehman, KDB stated that it was interested in Lehman only if Lehman first purged itself of its real estate and high yield assets.[221]   Lehman presented the SpinCo plan as part of an opportunity for KBD to invest in "Clean" Lehman post-spin, while avoiding exposure to future write-downs of Lehman's real estate assets.[222]   Second, in mid-August, Lehman presented the SpinCo idea to MetLife, as part of an effort to interest MetLife in an investment in Lehman either pre- or post-spin.[223]   Third, in late August and early September 2008, both the SpinCo plan and a possible acquisition of a share in IMD

---

[217] See Lehman, Summary of Conversations with Potential Capital Providers (Aug. 27, 2008) [LBEX-DOCID 947915], attached to e-mail from Alex Kirk, Lehman, to Michael Gelband, Lehman (Aug. 27, 2008) [LBEX-DOCID 961894].   List of potential investors includes Apollo, Blackstone, Carlyle, Cerberus, Colony, Fortress, J.E. Roberts, Lone Star, Lubert Adler, Och-Ziff, Vornado and Walton Street. Id.

[218] Id.

[219] Id.

[220] See e-mail from Herbert H. McDade, III, Lehman, to Hugh E. McGee, III, Lehman (Aug. 7, 2008) [LBHI_SEC07940_647910].

[221] Id.

[222] E-mail from Hugh E. McGee, III, Lehman, to Brad Whitman, Lehman, et al. (Aug. 13, 2008) [LBHI_SEC07940_406804] (forwarding e-mail from Gary S. Barancik, Perella Weinberg Partners (Aug. 9, 2008)).

[223] See e-mail from Mark Wilsmann, MetLife, to Paul A. Hughson, Lehman, et al. (Aug. 15, 2008) [LBHI_SEC07940_305703].

featured prominently in Lehman's negotiations with the Investment Corporation of Dubai ("ICD").[224]

### 3. Negotiations with the SEC

Lehman's senior management was aware that Lehman would need SEC approval for SpinCo's accounting treatment.[225] After consulting with outside accountants and legal counsel, Lehman decided in early August 2008 to contact the SEC to seek pre-clearance for the accounting treatment that was part of the SpinCo plan.[226]

Lehman planned to seek a waiver of the requirement that Lehman provide three years of audited financial statements for SpinCo, as reflected in "SEC talking points" documents from early August 2008.[227] Lehman's accountants told the SEC that unified historical financial data for SpinCo's diverse assets was not available.[228] They felt that such data would not be helpful to potential investors because SpinCo would be

---

[224] *See* e-mail from Hugh E. McGee, III, Lehman, to Jeffrey L. Weiss, Lehman (Sept. 4, 2008) [LBHI_SEC07940_2222166]. See Section III.A.c.4 of the Report, which discuss the role of SpinCo in Lehman's potential transactions with KDB, MetLife, and ICD in greater detail.

[225] E-mail from Daniel Kashdin, Lehman, to Daniel Kerstein, Lehman, *et al.* (July 11, 2008) [LBHI_SEC07940_401374]; Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 9.

[226] E-mail from Martin Kelly, Lehman, to David Goldfarb, Lehman, *et al.* (July 17, 2008) [LBEX-DOCID 560179]; Lehman Spinco Talking Points for SEC [Draft] (Aug. 6, 2008) [LBEX-DOCID 1295521], attached to e-mail from Daniel Kerstein, Lehman, to Steven Berkenfeld, Lehman (Aug. 6, 2008) [LBEX-DOCID 1297492].

[227] Lehman, Spinco Talking Points for SEC [Draft] (Aug. 6, 2008) [LBEX-DOCID 1295521]; Lehman, SEC Talking Points [Draft] (Aug. 8, 2008) [LBEX-DOCID 851411], attached to e-mail from Michael J. Langer, Lehman, to Thomas A. Russo, Lehman, *et al.* (Aug. 8, 2008) [LBEX-DOCID 965295].

[228] *Id.*; letter from John T. Bostelman, Sullivan & Cromwell, to John White, SEC, re: SpinCo - Proposed Term Sheet (Aug. 19, 2008), at p. 3 [EY-LE-LBHI-KEYPERS 3670025], attached to e-mail from John T. Bostelman, Sullivan & Cromwell, to Larry Wieseneck, Lehman, *et al.* (Aug. 19, 2008) [EY-LE-LBHI-KEYPERS 3670023].

managing those assets to maximize long-term value, not for short-term earnings.[229] Rather than provide three years of audited historical financial statements for SpinCo, Lehman offered to provide an audited opening balance sheet and up to three years of *prospective* financial statements, with additional information about the underlying properties and their cash flows.[230]

After an initial meeting with the SEC on August 12, 2008, Lowitt was "cautiously optimistic."[231] Wieseneck believed that the SEC was ready to be "helpful" in connection with the need for the required waiver.[232] The next day, McGee reported to the Board that it would be "easier" for the SEC to grant the waiver if Lehman made SpinCo "a liquidating entity, not an ongoing operating business."[233] The waiver also would permit Lehman to announce the spin-off transaction at the same time it made public its third quarter 2008 earnings.[234] However, making SpinCo a liquidating entity had adverse

---

[229] Letter from John T. Bostelman, Sullivan & Cromwell, to John White, SEC, re: SpinCo - Proposed Term Sheet (Aug. 19, 2008), at pp. 3-4 [EY-LE-LBHI-KEYPERS 3670025], attached to e-mail from John T. Bostelman, Sullivan & Cromwell, to Larry Wieseneck, Lehman, *et al.* (Aug. 19, 2008) [EY-LE-LBHI-KEYPERS 3670023].

[230] *Id.* at p. 3.

[231] E-mail from Ian T. Lowitt, Lehman, to Paolo R. Tonucci, Lehman (Aug. 12, 2008) [LBEX-DOCID 2642438].

[232] E-mail from Larry Wieseneck, Lehman, to Daniel Kerstein, Lehman, *et al.* (Aug. 12, 2008) [LBEX-DOCID 2642438].

[233] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Aug. 13, 2008), at p. 3 [LBEX-AM 003879].

[234] *Id.*

consequences, including making the spin-off taxable to shareholders.[235]  Lehman hoped to avoid making SpinCo taxable.[236]

Lehman submitted a SpinCo "Proposed Term Sheet" to the SEC on August 19, 2008, seeking a formal waiver of the financial statement requirement of Reg. S-X Rule 3-14.[237]  According to the proposed term sheet: "[Lehman] believes that, in light of the diverse characteristics of Spinco's holdings, presenting property-specific financial statements for select operating real estate assets would not convey meaningful information regarding Spinco."[238] Lehman proposed to present additional tabular data for operating real estate assets, in addition to three years of forecasts "without auditors' report."[239]  The proposed term sheet contained no reference to SpinCo as a "liquidating entity."[240]  It states that SpinCo's assets "will be managed to maximize long-term value for Spinco shareholders."[241]

Lehman also sought permission not to use mark-to-market accounting for SpinCo.[242]  On August 20, 2008, Fuld reported to the Board of Directors that Lehman

---

[235] *Id.*

[236] *See, e.g.,* Lehman, Discussion Materials for the Board of Directors [Draft] (July 19, 2008), at p. 10 [LBHI_SEC07940_404357] ("SpinCo will need to be deemed a viable stand-alone operating business for '40 Act, accounting purposes and to effect a tax-free distribution.").

[237] Letter from John T. Bostelman, Sullivan & Cromwell, to John White, SEC, re: SpinCo - Proposed Term Sheet (Aug. 19, 2008), at p. 2 [EY-LE-LBHI-KEYPERS 3670025], attached to e-mail from John T. Bostelman, Sullivan & Cromwell, to Larry Wieseneck, Lehman, *et al.* (Aug. 19, 2008) [EY-LE-LBHI-KEYPERS 3670023].

[238] *Id.* at p. 3.

[239] *Id.* at p. 2.

[240] *Id.* at pp. 1-5.

[241] *Id.* at pp. 3-4.

[242] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2008, at pp. 6-8.

and the SEC had "resolved" all of SpinCo's accounting problems except for the mark-to-market accounting requirement, which remained an "open item."[243]  Specifically, Lehman hoped to avoid using "fair value" accounting (*i.e.*, mark-to-market accounting under SFAS 157 and 159) in reporting the value of SpinCo's real estate loan assets,[244] and to use "hold to maturity" accounting for SpinCo's debt securities.[245]  Lehman senior officers believed that avoiding mark-to-market accounting for SpinCo's assets was critical to SpinCo's feasibility,[246] but it would require Lehman to be a pioneer in obtaining the SEC's agreement to allow that accounting treatment.[247]

---

[243] *See* Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Aug. 20, 2008), at p. 2 [LBEX-AM 003891].

[244] *Id.*; Letter from Martin Kelly, Lehman, to Wayne Carnall, SEC, re: request to describe why Spinco does not represent the sale of a business and is not required to apply fair value accounting after the initial transfer of assets (Aug. 21, 2008), at p. 1 [LBEX-DOCID 1298065], attached to e-mail from Robert W. Downes, Sullivan & Cromwell, to Larry Wieseneck, Lehman, *et al.* (Aug. 21, 2008) [LBEX DOCID 1297924]; *see also* Fair Value Measurements, Statement of Fin. Accounting Standards No. 157 (Fin. Accounting Standards Bd. 2008); The Fair Value Option for Financial Assets and Financial Liabilities, Statement of Fin. Accounting Standards No. 159 (Fin. Accounting Standards Bd. 2008).

[245] While the "hold to maturity" issue applied specifically to debt securities, which was only 10% of SpinCo's assets, Lehman also argued that it should not be required to use "fair value" accounting for the bulk of the loans, which was almost 70% of SpinCo's assets. Lehman wanted to account for the loans "at amortized cost with amortization of discount or premium under the effective yield method and subject to reserve for loan losses," or essentially the same method Lehman wanted to use for debt securities. *See* letter from Martin Kelly, Lehman, to Wayne Carnall, SEC, re: why SpinCo is not required to apply fair value accounting (Aug. 21, 2008), at p. 10 [LBEX-DOCID 1298065].

[246] E-mail from David Goldfarb, Lehman, to Martin Kelly, Lehman, *et al.* (Aug. 27, 2008) [LBEX-SIPA 007017].

[247] *See* Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 22, 2008), at p. 6 [LBEX-AM 003866].  *Accord* Examiner's Interview of David O'Reilly, Oct. 26, 2009, at p. 4; Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 9; Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at pp. 9-10; Examiner's Interview of Thomas H. Cruikshank, Oct. 8, 2009, at p. 9.

Lehman made a written request for SpinCo's accounting treatment in a confidential letter to the SEC on August 21, 2008.[248]  Lehman requested that the SEC not require SpinCo to provide audited historical financial statements.[249]  It contended that the transfer of assets from Lehman to SpinCo was not an acquisition of a business under S-X Rule 3-05 and Rule 11-01(d), nor were those assets an operating real estate business under S-X Rule 3-14.[250]  Lehman further explained that avoiding mark-to-market accounting was essential:

> [It is] critical to Spinco's asset management philosophy, as well as investors in Spinco, that the accounting framework of Spinco reflect fundamental asset valuations realizable over longer time horizons, as opposed to valuations reflective of current market liquidity.  This is the foundation of Spinco and the key to its success. . . .  If Spinco were subject to fair value accounting, we believe that it would be at a competitive disadvantage to its peers and would not be able to manage the assets in a fundamentally different manner than how Lehman must manage the assets now and therefore would not be able to maximize value for its shareholders.[251]

Lehman's letter stated that under U.S. GAAP an entity that can demonstrate the intent and ability to hold debt securities to maturity is entitled to use "hold to maturity" accounting for those assets.[252]  In SpinCo's case, that meant valuing the bulk of its assets "at amortized cost with amortization of discount or premium under the effective yield

---

[248] Letter from Martin Kelly, Lehman, to Wayne Carnall, SEC, re: why SpinCo is not required to apply fair value accounting (Aug. 21, 2008) [LBEX-DOCID 1298065], attached to e-mail from Robert W. Downes, Sullivan & Cromwell, to Larry Wieseneck, Lehman, *et al*. (Aug. 21, 2008) [LBEX-DOCID 1297924].

[249] *Id*. at pp. 3-7.

[250] *Id*. at pp. 3-4.

[251] *Id*. at p. 2.

[252] *Id*. at pp. 8-9.

method and recognition of any other-than-temporary declines in value in earnings."[253]

However, Lehman's formal request letter also emphasized that SpinCo would use "hold to maturity" accounting only for its post-spin financial reporting.[254] Initially, SpinCo would record the assets on its balance sheet "at their fair value at the date of transfer," and its ongoing quarterly and annual filings would include "fair value-related information in footnotes and supplemental disclosures."[255] The letter stressed that SpinCo would not resemble a liquidating trust.[256]

On August 27, 2008, the SEC responded, telling Lehman that the SEC "[had] not seen a spin off which is not a business (therefore requiring 3 yrs of audited historical financial statements) but are willing to give on this."[257] While the SEC basically conceded the issue of historical financials in Lehman's favor, Lehman's management believed that the SEC was seeking to engage in "horse trading" over the issues.[258] Citing "investor protection" concerns, the SEC offered to grant Lehman waivers of other requirements (*e.g.*, three years' historical financials, auditor-reviewed financial projections and updated projections and financial statements) in exchange for Lehman

---

[253] *Id.* at p. 10.

[254] *Id.* at p. 15.

[255] *Id.*

[256] *Id.* at p. 13 ("We view the profile of [SpinCo's] Initial Assets and the actions necessary to monetize them to be inconsistent with the basic principles of a liquidating trust, for which fair value accounting would be required.").

[257] E-mail from Martin Kelly, Lehman, to Thomas A. Russo, Lehman, *et al.* (Aug. 27, 2008) [LBEX-SIPA 007017].

[258] E-mail from David Goldfarb, Lehman, to Martin Kelly, Lehman, *et al.* (Aug. 27, 2008) [LBEX-SIPA 007017].

agreeing to apply fair value accounting to SpinCo's assets through SFAS 159.[259]  Lehman

resisted those trade-offs, arguing that not using fair value accounting was both

"critical" to SpinCo's success and typical for entities of its type.[260]  Lehman insisted that

its proposed accounting treatment was the "right answer."[261]  Lehman also asked its

accountants, Ernst & Young, to contact the SEC on Lehman's behalf.[262]

On August 28, 2008, Lehman resolved the open issues with the SEC.[263]  The

agreement permitted SpinCo to avoid fair value accounting in exchange for an

agreement to provide updated financial projections for three years.[264]  Lehman agreed

that SpinCo would use "hold to maturity" accounting for its debt securities (with

provisions for expected loan losses) and would not have to use mark-to-market

---

[259] E-mail from Martin Kelly, Lehman, to Thomas A. Russo, Lehman, *et al.* (Aug. 27, 2008) [LBEX-SIPA 007017].

[260] E-mail from David Goldfarb, Lehman, to Martin Kelly, Lehman, *et al.* (Aug. 27, 2008) [LBEX-SIPA 007017].

[261] *Id.*

[262] *Id.*; e-mail from David Goldfarb, Lehman, to William J. Schlich, Ernst & Young (Aug. 28, 2008) [LBEX-DOCID 2997901].

[263] *See* e-mail from Martin Kelly, Lehman, to Larry Wieseneck, Lehman, *et al.* (Aug. 28, 2008) [EY-LE-LBHI-KEYPERS 0907577] ("I spoke with Wayne Carnall [SEC] to accept their offer.  Specific agreement for the record is as follows: Initial 3 yr PFI [Projected Financial Information] prepared on a GAAP basis with no audit attestation.  Annually updated PFI through initial 3 yrs with fixed end date and no audit attestation.  Non-fair value accounting basis as outlined in our letter of August 21.  Waiver on Rule 3-14 with no separate F/S [Financial Statement] required for significant properties subject to exposures being consistent with with those outlined in our letter of August 21.  No historical F/S.  Initial opening audited BS [Balance Sheet] at fair value.  Other portfolio stratification information as outlined in the term sheet."); e-mail from William J. Schlich, Ernst & Young, to Janet E. Truncale, Ernst & Young, *et al.* (Aug 29, 2008) [EY-LE-LBHI-KEYPERS 0162146]; *see also* e-mail from David Goldfarb, Lehman, to Beth Rudofker, Lehman (Aug. 29, 2008) [LBEX-DOCID 1609099] ("We did get agreement from Securities Exhange Commiss yesterday for non-fair value acct'g. We agreed to update projections for 2 years, in lieu. Great answer for us and logical since historical cost acct'g is reflective of business plan.").

[264] *Id.*

accounting for its real estate loan assets.[265]   However, SpinCo would continue to value its equity securities at fair value, and SpinCo's initial balance sheet would be at fair value.[266]   The SEC also agreed not to require SpinCo to file three years of audited historical financial statements.[267]   Goldfarb lauded the result as a "Great answer for us."[268]

By the end of August 2008, Lehman still had not decided whether SpinCo would be organized as a C-corp or a partnership.[269]   Accordingly, Lehman could not resolve whether it would be possible to claim tax-free status for the distribution of SpinCo's assets to Lehman's shareholders.[270]

---

[265] E-mail from Martin Kelly, Lehman, to Larry Wieseneck, Lehman, *et al.* (Aug. 28, 2008) [EY-LE-LBHI-KEYPERS 0907577]; *see also* e-mail from David Goldfarb, Lehman, to Beth Rudofker, Lehman, *et al.* (Aug. 30, 2008) [LBHI_SEC07940_015928]; e-mail from Martin Kelly, Lehman, to Daniel Kerstein, Lehman, *et al.* (Sept. 10, 2008) [LBHI_SEC07940_916922].

[266] E-mail from Martin Kelly, Lehman, to Larry Wieseneck, Lehman, *et al.* (Aug. 28, 2008) [EY-LE-LBHI-KEYPERS 0907577].

[267] *Id.*

[268] E-mail from David Goldfarb, Lehman, to Beth Rudofker, Lehman (Aug. 29, 2008) [LBEX-DOCID 1609099].

[269] Letter from John T. Bostelman, Sullivan & Cromwell, to John White, SEC, re: SpinCo - Proposed Term Sheet (Aug. 19, 2008), at p. 1 [EY-LE-LBHI-KEYPERS 3670025], attached to e-mail from John T. Bostelman, Sullivan & Cromwell, to Larry Wieseneck, Lehman, *et al.* (Aug. 19, 2008) [EY-LE-LBHI-KEYPERS 3670023]; e-mail from Ian T. Lowitt, Lehman, to Daniel Kerstein, Lehman, *et al.* (Aug. 30, 2008) [LBEX-SIPA 003759] ("At the risk of stating the extremely obvious, [a] key issue [in deciding between C-Corp or partnership] is not upsetting our SEC agreement."   Earlier in the same e-mail chain, Yoav Wiegenfeld, Lehman, states to Larry Wieseneck, *et al.*: "If we want to do a tax free spin for shareholders the entity will have to be a c-corp."); Lehman, The Gameplan (Sept. 2008), at p. 3 [LBHI_SEC07940_653637] ("[SpinCo] [l]ikely to be treated as a C-Corp.").

[270] *See, e.g.,* e-mail from Larry Wieseneck, Lehman, to Shaun K. Butler, Lehman, *et al.* (Aug. 29, 2008) [LBHI_SEC07940_651788] ("[W]e can not refer to Spinco as a Liquidating Trust.   It can never be discussed as akin to one not that it is one.   It neither is liquidating nor is it a trust.   I want to highlight this because it is currently referenced as such in the document and this is a huge accounting issue.   If it were a Liq Trust, we would end up in a very bad place accounting wise."); e-mail from Yoav Wiegenfeld, Lehman, to Larry Wieseneck, Lehman, *et al.* (Aug. 30, 2008) [LBEX-SIPA 003759] ("We need to determine whether we can do a tax free spin, which depends on . . . identifying a qualifying active trade or business (we discussed

On September 3, 2008, Fuld reported to the Board that Lehman had received confirmation from the SEC that Lehman had "resolved with the SEC the major points that were required to be addressed for the proposed transaction to proceed," and indeed, that SpinCo was "proceeding nicely."[271]

### D. Early September 2008: Preparing to Announce "REI Global"

In late August 2008, Lehman began to develop a strategy to announce SpinCo to the public during its third quarter earnings call.[272] At the beginning of September 2008, Lehman confirmed to the news media that it was planning to spin off its troubled real estate assets into a separate company; one report called it a "'bad Lehman' spinoff."[273] On September 4, 2008, Lehman learned that Bloomberg was preparing to run a story reporting that Lehman would contribute $5 billion of equity to SpinCo, with "$3 billion

---

Aurora) . . . . We are in the process of vetting Aurora as a qualifying business and once we are comfortable it meets the tax requirements we expect to immediately go to the SEC."). *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 7-8 (Fuld recalled that SpinCo had to be a non-operating entity to avoid mark-to-market treatment, but as a result, the spin-off was no longer tax-free. Fuld said that Lehman never resolved that issue.).

[271] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 3, 2008), at pp. 1-2 [LBEX-AM 003899].

[272] *See* e-mail from Larry Wieseneck, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (Aug. 27, 2008) [LBHI_SEC07940_1237670]; e-mail from Larry Wieseneck, Lehman, to Shaun K. Butler, Lehman, *et al.* (Aug. 29, 2008) [LBHI_SEC07940_651788] (forwarding e-mail draft "Earnings Speech - RSF Remarks," announcing formation of "Lehman Commercial Real Estate Partnership"); e-mail from David Goldfarb, Lehman, to Beth Rudofker, Lehman, *et al.* (Aug. 30, 2008) [LBHI_SEC07940_015933].

[273] Peter Eavis, *Lehman's Sticky Situation - Real Estate Assets Pose Problems Even In Possible Spinoff*, Wall St. J., Sept. 2, 2008, at p. C10.

provided by outside investors (possibly KDB)."[274]   McGee worried that the story may raise false expectations about the SpinCo announcement.[275]

That same day, Lehman gave SpinCo an official name: "Real Estate Investments (REI) Global" ("REI Global").[276]   In Lehman internal "Q&A" presentations, as well as "Gameplan" presentations for investors and rating agencies, Lehman announced that the creation of REI Global would "remove substantially all of our commercial real estate (CRE) exposures," by "transferring the large majority of our commercial real estate-related assets to an appropriately capitalized new entity."[277]   Lehman described REI Global as nearly ready to "launch."[278]   SEC approvals for the new entity were in place, cash flow forecasts were complete, draft balance sheets were being prepared, and the process of determining the required consents and transferring assets to REI Global was underway.[279]   The Gameplan presentation discussed Lehman's decision to sell 55% of IMD, and the need to raise $3 billion in the fourth quarter of 2008, in advance of the

---

[274] E-mail from Monique Wise, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (Sept. 4, 2008) [LBHI_SEC07940_408952].

[275] E-mail from Hugh E. McGee, III, Lehman, to Monique Wise, Lehman, *et al.* (Sept. 4, 2008) [LBHI_SEC07940_408952] ("If we have a story that says we have outside investors for both equity and debt and then show up with no outside investors, it could create issues where we have none.  Spinco is a big positive and we need it to be considered as such.").

[276] E-mail from Beth Anisman, Lehman, to Beth Rudofker, Lehman (Sept. 4, 2008) [LBEX-DOCID 1606873].

[277] Lehman, The Gameplan (September 2008), at p. 2 [LBEX-DOCID 2727667]; Lehman, Q3 Firmwide Q&A - Summary (no date), at p. 45 [LBHI_SEC07940_750660].

[278] Lehman, The Gameplan (September 2008), at p. 6 [LBEX-DOCID 2727667]; Lehman, Q3 Firmwide Q&A - Summary (no date), at p. 49 [LBHI_SEC07940_750660].

[279] *Id.*

spin.[280]  The internal presentation links the IMD sale to the impact of the spin on Lehman's equity capital: "We continue to strengthen our capital position through the sale of [a] majority stake in IMD and through continuing discussions with strategic partners following the planned spin-out of REI Global."[281]

Lehman publicly introduced REI Global as part of its earnings preannouncement on September 10, 2008.[282]

## VI.    DISCUSSIONS WITH POTENTIAL STRATEGIC PARTNERS

This Section supplements the discussion in Section III.A.3.c of the Report by providing details on Lehman's discussions with additional potential strategic partners following the near collapse of Bear Stearns.

### A.  AIG

Lehman held discussions with AIG about a potential transaction starting in 2006 and continuing until after March 2008.  In 2006, Fuld had multiple conversations with Maurice "Hank" R. Greenberg, then Chairman and CEO of AIG, about AIG buying Lehman.[283]  When Greenberg was replaced as AIG's Chairman, those conversations continued with Greenberg's successor, Martin Sullivan.[284]

---

[280] Lehman, The Gameplan (September 2008), at pp. 2, 25, 32 [LBEX-DOCID 2727667].

[281] Lehman, Q3 Firmwide Q&A - Summary (no date), at pp. 3-4, 53-54 [LBHI_SEC07940_750660].

[282] Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008), at p. 4 [LBHI_SEC07940_3466969].  See Section III.A.3.c of the Report, which discusses the Sept. 10 earnings call in greater detail.

[283] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 21.

[284] *Id.*

In 2008, Fuld continued conversations about AIG buying Lehman with Sullivan, and Frank Zarb, a former member of AIG's board and the former acting-Chairman of AIG.[285] In March 2008, Lehman drafted a presentation analyzing a potential merger with AIG, under which AIG would have obtained a 20% stake in Lehman at $50 per share.[286] The presentation described the $50 share price, which was a 25% premium to Lehman's book value, as a "con" of the deal.[287] At some point, Sullivan or Zarb told Fuld that AIG had huge positions of its own to address, and that AIG would not be able to deal with Lehman.[288]

## B. UBS

As early as 2006 or 2007, Fuld met with Marcel Ospel, Chairman of the Board of UBS, to discuss a potential merger.[289] Fuld suggested that Lehman merge with Warburg, UBS's investment banking unit, and that UBS finance the merger, and Lehman run the combined firm.[290] Fuld and Ospel met in Switzerland and New York City in connection with that potential deal.[291] Fuld thought that a possible Lehman merger with UBS remained a real possibility.[292] In February 2008, Lehman drafted an

---

[285] Richard S. Fuld, Jr.,Lehman, Call Logs (various dates) [LBEX-WGM 674311; LBHI_SEC07940_016911]; Yalman Onaran & John Helyar, *Fuld Sought Buffett Offer He Refused as Lehman Sank (Update 1)*, Bloomberg, Nov. 10, 2008; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 21.

[286] Lehman, AIG (March 2008), at p.1 [LBEX-WGM 694967].

[287] *Id*. at p. 2.

[288] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 21.

[289] *Id*. at pp. 21-22.

[290] *Id*. at p. 22.

[291] *Id*.

[292] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 22.

analysis regarding a merger with UBS.[293]  That analysis noted that UBS took significantly larger than expected write-downs in the fourth quarter of 2007, and that UBS also disclosed significant exposure to high risk assets.[294]  However, on April 2, 2008, Ospel was replaced as Chairman of UBS because of its large subprime losses, and subsequently the deal faded away.[295]  Over the course of April and May 2008, there were passing references to potential transactions with UBS by Jeremy M. Isaacs, CEO of LBIE, Jeffrey L. Weiss, Co-Head of Global Finance, and David Goldfarb, Lehman's Global Head of Strategic Partnerships, in e-mails to Fuld, but there were no serious discussions with UBS at that time.[296]

### C.  GE

In late March 2008, Fuld reached out to Jeffrey Immelt, Chairman and CEO of General Electric.[297]  Fuld and Immelt discussed a "deal [f]or 20%" of a strategic stake in Lehman.[298]  According to Paulson, in spring 2008, Fuld had touted GE as a potential investor at the same time that Fuld told Paulson about the potential Buffett

---

[293] Lehman, Presentation, Project Tiger (Feb. 21, 2008) [LBHI_SEC07940_755446], attached to e-mail from Timothy G. Lyons, Lehman, to Christopher M. O'Meara, Lehman (Feb. 27, 2008) [LBHI_SEC07940_755445].

[294] *Id*. at p. 3.

[295] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 22.

[296] *See, e.g.*, e-mail from Jeffrey L. Weiss, Lehman, to Richard S. Fuld, Jr., Lehman (Apr. 3, 2008) [LBHI_SEC07940_033729]; e-mail from Jeremy M. Isaacs, Lehman, to Richard S. Fuld, Jr., Lehman (May 26, 2008) [LBHI_SEC07940_034982]; e-mail from David Goldfarb, Lehman, to Richard S. Fuld, Jr., Lehman (May 29, 2008) [LBHI_SEC07940_035043].

[297] Richard S. Fuld, Jr., Lehman, Call Logs (Mar. 27 - Apr. 1, 2008) [LBHI_SEC07940_016916].

[298] *Id*; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 13.

investment.[299]   Paulson told the Examiner that he thought the idea of GE investing in Lehman was "absurd."[300]   On March 30, 2008, Callan e-mailed Immelt a term sheet for proposed convertible stock.[301]   GE declined to take a strategic stake in Lehman.[302]

In early August 2008, Fuld briefly discussed with Immelt a joint venture with GE to spin off some of the commercial real estate held by Lehman and GE.[303]   Fuld could not recall the details of those discussions, but Fuld assumed that he had received enough "bad vibes" that he did not press the issue[304] and it never went forward.[305]

**D.  Carlos Slim**

On or about June 23, 2008, Steven M. Lessing, Lehman's Head of Client Relationship Management, suggested that Lehman reach out to Carlos Slim, a Mexican telecommunications billionaire and one of the richest men in the world.[306]   In early July 2008, Lehman requested that Jeb Bush, who was a Lehman advisor, discuss "Project Verde" with Slim.[307]   Jeb Bush had joined Lehman in August 2007 as an advisor in the

---

[299] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 12.

[300] *Id.*

[301] Lehman, Term Sheet, Summary Terms of the Proposed Convertible Preferred Stock (Mar. 20, 2008 [LBEX-DOCID 1103972], attached to e-mail from Erin M. Callan, Lehman, to Jeffrey Immelt, General Electric, *et al.* (Mar. 20, 2008) [LBEX-DOCID 1165875].

[302] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 13.

[303] *Id.*; Richard S. Fuld, Jr., Lehman, Call Logs (Aug. 4-5, 2008) [LBHI_SEC07940_016969].

[304] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 13.

[305] *Id.*

[306] *See* e-mail from Stephen M. Lessing, Lehman, to Richard S. Fuld, Jr., Lehman (June 23, 2008) [LBHI_SEC07940_035822]. *Accord* Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 27.

[307] E-mail from Stephen M. Lessing, Lehman, to Richard S. Fuld, Jr., Lehman (June 23, 2008) [LBHI_SEC07940_035822]; e-mail from Jeb Bush, Lehman, to Matt Casner, Lehman (July 5, 2008) [LBHI_SEC07940_212905].

Private Equity Group.[308]  On July 5, 2008, Bush reported that the meeting had been unsuccessful because Slim "did not express interest in jv or stock purchase. he did say he would be interested in looking at assets for sale."[309]  Lehman did not further pursue a strategic partnership with Slim.[310]

### E.   Morgan Stanley

On July 11, 2008, Fuld reached out to John Mack, CEO of Morgan Stanley, regarding a potential merger between Lehman and Morgan Stanley.[311]  Fuld knew that a merger with Morgan Stanley would be challenging because of the overlap between the firms' businesses and their different cultures.[312]  Nonetheless, Fuld requested a meeting with Mack, which took place at Mack's house in Rye, New York on July 12, 2008.[313]

At that meeting, Fuld and Mack, along with other Lehman and Morgan Stanley executives, discussed a potential merger between Lehman and Morgan Stanley.[314]  Fuld

---

[308] Dan Wilchins, *Lehman Hires Jeb Bush as Private Equity Advisor*, Reuters, Aug. 30, 2007, *available at* http://www.reuters.com/article/idUSN3046902620070830.

[309] E-mail from Jeb Bush, Lehman, to Matt Casner, Lehman (July 5, 2008) [LBHI_SEC07940_212905].

[310] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 27.  Fuld characterized the discussions about a deal with Slim as an informal "conversation in the hallway." *Id.*

[311] Richard S. Fuld, Jr., Lehman, Call Logs (July 11, 2008) [LBHI_SEC07940_016962]; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at pp. 27-28.

[312] E-mail from David Goldfarb, Lehman, to Richard S. Fuld, Jr., Lehman (July 11, 2008) [LBHI_SEC07940_036500]; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 28.

[313] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at pp. 27-28.

[314] In his interview with the Examiner, Fuld declined to say one side specifically proposed combining the firms, although the discussion did focus on the impact of such a combination.  Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 28.

and Mack both concluded that there was too much overlap between the two firms for there to be much to gain from a merger.[315]

Fuld and Mack had another conversation some time after that meeting in which Fuld urged that combining Lehman and Morgan Stanley would create a very strong firm.[316] Mack subsequently called Fuld to express concern about who would run that merged company. Fuld responded by telling Mack that he was perfectly willing to step aside for Mack.[317] Ultimately, Mack declined to continue discussions because there was too much overlap between Lehman and Morgan Stanley, and Morgan Stanley could not handle a merger at that time.[318]

On September 9, 2008, Fuld updated the Board on discussions with two unspecified "potential domestic partners."[319] One of those potential partners, which was not named in the Board minutes, was described as having concerns about the degree of overlap between Lehman and its own business.[320]

On September 11, 2008, Fuld told the Board that Fuld had recently contacted Mack about a potential merger, but Mack was not interested because he felt there was

---

[315] Id.
[316] Id.
[317] Id.
[318] Id.
[319] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 9, 2008), at p. 3 [LBEX-AM 003910].
[320] Id.

too much overlap between the firms, and not enough time for Morgan Stanley to announce a deal by September 14, 2008.[321]

Fuld reached out to Mack again on Sunday, September 14, 2008, because Lehman was in a "tough spot."[322]  Mack said there was too much going on for Morgan Stanley to consider a deal with Lehman.[323]

### F.   CITIC

In late July and early August 2008, Lehman discussed a potential transaction with CITIC Securities Company Limited ("CITIC"), a Chinese securities firm.[324]  By mid-July 2008, Fuld was aware of and welcomed contacts with CITIC about a potential transaction[325] and had discussed them with AIG's Greenberg.[326]

On August 2, 2008, Lehman created materials for an upcoming meeting with CITIC.[327]  Those materials included a PowerPoint presentation proposing that the

---

[321] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2008), at p. 2 [LBEX-AM 003918].

[322] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 28.

[323] *Id.*

[324] *Id.*; Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 18; Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 25 (McGee told the Examiner that Gary Parr of Lazard brought CITIC to Lehman as a potential investor).  During his interview with the Examiner, Parr could not recall who "C" might have been when shown a document referencing CITIC as C.  Examiner's Interview of Gary Parr, Sept. 14, 2009, at p. 13.

[325] *See* e-mail from Hugh E. McGee, III, Lehman, to Richard S. Fuld, Jr., Lehman (July 19, 2008) [LBHI_SEC07940_213012]; e-mail from Richard S. Fuld, Jr., Lehman, to Herbert H. McDade, III, Lehman (July 20, 2008) [LBHI_SEC07940_036638]; Examiner's Interview of Richard S. Fuld, Jr., Sept 30, 2009, at p. 30.

[326] Lehman, Richard S. Fuld, Jr., Call Logs (July 25, 28, 2008) [LBHI_SEC07940_016968].

[327] Lehman, Cheat-Sheet - CITIC Securities Strategic Partnership (July 25, 2008) [LBEX-DOCID 492732]; Lehman, Strategic Partnership Discussion Paper (July 25, 2008) [LBEX-DOCID 492750], attached to e-mail from Marisa Forte, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (Aug. 2, 2008) [LBEX-DOCID 556085]; Lehman, Breakfast Meeting outline (Aug. 2, 2008) [LBEX-DOCID 543493], attached to e-mail

parties' transaction should involve Lehman issuing new stock to CITIC, CITIC buying on the market additional Lehman shares totaling 5%, and CITIC issuing new shares to Lehman, representing 5% of CITIC's total shares on the market.[328]   Lehman further proposed that CITIC would receive 33% of Lehman's Asia franchise, and Lehman would receive 33% of CITIC's investment banking in China and 49% of CITIC's fund management in China.[329]   In addition, the proposal called for CITIC to make a net payment to Lehman of between $1.25 billion (based on Lehman's June 23, 2008 share price of $21.10) and $4.66 billion (based on a consensus December 2008 target price of $38.11).[330]

On August 4 and 5, 2008, Fuld and McDade met with CITIC Securities' Chairman and CEO Wang Dong Ming and CITIC securities advisor Donald Tang to discuss a potential transaction.[331]   Prior to the meetings, Fuld had told Geithner that he was in contact with CITIC about a potential transaction.[332]   Geithner advised Fuld that any deal would be welcome, so long as it was not the sort of deal where CITIC invested

---

from Marisa Forte, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (Aug. 2, 2008) [LBEX-DOCID 556085].

[328]   Lehman, Strategic Partnership Discussion Paper (July 25, 2008), at p. 1 [LBEX-DOCID 492750], attached to e-mail from Marisa Forte, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (Aug. 2, 2008) [LBEX-DOCID 556085].

[329]   *Id.*

[330]   *Id.* at p. 2.

[331]   Lehman, Richard S. Fuld, Jr., Call Logs (Aug. 4-5, 2008) [LBHI_SEC07940_016969]; e-mail from Zhizhong Yang, Lehman, to Jasjit Bhattal, Lehman (Sept. 1, 2008) [LBEX-DOCID 2830954]; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 30.

[332]   Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 18.

$1 billion in Lehman and Lehman invested $1 billion in CITIC.[333]  In subsequent meetings with CITIC, Fuld learned that was exactly the kind of deal CITIC was seeking. Fuld felt that the deal CITIC sought called for CITIC's investment in Lehman to be on much more favorable terms than Lehman's investment in CITIC.[334]  Fuld told the Examiner that he left the meetings without a good feeling for the prospect of a possible deal with CITIC.[335]  Lehman did not have any further significant contacts with CITIC.[336]

### G.  Sumitomo Mitsui Banking Corporation

In mid-January 2008, Masayuki Oku, the CEO of Sumitomo Mitsui Banking Corporation ("SMBC"), a Japanese bank, confirmed interest in establishing a strong relationship with Lehman.[337]  In order to achieve that end, SMBC wanted quietly to accumulate shares during February and work on partnering ideas.[338]  SMBC wanted a brief opportunity to perform due diligence prior to investing.[339]  Fuld was scheduled to meet with Oku at the end of February 2008.[340]  There is no evidence to suggest that anything came of those discussions.

---

[333] *Id.*

[334] *Id.*

[335] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 30.

[336] *Id.*

[337] E-mail from Akio Katsuragi, Lehman, to Jasjit Bhattal, Lehman, *et al.* (Jan. 17, 2008) [LBEX-DOCID 2376060].

[338] *Id.*

[339] E-mail from Akio Katsuragi, Lehman, to David Goldfarb, Lehman, *et al.* (Jan. 18, 2008) [LBEX-DOCID 2376060].

[340] E-mail from Akio Katsuragi, Lehman, to Jasjit Bhattal, Lehman, *et al.* (Jan. 17, 2008) [LBEX-DOCID 2376060].

In late March 2008, Goldfarb suggested reaching out to SMBC to solicit interest in Lehman's April capital raise.[341] On March 30, 2008, Jasjit "Jesse" Bhattal, CEO of Lehman Asia-Pacific, spoke with SMBC and learned that although SMBC wanted to participate, timing was an obstacle, given the planned April 1, 2008 announcement of the offering.[342] In late April 2008, Fuld and Goldfarb learned that SMBC was interested in buying $1 billion of Lehman's convertible preferred shares, with the goal being a strategic partnership where SMBC could invest in up to 20% of Lehman.[343] Goldfarb responded that Lehman already had issued convertible preferred and would be interested only if SMBC wanted to buy "real equity."[344] Fuld agreed.[345]

On September 4, 2008, Bhattal informed McDade and McGee that senior executives of SMBC recently told him SMBC that was interested in investing up to $1 billion in "Clean" Lehman.[346] Later that day, Lehman sent a nondisclosure agreement to SMBC.[347] However, on September 5, Lehman learned that SMBC had decided not to

[341] E-mail from David Goldfarb, Lehman, to Jasjit Bhattal, Lehman, *et al.* (Mar. 29, 2008) [LBHI_SEC07940_212271].

[342] E-mail from Larry Wieseneck, Lehman, to Matt Johnson, Lehman, *et al.* (Mar. 30, 2008) [LBHI_SEC07940_084494].

[343] E-mail from Akio Katsuragi, Lehman, to Jasjit Bhattal, Lehman, *et al.* (Apr. 22, 2008) [LBHI_SEC07940_034265]; e-mail from David Goldfarb, Lehman, to Akio Katsuragi, Lehman, *et al.* (Apr. 23, 2008) [LBHI_SEC07940_034265].

[344] E-mail from David Goldfarb, Lehman, to Akio Katsuragi, Lehman, *et al.* (Apr. 22, 2008) [LBHI_SEC07940_034265].

[345] E-mail from Richard S. Fuld, Jr., Lehman, to David Goldfarb, Lehman, *et al.* (Apr. 23, 2008) [LBHI_SEC07940_034265].

[346] E-mail from Jasjit Bhattal, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (Sept. 4, 2008) [LBHI_SEC07940_653470].

[347] Lehman, Non-disclosure Agreement [Draft] (Sept. 4, 2008) [LBEX-DOCID 2862475], attached to e-mail from Brad Whitman, Lehman, to Akio Katsuragi, Lehman, *et al.* (Sept. 4, 2008) [LBEX-DOCID 3056954]; e-

sign the confidentiality agreement because SMBC did not think it could make an

investment decision by the end of the next week.[348]  On September 10, SMBC confirmed

that it still wanted several more days before deciding whether to sign the confidentiality

agreement.[349]  By September 14, Lazard listed SMBC as a party that had no interest in a

sale or strategic investment in Lehman.[350]

### H.    Standard Chartered Bank

In mid-April 2008, Lehman's Chief Risk Officer, Christopher M. O'Meara,

considered the possibility of a combination with Standard Chartered, but he concluded

that Lehman's Executive Committee would not support such a deal.[351]

On July 15, 2008, McDade informed McGee and Fuld that Lehman was in the

process of reaching out to Standard Chartered.[352]  In a September 14, 2008 presentation

---

mail from Akio Katsuragi, Lehman, to Jasjit Bhattal, Lehman, *et al*. (Sept. 5, 2008) [LBHI_SEC07940_653927].

[348] E-mail from Akio Katsuragi, Lehman, to Jasjit Bhattal, Lehman, *et al*. (Sept. 5, 2008) [LBHI_SEC07940_653927].

[349] E-mail from Akio Katsuragi, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (Sept. 10, 2008) [LBHI_SEC07940_409803].

[350] Lazard, Project Green Situation Overview [Draft] (Sept. 14, 2008), at p. 6 [LBHI_SEC07940_410298], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (Sept. 14, 2008) [LBHI_SEC07940_410297].

[351] E-mail from Christopher M. O'Meara, Lehman, to Enrico Corsalini, Lehman (Apr. 14, 2008) [LBEX-DOCID 184119].

[352] E-mail from Hugh E. McGee, III, Lehman, to Herbert H. McDade, III, *et al.* (July 15, 2008) [LBHI_SEC07940_036551].

for Lehman, Lazard listed Standard Chartered as a party that had no interest in a sale or strategic investment in Lehman.[353]

## I.  HSBC

In May and July 2008, Lehman executives made several brief e-mail references to a potential deal with HSBC,[354] but no deal moved beyond the theoretical stage.[355]  Fuld said that he went to London to discuss a strategic partnership with Stephen Green, Group Chairman of HSBC, and that the two had conversations in mid-July 2008, but that those talks were not about a merger or selling Lehman to HSBC.[356]  On September 14, 2008, Lazard listed HSBC as a party that had no interest in a sale or strategic investment in Lehman.[357]

## J.  BNP Paribas

On July 15, 2008, McDade informed McGee and Fuld that Lehman was reaching out to BNP Paribas ("BNPP"), a global banking group headquartered in France.[358]  However, BNPP told Lehman that BNPP was concerned about several issues related to

---

[353] Lazard, Project Green Situation Overview [Draft] (Sept. 14, 2008), at p. 6 [LBHI_SEC07940_410298], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (Sept. 14, 2008) [LBHI_SEC07940_410297].

[354] *See* e-mail from Richard S. Fuld, Jr., Lehman, to David Goldfarb, Lehman (May 16, 2008) [LBHI_SEC07940_034773]; e-mail from David Goldfarb, Lehman, to Richard S. Fuld, Jr., Lehman (May 29, 2008) [LBHI_SEC07940_035043]; e-mail from David Goldfarb, Lehman, to Richard S. Fuld, Jr., Lehman (July 12, 2008) [LBHI_SEC07940_036502].

[355] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 29.

[356] Lehman, Richard S. Fuld, Jr., Call Logs (July 11, 14, 2008) [LBHI_SEC07940_016962]; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 29.

[357] Lazard, Project Green Situation Overview [Draft] (Sept. 14, 2008), at p. 6 [LBHI_SEC07940_410298], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (Sept. 14, 2008) [LBHI_SEC07940_410297].

[358] E-mail from Hugh E. McGee, III, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (July 15, 2008) [LBHI_SEC07940_036551].

Lehman.[359]   Those concerns included the U.S. markets, problems with a European firm running a Wall Street firm and BNPP's preference for a deal with Société Générale.[360] Lehman concluded that BNPP was unlikely to be interested in a deal.[361]   By September 14, 2008, Lazard listed BNPP as a party that had no interest in a sale or strategic investment in Lehman.[362]

### K.  Royal Bank of Canada

On July 15, 2008, McDade informed McGee and Fuld that Lehman was reaching out to Royal Bank of Canada.[363]   However, Lazard's September 14, 2008 presentation listed Royal Bank of Canada as a party that had no interest in a sale or strategic investment in Lehman.[364]

### L.  Société Générale

On July 15, 2008, McDade told McGee and Fuld that Lehman was exploring Société Générale as a potential partner.[365]   However, the September 14, 2008 Lazard

---

[359] E-mail from Antonio Villalon, Lehman, to Jeffrey L. Weiss, Lehman (July 17, 2008) [LBHI_SEC07940_644715].

[360] *Id.*

[361] *Id.*

[362] Lazard, Project Green Situation Overview [Draft] (Sept. 14, 2008), at p. 6 [LBHI_SEC07940_410298], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (Sept. 14, 2008) [LBHI_SEC07940_410297].

[363] E-mail from Hugh E. McGee, III, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (July 15, 2008) [LBHI_SEC07940_036551].

[364] Lazard, Project Green Situation Overview [Draft] (Sept. 14, 2008), at p. 6 [LBHI_SEC07940_410298], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (Sept. 14, 2008) [LBHI_SEC07940_410297].

[365] E-mail from Hugh E. McGee, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (July 15, 2008) [LBHI_SEC07940_036551].

presentation listed Société Générale as a party that had no interest in a sale or strategic investment in Lehman.[366]

## M. Lloyds

On July 15, 2008, McDade described Lloyds as a party to whom Lehman might reach out.[367] The July 22, 2008 Discussion Materials for the Board presentation lists Lloyds as a party that had not been contacted.[368] The Examiner's investigation did not uncover any evidence that Lehman contacted Lloyds about a partnership.

## N. Mitsubishi UFJ Financial Group

In September 2008, the *Times Online U.K.* reported rumors that Mitsubishi UFJ Financial Group ("Mitsubishi"), a Japanese bank, would invest in Lehman.[369] On September 4, a Mitsubishi company spokesperson confirmed that Mitsubishi would not invest in Lehman.[370] On September 14, Lazard listed Mitsubishi a party that had no interest in a sale or strategic investment in Lehman.[371]

---

[366] Lazard, Project Green Situation Overview [Draft] (Sept. 14, 2008), at p. 6 [LBHI_SEC07940_410298], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (Sept. 14, 2008) [LBHI_SEC07940_410297].

[367] E-mail from Hugh E. McGee, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (July 15, 2008) [LBHI_SEC07940_036551].

[368] Lehman, Discussion Materials for the Board of Directors (July 22, 2008), at p. 7 [LBHI_SEC07940_028484].

[369] Leo Lewis, *Tokyo Mitsubishi Joins Queue of Suitors for Lehman Brothers*, Times Online, Sept. 4, 2008, *available at* http://business.timesonline.co.uk/tol/business/industry_sectors/banking_and_finance/article4670213.ece; e-mail from Mark Lane, Lehman, to Scott J. Freidheim, Lehman, *et al.* (Sept. 3, 2008) [LBEX-DOCID 2882961] (forwarding article from The Times).

[370] E-mail from Ted Holzman, Sandler O'Neill, to Jeffrey Harte, Sandler O'Neill (Sept. 4, 2008) [LBEX-SON 016361] (forwarding article from Dow Jones).

[371] Lazard, Project Green Situation Overview [Draft] (Sept. 14, 2008), at p. 6 [LBHI_SEC07940_410298], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (Sept. 14, 2008) [LBHI_SEC07940_410297].

### O.  Nomura Securities

On September 10, 2008, Nomura Securities met with Lehman's representatives and said it was interested in a strategic partnership with Lehman.[372]  Nomura said that it would closely analyze Lehman's third quarter numbers.[373]   On September 12, 2008, Bhattal had a meeting at Nomura, which he described as "very interesting."[374]   On September 14, 2008, Lazard noted that Lehman had "recent inbound inquiries" from Nomura.[375]

On September 22, 2008, Nomura bid successfully for Lehman's Asian operations, beating out Standard Chartered, Barclays, CITIC, and Samsung Securities.[376]

### P.  Potential Partners Approached by Lehman

By September 14, 2008, Lehman had contacted more than 30 potential strategic partners.[377]   In addition to the parties discussed above, Lehman contacted numerous other entities.

---

[372] *See* e-mail from Akio Katsuragi, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (Sept. 10, 2008) [LBHI_SEC07940_409803].

[373] *Id.*

[374] E-mail from Jasjit Bhattal, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (Sept. 12, 2008) [LBHI_SEC07940_656143].

[375] Lazard, Project Green Situation Overview [Draft] (Sept. 14, 2008), at p. 5 [LBHI_SEC07940_410298], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (Sept. 14, 2008) [LBHI_SEC07940_410297].

[376] Vivian Wai-yin Kwok, *Nomura Wins The Lehman Asian Stakes*, Forbes.com, Sept. 22, 2008, *available at* http://www.forbes.com/2008/09/22/nomura-lehman-deal-markets-equity-cx_vk_0922markets03.html.

[377] Lazard, Project Green Situation Overview [Draft] (Sept. 14, 2008), at p. 5 [LBHI_SEC07940_410298], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (Sept. 14, 2008) [LBHI_SEC07940_410297].

Lehman approached Banco Bilbao Vizcaya Argentaria ("BBVA") during July 2008.[378]  Although BBVA met with Lehman, BBVA was focused on retail banking and not interested in Lehman.[379]

Kohlberg, Kravis & Roberts performed due diligence, but by September 14, 2008, was not interested in a potential transaction with Lehman.[380]

Lehman had exploratory discussions with Texas Pacific Group and Warburg Picnus but neither party expressed interest in a transaction with Lehman.[381]

By September 14, 2008, Lehman also had approached Bank of China, Deutsche Bank, Abu Dhabi Investment Authority, The Carlyle Group, Chinese Investment Corp., Kuwait Investment Authority, Kuwait Industries, Mubadala Development Company and Qatar Investment Authority, but none of these parties were interested in even having discussions regarding a potential transaction.[382]

---

[378] Lehman, Discussion Materials for the Board of Directors (July 22, 2008), at p. 7 [LBHI_SEC07940_028484].

[379] *Id.*

[380] Lazard, Project Green Situation Overview [Draft] (Sept. 14, 2008), at p. 5 [LBHI_SEC07940_410298], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (Sept. 14, 2008) [LBHI_SEC07940_410297].

[381] *Id.*

[382] *Id.* at p. 6.

# APPENDIX 14:  VALUATION - CDO

Appendix 14 provides the Examiner's model prices for the Collateralized Debt Obligation ("CDO") securities tested and the assumptions used in performing this valuation.  These model prices are discussed in Sections III.A.2.i(2)(a) & (3) of the Report.  This analysis was performed by Duff & Phelps, the Examiner's financial advisor.

**CDO Positions, Examiner's Model Price as of May 31, 2008**

A total of $544.5 million of CDO assets were tested by the Examiner's financial advisor as of May 31, 2008.  The Examiner's financial advisor's marks are summarized below:

| Name | Cusip | Asset Composition | Original Rating: Moody's/S&P/Fitch | May 2008 Rating: Moody's/S&P/Fitch | Price |
|---|---|---|---|---|---|
| CEAGO 2007-1A A1 | 14984XAA6 | RMBS - Midprime and Subprime | Aaa/AAA/NA | Baa2/BB/NA | 65.1 |
| CEAGO 2007-1A A2 | 14984XAC2 | RMBS - Midprime and Subprime | Aaa/AAA/NA | B2/CCC+/NA | 26.3 |
| CEAGO 2007-1A B | 14984XAD0 | RMBS - Midprime and Subprime | Aa2/AA/NA | B3/CCC/AA+ | 16.6 |
| CEAGO 2007-1A C | 14984XAE8 | RMBS - Midprime and Subprime | A2/A/NA | Ca/CCC-/NA | 0.9 |
| CEAGO 2007-1A D | 14984XAF5 | RMBS - Midprime and Subprime | Baa2/BBB+/NA | C/A/A | 1.1 |
| CEAGO 2007-1A S | 14984XAB4 | RMBS - Midprime and Subprime | Aaa/AAA/NA | A1/A/NA | 84.2 |
| CBRE 2007-1A D | 1248MLAL7 | 50% CMBS; 16% CMBS - Credit Tenanat Lease; 26% REIT | A2/A/A | A2/A/A | 50.4 |
| CBRE 2007-1A E | 1248MLAN3 | 50% CMBS; 16% CMBS - Credit Tenanat Lease; 26% REIT | A3/A-/A- | A3/A-/A- | 50.7 |
| ACCDO 5A B | 00388EAB7 | Mostly RMBS - Prime | NA/AA/AA | NA/AA/AA+ | 40.3 |
| NEWCA 2005-7A 3 | 651065AE4 | 50% CMBS Conduit; 20% RMBS; 10% CMBS Large Loans | A3/A/A | A3/A/A | 50.7 |

As discussed above, the assumptions used in estimating the prices for each CUSIP are as follows:

| Name | Cusip | Discount Margin (DM) | Default Rate (CDR) | Conditional Prepayment Rate (CPR) | Loss Severity | Forecasted Collateral Loss |
|---|---|---|---|---|---|---|
| CEAGO 2007-1A A1 | 14984XAA6 | 659 bps | Default Rate Curve | 1.0% | 55% | 27.5% |
| CEAGO 2007-1A A2 | 14984XAC2 | 1747 bps | Default Rate Curve | 1.0% | 55% | 27.5% |
| CEAGO 2007-1A B | 14984XAD0 | 4009 bps | Default Rate Curve | 1.0% | 55% | 27.5% |
| CEAGO 2007-1A C | 14984XAE8 | 4249 bps | Default Rate Curve | 1.0% | 55% | 27.5% |
| CEAGO 2007-1A D | 14984XAF5 | 4250 bps | Default Rate Curve | 1.0% | 55% | 27.5% |
| CEAGO 2007-1A S | 14984XAB4 | 659 bps | Default Rate Curve | 1.0% | 55% | 27.5% |
| CBRE 2007-1A D | 1248MLAL7 | 1003 bps | 0.1% | 0.0% | 68% | 5.8% |
| CBRE 2007-1A E | 1248MLAN3 | 1003 bps | 0.1% | 0.0% | 68% | 5.8% |
| ACCDO 5A B | 00388EAB7 | 1747 bps | Default Rate Curve | 8.0% | 55% | 13.0% |
| NEWCA 2005-7A 3 | 651065AE4 | 1003 bps | 3.0% | 1.0% | 68% | 12.0% |

A monthly default curve was used for Ceago and ACCDO, which are CDOs backed by RMBS. The default curve construction was done at the RMBS level by converting ABX indices prices to representative default rates. The default rate curve changed between May 2008 and August 2008 because of changes in the ABX indices values. NEWCA and CBRE are CDOs backed primarily by CMBS and conduit loans, which typically do not require complex default rate modeling; therefore, a constant default rate was assumed for these CDOs.

The constant default rates for May 2008 and August 2008 were obtained from Moody's research reports. In order to estimate prepayment rates, the Examiner's financial advisor analyzed the recent amortization history of the underlying collateral securities. The Examiner's financial advisor estimated the recovery rates by computing the weighted average recoveries of each collateral security, as reported by the three rating agencies, S&P, Moody's and Fitch. The discount margins were obtained from

JPMorgan Structured Finance research reports for May 2008 and August 2008 based on the ratings of the CDO tranches.

**CDO Positions, Examiner's Model Price as of August 31, 2008**

A total of $415.5 million of CDO assets were tested by the Examiner's financial advisor as of August 31, 2008. The Examiner's financial advisor's marks are summarized below:

| Name | Cusip | Asset Composition | Original Rating: Moody's/S&P/Fitch | August 2008 Rating: Moody's/S&P/Fitch | Price |
|---|---|---|---|---|---|
| CEAGO 2007-1A A1 | 14984XAA6 | RMBS - Midprime and Subprime | Aaa/AAA/NA | Baa2/BB/NA | 59.9 |
| CEAGO 2007-1A A2 | 14984XAC2 | RMBS - Midprime and Subprime | Aaa/AAA/NA | B2/CCC+/NA | 21.0 |
| CEAGO 2007-1A B | 14984XAD0 | RMBS - Midprime and Subprime | Aa2/AA/NA | B3/CCC/AA+ | 12.3 |
| CEAGO 2007-1A C | 14984XAE8 | RMBS - Midprime and Subprime | A2/A/NA | Ca/CCC-/NA | 1.0 |
| CEAGO 2007-1A D | 14984XAF5 | RMBS - Midprime and Subprime | Baa2/BBB+/NA | C/A/A | 1.2 |
| CEAGO 2007-1A S | 14984XAB4 | RMBS - Midprime and Subprime | Aaa/AAA/NA | A1/A/NA | 80.1 |
| CBRE 2007-1A D | 1248MLAL7 | 50% CMBS; 16% CMBS - Credit Tenanat Lease; 26% REIT | A2/A/A | A2/A/A | 42.5 |
| CBRE 2007-1A E | 1248MLAN3 | 50% CMBS; 16% CMBS - Credit Tenanat Lease; 26% REIT | A3/A-/A- | A3/A-/A- | 42.7 |
| ACCDO 5A B | 00388EAB7 | Mostly RMBS - Prime | NA/AA/AA | NA/AA/AA+ | 31.6 |
| NEWCA 2005-7A 3 | 651065AE4 | 50% CMBS Conduit; 20% RMBS; 10% CMBS Large Loans | A3/A/A | A3/A/A | 39.0 |

As discussed above, the assumptions used in estimating the prices for CUSIP are as follows:

| Name | Cusip | Discount Margin (DM) | Default Rate (CDR) | Conditional Prepayment Rate (CPR) | Loss Severity | Forecasted Collateral Loss |
|------|-------|---------------------|-------------------|-----------------------------------|---------------|----------------------------|
| CEAGO 2007-1A A1 | 14984XAA6 | 873 bps | Default Rate Curve | 1.0% | 55% | 32.0% |
| CEAGO 2007-1A A2 | 14984XAC2 | 2317 bps | Default Rate Curve | 1.0% | 55% | 32.0% |
| CEAGO 2007-1A B | 14984XAD0 | 5398 bps | Default Rate Curve | 1.0% | 55% | 32.0% |
| CEAGO 2007-1A C | 14984XAE8 | 5629 bps | Default Rate Curve | 1.0% | 55% | 32.0% |
| CEAGO 2007-1A D | 14984XAF5 | 5629 bps | Default Rate Curve | 1.0% | 55% | 32.0% |
| CEAGO 2007-1A S | 14984XAB4 | 873 bps | Default Rate Curve | 1.0% | 55% | 32.0% |
| CBRE 2007-1A D | 1248MLAL7 | 1406 bps | 2.3% | 0.0% | 64% | 3.0% |
| CBRE 2007-1A E | 1248MLAN3 | 1406 bps | 2.3% | 0.0% | 64% | 3.0% |
| ACCDO 5A B | 00388EAB7 | 2317 bps | Default Rate Curve | 8.0% | 55% | 19.0% |
| NEWCA 2005-7A 3 | 651065AE4 | 1406 bps | 3.7% | 1.0% | 82% | 18.0% |

# APPENDIX 15: NARRATIVE OF SEPTEMBER 4 THROUGH 15, 2008

Appendix 15 discusses the events between September 4, 2008 and September 15, 2008 in chronological order, as a reference in support of the text of Sections III.A.3 and 5, and III.C.6 of the Report.[1]  A chart of Lehman's stock price by the hour leads the discussion of each day.

I.   September 4, 2008................................................................................................. 4

    A.  JPMorgan met with Lehman. ........................................................................ 5

    B.  Lehman approached David L. Sokol about SpinCo financing............................ 7

II.  September 5, 2008................................................................................................. 8

    A.  JPMorgan considered Leman's condition and prospects. ..................................... 10

       1.  JPMorgan's feedback on Rating Agency Presentation ...................................... 10

       2.  JPMorgan warned Lehman that additional collateral may be required. ......... 10

       3.  JPMorgan talked to KDB. ............................................................................... 12

    B.  Citi internally downgraded Lehman's creditworthiness........................................ 13

III.  September 7, 2008................................................................................................ 13

IV.  September 8, 2008................................................................................................ 14

    A.  BofA agreed to begin due diligence. ..................................................................... 15

    B.  Lehman previewed its third quarter 2008 results to Citi. ...................................... 16

V.   September 9, 2008................................................................................................ 17

    A.  KDB's announcement................................................................................... 19

    B.  Rating agencies reacted............................................................................... 20

    C.  Lehman updated its Board. .......................................................................... 21

---

[1] Order Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code, at p. 4, Dkt. No. 2569, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 16, 2009).

D. Lehman executed cash deeds with HSBC. ......................................................................... 22

E. JPMorgan requests an additional $5 billion in collateral. ....................................... 23

F. The JPMorgan Security Agreement, Guaranty, and Amendment to the Clearance agreement ................................................................................................................. 24

VI. September 10, 2008 ................................................................................................................ 25

A. Lehman's pre-announcement earnings conference call. ........................................ 26

B. Moody's placed Lehman's rating on review. ........................................................... 28

C. Citi told Lehman it cut trading lines. ....................................................................... 29

D. Lehman began initial bankruptcy planning. .......................................................... 29

E. The FRBNY's agenda for meetings regarding Lehman. ........................................ 30

F. Barclays contacted the FSA. ...................................................................................... 31

VII. September 11, 2008 ................................................................................................................ 31

A. Fuld resigned from the FRBNY Board. ................................................................... 32

B. BofA began due diligence. ......................................................................................... 33

C. Barclays expressed interest in Lehman. ................................................................... 34

D. JPMorgan requested additional collateral. ............................................................. 35

E. Weil Gotshal continued to prepare for Lehman bankruptcy. ............................. 36

F. Lehman's management updated the Board. ............................................................ 37

VIII. September 12, 2008 ................................................................................................................ 39

A. Lehman began discussions with Barclays. .............................................................. 40

B. Lehman's negotiations with BofA. ........................................................................... 43

C. Meetings at the FRBNY. ............................................................................................. 44

D. Management disclosed bankruptcy planning to the Board. ................................. 45

E.  Lehman's Compensation Committee met...................................................46

F.  Citi amended its Clearing Agreement. ..................................................47

G.  Lehman posted $5 billion in cash to JPMorgan.....................................47

H.  Liquidity Pool.....................................................................................47

IX.  September 13, 2008...................................................................................48

A.  Negotiations with BofA failed. ...........................................................48

B.  Barclays discussions continued. ..........................................................49

C.  FRBNY informed that bankruptcy planning was skeletal......................51

X.  September 14, 2008....................................................................................52

A.  The FSA refused to waive the shareholder approval requirement for the Barclays
    deal....................................................................................................53

B.  Lehman reached out to Morgan Stanley. ..............................................54

C.  Fuld learned about the United Kingdom's "rule of insolvency."...........54

D.  FRBNY. ............................................................................................55

    1.  Wall Street consortium agreed to provide $20 billion to facilitate Barclays'
        acquisition of Lehman. ..............................................................55

    2.  Lehman developed a plan for an orderly liquidation. ...................55

    3.  Sunday meetings at the FRBNY................................................56

    4.  The FRBNY expands the PDCF window....................................56

    5.  The FRBNY directed Lehman to file for bankruptcy...................58

E.  Lehman suggested a sale in bankruptcy to Barclays..............................59

F.  The September 14, 2008 Board meeting................................................59

XI.  September 15, 2008...................................................................................62

A.  Lehman files for bankruptcy protection................................................62

B.   JPMorgan's clearing activities. ................................................................... 62

C.   The FRBNY's limitation on acceptable collateral. .................................. 63

D.   Negotiations between Lehman and Barclays. ......................................... 64

## I.   SEPTEMBER 4, 2008

During the day on Thursday, September 4, 2008, JPMorgan met with Lehman to discuss Lehman's anticipated third quarter results.[2]  That same day, Lehman presented the SpinCo plan to David L. Sokol, the President of MidAmerican Energy Holdings Co., a company majority-owned by Berkshire Hathaway, as part of Lehman's efforts to attract outside financing.[3]

That day, Lehman's stock opened at $16.73, down from the previous day's close at $16.94.  At that point, Lehman's stock had lost over 60% of its value since March 14, 2008, which was the last trading day prior to the near collapse of Bear Stearns.[4]

---

[2] JPMorgan, Lehman Brothers Holdings Inc. Briefing Memorandum (Sept. 4, 2008), at p. 1 [JPM-2004 0006171], attached to e-mail from Mark G. Doctoroff, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 3, 2008) [JPM-2004 0006170]; *see also* Lehman, JPMorgan Agenda (Sept. 4, 2008) [LBEX-DOCID 445367], attached to e-mail from Emil Cornejo, Lehman, to Emil Cornejo, Lehman (Sept. 3, 2008) [LBEX-DOCID 458321].

[3] Lehman, The Gameplan (Sept. 2008) [LBHI_SEC07940_653681], attached to e-mail from Hugh E. McGee, III, Lehman, to David L. Sokol, MidAmerican Energy Holdings Co., *et al.* (Sept. 4, 2008) [LBHI_SEC07940_653680].  *Accord* Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 17; Examiner's Interview of David L. Sokol, Sept. 22, 2009, at p. 4.

[4] *See* Yahoo! Finance, Historical LEH stock prices, *available at* http://finance.yahoo.com/q?s=LEHMQ.PK.

**LBHI Stock Price: Sept. 4, 2008**



### A. JPMorgan Met with Lehman

On Thursday, September 4, 2008, Barry L. Zubrow, JPMorgan's Chief Risk Officer, and a group of JPMorgan executives met with Lehman's Chief Financial Officer, Ian T. Lowitt, Global Treasurer, Paolo R. Tonucci and Chief Risk Officer, Christopher M. O'Meara, to discuss Lehman's third quarter results, which were scheduled to be released on September 18, 2008.[5] In preparation for the meeting, JPMorgan prepared a briefing memorandum about, and its executives discussed, Lehman's "strategy and challenges." These issues included Lehman's anticipated additional write-downs on

---

[5] *See* JPMorgan, Lehman Brothers Holdings Inc. Briefing Memorandum (Sept. 4, 2008), at p. 1 [JPM-2004 0006171, attached to e-mail from Mark G. Doctoroff, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 3, 2008) [JMP-2004 0006170]; *see also* Lehman, JPMorgan Agenda (Sept. 4, 2008) [LBEX-DOCID 445367], attached to e-mail from Emil Cornejo, Lehman, to Emil Cornejo, Lehman (Sept. 3, 2008) [LBEX-DOCID 458321].

real estate assets, a potential capital injection from KDB, the sale of all or part of the Investment Management Division ("IMD") and SpinCo.[6]   The meeting was an opportunity for Lowitt to update JPMorgan on Lehman's third quarter earnings and the status of SpinCo.[7]

The meeting focused on SpinCo, but the companies' executives also discussed issues concerning valuations of Lehman's collateral, triparty repo and Lehman's posted collateral.[8]   Lehman told JPMorgan that it believed JPMorgan was overcollateralized against Lehman's intraday risk.[9]   In its briefing memorandum, JPMorgan recognized that Lehman disagreed with JPMorgan's collateral valuations and JPMorgan also felt that collateral substitutions might be necessary.[10]   The memorandum noted that

---

[6] JPMorgan, Lehman Brothers Holdings Inc. Briefing Memorandum (Sept. 4, 2008), at p. 1 [JPM-2004 0006171], attached to e-mail from Mark G. Doctoroff, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 3, 2008) [JMP-2004 0006170] ("There is a strong desire at [Lehman] to have open and frank dialogue with JPM at all levels of our organizations. . . .  As [Lehman]'s primary operating services provider, [Lehman] management want to ensure that we are fully briefed on their strategy and challenges as they need our support to operate their business.").

[7] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at pp. 10-11.

[8] *See* JPMorgan, Lehman Brothers Holdings Inc. Briefing Memorandum (Sept. 4, 2008), at p. 2 [JPM-2004 0006171], attached to e-mail from Mark G. Doctoroff, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 3, 2008) [JMP-2004 0006170].  *Accord* Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 7; Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 11; Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 17.  See Section III.A.5.b of the Report, which discusses the September 4, 2008 meeting between Lehman and JPMorgan in greater detail.

[9] *Id*.

[10] JPMorgan, Lehman Brothers Holdings Inc. Briefing Memorandum (Sept. 4, 2008), at p. 2 [JPM-2004 0006171], attached to e-mail from Mark G. Doctoroff, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 3, 2008) [JMP-2004 0006170].

Lehman's collateral postings were "part of [its] liquidity pool . . . despite their less than cash liquidity profile."[11]

Lehman presented its SpinCo plan at the meeting; however, JPMorgan left the meeting with doubts about the plan's viability.[12]   Zubrow did not understand how Lehman could infuse enough money into SpinCo to cover the exposure of SpinCo's real estate loans.[13]   Zubrow told Lowitt that Lehman needed to provide more clarity on SpinCo because without that clarity, Lehman would "spook" the market with a SpinCo announcement.[14]   Tonucci confirmed that JPMorgan expressed doubts about SpinCo's viability when Lehman first presented the idea to JPMorgan on September 4.[15]

JPMorgan offered to assist Lehman by providing feedback on Lehman's draft presentations on SpinCo prior to Lehman's upcoming meetings with rating agencies.[16] On the evening of September 4, Tonucci sent JPMorgan a draft version of a presentation Lehman intended for rating agencies, seeking JPMorgan's comments.[17]

### B.   Lehman Approached David L. Sokol About SpinCo Financing

On September 4, 2008, Hugh "Skip" E. McGee, III, head of Lehman's Investment Banking Division, sent Sokol, a copy of the "The Gameplan," which outlined Lehman's

---

[11] *Id.*
[12] Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at p. 15.
[13] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 7.
[14] *Id.*
[15] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 11.
[16] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 7.
[17] E-mail from Paolo R. Tonucci, Lehman, to Mark G. Doctoroff, JPMorgan, *et al.* (Sept. 4, 2008) [JPM-2004 0006300].

survival plans focusing on SpinCo.[18]  Lehman's President and Chief Operating Officer, Herbert "Bart" H. McDade, III, and McGee also had a telephone call with Sokol, during which they explained a "good bank/ bad bank" plan (*i.e.*, SpinCo) and that Lehman would need an investor to execute the plan.[19]  Sokol was not interested in investing in SpinCo.  Sokol relayed the idea to Berkshire Hathaway's Chief Executive Officer ("CEO"), Warren E. Buffett,[20] but Sokol did not give Buffett "The Gameplan."[21]  During that discussion, Buffett dismissed the idea as unrealistic.[22]

## II.  SEPTEMBER 5, 2008

On Friday, September 5, 2008, JPMorgan provided Lehman feedback from the September 4, 2008 meeting.[23]  That same day, Zubrow called Lowitt to warn him that JPMorgan might request an additional $5 billion in collateral to protect against an adverse market reaction to Lehman's plans.[24]  JPMorgan learned from Korea Development Bank ("KDB") that Lehman's negotiations with KDB were not

---

[18] *See* Lehman, The Gameplan (Sept. 2008) [LBHI_SEC07940_653681], attached to e-mail from Hugh E. McGee, III, Lehman, to David L. Sokol, MidAmerican Energy Holdings Co., *et al.* (Sept. 4, 2008) [LBHI_SEC07940_653680].  *Accord* Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 17; Examiner's Interview of David L. Sokol, Sept. 22, 2009, at p. 4.

[19] Examiner's Interview of David L. Sokol, Sept. 22, 2009, at p. 4.

[20] Berkshire Hathaway owned a majority of MidAmerican Energy Holdings Co.

[21] *Id.*  Sokol does not recall specifically whether he communicated Lehman's SpinCo plan to Buffett.  *Id.* at p. 3.  However, Buffett recalled Sokol briefing him on the basic contours of the plan – or at least, a "thing they tossed out" about a CRE spin.  Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 4.

[22] Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 4.

[23] E-mail from Mark G. Doctoroff, JPMorgan, to Paolo R. Tonucci, Lehman (Sept. 5, 2008) [LBHI_SEC07940_556179].

[24] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 10.

advancing.[25]    On September 5, 2008, Citigroup internally downgraded Lehman's creditworthiness.[26]

That Friday, Lehman's stock opened at $14.71, down from Thursday's close at $15.17.  Over the course of the day, Lehman's stock climbed upward to close at $16.20.[27]

**LBHI Stock Price: Sept. 5, 2008**



[25] E-mail from Steven Lim, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al.* (Sept. 5, 2008) [JPM-2004 0006258].

[26] *See* e-mail from Melissa J. Torres, Citigroup, to John J. Foley, Citigroup, *et al.* (Sept. 6, 2008) [CITI-LBHI-EXAM 00088683] (noting this change was made on Friday, September 5, 2008); *see also* e-mail from Gregory Frenzel, Citigroup, to NA IRM Weekly Updates group, Citigroup (Sept. 7, 2008) [CITI-LBHI-EXAM 00107376] (Frenzel's weekly update from September 5, 2008); e-mail from Michael Mauerstein, Citigroup, to Katherine Lukas, Citigroup, *et al.* (Sept. 8, 2008) [CITI-LBHI-EXAM 00051890] (noting that the classification "is strictly an internal Citi matter," they have not communicated anything to Lehman about the change in its internal classification of Lehman, nor has Citi changed its operations with Lehman due to the classification change).

[27] *See* Yahoo! Finance, Historical LEH stock prices, *available at* http://finance.yahoo.com/q?s=LEHMQ.PK.

### A. JPMorgan Considered Lehman's Condition and Prospects

#### 1. JPMorgan's Feedback on Rating Agency Presentation

On Friday, September 5, Mark G. Doctoroff, an executive director at JPMorgan, sent an e-mail to Tonucci conveying the compiled JPMorgan feedback on Lehman's rating agencies presentation, which Tonucci had sent to JPMorgan the previous day.[28] Among other concerns, JPMorgan flagged several areas where it felt Lehman needed to provide more specific information, including: an operations timeline with specific dates and information, more aggressive expense reduction and other items such as management changes.[29] JPMorgan executives also suggested more of a focus on liquidity, especially over the 12 to 18 months ahead.[30] JPMorgan further suggested that Lehman's Chief Executive Officer, Richard S. Fuld, Jr., participate in future rating agency meetings.[31] Tonucci agreed with JPMorgan's feedback and said that he would push Fuld to participate in future meetings with the agencies.[32]

#### 2. JPMorgan Warned Lehman that Additional Collateral May Be Required

At a September 5, 2008 JPMorgan Investment Bank Risk Committee ("IBRC") meeting, IBRC members discussed investment banks, trading, markets and the

---

[28] *See* e-mail from Mark G. Doctoroff, JPMorgan, to Paolo R. Tonucci, Lehman (Sept. 5, 2008) [LBHI_SEC07940_556179].

[29] *See id*.

[30] *Id*.

[31] *Id*.

[32] E-mail from Mark G. Doctoroff, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al*. (Sept. 5, 2008) [JPM-2004 0006304].

skittishness of hedge funds regarding novations.[33]  JPMorgan also discussed the risk of runs on the banks, with particular concerns about Lehman and Merrill Lynch.[34] JPMorgan shared information discussed in IBRC meetings with the FRBNY.[35]

Late in the day on September 5, 2008, Zubrow called Lowitt to tell him that JPMorgan might need an additional $5 billion in collateral due to its concerns about an adverse market reaction to Lehman's plans.[36]  Zubrow characterized the call as a "place-marker" in case JPMorgan followed through with a collateral request.[37]  According to Zubrow, Lowitt said that although he hoped that JPMorgan would not make the request, he understood the nature of the situation.[38]  Lowitt told the Examiner that he recalled speaking with Zubrow on September 5, but only vaguely recalled Zubrow suggesting that JPMorgan might need more collateral.[39]  According to Lowitt, the focus of the conversation was the draft rating agency presentation.[40]

---

[33] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 6.  Lehman was aware by the end of July 2008 that novation requests were increasing, and some banks besides JPMorgan were declining novation requests from Lehman counterparties.  *See* e-mail from Eric Felder, Lehman, to Ian T. Lowitt, Lehman, *et al.* (July 28, 2008) [LBEX-DOCID 028924].

[34] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 6.

[35] *Id.* at p. 11; *see* e-mail from Arthur G. Angulo, FRBNY, to Timothy F. Geithner, FRBNY, *et al.* (Sept. 10, 2008) [FRBNY to Exam. 014605] (attaching September 7, 2008 JPMorgan "Lehman Brothers Exposure Overview").  See Section III.A.5.b of the Report, which discusses the details of this meeting in greater detail.

[36] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 10.

[37] *Id.*

[38] *Id.*

[39] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 18.

[40] *Id.*  See Section III.A.5.b of the Report, which discusses JPMorgan's analysis and basis for requiring additional collateral in greater detail.

### 3. JPMorgan Talked to KDB

On September 5, 2008, Steven Lim, JPMorgan's Senior Country Officer and Managing Director in Investment Banking for Korea, sent an internal e-mail to James "Jamie" L. Dimon, CEO of JPMorgan, Steven D. Black, Co-CEO of JPMorgan and other JPMorgan executives about a draft letter pitching JPMorgan as KDB's investment banker for its deal with Lehman.[41]  Lim's e-mail noted that KDB previously worked with Perella Weinberg Partners in connection with its negotiations with Lehman, but also reported that KDB had said that JPMorgan was the only investment bank with which KDB spoke.[42]  In his e-mail, Lim stated that he did not believe Lehman would be able to get a deal done with KDB by Lehman's September 10, 2008 deadline.[43]

During an internal meeting that same day, JPMorgan observed that a deal between Lehman and KDB did not seem to be moving forward.[44]  JPMorgan considered the status of Lehman's negotiations with KDB to be another sign of Lehman's deteriorating market position.[45]

---

[41] E-mail from Steven Lim, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al*. (Sept. 5, 2008) [JPM-2004 0006258].

[42] *Id*.

[43] *Id*.

[44] *Id*. at p. 2.

[45] See Section III.A.5.b of the Report, which discusses JPMorgan's consideration of its need for additional collateral from Lehman in greater detail.

## B. Citi Internally Downgraded Lehman's Creditworthiness

On September 5, 2008, Citi decided to downgrade its internal classification of Lehman's creditworthiness.[46] According to Thomas Fontana, Citi's Global Financial Institutions Risk Management Officer, Citi took this step because Lehman had "clearly defined problems,"[47] whereas Citi only previously saw that Lehman had "potential weakness."[48] When Citi internally downgraded Lehman's creditworthiness on September 5, "the credit engine [system] automatically suspended all trading lines," which did not mean that Citi stopped the trading lines, but that it more carefully monitored Lehman's trading activities.[49] Citi also instituted a requirement for internal approvals for trades with Lehman that were larger, longer in tenor, or riskier than usual.[50]

## III. SEPTEMBER 7, 2008

On Sunday, September 7, 2008, Henry M. Paulson, Jr., the Secretary of the Treasury, announced that the Government was taking over Fannie Mae and Freddie

---

[46] *See* e-mail from Melissa J. Torres, Citigroup, to John J. Foley, Citigroup, *et al.* (Sept. 6, 2008) [CITI-LBHI-EXAM 00088683] (noting this change was made on Friday, September 5, 2008); *see also* e-mail from Gregory Frenzel, Citigroup, to NA IRM Weekly Updates group, Citigroup (Sept. 7, 2008) [CITI-LBHI-EXAM 00107376] (Frenzel's weekly update from September 5, 2008); e-mail from Michael Mauerstein, Citigroup, to Katherine Lukas, Citigroup, *et al.* (Sept. 8, 2008) [CITI-LBHI-EXAM 00051890] (noting that the classification "is strictly an internal Citi matter," and they had not communicated anything to Lehman about the change in its internal classification of Lehman, nor had Citi changed its operations with Lehman due to the classification change).

[47] Handwritten notes of Thomas Fontana, Citigroup (Sept. 5, 2008), at p. 168 [CITI-LBHI-EXAM 00099649].

[48] *Id.* at p. 191.

[49] Email from Kathy El Ong, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Sept. 11, 2008) [CITI-LBHI-EXAM 00012823].

[50] *Id.*

Mac and that the Treasury Department had agreed to provide those entities with $200 billion in loans.[51] The Federal Housing Finance Agency placed Freddie and Fannie into conservatorship pursuant to the Housing and Economic Recovery Act of 2008.[52] Paulson's statement on September 7, 2008 included the assessment that "Fannie Mae and Freddie Mac are so large and so interwoven in our financial system that a failure of either of them would cause great turmoil in our financial markets here at home and around the globe. . . . And a failure would be harmful to economic growth and job creation."[53]

## IV.   SEPTEMBER 8, 2008

On Monday, September 8, 2008, after initial discussions earlier in the summer and renewed talks in August 2008, Bank of America ("BofA") agreed to begin due

---

[51] United States Treasury, Press Release: Statement by Secretary Henry M. Paulson, Jr., on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers (Sept. 7, 2008), *available at* http://www.ustreas.gov/press/releases/hp1129.htm (last visited Jan. 31, 2010); Mark Jickling, Congressional Research Service, CRE Report for Congress: Fannie Mae and Freddie Mac in Conservatorship (Sept. 7, 2008), *available at* http://fpc.state.gov/documents/organization/110097.pdf.

[52] Mark Jickling, Congressional Research Service, CRE Report for Congress: Fannie Mae and Freddie Mac in Conservatorship (Sept. 7, 2008), at p. 2, *available at* http://fpc.state.gov/documents/organization/110097.pdf.

[53] United States Treasury, Press Release: Statement by Secretary Henry M. Paulson, Jr., on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers (Sept. 7, 2008), *available at* http://www.ustreas.gov/press/releases/hp1129.htm (last visited Jan. 31, 2010).

diligence in support of a potential transaction with Lehman.[54]  That same day, Lehman

previewed its third quarter earnings for Citi.[55]

Following the previous day's announcement that the Government was placing

Fannie and Freddie in conservatorship, Lehman's stock opened at $17.62, over $1 higher

than its previous close.[56]  Over the course of the day, Lehman's stock traded down in

high volume.[57]

**LBHI Stock Price: Sept. 8, 2008**



| | 7:00 AM | 8:00 AM | 9:00 AM | 10:00 AM | 11:00 AM | 12:00 PM | 1:00 PM | 2:00 PM | 3:00 PM | 4:00 PM | 5:00 PM | 6:00 PM | 7:00 PM | 8:00 PM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEH | 18.49 | 18 | 17.6 | 17.73 | 16.89 | 14.61 | 14.2 | 14.49 | 14.29 | 14.24 | 14.62 | 14.06 | 13.95 | 13.95 |

## A.  BofA Agreed to Begin Due Diligence

On September 8, 2008, Gregory L. Curl, BofA's Global Strategic Development

and Planning Officer, contacted H. Rodgin Cohen, the Chairman of the law firm

---

[54] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 7.  Curl stated that on September 8 or 9, Bank of America agreed to begin diligence.  *Id.*  By noon on September 9, Fuld reported to the Board that he was awaiting a return phone call from a "potential domestic partner[]."  Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 9, 2008), at p. 2 [LBEX-AM 003910].

[55] *See* e-mail from Christopher M. Foskett, Citigroup, to Ian T. Lowitt, Lehman (Sept. 8, 2008) [LBEX-DOCID 070422].

[56] *See* Yahoo! Finance, Historical LEH stock prices, *available at* http://finance.yahoo.com/q?s=LEHMQ.PK.

[57] *Id.*

Sullivan & Cromwell, LLP.[58]   Cohen previously had served as the intermediary in

negotiations between BofA and Lehman.[59]   Curl contacted Cohen to begin the process of

looking into Lehman.[60]   In late August 2008, Fuld met with Kenneth D. Lewis, CEO of

BofA.[61]   Sometime after September 1, 2008, Henry M. Paulson, Jr., contacted Curl,

expressing concern about Lehman.[62]   Paulson asked Curl to look into whether BofA

could help.[63]   BofA remained reluctant to look into Lehman until Curl called Cohen on

September 8.[64]

**B.   Lehman Previewed Its Third Quarter 2008 Results to Citi**

On September 8, 2008, Lehman presented its expected results for third quarter

2008, as well as its game plan for going forward, to Citi.[65]   Citi's managing director

Christopher M. Foskett thought that Lehman's plan made sense, but that executing the

---

[58] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 7.  Curl stated that on September 8 or 9, Bank of America agreed to begin diligence.  *Id.*  By noon on September 9, Fuld reported to the Board that he was awaiting a return phone call from a "potential domestic partner[]."  Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 9, 2008), at p. 2 [LBEX-AM 003910].

[59] Id.

[60] Id.

[61] Fuld was uncertain of the date of this conversation but his call logs indicate that he had a telephone call with Lewis accompanied by the description "proposed deal."  Richard S. Fuld, Jr., Lehman, Call Logs (Aug. 26, 2008) [LBHI_SEC07940_016973].  *Accord* Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 5; Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 17.

[62] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 7.

[63] *Id.*  Paulson described his "job" during this time period as, among other things, working with Timothy F. Geithner to finalize a deal to sell Lehman to Bank of America or Barclays.  Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 17.

[64] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 7.

[65] *See* e-mail from Christopher M. Foskett, Citi, to Ian T. Lowitt, Lehman (Sept. 8, 2008) [LBEX-DOCID 070422].

plan was going to be challenging.[66]  Foskett commented that Lehman was "the most open amongst the brokers about [third quarter 2008] results and plans to address the stress and strain of the current environment."[67]

## V.  SEPTEMBER 9, 2008

On Tuesday, September 9, 2008, a South Korean government official announced the end of KDB's negotiations with Lehman, citing concerns over the United States markets, among other reasons.[68]  KDB also informed JPMorgan that KDB was ending its negotiations with Lehman.[69]  The press reported the South Korean official's statement later that day.[70]

That same day, Fitch and Standard and Poor's placed Lehman's rating on a negative watch.[71]  On Tuesday, Black called Fuld to request an additional $5 billion in collateral; Fuld agreed to post $3 billion immediately.[72]  Later that evening, JPMorgan requested that Lehman execute new Security and Guaranty Agreements and an

---

[66] *Id.*

[67] *Id.*

[68] Jin-Young Yook, *Korea FSC: KDB, Lehman Investment Talks Have Ended*, Dow Jones International News (Sept. 9, 2008) [LBEX-DOCID 131058]; Steve Goldstein, *Korean regulator says KDB talks with Lehman ended*, MarketWatch, Sept. 9, 2008 [LBEX-DOCID 131059]; Evan Ramstad & Jin-Young Yook, *Talks Between KDB, Lehman On Possible Investment End,* Wall St. J. Online, Sept. 9, 2009 [LBEX-DOCID 224552].

[69] E-mail from Steven Lim, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al.* (Sept. 9, 2008) [JPM-2004 0006320].

[70] *See* e-mail from Catherine Jones, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 131058]; e-mail from Timothy Sullivan, Lehman, to Mark G. Shafir, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 131059]; e-mail from Hugh E. McGee, III, Lehman, to Jasjit Bhattal, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 224552].

[71] E-mail from Stephen Lax, Lehman, to Rajiv Muthyala, Lehman, *et al.* (Sept. 9, 2008) [LBHI_SEC07940_557829] (forwarding Fitch press release, *Fitch Places Lehman Brothers on Rating Watch Negative*); *S&P places Lehman on negative ratings watch,* Associated Press (Sept. 9, 2008).

[72] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 6.

amendment to the Clearance Agreement.[73]   Lehman also executed a cash deed with HSBC, encumbering nearly $1 billion that Lehman had posted the previous week to ensure HSBC's continued clearing services.[74]

On Tuesday morning, Lehman's stock opened down, at $12.92, over the prior day's close.[75]   After the day's public announcements (from the South Korean government official and the rating agencies), Lehman's stock had lost nearly half of its value, closing at $7.79.[76] The trading volume was more than triple the prior day's volume.[77]   After watching Lehman's share price collapse, another of Lehman's remaining potential strategic partners, ICD, said it needed a "time out" in negotiations with Lehman.[78]

**LBHI Stock Price: Sept. 9, 2008**

---

[73] See *infra* Section V.F of this Appendix and Section III.A.5.b of the Report, which discusses the September agreements in greater detail.

[74] HSBC, Cash Deed between HSBC and LBIE (Sept. 9, 2008) [HBUS00001180]; HSBC, Cash Deed between HSBC and LBHI (U.K.) (Sept. 9, 2008) [HBUS00001190].

[75] *See* Yahoo! Finance, Historical LEH stock prices, *available at* http://finance.yahoo.com/q?s=LEHMQ.PK.

[76] *Id.*

[77] *Id.*

[78] Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 22.



| | 8:00 AM | 9:00 AM | 10:00 AM | 11:00 AM | 12:00 PM | 1:00 PM | 2:00 PM | 3:00 PM | 4:00 PM | 5:00 PM | 6:00 PM | 7:00 PM | 8:00 PM | 9:00 PM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEH | 13.95 | 13.63 | 13.5 | 12.8 | 10.57 | 12.635 | 12.635 | 12.635 | 8.9 | 9.59 | 8.01 | 8.58 | 8.77 | 8.35 |

## A. KDB's Announcement

On the morning of September 9, 2008, Lim e-mailed Dimon, Black and others at JPMorgan to inform the group that KDB's Governor Euoo-Sung Min had called Lim that day to confirm that KDB had ended negotiations with Lehman due to execution and timing concerns.[79]

Several hours later, the Chairman of South Korea's Financial Services Commission, Jun Kwang-woo, made a public statement, confirmed by another South Korean government official, that talks between KDB and Lehman were over.[80] KDB, on the other hand, declined to comment.[81] After Chairman Kwang-woo's announcement,

---

[79] E-mail from Steven Lim, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al.* (Sept. 9, 2008) [JPM-2004 0006320].

[80] Jin-Young Yook, *Korea FSC: KDB, Lehman Investment Talks Have Ended*, Dow Jones International News (Sept. 9, 2008) [LBEX-DOCID 131058]; Steve Goldstein, *Korean regulator says KDB talks with Lehman ended*, MarketWatch, Sept. 9, 2008 [LBEX-DOCID 131059]; Evan Ramstad & Jin-Young Yook, *Talks Between KDB, Lehman On Possible Investment End*, Wall St. J. Online, Sept. 9, 2009 [LBEX-DOCID 224552].

[81] *Id.*

the cost of insuring Lehman's debt surged by almost 200 basis points, some of Lehman's hedge fund clients pulled out and short-term creditors cut lending lines.[82]

On September 9, 2008, Fuld called Lewis to tell him that Lehman was going to pre-announce its third quarter results because of the public statement about the end of KDB negotiations and because the rating agencies "were making noise" about taking action related to Lehman's rating.[83] Lewis told Fuld to keep him apprised of any developments going forward.[84]

## B. Rating Agencies Reaction

During the afternoon of September 9, Fitch and Standard and Poor's placed Lehman's ratings on a negative watch.[85] Fitch's rating action was triggered by Lehman's decision to move up the date of its earnings call to announce SpinCo and Lehman's intent to raise capital.[86] Lehman had told Fitch just five days earlier that Lehman would announce SpinCo and the earnings report separately, with the former to occur first.[87] Fitch believed Lehman would have difficulty raising capital in the third

---

[82] Yalman Onaran & John Helyar, *Fuld Sought Buffett Offer He Refused as Lehman Sank (Update 1)*, Bloomberg, Nov. 10, 2009, *available at*
http://www.bloomberg.com/apps/news?sid=aZ1syPZH.RzY&pid=20601109.

[83] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 5.

[84] *Id*.

[85] E-mail from Stephen Lax, Lehman, to Rajiv Muthyala, Lehman, *et al.* (Sept. 9, 2008) [LBHI_SEC07940_557829] (forwarding Fitch, Press Release, *Fitch Places Lehman Brothers on Rating Watch Negative* (Sept. 9, 2008)); *S&P places Lehman on negative ratings watch*, Associated Press, Sept. 9, 2008.

[86] Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 7.

[87] Id.

quarter and wanted to convey that message to the market.[88]   Standard and Poor's

September 9 negative watch statement also cited Lehman's intent to raise capital and

the "precipitous" decline in Lehman's share price.[89]

### C. Lehman Updated Its Board

At noon on September 9, 2008, Lehman held a regularly noticed Board meeting.[90]

At the meeting, Lehman's management warned the Board that the meeting would "be

abbreviated in light of the morning's events," and that Lowitt was unavailable to

present his usual Financial Update because he "was preparing for a possible earnings

pre-announcement."[91]

Fuld updated the Board on discussions with two "potential domestic partners,"

including BofA.[92]   The other potential partner is not named in the Board minutes but is

described as having concerns about the degree of overlap between Lehman and its own

business.[93]   John Mack, Morgan Stanley's CEO, had expressed that concern about a

potential Lehman and Morgan Stanley merger in July 2008, when Fuld first suggested

combining Lehman and Morgan Stanley.[94]

---

[88] *Id.*

[89] *S&P places Lehman on negative ratings watch*, Associated Press (Sept. 9, 2008).

[90] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 9, 2008), at p. 1 [LBEX-AM 003910].

[91] *Id.* at pp. 1-2.

[92] *Id.* at p. 3.

[93] *Id.*

[94] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 28.

### D. Lehman Executed Cash Deeds with HSBC

On September 9, 2008, LBHI ("U.K.") and LBIE executed "Cash Deeds" to encumber the nearly $1 billion it posted to HSBC during late August and early September 2008.[95] Both Cash Deeds required deposits to cover intraday exposure. One of the Cash Deeds required LBHI (U.K.) and LBIE to maintain a deposit in the amount that HSBC estimated, in its good faith, to cover aggregate intraday exposures on specified accounts held by certain Lehman entities.[96] The deposit would be available to Lehman only if HSBC were satisfied that none of the Lehman entities covered by the Cash Deeds owed any outstanding debt to HSBC.[97] HSBC had the right to setoff the deposit against Lehman's clearing obligations.[98] The Cash Deed formally recognized that any extension of credit by HSBC to parties to the Cash Deed was left to HSBC's discretion.[99]

On September 9, 2008, Lowitt executed a Guaranty Amendment between Citi and LBHI.[100] The Amendment added nine Lehman subsidiaries to the parent guaranty and expanded the guaranty to custody agreements.[101]

---

[95] See Section III.A.5.d of the Report, which discusses the HSBC Cash Deeds in greater detail.

[96] HSBC, Cash Deed between HSBC and LBIE (Sept. 9, 2008), ¶ 5 [HBUS00001180]; HSBC, Cash Deed between HSBC and LBHI (U.K.) (Sept. 9, 2008), ¶ 5 [HBUS00001190].

[97] HSBC, Cash Deed between HSBC and LBIE (Sept. 9, 2008), ¶ 4 [HBUS00001180]; HSBC, Cash Deed between HSBC and LBHI (U.K) (Sept. 9, 2008), ¶ 6 [HBUS00001190]. "Debt" is used in the narrow sense contained in the Cash Deed. *Id.*

[98] HSBC, Cash Deed between HSBC and LBIE (Sept. 9, 2008), ¶ 5 [HBUS00001180]; HSBC, Cash Deed between HSBC and LBHI (U.K.) (Sept. 9, 2008), ¶ 4 [HBUS00001190].

[99] HSBC, Cash Deed between HSBC and LBHI (U.K.) (Sept. 9, 2008), ¶ 10 [HBUS00001190].

[100] See Section III.A.5.c of the Report, which discusses the Cit Guaranty Amendment in greater detail.

### E.  JPMorgan Requested an Additional $5 Billion in Collateral

On September 9, 2009, JPMorgan's Black called Fuld to request $5 billion in additional collateral.[102]  Black explained to Fuld that the requested collateral was intended to cover JPMorgan's exposure to Lehman in its entirety, and was not limited to triparty-repo exposure.[103]  According to Black, Lehman offered to post $3 billion immediately and post an additional $2 billion at a later time.[104]  Lehman pledged $1 billion in cash and approximately $1.7 billion of money market funds to JPMorgan that day.[105]

---

[101] *Id.*

[102] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 6; Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 10; Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 7. Deciphering a contemporaneous note, Buyers-Russo recalled that JPMorgan would ask for $5 billion, but accept $3 billion from Lehman.  Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 9; Jane Buyers-Russo, Unpublished Notes (Sept. 9, 2008), at p. 1 [JPM-EXAMINER00006052].  In a later contemporaneous note on September 9, Buyers-Russo wrote, "Black called Dick[,] asked for $3B – said ok."  Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 10; Jane Buyers-Russo, Unpublished Notes (Sept. 9, 2008), at p. 3 [JPM-EXAMINER00006052].

[103] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 7.

[104] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at pp. 6, 9; *see also* JPMorgan, JPMorgan's Responses to Examiner's First Set of Questions re Lehman/JPM Accounts & Collateral dated Sept. 3, 2009, at p. 17.  Black's communications did not occur in a single telephone call with Lehman that day, but in multiple calls.  Examiner's Interview of Steven D. Black, Sept. 23, 2009, at pp. 6-9.  Lehman's acceptance of the $3 billion request is consistent with the September Guaranty, which specifically invoked that figure in establishing maximum liability.  Guaranty (Sept. 9, 2008), at p. 2 [JPM-2004 0005813] ("The Guarantor's maximum liability under this Guaranty shall be THREE BILLION DOLLARS ($3,000,000,000) or such greater amount that the Bank has requested from time to time as further security in support of this Guaranty.").  There is evidence that Lehman agreed to post only $4 billion in response to JPMorgan's Sept. 9 request.  *See* e-mail from Donna Dellosso, JPMorgan, to Steven D. Black, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0006377] ("[Lehman] will maintain collateral of $4bln to cover intra-day exposure."); e-mail from Daniel J. Fleming, Lehman, to Mark G. Doctoroff, JPMorgan (Sept. 12, 2008) [LBEX-DOCID 405652] ("JPM now has a total of 4.6bn, 600mm more then agreed.").

[105] JPMorgan, JPMorgan's Responses to Examiner's Second Set of Questions re Lehman/JPM Accounts & Collateral (Oct. 13, 2009) at p. 9; Lehman, Collateral Pledged to JPM for Intraday As of 9/12/2008 COB [LBEX-AM 042364]; *see also* e-mail from Mark G. Doctoroff, JPMorgan, to Jane Buyers-Russo, JPMorgan, *et al.* (Sept. 9, 2008) [JPM-2004 0032520]; e-mail from Daniel Fleming, Lehman, to Paolo R. Tonucci, Lehman

## F. The JPMorgan Security Agreement, Guaranty, and Amendment to the Clearance agreement

On September 9, 2008, at 9:00 p.m.,[106] JPMorgan sent draft Security and Guaranty Agreements to Andrew Yeung, one of Lehman's in-house lawyers.[107]   Later that evening, JPMorgan sent a draft amendment to the Clearance Agreement.[108]   Yeung spoke with Gail Inaba, an in-house lawyer at JPMorgan, about the agreements.[109]   She told him that the terms of the agreements had already been agreed to by senior management.[110]   Inaba told Yeung that the agreements had to be executed prior to Lehman's accelerated earnings announcement scheduled for the next morning.[111]   Fuld did not recall any conversation with Black on the topic and otherwise was unaware of these agreements at the time of Inaba's statement to Yeung.[112]

---

(Sept. 9, 2008) [LBEX-DOCID 073380].  Lehman posted $300 million more – for a total of $3 billion – on Sept. 10.  JPMorgan Second Written Response at p. 9.

[106] All times refer to Eastern Time, unless otherwise specified.

[107] E-mail from Jeffrey Aronson, JPMorgan, to Andrew Yeung, Lehman, *et al.* (Sept. 9, 2008) [JPM-2004 0005594]; Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4.

[108] E-mail from Jeffrey Aronson, JPMorgan, to Andrew Yeung, Lehman, *et al.* (Sept. 9, 2008) [JPM-2004 0005039].  A draft Aurora Guaranty and draft Control Agreement were sent with the draft Amendment to the Clearance Agreement as well.  *See id.*

[109] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 3.

[110] *Id.* at p. 4.  According to Yeung, when he expressed his concern over the expanded scope of the collateral pledge, Inaba said "if you have concerns about this we will contact Dick Fuld."  *Id.*  Although she did not remember Yeung calling her, Inaba stated to the Examiner that she told Yeung and Paul Hespel that an agreement had been reached by very senior management at both firms, though not necessarily that Fuld and Black had reached agreement.  Examiner's Interview of Gail Inaba, Apr. 28, 2009, at p. 7.

[111] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4; Examiner's Interview of Gail Inaba, Apr. 28, 2009, at p. 8.

[112] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 15.

The agreements were negotiated through the night by Lehman counsel and executed by Tonucci on the morning of September 10, 2008.[113]   The agreements expanded JPMorgan's lien on Lehman accounts and extended LBHI's liability, guaranteeing all obligations — rather than only those related to clearing activities — for all of LBHI's subsidiaries.[114]

## VI.   SEPTEMBER 10, 2008

In light of the events of September 9, Lehman accelerated its earnings call eight days to Wednesday, September 10, 2008.[115]   During the earnings call, Fuld and Lowitt explained Lehman's planned restructuring and announced Lehman's third quarter losses.[116]   Rating analysts on the call reacted negatively to Lehman's efforts to restructure through SpinCo.[117]   By Wednesday afternoon, Moody's placed Lehman on negative watch for a downgrade, if Lehman failed to consummate a transaction by Monday, September 15, 2008.[118]   During the day, Barclays advised the Financial Services Authority ("FSA") that it was considering a deal with Lehman.[119]

---

[113] Email from Andrew Yeung, Lehman, to Gail Inaba, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0005218].

[114] See Section III.A.5.b of the Report, which discusses the September Agreements in greater detail.

[115] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 5; Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 7.

[116] Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008) [LBHI_SEC07940_612771].

[117] *See, e.g.,* e-mail from Robert Ferguson, Barclays Capital, to Mike Keegan, Barclays Capital (Sept. 10, 2008) [BCI-EX-(S)-00035195]; e-mail from Vincent Curotto, Sanford Bernstein, to Stuart Schwadron, Sanford Bernstein (Sept. 11, 2008) [SB-SEC 048150].

[118] E-mail from Paolo R. Tonucci, Lehman, to Carlo Pellerani, Lehman (Sept. 10, 2008) [LBHI_SEC07940_558653] (forwarding Moody's Investor Service, Press Release, *Moody's Places Lehman's*

On September 10, Lehman also took the first steps toward planning for a bankruptcy filing.[120]  Meanwhile, an internal FRBNY agenda suggested that federal assistance to Lehman was a possibility.[121]  That agenda did not necessarily reflect the views of senior FRBNY management; indeed it was not circulated to Geithner.[122]

On Wednesday, Lehman's stock opened up, at $9.15, over the previous day's close at $7.79.[123]  Over the course of the day, Lehman's stock lost value, officially closing Wednesday, September 10, at $7.25.[124]

**LBHI Stock Price: Sept. 10, 2008**



| | 6:00 | 7:00 | 8:00 | 9:00 | 10:00 | 11:00 | 12:00 | 1:00 | 2:00 | 3:00 | 4:00 | 5:00 | 6:00 | 7:00 | 8:00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEH | 10.4 | 10 | 10.25 | 9.2 | 9.26 | 8.66 | 8.2 | 8.1 | 7.98 | 8.38 | 8.9 | 9.02 | 7.25 | 7.25 | 6.97 |

## A.  Lehman's Pre-announcement Earnings Conference Call

On Wednesday, September 10, 2008, at 8:00 a.m., Lehman conducted its preliminary third quarter earnings call.[125]  Lehman was represented on the call by Fuld,

*A2 Rating On Review With Direction Uncertain* (Sept. 10, 2008)); Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 6.
[119] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 7.
[120] *See* Weil, Gotshal & Manges LLP, Time Records (Sept. 10, 2008) [LBEX-WGM 1146447].  *Accord* Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 21.
[121] FRBNY, Liquidation Consortium (Sept. 10, 2008) [FRBNY to Exam. 003517], attached to e-mail from Michael Nelson, FRBNY, to Christine Cumming, FRBNY, *et al*. (Sept. 10, 2008) [FRBNY to Exam. 003516].
[122] *Id*.
[123] *See* Yahoo! Finance, Historical LEH stock prices, *available at* http://finance.yahoo.com/q?s=LEHMQ.PK.
[124] *Id*.

Lowitt, McDade and Shaun Butler, its Director of Investor Relations. Several analysts participated in the call as well, including: Glen Schorr (UBS), Michael Hecht (Banc of America Securities), Mike Mayo (Deutsche Bank), Douglas Sipkin (Wachovia), William Tanona (Goldman Sachs) and Guy Moszkowski (Merrill Lynch).[126]

Fuld began his remarks by saying that the call was conducted on "clearly short notice" and that the company was announcing "several important financial and operating changes that amount to a significant repositioning of the firm, including aggressively reducing [its] exposure to both commercial real estate and residential real estate assets."[127] He then turned to the quarter's losses, which he blamed "mostly" on "the sales and write-downs of our residential and commercial real estate assets" and the "credit markets."[128]

Next, Fuld introduced Lehman's plan to address its commercial real estate assets.[129] He explained that a majority of the commercial real estate assets would be separated from the company's "core business by spinning off those assets to our shareholders and to an independent publicly traded entity which will be adequately

---

[125]  Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008) [LBHI_SEC07940_612771].
[126] *Id.*
[127] *Id.* at p. 2.
[128] *Id.*
[129] *Id.* at p. 3.

capitalized,"[130] *i.e.* SpinCo.  He further stated that the company would sell a majority stake in its IMD business.[131]

When the call was opened for analyst questions, the analysts asked about the sale of IMD and the SpinCo plan, mark-to-market accounting, valuations of Lehman's assets before the spin-off and the source of financing for the SpinCo transaction, among other issues.[132]

## B.  Moody's Placed Lehman's Rating on Review

On the late afternoon of September 10, 2008, Moody's announced that it placed Lehman's A2 rating on review with "direction uncertain."[133]  Blaine Frantz of Moody's issued a statement that "[a] key ratings factor will be Lehman's ability to turn around market sentiment. . . .  A strategic transaction with a stronger financial partner would likely add support to the ratings and result in a positive rating action."[134]

Lehman's Chief Legal Officer, Thomas A. Russo, told the Examiner that the Moody's announcement was the event that represented the final turning point when

---

[130] *Id.*

[131] *Id.*

[132] *Id.* at pp. 12-25.  See Section III.A.3.c.4 of the Report, which discusses the SpinCo plan in greater detail.

[133] E-mail from Paolo R. Tonucci, Lehman, to Carlo Pellerani, Lehman (Sept. 10, 2008) [LBHI_SEC07940_558653] (forwarding Moody's Investor Service, Press Release, *Moody's Places Lehman's A2 Rating On Review With Direction Uncertain* (Sept. 10, 2008))*.*

[134] *Id.*

Lehman's situation began to deteriorate.[135]  Russo feels that the Moody's announcement came before the market had time to digest Lehman's earnings announcement.[136]

Lowitt told Fuld that the rating agencies expected Lehman to reach a deal with a strategic partner within the next week or else Lehman would face a likely downgrade.[137] Lehman began to plan for an impending downgrade and the consequent loss of Lehman's ability to issue long-term debt.[138]

### C.   Citi Told Lehman It Cut Trading Lines

On September 10, Citi personnel mistakenly informed Lehman that Citi had cut the trading lines.[139]  That was not the case.[140]  Citi thereafter reminded its employees to be extra vigilant so that misinformation would not be communicated to Lehman or the marketplace.[141]

### D.   Lehman Began Initial Bankruptcy Planning

On September 10, 2008, Steven Berkenfeld, Lehman's Head of Legal, Compliance and Audit, called Stephen J. Dannhauser, the Chairman of the law firm Weil, Gotshal &

---

[135] Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 8.

[136] *Id.*

[137] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 6.

[138] *See* Lehman, The Gameplan - Downgrade Scenario (September 2008) [LBEX-DOCID 2727669], attached to e-mail from Matthew Blake, Lehman, to Ian T. Lowitt, Lehman, *et al.*, (Sept. 11, 2008) [LBEX-DOCID 2744462].

[139] E-mail from Kathy El Ong, Citi, to Ajaypal S. Bunga, Citi, *et al.* (Sept. 11, 2008) [CITI-LBHI-EXAM 00012823].

[140] *Id.*

[141] *Id.*

Manges LLP ("Weil"), to begin working on a possible bankruptcy filing for Lehman.[142]

Berkenfeld had not obtained any internal authorization to make that call.[143]  Russo did

not know that Berkenfeld made the call until later.[144]  Harvey R. Miller, the Chair of

Weil's bankruptcy department, first billed time to preparing for a Lehman bankruptcy

on September 10, 2008.[145]

### E.   The FRBNY's Agenda for Meetings Regarding Lehman

On September 10, 2008, the FRBNY staff internally circulated an outline, the

"Revised Consortium Gameplan," for the FRBNY's upcoming meeting with industry

leaders.[146]  The "Revised Consortium Gameplan" detailed a plan to hold meetings with

industry participants to fund Lehman's bad assets.[147]   According to the outline, the

FRBNY expected to decide before the meetings began on a maximum amount of capital

that it was willing to finance, but did not intend to disclose that amount to industry

participants.[148]

---

[142] *See* Weil, Gotshal & Manges LLP, Time Records (Sept. 10, 2008), at p. 1 [LBEX-WGM 1146447].  *Accord* Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 21.

[143] Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 21.

[144] Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 8.

[145] Weil, Gotshal & Manges LLP, Time Records (Sept. 10, 2008), at p. 1 [LBEX-WGM 1146447] (noting Miller's first time billed to Lehman as "T/Cs SJD 5x").

[146] FRBNY, Liquidation Consortium (Sept. 10, 2008) [FRBNY to Exam. 003517], attached to e-mail from Michael Nelson, FRBNY, to Christine Cumming, FRBNY, *et al.* (Sept. 10, 2008) [FRBNY to Exam. 003516]. This document was not seen or approved by Geithner.  *Id.*

[147] *Id.*

[148] *Id.* at p. 2

### F. Barclays Contacted the FSA

During the day on September 10, John Varley, Group CEO of Barclays, contacted Hector Sants, CEO of the FSA, to advise Sants that Barclays was considering bidding for Lehman.[149]  Sants did not object to the idea, but told Varley that the FSA would need to be kept closely informed of the development and the deal's details.[150]

## VII. SEPTEMBER 11, 2008

On Thursday, September 11, 2008, at the FRBNY's suggestion, Lehman entered into initial talks with Barclays, and began due diligence with BofA.[151]  Fuld resigned from the FRBNY's Board that afternoon.[152]  He did so at the suggestion of Thomas C. Baxter, Jr., General Counsel to the FRBNY, and FRBNY President Timothy F. Geithner, , because they told him to resign, "in case [they had] to do something [for or with Lehman] that weekend."[153]  Before the end of the day, JPMorgan called Lehman, seeking yet another $5 billion in new collateral.[154]

---

[149] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 7.

[150] *Id.*

[151] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2008) [LBEX-AM 003918].

[152] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 11.

[153] *Id.*

[154] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 13;  Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at pp. 9-10; Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 12; Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 21.

Between Wednesday's official close of $7.25 and Thursday's opening at $4.47, Lehman's stock lost almost 40% of its value.[155]  On Thursday, Lehman's stock traded in its highest volume for the entire week to close down at $3.79.[156]

**LBHI Stock Price: Sept. 11, 2008**



| | 5:00 | 6:00 AM | 7:00 AM | 8:00 AM | 9:00 AM | 10:00 AM | 11:00 AM | 12:00 PM | 1:00 PM | 2:00 PM | 3:00 PM | 4:00 PM | 5:00 PM | 6:00 PM | 7:00 PM | 8:00 PM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEH | 7.2 | 7.3 | 7.21 | 6.95 | 5.9 | 5.07 | 4.76 | 5.3 | 5.25 | 4.85 | 4.74 | 4.55 | 6.21 | 4.45 | 3.75 | 3.89 |

## A. Fuld Resigned from the FRBNY Board

On Thursday, September 11, Baxter called Russo and suggested that Fuld step down from the Board of the FRBNY.[157]  After Russo told Fuld about the conversation, Fuld called Geithner.[158] During that call, Geithner asked Fuld to step down from the Board "in case we have to do something for you or with you this weekend."[159]  Fuld said his conversation with Geithner left Fuld with the feeling that, if it came down to it, the FRBNY and Geithner would be there to provide assistance to Lehman.[160]  Geithner

[155] *See* Yahoo! Finance, Historical LEH stock prices, *available at* http://finance.yahoo.com/q?s=LEHMQ.PK.
[156] *Id.*
[157] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 11; Examiner's Interview of Thomas Baxter, Jr., Aug. 31, 2009, at p. 9.
[158] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 11.
[159] *Id. Accord* Examiner's Interview of Thomas C. Baxter, Jr., Aug. 31, 2009, at p. 9.
[160] Examiner's Interview of Richard S. Fuld, Jr. Apr. 28, 2009, at p. 11.

told the Examiner that he does not recall making the statement, but he was certain he was careful not to imply that Lehman could expect the FRBNY's support.[161] A FRBNY meeting agenda dated September 10, 2008 suggests that at least one FRBNY representative contemplated providing public funds to Lehman at that time.[162]

### B. BofA Began Due Diligence

BofA began due diligence on a potential deal with Lehman on September 11, 2008.[163] Fuld called Lewis on September 11, 2008 to inform him that the rating agencies were comforted when they heard that Lehman was negotiating with a major bank.[164] Fuld told the Examiner that during their conversation, he remarked to Lewis, "You know we're going to do this deal, don't you, Ken?" to which Lewis responded, "Yes, I do, Dick."[165] According to Lewis, he never indicated to Fuld that a deal would get done, but rather he was noncommittal in his answer.[166]

---

[161] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 9.

[162] *See* FRBNY, Liquidation Consortium presentation (Sept. 10, 2008) [FRBNY to Exam. 003517], attached to e-mail from Michael Nelson, FRBNY, to Christine Cumming, FRBNY, *et al.* (Sept. 10, 2008) [FRBNY to Exam. 003516]. *Accord* Examiner's Interview of William Brodows, Aug. 20, 2009, at p. 6; Examiner's Interview of Jan H. Voigts, Aug. 25, 2008.

[163] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 5. Curl told Examiner that Bank of America began its due diligence of Lehman on Sept. 9 or 10, 2008. Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 7.

[164] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 5.

[165] *Id.*

[166] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 5.

### C. Barclays Expressed Interest in Lehman

On Thursday, September 11, 2008, Fuld informed the Board that he had "not heard from Barclays directly, but that he had been advised of its potential interest by the Firm's regulators."[167]

Also on September 11, Varley informed the FSA that the Barclays Board would meet that day to consider whether Barclays should approach Lehman.[168] Varley told Sants that a bid for Lehman would be put together if three conditions were met: (1) there was a high degree of confidence that a deal can be completed "with the necessary support from the Federal Reserve to ensure this;" (2) there was liquidity support from the Federal Reserve; and (3) there was a discount on Lehman's net asset values.[169] Sants responded that the FSA's review would focus on the impact any transaction structure would have on Barclays' liquidity and capital, warning that the FSA would not approve any core Tier 1 number below the minimum requirement.[170] Later that day, Callum McCarthy, the Chairman of the FSA, contacted Geithner to discuss Lehman.[171]

---

[167] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2008), at p. 2 [LBEX-AM 003918]. Fuld told the Examiner that, prior to September 11, 2008, he had at least two conversations with Diamond. Each time, Diamond told Fuld there was too much overlap to do a deal. Also, some time early in the week of September 8, 2008, Checki of the FRBNY told Fuld that Barclays was interested in Lehman, but when Fuld called Diamond he was again told that there was too much overlap. Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 7.
[168] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 8.
[169] *Id.* ¶ 8.
[170] *Id.* ¶ 9.
[171] *Id.* ¶ 10.

According to the FSA, during that conversation, according to the FSA, Geithner left open the possibility of Government assistance for Lehman.[172]

### D. JPMorgan Requested Additional Collateral

On September 11, 2008, Lehman posted an additional $600 million in cash to JPMorgan.[173] That same day, JPMorgan executives met to discuss valuation issues they had identified with the securities that Lehman had posted as collateral over the summer.[174] JPMorgan had concluded that the securities posted as collateral were not worth nearly what Lehman claimed.[175] JPMorgan decided to request that Lehman provide $5 billion in cash collateral that day.[176] Dimon and Black called Lowitt, who was joined on the call by Fuld.[177] Zubrow and Tonucci recall participating in the conversation as well.[178] On that call, Black and Dimon requested a $5 billion cash collateral deposit by the next morning.[179] According to Black, there was no discussion of

---

[172] Id.

[173] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 12; e-mail from Mark G. Doctoroff, JPMorgan, to Henry E. Steuart, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0062065]; JPMorgan Second Written Responses, at p. 3.

[174] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 12.

[175] *Id.*

[176] *Id.*; e-mail from Paolo R. Tonucci, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Sept. 12, 2008) [LBEX-DOCID 073346] ("[JPM] want[s] $5bn tomorrow first thing").

[177] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 13; Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at pp. 9-10; Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 12; Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 21.

[178] Examiner's Interview of Barry L. Zubrow, Oct. 20, 2009, at p. 6; Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 16.

[179] *Id.*

how the request for $5 billion related to the $1.4 billion that Lehman putatively still owed in response to JPMorgan's September 9 collateral request for $5 billion.[180]

That same day, Jane Buyers-Russo, head of JPMorgan's broker-dealer unit, forwarded Tonucci a written notice of the $5 billion collateral call "as discussed between senior management."[181]  Pursuant to that notice, if JPMorgan did not receive the $5 billion in collateral by the opening of business on September 12, 2008, JPMorgan would "exercise [its] right to decline to extend credit to [Lehman] under the [Clearance] Agreement."[182]

### E.  Weil Gotshal Continued to Prepare for Lehman Bankruptcy

On September 11, 2008, Shai Waisman, a partner in Weil's bankruptcy department, billed time to Lehman described as "filing preparation."[183]  Also on September 11, a Weil attorney prepared a draft first day affidavit in support of a

---

[180] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at pp. 12-13.  There is evidence that Lehman agreed only to post $4 billion in response to JPMorgan's Sept. 9 request.  *See* e-mail from Donna Dellosso, JPMorgan, to Steven D. Black, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0006377] ("[Lehman] will maintain collateral of $4bln to cover intra-day exposure."); e-mail from Daniel J. Fleming, Lehman, to Mark G. Doctoroff, JPMorgan (Sept. 12, 2008) [LBEX-DOCID 405652] ("JPM now has a total of 4.6bn, 600mm more then agreed.").

[181] E-mail from Jane Buyers-Russo, JPMorgan, to Paolo R. Tonucci, Lehman (Sept. 11, 2008) [JPM-2004 0005411].

[182] *Id.* at p. 2.  At the same time, JPMorgan revised credit lines for some Lehman entities.  E-mail from David A. Weisbrod, JPMorgan, to Kelly A. Mathieson, JPMorgan (Sept. 12, 2008) [JPM-2004 0050026] (revised LBIE credit line to $1.4 billion); Examiner's Interview of Kelly A. Mathieson, Oct. 7, 2009, at p. 16. *See* § III.A.7 of the Report which discusses JPMorgan's collateral request on September 11, 2008 in greater detail.

[183] Weil, Gotshal & Manges LLP, Time Records (Sept. 11, 2008), at p. 6 [LBEX-WGM 1146447].

potential filing.[184]  Other Weil attorneys assisted in preparing the Chapter 11 petition.[185]

Weil also drafted Board resolutions approving a bankruptcy filing.[186]

### F.  Lehman's Management Updated the Board

On September 11, 2008, the Board held a telephonic meeting.[187]  Fuld updated the

Board on several issues.[188]  First, he advised the Board that Lehman believed that it had

the funding necessary to conduct its business on Friday, September 12, 2008.[189]  Fuld

also noted that "liquidity is forecasted to decrease to $30 billion that day as a result of

providing collateral."[190]  Fuld informed the Board that if Lehman could not complete a

transaction over the weekend, "the funding situation and rating agency situation would

be very difficult" because counterparties did not want to accept even high grade

collateral from Lehman.[191]  Fuld advised the Board that Lehman was working with the

FRBNY and the SEC on an orderly liquidation of assets supported by credit from the

FRBNY, if Lehman could not arrange a transaction.[192]

---

[184] *Id.* at p. 7.

[185] *Id.* at pp. 10, 17, 19.

[186] *Id.* at p. 19.

[187] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2008), at p. 1 [LBEX-AM 003918].

[188] *Id.* at pp. 1-2.

[189] *Id.* at p. 1.

[190] *Id.* at p. 2.

[191] *Id.*

[192] *Id.*

Second, Fuld informed the Board that Lehman had begun due diligence with BofA in connection with a possible deal.[193] Fuld stated that the goal was to announce a transaction by the evening of Sunday, September 14, 2008.[194] McDade told the Board about BofA's ongoing due diligence.[195]

Third, Fuld stated that he "had been advised of [Barclays'] potential interest by the Firm's regulators," although he had not heard this from Barclays directly.[196] Fuld was referring to a conversation with Terrence J. Checki, an executive vice president at the FRBNY, who told Fuld that Barclays was interested in Lehman.[197] Fuld had called Diamond, who told Fuld there was too much overlap to do a deal.[198] Nonetheless, Fuld recalled that he met with Diamond on September 11 or 12.[199] At that meeting, Fuld told Diamond that Fuld was willing to step down as CEO upon completion of a deal.[200] On September 11, Barclays began assembling its due diligence team and requested due diligence information, but Lehman was not able to begin delivering the bulk of the information until the next day.[201]

---

[193] *Id.* at p. 1.

[194] *Id.* at pp. 1-2.

[195] *Id.* at p. 2.

[196] *Id.*

[197] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009 at p. 7.

[198] *Id.*

[199] *Id.* *See* Tom Junod, *The Deal of the Century,* Esquire Magazine, October 2009, p. 157 (stating the meeting took place on Friday, September 12, 2008).

[200] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at pp. 7-8.

[201] *See, e.g.,* e-mail from Gerard LaRocca, Barclays, to James Walker, Barclays (Sept. 11, 2008) [BCI-EX-(S)-00033903]; e-mail from James Walker, Barclays, to Patrick Clackson, Barclays (Sept. 11, 2008) [BCI-EX-(S)-00021957]; e-mail from Gerard LaRocca, Barclays, to Richard Ricci, Barclays (Sept. 11, 2008) [BCI-EX-

Fourth, Fuld told the Board that he had recently contacted John Mack, Morgan Stanley's CEO, about a potential merger with Morgan Stanley.[202] Mack had told Fuld that there was too much overlap between the firms.[203] Mack also felt there was not enough time for Morgan Stanley to conduct due diligence and announce a deal by Sunday night.[204]

## VIII. SEPTEMBER 12, 2008

On Friday, September 12, 2008, as BofA continued its due diligence, Barclays began its own due diligence in connection with a possible deal.[205] In response to JPMorgan's request the previous day, Lehman posted $5 billion cash collateral.[206] Citi amended its Clearing Agreement with Lehman, strengthening its lien on Lehman's assets.[207] That evening, the CEOs of twelve Wall Street firms convened at the FRBNY at

---

00078752]; e-mail from Gerard LaRocca, Barclays, to Richard Ricci, Barclays (Sept. 11, 2008) [BCI-EX-00078770]; email from Gerard Reilly, Lehman, to Gerard LaRocca, Barclays, *et al.* (Sept. 11, 2008) [BARCLAYS-LB 00023388].

[202] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2008), at p. 2 [LBEX-AM 003918].

[203] *Id.*

[204] *Id.*

[205] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 12, 2008), at pp. 1-2 [LBEX-AM 003920].

[206] *See* e-mail from Christopher D. Carlin, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0033002] ("At 1130 EDT current balance in the Lehman Holding Co account is 4 billion 450 million vs the target 5 billion."); e-mail from Christopher D. Carlin, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0050902] ("Last 550 million received from Citi at 1:26PM NY time . . . balance in the Lehman Holding co account is now at 5 billion . . . ."); *see also* e-mail from Paolo R. Tonucci, Lehman, to Ian T. Lowitt, Lehman (Sept. 12, 2008) [LBEX-DOCID 4050567] ("JP should have their $5 bn.").

[207] Citibank, Direct Custodial Services Agreement Deed (Sept. 12, 2008) [CITI-LBHI-EXAM 00005903].

the Government's request to discuss Lehman's situation and possible remedies.[208]   At

the close of business on Friday, Lehman calculated its liquidity pool to contain $2 billion

of easily monetized liquidity.[209]

Lehman's stock officially opened Friday at $3.84 and traded in high volume

throughout the day.[210]  By Friday's official close, Lehman's stock was trading at $3.65.[211]

**LBHI Stock Price: Sept. 12, 2008**



| | 5:00 AM | 6:00 AM | 7:00 AM | 8:00 AM | 9:00 AM | 10:00 AM | 11:00 AM | 12:00 PM | 1:00 PM | 2:00 PM | 3:00 PM | 4:00 PM | 5:00 PM | 6:00 PM | 7:00 PM | 8:00 PM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEH | 5.71 | 5.32 | 5.41 | 4.87 | 4.5 | 4.24 | 3.91 | 3.9 | 3.88 | 3.76 | 3.69 | 3.79 | 3.81 | 3.77 | 3.95 | 3.93 |

## A.  Lehman Began Discussions with Barclays

On Friday, September 12, 2008, at 9:00 a.m., the board of directors of Barclays

authorized its management to undertake due diligence to determine whether there was

an opportunity for a transaction with Lehman.[212]  Barclays' management had presented

---

[208] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 9.

[209] Lehman, Ability to Monetize Chart (Sept. 12, 2008) [LBEX-WGM 784607].

[210] *See* Yahoo! Finance, Historical LEH stock prices, *available at* http://finance.yahoo.com/q?s=LEHMQ.PK.

[211] *Id*.

[212] Transcript of deposition testimony of Robert E. Diamond, *In re Lehman Brothers Holdings Inc.,* Case No. 08-13555 (Bankr. S.D.N.Y., Sept. 11, 2009), at pp. 24-25.

its board with two possible acquisition scenarios and both involved transactions that valued Lehman's stock at $5 per share.[213]

Varley informed Paulson that Barclays' board was prepared to consider a possible bid for Lehman.[214] Paulson also spoke to Alistair Darling, the United Kingdom's Chancellor of the Exchequer, during the day.[215] During that conversation, according to the FSA, Paulson told Darling that the FRBNY might provide Barclays with regulatory assistance to support a transaction.[216] Paulson told the Examiner that during the conversation, Chancellor Darling did not mention the need for a guaranty of Lehman's debts, but Darling did say that the FSA would not reject or approve the deal.[217] Paulson described Chancellor Darling's statement as a particularly British way of saying no.[218]

The September 12 discussions between the FSA and Barclays focused on quantifying the size and nature of Lehman's assets and their impact on Barclays' capital ratios.[219] Barclays advised the FSA that Barclays continued to seek unlimited access to

---

[213] *See* Barclays, Long Island Transaction Overview (Sept. 12, 2008), at p. 3 [BCI-EX-(S)-00053306_000001].
[214] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 12.
[215] *Id.* ¶ 23.
[216] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2008, at p. 20.
[217] *Id.*
[218] *Id.*
[219] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 27.

the FRBNY discount window although there remained debate within the Treasury as to who should provide the funding.[220]

Following the meeting of Barclays' Board, Diamond met with Fuld to discuss Barclays' interest.[221] According to Diamond, he told Fuld that there could be "no deal at a market price, the current market price, because of the risk and because of the overlap,"[222] and that Barclays' interest was only as a "rescue situation, meaning if this is a very, very distressed price."[223] According to Diamond, Barclays had two areas of concern about any potential deal with Lehman: long term funding and certain risk assets.[224] Barclays anticipated that the FSA would share those concerns.[225]

Sometime between 5:10 p.m. and 6:00 p.m. on September 12, Varley and Diamond had a call with Paulson and Geithner to discuss the potential deal.[226]

During a 4:00 p.m. Board meeting, Fuld informed Lehman's directors that Barclays had started due diligence, although he noted that there had not yet been any discussion "regarding transaction structure or price."[227] Fuld also told the Board that

---

[220] *Id.*

[221] Transcript of deposition testimony of Robert E. Diamond, *In re Lehman Brothers Holdings Inc., et al.,* Case No. 08-13555 (Bankr. S.D.N.Y., Sept. 11, 2009), at pp. 25-26.

[222] *Id.* at pp. 26-27.

[223] *Id.* at p. 32.

[224] E-mail from John Varley, Barclays, to Robert E. Diamond, Barclays, *et al.* (Sept. 12, 2008) [BCI-EX-00078748].

[225] *Id.*

[226] *See* Henry M. Paulson Jr., Call Logs (Sept. 2008), *available at* http://www.scribd.com/doc/21221123/Too-Big-To-Fail-Paulson-Call-Logs-and-Calendar-Sept-2008.

[227] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 12, 2008), at p. 1 [LBEX-AM 003920].

Barclays "would need approval from its stockholders for a transaction" and that "Barclays had only recently started its due diligence process."[228]

By Friday evening, Lehman's Global Co-Head of Capital Markets, Michael Gelband, and Lehman's Global Head of Principal Business, Alex Kirk, told McDade that they were encouraged by the dialogue between Lehman and Barclays.[229] Gelband and Kirk encouraged McDade to leave the BofA negotiations and join the Barclays discussions.[230] McDade promptly met with Diamond.[231] During that meeting, Diamond "walk[ed] through what his intentions and needs were if he was going to do a deal over the weekend and . . . tr[ied] to get a basic understanding . . . of what the core of the businesses were and how [McDade and Diamond] felt an integration would or would not work of the collective set of businesses."[232] According to McDade, "it was very clear that . . . at this point [Diamond] was contemplating the purchase of the whole firm."[233]

### B.  Lehman's Negotiations with BofA

As Friday, came to a close, BofA was winding down its due diligence.[234] Based on that due diligence, BofA believed that Lehman's valuations of its own commercial

---

[228] *Id.*

[229] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Brothers Holdings Inc.,* Case No. 08-13555 (Bankr. S.D.N.Y., Sept. 2, 2009), at p. 11.

[230] *Id.*

[231] *Id.*

[232] *Id.* at p. 12.

[233] *Id.* at pp. 13-14; Transcript of deposition testimony of Richard Ricci, *In re Lehman Brothers Holdings Inc.,* No. 08-13555 (Bankr. S.D.N.Y., Sept. 8, 2009), at p. 13.  *See* § III.C of the Report which discusses Barclays' due diligence and Lehman's negotiations with Barclays in greater detail.

[234] *See* e-mail from David M. Belk, Bank of America, to Walter J. Muller, Bank of America, *et al.* (Sept. 12, 2008) [BofA-SEC-00003515].

real estate positions were too high.[235] BofA's due diligence team also identified approximately $65 to $67 billion worth of Lehman assets that BofA would not have wanted at any price.[236] Consequently, Lewis believed that no deal with Lehman could work for BofA unless the Government would provide assistance to offset the undesirable assets.[237]

Fuld tried to call Lewis several times on Friday evening but Lewis did not answer any of those phone calls.[238] Despite that, Fuld did not yet suspect anything was awry with the potential BofA deal.[239]

### C. Meetings at the FRBNY

On the evening of September 12, the Government summoned the CEOs of twelve major investment banks to the FRBNY's offices.[240] No one from Lehman was invited or attended.[241] Baxter said that representatives from BofA and Barclays were not present because those firms were negotiating potential deals to acquire Lehman.[242] Curl told the Examiner that he thought a BofA representative had been present at the meeting.[243]

---

[235] *See, e.g.,* e-mail from Don Benningfield, Bank of America, to Rochelle Dobbs, Bank of America, *et al.* (Sept. 12, 2008) [BofA-SEC-00002774].

[236] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 5; Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 9.

[237] *Id.*

[238] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 6; Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 6.

[239] *Id.*

[240] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 9.

[241] *Id.*

[242] *Id.*

[243] Examiner's Interview of Gregory L. Curl, Oct. 19, 2009, at p. 10.

Paulson began the meeting by noting the absence of Lehman representatives.  He

explained that the meeting was convened to discuss Lehman,[244] and that federal money

would not be provided to rescue Lehman.[245]   As a result, Paulson said, the banking

industry needed to find a solution, because Lehman's failure would impact the entire

industry.[246]

### D.  Management Disclosed Bankruptcy Planning to the Board

Weil's billing records reflect work relating to a potential Lehman bankruptcy on

September 12, 2008.[247]  The head of Lehman's restructuring and finance group, Mark J.

Shapiro, approached Russo about establishing a bankruptcy-remote trust for employee

medical costs and taxes.[248]   At Russo's direction, Weil prepared motions to protect

certain Lehman benefit programs.[249]

Lehman's Board invited Miller to make a presentation at its telephonic

September 12, 2008 Board meeting.[250]   Lehman's Board minutes from that meeting

indicate that Miller advised the Board that "bankruptcy would be a very bad option"

---

[244] Examiner's Interview of Thomas Baxter Jr., May 20, 2009, at p. 9.

[245] *Id.*; Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 16.

[246] *Id.*  See Section III.A.6. of the Report, which discusses the FRBNY meetings in greater detail.

[247] *See* Weil Gotshal & Manges LLP, Time Records (Sept. 12, 2008) [LBEX-WGM 1146477].

[248] Examiner's Interview of Thomas A. Russo, May 22, 2009, at p. 10.

[249] *Id.*

[250] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 12, 2008) [LBEX-AM 003920].  Miller does not recall being physically present at a Board meeting until Sunday, September 14, 2008.  *Accord* Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 5.

under the circumstances.[251]  At the same meeting, Russo reported to the Board that "the Federal Reserve is interested in helping to facilitate an orderly wind-down and avoid a bankruptcy."[252]

Miller told the Examiner that Weil did not begin bankruptcy preparations by Friday, other than to begin to collect public information regarding Lehman.[253]  That evening, Miller had received a call from James L. Bromley, a partner at the law firm Cleary Gottlieb Steen & Hamilton ("Cleary Gottlieb"), on behalf of the FRBNY, requesting a meeting.  Bromley expressed no urgency to meet that night.[254]

### E.  Lehman's Compensation Committee Met

On September 12, 2008, at 5:00 p.m., Lehman's Compensation Committee held a telephonic meeting.[255]  The purpose of the meeting was to discuss how benefits to Jeremy M. Isaacs, CEO of LBIE, Andrew J. Morton, Lehman's Global Head of Fixed Income, and Benoit Savoret, Chief Operating Officer of LBIE, would be handled in the event of Lehman's sale or bankruptcy.[256]  The Committee authorized separation agreements with those three employees.[257]  The Committee also approved minimum compensation for Gerald Domini, who was the new global head of Equities, and

---

[251] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 12, 2008), at p. 2 [LBEX-AM 003920].
[252] *Id.*
[253] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 5.
[254] *Id.*
[255] Lehman Brothers Holdings Inc., Minutes of the Compensation and Benefits Committee (Sept. 9, 2008), at p. 1 [LBEX-AM 003922].
[256] *Id.*
[257] *Id.* at p. 2.

discussed the compensation package for Eric Felder, who was the new head of Lehman's Fixed Income Division.[258]   Sir Christopher Gent, a Lehman director, told the Examiner that the point of the meeting was to clarify for those individuals what would happen if Lehman was sold or filed bankruptcy, even if the approved plans never would be executed.[259]

### F.   Citi Amended its Clearing Agreement

On September 12, 2008, Citi and Lehman agreed to an amendment to their Clearing Agreement, which strengthened Citi's lien over LBI's property at Citi.[260]

### G.   Lehman Posted $5 Billion in Cash to JPMorgan

Following JPMorgan's request the previous day, Lehman delivered the full $5 billion cash collateral to JPMorgan on Friday, September 12, 2008.[261]

### H.   Liquidity Pool

By the end of the day on September 12, 2008, Lehman calculated that it had less than $2 billion remaining of easily monetized liquid assets.[262]

---

[258] *Id.* at pp. 2-3.

[259] Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at p. 27.

[260] Citibank, Direct Custodial Services Agreement Deed (Sept. 12, 2008) [CITI-LBHI-EXAM 00005903].

[261] *See* e-mail from Christopher D. Carlin, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al*. (Sept. 12, 2008) [JPM-2004 0033002] ("At 1130 EDT current balance in the Lehman Holding Co account is 4 billion 450 million vs the target 5 billion."); e-mail from Christopher D. Carlin, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0050902] ("Last 550 million received from Citi at 1:26PM NY time . . . balance in the Lehman Holding co account is now at 5 billion . . . ."); *see also* e-mail from Paolo R. Tonucci, Lehman, to Ian T. Lowitt, Lehman (Sept. 12, 2008) [LBEX-DOCID 4050567] ("JP should have their $5 bn.").

[262] Lehman, Ability to Monetize Chart (Sept. 12, 2008) [LBEX-WGM 784607].

## IX.  SEPTEMBER 13, 2008

At the noon Board of Directors meeting on Saturday, September 13, 2008, Russo told the Board that "the Federal Reserve believes that any bankruptcy filing by the Firm would be extremely disruptive.[263]  By early afternoon that day, BofA ended negotiations with Lehman and began talks with Merrill Lynch.[264]  Lehman continued negotiations with Barclays focused on a post-SpinCo transaction.[265]  During the day on Saturday, the FRBNY asked Barclays to guarantee Lehman's obligations leading up to the close of the transaction.  The requirement of the guaranty would have required Barclays' shareholders to approve the transaction.[266]  Nonetheless, on Saturday night Fuld believed that Lehman had a deal with Barclays.[267]

### A.  Negotiations with BofA Failed

On the morning of Saturday, September 13, 2008, Lewis heard that Paulson had said that the Government would be unwilling to intervene to save Lehman.[268]  Lewis contacted Paulson to make it clear that without sufficient Government assistance to balance out the unwanted Lehman assets, BofA would not do a deal.[269]  Paulson told

---

[263] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 13, 2008), at p. 2 [LBEX-AM 003927].

[264] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 7; Examiner's Interview of  Henry M. Paulson, Jr., June 25, 2009, at p. 19; Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 11-12.

[265] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 8.

[266] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 39.

[267] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 9.

[268] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 6.

[269] *Id*.

Lewis that the Government would not provide taxpayer money, but he also said that he wanted to reconvene with BofA later in the day to discuss other options.[270]

On Saturday afternoon, without informing anyone at Lehman, BofA began talks with Merrill Lynch about a potential merger.[271]  Lewis told the Examiner that the deal between BofA and Merrill did not interfere with any potential BofA deal with Lehman,[272] because by the time Merrill Lynch approached BofA, BofA had concluded that a deal with Lehman was unlikely.[273]  BofA already had brought its due diligence team home.[274]

Fuld continued to call Lewis throughout the day on Saturday without getting a response.[275]  At some point later in the day, Lewis' wife answered and told Fuld that if her husband wanted to talk to Fuld, Lewis would return the call.[276]  Lewis told the Examiner that he did not take Fuld's calls because Lewis did not think Fuld was in a position to help move the transaction forward.[277]

### B.   Barclays Discussions Continued

On Saturday, September 13, 2008, Lehman and Barclays discussed a potential deal that Fuld described as "life after SpinCo" because the contemplated deal did not

---

[270] *Id.*; Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 11.
[271] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 7.
[272] *Id.*
[273] *Id.*
[274] *Id.*
[275] Examiner's Interview of Richard S. Fuld, Jr. Apr. 28, 2009, at p. 7.
[276] *Id.*
[277] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 6.

include a purchase by Barclays of commercial real estate assets.[278]   During the day, Barclays advised the FSA that the FRBNY had asked Barclays to guarantee Lehman's obligations leading up to the close of the transaction.[279]   That guaranty would survive even if the transaction failed and it would make Barclays responsible for Lehman's existing and new business up until the time the transaction failed.[280]   Late in the day in the United Kingdom, Varley advised Sants that because of the guaranty, it was unlikely that a deal structure could be found that would satisfy Barclays' board.[281]

On Saturday in New York, McDade, Kirk and Cohen told Fuld that the approval of the FSA would not be an issue.[282]   Fuld reported to the Board on Saturday afternoon that Barclays had offered to purchase the operating subsidiaries of Lehman for $3 billion and that Barclays would guarantee Lehman's debt.[283]   Under the proposal, Lehman would receive the cash and would retain its commercial real estate assets, minority investments in hedge fund managers and limited partnership interests in Lehman-sponsored private equity funds.[284]

---

[278] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 8.

[279] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 39.

[280] *Id.*

[281] *Id.* ¶ 40.

[282] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 9.

[283] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 13, 2008), at p. 1 [LBEX-AM 003929].

[284] *Id.*

Also on Saturday, Barclays reached out to Buffett to ask whether Buffett would guarantee Lehman's operations until a Lehman-Barclays deal closed.[285] Barclays and Buffett discussed a scenario in which Buffett would provide a guaranty in support of the deal.[286] Buffett expressed interest in that possibility, but Barclays were not able to reach Buffett to further pursue that possibility.[287]

### C. FRBNY Informed That Bankruptcy Planning Was Skeletal

On Saturday, September 13, 2008, Weil's Miller told Cleary Gottlieb's Bromley and six or seven senior people from the FRBNY that Weil had not undertaken any serious bankruptcy preparation because the Lehman financial people were consumed with potential deals and therefore unavailable to the law firm.[288] Weil's billing records from Saturday related to bankruptcy work reflect numerous phone conferences with Lehman employees in "preparation for bankruptcy filings."[289] According to Miller, Weil prepared skeletal template documents, and Weil was "on watch" just as they had been with Bear Stearns.[290]

---

[285] Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at pp. 4-5.
[286] *Id*.
[287] *Id*.
[288] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 6.
[289] *See* Weil Gotshal & Manges, LLP, Time Records (Sept. 13, 2008), at p. 2 [LBEX-WGM 1146447].
[290] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 6.

## X.    SEPTEMBER 14, 2008

On Sunday, September 14, 2008, the FSA refused to waive the shareholder approval requirement for the Barclays deal, effectively ending the negotiations.[291]  Fuld reached out to Morgan Stanley to no avail.[292]  During the afternoon, Fuld learned about what he described as the "rule of insolvency" in the United Kingdom, which Fuld understood to make operating a business while insolventillegal.[293]  During the day, the FRBNY expanded access to its Primary Dealer Credit Facility ("PDCF") window but Lehman was told it was ineligible for the window.[294]  Representatives of the FRBNY told Lehman representatives that Lehman needed to declare bankruptcy.[295]  During a Board meeting that evening, SEC Chairman Christopher Cox and other Government representatives again pressed Lehman to file a bankruptcy petition.[296]   After that discussion, the Board resolved to declare bankruptcy.[297]

---

[291] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 43.

[292] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 28.

[293] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 12.  *Accord* Insolvency Act 1986, c. 45 § 214 (U.K.) (directors of a company may be personally liable to make a contribution in such amount "as the court thinks proper" under statute barring wrongful trading, if the directors "knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation.").

[294] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 13.

[295] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 7.

[296] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008), at p. 5 [LBEX-AM 003932].

[297] *Id.*

## A. The FSA Refused To Waive the Shareholder Approval Requirement for the Barclays Deal

On Sunday morning in the United Kingdom, the FSA and Barclays discussed the FRBNY's requirement that Barclays guarantee Lehman's obligations.[298]   The FSA acknowledged theoretically that it could waive the shareholder approval requirement.[299] However, the FSA concluded granting a waiver would "represent a compromise of one of the fundamental principles of the FSA's Listing Regime" because no precedent existed.[300]  During the early afternoon in the United Kingdom, Geithner spoke with FSA Chairman McCarthy, reiterating the FRBNY's requirement of a guaranty and suggesting that the urgency of the situation required a waiver of the shareholder approval requirement.[301]   Later that afternoon, Cox contacted McCarthy to discuss waiving the shareholder approval requirement.[302]  McCarthy cited the lack of precedent for such a waiver and noted that Barclays had yet to submit a formal proposal for the FSA's review of the deal.[303]  By 4:00 p.m. in the United Kingdom, Varley informed the FSA that discussions had ceased.[304]

Lehman's management had scheduled a Board meeting for noon on September 14, 2008, but delayed the meeting until 5:00 p.m. in order to try to come to some

---

[298] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 43.
[299] Id.
[300] Id.
[301] Id. ¶¶ 46-47.
[302] Id. ¶ 54.
[303] Id.
[304] Id. ¶ 56.

resolution at the FRBNY meetings.[305]  At some point on Sunday, Paulson told Fuld that the FSA would not waive the requirement that a guaranty of Lehman's obligations required the approval of Barclays' shareholders, and therefore the FSA would not approve the Barclays deal.[306]  Fuld asked Paulson to call Prime Minister Gordon Brown, but Paulson said he could not.[307]  Fuld asked Paulson to ask President Bush to call Prime Minister Brown, but Paulson said he was working on other ideas.[308]  Fuld brainstormed about other means to contact and convince the FSA to permit the deal, including having Jeb Bush, who was an advisor to Lehman at the time, ask President Bush to call Prime Minister Brown.[309]

### B.  Lehman Reached Out to Morgan Stanley

Fuld again reached out to Morgan Stanley's Mack on Sunday, September 14, 2008, because Lehman was in a "tough spot."[310]  Mack said there was too much going on for Morgan Stanley to consider a deal with Lehman.[311]

### C.  Fuld Learned About the United Kingdom's "Rule of Insolvency"

Sometime during the afternoon on September 14, 2008, Fuld learned about what he described as the "rule of insolvency" in the United Kingdom which Fuld understood to make operating a business while insolvent illegal.[312]

---

[305] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 9.
[306] *Id*.
[307] *Id*.
[308] *Id*.
[309] *Id*. at p. 10.
[310] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 28.
[311] *Id*.

### D. FRBNY

#### 1. Wall Street Consortium Agreed to Provide $20 Billion to Facilitate Barclays' Acquisition of Lehman

On Sunday, September 14, 2008, the consortium of banks assembled at the FRBNY agreed to provide at least $20 billion in private financing to liquidate Lehman's bad assets in order to assist Barclays' purchase of Lehman.[313]

#### 2. Lehman Developed a Plan for an Orderly Liquidation

On September 14, the FRBNY made clear that, with the potential Barclays deal dead, it would no longer keep funding Lehman.[314]  James P. Seery, Jr., Lehman's Global Head of Fixed Income - Loan Business, and others at Lehman then started working on an "orderly" liquidation plan for Lehman.[315]  The plan contemplated that it would take six months to effect an orderly unwinding of Lehman's positions.[316]  During that time, Lehman would have to continue to employ a substantial number of people, and pay bonuses to keep them.[317]  The plan also assumed that the FRBNY would provide financing support through the wind-down process.[318]  All work on the liquidation plan

---

[312] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 12.  *Accord* Insolvency Act 1986, c. 12, § 214 (U.K.) (directors of a company may be personally liable to make a contribution in such amount "as the court thinks proper" under statute barring wrongful trading, if the directors "knew, or ought to have concluded that there was no reasonable prospect would avoid going into insolvent liquidation).

[313] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 18.  See Section III.A.6 of the Report, which discusses the consortium in greater detail.

[314] Examiner's Interview of James P. Seery, Jr., November 12, 2009, at pp. 1-2.

[315] *Id.* at p. 2.

[316] *Id.*

[317] *Id.*

[318] *Id.*

came to a halt when word circulated that the Government had told Lehman that Lehman would need to file bankruptcy that evening.[319]

### 3. Sunday Meetings at the FRBNY

By the early afternoon of Sunday, September 14, 2008, Miller learned that discussions were not going well for Lehman at the FRBNY.[320] Miller, and other Weil attorneys, Dannhauser, Thomas A. Roberts and Lori Fife went to the FRBNY to represent Lehman.[321] On the way to the FRBNY meeting, Roberts received a call from another Weil attorney saying that Citi had been told that Lehman was being liquidated and requesting that Weil Gotshal represent Citi.[322]

### 4. The FRBNY Expanded the PDCF Window

On September 14, 2008, the FRBNY issued a press release that stated that "[t]he collateral eligible to be pledged at the Primary Dealer Credit Facility ("PDCF") has been broadened to closely match the types of collateral that can be pledged in the tri-party repo systems of the two major clearing banks."[323] Lehman soon learned that it was not eligible to use the window to continue its normal operations.[324] The FRBNY limited the collateral LBI could use for overnight financing to collateral that was in LBI's box at

---

[319] Examiner's Interview of James P. Seery, Jr., Nov. 12, 2009, at p. 2; Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 12-13; Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at pp. 7-8; Examiner's Interview of Scott Alvarez, Nov. 12, 2009, at p. 8.

[320] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 7.

[321] *Id.*

[322] *Id.*

[323] FRBNY, Press Release (Sept. 14, 2008), *available at*
http://www.federalreserve.gov/newsevents/press/monetary/20080914a.htm (last visited Jan. 24, 2010).

[324] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 13.

JPMorgan as of Friday, September 12, 2008.[325]  That restriction was referred to as the

"Friday criteri[on]."[326]

In addition, the FRBNY imposed larger haircuts on LBI's PDCF borrowing than it

did on other investment banks.[327]  The haircuts imposed on LBI's PDCF borrowing were

larger than under Lehman's pre-bankruptcy triparty borrowing.[328]

In connection with Lehman's preparations to file the LBHI chapter 11 petition,

the FRBNY, acting as a lender of last resort, advised Lehman that it would provide up

---

[325] Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 5; Examiner's Interview of Christopher Burke, July 7, 2009, at p. 3. An experimental allocation by Lehman to the PDCF on Monday morning showed at least $72 billion of eligible Lehman securities being swept into the PDCF system; *see* e-mail from John Palchynsky, Lehman, to Craig L. Jones, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 076981]. *See also* Lehman, PDCF Schedule of Eligible Securities (Sept. 14, 2008) [LBEX-DOCID 405695].

[326] Examiner's Interview of Robert Azerad, Apr. 20 2009, at p. 5; Examiner's Interview of Christopher Burke, July 7, 2009, at p. 3. According to Azerad, this restriction prevented Lehman from posting the range of collateral to the PDCF that other firms were allowed to post after September 15, 2008. Examiner's Interview of Robert Azerad, Apr. 20 2009, at p. 5; *see also* e-mail from Timothy Lyons, Lehman, to Ian T. Lowitt, Lehman (Sept. 14, 2008) [LBEX-DOCID 070210] (stating "the fed is letting the other eighteen broker dealers fund a much broader range of collateral than us").

[327] Examiner's Interview of Christopher Burke, July 7, 2009, at p. 3. *See also* e-mail from Ricardo S. Chiavenato, JPMorgan, to Christopher D. Carlin, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0055329]. *Accord* Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 5. According to Azerad, the FRBNY imposed the wider haircuts on Lehman because the FRBNY was not willing to take any losses in its overnight financing of Lehman. *Id.*

[328] *See* e-mail from George V. VanSchaick, Lehman, to John Feraca, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 077028] (discussing the larger haircuts imposed by the FRBNY on Lehman's PDCF borrowing); e-mail from Robert Azerad, Lehman, to Susan McLaughlin, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 457643] (explaining the PDCF haircuts would "result in a $4 billion drain in liquidity . . ."). *See also* Lehman, PDCF Schedule of Eligible Securities (Sept. 14, 2008) [LBEX-DOCID 405695] (detailing the PDCF haircuts applied to Lehman for the various categories of accepted securities); e-mail from Ricardo S. Chiavenato, JPMorgan, to Christopher D. Carlin, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0055329]. *But see* e-mail from Sindy Aprigliano, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 068353] (stating the haircut impact from using the PDCF would decrease to $2 billion).

to two weeks of overnight secured financing through the PDCF[329] to allow LBI to accomplish an orderly liquidation.[330]

### 5. The FRBNY Directed Lehman to File for Bankruptcy

Fuld told the Examiner that on Sunday afternoon, Erik R. Sirri, head of the SEC's CSE program, called Fuld and asked him to "promise [Sirri] one thing," which was that Lehman would not file for bankruptcy protection.[331] Not long after that conversation with Sirri, McDade called Fuld from the meeting at the FRBNY to tell him that "the Fed has just mandated that we file for bankruptcy."[332] At the FRBNY, Baxter said that Lehman needed to file by midnight that night.[333] Miller responded to Baxter's statement by asking why and objecting that the filing could not happen by midnight.[334] Miller said that a Lehman bankruptcy would "bring great destabilization in the market," "bring trading to a halt," and result in financial "Armageddon."[335] The Government representatives' reply was that the issue had been decided and there were cars available to take the Lehman people back to their offices.[336]

---

[329] According to Christopher Burke, the PDCF was created in March 2008 to permit investment banks to obtain financing from the Fed: (a) on an overnight basis; and (b) using a broader range of collateral than was eligible under Open Market Operations ("OMO") and Term Securities Lending Facility ("TSLF"). Examiner's Interview of Christopher Burke, July 7, 2009, at p. 3.

[330] Examiner's Interview of Shari D. Leventhal, Apr. 30, 2009, at pp. 4-5. Some Fed employees thought the Fed was risking too much exposure with the two week funding timeframe. *Id.* at 5.

[331] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 12.

[332] *Id.*

[333] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 7.

[334] *Id.*

[335] *Id.*

[336] *Id.* at p. 8.

### E. Lehman Suggested a Sale in Bankruptcy to Barclays

At about 6:00 p.m. on Sunday, September 14, Shapiro went to McDade's office to "make sure [McDade] understood that" Lehman could sell itself to Barclays in bankruptcy.[337]

Shapiro recommended to McDade that they see whether Barclays would be willing to purchase Lehman, in whole or in part, through a sale under Section 363 of the Bankruptcy Code.[338]   McDade called Diamond to discuss the idea.[339]   Barclays was interested and suggested that Lehman have a team ready to meet with Barclays' team early Monday morning.[340]

### F. The September 14, 2008 Board Meeting

Lehman's management scheduled a Board meeting for noon on Sunday, September 14, 2008, but delayed the meeting until 5:00 p.m. in light of the FRBNY meetings.[341]   The Board meeting re-convened at 7:50 p.m.[342]   As the Board was meeting,

---

[337] Transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y., Aug. 7, 2009), at p. 16.  Shapiro had not been involved in the previous negotiations between Lehman and Barclays; he had been preparing for a possible bankruptcy filing.  *Id.* at pp. 14-15.

[338] *Id.* at p. 18.  Section 363 of the Bankruptcy Code, among other things, authorizes a debtor to sell estate property outside the ordinary course of business.  11 U.S.C. § 363 (2006).

[339] Transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y., Aug. 7, 2009), at pp. 16-17; Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y., Sept. 2, 2009), at p. 6; Transcript of deposition testimony of Richard Ricci, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y., Sept. 8, 2009), at pp. 18-19; Transcript of deposition testimony of Jerry Del Missier, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y., Sept. 1, 2009), at pp. 42-43.

[340] Transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y., Aug. 7, 2009), at p. 20.

[341] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 9.

Cox, Baxter and other Government representatives called and asked to address the Board.[343]  Baxter said the call was arranged at the request of Paulson and Geithner.[344] Paulson said he urged Cox to call Lehman because Cox was having a hard time actually communicating the decision by the Government that Lehman's bankruptcy was the appropriate course.[345]

The Government representatives on the call included SEC general counsel Brian Cartwright and Allen Beller of Cleary, Gottlieb, who was representing the Treasury Department.[346]  According to Baxter, the purpose of the call was to emphasize that a bankruptcy filing by LBHI "made sense" but that the ultimate decision was for the Board.[347]  Baxter told the Examiner that he made the point "that opening on Monday was not an option because of the chaos in the markets."[348]

The Board's initial reaction to the Government's call suggesting that Lehman declare bankruptcy was "anger."[349]  The Board discussed the advantages and

---

[342] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008), at p. 5 [LBEX-AM 003932].

[343] *Id.*

[344] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 11.

[345] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 21.

[346] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008) [LBEX-AM 003932].

[347] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 11.

[348] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 21.

[349] Examiner's Interview of John F. Akers, Apr. 22, 2009 at p. 13; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 16.

disadvantages of a bankruptcy filing.[350]   It also discussed whether a delay in filing would allow time to plan and prepare Lehman to operate under Chapter 11 and prepare a more complete filing.[351]   Miller, who was then Lehman's lead bankruptcy counsel, told the Examiner that he did not think the rushed filing had an adverse impact on the estate.[352]   The Board felt at the time that one important consideration was the anticipated difficulty in meeting payment obligations on Monday.[353]   The Board questioned whether a substantial amount of the collateral pledged to JPMorgan could be recovered prior to filing.[354]   The Board also noted the Government's clear preference that Lehman file that night, the FRBNY's unwillingness to provide sufficient financing for Lehman and the ultimate inevitability of a bankruptcy filing under the circumstances.[355]   Lehman director Henry Kaufman was a proponent of "calling the Government's bluff" and opening on Monday,[356] but ultimately the Board concluded that filing for bankruptcy immediately was the appropriate course of action.[357]

---

[350] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008), at p. 4 [LBEX-AM 003932].

[351] *Id.*

[352] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 9.

[353] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008), at p. 5 [LBEX-AM 003932].

[354] *Id.*

[355] *Id.*

[356] Examiner's Interview of Henry Kaufman, Sept. 2, 2009, at p. 19.

[357] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008), at p. 5 [LBEX-AM 003932].

# XI.          SEPTEMBER 15, 2008

In the early hours of Monday, September 15, 2008, Weil Gotshal began filing for bankruptcy.[358]  Later that morning, after some confusion, JPMorgan agreed to continue clearing for Lehman.[359]  During the course of the day, Lehman renewed discussions with Barclays regarding a Section 363 sale in Lehman's bankruptcy case.[360]

## A.   Lehman Filed for Bankruptcy Protection

After discussion, upon a duly made and seconded motion, the Board unanimously resolved to file for bankruptcy protection under Chapter 11 of the Bankruptcy Code.[361]  Weil Gotshal filed around 1:30 a.m. on Monday, September 15, 2008.[362]

## B.   JPMorgan's Clearing Activities

Over Sunday night and into Monday morning, JPMorgan became concerned about Lehman's requests for JPMorgan to release Lehman collateral.[363]  JPMorgan used the Lehman collateral to secure non-intraday risk and JPMorgan's extension of intraday

---

[358] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 9.

[359] E-mail from Jane Buyers-Russo, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0055008].

[360] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y., Sept. 2, 2009) at p. 16; *see also* Transcript of deposition testimony of Michael Klein, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 12, 2009), at pp. 38-39.

[361] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008) [LBEX-AM 003936].

[362] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 9.

[363] *See* e-mail from Barry L. Zubrow, JPMorgan, to Heidi Miller, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0029745].  See Section III.C.6 of the Report which discusses JPMorgan's confusion over what trades to settle for Lehman on September 15, 2008 in greater detail.

credit to Lehman. JPMorgan was unwilling to release Lehman collateral if such action would leave JPMorgan under-collateralized. On that Monday morning, however, JPMorgan e-mails suggest that JPMorgan held excess Lehman collateral, and, according to those e-mails, JPMorgan denied to Lehman that JPMorgan held any such excess Lehman collateral.[364] By 8:50 a.m. on Monday morning, Lehman's triparty borrowing was unwound.[365] By mid-morning on Monday, the confusion was resolved, and JPMorgan clarified its position that "JPM [would] continue to act as the operating bank for [LBI] which include[d] being settlement bank for the various exchanges and the fed wire . . . ." but limited its aggregate exposure to $1 billion.[366]

### C. The FRBNY's Limitation on Acceptable Collateral

On September 15, 2008, the FRBNY confirmed that assets priced by Lehman were acceptable for the PDCF.[367] Following Lehman's bankruptcy, Lehman relied on the PDCF for approximately $30 billion in overnight financing it needed to repay its

---

[364] *See* e-mail from Heidi Miller, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0054402-03] ("All we need to talk this morning about the calls Leh[man] has been making about having us return a portion of our excess collateral to [LBHI]. We have taken the position that the[re] is no excess but they have not yet accepted that. We should make sure our statements are consistent since I am sure you will soon get called as well").

[365] *See* e-mail from Ed Corral, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0054416].

[366] E-mail from Jane Buyers-Russo, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0055008].

[367] *See* e-mail from John N. Palchynsky, Lehman, to George V. VanSchaick, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 118677] (stating JPMorgan had received oral confirmation from the Fed that Lehman priced assets were acceptable for the PDCF). *See also* e-mail from Ed Corral, JPMorgan, to Marco Brandimarte, JPMorgan (Sept. 15, 2008) [JPM-2004 0054468] (stating he believed the Fed had agreed to permit seller priced securities in the PDCF).

clearing banks.[368]  In addition to Lehman's PDCF borrowing, Lehman also funded its operations after the bankruptcy filing through two additional FRBNY programs, the Open Market Operations ("OMO") and the Term Securities Lending Facility ("TSLF"),[369] and tri-party term repos that had not yet expired.[370]  The FRBNY's overnight financing of LBI began Monday evening, September 15, with Lehman borrowing approximately $28 billion via the PDCF,[371] and continued through Thursday morning, September 18, 2008.[372]

### D.  Negotiations Between Lehman and Barclays

Post-bankruptcy negotiations between Barclays and Lehman began with a telephone call early Monday morning between McDade, McGee and Shafir, Lehman's

---

[368] See e-mail from David Weisbrod, JPMorgan, to Jamie L. Dimon, JPMorgan, et. al. (Sept. 15, 2008) [JPM-2004 0080146] (listing Lehman's triparty repo borrowing at $51 billion ($28 billion from the PDCF, $2 billion from Barclays, and $21 billion from other investors) for Monday).  Accord Alvarez & Marsal, Summary of Meeting with James Hraska on 10/08/08 (Oct. 8, 2008), at pp. 1-4 (listing the FRBNY's funding of Lehman (via the PDCF, OMO, and TSLF) for the week following the LBHI petition).

[369] Examiner's Interview of Christopher Burke, July 7, 2009, at p. 4; Alvarez & Marsal, Summary of Meeting with James W. Hraska on 10/08/08 (Oct. 8, 2008), at pp. 1-4.

[370] See e-mail from David A. Weisbrod, JPMorgan, to Jamie L. Dimon, JPMorgan, et. al. (Sept. 15, 2008) [JPM-2004 0080146] (listing $21 billion in "mainly term repos" as part of LBI's triparty borrowing for September 15).

[371] See e-mail from Ed Corral, JPMorgan, to William Walsh, JPMorgan, et al. (Sept. 15, 2008) [JPM-2004 0031195] (notifying the Fed that the Lehman assets used in LBI's $28 billion PDCF repo on Monday night satisfied the Friday criterion).  Earlier on Monday, Lehman estimated that it would borrow up to $35 billion through the PDCF on Monday night.  See e-mail from Sindy Aprigliano, Lehman, to Robert Azerad, Lehman (Sept. 15, 2008) [LBEX-DOCID 1071653] (providing Feraca's PDCF estimate of $27 billion plus a buffer of $8 billion); e-mail from Robert Azerad, Lehman, to Susan McLaughlin, Lehman, et al. (Sept. 15, 2008) [LBEX-DOCID 071550] (estimating $34 billion of PDCF borrowing); e-mail from Paolo R. Tonucci, Lehman, to Susan McLaughlin, Lehman, et al. (Sept. 15, 2008) [LBEX-DOCID 071550] (estimating $28.3 billion for the collateral value of the PDCF borrowing).

[372] Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 5.

Global Head of Mergers and Acquisitions, for Lehman, and Diamond, Christian del Messier and Michael Klein for Barclays.[373]

During that call, Diamond expressed concern about whether Barclays would be buying an intact business, given the media reports about Lehman employees leaving the headquarters building in droves.[374] The Lehman executives responded that they were confident that, if the deal was done quickly enough, they could keep a large part of the business together and deliver it to Barclays.[375] .

[373] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y., Sept. 2, 2009), at p. 16; *see also* Transcript of deposition testimony of Michael Klein, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y., Sept. 12, 2009), at pp. 38-39.
[374] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y., Sept. 2, 2009), at p. 17.
[375] *Id*. See Section III.C.6.c of the Report, which discusses post-bankruptcy negotiations in greater detail.

# APPENDIX 16: VALUATION- RESIDENTIAL WHOLE LOANS

Appendix 16 provides Lehman's detailed pricing data regarding residential whole loans ("RWL") and the Intex output used to calculate the Examiner's model prices for RWL discussed in the Report at Sections III.A.2.g. This analysis was prepared by Duff & Phelps, the Examiner's financial advisor.

**Minimum, Maximum and Weighted Average of Desk Prices for Lehman's U.S. RWL Portfolio as of May 31, 2008[1]**

| Type/Category | Number of Loans | Balance (US$million) | Minimum Desk Price | Maximum Desk Price | Weighted Average Desk Price |
|---|---|---|---|---|---|
| Performing | | | | | |
| FHA/VA | 1,999 | 154.0 | 88.4 | 102.5 | 99.9 |
| High LTV | 129 | 24.5 | 99.1 | 105.5 | 100.3 |
| Home Express | 12 | 1.3 | 0.7 | 105.0 | 95.7 |
| Neg Am | 594 | 228.5 | 60.1 | 95.6 | 93.8 |
| Prime Fixed | 2,532 | 456.0 | 0.7 | 104.1 | 84.1 |
| Prime Hybrid Arms | 4,188 | 1,229.7 | 0.1 | 110.9 | 93.3 |
| Reverse Mortgages | 4,104 | 618.1 | 93.7 | 104.2 | 99.2 |
| Scratch & Dent | 1,724 | 157.7 | 0.5 | 99.9 | 44.3 |
| Subprime | 2,052 | 87.5 | 1.4 | 101.0 | 55.4 |
| Subprime 2nds | 15,434 | 656.4 | 1.4 | 106.7 | 74.3 |
| Non Performing | | | | | |
| FHA/VA | 1,389 | 111.9 | 94.1 | 102.6 | 98.5 |
| High LTV | 2 | 0.1 | 100.0 | 101.6 | 100.7 |
| Home Express | 2 | 0.2 | 95.4 | 100.7 | 99.8 |
| Neg Am | 49 | 15.3 | 60.1 | 103.2 | 75.2 |
| Prime Fixed | 215 | 38.7 | 59.3 | 102.3 | 69.1 |
| Prime Hybrid Arms | 430 | 130.5 | 0.1 | 105.4 | 82.1 |
| Scratch & Dent | 2,361 | 225.0 | 0.5 | 74.4 | 42.8 |
| Subprime | 1,361 | 77.9 | 27.9 | 100.0 | 48.4 |
| Subprime 2nds | 6,357 | 229.0 | 0.6 | 94.6 | 50.3 |
| **Total** | **44,934** | **4,442.3** | **0.1** | **110.9** | **76.7** |

---

[1] Lehman, "New 05-30-08 WL Testing.xls," tab "WL Testing Summary" [LBEX-BARFID 0006698].

**Minimum, Maximum and Weighted Average of Desk Prices for Lehman's RWL Portfolio as of August 31, 2008[2]**

| Type/Category | Number of Loans | Balance (US$million) | Minimum Desk Price | Maximum Desk Price | Weighted Average Desk Price |
|---|---|---|---|---|---|
| Performing | | | | | |
| FHA/VA | 492 | 46.6 | 80.7 | 102.1 | 95.7 |
| High LTV | 77 | 15.2 | 99.1 | 106.7 | 101.8 |
| Home Express | 11 | 0.9 | 0.7 | 106.0 | 68.6 |
| Neg Am | 534 | 159.8 | 57.4 | 92.6 | 72.5 |
| Prime Fixed | 1,584 | 253.4 | 44.4 | 101.9 | 69.3 |
| Prime Hybrid Arms | 2,098 | 402.2 | 46.0 | 107.5 | 61.4 |
| Reverse Mortgages | 4,267 | 648.3 | 92.6 | 104.6 | 97.5 |
| Scratch & Dent | 1,182 | 90.1 | 0.0 | 65.2 | 40.8 |
| Subprime | 1,880 | 56.6 | 1.4 | 101.0 | 41.0 |
| Subprime 2nds | 14,226 | 382.9 | 0.0 | 64.2 | 47.2 |
| Intl. Resort Home Lending | 28 | 7.7 | 99.4 | 100.6 | 99.5 |
| Non-Performing | | | | | |
| FHA/VA | 923 | 70.8 | 80.7 | 101.3 | 98.8 |
| High LTV | 2 | 0.1 | 100.0 | 101.5 | 100.6 |
| Home Express | 2 | 0.2 | 94.9 | 96.7 | 95.2 |
| Neg Am | 95 | 27.9 | 57.4 | 92.5 | 70.2 |
| Prime Fixed | 432 | 72.0 | 44.4 | 103.5 | 70.3 |
| Prime Hybrid Arms | 1,380 | 261.2 | 46.0 | 105.5 | 62.7 |
| Scratch & Dent | 1,680 | 141.3 | 0.0 | 65.2 | 40.4 |
| Subprime | 1,052 | 52.3 | 0.3 | 100.0 | 37.5 |
| Subprime 2nds | 5,652 | 114.4 | 0.0 | 61.8 | 30.0 |
| **Total** | **37,597** | **2,804.0** | **0.0** | **107.5** | **60.3** |

[2] Lehman, "08-29-08 WL population testing.xls" [LBEX-LL 1875677].

**Desk-to-Product Control Price Variances in Lehman's U.S. RWL Portfolio as of May 31, 2008[3]**

| Performing | Desk Price | Market Value - Desk ($) | PC Price | Market Value - PC ($) | Variance ($) | Variance % |
|---|---|---|---|---|---|---|
| FHA/VA | 99.9 | 153,964,556 | 99.0 | 152,540,383 | (1,424,173) | -0.9% |
| High LTV | 100.3 | 24,487,002 | 89.0 | 21,720,084 | (2,766,917) | -11.3% |
| Home Express | 95.7 | 1,275,622 | 89.0 | 1,185,935 | (89,687) | -7.0% |
| Neg Am | 93.8 | 228,541,687 | 89.0 | 216,775,393 | (11,766,294) | -5.1% |
| PRIME FIXED | 84.1 | 456,043,313 | 89.0 | 482,532,457 | 26,489,144 | 5.8% |
| Prime Hybrid Arms | 93.3 | 1,229,652,468 | 89.0 | 1,172,384,322 | (57,268,146) | -4.7% |
| Reverse Mortgages | 99.2 | 618,084,216 | 100.8 | 628,328,194 | 10,243,978 | 1.7% |
| Scratch & Dent | 44.3 | 157,878,116 | 49.3 | 175,701,281 | 17,823,165 | 11.3% |
| Subprime | 55.4 | 87,350,807 | 65.0 | 102,526,712 | 15,175,905 | 17.4% |
| Subprime 2nds | 74.3 | 656,402,926 | 65.0 | 574,144,389 | (82,258,537) | -12.5% |
| Non-Performing | | | | | | |
| FHA/VA | 98.5 | 111,916,289 | 99.0 | 112,479,608 | 563,319 | 0.5% |
| High LTV | 100.7 | 135,053 | 49.3 | 66,141 | (68,913) | -51.0% |
| Home Express | 99.8 | 230,976 | 49.3 | 114,138 | (116,838) | -50.6% |
| Neg Am | 75.2 | 15,301,109 | 49.3 | 10,034,945 | (5,266,164) | -34.4% |
| PRIME FIXED | 69.1 | 38,688,490 | 49.3 | 27,621,373 | (11,067,117) | -28.6% |
| Prime Hybrid Arms | 82.1 | 130,492,841 | 49.3 | 78,393,892 | (52,098,949) | -39.9% |
| Scratch & Dent | 42.9 | 227,731,674 | 49.3 | 261,713,325 | 33,981,651 | 14.9% |
| Subprime | 48.2 | 75,111,235 | 49.3 | 76,803,363 | 1,692,128 | 2.3% |
| Subprime 2nds | 50.3 | 229,009,341 | 49.3 | 224,429,685 | (4,579,656) | -2.0% |
| **Total** | | **4,442,297,721** | | **4,319,495,620** | **(122,802,101)** | **-2.8%** |

[3] Lehman, "Pricing Package May 08.xls" [LBEX-BARFID 0006591].

**Desk-to-Product Control Price Variances in Lehman's U.S. RWL Portfolio as of August 31, 2008[4]**

| Performing | Desk Price | Market Value – Desk ($) | PC Price | Market Value - PC ($) | Variance ($) | Variance % |
|---|---|---|---|---|---|---|
| FHA/VA | 95.7 | 46,571,730 | 95.7 | 46,571,730 | (0) | 0.0% |
| High LTV | 101.8 | 15,204,055 | 66.3 | 9,900,523 | (5,303,531) | -34.9% |
| Home Express | 68.6 | 859,853 | 66.3 | 831,320 | (28,533) | -3.3% |
| Neg Am | 72.5 | 159,819,347 | 66.3 | 146,180,221 | (13,639,126) | -8.5% |
| PRIME FIXED | 69.3 | 253,393,137 | 66.3 | 242,443,574 | (10,949,564) | -4.3% |
| Prime Hybrid Arms | 61.4 | 402,167,481 | 66.3 | 434,037,761 | 31,870,280 | 7.9% |
| Reverse Mortgages | 97.5 | 648,314,615 | 97.5 | 648,314,615 | 0 | 0.0% |
| Scratch & Dent | 40.8 | 90,142,670 | 50.3 | 110,944,103 | 20,801,433 | 23.1% |
| Subprime | 41.0 | 56,627,784 | 50.3 | 69,323,442 | 12,695,658 | 22.4% |
| Subprime 2nds | 47.2 | 382,920,071 | 50.3 | 407,452,063 | 24,531,992 | 6.4% |
| International Resort Home Lending | 99.5 | 7,689,612 | 80.0 | 6,180,318 | (1,509,294) | -19.6% |
| Non-Performing | | | | | | |
| FHA/VA | 98.8 | 70,835,419 | 95.7 | 68,641,782 | (2,193,637) | -3.1% |
| High LTV | 100.6 | 134,795 | 50.3 | 67,319 | (67,475) | -50.1% |
| Home Express | 95.2 | 220,374 | 50.3 | 116,337 | (104,036) | -47.2% |
| Neg Am | 70.2 | 27,894,489 | 50.3 | 19,974,080 | (7,920,409) | -28.4% |
| PRIME FIXED | 70.3 | 71,987,226 | 50.3 | 51,463,603 | (20,523,623) | -28.5% |
| Prime Hybrid Arms | 62.7 | 261,247,198 | 50.3 | 209,464,944 | (51,782,254) | -19.8% |
| Scratch & Dent | 40.4 | 141,278,269 | 50.3 | 175,891,345 | 34,613,076 | 24.5% |
| Subprime | 37.5 | 52,251,513 | 50.3 | 70,073,927 | 17,822,414 | 34.1% |
| Subprime 2nds | 30.0 | 114,441,227 | 30.0 | 114,388,799 | (52,428) | 0.0% |
| | | | | | | |
| **Total** | | **2,804,000,865** | | **2,832,261,807** | **28,260,942** | **1.0%** |

---

[4] Lehman, "Pricing Package Aug 08.xls," tab "Whole Loans" [LBEX-BARFID 0006669].

**Desk-to-Examiner Price Variances in Lehman's U.S. RWL Portfolio as of May 31, 2008**

A total of $4.4 billion of U.S. RWL assets were tested by Lehman's Product Control group and the Examiner's financial advisor. While there were some significant variances, the Examiner's financial advisor found Lehman's valuation to be in aggregate within a range of reasonableness. The following table contains the loan types where the Examiner's financial advisor had a significant variance with Lehman marks.

| Loan Type | LEH mark | Examiner's mark | LEH MTM ($) | Examiner MTM ($) | Difference ($) |
|---|---|---|---|---|---|
| Prime-Hybrid ARMs | 93.3 | 81.1 | 1,229,652,468 | 1,067,660,105 | 161,992,363 |
| Prime-Fixed | 84.1 | 80.1 | 456,043,313 | 434,279,212 | 21,764,102 |
| Subprime | 55.4 | 55.4 | 87,350,807 | 87,384,305 | -33,498 |
| Subprime 2nds | 74.3 | 55.4 | 656,402,926 | 489,347,679 | 167,055,247 |
| Scratch & Dent | 44.3 | 55.4 | 157,878,116 | 197,441,196 | -39,563,080 |
| Alt A | 93.8 | 67.6 | 228,541,687 | 164,530,088 | 64,011,599 |
| Total | | | 2,815,869,318 | 2,440,642,584 | 375,226,733 |

| | |
|---|---|
| **Total Market Value of tested population** | $4.4 Billion |
| **Total Variance of tested population** | $375,226,733 |

The Examiner's financial advisor's marks are the average of the prices for the two respective deals from each category per the table below:

| LOAN TYPE | REPRESENTATIVE DEALS | PRICE |
|---|---|---|
| Prime – Hybrid ARMs | SARM 2008 – 02 | 80.0 |
| | SARM 2007-09 | 82.1 |
| | Average | 81.1 |
| Prime - Fixed | LMT 2006-03 | 79.0 |
| | LMT 2006-04 | 81.2 |
| | Average | 80.1 |
| Sub Prime | SASCO 2007-BC4 | 54.7 |
| | SASCO 2007-BNC1 | 56.1 |
| | Average | 55.4 |
| Alt A | Lehman XS Trust 07-10H | 66.5 |
| | Lehman XS Trust 2007 – 17H | 68.6 |
| | Average | 67.6 |

As discussed in the Report at Section III.A.2.g.4.f, the assumptions used in estimating the prices for each tranche of the representative deal are as follows:

| Product Type | Prepayment Rate | Default Rate | Loss Severity ($1^{st}/2^{nd}$ Lien) | Resulting Losses | Yield |
|---|---|---|---|---|---|
| Prime | 15% | 5% | 50% / 100% | High single digits | 10% |
| Alt-A | 10% | 10% | 50% / 100% | High teens – Low 20s | 15% |
| Subprime | 5% | 15% | 50% / 100% | Mid 30s | 20% |

The output for each of the deals was run through Intex, and the weightings used to estimate the price from each deal are provided below.

**Prime Hybrid Arms (Deal 1): SARM 2008-02**

| Tranche | Cusip | Type | Coupon | Float Formula | Original Rating: Moody's/S&P/Fitch/Dom | Current Rating: Moody's/S&P/Fitch/Dom | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| A1 | 86365BAA1 | SEN_SPR_FLT | 4.2219 | LIBOR_1MO + 1.75 | NA/AAA/NA/AAA | | 129,668 | 120,966 | 70.0% | 87.4 |
| A21 | 86365BAC7 | SEN_SPR_WAC | 6.4217 | | NA/AAA/NA/AAA | | 14,761 | 13,456 | 8.0% | 92.2 |
| A22 | 86365BAD5 | SEN_SPR_WAC | 6.4217 | | NA/AAA/NA/AAA | | 4,689 | 4,689 | 2.5% | 73.9 |
| A31 | 86365BAE3 | SEN_SUP_WAC | 6.4217 | | NA/AAA/NA/AAA | | 14,058 | 12,815 | 7.6% | 92.2 |
| A32 | 86365BAF0 | SEN_SUP_WAC | 6.4217 | | NA/AAA/NA/AAA | | 4,466 | 4,466 | 2.4% | 55.2 |
| R | 86365BAP8 | SEN_WAC | 6.4217 | | NA/AAA/NA/AAA | | - | - | 0.0% | 99.3 |
| A1X | 86365BAB9 | SEN_WAC_IO | 2.1999 | | NA/AAA/NA/AAA | | 129,668 | 120,966 | 0.0% | 2.3 |
| B1 | 86365BAL7 | JUN_WAC | 6.4217 | | NA/AA/NA/AA | | 6,668 | 6,666 | 3.6% | 24.6 |
| B2 | 86365BAM5 | JUN_WAC | 6.4217 | | NA/A/NA/A | | 3,150 | 3,149 | 1.7% | 13.7 |
| B3 | 86365BAN3 | JUN_WAC | 6.4217 | | NA/BBB/NA/BBB | | 2,222 | 2,221 | 1.2% | 8.9 |
| B4 | 86365BAQ6 | JUN_WAC_NO | 6.4217 | | | | 2,131 | 2,130 | 1.2% | 5.3 |
| B5 | 86365BAR4 | JUN_WAC_NO | 6.4217 | | | | 1,759 | 1,758 | 0.9% | 2.3 |
| B6 | 86365BAS2 | JUN_WAC_NO | 6.4217 | | | | 1,668 | 1,667 | 0.9% | 0.0 |
| A2 | 86365BAG8 | SEN_SPR_WAC | 6.4217 | | NA/AAA/NA/AAA | | 19,450 | 18,145 | 0.0% | 87.8 |
| A3 | 86365BAH6 | SEN_SUP_WAC | 6.4217 | | NA/AAA/NA/AAA | | 18,524 | 17,281 | 0.0% | 83.3 |
| A4 | 86365BAJ2 | SEN_SPR_WAC | 6.4217 | | NA/AAA/NA/AAA | | 28,819 | 26,270 | 0.0% | 92.2 |
| A5 | 86365BAK9 | SEN_SPR_WAC | 6.4217 | | NA/AAA/NA/AAA | | 9,155 | 9,155 | 0.0% | 64.8 |
| AP | 86365BAT0 | JUN_PEN_NO | 0 | | | | 185,240 | 173,983 | 0.0% | 0.0 |

**FINAL PRICE 80.0**

**Prime Hybrid Arms (Deal 2): SARM 2007-09**

| Tranche | CUSIP | Type | Coupon | Original Rating: Moody's/S&P/Fitch | Current Rating: Moody's/S&P/Fitch | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|
| 1A1 | 86364JAA5 | SEN_SPR_FLT | 6 | NA/AAA/AAA | NA/NA/A | 155,395 | 136,370 | 29.2% | 88.4 |
| 1A2 | 86364JAB3 | SEN_SUP_FLT | 6 | NA/AAA/AAA | NA/NA/BB | 17,266 | 15,152 | 3.2% | 88.4 |
| 1AX | 86364JAC1 | SEN_FLT_IO | 0.5 | NA/AAA/AAA | NA/NA/AAA | 172,661 | 151,522 | 0.0% | 1.1 |
| M1 | 86364JAG2 | MEZ_WAC | 6.6435 | NA/AA+/AA+ | NA/NA/B | 4,963 | 4,963 | 0.9% | 62.9 |
| M2 | 86364JAH0 | MEZ_WAC | 6.6435 | NA/AA+/AA | NA/NA/B | 2,481 | 2,481 | 0.5% | 33.1 |
| M3 | 86364JAJ6 | MEZ_WAC | 6.6435 | NA/AA/AA- | NA/NA/CCC | 1,432 | 1,432 | 0.3% | 25.4 |
| M4 | 86364JAK3 | MEZ_WAC | 6.6435 | NA/AA-/A | NA/NA/CC | 2,577 | 2,577 | 0.5% | 18.9 |
| M5 | 86364JAL1 | MEZ_WAC | 6.6435 | NA/A/A- | NA/NA/CC | 955 | 955 | 0.2% | 13.9 |
| M6 | 86364JAM9 | MEZ_WAC | 6.6435 | NA/A-/BBB | NA/NA/CC | 1,240 | 1,240 | 0.2% | 11.1 |
| M7 | 86364JAN7 | JUN_WAC | 6.6435 | NA/BBB+/BBB- | NA/NA/C | 1,145 | 1,145 | 0.2% | 8.3 |
| X | SARVW7PX0 | JUN_OC_NO | 0 | | | 190,891 | 169,751 | 0.0% | 0.0 |
| 2A1 | 86364JAD9 | SEN_SPR_WAC | 5.9962 | NA/AAA/AAA | NA/NA/AA | 290,870 | 263,562 | 54.7% | 87.3 |
| 2A2 | 86364JAE7 | SEN_SUP_WAC | 6.4928 | NA/AAA/AAA | NA/NA/BB | 32,319 | 29,285 | 6.1% | 71.1 |
| 2AX | 86364JAF4 | SEN_FLT_IO | 0.4966 | NA/AAA/AAA | NA/NA/AAA | 290,870 | 263,562 | 0.0% | 1.2 |
| RII | 86364JAS6 | SEN_WAC_NO | 6.4928 | NA/AAA/AAA | NA/NA/AAA | - | - | 0.0% | 0.0 |
| 2B1 | 86364JAP2 | JUN_WAC | 6.4928 | NA/AA/NA | | 11,714 | 11,682 | 2.2% | 13.0 |
| 2B2 | 86364JAQ0 | JUN_WAC | 6.4928 | NA/A/NA | | 2,756 | 2,748 | 0.5% | 5.7 |
| 2B3 | 86364JAR8 | JUN_WAC | 6.4928 | NA/BBB/NA | | 1,378 | 1,374 | 0.3% | 3.8 |
| 2B4 | 86364JAT4 | JUN_WAC_NO | 6.4928 | | | 1,722 | 1,717 | 0.3% | 2.4 |
| 2B5 | 86364JAU1 | JUN_WAC_NO | 6.4928 | | | 1,722 | 1,717 | 0.3% | 1.0 |
| 2B6 | 86364JAV9 | JUN_WAC_NO | 6.4928 | | | 2,070 | 1,501 | 0.4% | 0.0 |
| 1AP | 86364JAW7 | JUN_PEN_NO | 0 | | NA/NA/AAA | 190,891 | 169,751 | 0.0% | 0.0 |
| 2AP | 86364JAX5 | JUN_PEN_NO | 0 | | NA/NA/AAA | 344,551 | 313,587 | 0.0% | 0.0 |
| C | SARLEKMX0 | NPR_NPR_NO | 0 | | | - | - | 0.0% | 0.0 |

**FINAL PRICE 82.1**

**Prime Fixed (Deal 1): LMT 2006-03**

| Tranche | CUSIP | Type | Coupon | Float Formula | Original Rating: Moody's/S&P/Fitch | Current Rating: Moody's/S&P/Fitch | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| AP | 52520CAU9 | SEN_CPT_XRS_PO | 0 | | Aaa/AAA/AAA | Aaa/NA/A | 343 | 337 | 0.1% | 67.8 |
| AX | 52520CAV7 | SEN_CPT_NTL_IO_WAC_IO | 6 | | Aaa/AAA/AAA | Aaa/NA/A | 190 | 146 | 0.0% | 18.3 |
| 2A1 | 52520CAS4 | SEN_FLT | 2.8219 | LIBOR_1MO + 0.35 | Aaa/AAA/AAA | A1/NA/A | 123,201 | 87,698 | 23.5% | 81.8 |
| 2A2 | 52520CAT2 | SEN_INV_IO | 4.6781 | 7.15 - LIBOR_1MO | Aaa/AAA/AAA | A1/NA/AAA | 123,201 | 87,698 | 0.0% | 9.5 |
| R | 52520CBB0 | SEN_RES_FIX | 7.5 | | Aaa/AAA/AAA | Aaa/NA/AAA | - | - | 0.0% | 0.0 |
| 1A1 | 52520CAD7 | SEN_SPR_NAS_FIX | 6 | | Aaa/AAA/AAA | Aaa/NA/AAA | 26,956 | 26,956 | 5.1% | 77.2 |
| 1A2 | 52520CAE5 | SEN_PAC_FIX | 6 | | Aaa/AAA/AAA | Aa2/NA/A | 20,000 | 17,153 | 3.8% | 86.9 |
| 1A3 | 52520CAF2 | SEN_PAC_FIX | 6 | | Aaa/AAA/AAA | Aa2/NA/A | 11,145 | 6,145 | 2.1% | 93.5 |
| 1A4 | 52520CAG0 | SEN_FIX | 6 | | Aaa/AAA/AAA | Aa2/NA/A | 92,679 | 68,357 | 17.7% | 89.6 |
| 1A5 | 52520CAH8 | SEN_FIX | 6 | | Aaa/AAA/AAA | Aa2/NA/A | 3,862 | 3,862 | 0.7% | 72.0 |
| 1A6 | 52520CAJ4 | SEN_TAC_FLT_AD | 3.0719 | LIBOR_1MO + 0.60 | Aaa/AAA/AAA | Aa2/NA/A | 30,000 | 22,775 | 5.7% | 83.8 |
| 1A7 | 52520CAK1 | SEN_INV_IO | 2.9281 | 5.40 - LIBOR_1MO | Aaa/AAA/AAA | Aa2/NA/AAA | 30,000 | 22,775 | 0.0% | 3.6 |
| 1A8 | 52520CAL9 | SEN_FLT | 3.0719 | LIBOR_1MO + 0.60 | Aaa/AAA/AAA | Aa2/NA/A | 50,000 | 37,403 | 9.5% | 85.5 |
| 1A9 | 52520CAM7 | SEN_INV_IO | 2.9281 | 5.40 - LIBOR_1MO | Aaa/AAA/AAA | Aa2/NA/AAA | 50,000 | 37,403 | 0.0% | 3.5 |
| 1A10 | 52520CAN5 | SEN_SPR_PAC_FIX | 6 | | Aaa/AAA/AAA | Aaa/NA/AAA | 24,316 | 20,152 | 4.6% | 91.0 |
| 1A11 | 52520CAP0 | SEN_FIX_Z_CMP | 6 | | Aaa/AAA/AAA | Aa2/NA/A | 5,930 | 3,751 | 1.1% | 64.8 |
| 1A12 | 52520CAQ8 | SEN_SPR_PAC_FIX | 6 | | Aaa/AAA/AAA | Aaa/NA/AAA | 3,112 | 3,112 | 0.6% | 75.2 |
| 1A13 | 52520CAR6 | SEN_SUP_NAS_FIX | 6 | | Aa1/AAA/AAA | Aa3/NA/A | 4,400 | 4,400 | 0.8% | 56.6 |
| 3A1 | 52520CAA3 | SEN_SPR_FLT | 2.8219 | LIBOR_1MO + 0.35 | Aaa/AAA/AAA | Aaa/NA/AAA | 85,000 | 62,526 | 16.2% | 82.5 |
| 3A2 | 52520CAB1 | SEN_FLT | 2.8219 | LIBOR_1MO + 0.35 | Aaa/AAA/AAA | Aa3/NA/A | 6,808 | 5,008 | 1.3% | 72.7 |
| 3A3 | 52520CAC9 | SEN_INV_IO | 4.6781 | 7.15 - LIBOR_1MO | Aaa/AAA/AAA | Aa3/NA/AAA | 91,808 | 67,534 | 0.0% | 9.4 |
| M | 52520CAW5 | JUN_WAC | 6.6403 | | Aa2/AA+/AA+ | Ba3/NA/B | 12,573 | 12,409 | 2.4% | 23.5 |
| B1 | 52520CAX3 | JUN_WAC | 6.6403 | | NR/NR/AA | NR/NA/CCC | 8,382 | 8,273 | 1.6% | 12.8 |
| B2 | 52520CAY1 | JUN_WAC | 6.6403 | | NR/NR/A | NR/NA/CC | 4,977 | 4,912 | 0.9% | 7.0 |
| B3 | 52520CAZ8 | JUN_WAC | 6.6403 | | NR/NR/BBB | NR/NA/C | 3,929 | 3,878 | 0.7% | 3.5 |
| B4 | 52520CBA2 | JUN_WAC | 6.6403 | | NR/NR/BBB- | NR/NA/C | 786 | 776 | 0.2% | 1.6 |
| B5 | 52520CBC8 | JUN_WAC_NO | 6.6403 | | | NR/NA/C | 1,834 | 1,810 | 0.4% | 0.7 |
| B6 | 52520CBD6 | JUN_WAC_NO | 6.6403 | | | NR/NA/C | 1,834 | 1,814 | 0.4% | 0.0 |
| B7 | 52520CBE4 | JUN_WAC_NO | 6.6403 | | | NR/NA/NA | 1,833 | 194 | 0.0% | 0.0 |

**FINAL PRICE    79.0**

**Prime Fixed (Deal 2): LMT 2006-04**

| Tranche | CUSIP | Type | Coupon | Float Formula | Original Rating: Moody's/S&P/Fitch | Current Rating: Moody's/S&P/Fitch | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| AP1 | 52520RAK8 | SEN_XRS_PO | 0 | | Aaa/AAA/AAA | Aaa/NA/A | 1,390 | 1,246 | 0.3% | 67.4 |
| AX1 | 52520RAM4 | SEN_WAC_IO | 6 | | Aaa/AAA/AAA | Aaa/NA/AAA | 505 | - | 0.0% | 6.6 |
| AP2 | 52520RAL6 | SEN_XRS_PO | 0 | | NA/AAA/AAA | NR/NA/AA | 172 | 102 | 0.0% | 73.1 |
| AX2 | 52520RAN2 | SEN_WAC_IO | 6 | | NA/AAA/AAA | NR/NA/AAA | 600 | 359 | 0.0% | 0.0 |
| 1A1 | 52520RAA0 | SEN_NAS_FIX | 6 | | Aaa/AAA/AAA | Aaa/NA/A | 8,824 | 8,678 | 2.0% | 77.0 |
| 1A2 | 52520RAB8 | SEN_FLT | 3.0719 | LIBOR_1MO + 0.60 | Aaa/AAA/AAA | Aaa/NA/A | 50,000 | 38,411 | 11.4% | 84.2 |
| 1A3 | 52520RAC6 | SEN_INV_IO | 2.9281 | 5.40 - LIBOR_1MO | Aaa/AAA/AAA | Aaa/NA/AAA | 50,000 | 38,411 | 0.0% | 3.6 |
| 1A4 | 52520RAD4 | SEN_FIX | 6 | | Aaa/AAA/AAA | Aaa/NA/A | 28,481 | 22,800 | 6.5% | 85.6 |
| 2A1 | 52520RAE2 | SEN_FLT | 2.8719 | LIBOR_1MO + 0.40 | Aaa/AAA/AAA | Aaa/NA/A | 88,640 | 66,009 | 20.2% | 81.5 |
| 2A2 | 52520RAF9 | SEN_INV_IO | 4.6281 | 7.10 - LIBOR_1MO | Aaa/AAA/AAA | Aaa/NA/AAA | 88,640 | 66,009 | 0.0% | 10.2 |
| 1B1 | 52520RAP7 | JUN_WAC | 6.7284 | | NA/NA/AA | NR/NA/CCC | 6,354 | 6,263 | 1.4% | 18.1 |
| 1B2 | 52520RAQ5 | JUN_WAC | 6.7284 | | NA/NA/A | NR/NA/CC | 1,991 | 1,962 | 0.5% | 7.6 |
| 1B3 | 52520RAR3 | JUN_WAC | 6.7284 | | NA/NA/BBB | NR/NA/C | 1,517 | 1,495 | 0.3% | 4.2 |
| 1B4 | 52520RAW2 | JUN_WAC_NO | 6.7284 | | | NR/NA/C | 1,043 | 1,028 | 0.2% | 1.8 |
| 1B5 | 52520RAX0 | JUN_WAC_NO | 6.7284 | | | NR/NA/C | 759 | 708 | 0.2% | 0.1 |
| 1B6 | 52520RAY8 | JUN_WAC_NO | 6.7284 | | | NR/NA/NA | 664 | - | 0.2% | 0.0 |
| R | 52520RAV4 | SEN_FIX_RES | 5 | | NA/AAA/AAA | NR/NA/AAA | - | - | 0.0% | 0.0 |
| 3A1 | 52520RAG7 | SEN_FIX | 5 | | NA/AAA/AAA | NR/NA/AA | 43,050 | 31,193 | 9.8% | 83.4 |
| 4A1 | 52520RAH5 | SEN_FIX | 6 | | NA/AAA/AAA | NR/NA/AA | 133,430 | 93,738 | 30.4% | 85.9 |
| 5A1 | 52520RAJ1 | SEN_FIX | 6.5 | | NA/AAA/AAA | NR/NA/AA | 66,337 | 40,446 | 15.1% | 87.1 |
| 2B1 | 52520RAS1 | JUN_WAC | 5.9556 | | NA/NA/AA | NR/NA/B | 3,872 | 3,508 | 0.9% | 10.9 |
| 2B2 | 52520RAT9 | JUN_WAC | 5.9556 | | NA/NA/A | NR/NA/CCC | 999 | 905 | 0.2% | 4.9 |
| 2B3 | 52520RAU6 | JUN_WAC | 5.9556 | | NA/NA/BBB | NR/NA/CC | 624 | 565 | 0.1% | 3.0 |
| 2B4 | 52520RAZ5 | JUN_WAC_NO | 5.9556 | | | NR/NA/C | 499 | 452 | 0.1% | 1.7 |
| 2B5 | 52520RBA9 | JUN_WAC_NO | 5.9556 | | | NR/NA/C | 375 | 340 | 0.1% | 0.7 |
| 2B6 | 52520RBB7 | JUN_WAC_NO | 5.9556 | | | NR/NA/NA | 375 | 211 | 0.1% | 0.0 |
| X | LMT2EAMC0 | JUN_RES_NO | 0 | | | | 50,000 | 29,717 | 0.0% | 0.0 |

**FINAL PRICE    81.2**

8

Alt-A (Deal 1): LXS 2007-10H

| Tranche | CUSIP | Type | Coupon | Float Formula | Original Moody's/S&P/Fitch | Current Moody's/S&P/Fitch | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| IAIO | 525237AF0 | SEN_INV_IO | 3.7781 | 6.25 - LIBOR_1MO | Aaa/AAA/NA | Baa1/NA/NA | 657,339 | 567,516 | 0.0% | 5.3 |
| IA11 | 525237BF9 | SEN_SPR_FLT | 2.5919 | LIBOR_1MO + 0.12 | Aaa/AAA/NA | Baa1/NA/NA | 370,108 | 291,347 | 38.4% | 82.5 |
| IA12 | 525237BG7 | SEN_SPR_FLT | 2.5619 | LIBOR_1MO + 0.09 | Aaa/AAA/NA | Baa1/NA/NA | 10,000 | 7,872 | 1.0% | 82.5 |
| IA2 | 525237AB9 | SEN_SPR_FLT | 2.6919 | LIBOR_1MO + 0.22 | Aaa/AAA/NA | Baa2/NA/NA | 142,759 | 142,759 | 14.8% | 57.6 |
| IA3 | 525237AC7 | SEN_SPR_FLT | 2.7519 | LIBOR_1MO + 0.28 | Aaa/AAA/NA | Baa2/NA/NA | 68,738 | 68,738 | 7.1% | 43.0 |
| IA41 | 525237BH5 | SEN_SUP_FLT | 2.6719 | LIBOR_1MO + 0.20 | Aaa/AAA/NA | Baa1/NA/NA | 56,034 | 48,419 | 5.8% | 70.7 |
| IA42 | 525237BJ1 | SEN_SUP_FLT | 2.7919 | LIBOR_1MO + 0.32 | Aaa/AAA/NA | Caa2/NA/NA | 9,700 | 8,382 | 1.0% | 70.8 |
| IM1 | 525237AG8 | MEZ_FLT | 2.9219 | LIBOR_1MO + 0.45 | Aa1/AA+/NA | Ca/NA/NA | 24,161 | 24,161 | 2.5% | 24.6 |
| IM2 | 525237AH6 | MEZ_FLT | 3.0219 | LIBOR_1MO + 0.55 | Aa2/AA/NA | Ca/NA/NA | 13,039 | 13,039 | 1.4% | 16.7 |
| IM3 | 525237AJ2 | MEZ_FLT | 3.2219 | LIBOR_1MO + 0.75 | Aa3/AA/NA | C/NA/NA | 8,053 | 8,053 | 0.8% | 13.4 |
| IM4 | 525237AK9 | MEZ_FLT | 3.4719 | LIBOR_1MO + 1.00 | A1/AA-/NA | C/NA/NA | 7,286 | 7,286 | 0.8% | 11.8 |
| IM5 | 525237AL7 | MEZ_FLT | 3.7219 | LIBOR_1MO + 1.25 | A2/A+/NA | C/NA/NA | 7,670 | 7,670 | 0.8% | 10.1 |
| IM6 | 525237AM5 | MEZ_FLT | 4.2219 | LIBOR_1MO + 1.75 | A3/A/NA | C/NA/NA | 6,136 | 6,136 | 0.6% | 9.2 |
| IM7 | 525237AN3 | MEZ_FLT | 4.4719 | LIBOR_1MO + 2.00 | Baa1/A-/NA | C/NA/NA | 6,519 | 6,519 | 0.7% | 7.9 |
| IM8 | 525237AP8 | MEZ_FLT | 4.4719 | LIBOR_1MO + 2.00 | Baa2/BBB+/NA | C/NA/NA | 4,985 | 4,985 | 0.5% | 6.5 |
| IM9 | 525237AQ6 | JUN_FLT | 4.4719 | LIBOR_1MO + 2.00 | Baa3/BBB/NA | C/NA/NA | 4,985 | 4,985 | 0.5% | 5.4 |
| IX | LXSHPCJU0 | JUN_OC_RES_NO | 0 | | | | 767,024 | 664,338 | 0.0% | 0.0 |
| IP | LXS4J0QT0 | JUN_PEN_NO | 0 | | | | 767,024 | 664,338 | 0.0% | 0.3 |
| IIAIO | 525237AV5 | SEN_INV_IO | 4.5281 | 7.00 - LIBOR_1MO | Aaa/AAA/NA | Aaa/NA/NA | 156,082 | 106,497 | 0.0% | 6.9 |
| IIA1 | 525237AR4 | SEN_SPR_FLT | 2.6919 | LIBOR_1MO + 0.16 | Aaa/AAA/NA | Aaa/NA/NA | 92,263 | 62,953 | 9.6% | 75.0 |
| IIA2 | 525237AS2 | SEN_SPR_FIX_CAP | 7.5 | | Aaa/AAA/NA | Aaa/NA/NA | 34,000 | 23,199 | 3.5% | 82.8 |
| IIA3 | 525237AT0 | SEN_SPR_SUP_FLT | 2.7719 | LIBOR_1MO + 0.30 | Aaa/AAA/NA | Aaa/NA/NA | 44,811 | 30,575 | 4.6% | 75.3 |
| IIA4 | 525237AU7 | SEN_SUP_FLT | 2.9219 | LIBOR_1MO + 0.45 | Aaa/AAA/NA | Aa2/NA/NA | 19,008 | 12,969 | 2.0% | 75.7 |
| IIM1 | 525237AW3 | MEZ_FLT | 3.1219 | LIBOR_1MO + 0.65 | Aa1/AA+/NA | Baa1/NA/NA | 5,394 | 5,394 | 0.6% | 48.9 |
| IIM2 | 525237AX1 | MEZ_FLT | 3.1719 | LIBOR_1MO + 0.70 | Aa2/AA+/NA | Ba3/NA/NA | 4,820 | 4,820 | 0.5% | 46.6 |
| IIM3 | 525237AY9 | MEZ_FLT | 3.3219 | LIBOR_1MO + 0.85 | Aa3/AA+/NA | B3/NA/NA | 2,869 | 2,869 | 0.3% | 45.3 |
| IIM4 | 525237AZ6 | MEZ_FLT | 3.3719 | LIBOR_1MO + 0.90 | NA/AA/NA | NR/NA/NA | 7,805 | 7,805 | 0.8% | 38.2 |
| IIM5 | 525237BA0 | MEZ_FLT | 3.7219 | LIBOR_1MO + 1.25 | NA/A/NA | NR/NA/NA | 1,951 | 1,951 | 0.2% | 25.4 |
| IIM6 | 525237BB8 | MEZ_FLT | 4.2219 | LIBOR_1MO + 1.75 | NA/A/NA | NR/NA/NA | 4,591 | 4,591 | 0.5% | 20.6 |
| IIM7 | 525237BC6 | MEZ_FLT | 4.2219 | LIBOR_1MO + 1.75 | NA/A-/NA | NR/NA/NA | 1,492 | 1,492 | 0.2% | 15.1 |
| IIM8 | 525237BD4 | MEZ_FLT | 4.2219 | LIBOR_1MO + 1.75 | NA/BBB/NA | NR/NA/NA | 3,443 | 3,443 | 0.4% | 11.3 |
| IIM9 | 525237BE2 | JUN_FLT | 4.2219 | LIBOR_1MO + 1.75 | NA/BBB-/NA | NR/NA/NA | 1,721 | 1,721 | 0.2% | 7.6 |
| IIX | LXSXOP780 | JUN_OC_RES_NO | 0 | | | | 229,570 | 167,707 | 0.0% | |
| IIP | LXSJ845G0 | JUN_PEN_NO | 0 | | | | 229,570 | 167,707 | 0.0% | |
| ILTR | LXSU0AD20 | NPR_NPR_NO | 0 | | | | - | - | 0.0% | |
| IILTR | LXSFMRAE0 | NPR_NPR_NO | 0 | | | | - | - | 0.0% | |
| IR | LXS4O3BG0 | NPR_NPR_NO | 0 | | | | - | - | 0.0% | |
| IIR | LXSGSF430 | NPR_NPR_NO | 0 | | | | - | - | 0.0% | |
| IA12_FEE | LXSSKP0D0 | SEN_FEE | 0.07 | | | | 10,000 | 7,872 | 0.0% | |
| IA41_FEE | LXS1SE040 | SEN_FEE | 0.13 | | | | 56,034 | 48,419 | 0.0% | |
| IIA1_FEE | LXSHBD460 | SEN_FEE | 0.08 | | | | 92,263 | 62,953 | 0.0% | |

**FINAL PRICE    66.5**

Alt-A (Deal 2): LXS 2007-17H

| Tranche | CUSIP | Type | Coupon | Float Formula | Original Rating: Moody's/S&P/Fitch | Current Rating: Moody's/S&P/Fitch | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| A1 | 52525PAA9 | SEN_FLT | 3.2719 | LIBOR_1MO + 0.80 | Aaa/AAA/AAA | Aa3/NA/AAA | 527,987 | 441,178 | 78.5% | 77.5 |
| AIO | 52525PAC5 | SEN_IO | 1.75 | | Aaa/AAA/AAA | Aaa/NA/AAA | 527,987 | 441,178 | 0.0% | 3.3 |
| M0 | 52525PAP6 | MEZ_FLT | 3.5719 | LIBOR_1MO + 1.10 | NA/AAA/AAA | NR/NA/AAA | 45,761 | 45,761 | 6.8% | 51.1 |
| M1 | 52525PAD3 | MEZ_FLT | 3.7219 | LIBOR_1MO + 1.25 | NA/AA+/AA+ | NR/NA/A | 44,703 | 44,703 | 6.6% | 40.7 |
| M2 | 52525PAE1 | MEZ_FLT | 3.9719 | LIBOR_1MO + 1.50 | NA/AA/AA+ | NR/NA/BBB | 17,600 | 17,600 | 2.6% | 25.4 |
| M3 | 52525PAF8 | MEZ_FLT | 4.2219 | LIBOR_1MO + 1.75 | NA/AA-/AA | NR/NA/BB | 6,687 | 6,687 | 1.0% | 21.6 |
| M4 | 52525PAG6 | MEZ_FLT | 4.4719 | LIBOR_1MO + 2.00 | NA/A+/AA- | NR/NA/BB | 8,095 | 8,095 | 1.2% | 19.7 |
| M5 | 52525PAH4 | MEZ_FLT | 4.4719 | LIBOR_1MO + 2.00 | NA/A/A+ | NR/NA/BB | 6,687 | 6,687 | 1.0% | 16.9 |
| M6 | 52525PAJ0 | MEZ_FLT | 4.4719 | LIBOR_1MO + 2.00 | NA/A-/A | NR/NA/B | 5,631 | 5,631 | 0.8% | 14.6 |
| M7 | 52525PAK7 | MEZ_FLT | 4.4719 | LIBOR_1MO + 2.00 | NA/BBB+/A- | NR/NA/B | 5,631 | 5,631 | 0.8% | 12.7 |
| M8 | 52525PAL5 | JUN_FLT | 4.4719 | LIBOR_1MO + 2.00 | NA/BBB/BBB+ | NR/NA/B | 4,218 | 4,218 | 0.6% | 11.0 |
| X | LXSOPD5O0 | JUN_OC_NPR_NPR_NO | 0 | | | | 703,985 | 616,647 | 0.0% | |
| LTR | LXSJYKLN1 | JUN_RES_NO | 0 | | | | 703,985 | 616,647 | 0.0% | |
| R | LXSFL0D80 | JUN_RES_NO | 0 | | | | 703,985 | 616,647 | 0.0% | |
| P | LXSXOXQB0 | JUN_PEN_NO | 0 | | | | 703,985 | 616,647 | 0.0% | |

**FINAL PRICE  68.6**

Subprime (Deal 1): SASCO 2007-BC4

| Tranche | Cusip | Type | Coupon | Float Formula | Original Rating: Moody's/S&P/Fitch/Dom | Current Rating: Moody's/S&P/Fitch/Dom | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| A1 | 86365DAA7 | SEN_FLT | 3.0225 | LIBOR_1MO + 0.63 | Aaa/AAA/NA/AAA | Aaa/NA/NA/NA | 427,894 | 401,951 | 33.4% | 69.9 |
| A2 | 86365DAB5 | SEN_FLT | 2.8925 | LIBOR_1MO + 0.50 | NA/AAA/NA/AAA | | 20,765 | 20,765 | 1.6% | 36.8 |
| A3 | 86365DAC3 | SEN_FLT | 2.6425 | LIBOR_1MO + 0.25 | Aaa/AAA/NA/AAA | Aaa/NA/NA/NA | 273,418 | 249,062 | 21.4% | 82.3 |
| A4 | 86365DAD1 | SEN_FLT | 2.8925 | LIBOR_1MO + 0.50 | NA/AAA/NA/AAA | | 210,126 | 210,126 | 16.4% | 50.7 |
| M1 | 86365DAH2 | MEZ_FLT | 2.8925 | LIBOR_1MO + 0.50 | NA/AA+/NA/AA (high) | | 71,255 | 71,255 | 5.6% | 31.8 |
| M2 | 86365DAN9 | MEZ_FLT | 2.8925 | LIBOR_1MO + 0.50 | NA/AA/NA/AA | | 54,259 | 54,259 | 4.2% | 24.6 |
| M3 | 86365DAP4 | MEZ_FLT | 2.8925 | LIBOR_1MO + 0.50 | NA/AA-/NA/AA (low) | | 25,495 | 25,495 | 2.0% | 20.0 |
| M4 | 86365DAQ2 | MEZ_FLT | 2.8925 | LIBOR_1MO + 0.50 | NA/A+/NA/A (high) | | 25,495 | 25,495 | 2.0% | 17.5 |
| M5 | 86365DAR0 | MEZ_FLT | 2.8925 | LIBOR_1MO + 0.50 | NA/A/NA/A | | 26,149 | 26,149 | 2.0% | 15.1 |
| M6 | 86365DAS8 | MEZ_FLT | 2.8925 | LIBOR_1MO + 0.50 | NA/A-/NA/A (low) | | 21,573 | 21,573 | 1.7% | 13.1 |
| M7 | 86365DAT6 | MEZ_FIX_CAP | 5 | | NA/BBB+/NA/BBB (high) | | 17,650 | 17,650 | 1.4% | 12.8 |
| M8 | 86365DAU3 | MEZ_FIX_CAP | 5 | | NA/BBB/NA/BBB | | 15,689 | 15,689 | 1.2% | 11.6 |
| M9 | 86365DAV1 | MEZ_FIX_CAP | 5 | | NA/BBB-/NA/BBB (low) | | 15,689 | 15,689 | 1.2% | 10.3 |
| B1 | 86365DAY5 | MEZ_FIX_CAP | 5 | | NR/NR/NA/NR | | 20,919 | 20,919 | 1.6% | 8.4 |
| B2 | 86365DAZ2 | MEZ_FIX_CAP | 5 | | NR/NR/NA/NR | | 16,343 | 16,343 | 1.3% | 6.7 |
| B3 | 86365DBA6 | JUN_FIX_CAP | 5 | | NR/NR/NA/NR | | 36,608 | 36,608 | 2.9% | 4.2 |
| X | 86365DBL2 | JUN_OC_NO | 0 | | | | 1,307,438 | 1,257,139 | | |
| P | 86365DBM0 | JUN_PEN_NO | 0 | | | | 1,307,438 | 1,257,139 | | |
| R | 86365DAX7 | NPR_NPR_NO | 0 | | | | - | - | | |
| LTR | 86365DBN8 | NPR_NPR_NO | 0 | | | | - | - | | |

**FINAL PRICE  54.7**

Subprime (Deal 2): SASCO 2007-BNC1

| Tranche | Cusip | Type | Coupon | Float Formula | Original Rating: Moody's/S&P/Fitch | Current Rating: Moody's/S&P/Fitch | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| A1 | 86364XAA4 | SEN_FLT | 2.6125 | LIBOR_1MO + 0.22 | NA/AAA/AAA | NA/NA/AAA | 210,174 | 192,999 | 29.2% | 70.1 |
| A2 | 86364XAB2 | SEN_FLT | 3.4925 | LIBOR_1MO + 1.10 | NA/AAA/AAA | NA/NA/AAA | 275,052 | 258,869 | 38.2% | 71.3 |
| A3 | 86364XAC0 | SEN_FLT | 3.8925 | LIBOR_1MO + 1.50 | NA/AAA/AAA | NA/NA/AAA | 31,948 | 31,948 | 4.4% | 40.0 |
| A4 | 86364XAD8 | SEN_FLT | 3.8925 | LIBOR_1MO + 1.50 | NA/AAA/AAA | NA/NA/AAA | 24,412 | 24,412 | 3.4% | 40.8 |
| M1 | 86364XAE6 | MEZ_FLT | 4.3925 | LIBOR_1MO + 2.00 | NA/AA+/AA+ | NA/NA/AA+ | 18,289 | 18,289 | 2.5% | 37.2 |
| M2 | 86364XAF3 | MEZ_FLT | 4.3925 | LIBOR_1MO + 2.00 | NA/AA/AA | NA/NA/AA | 18,289 | 18,289 | 2.5% | 33.1 |
| M3 | 86364XAG1 | MEZ_FLT | 4.3925 | LIBOR_1MO + 2.00 | NA/AA-/AA- | NA/NA/AA- | 32,099 | 32,099 | 4.5% | 27.5 |
| M4 | 86364XAH9 | MEZ_FLT | 4.3925 | LIBOR_1MO + 2.00 | NA/A+/A+ | NA/NA/A+ | 11,571 | 11,571 | 1.6% | 23.3 |
| M5 | 86364XAJ5 | MEZ_FLT | 4.3925 | LIBOR_1MO + 2.00 | NA/A/A | NA/NA/A | 13,064 | 13,064 | 1.8% | 20.9 |
| M6 | 86364XAK2 | MEZ_FLT | 4.3925 | LIBOR_1MO + 2.00 | NA/A-/A- | NA/NA/A- | 9,704 | 9,704 | 1.3% | 18.8 |
| M7 | 86364XAL0 | MEZ_FLT | 4.3925 | LIBOR_1MO + 2.00 | NA/BBB+/BBB+ | NA/NA/BBB+ | 7,838 | 7,838 | 1.1% | 17.2 |
| M8 | 86364XAM8 | MEZ_FLT | 4.3925 | LIBOR_1MO + 2.00 | NA/BBB/BBB | NA/NA/BBB | 10,078 | 10,078 | 1.4% | 15.5 |
| M9 | 86364XAN6 | MEZ_FLT | 4.3925 | LIBOR_1MO + 2.00 | NA/BBB-/BBB- | NA/NA/BBB- | 7,838 | 7,838 | 1.1% | 13.9 |
| B1 | 86364XAP1 | MEZ_FLT_NO | 4.3925 | LIBOR_1MO + 2.00 | | NA/NA/BB+ | 10,078 | 10,078 | 1.4% | 12.3 |
| B2 | 86364XAQ9 | MEZ_FLT_NO | 4.3925 | LIBOR_1MO + 2.00 | | NA/NA/BB | 11,197 | 11,197 | 1.6% | 10.3 |
| B3 | 86364XAR7 | JUN_FLT_NO | 3.8925 | LIBOR_1MO + 1.50 | | | 27,620 | 27,620 | 3.8% | 6.3 |
| LTR | SASJ22TP0 | NPR_NPR_NO | 0 | | | | - | - | 0.0% | |
| R | SASXS1LQ0 | NPR_NPR_NO | 0 | | | | - | - | 0.0% | |
| X | SASEPCBJ0 | JUN_OC_NO | 0 | | | | 746,500 | 713,142 | 0.0% | |
| P | SASN5U9M1 | JUN_PEN_NO | 0 | | | | 746,500 | 713,142 | 0.0% | |

**FINAL PRICE**    **56.1**

## Desk-to-Examiner Price Variances in Lehman's U.S. RWL Portfolio as of August 31, 2008

A total of $2.8 billion of third quarter U.S. RWL assets were tested by Lehman's Product Control group and the Examiner's financial advisor.  While there were some significant variances, the Examiner's financial advisor again found Lehman's valuation to be in aggregate within a range of reasonableness.  The following table contains the loan types where the Examiner's financial advisor had a significant variance with Lehman marks.

| Loan Type | LEH mark | Examiner's mark | LEH MTM ($) | Examiner MTM ($) | Difference ($) |
|---|---|---|---|---|---|
| Prime-Hybrid ARMs | 61.4 | 81.0 | 402,167,481 | 530,192,409 | -128,024,928 |
| Prime-Fixed | 69.3 | 79.9 | 253,393,137 | 291,948,716 | -38,555,579 |
| Sub Prime | 41.0 | 55.6 | 56,627,784 | 76,704,146 | -20,076,363 |
| Subprime 2nds | 47.2 | 55.6 | 382,920,071 | 450,832,532 | -67,912,460 |
| Scratch & Dent | 40.8 | 55.6 | 90,142,670 | 122,756,062 | -32,613,393 |
| Alt A | 72.5 | 67.4 | 159,819,347 | 148,472,899 | 11,346,449 |
| **Total** | | | **1,345,070,490** | **1,620,906,764** | **-275,836,274** |

| | |
|---|---|
| **Total Market Value of tested population** | $2.8 Billion |
| **Total Variance of tested population** | $(275,836,274) |

The Examiner's financial advisor's marks are the average of the prices for the two respective deals from each category per the table below:

| LOAN TYPE | REPRESENTATIVE DEALS | PRICE |
|---|---|---|
| Prime – Hybrid ARMs | SARM 2008 – 02 | 80.2 |
| | SARM 2007-09 | 82.0 |
| | Average | 81.1 |
| Prime - Fixed | LMT 2006-03 | 78.7 |
| | LMT 2006-04 | 81.2 |
| | Average | 79.9 |
| Sub Prime | SASCO 2007-BC4 | 55.0 |
| | SASCO 2007-BNC1 | 56.2 |
| | Average | 55.6 |
| Alt A | Lehman XS Trust 07-10H | 65.9 |
| | Lehman XS Trust 2007 – 17H | 68.8 |
| | Average | 67.4 |

As discussed in the Report at Section III.A.2.g.4.f, the following are the assumptions used in estimating the prices for each tranche of the representative deal.

| Product Type | Prepayment Rate | Default Rate | Loss Severity (1st/2nd Lien) | Resulting Losses | Yield |
|---|---|---|---|---|---|
| Prime | 15% | 5% | 50% / 100% | High single digits | 10% |
| Alt-A | 10% | 10% | 50% / 100% | High teens – Low 20s | 15% |
| Subprime | 4% | 17% | 50% / 100% | Mid - High 30s | 20% |

The output for each of the deals was run through Intex, and the weightings used to estimate the price from each deal are provided below.

Prime Hybrid Arms (Deal 1): SARM 2008-02

| Tranche | Cusip | Type | Coupon | Float Formula | Original Rating: Moody's/S&P/Fitch/Dom | Current Rating: Moody's/S&P/Fitch/Dom | Original Balance (1000s) | Current Balance (1000s) | Weighting | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| A1 | 86365BAA1 | SEN_SPR_FLT | 4.2219 | LIBOR_1MO + 1.75 | NA/AAA/NA/AAA | | 129,668 | 120,966 | 70.0% | 86.9 |
| A21 | 86365BAC7 | SEN_SPR_WAC | 6.4217 | | NA/AAA/NA/AAA | | 14,761 | 13,456 | 8.0% | 92.4 |
| A22 | 86365BAD5 | SEN_SPR_WAC | 6.4217 | | NA/AAA/NA/AAA | | 4,689 | 4,689 | 2.5% | 76.0 |
| A31 | 86365BAE3 | SEN_SUP_WAC | 6.4217 | | NA/AAA/NA/AAA | | 14,058 | 12,815 | 7.6% | 92.4 |
| A32 | 86365BAF0 | SEN_SUP_WAC | 6.4217 | | NA/AAA/NA/AAA | | 4,466 | 4,466 | 2.4% | 64.4 |
| R | 86365BAP8 | SEN_WAC | 6.4217 | | NA/AAA/NA/AAA | | - | - | 0.0% | 0.0 |
| A1X | 86365BAB9 | SEN_WAC_IO | 2.1999 | | NA/AAA/NA/AAA | | 129,668 | 120,966 | 0.0% | 2.6 |
| B1 | 86365BAL7 | JUN_WAC | 6.4217 | | NA/AA/NA/AA | | 6,668 | 6,666 | 3.6% | 27.7 |
| B2 | 86365BAM5 | JUN_WAC | 6.4217 | | NA/A/NA/A | | 3,150 | 3,149 | 1.7% | 15.6 |
| B3 | 86365BAN3 | JUN_WAC | 6.4217 | | NA/BBB/NA/BBB | | 2,222 | 2,221 | 1.2% | 10.5 |
| B4 | 86365BAQ6 | JUN_WAC_NO | 6.4217 | | | | 2,131 | 2,130 | 1.2% | 6.8 |
| B5 | 86365BAR4 | JUN_WAC_NO | 6.4217 | | | | 1,759 | 1,758 | 0.9% | 3.6 |
| B6 | 86365BAS2 | JUN_WAC_NO | 6.4217 | | | | 1,668 | 1,667 | 0.9% | 1.0 |
| A2 | 86365BAG8 | SEN_SPR_WAC | 6.4217 | | NA/AAA/NA/AAA | | 19,450 | 18,145 | 0.0% | 88.2 |
| A3 | 86365BAH6 | SEN_SUP_WAC | 6.4217 | | NA/AAA/NA/AAA | | 18,524 | 17,281 | 0.0% | 85.2 |
| A4 | 86365BAJ2 | SEN_SPR_WAC | 6.4217 | | NA/AAA/NA/AAA | | 28,819 | 26,270 | 0.0% | 92.4 |
| A5 | 86365BAK9 | SEN_SPR_WAC | 6.4217 | | NA/AAA/NA/AAA | | 9,155 | 9,155 | 0.0% | 70.3 |
| AP | 86365BAT0 | JUN_PEN_NO | 0 | | | | 185,240 | 173,983 | 0.0% | 0.0 |

FINAL PRICE    80.2

**Prime Hybrid Arms (Deal 2): SARM 2007-09**

| Tranche | CUSIP | Type | Coupon | Original Rating: Moody's/S&P/Fitch | Current Rating: Moody's/S&P/Fitch | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|
| 1A1 | 86364JAA5 | SEN_SPR_FLT | 6 | NA/AAA/AAA | NA/NA/A | 155,395 | 136,370 | 29.2% | 88.3 |
| 1A2 | 86364JAB3 | SEN_SUP_FLT | 6 | NA/AAA/AAA | NA/NA/BB | 17,266 | 15,152 | 3.2% | 88.3 |
| 1AX | 86364JAC1 | SEN_FLT_IO | 0.5 | NA/AAA/AAA | NA/NA/AAA | 172,661 | 151,522 | 0.0% | 1.1 |
| M1 | 86364JAG2 | MEZ_WAC | 6.6435 | NA/AA+/AA+ | NA/NA/B | 4,963 | 4,963 | 0.9% | 65.4 |
| M2 | 86364JAH0 | MEZ_WAC | 6.6435 | NA/AA+/AA | NA/NA/B | 2,481 | 2,481 | 0.5% | 34.8 |
| M3 | 86364JAJ6 | MEZ_WAC | 6.6435 | NA/AA/AA- | NA/NA/CCC | 1,432 | 1,432 | 0.3% | 26.5 |
| M4 | 86364JAK3 | MEZ_WAC | 6.6435 | NA/AA-/A | NA/NA/CC | 2,577 | 2,577 | 0.5% | 19.9 |
| M5 | 86364JAL1 | MEZ_WAC | 6.6435 | NA/A/A- | NA/NA/CC | 955 | 955 | 0.2% | 14.6 |
| M6 | 86364JAM9 | MEZ_WAC | 6.6435 | NA/A-/BBB | NA/NA/CC | 1,240 | 1,240 | 0.2% | 11.7 |
| M7 | 86364JAN7 | JUN_WAC | 6.6435 | NA/BBB-/BBB- | NA/NA/C | 1,145 | 1,145 | 0.2% | 8.8 |
| X | SARVW7PX0 | JUN_OC_NO | 0 | | | 190,891 | 169,751 | 0.0% | 0.0 |
| 2A1 | 86364JAD9 | SEN_SPR_WAC | 5.9962 | NA/AAA/AAA | NA/NA/AA | 290,870 | 263,562 | 54.7% | 87.1 |
| 2A2 | 86364JAE7 | SEN_SUP_WAC | 6.4928 | NA/AAA/AAA | NA/NA/BB | 32,319 | 29,285 | 6.1% | 71.0 |
| 2AX | 86364JAF4 | SEN_FLT_IO | 0.4966 | NA/AAA/AAA | NA/NA/AAA | 290,870 | 263,562 | 0.0% | 1.1 |
| RII | 86364JAS6 | SEN_WAC_NO | 6.4928 | NA/AAA/AAA | NA/NA/AAA | - | - | 0.0% | 0.0 |
| 2B1 | 86364JAP2 | JUN_WAC | 6.4928 | NA/AA/NA | | 11,714 | 11,682 | 2.2% | 13.7 |
| 2B2 | 86364JAQ0 | JUN_WAC | 6.4928 | NA/A/NA | | 2,756 | 2,748 | 0.5% | 6.4 |
| 2B3 | 86364JAR8 | JUN_WAC | 6.4928 | NA/BBB/NA | | 1,378 | 1,374 | 0.3% | 4.5 |
| 2B4 | 86364JAT4 | JUN_WAC_NO | 6.4928 | | | 1,722 | 1,717 | 0.3% | 3.2 |
| 2B5 | 86364JAU1 | JUN_WAC_NO | 6.4928 | | | 1,722 | 1,717 | 0.3% | 1.7 |
| 2B6 | 86364JAV9 | JUN_WAC_NO | 6.4928 | | | 2,070 | 1,501 | 0.4% | 0.4 |
| 1AP | 86364JAW7 | JUN_PEN_NO | 0 | | NA/NA/AAA | 190,891 | 169,751 | 0.0% | 0.0 |
| 2AP | 86364JAX5 | JUN_PEN_NO | 0 | | NA/NA/AAA | 344,551 | 313,587 | 0.0% | 0.0 |
| C | SARLEKMX0 | NPR_NPR_NO | 0 | | | - | - | 0.0% | 0.0 |

**FINAL PRICE 82.0**

**Prime Fixed (Deal 1): LMT 2006-03**

| Tranche | CUSIP | Type | Coupon | Float Formula | Original Rating: Moody's/S&P/Fitch | Current Rating: Moody's/S&P/Fitch | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| AP | 52520CAU9 | SEN_CPT_XRS_PO | 0 | | Aaa/AAA/AAA | Aaa/NA/A | 343 | 336 | 0.1% | 68.4 |
| AX | 52520CAV7 | SEN_CPT_NTL_IO_WAC_IO | 6 | | Aaa/AAA/AAA | | 190 | 145 | 0.0% | 18.3 |
| 2A1 | 52520CAS4 | SEN_FLT | 2.8219 | LIBOR_1MO + 0.35 | Aaa/AAA/AAA | A1/NA/A | 123,201 | 85,287 | 23.5% | 81.2 |
| 2A2 | 52520CAT2 | SEN_INV_IO | 4.6781 | 7.15 - LIBOR_1MO | Aaa/AAA/AAA | A1/NA/AAA | 123,201 | 85,287 | 0.0% | 10.0 |
| R | 52520CBB0 | SEN_RES_FIX | 7.5 | | Aaa/AAA/AAA | Aaa/NA/AAA | - | - | 0.0% | 0.0 |
| 1A1 | 52520CAD7 | SEN_SPR_NAS_FIX | 6 | | Aaa/AAA/AAA | Aaa/NA/AAA | 26,956 | 26,956 | 5.1% | 77.7 |
| 1A2 | 52520CAE5 | SEN_PAC_FIX | 6 | | Aaa/AAA/AAA | Aa2/NA/A | 20,000 | 16,448 | 3.8% | 87.2 |
| 1A3 | 52520CAF2 | SEN_PAC_FIX | 6 | | Aaa/AAA/AAA | Aa2/NA/A | 11,145 | 6,102 | 2.1% | 92.5 |
| 1A4 | 52520CAG0 | SEN_FIX | 6 | | Aaa/AAA/AAA | Aa2/NA/A | 92,679 | 66,039 | 17.7% | 89.6 |
| 1A5 | 52520CAH8 | SEN_FIX | 6 | | Aaa/AAA/AAA | Aa2/NA/A | 3,862 | 3,848 | 0.7% | 72.2 |
| 1A6 | 52520CAJ4 | SEN_TAC_FLT_AD | 3.0719 | LIBOR_1MO + 0.60 | Aaa/AAA/AAA | Aa2/NA/A | 30,000 | 22,382 | 5.7% | 83.1 |
| 1A7 | 52520CAK1 | SEN_INV_IO | 2.9281 | 5.40 - LIBOR_1MO | Aaa/AAA/AAA | Aa2/NA/A | 30,000 | 22,382 | 0.0% | 4.2 |
| 1A8 | 52520CAL9 | SEN_FLT | 3.0719 | LIBOR_1MO + 0.60 | Aaa/AAA/AAA | Aa2/NA/A | 50,000 | 36,203 | 9.5% | 85.1 |
| 1A9 | 52520CAM7 | SEN_INV_IO | 2.9281 | 5.40 - LIBOR_1MO | Aaa/AAA/AAA | Aa2/NA/AAA | 50,000 | 36,203 | 0.0% | 4.0 |
| 1A10 | 52520CAN5 | SEN_SPR_PAC_FIX | 6 | | Aaa/AAA/AAA | Aaa/NA/AAA | 24,316 | 19,195 | 4.6% | 91.4 |
| 1A11 | 52520CAP0 | SEN_FIX_Z_CMP | 6 | | Aaa/AAA/AAA | Aa2/NA/A | 5,930 | 3,808 | 1.1% | 65.1 |
| 1A12 | 52520CAQ8 | SEN_SPR_PAC_FIX | 6 | | Aaa/AAA/AAA | Aaa/NA/AAA | 3,112 | 3,112 | 0.6% | 75.4 |
| 1A13 | 52520CAR6 | SEN_SUP_NAS_FIX | 6 | | Aaa/AAA/AAA | Aa3/NA/A | 4,400 | 4,400 | 0.8% | 57.3 |
| 3A1 | 52520CAA3 | SEN_SPR_FLT | 2.8219 | LIBOR_1MO + 0.35 | Aaa/AAA/AAA | Aaa/NA/AAA | 85,000 | 60,605 | 16.2% | 81.9 |
| 3A2 | 52520CAB1 | SEN_FLT | 2.8219 | LIBOR_1MO + 0.35 | Aaa/AAA/AAA | Aa3/NA/A | 6,808 | 4,854 | 1.3% | 71.9 |
| 3A3 | 52520CAC9 | SEN_FLT_IO | 4.6781 | 7.15 - LIBOR_1MO | Aaa/AAA/AAA | Aaa/NA/AAA | 81,808 | 65,459 | 0.0% | 10.0 |
| M | 52520CAW5 | JUN_WAC | 6.6403 | | Aa2/AA+/AA+ | Ba3/NA/B | 12,573 | 12,386 | 2.4% | 23.7 |
| B1 | 52520CAX3 | JUN_WAC | 6.6403 | | NR/NR/AA | NR/NA/CCC | 8,382 | 8,257 | 1.6% | 13.0 |
| B2 | 52520CAY1 | JUN_WAC | 6.6403 | | NR/NR/A | NR/NA/CC | 4,977 | 4,903 | 0.9% | 7.2 |
| B3 | 52520CAZ8 | JUN_WAC | 6.6403 | | NR/NR/BBB | NR/NA/C | 3,929 | 3,870 | 0.7% | 3.7 |
| B4 | 52520CBA2 | JUN_WAC | 6.6403 | | NR/NR/BBB- | NR/NA/C | 786 | 774 | 0.2% | 1.7 |
| B5 | 52520CBC8 | JUN_WAC_NO | 6.6403 | | | NR/NA/C | 1,834 | 1,810 | 0.4% | 1.3 |
| B6 | 52520CBD6 | JUN_WAC_NO | 6.6403 | | | NR/NA/C | 1,834 | 798 | 0.4% | 0.0 |
| B7 | 52520CBE4 | JUN_WAC_NO | 6.6403 | | | NR/NR/NA | 1,833 | - | 0.3% | 0.0 |

**FINAL PRICE 78.7**

Prime Fixed (Deal 2): LMT 2006-04

| Tranche | CUSIP | Type | Coupon | Float Formula | Original Rating: Moody's/S&P/Fitch | Current Rating: Moody's/S&P/Fitch | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| AP1 | 52520RAK8 | SEN_XRS_PO | 0 | | Aaa/AAA/AAA | Aaa/NA/A | 1,390 | 1,246 | 0.3% | 68.2 |
| AX1 | 52520RAM4 | SEN_WAC_IO | 6 | | Aaa/AAA/AAA | Aaa/NA/AAA | 505 | - | 0.0% | 0.0 |
| AP2 | 52520RAL6 | SEN_XRS_PO | 0 | | NA/AAA/AAA | NR/NA/AA | 172 | 102 | 0.0% | 75.2 |
| AX2 | 52520RAN2 | SEN_WAC_IO | 6 | | NA/AAA/AAA | NR/NA/AAA | 600 | 359 | 0.0% | 0.0 |
| 1A1 | 52520RAA0 | SEN_NAS_FIX | 6 | | Aaa/AAA/AAA | Aaa/NA/A | 8,824 | 8,678 | 2.0% | 77.3 |
| 1A2 | 52520RAB8 | SEN_FLT | 3.0719 | LIBOR_1MO + 0.60 | Aaa/AAA/AAA | Aaa/NA/A | 50,000 | 38,411 | 11.4% | 83.8 |
| 1A3 | 52520RAC6 | SEN_INV_IO | 2.9281 | 5.40 - LIBOR_1MO | Aaa/AAA/AAA | Aaa/NA/AAA | 50,000 | 38,411 | 0.0% | 4.1 |
| 1A4 | 52520RAD4 | SEN_FIX | 6 | | Aaa/AAA/AAA | Aaa/NA/A | 28,481 | 22,800 | 6.5% | 85.6 |
| 2A1 | 52520RAE2 | SEN_FLT | 2.8719 | LIBOR_1MO + 0.40 | Aaa/AAA/AAA | Aaa/NA/A | 88,640 | 66,009 | 20.2% | 80.9 |
| 2A2 | 52520RAF9 | SEN_INV_IO | 4.6281 | 7.10 - LIBOR_1MO | Aaa/AAA/AAA | Aaa/NA/AAA | 88,640 | 66,009 | 0.0% | 10.6 |
| 1B1 | 52520RAP7 | JUN_WAC | 6.7284 | | NA/NA/AA | NR/NA/CCC | 6,354 | 6,263 | 1.4% | 18.2 |
| 1B2 | 52520RAQ5 | JUN_WAC | 6.7284 | | NA/NA/A | NR/NA/CC | 1,991 | 1,962 | 0.5% | 7.7 |
| 1B3 | 52520RAR3 | JUN_WAC | 6.7284 | | NA/NA/BBB | NR/NA/C | 1,517 | 1,495 | 0.3% | 4.2 |
| 1B4 | 52520RAW2 | JUN_WAC_NO | 6.7284 | | | NR/NA/C | 1,043 | 1,028 | 0.2% | 1.9 |
| 1B5 | 52520RAX0 | JUN_WAC_NO | 6.7284 | | | NR/NA/C | 759 | 708 | 0.2% | 0.3 |
| 1B6 | 52520RAY8 | JUN_WAC_NO | 6.7284 | | | NR/NA/NA | 664 | - | 0.2% | 0.0 |
| R | 52520RAV4 | SEN_FIX_RES | 5 | | NA/AAA/AAA | NR/NA/AAA | - | - | 0.0% | 0.0 |
| 3A1 | 52520RAG7 | SEN_FIX | 5 | | NA/AAA/AAA | NR/NA/AA | 43,050 | 31,193 | 9.8% | 83.6 |
| 4A1 | 52520RAH5 | SEN_FIX | 6 | | NA/AAA/AAA | NR/NA/AA | 133,430 | 93,738 | 30.4% | 86.1 |
| 5A1 | 52520RAJ1 | SEN_FIX | 6.5 | | NA/AAA/AAA | NR/NA/AA | 66,337 | 40,446 | 15.1% | 87.3 |
| 2B1 | 52520RAS1 | JUN_WAC | 5.9556 | | NA/NA/AA | NR/NA/B | 3,872 | 3,508 | 0.9% | 11.5 |
| 2B2 | 52520RAT9 | JUN_WAC | 5.9556 | | NA/NA/A | NR/NA/CCC | 999 | 905 | 0.2% | 5.3 |
| 2B3 | 52520RAU6 | JUN_WAC | 5.9556 | | NA/NA/BBB | NR/NA/CC | 624 | 565 | 0.1% | 3.4 |
| 2B4 | 52520RAZ5 | JUN_WAC_NO | 5.9556 | | | NR/NA/C | 499 | 452 | 0.1% | 2.0 |
| 2B5 | 52520RBA9 | JUN_WAC_NO | 5.9556 | | | NR/NA/C | 375 | 340 | 0.1% | 1.0 |
| 2B6 | 52520RBB7 | JUN_WAC_NO | 5.9556 | | | NR/NA/NA | 375 | 211 | 0.1% | 0.5 |
| X | LMT2EAMC0 | JUN_RES_NO | 0 | | | | 50,000 | 29,717 | 0.0% | 0.0 |

FINAL PRICE 81.2

| Tranche | CUSIP | Type | Coupon | Float Formula | Original Rating: Moody's/S&P/Fitch | Current Rating: Moody's/S&P/Fitch | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| IAIO | 525237AF0 | SEN_INV_IO | 3.7781 | 6.25 - LIBOR_1M | Aaa/AAA/NA | Baa1/NA/NA | 657,339 | 567,516 | 0.0% | 5.5 |
| IA11 | 525237BF9 | SEN_SPR_FLT | 2.5919 | LIBOR_1MO + 0. | Aaa/AAA/NA | Baa1/NA/NA | 370,108 | 291,347 | 38.4% | 82.6 |
| IA12 | 525237BG7 | SEN_SPR_FLT | 2.5619 | LIBOR_1MO + 0. | Aaa/AAA/NA | Baa1/NA/NA | 10,000 | 7,872 | 1.0% | 82.5 |
| IA2 | 525237AB9 | SEN_SPR_FLT | 2.6919 | LIBOR_1MO + 0. | Aaa/AAA/NA | Baa2/NA/NA | 142,759 | 142,759 | 14.8% | 57.0 |
| IA3 | 525237AC7 | SEN_SPR_FLT | 2.7519 | LIBOR_1MO + 0. | Aaa/AAA/NA | Baa2/NA/NA | 68,738 | 68,738 | 7.1% | 41.0 |
| IA41 | 525237BH5 | SEN_SUP_FLT | 2.6719 | LIBOR_1MO + 0. | Aaa/AAA/NA | Baa1/NA/NA | 56,034 | 48,419 | 5.8% | 70.2 |
| IA42 | 525237BJ1 | SEN_SUP_FLT | 2.7919 | LIBOR_1MO + 0. | Aaa/AAA/NA | Caa2/NA/NA | 9,700 | 8,382 | 1.0% | 69.4 |
| IM1 | 525237AG8 | MEZ_FLT | 2.9219 | LIBOR_1MO + 1. | Aa1/AA+/NA | Ca/NA/NA | 24,161 | 24,161 | 2.5% | 20.8 |
| IM2 | 525237AH6 | MEZ_FLT | 3.0219 | LIBOR_1MO + 1. | Aa2/AA/NA | Ca/NA/NA | 13,039 | 13,039 | 1.4% | 13.2 |
| IM3 | 525237AJ2 | MEZ_FLT | 3.2219 | LIBOR_1MO + 1. | Aa3/AA/NA | C/NA/NA | 8,053 | 8,053 | 0.8% | 10.4 |
| IM4 | 525237AK9 | MEZ_FLT | 3.4719 | LIBOR_1MO + 1. | A1/AA-/NA | C/NA/NA | 7,286 | 7,286 | 0.8% | 8.8 |
| IM5 | 525237AL7 | MEZ_FLT | 3.7219 | LIBOR_1MO + 1. | A2/A+/NA | C/NA/NA | 7,670 | 7,670 | 0.8% | 7.5 |
| IM6 | 525237AM5 | MEZ_FLT | 4.2219 | LIBOR_1MO + 1. | A3/A/NA | C/NA/NA | 6,136 | 6,136 | 0.6% | 6.6 |
| IM7 | 525237AN3 | MEZ_FLT | 4.4719 | LIBOR_1MO + 2. | Baa1/A-/NA | C/NA/NA | 6,519 | 6,519 | 0.7% | 5.5 |
| IM8 | 525237AP8 | MEZ_FLT | 4.4719 | LIBOR_1MO + 2. | Baa2/BBB+/NA | C/NA/NA | 4,985 | 4,985 | 0.5% | 4.2 |
| IM9 | 525237AQ6 | JUN_FLT | 4.4719 | LIBOR_1MO + 2. | Baa3/BBB/NA | C/NA/NA | 4,985 | 4,985 | 0.5% | 3.2 |
| IX | LXSHPCJU0 | JUN_OC_RES_NO | 0 | | | | 767,024 | 664,338 | 0.0% | 0.0 |
| IP | LXS4J0QT0 | JUN_PEN_NO | 0 | | | | 767,024 | 664,338 | 0.0% | 0.2 |
| IIAIO | 525237AV5 | SEN_INV_IO | 4.5281 | 7.00 - LIBOR_1M | Aaa/AAA/NA | Aaa/NA/NA | 156,082 | 106,497 | 0.0% | 7.2 |
| IIA1 | 525237AR4 | SEN_SPR_FLT | 2.6319 | LIBOR_1MO + 0. | Aaa/AAA/NA | Aaa/NA/NA | 92,263 | 62,953 | 9.6% | 74.9 |
| IIA2 | 525237AS2 | SEN_SPR_FIX_CAP | 7.5 | | Aaa/AAA/NA | Aaa/NA/NA | 34,000 | 23,199 | 3.5% | 83.0 |
| IIA3 | 525237AT0 | SEN_SPR_SUP_FLT | 2.7719 | LIBOR_1MO + 0. | Aaa/AAA/NA | Aaa/NA/NA | 44,811 | 30,575 | 4.6% | 75.2 |
| IIA4 | 525237AU7 | SEN_SUP_FLT | 2.9219 | LIBOR_1MO + 0. | Aaa/AAA/NA | Aa2/NA/NA | 19,008 | 12,969 | 2.0% | 75.6 |
| IIM1 | 525237AW3 | MEZ_FLT | 3.1219 | LIBOR_1MO + 0. | Aa1/AA+/NA | Baa1/NA/NA | 5,394 | 5,394 | 0.6% | 48.6 |
| IIM2 | 525237AX1 | MEZ_FLT | 3.1719 | LIBOR_1MO + 0. | Aa2/AA+/NA | Ba3/NA/NA | 4,820 | 4,820 | 0.5% | 46.1 |
| IIM3 | 525237AY9 | MEZ_FLT | 3.3219 | LIBOR_1MO + 0. | Aa3/AA/NA | B3/NA/NA | 2,869 | 2,869 | 0.3% | 44.7 |
| IIM4 | 525237AZ6 | MEZ_FLT | 3.3719 | LIBOR_1MO + 0. | NA/AA/NA | NR/NA/NA | 7,805 | 7,805 | 0.8% | 38.0 |
| IIM5 | 525237BA0 | MEZ_FLT | 3.7219 | LIBOR_1MO + 1. | NA/AA-/NA | NR/NA/NA | 1,951 | 1,951 | 0.2% | 24.4 |
| IIM6 | 525237BB8 | MEZ_FLT | 4.2219 | LIBOR_1MO + 1. | NA/A/NA | NR/NA/NA | 4,591 | 4,591 | 0.5% | 19.1 |
| IIM7 | 525237BC6 | MEZ_FLT | 4.2219 | LIBOR_1MO + 1. | NA/A-/NA | NR/NA/NA | 1,492 | 1,492 | 0.2% | 13.4 |
| IIM8 | 525237BD4 | MEZ_FLT | 4.2219 | LIBOR_1MO + 1. | NA/BBB/NA | NR/NA/NA | 3,443 | 3,443 | 0.4% | 9.5 |
| IIM9 | 525237BE2 | JUN_FLT | 4.2219 | LIBOR_1MO + 1. | NA/BBB-/NA | NR/NA/NA | 1,721 | 1,721 | 0.2% | 5.9 |
| IIX | LXSXOP780 | JUN_OC_RES_NO | 0 | | | | 229,570 | 167,707 | 0.0% | |
| IIP | LXSJ845G0 | JUN_PEN_NO | 0 | | | | 229,570 | 167,707 | 0.0% | |
| ILTR | LXSU0AD20 | NPR_NPR_NO | 0 | | | | - | - | 0.0% | |
| IILTR | LXSFMRAE0 | NPR_NPR_NO | 0 | | | | - | - | 0.0% | |
| IR | LXS4O3BG0 | NPR_NPR_NO | 0 | | | | - | - | 0.0% | |
| IIR | LXSGSF430 | NPR_NPR_NO | 0 | | | | - | - | 0.0% | |
| IA12_FEE | LXSSKP0D0 | SEN_FEE | 0.07 | | | | 10,000 | 7,872 | 0.0% | |
| IA41_FEE | LXSISE040 | SEN_FEE | 0.13 | | | | 56,034 | 48,419 | 0.0% | |
| IIA1_FEE | LXSHBD460 | SEN_FEE | 0.08 | | | | 92,263 | 62,953 | 0.0% | |

FINAL PRICE 65.9

**Alt-A (Deal 2): LXS 2007-17H**

| Tranche | CUSIP | Type | Coupon | Float Formula | Original Rating: Moody's/S&P/Fitch | Current Rating: Moody's/S&P/Fitch | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| A1 | 52525PAA9 | SEN_FLT | 3.2719 | LIBOR_1MO + 0.80 | Aaa/AAA/AAA | Aa3/NA/AAA | 527,987 | 441,178 | 78.5% | 77.6 |
| AIO | 52525PAC5 | SEN_IO | 1.75 | | Aaa/AAA/AAA | Aaa/NA/AAA | 527,987 | 441,178 | 0.0% | 3.2 |
| M0 | 52525PAP6 | MEZ_FLT | 3.5719 | LIBOR_1MO + 1.10 | NA/AAA/AAA | NR/NA/AAA | 45,761 | 45,761 | 6.8% | 51.1 |
| M1 | 52525PAD3 | MEZ_FLT | 3.7219 | LIBOR_1MO + 1.25 | NA/AA+/AA+ | NR/NA/A | 44,703 | 44,703 | 6.6% | 42.0 |
| M2 | 52525PAE1 | MEZ_FLT | 3.9719 | LIBOR_1MO + 1.50 | NA/AA/AA+ | NR/NA/BBB | 17,600 | 17,600 | 2.6% | 26.6 |
| M3 | 52525PAF8 | MEZ_FLT | 4.2219 | LIBOR_1MO + 1.75 | NA/AA-/AA | NR/NA/BB | 6,687 | 6,687 | 1.0% | 22.5 |
| M4 | 52525PAG6 | MEZ_FLT | 4.4719 | LIBOR_1MO + 2.00 | NA/A+/AA- | NR/NA/BB | 8,095 | 8,095 | 1.2% | 20.5 |
| M5 | 52525PAH4 | MEZ_FLT | 4.4719 | LIBOR_1MO + 2.00 | NA/A/A+ | NR/NA/BB | 6,687 | 6,687 | 1.0% | 17.7 |
| M6 | 52525PAJ0 | MEZ_FLT | 4.4719 | LIBOR_1MO + 2.00 | NA/A-/A | NR/NA/BB | 5,631 | 5,631 | 0.8% | 15.3 |
| M7 | 52525PAK7 | MEZ_FLT | 4.4719 | LIBOR_1MO + 2.00 | NA/BBB+/A- | NR/NA/B | 5,631 | 5,631 | 0.8% | 13.3 |
| M8 | 52525PAL5 | JUN_FLT | 4.4719 | LIBOR_1MO + 2.00 | NA/BBB/BBB+ | NR/NA/B | 4,218 | 4,218 | 0.6% | 11.5 |
| X | LXSOPD5O0 | JUN_OC_NPR_NPR_NO | 0 | | | | 703,985 | 616,647 | 0.0% | |
| LTR | LXSJYKLN1 | JUN_RES_NO | 0 | | | | 703,985 | 616,647 | 0.0% | |
| R | LXSFL0D80 | JUN_RES_NO | 0 | | | | 703,985 | 616,647 | 0.0% | |
| P | LXSXOXQB0 | JUN_PEN_NO | 0 | | | | 703,985 | 616,647 | 0.0% | |

**FINAL PRICE 68.8**

**Subprime (Deal 1): SASCO 2007-BC4**

| Tranche | Cusip | Type | Coupon | Float Formula | Original Rating: Moody's/S&P/Fitch/Dom | Current Rating: Moody's/S&P/Fitch/Dom | Original Balance (1000s) | Current Balance (1000s) | Weight | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| A1 | 86365DAA7 | SEN_FLT | 3.1019 | LIBOR_1MO + 0.63 | Aaa/AAA/NA/AAA | Aaa/NA/NA/NA | 427,894 | 386,687 | 33.4% | 70.1 |
| A2 | 86365DAB5 | SEN_FLT | 2.9719 | LIBOR_1MO + 0.50 | NA/AAA/NA/AAA | NR/NA/NA/NA | 20,765 | 20,765 | 1.6% | 37.1 |
| A3 | 86365DAC3 | SEN_FLT | 2.7219 | LIBOR_1MO + 0.25 | NA/AAA/NA/AAA | Aaa/NA/NA/NA | 273,418 | 240,227 | 21.4% | 82.6 |
| A4 | 86365DAD1 | SEN_FLT | 2.9719 | LIBOR_1MO + 0.50 | NA/AAA/NA/AAA | NR/NA/NA/NA | 210,126 | 210,126 | 16.4% | 50.9 |
| M1 | 86365DAH2 | MEZ_FLT | 2.9719 | LIBOR_1MO + 0.50 | NA/AA+/NA/AAA (high) | NR/NA/NA/NA | 71,255 | 71,255 | 5.6% | 31.9 |
| M2 | 86365DAN9 | MEZ_FLT | 2.9719 | LIBOR_1MO + 0.50 | NA/AA/NA/AA | NR/NA/NA/NA | 54,259 | 54,259 | 4.2% | 25.1 |
| M3 | 86365DAP4 | MEZ_FLT | 2.9719 | LIBOR_1MO + 0.50 | NA/AA-/NA/AA (low) | NR/NA/NA/NA | 25,495 | 25,495 | 2.0% | 20.1 |
| M4 | 86365DAQ2 | MEZ_FLT | 2.9719 | LIBOR_1MO + 0.50 | NA/A+/NA/A (high) | NR/NA/NA/NA | 25,495 | 25,495 | 2.0% | 17.5 |
| M5 | 86365DAR0 | MEZ_FLT | 2.9719 | LIBOR_1MO + 0.50 | NA/A/NA/A | NR/NA/NA/NA | 26,149 | 26,149 | 2.0% | 15.1 |
| M6 | 86365DAS8 | MEZ_FLT | 2.9719 | LIBOR_1MO + 0.50 | NA/A-/NA/A (low) | NR/NA/NA/NA | 21,573 | 21,573 | 1.7% | 12.9 |
| M7 | 86365DAT6 | MEZ_FIX_CAP | 5 | | NA/BBB+/NA/BBB (high) | NR/NA/NA/NA | 17,650 | 17,650 | 1.4% | 12.9 |
| M8 | 86365DAU3 | MEZ_FIX_CAP | 5 | | NA/BBB/NA/BBB | NR/NA/NA/NA | 15,689 | 15,689 | 1.2% | 11.5 |
| M9 | 86365DAV1 | MEZ_FIX_CAP | 5 | | NA/BBB-/NA/BBB (low) | NR/NA/NA/NA | 15,689 | 15,689 | 1.2% | 10.2 |
| B1 | 86365DAY5 | MEZ_FIX_CAP | 5 | | NR/NR/NA/NR | NR/NA/NA/NA | 20,919 | 20,919 | 1.6% | 8.6 |
| B2 | 86365DAZ2 | MEZ_FIX_CAP | 5 | | NR/NR/NA/NR | NR/NA/NA/NA | 16,343 | 16,343 | 1.3% | 6.6 |
| B3 | 86365DBA6 | JUN_FIX_CAP | 5 | | NR/NR/NA/NR | NR/NA/NA/NA | 36,608 | 36,608 | 2.9% | 4.3 |
| X | 86365DBL2 | JUN_OC_NO | 0 | | | NR/NA/NA/NA | 1,307,438 | 1,233,040 | | |
| P | 86365DBM0 | JUN_PEN_NO | 0 | | | NR/NA/NA/NA | 1,307,438 | 1,233,040 | | |
| R | 86365DAX7 | NPR_NPR_NO | 0 | | | NR/NA/NA/NA | - | - | | |
| LTR | 86365DBN8 | NPR_NPR_NO | 0 | | | NR/NA/NA/NA | - | - | | |

**FINAL PRICE 55.0**