# APPENDIX 17:  REPO 105

I.  APPENDIX TO REPO 105 REPORT ..................................................................................2

   A.  Lehman's Repo 105 Accounting Policy Manual ................................................2

   B.  Types of Securities Used in Repo 105 Transactions.........................................9

   C.  Repo 105 Contracts..........................................................................................16

   D.  Linklaters Letter..............................................................................................20

      1.  Section 2.4 of the Linklaters Letter..........................................................32

   E.  Lehman Brothers Global Consolidated Balance Sheets .................................36

   F.  Expert Curriculum Vitae ................................................................................38

Appendix 17 to the Repo 105 Report provides additional details with respect to: Lehman's internal Repo 105 Accounting Policy, which is reprinted in its entirety; the types of securities Lehman utilized in Repo 105 transactions; the documentation for Repo 105 transactions and the intercompany repo between United States-based Lehman entities and LBIE; the Linklaters true sale opinion letter, which is reprinted in its entirety; and a list of LBHI Consolidated Balance Sheets reporting the Repo 105 usage on a particular date. The Appendix also contains the *curriculum vitae* of Dr. Gary Holstrum, whom the Examiner consulted in connection with the Examiner's investigation of Ernst & Young.

# I.      APPENDIX TO REPO 105 REPORT

## A.   Lehman's Repo 105 Accounting Policy Manual

Lehman's Repo 105 and Repo 108 Accounting Policy is set out below in its entirety:[1]

**Repo 105 and Repo 108**

A repurchase agreement (a repo) is an agreement under which we sell securities to a counterparty for cash with a simultaneous agreement to repurchase the same or equivalent securities at a specific price at a later date. A reverse repurchase agreement (a reverse repo) is an agreement under which we purchase securities from a counterparty with cash and simultaneously enter into an agreement to resell the same

---

[1] Lehman Brothers Holdings Inc., Accounting Policy Manual for Repo 105 and Repo 108 (Sept. 9, 2006) [LBEX-DOCID 3213290].

or equivalent securities at a specific price at a later date. In general, repurchase and reverse repurchase agreements are used by counterparties to obtain or invest short-term funds and are considered secured financing transactions. (Dr. Cash, Cr. Repo Liability) and a reverse repo is recorded as a lending (Dr. Reverse Repo Asset, Cr. Cash).

However, there are circumstances under which a repo should be re-characterized from a secured financing transaction to a sale of inventory and a forward to repurchase securities, provided certain criteria in SFAS 140 are met. This policy addresses such situations. The concepts discussed in this policy also apply to reverse repurchase agreements re-characterized from investing transactions to inventory repurchase transactions. However, because we generally do not engage in these transactions, the remainder of this policy addresses only the accounting for repo transactions re-characterized from secured financing transactions to sales of inventory and forward agreements to repurchase.

**Overview**

Repo 105 and Repo 108 transactions refer to repos with a counterparty in which we sell securities valued at a minimum of 105% (for fixed income securities) or 108% (for equity securities) of the cash received. That is, we sell fixed income securities with a fair value of at least $105 in exchange for $100 of cash for Repo 105, and equity securities with a fair value of at least $108 in exchange for $100 of cash for Repo 108.

(Note that we allow Repo 108 to be done at $107 of fair value but we still refer to these transactions as Repo 108.)

Repo 105 and Repo 108 contracts typically are executed by Lehman Brothers International (Europe) ("LBIE") because true sale opinions can be obtained under English law. We generally cannot obtain a true sale opinion under U.S. law.

For a repo to be re-characterized from a secured financing transaction to a sale of inventory, all the following SFAS criteria must be met:

- The transaction is a true sale at law (SFAS 140.9a).

- The transferee has the ability to pledge or exchange the transferred assets (SFAS 140.9b). and

- The transferor is considered to relinquish control of the securities transferred (SFAS 140.9c).

**True sale opinion**

This policy addresses repo transactions executed in the U.K. under a Global Master Repurchase Agreement ("GMRA") provided the counterparty resides in a jurisdiction covered under English law. Repos generally cannot be treated as sales in the United States because lawyers cannot provide a true sale opinion under U.S. law. See "Securitizations-adequacy of legal opinions" in this Accounting Policy Manual for more information about the requirements for legal opinions.

The U.K. law firm of Linklaters has issued us true sale opinions covering Repo 105 and Repo 108 transactions documented under a GMRA under English law. (Linklaters also has issued true sale opinions for securities lending transactions

documented under Overseas Securities Lending Agreements, Global Master Securities Lending Agreements, and Master Gilt Edged Stock Lending Agreements. However, all our current Repo 105 and Repo 108 transactions are documented under a GMRA.) For Repo 108, voting rights with respect to the transferred equity securities must be transferred to the repo counterparty for Linklaters to provide us with a true sale opinion.

**Ability to pledge or exchange the transferred assets**

The transferee must have the ability to pledge or exchange the transferred assets free of any contractual conditions imposed by us and/or operational constraints. This ability to pledge or exchange must be a legal right and an operational capability. For transactions involving third-party custodians such as in tri-party arrangements, the counterparty's re-use or re-hypothecation options in Tri-party Services Agreement must be executed to ensure the transferee has the legal right to pledge or exchange the transferred assets. Practical operational constraints must be removed to enable the transferee to pledge or exchange the transferred assets. An example of a practical operational constraint is re-transferring assets that are not considered readily obtainable in the marketplace. If such assets are used in the repo and the transferee pledges to or exchanges the assets with a third party, the transferee may be unable to re-deliver the same (or substantially the same) assets to the transferor because of the difficulty of obtaining such assets. As a result, the transferee would be operationally constrained

from pledging or exchanging the assets. Ordinarily, for an asset to be readily obtainable, a market must exist where the assets are either traded on a formal exchange or are considered liquid and trade in a market where price quotations either are published or are obtainable through another verifiable source.

**Relinquish control of the transferred assets**

Re-characterization of a repo from a secured financing transaction to a sale of inventory and a forward to repurchase assets is allowed only if we can demonstrate we have relinquished control of the transferred assets. We retain control over a transferred asset if we are assured of the ability to repurchase or redeem the transferred asset, even in the event of default by the transferee. Our right to repurchase the transferred asset is assured only if it is protected by obtaining collateral (*i.e.*, cash) sufficient to fund substantially all of the cost of purchasing the same or substantially the same replacement assets during the term of the contract. If we can fund substantially all of the cost of purchasing the same or substantially the same replacement assets, we are viewed as having the means to replace the assets, even if the transferee defaults, and we are considered not to have relinquished control of the assets. For purposes of this requirement, we have retained control of the transferred assets if a fixed income security is margined at less than 105% of the cash received or an equity security is margined at less than 107% of the cash received.

Transfers in which we transfer fixed income securities valued at a minimum of 105% of the cash received and equity securities valued at a minimum of 107% of the cash received are considered to be sales with a forward agreement to repurchase the securities rather than secured financing transactions. The assets transferred (i.e., sold) should be valued and margined frequently for changes in the market price of the assets to ensure the assets transferred equal or exceed 105% (or 107%) of the cash received. When both the foregoing criteria are met, the assets transferred are removed from our balance sheet and an asset under a derivative contract is recorded to reflect that we will repurchase, under a forward contract, the transferred assets.

**Example entries**

The following entries are recorded when a repo meets the criteria for re-characterization from a secured financing transaction to a sale of inventory and a forward agreement to repurchase assets. Assume a repo of $100 and we pledge $105 of fixed income collateral.

At the original sale date, our systems assume repos are secured financings so the entry before re-characterization is:

| | | |
|---|---|---|
| Dr. Cash | $100 | |
| Cr. Repo | | $100 |

The re-characterization entry is:

| | | |
|---|---|---|
| Dr. Repo | $100 | |
| Dr. Long inventory-derivative | $5 | |
| Cr. Inventory | | $105 |

We have an asset under a derivative contract because we are required to repurchase under a forward contract $105 worth of securities for payment of only $100.

At the repurchase date, the following entries are made (assuming frequent margining, where X is the value of the margin):

| | | |
|---|---|---|
| Dr. Inventory | $105+X | |
| Dr. Cash | | 100+X |
| Cr. Long inventory-derivative | | 5 |

## B. Types of Securities Used in Repo 105 Transactions

Lehman's Repo 105 Accounting Policy required that the assets used in a Repo 105 transaction "be readily obtainable," meaning that "a market must exist where the assets are either traded on a formal exchange or are considered liquid and trade in a market where price quotations either are published or are obtainable through another verifiable source."[2] The "true sale" opinion letter for Repo 105 transactions that Lehman received from the Linklaters law firm, conditioned its opinion on the assumption that "the Purchased Securities consist of liquid securities, so that the Buyer could easily dispose of the Purchased Securities and acquire equivalent securities if it wished."[3]

For the vast majority of Repo 105 transactions, Lehman used relatively liquid securities, but there were certain exceptions.[4] Three fields of data listed in the Lehman GFS balance sheet files are potential indicators of the relative liquidity of securities Lehman used in Repo 105 transactions: (1) security type, (2) credit rating, and (3) SFAS 157 pricing input level.[5] The Examiner analyzed data from Lehman GFS balance sheet

---

[2] Lehman Brothers Holdings Inc., Accounting Policy Manual for Repo 105 and Repo 108 (Sept. 9, 2006), at p. 2 [LBEX-DOCID 3213290].

[3] Letter from Linklaters, to Lehman Brothers International (Europe), re: Repurchase Transactions under a Global Master Repurchase Agreement (May 31, 2006), at p. 2 [LBEX-LBIE 000001]; *see also* e-mail from Thomas Siegmund, Lehman, to Kaushik Amin, Lehman (May 2, 2008) [LBEX-DOCID 601783] ("[I]nternal accounting set rules on what paper can be 105'ed . . . . [I]n the past, we had to use the most liquid paper. . . . [T]he true sale opinion is linked to liquidity and quality of paper – the lower liquidity and quality, the deeper the discount would have to be…and consequently the more expensive the exercise.").

[4] Duff & Phelps, Repo 105 Security Liquidity Analysis (Oct. 21, 2009), at p. 1.

[5] *Id.* at 1.

documents dated November 30, 2007 (fiscal year 2007), February 29, 2008 (first quarter 2008), and May 30, 2008 (second quarter 2008). The analysis shows that for the most part, Lehman complied with its policy of using only readily obtainable securities.[6]

Most securities Lehman used in Repo 105 transactions were "governmental" in nature, implying a certain level of liquidity.[7] While representing a relatively small percentage of Lehman's total Repo 105 assets/securities, at times the nominal amount of non-"governmental" securities Lehman used in Repo 105 transactions was quite large. For example, as of February 29, 2008 (the end of Lehman's first quarter 2008), Lehman utilized over $1 billion of highly structured securities, *i.e.*, CLOs and CDOs, private RMBS, CMBS and asset-backed securities, in Repo 105 transactions.[8] In the market environment that existed for Lehman in early 2008, these structured securities were likely relatively illiquid as indicated by declines in origination volumes, wider bid-offer spreads, and higher margin requirements.[9]

---

[6] *Id.* at 1-2.

[7] This security type includes, but is not limited to, governments, treasuries, and agencies. Agencies included Federal Home Loan Mortgage Corporation ("Freddie Mac"), Federal National Mortgage Association ("Fannie Mae"), and Federal Home Loan Bank System securities. *See* e-mail from Michael McGarvey, Lehman, to Jeff Michaels, Lehman, *et al.* (May 22, 2008) [LBEX-DOCID 482311] (transmitting list [LBEX-DOCID 472396] of available collateral for Repo 105 transactions, including Freddie Mac and Fannie Mae). By late summer 2008, however, Freddie Mac was no longer used for Repo 105 transactions due to counterparty demands. *See* e-mail from Marc Silverberg, Lehman, to Chaz Gothard, Lehman, *et al.* (Aug. 7, 2008) [LBHI_SEC07940_1742976] (stating that Freddie Mac has been removed from a Repo 105 counterparty's list because it is "no longer acceptable collateral to post for 105").

[8] Duff & Phelps, Repo 105 Security Liquidity Analysis (Oct. 21, 2009), at p. 1.

[9] *Id.* at 4.

Lehman used the following volumes of non-"government" securities in Repo 105 transactions:[10]

- November 30, 2007: $4.8 billion (out of a total of $29.9 billion in Repo 105 transactions), or 16% of the total Repo 105 volume;

- February 29, 2008: $4.8 billion (out of a total of $41.8 billion in Repo 105 transactions), or 11% of the total Repo 105 volume; and

- May 30, 2008:  $4.2 billion (out of a total of $44.5 billion in Repo 105 transactions), or 9% of the total Repo 105 volume.

---

[10] *Id.* at 3.  Note that the figures listed immediately below and in the succeeding chart report only the volumes of Repo 105 transactions that Lehman engaged in at quarter-end for the reported period.  The figures do not include the volume of Repo 108 transactions that Lehman undertook at the quarter-end periods.

**Repo 105 Usage - by Security Type[1]**

| ($ in Millions, # Actual) | Nov. 30, 2007 | | | Feb. 29, 2008 | | | May. 30, 2008 | | | Aug. 27, 2008[2] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Security Type | Usage | % of Use. | # of Sec. | Usage | % of Use. | # of Sec. | Usage | % of Use. | # of Sec. | Usage | % of Use. | # of Sec. |
| Governments | $ 15,519 | 52% | 447 | $ 21,402 | 51% | 421 | $ 27,357 | 61% | 372 | $ 11,208 | 63% | 212 |
| Treasuries | 1,778 | 6% | 18 | 5,508 | 13% | 62 | 6,533 | 15% | 84 | 2,658 | 15% | 44 |
| Agency | 7,828 | 26% | 96 | 10,121 | 24% | 123 | 6,340 | 14% | 61 | 38 | 0% | 2 |
| Sovereigns - Eurobonds | 28 | 0% | 26 | 65 | 0% | 13 | 74 | 0% | 19 | 26 | 0% | 6 |
| Canadian | - | -% | - | - | -% | - | 64 | 0% | 3 | 70 | 0% | 3 |
| **Total Governmental** | **$ 25,153** | **84%** | **587** | **$ 37,096** | **89%** | **619** | **$ 40,367** | **91%** | **539** | **$ 14,000** | **78%** | **267** |
| Corporate | 3,430 | 11% | 449 | 3,319 | 8% | 384 | 3,234 | 7% | 383 | 2,968 | 17% | 386 |
| CMO Agencies[3] | 809 | 3% | 80 | 937 | 2% | 109 | 346 | 1% | 25 | 230 | 1% | 19 |
| Asset Backs[4] | 76 | 0% | 13 | 99 | 0% | 9 | 240 | 1% | 21 | 84 | 0% | 9 |
| Corporate - Non G7 | 109 | 0% | 58 | 117 | 0% | 53 | 96 | 0% | 45 | 25 | 0% | 24 |
| Equity | 44 | 0% | 57 | 16 | 0% | 3 | 87 | 0% | 5 | 156 | 1% | 13 |
| Money Markets | 2 | 0% | 1 | 18 | 0% | 2 | 54 | 0% | 3 | 42 | 0% | 4 |
| Private Label[5] | 25 | 0% | 3 | 24 | 0% | 3 | 32 | 0% | 2 | 14 | 0% | 3 |
| Convertibles | 157 | 1% | 7 | 144 | 0% | 2 | 9 | 0% | 2 | - | - | - |
| Lehman Paper | 0 | 0% | 1 | 0 | 0% | 1 | 3 | 0% | 1 | 11 | 0% | 2 |
| Fund Units | - | -% | - | 0 | 0% | 1 | 1 | 0% | 1 | 0 | 0% | 1 |
| Sovereigns - Locals | - | -% | - | - | -% | - | - | -% | - | 317 | 2% | 2 |
| Strips | - | -% | - | 73 | 0% | 2 | - | -% | - | - | -% | - |
| Wholeloan[6] | - | -% | - | - | -% | - | - | -% | 8 | - | -% | 1 |
| Other[6] | - | -% | - | - | -% | - | - | -% | - | - | -% | 2 |
| Blank[7] | 110 | 0% | 8 | - | -% | - | 67 | 0% | 3 | - | -% | - |
| **Total Repo 105 Usage[8]** | **$ 29,916** | **100%** | **1,264** | **$ 41,844** | **100%** | **1,188** | **$ 44,536** | **100%** | **1,036** | **$ 17,847** | **100%** | **733** |

1. The GFS balance sheet field "Asset Category 1" was used to assign asset categories to the Repo 105 securities. A combination of the Account number, Product number and a number of other identifiers such as Division, Account Name and BPM Levels were used to identify the Repo 105 security on the GFS balance sheet, in order to ascertain an asset category from the GFS balance sheet.

2. The "Benefit Split" field in the Repo 105 spreadsheet for August 27, 2008 was found to match the "Asset Category 1" field on the GFS balance sheet for Aug 29, 2008 (with the exception of one security with a Repo 105 usage of ~$4.6MM). Therefore, we used the "Benefit Split" field to identify the security type for all Repo 105 securities, including ones that were missing from the August 29, 2008 GFS balance sheet.

   The total Repo 105 Usage for August 27, 2008, of $17.847 billion does not agree to the Total Repo 105 Usage presented in the summary information of $22.067 billion. This is because the summary information contains a manual addition of $4.220 billion dollars to the formulas calculating the "MTS America" and "ITS Asia" Repo 105 usage. There is no underlying support within the security detail Repo 105 Usage data for these additions, and we were therefore unable to include those amounts in our analysis.

3. "CMO Agency" category included securities whose Bloomberg types were CDO, CLO, Non-Agency MBS, CMBS and Credit linked notes. This categorization was a misnomer.

4. The "Asset Backs" category included securities whose Bloomberg types were CDO, CLO, MBS and other ABS.

5. The "Private Label" category includes Private Label MBS and CMBS securities.

6. The "Whole loan" and "Other" categories include entries in the May and August of 2008 in the Repo 105 inventory (see "# of Sec." columns), however they had a $0 Repo usage listed. This causes these buckets to show a positive count despite showing no Repo 105 usage.

7. "Blank" refers to securities that did not have an Asset Category 1 type in the GFS balance sheet.

8. Due to rounding differences, the Total Repo 105 Usage may not equal to the sum of the components above.

Sources:　November 30, 2007: LBEX-DOICD 3219746;　February 29, 2008: LBEX-DOCID 3219760;　May 30, 2008: LBEX-DOCID 2078195;　August 27, 2008: LBEX-DOCID 3361504.
　　　　　GFS balance sheets for: November

The vast majority of securities Lehman utilized in Repo 105 transactions were investment grade, with all but a few of the securities falling within the A to AAA range. In addition, the majority of Lehman's Repo 105 securities fit within Level 1 under SFAS

157's "Fair Value Level" GAAP-required reporting categories.[11]  On November 30, 2007, 71% of Lehman's Repo 105 securities were Level 1.[12]  On February 29, 2008, 82% of Lehman's Repo 105 securities were Level 1.[13]  On May 30, 2008, 86% of Lehman's Repo 105 securities were Level 1.[14]  For any quarter-ending period, the remainder of assets Lehman used in Repo 105 transactions consisted primarily of Level 2 securities; the evidence indicates that Lehman used few Level 3 assets for Repo 105 transactions. Nevertheless, on May 30, 2008, for example, Lehman used nineteen Level 3 securities in $153 million of Repo 105 transactions.[15]

---

[11] The valuation of Level 1 assets under SFAS 157 requires the use of directly observable inputs, *i.e.*, quoted prices in active markets for identical assets or liabilities accessible on the valuation date.  The valuation of Level 2 assets requires the use of directly or indirectly observable prices in active markets for similar assets or liabilities, quoted prices for identical or similar items in markets that are not active and inputs other than quoted prices such as yield curves, credit risks, and volatilities.  And the valuation of Level 3 assets requires the use of unobservable inputs that reflect management's own assumptions about the assumptions that market participants would make.

[12] Duff & Phelps, Repo 105 Security Liquidity Analysis (Oct. 21, 2009), at p. 6.

[13] *Id.*

[14] *Id.*

[15] *Id.*

# Repo 105 Usage - by Credit Rating[1]

| ($ in Millions, # Actual) | Nov. 30, 2007 | | | Feb. 29, 2008 | | | May. 30, 2008 | | | Aug. 27, 2008[2] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credit Rating | Usage | % of Use. | # of Sec. | Usage | % of Use. | # of Sec. | Usage | % of Use. | # of Sec. | Usage | % of Use. | # of Sec. |
| AAA | $ 18,989 | 63% | 581 | $ 30,113 | 72% | 652 | $ 31,258 | 70% | 497 | $ 10,269 | 58% | 276 |
| AA | 5,871 | 20% | 220 | 6,453 | 15% | 190 | 5,135 | 12% | 167 | 2,118 | 12% | 131 |
| A | 3,123 | 10% | 209 | 2,961 | 7% | 170 | 4,592 | 10% | 157 | 3,988 | 22% | 105 |
| **Total A-Range** | **$ 27,984** | **94%** | **1,010** | **$ 39,526** | **94%** | **1,012** | **$ 40,985** | **92%** | **821** | **$ 16,375** | **92%** | **512** |
| BBB | 749 | 3% | 121 | 943 | 2% | 94 | 586 | 1% | 113 | 271 | 2% | 77 |
| **Total Investment Grade** | **$ 28,732** | **96%** | **1,131** | **$ 40,470** | **97%** | **1,106** | **$ 41,571** | **93%** | **934** | **$ 16,645** | **93%** | **589** |
| BB | 77 | 0% | 14 | 45 | 0% | 11 | 67 | 0% | 18 | 48 | 0% | 18 |
| B | 32 | 0% | 8 | 0 | 0% | 4 | 50 | 0% | 20 | 48 | 0% | 23 |
| CCC | - | -% | - | - | -% | - | 47 | 0% | 7 | 55 | 0% | 7 |
| C | - | -% | - | - | -% | - | 15 | 0% | 1 | - | -% | - |
| NR | 2 | 0% | 2 | 2 | 0% | 1 | 70 | 0% | 1 | 82 | 0% | 5 |
| Missing[3] | - | -% | - | - | -% | - | - | -% | - | 140 | 1% | 21 |
| Blank[4] | 1,073 | 4% | 109 | 1,328 | 3% | 66 | 2,717 | 6% | 55 | 829 | 5% | 70 |
| **Total Repo 105 Usage[5]** | **$ 29,916** | **100%** | **1,264** | **$ 41,844** | **100%** | **1,188** | **$ 44,536** | **100%** | **1,036** | **$ 17,847** | **100%** | **733** |

1. The GFS balance sheet field "Standard and Poor Rating" was used to assign credit ratings to the Repo 105 securities. A combination of the Account number, Product number and a number of other identifiers such as Division, Account Name and BPM Levels were used to identify the Repo 105 security on the GFS balance sheet, in order to ascertain a credit rating from the GFS balance sheet.

   Intermediate ratings (e.g. BBB+, BBB-, etc.) are grouped into the BBB rating category.

   If securities did not have an S&P rating, but did have a Moody's rating, the Moody's rating was translated into the corresponding S&P rating, and was aggregated into the data. This was the case for 91 securities (totaling $1,016,149,209) as of November 30, 2007; 81 securities (totaling $1,002,564,495) as of February 29, 2008; 77 securities (totaling $1,368,098,094) as of May 30, 200; and 59 securities (totaling $556,476,516) as of August 27, 2008. No Fitch Ratings' information was available.

2. A GFS balance sheet for August 27, 2008 was not available. As a result, we used the August 29, 2008 GFS balance sheet to infer a Credit Rating, assuming that it would not have changed during the two day period. As a result, there is a higher percentage of 'Missing' securities, please see footnote 3 for further discussion.

   The total Repo 105 Usage for August 27, 2008 of $17.847 billion does not agree to the Total Repo 105 Usage presented in the summary information of $22.067 billion. This is because the summary information contains a manual addition of $4.220 billion dollars to the formulas calculating the "MTS America" and "ITS Asia" Repo 105 usage. There is no underlying support within the security detail Repo 105 Usage data for these additions, and we were therefore unable to include those amounts in our analysis.

3. "Missing" refers to all entries that could not be identified in the GFS balance sheet. This occurred only as of August 27, 2008 because of the two day gap between the GFS balance sheet used, and the Repo 105 usage data. We have access only to month-end GFS balance sheet information.

4. "Blank" refers to securities that did not have a Credit Rating entry in the GFS balance sheet. Upon manual examination of the securities with blank credit ratings as of May 30, 2008, we identified U.S. Treasury Inflation Index Notes, Japanese and German Treasuries, and U.S. Agencies above.

5. Due to rounding differences, the Total Repo 105 Usage may not equal to the sum of the components.

Sources:   November 30, 2007: LBEX-DOICD 3219746; February 29, 2008: LBEX-DOCID 3219760; May 30, 2008: LBEX-DOCID 2078195; August 27, 2008: LBEX-DOCID 3361504. GFS balance sheets for: November 30, 2007, February 29, 2008, May 30, 2008, and August 31, 2008

# Repo 105 Usage - by FAS 157 Fair Value Level[1]

| ($ in Millions, # Actual) | Nov. 30, 2007 | | | Feb. 29, 2008 | | | May. 30, 2008 | | | Aug. 27, 2008[2] | | |
| Fair Value Level | Usage | % of Use. | # of Sec. | Usage | % of Use. | # of Sec. | Usage | % of Use. | # of Sec. | Usage | % of Use. | # of Sec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $ 21,132 | 71% | 435 | $ 34,115 | 82% | 454 | $ 38,349 | 86% | 430 | $ 12,834 | 72% | 221 |
| 2 | 8,673 | 29% | 821 | 8,076 | 19% | 725 | 5,967 | 13% | 586 | 4,358 | 24% | 479 |
| 3 | 5 | 0% | 3 | 5 | 0% | 2 | 153 | 0% | 19 | 515 | 3% | 12 |
| Missing[3] | - | -% | - | - | -% | - | - | -% | - | 140 | 1% | 21 |
| Blank[4] | 105 | 0% | 5 | (352) | (1%) | 7 | 67 | 0% | 1 | - | -% | - |
| Total Repo 105 Usage[5] | $ 29,916 | 100% | 1,264 | $ 41,844 | 100% | 1,188 | $ 44,536 | 100% | 1,036 | $ 17,847 | 100% | 733 |

1. Valuation of **Level 1 assets** require the use of directly observable inputs, i.e. quoted prices in active markets for identical assets or liabilities accessible on the valuation date. Such prices are not adjusted for any effects of the reporting entity holding a large share of the overall trading volume.

   Valuation of **Level 2 assets** require the use of directly or indirectly observable prices in active markets for similar assets or liabilities, quoted prices for identical or similar items in markets that are not active, and inputs other than quoted prices such as yield curves, credit risks and volatilities. Such prices are not adjusted for any effects of the reporting entity holding a large share of the overall trading volume.

   Valuation of **Level 3 assets** require the use unobservable inputs that reflect management's own assumptions about the assumptions that market participants would make.

   The GFS balance sheet field "Fair Value Level" was used to assign FAS Levels to the Repo 105 securities. A combination of the Account number, Product number and a number of other identifiers such as Division, Account Name and BPM Levels were used to identify the Repo 105 security on the GFS balance sheet, in order to ascertain a FAS 157 Level from the GFS balance sheet.

   There were several Repo 105 securities which contained more than one entry in the GFS balance sheet, such that one of them would have a blank Fair Value Level, with all other descriptions equal, except for the balances. We assumed that Fair Value Levels would be consistent for the same products, and assigned the Fair Value Level of the non-blank entries. There were also an immaterial number of entries of Repo 105 securities which contained more than one entry in the GFS balance sheet, and had conflicting FAS levels for the same product. In these cases, we attempted to find the most appropriate FAS level by comparing the security with past and future GFS balance sheets.

2. A GFS balance sheet for August 27, 2008 was not available. As a result, we used the August 29, 2008 GFS balance sheet to infer a FAS 157 level, assuming that it would not have changed during the two day period. As a result, there is a higher percentage of 'Missing' securities, please see footnote 3 for further discussion.

   The total Repo 105 Usage for August 27, 2008, of $17.847 billion does not agree to the Total Repo 105 Usage presented in the summary information of $22.067 billion. This is because the summary information contains a manual addition of $4.220 billion dollars to the formulas calculating the "MTS America" and "ITS Asia" Repo 105 usage. There is no underlying support within the security detail Repo 105 Usage data for these additions, and we were therefore unable to include those amounts in our analysis.

3. "Missing" refers to all entries that could not be identified in the GFS balance sheet. This occurred only as of August 27, 2008 because of the two day gap between the GFS balance sheet used, and the Repo 105 usage data.

4. "Blank" refers to securities that did not have a Fair Value Level in the GFS balance sheet. As of February 29, 2008 there were 6 securities with a total Repo 105 Usage of $0, which had a Fair Value Level of 'C', which we have classified in the count as Blank.

5. Due to rounding differences, the Total Repo 105 Usage may not equal to the sum of the components above.

Sources:    November 30, 2007: LBEX-DOCID 3219746; February 29, 2008: LBEX-DOCID 3219760; May 30, 2008: LBEX-DOCID 2078195; August 27, 2008: LBEX-DOCID 3361504. GFS balance sheets for: November 30, 2007, February 29, 2008, May 30, 2008, and August 31

### C. Repo 105 Contracts

Lehman's internal Accounting Policy for Repo 105 transactions, the Linklaters letter, and the July 2006 Global Balance Sheet Overview of Repo 105/108 PowerPoint presentation referred to the Global Master Repurchase Agreement.[16]  Lehman acquired legal opinions from Linklaters covering other forms of contracts – namely, OSLA (Overseas Securities Lending Agreement), GESLA (Master Gilt Edged Stock Lending Agreement) and GMSLA (Global Master Securities Lending Agreement) – but these were never used.[17]

Instead, Lehman undertook all Repo 105 transactions pursuant to a "GMRA" or Global Master Repurchase Agreement, published by PSA and the International Securities Market Association, used for international repo agreements, and governed by English law (subject to modification by the parties).[18]  Lehman also engaged in non-

---

[16] Lehman Brothers Holdings Inc., Accounting Policy Manual, Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213310] ("This policy addresses repo transactions executed in the U.K. under a Global Master Repurchase Agreement ('GMRA') provided the counterparty resides in a jurisdiction covered under English law. . . . The U.K. law firm of Linklaters has issued us true sale opinions covering Repo 105 and Repo 108 transactions documented under a GMRA under English law."); Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489] ("A repo under a Global Master Repurchase Agreement [GMRA] is a 'true sale'"); *id.* at 3 (stating legal opinion in place for GMRA); Letter from Linklaters, to Lehman Brothers International (Europe), re: Repurchase Transactions under a Global Master Repurchase Agreement (May 31, 2006), at p. 1 [LBEX-LBIE 000001 - 000009] ("You have asked us to review the Global Master Repurchase Agreement ('GMRA') that you intend to use for repos or reverse repos and buy/sell backs of securities and financial instruments ('Securities') with various counterparties.").

[17] Lehman Brothers Holdings Inc., Accounting Policy Manual, Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213310]; Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 3 [LBEX-WGM 748489].

[18] *See* Securities Industry and Financial Markets Association, Supplemental Guidance Notes (June 1997), at p. 1, *available at* http://www.sifma.net/agrees/master_repo_supp_gn.pdf ("The GMRA has been developed as the standard agreement for international transactions in non-U.S. markets.").  The MRA,

Repo 105 repo transactions pursuant to the "MRA" or Master Repurchase Agreement, published by the Bond Market Association, used in the United States for domestic repo agreements, and governed by the laws of the State of New York.[19]  In addition to the differing choice of law provisions, the MRA and GMRA diverge with respect to: (1) remedies in the event of default; (2) agency provisions; (3) certain market-based provisions; (4) the regulatory status of certain United States counterparties, addressed by the MRA; and (5) United Kingdom gilt repo market, Australian, and Belgian Annexes available for the GMRA.[20]

Relying upon internal, Lehman-generated lists of "confirmed" Repo 105 trades for certain quarter-end periods in 2007 and 2008,[21] the Examiner requested the production of:  (1) any contracts or agreements covering the intercompany repo piece of Repo 105 trades (*e.g.*, a transfer of securities from United States-based Lehman entities to LBIE), if the trade included an intercompany transfer of assets; and (2) the contracts or agreements covering LBIE's transfer of the Repo 105 securities to third-party counterparties.

---

however, makes available an Annex III for International Transactions, governed by New York law, which may be an alternative to the GMRA where U.S. counterparties already have an MRA in place between them but would like to transact in foreign securities.  *See id.*

[19] *Id.*

[20] *Id.* at 2.

[21] Lehman, Repo 105 Collateral Test (Feb. 29, 2008) [LBEX-DOCID 609016] (attached to e-mail from Kieran Higgins, Lehman, to Kaushik Amin, Lehman (Apr. 8, 2008) [LBEX-DOCID 738567]); Lehman, MTS Repo Collateral with Counterparty (May 30, 2008) [LBEX-DOCID 3237604] (attached to e-mail from Ying-Yi Chen, Lehman, to Marc Silverberg, Lehman, *et al.* (Jun 6, 2008) [LBEX-DOCID 3234714]).

In addition to the contracts between LBIE and third parties, the Examiner also obtained two repurchase agreements that covered the intercompany repo transactions between LBI, a United States-based Lehman entity involved in Repo 105 transactions, and LBIE relating to the "confirmed" Repo 105 trades referenced in the Lehman-produced documents.

The first of the intercompany repo contracts was a GMRA between LBIE and LBI, dated November 1, 1996.[22]  Although the GMRA standard form contract was governed by and construed in accordance with the laws of England,[23]  the Annex amended the controlling law to New York:

> [E]xcept that all the terms and phrases which are used in this Agreement and which expressly refer to statutory provisions of the United States of America or any state thereof shall be governed by and construed in accordance with the federal laws of the United States of America and the laws of the State of New York.[24]

The Annex also modifies the GMRA to cover "U.S. Treasury instruments and other securities that are cleared primarily through a clearance facility in the United States."[25]  The Annex memorializes the intent of the parties "that each Transaction is a 'repurchase agreement' as that term is defined in Section 101 of Title 11 of the United States Code . . . and a 'securities contract' as that term is defined in Section 741 of Title

---

[22] Global Master Repurchase Agreement (Version 1 Gross Paying Securities) (Nov. 11, 1996) [LBEX-AM 333461].

[23] *Id.* ¶ 17.

[24] Annex 1 to Global Master Repurchase Agreement, Part 1, Supplemental Terms or Conditions (Nov. 1, 1996), ¶ 4 [LBEX-AM 333461].

[25] *Id.*

11 of the United States Code, as amended."[26]   The Annex also provides: "It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 10 hereof, is a contractual right to liquidate such Transaction as described in Section 555 and 559 of Title 11 of the United States Code, as amended."[27]

The second intercompany repo agreement, between LBI and LBCPI on one hand and LBIE on the other, was a MRA dated October 6, 1998 and governed by New York law.[28]

---

[26] *Id.*
[27] *Id.*
[28] Master Repurchase Agreement (September 1996 Version) (Oct. 6, 1998), at ¶ 16 [LBEX-AM 333493].

### D. Linklaters Letter[29]

One Silk Street
London EC2Y 8HQ
Telephone (44-20) 7456 2000
Facsimile (44-20) 7456 2222
Group 4 Fax (44-20) 7374 9318
DX Box Number 10 CDE
Direct Line 020 7456 3764
Direct Fax 020 7456 2222
simon.firth@linklaters.com

Lehman Brothers International (Europe)
One Broadgate
London EC2M 7HA
("**Lehman Brothers**")

31 May 2006

Dear Sirs

**Repurchase Transactions under a Global Master Repurchase Agreement**

## 1 Introduction

**1.1** You have asked us to review the Global Master Repurchase Agreement ("**GMRA**") that you intend to use for repos or reverse repos and buy/sell backs of securities and financial instruments ("**Securities**") with various counterparties. References to the GMRA in this opinion are to both the 1995

---

[29] Letter from Linklaters, to Lehman Brothers International (Europe), re: Repurchase Transactions under a Global Master Repurchase Agreement (May 31, 2006) [LBEX-LBIE 000001]. Lehman's internal Repo 105/108 Accounting Policy and an internal PowerPoint presentation referenced several iterations of the Linklaters opinion letter and witnesses state that Lehman refreshed the Linklaters letter on more than one occasion. *See* Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 3 [LBEX-WGM 748489] (stating that true sale opinion letter for GMRA was first obtained in May 2001, updated in September 2004, and further updated in May 2006); Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213293] (stating that Linklaters has issued opinions under a GMRA); *see also* Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 8 (stating that Edward Grieb refreshed the Linklaters letter). Though Lehman refreshed the letter several times, the Examiner has been able to locate only one version of the Linklaters letter, dated May 31, 2006.

version and the 2000 version of the GMRA: the analysis in relation to each of them is the same.

1.2     For the purposes of this opinion, we have examined a copy of the GMRA but no other documents.  Terms defined in the GMRA have the same meanings in this opinion.

1.3     Under the GMRA, the parties thereto may enter into transactions for Securities ("**Transactions**") in which one party, as Seller, agrees to sell Securities (the "**Purchased Securities**") to the other party as Buyer, against the payment of a price (the "**Purchase Price**") for the Purchased Securities to Seller.

1.4     At the same time, the parties enter into an agreement under which Buyer will sell to Seller Securities equivalent to the Purchased Securities (the "**Equivalent Securities**") at a certain date or on demand against payment of a price (the "**Repurchase Price**") by Seller to Buyer.

1.5     The purpose of this opinion is to advise you about whether the transfer of the Purchased Securities to the Buyer for the Purchase Price may, under English law, be classified as a sale involving the disposition of the Seller's entire proprietary interest in the Purchased Securities, as opposed to a charge.

1.6     This opinion is limited to English law as applied by the English courts and is given on the basis that it will be governed by and construed in accordance with English law.

1.7     For the purpose of this opinion we have assumed that:

(a)     there are no provisions of foreign law which would affect this opinion;

(b)     the GMRA and each of the Transactions is within the capacity and powers of each of the parties to it, will be validly executed and delivered by those parties and is valid, binding and enforceable under English law;

(c)     at the time of each Transaction each of the assets comprising the Purchased Securities are beneficially owned by Seller at the time of its transfer to Buyer; and

(d)     the Purchased Securities consist of liquid securities, so that the Buyer could easily dispose of the Purchased Securities and acquire equivalent securities if it wished.

## 2   Reclassification of the transaction

### 2.1   General

Generally speaking, the English courts recognise both the freedom of the owner of an asset to transfer his interest in that asset to another person and the freedom of the parties to a contract to determine the nature of the interest that is to be transferred. Whether a contract involves the sale of the owner's entire interest in the asset or the transfer of some lesser interest, such as a charge, is primarily determined by construing the terms of the contract.

In determining whether a person has entered into a contract involving the sale of an asset, the courts will look at the substance of the transaction: the terminology used by the parties to the transaction is not necessarily conclusive. Furthermore, if a series of transactions with respect to the same asset are entered into at the same time, it is the substance of the overall arrangements which is important. For example, an arrangement between two parties may purport to involve a sale but on its true analysis actually amount to a charge. Whether this is the case will depend on whether the legal nature of what has been agreed has the characteristics which the law recognises as those of a sale or those of a charge.

In the present case, we understand that the Purchased Securities will be transferred to Buyer pursuant to the GMRA. Usually the courts look only to the documentation pursuant to which assets have been transferred to determine whether the parties intended such a transfer to be a sale (albeit that such documentation may be construed in the light of any relevant background material). Accordingly, provided that the documentation recording the transfer of the Purchased Securities to Buyer is consistent with the parties' intentions that Seller should have disposed of its entire proprietary interest in the Purchased Securities to the Buyer, that would, in our opinion, evidence a sale rather than a charge. However, a court would look at the overall arrangements to determine whether a transfer should be classified as a sale or as a charge where it is alleged either that the terms of the documentation by which the assets were transferred had been supplemented or modified by provisions in other documentation or else that the sale documentation was a "sham" (see paragraph 2.5 below).

Consequently, it is necessary to consider, with respect to any Transaction, whether the arrangements for Buyer to transfer to Seller or its agent Equivalent Securities against the payment of the Repurchase Price by Seller (less any dividends, interest or other distributions of any kind paid in respect of the Purchased Securities ("**Income**") then payable and unpaid by Buyer to

Seller), would mean that the arrangements pursuant to which the Purchased Securities were transferred to Buyer would be construed as a charge. If so, Seller would retain a proprietary interest in the Purchased Securities and would not have effected a sale of them. It is also necessary to consider whether the Buyer's agreement to transfer any Income to Seller indicates that Seller has not disposed of its entire proprietary interest in the Purchased Securities.

## 2.2    The distinction between a sale and a charge

In our opinion, one of the essential characteristics of a sale of an asset is that the seller intends to transfer outright to the buyer his entire proprietary interest in the asset. Conversely, one of the essential characteristics of a charge is that, despite any transfer of assets between the parties, they intend the person creating the charge to retain a proprietary interest in the property which is the subject of the charge, so that on the discharge of his obligations he is entitled to the return of that property from the chargee. In other words, the chargor has not transferred outright to the chargee his entire proprietary interest in the assets transferred but has retained such an interest as allows him to demand the return of those assets on the discharge of his obligations.

Assets may be transferred to a transferee under an arrangement whereby such assets will or may be transferred by the transferee at a later date back to the transferor. However, if, in such a situation, the transferor is merely entitled to the delivery of *equivalent assets* (such as securities of the same series and nominal value) rather than the very assets that were originally delivered, this is, in our opinion, inconsistent with the existence of a charge because the transferor does not intend to retain a proprietary interest in the assets originally delivered. The only exception to this is where the transferee is to hold the assets on a fungible basis, together with other property of the same type, and the intention is to return a proportionate share of the pool of property that is held in this way. In the present case, however, there is no evidence of any such intention in the GMRA. The mere fact that the securities which are to be delivered have the same CUSIP numbers as the ones that the transferee originally received would not prevent them from being regarded as equivalent assets rather than the very assets that were originally delivered.

### 2.3 The effect of the transfer of Equivalent Securities

#### 2.3.1 Transfer to Seller of equivalent assets and the option of cash settlement in the event of redemption of the Purchased Securities

Paragraph 3(f) of the GMRA provides that Buyer shall transfer Equivalent Securities to Seller (i.e., Securities which are equivalent to, and not necessarily the same as, the Securities comprising the Purchased Securities, or, if and to the extent that the Purchased Securities have been redeemed, by paying a cash sum equivalent to the proceeds of the redemption). Moreover, Buyer is not required to hold the Purchased Securities separately from its own assets and nothing in the GMRA expressly restricts Buyer's right to deal with the Purchased Securities. This makes it clear that the parties do not intend Seller to have the right to require the return of the particular Purchased Securities transferred to Buyer in any Transaction or, therefore, to retain any proprietary interest in the Purchased Securities. In our opinion, therefore, and subject to the points made below, the transfer of Purchased Securities under any Transaction would be construed as a sale rather than a charge.

#### 2.3.2 Substitution

Paragraph 8 of the GMRA states that, if Seller requests and Buyer so agrees, a Transaction may be varied by the transfer by Buyer to Seller of Securities equivalent to the Purchased Securities (or of such of the Purchased Securities as shall be agreed) in exchange for the transfer by Seller to Buyer of other Securities of such amount and description as shall be agreed ("**New Purchased Securities**").

In our opinion, the variation of any Transaction by Seller transferring the New Purchased Securities to Buyer in return for Securities equivalent to the Purchased Securities does not affect the analysis that the original transfer of Purchased Securities would be construed as involving a sale rather than a charge. Again, Seller's right is to Equivalent Securities not the Purchased Securities. Likewise, provided that Seller's transfer of New Purchased Securities to Buyer under paragraph 8 of the GMRA is, and is intended to be, subject to the same arrangements applying to the purchase of the Purchased Securities under the GMRA, we believe that such transfer would also be regarded as involving a sale of the New Purchased Securities by Seller rather than a charge. This is not affected simply because the

consideration received by Seller in return for making that transfer may be itself the transfer of Equivalent Securities by Buyer.

### 2.3.3 Margin Payments

With respect to any transaction under the GMRA, at any time from the date of the purchase of the Purchased Securities (the "**Purchase Date**") to the date of the purchase of the Equivalent Securities (the "**Repurchase Date**") (or, if later, the date of the delivery of the Equivalent Securities to Seller or the date of the termination of the Transaction), each party is entitled to calculate its exposure under that Transaction (the "**Transaction Exposure**"). The Transaction Exposure is the difference between (i) the Repurchase Price multiplied by the applicable Margin Ratio (subject to recalculation where the Transaction relates to Securities of more than one description to which different Margin Ratios apply) and (ii) the Market Value of Equivalent Securities at such time. Buyer will have a Transaction Exposure if the value of (i) is greater than the value of (ii) and Seller will have a Transaction Exposure if the value of (ii) is greater than the value of (i).

Paragraph 4 of the GMRA provides that if at any time a party has a Net Exposure in respect of the other party, it may by notice require the other party to make a transfer to it of an aggregate amount or value at least equal to that Net Exposure (a "**Margin Transfer**"). There will be a Net Exposure if the aggregate of all of the first party's Transaction Exposures (plus any unpaid Income Payments due to it but less the amount of Net Margin provided to it) exceeds the aggregate of all the other party's Transaction Exposures (plus any unpaid Income Payments due to it but less the amount of Net Margin provided to it).

Subject to paragraph 4(d), when a party has a Net Exposure and requires the other party to pay a Margin Transfer to it, the Margin Transfer may be satisfied by the payment (or repayment) of Cash Margin or the delivery of Margin Securities (or Equivalent Margin Securities). Because the above arrangements do not give Seller any right to the Purchased Securities, they do not affect our opinion that the transfer of the Purchased Securities under any Transaction would be construed as involving a sale rather than a charge.

Paragraph 4 of the GMRA, however, further provides that Net Exposure may be eliminated by the repricing of Transactions or the adjustment of Transactions, or a combination of these methods.

If a Transaction is *repriced*, the Original Transaction is terminated and the parties enter into a new Transaction (the "**Repriced Transaction**").  Purchased Securities under the Repriced Transaction are Securities equivalent to the Purchased Securities under the Original Transaction.  The obligations of the parties with respect to the delivery of Purchased Securities and the payment of the Purchase Price under the Repriced Transaction are set off against their obligations with respect to the delivery of Equivalent Securities and the payment of the Repurchase Price under the Original Transaction and, accordingly, only a net cash sum is paid by one party to the other.

If a Transaction is *adjusted*, the Original Transaction is terminated and the parties enter into a new Transaction (the "**Replacement Transaction**"), under which the Purchased Securities are Securities agreed between the parties, the Market Value of which is substantially equal to the Repurchase Price under the Original Transaction.  The other terms of the Replacement Transaction are as agreed between the parties.  Assuming that under the Replacement Transaction the parties agree that Buyer shall transfer Equivalent Securities against payment of the Repurchase Price as per the provisions of GMRA, we would restate our opinion in paragraph 2.3.1 above.

Accordingly, we do not believe that these provisions affect our conclusion that the transfer of the Purchased Securities under the Original Transaction would be construed as involving a sale rather than a charge.

## 2.4    The effect of the arrangements regarding Income

Paragraph 5 of the GMRA provides that Buyer will pay to Seller an amount equal to any Income which is paid in respect of the Purchased Securities in the specified period.  In certain circumstances, a transfer of assets coupled with the retention of the right to receive the income on the assets could be construed as involving the retention of a proprietary interest in or relating to the assets, i.e. a transfer of title subject to the reservation that the rights to income are to be held on trust for the transferor.  Alternatively, an

undertaking to pay income on the assets could be construed as involving an implied restriction on the transferee's freedom to deal with the assets.

In the present case, however, paragraph 5 of the GMRA makes it clear that Buyer's obligation in this respect is simply an obligation to pay an amount which is equivalent to any Income paid in respect of the Purchased Securities (there being, under the GMRA, no obligation to hold such Income in a separate account or any other indication that a trust over it and/or the right to receive it is intended).

As a result, we do not think that the arrangements regarding the payment of any amounts equivalent to Income to Seller would be construed as involving the retention by Seller of a proprietary interest in the Purchased Securities. Accordingly, they do not affect the conclusion that, in our opinion, the transfer of the Purchased Securities to Buyer would be construed as involving a sale rather than a charge.

**2.5    The effect of the arrangements regarding voting**

The GMRA contains no provisions regarding voting rights. Accordingly, any voting rights attached to the Purchased Securities the record date for which is after they are transferred to the Buyer will pass to the Buyer. This is consistent with our conclusion that the transfer would be construed as involving a sale rather than a charge.

The position is slightly different under the Equities Annex to the GMRA (2000 version) (the "**Equities Annex**"), which contains certain supplementary terms and conditions for transactions in equities. Paragraph 4(b) of the Equities Annex provides that, where voting rights fall to be exercised in relation to any Purchased Securities which are equities and in respect of which Equivalent Securities have not been transferred, the Buyer shall use its best endeavours to arrange for voting rights of that kind to be exercised in relation to the relevant number of securities of that kind in accordance with the Seller's instructions.

If a provision entitling the Seller to direct how the votes attached to the Purchased Securities must be exercised were construed as imposing an obligation on the Buyer to continue to hold the Purchased Securities, such a provision might call into question whether the Seller had agreed to transfer its entire proprietary interest in the Purchased Securities to the Buyer. The courts might conclude that the substance of the arrangements in such a case was that the Buyer had agreed to hold the Purchased Securities during the term of the transaction and, notwithstanding the references to Equivalent

Securities, the true agreement was that the Buyer had agreed to redeliver the Purchased Securities on the termination of the transaction. This might, in turn, lead to the conclusion that the arrangements were intended to involve no more than a charge granted by the Seller over the Purchased Securities in favour of the Buyer. Alternatively, the GMRA might be construed as imposing a trust over the voting rights in favour of the Seller.

Paragraph 4(b) of the Equities Annex, however, provides that the Seller's right to give instructions regarding the exercise of voting rights applies only if the Buyer is holding the Purchased Securities. The Equities Annex cannot, therefore, be construed as imposing an express or implied obligation on the Buyer to continue to hold the Purchased Securities, or as constituting a trust over the voting rights in favour of the Seller. Accordingly, this does not affect our conclusion that the GMRA involves a sale of the Purchased Securities, even if they include equities and the Equities Annex is used.

## 2.6 Sham transactions

In coming to the conclusions set out in this opinion, we have assumed that the GMRA accurately reflects the agreement between the parties. If it is merely a "sham", i.e. the common intention of the parties is not to create the legal rights and obligations which the GMRA has the appearance of creating, then extrinsic evidence may be adduced to enable the courts to discover what was actually agreed. For example, if the parties' common intention is that the Buyer will not transfer Equivalent Securities on the Repurchase Date, but this provision has been included to make the transfer of the Purchased Securities by Seller look like it involves a sale, the courts will ignore such provision in determining whether the transfer actually did involve a sale or not.

Similarly, if the parties subsequently enter into an agreement (orally, in writing or by conduct) which is inconsistent with the GMRA, the courts may decide that they have agreed to vary the terms of the GMRA. We have therefore assumed that no such agreement has been or will be entered into.

## 3 Transfer of ownership

The steps that are required to be taken to transfer assets from one person to another are determined by reference to the laws of the jurisdiction in which the assets are regarded in law as being situated (the *lex situs* of the assets). Hence, even if, as a matter of English law, Seller would be regarded as having sold the Purchased Securities to Buyer (i.e. as having *agreed* to transfer its entire proprietary interest in the Purchased Securities to Buyer), whether Seller's entire proprietary interest has in fact been transferred pursuant to the GMRA is a

matter for the *lex situs* of the Purchased Securities.  In other words, the mere entry into of the GMRA (or any Transactions under it) will not be sufficient to transfer title to the Purchased Securities.  The Purchased Securities must actually be transferred pursuant to the GMRA.  The steps that need to be taken to achieve this will be a matter for the *lex situs*.  Where title to the Purchased Securities is evidenced by entries in a register or account maintained by or on behalf of an intermediary and Regulation 19 of the Financial Collateral Arrangements (No.2) Regulations 2003 applies, this will be the law of the country in which the account is maintained.

Furthermore the nature of Buyer's interest in the Purchased Securities will depend on the nature of the assets constituting the Purchased Securities and the way in which such are held by Buyer.  In other words, that interest may not be a proprietary interest.  For example, if as provided by paragraph 6(a) of the GMRA, delivery of the Purchased Securities takes place by book entry transfer through Euroclear, Clearstream or an agreed securities clearing system, this may not involve the transfer of a proprietary interest in any securities held in such system but merely an adjustment to the contractual (or other) obligations between the system (or its operator) and the person through which the Purchased Securities are held by Buyer in the system (ie the asset in question could be contractual rights in respect of the Purchased Securities, rather than the Purchased Securities themselves).  However, in each case, provided that Seller transfers to Buyer all the rights and interests it may have in or in relation to the Purchased Securities, retaining no enforceable interests, and intending to transfer its entire proprietary interest, then in our opinion, the transfer would properly be considered a sale as opposed to a charge.

**4      The creation of a fresh proprietary interest**

Even if the arrangements between Seller and Buyer for the transfer of the Purchased Securities would be construed as a sale and, hence, an agreement to transfer Seller's entire proprietary interest in the Purchased Securities, it also needs to be considered whether, in respect of any Transaction, the obligation of Buyer to transfer Equivalent Securities to Seller on the Repurchase Date gives Seller a fresh proprietary interest in the Equivalent Securities.

**4.1      The effect of the obligation to deliver Equivalent Securities**

Under English law, where a person has a contractual right to require the delivery of an asset and the courts would be prepared to grant a decree of specific performance to enforce the delivery obligation, he is treated as having the beneficial ownership of that asset.  Accordingly, where the *lex*

*situs* of the Securities constituting the Equivalent Securities is English law, then if Seller could obtain such a decree in respect of Buyer's obligations to transfer Equivalent Securities, Seller would be the beneficial owner of the Equivalent Securities and Buyer would hold the Equivalent Securities on trust for it.

An order of specific performance is a discretionary remedy and whether it will be given in any case will, therefore, depend on the circumstances. Generally, the courts will order specific performance where a failure to perform cannot be adequately compensated for by an award of damages, but not otherwise. The courts have previously taken the view that where a person owns assets which are not readily available (i.e. where their equivalent cannot be readily obtained from another source), damages may not be an adequate remedy for a breach of an obligation he has accepted to transfer them, and this will justify an order of specific performance. However, a court will not usually order specific performance of an obligation to transfer an asset where the obligee may fulfill his obligations to a counterparty either by transferring the asset or by doing something else.

Whether Seller has, as a result of Buyer's obligation to transfer Equivalent Securities, a proprietary interest in the Equivalent Securities, will depend on the liquidity of the Securities which comprise the Equivalent Securities. If the Securities are readily available in the market, specific performance would not, in our opinion, be available and so this obligation of Buyer would not give Seller a proprietary interest in the Equivalent Securities. On the other hand, if the Equivalent Securities are very illiquid, so that there is only a very limited market for them, following the Repurchase Date, a decree of specific performance probably could be obtained by Seller to enforce Buyer's obligations. At least at that stage, therefore, Seller probably would have a proprietary interest in the assets. In the present case we have assumed that, in respect of any transaction, all the Securities comprising the Equivalent Securities are liquid. The issue therefore would only arise if this were to cease to be the case prior to the Repurchase Date.

**4.2** **The effect of the agreement to pay Income to Seller and vote in accordance with its instructions**

It might be argued that Buyer's agreement in paragraph 5 of the GMRA to pay to Seller any Income which is paid in respect of the Purchased

Securities could be construed as involving an assignment of, or a declaration of trust over, Buyer's rights to that Income. Similarly, it might be argued that the arrangements in the Equities Annex regarding the exercise of voting rights could be construed as involving an assignment of, or a declaration of trust over, the voting rights attached to the Purchased Securities. However, for the same reasons that we do not consider that this agreement would be construed as the *reservation* of a proprietary interest in respect of the Purchased Securities (see paragraphs 2.4 and 2.5 above), we do not believe that it would be construed as the creation of a fresh proprietary interest over them, whether in respect of Income or voting rights.

5       **Conclusion**

Subject to the qualifications set out in this opinion, in respect of each Transaction, following the transfer by Seller to Buyer of the Purchased Securities, in our opinion, Seller will have disposed of its entire proprietary interest in the Purchased Securities by way of sale.

6       **Reliance on this opinion**

This opinion is addressed to you solely for your benefit in connection with the issue of the Notes. It is not to be transmitted to anyone else, nor is it to be relied upon by anyone else or for any other purpose or quoted or referred to in any public document or filed with anyone without our express consent. However, a copy of this opinion may be provided by Lehman Brothers to its auditors for the purpose of preparing the firm's balance sheets. We accept no responsibility or legal liability to any person other than the addressees specified above in relation to the contents of this opinion.

Yours faithfully

*/s/ Linklaters*


Linklaters

## 1. Section 2.4 of the Linklaters Letter

Repo 105 transactions allowed Lehman to maintain its level of earning assets while reducing the size of its balance sheet.[30]  The outright sale of securities inventory followed by a corresponding pay-off of liabilities with the sale proceeds also would have reduced the size of Lehman's balance sheet.  However, in contrast to Repo 105 transactions, an outright sale would have removed the net earnings associated with those securities sold.[31]  While Lehman removed the securities inventory used in Repo 105 transactions from its balance sheet for accounting purposes, Lehman continued to earn income on the securities throughout the term of the Repo 105 transaction.[32]

The Linklaters letter made clear that in the transactions contemplated under the letter, income (*i.e.*, coupon payments) received during the term of the repo by the buyer would be paid or otherwise credited to Lehman's account.[33]  For support, the Linklaters

---

[30] Duff & Phelps, Repo 105 Question for Examiner's Report (Nov. 30, 2009), at p. 1.

[31] *Id.* at 2.

[32] *Id.* at 2.

[33] Letter from Linklaters, to Lehman Brothers International (Europe), re: Repurchase Transactions under a Global Master Repurchase Agreement (May 31, 2006), § 2.4 [LBEX-LBIE 000001].  The Linklaters letter interprets the GMRA provision guaranteeing that the repo borrower continues to receive the income from the transferred securities as evidence that the repo borrower does ***not*** continue to have a proprietary interest in the securities.  *Id.*  The Linklaters letter acknowledged the counter-argument, namely that the repo borrower holds a proprietary interest in the transferred securities:

> In certain circumstances, a transfer of assets coupled with the retention of the right to receive the income on the assets could be construed as involving the retention of a proprietary interest in or relating to the assets.

*Id.*  Linklaters, however, read Paragraph 5's wording that the repo lender is obligated to pay the repo borrower "an amount equal to the amount paid by the issuer" as only an obligation to pay an amount

letter referred to Paragraph 5 of the Global Master Repurchase Agreements Lehman used for Repo 105 transactions.[34]  Specifically, Paragraph 5(i) provided that "where the Term of a particular Transaction extends over an Income Payment Date in respect of any Securities subject to that Transaction, Buyer [*i.e.*, the repo lender] shall on the date such Income is paid by the issuer transfer to or credit to the account of Seller [*i.e.*, the repo borrower] an amount equal to (and in the same currency as) the amount paid by the issuer."[35]  Typically, ordinary repo transactions would also have this feature – the ability to receive coupon payments during the term of the repo.[36]  This feature therefore does not explain why Lehman would undertake a Repo 105 transaction, instead of an ordinary repo transaction.

Thus, for example, assuming Lehman owned a security with a 4.0% yield, funded by a liability that cost 2.5%, Lehman's net earnings on that position would have

---

*equivalent* to the income on the securities, rather than the income itself, because the GMRA did not require that the income be held in a separate account or trust.  *Id.*

[34] Securities Industry and Financial Markets Association, Standard Forms, Global Master Repurchase Agreement (1995) ¶ 5 Income Payments, ["GMRA 1995 Version"], *available at*: http://www.sifma.org/services/stdforms/globalmasterrepurchase.html; Securities Industry and Financial Markets Association, Standard Forms, Global Master Repurchase Agreement (2000) ¶ 5 Income Payments, ["GMRA 2000 Version"], *available at*: http://www.sifma.org/services/stdforms/globalmasterrepurchase.html.

[35] *See* GMRA 1995 Version, ¶ 5 Income Payments;  GMRA 2000 Version, ¶ 5 Income Payments.

[36] *Compare* GMRA 1995 Version, ¶ 5 Income Payments; GMRA 2000 Version, ¶ 5 Income Payments *with* Securities Industry and Financial Market Association, Standard Forms, Master Repurchase Agreement (1996) ¶ 5, *available at*: http://www.sifma.org/services/stdforms/MRA/html.  *See also* Master Repurchase Agreement (1996 version); *see also* Master Repurchase Agreement Guidance Notes (Sept. 1996 Version), at p. 4, *available at* http://www.sifma.org/services/stdforms/pdf/master_repurchase_gn.pdf ("As amended, the Paragraph confirms that Seller is entitled to receive from Buyer an amount equal to all payments or distributions of Income made on or in respect of the Purchased Securities to the full extent it would be so entitled if the Purchased Securities had not been sold to Buyer (except insofar as Seller may have otherwise received them).").

been 1.5%.[37]  In a Repo 105 transaction, although the securities were removed from Lehman's balance sheet, Lehman continued to earn the 1.5% net spread.[38]  In an outright sale, by contrast, Lehman would have earned $0 (zero) on the securities sold – and would have had no cost on the corresponding liability extinguished – over the period in which the securities remained sold.[39]  In other words, in an outright sale Lehman would have lost all the net earnings associated with the securities position.[40]  As such, even if the cost of Repo 105 transactions was greater than that of ordinary borrowings it paid off with the Repo 105 proceeds, Lehman would have had an incentive to use Repo 105 transactions instead because the benefit to Lehman was two-fold: reduction in balance sheet while allowing Lehman to earn income.[41]

To take another example, if a borrowing under a Repo 105 transaction cost 2.65% (15 basis points more than the borrowing in the previous example), Lehman would have had net earnings of 1.35% on the Repo 105 securities (4.0% security yield, minus 2.65% Repo 105 borrowing cost).[42]  Even though the 1.35% is lower than the net earnings of 1.5% (earnings on securities funded by cheaper ordinary borrowings) from earlier in this example, in contrast to the *outright sale* of securities, every dollar of net earnings

---

[37] Duff & Phelps, Repo 105 Question for Examiner's Report (Nov. 30, 2009), at p. 2.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] To be clear, this two-fold incentive for Repo 105 is relative to an outright sale.  Like Repo 105 transactions, Lehman typically continued to earn income on securities transferred in ordinary repo transactions.

[42] Duff & Phelps, Repo 105 Question for Examiner's Report (Nov. 30, 2009), at p. 2.

from a Repo 105-funded security transaction would have resulted in incremental income for Lehman.[43]

Other potential reasons for Lehman's reliance on Repo 105 transactions as opposed to outright sales are less compelling. For example, the bid/offer spread may have precluded the use of an ordinary sale followed by an ordinary purchase to achieve the balance sheet reduction at quarter-end.[44] Over the course of many months and quarter-ends, the transaction costs on numerous sales and purchases would erode the net income earned on these security positions.[45] Ed Grieb, Lehman's former Global Financial Controller, explained that Repo 105 transactions were preferable to outright sales because it provided Lehman with "the assurance of getting the securities back in the future . . . at a set price instead of having to go in the marketplace and buy them."[46] However, given the generally liquid nature of the primarily "governmental" securities used in Repo 105 transactions, bid/offer spreads would have been relatively small and likely not a determining factor in any decision to use, or not use, the sale of these securities to manage Lehman's balance sheet.[47]

---

[43] *Id.* at 1.
[44] *Id.*
[45] *Id.*
[46] Examiner's Interview of Edward Grieb, Oct. 2, 2008, at 11.
[47] Duff & Phelps, Repo 105 Question for Examiner's Report (Nov. 30, 2009), at p. 1.

### E. Lehman Brothers Global Consolidated Balance Sheets

The Examiner collected archived Lehman Brothers Global Consolidated Balance Sheets ("GCBS documents") illustrating the trend of quarter-end spikes in Repo 105 usage followed by intra-quarter dips. Quarter-end dates are highlighted in yellow.

| Date | Production Number | Total Repo 105 |
|---|---|---|
| Aug 31, 2007 (Press Release) | LBEX-DOCID 3237230 | $36.407 billion |
| Sept 28, 2007 (Draft) | LBEX-DOCID 2705059 | $24.406 billion |
| Oct 30, 2007 (Draft) | LBEX-DOCID 2705943 | $20.072 billion |
| Oct 31, 2007 (Draft) | LBEX-DOCID 2705943 | $29.936 billion |
| Nov 29, 2007 (Final) | LBEX-DOCID 4342450 | $31.512 billion |
| Nov 30, 2007 (Final) | LBEX-DOCID 3439086 | $38.634 billion |
| Jan 29, 2008 | LBEX-DOCID 3363236 | $28.884 billion |
| Feb 13, 2008 | LBEX-DOCID 1697794 | $23.602 billion |
| Feb 15, 2008 | LBEX-DOCID 3215625 | $24.217 billion |
| Feb 19, 2008 | LBEX-DOCID 3215625 | $25.124 billion |
| Feb 22, 2008 | LBEX-DOCID 3363289 | $31.029 billion |
| Feb 28, 2008 (Press Release) | LBEX-DOCID 4517138 | $40.003 billion |
| Feb 29, 2008 (Press Release)[48] | LBEX-DOCID 579841 | $49.102 billion |
| Mar 12, 2008 | LBEX-DOCID 022302 | $26.685 billion |
| Mar 13, 2008 | LBEX-DOCID 765323 | $26.212 billion |
| Mar 14, 2008 | LBEX-DOCID 3438624 | $12.750 billion |
| Mar 27, 2008 | LBEX-DOCID 3363367 | $22.104 billion |
| Mar 28, 2008 | LBEX-DOCID 3363367 | $24.597 billion |
| Apr 3, 2008 | LBEX-DOCID 3438756 | $21.835 billion |
| Apr 4, 2008 | LBEX-DOCID 3438756 | $18.653 billion |
| Apr 11, 2008 | LBEX-DOCID 766086 | $20.260 billion |
| Apr 14, 2008 | LBEX-DOCID 766086 | $19.546 billion |
| Apr 18, 2008 | LBEX-DOCID 1961054 | $19.785 billion |
| Apr 21, 2008 | LBEX-DOCID 766088 | $21.907 billion |
| Apr 21, 2008 | LBEX-DOCID 1961054 | $21.907 billion |
| Apr 25, 2008 | LBEX-DOCID 3237475 | $23.154 billion |

---

[48] "Press release" version appears to reflect the reported numbers for net balance sheet. These were not publicly released documents, however.

| Apr 28, 2008 | LBEX-DOCID 766092 | $24.077 billion |
|---|---|---|
| Apr 29, 2008 | LBEX-DOCID 1337858 | $24.899 billion |
| Apr 30, 2008 (Draft) | LBEX-DOCID 394333 | $24.709 billion |
| May 5, 2008 | LBEX-DOCID 1961083 | $23.141 billion |
| May 6, 2008 | LBEX-DOCID 766102 | $24.388 billion |
| May 12, 2008 | LBEX-DOCID 766107 | $25.550 billion |
| May 13, 2008 | LBEX-DOCID 766107 | $25.282 billion |
| May 27, 2008 | LBEX-DOCID 3237577 | $39.237 billion |
| May 28, 2008 | LBEX-DOCID 766924 | $43.112 billion |
| May 29, 2008 | LBEX-DOCID 766925 | $46.820 billion |
| May 30, 2008 (Final) | LBEX-DOCID 1427836 | $50.383 billion |
| Jul 14, 2008 | LBEX-DOCID 3363529 | $17.315 billion |
| Jul 15, 2008 | LBEX-DOCID 3363529 | $16.828 billion |
| Jul 21, 2008 | LBEX-DOCID 3363538 | $15.528 billion |
| Jul 22, 2008 | LBEX-DOCID 3363538 | $17.099 billion |
| Jul 23, 2008 | LBEX-DOCID 3363541 | $14.786 billion |
| Jul 28, 2008 | LBEX-DOCID 3363542 | $14.596 billion |
| Jul 29, 2008 | LBEX-DOCID 3363542 | $14.548 billion |
| Aug 13, 2008 | LBEX-DOCID 084891 | $17.405 billion |
| Aug 14, 2008 | LBEX-DOCID 084891 | $18.274 billion |
| Aug 15, 2008 | LBEX-DOCID 1742024 | $19.436 billion |
| Aug 18, 2008 | LBEX-DOCID 2927703 | $19.712 billion |
| Aug 19, 2008 | LBEX-DOCID 861240 | $19.589 billion |
| Aug 20, 2008 | LBEX-DOCID 2927705 | $19.887 billion |
| Aug 21, 2008 | LBEX-DOCID 1742028 | $20.819 billion |
| Aug 22, 2008 | LBEX-DOCID 1742028 | $20.101 billion |
| Aug 25, 2008 | LBEX-DOCID 1742029 | $22.476 billion |
| Aug 26, 2008 | LBEX-DOCID 861234 | $23.971 billion |
| Aug 27, 2008 | LBEX-DOCID 861244 | $24.601 billion |
| Aug 28, 2008 | LBEX-DOCID 1427770 | $26.954 billion |
| Aug 29, 2008 (Final) | LBEX-DOCID 2808606 | $26.383 billion |

**F.   Expert Curriculum Vitae**

# GARY L. HOLSTRUM, Ph.D., CPA
## Consultant: Audit Litigation, Audit Committees, and Sarbanes-Oxley Compliance

**VITAE**                                                            JUNE 2009

| | |
|---|---|
| **PERSONAL:** | Address: 1 Beach Drive SE, St. Petersburg, FL 33701-3954 |
| | Phone: 727-867-8751      Cell Phone: 727-244-6390 |
| | Email: holstrum@tampabay.rr.com |
| | Web site: www.garyholstrum.com |
| | Wife: Jan |
| **CURRENT EMPLOYMENT:** Compliance | Consultant on Audit Litigation, Audit Committees, and Sarbanes-Oxley |
| **EMPLOYMENT: (2003-January 2009):** | Public Company Accounting Oversight Board |
| | 1666 K Street NW, Washington, DC 20006 |
| | *Associate Chief Auditor and Director of Research (Until November 2006) |
| | *Consultant, Office of Chief Auditor (2003 and November 2006-January 2009) |
| **EMPLOYMENT (FROM 1989 TO AUGUST 2004):** (1994-98) | Professor, School of Accountancy, University of South Florida |
| | 4202 Fowler Avenue, BSN 3403, Tampa, FL 33620-5500 |
| | Director of School (1989-94) and Coordinator of Accounting Ph.D. Program |
| **EDUCATION:** Accounting. | Ph.D., College of Business, University of Iowa.  Concentration: |
| | Supplemental Areas: Organizational Behavior, Economics, and Statistics. |
| | BA, University of Iowa.      Major: History |
| **PROFESSIONAL CERTIFICATION:** | CPA--Florida |
| **RECENT AWARD:** of | Received 2009 Distinguished Service in Auditing Award from Auditing Section American Accounting Association ([click here](#)) |

**PROFESSIONAL AND TEACHING EXPERIENCE: (Most recent first)**

○  Consultant, Oscher Consulting, Tampa, FL (Auditing and Financial Reporting Issues) (2008-present)

○  Board of Directors and Audit Committee for the University of South Florida Physicians Group (USFPG) of the USF College of Medicine, University Medical Services Association (UMSA), and USF Medical Services Support Corporation (MSSC) (Current member—since January 2009)

- Professor, USF School of Accountancy (1989-2004), Director (1989-94), Ph.D. Program Coordinator (94-98)

- Visiting Professor, University of Amsterdam, Netherlands, Fall 1998.

- KPMG Peat Marwick Professor of Accounting, University of Central Florida (1986-89)

- Professor of Accounting, University of Southern California (1983-86)

- Partner, Auditing Services, Deloitte Haskins & Sells (Now Deloitte & Touche), New York (5 years). Deloitte responsibilities are summarized below.

- Associate Professor of Accounting, University of Florida.

- Assistant Professor of Accounting, University of Texas at Austin.

- Graduate Teaching Assistant and Administrative Assistant to the Director of the MBA Program, University of Iowa.

- Loan Officer, Bank of America, Los Angeles, and First National Bank, Iowa City, Iowa.

## DESCRIPTION OF WORK AT THE PCAOB (2003 to January 2009):

- Activities related to being PCAOB Associate Chief Auditor and Director of Research included drafting and reviewing materials related to potential auditing and related professional practice standards of the PCAOB; identifying and summarizing the implications of existing research for potential standards; reviewing and commenting on summaries of results of PCAOB inspections; and presenting and discussing professional, regulatory, research and other issues related to the potential standards with the Board, the PCAOB's Standing Advisory Group, and other external parties. Significant accomplishments included keeping auditing researchers, educators, and practitioners informed of PCAOB standards-setting activities through a series of 11 "PCAOB Update" articles in *The Auditor's Report*; coordinating the planning and conduct of four PCAOB Symposiums for leading auditing professors, PCAOB personnel, and selected other regulators and standards-setters; and working with leaders of the Auditing Section of the American Accounting Association (AAA) to establish the PCAOB Research Synthesis Program (described later).

- **PCAOB Symposiums**
  Chairman of the Planning Group for a series of four PCAOB Symposiums (November 2004, February 2006, April 2007, and April 2008. Also a member of the Planning Group for the 2009 PCAOB Symposium). Worked on developing and securing approval for the proposal for the first Symposium in 2004 and for each of the next three symposia. At each of the initial four Symposiums, approximately 40 auditing researchers and educators and 35 representatives from the PCAOB, along with representatives of the SEC, FASB, and GAO participated in presentations and discussions of key issues of mutual interest to the PCAOB and the academic community. The Symposium Planning Group consisted of four representatives of the PCAOB and four representatives of the Auditing Section of the AAA. At each Symposium, the emphasis was not only on discussion of key issues but also on developing action plans for addressing the issues. For example, discussion initiated at the first PCAOB Symposium in 2004 led to working with Auditing Section leaders to establish the Research Synthesis Program.

- **Auditing Section's PCAOB Research Synthesis Program**

  As PCAOB Associate Chief Auditor and Director of Research, I worked with leaders of the Auditing Section of the American Accounting Association to establish nine teams of researchers dedicated to synthesizing existing research related to each of nine high priority PCAOB standards-setting projects. All nine Research Synthesis Teams completed their projects, submitted them to the PCAOB for input related to establishing new standards, and published the results of their projects in recognized peer-reviewed academic journals. The research issues for each of the projects were standards-setting policy issues identified in briefing papers prepared by staff of the PCAOB Office of Chief Auditor for the Standing Advisory Group and placed on the PCAOB website. The completed research synthesis reports were used by the Office of Chief Auditor staff and others at the PCAOB in preparing materials related to each of the standards-setting projects. The nine research synthesis projects addressed the following PCAOB projects:
    - Audit Confirmations
    - Audit Firm Quality Control
    - Audit Reporting Model
    - Auditor Risk Assessments
    - Communications with Audit Committees
    - Engagement Quality Review
    - Auditing Fair Value Measurements
    - Financial Fraud
    - Related Party Transactions.

- **Presentations**

  Presentations while at the PCAOB included presentations at various academic and auditing practice conferences between 2003 and 2008 on PCAOB activities, the significance of research input to PCAOB standards-setting, and the educational implications of the mission of the PCAOB. These conferences included annual meetings of the American Accounting Association, Mid-Year Meetings of the AAA Auditing Section, university conferences and state society of CPA conferences, PCAOB Small Business Forums, and various auditing research symposiums.

**TEACHING EMPHASIS:**

- Contemporary Issues in Auditing, Assurance Services, Financial Reporting, Audit Committees, Corporate Governance and International Business Reporting

**RESEARCH EMPHASIS:**

- Evaluating Audit Quality and Compliance with PCAOB and Professional Standards

- Corporate Governance, Audit Committees, Reliability of Business Reporting

- New Technology and the Role of Auditing, Attest, and Assurance Services in a Global Marketplace

- Educational Issues Related to Information Technology, International Accounting, Auditing and Assurance

- Audit and Assurance Judgment Processes--Models and Experiments Regarding Audit/Assurance Judgments.

- Establishing, Interpreting, and Implementing Audit, Attest, Assurance and Ethical Standards.

- Designing and Testing Audit/Assurance Decision Aids, Decision Support Systems, Expert Systems

**PROFESSIONAL LEADERSHIP POSITIONS (Between 1996 and 2006):**

○ Appointed the United States representative to the International Accounting Education Standards Board (IAESB) [formerly the International Federation of Accountants (IFAC) Education Committee] (January 1998 – October 2003).

  ○ IAESB liaison with the International Auditing and Assurance Standards Board (IAASB)
  ○ IAESB liaison with professional accounting associations in the following countries:
    ○ Japan, Bahamas, Barbados, Jamaica, Trinidad & Tobago
  ○ Co-Chair of task force to develop the first International Standard on Continuing Professional Education for Accountants (IES No.7)
  ○ Co-Chair of project on Assuring Quality Control in Internet Education and Distributive Learning in International Accounting Education

○ AICPA Pre-Certification Education Executive Committee, ex-officio member and liaison with the IAESB (1998-2003).

○ Member of the Consultative Advisory Group for the International Accounting Education Standards Board (IAESB) (representing the PCAOB and the United States) (2004-06).

○ Member, Editorial and Advisory Committee, project on *The IMPACT OF GLOBALISATION ON ACCOUNTANCY EDUCATION (2000-2003)*. This was a three-year research project headed by Mr. Gert Karreman of the Netherlands, former member of the IFAC Education Committee and head of education for Royal NIVRA, the Netherlands professional accounting association. It is a study of similarities and differences in accounting education internationally and of the impact globalization on the education process. Study was completed and presented at the World Congress of Accounting Educators and Researchers in Hong Kong in November 2002. The study was subsequently published and distributed worldwide in late 2002

○ Chair, *Future Audit, Attestation and Assurance Services Task Force*, Auditing Section of the American Accounting Association (AAA) (1994-97).

○ Member, *Future Audit Services Subcommittee*, AICPA Special Committee on Assurance Services (1995-97).

○ Member, *Relations with Educators Committee*, FICPA (1995-2000). Committee Chair (1996-97).

○ Member, *Program Committee*, American Accounting Association Annual Meeting (1997).

**AUDITING STANDARDS BOARD APPOINTMENTS (Primarily between 1988 and 1992):**

○ Appointed to the *Auditing Standards Board* for four annual terms (January 1988 to January 1992). The ASB establishes generally accepted auditing standards (*Statements on Auditing Standards*—SAS), attestation standards (*Statements on Standards for Attestation Engagements*—SSAE), and standards for accounting firm quality control (Statements on Quality Control Standards—SQCS).

○ Also appointed to the following task forces of the *Auditing Standards Board*:
  * *Audit Issues Task Force*—Planned ASB agenda.
  * *Audit Sampling Task Force* (Developed the current AICPA Audit Guide for Audit Sampling)
  * *Audit Confirmations Task Force*
  * *Use of Work of Other Auditors Task Force*
  * *Reporting on Internal Control Task Force*
  * *Auditing Accounting Estimates Task Force*
  * *ASB Projects Task Force*
  * *Clients with Conflicting Interests Task Force*

○ Member of Planning Group for the *Auditing Standards Board Expectation Gap Roundtable* (1992). One of four coordinators and editors of papers for the Roundtable, which was held in May, 1992, in

Charleston, SC.  The papers presented at the Roundtable were be published by the AICPA in 1993 for use in graduate seminars in auditing.

**OTHER PROFESSIONAL LEADERSHIP POSITIONS (1985-1996):**

○ Member of the *Faculty Advisory Group* for the "Excellence in Audit Education" Program of Coopers and Lybrand (1986-95). This was an international program of materials and support for audit education funded by the Coopers and Lybrand Foundation, working through the Auditing Section of the AAA.  Coordinator for the initial Auditing Faculty Symposium in May, 1987, to introduce Program to auditing professors at major schools nationally and internationally.

○ *AICPA Council*, the senior policy-forming body of the American Institute of CPAs (1992-95).

○ *Board of Governors* of the Florida Institute of CPAs (FICPA) (1993-95).

○ Member, *Communications Task Force*, FICPA (1994-96).

○ *Continuing Education Committee*, FICPA (1994-95).

○ *Accounting Accreditation Committee* of the American Assembly of Collegiate Schools of Business (AACSB) for three years (1992-95).  This Committee makes decisions on which undergraduate, masters, and doctoral accounting programs in the United States will be accredited

○ *Auditing Standards Committee*, Auditing Section of the American Accounting Association (1991-94).

○ Chair, (statewide) *Committee on Accounting Principles and Auditing Standards*, Florida Institute of CPAs for three years (1989-92).  This committee represents the accounting profession in Florida in providing input to the Financial Accounting Standards Board (FASB) and the Auditing Standards Board (ASB) and responding to exposure drafts of proposed accounting and auditing standards.

○ President, Auditing Section of the American Accounting Association (AAA) (1985-86).

○ Member, *Committee on Communications in Accounting Curriculum*, Federation of Schools of Accountancy (1989-90).

○ Chair, *Auditing Section Nominating Committee* (1987).

○ *Strategic Planning Task Force*, Auditing Section (1987-88).

○ Chair, *Peat Marwick Seminars Committee* of the AAA (1986-87).

○ *AAA Council*, Elected Member (1985-87).

○ *Professional Accounting Council*, University of Iowa (1985-87).

○ *Nominating Committee*, American Accounting Association (1986).

**EARLIER NATIONAL LEADERSHIP POSITIONS:**

○ Advisor to a member of the *Auditing Standards Board*.

○ Worked with the chairpersons of other ASB task forces to help develop the concepts and portions of drafts for the following *Statements on Auditing Standards* (SAS):

1. "Reporting on Internal Accounting Control," SAS No. 30.

2. "Audit Sampling," SAS No. 39.

3. "Materiality and Audit Risk," SAS No. 47.

○ Vice-President of the Auditing Section of the American Accounting Association (AAA) (1984-85).

○ *Wildman Medal Committee* (AAA), to select most significant contribution to accounting literature.

○ AACSB Visitation Team for accreditation of accounting programs at Pennsylvania State University.

○ *Advisory Board*, Robert M. Trueblood Seminars (3 years). Represented the AAA in meetings with the Touche Ross Foundation to plan a series of seminars for accounting professors.  These annual seminars have attracted about 90 faculty per year throughout the nation and have continued to the present time.

○ *Committee on Education*, AAA (3 years).

○ Chair, *Committee on Professorial Continuing Education*, AAA.

○ *Task Force on Continuing Education*, AAA.

○  *AICPA Curriculum Development Task Force.*

**PROFESSIONAL DEVELOPMENT TEACHING EXPERIENCE:**

 Development and presentation of seminars on new audit, attest, and assurance service standards, emerging information technology, and professional and political developments.  Presented to various accounting firms (1987-present).  Development and presentation of numerous staff-development courses offered for Deloitte staff at various levels (5 years); numerous management development courses on a variety of accounting, auditing, information systems, and control topics for non-accountant managers; and numerous CPE courses for the Florida Institute of CPAs and various accounting firms.

**PRIMARY RESPONSIBILITIES AS AUDIT PARTNER AT DELOITTE:**

Activities and responsibilities as an auditing services partner for Deloitte included developing and communicating the firm's auditing policies and techniques, working with the Auditing Standards Board and other groups in the establishment of professional standards, conducting auditing research projects, producing written materials and videotapes for staff development, coordinating the firm's national AuditSCOPE Seminars for educators, and maintaining the firm's relations with educators and researchers.  Also worked in the New York Practice Office as an audit partner on engagements for several large, multinational clients.  Also worked in Dallas office on audits of small and medium-size firms.

**EDITORIAL EXPERIENCE:**

○  Editorial Board, <u>Auditing: A Journal of Practice and Theory</u> (1987-94). Continued as an ad hoc reviewer.
○  Editorial Board, <u>Advances in Accounting</u> (1984-1986).
○  Editorial Board Member, <u>The Accounting Review</u> (3 years).
○  Contributing Editor, <u>The Journal of Accountancy</u>, (3 years).
○  Ad hoc reviewer of auditing research manuscripts for several other journals.
○  Various other editorial review committees for articles and books.
○  Reviewer for numerous candidates for promotion to Associate and Full Professor at various US universities.

**CONSULTING, EXPERT WITNESS AND OTHER LITIGATION SUPPORT EXPERIENCE:**

○  Litigation Support (Expert Witness), Board of Accountancy, State of Florida, Office of the Attorney General, American Express case.
○  Litigation Support (Expert Witness), Cases involving Florida Accounting Firms.
○  Litigation Support (Expert Witness), Case involving Coopers and Lybrand and PharMor.
○  Consultant on Financial Reporting and Internal Control for SEC-reporting company in Miami.
○  Litigation Support (Expert Witness), Case involving Ernst & Young.
○  Litigation Support (Expert Witness), Enforcement Division of the SEC
○  Consultant, Litigation Support on auditing and accounting issues for Orlando area firms.
○  Expert Witness, ESM Government Securities/Grant Thornton Litigation.
○  Consultant, Litigation Support re: auditing/accounting issues for three Los Angeles area firms.
○  Touche Ross & Co., New York, Consultant  and Principal Researcher on auditing research projects for the audit research staff.
○  Coopers and Lybrand, New York, Consultant and Principal Researcher on a research project concerning the evaluation of materiality of internal accounting control weaknesses.
○  Consultant to several small & medium-size accounting firms on various auditing issues.

- ○ Office of the Attorney General, State of Florida, Consultant on questions of audit evidence.
- ○ Florida Board of Accountancy, Assisted in the development of the Continuing Professional Education Examination.

**MOST SIGNIFICANT HONORS AND AWARDS:**
- ○ Distinguished Service in Auditing Award, American Accounting Association Auditing Section (January 2009)
- ○ Named "Florida Outstanding Educator" by the Florida Institute of CPAs (June 1991).
- ○ Received the American Accounting Association's "Innovation in Accounting Education Award" (August 1991) for work with the Faculty Advisory Group, "Excellence in Audit Education" Program, sponsored by Coopers and Lybrand (now Price Waterhouse Coopers).

# PUBLICATIONS:

**PUBLICATION SUMMARY:** Publications include (1) articles in refereed journals including the *Journal of Accounting Research, The Accounting Review, The Journal of Accountancy, Auditing: A Journal of Practice and Theory, Issues in Accounting Education, The Internal Auditor, Management Accounting, Abacus, Advances in Accounting,* and various other journals; (2) articles in professional journals; (3) published research monographs; (4) various published continuing professional education manuals; (5) published book reviews and discussant's comments; (6) research papers published in conference proceedings; (7) published cases for auditing education, and (8) a series of 13 "PCAOB Standards-Setting Update" articles published in *The Auditor's Report* since 2005.

## JOURNAL ARTICLES

1.  Series of 13 "PCAOB Standards Update" articles for The Auditor's Report, published by the Auditing Section of the American Accounting Association (published between July 2005 and February 2009). (with Douglas Carmichael, Chief Auditor until 2005; Tom Ray, Chief Auditor since 2005; and Greg Scates, Deputy Chief Auditor). (The most recent article and hyperlinks to earlier articles are available at http://aaahq.org/audit/Pubs/Audrep/09winter/item13.htm.)

2.  "New Assurance Service Opportunities for Information Systems Auditors," *IS Audit & Control Journal* (Vol. IV, June 1999) (with James Hunton and Cynthia Frownfelter-Lohrke).

3.  "The Internet and Distance Learning In Accounting Education: A Hypertext-Linked Exploration of the Topic." Published on the International Accounting Education Standards Board (IAESB) web site, November 1998. Because this research paper had extensive hyperlinks to numerous Web sites that are relevant to the topic, the IFAC Education Committee decided to have this paper, which deals with issues of quality assessment and quality assurance in Internet education, published on its Web site. IFAC encouraged all accounting associations that are member bodies of IFAC in over 100 countries worldwide to make the paper known and used by its educators and practitioners. It has been translated into several languages and was used as the basis for development of official international accounting education guidance on the topic by the IAESB. (with Joseph Lloyd-Jones of the University of Ottawa, Canada).

4.  "Assessing the Impact of the Internet and Distance Learning in International Accounting Education," *International Federation of Accountants* (IFAC) Quarterly, January 1999.

5. "New Forms of Assurance Service for New Forms of Information: The Global Challenge for Accounting Educators," *The International Journal of Accounting* (forthcoming Vol. 33, No. 3, 1998) (with James Hunton).

6. "The Role of Information Systems Auditors in WebTrust[SM] Assurance," *IS Audit & Control Journal* (Vol. IV, 1998) (with James Hunton).

7. "New Assurance Services: The Global Challenge for Accounting Educators," *International Federation of Accountants* (IFAC) Quarterly, January 1998.

8. "Control Environment Condition and the Interaction Between Control Risk, Account Type, and Management's Assertions" (Co-authored with Ron Marden and Sandra Schneider). *Auditing: A Journal of Practice and Theory* (Spring 1997).

9. "Information Systems Auditors Play a Critical Role in Shaping Future Assurance Services," *IS Audit & Control Journal* (Vol. III, 1997). (with James Hunton).

10. "Using Professional Judgment in Control Environment Evaluations: An Instructional Case" (Co-authored with Ron Marden and Sandra Schneider), *Issues in Accounting Education*, (Fall 1996).

11. "ASB Approves Five New Statements and an Exposure Draft," *The Auditors' Report*, Winter, 1992.

12. "ASB Moves Forward on Several Projects--Seeks Research Input on Expectations Gap Issues," *The Auditors' Report*, Fall, 1991.

13. "Auditing Standards Board Works on a Broad Agenda to Improve Audit Practice," *CPA Today*, November, 1991.

14. "The Auditor's Responsibility for Fraud and Illegal Acts--The 1991 ASB Agenda," *CPA Today*, July, 1991.

15. "ASB Seeks Greater Research Input," *The Auditors' Report*, Summer, 1991.

16. "ASB Actions Concerning Fraud," *The Auditors' Report*, Winter, 1991.

17. "New Guidance for Assessing Internal Control and Using the Work of Internal Auditors," *CPA Today*, July, 1990.

18. "ASB Topics of Importance to Educators and Researchers," *The Auditors' Report*, Summer, 1990.

19. "Information Systems in the Year 2000," *The Internal Auditor*, January-February, 1990. (Co-authored with Theodore J. Mock and Robert N. West).

20. "The Impact of the Control Risk Audit Guide," *CPA Today*, January, 1990.

21. "Internal Control and Internal Audit Issues Top ASB Agenda," *The Auditors' Report*, Winter, 1990.

22. "The New ASB Planning Structure and Emerging Standards," *The Auditors' Report*, Fall, 1989.

23. "The New Control Risk Audit Guide and Other ASB Guidance," *The Auditors' Report*, Summer, 1989.

24. "The Revised Financial Institution Confirmation Process and the New Standard Bank Confirmation Form," *CPA Today*, July, 1989.

25. "Auditing Standards Board Deliberations," *CPA Today*, April, 1989.

26. "Auditing Standards Board Update," *The Auditors' Report*, Winter, 1989.

27. "Critical Internal Control Issues: Their Impact on Auditors of Private and Public Entities," *CPA Today*, Jan., 1989.

28. "ASB Actions on Internal Control, Confirmations, and 'Expectation Gap' Issues," *The Auditors' Report*, Fall, 1988.

29. "ASB in Transition," *The Auditors' Report*, Summer, 1988.

30. "ASB Update," *The Auditors' Report*, Winter, 1988.

31. "Sources of Error and Inconsistency in Audit Judgment," *Advances in Accounting* (1987).

32. "Audit Judgment and Evidence Evaluation," (co-authored with Theodore J. Mock), *Auditing: A Journal of Practice and Theory* (Fall, 1985).

33. "Long-Range Planning and Control of Growth," (co-authored with Frank Daroca and W. Thomas Lin) *Journal of Accountancy* (December, 1984), pp. 118-134.

34. "A Review and Integration of Empirical Research on Materiality," (co-authored with William F. Messier, Jr.), *Auditing: A Journal of Practice and Theory* (Fall, 1982), pp. 45-63.

35. "Audit Judgment Research," *The Auditors' Report* (Fall, 1981).

36. "Reporting on Internal Accounting Control," (co-authored with Kenneth W. Stringer), an article in *Annual Accounting Review* (Volume 2, 1980), Harwood Academic Publishers, pp. 143-56. This article focuses on reporting issues, not study or evaluation issues.

37. "Studying, Evaluating and Reporting on Internal Accounting Control," (with Kenneth W. Stringer), *The Accounting Forum* (Volume 50, No. 1, May, 1980), pp. 1-13. This article centers on the study and evaluation of internal accounting control, with only a brief discussion of reporting issues.

38. "Internal Accounting Control: The Deloitte Approach," (co-authored with Kenneth W. Stringer), *Director's Monthly* (Jan.-Feb., 1980). This article discusses the specific approach developed by Deloitte, which employs a network analysis of internal control functions based on decision trees

and decision tables.  The co-authors participated heavily in this development, which was directed by Mr. Stringer.

39. "Internal Audits of Production Control Adaptiveness," (co-authored with William Collins) *The Internal Auditor*.

40. "The Effect of Budget Adaptiveness and Tightness on Managerial Decision Behavior," *Journal of Accounting Research*.

## PUBLISHED MONOGRAPHS AND BOOKS AND MATERIALS

1. Co-authored the draft of the first international standard on continuing professional development for professional accountants, published as International Accounting Education Standard No. 7 (IES 7): Continuing Professional Development: A Program of Lifelong Learning and Continuing Development of Professional Competence" (co-authored the draft and co-chaired the standard project with Steve Glover of the Canadian Institute of Chartered Accountants). (Initially issued in 2003. Subsequently revised by the IAESB in 2008).

2. "Auditor Independence: Beyond the Rules"—the Independence Education Program (IEP) (2000-2001). Participated in the authoring and development of written scenarios, a video case, a CD-ROM and a written "Faculty Toolkit" on auditor independence. These materials were the basis for four nationwide webcasts (at approximately 30 locations each) for practitioners and a separate nationwide webcast for educators. Co-anchored all the webcasts with Dan Guy (former VP of Auditing at the AICPA).  All materials were published and distributed to all members of the Auditing Section of the AAA as part of theIEP and are now available to all accounting educators through the AAA. Participated in the development of the following materials:

   ○ "Auditor Independence Scenarios"--Developed a series of published scenarios including teaching notes with Arnie Wright (Boston University) and Dan Guy.

   ○ "Beekman Office Supply—An Auditor Independence Video Case"— reviewed and edited the initial story line and subsequent video script for the case on auditor independence judgment (initially drafted by Robert Sack, former Chief Accountant of the Enforcement Division of the SEC).

   ○ "Auditor Independence—CD-ROM and Faculty Tool Kit"—worked with a team on the Independence Education Program (IEP) to develop materials and produce a CD-ROM disk for auditing and accounting educators. The CDs were distributed to all members of the Auditing Section of the AAA and to other educators and educational groups, with suggestions and instructions on how the videos, case, scenarios, PowerPoint slides and other support materials could be used in the classroom or as outside references for various courses.

3. *Quality Issues For Internet and Distributed Learning in Accounting Education*.  Lead author (with Joseph Lloyd-Jones) for this official IFAC Education Committee Discussion Paper, which was published and distributed as a monograph by the International Federation of Accountants (IFAC) to over 140 member accounting institutes in over 100 countries worldwide in January 2000.

4. "Dermaceutics Inc.; Risk Assessment and Planning," Author of this chapter in a monograph, <u>Excellence in Audit Education</u>, published as an American Accounting Association educational monograph and distributed to all members of the Auditing Section of the AAA for use in auditing courses, AAA (1992). Remaining chapters in the monograph were primarily authored by other members of the Faculty Advisory Group for the Excellence in Audit Education Project. Provided input to the overall project and monograph as a Faculty Advisory Group member.

5. <u>Dermaceutics Inc.; Risk Assessment and Planning</u> (Group Project), (Video Tape, Cases, and Computer Database), (Participated as a part of the Faculty Advisory Group and Coopers & Lybrand personnel to plan and produce the materials), Coopers & Lybrand Foundation (1990).

6. <u>The Impact of Technology on Auditing: Moving Into the 21st Century</u>, (with Ted Mock and Robert N. West) (a research monograph), Institute of Internal Auditors Research Foundation (1988).

7. <u>CableCo Chronicles: A Portrait of an Audit</u> (Group Project), (Video Tape and Cases), (Participated as a part of the Faculty Advisory Group and Coopers & Lybrand personnel to plan and produce the materials), Coopers & Lybrand Foundation (1988).

8. <u>Compilation and Review Tools</u>, a manual and a set of integrated computer software programs, published by Shepard's McGraw-Hill (1988).

9. <u>Disclosure Criteria and Segment Reporting</u>, (coedited with Russell M. Barefield), University of Florida Press.

10. <u>Operational Audits of Production Control</u>, (co-authored with William Collins), research monograph, Institute of Internal Auditors.

11. <u>New Accounting and Auditing Pronouncements: Analysis and Cases</u>, (co-authored with Charles McDonald and William Collins), a continuing education manual published by the Florida Institute of CPAs.

12. <u>Review of Existing Accounting and Auditing Pronouncements: Analysis and Cases</u>, (co-authored with Charles McDonald and William Collins), a continuing education manual published by the FICPA.

13. <u>Activities and Resources of The Galveston Bay</u>. A research monograph on the social, ecological, and economic benefits of pollution control in the Galveston Bay. Published by the Bureau of Business Research, The University of Texas.

## <u>PUBLISHED RESEARCH IN PROCEEDINGS OF SCHOLARLY MEETINGS</u>

1. "Comments on Borthik's 'Analysis of Design from a Community of Practice Dialog: Negotiating the Meaning of Auditing Information System Development'." Discussion comments published in the Proceedings of the University of Waterloo Symposium on Research on Information Systems Assurance. Discussion comments presented on October 31, 1999. Proceedings published in early 2000.

2. "Competence and Quality Assurance in Accounting Education: Global Issues from a U.S. Perspective," in *Foundations of Globalization in Higher Education in the Professions*, Proceedings of the Annual Conference of the Center for Quality Assurance in International Education, (1998).

3. "The Need for Professional Guidance on Decision Aids in Auditing," <u>Proceedings of the University of Southern California Audit Judgment Symposium</u>, (February, 1991).

4. "Innovative Approaches to Integrating Oral and Written Communication into the Accounting Curriculum," a presentation published in the <u>Proceedings of the 1989 Annual Meeting of the Federation of Schools of Accountancy</u> (published in 1990).

5. "The Impact of Emerging Information Technology on Audit Evidence," (with Theodore J. Mock and Robert N. West), <u>Auditing Symposium VIII, University of Kansas</u> (1986).

6. "The Fifth-Year Auditing Curriculum," <u>Proceedings: Annual Meeting the Federation of Schools of Accountancy</u> (December, 1986).

7. "The Auditor Expectations Gap: Research Issues and Opportunities," <u>Proceedings of the University of Alabama Research Convocation</u> (November, 1986).

8. "Expert Systems in Auditing: A Synopsis of Research Issues," <u>Proceedings of the Audit Judgment Symposium on Expert Systems, University of Southern California</u> (February, 1986).

9. "AUDBASE: The USC Auditing Research Database," <u>Abstracts of the American Accounting Association's Annual Meeting</u> (August, 1985). This was one of six research papers selected by referees from over 40 papers submitted through national competition for presentation at the national meeting. The presentation included a discussion of the paper and a live microcomputer demonstration of the database developed by the author at USC.

10. "Megatrends, Microcomputers, and Auditing Education," <u>Mary Ball Washington Forum Series in Accounting Education</u> (The University of West Florida, November, 1983), pp. 34-52.

11. "Audit Risk Model: A Framework for Current Practice and Future Research," (co-authored with James L. Kirtland), <u>Symposium on Auditing Research V</u>, (1982) University of Illinois.

12. "Improving Auditor Judgment Through Decision Modeling and Computer Assistance," research paper abstracted in <u>Proceedings of the American Accounting Association Annual Meeting</u> (1981).

13. "Reactive Bias in the Measurement of Internal Control Compliance," (co-authored with Bart H. Ward), <u>Proceedings of the Southeast Region AAA Meeting</u>.

14. "Suggestions for Behavioral Accounting Research Designs," (co-authored with Lewis F. Davidson), <u>Proceedings of the Southwest Region AAA Meeting</u>.

15. "Sources of Error in the Evaluation of Internal Control," (co-authored with Bart H. Ward), <u>Proceedings of the Southwest Region AAA Meeting</u>.

## PUBLISHED CRITIQUES, BOOK REVIEWS, ETC.

1. "Comments on 'Analysis of Design from a Community of Practice Dialogue: Negotiating the Meaning of Auditing Information System Development'," published in *Journal of Information Systems*, supplement 2000.

2. "Discussion of 'Multi-Location Audits'," critique comments on a research paper authored by Robert Allen and James Loebbecke, presented at the University of Illinois Auditing Research Symposium, September 1994. Discussion comments included in published conference proceedings.

3. "Comments on 'Reports on the Application of Accounting Principles - A Review of SAS 50'," Proceedings of the University of Kansas Auditing Symposium (1988).

4. "Comments on 'The Case for the Structured Audit Approach'," Proceedings of the University of Kansas Auditing Symposium (1984).

5. "Review of Robert Ashton's Human Information Processing in Accounting, Studies in Accounting Research #17," Auditing: A Journal of Practice and Theory (Fall, 1983).

6. "Comments on 'Human Information Processing Research in Auditing: A Review and Synthesis'," Proceedings of the University of Kansas Symposium on Auditing Problems (1982), pp. 84-88.

7. "Comments on 'Heuristics and Biases: Some Implications for Probabilistic Inference in Auditing'," Symposium on Auditing Research IV, (1980) University of Illinois.

## PUBLISHED AUDITING EDUCATION CASES:

1. "Using Professional Judgment in Control Environment Evaluations: An Instructional Case" (Co-authored with Ron Marden and Sandra Schneider), Issues in Accounting Education, (Fall 1996). (also listed above).

2. Dermaceutics Inc.: Risk Assessment and Planning, (Video, Six Cases, and Computer Database). (Participated in the development of the cases and other materials in the "Excellence in Audit Education" program as a member of the program Faculty Advisory Group. Materials were sponsored and distributed by the Coopers & Lybrand Foundation and have been used in over 250 schools in the U.S. and internationally.

## RESEARCH PAPERS AND PRESENTATIONS AT VARIOUS RESEARCH CONFERENCES:

1. Distinguished Service in Auditing Award acceptance speech at the 2009 Mid-Year Meeting of the American Accounting Association Auditing Section.

2. Approximately 30 presentations on PCAOB standards and operations made while Associate Chief Auditor and Director of Research (or a consultant) for the PCAOB (between July 2003 and present)

3. "Proposed International Education Standards: The Impact on Global Accounting Education and Development," presented at the AAA International Accounting Section Mid-Year Meeting, February 2003.

4. "E-Learning and Teaching: Lessons Learned & Future Prospects," presented at the World Congress of Accounting Educators, International Association of Accounting Educators and Researchers (IAAER), Hong Kong, November 15, 2002.

5. "Globalization of Accounting Education: The Changing Global Market and IFAC and AICPA Initiatives," presented at the Emerging Issues in International Accounting Conference, Niagara University, Niagara Falls, New York, August 3, 2001.

6. "Research on Changing the Competencies Required for New Assurance Services," paper accepted for presentation at the Annual Meeting of the European Accounting Association, Bordeaux, France, May 1999 (with Professor Eddy Vaassen, University of Amsterdam, and Carol Schelleman, Mastricht University).

7. "The Demand for Assurance on Electronic Commerce," research paper accepted for presentation at the Annual Meeting of the European Accounting Association, Bordeaux, France, May 1999 (with Professor Philip Wallage, University of Amsterdam).

8. "Research Opportunities Related to Assurance Services" a paper presented at the Copenhagen School of Business, November 1998.

9. "Dimensions of Auditor Judgments: The Relationship Between The Control Environment and Financial Statement Assertions." (with S. Schneider, C. Comunale, T. Benford, M. Barnes and R. Marden). Selected for presentation at the Symposium for Research on Internal Control, Auditing and Assurance Services. University of Amsterdam. November 1998.

10. "Research On Competencies Required For Future Providers Of Assurance For Business Entities," (with E. Vaassen and C. Schelleman). Selected for presentation at the Symposium for Research on Internal Control, Auditing and Assurance Services. University of Amsterdam. November 1998.

11. "Web Assurance: A Strategic Alliance." (with P. Wallage, A. Noeteberg, J. van der Kloet and A. Mendendorn). 1998. Working paper. Anton Dreesmann Institute for InfoPreneurship. University of Amsterdam. Presented at the Symposium for Research on Internal Control, Auditing and Assurance Services. University of Amsterdam. November 1998.

12. "The Internet and Distance Learning In Accounting Education: Opportunities and Challenges." (with J. Lloyd-Jones.) Working paper. University of South Florida and the International Federation of Accountants (IFAC) Education Committee. Presented at the Symposium for Research on Internal Control, Auditing and Assurance Services. University of Amsterdam. November 1998.

13. "Competence and Quality Assurance in Accounting Education: Global Issues from a U.S. Perspective," *Foundations of Globalization in Higher Education in the Professions*, Annual Conference of the Center for Quality Assurance in International Education, Washington, DC, May 1998.

14. "The Impact of Financial and Nonfinancial Performance Indicators on Auditors' Analytical Review Judgments." (with Sandra Schneider, Christie Comunale, Tanya Benford, and Monica Barnes). Presented at the Annual Meeting of the American Accounting Association, August 1998.

15. "New Forms of Assurance Services for New Forms of Information: The Global Challenge for Accounting Educators." (with James Hunton), selected for presentation at the Eighth World Congress of Accounting Educators in October 1997 in Paris.

16. "Dimensions Of Auditor Judgments Regarding The Relationship Between The Control Environment And Financial Statement Assertions." (with Sandra. Schneider, Christie Comunale, Tanya Benford, Monica Barnes, G. E. Campbell, and R. E. Marden). Presented at the Annual Meeting of the American Accounting Association, August 1997.

17. "Comparing Students' and Auditors' Judgments about the Control Environment: Bridging The Experience Gap," presented at the Northeast Regional Meeting of the AAA, New York City, April 20, 1996 (with S. L. Schneider, R. E. Marden, G. E. Campbell, M. Barnes, and C. Comunale).

18. "Using Multi-Dimensional Scaling in Analyzing Auditors' Evaluations of the Control Environment," presented at the Annual Meeting of the Society for Judgment and Decision Making, November 1995 (with S. L. Schneider, R. E. Marden, G. E. Campbell, M. Barnes, and C. Comunale).

19. "The Effect Of Experience And Expertise On The Auditor's Evaluation Of The Control Environment: Implications For Education, Training, And The Development Of Decision Aids," presented at the Southeast Regional Meeting of the AAA, April 1995 (with R. Marden, S. Schneider, and G. Campbell).

20. "The Effect Of Audit Experience On Professional Skepticism: A Management Fraud Scenario," presented at the mid-year meeting of the Auditing Section of the AAA, January 1995 (with S. Bhattacharya and K. Hooks).

21. "A Case Demonstration of Framing in an Auditor-Client Interview." Presented at the Teaching Forum of the Annual Meeting of the Society for Judgment and Decision Making, St. Louis, Mo., November 1994 (with S. L. Schneider, R. E. Marden and G. E. Campbell).

22. "CORE: A Generic Coding Scheme For Analyzing The Content Of Expert Interviews." Presented at the Annual Meeting of the Society for Judgment and Decision Making, St. Louis, Mo., November 1994 (with S. L. Schneider, R. E. Marden and G. E. Campbell).

23. "The Impact of The Control Environment in Financial Institutions: Learning From The Experts." Presented at the 1994 Annual Meeting of the American Accounting Association, August 12, 1994, New York City, New York (with S. L. Schneider, R. E. Marden and G. E. Campbell).

24. Marden, R., G. Holstrum, and S. Schneider. 1994. "The Effects of Framing on Auditor Evaluation of the Control Environment, Audit Risk Factors, and Client Assertions." Presented at the American Accounting Association Southeast Regional Meeting in Louisville, KY, April, 1994.

25.     "Framing Effects and Audit Decision Making: Control Environment Evaluation." at the annual meeting of the Society of Judgment and Decision-Making (November 1993) (with S. L. Schneider and R. E. Marden).

26.     "Methods of Integrating New Research and Standards on Internal Control into the Accounting Curriculum," at the national Auditing Education Conference co-sponsored by Price Waterhouse and the Auditing Section of the American Accounting Association, in Oxnard, California (February 1994).

27.     "Future Directions for Auditing Research that would Influence Audit Practice," a presentation at the University of Southern California Audit Judgment Symposium, February, 1992.

28.     "Excellence in Audit Education Part II--Introducing the New Video Simulation and Microcomputer Database Cases for Dermaceutics, Inc." a presentation of new materials at the National Symposium for the Coopers and Lybrand Excellence in Audit Education Program, New York City, June 27-28, 1990. (Attended by invited faculty throughout the US and Canada). Also made two regional presentations regarding Dermaceutics and this project in April 1991 (in Philadelphia for Northeast US universities and in Atlanta for Southeast US universities).

29.     "Using the New Audit Guide on Internal Control in the Auditing Classroom," a three-hour session presented jointly with Dr. Ray Whittington, Director of Auditing Research for the AICPA, at the annual meeting of the American Accounting Association (August 1990).

30.     Moderated a panel, "Implementing the Recommendations of the Accounting Education Change Commission," Southeast Regional Meeting of the American Accounting Association, April, 1990.

31.     Discussion Comments on Paul Casper's "Empirical Research on Confirmation of Accounts Receivable," The Auditing Judgment Symposium, University of Southern California, February 20, 1989.

32.     "Future Auditing Research Agenda: A Standard-Setting Perspective," presented at the University of Illinois Auditing Research Symposium (October, 1988).

33.     "An Emerging Taxonomy of Audit Evidence," co-authored with Ted Mock and presented by Dr. Mock at The University of Queensland, Brisbane, Australia (July, 1988), and The University of Otago, Dunedin, New Zealand (June, 1988).

34.     "Auditing in the First Decade of the 21st Century," co-authored with Ted Mock and presented by Dr. Mock to the Norwegian Society of Accountants, Oslo, Norway (November, 1987).

35.     "Bayesian Dimensions of Expert Systems in Auditing," (with Ted Mock and Paul Watkins) presented at the Bayesian Research Conference, Social Science Research Institute, USC (February, 1986).

36.     "An Auditing Research System," a paper presented at the Western Region AAA Meeting (May, 1985).

37. "Components of the Audit Evidence Evaluation Process," at the Symposium on Audit Judgment and Evidence Evaluation, University of Southern California (February, 1985).

38. "Auditors Make Cascaded Inferences--Sure They Do," (co-authored and presented jointly with Theodore J. Mock) at the Bayesian Research Conference, Social Science Research Institute, USC (February, 1985).

39. "AUDBASE: An Auditing Research Microcomputer Database," a paper and microcomputer demonstration of the database of auditing research literature developed by the author (consisting of over 1700 references), The Accounting Research Forum at USC (February, 1985).

40. "Sources of Error and Inconsistency in Auditor Judgment," a working paper presented at The Accounting Research Forum at USC (October, 1984).

41. "Auditor Judgment Training Programs of Big-8 Accounting Firms," a paper presented at the Annual Meeting of the American Institute for Decision Sciences (November, 1983).

42. "The Materiality Concept in Accounting and Auditing," Accounting Research Workshops at the University of Arizona, Arizona State University, and San Diego State University (February and March, 1982).

43. "Audit Judgments Under Uncertainty," Accounting Research Workshops at Indiana University (April, 1980) and the University of Southern California (January, 1981).

44. "The Design and Implementation of an Auditing Research System," Mid-Atlantic Region AAA Meeting (April, 1980).

45. "AUDITSCOPE: The Deloitte Haskins and Sells Audit Approach," a paper presented at several universities, one national AUDITSCOPE Seminar, and several regional AUDITSCOPE Seminars.

46. Presented several other papers and talks on various auditing research and practice issues at different national and regional AuditSCOPE Seminars (1980-84).

47. "Audit Judgment Research Opportunities and Issues: A Practitioner's  View," Symposium on Audit Judgment, University of Southern California (February, 1983).

48. The Future Environment for Auditing Education and Research," keynote address, Iowa Conference of Accounting Educators (October, 1982).

49. "Discussion Comments on William R. Kinney's paper, 'Regression Analysis in Auditing: A Comparison of Alternative Investigation Rules'," University of North Carolina Audit Risk Conference (May, 1982).

50. "Audit Judgment Workshop," Creighton University (a one-day workshop for auditing researchers and practitioners presented jointly with Jack Krogstad, Robert Ashton, and Robert Hylas) (May, 1982).

51. "The Creative Annual Report," Beta Alpha Psi Awards Banquet, San Diego State University (March, 1982).

52. "Computer-Assisted Audit Judgments," Research Seminar Presentation, University of Nebraska Visiting Scholar Program (April, 1981).

53. "Issues and Answers For Reporting on Internal Accounting Control," Western Region AAA Meeting (May, 1980).

54. "Bridging the Gap Between Academic and Professional Research in Auditing," Northeast Region AAA Meeting (April, 1980).

55. "Recent Developments Concerning Reporting on Internal Control," Southwest Region AAA Meeting (March, 1980).


**PRESENTATIONS TO PROFESSIONAL ORGANIZATIONS:**

1. Made presentations or was an invited participant in various IFAC International Accounting Seminars between 1998 and 2003 in Paris, France; Istanbul, Turkey; Mumbai, India; Helsinki, Finland; Amsterdam, Netherlands; London, England; Bahrain; Sydney, Australia; Budapest, Hungary; New York City; Beijing and Hong Kong, China; and Capetown, South Africa.

2. "Responding to the Crisis in Confidence: Top 10 Impacts on Future Auditing and Corporate Governance," presented at the USF Beta Alpha Psi Accounting Conference, November 22, 2002.

3. "Internet, Multimedia and Distance Learning in Accounting Education," presented at the Seminar for Directors of Education of Member Bodies of IFAC, held in conjunction with the World Congress of Accounting Educators, Hong Kong, November 16, 2002. (Seminar was hosted by the Hong Kong Office of the Australian Institute of Certified Public Accountants and attended by about 50 Directors of Education throughout the world.)

4. "New Framework of International Standards for Accounting, Auditing and Accounting Education: Impact on the U.S.," presented at the USF/FICPA Accounting Conference, October 2002.

5. "Enron—Lessons for the Accounting Profession," presented to the West Coast Chapter of the FICPA, April 25, 2002 (with Professor Celina Jozsi).

6. "Auditor Independence: The Challenge for Accounting Educators," at the Southeast AAA Meeting in Tampa, April 27, 2001 (with Professor Kay Tatum of the University of Miami.

7. "Auditor Independence—New Rules and Critical Judgments," for the USF/FICPA Accounting Conference, October 19, 2001.

8. "Auditor Independence: Lessons Learned After All the Pain," for the Tampa Office of PriceWaterhouseCoopers, November 15, 2001.

9. "Independence: Judgments Beyond the Rules," two-hour CPE session for the West Coast Chapter of the FICPA, November 14, 2000.

10. "The Critical Role of Auditor Independence—Current Problems and Proposed Solutions," for the USF/Beta Alpha Psi Accounting Conference, November 17, 2000.

11. Co-anchored a series of webcasts on "Auditor Independence—Beyond the Rules"—(Co-anchored with Dan Guy, former VP of Auditing of the AICPA) nationwide webcasts of "Independence: Beyond the Rules," produced by the Independence Education Program. Webcasts and related materials were funded by PriceWaterhouseCoopers and were reviewed and guided by an advisory committee appointed by the SEC.

    ○ Webcasts for Practitioners--Four separate webcasts for practitioners (3 hours each) were produced in June and July of 2000.

    ○ Webcast for Educators—Co-anchored a separate 3-hour national webcast (with Dan Guy) covering materials specifically adapted for university educators, delivered on October 27, 2000.

12. "Internet Education and Distance Learning: Paradigm Shift or Serious Threat," Presented at the National Association of State Boards of Accountancy (NASBA) CPE Conference in New Orleans, February 28, 2000.

13. "The Proposed NASBA/AICPA Framework for CPE," made presentation as a panelist on the Forum on the Proposed New CPE Framework," at NASBA's Fifth Annual CPE Conference, February 29, 2000.

14. "New Assurance Services: Impact for Accountants in the European Community," Presented at the Danish Professional Accounting Conference, jointly sponsored by the Copenhagen School of Business and the Danish Institute of Chartered Accountants, November 1998, Copenhagen, Denmark.

15. "New Assurance Services: Where Will They All Lead?" CPE Conference Sponsored by Gregory, Sharer & Stuart, June 1998.

16. "Assurance Services Update: Moving Into the 21st Century," USF Accounting Circle Conference, May 1998.

17. "So You Think the Internet Can be Secure!" The SunTrust/Fowler White Accounting Education Extravaganza for University Accounting Scholarships, May 1998.

18. "Continuing Professional Education in Emerging Assurance Services: How Should It Be Encouraged and Recognized by the Florida Board of Accountancy?" Invited presentation to the Continuing Professional Education Committee of the Florida Board of Accountancy, April 1998.

19. "Internet Security and Electronic Commerce," USF Beta Alpha Psi Accounting Conference, November 21, 1997.

20. "WebTrust: A New Assurance Service for Electronic Commerce," FICPA/Florida Gulf Coast University Accounting Conference, November 18, 1997.

21.     "Assurance Services for Electronic Commerce," USF Accounting Circle Conference, May 22, 1997.

22.     "Assurance Services in the 21st Century," USF/FICPA Accounting Conference, November 1996.

23.     "Emerging Audit and Assurance Services," West Coast Chapter, FICPA, Tampa, October 1996.

24.     "A Look at Audit and Assurance Services in the 21st Century," Sun Coast Chapter, FICPA, September 1996"New Developments for Future Audit, Attest, and Assurance Services," annual meeting of the FICPA, Puerto Rico, June 1996.

25.     "Emerging Assurance Services," Coopers & Lybrand Accounting Seminar, June 1996, Tampa.

26.     "The Future of Current Audit Services in the Year 2000," *Perspectives on Assurance Services Symposium*. Naples, Florida, April 1996.

27.     Future Assurance Services," a 3 1/2-hour panel presentation, *The CPA Journal Symposium on Future Assurance Services*. Made presentation and participated in an invited panel that included the Chair of the AICPA Special Committee on Assurance Services, the Chief Accountant of the SEC, the Vice-Chair/Chair-Elect of the AICPA, and representatives of other constituencies, New York City, January 5, 1996. Excerpts of speech on new assurance services printed in article, "Future Assurance Services," in The *CPA Journal*, April 1996.

28.     "The Retreat of the Traditional Audit and the Emergence of New Assurance Services," Palm Beach Chapter, FICPA, September 1995.

29.     "Building A Framework For Future Assurance Services--And New Auditing Standards," annual meeting of the FICPA, San Francisco, June 1995.

30.     "Emerging Auditing and Assurance Services," USF Accounting Circle Conference, May 1995.

31.     "Critical Factors in Evaluating The Control Environment." USF/FICPA Accounting Conference, December 1994 (with S. L. Schneider, R. E. Marden and G. E. Campbell).

32.     "New Framework for Financial Reporting, Auditing, and Assurance Services," West Coast Chapter, FICPA, November 1994.

33.     "The Descent of Traditional Audit Services and the Rise of New Assurance Services," Gulf Coast Chapter, FICPA, October 1994.

34.     "The Sante Fe Conference Proposals for Revising the Framework for Financial Reporting and Audit Assurance Services," USF Accounting Circle Conference, May 1994.

35.     "Financial Statements and Auditing in the Courtroom," presented seminar for courtroom judges in Florida, program sponsored by the AICPA, May 1994.

36.     "Auditing In a Distressed Economy," Sun Coast chapter, FICPA, January 1993.

37.     "Meeting Expanding User Demands for Audit/Assurance Services,"  USF Accounting Circle Conference, June 1993.

38.     "New Auditing Standards for Expanding User Demands," IMA Accounting Conference, June 1993.

39.     "New Information Wave Crashes Over the Auditing Profession," Central Florida Chapter, FICPA, June 1993.

40.     "Needed: New Approaches to Auditing and Assurance," West Coast Chapter, FICPA, October 1993.

41.     "New Initiatives in Audit, Attest, and Assurance,"  USF/FICPA Accounting Conference, December 1993.

42.     "New Responsibilities for Auditors for Detecting Fraud and Illegal Acts,"  West Coast Chapter, FICPA, February 1992.

43.     "Is the Auditing Expectations Gap Narrowing or Widening?"  Southwest Florida Chapter, FICPA, April 1992.

44.     "Controlling Audit Risk in Audits of Small Businesses," Florida Keys Conference, FICPA, May 1992.

45.     "Dilemmas Facing the Auditing Profession," Suncoast Chapter,  FICPA, St. Petersburg, May 1992.

46.     "Assessing the Future of the Auditing Profession," Annual Meeting, FICPA, Quebec City, Canada, June 1992.

47.     "Lessons Auditors Ignore at Their Own Risk," Annual Meeting, FICPA, Quebec City, Canada, June 1992.

48.     "Emerging Auditing Problems and Issues," FICPA Accounting/Auditing Conference, Destin, FL, June 1992.

49.     "Recent Auditing Standards--1992," USF Accounting Circle Conference, June 1992.

50.     "New Standards for Controlling Audit Risk," FICPA Accounting Show, Orlando, September 1992.

51.     "Auditing in a Distressed Economy," USF/FICPA Accounting Conference, December 1992.

**RESEARCH APPOINTMENTS, PROJECTS, GRANTS AND COORDINATION EFFORTS:**

○    **Independence Education Project (IEP)**—(See description above)
        Funded by PriceWaterhouseCoopers—Guided by an advisory committee appointed by the SEC.

○    **National Science Foundation Grant**

"Auditor Judgments about the Control Environment of Financial Institutions," (co-researcher with Dr. Sandra Schneider, Professor of Cognitive Psychology at USF, and assisted by Ron Marden, Christi Comunale, and Tanya Benford, doctoral students in Accounting and two doctoral students in cognitive psychology at USF ). Initial three-year project concerning auditor cognitive processes and judgments about the internal control environment of financial institutions; extended for a fourth year (1993-97)

○ **Institute of Internal Auditors Research Foundation Grant**
"The Impact of Technology on Auditing--Moving into the 21st Century," (co-researcher with Theodore J. Mock). Phase I of the research project on "Audit Evidence in the Year 2000" (1984-85) was funded by the Institute of Internal Auditors and completed in August, 1985. An additional grant was received from the Institute of Internal Auditors Research Foundation to fund Phase II, which was completed in the Spring of 1987 and published in 1988. This research was designed (1) to predict--through a Delphi study of information technology experts--the most important developments in information technology in the next fifteen years, (2) to analyze the impact of these developments on future audit evidence, and (3) to develop alternative scenarios of the nature of the audit process and alternative strategies for auditors to adapt to the predicted changes.

○ **Peat Marwick Foundation "Research Opportunities in Auditing" Grant**
"Auditing Research Database." Director and principal researcher for a project to develop a microcomputer database of recent auditing research. Funding provided by the Research Opportunities in Auditing program of the Peat, Marwick, Mitchell Foundation, including a grant to the researcher for the initial development of the database by the researcher plus a three-year continuing grant to the School of Accounting at USC to maintain and update the database (1984-87).

○ **USC Audit Judgment Symposia Grant**
Worked with Professor Ted Mock in developing proposals to secure four separate grants from the Deloitte Haskins and Sells Foundation to fund the first four USC Audit Judgment Symposia (1983-86) and in planning and conducting the international Symposia programs. These Symposia were presented jointly by the Center for Accounting Research and the Social Science Research Institute, both of USC. The USC Audit Judgment Symposium was merged with the Maastricht Audit Research Symposium to form the International Symposium on Auditing Research, which is now co-hosted by USC, the University of Limburg, the Nanyang Technological University, and the University of New South Wales.

○ **Institute of Internal Auditors Research Foundation Grant**
"Operational Audits of Production Control," (Co-researcher with Dr. William Collins). A research project and monograph funded and published by the Institute of Internal Auditors Research Foundation.

○ **Texas Water Quality Board Grant**
"Valuing the Resources of the Galveston Bay." Project Director and Principal Researcher for a study of the Economic and Societal Resources of the Galveston Bay. Research study was funded by the Texas Water Quality Board and the research report monograph was published by the Bureau of Business Research, University of Texas, Austin.

**COORDINATION OF PROFESSIONAL AND
RESEARCH CONFERENCES:**

○ Coordinator and Co-Editor, *Auditing Standards Board Expectations Gap Roundtable*, in May 1992 in Charleston, SC. This Roundtable conference was jointly sponsored by the Big Six Accounting Firms and included discussion papers based on joint research by leading auditing researchers and practitioners on the impact of the expectation gap SASs and continuing expectation gap issues. The Roundtable included a variety of individuals who have a major influence on establishing auditing standards and overseeing their proper implementation. Conference proceedings, *The Auditing Expectations Gap: Issues and Opportunities*, was published in 1993.

○ As Chairman of the Accounting Principles and Auditing Standards Committee of the FICPA, helped coordinate the FICPA Accounting and Auditing Conference, Destin, Florida (1992).

○ Helped plan the USF Accounting Circle Conferences (1992-98).

○ Co-chairman, "Symposium on Audit Judgment and Expert Systems in Auditing," University of Southern California, (Feb., 1986) and "Symposium on Audit Judgment and Evidence Evaluation," University of Southern California (Feb., 1985).

○ AUDITSCOPE SEMINARS--Program Coordinator and presenter for four international and four regional seminars. The AUDITSCOPE Seminars were sponsored by Deloitte for auditing researchers and faculty nationally and internationally. Topics varied from seminar to seminar to reflect new audit approaches developed by Deloitte to meet changes in statistical methodology, information technology, and auditing standards.

**CURRENT PROFESSIONAL MEMBERSHIPS:**

○ American Accounting Association (AAA), including the following sections
    ○ Auditing
    ○ International
    ○ Information Systems
○ American Institute of CPAs (AICPA)
○ Florida Institute of CPAs (FICPA)

**LEISURE ACTIVITIES:**

○ Distance bicycling, running, & roller-blading
○ Boating

# APPENDIX 18: SUMMARY OF LEHMAN COLLATERAL AT JPMORGAN

Appendix 18 summarizes collateral posted by Lehman at JPMorgan from June 2008 through September 2008 in response to JPMorgan's margin requirements and collateral requests, which are discussed in detail at Report Section III.A.5.b. The chart neither lists every collateral movement nor tracks every individual security, but summarizes significant collateral posts, transfers and returns. Collateral transfers and returns are indicated by italicized text.

| Date | Collateral | Summary |
| --- | --- | --- |
| June 19, 2008 | SASCO Freedom Spruce Pine Fenway | Lehman posted these assets with a face value of approximately $5.7 billion to LCD, an LBI clearance account,[1] based on Lehman's agreement to post $5 billion at JPMorgan to address JPMorgan's new margin requirement. |
| July 2, 2008 | Kingfisher HD Supply | Lehman posted these assets with a face value of approximately $1.44 billion to LCD, an LBI clearance account. |
| July 25, 2008 | Verano | Lehman posted this asset with a face value of roughly $1.35 billion to LCD, an LBI clearance account. |

---

[1] According to JPMorgan, LCD is an LBI account. JPMorgan First Written Responses, at p. 7; JPMorgan Second Written Responses, at p. 5; *see also* Spreadsheet [JPM-EXAMINER00006151] (spreadsheet showing LCD as part of DG92, an LBI dealer group). Alvarez & Marsal, however, "underst[ood] JPMorgan referred to the LCD account in a way that suggests it was a LCPI account." Alvarez & Marsal, Responses to Questions for Alvarez & Marsal/Weil, Gotshal & Manges (Dec. 7, 2009), at p. 1.

| Date | Collateral | Summary |
|---|---|---|
| July 2008 | Golden Gate<br>Loan FNG<br>Delta Topco<br>Cayman Partners<br>Riopelle Broadway | Lehman posted these assets in LCP, an LCPI clearance account. |
| July 2, 2008 -<br>August 8, 2008 | Freedom<br>Pine<br>Spruce<br>Verano<br>SASCO<br>HD Supply<br>Fenway | Lehman posted these assets to LCD, an LBI clearance account. In many instances, however, one CUSIP of the same security was being removed from LCD on or about the same date as the new CUSIP was being deposited. |
| *August 8, 2008* | *Spruce*<br>*Freedom*<br>*Pine*<br>*Kingfisher*<br>*Verano* | *Lehman moved these assets with a Lehman-stated value of roughly $5.9 billion from LCD, an LBI clearance account, to LCE, an LBHI clearance account. Around this time, Gifford Fong priced Freedom, Pine and Spruce at approximately $2 billion total, approximately $1.5 billion less than Lehman's stated value.* |
| *August 11, 2008* | *Fenway* | *Lehman moved this asset with a face value of roughly $2 billion from LCD, an LBI clearance account, to LCE, an LBHI clearance account.* |
| *August 15, 2008* | *Freedom*<br>Fenway | *Lehman removed Freedom (Lehman-stated value of roughly $1.42 billion) from LCE.* Lehman increased the face value of its Fenway pledge to $3 billion. |

| Date | Collateral | Summary |
|------|-----------|---------|
| *September 2, 2008* | *Kingfisher* | *Lehman transferred this asset with a face value of roughly $960 million from LCE, an LBHI clearance account, to LCD, an LBI clearance account.  Around this time, Gifford Fong priced the CLOs that remained in LCE (Spruce, Pine, and Verano) at approximately $1.75 billion, compared to Lehman's stated value of approximately $3.25 billion.* |
| September 9, 2008 | Cash | Lehman posted $1 billion cash in response to JPMorgan's September 9 collateral request for $5 billion (of which Lehman agreed to post $3 billion immediately). |
| September 9, 2008 | Money Market Funds | Lehman posted approximately $1.7 billion in money market funds in response to JPMorgan's September 9 collateral request. |
| September 10, 2008 | Cash | Lehman posted $300 million cash in response to JPMorgan's September 9 collateral request for $5 billion (of which Lehman agreed to post $3 billion immediately). |
| September 10, 2008 | Corporate bonds | Lehman provided JPMorgan corporate bonds with a Lehman-stated value of approximately $1.6 billion to value and possibly to substitute for some of the cash collateral Lehman posted in response to JPMorgan's September 9 collateral request. |
| September 11, 2008 | Cash | Lehman posted $600 million cash related to JPMorgan's September 9 collateral request. |
| *September 11, 2008* | *Corporate bonds* | *JPMorgan returned approximately $500 million of corporate bonds posted by Lehman.* |

| Date | Collateral | Summary |
|---|---|---|
| September 12, 2008 | Cash | Lehman posted $5 billion cash in response to JPMorgan's September 11 collateral request for $5 billion cash. |
| *September 12, 2008* | *Corporate bonds* | *JPMorgan returned the remaining corporate bonds (approximately $1 billion) to Lehman.* |
| *September 12, 2008* | *Pine* | *JPMorgan released $1 billion (Lehman-stated value) of Pine CLO to Lehman.* |

# APPENDIX 19:  LEHMAN'S DEALINGS WITH BANK OF AMERICA

This appendix discusses the current litigation between Lehman and Bank of America ("BofA").  At the time of this writing, Lehman and BofA are before the Court in an adversary proceeding.  The pending dispute stems from BofA's November 10, 2008 setoff of approximately $509 million from various LBHI accounts.[1]  Specifically, BofA set off the funds against debts it claims Lehman Brothers Special Financing incurred through derivative and swap agreements with BofA.[2]

Out of deference to the Court and to avoid interfering with active litigation, the Examiner has limited his investigation of this claim and does not reach conclusions about the relative merits of the parties' positions.  However, the $500 million collateral deposit and the related negotiations of the three-day notice provision in the 2008 Security Agreement are significant to the Examiner's investigation of Lehman's liquidity pool, discussed in more detail in the Liquidity Pool Section (Section III.A.5.i) of this Report.

---

[1] Joint Stipulation of Undisputed Facts, at ¶ 44, Docket No. 74, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Dec. 7, 2009).

[2] *Id*. at ¶ 45.

# I. LEHMAN FAILED TO SETTLE A $650 MILLION OVERDRAFT; BOFA DEMANDED INTRADAY PROTECTION

At the time of the bankruptcy, BofA had provided clearing and other financial services to Lehman for at least 16 years.[3]  In connection with its clearing services, BofA provided unsecured, intraday credit to cover overdrafts.[4]  In this vein, BofA required that Lehman clear any overdrafts by the end of each business day to prevent intraday credit from ripening into overnight credit.[5]

According to BofA, deteriorating market conditions in early 2008 prompted BofA to reevaluate its business relationships with broker-dealers and other financial institutions that used substantial overdraft credit.[6]  BofA began to monitor formally or, in some instances, to require cash deposits from certain clients after many incurred large overdrafts at the end of the second quarter of 2008.[7]

On July 25, 2008, Lehman failed to settle a $650 million overdraft before the end of the day (as required).[8]  According to Lehman, the failure arose from a payment error

---

[3] *Id.* at ¶ 7.

[4] *Id.* at ¶¶ 7-8.

[5] *Id.* at ¶ 8.

[6] Rule 7056-1(b) Statement of Undisputed Material Facts in Support of Bank of America's Motion for Summary Judgment, at ¶ 39, Docket No. 50, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Sept. 14, 2009).

[7] *Id.* at ¶ 43; *see also* Transcript of deposition testimony of Marisa Harney, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753, Bankr. S.D.N.Y., July. 14, 2009, at pp. 50-53 (discussing efforts in the summer of 2008 to reduce intraday exposure to broker-dealers because of large overdrafts).

[8] Joint Stipulation of Undisputed Facts, at ¶ 9, Docket No. 74, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Dec. 7, 2009).

by one of its clients.[9]  According to BofA, Lehman could not settle the overdraft because it arose from a segregated client account, which precluded Lehman from clearing the overdraft with its own funds.[10]  The overdraft ripened into overnight credit, which Lehman settled on July 28, 2008, the next business day.[11]

On August 14, 2008, BofA informed Lehman that Lehman would need to place a $650 million deposit with BofA "soon," to retain its overdraft credit.[12]  James Dever, BofA's relationship manager for Lehman, and Dever's boss, William White, relayed this information on behalf of BofA to Tonucci.[13]

On August 20, 2008, Dever contacted Tonucci again and informed him that BofA would reduce Lehman's intraday credit limit to zero if Lehman did not place an even larger deposit - $1 billion - with BofA by August 25, 2008.[14]  The greater figure

---

[9] Statement of Undisputed Material Facts in Support of Defendants Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing and Counterclaim-Plaintiff Lehman Brothers Holdings Inc.'s Motion for Summary Judgment, at ¶ 7, Docket No. 52, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Sept. 14, 2009).

[10] Rule 7056-1(b) Statement of Undisputed Material Facts in Support of Bank of America's Motion for Summary Judgment, at ¶ 47, Docket No. 50, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Sept. 14, 2009).  Lehman does not dispute that it informed BofA it could not commingle funds and attributes this to its understanding of FSA regulations. Response to Bank of America's Statement of Undisputed Material Facts, at ¶ 47, Docket No. 61, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Oct. 14, 2009).

[11] Joint Stipulation of Undisputed Facts, at ¶ 11, Docket No. 74, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Dec. 7, 2009).

[12] *Id.* at ¶ 13.

[13] *Id.*

[14] *Id.* at ¶ 14.

represented BofA's decision to require a deposit sufficient to cover Lehman's largest daily overdraft limits.[15]

## II. LEHMAN AND BOFA NEGOTIATED THE TERMS OF A SECURITY AGREEMENT

On the evening of August 21, 2008, BofA sent Lehman a document titled "Security Agreement" and a document titled "Customer Agreement."[16] These agreements provided for BofA's right to set off against the deposit sought by BofA to collateralize the intraday credit provided to Lehman. Lehman and BofA exchanged six drafts before executing the Security Agreement on August 25. The parties' Joint Stipulation of Undisputed Facts provides a draft-by-draft exposition of the negotiations over the terms of the agreements.[17] These negotiations are the subject of ongoing litigation.

However, one of the terms arising from these negotiations has broader significance for this Report. During the course of negotiations, BofA proposed a provision that allowed Lehman to remove assets from the deposit account with advance notice of three business days.[18]

---

[15] Bank of America's Local Bankruptcy Rule 7056-1(c) Response to Lehman Brothers' Statement of Undisputed Facts and Counterstatement of Facts in Opposition to Lehman Brothers' Motion for Summary Judgment, at p. 17, Docket No. 60, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Oct. 19, 2009).

[16] Joint Stipulation of Undisputed Facts, at ¶ 15, Docket No. 74, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Dec. 7, 2009).

[17] *Id.* at ¶¶ 15-33.

[18] *Id.* at ¶ 24.

### III. THE MINIMUM COLLATERAL VALUE AND THE THREE-DAY PROVISION

BofA's initial draft of the Security Agreement set the "minimum required collateral value" at $1 billion.[19] The agreement provided that if BofA ever determined that the value of the assets in the deposit account had fallen below $1 billion, BofA could demand that Lehman immediately deposit the difference.[20] Unless Lehman was in default, BofA would release any funds in excess of $1 billion to Lehman upon request[21] (the $1 billion figure was reduced to $500 million in subsequent drafts).[22]

On August 22, in Lehman's initial reply, Lehman struck out most of the collateral provision, including the amount of the minimum required deposit.[23] Lehman counter-proposed that it place collateral with BofA which Lehman could remove at any time without BofA's consent, but left the value amount of the collateral blank.[24]

On August 22, in BofA's second draft, BofA reinserted the requirement that Lehman provide collateral of $1 billion in a deposit account, but BofA also inserted a provision that allowed Lehman to remove assets from the deposit account with advance notice of three business days.[25]

---

[19] *Id.* at ¶ 16.
[20] *Id.*
[21] *Id.*
[22] *See id.* at ¶ 34.
[23] *Id.* at ¶ 22.
[24] *Id.*
[25] *Id.* at ¶ 24.

## IV. THE DEPOSIT AND SETOFF

Upon execution of the Security Agreement on August 25, Lehman immediately wired $500 million to the designated account (the "465" Account).[26]  As planned, the funds were transferred to a Eurodollar account in the Cayman Islands the next day.[27] The Eurodollar account was a "time deposit" that matured on September 25, 2008.[28] Interest on the Eurodollar account was deposited into the 465 Account upon maturity.[29] According to BofA, these two accounts composed the Deposit Account referenced in and secured by the Security Agreement.[30]

After September 25, the Eurodollar deposit matured daily and was renewed each day "until further notice."[31]  Lehman did not attempt to access the Eurodollar deposit or the interest account.[32]

According to Lehman, BofA "placed a permanent 'hold' on [the 465] account at its inception — the equivalent of an 'administrative freeze' — meaning that funds could not be taken out of the account without special authorization and [BofA's] manual

---

[26] Joint Stipulation of Undisputed Facts, at ¶35, Docket No. 74, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Dec. 7, 2009).

[27] *Id.* at ¶ 36.

[28] *Id.* at ¶ 37.

[29] *Id.* at ¶ 39.

[30] Bank of America's Local Bankruptcy Rule 7056-1(c) Response to Lehman Brothers' Statement of Undisputed Facts and Counterstatement of Facts in Opposition to Lehman Brothers' Motion for Summary Judgment, at p. 49, Docket No. 60, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Oct. 19, 2009).

[31] Joint Stipulation of Undisputed Facts, at ¶ 40, Docket No. 74, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Dec. 7, 2009).

[32] *Id.* at ¶ 42.

override of the hold."[33]  According to Lehman, the purpose of the permanent hold was to ensure that Lehman would not have "unfettered" access to the funds.[34]

BofA "denies Lehman's assertion that Bank of America placed a 'permanent hold' on the 465 Account to prevent Lehman's removal of the cash deposit at inception" and maintains that Lehman "retained access to the cash deposit," subject to the three-day notice provision described above.[35]

BofA and Lehman agree that LBHI had "merely negligible overdrafts," if any at all, on September 15 when LBHI declared bankruptcy.[36]  On November 10, BofA notified LBHI that BofA claimed a right to set off $1.9 billion against LBHI accounts.[37] Specifically, BofA claimed Lehman Brothers Special Financing owed BofA the $1.9 billion under an ISDA agreement, which included a guarantee by LBHI.[38]  That same day, BofA set off against approximately $509.3 million in various LBHI accounts,

---

[33] Statement of Undisputed Material Facts in Support of Defendants Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing and Counterclaim-Plaintiff Lehman Brothers Holdings Inc.'s Motion for Summary Judgment, at ¶ 47, Docket No. 52, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Sept. 14, 2009).

[34] *Id.* (quoting Transcript of deposition testimony of Evelyn Alpert, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753, Bankr. S.D.N.Y., June 12, 2009, at p. 28).

[35] Bank of America's Local Bankruptcy Rule 7056-1(c) Response to Lehman Brothers' Statement of Undisputed Facts and Counterstatement of Facts in Opposition to Lehman Brothers' Motion for Summary Judgment, at p. 45, Docket No. 60, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Oct. 19, 2009).

[36] Joint Stipulation of Undisputed Facts, at ¶ 43, Docket No. 74, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Dec. 7, 2009).

[37] *Id.* at ¶ 44.

[38] *Id.*

including the entirety of the funds in the Eurodollar and 465 accounts (approximately $501.8 million).[39]

BofA did not seek relief from the automatic stay.[40] Lehman did not consent to the setoff.[41] On November 21, 2008, Lehman demanded the return of the funds, protesting that the setoff violated the automatic stay and the terms of the Security Agreement.[42]

On November 26, BofA commenced an adversary proceeding, seeking declaratory relief establishing that the setoff was proper under the terms of the Security Agreement, and that it either did not require relief from the automatic stay or, alternatively, that BofA was entitled to relief in order to effect the setoff.[43] On January 2, 2009, Lehman filed an answer and counterclaim, asserting breach of contract and violation of the automatic stay and seeking return of the funds, plus interest, costs, and fees.[44]

---

[39] *Id.* at ¶ 45.

[40] *Id.*

[41] *Id.*

[42] *Id.* at ¶ 46.

[43] Adversary Complaint, at p. 2, Docket No. 1, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Nov. 26, 2008).

[44] Answer and Affirmative Defenses of Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc. and Counterclaims and Third-Party Complaint of Lehman Brothers Holdings Inc., at pp. 26-31, Docket No. 6, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Jan. 2, 2009) (also asserting claims for declaratory judgment that BofA must return the funds, to establish a constructive trust, and for turnover of property).

## V. THE SIGNIFICANCE OF THE CLAIMS TO THE LIQUIDITY SECTION OF THIS REPORT

Some of the arguments made during the course of the adversary proceeding are relevant to the Liquidity Pool Section (Section III.A.5.i) of this Report. This appendix does not analyze the merits of the parties' claims in the adversarial proceeding, nor should this appendix be read to take a position on any facts in dispute between the parties.

Lehman and BofA dispute the nature of the Deposit Account holding the $500 million.[45] Lehman argues that BofA did not have a common law right to setoff because the Deposit Account was a special purpose account, characterized by, among other things, restrictions on the pledgor's access.[46] According to Lehman, the three-day notice provision gave BofA "substantial control over the collateral," which was "substantially fettered."[47]

In contrast, BofA argues that the Deposit Account was a general account, accessible to Lehman with only "minor" and "administrative" restrictions, and, thus,

---

[45] *See, e.g.*, Bank of America's Local Bankruptcy Rule 7056-1(c) Response to Lehman Brothers' Statement of Undisputed Facts and Counterstatement of Facts in Opposition to Lehman Brothers' Motion for Summary Judgment, at pp. 48-50, Docket No. 60, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Oct. 19, 2009) (quoting and disputing Lehman's claims that the Eurodollar account was "not a bank account at all" or was at least not a general deposit account).

[46] Defendants Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing And Counterclaim-Plaintiff Lehman Brothers Holdings Inc.'s Opposition to Bank of America's Motion for Summary Judgment, at pp. 37-38, Docket No. 63, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Oct. 19, 2009).

[47] *Id.* at p. 38 (internal quotations omitted).

subject to setoff absent an express waiver.[48]  BofA claims to have devised the three-day proposal for Lehman's benefit and refers to the provision as "a creative solution that allowed its client to avoid a loss of liquidity."[49]

Elsewhere, Lehman personnel have relied on the three-day provision for the proposition that similar deposits placed with JPMorgan were properly included in Lehman's liquidity pool.[50]  Indeed, the provision was included in the agreements with JPMorgan at Lehman's behest.[51]

As discussed in more detail in the Liquidity Pool Section (Section III.A.5.i) of this Report, Lehman's access to the funds at JPMorgan and BofA subject to the three-day

---

[48] Memorandum of Law in Support of Bank of America's Motion for Summary Judgment, at pp. 42-48, Docket No. 48, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Sept. 14, 2009); *see also* Memorandum of Law in Opposition to Lehman Brothers' Motion for Summary Judgment and in Further Support of Bank of America's Motion for Summary Judgment, at pp. 17, 51-52, Docket No. 58, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Oct. 19, 2009).

[49] Memorandum of Law in Opposition to Lehman Brothers' Motion for Summary Judgment and in Further Support of Bank of America's Motion for Summary Judgment, at p. 6, Docket No. 58, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Oct. 19, 2009); *see also* Defendants Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing and Counterclaim-Plaintiff Lehman Brothers Holdings Inc.'s Memorandum of Law in Reply to Bank of America's Opposition to Lehman's Motion for Summary Judgment, at pp. 29-30 & n.24, Docket No. 71, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Nov. 9, 2009) (arguing that BofA placed "significant practical limitations on Lehman's ability to withdraw the collateral" by conditioning access to overdraft credit on keeping the deposit at BofA and that "both parties believed that the withdrawal restrictions were significant").

[50] *See* e-mail from Mark G. Doctoroff, JPMorgan, to Jane Buyers-Russo, JPMorgan, *et al.* (Sept. 9, 2008) [JPM-2004 0032520] (discussing Fleming's desire to include a similar three-day provision in the September 9 Guaranty and Security Agreement to avoid "the public issue of [Lehman's] liquidity pool having to drop"); *see also* Guaranty (Sept. 9, 2008), at p. 2 [JPM-2004 0005813] (including three-day provision in September 9 Guaranty with JPMorgan); Security Agreement (Sept. 9, 2008), at p. 3 [JPM-2004 0005873] (including three-day provision in September 9 Security Agreement with JPMorgan).

[51] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 8; Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at pp. 5-6; Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 14 n.7.  *But see* Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 5 (claiming that JPMorgan proposed the three-day provision); Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 7 (same).

provision is material to the propriety of Lehman's inclusion of those funds in its reported liquidity pool. Tonucci stated that Lehman included the BofA deposit in Lehman's liquidity pool because the cash was accessible with three-days' notice, and Lehman had internally defined "available liquidity" to mean liquid assets available within five days.[52]

Nevertheless, Lehman argues in the adversary proceeding that there were practical restrictions on Lehman's ability to access the deposit, in addition to the restrictions imposed by the notice itself. Specifically, "Lehman could not simply withdraw the funds upon which overdraft protection was conditioned — or at least could not do so for as long as [BofA] remained one of Lehman's key clearing banks, a role it had occupied for at least sixteen years."[53] "Lehman needed to maintain daylight overdraft protection, or else 'the system would grind to a halt.'"[54]

Finally, BofA may have counted the $500 million deposit in its *own* liquidity pool concurrent with Lehman counting the same deposit in its pool. In the course of a

---

[52] Transcript of deposition testimony of Paolo R. Tonucci, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753, Bankr. S.D.N.Y., July 16, 2009, at pp. 18-19. However, as described in more detail in the Bank of New York Mellon Section of this Report, Lehman's International Treasurer, Carlo Pellerani, was unaware of the significance of the three-day provision, and told the Examiner that did not know of a Lehman policy that defined "available liquidity" to mean liquid assets available within five days. See Section III.A.5.f of this Report.

[53] Defendants Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing and Counterclaim-Plaintiff Lehman Brothers Holdings Inc.'s Memorandum of Law in Reply to Bank of America's Opposition to Lehman's Motion for Summary Judgment, at pp. 29-30, Docket No. 71, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Nov. 9, 2009).

[54] *Id.* at p. 30 (quoting Transcript of deposition testimony of Bernadette Mazzella, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753, Bankr. S.D.N.Y., July 15, 2009, at pp. 39-42).

deposition, Lehman's counsel asked Evelyn Alpert, a senior vice president at BofA, whether the $500 million was included in BofA's "liquidity" once Lehman deposited it. Alpert responded:  "Every deposit that we have is included in our liquidity."[55]

---

[55] Transcript of deposition testimony of Evelyn Alpert, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753, Bankr. S.D.N.Y., June 12, 2009, at pp. 24:24-25:11.

# APPENDIX 20: KNOWLEDGE OF SENIOR LEHMAN EXECUTIVES REGARDING THE INCLUSION OF CLEARING-BANK COLLATERAL IN THE LIQUIDITY POOL

Appendix 20 describes what members of Lehman's senior management told the Examiner they knew, or did not know, about Lehman's inclusion of clearing-bank collateral in the firm's liquidity pool.

## A. Richard S. Fuld, Jr.

According to Fuld, it was only after September 15, 2008, through conversations with CFO Ian Lowitt, that he understood the impact of JPMorgan's collateral calls on Lehman's liquidity.[1] Still, Fuld opined that collateral pledged on an intraday basis was properly counted in Lehman's liquidity disclosures.[2] There was no "liquidity issue" in Fuld's view because, according to Fuld, the collateral was returned daily.[3] Following the bankruptcy, Fuld said he had a conversation with Lowitt, who advised him that collateral pledged intraday definitely counted toward liquidity.[4]

## B. Christopher M. O'Meara

O'Meara was CRO at the time of LBHI's bankruptcy filing on September 15, 2008. O'Meara said that Lehman's liquidity pool consisted of short-term investments

---

[1] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 12.

[2] *Id.* at p. 15; Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 5 (Fuld opined that collateral pledged intraday was properly included in Lehman's liquidity pool).

[3] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 12.

[4] *Id.* at p. 15.

that could be converted to cash.[5]  He did not appear to be aware that Lehman was

including clearing-bank collateral in its liquidity pool prior to LBHI's bankruptcy:

when asked whether certain collateral could have been included in Lehman's liquidity

pool, O'Meara said he would have to "huddle with the team to understand that better."[6]

He then argued for the propriety of including pledged collateral in the liquidity pool,

stating that if the collateral were only tied-up intraday, "it's still ours at the end of the

day."[7]

Thus O'Meara, like Fuld, said he was not aware that Lehman was not entitled to

all collateral included in the liquidity pool at the end of the day.  He further stated that

he was not aware that, due to the JPMorgan-Lehman Clearance Agreement and

associated security documentation, Lehman accounts at JPMorgan were encumbered

and that the collateral in those accounts was simultaneously included in the pool.

### C.  Paolo R. Tonucci

As Global Treasurer, Tonucci was familiar with the composition and definition of

Lehman's liquidity pool.  He stated that collateral eligible for inclusion in the pool was

that which was "high grade, investment quality," which could be "monetized within

five days."[8]  Tonucci stated that this was an internal Lehman policy, predating his

tenure as Global Treasurer, although he could not point to a specific document

---

[5] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 27.

[6] *Id.*

[7] *Id.*

[8] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 16.

supporting this statement.[9]  Tonucci further stated that he did not know "how formal" the five-day standard was, or how formal standards for including assets in the liquidity pool were generally.[10]  Tonucci noted that liquidity was not governed by anything as specific as a GAAP standard.  "Ultimately," Tonucci said, "the CFO [Lowitt] is responsible for determining what assets belong and do not belong [in the liquidity pool]."[11]

Tonucci listed other assets suitable for inclusion in the liquidity pool: government securities, major-listed equities, money funds with same or next-day liquidity, and reverse repurchase agreements ("reverse repos").[12]  Tonucci said that reverse repos were the "gold standard" for liquid assets eligible for inclusion in Lehman's liquidity reserves.[13]

The Examiner asked Tonucci whether collateral transferred to Lehman's clearing banks was properly included in Lehman's liquidity pool, highlighting the fact that funds transferred to clearing banks to cover intraday risk such as the June 12, 2008 $2 billion Citi deposit would not be available for Lehman's liquidity needs during that intraday period.  Tonucci responded that he "didn't think about it that way at the time"

---

[9] *Id.*

[10] *Id.*

[11] *Id.*  Note that Ian Lowitt said just the opposite, namely, that Tonucci was primarily responsible for the composition of the liquidity pool.  Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 24.

[12] In a reverse repo, the repo "lender" (Lehman) agrees to provide cash to its counterparty (the repo "borrower") in exchange for a security, where the repo "borrower" agrees to buys the security back from the lender at a slightly higher price in the future (the "repurchase" obligation).

[13] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 16.

that Lehman transferred the $2 billion to Citi.[14]  Tonucci elaborated:  Lehman did not

design its pool to cover "arbitrary" demands made by its clearing banks; rather, the

liquidity pool was defined to satisfy maturing obligations over a certain period of

time.[15]  While collateral demands may have been foreseeable in hindsight, the liquidity

pool was not designed to, or represented to, cover clearing-bank demands.[16]

Tonucci explained that Lehman believed it could include clearing-bank collateral

in the liquidity pool given that, in the case of Citi and JPMorgan, until early September,

that collateral was only transferred to secure intraday exposures, and was allegedly

released at the end of each day.[17]  Because Lehman only calculated its liquidity after the

close of business, the supposedly released collateral could be counted as "liquid."

Tonucci emphasized that no firm calculates liquidity intraday, on account of the

complexity of such a task.[18]

---

[14] *Id*. at p. 18.

[15] *Id*.

[16] *Id*.  Lehman described its liquidity pool as "primarily intended to cover expected cash outflows for twelve months in a stressed liquidity environment," where those outflows consisted of, for the most part, maturing, long-term, unsecured debt coming current, and repayment of commercial paper and bank loans.  Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed on July 10, 2008), at p. 80.  Lehman further described its pool as available to fund illiquid asset classes, and cover outflows associated with certain liquidity stress scenarios.  *Id.* at pp. 80-82, 84.  Lehman never disclosed that its liquidity pool contained encumbered assets.  When FRBNY analysts Art Angulo and Jan Voigts inferred for themselves that Lehman was including clearing-bank collateral in its liquidity pool, Angulo concluded, "[it] doesn't feel quite right to view [the collateral] as 'unencumbered,'" to which Voigts replied, "[a]greed."  E-mail from Jan H. Voigts, FRBNY, to Arthur G. Angulo, FRBNY (Aug. 21, 2008) [FRBNY to Exam. 033297].

[17] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 18.

[18] *Id*.  While Lehman did not know all the inflows and outflows that would ultimately transpire intraday until after the fact, Lehman did know that per its understanding with Citi and JPMorgan, it had to place a set amount of collateral with those institutions every day.

Tonucci provided another rationale for the inclusion of clearing-bank collateral in the pool: Lehman believed it could get the collateral back from the banks if it so requested.[19] The Examiner is, in fact, aware of two occasions in which Citi and HSBC returned cash to Lehman; on both occasions, however, Lehman promptly replaced the funds.[20] Asked if Lehman had ever tested its ability to get clearing-bank collateral back from JPMorgan in the summer of 2008, Tonucci replied that Lehman had not.[21] Nevertheless, Tonucci stated that Lehman could effect the return of intraday clearing-bank collateral. The Citi $2 billion cash deposit, Tonucci continued, was merely placed with Citi to demonstrate "good faith," and that there were "no restrictions on [Lehman's] ability to get it back."[22] Further, Tonucci said he was "confident" that

---

[19] *Id.*

[20] *See* e-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup (June 30, 2008) [CITI-LBHI-EXAM 00074989] (explaining that Lehman will replace the $200 million of the Citibank deposit the next morning); e-mail from Carlo Pellerani, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 28, 2008) [LBEX-AM 008853] (evidencing return of the HSBC deposit following the weekend); e-mail from Ian T. Lowitt, Lehman, to Jeremy Isaacs, Lehman (Aug. 28, 2008) [LBEX-AM 008940].

[21] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 18. The Examiner is aware, however that collateral moved out of the accounts at certain points. For example, on September 10, 2008, JPMorgan returned the "Pine" securities collateral upon Lehman's request. *See supra* Section III.A.5.b.1.m of this Report, which discusses Lehman's dealings with JPMorgan; *see also* e-mail from Edward J. Corral, JPMorgan, to Michael A. Mego, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-EXAMINER00005961] ("Let the CLO go."); e-mail from Michael A. Mego, JPMorgan, to Mark G. Doctoroff, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-EXAMINER00005936] ("Lehman Brothers is looking to Release $1 billion from the $6.2 billion held on their LCE account.").

[22] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 18. There were restrictions on Lehman's ability to access these funds. Citi documents and witness statements show that while Citi would likely have returned the $2 billion to Lehman if requested, Citi's risk desk had to be notified in advance of, and approve any release of the deposit. After release of the deposit Citi would reassess whether it would continue doing "business as usual" with Lehman. Examiner's Interview of Thomas Fontana, Aug. 19, 2008, at p. 5. Further, within Citi it was understood that Lehman's "asking for the deposit back does have distinct impacts on clearing capacity." E-mail from Jerry Olivo, Citigroup, to Michael Mauerstein, Citigroup, *et al.* (Aug. 29, 2008) [CITI-LBHI-EXAM 00076678].

Lehman could trade with Citi without the $2 billion, but that it would "be more difficult" without the deposit.[23] Lehman was "always beholden to an extent on the good will of its clearing banks," Tonucci said, but he factored in Lehman's "long and deep" history with those clearing banks (which had not asked previously for intraday collateral) in forming his judgment that the banks would have returned the collateral.[24]

While Tonucci assumed at the time of the collateral pledges that Lehman would be able to call back the pledges, it became apparent to him on or around September 10, 2008, that the banks would not return the collateral.[25] Tonucci said that within Lehman, there were no discussions about the propriety, impropriety or difficulties related to Lehman's inclusion of the clearing-bank collateral in the pool.[26]

In addition to the JPMorgan and Citi collateral, Tonucci recalled that collateral transfers to HSBC and Bank of America ("BofA") were also included in the liquidity pool. Tonucci defended the inclusion of the BofA collateral on the grounds that BofA was "very peripheral" to Lehman's funding operations and that Lehman could have moved its business to Citi.[27]

In total, Tonucci confirmed that the following assets were included in Lehman's liquidity pool: the $2 billion Citi deposit; $3 billion JPMorgan collateral pledged on

---

[23] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 18.
[24] *Id.*
[25] *Id.*
[26] *Id.* at p. 19.
[27] *Id.*

September 9 and 10, 2008;[28] the $5 billion cash collateral pledged to JPMorgan on September 12; at least "some of" the securities transferred to JPMorgan over the summer to mitigate the effects of JPMorgan's margin requirements; the approximately $1 billion transferred to and that remained at HSBC on September 1, 2008; and $500 million collateral placed with BofA on August 25, 2008.[29] Tonucci said that he did not recognize that these pledges materially reduced Lehman's "ability to monetize the pool" until September 12, 2008.[30]

### D. Robert Azerad

Azerad was the head of Lehman's Asset and Liability Management division, and had an active role in managing LBHI's liquidity pool. Azerad stated that the liquidity pool was composed of unencumbered assets that could be readily monetized.[31] Yet, when asked about Lehman's inclusion of intraday collateral in its liquidity pool, he defended doing so based upon the fact that liquidity was calculated at the end of each day.[32]

When asked what would happen if Lehman decided to sell or pledge cash and other assets that were committed to the clearing banks on an intraday basis, Azerad acknowledged that this would amount to "open battle" with JPMorgan, which Azerad

---

[28] Tonucci was not asked about the $600 million cash pledged to JPMorgan on September 11. *See id*. at p. 21.

[29] *Id*. at p. 19.

[30] *Id*.

[31] Examiner's Interview of Robert Azerad, Sept. 23, 2009, at p. 4.

[32] *Id*.

thought could force Lehman into bankruptcy.[33]  Still, he disagreed with altering his end-of-day conception of liquidity reporting to take this practical reality into account.[34] But Azerad did acknowledge that, in a sense, collateral pledged on an intraday basis was not truly "unencumbered."[35]  Azerad further stated that the inclusion of clearing-bank collateral was not a "black-and-white" issue for him, and that Lehman was not trying to "hide encumbrances," but rather stick to a consistent methodology of only calculating liquidity at the end of the day.[36]

Azerad stated that he developed the various "ability to monetize" tables[37] describing the relative liquidity of different portions of the liquidity pool only in the week prior to the chapter 11 filing by LBHI.[38]  He said that assets assigned a "high" ability to monetize could be liquidated in one day, assets assigned a "mid" ability to monetize could be liquidated within five days, and assets with a "low" ability to monetize were monetizable within one to two weeks.[39]  A table showing Lehman's "ability to monetize" the liquidity pool as of September 10, 2008 assigns a "low" "ability to monetize" $27 billion of the $37 billion pool.[40]

---

[33] *Id.* at p. 9.

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *See, e.g.*, Robert Azerad, Lehman, Liquidity Pool Summary (Sept. 9, 2008) [LBHI_SEC07940_557815].

[38] Examiner's Interview of Robert Azerad, Sept. 23, 2009, at p. 8.

[39] *Id.*

[40] Lehman, Liquidity Update (Sept. 10, 2008), at p. 4 [LBEX-WGM 725919].

### E. Daniel J. Fleming

In his second interview with the Examiner, on September 24, 2009, Lehman Cash and Collateral Management head Dan Fleming said he knew Lehman wanted to structure collateral deposits with its clearing banks to maintain its ability to include the collateral in the liquidity pool.[41]  Fleming recounted his knowledge of the $2 billion Citi deposit in particular:  If Lehman owed no obligations to Citi at the end of the day, the deposit was freely returnable to Lehman, and could therefore be included in the liquidity pool.[42]  Fleming also recounted his understanding of the pledge of securities collateral to JPMorgan in the summer of 2008 to mitigate the effects of JPMorgan's margin requirements:  while the collateral counted toward JPMorgan's NFE calculation, Lehman could theoretically take a portion of the collateral back so long as NFE remained positive.[43]  Fleming acknowledged that Lehman included collateral in its liquidity pool, despite the fact that there would be clearing consequences if Lehman did not return the collateral to the clearing banks each morning;[44] Fleming's view was that it was appropriate to include the assets because Lehman was legally entitled to them.[45] He also noted that disclosures concerning the pool were not his responsibility.[46]

---

[41] Examiner's Interview of Daniel J. Fleming, Sept. 24, 2009, at p. 4.

[42] *Id.* at p. 8.

[43] *Id.* at pp. 4-5.

[44] *Id.* at pp. 4, 8.

[45] *Id.* at p. 8.

[46] *Id.*

### F. Carlo Pellerani

Pellerani served as Lehman's International Treasurer.[47] Pellerani recalled that clearing banks began demanding collateral "towards the end," and further recalled attempting to find illiquid collateral to pledge in order to satisfy those banks' intraday risk concerns.[48] Pellerani did not recall any discussions about satisfying those banks' requests by using collateral from the liquidity pool.[49] Pellerani was not aware whether Lehman included clearing-bank collateral in its liquidity pool, or structured the terms of its deposits or pledges in order to justify doing so.[50] Nor was Pellerani aware of any Lehman policy or standard to the effect that an asset was "liquid" and suitable for inclusion in the liquidity pool if it could be monetized within five days.[51]

Pellerani rejected the distinction between clearing-bank "deposits" and "pledges" offered by Tonucci and other Lehman witnesses. The Examiner questioned Pellerani about an e-mail exchange between himself and Cornejo in which Cornejo argued that a $200 million deposit placed with Bank of New York ("BNYM") in order to cover exposure to Lehman, over which BNYM would have a right to set off would not be a formal "pledge" and therefore would not "affect" the liquidity pool.[52] Pellerani said he did not see the distinction between such a deposit and a "pledge" and further

---

[47] Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 3.
[48] *Id*. at p. 4.
[49] *Id*.
[50] *Id*.
[51] *Id*.
[52] *Id.* at pp. 4-5.

stated that a deposit such as that described in the e-mail was not "available liquidity" and thus was not something that should have been included in the liquidity pool.[53] "If [BNYM] is requiring a deposit in order to perform services, it can't be used in liquidity," Pellerani said.[54]

Presented with a hypothetical fact pattern (tracking the terms of the $2 billion Citi deposit) where Lehman placed a deposit with a clearing bank during the day to cover risk exposures that was returned to Lehman at the end of the day, Pellerani stated that he "would find it very, very hard to become comfortable including that [hypothetical deposit] in the liquidity pool."[55]

### G. Steven J. Engel

Engel was a Senior Vice President and Global Head of Funding for Lehman's Treasury department. In that capacity, he managed the investment of assets in LBHI's liquidity pool.[56] Engel stated that it was not appropriate to count assets in a liquidity pool that were deposited or pledged intraday with clearing banks, even if those assets were lien-free at night.[57] This was because the assets were required for day-to-day operations, and Engel could not think of a way the assets could be monetized

---

[53] *Id.* at p. 5.

[54] *Id.*

[55] *Id.*

[56] Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 8.

[57] *Id.* at pp. 10-11.

overnight.[58]   Engel believed it would be inappropriate for Lehman to include in its liquidity pool amounts deposited or pledged to BofA, JPMorgan, Citi, and HSBC.[59] Engel said it was not reasonable for Lehman to represent that it had greater than $40 billion in its liquidity pool on September 10, 2008 if the clearing banks would not return collateral counted in the liquidity pool.[60]   Engel further explained that it was not clear that Lehman would have gone to the PDCF to fund some of the securities.[61]

---

[58] *Id.* at p. 10.
[59] *Id*.
[60] *Id* at p. 13.
[61] *Id*.

# APPENDIX 21:  LBHI SOLVENCY ANALYSIS

This Appendix 21 was prepared by Duff & Phelps and accompanies the Examiner's analysis of LBHI's solvency prior to the petition date, discussed in Section III.B.3.b of the Report.  This Appendix also discusses the existence of option value in a firm's equity price, and describes the methodology utilized in the market-based valuation approach for determining solvency.

**To:**        The Examiner

**From:**      Duff & Phelps, LLC

**Subject:**   LBHI Solvency Analysis Appendix

**Date:**      February 1, 2010

## I.        Optionality Valuation Methodology

It is important to consider the concept of optionality and the existence of option value in a firm's equity price when evaluating what the market prices indicate relative to firm solvency.  Quite frequently there are insolvent firms with positive market value of equity.  This occurrence is detailed below.

<u>Optionality Overview</u>

The value of a stock option consists of two components:  intrinsic value and time value. Intrinsic value is the difference between stock price and strike price.  Time value reflects the probability that a stock price will exceed the strike price at some point prior to expiration.

When the stock price is less than the strike price, an option is considered to be "out of the money."  Out of the money options have zero intrinsic value.  While out of the money options may appear worthless because there is no intrinsic value, they often trade at positive values.  This is because of time value, which is the possibility that the stock price will become greater than the strike price before the option expires.  As an out of the money call option approaches maturity, the time value of the option decreases.

One key determinant of how much time value an option has is volatility.  All else being equal, greater volatility in a stock leads to higher option value.

<u>Equity as an Option</u>

Equity in a troubled firm, where the market value of the assets is less than the face value of the debt owed, has characteristics similar to an out of the money call option. The two primary similarities are exercisability and limited liability.  Just as the value of an option is impacted by intrinsic value, time value and volatility, so too is the value of a firm's equity.

<u>Exercisability</u>

Equity holders in a firm are residual claim holders. That is, they have claims on the cash flows of a firm after other financial claim holders are paid. If the value of a firm's assets exceeds the value of debt owed by the firm to other financial claim holders, shareholders receive the residual value of the firm. Equity holders also have the option to liquidate a firm at any time and pay off the debt holders. Therefore, payoff to equity holders (E) at any time is given by,

$$E = A - D, \quad \text{if } A > D$$

$$(\text{Or})$$

$$0, \quad \text{if } A <= D$$

Where A = Market Value of Assets & D = Par Value of Debt

Equity holders will only exercise their right to liquidate the firm when the market value of the firm's assets is greater than the par value of its debt. As such, the firm's par value of debt can be viewed as the strike price for the equity holders' option. Similarly, the firm's market value of assets is similar to the price of the stock upon which the option is relying (commonly referred to as the underlying stock price). Thus, the firm's market value of equity is similar to the market value of a call option.

<u>Limited Liability</u>

The maximum loss for the owner of a stock option is the amount that he pays for that option. If the option expires and the underlying stock price is less than the strike price of the option, the option is worth zero, regardless of how far below the strike price the stock is. Similarly, if a firm's assets are worth less than its debt, the most an equity holder in the firm can lose is the amount that he paid for his equity.

<u>Intrinsic Value</u>

As discussed above, the value of a firm's equity, upon liquidation (exercise) is equal to the difference between the market value of the firm's assets and the face value of its debt. In an insolvent firm, where the value of the firm's assets is less than the face value of debt, there is zero intrinsic value (just as a stock option where the underlying price is less than the strike price has no intrinsic value). Just as out of the money options often have positive value, insolvent firms often have positive market value of equity. This is because of time value.

Time Value

The value of a firm's assets is changing all of the time. Internal and external factors which influence the value of the firm's assets are constantly changing. Even when a firm's assets are worth less than the face value of its debt there is the possibility that those assets will gain enough value so that they are worth more than the firm's debt. This possibility is the reason that investors are often willing to pay positive values for equity in an insolvent company. The amount that these investors are willing to pay is influenced by both the amount of time that they feel the company will survive before having to file for bankruptcy and the likelihood that the asset value will grow before that time has expired. All else being equal, the longer the period prior to bankruptcy, the more an investor will be willing to pay for the firm's equity (similar to an investor being willing to pay more for a stock option with a longer duration than the same option with shorter duration). Further, the more volatile a firm's assets are, the more likely it is that they will become worth more than the firm's debt prior to bankruptcy.

Volatility

Just as the volatility of the underlying stock is a key determinant of the time value of an option, the volatility of a firm's assets is a key determinant of the time value embedded in a firm's equity. All else being equal, greater asset volatility leads to higher stock value.

Even as the market capitalization of Lehman Brothers gradually fell, starting several months prior to Chapter 11 bankruptcy, there was very high volatility in both its stock price and bond prices. This volatility was the result of both considerable uncertainty surrounding the broader market and Lehman specific issues including liquidity concerns, uncertainty about the market values of Lehman's assets, and several rumored potential transactions. The high volatility in Lehman's stock price is depicted in the following charts. The first chart depicts Lehman's stock volatility in absolute terms, measured by implied volatility of Lehman options. The last three charts display the volatility of Lehman's stock in relative terms, exhibited by daily stock changes for Lehman and its peers.

It is clear from both sets of charts that Lehman's stock was very volatile as the firm approached its bankruptcy. The stock volatility is indicative of high volatility of Lehman's assets which is the reason that the firm's equity continued to trade at positive values right up to its bankruptcy filing.





5





## II.    Market Solvency Calculations

As described in the Report, solvency is determined by comparing the market value of assets to the face value of the debt.  While accounting guidelines require companies to report the face value of debt (and in Lehman's case, mark-to-market asset values) in

quarterly increments, firms are not required to report on a monthly or daily basis. There was, however, a fluid public market for both Lehman's equity and its debt. Duff & Phelps ("D&P") evaluated the public values of both Lehman's equity and debt to deduce an implied market value of assets on each trading day from June 1 to September 15, 2008. D&P then compared that value to the face value of all of Lehman's liabilities to determine solvency on each date.

<u>Market Value of Assets</u>

As discussed in the Report, this analysis began with the formula, Assets – Liabilities = Equity and rearranged it so that Assets = Equity + Liabilities. This allowed D&P to use observable market values for Lehman's equity and its debt to calculate the fair market value of its assets. The market value of both Equity and Liabilities are available through a series of calculations. For the purposes of this exercise, the extended formula is laid out as:

Market Value of Equity + Adj. Book Value of Preferred Equity * Preferred Equity Price)

+

(Total Liabilities – Book Value of ST/LT Debt + Market Value of ST/LT Debt[1])

=

Market Value of Assets

1. *<u>Market Value of Equity</u>*

The market value of equity was determined by calculating the product of the total shares outstanding per Lehman's SEC filings and the closing stock price as of that date.

2. *<u>Market Value of Preferred Equity</u>*

The market value of preferred equity was determined by calculating the product of the book value of preferred equity, adjusted for additional issuances per SEC filings,[2] and the current market price of preferred equity. The current market price was based on

---

[1] Lehman's Total Liabilities included more than just Short Term/Long Term debt. This analysis assumed that the market value for this debt is equal to the par value. By subtracting the book value of Short Term/Long Term debt from and adding the market value of Short Term/Long Term debt to total liabilities, this analysis adjusted for the difference between the market and face values of those instruments.

[2] Preferred equity adjusted based on $4.0 billion preferred equity issuance on April 4, 2008 and a subsequent $2.0 billion placement on June 6, 2008 per Lehman's SEC filings.

Lehman's preferred stock issued in February 2008[3] as it had high liquidity on the dates in question and was an accurate indicator of price on each date.

### 3. *Total Liabilities*

Total Liabilities were taken from Lehman's SEC filings and encompassed all outstanding liabilities on Lehman's balance sheet.

### 4. *Book Value of Short Term Debt and Book Value of Long Term Debt*

The book value of short-term debt, current portions of long-term debt and remaining long-term debt were taken from Lehman's SEC filings as of the particular date.

### 5. *Market Value of Long Term Debt*

The market value of long term debt was approximated by using a sample of five publicly traded Lehman bonds, which represented various durations of Lehman debt, as a proxy. A proxy for the market price of all Lehman long term debt was determined by calculating the weighted average (by duration) price of the five publicly traded Lehman bonds. This market price was then multiplied by the book value of Lehman's long term debt to arrive at a market price for Lehman's long term debt. The following table depicts the bonds used and their weighting.

|  | Weighting | Bond CUSIP | Maturity Date | Coupon |
|---|---|---|---|---|
| 1 - 3 year Bonds | 29.4% | Average of CUSIP 524908CF5 and CUSIP 52517PSC6 | 11/01/2009 and 1/18/2012 | 7.875% and 6.625% |
| 3 - 5 year Bonds | 24.7% | CUSIP 52517PSC6 | 1/18/2012 | 6.625% |
| 5+ Senior Bonds | 30.8% | CUSIP 52517PF63 | 4/4/2016 | 5.5% |
| 5+ Subordinate Bonds | 15.0% | Average of CUSIP 524908UB4 and CUSIP 524908R36 | 1/3/2017 and 7/19/2017 | 5.57% and 6.5% |

---

[3] *See* Lehman Brothers Holdings Inc., Free Writing Prospectus, Accession No. 1104659-8-8130 (filed on Feb. 7, 2008) (CUSIP 52520W317 Perpetual Preferred offering with 7.95% coupon).

The Lehman debt maturity distribution from SEC filings was then matched with a mixture of Lehman bonds in the market of varying maturities that have high liquidity (determined both by issuance size and by availability of prices through Bloomberg). Also factored in was the fraction of outstanding debt that was subordinated rather than senior in choosing the five public bonds.

The weighting for the long term debt was calculated based on Lehman's long term debt as of August 31, 2008[4] as shown in the following table. Debt maturing beyond five years was broken into senior and subordinate debt.

| Maturity Date | Amount (USD millions) | Maturity Date | Amount (USD millions) |
|---|---|---|---|
| 11/30/2009 | $ 5,849 | 8/31/2012 | $ 5,767 |
| 2/28/2010 | 3,304 | 11/30/2012 | 3,312 |
| 5/31/2010 | 6,402 | 2/28/2013 | 5,136 |
| 8/31/2010 | 3,645 | 5/31/2013 | 1,852 |
| 11/30/2010 | 2,058 | 8/31/2013 | 2,617 |
| 2/28/2011 | 3,056 | 11/30/2013 | 1,091 |
| 5/31/2011 | 6,249 | 2/28/2014 | 4,189 |
| 8/31/2011 | 3,192 | 5/31/2014 | 1,498 |
| 11/30/2011 | 1,459 | 8/31/2014 | 1,439 |
| 2/29/2012 | 4,657 | | |
| 5/31/2012 | 3,519 | Beyond | 44,349 |
| **Total** | | | **$ 114,640** |

6.      *Market Value of Short Term Debt*

The market value of Lehman's short term debt was calculated based on the average of par and the daily price of Lehman's publicly traded debt with a March 13, 2009 maturity date.[5] Par is the value for debt with zero time to maturity and the March 13, 2009 maturity date was an appropriate price for debt maturing in six to nine months. Taking the average of the two approximates value through linear interpolation approximation over a maturation period of zero to nine months. This determined price was then multiplied by Lehman's book value of short term debt and current portions of long term debt from its SEC filings to arrive at a daily fair market value of the short term debt.

---

[4] Lehman, Funding Lehman Brothers (Sept. 11, 2008) [LBEX-DOCID 008482].

[5] *See* Lehman Brothers Holdings Inc., Prospectus (Form 424B2), Accession No. 1047469-4-5120 (filed on Feb. 20, 2004) (CUSIP 52517PVU2).

Solvency Par Value of Debt

When reporting debt amounts in its interim and annual financial statements, Lehman reported certain hybrid financial instruments at fair value as opposed to par value. In order to perform a solvency analysis, D&P adjusted Lehman's reported debt numbers to include the full par value of these instruments. The adjusted book value was determined by adding (1) the aggregate amount that the hybrid financial instruments exceed their fair value by[6] to (2) the total liabilities held on Lehman's balance sheet. Using Lehman's SEC filings, the following table shows how much the face value of Lehman's hybrid financial instruments exceeded fair value.

| Hybrid Financial Instruments | | | |
|---|---|---|---|
| *Amount by which Par exceeds Fair Value (USD billions)* | | | |
| **Date** | **Short Term** | **Long Term** | **Cumulative Total** |
| May 31, 2008 | $ 0.60 | $ 4.80 | $ 5.40 |
| February 29, 2008 | 0.51 | 3.90 | 4.41 |
| November 30, 2007 | 0.15 | 2.10 | 2.25 |
| August 31, 2007 | - | 1.55 | 1.55 |

---

[6] Adjusting hybrid instruments by the amount they exceed their fair value calculation brings the instruments to Par value.

# APPENDIX 22:  PREFERENCES AGAINST LBHI AND OTHER LEHMAN ENTITIES

This Appendix 22 was prepared by Duff & Phelps and details potential preferences against LBHI and other Lehman entities, which are discussed in Sections III.B.3.e and III.B.3.f of the Report.

**To:**        The Examiner

**From:**     Duff & Phelps, LLC

**Subject:**   Insider Preferences Against LBHI and Other Lehman Entities

**Date:**     February 1, 2010

**Preferences Against LBHI[1]**

**[Bullet Three of Examiner Order]**

## I.    METHODOLOGY

Bullet three of the Examiner Order directs the Examiner to investigate potential preference payments that were made by LBHI Affiliates to LBHI. Summarized below is the methodology undertaken by Duff & Phelps, LLC ("Duff & Phelps") to identify such potential preferences. It is not the purpose of this Appendix to address the merits of the legal issues pertaining to preferences and the defenses thereto. Nevertheless, such issues have played a significant role in the methodologies utilized, assumptions made, models constructed, and the overall scope of the work performed.

---

[1] The following are the Lehman systems (along with Lehman's description of these systems) that were relied upon in the analysis herein: DBS Global General Ledger ("DBS") (*see* DBS Global General Ledger Overview powerpoint presentation [LBEX-LL 766023]); Mainframe Trading System ("MTS") (*see* Lehman Live description of MTS [LBEX-LL 3396037]); Accounts Positions and Balances ("APB") (*see* Lehman Live description of APB [LBEX-LL 3396042]); Treasury Workstation ("TWS") (*see* Lehman Live description of TWS [LBEX-LL 2228241]); Global SmartSteam Reconciliation ("GSSR") (*see* Lehman Live description of GSSR [LBEX-LL 3396041]); and Global Cash and Collateral Management system ("GCCM") (*see* Lehman Live description of GCCM [LBEX-LL 3356455]).

## A. Relevant Entities and Relationships

There is a finite population of potential intercompany relationships from which potential preferences may be found – there are sixteen LBHI-LBHI Affiliate relationships.[2] As it is a requirement under any preference analysis that the debtor be insolvent when a transfer is made,[3] the primary focus was on those LBHI Affiliates that were found to be insolvent or nearly insolvent as of May 31, 2008. As discussed in other sections of the Report, this subset of LBHI Affiliates consists of: Lehman Brothers Commodity Services Inc. ("LBCS"); Lehman Brothers Special Financing Inc. ("LBSF"); Lehman Commercial Paper Inc. ("LCPI"); and the aviation entities – CES Aviation LLC, CES Aviation V LLC, and CES Aviation IX LLC. The aviation entities were disregarded because they were relatively insignificant when compared to the other potentially insolvent LBHI Affiliates.

---

[2] "LBHI Affiliate" is defined in the Examiner Order as "LBCC or any other entity that currently is an LBHI chapter 11 debtor subsidiary or affiliate." Examiner Order, at p. 3 (bullet one). The sixteen LBHI Affiliates are: LB 745 LLC; PAMI Statler Arms LLC; Lehman Brothers Commodity Services Inc.; Lehman Brothers Special Financing Inc.; Lehman Brothers OTC Derivatives Inc.; Lehman Brothers Derivative Products Inc.; Lehman Commercial Paper Inc.; Lehman Brothers Commercial Corporation; Lehman Brothers Financial Products Inc.; Lehman Scottish Finance L.P.; CES Aviation LLC; CES Aviation V LLC; CES Aviation IX LLC; East Dover Limited; Luxembourg Residential Properties Loan Finance S.a.r.l.; and BNC Mortgage LLC. Six debtor entities – LB Rose Ranch LLC, Structured Asset Securities Corporation, LB 2080 Kalakaua Owners LLC, Merit LLC, LB Somerset LLC, and LB Preferred Somerset LLC – are excluded because their petition dates came after January 16, 2009, the date of the Examiner Order. Two other debtor entities, Fundo de Investimento Multimercado Credito Privado Navigator Investimento No Exterior and Lehman Brothers Finance SA, are excluded because their chapter 11 cases were dismissed. Order Dismissing the Bankruptcy Case of Fundo de Investimento Multimercado Credito Privado Navigator Investimento No Exterior, Docket No. 2918, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Feb. 24, 2009); and Order Dismissing Chapter 11 Case of Lehman brothers Finance AG a/k/a Lehman Brothers Finance SA (Case No. 08-13887 (JMP)) and Granting Related Relief, Docket No. 3076, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Mar. 12, 2009).

[3] 11 U.S.C. § 547(b).

### B. Relevant Time Period

Duff & Phelps recognizes that the relevant preference period for intercompany transfers, as is the case with any preferential transfers to insiders, extends back one year from the LBHI Affiliate's bankruptcy filing.  Nonetheless, May 31, 2008 was selected as the cut-off date for identification because of the significant cost of interrogating Lehman's complex source systems.

The time period analyzed for each of the relevant LBHI Affiliates therefore consists of the approximate four-month period from June 1, 2008 through each LBHI Affiliate's bankruptcy filing.  LBCS and LBSF filed for bankruptcy on October 3, 2008; LCPI filed on October 5, 2008.[4]  This period of time between June 1, 2008 and the dates of the respective entities' bankruptcy filings is referred to throughout this Appendix as the "Defined Preference Period."

In the preference analyses discussed below, only data through September 30, 2008 has been reviewed and incorporated.  Minimal activity in GCCM, and no journal entries at all, were observed in the first three days in October leading up to LBCS's and LBSF's bankruptcy filings (or five days in the case of LCPI, although, as discussed below, no potential preferences or new value are calculated for LCPI).  Additionally, Duff & Phelps has observed that no "funding" activity – which, as discussed below, is

---

[4] LBCS Voluntary Petition, Docket No. 1, *In re Lehman Brothers Commodity Services Inc.*, No. 08-13885 (Bankr. S.D.N.Y. Oct. 3, 2008); LBSF Voluntary Petition, Docket No. 1, *In re Lehman Brothers Special Financing Inc.*, No. 08-13888 (Bankr. S.D.N.Y. Oct. 3, 2008); LCPI Voluntary Petition, Docket No. 1, *In re Lehman Commercial Paper Inc.*, No. 08-13900 (Bankr. S.D.N.Y. Oct. 5, 2008).

the primary source for identifying preferences – was recorded in GCCM after September 12, 2008.  For that reason, not incorporating data associated with these three days should not materially impact the preference analysis discussed herein.

## C.  Intercompany Accounts

For each relevant entity, the methodology of identifying potential preferences first focused on identifying all intercompany accounts between LBHI and the relevant LBHI Affiliate.  For these purposes, intercompany account liabilities were considered to be debt and not equity investments.

Each Lehman entity used an identical intercompany account numbering scheme to represent specific types of accounts.  Although the account number alone is not indicative of the entity holding that account, it is indicative, from the last four digits, of the Lehman counterparty.  For example, each affiliate has an intercompany account bearing the number 1262000099.  The last four digits (0099) indicate that this is an account with LBHI, because that is LBHI's legal entity code.  Each Lehman entity had its own legal entity code.  Branches of Lehman entities also had their own legal entity codes.  LBCS, LBSF and LCPI each had multiple accounts with LBHI, each ending in 0099, as well as additional accounts with LBHI (UK), LBHI's London branch, which ended in 0911.

The table below lists the intercompany account prefixes, along with their descriptions as set forth in Ernst & Young workpapers, which have been identified in connection with some or all of the three LBHI Affiliates at issue:[5]

| Account Prefix | Description |
|---|---|
| 12620 | Intercompany |
| 11084/21084 | Intercompany Derivatives |
| 11520/21020 | Repos/Reverse Repos – I/C |
| 12520 | Intercompany Securities Related |
| 21335 | Loan v. Cash - Intercompany |
| 12480/26050 | Interest Receivable/Payable – Intercompany |

The 1262000099 account is the intercompany account through which all of the affiliates' funding for LBCS, LBSF and LCPI with LBHI flowed.[6] In all cases, this account is by far the most active intercompany account. The other intercompany accounts with LBHI appear to have been established for other specific purposes. Some of the purposes are described in the table above. The activity reflected in the general ledger in these other accounts tends to be relatively minor, often reflecting accounting entries on only the first and last day of each month.

All of these intercompany accounts at issue begin with either a "1" or a "2." This methodology is consistent with common accounting practice of using account numbers beginning with "1" for asset accounts and account numbers beginning with "2" for liabilities.[7] Lehman entities would use a single account number to represent a certain

---

[5] Ernst & Young Walkthrough Template, Nov. 30, 2007, pp. 6-7 [EY-SEC-LBHI-CORP-GAMX-07-033383].

[6] Examiner's Interview of Ada Shek, Nov. 24, 2009, at p. 8.

[7] *E.g.,* DBS Global General Ledger Overview powerpoint presentation, Slide 14 [LBEX-LL 766023].

type of obligation between the entities, whether the account carried a debit or a credit balance. Thus, the account using the 12620 prefix, while an asset account, would often carry a credit balance, which, in substance, is a liability. The debit or credit balance would simply reflect whether LBHI was indebted to its affiliate or vice versa, but the same account number may be used in either instance. This was always the case with the "12620" intercompany account for LBCS, LBSF and LCPI.

### D. Branch Accounts

LBHI had a London branch, often referred to in Lehman's computer systems as LBHI (UK), which had a Legal Entity Code of 0911. Many affiliates had one or multiple accounts ending in 0911. LBHI (UK) maintained its own set of accounts, but LBHI consolidated these branch accounts in what appears to be an automatic computer script at each month end for purposes of reporting.

Some affiliates had their own branches. Such was the case with LCPI, which had a London branch, and LBCS, which had a European branch and a Canadian branch. Like LBHI, these affiliates consolidated their own branch accounts into their own accounts bearing the same number at each month-end for reporting purposes. However, LBSF, LBCS and LCPI did not consolidate their own separate intercompany accounts with LBHI and LBHI (UK). In other words, if the main entity and its own branch each carried an intercompany account 1262000099, these would be consolidated at month end. If, however, the main entity (or its branch) carried separate but

comparable accounts with both LBHI (*e.g.*, 1262000099) and LBHI (UK) (*e.g.*, 1262000911), these accounts would not be consolidated.

From June through September 2008, the value of each intercompany account between each of the three relevant LBHI Affiliates, on the one hand, and LBHI, on the other hand, including those held by the branches of each entity, is set forth in the attached Exhibit 1 (LBCS), Exhibit 2 (LBSF) and Exhibit 3 (LCPI).[8] As the month-end account data for each entity consolidates the comparable accounts held by its branches, the branch accounts at each month end were effectively "unconsolidated," and each account was set forth separately. On the right side of the table are the balances reported by LBCS, LBSF, LCPI and LBHI in their most current bankruptcy schedules.

### E.  Lehman's Cash Management System

Lehman's cash management system was in a state of transition over several years prior to the bankruptcy filings.[9] Prior to that time, Lehman's infrastructure for cash management was decentralized and fragmented, with many systems and bank accounts, causing difficulty in managing cash and liquidity.[10] Lehman then began to create a better system to manage real-world cash and funding activity.[11] Lehman's Global Cash and Collateral Management system ("GCCM") was the embodiment of this

---

[8] These Exhibits were compiled from data extracted from DBS.  *See* Debtor entity balance sheets.xlsx [LBEX-LL 3638796 to LBEX-LL 3638799]; and selected Branch's 091F 091J 0929 branch account detail.xlsx [LBEX-LL 3642894 to LBEX-LL 3643132].

[9] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 3.

[10] *Id.*

[11] *Id.*

revamped system.[12]  The benefits sought with this system included ring-fencing activity (which permitted the Treasury Group to isolate and/or categorize certain activity by business group or product line), streamlined reconciliations, lower costs, and increased efficiency and optimization.[13]  In GCCM, data was reported instantaneously, and the Treasury Group was thus able to monitor cash on a real-time basis.[14]

Lehman's goal with its revamped system was to achieve an in-house banking system similar to the Federal Reserve, where the various affiliates would transact business through bank accounts held by a parent entity, such as LBHI, with all transfers between and among them being merely virtual, involving in-house accounts.[15]  Lehman created "funding trees" for this purpose, whereby affiliates were grouped within the banking structure.[16]  Transfers or settlements among entities within the same tree would not involve the movement of real-world cash but rather debits or credits to the entities' in-house accounts, which eventually flowed up to the general ledger.[17]  If the entities were within the same tree, the transfer of real-world cash was unnecessary, because all of the money would "wash" into the same location.[18]  Only transfers among entities in

---

[12] *Id.*
[13] *Id.* at 4.
[14] *Id.*
[15] *Id.* at 3-4.
[16] *Id.* at 3.
[17] *Id.* at 4.
[18] *Id.*

different trees would involve a movement of real-world cash.[19]   Lehman had four

funding trees per currency.[20]

If this system had been implemented perfectly, there would have been one real-

world bank account per currency, per tree.[21]   In practice, however, there were various

operational difficulties associated with closing some accounts, prompting Lehman to

maintain multiple real-world bank accounts.[22]   In particular, some high-volume bank

accounts were kept intact to alleviate the concerns associated with customers being

accustomed to paying into these accounts and then having to switch to a new means of

payment.[23]   In some instances, virtual accounts were designed to avoid having to

change payment instructions for these numerous clients, and these real-world bank

accounts were converted to "no-credit accounts."[24]   If money was paid to a no-credit

account, the bank automatically moved the money to a different bank account.[25]

GCCM was never fully deployed.[26]   While it was fully implemented in Europe, in

the United States it was still in the process of being deployed on a system-by-system

basis (not a legal entity basis) at the time of the bankruptcy filings.[27]   Lehman was still

---

[19] *Id.*
[20] *Id.* at 3.
[21] *Id.* at 4.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*

several years away from achieving its goal of having a fully-integrated cash management system in the United States.[28]  GCCM was never deployed in Asia.[29]

The Treasury Group's function regarding Lehman's cash was to centralize all cash at the parent level and invest these funds overnight.[30]  Accordingly, Lehman aimed to "sweep" all of the cash from the various real-world bank accounts, leaving the accounts with a zero balance at the end of each day.[31]

### F.  Identification of Potential Preferences

#### 1.  Categories of Potential Preferences

Identifying potential preferences presented many challenges, particularly due to difficulties in understanding the cash flows between LBHI and its affiliates.  Lehman used many different computer systems for many different purposes.  Duff & Phelps was granted access to only some of these systems, and this access was often limited. Some of the computer systems, particularly GCCM, cite to various sources for the data presented.  Despite extensive efforts to adequately understand these source systems, obtaining sufficient detail behind particular transactions in order to gain a complete understanding of how and why they impacted intercompany accounts was a challenge.

Nevertheless, following are the categories of potential preference payments made by LBHI Affiliates to LBHI that Duff & Phelps has identified:

---

[28] *Id.*

[29] *Id.*

[30] *Id.* at 2.

[31] *Id.*

### a) Funding Transactions in GCCM

The transfers that have been specifically identified as potential preferences are those identified as "funding" transactions. These funding transactions reflected either 1) funds that were remitted from LBHI to the affiliates for use in their operations, for example to settle trades with their own customers, or 2) excess funds at the end of the day that were then "swept" by LBHI for centralized banking, which could be used for other purposes.[32]

These funding transactions can be tracked in GCCM, but not all Lehman entities were funded through this system. In GCCM, these cash transactions were manually recorded with the designation of "FUNDING" in the "Source" field, although this was actually not a "source" but rather a function entered by Treasury personnel.[33] For LBCS and LBSF, GCCM was the means of identifying funding transactions, although for LCPI it was not. Funding transactions involving cash sweeps from the affiliates tended to occur towards the end of the day. Sometimes, there were no funding transactions in any given business day, but in most days LBCS and LBSF had at least one funding transaction per day.[34]

Consistent with Lehman's goal to remove the need to move cash, many transactions recorded in GCCM merely affect virtual, or in-house, accounts. "Funding"

---

[32] Id.

[33] E.g., Memo from Erin Fairweather, Duff & Phelps, to File re: Discussion with Jay Chan, Lehman, Dec. 11, 2009, at p. 3.

[34] See Exhibits 4 & 13.

transactions, on the other hand, involve the movement of real-world cash. These cash movements can be verified through GSSR, the means by which Lehman reconciled its recorded cash transactions with bank statements.[35] GSSR, also known as SmartStream, was an automatic reconciliation of accounts relating to Cash, Securities and transactions.[36]

"Funding" is a clear concept in Lehman's cash management system. However, Lehman's other GCCM-related activity that impacted the intercompany accounts might also be considered a variant of funding.[37] If, for example, LBHI settled trading activity for an affiliate, rather than remitting the cash to the affiliate in question, LBHI may simply retain the cash, and the affiliate would simply reduce its intercompany account with LBHI.[38] This is tantamount to the affiliate receiving the funds into its own bank account and then having LBHI sweep it at the end of the day, which would clearly be entered into GCCM as a funding transaction.[39] Similarly, if one affiliate settles a trade

---

[35] GSSR-GCCM comparison Database 2009-11-04 v1.xlsb [LBEX-AM 340340 to LBEX-AM 345848].

[36] Lehman Live description of GSSR [LBEX-LL 3396041].

[37] Duff & Phelps obtained from Barclays a custom GCCM intercompany database containing many "fields" that are not observable through normal front-end user interface in GCCM. This custom database allowed Duff & Phelps to observe more information regarding each transaction and thus potential preferences. This database is limited to March 1, 2008 through September 15, 2008, and is further limited to transactions identified as "Intercompany" transactions in the "Journal Type" field. *See* GCCM Intercompany Reports [LBEX-LL 2415581 to LBEX-LL 2603022]. Duff & Phelps was informed that acquiring a complete "back-end" GCCM database without the "Intercompany" limitation would result in an enormous database that would be burdensome and time-consuming to run and to acquire from Barclays. Nevertheless, Duff & Phelps understands that this limitation is reasonable, given that all potential preferential transfers would likely have been recorded as "Intercompany" transactions, as they would affect an intercompany account.

[38] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 5.

[39] *Id.*

for another affiliate, again, rather than having the cash remitted to the trading affiliate, the cash may be swept by LBHI, and the trading affiliate would debit its intercompany account with LBHI. The form of the transactions could effectively be considered a type of funding.

Because of uncertainty in the facts surrounding each transaction, all GCCM activity that affects the intercompany account, and which is *not* identified with the source code of "funding," has been labeled as "quasi-funding" for the purposes of this Appendix. Duff & Phelps has run different models, some of which reflect this intercompany activity as a potential preference, while others disregard it as such. These models are discussed below.

### b) Funding Transactions in MTS

GCCM was not the only system through which LBHI Affiliates were funded by LBHI. Funding could also be accomplished through MTS, Lehman's U.S.-based trading platform for fixed-income securities.[40] LCPI was funded through MTS by means of purported repo transactions involving certain "Trust Receipts," which apparently were dummy securities referred to as "Trust 89" and "Trust 86," the details of which are discussed in greater detail below.[41] There were actually very many Trust Receipts

---

[40] *Id.* at 6-7.
[41] *Id.*; Trust 86.xlsx [LBEX-LL 3627748 to LBEX-LL 3627927]; Trust86 6-1-2007 to 10-3-2008.xlsx [LBEX-LL 3627928 to LBEX-LL 3628124]; Trust89.xlsx [LBEX-LL 3628125 to LBEX-LL 3628755]; Trust89 FY 2006 to 2008.xlsx [LBEX-LL 3628756 to LBEX-LL 3631626]; Trust89 round2.xlsx [LBEX-LL 3631627 to LBEX-LL 3632411]; Trust86 12-2007 to 9-2008.xlsx [LBEX-LL 3636692 to LBEX-LL 3636873]; Trust86 Trust89 2007 06 01 2008 10 03.xls [LBEX-LL 3658168 to LBEX-LL 3668279].

involving the Lehman entities, which served different purposes.[42]  Trust 89 and Trust 86

transactions were entered into extensively between LCPI and LBHI during the Defined

Preference Period.[43]  Through searches of Lehman's APB system, it has been verified

that neither LBCS nor LBSF was involved in any Trust 89 or Trust 86 transactions, either

with LBHI or any other Lehman entity.

Technically, these transactions were recorded in MTS as repos and reverse-

repos.[44]  However, these funding transactions were recorded by use of the designations

Trust 89 and Trust 86.  Although the Trust 89 and Trust 86 designations were recorded

in Lehman's MTS system as the "CUSIP" and the MTS Security ID (field labeled "MTS

SEC ID") for these purported trades, in reality these transactions were essentially

funding.  Within MTS, the product description (labeled "PR DSC") for Trust 89 states

"UNSECURED INTERCOMPANY FINANCING."  The necessity to book this activity as

purported trades was merely a software limitation in MTS, and Daniel Fleming stated

that these transactions were not real repos.[45]

Although Trust 89 and Trust 86 transactions both appear to constitute unsecured

lending between entities, Duff & Phelps has had difficulty gaining a full understanding

of their respective purposes.  The MTS data associated with these Trust 89 transactions

references "FUNDING" as the Security Definition Type (field labeled "SEC DEF TY").

---

[42] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 6, n. 2.
[43] *See* Exhibits 22 & 24.
[44] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 6.
[45] *Id*.

Daniel Fleming has advised that Trust 89 was used for occasions where the LCPI Chase account had excess cash at the end of the day, that the cash was moved to LBI's Chase account on an overnight basis, and that the trade was unwound the next day, with money being sent back with interest.[46]  Duff & Phelps observed in MTS the Trust 89 transactions between LBI and LCPI, but also observed Trust 89 transactions between LCPI and numerous other entities identified in Exhibit 26.[47]

Trust 86 transactions had a much more limited set of trading entities and counterparties.  All Trust 86 transactions observed in MTS were between LCPI, LBHI and LBI.[48]  Daniel Fleming advised that Trust 86 transactions also involved PAMI, ALI and LCC, but no such relationships have been observed in MTS with these entities.[49]  Trust 89 transactions refer to "FUNDING" as the Security Definition Type, whereas the Trust 86 transactions instead refer to "HIC" (Held in Custody) in that field.

Duff & Phelps requested additional clarity regarding these Trust Receipts, including their purpose, but no additional information has been provided.  A more detailed description of the particular Trust 89 and Trust 86 transactions entered into between LCPI and LBHI is set forth below, in the section pertaining to the preference analysis for LCPI.

---

[46] *Id.* at 6-7.

[47] *See* Exhibit 26 and discussion *infra*.

[48] LCPI's Trust 86 transactions during the Defined Preference Period were only with LBHI.  *See* Exhibit 26.

[49] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 7.  Fleming may have been confusing Trust 86 with Trust 89 transactions in this regard.

### G. Calculation of Preferences, Net of New Value

#### 1. Preliminary Consideration Regarding Antecedent Debt

Because a required element of any preference analysis is that the payment be made for or on account of an antecedent (pre-existing) debt,[50] the balance of these intercompany accounts is very significant. Duff & Phelps has assumed that the relevant LBHI Affiliate has an antecedent debt if, from the LBHI Affiliate's perspective, this intercompany account has a credit balance.

LBCS, LBSF and LCPI were all indebted to LBHI. A listing of the intercompany account balances between each of these three entities, on the one hand, and LBHI, on the other hand, is set forth in the attached Exhibits 1-3. The combined balances on all intercompany accounts with LBHI carried a credit balance from the affiliates' perspective. Of note, the affiliates' 1262000099 accounts also carried credit balances.

#### 2. Categories of Potential Preferences and New Value

To identify potential preferences, it is necessary to first review Lehman's general ledger activity, as reflected in Lehman's DBS data, as well as its cash transactions recorded in GCCM. To calculate the value of the preferences for LBCS and LBSF, net of new value provided by LBHI, Duff & Phelps started by determining the entire daily net debit and credit activity for the relevant intercompany account(s), as set forth in DBS.[51]

---

[50] 11 U.S.C. § 547(b).

[51] 0C11 intercompany version 2.xlsx [LBEX-LL 3638527 to LBEX-LL 3638795]; 0059 1262000099 Acct.xlsx [LBEX-LL 3637590 to LBEX-LL 3637745]; 0059 1262000911 Acct.xlsx [LBEX-LL 3637746 to LBEX-LL 3638526].

The selection of relevant accounts is discussed below. Daily DBS activity is categorized into five groups: 1) Up-Funding; 2) Down-Funding; 3) Net Quasi Up-Funding; 4) Net Quasi Down-Funding; and 5) Other.

Up-Funding and Down-Funding consist of the "funding" transactions identified in GCCM on that particular day. All such "funding" transactions flowing from the affiliate to LBHI for the day are summed and placed in the Up-Funding column, and all "funding" transactions flowing from LBHI to the affiliate are summed and placed in the Down-Funding column. Separating these into two columns is necessary because of assumptions discussed below regarding the timing of these payments.

Net Quasi Up-Funding and Net Quasi Down-Funding consist of the net GCCM-related activity that flows into the relevant account, with the exclusion of those sourced to the "funding" function and set forth in the Up-Funding and Down-Funding categories. Because, under Lehman's cash management system, all such GCCM-related intercompany activity could potentially be classified as relating to funding, these transactions are separated from those specifically designated as such but are nevertheless called "quasi-funding" for use in a separate analysis discussed below. All quasi-funding activity for each day is netted to a single amount. If this net amount is an up-flow from the affiliate to LBHI it is placed in the Net Quasi Up-Funding column, and if it the net amount is a down-flow from LBHI to the affiliate it is placed in the Net Quasi Down-Funding column. Thus, unlike the "funding" amounts discussed in the

preceding paragraph, there cannot be an entry in both columns for any given day. Altering this assumption can dramatically change the results.

The fifth column, denoted merely as "Other," consists of all other DBS-related activity affecting the relevant accounts for each day. To undertake a complete preference analysis based on this account activity, it would be necessary to research each of these entries, which are difficult to discern based on their descriptions, and the source systems associated with these entries were not readily available. Nevertheless, Duff & Phelps has observed that the vast majority of these journal entries are credits to the relevant accounts, meaning they caused the antecedent debt to become larger; thus, there are very few potential preferences that could possibly be discerned from a detailed review of these entries. In light of the costs and benefits associated with undertaking this review and analysis, in particular the minimal risk of missing a potential preference, Duff & Phelps has not undertaken a thorough review of the nature of the transactions behind these journal entries.[52]

---

[52] There is one adjustment made to the data. Both the 1262000099 account and the 1262000911 account contained certain journal entries on the first day of each month that were for the purpose of reversing entries made the previous day, *i.e.* the last day of the previous month. This is an accounting method commonly seen in Lehman's books and records. Certain activity is only entered once per month, at the end of the month, but rather than simply making an adjustment to this particular item at the end of the following month to update the balance of this item, Lehman instead would reverse the entry entirely on the first day of the month, thus removing it from the books entirely, and then re-recording this same item on the books and records in its full, new amount at the end of that month. This accounting methodology has no impact on the month-end account balances but does, however, result in an inaccurate account balance when viewed on an intra-month basis. It also skews the preference, net of new value, analysis, because the very large credit in the "Other" column represents potential new value, while the offsetting debit entry is ignored entirely. This effect on the running balance of preferences, net of new value, could be material. An adjustment to the "Other" data has therefore been made for purposes of the preference

### 3. Construction of Preference/New Value Models

With the account activity separated into the categories described above, Duff & Phelps has constructed three separate preference/new value analyses for the relevant accounts discussed below. These analyses are based on certain assumptions related to the transactions affecting the account. In any analysis, all Up-Funding activity, representing flows of cash from the affiliate to LBHI, is classified as a potential preference. Downward cash movements and other extensions of credit by LBHI constitute potential new value, although the different categories of credit activity considered vary, depending on the model.

**Timing Assumptions.** Because preferences can only be reduced by new value given by the creditor *after* the date of the preferential transfer, the order of the transfers is significant in a preference/new value analysis. A critical assumption in these models is that all Up-Funding activity occurred *after* all other activity for the day, meaning that it could not be reduced by any new value given by LBHI on that same day. All other account activity, including Down-Funding, is assumed to have occurred throughout the day. Accordingly, there are no additional assumptions made with regard to the timing of any other payments.

---

analysis alone, whereby these particular entries are merely *adjusted* to their new balances at the end of each month, rather than being reversed entirely on the first day of the month and then re-recorded entirely at the new amount at the end of each month. Although this adjustment is made to the preference calculation, it is not reflected in the "Other" column reported in each of the attached Exhibits.

**Model No. 1.** With the foregoing data and assumptions, Duff & Phelps has built three separate preference/new value models for LBCS and LBSF and calculated a running daily balance of the potential preferences net of new value under each model during the Defined Preference Period. The first model looks solely to Up-Funding and Down-Funding activity, with Up-Funding being the potential preference and Down-Funding being potential new value, and ignored all other activity. This analysis assesses the preference picture based on cash funding alone. In each of the preference/new value spreadsheets attached hereto as Exhibits 4-6 and 13-15, this preference/new value analysis is set forth in Column I. For any given day, the existing preference, net of new value, balance in Column I (*i.e.* the balance at the end of the previous day) is netted against the Down-Funding, constituting potential new value, for the present day. This new value will reduce the preference balance but not below zero. Any excess new value from Down-Funding is thus disregarded and is not carried forward and applied subsequently. After that netting produces a revised temporary preference balance (which is not reflected in the spreadsheets, as this is just an interim balance before the end of the day), the Up-Funding for the present day is applied, based on the notion that this Up-Funding occurs later in the day. This will increase the updated balance by the amount of the Up-Funding for the day, as that amount is all potential preference and is not reduced in any way, as this is assumed to be the last activity of the day. That addition will produce the revised potential preference, net of

new value, balance as of the end of that day, which is reflected in Column I for the given day.

**Model No. 2.** Second, Duff & Phelps considered only Up-Funding as the potential preference, with *all* credit activity, whether it is Down-Funding, Net Quasi Down-Funding or in the "Other" category, as potential new value. This analysis is in Column J of the aforementioned exhibits. This calculation is similar to that set forth in the previous paragraph but with material modifications. In this scenario, the preference, net of new value, balance at the end of the previous day is first netted with *all* credit activity for the present day, resulting in a revised (and necessarily reduced) temporary balance, again with the limitation that this balance cannot be reduced below zero. After this netting, the Up-Funding for the present day, which is considered to be the only potential preference for the day, is added to this temporary balance, resulting in the new potential preference, net of new value, balance at the end of the day. This revised balance is reflected in Column J for the given day.

**Model No. 3.** Third, Duff & Phelps considered Up-Funding *and* Quasi Up-Funding as potential preferences, with credit activity from all three categories as potential new value. This analysis, set forth in Column K in the attached exhibits, ignores only the net debit activity associated with the "Other" column. This calculation is similar to that set forth in Column J, with one material modification. The inclusion of Quasi Up-Funding as a preference may potentially increase the preference balance, but

it is not simply added to the Up-Funding for the day.  Instead, the preference balance at the end of the previous day is netted with both the credit activity for the day *and* the Net Quasi Up-Funding for the day, as this Net Quasi Up-Funding arises out of Lehman's daily operations throughout the day, unlike Up-Funding, which occurs at the end of the day.  This netting is applied to produce a revised temporary preference balance.  Unlike the previous models, in this scenario this revised temporary balance can be higher than the beginning balance, if the Net Quasi Up-Funding is greater than the other credit activity for the day.  Then, the Up-Funding is added to this temporary balance, resulting in the new potential preference, net of new value, calculation for the day.  This revised balance is reflected in Column K for the given day.

### 4.    Selecting the Relevant Intercompany Accounts

The three models of preferences, net of new value, will change based on which account(s) are selected for review.  For LBCS and LBSF, Duff & Phelps ran the three models discussed above based on three different sets of account data:  1) the 1262000099 account; 2) the 1262000911 account; and 3) a combination of these two intercompany accounts.

Analysis of LBCS's and LBSF's 1262000099 accounts by themselves is instructive, because these are the accounts that were impacted by all of the GCCM "Funding" activity.  Based on GCCM, there were no cash sweeps (or any other "funding" activity associated with these affiliates) by LBHI (UK), making an analysis based solely on those

entities' 1262000911 account alone less compelling. The combined approach would appear to be the most informative, as this would not only reflect all funding between the affiliates and LBHI but also other extensions of credit associated with the entities' trading activity, regardless of whether it arose out of a relationship between the affiliate and LBHI's London branch.

Duff & Phelps also considered undertaking a similar analysis with respect to the other intercompany accounts between the relevant debtors and LBHI/LBHI (UK), *i.e.* those with prefixes other than 12620. After reviewing the activity in those accounts, Duff & Phelps ruled out the need to include them in the analysis. First, those accounts often reflected little to no activity throughout the Defined Preference Period. Second, based on this review, it was not apparent that these journal entries reflected any actual transfers or extensions of credit that may constitute potential preferences or new value.

### H.  Analysis of Prior Course of Dealing with LBHI

Finally, Duff & Phelps analyzed LBCS's and LBSF's course of dealing with LBHI. This analysis was limited to the actual transactions between these parties, without consideration of industry practices among similar businesses. In doing so, Duff & Phelps looked back to the parties' "funding" and "quasi-funding" activities throughout the entire time period that such transactions were reported in GCCM, and noted

patterns in this activity.[53]  This analysis is contained in various exhibits attached hereto, as discussed below.

## II.  PREFERENCE ANALYSIS FOR LBCS, LBSF AND LCPI

### A.  LBCS

#### 1.  Funding Activity and New Value

All potential preferential transfers made from LBCS to LBHI were identified through GCCM, Lehman's cash management system.  First, the set of "Funding" transactions beginning on June 1, 2008 was identified from GCCM.[54]  As these transactions consisted of actual cash transfers, they were also verified through GSSR, which contained relevant bank statement data.[55]

Throughout the Defined Preference Period, there were significant "funding" cash flows between LBCS and LBHI, although the number of "funding" transactions per day

---

[53] LBCS's and LBSF's "funding" transactions for purposes of this ordinary course analysis were extracted from a separate custom intercompany report Duff & Phelps obtained from Barclays.  This report was limited to "funding" transactions but with no restrictions as to the dates.  *See* GCCM Funding transactions NEW.xls [LBEX-LL 3396885 to LBEX-LL 3406582].  Analysis of "quasi-funding" required subtracting the "funding" data from all GCCM-related journal entries for each entity.  That data was extracted from DBS.  *See* LBCS (0C11) GL Detail for GCCM entries for ordinary course.xlsx [LBEX-LL 3655400 to LBEX-LL 3655965]; LBSF (0059) GL Detail for GCCM entries for ordinary course 1-13-10.xlsx [LBEX-LL 3655966 to LBEX-LL 3658167].

[54]  Rather than using the usual front-end interface of GCCM, Duff & Phelps relied upon the custom intercompany report obtained from Barclays for this purpose.  *See supra* n. 38.  Although this report was only run through September 15, 2008, Duff & Phelps observed through the front-end user interface that there were no "Funding" transactions after September 12, 2008.

[55] Unfortunately, GSSR data was available only for the period beginning July 3, 2008.  *See* GSSR-GCCM comparison Database 2009-11-04 v1.xlsb [LBEX-AM 340340 to LBEX-AM 345848].  Nevertheless, for that time period, every LBCS funding payment recorded in GCCM was reconciled to the bank statements.  Funding activity recorded prior to July 3, 2008 could not be reconciled, but given that there was a 100% match between the payments recorded in GCCM and reconciled through GSSR for the majority of the time period at issue, Duff & Phelps found GCCM reliable as reflecting actual funding payments.

was only between one and seven per day. Of these, between zero and five transactions per day were Up-Funding transfers. At least one cash sweep occurred nearly every day, with the total dollar amount per day ranging widely, up to approximately $215 million.

As discussed above, limiting the universe of potential preferences to cash flows identified in GCCM by the source code of "funding" is complicated by Lehman's cash management system. One could conclude that potentially all debits to an affiliate's 1262000099 and 1262000911 accounts flowing through GCCM are potential preferences, despite the fact that Lehman's cash management system involved the use of many in-house/virtual accounts, and transfers of funds often did not involve the movement of real-world cash from one bank to another. For that reason, all debits flowing through GCCM, other than those labeled as "funding" in the source system column, were categorized as "quasi-funding" and considered in the alternative preference/new value analyses below.

The balances of potential preferences, net of new value, under the methodologies undertaken herein through September 30, 2008 are set forth the table below.[56]

---

[56] The time period of this preference analysis does not include October 1-3, 2008. Although GCCM data was available, DBS data was not available when this analysis was undertaken. Therefore, it was decided not to include GCCM data for October 2008 because the analysis would have been incomplete as DBS information was a critical part of the analysis. The following is the GCCM-related activity for October:

## LBCS
## Preference, Net of New Value, Balances ($)
### September 30, 2008

| Exhibit | Account | Up-Funding Preference Net of Down-Funding New Value | Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
|---|---|---|---|---|
| 4 | 1262000099 | 642,515,617 | 164,921,169 | 740,079,308 |
| 5 | 1262000911 | 0 | 0 | 0 |
| 6 | Combined | 642,515,617 | 14,919,678 | 633,128,085 |

These analyses are set forth in their entirety in the attached Exhibits 4-6. The following observations are apparent from the table above and the corresponding exhibits:

- Only the analyses related to intercompany account no. 1262000099, and for the combined accounts, produce a potential preference balance. Analysis of account 1262000911 alone does not yield any meaningful results, as there was no Up-Funding tied to that account.

- With respect to account 1262000911, the Quasi Funding activity was usually in the downward direction, meaning that any potential preferences from Net Quasi Up-Funding was subsequently netted by new value in the following days, ultimately leaving zero balances under all three approaches.

- The preference balances for the combined accounts approach is not simply the sum of the balances for the two individual account approaches. This is because, when the account activity is combined, excess new value from one account may be used to reduce a preference balance associated with another account. For that reason, the preference balance from the combined

| Date | GCCM Activity |
|---|---|
| October 1, 2008 | (168,341.79) |
| October 2, 2008 | (183,763.72) |
| October 3, 2008 | (538,912.63) |

approach will be lower than the sum of the balances under the two other approaches.

- For this particular entity, consideration of the Net Quasi Up-Funding as a potential preference has a significant effect on the preference balance. As seen in Exhibits 6, there is Net Quasi Up-Funding on 33 days throughout the Defined Preference Period, with the amount exceeding $100 million on six of those days. This activity had the effect of significantly increasing the preference balance throughout the Defined Preference Period.

The daily movement of these combined account balances based on DBS data is set forth in Exhibit 7. The daily movement of the potential preferences, net of new value, based on this methodology is attached as Exhibit 8.

### 2. Prior Course of Dealing with LBHI

LBCS's pattern of Up-Funding and Down-Funding with LBHI is set forth in the attached Exhibits 9-11, while LBCS's quasi-funding activity is illustrated in Exhibit 12.[57]

LBCS's total funding activity from April 5, 2007, when LBCS's funding transactions were first recorded in GCCM, through September 12, 2008, are broken down by dollar amount per month (Exhibit 9) and number of "funding" transactions per month (Exhibit 10). Each of these exhibits separates Up-Funding activity from Down-Funding activity. Exhibit 11 illustrates the average funding transaction amount per month.

Throughout the entire period under examination, there was not a consistent pattern as to the direction of the "funding" activity. There was a significant amount of Up-Funding and Down-Funding activity every month, in terms of both dollar amount

---

[57] The data for this analysis was extracted from GCCM and from DBS. *See* GCCM Funding transactions NEW.xls [LBEX-LL 3396885 to LBEX-LL 3406582]; LBCS (0C11) GL Detail for GCCM entries for ordinary course.xlsx [LBEX-LL 3655400 to LBEX-LL 3655965].

and number of transactions. As shown in Exhibit 9, the monthly funding activity, expressed in dollar amount, sometimes resulted in a net Up-Funding, while in other months there was a net Down-Funding. This pattern, or lack thereof, continued during the Defined Preference Period. In June and September 2008 there was net Down-Funding, but in July and August 2008 there was net Up-Funding. In this regard, there was no noticeable difference between the "funding" activity before and during the Defined Preference Period.

Overall, the extent of "funding" activity increased in the months during and immediately before the Defined Preference Period; however, this increased activity was in both directions and generally cancelled each other out. Exhibit 8 demonstrates that the number of "funding" transactions during May through August 2008 was approximately double the activity of some earlier months reviewed. Nevertheless, as noted above, the total net dollar amount involved in all of these transactions did not materially change. Exhibit 11 further shows that the average transaction amount did not materially change during the Defined Preference Period, and in the months where there was Up-Funding, the average amount was noticeably smaller than previous months.

LBCS's quasi-funding activity, as shown in Exhibit 12, shows a greater disparity in the level of activity beginning in March 2008. Prior to that time, the monthly amount of quasi-funding activity was a fraction of what it became in March and the months

thereafter. In particular, the Up-Funding more than doubled in May 2008 and remained at or above this level through August 2008. Because quasi-funding is based on GCCM activity, which was implemented over a period of time and was still not fully implemented even at the time of LBCS's bankruptcy, it is possible that the quasi-funding did not actually increase but would appear that it did due to greater activity being recorded in GCCM. Duff & Phelps has not investigated whether this is what happened.

## B. LBSF

### 1. Funding Activity and New Value

LBSF similarly had significant "funding" activity with LBHI throughout the relevant period. As with LBCS, the set of "funding" transactions beginning on June 1, 2008 were identified in GCCM and then reconciled with GSSR.[58] Throughout the Defined Preference Period, the number of "funding" transactions per day was between one and twelve per day. Of these, between zero and seven transactions per day were

---

[58] As was the case with LBCS, GSSR data relating to LBSF was available only for the period beginning July 3, 2008. *See* GSSR-GCCM comparison Database 2009-11-04 v1.xlsb [LBEX-AM 340340 to LBEX-AM 345848]. Nevertheless, for LBSF, every funding payment except for three – two of which were on September 12, 2008, the business day before LBHI's bankruptcy filing, and another in the amount of only $125 – could be traced to GSSR. These three payments were removed from the analysis. Funding activity recorded prior to July 3, 2008 could not be reconciled, but given that, for LBCS, there was a 100% match between the payments recorded in GCCM and reconciled through GSSR for the majority of the time period at issue, and that, for LBSF, there was a near 100% match, with all discrepancies being either insignificant or likely related to the impending bankruptcy filings and/or the condition of the entities at that late time, GCCM was found to be a reliable means for identifying actual "funding" payments for the portion of time GSSR data was not available.

Up-Funding transfers.  At least one such cash sweep occurred nearly every day, with the total dollar amount per day ranging widely, up to approximately $948 million.

Based on this data and other data derived from DBS, the same analysis undertaken above with respect to LBCS was constructed using LBSF data.  The balances of potential preferences, net of new value, under the methodologies undertaken herein are set forth in the table below:[59]

**LBSF**
**Preference, Net of New Value, Balances ($)**
**September 30, 2008**

| Exhibit | Account | Up-Funding Preference Net of Down-Funding New Value | Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
|---|---|---|---|---|
| 13 | 1262000099 | 3,773,000,144 | 682,009,859 | 2,407,243,419 |
| 14 | 1262000911 | 0 | 0 | 152,044,747 |
| 15 | Combined | 3,773,000,144 | 635,860,994 | 718,049,945 |

[59] As with LBCS, the time period of this preference analysis does not include October 1-3, 2008.  Although GCCM data was available, DBS data was not available when this analysis was undertaken.  Therefore, it was decided not to include GCCM data for October 2008 because the analysis would have been incomplete as DBS information was a critical part of the analysis.  The following is the GCCM-related activity for October:

| Date | GCCM Activity |
|---|---|
| October 1, 2008 | (1,670,144.10) |
| October 2, 2008 | (1,823,147.39) |
| October 3, 2008 | (5,349,424.17) |

These analyses are set forth in their entirety in the attached Exhibits 13-15. The following observations, some of which are identical to those noted with respect to LBCS, are apparent from the table above and the corresponding exhibits:

- LBSF's Up-Funding and Down-Funding were both substantial. Overall, the Down-Funding of $21.7 billion during the Defined Preference Period exceeded the Up-Funding of $19.4 billion during the same time. Nevertheless, nearly half of this Down-Funding occurred in June 2008. Thereafter, the Up-Funding exceeded the Down-Funding. The timing of these payments resulted in a potential preference balance of nearly $3.8 billion based on funding alone.

- Only the analyses related to intercompany account no. 1262000099, and for the combined accounts, produce a potential preference balance under the first two approaches. Analysis of account 1262000911 alone produces a potential preference balance only if Quasi Up-Funding is considered to be a potential preference, and even in that case only to the extent of $152 million.

- With respect to account 1262000911, the Quasi Funding activity in the downward direction on approximately half of the days, although the total Quasi Down-Funding of $20.8 billion throughout the Defined Preference Period was more than twice the $10.1 billion in Quasi Up-Funding. Nevertheless, under the approach that includes Quasi Up-Funding as a potential preference, there was still a potential preference balance at September 30, 2008. This was due to the increasing Quasi Up-Funding toward the end of the Defined Preference Period, which totaled $1.6 billion on and after August 29, 2008.

- Consideration of the Net Quasi Up-Funding as a potential preference has an effect on the preference balance based on analysis of either account individually or when combined; however, only where the activity is based on the 1262000099 account alone is that effect relatively significant. In that case, the potential preference balance is increased from $682 million to over $2.4 billion.

- The preference balances for the combined accounts approach is not simply the sum of the balances for the two individual account approaches. When the activity of the accounts is combined, excess new value from one account may be used to reduce a preference balance associated with another account.

For that reason, the preference balance from the combined approach will be lower than the sum of the balances under the two other approaches. In this case, that effect was significant. Potential new value from the 1262000911 account, arising out of more than $10 billion of net Quasi Down-Funding during the Defined Preference Period, substantially reduced the potential preference balance from $4.2 billion, based on the 1262000099 account alone, down to $718 million, under the combined approach.

The daily movement of these combined account balances based on DBS data is set forth in Exhibit 16. The daily movement of the potential preferences, net of new value, based on this methodology is attached as Exhibit 17.

### 2. Prior Course of Dealing with LBHI

LBSF's pattern of Up-Funding and Down-Funding with LBHI is set forth in the attached Exhibits 18-20, while LBSF's quasi-funding activity is illustrated in Exhibit 21.[60] LBSF's total funding activity from June 9, 2006, when LBSF's funding transactions were first recorded in GCCM, through September 12, 2008, are broken down by dollar amount per month (Exhibit 18) and number of "funding" transactions per month (Exhibit 19). Each of these exhibits separates Up-Funding activity from Down-Funding activity. Exhibit 20 illustrates the average funding transaction amount per month.

Throughout the entire period under examination, as with LBCS, there was not a consistent pattern as to the direction of LBSF's "funding" activity. As shown in Exhibit 13, the monthly funding activity, expressed in dollar amount, sometimes resulted in a

---

[60] The data for this analysis was extracted from GCCM and from DBS. *See* GCCM Funding transactions NEW.xls [LBEX-LL 3396885 to LBEX-LL 3406582]; LBSF (0059) GL Detail for GCCM entries for ordinary course 1-13-10.xlsx [LBEX-LL 3655966 to LBEX-LL 3658167].

net Up-Funding, while in other months there was a net Down-Funding, and no pattern is evident, including during the Defined Preference Period. Also similar to LBCS, in June and September 2008 there was net Down-Funding, but in July and August 2008 there was net Up-Funding. In this regard, there was no noticeable difference between the "funding" activity before and during the Defined Preference Period.

Like LBCS, the monthly funding activity for LBSF, both in terms of dollar amount and number of transactions, increased over time, but for LBSF this trend began significantly earlier, in mid-2007, and the total monthly funding amount actually decreased in July and August as compared to the previous eleven months. Moreover, Up-Funding as compared to Down-Funding also did not noticeably change at any point during the Defined Preference Period. Only in August was there a somewhat noticeable decline in Down-Funding, but the Up-Funding in that month remained at a relatively modest level for this entity – lower than most months in the previous year. Exhibit 15 further shows that the average funding transaction amount did not materially change during the Defined Preference Period, and in the months where there was Up-Funding, the average transaction amount was relatively small.

Unlike LBCS, LBSF's quasi-funding activity during the Defined Preference Period was consistent with that of the previous year and a half, as shown in Exhibit 21. Neither the Quasi Up-Funding nor the Quasi Down-Funding reflected unusual levels of

activity during the Defined Preference Period, as compared with the prior months under examination.

### C. LCPI

#### 1. Funding Activity and New Value

LCPI was funded through MTS, because its primary bank account was tied to that system.[61]  As discussed above, these transactions were not real repos and contained no actual security.[62]  Through searches of Lehman's APB system, which contains all trading data contained in MTS, TMS (Lehman's U.S.-based system for equity transactions involving LBI, which acted as the registered broker-dealer), ITS (international system for non-U.S. trades of both fixed-income and equity transactions), GL1 (U.K.-based system for stock and loan transactions) and CDY (commodities and foreign exchange transactions, also known as RISC), all "Trust 89" and "Trust 86" transactions involving LCPI and LBHI beginning from June 1, 2007 have been identified.  Duff & Phelps's observations are as follows:

##### a) "Trust 89"

Trust 89 transactions were generally recorded, from LCPI's perspective, as a repo.  (From LBHI's perspective, these same transactions were recorded as reverse-repos.)  These transactions purportedly consisted of two legs – a "sell" and then a

---

[61] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 7.
[62] *See supra* discussion accompanying n. 46.

"buy." Through the "sell," LCPI would receive funds from LBHI; through the "buy," LCPI would remit funds back to LBHI.

The Trust 89 transactions observed between LCPI and LBHI during the Defined Preference Period are listed in Exhibit 22. These transactions generally fall into two categories. One set of Trust 89s was in the range of $168 million to $330 million. When entering into these particular repos with LBHI, LCPI would also enter into reverse repos with Bankhaus for the same amounts and on the same dates and terms. This class of Trust 89s generally stayed open for approximately one week before being replaced with another identical or very similar repo that would open on the same day that the previous repo would close. The entities would book both the "sell" and "buy" legs at the same time, with the "sell" to settle that same day and the "buy" to always settle on December 31, 2014. Then, several days or a week later, the entities would replace the "buy" leg with a new "buy" leg, with identical terms as the former except that the settlement date would be altered to the present date. With that position closed, the entities would enter into a new Trust 89 repo on the same day, again with the "buy" booked to settle on December 31, 2014. The pattern would continue in that manner. Through this mechanism, there was always an open repo at the end of any given date. The amount for the new repo was usually identical to the previous; occasionally, it would be in a different amount. Because these repos were opened for approximately one week, only eighteen such transactions were recorded during the Defined Preference

Period.  The amount of the open position changed only twice.  The open position was $300 million as of June 1, 2008, increasing to $330 million on August 12, 2008, and decreasing to $168 million on August 26, 2008.  The final such transaction was booked on September 12, 2008, but only the "sell" leg settled.  The "buy" leg remained outstanding at the time of its bankruptcy filing.

The more significant set of Trust 89 transactions, in terms of both size and number of transactions, is between LCPI and the Lehman Capital Division of LBHI.[63] Throughout the relevant time period, the amount of these transactions ranged up to approximately $3 billion.  These particular repos appear to have been set up initially without a close date, but then the "buy" leg would be replaced typically after only one business day, to settle on that same date.  On August 8, 2008, these repos changed to being reverse repos from LCPI's perspective.

Exhibit 23 demonstrates LCPI's daily outstanding positions associated with its Trust 89, along with its Trust 86, transactions with LBHI beginning June 1, 2007, thus covering a full year prior to the Defined Preference Period as well.  The peak of LCPI's Trust 89 outstanding positions during this period, in the amount of $3.2 billion, was actually the starting point, June 1, 2008.  The following day, this outstanding amount

---

[63] The MTS data made reference to "LB Holdings/LCD" and "Lehman Capital, Division of."  This last description, listed as the counterparty to certain trades with LCPI, appears to be a truncation of a longer name.  These descriptions refer to "Lehman Capital Division," which is a division of LBHI.  *See* Email from Inessa Grinn, Barclays to Cole Morgan, Duff & Phelps, *et al.*, Jan. 5, 2010.  Accordingly, the Trust 89 transactions involving LCPI and this entity are included in the LCPI/LBHI analysis.

fell immediately to $1.1 billion and remained below $2 billion thereafter. On August 8, LCPI's position with respect to LBHI changed dramatically when it began entering into reverse repos with LBHI instead of repos, suggesting that LCPI's Trust 89 repo position as to LBHI was completely wiped out. Ultimately, LCPI had a Trust 89 reverse repo position with respect to LBHI at the time of LBHI's bankruptcy filing, in the amount of nearly $5.2 billion.

Duff & Phelps has not been able to identify any movements of cash associated with Trust 89 transactions. No Trust 89 transactions were located in TWS.[64] It is believed that the cash transfers were made through Lehman's FPS system, which was tied to MTS in some manner.[65] FPS is a system to which Duff & Phelps has not been provided access.

### b) "Trust 86"

LPCI's Trust 86 transactions with LBHI throughout the Defined Preference Period are listed in Exhibit 24. These transactions operated similarly to the Trust 89 transactions but with some differences. First, the transactions were typically in substantially larger amounts, with most being between $12 billion and $16 billion. Some were substantially smaller, however, ranging from mere hundreds of millions of

---

[64] Duff & Phelps was given very limited access to the live version of TWS. Accordingly, Duff & Phelps could only search for transactions by TWS Reference ID number, which was only helpful in the rare instances where that number was already known. Subsequently, Barclays provided Duff & Phelps with an Excel report downloaded from TWS, allowing for greater search capabilities. *See* DP_Data.xlsm [LBEX-BAR 000438 to LBEX-BAR 001101]. The TWS searches discussed in this Appendix with regard to Trust 89 and Trust 86 transactions are based on searches of this report.

[65] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 6.

dollars to approximately $1.2 billion, but these appear to be supplemental transactions. Second, most of the Trust 86 transactions were booked to settle, and did settle, within one business day. However, a subset of these transactions was booked in a more "open" manner, such that the transactions were booked to close on December 31, 2008 (*i.e.* the "buy" leg of the repo was scheduled to settle on that date), and then approximately two weeks later, Lehman would replace the "buy" leg with one that would settle on that date instead. Overall, there were 148 Trust 86 transactions that were opened and/or settled during the Defined Preference Period. Of these, three such transactions, totaling approximately $3.4 billion, remained open when LBHI and LCPI filed for bankruptcy.

With limited exception, all of the Trust 86 transactions that were booked to open and close within one business day have been located in TWS; however, none of the Trust 86 transactions that were initially booked to settle on December 31, 2008, and then re-booked approximately two weeks later to settle at that point instead, has been found in TWS. It is unclear how those particular Trust 86 transactions are different from the others, and why, on a categorical basis, one set can be found in TWS while the other set cannot.

LCPI's daily outstanding position to LBHI associated with Trust 86 is set forth in the attached Exhibit 23. LCPI's total outstanding Trust 86 position as to LBHI gradually increased from June 1 to August 14, 2008, when it reached a peak of $22.9 billion. On

September 12, 2008, this total open position was $18.7 billion, after entering into a new transaction with a notional amount of $15.3 billion. Although this last Trust 86 transaction was closed out according to its terms on September 15, 2008 and was not followed with another, Duff & Phelps has seen no evidence that the sum of $15.3 billion was ever remitted back to LBHI (as would normally be the case with a real repo). Duff & Phelps has been informed that these transactions would close out automatically in MTS, regardless of whether funds were actually transferred, and that the funds transfer still had to be manually authorized by the Treasury Department.[66] It is therefore likely that LCPI's final Trust 86 open position with respect to LBHI, on the dates of LBHI's and LCPI's bankruptcy filings, remained at $18.7 billion, despite the fact that this final Trust 86 transaction settled.

Duff & Phelps has had limited success tracing funds transfers related to these particular Trust 86 transactions. For all Trust 86 payments that have been identified, the transfers were between an LCPI account at Citibank, no. 40615659, and an LBHI account at Citibank, no. 40615202. Using the TWS Reference IDs associated with the Trust 86s that were found in TWS, as discussed above, Duff & Phelps was able to trace some of these transactions into GCCM and ultimately to GSSR, confirming the payment with bank statement data. The dollar amount reflected in the GCCM record does not correlate with the notional amount of the purported trade, as referenced in the TWS

---

[66] *Id.* at 7.

record.  Duff & Phelps understands that data would flow from TWS into GCCM and would be captured in a "pre-settlement" function, where the transaction was netted with other transactions.[67]  Ultimately, payments were made in "net" amounts of those transactions.  Duff & Phelps has, in fact, observed payments reflected in GCCM and GSSR that equate to the "net" amounts of the notional amounts of the "repos" closed and opened on that particular day, factoring in the interest paid on the Trust 86 "repo" closing out on that day.  For example, on September 12, 2008, when one Trust 86 in the amount of $16.15 billion was closed, and another in the amount of $15.277 billion was opened, a cash payment, as reflected in both GCCM and GSSR, was made in the amount of $874,060,404.51.[68]  When the interest on the $16.15 billion Trust 86, which amounts to $1,060,404.51 as stated in the TWS record,[69] is included in this netting, the cash payment reconciles perfectly with these transactions.

Duff & Phelps undertook the same analysis for other Trust 86 transactions, focusing on the month prior to September 12, 2008, but was able to reconcile the transactions with GCCM and GSSR records in only limited instances.  One problem noted is Lehman's apparent reluctance to make cash transfers in excess of $1 billion (although, at times, such transfers were made), resulting in some transfers being split

---

[67] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 7.
[68] GCCM Records for TWS Ref ID 185955H [LBEX-LL 2408921 to LBEX-LL 2408925]; TWS Records for TWS Ref ID 185955H [LBEX-LL 3406736 to LBEX-LL 3406739]; TWS Records for TWS Ref ID 186007H [LBEX-LL 3406743 to LBEX-LL 3406746]; GSSR-GCCM comparison Database 2009-11-04 v1.xlsb [LBEX-AM 340340 to LBEX-AM 345848].
[69] TWS Records for TWS Ref ID 185955H [LBEX-LL 3406736 to LBEX-LL 3406739].

between multiple cash payments, making it more difficult to trace the cash transactions. For example, on August 29, 2008, the net change in certain Trust 86 open positions was $1.116 billion, and Duff & Phelps was able to locate two payments in the amounts of $900 million and $104,065,215.63, which, when the recorded interest of $1,065,215.63, related to the positions being closed on that date, is included in the netting, reconciles perfectly.[70] Duff & Phelps obtained a download of data from the "pre-settlement" function in GCCM, which Duff & Phelps understands requires a significant effort in linking recorded transactions to specific payments but potentially could allow additional cash payments arising out of these transactions to be traced.[71]

### c) Other

The Examiner has considered whether funds arising out of capital infusions and remitted to LBHI from LCPI or on LCPI's behalf may constitute a preference. Accordingly, as described in the Examiner's Report, Duff & Phelps has identified all transfers of $900 million on August 28 and 29, 2008. Those payments are set forth in Exhibit 25.[72]

---

[70] GCCM Records for TWS Ref ID 185327H [LBEX-LL 2408886 to LBEX-LL 2408895]. This was the result of two Trust 86 transactions in the amounts of $16.155 million and $450 million (a reverse repo) closing on August 29, 2008 and another Trust 86 transaction in the amount of $14.702 million opening on August 29, 2008. TWS Records for TWS Ref ID 185327H [LBEX-LL 3406666 to LBEX-LL 3406669]; TWS Records for TWS Ref ID 185358H [LBEX-LL 3406670 to LBEX-LL 3406673]; TWS Records for TWS Ref ID 185395H [LBEX-LL 3406674 to LBEX-LL 3406677].

[71] MikePreSettlement2.xlsx [LBEX-LL 3356611 to LBEX-LL 3357411].

[72] Various GCCM Records [LBEX-LL 3396835 to LBEX-LL 3396884]; TWS Records for TWS Ref ID 185225H [LBEX-LL 3406662 to LBEX-LL 3406665]; TWS Records for TWS Ref ID 185212H [LBEX-LL 3406658 to LBEX-LL 3406661]; TWS Records for TWS Ref ID 185327H [LBEX-LL 3406666 to LBEX-LL

## 2. Prior Course of Dealing with LBHI

Trust 86 and Trust 89 transactions with LBHI were not new transactions for LCPI during the Defined Preference Period. To the contrary, both types of transactions had been entered into by LCPI and LBHI for at least a year prior to this time frame, although Duff & Phelps did not investigate the length of time in which these parties had been engaging in them. Exhibit 23 illustrates the combined Trust 86 and Trust 89 outstanding positions between LBHI and LCPI beginning June 1, 2007 – a full year prior to the Defined Preference Period.

---

3406669]; TWS Records for TWS Ref ID 185358H [LBEX-LL 3406670 to LBEX-LL 3406673]; TWS Records for TWS Ref ID 185395H [LBEX-LL 3406674 to LBEX-LL 3406677].

**Preferences Against Other Lehman Entities**

**[Bullet Four of Examiner Order]**[73]

## I.       Methodology

Bullet four of the Examiner Order directs the Examiner to investigate potential preference payments that were made by LBHI Affiliates to other Lehman entities. Summarized below is the methodology undertaken to identify such potential preferences.

### A.       Relevant Entities and Relationships

As with bullet three of the Examiner Order, Duff & Phelps has focused on preferential transfers from only three debtors:  LBCS, LBSF and LCPI.  However, unlike bullet three, there is a much larger population of potential intercompany relationships. Each of the three relevant LBHI Affiliates did not maintain an intercompany relationship with every single Lehman entity, but the list of intercompany accounts for each of the relevant LBHI Affiliates is extensive.

### B.       Relevant Time Period

As discussed above with respect to bullet three of the Examiner Order, the time period analyzed consists of the approximately four-month period from June 1 to the date of the bankruptcy filing for each of the relevant LBHI Affiliates, which is October 3,

---

[73] The following are the Lehman systems (along with Lehman's description of these systems) that were relied upon in the analysis herein:   DBS (*see* DBS Global General Ledger Overview powerpoint presentation [LBEX-LL 766023]); MTS (*see* Lehman Live description of MTS [LBEX-LL 3396037]); APB (*see* Lehman Live description of APB [LBEX-LL 3396042]); TWS (*see* Lehman Live description of TWS [LBEX-LL 2228241]); GSSR (*see* Lehman Live description of GSSR [LBEX-LL 3396041]); and GCCM (*see* Lehman Live description of GCCM [LBEX-LL 3356455]).

44

2008 for LBCS and LBSF, and October 5, 2008 for LCPI.  This is referred to as the "Defined Preference Period."  The problems discussed above, with respect to the data from September and October 2008, exist here as well.

### C.      Identification of Potential Preferences

Daniel Fleming stated in an interview that Lehman Affiliates did not "fund" each other.[74]  Despite these statements, Duff & Phelps searched for potential preferences under three approaches:  1) review of DBS data related to certain intercompany accounts; 2) searches in GCCM; and 3) searches in Lehman's MTS trading system for Trust Receipts involving LBCS, LBSF and LCPI.  The results of these approaches are discussed below.

## II.     Preference Analysis for the LBHI Affiliates

### 1.      DBS Approach

Several analyses to identify potential preferences were undertaken.  First, Duff & Phelps investigated general ledger activity of certain intercompany accounts for transactions that may constitute potential preferences.  This was done through examination of Lehman's DBS data.  Because of the very large number of intercompany relationships, it was decided that Duff & Phelps would search for potential preferences by first examining the intercompany accounts and their month-end balances and then investigating the account activity in months where there were swings in the month-end

---

[74] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 2.

balances of at least $100 million. Duff & Phelps limited the review to those intercompany accounts of LBCS, LBSF and LCPI that had credit balances (implying an antecedent debt owed by these entities to other affiliates) and where the month-end balance reflected a net debit change of at least $100 million from one month to the next. This task did not produce meaningful results for several reasons. The journal entries themselves were not descriptive enough to gain an understanding of the underlying transactions, necessitating a much more detailed investigation of the accounting personnel who recorded the entries and possibly of operational personnel who could explain the transactions themselves.[75] Such a lengthy and arduous procedure, coupled with the unavailability of many Lehman personnel who would be needed to describe the underlying transactions, rendered this approach completely ineffective, and Duff & Phelps abandoned such efforts.

### 2. GCCM "Funding" Data

Second, Duff & Phelps looked to GCCM for potential funding activities; however, Duff & Phelps was unable to identify any potential preferences through that approach either. Searches in GCCM during the Defined Preference Period have not revealed any "funding" activity between affiliates. As seen above with respect to bullet three of the Examiner Order, Lehman's practice was to have LBHI fund the affiliates

---

[75] In addition, many of the journal entries were merely source feeds from trading systems, and the detail of those transactions would need to be investigated through those trading systems themselves, which in itself would be a difficult task given the amount of data available through those means and the fact that customers were recorded by code rather than name.

through a concentrated cash management system.[76]  Accordingly, it is likely that there were no intercompany preferences from affiliate to affiliate, based on the analytical framework adopted under the analysis described above in the analysis of bullet three of the Examiner Order.[77]

### 3. Trust Receipts in MTS

Finally, Duff & Phelps looked for potential preferences in Lehman's trading systems.  As discussed at length above, Lehman's MTS system was a means by which some of the Lehman entities recorded funding transactions.  MTS was the system in which Lehman recorded Trust 86, Trust 89 and other similar Trust Receipts.[78]  These Trust transactions were structured in the form of repos, but the Trust Receipts did not constitute actual security for these purported trades and appeared to be related to funding.[79]  Nevertheless, Duff & Phelps has had difficulty ascertaining the purpose of these various Trust Receipts, as well as the manner in which they were transacted, in particular the movement of cash, which could be significant to a preference analysis.

Searches of MTS data have verified that LBCS and LBSF did not enter into any Trust 86, Trust 89 or other such Trust trades with any affiliates.  Each did, however,

---

[76] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at pp. 2-4.
[77] GCCM does reflect intercompany transactions between affiliates sourced to other systems, as ASAP, LOANIQ and TWS.  As discussed above with respect to bullet three of the Examiner Order, all such intercompany transactions in GCCM that were not identified as "Funding" were classified as "Quasi Funding."  Potentially, GCCM does reflect such quasi funding activities between affiliates, but due to its uncertain nature, Duff & Phelps did not quantify such activity.
[78] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at pp. 6-7.  The data relating to Trust 89 and Trust 86 transactions was extracted from APB and MTS.  *See supra* n. 42.
[79] *Id.*; *see also* discussion *supra* accompanying nn. 41-50.

enter into one type of Trust Receipt, with one counterparty each, during the Defined Preference Period.[80]  LBCS entered into at least one Trust 71 transaction with Champion Energy Marketing.  The "Security Description" provided by Barclays for Trust 71 is "WHOLE LOAN FUNDING."[81]  LBSF entered into at least one Trust 24 transaction with 7th Avenue, Inc.  The "Security Description" provided by Barclays for Trust 24 is "GIC DEAL (T),"[82] which is unknown to Duff & Phelps.  The details of these transactions, including number of transactions and the dollar amount, have not been investigated.

LCPI, on the other hand, entered into extensive Trust Receipt activity, as illustrated in part by the discussions of Trust 89 and Trust 86 above.  A list of all the Trust Receipts entered into by LCPI, along with the counterparties by Trust Receipt, is attached hereto as Exhibit 26.  Other than Trust 86 and Trust 89 activity, little is known about the details of these Trust Receipt transactions, including the number of transactions and dollar amount.  These Trust Receipts have not been investigated.

---

[80] The data relating to these additional Trust Receipts was extracted from MTS.  *See* Various Trusts 71-29-24-61-32-15-01 6-1-2007 to 10-3-2008.xlsx [LBEX-LL 3637043 to LBEX-LL 3637589].

[81] Email from Richard Policke, Barclays to Christopher McShea, Duff & Phelps, et al., Dec. 22, 2009.

[82] *Id.*

Exhibit 1

## LBCS/LBHI Unconsolidated Intercompany Accounts

| | General Ledger (2008) | | | | | Bankruptcy Schedules | |
|---|---|---|---|---|---|---|---|
| **LBCS Accounts with LBHI** | September | August | July | June | May | Filed by LBCS (10/3/08) | |
| 1108400099 | $661,678,601 | $650,708,731 | $674,946,307 | $680,880,382 | $658,230,038 | | |
| 1252000099 | ($5,942,519) | ($5,942,519) | ($5,930,199) | ($5,917,865) | ($5,906,336) | Receivables | |
| | | | | | | IC Derivative Receivable | $661,678,601 |
| 1262000099 (less 91J consol.) | ($1,826,164,488) | ($1,918,839,335) | ($2,196,053,511) | ($2,581,509,957) | ($1,954,416,309) | | |
| 1262000099 (on 91J books) | $2,754,725 | $2,713,391 | $2,766,820 | $2,674,846 | $2,536,915 | | |
| 1262000099 (consolidated) | ($1,823,409,763) | ($1,916,125,944) | ($2,193,286,691) | ($2,578,835,111) | ($1,951,879,394) | | |
| | | | | | | Payables | |
| 1262000911 (less 91F & 91J consol.) | ($589,999,146) | ($554,791,606) | ($574,643,073) | ($529,026,461) | ($277,565,308) | IC Securities Rec/Pay | ($5,942,519) |
| 1262000911 (on 91F books) | ($115,023,578) | ($100,987,265) | ($75,196,399) | ($37,536,573) | ($11,990,560) | IC Receivable/Payable | ($2,530,783,976) |
| 1262000911 (on 91J books) | ($24,096) | ($22,587) | ($26,189) | ($27,958) | ($31,039) | | |
| 1262000911 (consolidated) | ($705,046,820) | ($655,801,458) | ($649,865,660) | ($566,590,993) | ($289,586,906) | | |
| 2108400099 | $0 | $0 | $0 | $0 | $0 | | |
| **Total** | ($1,872,720,501) | ($1,927,161,190) | ($2,174,136,243) | ($2,470,463,587) | ($1,589,142,598) | **Total** | ($1,875,047,894) |
| **LBHI Accounts with LBCS** | September | August | July | June | May | Filed by LBHI (9/15/08) | |
| 1108400C11 | ($687,947,347) | ($687,947,347) | ($688,749,307) | ($681,643,656) | ($681,643,656) | | |
| 1252000C11 | $5,942,519 | $5,942,519 | $5,930,199 | $5,917,865 | $5,906,336 | Receivables | |
| | | | | | | IC Receivable | $2,600,024,927 |
| 1262000C11 (less 0911 consol.) | $1,893,866,337 | $1,918,839,335 | $2,196,053,512 | $2,581,509,957 | $1,954,416,310 | IC Securities Related Rec | $5,948,013 |
| 1262000C11 (on 0911 books) | $589,999,146 | $554,791,606 | $574,643,072 | $529,026,461 | $277,565,308 | | |
| 1262000C11 (consolidated) | $2,483,865,483 | $2,473,630,941 | $2,770,696,584 | $3,110,536,418 | $2,231,981,618 | | |
| | | | | | | Payables | |
| 2108400C11 | $2,693,637 | $37,238,619 | $13,802,999 | $763,274 | $23,413,618 | IC Receivable/Payable | ($70,719,579) |
| | | | | | | IC Derivative Receivable | ($661,678,601) |
| 126200091F (less 0911 consol.) | ($0) | ($0) | $0 | ($0) | $0 | | |
| 126200091F (on 911 books) | $115,023,578 | $100,987,265 | $75,196,399 | $37,536,573 | $11,990,560 | | |
| 126200091F (consolidated) | $115,023,578 | $100,987,265 | $75,196,399 | $37,536,573 | $11,990,560 | | |
| 126200091J (less 0911 consol.) | ($2,754,725) | ($2,713,391) | ($2,766,820) | ($2,674,846) | ($2,536,916) | | |
| 126200091J (on 911 books) | $24,096 | $22,587 | $26,189 | $27,958 | $31,039 | | |
| 126200091J (consolidated) | ($2,730,629) | ($2,690,804) | ($2,740,631) | ($2,646,888) | ($2,505,877) | | |
| **Total** | $1,916,847,241 | $1,927,161,193 | $2,174,136,243 | $2,470,463,586 | $1,589,142,599 | **Total** | $1,873,574,760 |

Source: DBS, Bankruptcy Schedules on Docket

Exhibit 2

## LBSF/LBHI Unconsolidated Intercompany Accounts

| General Ledger (2008) | | | | | | Bankruptcy Schedules | |
|---|---|---|---|---|---|---|---|
| **LBSF Accounts with LBHI** | September | August | July | June | May | Filed by LBSF (filed 10/3/08) | |
| 1108400099 | $0 | $20,759,318 | $27,318,396 | $5,756,250 | $5,455,477 | | |
| 1108400911 | $0 | ($1) | ($1) | ($1) | $0 | Receivables | |
| 1248000099 | ($1) | ($1) | ($1) | ($1) | ($1) | IC Receivable/Payable | $62,702 |
| 1262000099 | ($21,268,958,908) | ($18,949,155,149) | ($21,769,075,724) | ($17,482,474,364) | ($14,203,956,270) | Payables | |
| 1262000911 | $5,434,216,675 | $7,637,882,268 | $10,072,069,120 | $6,445,150,644 | $6,649,188,359 | IC Receivable/Payable | ($15,834,742,233) |
| | | | | | | IC Derivative Payable | ($3,647,239,958) |
| 2108400099 | ($2,315,325,527) | ($1,924,829,842) | ($1,293,516,353) | ($1,438,708,425) | ($1,322,492,094) | IC Derivative Payable | ($19,427,460) |
| 2108400911 | ($1,331,914,431) | ($2,506,956,657) | ($3,365,848,023) | ($3,352,905,200) | ($3,249,311,265) | | |
| 2605000099 | $0 | $0 | $25,912 | ($14,517) | ($58,445) | | |
| **Total** | ($19,481,982,192) | ($15,722,300,064) | ($16,329,026,674) | ($15,823,195,614) | ($12,121,174,239) | **Total** | ($19,501,346,949) |
| **LBHI Accounts with LBSF** | September | August | July | June | May | Filed by LBHI (9/15/08) | |
| 1108400059 | $7,750,181 | $4,463,896,162 | $4,631,211,906 | $4,787,413,647 | $4,565,717,752 | | |
| 1248000059 | $62,414 | $11,183 | $30,231 | $19,356 | $8,522 | Receivables | |
| | | | | | | IC Derivative Receivable | $1,544,848,639 |
| 1262000059 (less 0911 consol.) | $21,833,233,283 | $18,949,155,585 | $21,769,076,183 | $17,482,474,827 | $14,203,956,725 | IC Derivative Receivable | $1,762,019,805 |
| 1262000059 (on 0911 books) | ($5,332,592,384) | ($7,637,882,704) | ($10,072,069,579) | ($6,445,151,107) | ($6,649,188,814) | IC Interest Receivable | $10,759 |
| 1262000059 (consolidated) | $16,500,640,899 | $11,311,272,881 | $11,697,006,604 | $11,037,323,720 | $7,554,767,911 | IC Receivable/Payable | $15,636,933,675 |
| 2108400059 | $0 | ($72,632,710) | ($1,714,286) | ($1,750,000) | ($1,785,714) | Payables | |
| | | | | | | IC Receivable/Payable | ($663,650,372) |
| | | | | | | IC Derivative Payable | ($212,921,833) |
| **Total** | $16,508,453,494 | $15,702,547,516 | $16,326,534,455 | $15,823,006,723 | $12,118,708,471 | **Total** | $18,067,240,673 |

Source: DBS, Bankruptcy Schedules on Docket

**Exhibit 3**

**LCPI/LBHI Unconsolidated Intercompany Accounts**

| General Ledger (2008) | | | | | | Bankruptcy Schedules | |
|---|---|---|---|---|---|---|---|
| **LCPI Accounts with LBHI** | September | August | July | June | May | Filed by LCPI (filed 10/3/08) | |
| **1152000099** | $5,562,372,836 | $13,475,662,417 | $12,961,090,983 | $13,586,824,049 | $16,068,460,333 | | |
| **1248000099** | ($32,047,687) | ($32,047,687) | ($36,903,335) | ($141,971,156) | ($163,844,991) | Receivables | |
| **1252000099** | $35,079,826 | $35,079,826 | $94,882,719 | $94,685,366 | $94,500,908 | IC Receivable | $166,009,126 |
| | | | | | | IC Rev Repos | $5,562,372,836 |
| **1262000099** (less 0929 consol.) | ($17,507,972,596) | ($16,891,518,089) | ($23,318,582,990) | ($25,292,279,000) | ($26,924,913,655) | IC Securities Related Rec/Pay | $35,079,826 |
| **1262000099** (on 0929 books) | ($100,042,515) | ($100,042,846) | ($85,534,778) | ($85,357,142) | ($85,190,671) | | |
| **1262000099** (consolidated) | ($17,608,015,111) | ($16,991,560,935) | ($23,404,117,768) | ($25,377,636,142) | ($27,010,104,326) | Payables | |
| | | | | | | IC Interest Receivable | ($32,047,687) |
| **1262000911** (less 0929 consol.) | ($1,544,515,652) | ($1,717,106,259) | ($1,793,424,997) | ($1,966,090,145) | ($1,832,681,866) | IC Interest Payable | ($7,474,802) |
| **1262000911** (on 0929 books) | ($2,441,889,011) | ($2,513,079,421) | ($3,130,904,807) | ($3,558,953,399) | ($6,327,084,445) | IC Payable | ($21,567,586,359) |
| **1262000911** (consolidated) | ($3,986,404,663) | ($4,230,185,680) | ($4,924,329,804) | ($5,525,043,544) | ($8,159,766,311) | IC Payable | ($2,275,102) |
| **2102000099** | $0 | ($3,484,875,317) | ($6,498,733,922) | ($3,349,571,030) | ($3,379,112,030) | | |
| **2605000099** | ($7,474,802) | ($6,655,391) | ($2,028,578) | ($9,570,468) | ($9,674,150) | | |
| **Total** | ($16,036,489,601) | ($11,234,582,767) | ($21,810,139,705) | ($20,722,282,925) | ($22,559,540,567) | **Total** | ($15,845,922,162) |
| **LBHI Accounts with LCPI** | September | August | July | June | May | Filed by LBHI (9/15/08) | |
| **1152000045** | $3,483,008,087 | $3,484,854,287 | $6,498,712,722 | $3,349,550,000 | $3,379,091,000 | | |
| **1209000045** | $10,327,629,903 | $0 | $0 | $0 | $0 | Receivables | |
| **1248000045** | $2,616,876 | $38,750,550 | $38,994,049 | $151,605,178 | $166,361,369 | IC Interest Receivable | $38,612,113 |
| **1252000045** | ($35,079,826) | ($35,079,826) | ($94,882,719) | ($94,685,366) | ($94,500,908) | IC Receivable/Payable | $21,270,194,792 |
| | | | | | | IC Rev Repos | $3,469,101,704 |
| **1262000045** (less 0911 consol.) | $13,805,887,584 | $16,891,518,088 | $23,318,582,991 | $25,292,279,000 | $26,924,913,655 | | |
| **1262000045** (on 0911 books) | $1,538,707,915 | $1,717,106,259 | $1,793,424,997 | $1,966,090,145 | $1,832,681,866 | Payables | |
| **1262000045** (consolidated) | $15,344,595,499 | $18,608,624,347 | $25,112,007,988 | $27,258,369,145 | $28,757,595,521 | IC Repots | ($13,007,532,519) |
| | | | | | | IC Securities Related Rec/Pay | ($35,120,277) |
| **2102000045** | ($79,958,675) | ($13,475,662,415) | ($12,961,090,984) | ($13,586,824,048) | ($16,068,460,333) | Trade - Related Payables | ($11,938,765) |
| **2209000045** | ($23,255,894,971) | | | | | | |
| **2605000045** | ($2,333) | ($16,479) | ($14,389) | | | | |
| **1262000929** (less 0911 consol.) | $100,042,515 | $100,042,846 | $85,534,778 | $85,357,142 | | | |
| **1262000929** (on 0911 books) | $2,441,889,011 | $2,513,079,421 | $3,130,904,807 | $3,558,953,399 | | | |
| **1262000929** (consolidated) | $2,541,931,527 | $2,613,122,267 | $3,216,439,585 | $3,644,310,541 | $6,412,275,115 | | |
| **Total** | $8,328,846,087 | $11,234,592,731 | $21,810,166,252 | $20,722,325,450 | $22,552,361,764 | **Total** | $11,723,317,048 |

Source: DBS, Bankruptcy Schedules on Docket

**Exhibit 4**

LBCS Preference/New Value Analysis
Account 1262000099

| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Model 1: Up-Funding Preference Net of Down-Funding New Value | Model 2: Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
|---|---|---|---|---|---|---|---|---|---|---|
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| June 1, 2008 | (1,951,879,394) | - | - | - | - | (2,536,915) | (1,954,416,309) | - | - | - |
| June 2, 2008 | (1,954,416,309) | 88,000,000 | (42,200,000) | - | (8,213,791) | (28,037) | (1,916,858,137) | 88,000,000 | 88,000,000 | 88,000,000 |
| June 3, 2008 | (1,916,858,137) | 4,800,000 | (20,000,000) | - | (64,762,295) | (28,177) | (1,996,848,608) | 72,800,000 | 8,009,528 | 8,009,528 |
| June 4, 2008 | (1,996,848,608) | 31,900,000 | (60,000,000) | 4,939 | - | (28,077) | (2,024,971,746) | 44,700,000 | 31,900,000 | 31,900,000 |
| June 5, 2008 | (2,024,971,746) | 1,849,548 | (36,000,000) | - | (94,193) | (27,905) | (2,059,244,297) | 10,549,548 | 1,849,548 | 1,849,548 |
| June 6, 2008 | (2,059,244,297) | 45,663,920 | (2,168,619) | - | (5,720,396) | (82,916) | (2,021,552,307) | 54,044,850 | 45,663,920 | 45,663,920 |
| June 9, 2008 | (2,021,552,307) | 43,000,000 | (45,228,076) | - | (2,181,438) | (27,289) | (2,025,989,110) | 51,816,773 | 43,000,000 | 43,000,000 |
| June 10, 2008 | (2,025,989,110) | 52,745,607 | (52,040,000) | - | (4,353,854) | (27,160) | (2,029,664,517) | 52,745,607 | 52,745,607 | 52,745,607 |
| June 11, 2008 | (2,029,664,517) | 8,778,137 | (14,200,000) | - | (4,006,505) | (85,235) | (2,039,178,120) | 47,323,744 | 43,232,004 | 43,232,004 |
| June 12, 2008 | (2,039,178,120) | - | (65,311,785) | 2,294 | - | (26,816) | (2,104,514,426) | - | - | - |
| June 13, 2008 | (2,104,514,426) | 48,000,000 | (95,000,000) | - | (5,133,504) | (80,060) | (2,156,727,991) | 48,000,000 | 48,000,000 | 48,000,000 |
| June 16, 2008 | (2,156,727,991) | 126,766,821 | - | - | (15,413,766) | (26,648) | (2,045,401,584) | 174,766,821 | 159,326,407 | 159,326,407 |
| June 17, 2008 | (2,045,401,584) | 21,904 | (115,038,207) | - | (1,369,738) | (26,665) | (2,161,814,290) | 59,750,519 | 42,913,702 | 42,913,702 |
| June 18, 2008 | (2,161,814,290) | 58,390,935 | - | - | (1,968,594) | (26,739) | (2,105,418,686) | 118,141,454 | 99,309,305 | 99,309,305 |
| June 19, 2008 | (2,105,418,686) | 2,368,920 | (21,710,216) | - | (2,011,134) | (26,697) | (2,126,797,813) | 98,800,158 | 77,930,178 | 77,930,178 |
| June 20, 2008 | (2,126,797,813) | 15,413,290 | (410,167,531) | - | (498,339) | (80,183) | (2,522,130,576) | 15,413,290 | 15,413,290 | 15,413,290 |
| June 23, 2008 | (2,522,130,576) | 94,695,989 | - | 93,209,143 | - | (26,704) | (2,334,252,148) | 110,109,278 | 110,082,575 | 203,291,718 |
| June 24, 2008 | (2,334,252,148) | 88,924,915 | (96,279,977) | - | (28,591,949) | (31,321) | (2,370,230,481) | 102,754,216 | 88,924,915 | 167,313,385 |
| June 25, 2008 | (2,370,230,481) | 12,909,772 | (135,490,589) | - | (244,072) | (31,338) | (2,493,086,707) | 12,909,772 | 12,909,772 | 44,457,158 |
| June 26, 2008 | (2,493,086,707) | 76,438,746 | (52,000,000) | 352,371 | - | (157,812) | (2,468,453,402) | 76,438,746 | 76,438,746 | 76,438,746 |
| June 27, 2008 | (2,468,453,402) | 47,515,744 | - | 815,484 | - | (93,374) | (2,420,215,549) | 123,954,490 | 123,861,116 | 124,676,600 |
| June 30, 2008 | (2,420,215,549) | 4,714,958 | (83,000,000) | 30,588 | - | (80,365,108) | (2,578,835,111) | 45,669,448 | 4,714,958 | 4,714,958 |
| July 1, 2008 | (2,578,835,111) | 63,238,172 | - | 4,812,318 | - | (2,703,526) | (2,513,488,146) | 108,907,621 | 67,924,451 | 72,736,769 |
| July 2, 2008 | (2,513,488,146) | 13,000,000 | (140,000,000) | 79,192,992 | - | (28,537) | (2,561,323,690) | 13,000,000 | 13,000,000 | 24,901,224 |
| July 3, 2008 | (2,561,323,690) | 56,540,689 | (29,879,182) | - | (220,033) | (114,314) | (2,534,996,531) | 56,540,689 | 56,540,689 | 56,540,689 |
| July 4, 2008 | (2,534,996,531) | - | - | - | (457,309) | - | (2,535,453,840) | 56,540,689 | 56,083,380 | 56,083,380 |
| July 7, 2008 | (2,535,453,840) | 3,310,200 | (81,730,149) | - | (976,658) | (28,561) | (2,614,879,008) | 3,310,200 | 3,310,200 | 3,310,200 |
| July 8, 2008 | (2,614,879,008) | 61,569,577 | (36,000,000) | 578,023 | - | (28,476) | (2,588,759,884) | 61,569,577 | 61,569,577 | 61,569,577 |
| July 9, 2008 | (2,588,759,884) | 22,413,480 | - | - | (31,591) | (28,463) | (2,566,406,458) | 83,983,057 | 83,923,003 | 83,923,003 |
| July 10, 2008 | (2,566,406,458) | 169,986,955 | - | - | (16,963,400) | (28,392) | (2,413,411,295) | 253,970,012 | 236,918,166 | 236,918,166 |
| July 11, 2008 | (2,413,411,295) | 63,834,842 | - | - | (5,749,612) | (84,878) | (2,355,410,943) | 317,804,854 | 294,918,518 | 294,918,518 |
| July 14, 2008 | (2,355,410,943) | 49,800,000 | - | - | (10,237,432) | (86,487) | (2,315,934,912) | 367,604,854 | 334,394,549 | 334,394,549 |
| July 15, 2008 | (2,315,934,912) | 89,821,881 | - | - | (25,486,657) | (28,039) | (2,251,627,727) | 457,426,735 | 398,701,734 | 398,701,734 |
| July 16, 2008 | (2,251,627,727) | 30,490,342 | - | - | (56,892,790) | (27,968) | (2,278,058,143) | 487,917,077 | 372,271,318 | 372,271,318 |
| July 17, 2008 | (2,278,058,143) | 28,070,000 | (19,744,996) | 649,380 | - | (27,941) | (2,269,111,699) | 496,242,080 | 380,568,381 | 381,217,762 |
| July 18, 2008 | (2,269,111,699) | 49,085,502 | - | 49,761 | - | (83,566) | (2,220,060,001) | 545,327,583 | 429,570,318 | 430,269,460 |
| July 21, 2008 | (2,220,060,001) | 186,924,580 | (329,000,000) | - | (100,450,806) | (27,861) | (2,462,614,088) | 403,252,163 | 187,016,232 | 187,715,373 |

Source: DBS, GCCM

52

**Exhibit 4**

**LBCS Preference/New Value Analysis**
**Account 1262000099**

| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Model 1: Up-Funding Preference Net of Down-Funding New Value | Model 2: Up-Funding Preference Net of Down-Funding, Net and Other Activity New Value | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net and Other Activity New Value |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| July 22, 2008 | (2,462,614,088) | 29,386,338 | - | 662,290 | - | (27,623) | (2,432,593,083) | 432,638,501 | 216,374,947 | 217,736,378 |
| July 23, 2008 | (2,432,593,083) | 126,100,000 | - | 76,853,705 | - | (27,530) | (2,229,666,908) | 558,738,501 | 342,447,417 | 420,662,553 |
| July 24, 2008 | (2,229,666,908) | 133,444,170 | (11,020) | - | (8,716,834) | (27,532) | (2,104,978,123) | 692,171,651 | 467,136,202 | 545,351,338 |
| July 25, 2008 | (2,104,978,123) | 10,026,783 | (90,160,000) | - | (2,692,781) | (83,495) | (2,187,887,616) | 612,038,435 | 384,226,709 | 462,441,845 |
| July 28, 2008 | (2,187,887,616) | 68,200,000 | (3,700,000) | - | (46,237) | (154,365) | (2,123,588,219) | 676,538,435 | 448,526,106 | 526,741,242 |
| July 29, 2008 | (2,123,588,219) | 20,494,000 | (101,096,260) | - | (50,018,266) | (27,810) | (2,254,236,555) | 595,936,174 | 317,877,770 | 396,092,906 |
| July 30, 2008 | (2,254,236,555) | 737,668 | (11,000,000) | - | (717,526) | (28,270) | (2,265,244,684) | 585,673,842 | 306,869,641 | 385,084,777 |
| July 31, 2008 | (2,265,244,684) | 21,508,000 | (15,122,854) | 107,582,631 | - | (42,009,783) | (2,193,286,690) | 592,058,988 | 268,570,158 | 454,367,925 |
| August 1, 2008 | (2,193,286,690) | 6,079,444 | (6,517,143) | 2,375,731 | - | (2,852,581) | (2,194,201,240) | 591,621,288 | 268,046,697 | 456,220,195 |
| August 4, 2008 | (2,194,201,240) | 33,472,674 | (63,727,983) | 101,439,652 | - | (28,353) | (2,123,045,249) | 561,365,980 | 237,763,036 | 527,376,186 |
| August 5, 2008 | (2,123,045,249) | - | (34,624,157) | - | (246,714) | (28,107) | (2,157,944,227) | 526,741,823 | 202,864,058 | 492,477,208 |
| August 6, 2008 | (2,157,944,227) | 15,372,575 | (36,108,968) | - | (932,754) | (28,073) | (2,179,641,446) | 506,005,430 | 181,166,839 | 470,779,989 |
| August 7, 2008 | (2,179,641,446) | 43,725,767 | (30,000,000) | - | (5,382,253) | (28,140) | (2,171,326,072) | 519,731,197 | 189,482,213 | 479,095,363 |
| August 8, 2008 | (2,171,326,072) | 124,591,430 | (1,676,919) | - | (24,938,567) | (84,076) | (2,073,434,204) | 642,645,708 | 287,374,081 | 576,987,231 |
| August 11, 2008 | (2,073,434,204) | 310,000 | (59,345,549) | - | (213,506) | (28,133) | (2,132,711,392) | 583,610,159 | 228,096,892 | 517,710,043 |
| August 12, 2008 | (2,132,711,392) | 69,591,598 | (1,024,598) | - | (1,276,768) | (28,062) | (2,065,449,222) | 652,177,158 | 295,359,062 | 584,972,213 |
| August 13, 2008 | (2,065,449,222) | - | - | - | (511,066) | (86,311) | (2,066,046,599) | 652,177,158 | 294,761,685 | 584,374,836 |
| August 14, 2008 | (2,066,046,599) | 214,786,196 | (375,992) | - | (94,664) | (27,949) | (1,851,759,009) | 866,587,362 | 509,049,276 | 798,662,426 |
| August 15, 2008 | (1,851,759,009) | - | (30,300,000) | 88,306 | - | (83,963) | (1,882,054,665) | 836,287,362 | 478,665,313 | 768,366,770 |
| August 18, 2008 | (1,882,054,665) | 1,455,610 | (99,747,484) | 2,373,615 | - | (27,964) | (1,978,000,889) | 737,995,488 | 380,345,475 | 672,420,546 |
| August 19, 2008 | (1,978,000,889) | 23,612,384 | - | - | (122,095) | (27,951) | (1,954,538,551) | 761,607,872 | 403,807,813 | 695,882,884 |
| August 20, 2008 | (1,954,538,551) | 50,640,391 | (57,902,110) | 6,917,312 | - | (27,953) | (1,954,910,911) | 754,346,153 | 396,518,140 | 695,510,523 |
| August 21, 2008 | (1,954,910,911) | 5,429,732 | (43,180,742) | 113,061,661 | - | 51,538 | (1,879,548,723) | 716,595,143 | 358,767,130 | 770,821,174 |
| August 22, 2008 | (1,879,548,723) | 142,501,495 | - | - | (81,037,271) | (209,750) | (1,818,294,249) | 859,096,638 | 420,021,604 | 832,075,648 |
| August 25, 2008 | (1,818,294,249) | 82,657,003 | (85,000,000) | - | (25,530,686) | (28,145) | (1,846,196,077) | 856,753,641 | 392,119,776 | 804,173,820 |
| August 26, 2008 | (1,846,196,077) | 6,048,404 | (46,000,000) | 4,681,114 | - | (28,190) | (1,881,494,749) | 816,802,045 | 352,139,990 | 768,875,148 |
| August 27, 2008 | (1,881,494,749) | 9,845,520 | (76,275,365) | - | (398,478) | (28,192) | (1,948,351,265) | 750,372,199 | 285,283,474 | 702,018,633 |
| August 28, 2008 | (1,948,351,265) | 25,632,523 | (11,300,000) | 24,643,803 | - | (28,311) | (1,909,403,249) | 764,704,722 | 299,587,686 | 740,966,648 |
| August 29, 2008 | (1,909,403,249) | 7,974,297 | (57,687,486) | 23,637,941 | - | 24,999 | (1,935,453,498) | 714,991,533 | 249,874,497 | 714,891,400 |
| August 31, 2008 | (1,935,453,498) | - | - | 180,118 | - | 19,147,437 | (1,916,125,943) | 714,991,533 | 249,874,497 | 715,071,518 |
| September 1, 2008 | (1,916,125,943) | - | - | - | (106,157) | (2,713,391) | (1,918,945,491) | 714,991,533 | 249,768,340 | 714,965,361 |
| September 2, 2008 | (1,918,945,491) | 30,531,403 | - | - | (707,446) | (28,072) | (1,889,149,606) | 745,522,936 | 279,564,225 | 744,761,246 |
| September 3, 2008 | (1,889,149,606) | 37,347,280 | - | 1,453,505 | - | (27,943) | (1,850,376,764) | 782,870,216 | 316,883,562 | 783,534,088 |
| September 4, 2008 | (1,850,376,764) | 121,800,000 | - | 108,037,602 | - | (27,930) | (1,620,567,092) | 904,670,216 | 438,655,632 | 1,013,343,760 |
| September 5, 2008 | (1,620,567,092) | 4,817,772 | (22,298,218) | - | (2,014,734) | (83,665) | (1,640,145,937) | 887,189,770 | 419,076,787 | 993,764,915 |
| September 8, 2008 | (1,640,145,937) | 16,500,000 | (25,000,000) | - | (788,554) | (27,763) | (1,649,462,254) | 878,689,770 | 409,760,470 | 984,448,598 |

Source: DBS, GCCM

53

**Exhibit 4**

**LBCS Preference/New Value Analysis**
**Account 1262000099**

| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Model 1: Up-Funding Preference Net of Down-Funding New Value | Model 2: Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
|---|---|---|---|---|---|---|---|---|---|---|
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| September 9, 2008 | (1,649,462,254) | 19,407,434 | (45,393,248) | - | (4,833,354) | (27,728) | (1,680,309,149) | 852,703,956 | 378,913,574 | 953,601,703 |
| September 10, 2008 | (1,680,309,149) | 12,070,831 | (102,600,000) | 470,011 | - | (27,591) | (1,770,395,898) | 762,174,787 | 288,356,814 | 863,514,954 |
| September 11, 2008 | (1,770,395,898) | - | (84,859,170) | - | (330,212) | (27,462) | (1,855,612,741) | 677,315,617 | 203,139,971 | 778,298,111 |
| September 12, 2008 | (1,855,612,741) | 6,800,000 | (41,600,000) | - | (154,582) | (82,215) | (1,890,649,539) | 642,515,617 | 168,103,174 | 743,261,313 |
| September 15, 2008 | (1,890,649,539) | - | - | - | (99,682) | (27,367) | (1,890,776,587) | 642,515,617 | 167,976,125 | 743,134,265 |
| September 16, 2008 | (1,890,776,587) | - | - | - | (101,011) | (27,325) | (1,890,904,923) | 642,515,617 | 167,847,790 | 743,005,929 |
| September 17, 2008 | (1,890,904,923) | - | - | - | (107,655) | (78,632) | (1,891,091,210) | 642,515,617 | 167,661,503 | 742,819,642 |
| September 18, 2008 | (1,891,091,210) | - | - | - | (167,295) | (45,255) | (1,891,303,760) | 642,515,617 | 167,448,953 | 742,607,092 |
| September 19, 2008 | (1,891,303,760) | - | - | - | (501,939) | (135,780) | (1,891,941,479) | 642,515,617 | 166,811,234 | 741,969,373 |
| September 22, 2008 | (1,891,941,479) | - | - | - | (167,367) | (45,275) | (1,892,154,121) | 642,515,617 | 166,598,592 | 741,756,731 |
| September 23, 2008 | (1,892,154,121) | - | - | - | (167,385) | (45,280) | (1,892,366,785) | 642,515,617 | 166,385,927 | 741,544,067 |
| September 24, 2008 | (1,892,366,785) | - | - | - | (167,403) | (45,284) | (1,892,579,473) | 642,515,617 | 166,173,240 | 741,331,379 |
| September 25, 2008 | (1,892,579,473) | - | - | - | (166,071) | (44,924) | (1,892,790,468) | 642,515,617 | 165,962,245 | 741,120,384 |
| September 26, 2008 | (1,892,790,468) | - | - | - | (510,419) | (138,074) | (1,893,438,960) | 642,515,617 | 155,313,752 | 740,471,892 |
| September 29, 2008 | (1,893,438,960) | - | - | - | (172,897) | (46,771) | (1,893,658,628) | 642,515,617 | 165,094,085 | 740,252,224 |
| September 30, 2008 | (1,893,658,628) | - | - | - | (172,916) | 70,421,782 | (1,823,409,762) | 642,515,617 | 164,921,169 | 740,079,308 |

**LEGEND**

| Column | Description |
|---|---|
| A | Date on which transactions were recorded per DBS. |
| B | Daily beginning balance of liability owed to LBHI for account 1262000099 per DBS. |
| C | Total daily cash funding from LBCS to LBHI, as recorded in GCCM, relating to LBHI clearing bank accounts of real world cash (assumed to occur at end of day). |
| D | Total daily cash funding from LBHI to LBCS, as recorded in GCCM. |
| E | Net of all intercompany activity recorded in GCCM except for "funding," if this net activity results in a reduction of LBCS's intercompany liability to LBHI. |
| F | Net of all intercompany activity recorded in GCCM except for "funding," if this net activity results in an increase to LBCS's intercompany liability to LBHI. |
| G | Net of all journal entries affecting these intercompany accounts, other than those that are sourced from GCCM. |
| H | Daily ending balance of LBCS's liability to LBHI for account 1262000099 per DBS. |
| I | Cumulative balance of potential preferences based on Up-Funding (C), net of new value based on Down-Funding (D). New value from Down-Funding is applied first, because Up-Funding is assumed to occur at the end of the day. |
| J | Cumulative balance of potential preferences based on Up-Funding (C), net of new value based on Down-Funding (D), Net Quasi Down-Funding (F), and "Other" activity (G) where net "Other" activity is a credit.  Adjustments were made to certain beginning- and end-of-month "Other" journal entries for purposes of this balance. Potential new value from Columns (D), (F) and (G) are netted and applied first, as they are assumed to occur throughout the day.  The potential preference from Up-Funding is assumed to occur at the end of the day. |
| K | Cumulative balance of potential preferences based on Up-Funding (C) and Net Quasi Up-Funding (E), net of new value based on Down-Funding (D), Net Quasi Down-Funding (F), and "Other" activity (G) where net "Other" activity is a credit.  Adjustments were made to certain beginning- and end-of-month "Other" journal entries for purposes of this balance.  The potential preference from Net Quasi Up-Funding (E) is netted with all potential new value from Columns (D), (F) and (G) and applied together, as they are assumed to occur throughout the day.  The potential prefernce from Up-Funding (C) is applied last, as it is assumed to occur at the end of the day. |

Source: DBS, GCCM

**Exhibit 5**

**LBCS Preference/New Value Analysis**
**Account 1262000911**

| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Model 1: Up-Funding Preference Net of Down-Funding New Value | Model 2: Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
|---|---|---|---|---|---|---|---|---|---|---|
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| June 1, 2008 | (289,586,906) | - | - | - | - | 12,023,771 | (277,563,135) | - | - | - |
| June 2, 2008 | (277,563,135) | - | - | - | (125,359) | - | (277,688,495) | - | - | - |
| June 3, 2008 | (277,688,495) | - | - | - | (214,281,153) | - | (491,969,648) | - | - | - |
| June 4, 2008 | (491,969,648) | - | - | 215,599,530 | - | - | (276,370,117) | - | - | 215,599,530 |
| June 5, 2008 | (276,370,117) | - | - | - | (31,816) | - | (276,401,933) | - | - | 215,567,714 |
| June 6, 2008 | (276,401,933) | - | - | 10,516,075 | - | - | (265,885,859) | - | - | 226,083,789 |
| June 9, 2008 | (265,885,859) | - | - | 17,832,346 | - | - | (248,053,513) | - | - | 243,916,135 |
| June 10, 2008 | (248,053,513) | - | - | 8,809,879 | - | - | (239,243,634) | - | - | 252,726,014 |
| June 11, 2008 | (239,243,634) | - | - | 16,190,894 | - | - | (223,052,739) | - | - | 268,916,908 |
| June 12, 2008 | (223,052,739) | - | - | - | (24,266) | - | (223,077,006) | - | - | 268,892,642 |
| June 13, 2008 | (223,077,006) | - | - | 853,737 | - | - | (222,223,269) | - | - | 269,746,379 |
| June 16, 2008 | (222,223,269) | - | - | 281,390 | - | - | (221,941,879) | - | - | 270,027,769 |
| June 17, 2008 | (221,941,879) | - | - | 15,816,293 | - | 14,519 | (206,111,067) | - | - | 285,844,062 |
| June 18, 2008 | (206,111,067) | - | - | - | (36,278) | - | (206,147,344) | - | - | 285,807,784 |
| June 19, 2008 | (206,147,344) | - | - | - | (23,487) | - | (206,170,831) | - | - | 285,784,297 |
| June 20, 2008 | (206,170,831) | - | - | 3,781,674 | - | - | (202,389,157) | - | - | 289,565,971 |
| June 23, 2008 | (202,389,157) | - | - | - | (293,155,772) | - | (495,544,929) | - | - | - |
| June 24, 2008 | (495,544,929) | - | - | 8,060,949 | - | - | (487,483,980) | - | - | 8,060,949 |
| June 25, 2008 | (487,483,980) | - | - | - | (21,178,136) | - | (508,662,116) | - | - | - |
| June 26, 2008 | (508,662,116) | - | - | 19,842,480 | - | - | (488,819,636) | - | - | 19,842,480 |
| June 27, 2008 | (488,819,636) | - | - | - | (723,536) | - | (489,543,172) | - | - | 19,118,944 |
| June 30, 2008 | (489,543,172) | - | - | - | (38,531,355) | (38,516,463) | (566,590,991) | - | - | - |
| July 1, 2008 | (566,590,991) | - | - | - | (65,356) | 37,598,866 | (529,057,481) | - | - | - |
| July 2, 2008 | (529,057,481) | - | - | 38,772,466 | - | - | (490,285,016) | - | - | 38,772,466 |
| July 3, 2008 | (490,285,016) | - | - | 1,808,305 | - | - | (488,476,710) | - | - | 40,580,771 |
| July 4, 2008 | (488,476,710) | - | - | 7,906,186 | - | - | (480,570,525) | - | - | 48,486,957 |
| July 7, 2008 | (480,570,525) | - | - | - | (62,362) | - | (480,632,887) | - | - | 48,424,594 |
| July 8, 2008 | (480,632,887) | - | - | - | (2,017,969) | - | (482,650,856) | - | - | 46,406,625 |
| July 9, 2008 | (482,650,856) | - | - | - | (16,186,910) | - | (498,837,766) | - | - | 30,219,715 |
| July 10, 2008 | (498,837,766) | - | - | - | (1,250,223) | - | (500,087,989) | - | - | 28,969,492 |
| July 11, 2008 | (500,087,989) | - | - | - | (355,711) | - | (500,443,700) | - | - | 28,613,781 |
| July 14, 2008 | (500,443,700) | - | - | - | (57,444) | - | (500,501,144) | - | - | 28,556,337 |
| July 15, 2008 | (500,501,144) | - | - | - | (7,418) | 7,074 | (500,501,489) | - | - | 28,548,919 |
| July 16, 2008 | (500,501,489) | - | - | - | (191,365) | - | (500,692,854) | - | - | 28,357,554 |
| July 17, 2008 | (500,692,854) | - | - | - | (143,833) | - | (500,836,687) | - | - | 28,213,721 |
| July 18, 2008 | (500,836,687) | - | - | - | (238,432) | - | (501,075,119) | - | - | 27,975,289 |
| July 21, 2008 | (501,075,119) | - | - | - | (62,843,677) | - | (563,918,796) | - | - | - |

Source: DBS, GCCM

**Exhibit 5**

**LBCS Preference/New Value Analysis**
**Account 1262000911**

| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Model 1: Up-Funding Preference Net of Down-Funding New Value | Model 2: Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
|---|---|---|---|---|---|---|---|---|---|---|
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| July 22, 2008 | (563,918,796) | - | - | - | (11,748,720) | - | (575,667,516) | - | - | - |
| July 23, 2008 | (575,667,516) | - | - | - | (3,041,874) | - | (578,709,390) | - | - | - |
| July 24, 2008 | (578,709,390) | - | - | - | (17,881,253) | - | (596,590,644) | - | - | - |
| July 25, 2008 | (596,590,644) | - | - | - | (6,016,265) | - | (602,606,909) | - | - | - |
| July 28, 2008 | (602,606,909) | - | - | 13,971,427 | - | - | (588,635,482) | - | - | 13,971,427 |
| July 29, 2008 | (588,635,482) | - | - | 5,398,232 | - | - | (583,237,250) | - | - | 19,369,659 |
| July 30, 2008 | (583,237,250) | - | - | 7,109,491 | - | - | (576,127,759) | - | - | 26,479,149 |
| July 31, 2008 | (576,127,759) | - | - | - | (801,343) | (72,936,557) | (649,865,659) | - | - | - |
| August 1, 2008 | (649,865,659) | - | - | - | (223,370) | 75,224,666 | (574,864,364) | - | - | - |
| August 4, 2008 | (574,864,364) | - | - | - | (180,068) | - | (575,044,432) | - | - | - |
| August 5, 2008 | (575,044,432) | - | - | - | (480,076) | - | (575,524,508) | - | - | - |
| August 6, 2008 | (575,524,508) | - | - | - | (73,130) | - | (575,597,638) | - | - | - |
| August 7, 2008 | (575,597,638) | - | - | 9,836,949 | - | - | (565,760,689) | - | - | 9,836,949 |
| August 8, 2008 | (565,760,689) | - | - | - | (208,080) | - | (565,968,769) | - | - | 9,628,869 |
| August 11, 2008 | (565,968,769) | - | - | 832,281 | - | - | (565,136,488) | - | - | 10,461,150 |
| August 12, 2008 | (565,136,488) | - | - | - | (13,572,364) | - | (578,708,853) | - | - | - |
| August 13, 2008 | (578,708,853) | - | - | - | (21,239,528) | - | (599,948,381) | - | - | - |
| August 14, 2008 | (599,948,381) | - | - | - | (240,455) | - | (600,188,836) | - | - | - |
| August 15, 2008 | (600,188,836) | - | - | - | (216,800) | - | (600,405,636) | - | - | - |
| August 18, 2008 | (600,405,636) | - | - | 8,826,987 | - | 6,727 | (591,571,923) | - | - | 8,826,987 |
| August 19, 2008 | (591,571,923) | - | - | 649,249 | - | - | (590,922,674) | - | - | 9,476,236 |
| August 20, 2008 | (590,922,674) | - | - | - | (70,954) | - | (590,993,628) | - | - | 9,405,282 |
| August 21, 2008 | (590,993,628) | - | - | - | (70,609) | - | (591,064,236) | - | - | 9,334,673 |
| August 22, 2008 | (591,064,236) | - | - | - | (735,224) | - | (591,799,461) | - | - | 8,599,449 |
| August 25, 2008 | (591,799,461) | - | - | - | (1,979,737) | - | (593,779,198) | - | - | 6,619,712 |
| August 26, 2008 | (593,779,198) | - | - | 143,632 | - | - | (593,635,566) | - | - | 6,763,344 |
| August 27, 2008 | (593,635,566) | - | - | - | (280,160) | - | (593,915,726) | - | - | 6,483,183 |
| August 28, 2008 | (593,915,726) | - | - | - | (576,706) | - | (594,492,432) | - | - | 5,906,477 |
| August 29, 2008 | (594,492,432) | - | - | 9,382,572 | - | 30,163,957 | (554,945,904) | - | - | 15,289,049 |
| August 31, 2008 | (554,945,904) | - | - | - | - | (100,855,553) | (655,801,457) | - | - | - |
| September 1, 2008 | (655,801,457) | - | - | - | (68,814) | 101,011,951 | (554,858,320) | - | - | 15,220,235 |
| September 2, 2008 | (554,858,320) | - | - | - | (22,311,744) | - | (577,170,065) | - | - | - |
| September 3, 2008 | (577,170,065) | - | - | - | (900,237) | - | (578,070,301) | - | - | - |
| September 4, 2008 | (578,070,301) | - | - | 4,925,427 | - | - | (573,144,875) | - | - | 4,925,427 |
| September 5, 2008 | (573,144,875) | - | - | - | (128,149) | - | (573,273,024) | - | - | 4,797,278 |
| September 8, 2008 | (573,273,024) | - | - | - | (46,919) | - | (573,319,943) | - | - | 4,750,359 |

Source: DBS, GCCM

**Exhibit 5**

**LBCS Preference/New Value Analysis**
Account 1262000911

| Effective Date (A) | Antecedent Debt to LBHI - Beginning Balance (B) | Up-Funding (C) | Down-Funding (D) | Net Quasi Up-Funding (E) | Net Quasi Down-Funding (F) | Other Activity (G) | Antecedent Debt to LBHI - Ending Balance (H) | Model 1: Up-Funding Preference Net of Down-Funding New Value (I) | Model 2: Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value (J) | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value (K) |
|---|---|---|---|---|---|---|---|---|---|---|
| September 9, 2008 | (573,319,943) | - | - | - | (544,385) | | (573,864,328) | - | - | 4,205,974 |
| September 10, 2008 | (573,864,328) | - | - | 1,168,770 | | | (572,695,558) | - | - | 5,374,743 |
| September 11, 2008 | (572,695,558) | - | - | - | (65,304) | | (572,760,862) | - | - | 5,309,439 |
| September 12, 2008 | (572,760,862) | - | - | - | (18,379,428) | | (591,140,291) | - | - | - |
| September 15, 2008 | (591,140,291) | - | - | - | (205,184) | | (591,345,474) | - | - | - |
| September 16, 2008 | (591,345,474) | - | - | - | (319,677) | | (591,665,152) | - | - | - |
| September 17, 2008 | (591,665,152) | - | - | - | (73,850) | | (591,739,001) | - | - | - |
| September 18, 2008 | (591,739,001) | - | - | - | (89,219) | | (591,828,221) | - | - | - |
| September 19, 2008 | (591,828,221) | - | - | - | (270,225) | | (592,098,446) | - | - | - |
| September 22, 2008 | (592,098,446) | - | - | - | (90,974) | | (592,189,420) | - | - | - |
| September 23, 2008 | (592,189,420) | - | - | - | (91,775) | | (592,281,195) | - | - | - |
| September 24, 2008 | (592,281,195) | - | - | - | (92,164) | | (592,373,359) | - | - | - |
| September 25, 2008 | (592,373,359) | - | - | - | (74,947) | | (592,448,306) | - | - | - |
| September 26, 2008 | (592,448,306) | - | - | - | (236,720) | | (592,685,025) | - | - | - |
| September 29, 2008 | (592,685,025) | - | - | - | (82,344) | | (592,767,369) | - | - | - |
| September 30, 2008 | (592,767,369) | - | - | - | (81,098) | (112,198,351) | (705,046,819) | - | - | - |

**LEGEND**

| Column | Description |
|---|---|
| A | Date on which transactions were recorded per DBS. |
| B | Daily beginning balance of liability owed to LBHI for account 1262000911 per DBS. |
| C | Total daily cash funding from LBCS to LBHI, as recorded in GCCM, relating to LBHI clearing bank accounts of real world cash (assumed to occur at end of day). |
| D | Total daily cash funding from LBHI to LBCS, as recorded in GCCM. |
| E | Net of all intercompany activity recorded in GCCM except for "funding," if this net activity results in a reduction of LBCS's intercompany liability to LBHI. |
| F | Net of all intercompany activity recorded in GCCM except for "funding," if this net activity results in an increase to LBCS's intercompany liability to LBHI. |
| G | Net of all journal entries affecting these intercompany accounts, other than those that are sourced by GCCM. |
| H | Daily ending balance of LBCS's liability to LBHI for account 1262000911 per DBS. |
| I | Cumulative balance of potential preferences based on Up-Funding (C), net of new value based on Down-Funding (D). New value from Down-Funding is applied first, because Up-Funding is assumed to occur at the end of the day. |
| J | Cumulative balance of potential preferences based on Up-Funding (C), net of new value based on Down-Funding (D), Net Quasi Down-Funding (F), and "Other" activity (G) where net "Other" activity is a credit. Adjustments were made to certain beginning- and end-of-month "Other" journal entries for purposes of this balance. Potential new value from Columns (D), (F) and (G) are netted and applied first, as they are assumed to occur throughout the day. The potential preference from Up-Funding (C) is assumed to occur at the end of the day. |
| K | Cumulative balance of potential preferences based on Up-Funding (C) and Net Quasi Up-Funding (E), net of new value based on Down-Funding (D), Net Quasi Down-Funding (F), and "Other" activity (G) where net "Other" activity is a credit. Adjustments were made to certain beginning- and end-of-month "Other" journal entries for purposes of this balance. The potential preference from Net Quasi Up-Funding (E) is netted with all potential new value from Columns (D), (F) and (G) and applied together, as they are assumed to occur throughout the day. The potential preference from Up-Funding (C) is applied last, as it is assumed to occur at the end of the day. |

Source: DBS, GCCM

**Exhibit 6**

**LBCS Preference/New Value Analysis**
**Accounts 1262000099 & 1262000911 Combined**

| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Model 1: Up-Funding Preference Net of Down-Funding New Value | Model 2: Up-Funding Preference Net of Down-Funding Quasi Down-Funding and Other Activity New Value | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding Quasi Down-Funding and Other Activity New Value |
|---|---|---|---|---|---|---|---|---|---|---|
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| June 1, 2008 | (2,241,466,300) | - | - | - | - | 9,486,856 | (2,231,979,444) | - | - | - |
| June 2, 2008 | (2,231,979,444) | 88,000,000 | (42,200,000) | - | (8,339,150) | (28,037) | (2,194,546,632) | 88,000,000 | 88,000,000 | 88,000,000 |
| June 3, 2008 | (2,194,546,632) | 4,800,000 | (20,000,000) | - | (279,043,448) | (28,177) | (2,488,818,256) | 72,800,000 | 4,800,000 | 4,800,000 |
| June 4, 2008 | (2,488,818,256) | 31,900,000 | (60,000,000) | 215,604,470 | - | (28,077) | (2,301,341,864) | 44,700,000 | 31,900,000 | 192,276,393 |
| June 5, 2008 | (2,301,341,864) | 1,849,548 | (36,000,000) | - | (126,009) | (27,905) | (2,335,646,230) | 10,549,548 | 1,849,548 | 157,972,026 |
| June 6, 2008 | (2,335,646,230) | 45,663,920 | (2,168,619) | 4,795,678 | - | (82,916) | (2,287,438,166) | 54,044,850 | 45,663,920 | 206,180,091 |
| June 9, 2008 | (2,287,438,166) | 43,000,000 | (45,228,076) | 15,650,908 | - | (27,289) | (2,274,042,623) | 51,816,773 | 43,408,555 | 219,575,633 |
| June 10, 2008 | (2,274,042,623) | 52,745,607 | (52,040,000) | 4,456,025 | - | (27,160) | (2,268,908,151) | 52,745,607 | 52,745,607 | 224,710,106 |
| June 11, 2008 | (2,268,908,151) | 8,778,137 | (14,200,000) | 12,184,389 | - | (85,235) | (2,262,230,860) | 47,323,744 | 47,238,509 | 231,387,397 |
| June 12, 2008 | (2,262,230,860) | - | (65,311,785) | - | (21,973) | (26,816) | (2,327,591,432) | - | - | 166,026,824 |
| June 13, 2008 | (2,327,591,432) | 48,000,000 | (95,000,000) | - | (4,279,767) | (80,060) | (2,378,951,260) | 48,000,000 | 48,000,000 | 114,666,996 |
| June 16, 2008 | (2,378,951,260) | 126,766,821 | - | - | (15,132,376) | (26,648) | (2,267,343,463) | 174,766,821 | 159,607,797 | 226,274,793 |
| June 17, 2008 | (2,267,343,463) | 21,904 | (115,038,207) | 14,446,554 | - | (12,145) | (2,367,925,356) | 59,750,519 | 44,579,349 | 125,692,900 |
| June 18, 2008 | (2,367,925,356) | 58,390,935 | - | - | (2,004,871) | (26,739) | (2,311,566,031) | 118,141,454 | 100,938,674 | 182,052,225 |
| June 19, 2008 | (2,311,566,031) | 2,368,920 | (21,710,216) | - | (2,034,620) | (26,697) | (2,332,968,644) | 98,800,158 | 79,536,061 | 160,649,612 |
| June 20, 2008 | (2,332,968,644) | 15,413,290 | (410,167,531) | 3,283,335 | - | (80,183) | (2,724,519,733) | 15,413,290 | 15,413,290 | 15,413,290 |
| June 23, 2008 | (2,724,519,733) | 94,695,989 | - | - | (199,946,629) | (26,704) | (2,829,797,078) | 110,109,278 | 94,695,989 | 94,695,989 |
| June 24, 2008 | (2,829,797,078) | 88,924,915 | (96,279,977) | - | (20,530,999) | (31,321) | (2,857,714,461) | 102,754,216 | 88,924,915 | 88,924,915 |
| June 25, 2008 | (2,857,714,461) | 12,909,772 | (135,490,589) | - | (21,422,208) | (31,338) | (3,001,748,824) | 12,909,772 | 12,909,772 | 12,909,772 |
| June 26, 2008 | (3,001,748,824) | 76,438,746 | (52,000,000) | 20,194,851 | - | (157,812) | (2,957,273,039) | 76,438,746 | 76,438,746 | 76,438,746 |
| June 27, 2008 | (2,957,273,039) | 47,515,744 | - | 91,948 | - | (93,374) | (2,909,758,721) | 123,954,490 | 123,861,116 | 123,953,063 |
| June 30, 2008 | (2,909,758,721) | 4,714,958 | (83,000,000) | - | (38,500,767) | (118,881,572) | (3,145,426,101) | 45,669,448 | 4,714,958 | 4,714,958 |
| July 1, 2008 | (3,145,426,101) | 63,238,172 | - | 4,746,962 | - | 34,896,340 | (3,042,545,627) | 108,907,621 | 67,953,131 | 72,700,093 |
| July 2, 2008 | (3,042,545,627) | 13,000,000 | (140,000,000) | 117,965,458 | - | (28,537) | (3,051,608,706) | 13,000,000 | 13,000,000 | 63,637,014 |
| July 3, 2008 | (3,051,608,706) | 56,540,689 | (29,879,182) | 1,588,272 | - | (114,314) | (3,023,473,241) | 56,540,689 | 56,540,689 | 91,772,479 |
| July 4, 2008 | (3,023,473,241) | - | - | 7,448,877 | - | - | (3,016,024,365) | 56,540,689 | 56,540,689 | 99,221,355 |
| July 7, 2008 | (3,016,024,365) | 3,310,200 | (81,730,149) | - | (1,039,021) | (28,561) | (3,095,511,895) | 3,310,200 | 3,310,200 | 19,733,825 |
| July 8, 2008 | (3,095,511,895) | 61,569,577 | (36,000,000) | - | (1,439,946) | (28,476) | (3,071,410,740) | 61,569,577 | 61,569,577 | 61,569,577 |
| July 9, 2008 | (3,071,410,740) | 22,413,480 | - | - | (16,218,502) | (28,463) | (3,065,244,225) | 83,983,057 | 67,736,092 | 67,736,092 |
| July 10, 2008 | (3,065,244,225) | 169,986,955 | - | - | (18,213,622) | (28,392) | (2,913,499,284) | 253,970,012 | 219,481,033 | 219,481,033 |
| July 11, 2008 | (2,913,499,284) | 63,834,842 | - | - | (6,105,323) | (84,878) | (2,855,854,643) | 317,804,854 | 277,125,674 | 277,125,674 |
| July 14, 2008 | (2,855,854,643) | 49,800,000 | - | - | (10,294,526) | (86,487) | (2,816,436,057) | 367,604,854 | 316,544,260 | 316,544,260 |
| July 15, 2008 | (2,816,436,057) | 89,821,881 | - | - | (25,494,075) | (20,965) | (2,752,129,216) | 457,426,735 | 380,851,101 | 380,851,101 |
| July 16, 2008 | (2,752,129,216) | 30,490,342 | - | - | (57,084,155) | (27,968) | (2,778,750,997) | 487,917,077 | 354,229,320 | 354,229,320 |
| July 17, 2008 | (2,778,750,997) | 28,070,000 | (19,744,996) | 505,547 | - | (27,941) | (2,769,948,386) | 496,242,080 | 362,526,383 | 363,031,930 |
| July 18, 2008 | (2,769,948,386) | 49,085,502 | - | - | (188,671) | (83,566) | (2,721,135,121) | 545,327,583 | 411,339,649 | 411,845,196 |
| July 21, 2008 | (2,721,135,121) | 186,924,580 | (329,000,000) | - | (163,294,483) | (27,861) | (3,026,532,884) | 403,252,163 | 186,924,580 | 186,924,580 |

Source: DBS, GCCM

**Exhibit 6**

LBCS Preference/New Value Analysis
Accounts 1262000099 & 1262000911 Combined

| Effective Date (A) | Antecedent Debt to LBHI - Beginning Balance (B) | Up-Funding (C) | Down-Funding (D) | Net Quasi Up-Funding (E) | Net Quasi Down-Funding (F) | Other Activity (G) | Antecedent Debt to LBHI - Ending Balance (H) | Model 1: Up-Funding Preference Net of Down-Funding New Value (I) | Model 2: Up-Funding Preference Net of Down-Funding, Quasi Down-Funding and Other Activity New Value (J) | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Quasi Down-Funding and Other Activity New Value (K) |
|---|---|---|---|---|---|---|---|---|---|---|
| July 22, 2008 | (3,026,532,884) | 29,386,338 | - | - | (11,086,430) | (27,623) | (3,008,260,599) | 432,638,501 | 205,196,865 | 205,196,865 |
| July 23, 2008 | (3,008,260,599) | 126,100,000 | - | 73,811,830 | - | (27,530) | (2,808,376,299) | 558,738,501 | 331,269,335 | 405,081,165 |
| July 24, 2008 | (2,808,376,299) | 133,444,170 | (11,020) | - | (26,598,087) | (27,532) | (2,701,568,767) | 692,171,651 | 438,076,867 | 511,888,697 |
| July 25, 2008 | (2,701,568,767) | 10,026,783 | (90,160,000) | - | (8,709,046) | (83,495) | (2,790,494,525) | 612,038,435 | 349,151,109 | 422,962,939 |
| July 28, 2008 | (2,790,494,525) | 68,200,000 | (3,700,000) | 13,925,190 | - | (154,365) | (2,712,223,701) | 676,538,435 | 413,496,743 | 501,233,763 |
| July 29, 2008 | (2,712,223,701) | 20,494,000 | (101,096,260) | - | (44,620,034) | (27,810) | (2,837,473,805) | 595,936,174 | 288,246,639 | 375,983,659 |
| July 30, 2008 | (2,837,473,805) | 737,668 | (11,000,000) | 6,391,964 | - | (28,270) | (2,841,372,443) | 585,673,842 | 277,956,036 | 372,085,021 |
| July 31, 2008 | (2,841,372,443) | 21,508,000 | (15,122,854) | 106,781,288 | - | (114,946,341) | (2,843,152,350) | 592,058,988 | 204,284,526 | 405,194,799 |
| August 1, 2008 | (2,843,152,350) | 6,079,444 | (6,517,143) | 2,152,361 | - | 72,372,085 | (2,769,065,604) | 591,621,288 | 203,763,144 | 406,825,777 |
| August 4, 2008 | (2,769,065,604) | 33,472,674 | (63,727,983) | 101,259,584 | - | (28,353) | (2,698,089,681) | 561,365,980 | 173,479,482 | 477,801,700 |
| August 5, 2008 | (2,698,089,681) | - | (34,624,157) | - | (726,790) | (28,107) | (2,733,468,735) | 526,741,823 | 138,100,429 | 442,422,646 |
| August 6, 2008 | (2,733,468,735) | 15,372,575 | (36,108,968) | - | (1,005,884) | (28,073) | (2,755,239,084) | 506,005,430 | 116,330,079 | 420,652,297 |
| August 7, 2008 | (2,755,239,084) | 43,725,767 | (30,000,000) | 4,454,696 | - | (28,140) | (2,737,086,761) | 519,731,197 | 130,027,706 | 438,804,620 |
| August 8, 2008 | (2,737,086,761) | 124,591,430 | (1,676,919) | - | (25,146,647) | (84,076) | (2,639,402,973) | 642,645,708 | 227,711,494 | 536,488,408 |
| August 11, 2008 | (2,639,402,973) | 310,000 | (59,345,549) | 618,775 | - | (28,133) | (2,697,847,881) | 583,610,159 | 168,647,812 | 478,043,500 |
| August 12, 2008 | (2,697,847,881) | 69,591,598 | (1,024,598) | - | (14,849,132) | (28,062) | (2,644,158,075) | 652,177,158 | 222,337,618 | 531,733,306 |
| August 13, 2008 | (2,644,158,075) | - | - | - | (21,750,594) | (86,311) | (2,665,994,980) | 652,177,158 | 200,500,713 | 509,896,401 |
| August 14, 2008 | (2,665,994,980) | 214,786,196 | (375,992) | - | (335,119) | (27,949) | (2,451,947,844) | 866,587,362 | 414,547,849 | 723,943,537 |
| August 15, 2008 | (2,451,947,844) | - | (30,300,000) | - | (128,494) | (83,963) | (2,482,460,301) | 836,287,362 | 384,035,392 | 693,431,080 |
| August 18, 2008 | (2,482,460,301) | 1,455,610 | (99,747,484) | 11,200,602 | - | (21,237) | (2,569,572,812) | 737,995,488 | 285,722,280 | 606,318,569 |
| August 19, 2008 | (2,569,572,812) | 23,612,384 | - | 527,154 | - | (27,951) | (2,545,461,224) | 761,607,872 | 309,306,713 | 630,430,157 |
| August 20, 2008 | (2,545,461,224) | 50,640,391 | (57,902,110) | 6,846,357 | - | (27,953) | (2,545,904,539) | 754,346,153 | 302,017,040 | 629,986,842 |
| August 21, 2008 | (2,545,904,539) | 5,429,732 | (43,180,742) | 112,991,053 | - | 51,538 | (2,470,612,959) | 716,595,143 | 264,266,030 | 705,226,884 |
| August 22, 2008 | (2,470,612,959) | 142,501,495 | - | - | (81,772,495) | (209,750) | (2,410,093,710) | 859,096,638 | 324,785,279 | 765,746,133 |
| August 25, 2008 | (2,410,093,710) | 82,657,003 | (85,000,000) | - | (27,510,423) | (28,145) | (2,439,975,274) | 856,753,641 | 294,903,715 | 735,864,569 |
| August 26, 2008 | (2,439,975,274) | 6,048,404 | (46,000,000) | 4,824,746 | - | (28,190) | (2,475,130,315) | 816,802,045 | 254,923,928 | 700,709,529 |
| August 27, 2008 | (2,475,130,315) | 9,845,520 | (76,275,365) | - | (678,638) | (28,192) | (2,542,266,991) | 750,372,199 | 187,787,252 | 633,572,853 |
| August 28, 2008 | (2,542,266,991) | 25,632,523 | (11,300,000) | 24,067,097 | - | (28,311) | (2,503,895,681) | 764,704,722 | 202,091,465 | 671,944,162 |
| August 29, 2008 | (2,503,895,681) | 7,974,297 | (57,687,486) | 33,020,513 | - | 30,188,956 | (2,490,399,402) | 714,991,533 | 152,378,275 | 655,251,486 |
| August 31, 2008 | (2,490,399,402) | - | - | 180,118 | - | (81,708,116) | (2,571,927,400) | 714,991,533 | 143,125,927 | 646,179,255 |
| September 1, 2008 | (2,571,927,400) | - | - | - | (174,971) | 98,298,560 | (2,473,803,812) | 714,991,533 | 142,950,956 | 646,004,284 |
| September 2, 2008 | (2,473,803,812) | 30,531,403 | - | - | (23,019,190) | (28,072) | (2,466,319,671) | 745,522,936 | 150,435,097 | 653,488,425 |
| September 3, 2008 | (2,466,319,671) | 37,347,280 | - | 553,268 | - | (27,943) | (2,428,447,065) | 782,870,216 | 187,754,434 | 691,361,031 |
| September 4, 2008 | (2,428,447,065) | 121,800,000 | - | 112,963,029 | - | (27,930) | (2,193,711,966) | 904,670,216 | 309,526,504 | 926,096,130 |
| September 5, 2008 | (2,193,711,966) | 4,817,772 | (22,298,218) | - | (2,142,883) | (83,665) | (2,213,418,960) | 887,189,770 | 289,819,510 | 906,389,136 |
| September 8, 2008 | (2,213,418,960) | 16,500,000 | (25,000,000) | - | (835,473) | (27,763) | (2,222,782,196) | 878,689,770 | 280,456,274 | 897,025,900 |

Source: DBS, GCCM

59

**Exhibit 6**

### LBCS Preference/New Value Analysis
**Accounts 1262000099 & 1262000911 Combined**

| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Model 1: Up-Funding Preference Net of Down-Funding New Value | Model 2: Up-Funding Preference Net of Down-Funding, Quasi Down-Funding and Other Activity New Value | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Quasi Down-Funding and Other Activity New Value |
|---|---|---|---|---|---|---|---|---|---|---|
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| September 9, 2008 | (2,222,782,196) | 19,407,434 | (45,393,248) | - | (5,377,739) | (27,728) | (2,254,173,477) | 852,703,956 | 249,064,993 | 865,634,619 |
| September 10, 2008 | (2,254,173,477) | 12,070,831 | (102,600,000) | 1,638,781 | - | (27,591) | (2,343,091,456) | 762,174,787 | 158,508,233 | 776,716,640 |
| September 11, 2008 | (2,343,091,456) | - | (84,859,170) | - | (395,516) | (27,462) | (2,428,373,604) | 677,315,617 | 73,226,086 | 691,434,492 |
| September 12, 2008 | (2,428,373,604) | 6,800,000 | (41,600,000) | - | (18,534,011) | (82,215) | (2,481,789,830) | 642,515,617 | 19,809,860 | 638,018,267 |
| September 15, 2008 | (2,481,789,830) | - | - | - | (304,866) | (27,367) | (2,482,122,062) | 642,515,617 | 19,477,628 | 637,686,034 |
| September 16, 2008 | (2,482,122,062) | - | - | - | (420,688) | (27,325) | (2,482,570,075) | 642,515,617 | 19,029,615 | 637,238,021 |
| September 17, 2008 | (2,482,570,075) | - | - | - | (181,505) | (78,632) | (2,482,830,211) | 642,515,617 | 18,769,479 | 636,977,885 |
| September 18, 2008 | (2,482,830,211) | - | - | - | (256,514) | (45,255) | (2,483,131,981) | 642,515,617 | 18,467,709 | 636,676,116 |
| September 19, 2008 | (2,483,131,981) | - | - | - | (772,165) | (135,780) | (2,484,039,925) | 642,515,617 | 17,559,765 | 635,768,171 |
| September 22, 2008 | (2,484,039,925) | - | - | - | (258,341) | (45,275) | (2,484,343,540) | 642,515,617 | 17,256,149 | 635,464,556 |
| September 23, 2008 | (2,484,343,540) | - | - | - | (259,160) | (45,280) | (2,484,647,980) | 642,515,617 | 16,951,710 | 635,160,116 |
| September 24, 2008 | (2,484,647,980) | - | - | - | (259,567) | (45,284) | (2,484,952,831) | 642,515,617 | 16,646,858 | 634,855,265 |
| September 25, 2008 | (2,484,952,831) | - | - | - | (241,018) | (44,924) | (2,485,238,774) | 642,515,617 | 16,360,916 | 634,569,323 |
| September 26, 2008 | (2,485,238,774) | - | - | - | (747,138) | (138,074) | (2,486,123,986) | 642,515,617 | 15,475,704 | 633,684,110 |
| September 29, 2008 | (2,486,123,986) | - | - | - | (255,241) | (46,771) | (2,486,425,997) | 642,515,617 | 15,173,692 | 633,382,099 |
| September 30, 2008 | (2,486,425,997) | - | - | - | (254,014) | (41,776,569) | (2,528,456,581) | 642,515,617 | 14,919,678 | 633,128,085 |

**LEGEND**

| Column | Description |
|---|---|
| A | Date on which transactions were recorded per DBS. |
| B | Daily beginning balance of liability owed to LBHI for accounts 1262000099 and 1262000911 per DBS. |
| C | Total daily cash funding from LBCS to LBHI, as recorded in GCCM, relating to LBHI clearing bank accounts of real world cash (assumed to occur at end of day). |
| D | Total daily cash funding from LBHI to LBCS, as recorded in GCCM. |
| E | Net of all intercompany activity recorded in GCCM except for "funding," if this net activity results in a reduction of LBCS's intercompany liability to LBHI. |
| F | Net of all intercompany activity recorded in GCCM except for "funding," if this net activity results in an increase to LBCS's intercompany liability to LBHI. |
| G | Net of all journal entries affecting these intercompany accounts, other than those that are sourced to GCCM. |
| H | Daily ending balance of LBCS's liability to LBHI for accounts 1262000099 and 1262000911 per DBS. |
| I | Cumulative balance of potential preferences based on Up-Funding (C), net of new value based on Down-Funding (D). New value from Down-Funding is applied first, because Up-Funding is assumed to occur at the end of the day. |
| J | Cumulative balance of potential preferences based on Up-Funding (C), net of new value based on Down-Funding (D), Net Quasi Down-Funding (F), and "Other" activity (G) where net "Other" activity is a credit. Adjustments were made to certain beginning- and end-of-month "Other" journal entries for purposes of this balance. Potential new value from Columns (D), (F) and (G) are netted and applied first, as they are assumed to occur throughout the day. The potential preference from Up-Funding (C) is assumed to occur at the end of the day. |
| K | Cumulative balance of potential preferences based on Up-Funding (C) and Net Quasi Up-Funding (E), net of new value based on Down-Funding (D), Net Quasi Down-Funding (F), and "Other" activity (G) where net "Other" activity is a credit. Adjustments were made to certain beginning- and end-of-month "Other" journal entries for purposes of this balance. The potential preference from Net Quasi Up-Funding (E) is netted with all potential new value from Columns (D), (F) and (G) and applied together, as they are assumed to occur throughout the day. The potential preference from Up-Funding (C) is applied last, as it is assumed to occur at the end of the day. |

Source: DBS, GCCM

**Exhibit 7**



Source: DBS

**Exhibit 8**



Source: DBS, GCCM

**Exhibit 9**



Source: GCCM

**Exhibit 10**



Source: GCCM

**Exhibit 11**



Source: GCCM

**Exhibit 12**



Source: DBS, GCCM

**Exhibit 13**

**LBSF Preference/New Value Analysis**
**Account 1262000099**

| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Model 1: Up-Funding Preference Net of Down-Funding New Value | Model 2: Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
|---|---|---|---|---|---|---|---|---|---|---|
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| June 1, 2008 | (14,203,956,270) | - | - | - | - | (107,359) | (14,204,063,629) | - | - | - |
| June 2, 2008 | (14,204,063,629) | 1,803,331 | (818,795,797) | - | (41,816,425) | (53,022) | (15,062,925,542) | 1,803,331 | 1,803,331 | 1,803,331 |
| June 3, 2008 | (15,062,925,542) | 349,300,000 | (6,900,000) | - | (66,691,476) | (53,286) | (14,787,270,303) | 349,300,000 | 349,300,000 | 349,300,000 |
| June 4, 2008 | (14,787,270,303) | 828,500,000 | (143,000,000) | 60,664,463 | - | (53,097) | (14,041,058,937) | 1,034,900,000 | 1,034,846,903 | 1,095,511,366 |
| June 5, 2008 | (14,041,058,937) | 134,675,475 | (570,376,000) | - | (127,441,377) | (52,772) | (14,604,253,612) | 599,199,475 | 471,652,229 | 532,316,692 |
| June 6, 2008 | (14,604,253,612) | 6,700,005 | (914,892,259) | 109,756,659 | - | (127,704) | (15,402,816,910) | 6,700,005 | 6,700,005 | 6,700,005 |
| June 9, 2008 | (15,402,816,910) | 99,019,047 | (515,507,750) | - | (6,571,804) | (21,779) | (15,825,899,195) | 99,019,047 | 99,019,047 | 99,019,047 |
| June 10, 2008 | (15,825,899,195) | 359,800,000 | (93,346,195) | 303,881,923 | - | 43,866 | (15,255,519,602) | 365,472,853 | 365,472,853 | 669,354,775 |
| June 11, 2008 | (15,255,519,602) | 130,300 | (1,586,400,000) | 125,700,438 | - | (50,873) | (16,716,139,736) | 130,300 | 130,300 | 130,300 |
| June 12, 2008 | (16,716,139,736) | 76,348,933 | (300,000,000) | - | (1,222,434,720) | (145,941) | (18,162,371,464) | 76,348,933 | 76,348,933 | 76,348,933 |
| June 13, 2008 | (18,162,371,464) | 31,537,147 | (504,527,147) | 6,439,846 | - | (121,284) | (18,629,042,902) | 31,537,147 | 31,537,147 | 31,537,147 |
| June 16, 2008 | (18,629,042,902) | 240,000,000 | (1,286,647,955) | 99,750,147 | - | (50,395) | (19,575,991,105) | 240,000,000 | 240,000,000 | 240,000,000 |
| June 17, 2008 | (19,575,991,105) | 116,600,000 | (357,721,770) | 90,105,566 | - | (50,426) | (19,727,057,735) | 116,600,000 | 116,600,000 | 116,600,000 |
| June 18, 2008 | (19,727,057,735) | 219,400,000 | (551,578,775) | - | (382,710,673) | (50,567) | (20,441,997,750) | 219,400,000 | 219,400,000 | 219,400,000 |
| June 19, 2008 | (20,441,997,750) | 84,700,000 | (821,484,991) | - | (186,730,324) | (50,487) | (21,365,563,552) | 84,700,000 | 84,700,000 | 84,700,000 |
| June 20, 2008 | (21,365,563,552) | 756,220,478 | (4,500,000) | - | (30,860,640) | (64,123) | (20,644,967,837) | 836,220,478 | 805,295,715 | 805,295,715 |
| June 23, 2008 | (20,644,967,837) | 572,651,801 | (852,181,438) | 124,560,152 | - | (50,500) | (20,799,987,822) | 572,651,801 | 572,651,801 | 650,275,730 |
| June 24, 2008 | (20,799,987,822) | 159,400,000 | (404,760,439) | - | (52,199,725) | (71,942) | (21,097,619,928) | 327,291,362 | 275,019,695 | 159,400,000 |
| June 25, 2008 | (21,097,619,928) | 434,624,454 | (93,623,733) | 117,716,025 | - | (59,264) | (20,638,962,446) | 668,292,082 | 615,961,152 | 618,057,482 |
| June 26, 2008 | (20,638,962,446) | 611,801,750 | (125,007,030) | 3,163,338 | - | (1,091,156) | (20,150,095,544) | 1,155,086,802 | 1,101,664,716 | 1,106,924,384 |
| June 27, 2008 | (20,150,095,544) | 676,002,524 | (89,065,319) | - | (96,995,849) | (147,482) | (19,660,301,670) | 1,742,024,007 | 1,591,458,590 | 1,596,718,258 |
| June 30, 2008 | (19,660,301,670) | 712,800,000 | (26,251,000) | 1,300,966,908 | - | 190,311,397 | (17,482,474,364) | 2,428,573,007 | 2,278,007,590 | 3,584,234,166 |
| July 1, 2008 | (17,482,474,364) | 514,100,000 | (123,507,200) | 304,661,336 | - | (104,779,373) | (16,892,399,601) | 2,818,765,807 | 2,668,146,153 | 4,279,034,065 |
| July 2, 2008 | (16,892,399,601) | 14,400,000 | (481,800,000) | 29,091,687 | - | (53,966) | (17,330,761,880) | 2,351,365,807 | 2,200,692,186 | 3,840,671,786 |
| July 3, 2008 | (17,330,761,880) | 9,343,222 | (118,500,000) | 119,830,209 | - | (231,172) | (17,320,319,623) | 2,242,209,029 | 2,091,304,235 | 3,851,114,044 |
| July 4, 2008 | (17,320,319,623) | - | - | - | (2,245,671) | 15,006 | (17,322,550,288) | 2,242,209,029 | 2,089,058,564 | 3,848,868,372 |
| July 7, 2008 | (17,322,550,288) | 56,200,943 | (511,400,000) | - | (52,458,053) | (5,623) | (17,830,213,022) | 1,787,009,971 | 1,581,395,830 | 3,341,205,639 |
| July 8, 2008 | (17,830,213,022) | 413,302,229 | (81,654,229) | 35,493,265 | - | (53,851) | (17,463,125,608) | 2,118,657,971 | 1,912,989,979 | 3,708,293,053 |
| July 9, 2008 | (17,463,125,608) | 834,951,131 | (507,750) | - | (357,103,217) | (53,827) | (16,985,839,272) | 2,953,101,352 | 2,390,276,315 | 4,185,579,388 |
| July 10, 2008 | (16,985,839,272) | 326,400,000 | (23,184,216) | - | (60,945,223) | (53,694) | (16,743,622,404) | 3,256,317,136 | 2,632,493,182 | 4,427,796,256 |
| July 11, 2008 | (16,743,622,404) | 655,000,005 | (1,596,290) | - | (126,749,411) | (142,766) | (16,217,110,866) | 3,909,720,851 | 3,159,004,720 | 4,954,307,794 |
| July 14, 2008 | (16,217,110,866) | - | (433,600,000) | - | (119,642,026) | (53,241) | (16,770,406,133) | 3,476,120,851 | 2,605,709,454 | 4,401,012,527 |
| July 15, 2008 | (16,770,406,133) | 76,000,000 | (137,195,779) | 130,506,290 | - | (53,025) | (16,701,148,646) | 3,414,925,072 | 2,544,460,650 | 4,470,270,014 |
| July 16, 2008 | (16,701,148,646) | - | (333,091,100) | 5,998,380 | - | (52,891) | (17,028,294,257) | 3,081,833,972 | 2,211,316,660 | 4,143,124,404 |
| July 17, 2008 | (17,028,294,257) | 220,600,000 | (550,399,576) | 114,280,220 | - | (52,839) | (17,243,866,451) | 2,752,034,396 | 1,881,464,245 | 3,927,552,209 |
| July 18, 2008 | (17,243,866,451) | 234,110,125 | (80,000,000) | 32,184,944 | - | (127,274) | (17,057,698,657) | 2,906,144,521 | 2,035,447,095 | 4,113,720,004 |
| July 21, 2008 | (17,057,698,657) | 25,340,000 | (87,336,150) | 10,319,765 | - | 124,035 | (17,109,251,006) | 2,844,148,371 | 1,973,450,945 | 4,062,043,619 |

Source DBS, GCCM

**Exhibit 13**

**LBSF Preference/New Value Analysis**
**Account 1262000099**

| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Model 1: Up-Funding Preference Net of Down-Funding New Value | Model 2: Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
|---|---|---|---|---|---|---|---|---|---|---|
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| July 22, 2008 | (17,109,251,006) | 10,800,000 | (795,186,500) | 209,470,792 | - | (52,238) | (17,684,218,952) | 2,059,761,871 | 1,189,012,207 | 3,487,075,673 |
| July 23, 2008 | (17,684,218,952) | 436,800,000 | (100,077,000) | 81,317,294 | - | (52,063) | (17,266,230,721) | 2,396,484,871 | 1,525,683,144 | 3,905,063,904 |
| July 24, 2008 | (17,266,230,721) | 60,900,000 | (324,567,123) | 87,577,780 | - | (52,066) | (17,442,372,131) | 2,132,817,748 | 1,261,963,955 | 3,728,922,494 |
| July 25, 2008 | (17,442,372,131) | 460,300,000 | (149,899,912) | - | (68,378,712) | (127,631) | (17,200,478,386) | 2,443,217,836 | 1,503,857,700 | 3,970,816,239 |
| July 28, 2008 | (17,200,478,386) | 320,000,000 | (5,300,000) | - | (64,634,658) | (442,563) | (16,950,855,602) | 2,757,917,836 | 1,753,480,484 | 4,220,439,023 |
| July 29, 2008 | (16,950,855,602) | 57,970,270 | (420,000,250) | - | (38,636,043) | (52,593) | (17,351,574,218) | 2,395,887,856 | 1,352,761,868 | 3,819,720,407 |
| July 30, 2008 | (17,351,574,218) | 399,338,260 | (1,570,785) | - | (5,057,113,778) | (53,463) | (22,010,973,984) | 2,793,655,331 | 399,338,260 | 399,338,260 |
| July 31, 2008 | (22,010,973,984) | 386,112,284 | - | - | (141,545,605) | (2,668,419) | (21,769,075,724) | 3,179,767,616 | 640,511,384 | 640,511,384 |
| August 1, 2008 | (21,769,075,724) | 113,300,000 | (268,000) | - | (2,304,912,956) | (617,063) | (23,961,573,743) | 3,292,799,616 | 113,300,000 | 113,300,000 |
| August 4, 2008 | (23,961,573,743) | 70,500,000 | (74,745,850) | - | (64,748,110) | (53,618) | (24,030,621,322) | 3,288,553,766 | 70,500,000 | 70,500,000 |
| August 5, 2008 | (24,030,621,322) | 407,671,743 | (65,235,170) | - | (145,771,824) | (53,154) | (23,834,009,727) | 3,630,990,338 | 407,671,743 | 407,671,743 |
| August 6, 2008 | (23,834,009,727) | 336,600,000 | (350,000,000) | - | (16,764,587) | (53,089) | (23,864,227,403) | 3,617,590,338 | 377,454,067 | 377,454,067 |
| August 7, 2008 | (23,864,227,403) | 89,736,433 | (145,176,694) | 77,361,530 | - | (53,216) | (23,842,359,350) | 3,562,150,077 | 321,960,590 | 399,322,120 |
| August 8, 2008 | (23,842,359,350) | 188,200,000 | (21,499,043) | - | (167,278,332) | (158,999) | (23,843,095,724) | 3,728,851,034 | 321,224,216 | 398,585,746 |
| August 11, 2008 | (23,843,095,724) | 239,916,757 | (138,500,000) | 990,026,069 | - | (53,203) | (22,751,706,102) | 3,830,267,791 | 422,587,769 | 1,489,975,368 |
| August 12, 2008 | (22,751,706,102) | 509,777,225 | (8,769,257) | 38,393,522 | - | (22,032) | (22,212,326,643) | 4,331,275,759 | 923,573,705 | 2,029,354,827 |
| August 13, 2008 | (22,212,326,643) | 36,200,000 | (47,421,039) | 55,556,869 | - | (52,907) | (22,168,043,721) | 4,320,054,720 | 912,299,759 | 2,073,637,749 |
| August 14, 2008 | (22,168,043,721) | 203,058,988 | (6,834) | - | (23,937,464) | (52,856) | (21,988,981,886) | 4,523,106,874 | 1,091,361,594 | 2,252,699,584 |
| August 15, 2008 | (21,988,981,886) | 500,000,000 | (7,800,000) | - | (33,913,836) | 5,871,628 | (21,524,824,094) | 5,015,306,874 | 1,549,647,758 | 2,710,985,748 |
| August 18, 2008 | (21,524,824,094) | 583,802,500 | (1,142,400) | - | (262,563,798) | (51,365) | (21,204,779,157) | 5,597,966,974 | 1,869,692,695 | 3,031,030,685 |
| August 19, 2008 | (21,204,779,157) | 71,000,000 | (1,631,086) | 27,727,623 | - | (52,860) | (21,107,735,480) | 5,667,335,888 | 1,939,008,749 | 3,128,074,362 |
| August 20, 2008 | (21,107,735,480) | 16,260,549 | (224,580,000) | 514,945,901 | - | (52,863) | (20,801,161,893) | 5,459,016,437 | 1,730,636,435 | 3,434,647,949 |
| August 21, 2008 | (20,801,161,893) | 947,525,000 | (3,830,250) | 228,710,217 | - | (52,729) | (19,628,809,656) | 6,402,711,187 | 2,674,278,456 | 4,607,000,186 |
| August 22, 2008 | (19,628,809,656) | 96,429,881 | (66,500,000) | 193,500,794 | - | 3,480,257 | (19,401,898,723) | 6,432,641,068 | 2,704,208,337 | 4,830,430,861 |
| August 25, 2008 | (19,401,898,723) | 97,100,000 | (31,200,000) | 35,496,263 | - | (53,225) | (19,300,555,685) | 6,498,541,068 | 2,770,055,112 | 4,931,773,900 |
| August 26, 2008 | (19,300,555,685) | 44,898,884 | (153,000,000) | 14,074,968 | - | (53,311) | (19,394,635,144) | 6,390,439,952 | 2,661,900,684 | 4,837,694,441 |
| August 27, 2008 | (19,394,635,144) | 598,700,000 | (40,110,000) | 27,539,280 | - | (53,315) | (18,808,559,179) | 6,949,029,952 | 3,220,437,370 | 5,423,770,406 |
| August 28, 2008 | (18,808,559,179) | 23,080,000 | (350,000,000) | 864,397,519 | - | (53,539) | (18,271,135,199) | 6,622,109,952 | 2,893,463,831 | 5,961,194,386 |
| August 29, 2008 | (18,271,135,199) | 136,841,031 | (635,900,000) | - | (170,389,870) | (463,802) | (18,941,047,839) | 6,123,050,983 | 2,223,551,190 | 5,291,281,745 |
| August 31, 2008 | (18,941,047,839) | - | - | - | - | (8,107,310) | (18,949,155,149) | 6,123,050,983 | 2,215,443,880 | 5,283,174,435 |
| September 1, 2008 | (18,949,155,149) | - | - | - | (245,839) | 4,925 | (18,949,396,063) | 6,123,050,983 | 2,215,198,041 | 5,282,928,597 |
| September 2, 2008 | (18,949,396,063) | 94,358,527 | (480,000,000) | 27,875,780 | - | (53,088) | (19,307,214,845) | 5,737,409,510 | 1,829,503,480 | 4,925,109,815 |
| September 3, 2008 | (19,307,214,845) | 470,600,000 | (34,618,477) | - | (611,675,394) | (52,844) | (19,482,961,560) | 6,173,391,034 | 1,653,756,765 | 4,749,363,100 |
| September 4, 2008 | (19,482,961,560) | 396,800,000 | (700,000) | 16,411,506 | - | (52,820) | (19,070,502,874) | 6,569,491,034 | 2,049,803,946 | 5,161,821,786 |
| September 5, 2008 | (19,070,502,874) | 138,800,000 | (251,409,674) | 16,306,027 | - | (139,773) | (19,166,946,294) | 6,456,881,359 | 1,937,054,498 | 5,065,378,365 |
| September 8, 2008 | (19,166,946,294) | 490,000 | (187,300,000) | - | (62,181,820) | (52,503) | (19,415,990,617) | 6,270,071,359 | 1,688,010,175 | 4,816,334,043 |

Source DBS, GCCM

68

**Exhibit 13**

**LBSF Preference/New Value Analysis**
**Account 1262000099**

| Effective Date (A) | Antecedent Debt to LBHI - Beginning Balance (B) | Up-Funding (C) | Down-Funding (D) | Net Quasi Up-Funding (E) | Net Quasi Down-Funding (F) | Other Activity (G) | Antecedent Debt to LBHI - Ending Balance (H) | Model 1: Up-Funding Preference Net of Down-Funding New Value (I) | Model 2: Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value (J) | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value (K) |
|---|---|---|---|---|---|---|---|---|---|---|
| September 9, 2008 | (19,415,990,617) | 77,600,000 | (571,238,404) | 243,084,352 | - | (52,437) | (19,666,597,107) | 5,776,432,955 | 1,194,319,334 | 4,565,727,553 |
| September 10, 2008 | (19,666,597,107) | 115,000,000 | (780,222,924) | 465,350,568 | - | (52,178) | (19,866,521,641) | 5,111,210,031 | 529,044,231 | 4,365,803,018 |
| September 11, 2008 | (19,866,521,641) | 110,210,113 | (565,400,000) | - | (674,218,224) | (51,933) | (20,995,981,686) | 4,656,020,144 | 110,210,113 | 3,236,342,974 |
| September 12, 2008 | (20,995,981,686) | 707,000,000 | (1,590,020,000) | 74,267,430 | - | (155,479) | (21,804,889,735) | 3,773,000,144 | 707,000,000 | 2,427,434,925 |
| September 15, 2008 | (21,804,889,735) | - | - | 4,798,636 | - | (51,754) | (21,800,142,853) | 3,773,000,144 | 706,948,246 | 2,432,181,807 |
| September 16, 2008 | (21,800,142,853) | - | - | - | (1,002,148) | (51,674) | (21,801,196,675) | 3,773,000,144 | 705,894,424 | 2,431,127,985 |
| September 17, 2008 | (21,801,196,675) | - | - | - | (1,068,064) | (55,073) | (21,802,319,812) | 3,773,000,144 | 704,771,287 | 2,430,004,848 |
| September 18, 2008 | (21,802,319,812) | - | - | - | (1,659,763) | (85,583) | (21,804,065,158) | 3,773,000,144 | 703,025,941 | 2,428,259,501 |
| September 19, 2008 | (21,804,065,158) | - | - | - | (4,979,825) | (256,778) | (21,809,301,761) | 3,773,000,144 | 697,789,338 | 2,423,022,899 |
| September 22, 2008 | (21,809,301,761) | - | - | - | (1,660,478) | (85,620) | (21,811,047,858) | 3,773,000,144 | 696,043,241 | 2,421,276,801 |
| September 23, 2008 | (21,811,047,858) | - | - | - | (1,660,656) | (85,629) | (21,812,794,144) | 3,773,000,144 | 694,296,955 | 2,419,530,516 |
| September 24, 2008 | (21,812,794,144) | - | - | - | (1,660,835) | (85,639) | (21,814,540,618) | 3,773,000,144 | 692,550,481 | 2,417,784,042 |
| September 25, 2008 | (21,814,540,618) | - | - | - | (1,647,619) | (84,957) | (21,816,273,193) | 3,773,000,144 | 690,817,906 | 2,416,051,466 |
| September 26, 2008 | (21,816,273,193) | - | - | - | (5,063,954) | (261,116) | (21,821,598,263) | 3,773,000,144 | 685,492,836 | 2,410,726,397 |
| September 29, 2008 | (21,821,598,263) | - | - | - | (1,715,341) | (88,449) | (21,823,402,052) | 3,773,000,144 | 683,689,046 | 2,408,922,607 |
| September 30, 2008 | (21,823,402,052) | - | - | - | (1,679,188) | 556,122,332 | (21,268,958,908) | 3,773,000,144 | 682,009,859 | 2,407,243,419 |

**LEGEND**

| Column | Description |
|---|---|
| A | Date on which transactions were recorded per DBS. |
| B | Daily beginning balance of liability owed to LBHI for account 1262000099 per DBS. |
| C | Total daily cash funding from LBCS to LBHI, as recorded in GCCM, relating to LBHI clearing bank accounts of real world cash (assumed to occur at end of day). |
| D | Total daily cash funding from LBHI to LBCS, as recorded in GCCM. |
| E | Net of all intercompany activity recorded in GCCM except for "funding," if this net activity results in a reduction of LBCS's intercompany liability to LBHI. |
| F | Net of all intercompany activity recorded in GCCM except for "funding," if this net activity results in an increase to LBCS's intercompany liability to LBHI. |
| G | Net of all journal entries affecting these intercompany accounts, other than those that are sourced to GCCM. |
| H | Daily ending balance of LBSF's liability to LBHI for account 1262000099 per DBS. |
| I | Cumulative balance of potential preferences based on Up-Funding (C), net of new value based on Down-Funding (D). New value from Down-Funding is applied first, because Up-Funding is assumed to occur at the end of the day. |
| J | Cumulative balance of potential preferences based on Up-Funding (C), net of new value based on Down-Funding (D), Net Quasi Down-Funding (F), and "Other" activity (G) where net "Other" activity is a credit. Adjustments were made to certain beginning- and end-of-month "Other" journal entries for purposes of this balance. Potential new value from Columns (D), (F) and (G) are netted and applied first, as they are assumed to occur throughout the day. The potential preference from Up-Funding (C) is assumed to occur at the end of the day. |
| K | Cumulative balance of potential preferences based on Up-Funding (C) and Net Quasi Up-Funding (E) and net of new value based on Down-Funding (D), Net Quasi Down-Funding (F), and "Other" activity (G) where net "Other" activity is a credit. Adjustments were made to certain beginning- and end-of-month "Other" journal entries for purposes of this balance. The potential preference from Net Quasi Up-Funding (E) is netted with all potential new value from Columns (D), (F) and (G) and applied together, as they are assumed to occur throughout the day. The potential prefrence from Up-Funding (C) is applied last, as it is assumed to occur at the end of the day. |

Source DBS, GCCM

69

## Exhibit 14

### LBSF Preference/New Value Analysis
### Account 1262000911

| | | | | | | | | Model 1: | Model 2: | Model 3: |
|---|---|---|---|---|---|---|---|---|---|---|
| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Up-Funding Preference Net of Down-Funding New Value | Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| June 1, 2008 | 6,649,188,359 | - | - | - | - | 4,186,174,013 | 10,835,362,372 | - | - | - |
| June 2, 2008 | 10,835,362,372 | - | - | - | (191,320,409) | (13) | 10,644,041,950 | - | - | - |
| June 3, 2008 | 10,644,041,950 | - | - | - | (687,558,214) | (13) | 9,956,483,723 | - | - | - |
| June 4, 2008 | 9,956,483,723 | - | - | - | (260,832,707) | (12) | 9,695,651,004 | - | - | - |
| June 5, 2008 | 9,695,651,004 | - | - | 75,684,769 | - | (12) | 9,771,335,761 | - | - | 75,684,757 |
| June 6, 2008 | 9,771,335,761 | - | - | 770,266,237 | - | (37) | 10,541,601,961 | - | - | 845,950,957 |
| June 9, 2008 | 10,541,601,961 | - | - | 430,746,990 | - | (12) | 10,972,348,938 | - | - | 1,276,697,935 |
| June 10, 2008 | 10,972,348,938 | - | - | 19,011,921 | - | (12) | 10,991,360,847 | - | - | 1,295,709,843 |
| June 11, 2008 | 10,991,360,847 | - | - | - | (11,614,626) | (12) | 10,979,746,208 | - | - | 1,284,095,205 |
| June 12, 2008 | 10,979,746,208 | - | - | - | (22,714,528) | (12) | 10,957,031,669 | - | - | 1,261,380,665 |
| June 13, 2008 | 10,957,031,669 | - | - | - | (171,891,138) | (37) | 10,785,140,494 | - | - | 1,089,489,490 |
| June 16, 2008 | 10,785,140,494 | - | - | - | (214,405,171) | (12) | 10,570,735,311 | - | - | 875,084,307 |
| June 17, 2008 | 10,570,735,311 | - | - | 129,449,916 | - | (1,322,122) | 10,698,863,105 | - | - | 1,003,212,102 |
| June 18, 2008 | 10,698,863,105 | - | - | 471,790,064 | - | (12) | 11,170,653,157 | - | - | 1,475,002,153 |
| June 19, 2008 | 11,170,653,157 | - | - | 633,149,910 | - | 2,329,547 | 11,806,132,614 | - | - | 2,108,152,063 |
| June 20, 2008 | 11,806,132,614 | - | - | - | (199,559,426) | (503,677) | 11,606,069,511 | - | - | 1,908,088,960 |
| June 23, 2008 | 11,606,069,511 | - | - | 346,067,199 | - | (12) | 11,952,136,697 | - | - | 2,254,156,147 |
| June 24, 2008 | 11,952,136,697 | - | - | 103,882,053 | - | (17,329) | 12,056,001,421 | - | - | 2,358,020,871 |
| June 25, 2008 | 12,056,001,421 | - | - | - | (313,915,925) | (13) | 11,742,085,483 | - | - | 2,044,104,932 |
| June 26, 2008 | 11,742,085,483 | - | - | 32,865,742 | - | (13) | 11,774,951,212 | - | - | 2,076,970,661 |
| June 27, 2008 | 11,774,951,212 | - | - | - | (876,103,779) | (39) | 10,898,847,393 | - | - | 1,200,866,843 |
| June 30, 2008 | 10,898,847,393 | - | - | - | (530,656,042) | (3,923,040,708) | 6,445,150,644 | - | - | 670,210,801 |
| July 1, 2008 | 6,445,150,644 | - | - | 19,889,650 | - | 4,025,840,358 | 10,490,880,652 | - | - | 690,098,891 |
| July 2, 2008 | 10,490,880,652 | - | - | - | (9,296,472) | (12) | 10,481,584,168 | - | - | 680,802,407 |
| July 3, 2008 | 10,481,584,168 | - | - | - | (318,368,459) | (13) | 10,163,215,697 | - | - | 362,433,935 |
| July 4, 2008 | 10,163,215,697 | - | - | - | (19,218,322) | (38) | 10,143,997,337 | - | - | 343,215,576 |
| July 7, 2008 | 10,143,997,337 | - | - | 73,509,533 | - | (13) | 10,217,506,857 | - | - | 416,725,096 |
| July 8, 2008 | 10,217,506,857 | - | - | - | (602,950,037) | (13) | 9,614,556,808 | - | - | - |
| July 9, 2008 | 9,614,556,808 | - | - | 404,924,088 | - | (13) | 10,019,480,883 | - | - | 404,924,075 |
| July 10, 2008 | 10,019,480,883 | - | - | 126,035,183 | - | (13) | 10,145,516,053 | - | - | 530,959,245 |
| July 11, 2008 | 10,145,516,053 | - | - | - | (311,070,574) | (39) | 9,834,445,439 | - | - | 219,888,632 |
| July 14, 2008 | 9,834,445,439 | - | - | 288,740,149 | - | (14) | 10,123,185,574 | - | - | 508,628,767 |
| July 15, 2008 | 10,123,185,574 | - | - | - | (334,607,505) | (963,505) | 9,787,614,565 | - | - | 173,057,757 |
| July 16, 2008 | 9,787,614,565 | - | - | - | (714,024) | (14) | 9,786,900,527 | - | - | 172,343,720 |
| July 17, 2008 | 9,786,900,527 | - | - | - | (36,603,543) | (14) | 9,750,296,971 | - | - | 135,740,164 |
| July 18, 2008 | 9,750,296,971 | - | - | - | (66,925,105) | (2,974) | 9,683,368,892 | - | - | 68,812,085 |
| July 21, 2008 | 9,683,368,892 | - | - | 364,115,410 | - | (14) | 10,047,484,289 | - | - | 432,927,482 |

Source DBS, GCCM

**Exhibit 14**

**LBSF Preference/New Value Analysis**
**Account 1262000911**

| | | | | | | | | Model 1: | Model 2: | Model 3: |
|---|---|---|---|---|---|---|---|---|---|---|
| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Up-Funding Preference Net of Down-Funding New Value | Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| July 22, 2008 | 10,047,484,289 | - | - | 291,129,761 | - | (14) | 10,338,614,036 | - | - | 724,057,229 |
| July 23, 2008 | 10,338,614,036 | - | - | - | (215,852,243) | (14) | 10,122,761,780 | - | - | 508,204,972 |
| July 24, 2008 | 10,122,761,780 | - | - | - | (75,903,896) | (13) | 10,046,857,871 | - | - | 432,301,063 |
| July 25, 2008 | 10,046,857,871 | - | - | - | (447,560,488) | (40) | 9,599,297,343 | - | - | - |
| July 28, 2008 | 9,599,297,343 | - | - | - | (600,921,929) | (13) | 8,998,375,401 | - | - | - |
| July 29, 2008 | 8,998,375,401 | - | - | 40,276,610 | - | (13) | 9,038,651,998 | - | - | 40,276,597 |
| July 30, 2008 | 9,038,651,998 | - | - | - | (72,130,875) | (13) | 8,966,521,110 | - | - | - |
| July 31, 2008 | 8,966,521,110 | - | - | 71,721,754 | - | 1,033,826,255 | 10,072,069,119 | - | - | 71,721,754 |
| August 1, 2008 | 10,072,069,119 | - | - | 38,547,306 | - | (1,262,788,673) | 8,847,827,753 | - | - | 110,261,091 |
| August 4, 2008 | 8,847,827,753 | - | - | 64,122,823 | - | (14) | 8,911,950,562 | - | - | 174,383,900 |
| August 5, 2008 | 8,911,950,562 | - | - | - | (160,956,566) | (1,989) | 8,750,992,007 | - | - | 13,425,346 |
| August 6, 2008 | 8,750,992,007 | - | - | 237,217,179 | - | (14) | 8,988,209,173 | - | - | 250,642,511 |
| August 7, 2008 | 8,988,209,173 | - | - | - | (221,547,341) | (14) | 8,766,661,819 | - | - | 29,095,157 |
| August 8, 2008 | 8,766,661,819 | - | - | 14,034,435 | - | (41) | 8,780,696,213 | - | - | 43,129,551 |
| August 11, 2008 | 8,780,696,213 | - | - | - | (472,086,626) | (13) | 8,308,609,574 | - | - | - |
| August 12, 2008 | 8,308,609,574 | - | - | - | (594,634,705) | (13) | 7,713,974,856 | - | - | - |
| August 13, 2008 | 7,713,974,856 | - | - | 10,061,644 | - | (13) | 7,724,036,487 | - | - | 10,061,631 |
| August 14, 2008 | 7,724,036,487 | - | - | 270,576,150 | - | (25) | 7,994,612,612 | - | - | 280,637,756 |
| August 15, 2008 | 7,994,612,612 | - | - | - | (1,051,051,048) | (39) | 6,943,561,525 | - | - | - |
| August 18, 2008 | 6,943,561,525 | - | - | - | (413,185,193) | (9,809,984) | 6,520,566,348 | - | - | - |
| August 19, 2008 | 6,520,566,348 | - | - | - | (166,055,261) | 34,693 | 6,354,545,780 | - | - | - |
| August 20, 2008 | 6,354,545,780 | - | - | - | (151,638,607) | (13) | 6,202,907,160 | - | - | - |
| August 21, 2008 | 6,202,907,160 | - | - | - | (585,703,851) | (13) | 5,617,203,296 | - | - | - |
| August 22, 2008 | 5,617,203,296 | - | - | 37,020,609 | - | (39) | 5,654,223,866 | - | - | 37,020,570 |
| August 25, 2008 | 5,654,223,866 | - | - | 9,385,406 | - | (13) | 5,663,609,259 | - | - | 46,405,963 |
| August 26, 2008 | 5,663,609,259 | - | - | 72,590,112 | - | (38,230) | 5,736,161,141 | - | - | 118,957,845 |
| August 27, 2008 | 5,736,161,141 | - | - | - | (174,880,917) | 103,999,607 | 5,665,279,831 | - | - | - |
| August 28, 2008 | 5,665,279,831 | - | - | - | (135,396,227) | 1,315,110 | 5,531,198,714 | - | - | - |
| August 29, 2008 | 5,531,198,714 | - | - | 546,464,449 | - | (456,673,246) | 5,620,989,918 | - | - | 89,791,204 |
| August 31, 2008 | 5,620,989,918 | - | - | - | - | 2,016,892,350 | 7,637,882,268 | - | - | 89,791,204 |
| September 1, 2008 | 7,637,882,268 | - | - | 98,215,111 | - | (2,091,111,927) | 5,644,985,452 | - | - | 188,006,315 |
| September 2, 2008 | 5,644,985,452 | - | - | - | (44,273,593) | (13) | 5,600,711,846 | - | - | 143,732,709 |
| September 3, 2008 | 5,600,711,846 | - | - | - | (312,797,236) | (13) | 5,287,914,597 | - | - | - |
| September 4, 2008 | 5,287,914,597 | - | - | 308,022,980 | - | (12) | 5,595,937,565 | - | - | 308,022,967 |
| September 5, 2008 | 5,595,937,565 | - | - | - | (325,088,903) | (37) | 5,270,848,625 | - | - | - |
| September 8, 2008 | 5,270,848,625 | - | - | 21,449,044 | - | (12) | 5,292,297,657 | - | - | 21,449,031 |

**Exhibit 14**

**LBSF Preference/New Value Analysis**
**Account 1262000911**

| | | | | | | | | Model 1: | Model 2: | Model 3: |
|---|---|---|---|---|---|---|---|---|---|---|
| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Up-Funding Preference Net of Down-Funding New Value | Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| September 9, 2008 | 5,292,297,657 | - | - | 192,150,543 | - | (12) | 5,484,448,187 | - | - | 213,599,562 |
| September 10, 2008 | 5,484,448,187 | - | - | 356,556,105 | - | (12) | 5,841,004,280 | - | - | 570,155,655 |
| September 11, 2008 | 5,841,004,280 | - | - | - | (349,555,879) | (12) | 5,491,448,389 | - | - | 220,599,764 |
| September 12, 2008 | 5,491,448,389 | - | - | - | (99,796,430) | (36) | 5,391,651,922 | - | - | 120,803,297 |
| September 15, 2008 | 5,391,651,922 | - | - | 77,390,315 | - | (12) | 5,469,042,225 | - | - | 198,193,600 |
| September 16, 2008 | 5,469,042,225 | - | - | - | (56,396,055) | (12) | 5,412,646,157 | - | - | 141,797,532 |
| September 17, 2008 | 5,412,646,157 | - | - | 677,699 | - | (12) | 5,413,323,844 | - | - | 142,475,219 |
| September 18, 2008 | 5,413,323,844 | - | - | 719,050 | - | (13) | 5,414,042,881 | - | - | 143,194,256 |
| September 19, 2008 | 5,414,042,881 | - | - | 2,179,550 | - | - | 5,416,222,431 | - | - | 145,373,806 |
| September 22, 2008 | 5,416,222,431 | - | - | 734,987 | - | (13) | 5,416,957,405 | - | - | 146,108,780 |
| September 23, 2008 | 5,416,957,405 | - | - | 746,842 | - | (13) | 5,417,704,235 | - | - | 146,855,610 |
| September 24, 2008 | 5,417,704,235 | - | - | 749,376 | - | (13) | 5,418,453,598 | - | - | 147,604,973 |
| September 25, 2008 | 5,418,453,598 | - | - | 735,574 | - | (13) | 5,419,189,159 | - | - | 148,340,534 |
| September 26, 2008 | 5,419,189,159 | - | - | 2,220,348 | - | (41) | 5,421,409,466 | - | - | 150,560,841 |
| September 29, 2008 | 5,421,409,466 | - | - | 746,752 | - | (52) | 5,422,156,165 | - | - | 151,307,540 |
| September 30, 2008 | 5,422,156,165 | - | - | 737,207 | - | 11,323,302 | 5,434,216,674 | - | - | 152,044,747 |

**LEGEND**

| Column | Description |
|---|---|
| A | Date on which transactions were recorded per DBS. |
| B | Daily beginning balance of liability owed to LBHI for account 1262000911 per DBS. |
| C | Total daily cash funding from LBCS to LBHI, as recorded in GCCM, relating to LBHI clearing bank accounts of real world cash (assumed to occur at end of day). |
| D | Total daily cash funding from LBHI to LBCS, as recorded in GCCM. |
| E | Net of all intercompany activity recorded in GCCM except for "funding," if this net activity results in a reduction of LBCS's intercompany liability to LBHI. |
| F | Net of all intercompany activity recorded in GCCM except for "funding," if this net activity results in an increase to LBCS's intercompany liability to LBHI. |
| G | Net of all journal entries affecting these intercompany accounts, other than those that are sourced to GCCM. |
| H | Daily ending balance of LBSF's liability to LBHI for account 1262000911 per DBS. |
| I | Cumulative balance of potential preferences based on Up-Funding (C), net of new value based on Down-Funding (D). New value from Down-Funding is applied first, because Up-Funding is assumed to occur at the end of the day. |
| J | Cumulative balance of potential preferences based on Up-Funding (C), net of new value based on Down-Funding (D), Net Quasi Down-Funding (F), and "Other" activity (G) where net "Other" activity is a credit. Adjustments were made to certain beginning- and end-of-month "Other" journal entries for purposes of this balance. Potential new value from Columns (D), (F) and (G) are netted and applied first, as they are assumed to occur throughout the day. The potential preference from Up-Funding (C) is assumed to occur at the end of the day. |
| K | Cumulative balance of potential preferences based on Up-Funding (C) and Net Quasi Up-Funding (D), net of new value based on Down-Funding (D), Net Quasi Down-Funding (F), and "Other" activity (G) where net "Other" activity is a credit. Adjustments were made to certain beginning- and end-of-month "Other" journal entries for purposes of this balance. The potential preference from Net Quasi Up-Funding (D) is netted with all potential new value from Columns (D), (F) and (G) applied together, as they are assumed to occur throughout the day. The potential prefrence from Up-Funding (C) is applied last, as it is assumed to occur at the end of the day. |

Source DBS, GCCM

72

**Exhibit 15**

**LBSF Preference/New Value Analysis**
**Accounts 1262000099 & 1262000911 Combined**

| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Model 1: Up-Funding Preference Net of Down-Funding New Value | Model 2: Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
|---|---|---|---|---|---|---|---|---|---|---|
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| June 1, 2008 | (7,554,767,911) | - | - | - | - | 4,186,066,654 | (3,368,701,257) | - | - | - |
| June 2, 2008 | (3,368,701,257) | 1,803,331 | (818,795,797) | - | (233,136,834) | (53,034) | (4,418,883,592) | 1,803,331 | 1,803,331 | 1,803,331 |
| June 3, 2008 | (4,418,883,592) | 349,300,000 | (6,900,000) | - | (754,249,690) | (53,298) | (4,830,786,580) | 349,300,000 | 349,300,000 | 349,300,000 |
| June 4, 2008 | (4,830,786,580) | 828,600,000 | (143,000,000) | - | (200,168,244) | (53,110) | (4,345,407,934) | 1,034,900,000 | 834,678,646 | 834,678,646 |
| June 5, 2008 | (4,345,407,934) | 134,675,475 | (570,376,000) | - | (51,756,608) | (52,784) | (4,832,917,851) | 599,199,475 | 347,168,729 | 347,168,729 |
| June 6, 2008 | (4,832,917,851) | 6,700,005 | (914,892,259) | 880,022,896 | - | (127,741) | (4,861,214,949) | 6,700,005 | 6,700,005 | 318,871,631 |
| June 9, 2008 | (4,861,214,949) | 99,019,047 | (515,507,750) | 424,175,186 | - | (21,791) | (4,853,550,257) | 99,019,047 | 99,019,047 | 326,536,323 |
| June 10, 2008 | (4,853,550,257) | 359,800,000 | (93,346,195) | 322,893,843 | - | 43,853 | (4,264,158,755) | 365,472,853 | 365,472,853 | 915,883,972 |
| June 11, 2008 | (4,264,158,755) | 130,300 | (1,586,400,000) | 114,085,812 | - | (50,885) | (5,736,393,528) | 130,300 | 130,300 | 130,300 |
| June 12, 2008 | (5,736,393,528) | 76,348,933 | (300,000,000) | - | (1,245,149,248) | (145,953) | (7,205,339,799) | 76,348,933 | 76,348,933 | 76,348,933 |
| June 13, 2008 | (7,205,339,799) | 31,537,147 | (504,527,147) | - | (165,451,292) | (121,321) | (7,843,902,408) | 31,537,147 | 31,537,147 | 31,537,147 |
| June 16, 2008 | (7,843,902,408) | 240,000,000 | (1,286,547,955) | - | (114,655,024) | (50,407) | (9,005,255,794) | 240,000,000 | 240,000,000 | 240,000,000 |
| June 17, 2008 | (9,005,255,794) | 116,600,000 | (357,721,770) | 219,555,483 | - | (1,372,648) | (9,028,194,630) | 116,600,000 | 116,600,000 | 217,061,165 |
| June 18, 2008 | (9,028,194,630) | 219,400,000 | (551,578,775) | 89,079,391 | - | (50,579) | (9,271,344,592) | 219,400,000 | 219,400,000 | 219,400,000 |
| June 19, 2008 | (9,271,344,592) | 84,700,000 | (821,484,991) | 446,419,585 | - | 2,279,060 | (9,559,430,938) | 84,700,000 | 84,700,000 | 84,700,000 |
| June 20, 2008 | (9,559,430,938) | 756,020,478 | (4,500,000) | - | (230,420,066) | (567,799) | (9,038,898,326) | 836,220,478 | 756,020,478 | 756,020,478 |
| June 23, 2008 | (9,038,898,326) | 572,651,801 | (852,181,438) | 470,627,351 | - | (50,513) | (8,847,851,124) | 572,651,801 | 572,651,801 | 947,067,679 |
| June 24, 2008 | (8,847,851,124) | 159,400,000 | (404,760,439) | 51,682,328 | - | (89,271) | (9,041,618,506) | 327,291,362 | 327,202,091 | 753,300,297 |
| June 25, 2008 | (9,041,618,506) | 434,624,454 | (93,623,733) | - | (196,199,901) | (59,277) | (8,896,876,963) | 668,292,082 | 471,943,634 | 898,041,840 |
| June 26, 2008 | (8,896,876,963) | 611,801,750 | (125,007,030) | 36,029,080 | - | (1,091,065) | (8,375,144,332) | 1,155,086,802 | 957,647,186 | 1,419,774,472 |
| June 27, 2008 | (8,375,144,332) | 676,002,524 | (89,065,319) | - | (973,099,628) | (147,521) | (8,761,454,276) | 1,742,024,007 | 676,002,524 | 1,033,464,527 |
| June 30, 2008 | (8,761,454,276) | 712,800,000 | (26,251,000) | 770,310,867 | - | (3,732,729,311) | (11,037,323,720) | 2,428,573,007 | 1,362,551,524 | 2,490,324,394 |
| July 1, 2008 | (11,037,323,720) | 514,100,000 | (123,907,200) | 324,550,987 | - | 3,921,060,985 | (6,401,518,949) | 2,818,765,807 | 1,752,688,525 | 3,205,012,383 |
| July 2, 2008 | (6,401,518,949) | 14,400,000 | (481,800,000) | 19,795,215 | - | | (6,849,177,712) | 2,351,365,807 | 1,285,234,546 | 2,757,353,619 |
| July 3, 2008 | (6,849,177,712) | 9,343,222 | (118,500,000) | - | (198,538,250) | (231,185) | (7,157,103,926) | 2,242,209,029 | 977,308,333 | 2,449,427,405 |
| July 4, 2008 | (7,157,103,926) | - | - | - | (21,463,993) | 14,968 | (7,178,552,951) | 2,242,209,029 | 955,844,340 | 2,427,963,412 |
| July 7, 2008 | (7,178,552,951) | 56,200,943 | (511,400,000) | 21,051,480 | - | (5,636) | (7,612,706,164) | 1,787,009,971 | 500,639,646 | 1,993,810,199 |
| July 8, 2008 | (7,612,706,164) | 413,302,229 | (81,654,229) | - | (567,456,772) | (53,864) | (7,848,568,800) | 2,118,657,971 | 413,302,229 | 1,757,547,563 |
| July 9, 2008 | (7,848,568,800) | 834,951,131 | (507,750) | 47,820,870 | - | (53,840) | (6,966,358,390) | 2,953,101,352 | 1,247,691,769 | 2,640,157,973 |
| July 10, 2008 | (6,966,358,390) | 326,400,000 | (23,184,216) | 65,089,961 | - | (53,707) | (6,598,106,352) | 3,256,317,136 | 1,550,853,846 | 3,008,410,011 |
| July 11, 2008 | (6,598,106,352) | 655,000,005 | (1,596,290) | - | (437,469,985) | (142,806) | (6,382,665,427) | 3,909,720,851 | 1,766,294,771 | 3,223,850,936 |
| July 14, 2008 | (6,382,665,427) | - | (433,600,000) | 169,098,123 | - | (53,254) | (6,647,220,558) | 3,476,120,851 | 1,332,641,517 | 2,959,295,805 |
| July 15, 2008 | (6,647,220,558) | 76,000,000 | (137,195,779) | - | (204,101,215) | (1,016,529) | (6,913,534,082) | 3,414,925,072 | 1,066,327,993 | 2,692,982,281 |
| July 16, 2008 | (6,913,534,082) | - | (333,091,100) | 5,284,357 | - | (52,904) | (7,241,393,730) | 3,081,833,972 | 733,183,989 | 2,365,122,633 |
| July 17, 2008 | (7,241,393,730) | 220,600,000 | (550,399,576) | 77,676,678 | - | (52,853) | (7,493,569,480) | 2,752,034,396 | 403,331,560 | 2,112,346,883 |
| July 18, 2008 | (7,493,569,480) | 234,110,125 | (80,000,000) | - | (34,740,161) | (130,248) | (7,374,329,764) | 2,906,144,521 | 522,571,276 | 2,232,186,599 |
| July 21, 2008 | (7,374,329,764) | 25,340,000 | (87,336,150) | 374,435,175 | - | 124,022 | (7,061,766,717) | 2,844,148,371 | 460,575,126 | 2,544,625,624 |

Source: DBS, GCCM

**Exhibit 15**

**LBSF Preference/New Value Analysis**
Accounts 1262000099 & 1262000911 Combined

| | | | | | | | Model 1: | Model 2: | Model 3: |
|---|---|---|---|---|---|---|---|---|---|
| Effective Date | Antecedent Debt to LBHI - Beginning Balance | Up-Funding | Down-Funding | Net Quasi Up-Funding | Net Quasi Down-Funding | Other Activity | Antecedent Debt to LBHI - Ending Balance | Up-Funding Preference Net of Down-Funding New Value | Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value | Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value |
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) |
| July 22, 2008 | (7,061,766,717) | 10,800,000 | (795,186,500) | 500,600,553 | - | (52,252) | (7,345,604,916) | 2,059,761,871 | 10,800,000 | 2,260,787,425 |
| July 23, 2008 | (7,345,604,916) | 436,800,000 | (100,077,000) | - | (134,534,949) | (52,076) | (7,143,468,941) | 2,396,484,871 | 436,800,000 | 2,462,923,400 |
| July 24, 2008 | (7,143,468,941) | 60,900,000 | (324,567,123) | 11,673,884 | - | (52,079) | (7,395,514,260) | 2,132,817,748 | 173,080,797 | 2,210,878,081 |
| July 25, 2008 | (7,395,514,260) | 460,300,000 | (149,899,912) | - | (515,939,200) | (127,671) | (7,601,181,043) | 2,443,217,836 | 460,300,000 | 2,005,211,298 |
| July 28, 2008 | (7,601,181,043) | 320,000,000 | (5,300,000) | - | (665,556,588) | (442,571) | (7,952,480,202) | 2,757,917,836 | 320,000,000 | 1,653,912,140 |
| July 29, 2008 | (7,952,480,202) | 57,970,270 | (420,000,250) | 1,640,567 | - | (52,606) | (8,312,922,220) | 2,395,887,856 | 57,970,270 | 1,293,470,121 |
| July 30, 2008 | (8,312,922,220) | 399,338,260 | (1,570,785) | - | (5,129,244,653) | (53,476) | (13,044,452,874) | 2,793,655,331 | 399,338,260 | 399,338,260 |
| July 31, 2008 | (13,044,452,874) | 386,112,284 | - | - | (69,823,851) | 1,031,157,836 | (11,697,006,605) | 3,179,767,616 | 715,626,693 | 715,626,693 |
| August 1, 2008 | (11,697,006,605) | 113,300,000 | (268,000) | - | (2,266,365,650) | (1,263,405,736) | (15,113,745,991) | 3,292,799,616 | 113,300,000 | 113,300,000 |
| August 4, 2008 | (15,113,745,991) | 70,500,000 | (74,745,650) | - | (625,287) | (53,632) | (15,118,670,760) | 3,288,553,766 | 108,375,231 | 108,375,231 |
| August 5, 2008 | (15,118,670,760) | 407,671,743 | (65,235,170) | - | (306,728,390) | (55,143) | (15,083,017,720) | 3,630,990,338 | 407,671,743 | 407,671,743 |
| August 6, 2008 | (15,083,017,720) | 336,600,000 | (350,000,000) | 220,452,593 | - | (53,103) | (14,876,018,230) | 3,617,590,338 | 394,218,640 | 614,671,233 |
| August 7, 2008 | (14,876,018,230) | 89,736,433 | (145,176,694) | - | (144,185,810) | (53,230) | (15,075,697,531) | 3,562,150,077 | 194,539,339 | 414,991,932 |
| August 8, 2008 | (15,075,697,531) | 188,200,000 | (21,499,043) | - | (153,243,897) | (159,040) | (15,062,399,511) | 3,728,851,034 | 207,837,359 | 428,289,951 |
| August 11, 2008 | (15,062,399,511) | 239,916,757 | (138,500,000) | 517,939,443 | - | (53,216) | (14,443,096,528) | 3,830,267,791 | 309,200,899 | 1,047,592,935 |
| August 12, 2008 | (14,443,096,528) | 509,777,225 | (8,769,257) | - | (556,241,183) | (22,046) | (14,498,351,788) | 4,331,275,759 | 509,777,225 | 992,337,675 |
| August 13, 2008 | (14,498,351,788) | 36,200,000 | (47,421,039) | 65,618,513 | - | (52,920) | (14,444,007,234) | 4,320,054,720 | 498,503,266 | 1,046,682,228 |
| August 14, 2008 | (14,444,007,234) | 203,058,988 | (6,834) | 246,638,686 | - | (52,880) | (13,994,369,274) | 4,523,106,874 | 701,502,540 | 1,496,320,188 |
| August 15, 2008 | (13,994,369,274) | 500,000,000 | (7,800,000) | - | (1,084,964,884) | 5,871,589 | (14,581,262,569) | 5,015,306,874 | 500,000,000 | 903,555,304 |
| August 18, 2008 | (14,581,262,569) | 583,802,500 | (1,142,400) | - | (675,748,991) | (9,861,349) | (14,684,212,809) | 5,597,966,974 | 583,802,500 | 800,605,064 |
| August 19, 2008 | (14,684,212,809) | 71,000,000 | (1,631,086) | - | (138,327,636) | (18,166) | (14,753,189,700) | 5,667,335,888 | 514,825,610 | 731,628,174 |
| August 20, 2008 | (14,753,189,700) | 16,260,549 | (224,580,000) | 363,307,293 | - | (52,876) | (14,598,254,734) | 5,459,016,437 | 306,453,282 | 886,563,140 |
| August 21, 2008 | (14,598,254,734) | 947,525,000 | (3,830,250) | - | (356,993,635) | (52,742) | (14,011,606,360) | 6,402,711,187 | 947,525,000 | 1,473,211,513 |
| August 22, 2008 | (14,011,606,360) | 96,429,881 | (66,500,000) | 230,521,403 | - | 3,480,218 | (13,747,674,857) | 6,432,641,068 | 977,454,881 | 1,733,662,798 |
| August 25, 2008 | (13,747,674,857) | 97,100,000 | (31,200,000) | 44,881,670 | - | (53,238) | (13,636,946,426) | 6,498,541,068 | 1,043,301,643 | 1,844,391,229 |
| August 26, 2008 | (13,636,946,426) | 44,898,884 | (153,000,000) | 86,665,081 | - | (91,542) | (13,658,474,003) | 6,390,439,952 | 935,108,985 | 1,822,863,652 |
| August 27, 2008 | (13,658,474,003) | 598,700,000 | (40,110,000) | - | (147,341,637) | 103,946,292 | (13,143,279,348) | 6,949,029,952 | 1,346,357,348 | 2,234,112,015 |
| August 28, 2008 | (13,143,279,348) | 23,080,000 | (350,000,000) | 729,001,292 | - | 1,261,571 | (12,739,936,484) | 6,622,109,952 | 1,019,437,348 | 2,636,193,307 |
| August 29, 2008 | (12,739,936,484) | 136,841,031 | (635,900,000) | 376,074,580 | - | (457,137,048) | (13,320,057,921) | 6,123,050,983 | 136,841,031 | 2,056,071,870 |
| August 31, 2008 | (13,320,057,921) | - | - | - | - | 2,008,785,040 | (11,311,272,882) | 6,123,050,983 | 136,841,031 | 2,056,071,870 |
| September 1, 2008 | (11,311,272,882) | - | - | 97,969,273 | - | (2,091,107,002) | (13,304,410,611) | 6,123,050,983 | 136,841,031 | 2,154,041,143 |
| September 2, 2008 | (13,304,410,611) | 94,358,527 | (480,000,000) | - | (16,397,814) | (53,101) | (13,706,502,999) | 5,737,409,510 | 94,358,527 | 1,751,948,755 |
| September 3, 2008 | (13,706,502,999) | 470,600,000 | (34,618,477) | - | (924,472,630) | (52,856) | (14,195,046,962) | 6,173,391,034 | 470,600,000 | 1,263,404,792 |
| September 4, 2008 | (14,195,046,962) | 396,800,000 | (700,000) | 324,434,485 | - | (52,832) | (13,474,565,309) | 6,569,491,034 | 866,647,168 | 1,983,886,445 |
| September 5, 2008 | (13,474,565,309) | 138,800,000 | (251,409,674) | - | (308,782,876) | (139,810) | (13,896,097,669) | 6,456,881,359 | 445,114,808 | 1,562,354,085 |
| September 8, 2008 | (13,896,097,669) | 490,000 | (187,300,000) | - | (40,732,776) | (52,515) | (14,123,692,960) | 6,270,071,359 | 217,519,517 | 1,334,758,794 |

Source: DBS, GCCM

74

**Exhibit 15**

**LBSF Preference/New Value Analysis**
**Accounts 1262000099 & 1262000911 Combined**

| Effective Date (A) | Antecedent Debt to LBHI - Beginning Balance (B) | Up-Funding (C) | Down-Funding (D) | Net Quasi Up-Funding (E) | Net Quasi Down-Funding (F) | Other Activity (G) | Antecedent Debt to LBHI - Ending Balance (H) | Model 1: Up-Funding Preference Net of Down-Funding New Value (I) | Model 2: Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value (J) | Model 3: Up-Funding and Quasi Up-Funding Preference Net of Down-Funding, Net Quasi Down-Funding and Other Activity New Value (K) |
|---|---|---|---|---|---|---|---|---|---|---|
| September 9, 2008 | (14,123,692,960) | 77,600,000 | (571,238,404) | 435,234,894 | - | (52,449) | (14,182,148,920) | 5,776,432,955 | 77,600,000 | 1,276,302,834 |
| September 10, 2008 | (14,182,148,920) | 115,000,000 | (780,222,924) | 821,906,674 | - | (52,191) | (14,025,517,361) | 5,111,210,031 | 115,000,000 | 1,432,934,393 |
| September 11, 2008 | (14,025,517,361) | 110,210,113 | (565,400,000) | - | (1,023,774,103) | (51,946) | (15,504,533,297) | 4,656,020,144 | 110,210,113 | 110,210,113 |
| September 12, 2008 | (15,504,533,297) | 707,000,000 | (1,590,020,000) | - | (25,529,000) | (155,516) | (16,413,237,813) | 3,773,000,144 | 707,000,000 | 707,000,000 |
| September 15, 2008 | (16,413,237,813) | - | - | 82,188,951 | - | (51,766) | (16,331,100,628) | 3,773,000,144 | 706,948,234 | 789,137,185 |
| September 16, 2008 | (16,331,100,628) | - | - | - | (57,398,203) | (51,687) | (16,388,550,518) | 3,773,000,144 | 649,498,344 | 731,687,295 |
| September 17, 2008 | (16,388,550,518) | - | - | - | (390,365) | (55,086) | (16,388,995,968) | 3,773,000,144 | 649,052,894 | 731,241,845 |
| September 18, 2008 | (16,388,995,968) | - | - | - | (940,713) | (85,596) | (16,390,022,277) | 3,773,000,144 | 648,026,584 | 730,215,536 |
| September 19, 2008 | (16,390,022,277) | - | - | - | (2,800,275) | (256,778) | (16,393,079,329) | 3,773,000,144 | 644,969,532 | 727,158,483 |
| September 22, 2008 | (16,393,079,329) | - | - | - | (925,491) | (85,633) | (16,394,090,453) | 3,773,000,144 | 643,958,409 | 726,147,360 |
| September 23, 2008 | (16,394,090,453) | - | - | - | (913,814) | (85,642) | (16,395,089,909) | 3,773,000,144 | 642,958,953 | 725,147,904 |
| September 24, 2008 | (16,395,089,909) | - | - | - | (911,459) | (85,652) | (16,396,087,020) | 3,773,000,144 | 641,961,842 | 724,150,793 |
| September 25, 2008 | (16,396,087,020) | - | - | - | (912,044) | (84,971) | (16,397,084,035) | 3,773,000,144 | 640,964,827 | 723,153,778 |
| September 26, 2008 | (16,397,084,035) | - | - | - | (2,843,606) | (261,156) | (16,400,188,797) | 3,773,000,144 | 637,860,065 | 720,049,016 |
| September 29, 2008 | (16,400,188,797) | - | - | - | (968,589) | (88,501) | (16,401,245,888) | 3,773,000,144 | 636,802,974 | 718,991,925 |
| September 30, 2008 | (16,401,245,888) | - | - | - | (941,980) | 567,445,634 | (15,834,742,234) | 3,773,000,144 | 635,860,994 | 718,049,945 |

**LEGEND**

| Column | Description |
|---|---|
| A | Date on which transactions were recorded per DBS. |
| B | Daily beginning balance of liability owed to LBHI for accounts 1262000099 and 1262000911 per DBS. |
| C | Total daily cash funding from LBCS to LBHI, as recorded in GCCM, relating to LBHI clearing bank accounts of real world cash (assumed to occur at end of day). |
| D | Total daily cash funding from LBHI to LBCS, as recorded in GCCM. |
| E | Net of all intercompany activity recorded in GCCM except for "funding," if this net activity results in a reduction of LBCS's intercompany liability to LBHI. |
| F | Net of all intercompany activity recorded in GCCM except for "funding," if this net activity results in an increase to LBCS's intercompany liability to LBHI. |
| G | Net of all journal entries affecting these intercompany accounts, other than those that are sourced to GCCM. |
| H | Daily ending balance of LSFS's liability to LBHI for accounts 1262000099 and 1262000911 per DBS. |
| I | Cumulative balance of potential preferences based on Up-Funding (C), net of new value based on Down-Funding (D). New value from Down-Funding is applied first, because Up-Funding is assumed to occur at the end of the day. |
| J | Cumulative balance of potential preferences based on Up-Funding (C), net of new value based on Down-Funding (D), Net Quasi Down-Funding (F), and "Other" activity (G) where net "Other" activity is a credit. Adjustments were made to certain beginning- and end-of-month "Other" journal entries for purposes of this balance. Potential new value from Columns (D), (F) and (G) are netted and applied first, as they are assumed to occur throughout the day. The potential preference from Up-Funding (C) is assumed to occur at the end of the day. |
| K | Cumulative balance of potential preferences based on Up-Funding (C) and Net Quasi Up-Funding (E), net of new value based on Down-Funding (D), Net Quasi Down-Funding (F), and "Other" activity (G) where net "Other" activity is a credit. Adjustments were made to certain beginning- and end-of-month "Other" journal entries for purposes of this balance. The potential preference from Net Quasi Up-Funding (E) is netted with all potential new value from Columns (D), (F) and (G) and applied together, as they are assumed to occur throughout the day. The potential prefrence from Up-Funding (C) is applied last, as it is assumed to occur at the end of the day. |

Source: DBS, GCCM

75

**Exhibit 16**



Source: DBS

**Exhibit 17**



Source: DBS, GCCM

**Exhibit 18**



Source: GCCM

**Exhibit 19**



**LBSF Funding Transactions Per Month**

Source: GCCM

**Exhibit 20**



Source: GCCM

Exhibit 21



Source: DBS, GCCM

**Exhibit 22**                              Page 1 of 3

| | | Trust 89 Transactions Involving LCPI and LBHI | | |
| | | LCPI "Repos"/LBHI "Reverse Repos" Booked or Settled on or after 6/1/2008 | | |

| | Open Date | Initial Close Date | Final Close Date[1] | Amount[2] |
|---|---|---|---|---|
| 1 | 5/30/2008 | 12/31/2014 | 6/6/2008 | 300,000,000 |
| 2 | 5/30/2008 | 1/1/1900 | 6/2/2008 | 2,938,960,623 |
| 3 | 6/2/2008 | 6/2/2008 | 6/2/2008 | 841,778,872 |
| 4 | 6/2/2008 | 1/1/1900 | 6/3/2008 | 786,374,808 |
| 5 | 6/3/2008 | 1/1/1900 | 6/4/2008 | 725,793,969 |
| 6 | 6/4/2008 | 1/1/1900 | 6/9/2008 | 699,135,889 |
| 7 | 6/6/2008 | 12/31/2014 | 6/13/2008 | 300,000,000 |
| 8 | 6/9/2008 | 1/1/1900 | 6/10/2008 | 867,774,312 |
| 9 | 6/10/2008 | 1/1/1900 | 6/13/2008 | 696,023,738 |
| 10 | 6/13/2008 | 1/1/1900 | 6/16/2008 | 1,326,245,578 |
| 11 | 6/13/2008 | 12/31/2014 | 6/20/2008 | 300,000,000 |
| 12 | 6/16/2008 | 1/1/1900 | 6/17/2008 | 1,243,871,108 |
| 13 | 6/17/2008 | 1/1/1900 | 6/18/2008 | 1,338,871,108 |
| 14 | 6/18/2008 | 1/1/1900 | 6/19/2008 | 1,300,997,737 |
| 15 | 6/19/2008 | 1/1/1900 | 6/20/2008 | 1,254,929,214 |
| 16 | 6/20/2008 | 12/31/2014 | 6/27/2008 | 300,000,000 |
| 17 | 6/20/2008 | 1/1/1900 | 6/23/2008 | 1,226,011,048 |
| 18 | 6/23/2008 | 6/23/2008 | 6/23/2008 | 1,126,876,809 |
| 19 | 6/23/2008 | 1/1/1900 | 6/24/2008 | 1,112,474,049 |
| 20 | 6/24/2008 | 1/1/1900 | 6/25/2008 | 1,153,288,127 |
| 21 | 6/25/2008 | 1/1/1900 | 6/26/2008 | 1,194,322,800 |
| 22 | 6/26/2008 | 1/1/1900 | 6/27/2008 | 1,303,122,800 |
| 23 | 6/27/2008 | 12/31/2014 | 7/7/2008 | 300,000,000 |
| 24 | 6/27/2008 | 1/1/1900 | 6/30/2008 | 1,356,922,800 |
| 25 | 6/30/2008 | 6/30/2008 | 6/30/2008 | 1,221,851,478 |
| 26 | 6/30/2008 | 1/1/1900 | 7/1/2008 | 849,543,883 |
| 27 | 7/1/2008 | 1/1/1900 | 7/2/2008 | 941,719,432 |
| 28 | 7/2/2008 | 7/2/2008 | 7/2/2008 | 1,567,528,496 |
| 29 | 7/2/2008 | 1/1/1900 | 7/3/2008 | 1,555,968,034 |
| 30 | 7/3/2008 | 7/3/2008 | 7/3/2008 | 752,827,004 |
| 31 | 7/3/2008 | 1/1/1900 | 7/7/2008 | 779,496,229 |
| 32 | 7/7/2008 | 7/7/2008 | 7/7/2008 | 781,382,305 |
| 33 | 7/7/2008 | 12/31/2014 | 7/11/2008 | 300,000,000 |
| 34 | 7/7/2008 | 7/7/2008 | 7/7/2008 | 799,110,802 |
| 35 | 7/7/2008 | 1/1/1900 | 7/8/2008 | 780,554,605 |
| 36 | 7/8/2008 | 7/8/2008 | 7/8/2008 | 706,088,105 |
| 37 | 7/8/2008 | 1/1/1900 | 7/9/2008 | 702,387,291 |
| 38 | 7/9/2008 | 7/9/2008 | 7/9/2008 | 726,926,210 |
| 39 | 7/9/2008 | 1/1/1900 | 7/10/2008 | 890,771,912 |
| 40 | 7/10/2008 | 7/10/2008 | 7/10/2008 | 897,898,528 |
| 41 | 7/10/2008 | 1/1/1900 | 7/11/2008 | 869,089,633 |
| 42 | 7/11/2008 | 12/31/2014 | 7/18/2008 | 300,000,000 |
| 43 | 7/11/2008 | 7/11/2008 | 7/11/2008 | 1,015,345,387 |
| 44 | 7/11/2008 | 1/1/1900 | 7/14/2008 | 983,572,457 |
| 45 | 7/14/2008 | 1/1/1900 | 7/15/2008 | 992,449,015 |
| 46 | 7/15/2008 | 7/15/2008 | 7/15/2008 | 988,177,615 |
| 47 | 7/15/2008 | 1/1/1900 | 7/16/2008 | 1,079,438,760 |
| 48 | 7/16/2008 | 7/16/2008 | 7/16/2008 | 853,158,226 |

[1] "Open" trades were not settled at the time of LCPI's bankruptcy.

[2] Negative amounts represent reverse repos from LCPI's perspective and repos from LBHI's perspective.

Source: APB

**Exhibit 22**  Page 2 of 3

| | | | Trust 89 Transactions Involving LCPI and LBHI | |
|---|---|---|---|---|
| | | | LCPI "Repos"/LBHI "Reverse Repos" Booked or Settled on or after 6/1/2008 | |
| | **Open Date** | **Initial Close Date** | **Final Close Date**[1] | **Amount**[2] |
| 49 | 7/16/2008 | 1/1/1900 | 7/17/2008 | 946,986,943 |
| 50 | 7/17/2008 | 7/17/2008 | 7/17/2008 | 946,427,069 |
| 51 | 7/17/2008 | 1/1/1900 | 7/18/2008 | 938,627,069 |
| 52 | 7/18/2008 | 12/31/2014 | 7/25/2008 | 300,000,000 |
| 53 | 7/18/2008 | 1/1/1900 | 7/21/2008 | 990,009,192 |
| 54 | 7/21/2008 | 1/1/1900 | 7/22/2008 | 885,080,392 |
| 55 | 7/22/2008 | 7/22/2008 | 7/22/2008 | 892,806,455 |
| 56 | 7/22/2008 | 1/1/1900 | 7/23/2008 | 866,668,780 |
| 57 | 7/23/2008 | 7/23/2008 | 7/23/2008 | 863,093,167 |
| 58 | 7/23/2008 | 1/1/1900 | 7/24/2008 | 857,928,547 |
| 59 | 7/24/2008 | 7/24/2008 | 7/24/2008 | 846,874,384 |
| 60 | 7/24/2008 | 1/1/1900 | 7/25/2008 | 908,507,257 |
| 61 | 7/25/2008 | 12/31/2014 | 8/1/2008 | 300,000,000 |
| 62 | 7/25/2008 | 7/25/2008 | 7/25/2008 | 794,253,257 |
| 63 | 7/25/2008 | 7/25/2008 | 7/25/2008 | 984,253,257 |
| 64 | 7/25/2008 | 1/1/1900 | 7/28/2008 | 967,602,385 |
| 65 | 7/28/2008 | 7/28/2008 | 7/28/2008 | 959,614,613 |
| 66 | 7/28/2008 | 1/1/1900 | 7/29/2008 | 934,859,965 |
| 67 | 7/29/2008 | 7/29/2008 | 7/29/2008 | 769,646,576 |
| 68 | 7/29/2008 | 1/1/1900 | 7/30/2008 | 861,419,771 |
| 69 | 7/30/2008 | 7/30/2008 | 7/30/2008 | 852,924,720 |
| 70 | 7/30/2008 | 1/1/1900 | 7/31/2008 | 862,624,720 |
| 71 | 7/31/2008 | 7/31/2008 | 7/31/2008 | 822,239,081 |
| 72 | 7/31/2008 | 1/1/1900 | 8/1/2008 | 785,009,777 |
| 73 | 8/1/2008 | 1/1/1900 | 8/4/2008 | 775,117,606 |
| 74 | 8/4/2008 | 8/4/2008 | 8/4/2008 | 730,781,903 |
| 75 | 8/4/2008 | 1/1/1900 | 8/5/2008 | 759,850,969 |
| 76 | 8/5/2008 | 1/1/1900 | 8/6/2008 | 771,151,369 |
| 77 | 8/6/2008 | 1/1/1900 | 8/7/2008 | 786,274,929 |
| 78 | 8/7/2008 | 8/7/2008 | 8/7/2008 | 797,951,683 |
| 79 | 8/7/2008 | 1/1/1900 | 8/8/2008 | 811,030,665 |
| 80 | 8/8/2008 | 8/8/2008 | 8/8/2008 | (4,986,373,203) |
| 81 | 8/8/2008 | 8/8/2008 | 8/8/2008 | (4,961,872,983) |
| 82 | 8/8/2008 | 1/1/1900 | 8/11/2008 | (5,010,873,423) |
| 83 | 8/11/2008 | 8/11/2008 | 8/11/2008 | (7,012,570,840) |
| 84 | 8/11/2008 | 1/1/1900 | 8/12/2008 | (7,048,742,051) |
| 85 | 8/12/2008 | 8/12/2008 | 8/12/2008 | (5,221,232,175) |
| 86 | 8/12/2008 | 1/1/1900 | 8/13/2008 | (5,242,377,579) |
| 87 | 8/13/2008 | 8/13/2008 | 8/13/2008 | (5,342,801,253) |
| 88 | 8/13/2008 | 1/1/1900 | 8/14/2008 | (5,338,314,825) |
| 89 | 8/14/2008 | 1/1/1900 | 8/15/2008 | (5,269,071,543) |
| 90 | 8/15/2008 | 8/15/2008 | 8/15/2008 | (7,260,212,232) |
| 91 | 8/15/2008 | 8/15/2008 | 8/15/2008 | (5,269,071,543) |
| 92 | 8/15/2008 | 12/31/2014 | 8/22/2008 | 330,000,000 |
| 93 | 8/15/2008 | 1/1/1900 | 8/18/2008 | (4,667,613,289) |
| 94 | 8/18/2008 | 8/18/2008 | 8/18/2008 | (1,672,558,284) |
| 95 | 8/18/2008 | 1/1/1900 | 8/19/2008 | (2,628,597,544) |
| 96 | 8/19/2008 | 8/19/2008 | 8/19/2008 | (2,692,731,028) |

[1] "Open" trades were not settled at the time of LCPI's bankruptcy.

[2] Negative amounts represent reverse repos from LCPI's perspective and repos from LBHI's perspective.

Source: APB

**Exhibit 22**  Page 3 of 3

| | **Trust 89 Transactions Involving LCPI and LBHI** | | | |
|---|---|---|---|---|
| | LCPI "Repos"/LBHI "Reverse Repos" Booked or Settled on or after 6/1/2008 | | | |
| | **Open Date** | **Initial Close Date** | **Final Close Date**[1] | **Amount**[2] |
| 97 | 8/19/2008 | 1/1/1900 | 8/20/2008 | (2,707,731,028) |
| 98 | 8/20/2008 | 8/20/2008 | 8/20/2008 | (2,729,876,604) |
| 99 | 8/20/2008 | 1/1/1900 | 8/21/2008 | (2,757,058,470) |
| 100 | 8/21/2008 | 8/21/2008 | 8/21/2008 | (5,802,876,232) |
| 101 | 8/21/2008 | 1/1/1900 | 8/22/2008 | (5,804,624,877) |
| 102 | 8/22/2008 | 12/31/2014 | 8/26/2008 | 330,000,000 |
| 103 | 8/22/2008 | 1/1/1900 | 8/25/2008 | (6,437,936,402) |
| 104 | 8/25/2008 | 8/25/2008 | 8/25/2008 | (6,624,338,252) |
| 105 | 8/25/2008 | 1/1/1900 | 8/26/2008 | (6,694,218,289) |
| 106 | 8/26/2008 | 12/31/2014 | 8/29/2008 | 168,000,000 |
| 107 | 8/26/2008 | 8/26/2008 | 8/26/2008 | (6,725,781,055) |
| 108 | 8/26/2008 | 1/1/1900 | 8/27/2008 | (6,828,065,692) |
| 109 | 8/27/2008 | 8/27/2008 | 8/27/2008 | (6,101,036,204) |
| 110 | 8/27/2008 | 1/1/1900 | 8/28/2008 | (5,846,948,325) |
| 111 | 8/28/2008 | 8/28/2008 | 8/28/2008 | (5,816,798,320) |
| 112 | 8/28/2008 | 1/1/1900 | 8/29/2008 | (5,868,398,320) |
| 113 | 8/29/2008 | 8/29/2008 | 8/29/2008 | (5,988,466,627) |
| 114 | 8/29/2008 | 12/31/2014 | 9/5/2008 | 168,000,000 |
| 115 | 8/29/2008 | 1/1/1900 | 9/2/2008 | (5,211,169,446) |
| 116 | 9/2/2008 | 9/2/2008 | 9/2/2008 | (5,666,529,578) |
| 117 | 9/2/2008 | 9/2/2008 | 9/2/2008 | (5,162,370,338) |
| 118 | 9/2/2008 | 1/1/1900 | 9/3/2008 | (6,170,688,818) |
| 119 | 9/3/2008 | 9/3/2008 | 9/3/2008 | (6,162,421,690) |
| 120 | 9/3/2008 | 1/1/1900 | 9/4/2008 | (6,250,264,924) |
| 121 | 9/4/2008 | 9/4/2008 | 9/4/2008 | (6,235,093,085) |
| 122 | 9/4/2008 | 1/1/1900 | 9/5/2008 | (6,231,694,923) |
| 123 | 9/5/2008 | 12/31/2014 | 9/12/2008 | 168,000,000 |
| 124 | 9/5/2008 | 9/5/2008 | 9/5/2008 | (6,219,066,921) |
| 125 | 9/5/2008 | 1/1/1900 | 9/8/2008 | (6,184,091,163) |
| 126 | 9/8/2008 | 9/8/2008 | 9/8/2008 | (6,127,395,787) |
| 127 | 9/8/2008 | 1/1/1900 | 9/9/2008 | (6,091,552,190) |
| 128 | 9/9/2008 | 9/9/2008 | 9/9/2008 | (6,131,247,565) |
| 129 | 9/9/2008 | 1/1/1900 | 9/10/2008 | (6,162,476,420) |
| 130 | 9/10/2008 | 9/10/2008 | 9/10/2008 | (6,179,133,514) |
| 131 | 9/10/2008 | 1/1/1900 | 9/11/2008 | (6,175,909,618) |
| 132 | 9/11/2008 | 9/11/2008 | 9/11/2008 | (6,213,494,898) |
| 133 | 9/11/2008 | 9/11/2008 | 9/11/2008 | (6,225,404,330) |
| 134 | 9/11/2008 | 1/1/1900 | 9/12/2008 | (6,165,653,753) |
| 135 | 9/12/2008 | 12/31/2014 | 12/31/2014 | 168,000,000 |
| 136 | 9/12/2008 | Open | Open | (5,324,640,886) |

[1] "Open" trades were not settled at the time of LCPI's bankruptcy.

[2] Negative amounts represent reverse repos from LCPI's perspective and repos from LBHI's perspective.

Source: APB

**Exhibit 23**



Note: On December 28, 2007, the Trust 89 open position briefly spiked, while the Trust 86 open position dropped the same amount down to zero. A Trust 86 repo in the amount of $10.255 billion apparently was mis-labeled as Trust 89.

Source: APB

# Exhibit 24

## Trust 86 Trades Involving LCPI and LBHI
LCPI "Repos"/LBHI "Reverse Repos" Booked or Settled on or after 6/1/2008

|  | Open Date | Initial Close Date | Final Close Date[1] | Amount[2] |
|---|---|---|---|---|
| 1 | 5/30/2008 | 12/30/2008 | 6/17/2008 | $ 1,550,000,000 |
| 2 | 5/30/2008 | 6/2/2008 | 6/2/2008 | 14,443,000,000 |
| 3 | 5/30/2008 | 12/30/2008 | 6/9/2008 | 1,529,050,000 |
| 4 | 6/2/2008 | 6/3/2008 | 6/3/2008 | 13,493,000,000 |
| 5 | 6/2/2008 | 6/3/2008 | 6/3/2008 | 40,000,000 |
| 6 | 6/3/2008 | 6/4/2008 | 6/4/2008 | 13,600,000,000 |
| 7 | 6/4/2008 | 6/5/2008 | 6/5/2008 | 13,850,000,000 |
| 8 | 6/5/2008 | 6/6/2008 | 6/6/2008 | 13,850,000,000 |
| 9 | 6/6/2008 | 6/9/2008 | 6/9/2008 | 14,100,000,000 |
| 10 | 6/9/2008 | 6/10/2008 | 6/10/2008 | 14,100,000,000 |
| 11 | 6/9/2008 | 12/30/2008 | 6/11/2008 | 1,929,050,000 |
| 12 | 6/10/2008 | 12/30/2008 | 6/30/2008 | 1,050,000,000 |
| 13 | 6/10/2008 | 6/11/2008 | 6/11/2008 | 12,950,000,000 |
| 14 | 6/11/2008 | 6/11/2008 | 6/11/2008 | 1,462,000,000 |
| 15 | 6/11/2008 | 6/11/2008 | 6/11/2008 | 1,272,000,000 |
| 16 | 6/11/2008 | 6/12/2008 | 6/12/2008 | 13,100,000,000 |
| 17 | 6/11/2008 | 12/30/2008 | 6/17/2008 | 1,272,050,000 |
| 18 | 6/11/2008 | 6/12/2008 | 6/12/2008 | 12,000,000 |
| 19 | 6/12/2008 | 6/13/2008 | 6/13/2008 | 13,100,000,000 |
| 20 | 6/13/2008 | 6/16/2008 | 6/16/2008 | 14,709,000,000 |
| 21 | 6/16/2008 | 6/17/2008 | 6/17/2008 | 14,709,000,000 |
| 22 | 6/16/2008 | 6/17/2008 | 6/17/2008 | 104,000,000 |
| 23 | 6/17/2008 | 12/30/2008 | 6/30/2008 | 1,236,500,000 |
| 24 | 6/17/2008 | 12/30/2008 | 6/30/2008 | 1,063,050,000 |
| 25 | 6/17/2008 | 6/18/2008 | 6/18/2008 | 14,815,000,000 |
| 26 | 6/17/2008 | 6/18/2008 | 6/18/2008 | (120,000,000) |
| 27 | 6/18/2008 | 6/19/2008 | 6/19/2008 | 14,715,000,000 |
| 28 | 6/18/2008 | 6/19/2008 | 6/19/2008 | (24,000,000) |
| 29 | 6/19/2008 | 6/20/2008 | 6/20/2008 | 14,715,000,000 |
| 30 | 6/19/2008 | 6/20/2008 | 6/20/2008 | (104,000,000) |
| 31 | 6/20/2008 | 6/23/2008 | 6/23/2008 | 14,715,000,000 |
| 32 | 6/23/2008 | 6/24/2008 | 6/24/2008 | 14,665,000,000 |
| 33 | 6/23/2008 | 6/24/2008 | 6/24/2008 | 110,000,000 |
| 34 | 6/24/2008 | 6/25/2008 | 6/25/2008 | 15,610,000,000 |
| 35 | 6/25/2008 | 6/26/2008 | 6/26/2008 | 15,610,000,000 |
| 36 | 6/25/2008 | 6/26/2008 | 6/26/2008 | 44,000,000 |
| 37 | 6/26/2008 | 6/27/2008 | 6/27/2008 | 15,650,000,000 |
| 38 | 6/27/2008 | 6/30/2008 | 6/30/2008 | 15,400,000,000 |
| 39 | 6/30/2008 | 7/1/2008 | 7/1/2008 | 15,847,000,000 |
| 40 | 6/30/2008 | 7/1/2008 | 7/1/2008 | 70,000,000 |
| 41 | 6/30/2008 | 12/30/2008 | 7/11/2008 | 1,063,050,000 |
| 42 | 6/30/2008 | 12/30/2008 | 7/15/2008 | 1,236,500,000 |
| 43 | 6/30/2008 | 12/30/2008 | 7/11/2008 | 1,050,000,000 |
| 44 | 7/1/2008 | 7/2/2008 | 7/2/2008 | 15,947,000,000 |
| 45 | 7/1/2008 | 7/2/2008 | 7/2/2008 | (215,000,000) |
| 46 | 7/2/2008 | 7/3/2008 | 7/3/2008 | 15,837,000,000 |
| 47 | 7/2/2008 | 7/3/2008 | 7/3/2008 | (112,000,000) |
| 48 | 7/3/2008 | 7/7/2008 | 7/7/2008 | 15,837,000,000 |
| 49 | 7/7/2008 | 7/8/2008 | 7/8/2008 | 15,837,000,000 |

[1] "Open" trades were not settled at the time of LCPI's bankruptcy.

[2] Negative amounts represent reverse repos from LCPI's perspective and repos from LBHI's perspective.

Source: APB

# Exhibit 24

| | | | |
|---|---|---|---|
| **Trust 86 Trades Involving LCPI and LBHI** | | | |
| LCPI "Repos"/LBHI "Reverse Repos" Booked or Settled on or after 6/1/2008 | | | |

| | Open Date | Initial Close Date | Final Close Date[1] | Amount[2] |
|---|---|---|---|---|
| 50 | 7/7/2008 | 7/8/2008 | 7/8/2008 | 18,000,000 |
| 51 | 7/8/2008 | 7/9/2008 | 7/9/2008 | 16,037,000,000 |
| 52 | 7/9/2008 | 7/10/2008 | 7/10/2008 | 16,037,000,000 |
| 53 | 7/10/2008 | 7/11/2008 | 7/11/2008 | 16,037,000,000 |
| 54 | 7/11/2008 | 12/30/2008 | 7/16/2008 | 84,650,000 |
| 55 | 7/11/2008 | 12/30/2008 | 7/31/2008 | 101,695,000 |
| 56 | 7/11/2008 | 7/14/2008 | 7/14/2008 | 16,037,000,000 |
| 57 | 7/11/2008 | 7/14/2008 | 7/14/2008 | 100,000,000 |
| 58 | 7/14/2008 | 7/15/2008 | 7/15/2008 | 16,150,000,000 |
| 59 | 7/15/2008 | 12/30/2008 | 7/21/2008 | 691,500,000 |
| 60 | 7/15/2008 | 7/16/2008 | 7/16/2008 | 16,150,000,000 |
| 61 | 7/15/2008 | 7/16/2008 | 7/16/2008 | (156,000,000) |
| 62 | 7/16/2008 | 12/30/2008 | 7/31/2008 | 1,080,650,000 |
| 63 | 7/16/2008 | 7/17/2008 | 7/17/2008 | 16,050,000,000 |
| 64 | 7/17/2008 | 7/18/2008 | 7/18/2008 | 15,950,000,000 |
| 65 | 7/17/2008 | 7/18/2008 | 7/18/2008 | (138,000,000) |
| 66 | 7/18/2008 | 7/21/2008 | 7/21/2008 | 15,850,000,000 |
| 67 | 7/18/2008 | 7/21/2008 | 7/21/2008 | 148,000,000 |
| 68 | 7/21/2008 | 7/22/2008 | 7/22/2008 | 15,665,000,000 |
| 69 | 7/21/2008 | 7/21/2008 | 7/21/2008 | 361,500,000 |
| 70 | 7/21/2008 | 12/30/2008 | 7/23/2008 | 1,021,500,000 |
| 71 | 7/21/2008 | 7/22/2008 | 7/22/2008 | 72,000,000 |
| 72 | 7/22/2008 | 7/23/2008 | 7/23/2008 | 15,665,000,000 |
| 73 | 7/22/2008 | 7/23/2008 | 7/23/2008 | 170,000,000 |
| 74 | 7/23/2008 | 12/30/2008 | 7/31/2008 | 1,571,500,000 |
| 75 | 7/23/2008 | 7/24/2008 | 7/24/2008 | 15,835,000,000 |
| 76 | 7/24/2008 | 7/25/2008 | 7/25/2008 | 15,835,000,000 |
| 77 | 7/25/2008 | 7/28/2008 | 7/28/2008 | 15,835,000,000 |
| 78 | 7/25/2008 | 12/30/2008 | 7/28/2008 | 450,900,000 |
| 79 | 7/28/2008 | 7/29/2008 | 7/29/2008 | 15,685,000,000 |
| 80 | 7/28/2008 | 12/30/2008 | 7/29/2008 | 1,803,500,000 |
| 81 | 7/28/2008 | 7/29/2008 | 7/29/2008 | 46,000,000 |
| 82 | 7/29/2008 | 12/30/2008 | 8/15/2008 | 1,352,600,000 |
| 83 | 7/29/2008 | 7/30/2008 | 7/30/2008 | 16,185,900,000 |
| 84 | 7/30/2008 | 7/31/2008 | 7/31/2008 | 16,185,900,000 |
| 85 | 7/31/2008 | 7/31/2008 | 7/31/2008 | 2,116,500,000 |
| 86 | 7/31/2008 | 7/31/2008 | 7/31/2008 | 1,050,000,000 |
| 87 | 7/31/2008 | 7/31/2008 | 7/31/2008 | 1,977,107,722 |
| 88 | 7/31/2008 | 12/30/2008 | 8/15/2008 | 1,050,000,000 |
| 89 | 7/31/2008 | 12/30/2008 | 8/15/2008 | 1,977,107,722 |
| 90 | 7/31/2008 | 12/30/2008 | 8/19/2008 | 2,116,500,000 |
| 91 | 7/31/2008 | 8/1/2008 | 8/1/2008 | 15,985,900,000 |
| 92 | 7/31/2008 | 8/1/2008 | 8/1/2008 | (259,000,000) |
| 93 | 8/1/2008 | 8/4/2008 | 8/4/2008 | 15,785,900,000 |
| 94 | 8/4/2008 | 8/5/2008 | 8/5/2008 | 15,785,900,000 |
| 95 | 8/5/2008 | 8/6/2008 | 8/6/2008 | 15,785,900,000 |
| 96 | 8/6/2008 | 8/7/2008 | 8/7/2008 | 15,785,900,000 |
| 97 | 8/7/2008 | 8/8/2008 | 8/8/2008 | 15,785,900,000 |
| 98 | 8/8/2008 | 8/11/2008 | 8/11/2008 | 16,285,000,000 |
| 99 | 8/11/2008 | 8/12/2008 | 8/12/2008 | 16,285,000,000 |

[1] "Open" trades were not settled at the time of LCPI's bankruptcy.

[2] Negative amounts represent reverse repos from LCPI's perspective and repos from LBHI's perspective.

Source: APB

**Exhibit 24**

| | Trust 86 Trades Involving LCPI and LBHI | | | |
|---|---|---|---|---|
| | LCPI "Repos"/LBHI "Reverse Repos" Booked or Settled on or after 6/1/2008 | | | |
| | **Open Date** | **Initial Close Date** | **Final Close Date**[1] | **Amount**[2] |
| 100 | 8/12/2008 | 8/13/2008 | 8/13/2008 | 16,285,000,000 |
| 101 | 8/13/2008 | 8/14/2008 | 8/14/2008 | 16,385,000,000 |
| 102 | 8/13/2008 | 8/14/2008 | 8/14/2008 | 19,000,000 |
| 103 | 8/14/2008 | 8/15/2008 | 8/15/2008 | 16,605,000,000 |
| 104 | 8/14/2008 | 8/15/2008 | 8/15/2008 | (200,000,000) |
| 105 | 8/15/2008 | 8/18/2008 | 8/18/2008 | 14,170,000,000 |
| 106 | 8/15/2008 | 8/18/2008 | 8/18/2008 | (1,200,000,000) |
| 107 | 8/15/2008 | 12/30/2008 | 8/19/2008 | 948,058,420 |
| 108 | 8/15/2008 | 12/30/2008 | 8/19/2008 | 1,285,151,757 |
| 109 | 8/18/2008 | 8/19/2008 | 8/19/2008 | 12,970,000,000 |
| 110 | 8/19/2008 | 12/30/2008 | 8/27/2008 | 1,862,057,638 |
| 111 | 8/19/2008 | 12/30/2008 | 8/29/2008 | 924,021,657 |
| 112 | 8/19/2008 | 12/30/2008 | 9/3/2008 | 1,285,328,304 |
| 113 | 8/19/2008 | 12/30/2008 | 8/29/2008 | 773,041,393 |
| 114 | 8/19/2008 | 8/20/2008 | 8/20/2008 | 14,621,758,730 |
| 115 | 8/20/2008 | 8/21/2008 | 8/21/2008 | 15,072,000,000 |
| 116 | 8/20/2008 | 8/21/2008 | 8/21/2008 | 85,000,000 |
| 117 | 8/21/2008 | 8/22/2008 | 8/22/2008 | 15,158,000,000 |
| 118 | 8/21/2008 | 8/22/2008 | 8/22/2008 | 39,000,000 |
| 119 | 8/22/2008 | 8/25/2008 | 8/25/2008 | 15,835,000,000 |
| 120 | 8/25/2008 | 8/26/2008 | 8/26/2008 | 15,735,000,000 |
| 121 | 8/26/2008 | 8/27/2008 | 8/27/2008 | 15,735,000,000 |
| 122 | 8/26/2008 | 8/27/2008 | 8/27/2008 | 64,000,000 |
| 123 | 8/27/2008 | 8/27/2008 | 8/27/2008 | 1,662,909,948 |
| 124 | 8/27/2008 | 12/30/2008 | 8/29/2008 | 486,705,350 |
| 125 | 8/27/2008 | 8/28/2008 | 8/28/2008 | 15,955,000,000 |
| 126 | 8/28/2008 | 8/29/2008 | 8/29/2008 | 16,155,000,000 |
| 127 | 8/28/2008 | 8/29/2008 | 8/29/2008 | (450,000,000) |
| 128 | 8/29/2008 | 12/30/2008 | open | 486,705,350 |
| 129 | 8/29/2008 | 12/30/2008 | open | 924,021,657 |
| 130 | 8/29/2008 | 12/30/2008 | open | 773,041,393 |
| 131 | 8/29/2008 | 9/2/2008 | 9/2/2008 | 14,702,000,000 |
| 132 | 8/29/2008 | 9/2/2008 | 9/2/2008 | (113,000,000) |
| 133 | 9/2/2008 | 9/3/2008 | 9/3/2008 | 15,072,000,000 |
| 134 | 9/2/2008 | 9/3/2008 | 9/3/2008 | 24,000,000 |
| 135 | 9/3/2008 | 12/30/2008 | open | 1,285,328,304 |
| 136 | 9/3/2008 | 9/4/2008 | 9/4/2008 | 15,100,000,000 |
| 137 | 9/3/2008 | 9/4/2008 | 9/4/2008 | 52,000,000 |
| 138 | 9/4/2008 | 9/5/2008 | 9/5/2008 | 15,650,000,000 |
| 139 | 9/5/2008 | 9/8/2008 | 9/8/2008 | 15,640,412,616 |
| 140 | 9/5/2008 | 9/8/2008 | 9/8/2008 | 20,587,384 |
| 141 | 9/8/2008 | 9/9/2008 | 9/9/2008 | 15,665,000,000 |
| 142 | 9/8/2008 | 9/9/2008 | 9/9/2008 | (80,000,000) |
| 143 | 9/9/2008 | 9/10/2008 | 9/10/2008 | 15,586,000,000 |
| 144 | 9/9/2008 | 9/10/2008 | 9/10/2008 | 40,000,000 |
| 145 | 9/10/2008 | 9/11/2008 | 9/11/2008 | 16,126,000,000 |
| 146 | 9/10/2008 | 9/11/2008 | 9/11/2008 | 16,000,000 |
| 147 | 9/11/2008 | 9/12/2008 | 9/12/2008 | 16,150,000,000 |
| 148 | 9/12/2008 | 9/15/2008 | 9/15/2008 | 15,277,000,000 |

[1] "Open" trades were not settled at the time of LCPI's bankruptcy.

[2] Negative amounts represent reverse repos from LCPI's perspective and repos from LBHI's perspective.

Source: APB

**Exhibit 25**

**$900 Million Payments on August 28 & 29, 2008**

| | GCCM ID | Date | Sender Party | Sender Bank | Sender Account No. | Recipient Party | Recipient Bank | Recipient Account No. | Notes |
|---|---|---|---|---|---|---|---|---|---|
| 1 | D00005419207 | August 28, 2008 | LBI | JPM Chase | 66010373 | LBHI | Citibank | 40615202 | Three separate payments all part of a $3.343 billion transaction entered into TWS, for which the purpose is unknown. Payments were broken into three $900 million and one $365 million payments. |
| 2 | D00005419208 | August 28, 2008 | LBI | JPM Chase | 66010373 | LBHI | Citibank | 40615202 | |
| 3 | D00005419209 | August 28, 2008 | LBI | JPM Chase | 66010373 | LBHI | Citibank | 40615202 | |
| 4 | D00005420918 | August 28, 2008 | LBI | Unknown | Unknown | LBHI | Citibank | 40615202 | This payment is in reference to a transaction in the principal amount of $850 million, entered into TWS on August 27 to close on August 28. GCCM records reference United Missouri Bank as the Customer's Agent Bank. The purpose of the transaction is unknown. |
| 5 | D00005421322 | August 28, 2008 | LBI | JPM Chase | 66027098 | LBI | Citibank | 40615624 | The purpose of this payment is unknown. |
| 6 | D00005421323 | August 28, 2008 | LBI | JPM Chase | 66027098 | LBI | Citibank | 40615624 | The purpose of this payment is unknown. |
| 7 | D00005421324 | August 28, 2008 | LBI | JPM Chase | 66027098 | LBI | Citibank | 40615624 | The purpose of this payment is unknown. |
| 8 | D00005421325 | August 28, 2008 | LBI | JPM Chase | 66027098 | LBI | Citibank | 40615624 | The purpose of this payment is unknown. |
| 9 | D00005438075 | August 29, 2008 | LBI | JPM Chase | 66027098 | LBI | Citibank | 40615624 | The purpose of this payment is unknown. |
| 10 | D00005438076 | August 29, 2008 | LCPI | Citibank | 40615659 | LBHI | Citibank | 40615202 | Part of a net cash settlement related to LCPI Trust 86 transactions with LBHI. LCPI entered into a Trust 86 "repo" for $16.155 billion and a "reverse repo" for $450 million. On 8/29, both of those positions closed, and LCPI entered into a new Trust 86 for $14.702 million. The net amount of these transactions, factoring interest on the positions closed, amounted to a net payment of $1,004,065,216 from LCPI to LBHI. LCPI made two payments, one for $900 million and one for $104,065,216, in settlement of these positions. |

Source: GCCM, TWS, MTS

**Exhibit 26**

**Trust Receipts and Counterparties for trades in which**
**LCPI is either the Primary Entity or the Counterparty in MTS**
June 1, 2008 to September 30, 2008

**1COR**

FENWAY FUNDING LLC
TENSOR OPPORTUNITY LTD

**1CSA**

FENWAY FUNDING LLC

**1RWL**

FAR EAST NATIONAL BANK
FARMERS & MERCHANTS BANK
FID DMFMM/NEWBURY ST TRUST
FID FCR/PHILLIPS ST TRUST:
FID FICPDOM/COLCHESTER ST
FID FICPMM/COLCHESTER ST
FID FMMTRET/MMKT TRUST:
FID ICASH/PYRAMIS INST, EMP
FID MMCF/GARRISON ST TRUST:
FID MMDT/MASS MUNI DEPOSITORY
FID SELECT/SELECT PORT: MMKT
FID SHLMM/SHELL SAV GRP TRUST:
FID SPMM/HEREFORD ST TRUST:
FID VIPMM/VARIABLE INS PROD
RICOH CORPORATION
ROWAN COMPANIES, INC

**1WL**

FIDELITY MGMT & RSCH CO

**TPWLCOMPR**

BARCLAYS GBL INVESTORS NA
DANSKE BANK A/S LND BRANCH
LEHMAN RE LTD
STATE STREET GLOBAL ADVRS
SWEDBANK COMMERCIAL

**TPWLRESPR**

DANSKE BANK A/S LND BRANCH
LEHMAN RE LTD
SSGA FC1B WHOLE LOAN
STATE STREET GLOBAL ADVRS

**TRUST39**

LBI - LEHMAN BROTHERS INC.

**TRUST71**

ALASKA SEABOAARD PARTNERS LP

**TRUST75**

SASCO II

**TRUST86**

LBHI-LEHMAN BROTHERS HOLDINGS

**TRUST89**

LBHI-LEHMAN BROTHERS HOLDINGS
LBI - LEHMAN BROTHERS INC.
LEHMAN ALI INCORPORATED
LEHMAN BROTHERS BANKHAUS
LEHMAN CAPITAL,DIVISION OF (3)
LEHMAN INVESTMENT INC  (4)
PROPERTY ASSET MANAGEMENT INC  (5)

Source: APB

90