**Hearing Date and Time: April 22, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: April 17, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
In re                                          :        Chapter 11 Case No.
                                               :
LEHMAN BROTHERS HOLDINGS INC., et al.,         :        08-13555 (JMP)
                                               :
                          Debtors.             :        (Jointly Administered)
-------------------------------------------------------------------x
```

### NOTICE OF DEBTORS' MOTION PURSUANT TO
### SECTIONS 105(a), 362 AND 365 OF THE BANKRUPTCY CODE
### FOR AUTHORIZATION TO ASSUME CERTAIN AIRCRAFT LEASE
### AGREEMENTS AND TO CONSUMMATE CERTAIN RELATED TRANSACTIONS

PLEASE TAKE NOTICE that a hearing on the annexed motion, dated as of March 25, 2009 (the "Motion"), of Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases (together, the "Debtors"), pursuant to sections 105(a), 362, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for authorization to (i) assume non-exclusive aircraft lease agreements by and between (a) CES Aviation LLC, as Lessor, and Executive Fliteways, Inc. ("EFI"), as Lessee, dated September 1, 2007, (b) CES Aviation V LLC, as Lessor, and EFI, as Lessee, dated September 1, 2007, and (c) CES Aviation IX LLC, as Lessor, and EFI, as Lessee, dated September 1, 2007 (collectively, the "Agreements") and to consummate certain related transactions, including terminating the Agreements and paying the associated termination fees in accordance with the Agreements and (ii) agree to modify the automatic stay solely to the extent necessary to allow EFI to use certain funds on deposit with EFI to offset EFI's claims against the Debtors resulting from the termination of the Agreements, as all more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **April 22, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:   (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn:   Richard P. Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq., and Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:   Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:   Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v) any person or entity with a particularized interest in the Motion, so as to be so filed and received by no later than **April 17, 2009 at 4:00 p.m. (prevailing Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:   March 25, 2009
      New York, New York

           /s/ Alfredo R. Pérez
           Alfredo R. Pérez

           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York 10153
           Telephone: (212) 310-8000
           Facsimile: (212) 310-8007

           Attorneys for Debtors
           and Debtors in Possession

**Hearing Date and Time: April 22, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: April 17, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
|   |   |   |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
|   | : |   |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **08-13555 (JMP)** |
|   | : |   |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO SECTIONS**
**105(a), 362 AND 365 OF THE BANKRUPTCY CODE FOR**
**AUTHORIZATION TO ASSUME CERTAIN AIRCRAFT LEASE**
**AGREEMENTS AND TO CONSUMMATE CERTAIN RELATED TRANSACTIONS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

      Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), respectfully represent:

**Preliminary Statement**

      1.      Prior to the Commencement Date, Lehman held title to various aircraft through several of its debtor and non-debtor subsidiaries.   The aircraft were used to facilitate business transportation for Lehman employees prior to the commencement of these chapter 11 cases.   CES Aviation LLC, CES Aviation V LLC, and CES Aviation IX, LLC (the "Aviation Subsidiaries") are direct, wholly-owned subsidiaries of LBHI that filed for protection under chapter

11 on October 5, 2008.   The Aviation Subsidiaries' principal business was to hold title to certain aircraft of the Debtors (collectively, the "Aircraft").[1]

2.      The Aviation Subsidiaries and Executive Fliteways, Inc. ("EFI") entered into certain non-exclusive aircraft lease agreements pursuant to which the Aviation Subsidiaries leased the Aircraft to EFI in order that EFI may use the Aircraft to conduct certain charter services, as described more fully below.   EFI was responsible for all contracting with, billing, and collecting from charter customers.   EFI, among other things, also maintained the Aircraft in airworthy, marketable condition, stored the Aircraft in aircraft hangars, and supplied the Flight Crew to conduct all charter flights.   The Aviation Subsidiaries were responsible for reimbursing EFI for certain expenses incurred in operating the Aircraft.

3.      This Court recently authorized the Debtors to sell two of their aircraft, the G-IVSP and the Falcon 50, which resulted in a recovery to the Debtors' estates in the aggregate amount of $29,300,000.[2]   A motion to consider the sale of the S-76C+ is currently pending before this Court and is expected to close promptly upon Court approval.[3]   A successful sale of the S-76C+ will result in an additional recovery to the Debtors' estates.

---

[1] CES Aviation LLC held title to a Gulfstream Aerospace G-IVSP, bearing manufacturer's serial number 1448 and U.S. registration mark N300LB (the "G-IVSP").   CES Aviation IX held title to a Dassault model Falcon 50 aircraft, bearing manufacturer's serial number 179 and U.S. registration mark N232PR (the "Falcon 50").   CES Aviation V LLC holds title to a Sikorsky S-76C+ helicopter, bearing manufacturer's serial number 760486 and U.S. registration mark N151LB (the "S-76C+").   CES Aviation II LLC, a wholly-owned non-debtor subsidiary of LBHI, held title to a Gulfstream Aerospace G-IVSP, bearing U.S. registration number N250LB and manufacturer's serial number 1269 (the "G-IVSP II").

[2] *See*   Amended Order Pursuant to Sections 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6004 Authorizing Lehman Brothers Holdings Inc. to Enter into an Amended Sale and Purchase Agreement [Docket No. 2359];   Amended Order Pursuant to Sections 105 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002, 6004 and 9014, and Rules 6004-1, 9006-1 and 9014-1 of the Local Bankruptcy Rules Approving the Sale of Debtors Aircraft Pursuant to an Aircraft Sale and Purchase Agreement [Docket No. 2362].   The sale of the G-IVSP II, for the aggregate purchase price of $15,200,000, closed on February 12, 2009.

[3] *See*   Debtor's Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002, 6004 and 9014, and Rules 6004-1, 9006-1 and 9014-1 of the Local Bankruptcy Rules For Approval of

4.      As previously represented to this Court, the market for pre-owned aircraft is in precipitous decline.   Prior to the commencement of these chapter 11 cases, the Debtors were actively marketing their aviation assets in hopes of obtaining the maximum value for the assets in light of the softening market.   EFI played an important role in this process.   Following the Commencement Date, despite the Debtors' precarious financial condition, EFI agreed to continue to perform pursuant to the non-exclusive aircraft lease agreements based upon the Debtors' representations that EFI would be compensated.   Specifically, the Debtors agreed that in each motion for approval of the sale of the Aircraft, the Debtors would contemporaneously move the Court for authority to pay to EFI certain prepetition invoices representing flight support activity expenses incurred in the ordinary course of business.   In turn, EFI agreed to not assert its possessory interest in the Aircraft, enabling the Debtors to sell the Falcon 50 and the G-IVSP free and clear of all liens and encumbrances.[4]   The Debtors also agreed to seek Court authority to assume the non-exclusive aircraft lease agreements, terminate the agreements upon assumption, and make certain payments to EFI pursuant to the agreements in order to compensate EFI for its postpetition services.

5.      The sales of the G-IVSP and the Falcon 50, and the pending sale of the S-76C+, would not have been possible without the services provided by EFI pursuant to the non-exclusive aircraft lease agreements by and between EFI and each Aviation Subsidiary.   Thus, granting the relief requested by this Motion is appropriate.

the Sale of Debtor's Aircraft Pursuant to an Aircraft Sale and Purchase Agreement and Payment of Related Fees [Docket No. 3001].

[4] Prior to the sales of the G-IVSP and the Falcon 50, EFI was owed certain amounts on prepetition invoices and unpaid maintenance contracts.   This Court approved the payment of those prepetition fees.   CES Aviation V LLC is seeking similar authority to pay prepetition fees for flight activity expenses incurred in the ordinary course of business of operating the S-76C+.

**Background**

6.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").   The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").   The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On September 17, 2008, the U.S. Trustee appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

8.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").   A trustee appointed under SIPA is administering LBI's estate.

9.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner").   By order dated January 20, 2009 [Docket No. 2583], the Court approved the U.S. Trustee's appointment of the Examiner.

**Jurisdiction**

10.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.   This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**Lehman's Business**

11.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.   For more than 150 years, Lehman has been a

leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

      12.    Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## **Relief Requested**

      13.    By this Motion, pursuant to sections 105(a), 362 and 365 of the Bankruptcy Code and Bankruptcy Rules 4001, 6006 and 9014, the Debtors seek authorization to (i) assume non-exclusive aircraft lease agreements by and between (a) CES Aviation LLC, as Lessor, and EFI, as Lessee, dated September 1, 2007, (b) CES Aviation V LLC, as Lessor, and EFI, as Lessee, dated September 1, 2007, and (c) CES Aviation IX LLC, as Lessor, and EFI, as Lessee, dated September 1, 2007 (collectively, the "Agreements")[5] and to consummate certain related transactions, including terminating the Agreements and paying the associated termination fees in accordance with the Agreements and (ii) agree to modify the automatic stay solely to the extent necessary to allow EFI to use certain funds of the Debtors on deposit with EFI to offset EFI's claims against the Debtors as a result of the termination of the Agreements.   Complete copies of the Agreements are attached hereto at Exhibit "A."

---

[5]  EFI and CES Aviation II LLC entered into a similar Non-Exclusive Aircraft Lease Agreement dated as of September 1, 2007.

## The Non-Exclusive Aircraft Lease Agreements

The Terms

14.     Pursuant to the terms of the Agreements, the Aviation Subsidiaries leased

their respective Aircraft to EFI and EFI retained exclusive possession, command, and control of the

Aircraft and was in operational control at all times.   EFI was entitled to operate the Aircraft for the

following general purposes:

- to provide on-demand charter air transportation services exclusively to charter customers designated and/or approved by the Aviation Subsidiaries;

- to ferry the Aircraft from the operating base to and from charter customer's scheduled airport of embarkation and disembarkation;

- training of cockpit and ground crew personnel (the "Flight Crew");

- to conduct maintenance test flights and maintenance deliveries; and

- other purposes specified by the Aviation Subsidiaries.

EFI also provided the Flight Crew to charter all Aircraft flights and performed the maintenance,

repair, inspection, and overhaul work necessary to obtain certification and remain in good standing

pursuant to the Aeronautics Regulations of the Federal Aviation Administration and the Department

of Transportation.

15.     The Agreements expire on December 10, 2010 (the "Expiration Date").

Nevertheless, each party to the Agreements has a right to terminate without cause.   In the event of

an early termination by an Aviation Subsidiary, the annual hangar fee applicable to the year in

which the termination occurs is prorated and an early termination fee for monthly management

services is determined in accordance with the terms of the Agreements.   The Agreements also

require the Aviation Subsidiary to make severance payments to the Flight Crew.

16.    Each Aviation Subsidiary, as well as CES Aviation II LLC, advanced to EFI an operating deposit (the "Operating Deposits") in the amount of $100,000 contemporaneously with the execution of the Agreements.   The Operating Deposits acted essentially as security deposits. After the termination of the Agreements, the Operating Deposits were to be used to cover any amounts that may be owed to EFI and to protect EFI from nonpayment.   If no amounts were owed to EFI upon termination, or if there was a remainder amount, such funds were to be returned to the appropriate Aviation Subsidiary.   As of the date hereof, the Operating Deposits in the amount of $400,000 remain in the control of EFI.

Assumption and Termination of the Agreements

17.    Throughout the term of the Agreements, EFI maintained a possessory interest in the Aircraft.   However, upon the consummation of the sale of the S-76C+, EFI will no longer have any possessory interest in an asset of the Debtors.   Nevertheless, EFI has agreed to not assert a lien for amounts owed to it by the Debtors, or to otherwise interfere with the sale of the S-76C+, in reliance on the Debtors' representations set forth above.

18.    The Debtors hereby seek authority to assume the Agreements thereby fulfilling the Debtors' representations to EFI.   Upon the Court's approval of this Motion, the Debtors intend to terminate the Agreements prior to the Expiration Date.   As a result of the early termination, the Debtors and EFI have agreed that the Debtors will owe to EFI the amount of $637,825 (the "Termination Fee").   The Termination Fee is comprised of (i) early termination fees related to monthly management services; (ii) prorated hangar fees; and (iii) three months severance pay for employees laid off as a result of the termination of the Agreements.[6]   The Termination Fee does not consist of any prepetition fees.

---

[6] The Debtors and EFI agreed that the Debtors are not responsible for paying severance to employees who resigned to take new positions or to employees who were on long-term disability.

19.     The Aviation Subsidiaries, CES Aviation II LLC, and EFI have also agreed to apply the Operating Deposits toward the payment of the Termination Fee.   By doing so, the Debtors reduce the Termination Fee to the aggregate amount of $237,825.

### Assuming the Aircraft Lease Agreements
### is an Appropriate Exercise of the Debtors' Business Judgment

20.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."   *See Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001) (stating that section 365 allows the debtor in possession to "'maximize the value of the debtor's estate by assuming executory contracts [or unexpired leases] that benefit the estate and rejecting those that do not'") (quoting *L.R.S.C. Co. v. Rickel Home Ctrs. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000)).

21.     Courts apply the "business judgment" standard in determining whether an executory contract or unexpired lease should be assumed.   *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)*, 4 F.3d 1095, 1099 (2d Cir. 1993); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 162 (D. Del. 2006) ("Under section 365 of the Bankruptcy Code, a debtor may assume an executory contract or unexpired lease if (i) outstanding defaults under the contract or lease have been cured under section 365(b)(1) of the Bankruptcy Code, and (ii) the debtor's decision to assume such executory contract or unexpired lease is supported by valid business justifications."); *In re Nickels Midway Pier, LLC*, 341 B.R. 486, 493 (D.N.J. 2006) ("Although the Bankruptcy Code does not specify the standard to be applied in assessing the decision of a trustee or debtor in possession to assume or reject [] a contract, the Third Circuit has adopted the business judgment standard."); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) (stating that "[t]he standard for approving the assumption of an executory

contract is the business judgment rule" and noting that the bankruptcy court had to find that the

debtor was acting on an informed basis, in good faith, and with the honest belief that assumption

was in the best interests of the debtor and its estate in order to approve a motion to assume

prepetition agreements); *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 53-54 (Bankr. D. Del. 2001)

("The Debtor's decision to assume or reject an executory contract is based upon its business

judgment.") (citation omitted).

22.    Upon finding that a debtor has exercised its sound business judgment in

determining that assumption of an agreement is in the best interests of its estate, the Court should

approve the assumption of a contract under section 365(a) of the Bankruptcy Code. *See, e.g.*,

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 39-40

(3d Cir. 1989); *see also In re Exide Techs.*, 340 B.R. 222, 240 (Bankr. D. Del. 2006) (stating that,

under the business judgment standard, a court may not substitute its own judgment for that of the

debtor).

23.    The Debtors' have determined in their sound business judgment that

assumption of the Agreements is in the best interests of their estates and creditors.   By seeking

authority to assume the Agreements, the Debtors are ensuring that the sale of the S-76C+ will be

consummated without the interference of EFI.   Furthermore, and most importantly, by assuming

the Agreements, the Debtors are able to terminate the Agreements and pay to EFI the amounts due

to it as a result of the early termination—amounts the Debtors promised to pay EFI in exchange for

EFI's assistance in selling the Aircraft.

24.    Since the Commencement Date, EFI has been a source of great support in the

Debtors' efforts to maximize the value of their estates through the sales of their aviation assets.

EFI played a critical role in the successful sales of the G-IVSP, the G-IVSP II, and the Falcon 50,

which generated a total of $44,500,000. EFI, among other things, maintained the Aircraft in airworthy, marketable condition, prepared the Aircraft for all inspections required by the various aircraft sale and purchase agreements, supplied the Flight Crew to conduct test flights for potential purchasers, and acted generally as an intermediary between prospective purchasers of the Aircraft and the Aviation Subsidiaries.   Notably, EFI had multiple opportunities to interfere in the sales of the Aircraft, including the pending sale of the S-76C+, at a significant cost to the Debtors' estates but did not because of the Debtors' representations.

25.    The sound business reasons in favor of assuming the Agreements are bolstered by the minimal costs associated with the Motion.   As explained above, upon this Court's approval of the motion for the sale of the S-76C+, there will be no pre-petition amounts owed to EFI that need to be cured because all such payments have been fully satisfied with funds generated by the sales of the Aircraft.   Additionally, had the Debtors chosen to replace EFI, or if EFI refused to perform under the Agreements postpetition, the Debtors would most certainly have incurred costs equal to, or possibly exceeding, the Termination Fee as the Debtors would have been forced to find another party to take control of, maintain, and operate the Aircraft throughout the sale processes. Furthermore, if EFI asserted liens on the Aircraft, the Debtors would have incurred additional legal fees and delays in the sales of the Aircraft, threatening the ultimate recovery to the Debtors' estates. As this Court is aware, delays in the sale process have previously threatened the viability of the sales of the G-IVSP and the Falcon 50 and resulted in reduced purchase prices.[7]

26.    Based on the foregoing, the Debtors submit that assuming the Agreements at a cost of $237,5000 clearly represents a reasonable exercise of the Debtors' business judgment,

---

[7] *See* Debtors' Motion to Amend (i) Order Authorizing Sale of G-IVSP Aircraft and (ii) Order Authorizing Sale of Falcon 50 Aircraft [Docket No. 2318].

allows the Debtors to fulfill their representations to EFI upon which EFI relied, and, therefore, should be approved.

## Notice

27.    No trustee has been appointed in these chapter 11 cases.   The Debtors have served notice of this Motion in accordance with the procedures set forth in the order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditor's Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases.   The Debtors submit that no other or further notice need be provided.

28.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: March 25, 2009
       New York, New York

/s/ Alfredo R. Pérez
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# Exhibit "A"

## NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT

(Part 135 Operations)

Dated as of the 1st day of September, 2007,

between

**CES Aviation LLC**,
as Lessor,

and

**Executive Fliteways, Inc.**,
as Lessee,

concerning one Gulfstream model G-IV SP aircraft bearing

U.S. registration number N1LB,

and

manufacturer's serial number 1448.

This **NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT** (the "Agreement") is entered into as of this 1st day of September, 2007 (the "Effective Date"), by and between **CES Aviation LLC**, a Delaware limited liability company ("Lessor"), and **Executive Fliteways, Inc.**, a Delaware corporation ("Lessee").

## W I T N E S S E T H :

**WHEREAS**, Lessor is, as of the Effective Date of this Agreement, the registered owner of the Aircraft described and referred to herein;

**WHEREAS**, Lessee holds a current and valid Air Carrier Certificate and is authorized to use of the Aircraft for the conduct of On-Demand Operations in common carriage in accordance with the applicable requirements of Part 135 of the FARs;

**WHEREAS,** Lessor desires to lease the Aircraft to Lessee, and Lessee desires to lease the Aircraft from Lessor, in order that Lessee may use the Aircraft to conduct On-Demand Operations in common carriage; and

**WHEREAS**, during the term of this Agreement, the Aircraft may be subject to concurrent, non-exclusive leases to other lessees for use by such other lessees in operations under Part 91 of the FARs.

**NOW, THEREFORE**, in consideration of the foregoing premises, the mutual promises herein contained, and other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, the Lessor and Lessee agree as follows:

## SECTION 1.    DEFINITIONS

1.1    The following terms shall have the following meanings for all purposes of this Agreement:

**"Aircraft"** means the Airframe, the Engines identified herein, and the Aircraft Documents.  The Engines identified herein shall be deemed part of the "Aircraft" whether or not from time to time attached to the Airframe or on the ground.  Any other engines that may from time to time become attached to the Airframe on a temporary basis shall be included in the term "Aircraft" for so long as such engines are so attached.

**"Aircraft Accident"** has the same meaning given the term in 49 C.F.R. Section 830.2.

**"Aircraft Documents"** means all flight records, maintenance records, historical records, modification records, overhaul records, manuals, logbooks, authorizations, drawings and data relating to the Airframe, any Engine, or any Part, that have been provided to Lessee by Lessor, or are required by Applicable Law to be created or maintained with respect to the maintenance and/or operation of the Aircraft, or are required from time to time by the FAA with respect to the Aircraft, including, without limitation, shop records detailing service checks, inspections, tests, repairs or overhauls, and all records required for Part 135 compliance, including the date of each charter flight, the name of the person authorizing the charter flight, the name of the lead passenger, points of travel, flight and ground time, breakdown of charges for each trip, and other similar information.

**"Airframe"** means the Gulfstream model G-IV SP aircraft bearing manufacturer's serial number 1448 and United States registration number N1LB, together with any and all Parts (including, but not limited to, landing gear and auxiliary power units but excluding Engines or engines) so long as such Parts shall be either incorporated or installed in or attached to the Airframe.

**"Applicable Law"** means, without limitation, all applicable laws, treaties, international agreements, decisions and orders of any court, arbitration or governmental agency or authority and rules, regulations, orders, directives, licenses and permits of any governmental body, instrumentality, agency or authority, including, without limitation, the FARs and the Federal Aviation Act of 1958, as amended.

2

**"Certificate "** shall mean that certain Air Carrier Certificate issued to Lessee by the Federal Aviation Administration pursuant to Part 119 of the FARs and bearing certificate number AOQA201C.

**"Excess Hours Surcharge"** has the meaning ascribed to the term in Section 5.1.1.

**"Engines"** means two (2) Rolls-Royce model Tay 611-8 engines bearing manufacturer's serial numbers 18024 and 18026, together with any and all Parts so long as the same shall be either incorporated or installed in or attached to such Engine.

**"Event of Default"** means any event falling within either of the following categories:

(i)     a failure of a party to pay any sum that is due and payable to the other party on the date that such payment becomes due if such failure continues for more than ten (10) business days after receipt by the debtor party of oral or written notice that such payment is overdue;

(ii)    a breach by a party of any other provision of this Agreement if such breach continues for more than fifteen (15) business days without being cured after receipt by the breaching party of oral or written notice that a breach has occurred;

(iii)   any Aircraft Accident or Incident involving, or any Substantial Damage to, the Aircraft or any other aircraft leased by Lessor to Lessee shall occur as a direct result of any negligent act or failure to act of Lessee or any employee, contractor or direct agent of Lessee;

(iv)    a default by a party under any other agreement between the parties hereto that results in a termination of such other agreement;

(v)     a default by a party hereto or any affiliate of Lessor under any agreement between Lessee and any affiliate of Lessor that results in a termination of such other agreement.

**"Event of Loss"** shall mean any of the following events with respect to the Aircraft:

(i)     loss of the Aircraft or of the use thereof due to theft or disappearance (with loss being conclusive following 30 days or such other period specified in applicable insurance), destruction, damage beyond economic repair or rendition of the Aircraft permanently unfit for normal use for any reason;

(ii)    any damage to the Aircraft which results in an insurance settlement with respect thereto on the basis of an actual, constructive or compromised total loss; or

(iii)   the condemnation, confiscation or seizure of, or requisition of title to or use of, the Aircraft by private persons or by any governmental or purported governmental authority.

**"FAA"** means the Federal Aviation Administration of the United States Department of Transportation or any successor agency.

**"FARs"** means collectively the Aeronautics Regulations of the Federal Aviation Administration and the Department of Transportation, as codified at Title 14, Parts 1 to 399 of the United States Code of Federal Regulations.

**"Flight Crew"** means all cockpit, cabin, and ground crew personnel necessary for flight operations of the Aircraft.

**"Flight Hour"** means each flight hour of use of the Aircraft by Lessee.

**"Force Majeure"** means, not by way of limitation, an act of God, an act of nature, an act of civil or military authority, a strike or labor dispute, an unforeseeable mechanical failure, or an air traffic control delay, or any other event that is beyond the control of a party hereto.

**"Incident"** has the same meaning given the term in 49 C.F.R. Section 830.2.

**"Initial Term"** has the meaning ascribed to the term in Section 2.4.1.

**"Lessee-Originated Charter Customer"** means any charter customer originated by Lessee.

**"Lessor-Designated Charter Customer"** means Lessor's parent company and/or any other affiliate of Lessor and/or any charter customer referred to Lessee by Lessor.

**"Lien"** means any mortgage, security interest, lease or other charge or encumbrance or claim or right of others, including, without limitation, rights of others under any airframe or engine interchange or pooling agreement, but excluding mechanics' liens, hangar keepers' liens, materialmens' liens, and other similar liens (including, possessory liens, common law liens, and statutory liens to the extent that any such liens are similar to a mechanics' lien, a hangar keepers' liens, or a materialmens' lien) dischargeable in the ordinary course of business.

**"On-Demand Operations"** shall have the same meaning given the term in Section 119.3 of the FARs.

**"Operating Account"** shall mean a bookkeeping account maintained by Lessee to account for funds related to use, operation, maintenance, and storage of the Aircraft.

**"Operating Base"** means Long Island MacArthur Airport, Islip, New York.

**"Operating Base Fuel Supplier"** means Long Island Jet Center or any successor vendor operating out of the same location.

**"Operational Control"** has the same meaning given the term in Section 1.1 of the FARs.

**"Parts"** means all appliances, components, parts, instruments, appurtenances, accessories, furnishings or other equipment of whatever nature (other than complete Engines or engines) which may from time to time be incorporated or installed in or attached to the Airframe or any Engine and includes replacement parts.

**"Pilot in Command"** has the same meaning given the term in Section 1.1 of the FARs.

**"Pilot Qualification Standards"** means the Pilot Qualification Standards set forth in <u>Schedule B</u> hereof.

**"Substantial Damage"** has the same meaning given the term in 49 C.F.R. Section 830.2.

**"Taxes"** means all taxes of every kind (excluding any tax measured by or assessed against a taxpayer's income, including, without limitation, any income tax, gross income tax, net income tax, or capital gains tax) assessed or levied by any federal, state, county, local, airport, district, foreign, or other governmental authority, including, without limitation, sales taxes, use taxes, retailer taxes, duties, fees, excise taxes, and other similar taxes.

**"Term"** means the entire period from the Effective Date to the date this Agreement is terminated pursuant to Section 2.4.

## SECTION 2.     LEASE, DELIVERY AND USE OF THE AIRCRAFT; TERM

2.1    **Lease**.  Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the Aircraft, on the terms and conditions of this Agreement.

2.2     **Delivery**.  Lessor and Lessee agree that as of the date hereof the Aircraft has been delivered to Lessee and is in an airworthy condition with all necessary accessories and equipment required to safely conduct charter flight operations.

2.3     **Permitted Aircraft Uses**.  Lessee's leasehold interest in the Aircraft shall entitle Lessee to operate the Aircraft solely for the following purposes:

   2.3.1    To provide on-demand charter air transportation services exclusively to charter customers designated and/or approved by Lessor; provided, however, that the terms and conditions for the provision of such charter air transportation shall be as agreed by and between Lessee and such charter customer(s).

   2.3.2    To ferry the Aircraft from the Operating Base to a charter customer's scheduled airport of embarkation.

   2.3.3    To ferry the Aircraft from a charter customer's airport of disembarkation to the Operating Base.

   2.3.4    Flight Crew training.

   2.3.5    Maintenance test flights and maintenance deliveries.

   2.3.6    Other purposes as approved by Lessor in its sole discretion.

2.4     **Term**.

   2.4.1    **Initial Term**.  The initial term of this Agreement (the "Initial Term") shall become effective on the Effective Date and, subject to Sections 2.4.2 through 2.4.4, shall continue in effect until the 1st day of December, 2010 (the "Expiration Date").

   2.4.2    **Renegotiation and Extension**.  During the period commencing ninety (90) days prior to the expiration of the Initial Term of this Agreement and ending sixty (60) days prior to the expiration of the Initial Term of this Agreement, the parties hereto may negotiate the terms of a new Non-Exclusive Aircraft Lease Agreement.  In the event a new Non-Exclusive Aircraft Lease Agreement is not executed as of the date that is sixty (60) days prior to the last day of the Initial Term of this Agreement, and provided the parties hereto are negotiating in good faith the terms of a new Non-Exclusive Aircraft Lease Agreement as of such date, the term of this Agreement shall automatically be extended for an indefinite period that will terminate on the earlier of the date of execution of a new Non-Exclusive Aircraft Lease Agreement, or sixty (60) days after the date that either party hereto provides written notice to the other party that it is terminating negotiations.  In the event the execution of a new Non-Exclusive Aircraft Lease Agreement occurs during a period of extension of this Agreement under this Section 2.4.2, the Initial Term of such new Non-Exclusive Aircraft Lease Agreement, including any increases in the Hangar Fee set forth in Schedule A and/or Lessee's rates and charges, shall be made retroactive to the first day of the period of such extension.  During the period commencing on the day after the expiration of the Initial Term of this Agreement and ending on the day this Agreement terminates or the day prior to the effective date of a new Non-Exclusive Aircraft Lease Agreement, whichever shall apply, the Hangar Fee set forth in Schedule A shall be increased by ten  percent (10%); provided, however, that to the extent any retroactive increase in the Hangar Fee set forth in any new Non-Exclusive Aircraft Lease Agreement is more or less than ten percent (10%), the ten percent (10%) adjustment required by this Section 2.4.2 shall be adjusted retroactively to equal the adjustment in the new Non-Exclusive Aircraft Lease Agreement.  Upon execution of a new Non-Exclusive Aircraft Lease Agreement, Lessee shall immediately become entitled to debit the Operating Account an amount equal to the difference between the rates in this Non-Exclusive Aircraft Lease Agreement, as adjusted, and the new rates and charges retroactive to the effective date of the new Non-Exclusive Aircraft Lease Agreement.

2.4.3    **Event of Default**.  Upon the occurrence of an Event of Default, the non-defaulting party may terminate this Agreement by written notice to the defaulting party.

2.4.4    **Early Termination**.  Contrary provisions of Section 2.4.1 notwithstanding, each party shall have the right to terminate this Agreement without cause on ninety (90) days written notice to the other party.  In the event of an early termination of this Agreement pursuant to Section 2.4.3 or this Section 2.4.4, the Annual Hangar Fee applicable to the year in which the termination occurs shall be pro-prated by multiplying the annual Hangar Fee by a fraction, the numerator of which is the number of days from the most recent anniversary of the Effective Date to the date of separation of the Aircraft from Lessee's management/hangar, and the denominator of which is 365.  In addition, if such termination is caused by Lessor pursuant to this Section 2.4.4, then Lessee shall also be entitled to an early termination fee in an amount equal to  the lesser of (i) an amount equal to 25% of the annual Hangar Fee set forth in Schedule A, or (ii) the sum of all Hangar Fee payments that would, but for the early termination of this Agreement, have become due from and after the date this Agreement is terminated pursuant to Section 2.2.4 through the Expiration Date; provided however, that if after the Effective Date of this Agreement and prior to a termination of this Agreement by Lessor pursuant to this Section 2.4.4, Lessor shall have terminated any other Non-Exclusive Aircraft Lease Agreement (other than this Agreement) by and between Lessor and Lessee with respect to any other aircraft (other than the Aircraft) under a provision similar to this Section 2.4.4 following a sale of such other aircraft, and if neither Lessor nor any affiliate of Lessor shall have acquired another aircraft as a replacement for the sold aircraft, then in such event the amount in clause (i) of this Section 2.4.4 shall be increased to an amount equal to 66.67% of the Hangar Fee set forth in Schedule A.

2.4.5    **Coordination with Other Agreements.**  Sections 2.4.1 through 2.4.4 notwithstanding, under no circumstances may this Agreement be terminated for so long as that certain Air Charter Agreement by and between Lessee and Lehman Brothers Inc. remains in full force and effect; provided, however, that this Section 2.4.5 shall not be construed as a bar to termination of this Agreement under Section 2.4.2, Section 2.4.3, or Section 2.4.4 hereof if said Air Charter Agreement is terminated simultaneously.

2.5    **Event of Default**.  Upon any termination hereof under Section 2.4.3 following an Event of Default, in addition to such termination rights, the non-defaulting party shall be entitled to all other remedies available to it at law or in equity, provided, however, that in no event may either party be held liable to the other for any indirect, incidental, consequential, special, punitive, or exemplary damages of any kind.

2.6    **Non-Exclusivity.**

2.6.1    Lessee and Lessor acknowledge and agree that the Aircraft is leased to Lessee on a non-exclusive basis.  Lessor reserves the right to lease the Aircraft on a non-exclusive basis to third-parties for use under Part 91 of the FARs; provided, however, that Lessee shall have the exclusive right to use and operate the Aircraft for On-Demand Operations in common carriage under Part 135 of the FARs.  During any period during which another lessee of Lessor has scheduled use of the Aircraft, Lessee's leasehold rights to possession of the Aircraft under this Agreement shall temporarily abate, but Lessee's obligations to maintain, service and store the Aircraft pursuant to Section 3.3 shall continue unabated.   In no event will Lessee be liable to Lessor for any claims, damages, losses, liabilities, demands, suits, judgments, causes of action, civil or criminal legal proceedings, penalties, fines or other sanctions, attorneys fees, or other costs or expenses incurred by Lessor arising from Lessor's inability to provide the Aircraft to any such other lessee as a result of the Aircraft being unavailable due to scheduled or unscheduled repairs or maintenance, previously scheduled training flights, or any Force Majeure event, unless such unavailability arises from Lessee's gross negligence or willful misconduct.

2.6.2    Notwithstanding anything in this Agreement to the contrary, if during the Term of this Agreement Lessor leases the Aircraft on a non-exclusive basis to any person or entity other than Lessee, Lessor shall release, indemnify, defend and hold Lessee harmless from and against any and all

liabilities, claims, and losses of any kind arising out of or connected with the leasing of the Aircraft to such other person or entity; provided, however, that if such other person or entity retains Lessee to provide aircraft management and pilot services in connection with such other person's or entity's operation of the Aircraft, this Section 2.6 shall not apply to any liabilities, claims, or losses of any kind arising out of or connected with the leasing of the Aircraft to such other person or entity.

## SECTION 3.   AIRCRAFT MANAGEMENT, OPERATIONS, AND MAINTENANCE

3.1    **Title and Registration**.  Lessee acknowledges that title to the Aircraft shall remain vested in Lessor and Lessee shall commit no act, including an act of omission, that may adversely affect Lessor's title interest in the Aircraft.   The foregoing notwithstanding, Lessee may permit the imposition on the Aircraft of mechanics' liens, hangar keepers' liens, materialmens' liens, and other similar liens (including, possessory liens, common law liens, and statutory liens to the extent that any such liens are similar to a mechanics' lien, a hangar keepers' liens, or a materialmens' lien), including any such liens in favor of Lessee, provided that Lessee shall discharge, or cause to be discharged, any such permitted lien in the ordinary course of business upon payment by Lessor to Lessee of the debt that gave rise to the permitted lien.

3.2    **Operations**.  Lessee shall operate the Aircraft in accordance with Part 135 of the FARs during all flight operations conducted under this Agreement, except that Flight Crew training flights, maintenance test flights, maintenance delivery flights, and ferry flights may be operated in accordance with Part 91 of the FARs as provided in Section 91.501(b)(1) when common carriage is not involved.  Lessee shall not operate or locate the Airframe or any Engine, or suffer the Airframe or any Engine to be operated or located, in any area excluded from coverage by any insurance policy in effect or required to be maintained hereunder with respect to the Airframe or Engines.  Lessee shall not operate the Airframe or any Engine or permit the Airframe or any Engine to be operated during the Term except in operations for which Lessee is duly authorized, or to use or permit the Aircraft to be used for a purpose for which the Aircraft is not designed or reasonably suitable.  Lessee shall not permit the Airframe or any Engine to be maintained, used or operated during the Term in violation of any Applicable Law, or contrary to any manufacturer's operating manuals or instructions.  Lessee shall not knowingly permit the Aircraft to be used for the carriage of any persons or property prohibited by law, nor  during the existence of any known defect except in accordance with the FARs.

3.3    **Maintenance, Service, and Storage**.  Lessee shall perform or cause to be performed all maintenance, repair, inspection and overhaul work necessary to obtain certification for the Aircraft pursuant to the FARs and to maintain such certification during the term of this Agreement.  All such work on the Aircraft shall be performed in accordance with the standards set by regulations of the FAA.  Lessee shall provide or cause to be provided only licensed and qualified personnel to perform any maintenance, repair, inspection and overhaul work on the Aircraft.  All such personnel will be contracted for, or employed by Lessee. All equipment in the Aircraft shall be maintained and updated as required or recommended by the manufacturer of such equipment. In all cases other than "Major Repair" (as defined later in this Section), Lessee shall be the sole judge of the kind and extent of repairs necessary, and Lessor hereby grants authority to Lessee to perform or contract for the performance of all such necessary repairs and maintenance, provided that Lessee shall act reasonably in connection therewith. Lessor shall rely wholly on the expertise of Lessee as to the necessity of the labor and materials required under this paragraph.  For purposes of this Agreement, "Major Repair" is defined as being any single repair or maintenance procedure (or series of related repair or maintenance procedures) the cost of which is estimated to be in excess of Seven Thousand Five Hundred United States Dollars ($7,500.00).  Prior to the commencement of any work relating to a Major Repair, Lessee shall furnish Lessor with a written estimate of the cost of the Major Repair, which shall be subject to approval in writing by Lessor prior to the commencement of the Major Repair.  If at any time during the Term of this Agreement Lessee shall reasonably determine that the total cost of any Major Repair will exceed Fifty Thousand United States Dollars ($50,000.00), then notwithstanding any other provision of this Agreement to the contrary, Lessor shall, if requested by Lessee, pay the estimated Major Repair costs to Lessee prior to the due date of the payment of such costs by Lessee to the appropriate vendor or maintenance and repair facility; provided, however, that upon Lessor's request, Lessee shall provide Lessor documentation reasonably acceptable to Lessor supporting Lessee's request for such advance payment.  Contrary requirements of Section 9.1 notwithstanding, written notices concerning

Major Repairs will be provided to Lessor at the address specified in Section 5.8, delivered via mail or e-mail as contemplated therein. In the event Lessor refuses to approve any Major Repair, and/or pay in advance the estimated cost of any Major Repair that is estimated to be in excess of Fifty Thousand United States Dollars ($50,000.00), the parties shall discuss Lessor's reasons for refusing to approve and/or pay the estimated cost of the Major Repair and shall discuss and evaluate all reasonable alternatives, if any, to the requested Major Repair that may be available, and the parties shall thereafter each use their best efforts to resolve any issues and agree on an appropriate course of action in a prompt and timely manner. Subject to the foregoing, Lessee shall not be liable or responsible for any costs incurred by Lessor resulting from any failure to perform, or delay in the performance of, any Major Repair to the extent that such failure or delay is a result of a delay or failure of Lessor to approve in writing and/or pay the estimated cost of the Major Repair. Lessee shall establish accounts with vendors of services and supplies for the Aircraft and maintain all such accounts in good standing, subject to Lessor's obligation to pay or reimburse Lessee for such services and supplies as provided herein. All costs and expenses incurred in connection with the services performed and parts and supplies provided under this Section 3.3 shall be paid in accordance with Sections 5.2 through 5.6 of this Agreement.

3.4    **Flight Crews**. The Aircraft is being leased to Lessee hereunder without a Flight Crew. Lessee shall provide all Flight Crew personnel required for operations of charter flights.

3.5    **Operational Control.** It is jointly agreed and acknowledged between Lessor and Lessee that at all times while the Aircraft is in the possession of Lessee, Lessee shall have exclusive possession, command, and control of the Aircraft and shall retain operational control of the Aircraft at all times. Lessee shall exercise exclusive authority over initiating, conducting, or terminating any flight conducted pursuant to this Agreement, and the Flight Crew shall be under the exclusive command and control of Lessee in all phases of such flights and at all times. The parties acknowledge and agree that flights conducted by other lessee's of Lessor under Part 91 of the FAR's are not conducted pursuant to this Agreement, and Lessee shall have no right or obligation to have or exercise possession, command, or operational control of the Aircraft in connection with flights by Lessor's other lessees.

3.6    **Aircraft Documents**. Lessee shall at all times maintain and preserve all Aircraft Documents in a current and up-to-date manner. All Aircraft Documents shall be produced and maintained in the English language. All costs and expenses incurred in connection with the services performed under this Section 3.6 shall be paid in accordance with Sections 5.2 through 5.6 of this Agreement.

3.7    **Right to Inspect**. Lessor and/or Lessor's designated representatives shall have the right to inspect the Aircraft or the Aircraft Documents during Lessee's normal business hours, upon giving Lessee two (2) business days notice, to ascertain the condition thereof and to satisfy Lessor that the Aircraft and the Aircraft Documents are being properly maintained in accordance with the requirements of this Agreement. All required corrections shall be performed as soon as practicable after such inspection.

3.8    **Annual Budgets.** Lessee shall prepare and deliver to Lessor an estimated annual budget for all operations of the Aircraft upon Lessor's request.

## SECTION 4.  CONDITION DURING TERM AND RETURN OF AIRCRAFT

4.1    **Return**. Upon the last business day of the Term or the date of earlier termination hereof, Lessee shall return the Aircraft to the Lessor by delivering the same to Lessor fully equipped with all Engines installed thereon. Delivery shall be made at a location specified by Lessor, provided that if Lessor shall specify any location other than the Operating Base, Lessor shall reimburse Lessee for any costs and expenses incurred by Lessee to deliver the Aircraft to such location. The Aircraft at the time of its return shall be in the condition set forth in this Section 4 and shall be free and clear of all Liens.

4.2    **Condition of Aircraft**. The Aircraft at the time of its return to Lessor shall have been maintained and repaired in accordance with the provisions of this Agreement with the same care and consideration for the technical condition of the Aircraft as if it were to have been kept in continued regular service by the Lessee, and shall meet the following requirements:

4.2.1   **Operating Condition**.  The Aircraft shall be in the same condition as it was in on the Effective Date of this Agreement, ordinary wear and tear excepted.

4.2.2   **Cleanliness Standards**.  The Aircraft shall be clean and shall have received a recent exterior and an interior deep cleaning.

4.2.3   **Certificate of Airworthiness**.  The Aircraft shall have, and be in compliance with, a current valid certificate of airworthiness issued by the FAA, and shall be airworthy according to manufacturer's specifications and FAA regulations.

All costs and expenses incurred in connection with the services performed under this Section 4.2 shall be paid in accordance with Sections 5.2 through 5.6 of this Agreement.

4.3   **Aircraft Documents**.  Lessee shall return or cause to be returned to Lessor, at the time the Aircraft is returned to Lessor, all of the Aircraft Documents, updated and maintained by Lessee through the date of return of the Aircraft.  All costs and expenses incurred in connection with the services performed under this Section 4.3 shall be paid in accordance with Sections 5.2 through 5.6 of this Agreement.

## SECTION 5.  <u>FINANCIAL MATTERS</u>

5.1   **Charter Customer Relations**.  Lessee shall be responsible for all contracting with, billing, and collecting from charter customers, and only Lessee may bill charter customers for charter flights.   The total amount that Lessee shall charge a charter customer for any charter flight (including any repositioning flight associated with any charter flight) shall be the sum of the following:

5.1.1   **Hourly Rate Charges.**  An amount equal to the product of the applicable Hourly Rate set forth in <u>Schedule A</u> multiplied by the number of Flight Hours, rounded to the nearest one-tenth of one hour, flown during the flight.  In the event a Lessor-Designated Charter Customer utilizes the Aircraft for more than 450 Flight Hours in any calendar year, then in addition to the Hourly Rate set forth in <u>Schedule A</u>, the charter customer shall be charged a surcharge (the "Excess Hours Surcharge") in an amount equal to 2% of the Hourly Rate set forth in <u>Schedule A for</u> those Flight Hours in excess of 450 during the calendar year.

5.1.2   **Incidental Expenses.**  An amount equal to all incidental out-of-pocket costs incurred by Lessee in connection with the flight, including, without limitation, fuel surcharges, landing fees, ramp fees, customs fees, international handling fees, permit fees, Flight Crew passports and visas, overnight hangar fees, de-icing costs, contaminant recovery costs, Flight Crew per diem and meal expenses, Flight Crew transportation and hotels, equipment servicing, commissary stock and supplies obtained for a specific flight, trip-related communications charges, supplementary Flight Crew and cabin attendant costs, charts, manuals, and other publications obtained for the specific flight (*e.g.*, navigation, operations, and maintenance), and any other similar items, and for all non flight-related expenses incurred by Lessee at the request of the charter customer, including, without limitation, ground transportation charges, telecommunications charges, and catering services.

5.1.3   **Taxes.**  All Taxes, and any interest, penalties, fines, and additions imposed for non-collection of Taxes (other than interest, penalties, fines, and additions imposed for non-collection of Taxes arising from Lessee's gross negligence or willful or criminal misconduct) payable with respect to any Taxes, imposed or levied or arising out of, or as a result of, the charter of the Aircraft to the charter customer.

5.2   **Payment of Aircraft-Related Expenses.**  Lessee shall pay to the appropriate vendors all costs and expenses of maintaining and storing the Aircraft, and all costs and expenses of operating the Aircraft for charter flights, subject to Lessor's obligation to reimburse Lessee for all such costs and expenses as provided herein.

5.3    **Operating Account.**  Lessee shall maintain the Operating Account for the Aircraft.  Lessee shall make credits and debits to the Operating Account as follows:

    5.3.1    **Credits.**  Lessee shall credit the Operating Account the following amounts at the times indicated:

        5.3.1.1    **Charter Revenue (Lessor-Designated Charter Customers).**  Lessee shall credit the Operating Account an amount equal to the amount received from Lessor-Designated Charter Customers under Section 5.1 (excluding amounts attributable to Excess Hours Surcharges, which shall be retained by Lessee) for any charter flight when and as such amount is received from the charter customer.  Lessor shall bear the risk of non-payment of all amounts due and payable from Lessor-Designated Charter Customers.

        5.3.1.2    **Charter Revenue (Lessee-Originated Charter Customers).**  Lessee shall credit the Operating Account an amount equal to 85% of the amounts billed or billable to Lessee-Originated Charter Customers under Section 5.1.1, plus 98% of the amounts billed or billable to Lessee-Originated Charter Customers under Section 5.1.2 and 5.1.3.  Amounts to be credited to the Operating Account under this Section 5.3.1.2 for any charter flight shall be so credited on the earlier of (i) the date such amounts are received by Lessee from Lessee-Originated Charter Customers, or (ii) sixty (60) days after completion of the charter flight.  Lessee shall bear the risk of non-payment of all amounts due and payable from Lessee-Originated Charter Customers, provided however, anything to the contrary notwithstanding, in the event of the non-collectibility of a Lessee-Originated Charter Customer, Lessee shall only be responsible to Lessor for the direct operating costs for such charter. Non-collectibility shall mean Lessee has not collected the charter fees, after using diligent efforts by 120 days after the date of the charter. In the event that a non-collected charter invoice is subsequently collected by Lessee then Lessee shall remit to Lessor the amount due under this provision, less any amounts previously paid for direct operating costs plus amounts incurred in the collection of the delinquent charter invoice, including attorney's fees, court costs, collection company fees and any other costs associated with the collection of the delinquent invoice.

        5.3.1.3    **Fuel Tax Refunds and Credits.**  During the month immediately following the end of each calendar quarter, Lessee shall credit the Operating Account an amount equal to the product of the number of gallons of fuel used for charter flights of the Aircraft during the immediately preceding calendar quarter, multiplied by the difference between the Federal aviation fuel excise tax rates applicable to commercial flights and non-commercial flights respectively, as such rates may be changed by the federal government from time to time (the parties agree that as of the Effective Date of this Agreement, the difference between the Federal aviation fuel excise tax rates applicable to commercial flights and non-commercial flights is Seventeen and One-Half Cents ($0.175) per gallon).

    5.3.2    **Debits.**  Lessee shall debit from the Operating Account the following amounts at the times indicated:

        5.3.2.1    **Maintenance.**  All amounts necessary to pay the actual costs of all maintenance and servicing of the Aircraft, and the costs of shipping of parts and materials. Lessee shall debit the Operating Account for costs incurred for maintenance when and as such costs are incurred by Lessee.  Lessee shall negotiate with vendors of maintenance services and parts to obtain the most favorable prices. All debits under this Section 5.3.2.1 shall be in amounts equal to Lessee's actual costs of maintenance, with pass through of all discounts obtained by Lessee,

except that the cost of labor for services performed by Lessee's maintenance personnel shall be deemed to be the Labor Rate set forth in <u>Schedule A</u>, and the debits for parts acquired by Lessee in connection with such maintenance (but not the costs of shipping such parts) shall be the Parts Markup Percentage in excess of Lessee's actual cost.

5.3.2.2    **Hangar.**  Lessee shall debit the Operating Account an amount equal to one-twelfth (1/12) of the annual Hangar Fee set forth in <u>Schedule A</u> once per calendar month.

5.3.2.3    **Incidental Expenses and Taxes.**  At the end of each month, Lessee shall debit the Operating Account an amount equal to all Incidental Expenses and Taxes credited to the Operating Account during such month under Sections 5.1.2 and 5.1.3.  Lessee shall be responsible for payment of all Incidental Expenses and Taxes to the appropriate vendors and tax authorities.

5.3.2.4    **Direct Operating Costs.**  Lessee shall debit the Operating Account an amount equal to all direct costs of operating the Aircraft for each charter flight, including without limitation, the costs of fuel and fuel surcharges (including fuel used by the Aircraft's auxiliary power unit), prist, lubricants, oxygen and other aircraft consumable products, and the fixed hourly cost of any maintenance service plans that may be in effect with respect to the Aircraft. Lessee shall debit the Operating Account for all such direct operating costs when and as such costs are incurred by Lessee.  For purposes of Section 5.3.2.4, the debits attributable to fuel purchased during any calendar month from the Operating Base Fuel Supplier shall be the lesser of the two (2) Fuel Price Indices set forth in <u>Schedule A</u> on the first business day of the calendar month.  The debits attributable to any other direct operating cost under this Section 5.3.2.4 shall be determined by reference to Lessee's actual cost thereof, with pass-through of any discounts obtained by Lessee. Lessee shall negotiate with vendors of fuel, prist, lubricants, oxygen, other aircraft consumable products, ramp services, overnight hangar services, de-icing and contaminant recovery services, and other supplies and services to obtain the most favorable prices.  Upon Lessor's request, Lessee shall provide Lessor copies of invoices or other documents requested by Lessor that establish to Lessor's reasonable satisfaction the actual cost paid by Lessee for fuel purchased at any location other than the Operating Base Fuel Supplier, and all other direct operating costs, incidental expenses, and Taxes.

5.3.2.5    **Miscellaneous Costs**.  Lessee shall debit the Operating Account an amount equal to all miscellaneous costs and expenses of operating the Aircraft for all users when and as such costs and expenses are incurred.  For purposes of this Section 5.3.2.5, miscellaneous costs include, without limitation, costs of Jeppesen subscriptions and other subscriptions, aircraft stock and supplies (including CD's. DVD's, VCR tapes, consumables), aircraft licensing and registration fees, and other similar miscellaneous expenses that are not attributable to a specific flight.

5.3.2.6    **Commissions**.   Lessee shall debit the Operating Account an amount equal to the commissions incurred by Lessee to obtain and operate charters of the Aircraft.

5.4    **Monthly Statements**.  Not later than the last day of each calendar month, Lessee shall send to Lessor a statement summarizing all charter flight activity conducted during the immediately preceding calendar month, and an itemized listing of all credits to the Operating Account attributable to charter flights conducted during such immediately preceding calendar month, and all debits attributable to such preceding

month.  In the event Lessee shall not have received payment by the 25th day of any month for any charter flight conducted during the immediately preceding calendar month, the statement delivered on such date shall not include credits and debits attributable to such charter flight, and the credits and debits attributable to such flight shall be included on the next statement after payment for such charter flight is received by Lessee.  In the event a monthly statement shall indicate a net credit balance, Lessee shall, simultaneously with delivery of the monthly statement, pay to Lessor an amount equal to the net credit balance of the Operating Account.  In the event a monthly statement shall indicate a net debit balance, Lessor shall pay to Lessee an amount equal to the net debit balance of the Operating Account within twenty (20) days of receipt of the monthly statement.  In the event either party shall fail to pay any amount due and payable to the other party under this Section 5.4 by the due date thereof, such debtor party shall pay interest on the unpaid amount to the creditor party at a daily rate of 0.0328 percent.

5.5     **Operating Deposit.**  Lessor and Lessee agree that Lessor has advanced to Lessee an operating deposit in an amount equal to One Hundred Thousand United States Dollars (US$100,000.00).  The parties agree that the foregoing deposit amount was determined and agreed-to based in part on an estimate of one hundred twenty-five (125) Flight Hours of use of the Aircraft by all users thereof in any calendar quarter.  If at any time during the Term the Aircraft shall be operated during any calendar quarter more than one hundred thirty-seven and one-half (137.5) Flight Hours, the amount of the required operating deposit may, upon Lessee's written notice, be increased by Ten Thousand United States Dollars (US$10,000.00) for each twelve and one-half (12.5) Flight Hour increment that the total number of Flight Hours of use of the Aircraft by all users exceeded one hundred twenty-five (125) Flight Hours.  Lessor shall pay any increase in the operating deposit amount permitted by this Section 5.5 within thirty (30) days of receipt by Lessor of Lessee's written notice.

5.6     **Final Accounting.**  As soon as reasonably practicable after termination of this Agreement for any reason (including as a result of an Event of Default pursuant to Section 2.4.3), but in no event later than ten (10) days after all charter revenues for charter operations occurring prior to such termination have been received and credited to the Operating Account, Lessee shall provide to Lessor a final itemized accounting of the Operating Account, which in the absence of manifest error Lessor shall not contest, except in the case of a good-faith belief that such accounting is wholly or partially in error.  If the sum of such final itemized accounting (minus any amounts contested in good faith) plus the amount of all operating deposits paid to Lessee under Section 5.5 results in a balance owed to Lessor, Lessee shall pay such balance owed simultaneously with the delivery to Lessor of the final accounting.  If such final itemized accounting (minus any amounts contested) results in a balance owed to Lessee, Lessor shall pay such balance owed within twenty (20) days of receipt of the final accounting.  If the debtor party after such final accounting fails to pay any such balance owed by the due date thereof, the debtor party shall pay to the creditor party interest on the unpaid amount at a daily rate of 0.0328 percent.  Lessor and Lessee agree to exert good-faith best efforts to resolve any contested amounts as contemplated herein, and furthermore to pay any such amounts in accordance herewith, treating the date an amount is resolved as the date a final itemized accounting is provided with respect thereto for purposes of this Section 5.6.

5.7     **Records and Documents.**  The documents and records of Lessee (including, but not limited to, all bills, invoices, vouchers, and related data) relating to the Aircraft shall be maintained in accordance with Lessee's normal and customary accounting practices, consistently applied.  Upon two (2) business days notice to Lessee, Lessor or its representative may examine all of Lessee's documents and records that relate to costs and expenses incurred and/or paid with respect to the Aircraft and any services provided by Lessee with respect thereto.  Subject to the above two (2) business days advance notice requirement, Lessee may examine Lessee's records and documents at any time during Lessee's normal business hours on any day(s) (weekends and Federal and New York State holidays excluded) during the Term hereof and for a period of ten (10) years after the termination of this Agreement.  Lessor's examination of Lessee's records and documents hereunder is not intended to extend beyond Lessee's documents and records that relate to costs and expenses incurred and/or paid with respect to the Aircraft and services provided by Lessee with respect thereto, and expressly shall not include an examination of Lessee's sensitive and confidential information of a financial and proprietary nature not directly related to the Aircraft and the services of Lessee hereunder.

5.8     **Address for Invoices**.  All invoices and statements provided by the Lessee under this Section 5 shall be directed to the following address for payment:

> CES Aviation LLC
> 745 Seventh Avenue, 30th Floor
> New York, NY 10019
> ATTN: Gary Hoffman
> Telephone: 212-526-0846
> Facsimile: 646-346-8274
> Email:   egary.hoffman@lehman.com

## SECTION 6.  LIENS

6.1     Subject to Lessor's obligation to pay all amounts due and payable from Lessor to Lessee under this Agreement in a timely manner, Lessee shall ensure that no Liens are created or placed against the Aircraft by Lessee or third parties as a result of Lessee's actions; Lessee shall notify Lessor promptly upon learning of any Liens not permitted by these terms; Lessee shall, at its own cost and expense, take all such actions as may be necessary to discharge and satisfy in full any Lien not permitted by these terms promptly after the same becomes known to it; and Lessee shall pay all charges related to the Aircraft as they become due and payable.

## SECTION 7. INDEMNITIES AND INSURANCE

7.1     **General Indemnity**.  Neither party hereto will make any claim against the other for any loss or damage to the extent that the loss or damage is covered by the insurance policies covering the Aircraft that are required by this Section 7, and each party hereto represents and warrants to the other party that it will commit no act that will cause any coverage contained in the insurance policies covering the Aircraft that are required by this Section 7 to be voided.  Subject to the foregoing, each party to this Agreement hereby agrees to release, defend, indemnify and hold harmless the other party hereto and each other party's respective officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporations, successors and assigns, from and against any and all uninsured claims, damages, losses, liabilities, demands, suits, judgments, causes of action, civil and criminal legal proceedings, penalties, fines and other sanctions, and any reasonable attorney fees and other reasonable costs and expenses caused by or arising out of the negligent acts or omissions of the indemnifying party in connection with this Agreement.  Lessee further agrees to release, defend, indemnify and hold harmless Lessor and Lessor's officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporations, successors and assigns, from and against any and all uninsured claims, damages, losses, liabilities, demands, suits, judgments, causes of action, civil and criminal legal proceedings, penalties, fines and other sanctions, and any reasonable attorney fees and other reasonable costs and expenses caused by or arising out of (i) any failure of Lessee to maintain and operate the Aircraft in accordance with the terms and conditions of this Agreement, Part 135 of the FAR and/or Applicable Law; (ii) the use of the Aircraft by Lessee to provide on-demand air transportation services to any Lessee-Originated Charter Customer; and/or (iii) any contract or agreement by and between Lessee and any Lessee-Originated Charter Customer relating to the provision by Lessee of on-demand air transportation services to any Lessee-Originated Charter Customer or any third-party.  Likewise, Lessor further agrees to release, defend, indemnify and hold harmless Lessee and Lessee's officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporations, successors and assigns, from and against any and all uninsured claims, damages, losses, liabilities, demands, suits, judgments, causes of action, civil or criminal legal  proceedings, penalties, fines and other sanctions and any reasonable attorneys fees and other reasonable costs and expenses caused by or arising out of (i) Lessor's violation of the terms of this Agreement (ii) the use of the Aircraft for Lessor-Originated Charter Customers; and/or (iii) any contract or agreement by and between Lessor and any Lessor-Originated Charter Customer relating to the provision of on-demand air transportation services to any Lessor-Originated Charter Customer or any third-party.  In no event shall either party be liable to the other party for indirect, incidental, consequential, punitive, exemplary or special damages of any kind for any reason. For purposes of this Section 7.1, a claim shall be deemed to be covered by insurance even though the insurance may be subject to deductibles, self-insured retentions and comparable provisions.

7.2    **Insurance**.

    7.2.1    Lessor shall cause to be maintained in full force and effect at no cost to Lessee insurance covering the Aircraft for broad form passenger liability, public liability, including war risks and terrorism, property damage and all risk physical damage coverage in connection with the maintenance, use and operation of the Aircraft.  Such policy shall have a minimum of $500,000,000.00 combined limit for liability and a minimum hull coverage not less than the fair market value of the Aircraft (herein, the "Insurance Policy").  The Insurance Policy shall name Lessor and any first lien mortgage holder as loss payees of all physical damage/hull insurance proceeds as their interests may appear.  The Pilot Warranty clause in the Insurance Policy shall permit operation of the Aircraft by all pilots approved in the Aircraft by the Chief Pilot of Lessee.

    7.2.2    The Insurance Policy hereunder shall be in a form and with insurance companies acceptable to Lessee, which acceptance shall not be unreasonably withheld, conditioned or delayed.  Lessee acknowledges that the Insurance Policy will be provided by an affiliate of Lessor, and not by Lessor itself.

    7.2.3    The Insurance Policy, and any applicable excess and umbrella insurance policies, shall show Lessor,  Lessee, and their respective officers, directors and employees as named insureds.   It is expressly understood that Lessor's affiliate's policy is a proprietary document, and Lessee will not disclose its contents, terms or conditions without the expressed written consent of Lessor.  A copy of the Insurance Policy shall be furnished to Lessee.

    7.2.4    The Insurance Policy shall be for the benefit of Lessor, Lessor's affiliate that provides the policy, Lessee, and their respective officers, directors and employees, and any other parties designated by Lessor or its affiliate, and coverage provided to any named insured under the Insurance Policy shall not be invalidated by any act, neglect or breach by any other named insured thereunder. Lessor's rights to physical damage/hull insurance proceeds shall be the sole remedy for loss or damage to the Aircraft or loss of income and diminution of value arising from loss or damage to the Aircraft.  The risk of loss or damage to the Aircraft shall remain with Lessor at all times, including without limitation, all indirect, special or consequential damages.

    7.2.5    In the event of the total loss or destruction of the Aircraft, or such damage thereto which causes it to be irreparable in the opinion of the insurance carrier providing the insurance coverage hereinabove provided, or if the Aircraft is damaged such that it is improbable, in Lessor's reasonable opinion, that the Aircraft could be made operative within a period of one hundred and twenty (120) days, or if the Aircraft is stolen, condemned, confiscated, seized, or requisitioned, and is not returned within sixty (60) days, then this Agreement shall terminate thirty (30) days after the occurrence of such an event or determination; provided that notwithstanding any such termination, Lessee shall at no additional charge to Lessor provide all assistance and cooperation reasonably requested by Lessor in filing and processing any and all claims under the Insurance Policies.

    7.2.6    The Insurance Policy shall include a provision that Lessee will be provided with thirty (30) days prior written notice of cancellation or material change of the Insurance Policy.  Ten (10) days notice of cancellation shall apply with respect to non-payment of premium. Furthermore, the Insurance Policy shall provide that the subject policy shall be "primary" for the protection of Lessor and Lessee, notwithstanding any other or additional coverage carried by Lessee for Lessee's own benefit against similar risks.  Notwithstanding anything contained in this Agreement to the contrary, Lessee shall be entitled to suspend services under this Agreement immediately upon any cancellation, expiration, termination, or lapse of any insurance coverage required under this Section 7, and will resume such suspended services immediately upon the restoration of such insurance coverage.

7.3    **Tax Indemnification**.

7.3.1    Lessor shall release, indemnify, reimburse, defend and hold harmless Lessee and Lessee's officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporations, successors and assigns from any and all Taxes, and any interest, penalties, fines, and additions imposed for non-collection of Taxes payable with respect to any Taxes (collectively "Penalties and Interest), excluding Penalties and Interest arising from Lessee's gross negligence or willful or criminal misconduct (collectively "Excluded Penalties and Interest), imposed on the lease of the Aircraft to Lessee, and the use of the Aircraft by Lessee, except to the extent that any such Taxes have been paid to or on behalf of Lessee by any charter customer of Lessee.

7.3.2    The parties agree that all charter flights conducted by Lessee on behalf of charter customers will be classified as "commercial" for Federal excise tax purposes, and will therefore be subject to Federal excise taxes on air transportation services, and will also be subject to Federal excise taxes on aviation fuels, but at a rate lower than the rate applicable to fuel used on noncommercial flights.   Subject to the provisions hereafter set forth, neither party shall assert any position to the contrary in any tax return or any audit, claim, assessment, examination, or other formal or informal proceeding or inquiry (each of the foregoing being hereinafter referred to as an "Inquiry").

7.3.3    It is acknowledged that any Inquiry concerning any Taxes and/or Penalties and Interest for which Lessor may be responsible hereunder may also concern Taxes and/or Penalties and Interest that may be due and owing by Lessee for which Lessor has no responsibility (*e.g., taxes on services or supplies Lessee provides to its other clients and/or Excluded Penalties and Interest*).

7.3.4    If, in addition to Taxes and/or Penalties and Interest for which Lessor may be responsible hereunder, any Inquiry also concerns Taxes and/or Penalties and Interest due and owing by Lessee for which Lessor has no responsibility hereunder and/or Excluded Penalties and Interest:

7.3.4.1    the parties shall jointly control, manage, litigate, and/or defend such Inquiry, with each party responsible for its own defense costs and expenses;

7.3.4.2    neither party may settle, compromise, or fail to appeal a ruling in any such Inquiry over the reasonable objection of the other party;

7.3.4.3    a settlement at the administrative level or during the course of judicial proceedings may only be entered into with the consent of both parties, which consent shall not be unreasonably withheld, delayed or conditioned;

7.3.4.4    if either party, for any reason, fails to defend such Inquiry, then the other party may take control and manage, litigate and/or defend such Inquiry, and non-defending party shall reimburse the defending party for a pro-rata portion of the reasonable costs and expenses of such defense, including, without limitation, reasonable attorneys fees, that the parties reasonably determine relates to the defense of that portion of the Inquiry concerning taxes for which the non-defending party is responsible hereunder; and

7.3.4.5    for purposes of this Section 7.3, a party may reasonably object to the other party's proposed settlement, compromise or failure to appeal a ruling in an Inquiry if, (i) in the objecting party's reasonable judgment, taking such action will materially, adversely affect the objecting party's interests, giving effect to this Agreement and (ii) any such action does not include as an unconditional term thereof the giving of a release to the objecting party of any further liability for  Taxes and/or Penalties and Interest.

7.3.5    If any Inquiry concerns only Taxes and/or Penalties and Interest for which Lessor may be responsible hereunder, Lessor shall control, manage, litigate, and/or defend such Inquiry, and Lessor may not settle, compromise, or fail to appeal a ruling in any such Inquiry over the reasonable objection of Lessee. Lessee shall cooperate, at Lessor's expense, with Lessor in any

such defense to the extent reasonably requested by Lessor; provided, however, that if Lessor, for any reason, fails to defend such Inquiry in any manner it deems appropriate, then Lessee may take control and manage, litigate and/or defend such Inquiry, and Lessor shall, in addition to its indemnification obligations hereunder, reimburse Lessee for its reasonable costs and expenses of such defense and Lessee may not be challenged by Lessor in any decision Lessee may make to settle, compromise or fail to appeal a ruling in any Inquiry.

7.3.6    If any Inquiry requires the posting of a deposit or sum of money in order to preserve the right to participate in the Inquiry, then each party agrees to pay that portion of such deposit or other sum that bears the same ratio that the parties reasonably agree relates to each party's estimated responsibility hereunder for the total amount in controversy in the Inquiry, and if any Inquiry results in a final assessment or judgment of Taxes and/or Penalties and Interest for which Lessor is responsible hereunder, and no appeal from such final assessment or judgment is permitted or Lessor elects not to pursue a permitted appeal from such final assessment or judgment, Lessor shall immediately pay such Taxes and/or Penalties and Interest directly to the appropriate taxing authority on its own behalf or on behalf of Lessee, as the case may be, without further demand by Lessee.

7.3.7    In the event Lessee receives notice of any Inquiry concerning any Taxes and/or Penalties and Interest for which Lessor may be responsible hereunder, Lessee shall timely notify Lessor of such Inquiry within five (5) business days of receipt thereof.  Notwithstanding anything to the contrary contained in this Agreement, Lessee's failure to provide timely notice of any Inquiry, or to cooperate with Lessor in the defense against such Inquiry, shall relieve Lessor of its obligation to indemnify, reimburse, defend and hold harmless Lessee from any and all such Taxes and/or Penalties and Interest to the extent Lessor is prejudiced thereby.

## SECTION 8.  NOTICES

8.1    All communications, declarations, demands, consents, directions, approvals, instructions, requests and notices required or permitted by this Agreement shall be in writing and shall be deemed to have been duly given or made when delivered personally or transmitted electronically by e-mail or facsimile, receipt acknowledged, or in the case of documented overnight delivery service or registered or certified mail, return receipt requested, delivery charge or postage prepaid, on the date shown on the receipt therefor, in each case at the address set forth below:

| **If to Lessor:** | CES Aviation LLC<br>c/o Lehman Brothers Inc.<br>399 Park Avenue<br>New York, NY 10022<br>Attn:     Corporate Counsel | Tel:<br>Fax: | 212-526-0858<br>212-526-0339 |
|---|---|---|---|
| **With a copy to:** | Galland, Kharasch, Greenberg,<br>Fellman & Swirsky, P.C.<br>1054 31st Street, N.W., Suite 200<br>Washington, D.C.  20007<br>Attn:     Keith G. Swirsky | Tel:<br>Fax: | 202-342-5251<br>202-342-5219 |
| **And a copy to:** | Lehman Brothers Inc.<br>745 Seventh Avenue, 30th Floor<br>New York, NY 10019<br>Attn:     Gary Hoffman | Tel:<br>Fax: | 212-526-0846<br>646-346-8274 |
| **If to Lessee:** | Executive Fliteways, Inc.<br>One Clark Drive<br>Ronkonkoma, New York 11779<br>Attn:     John  W. Grillo | Tel:<br>Fax: | 631-588-5454<br>631-588-9560 |

| With a copy to: | McBreen, McBreen & Kopko | Tel: | 201-476-5400 |
|---|---|---|---|
| | 110 Summit Avenue | Fax: | 201-573-0574 |
| | Montvale, NJ 07645 | | |
| | Attn: Robert S. Moran, Jr. | | |

## SECTION 9.  WARRANTIES AND REPRESENTATIONS

9.1    **Representations and Warranties of Lessee**.  Lessee represents and warrants as of the date hereof and during the entire Term hereof as follows:

9.1.1    Lessee is the lawful owner of the Certificate and is authorized pursuant to its operations specifications to conduct On-Demand Operations in common carriage in accordance with the applicable requirements of Part 135 of the FARs, and said Certificate and operations specification are valid and in good standing.

9.1.2    Lessee has complied with all provisions of Part 298 of the FARs necessary to permit Lessee to operate as an Air Taxi Operator (as defined in Section 298.3 of the FARs), and is thereby authorized to operate as an Air Taxi Operator.

9.1.3    Prior to conducting any charter operations with the Aircraft under this Agreement, Lessee shall cause its operations specifications to be amended to authorize use of the Aircraft for the conduct of such charter operations.

9.1.4    Lessee will operate the Aircraft in accordance with Applicable Law and will not permit the Aircraft to be operated or possessed by other than currently qualified and certified Flight Crew members who at a minimum meet the Pilot Qualification Standards for the pilot position to which assigned.

9.1.5    All pilot Flight Crew members shall have at least the minimum total pilot hours required by any policy of insurance covering the Aircraft and will meet or exceed all requirements under any policy of insurance covering the Aircraft or Applicable Law.

9.1.6    Lessee is a validly organized corporation under the laws of the State of Delaware, and the person executing on behalf of Lessee has full power and authority to execute this Agreement on behalf of Lessee and by such execution shall bind Lessee under this Agreement.

9.1.7    No action, suit, or proceeding is currently pending or threatened against Lessee which shall in any material way adversely affect Lessee's financial status as of the date thereof, or materially impair the execution, delivery, or performance by Lessee of this Agreement or any other document.

9.1.8    The execution and delivery of this Agreement by Lessee and the performance of its obligations hereunder have been duly authorized by all necessary corporate action, and do not conflict in any material respect with any provision of Lessee's articles of incorporation, bylaws, any governmental regulations, or any other agreements that Lessee may now have with other parties.

9.1.9    Lessee is not subject to any restriction, which with or without the giving of notice, the passage of time, or both, prohibits or would in any material respect be violated by or be in conflict with this Agreement.

9.1.10    Lessee will not operate the Aircraft in any unsafe manner or contrary to any manual or instructions for the Aircraft or in violation of the terms or conditions of any insurance policy covering the Aircraft or any applicable statute, regulation, ordinance, or other law, or by any pilot who at a minimum does not meet the Pilot Qualification Standards for the pilot position to which assigned unless that pilot meets the pilot warranties of Lessor's applicable insurance policy and has written approval for flight duties from both the Lessee and the Lessor.

17

9.2     **Representations and Warranties of Lessor**.  Lessor represents and warrants as of the date hereof and during the entire Term hereof as follows:

    9.2.1    Lessor is a validly organized corporation under the laws of the State of Delaware and the person executing on behalf of Lessor has full power and authority to execute this Agreement on behalf of Lessor and by such execution shall bind Lessor under this Agreement.

    9.2.2    No action, suit, or proceeding is currently pending or threatened against Lessor which shall in any material way adversely affect Lessor's financial status as of the date hereof, or materially impair the execution, delivery, or performance by Lessor of this Agreement or any other document.

    9.2.3    The execution and delivery of this Agreement by Lessor and the performance of its obligations hereunder have been duly authorized by all necessary corporate action, and do not conflict in any material respect with any provision of Lessor's articles of incorporation, bylaws, any governmental regulations, or any other agreements that Lessor may now have with other parties.

    9.2.4    Lessor is not subject to any restriction, which with or without the giving of notice, the passage of time, or both, prohibits or would in any material respect be violated by or be in conflict with this Agreement.

    9.2.5    Lessor shall not commit any act, including an act of omission, that will cause the Aircraft to be operated in violation of Applicable Law; provided, however, that no action or act of omission of Lessor shall be considered to have caused the Aircraft to be operated in violation of Applicable Law if such violation of Applicable Law is the direct or indirect result of any act, including an act of omission, of Lessee under circumstances that would constitute a breach or default by Lessee or any obligation, covenant, or representation of Lessee under this Agreement, including, without limitation, the representations of Lessee set forth in Section 9.1.10.

## SECTION 10.  <u>MISCELLANEOUS</u>

10.1    **Entire Agreement.**  This Agreement, and all terms, conditions, warranties, and representations herein, are for the sole and exclusive benefit of the signatories hereto.  This Agreement constitutes the entire agreement of the parties as of its Effective Date and supersedes all prior or independent, oral or written agreements, understandings, statements, representations, commitments, promises, and warranties made with respect to the subject matter of this Agreement.  Provisions of this Agreement which by their nature survive the termination or expiration of this Agreement shall continue in full force and effect thereafter.

10.2    **Other Transactions.**  Except as specifically provided in this Agreement, none of the provisions of this Agreement, nor any oral or written statements, representations, commitments, promises, or warranties made with respect to the subject matter of this Agreement shall be construed or relied upon by any party as the basis of, consideration for, or inducement to engage in, any separate agreement, transaction or commitment for any purpose whatsoever.

10.3    **Prohibited and Unenforceable Provisions.**  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibitions or unenforceability in any jurisdiction.  To the extent permitted by applicable law, each of Lessor and Lessee hereby waives any provision of applicable law that renders any provision hereof prohibited or unenforceable in any respect.

10.4    **Enforcement.**  This Agreement, including all agreements, covenants, representations and warranties, shall be binding upon and inure to the benefit of, and may be enforced by Lessor, Lessee, and each of their agents, servants and personal representatives.  In the event either party shall file any suit or other claim to enforce any provision of this Agreement, the prevailing party shall be entitled to recover from the other

party all of the prevailing party's reasonable attorney's fees, court costs, and other costs of such enforcement immediately upon final adjudication of the controversy.

10.5    **Headings.**  The section and subsection headings  in this Agreement are for convenience of reference only and shall not modify, define, expand, or limit any of the terms or provisions hereof.

10.6    **Counterparts.**  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but both such counterparts shall together constitute but one and the same instrument.

10.7    **Amendments.**  No term or provision of this Agreement may be amended, changed, waived, discharged, or terminated orally, but only by an instrument in writing signed by the party against which the enforcement of the change, waiver, discharge, or termination is sought.

10.8    **No Waiver.**  No delay or omission in the exercise or enforcement of any right or remedy hereunder by either party shall be construed as a waiver of such right or remedy.  All remedies, rights, undertakings, obligations, and agreements contained herein shall be cumulative and not mutually exclusive, and in addition to all other rights and remedies which either party possesses at law or in equity.

10.9    **No Assignments or Subleases.**  Neither party may assign its rights or obligations under this Agreement without the prior written permission of the other.  Lessee shall not sublease the Aircraft to any person or entity, nor sell, transfer, pledge, hypothecate, or in any other manner transfer or relinquish the Aircraft or any interest therein to any person or entity, except that Lessee shall relinquish possession of the Aircraft from time to time to any other person or entity to whom Lessor has leased the Aircraft on a non-exclusive basis for use by such other person or entity in operations under Part 91 of the FARs.

10.10   **Governing Law.**  This agreement has been negotiated and delivered in the State of New York and shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, without giving effect to its conflict of laws provisions.

10.11   **Confidentiality; Non-Solicitation.** (a) The terms of this Agreement, its Schedules and any information gained through its negotiation and performance are considered confidential information by the Lessee and the Lessor. Both parties acknowledge that each has gained sensitive and proprietary information about the business of the other during the course of this Agreement and will protect that information from dissemination to third parties.  The foregoing notwithstanding, each party shall have the right to disclose such information to its attorneys, accountants and other advisors who have a reasonable need for such information in the ordinary course of business; provided, however, that a party disclosing such information to its attorneys, accountants and other advisors shall use reasonable efforts to cause such attorneys, accountants and other advisors to protect such information from dissemination. Any disclosure by one party of the other's business information or practices is a material breach and grounds for termination of this Agreement, as well as the exercise of any remedy at law or equity available to either party.  (b) Lessor agrees that for the period of one (1) year after the termination of this Agreement, Lessor will not directly or indirectly, solicit or provide charter services on any aircraft to any third party who was a charterer or offered as a prospective charterer by Lessee during the term of this Agreement. In the event Lessor does provide such charter services, Lessee will be entitled to a fee of fifteen (15%) percent of any charter revenues as liquidated damages for breach of this provision. Lessor agrees to furnish lessee all documentation and information necessary to calculate and verify the amounts due under this provision.

10.12   **Flight Crew Resources**.  It is acknowledged by the parties that Lessee has considerable investment in its highly trained and skilled employees, and that the loss of these employees causes significant expense to the Lessee.  In consideration of the investment in the indoctrination, training and development of such individuals, if during the term hereof and any extensions or within six months after termination of this Agreement, Lessor or any of its subsidiaries or affiliates, or any other business entity ten percent (10%) or more of which is owned by Lessor or any of its subsidiaries or affiliates (each of the foregoing an "Lessor Affiliate"), employs (on a full-time, permanent basis) or utilizes (on a full-time, permanent basis) the

services of any person who was an employee of Lessee within the six months immediately preceding the termination of this Agreement (excluding any person for whom Lessee is entitled to receive post-termination flight crew employment costs from any Lessor Affiliate), or if during the term hereof and any extensions or within six months after termination of this Agreement any other unrelated entity employs (on a full-time, permanent basis) or utilizes (on a full-time, permanent basis) the services of any person who was an employee of Lessee within the six months immediately preceding the termination of this Agreement (excluding any person for whom Lessee is entitled to receive post-termination flight crew employment costs from any Lessor Affiliate) for the purpose of providing charter services to Lessor similar to the charter services provided under this Agreement, Lessor agrees to compensate Lessee at the rate of $25,000.00 per employee so employed or utilized by Lessor or any Lessor Affiliate, or by any unrelated entity for the aforementioned purpose. This fee shall be due and payable immediately upon such employee being so employed or utilized by Lessor or any Lessor Affiliate, or by any unrelated entity for the aforementioned purpose. If within six months after termination of this Agreement, Lessor or any Lessor Affiliate shall utilize on a short-term day-rate basis the services of any employee of Lessee who served as a flight crew member on Lessor's Aircraft during the Term of this Agreement (excluding any person no longer employed by Lessee), or if within six months after termination of this Agreement, any other unrelated entity shall utilize on a short-term day-rate basis the services of any employee of Lessee who served as a flight crew member on Lessor's Aircraft during the Term of this Agreement (excluding any person no longer employed by Lessee) for the purpose of providing flight crew services to Lessor similar to the flight crew services provided under this Agreement, Lessor shall compensate Lessee at a rate of $2,500.00 per duty day for up to ten (10) duty days. The parties hereto acknowledge that provisions similar to this Section 10.12 are or may become contained in other agreements between Lessee and Lessor and/or between Lessee and one or more Lessor Affiliates. It being the intent of the parties that Lessee may become entitled to only a single recovery under all such provisions collectively with respect to each individual employee, the parties therefore agree that notwithstanding anything in this Section 10.12 to the contrary, in the event Lessor, any Lessor Affiliate, or any unrelated entity employs or utilizes any such employee under circumstances that would entitle Lessee to compensation under this Section 10.12 and/or any similar provision in any such other agreement, Lessee shall be entitled to recover compensation at the rate of $25,000.00 per employee only under this Agreement <u>or</u> one (1) such other agreement, but not under this Agreement <u>and</u> any other such agreement.

10.13    **Guaranty**.  Concurrently with execution hereof, Lessor shall cause Lehman Brothers Holdings Inc. to execute and deliver to Lessee a Guaranty in the form of <u>Schedule C</u> attached hereto, unless a previously delivered Guaranty in such form is still in full force and effect.

10.14    **Force Majeure**.  Neither party shall be liable to the other for failure or delay in the performance of their respective obligations hereunder if such failure or delay arises or results from a Force Majeure event.

10.15    **Changes in Applicable Law**.  The parties hereto reasonably believe that the performance by each of the parties hereto of their respective obligations arising hereunder will not violate any Applicable Law. Notwithstanding anything to the contrary contained herein, in the event (i) any Applicable Law shall be enacted or amended during the Term hereof in such a manner as to cause the performance by either party of any of its respective obligations hereunder to violate any Applicable Law, (ii) any Applicable Law shall be enacted or amended during the Term hereof in such a manner as to cause a substantial increase in the cost to either party to perform its respective obligations hereunder, or (iii) if the parties shall, after execution hereof, reasonably determine that the performance by either party of any of its respective obligations hereunder violates any existing Applicable Law; then upon and after such an event, (x) neither party shall be considered to be in breach or default hereof for failure to perform any obligation the performance of which would be in violation of Applicable Law or the cost of performance of which has substantially increased as a result of the enactment of any new, or the amendment of any existing, Applicable Law, and (y) the parties shall, as soon as reasonably possible, negotiate in good faith any revisions reasonably necessary to cause the performance by the parties hereunder to comply with all Applicable Law and to allocate to the parties any substantial increase in the costs incurred by the parties under this Agreement in order to comply with any new or amended Applicable Law.

*   *   *   ***Signature Page Follows***   *   *   *

**IN WITNESS WHEREOF**, the Lessor and the Lessee have each caused this **Non-Exclusive Aircraft Lease Agreement** to be duly executed as of the Effective Date.

LESSOR:

**CES Aviation LLC**


By:      _____
Print:    Francine S. Kittredge
Title:    Managing Director



LESSEE:

**Executive Fliteways, Inc.**


By:      _____
Print:    John W. Grillo_____
Title:    President

## NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT

### Schedule A

Hourly Rate:                     $ 5,500.00 per Flight Hour

Hangar Fee:                     $ 138,000.00 per year for each full year of the Term, commencing on and measured from the Effective Date hereof.  In the event the Term of this Agreement shall terminate on a date other than an annual anniversary of the Effective Date hereof, the Hangar Fee due and payable for the year in which this Agreement terminates shall be pro-rated accordingly.

Labor Rate:                     $ 84.00 per hour

The Hangar Fee and the Labor Rate may each be adjusted upward on each anniversary of the Effective Date of this Agreement by the greater of 3.75%, or an amount equal to the percentage change in the Consumer Price Index for the Northeast United States during the immediately preceding calendar year.

Parts Markup Percentage:  15% not to exceed $3,000 per part

Fuel Price Indices:

      a.        $ 1.64 per gallon above the thirty (30) day average per gallon price for jet fuel in New York Harbor as published on the last business day of the month in the OPIS Jet Fuel Report.  In the event the OPIS Jet Fuel Report shall cease to be published or shall be determined by the parties to be an unsuitable fuel price index, the parties shall substitute a mutually agreed-to reference.

      b.        $ 0.20 per gallon below the Operating Base Fuel Supplier's lowest posted retail rate on the first business day of the month.

## NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT

### Schedule B

**Pilot Qualification Standards**

| Criteria | Pilot in Command | Second in Command |
|---|---|---|
| Airman Certificate: | FAA ATP | FAA Commercial |
| Ratings: | appropriate category, class, and type | instrument-airplane, and appropriate category and class |
| Medical Certificate: | FAA 1st Class | FAA 1st Class |
| Flight Time: | | |
|     Total (all aircraft): | 4000 | 2000 |
|     Total PIC (all Aircraft): | 3000 | (not applicable) |
|     Fixed wing: | | |
|         Total: | 4000 | 1500 |
|         PIC: | 3000 | (not applicable) |
|         Last 12 months: | 300 | 200 |
|         PIC Last 12 months: | 300 | (not applicable) |
|     Multi-engine: | | |
|         Total: | 3000 | 1500 |
|         PIC: | 2000 | (not applicable) |
|         Last 12 months: | 300 | 200 |
|         PIC Last 12 months: | 300 | (not applicable) |
|     Gulfstream G-IV SP: | | |
|         Total: | 200 | 50 |
|         PIC: | 100 | (not applicable) |
|     Actual Instrument: | | |
|         Total: | 250 | 75 |
|         PIC: | 250 | (not applicable) |
| Takeoffs and Landings in Class B Airspace: | | |
|     Total: | 100 | 50 |
| Accidents, Incidents, FAA Sanctions within the preceding five years: | 0 | 0 |

## NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT

### Schedule C

### GUARANTY

**THIS GUARANTY** (the "Guaranty") is executed and delivered this 1st day of September, 2007, by **Lehman Brothers Holdings Inc.**, a Delaware corporation ("Guarantor"), in favor of **Executive Fliteways, Inc.**, a Delaware corporation ("Beneficiary").

The Guarantor, in consideration of Beneficiary's execution and delivery of a Non-Exclusive Aircraft Lease Agreement (the "Agreement"), dated as of the 1st day of September, 2007, with **CES Aviation LLC**, a Delaware limited liability company ("Obligor"), hereby represents, warrants, covenants and promises as follows:

1.      Guaranty.   Guarantor, hereby unconditionally, absolutely and irrevocably guarantees to Beneficiary, its successors and assigns, the prompt and timely performance by Obligor of all of Obligor's performance obligations, including payment obligations, arising under the Agreement and any successor agreement. The obligations of the Guarantor under this Guaranty shall be performed upon notice or demand following any failure by Obligor to perform any obligation under the Agreement or any successor agreement at the time performance is required under the Agreement or any successor agreement.

2.      Nature of Guaranty.   This Guaranty, and the Guarantor's obligations and liabilities hereunder constitute an absolute, unconditional and continuing guaranty of payment and performance, and may be enforced one or more times and by one or more demands or proceedings.  Further, Guarantor's obligations hereunder are in no way conditioned upon or limited by any attempt to collect from, or to exercise any rights or remedies against, Obligor.  This Guaranty shall continue in full force and effect for as long as the Agreement or any successor agreement remains in force.

3.      Miscellaneous.   This Guaranty is the binding obligation of Guarantor, its successors and assigns, and shall inure to the benefit of and be enforceable by Beneficiary, its successors and assigns, in accordance with the terms hereof.  This Guaranty shall be governed by the law of the State of New York, without regard to its conflict of laws provisions.  This Guaranty may not be amended, changed or modified in any manner, except by a writing signed by Guarantor.

**IN WITNESS WHEREOF,** this Guaranty has been duly executed and delivered by the Guarantor on the day and year first above written.

GUARANTOR:

**Lehman Brothers Holdings Inc.**

By:      _____
Print:      **Paolo Tonucci**
Title:      Global Treasurer

## <u>NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT</u>
(Part 135 Operations)

Dated as of the 1ˢᵗ day of September, 2007,

between

**CES Aviation IX LLC**,
as Lessor,

and

**Executive Fliteways, Inc.**,
as Lessee,

concerning one Dassault-Breguet model Falcon 50 aircraft bearing

U.S. registration number N232PR,

and

manufacturer's serial number 179.

This **NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT** (the "Agreement") is entered into as of this 1st day of September, 2007 (the "Effective Date"), by and between **CES Aviation IX LLC**, a Delaware limited liability company ("Lessor"), and **Executive Fliteways, Inc.**, a Delaware corporation ("Lessee").

## W I T N E S S E T H :

**WHEREAS**, Lessor is, as of the Effective Date of this Agreement, the registered owner of the Aircraft described and referred to herein;

**WHEREAS**, Lessee holds a current and valid Air Carrier Certificate and is authorized to use of the Aircraft for the conduct of On-Demand Operations in common carriage in accordance with the applicable requirements of Part 135 of the FARs;

**WHEREAS,** Lessor desires to lease the Aircraft to Lessee, and Lessee desires to lease the Aircraft from Lessor, in order that Lessee may use the Aircraft to conduct On-Demand Operations in common carriage; and

**WHEREAS**, during the term of this Agreement, the Aircraft may be subject to concurrent, non-exclusive leases to other lessees for use by such other lessees in operations under Part 91 of the FARs.

**NOW, THEREFORE**, in consideration of the foregoing premises, the mutual promises herein contained, and other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, the Lessor and Lessee agree as follows:

## SECTION 1.    DEFINITIONS

1.1     The following terms shall have the following meanings for all purposes of this Agreement:

**"Aircraft"** means the Airframe, the Engines identified herein, and the Aircraft Documents.  The Engines identified herein shall be deemed part of the "Aircraft" whether or not from time to time attached to the Airframe or on the ground.   Any other engines that may from time to time become attached to the Airframe on a temporary basis shall be included in the term "Aircraft" for so long as such engines are so attached.

**"Aircraft Accident"** has the same meaning given the term in 49 C.F.R. Section 830.2.

**"Aircraft Documents"** means all flight records, maintenance records, historical records, modification records, overhaul records, manuals, logbooks, authorizations, drawings and data relating to the Airframe, any Engine, or any Part, that have been provided to Lessee by Lessor, or are required by Applicable Law to be created or maintained with respect to the maintenance and/or operation of the Aircraft, or are required from time to time by the FAA with respect to the Aircraft, including, without limitation, shop records detailing service checks, inspections, tests, repairs or overhauls, and all records required for Part 135 compliance, including the date of each charter flight, the name of the person authorizing the charter flight, the name of the lead passenger, points of travel, flight and ground time, breakdown of charges for each trip, and other similar information.

**"Airframe"** means the Dassault-Breguet model Falcon 50 aircraft bearing manufacturer's serial number 179 and United States registration number N232PR, together with any and all Parts (including, but not limited to, landing gear and auxiliary power units but excluding Engines or engines) so long as such Parts shall be either incorporated or installed in or attached to the Airframe.

**"Applicable Law"** means, without limitation, all applicable laws, treaties, international agreements, decisions and orders of any court, arbitration or governmental agency or authority and rules, regulations, orders, directives, licenses and permits of any governmental body, instrumentality, agency or authority, including, without limitation, the FARs and the Federal Aviation Act of 1958, as amended.

**"Certificate "** shall mean that certain Air Carrier Certificate issued to Lessee by the Federal Aviation Administration pursuant to Part 119 of the FARs and bearing certificate number AOQA201C.

**"Excess Hours Surcharge"** has the meaning ascribed to the term in Section 5.1.1.

**"Engines"** means two (3) Honeywell model TFE731-3D1C engines bearing manufacturer's serial numbers P-76626, P76719, & P-76662, together with any and all Parts so long as the same shall be either incorporated or installed in or attached to such Engine.

**"Event of Default"** means any event falling within either of the following categories:

    (i)    a failure of a party to pay any sum that is due and payable to the other party on the date that such payment becomes due if such failure continues for more than ten (10) business days after receipt by the debtor party of oral or written notice that such payment is overdue;

    (ii)    a breach by a party of any other provision of this Agreement if such breach continues for more than fifteen (15) business days without being cured after receipt by the breaching party of oral or written notice that a breach has occurred;

    (iii)    any Aircraft Accident or Incident involving, or any Substantial Damage to, the Aircraft or any other aircraft leased by Lessor to Lessee shall occur as a direct result of any negligent act or failure to act of Lessee or any employee, contractor or direct agent of Lessee;

    (iv)    a default by a party under any other agreement between the parties hereto that results in a termination of such other agreement;

    (v)    a default by a party hereto or any affiliate of Lessor under any agreement between Lessee and any affiliate of Lessor that results in a termination of such other agreement.

**"Event of Loss"** shall mean any of the following events with respect to the Aircraft:

    (i)    loss of the Aircraft or of the use thereof due to theft or disappearance (with loss being conclusive following 30 days or such other period specified in applicable insurance), destruction, damage beyond economic repair or rendition of the Aircraft permanently unfit for normal use for any reason;

    (ii)    any damage to the Aircraft which results in an insurance settlement with respect thereto on the basis of an actual, constructive or compromised total loss; or

    (iii)    the condemnation, confiscation or seizure of, or requisition of title to or use of, the Aircraft by private persons or by any governmental or purported governmental authority.

**"FAA"** means the Federal Aviation Administration of the United States Department of Transportation or any successor agency.

**"FARs"** means collectively the Aeronautics Regulations of the Federal Aviation Administration and the Department of Transportation, as codified at Title 14, Parts 1 to 399 of the United States Code of Federal Regulations.

**"Flight Crew"** means all cockpit and ground crew personnel necessary for flight operations of the Aircraft.

**"Flight Hour"** means each flight hour of use of the Aircraft by Lessee.

**"Force Majeure"** means, not by way of limitation, an act of God, an act of nature, an act of civil or military authority, a strike or labor dispute, an unforeseeable mechanical failure, or an air traffic control delay, or any other event that is beyond the control of a party hereto.

**"Incident"** has the same meaning given the term in 49 C.F.R. Section 830.2.

**"Initial Term"** has the meaning ascribed to the term in Section 2.4.1.**"Lessee-Originated Charter Customer"** means any charter customer originated by Lessee.

**"Lessor-Designated Charter Customer"** means Lessor's parent company and/or any other affiliate of Lessor and/or any charter customer referred to Lessee by Lessor.

**"Lien"** means any mortgage, security interest, lease or other charge or encumbrance or claim or right of others, including, without limitation, rights of others under any airframe or engine interchange or pooling agreement, but excluding mechanics' liens, hangar keepers' liens, materialmens' liens, and other similar liens (including, possessory liens, common law liens, and statutory liens to the extent that any such liens are similar to a mechanics' lien, a hangar keepers' liens, or a materialmens' lien) dischargeable in the ordinary course of business.

**"On-Demand Operations"** shall have the same meaning given the term in Section 119.3 of the FARs.

**"Operating Account"** shall mean a bookkeeping account maintained by Lessee to account for funds related to use, operation, maintenance, and storage of the Aircraft.

**"Operating Base"** means Long Island MacArthur Airport, Islip, New York.

**"Operating Base Fuel Supplier"** means Long Island Jet Center or any successor vendor operating out of the same location.

**"Operational Control"** has the same meaning given the term in Section 1.1 of the FARs.

**"Parts"** means all appliances, components, parts, instruments, appurtenances, accessories, furnishings or other equipment of whatever nature (other than complete Engines or engines) which may from time to time be incorporated or installed in or attached to the Airframe or any Engine and includes replacement parts.

**"Pilot in Command"** has the same meaning given the term in Section 1.1 of the FARs.

**"Pilot Qualification Standards"** means the Pilot Qualification Standards set forth in <u>Schedule B</u> hereof.

**"Substantial Damage"** has the same meaning given the term in 49 C.F.R. Section 830.2.

**"Taxes"** means all taxes of every kind (excluding any tax measured by or assessed against a taxpayer's income, including, without limitation, any income tax, gross income tax, net income tax, or capital gains tax) assessed or levied by any federal, state, county, local, airport, district, foreign, or other governmental authority, including, without limitation, sales taxes, use taxes, retailer taxes, duties, fees, excise taxes, and other similar taxes.

**"Term**" means the entire period from the Effective Date to the date this Agreement is terminated pursuant to Section 2.4.

## SECTION 2.    <u>LEASE, DELIVERY AND USE OF THE AIRCRAFT; TERM</u>

2.1    **Lease**.  Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the Aircraft, on the terms and conditions of this Agreement.

2.2    **Delivery**.  Lessor and Lessee agree that as of the date hereof the Aircraft has been delivered to Lessee and is

in an airworthy condition with all necessary accessories and equipment required to safely conduct charter flight operations.

2.3    **Permitted Aircraft Uses**.  Lessee's leasehold interest in the Aircraft shall entitle Lessee to operate the Aircraft solely for the following purposes:

    2.3.1    To provide on-demand charter air transportation services exclusively to charter customers designated and/or approved by Lessor; provided, however, that the terms and conditions for the provision of such charter air transportation shall be as agreed by and between Lessee and such charter customer(s).

    2.3.2    To ferry the Aircraft from the Operating Base to a charter customer's scheduled airport of embarkation.

    2.3.3    To ferry the Aircraft from a charter customer's airport of disembarkation to the Operating Base.

    2.3.4    Flight Crew training.

    2.3.5    Maintenance test flights and maintenance deliveries.

    2.3.6    Other purposes as approved by Lessor in its sole discretion.

2.4    **Term**.

    2.4.1    **Initial Term**.  The initial term of this Agreement (the "Initial Term") shall become effective on the Effective Date and, subject to Sections 2.4.2 through 2.4.4, shall continue in effect until the 1st day of December, 2010 (the "Expiration Date").

    2.4.2    **Renegotiation and Extension**.  During the period commencing ninety (90) days prior to the expiration of the Initial Term of this Agreement and ending sixty (60) days prior to the expiration of the Initial Term of this Agreement, the parties hereto may negotiate the terms of a new Non-Exclusive Aircraft Lease Agreement.  In the event a new Non-Exclusive Aircraft Lease Agreement is not executed as of the date that is sixty (60) days prior to the last day of the Initial Term of this Agreement, and provided the parties hereto are negotiating in good faith the terms of a new Non-Exclusive Aircraft Lease Agreement as of such date, the term of this Agreement shall automatically be extended for an indefinite period that will terminate on the earlier of the date of execution of a new Non-Exclusive Aircraft Lease Agreement, or sixty (60) days after the date that either party hereto provides written notice to the other party that it is terminating negotiations.  In the event the execution of a new Non-Exclusive Aircraft Lease Agreement occurs during a period of extension of this Agreement under this Section 2.4.2, the Initial Term of such new Non-Exclusive Aircraft Lease Agreement, including any increases in the Hangar Fee set forth in <u>Schedule A</u> and/or Lessee's rates and charges, shall be made retroactive to the first day of the period of such extension.  During the period commencing on the day after the expiration of the Initial Term of this Agreement and ending on the day this Agreement terminates or the day prior to the effective date of a new Non-Exclusive Aircraft Lease Agreement, whichever shall apply, the Hangar Fee set forth in Schedule A shall be increased by  ten percent (10%); provided, however, that to the extent any retroactive increase in the Hangar Fee set forth in any new Non-Exclusive Aircraft Lease Agreement is more or less than ten percent (10%), the  ten percent (10%) adjustment required by this Section 2.4.2 shall be adjusted retroactively to equal the adjustment in the new Non-Exclusive Aircraft Lease Agreement.  Upon execution of a new Non-Exclusive Aircraft Lease Agreement, Lessee shall immediately become entitled to debit the Operating Account an amount equal to the difference between the rates in this Non-Exclusive Aircraft Lease Agreement, as adjusted, and the new rates and charges retroactive to the effective date of the new Non-Exclusive Aircraft Lease Agreement.

2.4.3    **Event of Default**.  Upon the occurrence of an Event of Default, the non-defaulting party may terminate this Agreement by written notice to the defaulting party.

2.4.4    **Early Termination**.  Contrary provisions of Section 2.4.1 notwithstanding, each party shall have the right to terminate this Agreement without cause on ninety (90) days written notice to the other party.  In the event of an early termination of this Agreement pursuant to Section 2.4.3 or this Section 2.4.4, the Annual Hangar Fee applicable to the year in which the termination occurs shall be pro-prated by multiplying the annual Hangar Fee by a fraction, the numerator of which is the number of days from the most recent anniversary of the Effective Date to the date of separation of the Aircraft from Lessee's management/hangar, and the denominator of which is 365.  In addition, if such termination is caused by Lessor pursuant to this Section 2.4.4, then Lessee shall also be entitled to an early termination fee in an amount equal to  the lesser of (i) an amount equal to 25% of the annual Hangar Fee set forth in Schedule A, or (ii) the sum of all Hangar Fee payments that would, but for the early termination of this Agreement, have become due from and after the date this Agreement is terminated pursuant to Section 2.2.4 through the Expiration Date; provided however, that if after the Effective Date of this Agreement and prior to a termination of this Agreement by Lessor pursuant to this Section 2.4.4, Lessor shall have terminated any other Non-Exclusive Aircraft Lease Agreement (other than this Agreement) by and between Lessor and Lessee with respect to any other aircraft (other than the Aircraft) under a provision similar to this Section 2.4.4 following a sale of such other aircraft, and if neither Lessor nor any affiliate of Lessor shall have acquired another aircraft as a replacement for the sold aircraft, then in such event the amount in clause (i) of this Section 2.4.4 shall be increased to an amount equal to 66.67% of the Hangar Fee set forth in Schedule A.

2.4.5    **Coordination with Other Agreements.**  Sections 2.4.1 through 2.4.4 notwithstanding, under no circumstances may this Agreement be terminated for so long as that certain Air Charter Agreement by and between Lessee and Lehman Brothers Inc. remains in full force and effect; provided, however, that this Section 2.4.5 shall not be construed as a bar to termination of this Agreement under Section 2.4.2, Section 2.4.3, or Section 2.4.4 hereof if said Air Charter Agreement is terminated simultaneously.

2.5    **Event of Default**.  Upon any termination hereof under Section 2.4.3 following an Event of Default, in addition to such termination rights, the non-defaulting party shall be entitled to all other remedies available to it at law or in equity, provided, however, that in no event may either party be held liable to the other for any indirect, incidental, consequential, special, punitive, or exemplary damages of any kind.

2.6    **Non-Exclusivity.**

2.6.1    Lessee and Lessor acknowledge and agree that the Aircraft is leased to Lessee on a non-exclusive basis.  Lessor reserves the right to lease the Aircraft on a non-exclusive basis to third-parties for use under Part 91 of the FARs; provided, however, that Lessee shall have the exclusive right to use and operate the Aircraft for On-Demand Operations in common carriage under Part 135 of the FARs.  During any period during which another lessee of Lessor has scheduled use of the Aircraft, Lessee's leasehold rights to possession of the Aircraft under this Agreement shall temporarily abate, but Lessee's obligations to maintain, service and store the Aircraft pursuant to Section 3.3 shall continue unabated.   In no event will Lessee be liable to Lessor for any claims, damages, losses, liabilities, demands, suits, judgments, causes of action, civil or criminal legal proceedings, penalties, fines or other sanctions, attorneys fees, or other costs or expenses incurred by Lessor arising from Lessor's inability to provide the Aircraft to any such other lessee as a result of the Aircraft being unavailable due to scheduled or unscheduled repairs or maintenance, previously scheduled training flights, or any Force Majeure event, unless such unavailability arises from Lessee's gross negligence or willful misconduct.

2.6.2    Notwithstanding anything in this Agreement to the contrary, if during the Term of this Agreement Lessor leases the Aircraft on a non-exclusive basis to any person or entity other than Lessee, Lessor shall release, indemnify, defend and hold Lessee harmless from and against any and all

liabilities, claims, and losses of any kind arising out of or connected with the leasing of the Aircraft to such other person or entity; provided, however, that if such other person or entity retains Lessee to provide aircraft management and pilot services in connection with such other person's or entity's operation of the Aircraft, this Section 2.6 shall not apply to any liabilities, claims, or losses of any kind arising out of or connected with the leasing of the Aircraft to such other person or entity.

**SECTION 3.    AIRCRAFT MANAGEMENT, OPERATIONS, AND MAINTENANCE**

3.1    **Title and Registration**.  Lessee acknowledges that title to the Aircraft shall remain vested in Lessor and Lessee shall commit no act, including an act of omission, that may adversely affect Lessor's title interest in the Aircraft.  The foregoing notwithstanding, Lessee may permit the imposition on the Aircraft of mechanics' liens, hangar keepers' liens, materialmens' liens, and other similar liens (including, possessory liens, common law liens, and statutory liens to the extent that any such liens are similar to a mechanics' lien, a hangar keepers' liens, or a materialmens' lien), including any such liens in favor of Lessee, provided that Lessee shall discharge, or cause to be discharged, any such permitted lien in the ordinary course of business upon payment by Lessor to Lessee of the debt that gave rise to the permitted lien.

3.2    **Operations**.  Lessee shall operate the Aircraft in accordance with Part 135 of the FARs during all flight operations conducted under this Agreement, except that Flight Crew training flights, maintenance test flights, maintenance delivery flights, and ferry flights may be operated in accordance with Part 91 of the FARs as provided in Section 91.501(b)(1) when common carriage is not involved.  Lessee shall not operate or locate the Airframe or any Engine, or suffer the Airframe or any Engine to be operated or located, in any area excluded from coverage by any insurance policy in effect or required to be maintained hereunder with respect to the Airframe or Engines.  Lessee shall not operate the Airframe or any Engine or permit the Airframe or any Engine to be operated during the Term except in operations for which Lessee is duly authorized, or to use or permit the Aircraft to be used for a purpose for which the Aircraft is not designed or reasonably suitable.  Lessee shall not permit the Airframe or any Engine to be maintained, used or operated during the Term in violation of any Applicable Law, or contrary to any manufacturer's operating manuals or instructions.  Lessee shall not knowingly permit the Aircraft to be used for the carriage of any persons or property prohibited by law, nor  during the existence of any known defect except in accordance with the FARs.

3.3    **Maintenance, Service, and Storage**.  Lessee shall perform or cause to be performed all maintenance, repair, inspection and overhaul work necessary to obtain certification for the Aircraft pursuant to the FARs and to maintain such certification during the term of this Agreement.  All such work on the Aircraft shall be performed in accordance with the standards set by regulations of the FAA.  Lessee shall provide or cause to be provided only licensed and qualified personnel to perform any maintenance, repair, inspection and overhaul work on the Aircraft.  All such personnel will be contracted for, or employed by Lessee. All equipment in the Aircraft shall be maintained and updated as required or recommended by the manufacturer of such equipment. In all cases other than "Major Repair" (as defined later in this Section), Lessee shall be the sole judge of the kind and extent of repairs necessary, and Lessor hereby grants authority to Lessee to perform or contract for the performance of all such necessary repairs and maintenance, provided that Lessee shall act reasonably in connection therewith. Lessor shall rely wholly on the expertise of Lessee as to the necessity of the labor and materials required under this paragraph.  For purposes of this Agreement, "Major Repair" is defined as being any single repair or maintenance procedure (or series of related repair or maintenance procedures) the cost of which is estimated to be in excess of Seven Thousand Five Hundred United States Dollars ($7,500.00).  Prior to the commencement of any work relating to a Major Repair, Lessee shall furnish Lessor with a written estimate of the cost of the Major Repair, which shall be subject to approval in writing by Lessor prior to the commencement of the Major Repair.  If at any time during the Term of this Agreement Lessee shall reasonably determine that the total cost of any Major Repair will exceed Fifty Thousand United States Dollars ($50,000.00), then notwithstanding any other provision of this Agreement to the contrary, Lessor shall, if requested by Lessee, pay the estimated Major Repair costs to Lessee prior to the due date of the payment of such costs by Lessee to the appropriate vendor or maintenance and repair facility; provided, however, that upon Lessor's request, Lessee shall provide Lessor documentation reasonably acceptable to Lessor supporting Lessee's request for such advance payment.  Contrary requirements of Section 9.1 notwithstanding, written notices concerning

Major Repairs will be provided to Lessor at the address specified in Section 5.8, delivered via mail or e-mail as contemplated therein.  In the event Lessor refuses to approve any Major Repair, and/or pay in advance the estimated cost of any Major Repair that is estimated to be in excess of Fifty Thousand United States Dollars ($50,000.00), the parties shall discuss Lessor's reasons for refusing to approve and/or pay the estimated cost of the Major Repair and shall discuss and evaluate all reasonable alternatives, if any, to the requested Major Repair that may be available, and the parties shall thereafter each use their best efforts to resolve any issues and agree on an appropriate course of action in a prompt and timely manner.  Subject to the foregoing, Lessee shall not be liable or responsible for any costs incurred by Lessor resulting from any failure to perform, or delay in the performance of, any Major Repair to the extent that such failure or delay is a result of a delay or failure of Lessor to approve in writing and/or pay the estimated cost of the Major Repair.  Lessee shall establish accounts with vendors of services and supplies for the Aircraft and maintain all such accounts in good standing, subject to Lessor's obligation to pay or reimburse Lessee for such services and supplies as provided herein.  All costs and expenses incurred in connection with the services performed and parts and supplies provided under this Section 3.3 shall be paid in accordance with Sections 5.2 through 5.6 of this Agreement.

3.4    **Flight Crews**.  The Aircraft is being leased to Lessee hereunder without a Flight Crew.  Lessee shall provide all Flight Crew personnel required for operations of charter flights.

3.5    **Operational Control.**  It is jointly agreed and acknowledged between Lessor and Lessee that at all times while the Aircraft is in the possession of Lessee, Lessee shall have exclusive possession, command, and control of the Aircraft and shall retain operational control of the Aircraft at all times.  Lessee shall exercise exclusive authority over initiating, conducting, or terminating any flight conducted pursuant to this Agreement, and the Flight Crew shall be under the exclusive command and control of Lessee in all phases of such flights and at all times.  The parties acknowledge and agree that flights conducted by other lessee's of Lessor under Part 91 of the FAR's are not conducted pursuant to this Agreement, and Lessee shall have no right or obligation to have or exercise possession, command, or operational control of the Aircraft in connection with flights by Lessor's other lessees.

3.6    **Aircraft Documents**.  Lessee shall at all times maintain and preserve all Aircraft Documents in a current and up-to-date manner.  All Aircraft Documents shall be produced and maintained in the English language.  All costs and expenses incurred in connection with the services performed under this Section 3.6 shall be paid in accordance with Sections 5.2 through 5.6 of this Agreement.

3.7    **Right to Inspect**.  Lessor and/or Lessor's designated representatives shall have the right to inspect the Aircraft or the Aircraft Documents during Lessee's normal business hours, upon giving Lessee two (2) business days notice, to ascertain the condition thereof and to satisfy Lessor that the Aircraft and the Aircraft Documents are being properly maintained in accordance with the requirements of this Agreement.  All required corrections shall be performed as soon as practicable after such inspection.

3.8    **Annual Budgets.**  Lessee shall prepare and deliver to Lessor an estimated annual budget for all operations of the Aircraft upon Lessor's request.

**SECTION 4.  CONDITION DURING TERM AND RETURN OF AIRCRAFT**

4.1    **Return**.  Upon the last business day of the Term or the date of earlier termination hereof, Lessee shall return the Aircraft to the Lessor by delivering the same to Lessor fully equipped with all Engines installed thereon.  Delivery shall be made at a location specified by Lessor, provided that if Lessor shall specify any location other than the Operating Base, Lessor shall reimburse Lessee for any costs and expenses incurred by Lessee to deliver the Aircraft to such location.  The Aircraft at the time of its return shall be in the condition set forth in this Section 4 and shall be free and clear of all Liens.

4.2    **Condition of Aircraft**.  The Aircraft at the time of its return to Lessor shall have been maintained and repaired in accordance with the provisions of this Agreement with the same care and consideration for the technical condition of the Aircraft as if it were to have been kept in continued regular service by the Lessee, and shall meet the following requirements:

4.2.1    **Operating Condition**.  The Aircraft shall be in the same condition as it was in on the Effective Date of this Agreement, ordinary wear and tear excepted.

4.2.2    **Cleanliness Standards**.  The Aircraft shall be clean and shall have received a recent exterior and an interior deep cleaning.

4.2.3    **Certificate of Airworthiness**.  The Aircraft shall have, and be in compliance with, a current valid certificate of airworthiness issued by the FAA, and shall be airworthy according to manufacturer's specifications and FAA regulations.

All costs and expenses incurred in connection with the services performed under this Section 4.2 shall be paid in accordance with Sections 5.2 through 5.6 of this Agreement.

4.3    **Aircraft Documents**.  Lessee shall return or cause to be returned to Lessor, at the time the Aircraft is returned to Lessor, all of the Aircraft Documents, updated and maintained by Lessee  through the date of return of the Aircraft.  All costs and expenses incurred in connection with the services performed under this Section 4.3 shall be paid in accordance with Sections 5.2 through 5.6 of this Agreement.

## SECTION 5.  FINANCIAL MATTERS

5.1    **Charter Customer Relations.**  Lessee shall be responsible for all contracting with, billing, and collecting from charter customers, and only Lessee may bill charter customers for charter flights.   The total amount that Lessee shall charge a charter customer for any charter flight (including any repositioning flight associated with any charter flight) shall be the sum of the following:

5.1.1    **Hourly Rate Charges.**  An amount equal to the product of the applicable Hourly Rate set forth in Schedule A multiplied by the number of Flight Hours, rounded to the nearest one-tenth of one hour, flown during the flight.  In the event a Lessor-Designated Charter Customer utilizes the Aircraft for more than 450 Flight Hours in any calendar year, then in addition to the Hourly Rate set forth in Schedule A, the charter customer shall be charged a surcharge (the "Excess Hours Surcharge") in an amount equal to 2% of the Hourly Rate set forth in Schedule A for those Flight Hours in excess of 450 during the calendar year.

5.1.2    **Incidental Expenses.**  An amount equal to all incidental out-of-pocket costs incurred by Lessee in connection with the flight, including, without limitation, fuel surcharges, landing fees, ramp fees, customs fees, international handling fees, permit fees, Flight Crew passports and visas, overnight hangar fees, de-icing costs, contaminant recovery costs, Flight Crew per diem and meal expenses, Flight Crew transportation and hotels, equipment servicing, commissary stock and supplies obtained for a specific flight, trip-related communications charges, supplementary Flight Crew costs, charts, manuals, and other publications obtained for the specific flight (*e.g.*, navigation, operations, and maintenance), and any other similar items, and for all non flight-related expenses incurred by Lessee at the request of the charter customer, including, without limitation, ground transportation charges, telecommunications charges, and catering services.

5.1.3    **Taxes.**  All Taxes, and any interest, penalties, fines, and additions imposed for non-collection of Taxes (other than interest, penalties, fines, and additions imposed for non-collection of Taxes arising from Lessee's gross negligence or willful or criminal misconduct) payable with respect to any Taxes, imposed or levied or arising out of, or as a result of, the charter of the Aircraft to the charter customer.

5.2    **Payment of Aircraft-Related Expenses.**  Lessee shall pay to the appropriate vendors all costs and expenses of maintaining and storing the Aircraft, and all costs and expenses of operating the Aircraft for charter flights, subject to Lessor's obligation to reimburse Lessee for all such costs and expenses as provided herein.

5.3    **Operating Account.**  Lessee shall maintain the Operating Account for the Aircraft.  Lessee shall make credits and debits to the Operating Account as follows:

5.3.1    **Credits.**  Lessee shall credit the Operating Account the following amounts at the times indicated:

5.3.1.1    **Charter Revenue (Lessor-Designated Charter Customers).**  Lessee shall credit the Operating Account an amount equal to the amount received from Lessor-Designated Charter Customers under Section 5.1 (excluding amounts attributable to Excess Hours Surcharges, which shall be retained by Lessee) for any charter flight when and as such amount is received from the charter customer.  Lessor shall bear the risk of non-payment of all amounts due and payable from Lessor-Designated Charter Customers.

5.3.1.2    **Charter Revenue (Lessee-Originated Charter Customers).**  Lessee shall credit the Operating Account an amount equal to 85% of the amounts billed or billable to Lessee-Originated Charter Customers under Section 5.1.1, plus 98% of the amounts billed or billable to Lessee-Originated Charter Customers under Section 5.1.2 and 5.1.3.  Amounts to be credited to the Operating Account under this Section 5.3.1.2 for any charter flight shall be so credited on the earlier of (i) the date such amounts are received by Lessee from Lessee-Originated Charter Customers, or (ii) sixty (60) days after completion of the charter flight.  Lessee shall bear the risk of non-payment of all amounts due and payable from Lessee-Originated Charter Customers, provided however, anything to the contrary notwithstanding, in the event of the non-collectibility of a Lessee-Originated Charter Customer, Lessee shall only be responsible to Lessor for the direct operating costs for such charter. Non-collectibility shall mean Lessee has not collected the charter fees, after using diligent efforts by 120 days after the date of the charter. In the event that a non-collected charter invoice is subsequently collected by Lessee then Lessee shall remit to Lessor the amount due under this provision, less any amounts previously paid for direct operating costs plus amounts incurred in the collection of the delinquent charter invoice, including attorney's fees, court costs, collection company fees and any other costs associated with the collection of the delinquent invoice.

5.3.1.3    **Fuel Tax Refunds and Credits.**  During the month immediately following the end of each calendar quarter,  Lessee shall credit the Operating Account an amount equal to the product of the number of gallons of fuel used for charter flights of the Aircraft during the immediately preceding calendar quarter, multiplied by the difference between the Federal aviation fuel excise tax rates applicable to commercial flights and non-commercial flights respectively, as such rates may be changed by the federal government from time to time (the parties agree that as of the Effective Date of this Agreement, the difference between the Federal aviation fuel excise tax rates applicable to commercial flights and non-commercial flights is Seventeen and One-Half Cents ($0.175) per gallon).

5.3.2    **Debits.**  Lessee shall debit from the Operating Account the following amounts at the times indicated:

5.3.2.1    **Maintenance.**  All amounts necessary to pay the actual costs of all maintenance and servicing of the Aircraft, and the costs of shipping of parts and materials. Lessee shall debit the Operating Account for costs incurred for maintenance when and as such costs are incurred by Lessee.  Lessee shall negotiate with vendors of maintenance services and parts to obtain the most favorable prices. All debits under this Section 5.3.2.1 shall be in amounts equal to Lessee's actual costs of maintenance, with pass through of all discounts obtained by Lessee,

except that the cost of labor for services performed by Lessee's maintenance personnel shall be deemed to be the Labor Rate set forth in <u>Schedule A</u>, and the debits for parts acquired by Lessee in connection with such maintenance (but not the costs of shipping such parts) shall be the Parts Markup Percentage in excess of Lessee's actual cost.

5.3.2.2    **Hangar.**  Lessee shall debit the Operating Account an amount equal to one-twelfth (1/12) of the annual Hangar Fee set forth in <u>Schedule A</u> once per calendar month.

5.3.2.3    **Incidental Expenses and Taxes.**  At the end of each month, Lessee shall debit the Operating Account an amount equal to all Incidental Expenses and Taxes credited to the Operating Account during such month under Sections 5.1.2 and 5.1.3.  Lessee shall be responsible for payment of all Incidental Expenses and Taxes to the appropriate vendors and tax authorities.

5.3.2.4    **Direct Operating Costs.**  Lessee shall debit the Operating Account an amount equal to all direct costs of operating the Aircraft for each charter flight, including without limitation, the costs of fuel and fuel surcharges (including fuel used by the Aircraft's auxiliary power unit), prist, lubricants, oxygen and other aircraft consumable products, and the fixed hourly cost of any maintenance service plans that may be in effect with respect to the Aircraft. Lessee shall debit the Operating Account for all such direct operating costs when and as such costs are incurred by Lessee.  For purposes of Section 5.3.2.4, the debits attributable to fuel purchased during any calendar month from the Operating Base Fuel Supplier shall be the lesser of the two (2) Fuel Price Indices set forth in <u>Schedule A</u> on the first business day of the calendar month.  The debits attributable to any other direct operating cost under this Section 5.3.2.4 shall be determined by reference to Lessee's actual cost thereof, with pass-through of any discounts obtained by Lessee. Lessee shall negotiate with vendors of fuel, prist, lubricants, oxygen, other aircraft consumable products, ramp services, overnight hangar services, de-icing and contaminant recovery services, and other supplies and services to obtain the most favorable prices.  Upon Lessor's request, Lessee shall provide Lessor copies of invoices or other documents requested by Lessor that establish to Lessor's reasonable satisfaction the actual cost paid by Lessee for fuel purchased at any location other than the Operating Base Fuel Supplier, and all other direct operating costs, incidental expenses, and Taxes.

5.3.2.5    **Miscellaneous Costs**.  Lessee shall debit the Operating Account an amount equal to all miscellaneous costs and expenses of operating the Aircraft for all users when and as such costs and expenses are incurred.  For purposes of this Section 5.3.2.5, miscellaneous costs include, without limitation, costs of Jeppesen subscriptions and other subscriptions, aircraft stock and supplies (including CD's. DVD's, VCR tapes, consumables), aircraft licensing and registration fees, and other similar miscellaneous expenses that are not attributable to a specific flight.

5.3.2.6    **Commissions**.  Lessee shall debit the Operating Account an amount equal to the commissions incurred by Lessee to obtain and operate charters of the Aircraft.

5.4    **Monthly Statements**.  Not later than the last day of each calendar month, Lessee shall send to Lessor a statement summarizing all charter flight activity conducted during the immediately preceding calendar month, and an itemized listing of all credits to the Operating Account attributable to charter flights conducted during such immediately preceding calendar month, and all debits attributable to such preceding month.  In the event Lessee shall not have received payment by the 25th day of any month for any charter flight conducted during the immediately preceding calendar month, the statement delivered on such date shall not include credits and debits attributable to such charter flight, and the credits and debits attributable

to such flight shall be included on the next statement after payment for such charter flight is received by Lessee.  In the event a monthly statement shall indicate a net credit balance, Lessee shall, simultaneously with delivery of the monthly statement, pay to Lessor an amount equal to the net credit balance of the Operating Account.  In the event a monthly statement shall indicate a net debit balance, Lessor shall pay to Lessee an amount equal to the net debit balance of the Operating Account within twenty (20) days of receipt of the monthly statement.  In the event either party shall fail to pay any amount due and payable to the other party under this Section 5.4 by the due date thereof, such debtor party shall pay interest on the unpaid amount to the creditor party at a daily rate of 0.0328 percent.

5.5    **Operating Deposit.**  Lessor and Lessee agree that Lessor has advanced to Lessee an operating deposit in an amount equal to One Hundred Thousand United States Dollars (US$100,000.00).  The parties agree that the foregoing deposit amount was determined and agreed-to based in part on an estimate of one hundred twenty-five (125) Flight Hours of use of the Aircraft by all users thereof in any calendar quarter.  If at any time during the Term the Aircraft shall be operated during any calendar quarter more than one hundred thirty-seven and one-half (137.5) Flight Hours, the amount of the required operating deposit may, upon Lessee's written notice, be increased by Ten Thousand United States Dollars (US$10,000.00) for each twelve and one-half (12.5) Flight Hour increment that the total number of Flight Hours of use of the Aircraft by all users exceeded one hundred twenty-five (125) Flight Hours.  Lessor shall pay any increase in the operating deposit amount permitted by this Section 5.5 within thirty (30) days of receipt by Lessor of Lessee's written notice.

5.6    **Final Accounting.**  As soon as reasonably practicable after termination of this Agreement for any reason (including as a result of an Event of Default pursuant to Section 2.4.3), but in no event later than ten (10) days after all charter revenues for charter operations occurring prior to such termination have been received and credited to the Operating Account, Lessee shall provide to Lessor a final itemized accounting of the Operating Account, which in the absence of manifest error Lessor shall not contest, except in the case of a good-faith belief that such accounting is wholly or partially in error.  If the sum of such final itemized accounting (minus any amounts contested in good faith) plus the amount of all operating deposits paid to Lessee under Section 5.5 results in a balance owed to Lessor, Lessee shall pay such balance owed simultaneously with the delivery to Lessor of the final accounting.  If such final itemized accounting (minus any amounts contested) results in a balance owed to Lessee, Lessor shall pay such balance owed within twenty (20) days of receipt of the final accounting.  If the debtor party after such final accounting fails to pay any such balance owed by the due date thereof, the debtor party shall pay to the creditor party interest on the unpaid amount at a daily rate of 0.0328 percent.  Lessor and Lessee agree to exert good-faith best efforts to resolve any contested amounts as contemplated herein, and furthermore to pay any such amounts in accordance herewith, treating the date an amount is resolved as the date a final itemized accounting is provided with respect thereto for purposes of this Section 5.6.

5.7    **Records and Documents.**  The documents and records of Lessee (including, but not limited to, all bills, invoices, vouchers and related data) relating to the Aircraft shall be maintained in accordance with Lessee's normal and customary accounting practices, consistently applied.  Upon two (2) business days notice to Lessee, Lessor or its representative may examine all of Lessee's documents and records that relate to costs and expenses incurred and/or paid with respect to the Aircraft and any services provided by Lessee with respect thereto.  Subject to the above two (2) business days advance notice requirement, Lessee may examine Lessee's records and documents at any time during Lessee's normal business hours on any day(s) (weekends and Federal and New York State holidays excluded) during the Term hereof and for a period of ten (10) years after the termination of this Agreement.  Lessor's examination of Lessee's records and documents hereunder is not intended to extend beyond Lessee's documents and records that relate to costs and expenses incurred and/or paid with respect to the Aircraft and services provided by Lessee with respect thereto, and expressly shall not include an examination of Lessee's sensitive and confidential information of a financial and proprietary nature not directly related to the Aircraft and the services of Lessee hereunder.

5.8    **Address for Invoices**.  All invoices and statements provided by the Lessee under this Section 5 shall be directed to the following address for payment:

CES Aviation IX LLC

12

745 Seventh Avenue, 30th Floor
New York, NY 10019
ATTN: Gary Hoffman
Telephone: 212-526-0846
Facsimile: 646-346-8274
Email:   egary.hoffman@lehman.com

## SECTION 6.  LIENS

6.1    Subject to Lessor's obligation to pay all amounts due and payable from Lessor to Lessee under this Agreement in a timely manner, Lessee shall ensure that no Liens are created or placed against the Aircraft by Lessee or third parties as a result of Lessee's actions; Lessee shall notify Lessor promptly upon learning of any Liens not permitted by these terms; Lessee shall, at its own cost and expense, take all such actions as may be necessary to discharge and satisfy in full any Lien not permitted by these terms promptly after the same becomes known to it; and Lessee shall pay all charges related to the Aircraft as they become due and payable.

## SECTION 7. INDEMNITIES AND INSURANCE

7.1    **General Indemnity**.  Neither party hereto will make any claim against the other for any loss or damage to the extent that the loss or damage is covered by the insurance policies covering the Aircraft that are required by this Section 7, and each party hereto represents and warrants to the other party that it will commit no act that will cause any coverage contained in the insurance policies covering the Aircraft that are required by this Section 7 to be voided.  Subject to the foregoing, each party to this Agreement hereby agrees to release, defend, indemnify and hold harmless the other party hereto and each other party's respective officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporations, successors and assigns, from and against any and all uninsured claims, damages, losses, liabilities, demands, suits, judgments, causes of action, civil and criminal legal proceedings, penalties, fines and other sanctions, and any reasonable attorney fees and other reasonable costs and expenses caused by or arising out of the negligent acts or omissions of the indemnifying party in connection with this Agreement. Lessee further agrees to release, defend, indemnify and hold harmless Lessor and Lessor's officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporations, successors and assigns, from and against any and all uninsured claims, damages, losses, liabilities, demands, suits, judgments, causes of action, civil and criminal legal proceedings, penalties, fines and other sanctions, and any reasonable attorney fees and other reasonable costs and expenses caused by or arising out of (i) any failure of Lessee to maintain and operate the Aircraft in accordance with the terms and conditions of this Agreement, Part 135 of the FAR and/or Applicable Law; (ii) the use of the Aircraft by Lessee to provide on-demand air transportation services to any Lessee-Originated Charter Customer; and/or (iii) any contract or agreement by and between Lessee and any Lessee-Originated Charter Customer relating to the provision by Lessee of on-demand air transportation services to any Lessee-Originated Charter Customer or any third-party.  Likewise, Lessor further agrees to release, defend, indemnify and hold harmless Lessee and Lessee's officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporations, successors and assigns, from and against any and all uninsured claims, damages, losses, liabilities, demands, suits, judgments, causes of action, civil or criminal legal  proceedings, penalties, fines and other sanctions and any reasonable attorneys fees and other reasonable costs and expenses caused by or arising out of (i) Lessor's violation of the terms of this Agreement (ii) the use of the Aircraft for Lessor-Originated Charter Customers; and/or (iii) any contract or agreement by and between Lessor and any Lessor-Originated Charter Customer relating to the provision of on-demand air transportation services to any Lessor-Originated Charter Customer or any third-party.  In no event shall either party be liable to the other party for indirect, incidental, consequential, punitive, exemplary or special damages of any kind for any reason. For purposes of this Section 7.1, a claim shall be deemed to be covered by insurance even though the insurance may be subject to deductibles, self-insured retentions and comparable provisions.

7.2    **Insurance**.

        7.2.1    Lessor shall cause to be maintained in full force and effect at no cost to Lessee insurance covering

the Aircraft for broad form passenger liability, public liability, including war risks and terrorism, property damage and all risk physical damage coverage in connection with the maintenance, use and operation of the Aircraft.  Such policy shall have a minimum of $500,000,000.00 combined limit for liability and a minimum hull coverage not less than the fair market value of the Aircraft (herein, the "Insurance Policy").  The Insurance Policy shall name Lessor and any first lien mortgage holder as loss payees of all physical damage/hull insurance proceeds as their interests may appear.  The Pilot Warranty clause in the Insurance Policy shall permit operation of the Aircraft by all pilots approved in the Aircraft by the Chief Pilot of Lessee.

7.2.2    The Insurance Policy hereunder shall be in a form and with insurance companies acceptable to Lessee, which acceptance shall not be unreasonably withheld, conditioned or delayed.  Lessee acknowledges that the Insurance Policy will be provided by an affiliate of Lessor, and not by Lessor itself.

7.2.3    The Insurance Policy, and any applicable excess and umbrella insurance policies, shall show Lessor, Lessee, and their respective officers, directors and employees as named insureds.   It is expressly understood that Lessor's affiliate's policy is a proprietary document, and Lessee will not disclose its contents, terms or conditions without the expressed written consent of Lessor.  A copy of the Insurance Policy shall be furnished to Lessee.

7.2.4    The Insurance Policy shall be for the benefit of Lessor, Lessor's affiliate that provides the policy, Lessee, and their respective officers, directors and employees, and any other parties designated by Lessor or its affiliate, and coverage provided to any named insured under the Insurance Policy shall not be invalidated by any act, neglect or breach by any other named insured thereunder. Lessor's rights to physical damage/hull insurance proceeds shall be the sole remedy for loss or damage to the Aircraft or loss of income and diminution of value arising from loss or damage to the Aircraft.  The risk of loss or damage to the Aircraft shall remain with Lessor at all times, including without limitation, all indirect, special or consequential damages.

7.2.5    In the event of the total loss or destruction of the Aircraft, or such damage thereto which causes it to be irreparable in the opinion of the insurance carrier providing the insurance coverage hereinabove provided, or if the Aircraft is damaged such that it is improbable, in Lessor's reasonable opinion, that the Aircraft could be made operative within a period of one hundred and twenty (120) days, or if the Aircraft is stolen, condemned, confiscated, seized, or requisitioned, and is not returned within sixty (60) days, then this Agreement shall terminate thirty (30) days after the occurrence of such an event or determination; provided that notwithstanding any such termination, Lessee shall at no additional charge to Lessor provide all assistance and cooperation reasonably requested by Lessor in filing and processing any and all claims under the Insurance Policies.

7.2.6    The Insurance Policy shall include a provision that Lessee will be provided with thirty (30) days prior written notice of cancellation or material change of the Insurance Policy.  Ten (10) days notice of cancellation shall apply with respect to non-payment of premium. Furthermore, the Insurance Policy shall provide that the subject policy shall be "primary" for the protection of Lessor and Lessee, notwithstanding any other or additional coverage carried by Lessee for Lessee's own benefit against similar risks.  Notwithstanding anything contained in this Agreement to the contrary, Lessee shall be entitled to suspend services under this Agreement immediately upon any cancellation, expiration, termination, or lapse of any insurance coverage required under this Section 7, and will resume such suspended services immediately upon the restoration of such insurance coverage.

7.3    **Tax Indemnification**.

7.3.1    Lessor shall release, indemnify, reimburse, defend and hold harmless Lessee and Lessee's officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporations, successors and assigns from any and all Taxes, and any interest, penalties, fines, and additions

imposed for non-collection of Taxes payable with respect to any Taxes (collectively "Penalties and Interest), excluding Penalties and Interest arising from Lessee's gross negligence or willful or criminal misconduct (collectively "Excluded Penalties and Interest), imposed on the lease of the Aircraft to Lessee, and the use of the Aircraft by Lessee, except to the extent that any such Taxes have been paid to or on behalf of Lessee by any charter customer of Lessee.

7.3.2    The parties agree that all charter flights conducted by Lessee on behalf of charter customers will be classified as "commercial" for Federal excise tax purposes, and will therefore be subject to Federal excise taxes on air transportation services, and will also be subject to Federal excise taxes on aviation fuels, but at a rate lower than the rate applicable to fuel used on noncommercial flights.  Subject to the provisions hereafter set forth, neither party shall assert any position to the contrary in any tax return or any audit, claim, assessment, examination, or other formal or informal proceeding or inquiry (each of the foregoing being hereinafter referred to as an "Inquiry").

7.3.3    It is acknowledged that any Inquiry concerning any Taxes and/or Penalties and Interest for which Lessor may be responsible hereunder may also concern Taxes and/or Penalties and Interest that may be due and owing by Lessee for which Lessor has no responsibility (*e.g., taxes on services or supplies Lessee provides to its other clients and/or Excluded Penalties and Interest*).

7.3.4    If, in addition to Taxes and/or Penalties and Interest for which Lessor may be responsible hereunder, any Inquiry also concerns Taxes and/or Penalties and Interest due and owing by Lessee for which Lessor has no responsibility hereunder and/or Excluded Penalties and Interest:

7.3.4.1    the parties shall jointly control, manage, litigate, and/or defend such Inquiry, with each party responsible for its own defense costs and expenses;

7.3.4.2    neither party may settle, compromise, or fail to appeal a ruling in any such Inquiry over the reasonable objection of the other party;

7.3.4.3    a settlement at the administrative level or during the course of judicial proceedings may only be entered into with the consent of both parties, which consent shall not be unreasonably withheld, delayed or conditioned;

7.3.4.4    if either party, for any reason, fails to defend such Inquiry, then the other party may take control and manage, litigate and/or defend such Inquiry, and non-defending party shall reimburse the defending party for a pro-rata portion of the reasonable costs and expenses of such defense, including, without limitation, reasonable attorneys fees, that the parties reasonably determine relates to the defense of that portion of the Inquiry concerning taxes for which the non-defending party is responsible hereunder; and

7.3.4.5    for purposes of this Section 7.3, a party may reasonably object to the other party's proposed settlement, compromise or failure to appeal a ruling in an Inquiry if, (i) in the objecting party's reasonable judgment, taking such action will materially, adversely affect the objecting party's interests, giving effect to this Agreement and (ii) any such action does not include as an unconditional term thereof the giving of a release to the objecting party of any further liability for  Taxes and/or Penalties and Interest.

7.3.5    If any Inquiry concerns only Taxes and/or Penalties and Interest for which Lessor may be responsible hereunder, Lessor shall control, manage, litigate, and/or defend such Inquiry, and Lessor may not settle, compromise, or fail to appeal a ruling in any such Inquiry over the reasonable objection of Lessee. Lessee shall cooperate, at Lessor's expense, with Lessor in any such defense to the extent reasonably requested by Lessor; provided, however, that if Lessor, for any reason, fails to defend such Inquiry in any manner it deems appropriate, then Lessee may take control and manage, litigate and/or defend such Inquiry, and Lessor shall, in addition to its indemnification obligations hereunder, reimburse Lessee for its reasonable costs and expenses of

such defense and Lessee may not be challenged by Lessor in any decision Lessee may make to settle, compromise or fail to appeal a ruling in any Inquiry.

7.3.6    If any Inquiry requires the posting of a deposit or sum of money in order to preserve the right to participate in the Inquiry, then each party agrees to pay that portion of such deposit or other sum that bears the same ratio that the parties reasonably agree relates to each party's estimated responsibility hereunder for the total amount in controversy in the Inquiry, and if any Inquiry results in a final assessment or judgment of Taxes and/or Penalties and Interest for which Lessor is responsible hereunder, and no appeal from such final assessment or judgment is permitted or Lessor elects not to pursue a permitted appeal from such final assessment or judgment, Lessor shall immediately pay such Taxes and/or Penalties and Interest directly to the appropriate taxing authority on its own behalf or on behalf of Lessee, as the case may be, without further demand by Lessee.

7.3.7    In the event Lessee receives notice of any Inquiry concerning any Taxes and/or Penalties and Interest for which Lessor may be responsible hereunder, Lessee shall timely notify Lessor of such Inquiry within five (5) business days of receipt thereof.  Notwithstanding anything to the contrary contained in this Agreement, Lessee's failure to provide timely notice of any Inquiry, or to cooperate with Lessor in the defense against such Inquiry, shall relieve Lessor of its obligation to indemnify, reimburse, defend and hold harmless Lessee from any and all such Taxes and/or Penalties and Interest to the extent Lessor is prejudiced thereby.

**SECTION 8.  NOTICES**

8.1    All communications, declarations, demands, consents, directions, approvals, instructions, requests and notices required or permitted by this Agreement shall be in writing and shall be deemed to have been duly given or made when delivered personally or transmitted electronically by e-mail or facsimile, receipt acknowledged, or in the case of documented overnight delivery service or registered or certified mail, return receipt requested, delivery charge or postage prepaid, on the date shown on the receipt therefor, in each case at the address set forth below:

| | | | |
|---|---|---|---|
| **If to Lessor:** | CES Aviation IX LLC<br>c/o Lehman Brothers Inc.<br>399 Park Avenue<br>New York, NY 10022<br>Attn:    Corporate Counsel | Tel:<br>Fax: | 212-526-0858<br>212-526-0339 |
| **With a copy to:** | Galland, Kharasch, Greenberg,<br>Fellman & Swirsky, P.C.<br>1054 31st Street, N.W., Suite 200<br>Washington, D.C.  20007<br>Attn:    Keith G. Swirsky | Tel:<br>Fax: | 202-342-5251<br>202-342-5219 |
| **And a copy to:** | Lehman Brothers Inc.<br>745 Seventh Avenue, 30th Floor<br>New York, NY 10019<br>Attn:    Gary Hoffman | Tel:<br>Fax: | 212-526-0846<br>646-346-8274 |
| **If to Lessee:** | Executive Fliteways, Inc.<br>One Clark Drive<br>Ronkonkoma, New York 11779<br>Attn:    John  W. Grillo | Tel:<br>Fax: | 631-588-5454<br>631-588-9560 |
| **With a copy to:** | McBreen, McBreen & Kopko<br>110 Summit Avenue<br>Montvale, NJ 07645 | Tel:<br>Fax: | 201-476-5400<br>201-573-0574 |

Attn:  Robert S. Moran, Jr.

**SECTION 9.  WARRANTIES AND REPRESENTATIONS**

9.1    **Representations and Warranties of Lessee**.  Lessee represents and warrants as of the date hereof and during the entire Term hereof as follows:

9.1.1    Lessee is the lawful owner of the Certificate and is authorized pursuant to its operations specifications to conduct On-Demand Operations in common carriage in accordance with the applicable requirements of Part 135 of the FARs, and said Certificate and operations specification are valid and in good standing.

9.1.2    Lessee has complied with all provisions of Part 298 of the FARs necessary to permit Lessee to operate as an Air Taxi Operator (as defined in Section 298.3 of the FARs), and is thereby authorized to operate as an Air Taxi Operator.

9.1.3    Prior to conducting any charter operations with the Aircraft under this Agreement, Lessee shall cause its operations specifications to be amended to authorize use of the Aircraft for the conduct of such charter operations.

9.1.4    Lessee will operate the Aircraft in accordance with Applicable Law and will not permit the Aircraft to be operated or possessed by other than currently qualified and certified Flight Crew members who at a minimum meet the Pilot Qualification Standards for the pilot position to which assigned.

9.1.5    All pilot Flight Crew members shall have at least the minimum total pilot hours required by any policy of insurance covering the Aircraft and will meet or exceed all requirements under any policy of insurance covering the Aircraft or Applicable Law.

9.1.6    Lessee is a validly organized corporation under the laws of the State of Delaware, and the person executing on behalf of Lessee has full power and authority to execute this Agreement on behalf of Lessee and by such execution shall bind Lessee under this Agreement.

9.1.7    No action, suit, or proceeding is currently pending or threatened against Lessee which shall in any material way adversely affect Lessee's financial status as of the date thereof, or materially impair the execution, delivery, or performance by Lessee of this Agreement or any other document.

9.1.8    The execution and delivery of this Agreement by Lessee and the performance of its obligations hereunder have been duly authorized by all necessary corporate action, and do not conflict in any material respect with any provision of Lessee's articles of incorporation, bylaws, any governmental regulations, or any other agreements that Lessee may now have with other parties.

9.1.9    Lessee is not subject to any restriction, which with or without the giving of notice, the passage of time, or both, prohibits or would in any material respect be violated by or be in conflict with this Agreement.

9.1.10    Lessee will not operate the Aircraft in any unsafe manner or contrary to any manual or instructions for the Aircraft or in violation of the terms or conditions of any insurance policy covering the Aircraft or any applicable statute, regulation, ordinance, or other law, or by any pilot who at a minimum does not meet the Pilot Qualification Standards for the pilot position to which assigned unless that pilot meets the pilot warranties of Lessor's applicable insurance policy and has written approval for flight duties from both the Lessee and the Lessor.

9.2    **Representations and Warranties of Lessor**.  Lessor represents and warrants as of the date hereof and during the entire Term hereof as follows:

17

9.2.1   Lessor is a validly organized corporation under the laws of the State of Delaware and the person executing on behalf of Lessor has full power and authority to execute this Agreement on behalf of Lessor and by such execution shall bind Lessor under this Agreement.

9.2.2   No action, suit, or proceeding is currently pending or threatened against Lessor which shall in any material way adversely affect Lessor's financial status as of the date hereof, or materially impair the execution, delivery, or performance by Lessor of this Agreement or any other document.

9.2.3   The execution and delivery of this Agreement by Lessor and the performance of its obligations hereunder have been duly authorized by all necessary corporate action, and do not conflict in any material respect with any provision of Lessor's articles of incorporation, bylaws, any governmental regulations, or any other agreements that Lessor may now have with other parties.

9.2.4   Lessor is not subject to any restriction, which with or without the giving of notice, the passage of time, or both, prohibits or would in any material respect be violated by or be in conflict with this Agreement.

9.2.5   Lessor shall not commit any act, including an act of omission, that will cause the Aircraft to be operated in violation of Applicable Law; provided, however, that no action or act of omission of Lessor shall be considered to have caused the Aircraft to be operated in violation of Applicable Law if such violation of Applicable Law is the direct or indirect result of any act, including an act of omission, of Lessee under circumstances that would constitute a breach or default by Lessee of any obligation, covenant, or representation of Lessee under this Agreement, including, without limitation, the representations of Lessee set forth in Section 9.1.10.

## SECTION 10.   MISCELLANEOUS

10.1   **Entire Agreement.**  This Agreement, and all terms, conditions, warranties, and representations herein, are for the sole and exclusive benefit of the signatories hereto.  This Agreement constitutes the entire agreement of the parties as of its Effective Date and supersedes all prior or independent, oral or written agreements, understandings, statements, representations, commitments, promises, and warranties made with respect to the subject matter of this Agreement.  Provisions of this Agreement which by their nature survive the termination or expiration of this Agreement shall continue in full force and effect thereafter.

10.2   **Other Transactions.**  Except as specifically provided in this Agreement, none of the provisions of this Agreement, nor any oral or written statements, representations, commitments, promises, or warranties made with respect to the subject matter of this Agreement shall be construed or relied upon by any party as the basis of, consideration for, or inducement to engage in, any separate agreement, transaction or commitment for any purpose whatsoever.

10.3   **Prohibited and Unenforceable Provisions.**  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibitions or unenforceability in any jurisdiction.  To the extent permitted by applicable law, each of Lessor and Lessee hereby waives any provision of applicable law that renders any provision hereof prohibited or unenforceable in any respect.

10.4   **Enforcement.**  This Agreement, including all agreements, covenants, representations and warranties, shall be binding upon and inure to the benefit of, and may be enforced by Lessor, Lessee, and each of their agents, servants and personal representatives.  In the event either party shall file any suit or other claim to enforce any provision of this Agreement, the prevailing party shall be entitled to recover from the other party all of the prevailing party's reasonable attorney's fees, court costs, and other costs of such enforcement immediately upon final adjudication of the controversy.

10.5   **Headings.**  The section and subsection headings  in this Agreement are for convenience of reference only and shall not modify, define, expand, or limit any of the terms or provisions hereof.

10.6     **Counterparts.**  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but both such counterparts shall together constitute but one and the same instrument.

10.7     **Amendments.**  No term or provision of this Agreement may be amended, changed, waived, discharged, or terminated orally, but only by an instrument in writing signed by the party against which the enforcement of the change, waiver, discharge, or termination is sought.

10.8     **No Waiver.**  No delay or omission in the exercise or enforcement of any right or remedy hereunder by either party shall be construed as a waiver of such right or remedy.  All remedies, rights, undertakings, obligations, and agreements contained herein shall be cumulative and not mutually exclusive, and in addition to all other rights and remedies which either party possesses at law or in equity.

10.9     **No Assignments or Subleases.**  Neither party may assign its rights or obligations under this Agreement without the prior written permission of the other.  Lessee shall not sublease the Aircraft to any person or entity, nor sell, transfer, pledge, hypothecate, or in any other manner transfer or relinquish the Aircraft or any interest therein to any person or entity, except that Lessee shall relinquish possession of the Aircraft from time to time to any other person or entity to whom Lessor has leased the Aircraft on a non-exclusive basis for use by such other person or entity in operations under Part 91 of the FARs.

10.10    **Governing Law.**  This agreement has been negotiated and delivered in the State of New York and shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, without giving effect to its conflict of laws provisions.

10.11    **Confidentiality; Non-Solicitation.**  (a) The terms of this Agreement, its Schedules and any information gained through its negotiation and performance are considered confidential information by the Lessee and the Lessor. Both parties acknowledge that each has gained sensitive and proprietary information about the business of the other during the course of this Agreement and will protect that information from dissemination to third parties.  The foregoing notwithstanding, each party shall have the right to disclose such information to its attorneys, accountants and other advisors who have a reasonable need for such information in the ordinary course of business; provided, however, that a party disclosing such information to its attorneys, accountants and other advisors shall use reasonable efforts to cause such attorneys, accountants and other advisors to protect such information from dissemination. Any disclosure by one party of the other's business information or practices is a material breach and grounds for termination of this Agreement, as well as the exercise of any remedy at law or equity available to either party. (b) Lessor agrees that for the period of one (1) year after the termination of this Agreement, Lessor will not directly or indirectly, solicit or provide charter services on any aircraft to any third party who was a charterer or offered as a prospective charterer by Lessee during the term of this Agreement. In the event Lessor does provide such charter services, Lessee will be entitled to a fee of fifteen (15%) percent of any charter revenues as liquidated damages for breach of this provision. Lessor agrees to furnish lessee all documentation and information necessary to calculate and verify the amounts due under this provision.

10.12    **Flight Crew Resources.**  It is acknowledged by the parties that Lessee has considerable investment in its highly trained and skilled employees, and that the loss of these employees causes significant expense to the Lessee.  In consideration of the investment in the indoctrination, training and development of such individuals, if during the term hereof and any extensions or within six months after termination of this Agreement, Lessor or any of its subsidiaries or affiliates, or any other business entity ten percent (10%) or more of which is owned by Lessor or any of its subsidiaries or affiliates (each of the foregoing an "Lessor Affiliate"), employs (on a full-time, permanent basis) or utilizes (on a full-time, permanent basis) the services of any person who was a employee of Lessee within the six months immediately preceding the termination of this Agreement (excluding any person for whom Lessee is entitled to receive post-termination flight crew employment costs from any Lessor Affiliate), or if during the term hereof and any extensions or within six months after termination of this Agreement any other unrelated entity employs (on a full-time, permanent basis) or utilizes (on a full-time, permanent basis) the services of any person who

19

was a employee of Lessee within the six months immediately preceding the termination of this Agreement (excluding any person for whom Lessee is entitled to receive post-termination flight crew employment costs from any Lessor Affiliate) for the purpose of providing charter services to Lessor similar to the charter services provided under this Agreement, Lessor agrees to compensate Lessee at the rate of $25,000.00 per employee so employed or utilized by Lessor or any Lessor Affiliate, or by any unrelated entity for the aforementioned purpose. This fee shall be due and payable immediately upon such employee being so employed or utilized by Lessor or any Lessor Affiliate, or by any unrelated entity for the aforementioned purpose. If within six months after termination of this Agreement, Lessor or any Lessor Affiliate shall utilize on a short-term day-rate basis the services of any employee of Lessee who served as a flight crew member on Lessor's Aircraft during the Term of this Agreement (excluding any person no longer employed by Lessee), or if within six months after termination of this Agreement, any other unrelated entity shall utilize on a short-term day-rate basis the services of any employee of Lessee who served as a flight crew member on Lessor's Aircraft during the Term of this Agreement (excluding any person no longer employed by Lessee) for the purpose of providing flight crew services to Lessor similar to the flight crew services provided under this Agreement, Lessor shall compensate Lessee at a rate of $2,500.00 per duty day for up to ten (10) duty days. The parties hereto acknowledge that provisions similar to this Section 10.12 are or may become contained in other agreements between Lessee and Lessor and/or between Lessee and one or more Lessor Affiliates. It being the intent of the parties that Lessee may become entitled to only a single recovery under all such provisions collectively with respect to each individual employee, the parties therefore agree that notwithstanding anything in this Section 10.12 to the contrary, in the event Lessor, any Lessor Affiliate, or any unrelated entity employs or utilizes any such employee under circumstances that would entitle Lessee to compensation under this Section 10.12 and/or any similar provision in any such other agreement, Lessee shall be entitled to recover compensation at the rate of $25,000.00 per employee only under this Agreement or one (1) such other agreement, but not under this Agreement and any other such agreement.

10.13   **Guaranty**. Concurrently with execution hereof, Lessor shall cause Lehman Brothers Holdings Inc. to execute and deliver to Lessee a Guaranty in the form of Schedule C attached hereto, unless a previously delivered Guaranty in such form is still in full force and effect.

10.14   **Force Majeure**. Neither party shall be liable to the other for failure or delay in the performance of their respective obligations hereunder if such failure or delay arises or results from a Force Majeure event.

10.15   **Changes in Applicable Law**. The parties hereto reasonably believe that the performance by each of the parties hereto of their respective obligations arising hereunder will not violate any Applicable Law. Notwithstanding anything to the contrary contained herein, in the event (i) any Applicable Law shall be enacted or amended during the Term hereof in such a manner as to cause the performance by either party of any of its respective obligations hereunder to violate any Applicable Law, (ii) any Applicable Law shall be enacted or amended during the Term hereof in such a manner as to cause a substantial increase in the cost to either party to perform its respective obligations hereunder, or (iii) if the parties shall, after execution hereof, reasonably determine that the performance by either party of any of its respective obligations hereunder violates any existing Applicable Law; then upon and after such an event, (x) neither party shall be considered to be in breach or default hereof for failure to perform any obligation the performance of which would be in violation of Applicable Law or the cost of performance of which has substantially increased as a result of the enactment of any new, or the amendment of any existing, Applicable Law, and (y) the parties shall, as soon as reasonably possible, negotiate in good faith any revisions reasonably necessary to cause the performance by the parties hereunder to comply with all Applicable Law and to allocate to the parties any substantial increase in the costs incurred by the parties under this Agreement in order to comply with any new or amended Applicable Law.

*   *   *   ***Signature Page Follows***   *   *   *

**IN WITNESS WHEREOF**, the Lessor and the Lessee have each caused this **Non-Exclusive Aircraft Lease Agreement** to be duly executed as of the Effective Date.

LESSOR:

**CES Aviation IX LLC**

By:     _____
Print:    Francine S. Kittredge
Title:    Managing Director


LESSEE:

**Executive Fliteways, Inc.**

By:     _____
Print:    John W. Grillo_____
Title:    President

## NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT

### Schedule A

Hourly Rate:        $ 4,000.00 per Flight Hour

Hangar Fee:        $ 70,800.00 per year for each full year of the Term, commencing on and measured from the Effective Date hereof.  In the event the Term of this Agreement shall terminate on a date other than an annual anniversary of the Effective Date hereof, the Hangar Fee due and payable for the year in which this Agreement terminates shall be pro-rated accordingly.

Labor Rate:        $ 84.00 per hour

The Hangar Fee and the Labor Rate may each be adjusted upward on each anniversary of the Effective Date of this Agreement by the greater of 3.75%, or an amount equal to the percentage change in the Consumer Price Index for the Northeast United States during the immediately preceding calendar year.

Parts Markup Percentage: 15% not to exceed $3,000 per part

Fuel Price Indices:

a.        $ 1.64 per gallon above the thirty (30) day average per gallon price for jet fuel in New York Harbor as published on the last business day of the month in the OPIS Jet Fuel Report.  In the event the OPIS Jet Fuel Report shall cease to be published or shall be determined by the parties to be an unsuitable fuel price index, the parties shall substitute a mutually agreed-to reference.

b.        $ 0.20 per gallon below the Operating Base Fuel Supplier's lowest posted retail rate on the first business day of the month.

## NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT

### Schedule B

**Pilot Qualification Standards**

| Criteria | Pilot in Command | Second in Command |
|---|---|---|
| Airman Certificate: | FAA ATP | FAA Commercial |
| Ratings: | appropriate category, class, and type | instrument-airplane, and appropriate category and class |
| Medical Certificate: | FAA 1st Class | FAA 1st Class |
| Flight Time: | | |
| Total (all aircraft): | 4000 | 2000 |
| Total PIC (all Aircraft): | 3000 | (not applicable) |
| Fixed wing: | | |
| Total: | 4000 | 1500 |
| PIC: | 3000 | (not applicable) |
| Last 12 months: | 300 | 200 |
| PIC Last 12 months: | 300 | (not applicable) |
| Multi-engine: | | |
| Total: | 3000 | 1500 |
| PIC: | 2000 | (not applicable) |
| Last 12 months: | 300 | 200 |
| PIC Last 12 months: | 300 | (not applicable) |
| Dassault-Breguet Falcon 50: | | |
| Total: | 200 | 50 |
| PIC: | 100 | (not applicable) |
| Actual Instrument: | | |
| Total: | 250 | 75 |
| PIC: | 250 | (not applicable) |
| Takeoffs and Landings in Class B Airspace: | | |
| Total: | 100 | 50 |
| Accidents, Incidents, FAA Sanctions within the preceding five years: | 0 | 0 |

## NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT

### Schedule C

### GUARANTY

**THIS GUARANTY** (the "Guaranty") is executed and delivered this 1st day of September, 2007, by **Lehman Brothers Holdings Inc.**, a Delaware corporation ("Guarantor"), in favor of **Executive Fliteways, Inc.**, a Delaware corporation ("Beneficiary").

The Guarantor, in consideration of Beneficiary's execution and delivery of a Non-Exclusive Aircraft Lease Agreement (the "Agreement"), dated as of the 1st day of September, 2007, with **CES Aviation IX LLC**, a Delaware limited liability company ("Obligor"), hereby represents, warrants, covenants and promises as follows:

1.      Guaranty.  Guarantor, hereby unconditionally, absolutely and irrevocably guarantees to Beneficiary, its successors and assigns, the prompt and timely performance by Obligor of all of Obligor's performance obligations, including payment obligations, arising under the Agreement and any successor agreement. The obligations of the Guarantor under this Guaranty shall be performed upon notice or demand following any failure by Obligor to perform any obligation under the Agreement or any successor agreement at the time performance is required under the Agreement or any successor agreement.

2.      Nature of Guaranty.  This Guaranty, and the Guarantor's obligations and liabilities hereunder constitute an absolute, unconditional and continuing guaranty of payment and performance, and may be enforced one or more times and by one or more demands or proceedings.  Further, Guarantor's obligations hereunder are in no way conditioned upon or limited by any attempt to collect from, or to exercise any rights or remedies against, Obligor.  This Guaranty shall continue in full force and effect for as long as the Agreement  or any successor agreement remains in force.

3.      Miscellaneous.  This Guaranty is the binding obligation of Guarantor, its successors and assigns, and shall inure to the benefit of and be enforceable by Beneficiary, its successors and assigns, in accordance with the terms hereof.  This Guaranty shall be governed by the law of the State of New York, without regard to its conflict of laws provisions.  This Guaranty may not be amended, changed or modified in any manner, except by a writing signed by Guarantor.

**IN WITNESS WHEREOF,** this Guaranty has been duly executed and delivered by the Guarantor on the day and year first above written.

GUARANTOR:

**Lehman Brothers Holdings Inc.**

By:      _____
Print:      **Paolo Tonucci**
Title:      Global Treasurer

# NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT
(Part 135 Operations)

Dated as of the 1st day of September, 2007,

between

**CES Aviation V LLC**,
as Lessor,

and

**Executive Fliteways, Inc.**,
as Lessee,

concerning one Sikorsky model S-76C+ aircraft bearing

U.S. registration number N151LB,

and

manufacturer's serial number 760486.

This **NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT** (the "Agreement") is entered into as of this 1st day of September, 2007 (the "Effective Date"), by and between **CES Aviation V LLC**, a Delaware limited liability company ("Lessor"), and **Executive Fliteways, Inc.**, a Delaware corporation ("Lessee").

**W I T N E S S E T H :**

**WHEREAS**, Lessor is, as of the Effective Date of this Agreement, the registered owner of the Aircraft described and referred to herein;

**WHEREAS**, Lessee holds a current and valid Air Carrier Certificate and is authorized to use of the Aircraft for the conduct of On-Demand Operations in common carriage in accordance with the applicable requirements of Part 135 of the FARs;

**WHEREAS,** Lessor desires to lease the Aircraft to Lessee, and Lessee desires to lease the Aircraft from Lessor, in order that Lessee may use the Aircraft to conduct On-Demand Operations in common carriage; and

**WHEREAS**, during the term of this Agreement, the Aircraft may be subject to concurrent, non-exclusive leases to other lessees for use by such other lessees in operations under Part 91 of the FARs.

**NOW, THEREFORE**, in consideration of the foregoing premises, the mutual promises herein contained, and other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, the Lessor and Lessee agree as follows:

**SECTION 1.    DEFINITIONS**

1.1      The following terms shall have the following meanings for all purposes of this Agreement:

**"Aircraft"** means the Airframe, the Engines identified herein, and the Aircraft Documents.  The Engines identified herein shall be deemed part of the "Aircraft" whether or not from time to time attached to the Airframe or on the ground.   Any other engines that may from time to time become attached to the Airframe on a temporary basis shall be included in the term "Aircraft" for so long as such engines are so attached.

**"Aircraft Accident"** has the same meaning given the term in 49 C.F.R. Section 830.2.

**"Aircraft Documents"** means all flight records, maintenance records, historical records, modification records, overhaul records, manuals, logbooks, authorizations, drawings and data relating to the Airframe, any Engine, or any Part, that have been provided to Lessee by Lessor, or are required by Applicable Law to be created or maintained with respect to the maintenance and/or operation of the Aircraft, or are required from time to time by the FAA with respect to the Aircraft, including, without limitation, shop records detailing service checks, inspections, tests, repairs or overhauls, and all records required for Part 135 compliance, including the date of each charter flight, the name of the person authorizing the charter flight, the name of the lead passenger, points of travel, flight and ground time, breakdown of charges for each trip, and other similar information.

**"Airframe"** means the Sikorsky model S-76C+ aircraft bearing manufacturer's serial number 760486 and United States registration number N151LB, together with any and all Parts (including, but not limited to, landing gear and auxiliary power units but excluding Engines or engines) so long as such Parts shall be either incorporated or installed in or attached to the Airframe.

**"Applicable Law"** means, without limitation, all applicable laws, treaties, international agreements, decisions and orders of any court, arbitration or governmental agency or authority and rules, regulations, orders, directives, licenses and permits of any governmental body, instrumentality, agency or authority, including, without limitation, the FARs and the Federal Aviation Act of 1958, as amended.

**"Certificate "** shall mean that certain Air Carrier Certificate issued to Lessee by the Federal Aviation Administration pursuant to Part 119 of the FARs and bearing certificate number AOQA201C.

**"Excess Hours Surcharge"** has the meaning ascribed to the term in Section 5.1.1.

**"Engines"** means two (2) Turbomeca model Arriel 2S1 engines bearing manufacturer's serial numbers 20057 and 20065, together with any and all Parts so long as the same shall be either incorporated or installed in or attached to such Engine.

**"Event of Default"** means any event falling within either of the following categories:

(i)    a failure of a party to pay any sum that is due and payable to the other party on the date that such payment becomes due if such failure continues for more than ten (10) business days after receipt by the debtor party of oral or written notice that such payment is overdue;

(ii)    a breach by a party of any other provision of this Agreement if such breach continues for more than fifteen (15) business days without being cured after receipt by the breaching party of oral or written notice that a breach has occurred;

(iii)    any Aircraft Accident or Incident involving, or any Substantial Damage to, the Aircraft or any other aircraft leased by Lessor to Lessee shall occur as a direct result of any negligent act or failure to act of Lessee or any employee, contractor or direct agent of Lessee;

(iv)    a default by a party under any other agreement between the parties hereto that results in a termination of such other agreement;

(v)    a default by a party hereto or any affiliate of Lessor under any agreement between Lessee and any affiliate of Lessor that results in a termination of such other agreement.

**"Event of Loss"** shall mean any of the following events with respect to the Aircraft:

(i)    loss of the Aircraft or of the use thereof due to theft or disappearance (with loss being conclusive following 30 days or such other period specified in applicable insurance), destruction, damage beyond economic repair or rendition of the Aircraft permanently unfit for normal use for any reason;

(ii)    any damage to the Aircraft which results in an insurance settlement with respect thereto on the basis of an actual, constructive or compromised total loss; or

(iii)    the condemnation, confiscation or seizure of, or requisition of title to or use of, the Aircraft by private persons or by any governmental or purported governmental authority.

**"FAA"** means the Federal Aviation Administration of the United States Department of Transportation or any successor agency.

**"FARs"** means collectively the Aeronautics Regulations of the Federal Aviation Administration and the Department of Transportation, as codified at Title 14, Parts 1 to 399 of the United States Code of Federal Regulations.

**"Flight Crew"** means all cockpit and ground crew personnel necessary for flight operations of the Aircraft.

**"Flight Hour"** means each flight hour of use of the Aircraft by Lessee.

**"Force Majeure"** means, not by way of limitation, an act of God, an act of nature, an act of civil or military authority, a strike or labor dispute, an unforeseeable mechanical failure, or an air traffic control delay, or any other event that is beyond the control of a party hereto.

**"Incident"** has the same meaning given the term in 49 C.F.R. Section 830.2.

**"Initial Term"** has the meaning ascribed to the term in Section 2.4.1.

**"Lessee-Originated Charter Customer"** means any charter customer originated by Lessee.

**"Lessor-Designated Charter Customer"** means Lessor's parent company and/or any other affiliate of Lessor and/or any charter customer referred to Lessee by Lessor.

**"Lien"** means any mortgage, security interest, lease or other charge or encumbrance or claim or right of others, including, without limitation, rights of others under any airframe or engine interchange or pooling agreement, but excluding mechanics' liens, hangar keepers' liens, materialmens' liens, and other similar liens (including, possessory liens, common law liens, and statutory liens to the extent that any such liens are similar to a mechanics' lien, a hangar keepers' liens, or a materialmens' lien) dischargeable in the ordinary course of business.

**"On-Demand Operations"** shall have the same meaning given the term in Section 119.3 of the FARs.

**"Operating Account"** shall mean a bookkeeping account maintained by Lessee to account for funds related to use, operation, maintenance, and storage of the Aircraft.

**"Operating Base"** means Long Island MacArthur Airport, Islip, New York.

**"Operating Base Fuel Supplier"** means Long Island Jet Center or any successor vendor operating out of the same location.

**"Operational Control"** has the same meaning given the term in Section 1.1 of the FARs.

**"Parts"** means all appliances, components, parts, instruments, appurtenances, accessories, furnishings or other equipment of whatever nature (other than complete Engines or engines) which may from time to time be incorporated or installed in or attached to the Airframe or any Engine and includes replacement parts.

**"Pilot in Command"** has the same meaning given the term in Section 1.1 of the FARs.

**"Pilot Qualification Standards"** means the Pilot Qualification Standards set forth in Schedule B hereof.

**"Substantial Damage"** has the same meaning given the term in 49 C.F.R. Section 830.2.

**"Taxes"** means all taxes of every kind (excluding any tax measured by or assessed against a taxpayer's income, including, without limitation, any income tax, gross income tax, net income tax, or capital gains tax) assessed or levied by any federal, state, county, local, airport, district, foreign, or other governmental authority, including, without limitation, sales taxes, use taxes, retailer taxes, duties, fees, excise taxes, and other similar taxes.

**"Term**" means the entire period from the Effective Date to the date this Agreement is terminated pursuant to Section 2.4.

## SECTION 2.    LEASE, DELIVERY AND USE OF THE AIRCRAFT; TERM

2.1    **Lease**.  Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the Aircraft, on the terms and conditions of this Agreement.

2.2     **Delivery**.  Lessor and Lessee agree that as of the date hereof the Aircraft has been delivered to Lessee and is in an airworthy condition with all necessary accessories and equipment required to safely conduct charter flight operations.

2.3     **Permitted Aircraft Uses**.  Lessee's leasehold interest in the Aircraft shall entitle Lessee to operate the Aircraft solely for the following purposes:

   2.3.1     To provide on-demand charter air transportation services exclusively to charter customers designated and/or approved by Lessor; provided, however, that the terms and conditions for the provision of such charter air transportation shall be as agreed by and between Lessee and such charter customer(s).

   2.3.2     To ferry the Aircraft from the Operating Base to a charter customer's scheduled airport of embarkation.

   2.3.3     To ferry the Aircraft from a charter customer's airport of disembarkation to the Operating Base.

   2.3.4     Flight Crew training.

   2.3.5     Maintenance test flights and maintenance deliveries.

   2.3.6     Other purposes as approved by Lessor in its sole discretion.

2.4     **Term**.

   2.4.1     **Initial Term**.  The initial term of this Agreement (the "Initial Term") shall become effective on the Effective Date and, subject to Sections 2.4.2 through 2.4.4, shall continue in effect until the 1st day of December, 2010 (the "Expiration Date").

   2.4.2     **Renegotiation and Extension**.  During the period commencing ninety (90) days prior to the expiration of the Initial Term of this Agreement and ending sixty (60) days prior to the expiration of the Initial Term of this Agreement, the parties hereto may negotiate the terms of a new Non-Exclusive Aircraft Lease Agreement.  In the event a new Non-Exclusive Aircraft Lease Agreement is not executed as of the date that is sixty (60) days prior to the last day of the Initial Term of this Agreement, and provided the parties hereto are negotiating in good faith the terms of a new Non-Exclusive Aircraft Lease Agreement as of such date, the term of this Agreement shall automatically be extended for an indefinite period that will terminate on the earlier of the date of execution of a new Non-Exclusive Aircraft Lease Agreement, or sixty (60) days after the date that either party hereto provides written notice to the other party that it is terminating negotiations.  In the event the execution of a new Non-Exclusive Aircraft Lease Agreement occurs during a period of extension of this Agreement under this Section 2.4.2, the Initial Term of such new Non-Exclusive Aircraft Lease Agreement, including any increases in the Hangar Fee set forth in Schedule A and/or Lessee's rates and charges, shall be made retroactive to the first day of the period of such extension.  During the period commencing on the day after the expiration of the Initial Term of this Agreement and ending on the day this Agreement terminates or the day prior to the effective date of a new Non-Exclusive Aircraft Lease Agreement, whichever shall apply, the Hangar Fee set forth in Schedule A shall be increased by ten percent (10%); provided, however, that to the extent any retroactive increase in the Hangar Fee set forth in any new Non-Exclusive Aircraft Lease Agreement is more or less than ten percent (10%), the ten percent (10%) adjustment required by this Section 2.4.2 shall be adjusted retroactively to equal the adjustment in the new Non-Exclusive Aircraft Lease Agreement.  Upon execution of a new Non-Exclusive Aircraft Lease Agreement, Lessee shall immediately become entitled to debit the Operating Account an amount equal to the difference between the rates in this Non-Exclusive Aircraft Lease Agreement, as adjusted, and the new rates and charges retroactive to the effective date of the new Non-Exclusive Aircraft Lease Agreement.

2.4.3    **Event of Default**.  Upon the occurrence of an Event of Default, the non-defaulting party may terminate this Agreement by written notice to the defaulting party.

2.4.4    **Early Termination**.  Contrary provisions of Section 2.4.1 notwithstanding, each party shall have the right to terminate this Agreement without cause on ninety (90) days written notice to the other party.  In the event of an early termination of this Agreement pursuant to Section 2.4.3 or this Section 2.4.4, the Annual Hangar Fee applicable to the year in which the termination occurs shall be pro-prated by multiplying the annual Hangar Fee by a fraction, the numerator of which is the number of days from the most recent anniversary of the Effective Date to the date of separation of the Aircraft from Lessee's management/hangar, and the denominator of which is 365.  In addition, if such termination is caused by Lessor pursuant to this Section 2.4.4, then Lessee shall also be entitled to an early termination fee in an amount equal to  the lesser of (i) an amount equal to 25% of the annual Hangar Fee set forth in Schedule A, or (ii) the sum of all Hangar Fee payments that would, but for the early termination of this Agreement, have become due from and after the date this Agreement is terminated pursuant to Section 2.2.4 through the Expiration Date; provided however, that if after the Effective Date of this Agreement and prior to a termination of this Agreement by Lessor pursuant to this Section 2.4.4, Lessor shall have terminated any other Non-Exclusive Aircraft Lease Agreement (other than this Agreement) by and between Lessor and Lessee with respect to any other aircraft (other than the Aircraft) under a provision similar to this Section 2.4.4 following a sale of such other aircraft, and if neither Lessor nor any affiliate of Lessor shall have acquired another aircraft as a replacement for the sold aircraft, then in such event the amount in clause (i) of this Section 2.4.4 shall be increased to an amount equal to 66.67% of the Hangar Fee set forth in Schedule A.

2.4.5    **Coordination with Other Agreements.**  Sections 2.4.1 through 2.4.4 notwithstanding, under no circumstances may this Agreement be terminated for so long as that certain Air Charter Agreement by and between Lessee and Lehman Brothers Inc. remains in full force and effect; provided, however, that this Section 2.4.5 shall not be construed as a bar to termination of this Agreement under Section 2.4.2, Section 2.4.3, or Section 2.4.4 hereof if said Air Charter Agreement is terminated simultaneously.

2.5    **Event of Default**.  Upon any termination hereof under Section 2.4.3 following an Event of Default, in addition to such termination rights, the non-defaulting party shall be entitled to all other remedies available to it at law or in equity, provided, however, that in no event may either party be held liable to the other for any indirect, incidental, consequential, special, punitive, or exemplary damages of any kind.

2.6    **Non-Exclusivity.**

2.6.1    Lessee and Lessor acknowledge and agree that the Aircraft is leased to Lessee on a non-exclusive basis.  Lessor reserves the right to lease the Aircraft on a non-exclusive basis to third-parties for use under Part 91 of the FARs; provided, however, that Lessee shall have the exclusive right to use and operate the Aircraft for On-Demand Operations in common carriage under Part 135 of the FARs.  During any period during which another lessee of Lessor has scheduled use of the Aircraft, Lessee's leasehold rights to possession of the Aircraft under this Agreement shall temporarily abate, but Lessee's obligations to maintain, service and store the Aircraft pursuant to Section 3.3 shall continue unabated.   In no event will Lessee be liable to Lessor for any claims, damages, losses, liabilities, demands, suits, judgments, causes of action, civil or criminal legal proceedings, penalties, fines or other sanctions, attorneys fees, or other costs or expenses incurred by Lessor arising from Lessor's inability to provide the Aircraft to any such other lessee as a result of the Aircraft being unavailable due to scheduled or unscheduled repairs or maintenance, previously scheduled training flights, or any Force Majeure event, unless such unavailability arises from Lessee's gross negligence or willful misconduct.

2.6.2    Notwithstanding anything in this Agreement to the contrary, if during the Term of this Agreement Lessor leases the Aircraft on a non-exclusive basis to any person or entity other than Lessee, Lessor shall release, indemnify, defend and hold Lessee harmless from and against any and all

liabilities, claims, and losses of any kind arising out of or connected with the leasing of the Aircraft to such other person or entity; provided, however, that if such other person or entity retains Lessee to provide aircraft management and pilot services in connection with such other person's or entity's operation of the Aircraft, this Section 2.6 shall not apply to any liabilities, claims, or losses of any kind arising out of or connected with the leasing of the Aircraft to such other person or entity.

**SECTION 3.    AIRCRAFT MANAGEMENT, OPERATIONS, AND MAINTENANCE**

3.1     **Title and Registration**.  Lessee acknowledges that title to the Aircraft shall remain vested in Lessor and Lessee shall commit no act, including an act of omission, that may adversely affect Lessor's title interest in the Aircraft.   The foregoing notwithstanding, Lessee may permit the imposition on the Aircraft of mechanics' liens, hangar keepers' liens, materialmens' liens, and other similar liens (including, possessory liens, common law liens, and statutory liens to the extent that any such liens are similar to a mechanics' lien, a hangar keepers' liens, or a materialmens' lien), including any such liens in favor of Lessee, provided that Lessee shall discharge, or cause to be discharged, any such permitted lien in the ordinary course of business upon payment by Lessor to Lessee of the debt that gave rise to the permitted lien.

3.2     **Operations**.  Lessee shall operate the Aircraft in accordance with Part 135 of the FARs during all flight operations conducted under this Agreement, except that Flight Crew training flights, maintenance test flights, maintenance delivery flights, and ferry flights may be operated in accordance with Part 91 of the FARs as provided in Section 91.501(b)(1) when common carriage is not involved.  Lessee shall not operate or locate the Airframe or any Engine, or suffer the Airframe or any Engine to be operated or located, in any area excluded from coverage by any insurance policy in effect or required to be maintained hereunder with respect to the Airframe or Engines.  Lessee shall not operate the Airframe or any Engine or permit the Airframe or any Engine to be operated during the Term except in operations for which Lessee is duly authorized, or to use or permit the Aircraft to be used for a purpose for which the Aircraft is not designed or reasonably suitable.  Lessee shall not permit the Airframe or any Engine to be maintained, used or operated during the Term in violation of any Applicable Law, or contrary to any manufacturer's operating manuals or instructions.  Lessee shall not knowingly permit the Aircraft to be used for the carriage of any persons or property prohibited by law, nor  during the existence of any known defect except in accordance with the FARs.

3.3     **Maintenance, Service, and Storage**.  Lessee shall perform or cause to be performed all maintenance, repair, inspection and overhaul work necessary to obtain certification for the Aircraft pursuant to the FARs and to maintain such certification during the term of this Agreement.  All such work on the Aircraft shall be performed in accordance with the standards set by regulations of the FAA.  Lessee shall provide or cause to be provided only licensed and qualified personnel to perform any maintenance, repair, inspection and overhaul work on the Aircraft.  All such personnel will be contracted for, or employed by Lessee. All equipment in the Aircraft shall be maintained and updated as required or recommended by the manufacturer of such equipment. In all cases other than "Major Repair" (as defined later in this Section), Lessee shall be the sole judge of the kind and extent of repairs necessary, and Lessor hereby grants authority to Lessee to perform or contract for the performance of all such necessary repairs and maintenance, provided that Lessee shall act reasonably in connection therewith. Lessor shall rely wholly on the expertise of Lessee as to the necessity of the labor and materials required under this paragraph.  For purposes of this Agreement, "Major Repair" is defined as being any single repair or maintenance procedure (or series of related repair or maintenance procedures) the cost of which is estimated to be in excess of Seven Thousand Five Hundred United States Dollars ($7,500.00).  Prior to the commencement of any work relating to a Major Repair, Lessee shall furnish Lessor with a written estimate of the cost of the Major Repair, which shall be subject to approval in writing by Lessor prior to the commencement of the Major Repair.  If at any time during the Term of this Agreement Lessee shall reasonably determine that the total cost of any Major Repair will exceed Fifty Thousand United States Dollars ($50,000.00), then notwithstanding any other provision of this Agreement to the contrary, Lessor shall, if requested by Lessee, pay the estimated Major Repair costs to Lessee prior to the due date of the payment of such costs by Lessee to the appropriate vendor or maintenance and repair facility; provided, however, that upon Lessor's request, Lessee shall provide Lessor documentation reasonably acceptable to Lessor supporting Lessee's request for such advance payment.  Contrary requirements of Section 9.1 notwithstanding, written notices concerning

Major Repairs will be provided to Lessor at the address specified in Section 5.8, delivered via mail or e-mail as contemplated therein. In the event Lessor refuses to approve any Major Repair, and/or pay in advance the estimated cost of any Major Repair that is estimated to be in excess of Fifty Thousand United States Dollars ($50,000.00), the parties shall discuss Lessor's reasons for refusing to approve and/or pay the estimated cost of the Major Repair and shall discuss and evaluate all reasonable alternatives, if any, to the requested Major Repair that may be available, and the parties shall thereafter each use their best efforts to resolve any issues and agree on an appropriate course of action in a prompt and timely manner. Subject to the foregoing, Lessee shall not be liable or responsible for any costs incurred by Lessor resulting from any failure to perform, or delay in the performance of, any Major Repair to the extent that such failure or delay is a result of a delay or failure of Lessor to approve in writing and/or pay the estimated cost of the Major Repair. Lessee shall establish accounts with vendors of services and supplies for the Aircraft and maintain all such accounts in good standing, subject to Lessor's obligation to pay or reimburse Lessee for such services and supplies as provided herein. All costs and expenses incurred in connection with the services performed and parts and supplies provided under this Section 3.3 shall be paid in accordance with Sections 5.2 through 5.6 of this Agreement.

3.4     **Flight Crews**. The Aircraft is being leased to Lessee hereunder without a Flight Crew. Lessee shall provide all Flight Crew personnel required for operations of charter flights.

3.5     **Operational Control.** It is jointly agreed and acknowledged between Lessor and Lessee that at all times while the Aircraft is in the possession of Lessee, Lessee shall have exclusive possession, command, and control of the Aircraft and shall retain operational control of the Aircraft at all times. Lessee shall exercise exclusive authority over initiating, conducting, or terminating any flight conducted pursuant to this Agreement, and the Flight Crew shall be under the exclusive command and control of Lessee in all phases of such flights and at all times. The parties acknowledge and agree that flights conducted by other lessee's of Lessor under Part 91 of the FAR's are not conducted pursuant to this Agreement, and Lessee shall have no right or obligation to have or exercise possession, command, or operational control of the Aircraft in connection with flights by Lessor's other lessees.

3.6     **Aircraft Documents**. Lessee shall at all times maintain and preserve all Aircraft Documents in a current and up-to-date manner. All Aircraft Documents shall be produced and maintained in the English language. All costs and expenses incurred in connection with the services performed under this Section 3.6 shall be paid in accordance with Sections 5.2 through 5.6 of this Agreement.

3.7     **Right to Inspect**. Lessor and/or Lessor's designated representatives shall have the right to inspect the Aircraft or the Aircraft Documents during Lessee's normal business hours, upon giving Lessee two (2) business days notice, to ascertain the condition thereof and to satisfy Lessor that the Aircraft and the Aircraft Documents are being properly maintained in accordance with the requirements of this Agreement. All required corrections shall be performed as soon as practicable after such inspection.

3.8     **Annual Budgets.** Lessee shall prepare and deliver to Lessor an estimated annual budget for all operations of the Aircraft upon Lessor's request.

## SECTION 4. CONDITION DURING TERM AND RETURN OF AIRCRAFT

4.1     **Return**. Upon the last business day of the Term or the date of earlier termination hereof, Lessee shall return the Aircraft to the Lessor by delivering the same to Lessor fully equipped with all Engines installed thereon. Delivery shall be made at a location specified by Lessor, provided that if Lessor shall specify any location other than the Operating Base, Lessor shall reimburse Lessee for any costs and expenses incurred by Lessee to deliver the Aircraft to such location. The Aircraft at the time of its return shall be in the condition set forth in this Section 4 and shall be free and clear of all Liens.

4.2     **Condition of Aircraft**. The Aircraft at the time of its return to Lessor shall have been maintained and repaired in accordance with the provisions of this Agreement with the same care and consideration for the technical condition of the Aircraft as if it were to have been kept in continued regular service by the Lessee, and shall meet the following requirements:

4.2.1 **Operating Condition**. The Aircraft shall be in the same condition as it was in on the Effective Date of this Agreement, ordinary wear and tear excepted.

4.2.2 **Cleanliness Standards**. The Aircraft shall be clean and shall have received a recent exterior and an interior deep cleaning.

4.2.3 **Certificate of Airworthiness**. The Aircraft shall have, and be in compliance with, a current valid certificate of airworthiness issued by the FAA, and shall be airworthy according to manufacturer's specifications and FAA regulations.

All costs and expenses incurred in connection with the services performed under this Section 4.2 shall be paid in accordance with Sections 5.2 through 5.6 of this Agreement.

4.3 **Aircraft Documents**. Lessee shall return or cause to be returned to Lessor, at the time the Aircraft is returned to Lessor, all of the Aircraft Documents, updated and maintained by Lessee through the date of return of the Aircraft. All costs and expenses incurred in connection with the services performed under this Section 4.3 shall be paid in accordance with Sections 5.2 through 5.6 of this Agreement.

## SECTION 5. <u>FINANCIAL MATTERS</u>

5.1 **Charter Customer Relations.** Lessee shall be responsible for all contracting with, billing, and collecting from charter customers, and only Lessee may bill charter customers for charter flights. The total amount that Lessee shall charge a charter customer for any charter flight (including any repositioning flight associated with any charter flight) shall be the sum of the following:

5.1.1 **Hourly Rate Charges.** An amount equal to the product of the applicable Hourly Rate set forth in <u>Schedule A</u> multiplied by the number of Flight Hours, rounded to the nearest one-tenth of one hour, flown during the flight. In the event a Lessor-Designated Charter Customer utilizes the Aircraft for more than 450 Flight Hours in any calendar year, then in addition to the Hourly Rate set forth in <u>Schedule A</u>, the charter customer shall be charged a surcharge (the "Excess Hours Surcharge") in an amount equal to 2% of the Hourly Rate set forth in <u>Schedule A for</u> those Flight Hours in excess of 450 during the calendar year.

5.1.2 **Incidental Expenses.** An amount equal to all incidental out-of-pocket costs incurred by Lessee in connection with the flight, including, without limitation, fuel surcharges, landing fees, ramp fees, customs fees, international handling fees, permit fees, Flight Crew passports and visas, overnight hangar fees, de-icing costs, contaminant recovery costs, Flight Crew per diem and meal expenses, Flight Crew transportation and hotels, equipment servicing, commissary stock and supplies obtained for a specific flight, trip-related communications charges, supplementary Flight Crew costs, charts, manuals, and other publications obtained for the specific flight (*e.g.*, navigation, operations, and maintenance), and any other similar items, and for all non flight-related expenses incurred by Lessee at the request of the charter customer, including, without limitation, ground transportation charges, telecommunications charges, and catering services.

5.1.3 **Taxes.** All Taxes, and any interest, penalties, fines, and additions imposed for non-collection of Taxes (other than interest, penalties, fines, and additions imposed for non-collection of Taxes arising from Lessee's gross negligence or willful or criminal misconduct) payable with respect to any Taxes, imposed or levied or arising out of, or as a result of, the charter of the Aircraft to the charter customer.

5.2 **Payment of Aircraft-Related Expenses.** Lessee shall pay to the appropriate vendors all costs and expenses of maintaining and storing the Aircraft, and all costs and expenses of operating the Aircraft for charter flights, subject to Lessor's obligation to reimburse Lessee for all such costs and expenses as provided herein.

5.3    **Operating Account.**  Lessee shall maintain the Operating Account for the Aircraft.  Lessee shall make credits and debits to the Operating Account as follows:

    5.3.1    **Credits.**  Lessee shall credit the Operating Account the following amounts at the times indicated:

        5.3.1.1    **Charter Revenue (Lessor-Designated Charter Customers).**  Lessee shall credit the Operating Account an amount equal to the amount received from Lessor-Designated Charter Customers under Section 5.1 (excluding amounts attributable to Excess Hours Surcharges, which shall be retained by Lessee) for any charter flight when and as such amount is received from the charter customer.  Lessor shall bear the risk of non-payment of all amounts due and payable from Lessor-Designated Charter Customers.

        5.3.1.2    **Charter Revenue (Lessee-Originated Charter Customers).**  Lessee shall credit the Operating Account an amount equal to 85% of the amounts billed or billable to Lessee-Originated Charter Customers under Section 5.1.1, plus 98% of the amounts billed or billable to Lessee-Originated Charter Customers under Section 5.1.2 and 5.1.3.  Amounts to be credited to the Operating Account under this Section 5.3.1.2 for any charter flight shall be so credited on the earlier of (i) the date such amounts are received by Lessee from Lessee-Originated Charter Customers, or (ii) sixty (60) days after completion of the charter flight.  Lessee shall bear the risk of non-payment of all amounts due and payable from Lessee-Originated Charter Customers, provided however, anything to the contrary notwithstanding, in the event of the non-collectibility of a Lessee-Originated Charter Customer, Lessee shall only be responsible to Lessor for the direct operating costs for such charter. Non-collectibility shall mean Lessee has not collected the charter fees, after using diligent efforts by 120 days after the date of the charter. In the event that a non-collected charter invoice is subsequently collected by Lessee then Lessee shall remit to Lessor the amount due under this provision, less any amounts previously paid for direct operating costs plus amounts incurred in the collection of the delinquent charter invoice, including attorney's fees, court costs, collection company fees and any other costs associated with the collection of the delinquent invoice.

        5.3.1.3    **Fuel Tax Refunds and Credits.**  During the month immediately following the end of each calendar quarter,  Lessee shall credit the Operating Account an amount equal to the product of the number of gallons of fuel used for charter flights of the Aircraft during the immediately preceding calendar quarter, multiplied by the difference between the Federal aviation fuel excise tax rates applicable to commercial flights and non-commercial flights respectively, as such rates may be changed by the federal government from time to time (the parties agree that as of the Effective Date of this Agreement, the difference between the Federal aviation fuel excise tax rates applicable to commercial flights and non-commercial flights is Seventeen and One-Half Cents ($0.175) per gallon).

    5.3.2    **Debits.**  Lessee shall debit from the Operating Account the following amounts at the times indicated:

        5.3.2.1    **Maintenance.**  All amounts necessary to pay the actual costs of all maintenance and servicing of the Aircraft, and the costs of shipping of parts and materials. Lessee shall debit the Operating Account for costs incurred for maintenance when and as such costs are incurred by Lessee.  Lessee shall negotiate with vendors of maintenance services and parts to obtain the most favorable prices. All debits under this Section 5.3.2.1 shall be in amounts equal to Lessee's actual costs of maintenance, with pass through of all discounts obtained by Lessee,

except that the cost of labor for services performed by Lessee's maintenance personnel other than the Maintenance Technician assigned to the Aircraft on a full-time basis shall be deemed to be the Labor Rate set forth in <u>Schedule A</u>, and the debits for parts acquired by Lessee in connection with such maintenance (but not the costs of shipping such parts) shall be the Parts Markup Percentage in excess of Lessee's actual cost.

5.3.2.2    **Hangar.**  Lessee shall debit the Operating Account an amount equal to one-twelfth (1/12) of the annual Hangar Fee set forth in <u>Schedule A</u> once per calendar month.

5.3.2.3    **Incidental Expenses and Taxes.**  At the end of each month, Lessee shall debit the Operating Account an amount equal to all Incidental Expenses and Taxes credited to the Operating Account during such month under Sections 5.1.2 and 5.1.3.  Lessee shall be responsible for payment of all Incidental Expenses and Taxes to the appropriate vendors and tax authorities.

5.3.2.4    **Direct Operating Costs.**  Lessee shall debit the Operating Account an amount equal to all direct costs of operating the Aircraft for each charter flight, including without limitation, the costs of fuel and fuel surcharges (including fuel used by the Aircraft's auxiliary power unit), prist, lubricants, oxygen and other aircraft consumable products, and the fixed hourly cost of any maintenance service plans that may be in effect with respect to the Aircraft. Lessee shall debit the Operating Account for all such direct operating costs when and as such costs are incurred by Lessee.  For purposes of Section 5.3.2.4, the debits attributable to fuel purchased during any calendar month from the Operating Base Fuel Supplier shall be the lesser of the two (2) Fuel Price Indices set forth in <u>Schedule A</u> on the first business day of the calendar month.  The debits attributable to any other direct operating cost under this Section 5.3.2.4 shall be determined by reference to Lessee's actual cost thereof, with pass-through of any discounts obtained by Lessee. Lessee shall negotiate with vendors of fuel, prist, lubricants, oxygen, other aircraft consumable products, ramp services, overnight hangar services, de-icing and contaminant recovery services, and other supplies and services to obtain the most favorable prices.  Upon Lessor's request, Lessee shall provide Lessor copies of invoices or other documents requested by Lessor that establish to Lessor's reasonable satisfaction the actual cost paid by Lessee for fuel purchased at any location other than the Operating Base Fuel Supplier, and all other direct operating costs, incidental expenses, and Taxes.

5.3.2.5    **Miscellaneous Costs**.  Lessee shall debit the Operating Account an amount equal to all miscellaneous costs and expenses of operating the Aircraft for all users when and as such costs and expenses are incurred.  For purposes of this Section 5.3.2.5, miscellaneous costs include, without limitation, costs of Jeppesen subscriptions and other subscriptions, aircraft stock and supplies (including CD's. DVD's, VCR tapes, consumables), aircraft licensing and registration fees, and other similar miscellaneous expenses that are not attributable to a specific flight.

5.3.2.6    **Commissions**.  Lessee shall debit the Operating Account an amount equal to the commissions incurred by Lessee to obtain and operate charters of the Aircraft.

5.4    **Monthly Statements**.  Not later than the last day of each calendar month, Lessee shall send to Lessor a statement summarizing all charter flight activity conducted during the immediately preceding calendar month, and an itemized listing of all credits to the Operating Account attributable to charter flights conducted during such immediately preceding calendar month, and all debits attributable to such preceding month.  In the event Lessee shall not have received payment by the 25th day of any month for any charter flight conducted during the immediately preceding calendar month, the statement delivered on such date

shall not include credits and debits attributable to such charter flight, and the credits and debits attributable to such flight shall be included on the next statement after payment for such charter flight is received by Lessee.  In the event a monthly statement shall indicate a net credit balance, Lessee shall, simultaneously with delivery of the monthly statement, pay to Lessor an amount equal to the net credit balance of the Operating Account.  In the event a monthly statement shall indicate a net debit balance, Lessor shall pay to Lessee an amount equal to the net debit balance of the Operating Account within twenty (20) days of receipt of the monthly statement.  In the event either party shall fail to pay any amount due and payable to the other party under this Section 5.4 by the due date thereof, such debtor party shall pay interest on the unpaid amount to the creditor party at a daily rate of 0.0328 percent.

5.5    **Operating Deposit.**  Lessor and Lessee agree that Lessor has advanced to Lessee an operating deposit in an amount equal to One Hundred Thousand United States Dollars (US$100,000.00).  The parties agree that the foregoing deposit amount was determined and agreed-to based in part on an estimate of one thirty (30) Flight Hours of use of the Aircraft by all users thereof in any calendar quarter.  If at any time during the Term the Aircraft shall be operated during any calendar quarter more than forty (40) Flight Hours, the amount of the required operating deposit may, upon Lessee's written notice, be increased by Ten Thousand United States Dollars (US$10,000.00) for each ten (10) Flight Hour increment that the total number of Flight Hours of use of the Aircraft by all users exceeded thirty (30) Flight Hours.  Lessor shall pay any increase in the operating deposit amount permitted by this Section 5.5 within thirty (30) days of receipt by Lessor of Lessee's written notice.

5.6    **Final Accounting.**  As soon as reasonably practicable after termination of this Agreement for any reason (including as a result of an Event of Default pursuant to Section 2.4.3), but in no event later than ten (10) days after all charter revenues for charter operations occurring prior to such termination have been received and credited to the Operating Account, Lessee shall provide to Lessor a final itemized accounting of the Operating Account, which in the absence of manifest error Lessor shall not contest, except in the case of a good-faith belief that such accounting is wholly or partially in error.  If the sum of such final itemized accounting (minus any amounts contested in good faith) plus the amount of all operating deposits paid to Lessee under Section 5.5 results in a balance owed to Lessor, Lessee shall pay such balance owed simultaneously with the delivery to Lessor of the final accounting.  If such final itemized accounting (minus any amounts contested) results in a balance owed to Lessee, Lessor shall pay such balance owed within twenty (20) days of receipt of the final accounting.  If the debtor party after such final accounting fails to pay any such balance owed by the due date thereof, the debtor party shall pay to the creditor party interest on the unpaid amount at a daily rate of 0.0328 percent.  Lessor and Lessee agree to exert good-faith best efforts to resolve any contested amounts as contemplated herein, and furthermore to pay any such amounts in accordance herewith, treating the date an amount is resolved as the date a final itemized accounting is provided with respect thereto for purposes of this Section 5.6.

5.7    **Records and Documents.**  The documents and records of Lessee (including, but not limited to, all bills, invoices, vouchers and related data) relating to the Aircraft shall be maintained in accordance with Lessee's normal and customary accounting practices, consistently applied.  Upon two (2) business days notice to Lessee, Lessor or its representative may examine all of Lessee's documents and records that relate to costs and expenses incurred and/or paid with respect to the Aircraft and any services provided by Lessee with respect thereto.  Subject to the above two (2) business days advance notice requirement, Lessee may examine Lessee's records and documents at any time during Lessee's normal business hours on any day(s) (weekends and Federal and New York State holidays excluded) during the Term hereof and for a period of ten (10) years after the termination of this Agreement.  Lessor's examination of Lessee's records and documents hereunder is not intended to extend beyond Lessee's documents and records that relate to costs and expenses incurred and/or paid with respect to the Aircraft and services provided by Lessee with respect thereto, and expressly shall not include an examination of Lessee's sensitive and confidential information of a financial and proprietary nature not directly related to the Aircraft and the services of Lessee hereunder.

5.8    **Address for Invoices**.  All invoices and statements provided by the Lessee under this Section 5 shall be directed to the following address for payment:

CES Aviation V LLC

745 Seventh Avenue, 30th Floor
New York, NY 10019
ATTN: Gary Hoffman
Telephone: 212-526-0846
Facsimile: 646-346-8274
Email:   egary.hoffman@lehman.com

## SECTION 6.  LIENS

6.1     Subject to Lessor's obligation to pay all amounts due and payable from Lessor to Lessee under this Agreement in a timely manner, Lessee shall ensure that no Liens are created or placed against the Aircraft by Lessee or third parties as a result of Lessee's actions; Lessee shall notify Lessor promptly upon learning of any Liens not permitted by these terms; Lessee shall, at its own cost and expense, take all such actions as may be necessary to discharge and satisfy in full any Lien not permitted by these terms promptly after the same becomes known to it; and Lessee shall pay all charges related to the Aircraft as they become due and payable.

## SECTION 7. INDEMNITIES AND INSURANCE

7.1     **General Indemnity**.  Neither party hereto will make any claim against the other for any loss or damage to the extent that the loss or damage is covered by the insurance policies covering the Aircraft that are required by this Section 7, and each party hereto represents and warrants to the other party that it will commit no act that will cause any coverage contained in the insurance policies covering the Aircraft that are required by this Section 7 to be voided.  Subject to the foregoing, each party to this Agreement hereby agrees to release, defend, indemnify and hold harmless the other party hereto and each other party's respective officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporations, successors and assigns, from and against any and all uninsured claims, damages, losses, liabilities, demands, suits, judgments, causes of action, civil and criminal legal proceedings, penalties, fines and other sanctions, and any reasonable attorney fees and other reasonable costs and expenses caused by or arising out of the negligent acts or omissions of the indemnifying party in connection with this Agreement. Lessee further agrees to release, defend, indemnify and hold harmless Lessor and Lessor's officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporations, successors and assigns, from and against any and all uninsured claims, damages, losses, liabilities, demands, suits, judgments, causes of action, civil and criminal legal proceedings, penalties, fines and other sanctions, and any reasonable attorney fees and other reasonable costs and expenses caused by or arising out of (i) any failure of Lessee to maintain and operate the Aircraft in accordance with the terms and conditions of this Agreement, Part 135 of the FAR and/or Applicable Law; (ii) the use of the Aircraft by Lessee to provide on-demand air transportation services to any Lessee-Originated Charter Customer; and/or (iii) any contract or agreement by and between Lessee and any Lessee-Originated Charter Customer relating to the provision by Lessee of on-demand air transportation services to any Lessee-Originated Charter Customer or any third-party.  Likewise, Lessor further agrees to release, defend, indemnify and hold harmless Lessee and Lessee's officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporations, successors and assigns, from and against any and all uninsured claims, damages, losses, liabilities, demands, suits, judgments, causes of action, civil or criminal legal  proceedings, penalties, fines and other sanctions and any reasonable attorneys fees and other reasonable costs and expenses caused by or arising out of (i) Lessor's violation of the terms of this Agreement (ii) the use of the Aircraft for Lessor-Originated Charter Customers; and/or (iii) any contract or agreement by and between Lessor and any Lessor-Originated Charter Customer relating to the provision of on-demand air transportation services to any Lessor-Originated Charter Customer or any third-party.  In no event shall either party be liable to the other party for indirect, incidental, consequential, punitive, exemplary or special damages of any kind for any reason. For purposes of this Section 7.1, a claim shall be deemed to be covered by insurance even though the insurance may be subject to deductibles, self-insured retentions and comparable provisions.

7.2     **Insurance**.

7.2.1     Lessor shall cause to be maintained in full force and effect at no cost to Lessee insurance covering

13

the Aircraft for broad form passenger liability, public liability, including war risks and terrorism, property damage and all risk physical damage coverage in connection with the maintenance, use and operation of the Aircraft. Such policy shall have a minimum of $500,000,000.00 combined limit for liability and a minimum hull coverage not less than the fair market value of the Aircraft (herein, the "Insurance Policy"). The Insurance Policy shall name Lessor and any first lien mortgage holder as loss payees of all physical damage/hull insurance proceeds as their interests may appear. The Pilot Warranty clause in the Insurance Policy shall permit operation of the Aircraft by all pilots approved in the Aircraft by the Chief Pilot of Lessee.

7.2.2    The Insurance Policy hereunder shall be in a form and with insurance companies acceptable to Lessee, which acceptance shall not be unreasonably withheld, conditioned or delayed. Lessee acknowledges that the Insurance Policy will be provided by an affiliate of Lessor, and not by Lessor itself.

7.2.3    The Insurance Policy, and any applicable excess and umbrella insurance policies, shall show Lessor, Lessee, and their respective officers, directors and employees as named insureds. It is expressly understood that Lessor's affiliate's policy is a proprietary document, and Lessee will not disclose its contents, terms or conditions without the expressed written consent of Lessor. A copy of the Insurance Policy shall be furnished to Lessee.

7.2.4    The Insurance Policy shall be for the benefit of Lessor, Lessor's affiliate that provides the policy, Lessee, and their respective officers, directors and employees, and any other parties designated by Lessor or its affiliate, and coverage provided to any named insured under the Insurance Policy shall not be invalidated by any act, neglect or breach by any other named insured thereunder. Lessor's rights to physical damage/hull insurance proceeds shall be the sole remedy for loss or damage to the Aircraft or loss of income and diminution of value arising from loss or damage to the Aircraft. The risk of loss or damage to the Aircraft shall remain with Lessor at all times, including without limitation, all indirect, special or consequential damages.

7.2.5    In the event of the total loss or destruction of the Aircraft, or such damage thereto which causes it to be irreparable in the opinion of the insurance carrier providing the insurance coverage hereinabove provided, or if the Aircraft is damaged such that it is improbable, in Lessor's reasonable opinion, that the Aircraft could be made operative within a period of one hundred and twenty (120) days, or if the Aircraft is stolen, condemned, confiscated, seized, or requisitioned, and is not returned within sixty (60) days, then this Agreement shall terminate thirty (30) days after the occurrence of such an event or determination; provided that notwithstanding any such termination, Lessee shall at no additional charge to Lessor provide all assistance and cooperation reasonably requested by Lessor in filing and processing any and all claims under the Insurance Policies.

7.2.6    The Insurance Policy shall include a provision that Lessee will be provided with thirty (30) days prior written notice of cancellation or material change of the Insurance Policy. Ten (10) days notice of cancellation shall apply with respect to non-payment of premium. Furthermore, the Insurance Policy shall provide that the subject policy shall be "primary" for the protection of Lessor and Lessee, notwithstanding any other or additional coverage carried by Lessee for Lessee's own benefit against similar risks. Notwithstanding anything contained in this Agreement to the contrary, Lessee shall be entitled to suspend services under this Agreement immediately upon any cancellation, expiration, termination, or lapse of any insurance coverage required under this Section 7, and will resume such suspended services immediately upon the restoration of such insurance coverage.

7.3    **Tax Indemnification**.

7.3.1    Lessor shall release, indemnify, reimburse, defend and hold harmless Lessee and Lessee's officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporations, successors and assigns from any and all Taxes, and any interest, penalties, fines, and additions

imposed for non-collection of Taxes payable with respect to any Taxes (collectively "Penalties and Interest), excluding Penalties and Interest arising from Lessee's gross negligence or willful or criminal misconduct (collectively "Excluded Penalties and Interest), imposed on the lease of the Aircraft to Lessee, and the use of the Aircraft by Lessee, except to the extent that any such Taxes have been paid to or on behalf of Lessee by any charter customer of Lessee.

7.3.2    The parties agree that all charter flights conducted by Lessee on behalf of charter customers will be classified as "commercial" for Federal excise tax purposes, and will therefore be subject to Federal excise taxes on air transportation services, and will also be subject to Federal excise taxes on aviation fuels, but at a rate lower than the rate applicable to fuel used on noncommercial flights.  Subject to the provisions hereafter set forth, neither party shall assert any position to the contrary in any tax return or any audit, claim, assessment, examination, or other formal or informal proceeding or inquiry (each of the foregoing being hereinafter referred to as an "Inquiry").

7.3.3    It is acknowledged that any Inquiry concerning any Taxes and/or Penalties and Interest for which Lessor may be responsible hereunder may also concern Taxes and/or Penalties and Interest that may be due and owing by Lessee for which Lessor has no responsibility (*e.g., taxes on services or supplies Lessee provides to its other clients and/or Excluded Penalties and Interest*).

7.3.4    If, in addition to Taxes and/or Penalties and Interest for which Lessor may be responsible hereunder, any Inquiry also concerns Taxes and/or Penalties and Interest due and owing by Lessee for which Lessor has no responsibility hereunder and/or Excluded Penalties and Interest:

7.3.4.1    the parties shall jointly control, manage, litigate, and/or defend such Inquiry, with each party responsible for its own defense costs and expenses;

7.3.4.2    neither party may settle, compromise, or fail to appeal a ruling in any such Inquiry over the reasonable objection of the other party;

7.3.4.3    a settlement at the administrative level or during the course of judicial proceedings may only be entered into with the consent of both parties, which consent shall not be unreasonably withheld, delayed or conditioned;

7.3.4.4    if either party, for any reason, fails to defend such Inquiry, then the other party may take control and manage, litigate and/or defend such Inquiry, and non-defending party shall reimburse the defending party for a pro-rata portion of the reasonable costs and expenses of such defense, including, without limitation, reasonable attorneys fees, that the parties reasonably determine relates to the defense of that portion of the Inquiry concerning taxes for which the non-defending party is responsible hereunder; and

7.3.4.5    for purposes of this Section 7.3, a party may reasonably object to the other party's proposed settlement, compromise or failure to appeal a ruling in an Inquiry if, (i) in the objecting party's reasonable judgment, taking such action will materially, adversely affect the objecting party's interests, giving effect to this Agreement and (ii) any such action does not include as an unconditional term thereof the giving of a release to the objecting party of any further liability for  Taxes and/or Penalties and Interest.

7.3.5    If any Inquiry concerns only Taxes and/or Penalties and Interest for which Lessor may be responsible hereunder, Lessor shall control, manage, litigate, and/or defend such Inquiry, and Lessor may not settle, compromise, or fail to appeal a ruling in any such Inquiry over the reasonable objection of Lessee. Lessee shall cooperate, at Lessor's expense, with Lessor in any such defense to the extent reasonably requested by Lessor; provided, however, that if Lessor, for any reason, fails to defend such Inquiry in any manner it deems appropriate, then Lessee may take control and manage, litigate and/or defend such Inquiry, and Lessor shall, in addition to its indemnification obligations hereunder, reimburse Lessee for its reasonable costs and expenses of

such defense and Lessee may not be challenged by Lessor in any decision Lessee may make to settle, compromise or fail to appeal a ruling in any Inquiry.

7.3.6    If any Inquiry requires the posting of a deposit or sum of money in order to preserve the right to participate in the Inquiry, then each party agrees to pay that portion of such deposit or other sum that bears the same ratio that the parties reasonably agree relates to each party's estimated responsibility hereunder for the total amount in controversy in the Inquiry, and if any Inquiry results in a final assessment or judgment of Taxes and/or Penalties and Interest for which Lessor is responsible hereunder, and no appeal from such final assessment or judgment is permitted or Lessor elects not to pursue a permitted appeal from such final assessment or judgment, Lessor shall immediately pay such Taxes and/or Penalties and Interest directly to the appropriate taxing authority on its own behalf or on behalf of Lessee, as the case may be, without further demand by Lessee.

7.3.7    In the event Lessee receives notice of any Inquiry concerning any Taxes and/or Penalties and Interest for which Lessor may be responsible hereunder, Lessee shall timely notify Lessor of such Inquiry within five (5) business days of receipt thereof.  Notwithstanding anything to the contrary contained in this Agreement, Lessee's failure to provide timely notice of any Inquiry, or to cooperate with Lessor in the defense against such Inquiry, shall relieve Lessor of its obligation to indemnify, reimburse, defend and hold harmless Lessee from any and all such Taxes and/or Penalties and Interest to the extent Lessor is prejudiced thereby.

## SECTION 8.  NOTICES

8.1    All communications, declarations, demands, consents, directions, approvals, instructions, requests and notices required or permitted by this Agreement shall be in writing and shall be deemed to have been duly given or made when delivered personally or transmitted electronically by e-mail or facsimile, receipt acknowledged, or in the case of documented overnight delivery service or registered or certified mail, return receipt requested, delivery charge or postage prepaid, on the date shown on the receipt therefor, in each case at the address set forth below:

| **If to Lessor:** | CES Aviation V LLC | Tel: | 212-526-0858 |
| | c/o Lehman Brothers Inc. | Fax: | 212-526-0339 |
| | 399 Park Avenue | | |
| | New York, NY 10022 | | |
| | Attn:    Corporate Counsel | | |
| | | | |
| **With a copy to:** | Galland, Kharasch, Greenberg, | Tel: | 202-342-5251 |
| | Fellman & Swirsky, P.C. | Fax: | 202-342-5219 |
| | 1054 31st Street, N.W., Suite 200 | | |
| | Washington, D.C.  20007 | | |
| | Attn:    Keith G. Swirsky | | |
| | | | |
| **And a copy to:** | Lehman Brothers Inc. | Tel: | 212-526-0846 |
| | 745 Seventh Avenue, 30th Floor | Fax: | 646-346-8274 |
| | New York, NY 10019 | | |
| | Attn:    Gary Hoffman | | |
| | | | |
| **If to Lessee:** | Executive Fliteways, Inc. | Tel: | 631-588-5454 |
| | One Clark Drive | Fax: | 631-588-9560 |
| | Ronkonkoma, New York 11779 | | |
| | Attn:    John  W. Grillo | | |
| | | | |
| **With a copy to:** | McBreen, McBreen & Kopko | Tel: | 201-476-5400 |
| | 110 Summit Avenue | Fax: | 201-573-0574 |
| | Montvale, NJ 07645 | | |

Attn:  Robert S. Moran, Jr.

## SECTION 9.  WARRANTIES AND REPRESENTATIONS

9.1     **Representations and Warranties of Lessee**.  Lessee represents and warrants as of the date hereof and during the entire Term hereof as follows:

9.1.1     Lessee is the lawful owner of the Certificate and is authorized pursuant to its operations specifications to conduct On-Demand Operations in common carriage in accordance with the applicable requirements of Part 135 of the FARs, and said Certificate and operations specification are valid and in good standing.

9.1.2     Lessee has complied with all provisions of Part 298 of the FARs necessary to permit Lessee to operate as an Air Taxi Operator (as defined in Section 298.3 of the FARs), and is thereby authorized to operate as an Air Taxi Operator.

9.1.3     Prior to conducting any charter operations with the Aircraft under this Agreement, Lessee shall cause its operations specifications to be amended to authorize use of the Aircraft for the conduct of such charter operations.

9.1.4     Lessee will operate the Aircraft in accordance with Applicable Law and will not permit the Aircraft to be operated or possessed by other than currently qualified and certified Flight Crew members who at a minimum meet the Pilot Qualification Standards for the pilot position to which assigned.

9.1.5     All pilot Flight Crew members shall have at least the minimum total pilot hours required by any policy of insurance covering the Aircraft and will meet or exceed all requirements under any policy of insurance covering the Aircraft or Applicable Law.

9.1.6     Lessee is a validly organized corporation under the laws of the State of Delaware, and the person executing on behalf of Lessee has full power and authority to execute this Agreement on behalf of Lessee and by such execution shall bind Lessee under this Agreement.

9.1.7     No action, suit, or proceeding is currently pending or threatened against Lessee which shall in any material way adversely affect Lessee's financial status as of the date thereof, or materially impair the execution, delivery, or performance by Lessee of this Agreement or any other document.

9.1.8     The execution and delivery of this Agreement by Lessee and the performance of its obligations hereunder have been duly authorized by all necessary corporate action, and do not conflict in any material respect with any provision of Lessee's articles of incorporation, bylaws, any governmental regulations, or any other agreements that Lessee may now have with other parties.

9.1.9     Lessee is not subject to any restriction, which with or without the giving of notice, the passage of time, or both, prohibits or would in any material respect be violated by or be in conflict with this Agreement.

9.1.10     Lessee will not operate the Aircraft in any unsafe manner or contrary to any manual or instructions for the Aircraft or in violation of the terms or conditions of any insurance policy covering the Aircraft or any applicable statute, regulation, ordinance, or other law, or by any pilot who at a minimum does not meet the Pilot Qualification Standards for the pilot position to which assigned unless that pilot meets the pilot warranties of Lessor's applicable insurance policy and has written approval for flight duties from both the Lessee and the Lessor.

9.2     **Representations and Warranties of Lessor**.  Lessor represents and warrants as of the date hereof and during the entire Term hereof as follows:

9.2.1    Lessor is a validly organized corporation under the laws of the State of Delaware and the person executing on behalf of Lessor has full power and authority to execute this Agreement on behalf of Lessor and by such execution shall bind Lessor under this Agreement.

9.2.2    No action, suit, or proceeding is currently pending or threatened against Lessor which shall in any material way adversely affect Lessor's financial status as of the date hereof, or materially impair the execution, delivery, or performance by Lessor of this Agreement or any other document.

9.2.3    The execution and delivery of this Agreement by Lessor and the performance of its obligations hereunder have been duly authorized by all necessary corporate action, and do not conflict in any material respect with any provision of Lessor's articles of incorporation, bylaws, any governmental regulations, or any other agreements that Lessor may now have with other parties.

9.2.4    Lessor is not subject to any restriction, which with or without the giving of notice, the passage of time, or both, prohibits or would in any material respect be violated by or be in conflict with this Agreement.

9.2.5    Lessor shall not commit any act, including an act of omission, that will cause the Aircraft to be operated in violation of Applicable Law; provided, however, that no action or act of omission of Lessor shall be considered to have caused the Aircraft to be operated in violation of Applicable Law if such violation of Applicable Law is the direct or indirect result of any act, including an act of omission, of Lessee under circumstances that would constitute a breach or default by Lessee of any obligation, covenant, or representation of Lessee under this Agreement, including, without limitation, the representations of Lessee set forth in Section 9.1.10.

## SECTION 10.  MISCELLANEOUS

10.1    **Entire Agreement.**  This Agreement, and all terms, conditions, warranties, and representations herein, are for the sole and exclusive benefit of the signatories hereto.  This Agreement constitutes the entire agreement of the parties as of its Effective Date and supersedes all prior or independent, oral or written agreements, understandings, statements, representations, commitments, promises, and warranties made with respect to the subject matter of this Agreement.  Provisions of this Agreement which by their nature survive the termination or expiration of this Agreement shall continue in full force and effect thereafter.

10.2    **Other Transactions.**  Except as specifically provided in this Agreement, none of the provisions of this Agreement, nor any oral or written statements, representations, commitments, promises, or warranties made with respect to the subject matter of this Agreement shall be construed or relied upon by any party as the basis of, consideration for, or inducement to engage in, any separate agreement, transaction or commitment for any purpose whatsoever.

10.3    **Prohibited and Unenforceable Provisions.**  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibitions or unenforceability in any jurisdiction.  To the extent permitted by applicable law, each of Lessor and Lessee hereby waives any provision of applicable law that renders any provision hereof prohibited or unenforceable in any respect.

10.4    **Enforcement.**  This Agreement, including all agreements, covenants, representations and warranties, shall be binding upon and inure to the benefit of, and may be enforced by Lessor, Lessee, and each of their agents, servants and personal representatives.  In the event either party shall file any suit or other claim to enforce any provision of this Agreement, the prevailing party shall be entitled to recover from the other party all of the prevailing party's reasonable attorney's fees, court costs, and other costs of such enforcement immediately upon final adjudication of the controversy.

10.5    **Headings.**  The section and subsection headings  in this Agreement are for convenience of reference only and shall not modify, define, expand, or limit any of the terms or provisions hereof.

10.6    **Counterparts.**  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but both such counterparts shall together constitute but one and the same instrument.

10.7    **Amendments.**  No term or provision of this Agreement may be amended, changed, waived, discharged, or terminated orally, but only by an instrument in writing signed by the party against which the enforcement of the change, waiver, discharge, or termination is sought.

10.8    **No Waiver.**  No delay or omission in the exercise or enforcement of any right or remedy hereunder by either party shall be construed as a waiver of such right or remedy.  All remedies, rights, undertakings, obligations, and agreements contained herein shall be cumulative and not mutually exclusive, and in addition to all other rights and remedies which either party possesses at law or in equity.

10.9    **No Assignments or Subleases.**  Neither party may assign its rights or obligations under this Agreement without the prior written permission of the other.  Lessee shall not sublease the Aircraft to any person or entity, nor sell, transfer, pledge, hypothecate, or in any other manner transfer or relinquish the Aircraft or any interest therein to any person or entity, except that Lessee shall relinquish possession of the Aircraft from time to time to any other person or entity to whom Lessor has leased the Aircraft on a non-exclusive basis for use by such other person or entity in operations under Part 91 of the FARs.

10.10    **Governing Law.**  This agreement has been negotiated and delivered in the State of New York and shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, without giving effect to its conflict of laws provisions.

10.11    **Confidentiality; Non-Solicitation.**  (a) The terms of this Agreement, its Schedules and any information gained through its negotiation and performance are considered confidential information by the Lessee and the Lessor. Both parties acknowledge that each has gained sensitive and proprietary information about the business of the other during the course of this Agreement and will protect that information from dissemination to third parties.  The foregoing notwithstanding, each party shall have the right to disclose such information to its attorneys, accountants and other advisors who have a reasonable need for such information in the ordinary course of business; provided, however, that a party disclosing such information to its attorneys, accountants and other advisors shall use reasonable efforts to cause such attorneys, accountants and other advisors to protect such information from dissemination. Any disclosure by one party of the other's business information or practices is a material breach and grounds for termination of this Agreement, as well as the exercise of any remedy at law or equity available to either party. (b) Lessor agrees that for the period of one (1) year after the termination of this Agreement, Lessor will not directly or indirectly, solicit or provide charter services on any aircraft to any third party who was a charterer or offered as a prospective charterer by Lessee during the term of this Agreement. In the event Lessor does provide such charter services, Lessee will be entitled to a fee of fifteen (15%) percent of any charter revenues as liquidated damages for breach of this provision. Lessor agrees to furnish lessee all documentation and information necessary to calculate and verify the amounts due under this provision.

10.12    **Flight Crew Resources.**  It is acknowledged by the parties that Lessee has considerable investment in its highly trained and skilled employees, and that the loss of these employees causes significant expense to the Lessee.  In consideration of the investment in the indoctrination, training and development of such individuals, if during the term hereof and any extensions or within six months after termination of this Agreement, Lessor or any of its subsidiaries or affiliates, or any other business entity ten percent (10%) or more of which is owned by Lessor or any of its subsidiaries or affiliates (each of the foregoing an "Lessor Affiliate"), employs (on a full-time, permanent basis) or utilizes (on a full-time, permanent basis) the services of any person who was a employee of Lessee within the six months immediately preceding the termination of this Agreement (excluding any person for whom Lessee is entitled to receive post-termination flight crew employment costs from any Lessor Affiliate), or if during the term hereof and any extensions or within six months after termination of this Agreement any other unrelated entity employs (on a full-time, permanent basis) or utilizes (on a full-time, permanent basis) the services of any person who

19

was a employee of Lessee within the six months immediately preceding the termination of this Agreement (excluding any person for whom Lessee is entitled to receive post-termination flight crew employment costs from any Lessor Affiliate) for the purpose of providing charter services to Lessor similar to the charter services provided under this Agreement, Lessor agrees to compensate Lessee at the rate of $25,000.00 per employee so employed or utilized by Lessor or any Lessor Affiliate, or by any unrelated entity for the aforementioned purpose. This fee shall be due and payable immediately upon such employee being so employed or utilized by Lessor or any Lessor Affiliate, or by any unrelated entity for the aforementioned purpose. If within six months after termination of this Agreement, Lessor or any Lessor Affiliate shall utilize on a short-term day-rate basis the services of any employee of Lessee who served as a flight crew member on Lessor's Aircraft during the Term of this Agreement (excluding any person no longer employed by Lessee), or if within six months after termination of this Agreement, any other unrelated entity shall utilize on a short-term day-rate basis the services of any employee of Lessee who served as a flight crew member on Lessor's Aircraft during the Term of this Agreement (excluding any person no longer employed by Lessee) for the purpose of providing flight crew services to Lessor similar to the flight crew services provided under this Agreement, Lessor shall compensate Lessee at a rate of $2,500.00 per duty day for up to ten (10) duty days. The parties hereto acknowledge that provisions similar to this Section 10.12 are or may become contained in other agreements between Lessee and Lessor and/or between Lessee and one or more Lessor Affiliates. It being the intent of the parties that Lessee may become entitled to only a single recovery under all such provisions collectively with respect to each individual employee, the parties therefore agree that notwithstanding anything in this Section 10.12 to the contrary, in the event Lessor, any Lessor Affiliate, or any unrelated entity employs or utilizes any such employee under circumstances that would entitle Lessee to compensation under this Section 10.12 and/or any similar provision in any such other agreement, Lessee shall be entitled to recover compensation at the rate of $25,000.00 per employee only under this Agreement or one (1) such other agreement, but not under this Agreement and any other such agreement.

10.13    **Guaranty**.  Concurrently with execution hereof, Lessor shall cause Lehman Brothers Holdings Inc. to execute and deliver to Lessee a Guaranty in the form of Schedule C attached hereto, unless a previously delivered Guaranty in such form is still in full force and effect.

10.14    **Force Majeure**.  Neither party shall be liable to the other for failure or delay in the performance of their respective obligations hereunder if such failure or delay arises or results from a Force Majeure event.

10.15    **Changes in Applicable Law**.  The parties hereto reasonably believe that the performance by each of the parties hereto of their respective obligations arising hereunder will not violate any Applicable Law. Notwithstanding anything to the contrary contained herein, in the event (i) any Applicable Law shall be enacted or amended during the Term hereof in such a manner as to cause the performance by either party of any of its respective obligations hereunder to violate any Applicable Law, (ii) any Applicable Law shall be enacted or amended during the Term hereof in such a manner as to cause a substantial increase in the cost to either party to perform its respective obligations hereunder, or (iii) if the parties shall, after execution hereof, reasonably determine that the performance by either party of any of its respective obligations hereunder violates any existing Applicable Law; then upon and after such an event, (x) neither party shall be considered to be in breach or default hereof for failure to perform any obligation the performance of which would be in violation of Applicable Law or the cost of performance of which has substantially increased as a result of the enactment of any new, or the amendment of any existing, Applicable Law, and (y) the parties shall, as soon as reasonably possible, negotiate in good faith any revisions reasonably necessary to cause the performance by the parties hereunder to comply with all Applicable Law and to allocate to the parties any substantial increase in the costs incurred by the parties under this Agreement in order to comply with any new or amended Applicable Law.

*    *    *    ***Signature Page Follows***    *    *    *

**IN WITNESS WHEREOF**, the Lessor and the Lessee have each caused this **Non-Exclusive Aircraft Lease Agreement** to be duly executed as of the Effective Date.

LESSOR:

**CES Aviation V LLC**

By:      _____
Print:   Francine S. Kittredge
Title:   Managing Director

LESSEE:

**Executive Fliteways, Inc.**

By:      _____
Print:   John W. Grillo_____
Title:   President

## <u>NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT</u>

### <u>Schedule A</u>

Hourly Rate:                  $ 4,250.00 per Flight Hour

Hangar Fee:                  $ 78,000.00 per year for each full year of the Term, commencing on and measured from the Effective Date hereof.  In the event the Term of this Agreement shall terminate on a date other than an annual anniversary of the Effective Date hereof, the Hangar Fee due and payable for the year in which this Agreement terminates shall be pro-rated accordingly.

Labor Rate:                  $ 84.00 per hour

The Hangar Fee and the Labor Rate may each be adjusted upward on each anniversary of the Effective Date of this Agreement by the greater of 3.75%, or an amount equal to the percentage change in the Consumer Price Index for the Northeast United States during the immediately preceding calendar year.

Parts Markup Percentage: 15% not to exceed $3,000 per part

Fuel Price Indices:

    a.    $ 1.64 per gallon above the thirty (30) day average per gallon price for jet fuel in New York Harbor as published on the last business day of the month in the <u>OPIS Jet Fuel Report</u>.  In the event the <u>OPIS Jet Fuel Report</u> shall cease to be published or shall be determined by the parties to be an unsuitable fuel price index, the parties shall substitute a mutually agreed-to reference.

    b.    $ 0.20 per gallon below the Operating Base Fuel Supplier's lowest posted retail rate on the first business day of the month.

## NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT

### Schedule B

**Pilot Qualification Standards**

| Criteria | Pilot in Command | Second in Command |
|---|---|---|
| Airman Certificate: | FAA ATP | FAA Commercial |
| Ratings: | appropriate category, class, and type | instrument-airplane, and appropriate category and class |
| Medical Certificate: | FAA 1st Class | FAA 1st Class |
| Flight Time: | | |
|     Total (all aircraft): | 4000 | 2000 |
|     Total PIC (all Aircraft): | 3000 | (not applicable) |
|     Helicopter: | | |
|         Total: | 4000 | 1500 |
|         PIC: | 3000 | (not applicable) |
|         Last 12 months: | 300 | 200 |
|         PIC Last 12 months: | 300 | (not applicable) |
|     Multi-engine helicopter: | | |
|         Total: | 3000 | 1500 |
|         PIC: | 2000 | (not applicable) |
|         Last 12 months: | 300 | 200 |
|         PIC Last 12 months: | 300 | (not applicable) |
|     Sikorsky S-76C+: | | |
|         Total: | 200 | 50 |
|         PIC: | 100 | (not applicable) |
|     Actual Instrument: | | |
|         Total: | 250 | 75 |
|         PIC: | 250 | (not applicable) |
| Takeoffs and Landings in Class B Airspace: | | |
|     Total: | 100 | 50 |
| Accidents, Incidents, FAA Sanctions within the preceding five years: | 0 | 0 |

## NON-EXCLUSIVE AIRCRAFT LEASE AGREEMENT

### Schedule C

### GUARANTY

**THIS GUARANTY** (the "Guaranty") is executed and delivered this 1st day of September, 2007, by **Lehman Brothers Holdings Inc.**, a Delaware corporation ("Guarantor"), in favor of **Executive Fliteways, Inc.**, a Delaware corporation ("Beneficiary").

The Guarantor, in consideration of Beneficiary's execution and delivery of a Non-Exclusive Aircraft Lease Agreement (the "Agreement"), dated as of the 1st day of September, 2007, with **CES Aviation V LLC**, a Delaware limited liability company ("Obligor"), hereby represents, warrants, covenants and promises as follows:

1.    <u>Guaranty</u>.  Guarantor, hereby unconditionally, absolutely and irrevocably guarantees to Beneficiary, its successors and assigns, the prompt and timely performance by Obligor of all of Obligor's performance obligations, including payment obligations, arising under the Agreement and any successor agreement. The obligations of the Guarantor under this Guaranty shall be performed upon notice or demand following any failure by Obligor to perform any obligation under the Agreement or any successor agreement at the time performance is required under the Agreement or any successor agreement.

2.    <u>Nature of Guaranty</u>.  This Guaranty, and the Guarantor's obligations and liabilities hereunder constitute an absolute, unconditional and continuing guaranty of payment and performance, and may be enforced one or more times and by one or more demands or proceedings.  Further, Guarantor's obligations hereunder are in no way conditioned upon or limited by any attempt to collect from, or to exercise any rights or remedies against, Obligor.  This Guaranty shall continue in full force and effect for as long as the Agreement  or any successor agreement remains in force.

3.    <u>Miscellaneous</u>.  This Guaranty is the binding obligation of Guarantor, its successors and assigns, and shall inure to the benefit of and be enforceable by Beneficiary, its successors and assigns, in accordance with the terms hereof.  This Guaranty shall be governed by the law of the State of New York, without regard to its conflict of laws provisions.  This Guaranty may not be amended, changed or modified in any manner, except by a writing signed by Guarantor.

**IN WITNESS WHEREOF,** this Guaranty has been duly executed and delivered by the Guarantor on the day and year first above written.

GUARANTOR:

**Lehman Brothers Holdings Inc.**

By:    _____
Print:    **Paolo Tonucci**
Title:    Global Treasurer

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                              :        Chapter 11 Case No.
                                                   :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*    :        08-13555 (JMP)
                                                   :
                          **Debtors.**             :        **(Jointly Administered)**
-------------------------------------------------------------------x

## ORDER APPROVING DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 362 AND 365 OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO ASSUME CERTAIN AIRCRAFT LEASE AGREEMENTS AND TO CONSUMMATE CERTAIN RELATED TRANSACTIONS

Upon the motion, dated March 25, 2009 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), pursuant to sections 105(a), 362, and 365 of title 11 of the United

States Code (the "Bankruptcy Code") and Rules 4001, 6006 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), for authorization to (i) assume non-exclusive

aircraft lease agreements by and between (a) CES Aviation LLC, as Lessor, and Executive

Fliteways, Inc. ("EFI"), as Lessee, dated September 1, 2007, (b) CES Aviation V LLC, as

Lessor, and EFI, as Lessee, dated September 1, 2007, and (c) CES Aviation IX LLC, as Lessor,

and EFI, as Lessee, dated September 1, 2007 (collectively, the "Agreements") and to

consummate certain related transactions, including terminating the Agreements and paying the

associated termination fees in accordance with the Agreements and (ii) agree to modify the

automatic stay solely to the extent necessary to allow EFI to use certain funds on deposit with

EFI to offset EFI's claims against the Debtors resulting from the termination of the Agreements,

all as more fully described in the Motion; and the Court having jurisdiction to consider the

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the

Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York

Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided in accordance with the

procedures set forth in the order entered February 13, 2009 governing case management and

administrative procedures [Docket No. 2837];   and a reasonable opportunity to object or be

heard regarding the Motion and Proposed Sale having been afforded to all such parties; and it

appearing that no other or further notice need be provided; and that the legal and factual bases set

forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is hereby:

ORDERED that the Motion is granted; and it is further

ORDERED that LBHI's assumption of the Agreements is hereby approved

pursuant to section 365(a) of the Bankruptcy Code, and the Agreements are hereby assumed; and

it is further

ORDERED that there are no existing defaults under any of the Agreements that

must be cured pursuant to section 365(b) of the Bankruptcy Code; and it is further

ORDERED that, the automatic stay pursuant to section 362(d)(1) of the

Bankruptcy Code is modified solely to the extent necessary to permit EFI to use the operating

deposits advanced to EFI by CES Aviation LLC, CES Aviation V, LLC and CES Aviation IX

LLC to offset its claims against the Debtors resulting from the termination of the Agreements;

and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.

Dated: April __, 2009
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE