WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11 Case No.** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.** | : | **08-13555 (JMP)** |
| **Debtors.** | : | **(Jointly Administered)** |

**DEBTORS' SUPPLEMENT TO MOTION OF THE DEBTORS AND CERTAIN CREDITORS TO CLARIFY OR AMEND THE DEBTORS' SUPPLEMENTAL NOTICE AND THE BAR DATE ORDER WITH RESPECT TO CLAIMS RELATING TO THE LEHMAN PROGRAMS SECURITIES ISSUED BY LBHI**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors and as debtors in possession, (the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), respectfully submit this pleading (a "Supplemental Pleading") as supplemental to the Motion of the Debtors and Certain Creditors to Clarify or Amend the Debtors' Supplemental Notice and the Bar Date Order with Respect to Claims Relating to the Lehman Programs Securities Issued by LBHI (the "Motion") and respectfully represent:

## I. Preliminary Statement

1. At the hearing held on February 19, 2010, the Court requested additional information relating to the Motion[1] and a declaration from the Debtors' supporting the Motion. Accordingly, attached hereto as Exhibits "A" and "B" respectively, are (a) a declaration of Steven Kotarba, an employee of Alvarez and Marsal North America, LLC ("A&M") who is head of the A&M team tasked with reviewing and reconciling claims filed against the Debtors (the "Declaration of Steven Kotarba"), and (b) a declaration of Jane Sullivan, an employee of Epiq Bankruptcy Solutions who works on bankruptcy solicitations with a specialization in public securities ("Declaration of Jane Sullivan"), which declarations describe the reasons for, and the benefits of, the relief sought in the Motion.

2. During negotiations relating to the agreement on the consensual Bar Date Order, the Debtors agreed to implement unique claims filing procedures for claims based on Lehman Programs Securities (as defined in the Bar Date Order) (the "LPS Procedures"). Also during those negotiations, it became clear and all parties agreed that the LPS Procedures would require clarification subsequent to the entry of the Bar Date Order, and therefore the Bar Date Order gave the Debtors the explicit right and the latitude to draft and publish a Securities Programs Bar Date Notice. As such, on July 27, 2009, the Debtors published the Notice of Deadlines for Filing Proofs of Claims Based on Lehman Programs Securities (the "Securities Programs Bar Date Notice").

3. This Supplemental Pleading and the attached declarations will explain that the Debtors published the supplement to the Securities Programs Bar Date Notice in order to implement the LPS Procedures and to provide information to creditors regarding the trading of

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

LPS and claims based thereon. Specifically, the Supplemental Notice was intended to address a unique issue created by Bankruptcy Rule 3001(e), which states that public security holders need not file notices of transfer. As a result, because the LPS are held by public security holders and individual holders and not an indenture trustee would be filing proofs of claim, there would be no way for the Debtors to know if distributions would be made to the actual holders of the claims when distributions are made to holders of claims identified on the claims register. Said another way, due to the effect of Bankruptcy Rule 3001(e), a security holder who filed a claim could then transfer the security and/or the proof of claim and Debtors would not know or have any way of tracking such transfer— and no indenture trustee to pay. To address this unique issue without seeking an amendment to the carefully thought out, crafted and negotiated procedures set forth in the Bar Date Order, and upon further review of the LBHI Issued LPS and the Debtors' books and records, the Debtors decided to amend their Schedules to mark the LBHI Issued LPS as not "contingent, "unliquidated" and "disputed." As such, regardless of whether a notice of transfer is filed, the Debtors could make distributions to the holders of record through the applicable clearing agency and be assured distributions would be made to the proper party. In the Supplemental Notice, the Debtors set forth their intent to amend the Schedules and other information relating to the trading of LPS to provide clear directions to holders of LPS of the procedures for trading LPS and claims based thereon.

4. The amendments to the Schedules and the use of the records of the relevant clearing agency to communicate and make distributions (if any) to holders of LBHI Issued LPS (i) clarifies the LPS Procedures, (ii) greatly eases the administrative burden on the estate in administering these claims, and (iii) provides greater certainty to the holders of LBHI Issued LPS and provides liquidity to the market for the trading of the LBHI Issued LPS. It is important to recognize that the LBHI Issued LPS are distinguishable from securities in most

other chapter 11 cases, and from all other LPS. Consequently, the Debtors believe that amending the Schedules for the LBHI Issued LPS is appropriate and necessary only for the LBHI Issued LPS, and not for any other claims.

5. The Moving Creditors previously notified the Debtors that they wanted the comfort of a Court order requiring the Debtors to act in accordance with their prior statements published in the Supplemental Notice. The Debtors did not think it was necessary to file the Motion since the Debtors had already published the Supplemental Notice. However, since the relief sought in the Motion is identical to the actions that the Debtors already have agreed to implement in the Supplemental Notice, the Debtors decided to join the Motion in order to ensure that the relief sought was both consistent with the actions the Debtors have agreed to take set forth in the Supplemental Notice and beneficial to the administration of the Debtors' estates.

## II. Debtors' Responses to the Questions Raised By the Court

6. At the hearing on February 19, 2010, the Court raised several questions and concerns with respect to the Motion and the requested relief. Incorporating the Declarations of Steven Kotaba and Jane Sullivan, the Debtors provide responses to each of the questions and concerns raised by the Court.

**Question: Why did the Debtors Publish the Supplemental Notice and Decide to Amend the Debtors' Schedules?**

**Response:**

7. Typically, in chapter 11 cases, claims based on publicly issued debt securities are filed against debtors by the indenture trustees for such securities. See Declaration of Jane Sullivan at ¶4. A global claim filed by an indenture trustee makes the administration of such claims by debtors simple by allowing debtors to communicate with, and make any distributions to one party, rather than contacting and maintaining a list of a constantly changing

group of security holders. Id. at ¶4. The LPS Procedures, which required all holders of LPS to file proofs of claim, were implemented because these securities do not have an indenture trustee and it was unclear whether any other party was authorized or required to file a proof of claim on behalf of all security holders.

8. Bankruptcy Rule 3001(e) requires that "if a claim other than one based on a publicly traded note, bond or debenture has been transferred…after the proof of claim has been filed, evidence of such transfer shall be filed by the transferee." FEDERAL RULES OF BANKRUPTCY PROCEDURE 3001(e). It therefore became apparent that holders of claims based on LBHI Issued LPS may not be required to, and may not, file notices of transfer pursuant to Bankruptcy Rule 3001(e). While Bankruptcy Rule 3001(e) appears on its face not to require notices of transfer to be filed based on LBHI Issued LPS claims, presumably because such instruments are typically administered by an indenture trustee, without the filing of such notices of transfer the Debtors would not have been able to track the transfers of claims on the claims register. See Declaration of Steven Kotarba at ¶4. Without certainty that notices of transfer pursuant to Bankruptcy Rule 3001(e) were required to be, and would be, filed in connection with transfers of claims based on LBHI Issued LPS, it would have been impossible for the Debtors to ensure that the claims register was accurate and the Debtors would run the risk of paying out twice on a large number of claims or paying the incorrect party.

**Question: Why was the Debtors' Decision to Amend the Debtors' Schedules the Appropriate and Fair Solution?**

**Response:**

9. The ambiguity in the LPS Procedures related only to the LBHI Issued LPS, which are only 56 of the 6,744 LPS, and therefore the Debtors' decision to amend the

Debtors' Schedules and seek the relief sought in the Motion only affects the LBHI Issued LPS and does not alter the LPS Procedures. See Declaration of Steven Kotarba at ¶6.

10. With respect to the LBHI Issued LPS, the holder of such security has a direct claim against LBHI as the issuer of such securities— a claim recognized on LBHI's books and records as outstanding as of the Commencement Date and included on the Debtors' Schedules. Id. at ¶5. With respect to all other LPS, the claim against LBHI is based only on a guarantee by LBHI of the payment obligations of the applicable issuer under such securities, and not a claim against LBHI directly as issuer of the security, nor were these securities directly identified on LBHI's books and records.

11. The LBHI Issued LPS were always included on the Debtors' Schedules. However, they initially were listed as "contingent," "disputed" and "unliquidated" liabilities of LBHI because the Debtors had not (and still have not) liquidated the claim amounts due and unpaid on the Commencement Date. See Id. at ¶3. However, at the time of the publication of the Supplemental Notice, LBHI had determined that the LBHI Issued LPS were not "contingent," "disputed" or "unliquidated" liabilities. See Id. at ¶5.

12. An alternative solution would have been for the Debtors to require that the clearing agencies permanently block the trading of all LBHI Issued LPS. While such solution would have fixed the ambiguity, it would have violated the provision of the Bar Date Order which provided that:

> Nothing in this Order shall prevent a holder of a Lehman Program Security that has filed a proof of claim from buying or selling claims based on a Lehman Programs Security in a manner consistent with the applicable clearing system. See Bar Date Order at 15

This provision was specifically requested by creditors that did not want to be barred from trading claims based on LPS or LPS.

13. The combination of (i) the implementation of unique and alternative claim filing procedures in the Bar Date Order, (ii) the administrative necessity to clarify the LPS Procedures, (iii) the reasons that the liabilities were listed as "contingent," "disputed" and "unliquidated" on the Schedules, and (iv) the right of the Debtors to publish a Securities Programs Bar Date Notice describing the implementation of the LPS Procedures, make these liabilities unique and the relief sought in the Motion is appropriate only for the LBHI Issued LPS, and not for any other liabilities of the Debtors.

**Question: How Does Amending the Debtors' Schedules and Relying on the Records of the Clearing Agencies Benefit the Debtors and the Administration of Their Estates?**

**Response:**

14. The actions set forth in the Supplemental Notice and the relief sought in the Motion are beneficial to the Debtors and their estates because they enable the Debtors to utilize the records of the clearing agencies to identify holders of the LBHI Issued LPS. See Declaration of Steven Kotarba at ¶9. In the Bar Date Order, the Debtors endeavored to establish clear and efficient claim filing procedures and to provide notice of such procedures to creditors. The clarification of the LPS Procedures and publication of the Supplemental Notice is consistent with such objective.

15. Because the Debtors and A&M have determined that the LBHI Issued LPS were not "contingent" or "disputed," and upon calculation of the amounts due and payable, will not be "unliquidated," it would be a total waste of the Debtors' resources for the Debtors to review claims filed based on such securities and to attempt to track the ownership and transfer of such securities and claims. See Id. at ¶8. The Debtors also chose to avoid the significant expense of reviewing and objecting to various claims based on the LBHI Issued LPS and of requiring Epiq to monitor and revise the claims register with respect to such liabilities that are

not contested by the Debtors. Each of the 56 LBHI Issued LPS is potentially owned by dozens of individual beneficial owners whose identities constantly change as a result of frequent trading.

16. In addition, amending the Schedules for the LBHI Issued LPS and relying on the records of the clearing agencies will greatly ease the administration of the claims based on the LBHI Issued LPS by allowing the Debtors to provide notices and distributions to the clearing agencies, rather than to a constantly changing group of security holders or claim holders. See Id. at ¶9; See Declaration of Jane Sullivan at ¶8. Regardless of the level of trading in such securities, the clearing agencies will maintain updated registers of the accountholders that are holding the securities on behalf of beneficial owners, and any notices and distributions delivered by the Debtors to the clearing agencies will then be able to reach the current owners of such securities automatically, via the customary channels. See Declaration of Jane Sullivan at ¶4. This is the same method that was used for distribution of notices and funds to security holders prior to the Commencement Date. See Id. at ¶4. Following this adjustment, the Debtors will be able to ensure that they communicate with and make distributions to the proper parties. See Id. at ¶4.

**Question: Were the Debtors Authorized to Decide to Amend their Schedules and Publish the Supplemental Notice?**

**Response:**

17. The Bar Date Order expressly authorized the Debtors to publish a notice for the implementation of the LPS Procedures. Specifically, The Bar Date Order provided that:

> "The Debtors, in coordination with the Creditors' Committee, are authorized to, and will, create a notice of the Securities Programs Bar Date (the "Securities Programs Bar Date Notice") and a proof of claim form (the "Securities Programs Proof of Claim Form") as necessary to provide notice of the Securities Programs Bar Date." Bar Date Order, p. 12.

The Supplemental Notice was a supplement to the Securities Programs Bar Date Notice to provide holders additional information relating to the transfer of claims based on LPS.

18. In addition to providing information to creditors regarding the trading of LPS and claims based thereon, the Supplemental Notice included a statement of intent by the Debtors to amend their Schedules to mark the LBHI Issued LPS as not "contingent," "unliquidated" or "disputed." Pursuant to Bankruptcy Rule 1009(a), the Debtors are permitted to amend their Schedules "as a matter of course at any time before the case is closed." FEDERAL RULES OF BANKRUPTCY PROCEDURE 1009(a). At the time the Supplemental Notice was published, the Debtors were not in a position to calculate the claim amounts for all of the LBHI Issued LPS. The Supplemental Notice was intended to provide notice to creditors of the Debtors' decision to amend its Schedules in the future, and provide clarity to the markets.

19. Importantly, the Supplemental Notice did not modify the provisions of Bar Date Order. The publication of the Supplemental Notice and the forthcoming amendments to the Debtor's Schedules are authorized by the Bar Date Order, and Bankruptcy Code, respectively.

**Question: Does the Relief Sought in the Motion Affect Prior Litigation Before the Court Regarding Late Filed Claims and the Bar Date Order?**

**Response:**

20. To date, there have been 14 motions filed with the Court seeking to have claims filed after the applicable bar date deemed timely. Only one of such motions relates to an LBHI Issued LPS, and in light of the Supplemental Notice and the Motion, that motion was withdrawn. Therefore, none of the prior litigation before the Court, or any other pending motion relating to claims filed after the applicable bar date will be affected by the outcome of the Motion. Notwithstanding the Motion and this Supplemental Pleading, the Debtors intend to defend the Bar Date Order and claim filing procedures set forth therein in the same manner as they have since the entry of the Bar Date Order.

## III. Conclusion

21. For the reasons set forth herein, to implement the LPS Procedures, the Debtors decided to amend their Schedules to mark the LBHI Issued LPS as not "contingent," "unliquidated" or "disputed" and to rely on the records of the applicable clearing agencies for distributions. The Debtors published notice of such actions and intents in the Supplemental Notice. Notwithstanding the Supplemental Notice, certain creditors thought it was necessary to file the Motion to provide absolute clarity to the implementation of the LPS Procedures as they relate to the LBHI Issued LPS. The relief sought in the Motion is consistent with the Debtors' agreed and published implementation of the LPS Procedures, as well as applicable bankruptcy rules and procedures.

WHEREFORE the Debtors respectfully requests the Court grant the Motion and grant such other and further relief as is just and proper.

Dated: New York, New York
March 15, 2010

/s/ Shai Y. Waisman
Shai Y. Waisman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for the Debtor and
Debtor In Possession

# Exhibit A

Declaration of Steven Kotarba

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| **LEHMAN BROTHERS HOLDINGS INC., *et al.*,** | : | **08-13555 (JMP)** |
| **Debtors.** | : | **(Jointly Administered)** |

## DECLARATION OF STEVEN R. KOTARBA

Pursuant to 28 U.S.C. § 1746, I, Steven R. Kotarba, declare:

1. I am over the age of 18 years and make these statements of my own personal knowledge. If called to testify, I could testify to truth of the matters set forth herein.

2. I am a Managing Director for Alvarez and Marsal North America, LLC ("A&M"). I am head of the team at A&M tasked with reviewing and reconciling claims filed against the above captioned debtors (the "Debtors").

3. I supervised the preparation of the Debtors' Schedules of Liabilities (the "Schedules"). The LBHI Issued LPS were identified on the Schedules as "contingent," "disputed" and "unliquidated" because at the time the Schedules were initially filed on March 12, 2009, and amended on June 15, 2009, the Debtors had not been able to

confirm that these securities were valid obligations of Lehman Brothers Holdings Inc. ("LBHI") or perform the calculations necessary to liquidate the claims as of September 15, 2008 (the "Commencement Date").

4. After the entry of the Bar Date Order, it came to my attention that, because the 56 LPS issued by LBHI (the "LBHI Issued LPS") do not have indenture trustees and individual holders were required to file claims, if holders of such claims were not required to file notices of transfer of claims with the Court or the Debtors, the Debtors would not have been able to track the transfers of claims on the claims register.

5. In consultation with the Debtors' court-appointed claims agent, Epiq Bankruptcy Solution, LLC, I, along with the assistance of my team and certain of the Debtors' retained professionals, reviewed the Debtors' books and records and the Debtors' Schedules and determined that each of the 56 LBHI Issued LPS do appear as obligations of LBHI pursuant to its books and records. After liquidating the final claim amounts due and payable on the LBHI Issued LPS as of the Commencement Date, the Debtors intend to amend their schedules to list these obligations as not "contingent," "disputed" or "unliquidated."

6. I, along with the Debtors' retained professionals, have determined that the ambiguity in the LPS Procedures relates only to the 56 LBHI Issued LPS, and therefore it is appropriate that any clarification to the LPS Procedures relate only to such securities.

7. The Debtors determined that it was in the best interest of the administration of their estates to amend the Schedules to mark the LBHI Issued LPS as not "contingent," "disputed" or "unliquidated" obligations of LBHI. However, in October 2009, the Debtors had not yet calculated the claim amounts due on the LBHI

Issued LPS, so they could not amend the Schedules at that time. To provide certainty to the markets and creditors, the Debtors decided to notify creditors of the Debtors' intent to amend their Schedules and other information relating the trading of LPS in a supplement to the Securities Programs Bar Date Notice.

8. The relief sought in the Motion, and the ultimate amendment to the Schedules to mark the LBHI Issued LPS as not "contingent," "disputed" or "unliquidated" will prevent the Debtors from unnecessarily expending time and resources reviewing claims related to obligations which are not contested by the Debtors, and save the Debtors the expense related to such administrative tasks.

9. Utilizing the records of the clearing agencies to distribute notices and payments to holders LBHI Issued LPS will ease the administrative burden on the Debtors by allowing the Debtors to deliver notices and funds only to the clearing agencies for forwarding to the actual claim holders, rather than the Debtors having to make distributions of notices and payments to hundreds of security holders and likely actually being in the position of having to pay on the same claim twice or more.

10. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 15th day of March, 2010.

/s/ Steven R. Kotarba
Steven R. Kotarba

Exhibit B

Declaration of Jane Sullivan

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| **LEHMAN BROTHERS HOLDINGS INC., *et al.*,** | : | **08-13555 (JMP)** |
| **Debtors.** | : | **(Jointly Administered)** |

## DECLARATION OF JANE SULLIVAN

Pursuant to 28 U.S.C. § 1746, I, Jane Sullivan, declare:

1. I am over the age of 18 years and make these statements of my own personal knowledge. If called to testify, I could testify to truth of the matters set forth herein.

2. I am an Executive Vice President of Epiq Bankruptcy Solutions ("Epiq") located at 757 Third Avenue, New York, New York 10017. I am head of the team at Epiq tasked with solicitations and claim filing procedures relating to securities for the above captioned debtors (the "Debtors").

3. The statements made herein are based on my experience working with solicitations and securities claims for over 20 years.

4. In most chapter 11 cases, the indenture trustee of each issuance of debt securities issued by a debtor files a global claim on behalf of the entire issuance. Holders do not need to file individual proofs of claim. The bonds continue to trade freely until a plan of reorganization may become effective, and distributions can be made pro rata to all current holders at the time of the distribution process. Notices and payments provided to the clearing agencies by debtors are automatically distributed through the clearing system (and the bank or brokerage firm that holds the securities on behalf of the beneficial holders) to the beneficial holders.

5. The other way to effect the claims process with respect to debt securities in a chapter 11 case is to require that beneficial owners file individual proofs of claim and prove their ownership of the bonds as part of the claiming process, on an individual basis. In order to prove ownership of the bonds, bondholders must "block" their positions from trading in the market. The reason blocking is necessary is because proof of ownership on a single date within the bar date period is not sufficient to prove ownership for purposes of the proof of claim. That is because a particular block of bonds could be traded on a daily basis throughout the bar date period, and each new owner could prove ownership on the day it held the position – resulting in claims filed well in excess of the outstanding amount. The only way to sufficiently prove ownership for the purpose of filing a claim on account of an underlying bond, is to permanently block a beneficial owner's bonds from trading, so that the claim and the bond position are inextricably linked.

6. The method where beneficial holders are required to file claims is administratively more difficult for the debtors and is significantly more costly to the

estate. In such cases, debtors are required to monitor the trading of claims based on the securities, facilitate the blocking and unblocking of claimed bond positions, and make distributions to a large ever-changing group of bondholders. In contrast, utilizing the records of the clearing agencies for distributions, rather than distributing directly to beneficial holders, is exponentially easier for debtors and significantly less costly.

7.  A modified form of the blocking and claiming procedure was used in connection with the Lehman Programs Securities, in which the bonds were temporarily blocked during the bar date period. Because the only claim for which the bondholder was filing its proof of claim related to a potential guaranty claim (and not a claim with respect to the underlying bond itself), the bonds were able to be unblocked, automatically, once the bar date passed.

8.  Whenever possible, the global claim method should be used. In the event there is no indenture trustee to file a claim, it is my strong recommendation that the issuer "schedule" the claim in place of the missing indenture trustee. If needed, a hearing can be held on valuation to determine the actual amount of the claim (although for most bonds, this involves only a simple calculation of the interest due as of the petition date). It is my opinion that the requirement of filing of individual bondholder claims with the attendant blocking that it requires should only be used when absolutely essential.

9.  Sometimes, a more complicated process is necessary to obtain the best result; but in the case of debt securities claims, the more simple and straightforward process is the one that yields an exponentially preferable result for all constituents.

10. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 12th day of March, 2010.

/s/ Jane Sullivan
Jane Sullivan