WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-----------------------------------------------------------------x

### NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AND RULE 6004(h) OF THE BANKRUPTCY RULES, FOR AUTHORIZATION TO ENTER INTO CERTAIN ASSET MANAGEMENT AND RELATED AGREEMENTS

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") pursuant to sections 105(a) and 363(b)(1) of title 11 of the United

States Code (the "Bankruptcy Code") and Rule 6004(h) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for authorization to enter into certain asset management and

related agreements, all as more fully described in the Motion, will be held before the Honorable

James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court,

Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New

York 10004 (the "Bankruptcy Court"), on **April 14, 2010 at 10:00 a.m. (Prevailing Eastern**

**Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Harvey R. Miller, Esq. and Lori R. Fife, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v) any person or entity with a particularized interest in the Motion, so as to be so filed and received by no later than **April 5, 2010 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: March 15, 2010
New York, New York

/s/ Lori R. Fife
Lori R. Fife

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                               :

**In re**                    :     **Chapter 11 Case No.**
                               :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.***,**  :     **08-13555 (JMP)**
                               :

               **Debtors.**     :     **(Jointly Administered)**
                               :
------------------------------------------------------------------x

**DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a)
AND 363 OF THE BANKRUPTCY CODE AND RULE 6004(h) OF
THE BANKRUPTCY RULES, FOR AUTHORIZATION TO ENTER
INTO CERTAIN ASSET MANAGEMENT AND RELATED AGREEMENTS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully

represent:

**Preliminary Statement**

        1.      Following the sale of the North American capital markets business to

Barclays Capital Inc. and similar sales to Nomura Holdings, Inc. in Europe and Asia, LBHI was

left with substantial assets but a minimal employee base and infrastructure. The Debtors

determined early on that they would realize diminished recoveries for their estates if they were

forced to liquidate all of their assets under the prevailing market conditions during the months after the commencement of their cases. Thus, to preserve and maximize the value of these estates, LBHI developed, by necessity, a workforce and infrastructure for the long-term management of the Debtors' long-term investments and illiquid assets.

2. Over the following 18 months, LBHI devoted considerable resources to develop a team of approximately 455 individuals, spread across LBHI's information technology infrastructure and five distinct asset classes – commercial real estate, residential mortgages, private equity and principal investments, corporate loans and derivatives – to effectively manage and wind-down the remaining long-term distressed and illiquid assets that were not subject to foreign insolvency proceedings. LBHI's asset management teams further developed and enhanced the skills required for, and an expertise and knowledge base specifically geared to, the management of such assets. The Debtors have determined that the capabilities of LBHI's asset management team are scalable and thus easily transferable to the management of other long-term investment assets for third parties as well. In the course of managing and administering such assets, LBHI has built a going-concern asset management business that may be of substantial value, with capabilities that may endure beyond the administration of these chapter 11 cases, and generate revenues.

3. In order to maximize the value of the asset management business and for the other reasons set forth herein, LBHI concluded that it is necessary to organize the following new entities: (i) LBHI LAMCO Holdings LLC, a special purpose vehicle wholly-owned by LBHI ("LBHI SPV"), (ii) LAMCO Holdings LLC ("LAMCO Holdings"), an entity directly and indirectly wholly-owned by LBHI,[1] (iii) LAMCO Holdings International B.V., a Netherlands

_____

[1] A 1% interest in LAMCO Holdings will be owned by LBHI SPV.

company wholly owned by LAMCO Holdings ("<u>LAMCO International</u>"), and (iv) LAMCO LLC, another wholly owned subsidiary of LAMCO Holdings ("<u>LAMCO LLC</u>" and, together with LAMCO Holdings, LAMCO International and their subsidiaries, "<u>LAMCO</u>"), to provide management services to the Debtors, their affiliates and potentially to third parties. The Debtors now seek authority to enter into agreements with LBHI SPV and LAMCO.

        4.       Specifically, the Debtors seek authority (i) for LBHI to transfer the majority of its existing employees, contribute its domestic asset management infrastructure and make an initial equity contribution of $20 million to LAMCO LLC, and for LBHI to contribute all of its equity interests in its European asset management companies, LBHI Services Ltd. and LBHI Estates Ltd., to LAMCO International, pursuant to a contribution agreement (the "<u>Contribution Agreement</u>"); (ii) for LBHI to enter into a shared services agreement (the "<u>Shared Services Agreement</u>") with LAMCO LLC to govern the use of certain contracts, assets and the services of certain employees; (iii) for LBHI to enter into an asset management agreement with LAMCO LLC (the "<u>Asset Management Agreement</u>") pursuant to which, subject to certain guidelines and protocols, the Debtors' assets will be managed by LAMCO LLC; and (iv) for the Debtors to enter into a letter agreement (the "<u>Intercompany Agreement</u>") for the allocation of management fees and other costs between LBHI and, among others, the other Debtors. Other than as described above and in the documents referred to above, none of the assets of the Debtors and their affiliates will be transferred in connection with the creation of LAMCO. Subject to the Asset Management Agreement, each Debtor will retain ownership and, ultimate decision making authority with respect to its assets.

        5.       Although LAMCO Holdings, LAMCO LLC and LAMCO International are non-debtor entities, they will be subject to certain restrictions that will afford this Court and

the Debtors' creditors a substantial degree of oversight and control. First, LAMCO Holdings will be required to seek Court or Creditors' Committee (defined below) approval of any acts for which LBHI would currently require Court or Creditors' Committee approval, as applicable. Second, LAMCO Holdings and LBHI have agreed to be governed by certain restrictions and to grant the Creditors' Committee certain rights over their going-forward operations and key corporate decisions, including compensation of directors, officers, and employees, the nature and extent of any third party contracts and the issuance of any equity or equity-derivative interest in LAMCO. In addition, LBHI will guarantee LAMCO Holdings' obligations underlying any of LBHI's existing employment contracts being transferred pursuant to the Contribution Agreement. These agreements are memorialized in LAMCO Holdings' limited liability company agreement (the "LLC Agreement" and, together with the Contribution Agreement, Shared Services Agreement, the Asset Management Agreement and the Intercompany Agreement, the "LAMCO Agreements"). Copies of the LAMCO Agreements are attached as exhibits hereto.

        6.      As described more fully below and in the affidavit of Bryan P. Marsal, dated March 12, 2010, attached hereto, the relief requested is in the best interests of all of the Debtors, their estates and creditors and is supported by the Creditors' Committee. First, LAMCO will aid the Debtors' employee retention efforts – especially to the extent that LAMCO is able to attract third-party business – by offering the potential for long-term employment to the individuals whose skills and knowledge are essential to the successful management of the Debtors' assets. In turn, the direct costs of administering the Debtors' estates, *i.e.*, the cost of recruiting new employees, should be reduced. Indirect costs and investment losses associated with turnover and loss of asset- and portfolio-specific knowledge should also be stemmed.

Second, establishing and equipping LAMCO LLC as Lehman's asset manager will allow for the possibility of attracting third-party clients that may significantly reduce the substantial costs of managing the Debtors' assets.  LBHI has already received, from third parties, indications of interest in the asset management expertise of Lehman's employees.  The Debtors expect that LAMCO will be able to enter into agreements to manage assets of third parties for a profit that would inure to LBHI's benefit, as the beneficial owner of LAMCO, and ultimately to the benefit of all the Debtors and their creditors.  None of the Debtors will be prejudiced by the Asset Management Agreement because services will be provided on a "cost-basis," i.e. LAMCO will not make a profit on the management of the Debtors' assets.  Rather, the Asset Management Agreement will replicate the current cost allocation among LBHI and its subsidiaries, while also offering the Debtors supervision and management of their assets pre- and post-chapter 11 plan consummation.  Finally, LBHI and the Creditors' Committee are in the process of exploring a strategic relationship with third parties with respect to LAMCO, including the possibility of selling an equity stake in LAMCO to a potential strategic partner, or otherwise entering into mutually beneficial ventures and arrangements with third parties.  A strategic relationship with a highly regarded third party would enhance the goodwill and brand value of LAMCO and thereby potentially enhance LAMCO's ability to attract and secure new business and enhance the equity value of LAMCO held by LBHI.  New business would, in turn, further LAMCO's efforts to retain its skilled workforce.  Accordingly, the Court should grant the relief requested in the Motion.

**Background**

7.        Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.  Lehman operated in three business segments:  capital markets, investment banking and investment management.

9.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

10.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

11.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA is administering LBI's estate.

12.     On September 22, 2008, LBHI and LBI consummated the Court-approved sale of Lehman's U.S. and Canadian capital markets and investment banking businesses and a portion of the investment management division, including the private investment management group and the institutional client group.  On May 4, 2009, LBHI and certain of its affiliates consummated the Court-approved sale of the assets owned, held, or used primarily in connection with Lehman's investment management business.  Throughout these chapter 11 cases, the Debtors and certain of their non-debtor subsidiaries have conducted numerous other asset sales and transferred certain related employees.  In addition, since the Commencement Date, over 80 foreign insolvency proceedings have been initiated, separating segments of the global Lehman enterprise.

13.     On September 29, 2009, LBHI filed a certificate of formation for LAMCO LLC with the Secretary of State of Delaware.[2]  On January 12, 2010, the Securities and Exchange Commission issued an order granting LAMCO LLC's registration as an investment advisor pursuant to Section 203(c)(2)(A) of the Investment Adviser Act of 1940.  [SEC File No. 801-70909].

14.     On March 15, 2010, the Debtors proposed and filed the Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. And Its Affiliated Debtors [Docket No. 7572] (the "Plan").  The Plan contemplates that LBHI shall serve as the "Plan Administrator" for each of the Debtors and that LAMCO will serve as the asset manager for certain assets of each of the Debtors under the Plan.  *See* Plan § 6.1.

---

[2]     LBHI is in the process of organizing LBHI SPV, LAMCO Holdings, and LAMCO International.

**Jurisdiction**

15.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**Relief Requested**

16.     By this Motion, the Debtors seek authorization, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004(h), to enter into the LAMCO Agreements.  In order for LAMCO to be in a position to begin operations no later than May 1, 2010, the Debtors' further request that the Court waive the requirements of Bankruptcy Rule 6004(h) and direct that any order granting the relief requested be effective immediately.

17.     The Debtors have worked closely with the Creditors' Committee to review, analyze and negotiate both the framework and the definitive documentation for the proposed transactions.  As set forth more fully below, the relief requested herein represents a reasonable exercise of the Debtors' business judgment.

**The Capabilities and Infrastructure of LBHI's Current Asset Management Teams**

18.     Following the sales to Barclays and Nomura, the Debtors were left with a significantly impaired employee base to manage their substantial remaining assets.  Over the last 18 months, LBHI, out of necessity, has built a highly-skilled team of employees with distinct capabilities.  LBHI currently employs approximately 385 employees[3] to manage Lehman's investments, along with approximately 70 employees from Alvarez & Marsal North America LLC ("A&M") who currently provide services to LBHI pursuant to the Order Approving Application Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Authorization to Employ and Retain Alvarez & Marsal North America, LLC [Docket No. 2278].  LBHI has also

---

[3]     Prior to the Commencement Date, most of these employees were employed by LBI.

established complete front, mid- and back-office staffs within each of its five major asset classes: commercial real estate, residential mortgages,[4] principal investments and private equity, corporate debt and derivatives.

(a) <u>Commercial Real Estate</u>. LBHI's commercial real estate team is currently comprised of approximately 78 real estate professionals located in New York, London, and Hong Kong, with expertise in global real estate finance, asset management, underwriting, syndication, technology and operations. These professionals have broad experience in highly structured real estate transactions across all property types, including: fixed and floating rate debt, term and revolving lines of credit, repurchase facilities, bridge loan facilities, distressed debt and strategic mezzanine and equity investments. Their capabilities include asset management (monitoring real estate investments and exposures to minimize risks and maximize returns, and assessing value to develop strategies that maximize value in real estate assets), real estate underwriting, and general transactional structuring and restructuring capabilities.

(b) <u>Residential Mortgages</u>. LBHI's approximately seven residential mortgage professionals are based in New York and work closely with LBHI's wholly owned mortgage origination and servicing platform, Aurora Loan Services, LLC, that itself employs over 1,300 individuals. This team's capabilities include asset management and portfolio management, mortgage restructuring, origination, and servicing, and claims recovery.

(c) <u>Principal Investments and Private Equity</u>. LBHI's approximately 37-person private equity group is located primarily in New York. These investment professionals have extensive experience in principal investing, corporate strategy, M&A and capital markets work, and are supported additionally by a legal and finance staff. The private equity team is capable of providing the full range of portfolio services, such as asset discovery and review, governance (board and committee roles, management and disposition), asset valuation and value maximization (analysis of sale opportunities, restructurings, follow on investments and capital calls), as well as restructuring and M&A, platform management, principal investment, and back end management and infrastructure functions (*e.g.* cash management, LP investor relations, management of capital calls and distributions).

(d) <u>Corporate Debt</u>. LBHI's approximately 55-person corporate debt team is split between 34 front office bankers and 21 loan operations professionals located in New York and London, and comprises a seasoned management team with an average of fifteen years of commercial lending experience, strong relationships with banks, private equity sponsors, lenders, and advisors. Through its robust loan operation platform and systems,

---

[4] Lehman also services, primarily through its bank platforms and non-debtor affiliates, a sizeable portfolio of approximately $300 billion of residential mortgages and commercial real estate loans through an additional 2,100 non-debtor employees.

the corporate debt team is capable of performing asset management functions such as credit and sector analysis, loan restructurings and workouts, loan valuation and trade execution using a variety of methodologies. The team is also capable of providing various administrative agency services such as managing the administrative agency functions for transactions in the United States and Europe, interface with both lending syndicates and borrowers on a variety of loan issues (e.g., restructurings, amendments), and effecting the timely movement of funds, settling of trades (par and distressed) and resolution of trade issues.

(e) Derivatives. LBHI's derivatives team is its largest, with approximately 254 professionals in the United States and Europe experienced in derivatives trading, structuring, sales, in-house legal services, risk management, operations and finance. The team is complemented by back office operations that focus on settlements, trade reconciliations, collateral management and unwind support. Over the last fifteen months, the derivatives team has established a transparent operating platform with strong internal controls and risk management capabilities, a specialized legal team, settlement protocols, central reporting metrics, independent valuation reviews. The team has also developed strategic partnerships on numerous key fronts, such as with third-party valuation experts, and niche operations service firms. The team's capabilities include: valuation expertise to assess and maximize value across interest rates, credit, FX, commodities, fund products, equities and ABS; established best practice processes for front–to–back derivatives unwind workflows – counterparty negotiations, structuring and assignments, trade reconciliation and valuations, settlement process and legal options analysis; live portfolio management capabilities (risk management, hedging, contract novations, relationships with street; auction process management, etc.); and an entire spectrum of unwind services from ongoing asset management to orderly unwind/disposition.

19.     During the pendency of the chapter 11 cases, the costs of LBHI's employees and general overhead have been allocated among the applicable Debtors and their non-debtor affiliates. Pursuant to the Intercompany Agreement, the Debtors will continue to use the same allocation methodology among LBHI and the applicable Debtors and their non-debtor affiliates. The Debtors seek authority to give LBHI an administrative expense claim in their chapter 11 cases for any reimbursement obligations to LBHI such Debtor may have under the LAMCO Agreements.

20.     Monthly costs of intellectual property and technology acquired and held by LBHI are allocated among the Debtors and their non-debtor affiliates based upon usage. To support the functions of its asset management teams, LBHI invested approximately $55 million

in building out its intellectual property and technology platforms and administrative

infrastructure through a combination of in-house and third-party platforms.  These include

- front office functions, such as risk analytics, market data processing, valuation, and trade capture;

- middle office functions, such as the handling of trade confirmations, trade processing, invoicing, collateral management, claims tracking, and position reporting;

- back office functions, such as clearance and settlement, treasury and cash management, trade reconciliation, general ledger and monthly financing reporting functions, and other financial and accounting functions; and

- corporate functions, such as human resource management, legal and compliance, and other functions such as document management.

LBHI has also partnered with Omnium LLC, a subsidiary of Citadel Investment Group, LLC, for

a number of technology and administrative functions, such as position management, profit and

loss, and third party financial reporting.  Certain other core infrastructure services, such as

network and telecommunications services, are being provided by BlueLock, LLC in the United

States and Asia, and Kelway (UK) Ltd. in Europe.

### The Proposed Structure and Governance of LAMCO

21.     The proposed LAMCO Agreements will, in essence, formalize and

maintain the *status quo* benefits and obligations among LBHI and the affiliates within its control.

LBHI provides its controlled subsidiaries with a variety of services, including asset management

services, at cost.  The establishment of LAMCO will result in an outsourcing to LAMCO LLC of

the asset management function at essentially the same cost for LBHI and its controlled

subsidiaries, pursuant to the Asset Management Agreement.

22.     To enable LAMCO LLC to commence operating, LBHI will, among other

things, together with LBHI SPV, (i) transfer its U.S.-based asset management employees and

related infrastructure and mid- and back-office employees, as listed on Schedule A of the

Contribution Agreement, along with all employment agreements[5] between LBHI and the transferred employees, and the LBHI Employee Plans listed on Schedule C of the Contribution Agreement; (ii) invest $20 million in cash to be used for general corporate purposes (including, e.g., working capital); and (iii) contribute certain intellectual property and technology assets dedicated to asset management. Assets to be contributed to LAMCO LLC will include third-party service agreements used in asset management and the acquisition of market data (listed on Schedule D-3 of the Contribution Agreement) with parties such as Citadel Solutions LLC, Natixis, Numerix, Eclerx and Trimont, as well as certain LAMCO trade names and related intellectual property. Certain tangible assets, such as desktop computers and related equipment, will also be transferred to LAMCO LLC, as well as certain documents and books and records primarily used in connection with the management and administration of the Lehman assets.

23. Of the approximately 455 employees who will be dedicated to LAMCO, approximately 385 are LBHI employees, and approximately 70 are A&M employees who currently provide services to LBHI, as stated above. Certain A&M employees are also expected to function as the initial directors and certain of the officers of LAMCO Holdings. The A&M employees who will be transferred to LAMCO LLC will continue to charge LBHI for their services as they have in the past, but will work for LAMCO LLC. LBHI will retain those approximately 220 employees and resources who are devoted to the administration of the Debtors' chapter 11 cases, such as claims administration and certain in-house legal, tax, human resources, insurance, finance, and accounting and treasury teams. LBHI and LAMCO LLC will also provide certain related services for each other pursuant to the Shared Services Agreement.

---

[5] Any contracts that LBHI will assign to LAMCO were entered into post-petition by LBHI. Upon assignment, LBHI will guarantee the payment obligations under these contracts.

24.     Pursuant to the Contribution Agreement, LBHI will transfer to LAMCO International all of LBHI's equity interests in its international asset management companies, LBHI Services Ltd. and LBHI Estates Ltd.  The contribution of LBHI Estates Ltd., however, will be subject to the requisite regulatory approvals associated with such contribution.  In the event that LBHI Estates Ltd. is not contributed at closing as a result of failure to obtain requisite regulatory approvals prior to such time, the parties will continue to take all actions necessary to obtain such approvals and, upon obtaining such approvals, will take all actions necessary to promptly consummate the contribution of LBHI Estates Ltd. to LAMCO International.  Additionally, LBHI may take additional action, with the consent of the Creditors' Committee, to integrate into LAMCO International after the closing, certain asset management staff and resources located outside of the United States and the United Kingdom.

25.     As set forth in the LLC Agreement, LAMCO Holdings will be managed by a board (the "Board"), comprised at all times of LBHI and LAMCO personnel, with LBHI personnel being a majority of the Board.  The Creditors' Committee, however, will have the right to require that an independent director, selected by mutual agreement between LBHI and the Creditors' Committee, be appointed as a member of the Board.  The Creditors' Committee will also have the right, prior to LBHI's emergence from chapter 11 or such later date that the Plan may extend the rights of the Creditors' Committee (the "Termination Date"), to designate not more than two representatives from its financial advisors to attend all meetings of the Board as observers (the "Observers").

26.     Prior to the Termination Date, LAMCO will not be permitted to take any action which, if such action were taken by LBHI, would require the approval of the Bankruptcy Court or the Creditors' Committee, without first obtaining the approval of the Bankruptcy Court

or the Creditors' Committee, as applicable, including with respect to compensation of directors, officers and employees of LAMCO. In addition, prior to the Termination Date, no action will be permitted to be taken by the Board, or by any member of the Board, officer, agent or employee of LAMCO Holdings or any of its subsidiaries, without the prior approval of the Creditors' Committee that would cause LAMCO Holdings or any of its subsidiaries to:

(a) make any changes to the form of entity or tax status of LAMCO Holdings or any of its subsidiaries, except that LAMCO Holdings may cause a subsidiary that is a "foreign eligible entity" (within the meaning of Regulations Section 301.7701-3(b)(2)) to make an election, effective on the date of the entity's formation, to be treated as an association taxable as a corporation for U.S. federal income tax purposes;

(b) amend, modify, supplement or waive any provision in the LLC Agreement or certificate of formation of LAMCO Holdings (other than as required by applicable law or as expressly provided in a plan of reorganization or liquidation of the Debtors);

(c) commence any liquidation, dissolution or voluntary bankruptcy, administration, recapitalization or reorganization in any form of transaction, make any arrangements with creditors as part of a liquidation or bankruptcy, or consent to the entry of an order for relief in an involuntary case, or take the conversion of an involuntary case to a voluntary case, or consent to the appointment or taking possession by a receiver, trustee or other custodian for all or substantially all of its property, or otherwise seek the protection of any applicable bankruptcy or insolvency law;

(d) enter into any merger or consolidation, whether to effect an acquisition, divestiture or otherwise, other than any internal reorganization involving LAMCO and its subsidiaries (provided that any such internal reorganization shall remain subject to approvals specified in subsection (a) of this paragraph and approvals specified in the last paragraph of this paragraph 26);

(e) enter into any sale, lease or other conveyance of assets outside of the ordinary course of its business, other than with respect to obsolete equipment;

(f) issue any equity or securities convertible into or exercisable for equity, including without limitation rights, warrants or options to purchase equity;

(g) enter into any extraordinary corporate transactions, such as a recapitalization, reorganization, joint venture or acquisition (excluding any joint venture or similar arrangement with respect to marketing arrangements and/or the management of a client's assets and which is non-exclusive and terminable without penalty (with a reasonable period of notice));

(h) make any loans or advances other than (i) ordinary-course advances to cover expenses of LAMCO Holdings or any manager, officer, authorized person or employee of LAMCO Holdings and (ii) for or on behalf of clients of LAMCO Holdings;

(i) guarantee, assume or incur indebtedness for borrowed money;

(j) make any material changes to the scope or nature of its business and operations;

(k) add the capacity, or otherwise agree, to manage assets in a new asset class to the extent that the addition of such asset class would require the hiring of additional personnel or the addition of infrastructure; or

(l) incur non-reimbursable client development expenses that are not subject to reimbursement by a client other than pursuant to a budget approved by the Creditors' Committee (at least once a year); such expenses are expected to be approximately $3.5 million per year.

Finally, pursuant to the LLC Agreement, prior to the Termination Date, without the consent of the Creditors' Committee, and except as otherwise permissible under the Contribution Agreement, LBHI will not be permitted either to sell any of its equity interest in LAMCO Holdings or any of its subsidiaries, or to contribute more than $20 million to LAMCO Holdings or any of its subsidiaries (not including (i) its payment obligations due under the applicable Asset Management Agreement, (ii) the guarantee by LBHI of LAMCO Holdings' obligations underlying any of the LAMCO LLC existing employment contracts, or (iii) the guarantee by LBHI of obligations under certain contracts).

27. All of LAMCO's investment advisory or service relationships with any person other than LBHI or a subsidiary of LBHI (each, a "New Client") will be required to be governed by an Approved Asset Management Agreement ("Approved AMA").[6] New Clients that would constitute less than $475 million in assets under management will require Board

---

[6] An Approved AMA means an asset management agreement between LAMCO LLC and a New Client entered into in accordance with guidelines to be agreed upon by LBHI, LAMCO LLC and the Creditors' Committee, including that (i) such New Client must agree that its recourse will be limited to LAMCO LLC and *not* LBHI or any LBHI affiliate and further agree to exculpate LBHI and such LBHI affiliates from all potential liability, and (ii) such asset management agreement will be terminable by LAMCO LLC on not more than 180 days' notice (inclusive of all wind down and cooperation periods) unless the Creditors' Committee otherwise agrees.

approval, while those that constitute more than $475 million will require the approval of the Board and, prior to the Termination Date, the Creditors' Committee.

28.     Additional salient provisions of the LAMCO Agreements are set forth below:[7]

| | |
|---|---|
| **Contribution** | *First Contribution*:  LBHI will transfer to (i) LAMCO Holdings 99% of its right, title and interest in certain of the assets related to the formation and operation of the Asset Management Business (as defined in the Contribution Agreement) and LAMCO Holdings will accept such assets and assume certain related liabilities and (ii) LBHI SPV the remaining 1% of its right, title and interest in certain of the assets related to the Asset Management Business and LBHI SPV will accept such assets and assume certain related liabilities (the "First Contribution"). |
| | *Second Contribution*:  Immediately following the First Contribution, LBHI SPV will transfer to LAMCO Holdings all of its right, title and interest in the Asset Management Business and LAMCO Holdings will accept such assets and assume certain related liabilities (the "Second Contribution"). |
| | *Third Contribution*:  Immediately following the Second Contribution, LAMCO Holdings will transfer (i) to LAMCO LLC all of its right, title and interest in the Domestic Asset Management Business (as defined in the Contribution Agreement) and LAMCO LLC will accept such assets and assume certain related liabilities; and (ii) to LAMCO International all of its right, title and interest in the equity interests in its European asset management companies, LBHI Estates Ltd. and LBHI Services Ltd. |
| **Shared Services** | LBHI and LAMCO will agree to provide to each other, on a fully-loaded cost basis, certain services pursuant to the Shared Services Agreement.  Services that LBHI will provide to LAMCO include human resources, tax, finance and accounting, treasury, payroll, and corporate insurance.  Services that LAMCO will provide to LBHI include technology and infrastructure support. |
| **Tax Status** | It is intended that each of LAMCO Holdings and LAMCO LLC initially will be classified as either a partnership or a disregarded entity for U.S. federal income tax purposes; it being understood that, the U.S. federal income tax classification of LAMCO Holdings and/or LAMCO LLC will be reconsidered at the time of sale or |

---

[7]     This summary of the LAMCO Documents (the "Summary") is qualified in its entirety by the provisions of the LAMCO Documents.  This Summary is intended to be used for information purposes only and shall not, in any way, affect the meaning or interpretation of the LAMCO Documents.  Capitalized terms used, but not otherwise defined herein, have the meanings ascribed to such terms in the LAMCO Documents.  To the extent that there is any inconsistency between the Summary and the LAMCO Documents, the LAMCO Documents control.

distribution of any LAMCO Holdings (or LAMCO LLC) equity or options to a third party to determine the optimal tax classification for the operation and future potential disposition of LAMCO Holdings and/or LAMCO LLC and that also makes best use of historic LBHI tax assets for the benefit of the LBHI estate.

| | |
|---|---|
| **Asset Management** | LBHI will engage LAMCO LLC to perform services with respect to assets/investments currently held directly or indirectly by LBHI (the "<u>Managed Assets</u>") pursuant to the Asset Management Agreement. |
| **Services** | Subject to the Protocols (as defined below), LAMCO LLC will perform asset management / investment management services (the "<u>Services</u>") for LBHI with respect to its Managed Assets. |
| | LAMCO LLC will also have discretion to cause LBHI to enter into *bona-fide* hedging transactions or other arrangements designed to hedge or reduce risks associated with the Managed Assets ("<u>Hedging Transactions</u>"), subject, with respect to the Debtors, to the protocol set forth in this Court's Order Pursuant to Sections 105 and 364 of the Bankruptcy Code Authorizing the Debtors to Grant First Priority Liens in Cash Collateral Posted in Connection with the Hedging Transactions the Debtors Enter Into Through Certain Futures and Prime Brokerage Accounts, entered on March 11, 2009 order [Docket No. 3047]. |
| **Disposition / Investment Protocols** | Current approval guidelines and protocols with respect to the disposition of, and/or further investment in, Managed Assets will be codified and maintained, with such changes agreed to by LBHI and the Creditors' Committee (the "<u>Protocols</u>"). |
| **Custody** | A Lehman entity's current custodial arrangements related to its Managed Assets will remain unchanged unless otherwise agreed to by such entity. |

**Asset Management Fees**

The management fees for LBHI will be calculated on an aggregate as well as asset-class-by-asset-class basis (the "<u>Management Fees</u>") based on the then-current annual budget forecast of the estimated Personnel and Non-Personnel Expenses (as defined below) for the next quarterly period as of the last business day of the prior calendar quarter (the "<u>Estimated Quarterly Fee Amount</u>").

<u>Personnel and Non-Personnel Expenses</u>:  equal to the fees, costs and expenses of the personnel performing the services in respect of each asset class, as well as the fees, costs and expenses of the corporate personnel (e.g., information technology, administrative, etc.) and related non-personnel expenses (i.e., base salary, bonus, benefits, occupancy payments (i.e. rent and other lease payments), technology and infrastructure costs, third party servicing costs, etc.) (collectively for all asset classes, "<u>Personnel and Non-Personnel Expenses</u>").

<u>Payment Period</u>:  quarterly in advance based on the estimated amount provided by LAMCO LLC to LBHI at least 5 business days prior to payment date.

The Estimated Quarterly Fee Amount (i) will be derived from the annual budget forecast, as adjusted from time to time, and (ii) will be subject to a true-up to actual amounts of underpayments or reimbursement of overpayments, as applicable, during the quarter with another true-up of underpayments or reimbursement of overpayments, as applicable, which the parties shall use commercially reasonable efforts to make within 30 business days and in any event no later than 90 business days after the end of the applicable quarterly period based on actual personnel and non-personnel expenses for such period (as determined in good faith by LAMCO LLC and with appropriate and reasonable supporting documentation if requested by LBHI).

<u>Invoices and Allocations</u>:  LAMCO LLC will invoice LBHI for the Estimated Quarterly Fee Amount and related true-ups and reimbursements; and LBHI shall be responsible for the payments of such invoices to LAMCO LLC. For the avoidance of doubt, the obligations to pay the Management Fee to LAMCO LLC pursuant to this Agreement shall be obligations solely of LBHI and not any of the entities listed on Schedule A of the Agreement.

<u>Internal Allocation of Management Fee by LBHI</u>

LBHI shall be responsible for internal allocations of such amounts among LBHI and the entities listed on Schedule A of the Agreement in accordance with the "LBHI Allocation Methodology" section below.

<u>LBHI Allocation Methodology</u>

The Management Fee will be internally allocated by LBHI among LBHI and the entities listed on Schedule A by LBHI based on the allocation methodology currently utilized by LBHI, which was

previously reviewed by the Creditors' Committee and its advisors. Such allocation methodology may be subject to revision by LBHI after review by the Creditors' Committee and its advisors.

<u>New Clients</u>:  In the event that LAMCO LLC engages with a new client (a "<u>New Client</u>"), the allocation of Personnel and Non-Personnel Expenses will be allocated between LBHI and the New Client based on a fair and reasonable methodology based on the facts and circumstances at the relevant time and which will fairly reflect the usage of time and resources dedicated to LBHI, on the one hand, and the New Client, on the other hand.  Prior to the Termination Date, such methodology will be subject to prior review and approval by the Creditors' Committee.

In addition to the fees and the applicable termination expense reimbursement (as set forth below), LAMCO LLC will be entitled to be reimbursed for all fees, costs and expenses incurred in providing the Services (e.g., legal, custodial, and third party consulting expenses, etc.) ("<u>Reimbursable Expenses</u>"), consistent with what is currently being incurred.

| | |
|---|---|
| **Reporting** | LAMCO LLC will provide reports consistent with what is being provided currently: (i) by management to LBHI and (ii) by LBHI to the Creditors' Committee and its advisors, and will make good-faith, reasonable efforts to comply with Creditors' Committee requests for additional reports and information. |
| | The Creditors' Committee and its advisors may communicate with employees of LAMCO LLC to the extent and in the manner in which it currently communicates with employees of LBHI and LBHI. |
| **Term** | The initial term of the Asset Management Agreement will be three years, subject to automatic one year renewals unless (i) terminated by LBHI earlier with cause upon 30 days notice (subject to a termination expense reimbursement (as set forth below)), (ii) terminated by LBHI earlier without cause upon 60 days notice (subject to a termination expense reimbursment (as set forth below)) or (iii) terminated by LBHI at least 90 days prior to the applicable term expiration date. |
| **Termination** | LBHI can terminate the Asset Management Agreement (i) after a determination of Cause (as defined in the Asset Management Agreement), upon not less than 30 days prior notice to LAMCO LLC (subject to a termination expense reimbursement), or (ii) with respect to all of its Managed Assets or all of its Managed Assets within one or more discrete asset classes, at any time without Cause upon not less than 60 days prior notice to LAMCO LLC (subject to a termination expense reimbursement).  Upon receipt by LAMCO LLC of a notice of termination from LBHI, LAMCO LLC shall promptly provide a copy of such notice to LBHI and, prior to the Termination Date, the Creditors' Committee. |

In the event of any termination of by LBHI prior to the Termination Date, in whole or in part in respect of its Managed Assets within one or more asset classes whereby such termination necessitates internal reallocation by LBHI of the Management Fees allocated to any of the entities listed on Schedule A of the Asset Management Agreement in respect of each such asset class (*pursuant to the LBHI Allocation Methodology above*) such that the Management Fee allocable to any such entity or entities is increased by an amount equal to three percent (3%) or more per annum, LBHI shall provide written notice of such increase in allocated fees, as soon as practicable, to the Creditors' Committee attaching a description of the effect of such termination on the fees allocated by LBHI to any other entity or entities listed on Schedule A in respect of each such asset class.

**Termination Fee and Termination Expense Reimbursement**

In the event that LBHI terminates any Services with respect to all or any of its Managed Assets with cause, LBHI will continue to pay all fees and Reimbursable Expenses for the 30-day notice period.

LBHI will have the right to terminate the Agreement and its obligations thereunder with respect to all or any portion of its Managed Assets at any time upon 60 days notice to the LAMCO LLC without Cause; provided that LBHI will continue to pay (i) all fees, costs and expenses through the end of such 60 day notice period and (ii) any costs for terminating any related Bona Fide Hedging Transactions or other contracts related to such Managed Asset, any salary, severance, occupancy payments (e.g., rent and other lease payments), costs of service providers and vendors and other overhead expenses of the LAMCO LLC (including, for the avoidance of doubt, any "personnel and non-personnel expenses" with respect to the related asset class or asset classes, and other reimbursable expenses) that were allocated in good faith by LAMCO LLC to the performance of the services for LBHI that were so terminated or which are incurred by LAMCO LLC in respect of the terminated services or the termination of the relevant Managed Asset in response to such termination.

In the event that LBHI terminates all or a part of its Managed Assets with the LAMCO LLC, LBHI will continue to pay the aggregate fees for a period of six months and the Client and/or any of the entities listed on Schedule A of the Asset Management Agreement, as applicable, will continue to be internally allocated its share of the Management Fees, less reductions in Personnel and Non-Personnel Expenses related to such termination, for a period of six months from the date of such termination, and, thereafter, such Management Fees shall be internally reallocated among LBHI and the entities listed on Schedule A of the Asset Management Agreement in accordance with LBHI Allocation Methodology set forth above taking proper account of such termination.

**Non-Solicit / Non-Hire**

LBHI will be subject to a non-solicit / non-hire with respect to employees of LAMCO LLC for the period ending one year from the

|  | date of termination of services, or, if earlier, 6 months following the effective date of the Plan. |
|---|---|
| **Limitation of Liability / Indemnification** | LAMCO LLC will be entitled to customary limitations on liabilities and indemnification protection, subject to customary carve-outs, including for gross negligence, willful misconduct, bad faith and fraud. |
| **Confidentiality** | LAMCO LLC will be subject to customary confidentiality provisions with respect to information learned regarding the assets through performing the Services. |
| **Assignment** | No assignment (as that term is defined in the Investment Advisers Act of 1940 (the "Advisers Act")) of the Asset Management Agreement by LAMCO LLC may be made without the consent of LBHI and the Creditors' Committee, and any such assignment made without such consent shall be null and void for all purposes; provided that, unless otherwise required by the Advisers Act (i) LAMCO LLC may be reconstituted or reorganized into any other form of business entity, and (ii) nothing in an Asset Management Agreement shall preclude changes in the composition of the direct or indirect members of LAMCO LLC, without such transactions being deemed an assignment. |
| **Fiduciary Duties** | The services to be provided by LAMCO LLC in respect of Managed Assets owned by an entity listed on Schedule A of the Asset Management Agreement shall be provided for the benefit of such entity and (ii) the duties set forth in the Asset Management Agreement owed to LBHI in respect of the services to be provided by LAMCO LLC for the benefit of such entity listed on Schedule A of the Asset Management Agreement shall be owed by LAMCO LLC to such entity listed on Schedule A of the Asset Management Agreement as if such entity was LBHI. |

## Extraordinary Provisions

| **Indemnification and Exculpation:** | LBHI shall reimburse, defend, indemnify and hold harmless LAMCO LLC, its affiliates and their partners, members, directors, officers and employees and any person controlled by or controlling LAMCO LLC ("LAMCO Indemnitees") for, from and against any and all losses (i) relating to (x) any misrepresentation or act or omission or alleged act or omission on the part of LBHI or any third party custodian or any of their other agents or advisers of such LBHI or (y) any act or omission taken in conformity with the instructions given by LBHI with respect to any matter; or (ii) arising out of or relating to a LAMCO Indemnitee's acts, omissions, transactions, duties, obligations or responsibilities arising pursuant to this Agreement in respect of LBHI's managed assets, unless, in the case of clause (ii), a court of competent jurisdiction has issued a final, non-appealable decision, judgment or order that such LAMCO |
|---|---|

Indemnitee's conduct constituted gross negligence, willful misconduct, bad faith, breach of fiduciary duty, material breach of any regulatory or legal requirements or fraud or a material breach of any other provision of the Agreement or LBHI's client charter.

LAMCO LLC shall reimburse, defend, indemnify and hold harmless LBHI, its affiliates and their partners, members, directors, officers and employees and any person controlled by or controlling such client indemnitees for, from and against any and all losses arising out of or relating to a LAMCO Indemnitee's acts, omissions, transactions, duties, obligations or responsibilities arising pursuant to the Agreement in respect of LBHI's managed assets, <u>provided</u> that a court of competent jurisdiction (or similar tribunal) has issued a final, non-appealable decision, judgment or order that such LAMCO Indemnitee's conduct constituted gross negligence, willful misconduct, bad faith, breach of fiduciary duty, material breach of any regulatory or legal requirements or fraud or a material breach of any other provision of the Agreement or such LBHI's client charter.

To the maximum extent permitted by law, neither LAMCO LLC nor any other LAMCO Indemnitee shall be liable to LBHI for any expenses, losses, damages, liabilities, demands, charges and claims of any kind or nature whatsoever (including (x) any legal expenses and costs and expenses relating to investigating or defending any demands, charges and claims and (y) for the avoidance of any doubt, any demands, charges and claims brought by any creditor of LBHI or its affiliates) arising out of any acts or omissions of LAMCO LLC, except to the extent that such losses are the result of an act or omission taken or omitted by LAMCO LLC or any other LAMCO Indemnitee during the term of the Agreement that constitutes gross negligence, willful misconduct, bad faith, breach of fiduciary duty, material breach of any regulatory or legal requirements, or fraud or a material breach of any other provision of the Agreement or LBHI's client charter.

### Sound Business Reasons Support the Relief Requested

29.     Ample authority exists for approval of the proposed LAMCO Agreements. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition or other use of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor.  *See In re*

*Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

30.     The Debtors believe that the establishment of LAMCO and LBHI's entry into the LAMCO Agreements will provide substantial benefits to all of the Debtors' stakeholders.  As a non-debtor going concern operation, LAMCO offers the prospect of long-term employment to the individuals whose skills and knowledge are essential to the successful management of the Debtors' assets.  The concept of LAMCO alone has been compelling enough, until now, to retain some of the Debtors' most talented asset managers.  Nonetheless, the Debtors have suffered and continue to suffer employee attrition.  Employees who have developed considerable skill, expertise and experience in the course of administering the largest chapter 11 cases in history, have begun seeking career opportunities elsewhere, and taking these skills with them.  The establishment of LAMCO and the ability to attract third party business will reduce this attrition.  This reduction in attrition will, in turn, reduce the cost to the estates of recruiting and training new employees.  Reduced attrition will further reduce indirect costs.  Employees, once trained, are a significant investment.  This investment is lost when employees leave, taking with them their knowledge and experience in managing the Debtors' illiquid, often esoteric assets.  In replacing old employees with new employees, time is lost and delay is inevitable as these new employees must be introduced to Lehman's vast and complex portfolios of assets.

31.     LAMCO would also make it possible for LBHI and its creditors to realize a return on the investment that has been made in developing LBHI's asset management teams and infrastructure.  LAMCO would assume the capabilities, infrastructure, and human capital

that LBHI has built for the purposes of administering these chapter 11 cases and transfer them to a vehicle that would be capable of preserving and fostering them, and efficiently deploying these asset management capabilities to each of the Debtors up until and beyond plan confirmation.

32.     Additionally, transferring its asset management capabilities to a distinct, non-debtor subsidiary will allow LBHI to market these capabilities to third-parties.  Like the Debtors, there are many institutions that have been left with legacy assets in the wake of the global financial crisis.  Many of these institutions are not in the business of holding and managing distressed assets; they therefore create "bad banks," or look to maximize the value of their legacy assets through outsourcing management or selling them.  Given that many of these assets are not marked-to-market, capital constraints at these institutions will lead to an increase in asset management opportunities as the negative capital impact from premature sales would be too large.  In these circumstances, LBHI sees a substantial opportunity.  Accordingly, LBHI foresees that LAMCO will target four types of entities to source its third-party services: financial services regulators, global financial institutions such as banks and insurance companies, alternative asset managers – such as hedge-funds or private equity funds – that have failed or are in distress, and other governmental agencies such as municipalities and government-sponsored enterprises.

33.     Finally, packaging these asset management capabilities into an independent company will allow LBHI to seek strategic partners interested in purchasing an interest in, or otherwise creating a strategic relationship with, LAMCO.  LAMCO's profits, in turn, would be available to offset the costs already expended in the development of LBHI's asset management capabilities and infrastructure, to reduce the costs of managing the Debtors' assets, and to preserve and maximize the Debtors' estates for distribution to the Debtors' creditors.

34.     The Creditors' Committee will have a significant oversight role in LAMCO's governance through the Termination Date.  In addition to the right to appoint, in consultation with LBHI, one independent member of its choosing to the Board, the Creditors' Committee will also have the opportunity to monitor LAMCO's governance by sending two Observers to all Board meetings.  The Creditors' Committee will also obtain consent rights to, *inter alia*, approvals of New Clients whose business exceeds $475 million in assets under management, and to certain other extraordinary transactions enumerated above.  In addition, LBHI will not be permitted either to sell any of its equity interest in LAMCO, or to contribute more than $20 million to LAMCO, without the consent of the Creditors' Committee.

35.     The establishment of LAMCO, in short, will allow LBHI to capitalize on the asset management capabilities that it has already developed as a result of these chapter 11 cases, and to fully realize their value for the benefit of the Debtors' creditors.  The potential benefits and upside to all of Debtors' stakeholders are substantial, whereas the potential downsides are minimal, if any.  Other than specific assets and liabilities that are being contributed by LBHI to LAMCO, such as employee contracts and certain technology resources, ownership of all assets will remain with each of the Debtors and non-debtor affiliates.  The fees that will be charged by LAMCO to the Lehman-related clients, including the Debtors, will be roughly equal to the current monthly operating costs currently borne by the Debtors.  Furthermore, the Debtors activities will continue to be subject to the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the orders and jurisdiction of the Bankruptcy Court.  While LBHI is in chapter 11, LAMCO will not be permitted to take any action which, if such action were taken by LBHI, would require the approval of the Bankruptcy Court or the Creditors' Committee, without first obtaining the approval of the Bankruptcy Court or the

Creditors' Committee, as applicable.  In short, there is no loss of control by the Debtors *or* the Court, and no change to the role of the Creditors' Committee.

36.     For these reasons, entry into the LAMCO Agreements represents an exercise of the Debtors' sound business judgment, is in the best interests of the Debtors' estates and creditors, and should be granted.

### Notice

37.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

38.     Except for as set forth above, no previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: March 15, 2010
       New York, New York

/s/ Lori R. Fife
Lori R. Fife

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                    :
In re                               :         **Chapter 11 Case No.**
                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :   **08-13555 (JMP)**
                                    :
                        **Debtors.**   :         **(Jointly Administered)**
                                    :
-------------------------------------------------------------------x

### AFFIDAVIT OF BRYAN P. MARSAL IN SUPPORT OF DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AND RULE 6004(h) OF THE BANKRUPTCY RULES, FOR AUTHORIZATION TO ENTER INTO CERTAIN ASSET MANAGEMENT AND RELATED AGREEMENTS

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF NEW YORK   )

Bryan P. Marsal, being duly sworn, deposes and says:

1.       I am the Chief Executive Officer and Chief Restructuring Officer of Lehman Brothers Holdings Inc. ("LBHI"), and Co-Chief Executive Officer with Alvarez & Marsal North America, LLC (together with its wholly owned subsidiaries, affiliates, agents, independent contractors and employees, "A&M"), a restructuring advisory services firm with numerous offices throughout the world.  I submit this affidavit in support of the motion (the "Motion") of LBHI and its affiliated debtors in the above referenced chapter 11 cases (collectively, "Debtors" and, together with their non-debtor affiliates, "Lehman") pursuant to sections 105(a) and 363 of the Bankruptcy Code[1] and rule 6004(h) of the Bankruptcy Rules, for authorization to enter into certain asset management and related agreements [Docket No. [ ]].

2.       I was appointed as Chief Restructuring Officer of LBHI on September 18, 2009 and Chief Executive Officer of LBHI on January 1, 2009.  I also serve on the Board of

---

[1]        Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

Directors of the majority of the other Debtors. I am thoroughly familiar with all material aspects of LBHI's day-to-day operations, business, and financial affairs, and, except as otherwise noted, I have person knowledge of the matters set forth herein.

3.     I hold both a B.B.A. and an M.B.A. from the University of Michigan. In 1983, I co-founded A&M to deliver specialized business advisory and management services to distressed and under-performing companies. I recently served as Chief Restructuring Officer of HealthSouth, the largest outpatient surgery, diagnostic testing and physical rehabilitation services provider in the United States. Previously, I served as the Chief Restructuring Manager of Arthur Andersen LLP, Chairman and CEO of Cluett American Corporation, Republic Health Corporation (renamed OrNdaHealthCorp.), Anthony Manufacturing, and Gitano. I also served as Chief Operating Officer of Alexanders' Department Stores. I serve on the board of Timex Corporation and previously served on the boards of Cluett American Corporation (Gold Toe Socks) and Essent Healthcare, Inc. I have been involved as an adviser or manager in high profile, large and complex cases. In this capacity, I have provided advisory leadership to companies, as well as secured and unsecured lender groups. Prior to co-founding A&M, I was Director of Operations Control of Norton Simon Inc. Before joining Norton Simon in 1982, I was a Vice President in the loan recovery division of Citibank, where I managed a workout team and was directly involved in large problem loan situations.

## The Decision To Establish LAMCO

2.     As described in the Motion, following the sale of the North American capital markets business to Barclays Capital Inc. and similar sales to Nomura Holdings, Inc. in Europe and Asia, LBHI was left with substantial assets but a minimal employee base and infrastructure. The Debtors determined early on that they would realize diminished recoveries

for their estates if they were forced to liquidate all of their assets under the prevailing market conditions during the months after the commencement of their cases. Thus, to preserve and maximize the value of these estates, LBHI developed, by necessity, a workforce and infrastructure for the long-term management of the Debtors' long-term investments and illiquid assets.

3. Over the following 18 months, LBHI devoted considerable resources to develop a team of approximately 455 individuals, spread across LBHI's information technology infrastructure and five distinct asset classes – commercial real estate, residential mortgages, private equity and principal investments, corporate loans and derivatives – to effectively manage and wind-down the remaining assets that were not otherwise subject to foreign insolvency proceedings. Of these approximately 455 individuals, approximately 385 are employed by LBHI, and approximately 70 are employees from A&M who currently provide services to LBHI pursuant to the Order Approving Application Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Authorization to Employ and Retain Alvarez & Marsal North America, LLC [Docket No. 2278]. LBHI has also established complete front, mid- and back-office staffs within each of these five major asset classes.

4. LBHI's asset management teams have further developed the skills required, and an expertise and knowledge base specifically geared to, the management of such long-term distressed and illiquid assets. The Debtors have determined that the capabilities of LBHI's asset management team are scalable and thus easily transferable to the management of other long-term investment assets for third parties as well. In the course of managing and administering such assets, LBHI has built a going-concern asset management business that may be of substantial value, with capabilities that may endure beyond the administration of these

chapter 11 cases, and generate revenues for the benefit of LBHI and its creditors. In order to maximize the value of the asset management business, LBHI concluded that it is necessary to organize a new separate but wholly owned subsidiary to provide management services to the Debtors and potentially to third parties.

**The Capabilities and Infrastructure of LBHI's Current Asset Management Teams**

5. **Commercial Real Estate.** LBHI's commercial real estate team is currently comprised of approximately 78 real estate professionals located in New York, London, and Hong Kong, with expertise in global real estate finance, asset management, underwriting, syndication, technology and operations. These professionals have broad experience in highly structured real estate transactions across all property types, including: fixed and floating rate debt, term and revolving lines of credit, repurchase facilities, bridge loan facilities, distressed debt and strategic mezzanine and equity investments. Their capabilities include asset management (monitoring real estate investments and exposures to minimize risks and maximize returns, and assessing value to develop strategies that maximize value in real estate assets), real estate underwriting, and general transactional structuring and restructuring capabilities.

6. **Residential Mortgages.** LBHI's approximately seven residential mortgage professionals are based in New York and work closely with LBHI's wholly owned mortgage origination and servicing platform, Aurora Loan Services, that itself employs over 1,300 individuals. This team's capabilities include asset management and portfolio management, mortgage restructuring, origination, and servicing, and claims recovery.

7. **Principal Investments and Private Equity.** LBHI's approximately 37-person private equity group is located primarily in New York. These investment professionals have extensive experience in principal investing, corporate strategy, M&A and capital markets work, and are supported additionally by a legal and finance staff. The private equity team is

capable of providing the full range of portfolio services, such as asset discovery and review, governance (board and committee roles, management and disposition), asset valuation and value maximization (analysis of sale opportunities, restructurings, follow on investments and capital calls), as well as restructuring and M&A, platform management, principal investment, and back end management and infrastructure functions (*e.g.* cash management, LP investor relations, management of capital calls and distributions).

8.    **Corporate Debt.**  LBHI's approximately 55-person corporate debt team is split between approximately 34 front office bankers and approximately 21 loan operations professionals located in New York and London, and comprises a seasoned management team with an average of fifteen years of commercial lending experience, strong relationships with banks, private equity sponsors, lenders, and advisors.  Through is robust loan operation platform and systems, the corporate debt team is capable of performing asset management functions such as credit and sector analysis, loan restructurings and workouts, loan valuation and trade execution using a variety of methodologies.  The team is also capable of providing various administrative agency services such as managing the administrative agency functions for transactions in the United States and Europe, interface with both lending syndicates and borrowers on a variety of loan issues (e.g., restructurings, amendments), and effecting the timely movement of funds, settling of trades (par and distressed) and resolution of trade issues.

9.    **Derivatives.**  LBHI's derivatives team is its largest, with approximately 254 professionals in the United States and Europe experienced in derivatives trading, structuring, sales, in-house legal services, risk management, operations and finance.  The team is complemented by back office operations that focus on settlements, trade reconciliations, collateral management and unwind support.  Over the last fifteen months, the derivatives team

has established a transparent operating platform with strong internal controls and risk management capabilities, a specialized legal team, settlement protocols, central reporting metrics, independent valuation reviews. The team has also developed strategic partnerships on numerous key fronts, such as with third-party valuation experts, and niche operations service firms. The team's capabilities include: valuation expertise to assess and maximize value across interest rates, credit, FX, commodities, fund products, equities and ABS; established best practice processes for front–to–back derivatives unwind workflows – counterparty negotiations, structuring and assignments, trade reconciliation and valuations, settlement process and legal options analysis; live portfolio management capabilities (risk management, hedging, contract novations, relationships with street; auction process management, etc.); and an entire spectrum of unwind services from ongoing asset management to orderly unwind/disposition.

10. **Infrastructure.** Monthly costs of intellectual property and technology acquired and held by LBHI are allocated among the Debtors and their non-debtor affiliates based upon usage. To support the functions of its asset management teams, LBHI invested approximately $55 million in building out its intellectual property and technology platforms and administrative infrastructure through a combination of in-house and third-party platforms. These include

- front office functions, such as risk analytics, market data processing, valuation, and trade capture;

- middle office functions, such as the handling of trade confirmations, trade processing, invoicing, collateral management, claims tracking, and position reporting;

- back office functions, such as clearance and settlement, treasury and cash management, trade reconciliation, general ledger and monthly financing reporting functions, and other financial and accounting functions; and

- corporate functions, such as human resource management, legal and compliance, and other functions such as document management.

LBHI has also partnered with Omnium LLC, a subsidiary of Citadel Investment Group, LLC, for a number of technology and administrative functions, such as position management, profit and loss, and third-party financial reporting. Certain other core infrastructure services, such as network and telecommunications services, are being provided by BlueLock, LLC in the United States and Asia, and Kelway (UK) Ltd. in Europe. I am informed by counsel that provisions for permissible affiliate use of these technology resources have been put into place.

### The Proposed Structure and Governance of LAMCO

11. The LAMCO Agreements will, in essence, formalize and maintain the *status quo* benefits and obligations among LBHI and the affiliates within LBHI's control. LBHI currently provides its controlled subsidiaries with a variety of services, including asset management services, at cost. The establishment of LAMCO will result in an outsourcing to LAMCO LLC of the asset management function at essentially the same cost for LBHI and its controlled subsidiaries, pursuant to the Asset Management Agreement. During the pendency of the chapter 11 cases, the costs of LBHI's employees and general overhead have been allocated among the applicable Debtors and their non-debtor affiliates. Pursuant to the Intercompany Agreement, the Debtors will continue to use the same allocation methodology among LBHI and the applicable Debtors and their non-debtor affiliates, or such revised methodology proposed by LBHI after review by the Creditors' Committee and its advisors.

12. Thus, none of the Debtors will be prejudiced by the Asset Management Agreement because management will be on a "cost-basis," i.e., LAMCO will not make a profit in the management of the Debtors' assets. Rather, the Asset Management Agreement will replicate the current cost allocation among LBHI and its subsidiaries, while also offering the

Debtors guaranteed supervision and management of their assets pre- and post-plan consummation.

13.     Certain A&M employees are expected to function as the initial directors and certain officers of LAMCO Holdings.  The A&M employees who will be dedictaed to LAMCO LLC will continue to charge LBHI for their services as they have in the past, but will work for LAMCO LLC.  LBHI will retain those approximately 220 employees and resources devoted to the administration of the Debtors' chapter 11 cases, such as claims administration and certain in-house legal, tax, human resources, insurance, finance, and accounting and treasury teams.  LBHI and LAMCO LLC will also provide certain related services for each other pursuant to the Shared Services Agreement.

14.     As set forth in the LLC Agreement, LAMCO Holdings will be managed by a board (the "Board"), comprised at all times of LBHI and LAMCO personnel, with LBHI personnel being a majority of the Board.  The Creditors' Committee, however, will have the right to require that an independent director, selected by mutual agreement between LBHI and the Creditors' Committee, be appointed as a member of the Board.  The Creditors' Committee will also have the right, prior to LBHI's emergence from chapter 11 (the "Emergence Date"), to designate not more than two representatives from its financial advisors to attend all meetings of the Board as observers (the "Observers").

15.     Other than as described in the Motion in the LAMCO Agreements, none of the assets of the Debtors and their affiliates will be transferred in connection with the creation of LAMCO.  Each Debtor will retain ownership and, subject to the Asset Management Agreement, ultimate decision making authority with respect to its assets.  Although LAMCO Holdings and LAMCO LLC will be non-debtor entities, they will be subject to certain

restrictions that will afford this Court and the Debtors' creditors a substantial degree of oversight and control. First, LAMCO Holdings will be required to seek Court or Creditors' Committee approval of any acts for which LBHI would currently require Court or Creditors' Committee approval, as applicable. Second, LAMCO Holdings and LBHI have agreed to be governed by certain restrictions, and to grant the Creditors' Committee certain rights, over their going-forward operations and key corporate decisions, including compensation of directors, officers, and employees, the nature and extent of any third-party contracts and the issuance of any equity or equity-derivative interest in LAMCO. These agreements are memorialized in LAMCO Holdings's limited liability company agreement (the "LLC Agreement" and, together with the Contribution Agreement, Shared Services Agreement, the Asset Management Agreement, and the Intercompany Agreement, the "LAMCO Agreements").

16.     All of LAMCO's investment advisory or service relationships with any person other than LBHI or a subsidiary of LBHI (each, a "New Client") will be required to be governed by an Approved AMA, as described in the Motion. New Clients that would constitute less than $475 million in assets under management will require Board approval, while those that constitute more than $475 million will require the approval of the Board and, prior to the Emergence Date, the Creditors' Committee.

**Sound Business Reasons Support the Relief Requested**

17.     In my considered business judgment, I believe that the establishment of LAMCO and LBHI's entry into the LAMCO Agreements will provide substantial benefits to all of the Debtors' stakeholders. First, LAMCO will aid the Debtors' employee retention efforts, especially to the extent that LAMCO is able to attract third-party business. As a non-debtor going concern operation, LAMCO offers the prospect of long-term employment to the individuals whose skills and knowledge are essential to the successful management of the

Debtors' assets. The concept of LAMCO alone has been compelling enough, until now, to retain

some of the Debtors' most talented asset managers. Nonetheless, the Debtors have suffered and

continue to suffer employee attrition. Employees, once trained, are a significant investment.

Employees who have developed considerable skill, expertise and experience in the course of

administering the largest chapter 11 cases in history, have begun seeking career opportunities

elsewhere, and taking these skills with them. The establishment of LAMCO and the ability to

attract third-party business will reduce this attrition. This reduction in attrition will, in turn,

reduce the cost to the estates of recruiting and training new employees. Reduced attrition will

further reduce indirect costs and investment losses associated with turnover and loss of asset- and

portfolio-specific knowledge. This investment is lost when employees leave, taking with them

their knowledge and experience in managing the Debtors' illiquid, often esoteric assets. In

replacing old employees with new employees, time is lost and delay is inevitable as these new

employees must be introduced to Lehman's vast and complex portfolios of assets.

    18.   LAMCO would also make it possible for LBHI and its creditors to realize

a return on the investment that has been made in developing LBHI's asset management teams

and infrastructure. LAMCO would encompass the capabilities, infrastructure, and human capital

that LBHI has built for the purposes of administering these chapter 11 cases and transfer them to

a vehicle that would be capable of preserving and fostering them, and efficiently deploying these

asset management capabilities to each of the Debtors up until and beyond plan confirmation.

    19.   Additionally, transferring its asset management capabilities to a distinct,

non-debtor subsidiary will allow LBHI to market these capabilities to third-parties. Like the

Debtors, there are many institutions that have been left with legacy assets in the wake of the

global financial crisis. Senior officers and employees of Lehman have met with third parties

who have indicated an interest in the asset management expertise of Lehman's employees. Many of these institutions are not in the business of holding and managing distressed assets; they therefore create "bad banks," or look to maximize the value of their legacy assets through outsourcing management or selling them. Given that many of these assets are not marked-to-market, capital constraints at these institutions will lead to an increase in asset management opportunities as the negative capital impact from premature sales would be too large. I believe that these circumstances present LBHI with a substantial opportunity. LAMCO will be equipped to enter into agreements to manage assets of third parties for a profit that would inure to LBHI's benefit, as an equity holder of LAMCO, and ultimately to the benefit of all of the Debtors. It is my expectation that LAMCO will target four types of entities to which to source its third-party services: financial services regulators, global financial institutions such as banks and insurance companies, alternative asset managers – such as hedge-funds or private equity funds – that have failed or are in distress, and other governmental agencies such as municipalities and government-sponsored enterprises.

20. Finally, packaging these asset management capabilities into an independent company will allow LBHI to seek strategic partners interested in purchasing an interest in, or otherwise creating a strategic relationship with, LAMCO. LAMCO's profits, in turn, would be available to offset the costs already expended in the development of LBHI's asset management capabilities and infrastructure, to reduce the costs of managing the Debtors' assets, and to preserve and maximize the Debtors' estates for distribution to the Debtors' creditors. LBHI and the Creditors' Committee are in the process of exploring a strategic relationship with third parties with respect to LAMCO, including the possibility of selling an equity stake in LAMCO to a potential strategic partner, or otherwise entering into mutually beneficial ventures

and arrangements with third parties. The process is being managed by Lazard Frères & Co. LLC, the Debtors' investment banker, who have been working closely with Houlihan Lokey Howard & Zukin Capital, Inc., the Creditors' Committee's investment banker. I believe that a strategic relationship with a well-reputed third party would enhance the goodwill and brand value of LAMCO, and thereby potentially enhance its ability to attract and secure new business and enhance the equity value of LAMCO held by LBHI. New business would, in turn, further LAMCO's efforts to retain its skilled workforce.

21.     While LBHI is in chapter 11, the Creditors' Committee will have a significant oversight role in LAMCO's governance. In addition to the right to appoint, in consultation with LBHI, one independent member of its choosing to the Board, the Creditors' Committee will also have the opportunity to monitor LAMCO's governance by sending two Observers to all Board meetings. The Creditors' Committee will also obtain consent rights to, *inter alia*, approvals of New Clients whose business exceeds $475 million in assets under management, and to certain other extraordinary transactions enumerated above. In addition, LBHI will not be permitted either to sell any of its equity interest in LAMCO, or to contribute more than $20 million to LAMCO, without the consent of the Creditors' Committee.

22.     The establishment of LAMCO, in short, will allow LBHI to capitalize on the asset management capabilities that it has already developed as a result of these chapter 11 cases, and to fully realize their value for the benefit of the Debtors' creditors. The potential benefits and upside to all of Debtors' stakeholders are substantial, whereas the potential downsides are minimal, if any. Other than specific assets and liabilities that are being contributed by LBHI to LAMCO, such as employee contracts and certain technology resources, ownership of all assets will remain with each of the Debtors. The fees that will be charged by

LAMCO to the Lehman-related clients, including the Debtors, will be roughly equal to the current monthly operating costs currently allocated by the Debtors. Furthermore, the Debtors activities will continue to be subject to the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the orders and jurisdiction of the Bankruptcy Court. In short, there is no loss of control by the Debtors *or* the Court, and no change to the role of the Creditors' Committee.

23. The Debtors have worked closely with the Creditors' Committee to review, analyze and negotiate both the framework and the definitive documentation of these transactions, and the relief requested in the Motion is supported by the Creditors' Committee as well. For all the foregoing reasons, I believe, in my considered business judgment, that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and their economic stakeholders, and should be approved.

Dated: New York, New York
         March 12, 2010

                                        /s/ Bryan P. Marsal_____
                                        BRYAN P. MARSAL

Sworn to before me this
12th day of March, 2010


/s/ Aaron Guth_____
Aaron Guth
Notary Public of the State of New York
No. 01GU6042149
Qualified in New York County
My Commission Expires July 9, 2010

**EXHIBIT B**

CONTRIBUTION AGREEMENT

by and among

LEHMAN BROTHERS HOLDINGS INC.,

LBHI LAMCO HOLDINGS LLC,

LAMCO HOLDINGS LLC

LAMCO LLC

and

LAMCO HOLDINGS INTERNATIONAL B.V.

Dated as of [●], 2010

# TABLE OF CONTENTS

ARTICLE I      Definitions ....................................................................... 2

    Section 1.01.    Definitions .......................................................... 2

ARTICLE II     The Contribution ............................................................ 7

    Section 2.01.    Assets to be Transferred .................................... 7

    Section 2.02.    Assumption of Liabilities and Indemnification ............. 11

    Section 2.03.    Indemnification Procedures ................................. 13

    Section 2.04.    Exclusive Remedy ............................................ 15

ARTICLE III    Additional Matters Related To The Contribution .......................... 15

    Section 3.01.    Certain Other Instruments and Agreements ............. 15

    Section 3.02.    Construction of Agreements ................................. 16

    Section 3.03.    No Representations or Warranties ....................... 16

    Section 3.04.    Further Assurances .......................................... 17

    Section 3.05.    Governmental and Third Party Filings, Consents and Approvals ............................................... 17

    Section 3.06.    Books, Records and Access to Information .............. 19

    Section 3.07.    Bank Accounts ................................................ 21

    Section 3.08.    No Intercompany Obligations .............................. 21

    Section 3.09.    Transfer Taxes ............................................... 21

ARTICLE IV    Closing ...................................................................... 21

    Section 4.01.    Closing ......................................................... 21

    Section 4.02.    Conditions Precedent ........................................ 22

ARTICLE V     Employee Matters ......................................................... 22

    Section 5.01.    Domestic Transferred Employees ....................... 22

    Section 5.02.    Continued Participation in LBHI Employee Plans ......... 22

    Section 5.03.    Compensation ................................................. 23

ARTICLE VI    Miscellaneous ............................................................. 23

    Section 6.01.    Interpretation ................................................. 23

    Section 6.02.    Amendment, Modification and Termination ............. 23

    Section 6.03.    Entire Agreement ............................................ 24

    Section 6.04.    Governing Law ............................................... 24

    Section 6.05.    Notices ........................................................ 24

    Section 6.06.    Assignment; Successors and Assigns .................... 25

# TABLE OF CONTENTS

**Page**

Section 6.07.    No Third Party Beneficiaries ............................................................ 25

Section 6.08.    Severability ................................................................................... 25

Section 6.09.    Injunctive Relief............................................................................ 25

Section 6.10.    Submission to Jurisdiction; Consent to Service of Process ............... 26

Section 6.11.    Waiver of Right to Trial by Jury...................................................... 26

Section 6.12.    Counterparts.................................................................................. 26

CONTRIBUTION AGREEMENT (this "**Agreement**") dated as of the [●] day of [●], 2010, by and among LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("**LBHI**"), LBHI LAMCO HOLDINGS LLC, a Delaware corporation ("**LBHI SPV**"), LAMCO HOLDINGS LLC, a Delaware limited liability company ("**LAMCO Holdings**"), LAMCO HOLDINGS INTERNATIONAL B.V., a Netherlands company ("**LAMCO International**"), and LAMCO LLC, a Delaware limited liability company ("**LAMCO**").

W I T N E S S E T H:

WHEREAS, LBHI is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "**Bankruptcy Court**") (Case No. 08-13555(3MP)) (the "**Bankruptcy Case**"); and

WHEREAS, on September 9, 2009, LBHI formed LAMCO as a Delaware limited liability company and owns 100% of the equity interests in LAMCO;

WHEREAS, on [●], 2010, LBHI formed LBHI SPV as a Delaware corporation and holds 100% of the equity interests in LBHI SPV (the "**LBHI SPV Equity Interests**");

WHEREAS, on [●], 2010, LBHI and LBHI SPV formed LAMCO Holdings as a Delaware limited liability company, whereby LBHI owns 99% of the membership interests in LAMCO Holdings and LBHI SPV holds 1% of the membership interests in LAMCO Holdings (the "**LAMCO Holdings Equity Interests**");

WHEREAS, on [●], 2010, LAMCO Holdings formed LAMCO International as a Netherlands company and holds 100% of the equity interests in LAMCO International (the "**LAMCO International Equity Interests**");

WHEREAS, pursuant to the terms of the Assignment and Assumption Agreement between LBHI and LAMCO Holdings, LBHI agreed to assign all of its right, title and interest in its membership interests in LAMCO to LAMCO Holdings and LAMCO Holdings agreed to assume all of LBHI's liabilities, obligations and responsibilities solely allocable to such interests and as a result, LAMCO Holdings holds 100% of the membership interests in LAMCO;

WHEREAS, subject to the requisite authority under, inter alia, sections 363 and 105(a) of the Bankruptcy Code, (i) LBHI desires to transfer to LAMCO Holdings 99% of its right, title and interest in certain of the assets related to the formation and operation of a domestic asset management business (the "**Domestic Asset Management Business**") and an international asset management business (the "**International Asset Management Business**", together with the Domestic Asset Management Business, the "**Asset Management Business**") and LAMCO Holdings desires to accept such assets and assume certain related liabilities, all as provided herein, and (ii) LBHI desires to transfer to LBHI SPV the remaining 1% of its right, title and

interest in certain of the assets related to the Asset Management Business and LBHI SPV desires to accept such assets and assume certain related liabilities, all as provided herein (such transactions being sometimes collectively referred to herein as the "**First Contribution**"), with LBHI retaining all assets not transferred to LAMCO Holdings and LBHI SPV, respectively, as contemplated herein and, except as set forth herein or in the Ancillary Agreements (as defined below), all liabilities not assumed by LAMCO Holdings and LBHI SPV as contemplated herein;

WHEREAS, immediately following the First Contribution, subject to the requisite authority under, inter alia, sections 363 and 105(a) of the Bankruptcy Code, LBHI SPV desires to transfer to LAMCO Holdings all of its right, title and interest in the Asset Management Business and LAMCO Holdings desires to accept such assets and assume certain related liabilities, all as provided herein (such transactions being sometimes collectively referred to herein as the "**Second Contribution**");

WHEREAS, immediately following the Second Contribution, subject to the requisite authority under, inter alia, sections 363 and 105(a) of the Bankruptcy Code, LAMCO Holdings desires to transfer to: (A) LAMCO all of its right, title and interest in the Domestic Asset Management Business and LAMCO desires to accept such assets and assume certain related liabilities, all as provided herein, and (B) LAMCO International all of its right, title and interest in the International Asset Management Business and LAMCO International desires to accept such assets and assume the related liabilities, all as provided herein (such transactions being sometimes collectively referred to herein as the "**Third Contribution**", together with the First Contribution and Second Contribution, the "**Contribution**");

NOW, THEREFORE, in consideration of the premises and of the mutual agreements, provisions and covenants contained in this Agreement and intending to be legally bound hereby, the parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01.  <u>Definitions</u>.  For purposes of this Agreement, the following terms have the respective meanings set forth below:

"**Action**" means any claim, action, suit, arbitration, mediation, inquiry, proceeding or investigation by or before any Governmental Authority, arbitrator or mediator.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the correlative terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities,

2

by contract or otherwise. Notwithstanding the foregoing definition of "Affiliate," for purposes of this Agreement, from and after the Closing, neither LAMCO Holdings nor any of its Subsidiaries shall be deemed an Affiliate of LBHI or LBHI SPV.

"**Agreement**" has the meaning set forth in the preamble above.

"**Ancillary Agreements**" has the meaning set forth in Section 3.01(b).

"**Assets**" means all assets, properties, rights, claims and interests of any kind, whether tangible or intangible, whether real, personal or mixed and wherever located.

"**Asset Management Assets**" has the meaning set forth in Section 2.01(a).

"**Asset Management Business**" has the meaning set forth in recitals above.

"**Asset Management Liabilities**" has the meaning set forth in Section 2.02(a).

"**Bankruptcy Case**" has the meaning set forth in recitals above.

"**Bankruptcy Code**" has the meaning set forth in recitals above.

"**Bankruptcy Court**" has the meaning set forth in recitals above.

"**Bankruptcy Court Order**" means the order of the Bankruptcy Court approving the transactions contemplated by this Agreement and the Ancillary Agreements, including the transfer of the Asset Management Assets free and clear of all Liabilities other than the Asset Management Liabilities.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in The City of New York.

"**Closing**" has the meaning set forth in Section 4.01.

"**Closing Date**" has the meaning set forth in Section 4.01.

"**Contribution**" has the meaning set forth in recitals above.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Conveyancing and Assumption Instrument**" has the meaning set forth in Section 3.01(a).

"**Creditors' Committee**" means the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., which was appointed by the Office of the United States Trustee on September 17, 2009, as revised or supplemented.

"**Domestic Asset Management Assets**" has the meaning set forth Section 2.01(a).

"**Domestic Asset Management Business**" has the meaning set forth in recitals above.

"**Domestic Asset Management Liabilities**" has the meaning set forth Section 2.02(a).

"**Domestic Business Employees**" means the employees of LBHI or its affiliates who are engaged in its Domestic Asset Management Business, as listed on Schedule A hereto.

"**Domestic Transferred Employees**" means those Domestic Business Employees who become employees of LAMCO in accordance with Section 2.01(a)(iv) and Section 5.01.

"**Domestic Transferred Employment Agreements**" has the meaning set forth in Section 2.01(a)(iv).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**First Contribution**" has the meaning set forth in the recitals above.

"**Governmental Authority**" means any United States federal, state or local or any foreign government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"**Indemnifying Party**" has the meaning set forth in Section 2.03(a).

"**Indemnitee**" has the meaning set forth in Section 2.03(a).

"**Information**" has the meaning set forth in Section 3.06(a).

"**Informed Party**" has the meaning set forth in Section 3.06(f).

"**International Asset Management Assets**" has the meaning set forth Section 2.01(a).

"**International Asset Management Business**" has the meaning set forth in recitals above.

"**International Asset Management Liabilities**" has the meaning set forth in Section 2.02(a).

"**International Business Employees**" means the employees of LBHI or its affiliates who are engaged in its International Asset Management Business, as listed on Schedule B hereto.

"**LAMCO**" has the meaning set forth in the preamble above.

"**LAMCO Balance Sheet**" has the meaning set forth in Section 2.01(a)(i).

"**LAMCO Holdings**" has the meaning set forth in the preamble above.

"**LAMCO Holdings Equity Interests**" has the meaning set forth in the recitals above.

"**LAMCO International**" has the meaning set forth in the preamble above.

"**LAMCO International Equity Interests**" has the meaning set forth in the recitals above.

"**LAMCO Work Papers**" has the meaning set forth in Section 2.01(a)(i).

"**LBHI**" has the meaning set forth in the preamble above.

"**LBHI Assets**" has the meaning set forth in Section 2.01(d).

"**LBHI Business**" means all of the businesses and operations of LBHI and its Subsidiaries other than the Asset Management Business.

"**LBHI Equity Interests**" has the meaning set forth in the recitals above.

"**LBHI Estates**" means LBHI Estates Ltd., a wholly owned subsidiary of LBHI.

"**LBHI Estates Equity Interests**" has the meaning set forth in Section 2.01(a).

"**LBHI Estates Regulatory Consents**" has the meaning set forth in Section 3.05.

"**LBHI Liabilities**" has the meaning set forth in Section 2.02(d).

"**LBHI Plans**" means the employee benefit plans maintained by LBHI that are listed on Schedule C hereto in which the Domestic Business Employees and International Business Employees participated (or were eligible to participate) immediately prior to the Closing.

"**LBHI Services**" means LBHI Services Ltd., a wholly owned subsidiary of LBHI.

"**LBHI Services Equity Interests**" has the meaning set forth in Section 2.01(a).

"**LBHI SPV**" has the meaning set forth in the preamble above.

"**LBHI SPV Equity Interests**" has the meaning set forth in the recitals above.

"**LBHI Subsidiaries**" mean the Subsidiaries of LBHI (other than LAMCO Holdings and any of its Subsidiaries).

"**Liabilities**" means all debts, liabilities and obligations of any kind or nature, whether accrued or fixed, absolute or contingent, matured or unmatured, or determined or determinable.

"**Licenses**" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental Authority.

"**Losses**" means any losses, Liabilities, damages, claims, demands, judgments or settlements of any nature or kind, known or unknown, fixed, accrued, absolute or contingent, liquidated or unliquidated, including all costs and expenses (legal, accounting or otherwise) relating thereto.

"**Net Proceeds**" has the meaning set forth in Section 2.03(d).

"**Person**" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, Governmental Authority, joint venture, limited liability company or other entity.

"**Real Property**" means all owned real property and all leasehold interests in real property of LBHI or any LBHI Subsidiary, including all rights arising out of the ownership or lease thereof, together with all buildings, structures, facilities, fixtures, and other improvements thereto.

"**Requesting Party**" has the meaning set forth in Section 3.06(e).

"**Second Contribution**" has the meaning set forth in the recitals above.

"**Shared Services Agreement**" has the meaning set forth in Section 3.01(b).

"**Subsidiaries**" means with respect to any Person, any corporation, limited liability company, partnership, trust or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power (or, in the case of a partnership, limited liability company or other similar entity, more than 50% of the general partnership, managing member or similar interests) are owned, directly or indirectly, by such Person.

"**Tax or Taxes**" means all federal, state, provincial, local, territorial and foreign income, profits, franchise, license, capital, capital gains, transfer, ad valorem, wage, severance, occupation, import, custom, gross receipts, payroll, sales, employment, use, property, real estate, excise, value added, goods and services, estimated, stamp,

alternative or add-on minimum, environmental, withholding and any other taxes, duties, assessments or governmental tax charges of any kind whatsoever, together with all interest, penalties and additions imposed with respect to such amounts.

"**Termination Date**" means the date on which a chapter 11 plan of LBHI becomes effective; provided, however, that in the event that such chapter 11 plan of LBHI extends the rights of the Creditors' Committee set forth herein beyond the date on which such chapter 11 plan of LBHI becomes effective, then the Termination Date shall be deemed to be the date on which such rights of the Creditors' Committee set forth herein expire pursuant to such chapter 11 plan of LBHI.

"**Third Contribution**" has the meaning set forth in the recitals above.

"**Transferred Contracts**" has the meaning set forth in Section 2.01(a)(iii).

"**Transferred Licenses**" has the meaning set forth in Section 2.01(a)(viii).

## ARTICLE II

## THE CONTRIBUTION

Section 2.01.   Assets to be Transferred.

(a)     At the Closing, subject to the terms and conditions of this Agreement, including Section 3.05 hereof, LBHI will assign, transfer, convey, and deliver to LAMCO Holdings, and contribute to the capital of LAMCO Holdings in respect of the LAMCO Holdings Equity Interests, 99% of LBHI's right, title and interest in and to the Asset Management Assets and LBHI will assign, transfer, convey, and deliver to LBHI SPV, and contribute to the capital of LBHI SPV in respect of the LBHI SPV Equity Interests, the remaining 1% of LBHI's right, title and interest in and to the Assets as set forth in clauses (i) through (ix) below (collectively, the "**Domestic Asset Management Assets**") and clauses (x) and (xi) below (collectively, the "**International Asset Management Assets**", and together with the Domestic Asset Management Assets, the "**Asset Management Assets**"):

(i)     All of the Assets reflected on the pro forma balance sheet of LAMCO (the "**LAMCO Balance Sheet**") as detailed on the work papers (the "**LAMCO Work Papers**") underlying the development of the LAMCO Balance Sheet, in each case, attached to Schedule D-1 hereto;

(ii)     The tangible Assets set forth on Schedule D-2 hereto;

(iii)     All rights and interests in the contracts or agreements of LBHI set forth on Schedule D-3 hereto (the "**Transferred Contracts**"), including shared contracts to be amended as contemplated by this Agreement;

(iv)     All Domestic Transferred Employees and employment agreements between LBHI and the Domestic Business Employees that are assigned to or assumed by LAMCO pursuant to Section 5.01 (the "**Domestic Transferred Employment Agreements**");

(v)     Cash in the amounts set forth on <u>Schedule D-4</u> hereto, which, on the Closing Date, shall be deposited, as directed by LAMCO Holdings, into the bank accounts created pursuant to Section 3.07;

(vi)     The trade names and service marks and registrations and applications therefor, trademarks, domain names and applications and registrations, and all common-law rights and the goodwill of the business appurtenant thereto, copyrights, copyright applications and registrations set forth on <u>Schedule D-5</u> hereto;

(vii)     A sublicense of LBHI's rights under Section 8.9(b) of the Asset Purchase Agreement, dated as of September 16, 2008, among LBHI, Lehman Brothers Inc., LB745 LLC and Barclays Capital Inc. for sole use in support of unwinding the business of LBHI and that of its current and former Subsidiaries;

(viii)     All Licenses (including applications therefor) utilized primarily in the conduct of the Domestic Asset Management Business listed on Schedule D-6 hereto (the "**Transferred Licenses**");

(ix)     All documents, books and records that are primarily used in or intended to be primarily used in, or are primarily related to the Domestic Asset Management Business, including personnel files for Domestic Transferred Employees, but excluding (i) personnel files for employees of LBHI  who are not Domestic Transferred Employees, (ii) such files as may be required under applicable law regarding privacy, (iii) documents which LBHI is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, (iv) historical books and records relating to the assets and investments managed by the Domestic Asset Management Business prior to the Closing and (v) any documents, books and records primarily related to the LBHI Business. For purposes of this subparagraph, an Asset shall be deemed to relate "primarily" to or be used "primarily" in the Domestic Asset Management Business if, prior to the Closing, its use in relation to the Domestic Asset Management Business relative to other uses of such Asset by the LBHI Business, is its primary use (and, if otherwise, such Asset shall be deemed to relate "primarily" to or be used "primarily" in the LBHI Business);

(x)     Subject to Section 3.05, LBHI's right, title and interest in its equity interests in LBHI Estates (the "**LBHI Estates Equity Interests**"), including LBHI's right, title and interest in and to the properties (real and personal), capital, distributions and profits and losses of LBHI Estates which are allocable to the LBHI Estates Equity Interests; and

(xi)     LBHI's right, title and interest in its equity interests in LBHI Services (the "**LBHI Services Equity Interests**"), including LBHI's right, title and interest in and to the properties (real and personal), capital, distributions and profits and losses of LBHI Services which are allocable to the LBHI Services Equity Interests.

(b)     Effective immediately following consummation of the contribution described in Section 2.01(a), subject to the terms and conditions of this Agreement, including Section 3.05 hereof, LBHI SPV will assign, transfer, convey, and deliver to LAMCO Holdings, and contribute to the capital of LAMCO Holdings in respect of its respective ownership of the LAMCO Holdings Equity Interests, all of LBHI SPV's right, title and interest in and to the Asset Management Assets.

(c)     Effective immediately following consummation of the contribution described in Section 2.01(b), subject to the terms and conditions of this Agreement, including Section 3.05 hereof, LAMCO Holdings will assign, transfer, convey, and deliver to: (i) LAMCO, and contribute to the capital of LAMCO in respect of the LAMCO Equity Interests, all of LAMCO Holdings' right, title and interest in and to the Domestic Asset Management Assets and (ii) LAMCO International, and contribute to the capital of LAMCO International in respect of the LAMCO International Equity Interests, all of LAMCO Holdings' right, title and interest in and to the International Asset Management Assets.

(d)     Anything in this Agreement to the contrary notwithstanding, LBHI shall retain all right, title and interest of LBHI in and to all of its Assets other than the Asset Management Assets (collectively and excluding the Asset Management Assets, the "**LBHI Assets**").  Without limiting the generality of the foregoing, the LBHI Assets shall include the following:

(i)     All Real Property and all easements, covenants, rights of way and appurtenances relating to all Real Property;

(ii)     All of LBHI's minute books and stock transfer books (except those of LAMCO);

(iii)     all cash and cash equivalents;

(iv)     all trade names and service marks and registrations and applications therefor, trademarks, domain names and applications and registrations, and all common-law rights and the goodwill of the business appurtenant thereto, copyrights, copyright applications and registrations, and patents and patent applications of LBHI;

(v)     The capital stock or other equity interests or investment, including marketable securities, in any Person, including the LBHI Subsidiaries, or in any joint venture;

(vi)     Any (i) confidential personnel and medical records pertaining to any employee other than the Domestic Transferred Employees; and (ii) other books and records that LBHI is required by law to retain, including books and records required to be retained by Rules 17a-3 and 17a-4 of the Exchange Act with respect to the Asset Management Assets or that LBHI reasonably determines are necessary to retain, including Tax returns, financial statements, and corporate or other entity filings; provided, however, that LAMCO shall have the right to make copies of any portions of such retained books and records that relate to the Domestic Asset Management Business;

(vii)     All the equipment relating to the provision of information-technology-related services, functions and responsibilities performed by employees of LBHI or its advisors prior to Closing;

(viii)     Any claim, right or interest of LBHI in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending before, on or after the Closing Date;

(ix)     All commercial real estate securities, loans or investments (including commercial loans, equity investments in such commercial real estate and other commercial real estate assets and all debt and equity positions);

(x)     All private equity investments and hedge fund investments;

(xi)     All residential real estate mortgage loans or securities;

(xii)     All corporate debt securities, loans or investments;

(xiii)     All derivatives contracts;

(xiv)     All artwork;

(xv)     All rights, claims, choses in action or other causes of action of LBHI against any Person that is subject to or under administration, receivership, bankruptcy or other similar insolvency proceeding; and

(xvi)     The right of LBHI to contest any claim or cause of action brought, prior to the Closing, against LBHI or any LBHI Subsidiary that is subject to or under administration, receivership, bankruptcy or other similar insolvency proceeding; and

(e)     Subject to Section 3.04 and 3.05, but notwithstanding anything else in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign (i) any claim, contract, license, lease, commitment or any claim or right or any benefit arising thereunder or resulting therefrom with respect to any business or Asset as to which consent to assignment or conveyance thereof is required but has not been obtained as of the Closing Date, nor (ii) any claim, contract, license, lease, commitment

or any claim or right or any benefit arising thereunder or resulting therefrom from which the businesses or Assets of LBHI or any LBHI Subsidiary, other than the Asset Management Business or Asset Management Assets, derive a benefit, without regard to whether such contracts or commitments relate primarily to the Asset Management Business, as to which amendments in accordance with Section 3.05 hereof have not been entered into as of the Closing Date.

Section 2.02. <u>Assumption of Liabilities and Indemnification</u>. (a) At the Closing, effective upon consummation of the contribution described in Section 2.01(a), LAMCO Holdings shall assume 99% of LBHI's right, title and interest in and to the Asset Management Liabilities (defined below) and LBHI SPV shall assume 1% of LBHI's right, title and interest in and to the Liabilities of LBHI as set forth in clauses (i) through (vi) below (collectively, the "**Domestic Asset Management Liabilities**") and clauses (vii) and (viii) below (collectively the "**International Asset Management Liabilities**", and together with the Domestic Asset Management Liabilities, the "**Asset Management Liabilities**"):

(i) all Liabilities reflected on the LAMCO Balance Sheet, as detailed on the LAMCO Work Papers underlying the development of the LAMCO Balance Sheet, except the Liabilities reflected thereon which have been discharged or satisfied between the date thereof and the Closing Date;

(ii) all Liabilities of LBHI under the Transferred Contracts, the Domestic Transferred Employment Agreements and the Transferred Licenses arising and to be performed on or after the Closing Date;

(iii) all Liabilities assumed by LAMCO or which LAMCO is obligated to pay, in each case pursuant to the provisions of Article V hereof;

(iv) all Liabilities which arise, accrue or are incurred on or after the Closing Date relating to or based upon the business or operation of the Domestic Asset Management Assets or the Domestic Asset Management Business as conducted on or after the Closing Date, including those related to (A) any contract, agreement, lease, license or other instrument included within the Domestic Asset Management Assets and not specified in Section 2.02(a)(ii) above and (B) any other activity undertaken by LAMCO on or after the Closing Date;

(v) all Liabilities related to the Domestic Transferred Employees for periods from and after the Closing Date, and all other Liabilities with respect to the Domestic Transferred Employees assumed by LAMCO under Article V hereof;

(vi) all Liabilities arising out of or related to any failure to act by LAMCO in accordance with this Agreement on or after the Closing Date;

(vii) subject to Section 3.05, all of LBHI's Liabilities solely allocable to the LBHI Estates Equity Interests, including LBHI's obligation to

fund its pro rata share of future capital contributions and other payment obligations as the sole shareholder of LBHI Estates; and

(viii)    all of LBHI's Liabilities solely allocable to the LBHI Services Interests, including LBHI's obligation to fund its pro rata share of future capital contributions and other payment obligations as the sole shareholder of LBHI Services.

(b)    At the Closing, effective upon consummation of the contribution described in Section 2.01(b), LAMCO Holdings shall assume all of LBHI SPV's right, title and interest in and to the Asset Management Liabilities.

(c)    At the Closing, effective upon consummation of the contribution described in Section 2.01(c), LAMCO shall assume all of LAMCO Holdings' right, title and interest in and to the Domestic Asset Management Liabilities and LAMCO International shall assume all of LAMCO Holdings' right, title and interest in and to the International Asset Management Liabilities.

(d)    Anything in this Agreement to the contrary notwithstanding, LBHI shall retain all right, title and interest of LBHI in and to all of its Liabilities other than the Asset Management Liabilities (collectively and excluding the Asset Management Liabilities, the "**LBHI Liabilities**").  Without limiting the generality of the foregoing, the LBHI Liabilities shall include the following:

(i)    all Liabilities which arise, accrue or are incurred before, on or after the Closing Date relating to or based upon the past, present or future business or operation of the LBHI Assets or the LBHI Business as heretofore, currently or hereafter conducted, including those related to any contract, agreement, lease, license or other instrument included within the LBHI Assets;

(ii)    except as reflected for in the LAMCO Balance Sheet, all Liabilities which arise, accrue or are incurred before, on or after the Closing Date relating to or based upon the past management or operation of the Domestic Asset Management Assets as conducted prior to the Closing Date, including those related to (A) any contract, agreement, lease, license or other instrument included within the Domestic Asset Management Assets and (B) any other activity undertaken by LAMCO, LBHI SPV or LAMCO Holdings before the Closing Date;

(iii)    all Liabilities arising out of or related to any Actions based upon events or conditions occurring before or on the Closing Date, including those related to the transactions contemplated by this Agreement;

(iv)    all Liabilities related to the Domestic Transferred Employees for periods prior to the Closing Date, to the extent and as more particularly described in Article V hereof, and all Liabilities relating to Domestic Business Employees who do not become Domestic Transferred Employees;

(v)     all Liabilities for Taxes of LBHI for any Tax periods (or portions thereof) ending before, on or after the Closing Date;

(vi)     all Liabilities arising out of or related to any failure by LBHI to act in accordance with this Agreement on or prior to or after the Closing Date; and

(vii)     all Liabilities based upon events or conditions occurring prior to the Closing which arise out of or relate to any present or former officer, director or employee of LBHI or the LBHI Subsidiaries who continue as an officer, director or employee of LAMCO or any of its Subsidiaries on the Closing Date.

(e)     After the Closing, in accordance with Section 2.03, LAMCO Holdings, LAMCO International and LAMCO shall jointly and severally defend and indemnify LBHI, LBHI SPV, each of their Affiliates and each of their respective officers, directors employees, partners, members, agents and advisors in respect of, and hold each of them harmless from and against, any and all Losses suffered, incurred or sustained by any of them or to which any of them becomes subject, resulting from, arising out of or relating to (i) any breach of representation or warranty or nonfulfillment of or failure to perform any covenant or agreement on the part of LAMCO Holdings, LAMCO International or LAMCO contained in this Agreement or (ii) an Asset Management Liability.

(f)     After the Closing, in accordance with Section 2.03, LBHI shall defend and indemnify LAMCO, LAMCO International, LAMCO Holdings, each of their Affiliates and each of their respective officers, directors employees, partners, members, agents and advisors in respect of, and hold each of them harmless from and against, any and all Losses suffered, incurred or sustained by any of them or to which any of them becomes subject, resulting from, arising out of or relating to (i) any breach of representation or warranty or nonfulfillment of or failure to perform any covenant or agreement on the part of LBHI contained in this Agreement or (ii) an LBHI Liability.

(g)     Each of (i) LBHI for itself and on behalf of the LBHI Subsidiaries and (ii) LAMCO Holdings for itself and on behalf of its Subsidiaries hereby releases and forever holds harmless each other and its respective Subsidiaries from any liability, obligation or responsibility for any and all past actions or failures to take action, including any actions which may be deemed to have been negligent or grossly negligent, relating to or arising out of the operation or conduct of any businesses, assets or operations managed or operated by, or operationally related to, directly or indirectly, LBHI prior to the Closing (including the Asset Management Business or the Asset Management Assets), except for any liability, obligation or responsibility (1) of any party under this Agreement and the Ancillary Agreements or (2) of any party for any fraudulent act or willful and intentional misconduct.

Section 2.03.     Indemnification Procedures.

13

(a)     With respect to all Actions as to which any Person is entitled to be indemnified pursuant to this Agreement (each, an "**Indemnitee**") pursuant to Section 2.02, to the extent applicable, the indemnifying party (the "**Indemnifying Party**") will use its reasonable best efforts at its own cost to have itself substituted in the place of such Indemnitee and to have such Indemnitee removed as a party to such Actions as promptly as is reasonably practicable.  Notwithstanding the foregoing, pending such substitution, and in cases where such substitution cannot be effected, such Indemnifying Party, after the Closing Date, will have the right to assume and direct the defense, prosecution or settlement of the Actions involved in accordance with the provisions of paragraph (c) hereof.

(b)     Upon receipt by any Indemnitee of any demand for payment to a third party with respect to any Loss (i) which is not related to an Action and (ii) for which such Indemnitee is entitled to be indemnified pursuant to the provisions of Section 2.02 hereof, such Indemnitee shall promptly forward such demand to such Indemnifying Party with a request that such Indemnifying Party make such payment directly as provided in such demand and, if such Indemnifying Party fails to object within 30 days of receipt of such notice, such Indemnifying Party shall be deemed to have accepted liability for such demand. If such Indemnifying Party does so respond within 30 days and rejects such claim, in whole or in part, such Indemnitee shall be free to pursue such remedies as may be available to such party under this Agreement and applicable law.  Such Indemnifying Party shall pay directly any amounts payable hereunder with respect thereto, provided, however, that if it is impracticable or impermissible for such Indemnifying Party to make such payment, such Indemnitee may proceed to make such payment directly and such Indemnifying Party promptly will reimburse such Indemnitee for such amount.

(c)     Any party seeking indemnification under this Section shall give prompt written notice to the Indemnifying Party of the commencement of any Action for which indemnification may be sought; provided, however, that the failure of any party to give notice as provided in this paragraph (c) shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent that such Indemnifying Party is actually materially prejudiced by such failure to give notice.  The Indemnifying Party shall be entitled to assume the defense of any such Action; provided, however, that any such Indemnitee shall be entitled to participate in any such Action with counsel of its own choice but at its own expense, and provided, further, however, that such Indemnitee shall have the right to employ separate counsel to represent such Indemnitee if, in such Indemnitee's reasonable judgment, a conflict of interest between such Indemnitee and such Indemnifying Party exists with respect to such Action (the costs of such counsel to be borne by the Indemnifying Party).  If such Indemnifying Party fails to assume the defense within a reasonable time, the Indemnitee may assume such defense upon notice to the Indemnifying Party and the reasonable fees and expenses of its attorneys will be covered by the indemnification provisions of Section 2.02. Any such Action may be compromised or settled in any manner by an Indemnifying Party without the consent of the Indemnitee, provided, however, that no such Action shall be compromised or settled in any manner which might adversely affect the interests of the Indemnitee without the prior written consent of such Indemnitee (which shall not be unreasonably withheld). Notwithstanding anything in this paragraph (c) to the contrary and without limiting the

generality of the foregoing, the Indemnifying Party shall not, without the prior written consent of the Indemnitee, (i) settle or compromise any Action or consent to the entry of any judgment which does not include as an unconditional term thereof the delivery by the claimant or plaintiff to the Indemnitee of a written release from all liability in respect of such Action or (ii) settle or compromise any Action in any manner that may materially and adversely affect the Indemnitee other than as a result of money damages or other money payments that are fully indemnified hereunder. No Action which has been assumed by the Indemnifying Party within a reasonable period of time in accordance with the terms of this Agreement shall be settled by the Indemnitee without the prior written consent of the Indemnifying Party.

(d)      The amount which an Indemnifying Party is required to pay to any Indemnitee pursuant to Section 2.02 shall be net of the Net Proceeds of any insurance policy paid to the Indemnitee with respect to the applicable Loss, it being understood and agreed that, each of LBHI, LBHI SPV, LAMCO Holdings, LAMCO International and LAMCO will use its reasonable best efforts to collect on insurance coverage of insurance carriers as to which it is the insured party, without regard to whether it is the Indemnitee or the Indemnifying Party hereunder. For purposes of this Section 2.03, "**Net Proceeds**" shall mean the insurance proceeds actually received, less any actual, additional or increased premium for 24 months, deductibles, co-payments, other payment obligations (including attorneys' fees and other costs of collection) or the present value of any future cost which is quantifiable with reasonable certainty, that relates to or arises from the making of such insurance claim.

(e)      In no event shall an Indemnifying Party be liable for punitive damages sustained or claimed by an Indemnitee except to the extent such damages arise from a third party claim. Losses shall be determined after taking into account any indemnity, contribution or other similar payment received by the Indemnitee from any third party with respect thereto.

Section 2.04.  Exclusive Remedy.  Following the Closing, Article II shall provide the sole and exclusive remedy for any and all claims under this Agreement. In furtherance of the foregoing, except as otherwise provided in Article II, the parties hereby waive, and release each other from, to the fullest extent permitted by applicable law, any and all other rights, defenses, claims and causes of action (including rights of contributions, if any) known or unknown, foreseen or unforeseen, which exist or may arise in the future, that it may have against LBHI or any of its Affiliates or LAMCO Holdings or any of its Affiliates, as the case may be, arising under or based upon any applicable law (including any such law arising under or based upon any securities law, common law or otherwise).

ARTICLE III

ADDITIONAL MATTERS RELATED TO THE CONTRIBUTION

Section 3.01.  Certain Other Instruments and Agreements.  (a) On or before the Closing Date, in connection with the transfers of Asset Management Assets

and the assumption of Asset Management Liabilities, LBHI, LBHI SPV, LAMCO Holdings, LAMCO International and LAMCO shall execute or cause to be executed by the appropriate entities such deeds, bills of sale, endorsements, consents, assignments, assumptions and other good and sufficient instruments of conveyance and assignment and assumption in form and substance reasonably satisfactory to the parties hereto as in such parties' reasonable judgment shall be necessary to effect the Contribution whereby LAMCO will assume the Domestic Asset Management Liabilities and LAMCO International will assume the International Asset Management Liabilities (each a "**Conveyancing and Assumption Instrument**").

(b)     On or before the Closing Date, LBHI, LBHI SPV, LAMCO Holdings and LAMCO, as applicable, will enter (or cause their applicable Subsidiaries to enter) into the following agreements (collectively, the "**Ancillary Agreements**"): (i) the Shared Services Agreement substantially in the form of Exhibit A hereto (the "**Shared Services Agreement**"), (ii) the Asset Management Agreement substantially in the form of Exhibit B hereto, and (iii) the Amended and Restated Limited Liability Company Agreement of LAMCO Holdings substantially in the form of Exhibit C hereto.

Section 3.02.   Construction of Agreements.  Notwithstanding any other provisions of this Agreement to the contrary, in the event and to the extent that there shall be a conflict between the provisions of this Agreement or any Conveyancing and Assumption Instrument, on the one hand, and the provisions of any of the Ancillary Agreements, on the other hand, the provisions of such Ancillary Agreement shall prevail.

Section 3.03.   No Representations or Warranties.  LAMCO Holdings understands and agrees that LBHI and LBHI SPV, each individually, is not, in this Agreement, in any Ancillary Agreement or any Conveyancing and Assumption Instrument or in any other agreement or document contemplated by this Agreement, representing or warranting in any way (a) as to the value or freedom from encumbrance of, or any other matter concerning, any Asset Management Asset or any Asset Management Liability or (b) as to the legal sufficiency to convey title to any Asset Management Asset or the execution, delivery and filing of the instruments relating to the conveyance of title thereto, it being agreed and understood that all the Asset Management Assets are being transferred "as is, where is" and that LAMCO Holdings shall bear the economic and legal risk that any conveyances of such Assets shall prove to be insufficient or that LAMCO Holdings' title to any such Assets shall be other than good and marketable and free from encumbrances. Similarly, LAMCO Holdings understands and agrees that LBHI and LBHI SPV, each individually, is not, in this Agreement or in any other agreement or document contemplated by this Agreement, including any Conveyancing and Assumption Instrument, representing or warranting in any way that the obtaining of the consents or approvals, the execution and delivery of instruments and documents and the making of the filings and applications contemplated by this Agreement shall satisfy the provisions of all applicable agreements or the requirements of all applicable laws or judgments, it being agreed and understood that, subject to Section 2.02(b), 3.04 and 3.05 hereof, LAMCO Holdings shall bear the economic and legal risk that any necessary consents or approvals are not obtained or that any requirements of law or judgments are not complied with.  LAMCO Holdings further represents that neither

LBHI, LBHI SPV, any of their Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Asset Management Business, the Asset Management Assets, the Asset Management Liabilities or the transactions contemplated by this Agreement, and none of LBHI, LBHI SPV, any of their Affiliates nor any other Person will have or be subject to any liability to LAMCO Holdings or any other Person resulting from the contribution to LAMCO Holdings or its representatives or LAMCO Holdings' use of, any such information, including any confidential memoranda or other descriptions distributed on behalf of LBHI or LBHI SPV relating to the Asset Management Business or any of the Asset Management Assets or Asset Management Liabilities or other publications or information provided to LAMCO Holdings or its representatives, or any other document or information in any form provided to LAMCO Holdings or its representatives in connection with the sale of the Asset Management Business and the transactions contemplated hereby. LAMCO Holdings acknowledges that it has conducted to its satisfaction, its own independent investigation of the Asset Management Business, the Asset Management Assets and the Asset Management Liabilities and, in making the determination to proceed with the transactions contemplated by this Agreement, LAMCO Holdings has relied on the results of its own independent investigation.

Section 3.04. <u>Further Assurances</u>. Subject to the allocation of risk with respect to the Contribution set forth in Section 3.03 hereof, from and after the Closing Date (i) LBHI and LBHI SPV shall use their reasonable best efforts to execute and deliver to LAMCO Holdings and, where necessary, shall use their reasonable best efforts (which shall include the incurrence of reasonable expenses) to file or cause to be filed of record all such assignments, deeds, bills of sale and other instruments or documents as reasonably may be required and to make all filings with and to obtain all licenses, permits, authorizations, qualifications, orders, consents and approvals of Governmental Authorities and third parties necessary to effect the Contribution in accordance with Section 3.05 hereof and will take such action as LAMCO Holdings may reasonably request in order to effect the assignment, transfer, conveyance and delivery to LAMCO Holdings of all of LBHI's and LBHI SPV's right, title and interest in and to the Asset Management Assets and the Asset Management Business and to otherwise do all things necessary and proper in the reasonable judgment of LBHI, LBHI SPV and LAMCO Holdings to carry out the terms of this Agreement (ii) LAMCO Holdings shall execute and deliver to LBHI and LBHI SPV all instruments or documents which reasonably may be required in order to effect the assumption by LAMCO Holdings of the Asset Management Liabilities or otherwise required to complete the transactions contemplated hereby (iii) LAMCO shall execute and deliver to LAMCO Holdings all instruments or documents which reasonably may be required in order to effect the assumption by LAMCO of the Domestic Asset Management Liabilities or otherwise required to complete the transactions contemplated hereby and (iv) LAMCO International shall execute and deliver to LAMCO Holdings all instruments or documents which reasonably may be required in order to effect the assumption by LAMCO International of the International Asset Management Liabilities or otherwise required to complete the transactions contemplated hereby.

Section 3.05.  Governmental and Third Party Filings, Consents and Approvals.  (a) Subject to the allocation of risk with respect to the Contribution set forth in Section 3.03 hereof, prior to the Closing Date LBHI, LBHI SPV, LAMCO Holdings, LAMCO International and LAMCO shall use reasonable best efforts to (i) make all filings with and to obtain all licenses, permits, authorizations, qualifications, orders, consents and approvals of Governmental Authorities and third parties necessary to effect the Contribution, including obtaining any necessary consents for the assignment of any claim, contract, license, lease, commitment or any claim or right or any benefit arising thereunder or resulting therefrom which cannot be assigned without such consent, (ii) obtain amendments to any material Transferred Contracts from which other businesses or assets of LBHI as well as the Domestic Asset Management Business or Domestic Asset Management Assets directly derive a benefit in order to provide that LAMCO has only the rights and obligations under those contracts and other commitments that relate to the Domestic Asset Management Business or the Domestic Asset Management Assets, provided that any such amendment shall be satisfactory in form and substance to each party hereto and (iii) obtain amendments to any material contracts from which other businesses or assets of LBHI as well as the International Asset Management Business or International Asset Management Assets directly derive a benefit in order to provide that LAMCO International has only the rights and obligations under those contracts and other commitments that relate to the International Asset Management Business or the International Asset Management Assets, provided that any such amendment shall be satisfactory in form and substance to each party hereto.  Notwithstanding anything to the contrary in this Agreement, in connection with obtaining consents or amendments from third parties, LBHI, LBHI SPV, LAMCO Holdings, LAMCO International and LAMCO shall not be required to (but may) pay any consideration or agree to any modification to any agreement that would impose additional Liabilities following the Closing.

(b)      If any consents or amendments necessary pursuant to paragraph (a) above are not obtained, each party shall, subject to the provisions relating to the allocation of risk set forth in Section 3.03, take all other action as may be reasonably requested by the other party in order to place the parties or their appropriate Subsidiaries, insofar as reasonably possible, in the same position as would have existed had the consents or amendments been obtained as intended; provided, however, that neither party shall be required to obtain substitute space with respect to any space under any lease not so assigned. Whether or not all of the Domestic Asset Management Assets and the Domestic Asset Management Liabilities shall have been legally transferred to, or assumed by, LAMCO prior to the Closing Date, the parties agree that, subject to the preceding sentence, as of the Closing Date, LAMCO shall have, and shall be deemed to have acquired, complete and sole beneficial ownership over all of the Domestic Asset Management Assets, together with all of LBHI's, LBHI SPV's and LAMCO Holdings' rights, powers and privileges incident thereto, and shall be deemed to have assumed in accordance with the terms of this Agreement all of such Liabilities, and all of LBHI's, LBHI SPV's and LAMCO Holdings' duties, obligations and responsibilities incident thereto. Whether or not all of the International Asset Management Assets and the International Asset Management Liabilities shall have been legally transferred to, or assumed by, LAMCO International prior to the Closing Date, the parties agree that, subject to the first sentence of this Section 3.05(b), as of the Closing Date, LAMCO

International shall have, and shall be deemed to have acquired, complete and sole beneficial ownership over all of the International Asset Management Assets, together with all of LBHI's, LBHI SPV's and LAMCO Holdings' rights, powers and privileges incident thereto, and shall be deemed to have assumed in accordance with the terms of this Agreement all of such Liabilities, and all of LBHI's, LBHI SPV's and LAMCO Holdings' duties, obligations and responsibilities incident thereto. Notwithstanding anything to the contrary herein (other than the preceding sentence), in the event that immediately prior to the contribution described in Section 2.01(a) the requisite regulatory consents have not been obtained with respect to the contribution of the LBHI Estates Equity Interests (pursuant to Section 2.01(a)(x)) (the "**LBHI Estates Regulatory Consents**"), then the LBHI Estates Equity Interests shall not be contributed pursuant to Section 2.01(a)(x) and the LBHI Liabilities solely allocable to the LBHI Estates Equity Interests shall not be contributed pursuant to Section 2.02(a)(vii) and, for the avoidance of doubt, (i) the LBHI Estates Equity Interests shall not be included in the definition of International Asset Management Assets for the purpose of this Agreement and (ii) the LBHI Liabilities solely allocable to the LBHI Estates Equity Interests (as described in Section 2.02(a)(vii)) shall not be included in the definition of International Asset Management Liabilities for the purpose of this Agreement. In the event that the LBHI Estates Equity Interests and the LBHI Liabilities solely allocable to the LBHI Estates Equity Interests are not contributed pursuant to the previous sentence, LBHI, LBHI SPV, LAMCO Holdings and LAMCO International shall continue to use reasonable best efforts to obtain the LBHI Estates Regulatory Consents. To the extent that the LBHI Estates Regulatory Consents are obtained after the Closing, LBHI, LBHI SPV, LAMCO Holdings and LAMCO International shall take all requisite action to cause, as promptly as practicable, the LBHI Estates Equity Interests and the LBHI Liabilities solely allocable to the LBHI Estates Equity Interests to be contributed to LAMCO International in a manner consistent with the manner in which the LBHI Estates Equity Interests and the LBHI Liabilities solely allocable to the LBHI Estates Equity Interests would have been contributed pursuant to the terms of this Agreement if the LBHI Estates Regulatory Consents had been obtained prior to Closing.

Section 3.06. <u>Books, Records and Access to Information</u>. (a) From and after the Closing Date, upon reasonable notice from LBHI, LAMCO and LAMCO International shall give to LBHI and its successors and their authorized accountants, counsel and other designated representatives reasonable access (including using its reasonable best efforts to give access to third parties or firms possessing information) and duplicating rights during normal business hours, in a manner that does not unreasonably interfere with LAMCO's or LAMCO International's business, to all records, books, contracts, instruments, computer data and other data and information (collectively, "**Information**") within LAMCO's or LAMCO International's possession or control relating to LBHI or the LBHI Subsidiaries to the extent such access is reasonably required by LBHI or its successors. From and after the Closing Date, upon reasonable notice from LAMCO Holdings, LAMCO International or LAMCO, LBHI shall give to LAMCO Holdings, LAMCO International or LAMCO and their respective successors and their respective authorized accountants, counsel and other designated representatives reasonable access (including using its reasonable best efforts to give access to Persons possessing information) and duplicating rights during normal business hours, in a manner

that does not unreasonably interfere with LBHI's business, to Information retained or controlled by LBHI to the extent such access is reasonably required by LAMCO Holdings, LAMCO International or LAMCO or their respective successors.  Information may be required under this Section for, among other things, audit, accounting, claims, litigation, regulatory and Tax purposes and for purposes of fulfilling disclosure and reporting obligations.

(b)	Subject to this Section 3.06, at all times from and after the Closing Date, each party will use its reasonable best efforts to make available to the other, upon written request, their respective officers, directors, employees and agents as witnesses, in a manner that does not unreasonably interfere with each other's businesses, to the extent that the same may reasonably be required in connection with any Actions in which the requesting party may from time to time be involved (except in the case of an adversarial Action by one party against the other party (which shall be governed by such discovery rules as may be applicable thereto)).

(c)	For a period of one year following the Closing Date, each party will use reasonable efforts to make available to a requesting party, during normal business hours and in a manner that will not unreasonably interfere with such party's business, its staff whenever and to the extent that they may reasonably be required in order to assist in effecting an orderly transfer of the Asset Management Assets and the Asset Management Liabilities, provided, however, that the services provided hereunder shall be of an occasional, non-repetitive nature, it being understood that transitional services generally are to be provided pursuant to the Shared Services Agreement.

(d)	A party providing Information or witnesses to the other shall be entitled to receive from the other, upon the presentation of invoices therefor, payments for such amounts relating to supplies, disbursements, and other out-of-pocket expenses, as may be reasonably incurred in providing such information or witnesses.

(e)	On or prior to the Closing Date, LBHI shall use its reasonable best efforts to deliver to LAMCO Holdings copies of corporate records and files that constitute Asset Management Assets.  Except as otherwise agreed in writing, each party shall retain all Information, if any, relating to any other party, for the periods after the Closing Date applicable to the Information in question as set forth in LBHI's retention policy as of the date hereof.  The parties shall retain any classes of information for any longer period which may be reasonably requested in writing by any party and specified in such request.  Notwithstanding the foregoing, any party may destroy or otherwise dispose of any Information not in accordance with LBHI's retention policy as of the date hereof, provided that prior to such destruction or disposal (i) such party shall provide no less than 90 nor more than 120 days' prior written notice to the other party hereto of any such proposed destruction or disposal (which notice shall specify in detail which of the Information is proposed to be so destroyed or disposed of) and (ii) if a recipient of such notice shall request in writing (a "**Requesting Party**") prior to the scheduled date for such destruction or disposal that any of the Information proposed to be destroyed or disposed of be delivered to such Requesting Party, such party proposing the destruction or disposal shall promptly arrange for the delivery of such of the Information as was

requested by the Requesting Party (it being understood that all out-of-pocket costs associated with the delivery of the requested Information shall be paid by the Requesting Party).

(f)    Any Information disclosed to a party (the "**Informed Party**") pursuant to the provisions of this Section will be kept confidential by such Informed Party, any of its Subsidiaries, Affiliates and the directors, officers, employees, representatives and controlling Persons, if any, of each and may not be disclosed unless (i) it becomes generally available to the public other than as a result of disclosure by such Informed Party or (ii) the Informed Party is required or ordered to disclose such Information (including by subpoena, interrogatory or other legal process); provided, however, that in the case of clause (ii) the Informed Party shall use its reasonable best efforts to obtain a protective or similar order if requested to do so by the Informing Party and to disclose only that portion of the Information which it believes is required  to be disclosed.

Section 3.07.   Bank Accounts.  On or before the Closing Date, LAMCO, LAMCO International and LAMCO Holdings will open such bank accounts as LBHI, LBHI SPV, LAMCO Holdings, LAMCO International and LAMCO shall reasonably deem appropriate to provide for a smooth transition of the operation of the Asset Management Business following the Closing.

Section 3.08.   No Intercompany Obligations.  There are not any intercompany or interdivisional receivables, payables or loans in existence as of the date hereof between LBHI or any LBHI Subsidiary, on the one hand, and LAMCO Holdings and its Subsidiaries, on the other hand, and the parties shall not incur or create any such intercompany or interdivisional receivables, payables or loans prior to the Closing Date.

Section 3.09.   Transfer Taxes.  LBHI, LBHI SPV, LAMCO Holdings, LAMCO International and LAMCO each will defend, indemnify and hold harmless the other and each of their Affiliates and each of their respective officers and directors against all sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges (including (without duplication for the definition of "Taxes") any interest and penalty thereon) that are primarily their liability under applicable Tax law and are payable in connection with the Contribution.

ARTICLE IV

CLOSING

Section 4.01.   Closing.  Subject to the satisfaction of the conditions set forth in Section 4.02 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the Contribution provided for in Article II hereof (the "**Closing**") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York 10153 (or at such other place as the parties may designate in writing) at 10 a.m. (New York time) on the Business Day following the satisfaction or waiver of the conditions set forth in Section 4.02 (other than conditions

that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "**Closing Date.**" Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and the Contribution shall have been consummated and be deemed effective as of 12:01 a.m. (New York time) on the Closing Date.

Section 4.02. <u>Conditions Precedent</u>. The respective obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing, of each of the following conditions:

(a) No statute, rule, regulation, executive order, decree, ruling, injunction or other order (whether temporary, preliminary or permanent) shall have been enacted, entered, promulgated or enforced by any Governmental Authority which prohibits, restrains or enjoins the consummation of the transactions contemplated by this Agreement or any of the Ancillary Agreements.

(b) The entry of the Bankruptcy Court Order.

ARTICLE V

EMPLOYEE MATTERS

Section 5.01. <u>Domestic Transferred Employees</u>. Upon the Closing Date, and effective upon the consummation of the Contribution, (i) all Domestic Business Employees who remain employed as of the Closing Date shall have their employment transferred to (the "<u>Domestic Transferred Employees</u>") and shall be deemed to automatically become employees of LAMCO, and (ii) LBHI shall have assigned to LAMCO and LAMCO shall have accepted assignment of the Domestic Transferred Employment Agreements; <u>provided</u>, <u>however</u>, that to the extent a Domestic Transferred Employee is party to an employment agreement that may not be unilaterally assigned pursuant to its terms or applicable law, LAMCO shall instead offer to any such Domestic Transferred Employee to assume such employment agreement effective as of the Closing Date on terms substantially comparable to those in effect between LBHI and such Domestic Transferred Employee immediately prior to the Closing Date. All Liabilities in respect of any Domestic Business Employee who does not become a Domestic Transferred Employee shall constitute LBHI Liabilities. All Liabilities relating to the Domestic Transferred Employees for periods from and after the Closing Date, as well as those Liabilities assumed by LAMCO under this Article V, shall constitute Domestic Asset Management Liabilities.

Section 5.02. <u>Continued Participation in LBHI Employee Plans</u>. From and after the Closing Date, the Domestic Transferred Employees and International Transferred Employees shall be eligible to continue participation in the LBHI Plans (subject to the terms of such plans, including the right to amend or terminate such plans, and any limitations established by LBHI from time to time, including any limitations intended to prevent duplication of benefits with new employee plans that may be

established by LAMCO) for so long as LAMCO and LBHI continue to be treated as a "single employer" within the meaning of Section 414(b) or Section 414(c) of the Code. LAMCO shall reimburse LBHI for all costs associated with such continued participation by Domestic Transferred Employees in the LBHI Plans as set forth in the Shared Services Agreement, and the foregoing obligation of LBHI shall be contingent upon LAMCO's compliance with such reimbursement requirement. Other than the provision of benefits under the LBHI Plans in accordance with this Section 5.02 and its obligations with respect to the LBHI Plans under the Shared Services Agreement, LBHI shall assume no obligation for, and LAMCO shall indemnify and hold LBHI harmless against, any and all Liabilities associated with the participation of the Domestic Transferred Employees in the LBHI Plans.

Section 5.03. <u>Compensation</u>. LAMCO shall assume all salary, bonus, employee benefits and severance payment obligations (including for any "Bonus Payments" as defined under the Domestic Transferred Employment Agreements), as well as related payroll tax obligations, due to be paid to the Domestic Transferred Employees on or after the Closing Date pursuant to the Domestic Transferred Employment Agreements or otherwise in accordance with Section 5.01, it being understood that such obligations shall include accrued salary obligations with respect to the Domestic Transferred Employees for the entire pay period in which the Closing Date falls, notwithstanding that LBHI employed the Domestic Transferred Employees during a portion of such period; provided however, that for the avoidance of doubt, all such obligations shall be subject to LBHI's payment obligations under the Asset Management Agreement.

## ARTICLE VI

## MISCELLANEOUS

Section 6.01. <u>Interpretation</u>. When reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated. The headings contained in this Agreement are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted. The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

Section 6.02. <u>Amendment, Modification and Termination</u>. This Agreement may be modified, amended or supplemented only in a writing executed by LBHI and LAMCO Holdings. Any material amendment, modification, supplement or waiver to this Agreement proposed to be made prior to the Termination Date shall require the prior approval of the Creditors' Committee. Notwithstanding the foregoing or any other provision of this Agreement, LBHI may unilaterally terminate this Agreement at

any time prior to the First Contribution without the consent of any other party (including the Creditors' Committee).

Section 6.03. <u>Entire Agreement</u>. This Agreement, including the schedules and exhibits hereto and together with the Ancillary Agreements, to the extent applicable, constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, between the parties hereto with respect to the subject matter hereof.

Section 6.04. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without regard to the principles of conflicts of laws thereof).

Section 6.05. <u>Notices</u>. Any and all notices, written consents or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number or email to the email address specified in this Section 6.05 prior to 5:00 p.m. (New York time) on a Business Day, (ii) the Business Day after the date of transmission, if such notice, written consent or communication is delivered via facsimile at the facsimile telephone number or email to the email address specified in this Section 6.05 later than 5:00 p.m. (New York time) on any date and earlier than 11:59 p.m. (New York time) on such date, (iii) when received, if sent by nationally recognized overnight courier service, or (iv) upon actual receipt by the party to whom such notice or written consent is required to be given. The address for such notices, written consents and communications shall be as follows:

If to LBHI or LBHI SPV:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, NY 10020
Attention: John Suckow
Email: john.suckow@lehmanholdings.com

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:      Michael Lubowitz
Facsimile:      (212) 310-8007
Email:          michael.lubowitz@weil.com

If to LAMCO Holdings or LAMCO:

LAMCO Holdings LLC
1271 Avenue of the Americas
New York, NY 10020
Attention: William Gordon
Email: wgordon@alvarezandmarsal.com

If to LAMCO International:

LAMCO Holdings International B.V.
1271 Avenue of the Americas
New York, NY 10020
Attention: William Gordon
Email: wgordon@alvarezandmarsal.com

Section 6.06.  <u>Assignment; Successors and Assigns</u>.  This Agreement may not be assigned by any party or by operation of law or otherwise without the prior written consent of each of the other parties (which consent may be granted or withheld in the sole discretion of such other party, as the case may be).  Subject to the preceding sentence, this Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

Section 6.07.  <u>No Third Party Beneficiaries</u>.  This Agreement is solely for the benefit of the parties hereto and their respective Subsidiaries and, with respect to the provisions of Article II hereof, their respective directors, officers and Affiliates, and should not be deemed to confer upon any other third parties (other than the Creditors' Committee which shall, until the Termination Date, be a third-party beneficiary of this Agreement with rights to enforce the obligations of the parties hereto) any remedy, claim, liability, reimbursement, claim of action or other right in excess of those existing without reference to this Agreement.

Section 6.08.  <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 6.09.  <u>Injunctive Relief</u>.  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this

Agreement.  The rights set forth in this Section 6.09 shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

Section 6.10.  <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)	Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 6.05 hereof; <u>provided</u>, <u>however</u>, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)	Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 6.05.

Section 6.11.  <u>Waiver of Right to Trial by Jury</u>.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

Section 6.12.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF the parties hereto execute this Agreement as of the date first above written.

**LEHMAN BROTHERS HOLDINGS INC.**

_____
Name:
Title:

**LBHI LAMCO HOLDINGS LLC**

_____
Name:
Title:

**LAMCO HOLDINGS LLC**

_____
Name:
Title:

**LAMCO LLC**

_____
Name:
Title:

**LAMCO HOLDINGS INTERNATIONAL B.V.**

_____
Name:
Title:

**<u>EXHIBIT C</u>**

**ASSET MANAGEMENT AGREEMENT**

**between**

**LAMCO LLC**

**and**

**LEHMAN BROTHERS HOLDINGS INC.**

**[_____], 2010**

# TABLE OF CONTENTS

**Page**

1.  Appointment and Status as Asset Manager ..................................................................... 1

2.  Management Services ...................................................................................................... 1

3.  Representations by Client ............................................................................................... 5

4.  Representations, Warranties and Covenants of the Manager ......................................... 5

5.  Portfolio Execution ........................................................................................................ 6

6.  Aggregation and Allocation of Orders .......................................................................... 7

7.  Conflicts of Interest; Affiliated Transactions ............................................................... 7

8.  Reports, Valuations, Meetings and Other Communications.......................................... 8

9.  Compensation; Expenses ............................................................................................... 9

10. Custody ......................................................................................................................... 11

11. Confidential Information .............................................................................................. 11

12. Directions to the Manager............................................................................................ 12

13. Limitation of Liability.................................................................................................. 12

14. Indemnification ............................................................................................................ 13

15. Non-Exclusive Management......................................................................................... 14

16. Effective Period of Agreement and Amendments ....................................................... 14

17. Duration and Termination............................................................................................ 15

18. Independent Contractor Status..................................................................................... 16

19. Assignment ................................................................................................................... 16

20. No Third Party Beneficiaries ....................................................................................... 17

21. Fiduciary Duties ........................................................................................................... 17

22. Severability .................................................................................................................. 17

23. Submission to Jurisdiction; Consent to Service of Process ........................................ 17

24. Waiver of Right to Trial by Jury.................................................................................. 18

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

25.    Governing Law ................................................................................................ 18

26.    Entire Agreement ........................................................................................... 18

27.    Notices and Other Communications .............................................................. 18

28.    Interpretation ................................................................................................. 19

29.    Headings; Internal References ....................................................................... 20

30.    Counterparts .................................................................................................. 20

# ASSET MANAGEMENT AGREEMENT

THIS AGREEMENT (together with all appendices, schedules and annexes hereto, which are hereby deemed a part hereof, and as amended, modified or supplemented from time to time, this "Agreement"), is made as of the ___ day of _____, 2010, by and between: (i) Lehman Brothers Holdings Inc., a corporation organized under the laws of Delaware (the "Client"); and (ii) LAMCO LLC, a limited liability company organized under the laws of Delaware (hereinafter called the "Manager").  For purposes of this Agreement only, (a) neither the Manager nor any of its subsidiaries shall be deemed an affiliate of the Client, and (b) the Client shall not be deemed an affiliate of the Manager or any of its subsidiaries.

WITNESSETH:

WHEREAS, the Client is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "Bankruptcy Court") (Case No. 08-13555(3MP)) (the "Bankruptcy Case");

THEREFORE, for and in consideration of the premises and of the mutual covenants herein contained, the parties hereby agree as follows:

1.  <u>Appointment and Status as Asset Manager</u>.  The Client hereby appoints the Manager to provide asset management and investment management services as further set forth in this Agreement and the Manager does hereby accept said appointment.

2.  <u>Management Services</u>.  (a) (i)  The Manager shall be responsible for providing to the Client the investment management services set forth as an appendix hereto and as amended in accordance with the terms of this Agreement. Notwithstanding the foregoing, the parties shall use commercially reasonable efforts to prepare, within 90 days of the date of this Agreement, a client charter (the "Client Charter"), which shall identify the assets of the Client (the "Managed Assets") and the investment management services to be provided by the Manager with respect to the specified asset classes (each, an "Asset Class") to which the Client's Managed Assets relate which services initially shall be substantially similar to those set forth in the applicable appendix hereto.  For the avoidance of doubt, the Manager and the Client acknowledge that Managed Assets attributable to an Asset Class may be held by the Client or any of the entities listed on Schedule A, and as a result, the compensation and expenses payable by the Client to the Manager pursuant to the terms of this Agreement shall be internally allocated among the Client and the entities listed on Schedule A in accordance with the terms set forth in Appendix F of this Agreement.  Following finalization of the Client Charter, the Manager shall provide to the Client the investment management services set forth therein in lieu of the investment management services set forth in the applicable appendix hereto.  Any amendment, modification or change to the Client Charter or an appendix to this Agreement proposed to be made prior to the Termination Date (as defined below) shall require the prior approval of the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., which was appointed by the Office of the United States

Trustee on September 17, 2009, as revised or supplemented (the "Creditors' Committee").  The "Termination Date" shall mean the date on which a chapter 11 plan of the Client becomes effective; provided, however, that in the event that such chapter 11 plan of the Client extends the rights of the Creditors' Committee set forth herein beyond the date on which such chapter 11 plan of the Client becomes effective, then the Termination Date shall be deemed to be the date on which such rights of the Creditors' Committee set forth herein expire pursuant to such chapter 11 plan of the Client.  If there is insufficient evidence of, or defects in, the title and ownership of a Managed Asset by the Client and such insufficiency or defect (x) did not result from a breach by the Manager of its duties under this Agreement and (y) could not be cured through the commercially reasonable good faith and diligent efforts of the Manager (an "Untitled Asset"), the Manager may, in its discretion, continue to provide services pursuant to this Agreement in respect of such Untitled Asset, and, in such case, (A) the Manager shall still be entitled to reimbursement of expenses incurred to cure such defect, and the payment of management fees in respect of such Untitled Asset and (B) the Manager Indemnitees (defined below) shall be entitled to the indemnities and exculpatory provisions of Sections 13 and 14 of this Agreement, in each case of clauses (A) and (B) with respect to such Untitled Asset.  Notwithstanding the foregoing, the Manager may elect not to continue to provide services in respect of an Untitled Asset if the related defect in title is not cured by the Client (or by the Manager at the direction of the Client) within 45 days following the delivery by the Manager to the Client of written notice specifying in reasonable detail (I) the defect in title respect of such Untitled Asset and (II) the Manager's efforts to cure such defect in title, in which case, the Manager shall still be entitled to retain or receive fees earned for services previously rendered with respect to such Untitled Asset.

(ii)     Subject to the Client's Client Charter, including the "Protocols" with respect to the relevant Asset Class identified therein (the "Protocols"), the Manager may enter into, acquire, maintain, restructure or terminate any bona fide short sales, assets, contracts, instruments or other arrangements designed to hedge or reduce one or more risks associated with, or to perform under, a Managed Asset ("Bona Fide Hedging Transactions"); provided that any such Bona Fide Hedging Transactions entered into with respect to a Managed Asset owned by Lehman Brothers Holdings Inc. or the entities listed on Schedule A hereto shall be subject to the protocol set forth in the Bankruptcy Court's March 11, 2009 order [Docket No. 3047].

(iii)     Notwithstanding anything herein to the contrary, the rights granted to, obligations of and limitations on, the Manager in this Agreement shall not exceed the rights, obligations and limitations of the Client with respect to the Client's Managed Assets.  Notwithstanding anything herein to the contrary, the Manager shall not take any actions on behalf of the Client to the extent such actions would be inconsistent with the Client's Client Charter, the Manager's duties under this Agreement or its rights and obligations under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or orders of the Bankruptcy Court or protocols or understandings with the Creditors' Committee.

(iv)     Upon the receipt of any Current Income or Disposition Proceeds (each as defined below) from a Managed Asset of the Client within any Asset Class (A) the portion of such income or proceeds comprised of cash shall not be deemed part of such Asset Class and shall, on a daily basis (to the extent practical), be deposited into an account designated by the Client for the receipt of such cash income or proceeds (which account shall be under the control of the Client or, if appointed by the Client, its custodian) and shall not be a Managed Asset and (B) any non-cash income or proceeds from such Managed Asset shall remain a Managed Asset and shall be subject to the Client's Client Charter, including the Protocols set forth therein in respect of the relevant Asset Class, and the securities, instruments, assets or other interests comprising such non-cash income or proceeds shall be held in the same accounts and manner as the Managed Asset from which they were generated.

(v)      For purposes of this Agreement, (A) "Current Income" shall mean interest, dividends and other income from Managed Assets other than Disposition Proceeds; (B) "Disposition Proceeds" shall mean all amounts (whether cash, securities, instruments, assets or other interests) received upon the Disposition of a Managed Asset; and (C) "Disposition" shall mean the sale, transfer, exchange, redemption, repayment, repurchase or other disposition of all or any portion of a Managed Asset for cash, securities, instruments, assets or other interests.

(vi)     With respect to the services to be provided to the Client, the Manager shall discharge its responsibility for the investment, management and control of the Client's Managed Assets as a fiduciary and act in good faith solely in the best interest of the Client and shall do so with that degree of care, skill, prudence and diligence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would exercise under similar circumstances in like positions.

(b)      *Authority and Delegation*.  Subject to the Client's Client Charter, including the Protocols set forth therein with respect to each Asset Class, the Client hereby delegates to the Manager all of its powers, authority, privileges and rights with regard to the management, transfer, sale, disposition, refinancing or restructuring of the Managed Assets and any other transactions related thereto and hereby appoints the Manager as its agent in fact with full authority and at its discretion to so manage and effect any such transactions (including Bona Fide Hedging Transactions) involving the Managed Assets in the Client's name, on the Client's behalf and at the Client's risk as the Manager deems appropriate from time to time in order to carry out the Manager's responsibilities hereunder.  Said powers, duties and responsibilities shall be exercised exclusively by the Manager pursuant to and in accordance with the provisions of this Agreement and the Client's Client Charter, including the Protocols set forth therein with respect to each Asset Class.  In addition, subject to the Client's Client Charter and Section 2(a)(vi) above, the Manager shall provide prior written notice to the Client of any of the following matters requiring action and shall be authorized to take the following actions after giving such prior notice to the Client: (i) vote, tender or convert any securities or similar instruments comprising the Managed Assets of the Client; (ii) execute waivers, consents and other instruments with respect to such securities or similar instruments; and (iii) endorse, transfer or deliver such securities or similar instruments or to consent to any

class action, plan of reorganization, merger, combination, consolidation, liquidation or similar plan with reference to such securities or similar instruments.  For the avoidance of any doubt, the Client retains all obligations (including future funding obligations) with respect to each Managed Asset as the record and beneficial owner thereof.  The Manager shall not acquire any asset (other than a Bona Fide Hedging Transaction entered into in accordance with Section 2(a)(ii)), if the terms of such acquisition would impose a future funding obligation on the Client without the prior written consent of the Client.  Unless the consent or approval of the Client is expressly required, the Manager may act in its discretion with respect to the Managed Assets.  Notwithstanding anything in this Agreement to the contrary, the Manager may, with the Client's prior written approval and, in the case of any delegation outside of the ordinary course of business proposed to be made prior to the Termination Date, with the prior written approval of the Creditors' Committee, delegate any or all of its discretionary investment, advisory and other rights, powers, functions and obligations hereunder to any sub-adviser, which may be a third party or any affiliate of the Manager; provided that (i) each such delegation shall be (i) revocable by the Manager upon notice to the delegate and (ii) the Manager shall continue to be liable to the Client for the Manager's obligations hereunder and for all actions of any such third parties or affiliates to the same extent as the Manager is liable for its own actions hereunder.  The Manager shall not incur sub-advisory fees without the written consent of the Client and, in the case of any delegation outside of the ordinary course of business proposed to be made prior to the Termination Date, without the prior written approval of the Creditors' Committee, in which case such fees shall be either (i) borne by the Client or (ii) incurred by the Manager and reimbursed by the Client.

(c)      *Power of Attorney and Proxy*.  The Client by executing this Agreement hereby irrevocably constitutes and appoints the Manager, with full power of substitution, the true and lawful attorney-in-fact, proxy and agent of the Client (and grants to the Manager the Client's full proxy, power and authority), to, subject to the Client Charter of the Client, including the Protocols with respect to the relevant Asset Class, (i) execute, vote, acknowledge, verify, swear to, deliver, record and file, in its or its assignee's name, place and stead, all agreements, instruments, documents and certificates and (ii) take any and all actions, in each case, that the Manager deems appropriate or necessary to enable the Manager to perform its services (including the Disposition, restructuring, refinancing, or funding of any Managed Asset) under this Agreement and deal in the Client's Managed Assets in accordance herewith.  The power of attorney and proxy granted herein shall be deemed to be coupled with an interest, shall be irrevocable, shall survive and not be affected by the Bankruptcy Case or the dissolution, bankruptcy, incapacity or legal disability of the Client and its affiliates and shall extend to its successors and assigns.  Any person dealing with the Manager may conclusively presume and rely upon the fact that any instrument referred to above, executed by such attorney-in-fact, proxy and agent, is authorized, regular and binding, without further inquiry.  If required, the Client shall execute and deliver to the Manager within ten (10) business days after the receipt of a request therefor, such further designations, powers of attorney, proxies or other instruments as the Manager shall reasonably deem necessary for the purposes of giving effect to the foregoing power of attorney or enabling the Manager to perform its services under this Agreement.

(d) *Further Assurances*.  The Client agrees to inform the Manager, and the Manager agrees to inform the Client, promptly in writing if any representation, warranty or agreement made, or information supplied, by such party in this Agreement is no longer true, correct or complete or requires exception and/or modification to remain true; provided that any information provided pursuant to this provision which relates to a period after the date of this Agreement and which alters the accuracy of any representation or warranty contained in this Agreement shall not be considered a breach of such representation or warranty.  The Client agrees to provide such information and execute and deliver such documents, instruments, certificates and opinions (including such documents, instruments, certificates and opinions that are required to allow the Manager to give instructions directly to any Third-Party Custodian (as defined below)) with respect to itself, all of its subsidiaries and any of its Managed Assets as the Manager may from time to time reasonably request to perform the services under this Agreement or to comply with any law, rule or regulation to which the Manager may be subject or for any other reasonable purpose.

3.  <u>Representations by Client</u>.  The Client hereby represents and warrants to, and agrees with, the Manager that, subject to the receipt of any necessary approvals of the Bankruptcy Court: (i) this Agreement has been duly authorized, executed and delivered by the Client and constitutes the Client's legal, valid and binding obligation and, without limitation, all transactions of any kind relating thereto authorized or otherwise contemplated by the Client in this Agreement with respect to each Managed Asset of the Client are within the Client's power, are duly authorized by the Client and, when duly entered into with a counterparty, will be the legal, valid and binding obligations of the Client, subject in each case to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity); (ii) without limitation, the execution and delivery by the Client of, and compliance by the Client with, this Agreement and the Client's Client Charter, and the performance by the Manager of the services hereunder, and the transactions and agreements which the Manager enters into on behalf of the Client with any counterparty pursuant to this Agreement will not violate the constituent documents of, or any law, rule, regulation, order, decree or judgment binding on the Client, or any contractual restriction binding on or affecting the Client or its properties and no governmental or other notice or consent is required in connection with the execution, delivery or performance of this Agreement by the Client or of any agreements governing or relating to the Client's obligations hereunder; and (iii) the Client shall have full responsibility for payment of all taxes due on capital or income held or collected for the benefit of the Client.

4.  <u>Representations, Warranties and Covenants of the Manager</u>.  (a)  The Manager hereby represents and warrants to, and agrees with, the Client that, subject to the receipt of any necessary approvals of the Bankruptcy Court as a result of the pending Bankruptcy Case: (i) this Agreement has been duly authorized, executed and delivered by the Manager and constitutes the Manager's legal, valid and binding obligation of the Manager, enforceable against it in accordance with its terms, subject in each case to applicable bankruptcy,

insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity); (ii) without limitation, the execution and delivery by the Manager of, and compliance by the Manager with, this Agreement, and the performance by the Manager of the services hereunder, and the transactions and agreements which the Manager enters into on behalf of the Client with any counterparty pursuant to this Agreement will not violate the constituent documents of, or any material law, rule, regulation, order, decree or judgment binding on the Manager, or any material contractual restriction binding on or affecting the Manager or its properties and no governmental or other notice or consent is required in connection with the execution or delivery of this Agreement by the Manager or, to the Manager's knowledge, of any agreements governing or relating to the Manager's obligations hereunder; and (iii) the Manager shall at all times act in accordance with (a) this Agreement (unless otherwise agreed to in advance by the Client) and (b) any provision of applicable law, including the U.S. Investment Advisers Act of 1940, as amended (the "Advisers Act") and all applicable rules and regulations of the Securities and Exchange Commission (the "SEC") promulgated thereunder, including by maintaining all necessary licenses, permits and other authorizations from the SEC and any other regulatory, self-regulatory or other governmental authority (each, a "Regulatory Authority"), except where a failure to act in accordance with this Agreement or where a failure to possess any licenses, permits and other authorizations or any non-compliance with the same, would not have a material adverse effect on the performance by the Manager of the services hereunder.

(b)     The Manager hereby covenants not to enter into any transaction or agreement on behalf of the Client pursuant to this Agreement unless such transaction or agreement complies with applicable law.

5.     Portfolio Execution.  The Client, unless it directs the Manager to use a particular broker or dealer (a "Directed Broker"), hereby delegates to the Manager sole and exclusive authority to designate the brokers or dealers through which all purchases and sales, or any other transactions related thereto, of Managed Assets on behalf of the Client will be made.  To the extent permitted by applicable law, such brokers or dealers may include any firm that may be presumed an affiliate of the Manager ("Affiliated Broker-Dealers").  The Manager will determine the rate or rates, if any, to be paid for brokerage services provided to the Client with respect to its Managed Assets.  The Manager agrees that securities are to be purchased through such brokers as, in the Manager's best judgment, shall offer the best combination of price and execution.  The Manager, in seeking to obtain best execution of portfolio transactions for the Client, may consider the quality and reliability of brokerage services, as well as research and investment information and other services provided by brokers or dealers.  Accordingly, the Manager's selection of a broker or dealer for transactions with respect to the Managed Assets may take into account such relevant factors as (i) price, (ii) the broker's or dealer's facilities, reliability and financial responsibility, (iii) when relevant, the ability of the broker to effect securities transactions, particularly with regard to such aspects as timing, order size and execution of the order, (iv) the broker's or dealer's recordkeeping capabilities and (v) the

research and other services provided by such broker or dealer to the Manager in a manner that falls within the safe harbor of Section 28(e) of the Securities and Exchange Act of 1934, as amended, provided that all such research and other services are used by the Manager for the benefit of the Client (collectively, "Research"). Upon the request of the Client, the Manager shall provide to the Client regular reports in such form and at such times as may reasonably be required by the Client, setting forth the amount of total brokerage business placed by the Manager with respect to the Managed Assets and the allocation thereof among brokers and dealers, identifying those brokers and dealers which provided research services, and containing such other information as the Client may reasonably request. In the event that the Client instructs the Manager to place orders through a Directed Broker, including a Directed Broker who is also an Affiliated Broker-Dealer, the Client hereby acknowledges that the Manager may not obtain "best execution" and waives any applicable "best execution" requirements with respect to transactions with such Directed Broker, provided that the Manager shall monitor and advise the Client if any such Directed Broker fails to obtain "best execution."

6.    Aggregation and Allocation of Orders. Subject to Section 2(a)(vi), the Client authorizes the Manager, at the Manager's discretion, to bunch or aggregate orders with respect to the Client's Managed Assets with orders of other clients and to allocate the aggregate amount of the investment among accounts (including accounts in which the Manager, its affiliates and/or their personnel have beneficial interests) in a fair and equitable manner. When portfolio decisions are made on an aggregated basis, the Manager may, in its discretion, place a large order to purchase or sell Managed Assets for the Client and the accounts of several other clients. The Client acknowledges that: (i) because of the prevailing trading activity, it is frequently not possible to receive the same price or execution on the entire volume of securities purchased or sold; (ii) if this occurs, the various prices may be averaged and the Client will be charged or credited with the average price, and the effect of the aggregation may operate on some occasions to the Client's disadvantage; (iii) although in such an instance the Client will be charged the average price, the Manager will make the information regarding the actual transactions available to the Client upon the Client's request; and (iv) the Manager and its affiliates are not required to bunch or aggregate orders, and therefore the Client may not receive the average price on any given trade. Notwithstanding the foregoing, to the extent the Manager has custody of the Managed Assets pursuant to Section 10 of this Agreement, the Manager will segregate and keep separate and readily identifiable such Managed Assets from the assets of its other clients.

7.    Conflicts of Interest; Affiliated Transactions. (a) *General*. This Agreement shall not be construed in any manner to preclude the Manager from engaging in any business or other activity whatsoever. If any matter arises with respect to one or more Managed Assets of the Client that the Manager determines in its good faith judgment may constitute a conflict of interest, the Manager shall provide prompt notice of such matter to the Client and the Creditors' Committee (provided that there shall be no requirement to provide notice to the Creditors' Committee if such a determination of the Manager is made on or after the Termination Date), and shall take such actions, including consultation with the Client or taking actions consistent with (i) the Client's Client Charter, including the Protocols set forth therein with respect to the relevant Asset Class, or (ii) the instruction

of the Client or procedures approved by the Client, as it determines acting in good faith may be necessary or appropriate to ameliorate the conflict. Upon the Manager taking an action in accordance with the instruction of, or procedures approved by, the Client, and subject to Section 2(a)(vi), the Manager shall be relieved of any liability for such conflict to the fullest extent permitted by law.

(b)  *Cross Trades*. From time to time, when determined by the Manager to be in the best interest of the Client and consistent with the Client's Client Charter and the Manager's duty to obtain "best execution," the Client's Managed Assets may be purchased from or sold to another account (including public or private collective investment vehicles) managed, maintained or trusteed by the Manager or an affiliate at prevailing market levels in accordance with applicable law and utilizing, with respect to pricing, such pricing methodology determined to be fair and equitable to the Client in the Manager's reasonable judgment. The Manager shall provide written confirmation to the Client of any cross trade effectuated pursuant to this Section 7(b).

(c)  *Agency Cross Trades*. Consistent with applicable law, the Client hereby authorizes the Manager to effect agency cross transactions on its behalf with its Affiliated Broker-Dealers, and understands that such Affiliated Broker-Dealers may retain commissions in connection with effecting any transactions for the Client. Upon registration of the Manager under the Advisers Act, the Manager and any Affiliated Broker-Dealers shall thereby be authorized, consistent with applicable law, by the Client to execute agency cross transactions (as defined in Rule 206(3)-2 under the Advisers Act) on behalf of the Client. The Client acknowledges that agency cross transactions may facilitate a purchase or sale of a block of securities of the Managed Assets at a predetermined price and may avoid unfavorable price movements which might otherwise be suffered if the purchase or sale order were exposed to the market; however, the Manager and its Affiliated Broker-Dealers may act as brokers for and receive commissions from, and therefore may have a potentially conflicting division of loyalties and responsibilities regarding, both parties to an agency cross transaction. The Client understands that its authority to the Manager to effect agency cross transactions for the Client is terminable at will without penalty, effective upon receipt by the Manager of written notice from the Client. The Manager shall provide written confirmation to the Client of any agency cross trade effectuated pursuant to this Section 7(c).

8.  <u>Reports, Valuations, Meetings and Other Communications</u>. (a) The Manager shall provide the Client with reports containing the valuations and status of the Managed Assets on such basis and at such times as shall be set forth in the Client's Client Charter under "Periodic Reporting" with respect to each Asset Class. To the extent valuation levels for the Managed Assets of the Client are provided pursuant to requirements set forth in the Client's Client Charter, such valuations will reflect the Manager's good faith and diligent effort to ascertain fair value levels (including accrued income, if any) for such Managed Assets based on pricing and valuation information believed by the Manager after due inquiry to be reliable under the circumstances or on such basis as shall be set forth in the Client's Client Charter under "Valuation" with respect to each Asset Class. The Client acknowledges that valuation levels may not ultimately be realized due to, among other factors, market conditions, future operating results, transaction size, legal

and contractual restrictions on transfers that may limit liquidity, any related transaction costs, the timing and manner of the sales, economic and political developments, interest rates and issuer-specific events, and sector positioning. Exchange rates determined by the Manager in good faith to be reasonable under the circumstances will be applied in valuing holdings in foreign currency. The Client agrees that the Manager is only obligated to send to the Client copies of any trade confirmations it receives upon written request of the Client. The Client acknowledges and agrees that (i) none of the information which the Manager provides the Client hereunder shall be deemed to be the official books and records of the Client, which shall be maintained and kept by the Client, for tax, accounting and all other purposes; provided that the Manager acknowledges that any such reporting and valuation information produced by it may serve as supporting information with respect to the official books and records maintained and kept by the Client; and (ii) the Client will not publish, reproduce (except for internal or archival purposes) or disseminate any non public pricing information provided by the Manager without the Manager's consent; provided that such consent shall not be required with respect to any disclosure (a) to the Creditor's Committee or the advisors of the Creditors' Committee, or (b) otherwise required in the Client's sole discretion, or by law, legal process or other compulsory process or regulatory inquiry, including in connection with disclosures made in connection with the Bankruptcy Case. Unless otherwise provided expressly in the Client's Client Charter under "Asset Management and Investment Management Services" with respect to an Asset Class, the Manager shall be responsible for determining the value of the Managed Assets of the Client.

(b)        The Manager, upon request of the Client, shall attend meetings with representatives of the Client to discuss the position of the Client's Managed Assets and the investment outlook, and shall submit its views in writing to the Client as requested by the Client from time to time.

(c)        In connection with services being provided hereunder, the Creditors' Committee and its advisors may communicate with employees of the Manager to the extent and in the manner in which it currently communicates with employees of the Client.

(d)        The Manager shall notify the Client and the Creditors' Committee promptly upon becoming aware of (i) any changes or events that could reasonably be expected to materially and adversely affect the Managed Assets of the Client or the Manager's management of such Managed Assets, including the following: any audit, investigation, inquiry, action or proceeding by any Regulatory Authority involving the Manager or such Managed Assets of which the Manager has received notification from such Regulatory Authority and (ii) any financial condition of or significant corporate event involving the Manager that would reasonably be expected to materially and adversely affect its ability to meet contractual commitments to the Client under this Agreement; provided that there shall be no requirement to provide notice to the Creditors' Committee if the Manager becomes aware of any change, event or condition set forth in the previous sentence on or after the Termination Date.

9.        Compensation; Expenses. (a) The Manager shall be compensated by the Client with respect to Managed Assets of the Client within a particular Asset Class in accordance

with the terms set forth in Appendix F with respect to such Asset Class, which amount shall be due and payable at the times and in the amounts set forth in Appendix F.

(b)    The Client shall be responsible for the payment of all costs, fees and expenses incurred in respect of the Client's Managed Assets.  By way of example, and not limitation, the Client will bear with respect to its Managed Assets: (i) any brokerage commissions, transfer fees, registration costs, taxes and other similar costs, (ii) fees and expenses of persons providing specialty pricing and valuation services, (iii) legal, financial, accounting, due diligence, placement, consulting and other advisory fees, costs and expenses, (iv) fees and expenses (including fees and expenses listed in any separate custody agreement) in connection with the custody of such Managed Assets held by a Third-Party Custodian (as defined in Section 10 hereof), (v) any travel and accommodation expenses, (vi) all costs and all fees (including commitment fees) and expenses due of any lenders, investment banks or other financing sources, (vii) any topping, termination or break-up fees, deposits or down payments of cash or other property that are forfeited in connection with a prospective or potential transaction, (viii) any taxes, fees or other governmental charges levied against the Managed Assets and all expenses incurred in connection with any tax audit, investigation, settlement or review of such Managed Assets, (ix) fees, costs and expenses of persons (other than, to avoid any doubt, persons regularly employed on a full-time basis by the Manager) providing mortgage servicing with respect to such Managed Assets, (x) a pro rata portion of fees, costs and expenses of any insurance usual and customary for asset management businesses similarly situated to the business of the Manager, and (xi) any expenses related to Bona Fide Hedging Transactions entered into with respect to such Managed Assets.  The Client hereby authorizes the Manager to incur such costs, fees and expenses with respect to the Client's Managed Assets and such transactions and such costs, fees and expenses shall be paid or reimbursed separately to the Manager by the Client within no more than thirty (30) days after the Client receives a written invoice therefor setting forth in reasonable detail the types of expenses with respect to the Client's Managed Assets.  Alternatively, the Manager may, on behalf of the Client, cause the Client to incur and pay directly any such costs, fees and expenses.  Any amounts paid as compensation by the Client to the Manager pursuant to Section 9(a) must not be duplicative of expenses paid or reimbursed by the Client pursuant to this Section 9(b).  Notwithstanding that the Manager is responsible for payment of the expenses (if any) relating to the services to be provided to the Manager pursuant to the Shared Services Agreement dated as of [●], 2010 between the Manager and the Client; the Client shall be responsible for reimbursement of any such amounts to the Manager.

(c)    On the date of this Agreement, the Client shall pay to the Manager, in advance, the estimated Personnel and Non-Personnel Expenses (as such term is defined in Appendix F under "Management Fees") (as estimated by the Manager) through the end of the second calander quarter of 2010, with any balance due to the Manager for services performed during the applicable management fee period to be paid by the Client at the time the Client pays the first Estimated Quarterly Fee Amount (as such term is defined in Appendix F under "Management Fees").

10.    Custody.  The Manager and the Client agree that (i) the current custodial arrangements related to the Managed Assets of the Client shall remain unchanged unless otherwise agreed by the Client and (ii) under the current custodial arrangements, such Managed Assets are held by the Client or, to the extent required, a "qualified custodian" as defined in Rule 206(4)-2 of the Advisers Act (a "Qualified Custodian") that is not affiliated with the Client or the Manager (a "Third-Party Custodian").  To the extent that the Client agrees to modify the current custodial arrangements with respect to the Client's Managed Assets, the Client may appoint and enter into an agreement with additional Third Party Custodians; provided, however, that, to the extent that the Manager is a Qualified Custodian, the Client may appoint the Manager as custodian of the Managed Assets or any portion thereof.  The Manager is authorized to give instructions (including, as applicable with respect to particular Managed Assets of the Client, in the exercise of its discretion in respect thereof) to such Third-Party Custodian with respect to all transaction and related decisions regarding such Managed Assets.  The Manager will have no liability with respect to the custodial arrangements of, or the acts, conduct, or omissions of, a Third-Party Custodian.  With respect to Managed Assets of the Client maintained by a Third-Party Custodian, the Manager shall have no responsibility or liability with respect to the collection of income or the physical acquisition, management of capital charges, or safekeeping of such Managed Assets, securities, funds, and/or other properties that comprise such Managed Assets or affecting authorized distributions.  All such duties shall be the sole obligation of the Client or Third-Party Custodian, if appointed.  To the extent that a Managed Asset of the Client is deemed an Untitled Asset, the Manager shall not be deemed to have custody of such Managed Asset unless the Client cures such insufficiency or defect without prejudice to the Manager.  To the extent the Manager has custody of Managed Assets of the Client, the Manager will segregate and keep separate and readily identifiable such Managed Assets from the assets of its other clients.

11.    Confidential Information.  The Manager agrees with the Client that it will, and will cause its officers, directors, affiliates and employees, agents and representatives to, at all times keep confidential and not divulge, furnish or make accessible to any person or entity, any confidential information, knowledge or data concerning or relating to this Agreement, the Client or any of the Client's Managed Assets, including positions, trading or other sale information, strategies, hedging and the like, or any other information related to any of the forgoing (the Client's "Confidential Information") without the prior written consent of the Client, except as follows:

(a)    Where disclosure is expressly permitted under the terms of this Agreement;

(b)    Where disclosure is required for the purpose of making, acquiring, restructuring, refinancing, settling, realizing, or engaging in any other transaction with respect to a Managed Asset of the Client in accordance with the terms of the Agreement and the Client's Client Charter, including the Protocols with respect to the related Asset Class;

(c)    Where disclosure is required by compulsory process, law or the order of any court or pursuant to any request or requirement of any Regulatory Authority, bank examiner or statutory auditor;

(d)     Where the disclosure is or becomes public by no fault of the Manager, any of its affiliates or any of their respective partners, members, directors, officers, employees, representatives or agents; or

(e)     Where disclosure is made to the Creditors' Committee or its advisors;

but in an event under paragraph (c) above, and unless precluded from doing so by applicable law or the obligation of immediate disclosure, the Manager shall give the Client, before making the disclosure, an opportunity to oppose the disclosure, and shall coordinate the wording of such disclosure with the Client (to the extent permitted by law).  The Manager shall be entitled to disclose information received by the Client to the Manager's directors, employees, service providers and professional advisors wherever located with respect to this Agreement (provided that (i) such disclosure is for the purpose of supporting the provision of services under this Agreement and (ii) such directors, employees, service providers and professional advisors (A) are also bound by an obligation of confidentiality substantially similar to this Section 11 and (B) need to know such information for the purpose of supporting the provision of services under this Agreement).

12.     <u>Directions to the Manager</u>.  (a)  All directions by or on behalf of the Client to the Manager shall be in writing signed by the persons set forth under "Authorized Person(s)" in the Client's Client Charter.  The Manager shall be fully protected in relying upon any direction in accordance with the previous sentence with respect to any instruction, direction or approval of the Client, and shall be so protected also in relying upon a certification duly executed on behalf of the Client as to the names of persons authorized to act for it under the Client's Client Charter and in continuing to rely upon such certification until notified by the Client to the contrary.

(b)     The Manager shall be fully protected in acting upon any instrument, certificate or paper believed by it in good faith to be genuine and to be signed or presented by the proper persons or upon any statement contained in any such writing and may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

13.     <u>Limitation of Liability</u>.  To the maximum extent permitted by law, neither the Manager nor any other Manager Indemnitee (as defined below) shall be liable to the Client for any expenses, losses, damages, liabilities, demands, charges and claims of any kind or nature whatsoever (including (x) any legal expenses and costs and expenses relating to investigating or defending any demands, charges and claims and (y) for the avoidance of any doubt, any demands, charges and claims brought by any creditor of the Client or its affiliates) (collectively, "<u>Losses</u>") arising out of any acts or omissions of the Manager, except to the extent that such Losses are the result of an act or omission taken or omitted by the Manager or any other Manager Indemnitee during the term of this Agreement that constitutes gross negligence, willful misconduct, bad faith, breach of fiduciary duty, material breach of any regulatory or legal requirements, fraud or a breach of Section 2(a)(vi), any material breach of any other provision of this Agreement or the Client's Client Charter.  Expenses incurred by a Manager Indemnitee in defense or settlement of

any claim that may be subject to a right of indemnification hereunder shall be advanced by the Client prior to the final disposition thereof; provided that each Manager Indemnitee shall repay any such amounts advanced to such Manager Indemnitee if it is finally determined that such Manager Indemnitee is not entitled to indemnification. Without limitation, neither the Manager nor any other Manager Indemnitee shall be liable to the Client for Losses resulting from or in any way arising out of (i) any action of the Client or any Third-Party Custodian of the Client or any of their other agents or advisers (other than the Manager, the Manager Indemnitees and any person or entity to whom the Manager has delegated its authority), (ii) any action of the Manager, following any direction of the Client or the Manager's failure to follow any unlawful direction of the Client, provided, that if the Manager knew or should have known that such direction was unlawful or would reasonably result in such Losses, the Manager so informed the Client, (iii) force majeure events beyond the control of the Manager, including any failure, default or delay in performance resulting from computer or other electronic or mechanical equipment failure, unauthorized access, strikes, failure of common carrier or utility systems, severe weather or breakdown in communications, in each case not reasonably within the control of the Manager or other causes commonly known as "acts of god", whether or not any such cause was reasonably foreseeable, (iv) following reasonable written notice from the Manager of its obligation to perform, any failure or default by the Client to perform on any commitment it has with respect to any of its Managed Assets, including any capital commitment subject to draw-down, or (v) general market conditions unrelated to any violation of this Agreement or the Client's Client Charter by the Manager. The Manager gives no warranty as to the performance or profitability of the Client's Managed Assets, nor any guarantee that the investment objectives, expectations or targets described in this Agreement and/or as set forth in the Clint's Client Charter will be achieved, including any risk control, risk management or return objectives, expectations or targets. The Managed Assets of the Client may suffer losses and income, if any, may fluctuate. Neither the Manager nor any other Manager Indemnitee shall be responsible for the performance by any person not affiliated with the Manager of such person's obligations in executing, completing or satisfying such person's obligations, except as provided in the penultimate sentence of Section 2(b) hereof. Other than its responsibilities with respect to the Managed Assets of the Client as described herein and in the Client's Client Charter, the Manager shall have no responsibility whatsoever for the management of any other assets of the Client and shall incur no liability for any Losses which may result from the management of such other assets. Nothing herein shall constitute a waiver or limitation of any rights which the Client may have, if any, under any applicable U.S. federal and state securities laws and that may not be waived.

14. Indemnification.

(a)     The Client shall reimburse, defend, indemnify and hold harmless the Manager, its affiliates and their partners, members, directors, officers and employees and any person controlled by or controlling the Manager ("Manager Indemnitees") for, from and against any and all Losses (i) relating to (x) any misrepresentation or act or omission or alleged act or omission on the part of the Client or any Third-Party Custodian or any of their other agents or advisers of the Client or (y) any act or omission taken in conformity with

the instructions given by the Client with respect to any matter; or (ii) arising out of or relating to a Manager Indemnitee's acts, omissions, transactions, duties, obligations or responsibilities arising pursuant to this Agreement in respect of the Client's Managed Assets, unless, in the case of this clause (ii), a court of competent jurisdiction (or similar tribunal) has issued a final, non-appealable decision, judgment or order that such Manager Indemnitee's conduct constituted gross negligence, willful misconduct, bad faith, breach of fiduciary duty, material breach of any regulatory or legal requirements, fraud or a breach of Section 2(a)(vi) or any material breach of any other provision of this Agreement or the Client's Client Charter.

(b)       The Manager shall reimburse, defend, indemnify and hold harmless the Client, its affiliates and their partners, members, directors, officers and employees and any person controlled by or controlling such ("<u>Client Indemnitees</u>") for, from and against any and all Losses arising out of or relating to a Manager Indemnitee's acts, omissions, transactions, duties, obligations or responsibilities arising pursuant to this Agreement in respect of the Client's Managed Assets, <u>provided</u> that a court of competent jurisdiction (or similar tribunal) has issued a final, non-appealable decision, judgment or order that such Manager Indemnitee's conduct constituted gross negligence, willful misconduct, bad faith, breach of fiduciary duty, material breach of any regulatory or legal requirements, fraud or a breach of Section 2(a)(vi) or any material breach of any other provision of this Agreement or the Client's Client Charter.

15.    <u>Non-Exclusive Management</u>.  The Client acknowledges and agrees that this advisory relationship is not exclusive and that the Manager may furnish investment and asset management and advisory services to others, and that the Manager shall be at all times free, in its discretion, to make recommendations to others which may be the same as, or may be different from those made to or on behalf of the Client.  The Client further understands that the Manager, its affiliates, and any officer, director, stockholder, employee or any member of their families may or may not have an interest in securities or assets in respect of which transactions may be recommended by the Manager.  Actions with respect to assets of the same kind may be the same as or different from the action which the Manager, or any of its affiliates, or any officer, director, stockholder, employee or any member of their families, or other investors may take with respect thereto.

16.    <u>Effective Period of Agreement and Amendments</u>.  This Agreement shall become effective on the date hereof.  Any amendment to this Agreement shall be written and signed by the Manager and the Client, provided, that such amendment shall only be binding on and enforceable against the Client if such amendment shall have been duly signed by the Client.  Any material amendment, modification, supplement or waiver to this Agreement proposed to be made prior to the Termination Date shall require the prior approval of the Creditors' Committee.  The Client has the right at any time and from time to time to amend, modify or change the Client's Client Charter by written notice to the Manager.  Notwithstanding any other provision hereof, this Agreement may be amended by the Manager, in its sole discretion, and without the consent of the Client to update the identity of the "<u>Notice Recipients</u>" of the Manager set forth in the Client's Client Charter where such persons have been changed by the Manager by written notice to the Client.

17.     <u>Duration and Termination</u>.  (a)  This Agreement shall continue in full force and effect in respect of the Client for an initial term of three years, subject to automatic renewal on an annual basis thereafter (the "<u>Term</u>") unless (i) terminated by the Client earlier for "<u>Cause,</u>" pursuant to Section 17(b) below, (ii) terminated by the Client earlier, in whole or in part, pursuant to Section 17(c) below or (iii) terminated by the Client effective as of the date of any automatic renewal of the Term by providing written notice of such termination to the Manager at least 90 days prior to the beginning of such automatic renewal term.

(b)     Following a determination of Cause (as defined below), the Client may terminate this Agreement on not less than 30 days notice to the Manager; <u>provided</u> that the Client will continue to pay all fees, costs and expenses pursuant to Section 9 above through the end of such 30 day notice period.  "Cause" shall mean a finding by any court or governmental body of competent jurisdiction in a final judgment of gross negligence, willful misconduct, bad faith, breach of fiduciary duty, material breach of any regulatory or legal requirements, or fraud by the Manager in the performance of its services hereunder, or a breach by the Manager of Section 2(a)(vi) or any material breach of any other provision of this Agreement or the Client's Client Charter.

(c)     The Client shall have the right to terminate this Agreement and its obligations hereunder with respect to all or any portion of its Managed Assets at any time upon 60 days notice to the Manager without Cause; <u>provided</u> that the Client will continue to pay (i) all fees, costs and expenses pursuant to Section 9 above through the end of such 60 day notice period and as provided in Appendix F and (ii) any costs for terminating any related Bona Fide Hedging Transactions or other contracts related to such Managed Asset, any salary, severance, occupancy payments (e.g., rent and other lease payments), costs of service providers and vendors and other overhead expenses of the Manager (including, for the avoidance of doubt, any "Personnel and Non-Personnel Expenses", as set forth in Appendix F with respect to the related Asset Class or Asset Classes, and other reimbursable expenses) that were allocated in good faith by the Manager to the performance of the services for the Client that were so terminated or which are incurred by the Manager in respect of the terminated services or the termination of the relevant Managed Asset in response to such termination.

(d)     Termination of the Manager's discretionary authority hereunder with respect to the Client and the Client's Managed Assets, including the termination of the power of attorney and proxy set forth in Section 2(c), shall be effective immediately upon the Client's delivery of written notice of termination to the Manager; <u>provided</u> that, to the extent applicable with respect to any Managed Assets, the Client shall honor any trades or other transactions entered into but not settled, closed or consummated, as applicable, before the date of any such termination.  Sections 2(c) and (d), 3, 9 (in respect of expenses incurred through the date of termination), 11, 12, 13, 17, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29 and 30 shall survive the termination of this Agreement.

(e)     The Client hereby agrees that during the period from the date of this Agreement until the earlier of (i) one year after termination or assignment of this Agreement with respect to all or any portion of its Managed Asset, or (ii) six months after the Termination

Date, it shall not solicit or seek to induce or encourage or actually induce or encourage any person who is employed by the Manager or its affiliates and who is primarily involved with the management of the related Asset Class at any time during such period to discontinue his or her employment with the Manager or its affiliates, and shall not hire or employ any such person or any other investment advisor or manager that has so solicited, induced or encouraged any such person.

(f)     In the event of any termination of this Agreement by the Client prior to the Termination Date, in whole or in part, pursuant to any provision of this Section 17 in respect of its Managed Assets within one or more Asset Classes whereby such termination necessitates internal reallocation by the Client of the Management Fees allocated to the entity or entities listed on <u>Schedule A</u> in respect of each such Asset Class (pursuant to the allocation methodology set forth on Appendix F) such that the Management Fee allocable to any such entity or entities is increased by an amount equal to three percent (3%) or more per annum, the Client shall provide written notice of such increase in allocated fees, as soon as practicable, to the Creditors' Committee attaching a description of the effect of such termination on the fees allocated by the Client to any other entity or entities listed on <u>Schedule A</u> in respect of each such Asset Class.

(g)     In the event of any termination of this Agreement by the Client in respect of the Managed Assets, the Manager shall cooperate on good faith in transitioning investment and management of such Managed Assets to an investment manager or other person or entity designated by the Client.

18.     <u>Independent Contractor Status</u>.  The Manager shall, for all purposes, be an independent contractor.  Except as authorized by this Agreement, the Manager shall have no authority to act for or represent the Client in any way and shall not be deemed an agent of the Client.  The Client and the Manager agree that, by entering into this Agreement, they do not form a partnership for any purpose and shall not be deemed to be partners in a joint venture or members of a joint enterprise in the conduct of any business.  The amounts paid by the Client to the Manager pursuant to this Agreement constitute compensation for asset management, investment management and administrative and custodial services rendered by the Manager to the Client.

19.     <u>Assignment</u>.  No assignment (as that term is defined in the Advisers Act) of this Agreement by the Manager in respect of Managed Assets of the Client may be made without the prior written consent of the Client and the Creditors' Committee, and any such assignment made without such consent shall be null and void for all purposes; <u>provided</u> that any such assignment proposed to made on or after the Termination Date shall not require prior written consent of the Creditors' Committee; and <u>provided further</u> that, unless otherwise required by the Advisers Act (i) the Manager may be reconstituted or reorganized into any other form of business entity and (ii) nothing in this Agreement shall preclude changes in the composition of the direct or indirect members of the Manager, that do not result in an assignment (as that term is defined in the Advisers Act). The Client may assign this Agreement (a) with the consent of the Manager (such consent not to be unreasonably withheld), (b) without the consent of the Manager as required pursuant to an order issued in connection with the Bankruptcy Case or (c) to any

successor or purchaser in connection with (i) a merger of the Client or (B) a sale of all or substantially all of the assets of the Client.  Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and permitted assigns.

20.    No Third Party Beneficiaries.  This Agreement is solely for the benefit of the parties hereto (and with respect to the provisions of Sections 14 and 19 hereof, Manager Indemnitees and permitted assignees, respectively) and the entities set forth on Schedule A, and should not be deemed to confer upon any other third parties (including any creditor of the Client or its affiliates other than the Creditors' Committee which shall, until the Termination Date, be a third-party beneficiary of this Agreement with rights to enforce the obligations of the parties hereto) any remedy, claim, liability, reimbursement, claim of action or other right.

21.    Fiduciary Duties.  Notwithstanding anything to the contrary set forth herein, (i) the services to be provided by the Manager hereunder in respect of Managed Assets owned by an entity listed on Schedule A hereto shall be provided for the benefit of such entity listed on Schedule A herto and (ii) the duties set forth in this Agreement owed to the "Client" in respect of the services to be provided by the Manager for the benefit of such entity listed on Schedule A hereto, including without limitation the duties of the Manager set forth in Sections 2(a)(vi) and 7(b), shall be owed by the Manager to such entity listed on Schedule A hereto as if such entity listed on Schedule A hereto was the "Client".

22.    Severability.  Any term or provision of this Agreement which is invalid or unenforceable in any applicable jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms or provisions of the Agreement in any jurisdiction.

23.    Submission to Jurisdiction; Consent to Service of Process.  (a)  Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 27 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 27.

24.     <u>Waiver of Right to Trial by Jury</u>.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

25.     <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to conflict of law principles thereof.

26.     <u>Entire Agreement</u>.  This Agreement, including the other appendices and schedules hereto and including in respect of the Client the Client's Client Charter, constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Manager and the Client with respect to the subject matter hereof.

27.     <u>Notices and Other Communications</u>.  (a)  All notices and written consents required or permitted to be sent under this Agreement shall be in writing, and shall be sent,

if to the Manager:     LAMCO LLC
                       1271 Avenue of the Americas
                       New York, NY 10020
                       Attention:  William Gordon
                       or by email to:  wgordon@alvarezandmarsal.com


                       With a copy to:
                       LAMCO LLC
                       1271 Avenue of the Americas
                       New York, NY  10020
                       Attention:  Ashvin Rao
                       or by email to:  ashvin.rao@lehmanholdings.com

if to the Client:      Lehman Brothers Holdings Inc.
                       1271 Avenue of the Americas
                       New York, NY 10020
                       Attention:  John Suckow
                       or by facsimile to:
                       or by email to: john.suckow@lehmanholdings.com

                       With a copy to:
                       Lehman Brothers Holdings Inc.
                       1271 Avenue of the Americas
                       New York, NY 10020
                       Attention:  Martha Solinger and Thomas Hommel

or by facsimile to:  (212) 520-0421
or by email to:
martha.solinger@lehmanholdings.com and
thomas.hommel@lehmanholdings.com

if to the Creditors'          Milbank, Tweed, Hadley & McCloy LLP
Committee:                    601 S. Figueroa St., 30th Floor
                              Los Angeles, CA 90017
                              Attention:  Brett Goldblatt
                              or by facsimile to:  (213) 892-4771
                              or by email to: bgoldblatt@milbank.com

                              With a copy to:
                              Houlihan Lokey Howard & Zukin Capital, Inc.
                              245 Park Avenue, 20th Floor
                              New York, NY 10167
                              Attention:  Ann Miller
                              or by facsimile to:  (212) 661-3070
                              or by email to:  AMMiller@HL.com

or such other name or address as may be given in writing to the other parties.  All notices and written consents hereunder shall be sufficient if delivered by facsimile, overnight mail, electronic mail or electronically via the internet using an id and password provided by the Manager.  Any notices or written consent to the Client shall be deemed given only upon sending in accordance herewith.

(b)        The Client acknowledges and agrees that where in this Agreement or otherwise instructions, reports, notices or other communications may be transmitted via electronic mail, the internet or other similar media, such communications may not be encrypted and there is no guarantee that such communications will be delivered to the intended recipient promptly, in the correct format or at all, it is possible that such communications may be intercepted, read and/or amended by unauthorized persons and the Manager cannot be responsible for unauthorized access. The Client agrees that all risks associated with the transmission of communications electronically or via the internet or other similar media shall be at the Client's risk.  The Client agrees that it will not share any user id, password and access to information provided electronically via the internet with any third party and will agree to other reasonable confidentiality restrictions with respect to information delivered through such medium.  If the Client no longer wishes to receive information via electronic mail, the internet or other similar media, or is unwilling to accept the risks inherent in electronic communication, the Client should contact the Manager to arrange for another means of supplying the information.  Subject to the preceding, the Client consents to receive (i) Part II of the Manager's Form ADV, (ii) the offer letter for Part II of Form ADV, and/or (iii) NASD Rule 2790 negative consent letters, as applicable, via electronic mail.

28.    Interpretation.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns

stated in either the masculine or the neuter gender shall include the masculine, the feminine and the neuter. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

29.   <u>Headings; Internal References</u>.  When a reference is made in this Agreement to Sections, Annexes, Exhibits or Schedules, such reference shall be to a Section, Annex, Exhibit or Schedule to this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement are for convenience and reference purposes only and shall not be deemed to alter or affect in any way the meaning or interpretation of any provisions of this Agreement.

30.   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

*[Rest of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: _____

Title: _____

LAMCO LLC,
by Lehman Brothers Holdings Inc., its managing member

By: _____

Name: _____

Title: _____

| Asset Class | Commercial Real Estate Assets, including, but not limited to: <br>– Corporate debt, mezzanine debt, mortgage debt, equity and real estate owned in various property types (e.g., retail, industrial, office, multifamily, hospitality, condominium and lot development), including: <br>   ○ Senior mortgages <br>   ○ B-Notes <br>   ○ 2nd and junior mortgages <br>   ○ Mezzanine loans <br>   ○ Preferred equity <br>   ○ Bridge equity <br>   ○ Equity in real estate <br>   ○ Corporate loans (secured and unsecured; syndicated and non-syndicated) <br>   ○ Seller financing <br>   ○ Bank loans <br>   ○ Ownership interest in funds (general and limited partner) <br>   ○ Real Estate Owned <br>   ○ Lines of credit and other future funding obligations |
|---|---|
| Asset Management and Investment Management Services | – Provide active portfolio management, which includes all tasks typically undertaken in this Asset Class with the objective of maximizing returns and minimizing risks given the capital structure, property type, property location and agreements (including buying, selling, refinancing, financing, restructuring, recapitalizing, hedging, and all similar asset management activities undertaken in the ordinary course) <br>– Provide property management services <br>– Provide financial modeling of real estate assumptions to support strategic decisions, including valuation assessments <br>– Provide due diligence in conjunction with third parties to support market and property assumptions <br>– Monitor real estate capital markets and property markets to determine appropriate exit strategies <br>– Provide financial information related to actual performance as well as forecasts |
| Management Fee | See Appendix F hereto. |
| Periodic Reporting | The Manager shall within sixty (60) calendar days after the end of each quarter furnish, or shall cause a Third-Party Custodian to furnish, to the Client a written statement of Assets under management ("AUM") for this Asset Class at the close of business on the last business day of each quarter.  In addition, from time to time as requested by the Client, the Manager shall prepare and provide the Client with such reports, statistics, data, and other records relating to the performance or other material information about the Managed Assets in this Asset Class for which the Manager is providing management services, in each case, (i) subject to any confidentiality restrictions to which the Manager may be subject including, but not limited to, reports on discounted payoffs, sales, properties and loans transferred to special purpose entities, restructurings and new financings and further subject to reasonable delays in the event of the late receipt of any necessary financial statements, (ii)  consistent with the reporting currently being provided to the Client by its management and |

| | |
|---|---|
| | (iii) consistent with the reporting currently being provided to the Creditors' Committee and its advisors by the Client. |
| Valuation | AUM will consist of the estimated recovery value, determined by the Manager, of all Assets comprising the Asset Class described in this Appendix, as set forth below:<br><br>(A) Given the illiquid nature of the portfolio, AUM will be based on the expected undiscounted net recovery of the underlying assets. AUM will be determined in good faith by the Manager with a methodology that shall be consistent with the current methodology used by the Client in reporting to the Creditors' Committee, taking into account such financial, structural, legal, economic, regulatory, market and other factors as it deems relevant under the circumstances, including when the Manager deems necessary or appropriate, information provided by servicers as well as independent third parties, such as appraisers and other valuation service providers. AUM for the portfolio will be calculated on a quarterly basis, with adjustments to AUM based on capital activities during the quarterly period.<br>(B) If the Manager in good faith determines that the valuation methods set forth herein are not available or do not fairly or accurately determine the value of a Managed Asset, the Manager may make such adjustments or use such alternative valuation method as it deems appropriate under the circumstances.<br>(C) Notwithstanding anything herein to the contrary, the determination of the AUM of the Managed Assets may be suspended (a "Suspension"), in the sole discretion of the Manager, in each of the following circumstances:<br>    (i) during the existence of any state of affairs that renders the disposal of the Managed Assets, in the view of the Manager, reasonably impracticable;<br>    (ii) during any breakdown in the means of communication normally employed in determining the price of any of the Managed Assets or the current price on any exchange or market on which prices for such assets are quoted; or<br>    (iii) if the Manager determines that such Suspension is in the best interests of the Client, or if for any other reason circumstances exist as a result of which, in the opinion of the Manager, it is not reasonably practical to determine the fair value of the Managed Assets fairly or accurately.<br><br>Upon the occurrence of a Suspension, Manager will use the most recent AUM determination for purposes of determining the Management Fees (as defined in Appendix F) and any threshold under the Protocols section below. |
| Protocols | During the pendency of the Bankruptcy Case, any investments or restructurings of a Managed Asset that has a value of $5 million or less ((i) based on a 12/31/08 mark; (ii) if the 12/31/08 mark is at least 50% less than the 9/17/08 mark, the 9/17/08 mark; or (iii) if subsequently agreed, the mark on a later date) may be executed by the Manager in its sole discretion, without consent of any Client. Any investments or restructurings above such threshold may be executed by the Manager, subject to approval by the Client. During the pendency of the Bankruptcy Case, any sale (or discounted payoff) of a Managed Asset with a value (based on a 12/31/08 mark, or if the 12/31/08 mark is at least 50% less |

| | than the 9/17/08 mark, the 9/17/08 mark or, if subsequently agreed, the mark on a later date) of $5 million or more, shall require approval by the Client. |
| | The Manager acknowledges that consent or approval by the Client as used throughout these Protocols may require the Client to obtain the approval of the Board of Directors of the Client, the Creditors' Committee or the Bankruptcy Court under applicable orders, agreements, understandings and/or protocols. |
| Authorized Person(s) | Name:  [TBD]                            Title:  [TBD] |

| Asset Class | Residential Mortgages Assets, including, but not limited to:<br>– Whole loans (Performing / Non-Performing): 1st mortgages; 2nd liens, home equity lines of credit, Prime, SubPrime, Alt-A, Alt-B, Reverse, Scratch-and-Dent<br>– Residential loan portfolios<br>– Student loans<br>– Small balance commercial<br>– Servicing rights<br>– Warehouse lines<br>– Mortgage backed securities and other structured securities<br>– Residential real estate owned<br>– Charged-off loans<br>– Auto loans and other securitizable loans<br>– Residential mortgage claims |
|---|---|
| Asset Management and Investment Management Services | – Provide active portfolio management, which includes all tasks typically undertaken in this Asset Class with the objective of maximizing returns and minimizing risks given the capital structure and investment type (including buying, selling, refinancing, financing, restructuring, recapitalizing, hedging, and all similar asset management activities undertaken in the ordinary course)<br>– Provide property management services<br>– Provide financial modeling of real estate assumptions to support strategic decisions, including valuation assessments<br>– Provide due diligence in conjunction with third parties to support market and property assumptions<br>– Monitor real estate capital markets and property markets to determine appropriate exit strategies<br>– Provide financial information related to actual performance as well as forecasts |
| Management Fee | See Appendix F hereto. |
| Periodic Reporting | The Manager shall within forty-five (45) calendar days after the end of each quarter furnish, or shall cause a Third-Party Custodian to furnish, to the Client a written statement of Assets under management ("AUM") for this Asset Class at the close of business on the last business day of each quarter.  In addition, from time to time as requested by the Client, the Manager shall prepare and provide the Client with such reports, statistics, data, and other records relating to the performance or other material information about the Managed Assets in this Asset Class for which the Manager is providing management services, in each case, (i) subject to any confidentiality restrictions to which the Manager may be subject including, but not limited to, reports on discounted payoffs, sales, properties and loans transferred to special purpose entities, restructurings and new financings and further subject to reasonable delays in the event of the late receipt of any necessary financial statements, (ii)  consistent with the reporting currently being provided to the Client by its management and (iii) consistent with the reporting currently being provided to the Creditors' Committee and its advisors by the Client. |
| Valuation | AUM will consist of the estimated recovery value, determined by the Manager, of all Assets comprising the Asset Class described in this Appendix, as set forth below: |

| | |
|---|---|
| | (A) The fair value of securities which are marketable securities shall equal:<br>(x) in the case of securities which are primarily traded on a securities exchange, the last sale price on such securities exchange on the date of determination, or if no sales occurred on any such day, the mean between the closing "bid" and "asked" prices on such date of determination; (y) if the principal market for such securities is, or is deemed to be, in the over the counter market, the average of the closing sale prices on each trading day during the five (5) trading day-period immediately prior to the date of the determination, as published by the National Association of Securities Dealers Automated Quotation System or similar organization, or if such price is not so published on any such day, the mean between the closing "bid" and "asked" prices, if available, on such day, which prices may be obtained from any reputable pricing service, broker or dealer; and (z) if such securities are traded on PORTAL, the fair value of such securities as reasonably determined by the Manager.<br><br>(A) The fair value of any Assets which are not marketable securities shall initially be determined in good faith by the Manager, taking into account such financial, structural, legal, economic, regulatory, market and other factors as it deems relevant under the circumstances, including when the Manager deems necessary or appropriate, information provided by independent third parties, such as appraisers and other valuation service providers.<br>(B) If the Manager in good faith determines that the valuation methods set forth herein are not available or do not fairly or accurately determine the value of a Managed Asset, the Manager may make such adjustments or use such alternative valuation method as it deems appropriate under the circumstances.<br>(C) Notwithstanding anything herein to the contrary, the determination of the AUM of the Managed Assets may be suspended (a "Suspension"), in the sole discretion of the Manager, in each of the following circumstances:<br>    (i) during the existence of any state of affairs that renders the disposal of the Managed Assets, in the view of the Manager, reasonably impracticable;<br>    (ii) during any breakdown in the means of communication normally employed in determining the price of any of the Managed Assets or the current price on any exchange or market on which prices for such assets are quoted; or<br>    (iii) if the Manager determines that such Suspension is in the best interests of a Client, or if for any other reason circumstances exist as a result of which, in the opinion of the Manager, it is not reasonably practical to determine the fair value of the Managed Assets fairly or accurately.<br><br>Upon the occurrence of a Suspension, Manager will use the most recent AUM determination for purposes of detemining the Management Fees (as defined in Appendix F) and any threshold under the Protocols section below. |
| Protocols | During the pendency of the Bankruptcy Case, any (i) sale or investment of a Managed Asset with a value ((i) based on a 12/31/08 mark; (ii) if the 12/31/08 mark is at least 50% less than the 9/17/08 mark, the 9/17/08 mark; or (iii) if subsequently agreed, the mark on a later date) of at least $5 |

| | |
|---|---|
| | million or (ii) discounted payoff or loan modification with a value of at least $5 million, shall require approval by the Client.

The Manager acknowledges that consent or approval by the Client as used throughout these Protocols may require the Client to obtain the approval of the Board of Directors of the Client, the Creditors' Committee or the Bankruptcy Court under applicable orders, agreements, understandings and/or protoocols. |
| Authorized Person(s) | Name:   [TBD]                    Title:   [TBD] |

| | |
|---|---|
| Asset Class | Corporate Debt Assets, including, but not limited to:<br>– US managed Corporate Debt Obligations<br>– UK managed Corporate Debt Obligations<br>– Bankhaus managed assets (until assets transferred to Lehman Commercial Paper Inc.)<br>– Various managed collateralized loan obligations, special purpose vehicles, and securitizations<br>– Asian managed Corporate Debt Obligations<br>– Other assets spread across multiple entities and regions<br>– Reconstituted debt including reinstated debt, junior debt with or without equity |
| Asset Management and Investment Management Services | – Provide active portfolio management, which includes all tasks typically undertaken in this Asset Class with the objective of maximizing returns and minimizing risks (including buying, selling, refinancing, financing, restructuring, recapitalizing, hedging, and all similar asset management activities undertaken in the ordinary course)<br>– Reduce unfunded commitments and letters of credit exposures;<br>– Maintain a credit review process, including an internal rating process<br>– Transfer of agency relationships<br>– Monitor corporate debt markets to determine appropriate exit strategies |
| Management Fee | See Appendix F hereto. |
| Periodic Reporting | The Manager shall within one hundred and five (105) calendar days after the end of each quarter and one hundred thirty five (135) calendar days after the end of each year furnish, or shall cause a Third-Party Custodian to furnish, to the Client a written statement of Assets under management ("AUM") for this Asset Class at the close of business on the last business day of each quarter.  In addition, from time to time as requested by the Client, the Manager shall prepare and provide the Client with such reports, statistics, data, and other records relating to the performance or other material information about the Managed Assets in this Asset Class for which the Manager is providing management services, in each case, (i) subject to any confidentiality restrictions to which the Manager may be subject including, but not limited to, reports on discounted payoffs, sales, properties and loans transferred to special purpose entities, restructurings and new financings and further subject to reasonable delays in the event of the late receipt of any necessary financial statements, (ii)  consistent with the reporting currently being provided to the Client by its management and (iii) consistent with the reporting currently being provided to the Creditors' Committee and its advisors by the Client. |
| Valuation | AUM will consist of the estimated recovery value, determined by the Manager, of all Assets comprising the Asset Class described in this Appendix, as set forth below:<br><br>(A) The Manager will obtain on a monthly basis independent market quotes from third party providers (e.g., Loan X, LPC) or financial institutions (e.g., Barclays, JPMorgan Chase, Deutsche Bank, RBS etc.)<br>(B) If the Manager in good faith determines that the independent market pricing quotes set forth herein do not fairly or accurately determine |

| | |
|---|---|
| | the value of a Managed Asset, the Manager may make such adjustments or use such alternative valuation method as it deems appropriate under the circumstances. |
| | (C) The fair value of any Assets (i.e. trade claims) not available through these independent sources shall initially be determined in good faith by the Manager, with a methodology that shall be consistent with the current methodology used by the Client in reporting to the Creditors' Committee, taking into account such financial, structural, legal, economic, regulatory, market and other factors as it deems relevant under the circumstances. |
| | (D) Notwithstanding anything herein to the contrary, the determination of the AUM of the Managed Assets may be suspended (a "Suspension"), in the sole discretion of the Manager, in each of the following circumstances: |
| |     (iv)  during the existence of any state of affairs that renders the disposal of the Managed Assets, in the view of the Manager, reasonably impracticable; |
| |     (v)   during any breakdown in the means of communication normally employed in determining the price of any of the Managed Assets or the current price on any exchange or market on which prices for such assets are quoted; or |
| |     (vi)  if the Manager determines that such Suspension is in the best interests of the Client, or if for any other reason circumstances exist as a result of which, in the opinion of the Manager, it is not reasonably practical to determine the fair value of the Managed Assets fairly or accurately. |
| | Upon the occurrence of a Suspension, Manager will use the most recent AUM determination for purposes of detemining the Management Fees (as defined in Appendix F) and any threshold under the Protocols section below. |
| Protocols | During the pendency of the Bankruptcy Case, any sale of, funding, new financings, advances, investment in or restructuring of a Managed Asset that has a value ((i) based on a 12/31/08 mark; (ii) if the 12/31/08 mark is at least 50% less than the 9/17/08 mark, the 9/17/08 mark; or (iii) if subsequently agreed, the mark on a later date) of less than $25 million may be executed by the Manager in its sole discretion, without consent of the Client. Any sale of, investment in or restructuring of a Managed Asset above such threshold may be executed by the Manager, subject to approval by the Client. |
| | Notwithstanding the foregoing, the sale, investment or restructuring of any Assets which are pledged to third parties, and are not part of the bankruptcy estate, and the termination of any unfunded Commitment, shall be subject to approval by the Client. |
| | The Manager acknowledges that consent or approval by each Client as used throughout these Protocols may require such Client to obtain the approval of the advisor to the retaining entity, loan book subcommittee, the Creditors' Committee or the Bankruptcy Court under applicable orders, agreements, understandings and/or protoocols. |
| Authorized Person(s) | Name:  [TBD]               Title:  [TBD] |

| | |
|---|---|
| Asset Class | Private Equity/Principal Investments, including, but not limited to:<br>– Direct private equity and illiquid credit investments in private and public companies in North America, Europe and Asia<br>– Limited Partner and General Partner interests in Lehman private equity funds<br>– Limited Partner and General Partner interests in third party private equity and hedge funds<br>– Restricted and non-restricted equity and equity-linked securities in small cap public companies |
| Asset Management and Investment Management Services | – Provide active portfolio management, which includes all tasks typically undertaken in this Asset Class with the objective of maximizing returns and minimizing risks (including buying, selling, refinancing, financing, restructuring, recapitalizing, hedging, and all similar asset management activities undertaken in the ordinary course)<br>– Reduce unfunded commitments<br>– Monitor markets to determine appropriate exit strategies<br>– Coordinate and supervise the preparation and review of all documents required in connection with the acquisition, disposition or financing of assets |
| Management Fee | See Appendix F hereto. |
| Periodic Reporting | The Manager shall within one hundred five (105) calendar days after the end of each quarter and one hundred thirty five (135) calendar days after the end of each year furnish, or shall cause a Third-Party Custodian to furnish, to the Client a written statement of Assets under management ("AUM") for this Asset Class.  In addition, from time to time as requested by the Client, the Manager shall prepare and provide the Client with such reports, statistics, data, and other records relating to the performance or other material information about the Managed Assets in this Asset Class for which the Manager is providing management services, in each case, (i) subject to any confidentiality restrictions to which the Manager may be subject and reasonable delays in the event of the late receipt of any necessary financial statements, (ii)  consistent with the reporting currently being provided to the Client by its management and (iii) consistent with the reporting currently being provided to the Creditors' Committee and its advisors by the Client. |
| Valuation | AUM will consist of the estimated recovery value, determined by the Manager, of all Assets comprising the Asset Class described in this Appendix, as set forth below:<br><br>(A) The fair value of any Assets which are not marketable securities shall be determined  in line with market practice valuation techniques  (e.g., DCF, comparable trading multiples, transaction multiples, etc.) by the Manager, with a methodology that shall be consistent with the current methodology used by the Client in reporting to the Creditors' Committee, taking into account such financial, structural, legal, economic, regulatory, market and other factors as it deems relevant under the circumstances, including when the Manager deems necessary or appropriate, information provided by independent third parties, such as appraisers and other valuation service providers.<br>(B) If the Manager in good faith determines that the valuation methods set |

| | |
|---|---|
| | forth herein are not available or do not fairly or accurately determine the value of a Managed Asset, the Manager may make such adjustments or use such alternative valuation method as it deems appropriate under the circumstances.<br><br>(C) Notwithstanding anything herein to the contrary, the determination of the AUM of the Managed Assets may be suspended (a "Suspension"), in the sole discretion of the Manager, in each of the following circumstances:<br><br>(vii) during the existence of any state of affairs that renders the disposal of the Managed Assets, in the view of the Manager, reasonably impracticable;<br><br>(viii) during any breakdown in the means of communication normally employed in determining the price of any of the Managed Assets or the current price on any exchange or market on which prices for such assets are quoted; or<br><br>(ix) if the Manager determines that such Suspension is in the best interests of the Client, or if for any other reason circumstances exist as a result of which, in the opinion of the Manager, it is not reasonably practical to determine the fair value of the Managed Assets fairly or accurately.<br><br>Upon the occurrence of a Suspension, Manager will use the most recent AUM determination for purposes of detemining the Management Fees (as defined in Appendix F) and any threshold under the Protocols section below. |
| Protocols | During the pendency of the Bankruptcy Case, any investment in, or sale of, a Managed Asset or operating business that has a value ((i) based on a 12/31/08 mark; (ii) if the 12/31/08 mark is at least 50% less than the 9/17/08 mark, the 9/17/08 mark; or (iii) if subsequently agreed, the mark on a later date) of less than $10 million may be executed or drawn, as applicable, by the Manager without consent of the Client. Sales or investments above such thresholds may be executed or made, as applicable, by the Manager, subject to approval of the Client.<br><br>The Manager acknowledges that consent or approval by the Client as used throughout these Protocols may require the Client to obtain the approval of the Board of Directors of the Client, the Creditors' Committee or the Bankruptcy under applicable orders, agreements, understandings and/or protoocols. |
| Authorized Person(s) | Name: [TBD]          Title: [TBD] |

| Asset Class | Derivatives and Other Contracts, including, but not limited to: |
|---|---|
| | – All derivative and derivative related contracts and underliers whether open, matured or terminated, regardless of whether such Derivatives Contracts represent receivables or payables on a net basis and specifically including Derivatives Contracts transacted between the Client and a current or former affiliate of the Client.<br>– Derivatives Contracts trade across all asset classes including, without limitation; interest rates, credit, FX, emerging markets, CMBS, equities, and commodities,, with global product and global currency underlyings<br>– All collateral and credit support contracts and assets related to Derivatives Contracts regardless of whether such collateral was posted or received<br>– All structured products such as notes, warrants and or certificates issued by or guaranteed by the Client or a current or former affiliate of the Client<br>– All guarantees related to Derivatives Contracts by Lehman Brothers Holdings Inc., regardless of whether such primary contract was entered into by the Client or a current or former affiliate of the Client<br>– All assets and liabilities, including guaranteed liabilities, of the Client representing or arising out of capital markets activities in relation to any other Asset not included within another Asset Class<br>– All other assets and liabilities, including guaranteed liabilities, of Lehman Brothers Special Financing Inc., Lehman Brothers Derivatives Products Inc., Lehman Brothers Financial Products Inc., Lehman Brothers Commercial Corporation, Lehman Brothers OTC Derivatives Inc., Lehman Brothers Commodity Services Inc., Merit LLC, 1271 LLC and any other current or former affiliate of the Client whose primary function is or was the transaction of Derivatives Contracts |
| Asset Management and Investment Management Services | – Provide active portfolio management of open, matured and terminated contracts, which includes all tasks typically undertaken in this Asset Class with the objective of maximizing recoveries and minimizing risks (including hedging, selling, refinancing, financing, restructuring, recapitalizing and all similar asset management activities undertaken in the ordinary course)<br>– Corporate services including project management, financial accounting and management information and financial analysis |
| Management Fee | See Appendix F hereto. |
| Periodic Reporting | The Manager shall within thirty (30) calendar days after the end of each quarter furnish, or shall cause a Third-Party Custodian to furnish, to the Client a written statement of Assets under management ("AUM") for this Asset Class at the close of business on the last business day of each quarter. In addition, from time to time as requested by such Client, the Manager shall prepare and provide the Client with such reports, statistics, data, and other records relating to the performance or other material information about the Managed Assets in this Asset Class for which the Manager is providing management services, in each case, subject to (i) any confidentiality restrictions to which the Manager may be subject and reasonable delays in the event of the late receipt of any necessary financial statements, (ii) consistent with the reporting currently being provided to |

| | |
|---|---|
| | the Client by its management and (iii) consistent with the reporting currently being provided to the Creditors' Committee and its advisors by the Client. Such AUM report will include both assets and liabilities on a gross basis. |
| Valuation | AUM will consist of the estimated recovery value, determined by the Manager, of all Assets comprising the Asset Class described in this Appendix, as set forth below:<br><br>(A) The fair value of Derivatives Contracts for which values can be ascertained with reference to underlying rates or securities whose prices are readily attainable in the market shall equal: (x) in the case of derivatives contracts for which the underlying rates or securities are traded on a securities exchange or are rates that are regularly published, the average of their last price or rate on each trading day during the five (5) trading-day period immediately prior to the date of determination, or if no sales or publications occurred on any such day, the mean between the closing "bid" and "asked" prices on such date and (y) if the principal market for such securities is, or is deemed to be, in the over-the-counter market, the average of the closing bid price or rate (as applicable) on each trading day during the five (5) trading day-period immediately prior to the date of the determination, as published by a recognized market on which such underlying securities are traded or rates published, including without limitation inter-broker offer markets.<br>(B) The fair value of any other Derivatives Contracts shall be determined in good faith by the Manager, taking into account such financial, structural, legal, economic, regulatory, market and other factors as it deems relevant under the circumstances, including when the Manager deems necessary or appropriate, information provided by independent third parties, such as appraisers and other valuation service providers.<br>(C) Notwithstanding anything herein to the contrary, the determination of the AUM of the Derivatives Contracts may be suspended (a "Suspension"), in the sole discretion of the Manager, in each of the following circumstances:<br>    (x)   during the existence of any state of affairs that renders the disposal or hedging of the Derivatives Contracts, in the view of the Manager, reasonably impracticable;<br>    (xi)  during any breakdown in the means of communication normally employed in determining the price of any of the Derivatives Contracts or the current price on any exchange or market on which prices for such assets are quoted; or<br>    (xii)  if the Manager determines that such Suspension is in the best interests of a Client, or if for any other reason circumstances exist as a result of which, in the opinion of the Manager, it is not reasonably practical to determine the fair value of the Managed Assets fairly or accurately.<br><br>Upon the occurrence of a Suspension, Manager will use the most recent AUM determination for purposes of detemining the Management Fees (as defined in Appendix F) and any threshold under the Protocols section below. |
| Protocols | The delivery of final legal settlement and release agreements in relation to Derivatives Contracts in existence prior to the commencement of the Bankruptcy Case (including for the avoidance of doubt agreements as to |

| | the allowance of claims against the Client) shall be subject to the approval of the Client. |
| | |
| | The Manager acknowledges that consent or approval by the Client as used throughout these Protocols may require the Client to obtain the approval of the Board of Directors of the Client, the Creditors' Committee or the Bankruptcy Court under applicable orders, agreements, understandings and/or protocols. |
| Authorized Person(s) | Name:  [TBD]          Title:  [TBD] |

**Appendix F**

**Management Fees Payable to LAMCO**

<u>Management Fees</u>: The management fees for the Client will be calculated on an aggregate as well as Asset-Class-by-Asset-Class basis (the "Management Fees") based on the then-current annual budget forecast of the estimated Personnel and Non-Personnel Expenses for the next quarterly period as of the last business day of the prior calendar quarter (the "Estimated Quarterly Fee Amount").

<u>Personnel and Non-Personnel Expenses</u>:  The fees, costs and expenses of the personnel performing the services in respect of each Asset Class as well as the fees, costs and expenses of the corporate personnel (e.g. information technology, administrative, etc.) and related non-personnel expenses (i.e., base salary, bonus, benefits, occupancy payments (i.e., rent and other lease payments), technology and infrastructure costs, third party servicing costs, etc.).

<u>Payment Period</u>:  Quarterly in advance on the first Business Day of each calendar quarter based on the estimated amount provided by the Manager to the Client at least 5 business days prior to the applicable payment date.

<u>True-up and Reimbursement</u>:  The Estimated Quarterly Fee Amount will be subject to a true-up to actual amounts of underpayments or reimbursement of overpayments, as applicable, during the quarter with another true-up of underpayments or reimbursement of overpayments, as applicable, which the parties shall use commercially reasonable efforts to make within 30 business days and in any event no later than 90 business days after the end of the applicable quarterly period based on actual Personnel and Non-Personnel Expenses for such period, as determined in good faith by the Manager and with appropriate and reasonable supporting documentation if requested by the Client.

<u>Invoices and Allocations</u>:  Manager will invoice the Client for the Estimated Quarterly Fee Amount and related true-ups and reimbursements; and the Client shall be responsible for the payments of such invoices to the Manager. For the avoidance of doubt, the obligations to pay the Management Fee to the Manager pursuant to this Agreement shall be obligations solely of the Client and not any of the entities listed on Schedule A.

<u>Maintaining Aggregate Fee Payment for Six (6) Months upon Termination</u>. In the event that the Client terminates all or a part of its Managed Assets with the Manager, the Client will continue to pay the aggregate Management Fees to the Manager, less reductions in Personnel and Non-Personnel Expenses related to such termination, for a period of six (6) months and will internally reallocate such Management Fees in accordance with the section below entitled "Reallocation of the Management Fee Resulting from a Termination by the Client".

**Internal Allocation of Management Fee by the Client**

<u>Internal Allocation of Management Fee by the Client</u>

The Client shall be responsible for internal allocations of such amounts among the Client and the entities listed on Schedule A in accordance with the "Client Allocation Methodology" section below.

<u>Client Allocation Methodology</u>

The Management Fee will be internally allocated among the Client and the entities listed on Schedule A by the Client based on the allocation methodology currently utilized by the Client, which was previously reviewed by the Creditors' Committee and its advisors.  Such allocation methodology may be subject to revision by the Client after review by the Creditors' Committee and its advisors.

<u>Reallocation of the Management Fee Resulting from a Termination by the Client</u>

In the event that the Client terminates all or a part of its Managed Assets with the Manager, the Client will continue to pay the aggregate Management Fees to the Manager for a period of six (6) months and

the Client and/or any of the entities listed on Schedule A, as applicable, will continue to be allocated its share of the Management Fees, less reductions in Personnel and Non-Personnel Expenses related to such termination, for a period of six (6) months from the date of such termination, and, thereafter, such Management Fees shall be internally reallocated among the Client and the entities listed on Schedule A in accordance with the Client Allocation Methodology taking proper account of such termination.

**New Clients**

In the event that Manager engages with a New Client, the allocation of Personnel and Non-Personnel Expenses will be allocated as between the Client and the New Client based on a fair and reasonable methodology based on the facts and circumstances at the relevant time and which will fairly reflect the usage of time and resources dedicated to the Client, on the one hand, and the New Client, on the other hand, and such methodology will be, prior to the Termination Date, subject to prior review and approval by the Creditors' Committee.

**Schedule A – List of Entities**

Lehman Brothers Holdings Inc.
Lehman Brothers Commodity Services Inc.
Lehman Brothers Special Financing Inc.
Lehman Brothers OTC Derivatives Inc.
Lehman Brothers Derivative Products Inc.
Lehman Commercial Paper Inc.
Lehman Brothers Commercial Corporation
Lehman Brothers Financial Products Inc.
LB Rose Ranch LLC
Merit LLC
LB Somerset LLC
LB Preferred Somerset LLC

**EXHIBIT D**

SHARED SERVICES AGREEMENT

dated as of [●]

between

LEHMAN BROTHERS HOLDINGS INC.

and

LAMCO LLC

# SHARED SERVICES AGREEMENT

This Shared Services Agreement, dated [●] (this "Agreement"), is made by and between Lehman Brothers Holdings Inc., a Delaware corporation ("LBHI") and LAMCO LLC, a Delaware limited liability company ("LAMCO").

## RECITALS

WHEREAS, LBHI, LAMCO and certain other entities entered into that certain Contribution Agreement, dated as of [●] (as amended and supplemented, the "Contribution Agreement"); and

WHEREAS, the parties hereto desire that (a) LBHI shall provide, or cause to be provided, to LAMCO (and/or other Subsidiaries of LAMCO Holdings LLC, collectively hereinafter referred to as the "LAMCO Entities") certain services, use of facilities and other assistance in accordance with the terms and subject to the conditions set forth herein and (b) LAMCO shall provide, or cause to be provided, to LBHI (and/or its current or former Affiliates, collectively hereinafter referred to as the "LBHI Entities") certain services, use of facilities and other assistance in accordance with the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.01    Certain Defined Terms.  Unless otherwise defined herein, any capitalized term used herein shall have the same meaning as in the Contribution Agreement.

The following capitalized terms used in this Agreement shall have the meanings set forth below:

"Benchmark Period" means the period between September 30, 2009 and the Closing Date.

"Creditors' Committee" means the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., which was appointed by the Office of the United States Trustee on September 17, 2009, as revised or supplemented.

"Force Majeure" means, with respect to a Person, an event beyond the control of such Person (or any Person acting on its behalf), including acts of God, storms, floods, riots, fires, sabotage, labor stoppage, civil commotion or civil unrest, interference by civil or military authorities, acts of war (declared or undeclared) or armed hostilities or other national or international calamity or one or more acts of terrorism or failure of energy sources or of Internet or telecommunications services.

"Information Systems" means computing, telecommunications or other digital operating or processing systems or environments, including computer programs, data, databases, computers, computer libraries, communications equipment, networks and systems. When referenced in connection with the Services, Information Systems shall mean the Information Systems accessed and/or used in connection with the Services.

"Provider" means the party hereto or its Subsidiary or Affiliate providing a Service or an Additional Service under this Agreement.

"Recipient" means a party hereto or its Subsidiary or Affiliate or to whom a Service or any Additional Service is being provided under this Agreement.

"Representative" of a Person means any director, officer, employee, agent, consultant, accountant, auditor, attorney or other representative of such Person.

"Termination Charges" means any portion of any costs for terminating any contracts related to performing Services, any salary, severance, rent, costs of service providers and vendors and other overhead expenses of a Provider [(including, for the avoidance of doubt, any "Personnel and Non-Personnel Expenses", as set forth in Appendix [__])] that were allocated in good faith by the Provider to the performance of the Services for a Recipient that were terminated or which are incurred by the Provider in respect of the terminated Services and, in each case, that cannot be reasonably avoided by such Provider; and provided, further, that any such expenses in connection with a partial termination shall be allocated, to the extent necessary, by the Provider on a fair and equitable basis.

"Termination Date" means the date on which a chapter 11 plan of LBHI becomes effective; provided, however, that in the event that such chapter 11 plan of LBHI extends the rights of the Creditors' Committee set forth herein beyond the date on which such chapter 11 plan of LBHI becomes effective, then the Termination Date shall be deemed to be the date on which such rights of the Creditors' Committee set forth herein expire pursuant to such chapter 11 plan of LBHI.

"Virus" means any computer instructions: (i) that adversely affect the operation, security or integrity of a computing, telecommunications or other digital operating or processing system or environment, including other programs, data, databases, computer libraries and computer and communications equipment, by altering, destroying, disrupting or inhibiting such operation, security or integrity; (ii) that without functional purpose, self-replicate without manual intervention; and/or (iii) that purport to perform a useful function but which actually perform either a destructive or harmful function, or perform no useful function and utilize substantial computer, telecommunications or memory resources.

## ARTICLE 2

## SERVICES AND TERMS

Section 2.01    Services; Scope.

(a)     Subject to the terms and conditions set forth in this Agreement, (i) LBHI shall provide, or cause to be provided, to the LAMCO Entities those services set forth on Schedules [●] hereto (the "LBHI Services") and (ii) LAMCO shall provide, or cause to be provided, to the LBHI Entities those services set forth on Schedules [●] hereto (the "LAMCO Services" and collectively with the LBHI Services, the "Services").  If, for any reason, LBHI is unable to provide any LBHI Service to the LAMCO Entities pursuant to the terms of this Agreement, LBHI shall provide to the applicable LAMCO Entity a substantially equivalent service (a "LBHI Substitute Service") in accordance with the terms of this Agreement, which such service shall be considered a LBHI Service for purposes of this Agreement.  If, for any reason, a LAMCO Entity is unable to provide any LAMCO Service to the LBHI Entities pursuant to the terms of this Agreement, LAMCO shall provide to the applicable LBHI Entity a substantially equivalent service (a "LAMCO Substitute Service") in accordance with the terms of this Agreement, which such service shall be considered a LAMCO Service for purposes of this Agreement.  Except with respect to Services being migrated to or from a third party service provider during the Benchmark Period, the scope of each Service shall be substantially the same as the scope of such service provided in the ordinary course during the Benchmark Period.  All Services shall be for the sole use and benefit of the respective Recipient, and any of such Recipient's customers or clients in their respective capacities as customer or client.

(b)     Each Service shall include, and the Service Charges (as defined herein) reflect charges for, such maintenance, support, error correction, updates and enhancements normally and customarily provided by the relevant Provider internally or to its Affiliates that receive such service.  Each Service shall include all functions, responsibilities, activities and tasks, and the materials, documentation, resources, rights and licenses to be used, granted or provided by the relevant Provider that are not specifically described in this Agreement as a part of such Service, but are incidental to, and would normally be considered an inherent part of, or necessary subpart included within, such Service or are otherwise necessary for such Provider to provide, or the Recipient to receive, such Service.

(c)     Throughout the term of this Agreement, each Provider and each Recipient of any Service shall cooperate with one another and use their good faith and commercially reasonable efforts to effect the efficient, timely and seamless provision and receipt of such Service.

(d)     Each Recipient shall be entitled to retain contractors or consultants to use the Services on behalf of the Recipient.

(e)     This Agreement shall not assign any rights to technology or intellectual property between the parties hereto.

Section 2.02     Shared Services Managers.

(a)     LBHI hereby appoints [●] to act as its initial services manager (the "LBHI Services Manager"), who will be directly responsible for coordinating and managing the delivery of the LBHI Services and receipt of the LAMCO Services and have authority to act on LBHI's behalf with respect to matters relating to this Agreement.  The LBHI Services Manager will work with the personnel of LBHI to periodically address issues and matters raised by LAMCO relating

to this Agreement.  Notwithstanding the requirements of <u>Section 9.05</u>, all communications from LAMCO to LBHI pursuant to this Agreement regarding routine matters involving the LBHI Services shall be made through the LBHI Services Manager, or such other individual as specified by the LBHI Services Manager in writing and delivered to LAMCO by email or facsimile transmission with receipt confirmed.  LBHI shall reasonably promptly notify LAMCO of the appointment of a different LBHI Services Manager, if necessary, in accordance with <u>Section 9.05</u>.

(b)     LAMCO hereby appoints [●] to act as its initial services manager (the "<u>LAMCO Services Manager</u>"), who will be directly responsible for coordinating and managing the delivery of the LAMCO Services and receipt of the LBHI Services and have authority to act on LAMCO's behalf with respect to matters relating to this Agreement.  The LAMCO Services Manager will work with the personnel of LAMCO to periodically address issues and matters raised by LBHI relating to this Agreement.  Notwithstanding the requirements of <u>Section 9.05</u>, all communications from LBHI to LAMCO pursuant to this Agreement regarding routine matters involving the Services shall be made through the LAMCO Services Manager, or such other individual as specified by the LAMCO Services Manager in writing and delivered to LBHI by email or facsimile transmission with receipt confirmed.  LAMCO shall reasonably promptly notify LBHI of the appointment of a different LAMCO Services Manager, if necessary, in accordance with <u>Section 9.05</u>.

Section 2.03     <u>Personnel</u>.  The Provider will have the right, in its sole discretion, to (i) designate which personnel it will assign to perform Services, and (ii) remove and replace such personnel at any time.

Section 2.04     <u>Performance and Receipt of Services</u>.  The following provisions shall apply to the Services:

(a)     <u>Security and Privacy</u>.  Each Provider and Recipient shall at all times comply with its own then in-force security guidelines and policies applicable to the performance, access and/or use of the Services and Information Systems, provided that in the case of LAMCO, such security guidelines and policies shall be no less stringent than those of LBHI as of the Effective Date. Where a Provider or Recipient receives access to the other party's Information Systems, then it shall also comply with such other party's security guidelines and policies. The Parties shall further cooperate to implement any firewalls or other security restrictions as may be required by applicable law or prudent risk mitigation procedures to separate access between data of one client and data of another client.

(b)     <u>No Viruses</u>.  Each of LAMCO and LBHI shall take commercially reasonable measures to ensure that no Viruses or similar items are coded or introduced into the Services or Information Systems.  If a Virus is found to have been introduced into the Services or Information Systems, the parties hereto shall use their commercially reasonable efforts to cooperate and to diligently work together to eliminate the effects of such Virus.

(c)     <u>Reasonable Care</u>.  Each Provider and Recipient shall exercise reasonable care in providing and receiving the Services to (i) prevent access to the Services or Information

Systems by unauthorized Persons and (ii) not damage, disrupt or interrupt the Services or Information Systems.

Section 2.05   Termination Services.  Each Provider shall reasonably cooperate with the Recipient of each Service, upon request and on commercially reasonable terms (which will be added to the Service Charges), to facilitate such Recipient's transition to provision of such services by a replacement provider or by its own employees.

Section 2.06   Superseding Provisions.  Notwithstanding anything to the contrary contained in this Agreement:

(a)   no Provider shall be required hereunder to take any action (including by providing any Services) that would constitute, or that the Provider reasonably believes would constitute, (i) a violation of applicable law, including any requirement of any Governmental Authority, (ii) a breach of such Provider's contractual obligations or (iii) any other violation of a third party's rights; provided that in each of the foregoing circumstances the Provider shall use reasonable efforts to work around the impediment and endeavor to provide Services in a manner that does not violate law, contractual obligations or third party rights; and

(b)   the Provider shall not be responsible for any failure to provide Services hereunder to the extent arising from (i) the Recipient's operations or systems or otherwise by the acts or omissions of the Recipient or individuals acting on its behalf, (ii) a third party's failure to provide such Services, provided that the Provider has used commercially reasonable efforts to mitigate the effect of such failure, or (iii) the failure of Recipient or its Affiliates to provide Services to Provider.

# ARTICLE 3

## ADDITIONAL AGREEMENTS AND ARRANGEMENTS

Section 3.01   Computer-Based Resources.  Each party (the "Accessing Party") shall continue to have access to the Information Systems of the other party (the "Providing Party"), to the extent such access to such Information Systems was available to the Accessing Party immediately prior to the Closing and remains necessary for the Accessing Party to operate its business; provided, that (a) the LBHI Entities may take reasonable measures to restrict access by the LAMCO Entities to any systems or data unrelated to the Asset Management Business, (b) the LAMCO Entities may take reasonable measures to restrict access by the LBHI Entities, to any systems or data unrelated to the LBHI Business, and (c) such continued access shall be subject to the Accessing Party complying with all reasonable security measures implemented by the Providing Party as deemed necessary by such Providing Party to protect its Information Systems.

Section 3.02   Termination of Support.  Each Provider shall provide the Recipient with notice as soon as practicable in the event that such Provider receives notice from any third party provider of material software used in the provision of any Service that such third party provider intends to cease supporting such software.

Section 3.03    Access.  Each Recipient will allow the relevant Provider and its Representatives reasonable access to the facilities and personnel of the Recipient, and shall provide such other reasonable cooperation and assistance, at the Recipient's cost, necessary for the performance of the Services for the Provider to fulfill its obligations under this Agreement.

Section 3.04    Third Party Contracts.  Each of LBHI and LAMCO acknowledges that (i) the other is party to certain third party contracts used in the provisions of certain of the Services (each a "Third Party Contract") and (ii) any party to a Third Party Contract shall make all decisions, in its sole discretion, regarding whether to renew or terminate (including early termination) each such Third Party Contract; provided, however, that such terminating party shall notify the Recipient of the related Service of any such decision to elect not to renew or to terminate any such Third Party Contract and the terminating party shall not incur any incremental obligation for Termination Charges that could be passed through to the other party hereunder without the other party's prior written consent, not to be unreasonably withheld, conditioned or delayed. All Services dependent on rights or services obtained under Third Party Contracts shall be rendered in a manner consistent with (and shall be subject to any limitations imposed in) the relevant Third Party Contract.

Section 3.05    Advisors.  LAMCO will reimburse LBHI for the costs incurred by LBHI in relation to work performed by employees of LBHI's advisors for the benefit of LAMCO.

# ARTICLE 4

# COSTS AND DISBURSEMENTS; PAYMENTS; AUDITS

Section 4.01    Costs and Disbursements; Payments.

(a)    Any Service to be provided by any Provider hereunder shall be charged to the Recipient thereof (such charges, the "Service Charges") at, except as set forth on any of the Schedules hereto, a cost equal to the Provider's fully-loaded costs and expenses for providing such Service (including in such fully-loaded costs and expenses (x) an allocation for overhead costs to the extent directly related to providing the Services, (y) the amount of the actual payments made by the Provider to third-party providers for providing Services, and (z) associated overhead costs relating to the Services provided by such third party providers, in each case without any markup for profit margins).  For purposes of this Agreement, "fully-loaded costs" shall include all cash and non-cash expenses in respect of employee payroll and benefits, occupancy, information technology infrastructure (e.g., software, hardware, data centers, storage, cabling and connectivity including the related maintenance, depreciation and amortization), personal technology (e.g., help desk, desktops, desktop applications, blackberries, cell phones, and voice handsets including the related maintenance, depreciation and amortization), all direct non-personnel expenses, and the cost of direct management of the Services and related personnel.

For the avoidance of doubt, Service Charges shall not include any amounts owed by a party (whether to third parties or Affiliates) prior to the Closing Date.

For the avoidance of doubt, Service Charges may increase or decrease, including as a result of (i) an increase or decrease in the amount of such Services being provided to the Recipient (as compared to the amount of the Services underlying the determination of a Service Charge), (ii) an increase or decrease in the rates or charges imposed by any third-party provider that is providing goods or services used by the Provider in providing the Services (as compared to the rates or charges underlying a Service Charge), (iii) an increase or decrease in the payroll or benefits for any employees used by the Provider in providing the Services, or (iv) any increase or decrease in costs relating to any changes requested by the Recipient in the nature of the Services provided (including relating to newly installed products or equipment or any upgrades to existing products or equipment).

(b)     The Provider shall deliver an invoice to the Recipient on a monthly basis (or, at the option of the Provider, at such other frequency as is consistent with the basis on which the Service Charges are determined and, if applicable, charged to Affiliates of the Provider) in arrears for the Service Charges due to the Provider under this Agreement.  The Recipient shall pay the amount of such invoice by wire transfer or check to the Provider within thirty (30) days of the date of such invoice as instructed by the Provider.  If the Recipient fails to pay such amount by such date, the Recipient shall be obligated to pay to the Provider, in addition to the amount due, interest at an interest rate of 1% per month, compounded monthly, accruing from the date the payment was due through the date of actual payment.  As soon as practicable after receipt of any reasonable written request by the Recipient, the Provider shall provide the Recipient with data and documentation reasonably satisfactory to the Recipient supporting the calculation of a particular Service Charge for the purpose of verifying the accuracy of such calculation.  If, after reviewing such data and documentation, the Recipient disputes the Provider's calculation of any amount due to the Provider, then the dispute shall be resolved pursuant to Section 7.01.

Section 4.02     Audits.  Each Recipient shall have the right at reasonable times and on reasonable advance notice to review, or to have an independent third party accounting firm review, the books and records of each relevant Provider with respect to the performance of Services hereunder and to confirm the accuracy of the Service Charges hereunder, in each case subject to reasonable security and confidentiality restrictions. All records reviewed in connection with such review shall be held in strict confidence by the auditor. Any audit shall be at the sole expense of the requesting Recipient except that if any audit reveals an overcharge of five percent (5%) or more, the relevant Provider shall reimburse the Recipient for its reasonable out-of-pocket costs of such audit.

## ARTICLE 5

## STANDARD FOR SERVICE; COMPLIANCE WITH LAWS

Section 5.01     Standard for Service.  Subject to the terms and conditions of this Agreement, the Provider agrees to perform the Services such that the nature, quality, standard of care and the service levels at which such Services are performed are no less than the nature, quality, standard of care and service levels at which the substantially same services were performed for the Recipient or its predecessor prior to the Closing Date in the ordinary course of business during the Benchmark Period (except with respect to Services being transitioned from

or to a third party service provider during the Benchmark Period in which case the standard shall be established by mutual agreement of the parties within a reasonable time following such transition).

Section 5.02   Professional and Workmanlike Fashion. Without limiting the warranty in Section 5.01, each Provider agrees to perform Services in a professional and workmanlike fashion.

Section 5.03   Disclaimer of Warranties.  Except as expressly set forth herein, the parties hereto acknowledge and agree that the Services are provided as-is, that the applicable Recipient assumes all risks and liabilities arising from or relating to its use of and reliance upon the Services and each Provider makes no representation or warranty with respect thereto. EXCEPT AS EXPRESSLY SET FORTH HEREIN, EACH PROVIDER HEREBY EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES REGARDING THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OR WARRANTY IN REGARD TO QUALITY, PERFORMANCE, NONINFRINGEMENT, COMMERCIAL UTILITY, MERCHANTABILITY OR FITNESS OF THE SERVICES FOR A PARTICULAR PURPOSE.

# ARTICLE 6

# INDEMNIFICATION; LIMITATION ON LIABILITY

Section 6.01   Indemnification of Each Provider by the Relevant Recipient. Subject to the limitations set forth in this Article 6, each Recipient shall indemnify and hold harmless each relevant Provider and its Affiliates and their respective officers and directors (each, a "Provider Indemnified Party") from and against any and all loss, liability, claim, damage or expense (including legal fees and expenses) ("Losses") to the extent owed to third parties, and reimburse each relevant Provider Indemnified Party for all expenses as they are incurred, whether or not in connection with pending litigation and whether or not any Provider Indemnified Party is a party, arising out of any claim by a third party to the extent caused by, resulting from or in connection with any of the Services rendered or to be rendered by or on behalf of such Provider pursuant to this Agreement, the transactions contemplated by this Agreement or such Provider's actions or inactions in connection with any such Services or transactions; provided that such Recipient shall not be responsible for any Losses of such Provider Indemnified Party to the extent that such Loss is caused by, results from, or arises out of or in connection with a Provider Indemnified Party's gross negligence or willful misconduct in connection with any such Services or transactions, actions or inactions related thereto.

Section 6.02   Indemnification of Each Recipient by the Relevant Provider. Subject to the limitations set forth in this Article 6, each Provider shall indemnify and hold harmless each relevant Recipient and its Affiliates and their respective officers and directors (each, a "Recipient Indemnified Party") from and against any and all Losses to the extent owed to third parties, and reimburse each relevant Recipient Indemnified Party for all expenses as they are incurred, whether or not in connection with pending litigation and whether or not any Recipient Indemnified Party is a party, arising out of any claim by a third party to the extent caused by, resulting from or in connection with such Provider's gross negligence, willful

misconduct or breach of Section 5.02; provided that such Provider shall not be responsible for any Losses of such Recipient Indemnified Party to the extent that such Loss is caused by, results from, or arises out of or in connection with a Recipient Indemnified Party's gross negligence or willful misconduct.

Section 6.03    Limited Liability of a Provider.  Notwithstanding Article 5 or anything else to the contrary contained herein, no Provider Indemnified Party shall have any liability in contract, tort or otherwise, for or in connection with any Services rendered or to be rendered by any Provider Indemnified Party pursuant to this Agreement, the transactions contemplated by this Agreement or any Provider Indemnified Party's actions or inactions in connection with any such Services or transactions, to any Recipient Indemnified Party, except for a breach of Section 5.02 or to the extent that any such Recipient Indemnified Party suffers a Loss that results from such Provider Indemnified Party's gross negligence or willful misconduct in connection with any such Services or transactions, actions or inactions related thereto.

Section 6.04    Limited Liability of a Recipient.  Notwithstanding Article 5 or anything else to the contrary contained herein, no Recipient shall have any liability in contract, tort or otherwise, for or in connection with the transactions contemplated by this Agreement or such Recipient's actions or inactions in connection with any Services or transactions, to any Provider, except (a) to the extent that any such Provider suffers a Loss that results from such Recipient's gross negligence or willful misconduct in connection with any such transactions, actions or inactions related thereto or (b) to the extent owed pursuant to Recipient's indemnification obligations in Section 6.01.

Section 6.05    Additional Limitation on Liability.

(a)    Notwithstanding any other provision contained in this Agreement, no party hereto shall be liable for any exemplary, special, indirect, punitive, incidental or consequential losses, damages or expenses, including any damages due to business interruption or loss of profits, except to the extent arising from or relating to such party's gross negligence or willful misconduct.

(b)    Except for the indemnification obligations set forth in Section 6.01, the aggregate liability and indemnification of each of LBHI and LAMCO (or their respective assignees in accordance with Section 9.10) with respect to this Agreement shall not exceed, in the aggregate, the aggregate amount of Service Charges paid hereunder to LBHI or LAMCO (or such respective assignees), as the case may be.

Section 6.06    Liability for Payment Obligations.  Nothing in this Article 6 shall be deemed to eliminate or limit, in any respect, a party's express obligation in this Agreement to pay or reimburse, as applicable, for (i) Termination Charges, (ii) Service Charges for Services rendered in accordance with this Agreement or (iii) other costs and expenses to the extent expressly provided herein.

Section 6.07    Obligations Several and Not Joint.  As between a Recipient and a permitted third-party assignee of the Recipient, the obligations of each such party under this Agreement shall be several and not joint.

Section 6.08   THE DISCLAIMER OF WARRANTY, LIMITATION OF LIABILITY AND OVERALL ALLOCATION OF RISK BETWEEN THE PARTIES ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE PARTIES.  EACH PROVIDER WOULD NOT BE ABLE OR WILLING TO PROVIDE THE SERVICES WITHOUT THE PROTECTIONS PROVIDED TO A PROVIDER PURSUANT TO SUCH PROVISIONS.  IF ANY APPLICABLE COURT HOLDS ANY DISCLAIMER, LIMITATION OF LIABILITY OR ALLOCATION OF RISK CONTAINED IN THIS SECTION TO BE UNENFORCEABLE, THEN A PARTY'S LIABILITY WILL BE LIMITED TO THE FULLEST POSSIBLE EXTENT PERMITTED BY APPLICABLE LAW.

## ARTICLE 7

### DISPUTE RESOLUTION

Section 7.01   Dispute Resolution.

(a)      In the event of any dispute, controversy or claim arising out of or relating to the transactions contemplated by this Agreement, or the validity, interpretation, breach or termination of any provision of this Agreement, or calculation or allocation of the costs of any Service, including claims seeking redress or asserting rights under any law (each, a "Dispute"), the parties hereto agree that the LBHI Services Manager and LAMCO Services Manager (or such other Persons as LBHI and LAMCO may designate) shall negotiate in good faith in an attempt to resolve such Dispute amicably.  If such Dispute has not been resolved to the mutual satisfaction of LBHI and LAMCO within twenty (20) days after the initial notice of the Dispute (or such longer period as such parties may agree), then, a senior executive on behalf of LBHI and a senior executive on behalf of LAMCO shall negotiate in good faith in an attempt to resolve such Dispute amicably for an additional ten (10) days (or such longer period as such parties may agree).  If such Dispute has not been finally resolved at the end of such ten-day period, then either party may pursue remedies in accordance with Section 9.11.

(b)      In any Dispute regarding the amount of a Service Charge, if after such Dispute is finally adjudicated pursuant to the dispute resolution and/or judicial process set forth in Section 7.01(a) or Section 9.11, it is determined that the Service Charge that the Provider has invoiced the Recipient, and that the Recipient has paid to the Provider, is greater or less than the amount that the Service Charge should have been, then (i) if it is determined that the Recipient has overpaid the Service Charge, the Provider shall within five (5) Business Days after such determination reimburse the Recipient an amount of cash equal to such overpayment, plus 1% per month, compounded monthly, accruing from the date of payment by the Recipient to the time of reimbursement by the Provider and (ii) if it is determined that the Recipient has underpaid the Service Charge, the Recipient shall within five (5) Business Days after such determination reimburse the Provider an amount of cash equal to such underpayment, plus 1% per month, compounded monthly, accruing from the date such payment originally should have been made by the Recipient to the time of reimbursement by the Recipient.

## ARTICLE 8

### TERMINATION

Section 8.01    Term; Termination.

(a)    This Agreement shall commence immediately upon the Closing Date and shall terminate upon the earliest to occur of (i) the mutual written agreement of the parties to terminate this Agreement in its entirety, (ii) the complete termination of the Asset Management Agreement or (iii) the third anniversary of the Closing Date.  In addition, (x) a Recipient may from time to time terminate this Agreement with respect to any particular Service, in whole but not in part (1) for any reason or no reason upon providing at least ninety (90) days prior written notice to the Provider of such termination, subject to the obligation to pay Termination Charges, as provided for under Section 8.02, (2) if the Provider of such Service has failed to perform any of its material obligations under this Agreement with respect to such Service, and such failure shall continue to exist thirty (30) days after receipt by the Provider of written notice of such failure from the Recipient, or (3) immediately upon mutual written agreement of the parties hereto, and (y) a Provider may terminate this Agreement with respect to one or more Services, in whole but not in part, at any time upon prior written notice to the Recipient if the Recipient has failed to perform any of its material obligations under this Agreement relating to such Service or Services, and such failure shall be continued uncured for a period of thirty (30) days after receipt by the Recipient of a written notice of such failure from the Provider.  In the event that the effective date of the termination of any particular Service is a day other than at the end of a billing period, the Service Charge associated with such Service shall be pro-rated appropriately.

(b)    A Recipient may from time to time request a reduction in part of the scope or amount of any particular Service.  If requested to do so by Recipient, the Provider agrees to discuss in good faith appropriate reductions to the relevant Service Charges in light of all relevant factors including the costs and benefits to the Provider of any such reductions.  In the event that any particular Service is reduced other than at the end of a billing period, the Service Charge associated with such Service for the billing period in which such Service is reduced shall be pro-rated appropriately.

(c)    The Recipient may terminate this Agreement upon the occurrence of a Force Majeure event pursuant to Section 8.04 below that materially disrupts the provision of Services, and Provider's failure to fully restore such Services within sixty (60) days.

Section 8.02    Effect of Termination.  Upon termination of any particular Service pursuant to this Agreement, the Provider of the terminated Service will have no further obligation to provide the terminated Service, and the relevant Recipient will have no obligation to pay any future Service Charges relating to any such Service; provided, however, that the Recipient shall remain obligated to the relevant Provider for (i) the Service Charges owed and payable in respect of Services provided prior to the effective date of termination and (ii) any Termination Charges.  Upon termination of any particular Service pursuant to this Agreement, the relevant Provider shall reduce for the next billing period the amount of the Service Charge for the category of Services in which the terminated Service was included (such reduction to reflect the elimination of all costs incurred in connection with the terminated service to the extent the same are not required to provide other Services to the Recipient), and, upon request of the Recipient, the Provider shall provide the Recipient with documentation and/or information regarding the calculation of the amount of the reduction.

Section 8.03    Survival.  In connection with termination of any Service, the provisions of this Agreement not relating solely to such terminated Service shall survive any such termination, and in connection with a termination of this Agreement, Article 1, Section 2.05, Article 6 (including liability in respect of any indemnifiable Losses under this Agreement arising or occurring on or prior to the date of termination), Article 7, Article 8, Article 9, all confidentiality obligations under this Agreement and liability for all due and unpaid Service Charges and Termination Charges shall continue to survive indefinitely.

Section 8.04    Force Majeure.  No party hereto (nor any Person acting on its behalf) shall have any liability or responsibility for failure to fulfill any obligation (other than a payment obligation) under this Agreement so long as and to the extent to which the fulfillment of such obligation is prevented, frustrated, hindered or delayed as a consequence of circumstances of Force Majeure; provided that (i) such party (or such Person) shall have exercised commercially reasonable efforts to minimize the effect of Force Majeure on its obligations and (ii) the nature, quality and standard of care that the Provider shall provide in delivering a Service after a Force Majeure shall be substantially the same as the nature, quality and standard of care that the Provider provides to its Affiliates and its other business components with respect to such Service.  In the event of an occurrence of a Force Majeure, the party hereto whose performance is affected thereby shall give notice of suspension as soon as reasonably practicable to the other stating the date and extent of such suspension and the cause thereof, and such party shall resume the performance of such obligations as soon as reasonably practicable after the removal of the cause.

## ARTICLE 9

## GENERAL PROVISIONS

Section 9.01    Independent Contractors.  In providing the Services hereunder, the Provider shall act solely as independent contractor and nothing in this Agreement shall constitute or be construed to be or create a partnership, joint venture, or principal/agent relationship between the Provider, on the one hand, and the Recipient, on the other.  All Persons employed by the Provider in the performance of its obligations under this Agreement shall be the sole responsibility of the Provider.

Section 9.02    Subcontractors.  Any Provider may hire or engage one or more subcontractors to perform any or all of its obligations under this Agreement subject to the Recipient's prior written approval, not to be unreasonably withheld; provided that regardless of such approval such Provider shall in all cases remain responsible for all its obligations under this Agreement.  Under no circumstances shall any Recipient be responsible for making any payments directly to any subcontractor engaged by a Provider.

Section 9.03    Books and Records.  All books, records and data maintained by a Provider for a Recipient with respect to the provision of a Service to such Recipient shall be the exclusive property of such Recipient.  The Recipient, at its sole cost and expense, shall have the right to inspect, and make copies of, any such books, records and data during regular business hours upon reasonable advance notice to the Provider.  At the sole cost and expense of the Recipient, upon termination of the provision of any Service, the relevant books, records and data

relating to such terminated Service shall be delivered by the Provider to the Recipient in a mutually agreed upon format to the address of the Recipient set forth in Section 9.05 or any other mutually agreed upon location; provided, however, that the Provider shall be entitled to retain one copy of all such books, records and data relating to such terminated Service for archival purposes and for purposes of responding to any dispute that may arise with respect thereto.

Section 9.04    Treatment of Confidential Information.

(a)    Confidential or proprietary information obtained under this Agreement shall be subject to Section 3.06 of the Contribution Agreement.

(b)    Each party shall comply with all applicable state, federal and foreign privacy and data protection laws that are or that may in the future be applicable to the provision or receipt of the Services hereunder.

Section 9.05    Notices.  Except with respect to routine communications by the LBHI Services Manager and LAMCO Services Manager under Section 2.02, all notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service, by facsimile with receipt confirmed (followed by delivery of an original via overnight courier service) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9.05):

(a)    if to LBHI:

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, NY 10019
Attention:  John Suckow
Facsimile:  [●]

(b)    if to LAMCO:

LAMCO LLC
745 Seventh Avenue
New York, NY 10019
Attention:  William Gordon
Facsimile:  [●]

Section 9.06    Regulatory Approval and Compliance.  Each party hereto shall be responsible for its own compliance with any and all laws applicable to its performance under this Agreement; provided, however, that each of LBHI and LAMCO shall, subject to reimbursement of out-of-pocket expenses by the requesting party, cooperate and provide one another with all reasonably requested assistance (including the execution of documents and the provision of relevant information) required by the requesting party to ensure compliance with all applicable

laws in connection with any regulatory action, requirement, inquiry or examination related to this Agreement or the Services.

Section 9.07    Further Assurances.  Each party hereto covenants and agrees that, without any additional consideration, it shall execute and deliver any further legal instruments and perform any acts that are or may become reasonably necessary to effectuate this Agreement.

Section 9.08    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party hereto.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of such parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement can be consummated as originally contemplated to the greatest extent possible.

Section 9.09    Entire Agreement.  Except as otherwise expressly provided in this Agreement, the Contribution Agreement and this Agreement constitute the entire agreement of the parties hereto with respect to the subject matter of this Agreement and supersede all prior agreements and undertakings, both written and oral, between or on behalf of the parties hereto with respect to the subject matter of this Agreement.

Section 9.10    Assignment; Third-Party Beneficiaries.

(a)    This Agreement shall not be assigned by operation of law or otherwise without the prior written consent of the parties hereto (which consent may be granted or withheld in the sole discretion of such other party).  Any assignment in contravention of this Section 9.10 shall be void.  Subject to the second preceding sentence, this Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

(b)    Except as provided in Article 6 with respect to Provider Indemnified Parties, this Agreement is for the sole benefit of the parties hereto and their permitted successors and assigns and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person (other than the Creditors' Committee which shall, until the Termination Date, be a third-party beneficiary of this Agreement with rights to enforce the obligations of the parties hereto) any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

Section 9.11    Governing Law; Submission to Jurisdiction.  (a) This Agreement (and any claims or disputes arising out of or related hereto or to the transactions contemplated hereby or to the inducement of any party to enter herein, whether for breach of contract, tortious conduct or otherwise, and whether predicated on common law, statute or otherwise) shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, in each case without reference to

any conflict of law principles that might lead to the application of the laws of any other jurisdiction.

(b)     Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 9.05</u> hereof; <u>provided</u>, <u>however</u>, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 9.05</u>.

Section 9.12     <u>Amendment</u>.  Any material amendment, modification, supplement or waiver to this Agreement proposed to be made prior to the Termination Date shall require the prior approval of the Creditors' Committee.  No provision of this Agreement, including any Schedule hereto, may be amended, supplemented or modified except by a written instrument making specific reference hereto or thereto signed by all the parties to this Agreement.  No waiver by any party of any provision hereof shall be effective unless explicitly set forth in writing and executed by the party so waiving.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other subsequent breach.

Section 9.13     <u>Rules of Construction</u>.  Interpretation of this Agreement shall be governed by the following rules of construction (a) words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires, (b) references to the terms Article, Section, paragraph and Schedule are references to the Articles, Sections, paragraphs and Schedules of this Agreement unless otherwise specified, (c) the terms "hereof," "herein," "hereby," "hereto," "hereunder" and derivative or similar words refer to this entire Agreement, including the Schedules hereto, (d) references to "$" shall mean U.S. dollars, (e) the word "including" and words of similar import when used in this Agreement shall mean "including, without limitation," unless otherwise specified, (f) the word "or" shall not be exclusive, (g) references to "written" or "in writing" include in electronic form, (h) provisions shall apply, when appropriate, to successive events and transactions, (i) the headings contained in this Agreement are for reference purposes only and

shall not affect in any way the meaning or interpretation of this Agreement, (j) LBHI and LAMCO have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or burdening any such party by virtue of the authorship of any of the provisions in any of this Agreement, (k) a reference to any Person includes such Person's successors and permitted assigns, (l) any reference to "days" means calendar days unless Business Days are expressly specified, and (m) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

Section 9.14 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, and by each party in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be as effective as delivery of a manually executed counterpart of this Agreement.

Section 9.15 <u>Waiver of Jury Trial</u>. EACH PARTY HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH SUCH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTIES WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER TRANSACTION AGREEMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.15</u>.

Section 9.16 <u>Enforcement</u>. The parties agree that irreparable damage may result, and that the parties may not have any adequate remedy at law, if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached or threatened to be breached. It is accordingly agreed that, notwithstanding <u>Section 7.01</u>, if either party breaches its obligation to consummate the transactions contemplated by this Agreement, the non-breaching party shall be entitled to seek equitable relief, in addition to all other remedies available to the parties at law or in equity as a remedy for any such breach or threatened breach. Such equitable remedies may be sought in any court referred to in <u>Section 9.11(b)</u>.

Section 9.17 <u>Non-Recourse</u>. No past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of either LBHI or LAMCO or their respective Affiliates shall have any liability for any obligations or liabilities of LBHI or LAMCO, respectively, under this Agreement of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

LEHMAN BROTHERS HOLDINGS INC.


By: _____
    Name:
    Title:


LAMCO LLC


By: _____
    Name:
    Title:

**EXHIBIT E**

# LAMCO HOLDINGS LLC

## LIMITED LIABILITY COMPANY AGREEMENT

THIS LIMITED LIABILITY COMPANY AGREEMENT of LAMCO HOLDINGS LLC, a Delaware limited liability company (the "Company"), having an address at c/o Lehman Brothers Holdings Inc., 1271 Avenue of the Americas, New York, New York 10020, is made as of the ___ day of _____, 2010, by Lehman Brothers Holdings Inc., a Delaware corporation ("LBHI"), and LBHI LAMCO HOLDINGS LLC, a Delaware limited liability company ("LBHI SPV").

1. Formation

    (a)    The Company has been formed as a Delaware limited liability company pursuant to the Delaware Limited Liability Company Act (the "LLC Act"). A certificate of formation of the Company (the "Certificate of Formation") was filed with the Secretary of State of Delaware on [●], 2010.

2. Capital Contributions

    (a)    Effective as of the date hereof, pursuant to the Contribution Agreement, LBHI contributed (i) 99% of its right, title and interests in and to the Asset Management Assets (hereinafter as defined in the Contribution Agreement) (including cash in the amount set forth on Schedule I hereto opposite its name) to the Company and (ii) 1% of its right, title and interests in and to the Asset Management Assets to LBHI SPV (the "First Contribution"). Immediately following the First Contribution, LBHI SPV contributed all of its right, title and interest in and to the Asset Management Assets (including cash in the amount set forth on Schedule I hereto opposite its name) to the Company (the "Second Contribution"). Immediately following the Second Contribution, the Company contributed: (i) all of its right, title and interest in and to the Domestic Asset Management Assets (as defined in the Contribution Agreement) (including cash in the amount set forth on Schedule I hereto) to LAMCO and (i) all of its right, title and interest in and to the International Asset Management Assets (as defined in the Contribution Agreement) to LAMCO International.

    (b)    Except as otherwise required by law, the Members shall have no obligation to make any further capital contributions to the Company. Persons or entities hereafter admitted as Members shall make such contributions of cash (or promissory obligations), property or services to the Company as shall be determined by the Board of Managers at the time of each such admission.

3. Definitions

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)       credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)      debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(*d*)*(4)*, 1.704-1(b)(2)(ii)(*d*)*(5)*, and 1.704-1(b)(2)(ii)(*d*)*(6)*.

"<u>Affiliate</u>" means, with respect to another Person, any Person directly or indirectly Controlling, Controlled by or under common Control with such other Person. For purposes of this Agreement, Affiliates of a Person that is an individual shall include his or her Family Members and Family Trusts.

"<u>Agreement</u>" means this Amended and Restated Limited Liability Company Agreement, as amended, modified or supplemented from time to time

"<u>Approved AMA</u>" means an asset management agreement substantially in the form approved by the Board of Managers, LBHI and the UCC, with such changes, either generally or in specific instances, as may be approved from time to time, by the Board of Managers, LBHI and, prior to the Termination Date, the UCC; <u>provided</u> however that if the UCC fails to respond to a request for approval of any such change within five (5) business days of receiving a request for such approval by the Board of Managers, such change shall be deemed to have been approved by the UCC.

"<u>Associated Entity</u>" has the meaning set forth in Section 14(a) hereof.

"<u>Authorized Persons</u>" has the meaning set forth in Section 8(a) hereof.

"<u>Board of Managers</u>" means the board of managers established pursuant to Section 7(a) hereof.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York (Manhattan).

"<u>Capital Account</u>" has the meaning set forth in Section 9(a) hereof.

"<u>Certificate of Formation</u>" has the meaning set forth in Section 1(a) hereof.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time or any successor federal income tax legislation.

"<u>Company</u>" has the meaning set forth in the forepart to this Agreement.

"<u>Company Minimum Gain</u>" has the same meaning as "partnership minimum gain" set forth in Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"<u>Contribution Agreement</u>" means the Contribution Agreement, dated as of the [●], 2010, between LBHI, LBHI SPV, the Company, LAMCO International and LAMCO.

"Control" means the possession, directly or indirectly, of the power to direct the management or policies of a Person, whether through ownership or voting of securities, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Electronic Transmission" means email and any other form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

"Equity Securities" means (i) of any Person that is a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (ii) of any other Person, any and all partnership, membership or other equity interests of such Person; and (iii) of any Person, warrants, options or other rights to acquire (whether by conversion, exercise, exchange or otherwise) or other securities that are convertible into or exchangeable or exercisable for any such shares, interests, participations, rights, other equivalents, partnership interests, membership interests or other equity interests.

"Family Members" means, with respect to any natural Person, such Person's spouse, children, parents and lineal descendants of such Person's parents (in each case, natural or adopted).

"Family Trusts" means, with respect to any natural Person, a trust limited partnership or limited liability company benefiting solely such individual or the Family Members of such individual.

"First Contribution" has the meaning set forth in Section 2(a) hereof.

"Fiscal Year" has the meaning set forth in Section 15 hereof.

"Gross Asset Value" means, with respect to any asset of the Company, the asset's adjusted basis for federal income tax purposes, except as follows:

      (i)      The Gross Asset Value of any asset contributed by a Member to the Company is the gross fair market value of such asset as determined by the Board of Managers at the time of contribution;

      (ii)     The Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of the following times: (a) the acquisition of any additional interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest in the Company; (c) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a Member capacity, or by a new Member acting in a Member capacity or in anticipation of becoming a Member; and (d) the liquidation of the Company within the meaning of Regulations Section

1.704-1(b)(2)(ii)(*g*); *provided*, *however*, that the adjustments pursuant to clauses (a), (b) and (c) above shall be made only if the Board of Managers reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(iii)    The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Board of Managers.

"Indemnitee" means any of (i) the current or former Members, Managers, Officers, Observers or Authorized Persons of the Company or their respective affiliates or any of their respective current or former members, partners, directors, shareholders, managers, officers or employees or (ii) the current or former members of the UCC.

"LAMCO" means LAMCO LLC, a Delaware limited liability company and wholly owned subsidiary of the Company.

"LAMCO International" means LAMCO Holdings International B.V., a Netherlands company and wholly owned subsidiary of the Company.

"LBHI" has the meaning set forth in the forepart to this Agreement.

"LBHI Designees" has the meaning set forth in Section 7(e) hereof.

"LBHI SPV" has the meaning set forth in the forepart to this Agreement.

"LLC Act" has the meaning set forth in Section 1(a) hereof.

"Liquidator" has the meaning set forth in Section 12(b).

"Losses" has the meaning set forth in Section 14(a) hereof.

"Majority in Interest of the Members" means Members whose Percentage Interests aggregate to greater than fifty percent of the Percentage Interests of all Members.

"Manager" means a member of the Board of Managers as designated in, or selected pursuant to, Section 7(e) hereof.

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" set forth in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

"Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" set forth in Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

"Members" means LBHI, LBHI SPV and all other persons or entities admitted as additional or substituted Members pursuant to this Agreement, so long as they remain Members. Reference to a "Member" means any one of the Members.

"Net Income" and "Net Loss" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss pursuant to this paragraph shall be added to such income or loss;

(ii)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*), and not otherwise taken into account in computing Net Income or Net Loss pursuant to this paragraph, shall be subtracted from such taxable income or loss;

(iii)   In the event the Gross Asset Value of any Company asset is adjusted pursuant to subdivisions (ii) or (iii) of the definition of "Gross Asset Value" herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Income or Net Loss;

(iv)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)     In lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, such amounts shall instead be determined in accordance with the requirements of Regulations Section 1.704-1(b)(2)(iv)(*g*); and

(vi)    Any items which are specially allocated pursuant to the provisions of Section 11(c) shall not be taken into account in computing Net Income or Net Loss.

"New Client" has the meaning set forth in Section 7(b).

"Nonrecourse Liability" has the meaning set forth in Regulations Section 1.752-1(a)(2).

"<u>Nonrecourse Deductions</u>" has the meaning set forth in Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"<u>Observer</u>" means any representative of the UCC's financial advisors, which are currently Houlihan, Lokey, Howard & Zukin, Inc. and FTI Consulting, Inc.

"<u>Officer</u>" has the meaning set forth in Section 8(a) hereof.

"<u>Percentage Interest</u>" means, as to any Member, the percentage set forth opposite such Member's name on Schedule I hereto, as such Schedule shall be amended from time to time in accordance with the provisions hereof. The combined Percentage Interest of all Members shall at all times equal 100%.

"<u>Person</u>" means any individual, partnership, limited liability company, association, corporation, trust or other entity.

"<u>Regulations</u>" means the Income Tax Regulations promulgated under the Code, as amended from time to time.

"<u>Second Contribution</u>" has the meaning set forth in Section 2(a) hereof.

"<u>Subsidiary</u>" of any Person means any other Person in which such Person owns, directly or indirectly, a majority of the voting stock or is a general partner or otherwise has the power to control, by agreement or otherwise, the management and general business affairs of such other Person.

"<u>Subsidiary Officer</u>" has the meaning set forth in Section 14(a) hereof.

"<u>Tax Advances</u>" has the meaning set forth in Section 10(b) hereof.

"<u>Termination Date</u>" means the date on which a chapter 11 plan of LBHI becomes effective; provided, however, that in the event that such chapter 11 plan of LBHI extends the rights of the UCC set forth herein beyond the date on which such chapter 11 plan of LBHI becomes effective, then the Termination Date shall be deemed to be the date on which such rights of the UCC set forth herein expire pursuant to such chapter 11 plan of LBHI.

"<u>Third-Party Client</u>" means any New Client that enters into an Approved AMA with LAMCO and becomes a New Client in accordance with Section 7(b) hereof.

"<u>UCC</u>" means the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., which was appointed by the Office of the United States Trustee on September 17, 2009, as revised or supplemented.

4.      <u>Registered Office and Principal Place of Business</u>

The registered office of the Company in the State of Delaware shall be 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, and its registered agent for service of process on the Company at such address is Corporation Service Company. The principal place of business

of the Company shall be located at c/o Lehman Brothers Holdings Inc., 1271 Avenue of the Americas, New York, New York 10020 or at such other or additional places as the Board of Managers may determine.

5.   Term

The term of the Company commenced on [●], 2010 and shall be perpetual unless the Company is earlier dissolved and terminated in accordance with the provisions of this Agreement.

6.   Business

The business of the Company is (i) to provide investment advisory services through its Subsidiaries (including LAMCO) to LBHI or its Subsidiaries and to any Third-Party Client pursuant to an Approved AMA and (ii) to engage in any lawful act or activity for which a limited liability company may be formed under the LLC Act.

7.   Management of the Company

(a)   General Authority.  A Board of Managers shall be established to manage the business and affairs of the Company.  Subject to the delegation of rights and powers as provided herein and the other limitations set forth in this Agreement, the Board of Managers shall have exclusive and complete authority and discretion to manage the business and conduct the operations and affairs of the Company. Except as otherwise specifically provided herein, the Board of Managers shall have all rights and powers of a "manager" under the LLC Act, and shall have all powers and rights as necessary, appropriate or advisable to effectuate and carry out the purposes and business of the Company; *provided*, *however*, that the Board of Managers shall not be permitted to take any action which, if such action were taken by LBHI, would require the approval of the Bankruptcy Court or the UCC, without first obtaining the approval of the Bankruptcy Court or UCC, as applicable, including, without limitation, actions taken with respect to compensation of directors, officers and employees of the Company.

(b)   New Client Approvals.  Anything in this Agreement to the contrary notwithstanding, neither the Company nor any of its Subsidiaries shall provide or agree to provide investment advisory or management services to any Person other than LBHI or a Subsidiary of LBHI (a "New Client") except in accordance with the following:

(i)   such New Client shall have entered into an Approved AMA with LAMCO;

(ii)   if at the time of entering into such Approved AMA, the value of the assets of such New Client to be managed by LAMCO and its Affiliates, taken together with the value of the assets of each Affiliate of such New Client then being managed or proposed to be managed by LAMCO and its Affiliates (in each case, as determined by the Board

of Managers in good faith and on a reasonable basis at the time of entering into such Approved AMA), equals (A) $475 million or more, such New Client shall have been approved in writing by the Board of Managers and, if prior to the Termination Date, the UCC or (B) less than $475 million, such New Client shall have been approved in writing by the Board of Managers.

(c)     <u>Additional UCC Approval Rights Over the Operations of the Company</u>. Anything in this Agreement to the contrary notwithstanding, prior to the Termination Date, no action shall be taken by the Company, the Board of Managers, or by any Manager, Authorized Person, director, manager, officer, agent or employee of the Company or any of its Subsidiaries, without the prior approval of the UCC, and which would cause or permit the Company or any of its Subsidiaries to:

(i)     make any change to the form of entity of the Company or any such Subsidiary or file an election to cause the Company or such Subsidiary to be classified as an association taxable as a corporation for U.S. federal income tax purposes, except that the Company may cause a Subsidiary that is a "foreign eligible entity" (within the meaning of Regulations Section 301.7701-3(b)(2)) to make an election, effective on the date of the entity's formation, to be treated as an association taxable as a corporation for U.S. federal income tax purposes;

(ii)    amend, modify, supplement or waive any provision in this Agreement or the Certificate of Formation (other than as required by law or as provided in Section 19(b) hereof);

(iii)   subject to Section 12(a)(i), commence any liquidation, dissolution or voluntary bankruptcy, administration, recapitalization or reorganization in any form of transaction, make any arrangements with creditors as part of a liquidation or bankruptcy, or consent to the entry of an order for relief in an involuntary case, or take the conversion of an involuntary case to a voluntary case, or consent to the appointment or taking possession by a receiver, trustee or other custodian for all or substantially all of its property, or otherwise seek the protection of any applicable bankruptcy or insolvency law;

(iv)    enter into any merger or consolidation, whether to effect an acquisition, divestiture or otherwise other than any internal reorganization involving solely the Company and its Subsidiaries; *provided* that any such internal reorganization shall remain subject to the approvals required under clause (i) of this Section 7(c) and Section 7(d) of this Agreement;

(v)     enter into any sale, lease or other conveyance of assets outside of the ordinary course of its business other than with respect to obsolete equipment;

(vi)    issue any equity or securities convertible into or exercisable for equity, including without limitation rights, warrants or options to purchase equity;

(vii)   enter into any extraordinary corporate transactions, such as a recapitalization, reorganization (other than an internal reorganization as permitted under clause (iv) above, including the proviso thereto), joint venture or acquisition (excluding any joint venture or similar arrangements with respect to marketing arrangements and/or the management of a Third-Party Client's assets and which is non-exclusive and terminable without penalty (with a reasonable period of notice));

(viii)  make any loan or advance other than (a) ordinary-course advances to cover expenses of the Company or of any Manager, Officer, Authorized Person, agent or employee of the Company and (b) for or on behalf of clients of the Company;

(ix)    guarantee, assume or incur indebtedness for borrowed money;

(x)     make any material change to the scope or nature of its business and operations;

(xi)    add the capacity, or otherwise agree, to manage assets in a new asset class to the extent that the addition of such asset class would require the hiring of additional personnel or the addition of infrastructure; or

(xii)   incur non-reimbursable client development expenses that are not subject to reimbursement by a client other than pursuant to a budget approved by the UCC (at least once a year) the amount of which is expected to be approximately $3.5 million per year.

(d)   Additional UCC Approval Rights Over LBHI and its Subsidiaries.  Anything in this Agreement to the contrary notwithstanding, prior to the Termination Date, without the prior approval by the UCC, LBHI agrees that it shall not, and shall not permit any of its Affiliates (other than the Company and its Subsidiaries) or any of the directors, officers, or employees of LBHI or any of such Affiliates to, and no action shall be taken by the Company, the Board of Managers or by any Manager, Authorized Person, director, manager, officer, agent or employee of the Company or any of its Subsidiaries that would permit LBHI or any of such Affiliates to:

(i)     make any loan or advance to, make any capital contribution or other investment in, or guarantee any indebtedness of the Company or any

of its Subsidiaries other than (A) the Cash Contribution, (B) the payment of obligations as and when due under the Asset Management Agreement, dated as of ____, 2010, between LBHI and certain of Subsidiaries party thereto and LAMCO or any successor asset management agreement or agreements, (C) the guarantee by LBHI of the Company's obligations under any of LAMCO's employment contracts existing on the date hereof and (D) the guarantee by LBHI of the obligations set forth on Schedule II hereto; provided, that LBHI may contribute, and cause LBHI SPV to contribute, to the Company, and the Company may contribute to one or more Subsidiaries, assets otherwise permitted to be contributed pursuant to the Contribution Agreement; or

(ii)    take or permit any other Person to take any action that would result in LBHI and its Subsidiaries (other than the Company and its Subsidiaries) owning directly or indirectly less than 100% of the Company's or any of its Subsidiaries' Equity Securities.

(e)    <u>Board of Managers</u>.  The Board of Managers shall have [  ] Managers or such other number as the Members shall determine by a vote of a Majority in Interest of the Members; *provided* that at least a majority of the Board of Managers shall at all times be comprised of LBHI personnel (the "<u>LBHI Designees</u>"). Until the Termination Date, the UCC shall have the right to require that an independent person be appointed as a member of the Board of Managers, such independent person to be selected by mutual agreement between LBHI and the UCC.  The Board of Managers shall initially be composed of the following individuals:

[                           ]
[                           ]
[                           ]

Vacancies on the Board of Managers or any committee thereof from whatever cause shall be filled by a vote of a Majority in Interest of the Members. Managers shall serve until they resign, die, become incapacitated or are removed. Managers can be removed with or without cause by a vote of a Majority in Interest of the Members. Determinations to be made by the Managers or a committee thereof in connection with the conduct of the business of the Company shall be made by affirmative vote of the majority of the Managers or members of such committee then in office unless otherwise specifically provided herein or in the LLC Act.

(f)    <u>Committees</u>.  The Board of Managers may designate one or more committees, each committee to consist of three or more of the Managers of the Company, and LBHI Designees shall at all times constitute at least a majority of each such committee. The Board of Managers may designate one or more Managers as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee, provided that at least a majority of such committee continues to be comprised of LBHI Designees. Any such committee,

to the extent provided in the resolution designating such committee and subject to any restrictions on the Board of Managers as provided herein, shall have and may exercise all of the powers of the Board of Managers in the management of the business and affairs of the Company; *provided*, *however*, that only the Board of Managers (subject to prior approval of the UCC as set forth herein) shall have power or authority in reference to (i) amending the Certificate of Formation of the Company, (ii) adopting an agreement of merger or consolidation, recommending to the Members the sale, lease or exchange of all or substantially all of the Company's property and assets, (iii) recommending to the Members a dissolution of the Company or a revocation of a dissolution or (iv) declaring a distribution or authorizing the issuance of any Equity Securities (unless in the case of clause (iv), the Board of Managers expressly resolves to delegate such power to a committee). Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board of Managers. Each committee shall keep regular minutes of its meetings and report the same to the Managers.

(g)     Place of Meetings and Meetings by Telephone.  All meetings of the Board of Managers and any committee may be held at any place that has been designated from time to time by resolution of the Board of Managers or the members of such committee. In the absence of such a designation, regular meetings shall be held at the principal place of business of the Company. Any meeting, regular or special, may be held by conference telephone or similar communication equipment as long as all Managers participating in the meeting can hear one another, and all Managers participating by telephone or similar communication equipment shall be deemed to be present in person at the meeting.

(h)     Regular Meetings.  Regular meetings of the Board of Managers shall be held at least once per year at such times and at such places as shall be fixed by the Board of Managers.

(i)     Special Meetings.  Special meetings of the Board of Managers for any purpose or purposes may be called at any time by a Majority in Interest of the Members or any LBHI Designee. Notice of the time and place of a special meeting shall be delivered personally or by telephone to each Manager and sent by first-class mail, by telecopy (or by Electronic Transmission) or by nationally recognized overnight courier, charges prepaid, addressed to each Manager at that Manager's address as it is shown on the record of the Company. In case the notice is mailed, it shall be deposited in the United States mail at least five (5) calendar days before the time of the holding of the meeting. In case the notice is delivered personally or by telephone or by telecopy (or by Electronic Transmission) or overnight courier, it shall be given at least two (2) calendar days before the time of the holding of the meeting. Any oral notice given personally or by telephone may be communicated either to the Manager or to a person at the office of the Manager who the person giving the notice has reason to believe will promptly communicate it to the Manager. The notice need not specify the purpose of the meeting.

(j)     UCC Observers.  Prior to the Termination Date, the UCC shall have the right to designate not more than two Observers to attend any meeting of the Board of Managers or any committee thereof.  The Company shall provide the Observer notice of every meeting of the Board of Managers and committee thereof on the same date and in the same manner as notice is given to the Managers or committee members, as applicable, at the address designated by each Observer.  The Observers will be entitled to receive all written materials and other information delivered to the Managers and committee members in connection with each such meeting and each action taken pursuant to clause (m) below on the same date that such materials and information are delivered to the Managers or committee members, as applicable.  Notwithstanding the foregoing, prior to the receipt of such materials and information, each Observer shall enter into a confidentiality agreement in a form reasonably acceptable to the Company and the UCC with respect to any meeting of the Board of Managers or any written materials or other information received by any Observer in connection therewith.

(k)     Waiver of Notice.  Notice of any meeting need not be given to any Manager who either before or after the meeting signs a written, or transmits by Electronic Transmission, a waiver, of notice, consent to holding the meeting, or approval of the minutes. The waiver of notice or consent need not specify the purpose of the meeting. All such waivers, consents, and approvals shall be filed with the records of the Company or made a part of the minutes of the meeting. Notice of a meeting shall also be deemed given to any Manager who attends the meeting without protesting before or at its commencement the lack of notice to that Manager.

(l)     Adjournment.  A majority of the Managers present may adjourn any meeting to another time and place. Notice of the time and place of holding an adjourned meeting need not be given unless the meeting is adjourned for more than forty-eight (48) hours, in which case notice of the time and place shall be given before the time of the adjourned meeting in the manner specified in subsection (i) of this Section 7.

(m)     Action Without a Meeting.  Any action to be taken by the Board of Managers or any committee at a meeting may be taken without such meeting by the written consent or consent by Electronic Transmission of a majority of the Managers or members of such committee then in office, except to the extent that the vote of a higher number of Managers is required by this Agreement or applicable law. Any written consent may be executed and given by facsimile, telecopy or similar means. Such written consents and consents by Electronic Transmission shall be filed with the minutes of the proceedings of the Managers.

(n)     Compensation.  Managers shall not receive any salary for their services as Managers or as members of committees, but by resolution of the Board of Managers (i) expenses of attendance may be allowed for attendance by Managers at each meeting and (ii) a fixed fee may be allowed for attendance by independent Managers at each meeting. Nothing herein contained shall be construed to

preclude any Manager from serving the Company in any other capacity, as an Officer, agent or otherwise, and receiving compensation thereof.

(o)  <u>Standard of Care</u>.  Notwithstanding anything to the contrary herein, (i) each Manager shall owe the same fiduciary duties to the Members that a director of a Delaware corporation owes to the shareholders of such corporation and (ii) each Officer and Authorized Person shall owe the same fiduciary duties to the Members that an officer of a Delaware corporation owes to the shareholders of such corporation.

(p)  <u>Subsidiaries</u>.  The Company shall cause LAMCO and each other material Subsidiary to at all times be governed by a board of directors, board of managers or similar governing body.  The composition (but not necessarily the individual members) of the board of directors, board of managers and each other governing board or body of each of the Company's Subsidiaries (each, a "<u>Sub Board</u>") shall be the same as that of the Board of Managers and each such Sub Board shall be governed by provisions substantially similar to <u>Sections 7(e)</u> through <u>7(o)</u>.

8.  <u>Officers/Authority</u>

(a)  <u>Officers and Authorized Persons</u>.  The Board of Managers may employ and retain persons as may be necessary or appropriate for the conduct of the Company's business, including employees and agents who may be designated as (i) officers with titles, including, but not limited to, "chairman," "chief executive officer," "president," "vice president," "treasurer," "secretary," "managing director," "chief financial officer," "assistant treasurer" and "assistant secretary" (each an "<u>Officer</u>") or (ii) authorized persons ("<u>Authorized Persons</u>") as and to the extent authorized by the Board of Managers, which persons may, but are not required to, be Officers.  Any two or more offices may be held by the same person.

(b)  <u>Authority</u>.  All Authorized Persons and Officers, if any, subject to the provisions of Section 7(c) hereof, shall have such authority and shall perform such duties as may be specified from time to time by the Board of Managers.  Unless the Board of Managers resolves otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office except as otherwise provided herein.  Subject to the terms herein, the Board of Managers may delegate to any Officer or Authorized Person any of the Board of Managers' powers under this Agreement; *provided* that the power to bind or sign on behalf of the Company may only be delegated by the Board of Managers to Authorized Persons.  Any delegation pursuant to this Section 8 may be revoked at any time by the Board of Managers.  Unless authorized by the Board of Managers or expressly permitted by this Agreement, no Officer, Authorized Person, agent or employee shall have any power or authority to bind the Company by any contract or engagement or to pledge its credit or to render it pecuniarily liable for any purpose or to any amount.

(c)     Election.  The Officers shall be chosen by the Board of Managers and shall hold the office for the term determined by the Board of Managers, or, if no term is specified, until the time at which their successors are appointed and qualified or their earlier death, incapacity or resignation, *provided* that an Officer or Authorized Person shall immediately cease to hold any and all offices in the Company to which he or she has been appointed without the necessity or acceptance of a resignation or relinquishment in the event that such Officer ceases to be employed by the Company, whether by retirement, termination or otherwise. A vacancy in any office arising from any cause may be filled for the unexpired portion of the term by the Board of Managers.

(d)     Removal.  Any Officer or Authorized Person may be removed by the Board of Managers at any time with or without cause.

(e)     Delegation of Power.  The Board of Managers may from time to time delegate the powers or duties of any Officer or Authorized Person to any other Officer, Authorized Person or other person whom it may select. The Board of Managers may appoint, employ, or otherwise contract with such other persons or entities for the transaction of the business of the Company or the performance of services for or on behalf of the Company as it shall determine in its sole discretion except as otherwise agreed to in writing by the Company.

(f)     Compensation.  Subject to Section 7 hereof, the compensation, if any, of each Officer or Authorized Person shall be such as the Board of Managers may from time to time determine.

(g)     Resignations.  Any Officer or Authorized Person may resign at any time by giving written notice or notice by Electronic Transmission to the Board of Managers. Any such resignation shall take effect at the time specified therein or if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

9.      Capital Accounts

(a)     Capital Accounts.  There shall be established and maintained for each Member a separate capital account ("Capital Account").  The initial balance of each Member's Capital Account shall equal the amount of money and the fair market value of any other property contributed or deemed contributed to the Company by such Member net of liabilities.  There shall subsequently be added to the Capital Account of each Member (i) the amount of money and the fair market value of any other property subsequently contributed to the Company by such Member net of liabilities and (ii) such Member's distributive share of Net Income and any item in the nature of income or gain that is specially allocated to the Member pursuant to Section 11(c).  There shall be subtracted from the Capital Account of each Member (x) the amount of any money, and the fair market value of any other property, distributed to such Member net of liabilities and (y) such Member's distributive share of Net Loss and any item in the nature of loss or expense that is

specially allocated to such Member pursuant to Section 11(c). The foregoing provision and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations.

(b)     Interest. No interest shall be payable to any Member by reason of the amount of such Member's capital contribution or Capital Account.

(c)     No Deficit Restoration Obligation. Notwithstanding any other provision of this Agreement to the contrary, at no time during the term of the Company or upon dissolution and liquidation thereof shall a Member with a negative balance in its Capital Account have any obligation to the Company or the other Members to restore such negative balance. In addition, no allocation to any Member of any loss, whether attributable to depreciation or otherwise, shall create any asset of or obligation to the Company, even if such allocation reduces the Capital Account of any Member or creates or increases a deficit in such Capital Account. It is also the intent of the Members that no Member shall be obligated to pay any such amount to or for the account of the Company or any creditor of the Company.

(d)     Transfer of Interest. In the event all or a portion of an interest in the Company is transferred, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred interest.

10.     Distributions

(a)     All cash and other distributable assets of the Company shall be distributed to the Members in accordance with their respective Percentage Interests. Distributions shall be made at such time, to such extent and in such manner as the Board of Managers shall determine.

(b)     To the extent the Board of Managers reasonably determines that the Company is required by law to withhold or to make tax payments on behalf of or with respect to any Member ("Tax Advances"), the Board of Managers may withhold such amounts and make such tax payments as so required. All Tax Advances made on behalf of a Member shall, at the option of the Board of Managers, (i) be promptly paid to the Company by the Member on whose behalf such Tax Advances were made or (ii) be repaid by reducing the amount of the current or next succeeding distribution or distributions which would otherwise have been made to such Member or, if such distributions are not sufficient for that purpose, by so reducing the proceeds of liquidation otherwise payable to such Member. Whenever the Board of Managers selects option (ii) pursuant to the preceding sentence for repayment of a Tax Advance by a Member, for all other purposes of this Agreement such Member shall be treated as having received all distributions (whether before or upon liquidation) unreduced by the amount of such Tax Advance. To the fullest extent permitted by law, each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability (including, without limitation, any liability for taxes,

penalties, additions to tax, interest or failure to withhold taxes) with respect to income attributable to or distributions or other payments to such Member.

11.  Allocations

(a)  General Application.  Except as explicitly provided elsewhere herein, Net Income or Net Loss for a Fiscal Year shall be allocated among the Members in a manner that shall, as nearly as possible, cause the Capital Account balance of each Member at the end of such Fiscal Year to equal the excess (which may be negative) of (i) the distributions that would be made to such Member if the Company were dissolved, its affairs wound up and its assets (including cash) sold for cash equal to their Gross Asset Values, all Company liabilities were satisfied (limited in the case of each Nonrecourse Liability to the Gross Asset Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 10(a) to the Members, minus (ii) the sum of the amount, if any, that such Member would be obligated to contribute to the capital of the Company and such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of the assets.

(b)  Loss Limitation.  Notwithstanding anything to the contrary in Section 11(a), the amount of items of Company expense and loss allocated pursuant to Section 11(a) to any Member shall not exceed the maximum amount of such items that can be so allocated without causing such Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year, unless each Member would have an Adjusted Capital Account Deficit.  All such items in excess of the limitation set forth in this Section 11(b) shall be allocated first, to Members who would not have an Adjusted Capital Account Deficit, pro rata, in proportion to their Capital Account balances, adjusted as provided in clauses (i) and (ii) of the definition of Adjusted Capital Account Deficit, until no Member would be entitled to any further allocation, and thereafter, to all Members, pro rata, in proportion to their respective Percentage Interests.

(c)  Notwithstanding anything to the contrary contained in this Section 11, the following special allocations shall be made in the following order:

(i)  *Minimum Gain Chargeback*.  If there is a net decrease during a Fiscal Year in either Company Minimum Gain or Member Nonrecourse Debt Minimum Gain, then notwithstanding any other provision of this Section 11, each Member shall receive such special allocations of items of Company income and gain as are required in order to conform to Regulations Section 1.704-2.

(ii)  *Qualified Income Offset*.  Subject to Section 11(c)(i) hereof, but notwithstanding any other provision of this Section 11, items of income and gain shall be specially allocated to the Members in a

manner that complies with the "qualified income offset" requirement of Regulations Section 1.704-1(b)(2)(ii)(d)(3).

(iii) *Deficit Capital Accounts Generally*. If a Member has a deficit Capital Account balance at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is then obligated to restore pursuant to this Agreement, and (ii) the amount such Member is then deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), respectively, such Member shall be specially allocated items of Company income and gain (consisting of a pro rata portion of each item of income and gain of the Company for such Fiscal Year in accordance with Regulations Section 1.704-1(b)(2)(ii)(*d*)) in the amount of such excess as quickly as possible, provided that any allocation under this Section 11(c)(iii) shall be made only if and to the extent that a Member would have a deficit Capital Account balance in excess of such sum after all allocations provided for in this Section 11 have been tentatively made as if this Section 11(c)(iii) were not in this Agreement.

(iv) *Deductions Attributable to Company Nonrecourse Debt*. Member Nonrecourse Deductions shall be specially allocated to the Members in the manner in which they share the economic risk of loss (as defined in Regulations Section 1.752-2) for such Member Nonrecourse Debt.

(v) *Allocation of Nonrecourse Deductions*. Nonrecourse Deductions of the Company shall be specially allocated to the Members pro rata in proportion to their respective Percentage Interests.

The amounts of any Company income, gain, loss or deduction available to be specially allocated pursuant to this Section 11(c) shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (v) of the definition of Net Income and Net Loss.

(d) Transfer of Interest. In the event of a transfer of all or part of an interest in the Company or the admission of an additional Member pursuant to Section 2 at any time other than the end of a Fiscal Year, the shares of items of Net Income or Net Loss and specially allocated items allocable to the interest transferred shall be allocated between the transferor and the transferee (or among the existing Members and the additional Member) in a manner determined by the Board of Managers in its sole discretion that is not inconsistent with the applicable provisions of the Code and Regulations.

(e) Tax Allocations.

(i)   *Sections 704(b) and 704(c) Allocations.*  Each item of income, gain, loss, deduction or credit for federal income tax purposes that corresponds to an item of income, gain, loss or expense that is either taken into account in computing Net Income or Net Loss or is specially allocated pursuant to Section 11(c) (a "*Book Item*") shall be allocated among the Members in the same proportion as the corresponding Book Item; *provided*, *however*, that in the case of any Company asset the Gross Asset Value of which differs from its adjusted tax basis for federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for federal income tax purposes in accordance with the principles of Sections 704(b) and (c) of the Code (using any permissible method determined by the Board of Managers) so as to take account of the difference between the Gross Asset Value and the adjusted tax basis of such asset.

(ii)   *Credits.*  All tax credits shall be allocated among the Members as determined by the Board of Managers in its sole and absolute discretion, consistent with applicable law.

The tax allocations made pursuant to this Section 11(e) shall be solely for tax purposes and shall not affect any Member's Capital Account or share of non-tax allocations or distributions under this Agreement.

12.   Dissolution

(a)   The Company shall be dissolved, wound up and terminated as provided herein upon the first to occur of the following:

(i)   a decree of dissolution of the Court of Chancery of the State of Delaware pursuant to Section 18-802 of the LLC Act; or

(ii)   the determination of all of the Members to dissolve the Company.

Except as expressly provided herein or as otherwise required by Delaware law, the Members shall have no power to dissolve the Company.

(b)   In the event of the dissolution of the Company for any reason, the Board of Managers or a liquidating agent or committee appointed by the Board of Managers shall act as a liquidating agent (the Board of Managers or such liquidating agent or committee, in such capacity, is hereinafter referred to as the "Liquidator"), and shall commence to wind up the affairs of the Company and to liquidate the Company assets.  The Members shall continue to share all income, losses and distributions during the period of liquidation in accordance with this Agreement.  The Liquidator shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company assets pursuant to such liquidation, giving due regard to the activity and condition of the relevant market and general financial and economic conditions.

(c)     The Liquidator shall have all of the rights and powers with respect to the assets and liabilities of the Company in connection with the liquidation and termination of the Company that the Board of Managers would have with respect to the assets and liabilities of the Company during the term of the Company, and the Liquidator is hereby expressly authorized and empowered to execute any and all documents necessary or desirable to effectuate the liquidation and termination of the Company and the transfer of any Company assets.

(d)     Notwithstanding the foregoing, a Liquidator which is not a Member shall not be deemed a Member and shall not have any of the economic interests in the Company of a Member; and such Liquidator shall be compensated for its services to the Company at normal, customary and competitive rates for its services to the Company, as reasonably determined by the Board of Managers.

(e)     Upon liquidation of the Company, the Company's assets shall be applied in the following order of priority:

    (i)      first, to pay the costs and expenses of the winding up, liquidation and termination of the Company;

    (ii)     second, to creditors of the Company, including Members who are creditors to the extent permitted by law, in the order of priority provided by law, including fees, indemnification payments and reimbursements payable to the Members or their Affiliates, but not including those liabilities for distributions to the Members in their capacity as Members under Section 18-601 or 18-604 of the LLC Act;

    (iii)    third, to establish reserves reasonably adequate to meet any and all contingent, conditional, unmatured or unforeseen liabilities or obligations of the Company; provided, however, that at the expiration of such period of time as the Liquidator may deem advisable, the balance of such reserves remaining after the payment of such contingencies or liabilities shall be distributed as hereinafter provided;

    (iv)     fourth, to the extent (without duplication) not permitted under clause (a) above, to the Members in satisfaction of liabilities or obligations of the Company to the Members; and

    (v)      fifth, the remainder to the Members in proportion to their respective Percentage Interests.

If the Liquidator, in its sole discretion, determines that Company assets other than cash are to be distributed, then the Liquidator shall cause the fair market value of the assets not so liquidated to be determined. Such assets shall be retained or distributed by the Liquidator as follows:

    (A)     The Liquidator shall retain assets having a value, net of any liability related thereto, equal to the amount by which the net

proceeds of liquidated assets are insufficient to satisfy the requirements of subparagraphs (i), (ii), (iii) and (iv) of this subparagraph (e); and;

(B)     The remaining assets shall be distributed to the Members in the manner specified in subparagraphs (iv) and (v) of this subparagraph (e).

13.     <u>Liability</u>

The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Indemnitee shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being an Indemnitee. The personal liability of any Indemnitee is eliminated or limited to the fullest extent permitted under the LLC Act, and no Indemnitee shall have any liability to the Company except as expressly required by the LLC Act; *provided*, *however*, that nothing contained herein shall protect any Indemnitee against any liability to the Company or the Members to which such Indemnitee would otherwise be subject by reason of any act or omission of such Indemnitee that involves actual bad faith, fraud or willful misconduct and, in the case of current or former Officers, employees and members of the Board of Managers, gross negligence.  The Indemnitee shall be protected against any liability for a breach of Section 7(o) except to the extent protection from such liability would not be permitted under Delaware law with respect to an officer or director of a Delaware corporation.

14.     <u>Indemnification; Insurance</u>

(a)     The Company, to the extent and in a manner permitted by Delaware law as in effect from time to time, shall indemnify any Indemnitee (including the heirs, executors, administrators or estate of any, such Indemnitee) who was or is made a party to or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding (including any appeal thereof), whether civil, criminal, administrative, regulatory or investigative in nature, (other than an action or suit by or in the right of the corporation to procure a judgment in its favor) by reason of the fact that such person is or was an Indemnitee, or is or was serving at the request of the Company as a manager, officer, authorized signatory, director, shareholder, member, partner, trustee, fiduciary, employee or agent (a "<u>Subsidiary Officer</u>") of another corporation, limited liability company, partnership, joint venture, trust, employee or agent of another corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise (an "<u>Associated Entity</u>"), against expenses (including attorneys' fees and disbursements), costs, judgments, fines, penalties and amounts paid in settlement actually and reasonably incurred ("<u>Losses</u>") by such Indemnitee in connection with, and shall advance expenses incurred by such person in advance of the final disposition of, such action, suit or proceeding, unless it is proven in a court with appropriate jurisdiction in a final, non-appealable judgment that such Indemnitee is liable in respect of the Losses referred to in this subparagraph and such Indemnitee's conduct constituted bad faith, fraud or willful misconduct and,

in the case of current or former Officers, employees and members of the Board of Managers, gross negligence. The Company shall indemnify any Indemnitee (including the heirs, executors, administrators or estate of any such Indemnitee) for a breach of Section 7(o) except to the extent such indemnification would not be permitted under Delaware law with respect to an officer or director of a Delaware corporation.

(b) Any Manager, Officer, Authorized Person, employee or agent of the Company, or person who is or was serving at the request of the Company as a Subsidiary Officer of any Associated Entity, shall be covered by the insurance of LBHI against any liability asserted against such person and incurred by such person in any capacity, or arising out of such person's status as such, whether or not the Company would have the power to indemnify such person against such liability under the provisions of this Section or applicable law.

15. <u>Fiscal Year</u>

The fiscal year of the Company (the "<u>Fiscal Year</u>") shall be the calendar year, except that if the Company is required by the Code to use a taxable year other than a calendar year, then the Fiscal Year shall be such taxable year.

16. <u>Accounting; Tax Matters</u>

(a) <u>Tax Matters</u>.

(i) For any tax period during which the Company has only one Member, it is the intention of the Member that the Company be treated, wherever permitted, as disregarded as an entity separate from, or otherwise treated as a division of, such sole Member for federal, state, local and foreign income tax purposes. For any tax period during which the Company has more than one Member, it is the intention of the Members that the Company shall be taxed, wherever permitted, as a "partnership" for federal, state, local and foreign income tax purposes. The Members agree to take all reasonable actions, including the amendment of this Agreement and the execution of other documents, as may reasonably be required in order for the Company to qualify for such treatment for federal, state, local and foreign income tax purposes.

(ii) LBHI shall be the Member authorized to prepare, execute and file tax returns on behalf of the Company LBHI SPV shall be the "tax matters partner" of the Company within the meaning of Code Section 6231(a)(7). In all other matters, LBHI shall represent the Company before the Internal Revenue Service and any state, local or foreign taxing authority.

(b) <u>Tax Elections</u>. All decisions and other matters concerning tax elections, the computation and allocation of items of income, gain, loss, deduction and credits among the Members, and accounting procedures, in each case, to the extent not specifically and expressly provided for by the terms of this Agreement, shall be

determined by the Board of Managers.  Any determination made pursuant to this Section 16(b) by the Board of Managers shall be conclusive and binding on all Members.

17.  Voting Interests in Subsidiaries

Except as otherwise determined by the Board of Managers, any Officer or Authorized Person shall each have full power and authority on behalf of the Company to attend and to act and to vote the stock or other equity interest of any corporation, company, partnership or other entity held by the Company in accordance with the wishes of the Board of Managers at any meeting of the stockholders, members, partners or other securityholders of such entity, or to execute written consents or transmit consents by Electronic Transmission in lieu thereof, and to execute a proxy for any other person to represent the Company at any such meeting, and at any such meeting such Officer, Authorized Person or the holder of any such proxy shall possess and may exercise any and all rights incident to ownership of the stock or other equity interest of such entity and which, as owner thereof, the Company might have possessed and exercised if present. The Board of Managers may from time to time confer like powers and authority regarding the stock or other equity interest of any such corporation, company, partnership or entity to any other person or persons.

18.  Records

Any records maintained by the Company in the regular course of its business, including its books of account and minute books, may be kept on, or by means of, or be in the form of, any information storage device or method; *provided* that the records so kept can be converted into clearly legible paper form within a reasonable time. The Company shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to any provision of the LLC Act.  Any records maintained by the Company shall be deemed to be solely the records of the Company and not of LBHI or any of its other affiliates.

19.  Amendment

(a)  Other than as described in subparagraph (b) below and subject to Section 7(c)(ii) hereof, the approval of the Majority in Interest of the Members of the Company shall be required to amend or waive any provision of this Agreement or the Certificate of Formation of the Company.

(b)  Notwithstanding anything to the contrary in this Agreement, this Agreement shall be automatically amended as expressly provided in a plan of reorganization or liquidation of LBHI or its affiliated debtors or debtors in possession without any further action required of any Person effective as of the date of the order of the Bankruptcy Court approving such plan of reorganization or liquidation.

20.  Bankruptcy

The bankruptcy (as defined in the LLC Act) of a Member of the Company shall not cause such Member to cease to be a Member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

21.     <u>Governing Law</u>

        This Agreement shall be construed and enforced in accordance with the law of the State of Delaware without regard to conflict of law principles.  Nothing in this Agreement, including Section 9(c), shall be construed to waive any provision of the LLC Act not permitted to be waived by a limited liability company agreement.

22.     <u>Third-Party Beneficiary Rights</u>

        No provision of this Agreement is intended or shall be construed to confer upon any person or entity any right, remedy or claim under or by reason of this Agreement or any part hereof, other than (i) the parties hereto and their respective successors and permitted assigns, (ii) the Managers (with respect to the rights expressly granted to the Managers hereunder), (iii) the UCC (which shall, until the Termination Date, be a third-party beneficiary of this Agreement with rights to enforce the obligations of the parties hereto), and (iv) Indemnitees, who shall be third-party beneficiaries of this Agreement with rights to enforce the provisions of Section 14 applicable to such Indemnitee.

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first written above.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____
Name:
Title:

**LBHI LAMCO HOLDINGS LLC**

By: _____
Name:
Title:

**SCHEDULE I**

| NAME | AMOUNT | PERCENTAGE INTEREST |
|------|--------|---------------------|
| Lehman Brothers Holdings Inc. | $19,800,000 | 99% |
| LBHI LAMCO Holdings LLC | $200,000 | 1% |
| **Total** | **$20,000,000** | **100%** |

# SCHEDULE II

Assigned Contracts Subject to LBHI Guarantee

[To Come]

**EXHIBIT F**

# INTERCOMPANY AGREEMENT

THIS INTERCOMPANY AGREEMENT (together with all appendices, schedules and annexes hereto, which are hereby deemed a part hereof, and as amended, modified or supplemented from time to time, this "<u>Agreement</u>"), is made as of the ___ day of _____, 2010, by and between: (i) Lehman Brothers Holdings Inc., a corporation organized under the laws of Delaware ("<u>LBHI</u>"); and (ii) each of the entities set forth on Schedule A hereto (which entites are also signatories to this Agreement) and their subsidiaries that are not subject to any bankruptcy, insolvency, administration or similar proceedings in a non U.S. jurisdiction, in each case that own or control any of the Managed Assets (each such entity, a "<u>Schedule A Entity</u>" and collectively, the "<u>Schedule A Entities</u>"). All capitalized terms not defined in this Agreement shall have the meaning ascribed to such terms in the Asset Management Agreement (as defined below).

## RECITALS

WHEREAS, LBHI is a debtor in possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "<u>Bankruptcy Code</u>"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "<u>Bankruptcy Court</u>") (Case No. 08-13555(3MP)) (the "<u>Bankruptcy Case</u>");

WHEREAS, each of the entities set forth on Schedule A hereto is also a debtor in possession and subsequently filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, on [●], 2010, LBHI and LAMCO LLC, a limited liability company organized under the laws of Delaware (the "<u>Manager</u>") entered into an Asset Management Agreement (together with all appendices, schedules and annexes thereto, the "<u>Asset Management Agreement</u>") pursuant to which LBHI engaged the Manager to perform services with respect to assets and investments currently held by LBHI and the Schedule A Entities;

WHEREAS, each of the Schedule A Entities desires to agree to acknowledge (i) the manner in which the Manager shall be compensated by LBHI pursuant to Section 9 of the Asset Management Agreement and (ii) the calculation of Management Fees payable by LBHI to the Manager, as described on Appendix F of the Asset Management Agreement; and

WHEREAS, each of the Schedule A Entities desires to agree to be bound by the internal allocation methodology described on Appendix F of the Asset Management Agreement and desires to agree to reimburse LBHI for each of their respective allocable share of fees, costs and expenses in accordance with the terms of the Asset Management Agreement and the internal allocation methodology described on Appendix F of the Asset Management Agreement.

## WITNESSETH

NOW, THEREFORE, BE IT RESOLVED, the parties hereby agree as follows:

1. <u>Acknowledgement of Compensation and Expenses; Management Fees</u>. Each of the Schedule A Entities acknowledges (i) the manner in which the Manager shall be compensated by LBHI pursuant to Section 9 of the Asset Management Agreement and (ii) the calculation of Management Fees payable by LBHI to the Manager, as described on Appendix F of the Asset Management Agreement.

2. <u>Agreement to Internal Allocation of Management Fees</u>. Each of the Schedule A Entities agrees to be bound by the internal allocation methodology described on Appendix F of the Asset Management Agreement and agrees to reimburse LBHI for each of their respective allocable share of fees, costs and expenses in accordance with the terms of the Asset Management Agreement and the internal allocation methodology described on Appendix F of the Asset Management Agreement.

3. <u>Treatment as Administrative Expense</u>. Any amounts at any time payable to LBHI under this Agreement by any of the entities set forth on Schedule A hereto shall be deemed allowed administrative expense claims in the respective the chapter 11 cases of the entities set forth on Schedule A hereto, with priority over any and all claims of the kind specified in 11 U.S.C. §§ 503(b) and 507(b) pursuant to 11 U.S.C. § 364(c)(1), which claim shall be senior to, and have priority over, all other claims.

4. <u>Assignment</u>. No assignment (as that term is defined in the U.S. Investment Advisers Act of 1940, as amended (the "Advisers Act") of this Agreement by any of the Schedule A Entities may be made without the prior written consent of LBHI and the Creditors' Committee, and any such assignment made without such consent shall be null and void for all purposes; provided that any such assignment proposed to made on or after the Termination Date shall not require prior written consent of the Creditors' Committee; and provided further that, unless otherwise required by the Advisers Act (i) the Schedule A Entities may be reconstituted or reorganized into any other form of business entity and (ii) nothing in this Agreement shall preclude changes in the composition of the direct or indirect members of the Schedule A Entities, that do not result in an assignment (as that term is defined in the Advisers Act). LBHI may assign this Agreement (a) with the consent of the Schedule A Entities (such consent not to be unreasonably withheld), (b) without the consent of the Schedule A Entities as required pursuant to an order issued in connection with the Bankruptcy Case or (c) to any successor or purchaser in connection with (i) a merger of LBHI or (B) a sale of all or substantially all of the assets of LBHI. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and permitted assigns.

5. <u>No Third Party Beneficiaries</u>. This Agreement is solely for the benefit of the parties hereto and should not be deemed to confer upon any other third parties (including any creditor of LBHI or its affiliates other than the Creditors' Committee which shall, until the Termination Date, be a third-party beneficiary of this Agreement with rights to enforce the obligations of the parties hereto) any remedy, claim, liability, reimbursement, claim of action or other right.

6. <u>Severability</u>. Any term or provision of this Agreement which is invalid or unenforceable in any applicable jurisdiction shall, as to such jurisdiction, be ineffective to the extent of

such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms or provisions of the Agreement in any jurisdiction.

7.   Submission to Jurisdiction; Consent to Service of Process.

(a)   Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)   Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 11.

8.   Waiver of Right to Trial by Jury.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

9.   Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to conflict of law principles thereof.

10.   Entire Agreement.  This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between LBHI and the Schedule A Entities with respect to the subject matter hereof.

11.   Notices and Other Communications.

(a)   All notices and written consents required or permitted to be sent under this Agreement shall be in writing, and shall be sent,

| | |
|---|---|
| if to LBHI: | Lehman Brothers Holdings Inc.<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attention:  John Suckow<br>or by facsimile to:<br>or by email to: john.suckow@lehmanholdings.com<br><br>With a copy to:<br>Lehman Brothers Holdings Inc.<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attention:  Martha Solinger and Thomas Hommel<br>or by facsimile to:  (212) 520-0421<br>or by email to:<br>martha.solinger@lehmanholdings.com and<br>thomas.hommel@lehmanholdings.com |
| if to a Schedule A<br>Entity: | Lehman Brothers Holdings Inc.<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attention:  John Suckow<br>or by facsimile to:<br>or by email to: john.suckow@lehmanholdings.com<br><br>With a copy to:<br>Lehman Brothers Holdings Inc.<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attention:  Martha Solinger and Thomas Hommel<br>or by facsimile to:  (212) 520-0421<br>or by email to:<br>martha.solinger@lehmanholdings.com and<br>thomas.hommel@lehmanholdings.com |
| if to the Creditors'<br>Committee: | Milbank, Tweed, Hadley & McCloy LLP<br>601 S. Figueroa St., 30th Floor<br>Los Angeles, CA 90017<br>Attention:  Brett Goldblatt<br>or by facsimile to:  (213) 892-4771<br>or by email to: bgoldblatt@milbank.com<br><br>With a copy to:<br>Houlihan Lokey Howard & Zukin Capital, Inc.<br>245 Park Avenue, 20th Floor<br>New York, NY 10167<br>Attention:  Ann Miller |

or by facsimile to:  (212) 661-3070
or by email to:  AMMiller@HL.com

or such other name or address as may be given in writing to the other parties.  All notices and written consents hereunder shall be sufficient if delivered by facsimile, overnight mail, electronic mail or electronically via the internet using an id and password provided by such party.  Any notices or written consent to a party shall be deemed given only upon sending in accordance herewith.

12.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: _____

Title: _____

LEHMAN BROTHERS COMMODITY
SERVICES INC.

By: _____

Name: _____

Title: _____

LEHMAN BROTHERS SPECIAL FINANCING
INC.

By: _____

Name: _____

Title: _____

LEHMAN BROTHERS OTC DERIVATIVES INC.

By: _____

Name: _____

Title: _____

LEHMAN BROTHERS DERIVATIVE
PRODUCTS INC.

By: _____

Name: _____

Title: _____


LEHMAN COMMERCIAL PAPER INC.

By: _____

Name: _____

Title: _____


LEHMAN BROTHERS COMMERCIAL
CORPORATION

By: _____

Name: _____

Title: _____


LEHMAN BROTHERS FINANCIAL PRODUCTS
INC.

By: _____

Name: _____

Title: _____

**LB ROSE RANCH LLC**

By: _____

Name: _____

Title: _____


**MERIT LLC**

By: _____

Name: _____

Title: _____


**LB SOMERSET LLC**

By: _____

Name: _____

Title: _____


**LB PREFERRED SOMERSET LLC**

By: _____

Name: _____

Title: _____

**Schedule A**
**List of Entities**

Lehman Brothers Holdings Inc.
Lehman Brothers Commodity Services Inc.
Lehman Brothers Special Financing Inc.
Lehman Brothers OTC Derivatives Inc.
Lehman Brothers Derivative Products Inc.
Lehman Commercial Paper Inc.
Lehman Brothers Commercial Corporation
Lehman Brothers Financial Products Inc.
LB Rose Ranch LLC
Merit LLC
LB Somerset LLC
LB Preferred Somerset LLC

## Proposed Order

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :        08-13555 (JMP)
                                          :
                 Debtors.                 :        (Jointly Administered)
                                          :
-------------------------------------------------------------------x
```

### ORDER GRANTING DEBTORS' MOTION PURSUANT TO
### SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AND RULE 6004(h)
### OF THE BANKRUPTCY RULES, FOR AUTHORIZATION TO ENTER INTO
### CERTAIN ASSET MANAGEMENT AND RELATED AGREEMENTS

Upon the motion, dated March 15, 2010 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), pursuant to sections 105(a) and 363(b)(1) of title 11 of the United

States Code (the "Bankruptcy Code") and Rule 6004(h) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for authorization to enter into certain asset management and

agreements related to LAMCO,[1] all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in

---

[1]     Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the Motion.

accordance with the procedures set forth in the amended order entered February 13, 2009

governing case management and administrative procedures [Docket No. 2837] to (i) the United

States Trustee for the Southern District of New York; (ii) the attorneys for the Official

Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the

Internal Revenue Service; (v) the United States Attorney for the Southern District of New York;

and (vi) all parties who have requested notice in these chapter 11 cases, and it appearing that no

other or further notice need be provided; and a hearing having been held to consider the relief

requested in the Motion; and the Court having found and determined that the relief sought in the

Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest

and that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code,

the Debtors are authorized, but not required, to enter into the LAMCO Agreements; and it is

further

ORDERED that pursuant to sections 105 and 363(b) of the Bankruptcy Code, the

Debtors are duly authorized and empowered to (a) execute, deliver, implement, and fully

perform any and all obligations, instruments, documents and papers, that may be necessary or

appropriate to consummate the transactions contemplated by the LAMCO Agreements

substantially in accordance with the description set forth in the Motion; and (b) take all other and

further actions as may be necessary to implement the transactions contemplated by the LAMCO

Agreements substantially in accordance with the description set forth in the Motion; and it is

further

ORDERED that the LAMCO Agreements, and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and has been agreed to between the Creditors' Committee, LBHI and LAMCO, and such actions shall be conclusive and binding in all respects on all parties in interest in these cases; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(h) are waived and this Order shall be effective immediately upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: [_____], 2010
     New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE