# A. 153

Page 240

1

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4    ------------------------x

5    In Re:

6                            Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al,   (Jointly Administered)

9            Debtors.

10   ------------------------x

11

12         DEPOSITION OF JONATHAN HUGHES

13              New York, New York

14              February 4, 2010

15

16   Reported by:

17   MARY F. BOWMAN, RPR, CRR

18   JOB NO. 27335

19

20

21

22

23

24

25

Page 241

1
2
3
4                    February 4, 2010
5                    9:40 a.m.
6
7            Deposition of JONATHAN HUGHES, held at
8    the offices of Jones Day, LLP, 222 East 41st
9    Street, New York, New York, before Mary F.
10   Bowman, a Registered Professional Reporter,
11   Certified Realtime Reporter, and Notary Public
12   of the State of New York and New Jersey.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 242

1
2                    APPEARANCES:
3
4    JONES DAY, LLP
5    Attorneys for Lehman Brothers, Inc.
6       222 EAST 41ST STREET
7       NEW YORK, NEW YORK   10017-6702
8    BY:  ROBERT W. GAFFEY, ESQ.
9       BRIDGET CRAWFORD, ESQ.
10
11
12   BOIES, SCHILLER & FLEXNER, LLP
13   Attorneys for Barclays and The Witness
14      575 Lexington Avenue
15      New York, New York   10022
16   BY:  JACK STERN, ESQ.
17
18
19   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
20   Attorneys for the Creditors Committee
21      51 Madison Avenue - 22nd Floor
22      New York, New York 10010
23   BY:  JAMES TECCE, ESQ.
24      ROBERT DAKIS, ESQ.
25

Page 243

1
2                    APPEARANCES:
3
4    HUGHES, HUBBARD & REED, LLP
5    Attorneys for the SIPA Trustee
6       One Battery Park Plaza
7       New York, New York   10004-1482
8    BY:  WILLIAM R. MAGUIRE, ESQ.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 244

1
2
3
4
5            IT IS HEREBY STIPULATED AND AGREED, by
6    and between the attorneys for the respective
7    parties herein, that filing and sealing be
8    and the same are hereby waived.
9            IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15            IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25

1        J. HUGHES
2   JONATHAN HUGHES,
3        called as a witness by the parties,
4        having been duly sworn, testified as follows:

**REDACTED**

1        J. HUGHES

**REDACTED**

1        J. HUGHES
2
3

**REDACTED**

12       Q.   From Barclays' perspective, are you
13   able to say, whatever Mr. Klein said, whether it
14   was in any way inconsistent with what Ms. Fife
15   later said on the record to the judge about
16   changes in the terms of the deal?
17       A.   No --
18

**REDACTED**

23
24
25

1        J. HUGHES
2
3
4        Q.   And do you know, does Barclays know if
5   Mr. Klein described to anyone in that courtroom
6   changes that had occurred in the transaction?
7        A.   I have asked the question and of the
8   people that were there from Barclays, nobody has
9   a clear recollection of either whether Mr. Klein
10  discussed or took others through changes to the
11  transaction as you described it or, indeed, what
12  the actual commentary was from anybody else
13  during that recess.
14       The recollections are only I think
15  meaningful to the extent that their belief is
16  that it was similar to what Ms. Fife and Weil
17  Gotshal subsequently discussed when the court
18  was back after the recess.
19       Q.   And so is Barclays in a position to
20  know whether Mr. Klein said anything that was
21  different or additional to what Ms. Fife told
22  the court?
23       A.   I don't think the recollections of the
24  people I spoke to are sufficiently clear to say
25  one way or the other.

Page 257

1          J. HUGHES

**REDACTED**

---

Page 258

1          J. HUGHES

**REDACTED**

17    Q.    So is Barclays able to say whether
18    anyone said anything in the off-the-record
19    session that was different or additional to what
20    Ms. Fife said on the record about the changes in
21    the transaction?
22    A.    Again, as I said earlier, the
23    recollections of the people present from
24    Barclays are not detailed, but generally
25    consistent in the sense that their recollections

---

Page 259

1          J. HUGHES
2    of what was said during the recess was roughly
3    consistent with what was said subsequently on
4    the record.

**REDACTED**

---

Page 260

1          J. HUGHES

**REDACTED**

14    Q.    So would it be accurate to say that
15    there were additional categories of securities
16    and other assets set forth in the clarification
17    letter?  Would that be an accurate statement?
18         MR. STERN:  Objection.
19    A.    No.
20    Q.    Would it be accurate to say that the
21    clarification letter amended the APA?
22    A.    I would not say that it amended the
23    APA.  I would say that it clarified certain
24    aspects of the APA, but it didn't -- it didn't
25    amend the deal.

Page 261

J. HUGHES

1
2    Q.   So that would be an inaccurate
3  statement to describe the clarification letter
4  as having amended the APA?
5        MR. STERN:  Objection to the form.
6    A.   I don't think I said that either.  I
7  think I said I wouldn't describe it in that way.
8  It may be I'd have to look again at the actual
9  language used in the clarification letter to see
10  if it was so -- if that term was used.
11        But substantively, it was a negotiated
12  method of describing changes during the course
13  of the week that needed to be documented.  Those
14  changes were to different aspects of the
15  transaction, but not to the essence of the sale
16  and purchase.

**REDACTED**

Page 262

J. HUGHES

1

**REDACTED**

Page 263

J. HUGHES

1

**REDACTED**

8    Q.   So in sum, is it Barclays' testimony
9  that the categories, that those categories did
10  not constitute additional assets added to the
11  transaction by the clarification letter?
12        MR. STERN:  Objection to the form,
13    asked and answered.
14    A.   I think, as I said a moment ago, that
15  if by "additional," you mean they were
16  previously not part of the business, then I
17  would disagree with you.
18        If by the use of the word
19  "additional," you mean additionally described,
20  then they were additionally described; in
21  addition to other assets, they were described.
22    Q.   Were the assets listed in the
23  clarification letter included to make up for a
24  shortfall of some kind?
25    A.   No.

Page 264

J. HUGHES

1
2    Q.   No?
3    A.   They were made -- they were, as I said
4  a moment ago, identified, for the reasons I
5  just expressed, because the valuations
6  with respect to other included assets were in
7  question in Barclays' mind at the time.  That
8  concern and questioning was had between Barclays
9  and Lehman Brothers and an agreement reached
10  that additional assets to the ones that had
11  previously been described should be identified
12  so that Barclays could reach a view as to
13  whether the assets it was going to be receiving
14  were similar in some senses to the value that
15  was represented to be being delivered with
16  respect to some of those assets previously.

**REDACTED**

Page 269

1          J. HUGHES
2              REDACTED
3
4
5
6     Q.   Is any agreement reached on the Friday
7  to include those assets in the transaction?
8        MR. STERN:  Objection to the form.
9     A.   There is, there was an agreement that
10  those assets as you describe them would be
11  included in the sale.  They had not been
12  previously identified.  But there was an
13  agreement on Friday that they -- following their
14  identification, that they would be included,
15  yes.
16     Q.   But with that description, you don't
17  acknowledge that the use of the verb "added"
18  would be appropriate, correct?  They are not
19  added to the deal in Barclays' view?
20        MR. STERN:  Objection to the form.
21     A.   I think, as I have said, they were not
22  added in the sense that they weren't assets
23  previously used in the business.  And they
24  weren't added in the sense that they were part
25  of the business as defined in the APA.  Nor were

Page 270

1          J. HUGHES
2  they identified as being excluded assets.  And
3  so for all those reasons, I wouldn't consider it
4  added.  I would consider there was -- I would
5  consider the -- I would consider them added only
6  in the sense that they were described and they
7  hadn't previously been described.

REDACTED

Page 271

1          J. HUGHES

REDACTED

Page 272

1          J. HUGHES

REDACTED

Page 273

1            J. HUGHES

REDACTED

Page 274

1            J. HUGHES

REDACTED

7    Q.   Now, by Friday, the 19th, by the time
8  of the sale hearing -- and again I'm trying to
9  save us all some time here, so I will make a
10  statement and then ask you some questions -- by
11  Friday September 19, the repurchase agreement
12  about which there has been so much testimony had
13  been entered into, correct?
14        MR. STERN:  Objection to the form.
15    A.   I think that's right, yes.

REDACTED

Page 275

1            J. HUGHES

REDACTED

Page 276

1            J. HUGHES

REDACTED

16    Q.   OK, fair point.  At its elemental
17  level, in referring to paragraph 13, was the
18  repurchase agreement an agreement between
19  Barclays as purchaser and LBI?
20        MR. STERN:  Now we are getting into a
21  topic -- you can answer this, but we have
22  not designated Mr. Hughes as a witness on
23  topics relating to the repurchase agreement.
24  If you are asking in relation to the
25  clarification letter, I think you can answer

Page 277

J. HUGHES

1
2      that.
3          So do you need to hear the question
4      again.
5          (Record read)
6          MR. STERN:  Objection to the form.
7      A.    The repurchase agreement was between
8      LBI and Barclays, but there were other parties
9      to the repurchase agreement.
10     Q.    For example, Bank of New York as
11     collateral agent, correct?
12         MR. STERN:  Objection to the form.
13     A.    Bank of New York did act as a
14     collateral agent.  JP Morgan also had acted
15     previously as a collateral agent.
16     Q.    The Barclays repurchase agreement
17     referred to in paragraph 13 included Bank of New
18     York -- I will get to JP Morgan, but let me put
19     my question.  The Barclays repurchase agreement
20     referred to in paragraph 13 included Bank of New
21     York as collateral agent, yes?
22     A.    Bank of New York acted as a collateral
23     agent for Barclays in the sense that as
24     securities were transferred by LBI, using JP
25     Morgan which held the collateral, those

Page 278

J. HUGHES

1
2      transfers were made to Barclays and Bank of New
3      York was to hold the collateral for Barclays.
4      Q.    Earlier in the week when there had
5      been the Fed repo, JP Morgan had been collateral
6      agent in the Lehman Fed repurchase agreement,
7      correct?
8      A.    That's correct.
9      Q.    When the assets in that Fed repo were
10     transferred into the Barclays repo, it was a
11     repo between Barclays, LBI and Bank of New York
12     as the collateral agent, is that what you are
13     describing?
14         MR. STERN:  Objection to the form.
15     A.    No, what I am trying to describe for
16     you, the role that Bank of New York played.
17     Bank of New York held the collateral for
18     Barclays after it had been transferred by LBI
19     through JP Morgan to Barclays.
20     Q.    And Bank of New York held the
21     collateral as Barclays' agent, correct?
22     A.    Yes.

REDACTED

Page 279

1          J. HUGHES

REDACTED

Page 280

1          J. HUGHES

REDACTED

1                    J. HUGHES

1                    J. HUGHES

1                    J. HUGHES



21    Q.    Even without regard to the detail of
22  the conversation, if you don't know it, do you
23  know if any reason was given to Weil Gotshal for
24  the need to include what wound up as paragraph
25  13?

1                    J. HUGHES
2      A.    I believe that prior to the sale
3  hearing and indeed for, you know, a period
4  before that Friday, it was agreed between the
5  parties that the securities that formed the repo
6  would be transferred to Barclays and the cash
7  that -- that Barclays had extended to LBI would
8  be left with LBI.  And that their was a -- there
9  was discussion between Cleary on the one hand
10  and Weil on the other about documenting some
11  aspects of that agreement with respect to the
12  repo, so I know that at a high level and broad
13  level.
14        The specific detail of those
15  discussions, I'm not sure I could help you with.
16    Q.    My topic is a little narrower.
17  Mr. Kaplan discusses in his declaration the fact
18  that the issuance of the notice of termination
19  was something that had to be corrected -- his
20  word, corrected.  What was it that, in the
21  termination of the repo, what was it about the
22  termination of the repo that caused the need to
23  correct anything?
24        MR. STERN:  You can answer that to the
25  extent you can answer it without referring

Page 313

1          J. HUGHES
2     to the legal advice that you got at the
3     time. I'm not sure if you can answer it on
4     that basis.
5          A.    Reading Alan Kaplan's declaration, I
6     see that as an explanation of why the notice of
7     termination was sent and an explanation of why
8     it was an error.
9          I'm not sure I can say anything beyond
10    what I see, what Alan Kaplan has said in his
11    declaration on that point. It is not the
12    subject of discussions among lawyers at Barclays
13    capital.
14         Q.    My questions arise from this sentence
15    in his declaration, "The parties corrected that
16    error in paragraph 13 of the clarification
17    letter." Are you with me in the document?
18         A.    Yes, I see that.
19         Q.    What were the implications of the repo
20    termination that needed to be corrected by
21    paragraph 13 of the clarification letter?
22         MR. STERN: Here again, I think this,
23    based on your previous answer, this calls
24    for privileged communications.
25         But you can answer subject to that.

Page 314

1          J. HUGHES
2          A.    I don't have a nonprivileged answer to
3     that question.
4          Q.    Was there any discussion between
5     Barclays and Lehman over the implications of the
6     termination of the repo that needed to be
7     corrected through paragraph 13?
8          A.    Again, I can't recount to you specific
9     discussions. I do believe there were
10    discussions among Barclays and Lehman's
11    representatives about the repo and to document
12    appropriately the agreement to transfer the
13    securities to Barclays in the sale and for
14    Lehman to retain the 45 billion of cash that
15    Barclays had extended to Lehman.
16         Q.    Was there a discussion between
17    Barclays and Lehman of the fact of the
18    termination creating a problem that needed to be
19    involved, that needed to be corrected through
20    the clarification letter?
21         A.    Again, I don't think I can recall for
22    you or relate to you any specific discussions.
23    I think Alan Kaplan's declaration explains why
24    it was believed there was an error, and I think
25    that is all -- I think that is all I am able to

Page 315

1          J. HUGHES
2     say.
3          Q.    Was there any -- able to say within
4     the restriction of not revealing privileged
5     information?
6          A.    Correct.
7          Q.    OK. Was there any discussion between
8     Barclays and Lehman or their counsel or their
9     representative counsel over any provisions of
10    the bankruptcy code that might be implicated
11    upon the termination of a repo involving a
12    debtor?
13         A.    I think I have already answered the
14    question. Because I think you're just asking
15    another question at a level of detail with
16    respect to which I don't think I am able to give
17    you an answer.
18         Q.    Do you know whether there were
19    discussions between Lehman and its
20    representatives and Barclays representatives as
21    to whether particular provisions of the
22    Bankruptcy Code needed to be addressed given the
23    termination of the repo on the 19th?
24         MR. STERN: Objection, asked and
25    answered.

Page 316

1          J. HUGHES
2          A.    Again, I think I have to repeat what I
3     have already said to you. I'm not -- if I
4     understand you correctly, you're again asking me
5     for a level of detail which I am not able to
6     recall. It would be -- you know, given the
7     confines that we already described.
8          Q.    It is the confines that makes me press
9     on this. I'm not asking about any conversations
10    you had with your own lawyers, Barclays or
11    Cleary or S&C or anybody.
12         A.    I understand.
13         Q.    I am asking if in the negotiations
14    between the parties, there were discussions
15    about any provisions of the Bankruptcy Code that
16    were implicated by the termination of the repo
17    on the 19th?
18         MR. STERN: Same objection, asked and
19    answered.
20         A.    I don't know. There were -- I do
21    recall and I do know that there were discussions
22    and negotiations between the parties which led
23    to the agreement to transfer the securities and
24    for Lehman to retain the cash. Greater levels
25    of detail than that, I'm not aware of.

Page 317

1          J. HUGHES

**REDACTED**

Page 318

1          J. HUGHES

**REDACTED**

Page 319

1          J. HUGHES

**REDACTED**

7     Q.    Same question with respect to Cleary,
8 yes or no -- and only yes or no please -- did
9 Barclays consult with Cleary about the
10 implications under the Bankruptcy Code of the
11 termination of the repo?
12    A.    When?
13    Q.    At any point prior to September 22 --
14 prior to and including September 22, 2008?
15    A.    I don't know the answer to that
16 question, but I do see Richard Smith's name on
17 this document and he is an employee in a legal
18 function at Barclays Capital.  And it's
19 possible, therefore, that that signifies
20 Barclays' involvement in a discussion.
21        But there is nothing on this document
22 that tells me there was a discussion, so I would
23 have to conclude I don't really know.
24    Q.    We may be missing each other a little
25 bit.  Put the document aside.  This is without

Page 320

1          J. HUGHES
2 reference to the document.  The question is
3 whether Barclays consulted with Cleary Gottlieb
4 about the implications under the Bankruptcy Code
5 on the termination of the repo.  It is -- but it
6 is just yes or no.  I don't want to know the
7 content of any advice if the answer is yes.
8    A.    The answer is yes.
9    Q.    And the same question with respect to
10 Sullivan & Cromwell.  Did Barclays consult with
11 Sullivan & Cromwell about the implications under
12 the Bankruptcy Code of the termination of the
13 repo?
14    A.    I don't know.
15    Q.    And when you say yes with respect to
16 Cleary Gottlieb, just for completeness in this
17 portion of the record, that's yes on or prior to
18 September 22, 2008?
19        MR. STERN:  If you remember.
20    A.    I can't be sure about the timing.
21    Q.    Was it at or around the time of the
22 sale hearing?
23    A.    I can't recall.
24    Q.    Was it in connection with the
25 negotiation of the terms of the clarification

Page 321

```
1                    J. HUGHES
2    agreement?
3        A.   I don't know whether it was specific
4    to the clarification letter.  Certainly it
5    related to the transaction as a whole.
```

REDACTED

Page 322

```
1                    J. HUGHES
```

REDACTED

Page 323

```
1                    J. HUGHES
```

REDACTED

Page 324

```
1                    J. HUGHES
```

REDACTED

Page 329

1                   J. HUGHES

**REDACTED**

Page 330

1                   J. HUGHES

**REDACTED**

6      Q.    Is it Barclays' view that it paid 250
7    million, it was obligated to pay 250 million
8    plus the value of the real estate to acquire all
9    assets used in the business, irrespective of the
10   value of the assets?
11          MR. STERN:  Objection to the form.
12     A.    I think it is Barclays' position that
13   we promulgated to give those things and --
14   together with giving up the 45 million of cash
15   repo and together with taking on certain
16   liabilities, and in return for that, Barclays
17   was to receive all of the assets used in the
18   business and at no point did anybody ever reach
19   an actual valuation with respect to those
20   assets.
21          So to that extent, there was a -- the
22   actual valuation of the assets was not, at the
23   end of the day, I wouldn't say it wasn't
24   relevant, but it was not determinative of the
25   transaction.

Page 331

1                   J. HUGHES
2          In other words, because nobody had the
3    ability to finally determine the valuation of
4    each and every asset used in the business, it
5    was nevertheless understood that each of those
6    assets would be transferred.  So to that extent,
7    the assets were to be transferred irrespective
8    of that value.
9          I should --
10          MR. STERN:  There is no question,
11   there is no question.
12     Q.    Is there anything you wanted to add?
13     A.    I just want to add one thing to that;
14   that is, that I believe that that was also the
15   understanding of the advisors to Lehman Brothers
16   and I believe that that is actually the
17   testimony of the advisors to Lehman Brothers.
18     Q.    So back to Barclays' view as opposed
19   to other people's testimony, Barclays' view, it
20   was Barclays' view that the court -- is it
21   Barclays' testimony that the court was told that
22   all the assets in Lehman's business, except
23   excluded assets, would be transferred to
24   Barclays regardless of what they were worth?
25          MR. STERN:  Objection to the form.

Page 332

1                   J. HUGHES
2          You can answer.
3      A.    I think that the court was told that
4    all of the assets used in the business were to
5    be transferred and I think the court was also
6    told that it was not feasible to give a value
7    with respect to those assets.  It was also --
8    the court was also told that it was wrong to
9    await valuations for each and every one of those
10   assets prior to making the final sale order.
11          And I believe the court was given from
12   time to time estimations of value with respect
13   to certain assets and certain liabilities and
14   the court made its ruling having heard all of
15   those things.
16     Q.    Did the estimations you referred to
17   make clear to the court that the estimated value
18   of the financial assets Barclays was acquiring
19   would exceed the estimated value of the
20   liabilities associated with those assets?
21     A.    I don't know whether the court
22   conducted a detailed, mathematical analysis at
23   that point in time.
24          I do believe the court was told that
25   all valuations were estimates.  I believe the

Page 333

1      J. HUGHES
2  court also heard objections which were plain in
3  suggesting that Barclays was gaining more assets
4  than it should gain and more assets than,
5  therefore, the liabilities were that it was
6  taking on.  And that the court rejected those
7  objections.  From that I conclude -- not what
8  the court concludes -- but I concluded that the
9  court was told that it was possible that the
10  assets would exceed liabilities.
11      Indeed, it is also I think correct to
12  say that Barclays' view that there would be a
13  greater number of assets acquired than
14  liabilities was a matter of public record, at
15  least two days prior to that sale hearing.  And
16  I think that it was therefore apparent or
17  capable of being apparent to everybody in the
18  court that that was the case.
19      Q.    Now, other than the objection, the
20  objections that you referred to, was -- and
21  these matters of public record, was there any
22  other information that would have made clear to
23  the court that the estimated value of the
24  financial estimates Barclays was acquiring would
25  exceed the estimated value of the liabilities of

Page 334

1      J. HUGHES
2  those assets, other than the objections and the
3  public record?
4      MR. STERN:  Objection to the form.
5  Asked and answered.
6      You can answer again.
7      A.    Again, I believe there was sufficient
8  information presented by Weil Gotshal to the
9  court with respect to both assets and
10  liabilities from which the court could reach the
11  conclusion that you described.
12      Whether, in fact, the court exercised
13  or engaged in that mathematical exercise, again,
14  I can't say.
15      Q.    And what are you specifically
16  referring to when you refer to the information
17  that Weil Gotshal supplied?  I am talking about
18  the statements made at the hearing on the 17th
19  and the 19th --
20      A.    In part, yes.
21      Q.    And the contents of the sale motion?
22      A.    In part, yes.
23      Q.    Anything else?
24      A.    When you say contents of the sale
25  motion, what would you include in that?

Page 335

1      J. HUGHES
2      Q.    The written motion that Lehman filed
3  on Wednesday the 17th.
4      A.    I'm not sure of the full content of
5  that was to be honest with you.
6      Q.    I'm really only looking for sources.
7  There is the written motion, there is the
8  hearing on the 17th, there is the hearing on the
9  19th.  Other than those three possible sources,
10  do you know of any other source where Weil
11  Gotshal would have given that information to the
12  court?
13      A.    I think there were other
14  representations made to the court after the 19th
15  which, in Barclays' view, evidence what was
16  plain at the time of the hearing.
17      Q.    When did that take place?  You are
18  referring to the December settlement hearings?
19      A.    I'm referring to the clarification
20  letter.  I'm referring to the subsequent
21  proceedings before the court, including the
22  December JP Morgan settlement hearing, the Bay
23  Harbor proceedings, and the like.
24      Q.    Prior to the issuance of the sale
25  order, let's use that point.  Apart from the

Page 336

1      J. HUGHES
2  sale motion, the hearing on the 17th and the
3  hearing on the 19th, are you aware of any other
4  means or mechanisms by which Weil Gotshal
5  described the transaction to the court prior to
6  the issuance of the sale order?
7      A.    No.
8      Q.    Now, what's the public record
9  information that you were referring to?
10      MR. STERN:  Objection to the form.
11      A.    Are you asking me about my reference
12  to Barclays having made it public that there was
13  to be a greater amount of assets than
14  liabilities acquired?
15      Q.    I am.
16      A.    I was specifically then referring to
17  the public communications that Barclays made I
18  think on the 17th of September about the -- its
19  understanding at that point of what the
20  potential gain might be on the acquisition.
21      Q.    That went out in the form of a press
22  release?
23      A.    It was a press release and there was a
24  call with analysts on the same day and around
25  about the same time.

Page 337

1          J. HUGHES
2     Q.   Was the press release submitted to
3 Judge Peck?
4     A.   I don't know.
5     Q.   Do you have any knowledge that it was?
6     A.   I don't.
7     Q.   Was Judge Peck invited to join the
8 analyst call?
9     A.   I think you would have to ask him that
10 question.
11     Q.   Do you know?
12     A.   I don't.
13     Q.   Do you know if the transcript was
14 prepared of the analyst call?
15     A.   I think there was, yes.
16     Q.   Do you know if that -- do you know
17 when that transcript was prepared?
18     A.   I would imagine at or around about the
19 same time, but I don't know definitively.
20     Q.   Do you know if that transcript was
21 submitted to Judge Peck?
22     A.   I don't know that it was.
23     Q.   Do you know if the contents of either
24 the press release or the analyst's call were
25 described in any way to the court prior to the

Page 338

1          J. HUGHES
2 issuance of the sale order?
3          MR. STERN:  Objection to the form.
4     You can answer.
5     Can you read the question again.
6     (Record read)
7     A.   I think there were aspects of the
8 press release and the call with analysts that
9 covered the same topic -- some of the same
10 topics that were also covered during
11 presentations to the court.
12     Whether the descriptions matched or
13 were directly similar, I couldn't say without
14 comparing the two.
15     Q.   Mr. Hughes, I am putting before you
16 the press release, a press release which
17 previously has been marked as Exhibit 344A.  Is
18 that the press release that you are referring
19 to?
20     A.   It looks like it, yeah.
21     Q.   Can you tell me where in that press
22 release I would find the information that would
23 inform me that the estimated value of the
24 financial assets Barclays was acquiring would
25 exceed the estimated value of the liabilities

Page 339

1          J. HUGHES
2 associated with those assets?
3     A.   I should preface my answer by saying
4 this press release, because it was dated 17th of
5 September, referred to aspects of the
6 transaction which were different on September 17
7 as compared to later in the week.
8     Q.   Just let me follow up on that a little
9 bit.  Did that change over the week?  Did
10 whether or not Barclays would receive assets
11 that exceeded the estimated value of the
12 liabilities associated with those assets, did
13 that concept change in between the signing of
14 the APA on the 16th and the sale hearing?
15     A.   The concept did not change.  How the
16 difference was made up ultimately did change
17 because it was described earlier in the week by
18 reference to certain portions of the transaction
19 and later in the week, it was described by
20 reference to different portions of the
21 transaction.  But the concept of there being a
22 difference between assets and liabilities never
23 changed.
24     Q.   The concept of the gain for Barclays
25 never changed?

Page 340

1          J. HUGHES
2     A.   Correct.
3     Q.   Let me go back to the press release.
4 Could you tell me where in the press release I
5 find the information that gives me notification
6 of the concept that there would be a gain for
7 Barclays in the transaction?
8     A.   There is reference to, in paragraph 2,
9 to the acquisition of trading assets with a then
10 estimated value of approximately 72 billion
11 dollars.  And liabilities with a then-estimated
12 value of approximately 68 billion dollars.
13     There are then references to other
14 assets and other payments and other features of
15 the then intended transaction which I think made
16 plain that the amount of assets acquired would
17 be greater than the amount of liabilities
18 acquired.
19     Q.   And that --
20     A.   So hopefully that answers the
21 question.  Does it specifically state language
22 in the terms of your question, no.  But it is
23 clear larger amounts of assets were to be
24 acquired than liabilities.
25     Q.   And anyplace else other than that

Page 341

J. HUGHES

1 section --
2         MR. STERN: Objection to the form.
3     Q.   -- from which the fact or inference
4 can be made of a gain for Barclays?
5         MR. STERN: Objection to the form.
6     A.   Well, I think I would include the
7 other aspects of my prior answer because I think
8 one has to take the whole of the -- whole of the
9 statement to fully understand what the intention
10 then was to be expressed.
11    Q.   And the delta between assets and
12 liabilities that's described in paragraph 2 of
13 the press release, does that take into account
14 the assumption of liabilities by Barclays for
15 compensation and cure?
16    A.   I don't know whether those specific
17 numbers then included estimates for comp and
18 cure, nor do I know whether it included then all
19 of the assets.  I think -- it is hard for me to
20 recall that, not least because, as I think you
21 know, the transaction that was being described
22 in this statement is -- it includes
23 descriptions, which as I said earlier, are very
24 different, very different from the description

Page 342

J. HUGHES

1 that is ultimately or that describe the ultimate
2 transaction.
3         So what was specifically included or
4 intended to be included at this point, I
5 couldn't say exactly.
6     Q.   So if Judge Peck had seen this press
7 release by the time of the sale hearing, it
8 wouldn't be describing the deal before him
9 anyway, is that right?
10        MR. STERN: Objection to the form.
11    A.   There would be aspects of the
12 transaction that had changed and some of those
13 aspects I believe were described, though I
14 believe not all of the aspects or all of the
15 changes were described.  But as we -- as I
16 previously said in answer to one of your earlier
17 questions, the concept of Barclays deriving a
18 gain on the transaction did not change.
19        It was never Barclays' intention to do
20 a transaction other than one which yielded a
21 gain and I believe it was apparent to --
22 throughout the discussions that that would be
23 the outcome.
24        I don't think -- I mean, this series

Page 343

J. HUGHES

1 of questions you prefaced with a reference to an
2 earlier exhibit, there was mention of the word
3 "flat."  At no point in time was there ever
4 discussion that a transaction would be flat,
5 that there would be any match between assets and
6 liabilities.  That was never a portion of the
7 discussion ever.
8     Q.   By discussion, you mean discussion
9 with the court?
10    A.   I mean with anybody.
11    Q.   Let's focus in on the court.  Was
12 there ever a discussion with the court to that
13 effect?
14    A.   That would be flat, no.
15    Q.   Was there ever discussion with the
16 court that there would be a day one gain for
17 Barclays?
18        MR. STERN: Objection to the form.
19    A.   I didn't recall anybody using that
20 specific expression, but as I said earlier, it
21 was clear to the court that all of the assets in
22 the business were to be transferred.  What there
23 were -- there were strident objections made
24 during the course of the hearing that Barclays

Page 344

J. HUGHES

1 was getting a windfall, that the transaction
2 shouldn't be finalized while some documentation
3 with respect to it remained outstanding, and the
4 court rejected those objections as we have also
5 discussed earlier.
6         What was actually presented to the
7 court was the result of the, you know, the
8 judgment of Weil Gotshal and they described what
9 they felt was relevant to be described.  So my
10 belief is the court did know and understand what
11 it needed to understand to reach the conclusion
12 it reached.
13    Q.   Is it your view that the court knew
14 that Barclays was going to make a gain on day
15 one?
16        MR. STERN: Objection to the form,
17    asked and answered.
18        You can answer it again.
19    A.   I don't think I can say it differently
20 from what I have already said.  I don't know
21 what was in the court's mind specifically.
22        I can tell you what I have told you
23 about what I heard and what I believe was said
24 by reference to the transcript, by reference to

Page 345

J. HUGHES

1  other documents that you also mentioned.
2      Q.    And that's by reference to the sale
3  motion, the two hearings, the press release and
4  the analyst call?
5          MR. STERN:  Objection, asked and
6      answered.
7      Q.    Anything else?
8          MR. STERN:  Objection, asked and
9      answered.
10     A.    I think I have answered the question.
11 The only part of it I think is worth repeating
12 is there were specific objections raised that
13 deal with your question, by which I mean there
14 were specific objections raised with the court
15 in which complainants suggested that Barclays
16 was getting much more by way of assets and value
17 than it was giving or taking on as liabilities.
18         The necessary implication of that was
19 that Barclays was to acquire more in assets than
20 it was giving up in liabilities, which would
21 necessarily yield some form of gain.  Whether
22 the court understood that to be an accounting
23 gain is a very different question and I don't
24 know whether the court made any judgment about

Page 346

J. HUGHES

1  an accounting gain.
2      Q.    So there was enough information in
3  Barclays' view for the court to discern that
4  there was a gain for Barclays of some kind out
5  of the transaction, correct?
6          MR. STERN:  Objection to the form.
7      Let me hear the question again.
8      (Record read)
9      A.    I believe so.

REDACTED

Page 347

J. HUGHES

REDACTED

22     Q.    In the brief that I showed you before,
23 Mr. Hughes, in paragraph 2, it is an Exhibit
24 582B. The statements we have been talking about
25 are prefaced with the sentence, "In fact, this

Page 348

J. HUGHES

1  court was never told the transaction necessarily
2  would be flat with assets perfectly equal to
3  liabilities."
4          In Barclays' view is the concept of a
5  flat exchange of assets and liabilities
6  inconsistent with the existence of an accounting
7  gain?
8          MR. STERN:  I am going to object to
9      the form.
10         You can answer it if you understand
11     the question.
12     A.    I should certainly preface my answer
13 by saying I'm not an accountant and so I can't
14 give you an answer which is necessarily correct,
15 if the answer requires real accounting
16 knowledge.  With that proviso, I think the
17 answer is yes.
18         I should also add that it was an
19 imperative for Barclays in conducting this
20 transaction that there would be a sufficient
21 difference between the two, that Barclays would
22 yield a gain in order that it be a capital
23 accretive transaction.
24     Q.    It was imperative that a gain be in

Page 349

1       J. HUGHES
2   existence on the first day?
3       A.   Yes.
4
5
6
7
8
9
10
11
12                  REDACTED
13
14
15
16
17
18
19
20
21
22       Q.   As a matter of fact, was the court
23   told that it was imperative for Barclays to make
24   a first day gain?
25       A.   Not that I am aware.

Page 350

1       J. HUGHES
2
3
4
5                  REDACTED
6
7
8
9
10       Q.   Was there a point where Barclays said
11   it would not close if it did not achieve a first
12   day gain?
13           MR. STERN:  Objection to the form.
14       A.   I don't think Barclays used that
15   expression, but Barclays did make it plain
16   during the course of the negotiations that
17   without being able to satisfy itself with
18   respect to the relative valuations of assets and
19   liabilities, it may well not close the
20   transaction.

                REDACTED

Page 351

1       J. HUGHES




                REDACTED

Page 352

1       J. HUGHES




                REDACTED

Page 353

1                 J. HUGHES

**REDACTED**

Page 354

1                 J. HUGHES

**REDACTED**

Page 355

1                 J. HUGHES
2
3
4
5
6
7
8
9                **REDACTED**
10
11
12
13
14
15
16
17
18
19      Q.    Barclays agreed to the insertion of
20   that reference to book value, correct?
21      A.    I think we must have because I think
22   we signed an agreement that had that expression
23   in it.
24          But I should add that I don't think
25   Barclays has ever felt that that particular

Page 356

1                 J. HUGHES
2   expression was of great consequence.
3      Q.    What's the basis of that statement
4   that you have never felt it was an expression of
5   great consequence?
6      A.    Because I think that this, the
7   language employed in this document at the time,
8   first of all, relates to a transaction that --
9   or to parts of the transaction which changed
10  meaningfully and what mattered to Barclays was,
11  at the time, was what was the appropriate
12  valuation for the relevant assets that were
13  under discussion.
14          If that was to be described by Lehman
15  Brothers as Lehman Brothers' book value, that
16  was one way to describe it.  And that
17  description didn't offend Barclays'
18  understanding of the appropriate valuation or
19  negotiated valuation with respect to those
20  assets at that time.

**REDACTED**

Page 441

1              J. HUGHES

**REDACTED**

Page 442

1              J. HUGHES

**REDACTED**

Page 443

1              J. HUGHES

**REDACTED**

Page 444

1              J. HUGHES
2
3
4
5              **REDACTED**
6
7
8
9              _____
10             JONATHAN HUGHES
11             Subscribed and sworn to
12             before me this     day
13             of January, 2010.
14
15             _____
16
17
18
19
20
21
22
23
24
25

Page 445

J. HUGHES
INDEX:

WITNESS        EXAM BY:        PAGE:
J. Hughes        Mr. Gaffey        245, 443
                Mr. Tecce        402
                Mr. Maguire        434

EXHIBITS

Exhibit No.                        Marked
Exhibit 579B Declaration of Alan Kaplan        311
Exhibit 580B Document Bates stamped        319
    WGM-Lehman E 14127 through 128
Exhibit 581B Document Bates stamped BCI EX        323
    1128326 through 28
Exhibit 582B Objection of Barclays Capital        330
    to Motion by Official
    Committee of Unsecured
    Creditors
Exhibit 583B Document Bates stamped        372
    BCI-EX(S) 53519 through 25
Exhibit 584B Document Bates stamped BCI        376
    EX(S) 23915 through 17 with
    attachment
Exhibit 585B Document Bates stamped BCI        378
    EX(S) 24581 through 84

---

Page 446

J. HUGHES
EXHIBITS

Exhibit No.                        Marked

Exhibit 586B Document Bates stamped BCI        395
    EX(S) 207204 through 205
Exhibit 587B Document Bates stamped BCI        400
    EX(S) 212311 through 312
Exhibit 588B Deposition of Jonathan Hughes        405
    dated January 15, 2010
Exhibit 589B E-mail dated  January 20,        429
    2010 with attachment

---

Page 447

J. HUGHES

CERTIFICATE
STATE OF NEW YORK )
                  )ss:
COUNTY OF NEW YORK)
        I, MARY F. BOWMAN, a Registered
Professional Reporter, Certified Realtime
Reporter, and Notary Public within and for
the State of New York, do hereby certify:
        That Jonathan Hughes, the witness
whose deposition is hereinbefore set forth,
was duly sworn by me and that such
deposition is a true record of the testimony
given by such witness.
        I further certify that I am not
related to any of the parties to this action
by blood or marriage and that I am in no way
interested in the outcome of this matter.
        In witness whereof, I have hereunto
set my hand this 4th day of January, 2010.


_____
        MARY F. BOWMAN, RPR, CRR

---

Page 448

J. HUGHES
* * *ERRATA SHEET* * *
NAME OF CASE:  In Re:  Lehman Brothers
DATE OF DEPOSITION: 2/4/10
NAME OF WITNESS:  J. Hughes
Reason codes:
    1. To clarify the record.
    2. To conform to the facts.
    3. To correct transcription errors.
Page _____ Line _____ Reason_____
From _____ to _____

Page _____ Line _____ Reason_____
From _____ to _____

Page _____ Line _____ Reason_____
From _____ to _____

Page _____ Line _____ Reason_____
From _____ to _____

Page _____ Line _____ Reason_____
From _____ to _____

Page _____ Line _____ Reason_____
From _____ to _____

Page _____ Line _____ Reason_____
From _____ to _____


_____
        JONATHAN HUGHES

# A. 154

Page 1

1        IN THE UNITED STATES BANKRUPTCY COURT

2        FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

    In re:                    )

5                             ) Chapter 11

    LEHMAN BROTHERS           ) Case No. 08-13555(JMP)

6   HOLDINGS, INC., et al,   ) (Jointly Administered)

                              )

7              Debtors.       )

    ----------------------)

8

9

10     CONTAINS HIGHLY CONFIDENTIAL PORTIONS

11             [Pgs 63-64]

12

13

14       DEPOSITION OF ALAN M. JOHNSON

15          New York, New York

16       Friday, February 12, 2010

17

18

19

20

21

22

23   Reported by:

24   MAYLEEN CINTRON, RMR, CRR

25   JOB NO. 28245

Contains Confidential Portions

---

Page 2

```
 1
 2
 3                  February 12, 2010
 4                  9:40  a.m.
 5
 6
 7         DEPOSITION OF ALAN M. JOHNSON, an
 8   expert witness, held at the offices of Jones
 9   Day LLP, 222 East 41st Street, New York, New
10   York, pursuant to Notice, before MayLeen
11   Cintron, a Registered Merit Reporter,
12   Certified Realtime Reporter, and Notary
13   Public of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   A P P E A R A N C E S:
 2
 3   JONES DAY LLP
 4   Attorneys for Debtors - Lehman Brothers, Inc.
 5      222 East 41st Street
 6      New York, New York 10017-6702
 7   BY: ROBERT W. GAFFEY, ESQ.
 8
 9
10   BOIES, SCHILLER & FLEXNER LLP
11   Attorneys for Barclays
12      5301 Wisconsin Ave., N.W.
13      Washington D.C. 20015
14   BY: AMY NEUHARDT, ESQ.
15      HEATHER KING, ESQ.
16
17
18   QUINN, EMANUEL, URQUHART,
19   OLIVER & HEDGES LLP
20   Attorneys for the Creditors Committee
21      51 Madison Avenue - 22nd Floor
22      New York, New York 10010
23   BY: ROBERT K. DAKIS, ESQ.
24
25
```

Page 4

```
 1   A P P E A R A N C E S: (Cont'd)
 2
 3   HUGHES, HUBBARD & REED LLP
 4   Attorneys for the SIPA Trustee
 5      One Battery Park Plaza
 6      New York, New York  10004-1482
 7   BY: FARA TABATABAI, ESQ.
 8
 9
10   ALSO PRESENT:
11   MICHAEL DAILEY, Jones Day
12
13         - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              -A. Johnson-
```

REDACTED

Page 14

1          -A. Johnson-
2
3
4
5
6
7
8
9
10
11
12          **REDACTED**
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 15

1          -A. Johnson-
2
3
4
5
6
7
8
9
10
11          **REDACTED**
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 16

1          -A. Johnson-
2
3
4
5          **REDACTED**
6
7
8
9
10    Q.  In those scenarios where you've
11  addressed an issue of whether there's a
12  potential conflict of interest that we've been
13  just talking about, have you ever been asked
14  to render an opinion as to whether it can be
15  discerned from the arrangement whether people
16  were acting in bad faith?
17    A.  No.
18    Q.  Have you ever been asked in that
19  scenario to discern from the arrangement
20  whether people are committing fraud?
21    A.  No.
22    Q.  Have you ever been asked, when
23  you've looked at that arrangement, to discern
24  whether people are breaching fiduciary duty?
25

Page 17

1          -A. Johnson-
2    Q.  Have you ever been asked in that
3  scenario whether people are aiding and
4  abetting a breach of fiduciary duty?
5    A.  No.
6    Q.  Do you consider yourself an expert
7  in any of those four areas?
8    A.  No.
9
10
11
12
13
14
15          **REDACTED**
16
17
18
19
20
21
22
23
24
25

Page 50

1          -A. Johnson-
2
3
4
5
6
7
8                **REDACTED**
9
10
11
12
13
14
15          Q.  Let me jump to -- if you look at
16    page 4 in the Summary of Conclusions, you say
17    the following in the first full paragraph on
18    that page:
19          "There is nothing about the oral or
20    written offers that suggests bad faith.  The
21    employment agreements I view, as a group,
22    reflect the economics and variations that
23    would have been expected at the time.  Said
24    another way, the agreements were consistent
25    with those found in the marketplace at that

Page 51

1          -A. Johnson-
2    point in time and consistent with Barclays'
3    need to ensure that the talent needed to run
4    the business it was buying would stay."  Do
5    you see that portion?
6          A.  Yes.
7          Q.  Your statement that there was
8    nothing about the oral or written offers that
9    suggests bad faith, let's ask you about that,
10    it is not within your expertise to determine
11    good or bad faith, correct?
12          A.  Right.  Yes.
13          Q.  The conclusion that you offered
14    there concerning whether the oral or written
15    offers suggest bad faith is based, as I
16    understand it, on nothing other than your
17    assessment of whether the amounts of
18    compensation were consistent with those found
19    in the marketplace; is that correct?
20          MS. NEUHARDT:  Objection to form.
21          A.  Base -- yes.  I think that's
22    basically right.
23          Q.  Okay.  So is there anything else,
24    other than the levels of compensation that
25    were offered, anything else at all, that

Page 52

1          -A. Johnson-
2    supports your conclusion that there's nothing
3    about the oral or written offers that suggests
4    bad faith?
5          A.  Well, it's not just the -- it is
6    not just the amounts.  Obviously, there was a
7    template in place for the broader 200
8    executives.  And I think in his report, we do
9    some comparisons to kind of have an individual
10    stack up to that.
11          So it is both, I think the amount,
12    it is how it -- how it aligned up with that
13    template.  Some of the executives, I believe,
14    got agreements for 2009.  So it is -- it is
15    not exactly just the singular number for 2008.
16    There is some other compensation elements that
17    I think formed the basis for my statement
18    there that there's both the amounts, the
19    structuring of them, what happened in 2009 and
20    so forth.  None of that, at least as an expert
21    in the field, would suggest there is something
22    untoward or bad faith occurred.
23          Q.  You're not an expert in the field,
24    however, of whether executives are acting in
25    good or bad faith, correct?

Page 53

1          -A. Johnson-
2          A.  Right.
3          Q.  So your opinion is limited to
4    determining whether the amounts and structure
5    of the compensation offered was within market
6    norms; is that correct?
7          A.  Yes.  It would -- is there anything
8    that would suggest something untoward from
9    these particular agreements.
10          Q.  So put another way, you didn't find
11    anything in the levels of compensation that
12    were offered to suggest they were inflated,
13    they were above market value or anything like
14    that?
15          MS. NEUHARDT:  Objection to form.
16          A.  Again, the caveat I had before both
17    amount and structure.  There was nothing about
18    how high or how low they were, or how they
19    deviated from the norms that would have
20    suggested something untoward.
21          Q.  Apart from looking that issue, you
22    did not conduct an examination to determine
23    whether the gentlemen to whom these offers
24    were made were acting in good or bad faith?
25          A.  I did not conduct that examination.

Contains Confidential Portions

Page 54

1          -A. Johnson-
2          Q.   And you took into account no other
3    facts or evidence in making your statement
4    that there nothing about the oral or written
5    offers that suggest bad faith; is that
6    correct?
7          A.   I think in the body of the report,
8    we -- I spend a lot of time talking about the
9    circumstances that existed in 2008.  So it is
10   both the amounts and I guess, obviously, the
11   context when those amounts and agreements were
12   formed.
13          But my report is focused on the
14   compensation, you know, part of the equation
15   not an examination of bad faith.
16
17
18
19
20
21
22
23
24
25

Page 55

1          -A. Johnson-
2
3
4
5
6
7
8
9
10
11                **REDACTED**
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 56

1          -A. Johnson-
2
3
4
5
6
7
8
9
10        **REDACTED**
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 57

1          -A. Johnson-
2
3
4
5
6
7
8
9
10        **REDACTED**
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 142

```
1          -A. Johnson -
2
3
4
5
6
7
8
9
10
11
12              REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 143

```
1
2
3          Q.  At the beginning of your report
4     where you say -- I'm back on page 4 of your
5     report, first full paragraph -- "there is
6     nothing about the oral or written offers that
7     suggest bad faith."  That sentence.
8          A.  Yes.
9          Q.  What is your definition of the term
10    "bad faith" as used in your report?
11         A.  Not fulfilling their either legal
12    or moral obligations to Lehman Brothers.
13         Q.  And you're not an expert in how
14    people fulfill either their legal or their
15    moral obligations, are you, sir?
16         A.  An expert?  No.
17
18
19
20              REDACTED
21
22
23
24
25
```

Page 144

```
1          -A. Johnson -
2
3
4
5
6
7              REDACTED
8
9
10
11
12
13
14
15
16
17    _____
18        ALAN M. JOHNSON
19
20
21    Subscribed and sworn to before me,
22    this _____ day _____ of 2010.
23
24    _____
25        Notary Public
```

Page 145

```
1     ------------------I N D E X------------------
2     WITNESS        EXAMINATION BY      PAGE
3     A. JOHNSON     MR. GAFFEY          5
4
5     ----------------EXHIBITS--------------------
6     EXHIBIT                 FOR I.D.
7     Exhibit 617B              5
8     Alan M. Johnson Expert Report on
9     Compensation Issues
10
11    Exhibit 618B              5
12    Materials Relied Upon by Alan M.
13    Johnson
14
15
16    ----------------EXHIBITS--------------------
17        [previously marked]
18    EXHIBIT                 FOR I.D.
19    Exhibit 25                73
20    Exhibit 117               74
21    Exhibit 489               74
22    Exhibit 19                112
23
24
25             ---
```

Page 146

```
1              C E R T I F I C A T E
2
3    STATE OF NEW YORK      )
4                           ) ss.:
5    COUNTY OF KINGS        )
6         I, MAYLEEN CINTRON, a Registered
7    Merit Reporter, Certified Realtime
8    Reporter and Notary Public within and
9    for the State of New York, do hereby
10   certify:
11        That ALAN M. JOHNSON, the witness
12   whose deposition is hereinbefore set
13   forth, was duly sworn by me and that
14   such deposition is a true record of the
15   testimony given by such witness.
16        I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I
19   am in no way interested in the outcome
20   of this matter.
21        IN WITNESS WHEREOF, I have hereunto set
22   my hand this 12th day of February 2010.
23
24        --------------------------
25           MAYLEEN CINTRON, RMR, CRR
```

Page 147

```
1         ERRATA SHEET FOR THE TRANSCRIPT OF:
2    Case Name: Re: Lehman Brothers Holdings
     Dep. Date: February 12, 2010
3    Deponent:  Alan M. Johnson
4    Pg. Ln. Now Reads    Should Read   Reason
     ___ ___ _____ _____ _____
5    ___ ___ _____ _____ _____
6    ___ ___ _____ _____ _____
7    ___ ___ _____ _____ _____
8    ___ ___ _____ _____ _____
9    ___ ___ _____ _____ _____
10   ___ ___ _____ _____ _____
11   ___ ___ _____ _____ _____
12   ___ ___ _____ _____ _____
13   ___ ___ _____ _____ _____
14   ___ ___ _____ _____ _____
15   ___ ___ _____ _____ _____
16   ___ ___ _____ _____ _____
17   ___ ___ _____ _____ _____
18   ___ ___ _____ _____ _____
19
20        _____
21          ALAN M. JOHNSON
22
     SUBSCRIBED AND SWORN BEFORE ME,
23   This___ day of_____, 2010.
24   _____
         Notary Public
25   My Commission Expires:_____
```

# A. 155

Page 1

1

2               UNITED STATES BANKRUPTCY COURT

3                SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5     In Re:

6                            Chapter 11

7     LEHMAN BROTHERS        Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al,    (Jointly Administered)

9              Debtors.

10       ------------------------x

11

12             DEPOSITION OF ALAN KAPLAN

13               New York, New York

14                March 1, 2010

15

16    Reported by:

17    MARY F. BOWMAN, RPR, CRR

18    JOB NO. 28619

19

20

21

22

23

24

25

Page 2

```
 1
 2
 3
 4                March 1, 2010
 5                 9:30 a.m.
 6
 7
 8        Deposition of ALAN KAPLAN, held at the
 9   offices of Jones Day, LLP, 222 East 41st Street,
10   New York, New York, before Mary F. Bowman, a
11   Registered Professional Reporter, Certified
12   Realtime Reporter, and Notary Public of the
13   State of New York and New Jersey.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2                APPEARANCES:
 3
 4   JONES DAY, LLP
 5   Attorneys for Lehman Brothers, Inc.
 6      222 East 41st Street
 7      New York, New York  10017-6702
 8   BY:  JENNIFER L. DEL MEDICO, ESQ.
 9
10   BOIES, SCHILLER & FLEXNER, LLP
11   Attorneys for Barclays and The Witness
12      5301 Wisconsin Ave. NW
13      Washington, DC  20015
14   BY:  JONATHAN SHAW, ESQ.
15
16   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
17   Attorneys for the Creditors Committee
18      51 Madison Avenue - 22nd Floor
19      New York, New York 10010
20   BY:  ROBERT DAKIS, ESQ.
21
22
23
24
25
```

Page 4

```
 1
 2                APPEARANCES:
 3
 4   HUGHES, HUBBARD & REED, LLP
 5   Attorneys for the SIPA Trustee
 6      One Battery Park Plaza
 7      New York, New York   10004-1482
 8   BY:  CARL MILLS, ESQ.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2
 3
 4
 5        IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that filing and sealing be
 8   and the same are hereby waived.
 9        IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15        IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25
```

Page 14

1          KAPLAN

**REDACTED**

Page 15

1          KAPLAN

**REDACTED**

Page 16

1          KAPLAN

**REDACTED**

Page 17

1          KAPLAN
2
3          **REDACTED**
4
5
6          Q.   Did you have other involvement in the
7     Fed replacement repo after September 17th?
8          A.   Certainly anything prior to the
9     closing I believe would have been privileged.
10         Q.   And I'm not asking for conversations
11    or -- just involvement.
12             MR. SHAW:  Objection to form, vague.
13         Q.   Did you have any involvement with
14    anyone else at Lehman or any other third parties
15    with respect to the Fed repo after September
16    17th?
17             MR. SHAW:  By third parties you're
18         excluding outside counsel for Barclays, I
19         take it?
20             MS. DEL MEDICO:  Yes.
21         A.   At least before the closing of the
22    transaction, I do not believe so.  I mean, it's
23    possible -- one possibility is, and I don't
24    recall, is, I don't remember whether the
25    documents were actually signed on the 17th or

KAPLAN

1
2    there may have been a little more back and forth
3    in terms of signing documents after that, but I
4    just don't recall.
5        Q.    After your conversation with
6    Mr. Lechner on the 17th, was there any more
7    substance to that conversation besides the fact
8    that the securities involving the repo would be
9    part of the purchase transaction?
10        MR. SHAW:  Objection, asked and
11    answered.
12        A.    Not that I recall.

**REDACTED**

1        KAPLAN

**REDACTED**

1        KAPLAN

**REDACTED**

1        KAPLAN
2
3
4
5
6        **REDACTED**
7
8
9
10
11
12
13
14
15
16        Q.    Did you have any, besides the meeting
17    on September 17 that we just spoke about, did
18    you have any other conversations with anyone at
19    the Fed about the Fed replacement repo?
20        A.    I don't recall.  It's possible --
21    there were no further meetings.  There may have
22    been a follow-up conference call, I just don't
23    recall.
24        Q.    After this meeting on September 17th,
25    did you personally do anything further with

Page 22

```
 1              KAPLAN
 2  regard to the Fed replacement repo?
 3      A.   Can you be more specific?
 4      Q.   Sure, did you, after this meeting on
 5  September 17th, did you do any further work on
 6  the Fed replacement repo, including
 7  conversations with how the repo would work or
 8  facilitating the repo, anything at all
 9  regarding --
10      A.   I think its privileged.
11          MR. SHAW:  You can answer yes or no.
12      But if it involves a legal work you did for
13      Barclays or discussions with Barclays
14      personnel, I think that would be privileged.
15      A.   The answer is yes, but it would be
16  privileged.
```

Page 23

```
 1              KAPLAN
```

**REDACTED**

Page 24

```
 1              KAPLAN
```

**REDACTED**

Page 25

```
 1              KAPLAN
```

**REDACTED**

Page 30

1                    KAPLAN

**REDACTED**

Page 31

1                    KAPLAN

**REDACTED**

Page 32

1                    KAPLAN

**REDACTED**

Page 33

1                    KAPLAN
2
3.
4
5
6
7
8
9
10                **REDACTED**
11
12
13
14
15
16
17
18
19
20
21      Q.   With respect to this notice of
22  termination, do you recall receiving this
23  document on or around September 19?
24      A.   I recall after September 19th,
25  probably on the 20th, either learning of a

KAPLAN

1
2  notice of termination or possibly receiving this
3  or noticing that I had received it.
4     Q.   What did you -- did you read the
5  document then on September 20th for the first
6  time?
7     A.   I don't recall if I read the document,
8  but I understood that a notice of termination
9  had been sent with respect to the master
10  repurchase agreement.
11     Q.   If you didn't read it, how did you
12  understand that it had been sent?
13     A.   I may have read it, I don't recall.
14     Q.   Did it come to you via e-mail or did
15  someone hand it to you, do you recall?
16     A.   I believe I would have received a
17  privileged e-mail.
18     Q.   If -- so you didn't receive this via
19  e-mail like you did in the ordinary course with
20  other notices of termination that you would get
21  and file in the PST files?
22        MR. SHAW:  Objection,
23     mischaracterizes --
24     A.   No, I didn't say that.  I don't recall
25  how I received it.  I probably received it by

KAPLAN

1
2  e-mail.  Whether I read it or not, I don't
3  recall.
4        There was a lot going on at the time
5  and whether I noticed it right away or after the
6  fact and whether I immediately moved it into a
7  PST folder, I just can't recall in this case.
8     Q.   Did someone at Barclays bring it to
9  your attention?
10        MR. SHAW:  Again, if this, if the
11     answer is a question involved with
12     privileged communication, please don't
13     divulge the details of that.
14     A.   It would have involved a privileged
15  communication.
16
17
18
19
20        **REDACTED**
21
22
23
24
25

KAPLAN

1
2
3
4
5
6
7
8
9  .
10
11        **REDACTED**
12
13
14
15
16
17
18
19
20
21
22
23
24
25

KAPLAN

1
2
3
4
5
6        **REDACTED**
7
8
9
10
11     Q.   Did you speak to anyone at Lehman or
12  its representatives at Weil Gotshal about the
13  notice of termination?
14     A.   I don't believe so, no.
15
16
17
18
19        **REDACTED**
20
21
22
23
24
25

Page 42

```
1              KAPLAN
2
3
4
5
6
7
8
9
10            REDACTED
11
12
13
14
15
16
17
18
19
20
21
22      Q.   Are you aware of Section 559 of the
23   Bankruptcy Code?
24      A.   I am.
25      Q.   What do you know about Section 559 of
```

Page 43

```
1              KAPLAN
2   the Bankruptcy Code?
3          MR. SHAW:  To the extent your
4      knowledge of Section 559 of the Bankruptcy
5      Code involves legal advice from Barclays'
6      counsel, I would caution you not to reveal
7      that.
8      A.   I'm familiar with 559 as dealing with
9   safe harbor for repo transactions, repurchase
10   transactions.
11      Q.   What -- can you describe the safe
12   harbor for repo transactions for me?
13          MR. SHAW:  If you have an
14      understanding apart from any legal advice
15      and legal analysis, you can give that.
16      A.   I mean, like other safe harbors, it
17   deals with the ability to terminate the
18   transactions without having to be concerned
19   about the stays and also deals with -- it is a
20   safe harbor for preferences and transfers as
21   well.
22      Q.   Do you know what happens to excess
23   collateral in a repurchase agreement under
24   Section 559?
25          MR. SHAW:  Are you asking for a legal
```

Page 44

```
1              KAPLAN
2   opinion?
3      Q.   I am asking his --
4      A.   I am aware that there is a part of 559
5   that talks about excess value, and I don't have
6   the exact words in front of me, having to be
7   returned to the debtor, yes.
8
9
10
11
12
13            REDACTED
14
15
16
17
18
19      Q.   And I understand that you never spoke
20   to anyone on the Lehman side of the table,
21   including Weil, about Section 559 of the
22   Bankruptcy Code, correct?
23      A.   That's correct.
24
25            REDACTED
```

Page 45

```
1              KAPLAN
```

REDACTED

Page 50

1    KAPLAN
2
3
4
5
6
7    REDACTED
8
9
10
11
12    Q.    At any time, were you part of any
13    discussions with Lehman or its representatives
14    at Weil Gotshal about paragraph 13 of the
15    clarification letter?
16    A.    No, I was not.
17    Q.    To your knowledge, was anybody on
18    Barclays' side of the table, Barclays or its
19    representatives involved in discussions with
20    Lehman or its representatives about provisions
21    in the clarification letter that address the
22    issue of the termination of the repo?
23    MR. SHAW:  Again, to the extent that
24    you -- that any information that you might
25    have relates or is a privileged

Page 51

1    KAPLAN
2    communication, I would caution you not to
3    divulge it.
4    MS. DEL MEDICO:  Even on a yes or no
5    answer on that?
6    A.    I don't have any specific knowledge
7    aside from this document you just showed me.

REDACTED

Page 52

1    KAPLAN

REDACTED

Page 53

1    KAPLAN

REDACTED

Page 70

1                    KAPLAN

**REDACTED**

Page 71

1                    KAPLAN
2
3
4
5              **REDACTED**
6
7
8
9    _____
10            ALAN KAPLAN
11   Subscribed and sworn to
12   before me this    day
13   of March, 2010.
14
15   _____
16
17
18
19
20
21
22
23
24
25

Page 72

1                    KAPLAN
2                    INDEX:

| WITNESS | EXAM BY: | PAGE: |
|---------|----------|-------|
| A. Kaplan | Ms. Del Medico | 6 |
| | Mr. Dakis | 51, 70 |
| | Mr. Mills | 52 |

Page 73

1                    KAPLAN
2                    CERTIFICATE
3    STATE OF NEW YORK )
4                     )ss:
5    COUNTY OF NEW YORK)
6        I, MARY F. BOWMAN, a Registered
7    Professional Reporter, Certified Realtime
8    Reporter, and Notary Public within and for
9    the State of New York, do hereby certify:
10       That ALAN KAPLAN, the witness whose
11   deposition is hereinbefore set forth, was
12   duly sworn by me and that such deposition is
13   a true record of the testimony given by such
14   witness.
15       I further certify that I am not
16   related to any of the parties to this action
17   by blood or marriage and that I am in no way
18   interested in the outcome of this matter.
19       In witness whereof, I have hereunto
20   set my hand this 1st day of March, 2010.
21
22   _____
23            MARY F. BOWMAN, RPR, CRR
24
25

Page 74

```
 1              KAPLAN
 2        * * *ERRATA SHEET* * *
 3   NAME OF CASE:  In Re:  Lehman
 4   DATE OF DEPOSITION:  3/1/10
 5   NAME OF WITNESS:  ALAN KAPLAN
 6   Reason codes:
 7      1. To clarify the record.
        2. To conform to the facts.
 8      3. To correct transcription errors.
 9   Page _____ Line _____ Reason_____
     From _____ to_____
10
11   Page _____ Line _____ Reason_____
     From _____ to_____
12
13   Page _____ Line _____ Reason_____
     From _____ to_____
14
15   Page _____ Line _____ Reason_____
     From _____ to_____
16
17   Page _____ Line _____ Reason_____
     From _____ to_____
18
19   Page _____ Line _____ Reason_____
     From _____ to_____
20
21   Page _____ Line _____ Reason_____
     From _____ to_____
22
23
24       _____
         ALAN KAPLAN
25
```

# A. 156

Page 1

1      IN THE UNITED STATES BANKRUPTCY COURT

2      FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

  In re:             )

5                     ) Chapter 11

  LEHMAN BROTHERS      ) Case No. 08-13555(JMP)

6  HOLDINGS, INC., et al, ) (Jointly Administered)

                    )

7         Debtors.  )

  -----------------------)

8

9

10

11

12       30(b)(6) DEPOSITION OF

13   CLEARY GOTTLIEB STEEN & HAMILTON LLP

14            by

15       VICTOR I. LEWKOW

16      New York, New York

17    Wednesday, February 10, 2010

18

19

20

21

22

23  Reported by:

24  MAYLEEN CINTRON, RMR, CRR

25  JOB NO. 28226

Page 2

```
 1
 2
 3                    February 10, 2010
 4                    10:02 a.m.
 5
 6
 7
 8         30(b)(6) DEPOSITION OF CLEARY
 9   GOTTLIEB STEEN & HAMILTON LLP, by VICTOR I.
10   LEWKOW, held at the offices of Cleary
11   Gottlieb Steen & Hamilton LLP, 450 Park
12   Avenue, New York, New York, pursuant to
13   Notice, before MayLeen Cintron, a Registered
14   Merit Reporter, Certified Realtime Reporter,
15   and Notary Public of the State of New York.
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
 1   A P P E A R A N C E S :
 2
 3   JONES DAY LLP
 4   Attorneys for Debtors - Lehman Brothers, Inc.
 5      222 East 41st Street
 6      New York, New York 10017-6702
 7   BY: ROBERT W. GAFFEY, ESQ.
 8      BRIDGET CRAWFORD, ESQ.
 9
10   BOIES, SCHILLER & FLEXNER LLP
11   Attorneys for Barclays
12      5301 Wisconsin Ave., N.W.
13      Washington D.C. 20015
14   BY: HAMISH HUME, ESQ.
15
16
17   QUINN, EMANUEL, URQUHART,
18   OLIVER & HEDGES LLP
19   Attorneys for the Creditors Committee
20      51 Madison Avenue - 22nd Floor
21      New York, New York 10010
22   BY: JAMES TECCE, ESQ.
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
 1   A P P E A R A N C E S : (Cont'd)
 2
 3   HUGHES, HUBBARD & REED LLP
 4   Attorneys for the SIPA Trustee
 5      One Battery Park Plaza
 6      New York, New York  10004-1482
 7   BY: WILLIAM R. MAGUIRE, ESQ.
 8      AMINA HASSAN, ESQ.
 9
10
11   CLEARY GOTTLIEB STEEN & HAMILTON LLP
12   Attorneys for the Witness: Victor Lewkow
13      One Liberty Plaza
14      New York, New York 10006
15   BY: BOAZ S. MORAG, ESQ.
16      ROBERT P. DAVIS, ESQ.
17
18
19
20         - - -
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
 1              -Lewkow-
 2   V I C T O R   I.   L E W K O W ,
 3      called as a witness, having been duly
 4      sworn by a Notary Public, was examined
 5      and testified as follows:
```

REDACTED

TSG Reporting - Worldwide    877-702-9580

Page 6

1    **-Lewkow-**

REDACTED

TSG Reporting - Worldwide    877-702-9580

Page 7

1    **-Lewkow-**
2
3
4    **In Paragraph 4 of your Declaration,**
5    **you say, "The transaction was never discussed**
6    **or documented as what might be called a**
7    **'balance sheet' transaction, which would have**
8    **included pre-closing and/or post-closing**
9    **purchase price adjustment provisions relating**
10    **to a valuation of the transferred assets and**
11    **liabilities".**
12    **Is the term "balance sheet**
13    **transaction" a term of art of some kind?**
14    MR. MORAG:  Object to the form.
15    You can answer.
16    A.  In many private acquisitions as
17    opposed to public company acquisitions, there
18    are price adjustments tied to an audited
19    balance sheet that is prepared as of the
20    closing date.
21    And I'm not sure if it is a broadly
22    used term, but it certainly is what I was
23    talking about.  So...
24
25

TSG Reporting - Worldwide    877-702-9580

Page 8

1    **-Lewkow-**
2
3    **Q.  So, there are not, I take it,**
4    **particular -- there is not a defined list of**
5    **things you expect to find, that you need to**
6    **see in a transaction in order to qualify as a**
7    **so-called "balance sheet transaction"; is that**
8    **right?**
9    MR. MORAG:  Objection to form.
10    A.  I would say that in my experience,
11    in the context of buying a business where
12    there were a lot of financial assets valued
13    and liabilities, the value of which changed
14    over -- could change or would change or did
15    change over time between signing and closing
16    or between if there weren't represented -- a
17    representation by the seller as to the value
18    as of signing, starting date could be actually
19    earlier than the signing of the asset purchase
20    agreement.
21    If between whatever date a balance
22    sheet was represented as of and the closing
23    date, the value of the assets and liabilities
24    had changed and I would expect as part of a
25    balance sheet transaction, for there to be pre

TSG Reporting - Worldwide    877-702-9580

Page 9

1    -Lewkow-
2    or post-closing price -- pre or post- closing
3    price adjustments.

REDACTED

TSG Reporting - Worldwide    877-702-9580

Page 10

1          -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 11

1          -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 12

1          -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 13

1          **-Lewkow-**
2
3
4
5
6
7
8
9
10
11
12          **REDACTED**
13
14
15
16
17
18
19
20
21
22
23          **Q.  Did Cleary Gottlieb play any role**
24   **in the negotiation of the transaction with**
25   **regard to arriving at a valuation of the**

TSG Reporting - Worldwide    877-702-9580

Page 14

```
1          -Lewkow-
2     assets to be transferred?
3          MR. MORAG:  Object to the form.
4     Vague.
5     A.  No.
```

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 15

```
1          -Lewkow-
```

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 16

```
1          -Lewkow-
```

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 17

```
1          -Lewkow-
```

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 18

1                    -Lewkow-

REDACTED

TSG Reporting - Worldwide    877-702-9580

Page 19

1                    -Lewkow-
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23        Q.  Can you tell me what you know with
24   regard to those discussions?
25        A.  As I stated in my declaration,

TSG Reporting - Worldwide    877-702-9580

Page 20

1                    -Lewkow-
2   Barclays, was my understanding, that Barclays'
3   trading and/or financial folks had been
4   provided certain information about the trading
5   positions; that it was contemplated that
6   Barclays would assume as part of an
7   acquisition of the business of substantially
8   all of the business.
9            And in the course of that, Barclays
10   had -- Barclays people had reached the view
11   that there were very significant -- that the
12   aggregate carrying value that they had been
13   furnished by Lehman was substantially higher
14   than Barclays believed was appropriate that
15   Monday or Tuesday.
16        Q.  And by "aggregate carrying value",
17   do you mean Lehman's book value?
18        A.  It's my -- I'm not an accountant,
19   as you know.  I'm a lawyer.  It is my
20   understanding that for an entity such as
21   Lehman, they are supposed to -- under
22   regulatory accounting principles, maybe
23   generally accepted accounting principles, I
24   don't know.  But as a general matter,
25   broker-dealers mark their portfolio to market

TSG Reporting - Worldwide    877-702-9580

Page 21

1                    -Lewkow-
2   on a daily basis.  And I believe that means
3   their book value is effectively adjusted each
4   day.  To the extent that a balance sheet is
5   prepared, the balance sheet is prepared based
6   on those marks.
7        Q.  So when you use the phrase
8   "aggregate carrying value," were you referring
9   to Lehman's books marked to market in that
10   manner?
11           MR. MORAG:  Object to the form.
12           MR. HUME:  Objection, asked and
13   answered.
14        A.  I think I've got nothing more to
15   say on that.
16        Q.  What did you mean to say when you
17   said "aggregate carrying value"?
18        A.  The value -- what I hear people
19   refer to as "the marks."  What they were being
20   marked at on the books of Lehman by Lehman.

REDACTED

TSG Reporting - Worldwide    877-702-9580

1          **-Lewkow-**

**REDACTED**

1          -Lewkow-

**REDACTED**

1          -Lewkow-

**REDACTED**

1          **-Lewkow-**
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23          **Q.  Now, to your knowledge, was the**
24     **document I have before you marked as**
25     **Exhibit 19, a product of the discussions**

Page 38

1        -Lewkow-
2  between Barclays and Lehman traders that
3  you're referring to in Paragraph 9 of your
4  Declaration?
5        MR. MORAG:  Object to the form.
6      A.  No.  I -- I wouldn't -- I mean,
7  I -- this was a Lehman Brothers document.  I
8  assume that as --
9        To the extent that Lehman Brothers,
10  having listened to Barclays' views as to
11  valuation may have changed their marks, as I
12  believe they did, it may have reflected those
13  judgments by Lehman as to the proper marking
14  of assets or liabilities.  But that's all.

REDACTED

Page 39

1        -Lewkow-

REDACTED

19      Q.  Do you know if Lehman did, in fact,
20  change its marks?
21      A.  I have no way of knowing that.
22      Q.  Did you or anyone else from Cleary
23  ever ask that question in the week
24  beginning -- well, from Tuesday, September
25  16th through the closing of the transaction on

Page 40

1        -Lewkow-
2  the 22nd?
3      A.  No.

REDACTED

23      Q.  Where did the $70 billion come from
24  that was put into subsection (d) of the
25  definition of "Purchased Assets"?

Page 41

1        -Lewkow-
2      A.  From Lehman.
3      Q.  Was it Barclays' understanding at
4  the time that that was an accurate estimation
5  of the book value of the described assets?
6        MR. MORAG:  Objection to form.
7      A.  To my knowledge, it was Barclays'
8  understanding that it represented what Lehman
9  Brothers -- having considered the discussions
10  I described earlier in terms of what they
11  concluded, after hearing Barclays, was the
12  proper mark to take on its balance sheet.
13  That it reflected Lehman's conclusions.
14      Q.  Was the term "book value" used for
15  a reason in subsection (d) in the definition
16  of "Purchased Assets"?
17        MR. HUME:  Objection.  Vague.
18      A.  Who's -- yeah, whose reason?
19      Q.  Well, was it supposed to say
20  "market value"?
21      A.  Not all assets on the balance sheet
22  have a market value.  There are -- it is my
23  understanding.  Again, I'm not an expert, a
24  broker-dealer expert or a market expert or a
25  valuation expert, but it is my understanding

1          -Lewkow-
2     that for some positions where there is no
3     active market, that other -- other things go
4     into how a broker-dealer is supposed to mark
5     their -- their valuation from an accounting
6     standpoint.
7          **Q.  Was it a considered choice of the**
8     **people who drafted the Asset Purchase**
9     **Agreement to use the phrase "book value"**
10    **instead of some other phrase such as "market**
11    **value"?**
12         MR. HUME:  Objection.  Vague and
13    lacks foundation.
14         A.  Can I have the question read back,
15    please?
16         (Record read.)
17         A.  I don't know how to answer that
18    question, final question.
19         Every -- we tried as a group, Weil
20    Gotshal, Simpson Thacher, Sullivan & Cromwell,
21    Cleary Gottlieb, tried to do the best we could
22    in drafting this Agreement under
23    extraordinarily unusual, difficult
24    circumstances.
25         I do recall that, that this was one

1          -Lewkow-
2     of those final changes that was added in
3     handwriting, if I had the other version of the
4     Agreement.  And somebody, I believe on
5     Lehman's side of the table said, suggested we
6     add in words such as -- to categorize that
7     what we were talking about were, you know, a
8     disfunction of assets.  And it was for that
9     purpose that it was referenced.
10         And I believe that it was first
11    suggested -- and again, I don't know from
12    whom, it might have been a Lehman person.  It
13    might have been one of their lawyers.  Said,
14    let's say, with a -- you know, with a
15    marking -- with marks of 70 billion, or some
16    words of that sort.
17         And some lawyer -- again, I don't
18    know on which side.  Because this was all
19    being done in group session issue -- said,
20    "Well, should we use the word" -- "from a
21    legal, instead of saying 'marks', should we
22    use the word 'book value'?"
23         And that's the word that went in.
24    But I don't think people were trying to draw a
25    distinction between book value and marks, at

1          -Lewkow-
2     least from what this lawyer believed, the
3     lawyer from Weil, understood "book value" to
4     mean in the context of financial assets held
5     by a broker-dealer.

**REDACTED**

1          **-Lewkow-**

**REDACTED**

1                    -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

1                    -Lewkow-
2
3
4
5
6
7
8
9
10
11                **REDACTED**
12
13
14
15
16
17
18
19
20        Q.   What was the purpose of the
21    Clarification Letter?
22        A.   The Clarification Letter was, as
23    set forth in the opening paragraph, "To
24    clarify the intent of the parties with respect
25    to certain provisions of the Asset Purchase

TSG Reporting - Worldwide    877-702-9580

1                    -Lewkow-
2    Agreement, supplement in certain respects the
3    agreements of the parties stated therein, and
4    amend the Asset Purchase Agreement in certain
5    respects."
6        Q.   Now, are there particular portions
7    of the Agreement that were amended or are
8    there particular portions that were
9    supplemented or are there particular portions
10    that were clarified?
11        MR. MORAG:  Objection to the form.
12        MR. HUME:  Objection to the form
13    and that it calls for an intersection
14    of the agreement.  And generally
15    Barclays will object to the extent you
16    ask the witness to give legal
17    interpretations of the contract as
18    revealing privilege.
19        A.   The answer is -- the document is
20    the document.  No one ever tried to say, all
21    right, this clause is a supplement; this
22    clause is an amendment; this clause is -- they
23    are what they are.  Certain -- certain things
24    did clarify; certain things amended.  No
25    one -- there was no reason -- there was no

TSG Reporting - Worldwide    877-702-9580

1                    -Lewkow-
2    effort to allocate into buckets in this
3    document.
4        Q.   Do you recall if the use of the
5    word "amend" was a deliberate drafting choice?
6        MR. MORAG:  Objection.
7        MR. GAFFEY:  That's a bad question.
8    Let me withdraw that question.
9        Q.   Do you recall if the word "amend"
10    was added at some point during exchanging
11    drafts of the Clarification Letter?
12        A.   I would need to see all the drafts
13    to be sure.  But my recollection is yes.
14        Q.   Okay.  I'm going to show you the
15    draft, so I'm not going to ask you to
16    speculate and pinpoint.
17        Do you recall any discussions
18    between the party, that is between Lehman and
19    Barclays or their representatives, about
20    adding the word "amend" to the Clarification
21    Letter?
22        A.   I have a vague recollection that
23    with the very first draft of the Clarification
24    Letter, which was prepared very quickly by
25    someone -- and I don't know which side --

TSG Reporting - Worldwide    877-702-9580

Page 50

1          -Lewkow-
2  after the Asset Purchase Agreement had been
3  signed and filed with the Court on Wednesday
4  morning, that the original first draft was a
5  page or two and it clearly was truly nothing
6  other than clarification.  And so that the
7  first draft did not use the word "amendment."
8          At some later point, as things got
9  more complicated and things were happening, it
10 became -- there was discussion that we should
11 add the word "amend."  That is my
12 understanding.

**REDACTED**

Page 51

1          -Lewkow-
2
3
4
5
6
7  **REDACTED**
8
9
10
11
12
13
14
15         The question, the issue is what you
16 talked about a minute ago --
17     A.  The word "amendment"?
18     Q.  Yes.  That it became more complex
19 and I decided to add the word "amendment,"
20 whether Mr. Harvey Miller was involved in
21 those discussions.
22     A.  I don't think -- I don't know what
23 Mr. Miller was doing talking internally with
24 his colleagues or with his clients.  Did he
25 participate in the exact wording of that?  I

Page 52

1          -Lewkow-
2  don't know.  I do have a distinct recollection
3  of him describing to the Court at the sale
4  hearing that Friday evening that there were
5  major changes in the deal.
6          So I can't imagine -- I don't want
7  to speculate.  I do not recall specifically
8  whether he was involved in adding the word
9  "amend" in that clause.
10     Q.  Was the Clarification Letter meant
11 to memorialize those major changes in the
12 deal?
13         MR. MORAG:  Object to form.
14     A.  I'm picking up the Clarification
15 Letter.  It was made to both supplement,
16 clarify and amend the Asset Purchase
17 Agreement.  And it was intended to be
18 consistent with what the Court had been told
19 this Friday evening.

**REDACTED**

25     Q.  The Clarification Letter,

Page 53

1          -Lewkow-
2  Exhibit 25, sets forth certain changes in the
3  definition of "Purchased Assets" from the
4  original Asset Purchase Agreement; is that
5  correct?
6          MR. HUME:  Object to the form.
7      A.  Can I look at --
8      Q.  Sure.
9      A.  -- both at the Clarification Letter
10 and the Asset Purchase Agreement?
11     Q.  Look at whatever you need to look
12 at.
13     A.  Thank you.
14         (Witness reviewing document.)
15     A.  Yes.
16     Q.  While you were present in court,
17 was Judge Peck told about the changes in the
18 definition of "Purchased Assets"?
19         MR. MORAG:  Object to the form.
20     A.  You can read the transcript as well
21 as I can, and I think it speaks for itself.
22         I think that what the judge was
23 told was about the substantive changes in the
24 deal, major changes in the deal that had been
25 orally agreed to, is my understanding, by

Page 54

1            -Lewkow-
2    representatives of Lehman and Barclays in a
3    couple of hours preceding the beginning of the
4    court hearing.
5            So it does not mean that -- as the
6    Court was well aware and as the Court noted,
7    that he did not have the document.  The
8    document did not yet exist but, you know,
9    major changes were described by Mr. Miller and
10   Ms. Fife to the Court.

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 55

1            -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 56

1            -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 57

1            -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

15 (Pages 54 to 57)

Page 62

1            -Lewkow-

2

3                **REDACTED**

4

5

6      **Q.   Take a look, if you would,**
7   **Mr. Lewkow at Paragraph 1, and tell me if**
8   **there are changes to the definition of**
9   **"Purchased Assets" affected by the**
10  **Clarification Letter, changes to the**
11  **definition from the Asset Purchase Agreement?**
12          MR. MORAG:  You're asking him --
13      A.   Yes.
14          MR. MORAG:  -- the Clarification
15  Letter?
16      A.   Yes.
17          MR. MORAG:  The last thing --
18      A.   The answer is yes.  There was a
19  change in the definition, that's correct.

20

21

22              **REDACTED**

23

24

25

TSG Reporting - Worldwide    877-702-9580

---

Page 63

1            -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

---

Page 64

1            -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

---

Page 65

1            **-Lewkow-**

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 66

-Lewkow-

1
2
3      Q.  Do you recall when it was that the
4  lawyers first learned that assets that had
5  been originally described in the long
6  positions were, in fact, in the repo?  When
7  did that happen?
8          MR. MORAG:  Object to the form.
9      A.  Yeah, I think -- first of all, I
10  can't answer for all lawyers.  That would
11  include the Weil Gotshal lawyers and other
12  lawyers on behalf of...
13          As to Cleary Gottlieb, at some
14  point I believe, at least one of my colleagues
15  that Thursday had heard that there had been --
16  that Barclays had extend -- provided repo
17  financing to Barclays.  I'm not sure.  It is
18  my understanding none of the details, we had
19  not been involved in that at all.  But it was
20  mentioned, and we learned more about it on
21  Friday and over the weekend.
22          But even as -- even as of the Court
23  hearing we knew very little about it.
24
25

           TSG Reporting - Worldwide    877-702-9580

Page 67

-Lewkow-

1
2
3
4
5
6
7
8
9
10
11      **REDACTED**
12
13
14
15
16
17
18
19      Q.  The question is:  Did there come a
20  time when you learned that the Repurchase
21  Agreement had been terminated by Barclays?
22      A.  There came --
23          MR. MORAG:  Objection to form.
24          MR. HUME:  I will object and
25  instruct you not to answer to the

           TSG Reporting - Worldwide    877-702-9580

Page 68

1          -Lewkow-
2  extent it would reveal a privilege from
3  Barclays.
4          MR. GAFFEY:  As to when?
5          MR. HUME:  Well, you assumed
6  when --
7          MR. GAFFEY:  It is attorney --
8          MR. HUME:  It was terminated.  What
9  does terminated mean?
10          MR. GAFFEY:  It means ended.
11      A.  It's a legal... If you want to ask
12  the question -- can I talk to counsel for
13  Barclays and my counsel?
14      Q.  Sure.  Absolutely.
15          (Whereupon, a recess was taken
16  from 11:49 a.m. to 11:52 a.m.)
17      A.  Before the break you asked me a
18  question about did there come a time of
19  learning about the termination of the repo.
20          Of course, the repo did terminate,
21  as I understand it, when we closed on Monday,
22  but I assume that's not what you're asking.
23      Q.  It is not.
24      A.  There did come a time over the
25  weekend, I don't recall whether it was

           TSG Reporting - Worldwide    877-702-9580

Page 69

1          -Lewkow-
2  Saturday or Sunday, where we did learn -- I
3  think I was reminded in preparing for the
4  deposition, that it was -- we initially
5  learned it when we were copied, or not copied
6  and then forwarded on an e-mail from Sullivan
7  & Cromwell who was co-counsel with us for
8  Barclays, and/or to -- to Weil, that there had
9  been an inadvertent notice given to Barclays
10  by folks in the -- I don't know who, but
11  someone at Barclays had sent a notice of
12  termination of the repo at some point, I
13  believe late Friday, and that that was done in
14  error and should be undone.
15          So if that's what you're asking
16  about, you've heard what my recollection is.
17      Q.  It is.  Let me show you what's
18  previously been marked as Exhibit 27.
19          Have you seen that document before,
20  sir?
21          (Witness reviewing document.)
22      A.  No, I don't believe I have.
23      Q.  You learned about the inadvertent
24  termination of the repo over the weekend; is
25  that right?

           TSG Reporting - Worldwide    877-702-9580

Page 70

1          -Lewkow-
2      A.  Yes.
3      **Q.  Was it the Saturday or the Sunday?**
4      A.  I don't know.
5      **Q.  Were you involved in any**
6  **discussion, you or anyone else from Cleary or**
7  **Barclays, involved in any discussions from the**
8  **Lehman folks or Weil Gotshal about the**
9  **inadvertent termination of the repo?**
10     A.  It is my -- I don't think I
11 personally was, but here as a
12 30(b)(6) witness --
13     **Q.  You are Cleary Gottlieb, sir.**
14     A.  -- internally.  I was perfectly
15 happy not knowing in my life.
16         It is my understanding that
17 following up on the e-mail from Sullivan &
18 Cromwell and the like, that the -- that there
19 may have been some discussions about, you
20 know, implementing this and getting it right
21 to -- to -- because it was, as I -- as I was
22 told at the time and we were told at the time,
23 and as I testified to, it was sent in error.
24 But I don't recall any other discussion.
25         I'm not aware of any other
        TSG Reporting - Worldwide    877-702-9580

Page 71

1          -Lewkow-
2  discussion that Cleary Gottlieb was aware of
3  with the other side on, on this subject.
4      **Q.  That's sort of where I'm leading.**
5  **Let me rephrase the question so you'll know**
6  **what it is I'm looking for here.**
7          **What knowledge does Cleary**
8  **Gottlieb have that Weil Gotshal or Lehman knew about**
9  **the termination of the repo, that it had been**
10 **terminated?**
11     A.  I believe, as I testified a minute
12 ago, that there was an e-mail that Sullivan &
13 Cromwell on behalf of Barclays sent to Weil
14 Gotshal.  And I believe there were some
15 follow-up conversations referencing the fact
16 that there had been an inadvertent notice that
17 had been sent on this subject.  Can I look at
18 the Clarification Letter?
19     **Q.  Sure.  Paragraph 13 is probably**
20 **where you want to go.**
21     A.  Fine.
22     **Q.  The language in Paragraph 13 was**
23 **supplied by Sullivan & Cromwell, correct?**
24     A.  I would have to look at this and
25 compare it to the words in the e-mail.  I
        TSG Reporting - Worldwide    877-702-9580

Page 72

1          -Lewkow-
2  don't know the answer to that.
3      **Q.  There is a reference in Paragraph**
4  **13 to the Notice of Termination, do you see**
5  **that?**
6      A.  Yes.
7      **Q.  Is the notice of termination that**
8  **is referred to in Paragraph 13 of the**
9  **Clarification Letter, the notice that we've**
10 **marked as Exhibit 27?**
11     A.  Well, it says it is a notice of
12 termination in Paragraph 13 dated
13 September 19.  Exhibit 27 that you've shown
14 me, that as I testified I do not believe I've
15 ever seen, it is dated September 19th.  It is
16 from Barclays, it is to Lehman, and it says it
17 is a notice of termination.  So it appears to
18 be it is, but that's all I can tell you.
19     **Q.  Was there any discussion between**
20 **the folks on the Barclays side of the table,**
21 **including Cleary, and the folks on the Lehman**
22 **side of the table including Weil Gotshal,**
23 **about whether there were implications under**
24 **the Bankruptcy Code to the fact that the repo**
25 **had been terminated?**
        TSG Reporting - Worldwide    877-702-9580

Page 73

1          -Lewkow-
2      A.  It is my understanding that to the
3  best of Cleary Gottlieb's knowledge, no.
4      **Q.  Did Cleary Gottlieb have**
5  **communications with any other person or entity**
6  **outside of your client, outside of Barclays**
7  **and Cleary, about Section 559 of the**
8  **Bankruptcy Code in connection with the**
9  **termination of the repo?**
10        MR. HUME:  Outside of any
11     privilege.
12        MR. GAFFEY:  Outside of any
13     privilege, yes.
14     A.  To the best of my knowledge, no,
15 subject to this caveat.  You will be taking my
16 partner's Ed Rosen's deposition.  He was
17 involved in the discussions with DTC and other
18 clearance -- clearing entities.  And since he
19 was going to be the 30(b)(6) witness on those
20 discussions, I have not consulted him.  So as
21 to whether or not there was anything on that
22 point, I do not know the answer on behalf of
23 Cleary Gottlieb.  Subject to that, the answer
24 is no.
25     **Q.  Were there discussions about 559**
        TSG Reporting - Worldwide    877-702-9580

Page 74

1          -Lewkow-
2  with any other self-regulating organizations
3  or governmental agency concerning Section 559
4  of the Bankruptcy Code.
5          A.  Not to my knowledge.
6          Q.  Mr. Lewkow, I'm going to show
7  you --
8          A.  This is starting to look like my
9  desk at the office.
10         Q.  I'm trying to make you feel at
11  home.  Let me add this to the pile there and
12  show you what previously was marked as Exhibit
13  579B, a Declaration of Alan Kaplan, deputy
14  general counsel of Barclays, that's been
15  submitted in Barclays's opposition papers on
16  Rule 60.  Have you seen this before?
17         A.  I can't remember if someone showed
18  me this in the last few days or not.
19         Q.  Take a minute if you would --
20         A.  I wouldn't swear that I haven't.
21  But if so, I didn't read it very careful.
22         Q.  There's a statement that Mr. Kaplan
23  makes that I want to see if you had any
24  knowledge about.  And it's in Paragraph 4 of
25  his declaration.  He is referring to the

TSG Reporting - Worldwide    877-702-9580

Page 75

1          -Lewkow-
2  notice going out erroneously, I'm
3  paraphrasing.  Then he says, "The parties
4  corrected that error in Paragraph 13 of the
5  Clarification Letter."  Do you see that?
6          A.  Yes, let me read all of
7  Paragraph 4, if I may?
8          Q.  Sure.
9          (Witness reviewing document.)
10         A.  Remind me of the question?
11         Q.  I think the question was:  Do you
12  see that?  But --
13         A.  I do.
14         Q.  Okay.  When Mr. Kaplan says "the
15  parties", plural, "The parties corrected the
16  problem with Paragraph 13", I show you that to
17  see if it refreshes your recollection in any
18  way whether there were any discussions between
19  the parties, that is between Barclays and its
20  representatives and Lehman and its
21  representative, about the problem created by
22  the termination of the repo?
23         MR. MORAG:  Objection to the form.
24         A.  I don't know what you mean by the
25  "problem created."  But I believe it was

TSG Reporting - Worldwide    877-702-9580

Page 76

1          -Lewkow-
2  discussed between the fact that this change
3  needed to be made, that it was sent in error.
4  It was discussed at least briefly between the
5  Barclays side, including Cleary and Sullivan &
6  Cromwell, and the Lehman side including Weil,
7  yes.
8          Q.  Again, does it refresh your
9  recollection, where you read Mr. Kaplan
10  talking about "correcting an error," does it
11  refresh your recollection about whether there
12  were any discussions between the Barclays side
13  of the table including Cleary, and the Lehman
14  side of the table including Weil, about
15  implications into the Bankruptcy Code from the
16  termination?
17         A.  I answered that question.  To the
18  best of my knowledge, there were no such
19  discussions.
20
21
22              REDACTED
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 77

1          -Lewkow-



              REDACTED



TSG Reporting - Worldwide    877-702-9580

1            -Lewkow-

**REDACTED**

1            **-Lewkow-**

**REDACTED**

1            -Lewkow-

**REDACTED**

1            -Lewkow-
2
3
4
5
6
7
8            **REDACTED**
9
10
11
12
13
14
15        **Q.  Was there any discussion with**
16  **anyone outside of the circle of Cleary and**
17  **Barclays to the effect that the Bankruptcy**
18  **Code would require the financing haircut in**
19  **the repo to be paid back into the estate over**
20  **and above the amount that Barclays had**
21  **advanced in the Repurchase Agreement?**
22        A.  Not to my knowledge.
23            MR. MORAG:  Objection to
24      characterization.
25        **Q.  Do you know if anyone at Cleary had**

Page 82

1        **-Lewkow-**
2    **communications with anyone outside of**
3    **privilege, that is anyone outside of**
4    **communications with your client concerning**
5    **whether anyone would seek to stay the**
6    **application of 559 of the Bankruptcy Code in**
7    **connection with the termination of the repo?**
8        A.  Not to my knowledge.

**REDACTED**

Page 83

1        -Lewkow-          **REDACTED**
2
3
4
5        Q.  Do you know whether there's a
6    reason Sullivan & Cromwell drafted the
7    language in Paragraph 13?
8            MR. HUME:  I instructed the witness
9        not to answer that.  To the extent it
10       reveals privilege, I don't know how you
11       can answer it otherwise.
12           THE WITNESS:  I actually think I
13       can.
14           MR. HUME:  If you can, go ahead.
15           A.   We had, as I testified earlier,
16   basically nothing to do with the creation, the
17   documentation, the implementation of the repo.
18   I don't know whether Sullivan & Cromwell did
19   or not, but we had not.  And so I'm not
20   surprised that we had nothing to do with
21   follow-ups with regard to that.

**REDACTED**

Page 84

1        **-Lewkow-**

**REDACTED**

Page 85

1        -Lewkow-

**REDACTED**

Page 106

1          **-Lewkow-**

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 107

1                    -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 108

1          **-Lewkow-**

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 109

1                    -Lewkow-
2
3
4          **Q.  Here we go.  Second sentence of**
5    **Paragraph 11, "Weil had circulated a revised**
6    **draft of the Clarification Letter by e-mail**
7    **during the sale hearing".  Do you recall that?**
8          A.  Yes.  That's the one that I
9    mentioned.  It's this draft that arrived while
10   I was in court, correct.
11         **Q.  That's this draft marked as**
12   **Exhibit 35?**
13         A.  Correct.
14         **Q.  Did anyone in the court have any**
15   **discussions about the draft that was**
16   **circulated by e-mail?**
17         A.  No.
18         **Q.  So other than this statement in**
19   **your Declaration that was circulated by**
20   **e-mail, do you have anything you can add as to**
21   **what anybody did about that fact?  Anybody**
22   **read it?  Talk about it?**
23         A.  No one -- no one had more than a
24   BlackBerry, no copies were ever delivered, to
25   my knowledge, certainly not to Cleary Gottlieb

TSG Reporting - Worldwide    877-702-9580

Page 110

1      -Lewkow-
2    or Barclays in the courtroom.  Whether
3    somebody from Weil had them handed a draft or
4    not?  I don't know.  But certainly no one on
5    our side saw them in the courtroom.

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 111

1            -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 112

1            -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 113

1            -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 126

1          -Lewkow-
2
3
4
5
6
7
8
9
10
11          **REDACTED**
12
13
14
15
16
17
18
19
20
21
22
23
24
25          **Q.  As you sat through the sale hearing**

TSG Reporting - Worldwide    877-702-9580

Page 127

1          **-Lewkow-**
2  **and heard the presentations to the Court from**
3  **the various lawyers who spoke to the judge,**
4  **was Cleary and Barclays's comfortable that the**
5  **aspect of the deal that had been discussed in**
6  **that session prior to the sale hearing were**
7  **accurately disclosed to the judge?**
8          MR. MORAG:  Object to the form.
9     Certainly you speak to Cleary.  As to
10    Barclays, I'm not sure if that calls
11    for a privilege conversation.
12         MR. GAFFEY:  Let me just ask as to
13    Cleary.  That's a good point.
14     A.  As was my understanding was,
15 typical the debtor's counsel on a sale would
16 normally be the ones who take the -- make the
17 presentation to the Court.
18         THE REPORTER:  Can I ask you to
19    please speak up?  Thank you.
20         THE WITNESS:  I'll try.
21     A.  As typical, Weil as counsel for the
22 debtor was making the presentation.  Maybe in
23 other context people would have seen a draft
24 of what Lori Fife was going to say or the
25 like.  But certainly, since it was such a

TSG Reporting - Worldwide    877-702-9580

Page 128

1          -Lewkow-
2  moving target we had, as I told you in your
3  last question, really hadn't had any
4  consultation as to what exactly she and
5  Mr. Miller were going to tell the Court.
6          That having been said, as I sat
7  there, I am, as a member of the Bar, I am -- I
8  do have obligations and certainly if I had
9  thought that I heard something that was
10 inconsistent with my understanding of the deal
11 or omitted information that was obvious that
12 should have been -- would make the description
13 of what the judge heard -- and by "description
14 of what the judge heard," I include everything
15 that he heard Wednesday and everything that
16 was in the Asset Purchase Agreement that he
17 had heard before.
18         If I thought he was being misled, I
19 obviously would have, as was Mr. Granfield who
20 was my partner who I was sitting next to, we
21 would have either, you know, addressed the
22 Court directly or would have talked to Weil
23 Gotshal and asked them to make appropriate
24 other statements to the Court.
25

TSG Reporting - Worldwide    877-702-9580

Page 129

1          **-Lewkow-**
2
3
4
5
6
7
8
9
10
11          **REDACTED**
12
13
14
15
16
17
18
19
20
21
22
23          **Q.  At the time that you had the**
24 **conversation with Mr. Klein and Ms. Fife, was**
25 **it at that point still within the**

TSG Reporting - Worldwide    877-702-9580

Page 130

```
1          -Lewkow-
2   contemplation of the parties that the
3   Clarification Letter would be submitted to the
4   Court?
5       A.  Well, we -- I don't -- the -- it
6   had been the contemplation on Wednesday and
7   Thursday, and the goal had been to, as I
8   testified earlier, to give the Court, to
9   give -- to have that ready to give the judge.
10  It was also the intention at that stage to try
11  to close Friday evening.
12          And on that sort of scenario, if,
13  in fact, you were there, it would have been
14  probably possible, one would have hoped to
15  have had a Clarification Letter that one could
16  have given to the Court.
17          It was clear to me, but I don't
18  recall that given what had changed and given
19  that there was a draft that had been served up
20  while we were in court, that -- given that it
21  showed up when it did, I was dubious even
22  before I saw it and before I talked to my
23  colleagues as to whether it did or didn't
24  reflect those discussions given the timing of
25  it.
```

TSG Reporting - Worldwide    877-702-9580

Page 131

```
1          -Lewkow-
2       So to me, it was, it would have
3   been shocking if before the Court could have
4   approved it, whether we would have had a final
5   Clarification Letter that we could have
6   provided the Court.
7       Q.  By the end of the sale hearing, no
8   Clarification Letter had been finalized and
9   everybody let to continue their work over the
10  weekend.  Was there a point during the weekend
11  when there were conversations between Barclays
12  on the one hand and Lehman on the other
13  including their representatives, about
14  bringing the Clarification Letter to the
15  judge?
16      MR. MORAG:  Objection to the form.
17      You can answer.
18      A.  What I recall, and to me the
19  Clarification Letter was -- it was getting
20  close to being signed.  I have a vague
21  recollection, I do have a recollection of
22  sitting in the room -- I did a lot of sitting
23  in the rooms -- with a number of Weil Gotshal
24  lawyers, including Harvey Miller, including
25  one or more of his corporate colleagues in
```

TSG Reporting - Worldwide    877-702-9580

Page 132

```
1          -Lewkow-
2   which -- and this would have been late Sunday
3   night, early hours of Monday morning.  I don't
4   know.  But it was very late, very late in the
5   game.  It might have even been Monday.
6           In fact, it might have been Monday
7   morning, you know, 5:00, 6:00, 7:00, just
8   shortly before we closed as I think about it.
9   I don't know when it was.  But it was late.
10  It wasn't Saturday.  It wasn't Sunday morning.
11  It wasn't even Sunday afternoon.  And we were
12  very close to, you know, finish.  The big
13  issues that people were dealing with were DTC
14  and J.P. Morgan and those sorts of issues were
15  really the big issues that people were facing.
16          But very late in the process,
17  Harvey Miller saying to a group of -- you
18  know, again, I don't know how many other -- it
19  was a very fluid group of people who would be
20  sitting in what room at what time that
21  weekend.  But there were a number of other
22  Weil people and Harvey Miller and me.  I don't
23  remember whether any of my colleagues were in
24  the room with me.
25          And Harvey looked at the assembled
```

TSG Reporting - Worldwide    877-702-9580

Page 133

```
1          -Lewkow-
2   group and said something like, Does anyone
3   think that we have done anything inconsistent
4   with what we've told the Court and have to
5   bring this -- go back to court?  Or something
6   like that.  I don't remember the words.  I'm
7   totally paraphrasing.
8           My recollection is, I've read
9   Mr. Miller's deposition transcript, and he
10  does not mention who -- he mentions a
11  conversation which is, I think, more or less
12  consistent with my recollection, but he
13  doesn't mention that anyone from Cleary
14  Gottlieb, like me, was there.
15          But -- and he may have had more
16  than one, so I have no way of knowing if it's
17  the same conversation.
18          But I do recall that.  And he
19  looked around the room and nobody said
20  anything.  It was mostly people on his side.
21  So that's the one that -- you know, in
22  connection with the finalization of the
23  Clarification Letter, that conversation took
24  place.
25      Q.  Were any of your bankruptcy
```

TSG Reporting - Worldwide    877-702-9580

Page 134

```
1            -Lewkow-
2    partners present during this conversation?
3        A.  I do not believe so.
```

**REDACTED**

Page 135

```
1                -Lewkow-
```

**REDACTED**

Page 136

```
1            -Lewkow-
```

**REDACTED**

Page 137

```
1            -Lewkow-
```

**REDACTED**

Page 226

1            -Lewkow-

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 227

1            **-Lewkow-**

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 228

1            -Lewkow-
2
3
4
5
6
7
8        **REDACTED**
9
10
11
12
13
14
15
16    _____
17        VICTOR I. LEWKOW
18
19
20
21    Subscribed and sworn to before me,
22    this ____ day _____ of 2010.
23
24    _____
25        Notary Public
    TSG Reporting - Worldwide    877-702-9580

Page 229

1    ------------------I N D E X------------------
2    WITNESS        EXAMINATION BY        PAGE
3    V. LEWKOW        MR. GAFFEY            5
4            MR. MAGUIRE        160
5            MR. HUME        226
6
7    DIRECTIONS: PAGE  79, 134, 185
8    MOTIONS:   [None]
9    REQUEST:   [None]
10
11    ----------------EXHIBITS-------------------
12    EXHIBIT                FOR I.D.
13    Exhibit 613A            6
14    Declaration of Victor Lewkow
15
16    Exhibit 614A            135
17    Letter from S&C, CGSH
18    00020701-20714
19
20    Exhibit, 615A            195
21    2PP 9/18/08 e-mail from J.
22    Potenciano to distribution re:
23    Preliminary 15c3-3 reserve lock-up
24    as of 9/17/08
25
    TSG Reporting - Worldwide    877-702-9580

Page 230

```
1    ----------------EXHIBITS------------------
2         [previously marked]
3    EXHIBIT                    FOR I.D.
4    Exhibit 1                  29
5    Exhibit 19                 31
6    Exhibit 518                45
7    Exhibit 25                 47
8    Exhibit 24                 58
9    Exhibit 27                 69
10   Exhibit 579B               74
11   exhibit 581B               92
12   Exhibit 28                 93
13   Exhibit 29                 93
14   Exhibit 30                 93
15   Exhibit 31                 93
16   Exhibit 32                 93
17   Exhibit 33                 93
18   Exhibit 34                 93
19   Exhibit 35                 93
20   Exhibit 36                 93
21   Exhibit 37                 93
22   Exhibit 34                 95
23   Exhibit 451                208
24   Exhibit 49                 210
25              - - -
```

TSG Reporting - Worldwide    877-702-9580

Page 231

```
1            C E R T I F I C A T E
2
3    STATE OF NEW YORK      )
4                          ) ss.:
5    COUNTY OF KINGS        )
6         I, MAYLEEN CINTRON, a Registered
7    Merit Reporter, Certified Realtime
8    Reporter and Notary Public within and
9    for the State of New York, do hereby
10   certify:
11        That VICTOR I. LEWKOW, the witness
12   whose deposition is hereinbefore set
13   forth, was duly sworn by me and that
14   such deposition is a true record of the
15   testimony given by such witness.
16        I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I
19   am in no way interested in the outcome
20   of this matter.
21        IN WITNESS WHEREOF, I have hereunto set
22   my hand this 10th day of February, 2010.
23
24        --------------------------
25        MAYLEEN CINTRON, RMR, CRR
```

TSG Reporting - Worldwide    877-702-9580

Page 232

```
1       ERRATA SHEET FOR THE TRANSCRIPT OF:
2    Case Name: Re: Lehman Brothers Holdings
     Dep. Date: February 10, 2010
3    Deponent: Cleary Gottlieb | Victor I. Lewkow
4    Pg. Ln. Now Reads    Should Read   Reason

5    ___ ___ _____ _____ ____
6    ___ ___ _____ _____ ____
7    ___ ___ _____ _____ ____
8    ___ ___ _____ _____ ____
9    ___ ___ _____ _____ ____
10   ___ ___ _____ _____ ____
11   ___ ___ _____ _____ ____
12   ___ ___ _____ _____ ____
13   ___ ___ _____ _____ ____
14   ___ ___ _____ _____ ____
15   ___ ___ _____ _____ ____
16   ___ ___ _____ _____ ____
17   ___ ___ _____ _____ ____
18   ___ ___ _____ _____ ____
19
20        _____
21        VICTOR I. LEWKOW
22
     SUBSCRIBED AND SWORN BEFORE ME,
23   This___ day of_____, 2010.
24   _____
         Notary Public
25   My Commission Expires:_____
```

TSG Reporting - Worldwide    877-702-9580

# A. 157

Page 1

1

2           UNITED STATES BANKRUPTCY COURT

3           SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5      In Re:

6                               Chapter 11

7      LEHMAN BROTHERS          Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al.,     (Jointly Administered)

9

               Debtors.

10

       ----------------------x

11

12

13

14           DEPOSITION OF MARTY MALLOY

15              New York, New York

16              March 1, 2010

17

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 28684

Page 2

1
2          March 1, 2010
3          9:43 A.M.
4
5          Deposition of MARTY MALLOY,
6     held at the law offices of Jones Day,
7     LLP, 222 East 41st Street, LLP, New
8     York, New York, before Kathy S. Klepfer,
9     a Registered Professional Reporter,
10    Registered Merit Reporter, Certified
11    Realtime Reporter, Certified Livenote
12    Reporter, and Notary Public of the State
13    of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2              A P P E A R A N C E S :
3
4     JONES DAY, LLP
5     Attorneys for Lehman Brothers, Inc.
6        222 East 41st Street
7        New York, New York  10017-6702
8     BY:  ROBERT W. GAFFEY, ESQ.
9
10    BOIES, SCHILLER & FLEXNER, LLP
11    Attorneys for Barclays Capital
12        333 Main Street
13        Armonk, New York  10504
14    BY:  CHRISTOPHER GREEN, ESQ.
15
16    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
17    Attorneys for the Creditors Committee
18        51 Madison Avenue, 22nd Floor
19        New York, New York  10010
20    BY:  JAMES C. TECCE, ESQ.
21
22
23
24
25

Page 4

1
2
3          A P P E A R A N C E S :  (Cont'd.)
4
5     HUGHES, HUBBARD & REED, LLP
6     Attorneys for the SIPA Trustee
7        One Battery Park Plaza
8        New York, New York  10004-1482
9     BY:  FARA TABATABAI, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1                    M. Malloy

**REDACTED**

Page 18

1          M. Malloy
2
3
4
5
6
7
8
9
10
11
12          REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 19

1          M. Malloy
2     Q.    You say in paragraph 3, "Rather, I was
3  simply reporting to Mr. LaRocca the nominal
4  value BONY had assigned to the collateral it had
5  received in connection with the September 18,
6  2008 repo transaction."
7          Do you see that sentence?
8     A.  I do.
9     Q.   I know everybody was busy that week,
10  but was that the purpose of your task in
11  preparing 144A, to give that information to Mr.
12  LaRocca?
13          MR. GREEN:  Object to the form.
14     A.   Yes, it was.  The purpose of this was
15  to see how much additional collateral we got in
16  that Friday morning because of the shortfall the
17  Thursday night.  That was the purpose of the
18  e-mail.
19     Q.   And in the next sentence of paragraph
20  3, you say you were "referring to a BONY
21  document" that you had received "shortly
22  before."  Do you see that?
23     A.   Yes.
24     Q.   What was the BONY document you were
25  referring to in your declaration?

Page 20

1          M. Malloy
2     A.   We had received BONY documents during
3  that previous day in order to look at the
4  valuations, and then I called the collateral
5  operations managers those Fridays to get the
6  latest information.
7     Q.   So when you prepared 144A, you
8  extracted figures from the BONY document, as you
9  say in your declaration, but also you extracted
10  relevant figures from your verbal communications
11  with others?
12          MR. GREEN:  Object.
13     Q.   Correct?
14     A.   Correct.
15          MR. GREEN:  Object to the form.
16     Q.   And the verbal communication that you
17  had with others, did they give you information
18  that was different from that available to you in
19  the BONY document you referring to in your
20  declaration?
21          MR. GREEN:  Object to the form.
22          Do you remember?
23          THE WITNESS:  Well, yes, because the
24  collateral had changed.  We got additional
25  collateral in on that Friday.

Page 21

1          M. Malloy
2     Q.   So in paragraph 3 of your declaration
3  where you say, "Referring to a BONY document I
4  had received shortly before, I extracted the
5  relevant figures and performed some mathematical
6  calculations adding up the numbers provided by
7  BONY and subtracting the $45 million that
8  Barclays had advanced," in addition to what you
9  described there, the calculations you did were
10  also dependent on other information; is that
11  right?
12          MR. GREEN:  Object to the form.
13     A.   Specifically, I started with the
14  valuations from the Thursday night.
15     Q.   Yes.
16     A.   And then updated it with the Friday's
17  figures, the BONY statements from the Thursday
18  night which we had received, which was a day
19  old, and then the Friday valuations.
20     Q.   And the Friday valuations you
21  understood also to be derived from BONY
22  valuations, correct?
23     A.   Yes.
24     Q.   They were not the result of any
25  internal valuation done by Barclays personnel?

Page 22

1              M. Malloy
2    A.   No.
3    Q.   So the calculations that you prepared
4 in Exhibit 144A derive entirely from BONY's
5 marks, correct?
6    A.   That is correct.
7    Q.   And you took the information you had
8 about the BONY marks and you put together a
9 calculation of what you describe in your e-mail
10 as excess collateral; is that right?
11       MR. GREEN:  Object to the form.
12    A.   In the e-mail, yes.
13    Q.   And the excess collateral, the number
14 on paragraph 144A is 7.19; that's billions,
15 correct?
16    A.   That number is in billions.
17    Q.   And so the calculations that you
18 performed or the calculations you put together
19 based on the BONY marks indicated there was
20 excess collateral of 7.19 billion in the repo,
21 correct?
22       MR. GREEN:  Object to the form.
23    A.   Based on the BONY marks, but the other
24 issue that we had is none of this collateral was
25 reconciled, so this was the best estimate that

Page 23

1              M. Malloy
2 we had at that point in time.
3    Q.   I would be grateful if I could just
4 have an answer to the question I actually asked,
5 which is the calculations that you put in
6 Exhibit 144A were based solely on BONY marks,
7 correct?
8    A.   Correct.
9    Q.   And the calculations you did in 144A
10 based solely on BONY markets indicated excess
11 collateral of 7.19 billion, correct?
12       MR. GREEN:  Object to the form.
13    A.   Yes.

**REDACTED**

Page 24

1              M. Malloy
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**REDACTED**

**REDACTED**

1          M. Malloy

2
3
4
5
6
7
8
9
10
11          **REDACTED**
12
13
14.
15
16
17
18
19
20
21
22
23
24.
25

1          M. Malloy

**REDACTED**

1          M. Malloy

2
3
4
5
6          **REDACTED**
7
8
9
10
11     Q.   Are you comfortable that your e-mail
12  accurately depicts the values that were drawn
13  from the BONY information that you had?
14          MR. GREEN:  Object to the form.
15     Q.   You know what, that question is just
16  way too complicated.
17          Were you comfortable that your e-mail
18  was accurate when you sent it?
19          MR. GREEN:  Object to the form.
20     A.   As accurate as this e-mail could be at
21  12 o'clock on that Friday with collateral
22  moving, yes.
23
24
25

**REDACTED**

Page 50

```
 1              M. Malloy
 2
 3
 4
 5
 6
 7
 8              REDACTED
 9
10
11
12
13
14
15
16
17
18
            _____
                MARTY MALLOY
19
20     Subscribed and sworn to
       before me this    day
21     of      2010.
22
            _____
23
24
25
```

Page 51

```
 1              M. Malloy
 2              CERTIFICATE
 3    STATE OF NEW YORK )
                       : ss
 4    COUNTY OF NEW YORK)
 5        I, Kathy S. Klepfer, a Registered
 6    Merit Reporter and Notary Public within and
 7    for the State of New York, do hereby
 8    certify:
 9        That MARTY MALLOY, the witness whose
10    deposition is herein before set forth, was
11    duly sworn by me and that such deposition is
12    a true record of the testimony given by such
13    witness.
14        I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18        I further certify that neither the
19    deponent nor a party requested a review of
20    the transcript pursuant to Federal Rule of
21    Civil Procedure 30(e) before the deposition
22    was completed.
23        In witness whereof, I have hereunto
24    set my hand this 1st day of March, 2010.
       -------------------------------
25        KATHY S. KLEPFER, RPR, RMR, CRR, CLR
```

Page 52

```
 1              M. Malloy
 2              INDEX
 3    TESTIMONY OF M. MALLOY:              PAGE
 4    Examination by Mr. Gaffey ...............    5
 5
 6    EXHIBITS:                     PAGE
 7    Exhibit 658C, Declaration of Marty Malloy     5
 8
 9    REQUESTS FOR PRODUCTION:
10    Page 16, Line 11
11    Page 24, Line 18
12
13    INFORMATION TO BE PROVIDED:
14    Page 13, Line 2
15
16
17
18
19
20
21
22
23
24
25
```

Page 53

```
 1              M. Malloy
 2    NAME OF CASE:  In re:  Lehman Brothers
 3    DATE OF DEPOSITION:  March 1, 2010
 4    NAME OF WITNESS:  Marty Malloy
 5    Reason Codes:
 6       1. To clarify the record.
         2. To conform to the facts.
 7       3. To correct transcription errors.
 8    Page _____ Line _____ Reason _____
      From _____ to _____
 9
      Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
      From _____ to _____
12
      Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
      From _____ to _____
15
      Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
      From _____ to _____
18
      Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
      From _____ to _____
21
      Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
      From _____ to _____
24
25        _____
```

# A. 158

Page 1

1          IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

    In re:                    )
5                             ) Chapter 11
    LEHMAN BROTHERS           ) Case No. 08-13555(JMP)
6   HOLDINGS, INC., et al, ) (Jointly Administered)
                              )
7              Debtors.   )
    ----------------------)

8

9

10

11

12

13       DEPOSITION OF PROF. PAUL PFLEIDERER

14            New York, New York

15         Tuesday, February 23, 2010

16

17

18

19

20

21

22

23   Reported by:

24   MAYLEEN CINTRON, RMR, CRR

25   JOB NO. 28399

Page 2

```
 1
 2
 3                  February 20, 2010
 4                  9:13 a.m.
 5
 6
 7        DEPOSITION OF PROF. PAUL
 8    PFLEIDERER, an expert witness, held at the
 9    offices of Jones Day LLP, 222 East 41st
10    Street, New York, New York, pursuant to
11    Notice, before MayLeen Cintron, a Registered
12    Merit Reporter, Certified Realtime Reporter,
13    and Notary Public of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```
TSG Reporting - Worldwide    877-702-9580

Page 3

```
 1    A P P E A R A N C E S:
 2
 3    JONES DAY LLP
 4    Attorneys for Debtors - Lehman Brothers, Inc.
 5        222 East 41st Street
 6        New York, New York 10017-6702
 7    BY: JAYANT W. TAMBE, ESQ.
 8        KELLY CARRERO, ESQ.
 9        XOCHITL STROHBEHN, ESQ.
10        ROBERT W. GAFFEY, ESQ. [as noted]
11
12
13    BOIES, SCHILLER & FLEXNER LLP
14    Attorneys for Barclays
15        5301 Wisconsin Ave., N.W.
16        Washington D.C. 20015
17    BY: JONATHAN M. SHAW, ESQ.
18
19
20    QUINN, EMANUEL, URQUHART,
21    OLIVER & HEDGES LLP
22    Attorneys for the Creditors Committee
23        51 Madison Avenue - 22nd Floor
24        New York, New York 10010
25    BY: ROBERT K. DAKIS, ESQ.
```
TSG Reporting - Worldwide    877-702-9580

Page 4

```
 1    A P P E A R A N C E S: (Cont'd)
 2
 3    HUGHES, HUBBARD & REED LLP
 4    Attorneys for the SIPA Trustee
 5        One Battery Park Plaza
 6        New York, New York  10004-1482
 7    BY: WILLIAM R. MAGUIRE, ESQ.
 8        FARA TABATABAI, ESQ. [as noted]
 9
10
11    ALSO PRESENT:
12    DR. MARC VELLRATH, Finance Scholars Group
13    RAJESH ANKALKOT, Alvarez & Marsal, Inc.
14
15            - - -
16
17
18
19
20
21
22
23
24
25
```
TSG Reporting - Worldwide    877-702-9580

Page 5

```
 1            - P. Pfleiderer-
```

REDACTED

TSG Reporting - Worldwide    877-702-9580

Page 162

1          - P. Pfleiderer-

**REDACTED**

Page 163

1          - P. Pfleiderer-

**REDACTED**

Page 164

1          **- P. Pfleiderer-**
2
3
4          **REDACTED**
5
6
7
8          **Q.  And once you combine the super set**
9     **of those, now there is something a little more**
10    **than 23 percent of the total fair value of the**
11    **repo collateral using Barclays' valuation for**
12    **which you don't have Bloomberg or Capital IQ**
13    **prices; is that right?**
14         A.  That's correct.
15         **Q.  So for more than three-quarters,**
16    **you do?**
17         A.  For 72 percent.
18         **Q.  72 percent?  I'm sorry about my**
19    **math.  We're trying to add it to 100 percent,**
20    **right?**
21         A.  I'm sorry.  I'm sorry.  I was
22    looking at the wrong number.  77 percent.
23         **Q.  So more than three-quarters?**
24         A.  Yes.    **REDACTED**
25

Page 165

1          **- P. Pfleiderer-**

**REDACTED**

Page 322

1          - P. Pfleiderer-

**REDACTED**

Page 323

1          - P. Pfleiderer-
2     **Q.   Are there any particular valuations**
3     **that Barclays has done that you would say you**
4     **disagree with or have you not made any such**
5     **determination?**
6          MR. SHAW:  Asked and answered.
7          A.   I haven't -- I haven't gone and
8     said here's a CUSIP that I would disagree with
9     because that wasn't the process.  I looked at
10    aggregates, I looked at marks that were being
11    placed by BoNY and the adjustments that were
12    made and found that those were reasonable
13    estimates of what could be achieved in an
14    orderly exit.  And that's my conclusion.

**REDACTED**

Page 324

1          - P. Pfleiderer-

**REDACTED**

Page 325

1          - P. Pfleiderer-

**REDACTED**

Page 350

1          - P. Pfleiderer-

**REDACTED**

TSG Reporting - Worldwide     877-702-9580

---

Page 351

1          **- P. Pfleiderer-**

7          .          **REDACTED**

14          (Time noted:  7:34 p.m.)

17          _____
18          PROF. PAUL PFLEIDERER
19
20
21     Subscribed and sworn to before me,
22     this _____ day _____ of 2010.
23
24     _____
25          Notary Public

TSG Reporting - Worldwide     877-702-9580

---

Page 352

1     ------------------I N D E X------------------
2     WITNESS          EXAMINATION BY          PAGE
3     PROF. PFLEIDERER  MR. TAMBE          5
4          MS. TABATABAI          324
5          MR. DAKIS          338
6
7     ----------------EXHIBITS--------------------
8     EXHIBIT                    FOR I.D.
9     Exhibit 633-A          6
10    Expert report of Professor Paul
11    Pfleiderer - Volume I
12
13    Exhibit 634-A          7
14    Expert report of Professor Paul
15    Pfleiderer - Vol II
16
17    Exhibit 635-A          7
18    2/22/10 letter to Jones Day from
19    Boies Schiller with attachment
20
21    Exhibit 636-A          7
22    2/22/10 e-mail to K. Carrero from
23    Davenport with attachments
24
25

TSG Reporting - Worldwide     877-702-9580

---

Page 353

1     ----------------EXHIBITS--------------------
2     EXHIBIT                    FOR I.D.
3     Exhibit 637-A          7
4     2/10/10 e-mail to K. Carrero
5
6     Exhibit 638-A          60
7     Appendix Two, list of documents
8     and other materials reviewed and
9     considered
10
11    Exhibit 639-A          65
12    BCI Exhibit 346, declaration of
13    Paul Pfleiderer
14
15    Exhibit 640-A          73
16    2/6/2010 letter to Jones Day from
17    Boise Schiller
18
19    Exhibit 641-A          200
20    E-mail re:  Acquisition balance
21    sheet, BCI-EX-(s)-00213990 with
22    attachments
23
24
25

TSG Reporting - Worldwide     877-702-9580

Page 354

```
 1   ----------------EXHIBITS-------------------
 2   EXHIBIT                    FOR I.D.
 3   Exhibit 642-A             245
 4   Agency mortgages, unsupported or
 5   excluded file type with attached
 6   spreadsheets, BCI-EX-00297317
 7
 8   Exhibit 643-A             247
 9   2/2/09 memo from PwC to Richard
10   Landreman, PwC-BarCapWP_00023327
11
12   Exhibit 644-A             287
13   E-mail from Michael McGarvey Re:
14   Here's the summary from the 12th,
15   BCI-EX-(S)-00213948-51 with
16   attachments
17
18   Exhibit 645-A             304
19   8/18/08 e-mail Re: Balance sheet
20   iterations,
21   BCI-EX-(S)-00213926-3936
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 355

```
 1   ----------------EXHIBITS-------------------
 2   EXHIBIT                    FOR I.D.
 3   Exhibit 646-A             312
 4   PwC Review of Barclays capital
 5   price testing methodology,
 6   PwC-BarCapWP_00022935-948 with
 7   attachments
 8
 9
10   ----------------EXHIBITS-------------------
11         [previously marked]
12   EXHIBIT                    FOR I.D.
13   Exhibit 533-A             235
14   Exhibit 19                286
15   Exhibit 200               294
16
17
18           - - -
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 356

```
 1          C E R T I F I C A T E
 2   STATE OF NEW YORK      )
 3                         ) ss.:
 4   COUNTY OF KINGS        )
 5        I, MAYLEEN CINTRON, a Registered
 6   Merit Reporter, Certified Realtime
 7   Reporter and Notary Public within and
 8   for the State of New York, do hereby
 9   certify:
10        That PROF. PAUL PFLEIDERER, the
11   witness whose deposition is
12   hereinbefore set forth, was duly sworn
13   by me and that such deposition is a
14   true record of the testimony given by
15   such witness.
16        I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I
19   am in no way interested in the outcome
20   of this matter.
21        IN WITNESS WHEREOF, I have hereunto set
22   my hand this 23rd day of February 2010.
23
24        --------------------------
25        MAYLEEN CINTRON, RMR, CRR
```

TSG Reporting - Worldwide    877-702-9580

Page 357

```
 1      ERRATA SHEET FOR THE TRANSCRIPT OF:
 2   Case Name: Re: Lehman Brothers Holdings
     Dep. Date: February 23, 2010
 3   Deponent:  Prof. Paul Pfleiderer
 4   Pg. Ln. Now Reads    Should Read   Reason
     ___ ___ _____ _____ ____
 5   ___ ___ _____ _____ ____
 6   ___ ___ _____ _____ ____
 7   ___ ___ _____ _____ ____
 8   ___ ___ _____ _____ ____
 9   ___ ___ _____ _____ ____
10   ___ ___ _____ _____ ____
11   ___ ___ _____ _____ ____
12   ___ ___ _____ _____ ____
13   ___ ___ _____ _____ ____
14   ___ ___ _____ _____ ____
15   ___ ___ _____ _____ ____
16   ___ ___ _____ _____ ____
17   ___ ___ _____ _____ ____
18   ___ ___ _____ _____ ____
19
20   _____
21     PROF. PAUL PFLEIDERER
22
     SUBSCRIBED AND SWORN BEFORE ME,
23   This___ day of_____, 2010.
24   _____
       Notary Public
25   My Commission Expires:_____
```

TSG Reporting - Worldwide    877-702-9580

# A. 159

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3              SOUTHERN DISTRICT OF NEW YORK

4      ------------------------x

5      In Re:

6                              Chapter 11

7      LEHMAN BROTHERS          Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al,   (Jointly Administered)

9              Debtors.

10     ------------------------x

11

12           DEPOSITION OF EDWARD J. ROSEN

13              New York, New York

14              February 19, 2010

15

16     Reported by:

17     MARY F. BOWMAN, RPR, CRR

18     JOB NO. 28461

19

20

21

22

23

24

25

Page 2

```
1
2
3
4              February 19, 2010
5              9:35 a.m.
6
7
8      Deposition of EDWARD J. ROSEN, held at
9   the offices of Cleary, Gottlieb, Steen &
10  Hamilton, LLP, One Liberty Plaza, New York, New
11  York, before Mary F. Bowman, a Registered
12  Professional Reporter, Certified Realtime
13  Reporter, and Notary Public of the State of New
14  York and New Jersey.
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
1
2              APPEARANCES:
3
4   JONES DAY, LLP
5   Attorneys for Lehman Brothers, Inc.
6      222 East 41st Street
7      New York, New York  10017-6702
8   BY:  ROBERT W. GAFFEY, ESQ.
9
10
11  BOIES, SCHILLER & FLEXNER, LLP
12  Attorneys for Barclays and The Witness
13     5301 Wisconsin Avenue, NW - Suite 800
14     Washington DC  20015
15  BY:  HAMISH HUME, ESQ.
16
17
18  QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
19  Attorneys for the Creditors Committee
20     51 Madison Avenue - 22nd Floor
21     New York, New York  10010
22  BY:  ROBERT DAKIS, ESQ.
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
1
2              APPEARANCES:
3
4   HUGHES, HUBBARD & REED, LLP
5   Attorneys for the SIPA Trustee
6      One Battery Park Plaza
7      New York, New York  10004-1482
8   BY:  WILLIAM R. MAGUIRE, ESQ.
9      AMINA HASSAN, ESQ.
10
11  CLEARY, GOTTLIEB, STERN & HAMILTON, LLP
12  Attorneys for the witness
13     One Liberty Plaza
14     New York, New York  10006
15  BY:  BOAZ S. MORAG, ESQ.
16     ROBERT P. DAVIS, ESQ.
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
1
2
3
4
5      IT IS HEREBY STIPULATED AND AGREED, by
6   and between the attorneys for the respective
7   parties herein, that filing and sealing be
8   and the same are hereby waived.
9      IT IS FURTHER STIPULATED AND AGREED
10  that all objections, except as to the form
11  of the question, shall be reserved to the
12  time of the trial.
13
14
15      IT IS FURTHER STIPULATED AND AGREED
16  that the within deposition may be sworn to
17  and signed before any officer authorized to
18  administer an oath, with the same force and
19  effect as if signed and sworn to before the
20  Court.
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 210

1                **ROSEN**

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

---

Page 211

1                ROSEN
2
3
4            **REDACTED**
5
6
7        Q.    OK.  I would like to show you -- let's
8    mark this as our next exhibit.
9            (Exhibit 631, document Bates stamped
10        BCI-EX(S) 201894 through 95 marked for
11        identification, as of this date.)
12        Q.    The document I have put before you
13    Mr. Rosen marked as Exhibit 631 bears Bates
14    number BCI-EX(S) 00201894 through 895.
15            Have you seen the document before?
16        A.    Again, not parsing every word, but it
17    looks like an e-mail that I sent.
18        Q.    And you'll see it is an e-mail from
19    you to Josephine Wang?
20        A.    Yes.
21        Q.    I can't --
22        A.    This is what I was referring to --
23        Q.    It is?
24        A.    -- earlier in terms of the sort of the
25    clarification of the language included in the

TSG Reporting - Worldwide    877-702-9580

---

Page 212

1                ROSEN
2    order, and then we asked SIPC and, I guess it
3    was Mike Macchiaroli now that I see this, to
4    confirm that they wouldn't seek such a stay.
5        Q.    I can't tell from the e-mail address
6    with whom or what is Josephine Wang affiliated.
7        A.    You can't tell that.  I think she is
8    in the legal department at SIPC.
9        Q.    And you say in this e-mail to
10    Josephine Wang and Steven Sharbeck, Mike
11    Macchiaroli, "Below is the language we believe
12    to be necessary to ensure that the order is
13    sufficiently broad to cover the relevant
14    Barclays Capital transactions."
15            Do you see that?
16        A.    Yes.
17        Q.    And below that is some proposed
18    language and below that is a note that says,
19    "Mike, I am trying to place us in the document,
20    are you with me?"
21            Where did the particular language set
22    off in italics come from, beginning, "Exercise
23    of any rights," and ending "September 24, 2008"?
24        A.    Probably from my colleague, Sandra
25    Rocks.

TSG Reporting - Worldwide    877-702-9580

---

Page 213

1                ROSEN
2        Q.    And was this particular language shown
3    to or discussed with, to your knowledge, anybody
4    on the Lehman side of the table, including its
5    business people or representatives?
6        A.    I think that certainly they would have
7    seen the order in the proposed sale -- the sale
8    order.
9        Q.    Well, you are a bit ahead of me.  I
10    guess I should have asked that.  The order that
11    you refer to, is that the sale order?
12        A.    Yes.
13        Q.    Do you know if this language wound up
14    in the sale order?
15        A.    I would have to check.  I believe so,
16    but I would have to check to confirm.
17        Q.    And in the language that you proposed
18    in this e-mail, there is a reference to section
19    559 of the Bankruptcy Code.  Do you see that?
20        A.    Yes.
21        Q.    Were you familiar with the terms of
22    Section 559 of the Bankruptcy Code when you
23    proposed this language to the Section and SIPC?
24        A.    No, I was the transmitter.
25        Q.    Do you know if anyone at -- on the

TSG Reporting - Worldwide    877-702-9580

Page 214

ROSEN

1    **ROSEN**
2    **Barclays side of the table, including its**
3    **representatives, spoke to anyone on the Lehman**
4    **side of the table, including its representatives**
5    **about Section 559 of the Bankruptcy Code?**
6        A.   I don't have a specific recollection
7    of that.
8        WITNESS' ATTORNEY:  Mr. Gaffey, let me
9        state for the record, for what it's worth,
10       the language, the italicized language says,
11       "The order that the stays set forth above
12       shall not apply to," and I just am not sure
13       whether or not that really is referring to
14       the sale order as opposed to some other
15       order.
16       MR. GAFFEY:  Neither am I.  That's why
17       I asked the question.
18       **Q.   Does what your counsel has to say**
19    **refresh your recollection?**
20       MR. HUME:  I think it is the SIPC
21       order.
22       A.   Hang on a second.  You know what, I
23    think you're right.  This predated the sale
24    order.  This is Wednesday -- this is the 17th of
25    September, so there was a stay put into place

TSG Reporting - Worldwide    877-702-9580

Page 215

ROSEN

1    ROSEN
2    and I guess this was to seek clarification of
3    that.
4        **Q.    This refers to the SIPC order, the**
5    **SIPA order?**
6        THE WITNESS:  Is that the only order?
7        MR. GAFFEY:  Let's go off the record
8        for a minute.
9        (Recess)
10       MR. GAFFEY:  Back on the record.
11       **Q.   Mr. Rosen, do you know one way or the**
12    **other what order is being referred to?  I mean**
13    **from memory, do you know one way or the other**
14    **what order is being referred to in the document**
15    **we have marked as 631, your e-mail?**
16       A.   I believe it was in anticipation of
17    the sale order, but I'm not 100 percent
18    confident.
19       **Q.    And how much time -- I know it was a**
20    **busy week -- but how much time did you devote to**
21    **conversations with the SEC about this assurance**
22    **language that's set out in Exhibit 631, this**
23    **issue?**
24       A.   I really don't have a clear
25    recollection.  We sent it down to them and I had

TSG Reporting - Worldwide    877-702-9580

Page 216

ROSEN

1                    ROSEN
2    a conversation and asked them to focus on it and
3    then come back.  I think there was -- they
4    understood what the import of it was.  And then
5    they came back and confirmed that they
6    wouldn't -- you know, that they agreed they
7    wouldn't exercise that right to seek a stay.
8    But it didn't take a lot of to'ing and fro'ing
9    on the telephone to get there.  Their people are
10   I think quite familiar with their rights.

REDACTED

TSG Reporting - Worldwide    877-702-9580

Page 217

1                    **ROSEN**

REDACTED

TSG Reporting - Worldwide    877-702-9580

Page 218

1         **ROSEN**

t

**REDACTED**

Page 219

1         ROSEN

**REDACTED**

Page 220

1         **ROSEN**
2
3
4
5
6
7
8        **REDACTED**
9
10
11
12
13
14
15
16
17    **Q.   You referred a few times today in**
18 **various contexts to -- you can put the document**
19 **aside.  To various circumstances where -- and**
20 **this is, again, not a quote, but you talked**
21 **about jeopardy to the deal closing by Monday the**
22 **22nd, that's a prospect that you have talked**
23 **about a few times today.  Was there a drop-dead**
24 **date for closing?**
25    A.   No, there was just a perception that

Page 221

1        ROSEN
2 if it didn't close by Monday, there could be
3 developments in the marketplace which might have
4 complicated or prevented the deal from getting
5 done.  I don't think it was an ultimatum.
6    I think people wanted to get the deal
7 done, but I think there was a concern that
8 letting another business cycle go by was just --
9 because we didn't know what was going to happen.
10 I think this was the weekend where we had
11 learned very late Sunday night that, you know,
12 Morgan Stanley and Goldman Sachs had quite
13 expeditiously become banks and people were
14 worried and the hurry to do that was no doubt in
15 part due to concerns.
16    So I wouldn't say that it was a drop
17 dead or an ultimatum or anything like that.  It
18 was that people realized it became more
19 complicated and there was more noise that could
20 interfere with the transaction the more time
21 that elapsed.  So we all, I think internally at
22 Cleary regarded it as, put it this way, if the
23 deal wasn't ready to close on Monday, we didn't
24 want to be the ones responsible for it not being
25 ready to close on Monday morning, so we took it

Page 222

ROSEN

Q.   **That issue aside, the deal could have closed on Tuesday?**

A.   Theoretically, it could have closed on Tuesday if things hadn't intervened.  It was more the risks that were associated with not closing expeditiously that were the concerns.  You had to remember, the markets were very volatile and there were assets whose valuation was the source of considerable uncertainty and concern.

**REDACTED**

_____
EDWARD J. ROSEN

Subscribed and sworn to
before me this EDWARD J. ROSEN  day
of February, 2010.

_____

TSG Reporting - Worldwide   877-702-9580

---

Page 223

ROSEN

INDEX:

WITNESS      EXAM BY:        PAGE:
E. Rosen       Mr. Maguire        6
               Mr. Gaffey     202

EXHIBITS

Exhibit No.                    Marked
Exhibit 622 declaration of Edward J. Rosen    8
Exhibit 623 document Bates stamped     120
    CGSH0002699 through 700
Exhibit 624 document Bates stamped DTCC     122
    00126 through 00198
Exhibit 625 document Bates stamped DTCC     152
    00359 through 361
Exhibit 626 document Bates stamped BCI-CG     175
    00024097 through 99
Exhibit 627 document Bates stamped CGSH     181
    0034491 through 92
Exhibit 628 document Bates stamped     183
    OCC36408 through 409
Exhibit 629 document Bates stamped OCC     186
    0036472 through 36473
Exhibit 630 document Bates stamped OCC     195
    0036482 through 483

TSG Reporting - Worldwide   877-702-9580

---

Page 224

ROSEN

EXHIBITS

Exhibit No.                    Marked
Exhibit 631 document Bates stamped     213
    BCI-EX(S) 201894 through 95
Exhibit 632 document Bates stamped CGSH     220
    163813 through 815

TSG Reporting - Worldwide   877-702-9580

---

Page 225

ROSEN

CERTIFICATE

STATE OF NEW YORK )
            )ss:
COUNTY OF NEW YORK)

I, MARY F. BOWMAN, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New York, do hereby certify:

That EDWARD J. ROSEN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 19th day of February, 2010.

_____

MARY F. BOWMAN, RPR, CRR

TSG Reporting - Worldwide   877-702-9580

Page 226

```
 1              ROSEN
 2           * * *ERRATA SHEET* * *
 3    NAME OF CASE:  In Re:  Lehman Brothers
 4    DATE OF DEPOSITION:  February 19, 2010
 5    NAME OF WITNESS:  EDWARD J. ROSEN
 6    Reason codes:
 7        1. To clarify the record.
          2. To conform to the facts.
 8        3. To correct transcription errors.
 9    Page _____ Line _____ Reason_____
      From _____ to_____
10
11    Page _____ Line _____ Reason_____
      From _____ to_____
12
13    Page _____ Line _____ Reason_____
      From _____ to_____
14
15    Page _____ Line _____ Reason_____
      From _____ to_____
16
17    Page _____ Line _____ Reason_____
      From _____ to_____
18
19    Page _____ Line _____ Reason_____
      From _____ to_____
20
21    Page _____ Line _____ Reason_____
      From _____ to_____
22
23
24        _____
          EDWARD J. ROSEN
25
```

TSG Reporting - Worldwide     877-702-9580

## ERRATA SHEET

NAME OF CASE:     In re: Lehman Brothers Holdings, Inc., Case No. 08-13555 (JMP)

DATE OF DEPOSITION:     February 19, 2010

NAME OF WITNESS:     Edward J. Rosen

1.     p. 11, line 15

Description – add "**and**" after "market"

Reason for Change – transcription error

2.     p. 16, line 24

Description – change "exchange" to "**exchanges**"

Reason for Change – transcription error or to clarify response

3.     p. 19, line 10

Description – add "**by**" after "and"

Reason for Change – transcription error

4.     p. 19, line 17

Description – delete "to"

Reason for Change – to clarify response

5.     p. 19, line 24

Description – change "brother teller" to "**broker dealer**"

Reason for Change – transcription error

6.     p. 32, line 7

Description – delete "the"

Reason for Change – transcription error

7.      p. 41, line 6

<u>Description</u> – add "**and**" before "there"

<u>Reason for Change</u> – transcription error or to clarify response

8.      p. 41, line 17

<u>Description</u> – add "**the**" before "customer"

<u>Reason for Change</u> – to clarify response

9.      p. 41, line 18

<u>Description</u> – change "them" to "**it**"

<u>Reason for Change</u> – to clarify response

10.      p. 53, lines 8–9

<u>Description</u> – add "**then**" after "I was there" and add "**reconvened**" after "it was"

<u>Reason for Change</u> – to clarify response

11.      p. 55, line 22

<u>Description</u> – add "**and**" after "amendment"

<u>Reason for Change</u> – to clarify response

12.      p. 58, line 19

<u>Description</u> – change "3-3" to "**15c3-3**"

<u>Reason for Change</u> – to clarify response

13.      p. 58, line 23

<u>Description</u> – change "it" to "**the amount**"

<u>Reason for Change</u> –to clarify response

14.    p. 59, line 2

Description – add "**was**" before "contemplated"

Reason for Change – to clarify response

15.    p. 60, line 11

Description – change "Those" to "**The**"

Reason for Change – transcription error or to clarify response

16.    p. 60, line 16

Description – add "**or**" after "alternatives"

Reason for Change – to clarify response

17.    p. 61, line 16

Description – change "were" to "**where**"

Reason for Change – transcription error or to clarify response

18.    p. 62, line 7

Description – add "**a participant**" after "was"

Reason for Change – transcription error or to clarify response

19.    p. 75, lines 6 and 7

Description – change "insure" to "**ensure**" (there are two instances)

Reason for Change – spelling mistakes

20.    p. 75, line 10

Description – change "at" to "**that**"

Reason for Change – transcription error

21.     p. 75, line 11

<u>Description</u> – add "**against**" after "protected"

<u>Reason for Change</u> – to clarify response

22.     p. 75, line 23

<u>Description</u> – add "**or**" after "of,'"

<u>Reason for Change</u> – to clarify response

23.     p. 79, line 6

<u>Description</u> – add "**not**" after "had"

<u>Reason for Change</u> – to correct response

24.     p. 82, line 8

<u>Description</u> – add "**only**" after "not"

<u>Reason for Change</u> – transcription error or to correct response

25.     p. 83, line 6

<u>Description</u> – change "cash" to "**non-cash**"

<u>Reason for Change</u> – transcription error or to correct response

26.     p. 87, line 17

<u>Description</u> – change "read" to "**make**"

<u>Reason for Change</u> – to clarify response

27.     p. 87, line 18

<u>Description</u> – add "**at**" after "know"

<u>Reason for Change</u> – to clarify response

28.     p. 93, line 24

<u>Description</u> – change "3-3" to "**15c3-3**"

<u>Reason for Change</u> – to clarify response

29.     p. 96, line 2

<u>Description</u> – delete "a"

<u>Reason for Change</u> – transcription error

30.     p. 96, line 3

<u>Description</u> – change "3-3" to "**15c3-3**"

<u>Reason for Change</u> – to clarify response

31.     p. 96, line 9

<u>Description</u> – change "him. I" to "**him, but I**"

<u>Reason for Change</u> – to clarify response

32.     p. 96, lines 20–21

<u>Description</u> – change "those effects" to "**that effect**"

<u>Reason for Change</u> – transcription error or to clarify response

33.     p. 97, line 23

<u>Description</u> – change "3-3" to "**15c3-3**"

<u>Reason for Change</u> – to clarify response

34.     p. 108, line 21

<u>Description</u> – change "3-3" to "**15c3-3**"

<u>Reason for Change</u> – to clarify response

5

35.     p. 113, line 15

<u>Description</u> – change "3-3" to "**15c3-3**"

<u>Reason for Change</u> – to clarify response

36.     p. 125, line 4

<u>Description</u> – add "**there**" after "recourse"

<u>Reason for Change</u> – to clarify response

37.     p. 125, line 23

<u>Description</u> – change "in" to "**sitting**"

<u>Reason for Change</u> – to clarify response

38.     p. 129, line 12

<u>Description</u> – change "a" to "**the**"

<u>Reason for Change</u> – to clarify response

39.     p. 131, line 25

<u>Description</u> – change "accountant" to "**accounts**"

<u>Reason for Change</u> – transcription error or to clarify response

40.     p. 134, line 10

<u>Description</u> – change "prefer to do" to "**prefer not to have to do**"

<u>Reason for Change</u> – to clarify response

41.     p. 135, line 14

<u>Description</u> – add "**facts**" after "presupposes"

<u>Reason for Change</u> – to clarify response

42.      p. 135, line 18

<u>Description</u> – delete "which"

<u>Reason for Change</u> – to clarify response

43.      p. 138, line 4

<u>Description</u> – add "**million**" after "250"

<u>Reason for Change</u> – to clarify response

44.      p. 138, line 13

<u>Description</u> – change "some" to "**the source**"

<u>Reason for Change</u> – transcription error or to correct response

45.      p. 138, line 16

<u>Description</u> – add "**that**" before "was"

<u>Reason for Change</u> – to clarify response

46.      p. 141, line 18

<u>Description</u> – delete "their principals"

<u>Reason for Change</u> – to clarify response

47.      p. 142, line 14

<u>Description</u> – add "**million**" after "250"

<u>Reason for Change</u> –to clarify response

48.      p. 142, line 15

<u>Description</u> – add "**that**" after "like"

<u>Reason for Change</u> – to clarify response

49.    p. 143, line 23

<u>Description</u> – change "was being" to "**had been**"

<u>Reason for Change</u> – to correct response

50.    p. 149, line 3

<u>Description</u> – change "Dan" to "**Don**"

<u>Reason for Change</u> – transcription error

51.    p. 150, line 25

<u>Description</u> – add "**and DTC**" after "Barclays"

<u>Reason for Change</u> – to clarify response

52.    p. 153, line 5

<u>Description</u> – change "in" to "**and**"

<u>Reason for Change</u> – transcription error or to clarify response

53.    p. 153, line 10

<u>Description</u> – change "them" to "**him**"

<u>Reason for Change</u> – transcription error or to clarify response

54.    p. 160, line 9

<u>Description</u> – change "would realize" to "**have organized**"

<u>Reason for Change</u> – transcription error

55.    p. 165, line 23

<u>Description</u> – change "draft" to "**drafts**"

<u>Reason for Change</u> – transcription error

56.   p. 166, line 9

<u>Description</u> – add "**its location**" after "describe"

<u>Reason for Change</u> –to clarify response

57.   p. 166, line 10

<u>Description</u> – change "was a room on a floor" to "**were rooms on two floors**"

<u>Reason for Change</u> – to correct response

58.   p. 176, line 23

<u>Description</u> – change "future" to "**futures**"

<u>Reason for Change</u> – transcription error

59.   p. 179, line 12

<u>Description</u> – add "**that**" after "for"

<u>Reason for Change</u> – transcription error or to clarify response

60.   p. 186, line 6

<u>Description</u> – add "**what**" after "about"

<u>Reason for Change</u> – transcription error or to clarify response

61.   p. 186, line 9

<u>Description</u> – add "**the OCC**" after "obligations"

<u>Reason for Change</u> – to clarify response

62.   p. 191, line 8

<u>Description</u> – change "executed the TAA and was carrying at" to "**Barclays executed the TAA
and was carrying the account at**"

<u>Reason for Change</u> – transcription error or to clarify response

63.     p. 191, line 19

<u>Description</u> – change "So it performed an obligation of" to "**So if Barclays performed an obligation in respect of**"

<u>Reason for Change</u> – to clarify response

64.     p. 193, line 15

<u>Description</u> – delete "will"

<u>Reason for Change</u> – to clarify response

65.     p. 194, line 18

<u>Description</u> – change "on, my recollection, is to" to "**on, it is my recollection, to**"

<u>Reason for Change</u> – to clarify response

66.     p. 195, line 3

<u>Description</u> – change "feeling" to "**dealing**"

<u>Reason for Change</u> – transcription error

67.     p. 195, line 24

<u>Description</u> – change "sort of the" to "**OCC**"

<u>Reason for Change</u> – transcription error

68.     p. 196 , line 8

<u>Description</u> – change "saying" to "**sanguine**"

<u>Reason for Change</u> – transcription error

69.     p. 197, line 8

<u>Description</u> – change "options" to "**listed options business**"

<u>Reason for Change</u> – to clarify response

70.    p. 201 , line 4

<u>Description</u> – change "than" to "**that were**"

<u>Reason for Change</u> – to clarify response

71.    p. 205, line 7

<u>Description</u> – change "34 SIPC" to "**34 Act or SIPA**"

<u>Reason for Change</u> – transcription error

72.    p. 206 , line 2

<u>Description</u> – add "**and**" after "insolvency"

<u>Reason for Change</u> – transcription error or to clarify response

73.    p. 211, line 25

<u>Description</u> – change "of the language included" to "**language to be included**"

<u>Reason for Change</u> – to clarify response

74.    p. 212, line 2

<u>Description</u> – change "SIPC" to "**the SEC**"

<u>Reason for Change</u> – transcription error

75.    p. 212, line 10

<u>Description</u> – change "Sharbeck" to "**Harbeck**"

<u>Reason for Change</u> – spelling error

## ACKNOWLEDGMENT OF DEPONENT

Pursuant to 28 U.S.C. § 1746, I, Edward J. Rosen, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of February 19, 2010; that, subject to the corrections noted on the attached errata sheet, the transcript is a true, complete and correct record of my testimony.

I certify under penalty of perjury that the foregoing is true and correct.

March 16, 2010

New York, New York

_____

Edward J. Rosen

12

# A. 160

Page 1

1

2         UNITED STATES BANKRUPTCY COURT

          SOUTHERN DISTRICT OF NEW YORK

3     ------------------------------x

      In Re:                    Chapter 11

4     LEHMAN BROTHERS            Case No. 08-13555 (JMP)

      HOLDINGS, INC., et al.,    (Jointly Administered)

5     ------------------------------)

6

7         * * * HIGHLY CONFIDENTIAL * * *

8       DEPOSITION OF ANTHONY SAUNDERS

9           New York, New York

10        Monday, February 8, 2010

11

12

13

14

15

16

17

18

19    Reported by:

      FRANCIS X. FREDERICK, CSR, RPR, RMR

20    JOB NO. 28244

21

22

23

24

25

Page 2

```
1
2
3
4              February 8, 2010
5              9:35 a.m.
6
7
8
9          HIGHLY CONFIDENTIAL deposition of
10    ANTHONY SAUNDERS, held at the offices of
11    Jones Day, 222 East 41st Street, New
12    York, New York, pursuant to Notice,
13    before Francis X. Frederick, a Certified
14    Shorthand Reporter, Registered Merit
15    Reporter and Notary Public of the States
16    of New York and New Jersey.
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
1
2      A P P E A R A N C E S:
3
4        JONES DAY, LLP
5        Attorneys for Lehman Brothers, Inc.
6          222 East 41st Street
7          New York, New York  10017-6702
8        BY:   DAVID L. CARDEN, ESQ.
9            BART GREEN, ESQ.
10
11       BOISE SCHILLER & FLEXNER, LLP
12       Attorneys for Barclays Capital
13         575 Lexington Avenue - 7th Floor
14         New York, New York  10022
15       BY:   JACK G. STERN, ESQ.
16
17       QUINN, EMANUEL, URQUHART, OLIVER &
18       HEDGES, LLP
19       Attorneys for the Creditors Committee
20         51 Madison Avenue - 22nd Floor
21         New York, New York 10010
22       BY:   ROBERT K. DAKIS, ESQ.
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
1
2      A P P E A R A N C E S:  (Cont'd.)
3
4        HUGHES, HUBBARD & REED, LLP
5        Attorneys for the SIPA Trustee
6          One Battery Park Plaza
7          New York, New York  10004-1482
8        BY:   CARL W. MILLS, ESQ.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
1            A. SAUNDERS - CONFIDENTIAL
```

REDACTED

TSG Reporting - Worldwide    877-702-9580

Page 10

1    A. SAUNDERS - CONFIDENTIAL

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

---

Page 11

1    A. SAUNDERS - CONFIDENTIAL

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

---

Page 12

1    A. SAUNDERS - CONFIDENTIAL

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

---

Page 13

1    A. SAUNDERS - CONFIDENTIAL
2
3
4
5
6    **REDACTED**
7,
8
9
10
11
12
13    **In your view did the market care**
14    **what the terms of the transaction were?**
15    A.   I think they really cared so much
16    about the support Barclays gave to Lehman and
17    to allow Lehman go down with a fire sale.
18    **Q.   And just to make certain I'm**
19    **clear, the specific terms of the transaction,**
20    **whether or not Barclays made a billion dollars**
21    **or spent an extra billion dollars on getting**
22    **it, the market was indifferent to those kinds**
23    **of -- to that kind of granular analysis,**
24    **right?**
25    A.   That's a very general question.

TSG Reporting - Worldwide    877-702-9580

Page 14

1         A. SAUNDERS - CONFIDENTIAL
2    Who do you mean in the market?
3        Q.   Well, you've talked to me about --
4    or pardon me.  You've talked in your report
5    about the impact on the markets.  So I'm
6    speaking about the market generally.
7        A.   Yeah.  I'm saying in the big
8    picture view I think people were highly
9    concerned about other banks going down.  And
10   they were concerned about resolving that
11   issue.  And I think they just were happy to
12   see Lehman being taken over by Barclays.
13       Q.   Yeah.  Just make sure I'm clear on
14   what you're saying.  It was the mere fact of
15   Barclays taking Lehman over, not the terms of
16   the transaction that was salutary to the
17   market as you stated in your report.
18       A.   Well, I think people didn't know
19   what the actual terms were.  Even Barclays,
20   itself, at the time because of the uncertainty
21   of the assets and the liabilities didn't know
22   the actual terms of the deal.  All it knew was
23   that it was acquiring the business.
24       Q.   Okay.  I take it you would agree
25   with me that on Monday, the 22nd of September,

TSG Reporting - Worldwide    877-702-9580

Page 15

1         A. SAUNDERS - CONFIDENTIAL
2    when the transaction closed, the market did
3    not know the terms of that transaction,
4    correct?
5        MR. STERN:  Objection to the form.
6        A.   I would say it's very close to
7    arguing that Barclays didn't know the terms
8    either.
9        Q.   I just want to be get a yes or no
10   to my question.  I'm not sure I understood
11   your answer.
12       A.   I'm just saying in general very
13   few people, if any, knew the value of that
14   deal.
15       Q.   And that was true on September
16   22nd of 2008, correct?
17       A.   That's my belief, yes.
18       Q.   And it was true on September 23rd
19   of 2008, correct?
20       A.   Yes.  That's correct.
21       Q.   And throughout the week of
22   September 22nd it remained true, did it not?
23       A.   That's true.
24       Q.   So -- I think you say --
25       MR. CARDEN:  Let's just mark your

TSG Reporting - Worldwide    877-702-9580

Page 16

1         A. SAUNDERS - CONFIDENTIAL
2    report.
3        (Deposition Exhibit 600, Expert
4    Report of Professor Anthony Saunders,
5    January 8, 2010, marked for
6    identification as of this date.)
7    BY MR. CARDEN:
8        Q.   Just to make certain we're clear
9    on our dates today, I think you're quite aware
10   that, as we've already said, September 22nd
11   was the date the transaction closed.  That was
12   a Monday.
13       A.   Um-hum.
14       Q.   The court hearing approving the
15   transaction was on Friday, September 19th and
16   into the early morning hours of September
17   20th, correct?
18       A.   That's my understanding.
19       Q.   And the Asset Purchase Agreement,
20   which is referenced in your report, is dated
21   September 16th, the Tuesday, right?
22       A.   Correct.
23       Q.   The salutary effect that the
24   transaction had on the market which you
25   reference in your report, was that salutary

TSG Reporting - Worldwide    877-702-9580

Page 17

1         A. SAUNDERS - CONFIDENTIAL
2    effect achieved by the approval of the
3    transaction on Friday, September 19th?
4        A.   You said the 20th or --
5        Q.   Oh, and into the morning of the
6    20th.
7        A.   Was the salutary effect?  I think,
8    yes, my but-for world is to consider one case
9    where the transaction had been refused or
10   turned down on the 20th.
11       Q.   And the -- I think -- you recall
12   the reference in your report to the salutary
13   effect of the transaction on the market,
14   correct?
15       A.   Yes.
16       Q.   That salutary effect on the market
17   had already been accomplished by the time the
18   transaction actually closed on the 22nd, had
19   it not?
20       A.   No.  The market was closed over
21   the weekend.  I think over the weekend Morgan
22   Stanley and Goldman Sachs were in terrible
23   trouble, not clear that they were going to
24   open.  My view is if the transaction had been
25   refused on the 20th there's every possibility

TSG Reporting - Worldwide    877-702-9580

Page 18

1       A. SAUNDERS - CONFIDENTIAL
2  they might not have opened on the 22nd.  In my
3  opinion.
4       **Q.   I think you answered something**
5  **different than I asked.  I'm not sure.  Let me**
6  **just try again.  The salutary effect which you**
7  **reference in your report that the transaction**
8  **had on the marketplace was an effect that was**
9  **accomplished in connection with the**
10 **Lehman/Barclays transaction by the court's**
11 **approval on September 19th and into the early**
12 **morning hours of September 20th, correct?**
13      A.   Perhaps I'm missing what you're
14 saying.  I'm saying the salutary effect is the
15 effect on the market once it opens on a
16 Monday.  The market is closed on the weekend.
17 So I'm not quite sure I understand what you're
18 trying to get at.
19      **Q.   Okay.  I understand our disconnect**
20 **here.  Let me try again.**
21      **I appreciate the market is not**
22 **opened on the weekend so there cannot be any**
23 **market impact on the weekend.  But what I'm**
24 **saying is that when the market opened on**
25 **Monday, the salutary effect that the**

TSG Reporting - Worldwide     877-702-9580

Page 19

1       A. SAUNDERS - CONFIDENTIAL
2  transaction -- the Lehman/Barclays transaction
3  had was as a consequence of the court's
4  approval on the 19th and the 20th, correct?
5       A.   I believe as a financial economist
6  that Goldman or Morgan Stanley might not have
7  opened for business on the Monday without the
8  Lehman deal going through.  If that's not
9  salutary effect, I don't know what is because
10 if they'd gone down everybody would have gone
11 down.
12      **Q.   I'm not contesting for purposes of**
13 **my question whether or not you're correct in**
14 **your conclusion about it having a salutary**
15 **effect or not.  I'm simply trying to**
16 **understand what was it that caused the**
17 **salutary effect and that was the approval by**
18 **the court, wasn't it?**
19      A.   Yes.  That Barclays was going to
20 take over LBI.
21      **Q.   Okay.  Now, with regard -- just**
22 **trying to understand the timing of things for**
23 **the week so we can come back and take it**
24 **apart.  If the transaction between Lehman and**
25 **Barclays had been approved on the 19th into**

TSG Reporting - Worldwide     877-702-9580

Page 20

1       A. SAUNDERS - CONFIDENTIAL
2  the early morning hours of the 20th but had
3  closed on, say, Wednesday, the 24th, just to
4  get the paperwork done, would that have had
5  any adverse impact on the market?
6       A.   Well, I think Barclays had
7  committed or pre-committed to do the deal so I
8  think the markets would have known rationally
9  that the deal would have been completed on the
10 23rd or 24th.
11      **Q.   Right.**
12      A.   I mean, obviously, the longer the
13 time between the approval and the actual
14 conclusion of the deal then there's more
15 uncertainty.  But you asked me like two days
16 later would it make much of an effect, I would
17 say no.
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide     877-702-9580

Page 21

1       A. SAUNDERS - CONFIDENTIAL

REDACTED

TSG Reporting - Worldwide     877-702-9580

Page 26

1      A. SAUNDERS - CONFIDENTIAL
2
3
4
5
6
7
8                   REDACTED
9
10
11
12
13
14
15
16
17
18
19      Q.   I apologize.  We're on paragraph
20  12, your report, second full sentence.  It
21  begins in the penultimate line, the phrase --
22  I'll just read the whole sentence.  "As such,
23  it is reasonable to believe at the time, and
24  it is also reasonable to conclude now that the
25  acquisition had a calming and salutary effect
      TSG Reporting - Worldwide    877-702-9580

Page 27

1      A. SAUNDERS - CONFIDENTIAL
2  on conditions in the financial markets."
3      Do you see that?
4      A.   Yes.
5      Q.   And by that you're referring to
6  the transaction that was approved on the 19th
7  and the 20th as you've said, correct?
8      A.   That the approval of the
9  acquisition.
10      Q.   Yes.
11      A.   Yes.
12      Q.   Okay.  Would that same salutary
13  effect have occurred had Lehman Brothers
14  realized a gain on the transaction of
15  $5 billion?
16      A.   Well, nobody knew what the gains
17  or not were at the time.  Barclays had taken
18  an enormous risk.  So I don't --
19      Q.   I'm not talking about Barclays'
20  risk.
21      A.   I mean, ex post or ex ante?  I
22  mean, I'm not sure what world we're in.
23      Q.   Let's just stay with my question
24  for a moment.  I'm not talking about what risk
25  was assumed.  Let's deal with risk for just a
      TSG Reporting - Worldwide    877-702-9580

Page 28

1      A. SAUNDERS - CONFIDENTIAL
2  moment though.  It is in the nature of and in
3  the business of financial institutions to take
4  risk; isn't it, Mr. Saunders?
5      A.   Yeah.  But usually you have time
6  to do proper due diligence.  This was a case
7  where there was nearly no time to do due
8  diligence and time was of the essence.  And
9  everything was done in a very, very telescoped
10  period.
11      Q.   Many question was simply isn't it
12  in the nature of financial institutions to
13  take risk?
14      A.   To take risks, sure.  But to
15  understand the risk that they're taking is
16  important.
17      Q.   If in the transaction between
18  Barclays and Lehman Brothers, Lehman had
19  realized a gain on the transaction, would the
20  same salutary effect you reference in
21  paragraph 12 have occurred?
22      A.   You mean ex post?
23      Q.   Yeah.
24      A.   Like going ahead like a year
25  later?
      TSG Reporting - Worldwide    877-702-9580

Page 29

1      A. SAUNDERS - CONFIDENTIAL
2      Q.   Well, any time.
3      A.   I mean, be reasonable in terms of
4  what time period we're talking about here.
5      Q.   Well, your report doesn't
6  reference any time period in terms of the
7  salutary effect except immediately.
8      A.   Yes.
9      Q.   Your report on the salutary effect
10  on the market really is an immediate effect,
11  correct?
12      A.   Absolutely.
13      Q.   Okay.  It is not what might have
14  happened six months later.
15      A.   That's correct.
16      Q.   Okay.  So let's stay with your
17  approach to salutary effect as of on
18  immediate, all right?  You with me?
19      A.   Yes.
20      Q.   Okay.  If Lehman Brothers had
21  recognized a gain on the transaction of
22  $5 billion would the same salutary effect that
23  the transaction had when it was approved have
24  occurred?
25      A.   The salutary effect was an
      TSG Reporting - Worldwide    877-702-9580

1    A. SAUNDERS - CONFIDENTIAL
2  immediate effect. Ex post there was an
3  outcome where Barclays made a gain. If Lehman
4  would have made a gain this would have been
5  after the fact. I mean, nobody would know in
6  the future.
7    **Q. Are you simply saying that it**
8  **would not have an impact on your conclusion**
9  **that it was salutary because nobody knew**
10 **whether there was a gain or a loss?**
11    A. Nobody knew at the time. Nobody
12 knew the assets and the liabilities. There
13 was a huge risk. Barclays took the risk. Ex
14 post it turned out to be profitable. Ex post
15 it could have turned out to be a loss. It
16 happened to be, because of the uncertainty,
17 enormous, it turned out, ex post to be
18 profitable to Barclays. But at the time the
19 salutary effect was the immediacy of the
20 transaction.
21    **Q. And the salutary effect was only**
22 **the immediacy of the transaction, not the**
23 **terms of the transaction, correct?**
24    A. The terms of the transaction was
25 the acquisition of the business. The business

1    A. SAUNDERS - CONFIDENTIAL
2  was both the real and the financial assets
3  which were uncertain at the time. Barclays
4  took a huge risk.
5    **Q. My question again is different.**
6  **My question is without regard to what happened**
7  **in the future, it is the mere fact of the**
8  **transaction having taken place that created**
9  **the salutary effect in the marketplace, not**
10 **the question of who gained or who lost on the**
11 **transaction, correct?**
12    A. Because nobody would know back
13 then who would gain and who would lose.
14    **Q. So you're agreeing with me,**
15 **correct?**
16    A. I'm saying we don't know because
17 of the uncertainty at the time. The salutary
18 effect was the transaction took place to
19 eliminate this issue about too big to fail.
20    **Q. I just want to make sure what**
21 **you're saying. I'm just trying to get to what**
22 **you're saying now. You're saying the salutary**
23 **effect had nothing at all to do with what the**
24 **terms of the transaction were because the**
25 **market didn't know what the terms were,**

1    A. SAUNDERS - CONFIDENTIAL
2  correct?
3    A. I was saying at the time there was
4  huge uncertainty about the terms of the
5  transaction.
6    **Q. So the market didn't know that.**
7    A. They might have had expectations
8  but nobody would know with certainty what the
9  terms of the transaction were.
10    **Q. Did you know -- did you do an**
11 **analysis of what the market's expectations**
12 **were of the terms of the transaction?**
13    A. Well, as I say, I just don't
14 believe anybody really knew at that time the
15 terms of the transaction. All they knew was
16 that Barclays took an enormous risk.
17    **Q. Did you read the transcript of the**
18 **appearance before the court on the 19th and**
19 **the 20th?**
20    A. Way, way back. Probably in
21 August, September when I was engaged to do
22 this report.
23    **Q. And in reading that transcript did**
24 **you develop an opinion as to what the terms of**
25 **the transaction were?**

1    A. SAUNDERS - CONFIDENTIAL
2    A. No. I think my impression from
3  the whole -- was the need of the timing was
4  immediacy and time was of the essence and
5  there was huge uncertainty.
6    **Q. I appreciate the need. I**
7  **appreciate the uncertainty. I'm asking a**
8  **different question. The question is when you**
9  **read the transcript did you develop an opinion**
10 **as to what you thought the terms of the**
11 **transaction were?**
12    MR. STERN: In fairness, David,
13 when you're talking about terms are we
14 talking about contractual terms or value
15 terms?
16    MR. CARDEN: Any way he wants to
17 characterize it.
18    MR. STERN: You're using this
19 phrase "terms" of the transaction as if
20 we're talking about the contractual
21 terms which obviously were written down
22 but are we talking about values or
23 contractual terms?
24    A. I'm understanding you're talking
25 about the value.

Page 34

A. SAUNDERS - CONFIDENTIAL

1         A. SAUNDERS - CONFIDENTIAL
2    Q. Yes.
3    A. I mean, I think the numbers are in
4 the contract, presumably.
5    **Q. I was -- that's right. We're not**
6 **always grateful for Jack's somewhat lengthy**
7 **objections but he didn't really object. I**
8 **don't mind his contribution here. All I'm**
9 **really saying is --**
10    A. I'm an economist. When I think
11 you say terms I'm thinking of value.
12    Q. That's what I was meaning by that.
13 So we're on the same page.
14    A. Not contractual terms.
15    **Q. That's right. So, you now, last**
16 **time I was with you we established you're not**
17 **an expert at the law. So we don't have to go**
18 **back over that territory.**
19       **But let me ask you, on Friday, the**
20 **19th, then Saturday, the 20th when -- strike**
21 **that.**
22       **When you read the transcript of**
23 **the court appearance on the 19th and the 20th,**
24 **did you develop an opinion of what the terms**
25 **of the transaction were?**

TSG Reporting - Worldwide    877-702-9580

Page 35

1         A. SAUNDERS - CONFIDENTIAL
2    A. All I would say this was a huge
3 risk. My impression was that it was a huge
4 risk for Barclays because it was very
5 difficult at that time given the turmoil in
6 the market to figure out the value of the
7 assets and the value of the liabilities.
8    **Q. Are you telling me you didn't**
9 **develop an understanding of the terms, Mr.**
10 **Saunders? I don't mean to be ungenerous but**
11 **every time I ask you a question you don't need**
12 **to give me the Talismanic invocation of risk.**
13    A. No, I understand the contractual
14 terms, but the values of those assets and
15 liabilities were highly uncertain. That's
16 what I'm trying to get across.
17    **Q. The court was told what some of**
18 **those assets were worth, correct?**
19    A. I don't remember.
20     MR. STERN: Objection to the form.
21    A. I don't know.
22    **Q. Okay. Then let's just go to that**
23 **and make certain we get it out of the way.**
24      **Do you have a present**
25 **recollection, Mr. Saunders, as to whether you**

TSG Reporting - Worldwide    877-702-9580

Page 36

1         A. SAUNDERS - CONFIDENTIAL
2 were able to determine what the value of the
3 transaction was based upon reading the
4 transcript of the court appearance on
5 September 19th and 20th?
6    A. No.
7     MR. STERN: Are we done with
8 paragraph 12?
9     MR. CARDEN: We are.
10    **Q. Let's look at paragraph 11. And**
11 **I'm just coming back and picking something up**
12 **we talked about a little earlier. In the**
13 **second line of paragraph 11 you state that**
14 **virtually every major financial institution**
15 **was fragile.**
16     **Do you see that?**
17    A. Yes.
18    **Q. Were there any exceptions to the**
19 **fragility of any of those major financial**
20 **institutions as of September 2008 in your**
21 **view?**
22    A. Well, I think --
23    **Q. Or was it all relative?**
24    A. It's relative.
25    **Q. They were all at risk, weren't**

TSG Reporting - Worldwide    877-702-9580

Page 37

1         A. SAUNDERS - CONFIDENTIAL
2 they, sir?
3    A. Everybody's at risk. That's the
4 idea of financial institutions. But I think
5 Barclays was one of the most soundest of the
6 financial institutions in the world.
7    **Q. I didn't say anything about**
8 **Barclays. I was just asking about whether**
9 **you --**
10    A. I was giving you an example.
11    **Q. Do you agree with me, Mr.**
12 **Saunders, that the market would not have**
13 **thought it to be a catastrophe if Barclays**
14 **had, at the moment it did the transaction,**
15 **recognized a loss?**
16    A. I don't understand how it could --
17 I'm not an accountant. I don't know how
18 you --
19    **Q. I'm just asking you for your view**
20 **on the markets. The markets -- we're talking**
21 **about the markets.**
22    **Would the markets, on Monday,**
23 **September 22nd, have thought it to be a**
24 **catastrophe if Barclays had lost money on day**
25 **one in entering into the Lehman transaction?**

TSG Reporting - Worldwide    877-702-9580

Page 38

A. SAUNDERS - CONFIDENTIAL

1  A.  I really don't know what you mean
2  by losing money.  I mean, it's such a wide
3  open question.  What do you mean by losing
4  money?
5  Q.  Well, do you think the market
6  would have cared one way or the other whether
7  Barclays lost money on the transaction when it
8  opened for business on the 22nd?
9  A.  I just think that they were
10 concerned that Barclays did the deal.
11 Q.  Not whether Barclays made or lost
12 money, correct?
13 A.  Nobody whether Barclays would --
14 at the time there was huge uncertainty.  I'll
15 just reiterate what I said.
16 Q.  But if the market had known that
17 Barclays lost money on the transaction, do you
18 agree with me that it would not have thought
19 it to be a catastrophe?
20 MR. STERN:  Objection to the form.
21 A.  I just don't understand the
22 question.  It's --
23 Q.  Well, do you think the market
24 cared on Monday morning, September 22nd,
25

TSG Reporting - Worldwide    877-702-9580

Page 39

A. SAUNDERS - CONFIDENTIAL

1  whether or not Barclays did or did not make
2  money on the transaction with Lehman Brothers?
3  A.  They were happy that Barclays, as
4  I said, took over Lehman.
5  Q.  I understand they cared about the
6  fact of the transaction.  We've established
7  that.
8  A.  Yes.
9  Q.  I understand you to be saying that
10 on Monday morning, September 22nd, the market
11 was very -- it was a salutary effect that
12 there was a transaction, correct?
13 A.  Correct.
14 Q.  Okay.  My question is different.
15 My question is would the market -- would that
16 salutary effect on the market not have taken
17 place had the market known that Barclays lost
18 money as of that moment on the Lehman
19 transaction?
20 A.  Well, why rationally would
21 Barclays, if it knew exactly at that time it
22 was going to lose money, would it have done
23 the transaction?
24 Q.  Just answer my question.  We can
25

TSG Reporting - Worldwide    877-702-9580

Page 40

A. SAUNDERS - CONFIDENTIAL

1  come at the second --
2  A.  It doesn't make economic sense to
3  me.
4  Q.  Well, I'm trying to keep the focus
5  on the market.  Now you just brought it over
6  to Barclays.  And, you know, we're going to
7  get on fine so long as we stay on my focus
8  here.  And we can come back to that if you
9  wish but the point is I'm asking about the
10 market, not about Barclays and what Barclays
11 would or wouldn't have done.  That's for
12 Barclays to argue.  You don't need to argue
13 that for them.
14    I'm asking about the market.  So
15 let's stay with the market for a moment, all
16 right?
17    On Monday morning, September 22nd,
18 had the market learned some way that Barclays
19 had actually realized a loss on the Lehman
20 transaction, would it have been a catastrophe
21 for the market?
22 MR. STERN:  Objection to the form.
23 A.  The market's so generic.  It
24 includes Barclays' shareholders.  It includes

TSG Reporting - Worldwide    877-702-9580

Page 41

A. SAUNDERS - CONFIDENTIAL

1  shareholders of other banks.  What do you mean
2  by the market?
3  Q.  Well, you've used "the market"
4  throughout your report, sir.  I'm using the
5  same way you're using it.
6  A.  Yes, but not in the context of
7  this hypothetical that you're talking about.
8  Q.  Well, you say in paragraph 12 --
9  A.  I'm saying there's huge
10 uncertainty at the time.
11 Q.  Okay.  Let's go to paragraph 12.
12 You tell me that the acquisition had a calming
13 and salutary effect on conditions in financial
14 markets.
15    Do you see that?
16 A.  Yes.
17 Q.  Now, if the transaction had --
18 pardon me.
19    If at the moment the transaction
20 was closed on Monday morning, September 22nd,
21 and Barclays realized a loss on the
22 transaction, would that salutary effect have
23 been destroyed, sir?
24 A.  I think there would still have

TSG Reporting - Worldwide    877-702-9580

1       A. SAUNDERS - CONFIDENTIAL
2   been a salutary effect but it might have been
3   different.
4       **Q.   You didn't do any analysis on**
5   **that, sir, did you?**
6       A.   I didn't believe that it was a
7   reasonable possibility.  Nobody knew the
8   assets and liabilities at the time.  So I
9   thought it was just something worth -- not
10  worth looking at.

1       A. SAUNDERS - CONFIDENTIAL

**REDACTED**

1       A. SAUNDERS - CONFIDENTIAL

**REDACTED**

1       A. SAUNDERS - CONFIDENTIAL
2
3
4
5
6
7   **REDACTED**
8
9
10
11
12
13
14
15      **Q.   So if you didn't see any**
16  **valuations then I take it they couldn't have**
17  **formed the basis of your conclusion that it**
18  **had a salutary effect, correct?**
19      A.   It had a salutary effect because
20  the market was concerned about Lehman being
21  taken over and not going under.
22      **Q.   Again, to try to be clear, the**
23  **salutary effect you describe in your report**
24  **that resulted from the signing of the APA was**
25  **as a consequence of the transaction occurring**

Page 46

1        A. SAUNDERS - CONFIDENTIAL
2   as opposed to the specific the terms of that
3   transaction, correct?
4        A.   Well, the transaction being
5   proposed to occur.
6        **Q.   Yes.  Correct?**
7        A.   Correct.

REDACTED

TSG Reporting - Worldwide    877-702-9580

Page 47

1        A. SAUNDERS - CONFIDENTIAL

REDACTED

TSG Reporting - Worldwide    877-702-9580

Page 48

1        A. SAUNDERS - CONFIDENTIAL

REDACTED

TSG Reporting - Worldwide    877-702-9580

Page 49

1        A. SAUNDERS - CONFIDENTIAL

REDACTED

TSG Reporting - Worldwide    877-702-9580

1          A. SAUNDERS - CONFIDENTIAL

**REDACTED**

1          A. SAUNDERS - CONFIDENTIAL

**REDACTED**

1          A. SAUNDERS - CONFIDENTIAL

**REDACTED**

1          A. SAUNDERS - CONFIDENTIAL
2
3
4
5
6
7
8
9
10
11
12
13              **REDACTED**
14
15
16
17
18
19          _____
20          ANTHONY SAUNDERS
21
22    Subscribed and sworn to before me
23    this ___ day of _____, 2010.
24    _____
25

Page 62

```
 1
 2        C E R T I F I C A T E
 3  STATE OF NEW YORK   )
 4              : ss.
 5  COUNTY OF NEW YORK  )
 6        I, FRANCIS X. FREDERICK, a Notary
 7  Public within and for the State of New
 8  York, do hereby certify:
 9        That ANTHONY SAUNDERS, the witness
10  whose deposition is hereinbefore set
11  forth, was duly sworn by me and that
12  such deposition is a true record of the
13  testimony given by the witness.
14        I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that I
17  am in no way interested in the outcome
18  of this matter.
19        IN WITNESS WHEREOF, I have
20  hereunto set my hand this 8th day of
21  February, 2010.
22
23        _____
24        FRANCIS X. FREDERICK
25
```

TSG Reporting - Worldwide    877-702-9580

Page 63

```
 1
 2  ---------------- I N D E X -----------------
 3  WITNESS      EXAMINATION BY     PAGE
 4  ANTHONY SAUNDERS   MR. CARDEN      5
 5
 6
 7
 8
 9  ---------- INFORMATION REQUESTS ------------
10  DIRECTIONS:  NONE
11  RULINGS:  NONE
12  TO BE FURNISHED:  NONE
13  REQUESTS:  NONE
14  MOTIONS:  NONE
15
16  ------------------ EXHIBITS ------------------
17  EXHIBIT                   FOR ID.
18  Exhibit 600
19  Expert Report of Professor
20  Anthony Saunders, January 8, 2010....... 16
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 64

```
 1
 2  NAME OF CASE:  IN RE:  LEHMAN BROTHERS
 3  DATE OF DEPOSITION:  FEBRUARY 8, 2010
 4  NAME OF WITNESS:  ANTHONY SAUNDERS
 5  Reason codes:
       1. To clarify the record.
       2. To conform to the facts.
       3. To correct transcription errors.
 6
 7  Page _____ Line _____ Reason _____
    From _____ to _____
 8
    Page _____ Line _____ Reason _____
 9  From _____ to _____
10  Page _____ Line _____ Reason _____
    From _____ to _____
11
    Page _____ Line _____ Reason _____
12  From _____ to _____
13  Page _____ Line _____ Reason _____
    From _____ to _____
14
    Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
    From _____ to _____
17
    Page _____ Line _____ Reason _____
18  From _____ to _____
19  Page _____ Line _____ Reason _____
    From _____ to _____
20
    Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
    From _____ to _____
23
24        _____
          ANTHONY SAUNDERS
25
```

TSG Reporting - Worldwide    877-702-9580

# A. 161

Page 223

1

2           UNITED STATES BANKRUPTCY COURT

3           SOUTHERN DISTRICT OF NEW YORK

4      ---------------------x

5      In Re:

6                              Chapter 11

7      LEHMAN BROTHERS        Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al.,   (Jointly Administered)

9

              Debtors.

10

       ----------------------x

11

12

13

14    CONTINUED VIDEOTAPED DEPOSITION OF JAMES SEERY

15              New York, New York

16              March 3, 2010

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 28549

Page 224

```
 1
 2              March 3, 2010
 3
 4        Continued videotaped deposition of
 5    JAMES SEERY, held at the law offices of
 6    Quinn, Emanuel, Urquhart, Oliver & Hedges,
 7    LLP, 51 Madison Avenue, New York, New York,
 8    before Kathy S. Klepfer, a Registered
 9    Professional Reporter, Registered Merit
10    Reporter, Certified Realtime Reporter,
11    Certified Livenote Reporter, and Notary
12    Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 225

```
 1
 2              A P P E A R A N C E S :
 3
 4    JONES DAY, LLP
 5    Attorneys for Lehman Brothers, Inc.
 6       222 East 41st Street
 7       New York, New York  10017-6702
 8    BY:  JENNIFER DEL MEDICO, ESQ.
 9
10    BOIES, SCHILLER & FLEXNER, LLP
11    Attorneys for Barclays Capital
12       575 Lexington Avenue - 7th Floor
13       New York, New York  10022
14    BY:  JACK G. STERN, ESQ.
15
16    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
17    Attorneys for the Creditors Committee
18       865 Figueroa Street, 10th Floor
19       Los Angeles, California  90017
20    BY:  ERICA P. TAGGART, ESQ.
21          TYLER WHITMER, ESQ.
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 226

```
 1
 2
 3        A P P E A R A N C E S :  (Cont'd.)
 4
 5    HUGHES, HUBBARD & REED, LLP
 6    Attorneys for the SIPA Trustee
 7       One Battery Park Plaza
 8       New York, New York  10004-1482
 9    BY:  CARL W. MILLS, ESQ.
10
11
12
13
14    ALSO PRESENT:
15       MATTHEW SMITH, Legal Video Specialist
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 227

```
 1              J. Seery
```

REDACTED

TSG Reporting - Worldwide    877-702-9580

1          J. Seery

**REDACTED**

1          J. Seery

**REDACTED**

1          J. Seery

**REDACTED**

21       Q.   Okay.  So let's look now at what I've
22  put before you as Exhibit 666.  Can you identify
23  this document?
24       A.   It's kind of evil.  That's very funny.
25       These are documents that -- excuse me.

1          J. Seery
2   I got a good chuckle out of that -- these are
3   documents that are part of some notes that I
4   have with -- from around the time that Lehman
5   was sold to Barclays.
6        Q.   And if you turn to the very last page
7   that ends in the Bates that ends in 70, does
8   this relate to the information that you received
9   from Lehman traders?
10       A.   This does.
11       Q.   Okay.  Can you just flip through to
12  see, are there any other pages that relate to
13  the information that you got back from Lehman
14  traders?
15       A.   I don't think so.  I mean, there are
16  some -- I don't think so.
17       Q.   Okay.  So can you describe what is
18  being shown here on that last page that's 70?  I
19  can -- did you create this document?
20       A.   I don't believe I created it.  I don't
21  know who did this for me.
22       Q.   Did you give input into this document?
23       A.   Yes, I believe so.

**REDACTED**

Page 276

1            J. Seery

**REDACTED**

TSG Reporting - Worldwide     877-702-9580

Page 277

1            **J. Seery**

**REDACTED**

TSG Reporting - Worldwide     877-702-9580

Page 278

1            **J. Seery**
2
3
4
5
6
7
8
9
10            **REDACTED**
11
12
13
14
15
16
17
18
19
20     **Q.   Okay.  Under that is 45.5.  What did**
21 **that figure represent?**
22     A.   I don't recall how it came up with
23 that 45.5.  That's my writing.
24     **Q.   And what about 1.9BN, what does that**
25 **represent?**

TSG Reporting - Worldwide     877-702-9580

Page 279

1            **J. Seery**
2     A.   I don't recall right now what that is.
3 I'd have to refresh my recollection on that.

**REDACTED**

TSG Reporting - Worldwide     877-702-9580

Page 392

1          J. Seery

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 393

1          J. Seery

**REDACTED**

TSG Reporting - Worldwide    877-702-9580

Page 394

1          J. Seery

**REDACTED**

17          oOo

19    _____
      JAMES SEERY
20
21    Subscribed and sworn to
      before me this    day
22    of        2010.
23

24    _____
25

TSG Reporting - Worldwide    877-702-9580

Page 395

1          J. Seery
2          CERTIFICATE
3    STATE OF NEW YORK )
4          : ss
     COUNTY OF NEW YORK)
5        I, Kathy S. Klepfer, a Registered
6    Merit Reporter and Notary Public within and
7    for the State of New York, do hereby
8    certify:
9        That JAMES SEERY, the witness whose
10   deposition is herein before set forth, was
11   duly sworn by me and that such deposition is
12   a true record of the testimony given by such
13   witness.
14       I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage and that I am in no way
17   interested in the outcome of this matter.
18       I further certify that neither the
19   deponent nor a party requested a review of
20   the transcript pursuant to Federal Rule of
21   Civil Procedure 30(e) before the deposition
22   was completed.
23       In witness whereof, I have hereunto
24   set my hand this 3rd day of March, 2010.
25   ------------------------------

TSG Reporting - Worldwide    877-702-9580

Page 396

1          J. Seery
2          INDEX
3  TESTIMONY OF J. SEERY:                    PAGE
4  Examination by Ms. Taggart  ................   228
5  Examination by Mr. Mills   ................   383
6
7  EXHIBITS:                          PAGE
8  Exhibit 665, Declaration of James Seery      234
9  Exhibit 666, a document bearing Bates Nos.   269
10  JS-LB-BANKR000001 through 70
11  Exhibit 667, a document bearing Bates Nos.   331
12  HLHZ0011913 with attachment
13  Exhibit 668, excerpts from the transcript    379
14  of the September 19 hearing
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

---

Page 397

1          J. Seery
2  NAME OF CASE:  In re:  Lehman Brothers Holdings
3  DATE OF DEPOSITION:  March 3, 2010
4  NAME OF WITNESS:  James Seery
5  Reason Codes:
6     1. To clarify the record.
      2. To conform to the facts.
7     3. To correct transcription errors.
8  Page _____ Line _____ Reason _____
   From _____ to _____
9
   Page _____ Line _____ Reason _____
10  From _____ to _____
11  Page _____ Line _____ Reason _____
   From _____ to _____
12
   Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
   From _____ to _____
15
   Page _____ Line _____ Reason _____
16  From _____ to _____
17  Page _____ Line _____ Reason _____
   From _____ to _____
18
   Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
   From _____ to _____
21
   Page _____ Line _____ Reason _____
22  From _____ to _____
23  Page _____ Line _____ Reason _____
   From _____ to _____
24
25          _____

TSG Reporting - Worldwide    877-702-9580

# A. 162

EX-99.1 9 a08-22764_5ex99d1.htm EX-99.1

**Exhibit 99.1**

## LEHMAN BROTHERS

# Press Release

*For Immediate Release*

| | |
|---|---|
| **Leman Brothers Media Contact:** | **Monique Wise** 1-646-333-9056 **Mark Lane** 1-646-333-8247 |
| **Barclays Capital Media Contact:** | **Leigh Bruce** 44 (0)20-7773-7371 **Peter Truell** 1-212-412-7576 **Simon Eaton** 44 (0) 7917-068-479 |
| **Investor Contact:** | **Mark Merson** 44 (0) 20-7116-5752 **John McIvor** 44 (0) 20-7116-2929 |

### BARCLAYS TO ACQUIRE LEHMAN BROTHERS'

### BUSINESSES AND ASSETS

- **Barclays Agrees to Acquire Lehman Brothers' North American Investment Banking, and Fixed Income and Equities Sales, Trading and Research Operations, Including Approximately 10,000 Employees**

- **Discussions to Acquire Lehman Brothers' Select Operations Outside of North America**

- **Barclays Agrees to Purchase Lehman Brothers' Headquarters Office Building and Two Other Facilities**

- **Barclays Enters into Support Agreement with Lehman Brothers to provide:**
  - **$500 Million DIP-Financing to Lehman Brothers Holdings Inc.**
  - **A Substantial Interim Credit Facility to Lehman Brothers Inc.**

**London and New York, September 16, 2008** – Barclays Capital, the investment banking division of Barclays Bank PLC (LSE: BARC), has signed a definitive agreement to acquire

substantially all of the North American businesses and operating assets of Lehman Brothers Inc., a wholly-owned subsidiary of Lehman Brothers Holdings Inc. (NYSE: LEH), and certain related assets of Lehman Brothers Holdings Inc. and its affiliates for consideration consisting of assumed liabilities, $250 million in cash and certain contingent considerations. Barclays also entered into a definitive agreement to acquire the headquarters of Lehman Brothers, located at 745 Seventh Avenue in New York City, as well as its two data centers located in New Jersey for an aggregate of approximately $1.45 billion. The final acquisition price of the headquarters and other real estate assets is subject to appraised value.

The businesses to be acquired will include Lehman Brothers' Investment Banking, and Fixed Income and Equities Sales, Trading and Research operations, as well as certain supporting functions. These operations will be acquired by Barclays Capital, accelerating the growth of a formidable player in the global marketplace. Approximately 10,000 employees of Lehman Brothers Inc. and Lehman Brothers Holdings Inc. in North America and certain of its subsidiaries will join Barclays upon the closing of the transactions.

In addition to the agreed transaction, Barclays Capital intends to immediately commence discussions with the relevant international regulatory authorities to acquire Lehman Brothers' similar operations outside North America, although there can be no assurances such international operations will be acquired.

Barclays Capital also has agreed to provide debtor-in-possession (DIP) financing to Lehman Brothers Holdings Inc. of $500 million and a substantial interim credit facility to Lehman Brothers Inc. to fund Lehman Brothers Inc.'s ongoing operations. Barclays has also entered into an agreement to provide information technology, operational and other support services. These steps ensure Lehman Brothers' continued operations and ability to meet client expectations.

Lehman Brothers Holdings Inc.'s U.S. registered broker-dealers will continue their normal operations.

Separately, Lehman Brothers Holdings Inc. is engaged in advanced discussions to sell its Investment Management Division to a third party in an unrelated transaction.

Commenting on this announcement, John Varley, Barclays Group Chief Executive, said, "The proposed acquisition of Lehman Brothers North American investment banking and capital market operations accelerates the execution of our strategy of diversification by geography and business in pursuit of profitable growth on behalf of our shareholders, in particular increasing the percentage of Barclays earnings sourced in North America. This transaction delivers the strategic benefits of a combination with Lehman Brothers core franchise, whilst meeting Barclays strict financial criteria, and strengthening our capital ratios."

Robert E. Diamond, Jr., Barclays President, said, "This is a once in a lifetime opportunity for Barclays. We will now have the best team and most productive culture across the world's major financial markets, backed by the resources of an integrated universal bank. We welcome the opportunity to add Lehman's people and capabilities to the Barclays team."

"This is a wonderful outcome for a great number of our employees that will preserve and strengthen our terrific franchise," said Richard S. Fuld, Jr., Chairman and Chief Executive Officer of Lehman Brothers.

Bart McDade, Lehman Brothers President and Chief Operating Officer, said, "Lehman Brothers strength has always been our client franchise. With this transaction, we have the opportunity to continue the growth and development of our U.S. investment banking and capital market franchises with one of the leading financial institutions in the world. Together with Barclays, these businesses will be a part of a global financial services powerhouse delivering a comprehensive suite of products and services to our clients."

The transactions have been approved by the Boards of Directors of Barclays Bank PLC, Lehman Brothers Holdings Inc. and Lehman Brothers Inc. No shareholder approvals are required for the transactions.

The transaction is subject to Bankruptcy Court approval. Lehman Brothers will file an emergency motion with the Bankruptcy Court for the Southern District of New York to seek a hearing to approve a break-up fee and related bid procedures and will seek a hearing in the Bankruptcy Court for later this week to obtain approval of the transaction.

About Barclays Bank PLC

Barclays is a major global financial services provider engaged in retail and commercial banking, credit cards, investment banking, wealth management and investment management services, with an extensive international presence in Europe, the USA, Africa and Asia.

With over 300 years of history and expertise in banking, Barclays operates in over 50 countries and employs 147,000 people. Barclays moves, lends, invests and protects money for over 42 million customers and clients worldwide.

About Barclays Capital

Barclays Capital is the investment banking division of Barclays Bank PLC which has an AA long-term credit rating and a balance sheet of £1.4 trillion. With a distinctive business model, Barclays Capital provides large corporate, government and institutional clients with solutions to their financing and risk management needs. Barclays Capital has offices around the world, employs over 16,300 people and has the global reach and distribution power to meet the needs of issuers and investors worldwide.

About Lehman Brothers

Lehman Brothers (ticker symbol: LEH), an innovator in global finance, serves the financial needs of corporations, governments and municipalities, institutional clients and high net worth individuals worldwide. Founded in 1850, Lehman Brothers maintains leadership positions in equity and fixed income sales, trading and research, investment banking, private investment management, asset management and private equity. The Firm is headquartered in New York, with regional headquarters in London and Tokyo, and operates in a network of offices around the world. For further information about Lehman Brothers' services, products and recruitment opportunities, visit the Firm's Web site at www.lehman.com.

**Analyst and Investor Conference Call**

A conference call for analysts and institutional investors will be hosted by John Varley, Barclays Group Chief Executive and Robert E. Diamond, Jr., Barclays President. The call will commence at 12.00pm (BST) 17 September 2008.

To access the live conference call please dial 0845 401 9092 (UK callers) or +44 20 3023 4419 (all other locations). Access code: "Barclays Announcement". A live webcast of the conference call will also be available at www.barclays.com/investorrelations.

A replay of the conference call and webcast will be available after the event. Access will be available via the Barclays investor relations website at the above address.

**Forward-looking statements**

This announcement contains certain forward-looking statements with respect to certain of Barclays plans and its current goals and expectations relating to its future financial condition and performance and which involve a number of risks and uncertainties. Barclays cautions readers that no forward-looking statement is a guarantee of future performance and that actual results could differ materially from those contained in the forward-looking statements. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements sometimes use words such as 'aim', 'anticipate', 'target', 'expect', 'estimate', 'intend', 'plan', 'goal', 'believe', or other words of similar meaning. Examples of forward-looking statements include, among others, statements regarding consummation of the proposed acquisition of the Lehman Brothers businesses by Barclays within the expected timeframe and on the expected terms (if at all), the benefits of the proposed acquisition of certain of the Lehman Brothers businesses by Barclays, including the achievement of synergy targets, Barclays future financial position, income growth, impairment charges, business strategy, projected costs, estimates of capital expenditure and revenue benefits, projected levels of growth in the banking and financial markets, the enlarged group's future financial and operating results, future financial position, projected costs, estimates of capital expenditure, and plans and objectives for future operations of Barclays and the enlarged group and other statements that are not historical fact.

By their nature, forward-looking statements involve risk and uncertainty because they relate to future events and circumstances, including, but not limited to, UK domestic and global economic and business conditions, the effects of continued volatility in credit markets, market-related risks such as changes in interest rates and exchange rates, the policies and actions of governmental and regulatory authorities, changes in legislation, the further development of standards and interpretations under International Financial Reporting Standards ("IFRS") applicable to past, current and future periods, evolving practices with regard to the interpretation and application of standards under IFRS, the outcome of pending and future litigation, the success of future

acquisitions and other strategic transactions and the impact of competition — a number of which factors are beyond Barclays control. As a result, Barclays actual future results may differ materially from the plans, goals, and expectations set forth in Barclays forward-looking statements. Any forward-looking statements made herein by or on behalf of Barclays speak only as of the date they are made. Except as required by the FSA, the London Stock Exchange or applicable law, Barclays expressly disclaims any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements contained in this announcement to reflect any changes in Barclays expectations with regard thereto or any changes in events, conditions or circumstances on which any such statement is based. The reader should, however, consult any additional disclosures that Barclays has made or may make in documents it has filed or may file with the SEC.

###

# A. 163

**Hearing Date:  September 19, 2008 at 4 p.m.**

David M. Friedman (DF-4278)
David S. Rosner (DR-4214)
Andrew K. Glenn (AG-9934)
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800

Attorneys for Bay Harbour Management L.C., Bay Harbour Master Ltd.,
Trophy Hunter Investments, Ltd., BHCO Master, Ltd.,
MSS Distressed & Opportunities 2 and Institutional Benchmarks

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC, | : | |
| | : | Case No. 08-13555 (JMP) |
| Debtor. | : | |
| | : | (Jointly Administered) |
| | : | |

## OBJECTION OF BAY HARBOUR MANAGEMENT L.C., BAY HARBOUR MASTER LTD., TROPHY HUNTER INVESTMENTS, LTD., BHCO MASTER, LTD., MSS DISTRESSED & OPPORTUNITIES 2 AND INSTITUTIONAL BENCHMARKS  TO THE DEBTORS' MOTION TO (A) SCHEDULE A SALE HEARING, (B) ESTABLISH SALE PROCEDURES, (C) APPROVE A BREAK-UP FEE; AND (D) APPROVE THE SALE OF THE PURCHASED ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS RELATING TO THE PURCHASED ASSETS

Bay Harbour Management L.C., Bay Harbour Master Ltd., Trophy Hunter Investments,

Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2 and Institutional Benchmarks

(collectively, "Bay Harbour"), creditors of  Lehman Brothers Inc. ("LBI") and counterparty to

contracts with Lehman Brothers Holdings Inc. ("LBHI" or the "Debtor") and Lehman Brothers

International (Europe) ("LBIE"), hereby submit this objection (the "Objection") to the Debtors'

Motion To (A) Schedule A Sale Hearing, (B) Establish Sale Procedures, (C) Approve A Break-Up Fee; And (D) Approve The Sale Of The Purchased Assets And The Assumption And Assignment Of Contracts Relating To The Purchased Assets (the "Sale Motion") [Docket No. 60] and respectfully represents as follows:

## INTRODUCTION

1.    Bay Harbour Master, Ltd. Trophy Hunter Investments, Ltd. and BHCO Master, Ltd. are investment funds.  MSS Distressed & Opportunities 2 and Institutional Benchmarks are managed accounts.  These entities have prime brokerage accounts with LBIE and LBI.  LBI is the agent on these accounts.

## OBJECTION

### A.    The Barclays Sale May Include Cash That Was Misappropriated From Customers.

2.    The Debtor seeks this Court's approval of a sale of substantially all of the assets of LBI, LBHI (together with LBI, the "Sellers"),[1] and LB 745 LLC to Barclays Capital Inc. ("Barclays") for *di minimis* consideration purportedly to stabilize confidence in the marketplace, to save jobs, and to minimize the Sellers' losses.  Although these are laudable goals -- Bay Harbour is sympathetic to the plight of Lehman employees -- the proposed sale to Barclays pursuant to the Purchase Agreement (the "Barclays Sale") should not come at the expense of innocent customers potentially defrauded out of billions of dollars on the eve of this bankruptcy.

3.    At all relevant times, Bay Harbour dealt with LBI employees in its prime brokerage relationship and believed that its cash and securities safely would be held for its

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

account. Nonetheless, despite repeated assurances of the integrity of the cash and securities

deposited with LBI and LBIE, Bay Harbour's cash and securities -- indisputably Bay Harbour's

and not LBI's or LBIE's property -- appears to have been siphoned from London to the United

States as part of an $8 billion asset transfer (the "Defalcated Funds") and then "trapped" by the

midnight bankruptcy filing by the Sellers.[2]  In this regard, the September 17, 2008 edition of the

London Evening Standard stated that:

> [B]illions of dollars disappeared from Lehmans' London bank
> account over the weekend. . . . [According to a Lehman source],
> [t]he money was not returned to our bank account from the US and
> all we were left with was a bunch of useless assets. Nobody can
> tell us where it has gone. What we do know is that the money
> disappeared on Friday night and did not come back into our
> account on Monday morning.[3]

4.      To Bay Harbour's knowledge, the Sellers do not dispute the transfer of the

Defalcated Funds from the United Kingdom operations with no consideration in return for Bay

Harbour and other customers. But none of the pleadings in these cases discloses the fate of the

Defalcated Funds; nor do they disclose whether Barclays knew about or benefited from the

transfer of the Defalcated Funds or otherwise were involved. Bay Harbour is not alleging that it

was. It is alleging that neither it nor this Court knows.

5.      What is clear, however, is that Barclays will be receiving a substantial portion of

cash and securities held by the Debtor and LBI. It is possible that some or all of this cash and

securities may derive from the Defalcated Assets or that the transfer of the Defalcated Funds

may have been manipulated to prop up LBI for sale, or otherwise used for the Debtors' and its

affiliates' (other than LBIE) operations. Press reports disclose that Barclays initially backed out

---

[2]      The Sellers have only $1.3 billion in cash, $700 million of which goes to Barclays. The remaining
Defalcated Funds apparently have been dissipated from the Debtors' estates.

[3]      A true and correct copy of this article is annexed hereto as Exhibit A.

of a Lehman transaction when the Treasury Department refused to guarantee Lehman's trading operations.[4] It is possible that the Defalcated Funds were used, in whole or in part, as a partial substitute for the Treasury's guarantee. Nobody, including the Court, knows.

6.    Nonetheless, under the proposed sale order (the "Sale Order"), Barclays takes free and clear of all claims, other than claims it expressly assumes, claims arising after the Petition Date, and claims arising after the Closing of the Barclays Sale. Barclays apparently will not assume the claims of Bay Harbour and other potentially defrauded customers who at this point apparently cannot recover the cash in their prime brokerage accounts, and who, by Court order are being restrained from seeing to recover it from the Purchaser and possible beneficiary.

7.    Customer-creditors such as Bay Harbour have seen over $8 billion of cash and securities accounts evaporate literally overnight -- with no government assistance and no government pressure to protect these innocent customers -- but instead a concerted effort to rush through a sale to the very entity, after access to the Sellers' books and records, that had earlier "walked" from the deal. Now that Barclays has reentered the deal, the Barclays Sale threatens to further dissipate the ability of LBIE's Administrator and customers to recover their rightful property and to protect Barclays from claims to this cash, without an opportunity for discovery on only four days' notice.

8.    The Court should not participate in this result. Approving the Barclays Sale would set a very dangerous precedent that the exigency of a sale allows a debtor to eviscerate creditors rights in ways expressly prohibited by the Bankruptcy Code and applicable law.

---

[4]    Forbes, "Barclays In The Driving Seat," Sept. 16, 2008. A true and correct copy of this article is annexed hereto as Exhibit B.

**B.    As A Matter Of Law, The Debtor Cannot Sell -- And
        Barclays Cannot Buy -- Assets That The Debtors Do Not Own.**

9.      Although there may be exigencies justifying the sale of property *validly owned by*

*the Debtor*, those exigencies do not justify selling assets that are not property of the estate and

without a factual investigation into title and transfer.  The unprecedented pace of the Barclays

Sale, the lack of disclosure of the facts leading up to the Barclays Sale, and the broad scope of

the transaction precludes parties in interest from conducting appropriate and meaningful factual

investigation through discovery.

10.     Barclays cannot acquire cash rightly belonging to potentially defrauded customers

such as Bay Harbour.  The Debtor can only sell assets to which it has good title and that are

property of the estate.  11 U.S.C. § 541.  The Debtor cannot sell assets owned by third parties,

nor can it sell assets subject to a constructive trust because they are not property of the estate as a

matter of law.  As the Second Circuit held in *Flanagan v. Mangan*, 503 F.3d 171 (2d Cir. 2007):

> *The effect of a constructive trust in bankruptcy is profound.*  While the bankrupt
> estate is defined very broadly under § 541(a)(1) of the Bankruptcy Code to
> include all legal or equitable interests of the debtor, *any property that the debtor*
> *holds in constructive trust for another is excluded from the estate* pursuant to §
> 541(d), which states:
>
>> Property in which the debtor holds, as of the commencement of the
>> case, only legal title and not an equitable interest . . . becomes
>> property of the estate . . . only to the extent of the debtor's legal
>> title to such property, but not to the extent of any equitable interest
>> in such property that the debtor does not hold.

*Id.* at 180-81.

11.     "New York law generally requires four elements for a constructive trust:  "(1) a

confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the

subject res made in reliance on that promise; and (4) unjust enrichment." *In re First Central Fin.*

*Corp.*, 377 F.3d 209, 212 (2d Cir. 2004).  The fourth element is the most important since "the

purpose of the constructive trust is prevention of unjust enrichment." *Simonds v. Simonds*, 45

N.Y.2d 233, 242, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978); *see also In re Koreag, Controle et*

*Revision S.A.*, 961 F.2d 341, 354 (2d Cir. 1992) (holding that unjust enrichment constitutes the

"key factor" in determining whether a constructive trust should be imposed).   Customer property

acquired through fraud or misappropriation is subject to a constructive trust.   Specifically, New

York law provides that a constructive trust arises against an entity that, by fraud or by abuse of

confidence, or by commission of a wrong or other form of unconscionable conduct, artifice,

concealment, or questionable means, either has obtained or holds the legal right to property

which in equity and in good conscience it ought not to hold.   *Silverman v. K.E.R.U. Realty Corp.,*

*(In re Allou Distributors, Inc.)*, 379 B.R. 5, 39 (Bankr. E.D.N.Y. 2007); *TeseMilner v. TPAC,*

*LLC (In re TicketPlanet.com)*, 313 B.R. 46. 48 (Bankr. S.D.N.Y. 2004).

12.     Here, the Defalcated Funds apparently include funds from customer accounts at

LBIE.   LBI indisputably acted as agent for customers, promised to maintain the customer's

accounts pursuant to the prime brokerage agreement.   Now, after Bay Harbour deposited funds

with LBI and LBIE in reliance on that promise, LBI, LBHI and ultimately, Barclays, will be

unjustly enriched to the extent that the Defalcated Funds are transferred to Barclays free and

clear of all associated claims.   This is a prima facie case for the imposition of a constructive trust

against the Defalcated Funds.

## C.     The Court Cannot Cleanse Title Without A Full Adjudication On The Merits.

13.     The proposed form of Sale Order includes a finding that "[t]he Debtors and LBI

are the sole and lawful owners of the Purchased Assets." Sale Order, Finding N; *see also* Sale

Order, Finding G (finding of corporate authority to sell).   The Court simply cannot make these

findings under the circumstances.

14.    The Court has no record at this time to determine that the Sellers own the

Purchased Assets. Consequently, the Court has no substantive ability to adjudicate, without a

record, that the Sellers' own the Purchased Assets and that Barclays obtain good title thereto

under this sale.[5]

15.    In short, the Court can not make a finding that the Debtors can sell the Defalcated

Funds and other customer property that they do not own, Sale Order, Finding Q, nor can it grant

*actual title to the Purchased Assets* with the issue of title open for investigation, accounting, and

potential recovery. Sale Order ¶ 4. Any transfer must, to protect those with legitimate customer

claims to property taken from LBIE must have their liabilities attach to the Purchased Assets

insofar as the Purchased Assets are or are derived from the LBIE transfer.

16.    Accordingly, should the Court approve the Sale, the Sale Order must make clear

that: (i) Barclays will not be acquiring title to assets or their proceeds that the Sellers do not own

and these assets (or their value) may be recovered, (ii) parties with claims to ownership or

constructive trust to assets subject to the Sale will have the right to assert their ownership claims

(which are not interests of the nature addressed in section 363(f) of the Bankruptcy Code) against

Barclays, and (iii) cash and securities in an amount of at least $8 billion of securities to be

transferred to or from Barclays should be frozen pending a final determination with respect to the

rights to such cash and securities in plenary litigation. Moreover, to ensure that the rights of the

LBIE Administrator and Bay Harbor are not further prejudiced by the Barclays Sale, all cash to

be transferred pursuant to the Purchase Agreement should be placed into segregated accounts

pending the outcome of litigation. Otherwise, the Defalcated Funds could be dissipated further,

---

[5]    Similarly, the Court does not have jurisdiction to order a sale free and clear of non-Debtor assets. Thus, the
Sale Order should be revised to make this clear.

which will disadvantage the LBIE Administrator, Bay Harbor, and other parties in interest from obtaining legal and equitable redress of the conversion of the Defalcated Funds.[6]

**D.**    **The Court Cannot Find That Barclays Is A Good Faith Purchaser.**

17.    The Court may not find Barclays to be a good faith purchaser (Sale Order, Finding K; Order, para. 19) absent investigation into the facts surrounding the transfer of the Defalcated Assets, including its knowledge of the Sellers' books and records and whether it knew of the transfer of the Defalcated Assets. Barclays was involved with the Lehman entities before it "walked away" and it may have known of the asset stripping. Thus, the Court should not adopt any finding that insulates Barclays from successor liability from customer ownership and constructive trust claims to any customer property. Sale Order, Finding P.

18.    A court cannot make a binding finding of fact without providing litigants notice and a meaningful opportunity to be heard. *See* U.S. CONST., 5th Amend. The fundamental rules of due process apply with equal force to bankruptcy proceedings. "The normal operation of the Bankruptcy Code . . . is predicated on the satisfaction of constitutional standards of due process." *In re Arch Wireless*, 332 B.R. 241, 251 (Bankr. D. Mass. 2005). The notice required by due process is "notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "The statutory command for notice embodies a *basic principle of justice - that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights.*" *City of New York v. N.Y., N.H. & Hartford R.R.*, 344 U.S. 293, 297 (1953) (emphasis added); *W. Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus.)*, 43 F.3d 714, 721 (1st Cir. 1994) ("Bankruptcy Code § 102(1)

---

[6]    The Motion does not explain why the Debtors are "selling" hundreds of millions of cash to Barclays while Barclays is providing $250 million of cash in exchange, and whether this is being done "to cleanse" the $700 million in cash from claims of LBIE and its creditors.

[requiring appropriate notice and appropriate hearing] is founded in fundamental notions of procedural due process"). "Specifically, the reorganization process depends upon all creditors and interested parties being properly notified of all vital steps in the proceeding so they may have the opportunity to protect their interests." *Reliable Elec. Co. v. Olson Constr. Co.*, 726 F.2d 620, 623 (10th Cir. 1984); *In re Stilwell*, 120 F.2d 194 (2d Cir. 1941) (same). Because parties in interest have not -- and, indeed, cannot -- be afforded due process to conduct discovery into the background of the Barclays Sale, there is no basis to give Barclays this protection. *Cf. Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.") (*quoted with approval in Goldberg v. Kelly*, 397 U.S. 254, 270 (1970)). Accordingly, the Court should adjourn consideration of the Barclays Sale for a reasonable time to enable parties in interest to conduct meaningful discovery into the underlying facts.

19.     There is no adequate record -- nor any meaningful opportunity for discovery -- of the conduct of the parties during the time leading up to the LBIE transfer and then the Barclays Sale. This precludes a good faith finding.[7]

## E.     Specific Issues With The Purchase Agreement.

20.     The Purchase Agreement is very vague on a number of points. The Court should not approve the Barclays Sale unless the Debtors clarify, among other things:

- What assets are being sold.

- What value the Debtors are providing.

- What are the Intercompany Claims and what, if any, are being released.

---

[7] Even if the Court makes findings concerning good faith, under no circumstances should the Sale Order exculpate any officers, directors, shareholders, affiliates, subsidiaries, partners and any other parties from any liability for any misconduct relating to the Defalcated Funds or otherwise.

- The uses of the Defalcated Funds.

**F.**    **Protection of Creditors.**

21.    Notwithstanding the above, should the Court approve the sale, there are several

ways in which it can protect Bay Harbour's rights.  First the Court can eliminate the Debtors'

release of "Interests" in Order, para. 24, because Bay Harbour has and likely will prosecute

substantial claims against the Debtors and its affiliates.  Second, the Court may provide in the

Sale Order that Barclays is only purchasing assets that the Sellers own and not those fraudulently

transferred in from LBIE or elsewhere.  Third, the Court can permit liabilities associated with

assets transferred from LBIE to attach to the Purchased Assets and become Barclays'

responsibility.  Fourth, the Court can require Barclays to segregate at least $8 billion of cash and

securities it is buying until there is a full and complete determination by the Administrator and its

creditors as to whether that cash rightfully belongs back in LBIE.  Fifth, the Court can require

the Sellers to segregate the proceeds of sale pending a full and complete determination by the

Administrator and its creditors as to whether that cash rightfully belongs back in LBIE.  Sixth,

the Court can refuse the good faith finding and associated protections pending a full and

complete investigation into the circumstances surrounding the LBIE transfer of the Defalcated

Assets, the conduct of the negotiations, and the knowledge and access of Barclays regarding the

transfer.

## CONCLUSION

WHEREFORE, Bay Harbor respectfully requests that the Court deny approval of the

Barclays Sale unless the Sale Order is amended to protect creditors as described herein and grant

such other and further relief in favor of Bay Harbour as is deemed just and proper.

Dated: September 19, 2008
     New York, New York

By:  /s/  David S. Rosner
David M. Friedman (DF-4278)
David S. Rosner (DR-4214)
Andrew K. Glenn (AG-9934)
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800

Attorneys for Bay Harbour Management
L.C.., Bay Harbour Master Ltd., Trophy Hunter
Investments, Ltd., BHCO Master, Ltd., MSS
Distressed & Opportunities 2 and Institutional
Benchmarks

# Exhibit A

My anger over Lehmans' $5 billion 'betrayal of London | News    Page 1 of 4

# Evening Standard

standard.co.uk

Homes & Property

London, Thursday 18.09.08

## News

David Cohen, Evening Standard
17.09.08

**The day after the fall of Lehman Brothers, Robert Daniels, a director and a senior departmental head at the Canary Wharf headquarters, is sitting contemplating his future over a stiff espresso when an incongruous email drops onto his BlackBerry.**

It is from Ravi Mattu, global head of research at Lehmans on Wall Street, and it says: "I am extremely pleased to announce that for the ninth year in a row, Lehman Brothers' fixed income research team is ranked number one in the annual institutional investor survey of 1,330 professionals at 490



Banking wilderness: Lehmans' high-tech offices in the City stand empty

institutions. This achievement is the direct result of a team effort and I want to congratulate the entire fixed income division for this tremendous honour."

At first Robert, 36, a father of three who lives in Chelsea and who would have earned $700,000 this year, shows me the email as an example of the "bizarre culture of denial" that has characterised the past few months at Lehmans.

"I've heard of rearranging the deck chairs on the Titanic while it's sinking but not after the ship has already sunk," he says. "If it wasn't so sad, it would be pretty hilarious."

Woken on Monday by a 4am text from a colleague in New York to say that Lehmans had filed for bankruptcy, Robert has watched his $200,000-worth of Lehman shares (half of last year's bonus) dwindle to less than a prawn sandwich. He is shocked at how badly things have turned out, he says when we meet outside the company's gleaming offices, but as the day progresses, his resentment at being left "rudderless" for so long "and now jobless" will turn to anger.

He and his colleagues now know that the New York subsidiary of Lehmans is doing a deal with - Barclays Bank to save its broker/dealer operation. "This is the disgusting bit," he says, "it has been done at the expense of Lehmans in London."

What does he mean? According to Robert, billions of dollars disappeared from Lehmans' London bank account over the weekend. On Fridays, he explains, London typically transfers billions to New York and is issued with a portfolio of assets in return. "It's a standard inter-company transfer that happens every Friday to fund the US assets over the weekend and every Monday the trade is reversed," says Robert.

This Monday, he says, was different. "The money was not returned to our bank account from the US and all we were left with was a bunch of useless assets. Nobody can tell us where it has gone. What we do know is that the money disappeared on Friday night and did not come back into our account on Monday morning. That is why the administrators came in on Monday and found no cash and said they probably can't pay our September salaries.

"People were surprised, because a few days before we had over $5 billion in our bank account, now we suddenly couldn't even afford the $150 million September salary bill."

From a legal perspective, the reason the money was not returned is straightforward: late on Sunday night, Lehman declared bankruptcy and as such all assets were frozen pending the liquidators.

But according to Robert and his colleagues, questions are being asked about the "fortuitous Sunday night timing" of the bankruptcy announcement — "at least as far as the US subsidiary of Lehmans is concerned".

"A few hours later and those billions would have been back in London, making the London subsidiary cash-rich and a more attractive takeover target to potential suitors like Barclays than the hitherto cash-poor parent parts of the US subsidiary," says Robert.

"Most of the 4,500 London employees of Lehmans have no idea that we might have been sold down the river by our New York colleagues but those who do know are extremely upset. It's like we've been stabbed in the back.

"The consequences could be grave. It could be a huge legal issue, setting London Lehman employees against their New York colleagues. But it goes beyond who gets paid their September salaries. This is billions we're talking about, billions that have been moved overnight out of the

My anger over Lehmans' $5 billion 'betrayal of London'| News    Page 2 of 4

UK to the US to the detriment of the British economy, and which might have to be repatriated to London."

Robert, whose name has been changed at his request to protect his identity and who was headhunted to join LehmanS from another City bank two years ago, says that since thunder clouds began gathering over his company some five months ago, the top brass have attempted to keep middle management like him in the dark.

"Lehman is run by a very tight group of people who never consulted with us and hardly bothered to come to London. We called Richard Fuld [the chief executive officer nicknamed The Gorilla because of his obsession with weight lifting] the invisible man because he never put in an appearance. And when the big guns did come, like Kaushik Amin, global head of liquid markets, he told us nothing and showed no leadership."

Robert recalls the morning meeting hosted by Amin a few weeks ago. "He addressed about 40 traders on the fourth floor and when he finished, the traders started telling him about other banks being reticent to trade with us and asking for reassurance as to our future. He said: Everything is fine, we're the market leaders.' Then he rebuked the traders for not wearing ties on the trading floor at all times.

"In retrospect you wonder: was he blinded by arrogance? Was he in denial? How could he tell us off for not wearing a tie at a time when the bank was going under?"

The first rumours of rain, Robert says, came in May this year when Lehmans posted its second quarter results showing losses of $2.8 billion, "the first time the bank had experienced negative earnings".

"It showed that our micro-hedge strategy — of hedging our bets against a collapsing property market by betting on interest rates falling — had failed.

"Contrary to popular belief, the problem was not our exposure to the sub-prime market, which was acceptable, but rather our massive $85 billion investment in the commercial property market which had suffered the knock-on effect of the precipitous collapse in the residential housing market.

"The losses caused a great deal of anxiety inside the firm, and speculation from other bankers, that we were about to go the way of Northern Rock and it meant that some other banks didn't want to trade with us any more.

"The response by the top brass was to get us managers to go out and see clients to tell them it was just a blip' and that Lehmans was very much in business'.

"But one by one, clients that had been trading with us for years started to make excuses and shy away from any exposure to us."

As confidence drained away, Jeremy Isaacs, chief executive of Lehmans in Europe, the Middle East and Asia, arranged for a Q&A session last June to calm his employees' nerves. There was only room for director level and above as 200 bankers crammed into Lehmans' ground floor auditorium.

"Isaacs told us that some bad decisions had been made but he pinned it on two individuals — operating officer Joe Gregory and the chief financial officer Erin Callan — who had both since been fired and he said that everything was going to be fine.

"His mood was a mixture of confidence and arrogance and he succeeded in reassuring many of us that it was inconceivable the bank would fail. At that stage, we knew there was a hole in the hull but none of us — except perhaps Jeremy — had any idea just how large it was."

For months the bank limped on, trying to implement a new strategy of raising fresh capital and turning away from real estate towards a commission-based income model. The former led to failed talks with the Korean Development Bank, the latter foundered because of speculation as to mounting third quarter losses that caused clients to shy away.

For Robert, it was a confusing time. His own division, he says, had an incredible year and posted record profits for the second year running. "In our section, we were making hundreds of millions for the bank. It was hard to keep reminding ourselves about the bleak bigger picture."

Three weeks ago, staff were informed of the new "good bank, bad bank" strategy, whereby the toxic commercial real estate assets were to be hived off into a separate company and the good - profitable bits kept in Lehman Brothers. Last week the market responded to this strategy, along with the announcement of third quarter losses of $3.9 billion, by knocking 45 per cent off the value of the shares. From a high of $60, the shares were worth just $7.79.

"At that point, the atmosphere inside our Bank Street office was frantic. We knew there was no longer a strategy and that what we desperately needed was a buyer to bail us out."

Nevertheless, says Robert, even as late as Friday night, he felt 100 per cent convinced that Lehmans would survive and that Barclays or Bank of America would buy it out. "I would have bet anything on it. I went to bed on Sunday night fully expecting to go in for business as usual on Monday."

Is he worried about his future? "Yes," he says. "Although I live frugally compared to your typical banker, I have three young children at private schools. My wife and I sat up last night working out that we have enough money to survive for six months. It won't be easy getting a job in the current conditions. Some of my colleagues have already been out interviewing today but nobody I know has had any luck.

"There was a lot of stress in the building on Monday with some people angrily packing their belongings in boxes and leaving. Today it's quieter. I came in later after taking my seven-year-old

My anger over Lehmans' $5 billion 'betrayal' of London | News                    Page 3 of 4

son to school. He wanted to know why I was taking him, because I never do. I said: Because I've lost my job.' He said: Good, maybe now I'll see more of you.' His perspective helped take the edge off, I suppose.

"But then I saw a colleague who has been at the bank a long time and who has lost $10 million — all his bonuses, vested in shares, are now worth nothing. I think we're all beginning to understand that banking is a risky business. Sometimes you hit the bar, and sometimes the bar hits you.

"Right now, although there are a lot of bankers with very sore heads, we are determined to get to the bottom of what's happened to the billions of dollars that were transferred late on Friday to New York and that were never returned to London."

Link to: 🐾 🐱 ⬛ 📘                                    | Show all

### Reader Views (21)

Here's a sample of the latest views published. You can click view all to read all views that readers have sent in.

Its true - every single bank worker is greedy and everyone at Lehmans deserved to lose their jobs! I should know - I work for a bank in Docklands myself, all we do all day is sit in the boardrooms, smoking cigars, counting our millions and looking down on everyone else!
WAKE UP! All these horrible comments sum England as a nation up - just bloody ignorant. Approx. 97% of bank employees are on normal wages with mortgages and bills to play like everyone else - its disgusting that a majority of the country are finding some joy in seeing other normal peoples misfortune, and make me sad to be British.

- City Worker, London

Yes it's sad for the people who have been affected who are not in the top 5% of high earners. Can I just ask though, what is the the 'average wage' in the City these days?

- S-M Hearmon, London, UK

Boy, you people have some pretty disgusting comments. Do you have any idea how hard these people work? I used to work at Lehman. I wasn't a big shot by any means, but I worked bloody hard. At my desk at 7am - out usually by 10pm - on call all weekends. The point of the article is that the big shots at Lehman were always treating the "little people" like crap. Of 7,000 employees, I would say there were about 200 jackasses, the rest very hard-working decent people. The economy is the UK is rubbish - the only thing holding it up in part are the City banks - People - get educated and get a grip - this is a tragedy - oh! and for you people out there mocking a huge salary, somebody in Kenya making $12 a month could look at you and not understand how, if you lost your job at Tesco, could only get by for 6 months. It is all relative. I lived in the UK for 2 years and it really is a souless nation - good grief!

- Tess, Phoenix, AZ

## Add your comment                                    **Show all**

**Name:**

**Email:**            Your email address will not be published

**Town and country:**

**Your comment:**        Terms and conditions

You have  characters left.                    make text area bigger

☐ Remember me - this will save your name, location and email address for when you leave your next comment.

☐ Email me a link to these comments

My anger over Lehmans' $5 billion 'betrayal' of London | News

Clear    submit comment

# Exhibit B



Market Scan

# Barclays In The Driving Seat

Javier Espinoza, 09.16.08, 10:50 AM ET

LONDON - **Lehman Brothers Holdings** might have filed for Chapter 11 bankruptcy but it still has some attractive assets.

Barclays emerged from the rubble after the bloody fall of Wall Street's giant. It held private talks Tuesday afternoon trying to seal a better deal on some of the still-profitable divisions at Lehman. "We are having talks but they might not come to something," a Barclays' representative told Forbes.com.

Barclays, reportedly the only bidder, has finally come out and admitted its interest in buying some leftover assets. (See "Barclays Picking At Lehman Scraps.") The British bank's shares were trading 8.9%, or 28 pence (50 cents) lower at 288 pence (5.13 cents), on Tuesday afternoon in London.

Although Barclays would not reveal which assets it wants to buy, analysts told Forbes.com it makes sense to ignore the toxic ones, linked to bad investments in the mortgage markets, and go for those that would complement its business.

"There a lot of stuff that it's still very good, " Leigh Goodwin, an analyst with Fox-Pitt Cochran Caronia, told Forbes.com. "Barclays has been consistent at saying it wants to expand its operations in the U.S. and it might be able to extract good assets from Lehman's business. It is being opportunistic," he said.

Goodwin said some of the potential assets Barclays would like to put in the bag are the lender's brokerage division and its asset management business.

Barclays had been in talks with Lehman last weekend about a full takeover, but the British bank balked when it could not get the U.S. Treasury to guarantee Lehman's trading obligations. Shares across the planet plunged as a reaction.

Bob Diamond, head of the Barclays Capital investment bank arm, refused to bid for Lehman after the U.S. government said it wouldn't act as a guarantor to Lehman's debt. (See "Barclays Wins By Losing Lehman.")

"I am not aware of anybody else in the bidding process. It's not a fair situation and Barclays is clearly in the driving seat," said Neil Smith, an analyst with WestLB Research.

# A. 164

EX-10.5 6 a08-22764_5ex10d5.htm EX-10.5

Exhibit 10.

EXECUTION COPY

**TRANSITION SERVICES AGREEMENT**

dated as of September 22, 2008

between

**LEHMAN BROTHERS HOLDINGS INC.**

and

**BARCLAYS CAPITAL INC.**

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement, dated September 22, 2008 (this "Agreement"), is made by and between Barclays Capital Inc., a Connecticut corporation ("BarCap"), and Lehman Brothers Holdings Inc., a Delaware corporation ("LBHI").

### RECITALS

WHEREAS, LBHI, Lehman Brothers Inc., LB 745 LLC and BarCap have entered into that certain Asset Purchase Agreement, dated as of September 16, 2008 (as amended and supplemented, the "Purchase Agreement");

WHEREAS, it is contemplated by the Purchase Agreement that (a) BarCap shall provide, or cause to be provided, to LBHI (and/or its Affiliates on the date hereof including the IMD Entities, collectively hereinafter referred to as the "LBHI Entities") certain services, use of facilities and other assistance on a transitional basis and in accordance with the terms and subject to the conditions set forth herein and (b) LBHI shall provide, or cause to be provided, to BarCap (and/or its Affiliates on the date hereof, collectively hereinafter referred to as the "BarCap Entities") certain services, use of facilities and other assistance on a transitional basis and in accordance with the terms and subject to the conditions set forth herein; and

WHEREAS, the Purchase Agreement contemplates execution and delivery of this Agreement by BarCap and LBHI.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE 1

### DEFINITIONS

Section 1.01    Certain Defined Terms.  Unless otherwise defined herein, any capitalized term used herein shall have the same meaning as in the Purchase Agreement.

The following capitalized terms used in this Agreement shall have the meanings set forth below:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, control by a general partner, by contract or otherwise; provided that such other Person shall no longer be deemed an Affiliate once such control ceases.

1

"Benchmark Period" means the twelve-month period prior to the Closing Date.

"Force Majeure" means, with respect to a Person, an event beyond the control of such Person (or any Person acting on its behalf), including acts of God, storms, floods, riots, fires, sabotage, labor stoppage, civil commotion or civil unrest, interference by civil or military authorities, acts of war (declared or undeclared) or armed hostilities or other national or international calamity or one or more acts of terrorism or failure of energy sources or of Internet or telecommunications services.

"IMD Entities" means (i) the entities that, on the date hereof, conduct the investment management business of LBHI and its Affiliates and (ii) in each case solely to the extent permitted under Section 9.10, their successors and assigns with respect to such business.

"Information Systems" means computing, telecommunications or other digital operating or processing systems or environments, including computer programs, data, databases, computers, computer libraries, communications equipment, networks and systems. When referenced in connection with the Services, Information Systems shall mean the Information Systems accessed and/or used in connection with the Services.

"Prime Rate" means the prime rate published in the Eastern Edition of The Wall Street Journal or a comparable newspaper if The Wall Street Journal shall cease to publish the prime rate.

"Provider" means the party hereto or its subsidiary or Affiliate providing a Service or an Additional Service under this Agreement.

"Recipient" means a party hereto or its subsidiary or Affiliate to whom a Service or any Additional Service is being provided under this Agreement.

"Representative" of a Person means any director, officer, employee, agent, consultant, accountant, auditor, attorney or other representative of such Person.

"Termination Charges" shall mean any portion of any fees or expenses payable to any unaffiliated, third-party provider as a result of any early termination or reduction of a Service that cannot reasonably be avoided by the Provider.

"Virus" shall mean any computer instructions (i) that adversely affect the operation, security or integrity of a computing, telecommunications or other digital operating or processing system or environment, including without limitation, other programs, data, databases, computer libraries and computer and communications equipment, by altering, destroying, disrupting or inhibiting such operation, security or integrity; (ii) that without functional purpose, self-replicate without manual intervention; and/or (iii) that purport to perform a useful function but which actually perform either a destructive or harmful function, or perform no useful function and utilize substantial computer, telecommunications or memory resources.

2

## ARTICLE 2

### SERVICES AND TERMS

Section 2.01    Services; Scope.

(a)    Subject to the terms and conditions set forth in this Agreement, (i) BarCap shall provide, or cause to be provided, to the LBHI Entities those services (the "BarCap Services") that were being provided (x) by any Subsidiary of LBHI that is acquired by BarCap or one of its Affiliates pursuant to the Purchase Agreement or a vendor of such Subsidiary, or (y) by the LBHI Entities or a vendor thereof through the use of the Purchased Assets or the Transferred Employees, to the IMD Business and any other businesses of the LBHI Entities prior to the Closing that were not acquired by BarCap under the Purchase Agreement (each such business, a "Retained LBHI Business"), and (ii) LBHI shall provide, or cause to be provided, to the BarCap Entities those services that were being provided by an LBHI Entity or a vendor thereof prior to the Closing to the businesses acquired by BarCap under the Purchase Agreement (the "LBHI Services" and collectively with the BarCap Services, the "Services"). If, for any reason, BarCap is unable to provide any BarCap Service to the LBHI Entities pursuant to the terms of this Agreement, BarCap shall provide to the applicable LBHI Entity a substantially equivalent service (a "BarCap Substitute Service") in accordance with the terms of this Agreement, which such service shall be considered a BarCap Service for purposes of this Agreement. The scope of each BarCap Service shall be substantially the same as the scope of such services provided by the applicable LBHI Entity to the applicable Retained LBHI Business in the ordinary course during the Benchmark Period (in each case, to the extent such BarCap Service was provided using Purchased Assets or by Transferred Employees), and the use of each BarCap Service by an LBHI Entity shall include use by such LBHI Entity's contractors in substantially the same manner as used by such contractors in the ordinary course, during the Benchmark Period. If, for any reason, an LBHI Entity is unable to provide any LBHI Service to the BarCap Entities pursuant to the terms of this Agreement, LBHI shall provide to the applicable BarCap Entity a substantially equivalent service (an "LBHI Substitute Service") in accordance with the terms of this Agreement, which such service shall be considered an LBHI Service for purposes of this Agreement. The scope of each LBHI Service shall be substantially the same as the scope of such service provided by the applicable Retained LBHI Business to the applicable LBHI Entity in the ordinary course during the Benchmark Period, and the use of each LBHI Service by a BarCap Entity shall include use by such BarCap Entity's contractors in substantially the same manner as used by such contractors in the ordinary course, during the Benchmark Period. All Services shall be for the sole use and benefit of the respective Recipient, including any of such Recipient's customers or clients of the type who received the use and benefit of the equivalent services in the ordinary course during the Benchmark Period; provided, however, that the Recipient agrees that it shall not re-market or act as a service provider with respect to any of the Services hereunder to a third party.

(b)    Each Service shall include, and the Service Charges reflect charges for, such maintenance, support, error correction, updates and enhancements normally and customarily provided by the relevant Provider to its subsidiaries that receive such service. Each Service shall include all functions, responsibilities, activities and tasks, and the materials, documentation, resources, rights and licenses to be used, granted or provided by the relevant

3

Provider that are not specifically described in this Agreement as a part of such Service, but are incidental to, and would normally be considered an inherent part of, or necessary subpart included within, such Service or are otherwise necessary for such Provider to provide, or the Recipient to receive, such Service.

(c)    Throughout the term of this Agreement, (i) each Provider and each Recipient of any Service shall cooperate with one another and use their good faith and commercially reasonable efforts to effect the efficient, timely and seamless provision and receipt of such Service and (ii) the Recipient shall use its good faith and commercially reasonable efforts to transition away and wind down its use of the Services.

(d)    This Agreement shall not assign any rights to Technology or Intellectual Property between the parties hereto.

(e)    Notwithstanding anything to the contrary herein, for the avoidance of doubt, Lehman Brothers Holdings plc, Lehman Brothers Limited, LB UK RE Holdings Limited and Lehman Brothers International (Europe) shall not be deemed LBHI Entities hereunder.

Section 2.02    Conversion Services.

(a)    During the term of this Agreement, the parties shall provide, or cause to be provided, the following information and support to the other party, as applicable, which support shall be included within the Services described herein or in the Schedules hereto:

(i)    current and reasonably available historical data owned by the Provider and related to the Services and predecessor services thereto as reasonably required by the relevant Recipient in connection with the conduct of the Business (in the case of BarCap) or the Retained LBHI Business (in the case of the LBHI Entities) or for litigation or regulatory purposes, in a manner and within a time period as mutually agreed by the parties; and

(ii)    on commercially reasonable terms, which will be added to the Service Charges, the services of the employees and contractors of the relevant Provider whose assistance, expertise or presence is necessary to assist the Recipient's transition team in establishing a fully functioning stand-alone environment (it being understood that the services of employees and contractors pursuant to this clause (ii) are not intended to be a substitute for the services of its own employees and third party consultants and advisors to be engaged by the relevant Recipient in connection with such transition or similar services, but instead to facilitate coordination with such individuals).

Section 2.03    Transition Services Managers.

(a)    BarCap shall appoint an individual, by giving written notice thereof to LBHI within three Business Days following the date hereof, to act as its initial services manager (the "BarCap Services Manager"), who will be directly responsible for coordinating and managing the delivery of the BarCap Services and have authority to act on BarCap's behalf with respect to matters relating to this Agreement. The BarCap Services Manager will work with the personnel of BarCap to periodically address issues and matters raised by LBHI relating to this Agreement. Notwithstanding the requirements of Section 9.05, all communications from LBHI

4

to BarCap pursuant to this Agreement regarding routine matters involving the BarCap Services shall be made through the BarCap Services Manager, or such other individual as specified by the BarCap Services Manager in writing and delivered to LBHI by email or facsimile transmission with receipt confirmed. BarCap shall reasonably promptly notify LBHI of the appointment of a different BarCap Services Manager, if necessary, in accordance with Section 9.05.

(b)    LBHI shall appoint an individual, by giving written notice thereof to BarCap within three Business Days following the date hereof, to act as its initial services manager (the "LBHI Services Manager"), who will be directly responsible for coordinating and managing the delivery of the LBHI Services and have authority to act on LBHI's behalf with respect to matters relating to this Agreement. The LBHI Services Manager will work with the personnel of LBHI to periodically address issues and matters raised by BarCap relating to this Agreement. Notwithstanding the requirements of Section 9.05, all communications from BarCap to LBHI pursuant to this Agreement regarding routine matters involving the Services shall be made through the LBHI Services Manager, or such other individual as specified by the LBHI Services Manager in writing and delivered to BarCap by email or facsimile transmission with receipt confirmed. LBHI shall reasonably promptly notify BarCap of the appointment of a different LBHI Services Manager, if necessary, in accordance with Section 9.05.

Section 2.04    Personnel; Authorized Signatories. The Provider will have the right, in its sole discretion, to (i) designate which personnel or third party service providers it will assign to perform Services, and (ii) remove and replace such personnel or third party service providers at any time.

Section 2.05    Performance and Receipt of Services. The following provisions shall apply to the Services:

(a)    Security and Privacy. Each Provider and Recipient shall at all times comply with its own then in-force security guidelines and policies applicable to the performance, access and/or use of the Services and Information Systems. Where a Provider or Recipient receives access to the other party's Information Systems, then it shall also comply with such other party's security guidelines and policies. The parties acknowledge that historically the Services governed by this Agreement have been rendered within a single group of related entities and a shared security environment, and that in order for Services to be rendered among and between the BarCap Entities and the LBHI Entities as unrelated entities additional systems, procedures, guidelines and policies may need to be established to render the Services in compliance with Law, regulation, and applicable privacy and security policies. Each of the LBHI Entities and the BarCap Entities shall use its reasonable efforts to establish such additional systems, procedures, guidelines and policies in a manner that will not disrupt the rendering of Services or the LBHI Retained Businesses or the Business, respectively. Recipient shall bear all of its own costs and expenses in connection with such an effort; Provider's costs and expenses in connection with such an effort will be included in the Service Charges to the extent directly related to providing the Services.

(b)    No Viruses. Each of LBHI and BarCap shall take commercially reasonable measures to ensure that no Viruses or similar items are coded or introduced into the Services or Information Systems. If a Virus is found to have been introduced into the Services or

5

Information Systems, the parties hereto shall use their commercially reasonable efforts to cooperate and to diligently work together to eliminate the effects of such Virus.

(c)      Reasonable Care.  Each Provider and Recipient shall exercise reasonable care in providing and receiving the Services to (i) prevent access to the Services or Information Systems by unauthorized Persons and (ii) not damage, disrupt or interrupt the Services or Information Systems.

Section 2.06      Termination Services.  Each Provider shall reasonably cooperate with the Recipient of each Service, upon request and on commercially reasonable terms (which will be added to the Service Charges), to facilitate such Recipient's transition to provision of such services by a replacement provider or by its own employees.

Section 2.07      Superseding Provisions.  Notwithstanding anything to the contrary contained in this Agreement:

(a)      no Provider shall be required hereunder to take any action (including by providing any Services) that would constitute, or that the Provider reasonably believes would constitute, (i) a violation of applicable Law, including any requirement of any Governmental Body, (ii) a breach of such Provider's contractual obligations or (iii) any other violation of a third party's rights; provided that in each of the foregoing circumstances the Provider shall use reasonable efforts to work around the impediment and endeavor to provide Services in a manner that does not violate Law, contractual obligations or third party rights;

(b)      no Provider shall be required hereunder to fund the Services or otherwise provide financial support, benefits or other consideration on the Recipient's behalf to third parties, or to take custody of, settle, clear or handle securities, in connection with the Services, and the obligation to perform any Service involving funds shall be subject to the Recipient having previously made such funds available to the Provider specifically for such purpose;

(c)      any obligation to provide Services or otherwise undertake activities hereunder shall be limited to the party's use of good faith and commercially reasonable efforts; and

(d)      the Provider shall not be responsible for any failure to provide Services hereunder to the extent arising from (i) the Recipient's operations or systems or otherwise by the acts or omissions of the Recipient or individuals acting on its behalf or (ii) a third party's failure to provide such Services or (iii) the failure of Recipient or its Affiliates to provide Services to Provider.

## ARTICLE 3

## ADDITIONAL AGREEMENTS AND ARRANGEMENTS

Section 3.01      Computer-Based Resources.  Commencing on the Closing Date, and for ninety (90) days thereafter, each party (the "Accessing Party") shall continue to have access to the Information Systems of the other party (the "Providing Party"), to the extent such access to such Information Systems was available to the Accessing Party immediately prior to

6

the Closing and remains necessary for the Accessing Party to operate its business; provided, that (a) the BarCap Entities may take reasonable measures to restrict access by the LBHI Entities to any systems or data unrelated to the Retained LBHI Business to which the LBHI Entities are not entitled to access, (b) the LBHI Entities may take reasonable measures to restrict access by the BarCap Entities, to any systems or data unrelated to the Business to which the BarCap Entities are not entitled to access, and (c) such continued access shall be subject to the Accessing Party complying with all reasonable security measures implemented by the Providing Party as deemed necessary by such Providing Party to protect its Information Systems. Commencing no later than ten Business Days after the Closing Date, representatives of BarCap and LBHI with authority in the area of Information Systems (the "IT Committee") shall meet at such reasonable time, place and manner as they may agree, to develop a plan for migrating from the Information System infrastructure as deployed as of the Closing Date, to a final Information Systems infrastructure satisfactory to both BarCap and LBHI (the "IT Migration Plan"). The parties shall use reasonable efforts to enter into an IT Migration Plan no later than one month after the Closing Date and shall include, among other provisions, a time line for completing the migration of Information Services and a final migration deadline after which neither BarCap nor any LBHI Entity shall have access to all or any part of the Information Systems of the other party, except to the extent reasonably necessary for the receipt of the Services (subject to the accessing party complying with all reasonable security measures implemented by the providing party as deemed necessary by such providing party to protect its Information Systems), or as otherwise agreed in a separate agreement. When finalized in writing and executed by the authorized representatives of BarCap and the LBHI Entities, the IT Migration Plan shall be deemed to be incorporated into this Agreement as an amendment and addition hereto.

Section 3.02    Termination of Support. BarCap shall provide the IMD Entities with notice a reasonable period in advance of ceasing to support any material software contained within the Purchased Assets that directly supports the IMD Business. Following receipt of such notice, if the IMD Entities so elect in writing, BarCap shall use reasonable efforts provide the IMD Entities with a copy of such software in source code and object code form and any associated documentation for their use pursuant to Section 8.9 of the Purchase Agreement; provided, however, that following such receipt, the IMD Entities shall endeavor to support their own services through the use of such software and if the IMD Entities are successful in doing so, then BarCap shall no longer be obligated to provide the Service to the extent previously supported by such software.

Section 3.03    Point System. Until the earlier of the first anniversary of the Closing Date and the date on which BarCap and the relevant IMD Entity enter into an arms length agreement on mutually agreeable terms, the IMD Entities will have the option to become "enterprise level" clients at prevailing market rates of the Point System application/service.

Section 3.04    Access. BarCap or LBHI, as the case may be, will allow the relevant Provider and its Representatives reasonable access to the facilities and personnel of the relevant Recipient, and shall provide such other reasonable cooperation and assistance, at the Recipient's cost, necessary for the performance of the Services for the Provider to fulfill its obligations under this Agreement.

7

Section 3.05    Schedules.  The parties acknowledge and agree that the Services contemplated to be provided hereunder are not enumerated, defined or described in detail.  For purposes of illustration, the Services may include (or include aspects of) operational, financial, corporate, human resources, information technology and other services.  The parties shall cooperate in good faith to create Schedules to this Agreement, within thirty days following the Closing Date, that will contain a specific list of certain of the Services to be provided pursuant hereto, including, with respect to the IMD Business, potential additional specificity on the pricing model.  For the avoidance of doubt, but subject to Section 3.07, none of the Services shall require the relevant Provider to provide the legal services of any attorney to the Recipient in connection with any such Service (unless otherwise agreed in writing by the parties hereto).

Section 3.06    Assignment of Shared Purchased Contracts.  With respect to Purchased Contracts that relate both to (i) the business acquired by BarCap under the Purchase Agreement and (ii) Retained LBHI Businesses ("Shared Purchased Contracts"):

(a)    where BarCap has the contractual right to assign the portion of its rights under such agreements that relate to any of the Retained LBHI Businesses (while retaining the portion of such rights that relate to the Business), with no additional payment to the counterparty thereof, it shall exercise such right. If BarCap has the contractual right to make such partial assignment but only upon payment to the counterparty thereof, it shall notify LBHI of the amount of the required payment and shall exercise such right upon receipt of payment by LBHI of the amount required to be paid to the counterparty; and

(b)    where BarCap does not have the contractual right to assign the portion of its rights under such agreements, BarCap shall cooperate in good faith with LBHI in LBHI's efforts to enter into a replacement agreement on comparable terms; provided that BarCap shall have no obligation to pay anything of value  with respect to such cooperation; and

(c)    the recipient of such partial assignment or counterparty to such replacement agreement shall be, as applicable, LBHI or the assignee of the relevant Retained LBHI Business.

Section 3.07    Further Access.

(a)    For a period of two years after the Closing Date, the BarCap Entities shall provide, or use reasonable efforts to cause to be provided to, the LBHI Entities at no charge (other than BarCap's out-of-pocket costs and expenses including contractor fees) with reasonable access to all individuals who were employees or contractors of the LBHI Entities prior to the Closing Date (and are employees or contractors of the BarCap Entities at the time of requested access), and who have material knowledge about the Retained LBHI Businesses or the Excluded Liabilities, and BarCap shall use reasonable efforts to provide such individuals' cooperation therewith. As part of the foregoing, for a period of ninety (90) days after the Closing, (i) such employees shall provide reasonably necessary assistance to the LBHI Entities in the unwinding of the Retained LBHI Business and (ii) such employees that are attorneys shall provide reasonably necessary legal services in the unwinding of the Retained LBHI Business, provided that such assistance in (i) and (ii) shall be deemed Services as to which the Service Charges

8

apply and in all instances shall be subject to any confidentiality, professional or ethical obligations or restrictions (including without limitation any potential conflicts).

(b)    For a period of two years after the Closing Date, the LBHI Entities shall provide, or use reasonable efforts to cause to be provided to, the BarCap Entities at no charge (other than LBHI's out-of-pocket costs and expenses including contractor fees) with reasonable access to all individuals who were employees or contractors of the LBHI Entities prior to the Closing Date (and are employees or contractors of the LBHI Entities at the time of requested access), and who have material knowledge about the Business or the Services to be provided by the BarCap Entities, and LBHI shall use reasonable efforts to provide such individuals' cooperation therewith.

(c)    The parties recognize and understand that there will be substantial efforts in the period following the Closing Date in the integration of the Transferred Employees and the Purchased Assets into BarCap's operations and the operation of the Business, and the continuing efforts of LBHI to divest the remaining assets and wind down the Retained LBHI Business while maintaining the continuity thereof. As such, the parties will work together to reasonably accommodate each other in such efforts while balancing BarCap's needs for integration and operation with LBHI's needs for information and support.

Section 3.08    Data Centers. To the extent BarCap is assuming material data center contracts as part of the Purchased Assets, the parties will negotiate in good faith a post-Closing data center strategy to reasonably address such issues as part of this Agreement.

Section 3.09    IMD Employees. During the thirty-day period following the Closing Date, the parties shall cooperate in good faith to develop a reasonable procedure (a) pursuant to which BarCap will endeavor to provide notice to LBHI prior to terminating the employment of any Transferred Employees during the six months following the Closing Date who are dedicated (or primarily dedicated) to the IMD Business, to the extent permitted under applicable confidentiality and privacy obligations and (b) to identify any Transferred Employees whose functions prior to the Closing Date were unrelated to the Business (if any).

Section 3.10    Notices. If any of the LBHI Entities receive any notices related to the Business it shall promptly forward them to BarCap and if any of the BarCap Entities receive any notices related to the Retained LBHI Businesses it shall promptly forward them to LBHI.

Section 3.11    Software. For a period of ninety days following the Closing Date, upon the request of LBHI, the parties will cooperate in good faith to identify any software included in the Purchased Assets for which there is no third party vendor or service provider that can reasonably provide comparable software and absence of which would cause a material adverse effect on the value of the relevant underlying business operations or assets of the Retained LBHI Businesses. The BarCap Entities will use reasonable efforts to provide a copy of such software to LBHI (in source code and object form and associated documents, to the extent in their reasonable possession); provided that such software shall be governed by the scope of the license in Section 8.9(b) of the Purchase Agreement.

9

Section 3.12.    Access to Books and Records. (a) The BarCap Entities shall provide the LBHI Entities reasonable access to books and records acquired as part of the Purchased Assets that are related and material to the Retained LBHI Business (to the extent such books and records are in a BarCap Entity's possession at the time of requested access); and (b) the LBHI Entities shall provide the BarCap Entities reasonable access to books and records that are related and material to the Business (to the extent such books and records are in an LBHI Entity's possession at the time of requested access).

## ARTICLE 4

## COSTS AND DISBURSEMENTS; PAYMENTS

Section 4.01    Costs and Disbursements; Payments.

(a)    Any Service to be provided by any Provider hereunder shall be charged to the Recipient thereof as follows (such charges, the "Service Charges"):

(i)    until the date that is nine (9) months after the Closing Date, at a cost equal to the Provider's fully-loaded costs and expenses for providing such Service (including in such fully-loaded costs and expenses (x) an allocation for overhead costs to the extent directly related to providing the Services, (y) the amount of the actual payments made by the Provider to third-party providers for providing Services, and (z) associated overhead costs relating to the Services provided by such third-party providers) ("Provider's Cost"), but without any markup for profit margin; and

(ii)    on and after the date that is nine (9) months after the Closing Date (including during any extension of the term of this Agreement), at a cost equal to Provider's Cost plus 15% of Provider's Cost.

Service Charges shall include value-added taxes and all other taxes payable in respect of the provision of the Services other than taxes imposed on the net income of the Provider. If LBHI or BarCap (as applicable) is required, by Law or to otherwise avoid legal penalties under Law, to pay, directly or indirectly, to an Affiliate any transfer pricing markup or equivalent cost in order to deliver a Service, then such transfer pricing markup or cost shall be included in the relevant Service Charges, unless such mark-up or cost is subsequently recoverable by LBHI or BarCap (as applicable).

For the avoidance of doubt, Service Charges shall not include any amounts owed by a party (whether to third parties or Affiliates) prior to the Closing Date.

For the avoidance of doubt, Service Charges may increase or decrease, including, as a result of (i) an increase or decrease in the amount of such Services being provided to the Recipient (as compared to the amount of the Services underlying the determination of a Service Charge), (ii) an increase or decrease in the rates or charges imposed by any third-party provider that is providing goods or services used by the Provider in providing the Services (as compared to the rates or charges underlying a Service Charge), (iii) an increase or decrease in the payroll or benefits for any employees used by the Provider in providing the Services, or (iv) any increase or decrease in costs relating to any changes requested by the Recipient in the nature of the Services

10

provided (including relating to newly installed products or equipment or any upgrades to existing products or equipment).

(b)    The Provider shall deliver an invoice to the Recipient on a monthly basis (or, at the option of the Provider, at such other frequency as is consistent with the basis on which the Service Charges are determined and, if applicable, charged to Affiliates of the Provider) in arrears for the Service Charges due to the Provider under this Agreement. The Recipient shall pay the amount of such invoice by wire transfer or check to the Provider within thirty (30) days of the date of such invoice as instructed by the Provider; provided that to the extent consistent with past practice with respect to Services rendered outside the United States, payments may be made in local currency. If the Recipient fails to pay such amount by such date, the Recipient shall be obligated to pay to the Provider, in addition to the amount due, interest at an interest rate of 1-1/2% per month over the Prime Rate, compounded monthly, accruing from the date the payment was due through the date of actual payment. As soon as practicable after receipt of any reasonable written request by the Recipient, the Provider shall provide the Recipient with data and documentation reasonably satisfactory to the Recipient supporting the calculation of a particular Service Charge for the purpose of verifying the accuracy of such calculation. If, after reviewing such data and documentation, the Recipient disputes the Provider's calculation of any amount due to the Provider, then the dispute shall be resolved pursuant to Section 7.01.

Section 4.02    No Right to Set-Off. The Recipient shall pay the full amount of costs and disbursements incurred under this Agreement, and shall not set-off, counterclaim or otherwise withhold any other amount owed to the Provider on account of any obligation owed by the Provider to the Recipient.

## ARTICLE 5

## STANDARD FOR SERVICE; COMPLIANCE WITH LAWS

Section 5.01    Standard for Service. Subject to the terms and conditions of this Agreement, the Provider agrees to perform the Services such that the nature, quality, standard of care and service levels at which such Services are performed are no less than the nature, quality, standard of care and service levels at which the substantially same services were performed by or on behalf of the Provider prior to the Closing Date in the ordinary course of business during the Benchmark Period; provided, however, that notwithstanding the foregoing, the Provider shall have no liability hereunder for any Losses incurred by the Recipient except to the extent arising from Provider's gross negligence or willful misconduct (and in any case subject to the limitations set forth in Article 6).

Section 5.02    Disclaimer of Warranties. Except as expressly set forth herein, the parties hereto acknowledge and agree that the Services are provided as-is, that the applicable Recipient assumes all risks and liabilities arising from or relating to its use of and reliance upon the Services and each Provider makes no representation or warranty with respect thereto. EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE PROVIDERS HEREBY EXPRESSLY DISCLAIM ALL REPRESENTATIONS AND WARRANTIES REGARDING THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OR WARRANTY IN REGARD TO QUALITY, PERFORMANCE,

11

NONINFRINGEMENT, COMMERCIAL UTILITY, MERCHANTABILITY OR FITNESS OF THE SERVICES FOR A PARTICULAR PURPOSE.

## ARTICLE 6

## INDEMNIFICATION; LIMITATION ON LIABILITY

Section 6.01    Indemnification of Each Provider by the Relevant Recipient. Subject to the limitations set forth in this Article VI, each Recipient shall indemnify and hold harmless each relevant Provider and its Affiliates and Representatives (each, a "Provider Indemnified Party") from and against any and all loss, liability, claim, damage or expense (including legal fees and expenses) ("Losses") to the extent owed to third parties, and reimburse each relevant Provider Indemnified Party for all expenses as they are incurred, whether or not in connection with pending litigation and whether or not any Provider Indemnified Party is a party, arising out of any claim by a third party to the extent caused by, resulting from or in connection with any of the Services rendered or to be rendered by or on behalf of such Provider pursuant to this Agreement, the transactions contemplated by this Agreement or such Provider's actions or inactions in connection with any such Services or transactions; provided that such Recipient shall not be responsible for any Losses of such Provider Indemnified Party to the extent that such Loss is caused by, results from, or arises out of or in connection with a Provider Indemnified Party's gross negligence or willful misconduct in connection with any such Services or transactions, actions or inactions related thereto.

Section 6.02    Limited Liability of a Provider. Notwithstanding Article V or anything else to the contrary contained herein, no Provider Indemnified Party shall have any liability in contract, tort or otherwise, for or in connection with any Services rendered or to be rendered by any Provider Indemnified Party pursuant to this Agreement, the transactions contemplated by this Agreement or any Provider Indemnified Party's actions or inactions in connection with any such Services or transactions, to any Recipient Indemnified Party, except to the extent that any such Recipient Indemnified Party suffers a Loss that results from such Provider Indemnified Party's gross negligence or willful misconduct in connection with any such Services or transactions, actions or inactions related thereto.

Section 6.03    Limited Liability of a Recipient. Notwithstanding Article V or anything else to the contrary contained herein, no Recipient shall have any liability in contract, tort or otherwise, for or in connection with the transactions contemplated by this Agreement or such Recipient's actions or inactions in connection with any Services or transactions, to any Provider, except (a) to the extent that any such Provider suffers a Loss that results from such Recipient's gross negligence or willful misconduct in connection with any such transactions, actions or inactions related thereto or (b) to the extent owed pursuant to Recipient's indemnification obligations in Section 6.01.

Section 6.04    Additional Limitation on Liability.

(a)    Notwithstanding any other provision contained in this Agreement, no Provider Indemnified Party shall be liable for any exemplary, special, indirect, punitive,

12

incidental or consequential losses, damages or expenses, including any damages due to business interruption or loss of profits.

(b)    Except for the indemnification obligations set forth in Section 6.01, the aggregate liability and indemnification of each of BarCap and LBHI (or their respective assignees in accordance with Section 9.10) with respect to this Agreement shall not exceed, in the aggregate, the aggregate amount of Service Charges paid hereunder to BarCap or LBHI (or such respective assignees), as the case may be.

Section 6.05    Liability for Payment Obligations.  Nothing in this Article VI shall be deemed to eliminate or limit, in any respect, a party's express obligation in this Agreement to pay or reimburse, as applicable, for (i) Termination Charges, (ii) Service Charges for Services rendered in accordance with this Agreement, (iii) amounts in respect of conversion services provided pursuant to Section 2.02, or (iv) other costs and expenses to the extent expressly provided herein.

Section 6.06    Obligations Several and Not Joint.  As between a Recipient and a permitted third-party assignee of the Recipient, the obligations of each such party under this Agreement shall be several and not joint.

Section 6.07    THE DISCLAIMER OF WARRANTY, LIMITATION OF LIABILITY AND OVERALL ALLOCATION OF RISK BETWEEN THE PARTIES ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE PARTIES.  THE PROVIDER WOULD NOT BE ABLE OR WILLING TO PROVIDE THE SERVICES WITHOUT THE PROTECTIONS PROVIDED TO PROVIDER PURSUANT TO SUCH PROVISIONS.  IF ANY APPLICABLE COURT HOLDS ANY DISCLAIMER, LIMITATION OF LIABILITY OR ALLOCATION OF RISK CONTAINED IN THIS SECTION TO BE UNENFORCEABLE, THEN A PARTY'S LIABILITY WILL BE LIMITED TO THE FULLEST POSSIBLE EXTENT PERMITTED BY APPLICABLE LAW.

### ARTICLE 7

### DISPUTE RESOLUTION

Section 7.01    Dispute Resolution.

(a)    In the event of any dispute, controversy or claim arising out of or relating to the transactions contemplated by this Agreement, or the validity, interpretation, breach or termination of any provision of this Agreement, or calculation or allocation of the costs of any Service, including claims seeking redress or asserting rights under any Law (each, a "Dispute"), the parties hereto agree that the BarCap Services Manager and LBHI Services Manager (or such other Persons as BarCap and LBHI may designate) shall negotiate in good faith in an attempt to resolve such Dispute amicably.  If such Dispute has not been resolved to the mutual satisfaction of BarCap and LBHI within sixty (60) days after the initial notice of the Dispute (or such longer period as such parties may agree), then, a senior executive on behalf of BarCap and a senior executive on behalf of LBHI shall negotiate in good faith in an attempt to resolve such Dispute amicably for an additional twenty (20) days (or such longer period as such parties may agree).  If

13

such Dispute has not been finally resolved at the end of such twenty-day period, then either party may pursue remedies in accordance with Section 9.11. Notwithstanding the foregoing, a Provider shall have no obligation to comply with this Section 7.01(a) before exercising any rights or remedies it may have under this Agreement.

(b)    In any Dispute regarding the amount of a Service Charge, if after such Dispute is finally adjudicated pursuant to the dispute resolution and/or judicial process set forth in Section 7.01(a) or Section 9.11, it is determined that the Service Charge that the Provider has invoiced the Recipient, and that the Recipient has paid to the Provider, is greater or less than the amount that the Service Charge should have been, then (i) if it is determined that the Recipient has overpaid the Service Charge, the Provider shall within five (5) Business Days after such determination reimburse the Recipient an amount of cash equal to such overpayment, plus 1-1/2% per month over the Prime Rate, compounded monthly, accruing from the date of payment by the Recipient to the time of reimbursement by the Provider and (ii) if it is determined that the Recipient has underpaid the Service Charge, the Recipient shall within five (5) Business Days after such determination reimburse the Provider an amount of cash equal to such underpayment, plus 1-1/2% per month over the Prime Rate, compounded monthly, accruing from the date such payment originally should have been made by the Recipient to the time of reimbursement by the Recipient.

## ARTICLE 8

## TERMINATION

Section 8.01    Termination.

(a)    This Agreement shall commence immediately upon the Closing Date and shall terminate as to any particular Service upon the earliest to occur of (i) the first date on which the applicable party has no further need to have such Service provided by the applicable Provider or (ii) the mutual written agreement of the parties to terminate this Agreement in its entirety or (iii) as further set out below. All Services shall terminate no later than the earliest of (x) eighteen (18) months following the Closing Date and (y) twelve (12) months from the closing date of the sale of the Retained LBHI Business or portion of the Business, as applicable, to which such Service relates or from which the Service is provided and (z) such date as Recipient has developed an alternative source of such Services; provided, that if there is no third party vendor or service provider that can reasonably provide a comparable Service, and the absence of such Service would cause a material adverse effect on the value of the relevant underlying business operations or assets, then, upon written notice from Recipient at least sixty (60) days prior to the twelve month anniversary of the Closing Date, such services shall be extended until the earliest of: (1) thirty (30) months following the Closing Date; (2) twenty-four (24) months from the closing date of the sale of the Retained LBHI Business or portion of the Business, as applicable, to which such Service relates or from which the Service is provided and (3) such date as Recipient has developed an alternative source of such Services. This Agreement shall terminate once the provision of Services hereunder has terminated, and, for the avoidance of doubt, this Agreement shall terminate at the end of the time periods set forth above.

14

(b)      The Retained LBHI Businesses will use reasonable efforts to alter their operations to minimize or eliminate the need for BarCap Services (including by obtaining replacement services from a third party provider) as promptly as reasonably practicable as they wind down their operations or dispose of them to a third party. In addition, (i) a Recipient may from time to time terminate this Agreement with respect to any particular Service, in whole but not in part (1) for any reason or no reason upon providing at least thirty (30) days prior written notice to the Provider of such termination, subject to the obligation to pay Termination Charges, as provided for under Section 8.02, (2) if the Provider of such Service has failed to perform any of its material obligations under this Agreement with respect to such Service, and such failure shall continue to exist thirty (30) days after receipt by the Provider of written notice of such failure from the Recipient, or (3) immediately upon mutual written agreement of the parties hereto, and (ii) a Provider may terminate this Agreement with respect to one or more Services, in whole but not in part, at any time upon prior written notice to the Recipient if the Recipient has failed to perform any of its material obligations under this Agreement relating to such Service or Services, and such failure shall be continued uncured for a period of thirty (30) days after receipt by the Recipient of a written notice of such failure from the Provider. In the event that the effective date of the termination of any particular Service is a day other than at the end of a billing period, the Service Charge associated with such Service shall be pro-rated appropriately.

(c)      A Recipient may from time to time request a reduction in part of the scope or amount of any particular Service. If requested to do so by Recipient, the Provider agrees to discuss in good faith appropriate reductions to the relevant Service Charges in light of all relevant factors including the costs and benefits to the Provider of any such reductions. In the event that any particular Service is reduced other than at the end of a billing period, the Service Charge associated with such Service for the billing period in which such Service is reduced shall be pro-rated appropriately. Without limiting Section 8.01(a), the IMD Entities may request termination of any particular Service with respect to them upon six (6) months' prior written notice in which case such Service will be terminated and charges for such Service will cease accruing at the end of such six (6) month period.

(d)      The Recipient may terminate this Agreement upon the occurrence of a Force Majeure event pursuant to Section 8.04 below that materially disrupts the provision of Services, and Provider's failure to fully restore such Services within 90 days, and the Provider's further failure to fully restore such Services 30 days after its receipt of written notice of Recipient's intention to so terminate pursuant to this Section 8.01(c) sent after the expiration of the initial 90-day period.

(e)      The parties agree to discuss in good faith implementing reasonable measures to address situations that may arise after the date of this Agreement in which Recipient requires an extension of the provision of one or more Services beyond the term provided for herein or Provider requires relief from the provision of one or more Services because such Services are unduly burdensome or inconsistent with the strategic and operational objectives of Provider.

(f)      The BarCap Entities may suspend the Services to an LBHI Entity (but no other LBHI Entity) that materially defaults in its obligation to perform or provide Services to any BarCap Entity hereunder, for so long as such default continues. Without limiting the forgoing,

15

such a default shall be deemed to exist where, had such Services been provided by or been obligated to be provided by LBHI to the BarCap Entities, the failure to perform or provide such Services would constitute a default by LBHI.

Section 8.02    Effect of Termination.  Upon termination of any particular Service pursuant to this Agreement, the Provider of the terminated Service will have no further obligation to provide the terminated Service, and the relevant Recipient will have no obligation to pay any future Service Charges relating to any such Service; provided, however, that the Recipient shall remain obligated to the relevant Provider for (i) the Service Charges owed and payable in respect of Services provided prior to the effective date of termination and (ii) any Termination Charges.  Upon termination of any particular Service pursuant to this Agreement, the relevant Provider shall reduce for the next billing period the amount of the Service Charge for the category of Services in which the terminated Service was included (such reduction to reflect the elimination of all costs incurred in connection with the terminated service to the extent the same are not required to provide other Services to the Recipient), and, upon request of the Recipient, the Provider shall provide the Recipient with documentation and/or information regarding the calculation of the amount of the reduction.

Section 8.03    Survival.  In connection with termination of any Service, the provisions of this Agreement not relating solely to such terminated Service shall survive any such termination, and in connection with a termination of this Agreement, Article I, Article VI (including liability in respect of any indemnifiable Losses under this Agreement arising or occurring on or prior to the date of termination), Article VII, Article VIII, Article IX, all confidentiality obligations under this Agreement and liability for all due and unpaid Service Charges and Termination Charges shall continue to survive indefinitely.

Section 8.04    Force Majeure.  No party hereto (nor any Person acting on its behalf) shall have any liability or responsibility for failure to fulfill any obligation (other than a payment obligation) under this Agreement so long as and to the extent to which the fulfillment of such obligation is prevented, frustrated, hindered or delayed as a consequence of circumstances of Force Majeure; provided that (i) such party (or such Person) shall have exercised commercially reasonable efforts to minimize the effect of Force Majeure on its obligations and (ii) the nature, quality and standard of care that the Provider shall provide in delivering a Service after a Force Majeure shall be substantially the same as the nature, quality and standard of care that the Provider provides to its Affiliates and its other business components with respect to such Service.  In the event of an occurrence of a Force Majeure, the party hereto whose performance is affected thereby shall give notice of suspension as soon as reasonably practicable to the other stating the date and extent of such suspension and the cause thereof, and such party shall resume the performance of such obligations as soon as reasonably practicable after the removal of the cause.

## ARTICLE 9

## GENERAL PROVISIONS

Section 9.01    Independent Contractors.  In providing the Services hereunder, the Provider shall act solely as independent contractor and nothing in this Agreement shall constitute

16

or be construed to be or create a partnership, joint venture, or principal/agent relationship between the Provider, on the one hand, and the Recipient, on the other. All Persons employed by the Provider in the performance of its obligations under this Agreement shall be the sole responsibility of the Provider.

Section 9.02    Subcontractors. Any Provider may hire or engage one or more subcontractors to perform any or all of its obligations under this Agreement; provided that such Provider shall in all cases remain responsible for all its obligations under this Agreement. Under no circumstances shall any Recipient be responsible for making any payments directly to any subcontractor engaged by a Provider.

Section 9.03    Books and Records. All books, records and data maintained by a Provider for a Recipient with respect to the provision of a Service to such Recipient shall be the exclusive property of such Recipient. The Recipient, at its sole cost and expense, shall have the right to inspect, and make copies of, any such books, records and data during regular business hours upon reasonable advance notice to the Provider. At the sole cost and expense of the Recipient, upon termination of the provision of any Service, the relevant books, records and data relating to such terminated Service shall be delivered by the Provider to the Recipient in a mutually agreed upon format to the address of the Recipient set forth in Section 9.05 or any other mutually agreed upon location; provided, however, that the Provider shall be entitled to retain one copy of all such books, records and data relating to such terminated Service for archival purposes and for purposes of responding to any dispute that may arise with respect thereto.

Section 9.04    Treatment of Confidential Information.

(a)    The parties hereto shall not, and shall cause all other Persons providing Services or having access to information of the other party that is known to such Person as confidential or proprietary ("Confidential Information") not to, disclose to any other Person or use, except for purposes of this Agreement, any Confidential Information of the other party; provided, however, each party may disclose Confidential Information of the other party, to the extent permitted by applicable Law (i) to its Representatives on a need-to-know basis in connection with the performance of such party's obligations under this Agreement, (ii) in any report, statement, testimony or other submission required to be made to any Governmental Body having jurisdiction over the disclosing party, or (iii) in order to comply with applicable Law, or in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to the disclosing party in the course of any litigation, investigation or administrative proceeding. In the event that a party hereto becomes legally compelled (based on advice of counsel) by deposition, interrogatory, request for documents subpoena, civil investigative demand or similar judicial or administrative process to disclose any Confidential Information of the other party, such disclosing party shall provide the other party with prompt prior written notice of such requirement, and, to the extent reasonably practicable, cooperate with the other party (at such other party's expense) to obtain a protective order or similar remedy to cause such Confidential Information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege. In the event that such protective order or other similar remedy is not obtained, the disclosing party shall furnish only that portion of the Confidential Information that has been legally compelled, and shall exercise

17

its reasonable best efforts (at such other party's expense) to obtain assurance that confidential treatment will be accorded such Confidential Information.

(b)    Each party hereto shall, and shall cause its Representatives to protect the Confidential Information of the other parties by using the same degree of care to prevent the unauthorized disclosure of such as the party uses to protect its own confidential information of a like nature.

(c)    Each party shall comply with all applicable state, federal and foreign privacy and data protection Laws that are or that may in the future be applicable to the provision of the Services hereunder.

Section 9.05    Notices. Except with respect to routine communications by the BarCap Services Manager and LBHI Services Manager under Section 2.03, all notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service, by facsimile with receipt confirmed (followed by delivery of an original via overnight courier service) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9.05):

    (a)    if to BarCap:

        Barclays Capital Inc.
        200 Park Avenue
        New York, NY 10166
        Attention: Jonathan Hughes, Esq.
        Facsimile: (212) 412-7519

        with a copy to:

        Cleary Gottlieb Steen & Hamilton LLP
        One Liberty Plaza
        New York, NY 10006
        Attention: Duane McLaughlin
        Facsimile: (212) 225-3999

    (b)    if to LBHI:

        Lehman Brothers Holdings Inc.
        745 Seventh Avenue
        New York, NY 10019
        Attention: Steven Berkenfeld, Esq.
        Facsimile: (646) 758-4226

18

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Jeffrey Osterman
Facsimile: (212) 310-8007

Section 9.06    Regulatory Approval and Compliance. Each party hereto shall be responsible for its own compliance with any and all Laws applicable to its performance under this Agreement; provided, however, that each of BarCap and LBHI shall, subject to reimbursement of out-of-pocket expenses by the requesting party, cooperate and provide one another with all reasonably requested assistance (including the execution of documents and the provision of relevant information) required by the requesting party to ensure compliance with all applicable Laws in connection with any regulatory action, requirement, inquiry or examination related to this Agreement or the Services.

Section 9.07    Further Assurances. Each party hereto covenants and agrees that, without any additional consideration, it shall execute and deliver any further legal instruments and perform any acts that are or may become reasonably necessary to effectuate this Agreement.

Section 9.08    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of such parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement can be consummated as originally contemplated to the greatest extent possible.

Section 9.09    Entire Agreement. Except as otherwise expressly provided in this Agreement, the Purchase Agreement and this Agreement constitute the entire agreement of the parties hereto with respect to the subject matter of this Agreement and supersede all prior agreements and undertakings, both written and oral, between or on behalf of the parties hereto with respect to the subject matter of this Agreement.

Section 9.10    Assignment; Third-Party Beneficiaries.

(a)    This Agreement shall not be assigned or sublicensed by operation of Law or otherwise without the prior written consent of the parties hereto; provided, however, that, subject to Section 9.10(b):

(i)    the LBHI Entities shall have a right to assign their rights and obligations hereunder, in whole or in part, (A) with respect to the IMD Entities (as of the date hereof) to one or more related purchasers (in a single transaction or a series of related

19

transactions) of (x) any or all of the IMD Business or (y) any or all of the assets of, or entities that conduct, the IMD Business, and (B) with respect to any other acquirors of the Retained LBHI Business, if the absence of such Service would cause a material adverse effect on the value of the underlying business operations or assets, and

(ii)    the BarCap Entities may assign their rights and obligations hereunder, in whole or in part, (A) with respect to any acquirors of the Business, if the absence of such Service would cause a material adverse effect on the value of the underlying business operations or assets, and (B) to a single purchaser (in a single transaction or a series of related transactions) of (x) any or all of the Business or (y) any or all of the assets of, or entities that conduct, the Business.

(b)    Notwithstanding anything to the contrary, the total number of parties to which each of the LBHI Entities, on one hand, and the BarCap Entities, on the other hand, may assign their rights and obligations pursuant to Section 9.10(a) shall not exceed six (i.e., up to six separate assignments for each party to this Agreement); provided that the LBHI Entities shall have the right to assign their rights and obligations hereunder up to two additional parties provided that, notwithstanding Section 8.01(a), in the case of such two additional parties, the Services pursuant to those assigned rights shall terminate one (1) year after the Closing Date. With respect to the sale of the following businesses – the IMD Business; the LBHI Entity private equity business; and the businesses conducted by the LBHI Entities in each of India, Asia and Europe - if there is an assignment hereunder to a single buyer of more than one of the foregoing businesses, then, solely for the purposes of this Section 9.10(b), such assignment shall count as separate assignment for each of such businesses. For illustrative purposes, if there is an assignment hereunder to a single buyer for the India and Asian businesses, then it shall count as two assignments towards the total of 6. The parties agree to negotiate in good faith if either party requests the right to make additional assignments hereunder to a buyer of a part of such party's business to which this Agreement relates if the absence of such Service would cause a material adverse effect to the underlying business operations or asset being sold.

(c)    Any permitted assignee in accordance with this Section 9.10 shall be required to execute a counterpart to this Agreement, agreeing to be bound by the terms and conditions set forth herein. Further, permitted assignees hereunder shall not themselves be permitted to assign any part of the rights or obligations assigned to them without the prior written consent of the non-assigning party. Each party shall require any assignee or purchaser of any business or asset that had been providing (or had been used to provide) Services hereunder, the absence of which would cause a material adverse effect to the Recipient, to continue to provide Services to the Recipient pursuant to the terms and conditions of this Agreement as a condition to such assignment or purchase. For the avoidance of doubt, a change of control of an entity shall be deemed an assignment hereunder.

(d)    Except as provided in Article 6 with respect to Provider Indemnified Parties, this Agreement is for the sole benefit of the parties hereto and their permitted successors and assigns and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

20

Section 9.11        Governing Law; Submission to Jurisdiction. (a) This Agreement (and any claims or disputes arising out of or related hereto or to the transactions contemplated hereby or to the inducement of any party to enter herein, whether for breach of contract, tortious conduct or otherwise, and whether predicated on common law, statute or otherwise) shall in all respects be governed by, and construed in accordance with, the Laws of the State of New York, including all matters of construction, validity and performance, in each case without reference to any conflict of Law principles that might lead to the application of the Laws of any other jurisdiction.

(b)        Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 9.05 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)        Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.05.

Section 9.12        Amendment. No provision of this Agreement, including any Schedule hereto, may be amended, supplemented or modified except by a written instrument making specific reference hereto or thereto signed by all the parties to this Agreement. No waiver by any party of any provision hereof shall be effective unless explicitly set forth in writing and executed by the party so waiving. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other subsequent breach.

Section 9.13        Rules of Construction. Interpretation of this Agreement shall be governed by the following rules of construction (a) words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires, (b) references to the terms Article, Section, paragraph and Schedule are references to the Articles, Sections, paragraphs and Schedules of this Agreement unless otherwise specified, (c) the terms "hereof," "herein," "hereby," "hereto," "hereunder" and derivative or similar words refer to this entire Agreement, including the Schedules hereto, (d) references to "$" shall mean U.S. dollars, (e) the word "including" and words of similar

21

import when used in this Agreement shall mean "including, without limitation," unless otherwise specified, (f) the word "or" shall not be exclusive, (g) references to "written" or "in writing" include in electronic form, (h) provisions shall apply, when appropriate, to successive events and transactions, (i) the headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement, (j) BarCap and LBHI have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or burdening any such party by virtue of the authorship of any of the provisions in any of this Agreement, (k) a reference to any Person includes such Person's successors and permitted assigns, (l) any reference to "days" means calendar days unless Business Days are expressly specified, and (m) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

Section 9.14    Counterparts. This Agreement may be executed in two or more counterparts, and by each party in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be as effective as delivery of a manually executed counterpart of this Agreement.

Section 9.15    Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH SUCH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTIES WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER TRANSACTION AGREEMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.15.

Section 9.16    Enforcement. The parties agree that irreparable damage may result, and that the parties may not have any adequate remedy at Law, if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached or threatened to be breached. It is accordingly agreed that, notwithstanding the penultimate sentence of Section 7.01(a), if either party breaches its obligation to consummate the transactions contemplated by this Agreement, the non-breaching party shall be entitled to seek equitable relief, in addition to all other remedies available to the parties at Law or in equity as a remedy for any such breach or threatened breach. Such equitable remedies may be sought in any court referred to in Section 9.11(b).

Section 9.17    Non-Recourse. No past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative

22

of either BarCap or LBHI or their respective Affiliates shall have any liability for any obligations or liabilities of BarCap or LBHI, respectively, under this Agreement of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

23

Page 25 of 2.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

LEHMAN BROTHERS HOLDINGS INC.

By:     /s/ Steven Berkenfeld
        Name: Steven Berkenfeld
        Title: Vice President

BARCLAYS CAPITAL INC.

By:     /s/ Gerard LaRocca
        Name: Gerard LaRocca
        Title: Chief Executive Officer

1