# A. 181

## Unknown

**Sent:** Tuesday, March 24, 2009 10:43 PM

| | |
|---|---|
| **From:** | david.murgio@weil.com [david.murgio@weil.com] |
| **Sent:** | Friday, September 19, 2008 9:15 PM (GMT) |
| **To:** | PDowd@stblaw.com [PDowd@stblaw.com]; pmartelli@stblaw.com [pmartelli@stblaw.com]; Berkenfeld, Steven [sberkenf@lehman.com]; akeller@stblaw.com [akeller@stblaw.com]; jfinley@stblaw.com [jfinley@stblaw.com]; vlewkow@cgsh.com [vlewkow@cgsh.com]; dleinwand@cgsh.com [dleinwand@cgsh.com]; feldsteinh@sullcrom.com [feldsteinh@sullcrom.com]; ClaytonW@sullcrom.com [ClaytonW@sullcrom.com]; Richard.Smith3@barcap.com [Richard.Smith3@barcap.com]; Jonathan.Hughes@barcap.com [Jonathan.Hughes@barcap.com]; Genirs, Kevin [Kevin.Genirs@lehman.com]; lori.fife@weil.com [lori.fife@weil.com]; michael.lubowitz@weil.com [michael.lubowitz@weil.com]; robert.messineo@weil.com [robert.messineo@weil.com]; rod.miller@weil.com [rod.miller@weil.com]; Shai.Waisman@weil.com [Shai.Waisman@weil.com]; james.grogan@weil.com [james.grogan@weil.com]; jane.mcdonald@weil.com [jane.mcdonald@weil.com]; harvey.miller@weil.com [harvey.miller@weil.com] |
| **Subject:** | Revised Clarification Letter |
| **Attach:** | Clarification Letter_#1916861.DOC;Clarification Letter_#1916861.DOC |

Please find attached a revised version of the Clarification Letter reflecting our conversation this afternoon.  The blackline is marked to reflect changes from the draft previously circulated by Cleary.

Regards.

David

---

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel:  (212) 310 8764
Fax: (212) 310 8007
e-mail:  david.murgio@weil.com


EXHIBIT
3S

10284822

*WGM Draft – September 19, 2008 – 5:00 pm*

## BARCLAYS CAPITAL INC.

September __, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements of the parties stated therein and shall amend the Agreement to the extent necessary so as to be consistent with this letter, and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets; Excluded Assets.

(a)    The Purchased Assets means all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), including the items set forth in clauses (a) through (d) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets," plus, with respect to securities of LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto; it being understood that the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 million. The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short agreements relating to short positions of LBI. Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage trading operations of LBI and (c) all prime brokerage accounts, and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business). Purchased Intellectual Properties includes Intellectual Property Rights, Software and Technology, wherever in the world held by Holdings or

1

NY2:\1916861\06\1532506!.DOC\73683.1037

10279863

any of its Subsidiaries, that are primarily used or necessary for the conduct by Purchaser of the Business and for conduct of the commodities business.  For the avoidance of doubt, the Business includes the Sellers' commodities business.

(b)     The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of LBHI and its Subsidiaries.  In lieu of the assets referred to in clause (k) of the definition of "Excluded Assets," the following shall be Excluded Assets:  All of the investments held by Sellers or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement (as hereinafter defined).  Also included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time.  Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries.  For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC,  are Excluded Assets (rather than Purchased Assets).  The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.  Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.     IMD Business.  For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business.  As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and Purchased Assets and the Business include the private investment management business (other than the CTS (Corporate Cash) business).  The employees of PIM of the Closing Date shall become Transferred Employees.  For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the private investment management business of Seller (the "PIM Business") in the pool of Transferred Employees.  Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business.  The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(c).  The Purchased Assets include forgivable notes issued by the Transferred Employees of the PIM Business to Seller.  Purchaser agrees to pay any proceeds it receives in respect of such notes to Seller if and when received.

3.     Assumed Liabilities.  Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser, after the Closing, in connection with the

2

10279863

Business.  Nothing in this Paragraph 4 is intended to modify Section 8.12 of the Agreement and no Liabilities described in clause (i) shall be "Assumed Liabilities."

4.    License.  All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or a purchaser of any other businesses of Seller and its Subsidiaries, in each case solely for use in connection with the winding up of any such businesses.

5.    Long Positions.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (other than exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" and TBA MS, but not any other over-the-counter derivatives such as spot and forward currency contracts).  The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

6.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    Certain Cash Proceeds.  Any cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions, before the Closing, shall be delivered to Purchaser.

11.    Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

12.    Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations, respectively, of Seller or its Subsidiaries or between or among any Seller or any of LBHI or any Subsidiary of LBHI.  It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

3

10279863

13.     Schedule 12.3.  Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

14.     Barclays Repurchase Agreement.  At the Closing, Purchaser and its Affiliates will release Seller and its Subsidiaries from any obligation under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates.

15.     Risk of Loss of Artwork.  During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

16.     Records.  The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail.  The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

17.     Subleases.  Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)     As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)     With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering

4

10279863

into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces.  Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below.  In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has

5

10279863

recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.    _Deferred Transfers_.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.    _745 Seventh Avenue_.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

1.1    20.    _Prorations_.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.    _Schedules_.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    _Definition of Contract._  Contract shall not include swap agreements.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

10279863

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LB 745 LLC

By: _____
Name:
Title:

10279863

~~CGSH~~WGM ~~Comments~~Draft – September 19, 2008 ~~5:00~~ 1230pm

[~~Letterhead of Barclays~~]
**BARCLAYS CAPITAL INC.**

September [___], 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn:  Steven Berkenfeld, Esq.
Facsimile:  (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser").  Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement.  This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements of the parties stated therein and shall amend the Agreement to the extent necessary so as to be consistent with this letter, and is binding on the parties hereto upon its execution and delivery.

     1.    Purchased Assets; Excluded Assets.

    (a)    The Purchased Assets means all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), including the items set forth in clauses (a) through (d) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets~~.~~," plus, with respect to securities of LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto; it being understood that the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 million. The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short agreements relating to short positions of LBI.  Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage trading operations of LBI (~~but mortgage securities only to the extent referred to below~~) and (c) all prime brokerage accounts, and repurchase ~~agreementand~~agreement and securities lending operations of the Business (for the avoidance of doubt, other than those

that are part of the IMD Business). ~~The categories of securities referred to in clause (d) of the "Purchased Assets" definition in the Agreement include only securities in such categories owned by LBI and not any other affiliate of LBI and with respect to collateralized short-term agreements, only those collateralized short-term agreements relating to short-term positions of LBI.~~ Purchased Intellectual Properties includes Intellectual Property Rights, Software and Technology, wherever in the world held by Holdings or any of its Subsidiaries, that are primarily used or necessary for the conduct by Purchaser of the Business and for conduct of the commodities business. For the avoidance of doubt, the Business includes the Sellers' commodities business.

(b)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of LBHI and its Subsidiaries. In lieu of the assets referred to in clause (k) of the definition of "Excluded Assets," the following shall be Excluded Assets. All of the investments held by Sellers or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement (as hereinafter defined). Also included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business. As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and Purchased Assets and the Business include the private investment management business (other than the CTS (Corporate Cash) business) ("PIM"). The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the private investment management business of Seller (the "PIM Business") in the pool of Transferred ~~Employees. Accordingly, additional amounts shall be paid as bonuses in accordance with Section 9.1(c), and the employees of the PIM business~~ Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM

2

10279864

Business will be treated in a manner consistent with the principles set forth in Section 9.1(c). The Purchased Assets include forgivable notes issued by the Transferred Employees of the PIM Business to Seller. Purchaser agrees to pay any proceeds it receives in respect of such notes to Seller if and when received.

3.    Excluded Assets.  Included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration.  Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries.  Clause (i) of the definition of "Assumed Liabilities includes only liabilities associated with assets owned by LBI and not assets owned by any Affiliate of LBI.  The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.  Section 1.1(h) of the Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."4    Assumed Liabilities  Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser, after the Closing, in connection with the Business.  Nothing in this Paragraph 4 is intended to modify Section 8.12 of the Agreement; and no Liabilities described in clause (i) shall be "Assumed Liabilities."

5.4.    License.  All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or a purchaser of any other businesses of Seller and its Subsidiaries, in each case solely for use in connection with the winding up of any such businesses.

6.5.    Long Positions.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (other than exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" and TBA MS$_s$ but not any other over-the-counter derivatives such as spot and forward currency contracts).  The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

7.6.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

8.    Residential Real Estate Mortgage Securities.  To facilitate the division of residential real estate mortgage securities referred to in clause (e) of the definition of Purchased

3

10279864

~~Assets and clause (k) of the definition of Excluded Assets between Purchaser and Seller,
Purchaser will acquire non-agency residential mortgage backed securities and manufactured
housing securities (which are therefore considered Purchased Assets) and Seller will retain
HELOC, ABS, CDO, CLO, VFN, franchise loan, student loan, [scratch and dent], second lien,
and reverse mortgage backed securities (which are therefore considered Excluded Assets), in
each case as will be further allocated by the parties. [What is happening with scratch and dent?]~~

9.7.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for
Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement
(each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

~~10.        Excluded Cash Assets and Retained Cash.    All cash, cash equivalents,
bank deposits or similar cash items of Seller and its Subsidiaries are Excluded Assets, other than
the "Retained Cash," which is a Purchased Asset.  The "Retained Cash" is $700 million in cash,
cash equivalents, bank deposits or similar cash items (rather than $1.3 billion), plus the8.~~ Certain
Cash Proceeds.   Any cash amount received from closing out Long Positions, less the cash
amount expended to close out Short Positions, before the Closing, shall be delivered to
Purchaser.

11.    Payables, Deposits and Receivables.  No payables or deposits of a Seller
or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased
Contract.  No receivables shall be Purchased Assets, except to the extent resulting from a
Purchased Contract.

12.    Intercompany Obligations.  Except as expressly contemplated by this
Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed
Liabilities shall not include any intercompany receivables or payables or other obligations,
respectively, of Seller or its Subsidiaries or between or among any Seller or any of LBHI or any
Subsidiary of LBHI.  It is understood that nothing contained in this letter shall affect the rights or
obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

13.    ~~Eagle Energy as Excluded Asset.    The equity interests and assets of
Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the
energy marketing and services business of Eagle Energy Management LLC,    are Excluded
Assets (rather than Purchased Assets).    14.~~    Schedule 12.3.  Following the Closing, the parties
shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities)
among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to
be signed by the parties.

14.    Barclays Repurchase Agreement.  At the Closing, Purchaser and its
Affiliates will release Seller and its Subsidiaries from any obligation under the September 18,
2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its
Affiliates.

15.    Risk of Loss of Artwork.  During such period that Purchaser has the right
to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement,
Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged
or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent

4

10279864

with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

16.    Records.  The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail.  The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

17.    Subleases.  Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the

5

demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)     If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.     <u>Deferred Transfers</u>. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of

6

10279864

Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished

1.1    20.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Arrangements Regarding DTCC.  The parties have agreed to the arrangements with respect to accounts maintained by LBI with DTCC set forth on Exhibit I hereto.  [Will provide comments on revised version reflecting agreement in principal when provided]

21.    Definition of Contract.  Contract shall not include swap agreements.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank.]*

10279864

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LB 745 LLC

By: _____
Name:
Title:

10279864

**The following is based on an earlier preliminary draft and does not reflect the current agreement in principle; it is included only to facilitate inclusion of the final version.**

EXHIBIT I: Liabilities Related to Clearing Securities Trades (DTCC)

(a)    Assumed Liabilities shall include Assumed Depositary Liabilities and Excluded Liabilities shall include Excluded Depositary Liabilities (each as defined below).

(b)    On September 19, 2008, Purchaser informed DTC that, if it is selected as the successful bidder to acquire the Business, Purchaser will guaranty the open trades and amounts due to DTCC on the accounts and subaccounts that were in the draft of DTCC which roll up into the 0074 Accounts, effective as of the opening of the trading day on Monday, September 21, 2008, in an aggregate net amount not to exceed $250 million.

(c)    Sections 3.2 and 3.3 of the Agreement shall hereby be amended and restated in their entirety as follows:

3.2    Payment of Cash Amount.  On the Closing Date, Purchaser shall pay to Seller an amount equal to the Cash Amount, less $250 million, which shall be paid by wire transfer of immediately available funds into an account designated by Seller.

3.3    Adjustments.

(a)    As soon as practicable, Seller shall determine, and notify Purchaser of, the amount of the Excluded Depositary Liabilities.  On the Business Day following the date on which Seller notifies Purchaser of such amount, Purchaser shall pay to Seller an amount equal to $250 million, less the Excluded Depositary Liabilities,1 which shall be paid by wire transfer of immediately available funds into an account designated by Seller; provided, however, that, if the Excluded Depositary Liabilities equals or exceeds $250 million, Purchaser shall not be required to pay any amount to Seller pursuant to this Section 3.3(a) [and Purchaser shall be entitled to a credit in the amount of such excess against amounts payable by Purchaser to Seller under the Transition Services Agreement].  The amount of any payment to be made pursuant to this Section 3.3(a) shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to the rate of interest published from time to time by the *Wall Street Journal* as the "prime rate" at JP Morgan Chase during the period from the Closing Date to the date of payment.  Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of three hundred sixty-five (365) days and the actual number of days elapsed.

(b)    Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including

---

1 Can this amount be calculated with certainty?  Consider whether dispute resolution provisions are necessary.

9

10279864

repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof). Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss. If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (i) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (ii) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3(b)). For purposes of this Section 3.3(b), the time value of money shall be disregarded and no interest shall be deemed earned.

3.4   Definitions. For purposes of this Article III, the terms set forth below shall have the following definitions:

(a)   "074 Accounts" means [all accounts and subaccounts in the draft of DTCC, prior to the Closing, that roll up into LBI's Account No. 0074.]

(b)   "Assumed Depositary Liabilities" means the net amount of all Depositary Liabilities incurred in respect of trades made subsequent to the Closing on 074 Accounts that constitute Purchased Assets.

(c)   "Depositary Liabilities" means Liabilities of LBHI and its Subsidiaries to DTCC in respect of 074 Accounts.

(d)   "DTCC" means the Depositary Trust & Clearing Corporation.

(e)   "Excluded Depositary Liabilities" means all net amount of all Depositary Liabilities, other than Assumed Depositary Liabilities. Excluded Depositary Liabilities shall include Depositary Liabilities incurred in respect of (A) trades made prior to the Closing on all 074 Accounts and (B) trades made subsequent to the Closing on 074 Accounts that constitute Excluded Assets.

10279864

## Section 3.2 & 3.3 Escrow Alternative

3.2    Payment of Cash Amount.  On the Closing Date, Purchaser shall pay (a) $250 million of the Cash Amount to the Escrow Agent and (b) the remainder of the Cash Amount to Seller, each of which shall be paid by wire transfer of immediately available funds into an account designated by the Escrow Agent or Seller, as applicable.

3.3    Adjustments.

(a)    As soon as practicable, Seller shall determine, and notify the Escrow Agent of, the amount of the Excluded Depositary Liabilities.  On the Business Day following the date on which Seller notifies the Escrow Agent of such net amount, the Escrow Agent shall pay, by wire transfer of immediately available funds into an account designated by Seller or Purchaser, as applicable:

(i)    to Purchaser an amount equal to the Excluded Depositary Liabilities; and

(ii)    to Seller the remainder of the Escrow Funds.

provided, however, that, if the Excluded Depositary Liabilities equals or exceeds $250 million, the Escrow Agent shall pay to Purchaser all $250 million of Escrow Funds [and Purchaser shall be entitled to a credit in the amount of such excess against amounts payable by Purchaser to Seller under the Transition Services Agreement].  The amount of any payment to be made pursuant to this Section 3.3(a) shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to the rate of interest published from time to time by the *Wall Street Journal* as the "prime rate" at JP Morgan Chase during the period from the Closing Date to the date of payment.  Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of three hundred sixty-five (365) days and the actual number of days elapsed.

(b)    Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof).  Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss.  If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (i) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (ii) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3(b)).  For

11

10279864

purposes of this Section 3.3(b), the time value of money shall be disregarded and
no interest shall be deemed earned.

10279864

Document comparison done by DeltaView on Friday, September 19, 2008 5:10:19 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1916861/8 |
| Document 2 | pcdocs://ny2/1916861/9 |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 35 |
| Deletions | 64 |
| Moved from | 11 |
| Moved to | 11 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 121 |

10279864