# A. 182

| From: | Yang, Jasen: Markets (NYK) |
| Sent: | Saturday, September 20, 2008 9:47 PM |
| To: | Cox, Archie: Barclays Capital (NYK) |
| Cc: | King, Stephen: Markets (NYK); Clackson, Patrick: Finance (LDN) |
| Subject: | Lehman Financing Facility Assets |

Archie,

Please see below market values (as assigned by the repo custodian for Thursday COB) for the Fed financing facility collateral, divided by product type and the business unit reviewing the assets.

| Business Unit | Type | Millions (USD) Repo MV |
|---|---|---|
| Agency Mortgages | US Agency CMO | 4,720 |
| | US Agency Pool | 9,190 |
| Agency Mortgages Total | | 13,909 |
| Corporate Credit | Corporates | 3,072 |
| Corporate Credit Total | | 3,072 |
| EM | EM | 200 |
| | Govies | 80 |
| EM Total | | 280 |
| Equities | ADR | 302 |
| | Convertible | 37 |
| | Convertible Preferred | 85 |
| | Equities | 7,571 |
| | ETF | 601 |
| | Mutual Fund | 12 |
| | Preferred | 31 |
| | Warrants | 221 |
| Equities Total | | 8,860 |
| Munis | Munis | 464 |
| Munis Total | | 464 |
| PMTG | CDO | 13 |
| | CLO | 1,085 |
| | CMBS | 232 |
| | Franchise | 79 |
| | Unknown | 1 |
| | US ABS Home Eq | 669 |
| | US ABS Man. Housing | 27 |
| | US ABS Other | 73 |
| | US Non-Agency CMO | 1,289 |
| PMTG Total | | 3,468 |
| Rates | Agencies | 9,552 |
| | Sovereigns | 0 |
| | Treasuries | 5,406 |
| | Unknown | 1 |
| Rates Total | | 14,959 |
| Short Term | CDs | 36 |
| | CP | 30 |
| Short Term Total | | 67 |
| Grand Total | | 45,078 |

1

Highly Confidential


EXHIBIT
275
KK 8/26/09

BCI-EX-00081015

10334908

Jasen Yang
Barclays Capital
Principal Mortgage Trading Group
200 Park Avenue
New York, New York 10166
jasen.yang@barclayscapital.com
Tel: (212) 412 7613
Fax: (212) 412 5861

2

# A. 183



"David LEINWAND"
<dleinwand@cgsh.com>

09/21/2008 06:06 PM

To robert.messineo@weil.com, david.murgio@weil.com,
"Finley, John G" <jfinley@stblaw.com>
cc myersk@sullcrom.com,
Richard.Smith3@barclayscapital.com, "Robert P DAVIS"
<rdavis@cgsh.com>, "Duane MCLAUGHLIN"
<dmclaughlin@cgsh.com>
bcc
Subject Fw: New Paragraph 13

See below.  Language from Barclays for the letter re the unwinding of the barclays repurchase

David Leinwand
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2838 | f: +1 212 225 3999
www.clearygottlieb.com | dleinwand@cgsh.com
----- Forwarded by David LEINWAND/NY/Cgsh on 09/21/2008 06:02 PM -----
"Myers, Ken S." <myersk@sullcrom.com>

21 September 2008 05:12 PM

To "'dleinwand@cgsh.com'" <dleinwand@cgsh.com>
cc
Subject Fw: New Paragraph 13

Ken S. Myers
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Tel: (212) 558-4857
Fax: (212) 558-3588

----- Original Message -----
From: Richard.Smith3@barclayscapital.com <Richard.Smith3@barclayscapital.com>
To: Myers, Ken S.; Serota, Daniel
Sent: Sun Sep 21 17:05:53 2008
Subject: Re: New Paragraph 13

Please send to cleary team too.

----- Original Message -----
From: Myers, Ken S. <myersk@sullcrom.com>
To: 'ann.peterson@weil.com' <ann.peterson@weil.com>; Smith, Richard: Legal
(NYK); Serota, Daniel <SerotaD@sullcrom.com>
Sent: Sun Sep 21 17:03:43 2008
Subject: New Paragraph 13



13. Barclays Repurchase Agreement. Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Buyer shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void ab initio in all respects.

Ken S. Myers
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Tel: (212) 558-4857
Fax: (212) 558-3588

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

---

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unless specifically indicated, this e-mail is not an offer to buy or sell or a solicitation to buy or sell any securities, investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Barclays. Any views or opinions presented are solely those of the author and do not necessarily represent those of Barclays. This e-mail is subject to terms available at the following link: www.barcap.com/emaildisclaimer. By messaging with Barclays you consent to the foregoing. Barclays Capital is the investment banking division of Barclays Bank PLC, a company registered in England (number 1026167) with its registered office at 1 Churchill Place, London, E14 5HP. This email may relate to or be sent from other members of the Barclays Group.

---

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

WGM-LEHMAN-E 00014128

# A. 184

| | |
|---|---|
| **From:** | Sell, Stephen: Markets (NYK) |
| **Sent:** | Sun, 21 Sep 2008 18:33:16 GMT |
| **To:** | Joshi, Dixit: EDG (LDN); Moreira, Nicholas: EDG (NYK); Warren, Doug: Credit Derivatives (NYK); Hamilton, Tom: RMBS Trading (NYK); Harrison, Harry: Fixed Income (NYK); Duff, Mimi: Fixed Income (NYK); Stack, Tim: Futures (NYK); Ogeneski, Chris: Credit Markets (NYK); Ogeneski, Chris: Credit Markets (NYK); Frisbee, Richard: M/M (NYK); Leyhane, Nick: EDG (LDN); Gradowczyk, Diego: EMG Mkts Trading (NYK); Graf, Michael: USD FI Agency & SAS Trading (NYK) |
| **CC:** | King, Stephen: Markets (NYK); Walker, James: Finance (NYK); Rodefeld, John: Operations (NYK); Morton, Marcus: Finance (NYK); Ornstein, David: Markets (LDN); Willett, Bradford: Credit Derivatives (NYK); Sheehan, James: Credit Derivatives (NYK); Logozzo, Joseph: Markets (NYK); Scott, Teri: Finance (NYK); Yoss, Eric: Market Risk (NYK); Meili, Stephan: Market Risk (NYK); Murphy, Michael: Markets (NYK); Montgomery, Ian: Barclays Capital (NYK); Hamill, Paul: Markets (NYK); Rose, Charles: Credit Markets (NYK); Orciuoli, Ralph: FI (NYK); Nakum, Anatoly: Credit Derivatives (NYK); Greenbaum, Rich: IT (NYK); Nigam, Rakesh: IT (NYK); Chinai, Neil: IT (NYK) |
| **Subject:** | Bookings - Lehman Financing Facility |

Folks,

I've received agreement/consensus from Stephen King and James Walker, we should progress down the following path:

- o We should book all positions from the Lehman Financing Facility to BCI (~45bn securities - see attached file)
- o We should book based on the price within the BONY file, at least for Day 1
- o Positions should be booked to a separate book within BCI to keep the positions segregated for now

If anyone has any questions, please let me know as soon as possible. I'm at x3012.

Open Issues/Questions:

- • James Walker to confirm with Jonathan Hughes that we and Lehman are in agreement on the file/amount to be transferred from Lehman Financing Facility to BCI
- • John Rodefeld and James Walker to get an answer on whether we are taking on the Forward positions (trades done by LEH last week)



EXHIBIT

587 h

2|4|16

HIGHLY CONFIDENTIAL

- John Rodefeld and James Walker to confirm what settlement date we should use for the positions we transfer from Lehman Financing Facility to BCI
- John Rodefeld - Can you please provide an Asset Control point person that we can deal with for any securities which are not set-up in our systems.  As a first step, can you advise which ones are not set-up.

<<...>>

Steve

HIGHLY CONFIDENTIAL

# A. 185

**From:**    Morton, Marcus: Finance (NYK)
**Sent:**    Fri, 03 Oct 2008 00:23:06 GMT
**To:**    Cuaycong, Dale: Planning (LDN)
**CC:**    Romain, Gary: Finance (LDN)
**Subject:** RE: RED Briefing - Lehman Assets Acquired

Dale

It is hard to do a simple look through since the make up of the original and final balance sheets are very different.

This is the schedule I have for the trading inventory included in the original deal

Per the press release we were due to acquire assets and liabilities of $72 and $68bn respectively. Of this assets of $65bn and liabilites of $48.5bn were the securities and derivative balances with the remainder of the balance sheet made up of other items such as payables/receivables etc.

The current acquisition balance sheet that I have shows assets of $52bn and liabilities of $47bn so the net asset value is materially the same as the statement. The $52bn is largely made up of the traded assets acquired and cash. The liabilities are mainly a $45bn financing position.

The main reason for the change is that BarCap took delivery solely of the unencumbered assets in the Lehman depository. This meant that any otc derivatives, payables/receivables or any matched repos and reverses that may have been included in the original balance sheet would not have been part of the final acquisition.

Hope this helps

Marcus

These schedules show the trading assets (i.e. securities) that I have. All three are very draft and have not been fully signed off or audited

Expected inventory
<<...>>
Received Inventory

    BCI-EX-(S)-00207819

<<...>>

DRAFT Acquisition Balance sheet
<<...>>

| | |
|---|---|
| **From:** | Romain, Gary: Finance (LDN) |
| **Sent:** | Thursday, October 02, 2008 11:03 AM |
| **To:** | Cuaycong, Dale: Planning (LDN); Morton, Marcus: Finance (NYK) |
| **Subject:** | RE: RED Briefing - Lehman Assets Acquired |

Dale,

I'm not going to be able to assist on this point unfortunately.

Marcus, do you have the differences between initial portfolio and final acquired portfolio (and reasons for the variances)?  Apologies if I've pointed Dale in the wrong direction.

Regards,

Gary

| | |
|---|---|
| **From:** | Cuaycong, Dale: Planning (LDN) |
| **Sent:** | Thursday, October 02, 2008 10:49 AM |
| **To:** | Romain, Gary: Finance (LDN) |
| **Subject:** | FW: RED Briefing - Lehman Assets Acquired |

Gary,

Here's what I want to talk to you about.  I work in Bob Diamond's office and we're preparing a brief for him and need some Lehman-related information.

Please see below.

My global dial is 8773 1900.

I'll wait for your call.

Regards,

| | |
|---|---|
| **From:** | Syal, Vivek: Finance (LDN) |
| **Sent:** | 02 October 2008 15:44 |
| **To:** | Cuaycong, Dale: Planning (LDN) |
| **Subject:** | RE: RED Briefing - Lehman Assets Acquired |

It's Gary Romain who can help

| | |
|---|---|
| **From:** | Cuaycong, Dale: Planning (LDN) |

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00207820

**Sent:**  02 October 2008 15:41
**To:**   Syal, Vivek: Finance (LDN)
**Subject:**   RED Briefing - Lehman Assets Acquired

Hi Viv,

I just left you a voicemail.  I understand that you're the man for the information we need for a RED briefing for an investor meeting.

Here's what we're looking for:

- Breakdown of the portfolio we announced we would take
- Breakdown of the portfolio we ended up taking
- Reasons for the variance (across each, 1-2 bullets of rationale/other comments)


Apologies for the urgency but could we get the information by 4PM tomorrow so we can complete the brief and send off before COB tomorrow?

Thanks,

Dale

HIGHLY CONFIDENTIAL

Lehman Brothers Inc
Balance Sheet by GAAP Asset Type
9/18/2008

| GAAP Asset Class 1 Name | Net Long Inventory Identified | 9/12 Bal. Sheet | Difference | Net Short Inventory Identified | 9/12 Bal. Sheet | Difference |
|---|---|---|---|---|---|---|
| Total CD's and Other Mon Mkt Instr. Total | 1,015 | 1,014 | 0 | - | - | - |
| Total Corp. Obligations & Spot Total | 5,060 | 5,141 | (81) | (1,981) | (2,004) | 23 |
| Total Corporate Stocks & Options Total | 8,432 | 8,432 | - | (6,951) | (6,951) | 0 |
| Total Derivatives & Other Contr. Total | 3,882 | 4,838 | (957) | (2,934) | (4,536) | 1,602 |
| Total TBA's* | 1,773 | | | (1,860) | | |
| Total FX Forward (assumed) | 900 | | | (900) | | |
| Total EX Trades | 1,209 | | | (174) | | |
| Other? | | | | | | |
| Total Governments & Agencies Total | 39,172 | 39,173 | (1) | (35,003) | (35,003) | (0) |
| Total Government | 35,684 | | | TBD | | |
| Total Agency (CMO's & Pass Throughs) | 3,488 | | | TBD | | |
| Total Mortgages & Mortgage Backed Total | 3,318 | 6,556 | (3,238) | - | (16) | 16 |
| Purchased Senior RMBS | 1,348 | | | | | |
| Purchased Sub RMBS | 987 | | | | | |
| Purchased IO & PO | 621 | | | | | |
| Purchased MH | 362 | | | | | |
| Not Purchased (ABS CDO's, CMBS/CRE, CLO's, HY CDO's, Second Liens, S&D, Reverse Mort and Other) | 3,095 | | | (16) | (16) | |
| CMO's | 143 | | | | | |
| Grand Total | 60,879 | 65,155 | (4,277) | (46,869) | (48,510) | 1,641 |

*As of 8/29/2008

HIGHLY CONFIDENTIAL

**Long Island - Acquisition Summary [draft - subject to detailed verification and audit]**

| | $bn | $bn | Notes | Split BCI $bn | LLCs $bn | Notes |
|---|---|---|---|---|---|---|
| Inventory at fair value | | 42.71 | | 37.71 | 5.00 | (2) |
| Additional DTC collateral expected | | 0.95 | (5) | 0.95 | - | |
| Exchange traded options | | - | (7) | - | - | |
| DTC margin received | | 0.30 | | 0.30 | - | |
| 15c3 asset | | 0.77 | | 0.77 | - | |
| Cash | | 7.00 | | 7.00 | - | |
| **Financial Assets** | | **51.73** | | **46.73** | **5.00** | |
| | | | | | | |
| Subsidiaries (3 overseas + Townsend) | | 0.03 | (8) | - | 0.03 | |
| 7th Avenue | | 0.96 | | - | 0.96 | |
| Data Centres | | 0.33 | | - | 0.33 | |
| Intangible assets/operating leases | | - | (1) | - | - | |
| Fixtures, fittings, software, etc | | 0.68 | (6) | - | 0.68 | |
| | | | | | | |
| **Total Assets** | | **53.73** | | **46.73** | **7.00** | |
| | | | | | | |
| Repo liability | 45.00 | | | 45.00 | - | |
| Cure payment | 0.14 | | (4) | 0.14 | - | |
| Tax provision | 0.30 | | | 0.30 | - | |
| Bonus accrual | 2.00 | | (9) | 2.00 | - | |
| | | | | | | |
| **Total Liabilities** | | **47.44** | | **47.44** | **-** | |
| | | | | | | |
| **Net assets** | | **6.29** | | **(0.70)** | **7.00** | |
| | | | | | | |
| Consideration: | | | | | | |
| Assets | 0.25 | | | | | |
| 7th Avenue | 0.96 | | | | | |
| Data Centre | 0.33 | | | | | |
| **Total consideration** | | **1.54** | | | | |
| | | | | | | |
| **Negative goodwill** | | **4.76** | | | | |

**Notes:**

(1) E&Y have been engaged to conduct a review for intangible assets (customer relationships etc).
(2) BCI vs LLC split under discussion (S King, S Grbic)
(4) Per initial estimate from Jai Westwood.
(5) Subject to legal clarification.
(6) 50% of previously capitalised software is included as an estimate, since it is unlikely all will have a value post-acquisition.
(7) Conservative estimate - once related issues resolved, an asset of between small negative and $0.5bn asset is possible.
(8) Excluding fixed assets to avoid double-counting.
(9) An element of this amount will be recorded in equity rather than as a liability (estimated $0.26b)

NB: Potential further adjustment - direct acquisition costs

PROVISIONAL, NOT TIED WITH OPS/FINANCE

| Desk | Barc COB 9/19 MV |
|------|------------------|
| Agency Mortgages | 13,023 |
| *CMO* | *3,942* |
| *Passthrus* | *8,778* |
| *Other (GNMA/VA/FHA)* | *303* |
| Corporate Credit [1] | 1,277 |
| *IG* | *923* |
| *HY* | *338* |
| *Unknown (Est)* | *16* |
| EM [2] | 324 |
| Equities | 9,852 |
| *Cash Equities* [3] | *8,738* |
| *Convertibles* | *1,114* |
| Munis [4] | 427 |
| PMTG | 1,841 |
| *Non-agency RMBS* | *854* |
| *Other ABS/CMBS/CDO* | *987* |
| Rates | 14,989 |
| *Treasuries* | *5,287* |
| *Agencies (Est)* | *9,702* |
| Short Term [6] | 60 |
| Total | 41,792 |
| Cash from JPM | 7,000 |
| Derivative Assets | |
| Derivative Liabilities | (579) |
| Exchange Traded Margin | 1,209 |
| Grand Total | 48,792 |

# A. 186

Rod Miller/NY/WGM/US

10/28/2008 02:43 PM

To    thomas.roberts@weil.com, michael.lubowitz@weil.com,
Lori Fife/NY/WGM/US@WGM

cc

bcc

Subject    Fw:    Redact - Privileged

History:        🖅 This message has been replied to.

For your review, since you all attended the meeting.    Redact - Non Responsive

Redact - Non
Responsive

----- Forwarded by Rod Miller/NY/WGM/US on 10/28/2008 03:42 PM -----
"Welikson, Jeffrey" <jeffrey.welikson@lehman.com>

10/28/2008 03:19 PM

To    <rod.miller@weil.com>
cc
Subject    Redact - Privileged

Rod,

Redact - Privileged

<<2008-09-16 Board meeting Minutes kbc.doc>>

Thanks,
Jeff


Jeffrey A. Welikson
Managing Director and Corporate Secretary
Head of Corporate Law
Lehman Brothers
1271 Avenue of the Americas - 42nd Floor
New York, New York 10020
phone: (212) 526-0546
fax:     (646) 758-2651
email:  jeffrey.welikson@lehman.com


CONFIDENTIAL:  ATTORNEY CLIENT PRIVILEGE

WGM-LEHMAN-E 00021493

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - -

This message is intended only for the personal and confidential use of the
designated recipient(s) named above.  If you are not the intended recipient of
this message you are hereby notified that any review, dissemination,
distribution or copying of this message is strictly prohibited.  This
communication is for information purposes only and should not be regarded as
an offer to sell or as a solicitation of an offer to buy any financial
product, an official confirmation of any transaction, or as an official
statement of Lehman Brothers.  Email transmission cannot be guaranteed to be
secure or error-free.  Therefore, we do not represent that this information is
complete or accurate and it should not be relied upon as such.  All
information is subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within
this communication (including any attachments) is not intended or written to
be used and cannot be used for the purpose of (i) avoiding U.S. tax related
penalties or (ii) promoting, marketing or recommending to another party any



transaction or matter addressed herein. 2008-09-16 Board meeting Minutes kbc.doc

WGM-LEHMAN-E 00021494

# LEHMAN BROTHERS HOLDINGS INC.

## Minutes of the Board of Directors
## September 16, 2008

A meeting of the Board of Directors of Lehman Brothers Holdings Inc. (the "Corporation" or collectively with its subsidiaries, the "Firm") was held jointly with a meeting of the Board of Directors of Lehman Brothers Inc. ("LBI") telephonically at 6 a.m. on September 16, 2008, pursuant to written notice.

## PRESENT – LBHI BOARD MEMBERS

Mr. Michael L. Ainslie
Mr. John F. Akers
Mr. Roger S. Berlind
Mr. Thomas H. Cruikshank (*also a LBI Board Member*)
Ms. Marsha Johnson Evans
Mr. Richard S. Fuld, Jr. (*also a LBI Board Member*)
Sir Christopher Gent
Mr. Jerry A. Grundhofer
Mr. Roland A. Hernandez
Mr. Henry Kaufman
Mr. John D. Macomber

## PRESENT – OTHER LBI BOARD MEMBERS

Mr. Howard L. Clark, Jr.
Mr. Frederick Frank

## ALSO PRESENT BY INVITATION

Mr. Ian T. Lowitt
Mr. Herbert H. McDade III
Mr. Hugh E. McGee III
Mr. Thomas A. Russo
Mr. Mark Shafir
Mr. Jeffrey A. Welikson
Mr. Andrew J. Levander (Dechert)
Ms. Lori Fife (Weil Gotshal & Manges)
Mr. Michael Lubowitz (Weil Gotshal & Manges)
Mr. Thomas Roberts (Weil Gotshal & Manges)
Mr. Alvin Brown (Simpson Thacher & Bartlett)
Mr. John Finley (Simpson Thacher & Bartlett)
Mr. Andrew Keller (Simpson Thacher & Bartlett)
Mr. Barry W. Ridings (Lazard)

Mr. Russo introduced the meeting, stating that the Board of Directors of each of the Corporation and LBI is present because the matters to be considered involve both companies. Mr. Russo reported that the agenda items for the meeting are an asset sale transaction for consideration by both companies, the retention of Alvarez & Marsal for consideration by the Corporation, and a debtor-in-possession financing facility for the Corporation. Mr. Russo reported that there are still a few details to be resolved on the sale transaction, but the Firm is hoping to be in a position to announce the transaction before the U.S. markets open. He introduced Mr. Roberts of Weil, Gotshal & Manges to present the transaction.

## APPROVAL OF THE SALE OF CERTAIN ASSETS AND OF DEBTOR-IN-POSSESSION FINANCING

Mr. Roberts stated that Mr. Barry Ridings of Lazard is present at the meeting, and that the Board of Directors of the Corporation will be asked to consider the retention of Lazard by the Corporation. Mr. Roberts presented the proposed transaction with Barclays, as consisting of (1) the sale to Barclays of 745 Seventh Avenue for approximately $1 billion, to close within the next week, (2) debtor-in-possession ("DIP") financing from Barclays of $500 million for the Corporation, half in the form of a term facility and half in the form of a revolving facility, which would probably start that day, and (3) the transfer of most assets of the U.S. broker dealer, along with approximately 10,000 employees, to Barclays. Mr. Roberts stated that this transaction would benefit the creditors of the Corporation and also save the franchise and many jobs.

The Directors asked which entity will receive the proceeds from the sale of 745 Seventh Avenue and are advised it is the Corporation. The Directors asked about the timeline and are advised that the Bankruptcy Court hearing to approve the transaction is expected to be held on Friday or Monday. The Directors asked about employees to be retained at the Corporation and are advised it will be certain commercial real estate managers and managers of other assets retained by the Corporation, as well as the employees of Aurora and certain support groups at the Corporation.

The Directors asked about the sale of the Investment Management Division ("IMD"), and are advised that it is not included in this transaction. The Directors asked how the sale price for 745 Seventh Avenue was determined, and are advised it was an internal evaluation but that the Corporation retained Cushman & Wakefield and is expecting its oral appraisal that morning. The Directors asked about the DIP financing, and are advised that it will be secured by shares of Neuberger Berman and will become due upon the sale of Neuberger Berman. The Directors are also advised that the transaction involves the sale of two data centers at appraised value, and that the two data centers have an aggregate book value of $450 million and are owned by the Corporation.

Mr. Shafir continued the description of the transaction, describing the assets and liabilities to be transferred to Barclays and stating that there would be an additional purchase price component of $250 million for goodwill.

2

Mr. Roberts resumed by describing that it is a condition to the transaction that eight specific Firm employees enter into employment agreements with Barclays. He stated that Mr. McGee was one of those employees, so interested Firm employees were involved in the transaction negotiations on behalf of the Firm. Mr. Roberts reported that Mr. McDade was subsequently advised by Barclays that his agreement to continued employment was a condition precedent to the transaction. Mr. Roberts reported that both Weil, Gotshal & Manges and Simpson Thacher & Bartlett then told Barclays there were to be no more discussions concerning Mr. McDade's employment until all terms of the Firm transaction were completed. Mr. Roberts reported that the discussions regarding Mr. McDade's employment were suspended to protect Mr. McDade's independence.

Mr. Lubowitz of Weil, Gotshal & Manges reported on the most significant contract terms for the proposed sale of assets. He described that the contract provides that closing must occur within eight days of signing, and that Weil, Gotshal & Manges expected to go into Bankruptcy Court later that day to get the Bankruptcy Court approval process underway. Mr. Lubowitz reported that the contract is quite tight in terms of Barclays' obligation to close. He stated that there is no MAE ("material adverse effect") clause, and there is no bringdown of the representations and warranties. He described that one significant condition of the proposed sale is that a minimum percentage of the Firm's top 200 employees must indicate that they will stay at Barclays post-closing. Mr. Lubowitz reported that Barclays has requested that such percentage be 75%, but that the percentage is still open. Mr. McDade stated that the Firm expects to be able to satisfy a 75% test but is trying to reduce the percentage to create more certainty. Mr. Lubowitz described that the assets being sold include the Lehman Brothers name, but that the name will be licensed back to the rest of the Firm, including the Asset Management Group. Mr. Lubowitz described that the contract allows the Corporation to consider other bids, but provides for a 3% break-up fee. The Directors asked about the break-up fee and about the status of the Firm's operations in the United Kingdom and Asia.

Mr. Brown of Simpson Thacher & Bartlett reported on the employee benefits aspects of the proposed sale of assets. He reported that the Firm proposed post-closing covenants to protect employee benefits, but that the only commitment Barclays would make is to keep current severance levels in place for the balance of the calendar year. Mr. Brown reported that Barclays would not assume any liability for the Firm's pension or benefit plans. He described the status of the Firm's pension plans, deferred compensation plans, and 401(k) plan. Mr. Brown reported that the Firm is attempting to eliminate a contract provision which provides that Barclays' confidentiality obligation terminates if the agreement terminates. Mr. Brown described the draft employment letters for eight specific Firm employees which are a condition to the deal. He described that the draft employment letters provide for at-will employment for a period of time, with salary and guaranteed cash bonus and a retention award.

The Directors asked about the Firm subsidiaries and employees which will remain with the Corporation. Ms. Fife described that approximately two thousand employees

3

WGM-LEHMAN-E 00021497

will be moved from the Corporation to LBI that morning in advance of the transaction with Barclays.

The Directors are briefed on the timeline for the day and on the fact that the Barclays transaction is subject to Bankruptcy Court approval, and that another party can make a topping bid. The Directors are advised that the plan is to sign the Barclays transaction that morning, then make a public announcement of the transaction, and then request Bankruptcy Court approval that day of the break-up fee and interim authority for the DIP financing. The Directors are advised that those matters should get heard and approved by the Bankruptcy Court that afternoon. The Directors are also advised that the Corporation will ask the Bankruptcy Court that day to set a hearing for approval of the sale, that there will be an organizational meeting with the U.S. Trustee that evening and that a creditors' committee should be appointed then. The Directors are advised that the creditors' committee will be briefed on the transaction the next day. The Directors are advised that it will be necessary to put LBI in a Securities Investor Protection Corporation ("SIPC") proceeding for a very short period of time to facilitate the sale of LBI assets to Barclays.

Mr. Ridings of Lazard advised the Directors that the applicable standards for this sale (under Section 363 of the Bankruptcy Code) are to obtain the highest and best price and a price greater than liquidation value. He advised the Directors that he believes these tests can be met, but that it will be a close decision for the Bankruptcy Court judge. He advised that the chances of a topping bid are very remote since the business is deteriorating. He advised that he will testify at the Bankruptcy Court hearing in support of approval of the proposed transaction with Barclays.

Mr. Russo asked for any questions or comments. The Directors summarized the consideration as follows: $1 billion to the Corporation for 745 Seventh Avenue, $250 million to LBI for the Lehman Brothers name, and $450 million to the Corporation for the data centers. [For LBI, the transaction was described as a wash – with Barclays assuming liabilities ($64 billion) basically equivalent to the assets ($70 billion) plus assuming some employees and accounts.]

Mr. Lowitt advised that he believes that LBI would not be able to fund itself that day without this deal, based on how funding went yesterday. Mr. Lowitt stated that if the Firm does not do this deal that day, LBI would have to declare bankruptcy.

The Directors asked questions about the sale and license-back of the Lehman Brothers name, Barclays' ability to solicit Firm employees if the deal does not go forward, and the fact that Barclays will have already signed up approximately 200 of the Firm's employees. The Directors asked if Mr. Levander has any objections. Mr. Levander asked bankruptcy counsel about the acceptability of the break-up fee. Mr. Russo asked to release Messrs. McDade and McGee from the meeting to finalize the transaction. Messrs. McDade and McGee then left the meeting. The Directors asked if the transaction is subject to approval by Barclays' board of directors or shareholders, and are advised that Barclays only requires board approval and that its board is meeting now.

4

WGM-LEHMAN-E 00021498

The Directors asked about the other members of the Firm's management executive committee who are included among the eight employees whose agreement to continue employment is a condition to the deal, and they are advised that Messrs. Felder, Donini, Lowitt, Gelband, and Lee are included.

Mr. Russo asked for a motion to approve this transaction in principle with authority delegated to appropriate officers to negotiate final terms and report back to the Executive Committee of the Board of Directors of the Corporation for final approval of the transaction.

Mr. Roberts summarized the Board approvals being requested as follows: the approval of the transaction with Barclays, the execution of documents and the taking of actions in connection with the outline presented that day, and the retention of Lazard on terms to be negotiated by the management executive committee. After discussion, upon motion duly made and seconded, it was unanimously resolved

## Authorization of DIP Facility

**WHEREAS**, it is proposed that Lehman Brothers Holdings Inc. ("LBHI") enter into (i) a [$450] million Debtor-in-Possession Credit Agreement, to be dated on or about the date hereof (the "DIP Facility"), by and between, LBHI and Barclays Bank PLC (the "Agent"), (ii) a Pledge Agreement, to be dated on or about the date hereof (the "Pledge Agreement"), relating to LBHI's equity interest through a subsidiary in the business of Neuberger & Berman by and between LBHI and the Agent, and (iii) all other documents, instruments and certificates required or appropriate in connection with execution, delivery or performance of such agreements (the items referred to in the foregoing clauses (i) - (iii) being individually a "Loan Document" and collectively, the "Loan Documents"), substantially on the material terms described to the Board of Directors by its legal counsel, Weil, Gotshal & Manges LLP ("Weil"), including a final maturity of the earlier of six months and the closing of the sale of the investment management division;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Loan Documents, substantially on the material terms described to the Board of Directors by Weil, on the date hereof, to provide debtor-in-possession financing in such aggregate principal amounts as so described, are authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of each of the Loan Documents is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter into each of the Loan Documents and consummate the transactions contemplated thereby; and further

5

**RESOLVED** that each of the Chief Executive Officer, the Chief Financial Officer, the Chief Restructuring Officer, the President, any Vice President, the Treasurer, any Assistant Treasurer, the Secretary, any Assistant Secretary and any other person designated and so authorized to act (each, an "Authorized Officer") of LBHI is, individually authorized, empowered and directed, in the name and on behalf of LBHI to perform such acts and deeds and to negotiate, prepare, execute and deliver the Loan Documents substantially in accordance with the material terms described to the Board of Directors by its legal counsel, Weil, Gotshal & Manges LLP, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and delivery thereof; and further

**RESOLVED** that each Authorized Officer of LBHI is individually authorized, empowered and directed to take such additional action from time to time and execute, certify, deliver, file and record with the appropriate judicial, public and governmental authorities or any other persons or entities from time to time such additional documents, instruments and agreements, including, without limitation, Uniform Commercial Code financing statements, intellectual property recordations, and any amendment, extension, waiver or consent in connection with the Loan Documents, as any such Authorized Officer may deem appropriate or desirable to implement the provisions and carry out the purposes of the foregoing resolutions and the Loan Documents authorized and approved thereby, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such action to be the conclusive evidence of the authority therefor granted.

## Authorization of Asset Purchase Agreement

**WHEREAS**, it is proposed that Lehman Brothers Inc. ("LBI") sell substantially all of the assets comprising its U.S. and Canadian investment banking and capital markets businesses, including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant, and that LBHI sell its assets primarily related to the conduct of such businesses and cause its appropriate subsidiaries to sell the headquarters building of LBHI and LBI at 745 Seventh Avenue and other real estate assets related to such businesses, pursuant to an Asset Purchase Agreement, to be dated on or about the date hereof (the "Asset Purchase Agreement") by and among Barclays Capital Inc. ("BarCap"), LBHI and LBI;

6

WGM-LEHMAN-E 00021500

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Asset Purchase Agreement, substantially on the material terms described to the Board of Directors by its legal counsel, Weil and Simpson, Thacher & Bartlett LLP ("Simpson" and together with Weil, "Counsel"), on the date hereof, to sell the assets described above is authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Asset Purchase Agreement is authorized and approved in every respect as being in the best interest of LBHI [and LBI], and (iii) LBHI [and LBI] shall enter the Asset Purchase Agreement and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Asset Purchase Agreement substantially in accordance with the material terms described to the Board of Directors by Counsel, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof; and further

[**RESOLVED** that each of the Chief Executive Officer, the Chief Financial Officer, the President, either Co-Chief Administrative Officer, the Treasurer, any Assistant Treasurer, any Managing Director, the Secretary, any Assistant Secretary and any other person designated and so authorized to act (each, an "Authorized Officer") of LBI is, individually, authorized, empowered and directed, in the name and on behalf of LBI , to perform such acts and deeds and to negotiate, prepare, execute and deliver the Asset Purchase Agreement substantially on the material terms as described to the Board of Directors by Counsel, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.]

**[Authorization of Overnight Facility**

**WHEREAS**, it is proposed that LBI enter into a collateralization and intraday liquidity facility pursuant to an Interim Support and Cooperation Agreement, to be dated on or about September 16, 2008 (the "Interim Support Agreement") between LBI and Barclays Capital Inc.;

WGM-LEHMAN-E 00021501

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Interim Support Agreement, substantially on the material terms described to the Board of Directors by [Ian Lowitt, Chief Financial Officer], on the date hereof, to enter into a collateralization and intraday liquidity facility to be provided by BarCap, is authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Interim Support Agreement is authorized and approved in every respect as being in the best interest of LBI, and (iii) LBI shall enter the Interim Support Agreement and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBI is, individually, authorized, empowered and directed, in the name and on behalf of LBI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Interim Support Agreement substantially on the material terms described to the Board of Directors by [Mr. Lowitt], on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.]

**Authorization of Retention of Lazard by LBHI**

**WHEREAS**, it is proposed that LBHI, in conjunction with entering into the Asset Purchase Agreement and the Loan Documents as described herein, enter into a financial advisory agreement to be dated on or about September 16, 2008 (the "Financial Advisory Agreement") between LBHI and Lazard Ltd. ("Lazard") whereby, among other things, Lazard will serve as LBHI's financial advisor in connection with, and provide certain valuation services with respect to, the restructuring of the LBHI's business;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Financial Advisory Agreement, [substantially on the material terms described to the Board of Directors by Mr. Barry Ridings of Lazard, on the date hereof,] is authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Financial Advisory Agreement is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter the Financial Advisory Agreement and consummate the transactions contemplated thereby and further

8

WGM-LEHMAN-E 00021502

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Financial Advisory Agreement [substantially on the material terms described to the Board of Directors by Mr. Ridings, on the date hereof,] with such changes, additions and modifications thereto as such Authorized Officer shall consider necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.

## General Authority and Ratification of Past Actions for LBHI

**RESOLVED** that other appropriate officers of LBHI designated by the Authorized Officers of LBHI, respectively, are authorized to execute, or join in the execution of, agreements, documents and instruments on behalf of LBHI, respectively, to attest or deliver certificates on behalf of LBHI and to take such additional action on behalf of LBHI as the Authorized Officers of LBHI may deem appropriate or desirable, relating to any document that the Authorized Officers of LBHI have been authorized to execute on behalf of LBHI pursuant to the foregoing resolutions and to perform and carry out the purposes of the Loan Documents, the Asset Purchase Agreement, [the Interim Support Agreement,] the Engagement Letter [(as hereinafter defined)] and the Financial Advisory Agreement, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such additional action to be the conclusive evidence of the authority therefor granted; and further

**RESOLVED** that the authority given hereunder is retroactive and any and all acts relating to the subject matter of the foregoing resolutions performed prior to the passage of the foregoing resolutions by any of the officers of LBHI are ratified, confirmed and approved in all respects.

## [General Authority and Ratification of Past Actions for LBI

**RESOLVED** that other appropriate officers of LBI designated by the Authorized Officers of LBI, respectively, are authorized to execute, or join in the execution of, agreements, documents and instruments on behalf of LBI, respectively, to attest or deliver certificates on behalf of LBI and to take such additional action on behalf of LBI as the Authorized Officers of LBI may deem appropriate or desirable, relating to any document that the Authorized Officers of LBI have been authorized to execute on behalf of LBI pursuant to the foregoing resolutions, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such additional action to be the conclusive evidence of the authority therefore granted; and further

WGM-LEHMAN-E 00021503

**RESOLVED** that the authority given hereunder is retroactive and any and all acts relating to the subject matter of the foregoing resolutions performed prior to the passage of the foregoing resolutions by any of the officers of LBI are ratified, confirmed and approved in all respects.]

Mr. Shafir updated the Directors on the potential sale of IMD, stating that Bain Capital and Hellman & Friedman may together purchase a 100% interest in IMD. He reported that negotiations have commenced, that final due diligence is underway, and that Private Equity will probably be excluded from the transaction. He reported that the IMD business is deteriorating, given the current situation. Messrs. Shafir and Ridings then left the meeting.

## APPROVAL OF THE RETENTION OF ALVAREZ & MARSAL

Mr. Russo stated that the next agenda item was for the Board of Directors of the Corporation to consider the engagement of Alvarez & Marsal as Restructuring Advisor, including the election of Mr. Bryan Marsal as Chief Restructuring Officer of the Corporation. Ms. Fife of Weil, Gotshal & Manges presented to the Board of the Corporation and described that it is very common in Chapter 11 cases to hire chief restructuring officers to prepare restructuring plans and budgets, and to deal with the bankruptcy case generally, leaving the Corporation's employees the time to operate the business. Ms. Fife reported that Weil, Gotshal & Manges has previously worked with Alvarez & Marsal and with Mr. Marsal, and that Mr. Marsal was interviewed yesterday by Mr. Russo. The Directors of the Corporation asked questions regarding the compensation which would be paid, and were advised that it would be based on hourly fees comparable to a law firm. The Directors of the Corporation asked about the amount of time the Corporation will be in Chapter 11 proceedings and the possibility of there being residual value for the Corporation's stockholders. Mr. Levander asked Ms. Fife to speak about Alvarez & Marsal, including their reputation, their competitors, and potential conflicts with the Firm. Ms. Fife reported that Alvarez & Marsal is one of the two leading firms in this area, very highly regarded and very experienced. She stated that Weil, Gotshal & Manges recommends them very highly. Ms. Fife stated that the retention of Alvarez & Marsal would require approval by the Bankruptcy Court, and that the Bankruptcy Court will require that Alvarez & Marsal be free of conflicts. Mr. Levander stated that he holds a high opinion of Alvarez & Marsal as well.

After discussion, upon motion duly made and seconded, it was unanimously resolved

### Authorization of Engagement Letter

**WHEREAS**, it is proposed that LBHI enter into an engagement letter to be dated on or about the date hereof (the "Engagement Letter") between LBHI and Alvarez & Marsal North America, LLC ("A&M")

10

whereby, among other things, A&M will serve as LBHI's Restructuring Advisor, subject to such approval by the U.S. Bankruptcy Court for the Southern District of New York of the retention of A&M as may be required by law;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Engagement Letter, [substantially on the material terms [and in the form] presented to the Board of Directors on the date hereof,] is authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Engagement Letter is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter the Engagement Letter and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Engagement Letter [substantially on the material terms [and in the form] presented to the Board of Directors on the date hereof,] with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefor to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.

**Authorization of Retention of Bryan Marsal**

**WHEREAS**, it is proposed that LBHI, in accordance with Article V, Section 21 of its By-Laws, and as contemplated by clause 1(a) of the Engagement Letter as described herein, retain and appoint Bryan P. Marsal of A&M as its Chief Restructuring Officer;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that Bryan P. Marsal be, and hereby is, appointed, effective immediately, to serve as the Chief Restructuring Officer of LBHI, having in such capacity the rank of [Senior] Executive Vice President and authority and supervision over the restructuring of the business, operations, finances and activities of LBHI and its subsidiaries, including, without limitation, the sale of assets of LBHI and its subsidiaries, consistent with the purposes of the Engagement Letter, to serve as such until his successor is elected or appointed and qualified or, if earlier, until his death, resignation or removal from office.

WGM-LEHMAN-E 00021505

Mr. Russo then reviewed the timeline for that morning.

There being no further business to come before the meeting, the meeting was, upon motion duly made and seconded, adjourned.

Respectfully submitted,

Jeffrey A. Welikson
Secretary of the Meeting

12

WGM-LEHMAN-E 00021506

# A. 187



**Michael Lubowitz/NY/WGM/US**

10/29/2008 10:36 AM

To    Rod Miller/NY/WGM/US@WGM
cc
bcc

Subject   Re: Fw: 08-09-16 Board Meeting Minutes kbc

here a few nits. I don't recall the reference to the 64 and 70 billion asset/liability numbers.



08-09-16 Board Meeting Minutes kbc_#1931812.DOC

Rod Miller/NY/WGM/US

**Rod Miller/NY/WGM/US**

10/28/2008 09:19 PM

To    michael.lubowitz@weil.com
cc

Subject   Fw: 08-09-16 Board Meeting Minutes kbc

For comments.

----- Forwarded by Rod Miller/NY/WGM/US on 10/28/2008 09:19 PM -----

**NY Document Production**

Sent by: Stephany Duncan

                                          To   Rod Miller/NY/WGM/US@WGM

10/28/2008 09:18 PM                       cc

                                          Subject  08-09-16 Board Meeting Minutes kbc

Secretarial & Document Services
Weil Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY  10153



(212) 310-8216   08-09-16 Board Meeting Minutes kbc_#1931812.DOC

WGM-LEHMAN-E 00021559

## LEHMAN BROTHERS HOLDINGS INC.

### Minutes of the Board of Directors
### September 16, 2008

A meeting of the Board of Directors of Lehman Brothers Holdings Inc. (the "Corporation" or collectively with its subsidiaries, the "Firm") was held jointly with a meeting of the Board of Directors of Lehman Brothers Inc. ("LBI") telephonically at 6 a.m. on September 16, 2008, pursuant to written notice.

### PRESENT – LBHI BOARD MEMBERS

Mr. Michael L. Ainslie
Mr. John F. Akers
Mr. Roger S. Berlind
Mr. Thomas H. Cruikshank (*also a LBI Board Member*)
Ms. Marsha Johnson Evans
Mr. Richard S. Fuld, Jr. (*also a LBI Board Member*)
Sir Christopher Gent
Mr. Jerry A. Grundhofer
Mr. Roland A. Hernandez
Mr. Henry Kaufman
Mr. John D. Macomber

### PRESENT – OTHER LBI BOARD MEMBERS

Mr. Howard L. Clark, Jr.
Mr. Frederick Frank

### ALSO PRESENT BY INVITATION

Mr. Ian T. Lowitt
Mr. Herbert H. McDade III
Mr. Hugh E. McGee III
Mr. Thomas A. Russo
Mr. Mark Shafir
Mr. Jeffrey A. Welikson
Mr. Andrew J. Levander (Dechert)
Ms. Lori Fife (Weil Gotshal & Manges)
Mr. Michael Lubowitz (Weil Gotshal & Manges)
Mr. Thomas Roberts (Weil Gotshal & Manges)
Mr. Alvin Brown (Simpson Thacher & Bartlett)
Mr. John Finley (Simpson Thacher & Bartlett)
Mr. Andrew Keller (Simpson Thacher & Bartlett)
Mr. Barry W. Ridings (Lazard)

WGM-LEHMAN-E 00021560

Mr. Russo introduced the meeting, stating that the Board of Directors of each of the Corporation and LBI is present because the matters to be considered involve both companies. Mr. Russo reported that the agenda items for the meeting are an asset sale transaction for consideration by both companies, the retention of Alvarez & Marsal for consideration by the Corporation, and a debtor-in-possession financing facility for the Corporation. Mr. Russo reported that there are still a few details to be resolved on the sale transaction, but the Firm is hoping to be in a position to announce the transaction before the U.S. markets open. He introduced Mr. Roberts of Weil, Gotshal & Manges to present the transaction.

## APPROVAL OF THE SALE OF CERTAIN ASSETS AND OF DEBTOR-IN-POSSESSION FINANCING

Mr. Roberts stated that Mr. Barry Ridings of Lazard is present at the meeting, and that the Board of Directors of the Corporation will be asked to consider the retention of Lazard by the Corporation. Mr. Roberts presented the proposed transaction with Barclays, as consisting of (1) the sale to Barclays of 745 Seventh Avenue for approximately $1 billion, to close within the next week, (2) debtor-in-possession ("DIP") financing from Barclays of $500 million for the Corporation, half in the form of a term facility and half in the form of a revolving facility, which would probably start that day, and (3) the transfer of most assets of the U.S. broker dealer, along with approximately 10,000 employees, to Barclays. Mr. Roberts stated that this transaction would benefit the creditors of the Corporation and also save the franchise and many jobs.

The Directors asked which entity will receive the proceeds from the sale of 745 Seventh Avenue and are advised it is the Corporation. The Directors asked about the timeline and are advised that the Bankruptcy Court hearing to approve the transaction is expected to be held on Friday or Monday. The Directors asked about employees to be retained at the Corporation and are advised it will be certain commercial real estate managers and managers of other assets retained by the Corporation, as well as the employees of Aurora and certain support groups at the Corporation.

The Directors asked about the sale of the Investment Management Division ("IMD"), and are advised that it is not included in this transaction. The Directors asked how the sale price for 745 Seventh Avenue was determined, and are advised it was an internal evaluation but that the Corporation retained Cushman & Wakefield and is expecting its oral appraisal that morning. The Directors asked about the DIP financing, and are advised that it will be secured by shares of Neuberger Berman and will become due upon the sale of Neuberger Berman. The Directors are also advised that the transaction involves the sale of two data centers at appraised value, and that the two data centers have an aggregate book value of $450 million and are owned by the Corporation.

Mr. Shafir continued the description of the transaction, describing the assets and liabilities to be transferred to Barclays and stating that there would be an additional purchase price component of $250 million for goodwill.

WGM-LEHMAN-E 00021561

Mr. Roberts resumed by describing that it is a condition to the transaction that eight specific Firm employees enter into employment agreements with Barclays. He stated that Mr. McGee was one of those employees, so interested Firm employees were involved in the transaction negotiations on behalf of the Firm. Mr. Roberts reported that Mr. McDade was subsequently advised by Barclays that his agreement to continued employment was a condition precedent to the transaction. Mr. Roberts reported that both Weil, Gotshal & Manges and Simpson Thacher & Bartlett then told Barclays there were to be no more discussions concerning Mr. McDade's employment until all terms of the Firm transaction were completed. Mr. Roberts reported that the discussions regarding Mr. McDade's employment were suspended to protect Mr. McDade's independence.

Mr. Lubowitz of Weil, Gotshal & Manges reported on the most significant contract terms for the proposed sale of assets. He described that the contract provides that closing must occur within eight days of signing, and that Weil, Gotshal & Manges expected to go into Bankruptcy Court later that day to get the Bankruptcy Court approval process underway. Mr. Lubowitz reported that the contract is quite tight in terms of Barclays' obligation to close. He stated that there is no MAE ("material adverse effect") clause, and there is no bringdown of the representations and warranties. He described that one significant condition of the proposed sale is that a minimum percentage of the Firm's top 200 employees must indicate that they will stay at Barclays post-closing. Mr. Lubowitz reported that Barclays has requested that such percentage be 75%, but that the percentage is still open. Mr. McDade stated that the Firm expects to be able to satisfy a 75% test but is trying to reduce the percentage to create more certainty. Mr. Lubowitz described that the assets being sold include the Lehman Brothers name, but that the name will be licensed back to the rest of the Firm, including the Asset Management Group. Mr. Lubowitz described that the contract allows the Corporation to consider other bids, but provides for a 3% break-up fee. The Directors asked about the break-up fee and about the status of the Firm's operations in the United Kingdom and Asia.

Mr. Brown of Simpson Thacher & Bartlett reported on the employee benefits aspects of the proposed sale of assets. He reported that the Firm proposed post-closing covenants to protect employee benefits, but that the only commitment Barclays would make is to keep current severance levels in place for the balance of the calendar year. Mr. Brown reported that Barclays would not assume any liability for the Firm's pension or benefit plans. He described the status of the Firm's pension plans, deferred compensation plans, and 401(k) plan. Mr. Brown reported that the Firm is attempting to eliminate a contract provision which provides that Barclays' confidentiality obligation terminates if the agreement terminates. Mr. Brown described the draft employment letters for eight specific Firm employees which are a condition to the deal. He described that the draft employment letters provide for at-will employment for a period of time, with salary and guaranteed cash bonus and a retention award.

The Directors asked about the Firm subsidiaries and employees which will remain with the Corporation. Ms. Fife described that approximately two thousand employees will be moved from the Corporation to LBI that morning in advance of the transaction with Barclays.

WGM-LEHMAN-E 00021562

The Directors are briefed on the timeline for the day and on the fact that the Barclays transaction is subject to Bankruptcy Court approval, and that another party can make a topping bid. The Directors are advised that the plan is to sign the Barclays transaction that morning, then make a public announcement of the transaction, and then request Bankruptcy Court approval that day of the break-up fee and interim authority for the DIP financing. The Directors are advised that those matters should get heard and approved by the Bankruptcy Court that afternoon. The Directors are also advised that the Corporation will ask the Bankruptcy Court that day to set a hearing for approval of the sale, that there will be an organizational meeting with the U.S. Trustee that evening and that a creditors' committee should be appointed then. The Directors are advised that the creditors' committee will be briefed on the transaction the next day. The Directors are advised that it will be necessary to put LBI in a Securities Investor Protection Corporation ("SIPC") proceeding for a very short period of time to facilitate the sale of LBI assets to Barclays.

Mr. Ridings of Lazard advised the Directors that the applicable standards for this sale (under Section 363 of the Bankruptcy Code) are to obtain the highest and best price and a price greater than liquidation value. He advised the Directors that he believes these tests can be met, but that it will be a close decision for the Bankruptcy Court judge. He advised that the chances of a topping bid are very remote since the business is deteriorating. He advised that he will testify at the Bankruptcy Court hearing in support of approval of the proposed transaction with Barclays.

Mr. Russo asked for any questions or comments. The Directors summarized the consideration as follows: $1 billion to the Corporation for 745 Seventh Avenue, $250 million to LBI for the Lehman Brothers name, and $450 million to the Corporation for the data centers. [For LBI, the transaction was described as a wash – with Barclays assuming liabilities ($64 billion) basically equivalent to the assets ($70 billion) plus assuming some employees and accounts.]

Mr. Lowitt advised that he believes that LBI would not be able to fund itself that day without this deal, based on how funding went yesterday. Mr. Lowitt stated that if the Firm does not do this deal that day, LBI would have to declare bankruptcy.

The Directors asked questions about the sale and license-back of the Lehman Brothers name, Barclays' ability to solicit Firm employees if the deal does not go forward, and the fact that Barclays will have already signed up approximately 200 of the Firm's employees. The Directors asked if Mr. Levander has any objections. Mr. Levander asked bankruptcy counsel about the acceptability of the break-up fee. Mr. Russo asked to release Messrs. McDade and McGee from the meeting to finalize the transaction. Messrs. McDade and McGee then left the meeting. The Directors asked if the transaction is subject to approval by Barclays' board of directors or shareholders, and are advised that Barclays only requires board approval and that its board is meeting now. The Directors asked about the other members of the Firm's management executive committee who are included among the eight employees whose agreement to continue employment is a condition to the deal, and they are advised that Messrs. Felder, Donini, Lowitt, Gelband, and Lee are included.

WGM-LEHMAN-E 00021563

Mr. Russo asked for a motion to approve this transaction in principle with authority delegated to appropriate officers to negotiate final terms and report back to the Executive Committee of the Board of Directors of the Corporation for final approval of the transaction.

Mr. Roberts summarized the Board approvals being requested as follows: the approval of the transaction with Barclays, the execution of documents and the taking of actions in connection with the outline presented that day, and the retention of Lazard on terms to be negotiated by the management executive committee. After discussion, upon motion duly made and seconded, it was unanimously resolved

### Authorization of DIP Facility

**WHEREAS**, it is proposed that Lehman Brothers Holdings Inc. ("LBHI") enter into (i) a [\$450] million Debtor-in-Possession Credit Agreement, to be dated on or about the date hereof (the "DIP Facility"), by and between, LBHI and Barclays Bank PLC (the "Agent"), (ii) a Pledge Agreement, to be dated on or about the date hereof (the "Pledge Agreement"), relating to LBHI's equity interest through a subsidiary in the business of Neuberger & Berman by and between LBHI and the Agent, and (iii) all other documents, instruments and certificates required or appropriate in connection with execution, delivery or performance of such agreements (the items referred to in the foregoing clauses (i) - (iii) being individually a "Loan Document" and collectively, the "Loan Documents"), substantially on the material terms described to the Board of Directors by its legal counsel, Weil, Gotshal & Manges LLP ("Weil"), including a final maturity of the earlier of six months and the closing of the sale of the investment management division;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Loan Documents, substantially on the material terms described to the Board of Directors by Weil, on the date hereof, to provide debtor-in-possession financing in such aggregate principal amounts as so described, are authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of each of the Loan Documents is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter into each of the Loan Documents and consummate the transactions contemplated thereby; and further

**RESOLVED** that each of the Chief Executive Officer, the Chief Financial Officer, the Chief Restructuring Officer, the President, any Vice President, the Treasurer, any Assistant Treasurer, the Secretary, any Assistant Secretary and any other person designated and so authorized to act (each, an "Authorized Officer") of LBHI is, individually authorized,

WGM-LEHMAN-E 00021564

empowered and directed, in the name and on behalf of LBHI to perform such acts and deeds and to negotiate, prepare, execute and deliver the Loan Documents substantially in accordance with the material terms described to the Board of Directors by its legal counsel, Weil, Gotshal & Manges LLP, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and delivery thereof; and further

**RESOLVED** that each Authorized Officer of LBHI is individually authorized, empowered and directed to take such additional action from time to time and execute, certify, deliver, file and record with the appropriate judicial, public and governmental authorities or any other persons or entities from time to time such additional documents, instruments and agreements, including, without limitation, Uniform Commercial Code financing statements, intellectual property recordations, and any amendment, extension, waiver or consent in connection with the Loan Documents, as any such Authorized Officer may deem appropriate or desirable to implement the provisions and carry out the purposes of the foregoing resolutions and the Loan Documents authorized and approved thereby, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such action to be the conclusive evidence of the authority therefor granted.

**Authorization of Asset Purchase Agreement**

**WHEREAS**, it is proposed that Lehman Brothers Inc. ("LBI") sell substantially all of the assets comprising its U.S. and Canadian investment banking and capital markets businesses, including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant, and that LBHI sell its assets primarily related to the conduct of such businesses and cause its appropriate subsidiaries to sell the headquarters building of LBHI and LBI at 745 Seventh Avenue and other real estate assets related to such businesses, pursuant to an Asset Purchase Agreement, to be dated on or about the date hereof (the "Asset Purchase Agreement") by and among Barclays Capital Inc. ("BarCap"), LBHI and LBI;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Asset Purchase Agreement, substantially on the material terms described to the Board of Directors by its legal counsel, Weil and Simpson, Thacher & Bartlett LLP ("Simpson" and together with Weil, "Counsel"), on the date hereof, to sell the assets described above is authorized and approved in every respect, (ii) each transaction effected or

WGM-LEHMAN-E 00021565

to be effected pursuant to the terms and provisions of the Asset Purchase Agreement is authorized and approved in every respect as being in the best interest of LBHI [and LBI], and (iii) LBHI [and LBI] shall enter the Asset Purchase Agreement and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Asset Purchase Agreement substantially in accordance with the material terms described to the Board of Directors by Counsel, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof; and further

[**RESOLVED** that each of the Chief Executive Officer, the Chief Financial Officer, the President, either Co-Chief Administrative Officer, the Treasurer, any Assistant Treasurer, any Managing Director, the Secretary, any Assistant Secretary and any other person designated and so authorized to act (each, an "Authorized Officer") of LBI is, individually, authorized, empowered and directed, in the name and on behalf of LBI , to perform such acts and deeds and to negotiate, prepare, execute and deliver the Asset Purchase Agreement substantially on the material terms as described to the Board of Directors by Counsel, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.]

[**Authorization of Overnight Facility**

**WHEREAS**, it is proposed that LBI enter into a collateralization and intraday liquidity facility pursuant to an Interim Support and Cooperation Agreement, to be dated on or about September 16, 2008 (the "Interim Support Agreement") between LBI and Barclays Capital Inc.;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Interim Support Agreement, substantially on the material terms described to the Board of Directors by [Ian Lowitt, Chief Financial Officer], on the date hereof, to enter into a collateralization and intraday liquidity facility to be provided by BarCap, is authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Interim Support Agreement is authorized and approved in every respect as being in the best interest of LBI, and (iii)

WGM-LEHMAN-E 00021566

LBI shall enter the Interim Support Agreement and consummate the transactions contemplated thereby; and further

RESOLVED that each Authorized Officer of LBI is, individually, authorized, empowered and directed, in the name and on behalf of LBI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Interim Support Agreement substantially on the material terms described to the Board of Directors by [Mr. Lowitt], on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.]

**Authorization of Retention of Lazard by LBHI**

WHEREAS, it is proposed that LBHI, in conjunction with entering into the Asset Purchase Agreement and the Loan Documents as described herein, enter into a financial advisory agreement to be dated on or about September 16, 2008 (the "Financial Advisory Agreement") between LBHI and Lazard Ltd. ("Lazard") whereby, among other things, Lazard will serve as LBHI's financial advisor in connection with, and provide certain valuation services with respect to, the restructuring of the LBHI's business;

**NOW, THEREFORE, BE IT:**

RESOLVED that (i) the execution, delivery and performance of the Financial Advisory Agreement, [substantially on the material terms described to the Board of Directors by Mr. Barry Ridings of Lazard, on the date hereof,] is authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Financial Advisory Agreement is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter the Financial Advisory Agreement and consummate the transactions contemplated thereby and further

RESOLVED that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Financial Advisory Agreement [substantially on the material terms described to the Board of Directors by Mr. Ridings, on the date hereof,] with such changes, additions and modifications thereto as such Authorized Officer shall consider necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.

WGM-LEHMAN-E 00021567

## General Authority and Ratification of Past Actions for LBHI

**RESOLVED** that other appropriate officers of LBHI designated by the Authorized Officers of LBHI, respectively, are authorized to execute, or join in the execution of, agreements, documents and instruments on behalf of LBHI, respectively, to attest or deliver certificates on behalf of LBHI and to take such additional action on behalf of LBHI as the Authorized Officers of LBHI may deem appropriate or desirable, relating to any document that the Authorized Officers of LBHI have been authorized to execute on behalf of LBHI pursuant to the foregoing resolutions and to perform and carry out the purposes of the Loan Documents, the Asset Purchase Agreement, [the Interim Support Agreement,] the Engagement Letter [(as hereinafter defined)] and the Financial Advisory Agreement, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such additional action to be the conclusive evidence of the authority therefor granted; and further

**RESOLVED** that the authority given hereunder is retroactive and any and all acts relating to the subject matter of the foregoing resolutions performed prior to the passage of the foregoing resolutions by any of the officers of LBHI are ratified, confirmed and approved in all respects.

## [General Authority and Ratification of Past Actions for LBI

**RESOLVED** that other appropriate officers of LBI designated by the Authorized Officers of LBI, respectively, are authorized to execute, or join in the execution of, agreements, documents and instruments on behalf of LBI, respectively, to attest or deliver certificates on behalf of LBI and to take such additional action on behalf of LBI as the Authorized Officers of LBI may deem appropriate or desirable, relating to any document that the Authorized Officers of LBI have been authorized to execute on behalf of LBI pursuant to the foregoing resolutions, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such additional action to be the conclusive evidence of the authority therefore granted; and further

**RESOLVED** that the authority given hereunder is retroactive and any and all acts relating to the subject matter of the foregoing resolutions performed prior to the passage of the foregoing resolutions by any of the officers of LBI are ratified, confirmed and approved in all respects.]

Mr. Shafir updated the Directors on the potential sale of IMD, stating that Bain Capital and Hellman & Friedman may together purchase a 100% interest in IMD. He reported that negotiations have commenced, that final due diligence is underway, and that Private Equity will probably be excluded from the transaction. He reported that the IMD

WGM-LEHMAN-E 00021568

business is deteriorating, given the current situation.  Messrs. Shafir and Ridings then left the meeting.

## APPROVAL OF THE RETENTION OF ALVAREZ & MARSAL

Mr. Russo stated that the next agenda item was for the Board of Directors of the Corporation to consider the engagement of Alvarez & Marsal as Restructuring Advisor, including the election of Mr. Bryan Marsal as Chief Restructuring Officer of the Corporation.  Ms. Fife of Weil, Gotshal & Manges presented to the Board of the Corporation and described that it is very common in Chapter 11 cases to hire chief restructuring officers to prepare restructuring plans and budgets, and to deal with the bankruptcy case generally, leaving the Corporation's employees the time to operate the business.  Ms. Fife reported that Weil, Gotshal & Manges has previously worked with Alvarez & Marsal and with Mr. Marsal, and that Mr. Marsal was interviewed yesterday by Mr. Russo.   The Directors of the Corporation asked questions regarding the compensation which would be paid, and were advised that it would be based on hourly fees comparable to a law firm.  The Directors of the Corporation asked about the amount of time the Corporation will be in Chapter 11 proceedings and the possibility of there being residual value for the Corporation's stockholders.  Mr. Levander asked Ms. Fife to speak about Alvarez & Marsal, including their reputation, their competitors, and potential conflicts with the Firm.  Ms. Fife reported that Alvarez & Marsal is one of the two leading firms in this area, very highly regarded and very experienced.  She stated that Weil, Gotshal & Manges recommends them very highly.  Ms. Fife stated that the retention of Alvarez & Marsal would require approval by the Bankruptcy Court, and that the Bankruptcy Court will require that Alvarez & Marsal be free of conflicts.  Mr. Levander stated that he holds a high opinion of Alvarez & Marsal as well.

After discussion, upon motion duly made and seconded, it was unanimously resolved

### Authorization of Engagement Letter

**WHEREAS**, it is proposed that LBHI enter into an engagement letter to be dated on or about the date hereof (the "Engagement Letter") between LBHI and Alvarez & Marsal North America, LLC ("A&M") whereby, among other things, A&M will serve as LBHI's Restructuring Advisor, subject to such approval by the U.S. Bankruptcy Court for the Southern District of New York of the retention of A&M as may be required by law;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Engagement Letter, [substantially on the material terms [and in the form] presented to the Board of Directors on the date hereof,] is authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Engagement

WGM-LEHMAN-E 00021569

Letter is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter the Engagement Letter and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Engagement Letter [substantially on the material terms [and in the form] presented to the Board of Directors on the date hereof,] with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefor to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.

## Authorization of Retention of Bryan Marsal

**WHEREAS**, it is proposed that LBHI, in accordance with Article V, Section 21 of its By-Laws, and as contemplated by clause 1(a) of the Engagement Letter as described herein, retain and appoint Bryan P. Marsal of A&M as its Chief Restructuring Officer;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that Bryan P. Marsal be, and hereby is, appointed, effective immediately, to serve as the Chief Restructuring Officer of LBHI, having in such capacity the rank of [Senior] Executive Vice President and authority and supervision over the restructuring of the business, operations, finances and activities of LBHI and its subsidiaries, including, without limitation, the sale of assets of LBHI and its subsidiaries, consistent with the purposes of the Engagement Letter, to serve as such until his successor is elected or appointed and qualified or, if earlier, until his death, resignation or removal from office.

Mr. Russo then reviewed the timeline for that morning.

There being no further business to come before the meeting, the meeting was, upon motion duly made and seconded, adjourned.

Respectfully submitted,

Jeffrey A. Welikson
Secretary of the Meeting

WGM-LEHMAN-E 00021570

# LEHMAN BROTHERS HOLDINGS INC.

## Minutes of the Board of Directors
## September 16, 2008

A meeting of the Board of Directors of Lehman Brothers Holdings Inc. (the "Corporation" or collectively with its subsidiaries, the "Firm") was held jointly with a meeting of the Board of Directors of Lehman Brothers Inc. ("LBI") telephonically at 6 a.m. on September 16, 2008, pursuant to written notice.

## PRESENT – LBHI BOARD MEMBERS

Mr. Michael L. Ainslie
Mr. John F. Akers
Mr. Roger S. Berlind
Mr. Thomas H. Cruikshank (*also a LBI Board Member*)
Ms. Marsha Johnson Evans
Mr. Richard S. Fuld, Jr. (*also a LBI Board Member*)
Sir Christopher Gent
Mr. Jerry A. Grundhofer
Mr. Roland A. Hernandez
Mr. Henry Kaufman
Mr. John D. Macomber

## PRESENT – OTHER LBI BOARD MEMBERS

Mr. Howard L. Clark, Jr.
Mr. Frederick Frank

## ALSO PRESENT BY INVITATION

Mr. Ian T. Lowitt
Mr. Herbert H. McDade III
Mr. Hugh E. McGee III
Mr. Thomas A. Russo
Mr. Mark Shafir
Mr. Jeffrey A. Welikson
Mr. Andrew J. Levander (Dechert)
Ms. Lori Fife (Weil Gotshal & Manges)
Mr. Michael Lubowitz (Weil Gotshal & Manges)
Mr. Thomas Roberts (Weil Gotshal & Manges)
Mr. Alvin Brown (Simpson Thacher & Bartlett)
Mr. John Finley (Simpson Thacher & Bartlett)
Mr. Andrew Keller (Simpson Thacher & Bartlett)
Mr. Barry W. Ridings (Lazard)

WGM-LEHMAN-E 00021571

Mr. Russo introduced the meeting, stating that the Board of Directors of each of the Corporation and LBI is present because the matters to be considered involve both companies. Mr. Russo reported that the agenda items for the meeting are an asset sale transaction for consideration by both companies, the retention of Alvarez & Marsal for consideration by the Corporation, and a debtor-in-possession financing facility for the Corporation. Mr. Russo reported that there are still a few details to be resolved on the sale transaction, but the Firm is hoping to be in a position to announce the transaction before the U.S. markets open. He introduced Mr. Roberts of Weil, Gotshal & Manges to present the transaction.

## APPROVAL OF THE SALE OF CERTAIN ASSETS AND OF DEBTOR-IN-POSSESSION FINANCING

Mr. Roberts stated that Mr. Barry Ridings of Lazard is present at the meeting, and that the Board of Directors of the Corporation will be asked to consider the retention of Lazard by the Corporation. Mr. Roberts presented the proposed transaction with Barclays, as consisting of (1) the sale to Barclays of 745 Seventh Avenue and related data centers for approximately $1.45 billion, to close within the next week, (2) debtor-in-possession ("DIP") financing from Barclays of $500 million for the Corporation, half in the form of a term facility and half in the form of a revolving facility, which would probably start that day, and (3) the transfer of most assets of the U.S. broker dealer, along with approximately 10,000 employees, to Barclays. Mr. Roberts stated that this transaction would benefit the creditors of the Corporation and also save the franchise and many jobs.

The Directors asked which entity will receive the proceeds from the sale of 745 Seventh Avenue and are advised it is the Corporation indirectly through its subsidiary which owns that real estate. The Directors asked about the timeline and are advised that the Bankruptcy Court hearing to approve the transaction is expected to be held on Friday or Monday. The Directors asked about employees to be retained at the Corporation and are advised it will be certain commercial real estate managers and managers of other assets retained by the Corporation, as well as the employees of Aurora and certain support groups at the Corporation.

The Directors asked about the sale of the Investment Management Division ("IMD"), and are advised that it is not included in this transaction. The Directors asked how the sale price for 745 Seventh Avenue was determined, and are advised it was an internal evaluation but that the Corporation retained Cushman & Wakefield and is expecting its oral appraisal that morning. The Directors asked about the DIP financing, and are advised that it will be secured by shares of Neuberger Berman and will become due upon the sale of Neuberger Berman. The Directors are also advised that the transaction involves the sale of two data centers at appraised value, and that the two data centers have an aggregate book value of $450 million and are owned by the Corporation.

Mr. Shafir continued the description of the transaction, describing the assets and liabilities to be transferred to Barclays and stating that there would be an additional purchase price component of $250 million for goodwill.

WGM-LEHMAN-E 00021572

Mr. Roberts resumed by describing that it is a condition to the transaction that eight specific Firm employees enter into employment agreements with Barclays. He stated that Mr. McGee was one of those employees, so interested Firm employees were involved in the transaction negotiations on behalf of the Firm. Mr. Roberts reported that Mr. McDade was subsequently advised by Barclays that his agreement to continued employment was a condition precedent to the transaction. Mr. Roberts reported that both Weil, Gotshal & Manges and Simpson Thacher & Bartlett then told Barclays there were to be no more discussions concerning Mr. McDade's employment until all terms of the Firm transaction were completed. Mr. Roberts reported that the discussions regarding Mr. McDade's employment were suspended to protect Mr. McDade's independence.

Mr. Lubowitz of Weil, Gotshal & Manges reported on the most significant contract terms for the proposed sale of assets. He described that the contract provides that closing must occur within eight days of signing, and that Weil, Gotshal & Manges expected to go into Bankruptcy Court later that day to get the Bankruptcy Court approval process underway. Mr. Lubowitz reported that the contract is quite tight in terms of Barclays' obligation to close. He stated that there is no MAE ("material adverse effect") clause, and there is no bringdown of the representations and warranties. He described that one significant condition of the proposed sale is that a minimum percentage of the Firm's top 200 employees must indicate that they will stay at Barclays post-closing. Mr. Lubowitz reported that Barclays has requested that such percentage be 75%, but that the percentage is still open. Mr. McDade stated that the Firm expects to be able to satisfy a 75% test but is trying to reduce the percentage to create more certainty. Mr. Lubowitz described that the assets being sold include the Lehman Brothers name, but that the name will be licensed back to the rest of the Firm, including the Asset Management Group. Mr. Lubowitz described that the contract allows the Corporation to consider other bids, but provides for a 3% break-up fee. The Directors asked about the break-up fee and about the status of the Firm's operations in the United Kingdom and Asia.

Mr. Brown of Simpson Thacher & Bartlett reported on the employee benefits aspects of the proposed sale of assets. He reported that the Firm proposed post-closing covenants to protect employee benefits, but that the only commitment Barclays would make is to keep current severance levels in place for the balance of the calendar year. Mr. Brown reported that Barclays would not assume any liability for the Firm's pension or benefit plans. He described the status of the Firm's pension plans, deferred compensation plans, and 401(k) plan. Mr. Brown reported that the Firm is attempting to eliminate a contract provision which provides that Barclays' confidentiality obligation terminates if the agreement terminates. Mr. Brown described the draft employment letters for eight specific Firm employees which are a condition to the deal. He described that the draft employment letters provide for at-will employment for a period of time, with salary and guaranteed cash bonus and a retention award.

The Directors asked about the Firm subsidiaries and employees which will remain with the Corporation. Ms. Fife described that approximately two thousand employees will be moved from the Corporation to LBI that morning in advance of the transaction with Barclays.

3

WGM-LEHMAN-E 00021573

The Directors are briefed on the timeline for the day and on the fact that the Barclays transaction is subject to Bankruptcy Court approval, and that another party can make a topping bid. The Directors are advised that the plan is to sign the Barclays transaction that morning, then make a public announcement of the transaction, and then request Bankruptcy Court approval that day of the break-up fee and interim authority for the DIP financing. The Directors are advised that those matters should get heard and approved by the Bankruptcy Court that afternoon. The Directors are also advised that the Corporation will ask the Bankruptcy Court that day to set a hearing for approval of the sale, that there will be an organizational meeting with the U.S. Trustee that evening and that a creditors' committee should be appointed then. The Directors are advised that the creditors' committee will be briefed on the transaction the next day. The Directors are advised that it will be necessary to put LBI in a Securities Investor Protection Corporation ("SIPC") proceeding for a very short period of time to facilitate the sale of LBI assets to Barclays.

Mr. Ridings of Lazard advised the Directors that the applicable standards for this sale (under Section 363 of the Bankruptcy Code) are to obtain the highest and best price and a price greater than liquidation value. He advised the Directors that he believes these tests can be met, but that it will be a close decision for the Bankruptcy Court judge. He advised that the chances of a topping bid are very remote since the business is deteriorating. He advised that he will testify at the Bankruptcy Court hearing in support of approval of the proposed transaction with Barclays.

Mr. Russo asked for any questions or comments. The Directors summarized the consideration as follows: Approximately $1 billion to the Corporation for 745 Seventh Avenue, $250 million to LBI for the Lehman Brothers name, and approximately $450 million to the Corporation for the data centers. [For LBI, the transaction was described as a wash – with Barclays assuming liabilities ($64 billion) basically equivalent to the assets ($70 billion) plus assuming some ~~employees and accounts.~~]employee liabilities and contractual cure amounts.

Mr. Lowitt advised that he believes that LBI would not be able to fund itself that day without this deal, based on how funding went yesterday. Mr. Lowitt stated that if the Firm does not do this deal that day, LBI would have to declare bankruptcy.

The Directors asked questions about the sale and license-back of the Lehman Brothers name, Barclays' ability to solicit Firm employees if the deal does not go forward, and the fact that Barclays will have already signed up approximately 200 of the Firm's employees. The Directors asked if Mr. Levander has any objections. Mr. Levander asked bankruptcy counsel about the acceptability of the break-up fee. Mr. Russo asked to release Messrs. McDade and McGee from the meeting to finalize the transaction. Messrs. McDade and McGee then left the meeting. The Directors asked if the transaction is subject to approval by Barclays' board of directors or shareholders, and are advised that Barclays only requires board approval and that its board is meeting now. The Directors asked about the other members of the Firm's management executive committee who are included among the eight employees whose agreement to continue

WGM-LEHMAN-E 00021574

employment is a condition to the deal, and they are advised that Messrs. Felder, Donini, Lowitt, Gelband, and Lee are included.

Mr. Russo asked for a motion to approve this transaction in principle with authority delegated to appropriate officers to negotiate final terms and report back to the Executive Committee of the Board of Directors of the Corporation for final approval of the transaction.

Mr. Roberts summarized the Board approvals being requested as follows: the approval of the transaction with Barclays, the execution of documents and the taking of actions in connection with the outline presented that day, and the retention of Lazard on terms to be negotiated by the management executive committee. After discussion, upon motion duly made and seconded, it was unanimously resolved

### Authorization of DIP Facility

**WHEREAS**, it is proposed that Lehman Brothers Holdings Inc. ("LBHI") enter into (i) a [$450] million Debtor-in-Possession Credit Agreement, to be dated on or about the date hereof (the "DIP Facility"), by and between, LBHI and Barclays Bank PLC (the "Agent"), (ii) a Pledge Agreement, to be dated on or about the date hereof (the "Pledge Agreement"), relating to LBHI's equity interest ~~through a subsidiary~~ in the business of Neuberger & Berman by and between LBHI and the Agent, and (iii) all other documents, instruments and certificates required or appropriate in connection with execution, delivery or performance of such agreements (the items referred to in the foregoing clauses (i) - (iii) being individually a "Loan Document" and collectively, the "Loan Documents"), substantially on the material terms described to the Board of Directors by its legal counsel, Weil, Gotshal & Manges LLP ("Weil"), including a final maturity of the earlier of six months and the closing of the sale of the investment management division;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Loan Documents, substantially on the material terms described to the Board of Directors by Weil, on the date hereof, to provide debtor-in-possession financing in such aggregate principal amounts as so described, are authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of each of the Loan Documents is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter into each of the Loan Documents and consummate the transactions contemplated thereby; and further

**RESOLVED** that each of the Chief Executive Officer, the Chief Financial Officer, the Chief Restructuring Officer, the President, any Vice

WGM-LEHMAN-E 00021575

President, the Treasurer, any Assistant Treasurer, the Secretary, any Assistant Secretary and any other person designated and so authorized to act (each, an "<u>Authorized Officer</u>") of LBHI is, individually authorized, empowered and directed, in the name and on behalf of LBHI to perform such acts and deeds and to negotiate, prepare, execute and deliver the Loan Documents substantially in accordance with the material terms described to the Board of Directors by its legal counsel, Weil, Gotshal & Manges LLP, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and delivery thereof; and further

 **RESOLVED** that each Authorized Officer of LBHI is individually authorized, empowered and directed to take such additional action from time to time and execute, certify, deliver, file and record with the appropriate judicial, public and governmental authorities or any other persons or entities from time to time such additional documents, instruments and agreements, including, without limitation, Uniform Commercial Code financing statements, intellectual property recordations, and any amendment, extension, waiver or consent in connection with the Loan Documents, as any such Authorized Officer may deem appropriate or desirable to implement the provisions and carry out the purposes of the foregoing resolutions and the Loan Documents authorized and approved thereby, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such action to be the conclusive evidence of the authority therefor granted.

## Authorization of Asset Purchase Agreement

 **WHEREAS**, it is proposed that Lehman Brothers Inc. ("LBI") sell substantially all of the assets comprising its U.S. and Canadian investment banking and capital markets businesses, including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant, and that LBHI sell its assets primarily related to the conduct of such businesses and cause its appropriate subsidiaries to sell the headquarters building of LBHI and LBI at 745 Seventh Avenue and other real estate assets related to such businesses, pursuant to an Asset Purchase Agreement, to be dated on or about the date hereof (the "<u>Asset Purchase Agreement</u>") by and among Barclays Capital Inc. ("BarCap"), LBHI, <u>LBI</u> and <s>LBI</s><u>LB 745 LLC</u>;

**NOW, THEREFORE, BE IT:**

 **RESOLVED** that (i) the execution, delivery and performance of the Asset Purchase Agreement, substantially on the material terms described to the Board of Directors by its legal counsel, Weil and

WGM-LEHMAN-E 00021576

Simpson, Thacher & Bartlett LLP ("Simpson" and together with Weil, "Counsel"), on the date hereof, to sell the assets described above is authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Asset Purchase Agreement is authorized and approved in every respect as being in the best interest of LBHI [and LBI], and (iii) LBHI [and LBI] shall enter the Asset Purchase Agreement and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Asset Purchase Agreement substantially in accordance with the material terms described to the Board of Directors by Counsel, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof; and further

[**RESOLVED** that each of the Chief Executive Officer, the Chief Financial Officer, the President, either Co-Chief Administrative Officer, the Treasurer, any Assistant Treasurer, any Managing Director, the Secretary, any Assistant Secretary and any other person designated and so authorized to act (each, an "Authorized Officer") of LBI is, individually, authorized, empowered and directed, in the name and on behalf of LBI , to perform such acts and deeds and to negotiate, prepare, execute and deliver the Asset Purchase Agreement substantially on the material terms as described to the Board of Directors by Counsel, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.]

[**Authorization of Overnight Facility**

**WHEREAS**, it is proposed that LBI enter into a collateralization and intraday liquidity facility pursuant to an Interim Support and Cooperation Agreement, to be dated on or about September 16, 2008 (the "Interim Support Agreement") between LBI and Barclays Capital Inc.;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Interim Support Agreement, substantially on the material terms described to the Board of Directors by [Ian Lowitt, Chief Financial Officer], on the date hereof, to enter into a collateralization and intraday liquidity facility to be provided by BarCap, is authorized and approved in

WGM-LEHMAN-E 00021577

every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Interim Support Agreement is authorized and approved in every respect as being in the best interest of LBI, and (iii) LBI shall enter the Interim Support Agreement and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBI is, individually, authorized, empowered and directed, in the name and on behalf of LBI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Interim Support Agreement substantially on the material terms described to the Board of Directors by [Mr. Lowitt], on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.]

## Authorization of Retention of Lazard by LBHI

**WHEREAS**, it is proposed that LBHI, in conjunction with entering into the Asset Purchase Agreement and the Loan Documents as described herein, enter into a financial advisory agreement to be dated on or about September 16, 2008 (the "Financial Advisory Agreement") between LBHI and Lazard Ltd. ("Lazard") whereby, among other things, Lazard will serve as LBHI's financial advisor in connection with, and provide certain valuation services with respect to, the restructuring of the LBHI's business;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Financial Advisory Agreement, [substantially on the material terms described to the Board of Directors by Mr. Barry Ridings of Lazard, on the date hereof,] is authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Financial Advisory Agreement is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter the Financial Advisory Agreement and consummate the transactions contemplated thereby and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Financial Advisory Agreement [substantially on the material terms described to the Board of Directors by Mr. Ridings, on the date hereof,] with such changes, additions and modifications thereto as such Authorized Officer shall consider necessary or appropriate, the

WGM-LEHMAN-E 00021578

authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.

## General Authority and Ratification of Past Actions for LBHI

**RESOLVED** that other appropriate officers of LBHI designated by the Authorized Officers of LBHI, respectively, are authorized to execute, or join in the execution of, agreements, documents and instruments on behalf of LBHI, respectively, to attest or deliver certificates on behalf of LBHI and to take such additional action on behalf of LBHI as the Authorized Officers of LBHI may deem appropriate or desirable, relating to any document that the Authorized Officers of LBHI have been authorized to execute on behalf of LBHI pursuant to the foregoing resolutions and to perform and carry out the purposes of the Loan Documents, the Asset Purchase Agreement, [the Interim Support Agreement,] the Engagement Letter [(as hereinafter defined)] and the Financial Advisory Agreement, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such additional action to be the conclusive evidence of the authority therefor granted; and further

**RESOLVED** that the authority given hereunder is retroactive and any and all acts relating to the subject matter of the foregoing resolutions performed prior to the passage of the foregoing resolutions by any of the officers of LBHI are ratified, confirmed and approved in all respects.

## [General Authority and Ratification of Past Actions for LBI

**RESOLVED** that other appropriate officers of LBI designated by the Authorized Officers of LBI, respectively, are authorized to execute, or join in the execution of, agreements, documents and instruments on behalf of LBI, respectively, to attest or deliver certificates on behalf of LBI and to take such additional action on behalf of LBI as the Authorized Officers of LBI may deem appropriate or desirable, relating to any document that the Authorized Officers of LBI have been authorized to execute on behalf of LBI pursuant to the foregoing resolutions, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such additional action to be the conclusive evidence of the authority therefore granted; and further

**RESOLVED** that the authority given hereunder is retroactive and any and all acts relating to the subject matter of the foregoing resolutions performed prior to the passage of the foregoing resolutions by any of the officers of LBI are ratified, confirmed and approved in all respects.]

Mr. Shafir updated the Directors on the potential sale of IMD, stating that Bain Capital and Hellman & Friedman may together purchase a 100% interest in IMD. He

WGM-LEHMAN-E 00021579

reported that negotiations have commenced, that final due diligence is underway, and that Private Equity will probably be excluded from the transaction. He reported that the IMD business is deteriorating, given the current situation. Messrs. Shafir and Ridings then left the meeting.

## APPROVAL OF THE RETENTION OF ALVAREZ & MARSAL

Mr. Russo stated that the next agenda item was for the Board of Directors of the Corporation to consider the engagement of Alvarez & Marsal as Restructuring Advisor, including the election of Mr. Bryan Marsal as Chief Restructuring Officer of the Corporation. Ms. Fife of Weil, Gotshal & Manges presented to the Board of the Corporation and described that it is very common in Chapter 11 cases to hire chief restructuring officers to prepare restructuring plans and budgets, and to deal with the bankruptcy case generally, leaving the Corporation's employees the time to operate the business. Ms. Fife reported that Weil, Gotshal & Manges has previously worked with Alvarez & Marsal and with Mr. Marsal, and that Mr. Marsal was interviewed yesterday by Mr. Russo. The Directors of the Corporation asked questions regarding the compensation which would be paid, and were advised that it would be based on hourly fees comparable to a law firm. The Directors of the Corporation asked about the amount of time the Corporation will be in Chapter 11 proceedings and the possibility of there being residual value for the Corporation's stockholders. Mr. Levander asked Ms. Fife to speak about Alvarez & Marsal, including their reputation, their competitors, and potential conflicts with the Firm. Ms. Fife reported that Alvarez & Marsal is one of the two leading firms in this area, very highly regarded and very experienced. She stated that Weil, Gotshal & Manges recommends them very highly. Ms. Fife stated that the retention of Alvarez & Marsal would require approval by the Bankruptcy Court, and that the Bankruptcy Court will require that Alvarez & Marsal be free of conflicts. Mr. Levander stated that he holds a high opinion of Alvarez & Marsal as well.

After discussion, upon motion duly made and seconded, it was unanimously resolved

### Authorization of Engagement Letter

**WHEREAS**, it is proposed that LBHI enter into an engagement letter to be dated on or about the date hereof (the "Engagement Letter") between LBHI and Alvarez & Marsal North America, LLC ("A&M") whereby, among other things, A&M will serve as LBHI's Restructuring Advisor, subject to such approval by the U.S. Bankruptcy Court for the Southern District of New York of the retention of A&M as may be required by law;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that (i) the execution, delivery and performance of the Engagement Letter, [substantially on the material terms [and in the form] presented to the Board of Directors on the date hereof,] is

WGM-LEHMAN-E 00021580

authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Engagement Letter is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter the Engagement Letter and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Engagement Letter [substantially on the material terms [and in the form] presented to the Board of Directors on the date hereof,] with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefor to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.

## Authorization of Retention of Bryan Marsal

**WHEREAS**, it is proposed that LBHI, in accordance with Article V, Section 21 of its By-Laws, and as contemplated by clause 1(a) of the Engagement Letter as described herein, retain and appoint Bryan P. Marsal of A&M as its Chief Restructuring Officer;

**NOW, THEREFORE, BE IT:**

**RESOLVED** that Bryan P. Marsal be, and hereby is, appointed, effective immediately, to serve as the Chief Restructuring Officer of LBHI, having in such capacity the rank of [Senior] Executive Vice President and authority and supervision over the restructuring of the business, operations, finances and activities of LBHI and its subsidiaries, including, without limitation, the sale of assets of LBHI and its subsidiaries, consistent with the purposes of the Engagement Letter, to serve as such until his successor is elected or appointed and qualified or, if earlier, until his death, resignation or removal from office.

Mr. Russo then reviewed the timeline for that morning.

There being no further business to come before the meeting, the meeting was, upon motion duly made and seconded, adjourned.

Respectfully submitted,


Jeffrey A. Welikson
Secretary of the Meeting

WGM-LEHMAN-E 00021581

Document comparison done by DeltaView on Wednesday, October 29, 2008 11:36:10 AM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1931812/1 |
| Document 2 | pcdocs://ny2/1931812/2 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | Count |
|---|---|
| Insertions | 12 |
| Deletions | 15 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 27 |

WGM-LEHMAN-E 00021582