# A. 188

**From:** Teague, Sean: Finance (NYK)
**Sent:** Thu, 12 Feb 2009 14:48:50 GMT
**To:** Litvin, Tal: Finance (NYK)
**CC:** Bade, Mike: Finance (NYK); Haniff, Christopher: Finance (NYK)
**Subject:** RE: Acquisition balance sheet

---

The Lehman Opening Balance Sheet is broken out into 4 distinct portfolios.

The Lehman Portfolio1 asset settled on 09/22.   While the JPM Portfolio3 assets legal settlement date was 12/22.
<<...>>

The following winzip contains ListA and ListB assets valued as of year-end that are expected to settle shortly.
<<...>>

Here is the valuation methodology:
<<...>>

-Sean

---

**From:** Litvin, Tal: Finance (NYK)
**Sent:** Thursday, February 12, 2009 9:36 AM
**To:** Teague, Sean: Finance (NYK)
**Cc:** Bade, Mike: Finance (NYK)
**Subject:** Acquisition balance sheet

Sean - Do you have a schedule that has all the assets acquired and the day 1 valuation from the lehman acquisition that you can share with us?

EXHIBIT
(0414
3/23/10 -

**HIGHLY CONFIDENTIAL**

BCI-EX-(S)-00213990

BCI-EX-(S)-00213995

"SUMMARY" TAB

USD

| Products | Notional | BONY Value | PCG Value | MV 09-22 w. Bid-Offer | PCG Liquidity Value | MV 09-22 w. Bid-Offer+Sales | PCG Liquidity Value | Hybrid Closing Value |
|---|---|---|---|---|---|---|---|---|
| Agency Mortgages | 42,170,399,789 | 13,905,535,110 | 13,077,311,000 | | | | | |
| Corporates | 2,421,246,715 | 1,395,306,444 | 1,398,935,117 | | | | | |
| Emerging Markets | 301,303,452 | 285,618,784 | 269,476,287 | | | | | |
| Equities | 2,452,767,341 | 9,891,984,511 | 9,712,437,885 | | | | | |
| Treasuries/Agencies/Munis | 16,214,490,917 | 15,789,421,385 | 15,480,022,295 | | | | | |
| | | | | | | | | |
| PMTG | 22,023,151,007 | 2,618,575,424 | 1,803,477,861 | 1,431,379,253 | 372,098,607 | 1,431,379,253 | 372,098,607 | 432,604,987 |
| PMTG II | 2,496,513,653 | 1,170,833,788 | 824,320,128 | 643,840,635 | 180,479,490 | 643,840,635 | | 634,749,627 |
| PMTG Subtotal | 24,519,664,660 | 3,789,209,212 | 2,627,797,986 | | | | | |
| Totals | 88,079,872,874 | 45,037,075,446 | 42,595,980,349 | 40,677,301,858 | 1,888,878,492 | | | |

(PMTG Unchanged, PMTG II Unchanged)

LLCA Allocation of above

| | PCG Value | MV 09-22 w. Bid-Offer | PCG Liquidity Value |
|---|---|---|---|
| Corporates | 54,503,316 | 54,503,316 | |
| PMTG | 1,623,991,549 | 1,278,298,980 | |
| PMTG II | 850,743,756 | 470,275,909 | 526,160,417 |
| Totals | 2,329,238,622 | 1,803,078,205 | |

| Products | Changes | PCG Value | MV 09-22 w. Bid-Offer | PCG Liquidity Value |
|---|---|---|---|---|
| Equities | changes relate to b/o | 39,061,371 | 25,016,089 | 14,045,282 |
| Treasuries/Agencies/Munis | Correction to Munis 09-19 link changes OBS by: | 14,914,058 | 14,914,058 | - |
| PMTG | | (21,579,661) | 239,383 | (21,819,045) |
| Totals | | 32,395,767 | 44,676,527 | (7,272,885) |

| As of: 09-Jan-09 | Notional | BONY Value | PCG Value | MV 09-22 w. Bid-Offer | PCG Liquidity Value |
|---|---|---|---|---|---|
| Agency Mortgages | 42,170,399,789 | 13,905,535,110 | 13,077,311,000 | | |
| Corporates | 2,421,246,715 | 1,395,306,444 | 1,398,935,117 | | |
| Emerging Markets | 301,303,452 | 285,618,784 | 269,476,287 | | |
| Equities | 2,452,767,341 | 9,891,984,511 | 9,673,376,294 | | |
| Treasuries/Agencies/Munis | 16,214,490,917 | 15,789,421,385 | 15,465,108,237 | | |
| | | | | | |
| PMTG | 22,023,151,007 | 2,618,575,424 | 1,825,057,522 | 1,431,139,870 | 393,917,652 |
| PMTG II | 2,496,513,653 | 1,170,833,788 | 824,320,125 | 643,840,635 | 180,479,490 |
| PMTG Subtotal | 24,519,664,660 | 3,789,209,212 | 2,649,377,647 | | |
| Totals | 88,079,872,874 | 45,037,075,446 | 42,533,584,582 | 40,632,625,331 | 1,895,951,477 |

# A. 189

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | USD | | | | 22-Sep | | |
| 2 | | Notional | | BONY Value | PCG Value | MV 09-22 w. Bid-Offer | PCG Liquidity Value |
| 3 | Agency Mortgages | 42,170,399,789 | 13,905,535,110 | 13,077,311,000 | 12,619,993,309 | 457,317,691 |
| 4 | Corporates | 2,421,246,715 | 1,395,306,444 | 1,398,935,117 | 1,398,935,117 | - |
| 5 | Emerging Markets | 301,303,452 | 265,618,784 | 269,476,287 | 261,391,999 | 8,084,289 |
| 6 | Equities | 2,452,767,341 | 9,891,984,511 | 9,725,438,684 | 9,343,263,702 | 382,174,982 |
| 7 | Treasuries/Agencies/Munis | 16,214,490,917 | 15,789,421,385 | 15,480,022,295 | 14,991,498,861 | 488,523,433 |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | PMTG | 22,023,151,007 | 2,618,575,424 | 1,803,477,861 | 1,431,379,253 | 372,098,607 |
| 11 | PMTG II | 2,496,513,653 | 1,170,633,788 | 824,320,125 | 643,840,635 | 180,479,490 |
| 12 | PMTG Subtotal | 24,519,664,660 | 3,789,209,212 | 2,627,797,986 | | |
| 13 | | | | | | |
| 14 | Totals | 88,079,872,874 | 45,037,075,446 | 42,578,981,368 | 40,690,302,877 | 1,888,678,492 |
| 15 | | | | | | | | 42.565 |
| 16 | LLCA Allocation of above | | | | | | 42.605 |
| 17 | Corporates | | | | 54,503,316 | 54,503,316 | 0.0400 |
| 18 | PMTG | | | | 1,623,991,549 | 1,278,298,980 | 42.6050 |
| 19 | PMTG II | | | | 650,743,756 | 470,275,909 | 42.5790 |
| 20 | | | | | 2,329,238,622 | 1,803,078,205 | 526,160,417 | 0.0260 |
| 21 | | | | | | | |
| 22 | | | | | | | |
| 23 | | | | | | | |
| 24 | | | | | PCG Value | MV 09-22 w. Bid-Offer | PCG Liquidity Value |
| 25 | Amendments | | | | | | |
| 26 | Agency Mortgages | | | | | 4,506,997 | 500,777 |
| 27 | Equities | | | | 52,082,390 | 38,017,108 | 14,048,282 |
| 28 | Treasuries/Agencies/Munis | WIP (changes relate to b/o and rounding +13.2mm)) | | | 14,914,088 | 14,914,088 | - |
| 29 | PMTG | Correction to Munis 09-19 link changes OBS by: | | | (21,575,681) | 238,383 | (21,519,048) |
| 30 | Totals | | | | 45,396,786 | 57,677,546 | (7,272,985) |
| 31 | | | | | | | |
| 32 | As of: 09-Jan-09 | Notional | | BONY Value | PCG Value | MV 09-22 w. Bid-Offer | PCG Liquidity Value |
| 33 | Agency Mortgages | 42,170,399,789 | 13,905,535,110 | 13,077,311,000 | 12,615,486,312 | 456,816,914 |
| 34 | Corporates | 2,421,246,715 | 1,395,306,444 | 1,398,935,117 | 1,398,935,117 | - |
| 35 | Emerging Markets | 301,303,452 | 265,618,784 | 269,476,287 | 261,391,999 | 8,084,289 |
| 36 | Equities | 2,452,767,341 | 9,891,984,511 | 9,673,376,294 | 9,305,246,594 | 368,129,700 |
| 37 | Treasuries/Agencies/Munis | 16,214,490,917 | 15,789,421,385 | 15,465,108,237 | 14,976,584,804 | 488,523,433 |
| 38 | | | | | | |
| 39 | | | | | | |
| 40 | PMTG | 22,023,151,007 | 2,618,575,424 | 1,825,057,522 | 1,431,139,870 | 393,917,652 |
| 41 | PMTG II | 2,496,513,653 | 1,170,633,788 | 824,320,125 | 643,840,635 | 180,479,490 |
| 42 | PMTG Subtotal | 24,519,664,660 | 3,789,209,212 | 2,649,377,647 | | |
| 43 | | | | | | |
| 44 | Totals | 88,079,872,874 | 45,037,075,446 | 42,533,584,582 | 40,632,625,331 | 1,895,951,477 |
| 45 | | | | | | |

Highly Confidential

BCI-EX-00099519



Exhibit
86 B
KK 8709

| | H | I | J | K | L | M |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | MV 09-22 w. Bid-Offer+Sales | PCG Liquidity Value | Hybrid Closing Value |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | Unchanged | | 1,431,379,253 | 372,098,607 | 432,804,987 |
| 11 | | Unchanged | | 843,840,635 | | 634,749,627 |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |
| 21 | | | | | | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |
| 26 | | | | | | |
| 27 | | | | | | |
| 28 | | | | | | |
| 29 | | | | | | |
| 30 | | | | | | |
| 31 | | | | | | |
| 32 | | | | | | |
| 33 | | | | | | |
| 34 | | | | | | |
| 35 | | | | | | |
| 36 | | | | | | |
| 37 | | | | | | |
| 38 | | | | | | |
| 39 | | | | | | |
| 40 | | | | | | |
| 41 | | | | | | |
| 42 | | | | | | |
| 43 | | | | | | |
| 44 | | | | | | |
| 45 | | | | | | |

Highly Confidential

BCI-EX-00099520

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 46 | | | | 42.5335 | | | |
| 47 | | | | 42.5726 | | | |
| 48 | | | -0.0391 | | | | |

Highly Confidential

BCI-EX-00099521

# A. 190

# BARCLAYS PLC

## MINUTES OF A MEETING OF THE BOARD OF DIRECTORS

### HELD AT 1 CHURCHILL PLACE, LONDON E14 5HP

### ON TUESDAY 16 SEPTEMBER 2008

**Present:**

Marcus Agius* - Chairman

| | |
|---|---|
| David Booth* | Sir Richard Broadbent* |
| Fulvio Conti* | Bob Diamond* |
| Chris Lucas* | Sir Nigel Rudd* |
| Frits Seegers* | Sir John Sunderland* |
| John Varley* | Patience Wheatcroft* |

**In Attendance:**

| | |
|---|---|
| Lawrence Dickinson | Company Secretary |
| Patrick Gonsalves | Deputy Secretary |
| Mark Harding | Group General Counsel |
| Joanna Baker | Barclays Corporate Development |
| Robert le Blanc | Barclays Capital |
| Dan Meredith Jones | CFO, Western Europe |
| Rich Ricci | Barclays Capital |
| Judith Shepherd | General Counsel, GRCB |

\* By conference call

**Apologies:**   Leigh Clifford

Sir Andrew Likierman

Sir Michael Rake

Stephen Russell



**HIGHLY CONFIDENTIAL**                                                              BCI-EX-(S)-00128326

PROJECT LONG ISLAND

1.    INTRODUCTION

John Varley reported to the Board that the possibility of acquiring the Project Long Island (Lehman) broker/dealer business in the US for $250 million was now being investigated. As Lehman had now been put into Chapter 11 bankruptcy, the transaction would require the approval of the bankruptcy courts.

2.    PROPOSED TRANSACTION

The proposal was for Barclays to negotiate with Lehman management to acquire the US broker/dealer business which had a gross balance sheet of $75 billion and Weighted Risk Assets of $13 billion. The transaction created $2 billion of negative goodwill. Barclays would separately buy the New York Head Office premises and two data centres. The intention was also to issue up to £600 million of ordinary shares of Barclays to support the transaction and to improve the Group's Equity Ratio. The assets being acquired were good quality. A meeting would be held with the FSA to obtain confirmation of their non-objection.

3.    BUSINESS BEING ACQUIRED

The US broker/dealer business employed around 8-10,000 people. It would not include the US Asset Management and Wealth Management businesses or the commercial property assets. It did include the Private Equity business. This would provide Barclays Capital with US licenses and clearances that it did not currently possess. The assets acquired had been marked to market by Barclays Capital to confirm the valuation. The balance sheet acquired consisted of $45 billion of liquid assets and $30 billion of less liquid assets. The business, under its previous ownership structure, had an income run rate of $5 billion per annum. It was noted, however, that we were not taking the assignment of any open contractual arrangements or income stream. The combined business would employ 24,000 people but that would be reduced following integration.

4.    CAPITAL

The transaction created post-tax negative goodwill of $2 billion which would result in an Equity Ratio, on the FSA's calculation basis, of 5.96%, which could be improved further by a capital raising. A number of investors had expressed an interest in providing financial backing to the transaction. The Board discussed the structuring and timing of a possible under-writing to the key investors.

HIGHLY CONFIDENTIAL
                                                            BCI-EX-(S)-00128327

5.    RETENTION OF LEHMAN STAFF

An 'in principle' agreement had been reached with Lehman's US senior leadership team on the bonus arrangements, subject to approval of the proposals by the Board HR and Remuneration Committee.

The Board discussed the risk of an interloper and of the transaction not receiving the approval of the US bankruptcy court. It would be very important for the court decision to be received very quickly. It was hoped that a brief announcement would be issued to the market shortly.

The Board approved, in principle, the acquisition of the Lehman's US based broker/dealer business and associated operating assets, as well as the issuance of shares to increase the Group's capital ratios in the most cost-effective way that did not result in a sizeable overhang of Barclays shares. A meeting of the Board Finance Committee would be held to give final approval to the transaction.

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00128328

# A. 191

**From:**   Exall, Paul: HR (LDN)
**Sent:**   Tue, 23 Sep 2008 19:45:54 GMT
**To:**   Evans, Michael: HR (LDN)
**CC:**   Sinclair, Pamela: HR (NYK)
**Subject:** RE: Retention issues re: GBs raised by the business --- Straw-man thoughts

---

Michael - Pls don't forward this note until Pam & I chat to you, thanks

---

**From:** Evans, Michael: HR (LDN)
**Sent:** Tuesday, September 23, 2008 3:43 PM
**To:** Exall, Paul: HR (LDN)
**Cc:** Sinclair, Pamela: HR (NYK)
**Subject:** Re: Retention issues re: GBs raised by the business --- Straw-man thoughts

Thanks. I will review and revert

---

**From:** Exall, Paul: HR (LDN)
**To:** Evans, Michael: HR (LDN)
**Cc:** Sinclair, Pamela: HR (NYK)
**Sent:** Tue Sep 23 19:51:23 2008
**Subject:** Retention issues re: GBs raised by the business --- Straw-man thoughts

Michael - The below are some straw-man thoughts we have pulled together in response to some
demands from the business. Not sure if there is any appetite to do this, but worth raising and
giving some thought to whether this is an issue we wish to address.

**Situation**

The original principles with regard to delivering guaranteed bonuses for US Lehman staff in 2008
was that the "Elite 8" and Tier 1 would be receive guaranteed bonuses and deferred cash awards
(175 to 200 people) quivalent to either 80% or 75% of 2007 total compensation. Any guaranteed
bonuses below this would be decided on an exception basis. For the remainder of the population,
while the overall pool is determined, individual bonuses would be discretionary based on our pay-
for-performance philosophy.

Currently, the business has proposed to issue guaranteed bonuses to approximately 400
individuals (more than twice the original intended total) at levels $138m higher than originally
anticipated.

**Issue**

**HIGHLY CONFIDENTIAL**                                                    **BCI-EX-(S)-00228642**

Certain businesses now have clear appetite to issue guaranteed bonuses to a "Tier 2" i.e., individuals below the "top 400" already guaranteed. The rationale they have is that they believe is a producer Tier 3 that requires some level of comfort to retain their services and that without guaranteed bonuses for this population there is a clear flight risk.

The businesses, at this stage, suggesting that guaranteed bonuses targeted at a "Tier 2" level is required include: investment banking, prime services, sales, and assorted rates businesses.

**Question**

Do we respond? And if so, how?

**Straw-men approaches**

- Do nothing, continue to manage guaranteed bonuses on an exception basis

    Advantages
    Maintains our original principles (notwithstanding the larger population now guaranteed)
    Complete control over GB spend

    Risks/Disadvantages
    Speed of decision making, availability of senior management
    Difficulty in strategically prioritising GB spend to maximise retention impact

**REDACTED**

- Model and allocate specific GB pools to individual business areas to manage within the overall $1.4bn

    Advantages
    ExCo still maintains control of overall GB pools
    Business has flexibility to focus guarantee bonus spend in accordance with perceived risk/need
    Speed of execution is enhanced

    Risks/Disadvantages
    Contrary to original principles; the thin end of the wedge (where do we stop?)
    Difficulty in modelling GB pools to distribute; tactically, do we use a blunt tool across the board (proportion of residual non-guaranteed staff) or a focussed

**HIGHLY CONFIDENTIAL**

approach (e.g., big-sheet methodology, ExCo decides key franchise businesses to prioritise GB spend)?

Lack of control on individual guaranteed bonuses; decisions left with Lehman staff

Currently we have "overspent"; a finite pool would mean a further and substantial squeeze on non-guaranteed people, flight risk?

Spending more than $1.4bn is dilutive to current negative goodwill calculation

- Maintain current approach to additional GBs by exeption onlu, but make more use of deferred awards either in cash (as with "Elite 8" / Tier 1) or in Barclays restricted stock

  Advantages
  Maintains our original principles (notwithstanding the larger population now guaranteed)
  Complete control over GB spend (only using increased deferred awards)
  Speed of execution is enhanced
  Enhances retention of key "Tier 2" staff; deferred awards vest over 2 years
  Non-dilutive to negative goodwill calculation

  Risks/Disadvantages
  May not address business concerns adequately
  Additional costs, mainly in 2009 and 2010
  Difficulty in modelling additional "deferred award pools" to distribute; tactically, do we use a blunt tool across the board (proportion of residual non-guaranteed staff) or a focussed approach (e.g., big-sheet methodology, ExCo decides key franchise businesses to prioritise GB spend)?

**HIGHLY CONFIDENTIAL**

# A. 192



Δ π EXHIBIT 3920B
Deponent Purcell
Date 1/13/10 Rptr. KK
www.DEPOBOOK.com

Nitin Bajpai
Sent:        Saturday, September 20, 2008 06:03 AM
To:          Sally Rocker NY; jacob@jgfund.com; J. Christopher Flowers NY; jjoros@jcfco.com
CC:          jacob@unionsquaregroup.com; Edward Gilbert
Subject:     Re: Lehman bankruptcy/Shinsei

Sally. We should get the court order tomorrow from the counsel to the UCC. Yes, this was an
abbreviated process. The UCC is still sorting out it's bylaws - and the sale has been approved
already. Clearly this is highly unusual.
Ed: Can you sort out any confidentialiy details with Sally so we can pass on the information we
have.
Sally:  Milbank is the UCC counsel well versed with Chapter 11 issues. The key is the process
followed which entailed a DIP loan that is fully drawn down.  If the sale was not approved, the DIP
would have been due - and if someone hadn't provided a new DIP, the entire stake of the asset
management unit could have been foreclosed on (if the DIP could not have been repaid). No other DIP
lender was forthcoming - admittedly they may not have had any information.
Again, we did not expect to drive this process. Rather we want to ensure that our guarantee is not
subordinated to other Direct Creditors at LEH. We are a fairly small Direct Creditor at LEH (JPY
9bn) and our ability to influence the process is small.
Regards.
Nitin Bajpai
Tel : +44 20 7747 3515
Fax : +44 20 7839 2203
Mobile : +44 7825 626030

Shinsei International Limited ('SIL') is registered in England, company number 5232501 and
registered office at 6 Duke Streer St. James's, London, SW1Y 6BN.
SIL is a member of the Shinsei Bank Group and is authorised and regulated by the Financial Services
Authority.
-----Original Message-----
From: Rocker, Sally <srocker@jcfco.com>
To: Nitin Bajpai; 'jacob@jgfund.com' <jacob@jgfund.com>; J. Christopher Flowers NY; Oros, John
<jjoros@jcfco.com>
CC: 'jacob@unionsquaregroup.com' <jacob@unionsquaregroup.com>
Sent: Sat Sep 20 21:37:21 2008
Subject: Re: Lehman bankruptcy/Shinsei
Nitin: It seems unusual that the auction process was so abbreviated or nonexistent really. Have you
spoken with a bankruptcy lawyer? Do you have the court order?
Regards,
Sally

From: Nitin.Bajpai@shinseiinternational.com
To: jacob@Jgfund.com ; Flowers, J. Christopher; Oros, John
Cc: Rocker, Sally; jacob@unionsquaregroup.com
Sent: Sat Sep 20 01:25:48 2008
Subject: RE: Lehman bankruptcy/Shinsei

Jacob: Thanks. We just heard from the UCC counsel that the LBI sale was just approved. We will get a
more detailed report tomorrow. Although we agree completely with your observations, the entire
process appears to have been rushed through on a some kind of pre-negotiated basis with either tacit
or formal approval from various govt agencies. Technically speaking, I believe that Barclays
submitted a "Stalking Horse Bid" under a "363 Sales Process" along with the DIP loan (this is a
typical way of expediting a sale in a chapter 11). Although there may have been time for someone
else to bid (perhaps just a day), no other bidder submitted a bid under the bid procedures that the
court approved (with the information made available). The eventual decision to expedite a process
with this type of speed and to approve a transaction with really no information is the bankruptcy
court's call. Even if the UCC had objected, all indications were that the judge would have ruled
against it and executed the transaction.

Whether there is a chance to challenge this transaction further or to overturn it is something we
can discuss with the UCC counsel tomorrow. I would be doubtful that we could. We are hopeful that
other asset sales of Lehman subsidiaries will follow a more traditional process.

As far as Shinsei is concerned, we have 2 basic types of positions: (a) a $231mm equivalent loan to
a Japanese subsidiary of Lehman (called Sunrise Finance) which has substantial assets that can be

used to repay us what we hope is an amount higher than the level that the unsecured creditors will
receive from LEH (we also have a guarantee from LEH for this claim and any shortfall will rank pari
passu at LEH); and (b) approximately $80mm equivalent in various bonds at the LEH level.

I will cc a few other folks going forward who can work with Sally to sign up any other agreements we
need to in order to share the information with you so that we can seek your assistance and guidance
going forward.

Regards
Nitin

_____
From: Jacob Goldfield [mailto:jacob@Jgfund.com]
Sent: Saturday, September 20, 2008 1:54 PM
To: Nitin Bajpai; J. Christopher Flowers NY; jjoros@jcfco.com
Cc: Sally Rocker NY; jacob@unionsquaregroup.com
Subject: RE: Lehman bankruptcy/Shinsei


While I have no experience with creditor committees and such, I offer some observations:
1. That there aren't other bidders isn't reason not to object.  You should object because you don't
know the value of the assets sold, that value can be known and since this was an uncompetitive
process, that value should be assessed.  Does the court have a valuation opinion that this value is
fair?  How could it not be a rip off if there weren't other bidders invited?  Were there?  Was
Shinsei?
2. The argument that market stability is implicated isn't yet justified and could very well be
false.  I would like to hear those arguments or understand better the circumstances before
concluding that's right.  It's likely false.  A way it becomes true is if there's some bridge debt
supporting illiquid assets that's somehow contingent on the rapid completion of this transaction.
But if so, let's hear about it.
3. Shinsei should consider whether it wants to compete with this bid.  That would depend on how
cheap it is on an asset value basis. Yes, I realized it also comes with highly skilled employees and
systems.  I don't regard that as a negative.  Also, the Tokyo part may still be viable.  I will
check.

Sally, please make sure that we can proceed here under our NDA.   I won't disclose any confidential
information tho I don't know that I have any at this point.  It also occurs to me that the
beneficiary of that agreement is the unsecured creditors, who would be helped by our involvement.


_____
From: Nitin.Bajpai@shinseiinternational.com [Nitin.Bajpai@shinseiinternational.com]
Sent: Saturday, September 20, 2008 12:32 AM
To: jcflowers@jcfco.com; jjoros@jcfco.com
Cc: Jacob Goldfield
Subject: RE: Lehman bankruptcy/Shinsei


Gents: Shinsei is on the Unsecured Creditors Committee (UCC) of Lehman Brothers Holding Inc (LEH).
At the time of filing last sunday night, the petition listed approximately $158bn of total debt with
$155bn being Bond Debt and $3bn being Bank Debt. Clearly, this figure will increase as liabilities
flowing from derivative positions and perhaps other guarantee obligations from subsidiaries) will
eventually flow up to LEH. Shinsei was listed as a Bank Debt Creditor with a $231mm claim. This
claim is actually a direct obligation of a subsidiary in Japan with an unconditional guarantee from
LEH.

The UCC has met a couple of times but the process is moving along at breakneck speed with extremely
limited information. The UCC has hired Houlihan Lokey as its financial advisors and Milbank Tweed as
its legal advisor. All parties seem to agree that there is virtually no information being made
available on the assets and liabilities of Lehman Brothers Inc - which is the subsidiary being sold -
and what the appropriate valuation should be. There is some information on the real estate being
sold (the HQ building and the data centers in Jersey). Inspite of this, the current stance of the
UCC is not to object as there does not appear to be a viable option and the judge seems determined
to move the process along and to approve the sale (even while he acknowledges that there is
insufficient information - but cites the necessity to preserve "financial stability" as an
overriding concern) . Hearings are still going on and the court was expected to adjourn at midnight
EST on Friday.

The UCC's members are Wilmington Trust (interim chair), Bank of New York, RBS (expected to
officially join), Metlife, Mizuho Corporate and Shinsei. Given the rushed process, we are still in
the process of adopting bylaws etc and to come up with a way to function as a body.

I suggest we set up a call with you and Milbank for Sat EST to get a full update. We will also work on a solution to get you added as Shinsei representatives on the UCC if possible (in order to help us maximize our recovery). This will give you direct access to any information being made available – which is extremely scant. If this is not possible, we will try to get a CA signed up with you (potentially as our advisors) to share information received via the court.

We have managed to find an organizational structure from other sources (none has been made available through the proceedings) that I am attaching to this email. Asset and Liability information is unavailable at the moment.

I am in Tokyo at present and am available on +447825626030 at any time.

Regards
Nitin

From: Flowers, J. Christopher [mailto:jcflowers@jcfco.com]
Sent: Saturday, September 20, 2008 12:03 PM
To: Oros, John
Cc: Jacob Goldfield; Nitin Bajpai
Subject: Lehman bankruptcy/Shinsei

John:  I spoke to Jacob earlier tonight.  Shinsei is on the creditor committee for Lehman and as a result is looking at the sale to Barclays, which hasn't happened yet.  We want to make sure we are not being screwed and also to see if there is an opportunity for us.  This will probably be running over the weekend; the schedule isn't clear right now.  Jacob is going to help out and I hope you will too.  Nitin is going to let you both know what the program is.  Regards, Chris

CONFIDENTIAL

# A. 193



Michael Klein
917-957-7686

Mike Keegan

Δ π EXHIBIT 466
Deponent: Seery
Date 3/3/10 Rptr. KK
WWW.DEPOBOOK.COM

Highly Confidential

JS-LB-BANKR 000001

**Long (Fed Facility)**

| Asset Type | Lehman MV ($ bns) | Haircut | |
|---|---|---|---|
| Agency Debentures | 11.08 | 2% | 0.22 |
| Agency PTs | 9.51 | 5% | 0.48 |
| Agency CMOs | 4.73 | 5% | 0.24 |
| Treasuries | 7.18 | 2% | 0.14 |
| Non-US Govt | 0.33 | 4% | 0.01 |
| Munis | 0.14 | 5% | 0.01 |
| Corporates | 5.88 | 10% | 0.59 |
| Equities | 4.42 | 10% | 0.44 |
| Non-Agency Mortgage | 2.55 | 55% | 1.40 |
| MH | 0.38 | 55% | 0.21 |
| CMBS | 0.26 | 50% | 0.13 |
| CDO | 0.77 | 75% | 0.58 |
| CLO | 0.18 | 50% | 0.09 |
| CDO Eq | 0.03 | 100% | 0.03 |
| Other | 0.62 | 30% | 0.19 |
| Other ABS | 0.89 | 30% | 0.27 |
| Unassigned | 1.70 | 60% | 1.02 |
| Total | | 6.04 | 6.04 |

45.5
1.9 bn

**Short**

| Asset Type | Lehman MV ($ bns) | Haircut | #VALUE! |
|---|---|---|---|
| Agencies & Treasuries | 20.10 | 2% | 0.40 |
| Equities | 5.60 | 10% | 0.56 |
| Corporate Credit | 1.70 | 10% | 0.17 |
| Total | 27.40 | 1.13 | 31.02 |

| Long & Short Netted | | 7.17 |
|---|---|---|

Highly Confidential

# A. 194

| | |
|---|---|
| **From:** | Despins, Luc |
| **Sent:** | Wednesday, October 15, 2008 12:00 PM |
| **To:** | 'lori.fife@weil.com' |
| **Cc:** | BGeer@HLHZ.com; Bell, Crayton L. <CBell@milbank.com>; MFazio@HLHZ.com; harvey.miller@weil.com |
| **Subject:** | RE: Lehman/Barclays' Transaction |

Lori, let's just schedule the call/meeting. There is no point, at this stage, in going through an exchange of emails over why we disagree with your mootness contention. Thank you.

**From:** lori.fife@weil.com [mailto:lori.fife@weil.com]
**Sent:** Monday, October 13, 2008 11:50 PM
**To:** Despins, Luc
**Cc:** BGeer@HLHZ.com; Bell, Crayton L.; MFazio@HLHZ.com; harvey.miller@weil.com
**Subject:** RE: Lehman/Barclays' Transaction

I really am at a loss to figure out why you and the other committee professionals are spending so much time on the Barclays sale. What could you or anyone for that matter do even if it turned out that the assets turned out to be greater? As you know, the sale has been consummated which effectively moots out any relief you might be seeking. I would really appreciate it if you would enlighten me as to the potential actions vis a vis Barclays other than in connection with the TSA.

In any event I will try to set up a call but we are all very busy this week given the hearing on the 16th so it will have to wait until next week.
I'm sure you understand - thanks.

Lori R. Fife, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Tel. 212 310- 8318
Fax 212 310- 8007

"Despins, Luc" <LDespins@milbank.com>

10/13/2008 03:47 PM

To <lori.fife@weil.com>
cc <BGeer@HLHZ.com>, "Bell, Crayton L." <CBell@milbank.com>, <MFazio@HLHZ.com>
Subject RE: Lehman/Barclays' Transaction



Lori, this is not in connection with sealing motion (although I want to know more about the schedules before that issue is up before the court), but rather our concern is with respect to the securities which were transferred. Houlihan has reviewed them and can not even come close to the amount which was announced in court (I think it was $47.4 billion) and there is also a discrepancy on the liability side (although it could but much smaller than the issue on the asset side). Houlihan's review would indicate that the securities transferred could be worth billions more than the $47.4 billion. There may very well be a logical explanation for all of this, which is why the first meeting is just to explore the issues.

MTHM0012869

Hope this is helpful.

---

**From:** lori.fife@weil.com [mailto:lori.fife@weil.com]
**Sent:** Monday, October 13, 2008 2:38 PM
**To:** Despins, Luc
**Cc:** BGeer@HLHZ.com; Bell, Crayton L.; MFazio@HLHZ.com
**Subject:** Re: Lehman/Barclays' Transaction

Luc - I am happy to arrange a call but it would be helpful if you could provide more specifics so I can make sure I get the right people. What in particular are you looking for in connection with the schedules? Also, is this in connection with the sealing motion?
Thanks.


Lori R. Fife, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Tel. 212 310- 8318
Fax  212 310- 8007


"Despins, Luc" <LDespins@milbank.com>

|  |  |
|---|---|
| 10/13/2008 11:23 AM | To <lori.fife@weil.com> |
|  | cc <BGeer@HLHZ.com>, "Fazio, Michael" <MFazio@HLHZ.com>, "Bell, Crayton L." <CBell@milbank.com> |
|  | Subject Lehman/Barclays' Transaction |


Lori, we would like to set up a meeting or conference call with someone at
Weil, Lehman, A&M and Lazard to discuss issues related to the asset
schedules to the Barclays agreement. Could you identify the appropriate
persons to participate in such a meeting/call? We would propose a low key
preliminary meeting/call during which we would explain our concern about
the schedules. It is important for that preliminary meeting/call to take
place before the hearing on Thursday.

Let me know. Thanks.


**Milbank**
**Financial Restructuring Group**
**Luc A. Despins**
1 Chase Manhattan Plaza
New York, NY 10005-1413
T: 212-530-5660  F: 212-822-5660
C: 917-232-2530

CONFIDENTIAL

ldespins@milbank.com
www.milbank.com

=================================================================

**IRS Circular 230 Disclosure:** U.S. federal tax advice in the foregoing message from Milbank, Tweed, Hadley & McCloy LLP is not intended or written to be, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed regarding the transactions or matters addressed. Some of that advice may have been written to support the promotion or marketing of the transactions or matters addressed within the meaning of IRS Circular 230, in which case you should seek advice based on your particular circumstances from an independent tax advisor.
=================================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

=================================================================

**IRS Circular 230 Disclosure:** U.S. federal tax advice in the foregoing message from Milbank, Tweed, Hadley & McCloy LLP is not intended or written to be, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed regarding the transactions or matters addressed. Some of that advice may have been written to support the promotion or marketing of the transactions or matters addressed within the meaning of IRS Circular 230, in which case you should seek advice based on your particular circumstances from an independent tax advisor.
=================================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

CONFIDENTIAL

MTHM0012871