QUINN EMANUEL URQUHART & SULLIVAN LLP
Susheel Kirpalani
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010

Erica M. Taggart
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017

*Special Counsel to the Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.*

Hearing Date:
APRIL 9, 2010

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : Case No. 08-13555 (JMP) |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : Jointly Administered |
| | : |
| Debtors. | : |

-------------------------------------------------------------------x

| | |
|---|---|
| In re: | : SIPA Proceeding |
| | : Case No. 08-01420 (JMP) |
| **LEHMAN BROTHERS INC.,** | : |
| | : |
| Debtor. | : |

-------------------------------------------------------------------x

**MEMORANDUM OF LAW OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL., (I) IN
OPPOSITION TO MOTION OF BARCLAYS' CAPITAL INC. TO ENFORCE SALE
ORDER AND SECURE DELIVERY OF ALL UNDELIVERED ASSETS AND (II) IN
FURTHER SUPPORT OF ITS MOTION, PURSUANT TO 11 U.S.C. § 105(a), FED. R.
CIV. P. 60(b), AND FED. R. BANKR. P. 9024, FOR RELIEF FROM ORDER UNDER
11 U.S.C. §§ 105(a), 363, AND 365 AND FEDERAL RULES OF BANKRUPTCY
PROCEDURE 2002, 6004 AND 6006 AUTHORIZING AND APPROVING
(A) SALE OF PURCHASED ASSETS FREE AND CLEAR OF LIENS AND
OTHER INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
DATED SEPTEMBER 20, 2008 (AND RELATED SIPA SALE ORDER)**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   FACTUAL BACKGROUND RELEVANT TO DISPUTING BARCLAYS PURPORTED DEFENSES ..............................................................................................12

    A.    PHASE 1: PRE-HEARING (SEPTEMBER 16 THROUGH SEPTEMBER 19) ..............12

        1.    OBTAINING BOARD OF DIRECTORS' APPROVALS (SEPTEMBER 16) ........13

        2.    EXECUTED APA (SEPTEMBER 16) ............................................................15

        3.    CREDITORS' COMMITTEE'S INITIAL MEETING (SEPTEMBER 17) ...........16

        4.    BARCLAYS' PRESS RELEASE AND ANALYST CALL (SEPTEMBER 17) ......................................................................................16

        5.    BID PROCEDURES HEARING (SEPTEMBER 17) .........................................21

        6.    LEHMAN ADVISES COMMITTEE TRANSACTION IS "AN EVEN EXCHANGE" (SEPTEMBER 18) ....................................................................22

        7.    LEHMAN SELLERS PREPARE LIQUIDATION VALUATION AT BARCLAYS' REQUEST (SEPTEMBER 19) ....................................................23

        8.    LEHMAN–HOULIHAN TELEPHONE CALLS CONFIRM EVEN EXCHANGE (SEPTEMBER 19) ..................................................................26

    B.    PHASE 2: SALE HEARING (SEPTEMBER 19) .........................................................27

        1.    WHAT WAS DISCLOSED TO COURT .........................................................27

        2.    WHAT WAS NOT DISCLOSED TO COURT ..................................................30

            (A)    IMPERATIVE TO BARCLAYS TO REALIZE A DAY-ONE GAIN..........................................................................................30

            (B)    EMBEDDED $5 BILLION DISCOUNT NEITHER DISCLOSED TO COURT NOR IDENTIFIED IN TRANSACTION DOCUMENTS .......................................................................33

            (C)    VALUE REPRESENTED TO COURT ($47.4 BILLION) WAS NOT MARK-TO-MARKET VALUE ON LEHMAN SELLERS' BOOKS BUT INSTEAD APPEARS TO BE SUM OF LIQUIDATION VALUE AND CLEARANCE BOX ASSETS ................36

i

(D)    USE OF BARCLAYS REPURCHASE AGREEMENT TO
TRANSFER EMBEDDED, $5 BILLION DISCOUNT ...........................37

(E)    ELEVENTH HOUR DEMANDS THAT LEHMAN SELLERS
LOCATE AND TRANSFER ADDITIONAL ASSETS...........................38

(F)    SUPPOSED "OFF-THE-RECORD" CONVERSATIONS ....................41

(G)    OVERSTATED CURE AND COMPENSATION LIABILITIES ..............42

C.    PHASE 3:  CLOSING WEEKEND ( SEPTEMBER 20- 22) ..........................................45

1.    AFTER EXCLUDING COMMITTEE'S PROFESSIONALS FROM
MEETINGS AND DISCUSSIONS, LEHMAN SELLERS AND BARCLAYS
ADVISE THEM OF SALIENT TRANSACTION TERMS HOURS
BEFORE CLOSING .....................................................................................45

2.    DISCUSSIONS CONCERNING ALLEGED COMMITTEE CONSENT TO
MATERIAL TRANSACTION MODIFICATIONS ............................................51

3.    VALUATION OF SECURITIES TRANSFERRED ...........................................53

D.    PHASE 4:  VERIFICATION OF LEHMAN SELLERS AND BARCLAYS'
REPRESENTATIONS (SEPTEMBER 2008 THROUGH DECEMBER 2008) ................55

1.    REQUESTS FOR SCHEDULES; FILED VERSIONS CONTAIN
OUTDATED MARKS; RESERVATIONS OF RIGHTS ON FINALITY ............57

2.    RECONCILIATION REQUESTS ....................................................................59

3.    OCTOBER AND NOVEMBER 2008 MEETINGS AMONG COMMITTEE
REPRESENTATIVES AND LBHI ESTATE REPRESENTATIVES ...................60

E.    PHASE 5:  INTENSIFIED EFFORTS TO OBTAIN RECONCILIATION
(DECEMBER 2008 THROUGH MARCH 2009).........................................................67

1.    DECEMBER 2008 AND JANUARY 2009 BARCLAYS' SETTLEMENTS .........68

2.    INFORMAL LETTER REQUESTS AND MEETINGS LEAD NOWHERE
(JANUARY 2009 THROUGH MARCH 2009).................................................74

F.    PHASE 6:  RULE 2004 DISCOVERY AND LITIGATION (APRIL 2009
THROUGH SEPTEMBER 2009)...............................................................................77

III.   ARGUMENT ..................................................................................................80

   A.   BARCLAYS HAS NOT PRESENTED ANY PRE-CLOSING EVIDENCE
        SUPPORTING ITS VALUATION OR REFUTING EVIDENCE THAT $5
        BILLION DISCOUNT OFF LEHMAN'S BOOK VALUES REFLECTED A
        NEGOTIATED, BUT UNDISCLOSED PRICE REDUCTION ........................................80

   B.   SIGNIFICANT TRANSACTION TERMS WERE NOT DISCLOSED TO COURT -
        - CONSUMMATED TRANSACTION DIFFERED MATERIALLY FROM
        TRANSACTION REPRESENTED TO, AND APPROVED BY COURT .........................82

        1.   COURT WAS NOT APPRISED OF, AND DID NOT APPROVE "GAIN"
             TRANSACTION ...........................................................................................83

        2.   COURT DID NOT APPROVE CLARIFICATION LETTER TO EXTENT
             IT MATERIALLY AMENDED APA BY EFFECTUATING
             NEGOTIATED $5 BILLION DISCOUNT TO BARCLAYS AND
             transferring CLEARANCE BOX ASSETS, 15C3 ACCOUNTS AND
             OCC ACCOUNTS .......................................................................................85

   C.   BARCLAYS' FAILURE TO MAKE ADEQUATE DISCLOSURE OF SALIENT
        TERMS OF SALE TRANSACTION FORFEITED ITS ENTITLEMENT TO
        363(M) AND FINALITY PROTECTIONS ..................................................................95

        1.   TRANSPARENCY AND DISCLOSURE ARE SINE QUA NON OF
             363(M) AND FINALITY PROTECTIONS .......................................................95

        2.   BARCLAYS ASSUMED RISK OF NOT RETURNING TO COURT .................98

        3.   SECTION 363(M) OF BANKRUPTCY CODE DOES NOT APPLY TO
             MOTIONS FILED PURSUANT TO RULE 60(B) ............................................99

   D.   COMMITTEE IS ENTITLED TO RULE 60(B) RELIEF NOTWITHSTANDING
        FINALITY TYPICALLY ATTENDANT TO SALE ORDERS .....................................101

        1.   COMMITTEE IS ENTITLED TO RULE 60(B)(1) RELIEF AS A
             RESULT OF MULTIPLE MISTAKES OF FACT ..........................................103

        2.   NEWLY DISCOVERED EVIDENCE PROVIDES A BASIS FOR RULE
             60(B)(2) RELIEF ......................................................................................107

             (A)   EVIDENCE WAS NEWLY DISCOVERED........................................108

             (B)   COMMITTEE WAS JUSTIFIABLY IGNORANT OF NEW
                   EVIDENCE ................................................................................112

(C)    NEWLY DISCOVERED EVIDENCE WOULD PRODUCE
DIFFERENT RESULT.................................................................114

3.    RULE 60(B)(3) AND RULE 60(B)(6) RELIEF ARE AVAILABLE
ALTERNATIVELY AS RESULT OF MISREPRESENTATIONS MADE
TO COURT..............................................................................115

4.    COMMITTEE REQUESTED RULE 60 RELIEF ON TIMELY BASIS
(RULE 60(C))..........................................................................117

5.    COMMITTEE AND LBHI ESTATE ARE ENTITLED TO
AFFIRMATIVE RELIEF  UNDER RULE 60 AND UNDER SECTIONS
549 AND 559 OF BANKRUPTCY CODE ....................................128

E.    EVEN IF RULE 60 DOES NOT PROVIDE A BASIS FOR RELIEF, COURT
RETAINS POWER TO MODIFY ITS PRIOR ORDER WITHOUT RULE 60..............134

F.    NEITHER MANDATE RULE NOR ESTOPPEL OR WAIVER DOCTRINES
PROVIDE BARCLAYS WITH VALID DEFENSES TO COMMITTEE'S RULE
60(B) MOTION AND ADVERSARY COMPLAINT ....................................135

1.    MANDATE RULE DOES NOT APPLY WHEN COMMITTEE WAS
NOT PARTY TO BAY HARBOUR APPEAL, ISSUE DECIDED HAD NO
BEARING ON RELIEF REQUESTED, AND NEW EVIDENCE
EXCEPTION APPLIES ................................................................135

2.    JUDICIAL ESTOPPEL HAS NO APPLICATION WHEN COMMITTEE
HAS TAKEN CONSISTENT POSITIONS ........................................140

3.    NEITHER EQUITABLE ESTOPPEL NOR WAIVER PROVIDES A
SUSTAINABLE DEFENSE WHEN COMMITTEE WAS NOT AWARE
OF MATERIAL DISCREPANCIES AND DID NOT STAY SILENT
WITH RESPECT TO ITS RECONCILIATION REQUESTS ..........................142

G.    COMMITTEE CONSENT IS IRRELEVANT AND WAS NEVER PROVIDED IN
ANY EVENT................................................................................145

1.    COMMITTEE NEVER CONSENTED TO SALE TRANSACTION...................145

2.    COMMITTEE CONSENT CANNOT CLEANSE INADEQUATE
DISCLOSURE AND BARCLAYS' FAILURE TO OBTAIN COURT
APPROVAL OF MATERIAL MODIFICATIONS TO SALE
TRANSACTION........................................................................146

IV.    CONCLUSION ................................................................................149

# TABLE OF AUTHORITIES

**Page**

**Cases**

Anderson v. Cryovac, Inc., 862 F.2d 910 (1st Cir. 1988)............................................................ 115

Aramony v. United Way of America, 28 F.Supp. 2d 147 (S.D.N.Y. 1998), rev'd on other
grounds, 191 F.3d 140 (2d Cir. 1999).................................................................................. 144

Atkinson v. Prudential Prop. Co., Inc., 43 F.3d 367 (8th Cir. 1994) ......................................... 115

Bank of China v. Huang (In re Huang), 275 F.3d 1173 (9th Cir. 2002)..................................... 131

Bankers Mortgage Co. v. United States, 423 F.2d 73 (5th Cir. 1970), cert. denied, 399
U.S. 927 (1970)...................................................................................................................... 102

Caraway v. Sain, 23 F.R.D. 657 (N.D. Fla. 1959) ..................................................................... 118

Colony Hill Associates v. Kabro Associates of West Islip, LLC (In re Colony Hill
Associates), 111 F.3d 269 (2nd Cir. 1997) ......................................................................... 96, 98

Contemporary Mission, Inc. v. U.S. Postal Service, 648 F.2d 97 (2d Cir. 1981)...................... 126

Cumberland Farms Dairy, Inc. v. National Farmers' Organization, Inc. (In re Abbotts
Dairies of Pennsylvania, Inc.), 788 F.2d 143 (3rd Cir. 1986)................................................ 95

Ferrell v. Trailmobile, Inc., 223 F.2d 697 (5th Cir. 1955).......................................................... 113

Fogel v. Chestnutt, 668 F.2d 100 (2d Cir. 1981) ....................................................................... 139

Gey Associates General Partnership v. 310 Associates, L.P., 2002 WL 31426344
(S.D.N.Y. October 29, 2002) ................................................................................................. 103

Griggs v. Marion Hospital Corp., No. 2004-CV-4241, 2005 WL 1802249 (S.D. Ill. Jul.
28, 2005) ................................................................................................................................ 142

Hawknet, Ltd. v. Overseas Shipping Agencies, 590 F.3d 87 (2d Cir. 2009)............................. 142

In re Alan Gable Oil Development Co., 978 F.2d 1254 (4th Cir. 1992) ..................................... 100

In re Am. Freight Sys., Inc., 126 B.R. 800 (D. Kan. 1991) ........................................................ 102

In re BCD Corp., 119 F. 3d 852 (10th Cir. 1997)....................................................................... 103

In re Bel Air Assocs., 706 F.2d 301 (10th Cir. 1983).................................................................. 95

In re Blutrich Herman & Miller, 227 B.R. 53 (Bankr. S.D.N.Y. 1998) ..................................... 134

In re Charles & Lillian Brown's Hotel, Inc., 93 B.R. 49 (Bankr. S.D.N.Y. 1988).................... 126

In re Chung King Inc., 753 F.2d 547 (7th Cir. 1985) ................................................. 101

In re Colarusso, 280 B.R. 548 (Bankr. D. Mass 2002) ............................................... 143

In re Commodore Int'l Ltd., 262 F.3d 96 (2d Cir. 2001)............................................. 147

In re Contr. Tech., Ltd., 343 B.R. 573 (Bankr. S.D. Tex. 2006) .................................... 130

In re Cremidas' Estate, 14 F.R.D. 15 (D. Alaska 1953) ............................................. 118

In re Crystal Apparel, Inc., 220 B.R. 816 (Bankr. S.D.N.Y. 1998)................................. 147

In re Emergency Beacon Corp., 666 F.2d 754 (2d Cir. 1981) ....................................... 105

In re Engineering Products Co.,121 B.R. 246 (Bankr. E.D. Wash. 1990)........................ 96, 97

In re Frankel, 191 B.R. 564 (Bankr. S.D.N.Y. 1995) ................................................ 101

In re G.A.D., Inc., 340 F.3d 331 (6th Cir. 2003) ..................................................... 117

In re General Insecticide Co., 403 F.2d 629 (2d Cir. 1968) ........................................ 101

In re Gucci, 126 F.3d 380 (2d Cir. 1997)......................................................... 95, 101

In re International Fibercom, Inc., 503 F.3d 933 (9th Cir. 2007) .................................. 126

In re KDI Holdings, Inc., 277 B.R. 493 (Bankr. S.D.N.Y. 1999).................................... 147

In re Lawrence, 293 F.3d 615 (2d Cir. 2002) .................................................. 115, 116

In re LWD, Inc., 2009 WL 5198060 (W.D.Ky. 2009) ................................................. 82

In re M Capital Corp., 290 B.R. 743 (9th Cir., 2003)................................................ 100

In re Marlar, 288 B.R. 823 (Bankr. W.D. Ark. 2003)................................................ 136

In re McLean Industries, Inc., 76 B.R. 291 (Bankr. S.D.N.Y. 1987) ............................... 126

In re Metaldyne, 409 B.R. 661 (Bankr. S.D.N.Y. 2009) ............................................. 147

In re New England Mut. Life Ins. Co. Sales Practices Litigation, 204 F.R.D. 6 (D. Mass.
    2001) ...................................................................................................... 117

In re Newport Offshore, Ltd., 86 B.R. 325 (Bankr. D.R.I. 1988)................................... 143

In re Old Carco LLC, 2010 WL 31430 (Bankr. S.D.N.Y. Feb. 05, 2010) ............................ 134

In re Polycel Liquidation, Inc., No. 00-62780, 2007 WL 77336 (D.N.J. Jan. 8, 2007)............. 129

In re Refco, Inc., 336 B.R. 187 (Bankr. S.D.N.Y. 2006)............................................ 146

In re Rockefeller Ctr. Props., 266 B.R. 52 (S.D.N.Y. 2001) ...................................... 144

In re Rome Family Corporation, 407 B.R. 65 (Bankr. D. Vt. 2009) .......................... 117

In re Roundabout Theatre Co., 131 B.R. 14 (S.D.N.Y. 1991)..................................... 142

In re Summit Ventures, 161 B.R. 9 (Bankr. D. Vt. 1992) ........................................... 100

In re Tri-Cran, Inc., 98 B.R. 609 (Bankr. D. Mass. 1989)..................................... 95, 98

In re TWA, 261 B.R. 103 (Bankr. D. Del. 2001)......................................................... 131

In re Varat Enterprises, Inc., 81 F.3d 1310 (4th Cir. 1996)........................................ 143

In re W.T. Grant Co., 20 B.R. 186 (S.D.N.Y. 1982) ................................................... 137

In re Woods, 173 F.3d 770 (10th Cir. 1999)................................................................ 117

J.D. Pharmaceutical Distrib., Inc. v. Save-On Drugs & Cosmetics Corp., 893 F.2d 1201
    (11th Cir. 1990)....................................................................................................... 118

Jacobs v. New York Founding Hosp., 577 F.3d 93 (2d Cir. 2009) ............................ 100

Johnson v. Askin Capital Mgmt., L.P., 202 F.R.D. 112 (S.D.N.Y. 2001)................... 108

Kosakaw v. New Rochelle Radiology Assocs., 274 F.3d 706 (2d Cir. 2001)............. 142

Kurzweil v. Philip Morris Cos., 1997 U.S. Dist. LEXIS 4451 (S.D.N.Y. 1997) .............. 109, 110

Lamont v. Grass (In re Lamont), 453 F. Supp. 608 (N.D.N.Y. 1978)........................ 103

Lasky v. Cont'l Prods. Corp., 804 F.2d 250 (3d Cir. 1986) ....................................... 102

Londsdorf v. Seefeldt, 47 F.3d 893 (7th Cir. 1995).................................................... 115

Lone Star Indus., Inc. v. Compania Naviera Perez Compac (In re New York Trap Rock
    Corp.), 42 F.3d 747 (2d Cir. 1994) ......................................................................... 82

Marquette Corp. v. Priester, 234 F .Supp. 799 (D.C.S.C. 1964) ................................ 118

Marshall v. Monroe & Sons, Inc., 615 F.2d 1156 (6th Cir. 1980)............................. 102

MDFC Loan Corp. v. First Shopping Center Partnership, No. -93 C 4481, 1996 WL
    99909 (N.D. Ill. Mar. 1, 1996).................................................................................. 142

Myers v. Martin (In re Martin), 91 F.3d 389 (3d Cir. 1996) ....................................... 82

Negron v. Weiss, No. 06 CV 1288, 2006 WL 2792769 (E.D.N.Y. Sept. 27, 2006) .................. 142

Nemaizer v. Baker, 793 F.2d 58 (2d Cir. 1986) ........................................................ 102

New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 352 F.3d 599 (2d Cir. 2003) .............................................................................................................. 136

Official Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983) ............................................................................... 96

Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir. 1998) ...................... 142

Ope Shipping, Ltd. v. Underwriters at Lloyds, 100 F.R.D. 428 (S.D.N.Y. 1983) .................... 113

Otte v. Mfrs. Hanover Commercial Corp. (In re Texlon Corp.), 596 F.2d 1092 (2d Cir. 1979) ........................................................................................................... 134

Peirre v. Bernuth, 20 F.R.D. 116 (S.D.N.Y. 1956) ..................................................... 102

Pence v. Langdon, 99 U.S. 578 (1878) ..................................................................... 143

Peyser v. Searle Blatt & Co., Ltd., 2000 U.S. Dist. LEXIS 18432 (S.D.N.Y. Dec. 22, 2000) ........................................................................................................... 112

Pierce Assocs., Inc. v. Nemours Found., 865 F.2d 530 (3d Cir. 1989) .................................... 117

PRC Harris, Inc. v. Boeing Co., 700 F.2d 894 (2d Cir. 1983) ........................................... 117

R.N. v. Suffield Bd. of Educ., 194 F.R.D. 49 (D. Conn. 2000) .......................................... 117

Radack v. Norwegian America Line Agency, Inc., 318 F.2d 538 (2d Cir. 1963), cert. denied, 423 U.S. 1079 (1979) ............................................................................. 128

Rand Int'l Leisure Prods., Ltd. v. TekSource, L.C., No. 97 CV 0319, 1998 WL 372356 (E.D.N.Y. July 2, 1998) ...................................................................................... 116

Richstone v. Chubb Colonial Life Ins., 988 F.Supp. 401 (S.D.N.Y. 1997) ............................... 144

Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113 (2d Cir. 2004) ........................... 141

Ryan v. United States Lines Co., 303 F.2d 430 (2d Cir. 1962) ............................................ 108

Scherer v. City of New York, No. 03 CIV. 8445, 2007 WL 2710100 (S.D.N.Y. Sept. 7, 2007) ........................................................................................................... 116

Seese v. Volkswagenwerk, 679 F.2d 336 (3d Cir. 1982) ................................................. 139

State Bank of Southern Utah v. Gledhill (In re Gledhill), 76 F.3d 1070 (10th Cir. 1996) ......... 128

State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158 (2d Cir. 2004) .......................................................................................................................... 115

Stefanopoulous v. City of New York, 2008 WL 4820558 (2d Cir. 2008)................................. 105

Thompson v. County of Franklin, 180 F.R.D. 216 (N.D.N.Y. 1998)................................. 108, 110

U.S. v. Baus, 834 F.2d 1114 (1st Cir. 1987)............................................................................. 126

U.S. v. Cirami, 563 F.2d 26 (2d Cir. 1977) ...................................................................... 136, 138

U.S. v. Forty-Eight Thousand, Five Hundred Ninety-Five Dollars, 705 F.2d 909 (7th Cir. 1983) ...................................................................................................................................... 117

U.S. v. Quinones, 511 F.3d 289 (2d Cir. 2007) ........................................................................ 142

U.S. v. Stanley, 54 F.3d 103 (2d Cir. 1995) ............................................................................. 138

U.S. v. Vidal, 136 Fed. Appx. 438 (2d Cir. 2005)..................................................................... 138

U.S. v. Zvi, 25 Fed. Appx. 34 (2d. Cir. 1995) .......................................................................... 138

United States v. Holtzman, 762 F.2d 720 (9th Cir. 1985) ......................................................... 118

United States v. Int'l Bhd. of Teamsters, 247 F.3d 370 (2d Cir. 2001)...................................... 107

Whimsicality, Inc. v. Rubie's Costume Co., Inc., 836 F. Supp. 112 (E.D.N.Y. 1993) ...... 107, 110

Whitaker v. Assoc. Credit Servs., Inc., 946 F.2d 1222 (6th Cir. 1991)...................................... 102

Wisser Co. v. Mobil Oil Corp., 730 F.2d 54 (2d Cir. 1984)...................................................... 144

Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art, 324 Fed. Appx. 117 (2d Cir. 2009)............. 140

**Statutes**

11 U.S.C. § 559.......................................................................................................................... 133

11 U.S.C. § 363(m) ...................................................................................................................... 99

11 U.S.C. § 562.......................................................................................................................... 133

Fed. R. Civ. P. 60(b)(2).............................................................................................................. 107

Fed. R. Civ. P. 60(c)(1)............................................................................................................... 117

**Other Authorities**

11 Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 2859 (2d ed. 1995) ......................... 112

3 Collier On Bankruptcy ¶ 363.11 (15th ed. 2009)....................................................................... 99

The Committee submits this memorandum (a) in opposition to the Barclays Enforcement Motion,[1] (b) in response to the Barclays Brief,[2] and (c) in further support of the Committee Rule 60 Motion,[3] and in support thereof, respectfully states as follows:

## I.    PRELIMINARY STATEMENT

1.    Despite its bulk, the Barclays Brief fails to refute the central tenet of the Committee's claim -- that the balanced, going-concern transaction presented to the Court and approved by the Sale Order bears no resemblance to the transaction consummated.  Instead, Barclays realized a windfall through (a) a negotiated, but undisclosed $5 billion discount off the Purchased Assets' book values, (b) changes in valuation standards from a book (or mark-to-market) methodology to a liquidation methodology -- the *exact* result that the Sale Transaction was advertised would avoid, (c) 11th hour demands for additional assets and (d) artificial assumption of  inflated liabilities.  Barclays failed to disclose any of these material modifications of the Sale Transaction to the Court, a shortcoming that incurably infected the sale process, forfeiting Barclays' entitlement to section 363(m) protections, defeating claims of finality, and justifying Rule 60 relief and the recovery of unauthorized transfers under section 549 of the Bankruptcy Code.

---

[1]    Motion Of Barclays Capital Inc. To Enforce The Sale Order And Secure Delivery Of All Undelivered Assets, dated January 29, 2010 (the "Barclays Enforcement Motion").

[2]    Memorandum Of Barclays Capital Inc. In Opposition To The Rule 60 Motions And In Support Of Motion Of Barclays Capital Inc. To Enforce The Sale Order And Secure Delivery Of All Undelivered Assets, dated January 29, 2010 (the "Barclays Brief").

[3]    Motion Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al., Pursuant To 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9024, For Relief From Order Under 11 U.S.C. §§ 105(a), 363, And 365 And Federal Rules Of Bankruptcy Procedure 2002, 6004 And 6006 Authorizing And Approving (A) Sale Of Purchased Assets Free And Clear Of Liens And Other Interests And (B) Assumption And Assignment Of Executory Contracts And Unexpired Leases, Dated September 20, 2008 (And Related SIPA Sale Order) And Joinder in Debtors' And SIPA Trustee's Motions For an Order Under Rule 60(b) to Modify Sale Order, dated September 15, 2009 (the "Committee Rule 60 Motion," and, with the Rule 60(b) Motions of LBHI and the SIPA Trustee, the "Rule 60 Motions").  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Committee Rule 60 Motion.

1

2.      The transaction represented to the Court (and Committee) entailed Barclays acquiring assets, on a going concern basis, used primarily in connection with the Lehman Sellers' North American broker-dealer business, including real estate, data centers, executory contracts and personnel, in exchange for specified cash consideration.  With respect to the financial assets, the Sale Transaction purportedly avoided the catastrophic losses that would ensue from their liquidation.  As presented, Barclays would acquire the Lehman Sellers' "matched book," i.e., acquire assets consisting of "long positions" and assume liabilities for the "short positions."  With respect to that "book," the Lehman Sellers presented the transaction to the Court, their Boards and the Committee, as balanced, an "even exchange" or a "wash" -- where assumed liabilities equaled transferred assets based on the ***book value*** of those assets (which the Lehman Sellers marked-to-market on a daily basis).  And while the Lehman Sellers presented the transaction to the Court in those terms during the Sale Hearing, Barclays remained perfectly silent in the courtroom, knowing full well it had already insisted on receiving a significant, day-one gain (and would, in point of fact, receive that gain, in an amount of at least $4 billion).

3.      ***"Tag … You're It."***  The centerpiece of Barclays' defense is the unsubstantiated assertion that both the Court and the Committee were aware of the significant gain Barclays would realize.  Barclays argues the Court approved that gain because it authorized the Lehman Sellers to transfer assets to Barclays ***irrespective of their value*** and overruled objections based on the suspicion (albeit unsubstantiated with record evidence) that Barclays stood to receive a windfall.  Barclays maintains the Committee also was aware of the $5 billion negotiated discount, inflated liabilities, and additional asset transfers -- but failed to take timely action to bring them to the Court's attention.  Barclays' tendentious "Tag … You're It" defense heaps on the Court and the Committee a smattering of attenuated and irrelevant information circulating in the market-place and purportedly appearing in the inaccurately-styled Clarification Letter (but

2

not disclosed to the Court). Barclays' efforts to tag both the Court and the Committee with knowledge of the material differences between the transaction described to the Court and the one consummated should not be countenanced.

4.    ***Incurable Failures To Disclose.***  The Committee neither knew of, nor consented to the secret discounts, inflated liabilities, and 11th hour asset grabs by Barclays. But even if the Committee had known of, or consented to those differences, Committee consent could not, under any circumstances, cleanse Barclays of its failure to disclose adequately these significant features of the transaction to the Court. As the purchaser seeking the benefits of a Court order under section 363 of the Bankruptcy Code, it was incumbent on Barclays, not the Committee, to make appropriate disclosures. The central issue for the Court's consideration is not whether and when the Committee became aware of these material modifications, but instead whether Barclays satisfied the disclosure requirements of section 363 of the Bankruptcy Code. Indeed, the Court already had made itself available into the early morning hours of Saturday, September 20, and surely would have made itself available to review and consider any material changes before the markets opened on Monday, September 22. Barclays simply chose not to avail itself of that option in the hope of reaping a windfall under cover of darkness. The consequences of Barclays' inaction should be borne by Barclays, not the estates.

5.    As the Court is aware, the Sale Transaction proceeded at breakneck speed. Barclays obtained approval of the Sale Transaction on the fifth day of LBHI's bankruptcy case and closed on the eighth day of the case. The events that unfolded in the initial days of the chapter 11 cases through the commencement of this litigation on September 15, 2009, fall squarely within six distinguishable "phases," each of which is detailed in the supplemental Factual Background section that follows, with citations to record evidence:

- ***Phase 1: Pre-Hearing (Tuesday, September 16 Through Friday, September 19)***. Barclays' and the Lehman Sellers' respective Boards of Directors approved the Sale Transaction on Tuesday, September 16. Barclays packaged the transaction to its Board of Directors as an opportunity to extract good assets while mitigating risks.

The Lehman Sellers described the transaction to their Boards as a "wash" with respect to LBI, with Barclays assuming liabilities that equaled assets.

o   The APA ascribed book values of $70 billion to the Lehman Sellers' long positions and $69 billion to their short positions.  Undisclosed to anyone apart from a handful of negotiators, however, Barclays and the Lehman Sellers had agreed to a $5 billion purchase price reduction -- or "discount" -- off the assets' book value -- which was neither reflected in the transaction documents nor disclosed to the Court.

o   On Wednesday, September 17, the Committee met for the first time having been appointed that same day.  Facing a host of difficult and unprecedented issues, it worked diligently to familiarize itself with the terms of the Sale Transaction.  The Committee immediately dispatched its newly-selected counsel to the Bid Procedures Hearing, scheduled  for 4:00 p.m. that day, to request (albeit unsuccessfully) an adjournment.  During a Thursday, September 18 meeting, the Lehman Sellers described the Sale Transaction to the Committee professionals *as an even exchange* -- where the assets' book value ($72 billion) equaled liabilities ($72 billion).  Telephone calls among the Committee's newly-selected financial advisor Houlihan and the Lehman Sellers on Thursday night, September 18, and during the morning of Friday, September 19 confirmed that the book being transferred still matched, even though the value of those assets (*based on Lehman marks*) had declined.

•   *Phase 2:  Sale Hearing (Friday, September 19).*  During the Sale Hearing, the Lehman Sellers advised the Court that they had marked their assets on *a line-by-line basis that day* -- and that market deterioration had resulted in a decline in the value of the assets being transferred to Barclays to $47.4 billion.  They still presented a balanced transaction, where assumed (or extinguished) liabilities equaled or exceeded assets.  The Lehman Sellers also advised the Court that the Clarification Letter (which was described as purportedly clarifying which subsidiaries would fall within the "Purchased Assets" definition) was nearly complete and on its way to Court.  Yet, the letter was neither presented to, nor reviewed by the Court before the Sale Order was entered or at any time thereafter.

o   Notably, significant aspects of the Sale Transaction were *not* disclosed to the Court during the Sale Hearing, e.g., (a) Barclays' insistence that it receive a day-one gain on the transaction; (b) Barclays' position that the Court authorized it to acquire assets *irrespective of their value*; (c) the previously negotiated $5 billion discount off the book value of the Lehman Sellers' assets that did not appear in any transaction documents (including the Clarification Letter); (d) the use of the Barclays Repurchase Agreement to funnel that secret discount to Barclays; (e) the transfer of *additional* assets -- which the Lehman Sellers hurriedly gathered in response to Barclays' 11th hour demands -- including the Clearance Box Assets and the 15c3 Accounts; (f) the $47.4 billion figure, styled as a mark-to-market value arrived at that day, may have

reflected the sum of the *liquidation* value (not book value) of those assets together with the Clearance Box Assets; and (g) the overstatement of the Cure and Compensation Liabilities by billions of dollars.  Taken together, the undisclosed aspects of the Sale Transaction resulted in Barclays receiving (or claiming entitlement to) billions of dollars of estate assets beyond the transaction described to or approved by the Court at the Sale Hearing.

- *Phase 3:  Closing Weekend (Saturday, September 20 Through Monday, September 22)*.  After the Sale Hearing, on Saturday morning (September 20), the Lehman Sellers' invited the Committee professionals to attend the closing, but that invitation afforded them few privileges beyond requesting admittance to meetings.  Committee professionals were excluded both from meetings and from discussions in meetings they were allowed to attend.  After repeated demands for a list of the assets being transferred (and their marks), the Lehman Sellers furnished the September 21 Schedules (as defined below), indicating that, with respect to the financial assets, the marked value of the cash and securities that would be transferred to Barclays was $49.9 billion.  That begged additional questions, <u>e.g.</u>, why that amount differed from the $47.4 billion figure given to the Court.  After repeated demands for a meeting to explain the discrepancy, the Lehman Sellers and Barclays finally met with the Committee professionals shortly before the actual closing (<u>i.e.</u>, in the early morning hours of Monday, September 22).  This included two meetings with James Seery and the third (and final) meeting with, among others, Michael Klein of Barclays and counsel to the Lehman Sellers.

  - Seery advised the marks on the September 21 Schedules ($49.9 billion) were stale and should be disregarded.  Klein advised of four significant developments.  *First*, Klein confirmed Seery's statement that the $49.9 billion marks were stale and elaborated that the value of the securities had declined to between $44 billion and $45 billion.  *Second*, Cure and Compensation Liabilities remained fixed at $4.25 billion and would be assumed by Barclays in addition to the $45.5 billion relating to the Barclays Repurchase Agreement (as defined below).  *Third*, because the value of the securities had declined to between $44 and $45 billion, the Clearance Box Assets ($1.9 billion) would also be transferred to Barclays -- to get Barclays "back to" the $47.4 billion disclosed to the Court.  *Fourth*, because the liabilities assumed ($49.75 billion) exceeded the securities transferred ($47 billion), the creditors had "made an additional $2 billion" that weekend.  To make sure he was perfectly clear, Klein outlined the changes to the transaction on the Manila Folder (defined below).

  - The alleged "decline" in the value of the assets transferred to which Seery and Klein referred (from $49.9 billion to between $44 and $45 billion), however was *not* the result of the Lehman Sellers' mark-to-market valuations or anything taking place outside the parties' negotiations.  *Instead, they were liquidation values*, prepared under pressure from Barclays, which purported to reduce the "book" or "mark-to-market" valuations by approximately $5 billion -- coincidentally (or conveniently) the same amount of the negotiated

discount.  Whether this was to facilitate funneling the previously negotiated $5 billion discount to Barclays through the Barclays Repurchase Agreement -- by terminating it and eliminating the excess collateral that would have reverted to the Lehman Sellers under section 559 of the Bankruptcy Code -- or part of a new effort to transfer additional assets (e.g., the Clearance Box Assets) by claiming (baselessly) that the transaction should be valued under liquidation standards, it was neither reflected in the APA, disclosed to the Committee, nor disclosed to and approved by the Court.

o   Seery testified that the Lehman Sellers had marked their books and arrived at a "book" value of nearly $50 billion as of September 19.  The September 21 Schedules (which Seery and Klein told the Committee professionals to ignore) confirmed this amount.  As Rule 60 Movant's expert (Dr. Mark Zmijewski) explains, at this point in time, the market value of the collateral posted to support the Barclays Repurchase Agreement was considerably greater than the value that Klein described (and closer to the Lehman Sellers' September 19 marks of approximately $50 billion).  This was known to Barclays, whose Chief Financial Officer was advised Friday, September 19, of a significantly higher value ($52 billion) based on the marks ascribed by Barclays' custodian under the Barclays Repurchase Agreement (BoNY).

o   The Committee professionals never "consented" to these modifications from the transaction represented to the Court.  Because they had no ability to diligence Klein's 11th hour explanations, the Committee professionals advised the Lehman Sellers' counsel that they were relying on their representations (and Barclays') with respect to the market value deterioration (which they questioned), *but* they insisted on a post-closing reconciliation to confirm those representations.  The Committee professionals then left the closing to avoid confusion over whether their continued presence might be construed as consent.

o   Above all, the issue of Committee consent, while discussed (even distorted) extensively in the Barclays Brief, is irrelevant.  The Committee cannot excuse Barclays from the need to secure Court approval of material modifications to the Sale Transaction represented to and approved by the Court.

- *Phase 4:  Verification (September 2008 Through December 2008)*.  Immediately after the closing, the Committee professionals pursued confirmation of the Lehman Sellers' and Barclays' explanations of changes to the transaction.  Among other things, they requested a detailed reconciliation of the assets transferred, their marked values (as of the closing) and the supporting documentation for those marks.

o   On September 25, following several requests from the Committee for Schedules A and B to the Clarification Letter, the Lehman Sellers finally transmitted copies.  Those Schedules contained the same marks ($49.9 billion) appearing on the September 21 Schedules -- which Seery and Klein told the Committee professionals to ignore as stale only three days before.

o On September 29, Weil and A&M had a rushed meeting with Alex Kirk and
Paolo Tonucci to discuss the Sale Transaction. Kirk and Tonucci reiterated
the alleged explanation about outdated marks and market deterioration
resulting in lower marked values (to between $44 and $45 billion). Houlihan
also met with A&M during that week and discussed its concerns about the
value of the assets transferred and its pursuit of a final reconciliation.

o On October 8, LBHI and its advisors (including A&M) hosted their regularly-
scheduled meeting with the Committee and its professionals. The 92-page
A&M October 8 Presentation (as defined below) distributed to the Committee
for the meeting referred to the Sale Transaction on two slides and recounted
the discussion that A&M had with Kirk and Tonucci on September 29
concerning the supposedly "stale" Lehman marks and an alleged "negotiated
reduction." That prompted Houlihan to stress to A&M the importance of
reaching a final understanding of the assets transferred and their values.
A&M agreed, but, at the time, the estates' ability to reconstruct the Sale
Transaction was hampered by disputes concerning Barclays' lack of
cooperation under the Transition Services Agreement (the "TSA"). The
estates had no choice but to make resolution of TSA disputes and data
preservation their first priority after having lost their information systems and
institutional knowledge in the Sale Transaction to Barclays.

o On October 13, Committee counsel requested a meeting with LBHI's counsel
to review these issues. After repeated requests, a meeting to discuss these
issues took place on November 21.

- **Phase 5: Intensified Pursuit of Reconciliation (December 2008 Through March
2009).** In December 2008, the Committee's investigation into the Sale Transaction
intensified when the SIPA Trustee submitted the settlement of an internecine dispute
between Barclays and JPMC for the Court's approval. The Committee's Limited
Objection argued the settlement motion should be adjourned until the conclusion of
its investigation because the settlement papers contained declarations averring facts
that directly contradicted representations made to the Committee professionals at the
closing. For example, the Leventhal Declaration averred that the cash and securities
transferred were valued at $49.7 billion, directly contradicting the $44 to $45 billion
figures recounted by the Lehman Sellers and Barclays to the Committee
professionals. At the hearing to consider the Limited Objection, Barclays opposed
the Committee's request (arguing it was not "pertinent"), but made never asserted that
the Committee failed to seek timely reconsideration of, or failed to timely appeal
from, the Sale Order. Nor did Barclays dispute the $49.7 billion valuation contained
in the Leventhal Declaration.

o The Court decreed that its findings in connection with the settlement would
have no collateral estoppel effect on the Committee's investigation. Without
setting any deadlines for providing information, the Court also directed the

7

Committee and Barclays to attempt a consensual resolution of the
Committee's information requests.  To that end, the Committee promptly
forwarded an informal document request to Barclays, attended two meetings
to discuss the requests, and sent a supplemental request (because, among other
things, its questions remained unanswered).

o   Barclays did not produce any documents to the Committee until the end of
March 2009.  As produced, a majority of the documents were unintelligible,
and Barclays refused to produce the documents in an electronic format until
May 28, 2009.  In any event, the documents it produced were not responsive
to the Committee's primary request:  a simple reconciliation showing the
marks on the transferred assets, the date of those marks, and documentation
supporting those marks.

- ***Phase 6:  Rule 2004 Discovery and Litigation (April 2009 Through September
2009)***.  In early 2009, following the Committee's initiative, LBHI initiated its own
investigation.  LBHI notified Barclays in early February 2009 of its own concerns
about whether the Cure and Compensation Liabilities ($4.25 billion as identified on
the 9-16-08 Balance Sheet (as defined below)) had been inflated.  That inquiry met a
curt response from Barclays, which maintained those figures were nothing more than
unenforceable estimates.  At this point, as the Committee's attempts to obtain answers
to its questions concerning the Sale Transaction continued to prove unsuccessful, the
Committee and LBHI began to coordinate their investigative efforts.  In April 2009,
LBHI served its own document demands on Barclays, to which Barclays refused to
respond, prompting a Rule 2004 motion (joined by the Committee).  Further
stonewalling access to information, Barclays objected to the LBHI Rule 2004 motion
(and the Committee's joinder), arguing for the first time that investigations into the
Sale Transaction were moot and could not lead to any sustainable causes of action.
Overruling Barclays' objections, the Court authorized discovery, and the Rule 60
Motions from each estate fiduciary, the Committee, LBHI and the SIPA Trustee,
followed a summer of intensive discovery.

6.      ***Adequate Disclosure Is <u>Sine</u> <u>Qua</u> <u>Non</u> Of Section 363 Protections.***  Bankruptcy

sales afford purchasers certainty and finality.  As a precondition to receiving those protections,

however, the sale process must be marked by transparency and full disclosure.  Since both were

lacking in this case, Barclays forfeited its entitlement to any protection.  Critically, Barclays does

not point to any record evidence validly disputing the documents and testimony adduced during

Rule 2004 discovery confirming the existence of a negotiated $5 billion discount, its omission

from the APA, or the subsequent agreement to transfer the discount to Barclays through the

Barclays Repurchase Agreement.  Nor does it deny the failure to apprise the Court of the

discount or the absence of any mention of the discount in the Clarification Letter.

7.      Barclays' self-serving description of the change in valuation standards for the

financial assets from book value to liquidation value -- i.e., that it was designed to account for

Barclays' disagreement with the Lehman Sellers' supposedly "stale" or "aggressive" marks and

purportedly to "adjust" to a so-called "fair market value"[4] -- ignores the fact that Barclays had

agreed expressly to pay book value in the APA.  It also ignores Barclays' statements to analysts

on September 17 that Barclays had confidently marked the assets to market.  To the extent

Barclays points to the Clarification Letter's modification of the "Purchased Assets" definition in

the APA to delete references to book value in an effort to justify its insistence on applying a

liquidation valuation standard, that material change in the transaction's terms was not disclosed

to the Court by Barclays during the Sale Hearing or thereafter.  The transaction was represented

to the Court as a going-concern sale, avoiding the value-depleting consequence of a liquidation.

Based on the presentation, everyone in the courtroom (except for Barclays and a handful of the

Lehman Sellers' negotiators) understood that the assets were being valued on a going-concern,

book value basis -- and were not being ascribed liquidation values.

8.      ***Barclays' Defenses To Rule 60 Relief Fall Flat***.  Barclays argues principally

(and inconsistently) that (a) the parties did not agree to any discount but instead to a valuation

that purported to reflect the assets' true market value and (b) even if they did agree to a discount,

the Committee was well aware of it.  To that end, Barclays maintains the Committee did not seek

Rule 60 relief on a timely basis, and its motion does not rely on new evidence.  Barclays is

wrong.

---

[4]      Barclays Br. ¶ 21.

9

9.      With respect to valuation of the financial assets transferred, the Lehman Sellers'
mark-to-market valuations on September 19 (which the parties supposedly agreed in the APA
would govern the transaction) reflected a value of nearly $50 billion.  BoNY, Barclays' collateral
custodian, ascribed a $52 billion valuation.  Barclays' ex post facto expert valuation of $45.5
billion mirrors the liquidation valuation that the Lehman Sellers prepared at Barclays' request on
September 19 (i.e., between $44.6 billion and $45.5 billion) -- even though Barclays' expert
(Professor Paul Pfleiderer) testified that a "fire-sale" discount was not applied to the transferred
positions.

10.     Barclays argues the Committee was aware of the material extent to which the
approved transaction differed from the consummated transaction.  The Committee's advisors
were told by Klein in the presence of the Lehman Sellers' counsel that economic changes to the
assets being acquired and liabilities being assumed necessitated changes to Barclays' economic
compensation.  This could not be verified on a single Sunday in September, so the Committee's
advisors insisted on a reconciliation to subsequently substantiate Klein's statements.  This is
hardly "knowledge and consent."

11.     Nor can Barclays "tag" the Committee with knowledge of all aspects of the
consummated transaction through the Clarification Letter.[5]  While the Committee professionals
finally received a draft of the Clarification Letter during the closing weekend, their review
afforded only a partial picture of the modifications.  It made no mention of the $5 billion
negotiated discount and neither the Committee nor its professionals were told the assets would be
valued on a liquidation basis.

---

[5]     Notably, Barclays does not take that position with respect to the Court.  If the Clarification Letter
provided the transparency concerning transaction modifications that Barclays claims, Barclays
surely should have submitted the Clarification Letter to the Court for review and approval.

12.    The Committee professionals were advised hours before the closing that the value of the assets had declined to between $44 billion and $45 billion because of market factors -- not because of an arrangement to change valuation methods to effectuate a pre-agreed discount of $5 billion.  That alleged decline further eliminated the prospect that excess collateral under the Barclays Repurchase Agreement would be returned to the estates.

13.    With respect to its estoppel and waiver defenses, Barclays simply cannot explain away the Committee's persistent efforts, commenced prior to the closing and spanning months, to obtain a transaction reconciliation.  The Committee's actions hardly can be characterized as "staying silent."  Since the transaction closed, the Committee's position has been consistent -- it demanded a reconciliation confirming that the consummated transaction squared with the transaction represented to the Court and the Committee.  Its efforts not only included prompt demands on the estates and Barclays for information, but also appearances in Court to protect against findings that would compromise that investigation, such as its opposition to approval of the December Settlement.

14.    Barclays similarly cannot invoke the mandate rule with respect to the Bay Harbour Appeal of the Sale Order.  That appeal examined a narrow issue unrelated to the issues underlying the Rule 60 Motion and did not result in a mandate precluding the Committee's requests for relief from the Sale Order.  Moreover, as the Committee advised the Court at the Sale Hearing, it lacked sufficient time to complete the necessary diligence to reach an informed position.  Notwithstanding its diligent efforts, that fact remained true through the period in which it could seek reconsideration or lodge an appeal.  Sufficient information to justify the initiation of a lawsuit demanding recovery of more than $5 billion -- litigation which cannot be commenced lightly under any circumstances -- simply was not available.

15.     From its inception, the Lehman Sellers and Barclays touted the Sale Transaction's benefits to the estates.  In addition to saving jobs, the estates purportedly stood to realize (even in a depressed market) a good recovery through a going-concern sale that avoided a hurried and chaotic liquidation.  The facts unearthed during Rule 2004 discovery reveal otherwise, i.e., that Barclays reaped a windfall by buying assets at significant undisclosed discounts and at liquidation values.  The Committee does not seek to rewrite the terms of the Sale Transaction.  Rather, it seeks to hold Barclays to the Sale Transaction described to the Court, i.e., the going concern sale of financial assets based on their book value where liabilities assumed equaled or exceeded assets transferred.  To that end, the relief the Committee requests aims to re-establish the benefits that originally justified the Court's approval of the Sale Transaction.

## II.     FACTUAL BACKGROUND RELEVANT TO DISPUTING BARCLAYS PURPORTED DEFENSES

16.     The following supplemental statement of facts describes salient events preceding the filing of the Committee's Rule 60 Motion.  It also addresses the Committee's knowledge (or lack thereof) of certain aspects of the Sale Transaction before and after the Sale Hearing -- albeit an irrelevant issue but discussed extensively in the Barclays Brief.  The facts not only clarify Barclays' distortions of the record, but they speak directly to (and refute) Barclays' defenses of waiver, estoppel and untimeliness.

### A.     PHASE 1:  PRE-HEARING (SEPTEMBER 16 THROUGH SEPTEMBER 19)[6]

17.     On the eve of LBHI's bankruptcy filing, specifically during the weekend of September 13, 2008, through September 14, 2008, Barclays sought to purchase nearly all the assets and assume nearly all the liabilities of LBHI (the "Barclays Initial Bid") by acquiring

---

[6]     Exhibits cited herein refer both to exhibits filed with the Committee Rule 60 Motion and new exhibits filed with this Memorandum.  New exhibits begin with Exhibit 55, following sequentially from the last exhibit filed with the Committee Rule 60 Motion.

100% of LBHI's equity.[7]  At the eleventh hour, however, the parties abandoned that transaction,[8] and LBHI promptly filed for bankruptcy protection early the next day (Monday, September 15). On Tuesday, September 16, Barclays advised its Senior Leaders that:  "Lehmans' [sic] shift into administration means *we now have the opportunity to purchase what we regard as the good parts of the investment bank (including people, infrastructure and licenses), without having to take on any exposure to the bad parts*.  This remains *a rare opportunity* to accelerate execution of our strategy by expanding our US investment banking operations."[9]

### 1.    OBTAINING BOARD OF DIRECTORS' APPROVALS (SEPTEMBER 16)

18.    At 6:00 a.m. on Tuesday, September 16, the LBHI Board of Directors met to consider approval of the Sale Transaction.  The consideration was described as follows: "approximately $1 billion … for 745 Seventh Avenue, $250 million … for the Lehman Brothers name, and approximately $450 million … for the data centers.  *For LBI, the transaction was described as a wash -- with Barclays assuming liabilities, including employee liabilities and contract cure amounts, basically equivalent to the assets*."[10]  At that meeting, the LBHI Board of Directors authorized execution of the APA.[11]

---

[7]    See Exhibit 86 (Witness Statement of Clive Adamson) at 5 ¶ 14 ("In the first, unsuccessful transaction, Barclays was to buy the shares of  … [LBHI,] the group's parent company"); Exhibit 64 (Tr., Deposition of Jonathan Hughes, February 4, 2010) ("Hughes Tr. (2)") at 419:7-420:4) ("[T]here were discussions during the weekend prior to the 15th … to do a much bigger transaction and to acquire potentially the whole of Lehman Brothers …. [i.e.,] the acquisition by Barclays of all of the assets and liabilities of the Lehman Brothers Holdings Group"); Exhibit 75 (Tr., Deposition of John Varley, September 3, 2009) ("Varley Tr.") at 14:21-15:3 ("[Referring] to the transaction that we were looking at on the Saturday and the Sunday as Lehman one …. The transaction that we announced on Wednesday as Lehman two and the transaction that we implemented as Lehman three").

[8]    See Ex. 64 Hughes Tr. (2) at 420:21-24 ("[F]undamentally, it needed financial support of a type that was not available to be able to conclude the transaction").

[9]    Exhibit 100 (email from John Varley to "Senior Leaders Communications" dated September 16, 2008) (BCI-EX-(S)-00053452) (emphasis added).  See Ex. 75 Varley Tr. at 39:20-21 ("I recognize it as a communication that I sent to the senior leaders of the group").

[10]    See Exhibit 101 (LBHI Minutes of the Board of Directors September 16, 2008) (Deposition Exhibit 489) ("LBHI Board Minutes") at 4 (listing attendees).

19.    The Board of Directors of Barclays PLC, Barclays' parent company, convened a

meeting the same day to consider the Sale Transaction.  It was advised "the US broker/dealer

business … **had a gross balance sheet of $75 billion** …. **The assets being acquired were good**

**quality …. The assets acquired had been marked to market by Barclays Capital to confirm the**

**valuation**."[12]   The Board received a presentation hailing the transaction's benefits (the "Barclays

Board Presentation"):  "In this transaction …. [w]e would acquire $75bn of assets and liabilities

…. [we] would offer $250m to acquire the business[,] and we are buying $1.5bn worth of

---

Barclays relies extensively on the testimony of Lazard Freres' Barry Ridings, specifically that he
did not understand this transaction to be a "wash."  See Exhibit 72 (Tr., Deposition of Barry
Ridings, January 15, 2010) ("Ridings Tr.") at 22:23-23:7 ("[Q] Did you in fact believe on
September 19th that this transaction was going to be a wash?  [A] Again, just to be clear what you
mean by a wash … everything sold equals everything purchased.  [Q] That's right.  [A] No").
Yet, Ridings was present at the LBHI Board of Directors meeting where the transaction was, for
LBI, **"described as a wash."** Ex. 101 LBHI Board Minutes at 4 (emphasis added).  The Board
minutes contain no mention that Ridings or any other attendee corrected this description.

Moreover, LBHI's counsel, Thomas Roberts, described the "sale transaction, as closed, as very
similar to the transaction contemplated by the APA [including] Barclays' acquisition of assets
and liabilities at a 'wash'."  See Report of Anton R. Valukas, Examiner, dated March 11, 2010,
the relevant portions of which are attached hereto as Exhibit 88 ("Examiner's Report") at 2136.

[11]    Ex. 101 LBHI Board Minutes at 6-7.  Several of the individuals negotiating the Sale Transaction
on the Lehman Sellers' behalf became Barclays' employees following the closing and received
significant bonuses after leaving Lehman.  See Committee Rule 60 Motion, Ex. 7 (Tr., Deposition
of Ian Lowitt, August 20, 2009) ("Lowitt Tr.") at 8:15-9:2, 16:12-17:2, 17:14-20:4; 21:13-17,
30:25-31:12; Committee Rule 60 Motion, Ex. 3 (Tr., Deposition of Bart McDade, September 2,
2009) ("McDade Tr.") at 60:9-18, 197:10-18; Exhibit 77 (Tr., Deposition of Alex Kirk, August
31, 2009) ("Kirk Tr.") at 11:4-19, 14:12-18, 14:25-15:7, 18:7-22; Committee Rule 60 Motion Ex.
2 (Tr., Deposition of Steven Berkenfeld, August 6, 2009) ("Berkenfeld Tr.") at 20:7-18, 55:23-
59:11; Committee Rule 60 Motion, Ex. 8 (Tr., Deposition of Eric Felder, July 31, 2009) ("Felder
Tr.") at 38:15-40:13;  Committee Rule 60 Motion, Ex. 9 (Tr., Deposition of Paolo Tonucci,
August 14, 2009) ("Tonucci Tr.") at 6:5-22; Committee Rule 60 Motion, Ex. 5 (Tr., Deposition of
Mark Shapiro, August 7, 2009) ("Shapiro Tr.") at 7:14-18; Committee Rule 60 Motion, Ex. 10
(Tr., Deposition of Robert Azerad, August 17, 2009) ("Azerad Tr.") at 6:5-14; Exhibit 79 (Tr.,
Deposition of Alastair Blackwell, August 7, 2009) ("Blackwell Tr.") at 8:15-22; Committee Rule
60 Motion, Ex. 12 (Tr., Deposition of James Hraska, August 14, 2009 ("Hraska Tr.") at 15:2-14;
Exhibit 111 (Tr., Deposition of Martin Kelly, August 18, 2009) ("Kelly Tr.") at 8:2-9:14.

[12]    See Exhibit 102 (Deposition Exhibit 581B) (Barclays PLC Minutes of a Meeting of the Board of
Directors) (BCI-EX-(S)-00128326-28) at 1-2 (emphasis added).

company-related property (HQ and data centres)."[13]  The Barclays Board Presentation assured

that "[t]his transaction structure *mitigates some of the risks that we previously identified*:  *It*

*significantly reduces the amount of assets we acquire.  We extract 'clean' assets and*

*contracts*...."[14]  The presentation identified three "primary risks," none of which included market

volatility or an inability to accurately mark the assets.[15]  The Barclays PLC Board of Directors

approved the Sale Transaction.

### 2.    EXECUTED APA (SEPTEMBER 16)

20.    The APA defined "Purchased Assets" to include assets used "*in connection with*"

the broker-dealer business, including "government securities, commercial paper, corporate debt,

corporate equity, exchange traded derivatives and collateralized short-term agreements *with a*

*book value as of the date hereof of approximately $70 billion*."[16]  The APA further provided for

assumption of liabilities *"with a book value as of the date hereof of approximately $69*

*billion."*[17]  It also required Barclays to assume certain liabilities for contract cure payments and

accrued employee compensation (the "Cure and Compensation Liabilities").[18]

---

[13]    Committee Rule 60 Motion, Ex. 31 ("Project Long Island: Board Discussion Materials 16 September 2008" with cover email) (Deposition Exhibit 378) at 2.

[14]    Id. (emphasis added).

[15]    Id. (listing risks:  "[1] If we do not get a fixed price from the major investors … before announcement, we take the risk that the share issuance raises less than the $3.4bn current market value of these shares.  [2] We have performed accelerated due diligence and there will be a number of loose ends upon separation from Long Island (e.g. continuation of Group Services).  [3] We will be subject to a US legal process which is unpredictable").  See also id. at 10 ("Remaining issues/Risks and mitigants").

[16]    Committee Rule 60 Motion, Ex. 20 (Asset Purchase Agreement Among Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC and Barclays Capital Inc., Dated as of September 16, 2008) ("APA") § 1.1 (definition of "Purchased Assets") (emphasis added).

[17]    Ex. 20 APA § 2.3(i).  See also APA § 3.3 (requiring Purchaser to determine "with respect to each Position (long or short, including repos), that was part of the Purchased Assets ... the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof).").

[18]    Ex. 20 APA §§ 2.5, 9.1(c).

21.    In connection with the APA, a balance sheet was prepared listing the assets transferred to and liabilities assumed by Barclays (the "9-16-08 Balance Sheet"), which listed "Adj. Total Assets" of $72.65 billion, "Liabilities" of $68.4 billion, *plus* the "Cure pmt" liability of $2.25 billion and the "Comp" liability of $2.0 billion.  Thus, the 9-16-08 Balance Sheet reflected a transaction that was in complete balance.

### 3.    CREDITORS' COMMITTEE'S INITIAL MEETING (SEPTEMBER 17)

22.    On Wednesday, September 17, the newly formed Committee conducted its first meeting to begin the process of selecting its professionals, including its counsel (Milbank) and financial advisors (Houlihan and FTI).[19]  In addition to the Sale Transaction, the Committee faced a mountain of tasks and began reviewing and considering urgent issues for the first time immediately after the selection of its professionals.[20]

### 4.    BARCLAYS' PRESS RELEASE AND ANALYST CALL (SEPTEMBER 17)

23.    On Wednesday, September 17, Barclays issued a press release touting the recently executed APA (the "September 17 Press Release").  The release indicated "Barclays will acquire trading assets with a current estimated value of £40bn (US$72bn) and trading liabilities with a current estimated value of £38bn (US$68bn) for a cash consideration of £0.14bn (US$0.25bn).  Barclays will also acquire the New York headquarters of Lehman Brothers as well as its two data

---

[19]    Exhibit 58 (Tr., Deposition of Noel Purcell, January 13, 2010) ("Purcell Tr.") at 6:17-19 ("The Committee was formed on September 17, 2008, with our first meeting that morning to begin to select the professionals").

[20]    Exhibit 55 (Tr., Deposition of Saul Burian, December 17, 2009) ("Burian Tr.") at 12:22-13:3 ("[W]e were drinking from a fire hose in all sorts of issues …. trying to get our arms around all the non-Barclays related issues"), 215:21-215:25 ("There was just a never ending number of issues and concerns and we wanted to know what was it that impacted creditors that we needed to jump on to immediately to preserve and protect value"); Ex. 58 Purcell Tr. at 7:9-8:4 ("On September 17, the Committee took most of the day to put together a professional team …. Late that evening, there was a discussion … about some of the urgent natures within Lehman Brothers' estate.  That included a number of different aspects of the estate, funding issues, liquidity issues, and that included things like sale of certain assets").

centres at close to their current market value."[21]  Barclays also hosted an analyst call that day

(the "September 17 Analyst Call"), where it:

- announced "the transaction is capital ratio accretive …. And the source of that accretion is the negative goodwill from the transaction, which amounts to about 2 billion US dollars post tax;"[22]

- touted  "[t]he acquisition of these businesses and assets significantly enhances BarCap's position in the United States by a transaction *that is de-risked by excluding the overwhelming majority of Lehman risk assets*;"[23] and

- advised it had just completed its own *mark-to-market valuation* of the securities the 72 hours before, which left it very comfortable that it was acquiring "high quality, tradable" assets.[24]

24.    Barclays submits the September 17 Press Release and Analyst Call apprised

interested parties, including the Court and the Committee, that Barclays stood to realize a

significant gain on the Sale Transaction.[25]  Barclays is wrong.

---

[21]    Exhibit 103 ("Barclays announces agreement to acquire Lehman Brothers North American investment banking and capital markets business" press release dated September 17, 2008, with cover email) (Deposition Exhibit 344A) (BCI-EX-(S)-00053482-88) at 1.

[22]    Exhibit 104 ("Transcript_Barclays-Lehman_Agreement_Announcement_-_17_Sept_08.pdf" with cover email) (Deposition Exhibit 476B) (HLHZ 0009125-44) at 2.

[23]    Id. (emphasis added).   See also id. at 7 ("What we have taken is a portfolio of trading assets and liabilities *that are first of all de-risked* and secondly those that need to support the ongoing *parts of the business that we have acquired*.  And therefore they are predominantly market making assets and liabilities and very tradable") (emphasis added).

[24]    Id. at 4 ("[W]e had just completed 72 hours of due diligence on every position …. and were able to establish the marks"); 5 ("[Q] Or is that very much, *this is mark to market as of last night, all the toxic stuff is outside of this portfolio* ….?  [A] The 'or is it' piece of your analysis … is the right way of looking at it"); 13-14 ("If we look at the portfolio of assets that we have acquired, it is less than 5% that you would regard as mortgage related.  *Those are marked down and then marked again through the due diligence process …. [T]he vast majority of the book is very high quality, easily tradable assets and liabilities …. [H]aving gone through the due diligence on the weekend, again all our comments around risk is not generic proof true.  I think we have come out of the process very comfortable and if anything confirmed our marks*") (emphasis added).

[25]    See Barclays Br. ¶¶ 17, 43.

25.    *First,* the September 17 Press Release made no mention of any gain Barclays would realize from the Sale Transaction.  According to Barclays, the gain easily could be calculated by subtracting the liabilities assumed from the assets acquired (i.e., $72 billion less $68 billion).[26]  Still, the September 17 Press Release neither made such a calculation, nor mentioned the Cure and Compensation Liabilities listed on the 9-16-08 Balance Sheet of $4.25 billion (which, if added to the liabilities listed in the press release, would have balanced assets and liabilities).[27]

26.    *Second*, the September 17 Analyst Call cryptically described a United Kingdom purchase accounting convention that appeared applicable to Barclays' acquisition of the Lehman Sellers' buildings, data centers and personnel.  It did not mention the long positions, the Barclays Repurchase Agreement, or its acquisition of the securities collateralizing that agreement.  To that end, it hardly warranted the Committee pursuing emergency relief from the Court claiming the sale was approved based on incorrect information.  Instead, it provided the basis for further questions and investigation -- which Houlihan put to Barclays and the Lehman Sellers after reading the press release:

> The idea that Barclays had said they are going to book a profit on the transaction was extremely troubling and it was together with … Fazio and Geer's review of those [September 21] schedules that prompted me to demand that we get a full understanding and update as to what, exactly what was being transferred and at what values to whom. And that's why I was so aggressive in demanding that we have that [Klein] meeting …. Again, if someone said to me what those words mean is … Barclays is taking the book for 2 billion less than what it's worth, it certainly would have been a basis for objection and would have been very, very serious conversation.  But telling me that some foreign company through accounting rules that I was not familiar with was taking a position on the assets that they were getting for accounting treatment when the transaction was

---

[26]    <u>Ex. 64</u> Hughes Tr. (2) at 340:4-12 ("[Q] Could you tell me where in the press release I find the information that gives me notification of the concept that there would be a gain for Barclays in the transaction?  [A] There is reference to, in paragraph 2, to the acquisition of trading assets with a then estimated value of approximately 72 billion dollars.  And liabilities with a then-estimated value of approximately 68 billion dollars").

[27]    <u>Ex. 103</u> September 17 Press Release.

complex, multifaceted and involved assets that I didn't know, .… it was important enough to follow up and ask, but not enough to run into court with my hair on fire.[28]

27.    The Lehman Sellers' financial advisor (Lazard Freres) had the same reaction to the announcement, dismissing it as an irrelevant announcement of U.K. accounting treatment: "[Q] As the Reuters article reports, Barclays made an announcement of this … anticipated gain, two days before the hearing …. [A] It's not a surprise to me, but it's Barclays' accounting gain, so … I'm not going to put a lot of relevance on the U.K. accounting for this."[29]  Indeed, even Barclays appears to concede the gain was mentioned in the context of an "accounting line item."[30]

28.    ***Third***, the information contained in the September 17 Press Release and Analyst Call became outdated, irrelevant and inaccurate by the time it was circulated to the Committee and its representatives, i.e., Saturday, September 20, after the Sale Hearing.[31]  Varley's

---

[28]    Ex. 55 Burian Tr. at 298:25-302:13.  See Part II.C.1 infra ("After Excluding Committee's Professionals From Meetings And Discussions, Lehman Sellers And Barclays Advise Them Of Salient Transaction Terms Hours Before Closing"); Exhibit 57 (Tr., Deposition of Dennis O'Donnell, January 6, 2010) ("O'Donnell Tr.") at 40:6-18 ("[W]e were looking at many issues, had many unanswered questions. That announcement was one element of the facts of which we were aware of that weekend that we had questions about, but we did not ask Barclays about it …. [T]he announcement spoke of a $2 billion gain of some sorts, but it was couched in accounting jargon that we at Milbank did not definitively have an understanding of"); Exhibit 70 (Tr., Deposition of Bryan Marsal, December 22, 2009) ("Marsal Tr.") at 207:2-8 ("[Q] [C]an you see Barclays' position where they've announced that it was going to be a gain publicly …. [A] But we all know that there's a purchase accounting gain in there").

[29]    Ex. 72 Ridings Tr. at 25:2-16.

[30]    See Barclays Br. ¶ 106 ("In that [September 17 Analyst Call], senior management of Barclays made clear that the transaction was expected to generate approximately $2 billion in positive capital for the Barclays balance sheet.  The announcement explained that this 'capital accretion' would come from 'negative goodwill' in the transaction -- which is the accounting line item that results when the fair value of the assets acquired in a transaction exceed the fair value of the liabilities assumed on the balance sheet.") (internal citation omitted).

[31]    See Ex. 64 Hughes Tr. (2) at 341:20-342:16 ("I think -- it is hard for me to recall that, not least because, as I think you know, the transaction that was being described in this statement is -- ***it includes descriptions, which as I said earlier, are very different … from the description that is ultimately or that describe the ultimate transaction …. [Q] So if Judge Peck had seen this press release by the time of the sale hearing, it wouldn't be describing the deal before him anyway, is that right? …. [A] There would be aspects of the transaction that had changed and some of***

description of three separate transactions, i.e., "Lehman One" (Barclays Initial Proposal),

"Lehman Two" (September 17 Press Release and Analyst Call) and "Lehman Three" (the

consummated transaction), confirms Hughes' admission.[32]  Similarly, Milbank understood the

September 17 Press Release and Analyst Call examined "a different transaction."[33]

29.    **Fourth,** even if the press release did contain relevant information, Barclays never

advised the Court of the September 17 Press Release, the September 17 Analyst Call, or the

accounting gain mentioned during that call.  While Barclays felt compelled to distribute the

September 17 Press Release to its regulators in the United Kingdom, the Financial Services

Authority, neither the September 17 Press Release nor the transcript from the September 17

Analyst Call were presented or mentioned to the Court in connection with its approval of the

Sale Transaction.[34]

---

*those aspects I believe were described, though I believe not all of the aspects or all of the*
*changes were described*") (emphasis added).

[32]    See Ex. 75 Varley Tr. at 14:20-15:3.

[33]    See Ex. 57 O'Donnell Tr. at 35:24-36:8 ("The announcement … related to a version of the
transaction that was not the version of the transaction approved by the Court or under discussion
over the weekend, so … Milbank did not attempt to draw any comparisons between what was
discussed in that announcement and what was approved by the Court or was under discussion
over the weekend").

[34]    See Exhibit 105 (September 17, 2008, email from John Varley to Hector Sants (FSA) attaching
September 17 Press Release) (Deposition Exhibit 583B) (BCI-EX-(S)-00053519-25); Ex. 64
Hughes Tr. (2) at 371:19-372:13 ("[Q]. And for what reason did Barclays submit the press release
to Hector Sants of FSA?  [A] release of this form would have been required to have been shared
with the FSA by reason of U.S. regulations …. in the sense that it contains information which is
of relevance to a UK-regulated entity and statements made to the public with respect to that are
required to be shared with the FSA.  Hector Sants is the chief executive of the FSA, and … [this]
would be something that John Varley as the group chief executive would likely also want to share
with Hector Sants in any event").

30.    *Lastly,* the Committee did not see either the September 17 Press Release or a transcript of the September 17 Analyst Call until *after* the Sale Hearing.[35]  This delay is not surprising when the Committee had its first meeting on September 17.  Similarly, Houlihan did not see the September 17 Press Release or transcript from the Analyst Call until after the Sale Hearing.[36]

### 5.    BID PROCEDURES HEARING (SEPTEMBER 17)

31.    On Wednesday, September 17, approximately *40 minutes* after Milbank's selection as proposed Committee counsel, the Lehman Sellers and Barclays proceeded to Court seeking approval of the bid procedures for the Sale Transaction (the "Bid Procedures Hearing"). Newly-selected (and proposed) Committee counsel requested (albeit unsuccessfully) that the Court adjourn the Bid Procedures Hearing given the pace with which the Sale Transaction was proceeding and the limited time afforded to the Committee to review it:  "Clearly, we're not going to have a prolonged argument over this but … the committee wanted us to request, a short adjournment until tomorrow morning so that we can actually get up to speed and have an informed discussion …. [W]e want a short adjournment until tomorrow morning."[37]

---

[35]    See Exhibit 105 (September 22, 2008, 4:50 PM email from Edward Gilbert to Julie Becker) (Deposition Exhibit 478B) (CMTE0002527-28); Exhibit 107 (email chain forwarding to Edward Gilbert message concerning Investor Call at 6:53 a.m. on Monday, September 22, 2008) (Deposition Exhibit 477B).

[36]    See Ex. 55 Burian Tr. at 196:14-197:11, (stating he received press release Saturday night (September 20)); 298:20-21 (stating he received transcript of investor call Sunday (September 21)).

[37]    Exhibit 81 (Tr., Hearing, September 17, 2008) at 27:21-28:11.  The Lehman Sellers also advised the Court of a repurchase agreement with Barclays, but styled the agreement as an *interim financing measure*.  See id. at 22:8-11; 23:21-24:12 ("[I]n the interim, LBI has entered into an arrangement with the prospective purchaser where there's a repo agreement in which they are backing up and allowing these repos to be settled and to be financed").

### 6.    LEHMAN ADVISES COMMITTEE TRANSACTION IS "AN EVEN EXCHANGE" (SEPTEMBER 18)

32.    On Thursday, September 18, the Committee professionals attended their first in-person meeting with the Debtors in the offices of Weil, Gotshal & Manges LLP ("Weil").[38]  They were advised that the net impact of the transaction *was essentially an even exchange.*[39]  While copies of the 9-16-08 Balance Sheet were distributed to the Committee professionals (confirming an even exchange), the Committee professionals received no specific details and essentially were advised that their role in the transaction would be limited (and that limited involvement would have to suffice).[40]

33.    Later that evening, Houlihan participated in a conference call with James Seery, at the time Lehman Brothers' Global Head of Fixed Income, at which point Seery provided the same high-level of information recounted at the meeting earlier that day, including the matching assets and liabilities figures identified on the 9-16-08 Balance Sheet.[41]

---

[38]    See Ex. 55 Burian Tr. at 110:24-111:3 ("We got retained Wednesday night.  The first time the debtors had time to meet with us and explain to us the transaction was on Thursday").  See also Ex. 57 O'Donnell Tr. at 9:24-11:15.

[39]    See Ex. 55 Burian Tr. at 119:19-120:6 ("[M]y understanding when we met that Thursday at Weil, when the deal was presented to us, whether it was by Harvey Miller or by one of his partners or by Mark Shapiro or Jim Seery, *it was a give and take*.  We were told … we needed to look at *the net impact of the transaction, which is essentially an even exchange*") (emphasis added); 275:4-8 ("The deal, as I was explained in the conference rooms, were that there was going to be *a balanced exchange of the owned securities to match against … the liabilities*") (emphasis added).

[40]    See Ex. 55 Burian Tr. at 198:3-203:10 ("[W]e had an organizational meeting at Weil where the committee advisors sat down with the Weil and Lehman teams … and the purpose was … we know you only got retained and this is your first meeting, but we have a hearing tomorrow to approve the sale. *And there was a clear understanding that you are not going to get to do much and we are going to tell you what we did and that's going to have to be enough* …. I can tell you we were given [the 9-16-08 Balance Sheet] …. *I remember being very frustrated at that meeting because I personally tried to get into details and any time we asked a detail … someone would say, oh, wow, that's really interesting but that's a detail.  The big picture is we have got to close this transaction*") (emphasis added).

[41]    See Exhibits 108, 109, 110 (notes from and email regarding September 18, 2008, Seery conference call) (Deposition Exhibits 468B, 469B, 470B) (HLHZ0028090-91, HLHZ0000001-6, HLHZ0016324).  See also Ex. 55 Burian Tr. at 208:23-209:2 (recounting summary of September

**7.    LEHMAN SELLERS PREPARE LIQUIDATION VALUATION AT BARCLAYS'
REQUEST (SEPTEMBER 19)**

34.    Early in the week of September 15, the Fed financed LBI through the Fed

Repurchase Agreement, providing $45.0 billion in cash to LBI collateralized by the Fed

Portfolio.  Barclays ultimately assumed the Fed's financing of LBI through its own repurchase

agreement, extending loans of approximately the same amount (the "Barclays Repurchase

Agreement").[42]  JPMorgan Chase Bank, N.A. ("JPMC"), the Fed's custodian on the Fed

Repurchase Agreement, began the process of moving the Fed Portfolio to Bank of New York

("BoNY"), custodian for the Barclays Repurchase Agreement, on September 18.[43]  As set forth

more fully in ¶ 43 of the Committee Rule 60 Motion, Barclays would not accept certain

securities in the Fed Portfolio (approximately 20%) and instead "cherry picked" higher quality

assets to collateralize the Barclays Repurchase Agreement (hereinafter, the "Barclays Repo

Collateral").[44]

---

18, 2008, Seery call:  "The discussion [was] about … what's going on with respect to the book, generally that the deal was cut on these numbers and that the book is holding up relatively well …").

[42]    See Committee Rule 60 Motion Ex. 15 (Tr., Deposition of Gerard LaRocca, August 19, 2009) ("LaRocca Tr.") at 29:19-30:21; Ex. 9 Tonucci Tr. at 36:23-40:6.

While Barclays contends it extended $45.0 billion in cash, the Lehman Sellers advised the Court that Barclays extended $45.5 billion in cash (a $500 million discrepancy).  Compare Exhibit 82 (Tr., Hearing, September 19, 2008) ("Sale Hearing Tr.") at 63:18-22 (stating Barclays replaced the Fed in the amount of $45.5 billion), with, January 8, 2010 Expert Report of Professor Paul Pfleiderer ("Pfleiderer Report") at 9 (¶ 15) (maintaining there is no dispute with respect to Barclays transfer of *$45* billion) (emphasis added).

[43]    See Exhibit 78 (Tr., Deposition of David Petrie, August 26, 2009) ("Petrie Tr.") at 53:3-12, 113:3-11; Ex. 15 LaRocca Tr. at 35:18-36:24.  Issues relating to the transfer of securities, securities left at JPMC, and the $7 billion in cash resulted in a post-transaction settlement agreement in December 2008 among JPMC, Barclays and LBI (the "December Settlement"), discussed below.

[44]    See Ex. 79 Blackwell Tr. at 169:4-169:23 ("[T]here is also a subset of securities that weren't eligible under the ... terms of the repo agreement Barclays had in place with Lehman, which was standard practice … so poorer quality collateral was funded by the Fed.  So it was clear based on the schedules which securities fell outside of that in terms of their quality.  So yes, my team worked ... to refine that list based on that requirement….").  See also Ex. 77 Kirk Tr. at 66:7-67:23 ("[T]he Fed had been providing a repo for Lehman Brothers earlier in the week of approximately $50 billion …. [D]uring the transfer of those – that loan and the collateral

35.     The Lehman Sellers marked their books daily.  According to Seery, as of
September 19, the book or mark-to-market value of the assets being transferred to Barclays was
approximately $50 billion.[45]  With respect to the Fed Portfolio, the Lehman Sellers marked the
value on their books at $50.64 billion.[46]

36.     In the morning of Friday, September 19, Barclays purportedly complained to the
Lehman Sellers that the Lehman Sellers' marks "weren't reflective of the actual market, and if
you went to liquidate these assets, you wouldn't get nearly that amount."[47]  Accordingly, the
Lehman Sellers promptly arrived at a ***liquidation value***; i.e., "it was, in the market today, if you
had to liquidate this collateral quickly … within a couple days, what would you expect to get, …
and what would happen if 50 billion in securities hit the market in rapid succession."[48]

---

associated with that loan, there were many pieces of collateral that Barclays could not value, so
they did not accept them in the transfer from the Fed …. And at some point during that process,
Barclays became very uncertain as to some percentage of that collateral, … maybe as much as …
20 percent … and when Barclays didn't accept those positions, … JPMorgan was left with
collateral that they were not comfortable with but Barclays would not accept…").

[45]   See Exhibit 59 (Tr., Deposition of James Seery, March 3, 2010) ("Seery Tr.") at 240:22-242:9
("[Q] ***[D]id Lehman have marks for the securities that were going over?  [A] Yes.  [Q] And as
of September 19, what was the most recent time that Lehman had marks for those securities?
[A] They would have been marked everyday …. [Q] And do you know what was the aggregate
value according to Lehman's marks of the collateral that was going to Barclays as of
September 19?  [A] I believe it was about $50 billion***") (emphasis added); 251:4-13 ("[Q]
[W]hen [you said earlier] Lehman folks were pushing back with Barclays, they were describing
that they believed Lehman's marks were accurate and that for the illiquid securities, that ... they
were modeled well.  What did you mean that they were modeled well?  [A] That the -- that the
estimated recoveries reflected in the mark were accurate"); 252:25-253:7 ("[Q] But you were
familiar generally with this process that Lehman was using to mark illiquid securities, right?  [Q]
Yes.  [Q] And you had … confidence in it at the time?  [A]  Yes").

[46]   See Ex. 59 Seery Tr. at 273:6-10 ("[Q] And does that [Lehman Market Value] … reflect the
market value that Lehman had on its books as of September 19? [A] That would reflect the mark
that Lehman had on its books as of that date"); 277:9-14 ("[Q] And can you tell me from looking
at [the] original what is the number that was originally under the total that would come under
what Lehman MV or their Lehman marks as of September 19 was for ... that collateral?  [A]
$50.64") (referring to Exhibit 112 (Seery hard copy documents) (Deposition Exhibit 666) ("Seery
Notes") (JS-LB-BANKR 000001-70) at JS-LB-000070); 300:6-21 (same).

[47]   Ex. 59 Seery Tr. at 263:20-264:2.

[48]   Id. at 257:25-258:25.

37.    The liquidation valuation ranged from $44.6 billion to $45.5 billion. Seery could not confirm which of these two figures ultimately was arrived at as the liquidation value, but his notes reflect a $6.04 billion "discount" (from the $50.64 billion September 19 mark for the Fed Portfolio) and a $45.5 billion total for the assets.[49]

38.    Notably, the $44 billion to $45 billion figures arrived at are the very same figures that would be given to the Committee professionals for the Barclays Repo Collateral in the hours before the closing.[50] Quite conveniently, this reduction from the book or mark-to-market valuations also approximates the $5 billion negotiated discount which had been agreed upon days before and which was intended to be funneled to Barclays through the termination of the Barclays Repurchase Agreement. Whether the analysis was planned or coincidence, the downward adjustment to liquidation value could be used to ensure that any excess value owing to the estates after the termination of the Barclays Repurchase Agreement (e.g., under section 559 of the Bankruptcy Code) would be extinguished.

39.    Seery asserts in his Declaration that he apprised the Committee professionals of the assets' "actual" value. His deposition revealed that the term "actual" in his Declaration means "liquidation value." Houlihan confirmed, however, it was not told the assets were being ascribed a liquidation value.[51]

---

[49]    Id. at 277:21-278:13 (describing $6.04 billion as haircut discount for liquidation value); 302:24-304:15 (noting $45.5 billion figures appears to be "within the context"). See Ex. 112 Seery Notes at JS-LB-BANKR 000070.

[50]    See Part II.C.1 ("After Excluding Committee's Professionals From Meetings And Discussions, Lehman Sellers And Barclays Advise Them Of Salient Transaction Terms Hours Before Closing").

[51]    Compare Exhibit 85 (Declaration of Saul Burian dated March 18, 2010) ("Burian Decl.") at ¶ 3 ("During this [Seery] conversation or at any point thereafter, I was never told that the value ascribed to the assets being transferred to Barclays was a liquidation value, not a book or mark-to-market value"), ¶ 9 ("After due inquiry, and to the best of my knowledge, at no time during the sale process did any representatives of Barclays or the Lehman Sellers advise Houlihan that either party was valuing the assets being transferred to Barclays on a liquidation basis. Up until recently, it was Houlihan's understanding that the assets would be valued using only book value or mark-to-market value"); with Barclays Br. Ex. 370 (Declaration Of James Seery dated January

### 8.    LEHMAN–HOULIHAN TELEPHONE CALLS CONFIRM EVEN EXCHANGE (SEPTEMBER 19)

40.    Barclays submits it advised the Committee, before the Sale Hearing and during the closing, of a $5 billion haircut on the Fed Portfolio (and thereby tagged the Committee with knowledge of the discount).[52]  Barclays conveniently omits the significant portions of Houlihan's conversations with the Lehman Sellers that discredit Barclays' position.  On Friday, September 19, shortly before the Sale Hearing started, Burian had one or two rushed calls with Seery and/or Shapiro to discuss the Sale Transaction.[53]  During the first call, Burian was told $50.64 billion in assets would be transferred to Barclays and a $45.5 billion extension was mentioned, as was a collateralized repurchase agreement.[54]  Immediately thereafter, however, Seery and/or Shapiro told Burian to ignore that information because it was wrong.  Burian thereafter crossed out his notes recording that conversation.[55]

---

28, 2010) (the "Seery Decl.") ¶ 6 (averring "the estimated actual value of the Fed repo securities (as opposed to their marked value) had shrunk to approximately $45.5 billion") and Ex. 59 Seery Tr. at 323:11-23 ("[Q] What do you mean by 'marked value'?  [A] The marked value on our books [as of September 19] …. [Q] What do you mean by 'actual value'?  [A] What you could receive if you went and sold them.  [Q] So when you refer to the 'estimated actual value,' you mean the value that your Lehman traders had estimated --  [A] The liquidation bid").

[52]    Barclays Br. ¶¶ 29 n.25, 166, 180.

[53]    See Exhibit 113 (Saul Burian contemporaneous notes) ("Burian Notes") (Deposition Exhibit 472B) (HLHZ 0038187-91).  See also Burian Tr. at 219:11-14 ("I don't remember if that was one call or a quick call, hang up, and then a call back … 20 minutes later …. I think it was two").  But see Ex. 59 Seery Tr. 310:19-311:5 ("[Q]. Do you remember … if you hung up the phone or if you stayed on the phone?  [A]. Stayed on. …. I remember putting them on hold or mute, hearing that there were changes, saying I'll come right back to you, picking them back up and describing the changes").

[54]    See Ex. 113 Burian Notes at HLHZ 0038189; Ex. 55 Burian Tr. at 222:1-223:19.  The Burian Notes also reference a $5 billion figure, but when asked "Why do you think the 5 billion was netting of the 50 billion to get to 45.5?", he did not have a specific recollection of that number.  See Burian Tr. 228:8-12.

[55]    See Ex. 55 Burian Tr. at 225:12-226:24 ("I also want to explain the cross-out.  Jim Seery and Mark Shapiro …. were on the phone rattling this off …. And then as soon as they were done, …. [they said] t]hat's all wrong, scratch that and forget it …. Saul, here is what's going on, 50.64, we got 25, 4 ---collateralized …. forget that, scratch it.  Let me tell you what's really going on"); 229:12-15 (same); 230:7-232:4 (same); 240:3-7 (same); 242:3-19 (same).  See also Ex. 59 Seery Tr. at 311:6-10 ("[Q] Do you remember if you said anything to the effect of 'what I told you was wrong' or 'disregard that' or 'that's not the deal now' …. [A] It would be along those lines.").

41.     Later during their conversation, Seery and/or Shapiro told Burian that assets valued at $45.5 billion were being transferred to Barclays.[56]  They did not mention a "haircut" with respect to any repurchase agreement transaction, but did indicate that the Cure and Compensation Liabilities totaled $4.25 billion, i.e., making this transaction an even-for-even match or one favoring the estates.[57]  They did not tell Burian that the asset figures were a *liquidation* value, not a book or mark-to-market value.[58]

**B.     PHASE 2: SALE HEARING (SEPTEMBER 19)**

**1.     WHAT WAS DISCLOSED TO COURT**

42.     During the Sale Hearing, the Lehman Sellers indicated "material" changes had taken place to the transaction outlined in the APA and stated the values of the assets transferred had changed because of *market fluctuations*:

> Let me try to summarize the changes that were made to the transaction.  *In terms of the economic changes, they result largely because of the markets,* unfortunately.  And from the time that the transaction was actually entered into till now, *the markets dropped and the value of the securities dropped as well.  So, originally, we were selling assets that had a value of seventy -- approximately seventy billion dollars.  And today … we're only selling assets that have a value of 47.4 billion dollars.  Barclays is assuming liabilities, however, of 45.5 billion*

---

[56]    Elsewhere, Burian's notes reflect a $47.4 billion figure.  While it is unclear if the Clearance Box Assets were mentioned on the call, the $1.9 billion value ascribed to the Clearance Box Assets would explain the references to the $45.5 billion and the $47.4 billion of assets being transferred to Barclays.

[57]    See Ex. 55 Burian Tr. at 234:25-241:20 ("[T]he last page of these notes was from that last conversation before the hearing …. I don't remember if Jim Seery was on that call or not and who else was on the call, but definitely I believe Mark [Shapiro] was on this call …. It was … that *it was no haircut, it was a direct even-for-even match* …. The word 'haircut' never came up in the conversation …. The terms of the repo never came up in the conversation …. [T]he 45.5 was right, but did not represent a par value.  It represented a mark value …. I don't remember a specific conversation about who marked the book, but the *understanding of the conversation was we were talking a common language and that these were Lehman marks*") (emphasis added); Ex. 113 Burian Notes at HLHZ0038191 (illustrating assets changing from $72 billion to $47.4 billion, liabilities changing from $68 billion to $45.5 billion, and Cure and Compensation Liabilities at $4.25 billion).

[58]    See Ex. 85 Burian Decl. at ¶¶ 3, 9.

27

***dollars in connection with those assets.  So that has not changed from the
original transaction.*** …. Barclays is still agreeing to pay the cure amounts on any
leases that it assumes or that we assume and assign to it.  Barclays is also agreeing
to the same employee compensation arrangements.  And it is also agreeing to pay
the 250 million dollars of goodwill to LBI.[59]

43.    With respect to the method used to arrive at those values, McDade testified that a

***line-by-line*** valuation had been performed the night before and the day of the Sale Hearing:

> Q:  [C]an you please describe for the Court how it is that the debtor determined
> that fair value was being realized for the sale of those assets?  ….
> A:  The individual assets on the balance sheet, the trading inventory was bottoms
> up, meaning individual line item detail processed through all of our individual
> risk business units in coordination with the normal finance professionals who are
> incorporated into the valuation process ….
> Q:  ***Does Lehman have any valuations -- internal valuations of any of the assets
> that are being transferred to Barclays?***
> A: ***Absolutely.  There are many complex securities involved.  Many different
> models that we use to evaluate those securities***.
> Q:  ***And so, sir, is it your testimony then that a valuation was conducted within
> Lehman of all the assets that are being transferred to Barclays?  When was it
> conducted?***
> A:  ***Portfolio moved during the week, but that was conducted all last evening.
> All through and up to the agreement -- the agreement today.***
>
> \* \* \*
>
> Q:  ***Has an audit been accomplished of the securities that are to be transferred
> to Barclays under the proposed transactions?***
> A:  If you mean an audit by external valuation process?
> Q:  By identification of the securities?
> A:  ***Absolutely, line by line.***[60]

---

[59]    <u>Ex. 82</u> Sale Hearing Tr. at 46:20-47:15 (emphasis added).

These modifications were described as the "major" changes.  <u>See</u> <u>id.</u> at 54:18-55:16 ("Those are
the major changes to the transaction.  There were some other clarifications that we made but I
don't consider them material, Your Honor.  [THE COURT] I still consider 500 million dollars
material, though.").

[60]    <u>Ex. 82</u> Sale Hearing Tr. at 109:6-110:3; 126:21-127:1 (emphasis added).

44.     According to Barclays, the Court was told the Clarification Letter would reflect "material" changes to the transaction.[61]  To the contrary, the Court was advised that:  "Some other changes that were made to the contracts affect what are called purchased assets and what are excluded assets.  There was some confusion as to which subsidiaries, if any, were being sold.  And we've clarified in a clarification letter which we're hoping to finalize and actually present to Your Honor whenever it comes down here."[62]

45.     Neither Barclays nor the Lehman Sellers presented the Clarification Letter to the Court during the Sale Hearing or any time thereafter.  This is true even though the Court specifically asked for documents reflecting the transaction modifications and advised they were important to its understanding of the transaction:

> THE COURT:  I may have some [questions] as we proceed. It's hard for me to tell, based upon this helpful oral presentation, how the deal has moved in terms of material changes and whether or not those changes affect, in any way, the objectors and whether or not these are changes that make the objectors happy or sad …. It's unclear to me at the moment because I haven't had a chance to reflect on it and I don't know what documents have been prepared that will clarify this.  But I'm confident that as the evening progresses, I'll learn more.  [COUNSEL TO LEHMAN SELLERS]:  Yes.  We're hopeful that we'll have the documents so that everyone can look at them.[63]

46.     The Committee neither objected to nor affirmatively supported the Sale Transaction "because there has been insufficient time for us to really do all the due diligence that we would feel should be done to take that next step of saying yes, this is the best deal and we're supportive actively."[64]

---

[61]     Barclays Br. ¶¶ 33, 165.

[62]     Ex. 82 Sale Hearing Tr. at 48:5-10.

[63]     Ex. 82 Sale Hearing Tr. at 55:12-23.

[64]     Ex. 82 Sale Hearing Tr. at 67:16-21 (emphasis added).

47.    The Court entered the Sale Order in the early morning hours of Saturday, September 20.  Notably, the Sale Order (a) prohibited material modifications to the Sale Transaction and (b) included a provision requiring Committee consent to even non-material modifications to the Sale Transaction.[65]

### 2.    WHAT WAS *NOT* DISCLOSED TO COURT

48.    Neither the Lehman Sellers nor Barclays disclosed certain salient features of the Sale Transaction to the Court, including modifications that had been agreed upon before the Sale Hearing concluded.  The Court was not advised about Barclays' insistence on receiving a day-one gain in connection with the transaction, the $5 billion undisclosed discount, the change in marking assets from book value to liquidation value, and the transfer of additional assets.

### (a)    IMPERATIVE TO BARCLAYS TO REALIZE A DAY-ONE GAIN

49.    From the initial days of the transaction, "[i]t was never Barclays' intention to do a transaction other than one which yielded a gain …. [I]t was an imperative for Barclays in conducting this transaction that there would be a sufficient difference between the two, that Barclays would yield a gain in order that it be a capital accretive transaction."[66]  Barclays

---

[65]    See Committee Rule 60 Motion, Ex. 24 (Order Under 11 U.S.C. §§ 105(a), 363, And 365 And Federal Rules Of Bankruptcy Procedure 2002, 6004 And 6006 Authorizing And Approving (A) The Sale Of Purchased Assets Free And Clear of Liens And Other Interests And (B) Assumption And Assignment of Executory Contracts And Unexpired Leases, dated September 20, 2008) ("Sale Order") § 3 ("The Debtors are hereby authorized and directed to (1) execute the Purchase Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Purchase Agreement"); § 25 ("The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and has been agreed to between the Committee, the Debtors and the Purchaser.").

[66]    Ex. 64 Hughes Tr. (2) at 342:20-22, 348:19-24.  See also Ex. 64 Hughes Tr. (2) at 348:25-349:3 ("[Q] *It was imperative that a gain be in existence on the first day?*  [A] *Yes.*") (emphasis added).

maintains the Court was well aware of this fact, which Barclays styles as "irrelevant" in any event.[67]

50.     While Barclays contends there was enough information available for the Court to discern the gain, it was not disclosed to the Court.  According to Barclays, "***the actual valuation of the assets was not, at the end of the day, I wouldn't say it wasn't relevant, but it was not determinative of the transaction.  In other words, because nobody had the ability to finally determine the valuation of each and every asset used in the business, it was nevertheless understood that each of those assets would be transferred.  So to that extent, the assets were to be transferred irrespective of that value***."[68]

51.     Barclays similarly submits the Court was well aware of the fact that assets would be transferred irrespective of value:  "[Q] Was there enough information in Barclays' view for the court to discern that the Lehman assets being transferred in the sale of the business were being transferred irrespective of their value? …. [A] I think the answer is yes...."[69]

52.     Barclays also deduces that the Court was aware of the gain because (a) it overruled objections from parties complaining that Barclays stood to realize a gain and (b) Barclays purportedly disclosed the gain in the September 17 Press Release and mentioned it during the September 17 Analyst Call.  Barclays concedes, however, that neither party

---

[67]     See Exhibit 63 (Deposition of Jonathan Hughes, January 15, 2010) ("Hughes Tr. (1)") at 39:19-21 (irrelevant whether "windfall profit did or did not exist"), Ex. 64 Hughes Tr. (2) at 346:3-16 ("[Q] So there was enough information in Barclays' view for the court to discern that there was a gain for Barclays of some kind out of the transaction, correct? …. [A] I believe so …. ***Whether it is relevant or not, I don't know***") (emphasis added).

[68]     Ex. 64 Hughes Tr. (2) at 330:21-331:8; see also id. at 330:6-20 ("[Q] Is it Barclays' view that it paid 250 million … plus the value of the real estate to acquire all assets used in the business, irrespective of the value of the assets? …  [A] Barclays was to receive all of the assets used in the business and at no point did anybody ever reach an actual valuation with respect to those assets"); 332:3-25 (maintaining the Court and all parties knew the values were estimates incapable of more precise valuation); Barclays Br. at ¶ 34 (describing allegation of the undisclosed discount as "irrelevant.").

[69]     See Hughes Tr. (2) at 346:17-347:9.

specifically advised the Court that the value of the financial assets Barclays stood to receive

exceeded the liabilities Barclays assumed.[70]

> [Q] Did the estimations ... make clear to the [C]ourt that the estimated value of the financial assets Barclays was acquiring would exceed the estimated value of the liabilities associated with those assets?  [A] I don't know whether the court conducted a detailed, mathematical analysis at that point in time.  I do believe the court was told that all valuations were estimates …. [It] also heard objections which were plain in suggesting that Barclays was gaining more assets than it should gain and more assets than, therefore, the liabilities …. [and] rejected those objections.  From that I conclude … that the court was told that it was possible that the assets would exceed liabilities …. Barclays' view that there would be a greater number of assets acquired than liabilities was a matter of public record, at least two days prior to that sale hearing.  And I think that it was therefore apparent or capable of being apparent to everybody in the court that that was the case.[71]

53.    Barclays also points to a Friday, September 19, email to Milbank from a

dissenting creditor alleging Barclays will realize a "windfall" in the transaction (and the

creditor's assertion of that argument at the Sale Hearing).  As Houlihan testified, however, that

email contains inaccuracies of its own that were inconsistent with Houlihan's discussions with

the Lehman Sellers and their advisors at that time; the email and the creditor's objection at the

Sale Hearing were considered more rumor than an appropriate substitute for due diligence -- and

certainly not grounds to disbelieve the direct and unambiguous representations by estate

---

[70]    See id. at 332:16-333:18.

[71]    See Ex. 64 Hughes Tr. (2) at 332:16-333:18.

fiduciaries to the Court and the Committee.[72]  Even the Court noted that the creditor's objection was based on speculation.[73]

54.     Lastly, Barclays asserts, incredibly, that section 7.2 of the APA prohibited Barclays from making disclosures to the Court on its own accord:  "Purchaser shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Assets hereunder."[74]  That section, however, contains no such prohibition and instead only prohibits Barclays from joining in pleadings that oppose the Sale Transaction or otherwise take adverse positions to its approval.[75]

### (b)     EMBEDDED $5 BILLION DISCOUNT NEITHER DISCLOSED TO COURT NOR IDENTIFIED IN TRANSACTION DOCUMENTS

55.     Certain of the negotiators for the Lehman Sellers and Barclays agreed early in the negotiations that Barclays would receive a $5 billion discount from the transferred assets' book value.  Neither Barclays nor the Lehman Sellers disclosed that discount to the Court or in the transaction documents (including the APA, the First Amendment, *and the Clarification Letter*).

---

[72]     See Exhibit 114 (September 19, 2008 email to Daniel Golden) (Deposition Exhibit 474B); Ex. 55 Burian Tr. at 273:20-274:11 ("I was aware of chatter, as there is in every bankruptcy sale, about people who are not informed of what's going on, worried that Barclays was getting a good deal in a variety of respects …. [T]here are at least two, probably three conversations with … Lehman about this topic.  And there are clear mistakes in the email about how the transaction was structured and typically, while it is interesting to hear the uninformed market, what I rely on is my access, my diligence and the information I get directly from the horses' mouth and my understanding of the transaction directly").

[73]     See Ex. 82 Sale Hearing Tr. at 170:15-16 ("Mr. Golden, in effect, you're asking me to weigh your speculation against their speculation").  See Part II.A.4 ("Barclays Press Release And Analyst Call").

[74]     See Barclays Br. ¶ 163; Ex. 20 APA at 22-23 (§ 7.2).

[75]     Confirming that section 7.2 did not contain the restrictions Barclays contends, Barclays' counsel made numerous statements on the record at the Sale Hearing.  See Ex. 82 Sale Hearing Tr. at 132:21-133:18, 177:10-19, 179:7-180:4, 183:15-184:25, 199:10-200:15, 203:12-204:13, 230:16-231:11, 233:11-21, 235:6-10, 245:5-246:24.

The evidentiary record (much of which was supplied by Barclays employees), however, is
replete with evidence substantiating the existence of the $5 billion discount:

- Tonucci testified that the final Sale Transaction included a discount to Barclays off
  the Lehman Sellers' marks by about $5 billion;[76]

- Ricci testified that we worked to "ensure that we, whatever assets we did take, were
  taken at the ***appropriate price***" and that the "appropriate price" included a discount to
  Barclays off of Lehman's marks for the assets;[77]

- Lowitt testified to the existence of a negotiated $5 billion difference between the
  amount shown on the Lehman Sellers' books and the amount Barclays agreed to pay
  for the assets;[78]

- Kelley's notes recorded a "loss of $5.25 and loss on sale of $5.75."[79]  Kelley
  confirmed these numbers indicated the loss to the Lehman Sellers was either $5.25 or

---

[76]    See Ex. 9, Tonucci Tr. at 29:22-30:17 ("[Q] You understood the 5 billion dollars all in economic
loss versus our marks to be a reference [in Deposition Ex. 136A] to a discount off the marks,
correct?  [A] Yes. [Q] ***The deal that was ultimately done and closed on September 22, that too
included a discount off of Lehman's marks, correct?  [A] That is correct***.  [Q] Okay, and the
amount of that discount off of Lehman's marks was about $5 billion, is that right?  ....  [A]
***[V]ersus the valuations that I recall seeing from our analysis it was about that number*****....*
***About $5 billion.***") (emphasis added).

[77]    See Exhibit 80 (Tr., Deposition of Rich Ricci, September 8, 2009) ("Ricci Tr.") at 28:10-29:4,
44:23-45:20 ("[Q] The question is ***do you know that the prices at which Barclays was agreeing
to purchase the assets reflected in the [APA] which are given at approximately $70 billion
reflect a discount off of whatever Lehman marks existed as of that time***? ....  [A]  [G]iven what I
know about the timing of when we first started looking at their assets versus when this agreement
was signed, ***I would think there would have been a discount, yes, of Lehman assets -- the
Lehman marks on their assets, yes.***") (emphasis added).

[78]    See Ex. 7, Lowitt Tr. at 45:8-17 ("[Q] ***Do you know if what was agreed to between the parties in
their negotiating session with regard to this difference between the amount shown on the books
and the price paid was an agreement in terms of a percentage of what was shown in the
amount of the books or a raw number***?  [A] My recollection is that it was a number, not a
percentage .... ***[I]t was $5 billion.***") (emphasis added).

[79]    Committee Rule 60 Motion, Ex. 33 (Martin Kelly's handwritten notes) (BCI-EX-00115167-73) at
BCI-EX-00115169.

5.75 billion.[80]  Kelly testified that "the 5 billion represents the difference between the negotiated price and the values of those assets on Lehman's books;"[81]

- After the parties executed the APA, Kelley emailed Lowitt describing the agreement that had been reached:  "*Well, it took all night and lots of back and forth but the deal is done and ready for the Board.  Final price did not change meaningfully - approx* [sic] *a $5b all in economic loss versus our marks and $3.6b of resi assets left behind*;"[82]

- On September 17, Gerard Reilly emailed Ian Lowitt, noting he "went through all docs and did not see reference to the price haircut," to which  Lowitt responded, "Since not in contract, hard to see what to d[o];"[83] and

- The APA (§ 9.1) required delivery of the 9-16-08 Balance Sheet on or after closing.  It shows assets and liabilities matching at $72.65 billion.  Kelly testified the $62 billion asset subtotal on that balance sheet was understated by $5 billion.[84]

---

[80]   See Ex. 111 Kelly Tr. at 229:2-13 ("[Q] [T]he 5.25 loss to Lehman …. [T]hat's primarily a function of the difference between the book value of the inventory and the … negotiated value in the contract for the securities? …. [A] It likely accounts for the difference based on these estimates at this point in time.").

[81]   See Ex. 111 Kelly Tr. at 46:11-16 ("[Q] When you wrote, 'Approx. a 5 billion all in economic loss versus our marks,' what did you mean by that?  [A] I recall that *the 5 billion represents the difference between the negotiated price and the values of those assets on Lehman's books.*") (emphasis added), 66:7-16 ("[Q] [Was] the pricing of the agreement … that Barclays would pay Lehman 5 billion less than Lehman had thought the assets were worth?  [A] *My understanding was that the negotiated sales price across all of those asset portfolios resulted in a $5 billion, approximately $5 billion loss to Lehman relative to its marks at that time.*") (emphasis added).

[82]   Committee Rule 60 Motion, Ex. 32 (September 16, 2008, email from Kelly to Lowitt, copy Tonucci) (emphasis added).

[83]   Committee Rule 60 Motion, Ex. 30 (September 17-18, 2008 email exchange between Reilly and Lowitt).

[84]   See Ex. 111 Kelly Tr. at 108:7-16 ("[Q] [F]or these asset classes … were they shown on Lehman books at an amount higher than $62 billion at or about the time this schedule was prepared?  [A] My understanding is yes, they were, in aggregate.  [Q] Were they $5 billion higher, is that your understanding?  [A] Approximately $5 billion higher.") (referring to Committee Rule 60 Motion, Ex. 34 (9-16-08 11:18 a.m. balance sheet) (Deposition Exhibit 19).  See also Ex. 7 Lowitt Tr. at 82:7-82:13 ("[T]hese asset numbers … reflect what Barclays were willing to pay for … $72.65 billion worth of assets, which was less … than the amount they were on Lehman's books for, and the amount less is probably the 5 billion that you referenced.").

(c)    **VALUE REPRESENTED TO COURT ($47.4 BILLION) WAS NOT MARK-TO-MARKET VALUE ON LEHMAN SELLERS' BOOKS BUT INSTEAD APPEARS TO BE SUM OF LIQUIDATION VALUE AND CLEARANCE BOX ASSETS**

56.    Notwithstanding nearly 2 million pages of documents produced and over 60 depositions, no witness or document has ever explained coherently how the $47.4 billion figure represented to the Court was arrived at as the value of assets being transferred to Barclays.  The documents (i.e., the APA) were clear (and corroborated by McDade's testimony):  These were book or mark-to-market valuations updated *that* morning.[85]  Yet, record evidence suggests otherwise.  Seery testified that the Lehman Sellers marked the assets being transferred to Barclays on the books as of September 19 at nearly $50 billion and the Fed Portfolio at $50.6 billion.[86]

57.    Moreover, the $47.4 billion number appears to be a combination of the liquidation value ascribed by the Lehman Sellers on Friday, September 19, of $45.5 billion for the Barclays' Repo Collateral plus the Clearance Box Assets (as defined below) totaling between $1.9 billion and $2.3 billion -- which the Lehman Sellers had agreed to provide on Friday, September 19.[87]  Indeed, Seery's notes reflected a replacement of the $50.64 billion mark with "$45.5 … 1.9 bn."[88]  While Seery could not recall whether that provided the source of the $47.4 billion figure,

---

[85]    Ex. 82 Sale Hearing Tr. at 109:6-110:3.

[86]    See Ex. 59 Seery Tr. at 240:25-242:9; 273:6-10; 300:14-21; Ex. 112 Seery Notes at JS-LB-BANKR 000070.

[87]    See Ex. 59 Seery Tr. at 302:24-304:15 (describing how the liquidation value analysis led to the $45.5 billion figure); 351:3-21 ("There were $1.9 billion of securities … that were at the DTC … plus some at [BoNY] that were in a separate clearing-type box. … Those numbers are the same and they don't know [sic][show] up anywhere else, so I'm going to guess they were … referring to the same thing"); Part II.B.2. ("Eleventh Hour Demands That Lehman Sellers Locate And Transfer Additional Assets").

[88]    Ex. 112 Seery Notes at JS-LB-BANKR 000070.

the sum of the liquidation value of $45.5 billion ascribed that day and the alleged value of the

Clearance Box Assets ($1.9 billion) totals $47.4 billion.[89]

58.     Assuming the $47.4 billion figure reflects the total of these two numbers, the

Court was advised mistakenly that the figure represented the Lehman Sellers' book or mark-to-

market value.  Instead, it represented liquidation values ascribed because of the Lehman Sellers'

and Barclays' negotiations, ***not market fluctuation***.

**(d)     USE OF BARCLAYS REPURCHASE AGREEMENT TO TRANSFER EMBEDDED, $5 BILLION DISCOUNT**

59.     On or about Thursday, September 18, the Barclays Repurchase Agreement

became the mechanism through which the previously agreed-upon $5 billion discount off the

book values would be transferred to Barclays.[90]  Barclays would keep the Barclays Repo

Collateral instead of the assets identified on the 9-16-08 Balance Sheet.  Even though the parties

reached this agreement before the Sale Hearing, it was never disclosed to the Court.[91]  During the

Bid Procedures Hearing, the Court was advised that Barclays would step into the Fed's shoes and

---

[89]     See Ex. 59 Seery Tr. at 278:20-279:3 (failing to recall what $45.5 billion and $1.9 billion in notes reflects); 288:17-289:10 (recalling that he spoke with Fife before the hearing, but not recalling whether $47.4 billion or liquidation value was discussed); 314:15-315:3 (not able to recall how parties arrived at $47.4 billion).

[90]     See Committee Rule 60 Motion, Ex. 39 (September 18, 2008, email from Reilly to Lowitt and Gelband, copy Tonucci and Kelly) ("***Not clear on the amount of block discount or how we make it happen.  Defaulting on repo could be the best as discount could be taken from haircut.  If not that then we need to give business an allocation of block discount so they can mark down the books tonight***") (emphasis added); Ex. 9 Tonucci Tr. at 32:4-33:9 ("[Q] How did Barclays get the 5 billion-dollar discount? .... Was the discount given to Barclays by defaulting on the repo? .... [A] Yes, I would say that was the way in which the transaction was settled, so that is fair."), 132:15-133:21 ("[Q] Do you remember discussing with anyone at Lehman defaulting on the repo as a way of providing the discount to Barclays?  [A] Yes …. I think it was with Ian and with Gerry, perhaps Martin Kelly as well.").

[91]     See Ex. 64 Hughes Tr. (2) at 302:24-303:7 ("[Q] [D]o you know if the agreement to identify assets included in the Barclays repurchase agreement had been made before the end of the sale hearing?  [A] I think they had, yes.").  See also Ex. 77 Kirk Tr. at 72:23-73:9; Ex. 9 Tonucci Tr. at 39:22-40:20, 142:23-143:6; Ex. 7 Lowitt Tr. at 118:14-119:5.

assume its financing obligations, but it was not advised that the repurchase agreement financing had been transformed into an asset sale by the means of an agreed-upon default.

60.    Barclays asserts the Committee knew of the existence of the discount at the time of the Sale Hearing because it was or should have been generally aware that repo transactions involve haircuts, but the testimony from the Committee professionals is uniform:  The Committee was not informed of any discount at any time prior to the Sale Hearing.  Burian testified clearly that the term "haircut" was not mentioned in his pre-hearing conversations with Seery and/or Shapiro.[92]  Milbank confirmed that it was not told about the terms of the Barclays Repurchase Agreement prior to the Sale Hearing and instead that its knowledge was limited to what the Lehman Sellers and Barclays advised the Court.[93]

61.    Neither Milbank nor Houlihan testified that Barclays advised the Committee (or the Court for that matter) that a previously negotiated $5 billion discount off the assets' book value would be effectuated by terminating the Barclays Repurchase Agreement and transferring the excess Barclays Repo Collateral to Barclays (along with other additional assets) -- either before the Sale Hearing or at any time thereafter.

(e)    **ELEVENTH HOUR DEMANDS THAT LEHMAN SELLERS LOCATE AND TRANSFER ADDITIONAL ASSETS**

62.    Even though Barclays had signed and obtained Court approval of an APA that provided for the transfer of assets at their *book* value, Barclays abruptly took the position prior to closing that the Lehman Sellers had overstated the value of the Purchased Assets on their books.[94]  On Friday, September 19, Barclays began a campaign to extort from the Lehman

---

[92]    See Part II.A.8 ("Lehman-Houlihan Telephone Calls Confirm Even Exchange (September 19)").

[93]    See Ex. 57 O'Donnell Tr. at 15:7-24:14 ("[Q] By the end of the Sale Approval Hearing, what understanding or knowledge did Milbank have concerning the amount of securities transferred to Barclays in connection with replacing the Fed repo?  [A] Again, I think our knowledge would have been limited to what was represented on the record at the hearing. …. ").

[94]    See Exhibit 68 (Tr., Deposition of Victor L. Lewkow, February 10, 2010) ("Lewkow Tr.") at 20:2-15 ("Barclays' trading and/or financial folks had been provided certain information about

estates any and all additional, unencumbered assets that could be located for transfer.  The record

is replete with evidence of Barclays' aggressive conduct:

- Tonucci testified that Lowitt had instructed him to find additional assets in order for the Sale Transaction to close;[95]

- According to Lowitt, McDade had asked him on September 19 to find "between 3 and 4 billion dollars" of additional value to Barclays to add to the transaction;[96]

- Kirk testified the Lehman Sellers began searching to "find some, some identifiable bucket of value until Barclays said, yeah, that's enough;"[97]

- Ricci testified that the Lehman Sellers had to find additional assets until Barclays was satisfied that there was nothing left;[98] and

---

the trading positions …. And in the course of that, Barclays had … reached the view that … the aggregate carrying value that they had been furnished by Lehman was substantially higher than Barclays believed was appropriate that Monday or Tuesday."); 23:3-9 ("Barclays made ... its view of the marks, that they were overstated substantially, clear to Lehman people and urged … Lehman to take a fresh look at the values that they were carrying them on their books ....").

[95]   See Ex. 9 Tonucci Tr. at 54:24-55:15 ("[Q] And do you recall there being an effort on September 19 to find additional collateral for Barclays?  [A] I do …. [W]e were asked on the morning of the 19th to find if there was additional collateral to include in the transaction. …. I believe I was asked by Ian Lowitt …. He said that it was necessary for the transaction to close and he reiterated that through the day.").

[96]   See Ex. 7 Lowitt Tr. at 62:8-20 ("[Q] [W]hat did Mr. McDade say to you about finding additional sources of value? …. [A] [H]e would have asked me where, if anywhere, were there additional sources of value we could include in a new transaction.  [Q] Did Mr. McDade give you a target number for additional sources of value.  How much he needed to find?  [A] My recollection is between 3 and 4 billion dollars.").

[97]   Ex. 77 Kirk Tr. at 112:17-24.

[98]   See Ex. 80 Ricci Tr. at 158:4-159:4 ("[Q] At any point did anybody at Lehman suggest that Barclays was being piggish?  [A] … [Lehman said] there's nothing left.  And I said something like to him, well, fine, we're not going to be -- we're not going to be pigs and go after every last nickel.  We'll try to get comfortable with what you have given us, and if that's the case, we're done.  [Q] So is it fair to say that Barclays stopped looking for additional Lehman assets when Mr. Kirk said there was nothing else left to transfer to Barclays?  [A] I recall saying to Alex that -- he was very worried that we were going to walk because we had asked for more assets, they had given us what we [sic] could, he was worried we were going to walk, and I said, okay, if this is it, if this is all we can find before we go to court …we'll take it, we'll take the chance, but we won't kill the deal over looking for more assets.").

- Klein gloated to Diamond in an email sent early Saturday, September 20: "*We clawed back 3B more of value in the transaction* and cut the building prices by $160 mm tonight."[99]

63.    The primary source of additional value was the "non-actionable box" -- "a box of assets which is financed on an unsecured basis" (the "Clearance Box Assets") that supposedly became Schedule B to the Clarification Letter and was valued at between $1.9 billion and $2.3 billion.[100]    Another source of additional assets was the excess in the reserves LBI maintained pursuant to Rule 15c3 of the Securities Exchange Act (the "15c3 Accounts"),[101] which contained securities valued at between $750 million and $1 billion.[102]    Notably, Barclays and the Lehman Sellers agreed on Friday (September 19), *before* the Sale Hearing, that the Clearance Box Assets and the 15c3-3 Accounts would be transferred to Barclays -- but did not advise the Court of that agreement.[103]

---

[99]    Committee Rule 60 Motion, Ex. 43 (September 20, 2008, email from Michael Klein to Bob Diamond) (emphasis added).

[100]    See Ex. 10 Azerad Tr. at 110:25-111:10 (explaining Clearance Box Assets); Ex. 7 Lowitt Tr. at 185:22-186:11 (noting Clearance Box Assets are "slightly bigger" than $1.9 billion); Ex. 9 Tonucci Tr. at 125:11-18 (noting Clearance Box Assets became Schedule B); Committee Rule 60 Motion, Ex. 45 (September 21, 2008, email from Forrest to Lowitt) (identifying $2.3 billion in potentially transferable assets).

[101]    See Ex. 111 Kelly Tr. at 129:6-18 ("My recollection is that there was an effort to identify whether there was a surplus in funds segregated under the 15c3 requirement.  [Q] Apart from the effort to find a surplus in funds, the segregated funds under 15c3, were there other types of assets that were being searched for to transfer to Barclays?  [A] My recollection is there was a general effort to identify unencumbered and pledgeable assets.").  See also Ex. 7 Lowitt Tr. at 67:21-68:13 (explaining 15c3 Securities).

[102]    Compare Ex. 9 Tonucci Tr. at 146:11-147:3 (noting "additional" assets "over and above the repo assets" included Clearance Box Assets of $1.9 billion and 15c3 Accounts of $1 billion); with Ex. 7 Lowitt Tr. at 60:3-9 (valuing "additional elements" of Clearance Box Assets at $2 billion and 15c3 Accounts at "around 750 to 800 million dollars").

[103]    See Ex. 63 Hughes Tr. (1) at 17:14-22 (advising he had been told of conversation at Sale Hearing (off the record) among Barclays' attorneys and Michael Klein (Barclays' negotiator) "[t]hat there had been a discussion and an agreement about the clearance box assets, and most importantly, I think, that Lehman Brothers had represented to Barclays that there were assets in what were termed the clearance boxes … which were earlier in the day identified as being capable of being delivered in the transaction to Barclays."); Ex. 68 Lewkow Tr. at 115:12-123:13 (recounting conversation with Michael Klein concerning "the identification of those assets, of additional -- those assets that would be transferred" based on discussions that took place "on Friday morning" or "early afternoon" which included Clearance Box Assets and 15c3 Accounts).

## (f)    SUPPOSED "OFF-THE-RECORD" CONVERSATIONS

64.    Barclays asserts that during a Sale Hearing recess, the Lehman Sellers advised parties in interest of significant transaction changes.[104]  Burian's recollection of the portion of the "recess" conversation that he heard, however, simply confirmed his conversation with Seery and/or Shapiro shortly before the Sale Hearing.[105]

65.    Barclays' counsel testified to a conversation between Michael Klein and the Lehman Sellers' counsel at the Sale Hearing concerning the Clearance Box Assets and the 15c3 Accounts.  That, however, does not appear to be the same off-the-record conversation as the recess conversation to which Barclays repeatedly points.[106]  Klein testified to playing a very limited role during the Sale Hearing and instead insisted he remained at the back of the Courtroom.  Klein also testified that he did *not* participate in the large "sidebar" discussion.[107]

---

[104]    Barclays Br. ¶ 166.

[105]    See Ex. 55 Burian Tr. at 314:3-6 ("[Q] In that discussion or huddle, do you remember what the lawyers from Weil said?  [A] Not with specificity.  I remember, it was for the most part, consistent with what I was told right before the hearing.").  Cf. O'Donnell Tr. at 19:6-20:12 ("[Q] Do you recall during that recess any person from Lehman referring to a category of additional assets estimated by Lehman to be worth $1.9 billion?  [A] Again, no recollection of that that [sic] was discussed during that recess. .... [Q] Did Milbank participate in any discussions either before the hearing or during the hearing concerning a category of assets described as being worth $1.9 billion?  [A] To the best of my recollection, no.").

[106]    See Ex. 68 Lewkow Tr. at 118:13-119:6 ("And there was a conversation that took place that .... I believe that one of them may have included … Lehman Brothers business folks or representatives or Lazard representatives. …. The only three people I am sure of were present were Michael Klein, Lori Fife and me.  There may have been somebody else there from Barclays there as well, like Archie Cox.  I just don't remember.").

[107]    See Exhibit 76 (Tr., Deposition of Michael Klein, September 12, 2009) ("Klein Tr.") at 135:13-138:20 (reviewing Deposition Exhibit 381 (attached hereto as Exhibit 144 (email chain between Klein and Ricci dated September 19, 2008)) where Ricci told Klein creditors were "squawking" and Klein told Ricci he would be meeting with creditors "shortly;" "I do know that during the court the Weil team pulled a bunch of folks aside, including creditor folks, to explain the transaction in sort of elongated, elaborate sidebar.  So I assume that that's what my comment back is referring to .… [Q] Did you participate in the elongated sidebar?  [A] No, I was in the … very, very last row … and as a result, I didn't have the ability physically to get to the front.").

Barclays could not recall with certainty the conversations in which Klein participated at the Sale Hearing (or who attended those conversations).[108]

66.     Lastly, the recess to which Barclays refers *occurred prior to* the Lehman Sellers' description of "major" transaction modifications.  Presumably the Lehman Sellers provided the very same details and important information to the Court that they outlined during that recess, a fact Hughes confirmed.[109]

### (g)   OVERSTATED CURE AND COMPENSATION LIABILITIES

67.     The 9-16-08 Balance Sheet listed Cure and Compensation Liabilities at $2.25 billion and $2 billion, respectively.[110]  During the Sale Hearing, the Lehman Sellers advised the Court that Contract Cure would total $1.5 billion.[111]  These amounts were grossly inflated, and the extent to which they were manipulated to make the transaction "balance" was not disclosed to the Court:

---

[108]     See Ex. 63 Hughes Tr. (1) at 11:21-16:3 ("My understanding is that there was at one point in the proceedings an off-the-record description … provided to the assembled mass …. I believe it did include a presentation … of Weil Gotshal's meaningful thoughts about certain aspects of the transaction, and that … the presentation included representatives of Lehman, Weil Gotshal, the creditors committee, the trustee, and possibly others …. [Q] And who gave that presentation?  [A] I believe it was Lori Fife …. I don't think that I have ascertained with any certainty that anybody else made any representations …. There are some recollections that Michael Klein may have also discussed certain aspects of the transaction with similar groupings.  Whether it was part of that same presentation or whether it was different, I haven't been able to establish …. [Q] Did you speak with Mr. Klein about any off-the-record discussion?  [A] I have spoken to Mr. Klein about that, yes …. I think it's fair to say his recollection was not precise, which is why … I mentioned that not all recollections were clear ….").

[109]     See, e.g., Ex. 64 Hughes Tr. (2) at 258:17-259:4 ("[Q] So is Barclays able to say whether anyone said anything in the off-the-record session that was different or additional to what Ms. Fife said on the record about the changes in the transaction? …. [A] [T]he recollections of the people present from Barclays are not detailed, but generally consistent in the sense… that … what was said during the recess was roughly consistent with what was said subsequently on the record.").

[110]     See Ex. 34 (9-16-08 11:18 a.m. balance sheet).

[111]     See Ex. 82 Sale Hearing Tr. at 99:22-25 ("Barclays will also assume exposure for the employees that accept offers of employment, which is estimated to have … an exposure of approximately two billion dollars"); 100:1-4 ("Barclays is also assuming the cure amounts relating to contracts and leases that will be assumed pursuant to the asset purchase agreement. And that has a potential exposure … of 1.5 billion dollars….").

- Prior to the Sale Hearing, Barclays had estimated the Cure and Compensation Liabilities at $1.3 billion combined, not the $4.25 billion outlined in the 9-16-08 Balance Sheet or the $3.5 billion disclosed to the Court;[112]

- The Lehman Sellers' representatives who devised the Contract Cure figure contend they overstated it by no less than ***one billion dollars***, and actual payments may have totaled only ***$238 million***;[113]

- The negotiated Compensation Liability estimate ($2 billion) similarly exceeded the accrual for cash compensation on the Lehman Sellers' books by $1 billion, and actual bonus payments totaled only $1.5 billion, or $500 million less than was disclosed to the Court.[114]

68.    Houlihan testified, however, that it was advised the $2 billion Compensation

Liabilities figure was taken from the Lehman Sellers' balance sheet and was not a negotiated

figure.[115]  Moreover, Barclays has no response to evidence that the Compensation Liabilities

were inflated, instead presenting Alan M. Johnson, a compensation expert, who opines simply

---

[112]    See Committee Rule 60 Motion, Ex. 49 (September 19, 2008 email from Trevelyan to Clackson ("[T]he negative goodwill arises because the 2.25 cure payment and 2.0 comp provision won't be valued at that amount but instead c.1.3...."); Committee Rule 60 Motion, Ex. 19 (Tr., Deposition of Patrick Clackson, September 4, 2009) ("Clackson Tr.") at 98:21-101:19 (explaining that "c.1.3" meant "circa 1.3").  See also Ex. 80 Ricci Tr. at 125:4-20, 145:20-146:9 (noting Barclays "hoped that we could pay less than what we had assumed" and hoped to "under-spend to create some cushion").

[113]    See Ex. 5 Shapiro Tr. at 63:9-66:21; 148:12-151:3; 153:20-155:8 (discussing how Shapiro, whose team helped estimate contract cure payments, used a $1.5 billion estimate and could not explain the $2.25 billion estimate); Ex. 111 Kelly Tr. at 134:5-24 (indicating the $2.25 billion figure was overstated by approximately $1.25 billion), 136:2-10 (recounting that McDade told him "we just left a billion dollars on the table" when advised of the overstatement); Committee Rule 60 Motion, Ex. 50 (July 16, 2009, letter from Barclays counsel covering spreadsheet with "aggregate cure payments") (BCI-EX00077272-286).

[114]    See Ex. 111 Kelly Tr. at 116:19-117:14 (noting compensation estimate exceeded accrual by $1 billion); Ex. 7 Lowitt Tr. at 213:7-25 (noting $2 billion was negotiated figure that was "larger than the sort of accrual for cash bonus"); Committee Rule 60 Motion, Ex. 54 (Spreadsheet of 2008 Bonuses).

[115]    See Ex. 55 Burian Tr. at 280:6-8 ("The severance and the accrued comp came off Lehman's books and records as what they accrued on their balance sheet.  So that was the Lehman number for what the liability."); 283:13-20 ("[T]he balance sheet number, the employee-related obligations, was -- however accountants accrue for that stuff.  So I guess if you are saying that accrual was an estimate, that's fine, but it was a firm number off what the balance sheet said the liabilities were as accrued by Lehman.").

that the Compensation Liabilities which Barclays paid were reasonable.  However, even Johnson

conceded that the $2 billion figure was inflated and that he did not know what it encompassed.[116]

69.    Barclays asserts the Lehman Sellers filed the Contract Cure payments with the

Court at the time of the Sale Hearing, listing the lower amounts, and therefore a party could have

discovered they were significantly less than the $1.5 billion represented to the Court.[117]

Additional Contract Cure payment schedules, however, were filed, under the terms of the APA,

*60 days after closing*, illustrating that the schedules the Lehman Sellers filed originally were

neither definitive nor instructive -- a fact Milbank understood.[118]

70.    Lastly, even if the values ascribed to the Cure and Compensation Liabilities did

constitute estimates, the degree to which they differed from the actual amounts is so extreme

(i.e., $4.25 billion versus $1.7 billion) that they hardly can be said to have been arrived at in

good faith.

---

[116]    See Exhibit 65 (Tr., Deposition of Alan M. Johnson, February 12, 2010) ("Johnson Tr."), at
131:23-25 ("So there was – but I don't recall anyone saying that the accrued '08 financial year
liability was $2 billion"); 132:2-22 ("[Q]  You've seen materials that indicate that the accrued
bonus liability was different from $2 billion?  [A]  The testimony I recall, I recall a number of a
billion, I recall a figure of 700 million.  I think there is an affidavit somewhere here that had that.
But I don't – I've seen no testimony that anything approaching that magnitude was $2 billion");
142:14-143:2.

[117]    It is unclear whether Barclays would also seek to impose that exercise on the Court.

[118]    Cf. Ex. 57 O'Donnell Tr. at 99:12-16 ("[Q] Did Milbank have an understanding that, within 60
days of the closing, there would be a further filing with respect to designated contracts and
proposed cure amounts for those contracts? .... [A] Yes.").  Cf. Barclays Br. ¶ 98 ("[T]he amount
of any future cure payment would depend upon which contracts Barclays chose to assume within
60 days after the closing....").

Anecdotally, it is not unusual for contract cure schedules to take aggressively low estimates that
are then negotiated or litigated with the holders of executory contracts.  Here, the estimates were
inflated by no less than 500% over the actual liability.

C.   **PHASE 3:  CLOSING WEEKEND ( SEPTEMBER 20- 22)**

71.     Following the Sale Hearing and entry of the Sale Order in the early morning hours of Saturday September 20, the parties proceeded to Weil's offices to "close" the Sale Transaction.  The closing occupied no less than an entire floor of conference rooms in Weil's offices.[119]

1.   **AFTER EXCLUDING COMMITTEE'S PROFESSIONALS FROM MEETINGS AND DISCUSSIONS, LEHMAN SELLERS AND BARCLAYS ADVISE THEM OF SALIENT TRANSACTION TERMS HOURS BEFORE CLOSING**

72.     The Committee professionals arrived at the Lehman Sellers' offices on Saturday morning intent on verifying the description of the transaction provided at the Sale Hearing. Cooperation and access, however, was not forthcoming.[120]  The closing consisted of a series of meetings throughout Weil's offices.  While Committee professionals  were invited to Weil's offices for the closing -- the Lehman Sellers and Barclays either denied them access to ongoing negotiations and meetings (e.g., meetings to negotiate the Clarification Letter) or, upon their arrival in meetings and discussions, excluded them from discussions:

> [Q] [W]as Houlihan invited to stay through the closing, in order to review and finalize the schedules?
> [A] Definitely not to review and finalize schedules.... We were specifically disinvited from many of the important meetings.  We asked to sit during the negotiation by Tom

---

[119]   See Exhibit 71 (Tr., Deposition of Harvey Miller, January 7, 2010) ("Miller Tr.") at 22:10-25 ("[T]he arrangements were made to start the closing the following morning …. This entire floor was devoted to the Lehman closing, and that closing went from starting whatever time they started on Saturday …. and basically it was to close and consummate before the opening of the market Monday morning"); 100:19-23 ("[Q] [W]as the closing a single meeting or was it a series of meetings that were taking place simultaneously?  [A] A series of meetings.  This entire floor was consumed with meetings.").

[120]   See Ex. 55 Burian Tr. at 123:23-124:11 ("[Q] You did do some verification work before the closing; is that right? …. [A] We attempted to do some verification work [before the closing] …. **[Q] Time was limited, correct?  [A] Time and cooperation.  [Q] Whose cooperation was limited?  [A] Barclays and Lehman.**") (emphasis added).  See Exhibit 145 (email from Committee counsel to Lehman Sellers' counsel dated Saturday, September 20, 2008, at 11:15 a.m.) (asking to "make sure that your corporate team involves my corporate partners … in all discussions and meetings with respect to the documentation and closing of the Barclays transaction?") (MTHM0005763).

Roberts of the clarification letter, where the estate was going through the issues, and we were told you are not permitted to …. We spent so much time begging to be paid attention to, that to them, if we wanted to sit there, we were welcome, but we were not included in discussions …. If you are asking me was I invited, I would say no …. I think that we were welcome to remain on the floor, to walk around the 25th conference center … and to see people exchanging schedules or signing documents, and I was clear that I felt welcome to stay, but was I invited to actively participate in the negotiation or determination or compilation of these documents?  Absolutely not.[121]

73.     One of the items the Committee professionals demanded was "a complete list of what assets were being transferred, what liabilities were being assumed and what the marked values were, the book values were, and as of what dates those marks related to."[122]  Finally, at mid-day on Sunday, September 21, Committee professionals received a list of assets totaling $49,902,924,897.20 (the "September 21 Schedules").[123]  Houlihan was advised initially that the September 21 Schedules were "likely [an] incomplete list with old [Lehman] marks regarding a variety of assets that were going to be retained or transferred to Barclays as part of the transaction."[124]

---

[121]     See Ex. 55 Burian Tr. at 143:13-144:23; 145:20-46:4.

Barclays submits Committee representatives were "intimately involved" in the negotiations based on statements made by Committee counsel during the December Settlement Hearing.  As set forth below, however, that statement is taken out of context -- the point being made to the Court was that the Committee was a party to the Sale Order with sufficient standing to challenge the December Settlement to the extent it impacted the Committee's ongoing investigation into the Sale Transaction.  See infra Part II.E.1 ("December 2008 And January 2009 Settlements").

[122]     See Ex. 55 Burian Tr. at 124:12-125:16 ("I'm talking about the marks relevant to the transfer of those assets.  Our understanding was that Barclays was not marking the Lehman assets and that the book value references in the contract were the Lehman marks.  So when … Ms. Fife stood up in court and says a number, that was the Lehman marks against which these transfers were being measured …. [W]e made specific requests of anyone and everyone who would listen to us. … saying could we please have some understanding, a list of what assets are moving, to whom they are moving and how they are marked").

[123]     See Exhibit 115 (email from Milbank to Houlihan attaching zipped spreadsheet, dated September 21, 2008, 11:34 a.m.) (Deposition Exhibit 461B) (HLHZ0011913) ("September 21 Schedules") at 2.

[124]     Ex. 55 Burian Tr. at 130:18-22.  See id. at 133:10-14 ("[O]ur understanding was that this was the roll-up of the four different classes of assets based on Lehman's marks as of an indeterminate date or time.").

74.     Still, the September 21 Schedules begged a series of questions concerning the assets to be transferred.  Thus, the Committee professionals insisted on a meeting with the Lehman Sellers and/or Barclays for an explanation.  The Lehman Sellers and Barclays finally acceded to those requests late in the evening on Sunday, September 21, and in the early-morning hours of Monday, September 22 (shortly before the closing ended) -- through approximately three meetings, two with Seery and the third with Klein and counsel to the Lehman Sellers.[125]

75.     Seery advised Houlihan against relying on the marks in the September 21 Schedules because the marks, while the Lehman Sellers' marks, were outdated, i.e., from the Monday September 15, or Tuesday, September 16, period.[126]   The short, ten-minute Klein conversation followed, which Houlihan still believes "is the single most important conversation" of the entire Sale Transaction:[127]

> So pressure is building throughout the night and it is now morning.  We are hearing things about the clarification letter, things changing.  My guys are telling me that there is this list of assets that doesn't match what we have been told was going to be the deal and the court, we are getting anxious and upset and finally I turned to [Mr. Miller] and said, we are tired and we are being ignored and we are not doing anything or something to that effect, we need to know what is going on, what is the deal, do we have a problem, is there a problem. …. [W]e can't delay anymore. We need to know.  He … basically grabbed Michael [Klein] …. [H]e came into the room and  … [i]t was like now is your opportunity to get information.  So  … I sat down and he came in and I think [Mr. Miller]

---

[125]     See id. at 131:20-132:12; Exhibit 56 (Tr., Deposition of Michael Fazio, February 12, 2010) ("Fazio Tr.") at 33:8-22.

[126]     See Ex. 55 Burian Tr. at 131:14-131:20 ("At some point on Sunday, through Milbank, we were given this [September 21 Schedules] and said we are trying to reconcile it, but this is what we currently have, but don't rely on the marks because they are old …. There were two conversations with Jim Seery and his team"); 137:14-138:11 ("[W]e believed at the time that these came off the Lehman system …. [W]e were specifically told that these were not the market values of these assets as of that time …. The last conversation on which we relied on was a conversation with Michael Klein, Harvey Miller, I believe Tom Roberts was there, Mike Fazio"); 140:20-143:8 (referring to Seery and Klein conversations); Ex. 56 Fazio Tr. at 19:10-17 ("[Q] And were you ever told who assigned those market values to the collateral?  [A] I was told that it came off the Lehman system earlier in the week.  [Q] Were you given a date earlier in the week?  [A] I was given Monday, Tuesday time periods").

[127]     See Ex. 55 Burian Tr. at 142:21-143:8.

may have said a preamble or something like, hey, you tell us what the deal is. …. [A]nd then Mike [Klein] launched into what purported to be the final negotiated deals, now 1:30 to 2:30 in the morning, and he [said] ... there has been a lot of confusion and he said this is what happened and this is what's going on, and this is why you should be comfortable. And he -- all the markings on that page are his markings.[128]

76.    To make sure he was perfectly clear, Klein outlined the transaction modifications on a yellow manila folder to Burian, Fazio, Mr. Miller and others (the "Manila Folder").[129] Klein made the following representations after Houlihan expressed concern that it appeared Barclays was assuming $45.5 billion in liabilities against $49.9 billion in assets.

77.    *First*, the value of the assets on the September 21 Schedules being transferred had dropped from earlier that week -- the specific date, Klein could not recollect -- from $49.9 billion to between $44 and $45 billion (hence the "pre-mark 49.9" and "44+45 post-mark" on the Manila Folder):

> [H]e was saying to me you're right, you showed me an exhibit earlier [the September 21 Schedules], you're right that your concern was that roughly 50 billion of securities, which matches up to [the September 21 Schedules] …. [the] 49.9 that you have been looking at is premark.  That's stuff that relates to not today's value, that's premark.  We asked at one point premarked as of when and he says, listen, it doesn't matter …. 49.9 is the old value of what it was we are getting.  And then he said, post-mark, which means, which was we have lost 4 to 5 billion dollars over the last period of time …. We said what time period did it happen.  Saturday. … [I]t was like, listen, you want an explanation of the deal, here is the deal.  50 billion of assets, they have dropped in value, and they are now – we agree with Lehman that these assets are worth 44 to 45, and therefore, you know, were short.[130]

---

[128]    Id. at 246:14-248:8.

[129]    See ¶ 81 infra (single page of handwritten notations) (Deposition Exhibit 338B).

[130]    See Ex. 55 Burian Tr. at 253:20-255:7.  Audaciously, Barclays maintains the Committee was aware of the negotiated discount because it had documents in its possession showing Barclays received assets valued at $49.9 billion.  See Barclays Br. ¶¶ 48, 485, 499, 592.  Barclays and the Lehman Sellers, however, told the Committee professionals to ignore the $49.9 billion value because the value of the securities had fallen.  Barclays then dedicates much of its brief to disclaiming the validity of the $49.9 number (which was supposed to afford the Committee notice) and instead asserting it received assets valued at $45.5 billion.

78.     **Second,** the liabilities (Cure and Compensation ($4.25 billion) and Barclays Repurchase Agreement ($45.5 billion)) **remained unchanged**.[131]

79.     **Third,** because the value of the Barclays Repo Collateral had declined, in order to keep the transaction balanced, additional securities (the Clearance Box Assets) would be transferred to Barclays.  Stated differently, Barclays would receive **an additional** $1.9 billion in the Clearance Box Assets to realize the $47 billion disclosed to the Court.[132]

80.     **Fourth,** because Barclays was assuming liabilities totaling $49.75 billion, against assets of $47 billion, the values of the securities against the liabilities assumed tipped decidedly **in favor of the estates**, and **creditors had actually made an additional $2 billion**:

> I think the most important part of the whole conversation was the right side of the balance sheet [on the Manila Folder], not the left, and that is **Michael Klein said, hey, we are owed 45 and a half billion dollars, as you know, Saul, the extra liabilities we are assuming on the cures and employee severance is 4 and a quarter.  Even after taking the 1.9 billion of additional securities … you made 2 billion dollars this weekend.  If anything, you should be happy.**[133]

81.     The conversation ended with Houlihan stating the obvious:  that it could not diligence their representations concerning the alleged decline in the value to the securities that night (or even in the immediate future), that it had no choice but to rely on their representations, and that it wanted a reconciliation verifying those representations:

---

[131]   See Ex. 55 Burian Tr. at 279:13-280:8 ("[Q] Did you understand that both on the asset side and the liability side, the figures Mr. Klein and others discussed with you were estimates?  [A] …. The 4.25 was always consistent …. The severance and the accrued comp came off Lehman's books and records as what they accrued on their balance sheet.  So that was the Lehman number for what was the liability.").

[132]   See Ex. 55 Burian Tr. at 264:2-10 ("The add box, that was basically Michael Klein telling me in order to match up with the right side of the page [on the Manila Folder], Barclays needed to be paid additional securities to balance the transaction.  And therefore, we had to give him that -- they had to find securities that were not originally part of the Fed loan in order to make up for the liabilities being assumed and the deterioration in value."); 255:7-10 ("**We are adding 1.9 billion of assets that are unencumbered that were not part of the repo to get to a total of what Barclays is getting of 47.**") (emphasis added).

[133]   Id. at 266:5-16 (emphasis added).

I took comfort in the fact that the number footed because it showed that this -- what Michael Klein said to me was consistent with what I was told by my guys, which is … there is a list of securities [September 21 Schedules] that purport to be part of the transfer.  It is close to 50 billion dollars. …. [T]he Barclays loan is 45.5, and here I had a, not only a plausible but consistent explanation of the mismatch, that there was some significant deterioration in value in the interim.  Mike [Fazio] wanted to ask about that and that was cut off …. I turned to [Mr. Miller] and said … are you comfortable with this, is this what's going on, and he said, yeah …. [T]hen the conversation clearly ended with us saying, gentlemen … *if this is what's going on, this is an explanation, … I understand it[;] you know … I can't diligence this[;] I have to trust you and what you're telling me is going on*…. *[I]t sounds like … the values have dropped in value. … [W]e don't understand why those values would have dropped, but if that's where Lehman and you guys are and the values dropped, we will get a reconciliation and it is what it is*.[134]

82.     According to Burian, Lehman Sellers' counsel indicated he was comfortable with Klein's description of the transaction.[135] Following the conversation, the Lehman' Sellers' counsel advised there was nothing for the Committee to do in connection with the closing, reiterating a prior comment that the Committee's consent was not required for the Clarification Letter or other modifications to the Sale Transaction from what was represented to the Court.[136] Burian took the Manila Folder from the meeting, as it was the only evidence he had of the explanation Barclays and the Lehman Sellers had provided.  The Manila Folder appears below (not actual size):[137]

---

[134]    <u>Ex. 55</u> Burian Tr. at 262:13-263:17 (emphasis added).

[135]    <u>See</u> <u>Ex. 55</u> Burian Tr. at 262:25-263:17 (during Klein conversation, "I turned to [Mr. Miller] and said … are you comfortable with this, is this what's going on, and he said, yeah …. [T]he conversation clearly ended with us saying, … if this is what's going on, this is an explanation, .... I can't diligence this, I have to trust you and what you're telling me is going on …. [W]e don't understand why those values would have dropped, but if that's where Lehman and you guys are and the values dropped, we will get a reconciliation and it is what it is."); Burian Decl. ¶ 6; <u>see also</u> Examiner's Report at pp. 2205-06 ("Burian advised the Examiner that, following a conference call with the Creditors Committee late on Sunday night, the Creditors Committee advisors left Lehman.  Burian stated that as they left, he and Despins approached Miller, and Burian advised Miller that the Creditors Committee was not signing off on the deal, even though everything Burian had heard 'sounded okay'.") (footnote omitted).

[136]    <u>See</u> Burian Decl. ¶ 7; <u>Ex. 55</u> Burian Tr. at 79:14-82:12.  <u>See also</u> Part II.C.3 ("Discussions Concerning Alleged Committee Consent to Material Modifications").

[137]    The markings on the Manila Folder relating to RESIs were written by Burian.  All other markings were written by Klein.  <u>See</u> <u>Ex. 55</u> Burian Tr. at 247:18-248:8.



## 2.    DISCUSSIONS CONCERNING ALLEGED COMMITTEE CONSENT TO MATERIAL TRANSACTION MODIFICATIONS

83.    The Barclays Brief contends that the Committee consented to modifications

between the Sale Transaction represented to the Court and the transaction ultimately

consummated, and therefore is estopped from challenging these material differences.[138]  As

argued below, the issue of Committee consent is irrelevant because, among other things, the

---

[138]    See Barclays Br. ¶¶ 180, 181, 183, 200, 231, 232, 241, 254, 626-628.

consummated transaction differed materially from the transaction represented to the Court.  To

that end, modifications required Court approval, and Committee consent (if any) does not excuse

Barclays from seeking further Court approval.[139]  In any event, Barclays distorts statements the

Committee professionals made in the final hours of the closing.

84.    ***First***, when the Committee professionals advised the Lehman Sellers' counsel

that the Committee would not be in a position, given the hour and inability to complete its due

diligence, to provide consent, their response was that Committee consent was not necessary

because the Clarification Letter did not modify the Sale Transaction:

> We were specifically told that our consent was not necessary and therefore, that this
> clarification letter was not a change. …. [T]he most important conversation was probably
> with me and [Mr. Miller] where we made it very clear as it got later and later Sunday that
> we were going to be unable to get a quorum of the committee, and there was a limit to
> how late we could have calls, and therefore, we were reaching the time where if
> committee consent were needed, it just would not be available.  And then later on, before
> I left for the evening, we confirmed again, saying is there any need for us to be here, do
> you need us to sign off on anything, and we were told that the transaction was moving
> forward and the committee was not necessary.[140]

85.    ***Second***, to the extent (if any) that Houlihan stated after the Klein conversation

and before leaving the closing that it did not oppose the transaction as explained by Barclays and

the Lehman Sellers (i.e., "if it's okay with you, it's okay with us"),[141] during or immediately

after the Klein meeting, Burian made clear that the Committee (a) was relying on the Lehman

Sellers' and Barclays' representations concerning market value deterioration and the other

---

[139]    See Part III.G ("Committee Consent Is Irrelevant And Was Never Provided In Any Event").

[140]    Ex. 55 Burian Tr. at 79:14-81:17.  See id. at 328:18-331:17 ("[T]he foundation of the
conversation with [Mr. Miller] about do you need … this committee to consent to anything was
premised on or following the explanation we both received [from Klein] as to what the
transaction was …. [Q] What … did he say specifically concerning whether in his view it was
necessary to have committee consent in order to close the transaction? …. [A] I don't need you.  I
don't care if you stay or go.").  See also Burian Decl. ¶ 7.

[141]    See Ex. 71 Miller Tr. at 29:21-25 ("[A]t some point between 3 and 5 A.M., they basically said
that they were leaving and said, 'Everything's fine, and going forward, if it's okay with you, it's
okay with us'."); 101:20-102:5 (same).

particulars of the sale -- which Houlihan had no ability to diligence or confirm, and (b) would require a reconciliation verifying and confirming Barclays' and the Lehman Sellers' representations.

86.    **Third,** at the conclusion of the Klein meeting, the Committee professionals left the Lehman Sellers' offices for the specific purpose of avoiding confusion over whether their continued presence might be construed as consent.[142]

87.    **Lastly**, in his declaration, Burian makes clear that the Committee never consented to the changes in the Sale Transaction from what was told to the Court at the sale hearing.[143]

### 3.    VALUATION OF SECURITIES TRANSFERRED

88.    In the final hours of the closing, Seery and Klein advised Houlihan that the Barclays Repo Collateral declined from the Lehman marks earlier that week ($49.9 billion) to between $44 and $45 billion -- justifying transfer of the Clearance Box Assets ($1.9 billion). The value of the Barclays Repo Collateral, however, was significantly higher.

89.    **First**, Seery explained that the Lehman Sellers' mark-to-market valuations on their books as of September 19, prepared using models in which he had confidence, valued the assets being transferred to Barclays at nearly $50 billion (and the Fed Portfolio at $50.64 billion). It was only when the they assumed a quick **liquidation** that the Lehman Sellers arrived at the range of $44.6 billion to $45.5 billion. Stated differently, these figures did not change because of

---

[142]    See Examiner's Report at 2206 ("According to Despins, in the early morning hours of Monday, the Creditors Committee legal and financial advisors departed Lehman's offices following a conference call with the Creditors Committee. Despins advised the Examiner that, as the Creditors Committee advisors left Lehman, they made it very clear to Miller and Roberts that the Creditors Committee was not consenting to the transaction. Despins explained that the advisors deliberately left the closing to prevent their presence from being interpreted as consent." (internal citations omitted)).

[143]    See Burian Decl. ¶ 8 ("At no time during the weekend closing, did I advise Mr. Miller that the Committee consented to changes to the Sale Transaction from what was told to the Court at the Sale Hearing"). See also Examiner's Report at 2206 ("Despins also advised the Examiner that the Creditors' Committee never consented to the transaction that closed on Monday").

any market deterioration -- as represented to the Court and to the Committee.  Contrary to Barclays' position that they were negotiated to arrive at so-called true market value, they instead were negotiated downward from market value to liquidation value.[144]

90.    **Second,** the documents reveal a valuation for the Barclays Repo Collateral at between $49.9 billion (the September 21 Schedules) and $52.19 billion (marked by Barclays' collateral agent, BoNY, and given to Barclays CFO Gerard LaRocca by Marty Malloy).[145] Malloy concedes the valuations in that email are based on the BoNY valuations, but attempts to disclaim their accuracy by maintaining (without substantiation) that BoNY did not have sufficient time to value the collateral.  Yet Malloy admits that statement was not based on a single conversation with anyone at BoNY and instead rested on his own speculation.[146] Moreover, despite Malloy's testimony, Barclays had concluded that "We should book all positions from the Lehman Financing Facility to BCI (~45bn securities ...)[.]  **We should book based on the price within the BoNY file, at least for Day 1**"[147]

---

[144]    See Part II.A.7 ("Lehman Sellers Prepare Liquidation Valuation At Barclays' Request (September 19)"); II.B.2.c ("Value Represented To Court ($47.4 Billion) Was Not Mark-To-Market Value On Lehman Sellers' Books But Instead Appears To Be Sum Of Liquidation Value And Clearance Box Assets").

[145]    Committee Rule 60 Motion, Ex. 36 (September 19, 2008, email from Marty Malloy to Gerard LaRocca) (Deposition Exhibit 144A); Committee Rule 60 Motion, Ex. 37 (September 19, 2008, email from Patrick Clackson to Rich Ricci forwarding attachment titled "Haircut Summary") (Deposition Exhibit 133) (showing haircut of $7.17 billion).  See also Committee Rule 60 Motion, Ex. 38 (September 21, 2008, email from Rich Ricci to Michael Klein) (Deposition Exhibit 382) ("Pretty convinced resis not in 52 after talking to a few people.  Will confirm, but more confident.  Where the resis went more troubling.  Worried about stepping blind into dtcc."); Committee Rule 60 Motion, Ex. 25 (executed Clarification Letter) (Deposition Exhibit 25) at ¶ 13 (identifying BoNY as Collateral Agent).

[146]    See Exhibit 69 (Tr., Deposition of Marty Malloy, March 1, 2010) ("Malloy Tr.") at 21:20-22:2, 39:7-46:12.

[147]    Exhibit 116 (September 21, 2008, email from Stephen Sell) (Deposition Exhibit 587B) (emphasis added).  See also Ex. 64 Hughes Tr. (2) at 276:16-277:14 (noting BoNY was collateral agent); Ex. 78 "Petrie Tr." at 153:25-154:15 (noting that BoNY as custodian "prices our securities" and that Barclays uses BoNY valuations when lending securities).  See also Exhibit 117 (Korycki notes from September 29 meeting) (Deposition Exhibit 563B) (referring to "Friday transfer BoNY records agreed").

91.   **Third**, Barclays never took the position the securities were worth less than $49 billion.  For example, on October 4, 2008, Barclays wrote to the Fed, indicating its position that it should receive $49 billion in collateral to secure the $45.5 billion loan, not the $47.4 billion disclosed to the Court.[148]  It also did not deny the $49.7 billion figure identified in the Leventhal Declaration submitted in connection with the December Settlement during the hearing to consider approval of that settlement.[149]

92.   **Fourth**, Movants' experts discredit Barclays' expert opinions by explaining they are based on flawed valuation methodologies.  Based on an independent valuation, the Lehman Sellers transferred approximately $51 billion in cash and securities (as of September 19) to Barclays as the Barclays Repo Collateral, which was well in excess of the value disclosed to the Court.[150]

### D.   PHASE 4:  VERIFICATION OF LEHMAN SELLERS AND BARCLAYS' REPRESENTATIONS (SEPTEMBER 2008 THROUGH DECEMBER 2008)

93.   Immediately after the closing, the Committee professionals requested verification of the information provided by the Lehman Sellers and Barclays by, among other things, seeking a detailed reconciliation showing the value of the assets transferred, the marks on those assets, and the dates and methods of those marks.  Burian described the Committee's efforts:

> The main thing we did was to request reconciliation from the company as to what exactly occurred in order to be able to verify that the representations were true and that what happened was consistent with the court order.  At that point in time, … we did not expect there to be any problems.  We thought that what we were concerned about, there must be logical answers for and there was not great concern or urgency and we also knew that as an official committee and a more normal environment, we would have the opportunity,

---

[148]   Exhibit 143 (October 4, 2008, emails from Jonathan Hughes to Thomas Baxter) (Deposition Exhibit 586B) ("[T]he deal at the time between ourselves, the Fed and Lehman was 45 odd cash for 49odd [sic]value of securities.").

[149]   See Part II.E.5.1 ("December and January Barclays' Settlements").

[150]   Expert Report of Mark E. Zmijewski at 6 (the "Zmijewski Report").  See also id. at 5 (indicating Pfleiderer Report undervalues assets transferred to Barclays ($45.5 billion) by $5.1 billion). These values ascribe to Barclays the full $7 billion in cash notwithstanding its later agreement to compromise its claim to approximately $5 billion in the December Settlement.

the debtor would be responsive now that the crisis was over.  So for the most part, in the October and November time frame, it was mainly asking for reconciliations of and getting … a better understanding of what exactly Barclays got …. [W]e merely wanted to get a complete and final list …. [151]

94.    Houlihan's Mike Fazio explained similarly that during the two-week period after

the closing, Houlihan "attempt[ed] to get a detailed listing of the securities [that had been]

transferred associated with the transaction, as well as the market values as of the closing date."[152]

95.    At the time, Houlihan had no reason to disbelieve Barclays and the Lehman

Sellers' representations concerning the final-hour modifications or to proceed with the same

urgency with which the Sale Transaction proceeded.  It simply wanted a reconciliation that

squared with what it was told:

> [A]t that time, I found it hard to believe that someone would misrepresent to the [C]ourt or that people would not tell counsel what the full transaction was and, therefore, that the [J]udge would not be apprised of something as important as 5 billion dollars.  And therefore, even then, my assumption of the assignment was that we, at the direction of the [C]ommittee, merely had a bookkeeping reconciliation and we would write a report that would just balance the books and we would be done.  There was confusion, but … there wouldn't be any real serious problem here. …. Our assignment was not … repeat to me that you repeated numbers from Lehman.  Our assignment was to go beyond what Weil was told and balance the book.  At that point in time, there was absolutely no great urgency.  The expectation was this was going to be fine and we would get the numbers and we would move on.  It wasn't like we need to go track an asset that was a melting ice cube, that value was being lost.  What was done was done and we expected an explanation, and if the explanation didn't comport to what was supposed to happen, we felt confident we would be able to get the assets back.[153]

96.    During this period, Committee Counsel also pursued similar information from

counsel to both the Lehman Sellers and Barclays.[154]

---

[151]    Ex. 55 Burian Tr. at 154:2-155:23.

[152]    Ex. 56 Fazio Tr. at 38:11-15.

[153]    Ex. 55 Burian Tr. at 182:2-187:3.

[154]    See Ex. 57 O'Donnell Tr. at 143:22-154:14 (recounting communications among Milbank and Weil regarding Committee concerns about value of securities transferred); 154:16-156:6 (recounting discussions between Milbank and Cleary Gottlieb regarding the same).

### 1. REQUESTS FOR SCHEDULES; FILED VERSIONS CONTAIN OUTDATED MARKS; RESERVATIONS OF RIGHTS ON FINALITY

97.    Immediately after the closing, Committee counsel tried to obtain copies of the Schedules attached to the Clarification Letter, i.e., Schedule A (supposedly the Barclays Repo Collateral) and Schedule B (supposedly the Clearance Box Assets) (collectively, the "Schedules") because they had not been shared with the Committee, whose requests for the Schedules had gone unanswered.[155]  Committee counsel was advised the Schedules were being finalized and would be provided.[156]  But as of September 25, the Schedules had **not** been finalized because the Lehman Sellers and Barclays still were reconciling them and negotiating their final form.[157]

---

[155]    Exhibit 91 (email from Committee counsel to Lehman Sellers' counsel, September 25, 2008, 10:09 a.m.) (MTHM0005739) (noting Committee counsel "has made several requests for the asset schedules … and has received NO response."). See also Ex. 55 Burian Tr. at 146:5-12 ("[W]e did not get [Schedules] until after the closing."); Exhibit 90 (September 23, 2008, email from Committee counsel to Lehman Sellers' counsel:  "We have not yet been provided with the Schedule A and Schedule B….") (MTHM0005970).

[156]    Ex. 91 (email from Lehman Sellers' counsel to Committee counsel, September 25, 2008, 10:28 a.m.) (MTHM0005739) ("Luc, I am sure that the schedules will be furnished asap.  I don't believe it is helpful to suggest that the schedules may have been manipulated post closing.  You were invited to stay Monday AM as the schedules were reviewed and finalized").

[157]    See, e.g., Exhibit 123 (September 22-25, 2008, email exchanges between Barclays' and Lehman Sellers' counsel) (CGSH00062751-56) at CGSH00062753 ("The original schedule on the closing table was prepared by LBI, but was replaced by a schedule prepared by BarCap as the one prepared by LBI did not perfectly track what BarCap had received in the Fed transaction, which was the purpose of Schedule A.  Schedule B was prepared by LBI as to what its records indicated as of Sunday, September 21st as to what was in the unencumbered 'box' and should have matched what BarCap received Monday morning, ***although there may have been deviations between the time the information was prepared and the trade.***") (emphasis added); Exhibit 124 (September 25-26 email exchanges between Cleary and Weil) (CGSH00066049-52) at CGSH00066051 ("Can you send us the agreed [S]chedule B?" asked September 26, 1:07 p.m.); CGSH00066049 (told September 26, 2008, 1:34 p.m. that "[t]here will be a third part of Schedule B that is still being reconciled and that Lehman expects to move on Monday. …. ***Our guys are still running their reconciliation to confirm that there are no errors in the Barclays list.***") (emphasis added); Exhibit 128 (September 28, 2008, 9:03 p.m., email from Duane McLaughlin) (Deposition Exhibit 261) ("Attached please find two files which include what Barclays believes should be included on Schedules A and B.  ***These reflect conversation[s] with Paolo over the weekend, and we believe are agreed between Barclays and Lehman.  Please note that Barclays is not indicating that the listed securities have been delivered …. In addition, Barclays notes that there may be additional securities in the LBI clearance boxes that Barclays would also be entitled to receive under the APA.***") (emphasis added).

98.    Barclays submits the Schedules, once they were delivered, revealed to the Committee, as of September 25, that the value of the assets being transferred to Barclays totaled at least $49.9 billion.[158]  Barclays' argument fails.

99.    **First,** while the Committee professionals received a copy of the Schedules on September 25, that version contained the same chart distributed to Houlihan Sunday morning on the September 21 Schedules -- listing assets of $49.9 billion.  This is the very same chart Seery and Klein disclaimed over the closing weekend as containing outdated Lehman marks.[159]  Accordingly, the values on the September 25 drafts were inconsistent with the Klein and Seery conversations the weekend before.

100.    **Second**, Barclays expressly disclaimed the values in the September 25 schedules.  When the Lehman Sellers and Barclays submitted a joint motion to file the Schedules "under seal," Barclays' counsel insisted that any copy of the Schedules distributed to any party contain cover letters clarifying specifically that the Schedules **were not final**:  "These covers need to be attached any time the Schedules are sent out…."  The covers disclaimed that "[t]he listing of any security on this Schedule A does not indicate that such security has been delivered to Purchaser or the value of such security. …. [T]he par amounts set forth … are provided for informational purposes only and are not indicative of the value of the securities."[160]  Schedule B, which

---

[158]    See Barclays Br. ¶¶ 239-40.

[159]    Compare Ex. 115 (September 21, 2008, email attaching September 21 Schedules) at 2 (listing total at 49,902,924,897.20), with Exhibit 125 (September 25, 2008 email with Schedules A and B to Clarification Letter) (WGM-Lehman-E 00015992-94) (listing value of securities on Schedule A at $49,902,824,897.20).  See also Ex. 55 Burian Tr. at 150:18-22 (stating as of September 25, Houlihan understood the schedules to constitute "a list of indeterminate date with indeterminate marks as of an unknown date of assets that comprise – that was not the final list of what went over to Barclays.").

[160]    Exhibit 126 (email from Weil to Cleary dated September 29, 2008, 5:07 p.m., regarding Joint Motion to File Schedules Under Seal and attaching draft documents regarding same) (CGSH00032004-26) at CGSH00032025.  See, e.g., Joint Motion Of Debtors And Barclays Capital Inc. For Entry Of An Order Authorizing To File Under Seal Certain Schedules To The Asset Purchase Agreement, dated September 29, 2008.

purported to contain the Clearance Box Assets, contained an additional disclaimer: "Schedule B lists securities believed to be held in LBI's 'clearance boxes' as of the time of the Closing … and is without prejudice to the right of the Purchaser to receive other securities held in such clearance boxes but not listed on Schedule B or to return securities.…"[161]  On October 15, 2008, the Lehman Sellers and Barclays filed summary pages containing **par amounts** of the securities supposedly appearing on the Schedules.  Again, those pages specifically disclaimed that the filed Schedules were final.[162]

### 2.    RECONCILIATION REQUESTS

101.    On October 13, 2008, Committee counsel asked LBHI's counsel for "a low key preliminary meeting/call during which we would explain our concern about the schedules."[163] The "concern" related to the inability to reconcile the schedules with the $47.4 billion figure announced in Court:  "Houlihan has reviewed them and can not even come close to the amount which was announced in [C]ourt …. There may very well be a logical explanation for all of this, which is why the first meeting is just to explore the issues."[164]  The need for such a meeting was questioned, given that the transaction had been consummated.[165]  Ultimately, however, an initial meeting among counsel to explore these issues took place on November 21, 2008.

---

[161]    Ex. 126 at CGSH00032026.

[162]    See Docket No. 1042.

[163]    Exhibit 127 (October 13-15, 2008, email exchange between Committee counsel and LBHI counsel) (Deposition Exhibit 504) (MTHM0012869-71) at MTHM0012870 (October 13, 2008, 11:50 p.m., email from Milbank to Weil).

[164]    Id. at MTHM0012869 (October 13, 2008, 3:47 p.m., email from Committee counsel to LBHI counsel).

[165]    See Ex. 127 at MTHM0012869 (October 13, 2008, 11:50 p.m., email from Committee counsel to LBHI counsel) ("I really am at a loss to figure out why you and the other committee professionals are spending so much time on the Barclays sale.  What could you or anyone for that matter do even if it turned out that the assets turned out to be greater?  As you know, the sale has been consummated which effectively moots out any relief you might be seeking.  I would really appreciate it if you would enlighten me as to the potential actions vis a vis Barclays other than in connection with the TSA.  In any event, I will try to set up a call…."); Ex. 55 Burian Tr. at 178:13-21 ("I don't remember specifically when we got responses …. I know there was a

---

### 3. OCTOBER AND NOVEMBER 2008 MEETINGS AMONG COMMITTEE REPRESENTATIVES AND LBHI ESTATE REPRESENTATIVES

102.    A week after the Sale Transaction closed, Paolo Tonucci and Alex Kirk (both of whom went to work for Barclays after the Sale Transaction) met with the Lehman Sellers' advisors (Weil and Alvarez & Marsal ("A&M")) to discuss the Sale Transaction.  During a rushed September 29, 2008, meeting, they appeared to continue the same story line Klein had initiated in his discussion with Houlihan, i.e., that the value of the securities collateralizing the repurchase agreement had declined abruptly during the week of the Sale Transaction by $5 billion off the Lehman Sellers' marks -- so that the value of the Schedule A (Barclays Repo Collateral) totaled $44 billion (***using the BoNY marks***) and the value of collateral, after subtracting the JPMorgan Chase Bank N.A. "cash" of $7 billion (discussed below), totaled $38 billion.[166]  James Fogarty, who attended the meeting from A&M, stated the meeting did not provide a clear understanding of the transaction.[167]  Around this time, Fazio met with A&M, impressing on them the need to resolve these issues.[168]

---

[response to the effect of] … why do you care, the transaction is closed, the appeal period is over …. But generally speaking …. I don 't remember receiving any reconciliation or any … global answer to the questions we were asking."); Ex. 57 O'Donnell Tr. at 153:10-154:14 (noting that Lehman Sellers' counsel was not "initially receptive to our concerns, and what ensued was a process to convince Weil that these concerns appear to have some basis and that they need to be investigated further[;]" noting further reaction was that "it was [not] a productive use of the Committee or the Debtors' time to investigate these issues further.")

[166]   See Exhibit 66 (Tr., Deposition of Mary Alice Korycki, dated February 4, 2010) ("Korycki Tr.") at 43:5-9 (explaining purpose of September 29 meeting was "to get an understanding of the Barclays transaction from Alex and Paolo."); Ex. 117 (Korycki 9/29 meeting notes) (referring to (a) "Barclays financing collateral - $44 billion," "sent sec $44 billion," "Friday transfers BoNY records agreed," and "Leadsheet BoNY collateral 44" (AM004887), (b) "Collateral JPM $45 B … Barclays $38 B Collateral $7 B Cash" (AM004889); and (c) "Pd $38 cash to buy $42.9 asset Lehman Value Differentiation $5.1 … $38 valued assets") (AM004890) and (d) "1st Repo w/Fe[d] Monday, 9/15 $48-49" (AM004890)).  See also Ex. 66 Korycki Tr. at 45:13-18, 53:15-18, 55:3-56:2., 86:19-24, 88:14-25, 100:18-25 (examining notes).

[167]   See Exhibit 62 (Tr., Deposition of James Fogarty, January 15, 2010) ("Fogarty Tr.") at 57:7-58:9.

[168]   Ex. 56 Fazio Tr. at 35:6-13; 40:20-41:2; 37:21-39:5 (noting discussions with A&M during week of September 22 or September 29 to raise concerns of "not having a detailed list of the securities or the market values associated with that transaction"); Exhibit 67 (Tr., Deposition of Phil Kruse, December 17, 2009) ("Kruse Tr.") at 157:23-159:16 ("My recollection during the first quarter of

103.    On October 1, 2008, Houlihan met with A&M to discuss the Sale Transaction,

including the value of the assets transferred and liabilities assumed, the alleged decline in value

of the Schedule A securities by $5 billion and the estimated cure amounts of $2.25 billion (where

Houlihan asked for backup).[169]

104.    On October 8, 2008, the Committee and its advisors met with LBHI and its

advisors (including A&M) as part of their routine, monthly meetings to discuss a wide array of

issues affecting the estates.  In connection with the meeting, A&M prepared a 92-page

presentation (the "October 8 Presentation") which provided discussion materials relating to an

ambitious agenda of no less than 9 different aspects of the chapter 11 cases.[170]  The "Significant

Transactions" topic entailed discussions of four significant asset dispositions (e.g., Neuberger

Berman), including the Sale Transaction.  One slide covering the Sale Transaction states "Asset

Purchased … $43.1 Billion Repo Assets – Book value per Lehman 'stale' marks; negotiated a

---

our administration of the estate, … Mike Fazio … was expressing some concerns about the
economics of the deal…. I remember Mike telling us that they … had asked Barclays and
Lehman people for the details behind the difference between the marked values and what was
determined to be the negotiated value as depicted on that [Manila Folder] …. They were
promised the details at the time and never got them.  And I think that was part of what was
underlying their concerns over the economics of the deal.").

[169]    See Ex. 56 Fazio Tr. at 40:8-12 ("We had numerous conversations with the Alvarez & Marsal
people with respect to the value of the securities and the identification of those securities that
were being transferred as part of the transaction."); 77:3-10 ("We would have talked with Fogarty
[A&M] and the estate about this many times; that these were stale marks and the actual marks as
represented to us, the actual marks as represented by Mr. Seery and Mr. Klein, the actual marks
had declined significantly between the time of the last run and the Friday the 19th."). See Ex. 66
Korycki Tr. at 19:2-3, 148:10-150:2 (discussing meetings, topics, including request for backup
concerning cure payments).

[170]    Exhibit 129 ("Lehman Brothers Holdings Inc. Report To Unsecured Creditors Committee,
October 8, 2008") (Deposition Exhibit 461A) (AM004503-95) ("October 8 Presentation") at 2
("Contents.  I. Operational Overview  II. Liquidity  III. Significant Transactions  IV. Proposed
Transactions  V. Claims Management Issues  VI. Wind-Down  VII. Coordination With
Administrators  VIII. Protocols and IX. Bailout Legislation").  Cf. Burian Tr. at 157:7-12 ("We
met with Alvarez & Marsal about a broad variety of topics on a consistent basis.  There were
meetings where Barclays issues were raised, but it wasn't -- the purpose of the meetings were not
to talk about Barclays.").

$5.0 billion reduction".[171]   According to Barclays, the October 8 Presentation reveals that the

Committee and A&M were aware of the agreed-upon, $5 billion negotiated discount and failed

to take timely action to object to it or otherwise bring it to the Court's attention.  Barclays'

argument fails for a host of reasons.

105.    *First*, the October 8 Presentation was prepared by A&M, an outsider to the Sale

Transaction, who neither negotiated, documented nor requested approval of the transaction.[172]

Instead, A&M was installed as the estates' crisis managers after the Sale Transaction was

negotiated and was instructed not to get involved in the Sale Transaction.[173]  On Sale Transaction

issues, A&M had no choice but to direct the Committee to the Lehman Sellers' attorneys, who in

any event were not advised of the discount.[174]

106.    *Second*, at the time of the October 8 Presentation, A&M had not developed a

view as to whether the marks had declined because of market factors or whether the parties

negotiated a $5 billion discount.  It since has developed a view that the transaction contained a

built-in gain.[175]

---

[171]    Ex. 129 October 8 Presentation at 28 (AM004631).

[172]    The Committee also was not an "insider" to the Sale Transaction.  The Committee did not
negotiate the transaction documents or present the transaction to the Court for approval.

[173]    See Ex. 70 Marsal Tr. at 16:19-18:7, 116:20-25 ("[Berkenfeld said] I was being hired to … be
focusing on the wind-down of the estate excluding those two transactions which were under way
and I was not … to put myself in the middle of those transactions because they were on the verge
of closing.").

[174]    Cf. Ex. 55 Burian Tr. at 174:6-20 ("[Q] I understand you said this [October 8] meeting was really
not the setting in which to question these points.  Was there a subsequent opportunity to question
these points? …. [A] [W]e had an opportunity, but you have to understand that A&M's position
was …. [t]hey weren't party to this transaction, and … we should get the information from Weil,
from Lehman or from Barclays.").  See also Ex. 71 Miller Tr. at 79:5-17 ("[Q] And were you or
anyone else at Weil Gotshal privy to any discussions concerning a negotiated -- a negotiation of
an overall $5 billion loss versus Lehman's marks?  [A] I don't believe so.  [Q] Were you or
anyone else at Weil Gotshal involved in any discussions concerning a negotiated discount that
Lehman on the one hand agreed to give to Barclays on the other from Lehman's book values? ….
[A] No, I never heard the expression 'discount'.").

[175]    See Ex. 70 Marsal Tr. at 170:17-171:10 ("My understanding was … that the parties had
negotiated based on an updated assessment, their assessment of the value of the securities, and

107.    The October 8 Presentation simply rehashed the rushed September 29 meeting that A&M had with Tonucci and Kirk, where they repeated Klein's explanation, i.e., that the securities had declined in value (**not** that the parties agreed to a $5 billion discount or adjusted to liquidation value).[176]  Moreover, A&M also was being advised during this period (i.e., between the closing and September 30, 2008), that the Sale Transaction constituted an even exchange, with assets equaling liabilities.[177]

108.    ***Third,*** in response to the October 8 Presentation -- which was the first time Houlihan "ever heard the phrase 'negotiated 5 billion reduction'" -- Houlihan indicated "we've really got to dig into this," and A&M agreed.[178]  Houlihan "renewed [their] request for a reconciliation of what exactly was transferred to Barclays, when it was transferred, what the Lehman marks of those assets were, and as of what date."[179]

---

that that's what this had represented, that there had been a deterioration in the securities during this period of time, during the market chaos. …. As of October 8th that's what I believed. …. [Q] [W]hat do you believe differently now.  [A] I don't believe that's what happened.  I believe that there was a built-in gain in this transaction.").

[176]    See Ex. 67 Kruse Tr. at 122:23-123:3 ("I take this as Jim [Fogarty (A&M)] was relaying information that we had come to understand through others at that point.  I don't think we were making a qualitative judgment at that point that it's right, wrong, or otherwise."); 155:12-16 ("I would characterize … what we were doing at this time relaying information that had been given to us in connection with that transaction to our UCC constituency.").  See also Exhibit 60 (Tr., Deposition of David Coles, February 4, 2010) ("Coles Tr.") at 70:21-71:9 ("[Q] The 5 billion that's referred to in the notes of the meeting with Weil and former Lehman employees, Kirk and Tonucci, on or about September 29, … do you have any recollection of whether that was explained to you, the $5 billion, at the time and what was said about that? …. [A] I remember certainly 'marks' was used.  I'm seeing 'stale marks' here [on October 8 Presentation].  I think that's Jim [Fogarty] quoting from that meeting, and it's 'stale' in inverted commas.").

[177]    See Ex. 70 Marsal Tr. at 15:11-15:14 ("[Q] So you specifically recall that in that conversation Mr. Berkenfeld saying that the assets were going to equal liabilities?  [A] Yes."); 115:18-22 (same).

[178]    Ex. 55 Burian Tr. at 174:22-175:10.

[179]    Ex. 55 Burian Tr. at 178:6-10.

109.    Fazio similarly stressed the need to the LBHI estate to pursue the reconciliation:
"[Q] Going back in time to this meeting … did you say anything at this meeting specifically concerning this line [in the October 8 Presentation]? …. [A] I would have commented … on the entire line and the fact that the stale marks and the securities detail that we did not have associated with the transaction or they didn't have associated with coming up with a detail[ed] mark-to-market of all the securities transferred and their market values on the 19th."[180]

110.    James Fogarty (A&M) recounted Fazio's position at the time:  "I recall framing in my presentation … a general concern for not understanding the $5 billion reduction and I recall either in that meeting that day or the day before, the day after, somewhere around that period of time, a conversation with Mike Fazio of Houlihan Lokey where they were concerned about that $5 billion reduction on behalf of their committee. …. Mike expressed concern that it -- that there wasn't a fair reduction in the value …. but was struggling to have complete understanding of what transpired."[181]

111.    ***Fourth***, the environment in early October 2008, after the Sale Transaction closed, did not suggest a need to proceed to Court urgently.  Instead, Committee professionals had every expectation of cooperation and were receiving cooperation from LBHI, albeit in connection with other equally significant, but more pressing projects:

> [T]here was nothing that would warrant expedited transaction [sic][relief] because the transaction closed, security is probably not there anymore.  Barclays was good for the money.  So if there was a mistake and money had to be returned, that's not the type of thing that you would run to court with your hair on fire saying there has to be an expeditious resolution.  We also were dealing with an estate that was beleaguered by a number of issues that we had never seen before in a restructuring …. [T]o take what we hoped was merely going to be a reconciliation of what happened in a manner consistent with the court order to the level of running to a judge to say it has got to be dealt with today seemed disproportionate and unnecessary. …. [O]ur expectation was we were not owed, that no one had taken improperly 5 billion dollars …. [The October 8 presentation]

---

[180]    <u>Ex. 56</u> Fazio Tr. at 77:13-23

[181]    <u>Ex. 62</u> Fogarty Tr. at 117:5-118:4.

was something that confirmed to me the need to get the reconciliation done and make sure that the transfers were as described. …. At that time I had the expectation of cooperation.  There was no reason to go to Judge Peck."[182]

112.    Indeed, at this point, Houlihan was in its "trust-and-verify mode where … naively, in retrospect, [it] assumed the transaction was as described, and no assets were taken in excess of the values that were told.  So in that time frame … Houlihan's focus was to get a reconciliation."[183]

113.    *Fifth*, during these initial stages of the cases, the estates faced a wide range of more pressing challenges, including a resolution of disputes with Barclays under the TSA that obstructed the estates' access to information concerning the transferred assets.  The TSA was supposed to ensure post-closing access to critical employees, institutional knowledge and infrastructure.  At that time, however, disputes arose between the Lehman Sellers and Barclays over access to information needed to administer the bankruptcy cases, including information regarding the Sale Transaction.[184]

---

[182]    Ex. 55 Burian Tr. at 179:14-183:12.

LBHI's professionals were cooperating with the Committee's professionals as best they could on a host of other issues of equal significance.  See Burian Tr. at 183:17-183:24 ("I was getting enormous cooperation in the month of October from the debtor on a myriad of issues worth many, many billions of dollars besides Barclays.  So you have to look at cooperation in a broader context when you want to criticize a debtor estate or demand a court order for expeditious discovery.").

[183]    Ex. 55 Burian Tr. at 335:4-10.

[184]    Exhibit 130 (December 24, 2008, letter to Jonathan Hughes (Barclays) from Thomas Roberts (Weil)) (CGSH00111078-81) ("LBHI believes there are a number of problems with BarCap's performance under the TSA that require an immediate action plan and clear timetable for resolution. …. As you know, [Mr. Marsal] believes that the ***delays they have experienced in receiving data to which they are entitled under the letter and spirit of the TSA is materially and adversely hampering (and in some instances preventing) the proper management of the LBHI estate***.  The delays in resolving the data issues are impacting value realization by the estate as the continued failure to receive data belonging to LBHI on a timely basis makes responsible, informed decision making impossible.  ***It also prevents effective dialogue with the various constituencies to whom he is responsible, including the Creditor's*** [sic] ***Committee.***") (emphasis added).

114.     Indeed, both A&M's and the Committee's ability to obtain Sale Transaction
information was handicapped by an inability to access legacy Lehman systems and personnel,
because they were under Barclays' control.  As Marsal explained:

> To the extent that I have access to the information and the transaction information, I can
> reinstruct [sic][reconstruct] whatever has happened.  That's my focus at this point in the
> crisis. …. [T]o the extent that there were problems with this transaction, as long as we
> preserved the data, as long as we understood what was transferred around, if there were
> mistakes at the end of that day[,] that preservation of that data would permit us to come
> back and to sit down and to talk about this.[185]

115.     **_Sixth_**, Barclays ascribes self-serving significance to the October 8 Presentation,
conveniently ignoring the slide's mention of "Lehman 'stale' marks."  During the closing
weekend, the Committee professionals were advised that the Lehman marks ($49.9 billion) were
"stale" because the market value of the securities had declined by $5 billion to between $44 and
$45 billion.  To that end, the October 8 Presentation was consistent with that explanation.[186]

116.     Lastly, Barclays points to the email sent by Connor Tully of FTI Consulting (the
Committee's retained accountants) to LBHI concerning his October 3, 2008, meeting with A&M
and Houlihan.[187]  According to Barclays, this email also evidences the Committee professionals'
knowledge of the negotiated $5 billion discount because it attaches an A&M presentation
referring to that discount.  Tully, however, was not part of the team of Committee professionals

---

[185]     Ex. 70 Marsal Tr. at 54:5-9, 84:22-85:5.  See also id. at 23:5-24:5, 85:6-86:4, 89:2-7, 95:2-15,
113:12-19.  See also Ex. 67 Kruse Tr. at 155:20-156:2 ("Did we take action?  This was not a
priority at the time.  We were not -- again, as it relates to Barclays, the TSA was our primary
focus.  Getting ourselves in a position where we could run the wind-down of this enormously
large operation in a competent way, that was our focus."); 103:11-104:8 (noting effort to get
reconciliation "was not really feasible based on the information available to us in that first quarter
of the administration of the estate.").

[186]     Indeed, Marsal interpreted the October 8 Presentation to relate to the question of whether the
marks were "stale."  See Ex. 70 Marsal Tr. at 169:8-23 ("[T]he interpretation that I draw from
this presentation, the presentation when it said stale marks, that would tell me that the marks were
old.  They marks were out of date.  And that the value of the collateral had actually deteriorated
$5 million [sic] [billion] that they were receiving.  That's what I would have interpreted….").

[187]     Exhibit 131 (October 6, 2008, email from Conor Tully (FTI) to Daniel Fleming (Lehman) et al.
regarding "Lehman – JPM Chase Transactions") (Deposition Exhibit 463B).

pursuing a reconciliation of the assets transferred in connection with the Sale Transaction. Instead, he was tasked with reviewing the estates' cash position, focusing on the Sale Transaction with respect to the $7 billion cash issue with JPMC, and contract cure payments.[188]

E.    **PHASE 5:  INTENSIFIED EFFORTS TO OBTAIN RECONCILIATION (DECEMBER 2008 THROUGH MARCH 2009)**

117.    At all times post-closing, the Committee's efforts focused on obtaining a reconciliation that verified Barclays' and the Lehman Sellers' representations.  In December 2008, those efforts intensified when LBI, Barclays and JPMC requested approval of certain Sale Transaction disputes through the December Settlement Motion (as defined below):

> [T]he SIPA trustee filed a settlement motion which described the transaction by the affidavits … [of] Barclays and other parties to that transaction and that took it up a notch. That made us nervous because then we were much more concerned because there seemed to be facts that contradicted what we had heard.  We still expected there to be perfectly rational[] explanations, so during that period of time, I believe we started interacting based on the judge's direction directly with Barclays and its representatives through Cleary Gottlieb, its law firm.[189]

118.    Thereafter, the Committee began seeking reconciliation information directly from Barclays and their counsel (as opposed to just through the estates, whose ability to respond was inhibited by Barclays' blocking access to information systems and employees).

---

[188]    See Exhibit 74 (Tr., Deposition of Connor Tully, February 10, 2010) ("Tully Tr.") at 16:17-22 ("[M]y role, a very significant piece … was we were doing cash management.  So we were trying to -- in any bankruptcy case, cash, understanding your cash position on the day of filing and what it is going to be going forward is imperative."); 18:7-18:24 ("[W]e wanted to … make sure we were staying on top of the people who were trying, supposed to be monitoring that process…. The focus was … to insure that claims weren't actually double counted.").

[189]    Ex. 55 Burian Tr. at 154:23-155:13.

1.    DECEMBER 2008 AND JANUARY 2009 BARCLAYS' SETTLEMENTS

119.    In December 2008 and January 2009, LBI filed two motions seeking approval of

certain settlements:

- the December 2008 Settlement Motion,[190] purportedly resolving disputes over the approximately $7 billion in securities and cash that JPMC retained and did not transfer to Barclays in connection with the Barclays Repurchase Agreement; and

- the January 2009 Settlement Motion,[191] purportedly resolving disputes concerning the failure by the DTCC to transfer to Barclays securities in LBI customer accounts.

120.    The December Settlement involved internecine disputes among LBI, JPMC and

Barclays.  Indeed, in an October 11, 2008, letter to Barclays regarding the then ongoing dispute,

JPMC asserted (as does the Committee in its Rule 60 Motion) that Barclays failed to adequately

disclose the salient terms of the Sale Transaction to the Court, including that Barclays received

$49.7 billion in securities (not $47.4 billion):

> On Friday night, for the first time as far as we know, the Bankruptcy Court was apprised of a different 'deal' between Barclays Capital and Lehman Brothers -- and that Barclays Capital was no longer purchasing $70 billion in assets and assuming $69 billion in related debt.  ***But the Court was not apprised of the purchase that Barclays Capital now says it agreed to make.  Instead of the Court being told that Barclays Capital was purchasing approximately $49.7 billion in securities for $45 billion in cash, the Court was told that Barclays Capital was purchasing $47.4 billion in securities for $45.5 billion in cash. In addition, the Court was told that the reason for the change was a deterioration in market prices, an explanation that we now know to be incorrect***. .... ***It is altogether possible that the LBI estate and its creditors gave you more or less value than you were entitled to receive.  Moreover, the Bankruptcy Court was told that Barclays Capital was to receive $47.4 billion (not $49.7 billion) in securities and to pay $45.5 billion (not $45***

---

[190]    Motion Under 11 U.S.C. §§ 105 And 365 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement, filed on December 5, 2008 (the "December 2008 Settlement Motion") (Docket No. 387 in Case No. 08-1420 (JMP)).

[191]    Motion Under Fed. R. Bankr. P. 9019(a) For Approval of Settlement and Compromise, filed on January 22, 2009 (the "January 2009 Settlement Motion") (Docket No. 586 in Case No. 08-1420 (JPM)).

*or $45.2 billion) in cash*.  We are both duty-bound to ensure that LBI received the value it was supposed to receive in exchange for your $45 billion.[192]

121.    Various factual affidavits filed in support the December Settlement Motion, including the Leventhal Declaration, set forth facts contradicting Seery's and Klein's representations to the Committee's and the Lehman Sellers' professionals (i.e., stating assets totaling $49.7 billion were transferred to Barclays versus the $44-45 billion (plus the Clearance Box Assets) recounted by Klein and cash extended under the repurchase agreement totaled $45.0 billion (not $45.5 billion)).[193]  Barclays also acknowledged that between September 19 and September 23, it was unaware that $7 billion in cash was not deposited in its accounts.[194]

122.    The Committee formally opposed the December Settlement Motion, arguing

it seeks the Court's imprimatur of Barclays', the SIPA Trustee's and JPMC's depiction of the facts and circumstances surrounding the Sale Transaction without any documentary support.  Those purported facts cannot be verified absent the receipt of final reconciliations from the Sale Transaction's principal parties, i.e., LBHI, the SIPA Trustee, the New York Fed, and Barclays, for each step of the transaction.  Such information to date has not been provided to the Committee.  Moreover, the Settlement Motion's factual predicate is either incomplete or fails to square with certain representations Barclays and LBHI made to the Committee concerning the Sale Transaction prior to, and in connection with, the closing.[195]

---

[192]    Ex. 29 (Draft Letter from Jamie Dimon to John Varley, Oct. 11, 2008, with cover email) (BCI-CG00059718-26) at BCI-CG00059724, BCI-CG00059725 (emphasis added).

[193]    See Ex. 28 (Declaration Of Shari D. Leventhal In Support Of Trustee's Motion For Entry Of An Order Approving A Settlement Agreement) ("Leventhal Decl.") ¶ 12 ("Pursuant to the [Barclays Repurchase Agreement] … LBI was to provide Barclays with approximately $49.7 billion in securities in return for the $45 billion in cash").

[194]    See Exhibit 87 (Declaration Of Gerard LaRocca In Support Of The Trustee's Motion For Entry Of An Order Approving A Settlement Agreement, dated December 5, 2008) ("LaRocca Decl.") ¶¶ 7-12 (noting Barclays did not discover the absence of $7 billion in cash, supposedly deposited on September 19, until September 23).

[195]    Exhibit 133 (Limited Objection Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., Et Al., To SIPA Trustee's Motion Under 11 U.S.C. §§ 105 And 363 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement) (Deposition Exhibit 458B) at 3 ¶ 4.

123.    In an attempt to settle the Limited Objection, the Committee submitted a list of documents it considered important to its investigation for production from Barclays and the DTCC, including, inter alia, global reconciliations and supporting schedules, with a proposal that they be provided on or before January 15, 2009.  Because agreement on the proposal was not reached, the Committee continued prosecuting the Limited Objection.

124.    At the hearing on the December Settlement Motion and the Limited Objection, Committee counsel reiterated the Committee's concerns and asked the Court to order Barclays to provide a reconciliation by mid-January 2009:

> [A]s of that late Sunday night, early Monday morning, our financial advisors were told that ... ["][T]his is the transaction that has to close.  These are the numbers["] -- they're actually given a manila folder, which I photocopied here, that has all of the numbers that Mr. Burian outlined in his declaration.  ["]And it's for these reasons we need to go forward.  Don't worry.  There will be a reconciliation post-closing.["] .... [W]e see declarations that have different numbers, different understandings than what people were told .... [O]ne of the major changes from that weekend was ... that the value from Ms. Fife's comments on that Friday up until Sunday had gotten even worse than the 47.4 and that they have actually decreased now to forty-four or forty-five billion dollars ….
>
> And so, our request was ... by mid-January, at least, there be a final reconciliation ....  It's not that the information doesn't exist.  The declarants are relying on something when they're making statements about assumed liabilities and asset values of particular dates.  When people market [sic] [mark] to market securities, we want to make sure they didn't stick their finger in the air and say, hmm, five billion dollars additional assets, please, Lehman Brothers. ….  If everything turns out that it was a frenzied time but that, in fact, was the [mark] to market value as of that weekend … then that would be fine.  But there are major discrepancies between what we were told that weekend and what's being put forth here today.[196]

125.    Barclays made a single, short statement at the hearing with respect to the Limited Objection:  "We regard the creditor committee objection … as not germane to your decision whether to accept this motion and approve the settlement.  They want to exhume information related back to the sale.  That is not pertinent and does not bear upon the question before you

---

[196]    Exhibit 83 (Tr., Hearing December 22, 2008) ("Dec. 22 Hearing Tr.") at 46:16-49:5.

today."[197]  Notably, Barclays did not deny the $49.7 billion figure in the Leventhal Declaration.

Nor did Barclays contend the Committee had the relevant information such that it knew the value

of the assets transferred or that the Committee otherwise knew about Barclays' gain on the

transaction.  Barclays also did not challenge the Limited Objection on the grounds that the

reconsideration and appeal period with respect to the Sale Order had expired or that the

Committee's reconciliation requests were stale or moot.  That silence is especially telling when

Barclays had just completed its briefing in the Bay Harbour Appeal (as defined below) of the

Sale Order to the District Court.

126.    The Court ultimately suggested that the parties work cooperatively to provide the

Committee with the information it had requested (albeit without ordering a deadline within

which that information should be provided):

> It's not a ruling, and I'm not ordering anybody to do anything because there's nothing
> before me that leads to the entry of an order at least at this point other than an order with
> respect to the settlement agreement itself.  It's obviously in the best interest of orderly
> case administration that information be shared as promptly as it can be consistent with the
> other conflicting obligations that the financial advisors and lawyers have in this massive
> case with enormously complicated issues.  Nonetheless, I consider it to be important for
> us to get to what I'll call closure with respect to the basics of the transaction that was
> approved by order entered September 20th.  And this motion with respect to the
> settlement agreement is a reasonable platform on which to address some of these issues
> because while this is not fairly to be characterized as a cleanup item, it's a very
> significant matter. It does draw all of our attention back to what happened in September.
> And I think it important that there be reasonably prompt resolution of outstanding
> questions that the committee may have on the subject. I would hope that it's not
> necessary for the committee to have to file 2004 requests in order to get the information
> that it seeks which seems to be reasonable and consistent with its mandate.[198]

---

[197]    <u>Ex. 83</u> Dec. 22 Hearing Tr. at 41:7-11.

[198]    <u>Ex. 83</u> Dec. 22 Hearing Tr. at 50:9-51:6.

127.    Barclays now takes three incredulous positions with respect to the December Settlement.  It first argues the Committee is bound by the asset valuations articulated in the December Settlement notwithstanding its objection.[199]  It is Barclays, however, that is bound by the reservation of rights language in the order approving the December Settlement, a reservation it specifically affirmed.[200]

128.    Barclays next argues the Committee conceded it was "intimately" involved in the negotiations during that hearing.[201]  The statement to which Barclays refers, however, is taken out of context.  The point being made was that the Committee had standing to oppose the December Settlement because the Committee was a party to the Sale Order.[202]  As noted above, the Committee had no involvement in negotiating the agreement (not having been appointed when the parties signed the APA).

129.    Lastly, Barclays argues the Committee adopted the factual statements submitted in connection with the December Settlement Motion because reference is made in footnote 12 of the Limited Objection to the Fed Portfolio.[203]  As noted above, however, the Committee maintained expressly that none of the factual underpinnings of the December Settlement should

---

[199]    Barclays Br. at ¶ 254.

[200]    See Order Approving December Settlement Motion (Docket No. 464 in SIPA Proceeding) at 2 ("[N]othing in this Order shall bind, be collateral estoppel or otherwise prejudice any other matter in this case, the Chapter 11 Cases or any related case with respect to the facts alleged in the Motion or in the accompanying Moore Declaration, Leventhal Declaration, or LaRocca Declaration, other than the approval of the Settlement Agreement and the authorization for the Trustee to take such action and execute the Settlement Agreement and such documents as may be necessary or appropriate to effectuate the Settlement Agreement and transfer of the Settlement Securities and Settlement Payment to Barclays").  See also Ex. 83 Dec. 22 Hearing Tr. at 34:24-35:5; 40:8-19 (Barclays' counsel affirming reservation of rights).

[201]    Barclays Br. ¶ 181.

[202]    Cf. Ex. 83 Dec. 22 Hearing Tr. at 45:25-46:5 ("And we did submit the declaration of Mr. Saul Burian from Houlihan Lokey who was intimately involved in those negotiations.  The *sale order itself made the [C]reditors[] [C]ommittee a party, if you will*, to the transaction in the sense that it couldn't be changed without the [C]reditors[] [C]ommittee consent, even an immaterial change") (emphasis added).

[203]    See Barclays Br. ¶¶ 200, 254.

72

apply with respect to the Committee's investigation.  The fact that the Limited Objection referred to the Leventhal Declaration does not undermine the Committee's position.

130.    In January 2009, LBI and Barclays returned to Court with the DTCC for a second settlement relating to the Sale Transaction.  The Committee raised the very same issue, that is, to ensure no factual findings made in connection with the January Settlement had any binding impact on the Committee's investigation and requests for reconciliations.[204]  During the hearing to consider approval of the January Settlement, the Committee again stated its position on the record.  Indeed, even LBHI joined in that reservation of rights.[205]  Barclays again made no mention at the hearing of the alleged finality of the Sale Order, the passage of the reconsideration and appeal periods, the Committee's possession of relevant information, the Committee's (and the Court's) knowledge of the gain it received, and the supposed mootness of the Committee's investigation.  The order approving the January Settlement contained the same reservation of rights.[206]

---

[204]    See Response Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. To SIPA Trustee's Motion Under Fed. R. Bankr. P. 9019(A) For Approval Of Settlement And Compromise Among Depository Trust And Clearing Corporation And Certain Of Its Subsidiaries And Barclays Capital Inc. (Docket No. 663.).

[205]    See Exhibit 84 (Tr., Hearing February 11, 2009) at 63:21-64:11 ("Our second concern was just that the reservation of rights of the [C]ommittee and the LBHI estates that appeared in the first settlement resolution with Chase back in December, that the same reservation of rights appear in connection with this settlement with the same force and effect.  As the Court knows, we're investigating the sale transaction. We want to make sure that we have the same reservation that we obtained previously. …. THE COURT: That's fine. I remember that reservation of rights, and you still have it as far as I'm concerned.  MR. TECCE: Thank you very much.  MR. MILLER: And the debtor also, Your Honor.  The debtor?  THE COURT:  You have it, too, Mr. Miller.").

[206]    See Order Approving January Settlement Agreement (Docket No. 690 in SIPA Proceeding) at 2 ("[T]he facts alleged in the Motion shall not bind, be collateral estoppel or otherwise prejudice any other matter in this case, the Chapter 11 cases or any related case").

### 2. INFORMAL LETTER REQUESTS AND MEETINGS LEAD NOWHERE (JANUARY 2009 THROUGH MARCH 2009)

131.    Heeding the Court's admonition that the Committee should seek information on a consensual basis, promptly following the December 22, 2008, hearing, the Committee prepared and transmitted on December 26, 2008, an informal document request to Barclays and the DTCC (the "December 26 Request").[207]  The December 26 Request asked for the production of, among other things, detailed schedules showing the securities to be transferred (and actually transferred), with their mark-to-market valuations on a security-by-security basis (and supporting documentation) as of three dates in time:  September 16, 2008 (the APA), September 19, 2008 (the Sale Hearing), and September 22, 2008 (the closing).

132.    Barclays' counsel and the Committee representatives ultimately scheduled and conducted a "meet and confer" call on January 13, 2009, attended by both counsel as well as Burian and Fazio to review the December 26 Requests:  "We followed up by asking for information and … I remember the conference call with [Barclays counsel] … where I once again explained what I was trying to do, what we were trying to do.  It was not hostile.  We just wanted to write a report and be done because we assumed there were reasonable answers".[208]

---

[207]    See Exhibit 93 (December 26, 2008, letter from James Tecce to Lindsee Granfield and Sheldon Hirschon) (CMTE0006673-76) ("December 26 Request").

[208]    Ex. 55 Burian Tr. at 188:2-11.

133.    At the conclusion of the January 13, 2009, conference call, the parties agreed that
an in-person meeting provided a logical next step, which took place on February 3, 2009, at
Boies Schiller's offices (the "February 3 Meeting") among certain Barclays principals, Barclays'
counsel, Houlihan and Committee counsel.  Contrary to Barclays' position that it answered the
Committee's questions, those questions went largely unanswered, especially when it became
apparent the Barclays' principals at the meeting were not intimately involved in either the
negotiations or setting the marks for the assets:

> The Barclays executives at that meeting … said they were not involved in any way in the
> negotiations of the transaction, but had two roles; one was to [prepare for] taking the
> assets and hedging them, and the other one spoke a lot about the mechanics of transfer.
> *At that meeting, we specifically asked about negotiations, development of marks and
> were told that they were not involved*.  I also think we followed up and said whose marks
> were they that they were taking these assets at and I believe [we] were told, but I can't --
> I can't tell you with certainty who said it, but I think we were told that they were the
> Lehman marks.  But again, the three individuals from Barclays were very clear at that
> meeting they were not -- that's why we followed up and asked for meetings with the
> former Lehman CFO who is now a Barclays employee to talk about developments of
> marks …. [S]o to answer your question with clarity and … specificity, … *we asked about
> marks and who developed them, but it became obvious those were the wrong people to
> ask those details to*.[209]

134.    Fazio's recollection of the meeting comports squarely with Burian's:  "[W]e had
still come out of that meeting requesting significant amounts of information that we did not get
… information that we had requested numerous times …. [T]he main purpose of the meeting is
to get information associated with the detailed schedules that we had requested numerous times
and have not received …. I would contend that they did not answer all our questions…."[210]

135.    No greater evidence exists that the Committee's questions were not answered (as
Barclays submits) at the February 3 Meeting than the *second letter request* the Committee sent
to Barclays the following week, on February 10, 2009 (the "February 10 Request").  It reiterated

---

[209]    Ex. 55 Burian Tr. at 189:4-190:7 (emphasis added).

[210]    Ex. 56 Fazio Tr. at 79:9-80:8.

75

some of the requests contained in the December 26 Request (including a request for detailed schedules), albeit refined by the February 3 Meeting discussions (e.g., asking for documents showing the receipt of securities by Barclays' collateral agent (BoNY)).[211]

136.    As of early March 2009, Barclays still had not responded to either the December 26 Request or the February 10 Request, despite the Committee's reminder that those requests had been outstanding for some time.[212]  On March 13, 2009, the United States District Court for the Southern District of New York affirmed a pending appeal from the Sale Order in the Bay Harbour Appeal.  Whether as a result of coincidence or otherwise, a week later, on March 20, 2009, Barclays finally produced documents it maintained were responsive to the December 26 and February 10 Requests. The production included thousands of pages of spreadsheets unintelligible in the manner produced.  Barclays initially denied the Committee's requests that the documents be produced electronically and insisted on producing hard copies of the spreadsheets.[213]  Barclays finally agreed to provide the documents in an electronic format and produced them accordingly on or about May 28, 2009.

---

[211]    Exhibit 94 (February 10, 2009, letter from James Tecce to Lindsee Granfield and Jonathan Schiller) (CMTE0007349).

[212]    Exhibit 95 (March 3, 2009, email from James Tecce to Jack Stern ("Thank you for your call earlier today advising Barclays is still searching for responsive documents to our two letters (and anticipates production within the next two weeks).  As you know, the Committee is anxious to receive documents and continue with their investigation.  Please note from their perspective, the requests have been outstanding for some time [] so we ask that you keep us advised of your progress (and whether you anticipate further delays beyond two weeks).  To that end, the Committee's rights to pursue the discovery through other channels (e.g., Rule 2004) are reserved.").

[213]    Exhibit 99 (April 27–May 12, 2009, email exchange between Jack Stern and James Tecce regarding production format) (CMTE0011863-64) at CMTE0011863 (where Stern explains on April 27 the "color coding" system Barclays devised to separate spreadsheets to facilitate review after not producing documents in native format); id. (response from Tecce on May 12 explaining "insert sheet" system was not workable); Exhibit 97 (April 23, 2009, letter from Jack Stern to James Tecce) (CMTE0011962) ("Following up on our discussion, enclosed is a sample print-out of selected material.  If this is acceptable, we will print out the entire production for you in this format.").

137.     Importantly, at no time did Barclays provide a final reconciliation or a balance sheet identifying the specific assets transferred, the specific liabilities assumed and their respective mark-to-market valuations on a security by security basis for September 19 (with an explanation of the methods used to arrive at those marks).[214]  Indeed, in response to the December 26 Request, during the February 3 Meeting, or in response to the February 10 Request, Barclays could simply have provided specific responses to the Committee's questions (e.g., by providing a written explanation of its position with respect to the value of the assets transferred or a written explanation of the illegible schedules it produced).

### F.     PHASE 6:  RULE 2004 DISCOVERY AND LITIGATION (APRIL 2009 THROUGH SEPTEMBER 2009)

138.     On or about February 8, 2009, Barclays PLC issued its Results Announcement for 2008 (the "Results Announcement") stating, among other things, that Barclays realized a gain of "£2,262m relating to Lehman Brothers North American Business," i.e., nearly $4.2 billion at the then prevailing exchange rate.[215]  Notably, Barclays made no mention of the Results Announcement at the February 3 Meeting, nor did it provide any documents relating to the announcement in response to either the December 26 or February 10 Requests.

---

[214]     Barclays appears to maintain audaciously that the January 2010 Pfleiderer Report answers the Committee's requests for security-level, mark-to-market valuations.  See Ex. 56 Fazio Tr. at 81:3-10 (asking whether Barclays provided documents in response to Committee's letter inquiry:  "[A] They have given some documents to the Committee, that's correct.  They have not answered all of my questions to give me a detailed listing of every security that was transferred and its market value on the 19th [of September 2008].  [Q] Have you reviewed Professor Pfleiderer's report in this case?"); Ex. 55 Burian Tr. at 184:23-185:12 ("I have never received the bridge between the … 47.4 number, I think, as to how much of that was purported to be, as she described, and everyone was saying in conference rooms, market deterioration in the portfolio as compared to closeouts or securities that turned out not to have been returned to Lehman.  Nor have I even received … even the most simplest request of what exactly did go over and what were the marks on that date when they went over").

[215]     Ex. 53 (Barclays PLC Results Announcement: Figures 2008) (Deposition Exhibit 22) at 3, 7, 29.

139.    At this point, LBHI, having progressed with respect to its TSA issues, now had a greater ability to focus on attempting to reconstruct Sale Transaction.  On February 11, 2009, A&M sent a letter to Barclays advising of the material discrepancies between the Cure and Compensation Liabilities outlined in the transaction documents ($4.25 billion) and the realized amounts (approximately $1.7 billion):

> [These items] are clearly material to the debtor estates and we welcome your assistance in ensuring that our understanding of the books and records of the various referenced estates, and of the sale contract, is correct.  You may also have supporting documentation or analyses that explain these discrepancies.  If that is not possible, however, we reserve our rights to seek judicial relief based on the material differences between the projected and actual liabilities for these categories and expenses.[216]

140.    When Barclays responded to the February A&M Letter by insisting that Barclays was well within its rights under the contracts, the estates engaged special counsel, Jones Day:

> 4 billion was … assumed to be liabilities, if the liabilities turned out to be 1, where did you get the 4 from?  And it just so happens that the guys who provided you the estimate of 4 are now on your payroll.  Shouldn't we find -- shouldn't we discover what exactly from -- without going to court, shouldn't we talk about this and get an explanation.  And the reaction we got was ["]read your contract.["]  That's the reaction.  ["]Read your contract["] …. Then … when the financial accounting systems kicked in and we started to be able to look at what happened on the accounting, where did this 4 billion come from? …. And it never got anywhere because instead what we got back was ["]read your documents.["]  That's at which point we hired Jones Day …. [T]rust me, the last thing we want to do is attack Barclays, the source of all our information."[217]

141.    At or around this time, as the estate's investigation escalated and the Committee's request for a simple reconciliation remained unanswered, the Committee and LBHI began coordinating their investigative efforts with respect to the Sale Transaction.  On April 13, 2009, LBHI forwarded an informal document request to Barclays following up on the February A&M Letter requesting 20 different categories of Sale Transaction documents, including a

---

[216]    Exhibit 145 (February 19, 2009, letter from Bryan Marsal to Jonathan Hughes) (Deposition Exhibit 497) ("February A&M Letter").

[217]    Ex. 70 Marsal Tr. at 202:2-203:14; 206:16-22.

catchall request for all documents produced to the Committee.[218]  Barclays, however, refused to

produce documents responsive to LBHI's informal requests, prompting LBHI to file its motion,

pursuant to Rule 2004 (the "Rule 2004 Motion") seeking an order compelling that production.[219]

The Committee and LBI joined in the Rule 2004 Motion.  The Committee stressed it would

avoid duplication of effort and coordinate with the estates' investigation, but requested access to

any discovery given to LBHI.[220]

142.    Barclays tried to block both LBHI's and the Committee's access to discovery; it

even filed a separate objection to the Committee's joinder.[221]  Barclays asserted, for the first time

and despite numerous opportunities to raise these arguments in meetings with the Committee, in

response to the Committee's requests and in connection with the December and January

Settlement hearings, that the discovery related to unsustainable claims.  Barclays argued among

other things that it already had answered the Committee's questions.

143.    The Court overruled Barclays' objections and authorized discovery on June 24,

2009, after which a wave of document production and depositions started which continued over

the summer of 2009.  Ultimately, the Movants filed the Rule 60 Motions on September 15, 2009.

---

[218]    Exhibit 96 (April 13, 2009, letter from Robert Gaffey to Lindsee Granfield and Jonathan
Schiller).

[219]    Motion Of Debtor and Debtor In Possession For An Order, Pursuant to Fed. R. Bankr. P. 2004,
Authorizing Discovery from Barclays Capital, Inc., dated March 18, 2009 (Docket No. 3596 in
Case No. 08-13555 (JMP)).

[220]    Response Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et
al., To Debtor's Motion For An Order, Pursuant To Fed. R. Bankr. P. 2004, Authorizing
Discovery From Barclays Capital, Inc., dated June 5, 2009 (Docket No. 3778 in Case No. 08-
1420 (JMP)) at 2 ("[T]he Committee supports the Debtors' investigation. …. In order to ensure
an efficient investigation and avoid duplication, the Committee intends to coordinate its efforts
with those of the Debtors. …. [T]o the extent Barclays produces documents to the Debtors, the
Committee should receive copies of those documents").

[221]    Objection Of Barclays Capital Inc. To Proposed Joinders In Debtors' Motion For An Order
Under Rule 2004 Authorizing Discovery Of Barclays Capital Inc. (Docket No. 4093).

### III. ARGUMENT

**A. BARCLAYS HAS NOT PRESENTED ANY PRE-CLOSING EVIDENCE SUPPORTING ITS VALUATION OR REFUTING EVIDENCE THAT $5 BILLION DISCOUNT OFF LEHMAN'S BOOK VALUES REFLECTED A NEGOTIATED, BUT UNDISCLOSED PRICE REDUCTION**

144.    Despite its length, what is most remarkable about the Barclays Brief is not what it says but what it does not say -- namely, that the Purchased Assets were not sold at a $5 billion discount, that the values ascribed to the Purchase Assets do not reflect a negotiated figure and, most importantly, that appropriate disclosure of these material facts was made to the Court prior to the entry of the Sale Order.  The absence of these statements, while glaring, is not surprising given the evidence developed in discovery.

145.    Barclays argues that to the extent that the negotiators did agree to a $5 billion discount, it was taken from the Lehman Sellers' marks to reflect the securities' "true" market value, rather than to give Barclays a discount off the Purchased Assets' book value.  The undisputed evidence, however, demonstrates that this was a $5 billion discount off the Lehman Sellers' mark to market valuations on their books, not an adjustment to arrive at so-called "true" market value.

146.    Although Barclays repeatedly asserts the discount conveyed to Barclays actually reflected the "market value" of the securities,[222] this assertion is largely unsupported by evidence.  Notably, Barclays does not point to any document created before the September 22 closing that substantiates an actual calculation of the market value of the securities at $5 billion less than the mark-to-market valuations on the Lehman Sellers' books.

---

[222]    See, e.g., Barclays Br. ¶¶ 21, 82, 86, 279 & n. 119.

147.     Instead, Barclays relies on the after-the-fact opinion of its expert witness, Professor Pfleiderer, who opines that, in retrospect, the value of the collateral ended up being, at most, $500 million more than the financing extended under the repurchase agreement.[223] Irrespective of its flaws (which are examined in detail in the Movants' experts' reports),[224] Barclays' after-the-fact litigation opinion is not relevant to assessing the purpose of the discount as negotiated between the Lehman Sellers and Barclays.

148.     Barclays also cites to deposition testimony of its employees listing various reasons Barclays argued for a price reduction off the Lehman Sellers' marks, including Barclays' suspicion that the Lehman Sellers' marks were outdated or somehow inflated.[225]  However, not a single Barclays' witness described a process of examining the so-called "true" market value or arriving at the number that was presented to the Court.  Moreover, the deposition testimony cited by Barclays in support of its assertion actually demonstrates that the price discount was done to protect Barclays against some potential future drop in value, and not a mark-to-market valuation.[226]

149.     Barclays' position that the Lehman Sellers' marks were "stale" is surprising considering the Lehman Sellers marked their books to market daily, and Barclays itself had confidently advised analysts on September 17 of Barclays' ability to mark the assets to market. The $72 billion figure in the September 17 Press Release mirrors the $72 billion figure on the 9-

---

[223]     Barclays Br. ¶ 86 (citing Pfleiderer Report).

[224]     For example, Professor Pfleiderer states that Barclays' "fair value" valuation does not apply any "fire sale" discount to the transferred positions.  See Pfleiderer Report ¶ 63. Seery, however, testified that the $45 billion figure reflects a liquidation value.  See Part II.A.7 ("Lehman Sellers Prepare Liquidation Valuation At Barclays' Request (September 19)").

[225]     Barclays Br. ¶ 76 & n. 51.

[226]     See, e.g., Exhibit 61 (Tr., Deposition of Mike Keegan, August 28, 2009) ("Keegan Tr.") at 25:10-21 ("[W]e need to put a haircut on these assets because the volume of the assets plus the timing … we're trying to predict what the assets of are going to be worth on Thursday, Friday when the deal closes"); 28:23-29:20.

16-08 Balance Sheet, undermining Barclays claim that the Lehman Sellers' mark-to-market

models were overly optimistic.[227]

150.    With this evidence in mind, it is clear that Barclays' claim that the Committee

knew of the "discount" is meritless.  As Barclays itself concedes, the Committee was told the

value of the assets being transferred to Barclays had dropped because of market deterioration

from $49.9 billion to between $44-45 billion such that Barclays was still assuming liabilities

equaling or exceeding the acquired assets.[228]  But being told that the market value of securities

had dropped by $5 billion is far different than learning months after the fact that the parties had

agreed to a price discount from book value or ascribed liquidation value.

B.    SIGNIFICANT TRANSACTION TERMS WERE NOT DISCLOSED TO COURT --
CONSUMMATED TRANSACTION DIFFERED MATERIALLY FROM TRANSACTION
REPRESENTED TO, AND APPROVED BY COURT

151.    The transaction represented to the Court bears little resemblance to the transaction

consummated.  Because Barclays failed to apprise the Court of material aspects of the Sale

Transaction, Barclays forfeited any entitlement to finality protections, thus justifying relief from

the Sale Order.  See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996)

(noting section 363 serves to subject "a trustee's actions to complete disclosure and review by

the creditors of the estate and by the bankruptcy court"); Lone Star Indus., Inc. v. Compania

Naviera Perez Compac (In re New York Trap Rock Corp.), 42 F.3d 747, 752 (2d Cir. 1994)

(noting general policy against undisclosed agreements in context of a sale order); In re LWD,

Inc., 2009 WL 5198060, at *5 (W.D.Ky. 2009) (affirming lower court's denial of motion to

---

[227]    See Part II.A.4 ("Barclays Press Release And Analyst Call"); Part II.A.7 ("Lehman Sellers
Prepare Liquidation Valuation At Barclays' Request").

[228]    Barclays Br. ¶ 204 ("[T]he Creditors' Committee admits that it was told that Barclays was
acquiring Repo Collateral that initially was thought to be worth in excess of $49 billion, but
which in fact was believed to be of uncertain value and worth significantly less than that --
approximately $44-45 billion.").  See Part II.C.1 ("After Excluding Committee Professionals
From Meetings and Discussions, Lehman Sellers and Barclays Advise Them Of Salient
Transaction Terms Hours Before Closing").

compel performance under sale order: "[r]ather than following the Term Sheet ... Debtors improperly transferred assets to purchaser and failed to disclose a major asset that was ultimately purchased for insufficient consideration at the 363 Sale").

### 1.    COURT WAS NOT APPRISED OF, AND DID NOT APPROVE "GAIN" TRANSACTION

152.    From its inception, Barclays and the Lehman Sellers presented a transaction where Barclays would acquire real estate, data centers and personnel used primarily in connection with the broker-dealer business in exchange for specific consideration and the Lehman Sellers' "long book," while assuming or extinguishing their "short positions" and Cure and Compensation Liabilities in an equal (or slightly greater) amount.  At all times, the transaction described to the Court -- whether in documents presented to the Court (e.g., the APA) or during the Sale Hearing – was in balance or favoring the estates.

153.    The Lehman Sellers described the transaction as an even exchange to their Board of Directors, to their crisis managers (A&M) and to the Committee professionals.  At the September 16 Board of Directors meeting (attended by Lazard Freres' Barry Ridings), the transaction was described for LBI "as a wash."[229]  Berkenfeld described the transaction to Marsal as one where assets equaled liabilities and testified separately that was his understanding.[230]  On Thursday, September 18 (when the Lehman Sellers distributed the 9-16-08 Balance Sheet and during a call with Seery), on Friday September 19 (during calls among Seery and/or Shapiro and Burian) and Sunday, September 21 (during discussions among the Committee professionals and Seery and Klein), the Lehman Sellers and Barclays repeatedly described an even exchange.[231]

---

[229]    See Ex. 101 (LBHI Board Minutes).

[230]    See Ex. 70 Marsal Tr. at 14:19-15:14, at 115:18-22.  See Ex. 2 Berkenfeld Tr. at 112:7-25 ("My understanding of the transaction is that, on acquisition, as reflected in the Asset Purchase Agreement, it was not intended that Barclays would have an immediate excess value in the assets they were bringing over").

[231]    See Ex. 55 Burian Tr. at 119:19-120:6, 208:16-209:6, 253:18-255:11, 234:24-241:20, 262:14-263:18, 264:3-11, 255:8-11, 275:5-14, 278:5-17, 279:14-284:8.

154.    Barclays viewed the transaction differently.  From its inception, Barclays insisted on realizing a sufficient gain so that the Sale Transaction would be capital accretive.[232]  Notably, neither Barclays nor the Lehman Sellers disclosed Barclays' imperative or the gain to the Court (or to the Committee).  Barclays claims the Court was aware of the gain because (a) the Court authorized the transfer of assets to Barclays *irrespective of their value*; (b) the Court reviewed and overruled objectors to the Sale Transaction who complained Barclays stood to realize a windfall; and (c) the September 17 Press Release and Analyst Call, while not disclosed to the Court, did announce a gain.[233]  It submits the same for the Committee, even though the September 17 Press Release (i) is silent regarding a gain; (ii) the gain mentioned on the September 17 Analyst Call cryptically described a United Kingdom accounting convention (causing even the Lehman Sellers' investment bankers (Lazard Freres) to dismiss the statement as irrelevant); and (iii) by Barclays' own admission, became outdated by Saturday, September 20, because it addressed a different transaction.[234]  Moreover, Barclays' argument that the Court approved the transfer of assets irrespective of their value (and without a cap) does not square with the finding in the Sale Order of "reasonably equivalent value."[235]  The transfer of limitless amounts of assets cannot be considered reasonably equivalent to any value.

---

Barclays relies on the testimony of Mr. Miller that he did not understand this would constitute a balanced transaction.  Yet, the deponent did not negotiate the transaction documents.  See, e.g., Ex. 71 Miller Tr. at 77:22-17, 28:11-22.  In point of fact, the Lehman Sellers' chief negotiator testified differently, see Ex. 98 McDade Tr. at 160:8-20, 216:23-217:23, as did Mr. Roberts, who negotiated the transaction documents.  See Ex. 88 Examiner's Report at 2136 (describing the sale transaction as closed and the sale transaction in the APA as entailing "Barclays' acquisition of assets and liabilities at a 'wash' …").

[232]    See Ex. 64 Hughes Tr. at 342:20-24, at 348:19-24, at 346:3-16, at 348:24-349:3.

[233]    See Barclays Br. ¶ 17; Ex. 64 Hughes Tr. at 330:6-331:8, 332:11-333:18, 332:3-333:10, 346:17-347:9.

[234]    See supra Part II.A.4. ("Barclays' Press Release And Analyst Call (September 17)").

[235]    See Ex. 24 Sale Order ¶ 19.

155.    While Barclays maintains it assumed extraordinary risk with respect to the Sale Transaction,[236] it eagerly communicated an entirely different message to its Board of Directors and analysts.  In the September 16 Barclays Board Presentation, it noted specifically an ability to "mitigate" risks.  The risks Barclays identified included "loose ends" upon separation of the broker-dealer assets from the balance of the bank and securing Court approval.  Notably, Barclays did not consider market volatility or the illiquidity of the assets a risk.  It also touted to its investors in the September 17 Press Release and during the Analyst Call, that it had "*de-risked the transaction by excluding the overwhelming majority of the Lehman risk assets.*"[237]  Barclays felt comfortable it was acquiring "high quality, tradable" assets, a conclusion it reached having completed its own *mark-to-market* valuation during the 72 hours before the report.[238]

> ### 2.    COURT DID NOT APPROVE CLARIFICATION LETTER TO EXTENT IT MATERIALLY AMENDED APA BY EFFECTUATING NEGOTIATED $5 BILLION DISCOUNT TO BARCLAYS AND TRANSFERRING CLEARANCE BOX ASSETS, 15C3 ACCOUNTS AND OCC ACCOUNTS

156.    As described to the Court, the Clarification Letter served initially to clarify confusion over which subsidiaries would be included in the Sale Transaction.[239]  Notwithstanding Barclays' claim that the Clarification Letter did not amend the APA,[240] over the closing weekend, the Clarification Letter's role evolved significantly into the vehicle through which the parties purported to memorialize material departures from the represented transaction -- specifically the alleged transfer to Barclays of billions in negotiated discounts and additional assets.[241]  Because the Court was not apprised of these modifications and was never

---

[236]    Barclays Br. ¶ 41.

[237]    See Exhibit 113 Burian Notes.

[238]    See Part II.A.1 ("Obtaining Board of Directors' Approvals (September 17)").

[239]    See Ex. 82 Sale Hearing Tr. at 48:5-10.

[240]    Barclays Br. ¶ 37.

[241]    Cf. Ex. 68 Lewkow Tr. at 49:17-50:11 ("[W]ith the very first draft of the Clarification Letter, which was prepared very quickly by someone … after the Asset Purchase Agreement had been

shown a copy of the document that purported to reflect them, the Court did not approve the

Clarification Letter.  Indeed, an oblique reference to the Clarification Letter in the Sale Order

does not provide a legitimate substitute to the filing of a separate motion to approve the

Clarification Letter, nor mean the Court reviewed and approved the letter.  An examination of

the Clarification Letter's various draft versions reveals its evolution both before and after the

Sale Hearing.[242]

| PRE-SALE HEARING | |
| --- | --- |
| DATE, TIME AND SIGNIFICANCE | NOTABLE LANGUAGE IN DRAFT CLARIFICATION LETTER |
| • Wednesday September 17 at 4:48 p.m. (Dep. Ex. 28) | This letter agreement clarifies the meaning of certain provisions of the Agreement<br><br>The Purchased Assets will include the equity in (or, at the option of the Purchaser, the assets of) the direct or indirect Canadian subsidiary of LBHI that holds the broker-dealer license for the Canadian operations of the business (¶ 1) |
| • Thursday, September 18 at 12:26 a.m. (Dep. Ex. 29) | This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement … |

---

signed and filed with the Court on Wednesday morning -- that the original first draft was a page or two and it clearly was truly nothing other than clarification …. At some later point, as things got more complicated and things were happening, it became -- there was discussion that we should add the word 'amend'"); at 48:19-24 (discussing when word "amend" was added to preamble: "[t]he answer is -- the document is the document. No one ever tried to say, all right, this clause is a supplement; this clause is an amendment; this clause is – they are what they are. Certain … things did clarify; certain things amended").

[242]  See Exhibit 121 (containing 9 drafts of the Clarification Letter (*pre-Sale Hearing versions*) from (1) September 17 at 4:48 p.m. (Deposition Exhibit 28), (2) September 18 at 12:26 a.m. (Deposition Exhibit 29), (3) September 18 at 2:39 p.m. (Deposition Exhibit 30), (4) September 18 at 11:40 p.m. (Deposition Exhibit 31), (5) September 19 at 3:36 a.m. (Deposition Exhibit 32), (6) September 19 at 5:24 a.m. (Deposition Exhibit 614A) (7) September 19 at 9:01 a.m. (Deposition Exhibit 33), (8) September 19 at 12:09 p.m. (Deposition Exhibit 34), (9) September 19 at 9:15 p.m. (Deposition Exhibit 35) and Exhibit 122 (containing 4 drafts of the Clarification Letter (*post-Sale Hearing versions*) from (1) September 20, 2008 at 2:39 p.m. (Deposition Exhibit 36), (2) September 20 at 11:13 p.m. (Deposition Exhibit 37), and (3) September 21 at 12:35 p.m. (WGM-LEHMAN-E 00013962), and (4) September 21 at 5:03 p.m. (Committee Rule 60 Motion Ex. 42).

| Date, Time and Significance | Notable Language in Draft Clarification Letter |
|---|---|
| • Thursday, September 18 at 2:39 p.m. (Dep. Ex. 30)<br><br>• Addition of specific assets to "Purchased Assets" definition | Subject to Section 8 below [Residential Real Estate Mortgage Securities], the only financial assets that shall constitute Purchased Assets are the financial assets reflected on Exhibit A, and the only financial liabilities that shall constitute Assumed Liabilities are the liabilities set forth on Exhibit A. *It is acknowledged that the values of assets set forth on Exhibit A reflect Seller's marks as of the date and time set forth on Exhibit A* and that the face and nominal amount of such assets may be different than such marks.<br><br>Purchased assets shall include the government securities trading and mortgage trading operations of the LBI (but mortgage securities only to the extent referred below) (¶ 3)<br><br>[Purchased Assets includes] assets … to the extent used in the conduct of the Business as the Business was conducted on the date of the Agreement (¶ 4) |
| • Thursday, September 18 at 11:40 p.m. (Dep. Ex. 31)<br><br>• Paragraph 6 "Financial Assets and Liabilities" deleted; reference to 9-16-08 Balance Sheet added | Purchased Assets means all the assets of Seller used in connection of [sic] the Business<br><br>Included in the 'Excluded Assets' are all the categories of assets valued at '0' on the [9-16-08 Balance Sheet] …. Included in 'Excluded Liabilities' are all the categories of liabilities valued at '0' on the [9-16-08 Balance Sheet] (¶ 10). |
| • Friday, September 19 at 3:36 a.m. (Dep. Ex. 32)<br><br>• Reference to 9-16-08 Balance Sheet is deleted | Also included in Purchased Assets are (a) the equity of … Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA … [and] (c) all prime brokerage accounts and securities lending operations of the Business … |
| • Friday, September 19 at 5:34 a.m. (Deposition Exhibit 614A)<br>• "[R]estyl[ing] this document as a First Amendment, rather than a side letter"<br>• 9-16-08 Balance Sheet reference is restored | First Amendment To Asset Purchase Agreement …. WHEREAS, the Seller, 745 and the Purchaser desire to amend the APA as set forth below |
| • Friday September 19 at 9:01 a.m. (Dep. Ex. 33)<br>• No mention of Barclays Repurchase Agreement | Purchased Assets means all of the assets of Seller *used primarily* in the Business or necessary to the operation of the Business (emphasis added) |

| DATE, TIME AND SIGNIFICANCE | NOTABLE LANGUAGE IN DRAFT CLARIFICATION LETTER |
|---|---|
| • Friday, September 19 at 12:09 p.m. (Dep. Ex. 34)<br><br>• "Amend" used for the first time to refer to agreements "referenced herein" | This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements of the parties stated herein and shall amend the agreement to the extent necessary to be consistent with this letter |
| • Friday, September 19, 2008 at 5:00 p.m. (emailed at 9:15 p.m.) (Dep. Ex. 35)<br><br>• First mention of the Barclays Repurchase Agreement -- but securities collateralizing agreement are not listed in "Purchased Assets" definition | 1. Purchased Assets; Excluded Assets.  (a) The Purchased Assets means … with respect to securities of LBI … municipal securities, residential mortgage securities and other securities of which there is a summary description, by category … reflected in Exhibit A hereto; it being understood that the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 billion … (b) In lieu of the assets referred to in clause (k) of the definition of "Excluded Assets," the following shall be Excluded Assets; All of the investments held by Sellers or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset backed securities and corporate loans, ***other than those subject to the Barclays Repurchase Agreement …*** (emphasis added)<br><br>14. Barclays Repurchase Agreement.  At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates, from all their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates. |
| **POST-SALE HEARING** | |
| • Saturday, September 20, 2008 at 2:39 p.m. (Dep. Ex. 36)<br><br>• First combination of unwinding the Barclays Repurchase Agreement with both express inclusion of collateral as "purchased assets" and Clearance Box Assets<br><br>• Recognizes that Clarification Letter amends APA "in certain respects" to be consistent with letter | This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respect the agreements of the parties stated herein and amends the Agreement in certain respect and to be consistent with the provisions of this letter ….<br><br>1.  Purchased Assets; Excluded Assets.  (a)  The Purchased Assets means ... plus the securities owned by LBI and either (A) ***pledged to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined above) [sic], as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates*** of (B) ***such securities as Purchaser may, within 60 days after the Closing select to receive and are held in the clearance 'box' on the Closing date as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates*** … (emphasis added) |

| DATE, TIME AND SIGNIFICANCE | NOTABLE LANGUAGE IN DRAFT CLARIFICATION LETTER |
|---|---|
| • Saturday, September 20, 2008 at 11:13 p.m. (Dep. Ex. 37)<br><br>• Asks who Collateral Agent is for Barclays Repurchase Agreement; modifies again "amends" and "intention" language<br><br>• Introduces concept of "Schedule A" and "Schedule B" to "Purchased Assets" definition | This letter agreement … clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects and is binding on the parties hereto upon its execution and delivery<br><br>13. <u>Barclays Repurchase Agreement</u>. At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates, from all their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates … [IS THIS A TRI-PARTY REPO?  IF SO, WHO IS THE COLLATERAL AGENT'?] |
| • Sunday, September 21 at 12:35 p.m.  (WGM-LEHMAN-E 00013962).<br><br>• Adds Bank of New York as Collateral Agent under Barclays Repurchase Agreement | This letter agreement … clarifies the intention of the parties with respect to certain provisions of the Agreement, *supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects* and is binding on the parties hereto upon its execution and delivery<br><br>13. <u>Barclays Repurchase Agreement</u>.  At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates, from all their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates *and Bank of New York as collateral agent* (emphasis added) |
| • Sunday, September 21, 2008, at 5:03 p.m. (Committee Rule 60 Motion Ex. 42)<br><br>• First version of the operative clause to "rescind" the termination of the Barclays-LBI Repurchase Agreement sent by email | 13. <u>Barclays Repurchase Agreement</u>. Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "<u>Barclays Repurchase Agreement</u>") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Buyer shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) *the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void <u>ab initio</u> in all respects* (emphasis added) |

157.    Most importantly, the Clarification Letter effectuated the transfer to Barclays of

the previously negotiated, undisclosed $5 billion discount off the Purchased Assets' book value.

Over the closing weekend, Barclays learned it "inadvertently" terminated the Barclays

89

Repurchase Agreement.[243]  Legally, that would result in any excess collateral (or haircut)

reverting to the Lehman Sellers' estates under section 559 of the Bankruptcy Code.  This issue

clearly could have been within Barclays' contemplation, considering its counsel simultaneously

was negotiating with the Securities and Exchange Commission for certain exclusions (or "carve-

outs") from the order initiating LBI's SIPA Proceeding, specifically for the exercise of rights

under sections 555 and 559 of the Bankruptcy Code.[244]  The Clarification Letter was amended

late Sunday afternoon (September 21) through language proposed by Barclays' counsel to

simultaneously rescind the Termination Notice, to "terminate" the Barclays Repurchase

Agreement, and to preclude the application of section 559 of the Bankruptcy Code.[245]

158.    The agreement to use the Barclays Repurchase Agreement as the vehicle through

which billions in assets (i.e., excess Barclays Repo Collateral) would be transferred to Barclays

was reached *prior to* the Sale Hearing.  Nonetheless, Barclays did not disclose to the Court

during the Sale Hearing that such an agreement had been reached, or that it would serve to

transfer an undisclosed negotiated discount.[246]  The APA provided for a transfer of the long

positions and the assumption of the short positions, each at book value.  The Court was not told

---

[243]    See Committee Rule 60 Motion Ex. 52 ("Notice of Repurchase Date.  Notice of Termination")
(BCI-EX-00109164) (Deposition Exhibit 27) ("Termination Notice").  See Ex. 68 Lewkow Tr. at
68:24-69:14, 80:20-24 ("There did come a time over the weekend … where we did learn … that
there had been an inadvertent notice given … that that was done in error and should be undone
…. [Q] What needed to be corrected then, in connection with the termination of the repo …. [A]
That it was in error.  It wasn't supposed to be terminated.").

[244]    See Exhibit 119 (September 17, 2008, email from Edward Rosen (Cleary Gottlieb) to Securities
and Exchange Commission and Securities Investor Protection Corporation concerning carve-outs
regarding stay of section 559 rights) (Deposition Exhibit 631); Exhibit 120 (September 18, 2008,
email from Securities and Exchange Commission to Ed Rosen) (Deposition Exhibit 632)
(confirming stay of exercise of section 555 and 559 rights would not be implemented).

[245]    Ex. 25 Clarification Letter § 13; Exhibit 42 (September 21, 2008, email thread between Weil and
Cleary attorneys et al.  proposed Paragraph 13 to Clarification Letter which provides for
rescission of Termination Notice) (another version also marked Deposition Exhibit 580B).

[246]    See Ex. 64 Hughes Tr. at 302:22-303:7; Ex. 77 Kirk Tr. at 72:23-73:9; Ex. 9 Tonucci Tr. at
39:22-40:20, 142:23-143:6; Ex. 7 Lowitt Tr. at 118:14-21.  See Part II.B.2.d ("Use Of Barclays
Repurchase Agreement To Transfer Embedded $5 Billion Discount").

that they had been substituted by the Barclays Repo Collateral (Schedule A), at liquidation value, and the Clearance Box Assets (Schedule B).

159. The Clarification Letter also appears to have materially altered the definition of Purchased Assets by changing the valuation standard from a book value to a liquidation value. The APA refers to assets with a "book" value -- but the Clarification Letter makes no mention of book value. The Lehman Sellers marked their books daily, and the mark-to-market values ascribed to the assets being transferred to Barclays on September 19 was nearly $50 billion. The Lehman Sellers also marked the Fed Portfolio at $50.64 billion as of September 19. The September 21 Schedules listed cash and securities collateralizing the Barclays Repurchase Agreement of $49.9 billion. On Friday, the Lehman Sellers performed a liquidation valuation that resulted in values ranging from $44.6 billion to $45.5 billion, values similar to the $47.4 billion figure described to the Court (and equal to that figure, when the Clearance Box Assets supposedly valued at $1.9 billion are added). Whether to funnel the discount to Barclays through the Barclays Repurchase Agreement or otherwise, changing the standards on which the assets were valued from mark-to-market methodology to a liquidation methodology, and specifically attributing liquidation values to the collateral, eliminated the excess value that would otherwise revert to the Lehman Sellers under section 559 of the Bankruptcy Code upon termination.[247]

160. The Clarification Letter purportedly provides for the transfer of billions in additional assets to Barclays, including the Clearance Box Assets (valued at between $1.9 billion and $2.3 billion) and the 15c3 Accounts (valued at between $750 million and $1 billion). The Clearance Box Assets and the 15c3 Accounts were referred to in the Clarification Letter in

---

[247] See Part II.A.7 ("Lehman Sellers Prepare Liquidation Valuation At Barclays' Request (September 19)"); Part II.B.2.c ("Value Represented To Court ($47.4 Billion) Was Not Mark-To-Market Value On Lehman Sellers' Books But Instead Appears To Be Sum Of Liquidation Value And Clearance Box Assets"); Part II.C.1 ("After Excluding Committee's Professionals From Meetings And Discussions, Lehman Sellers And Barclays Advise Them Of Salient Transaction Terms Hours Before Closing"); Burian Decl. ¶ 3, 9.

response to Barclays' demands, **_not to compensate for a shortfall_** -- even though Klein told the Committee professionals that Barclays needed the Clearance Box Assets to restore the transferred assets figure to $47.4 billion.[248]   Barclays also asserts entitlement to margin accounts with the Options Clearing Corporation (the "OCC Accounts") that collateralize Lehman's participation on exchanges where derivatives are traded, which may have contained between $2.3 billion and $5 billion in cash and securities.[249]   While there is no reference to the OCC Accounts anywhere in the Clarification Letter, Barclays asserts entitlement to those assets based on an oblique parenthetical phrase in the letter.

161.   Notably, the Court was never apprised of the transfer of these assets to Barclays or advised that the transfer would be documented through the Clarification Letter.  While the last draft in existence prior to the Sale Hearing (Deposition Exhibit 35) tracks to some extent the transaction description enunciated to the Court during the Sale Hearing, the next draft (Deposition Exhibit 36) differs dramatically and speaks, for the first time, specifically to the issue of amending the APA and transferring some of these assets (e.g., the Clearance Box Assets).  There is no excuse for Barclays not disclosing these transfers during the Sale Hearing, when the agreements to transfer them had been reached **_prior to_** the Sale Hearing.[250]

---

[248]   Compare Ex. 64 Hughes Tr. at 263:22-25 ("[Q] Were the assets listed in the Clarification Letter included to make up a shortfall of some kind?  [A] No"), with Barclays Br. ¶ 141 (stating other assets delivered to "make up for a shortfall").  See also Ex. 55 Burian Tr. at 264:3-11, 255:8-11.

[249]   See Committee Rule 60 Motion Ex. 46 (September 19, 2008, email from Lowitt to McDade) ("We did find 5 bn of exchange listed options which we are investigating."); Committee Rule 60 Motion Ex. 47 (Valuation Spreadsheet ascribing $2.3 value to OCC Accounts); Ex. 98 McDade Tr. at 275:14-278:4 (indicating McDade was unaware of agreements or negotiations concerning OCC Accounts transfer).

[250]   See Ex. 63 Hughes Tr. at 17:14-22 (agreement to transfer Clearance Box Assets reached before Sale Hearing); Ex. 68 Lewkow Tr. at 115:12-123:5 (agreement concerning transfer of Clearance Box Assets and 15c3 Accounts reached before Sale Hearing).

162.    Barclays submits the Committee cannot now argue the Court did not approve the Clarification Letter because the Committee professionals (a) reviewed versions of the Clarification Letter before the parties signed it, (b) knew these additional assets would be transferred to Barclays prior to the Sale Hearing and raised no objection, and (c) knew that repurchase agreements typically involve "haircuts."[251]  Barclays' arguments miss the mark.

163.    **First,** the Committee does not take issue with the use of the Barclays Repurchase Agreement as the mechanical vehicle through which the parties consummated certain elements of the Sale Transaction.  Instead, the Committee takes issue with the parties' use of the Barclays Repurchase Agreement to pass a secret, negotiated $5 billion discount through to Barclays without disclosing the discount to the Court (and the Committee).[252]

164.    **Second,** the evidence adduced illustrates that the Committee professionals were **not** aware of the transfer of these assets (or Barclays' claim to them) prior to the Sale Hearing.  Edward J. Rosen, Barclays' counsel's 30(b)(6) witness on the subject of exchange traded derivatives, testified that at no point in time did he have any conversation with any Committee representatives about the OCC Accounts.[253]  Committee counsel recalled specifically that it was

---

[251]    See Barclays Br. ¶¶ 180, 199.

[252]    Cf. Ex. 55 Burian Tr. at 83:11-84:12 ("I am going to focus on the last [Klein] conversation …. I actually had a draft of the clarification letter at that time …. [W]e didn't have the background or the details of what -- not what the words meant, but what was actually happening pursuant to those words, and therefore, I was concerned and asked the question, and … the answer I was given was, we are going to sit down with you now and explain it to you.  And then we had that explanation …. [A]ssuming that these words were describing businesses and assets, as we were explained, then we thought on balance, the clarification letter was fine").

[253]    See Ex. 73 Rosen Tr. at 117:24-118:11 (discussing parenthetical in clarification letter that Barclays claims added cash posted as collateral for exchange traded derivatives to the definition of Purchased Assets):  "[Q] [D]o you know whether the trustee had any knowledge about the amount of the property that was the subject of that parenthetical?  [A] … I assume that as part of this, the trustee was looking at what was there.  [Q] Is your answer the same with respect to the creditors committee?  [A] **I've had no direct interaction with them, the creditors committee, such that I can recall.**") (emphasis added).  See Ex. 63 Hughes Tr. at 127:17-128:8 (unable to recall whether Committee was present during exchange traded derivatives discussions).

not advised of the Clearance Box Assets until after the Sale Hearing.[254]  With respect to the 15c3

Accounts, the Committee was advised of these modifications after the Sale Hearing.[255]

165.    **Third**, while the Committee professionals may have become aware that these

additional assets were to be transferred to Barclays during the closing weekend, they were

apprised of those transfers in the context of Barclays' and the Lehman Sellers' representations

that the marked value of the Barclays Repo Collateral, i.e., the value on the Lehman Sellers'

books, **had declined by $5 billion**, thereby extinguishing any haircut.[256]

166.    **Lastly**, neither the September 17 Press Release nor the September 17 Analyst Call

afforded or revealed knowledge of the $5 billion discount or embedded gain.  If anything, they

simply prompted additional investigation.[257]

---

[254]    Ex. 57 O'Donnell Tr. at 19:6-20:12 ("[Q] Do you recall during that recess any person from
Lehman referring to a category of additional assets estimated by Lehman to be worth $1.9
billion?  [A] Again, no recollection of that that [sic] was discussed during that recess. .... [Q] Did
Milbank participate in any discussions either before the hearing or during the hearing concerning
a category of assets described as being worth $1.9 billion?  [A] To the best of my recollection,
no.").

Burian could not recall whether Houlihan was told before or after the Sale Hearing about the
Clearance Box Assets.  See Ex. 55 Burian Tr. at 317:19-319:14.

[255]    See supra Part II.A.8 ("Lehman-Houlihan Telephone Calls Confirm Even Exchange (September
19)"); Part II.B.2.e ("What Was Not Disclosed To Court – Supposed Off The Record
Conversations"); Ex. 55 Burian Tr. at 219:12-15, 222:1-223:16, 234:24-241:20, 305:17-309:11,
314:3-15, 317:19-319:14; Ex. 57 O'Donnell Tr. at 19:7-20:12, 22:25-23:12; Exhibit 73 (Tr.,
Deposition of Edward J. Rosen, February 19, 2010) ("Rosen Tr.") at 117:24-118:1; Ex. 63
Hughes Tr. at 127:17-128:9 (noting no specific disclosures made to the Committee); 151:6-
152:14 (averring that the Committee may have been informed of the changes over the closing
weekend).

[256]    See Part II.A.8 ("Lehman-Houlihan Telephone Calls Confirm Even Exchange (September 19)");
Part II.C.1 ("After Excluding Committee's Professional From Meetings And Discussions,
Lehman Sellers And Barclays Advise Them Of Salient Transaction Terms Hours Before
Closing").

[257]    See Part II.A.4 ("Barclays' Press Release And Analyst Call (September 17)").

### C.   BARCLAYS' FAILURE TO MAKE ADEQUATE DISCLOSURE OF SALIENT TERMS OF SALE TRANSACTION FORFEITED ITS ENTITLEMENT TO 363(M) AND FINALITY PROTECTIONS

167.   Barclays contends that the Committee's Rule 60 Motion is barred as a matter of law by section 363(m) of the Bankruptcy Code, which protects a good faith purchaser from the deleterious effects of an appeal of a sale order following the closing of the sale.[258]  In failing to disclose material features of the Sale Transaction to the Court, Barclays forfeited its entitlement to any section 363(m) protections.

### 1.   TRANSPARENCY AND DISCLOSURE ARE SINE QUA NON OF 363(M) AND FINALITY PROTECTIONS

168.   The Bankruptcy Code does not define the term "good faith" as used in section 363(m).  In re Tri-Cran, Inc., 98 B.R. 609, 618 (Bankr. D. Mass. 1989); see Cumberland Farms Dairy, Inc. v. National Farmers' Org., Inc. (In re Abbotts Dairies of Pennsylvania, Inc.), 788 F.2d 143, 147 (3d Cir. 1986) (stating that "neither the Bankruptcy Code nor the Bankruptcy Rules attempts to define 'good faith'").

169.   Instead, courts analyzing transactions under Bankruptcy Code section 363(m) have "turned to traditional equitable principles, holding that the phrase [good faith purchaser] encompasses one who purchases in 'good faith' and for 'value.'"  Id. (citing In re Bel Air Assocs., 706 F.2d 301, 305 (10th Cir. 1983); In re Rock Indust. Machinery Corp., 572 F.2d 1195, 1197 (7th Cir. 1978)).[259]

---

[258]   Barclays Br. ¶ 232.

[259]   See also Tri-Cran, 98 B.R. at 618 (good faith purchaser requirement "speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (quoting Rock Indus., 572 F.2d at 1198; Abbotts Dairy, 788 F.2d at 147; Bel Air Assocs., 706 F.2d at 305 n. 11).  See also In re Gucci, 126 F.3d 380, 390 (2d Cir. 1997) (holding "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made").

170.    The significance of full disclosure in the context of good faith findings in section

363 sales cannot be overemphasized.  See Colony Hill Assocs. v. Kabro Assocs. of West Islip,

LLC (In re Colony Hill Assocs.), 111 F.3d 269, 277 (2nd Cir. 1997) (Indeed, "[m]any courts

ruling on challenges to a purchaser's good faith status have focused on whether the acts about

which the appellant complained were disclosed to the bankruptcy court"); In re Engineering

Prods. Co., 121 B.R. 246, 249 (Bankr. E.D. Wash. 1990) ("Of paramount importance is the

existence of good faith -- *of full disclosure* and fair dealing on the part of all interested parties")

(emphasis added).

171.    The Lehman Sellers consummated the Sale Transaction pursuant to section

363(b) of the Bankruptcy Code, implicating the standards enunciated in Official Committee of

Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983).

Lionel examined "to what extent Chapter 11 permits a bankruptcy judge to authorize the sale of

an important asset of the bankrupt's estate out of the ordinary course of business and prior to

acceptance of any plan of reorganization."  The Lionel creditors' committee insisted that Lionel

sell its 82% equity interest in Dale Electronics, Inc. (the "Dale Stock"), an asset accounting for

approximately one-third of the value of Lionel's consolidated assets.  The equity holders

objected, arguing that such a sale, "prior to approval of a reorganization plan, deprives the equity

holders of the Bankruptcy Code's safeguards of disclosure, solicitation and acceptance and

divests the debtor of a dominant and profitable asset which could-serve as a cornerstone for a

sound plan."  The Second Circuit determined the Dale Stock could not be sold under section

363(b) of the Bankruptcy Code, thereby confirming a longstanding principle that significant

assets must be sold pursuant to a chapter 11 plan.

172.    Although courts today are more willing to permit significant asset sales outside

the confines of a Chapter 11 plan, Lionel and its progeny still support the proposition that sales

through section 363(b) of the Bankruptcy Code and sales through a plan process are not equally

favored.  In the plan process, a sufficient quantum of creditors can overrule the debtors'

purported exercise of their "business judgment," and management can test that judgment against

the creditors' will.  That tension requires disclosure through a plan process -- because the

Bankruptcy Code enables creditors to be the arbiter of management's decision on an informed

basis brought about by the disclosure attendant to the chapter 11 plan process.

173.    In the absence of the protections afforded by the plan and disclosure statement

process, however, as a predicate to a sale of a substantial portion of the debtor's assets pursuant

to section 363(b), courts still will require debtors to introduce evidence of "some articulated

business justification" for the sale, Engineering Prods., 121 B.R. at 247 (quoting In re Lionel

Corp., 722 F.2d at 1070), and to make "a showing that the purchase price is fair and reasonable,

that the sale is in the best interest of the estate, and that the assets will substantially diminish in

value if not immediately sold."  Id. (quoting Abbotts Dairies, 788 F.2d at 146).

174.    Implicit in the requirement that the sale price must be fair and reasonable is the

requirement that there will be full disclosure of the assets the debtor is conveying and the

consideration the debtor is to receive; in the absence of such disclosure, a court is unable to

assess whether the sale price is "fair and reasonable" and whether the sale is supported by a

sound business justification.  These disclosures, therefore, are mandatory.

175.    Here, Barclays failed to make significant disclosures to the Court regarding

fundamental provisions of the Sale Transaction, relating directly to value, which Barclays

mistakenly believed was irrelevant to the Court's approval of the sale.  To the contrary, the

failure to disclose to the Court Barclays' day-one gain imperative, the $5 billion discount off the

Purchased Assets' book value, billions in additional assets and the overstatements of liabilities,

strip Barclays of any entitlement to section 363(m) protection.

176.    A review of extant case law confirms this conclusion.  Compare In re Colony Hill
Assocs., 111 F.3d at 274-77 (refusing to vacate sale order on application of disgruntled bidder
when (i) disgruntled bidder's late bid and request to adjourn sale hearing were rejected; (ii)
initial bidder and secured creditor agreed to block disgruntled bidder's bid; and (iii) on appeal,
disgruntled bidder argued initial bidder and secured creditor conspired to exclude it from bidding
process and buy assets at depressed valuation, because "all relevant facts regarding the parties'
bids and positions *were disclosed to the bankruptcy court*") (emphasis added) with In re Tri-
Cran, 98 B.R. at 623-24 (in chapter 11 case of cranberry farming corporation, (i) minority
shareholders objected to debtor's motion to sell nearly all assets in a private sale, arguing debtor
failed to identify buyer and disclose its relationships with debtor and third parties and
(ii) subsequently appointed chapter 7 trustee discovered in a subsequent investigation that certain
of debtor's shareholders had arranged sale to undisclosed purchaser at a discount price as part of
secret deal to maintain control of corporation's assets; Rule 60(b) motion granted to set aside
sale in which "[t]hrough their insider dealing, concealment, and misrepresentation, [purchaser
and its cohorts] short circuited the judicial machinery and prevented its usual function in an
imperial manner .... Had the facts about [Purchaser's] relationship to the Debtor and about the
nature of the dealings between them come to light, the Court would not have permitted the sale
to go forward").

### 2.    BARCLAYS ASSUMED RISK OF NOT RETURNING TO COURT

177.    At the Sale Hearing, the Court acknowledged that the importance of the Sale
Transaction, indicating that it was "prepared to stay here for as long as it takes if you're prepared
to stay here for as long as it takes."[260]  Given the significance of the transaction and the
materiality of the changes that took place over the weekend, the Court surely would have made
itself available to review the Clarification Letter and other changes *before the markets opened*

---

[260]    See Sale Hearing Tr. at 243:20-22.

98

on Monday, September 22.  Barclays assumed the risk of not returning to Court.  Indeed, as a purchaser seeking section 363(m) protection, the onus fell on Barclays to take steps to protect its position -- which it failed to do.

178.    Barclays cannot seriously dispute that the differences between the Sale Transaction represented to the Court and the transaction consummated were material and that it might have to return to Court for approval.  Barclays now suggests that the Committee had the burden to return to Court to alert the Court of the Committee's concerns regarding the Sale Transaction.  If sustained, Barclays' argument would shift the burden of disclosure under section 363 of the Bankruptcy Code to a party that did not sign the transaction documents or seek their approval.

### 3.    SECTION 363(M) OF BANKRUPTCY CODE DOES NOT APPLY TO MOTIONS FILED PURSUANT TO RULE 60(B)

179.    According to Barclays, section 363(m) of the Bankruptcy Code requires that the Committee satisfy a higher standard (e.g., bad faith) to prevail on its Rule 60(b) Motion.  Barclays deduces that because section 363(m) applies to appeals from sale orders, it applies to motions seeking relief from sale orders pursuant to Rule 60, and, as a result, the Committee Rule 60 Motion fails absent a showing of bad faith.[261]  Barclays overstates its position.

180.    *First,* "[s]ection 363(m) provides that a purchase … of property of the estate is protected from the effects of reversal on appeal of the authorization to sell … as long as the purchaser acted in good faith and the appellant failed to obtain a stay of the sale."  3 Collier On Bankruptcy ¶ 363.11 (15th ed. 2009).  By its terms, the statute only applies in the context of orders reversed or modified on appeal.  See 11 U.S.C. § 363(m) ("***Reversal or modification on appeal*** of an authorization under [this section] ... does not affect the validity of a sale … under

---

[261]    In arguing the inapplicability of section 363(m) to its Rule 60 Motion, the Committee is not acknowledging that the bad faith standard could not be met.

such authorization to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal) (emphasis added). In drafting and amending the Bankruptcy Code, Congress was aware of Rule 60(b) and never extended section 363(m) beyond its terms to preclude the application of Rule 60 to sale orders. Congress's refusal to do so is telling.[262]

181.    **Second**, as Barclays concedes, courts considering the scope of section 363(m) of the Bankruptcy Code have limited its application to appeals and declined to find it precludes Rule 60 applications. See In re Alan Gable Oil Dev. Co., 978 F.2d 1254, 1255 (4th Cir. 1992) (Section 363(m) does not divest the bankruptcy court of the power to upset a sale under Rule 60(b)); In re M Capital Corp., 290 B.R. 743, 750 (9th Cir., 2003) (finding that if bankruptcy court becomes aware of lack of good faith or misconduct, it has ample authority to revisit its order approving sale and may vacate sale, modify order, or grant other appropriate relief).

182.    **Third**, simply because the Sale Order was appealed and affirmed does not mean that Rule 60 relief cannot be obtained post-appeal. See In re Tri-Cran, Inc., 98 B.R. at 618 (in examining matter remanded to bankruptcy court by district court (after district court entertained an appeal from order under section 363(b)), bankruptcy court found that because matter before it was not an appeal, but instead a motion to set aside a sale pursuant to Rule 60(b), section 363(m) of Bankruptcy Code did not apply).[263]

---

[262]    Cf. Jacobs v. New York Founding Hosp., 577 F.3d 93, 100 (2d Cir. 2009) ("The ancient maxim expressio unius est exclusio alterius (mention of one impliedly excludes others) cautions us against engrafting an additional exception to what is an already complex [statute]") (citations omitted).

[263]    Barclays' cases do not support the extension of section 363(m) of the Bankruptcy Code to Rule 60(b) motions. In re Summit Ventures, 161 B.R. 9 (Bankr. D. Vt. 1992), did not rely on 363(m) in denying Rule 60(b) relief. Instead, it held that a failure to provide notice to disgruntled bidders did not entitle them to Rule 60 relief. Summit Ventures did not purport to establish a rule that section 363(m) of the Bankruptcy Code precludes Rule 60(b) relief. Instead, it simply found that based on the facts of that case, the sales process was fundamentally fair. Summit Ventures is entirely distinguishable from the instant case, where the failure to disclose material terms of the consummated sale incurably infected the sale process. Indeed, the Committee is not simply arguing that notice was deficient, but instead that inadequate disclosure numerous factual

100

### D.   COMMITTEE IS ENTITLED TO RULE 60(B) RELIEF NOTWITHSTANDING FINALITY TYPICALLY ATTENDANT TO SALE ORDERS

183.   Barclays did not disclose to the Court that it insisted on a gain from the transaction's inception, that it ensured that gain by receiving a negotiated $5 billion discount off the Purchased Assets' book value, that the Cure and Compensation Liabilities were inflated, that the standards for valuing assets from book value to liquidation value changed, or that it demanded and received additional assets in the final hours before the Sale Order was entered. Because Barclays failed to disclose these features from the outset, the Court was not in a position to fully evaluate the Sale Transaction. Moreover, mistakes and misrepresentations concerning the values of the assets and other key terms of the Sale Transaction entitle the Committee to Rule 60(b) relief in order to ensure that Barclays receives only the value disclosed to and approved by the Court.

184.   Barclays argues that the Committee's requested relief from the Sale Order is "especially disfavored," and that the Court's discretion to grant the Rule 60(b) Motions is "very limited," because the Rule 60(b) Motions relate to a section 363 sale order.[264] However, nothing in the relevant text of the Bankruptcy Code, the Bankruptcy Rules, the Federal Rules of Civil Procedure or relevant case law imposes a heightened standard for granting Rule 60(b) relief from sale orders.[265]

---

mistakes and misrepresentations rendered the sale process defective and fundamentally unfair. Barclays' only other purported authority for the proposition that section 363(m) precludes Rule 60 relief comes from In re Gucci, 126 F. 3d at 387, which does not even discuss section 363(m) of the Bankruptcy Code in the context of an appeal.

[264]   Barclays Br. ¶ 521

[265]   Indeed, the cases cited by Barclays do not establish the existence of a heightened standard for granting Rule 60(b) relief from the Sale Order. See, e.g., In re Chung King, Inc., 753 F.2d 547 (7th Cir. 1985) (holding that relief may be granted from sale order either (i) where the sale price was wholly inadequate as to shock conscious or (ii) there is a price discrepancy and some other aggravating factor such as fraud, mistake or imprudence); In re General Insecticide Co., 403 F.2d 629 (2d Cir. 1968) (holding a bankruptcy sale could be overturned when "tinged with fraud, error or similar defects which would in equity affect the validity of any private transaction;" decision did not examine interplay between Rule 60(b) and sale orders); In re Frankel, 191 B.R. 564 (Bankr. S.D.N.Y. 1995) (holding that Rule 60 is appropriate mechanism for challenging sale and

185.    The decision to grant Rule 60(b) relief from an order is left to the sound discretion of the court, which may draw on its reservoir of equitable powers to grant that relief.[266] Rule 60(b) "strikes a balance between serving the ends of justice and preserving the finality of judgments."[267] Critically, Rule 60(b) relief is available from an order approving a sales transaction where, as here, there is a fundamental defect in the sales process, including the failure to adequately disclose transaction terms to the Court.[268] To that end, "inadequacy of price, accompanied with other circumstances having a tendency to cause such inadequacy, or indicating any apparent unfairness or impropriety, will justify setting aside [a] sale."[269]

---

that motion to vacate sale order may be granted where "fundamental errors or compelling equities arising out of fraud, mistake or like infirmity, such as defective notice to interested parties of the sale or 'grossly inadequate' sales price, justify setting aside a confirmed sale").

[266]    See, e.g., Kirwan, 164 F.3d 1175, 1177-78 (8th Cir. 1999) (noting in Rule 60(b) context, "[g]eneral equitable principles govern the exercise of discretion"); Lasky v. Cont'l Prods. Corp., 804 F.2d 250, 256 (3d Cir. 1986) (60(b)(6) case); Marshall v. Monroe & Sons, Inc., 615 F.2d 1156, 1160 (6th Cir. 1980) (60(b)(1) case); Whitaker v. Assoc. Credit Servs., Inc., 946 F.2d 1222, 1224 (6th Cir. 1991) (60(b)(1) case); Peirre v. Bernuth, 20 F.R.D. 116, 117 (S.D.N.Y. 1956) (describing Rule 60 as "a grand reservoir of equitable power to do justice in a particular case") (60(b)(6) case)) (citation omitted).

[267]    Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986). See also In re Emergency Beacon Corp., 666 F.2d 754, 759 (2d Cir. 1981) (stating Rule 60(b) relief is appropriate "where the judgment may work an extreme and undue hardship"); Bankers Mortgage Co. v. United States, 423 F.2d 73, 77 (5th Cir. 1970), cert. denied, 399 U.S. 927 (1970) (noting Rule 60(b) "preserve[s] the delicate balance between the sanctity of final judgments ... and the incessant command of the court's conscience that justice be done in light of all the facts"); Gey Associates General Partnership v. 310 Associates, L.P., 2002 WL 31426344 (S.D.N.Y. October 29, 2002) (holding that bankruptcy court did not abuse its discretion in reversing order authorizing breakup fees in sale transaction based on mistake of fact).

[268]    See, e.g., In re Emergency Beacon Corp., 666 F.2d at 761 (vacating a portion of order under Rule 60(b)(6) because full disclosure was not made to court); In re BCD Corp., 119 F.3d 852, 860-62 (10th Cir. 1997) (affirming lower court's decision to set aside original sale when sale order had been entered without a disclosure of sale terms; finding notice and hearing requirements therefore were not met because parties did not have appropriate information to raise informed objections); In re Lawrence, 293 F.3d 615, 624-26 (2d Cir. 2002) (noting bankruptcy court's statement that "[i]f there were misrepresentations at the time of the sale, this Court approved such sale not fully knowing all the salient facts" and remanding to district court to consider Rule 60(b)(3) relief).

[269]    In re Am. Freight Sys., Inc., 126 B.R. 800, 803 (D. Kan. 1991) (affirming bankruptcy court's decision to vacate sale order because court and creditors were misled concerning property sold, i.e., they were advised 11 acres of property with an appraised value of $1,330,000 would be sold at 70% of value even though sale actually involved 24 acres of property with an appraised value

1.      COMMITTEE IS ENTITLED TO RULE 60(B)(1) RELIEF AS A RESULT OF
MULTIPLE MISTAKES OF FACT

186.    Rule 60(b)(1) permits relief from an order based on mistakes of fact or law that
render the sales process defective.  See In re 310 Assocs., 346 F.3d at 31 (granting relief from
sale order where there was a mistake of fact regarding whether party was stalking horse bidder
entitled to breakup fees); In re BCD Corp., 119 F. 3d at 860 (setting aside sale where "there was
a fundamental defect in the bidding process due to lack of notice to the creditors of the sale").

187.    The circumstances surrounding the Sale Transaction include a number of factual
mistakes that warrant relief from the Sale Order.   The APA clearly ascribes nearly matching
"book values" to the long and short positions, which is consistent with the explanation afforded
to the Court.  The Lehman Sellers described the transaction to their Board and the Committee as
a wash and an even exchange.  The central mistake of fact was the Court's understanding that the
value of the financial assets presented in the transaction reflected the Lehman Sellers' book value
through an even exchange.  In point of fact, the valuation reflected a $5 billion negotiated
discount from that book value.[270]

188.    Similarly, a mistake with respect to the alleged decline in the market value of the
assets underlies the Sale Order.  The Court was under the mistaken impression that the value of
the Lehman Sellers' assets (apart from the real estate and data centers) declined from $70 billion
to $47.4 billion as a result of market volatility.  However, the Lehman Sellers' marks ($49.9
billion), Barclays' custodian's (BoNY's) marks ($52 billion) and the Movants' expert reports

---

of $1,675,000 to be sold at 55% of value); Lamont v. Grass (In re Lamont), 453 F. Supp. 608,
609-10 (N.D.N.Y. 1978) (affirming bankruptcy court's decision to vacate a sale order where it
determined a fundamental mistake occurred -- a bidder was not given notice of meeting of
creditors where bid was to be considered), aff'd 603 F.2d 213 (2d Cir. 1979).

[270]    See Part II.A.1 ("Obtaining Board of Director Approvals"); Part II.A.6 ("Lehman Advises
Committee Transaction Is 'An Even Exchange' (September 18)"); Part II.A.8 ("Lehman-
Houlihan Telephone Calls Confirm Even Exchange (September 19)"); Part II.B.2 ("What Was
Not Disclosed to Court").

($51 billion) demonstrate otherwise. Moreover, unbeknownst to the parties in the courtroom, $47.4 billion may not have been the "book value," but instead may have been the liquidation value of the Barclays Repo Collateral together with the Clearance Box Assets. The purported market value was not arrived at by using the Lehman Sellers' mark-to-market methods (notwithstanding McDade's testimony to the contrary and the text of the APA).[271]

189.    Barclays maintains the Court authorized the transfer of no less than $50 billion in assets because, in addition to the $47.4 billion, it also authorized the transfer of $3 billion in residential mortgage securities.[272] Accepting that argument, however, would be authorizing Barclays to "double count" those securities, which also appear on Schedule A (the Barclays Repo Collateral) and Schedule B (the Clearance Box Assets) of the Clarification Letter.[273] To that end, they fell within the $47.4 billion figure, which, as noted, may reflect the sum of the liquidation value of the Barclays Repo Collateral together with the Clearance Box Assets.[274]

190.    The overstatement of Cure And Compensation Liabilities by approximately $1.8 billion dollars provides another mistake for Rule 60(b) purposes. The 9-16-08 Balance Sheet ascribed a valuation of $4.25 billion to these liabilities. During the Sale Hearing, the Court was assured that "Barclays is also agreeing to the same employee compensation agreements."[275] Even though the Court was told and reassured that this figure was an accurate representation of the compensation liability, Barclays was aware that the $2 billion amount was overstated by no

---

[271]    See Part II.A.7 ("Lehman Sellers Prepare Liquidation Valuation At Barclays' Request (September 19)"), Part II.B.2.c ("Value Represented To Court ($47.4 Billion) Was Not Mark-To-Market Value On Lehman Sellers' Books But Instead Appears To Be Sum Of Liquidation Value And Clearance Box Assets").

[272]    Barclays Br. ¶¶ 167, 197-98.

[273]    See Zmijewksi Report at ¶ 40.

[274]    See Part II.B.2.c ("Valuation Presented To Court ($47.4 Billion) Was Not Mark-To-Market Value On Lehman Sellers' Books But Instead Appears To Be Sum Of Liquidation Value And Clearance Box Assets").

[275]    Ex. 82 Sale Hearing Tr. at 48:13-14, 100:22-25.

less than $1 billion against the amount accrued on the Lehman Sellers' books.[276]  More egregious mistakes were made with respect to the Cure amounts.  Barclays and the Lehman Sellers represented to the Court that Barclays would assume up to an estimated $1.5 billion in contract Cure liabilities.[277]  The Court was never informed, however, that Barclays knew at the time of the Sale Hearing that it was going to pay substantially less.  Indeed, it paid only $238 million.[278]

191.    The impact of the self-styled "Clarification Letter" serves as an additional example of a mistake of fact regarding the Sale Transaction.  The Clarification Letter was described to the Court as merely clarifying certain provisions of the APA concerning the addition of certain subsidiaries.[279]  It was never disclosed to the Court that the Clarification Letter would attempt to materially amend the APA, e.g., by facilitating the transfer of additional value to Barclays through the repurchase transaction, including the $5 billion discount and additional assets that were not required to compensate for a shortfall.[280]

192.    According to Barclays, only unilateral litigation mistakes (i.e., failing to timely file a brief) warrant Rule 60(b) relief.[281]  However, courts have not taken such a narrow view and instead have granted relief from sales orders when, as here, the parties (and Court) were mistaken about the material terms of a sales transaction.  See In re Emergency Beacon Corp., 666 F.2d at 759.

---

[276]    See Part II.B.2.f ("Overstated Cure And Compensation Liabilities").

[277]    Ex. 82 Sale Hearing Tr. at 101:1-4.

[278]    See Part II.B.2.g ("Overstated Cure and Compensation Liabilities").

[279]    Ex. 82 Sale Hearing Tr. at 48:5-10.

[280]    See Part III.B.2 ("Court Never Approved Clarification Letter To Extent It Materially 'Amends' APA By Effectuating Negotiated $5 Billion Discount To Barclays And Transferring Clearance Box Assets, 15c3 Accounts And OCC Accounts").

[281]    Barclays Br. ¶¶ 571-80.

193.    Barclays argues that there is no mistake because the Committee was, in fact, aware of and understood the material terms of the consummated transaction, including the embedded price discount.[282]  Barclays is clearly mistaken as to what the Committee knew and understood.  In the context of a complex sale transaction, occurring at a rapid pace, Barclays cannot defeat a claim of mutual mistake simply by claiming it understood the transaction.  Evidence exists that it did not, including, among other things, losing track of $7 billion in cash in the days after the transaction closed[283] and the months of delay until it consummated the December and January Settlements.  Moreover, the Committee submits Barclays is mistaken in its belief that it is entitled to receive billions of dollars in value beyond what was disclosed to and approved by the Court.

194.    Barclays next contends that "unilateral" mistakes regarding the "negotiation and comprehension" of transaction documents provide no basis for relief.  Barclays, and perhaps a handful of the Lehman Sellers destined for employment at Barclays, may have been aware of the $5 billion discount, but Barclays cannot point to any evidence showing the Court and the Committee were aware of the discount.

195.    Barclays' final argument is that a unilateral mistake is only effective in the context of a Rule 60(b) motion when state law permits reformation of a contact based upon a unilateral mistake -- which relief, Barclays notes, is unavailable under New York law.[284]  The Committee, however, has not asked the Court to reform the Sale Transaction documents.  Instead, it asks the Court to ensure that the consummated transaction mirrors the transaction presented to and approved by the Court.

---

[282]    Barclays Br. ¶ 180.

[283]    See LaRocca Decl. ¶¶ 7-12.

[284]    Barclays Br. ¶ 573.

### 2. NEWLY DISCOVERED EVIDENCE PROVIDES A BASIS FOR RULE 60(B)(2) RELIEF

196.    Rule 60(b)(2) provides that a court may relieve a party from a final judgment on the basis of newly discovered evidence "which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." FRCP 60(b)(2). To vacate a judgment under Rule 60(b)(2), the movant must demonstrate (1) the newly discovered evidence consists of facts that existed at the time of the prior decision; (2) the movant was excusably ignorant of the facts at the time of the original judgment, despite using due diligence to learn of them; (3) the newly discovered evidence is admissible and will likely change the result of the prior ruling; and (4) the newly discovered evidence is not merely cumulative of evidence already offered. See United States v. Int'l Bhd. of Teamsters, 247 F.3d 370, 392 (2d Cir. 2001) (listing factors); see also Whimsicality, Inc. v. Rubie's Costume Co., Inc., 836 F. Supp. 112, 117 (E.D.N.Y. 1993). The Committee Rule 60 Motion satisfies each of these elements.

197.    As demonstrated above, material facts then in existence were not presented for the Court's consideration at the Sale Hearing prior to the entry of the Sale Order. In particular, Barclays did not advise the Court of the following facts at the Sale Hearing:

- ***Immediate Gain for Barclays.*** It was a condition precedent of the Sale Transaction that Barclays realize an immediate, day one gain.

- ***Five Billion Dollar Discount.*** Barclays and several of the Lehman Sellers' negotiators (who would soon transfer to Barclays) had agreed that the financial assets transferred to Barclays would be "valued" at $5 billion less than the existing book value of those assets.

- ***Use of Barclays Repurchase Agreement To Transfer Discount.*** The APA the Court was approving would not be used to consummate the Sale Transaction. Rather, the transaction would be consummated through termination of the Barclays Repurchase Agreement (which was never presented to or approved by the Court). That agreement also would be the conduit through which the $5 billion embedded discount would be transferred to Barclays -- a result aided by Barclays unilaterally ignoring the APA and ascribing liquidation values to extinguish the Lehman Sellers' residual interest in the Barclays Repo Collateral.

- ***Transfer of Billions In Additional Assets.*** Additional assets (never before identified) would be transferred to Barclays, ostensibly to fill-in the illusory shortfall in the value of the Purchased Assets (or compensate for a liquidation valuation), notwithstanding that such transfers had been agreed to prior to the commencement of the Sale Hearing.

- ***Inflated Cure and Compensation Liabilities.*** The Cure and Compensation Liabilities were substantially lower (by approximately $1.8 billion) than the amounts disclosed to the Court. This is true even though the amount of those liabilities played an important role in the Court's approval of the break-up fee and, ultimately, the sale itself.

(a)    EVIDENCE WAS NEWLY DISCOVERED

198.    "Evidence is considered 'newly discovered' for purposes of Rule 60(b)(2) if it 'existed at the time of the prior adjudication but … was discovered by the movant only after the entry of judgment.'" Johnson v. Askin Capital Mgmt., L.P., 202 F.R.D. 112, 114 (S.D.N.Y. 2001) (quoting Walker v. Dep't of Veterans Affairs, No. 94 CIV. 5591, 1995 WL 625689, at *1 (S.D.N.Y. Oct. 25, 1995)). See also Ryan v. United States Lines Co., 303 F.2d 430, 434 (2d Cir. 1962) (newly discovered evidence is in existence at time of earlier disposition but not discovered until after entry of judgment). Notably, newly discovered evidence includes evidence that, while in existence, was not in the movant's possession prior to the rendering of the judgment. See Thompson v. County of Franklin, 180 F.R.D. 216, 221 (N.D.N.Y. 1998) (documents in existence prior to the decision, but not actually in movant's possession until after entry of decision, constitute new evidence).

199.    Barclays cannot dispute that the gain imperative, the negotiated discount, the use of the Barclays Repurchase Agreement to funnel that discount, the attribution of liquidation values to assets in a going-concern, book value transaction, the transfers of additional assets and the inflated liabilities, all were in existence at the time of the Sale Hearing.[285] Instead, Barclays submits they do not constitute new evidence within the parameters of Rule 60(b)(2) because they were known to the Committee and the other movants.

---

[285]    See supra Part II.B.2. ("What Was Not Disclosed To Court").

200.    More specifically, Barclays submits the Committee had enough information at the time of the Sale Hearing that it could cobble together to understand the Clarification Letter (and hence the material differences between the consummated transaction and the transaction represented to the Court), know the Barclays Repo Collateral was worth $49 billion, know the parties' agreement to a discount and discern that the estimates for Cure and Compensation Liabilities significantly overstated actual accruals.[286]  Barclays is wrong.

201.    **First,** Barclays' assertions glaringly ignore its own failure to disclose these material facts to the Court prior to entry of the Sale Order.  Even if the Committee was aware of these facts, that does not excuse Barclays from its obligation as the purchaser (seeking section 363(m) protection) to disclose them to the Court.  Barclays does not deny these facts were not disclosed to the Court.  It merely assumes the Court either was aware of them or considered them irrelevant.

202.    **Second**, the record contains no evidence the Committee knew about any of these facts.  Barclays maintains it has established knowledge of the discount (and Barclays' gain) by virtue of the September 17 Press Release and Analyst Call and Houlihan's understanding that repurchase agreements contain haircuts.[287]

203.    As noted above, the September 17 Press Release and Analyst Call are not the silver bullets Barclays claims.[288]  Moreover, even if the September 17 Press Release was relevant, <u>Kurzweil v. Philip Morris Cos.</u>, 1997 U.S. Dist. LEXIS 4451, *13-19 (S.D.N.Y. 1997), supports the proposition that evidence in the "public record" is not considered automatically to be in the movant's possession -- which is the case here -- when the Committee did not see the Press Release until ***after*** the Sale Hearing.  In <u>Kurzweil</u>, the Court found that in light of the large

---

[286]    Barclays Br. ¶ 48.

[287]    Barclays Br. ¶ 175.

[288]    <u>See</u> <u>infra</u> Part II.A.4 ("September 17 Press Release And Analyst Call").

volume of documents to be reviewed and analyzed, Rule 60(b)(2) relief was appropriate even though the new evidence was published in the public record two months before the court's judgment.  The court reasoned that there was a difference between the documents being available versus the movant's actual possession of the documents.  Id.  Accordingly, where the movant did not have actual possession of the evidence, the Rule 60(b)(2) motion should be granted.  Id. at 30.  "[T]he fact that the evidence could have been discovered shortly before the order was issued will not bar plaintiffs from relief pursuant to Rule 60(b)."  Kurzweil v. Philip Morris Cos., 1997 U.S. Dist. LEXIS 4451, at *19.[289]

204.    With respect to the haircut, Houlihan's general understanding of haircuts is entirely irrelevant when the Lehman Sellers and Barclays advised the Committee professionals of a balanced transaction and/or that the values of the financial assets had declined to the point where they were significantly less than the liabilities Barclays would assume.  The Committee hardly "knew the Repo Collateral had 'marks' of over $49 billion," when Seery and Klein both told Houlihan to ignore the $49.9 billion figure on the September 21 Schedules and that the marks had declined in value by $5 billion.  Moreover, that decline was described to have resulted from market deterioration -- not a negotiated discount.[290]

---

[289]    See also Whimsicality, Inc. v. Rubie's Costume Co., Inc., 836 F. Supp. 112, 119 (E.D.N.Y. 1993) (granting Rule 60(b) motion based on a subsequently acquired affidavit, which the court reasoned was "unusual evidence which a diligent attorney would not expect to be available"); Thompson v. County of Franklin, 180 F.R.D. at 222-23 (granting the 60(b)(2) motion because movant was not in possession of documents until after entry of decision and concluding movant satisfied the due diligence prong of Rule 60(b)(2) because it was not until after entry of judgment that movant "had any inkling" of existence of new evidence).

[290]    See Part II.A.6 ("Lehman Advises Committee Transaction Is 'An Even Exchange' (September 18)"); Part II.A.7; Part II.A.8 ("Lehman-Houlihan Telephone Calls Confirm Even Exchange (September 19)"); Part II.C.1 ("After Excluding Committee's Professionals From Meetings And Discussions, Lehman Sellers And Barclays Advise Them Of Salient Transaction Terms Hours Before Closing").

205.    Barclays maintains that the Committee was aware of inflated Cure and Compensation Liabilities because of a schedule filed with the Court after the Sale Transaction.[291] That schedule, however, only pertained to Cure Liabilities and was susceptible to change, especially when the APA afforded *sixty days* to finalize it.[292]  Even A&M, presumably in a better position than the Committee to assess the Cure and Compensation Liabilities, did not begin to realize the fallacy of the $4.25 billion figure under the 9-16-08 Balance Sheet until February 2009 because Barclays had impeded its access to the Lehman Sellers' accounting systems with which it would conduct that analysis.  Moreover, the degree to which the estimates ($4.25 billion) differ from the actual amounts (approximately $1.7 billion) is sufficiently egregious to suggest they were inflated.

206.    Barclays also contends the Committee became aware of the additional assets (e.g., the Clearance Box Assets and the 15c3 Accounts) by reviewing the Clarification Letter.  The Committee became aware of these additional assets through rushed reviews of drafts of the Clarification Letter, but, inter alia,  (a) no mention of the negotiated $5 billion discount was made (either to the Committee or in the Clarification Letter) and (b) Houlihan was advised the Clearance Box Assets would be added to compensate for market deterioration -- not the attribution of liquidation values.[293]

207.    Indeed, if the Clarification Letter provided the transparency and disclosure Barclays maintains, then Barclays surely should have disclosed it to the Court for its review and approval prior to entry of the Sale Order.  It declined to do so.

---

[291]    Barclays Br. ¶¶ 49, 294-97.

[292]    See Part II.B.2.g ("Overstated Cure and Compensation Liabilities").

[293]    See Part II.A.8 ("Lehman-Houlihan Telephone Calls Confirm Even Exchange (September 19)"); Part II.B.2; Part II.C.1 ("After Excluding Committee's Professionals From Meetings And Discussions, Lehman Sellers And Barclays Advise Them Of Salient Transaction Terms Hours Before Closing").

208.    **Third,** the Committee's actions from and after the closing, including, inter alia,

repeated requests for a reconciliation, advising the estates of the need for a final reconciliation

and investigation, and objecting to the December Settlement, clearly confirm the Committee's

lack of understanding.  The Committee did not develop a meaningful understanding of the Sale

Transaction until after receiving the Rule 2004 discovery, at which point it filed the Committee

Rule 60 Motion.  Accordingly, the Committee could not have acted in the time period provided

under Rule 59(b).

**(b)    COMMITTEE WAS JUSTIFIABLY IGNORANT OF NEW EVIDENCE**

209.    Rule 60(b)(2) relief requires a demonstration of justifiable ignorance of the newly

discovered evidence despite due diligence.  That showing requires "specific examples of the

attempts, if any, undertaken to locate the evidence at an earlier date."  Peyser v. Searle Blatt &

Co., Ltd., 2000 U.S. Dist. LEXIS 18432, at *8 (S.D.N.Y. Dec. 22, 2000) (citing U.S. v. 710

Main Street, Peekskill, 753. F. Supp. 121, 127 (S.D.N.Y 1990)).[294]

210.    The Committee stated at the Sale Hearing that it had insufficient time --

approximately 48 hours -- to perform appropriate due diligence to arrive at an informed

decision.[295]  Prior to the Sale Hearing, the Committee professionals attended meetings at Weil on

September 18 and conferred with the Lehman Sellers on Thursday, September 18, and Friday,

September 19.[296]  Following the Sale Hearing, the Committee professionals proceeded to the

offices of the Lehman Sellers' counsel to gather what information they could given their limited

---

[294]    See Nichols v. Alker, 235 F.2d 246 (2d Cir. 1956) (requiring a showing of "substantial evidence
.... which was not obtainable by due diligence in time to present it .... in the original ....
proceedings"); see also 11 Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 2859, at 303-
04 (2d ed. 1995) ("The rule speaks of 'due diligence,' and the moving party must show why he
did not have the evidence at the time of the trial or in time to move under Rule 59(b)").

[295]    See Sale Hearing Tr. at 67:16-21.

[296]    See Part II.A.6 ("Lehman Advises Committee Transaction Is 'An Even Exchange' (September
18)"); Part II.A.8 ("Lehman-Houlihan Telephone Calls Confirm Even Exchange (September
19)").

112

access to meetings taking place.  The conversations that took place that weekend with Barclays and the Lehman Sellers included representations regarding a balanced transaction (or one that favored the estates).

211.    The Committee had no reason to question the accuracy of the information provided.  Indeed, the Committee professionals advised specifically that they had no choice but to rely on those representations because they could not diligence them in the timeframe afforded.  Prior to closing, however, the Committee professionals advised the Lehman Sellers' advisors that the Committee fully expected to receive a full reconciliation substantiating those changes, which it pursued immediately after the closing.[297]  When that reconciliation was not forthcoming, the Committee promptly intensified its investigative efforts.  Once the Committee became aware of the potential existence of new evidence, it joined in reasonable Court-authorized discovery.

212.    Lastly, even if the Court finds the Committee has not satisfied the due diligence rule, the facts presented warrant relief to avoid a miscarriage of justice.[298]  Absent relief, Barclays will retain billions in assets even though the Court neither reviewed nor approved these aspects of the Sale Transaction because of inadequate disclosure.

---

[297]    See Part II.D ("Phase 4:  Verification Of Lehman Sellers And Barclays' Representations (September 2008 Through December 2008)"); Part II.C.1 ("After Excluding Committee's Professionals From Meetings And Discussions, Lehman Sellers And Barclays Advise Them Of Salient Transaction Terms Hours Before Closing"); Part II.A.8 ("Lehman-Houlihan Telephone Calls Confirm Even Exchange (September 19)"); Part II.C.2 ("Discussions Concerning Alleged Committee Consent to Material Transaction Modifications").

[298]    A narrow exception to the due diligence rule has been recognized to prevent a grave miscarriage of justice even though the "newly discovered evidence" supporting that order would have been available to the moving party at trial had that party exercised proper diligence.  Ferrell v. Trailmobile, Inc., 223 F.2d 697, 698 (5th Cir. 1955).  Courts in this Circuit have recognized the Ferrell doctrine, characterizing it as a "narrow exception." Ope Shipping, Ltd. v. Underwriters at Lloyds, 100 F.R.D. 428, 432 (S.D.N.Y. 1983) ("a new trial may be ordered to prevent a grave miscarriage of justice even though the newly discovered evidence supporting that order would have been available to the moving party at trial had that party exercised proper diligence").  Specifically, this exception has been "restricted to cases in which the evidence is material and conclusive." Id.

(c)   **NEWLY DISCOVERED EVIDENCE WOULD PRODUCE DIFFERENT RESULT**

213.   While some creditors objected to the Sale Transaction and claimed that Barclays was receiving a windfall, concrete record evidence conclusively supporting those arguments was not presented.  Instead, the Court concluded those statements represented speculation instead of record evidence.  Had the evidence uncovered following Rule 2004 discovery concerning the dramatic shifts in the contours of the consummated transaction been disclosed to the Court at the Sale Hearing, it likely would have sustained those objections.

214.   The Court reviewed and approved a going-concern transaction purportedly based on mark-to-market valuations on the Lehman Sellers' books.  In fact, the transaction involved a significant discount to Barclays of $5 billion (and attribution of liquidation value to the financial assets).  The Court simply may not have approved a liquidation of the Lehman Sellers' financial assets to Barclays as beneficial to the estates.

215.   Moreover, the facts presented fall squarely within the "exceptional circumstances" typically present when Rule 60(b)(2) motions are granted.  This is the largest and, arguably, the most complex bankruptcy case in history.  The Sale Transaction is of a magnitude never before seen in a bankruptcy case.  On top of all these factors, the Sale Transaction was approved and consummated within eight (8) days of the commencement of these cases.  The very result the Sale Transaction supposedly was pursued to avoid, i.e., an inevitable liquidation – may have occurred.

### 3.    RULE 60(B)(3) AND RULE 60(B)(6) RELIEF ARE AVAILABLE ALTERNATIVELY AS RESULT OF MISREPRESENTATIONS MADE TO COURT

216.    Misrepresentations, whether intentional or unintentional, provide a basis for Rule 60(b)(3) relief.[299]  Rule 60(b)(3) relief is appropriate where key terms of a sale order are misrepresented to the bankruptcy court and the bankruptcy court approves the sale based on those misrepresentation.  See, e.g., In re Lawrence, 293 F.3d 615, 625-26 (2d Cir. 2002) (after sale of debtor's securities of biotech company to consortium of undisclosed purchasers, debtors learned purchasers were insiders with advance knowledge of a lucrative discovery announced 30 days later; bankruptcy court reopened sale order so information could be presented to the court; according to Second Circuit, scenario (i.e., purchasers withholding information from sellers and court that could not have been discovered in diligence process) provided precise situation warranting Rule 60(b)(3) relief).

217.    Barclays argues that the Committee did not "plead with particularity" any fraud, misrepresentation or misconduct by Barclays.[300]  The record is replete with misrepresentations concerning the Sale Transaction that warrant Rule 60(b)(3) relief.  Barclays and the Lehman Sellers presented the Sale Transaction to the Court and the Committee as an even exchange, where the book value of the assets equaled liabilities or favored the estates.  The Court and the Committee also were told that the asset values had declined because of market deterioration to $47.4 billion and that Cure and Compensation Liabilities totaled not less than $3.5 billion.

---

[299]    See Londsdorf v. Seefeldt, 47 F.3d 893, 897 (7th Cir. 1995) ("[Rule] 60(b)(3) applies to both intentional and unintentional misrepresentations").  Relief is appropriate under Rule 60(b)(3) where the misrepresentations "foreclosed full and fair preparation or presentation of [the movant's] case." Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988); State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 176 (2d Cir. 2004); Atkinson v. Prudential Prop. Co., Inc., 43 F.3d 367, 372-73 (8th Cir. 1994) (requiring a showing "that the opposing party engaged in a fraud or misrepresentation that prevented the movant from fully and fairly presenting its case").

[300]    Barclays Br. ¶¶ 266-69.

Indeed, Committee professionals were told over the closing weekend that they "made $2 billion" from these developments. These disclosures disguised both Barclays' insistence on a gain and a $5 billion discount and the fact that represented values were the result of negotiations, not market fluctuations.

218.    Barclays makes no attempt to directly address the myriad misrepresentations, instead arguing against Rule 60(b)(3)'s applicability because Barclays purportedly did not act as an "opposing party."[301]  However, the misrepresentations at issue here justify relief under subsection (b)(3) or (b)(6) of Rule 60, regardless of Barclays' status at the time they were made. Indeed, cases have granted Rule 60(b)(3) relief even where a debtor, who supported the transaction, later claimed the transaction terms were misrepresented to it. See In re Lawrence, 293 F.3d at 625.  Given that from inception, the Committee has questioned the Sale Transaction, and indeed, at the Sale Hearing, did not expressly support the transaction, Barclays cannot so quickly claim that it is not effectively adverse (i.e., "an opposing party") to the Committee.

219.    Moreover, Barclays itself sought relief from the Sale Order under Rule 60, implicitly acknowledging its status as a party.  Having taken this position when it proves beneficial, Barclays is now hard-pressed to disclaim its status as a party in the context of the Movants' Rule 60 Motion.

220.    Lastly, Rule 60(b)(6) relief is appropriate when relief under clauses (1) through (5) of Rule 60(b) is not applicable.  The Committee has pleaded its entitlement to Rule 60(b)(6) relief in the alternative to the extent that Rule 60(b)(3) is not applicable because Barclays is not an "opposing party."[302]

---

[301]    Barclays Br. ¶¶ 598-99.

[302]    See Scherer v. City of New York, No. 03 CIV. 8445, 2007 WL 2710100, *4 (S.D.N.Y. Sept. 7, 2007); Rand Int'l Leisure Prods., Ltd. v. TekSource, L.C., No. 97 CV 0319, 1998 WL 372356, *2 (E.D.N.Y. July 2, 1998) (noting "grounds asserted for relief pursuant to Rule 60(b)(6) must be other than those recognized in clauses (1) through (5) of the rule….").

### 4.    COMMITTEE REQUESTED RULE 60 RELIEF ON TIMELY BASIS (RULE 60(C))

221.    Rule 60(c)(1) requires that motions be filed within a reasonable time from the entry of the relevant order, but in no event more than one year later under Rule 60(b)(1)-(b)(3).[303]  Courts look to a variety of factors when determining what constitutes "reasonable," including the complexity of the proceedings, length and the circumstances of delay in filing, prejudice to the opposing party, and equitable considerations.[304]

222.    Courts make "reasonable time" determinations on a case-by-case basis, considering the particular facts and circumstances of each case.  The Committee has satisfied Rule 60(c) by filing the Committee Rule 60 Motion (dated September 15, 2009) within a year of the entry of the Sale Order (September 20, 2008).  See e.g., Pierce Assocs., Inc. v. Nemours Found., 865 F.2d 530, 548 (3d Cir. 1989) (finding 364 day delay in filing Rule 60(b) motion reasonable in the context of a "particularly complex matter" where the parties acted "with great haste"); In re New England Mut. Life Ins. Co. Sales Practices Litigation, 204 F.R.D. 6, 11 (D. Mass. 2001) (finding reasonable time depends on the facts of each case); U.S. v. Forty-Eight Thousand, Five Hundred Ninety-Five Dollars, 705 F.2d 909, 912-913 (7th Cir. 1983) (finding 49 week delay in filing motion reasonable where movant was precluded from acting to protect his

---

[303]    See Fed. R. Civ. P. 60(c)(1) ("A motion under Rule 60(b) must be made within a reasonable time -- and for reasons (1), (2) and (3), no more than a year after the entry of the judgment or order or the date of the proceeding").

[304]    See, e.g., In re G.A.D., Inc., 340 F.3d 331, 334 (6th Cir. 2003) (evaluating "length and circumstances of delay in filing, prejudice to opposing party by reason of the delay, and circumstances warranting equitable relief"); In re Rome Family Corp., 407 B.R. 65, 80 (Bankr. D. Vt. 2009) (entertaining rule 60(b)(4) memorandum in light of the unforeseen shift in ownership of the asset, the failure of key parties to fulfill their statutory duties, the amount of time that elapsed between the sale and the determination of ownership, and the overall equities of the case).  See PRC Harris, Inc. v. Boeing Co., 700 F.2d 894, 897 (2d Cir. 1983); R.N. v. Suffield Bd. of Educ., 194 F.R.D. 49, 51 (D. Conn. 2000) (finding motion was filed in a reasonable time where defendant tried to resolve the issue and filed the motion as soon as it realized its efforts were to no avail); Kirwan, 164 F.3d at 1178 (considering the sequence of relevant events and finding it was not inappropriate for bankruptcy court to reconsider its prior orders); see also In re Woods, 173 F.3d 770, 780-81 (10th Cir. 1999) (finding that inadvertence did not result from lack of diligence because outside forces involved in timing of motion).

interests); <u>Caraway v. Sain</u>, 23 F.R.D. 657, 660 (N.D. Fla. 1959) (finding delay of 58 days after

entry of judgment reasonable); <u>In re Cremidas' Estate</u>, 14 F.R.D. 15, 18 (D. Alaska 1953)

(finding that delay of three years does not bar motion under Federal rule); <u>Marquette Corp. v.

Priester</u>, 234 F .Supp. 799, 802 (D.C.S.C. 1964) (finding delay of 15 months to file 60(b) motion

under (b)(4) and (b)(6) reasonable); <u>see</u> <u>also</u> <u>United States v. Holtzman</u>, 762 F.2d 720, 725 (9th

Cir. 1985) (finding five year delay in filing motion under Rule 60(b) permissible where litigant

reasonably interpreted an injunction to authorize litigant's conduct and timely relief was sought

upon receipt of notice to the contrary); <u>J.D. Pharmaceutical Distrib., Inc. v. Save-On Drugs &

Cosmetics Corp.</u>, 893 F.2d 1201, 1207 (11th Cir. 1990) (finding seven month delay allowable

and granting relief from judgment because party was never served with requests for admissions

or motion for summary judgment).

223.    Barclays contends the Committee Rule 60 Motion is untimely because each of the

mistakes of fact and misrepresentations were known to the Committee long before the Rule 60(b)

Motions were filed, [305] and because the Committee did not seek relief in a timely fashion by

waiting nearly a year.  Barclays' defense not only mischaracterizes the state of the Committee's

knowledge, but it ignores the history of the Committee's relentless efforts to obtain a

reconciliation of the Sale Transaction that squared with Barclay's and the Lehman Sellers'

representations.

---

[305]    Barclays Br. ¶¶ 546-52.

224.    Barclays cannot dispute that the factual bases upon which the Committee's Rule 60 Motion rest constitute new evidence of which the Committee was not aware until after Rule 2004 discovery was ordered.  Nor can it challenge the Committee's timeliness in acting on that evidence.[306]  As the timeline below illustrates, the Committee requested relief on a timely basis:

---

[306]    See Part II.A.4 ("Barclays Press Release And Analyst Call (September 17)"); Part II.B.2 ("What Was *Not* Disclosed To Court"); Part II.C.1 ("After Excluding Committee's Professionals From Meetings And Discussions, Lehman Sellers And Barclays Advise Them Of Salient Transaction Terms Hours Before Closing"); Part III.B ("Significant Transaction Terms Were Not Disclosed During Sale Hearing – Consummated Transaction Differed Significantly From Transaction Represented To, And Approved By Court"); Part III.D.2.a ("Newly Discovered Evidence Provides A Basis For Rule 60(b)(2) Relief.  Evidence Was Newly Discovered").

## Phase 1
## PRE-HEARING
### Tuesday, September 16 Through Friday, September 19

| Tuesday, September 16, 6:00 AM | Tuesday, September 16 | Wednesday, September 17, 11:00 GMT | Wednesday, September 17 | Thursday, September 18, 9:00 PM | Friday, September 19 |
|---|---|---|---|---|---|
| LBHI and LBI Boards of Directors approve Sale Transaction | Parties sign APA | Barclays holds analyst call | Committee unsuccessfully requests adjournment at Bid Procedures Hearing | Houlihan conference call with Lehman Sellers (Seery and/or Shapiro) | Parties agree 1) to use Barclays Repurchase Agreement to transfer assets and 2) to transfer Clearance Box assets and 15c3 accounts |

| Tuesday, September 16, 11:00 GMT | Wednesday, September 17, 00:30 GMT | Wednesday, September 17 | Thursday, September 18 | Friday, September 19 | Friday, September 19, shortly before Sale Hearing |
|---|---|---|---|---|---|
| Barclays PLC Board of Directors approves Sale Transaction | Barclays issues press release | Committee appointed, holds first meeting | Committee professionals' 1st meeting with Lehman Sellers regarding Sale Transaction | Barclays sends LBI "Notice of Repurchase Date; Notice of Termination" | Two telephone calls between Houlihan and Lehman Sellers (Seery and/or Shapiro) |

In re Lehman Brothers Holdings Inc. – Chapter 11 Case No. 08-13555 (JMP)
Memorandum of Law of Official Committee of Unsecured Creditors—March 18, 2010

03690.61377/3375653.9                  120



## Phase 2
## SALE HEARING
### Friday, September 19

**Friday, September 19, 4:36 PM**
Sale Hearing opens

**Friday, September 19, approx. 6:00 PM**
Announcement that Clarification Letter will be brought to Court

**Friday, September 19, 12:41 AM**
Sale Hearing adjourns

**Saturday, September 20, approx. 2:00 AM**
Court enters Sale Order

## Phase 3
## CLOSING WEEKEND
### Saturday, September 20 Through Monday, September 22

**Saturday, September 20, morning**
Parties meet at Weil office for closing

**Sunday, September 21**
Barclays learns it "accidentally" terminated Barclays Repurchase Agreement and proposes Paragraph 13 of Clarification Letter to provide for rescission of Termination Notice

**Monday, September 22, late night/early morning**
Committee professionals have two of three meetings with Lehman Sellers

**Monday, September 22, approx. 1:30-2:30 AM**
Committee professionals have third meeting with Lehman Sellers and Barclays; Klein outlines discussion on yellow Manila Folder

**Monday, September 22, 8:00 AM**
Sale Transaction closes

In re Lehman Brothers Holdings Inc. – Chapter 11 Case No. 08-13555 (JMP)
Memorandum of Law of Official Committee of Unsecured Creditors – March 18, 2010

03690.61377/3375653.9                    121



## Phase 4
## VERIFICATION
### September Through December 2008

**Thursday, September 25, 10:28 AM**
Committee reiterates request to Lehman Sellers for asset schedules

**Thursday, September 25, 7:07 PM**
Lehman Sellers transmit Clarification Letter and Schedules A and B

**Monday, September 29**
Weil and A&M meet with Tonucci and Kirk

**Wednesday, October 1**
Houlihan meets with A&M

**Wednesday, October 8**
LBHI and advisors including A&M host routine meeting with Committee and professionals

**Monday, October 13**
Committee counsel requests meeting with LBHI counsel to discuss Sale Transaction

**Wednesday, October 15**
Lehman Sellers and Barclays file summary pages of Schedules which disclaim finality

**Friday, November 21**
Meeting among counsel to LBHI and Committee to discuss Sale Transaction

In re Lehman Brothers Holdings Inc. – Chapter 11 Case No. 08-13555 (JMP)
Memorandum of Law of Official Committee of Unsecured Creditors – March 18, 2010

03690.61377/3375653.9    122



## Phase 5
## INTENSIFIED PURSUIT OF RECONCILIATION
### December 2008 Through March 2009

**Friday, December 5**
SIPA Trustee files "December 2008 Settlement Motion"

**Friday, December 19**
Committee files Limited Objection to December 2008 Settlement Motion

**Friday, December 26**
Committee sends 1st informal document request to Barclays and DTCC

**Thursday, January 22**
SIPA Trustee files "January 2009 Settlement Motion"

**Monday, February 9**
Barclays issues Results Announcement for 2008 which declares £2.262 billion gain on acquisition

**Wednesday, February 11**
Court approves January Settlement and reiterates Committee reservation of rights concerning investigation

**Thursday, December 18**
Final versions of Schedule A and Schedule B to the Clarification Letter, without market values, filed under seal

**Monday, December 22**
Hearing on December Settlement; Court indicates Barclays and Committee should cooperate on information requests

**Tuesday, January 13, 2009**
"Meet and Confer" (call) among Barclays and Committee regarding requests for reconciliation

**Tuesday, February 3**
In-person meeting between Barclays and Committee regarding requests for reconciliation

**Tuesday, February 10**
Committee sends 2nd letter requesting reconciliation information

**Friday, March 20**
Barclays produces documents (hard copy) to Committee

In re Lehman Brothers Holdings Inc. – Chapter 11 Case No. 08-13555 (JMP)
Memorandum of Law of Official Committee of Unsecured Creditors – March 18, 2010

# Phase 6
# RULE 2004 DISCOVERY AND LITIGATION
## *April Through September 2009*



| | | | |
|---|---|---|---|
| **Monday, April 13** — LBHI sends informal document request to Barclays | **Thursday, May 28** — Barclays produces documents to Committee in electronic format | **Friday, June 5** — Barclays objects to Rule 2004 Motion and Committee's Joinder | **Tuesday, July 14** — Barclays begins Rule 2004 production of documents |

**Monday, May 18** — LBHI files "Rule 2004 Motion" seeking order compelling discovery

**Friday, June 5** — Committee and LBI join in LBHI's Rule 2004 Motion

**Thursday, June 25** — Court enters order authorizing discovery

**Friday, July 31** — First Rule 2004 deposition taken

**Tuesday, September 15** — Committee, LBHI and LBI file Rule 60 motions

In re Lehman Brothers Holdings Inc. – Chapter 11 Case No. 08-13555 (JMP)
Memorandum of Law of Official Committee of Unsecured Creditors – March 18, 2010

225.    Barclays argues the Court should ignore the Committee's persistent attempts to obtain a reconciliation and instead deny the Rule 60 Motions because they were not filed immediately after the Sale Transaction closed.  At that time, however, the Committee lacked sufficient information to justify the current application and did not uncover it until Rule 2004 discovery took place.

226.    That position is not surprising considering the complexities inherent in the transaction which were exacerbated by the pace with which it proceeded.  Barclays has conceded on numerous occasions that the Sale Transaction was incredibly complex and arose out of the unique circumstances present in September 2008. [307]  This fact is corroborated by the confusion expressed by third parties with better access to information than the Committee.[308]

227.    Barclays' own actions confirm the state of confusion that existed after the Sale Transaction's closing.  Between September 19 and September 23, Barclays was not aware that $7 billion in cash was not in its accounts.  It took Barclays and the SIPA Trustee three months to negotiate a settlement with respect to the missing funds.  It took the SIPA Trustee, Barclays and

---

[307]    See, e.g., December Settlement Motion ¶¶ 3, 5-13; Bay Harbour Docket No. 10 at 7, 12, 15; LBHI Docket No. 3776 ¶¶ 44-48.

[308]    See Exhibit 139 (September 29, 2008, email from Fed to JPMC) ( FRBNY to LBHI 02055-02056) ("Obviously this is a lot to sort through ... I have asked some of our investigators to help go through these transactions .... I am somewhat confused by the first chart ...."); Exhibit 135 (September 30, 2008, email from JPMC to Fed) (FRBNY to LBHI 04951) ("JPM is not able to tell whether particular securities successfully moved to BONY/BarCap."); Exhibit 137 (October 1, 2008, internal Fed email) (FRBNY to LBHI 01816-17) ("[T]here are approximately 12,000 transactions (CUSIP numbers) in this test group I have gotten through almost 6,000 of these numbers and have been able to match less than half.  I cannot explain why there are transactions on the Barclays/DTC list that cannot be found on the Chase/DTC list and why there are transactions on the Chase/DTC list that are not found on the Barclays/DTC list."); id.  ("I think Pat's final paragraph is so telling about how messed up this is."); Exhibit 136 (October 1, 2008, email from Fed to DTCC) (FRBNY to LBHI 07641) ("Chase and Barclays are still fighting about what happened that night .... Chase has provided a lot of data and so has Barclays.  However Chase's data stops at the Lehman DTC account and so there is a bit of a black hole in the middle of all of this."); Exhibit 138  (October 6, 2008, internal Fed email) (FRBNY to LBHI 05788) ("In comparing the list of securities that Barclays says it received and the securities that JPMC says it delivered we find there is little overlap between the two. Consequently, it is not obvious what Barclays has actually received from JPMC.").

the DTCC four months to negotiate the January Settlement concerning undelivered securities.  It took Barclays and the SIPA Trustee sixteen months (until December 2009) to negotiate their settlement concerning the transfers of customer accounts.  Barclays cannot maintain that any party in interest could garner sufficient information and conduct the appropriate diligence to mount a lawsuit seeking the recovery of more than $5 billion in that time period, i.e., before the end of October 2008.

228.    Moreover, from and after the filing of the Bay Harbour Appeal, had the Committee requested Rule 60 relief, Barclays likely would have argued (incorrectly, given the lack of overlap in the appeal and the Rule 60 Motions) that the appeal divested the Court of jurisdiction. Contemporary Mission, Inc. v. U.S. Postal Service, 648 F.2d 97, 107 (2d Cir. 1981) (holding that filing of the notice of appeal divested the district court of jurisdiction to entertain the 60(b) motion); see also In re Charles & Lillian Brown's Hotel, Inc., 93 B.R. 49, 53 (Bankr. S.D.N.Y. 1988) ("This divestiture of jurisdiction has been held to apply to motions pursuant to FRCP 60(b)"); In re McLean Industries, Inc., 76 B.R. 291 (Bankr. S.D.N.Y. 1987) (same).

229.    Barclays also cannot complain of the Committee's alleged delay, considering its own role in causing any such delay.  Rule 60(b) relief is warranted when the movant can "demonstrate 'that circumstances beyond its control prevented timely action to protect its interests.'"  In re International Fibercom, Inc., 503 F.3d 933, 945 (9th Cir. 2007) (quoting Alpine Land & Reservoir, 984 F.2d 1047, 1049 (9th Cir. 1993)); U.S. v. Baus, 834 F.2d 1114, 1123 (1st Cir. 1987) (finding it would "result in manifest unfairness to deny relief on account of movant's failure to seek Rule 60(b)(6) relief prior to the government's 1985 collection effort when the government (1) lulled guarantors into delaying through its promises, (2) itself delayed two years and (3) breached its obligations under settlement agreement").

230.    Here, it bears noting that Barclays never provided the simple (but detailed) reconciliation showing the assets transferred, their marked value, and the date and methods for those marks.  Indeed, Barclays was free *at any time* -- at the December Settlement Hearing, at the January Settlement Hearing, during the meetings in January and February 2009, or in response to either the December 26 or February 10 Request -- to advise the Committee (a) of its position concerning the value of the assets transferred and (b) of its position concerning whether the Committee's investigation was moot given the passage of the reconsideration and appeal periods.  It did nothing.  It is telling that Barclays points to its expert report, *filed in 2010*, to argue the Committee has received the accounting it requested.[309]

231.    Moreover, the Committee and Barclays negotiated for nearly four months (from December 2008 through March 2009) for the production of documents.  Even after Barclays finally produced documents, the limited production was mostly unintelligible and did little to advance the Committee's understanding of the Sale Transaction.  The same can be said for the in-person meetings.  Barclays brought operational people who did not engage in the relevant negotiations, even though the Committee specifically requested high-level information concerning the contours of the consummated transaction.  Barclays also objected to LBHI's request for Rule 2004 discovery (and the Committee's joinder thereto).

232.    Barclays also complains it will be prejudiced if the Court grants the Committee Rule 60 Motion.[310]  Delay alone, however, does not substantiate an argument based on prejudice.[311]  Moreover, Barclays' claims of prejudice are based Barclays' reliance on a transaction that was neither disclosed to nor authorized by the Court.

---

[309]    See Barclays Br. ¶¶ 305, 685.

[310]    Barclays Br. ¶ 558.

[311]    See, e.g., Davis v. Musler, 713 F.2d 907, 916 (2d Cir. 1983) (holding district court abused its discretion in denying Rule 60(b) relief from a default judgment and holding "delay alone is not a sufficient basis for establishing prejudice") (citing Feliciano v. Reliant Tooling Co., Ltd., 691 F.2d 653, 656-57 (3d Cir. 1982)); see also, In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 127-

233.     Lastly, Barclays argues the Sale Transaction has closed and cannot be unwound. That does not, however, accurately describe the requested relief.  The Committee has not asked to unwind the Sale Transaction in its entirety.  Instead, it insists that the consummated transaction conform to and reflect the transaction reviewed and approved by the Court.

### 5.     COMMITTEE AND LBHI ESTATE ARE ENTITLED TO AFFIRMATIVE RELIEF  UNDER RULE 60 AND UNDER SECTIONS 549 AND 559 OF BANKRUPTCY CODE

234.     Barclays asserts that the Committee Rule 60 Motion fails because Rule 60 does not authorize "affirmative relief" beyond simply setting aside a judgment.[312]  Barclays also mischaracterizes the relief the Committee requests as "re-writing" the APA.[313]  Barclays misstates both the available scope of Rule 60(b) relief and the relief the Committee requests.

235.     Rule 60(b) grants the courts broad discretion to fashion appropriate relief, including a "grand reservoir of equitable power to do justice in a particular case."  State Bank of Southern Utah v. Gledhill (In re Gledhill), 76 F.3d 1070, 1080 (10th Cir. 1996) (court could grant equitable relief and reinstitute automatic stay under Rule 60(b) even though such relief typically requires an adversary proceeding) (citing Radack v. Norwegian America Line Agency, Inc., 318 F.2d 538, 542 (2d Cir. 1963), cert. denied, 423 U.S. 1079 (1979)). This means courts have "broad authority to relieve a party from a final judgment 'upon such terms as are just.'"  Id. (quoting Rule 60(b)(6)).

---

28 (3d Cir. 1999) (holding prejudice must "be something more closely tied to the merits of the issue"); Pratt v. Philbrook, 109 F.3d 18, 22 (1st Cir. 1997) ("it is always prejudicial for a party to have a case reopened after it has been closed advantageously by an opponent's default."); Smith v. Widman Trucking & Excavating, Inc., 627 F.2d 792, 798 (7th Cir. 1980) (holding delay and possibility that party will have to return money received in judgment not sufficient prejudice to deny Rule 60(b) motion).

[312]     Barclays Br. ¶¶ 526-30.

[313]     Barclays Br. ¶¶ 531-40.

236.    Moreover, the Committee is not seeking to rewrite or modify the Sale Order or the APA.[314]  The Committee is simply seeking to enforce the terms of the Sales Transaction as presented to and approved by the Court, which is entirely proper in a Rule 60(b) motion. Barclays should not receive assets in excess of the value it represented ($47.4 billion) or credit for liabilities it never assumed.  Nor should it have the ability to point to the Clarification Letter, which was never reviewed and approved, as a basis to keep those assets.

237.    In re Polycel Liquidation, Inc., No. 00-62780, 2007 WL 77336 (D.N.J. Jan. 8, 2007), provides instruction.  In Polycel, the debtor sold substantially all its assets to a purchaser in a section 363 sale.  The purchaser claimed the terms of the sale order and purchase agreement were broad enough to incorporate certain injection molds.  Following the closing, a third party sought relief from the sale order under Rule 60(b) claiming ownership of the molds.  The court ultimately granted the relief requested and ordered the molds be returned to the debtors, finding it was not reforming the asset purchase agreement but rather was enforcing the deal as disclosed to the Court.  See id. at *9.

238.    Critically, Barclays ignores the Committee's Adversary Complaint requesting declaratory relief that the Court did not approve the Clarification Letter (which purported to document several of these undisclosed, additional transfers).  It also ignores sections 549 and 559 of the Bankruptcy Code, which provide relief for unauthorized transfers and the recovery of the haircut with respect to the Barclays Repurchase Agreement.  To the extent relief from the Sale Order is granted, or the Sale Order otherwise is set aside, the transfers effectuated pursuant to the Sale Order no longer can be considered "authorized" and instead are subject to recovery for the benefit of the estate.

---

[314]    Barclays Br. ¶ 442.

239.     Barclays suggests the Committee (or LBHI) is not entitled to relief under section 549 of the Bankruptcy Code because the mandate rule bars any argument that Barclays' receipt of $5 billion in additional assets was not authorized.[315]  As discussed below, Barclays' suggestion that the Committee, who was a not a party to the Bay Harbour Appeal, is barred by the mandate rule from challenging a portion of the Sale Transaction or pursuing issues that were never pressed before the appellate courts is without merit.[316]

240.     Barclays next argues that section 549 of the Bankruptcy Code is not applicable because the parties signed and approved the Clarification Letter, and as such are now precluded from challenging its terms.[317]  Barclays overstates the facts.  In the first instance, the Committee never signed the Clarification Letter.  More importantly, the Court never approved the Clarification Letter.[318]

241.     Barclays further argues the Committee cannot seek relief from selective portions of the Clarification Letter.[319]  The Committee, however, seeks enforcement of section 549 of the Bankruptcy Code to recover assets transferred to Barclays through the Clarification Letter without Court authorization -- not selective enforcement of the Clarification Letter.  That result ensures the transaction consummated resembles the one reviewed and approved by the Court -- precisely the type of relief contemplated by section 549.  See In re Contr. Tech., Ltd., 343 B.R. 573, 584 (Bankr. S.D. Tex. 2006) (principal purpose of section 549 is to assure creditors "that the estate's fiduciary complies with applicable distribution law and Court orders"); In re

---

[315]     Barclays Br. ¶¶ 616-17.

[316]     See Part III.F ("Neither Mandate Rule Not Estoppel Or Waiver Doctrines Provide Barclays With Valid Defenses To Committee's Rule 60(b) Motion And Adversary Complaint").

[317]     Barclays Br. ¶¶ 626-30.

[318]     See Part III.B.2 ("Court Did Not Approve Clarification Letter To Extent It Materially Amended APA By Effectuating Negotiated $5 Billion Discount To Barclays And Transferring Clearance Box Assets, 15c3 Accounts and OCC Accounts").

[319]     Barclays Br. ¶ 645.

Centennial Textiles, Inc., 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998) (holding section 549 permits a trustee to "restore the estate to the financial condition it would have enjoyed if the [unauthorized] transfer had not occurred").

242.    Barclays also argues that the Movants also cannot establish entitlement to relief under section 559 of the Bankruptcy Code when (i) the Clarification Letter provides for the transfer of **all** of the Barclays Repo Collateral; (ii) there is no excess Barclays Repo Collateral; (iii) the December Settlement bars the section 559 claims; and (iv) the mandate rule, estoppel and waiver doctrines bar the claim.  Each of these purported defenses fails.

243.    **First**, the Committee vigorously disputes the Clarification Letter's validity, including its provisions terminating the Barclays Repurchase Agreement and waiving the estates' rights to excess collateral.  The Court neither reviewed nor approved the Clarification Letter, and Barclays never advised the Court that the Barclays Repurchase Agreement would be utilized as the convenient vehicle for transferring the previously agreed to (but undisclosed) $5 billion discount or "haircut" to Barclays.  Indeed, Barclays cannot rely on the Clarification Letter to eviscerate fundamental estate protections.  Cf. In re TWA, 261 B.R. 103, 113-14 (Bankr. D. Del. 2001) (contractual provision which purports to waive debtor's right to reject contract under the Bankruptcy Code violates public policy and is not enforceable); see also Bank of China v. Huang (In re Huang), 275 F.3d 1173, 1177 (9th Cir. 2002) ("It is against public policy for a debtor to waive the prepetition protection of the Bankruptcy Code.").

244.    Moreover, the facts surrounding the insertion of section 13 of the Clarification Letter suggest it was designed to eliminate the estates' rights under section 559 of the Bankruptcy Code.  Barclays had issued the Termination Notice on Friday, September 19, but subsequently rescinded it.  The rescission of that notice presumably was unnecessary because the Barclays Repurchase Agreement would terminate on the following Monday, September 22, at the closing.  Nonetheless, the Clarification Letter (a) rescinds the Termination Notice; (b)

terminates the Barclays Repurchase Agreement; and (c) waives the estates' rights to section 559

excess through releases. That result only could be accomplished within the confines of the

Clarification Letter (and its release provisions).[320] Absent the illicit Clarification Letter,

Barclays has no rights to the excess collateral.

245.    ***Second***, no less than $4.9 billion of excess value does exist that should be

returned to the estates beyond the financing extended to LBI under the Barclays Repurchase

Agreement ($45.0 billion). Barclays' own custodial agent, BoNY, valued the Barclays Repo

Collateral on a contemporaneous basis (September 19) at approximately $52 billion. The

Lehman Sellers' mark-to-market valuation for the Barclays Repo Collateral was approximately

$50 billion as of September 19, and the September 21 Schedules reflected a value of $49.9

billion. A number of Barclays' executives (previously Lehman employees), including Lowitt,

Tonucci and Kelly, all testified to a $5 billion discount being applied to the value of the Barclays

Repo Collateral, and Barclays advised the Fed on October 4 that the value was approximately

$49 billion.[321] The only valuation that supports Barclays' position that the haircut has

evaporated is the liquidation valuation that Seery prepared (conveniently) at Barclays' insistence,

ascribing values in the $44.6 to $45.5 billion range.[322]

---

[320]    See Part II.B.2 ("What Was Not Disclosed To Court"); Part III.B.2 ("Court Did Not Approve
        Clarification Letter To Extent It Materially Amended APA By Effectuating Negotiated $5 Billion
        Discount To Barclays And Transferring Clearance Box Assets, 15c3 Accounts And OCC
        Accounts").

[321]    See Part II.C.3 ("Valuation Of Securities Transferred"). Barclays' own expert, Professor
        Pfleiderer, acknowledges an excess of at least $500 million, which increases by an additional
        approximate $2 billion if the collateral that Barclays received in the December Settlement is
        valued properly at approximately $7 billion and not the approximately $5 billion that Barclays
        agreed to accept in the December Settlement.

[322]    See Part II.A.7 ("Lehman Sellers Prepare Liquidation Valuation At Barclays' Request
        (September 19)").

246.     By its own terms, section 559 applies to more than liquidations, by stating
expressly that it applies irrespective "if any such assets are disposed of on the date of
liquidation."  11 U.S.C.  § 559.  No case cited in the Barclays Brief provides otherwise.  Also,
section 562 of the Bankruptcy Code provides that value should be measured by "commercially
reasonable determinants of value" on the liquidation *or termination* date, and if not available on
such date, "as of the earliest subsequent date or dates on which there are commercially
reasonable determinants of value."  11 U.S.C. § 562.  Here, commercially reasonably
determinants of value exist, including, among others, Barclays' own collateral agent, BoNY, or
the value ascribed by JPMC, as an independent agent for LBI.

247.     ***Third***, the Order approving the December Settlement specifically provides that it
will not "bind, be collateral estoppel or otherwise prejudice any other matter in this case."
According to Barclays, the Committee withdrew the Limited Objection.[323]  That statement
simply is wrong.  The Committee pressed its objection at the hearing on the December
Settlement, indicated it did not accept the statements made in connection with the settlement, and
enjoys the protections of an order that expressly precluded any collateral estoppel effect of those
factual statements.[324]

248.     ***Lastly,*** the procedural roadblocks that Barclays seeks to erect to prevent the Court
from hearing the merits of the Committee's 559 claim are misplaced.  As discussed more fully
below, the mandate rule and the estoppel and waiver doctrines have no applicability to the
Committee Rule 60 Motion, including the claims asserted under section 559 of the Bankruptcy
Code, especially when the Bay Harbour Appeal did not examine this issue.[325]

---

[323]     Barclays Br. at ¶ 295 n. 215.

[324]     See Part II.E.1 ("December 2008 And January 2009 Barclays' Settlements").

[325]     See Part III.F ("Neither Mandate Rule Nor Estoppel Or Waiver Doctrines Provide Barclays With
Valid Defenses To Committee's Rule 60(b) Motion And Adversary Complaint").

### E.    EVEN IF RULE 60 DOES NOT PROVIDE A BASIS FOR RELIEF, COURT RETAINS POWER TO MODIFY ITS PRIOR ORDER WITHOUT RULE 60

249.    The Second Circuit has recognized that a bankruptcy court may reconsider an order as an exercise of its inherent authority -- even after the time for appeals has lapsed for "good reason."  See Otte v. Mfrs. Hanover Commercial Corp. (In re Texlon Corp.), 596 F.2d 1092, 1100 (2d Cir. 1979).  In Texlon, the Second Circuit affirmed a bankruptcy court's grant of relief from a financing order based on the bankruptcy court's inherent power:  "a district court sitting in bankruptcy could in its discretion rehear a case even after the expiration of the period allowed for appeal 'if no intervening rights will be prejudiced by its action' and that if the court rehears the petition 'upon the merits', the time to appeal would run from its grant or denial."  Texlon, 596 F.2d at 1100 (internal citations omitted).  Texlon has been interpreted as recognizing "'practical utility' in a rule that allowed for bankruptcy orders to be vacated or modified where 'subsequent events presented during administration' showed the need for such relief."  In re Old Carco LLC, 2010 WL 31430 *2 (Bankr. S.D.N.Y. Feb. 05, 2010).[326]  To that end, the "decision whether to reconsider an order, judgment or proceeding under its inherent power is within the court's discretion."  Old Carco LLC, 2010 WL 31430 at *2 (citing Texlon, 596 F.2d at 1100).

250.    Ample cause outside of Rule 60 exists to grant the Committee relief from the Sale Order and hold Barclays to the terms of the Sale Transaction described to and approved by the Court.  Grossly inadequate disclosure -- that failed to identify a $5 billion discount, inflated liabilities, unilateral changes to valuation standards (from book to liquidation value), Barclays'

---

Barclays also argues the Barclays Repurchase Agreement does not constitutes a "repurchase agreement" within the meaning of section 101(47) of the Bankruptcy Code, but does not provide any case or statutory support to substantiate its argument.

[326]    Courts in this Circuit have continued to recognize the validity of the Texlon rule.  See id. (discussing Texlon doctrine, but finding facts did not warrant modification of order); In re Blutrich Herman & Miller, 227 B.R. 53, 60 (Bankr. S.D.N.Y. 1998) (holding that "[n]otwithstanding the usual jurisprudence under Rule 60(b), it is also well established that bankruptcy courts, as courts of equity, have the power to reconsider, modify or vacate previously-entered orders unless intervening rights have vested in the interim in reliance on those orders").

insistence on a day-one gain and 11th hour demands for additional assets -- incurably infected the sale process. Barclays' own recalcitrance in the discovery process, which caused the Committee, LBHI and the SIPA Trustee months of delay in reconstructing the Sale Transaction, self-servingly hid the considerable gains Barclays realized. Accordingly, to the extent that Rule 60(b) relief is not available, the Committee submits the Court still should use its inherent power to grant the requested relief from the Sale Order.

### F. NEITHER MANDATE RULE NOR ESTOPPEL OR WAIVER DOCTRINES PROVIDE BARCLAYS WITH VALID DEFENSES TO COMMITTEE'S RULE 60(B) MOTION AND ADVERSARY COMPLAINT

251.    Barclays argues that the Committee's alleged failure to appeal the Sale Order bars its Rule 60 Motion and Adversary Complaint based on several inapplicable legal doctrines -- the mandate rule and theories of estoppel and waiver. Barclays cannot legitimately assert any of these defenses.[327]

### 1. MANDATE RULE DOES NOT APPLY WHEN COMMITTEE WAS NOT PARTY TO BAY HARBOUR APPEAL, ISSUE DECIDED HAD NO BEARING ON RELIEF REQUESTED, AND NEW EVIDENCE EXCEPTION APPLIES

252.    On September 21, 2008, Bay Harbour appealed the Sale Order (the "Bay Harbour Appeal") to the United States District Court for the District of New York (the "District Court"), arguing the Court failed to consider whether Barclays was complicit in transfers totaling $8 billion dollars from Lehman Brothers Inc. (Europe) ("LBIE") to Lehman entities in North America -- funds Bay Harbour styled the "Defalcated Funds."[328] According to Barclays, the

---

[327]    The Committee notes that Barclays continues to refuse to differentiate among the Committee, LBHI and the SIPA Trustee. Indeed, circumstances which Barclays argues justify defeating LBHI's and the SIPA Trustee's Rule 60 Motions simply do not apply to the Committee. The Committee neither approved the Sale Transaction, signed the Clarification Letter, joined in the Bay Harbour Appeal (as defined below), or joined as a party to the December Settlement Agreement. Instead, the Committee vigilantly and persistently pursued a reconciliation of the transaction, even bringing these issues to the Court's attention in connection with the Limited Objection to the December Settlement.

[328]    Exhibit 140 (Appellants' Opening Brief, Bay Harbour Mgmt., L.C. v. Lehman Brothers Holdings, Inc., :08-cv-08869-DLC (S.D.N.Y. Nov. 14, 2008)) at pp. 4, 20-21.

decision of the United States District Court for the Southern District of New York (the "District Court") affirming the Sale Order (the "District Court Decision") bars the Committee from "making claims ... that **could have been raised** on appeal but were not (such as the lack of a valuation cap or a 'wash' requirement)."[329]  Barclays also submits the mandate rule bars a challenge from the Committee to the value it received because the Committee "could have joined Bay Harbour" in its appeal.[330]  Barclays is wrong.

253.    **First,** the District Court Decision does not contain an express mandate that precludes any of the Committee's arguments in the Rule 60 Motion or Adversary Complaint. Courts are careful to note that "from the proposition that the trial court must adhere to the decision of the appellate court there is the corollary that upon remand the trial court may consider matters not expressly or implicitly part of the decision of the court of appeals." U.S. v. Cirami, 563 F.2d 26, 33 (2d Cir. 1977) (citation omitted); see also New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 352 F.3d 599, 606 (2d Cir. 2003) ("Put simply, the law of the case does not extend to issues an appellate court did not address.") (internal quotations omitted).  Here, the District Court Decision does not contain an express mandate that precludes any of the Committee's arguments in its Rule 60(b) Motion or Adversary Complaint.

254.    Even if there were an express, limited mandate, the mandate rule still would not apply against the Committee, which was not a party to the appeal.  The only case Barclays cites that applied the mandate rule to a non-party is In re Marlar, 288 B.R. 823 (Bankr. W.D. Ark. 2003).  In that case, however, the appellate court (Eighth Circuit) had expressly outlined a mandate, i.e., it "direct[ed] the bankruptcy court not to satisfy the bankruptcy claim of [the party against whom the mandate rule was later applied], directly or indirectly." Id. at 826.  Because it had a direct and specific mandate, Marlar cannot be read to imply that the mandate rule generally

---

[329]    Barclays Br. ¶ 205 (emphasis added).
[330]    Barclays Br. ¶ 204.

applies to third parties who were not parties to the appeal.  Indeed, the <u>Marlar</u> mandate

specifically applied to a third party.[331]

255.     **_Second_**, the District Court Decision focused on a narrow issue, <u>i.e.</u>, the allegedly

Defalcated Funds and transfers among LBIE and other Lehman entities, which has no bearing on

the Committee's Rule 60 Motion.  The District Court Decision found that this Court "carefully

considered Appellants' claims about the Defalcated Funds" and considered them "irrelevant to

Barclays's good faith status."  Based on that narrow finding, the District Court affirmed and

dismissed the appeal.[332]  The District Court's mandate is not so broad as to find that Barclay's

status as a good faith purchaser is unassailable for other reasons (apart from the Defalcated

Funds), such as a failure to disclose material aspects of the Sale Transaction and receiving an

unauthorized windfall.

256.     **_Third,_** the mandate rule does not apply to arguments that the District Court did

not decide either explicitly or necessarily by implication.  Notably absent from the District

Court's decision is any discussion of inadequate disclosure, a negotiated $5 billion discount,

inflated liabilities, or the Clarification Letter (including whether it was approved by the Court).

Nor does the ruling that this Court did not err in holding Barclays a good faith purchaser after

considering the issue of the Defalcated Funds necessarily imply that the transaction

consummated is consistent with the transaction represented to and approved by the Court.

Moreover, the Committee's Rule 60(b) Motion and Adversary Complaint make no mention of

the Defalcated Funds.

---

[331]     The only other case Barclays cites for this proposition did not apply the mandate rule.  Instead, it
applied <u>res judicata</u> to prevent parties from raising "the same claims that were [previously]
litigated and lost."  <u>In re W.T. Grant Co.</u>, 20 B.R. 186, 189 (S.D.N.Y. 1982).  Barclays does not
even attempt to argue that the doctrine of <u>res judicata</u> applies to the Committee's claims.

[332]     <u>Exhibit 146</u>, (District Court Opinion, <u>Bay Harbour Mgmt., L.C. v. Lehman Brothers Holdings,
Inc.</u>, :08-cv-08869-DLC (S.D.N.Y. March 13, 2009)), p. 17, 20.

257.    **Fourth,** Barclays' attempts, based on inapposite case law, to argue that the mandate rule extends beyond the issues **actually decided** to any issue that **could have been decided** by the appellate court, fails.[333]  Barclays relies primarily on U.S. v. Stanley, 54 F.3d 103 (2d Cir. 1995) and two other cases relying on Stanley.  See U.S. v. Vidal, 136 Fed. Appx. 438, 440 (2d Cir. 2005); U.S. v. Zvi, 25 Fed. Appx. 34, 36 (2d. Cir. 1995).  All three cases denied reconsideration of a **second** appeal.  They also did not examine a Rule 60(b) motion filed in a bankruptcy case by an entity not a party to the appeal.

258.    Moreover, Stanley supports the proposition that the mandate rule depends upon the scope of the mandate.  Stanley recognized it had "identified a narrow issue for remand" and held that the mandate rule barred the appellants' argument because it went beyond that narrow mandate.  Stanley, 54 F.3d at 108; see also Zvi, 25 Fed. Appx. at 36-37 ("The authority granted to the district court under the mandate did not extend to" issue raised on remand and subsequently appealed).[334]

259.    Here, the Committee did not appeal the Sale Order and does not seek relief on remand within the confines of an order from the appellate court specifically identifying a narrow mandate.  Instead, the Committee is litigating claims in an ongoing bankruptcy case following an unrelated appeal.  Under these circumstances, the mandate rule bars only matters "expressly or implicitly part of the decision of the court of appeals."  Cirami, 563 F.2d at 32 (noting this would be the case "at a later stage in the litigation where the case is again before the trial court not on remand but, for example, on a new motion to vacate the judgment"); see also U.S. v. Minicone,

---

[333]    Barclays Br. ¶¶ 202-03.

[334]    Stanley and its progeny are further distinguishable because their reasoning rests on waiver where the same party "decided on his first appeal to forego" the argument being barred.  Stanley, 54 F.3d at 107 ("[T]he mandate rule forecloses litigation of issues decided by the district court but foregone on appeal **or otherwise waived**") (quoting U.S. v. Bell, 5 F.3d 64, 66 (4th Cir. 1993)) (emphasis added).  That reasoning falls apart as Barclays attempts to apply the mandate rule to a non-party to the appeal.

994 F.2d 86, 89 ("Of course, there is a corollary to [the mandate] rule – if an issue was not part of the appellate decision, a trial court may consider the matter.").[335]

260.     **Fifth,** even if the District Court decision did contain a mandate, the instant facts warrant application of the new evidence exception to the mandate rule, i.e., the recognized exception that when the party relies on new evidence not available on appeal, the mandate rule does not apply.  See U.S. v. Argentina, No. 00-62780, 2008 WL 510556, at *1 (2d Cir. Feb. 26, 2008); Highland Financial Corp., 216 B.R. 109, 114 (Bankr. S.D.N.Y. 1997) (noting an exception given "the availability of substantially different evidence at the trial on remand").[336]

261.     Evidence newly discovered through Rule 2004 discovery is sufficient to invoke this exception.  Here, it would be inequitable to apply the mandate rule against the Committee (and accept the argument that the Committee should have joined in the Bay Harbour appeal) because the Committee had no ability to develop a sufficient record to lodge an appeal during the relevant period.

262.     It is telling that in the Bay Harbour Appeal, Barclays did not dispute the representations of value given to the Court to which the Committee now seeks to hold Barclays. The LBHI's appellate brief stated "[b]y the time the Sale Hearing was conducted, the value of the securities to be transferred to Barclays declined from $72 billion at the beginning of that week to $47.4 billion and the liabilities to be assumed by Barclays declined from $68 billion to

---

[335]     The other cases cited by Barclays for the proposition that the mandate rule should apply to matters the District Court did not decide have been cited out of context.  For example, in Fogel, the court notes the mandate rule barred an argument because it was "decided by necessary implication" in a prior appeal.  Fogel v. Chestnutt, 668 F.2d 100, 109-10 (2d Cir. 1981) (barring argument that statute had no private cause of action after previously upholding a verdict on very same cause of action).  Seese involved a Rule 60(b) motion filed by a party after appeal and denial of a petition for certiorari to the Supreme Court.  Seese v. Volkswagenwerk, 679 F.2d 336, 337 (3d Cir. 1982).  Seese is distinguishable because "the basis of the rule 60(b) motion was before [that] court and the Supreme Court and thus could not be considered by the district court." Id. at n. 1.  By contrast, the Committee's claims were never presented to the District Court for review and consideration.

[336]     See Part III.D.2 ("Newly Discovered Evidence Provides A Basis For Rule 60(b)(2) Relief").

$45.5 billion."[337]  Barclays did not dispute that explanation of the value (as it does now).  In fact,
Barclays cited to the same testimony to note that "the Debtors explained changes to the proposed
APA, including an hour-long discussion off the record, followed by a re-explanation of the terms
to the Bankruptcy Court."[338]

### 2. JUDICIAL ESTOPPEL HAS NO APPLICATION WHEN COMMITTEE HAS TAKEN CONSISTENT POSITIONS

263.    "A party wishing to invoke judicial estoppel must show that '(1) the party against
whom the estoppel is asserted took *an inconsistent position* in a prior proceeding and (2) that
position was adopted by the first tribunal in some manner.'"  Zurich Am. Ins. Co. v. Felipe
Grimberg Fine Art, 324 Fed. Appx. 117, 119 (2d Cir. 2009) (quoting Rodal v. Anasthesia Group
of Onondaga, PC., 369 F.3d 113, 118 (2d Cir. 2004)) (emphasis added).

264.    The doctrine of judicial estoppel cannot defeat the Committee Rule 60 Motion or
its Adversary Complaint because the Committee has not taken an inconsistent position.  The
position the Committee has taken consistently with respect to the Sale Transaction (enunciated at
the Sale Hearing) is that it lacked sufficient information.  After the Sale Hearing, the Committee
appeared in connection with the December Settlement, *opposing its approval* because it did not
want the settlement to have any collateral estoppel effect on its examination of the Sale
Transaction.  Lastly, the Committee appeared in support of LBHI's Rule 2004 Motion, further
stressing the need for information to reach the truth about assets transferred.

---

[337]    Exhibit 141 (Answering Brief of Lehman Brothers Holdings Inc., *et al.*, in Opposition to Bay
Harbour Appeal, Bay Harbour Mgmt., L.C. v. Lehman Brothers Holdings, Inc., :08-cv-08869-
DLC (S.D.N.Y. Dec. 12, 2008)) at 12.

[338]    Exhibit 142 (Appellee Barclays Capital Inc.'s Memorandum of Law in Opposition to Bay
Harbour *Et Al.*'s Appeal, Bay Harbour Mgmt., L.C. v. Lehman Brothers Holdings, Inc., :08-cv-
08869-DLC (S.D.N.Y. Dec. 12, 2008)) at 10.

265.     Barclays attempts to avoid this fact by pointing to disputed testimony about what the Committee did **outside of court**.[339]  But the doctrine of judicial estoppel requires that the Committee take inconsistent positions **on the facts** and **in court**.  See Rodal v. Anesthesia Group of Onondaga, P.C., 369 at 118 ("The doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding.") (emphasis added).  Moreover, the Committee continued to take the position that further investigation of the Sale Transaction was warranted well after the out-of-court "positions" highlighted by Barclays.

266.     When applying the doctrine of judicial estoppel, "a court must carefully consider the contexts in which [even] apparently contradictory statements are made to determine if there is, in fact, direct and irreconcilable contradiction."  Id. at 119.  Because there is no contradiction between the Committee's prior position that further factual examination of the Sale Transaction was required (i.e., both at the Sale Hearing, in connection with the December Settlement,  in connection with the January Settlement and in connection with LBHI's Rule 2004 Motion) and its current, substantive positions as articulated in the Committee Rule 60 Motion, judicial estoppel does not apply.

267.     Moreover, Barclays does not identify any applicable authority suggesting the Committee is estopped from bringing its Rule 60 Motion or Adversary Complaint.  The cases cited by Barclays applied judicial estoppel to prevent a debtor from asserting a claim it failed to disclose in prior bankruptcy proceedings.  Barclays uses the cases to argue that silence or

---

[339]     See Barclays Br. ¶ 467 n. 178 ((1) quoting disputed testimony from James Seery that the Committee "signed off" on the Clarification Letter prior to closing and (2) quoting disputed testimony from Harvey Miller that Committee representatives told him "we're satisfied" prior to closing).  But see Part II.A.6 ("Lehman Advises Committee Transaction Is 'An Even Exchange' (September 18)"); Part II.A.3, Part II.C.1 ("After Excluding Committee's Professionals From Meetings And Discussions, Lehman Sellers and Barclays Advise Them Of Salient Transaction Terms Hours Before Closing"); Part II.C.2 ("Discussions Concerning Alleged Committee Consent to Material Transaction Modifications").

inaction can lead to judicial estoppel.  But that argument ignores the fact that courts considered "silence" tantamount to taking an affirmative position in the context of those cases because a debtor in bankruptcy is required by law to disclose all claims.[340]

**3.    NEITHER EQUITABLE ESTOPPEL NOR WAIVER PROVIDES A SUSTAINABLE DEFENSE WHEN COMMITTEE WAS NOT AWARE OF MATERIAL DISCREPANCIES AND DID NOT STAY SILENT WITH RESPECT TO ITS RECONCILIATION REQUESTS**

268.    Estoppel applies when "1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to her detriment."  Kosakaw v. New Rochelle Radiology Assocs., 274 F.3d 706, 725 (2d Cir. 2001) (citations omitted).  "Since equitable estoppel is an affirmative defense, [the party asserting the defense] has the burden of establishing its elements."  In re Roundabout Theatre Co., 131 B.R. 14, 17 (S.D.N.Y. 1991).  Barclays cannot satisfy any of these elements.

269.    As the cases cited by Barclays explain, waiver "requires the intentional relinquishment of a known right."  U.S. v. Quinones, 511 F.3d 289, 321 n. 3 (2d Cir. 2007) (internal quotations omitted).  "[T]he doctrine of waiver demands conscientiousness, not clairvoyance, from parties."  Hawknet, Ltd. v. Overseas Shipping Agencies, 590 F.3d 87, 92 (2d Cir. 2009).  Similarly, with respect to equitable estoppel, "[o]ne cannot waive or acquiesce in a

---

[340]    See Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 416-17 (3d Cir. 1998) (describing statutes and case law requiring full disclosure of claims in bankruptcy as supporting application of judicial estoppel); Negron v. Weiss, No. 06 CV 1288, 2006 WL 2792769 at *4 (E.D.N.Y. Sept. 27, 2006) (same); MDFC Loan Corp. v. First Shopping Center Partnership, No. - 93 C 4481, 1996 WL 99909 at *7 (N.D. Ill. Mar. 1, 1996) (same); Griggs v. Marion Hospital Corp., No. 2004-CV-4241, 2005 WL 1802249 at *1 (S.D. Ill. Jul. 28, 2005) (same).

As the chief case relied upon by Barclays explains, a former debtor's "failure to list its claim against the [opposing party] worked in opposition to the preservation of the integrity of the system which the doctrine of judicial estoppel seeks to protect."  Oneida, 848 F.2d at 419.  This narrow application of judicial estoppel to after-asserted claims undisclosed in a prior bankruptcy has no application here, especially when the Committee hardly can be said to have "remained silent" on this issue.

wrong while ignorant that it had been committed.  Current suspicion and rumor are not enough.

There must be knowledge of facts which will enable the party to take effectual action.  Nothing

short of this will do." Pence v. Langdon, 99 U.S. 578, 581 (1878).

270.    ***First,*** neither waiver nor equitable estoppel apply when the Committee was not

aware of the material facts Barclays failed to disclose in connection with the Sale Transaction

until after Rule 2004 discovery commenced.[341]  See, e.g., In re Varat Enters., Inc., 81 F.3d 1310,

1317 (4th Cir. 1996) (noting party will only be estopped where it "knew the relevant facts").

The Committee's words and actions throughout the relevant time period show both that it did ***not***

remain silent and that it did ***not*** have access to the relevant facts.[342]

271.    ***Second,*** the random information to which Barclays points, e.g., the September 17

Press Release and Analyst Call and the October 8 Presentation, hardly afforded the Committee

sufficient knowledge to make its current claims (or reveal that knowledge), especially given the

representations made to the Court and the Committee and the blatant failures to make adequate

disclosures.[343]

272.    Barclays is not aided by the fact that the Committee was concerned, but did not

have sufficient information to act on these concerns.  Indeed, as the Supreme Court explained in

Pence, suspicions and concerns do not amount to sufficient knowledge to support the doctrine of

---

[341]    See Part II.B.2 ("What Was ***Not*** Disclosed To Court"), Part II.C.1 ("After Excluding Committee's Professionals From Meetings And Discussions, Lehman Sellers And Barclays Advise Them of Salient Transaction Terms Hours Before Closing"); Part III.D. ("Newly Discovered Evidence Provides a Basis for Rule 60(b)(2) Relief").

[342]    The other two cases Barclays cites for silence supporting a finding of estoppel are clearly distinguishable.  In In re Colarusso, 280 B.R. 548, 560 (Bankr. D. Mass 2002), the estopped party bid to purchase property from the estate -- thereby acknowledging the estate owned that property -- before later attempting to claim part of the property through adverse possession.  In re Newport Offshore, Ltd., 86 B.R. 325, 325 (Bankr. D.R.I. 1988) involved a party's calculated scheme to clandestinely insert a set-off claim by deception so severe it led the bankruptcy court to hold the party in contempt.

[343]    See Part II.A.4 ("Barclay Press Release and Analyst Call"); Part II.D.3 ("October and November 2008 Meetings Among Committee Representatives and LBHI Estate Representatives").

waiver or acquiescence.  99 U.S. at 581.  More recently, Aramony v. United Way of America, 28 F. Supp. 2d 147, 171-72 (S.D.N.Y. 1998), rev'd on other grounds, 191 F.3d 140 (2d Cir. 1999), emphasized the irrelevance of suspicion.  When the United Way withheld benefits from its former CEO who had engaged in fraud, the former CEO argued the organization had waived its right to do so by votes of confidence and its rejection of the CEO's offer to resign.  The court disagreed, even though the United Way knew at the time that the CEO had caused the organization to purchase property for his personal use and had charged the organization for personal expenses:  "[the United Way was] informed at the time that these charges were the result of 'apparently inadvertent procedural admissions.'"  Id.  (citation to record omitted).  The court found no waiver because the organization's suspicions were assuaged by a plausible explanation and it was unaware of all of the facts of the CEO's misconduct.  Id.; see also Wisser Co. v. Mobil Oil Corp., 730 F.2d 54, 59-60 (2d Cir. 1984) (refusing to find waiver where "any delay here was to confirm what [the party] previously merely suspected").

273.  **Third,** the Committee hardly stayed "silent."  After advising the Court it lacked sufficient information to reach an informed position during the Sale Hearing, post-closing, its diligence continued persistently.  Accordingly, equitable estoppel does not apply.  See In re Rockefeller Ctr. Props., 266 B.R. 52, 60 (S.D.N.Y. 2001) (noting that estoppel requires "conduct which amounts to a false representation or concealment of material facts" and refusing to find estoppel where the party against whom estoppel was urged "actually requested further discovery to learn [the] very facts [at issue]").  The defense of waiver similarly is inapplicable.  Cf. Richstone v. Chubb Colonial Life Ins., 988 F.Supp. 401, 403 (S.D.N.Y. 1997) (holding party did not waive right of removal even after filing motion to dismiss in state court where "the grounds

raised in [the party's] motion to dismiss in state court do not indicate that [the party] had any reason to know at that point that the action was removable").[344]

### G.    COMMITTEE CONSENT IS IRRELEVANT AND WAS NEVER PROVIDED IN ANY EVENT

274.    Barclays maintains the Committee consented to the transaction (even to the extent it materially differed from the transaction reviewed and approved by the Court).[345]  Barclays' position finds no support in the record.

#### 1.    COMMITTEE NEVER CONSENTED TO SALE TRANSACTION

275.    Stated simply, the Committee never consented to the Sale Transaction.[346]  After the Sale Hearing, the Committee professionals attended the weekend closing at Weil's offices. Given the complexity of the Sale Transaction and the alacrity of the closing (approximately 55 hours after entry of the Sale Order), the Committee still was not in a position at the time of the closing to (and, in fact, never did) provide its consent to the consummated transaction.

276.    Attempting to create Committee consent, Barclays seizes upon the deposition of Lehman Seller's counsel relating part of a conversation he had had with Burian.[347]  Lehman Sellers' counsel testified that, shortly before closing, Burian told him that "if it's okay with you, it's okay with us."[348]  Those statements are taken out of context.

---

[344]    The hearing on the December Settlement Motion is especially important in this regard, where the Court, the SIPA Trustee, LBHI and Barclays all agreed that approval of the settlement had no bearing on future claims.  It was within that context that the Committee argued the Limited Objection to the Court, seeking further investigation of the value of the assets transferred to Barclays pursuant to the Sale Transaction.  Notably, Barclays' position was enunciated at that hearing *after* it filed its response briefs in the Bay Harbour Appeal, yet it made no mention of its current arguments concerning failure to seek reconsideration and appeal.  Barclays cannot now argue that the Committee waived or should be estopped from bringing claims because it did not participate in that appeal.

[345]    Barclays Br. at 208-09.

[346]    Burian Decl. ¶ 8; Examiner's Report at 2206.

[347]    Ex. 71 Miller Tr. at 29:19-25.

[348]    Id.

277.     Before leaving, Burian said that the Committee (a) was relying on Barclays' and the Lehman Sellers' representations concerning market value deterioration -- which it had no ability to diligence or confirm and (b) would require a reconciliation verifying and confirming the Lehman Sellers' and Barclays' representations.[349]  The evidence adduced, however, contradicts those representations.  To the extent (if any) the Committee provided even conditional consent, i.e., based on those representations and subject to receiving a reconciliation, that consent was procured on the basis of inaccurate information and is of no force and effect. Moreover, the Committee professionals decided to leave the closing to avoid any misapprehension that their continued presence would be construed as consent to the transaction modifications taking place.[350]

278.     Lastly, the record suggests Committee consent was not solicited.  The Lehman Sellers told the Committee professionals their consent was not necessary for post-hearing modifications.[351]

### 2.     COMMITTEE CONSENT CANNOT CLEANSE INADEQUATE DISCLOSURE AND BARCLAYS' FAILURE TO OBTAIN COURT APPROVAL OF MATERIAL MODIFICATIONS TO SALE TRANSACTION

279.     Assuming, arguendo, Committee consent was obtained, it does not excuse Barclays' disclosure failures.  As this Court has recognized, the active participation of official creditors' committees is vital to the effective administration of chapter 11 cases.[352] Notwithstanding that role, the Committee does not perform judicial functions.  Its consent to a

---

[349]     See Ex. 71 Miller Tr. at 29:19-25, 101:20-102:5; Ex. 55 Burian Tr. at 263:2-18.

[350]     See Examiner's Report at 2206.

[351]     See Part II.C.2. ("Discussions Concerning Alleged Committee Consent to Material Transaction Modifications").

[352]     See, e.g., In re Refco, Inc., 336 B.R. 187, 195 (Bankr. S.D.N.Y. 2006) ("'An official committee of creditors plays a pivotal role in the bankruptcy process. The function of an official creditors committee is to aid, assist and monitor the debtor to ensure that the unsecured creditors' views are heard and their interests promoted and protected.'") (quoting Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 514 (S.D.N.Y. 1994)).

debtor's actions or transactions does not obviate the need for parties to make appropriate disclosures to the Court or to obtain court approval for those actions if required by the Bankruptcy Code or applicable law.[353]

280.    The recent case of <u>In re Metaldyne</u>, 409 B.R. 661 (Bankr. S.D.N.Y. 2009), is instructive on the limits of an estate fiduciary's ability to unilaterally modify a court order and the risks attendant in not seeking separate Court approval for those modifications.  After the debtors' bidding procedures for the sale of assets to the stalking horse bidder, RHJ International S.A. ("<u>RHJI</u>"), were approved, the debtors received another stalking horse bid from HHI Holdings, LLC ("<u>HHI</u>") and determined it was the superior bid.  RHJI argued it had satisfied all due diligence conditions and could block HHI's bid.  The court disagreed, concluding RHJI had not satisfied the due diligence condition under the original bidding procedures order because it had not submitted the satisfaction notice by the deadline.  <u>Id.</u>  RHJI argued it had timely submitted the notice under the extensions agreed to between it and the debtors.  The court rejected this position, noting that while the parties may have agreed to an extension, "the Court never approved the amendments."  <u>Id.</u>  The Court concluded that "[u]nless and until amended ***and approved by the Court,*** the Bidding Procedures Order only entitled RHJI to the bidder protections if it delivered its notice of satisfaction with due diligence on or before July 2, 2009.  It did not do so.  Therefore, the Debtors are not obligated to pay the break-up fee and expense reimbursement to RHJI."  <u>Id.</u>  at 667 (emphasis in original).

---

[353]    <u>See</u>  <u>In re Crystal Apparel, Inc.</u>, 220 B.R. 816, 829 n.7 (Bankr. S.D.N.Y. 1998) ("The approval of counsel or even the Committees or Debtor is not a substitute for court approval of any transaction found to require court approval"); <u>cf.</u> <u>In re Commodore Int'l Ltd.</u>, 262 F.3d 96, 100 (2d Cir. 2001) (Court approval required for a committee to bring an estate action even if the debtor and committee both consent to the committee bringing the action); <u>In re KDI Holdings, Inc.</u>. 277 B.R. 493, 504-05 (Bankr. S.D.N.Y. 1999) (same).

281.    Similar to the purchaser in <u>In re Metaldyne</u>, Barclays assumed the risk of closing on the Sale Transaction without seeking separate court approval of the Clarification Letter and the other modifications to the represented transaction.  The fact that LBHI and LBI signed the Clarification Letter (and even if the Committee did consent to it) does not relieve Barclays from its obligation to disclose and present it to the Court.

282.    Lastly, Barclays may be relying on paragraph 25 of the Sale Order, which authorizes non-material modifications to the Sale Transaction that do not negatively impact the estates provided the Committee consents.  That paragraph is not the savings clause that Barclays suggests.  The consummated transaction differed materially from the one represented to the Court.  Those differences negatively impacted the estates.  Only subsequent Court approval could legitimize them.[354]

---

[354]    ***Joinder***.  In the interest of avoiding duplication, the Committee also joins in the briefs filed by LBHI and the SIPA Trustee.  The Committee further, and more specifically, adopts and incorporates herein the SIPA Trustee's argument section "I. THE TRUSTEE IS ENTITLED TO THE DISPUTED ASSETS" in its entirety, and adopts and incorporates herein the Debtors' Argument sections:  "I. THE MANIFEST FAILURE TO DISCLOSE MATERIAL TERMS AND AMENDMENTS WARRANTS RELIEF UNDER RULE 60" in its entirety; "III. (C) Barclays' Self-Serving Public Policy Arguments Miss the Point;" and "III. (D) Barclays' Constitutional Argument Is Without Merit."

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Committee respectfully requests that the Court enter an

order (A) granting the Rule 60 Motions, (B) denying the Barclays Enforcement Motion and (C)

awarding the Committee such further, different relief as the Court deems appropriate.


Dated: March 18, 2010
        New York, New York


                              **QUINN EMANUEL URQUHART &**
                              **SULLIVAN LLP**

                              /S/ James C. Tecce
                              Susheel Kirpalani
                              James C. Tecce

                              51 Madison Avenue, 22nd Floor
                              New York, New York 10010
                              Telephone No.:  (212) 849-7000

                              Erica M. Taggart
                              865 S. Figueroa Street, 10th Floor
                              Los Angeles, California  90017

                              *Special Counsel to the Official Committee Of*
                              *Unsecured Creditors Of Lehman Brothers*
                              *Holdings Inc., et al.*