1

2               UNITED STATES BANKRUPTCY COURT

3               SOUTHERN DISTRICT OF NEW YORK

4       ------------------------x

5       In Re:

6                           Chapter 11

7       LEHMAN BROTHERS        Case No. 08-13555(JMP)

8       HOLDINGS, INC., et al,   (Jointly Administered)

9                 Debtors.

10      ------------------------x

11

12             DEPOSITION OF SAUL BURIAN

13               New York, New York

14               December 17, 2009

15

16      Reported by:

17      MARY F. BOWMAN, RPR, CRR

18      JOB NO. 26532

19

20

21

22

23

24

25

## Page 2

```
 1
 2
 3
 4              December 17, 2009
 5              9:35 a.m.
 6
 7
 8       Deposition of SAUL BURIAN, held at
 9   the offices of Boies, Schiller & Flexner,
10   LLP, 575 Lexington Avenue, New York, New
11   York, before Mary F. Bowman, a Registered
12   Professional Reporter, Certified Realtime
13   Reporter, and Notary Public of the State of
14   New York.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2              APPEARANCES:
 3
 4   JONES DAY, LLP
 5   Attorneys for Lehman Brothers, Inc.
 6      222 East 41st Street
 7      New York, New York   10017-6702
 8   BY:  TRACY V. SCHAFFER, ESQ.
 9         SUSAN A. TURK, ESQ.
10
11   BOIES, SCHILLER & FLEXNER, LLP
12   Attorneys for Barclays and The Witness
13      575 Lexington Avenue
14      New York, New York   10022
15   BY:  JACK G. STERN, ESQ.
16         CAMILLE OBERKAMPF, ESQ.
17
18   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
19   Attorneys for the Creditors Committee
20      865 Figueroa Street, 10th Floor
21      Los Angeles, CA  90017
22   BY:  ERICA TAGGART, ESQ.
23         JAMES S. TECCE, ESQ.
24         TYLER WHITMER, ESQ.
25
```

## Page 4

```
 1
 2              APPEARANCES:
 3
 4   HUGHES, HUBBARD & REED, LLP
 5   Attorneys for the SIPA Trustee
 6      One Battery Park Plaza
 7      New York, New York   10004-1482
 8   BY:  NEIL OXFORD, ESQ.
 9
10   Also Present:
11      Nicholas Kemp, Paralegal,
12      Boies Schiller & Flexner
13      Steve Sanpietro, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1
 2
 3
 4
 5       IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that filing and sealing be
 8   and the same are hereby waived.
 9       IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15       IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25
```

BURIAN

1
2       (Exhibit 457-B, Notice of Deposition
3   marked for identification, as of this date.)
4       THE VIDEOGRAPHER:  This is the start
5   of the tape labeled number 1 of the
6   videotape deposition of Saul Burian in the
7   matter of In re Lehman Brothers Holding,
8   Inc., et al.
9       This deposition is being held at
10  575 Lexington Avenue, New York, New York, on
11  Thursday, December 17, 2009, at
12  approximately 9:34 a.m.
13      My name is Steve Sanpietro from TSG
14  Reporting, Inc.  I am the legal video
15  specialist.  The court reporter today is
16  Mary Bowman in association with TSG
17  Reporting.
18      Will the court reporter please swear
19  in the witness.
20      (Witness affirmed)
21      THE VIDEOGRAPHER:  Will counsel please
22  state your appearance for the record.
23      MR. STERN:  Jack Stern, from Boies,
24  Schiller & Flexner for Barclays.
25      MS. OBERKAMPF:  Camille Oberkampf from

BURIAN

1
2   Boies, Schiller & Flexner for Barclays.
3       MS. SCHAFFER:  Tracy Schaffer and
4   Susan Turk from Jones Day for LBHI.
5       MR. OXFORD:  Neil Oxford from Hughes,
6   Hubbard & Reed for the SIPA trustee.
7       MR. TECCE:  James Tecce, Quinn
8   Emanuel, Urquhart, Oliver & Hedges for the
9   official committee.
10      MR. WHITMER:  Tyler Whitmer, Quinn
11  Emanuel, for the committee.
12      MS. TAGGART:  Erica Taggart with Quinn
13  Emanuel for the committee and the witness.
14  SAUL BURIAN,
15      called as a witness by the parties,
16      having been duly affirmed, testified as
17      follows:
18  EXAMINATION BY
19  BY MR. STERN:
20      Q.   Good morning, Mr. Burian.  Could you
21  describe for us your education, starting with
22  college?
23      A.   Sure.  Good morning.
24      I went to Yeshiva College here in New
25  York City.  I went to Columbia University School

BURIAN

1
2   of Law, also here in the city.
3       Q.   Could you describe your professional
4   experience before you joined Houlihan Lokey?
5       A.   Starting after law school or --
6       Q.   Yes.
7       A.   So after I left Columbia, I joined the
8   firm Kramer Levin Naftalis & Frankel.  I was
9   there for 13, 14 years, and then joined Houlihan
10  Lokey, which is where I am now.
11      Q.   What was your position at Kramer Levin
12  when you left Kramer Levin?
13      A.   I was a partner of the firm.
14      Q.   In what practice area?
15      A.   Restructurings and business
16  reorganizations.
17      Q.   And was that your practice area for
18  your entire time at Kramer Levin?
19      A.   The first short period of time I split
20  my time between the corporate department and the
21  restructuring department.  I wanted to
22  specialize in distressed transactions.
23      Q.   So for how many years at Kramer Levin
24  did you practice bankruptcy law?
25      A.   Again, I'm not sure what you mean by

BURIAN

1
2   bankruptcy law.  I spent most of my time in the
3   early years doing corporate transactions in and
4   around insolvencies.  I did public offerings and
5   other stuff as well, but for the most part
6   corporate transactions that related to
7   restructuring matters.
8       Later on, I started working more
9   broadly on restructuring matters.  So you decide
10  when that means I started doing bankruptcy law
11  and when I didn't.
12      Q.   Fine.
13      When was Houlihan Lokey first engaged
14  to serve as financial advisor to the creditors
15  committee in the Lehman case?
16      A.   I will consider engagement to be when
17  the committee said you're hired, not when the
18  court order was entered.  I interviewed with
19  the committee, I believe it was the Wednesday
20  night after the filing.  If you have a calendar,
21  I could be more specific about dates.  But it
22  was that Wednesday night.
23      Q.   For ease of reference, I'll give you a
24  calendar for September 2008.
25      A.   OK.  So I would say Wednesday, the

Page 10

BURIAN

1    17th of September.
3    **Q.   And how did Houlihan go about**
4    **selecting its team for this representation?**
5    MS. TAGGART:  Object to form.
6    THE WITNESS:  Does that mean I
7    continue or I stop?
8    MS. TAGGART:  Yes, go ahead.
9    A.   Well, in a financial restructuring
10   group, we have a number of managing directors
11   who have experience in complicated matters.  We
12   were invited to meet with the committee on that
13   Wednesday morning, the 17th, and it was a
14   combination of who had availability for a matter
15   this time consuming and this complex, as well as
16   who had the requisite combination of skills for
17   a deal of this size.
18   There is no specific formulas.  It is
19   probably similar to how you got involved in the
20   Barclays litigation.
21   **Q.   Ultimately who were the key members of**
22   **the Houlihan team?**
23   MS. TAGGART:  Object to form and to
24   time.  When -- when do you mean?
25   **Q.   At the outset.**

Page 11

BURIAN

2    A.   You know, Lehman is a very, very large
3    matter.  Eric Siegert and I sort of quarterback
4    the whole transaction, but -- the whole
5    representation of the committee, but with
6    respect to a variety of different areas, there
7    are different people that day-to-day are more
8    responsible than others.
9    This has required a pretty significant
10   effort.
11   **Q.   During the first week of your**
12   **engagement, who were the most senior members of**
13   **your team?**
14   A.   Eric and I.  Mike Fazio.  Brad Geer.
15   Tanja Alto was very active.
16   We then had certain people that we
17   were trying to get up to speed on different
18   assets.  We had the financial institutions group
19   that was very active the first couple -- you
20   know, first couple of months, mainly on
21   Neuberger Berman and its related assets.
22   It is hard to answer with -- is that
23   the answer you are looking for?
24   **Q.   That's fine.**
25   **Were you and Mr. Siegert the most**

Page 12

BURIAN

2    **senior members of the team?**
3    A.   Again, senior in terms of age, senior
4    in terms of the firm?
5    Jeff Werbalowsky, who is the co-CEO of
6    our firm, attended the pitch and was available
7    when and if we needed him.
8    If you are asking who actually
9    performed services, billed time, recorded time
10   and organized work groups, Eric and I were the
11   two managing directors that did that.
12   **Q.   You supervised the matter?**
13   MS. TAGGART:  Object to form.
14   Go ahead.
15   A.   I worked on the matter and supervised
16   it as well.  And we split up responsibilities
17   for different things.
18   **Q.   And what role did Mr. Fazio have?**
19   A.   Then or now?
20   **Q.   At the time in the first week after**
21   **the engagement.**
22   A.   You know, we were drinking from a
23   firehose in all sorts of issues.  Mike was
24   supporting me in trying to understand the
25   Barclays transaction, give advice, and also

Page 13

BURIAN

2    trying to get our arms around all the
3    non-Barclays-related issues, you know, at
4    Lehman.
5    **Q.   What was Mr. Geer's role?**
6    A.   There, too, Brad was also helpful in
7    trying to figure out what needed to get done,
8    assign responsibilities, and he, too, focused on
9    aspects of the Barclays transaction.
10   At that point in time, I don't know if
11   it is possible to really adequately describe how
12   much was going on at once.  And therefore, just
13   to create lists of what had to get done was a
14   full-time job.
15   So Brad and Mike were extremely
16   helpful in that regard.
17   **Q.   At the time, did you feel that you had**
18   **selected a team that was highly qualified to do**
19   **the assignment that you had?**
20   MS. TAGGART:  Objection to form.
21   A.   Yeah, I'm not sure -- we were
22   comfortable that the representation of the
23   committee was adequate, and the committee
24   selected us because they had confidence in us, I
25   guess.

BURIAN

1
2    Q.    You felt that you had a team that was
3  highly qualified to analyze the financial
4  aspects of the bankruptcy sale?
5        MS. TAGGART:  Object to form.
6    A.    When we first got involved, we didn't
7  know what the sale was.  So it is sort of a
8  chicken and egg problem.
9        We had a team that has as much or more
10 experience in advising committees in complex
11 transactions of all types.  All types, not just
12 financials.  And we didn't know exactly what
13 would be faced, but our job is try to dive in,
14 understand it the best we can and give advice.
15   Q.    And I understand that the situation
16 was very expedited.  Did you feel that you had a
17 team that was as capable as any financial
18 advisory team of handling such an expedited
19 situation?
20       MS. TAGGART:  Object to form.  Calls
21 for speculation.
22   A.    Again, you keep on talking about as
23 qualified or as any other team.  Theoretically I
24 can get an all-star dream team of people,
25 parachute them in, and I could cherry-pick from

BURIAN

1
2  every firm around the world and find the right
3  person that could match up with every single
4  need.  That's not the way the real world works.
5  That's not the way restructuring firms work.
6        So, no, we were not as qualified as any
7  team I can imagine could have been at the time.
8  And if anything, as you know, Houlihan Lokey
9  does not have a capitals markets practice.  We
10 don't do sales and trading.  We don't do public
11 offerings.
12       As many, many of these things we don't
13 do, and therefore, in retrospect, it might have
14 been nice to have some of that expertise.
15   Q.    What other financial advisors worked
16 for the committee in that time period?
17       MS. TAGGART:  Objection, foundation.
18   A.    There was another financial advisory
19 firm that was retained the same night, FTI
20 Consulting.
21   Q.    Did Houlihan work with FTI Consulting
22 in the period from September 17 through the end
23 of September?
24   A.    Sure.
25   Q.    Did FTI have the capital markets

BURIAN

1
2  experience that you just said Houlihan lacked?
3    A.    No.  I mean not to my knowledge.  They
4  focused mainly on the TSA aspects of the
5  transaction and the integration and computer IT
6  issues, which was an area that we were not as
7  familiar with.
8    Q.    Did Houlihan ever advise the committee
9  that it felt that Houlihan lacked certain
10 necessary experience to handle the assignment?
11       MS. TAGGART:  Hold on.  Wait, I want
12 to read that.
13       Is this before or after the retention,
14 Jack?  Are you asking before or after the
15 retention did Houlihan advise the committee?
16       MR. STERN:  At any time.
17       MS. TAGGART:  Then I will object to
18 privilege.  You can answer before the
19 retention.
20       MR. STERN:  You're instructing him not
21 to answer?
22       MS. TAGGART:  Yes, I am instructing
23 not to answer after the retention about
24 Houlihan's advice to the committee about the
25 experience that Houlihan had.

BURIAN

1
2        So you should -- can you read, reread
3  the question.
4        And you should answer up until the
5  point that you were retained.
6        (Record read)
7    A.    We did not believe we lacked necessary
8  experience, nor did we -- we advised the
9  committee accurately about what our relative
10 strengths and weaknesses were, and they chose us
11 as the best firm to represent them.
12   Q.    At any time did Houlihan provide legal
13 advice to the committee?
14   A.    No.
15       THE WITNESS:  Sorry.
16       MS. TAGGART:  That's all right.
17 Objection.
18       It's OK.  I was just going to tell you
19 to answer yes or no to that, so go ahead.
20   A.    No.
21   Q.    We have premarked as Exhibit 457-B the
22 30(b)(6) notice for this deposition.
23 Mr. Burian, you understand that you're
24 testifying today both in your individual
25 capacity and as a 30(b)(6) representative of

Page 18

**BURIAN**

1
2  Houlihan Lokey?
3      A.   I do understand that.
4      Q.   And did you review this deposition --
5      A.   I am sorry, sir.  Am I supposed to
6  look at the camera or look -- I keep feeling I'm
7  looking this way, but you're over there.
8          (Discussion held off the record)
9      Q.   Mr. Burian, did you review before this
10  deposition the deposition notice that we have
11  marked as Exhibit 457-B?
12      A.   I did.
13      Q.   Did you have an opportunity before
14  this deposition to review the definitions that
15  appear on page 3?
16      A.   I did.  When I received it, I did.
17  It's been a while.
18      Q.   That's fine.  I want to take a moment
19  to go through some of those definitions, as we
20  may be using some of these terms later.  And if
21  we do, we may need to refer back to this
22  document.
23          Looking at definition number 16 on
24  page 5, do you see there is a definition there
25  of the term "Fed replacement transaction"?

Page 19

**BURIAN**

1
2      A.   I do.
3      Q.   If you could take a moment to review
4  that definition and let me know if that is
5  understandable to you.
6      A.   I'm sorry, if the words are
7  understandable to me?
8      Q.   If the definition is understandable.
9      A.   Yeah, I understand your definition of
10  "Fed replacement transaction."
11          MS. TAGGART:  Let me note for the
12      record, part of this is referring to "as
13      described in another declaration."  I think
14      if you are going to rely on that being the
15      full definition, maybe we have that part of
16      the declaration out.
17      Q.   I don't think we'll have much
18  difficulty understanding what we are talking
19  about when we talk about the Fed replacement
20  transaction, and when we get to that, we will
21  come back to the definition.
22      A.   I have no problem going in that
23  direction.  My only concern is, I don't want to
24  be -- I don't want you to assume that the facts
25  in these definitions are facts that I know of on

Page 20

**BURIAN**

1
2  my own account or that I necessarily agree with.
3      Q.   I understand.  That's not what I am
4  asking.
5      A.   OK.
6      Q.   I am just asking if the definition is
7  understandable.
8      A.   I understand that the Fed replacement
9  transaction that you want to use for this
10  definition is Barclays stepping into the shoes
11  of the Fed and Shari Leventhal says that you
12  funded 45 billion in that transaction.
13      Q.   Let me ask you about definition number
14  28 on page 6.  This defines the term "repo
15  collateral," and it says, "Repo collateral means
16  the collateral actually transferred to Barclays
17  as part of the Fed replacement transaction."
18      A.   Um-hm.
19      Q.   "Which shall be defined for purposes
20  of this notice to include the 7 billion dollar
21  cash amount."
22          And then the term "7 billion dollar
23  cash amount" is defined in definition number 2
24  on page 3.  Do you see that?
25          And it says, "The 7 billion dollar

Page 21

**BURIAN**

1
2  cash amount shall mean the 7 billion dollars in
3  cash that was understood by Barclays as of the
4  time of the September 22, 2008 closing to have
5  been posted to a Barclays account at JPMC
6  because certain collateral had not been
7  transferred to Barclays as anticipated in the
8  Fed replacement transaction."
9          And I'm not asking you to agree with
10  those definitions or any of the facts stated,
11  but do you understand those two definitions?
12      A.   I understand how you want to define
13  those terms.  If you want to proceed on that
14  basis, that's fine.  But when you use those
15  terms, you have to be careful, because there are
16  aspects of those definitions that are -- that
17  concern me.
18      Q.   I understand.
19          Now, what did you do to prepare for
20  this deposition?
21      A.   I mean a number of things.  Reviewed
22  the e-mails and notes that were sent over as
23  part of discovery.  I read some of the
24  definitions in the asset purchase agreement.  I
25  looked at a variety of those documents.

Page 22

BURIAN

1
2    Obviously met with counsel to better
3    understand what it is that I am supposed to be
4    doing in the room today, answering questions and
5    not being argumentative and all the good things.
6    **Q.   Did you meet with anybody else at**
7    **Houlihan in order to prepare concerning the**
8    **30(b)(6) topics?**
9    A.   Well, I talk to people at Houlihan all
10   the time obviously.  It is hard to know if it is
11   about this or things generally, but yes, I spoke
12   to -- what were those things called, the
13   questions I was asked, interrogatories, and I
14   had an associate pull a log of --
15       MS. TAGGART:  Let me object, on
16       privilege.  I want you to not answer your
17       communications with these people.
18       Why don't you just say the people that
19       you interacted with that might be at all in
20       preparation for this deposition.  Just the
21       names of people.
22   A.   I checked my calendar.  I am sorry.  I
23   checked my calendar, which may have included
24   talking to my assistant.  I spoke to Brad Geer.
25   I spoke to Mike Fazio.  I spoke to Eric Siegert,

Page 23

BURIAN

1
2    mainly to complain that I had to do this and he
3    wasn't.
4        I spoke to Ann McCovsky.  I spoke to
5    other associates or VPs at Houlihan.
6    **Q.   Where is Mr. Siegert based?**
7    A.   He lives in Minneapolis and works out
8    of our Minneapolis office.
9    **Q.   Where is Mr. Geer based?**
10   A.   Minneapolis.
11   **Q.   Mr. Fazio?**
12   A.   New York.
13   **Q.   And you're based in New York?**
14   A.   Correct.
15   **Q.   Was Mr. Siegert in New York at all**
16   **during the events from September 17 through the**
17   **closing of the transaction on September 22?**
18   A.   My recollection is he was in New York
19   on Thursday and then he left and did not come
20   back until after the closing.
21   **Q.   Was Mr. Geer in New York for any of**
22   **that time period?**
23   A.   I believe Mr. Geer also left on
24   Thursday and returned on Sunday, the 21st.
25   **Q.   Now, you said in preparation for this**

Page 24

BURIAN

1
2    **deposition you reviewed your calendar.  Is that**
3    **a calendar of events during the period of**
4    **September 2008?**
5    A.   Yeah.  We looked at -- I looked at a
6    calendar and tried to remember meetings and
7    tried to make sure I understood the time frame
8    of the different events.
9    **Q.   I am trying to understand what**
10   **calendar you looked at.  Was it a personal**
11   **calendar that listed your appointments?**
12   A.   No.  I mean I carry a Blackberry
13   obviously, but it doesn't go back that far.
14   **Q.   So in other words, you didn't look at**
15   **a calendar that listed your particular meetings**
16   **and phone calls and other activities during that**
17   **period?**
18   A.   Honestly I did look at my Blackberry
19   to look to see if the committee meeting was the
20   16th or the 17th, our retention, but it was all
21   blank.
22   **Q.   In other words, your Blackberry didn't**
23   **retain that information?**
24   A.   It doesn't go back more than a year.
25   **Q.   So what type of calendar did you look**

Page 25

BURIAN

1
2    **at?  Just a blank calendar?**
3    A.   So when I opened it up, it wasn't
4    there, and then someone reminded me the
5    Wednesday was the committee meeting.
6    **Q.   OK.**
7    A.   I think I looked at the retention
8    application.
9    **Q.   Did you review the committee's Rule 60**
10   **motion?**
11   A.   I have reviewed it, not in connection
12   with this deposition.  I saw it way back when.
13   **Q.   I think you said you reviewed e-mails**
14   **and notes that were part of the discovery.  Were**
15   **those e-mails and notes that Houlihan produced?**
16   A.   You know, I'm not sure.  I was given
17   a --
18       MS. TAGGART:  Don't go into which
19       documents you were given.  If you know
20       what you reviewed had been produced, you can
21       answer that.  And if you know who produced
22       it.
23   A.   It was certainly Houlihan e-mails in
24   the things that I looked at.  The rest of your
25   question, I can't respond to.

Page 26

BURIAN

1
2    Q.   Did reviewing that material refresh
3    your recollection concerning the facts?
4    A.   Well, there are two aspects of this
5    deposition, right?  I was told that I'm the
6    Houlihan representative even beyond things that
7    I have direct personal knowledge of, if I feel
8    comfortable I can say with authority that they
9    occurred or didn't occur.
10        So to the extent that they related to
11   events that I was not directly part of, they
12   might have.
13   Q.   They might have refreshed your
14   recollection?
15   A.   Again, there are two aspects of this.
16   There is things that I know because I was there,
17   I did, I saw, I participated.
18   Q.   Let me focus on that.  Let me focus on
19   that.
20        Did anything that you reviewed in
21   preparation for this deposition refresh your
22   recollection concerning those matters, those
23   matters you were involved in?
24   A.   Yeah.  I had some notes that we
25   produced that helped me remember the -- how the

Page 27

BURIAN

1
2    deal was described to us at different times.
3    Q.   Did you review any privileged
4    communications?
5         MS. TAGGART:  Object to form and I
6    guess fundamentally.
7         But if you know if you reviewed
8    privileged communications, you can answer.
9    A.   You have to define that for me,
10   because it keeps changing.  I know there was a
11   hearing about that yesterday, but I don't
12   think -- I don't think so.  Things I got were
13   redacted.  It was -- I think I only received
14   what you received.  So if you received
15   privileged information, then yes, but I don't
16   think you did, so no.
17   Q.   Did you review any summaries of the
18   sale transaction that Houlihan had provided to
19   the committee?
20   A.   No. No.
21   Q.   Did you review any summaries of the
22   sale approval hearing that Houlihan had provided
23   to the committee?
24   A.   No.
25   Q.   During the period from September 17

Page 28

BURIAN

1
2    through September 22, when Houlihan provided
3    summaries to the committee concerning the
4    transaction, what was the purpose of those
5    summaries?
6         MS. TAGGART:  Object to form.  And
7    vague.
8    A.   We didn't provide written summaries to
9    the committee.  I don't know that wasn't your
10   question, but I am trying to move this along.
11   We didn't provide written summaries.
12   Q.   It is your testimony today that
13   Houlihan never provided a written summary of the
14   status of negotiations or the status of the
15   agreement?
16   A.   I have no recollection of any written
17   Houlihan summary of the transaction.
18   Q.   I would like to mark as the next
19   exhibit a document labeled "limited Objection of
20   Official Committee of Unsecured Creditors."
21        (Exhibit 458-B, document labeled
22   "Limited Objection of Official Committee of
23   Unsecured Creditors" marked for
24   identification, as of this date.)
25   Q.   This will be labeled 458-B.

Page 29

BURIAN

1
2    A.   You are not marking the attachments?
3    You are just the objection?
4    Q.   Correct.  We will get to the
5    attachments separately.
6         Mr. Burian, do you recognize the
7    document that we have marked as Exhibit 458-B?
8    A.   I do.
9    Q.   And what is it?
10   A.   It's my committee's limited objection
11   to the SIPC settlement with Barclays.
12   Q.   And at the time you submitted a
13   declaration that supported this objection; is
14   that right?
15   A.   I did.  I see it is not attached.
16   Q.   We will mark that separately, but my
17   question is, when you submitted your declaration
18   in support of this objection, did you review the
19   objection itself?
20   A.   Yeah, I must have.
21   Q.   And do you recall whether you did or
22   not?
23   A.   I did.  I mean I must have.
24   Q.   At the time, did you believe that
25   everything stated in the objection was accurate?

**BURIAN**

1
2       A.    In this objection?
3       Q.    Yes.
4       A.    At the time did I think everything
5   stated in this objection -- the things that
6   concerned me, I checked, I read, and would have
7   corrected if I thought there was a mistake.
8           If there is things in here that don't
9   relate to me, then I may have left it to Quinn
10  Emanuel to get right.
11      **Q.    Let's look at page 8, and specifically**
12  **footnote 12.  Do you see that?**
13      A.    Yes.
14      **Q.    It states, "At the sale hearing, the**
15  **Lehman sellers indicated the value of the Fed**
16  **portfolio securities was 47.4 billion dollars."**
17  **As of the time this objection was**
18  **submitted, was that an accurate statement of**
19  **what the committee believed the 47.4 billion**
20  **dollars represented?**
21          MS. TAGGART:  Objection to form, and
22  as worded I am going to object on privilege
23  and instruct not to answer.
24          So don't answer.
25          MR. STERN:  You're instructing him not

BURIAN

1
2   to answer?
3           MS. TAGGART:  Yes.  He should not
4   answer what the committee believed was the
5   value of the Fed portfolio at that time.
6   And I know there is going to be a
7   deposition, a 30(b)(6) deposition of the
8   committee, so --
9           MR. STERN:  You have instructed him
10  not to answer?
11          MS. TAGGART:  Yes.  I think any
12  understanding that he has of what the
13  committee believed at that time would be
14  based on privileged communications, so I am
15  instructing not to answer.
16          And that's also not something that's
17  in the 30(b)(6) notice.  He is testifying
18  for Houlihan and he is the Houlihan 30(b)(6)
19  witness.
20          MR. STERN:  He is also testifying in
21  his individual capacity.
22      **Q.    Let me ask a different question.**
23  **Mr. Burian, looking again at footnote 12 of this**
24  **objection, at the time that you reviewed this**
25  **objection, did you have any reason to believe**

**BURIAN**

1
2   **that this statement was an inaccurate or false**
3   **statement?**
4           MS. TAGGART:  Hold on.  The statement
5   being that the Lehman sellers had said that
6   the value of the Fed portfolio was 47.4
7   billion?
8           MR. STERN:  Please, please.  I think
9   you know that you are entitled to object to
10  form or to instruct not to answer.  But
11  speaking objections are not allowed.
12          Let me ask the question again.  Let's
13  see if we can adhere to the rules.
14      **Q.    Mr. Burian, looking again at**
15  **footnote 12, it states, "At the sale hearing,**
16  **the Lehman sellers indicated the value of the**
17  **Fed portfolio securities was 47.4 billion."**
18  **My question to you, based on your**
19  **personal knowledge, at the time that was said to**
20  **the court in this submission, was that an**
21  **accurate statement of what you understood the**
22  **47.4 billion dollars to represent?**
23          MS. TAGGART:  Object to form.
24      **Q.    You can answer.**
25          MS. TAGGART:  You can answer if you

BURIAN

1
2   understand.
3       A.    What definition are we using for Fed
4   portfolio securities?  Are we using the
5   colloquial definition of the securities that
6   were part of the repo, or using your definition
7   that says in retrospect it included 7 billion in
8   cash, it didn't include 7 billion in cash?
9           You know, that's why I stated to you
10  earlier that you were going to have this
11  problem, because I don't know what Barclays
12  intended it to include and, as you know, the
13  7 billion in cash may or may not have been
14  moved.
15      **Q.    Let's look back at --**
16      A.    At the closing, not at the hearing.
17  So --
18      **Q.    Let's look back at paragraph 7, which**
19  **begins on page 4.**
20      A.    Paragraph 7 of the --
21      **Q.    Of the committee's objection.  You can**
22  **put the 30(b)(6) notice to the side.  I'm not**
23  **referring to that.**
24      A.    OK, but in -- I kept it out only
25  because I was concerned about definitions.

Page 34

BURIAN

Q. Let's put that to the side. I'm not focusing on the definitions in that, and I apologize if I created confusion by referring to that for that purpose. I don't believe that the 30(b)(6) notice defines this term, but I believe the committee's objection does.

A. OK.

Q. So let's focus on the committee's objection.

Paragraph 7 on page 4 states, "On or about September 15, 2008, the Federal Reserve Bank of New York, the New York Fed extended a collateralized line of overnight financing to LBI. On September 16, the New York Fed advised Barclays Capital, Inc. that Barclays needed to take out the New York Fed's exposure to LBI prior to the closing of its transaction. Barclays thus agreed to assume the New York Fed's obligations to fund LBI, which entailed the New York Fed transferring LBI securities to Barclays in order to collateralize that obligation (hereinafter the Fed portfolio and the securities in such portfolio, the Fed portfolio securities)."

Page 35

BURIAN

Do you see that definition of Fed portfolio securities?

A. Yes.

Q. Based on that definition, can you tell me whether the statement in footnote 12 on page 8 was an accurate statement of your understanding at the time?

MS. TAGGART: Object to form, and which time?

Q. At the time this objection was submitted to Judge Peck.

A. Do I call you Jack or Mr. Stern?

Q. Either.

A. Mr. Stern, this footnote just relates back to the sale hearing and says -- it quotes the transcript. It says the Lehman sellers indicated a value of 47.4.

My recollection -- I can't tell you I had a firm -- that I thought about this footnote very much at the time this was filed. So if you are asking me did I focus on this and determine it to be true, I can't answer.

But I can tell you that generally speaking, my understanding sitting in the

Page 36

BURIAN

courtroom was that there was 47.4 of securities that were going to be transferred to Barclays -- going to be transferred to Barclays.

Q. And those were the Fed portfolio securities?

A. Those were supposed to be a termination -- the securities that no one else had grabbed in the interim and that no one else asserted a first priority senior security interest, and I believe that the understanding was that whatever free securities were available were going to be -- were pledged to the Fed and then pledged to Barclays.

I'm just trying not to be -- sorry.

Q. So let me come back to what the committee told the court in this objection. The committee told the court that at the sale hearing, the Lehman sellers indicated the value of the Fed portfolio securities was 47.4 billion.

And my question is simply, was that statement to the court an accurate reflection of your understanding at the time this objection was made?

Page 37

BURIAN

MS. TAGGART: Object to form.

A. Honestly, I want this to go as quickly as possible, but you're jumping between three different times, saying is my recollection of this footnote as it relates back to the hearing date accurate when I sat at the hearing or when I am sitting reading --

Q. At the time --

A. I honestly don't know what you want.

Q. At the time this objection was submitted to Judge Peck, did you have any reason to believe that this statement in footnote 12 was not accurate?

A. I believed when this was -- when I read this -- I didn't correct it, so I thought it was true, and I -- and that the judge was apprised that securities worth 47.4 were going to be transferred.

Q. So at the time you reviewed this objection, which was in December of 2008 --

A. Oh. And that these were -- to fully answer your question, and that those were, the securities were part of the repo. I just want to be complete.

Page 38

BURIAN

1    BURIAN
2    **Q.   So you believed that the judge was**
3    **apprised that the securities worth 47.4 billion**
4    **dollars were going to be transferred and that**
5    **the securities were part of the repo?  Is that**
6    **correct?**
7         A.   Yeah, now that I think about it, there
8    may have been vagueness about transferred or
9    kept because of the cancellation of the repo.  I
10   don't remember that detail.
11        But yeah, that basically 47.4 billion
12   of securities, Barclays was going to end the
13   transaction by taking, keeping, being
14   transferred to 47.4 billion of securities.
15   **Q.   Those are the securities that were**
16   **being transferred as part of the repo, correct?**
17        A.   I don't remember that -- I don't
18   remember -- we can look at the transcript
19   together if you like, how definitive Lori was
20   about -- Ms. Fife from Weil, how definitive she
21   was about exactly where the securities came
22   from.
23   **Q.   That's why I am focusing on this.  In**
24   **December 2008, the committee told Judge Peck**
25   **that it understood that at a sale hearing, the**

Page 39

BURIAN

1    **BURIAN**
2    **Lehman sellers indicated the value of the Fed**
3    **portfolio securities was 47.4 billion dollars.**
4    **You have no reason to believe that that**
5    **statement to Judge Peck in December of 2008 was**
6    **an inaccurate or false statement, do you?**
7         A.   Again, because maybe I am missing a
8    nuance here, I know now and I knew in December
9    that there was a lot of confusion about what was
10   part and not part of the Fed portfolio package.
11   There were allegations that JP Morgan took
12   assets, problems that DTC refused to clear
13   assets.
14        There were all sorts of disputes going
15   on that for the most part were not explained to
16   us.  We were told -- I understand that some cash
17   was substituted.
18        So if you are asking me did I know in
19   December whether some very narrow definition of
20   exact collateral for a specific repo in one
21   particular place was 47.4, I would have assumed
22   not.  It was an amalgam of a bunch of things.
23        Are you asking me sitting at the
24   hearing whether I thought that Lori was
25   describing the transaction that I had been

Page 40

BURIAN

1    BURIAN
2    described earlier that day, that was we have a
3    repo, we have collateral for the repo and they
4    are going to -- that that's 47.4, yes.
5         So what this footnote is saying, and
6    it wasn't meant to be parsed the way you are
7    parsing it, what this footnote is saying is,
8    golly gee whiz, the transaction was a simple
9    transaction in which the repo obligations and
10   the assets were being transferred.  And the Fed
11   portfolio securities were at that time, we
12   thought, what those securities -- the bucket of
13   securities that were involved.
14        Is that helpful?
15   **Q.   Let me try to ask my question again,**
16   **because I need an answer to my question, which**
17   **is a simple question.**
18        **Footnote 12 of this objection, which**
19   **is dated as of December 19, 2008, states, "At**
20   **the sale hearing, the Lehman sellers indicated**
21   **the value of the Fed portfolio securities was 47**
22   **billion dollars."**
23        **My question is, as of the time this**
24   **objection was submitted, as of the time this**
25   **statement was made to Judge Peck, you did not**

Page 41

BURIAN

1    **BURIAN**
2    **have any reason to believe, did you, that this**
3    **was an inaccurate statement of what the Lehman**
4    **sellers had indicated?**
5         MS. TAGGART:  Objection --
6    **Q.   Yes or no?**
7         MS. TAGGART:  Objection to form, asked
8    and answered.  He just gave that answer.  He
9    can answer one more time, but that's going
10   to be all.
11        A.   I didn't go back and read the whole
12   trial transcript when this was filed, and
13   therefore, I didn't have a view as to whether
14   this was a direct quote or not of Ms. Fife.
15   **Q.   Did you have any reason to believe**
16   **this was an inaccurate statement of what she had**
17   **said?**
18        MS. TAGGART:  Objection, asked and
19   answered.  Object to form.
20        OK, do you want to answer that again?
21        A.   I think it was an accurate description
22   of what we all thought she said.
23   **Q.   Let's turn now to another part of the**
24   **objection, paragraph 9 on page 6.  It states,**
25   **"The hearing" -- are you with me on paragraph 9?**

Page 42

BURIAN

1
2     A.   I am.
3     Q.   Paragraph 9 states, "The hearing to
4  consider approval of the transaction (the sale
5  hearing) commenced on Friday evening,
6  September 19, 2008.  At the sale hearing, the
7  Lehman sellers advised the court of certain
8  changes to the sale transaction's terms since
9  executing the purchase agreement on
10  September 16th, purportedly resulting from
11  dramatic changes in the value of the Fed
12  portfolio securities being transferred to
13  Barclays, now 47.4 billion dollars, and
14  liabilities being assumed by Barclays, now
15  45.5 billion dollars."
16         Now, do you see that this refers to
17  liabilities being assumed by Barclays of 45.5
18  billion dollars?  Do you see that?
19     A.   I see the words, yeah, sure.
20     Q.   And at the time that this objection
21  was submitted, did you understand that
22  45.5 billion dollars to refer to the amount of
23  Lehman's repurchase agreement obligation to the
24  Fed?
25         MS. TAGGART:  Objection to form.

Page 43

BURIAN

1
2         If you understand the question, you
3  can answer.
4     A.   No.
5     Q.   You didn't understand the 45.5 billion
6  dollars to refer to the amount that Lehman owed
7  the Fed under its repurchase agreement?
8     A.   That's correct, I did not.
9     Q.   You did not.
10     A.   Jack, you are referring to --
11     Q.   Are we off the record?
12     A.   No, we are on the record.
13         When you asked that question,
14  referring to what date?  You keep asking about
15  what Lehman owed the Fed.  According to the
16  affidavit, there was no Fed loan.  It was a
17  Barclays loan at that date.
18         And I just don't -- I'm happy to
19  say -- you say is it yes or no and play games,
20  but I want to get to the --
21     Q.   Did you understand the 45.5 billion to
22  be the amount that Barclays would pay in
23  replacing the Fed repo?
24     A.   I can't answer that either.  No.
25     Q.   Why not?

Page 44

BURIAN

1
2     A.   Because I have no idea what Barclays
3  paid the Fed, and they were different times, and
4  I don't know -- I don't know if Barclays
5  extended more funds over a period of time from
6  the takeout of the Fed.
7         What this sentence says is we thought
8  and we were told that the Barclays' repo
9  obligation as of the weekend, as of that Friday
10  hearing, was 45.5 billion.  And the assets
11  supporting it had dropped to 47.4 billion.
12         I know I didn't answer yes or no, but
13  I am trying to correct the obvious misstatements
14  or try to make sure this goes faster.
15         MS. TAGGART:  Make sure you say what
16  you need to explain your answer.
17     A.   Was that helpful or you want me to
18  answer yes or no?
19     Q.   Hold on.
20         So what you're telling me, Mr. Burian,
21  is that this sentence in paragraph 9 of the
22  objection is saying that the committee thought
23  that the Barclays repo obligation as of the sale
24  approval hearing was 45.5 billion and the assets
25  supporting it were 47.4 billion?  Is that

Page 45

BURIAN

1
2  correct?
3     A.   Yes.  That's correct.  What the
4  committee thought.  That's what I was told, what
5  I thought.
6     Q.   Now let me move on to another
7  document.  Let's mark this as the next exhibit.
8         (Exhibit 459-B, transcript dated
9     December 22, 2008 marked for identification,
10     as of this date.)
11     Q.   Exhibit 459-B is an excerpt of a
12  transcript of a hearing before Judge Peck on
13  December 22, 2008, and I am going to point you
14  to a specific section of this and then ask you a
15  question about it.
16         Looking at page 45 of the transcript,
17  you see Mr. Kirpalani is speaking?
18     A.   I do.
19     Q.   Do you know who Mr. Kirpalani is?
20     A.   I do.
21     Q.   Who is he?
22     A.   A lawyer at Quinn Emanuel.
23     Q.   And he represents the creditors
24  committee?
25     A.   That is correct.

Page 46

```
              BURIAN
 1
 2    Q.   And at the bottom of page 45, starting
 3    at line 21, when Mr. Kirpalani says, "Your Honor
 4    knows better than I, from the Friday night when
 5    you approved the sale going forward, were
 6    thereafter spun into a whole variety of
 7    additional discussions and negotiations into
 8    Saturday and Sunday.  And we did submit the
 9    declaration of Mr. Saul Burian from Houlihan
10    Lokey, who was involved -- who was intimately
11    involved in those negotiations.
12        "The sale order itself made the
13    creditors committee a party, if you will, to the
14    transaction in the sense that it couldn't be
15    changed without the creditor committee's
16    consent, even an immaterial change."
17        And my question is, to your knowledge,
18    was that statement to Judge Peck by the
19    creditors committee counsel an accurate
20    statement?
21        MS. TAGGART:  Objection to form.
22    Compound.
23    Q.   Was it an accurate statement?
24    A.   As long as you understand what
25    intimately involved in those negotiations means,
```

Page 47

```
              BURIAN
 1
 2    yes.
 3    Q.   And help me understand intimately
 4    involved in those negotiations.
 5    A.   I was intimately involved in all
 6    creditor committee aspects of the negotiations.
 7    But I was not intimately involved in what
 8    appeared to be all sorts of discussions and
 9    negotiations among and by other parties during
10    that fateful weekend.
11    Q.   So subject to that qualification,
12    Mr. Kirpalani's statement is accurate, correct?
13    A.   The court order, I'm told, has the
14    terms of what changes the committee needs to
15    look at.  I think he is summarizing here the
16    idea that if there were changes, we were
17    supposed to -- if the company believed that
18    there were changes, they would need to get our
19    consent.
20        But the standard relates back to the
21    order.
22    Q.   And you were familiar with the sale
23    order at the time it was issued?  You read it?
24    A.   At the time it was issued?  Exactly
25    what time is that?
```

Page 48

```
              BURIAN
 1
 2    Q.   Did you read the sale order before the
 3    closing?
 4    A.   No.
 5    Q.   Coming back to Mr. Kirpalani's
 6    statement, I just want to make sure I understand
 7    your testimony.  I think you explained to me how
 8    your involvement in the negotiations.  Subject
 9    to that explanation, is what Mr. Kirpalani told
10    Judge Peck correct?
11        MS. TAGGART:  Object to form.
12    A.   I refer back to the sale order for
13    what the consents were needed or not needed, but
14    otherwise, yeah.
15    Q.   Now, did you attend the sale hearing?
16    A.   I -- well, which one?
17    Q.   The sale hearing on September 19, the
18    final sale approval hearing?
19    A.   I attended most of it or a large
20    portion of it.
21    Q.   It ran into the Sabbath?
22    A.   Correct.
23    Q.   So I understand that you wouldn't be
24    there during the Sabbath, correct?
25    A.   I was not there during the Sabbath,
```

Page 49

```
              BURIAN
 1
 2    correct.
 3    Q.   You would make an attempt -- what --
 4    do you recall at what time you left the sale
 5    hearing?
 6    A.   I mean we could back into it by
 7    seeing -- you know, 18 minutes after sunset, I
 8    would have left, but I don't remember the exact
 9    time.  I was --
10    Q.   I understand.  I understand.
11        Do you recall whether you were present
12    for the opening of the sale hearing?
13    A.   Absolutely.
14    Q.   Were you present for a recess that was
15    taken shortly after the hearing began?  If you
16    remember?
17    A.   I'm not sure exactly which recess you
18    are referring to, if there was, but I was
19    there -- I went through all of the
20    case-in-chief, and I think I left when some
21    parts were beginning -- some of the smaller
22    creditors were beginning to make statements.
23        It was -- must have been, I'm
24    assuming, not the beginning of the hearing.
25    What time did the hearing start?  Do you
```

Page 50

BURIAN

1   remember?
2       Q.   We will come to that, we will come to
3   that later in more detail.  But for now, I just
4   wanted to get a general recollection.
5       Did somebody report to you concerning
6   what had occurred to the -- parts of the hearing
7   that you were not present at?
8       A.   Yes.
9       Q.   And who did that?
10      A.   A variety of people told me about the
11  hearing.  Most importantly, I heard it from the
12  Milbank lawyers, you know, that the sale was
13  approved.  Mike Fazio gave me a rundown.
14      Q.   Was Mike Fazio the only Houlihan
15  representative who attended the entire sale
16  approval hearing?
17      A.   I don't remember.
18      Q.   Mr. Geer was not there?
19      A.   To the best of my knowledge, he was
20  not there.
21      Q.   And Mr. Siegert was not there?
22      A.   He was -- I am pretty sure he was not
23  there.  Neither of them were in New York then.
24      Q.   And did you at some point over the

Page 51

BURIAN

1   weekend after the hearing review a transcript of
2   the hearing?
3       A.   No.
4       Q.   Do you recall what Mr. Fazio reported
5   to you concerning the parts of the hearing you
6   missed?
7       A.   Yeah.  I can't swear on a Bible that
8   everything that I am telling you is what
9   Mr. Fazio told me as opposed to a collection of
10  what I heard from everybody, so --
11      Q.   Understood.
12      A.   It is hard sometimes to separate that
13  out.  But frankly, what I was told is that the
14  hearing was anticlimactic, sort of a nonevent,
15  and a lot of people got up to make some noise.
16  The ad hoc committee represented by Akin Gump,
17  you know, made an objection that was not
18  supported, that a bunch of creditors had some
19  parochial issues.
20      I was at the hearing portion when DTC
21  made their comments and others dealing with
22  trading issues or JP Morgan, but I was told that
23  may have -- because remember, people were giving
24  me descriptions that could have been parts of

Page 52

BURIAN

1   the hearing I was at.  So I don't know -- I
2   can't promise you if the DTC lawyer spoke twice
3   or once, just when I was there or not.
4       Generally speaking, it was what you
5   would expect for something that was as large as
6   this with so many parties, people getting up to
7   say their piece.  More clarifications.  Nothing
8   exciting other than Judge Peck's approval, which
9   seemed to -- people said he was emotional and
10  felt the weight of the moment that was a hushed
11  courtroom and a meaningful moment.
12      But substantively, I was told that I
13  missed nothing.
14      Q.   At some point, did you get involved
15  in -- withdrawn.
16      Going into the weekend, the weekend of
17  September 20, 21, did you have a transcript of
18  what had been said at the hearing?
19      A.   I don't think so.
20      Q.   Do you recall at any point before the
21  closing on September 22, reviewing a transcript
22  of the sale approval hearing?
23      A.   I do not.
24      Q.   But you felt going into that weekend

Page 53

BURIAN

1   and before the closing that you had adequate
2   information concerning what had occurred at the
3   hearing both based on your own attendance and
4   the reports that you got?
5       MS. TAGGART:  Object to form.
6       A.   Yes.
7       Q.   And now, after you left the hearing to
8   observe the Sabbath, when did you get back to
9   work on this matter?
10      A.   Immediately after Sabbath ended,
11  called the people from Milbank that were at Weil
12  Gotshal.  I think I either tried to reach Mike
13  Fazio or reached him, but either way, the result
14  of those conversations were that I went over to
15  Weil Gotshal.
16      Q.   Do you recall roughly when you went to
17  Weil?
18      A.   You know, maybe I should have prepared
19  more, but we could figure it out again by
20  looking at when sundown was on Saturday night.
21      Q.   Sometime after sundown?
22      A.   I think I had to drop off one of my
23  kids at a play date, because I had no coverage
24  that night, and I continued down in a cab.  So

Page 54

BURIAN

1
2    it couldn't have been more than a half hour, an
3    hour after Sabbath ended.  I just don't remember
4    exactly.
5        Q.    Sometime that evening of Saturday,
6    September 20?
7        A.    Right.
8        Q.    And from that point through the
9    closing on September 22, were you present at
10    Weil for that entire time period?
11       A.    No.
12       Q.    Tell me, you know, during that period
13    from Saturday evening, the 20th, through the
14    closing, as best you can recall, when you were
15    present at Weil.
16       A.    I believe I was at Weil -- I think --
17    I'm not sure, but I think I went home at one
18    point Saturday night and got a few hours of
19    sleep.  I honestly don't remember, but I -- I'm
20    pretty sure at some point Sunday morning,
21    Saturday night, I did go home.
22           I mean I remember I did not carry a
23    gym bag, I didn't bring stuff with me for the
24    night to Weil, so I would have gone home and
25    changed my clothes and showered or whatever.  So

Page 55

BURIAN

1
2    that I do remember.
3        Q.    At some point you returned to Weil?
4        A.    Yeah.  So I definitely went home at
5    some point Saturday night.  I can't swear on a
6    Bible if it was 12 o'clock or 4 o'clock in the
7    morning, but kind of late.  Probably -- I did go
8    home for a few hours.
9            And Sunday, I left Weil -- got there
10   early and, you know, I left Weil somewhere
11   between 2:30 and 4:00 in the morning.
12       Q.    So that would have been 2:30 or --
13   between 2:30 and 4:00 in the morning of the
14   22nd?
15       A.    Of Monday, the 22nd.
16       Q.    And you -- do you know when the
17   closing occurred?
18       A.    I've been told that it closed before
19   the open of business on Monday, the 22nd.
20       Q.    You were not present for the physical
21   closing?
22       A.    In this day and age, physical, I'm not
23   sure what a physical closing means.  Does that
24   mean sign everything, all in escrow, somebody
25   says are we closed, we're closed?  You know,

Page 56

BURIAN

1
2    things move --
3        Q.    Let me rephrase.
4        A.    I was not there when -- I was not at
5    Weil Gotshal, you know, between the hours of
6    let's say 5:00 and 8:00 in the morning when, you
7    know, people became legally committed and it was
8    deemed done.
9        Q.    Was anybody from Houlihan present for
10   that closing?
11       A.    I don't believe anyone was at -- no --
12   I don't believe anyone from Houlihan was at Weil
13   from 5:00 to 8:00 in the morning.
14       Q.    Was anybody from Milbank there?
15           MS. TAGGART:  Object to foundation.
16       A.    I do not believe anyone from Milbank
17   was there during those hours either.
18       Q.    Was there any representative of the
19   committee present at the closing on the morning
20   of Monday, September 22?
21           MS. TAGGART:  Object to foundation.
22       A.    There was no committee representative
23   at Weil between those hours of 4:00 to 8:00,
24   4:00 to 9:00.
25       Q.    At some point after the closing, you

Page 57

BURIAN

1
2    received a copy of the final purchase agreement;
3    is that right?
4        A.    Yeah.
5            MS. TAGGART:  Jack, I think we might
6    want to take a break soon, if this is going
7    to be --
8            MR. STERN:  Sure, we can take a short
9    break.  Sure.
10           THE VIDEOGRAPHER:  The time is now
11   10:39 a.m.  We are now off the record.
12           (Recess)
13           THE VIDEOGRAPHER:  This is the start
14   of tape number 2.  The time is 10:51 a.m.
15   We are now back on the record.
16   BY MR. STERN:
17       Q.    To come back to my last question, at
18   some point after the closing, you did receive a
19   copy of the final purchase agreement; is that
20   right?
21       A.    I received an execution copy of the
22   asset purchase agreement.  The actual agreement,
23   if that's what you are referring to, not all
24   the -- this looks a lot thicker than anything I
25   ever got, so I'm concerned about that.

Page 58

BURIAN

1
2     Q.   Let's look at it.  Let me put before
3  you a document that we have previously marked,
4  that has been previously marked as Exhibit 26.
5         Mr. Burian, this is a copy of the
6  notice of filing of the purchase agreement and
7  it has three exhibits.  Exhibit A, the asset
8  purchase agreement dated September 16, 2008;
9  Exhibit B, the first amendment to the asset
10 purchase agreement dated September 19, 2008, and
11 Exhibit C, executed clarification letter
12 agreement dated September 20, 2008.
13        After the closing, did you have all of
14 these agreements?
15     A.   I -- yes, I've seen each of these
16 three agreements.
17     Q.   And did you understand at the time
18 that these three agreements comprised the final
19 purchase agreement?
20        MS. TAGGART:  Object to form.  Calls
21 for a legal conclusion and vague as to time.
22     A.   At which time?
23     Q.   After the closing, did you understand
24 that these three documents, the documents that
25 were filed with the court on September 22,

Page 59

BURIAN

1
2  comprised the final purchase agreement?
3        MS. TAGGART:  Same objections.
4     A.   I've been told that these are the --
5  this is the asset purchase agreement and the
6  clarification letter and the amendment that
7  governed the transaction.  There are exhibits
8  and other transfer and other documents and
9  schedules that go with them, but this, what you
10 are handing me purports to be the legally
11 binding agreement among the parties.
12     Q.   And at the time that you received the
13 final purchase agreement, did you understand
14 that it was a fully integrated, written
15 agreement?
16        MS. TAGGART:  Object to form.  And
17 calls for a legal conclusion.  Also, could
18 call for privileged information.
19        If you have an opinion that you
20 yourself have formed about that, go ahead.
21 If it is informed by something like if you
22 spoke to counsel about it, don't reveal
23 that.
24        Do you need to hear the question
25 again?

Page 60

BURIAN

1
2     A.   I didn't think in those terms or
3  consider that issue.
4     Q.   But my question is, if you would take
5  a look at the asset purchase agreement, which is
6  Exhibit A, and specifically at page 39.  There
7  is a Section 13.5.  Do you see that?
8     A.   Yes, I do.
9     Q.   And the second sentence of that
10 section says, "This agreement can be amended,
11 supplemented or changed and any provision hereof
12 can be waived only by written instrument making
13 specific reference to this agreement signed by
14 the party against whom enforcement of any such
15 amendment, supplement, modification or waiver is
16 sought."
17        Did you understand at the time that
18 the final purchase agreement was a fully
19 integrated, written agreement that could not be
20 changed unless it was changed in writing, signed
21 by the parties?
22        MS. TAGGART:  Object to form.  Calls
23 for a legal conclusion.  Could call for
24 privileged information.
25        You should answer if you had on your

Page 61

BURIAN

1
2  own an opinion about that question.
3     A.   Honestly, I don't think in terms of
4  fully integrated -- whatever the other term was.
5  Do I know that documents -- that legal
6  obligations need to be signed?  Yeah.
7     Q.   You were an experienced transactional
8  lawyer?
9     A.   I'm saying -- the reason why a
10 clarification letter -- are you asking me
11 whether I thought that you could have -- ask me
12 the question again.
13     Q.   Did you understand that all the terms
14 of the agreement, that all the terms of the sale
15 transaction had to be reflected in these written
16 agreements that are marked as Exhibit 26?
17        MS. TAGGART:  Object to form.  Calls
18 for a legal conclusion.  Could call for
19 privileged advice.
20        But if you formed an understanding at
21 the time on your own, you can answer.
22     A.   This and its associated schedules, and
23 there were real estate transfer documents and
24 other things, there were -- there was -- there
25 were other related documents, that the table had

Page 62

BURIAN

1
2 many, many other things.
3        So those, that combination of things
4 was the corporate transaction.
5    Q.   And did you understand that the
6 transaction couldn't, could not be changed
7 orally?
8        MS. TAGGART:  Object to the form.
9 Calls for a legal conclusion.
10       If you formed your own independent
11 understanding at the time about that, you
12 can answer.
13   A.   You know, it depends what you mean by
14 orally.  We often in bankruptcy state things on
15 the record that are binding, and we often
16 have -- you know, that transcript or
17 representation is binding.
18       So these were the agreements and then
19 there was the record of the hearings.
20   Q.   OK.  Did you have any understanding at
21 the time you reviewed these final agreements
22 that they incorporated any provision of any
23 transcript of any hearing?
24   A.   You know --
25       MS. TAGGART:  Object to time and --

Page 63

BURIAN

1
2    Q.   Yes or no?
3        MS. TAGGART:  No.  I am going to --
4 let me read it again.  Hold on.
5    Q.   Let me ask another question.
6    A.   I am not going to answer if --
7        MS. TAGGART:  I don't want you to
8 answer it.
9    Q.   OK.  Is there any -- did you
10 understand that the sale transaction would be
11 governed by the final written agreements that
12 the parties executed?
13       MS. TAGGART:  Object to form.  Calls
14 for a legal conclusion.
15       Go ahead.
16   A.   I understand and I understood that
17 this and all associated schedules and other
18 documents related to it purported to be the
19 agreement that Barclays and LBHI and the debtors
20 agreed to, and that among them, this was the
21 deal.
22       I also understood that the capacity to
23 act in bankruptcy correlates to the court order
24 and the sale order, and the court order and the
25 sale hearing and representations made in court,

Page 64

BURIAN

1
2 so that no matter what this document said, it
3 could not go beyond what the court authorized.
4        And therefore, if I really -- I want --
5 let me just finish.  If you are asking me
6 whether I understand that Barclays' commitments
7 and LBHI's agreements were supposed to be
8 written down in these documents and that oral
9 chatter would not be an amendment to it, of
10 course, corporate transactions work that way.
11 You write down your understandings.
12       If you are asking me whether this
13 document, when I reviewed it post closing, I
14 said this is -- this governs a transaction,
15 nothing outside these four corners has any
16 impact on the transfers that occurred, the
17 answer would be no.
18   Q.   OK.  Did you believe that the written
19 terms were binding on the parties?
20       MS. TAGGART:  Objection.  Form, calls
21 for a legal conclusion.
22   A.   Not on the debtor estates, if they
23 conflicted with their capacity to contract.
24   Q.   Did you identify anything at the time
25 that you felt conflicted with the debtor

Page 65

BURIAN

1
2 estate's ability, capacity to contract?
3        MS. TAGGART:  Objection and vague as
4 to time.  When are you asking?
5    Q.   Right after the closing?
6    A.   Right after like --
7    Q.   Well, from the time of the closing
8 through September 30, did you identify anything
9 in these written agreements marked as Exhibit 26
10 that conflicted with what the court had been
11 told?
12       MS. TAGGART:  Object to form, called
13 for legal and also could call for privileged
14 information.
15       If you independently looked at
16 something and through September 30 can
17 answer that, go ahead.
18   A.   I did not have a specific view.  I
19 only had what we were -- what was represented to
20 us.  We didn't have the ability -- the answer
21 is, what I knew on that date, I thought it was
22 probably fine.  I didn't know of anything in
23 particular.
24       But my direct knowledge of the
25 underlying facts, you know, in retrospect turned

BURIAN

1                            BURIAN
2  out to be quite wrong.
3      **Q.**  **Based on reviewing the agreement --**
4  **withdrawn.**
5        **After the closing, am I correct that**
6  **you reviewed the final agreement?**
7      A.  I did not read it cover to cover.  It
8  was done, there was the next crises or crisises,
9  so I never sat down after the closing and read
10  every single one of these documents to look for
11  things that were consistent or inconsistent.
12      I --
13      **Q.**  **You're saying that between --**
14      MS. TAGGART:  Hold on, did you finish?
15      **Q.**  **Are you saying --**
16      MS. TAGGART:  Hold on.
17      A.  I was trying to answer your question.
18  The question was, did I search the document for
19  things that -- why don't you read back your
20  question.
21      **Q.**  **Let me ask this.**
22      MS. TAGGART:  He needs to finish his
23  answer.  Can we read back the question.
24      (Record read)
25      A.  The answer was, I reviewed pieces of

1                            BURIAN
2  it from time to time.  I don't remember ever
3  sitting down and studying and reading all the
4  documents in the final agreement.
5      **Q.**  **OK.  So from the time after the**
6  **closing on September 22, through the end of**
7  **September, you did not review these final**
8  **agreements carefully?**
9      MS. TAGGART:  Objection.
10      **Q.**  **Is that right?**
11      MS. TAGGART:  Mischaracterizes the
12  statement and object to form.
13      MR. STERN:  Please, please.  These
14  speaking objections are really taking a lot
15  of time.  If you have an objection to the
16  form or you want to instruct him not to
17  answer, that's what the rules provide for.
18      **Q.**  **So let me ask the question.  From the**
19  **time after the closing on September 22, through**
20  **the end of September, did you review the final**
21  **agreements carefully?**
22      MS. TAGGART:  Object to form.  Asked
23  and answered.
24      A.  I reviewed them sufficiently for my
25  purposes.

1                            BURIAN
2      **Q.**  **And in doing that review that was**
3  **sufficient for your purposes, did you identify**
4  **anything on the face of the agreements that was**
5  **inconsistent with what you understood the court**
6  **had been told at the sale approval hearing on**
7  **September 19, 2008?**
8      A.  We identified lists of questions in
9  order to determine whether or not these -- this
10  transaction was consistent.
11      We --
12      MS. TAGGART:  That's it.
13      **Q.**  **You had lists of questions.  Did you**
14  **identify anything that you believed in this time**
15  **period between September 22 and the end of**
16  **September was on its face inconsistent with what**
17  **the court had been told?**
18      MS. TAGGART:  I am going to object
19  now.  Form, compound and also privileged.
20  And I am going to instruct not to answer for
21  things that are after the closing that
22  his -- his analysis of it, unless you
23  communicated to someone other than someone
24  at Houlihan and the committee, on work
25  product.

1                            BURIAN
2      MR. STERN:  You're instructing him not
3  to answer?
4      MS. TAGGART:  Yes.
5      **Q.**  **Let's be clear about this then.  In**
6  **this time period between September 17 -- I am**
7  **sorry.**
8      **In the time period between**
9  **September 22, 2008 and the end of September, did**
10  **you identify anything on the face of the**
11  **agreements marked as Exhibit 26 that was**
12  **inconsistent with what you understood the court**
13  **had been told at the approval hearing?**
14      MS. TAGGART:  Same objections.  Form,
15  asked and answered.
16      To the extent, though, that you're
17  asking for any of his analysis after the
18  closing that was not communicated to someone
19  outside Houlihan and the committee, I am
20  going to object on work product and instruct
21  not to answer.
22      MR. STERN:  So you're instructing him
23  not to answer a question concerning whether
24  the final purchase agreement was or was not
25  consistent with what he understood the court

BURIAN

1  BURIAN
2  had been told at the sale approval hearing?
3      MS. TAGGART:  If you want to ask him
4  today about things like whether it is
5  consistent, but if you are asking for his
6  analysis between September 22nd and the
7  30th, either in Houlihan or with the
8  committee, I think that that's work product
9  and I'm going to instruct not to answer.
10     Q.    Between September 22 and September 30,
11 did you or the committee consider making a
12 motion before Judge Peck for reconsideration of
13 his sale order?
14     MS. TAGGART:  I am going to object on
15 form, but also on privilege and instruct not
16 to answer.  It is both work product
17 privilege and attorney/client privilege.
18     Q.    Between September 22 -- withdrawn.
19     Did you understand after the sale
20 approval hearing that there was a certain amount
21 of time available to the committee to make a
22 motion for reconsideration of the sale order?
23     MS. TAGGART:  Object to form.  Calls
24 for a legal conclusion.
25     If you have an independent answer to

BURIAN

1  BURIAN
2  that, that's not based on any advice from
3  counsel, go ahead and answer.
4      A.   Generally one can appeal an order, or
5  one can seek reconsideration of an order.  At
6  the time, I did not know what time frames --
7  what the rules were for the time frames for
8  reconsideration of orders.
9      Q.   Did you ask anybody?
10     A.   I probably knew at some point, but I
11 didn't remember then.
12     Q.    Then did you ask anybody?
13     MS. TAGGART:  Objection.  You can say
14 if you asked somebody that wasn't like your
15 counsel, but don't -- I instruct you not to
16 answer whether you asked your counsel that
17 question or anyone of the committee.
18     A.   So did I ask someone what the time
19 frame for reconsideration was that was not a
20 committee member, counsel or financial advisor
21 to the committee?
22     MS. TAGGART:  Yes.
23     A.   I don't think so.  I can't be sure,
24 but I don't think so.  I would say no.
25     Q.    So you don't recall at the time,

BURIAN

1  BURIAN
2  between September 22 and the end of September,
3  being aware of the date by which the committee
4  would have to make a motion for reconsideration?
5      A.   I don't recall knowing that
6  information.
7      Q.    What litigation was the committee
8  contemplating in that period?
9      MS. TAGGART:  Objection, instruct not
10 to answer on privilege.
11     Q.    Was the committee considering
12 litigation in that period?
13     MS. TAGGART:  Objection, instruct not
14 to answer on privilege.
15     MR. STERN:  You asserted work product
16 before, and I'm trying to explore whether
17 there is a basis for a work product claim.
18     Q.    In that period between September 22
19 and September 30, to your knowledge, was the
20 committee contemplating litigation in connection
21 with the sale transaction?
22     MS. TAGGART:  Same objection, same
23 instruction, don't answer.
24     Q.    Now, based on your review of the final
25 purchase agreement, which is marked as

BURIAN

1  BURIAN
2  Exhibit 26, did you identify any specific
3  provision that you felt you needed to discuss
4  with Weil Gotshal because it was inconsistent
5  with what Weil Gotshal had told Judge Peck about
6  the transaction?
7      MS. TAGGART:  Objection, I'm going to
8  instruct not to answer, that you could
9  answer, and if you want to ask the
10 question --
11     MR. STERN:  Are you instructing?
12     MS. TAGGART:  Yes.  I'm instructing on
13 that, but I am going to explain why.
14     MR. STERN:  If there is an
15 instruction, just an instruction is needed.
16 I don't need a speech.
17     So you are instructing him not to
18 answer?
19     MS. TAGGART:  Yes.  I am allowed to
20 state the basis of my instruction.
21     MR. STERN:  It is not necessary.  If
22 you instruct, you can instruct.  You don't
23 have to make a speech every time you do the
24 instruction.
25     MS. TAGGART:  I am allowed to explain

Page 74

BURIAN

1    on the record why I am giving a privilege
2    instruction.
3        MR. STERN:  Then we are going to be
4    here longer than seven hours.
5        MS. TAGGART:  I have reasons why I am
6    giving this privilege instruction.  If you
7    would like not to hear them, that's OK.
8        MR. STERN:  I just want the
9    instruction.
10       MS. TAGGART:  I am instructing not to
11   answer.
12       MR. STERN:  You are instructing him
13   not to answer.
14       **Q.   Did you ever -- after the closing on**
15   **September 22, 2008, did you ever have a**
16   **discussion with anyone from Lehman or Weil or**
17   **Lazard concerning whether any aspect of the**
18   **final purchase agreement was inconsistent with**
19   **what Weil had represented to Judge Peck at the**
20   **sale approval hearing?**
21       MS. TAGGART:  You can answer yes or no
22   to that.
23       A.   Yes.
24       **Q.   Did you have any such discussion with**

Page 75

**BURIAN**

1    **Weil or Lehman or Lazard at any time between**
2    **September 22 and the end of September, 2008?**
3        A.   I don't specifically recall the exact
4    dates.  Part of the problem here is, you keep on
5    using the phrase "inconsistent."  If a contract
6    says securities are being transferred, that's
7    not -- that may not be inconsistent.  But if I
8    am not sure whether the securities that were
9    actually transferred were or were not
10   consistent, asking me very narrow questions
11   about did I find an inconsistency in the
12   document doesn't help anything.  I honestly
13   don't know if I should answer yes or no to that.
14       **Q.   Well, you --**
15       A.   I truly am trying to explain.  If it
16   helps it go faster, great.  If it doesn't, I'll
17   pay for the three seconds.
18       My point is, our questions were not
19   what the document said, but how -- what actually
20   happened pursuant to the documents.  So I don't
21   know if it was exactly between the 22nd and
22   23rd, but on multiple occasions we asked people
23   from Lazard and Weil, not the privileged stuff,
24   for reconciliations of, this provision says

Page 76

BURIAN

1    this, what happened under that provision in
2    order to determine whether that provision or
3    whether the execution of that provision was
4    consistent or inconsistent.
5        Does that help?
6        **Q.   Consistent or inconsistent with what?**
7        A.   With what we thought the judge was
8    apprised.
9        **Q.   What you thought the judge was told?**
10       A.   With what the judge was told.
11       So --
12       **Q.   Let me just break this down into two**
13   **sections.  I am going to come to what you are**
14   **talking about, which is the analysis of the**
15   **transfers.  But right now I'm just focusing on**
16   **the face of the agreement.  And I would like to**
17   **try to get an answer to that before moving on to**
18   **the list of questions that you referred to.**
19       **Did you have any discussion with**
20   **anyone from Lehman or Weil or Lazard between**
21   **September 22 and September 30 concerning whether**
22   **anything on the face of the final agreements,**
23   **anything on the face of the final agreements was**
24   **not consistent with what Weil had represented to**

Page 77

**BURIAN**

1    **the court concerning the agreement?**
2        A.   When you say "inconsistent," what you
3    mean is directly opposite?
4        **Q.   What do you understand the word**
5    **"inconsistent" to mean?**
6        MS. TAGGART:  Object to form.
7    Argumentative.
8        A.   We had many conversations about, that
9    some of these aspects were not described in
10   detail to the court.  That does not necessarily
11   mean that they were inconsistent with the
12   transaction that was described to the court.
13       **Q.   So tell me about those --**
14       A.   That's why I am having trouble with --
15   yes.
16       **Q.   Tell me about those discussions in**
17   **which you discussed whether specifics of the**
18   **final agreement had been described to the court.**
19       MS. TAGGART:  This is the same time
20   period and the same people we were speaking
21   about before.
22       A.   Are we talking about during that
23   weekend?
24       **Q.   We are talking about from September 22**

Page 78

BURIAN

through the end of September.

1
2
3    A.   Oh, we did not have detailed
4    conversations about that, during that period of
5    time.  Again, if it happened between 22nd or the
6    30th.  It may have been early October when the
7    Weil Gotshal lawyers finally got some sleep.  I
8    don't remember exactly what it was, but we would
9    have had more general conversations regarding
10   what exactly happened as opposed to, you know,
11   the more detailed conversations of whether this
12   was described in detail or not described in
13   detail.
14   Q.   How soon after the closing on
15   September 22 did you review the final
16   clarification letter that is Exhibit C to
17   Deposition Exhibit 26?
18   A.   I was pretty tired also.  I don't -- I
19   know I got it Monday, Tuesday or Wednesday.  I
20   can't recall exactly when I read it completely.
21   Q.   Do you think you read it the week of
22   September 22?
23   A.   I certainly read portions of it during
24   that week.
25   Q.   When you did that review of the

Page 79

BURIAN

1
2    clarification letter, were there any provisions
3    of the clarification letter that you thought
4    should be brought to Judge Peck's attention?
5    MS. TAGGART:  I am going to -- this is
6    after the closing?  I am going to object to
7    that answer and instruct not to answer on
8    privilege.
9    If you communicated something about
10   that to somebody, then -- that's outside the
11   committee or your financial advisors, you
12   can answer.
13   A.   It is the same answer in that I read
14   it and had questions.  We were specifically told
15   that our consent was not necessary and
16   therefore, that this clarification letter was
17   not a change.
18   To go and say to the estate that they
19   were wrong or there was a mistake, you know, at
20   that point in time didn't make sense.  It was a
21   question of, great, the transaction closed, tell
22   us what happened and confirm what we were
23   represented.
24   It was more review for the purposes of
25   follow-up, not for -- no one at that point in

Page 80

BURIAN

1
2    time, at least I did not at that point in time
3    have, you know, an "I got you" mentality, is
4    this consistent or inconsistent.  It was, a lot
5    happened.  A lot of people knew about what
6    happened and I don't.  You know, explain it to
7    me, so that I could determine whether it was,
8    you know, consistent or inconsistent.
9    Q.   Who told you that the clarification
10   letter was not a change?
11   MS. TAGGART:  Objection.  You can
12   answer if there is anybody at -- that's not
13   the Houlihan, the committee or your counsel.
14   A.   That Saturday night and Sunday
15   morning, when we got the clarification letter,
16   you know, we asked about it.  We were told that
17   this was a means of execution in order to avoid
18   a double transfer of the securities.
19   The idea was to change the APA from a
20   purchase of assets to a closeout of a repo in a
21   manner consistent with what Ms. Fife had told
22   the court, and that there were, you know, other
23   provisions obviously in order to clarify the
24   APA, and we specifically asked whether you
25   wanted, needed committee consent to anything and

Page 81

BURIAN

1
2    were told no.
3    Q.   OK.  You said you were told.  Who was
4    telling you those things?
5    A.   Well, I said a lot of things in that
6    answer.  So the part about the committee
7    consent, the most important conversation was
8    probably with me and Harvey from Weil Gotshal,
9    where we made it very clear as it got later and
10   later Sunday that we were going to be unable to
11   get a quorum of the committee, and there was a
12   limit to how late we could have calls, and
13   therefore, we were reaching the time where if
14   committee consent were needed, it just would not
15   be available.
16   And then later on, before I left for
17   the evening, we confirmed again, saying is there
18   any need for us to be here, do you need us to
19   sign off on anything, and we were told that the
20   transaction was moving forward and the committee
21   was not necessary.
22   Q.   Who told you that and what did they
23   say?
24   A.   Most of the conversations were in the
25   hallways at Weil, so I'm not sitting down in

Page 82

BURIAN

1
2  organized conference rooms where we introduce
3  ourselves.
4          But the main conversation on both
5  those fronts, both before the committee went to
6  sleep and before I left, were me and, I believe
7  Harvey. You know, Tom Roberts was there. Lori
8  Fife was all around the place. There were
9  corporate lawyers from Weil, but the main
10 conversation -- really the conversation that I
11 have a firm recollection of before I left was me
12 and Harvey.
13     Q.  And in that conversation, did you
14 discuss whether the clarification letter would
15 create any changes that would have to be
16 described to Judge Peck after the closing?
17     A.  Described to Judge Peck after closing?
18     Q.  Yes.
19     A.  No, I didn't have a conversation with
20 Harvey about post-closing disclosure. No.
21     Q.  Did Mr. Miller ever indicate to you
22 that he thought that there was some aspects of
23 the clarification letter that would have to be
24 disclosed to Judge Peck?
25     A.  No.

Page 83

BURIAN

1
2     Q.  At the time, did you believe that any
3  such disclosure would be necessary?
4     A.  At which exact time? I mean there was
5  a --
6     Q.  At the time you had those discussions.
7     A.  I am going to focus on the last
8  conversation, so for your benefit, I actually
9  had a draft of the clarification letter at that
10 time.
11         We asked the question. So obviously
12 it was a thought in my mind as to whether or not
13 this was or was not, but we didn't have the
14 background or the details of what -- not what
15 the words meant, but what was actually happening
16 pursuant to those words, and therefore, I was
17 concerned and asked the question, and that --
18 and the answer I was given was, we are going to
19 sit down with you now and explain it to you.
20         And then we had that explanation, and
21 then we confirmed that in light of the
22 explanation, we are going to go home, do you
23 need us, and we were told no.
24     Q.  OK. Focusing on the words in the words in

Page 84

BURIAN

1
2  the agreement that you had as of that time that
3  caused you to think that a further disclosure
4  should be made to Judge Peck, concerning the
5  words of the agreement?
6     A.  Concerning the words of the agreement.
7         MS. TAGGART: Object to form.
8     A.  It is too narrow of a question to
9  really answer, because assuming that these words
10 were describing businesses and assets, as we
11 were explained, then we thought on balance, the
12 clarification letter was fine.
13         Clearly, whether -- clearly a true-up
14 or an explanation of what actually closed would
15 be useful. I didn't form a legal view as to
16 whether and how that would be communicated to
17 Judge Peck.
18     Q.  And the true-up, would that have
19 concerned the identity or value of assets being
20 transferred?
21         MS. TAGGART: Object to form.
22     A.  Look at paragraph 4 on page 3 of the
23 clarification letter.
24     Q.  No. Let's stick with my question.
25     A.  You asked me about the words of the

Page 85

BURIAN

1
2  letter, so I am trying to give you an example.
3         There is a number there on the bottom
4  of page 3 in paragraph 4 which is an aggregate
5  of 1.29 billion dollars. In my experience, it
6  would be highly unlikely if at some point the
7  judge were not informed of what exactly the
8  aggregate consideration was actually paid for
9  the assets.
10         So did I have a problem with the words
11 on the bottom of page 3? No, I didn't think
12 about it then, but you are asking me the
13 question now. Did I have an expectation that
14 they would be disclosed either in the form of
15 filing documents with the court or saying to
16 your Honor, good news, we closed and we got 1.29
17 billion dollars? Of course.
18     Q.  So you are talking about confirmation
19 that the consideration was actually paid?
20     A.  Not confirmation. Just what the
21 number was. Remember at the hearing, Ms. Fife
22 said that there is still open issues. We found
23 out that one of the issues related to, you know,
24 whether it was pre or post commission, and that
25 issue was ultimately settled.

Page 86

BURIAN

1
2    So I would have expected -- so again,
3    fixing that number was in my view consistent
4    with Ms. Fife's disclosure to the court that
5    there was going to be a relatively modest
6    negotiation on the exact amount.  The words
7    here --
8    **Q.    You are talking about the appraisal of**
9    **buildings?**
10   A.    Not only the appraisal.  It was also
11   whether or not you used the pre-fee or post-fee
12   number.
13   **Q.    For the buildings?**
14   A.    For the buildings.
15   **Q.    So --**
16   A.    But they --
17   **Q.    Let's go back to your list of**
18   **questions.**
19       MS. TAGGART:  He needs to finish.
20   A.    I want to finish answering your
21   question.
22       So your focusing on the words in
23   paragraph 4 is a perfect example where I
24   understood the words, I was not troubled that it
25   was inconsistent with, to use your language, on

Page 87

BURIAN

1
2    the order itself, but I did have an expectation
3    that there would be disclosure at some point of
4    what actually happened.
5    **Q.    Now, let's stick with this agreement**
6    **that you're looking at, the clarification**
7    **letter, which is Exhibit C.  If you look at**
8    **page 1, under the first section, purchased**
9    **assets, you see that in Section 1(a)(ii) -- are**
10   **you with me?**
11   A.    I'm listening.
12   **Q.    Exhibit C, if you could just look at**
13   **Exhibit C.**
14   A.    Give me one second, please.
15       Yeah.  Sorry.
16   **Q.    On page 1 of Exhibit C, this is the**
17   **clarification letter, on the first page under**
18   **Section 1(a)(ii), you see it says, "With respect**
19   **to Clauses A, D and E of the definition of**
20   **purchased assets in the original agreement,**
21   **instead of the items referred to in such**
22   **clauses, A, the securities owned by LBI and**
23   **transferred to purchaser or its affiliates under**
24   **the Barclays repurchase agreement" --**
25   A.    Where are you?

Page 88

BURIAN

1
2    **Q.    On the clarification letter --**
3    A.    Page 1?
4    **Q.    Exhibit C, page 1, the bottom part of**
5    **the page, Section 1(a)(ii).**
6    A.    Now I see it, OK.
7    **Q.    "With respect to Clauses A, D and E of**
8    **the definition of purchased assets in the**
9    **original agreement, instead of the items**
10   **referred to in such clauses --**
11   A.    Right.
12   **Q.    -- "A, the securities owned by LBI and**
13   **transferred to purchaser or its affiliates under**
14   **the Barclays repurchase agreement as defined**
15   **below, as specified on Schedule A, previously**
16   **delivered by seller and accepted by purchaser."**
17   **That reference to the Barclays repurchase**
18   **agreement, based on that reference, did you**
19   **understand that the repurchase agreement**
20   **collateral would be included as a purchased**
21   **asset?**
22   A.    Yes.
23   **Q.    And --**
24   A.    I am sorry.  We are talking
25   colloquially, not whatever definition we talked

Page 89

BURIAN

1
2    about earlier.
3    **Q.    For now going forward, let's ignore**
4    **the definitions in the 30(b)(6) notice and we**
5    **will define things as we go along.**
6    A.    OK, OK.  So yes, I did.
7    **Q.    At the time, did you also, based on**
8    **your experience, understand that it is common in**
9    **financings like the Fed repurchase agreement for**
10   **there to be a cushion or a haircut in valuing**
11   **the assets in relation to the liabilities?**
12       MS. TAGGART:  Object to form.
13       MS. SCHAFFER:  Objection to form.
14   A.    I was aware that repos, the amount,
15   the amount lent on a repo was usually slightly
16   less than the value of the securities that
17   backed the repo.  I know "lent" is not the
18   technical term, it is a purchase and sale, but
19   the amount extended by the repo participants.
20   **Q.    So you understood that the value of**
21   **the securities purchased under the repurchase**
22   **agreement would typically exceed the amount of**
23   **cash paid for those securities?**
24   A.    Typically exceed.
25   **Q.    Typically.**

Page 90

**BURIAN**

1
2    A.   In a normal situation.
3    **Q.   And were you aware that the Fed had**
4    **advance rates or haircuts that it made available**
5    **publicly?**
6         MS. TAGGART:  Object to form.
7    Foundation.
8    A.   I was not aware of any public
9    announcement by the Fed as to what their repo
10   advance rates were for these assets.
11   **Q.   Were you aware that there were sources**
12   **by which you could find out the Fed's advance**
13   **rates?**
14        MS. TAGGART:  Object to form.
15   Foundation.
16   A.   No.
17   **Q.   Did you have any reason to think that**
18   **those advance rates were a secret?**
19        MS. TAGGART:  Object to form.
20   Foundation.
21   A.   I didn't think about it.  I didn't
22   know one way or the other.
23   **Q.   At the time, did you understand that**
24   **the repo collateral that was being included as a**
25   **purchased asset included that haircut?**

Page 91

**BURIAN**

1
2         MS. TAGGART:  Object to the form.
3    A.   No.
4    **Q.   What did you understand all the repo**
5    **collateral to mean?**
6         MS. TAGGART:  Object to vague as to
7    time.
8    A.   It is a good point.  As of what time?
9    **Q.   As of the time you read this**
10   **agreement.**
11   A.   First time, post closing, preclosing?
12   Yesterday?
13   **Q.   Post closing, when you read the final**
14   **clarification letter.**
15   A.   Right.
16   **Q.   And it states, "The securities owned**
17   **by LBI and transferred to purchaser or its**
18   **affiliates under the Barclays repurchase**
19   **agreement."**
20        **Did you understand that to mean all of**
21   **the securities that had been transferred to**
22   **Barclays in connection with the repurchase**
23   **agreement?**
24        MS. TAGGART:  I am still going to have
25   to object, vague as to time, and he can't

Page 92

**BURIAN**

1
2    answer everything after the closing.  Could
3    you be a little more specific.
4    **Q.   Is there -- there is an objection, but**
5    **you can answer.**
6         MS. TAGGART:  Well, as it is, I would
7    have to do on privilege.  I wouldn't allow
8    him to answer the question of anytime that
9    his understanding post closing, of what he
10   thought that it meant.
11        So I guess I have to object and
12   instruct not to answer.
13   **Q.   At the time after the closing that you**
14   **read this agreement, the clarification letter, I**
15   **think we established that you understood that**
16   **the repo collateral was being treated as a**
17   **purchased asset; is that correct?**
18   A.   Yes.
19   **Q.   Did you understand that the haircut**
20   **was a part of the repo collateral?**
21   A.   I told you before, no.  My answer is
22   in my affidavit.  I'm not sure I understand --
23   I'm happy to try to get you to ask the question
24   more properly, if you like, but my answer is in
25   my affidavit.

Page 93

**BURIAN**

1
2    I thought that the repo collateral was
3    less than the value -- the value was less than
4    the amount outstanding on the Barclays repo.
5    **Q.   That's not what I am asking.  I am not**
6    **asking what you understood the value to be.  I**
7    **am asking whether you understood that under the**
8    **clarification letter, all the repo collateral**
9    **would be treated as a purchased asset.**
10   A.   You asked that several times, and I
11   said yes, but then you asked a follow-up
12   question about my understanding of the value.
13   **Q.   OK.  So the answer is yes?**
14   A.   I --
15        MS. TAGGART:  He needs to explain it.
16   A.   I understood that the transaction was
17   being modified from an asset purchase agreement
18   where you would have to transfer securities, to
19   a repo closeout in which the assets already held
20   by Barclays would just stay at Barclays and not
21   be sent back pursuant to the closeout of the
22   repo and then transferred again.  That was my
23   understanding.
24   **Q.   Now, with respect to that category of**
25   **securities which were to be listed on**

1　　　　　　**BURIAN**
2　**Schedule A --**
3　　**A.  Right.**
4　　**Q.  -- was there a condition requiring an**
5　**agreed valuation for those securities?**
6　　　　MS. TAGGART:  Object to form.  Calls
7　for a legal conclusion.
8　　A.  Was there a condition?
9　　**Q.  Was there a condition in the**
10　**agreement --**
11　　A.  In the agreement.
12　　**Q.  -- calling for a valuation of that**
13　**class of securities?**
14　　　　MS. TAGGART:  Also, the document
15　speaks for itself.
16　　A.  Well, the clarification letter does
17　not say of a particular amount or a particular
18　value.  But there were --
19　　**Q.  Yeah.**
20　　A.  But I don't know -- what was the
21　phrase you used before?  Integrated document?
22　The -- there was an understanding that we think
23　was a binding understanding of what the
24　aggregate assets could have been.
25　　　　So it is -- so if you are asking me

1　　　　　　BURIAN
2　whether this section says up to or equal to,
3　there is no number in Section 1(a)(ii).
4　　**Q.  Was -- did Weil Gotshal ever tell the**
5　**court, to your knowledge, that the final**
6　**agreement would contain a condition capping the**
7　**value of the assets Barclays would acquire?**
8　　A.  There was no discussion of a cap or no
9　cap.  I believe the representation was a
10　balanced transaction, and therefore, if assets
11　went up or liabilities went up, things would be
12　imbalanced, so that it was what -- at the
13　Wednesday hearing, my understanding is that, you
14　know, Mr. Miller made very clear that we are
15　getting 1.7 billion, we are giving assets, and
16　there is an assumption of liabilities equal to
17　the assets being taken.
18　　　　And then the Friday hearing, we were
19　told things dropped in value, shorts are being
20　closed out, and now there is going to be a
21　like-for-like exchange on the assets being
22　transferred, and we are still getting our net
23　cash amount.
24　　　　So would -- was there a particular
25　word "cap" used?  And did it matter if it was

1　　　　　　BURIAN
2　47.4 or 47.5 or 47.3?  That was not my
3　understanding.  My understanding was that there
4　was a relationship between liabilities and
5　assets -- liabilities and assets that was very,
6　very firm.
7　　**Q.  Now, you understand that Weil Gotshal**
8　**informed the court at the hearing on the 19th**
9　**that there had been changes in the transaction?**
10　　A.  Of course.
11　　**Q.  And you understood that Weil Gotshal**
12　**had informed the court on the 19th that there**
13　**was no final agreement yet?  No final written**
14　**agreement?**
15　　　　MS. TAGGART:  Object to form.
16　　　　MS. SCHAFFER:  Objection to form.
17　　A.  Yes, I remember a reference to a
18　clarification letter is coming down, was going
19　to come down to court, and when I left, it
20　wasn't there, and I was subsequently told it
21　never appeared.
22　　**Q.  Do you believe that Weil Gotshal ever**
23　**used the phrase "balanced transaction" before**
24　**Judge Peck in describing the deal?**
25　　　　MS. TAGGART:  Objection, the

1　　　　　　BURIAN
2　transcript will speak for itself.
3　　A.  I can go back to the transcript.  I
4　was at the Wednesday hearing and it was clear as
5　day to me --
6　　**Q.  I am talking about the Friday hearing.**
7　　　　MS. TAGGART:  Wait, let him finish.
8　　A.  I need to talk about Wednesday because
9　Friday doesn't happen in a vacuum.
10　　　　Friday Ms. Fife stood up and said,
11　"Your Honor, things have changed.  Let me tell
12　you what's changed."
13　　　　And it was on -- it was a continuation
14　of a description at the Wednesday hearing.  And
15　that's the way I understood it, and that's the
16　way I believe most people would have understood
17　it.
18　　**Q.  Did Weil Gotshal ever tell the court**
19　**at the final approval hearing that there were**
20　**firm valuations for the classes of assets that**
21　**were being transferred to Barclays?**
22　　　　MS. TAGGART:  Object to form.  The
23　transcript will speak for itself.
24　　　　MS. SCHAFFER:  Objection to form.
25　　A.  Let's keep in mind, I haven't read the

Page 98

BURIAN

1  whole transcript, and I told you that I left
2  after what I thought was the most important
3  part, when it was subsequently described to me
4  as being the description of the deal by Weil.
5  So I can't say what occurred after I left and
6  the transcript does speak for itself.
7         I will tell you -- I am sorry, your
8  question was again?  I was so focused on the
9  other parts.
10     **Q.  Did Weil Gotshal ever tell the court**
11  **at the final approval hearing that there were**
12  **firm valuations for the classes of assets that**
13  **were being transferred to Barclays?**
14     A.   The asset purchase agreement talks
15  about book value.  We were told it was a book
16  value on the Lehman books, and Lori, Ms. Fife,
17  talked about that we now have assets of 47.4,
18  and to us, that was -- that meant that they
19  thought they had assets of 47.4.  It sounded
20  pretty firm to us.
21     **Q.  We have covered the 47.4 already.**
22  **What I am talking about is the entire array of**
23  **purchased assets.  Did Weil Gotshal ever tell**
24  **the court that there were specific valuations or**

Page 99

BURIAN

1  appraisals prepared for each class of purchased
2  assets?
3         MS. TAGGART:  Object to form.
4     **Q.   To the best of your knowledge.**
5     A.   To the best of my knowledge, the
6  appraisals were not -- I don't believe that they
7  described in particular the appraisal on the
8  real estate yet, but Ms. Fife gave the range and
9  informed the court that there may need to be an
10  adjustment.
11        There was no appraisal of the
12  securities.  They were described as being worth
13  a particular value, which in the context of the
14  asset purchase agreement meant book value on the
15  Lehman books.
16        And there was specifically no
17  representation about the value of the franchise,
18  which was being paid 250 million dollars, that
19  was a number that was the price, and there was
20  no -- to the best of my knowledge, no
21  representation or appraisal other than either
22  Miller or Ms. Fife saying if the transaction
23  doesn't occur, we think it may be worth
24  significantly less than 250 million, but no

Page 100

BURIAN

1  attempt to value what it was worth if -- you
2  know, in an ordinary course, stable environment.
3         So there were three -- at that time,
4  there were three buckets of assets.  One had
5  appraisals, but not finalized.  One had a
6  particular value, but not off of an appraisal,
7  and the other one, there was no attempt to make
8  an appraisal.
9     **Q.   Let's take a look at the original**
10  **asset purchase agreement, which is Exhibit A**
11  **within Deposition Exhibit 26.  And I want to**
12  **point you to page 6, which lists a series of**
13  **purchased assets.**
14        **I want to focus on a number of the**
15  **assets that are described here.  If you see,**
16  **item B refers to all deposits.  Do you see that**
17  **description?**
18     A.   Yes.
19     **Q.   In your view at the time of the**
20  **approval hearing, did you believe that that**
21  **asset category could have value to Barclays?**
22        MS. TAGGART:  Object to form.
23  Foundation.
24     A.   Sure.

Page 101

BURIAN

1     **Q.   Did you have a valuation or any**
2  **representation concerning the value of that**
3  **asset category?**
4     A.   No.
5     **Q.   It was uncertain?**
6     A.   Yes.
7         MS. TAGGART:  Object to form.
8     **Q.   Looking at category C, that refers to**
9  **"transferred property leases together with all**
10  **improvements, fixtures and other appurtenances**
11  **thereto and rights in respect thereof."**
12        **At the time of the sale approval**
13  **hearing, did you believe that that asset would**
14  **have value to Barclays?**
15     A.   Yes.
16     **Q.   Did you have a valuation for that**
17  **asset category?**
18     A.   It was in the real estate appraisals.
19     **Q.   Well, the real estate appraisals**
20  **related to the headquarters buildings and data**
21  **centers, correct?**
22     A.   Yes.
23     **Q.   Was there a valuation for the leases?**
24     A.   We need to go back to the definition

Page 102

BURIAN

1
2  of leases.  Are these leases in those buildings?
3  I think that's what they were, right?
4      Q.    Well, there are leases in different
5  parts of the country, San Francisco and a
6  variety of different places.
7      A.    No.  They could have been an asset or
8  a liability frankly.
9      Q.    OK.
10      A.    Because --
11      Q.    Do you know if there was a valuation
12  of that asset category?
13      A.    I do not know.
14      Q.    It was uncertain?
15      A.    I don't know that either.
16      Q.    So you don't know one way or the
17  other?
18      MS. TAGGART:  Object to form.
19      A.    I don't know if it was an asset or a
20  liability.
21      Q.    OK.  Now, looking at category D, this
22  refers to certain securities and positions with
23  a book value as of the date hereof of
24  approximately 70 billion dollars.
25      Did you understand that that provision

Page 103

BURIAN

1
2  was deleted by the clarification letter?
3      A.    It was replaced by the clarification
4  letter, yes.
5      Q.    And so that provision ultimately
6  became irrelevant, correct?
7      MS. TAGGART:  Object to form.
8      A.    I wouldn't say irrelevant.  I would
9  say it wasn't part of the -- it was modified by
10  the clarification letter.
11      Q.    It was modified by the clarification
12  letter.  How did it remain relevant?
13      MS. TAGGART:  Object to form.
14      Q.    To the final agreement if it was
15  modified?
16      A.    Well, it is here, we are reading it,
17  we are talking about it.
18      Q.    How does it relate to the final
19  agreement if it was taken out of the final
20  agreement?
21      MS. TAGGART:  Object to form, asked
22  and answered, argumentative.
23      A.    Because when someone says here are the
24  following changes to the agreement, you need to
25  know what the agreement is to know what the

Page 104

BURIAN

1
2  changes are, right?
3      Q.    As of the final agreement, did this
4  provision D have any effect?
5      MS. TAGGART:  Object to form.
6      Q.    Any binding effect?
7      MS. TAGGART:  Objection to form, calls
8  for a legal conclusion.
9      A.    I told you earlier that when the
10  estate described the changes to the deal, to the
11  court, what the basis was from which those
12  changes are being described was relevant to me.
13  I needed this information to understand the
14  clarification letter, and therefore, the
15  clarification letter -- I am sorry, therefore,
16  this provision is relevant to our conversation.
17      Q.    OK.  So it was relevant insofar as it
18  had some bearing on how the final agreement
19  changed?
20      MS. TAGGART:  Object to form.
21  Mischaracterizes the testimony.
22      Q.    Is that what you are saying?
23      A.    It was relevant to my understanding of
24  the transaction as it existed then, as it
25  existed over that weekend and as it exists now.

Page 105

BURIAN

1
2      Q.    And you -- but you understood that
3  provision D was modified or replaced by the
4  clarification letter?
5      A.    You read to me the clarification
6  letter.  I understand the clarification letter
7  replaces A, D and E with subparagraph 1(a)(ii)
8  of the clarification letter.
9      Q.    Turning now to page 7 of the APA, do
10  you see at the top there is a purchased asset G,
11  purchased intellectual property?
12      A.    Yes.
13      Q.    Do you see that?
14      A.    Yes.
15      Q.    At the time, did you believe that that
16  asset category would have value to Barclays?
17      A.    My assumption was there was net value
18  in G to Barclays.
19      Q.    Did you have a valuation for that
20  asset?
21      A.    I did not.
22      Q.    The value was uncertain?
23      A.    Again, I don't know if it was
24  uncertain.  I did not know it.
25      Q.    To you it was uncertain?

**BURIAN**

1
2  A.  I did not know the valuation of those
3  assets.
4  **Q.  So it was uncertain?**
5  MS. TAGGART:  Objection, asked and
6  answered.
7  **Q.  To you?**
8  MS. TAGGART:  And object to form.  He
9  has already answered this.
10  And I think you don't need to answer
11  it again.
12  MR. STERN:  Yeah.  That's not a valid
13  objection.
14  **Q.  You did not have any certain valuation**
15  **of this asset category?**
16  MS. TAGGART:  Objection, asked and
17  answered.
18  **Q.  Is that correct?**
19  MS. TAGGART:  Go ahead and answer it
20  again.
21  A.  I don't recollect any specific
22  valuation of intellectual property in G.
23  **Q.  H, purchased contracts.  Did you**
24  **assume that that would have value to Barclays?**
25  A.  That's a good one.  I did not --

BURIAN

1
2  again, I did not know if it was an asset or a
3  liability because of the cure costs.  I mean
4  obviously it is listed, Barclays wanted them,
5  you assume people want things.  Then again in
6  bankruptcy, debtors tell you you want something
7  because they don't want it.  So I couldn't have
8  been sure.
9  **Q.  You didn't know one way or the other**
10  **whether it was a positive or negative value?**
11  A.  I assumed it was positive, but I knew
12  there was net liabilities against it.
13  **Q.  You didn't have any valuation of that**
14  **asset category?**
15  A.  I did not.
16  **Q.  Now, on page 8, page 8, item Q, refers**
17  **to "all past and present goodwill and other**
18  **intangible assets associated with or symbolized**
19  **by the business, including customer and supply**
20  **lists."**
21  **Did you at the time assume that that,**
22  **that asset category would have value to**
23  **Barclays?**
24  A.  Yeah.  You were being careful -- my
25  understanding, you were being careful to make

BURIAN

1
2  sure that you got the Lehman name and the Lehman
3  fixed income and other relevant trading
4  business, and you wanted to make sure that you
5  got the data that went with the functioning of
6  that business.
7  **Q.  And did you have a valuation for that**
8  **asset category?**
9  A.  We were not given a valuation of that
10  category.
11  **Q.  As of the sale approval hearing, did**
12  **you have a valuation for all of the purchased**
13  **assets listed in the APA?**
14  A.  I -- we went through this before.  We
15  were not given a valuation prior to this, other
16  than the -- I don't think we got a draft of the
17  real estate appraisals or not.  I don't think
18  so.  I think the appraisals came in later on
19  Friday.  I have to think about it.
20  But we were given, you know, a balance
21  sheet that described some of the purchased
22  assets.  But I don't know if that's called a
23  valuation or not.
24  **Q.  At the time, did you consider the**
25  **absence of a valuation of all the purchased**

**BURIAN**

1
2  **assets to be a reason to object to the sale?**
3  A.  We were very concerned about the
4  lack -- not the lack of valuation, but the lack
5  of clarity as to what exactly was included --
6  sorry, not the -- we were concerned that we were
7  unclear, that no one had the time or the
8  willingness to describe to us what exactly was
9  included in many of these categories, so that
10  was a concern.
11  We decided to make that clear to the
12  judge and to neither support nor object, because
13  we didn't have enough information with which to
14  make a reasonable decision.
15  **Q.  Did you consider the lack of**
16  **information that you just described to be a**
17  **reason to object to the sale?**
18  MS. TAGGART:  Objection, form, asked
19  and answered.
20  A.  Did I -- you say consider --
21  **Q.  Did you believe --**
22  A.  Did I conclude it was a reason or did
23  I think about would it be -- did I consider that
24  issue?  Which way do you --
25  **Q.  Well, did you conclude that the**

Page 110

1              **BURIAN**
2    **committee -- withdrawn.**
3          **Did you personally ever have the view**
4    **that the committee should object to the sale**
5    **because of the lack of information that you just**
6    **described?**
7          A.   I did not conclude personally that if
8    I were the committee I would object based on the
9    lack of information.
10         **Q.   Isn't it customary in transactions**
11   **that are submitted for bankruptcy court**
12   **approval, for lack of information to be a basis**
13   **for objecting to the transaction?**
14         MS. TAGGART:  Object to form.
15         A.   Yes.
16         **Q.   Why in these circumstances did you**
17   **conclude personally that if you were the**
18   **committee, you would not object based on the**
19   **lack of information here?**
20         A.   I also concluded that I would not
21   support.  Let's keep that in mind.
22         And the answer to your question is,
23   you have to look at the context of what was
24   happening at the time.  We got retained
25   Wednesday night.  The first time the debtors had

Page 111

1                BURIAN
2    time to meet with us and explain to us the
3    transaction was on Thursday.
4          Other than the meeting at which we are
5    told about the dire consequences, the meltdown
6    of Lehman internationally, the takeover of
7    Lehman assets by trustees around the world, and
8    all of -- oh, we were also informed that we may
9    have a SIPC trustee coming in to LBI and we
10   should think about it and address that and look
11   over those court orders.
12         The sale hearing was the next day.
13   There was -- this was nothing traditional or
14   common about this practice, and I think if you
15   look at the transcript, you will see our
16   counsel's telling the judge that this kind of
17   running a case just cannot continue and begging
18   him for some semblance of normalcy going
19   forward.
20         So in the context where we were told
21   by people that I respect and people that in
22   retrospect perhaps did not know the transaction
23   that they were purporting -- that they were
24   supporting, that there would be dire
25   consequences to Lehman, it would be affecting 10

Page 112

1                BURIAN
2    to 12 thousand employees, that the federal
3    government, through its agencies, the Federal
4    Reserve Bank and the SEC, were very focused on
5    asking for this transaction to move forward, we
6    thought -- I thought that instead of saying
7    nothing can happen and let everything blow up
8    unless I, Saul Burian, understand every aspect
9    of it, my judgment at the time was that if
10   highly credible people who purported to look
11   into it and know the facts say, let me explain
12   to you what is happening, and if they put those
13   facts on the record of the case and say, this is
14   what is happening, we could trust and verify.
15         We could say, we can't support this,
16   your Honor, because we can't independently tell
17   the court that we know that that is what is
18   happening, but if what is being described is
19   what is happening, then we have no objection,
20   and we will verify that that is what occurred.
21         In those circumstances, at that hour,
22   in light of all the other things that were going
23   on, being very clear this is not the way we
24   would like to handle 363 sales generally, we --
25   I thought that was the better of the two

Page 113

1                BURIAN
2    options.
3          **Q.   So despite the lack of information,**
4    **there were in your view countervailing**
5    **considerations that in your view counseled**
6    **against objecting?**
7          MS. TAGGART:  Object to form.
8          Misstates his testimony.
9          A.   I think you're trying -- I'm not sure
10   why you are trying to summarize what I said.
11   But yes, I think what I said was there were
12   considerations and that in those circumstances,
13   when we had highly credible representations of
14   what was going to occur, we did not feel that we
15   should block the sale or attempt to block the
16   sale, the question of, you know, whether we
17   should attempt to block the sale, based on us
18   independently verifying the facts.
19         **Q.   OK.  And did that view change between**
20   **the time of the closing on September 22 and the**
21   **end of September?**
22         MS. TAGGART:  Object to form and calls
23   for privilege as said.
24         I am going to object and instruct you
25   not to answer.

Page 114

BURIAN

1
2    Q.   So --
3    A.   What time frame are you asking me?
4    Q.   I am asking you from the closing on
5    September 22 through the end of September,
6    September 30, whether at any time you had a
7    different view than the view you just described.
8        MS. TAGGART:  Object to form.
9        You can try to answer.
10   A.   I don't recollect having a different
11   view that we made a mistake not supporting and
12   not objecting.  I didn't -- I do remember
13   putting on our -- putting on our tickler sheet
14   to verify, trust and verify.
15   Q.   And the items that you needed to
16   verify were those considerations that you
17   described concerning the employees, effect on
18   the financial system; is that right?
19   A.   No.  I never said that.
20   Q.   Let me make sure I understand your
21   previous answer.  As I understood it, you said
22   that various credible people were saying things
23   such as in the absence of the sale, there would
24   be dire consequences for Lehman?
25   A.   That's not what I said.  What I said

Page 115

BURIAN

1
2    was that -- that is also true.  That's not what
3    I said.
4        What I said was credible people were
5    explaining to us what the transaction was and
6    what the import of these documents meant.  So
7    that even though I couldn't verify whether what
8    A or B or C exactly was, I had a degree of
9    comfort that highly credible people were telling
10   me they looked into those questions and this is
11   what it means.  And based on those
12   representations, even though I didn't have
13   enough information to support, I felt
14   comfortable not objecting.
15       It is also true that we were told by a
16   variety of people about the dire consequences to
17   the world as we know it, you know, if the
18   transaction did not close, but that's not what I
19   was referring to, you know, when I talked about
20   relying on third parties.
21   Q.   OK.  But those statements about the
22   dire consequences --
23   A.   I am sorry.  And it also was not what
24   I meant when I said trust and verify.  I was not
25   going to go verify whether the deal didn't

Page 116

BURIAN

1
2    happen, you know, financial markets would have
3    been disturbed.
4        When I said trust and verify, I wanted
5    to verify that the representations as to what
6    the deal was, is, were in fact what occurred in
7    connection with the deal.  I mean it wasn't to
8    figure out whether or not the SEC governors
9    would have preferred the deal to close or not.
10   Commissioners, not governors.
11   Q.   In forming your view that despite the
12   lack of information the committee should not
13   object to the sale, did you take into
14   consideration the other factors that were being
15   described at the time?  In other words, the dire
16   consequences for Lehman, the dire consequences
17   for employees, the consequences for the
18   financial system, the concerns of the federal
19   regulators, did you take those factors into
20   consideration?
21       MS. TAGGART:  Objection to form.  The
22   preface misstated his testimony.
23       But you can answer.
24   A.   I took those into consideration in
25   terms of context and timing.  Not in terms of

Page 117

BURIAN

1
2    substance.  Should I explain?
3    Q.   Yes.  What does that mean?
4    A.   The fact that a regulator or any third
5    party is saying I'm worried about the impact on
6    something else, that's not -- that's extraneous
7    to the bankruptcy estate, is relevant to the
8    speed and timing of the transaction, but would
9    not be a reason to compromise rights and assets
10   of the estate.  My fiduciary duty is to
11   creditors of the Lehman estates.
12       But vis-a-vis timing of hey, there is
13   a reason why we are going to throw some of the
14   procedural protections out the window and do
15   this in an unbelievably quick time frame and
16   instead of doing direct diligence, you are going
17   to rely on other people's representations,
18   there, I did feel that those considerations as
19   to timing were relevant.
20       It was also true that those timing
21   issues also had some impact directly on the
22   Lehman estate, vis-a-vis the desire to transfer
23   customer accounts and bring in a SIPC trustee.
24   The issues relating to other foreign
25   jurisdictions and Lehman operations and a

Page 118

BURIAN

1  concern of would the Lehman franchise be less
2  valuable to Barclays if there were a significant
3  delay, vis-a-vis the retention of employees and
4  the rest.
5      So the factors that you provided were
6  relevant in the time frame and procedural
7  context of the matter, but would not alone have
8  been enough to say, sure, you know, we don't
9  care what happens, or give away estate assets,
10  or the estate should assume liabilities it
11  wouldn't otherwise have to assume.
12      You seem confused. I know I'm not
13  supposed to help, but for instance --
14  **Q. No, just --**
15      A. -- one could have asked for an
16  adjournment of the hearing, right? My options,
17  if I were the committee, is not limited to
18  support or object. And whether we looked for an
19  adjournment to delay consideration of the
20  hearing was impacted by all those issues I
21  raised in my answer.
22  **Q. OK. Now, going back to the APA,**
23  **page 12, on page 12, there is a continuation of**
24  **a list of assumed liabilities, and item I lists**

Page 119

BURIAN

1  all short positions. Do you see that?
2      A. Yes.
3  **Q. Now, at the time in September of 2008,**
4  **did you recognize that those short positions**
5  **might have been more profitable to Barclays to**
6  **own than the long positions?**
7      MS. TAGGART: Object to form.
8      A. Did I believe that the short positions
9  were more profitable than the longs?
10  **Q. Did you consider whether in those**
11  **circumstances, in that week of September 2008,**
12  **the short positions might be more profitable to**
13  **own than the long positions? Did you consider**
14  **that?**
15      A. We were told the opposite.
16  **Q. Who told you that?**
17      A. These were listed as liabilities, and
18  my understanding when we met that Thursday at
19  Weil, when the deal was presented to us, whether
20  it was by Harvey Miller or by one of his
21  partners or by Mark Shapiro or Jim Seery, it was
22  a give and take.
23      We were told that Barclays was taking
24  all the short positions related to the book, and

Page 120

BURIAN

1  these were liabilities and obligations that
2  you -- that Barclays, not you -- that Barclays
3  was taking, and therefore, we needed to look at
4  the net impact of the transaction, which is
5  essentially even exchange.
6      The context of that conversation is
7  that these positions were contras and not
8  positives.
9  **Q. I understand these positions were**
10  **listed as liabilities, but you understood at the**
11  **time what a short position was?**
12      A. I understand what a short position is.
13  **Q. And did you understand that a short**
14  **position in certain circumstances may be more**
15  **profitable than a long position?**
16      A. The -- this is not just shorts,
17  though. These are also repos, obligations.
18  So --
19  **Q. I understand. I am focusing on short**
20  **positions.**
21      A. Theoretically could a short position
22  be positive? Yes. But then theoretically a
23  long could be negative, if it is an option and
24  not ownership of that security.

Page 121

BURIAN

1      By the way, can we back up. This is
2  as of when? Because we were told that all these
3  shorts were closed out and that you didn't take
4  any shorts. So is this before Thursday or after
5  Thursday, the 18th?
6  **Q. Well, I'm just asking -- I was asking**
7  **about your understanding based on reading the**
8  **agreement.**
9      A. But when? My understanding reading
10  the agreement on Friday --
11  **Q. Well, you understand that the short**
12  **positions ultimately were not available, is what**
13  **you are saying?**
14      A. My understanding is that Barclays did
15  not take any short positions.
16  **Q. Right. So my question was simply**
17  **whether at one point when it was contemplated**
18  **that Barclays would take short positions,**
19  **whether those positions might be under certain**
20  **circumstances more valuable than the long**
21  **positions.**
22      MS. TAGGART: Object to form. Asked
23  and answered.
24  **Q. I agree.**

Page 122

**BURIAN**

1
2    A.    Specifically the answer is -- now you
3    are asking more generally as opposed to
4    specifically.  You said before could a -- let me
5    finish -- could a short be more valuable than a
6    long, but now you are asking me whether I
7    considered whether the short positions were more
8    valuable than the long positions.
9            No, that was not our contemplation and
10   not what we thought.
11   **Q.    You didn't recognize at the time that**
12   **that was a possibility?**
13           MS. TAGGART:  Objection, asked and
14       answered.  Object to form.
15   A.    In the aggregate, we were specifically
16   told that the aggregate of paragraph I was a
17   69 billion dollars contra, and the aggregate of
18   paragraph -- the definition of the purchased
19   assets you showed me before, was approximately
20   170 billion positive.
21           So could there have been a single
22   position that was a positive versus a negative?
23   But in the aggregate this was a one --
24   approximately a 1 billion dollar positive
25   differential.

Page 123

BURIAN

1
2    **Q.    I understand that you were told there**
3    **was a liability, but my question was simply**
4    **whether short positions, short positions in the**
5    **aggregate could have had more positive value**
6    **under the circumstances than the long positions.**
7    A.    No.
8            MS. TAGGART:  Object to form.  Asked
9        and answered.
10   **Q.    That's not -- that was impossible?**
11   A.    That was not even a remote
12   contemplation at the time in any of the meetings
13   or discussions that I attended.  Nor would that
14   be consistent with anything that was told to us
15   or explained to us.
16           And this is a perfect example of what
17   I described before, which is trust and verify.
18   Which is read the -- read the agreement and
19   understand what it says, but not have the
20   opportunity to look beneath those words to look
21   at and diligence it, and why we took no position
22   at the hearing.
23   **Q.    So let's move on to verification.  You**
24   **did do some verification work before the**
25   **closing; is that right?**

Page 124

**BURIAN**

1
2            MS. TAGGART:  Object to form.
3    A.    We attempted to do some verification
4    work.
5    **Q.    You attempted to do some verification**
6    **work before the closing, correct?**
7    A.    Correct.
8    **Q.    Time was limited, correct?**
9    A.    Time and cooperation.
10   **Q.    Whose cooperation was limited?**
11   A.    Barclays and Lehman.
12   **Q.    What did Barclays fail to provide to**
13   **you that you requested of Barclays?**
14   A.    We requested innumerable times for a
15   complete list of what assets were transferring,
16   what liabilities were being assumed and what the
17   marked values, the book values were, and as of
18   what dates those marks related to.
19   **Q.    Are you talking about the Lehman**
20   **marks?**
21   A.    I'm talking about the marks relevant
22   to the transfer of those assets.  Our
23   understanding was that Barclays was not marking
24   the Lehman assets and that the book value
25   references in the contract were the Lehman

Page 125

BURIAN

1
2    marks.
3            So when Lori Fife, Ms. Fife stood up
4    in court and says a number, that was the Lehman
5    marks against which these transfers were being
6    measured.
7    **Q.    So just to be clear, are you saying**
8    **that you made specific requests from Barclays**
9    **for information concerning Lehman's marks?**
10   A.    To be clear, we made specific requests
11   of anyone and everyone who would listen to us,
12   sort of like the Old Testament prophet screaming
13   out in the wild and no one listening, saying
14   could we please have some understanding, a list
15   of what assets are moving, to whom they are
16   moving and how they are marked.
17   **Q.    And you're saying you did not receive**
18   **that information?**
19   A.    We did not receive that information.
20   Well, what time period, sir?
21   **Q.    Well, I am focusing on the time period**
22   **between the sale approval hearing and the**
23   **closing.**
24   A.    That is correct.
25           Oh, what I should actually say --

| Page 126 | Page 127 |
|---|---|

**Page 126**

BURIAN

1
2  Q.   There is no question.
3  A.   I know, but I am finishing my answer.
4  What I should actually say is I never got
5  anything that was so described to me or Houlihan
6  as representing such a list.
7  Q.   Let's mark this as the next exhibit.
8         (Exhibit 460-B, document Bates stamped
9  WGM Lehman E1592 with attachments marked for
10 identification, as of this date.)
11        (Exhibit 461-B, document Bates stamped
12 HLHZ11913 with attachment marked for
13 identification, as of this date.)
14 Q.   Let me show you what we have marked as
15 461-B.  And have -- 461-B in front of you.
16 A.   This one?
17 Q.   Yes, take 461-B.  We will get to the
18 others.
19        Do you see that 461-B is a document
20 dated Sunday, September 21, 2008, 11:34 a.m.,
21 addressed from Brian Kelly at Milbank to Ann
22 Comisky and Brian -- and Michael Fazio?
23 A.   Yes.
24 Q.   And what do you understand this
25 material to be?

**Page 127**

BURIAN

1
2  A.   The material attached to the e-mail?
3         MS. TAGGART:  Objection, vague as to
4  time.  Do you mean sitting here today or
5  then?
6  Q.   Do you recall reviewing this material
7  at the time it was received on September 21?
8  A.   No.
9  Q.   Do you know whether others at Houlihan
10 did?
11 A.   Yes.
12 Q.   Who conducted that review?
13 A.   For the most part, Michael Livanos.
14 Q.   And did Mr. Livanos report to you
15 concerning his review of this information?
16        MS. TAGGART:  This is just asking for
17 a yes or no.
18 A.   Who is "you"?
19        MS. TAGGART:  So I think he is
20 asking --
21 Q.   You personally.
22        MS. TAGGART:  -- Mike Livanos to you,
23 Saul Burian.
24 A.   Me personally.
25 Q.   Yeah.

| Page 128 | Page 129 |
|---|---|

**Page 128**

BURIAN

1
2  A.   Not as a 30(b) rep.
3  No.
4  Q.   Did Mr. Livanos report to others at
5  Houlihan concerning the information contained in
6  this exhibit?
7  A.   Yes.
8  Q.   And what did he report?
9         MS. TAGGART:  I am going to object and
10 I think that calls for privileged
11 information on work product.  I am willing
12 to have some testimony about that
13 discussion, but I am going to need to have
14 an agreement from you that that doesn't
15 waive privilege.  I think there is a work
16 product privilege that can be waived about
17 that discussion.
18        THE WITNESS:  So I can answer, but it
19 doesn't --
20        MS. TAGGART:  I need an agreement from
21 him that that's not going to waive
22 privilege.
23        MR. STERN:  I have no idea what you
24 are talking about with privilege.
25 Q.   All I am asking is, with respect to

**Page 129**

BURIAN

1
2  the information that's in Exhibit 461-B, if
3  Houlihan ever developed an understanding
4  concerning what this information was.
5         MS. TAGGART:  That's a different
6  question.  I would object to form.
7         You can answer that yes or no to the
8  extent you understand it.
9  A.   Yes.
10 Q.   What was that understanding?
11        MS. TAGGART:  That's -- I am sorry,
12 objection to anything past the closing.  You
13 can say what was your understanding of
14 Houlihan's understanding preclosing of what
15 this information was.
16 A.   It changed over time.  But our
17 understanding was that this was a preliminary
18 list of securities as of an indeterminate date
19 that may or may not go over to Barclays with
20 marks that were as of a -- that were as of a
21 date that we weren't sure.  At different times,
22 Monday, Tuesday, Wednesday or Thursday, unclear
23 as to what the marks represented.
24        So that's what we understood this
25 document to be.

Page 130

BURIAN

1
2     MR. STERN:  I think we need to change
3  the tape, so we will take a short break.
4     THE VIDEOGRAPHER:  That is the end of
5  tape number 2.  The time is now 12:20 p.m.
6  We are now off the record.
7     (Recess)
8     THE VIDEOGRAPHER:  This is the start
9  of tape number 3.  The time is 12:33 p.m.
10  We are now back on the record.
11  BY MR. STERN:
12     Q.  Let's go back to Exhibit 461-B.  As of
13  Sunday, September 21, did you or anyone at
14  Houlihan understand this listing to relate to
15  the Barclays replacement of the Fed repo?
16     A.  Relate?  Yes.
17     Q.  And how did it relate?
18     A.  We were told that this was a likely
19  incomplete list with old marks regarding a
20  variety of assets that were going to be retained
21  or transferred to Barclays as part of the
22  transaction.
23     Q.  And who told you that?
24     A.  There were -- I don't remember
25  specifically if it was, you know, in connection

Page 131

BURIAN

1
2  with the e-mail to Milbank, but there was
3  clearly conversations with the Lehman team that
4  were trying to reconcile the securities.
5     What you need to know for context to
6  answer that question is, I believe Saturday
7  night and Sunday morning there seemed to be a
8  surprisingly large amount of confusion as to
9  what the security repos -- securities subject to
10  repos were and an effort to determine them, I
11  call them younger kids but younger professionals
12  trying to compile lists, go down to the DTC and
13  otherwise try to figure it out.
14     At some point on Sunday, through
15  Milbank, we were given this and said we are
16  trying to reconcile it, but this is what we
17  currently have, but don't rely on the marks
18  because they are old.
19     Q.  Who said the marks were old?
20     A.  There were two conversations with Jim
21  Seery and his team, one in which we -- I believe
22  there were two conversations between Seery and
23  his team, one in which we got this or were told
24  it was coming.  That meeting was rushed, and I
25  was told it was part of the normal hubbub and

Page 132

BURIAN

1
2  therefore wasn't complete.
3     And then after we got this, several
4  hours later towards the -- later in the night,
5  there was a follow-up conversation with Mike
6  Fazio and Brad Geer where Jim Seery and perhaps
7  others from his team saying whoa, whoa, whoa,
8  what exactly is this, because we have a lot of
9  questions about it.
10     Q.  This is on the evening of Sunday, the
11  21st?
12     A.  This is Monday morning, Sunday night.
13     Q.  Looking at the first page under the
14  tab A, do you see there is a column labeled
15  "Collateral" and a column labeled "Market
16  Value"?
17     A.  Yes.
18     Q.  What did you understand these figures
19  to represent?
20     MS. TAGGART:  Objection, can you
21  specify whether it is in his personal
22  capacity or Houlihan's capacity that you ask
23  that?
24     Q.  First personally, did you have any
25  understanding concerning what these figures

Page 133

BURIAN

1
2  represented?
3     A.  I don't remember seeing these figures
4  that night.  It never percolated up to me.
5     Q.  Did Houlihan, to your knowledge, have
6  an understanding concerning what these figures
7  represented?
8     A.  Well, we had -- I can tell you what
9  our understanding was.  I can't tell you that we
10  understood correctly.  We were -- our
11  understanding was that this was the roll-up of
12  the four different classes of assets based on
13  Lehman's marks as of an indeterminate date or
14  time.
15     Q.  Which four different classes of
16  assets?
17     A.  Well, the thing you showed me, the
18  page you showed me, has four lists of assets,
19  Fed collateral, DTC 074, DTC 636 and TP cash,
20  and it added up to 49,902,000 and change.
21     So our understanding was that -- we
22  didn't -- I don't believe anyone at Houlihan
23  re-added all the columns, but our understanding
24  was that this summary page was the roll-up of
25  all the pages thereafter which said that these

Page 134

BURIAN

2 securities listed had a market value as of some
3 date, based on someone's marking, of 49,902,924.
4     Q.    Staying with this page, you see there
5 is a line that says TP cash, 7 billion?
6     A.    Yes.
7     Q.    What was your understanding at the
8 time of what that meant?
9         MS. TAGGART:  Personally or Houlihan?
10     Q.    Start personally.
11     A.    Again, I hadn't seen this page.  So
12 you may be better off --
13     Q.    All right.  Did Houlihan have an
14 understanding at the time as to what that meant?
15     A.    No.
16     Q.    Did Houlihan ask anybody what it
17 meant?
18     A.    We did.
19     Q.    What were you told?
20     A.    Well, there are two conversations that
21 were important.  One was after this was
22 reviewed, when Mike Fazio and Brad Geer sat down
23 and tried to get an explanation, and the other
24 one, which was the more important one, where I
25 got pulled into the room and participated in

Page 135

BURIAN

2 that conversation about what the transaction was
3 and what we believed it was shortly before
4 closing.
5     Q.    I'm focusing on the 7 billion dollar
6 figure.  Can you tell me what Houlihan was told
7 that represented?
8     A.    Again, I can't say specifically this
9 7 billion, what it represented.  I can tell you
10 that when we -- before we left that night, we
11 were given an explanation of why there was cash
12 being delivered, and our understanding was this
13 cash was in replacement of securities that were
14 or should have been in the repo securities but
15 somehow or another got sold or converted to
16 cash, and therefore, to make Barclays whole,
17 they were merely, in lieu of giving the
18 securities, giving the cash that represented --
19 that were the proceeds of those securities.
20     Q.    You're sure that's precisely what you
21 were told?
22         MS. TAGGART:  Objection, object to
23     form.  Argumentative.
24         I guess you can answer.
25     A.    Am I sure that's precisely what I was

Page 136

BURIAN

2 told?  Again, I didn't see this 7 million (sic)
3 dollar number on this page that night, so I am
4 answering generally about why was there cash
5 included in the exchange as opposed to this
6 particular number.
7         And I am fairly comfortable that my
8 recollection is that I was told that the reason
9 cash was included when cash was not otherwise
10 part of the asset purchase agreement, was
11 because it was in substitution of securities
12 that were liquidated.
13     Q.    You are fairly comfortable but are you
14 sure that that is what you were told?
15         MS. TAGGART:  Objection, object to
16     form.  Asked and answered, argumentative.
17         If you want to answer again, go ahead.
18     A.    Am I sure if that's what I was told.
19 Yeah, I mean -- there could have been a piece
20 maybe that a security wasn't sold but somehow
21 got held up in transfer, so maybe it was not
22 directly the proceeds of those transfers, but I
23 think that -- I have to go back and look at the
24 manila folder and remind myself exactly how it
25 was described, but it was either proceeds of

Page 137

BURIAN

2 securities that were supposed to be part of it,
3 or cash reflecting securities that were not in
4 that bucket anymore for some other reason.
5     Q.    OK.  So it was either or the other?
6     A.    I -- my impression was mostly
7 proceeds, but I'm not -- I can't be sure.
8     Q.    OK.  Did Houlihan understand that the
9 marks in this document 461-B were marks that
10 JP Morgan had put on these securities?
11     A.    Absolutely not.
12     Q.    You had no understanding one way or
13 the other?
14     A.    No, no.  We understood, we believed at
15 the time that these came off the Lehman
16 system -- now, maybe you are telling me the
17 Lehman system is derivative of JP Morgan, I
18 don't know.  But the words "JP Morgan" and
19 "marks" were never in the same sentence, to the
20 best of my knowledge.
21     Q.    So as far as you knew on the evening
22 of the 21st,the morning of the 22nd, the market
23 values listed here were from Lehman's books and
24 records?
25         MS. TAGGART:  Personal or Houlihan?

Page 138

BURIAN

1
2    A.   No.
3    Q.   **Houlihan.**
4    A.   No.  As I said to you before, we were
5   specifically told that these were not the market
6   values of these assets as of that time.
7    Q.   **And who specifically told you that?**
8    A.   The last conversation on which we
9   relied on was a conversation with Michael Klein,
10  Harvey Miller, I believe Tom Roberts was there,
11  Mike Fazio.
12   Q.   **Did you ask what the source of these**
13  **market value figures was?**
14   A.   Houlihan did ask.
15   Q.   **And what was Houlihan told?**
16   A.   They were told these were old marks
17  from Lehman of securities that may or may not be
18  still at Lehman.
19   Q.   **Did you understand that this was a**
20  **list of securities that Barclays was to have**
21  **received in connection with replacing the Fed**
22  **repurchase agreement?**
23   A.   That is a nuance or detail that I am
24  not 100 percent sure.  The conversations were
25  not about the repo.  The conversations were what

Page 139

BURIAN

1
2   is Barclays getting.
3       Obviously, when you look at the
4   clarification letter, which we did not have at
5   the time, you could say these were backing the
6   repo or should have been backing the repo in the
7   sense of the cash substitution, but I don't
8   think that we understood Sunday morning that
9   nuance.
10      Our understanding was this was a list
11  of assets that was a working list of assets that
12  some large portion of were going to be
13  transferred to Barclays.
14   Q.   **You didn't have a draft clarification**
15  **letter by the time you left in the early morning**
16  **of September 22?**
17   A.   Oh, yeah, by then I did.  But you were
18  asking about our initial understanding of what
19  this document represented, what this list of
20  securities represented.  And that's what I was
21  answering.
22   Q.   **Did there ever come a time before the**
23  **closing when Houlihan understood that this list**
24  **was intended to represent securities to be**
25  **transferred to Barclays in connection with**

Page 140

BURIAN

1
2   **replacing the Fed repo?**
3    A.   No.
4    Q.   **Did anyone from Houlihan ever sit down**
5   **with anybody from Lehman or Barclays or Weil or**
6   **Lazard and review this list with them?**
7    A.   We tried.  There was a very excited
8   environment at the time.  There were huge
9   meetings that we were asked not to attend that
10  appeared to be or were described to us to relate
11  to JP Morgan holding back -- someone used the
12  word "stealing," someone used the word
13  "selling," someone used the word "set offing" --
14  securities that we were led to believe or we
15  thought meant some of these securities, and with
16  all the hubbub going around about what actually
17  was being transferred, in that context, we would
18  say to people what -- where are you, what are
19  being transferred?
20      At one point in time, we finally did,
21  we, Houlihan finally did sit down with Jim Seery
22  and with -- there were maybe some of his junior
23  people there, and said OK, we got this list, we
24  have looked at this list, we are confused by the
25  list, explain it to us.

Page 141

BURIAN

1
2       And we did make several comments about
3   the list, and he responded.  It was a relatively
4   short, though, almost like doing us a favor by
5   giving us -- you know, giving us some time on
6   that busy night.
7    Q.   **What comments did you make about the**
8   **list, or did Houlihan make about the list?**
9    A.   I was not --
10   Q.   **What comments did Houlihan make about**
11  **the list?**
12   A.   Right.  So I will give you the
13  substance of the comments, as they percolated up
14  to me generally, and in light of my following up
15  with them.
16      But our comments were, do we now know
17  which -- whether this is the list of
18  securities -- have you been able to determine
19  what actually is there and being transferred?
20  Is this something we can rely on as the core
21  business securities?
22      The second issue was -- and this was
23  the main issue -- when were these marks as of?
24  And our understanding was that these marks were
25  from earlier in the week.  Can you explain all

Page 142

BURIAN

1  
2  the noise we are hearing about how these
3  securities dropped in value? Because when you
4  look at a variety of the categories, it looks
5  like they went up in value or stayed stable, so
6  can you explain to us what is going on. What is
7  the concern, what is the give and take, what's
8  going on.
9      Q.    And who had this conversation?
10     A.    This was Brad Geer and Mike Fazio with
11  Jim Seery and his juniors.
12     Q.    Now --
13     A.    Well, you asked generally did we have
14  any -- that percolated up to me, and then that
15  led to several hours later, you know, my telling
16  Harvey, I know we are very busy, I know there is
17  a lot going on and we are only the committee,
18  but we need an explanation of what is happening,
19  partly because of concerns that were percolating
20  up about what's going on here.
21         And that led to what we still believe
22  is the single most important conversation, the
23  one with the principals right before we left.
24     Q.    That was a conversation with Harvey
25  Miller?

Page 143

BURIAN

1  
2     A.    Harvey Miller, Michael Klein,
3  et cetera.
4     Q.    Anybody else?
5     A.    I told you before I believe Tom
6  Roberts was there. I believe Lori Fife was in
7  and out. Mike Fazio was the Houlihan person
8  with me.
9     Q.    Now, before you left the building,
10  before you left Weil in the early morning hours
11  of September 22 --
12     A.    It could have been late morning hours.
13     Q.    Or late morning hours, were -- was
14  Houlihan invited to stay through the closing, in
15  order to review and finalize the schedules?
16     A.    Definitely not to review and finalize
17  schedules. Was I invited to stay? I was
18  welcome to eat as much pizza as I liked. I
19  can't tell you how many football games I watched
20  during the first month of Lehman sitting in
21  rooms being ignored by lawyers, you know,
22  starting on the 19th through October.
23         We were specifically disinvited from
24  many of the important meetings. We asked to sit
25  during the negotiation by Tom Roberts of the

Page 144

BURIAN

1  
2  clarification letter, where the estate was going
3  through the issues, and we were told you are not
4  permitted to.
5         I walked into one of the very large
6  meetings and just sat down in a chair and
7  listened to the SEC, to the DTC, Barclays, and
8  Lehman and JP Morgan go in and out, everybody
9  yelling at JP Morgan about issues. I certainly
10  was not invited, but they were not so impolite
11  as to demand that I leave. Although there was a
12  time when people took a break, and we purposely
13  stayed in our seat so we didn't have to walk in
14  the room again and be asked to leave.
15         So to say invited is a tough one. We
16  spent so much time begging to be paid attention
17  to, that to them, if we wanted to sit there, we
18  were welcome, but we were not included in
19  discussions. So --
20     MR. STERN: Mark this as the next
21  exhibit, please.
22     A.    If you are asking me was I invited, I
23  would say no. Was I welcome to hang around, the
24  answer was yes.
25         (Exhibit 462-B, document Bates stamped

Page 145

BURIAN

1  
2  MTHM5739 marked for identification, as of
3  this date.)
4     Q.    We have marked as Exhibit 462-B an
5  e-mail exchange between Harvey Miller and Luc
6  Despins and others, and I am just going to focus
7  on one part of the message from Harvey Miller.
8         In his e-mail to Mr. Despins and
9  others, September 25, 10:28 a.m., he states,
10  "You were invited to stay Monday a.m. as the
11  schedules were reviewed and finalized."
12         Is it your testimony that that is not
13  accurate?
14     A.    My testimony is I'm defining what
15  "invited" means. Harvey was not involved in --
16  to the best of my knowledge, in these schedules,
17  and I think that anyone who was there would
18  recollect that we were certainly not involved or
19  invited to finalize schedules and be there.
20         I think that we were welcome to remain
21  on the floor, to walk around the 25th conference
22  center, eat as much popcorn as we liked, and to
23  see people exchanging schedules or signing
24  documents, and I was clear that I felt welcome
25  to stay, but was I invited to actively

Page 146

```
                BURIAN
 1
 2   participate in the negotiation or determination
 3   or compilation of these documents?  Absolutely
 4   not.
 5        Q.   Do you deny that the committee was
 6   given an opportunity to review the schedules
 7   that were reviewed in connection with the
 8   closing?
 9        MS. TAGGART:  Object to form, asked
10   and answered.
11        A.   I don't deny.  I am telling you that
12   we did not get them until after the closing.
13   Hard to review what you don't have.
14        Q.   But you don't deny that the committee
15   was given that opportunity?
16        A.   Opportunity to review what I don't
17   have?
18        MS. TAGGART:  Object to form.  Asked
19   and answered.
20        A.   I'll -- we were not given the
21   opportunity to review the schedules prior to
22   closing.
23        Q.   So it is your testimony that you were
24   not given an opportunity to stay for the
25   closing?
```

Page 147

```
                 BURIAN
 1
 2        MS. TAGGART:  Objection to form.
 3   Asked and answered.
 4        A.   I was given the opportunity to sit in
 5   a room in the Weil Gotshal building through the
 6   time at which the closing purportedly occurred.
 7        Q.   And do you know whether in connection
 8   with that closing schedules were reviewed?
 9        A.   I am sure that schedules -- well, I
10   don't know, but I would assume that since
11   schedules were prepared, that someone in many of
12   the rooms that we were told that we couldn't go
13   into were reviewing schedules.  As a matter of
14   fact, as you know --
15        Q.   Let me just -- were you told that you
16   couldn't attend the closing?
17        MS. TAGGART:  Object to form.  Asked
18   and answered.
19        A.   Can you please define exactly where
20   the closing occurred and exactly at what time it
21   occurred, so that I can then answer whether I
22   happened to have been in that vicinity or could
23   have been in that vicinity at that time?
24        Was it in Conference Room 25A, 25B?
25   Was it C?
```

Page 148

```
                 BURIAN
 1
 2        I was allowed to go in the kitchen.  I
 3   had all the popcorn and pretzels that I wanted.
 4   Was that where the closing occurred, sir?
 5        Q.   You know that the closing occurred
 6   after you left the building, right?
 7        A.   I was told that it occurred.
 8        Q.   Did anybody tell you that you couldn't
 9   remain and attend the closing?  Did anybody tell
10   you that?
11        A.   No one told me that I could attend the
12   closing.
13        Q.   But nobody told you you couldn't
14   either?
15        A.   I am telling you point blank, as
16   clearly as I can without legal manipulation of
17   words, that I felt perfectly comfortable
18   remaining at Weil Gotshal for as long as I
19   liked.
20        Q.   OK.
21        A.   I probably could be there until now
22   and grow old in a conference room if I could
23   have kept myself occupied and if pretzels and
24   popcorn had enough nutrients to keep me healthy.
25        Q.   Let's look at Exhibit 460-B.
```

Page 149

```
                 BURIAN
 1
 2        A.   Which one is that, sir?
 3        Q.   There you go.
 4        A.   In full answer to my question, I was
 5   specifically told that my presence was not
 6   necessary at the closing.
 7        Q.   Who told you that?  Who told you that?
 8        A.   Mr. Miller.
 9        Q.   Did you agree?
10        A.   Did I agree that my presence wasn't
11   necessary at the closing?  I didn't have a firm
12   view.  I asked the question, was given the
13   answer, and therefore went home.
14        Q.   Let's look at Exhibit 460-B.  Do you
15   recognize this material as schedules that
16   Milbank received and that Houlihan ultimately
17   received after the closing?
18        A.   You will notice it is dated the 25th,
19   which is, you know, Thursday after the Monday
20   closing.  You will notice that it appears that
21   it was sent over and that even then, it was
22   still represented as not the actual list of the
23   assets that were transferred to Barclays.
24        So five days later, we still did not
25   have a list of what was transferred.
```

Page 150

BURIAN

1
2    Q.   If you can answer my question, we will
3    get through this a lot faster.
4         My question is, do you recognize this
5    material as including schedules that Milbank
6    received and Houlihan ultimately received after
7    the closing?
8    A.   Are you asking me if I got this after
9    the closing?
10   Q.   Did Houlihan receive this?
11   A.   I can't look at every single page, but
12   yes, Houlihan got a list from Milbank of what
13   Weil sent to Milbank of the not final list of
14   assets that purportedly went across or in the
15   repo transaction remained at Barclays.
16   Q.   Did Houlihan understand what these
17   schedules were?
18   A.   I told you that we understood them to
19   be exactly what I said, a list of indeterminate
20   date with indeterminate marks as of an unknown
21   date of assets that comprise -- that was not the
22   final list of what went over to Barclays.
23   Q.   Did you understand -- did Houlihan
24   understand that the first attachment was a
25   preliminary version of Schedule A to the

Page 151

BURIAN

1
2    clarification letter?
3    A.   We understood that the first part was
4    a preliminary schedule of Schedule A to the
5    clarification letter relating to the collateral
6    on the repo.
7    Q.   Did Houlihan understand that the
8    second part was a preliminary Schedule B to the
9    clarification letter?
10   A.   We did.
11   Q.   And did Houlihan ask any questions of
12   Lehman concerning these lists?
13   A.   I can't tell you it was directly
14   related to this list, but it is the same
15   questions that we asked repeatedly over that
16   time frame from the closing until today.
17   Q.   Did Houlihan compare the Schedule A
18   attached to 460-B to the Schedule A it
19   previously received as reflected in 461-B?
20       MS. TAGGART:  When?
21       Wait.  Don't answer yet.
22       When?  Are you saying at any time?  I
23   need to know for my privilege objection.
24   Q.   Did Houlihan compare the Schedule A in
25   460-B and Schedule A in 461-B at any time after

Page 152

BURIAN

1
2    Houlihan received 460-B?
3        MS. TAGGART:  I will object on work
4    product grounds and instruct you not to
5    answer as to the internal analysis that
6    Houlihan did of the schedules.
7        MR. STERN:  Why don't we stop for
8    lunch.  Let's go off the record.
9        THE VIDEOGRAPHER:  Time is 1:01 p.m.
10   We are now off the record.
11       (Recess)
12       (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 153

BURIAN

1
2    AFTERNOON SESSION
3        1:41 p.m.
4        THE VIDEOGRAPHER:  The time is the
5    time is now 1:41 p.m.  We are now back on
6    the record.
7    BY MR. STERN:
8    Q.    Mr. Burian, this morning, I believe
9    you referred to your approach as one of trust
10   and verify.  Do I have that right?
11   A.   Correct.
12   Q.    What did Houlihan do after the
13   closing to verify the information it had been
14   given?
15   A.   In what period of time?
16   Q.   After the closing.
17   A.   Well, there are different periods of
18   time.
19   Q.   Go chronologically.?
20       MS. TAGGART:  Well, object to form.
21       You can answer what you did with
22   anyone outside of Houlihan or the committee,
23   and why don't we take it up through
24   December, and if he wants to go on after
25   that, we will take it one at a time.

Page 154

BURIAN

1
2    A.   The main thing we did was to request
3  reconciliation from the company as to what
4  exactly occurred in order to be able to verify
5  that the representations were true and that what
6  happened was consistent with the court order.
7         At that point in time, we fully
8  expected -- we did not expect there to be any
9  problems.  We thought that what we were
10 concerned about, there must be logical
11 answers for and there was not great concern
12 or urgency and we also knew that as an
13 official committee and a more normal
14 environment, we would have the opportunity,
15 the debtor would be responsive now that the
16 crisis was over.
17        So for the most part, in the October
18 and November time frame, it was mainly asking
19 for reconciliations of and getting, you know, a
20 better understanding of what exactly Barclays
21 got and did not get.
22        Obviously, at some point in time, you
23 file, someone filed, maybe the SIPA trustee
24 filed a settlement motion which described the
25 transaction by the affidavits, by the Barclays

Page 155

BURIAN

1
2  and other parties to that transaction and that
3  took it up a notch.  That made us nervous
4  because then we were much more concerned because
5  there seemed to be facts that contradicted what
6  we had heard.
7         We still expected there to be
8  perfectly rationale explanations, so during
9  that period of time, I believe we started
10 interacting based on the judge's direction
11 directly with Barclays and its
12 representatives through Cleary Gottlieb, its
13 law firm.  That's when we met for the first
14 time in an effort to --
15    Q.   February 3?
16    A.   That sounds right.
17    Q.   Now, let's just go back in time to the
18 week after the closing.  The period between
19 September 22 and September 30.  What
20 verification efforts did Houlihan undertake in
21 that period of time?
22    A.   To the best of my knowledge, we merely
23 wanted to get a complete and final list of what
24 exactly -- what the documents were.  As you see,
25 you gave me an exhibit earlier in the morning

Page 156

BURIAN

1
2  that was saying, well, here is a preliminary
3  list and I'm sure that either directly or
4  indirectly, we would have said OK, the deal
5  closed, where is the final list.
6         But other than asking for verification
7  of what transferred and, you know -- we probably
8  did not do much.
9    Q.   Were you aware that on September 30,
10 Weil filed with the court the final versions of
11 Schedule A and Schedule B?
12    A.   I don't remember the exact date, but I
13 do know at some point schedules -- at some
14 point, the document you handed me as an exhibit
15 was filed with the court.  You probably know the
16 date.
17        But at some point the schedules were
18 filed, although that was not what we asked
19 for in the sense of that was a redacted
20 version for public consumption.  I don't
21 remember if it was under seal, but I think
22 the marks were all off, it was not directly
23 responsive to what we were looking for.
24    Q.   At some point, at some point in
25 October, did Houlihan meet with Alvarez & Marsal

Page 157

BURIAN

1
2  to get more information concerning the asset
3  transfers?
4    A.   To Barclays?
5    Q.   Yes.
6    A.   We never met with Alvarez & Marsal
7  specifically about the asset transfers.  We met
8  with Alvarez & Marsal about a broad variety of
9  topics on a consistent basis.  There were
10 meetings where Barclays issues were raised, but
11 it wasn't -- the purpose of the meetings were
12 not to talk about Barclays.
13    Q.   Did either Houlihan or FTI, to the
14 best of your knowledge, ever receive information
15 from Alvarez & Marsal concerning the assets that
16 had been transferred to Barclays?
17    A.   That's a very broad question because
18 it could relate to a lot of different pieces.
19 So it is hard.
20    Q.   Let me try to make it more specific.
21    A.   I'm in a meeting --
22    Q.   Let me try to make it more specific.
23      (Exhibit 463-B memo dated October 6,
24 2008 marked for identification, as of this
25 date.)

Page 158

**BURIAN**

1    A.   OK.
2    **Q.   I have handed you a document that we**
3 **have marked as Exhibit 463. I'll ask you to**
4 **take a look at the document. It is a multi-page**
5 **document, and after you have had a chance to**
6 **review this, I'll ask you if you have ever seen**
7 **this before or any part of it before.**
8         MS. SCHAFFER:  If I could just ask a
9    question, do you know where this document is
10   from?
11        MR. STERN:  Yes, I do.
12        MS. SCHAFFER:  Where is it?
13        MR. STERN:  It was a part of the
14   e-mails of the Lehman people, individuals
15   who are listed on it. And I believe that
16   just recently Alvarez has produced it as
17   well.
18   A.   OK, I have perused the first two pages
19 of the exhibit.
20   **Q.   Is this a document you have ever seen**
21 **before?**
22   A.   I have no specific recollection.  I
23 wouldn't be surprised if it was e-mailed to me
24 but I -- if it was -- I don't remember. I don't

Page 159

**BURIAN**

1 have a specific recollection about this
2 document.
3    **Q.   Who is Connor Tully?**
4    A.   Connor Tully is one of the FTI
5 employees working on the Lehman case.
6    **Q.   And what is his role in relation to**
7 **the creditors committee?**
8    A.   He reports, I believe to Sam Star and
9 he is sort of the day-to-day, sort of
10 Jack-of-all-trades FTI representative, attends
11 committee meetings.  We are working with him now
12 on several financial analyses for different open
13 issues.
14   **Q.   Who is Sam Star?**
15   A.   Sam Star is an FTI officer who is also
16 working day-to-day on the Lehman case.
17   **Q.   For the committee?**
18   A.   For the committee.
19   **Q.   And William Fox?**
20   A.   Where do you have William Fox? Oh,
21 Bill Fox. I'm not sure who it was.  That could
22 either be a Lehman FTI person or it could be
23 someone else over at FTI.
24   **Q.   Now, looking at the first page, the**

Page 160

**BURIAN**

1 **cover e-mail, there is a heading that says LBI**
2 **repo transactions on the first page. Do you see**
3 **that heading?**
4    A.   Yes.
5    **Q.   Do you recall whether FTI reported to**
6 **Houlihan any of the information --**
7    A.   I am sorry, you are asking about the
8 subject line e-mail?  You are talking about the
9 bold letters?
10   **Q.   Bold letter heading, "LBI repo**
11 **transactions."**
12   A.   Sure.
13   **Q.   You see that?**
14   A.   Sure.
15   **Q.   Do you recall whether FTI reported to**
16 **Houlihan any of the information reflected in**
17 **this section?**
18        MS. TAGGART:  Objection, vague and
19    also objection on the privilege. And I'm
20    going to instruct not to answer.
21   **Q.   In this section, LBI repo**
22 **transactions, Mr. Connor states, "Close of**
23 **business Wednesday, September 17, Lehman had a**
24 **45 billion dollar repo with the Fed primary**

Page 161

**BURIAN**

1 **dealer credit facility, PDCF against collateral**
2 **with a market value of 49.7 billion."**
3         **Did FTI ever report that information**
4 **to Houlihan?**
5    A.   I don't -- I would rather say whether
6 I knew this as not -- as opposed to who reported
7 it to me. I can't remember back then whether I
8 read it or knew it.
9    **Q.   I realize you might rather say it, but**
10 **I would like an answer to my question.**
11   A.   Whether FTI specifically reported this
12 sentence to me?
13   **Q.   Whether it reported that information**
14 **to you.**
15   A.   I can't recollect if I heard it from
16 FTI or another source.
17   **Q.   Then it goes on to say, "Close of**
18 **business on Thursday, Fed wanted out of the repo**
19 **and required Barclays to step into the trade. I**
20 **am not totally clear on how this worked or if**
21 **Barclays agreed to this. But I believe as part**
22 **of the Barclays transaction, they settled up**
23 **with the Fed on Friday. See the attached**
24 **summary I received from A&M, Jim Fogarty's**

Page 162

1            **BURIAN**
2    group."
3          **Now, focusing for now just on the**
4    **text,  we will get to the attached summary,**
5    **is this information concerning the Fed repo**
6    **information that FTI reported to Houlihan?**
7        A.    Again, it is the same answer.  I am
8    aware of these facts.  I can't time my awareness
9    specifically to this e-mail.
10       **Q.    Now, further down, in the fourth**
11   **paragraph, third sentence says, "Discussed 7**
12   **billion dollars."  Do you see that line?**
13   **"Discussed 7 billion dollars of collateral."**
14       A.    One, two, three, four -- as an aside.
15   How does the paragraph start?
16       **Q.    Next paragraph.**
17       A.    "It was an incredible amount of work
18   to simply reconcile and gets trade to clear."
19       **Q.    Next paragraph which starts on**
20   **Thursday night?**
21       A.    "15.8 was booked by Chase."
22       **Q.    Next line and line after that.**
23       A.    On Friday morning, Chase's top
24   priority was to reconcile this trade and
25   contacting Barclays" --

Page 163

1            BURIAN
2        **Q.    Let me focus you on the next line.  It**
3    **says, "Discussed," you see it says, "Discussed 7**
4    **billion dollars of collateral missing.  But I**
5    **believe this just means everything didn't clear,**
6    **so Chase ended up doing a 7 billion dollar box**
7    **loan."**
8        A.    I see that language.
9        **Q.    OK.  Is that information that FTI**
10   **reported to you at the -- at or around the time**
11   **of this e-mail?**
12       A.    I don't recollect specifically that it
13   was communicated or not communicated.
14       **Q.    Let's turn to the next page, top of**
15   **the page.  "In trying to tie this together to**
16   **the Barclays transaction, I noted that the**
17   **attached summary reflects a line called**
18   **'Extinguish liability to Fed 38 billion**
19   **dollars.'  Is this the 45 billion dollar Fed**
20   **repo reduced for the 7 billion dollar box loan?"**
21          **Is that a question or an issue that**
22   **FTI discussed with Houlihan around this time?**
23          MS. TAGGART:  Objection to form.
24          You can answer yes or no if that issue
25   was discussed between FTI and Houlihan, that

Page 164

1            BURIAN
2    subject was discussed.
3        A.    You asked this question or an issue
4    that was discussed and the answer is that the
5    issue of reconciling what JP Morgan took or
6    didn't take was an important topic among all the
7    parties to the transaction and FTI was taking
8    the lead in trying to figure out the flow of
9    funds to figure out how much JP Morgan owed or
10   did not owe.
11          So the issue being addressed here on
12   is something that was certainly discussed.
13   The specifics that Connor was trying to
14   figure out if that entry was a net or gross
15   entry, I can't recollect if that rose to my
16   level or was communicated to Houlihan.
17       **Q.    Fair enough.  Let's look at the**
18   **attached summary which at the bottom is labeled**
19   **"Alvarez & Marsal draft Barclays deal recap,"**
20   **and there are page numbers at the bottom running**
21   **from 1, 2, 3, 4 through 5.  Focusing on the**
22   **first page, do you recall ever seeing or**
23   **reviewing this information?**
24       A.    Never saw this.
25       **Q.    Looking at the asset side of the**

Page 165

1            **BURIAN**
2    **sheet, there is a line that says, "Negotiated**
3    **mark haircut" and it lists a figure of 5**
4    **billion.  Do you know what that means?**
5          MS. TAGGART:  Objection, foundation,
6    calls for speculation.
7        **Q.    Do you know?**
8        A.    I know what the words mean, but what
9    exactly are you asking me?
10       **Q.    I'm asking if you know what this means**
11   **in this document?**
12       A.    I don't know specifically what it
13   means in this document.  I know what it may mean
14   in reference to the issues in dispute in the
15   litigation.
16       **Q.    And what's your understanding?**
17          MS. TAGGART:  Objection, calls for
18   speculation.
19          Testify to what you know.  Don't
20   speculate.
21          MS. SCHAFFER:  Objection.
22       A.    Well, I've never seen this document
23   before and I didn't prepare the document.  So I
24   can't -- it looks to me, looking at the
25   document, that it is saying that there was a

Page 166

BURIAN

1 negotiation and that the assets had a haircut.
2 **Q.   Now, are you sure you never saw this**
3 **document before?**
4       MS. TAGGART:  Objection, asked and
5       answered.
6    A.   Am I sure?  I can tell you that
7 sitting here, I don't remember seeing it.
8 Whether this is in my in box somewhere, that's a
9 possibility.  But I don't remember seeing this
10 document before.  I've heard the phrase
11 "negotiated mark haircut" before.
12    **Q.   Do you know whether anyone else at**
13 **Houlihan had this document?**
14    A.   I don't.  I don't.
15    **Q.   Now, further down on the asset side,**
16 **you see there is a line for unencumbered box and**
17 **it lists a figure of 1.9.**
18    A.   Yes.
19    **Q.   Do you know what that is a reference**
20 **to?**
21       MS. TAGGART:  Objection, foundation,
22       calls for speculation.
23    A.   Only by what I know elsewhere in the
24 transaction that there was, to fill the hole in

Page 167

BURIAN

1 the transaction, 1.9 billion of the securities
2 unconnected to the repo were purportedly
3 transferred to Barclays.
4    **Q.   Up above that, there is a line that**
5 **says, "Assets transferred under repo, stale**
6 **marks, 43.07."  Do you see that?**
7    A.   Yes.
8    **Q.   Do you know what that 43 billion**
9 **dollar figure relates to?**
10       MS. TAGGART:  Objection, foundation,
11       speculation.
12    A.   It A a footnote?  Is there a
13 description I can look at it?  The answer is no,
14 I have no idea what that is.
15    **Q.   And then on the liability side, there**
16 **is a line that says, "Extinguish liability to**
17 **Fed," and it lists a figure of 38.  Do you see**
18 **that?**
19    A.   I do.
20    **Q.   What do you understand that figure to**
21 **represent?**
22       MS. TAGGART:  Objection, foundation.
23    A.   Just what it says, it sounds like I
24 would have a -- frankly, I find this number to

Page 168

BURIAN

1 be surprising.  It sounds like this piece of
2 paper is saying that the Fed liability was only
3 38 billion.
4    **Q.   And you understood it to be more than**
5 **in the range of 45?**
6    A.   No, I understood it to be more in the
7 range of 45.5.  500 million matters.
8    **Q.   So you understood it to be 45.5 and**
9 **this says 38?**
10    A.   Correct.
11    **Q.   Did you also understand that there was**
12 **a 7 billion dollar shortfall in delivery?**
13    A.   Again, what I understood was -- what
14 was described to us that night, that for a
15 variety of reasons, whether shortfall in
16 delivery because they were closed out and not
17 transferred, that 7 billion was missing.  But
18 that 7 billion was inclusive of the assets.  It
19 wasn't the assets plus 7 billion.  It was
20 included in the number.
21    **Q.   It was included in the 45.5?**
22       MS. TAGGART:  Object to form.
23    A.   No.  It was included in the A assets
24 to balance against the 45.5.

Page 169

BURIAN

1    **Q.   Looking at the next page, page 2, do**
2 **you recall ever seeing this document before?**
3    A.   Nope.
4    **Q.   Do you -- do you know whether the**
5 **amounts listed here are Lehman marks or Bank of**
6 **New York marks or JP Morgan marks?**
7       MS. TAGGART:  Objection, lack of
8       foundation.
9    **Q.   If you know.**
10    A.   I don't know that they are marks as
11 opposed to face amounts, but if you are telling
12 me they are marks, we can compare them to the
13 other schedule and see if they match up and then
14 I can tell you by looking at this document
15 alone, I do not know.
16    **Q.   OK.  Fair enough.  Now, did there come**
17 **a time in October that you attended the meeting**
18 **or presentation that Alvarez gave to the**
19 **creditors committee?**
20    A.   Yes, I did.
21    **Q.   Did anybody else from Houlihan attend**
22 **that presentation?**
23    A.   Yes.  I can't tell you exactly because
24 depending on the issue, people would come in and

Page 170

BURIAN

1 out because of their particular issue. I know I
2 was there for the whole meeting. I know Mike
3 Fazio sat next to me at the meeting. If it is
4 critical, I can try to remember who came for
5 what or look at the agenda for other issues.
6      Are you talking about the meeting
7 shortly after this e-mail that was the first
8 week in October?
9     Q.   Yes.
10    A.   Yes, that was the committee meeting at
11 which Alvarez presented.
12      (Exhibit 464-B, document Bates stamped
13 LAZ-A4419 through 4424 marked for
14 identification, as of this date.)
15      MR. STERN:  Let's mark this document
16 as 465-B.
17      (Exhibit 465-B, document Bates stamped
18 LAZ-A 4419 through 44511 marked for
19 identification, as of this date.)
20    Q.   I am only going to reference 464-B,
21 the excerpts from this, but for the sake of
22 completeness, I marked 465-B which appears to be
23 the complete presentation. So I would like to
24 direct your attention to the abbreviated

Page 171

BURIAN

1 document, 464-B.
2    A.   OK.
3    Q.   Let's start by looking at the third
4 page of the document, which is the contents
5 page.
6    A.   Contents page?
7    Q.   And you see there a list of agenda
8 items.
9    A.   I do.
10    Q.   And your recollection is that you were
11 present for the entire presentation?
12    A.   I was.
13    Q.   The second item -- I am sorry, it is
14 actually. It looks like there is a typo. There
15 is a line in the agenda for significant
16 transactions. And it lists Fogarty, Ehrmann and
17 Coles next to it.
18    A.   Yes.
19    Q.   Do you see that?
20    A.   I do.
21    Q.   Who are Fogarty, Ehrmann and Coles?
22    A.   Fogarty and Ehrmann are both members
23 of the A&M team that I believe are full-time
24 over at Lehman. Coles, I forget. I think he is

Page 172

BURIAN

1 also an A&M -- I think he is A&M and not legacy
2 Lehman, but I can't be sure.
3    Q.   Let's turn to the next page of this
4 document which is in the bottom left. It has a
5 page number 28. At the top, it is labeled,
6 "III, significant transactions"?
7    A.   I see that.
8    Q.   And then capital letter A, it states
9 "Sale of Lehman Brothers Inc. broker/dealer to
10 Barclays," and in parentheses, it lists Fogarty
11 as the presenter.
12    A.   Right.
13    Q.   Under this, it has some bullet points
14 and it refers to "assets purchased." Do you see
15 that?
16    A.   Yes.
17    Q.   There is a reference to 43.1 billion
18 dollar repo assets. What was said about that
19 item if you recall?
20    A.   I recall really there was -- it was
21 just read off as this is what the transaction
22 was. I don't remember the number even was
23 mentioned orally as opposed to being up on the
24 screen. They had a pretty heavy, heavy agenda

Page 173

BURIAN

1 with a lot of other pressing issues.
2    Q.   Did anybody from Houlihan ask what the
3 43.1 billion represented?
4    A.   I don't recollect anyone asking what
5 that particular number represented. It was not
6 the environment for that sort of give-and-take.
7 I do remember that we asked if this was an
8 example of a need for greater detail to
9 reconcile what occurred.
10    Q.   Did anybody from Alvarez ever tell you
11 whether this figure was based on Bank of New
12 York marks?
13    A.   No.
14    Q.   Did they ever tell you what -- whether
15 this reflected the collateral that had actually
16 been transferred to Barclays?
17    A.   Yeah, we assumed. Did they actually
18 say that, was it explicit, or I just knew that?
19 I remember you say collateral, that number I
20 think included a 7 billion in cash.
21    Q.   You think the 43 included the 7? Or
22 excluded the 7?
23    A.   I thought, at the time, I thought that
24 included.

Page 174

BURIAN

1
2    Q.   Did anybody tell you that?
3    A.   No.  I see here the 7 billion is not
4    mentioned at all.  It is strange for it not to
5    be mentioned.
6    Q.   Was -- after the -- I understand you
7    said this meeting was really not the setting in
8    which to question these points.  Was there a
9    subsequent opportunity to question these points?
10   A.   It is sort of like the word "invite"
11   before, you are talking about opportunities.  I
12   am trying to give you a complete explanation.
13       The answer is of course we had an
14   opportunity, but you have to understand that
15   A&M's position was this was not their
16   problem.  They didn't do this transaction,
17   they weren't party to this transaction, and
18   if we had issues or concerns, we should get
19   the information from Weil, from Lehman or
20   from Barclays.
21       We raised questions -- for instance,
22   this is the first time I remember ever
23   hearing the phrase "negotiated 5 billion
24   reduction" and sitting there, it did make me
25   nervous and that was something that I don't

Page 175

BURIAN

1
2    know if I raised my hand or someone else
3    raised their hand and said, you know, we've
4    really got to dig into this.  But -- and the
5    answer was, as the answer always was, of
6    course, open Kimono, we will find, you know,
7    let's reconcile away.
8        But --
9    Q.   That's what Alvarez said?
10   A.   Yes.
11   Q.   Was anybody from Weil present at this
12   meeting?
13   A.   Sure.
14   Q.   Anybody from Lazard?
15   A.   May I look at the larger document?
16   Q.   Sure.
17   A.   I don't believe -- Lazard really had
18   wound down their involvement to very specific
19   M&A assignments at that time.  I don't have a
20   particular memory of them being active, you
21   know -- it was still early in the case,
22   October 8.
23       I would think that at least Matthew
24   Whiting or someone was there, but I can't --
25   there is nothing on this list that is a

Page 176

BURIAN

1
2    Lazard assignment and I don't have any
3    recollection of interacting with Lazard at
4    this meeting.
5    Q.   So let's go back to the page we were
6    looking at where you identified the phrase
7    "negotiated to 5 billion dollar reduction."  You
8    said that made you nervous and you really had to
9    dig into this.  What did Houlihan do at the time
10   to dig into that?
11   A.   I answered you earlier and you cut me
12   off when I was giving you the chronology of what
13   we did and I was telling that you there really
14   were three stages.  I started describing the
15   first stage of our involvement.  Stage number 1
16   was closing through the filing of the SIPA
17   motion.  That's the December motion I'm
18   referring to as the SIPA settlement motion.  And
19   this falls within that time period where --
20   Q.   This is in October.  What did you do
21   in October?
22   A.   I'm saying this is during the time
23   period from the closing through December --
24   Q.   I'm not talking about December.  I am
25   talking about in October.  Let me ask you a

Page 177

BURIAN

1
2    different question.  In the month of October
3    2008, what did Houlihan do to dig into this
4    negotiated 5 billion dollar reduction?
5    A.   We asked for -- let's make clear --
6    Q.   Can you answer my question first?
7        MS. TAGGART:  He is trying to answer
8    your question.
9    A.   I am trying to put it in context, but
10   I'm happy --
11   Q.   I am asking very specific question.?
12       MS. TAGGART:  He gets to finish his
13   answer to your question.
14   A.   What exactly do you want to know and I
15   will answer it particularity.
16   Q.   I think my question is very clear.?
17       MS. TAGGART:  You either withdraw
18   start a question or start a new one.
19       MR. STERN:  I am going to start a new
20   one?
21       MS. TAGGART:  Then he needs to finish
22   the answer.
23       MR. STERN:  No, no, no.
24       MS. TAGGART:  No.  Then read back the
25   question.

Page 178

BURIAN

1
2     Q.   Let me ask a new question.  What did
3  Houlihan do in October 2008 to dig into
4  questions relating to this line negotiated 5
5  billion dollar reduction?
6     A.   At my direction and supervision, we
7  renewed our request for a reconciliation of what
8  exactly was transferred to Barclays, when it was
9  transferred, what the Lehman marks of those
10  assets were, and as of what date.
11     Q.   And in October of 2008, did you get
12  responses to those inquiries?
13     A.   I don't remember specifically when we
14  got responses, how.  I know there was a catty
15  sort of response at Weil at one point, why do
16  you care, the transaction closed, the appeal
17  period is over, something like that.  But
18  generally speaking, I'm sure there was back and
19  forth, but I do not remember receiving any
20  reconciliation or any, you know, global answer
21  to the questions we were asking.
22     Q.   If you didn't receive the information,
23  did you or the committee consider going to the
24  judge to ask for expedited discovery concerning
25  these questions?

Page 179

BURIAN

1
2     MS. TAGGART:  Object to form and
3  privilege and I am going to instruct not to
4  answer on attorney/client and work product.
5  So don't answer.
6     Q.   If you felt there was information that
7  was important information you needed, did you
8  personally realize that you could go to the
9  court and request the court's assistance?
10     A.   Yes.
11     Q.   Did you do anything to request the
12  court's assistance?
13     A.   Obviously, it is up to counsel to make
14  these decisions.  But in my view, there was
15  nothing that would warrant expedited transaction
16  because the transaction closed, security is
17  probably not there anymore.  Barclays was good
18  for the money.  So if there was a mistake and
19  money had to be returned, that's not the type of
20  thing that you would run to court with your hair
21  on fire saying there has to be an expeditious
22  resolution.
23     We also were dealing with an estate
24  that was beleaguered by a number of issues
25  that we had never seen before in a

Page 180

BURIAN

1
2  restructuring where the senior parties at
3  Weil and others were burning night after
4  night and, therefore, to take what we hoped
5  was merely going to be a reconciliation of
6  what happened in a manner consistent with the
7  court order to the level of running to a
8  judge to say it has got to be dealt with
9  today seemed disproportionate and
10  unnecessary.
11     Q.   So a 5 billion dollar reduction did
12  not rise to the level, in your view, as
13  something worth bringing to the court's
14  attention?
15     MS. TAGGART:  Object to form,
16  misstates the testimony.
17     A.   Oh, no -- that's completely --
18     MS. TAGGART:  Argumentative.
19     A.   That's completely not what I said.
20     Q.   Let's go back to October of 2008.
21     A.   I want to finish my answer.
22     Q.   Let me ask the question.?
23     MS. TAGGART:  Again, he needs to
24  finish his answer to the question that you
25  posed.

Page 181

BURIAN

1
2     MR. STERN:  I think he answered?
3     MS. TAGGART:  No, he didn't answer.
4  Finish your answer.
5     Q.   Go ahead.
6     A.   That's --
7     MS. TAGGART:  Do you want to hear the
8  question again?
9     THE WITNESS:  Sure.
10     MS. TAGGART:  "So a 5 billion dollar
11  reduction did not rise to the level, in your
12  view, as something worth bringing to the
13  court's attention?"
14     A.   Five billion dollars is an enormous
15  amount of money and it is certainly something
16  that we will take very careful attention to, and
17  if we believe we are owed, we will bring to the
18  court's attention to collect.
19     The question that I was answering was
20  whether or not at that time, we thought
21  expeditious discovery was something that I
22  personally would recommend to counsel and to
23  the committee and what I answered was that at
24  that time, our expectation was we were not
25  owed, that no one had taken improperly 5

Page 182

BURIAN

1  billion dollars.  Frankly, even at that time,
2  I found it hard to believe that someone would
3  misrepresent to the court or that people
4  would not tell counsel what the full
5  transaction was and, therefore, that the
6  judge would not be apprised of something as
7  important as 5 billion dollars.
8          And therefore, even then, my
9  assumption as a supervisor of the assignment was
10 that we, at the direction of the committee,
11 merely had a bookkeeping reconciliation and we
12 would write a report that would just balance the
13 books and we would be done.  There was
14 confusion, but that there wouldn't be any real
15 serious problem here.
16     Q.   Now, I believe you said that when you
17 saw this reference to negotiated a 5 billion
18 dollar reduction, it made you nervous, is that
19 right?
20     A.   That is correct.
21     Q.   And it was something that you felt you
22 needed to dig into, is that correct?
23     A.   It was something that confirmed to me
24 the need to get the reconciliation done and make

Page 183

BURIAN

1  sure that the transfers were as described.
2     Q.   But it is not something that you felt
3  in October 2008 warranted an effort to enlist
4  the court's assistance in getting further
5  information?
6          MS. TAGGART:  Object to form,
7  mischaracterizes his testimony and asked and
8  answered.
9     A.   At that time, I had the expectation of
10 cooperation.  There was no reason to go to Judge
11 Peck.
12     Q.   And did you get cooperation in the
13 month of October?
14     A.   Again, I told you I think of these
15 time periods in buckets and not in particular
16 days and I was getting enormous cooperation in
17 the month of October from the debtor on a myriad
18 of issues worth many, many billions of dollars
19 besides Barclays.
20          So you have to look at cooperation in
21 a broader context when you want to criticize
22 a debtor estate or demand a court order for
23 expeditious discovery.  So the answer is I
24 was getting a lot of cooperation.

Page 184

BURIAN

1          Did I get answers to this particular
2  question in October?  Well, I still haven't
3  gotten the answers so the answer is no.
4     Q.   Your testimony is as of today, you
5  still haven't gotten the answers?
6          MS. TAGGART:  Objection, he just said
7  his testimony.  I object to form and
8  argumentative.
9          If you want it say it again, you can.
10    A.   As of today, to the best of my
11 knowledge, I have never received a
12 reconciliation of what was originally part --
13 assumed to be part or contemplated to be part of
14 the transaction as signed on that Tuesday and
15 described that Wednesday in court which got the
16 70 billion and 69 billion.  I never got a
17 reconciliation of what exactly was intended by
18 the numbers Ms. Fife said in court and what the
19 basis of that was and whose marks they were as
20 of what date.
21          I have never received the bridge
22 between the 70 and the -- now I am getting a
23 little confused, if I am wrong, the 47.4
24 number, I think, as to how much of that was

Page 185

BURIAN

1  purported to be, as she described and
2  everyone was saying in conference rooms,
3  market deterioration in the portfolio as
4  compared to closeouts or securities that
5  turned out not to have been returned to
6  Lehman.  Nor have I even received, to the
7  best of my knowledge, even the most simplest
8  request of what exactly did go over and what
9  were the marks on that date that they went
10 over.
11          So I haven't gotten, to the best of my
12 knowledge, even the simplest stuff, let alone
13 what we really need to write the memo and be
14 done.
15     Q.   In October, did you request an
16 opportunity to discuss those questions with Ms.
17 Fife or Mr. Miller?
18     A.   I don't remember if it was done
19 through a formal invitation or request.  We said
20 in meetings -- at that point in time, I was
21 spending many, many, many nights with Ms. Fife
22 working on a variety of things and in those
23 meetings, we would always -- we would say
24 periodically where are we on the reconciliation,

Page 186

BURIAN

1 when are we getting those documents, how is it
2 going.
3     Q.   Did you ever ask Ms. Fife what the
4 47.4 represented in relation to the 70?  Or any
5 of those other figures that you just mentioned?
6     A.   Ms. Fife wouldn't be the right person
7 to ask for the back-up for it because she said
8 in court -- and I believe, you know, either she
9 or someone else at Weil said to us that was the
10 numbers we got from our clients as to what was
11 available to be transferred.
12     Our assignment was not, you know,
13 repeat to me that you repeated numbers from
14 Lehman.  Our assignment was to go beyond what
15 Weil was told and balance the book.
16     At that point in time, there was
17 absolutely no great urgency.  The expectation
18 was this was going to be fine and we would
19 get the numbers and we would move on.  It
20 wasn't like we need to go track an asset that
21 was a melting ice cube, that value was being
22 lost.  What was done was done and we expected
23 a explanation, and if the explanation didn't
24 comport to what was supposed to happen, we

Page 187

BURIAN

1 felt confident we would be able to get the
2 assets back.
3     Q.   Do you remember on February 3, 2009,
4 you came to these offices and met with certain
5 executives from Barclays and certain lawyers
6 from Barclays?
7     A.   I believe you were there.
8     Q.   And you had an opportunity to ask
9 questions concerning the transaction?
10     A.   We did.
11     Q.   After that meeting, did you or anyone
12 else from Houlihan raise any follow-up
13 questions?
14     A.   Sure.
15     Q.   Who did you call?
16     A.   Well, we were not allowed to call
17 Barclays directly.  We were told not to.
18     Q.   Did you ask for a follow-up meeting?
19     MS. TAGGART:  Wait, wait.  He is still
20 finishing his answer.
21     Q.   Did you ask for follow-up meeting?
22     MS. TAGGART:  He is finishing his
23 answer to the first question.
24     A.   I understand the communications were

Page 188

BURIAN

1 through counsel.  We followed up by asking for
2 information and I remember reviewing one or two
3 letters in that regard and I remember the
4 conference call with Lindsey Greenfield that I
5 believe it was either before or after that
6 meeting where I once gain explained what I was
7 tying to do, what we were trying to do.
8     It was not hostile.  We just wanted to
9 write a report and be done because we assumed
10 there were reasonable answers, and so my
11 understanding from the -- again, I told you
12 there were buckets.  So there was a bucket of
13 times from September to the filing of the
14 motion in December.  You're now asking about
15 the second bucket of time from December
16 through mid February, right?
17     Q.   Let me just ask you a specific
18 question.  When you were talking about this
19 reference, Exhibit 464-B, to a 5 billion dollar
20 reduction.
21     A.   Correct.
22     Q.   At that meeting on February 3, 2009,
23 did you ask Barclays' executives any questions
24 concerning that issue?

Page 189

BURIAN

1     MS. TAGGART:  Which meeting is that?
2     Q.   February 3, 2009 meeting.
3     A.   The Barclays executives at that
4 meeting, to the best of my knowledge, said they
5 were not involved in any way in the negotiations
6 of the transaction, but had two roles; one was
7 to compare taking the assets and hedging them,
8 and the other one spoke a lot about the
9 mechanics of transfer.
10     At that meeting, we specifically asked
11 about negotiations, development of marks and
12 were told that they were not involved.
13     I also think we followed up and said
14 whose marks were they that they were taking
15 these assets at and I believe they were told,
16 but I can't -- I can't tell you with certainty
17 who said it, but I think we were told that they
18 were the Lehman marks.
19     But again, the three individuals from
20 Barclays were very clear at that meeting they
21 were not -- that's why we followed up and asked
22 for meetings with the former Lehman CFO who is
23 now a Barclays employee to talk about
24 developments of marks.

Page 190

BURIAN

1
2    So indirectly -- so to answer your
3    question with clarity and specificness,
4    specificity, sorry, we asked about marks and
5    who developed them, but it became obvious
6    those were the wrong people to ask those
7    details to.
8    **Q.    Again, referring to 464-B and this**
9    **reference to a 5 billion dollars reduction, did**
10   **you understand that 5 billion dollars to relate**
11   **to the repo or to something else?**
12       MS. TAGGART:  Objection, foundation.
13       MS. SCHAFFER:  Objection to form.
14   A.   It is on the line of repo.  Looking at
15   it now, it looks likes it relates to that line.
16   But I honestly had -- I, to make this go
17   quicker, I understood the 5 billion reduction to
18   relate to marks on securities that were
19   purportedly transferred to Barclays.
20       I wasn't thinking whether it was the
21   repo assets or not, because it was a Schedule
22   A and Schedule B, but it is on the same line
23   as the Schedule A, what looks like Schedule A
24   type assets.
25   **Q.    You didn't know whether that figure**

Page 191

BURIAN

1
2    **related to the haircut in the repo or whether it**
3    **related to something else?**
4        MS. TAGGART:  Objection, form.
5    **Q.   Is that fair?**
6    A.   I certainly had no idea.  The word
7    "haircut" never came up.
8    **Q.    And you never asked?**
9    A.   OK, are you talking about at the
10   February meeting with you?
11   **Q.   I am talking about October.**
12   A.    Or talking about the committee meeting
13   with the committee?
14   **Q.    I am talking about October.  This**
15   **presentation by Alvarez, Exhibit 464-B.**
16   A.    The word "haircut" never came up, to
17   the best of my knowledge, at the committee
18   meeting with Alvarez.
19   **Q.    But I think you testified earlier that**
20   **you were generally aware that the purchase**
21   **agreements typically involve a haircut, is that**
22   **right?**
23       MS. TAGGART:  Objection, asked and
24   answered, misstates the testimony.
25   **Q.   Is that right?**

Page 192

BURIAN

1
2    A.    What I said before, I said my
3    understanding was this repo was short
4    collateral.  But generally speaking, repo
5    participants will lend or advance less than the
6    full value of the securities.
7    **Q.    And you were given information that JP**
8    **Morgan had marked the repo collateral at 49.9**
9    **billion, is that right?**
10   A.    Nope.
11   **Q.    You were not given that information?**
12   A.    Nope.  We talked earlier that the only
13   person who ever told me about JP Morgan marks is
14   you.
15   **Q.    You were given information that**
16   **somebody had marked the repo collateral at 49.9**
17   **billion, correct?**
18       MS. TAGGART:  Object to form.
19   A.    Yes, we were told at some point in
20   time there was a bucket of assets to be
21   transferred to Barclays or retained by Barclays
22   that had a Lehman mark of around 49. something
23   billion dollars.
24       MR. STERN:  Let's mark as the next
25   exhibit this document.

Page 193

BURIAN

1
2    (Exhibit 466-B, document Bates stamped
3    HLHZ 35872 through 74 marked for
4    identification, as of this date.)
5    **Q.    My only question about 466-B is**
6    **whether this is a document you recall seeing?**
7    A.    I don't have a specific recollection
8    about this e-mail.  October 10?
9    **Q.    Let's take a short break.**
10       THE VIDEOGRAPHER:  The time now is
11   2:33 p.m., we are now off the record.
12       (Recess)
13       THE VIDEOGRAPHER:  This is the start
14   of tape number 4.  The time is now 2:43 p.m.
15   We are now back on the record.
16   **Q.    Let's go back to September 17, the**
17   **Wednesday I believe you testified that Houlihan**
18   **was first engaged, at least informally.  At that**
19   **point in time, did you receive the sale motion**
20   **that Weil had made?**
21   A.    At that point in time, did I receive
22   it?
23   **Q.    Yeah.**
24   A.    I already had it.
25   **Q.    You had it.  OK.  And you reviewed**

Page 194

**BURIAN**

1  that?

2  A.  I did.

3  Q.  As of that date, the 17th, were you

4  aware that Barclays had issued a press release

5  and had an analyst call concerning the

6  transaction?

7  A.  I can't tell you that I knew that the

8  17th.  I don't remember if I knew it on the

9  17th.  I don't think -- I don't know if I knew

10  it on the 17th.

11  MR. STERN:  All right, let's mark this

12  as the next exhibit.

13  (Exhibit 467-B, document Bates stamped

14  HLHZ 16856 through 57 marked for

15  identification, as of this date.)

16  Q.  I have shown you the document that we

17  have marked as 467-B, and before you take a look

18  at it, let me just tell you where I am going to

19  focus you on, then I will give you a chance to

20  review it.

21  First I am going to ask you who Ann

22  Marie Miller is.  And then I am going to

23  focus you on the first two paragraphs on page

24  1 of this exhibit and then on the second

---

Page 195

**BURIAN**

1  page, the 6th and 7th paragraph.

2  A.  OK.

3  Q.  Is this something -- well who is Ann

4  Marie Miller?

5  A.  Ann Marie Miller works for me.  She is

6  an officer, a junior officer in the group who

7  has been active in the Lehman matter.

8  Q.  Do you recall seeing this document on

9  or around September 17?

10  A.  Yeah, I -- I don't remember seeing

11  this e-mail in particular.  I'm not on it.  Are

12  you asking me about the e-mail or the press

13  release that's copied on the e-mail?

14  Q.  Well, the substance of the e-mail?

15  A.  I mean, I was in the room.  I knew --

16  I don't have a specific recollection of

17  receiving a copy of this news article.

18  Q.  OK.  Let's turn to the second page.

19  A.  Obviously Houlihan had it, Ann Marie

20  had it.

21  Q.  Yes, looking at the second page, the

22  sixth paragraph down states, "For Barclays, the

23  deal will have an immediate positive impact.

24  Expected to add to earnings in the first year

---

Page 196

**BURIAN**

1  and will provide a very high return on

2  investment, Varley said.  The deal would also

3  lift Barclays' capital ratio even before the

4  bank completes a planned capital injection

5  alongside the deal because of a negative good

6  will adjustment from the deal, amounting to

7  about 2 billion dollars after tax."

8  That information that I just read, is

9  that information that you were aware of on or

10  around September 17?

11  MR. SNOO::  Object to form.

12  A.  Not the 17th itself.  I got the -- I

13  saw either a summary or the press release itself

14  or that information about those statements

15  sometime the morning of the 18th to the 21st.  I

16  don't remember exactly when I saw this.

17  Q.  Do you recall whether you were aware

18  of this before the sale approval hearing?

19  MS. TAGGART:  Object to form.

20  A.  My memory is that I was given this

21  Saturday night, the 20th, is my best

22  recollection, but I can't be sure.  I just

23  honestly don't know.  I wasn't -- the problem is

24  I wasn't in the office and didn't have access to

---

Page 197

BURIAN

1  e-mail for an extended period of time.

2  So my -- I was in the office Friday

3  morning, but I was doing other things.  We

4  can talk about that if you want later, but

5  I -- I just -- I know I knew it, these

6  quotes.  I remember talking about knowing

7  these quotes on the 20th -- I mean on the

8  21st and I believe I got them on the night of

9  the 20th.  I don't have any firm recollection

10  before that.

11  Q.  Was the fact that Barclays had

12  announced that it anticipated a negative good

13  will adjustment of 2 billion dollars after tax

14  something that you considered at the time to be

15  a basis for objecting to the sale?

16  MS. TAGGART:  Object to form.

17  A.  A basis, that alone a basis for

18  objection?  No.

19  Q.  Let's move to the 18th of September,

20  which was a Thursday.  And I'll ask you if you

21  can tell me what meetings and conversations you

22  took part in -- that is, you personally -- on

23  that Thursday, September 18, in connection with

24  the sale transaction.

**BURIAN**

1
2    A.    "In connection" is very broad, but the
3    main thing was, we had an organizational meeting
4    at Weil where the committee advisors sat down
5    with the Weil and Lehman teams in a big room,
6    chaired by Harvey, and the purpose was, the main
7    purpose of the Weil Gotshal and Lehman teams
8    were, we know you only got retained and this is
9    your first meeting, but we have a hearing
10   tomorrow to approve the sale.  And there was a
11   clear understanding that you are not going to
12   get to do much and we are going to tell you what
13   we did and that's going to have to be enough.
14        So we spent time at that meeting going
15   through some of the history and some of the
16   details of the transaction.  We also talked
17   about other things at that meeting beyond
18   Barclays.  So that was the main opportunity
19   or meeting with representatives of the estate
20   about this transaction.
21        Obviously the transaction -- you asked
22   a very broad question.  The transaction came up
23   at other subsequent meetings either directly or
24   indirectly.
25        Q.    During the day on the 18th, let's say

**BURIAN**

1
2    from 8 a.m. to 6 p.m., were you at Weil Gotshal
3    for that entire period?
4        A.    No.
5        Q.    You were there for meetings or a
6    meeting?
7        A.    I don't know how you define "meeting."
8    In bankruptcy land, meetings sort of never end.
9    They sort of move from one to the other.
10       Q.    That's my question.
11       A.    Yeah, we met, I spoke to my guys.  We
12   met with FTI and Milbank, started comparing
13   notes of what was going on.  We had a big
14   meeting that all the estate reps came in.  I'm
15   sure we had a huddle thereafter.  And at some
16   point, you know, I left Weil and actually went
17   to Lehman itself.
18       Q.    While you were at Weil for the meeting
19   or meetings that took place there, what were you
20   told in connection with the Barclays
21   transaction?
22       A.    I can't repeat everything verbatim.  I
23   can tell you that we were given a balance sheet
24   which I have seen as an exhibit somewhere that
25   was -- that was produced by someone.  And we got

**BURIAN**

1
2    the whole speech about how the world rests on
3    this transaction closing, and the Fed, the
4    Treasury and everyone else.
5        We had a long conversation about, you
6    know, the fact that there were no
7    alternatives, and this made sense, and that
8    Barclays is getting a great deal because they
9    are getting a franchise asset, you know, of
10   the whole Lehman trading division for only
11   250 million, but it is worthless to us if we
12   don't do the deal.  So don't look in their
13   pocket, look in your own pocket.
14        We had a whole discussion about what
15   the company was trying to do to finalize
16   timing-wise and to -- what was left open to
17   negotiate and what were the hurdles to
18   closing and then we had someone walk us
19   through the economics of the securities
20   transfer.
21       Q.    Now, given your experience in
22   restructuring and in bankruptcy-related work, I
23   assume that you had existing relationships with
24   a number of people who were involved in these
25   meetings?

**BURIAN**

1
2        A.    I knew many of the people in the room.
3        Q.    You knew some of the people from Weil?
4        A.    I knew -- yes.
5        Q.    Were people from Lazard at any of
6    these meetings?
7        A.    You know, it's funny, they really
8    played, in correlation to us, a very small role.
9    I don't -- again, it is like the answer to the
10   other question about the Alvarez & Marsal
11   meeting where I said I don't remember them being
12   there, but my gosh, that's the kind of meeting
13   they would be at.  I don't know for sure.  I
14   don't recall.  I would assume they were, but I
15   don't know.
16       Q.    Did you know Barry Ridings from
17   previous work?
18       A.    Sure.  I don't remember if Barry was
19   there or not.
20       Q.    And you knew Jim Seery from prior
21   experience?
22       A.    I knew Jim Seery.
23       Q.    And on the 18th, am I right in that in
24   addition to this larger meeting, what you and
25   your team really wanted to do was to talk to Jim

Page 202

**BURIAN**

1 Seery?
2       MS. SCHAFFER: Object to form.
3       MS. TAGGART: Objection to form.
4       A.   Not to the exclusion of a lot of other
5   things.
6       Q.  I'm not saying to the exclusion of
7   other things, but wasn't one of your concerns
8   that you have an opportunity to talk to Jim?
9       A.   We weren't concerned.  We expected to
10  talk to the business people, whether it was Mark
11  Shapiro, Alex Kirk or Jim.  These people looked
12  horrible.  I mean, they looked like they hadn't
13  slept or changed their clothes in days and
14  really the question was who was available to
15  walk us through.
16      I can't tell you there was specific
17  anxiety, concern about talking to Jim.  Jim
18  was someone we knew and was someone that was
19  offered as someone that could explain to us
20  and he continued to be a contact person who
21  interacted with us.
22      Q.   Sure.  And do you recall at some point
23  writing to your team concerning the larger
24  meeting and saying this is a waste for the four

Page 203

**BURIAN**

1 of us, if Seery is available, we should talk to
2   him now?
3       A.   I remember being very frustrated at
4   that meeting because I personally tried to get
5   into details and any time we asked a detail,
6   Mark Shapiro would start answering and someone
7   would say, oh, wow, that's really interesting,
8   but that's a detail.  The big picture is we have
9   got to close this transaction.  The markets
10  depend on it.  There is no alternative.
11      And we really -- I won't say we were
12  prevented from, but it was made very, very
13  clear.  This was a 35 or 50,000-foot meeting
14  and that, you know, getting into behind the
15  numbers or details was not -- was not -- and,
16  therefore, either I wrote it or I said it or
17  I felt it, I can't be sure.  If you are
18  looking at an e-mail from me, share it with
19  me please.
20      I know that sitting in the meeting, I
21  did feel it was a waste of time and we
22  learned some interesting things and important
23  things, but we weren't getting into enough
24  detail to carry it forward.

Page 204

**BURIAN**

1       Q.   You mentioned Mark Shapiro.  You knew
2   Mark from previous experience?
3       A.   I had worked with him on one other
4   deal, at least one other deal.
5       Q.   When he got into certain details, who
6   was it who tried to shift attention away from
7   those details to larger picture issues?
8       MS. TAGGART:  Object to form,
9   mischaracterizes the testimony.
10      MS. SCHAFFER:  Object to form.
11      A.   It was, oh, you want to know about the
12  employee liabilities, we've got to follow up on
13  that.  What it really -- OK, good, let's follow
14  up on that.  It wasn't like don't tell him
15  anything.  It was there were a lot of people in
16  the room who have a lot of things they have to
17  do.  This is an organizational meeting and a
18  download and it really was Tom Roberts, Harvey,
19  maybe Barry actually may have, some point may
20  have talked about alternatives and whether there
21  were alternatives.  It was not about the
22  specific structure of the -- the details of
23  lines.
24      They did walk us through the assets

Page 205

**BURIAN**

1 and liabilities, going over, and they did,
2   similar to what Harvey did in court on
3   Wednesday, walk us through the big picture of
4   what they were accomplishing and what the
5   transaction was.
6       Q.   Who controlled the meeting agenda?
7       A.   Oh --
8       MS. TAGGART:  Object to form,
9   foundation.
10      A.   There was no question that it was --
11  that Harvey was in charge.  Mr. Miller.  Am I
12  supposed to use first names, last names?
13      Q.   That's fine.
14      A.   You all know who Harvey is.
15      Q.   Did there come a time when you and
16  your team did get to speak with Jim Seery?
17      A.   Yes.
18      Q.   And when did that occur?
19      A.   Well, I spoke to him, I spoke to him
20  at that meeting when he was there, but there was
21  a follow-up conference call that I did not
22  participate in that we sent you both handwritten
23  and typed up notes regarding -- that a subset of
24  our team was on.  I was not on that call.

Page 206

BURIAN

1
2     MR. STERN:  Let me mark the exhibit
3  and I will ask you who was on this call?
4  A.    That's fine.
5        (Exhibit 468-B, document Bates stamped
6  HLHZ 28090 through 91 marked for
7  identification, as of this date.)
8        MR. STERN:  By the way, do you have
9  the originals that we requested?
10       MR. WHITMER:  I think we do.
11       MR. STERN:  Could we take a look at
12 that.
13       (Exhibit 469-B, document Bates stamped
14 HLHZ 00001 through 0006 marked for
15 identification, as of this date.)
16       (Exhibit 470-B, document Bates stamped
17 HLHZ 16324 marked for identification, as of
18 this date.)
19       (Exhibit 471-B, document Bates stamped
20 HLHZ 16325 marked for identification, as of
21 this date.)
22       THE VIDEOGRAPHER:  The time is now
23 3:03 p.m.  We are now back on the record.
24 We went off the record at 3 p.m.
25 Q.  Mr. Burian, I have placed in front of

Page 207

BURIAN

1
2  you four related document, documents I think are
3  related, 468-B, 469B, 470B, and 471B.
4        Let me start by focusing on 468-B and
5  469-B.
6  A.  OK.
7  Q.    The notes in 469-B, whose are those
8  notes?
9  A.    I believe they are Dan Metrikin.
10 Q.    Who is Dan Metrikin?
11 A.    Dan is an analyst that works for me in
12 the New York office.
13 Q.    And these are notes of a meeting with
14 Jim Seery or call with Jim Seery?
15 A.    I believe it is notes of a conference
16 call with Jim Seery.
17 Q.    And you did not participate in that
18 call?
19 A.    I did not.
20 Q.    Who else did participate?
21 A.    I wasn't on the call.  My
22 understanding is that from Houlihan, it was
23 Mike Fazio.
24 Q.    And Dan Metrikin?
25 A.    Correct.

Page 208

BURIAN

1
2  Q.    After Mike and Dan had this call with
3  Jim Seery, did either of them report to you on
4  what they had learned?
5  A.    At some point after, yeah.  Not
6  immediately after.
7  Q.    And the typed notes, 468-B, is that
8  something that you were given around the time on
9  the 18th or the 19th?
10 A.    I don't remember if I was given the
11 written notes.  I certainly was given a summary
12 of the gist.
13 Q.    And what was the summary of the gist
14 that you got?
15 A.    The -- things had been relatively busy
16 at Lehman; that they had a Barclays deal that
17 Barclays walked away from; that they were forced
18 to file by the Fed; that they really thought,
19 Jim Seery thought there was no way that B of A
20 or the Korean Development Bank would jump back
21 in, from a timing perspective, from a risk
22 appetite perspective.
23       The discussion about, you know, what's
24 going on with respect to the book, generally
25 that the deal was cut on these numbers and

Page 209

BURIAN

1
2  that the book is holding up relatively well,
3  although a lot of concern about assets
4  disappearing, not coming back to Lehman, and
5  therefore, concern -- I could read this and
6  repeat this to you.  I'm asking you --
7  Q.    I'm not asking you to do that.
8  A.    You are asking my recollection at the
9  time of what was said, what I understood.  So
10 this is a summary, so we can go back and look at
11 the notes obviously in more detail.
12 Q.    Let me interrupt for one second
13 then --
14       MS. TAGGART:  Do you have more to say?
15 A.    I am happy to be interrupted.
16 Q.    I will interrupt and let you come back
17 to add to the summary.?
18       MS. TAGGART:  I don't know if it works
19 like that, but it sounds like he is done.
20 Q.    In this call, did Mr. Seery say
21 anything to your team about Barclays stepping
22 into the shoes of the Fed in relation to the
23 Fed's repurchase agreement?
24 A.    Without looking at the notes, I don't
25 have a recollection.

Page 210

BURIAN

1
2      Q.    OK.
3      A.    I knew that fact leading into Friday.
4  I can't tell you if I found that out, you
5  know -- exactly where I found that out or from
6  whom, you know, Thursday or Friday morning.
7      Q.    OK.  Did Mr. Seery discuss with you,
8  your team whether exchange-traded derivatives
9  would be part of the purchased assets under the
10 asset purchase agreement?
11     A.    There was confusion about -- there was
12 confusion about which derivatives was going and
13 not going and we were told both at the Thursday
14 meeting at Weil and then later at the Seery call
15 that certain derivatives were intended to go.
16     Q.    In other words, exchange-traded
17 derivatives were intended to go, but
18 over-the-counter were not?
19         MS. TAGGART:  Objection to form,
20 foundation.
21         MS. SCHAFFER:  Objection to form.
22     A.    I don't remember if the words
23 over-the-counter were ever used.  Maybe like
24 privately negotiated.  There were other phrases
25 for them.  But generally, what could be priced

Page 211

BURIAN

1
2  and traded by Barclays immediately was supposed
3  to go and the other stuff was not.  That was my
4  understanding.  I'm still not sure if that's
5  what happened, but that's my understanding.
6      Q.    Who prepared the document that we have
7  marked as 468-B, if you know?
8      A.    These notes?
9      Q.    Yes, the typed notes.
10     A.    My best of my understanding is Dan
11 typed up his notes.
12     Q.    And 469-B are his notes?
13     A.    Yeah, that's my understanding.
14     Q.    Let's look at Exhibit 470-B.  This is
15 an e-mail --
16     A.    470?
17     Q.    470.  This is an e-mail from Dan
18 Metrikin to others.  Is this e-mail, to the best
19 of your recollection, referring to the
20 conversation with Jim Seery and his notes from
21 that conversation?
22     A.    That's what it purports to say.
23     Q.    And Connor Gillen is a Houlihan
24 employee?
25     A.    No, Connor is an FTI employee.  So it

Page 212

BURIAN

1
2  looks like from this e-mail that Connor was on
3  the call and that Dan and Connor -- I mean,
4  listen, you can read this as much as I can.
5      Q.    Connor Gillen, is he, that's a
6  different Connor from Connor Tully.
7      A.    Oh, I am sorry.
8      Q.    So I'm just asking if Connor Gillen is
9  a Houlihan person if you know?
10     A.    You know, I'm -- maybe I'm nervous,
11 I'm just blacking out.
12     Q.    You're not sure.  You're not sure, OK.
13     A.    We do have an analyst named Connor
14 that works in my group.  We have many analysts.
15 I apologize.
16     Q.    No, no.
17     A.    Do you have a copy of the -- my
18 response to the interrogatories?  Can I please
19 have the list of employees that worked on the
20 Lehman matter during September and October?
21     Q.    I don't have that with me, but we can
22 dig it out.
23     A.    It is just embarrassing.
24     Q.    It is fine.  It was a minor thing.?
25         MS. TAGGART:  We can try to figure it

Page 213

BURIAN

1
2  out on a break.
3      Q.    Let's look at 471-B.
4      A.    Thank you for pointing out.  I saw
5  Connor.  I think the point is that was not
6  Connor Tully.  Sorry, what do you want me to
7  look at?
8      Q.    471-B.
9      A.    471-B.
10     Q.    Now, this is an e-mail exchange
11 between Eric Siegert and Jim Seery.
12     A.    Correct.
13     Q.    Eric and -- Eric Siegert and Jim Seery
14 knew each other from before this transaction?
15     A.    That's my understanding.
16     Q.    And did Eric participate in any of the
17 discussions with Jim Seery concerning the
18 transaction?
19     A.    I don't think so.  I don't know.  I
20 don't know of any material -- certainly nothing
21 material that came back to me.  I was told that
22 he was not on that Thursday call and he was
23 definitely not part of any of the in-person --
24 early in the morning, we talked about a couple
25 of Seery conversations.

Page 214

BURIAN

1
2      Q.   Yes.
3      A.   He was not part of those either.
4      Q.   Do you know whether Eric Siegert had
5  any separate conversations with Jim Seery about
6  the transaction?
7      A.   I have not been informed that there is
8  anything, meaning in person or by telephone.
9      Q.   By phone?
10     A.   Not by -- I mean, obviously there is
11  an e-mail here, but not --
12     Q.   Well, Siegert was not in New York
13  City?
14     A.   Correct.  Thursday he was.
15     Q.   Oh, he was?
16     A.   Thursday he was and, therefore, they
17  clearly communicated at the big Weil meeting.
18  He was at the meeting and I'm sure Eric must
19  have said something, I don't remember.  But to
20  the best of my knowledge, there was no
21  substantive follow-up diligence meeting that
22  Eric was part of.
23     Q.   OK, with Jim Seery.  All right.  So
24  this call with Jim Seery took place the evening
25  of the 18th around 9 p.m., is that right?

Page 215

BURIAN

1
2      A.   Thursday night.
3      Q.   OK.  Where were you Thursday night?
4      A.   I was at Lehman, the building -- now
5  the Barclays building.
6      Q.   745 Seventh?
7      A.   The one that is now that ugly color of
8  blue or green -- used to be green.  Now it is
9  blue.
10     Q.   What were you doing at that time?
11     A.   I was meeting with senior management
12  of Lehman focused on what else was melting down
13  outside of the Barclays transaction.
14     Q.   And what else was melting down?
15     A.   I mean, it was a very broad, long
16  conversation.  I produced my notes to you of
17  that conversation, which only doesn't even do
18  full justice, I guess, to all the details.
19         But Lehman is a, was a multinational
20  investment bank, stopped cold turkey an
21  arbitrary time and date.  There was just a
22  never ending number of issues and concerns
23  and we wanted to know what was it that
24  impacted creditors that we needed to jump on
25  to immediately to preserve and protect value.

Page 216

BURIAN

1
2      Q.   We will take a look at your notes.
3         MR. STERN:  Let's mark this as the
4  next exhibit.
5         (Exhibit 472-B, document Bates stamped
6  HLHZ 38187 through 191 marked for
7  identification, as of this date.)
8      Q.   What is the document that we have
9  marked as 472-B?
10     A.   Looks like pages of notes I took the
11  evening of the 25th through the morning of the
12  26th.
13     Q.   I am sorry, you mean the 18th--
14     A.   I am sorry, the morning -- the evening
15  of the 18th through the morning of the 19th, I
16  apologize.
17     Q.   That's OK.  Aside from these notes,
18  did you take any other notes concerning the
19  transaction at any time from the 17th through
20  the 22nd?
21     A.   I definitely remember writing things
22  down.  But they were not -- like, for instance,
23  the answer is I -- there is nothing that I have
24  or could find that I haven't given to counsel
25  and been reviewed by them.  I do have a

Page 217

BURIAN

1
2  recollection of things, but not notes like this,
3  not coherent, but for instance, the balance
4  sheet nits and jottles, but I --
5         MS. TAGGART:  I don't want to
6  misrepresent, there are -- and if it hasn't
7  been there, it will be on a privilege log
8  there have been some notes that have been
9  withheld on the privilege grounds.
10        MR. STERN:  From the 17th through the
11  27th?
12        MS. TAGGART:  Maybe, I could check the
13  dates if that's possible.  It wasn't
14  withheld because it was after that time.  It
15  was withheld because there was
16  attorney/client communications.
17     A.   I can help you go through and see what
18  dates they were from.
19     Q.   The balance sheet that you are
20  referring to, can you describe that to me?
21     A.   Can I ask someone to give it to you?
22     Q.   Sure, if you have it.
23     A.   Could someone give that exhibit that
24  was handed out at the --
25        MS. TAGGART:  It is Exhibit 19.  I

Page 218

BURIAN

1
2   don't think we have a copy of it, but that's
3   what he is talking about.
4       Q.   OK.  All right.  Looking back at
5   Exhibit 472-B, were these --
6       A.   Now these are my notes.
7       Q.   472-B?  These are your notes, this is
8   your handwriting?
9       A.   Yes.  My mother would be appalled, but
10  yes.
11      Q.   I think we can make it out.
12          Did these notes reflect more than one
13  meeting?
14      A.   These multiple pages?
15      Q.   Yes.
16      A.   Yes.
17      Q.   Can you take me through the notes and
18  tell me which sections relate to different
19  meetings if you can recall starting at the top?
20      A.   Sure, to the best of my knowledge,
21  Thursday night the 18th, first page, second
22  page, and probably, I can't be certain, but
23  probably up to where it says A/R on the third
24  page.
25      Q.   OK.

Page 219

BURIAN

1
2       A.   No, including the A/R.
3       Q.   Including the A/R, OK, and then after
4   the A/R, when would you have taken those notes?
5       A.   I believe this was early on Friday
6   morning, the -- here is the issue.  I don't
7   remember if the balance of this page and the
8   next page up to the line that goes like this --
9   with the camera, up to this line.
10      Q.   OK.
11      A.   I don't remember if that was one call
12  or a quick call, hang up, and then a call back,
13  you know, 20 minutes later.  If I had to swear
14  or guess, I think it was two, but it was such --
15  so close to each other, I don't know if it
16  matters.
17      Q.   After that line with the diamond and
18  the line through it on page 38190, the notes
19  after that, when were those taken?
20      A.   I believe that that was -- I'm not
21  sure, but I believe that that was a subsequent
22  call later in the morning on Friday before the
23  hearing.
24      Q.   The hearing was in the afternoon.
25  Could these notes have been taken in the

Page 220

BURIAN

1
2   afternoon?
3       A.   They were -- well, let me back up and
4   make it easier for you.  If you turn the page,
5   these are my contemporaneous notes of what I was
6   told, the transaction was going into the hearing
7   on Friday.  I remember being anxious and nervous
8   that I got these and I had to figure out like --
9   I missed the beginning of the hearing and I had
10  to get moving and also wanted to describe this
11  to the committee before the hearing started.
12      Q.   You're talking about page 38191?
13      A.   The last page.
14      Q.   OK, fine.
15      A.   So if you work backwards, this was the
16  final communication to me before the hearing and
17  then the one -- so now backing up, I don't
18  remember if this little bottom piece was part of
19  that same conversation, but it got so confusing
20  if I turn the page and said -- it would be like
21  me, and what I think happened is I started
22  taking notes at the bottom, trying to figure out
23  how what they are now telling me comports with
24  what they told me earlier in the day, and I said
25  forget it, switch, just tell me what was, what

Page 221

BURIAN

1
2   is, and let's ignore the previous two
3   conversations that we had because if you are
4   telling me those are all wrong anyway.
5          So let's get what was as of the
6   hearing date on Wednesday and what is as of
7   now that I am going to court.  So my point is
8   I don't remember exactly if these notes below
9   that squiggly -- not the squiggly line, the
10  arched line, were part of the previous
11  conversation or part of the next one.
12      Q.   OK, fine.  Let me just go through this
13  with you and I'm going to skip through the first
14  two pages and I'm going to start with the third
15  page which is Bates number 38189.  The bottom
16  half of that page with the X through it, do you
17  see that?
18      A.   Well, for the camera, the X and these
19  lines.
20      Q.   Yes, and we have this as an exhibit,
21  so we will be able to refer to it.
22      A.   OK.
23      Q.   The bottom half of the page, can you
24  tell me what that says?
25      A.   You want me to read my handwriting?

Page 222

BURIAN

1
2     Q.   Yes.  It looks like it says
3  L-B/something?
4     A.   S-B.
5     Q.   S-B.  What does the S-B relate to?
6  What does that mean?
7     A.   Long book/short book.
8     Q.   And then what does it say?
9     A.   50.64 B, assets; 27.4 B agencies,
10 equities, corporate.
11    Q.   And then what does it say?
12    A.   Collateralized repo of Barclays Fed
13 loan.
14    Q.   And then what does it say?
15    A.   They took all the Fed securities,
16 Corp. something or other, CDO, financing of -- I
17 think it says Corp. loan sales, but I'm not
18 sure.
19         MR. STERN:  Do we have the original of
20 these notes?
21         MR. WHITMER:  It is going to take me a
22 minute to make sure I don't have any
23 anything privileged in them.
24    Q.   What does the next line say?
25    A.   The original is not going to help you.

Page 223

BURIAN

1
2  It is my handwriting.  Do you want me to keep on
3  reading?
4     Q.   You think it says Corp. loan sales,
5  but you're not sure.  CDO --
6     A.   It says financing of, I think it says
7  Corp. loan something.
8     Q.   OK.  And then the next line, what does
9  that say it?  It looks like there is a number?
10    A.   5 billion.
11    Q.   What does that relate to?
12    A.   I don't know.  I mean --
13    Q.   Next line.
14    A.   Total extension, 45.5 billion.
15    Q.   Below that?
16    A.   Cure payments, 250, underneath an
17 arrow that says 250, good will payment, and then
18 another below that, an arrow that says, comp and
19 severance.
20    Q.   Hold on for a second.  We need to give
21 her a break.
22         So below comp and severance, what does
23 it say?
24    A.   I think it says 1.02 and then it says
25 New Jersey appraisals, 110 million shy.

Page 224

BURIAN

1
2     Q.   OK, and then next line?
3     A.   Repo 50.6, here it says million.
4     Q.   It says MM?
5     A.   MM.
6     Q.   And then below that?
7     A.   No upside in the portfolio.
8     Q.   And to the bottom left, it says 5
9  p.m.?
10    A.   Correct.
11    Q.   What is that a reference to?
12    A.   I honestly don't know.
13    Q.   And going back to the 5 billion dollar
14 figure in the middle of your notes, did you tell
15 me that you don't recall what that represents?
16    A.   We have to --
17         MS. TAGGART:  Wait, hold on, let me
18 just read that.  I was dealing with
19 originals.
20         OK, go ahead.
21    A.   You need to be more clear about the
22 question, about what I thought it represented.
23    Q.   Well, let's do it both ways.  I think
24 you read your notes under -- it says they took
25 all the Fed securities and under that, there is

Page 225

BURIAN

1
2  a figure with a dollar sign, 5B.  Do you see
3  that?
4     A.   Yup.
5     Q.   Do you know or do you remember what
6  that is a reference to?
7     A.   No.  Because -- no.
8         MS. TAGGART:  For the record, we have
9  the original of that page.  Well --
10    Q.   Do you know with whom you were
11 speaking when you took those notes?
12    A.   Yeah.  I also want to explain the
13 cross-out.  Jim Seery and Mark Shapiro, one or
14 both of them were on the phone for all three of
15 these pages.  That's where the information came
16 from on all three of these pages and --
17    Q.   In the last page --
18         MS. TAGGART:  Let him finish.
19    A.   -- and the 5 billion I think it was
20 the netting of the 50 billion to get to 45
21 billion, 45.5.  Although I honestly don't
22 remember how that correlates to 27.4 on the
23 right side.
24    Q.   Why do you think the 5 billion was
25 netting of the 50 billion to get to 45.5?

Page 226

BURIAN

1     **BURIAN**
2     A.   I don't know if I can -- I am happy to
3  explain to you the -- they were on the phone
4  rattling this off.  I didn't get a chance to ask
5  them questions.  And then as soon as they were
6  done, like there was like a lot of noise in the
7  background, like whispering or shuffling and
8  talking, and then they came back on the phone
9  and said something to the effect of, oh, my,
10  although the language was more investment
11  banking then oh, my.  That's all wrong, scratch
12  that and forget it.
13     I told you before I don't remember if
14  they said scratch that, forget it.  I turned
15  the page and then was told the top of the
16  next page or if they hung up on me and then
17  came back shortly thereafter and gave me the
18  information on the top of the page.  So this
19  was OK, Saul, here is what's going on, 50.64,
20  we got 25, 4 -- -collateralized, running
21  through the issues, and then oh, mumble,
22  mumble, mumble, noise, noise, noise, forget
23  that, scratch it.  Let me tell you what's
24  really going on.
25     I believe they hung up on me -- not

Page 227

BURIAN

1  hung up on me being nasty, I have got to go.
2  There was a lot of noise in the background
3  and bedlam and they were preparing for the
4  hearing and yada, yada, yada, but it wasn't a
5  two-way conversation where I could say, what
6  is that 5 billion, what is that, what is the
7  127.4.
8     It was write down what someone was
9  very very, very quickly, next page -- two
10  pages over is much more of me participating
11  in the conversation and saying, whoa, whoa,
12  whoa, not that page, next page, of me saying
13  I want to understand it better, I need to get
14  this right, and you need to explain this to
15  me.
16     That's why I don't want to sound like
17  an idiot, someone says what did you write
18  down, what's your recollection.  I was really
19  trying to write down as fast as I could what
20  someone was throwing at me and then they hung
21  up or said scratch it and move on.  So if you
22  look at the next page, what they said to me
23  was -- I am sorry I don't know if there is a
24  question.

Page 228

BURIAN

1     **BURIAN**
2     Q.   **What was the question?**
3     A.   What is --
4     Q.   **Let's hear the question because we are**
5  **going to be here late in the evening if you**
6  **don't answer the question.**
7     (Record read as follows:)
8     "Q:  Why do you think the 5 billion
9  was netting of the 50 billion to get to
10  45.5?"
11     A.   I don't have -- I do not have a
12  specific recollection of what that number was.
13     MR. STERN:  Can you in the record
14  reflect the question again.
15     Q.   **You believe at some point in this**
16  **conversation with Jim Seery and possibly Mark**
17  **Shapiro, that they ended the conversation?**
18     A.   Correct.
19     Q.   **And then did they call you back or did**
20  **you call them back?**
21     A.   As I said earlier, I don't remember if
22  I was on hold for a period of time and there was
23  a conversation that continued or they hung up
24  and one of us called each other back.
25     My impression was they were running

Page 229

BURIAN

1     **BURIAN**
2  from room to room or, I don't know if they
3  were Lehman or Weil, so it was hard to reach
4  them.  So I -- subject to the fact that I am
5  not 100 percent sure if there was one long
6  conversation or a separate one, I think that
7  they called me back.  I'm not 100 percent
8  sure.
9     Q.   **On this sheet that's bearing Bates**
10  **number 38189, do you recall when you crossed out**
11  **the information at the bottom half of the page?**
12     A.   During the conversation -- at the end,
13  when they said scratch that, forget it, ignore
14  that, that is all wrong, I crossed it out and
15  turned the page.
16     Q.   **When -- and you have specific**
17  **recollection that they said that is all wrong?**
18     MS. TAGGART:  Object to form,
19  argumentative.
20     A.   Absolutely -- I am sorry, absolutely.
21     Q.   **Who said that?**
22     A.   I believe it was Seery, but it could
23  have been Mark Shapiro.
24     Q.   **Do you recall whether both of them**
25  **were on that call?**

Page 230

```
1            BURIAN
2      A.  I do not recall if both were on the
3  call.
4      Q.  OK.  Do you recall whether they said
5  that all of this information that you crossed
6  out was wrong or some parts of it were wrong?
7      A.  It wasn't that specific.  It was let's
8  start all over, let's not be confused, that's
9  wrong, that's wrong, let me tell you what the
10 deal was.  As you --
11     Q.  So then you --
12         MS. TAGGART:  Wait, he is finishing.
13     A.  As you can see in the context of the
14 conversation, they came back, I was still
15 confused, and then we had the last conversation
16 before the hearing.  So this was iterative.
17     Q.  You say as you can see, but I can't
18 necessarily see that.  I am really relying on
19 your testimony and your recollection.  Because I
20 don't think it is obvious from what's on the
21 page.
22     A.  Well, what's on the --
23         MS. TAGGART:  What's the question?
24     Q.  Let's turn to the next page --
25     A.  Can I just be clear because I think
```

Page 231

```
1            BURIAN
2  the question was when did I --
3         MR. STERN:  Is something the matter?
4         MS. TAGGART:  You were making a speech
5  about your comment on his testimony.
6         MR. STERN:  I wasn't making a speech,
7  certainly not compared to your speech making
8  today.
9         MS. TAGGART:  Are you going to let me
10 to answer you questions now?  Would you like
11 to know what's the matter.
12         MR. STERN:  I have given you plenty of
13 time to make speeches.  Let's ask the next
14 question.
15         MS. TAGGART:  You ask questions and he
16 will give you the answer.
17     A.  I am answering your question.
18     Q.  You have to answer questions, OK?  It
19 is not an opportunity just to speak.?
20         MS. TAGGART:  Let's get on with a
21 question, not a little talk about this.
22     Q.  Looking at the next page, 38190, what
23 does that information reflect?
24     A.  The top half above the curved line, as
25 I previously testified, represents a telephone
```

Page 232

```
1            BURIAN
2  conversation with Lehman representatives that
3  followed them telling me to ignore the previous
4  information.
5      Q.  OK.  So above the curved line is a
6  conversation with whom?
7      A.  I believe it was Jim Seery and Mark
8  Shapiro or just Mark Shapiro.
9      Q.  And read to me these notes, so that we
10 know what they say.
11     A.  45.5 -- dollar line sign, 45.5 long,
12 all shorts closed out, I wrote in paren, maybe
13 some.  And then I crossed out at that time, the
14 maybe some.
15         Loan is at 45.5, real estate, real
16 estate, RE --- losing 100 MM.  Comp and
17 severance losing the upside in the portfolio,
18 no cash.  350 PIM broker, I can't reed what
19 the next two items are with the numbers.  I
20 know what they represent, but I'll stick to
21 answering the question and reading it to you.
22 So I can't read it, it was P, and then
23 something and then 220 and then 300.  Then
24 something else, 110 and then 1150.  And they
25 have totalling of those columns which have
```

Page 233

```
1            BURIAN
2  the 330 to 450.
3         Then 20-30-B closed out, space,
4  crossed out and beneath that is a line,
5  repo-but nothing after the dash, and then
6  below that, I believe that scrawl is
7  agencies-1 to 2.  I think it may say pass
8  through, but I'm not sure what that says,3 to
9  5 percent, Corp., 5 to 10 percent,
10 ill-liquid, empty, nothing there, space.
11         Should I stop at the line?
12     Q.  Is that when the conversation ended?
13     A.  As I said to you earlier, I wasn't
14 sure if below the line was that conversation or
15 the beginning of the next conversation when I
16 continued to be confused and insisted on not
17 relating back to things, but starting all over
18 Wednesday to Friday as opposed to interim
19 conversations that I was told don't -- that's
20 why I was not sure.
21     Q.  What would help me to understand --
22         MS. TAGGART:  I have the originals and
23 I will note there is a change in pen color,
24 so if you want to refer to that, there is
25 the original page.
```

---

Page 234

BURIAN

1                  BURIAN
2     Q.   On page 3841 --
3     A.   Am I allowed to see that, too?
4         MS. TAGGART:  Sure this is the next
5    page, but the back of it has some privilege,
6    so please don't look under that.
7     Q.   This is a separate pen.  OK.
8        So just --
9     A.   Were you asking me if that's a
10   separate pad?
11    Q.   It is a different -- on page 38191, it
12  appears from the original that that's written in
13  a different pen.
14    A.   Different pen, it is the same pad.
15    Q.   I said pen.
16    A.   Oh, yeah, OK.  I thought you said pad,
17  P-A-D.
18    Q.   So does that refresh your
19  recollection, looking at the original, that the
20  last page of this exhibit 38190 -- I am sorry,
21  38191 was written at a different time than most
22  of the blue notes on 38190?
23    A.   It doesn't refresh my recollection.
24  It is what I said now at least three times,
25  which is the last page of these notes was from

---

Page 235

BURIAN

1                  BURIAN
2  that last conversation before the hearing.  My
3  only ambiguity was on the previous page which is
4  page -- where is the squiggly line page?  Here,
5  it ended 190 and now looking at this, I notice
6  that the numbers on the right side, 47.4, 45.5,
7  2 cure, two employees is in a different color
8  pen, and that's consistent with what I said
9  before, that some portion of this page may have
10 been the beginning of the next conversation and
11 not only, you know, part of that conversation.
12    Q.   And when did the next conversation
13  take place, the conversation that's reflected on
14  38191?
15    A.   That was -- well, I have a firm
16  recollection that this conversation ended with
17  Saul, I got to go to the hearing.
18    Q.   Who said that?
19    A.   Probably I think Mark Shapiro; I got
20  to go. So this was whatever period of time that
21  the people with Mark felt he had to get there in
22  time for.  So back it up from when the hearing
23  started to when someone would have thought
24  travel was necessary, the hearing was 2 o'clock.
25  Probably 1, 1:30.

---

Page 236

BURIAN

1                  BURIAN
2    Q.   So you believe this last page reflects
3  notes of a conversation with Mark Shapiro?
4    A.   I don't remember if Jim Seery was on
5  that call or not and who else was on the call,
6  but definitely I believe Mark was on this call.
7    Q.   So this -- OK. So this last page is
8  the 19th which is a Friday?
9    A.   Correct.
10    Q.   And --
11    A.   Well, the other page is also the 19th.
12    Q.   And the previous two pages were early
13  Friday, I think you said the very beginning of
14  the notes started on the 18th?
15    A.   The top, I don't know the squiggles of
16  189, where it says 4.6, 9, 3-6, 1.5, 2. I don't
17  know when that was from.  But above that, up to
18  the A/R that we drew a line by A/R, that was
19  from the night before.
20    Q.   Now, looking at the top of page 38190,
21  where it says 45.5 long, all shorts closed out,
22  loan is at 45.5?
23    A.   Um-hm.
24    Q.   What did you understand all that to
25  mean?

---

Page 237

BURIAN

1                  BURIAN
2    A.   It was exactly what I told you
3  earlier, that it was no haircut, it was a direct
4  even-for-even match.
5    Q.   So your recollection is that you were
6  told by Jim Seery and/or Mark Shapiro that there
7  was no haircut in the repo?
8    A.   The word "haircut" never came up in
9  the conversation.  So the answer is no to that
10 question.
11    Q.   So they never told you there was no
12  haircut?
13    A.   They told me that we had a 45.5 asset
14  position against a loan of 45.5.  I then
15  deducted 45.5 from 45.5 and determined that
16  there was nothing, no value in excess of the
17  loan on my own without being told that.
18    Q.   And you're sure as you sit here today
19  that that is what they told you concerning the
20  terms of the repo?
21         MS. TAGGART:  Objection to form.
22         MS. SCHAFFER:  Objection to form.
23         MS. TAGGART:  Asked and answered.
24    A.   The terms of the repo never came up in
25  the conversation.

Page 238

BURIAN

1
2      Q.   What was this a reference to?
3      A.   I was told that it was 45.5 billion
4  dollars of assets going to Barclays against a
5  45.5 billion dollar loan from Barclays.  The
6  mechanics of Fed portfolio securities, cash,
7  noncash, all that stuff in these quick
8  conversations was irrelevant.  We were just
9  focusing on the substance of what was moving to
10  whom.
11      Q.   You say there was no discussion of
12  there being a repo?
13      A.   This was described as, right, the loan
14  was described as Barclays' loan to us which at
15  the time we thought it was a simple transaction
16  at Barclays stepping into the full amount that
17  the Fed was owed.  The -- there was no
18  discussion on the mechanics of that step in.
19      Q.   So in other words, this discussion at
20  the top of 38190, you did understand to relate
21  to the repo?
22      A.   Getting back to what I said was -- I
23  didn't give it it a second thought of whether it
24  related or didn't.  I can't tell you if I knew
25  then what I know how about the clarification

Page 239

BURIAN

1
2  letter and the mechanic for execution.  The
3  conversation was quick.  It was short.  It was
4  pressured and it was about, hey, just tell me
5  the substance of what is happening, what are we
6  giving, what are we getting.  I don't have -- we
7  didn't talk about haircuts or mechanics.
8      Q.   Did you have an opportunity to ask
9  them what the basis was for the 45.5 long figure
10  at the top of page 38190?
11      MS. TAGGART:  Object to form.
12      A.   I did later in the next page in that
13  conversation.  But at this conversation, I
14  merely wrote down what they told me.
15      Q.   What did they tell you was the basis
16  for the 45.5 long?
17      A.   I don't remember specifically if they
18  said the basis for the 45.5 is, but all the
19  conversations, these were -- I thought they were
20  the Lehman marks.
21      Q.   OK.
22      A.   And --
23      Q.   Did you have a chance to find out from
24  them how that 45.5 long on page 28190 related,
25  if it did, to the 50.64 billion dollar figure on

Page 240

BURIAN

1
2  page 38189?
3      A.   I was told that that number -- that
4  that whole thing was wrong or misunderstanding
5  of the transaction, I should rely on these
6  numbers, and then of course, they call back and
7  said this is what you should rely on.
8      Q.   I don't think that answers my
9  question.
10      A.   We didn't go back and forth comparing
11  this to the conversation they told me to listen
12      Q.   Let me ask you my question again.  Did
13  you have a chance to ask or did you ever find
14  out whether there was any relationship between
15  the 45.5 long at the top of page 38190 and the
16  50.64 at the middle of page 28189?
17      MS. TAGGART:  Objection, asked and
18  answered.
19      A.   Only in the context of the
20  conversations that revolved around -- that ended
21  in my notes on page 191.
22      Q.   And what did you find out about the
23  relationship between those two figures?
24      A.   That they were wrong.
25      Q.   Both figures were wrong?

Page 241

BURIAN

1
2      A.   No, that the 45.5 was right, but did
3  not represent a par value.  It represented a
4  mark value.
5      Q.   What did you -- what were you told the
6  45.5 represented?
7      A.   Let's back up to when?
8      Q.   During this conversation?
9      A.   On page 190?
10      Q.   Yes.
11      A.   That these were the value of the long
12  position being transferred to Barclays.
13      Q.   And do you know, did they tell you who
14  arrived at that value?
15      A.   I don't remember a specific
16  conversation about who marked the book, but the
17  understanding of the conversation was we were
18  talking a common language and that these were
19  the Lehman marks.
20      Q.   Did they explain to you what the
21  figure 50.64B on page 38189 represented?
22      A.   I am sorry?
23      Q.   Did they explain to you what the 50.64
24  billion figure on page 38189 represented?
25      A.   In the subsequent conversations?

Page 242

1            BURIAN
2      Q.   In any conversation.
3      A.   Well, as I said to you before, in that
4  very quick conversation, they said, OK, here's
5  numbers, he rattled down, we got 50.64 billion
6  of assets with 27.4 billion representing these
7  things and he ran through the numbers, I took
8  notes as quickly as I could, and then he told me
9  scratch that, it is all wrong, I'll get back to
10 you.  Or I was on hold for a while.  I don't
11 remember if it was the same conversation or
12 separate.
13           In the subsequent conversation, we did
14 not go back to that, and as I said earlier,
15 because we were so confused about what we are
16 going back to and what we are not going back
17 to, we decided to scrap all the conversations
18 and start all over on 191, just tell me what
19 the deal is.
20     Q.   That doesn't answer my question.
21     A.   I tried.
22     Q.   My question is very narrow.  Did
23 Mr. Seery or Mr. Shapiro, whoever else was in
24 this conversation with you, explain to you the
25 basis of the 50.64 billion dollar figure at the

Page 243

1            BURIAN
2  middle of page 38189?
3      A.   No.
4           MS. TAGGART:  Is this a good time for
5  a break?
6           MR. STERN:  You need a break?  OK.
7           THE VIDEOGRAPHER:  The time is now
8  3:49 p.m., we are now off the record.
9           (Recess)
10          THE VIDEOGRAPHER:  This is the start
11 of tape number 5.  The time is 4:01 p.m., we
12 are now back on the record.
13     Q.   Let me hand you an exhibit previously
14 marked as Exhibit 338-B.  And we have the
15 original of this.  Could you for the record just
16 describe the original to us?
17     A.   Can I hold it up to the camera?  Does
18 that help?
19     Q.   Sure.
20     A.   It's a -- a manila folder with -- the
21 back of the manila folder has two different
22 handwritings on it.  The predominant one is blue
23 and that's a felt-like pen or Roller Ball, and
24 then a more cheaper pen, there is a different
25 shade of blue or black that's on the center.

Page 244

1            BURIAN
2      Q.   And the different shade says the word
3  "RESIs" and there are two numbers 2.5 and 3.5
4  below it.
5      A.   Correct.
6      Q.   Can you tell us what this is?
7      A.   This is an exhibit, this is a
8  document -- how is that for a neutral phrase? --
9  that was given to me by Michael Klein early the
10 morning of the 22nd of September.
11     Q.   Are the notations on this document
12 notations that were made during the course of
13 the meeting that you had?
14     A.   Yes.
15     Q.   And tell me who was in the meeting?
16     A.   From Houlihan, it was me and Mike
17 Fazio.  I believe Lori Fife was in for the part
18 or all of the meeting but certainly Harvey
19 Miller was there for the whole meeting.  I think
20 Tom Roberts.  Maybe Krasnow, I don't remember.
21          MS. TAGGART:  Off the record for just
22 a moment.
23          THE VIDEOGRAPHER:  Off the record.
24          (Recess)
25          (Exhibit 473-B, document Bates stamped

Page 245

1            BURIAN
2  LBHI 4414 through 4415 marked for
3  identification, as of this date.)
4           (Exhibit 474-B, document Bates stamped
5  MTHM 5778 marked for identification, as of
6  this date.)
7           THE VIDEOGRAPHER:  The time is 4:07
8  p.m., we went off the record at 4:04 p.m.
9      Q.   When we went off the record, we were
10 looking at 338-B and I asked you who was in the
11 meeting and you told me from Houlihan, it was
12 you and Mike Fazio, Lori Fife for part of the
13 meeting, certainly Harvey Miller was there for
14 the whole meeting, you said you thought Tom
15 Roberts, maybe Krasnow, you didn't remember.
16 Anybody else?
17     A.   Well, Richard Klein from --
18     Q.   Michael Klein?
19     A.   Michael Klein, the Barclays
20 representative.
21     Q.   And where did the meeting take place?
22     A.   One of the smaller conference rooms on
23 the 25th floor of Weil.
24     Q.   At what point in the meeting did
25 Mr. Klein write on the Manila folder that we

Page 246

**BURIAN**

1  **have marked as Exhibit 338-B?**
2      A.   Very, very early.  It was -- when we
3  say meeting --
4      **Q.   Conversation.**
5      A.   It was very early.  I mean, that's
6  what this was about.
7      **Q.   And describe to me how the**
8  **conversation went.**
9      A.   To do that accurately, I need to give
10  you the five seconds before the conversation
11  started, because there was a --
12      **Q.   Sure.**
13      A.   So pressure is building throughout the
14  night and it is now morning.  We are hearing
15  things about the clarification letter, things
16  changing.  My guys are telling me that there is
17  this list of assets that doesn't match what we
18  have been told was going to be the deal and the
19  court, we are getting anxious and upset and
20  finally I turned to Harvey and said, we are
21  tired and we are being ignored and we are not
22  doing anything or something to that effect, we
23  need to know what is going on, what is the deal,
24  do we have a problem, is there a problem.

Page 247

BURIAN

1      And he was like, well, I don't know,
2  negotiations, yada, yada, yada.  And I say,
3  Harvey, we can't delay anymore.  We need to
4  know.  He turned, like said, wait there a
5  second, and he basically grabbed Michael and I
6  wasn't part of the conversation, but the
7  implication from the body language was I know
8  you're busy, there was a separate room where
9  Archie Cox was, a lot of other important people,
10  and my impression, he said this is something
11  that you have to make time for and I won't say
12  in an exasperated way, because he is very
13  polite, but in a time-sensitive way, he came
14  into the room and it wasn't like, hey, wait for
15  me, I am going to bring other people.  It was
16  like now is your opportunity to get information.
17      So Mike and I sat down and he came in
18  and I think Harvey may have said a preamble
19  or something like, hey, you tell us what the
20  deal is.  I believe he said us, including
21  him, he may have meant me, but he said, I
22  think he said us, I think he wanted to hear
23  it himself, and then Mike launched into what
24  purported to be the final negotiated deals,

Page 248

BURIAN

1  now 1:30 to 2:30 in the morning, and he, you
2  know, there has been a lot of confusion and
3  he said this is what happened and this is
4  what's going on, and this is why you should
5  be comfortable.  And he -- all the markings
6  on that page are his markings.  Other than me
7  writing the other print, the RESIs 2.5, 3.5.
8      **Q.   I see.  That's your handwriting.**
9      A.   That's my handwriting.
10      **Q.   And what was your basis for making**
11  **that notation?**
12      A.   It was after the conversation -- it
13  was after he finished and he handed me the
14  folder and then I asked him how does -- he
15  didn't understand the context of the whole
16  conversation, like we were doing the back first
17  I asked him how does that split, 50/50 or RESIs
18  at 2 and a half, 3 and a half, all the numbers
19  we have been reading, and as my wont, I doodled
20  "RESIs 2 and a half, 3 and a half."  And he --
21      **Q.   What did you understand that to**
22  **represent?**
23      A.   My doodle?
24      **Q.   Yes.**

Page 249

**BURIAN**

1      A.   That I had said 2 and a half, 3 and a
2  half, I wanted to understand how that correlated
3  to which assets were going or not going.  And
4  then I doodled -- I guess I figured it would be
5  somewhere in this quadrant that those would
6  belong in one of the boxes, but I --
7      **Q.   You were not sure?**
8      A.   No, I was sure what my question was,
9  explain to me in this morass why the deal was
10  50/50, why it was we had upside in some of these
11  things, how come originally in court it was
12  going to the DTC, and I think 2 and a half or 3
13  and a half was going to stay or go, those
14  details are fuzzy now in your whole explanation
15  of what the deal is, where do the RESIs fit in.
16  That is what I was saying when I doodled that on
17  the manila folder.
18      **Q.   Did you understand that Barclays was**
19  **receiving certain of the RESIs through the repo**
20  **replacement?**
21      A.   I had no idea if it was through or not
22  through.  I did know that the new deal included
23  some RESIs.  I asked how those RESIs compared to
24  other RESIs, because there were three sets of

Page 250

BURIAN

1                BURIAN
2  RESIs. It was -- at different times, there was
3  confusion in my mind of RESIs that were not
4  going to Barclays, RESIs that were going
5  Barclays, RESIs staying at DTC, RESIs that were
6  being split, and until today, I have never
7  gotten an explanation.
8      Q.  Did you know whether there are certain
9  RESIs that would be seized by JP Morgan?
10     A.  That would be subsequently seized?
11     Q.  Or had been?
12         MS. TAGGART:  Object to form,
13     foundation.
14     A.  I am sorry, what's the question?
15     Q.  Did you know whether there were
16  certain RESIs that either had been or would be
17  seized by JP Morgan?
18         MS. TAGGART:  Object to form,
19     foundation.
20     A.  Not with particularity.  I knew
21  leading up to this meeting Wednesday -- sorry,
22  Thursday and Friday hearing about how assets
23  weren't coming back and Saturday and Sunday were
24  endless meetings and wranglings, the deal is go
25  to blow up, JP Morgan won't cooperate, can't the

Page 251

BURIAN

1                BURIAN
2  Fed do something, all that stuff.  About
3  transfers from JP Morgan, I do not remember
4  whether the word "RESIs" were particularly
5  referenced in that connection.
6      Q.  So going back to the manila folder,
7  upper left quadrant, there is a notation 49.9
8  that's circled.
9      A.  The upper left is 72.68.
10     Q.  I am focusing on 49.9 and next to
11  that, it says, "Premarked."  What did you
12  understand that 49.9 figure to be?
13     A.  I have a very clear recollection.
14  The -- what was going on was we were trying to
15  understand what the deal was and when Mike told
16  us, Mr. Klein told us was, yes, you're right,
17  you have seen reports and you have seen numbers
18  that's close to 50 million dollars, and you've
19  seen -- and that basically we are getting -- we,
20  Barclays is getting -- I'm not sure 44.4 or 44.9
21  now that I am looking at it carefully, but we
22  are getting roughly 50 billion of assets with a
23  premark value --
24     Q.  Excuse me for a second.  Are you
25  saying you don't know whether this number that's

Page 252

BURIAN

1                BURIAN
2  circled --
3         MS. TAGGART:  No, no, he gets to do
4     the whole answer and then you can have a
5     clarification.  But --
6      Q.  You mentioned 44.4 or 44.9.
7         MR. STERN:  Please, Erica.
8         MS. TAGGART:  No, he gets to finish --
9     you have got a transcript.  You can ask
10    things, but he gets to answer.
11     Q.  Are you saying that figure is 49.9 or
12  44 --
13         MS. TAGGART:  No, no --
14         MR. STERN:  Please, would you stop?
15         MS. TAGGART:  No, you interrupted.  He
16    has to put his answer on the record and then
17    you can clarify anything that you want.
18         Why don't you go back to what you were
19    answering, and then you can ask the
20    clarification.  We have the whole transcript
21    you can go back to any part to get
22    clarification.
23         Why don't you keep going.
24     A.  I must admit, Erica, I am a little
25  lost.

Page 253

BURIAN

1                BURIAN
2      Q.  I think that's because your counsel is
3  interrupting.  Let me ask a question.?
4         MS. TAGGART:  Wait, wait, wait.
5         MR. STERN:  We are going to be here
6     very late tonight.
7         MS. TAGGART:  No, we are going to stop
8     it at 7.
9         MR. STERN:  No, we are not.
10        MS. TAGGART:  Do you have any more to
11    add to your answer.  Is there any more that
12    you want to add to your answer?  It is OK,
13    if you don't know and we can do a new
14    question and new answer.
15     A.  I was explaining the 49.49 premarked
16  number that's circled on the page, and then I
17  said, wow, look, the jiggle is not closed.  But
18  there is no question in my mind that that was,
19  at the time, it was 49.9 billion and that the
20  intention was that he was saying to me you're
21  right, you showed me an exhibit earlier, you're
22  right that your concern was that roughly 50
23  billion of securities, which matches up to
24  Exhibit 461-B, at the time I didn't have this.
25     Q.  You did not have 461-B?

Page 254

**BURIAN**

1      A.   Not in my hands, and as I said
2  earlier, I knew that there was confusion and we
3  were concerned about what securities were going
4  and what appeared to be a difference in the
5  valuation, in the value of what Barclays was
6  getting, and that, you know, was there a 45.5
7  billion in liabilities against 50 billion of
8  assets, and therefore, what he said to me was,
9  hey, 49.9 that you have been looking at is
10 premark.  That's stuff that relates to not
11 today's value, that's premark.
12      We asked at one point premarked as of
13 when and he says, listen, it doesn't matter
14 if it is, you know, what the date and when,
15 but I am telling you, when we came in this
16 meeting today and we are trying to close the
17 transaction, 49.9 is the old value of what it
18 was we are getting.
19      And then he said, post mark, which
20 means, which was we have lost 4 to 5 billion
21 dollars over the last period of time.
22 Markets have been, a lot of ill-liquids.  We
23 said what time period did it happen.
24 Saturday.  You know, it was like listen, you

Page 255

BURIAN

1  want an explanation of the deal, here is the
2  deal.  50 billion of assets, they have
3  dropped in value, and they are now -- we
4  agree with Lehman that these assets are worth
5  44 to 45, and therefore, you know, we were
6  short.  We are adding 1.9 billion of assets
7  that are unencumbered that were not part of
8  the repo to get to a total of what Barclays
9  is getting of 47.
10      And that is my absolute understanding
11 of the left, top left quadrant of the page
12 and that 47 is tied to -- is the final number
13 as compared to the 72 which is where what he
14 said was the original contemplation when the
15 document was originally signed.
16      Q.   I think you said that you personally
17 **did not have the information contained in 461-B**
18 **at the time of this conversation with Mr. Klein**
19 **and Mr. Miller.  Is that right?**
20      A.   That is correct.
21      Q.   **But your team -- the Houlihan team,**
22 **that is -- did have the information reflected in**
23 **Exhibit 461, is that right?**
24      A.   That is correct.

Page 256

BURIAN

1      Q.   **Did anybody from your team bring to**
2  **your attention the information in 461-B that is**
3  **summarized right under tab A?**
4      A.   Yes.
5      Q.   **Who did that?**
6      A.   It came up a number of times.  The
7  most obvious one is Mike Fazio who goaded me or
8  convinced me I need to be much more firm to get
9  an explanation of what was going on, following
10 his conversations with Seery where we were told
11 those numbers are no longer relevant and that
12 both the corpus of what was being transferred
13 may not be accurate and the value of what was
14 being transferred has degraded.
15      And therefore, that was in my mind
16 when I said in an aggressive manner, we need
17 to understand what is going on and, frankly,
18 that is also why when Michael Klein, not
19 Fazio, explained this to me, I was relieved.
20 Because it footed in a positive way, it
21 footed in a benign explanation to what it is
22 that I had been hearing from my team and
23 things were OK, as opposed to nefarious.
24      Q.   **Did you believe at the time that there**

Page 257

**BURIAN**

1  **was a certain valuation, in other words, a**
2  **valuation with certainty of the repo collateral**
3  **that Barclays had received?**
4      MS. TAGGART:  Object to form.
5      A.   When Michael said to me, Mr. Klein
6  said it was between 44 and 45, so obviously
7  that's a range.
8      Q.   **It's a range.  Did you know whether**
9  **that was a figure that reflected a valuation by**
10 **Barclays?**
11      A.   It was -- is there a rest of the
12 question?
13      Q.   **No, that was the question.  Did you**
14 **know whether that was a range that reflected a**
15 **valuation by Barclays?**
16      A.   Michael told me that there was
17 deterioration in value from the premark.  I know
18 that we were discussing all day long, they
19 appeared to be discussing all day long what
20 securities were there and what the values were.
21 The implication was that for the purposes of
22 closing the transaction, they agreed that the
23 securities were worth 44 to 45.
24      Q.   **Did that reflect a formal valuation or**

Page 258

**BURIAN**

1    **BURIAN**
2    an agreement?
3    MS. TAGGART: Object to form.
4    A.   I -- the Lehman books were either
5    ill-liquids and other things, the marking
6    process at Lehman was complicated. It wasn't a
7    formal valuation in my understanding. So I
8    can't tell you -- the distinction between a
9    valuation and an agreement is short of vague
10   because of the way in which Lehman marked their
11   books. My understanding, this was a good faith
12   number agreed upon by the parties as to the
13   value of the securities, actually tangible
14   value.
15   Q.   Did you understand it to be an
16   estimated value?
17   A.   There is a range, 44 to 45. So it has
18   got to be an estimate, right?
19   Q.   Further down on the folder, there is a
20   line that says, "Timing of 49.9." Do you see
21   that?
22   A.   I do.
23   Q.   Could you explain to me the notes that
24   appear below that?
25   A.   Do you want me to read them to you?

Page 259

BURIAN

1    BURIAN
2    Q.   Read them and then tell me what you
3    understood them to mean.
4    A.   Well, we only did the top left
5    quadrant, not the top right. But first they
6    described to me what the economic substance of
7    the transaction is and then below the line, I
8    said OK, now all the nonsense, the last two
9    days, let's talk about what the problems have
10   been and how we are actually going to effectuate
11   the transaction described above and, therefore,
12   timing of 49.9 is shorthand for how the premark
13   securities were going to move. And to make
14   things simple, I thought that all these
15   numbers -- well, since -- it says 41 to 42 of it
16   was transferred to Barcap from JPM. I think
17   that was as of Friday, but -- it says Friday, as
18   of Friday. But 8.55 was held up.
19   As you know from my affidavit, I have
20   questions about that 8.55 number. Then there
21   is an arrow there that says somehow or
22   another decided that in lieu of 8.55, that is
23   not -- that didn't make it across, that a
24   substitute 7.4 of cash for that 8.55. So on
25   a premark basis, what he was telling me is

Page 260

1    BURIAN
2    you're getting, we are taking 48.4 to 50.4 of
3    premark value and that's how this stuff
4    spread across.
5    Q.   Now, these part of the notes, did
6    Mr. Klein provide this information on his own or
7    did Mr. Miller, Harvey Miller provide some of
8    the information that Michael Klein wrote down?
9    A.   Mr. Miller didn't say a word. This is
10   all Michael Klein explaining this to me in a
11   charged environment to explain that there was
12   nothing nefarious going on.
13   Q.   So Harvey Miller, nobody else in the
14   meeting said anything relating to the 8.55 or
15   the 7.4?
16   A.   Certainly not at the beginning when
17   this was being written. This is Michael telling
18   us what the day's resolution was, Michael Klein,
19   I am sorry, I will say Mr. Klein. Whether there
20   was a subsequent conversation, I don't remember.
21   Q.   Did anyone in that conversation
22   reference a box loan that JP Morgan had made to
23   Lehman?
24   A.   Not in this conversation.
25   Q.   Now, I think you said that Mike Fazio

Page 261

1    **BURIAN**
2    had reviewed 461-B?
3    A.   What I said to you is Mike Livanos
4    reviewed it. I can't tell you how much time
5    Fazio did or did not. He certainly saw the
6    summary of the front page.
7    Q.   OK. You think that Mike Fazio saw the
8    summary?
9    A.   Definitely saw the summary.
10   Q.   OK, and the summary refers to a cash
11   line of 7 billion. Do you see that?
12   A.   I do.
13   Q.   In this meeting with Mr. Klein, did
14   Michael Fazio ask any questions about the
15   relationship between the 7.4 and the 7 billion
16   that is listed on Exhibit 461-B?
17   A.   Nope.
18   Q.   Did Mr. Fazio, during this
19   conversation, ask any questions about the
20   relationship between the total figure, the 49.9
21   billion in Exhibit 461-B and the 49.9 figure
22   that appears on Exhibit 338-B?
23   A.   No.
24   Q.   How long was the conversation in which
25   Mr. Klein wrote these notes?

Page 262

BURIAN

1
2    A.   Ten to 20 minutes, 10 to 15 minutes.
3    **Q.   And then how did the conversation end?**
4    A.   Well, I started to ask a question
5 about the RESIs and didn't get an answer.  There
6 was agitation that Michael Klein was needed
7 elsewhere.  Mike Fazio tried to have the
8 conversation about mark, when, post mark, how,
9 as of what date.  We didn't make specific
10 reference to this, but the idea was --
11    **Q.   This being 461-B?**
12    A.   Yeah, yeah.  I mean, I frankly -- and
13 maybe I was naive -- I took comfort in the fact
14 that the number footed because it showed that
15 this -- what Michael Klein said to me was
16 consistent with what I was told by my guys,
17 which is, hey, here is a list of securities
18 that purport to be part of the transfer.  It is
19 close to 50 billion dollars.  Hey, what's up,
20 when the Barclays loan is 45.5, and here I had
21 a, not only a plausible but consistent
22 explanation of the mismatch, that there was some
23 significant deterioration in value in the
24 interim.  Mike wanted to ask about that and that
25 was cut off or not included and then I know I

Page 263

BURIAN

1
2 turned to Harvey and said Harvey, are you
3 comfortable with this, is this what's going on,
4 and he said, yeah, or something to that effect.
5 You know, and then the conversation clearly
6 ended with us saying, gentlemen, or something
7 like that, if this is what's going on, this is
8 an explanation, I got it, I understand it, you
9 know, I can't diligence this, I have to trust
10 you and what you're telling me is going on.
11    But this is going on, it sounds like
12 there is a mess up with JP Morgan and the
13 values have dropped in value.  You know, we
14 don't understand why those values would have
15 dropped, but if that's where Lehman and you
16 guys are and the values dropped, we will get
17 a reconciliation and it is what it is.
18    **Q.   There is a reference here to add box
19 1.9.  What is that a reference to?**
20    A.   Again, we do need for completion --
21 because I don't think -- this part of the story
22 you're not hearing, talk about the top right
23 corner which you --
24    **Q.   I am asking about the add box, 1.9,
25 that's my question?**

Page 264

BURIAN

1
2    A.   The add box, that was basically
3 Michael Klein telling me in order to match up
4 with the right side of the page, Barclays needed
5 to be paid additional securities to balance the
6 transaction.  And therefore, we had to give him
7 that -- they had to find securities that were
8 not originally part of the Fed loan in order to
9 make up for the liabilities being assumed and
10 the deterioration in value.
11    **Q.   Now, this meeting or this conversation
12 was not the first time you had heard of that
13 asset category?**
14    A.   Of the 1.9 asset category?
15    **Q.   Yeah.**
16    A.   Oh, again, there was lack of precision
17 about numbers have been flying around, but
18 before this, I saw a clarification letter that
19 talked about assets on a B list or something.
20    **Q.   Do you recall any discussion before
21 the approval hearing concerning the clearance
22 box assets being estimated by Lehman to be worth
23 1.9 billion?**
24    A.   I think my notes have a reference
25 to -- the night, right before the hearing in the

Page 265

BURIAN

1
2 final summary of the hearing -- I am trying to
3 remember when I first heard about this.
4    But I do know that some point, whether
5 it was Friday before the hearing or it was
6 Saturday night or Sunday, that they were
7 looking for additional assets to make up for
8 the deterioration in value or the stuff that
9 JP Morgan took or that didn't show up, you
10 know, when they were trying to do the repo.
11    **Q.   You don't recall whether you were told
12 that before the hearing?**
13    A.   It is sort of like the name of the
14 analyst.
15    **Q.   You don't remember?**
16    A.   I'm a little nervous to say yes
17 because I don't have a specific recollection.
18    **Q.   Then that's fine.**
19    **Now, you wanted to tell me about the
20 upper right-hand corner of this chart,
21 Exhibit 338-B?  Did you want to tell me about
22 that?**
23    A.   I wanted to give you the context for
24 understanding how the 1.9 was used to foot to
25 the 47.  That's the reason for that.

Page 266

1              BURIAN
2     Q.   OK, was there anything else you
3  thought I should know about Exhibit 338-B?
4        MS. TAGGART:  Objection to form.
5     A.   Yeah, yeah, I think the most important
6  part of the whole conversation was the right
7  side of the balance sheet, not the left, and
8  that is Michael Klein said, hey, we are owed 45
9  and a half billion dollars, as you know, Saul,
10 the extra liabilities we are assuming on the
11 cures and employee severance is 4 and a quarter.
12 Even after taking the 1.9 billion of additional
13 securities, we are short, and this is about as
14 close to a quote as I can tell you, is you made
15 2 billion dollars this weekend.  If anything,
16 you should be happy.
17    Q.   Now, the 4.25 billion, what did you
18 understand that to be comprised of?
19    A.   There was, in some notes it is 4
20 billion, some it is 4.25, but that was described
21 as Barclays -- Barclays was supposed to --
22 whether they did or not, we can talk about if
23 you want, but at this time, my understanding was
24 Barclays was going to be responsible for paying
25 all the accrued compensation and severance

Page 267

1              BURIAN
2  liabilities of the 10 to 12,000 Lehman employees
3  that were supposed to -- that were going to go
4  over to Barclays and -- and that included the
5  severance for people who declined to go to
6  Barclays and the accrued comp for those who went
7  to Barclays and the other portion of this was
8  someone's estimate of what the cure costs were
9  for those contracts necessary to deliver the
10 franchise to Barclays.
11    Q.   OK.  On the comp portion of what you
12 just discussed, what did you understand the
13 estimate of Barclays' potential exposure to be?
14    A.   I only understood what people told me
15 and I can go look at the balance sheet that's
16 Exhibit 19, if it was 2 or 225, one of them had
17 a 25 at the end.  Whether it was the cure or the
18 severance, but so someone -- I was told that
19 that number was either 2 billion or 2.25
20 billion, was the assumed liabilities in respect
21 of employees.
22    Q.   You had the APA though, didn't you?
23    A.   Sure.
24    Q.   And you -- did you read the APA on,
25 provisions on compensation and severance for

Page 268

1              BURIAN
2  transferred employees?
3     A.   I did.
4     Q.   And from that, did you understand what
5  Barclays' potential exposure was?
6     A.   No.
7     Q.   Nobody gave you an estimate?
8     A.   I just told you what the estimate was
9  and then you asked me if I got it from the APA.
10 The APA has words, it says I am picking up
11 liabilities.  I got the estimate from Weil and
12 Lehman and at the court hearings.  I didn't get
13 that from the APA.  I don't believe the APA has
14 a number.
15    Q.   But you had access to the APA?
16    A.   I had more than access to the APA.  I
17 had a copy of the APA.
18    Q.   And with respect to cure payments, did
19 you understand that under Section 2.5 of the
20 APA, Barclays had discretion concerning which
21 contracts it would and would not assume?
22        MS. TAGGART:  Objection, form, calls
23    for a legal conclusion.  The document speaks
24    for itself.
25    A.   I understood that Barclays had the

Page 269

1              BURIAN
2  right to cherry-pick those contracts necessary
3  for the operation of the Business, capital B.
4        My comment earlier was not about cure,
5  it was about the severance and accrued comp,
6  not about the cure.
7     Q.   What did you understand Weil Gotshal
8  to have told the court concerning Barclays'
9  exposure with respect to cure payments?
10        MS. TAGGART:  Object to form.
11        MS. SCHAFFER:  Objection.
12    A.   Again, at the hearings I was at, you
13 know, I don't remember particularly every single
14 reference.  I can tell you that my understanding
15 at the time was that the liabilities that
16 Barclays -- that Barclays was going to assume
17 the cure, severance, and accrued comp of the
18 Lehman employees.
19    Q.   Did you understand that there was some
20 uncertainty concerning the actual cure payments
21 that Barclays would ultimately make?
22        MS. TAGGART:  Object to form,
23    foundation.
24    A.   Sure.  I understood that there was
25 still open as to which contracts Barclays would

Page 270

BURIAN

1 take.
2    Q.   And did you or did anybody on your
3 team review the list of closing date contracts
4 that were filed on September 18?
5    A.   I don't have a firm recollection on
6 that topic.
7    Q.   You don't recall whether anybody on
8 your team looked at that list and added up the
9 cure amounts that were on that list?
10    A.   I don't know for sure if someone
11 mechanically added up the -- the cure was
12 discussed and we moved on pretty quickly from
13 that issue.
14    Q.   Let's go back to Friday before the
15 approval hearing.  Let me give you what we have
16 marked as Exhibit 473-B.
17    A.   Is this a.m. or p.m.?
18    Q.   Well, it is -- I think it is 20
19 minutes after midnight on the 19th.  Because it
20 is GMT time.  So you should subtract four hours.
21    I want to first ask you if this is
22 something you have seen before?
23    A.   Never saw this before.  Well, I don't
24 recall seeing this before.

Page 271

BURIAN

1    It says, "Please see questions below
2 from Houlihan," and then you see there is a list
3 of questions.
4    A.   Yes, do you want me to read them.
5    Q.   No, I am asking you if you see that
6 there is a list of questions here.
7    A.   Yes, I see a list of 1 through 19.
8    Q.   Do you know who prepared that list?
9    A.   I do not.
10    Q.   Do you know whether anybody from
11 Houlihan followed up with Lehman on some or all
12 of the questions that were listed here?
13    A.   You are making it sound like this is a
14 Houlihan list as opposed to Jackie Marcus taking
15 notes in a meeting and saying here, here are the
16 things that Houlihan wants to know.  And I can't
17 make that assumption.
18    Q.   OK, all right, so this may be a list
19 that Jackie Marcus prepared based on
20 conversations with Houlihan?
21    A.   Yeah, I mean, again, we are not -- I'm
22 not supposed to guess in a deposition.
23    Q.   But that's --
24    A.   Typically if there is a Houlihan list,

Page 272

BURIAN

1 we probably would have e-mailed it to her and
2 she would have forwarded it as opposed to this
3 looks like it has been typed into the body of
4 the e-mail itself.
5    Q.   OK.  Let me show you Exhibit 474-B.
6 Unfortunately, this is a difficult document to
7 read, but this is the way it was produced to us.
8 Now, do you see at the top that you are copied
9 or you are sent an e-mail with a list of e-mails
10 below it?
11    A.   I do.
12    Q.   Do you recall receiving this e-mail?
13    A.   I don't recall specifically receiving
14 this e-mail.  I read it and I don't -- I'm not
15 going to question or debate that I got it.  I
16 don't specifically remember the e-mail.
17    Q.   All right, let me start at the bottom
18 and I'll just read the bottom e-mail which is
19 September 19, 8:51 a.m. and it looks like it is
20 an e-mail from somebody at Goldman Sachs to
21 Danny Golden.  Who is Danny Golden?
22    A.   Danny is a partner at Akin Gump, the
23 law firm.
24    Q.   And he represented bond holders in

Page 273

BURIAN

1 connection with the Lehman bankruptcy?
2    A.   He represented an ad hoc group of
3 Lehman creditors.  I read it.  I just quickly
4 read it, if you want to save the time of
5 reading.
6    Q.   I'm happy to read it.  It says,
7 "Danny, details of our argument are that the
8 estate should only be authorized to sell
9 Barclays those assets which are necessary to
10 obtain the U.S. investment banking and
11 broker/dealer business.  The proposed sale goes
12 way beyond this in that it allows Barclays to
13 cherry-pick owned inventory, investment and
14 other assets at windfall discount to FMV.  The
15 discount is at least several billion dollars."
16    Now, is that a statement that you were
17 aware of before the approval hearing?
18    A.   I don't recollect whether I
19 specifically read that statement.  I was aware
20 of chatter, as there is in every bankruptcy
21 sale, about people who are not informed of
22 what's going on, worried that Barclays was
23 getting a good deal in a variety of respects.
24 11 o'clock in the morning, you know, as I

Page 274

BURIAN

1    testified earlier, there are at least two,
2    probably three conversations with Barclays -- I
3    mean with Lehman about this topic.  And there
4    are clear mistakes in the e-mail about how the
5    transaction was structured, and typically, while
6    it is interesting to hear the uninformed market,
7    what I rely on is my access, my diligence, and
8    the information I get directly from the horses'
9    mouth and my understanding of the transaction,
10   directly.
11        So yeah, I heard from Danny in court,
12   out of court or at some time, maybe I read
13   this, maybe I didn't.  I knew generally that
14   there was a concern just like there was a
15   concern about whether it was Barclays taking
16   over European businesses.  I mean, this is
17   just one of many rumors or concerns about
18   what was going on worldwide in Lehman.  That
19   creditors brought up.
20        **Q.   And you did not attach much weight to**
21   **it?**
22        MS. TAGGART:  Object to form.
23        A.   It is not about attaching much weight
24   about it.  But the deal never was that Barclays

Page 275

BURIAN

1    was only getting what was the minimum necessary
2    to run the U.S. I-B business.
3        The deal, as I was explained in the
4    conference rooms, were that there was going
5    to be a balanced exchange of the owned
6    securities to match against, you know, the
7    liabilities, and frankly, that was a positive
8    for us, not a negative, because we were a
9    bankrupt estate.  We wouldn't be able to
10   manage the book or hedge against the book.
11   So the premise was wrong.
12        So when you are looking at that, hey,
13   in retrospect, he may be dead on, but at the
14   time, I would have, A, been very, very busy
15   and not sleeping and I was probably on the
16   phone with either the committee or trying to
17   reach the Lehman folks, Mark Shapiro, et
18   cetera.  So this is not something that would
19   be like a hold-your-horses, material moment.
20        **Q.   You referred to a balanced exchange of**
21   **assets and liabilities.  Does that mean the**
22   **assets would equal the liabilities?**
23        A.   Other than Michael telling me I made 2
24   billion dollars at the end, and I have asked

Page 276

BURIAN

1    twice for that exhibit which I know you have, I
2    think Exhibit 19 from the Weil meeting, what was
3    described to us was we are selling the franchise
4    cheaply for 250 million and we all recognize
5    that was -- people thought that was a great deal
6    for the franchise and we are selling the
7    buildings for fair value.
8        But when it came to the securities
9    being transferred, the tradeable book, that
10   that was a 100 percent balanced transaction
11   against the liabilities against the book,
12   plus the assumptions of cure, severance,
13   and -- cure, severance and accrued
14   compensation.  There is no question that's
15   the way it was described.  And that's what
16   Michael was addressing at that meeting when
17   he went back to it that night.
18        **Q.   So you made a comment that Michael is**
19   **telling me I made 2 billion dollars.  What does**
20   **that mean?**
21        A.   What it means is when --
22        **Q.   Who is the "I" in Michael telling me I**
23   **made 2 billion dollars, who is the I?**
24        A.   Being facetious, I am, the creditors

Page 277

BURIAN

1    of Lehman.  I am the embodiment of the creditors
2    of Lehman.
3        **Q.   Oh, in other words, he is saying the**
4    **creditors made 2 billion.**
5        A.   The estate, we are up, we did well.
6        **Q.   Now, going back to the assets, the**
7    **purchased assets --**
8        A.   You asked a question about what I
9    think he meant when he said that I made 2
10   billion dollars which is what I reached for this
11   to explain.
12        **Q.   I think you answered it.  My question**
13   **was who was the "I" he was referring to.?**
14        MS. TAGGART:  Hold on, let me see.
15        A.   Can you read that back, I don't know
16   if I answered that.
17        MS. TAGGART:  OK, there is a pending
18   question.  "So you made a comment that
19   Michael telling me I made 2 billion dollars,
20   what does that mean?"
21        Do you want to -- is there any more
22   that you would like to answer on that
23   question?
24        A.   I don't think I was finished.  You

Page 278

BURIAN

1    interrupted when you said who is the I. I think
2    I could be wrong.
3        But that the 2 billion I made was I
4    was told golly, gee whiz, they are getting 44
5    to 45 in securities plus the 1.9 for a total
6    of approximately 46 to 47. He rounded it up
7    to 47, but they are taking 49.75 billion of
8    liabilities and it is no longer in balance.
9    I made 2 billion bucks over the weekend. And
10   that is all there is. That's what the value
11   is and Barclays is going -- not do me a
12   favor, but Barclays is going to close and
13   this is what the deal now is. So that's what
14   the conversation about the I as in the
15   creditors made money.
16       Q.   In other words, assuming those
17   estimated figures were accurate?
18       A.   No.
19           MS. TAGGART:  Object to form,
20   misstates the testimony.
21       A.   No, being told these are the figures
22   upon which the closing is going to proceed and
23   all that's left going on is lawyers documenting
24   being told this is the deal.

Page 279

BURIAN

1        Q.   Sir, you did not understand that the
2    figures were estimates?
3            MS. TAGGART:  Objection to form and
4    argumentative.
5        A.   You did not say that before. Yes, I
6    knew it was 44 to 45. So I made approximately 2
7    billion over the weekend.
8        Q.   Did you --
9        A.   But the corpus of securities were now
10   nailed down and their value was 44 to 45
11   billion.
12       Q.   Did you understand that both on the
13   asset side and the liability side, the figures
14   Mr. Klein and others discussed with you were
15   estimates?
16       A.   Let's take that compound question. On
17   the liability side, no. I thought that 45
18   was -- 45.5 was as consistent as a number gets
19   throughout this whole thing. And therefore,
20   that was the balance of a loan. That did not
21   appear to be an estimate, other than, other than
22   as a rounding, right, because I doubt it was
23   exactly 45.5 with no cents. But it was not a
24   number that was moving or subject to change. It

Page 280

BURIAN

1    was a rounding of a number.
2        The 4.25 was always consistent of what
3    the -- I was told the cure -- not the cure.
4    The severance and the accrued comp came off
5    Lehman's books and records as what they
6    accrued on their balance sheet. So that was
7    the Lehman number for what was the liability.
8        I don't know if the camera can see the
9    expression on the face because you are making
10   it hard --
11       Q.   Did you --
12       A.   I don't know if the camera can see,
13   you are making a lot of funny faces and I'm not
14   done answering the question.
15       Q.   When you finish, I am going to follow
16   up with a question because I found your
17   testimony incredible.
18           MS. TAGGART:  No, no, no, you are not
19   testifying about his testimony.
20       Why don't you answer --
21       Q.   Go ahead.
22       A.   That's fine, I am telling you what I
23   thought in the room at the time and why --
24       Q.   What question are you answering?  What

Page 281

BURIAN

1    is my question?
2            MS. TAGGART:  Wait, wait, he will just
3    answer the question that's fending.
4        Q.   I want to find out, do you know what
5    my question is?
6            MS. TAGGART:  You can ask that after
7    he answers the question.
8            MR. STERN:  I am entitled to know if
9    the witness is answering my question.
10           MS. TAGGART:  You can read the
11   question back next.
12       Q.   Sir, do you know what question you are
13   answering?
14           MS. TAGGART:  Why don't you read back
15   the last question.
16       Q.   No, no, no. Mr. Burian, do you know
17   what question you are answering?
18           MS. TAGGART:  Don't answer that. You
19   don't have to answer that.
20       Q.   What is the question?
21           MS. TAGGART:  If we have a question
22   about --
23       Q.   What is the question you are
24   answering?

Page 282

**BURIAN**

1
2    MS. TAGGART:  If we have a question
3    about what question is pending, let's go to
4    the court reporter.  You don't have to --
5    just don't answer that.
6    **Q.  What question are you answering now?**
7    MS. TAGGART:  Don't answer it.
8    **Q.  The question is whether you understood**
9    **that the liabilities were estimates.  You told**
10   **me about the 45 or the 45.5.  Now, on the 4.25,**
11   **didn't you understand, based on what Weil**
12   **Gotshal told the court, that those were**
13   **estimates?**
14   MS. TAGGART:  Objection to form, asked
15   and answered.  Argumentative.
16   But if you want to answer, you can go
17   ahead and answer that question.
18   A.   Your question related to assets and
19   liabilities.  And I directed you to liabilities.
20   **Q.  What is the question I am asking now,**
21   **what is the question I am asking now?**
22   A.   So therefore --
23   **Q.  Let's have the question reread.**
24   A.   On the liability side.
25   **Q.  Let's have the question reread?**

Page 283

**BURIAN**

1
2    MS. TAGGART:  He is answering the
3    question that you had.
4    **Q.  You are not answering the question.**
5    **My question was very clear.  Could you please**
6    **reread it.  I didn't use the word "assets"?**
7    A.   The first time or the second time?
8    **Q.  Listen to the question that has just**
9    **been asked.?**
10   MS. TAGGART:  We are going to take a
11   break after this one.
12   (Record read)
13   A.   As I was saying, the balance sheet
14   number, the employee-related obligations, was --
15   however accountants accrue for that stuff.  So I
16   guess if you are saying that accrual was an
17   estimate, that's fine, but it was a firm number
18   off what the balance sheet said the liabilities
19   were as accrued by Lehman.
20   On the cure amounts, obviously, it
21   depended on which contracts were taken and
22   subject to negotiation with third parties as
23   to how much they think they were owed.  So
24   with respect to the liability side, the
25   preponderance of the number, my understanding

Page 284

**BURIAN**

1
2    was was a rounding number.  The 45.5 was
3    pretty firm.  On the extra liabilities side,
4    I understood that this was a consistent
5    number throughout that had whatever weight
6    you want to give the source of that
7    information.
8    MS. TAGGART:  OK, let's take a break.
9    MR. STERN:  Let me finish this line of
10   questions.
11   MS. TAGGART:  No, I don't like -- we
12   are taking a break.
13   MR. STERN:  When you are taking
14   depositions, we finish lines of questions.
15   MS. TAGGART:  We are still going to
16   count it by the video record.  This won't
17   count against you.  It is still going to be
18   seven video, but we need to take a break.
19   MR. STERN:  Let me finish the line of
20   the questions.
21   MS. TAGGART:  You get to ask your
22   question -- I don't like the whole temper
23   of the room.
24   MR. STERN:  Let's continue with this
25   line of questions, please.

Page 285

**BURIAN**

1
2    MS. TAGGART:  No, go off the record.
3    MR. STERN:  I am entitled to finish my
4    line of questions?
5    MS. TAGGART:  You are entitled to
6    finish your question.  I let him answer your
7    question.  Now we are going to take a break.
8    Let's go.  Would you, please.
9    THE WITNESS:  Fine.
10   MR. STERN:  Are we still on the
11   record?
12   MS. TAGGART:  No, we are off the
13   record.  If you want to count the time
14   against your seven hours, we will stay on
15   the record.
16   MR. STERN:  I want to state on the
17   record that during this break, I don't want
18   you discussing this area of questioning with
19   the witness.
20   MS. TAGGART:  We won't talk anything
21   about the substance of the testimony.
22   THE WITNESS:  Do you want me to stay
23   in here?
24   MS. TAGGART:  No, I want you to come
25   with me.

Page 286

1                 BURIAN
2          THE VIDEOGRAPHER:  The time is now
3    4:57 p.m., we are now off the record.
4          (Recess)
5          THE VIDEOGRAPHER:  This is the start
6    of tape number 6.  The time is now 5:10 p.m.
7    we are now back on the record.
8      **Q.    We were on the subject of whether**
9    **there was a balance in the transaction between**
10   **assets and liabilities.  Was it your**
11   **understanding prior to the closing that there**
12   **would be perfect, equivalent, mathematical**
13   **balance between purchased assets and assumed**
14   **liabilities?**
15     A.  I'm struggling with the word "perfect
16   mathematical balance."  And I don't know if
17   there is a special meaning your attaching to
18   that term.  And certainly there was not a
19   balance with respect to the 250 million for the
20   franchise.
21          We believed and we still believe the
22   franchise was worth more than that.  But I
23   did believe that when it came to the
24   securities side and either the set-off or the
25   repo, plus the liabilities assumed in respect

Page 287

1                 BURIAN
2    of employees and cures, that the intent of
3    the transaction was that, based on the
4    estimates as of closing, they would be in
5    balance.
6      **Q.    So that view is limited to the**
7    **tradeable financial assets?**
8          MS. TAGGART:  Object to form,
9    mischaracterizes the testimony.
10     A.   Yeah, tradeable -- some of these
11   stocks were ill-liquids, they didn't trade much.
12   But when you talk about the kind of things you
13   find on Exhibits A and B, the securities, the --
14   they were supposed to -- I will get yelled at
15   for not answering the question, so I am trying
16   to be very, very careful to answer exactly the
17   question.
18          So my understanding was that the other
19   parts of the transaction were what they were,
20   but vis-a-vis the Fed and then Barclays
21   liabilities plus those assumed liabilities I
22   referred to, they were supposed to match the
23   assets, and net, net, net, what this
24   transaction was about, was getting rid of the
25   book, which is supposed to be a benefit to

Page 288

1                 BURIAN
2    us, and selling the real estate.
3          You could argue whether that was pure
4    balance on the real estate, the appraisals
5    were what they were, and I'm not challenging
6    those appraisals, and then 250 for the
7    franchise which that franchise could be worth
8    more or less.  So there was no balance there.
9      **Q.    OK. And you understood that there**
10   **were a number of additional purchased assets in**
11   **addition to the securities, correct?**
12          MS. SCHAFFER:  Objection.
13     A.   There was a real estate, yes, there
14   was the real estate and assets associated with
15   the business, the franchise.
16     **Q.    And the list of purchased assets that**
17   **we went through earlier today?**
18          MS. TAGGART:  Object to form.
19     A.   I don't know if you are saying that as
20   in addition to what I said or as further
21   clarification to what I said because most of the
22   list of assets and purchased assets relate to
23   lawyers being careful in my understanding to
24   define what is the franchise being transferred
25   for 250 million dollars.

Page 289

1                 BURIAN
2      **Q.    You did not have a definite valuation**
3    **for all purchased assets in the aggregate as of**
4    **the closing, is that right?**
5      A.   Yes.
6      **Q.    You did not have a definite valuation**
7    **of all the assumed liabilities in the aggregate**
8    **as of the closing, is that correct?**
9      A.   Define valuation.  We had -- we,
10   again, 45.5 doesn't require a valuation.  It is
11   a number I'm told.  There is a loan.  The
12   balance is rounded to approximately 45.5, that's
13   a number.  It is not a valuation.
14          So I had that and I had on the other
15   liabilities, I had a description of how they
16   were derived.  One wouldn't value those
17   liabilities.  One would describe them and would
18   perhaps, using your words from before, provide
19   the estimate of them.
20     **Q.    So you did not have a definite**
21   **valuation of all the assumed liabilities in the**
22   **aggregate as of the closing?**
23          MS. TAGGART:  Object to form, asked
24   and answered.
25     **Q.    Am I right about that?**

Page 290

**BURIAN**

1
2      A.   I did not know at the closing which
3   contracts you were going to take.  I did not
4   know at the closing the precise exact number of
5   what the severance and accrued comp was for
6   employees.  I didn't know if an employee might
7   have died between Saturday and Monday.  I just
8   didn't know that.
9      **Q.   In other words, there were conditions**
10  **that might bear on the amounts ultimately paid**
11  **for comp and severance?**
12     A.   On the comp and severance side, sure.
13     **Q.   If you look at your copy of the APA**
14  **which is in front of you tab A of Exhibit 92.**
15     A.   Exhibit 92.
16     **Q.   This is the exhibit you have in front**
17  **of you, I am sorry, Exhibit 26.  Exhibit 26.**
18  **Looking at Exhibit 26, tab A, page 11, do you**
19  **see there under Section 2.3, there is a list of**
20  **assumed liabilities.**
21     A.   There are.
22     **Q.   Did you have a valuation for the**
23  **assumed liabilities listed under categories A,**
24  **B, D, E, and F?**
25     A.   You said A, I was reading A, what --

Page 291

BURIAN

1
2      **Q.   B, D, E, and F.  My question is**
3   **whether you had a valuation or an estimated**
4   **valuation for those categories as of the**
5   **closing?**
6      A.   No.
7      **Q.   And looking at the next page, looking**
8   **at categories G and H, did you have a valuation**
9   **or an estimated valuation for those categories**
10  **of assumed liabilities?**
11     A.   Not a specific valuation, no.
12        MR. STERN:  Let's mark as the next
13     exhibit e-mail dated September 19, 2008.
14        (Exhibit 475-B, e-mail dated September
15     19, 2008 marked for identification, as of
16     this date.)
17     **Q.   I have put in front of you Exhibit**
18  **475-B.  I will ask you to look at it and tell me**
19  **if you recognize it?**
20     A.   I do not.  I recognize it is an e-mail
21  from Barry Ridings to Mark Shapiro.
22     **Q.   That's the e-mail at the top and then**
23  **below that, there is an e-mail from Eric Siegert**
24  **to Barry Ridings copying you.  Do you see that?**
25     A.   Yup.

Page 292

BURIAN

1
2      **Q.   Mr. Siegert writes, and this is as of**
3   **September 19, I believe it is listed as**
4   **Minneapolis, so I believe in New York, it's**
5   **about 10:11 a.m.  Mr. Siegert writes, how did**
6   **the Fed actions --**
7      A.   Minneapolis is one-hour difference?
8      **Q.   Is it one or two?**
9      A.   I think it is one, right?
10     **Q.   In any event, it is 8:11 a.m. in**
11  **Minneapolis.  And Mr. Siegert writes, "How did**
12  **the Fed actions potentially impact the value of**
13  **the book.  Will Barclays maybe get a windfall**
14  **selling our marked down book at some stupid**
15  **price to the Feds.  We can't let that happen."**
16     **Do you recall seeing that message from**
17  **Mr. Siegert to Mr. Ridings?**
18     A.   I remember talking about this issue.
19  I don't remember this particular e-mail.
20     **Q.   What was the issue that this e-mail**
21  **addresses?**
22     A.   I mean, shortly after the Fed let --
23  after the government let Lehman fail, they
24  announced a rescue package of some sort that
25  allowed a modification to the program under

Page 293

BURIAN

1
2   which real estate and other types of securities
3   could be borrowed against to preserve liquidity
4   in the system and the question was whether or
5   not there was -- whether or not that change in
6   the Fed -- the first step was whether or not we
7   were eligible for the Fed program because did
8   we -- could we get liquidity and preserve the
9   value of the assets that way.
10        And secondly, whether there was a
11  quick flip going on where we were going to
12  give assets based on Lehman's marks of value,
13  but then the government program would ascribe
14  higher values for the purposes of collateral
15  to those same exact securities.
16     **Q.   And when Mr. Siegert referred to our**
17  **marked down book, what do you understand he was**
18  **referring to?**
19        MS. TAGGART:  Objection, foundation.
20     A.   He was -- I believe he was referring
21  to "our" as in Lehman, we take our -- we take
22  things personally, and we were told that values
23  had been dropping over the four to nine weeks
24  prior to the sales transaction, and therefore,
25  the assumption was that fair market value was

Page 294

```
                    BURIAN
1
2   marked down over a period of time based on
3   drop -- concerns in the marketplace about Bear
4   Stearns, Lehman, Merrill Lynch.
5       Q.   Whose assumption was that?
6       A.   I can't go into every person that
7   assumed that.  I think it was a fact that there
8   was a lot of concern in the financial community
9   about investment banks and that going into the
10  Lehman filing, there was a -- my recollection is
11  there was a period of time where real estate and
12  structured vehicle securities were becoming less
13  liquid and, therefore, being priced at a lower
14  rate.
15      MS. TAGGART:  Can you say who produced
16  this document?  There is not a Bates number
17  on it.
18      MR. STERN:  We will have to get back
19  to you on that.  It may be that it's a
20  Lehman -- it is -- Mark Shapiro is copied on
21  it.  It may simply be a Lehman e-mail that
22  was not produced.
23      MS. TAGGART:  I guess we will take
24  this up after.
25      MR. STERN:  It is not a controversial
```

Page 295

```
                    BURIAN
1
2   issue.
3       Let's mark this as the next exhibit.
4       (Exhibit 476-B, document Bates stamped
5   HLHZ 9125 through 9144 marked for
6   identification, as of this date.)
7       Q.   This will be 476-B.
8       A.   This whole thing?
9       Q.   Yes.  I'll ask you if you can, to
10  identify what this document is.
11      A.   The front page appears to be an e-mail
12  from Ed Gilbert to a variety of people,
13  including me.  Someone help me out here, yes,
14  including me.  Including me.
15      Q.   Yes.  And there is an attachment, if
16  you look at the page ending with the Bates
17  numbers 9127, do you recognize that document?
18      A.   I do.
19      Q.   And what is it?
20      A.   This is the transcript of the Barclays
21  investor call or, you know, public call
22  regarding the Lehman transaction.
23      MR. STERN:  Let's mark as the next
24  exhibit this document.
25      (Exhibit 477-B, document Bates stamped
```

Page 296

```
                    BURIAN
1
2   CMTE 911 marked for identification, as of
3   this date.)
4       Q.   This will be 477-B.  Looking at
5   Exhibit 477-B.  Can you tell me if this is a
6   document you have ever seen before?
7       A.   This is the one pager?
8       Q.   Yes.
9       A.   It does not look familiar to me.
10      Q.   The bottom of the text, it says,
11  "Subject: Barclays investor call transcript
12  from Wednesday where they described how great
13  the Lehman buy is; 2 billion dollars negative
14  good will after tax," or minus 2 billion good
15  will after tax, it says.
16      Then above that, there is a note from
17  Ed Gilbert.  Who is Ed Gilbert?
18      A.   Ed Gilbert is a member of the
19  creditors committee, the representative of
20  Shinsei Bank on the creditors committee.
21      Q.   He says, "We will make sure this
22  information is considered in the Lehman
23  proceeding."  Do you see that?
24      A.   I do.
25      Q.   Do you know whether this
```

Page 297

```
                    BURIAN
1
2   information -- namely, how Barclays described
3   how great the Lehman buy is -- is something that
4   the committee felt should be considered in the
5   Lehman proceeding?
6       MS. TAGGART:  Object to form,
7   foundation.  As described, I think
8   privileged, so I'll instruct not to answer.
9       MR. STERN:  Let's move on.  This
10  document.
11      (Exhibit 478-B, document Bates stamped
12  CMTE 2527 through 278 marked for
13  identification, as of this date.)
14      A.   Should I put this one aside?
15      Q.   Yeah.
16      A.   We never talked about it.
17      Q.   Yes, we did, briefly.
18      Looking at Exhibit 478-B, this appears
19  to be an e-mail at the top from L. Edward
20  Gilbert to J. Becker.  Who is Julie Becker?
21      A.   Julie Becker is a representative on
22  the creditors committee from Wilmington.
23      Q.   At the bottom, she says, "Thanks much
24  for sharing this transcript," referring to the
25  transcript we looked at in 476-B, and then above
```

Page 298

BURIAN

1  he says, "Interesting to understand what a
2  bargain Barclays thinks it has."
3       And my question is, at any time before
4  the sale approval hearing or after the sale
5  approval hearing, did the committee believe
6  that the acquisition gain that Barclays
7  anticipated was a basis to object to the
8  transaction?
9       MS. TAGGART: I am going to object to
10  form and also for calling for privileged
11  communications and instruct not to answer.
12  Q.   Did the committee ever have a view --
13  withdrawn.
14       Did you ever have an opinion one way
15  or the other concerning whether the
16  anticipated gain that Barclays announced on
17  September 17, 2008, was a basis for the
18  committee to object to the sale?
19  A.   I got the transcript as you saw on
20  Sunday. After the transaction was approved.
21  And we were in effectuation mode, not objection
22  mode. The judge had signed an order.
23       So the context of your question about
24  objecting isn't really relevant. The idea

Page 299

BURIAN

1  that Barclays had said that they are going to
2  book a profit on the transaction was
3  extremely troubling and it was together with
4  the other stuff we talked about, Fazio and
5  Geer's review of those schedules that
6  prompted me to demand that we get a full
7  understanding and update as to what, exactly
8  what was being transferred and at what values
9  to whom. And that's why I was so aggressive
10  in demanding that we have that meeting.
11  Q.   OK. Houlihan was aware, as of
12  September 17, was it not, that Barclays had
13  announced on September 17 that it anticipated
14  booking a profit on the transaction?
15  A.   I told you earlier I'm not sure if I
16  knew about it or we knew about on the 17th or
17  18th because we got retained the night of the
18  17th and we were not -- I was not at my own
19  office. We were awaiting our turn to interview
20  until very late. So as you said earlier, I
21  don't know if I knew about that, 17th or the
22  18th.
23  Q.   But you may have?
24  A.   Yes, when I -- I'm not sure if I knew

Page 300

BURIAN

1  it, then I guess I may have.
2  Q.   Earlier in the deposition, we looked
3  at a Houlihan e-mail as of the 17th that
4  referred to it, correct?
5       MS. TAGGART: Object to form and asked
6  and answered.
7  A.   I don't remember that, particularly
8  telling you on the 17th. I can't tell you now
9  whether I knew that fact on the 17th or the
10  18th.
11  Q.   But you may have?
12  A.   I may have.
13       MS. TAGGART: Object to form.
14  Q.   At that time, at that time, did you
15  consider that to be a basis for objecting to the
16  sale?
17       MS. TAGGART: Object to form.
18  A.   A single isolated fact out of context
19  is not or is a basis for objection? You object
20  to a transaction based on the totality of the
21  transaction and whether it is fair. The right
22  response to that was to investigate, to ask
23  questions, to find out. It was a basis for
24  asking follow-up questions to understand what

Page 301

BURIAN

1  was going on.
2       I did not spend a lot of time thinking
3  about the accounting treatment by Barclays.
4  The fact that they booked was less relevant
5  than understanding what we were giving and
6  what we were getting. And I was positive
7  that, for instance, they were getting a great
8  deal on the franchise. I didn't dive into at
9  the time what made up the negative 2 billion
10  of good will, how it was calculated, or what
11  that number meant other than to do the
12  investigations and ask the questions that we
13  talked about earlier.
14  Q.   And in itself, in isolation, that
15  fact, in your view, was not a basis to object?
16       MS. TAGGART: Objection, asked and
17  answered, objection to form.
18  A.   Again, if someone said to me what
19  those words mean is, and not understanding what
20  you are hearing from everyone else in the
21  transaction, Barclays is taking the book for 2
22  billion less than what it's worth, it certainly
23  would have been a basis for objection and would
24  have been a very, very serious conversation.

Page 302

BURIAN

1                  BURIAN
2        But telling me that some foreign
3   company through accounting rules that I was not
4   familiar with was taking a position on the
5   assets that they were getting for accounting
6   treatment when the transaction was complex,
7   multifaceted and involved assets that I did
8   know, I did believe they were getting on the
9   cheap, e.g., the global franchise, the Lehman
10  name and the rights thereto, wasn't a huge --
11  was it was important enough to follow up and
12  ask, but not enough to run into court with my
13  hair on fire.
14      **Q.   You say it was important enough to**
15  **ask.  Did you ask anybody from Barclays before**
16  **the sale approval hearing on what basis Barclays**
17  **anticipated such a gain?**
18      A.   We were not given that opportunity.
19      **Q.   Did you attempt to ask that question?**
20      A.   We were going to play linguistics
21  about what does it mean to attempt.  But when
22  you are on the phone with somebody who says I
23  only have a couple of seconds, here is the
24  story, no, no, no scratch that, click, I am
25  going to call you back, call you back, here is

Page 303

BURIAN

1   the final numbers, it is bedlam here, I am
2   really busy, you don't spend a lot of time
3   asking them about what -- their adversary is --
4   their accounting treatment.
5       You are saying, hey, Mark, hey Jim,
6   what is the deal, what are you giving and
7   what are you getting.  And I walked you
8   through the time frame there.  So to say that
9   I didn't attempt is not fair, but to say in a
10  short window we had of communication, it
11  didn't come up, that is fair.
12      **Q.   I am not asking you to make a judgment**
13  **what's fair and not fair.  I am asking you did**
14  **you attempt to ask Barclays on what basis it**
15  **anticipated recording a gain on the transaction?**
16      A.   Before the sale hearing?
17      **Q.   Yes.?**
18      MS. TAGGART:  Object to form, asked
19  and answered.
20      A.   I amend my answer.  Sorry, I confused
21  the Lehman employees with Barclays.
22      I never had a conversation with
23  Barclays about any topic prior to the sale
24  hearing.  So there was no discussion with

Page 304

BURIAN

1                  BURIAN
2   them about any of these topics.
3       **Q.   Did you request any conversations --**
4   withdrawn.
5       **Did you request an opportunity to**
6   **speak with anybody at Barclays about its**
7   **anticipated gain?**
8       A.   No.
9       MR. STERN:  Let's mark this as the
10  next exhibit.  This will be 479-B.
11      (Exhibit 479-B, document Bates stamped
12  CMTE 882 marked for identification, as of
13  this date.)
14      **Q.   Is this a document that you recognize**
15  **or had ever seen before?**
16      A.   It does not look familiar.
17      **Q.   Do you recognize any of the names on**
18  **this exhibit 479-B?**
19      A.   Nope, I do not.
20      MR. STERN:  This will be the next
21  Exhibit 480.
22      (Exhibit 480-B, document Bates stamped
23  HLHZ 9119 through 9120 marked for
24  identification, as of this date.)
25      MS. TAGGART:

Page 305

BURIAN

1                  BURIAN
2       THE WITNESS:  Do this mean it came
3   from us, CMTE.
4       MS. TAGGART:  The committee.
5       THE WITNESS:  It came from us?
6       MS. TAGGART:  The committee members,
7   instead of Houlihan.
8       THE WITNESS:  Oh, so it could be
9   internal by the committee members.
10      MS. TAGGART:  Right.
11      **Q.   So looking at Exhibit 480-B, is this a**
12  **series of e-mails that you recognize?**
13      A.   I mean, it is redacted.  So I do
14  remember reading the last -- second to last
15  e-mail, the response by Harvey to Luc.
16      **Q.   Let's go to the part that's not**
17  **redacted, starting with the bottom e-mail from**
18  **Luc Despins, 9/22/2008, 7:15 a.m. AST, to Harvey**
19  **Miller.  "One, did it close; two, what happened**
20  **to regulated capital."  And what I wanted to ask**
21  **is on the second question, what did you**
22  **understand that to relate to?**
23      A.   The controversy or discussions
24  relating to the 15c3 accounts.
25      **Q.   What did you know about those**

Page 306

1   **BURIAN**
2   discussions?
3          MS. TAGGART:  Object to form.
4      A.   In what time period?
5      **Q.   For the closing.**
6      A.   I told you earlier that I walked into
7   the room at one point, sort of sat myself down
8   to listen, uninvited.
9          One of the conversations I heard in
10  that room and later or at the time the
11  clarification letters a reference to 15c3 was
12  the discussion or argument or negotiation
13  about who was going to get the cash and
14  securities that were posted with regulators
15  to back up the trading.
16         I remember a discussion about was it
17  in the deal or out of the deal and was it
18  appropriate to be in or out of the deal and
19  this may explain why I wasn't invited to any
20  more rooms, but I did sort of raise my hand
21  and say, wait a minute, to the extent this
22  stuff is cash, it can't be an acquired asset.
23  There can't be any ambiguity.  To the extent
24  it is a deposit of securities, where their
25  argument could be, you know, whether those

Page 307

1   BURIAN
2   securities are necessary for the functioning
3   of the business.  Because when Lehman owned
4   the business, they were necessary.  But
5   Barclays doesn't need them, you know.  If
6   that's an argument going on, I don't know
7   what the intention of the parties were.  But
8   cash is cash and it is clear that cash
9   doesn't go.  And everyone was like not happy
10  that I said that.
11     **Q.   Who was the "everyone" in the room?**
12     A.   The main conversation I had was
13  actually spillover in the hallway with Harvey
14  where I said to him I don't know how you have a
15  modification to an agreement that has cash going
16  across that's Lehman cash.  The document is
17  clear that we keep cash.
18         The context was, I heard from him, I
19  heard from someone else, I heard in the
20  meeting, at one point I had heard that there
21  was roughly a billion, 5 -- no, I forget -- I
22  don't remember the exact number, but
23  including the cash and security is a large
24  number and they were going split the baby in
25  half and they would get half the cash, we get

Page 308

1   BURIAN
2   half the cash, Barclays got half the
3   securities and we get half the securities,
4   and I made probably an obnoxious comment at
5   the time of even in Lehman, a couple hundred
6   in million in cash matters and cash is cash
7   and it shouldn't go to Barclays.
8          So --
9      **Q.   So aside from Harvey Miller, who else**
10  **participated in this conversation?**
11     A.   It was in the hallway by where the
12  secretaries were typing.
13     **Q.   I see.**
14     A.   Luc was there, the spillover
15  conversation when I said these things.  Harvey
16  was there.  I think Tom Roberts was there.  The
17  representatives of Barclays were sort of like
18  down the hall, coming in, listening.  There was
19  a lot of milling around going on, so it is hard
20  to say who exactly was there.
21     **Q.   Do you recall approximately when that**
22  **conversation took place?  Was it Sunday**
23  **afternoon?**
24     A.   No, no.  It was later.  It was before
25  I sort of got more angry and demanded a meeting

Page 309

1   BURIAN
2   with Michael Klein.  So it must have been
3   between -- I think it was before that meeting,
4   between 11 and 1.  Could it have been after?
5   It's possible, but I don't think so.
6      **Q.   OK.  So when you had the meeting with**
7   **Michael Klein and Harvey Miller that's reflected**
8   **in the -- on the manila folder, Exhibit 338-B,**
9   **did you ask Mr. Klein or Mr. Miller where the**
10  **15c3 asset was?**
11     A.   After Mr. Klein left, I think I said,
12  hey, where are we on the other open issues
13  because remember or you don't remember, the 15c3
14  issue was not -- what was the term you used
15  before, tradeable securities, the bucket of
16  securities, we were using that term, it was not
17  part of the bucket of securities.  That whole
18  thing related to what was it that Barclays was
19  getting for 250 million.  What was the franchise
20  they were getting.  It was a different topic.
21  And that was whatever was necessary to operate
22  the business and the argument was whether the
23  regulatory capital was or was not necessary.
24         So I recollect I did ask hey where
25  does that stand.

Page 310

BURIAN

1      BURIAN
2    Q.   What were you told?
3    A.   As you can see from Luc's e-mail as of
4  7:15 in the morning, we still weren't sure how
5  that played out other than my comment to Harvey
6  and others that were standing there that you
7  guys say this is all kosher pursuant to the
8  court order and the hearing, I don't know how
9  you transfer cash and say that that isn't a
10  change.
11        (Exhibit 481-B, document entitled,
12    "Notice of Assumption and Assignment" marked
13    for identification, as of this date.)
14    Q.   Looking at Exhibit 481-B, this appears
15  to be a notice of assumption and assignment of
16  amounts necessary to cure defaults under
17  contracts and leases to be assumed and assigned
18  to successful purchaser.
19        On the second page, it appears to be
20  dated September 18, 2008.  At the bottom of
21  the first page, it refers to an Epic Systems
22  website.  It says, "The debtors will compute
23  the appropriate cure amount for each closing
24  date contract and will list such cure amounts
25  on the website prior to the hearing."

Page 311

BURIAN

1      BURIAN
2        Do you recall one way or the other
3  whether anybody at Houlihan reviewed the
4  information that was available on that
5  website concerning cure amounts for closing
6  date contracts?
7    A.   You're assuming it was available and
8  when it was available.  I didn't and I did not
9  go to that website.  Do you know what time this
10  was filed?
11    Q.   I don't know for sure.
12    A.   So you don't know how much time
13  elapsed between the filing of this document and
14  the hearing itself?
15    Q.   I don't know.  But it is a matter of
16  record.  We can find that out, and my question
17  is really just simply whether if you know anyone
18  at Houlihan reviewed the information that was
19  available on that website when it became
20  available?
21    A.   In respect of this estimate of cures?
22    Q.   Yes.
23    A.   I don't know.
24        MR. STERN:  Let's take a short break.
25        THE VIDEOGRAPHER:  The time is now

Page 312

BURIAN

1      BURIAN
2  5:49 p.m., we are now off the record.
3        (Recess)
4        THE VIDEOGRAPHER:  The time is now
5  5:55 p.m., we are now back on the record.
6    Q.   I want to go back to the date of the
7  sale approval hearing, September 18, and ask you
8  if you recall at any point that day, that Friday
9  meeting with Barry Ridings or having
10  conversation with Barry Ridings from Lazard?
11    A.   I do.
12    Q.   And do you recall when you met with
13  him or spoke to him?
14    A.   I believe I spoke to him in the
15  courtroom between the bench and the counsel
16  tables.
17    Q.   Did you have any discussion with
18  Mr. Ridings that Friday concerning the substance
19  of the transaction?
20    A.   Yes.
21    Q.   What did he say to you about the
22  substance of the transaction?
23    A.   In the context of a huddle in front of
24  the counsel table where someone, Lori was
25  walking through what the changes in the

Page 313

BURIAN

1      BURIAN
2  transaction were and what was going to be told
3  to the court and I was like looking and making
4  sure it was consistent with what I had been told
5  on the phone when I made that list a little bit
6  earlier.
7        And Barry basically said at one point,
8  hey, this has to happen, enormous pressure
9  for this to happen, there were no
10  alternatives, you definitely don't want to
11  own these securities in a meltdown bankruptcy
12  environment or something to that effect.  You
13  know, continuing the theme of today's really
14  important and we have got to get approval
15  today.
16    Q.   Was that something that he said during
17  the courtroom recess?
18    A.   I don't remember if it was a recess or
19  it was immediately before the hearing started.
20  I don't remember when -- I know I was on the
21  other side.  I was on the lawyer's side of the
22  BAR, so it couldn't have been when the hearing
23  was in process.  It could have been right before
24  or shortly -- they could have started and then
25  stopped.

Page 314

BURIAN

1
2      Q.   In that discussion or huddle, do you
3  remember what the lawyers from Weil said?
4      A.   Not with specificity.  I remember, it
5  was for the most part, consistent with what I
6  was told right before the hearing.  You know, I
7  think there was confusion about how we are going
8  to handle DTC, which then played out in the
9  hearing when Sheldon Hirschhorn stood up and
10 going back and forth.  I think there was some
11 confusion about which RESIs were in and out.  I
12 think Lori was trying to explain to Luc some of
13 what had already been explained to me when I
14 got down to the hearing, I didn't have a chance
15 to talk to Luc beforehand.
16     Q.   Did you or anybody else from Houlihan
17 take notes of that discussion?
18     A.   To my knowledge, no.  Just a
19 conversation.
20     Q.   Any other recollection of what was
21 said in that huddle?
22     A.   You know, it is not really relevant.
23 I mean, wow, look at this crowd, I can't believe
24 we are all at full capacity.
25     Q.   General commentary?

Page 315

BURIAN

1
2      A.   When was the last time the bankruptcy
3  court had the media staked out outside.
4      Q.   In that huddle, did Mr. Miller, Harvey
5  Miller speak?
6      A.   I don't remember whether it was Lori
7  or Harvey that went through what the changes
8  were.  I'm sure if we were talking about -- it
9  was commentary about, wow, this is really,
10 really short and it may go all night and kind of
11 deal with all the objections and what are you
12 going to do about people showing up who don't
13 know where their assets are and cures and the
14 attitude was it will be what it will be and we
15 will muddle through.
16     Q.   At the courthouse, did anyone
17 representing the committee complain to Lehman or
18 Barclays about the inclusion in the sale of
19 clearance box assets?
20         MS. TAGGART:  Objection, foundation.
21     Q.   The so-called 1.9 bucket?
22     A.   I understood that this was necessary
23 to balance the transaction because of a
24 combination of a loss of value in the portfolio
25 and/or the fact that securities that were

Page 316

BURIAN

1
2  supposed to be in that bucket weren't there and
3  the reason I am giving an explanation was is
4  that "complain," we said we would like to
5  understand that, is that true.  But it wasn't
6  like how dare you add those securities to the
7  package.  It wasn't don't do it.  It was why are
8  they necessary and let's make sure we understand
9  this later.
10         MR. STERN:  Can you reread my question
11 please.
12         (Record read).
13         MS. TAGGART:  Same objection.
14     A.   Is there a question?
15     Q.   Yes, that question.
16     A.   As I just said, don't think I would
17 characterize it -- I don't know if you would
18 characterize it as a complaint or not, but it
19 was what -- explain to us how this is and why it
20 is necessary.
21     Q.   And your previous answer referred to
22 what you understood as of the hearing?
23     A.   My previous answer?
24         MS. TAGGART:  Object to form.
25         MR. STERN:  Withdrawn.  Withdrawn.

Page 317

BURIAN

1
2  Let's go off the record for a second.
3         THE VIDEOGRAPHER:  The time is 6:02
4  p.m., we are going off the record.
5         (Recess)
6         THE VIDEOGRAPHER:  The time is 6:04
7  p.m., we are now back on the record.
8      A.   Are you going to reask me the question
9  you asked off record?
10     Q.   Let me think about it.?
11         MS. TAGGART:  Off the record, there
12 was some discussion about a prior question,
13 answer.
14     I guess, all my question to you, and
15 Jack can ask his own, is there anything that
16 you want to clarify based on some of the
17 off-the-record conversation?
18     A.   Yeah, I, sitting here, I don't
19 remember whether or not I am combining pre and
20 post hearing information and the explanation for
21 1.9 billion box assets and honestly it has been
22 a long day, I don't remember if I knew it at the
23 hearing or I found out Saturday night or Sunday
24 following the hearing.  I just don't recollect
25 right now.

Page 318

BURIAN

1          BURIAN
2          THE VIDEOGRAPHER:  Counsel, can I have
3     one second.  When you said off the record, I
4     thought you were going off the record.
5          Can you please reiterate for the
6     record what you said I had taken under the
7     sound out.
8          MS. TAGGART:  Before the witness
9     answered, I had said that while we were off
10    the record previously, there had been some
11    discussion about an earlier question and
12    answer that the witness had had and I asked
13    the witness if he wanted to clarify anything
14    on the record now.
15         THE WITNESS:  Did you get my answer on
16    the sound.
17         MS. TAGGART:  I believe I did.  Yes.
18    Thank you.
19    A.    That related to whatever my counsel
20    just said.
21    Q.    Let's go back to the sale approval
22    hearing.  At any point before that hearing or
23    during the recess at that hearing, did anyone
24    acting on behalf of creditors committee express
25    concern to Lehman or Barclays about the prospect

Page 319

BURIAN

1          BURIAN
2     of including clearance box assets, the so-called
3     1.9 bucket among the purchased assets, if you
4     remember?
5          MS. TAGGART:  Objection, foundation.
6     A.    I don't specifically remember a
7     conversation about the clearance box assets, but
8     it was a consistent theme of what assets were
9     being added, whether assets were being added and
10    whether -- and why.  So it wouldn't surprise me
11    or not surprise me.  I don't specifically
12    recollect it being narrow to clearance box
13    assets.
14    Q.    Now, the next day after you returned
15    from the Sabbath and went to Weil, what was the
16    first thing you did?
17    A.    I don't remember the first thing I
18    did.
19    Q.    Do you remember generally what your
20    activities were?
21    A.    Yeah, I found Mike Fazio and anybody
22    else that was there, that was my people.  I got
23    an update on what occurred and where things
24    stood.
25    Q.    Which of your people were there?

Page 320

BURIAN

1          BURIAN
2     A.    I know for sure Mike Fazio was there.
3     I don't remember whether Ann Miller and/or Tanja
4     Aalto was there, A-A-L-T-O, and there probably
5     was, there may have been probably was associate
6     or analyst.  But I don't have a firm
7     recollection.
8     Q.    And while you were at Weil that
9     Saturday evening, did you review any drafts of
10    the clarification letter?
11    A.    I don't remember whether I got drafts
12    of the clarification letter Saturday night into
13    Sunday morning or after I went home to change
14    and came back, whether I got it sometime on
15    Sunday.  I don't have a specific recollection of
16    that timing.
17    Q.    Now, over what weekend, did you
18    participate in any meetings with the creditors
19    committee or any conversations with the
20    creditors committee?
21    A.    I did.
22    Q.    Did you report to the creditors
23    committee concerning the status of the
24    transaction?
25         MS. TAGGART:  Just respond yes or no

Page 321

BURIAN

1          BURIAN
2     to that.
3     A.    I reported to the creditors committee
4     my understanding of the status of the
5     transaction.
6     Q.    And what did you tell the creditors
7     committee?
8          MS. TAGGART:  I am going to object on
9     privilege and instruct not to answer.
10    Q.    What was the purpose of the your
11    report to the committee concerning the status of
12    the transaction?
13         MS. TAGGART:  OK, you can answer that.
14    Don't reveal any of the substance of the
15    communication and I object to form, but if
16    you understand it, you can go ahead and
17    answer it.
18    A.    We were to keep the committee up to
19    date on what we knew about a very important
20    transaction of an estate that they were
21    fiduciaries of.
22    Q.    Were you providing any legal advice to
23    the committee?
24    A.    Me personally?  Houlihan, me --
25    Q.    Houlihan?

Page 322

BURIAN

1
2       A.   No, we don't provide legal advice to
3    clients.
4       Q.   What did you tell the committee about
5    the status of the transaction?
6           MS. TAGGART:  I am going to object and
7       instruct not to answer on privilege.
8       Q.   Were there certain decisions that the
9    committee needed to make based on the
10   information you were providing?
11          MS. TAGGART:  Hold on.  Object to form
12      and foundation, but if you know, you can
13      answer.
14      A.   Can you read me back the question.
15          (Record read)
16      A.   It turned out to be no.
17      Q.   If the committee did not have any
18   decisions to make, then what was the purpose of
19   reporting information to them?
20          MS. TAGGART:  Objection to form.
21      A.   I could tell you have never
22   represented a creditors committee before.
23      Q.   Actually, I have.
24      A.   Oh, well, it's -- the creditors
25   committee wanted to be up to speed and informed

Page 323

BURIAN

1
2    about what was going on; was the Barclays
3    transaction going to close or not going to
4    close.  Was there -- they had heard about JP
5    Morgan issues, what were they, they wanted to be
6    informed.  They wanted to exercise their
7    reasonable diligence to know what was going on.
8       Q.   Well, did the committee consider
9    whether there might be an opportunity post
10   closing to challenge the transaction?
11          MS. TAGGART:  I am going to object
12      to --
13      Q.   Or a reason to challenge the
14   transaction?
15          MS. TAGGART:  I will object on form
16      and privilege and instruct not to answer.
17      Q.   Over the weekend leading to the
18   closing, did the committee consider whether it
19   should challenge the transaction or bring to the
20   court's attention any aspects of the
21   transaction?
22          MS. TAGGART:  Objection, form,
23      foundation and privilege, and I'll instruct
24      not to answer.
25      Q.   Did you have any discussions with

Page 324

BURIAN

1
2    anybody at Weil either before the closing or
3    after the closing, concerning whether it might
4    be necessary to return and appear before Judge
5    Peck to provide a further description of the
6    transaction?
7           MS. SCHAFFER:  Objection to form.
8           MS. TAGGART:  I am just going to --
9       what time period are you asking?
10      Q.   Let's say over the weekend leading to
11   the closing or in the few days following the
12   closing.?
13          MS. TAGGART:  You can answer.
14      A.   Yes.
15      Q.   And with whom did you have any such
16   discussion?
17      A.   Mainly with Mr. Miller in connection
18   with my asking him if he was comfortable that he
19   could close this transaction without going back
20   to court and without committee consent.
21      Q.   When did that discussion take place?
22      A.   That conversation took place before we
23   left, obviously.  It took place in connection
24   with my objection to the transfer of 15c3 cash,
25   when I said something to the effect of how do

Page 325

BURIAN

1
2    you transfer cash when a document is clear on
3    its face that the cash is not part of that
4    transaction.  And then it came up in connection
5    with our leaving when I asked whether or not we
6    needed to consent to this or not.
7       Q.   So am I right that you had a number of
8    conversations with Mr. Miller on this subject?
9           MS. SCHAFFER:  Objection to form.
10      A.   The first one I tried to give you a
11   context because it wasn't about this subject.
12   It was about whether or not the estate should
13   agree to give all that cash to Barclays.  It
14   wasn't like the conversation wasn't about going
15   back to Judge Peck.  The conversation was about,
16   I don't know, I wouldn't be giving away that
17   cash, and as you can see from the result,
18   someone ultimately agreed with me that giving
19   that cash was not the right answer.
20          The second conversation, I do agree
21   with your characterization which is it was
22   about, do you need me, and do you need, you
23   know -- are you going to close and how are you
24   going to close.
25          Now that I think about it, there may

Page 326

BURIAN

1
2 have been a very short other conversation
3 somewhere in the 11 to 12 o'clock range when we
4 told the debtor that our committee was going to
5 bed and that we were concerned that we were
6 going to not be able to muster a quorum, and
7 again, we are not involved in all these
8 conversations, the clarification letter.
9        I think I may have said this earlier,
10 if I didn't, I will say it again, we were not
11 permitted to audit, to sit in the meeting
12 where the clarification letter was discussed
13 and negotiated and we said, you guys are
14 going in there, we are just telling you if
15 modifications come out of that meeting where
16 you need our consent, we are losing the
17 committee and we are concerned about a
18 quorum.
19        So maybe that was more of an
20 announcement and not a conversation.  But it
21 was, I want to be complete in those
22 conversations -- in those interactions.
23    Q.   What did Mr. Miller say to you
24 concerning whether he was comfortable closing
25 the transaction without going back to court?

Page 327

BURIAN

1
2    A.   I think his quote was I don't need
3 you.  I wasn't sure at the time --whether he
4 meant generally I was worthless or about this
5 transaction.  But following up, he made it clear
6 that I was welcome to stay or go, I was welcome
7 to have quorum of the committee or not, but it
8 was irrelevant and unnecessary.
9    Q.   I want to distinguish between two
10 things which I think you said you discussed with
11 Mr. Miller, with Harvey Miller.
12        One was whether he was comfortable
13 closing the transaction without going back to
14 court.  Second was whether he was comfortable
15 closing the transaction without creditors
16 committee consent.
17        Let me focus on the first.  What
18 did Harvey Miller say to you about whether he
19 was comfortable closing the transaction
20 without going back to court?
21    A.   I apologize.  When I said he was
22 comfortable closing without me, I thought it was
23 obvious that of course that meant he didn't need
24 to go to court.
25        He did not -- I don't remember the

Page 328

BURIAN

1
2 exact words, but he told me that this
3 transaction was closing tonight, there was --
4 they were not going back to court.
5    Q.   Did he say anything to explain to you
6 why he was comfortable closing the transaction
7 without going back to court?
8    A.   It was not a debate.  It was not a
9 let's go through the following issues and
10 analyze each one.  It was his conclusion that
11 this transaction was closing and I didn't say do
12 you need to go to court.  I said do you need my
13 consent, my committee consent which was a lower
14 standard than going back to court, and when he
15 said to me no, you can do what you want, we
16 don't need you, to me, that was obvious that he
17 was not going back to court.
18    Q.   Did Mr. Miller explain to you why in
19 his view committee consent was not necessary to
20 close the transaction?
21        MS. SCHAFFER:  Objection to form.
22    A.   We did not have a long discussion.
23 The implication was clear that this was -- he
24 did not explain it to me.  I had my impressions,
25 but he did not verbalize in that conversation a

Page 329

BURIAN

1
2 detailed explanation as to why he was
3 comfortable.
4    Q.   What were your impressions?
5        MS. TAGGART:  Objection to form, asked
6    and answered.
7    A.   Well, throughout the conversation
8 really it was the follow-up, the repercussions
9 of the main meeting with Michael Klein that all
10 this stuff was plumbing, that when it came to
11 what was in or out of the business, e.g., what
12 was, you know, a contract or not a contract or
13 was -- you know, the details with respect to
14 particular assets that were necessary for
15 operating the business, those were details that
16 were consistent with the court order, they were
17 transferring the operating business and lawyers
18 will be lawyers they will fight about it.  But
19 these were not big deals vis-a-vis the real
20 estate, they had compromised it and that was
21 done and consistent with more or less what Lori
22 said.  And the big issue was on the securities
23 where we were both comfortable that if anything
24 net, net, net, this was better, not worse, than
25 what was described to the court.

Page 330

BURIAN

1
2      So the conversation with Harvey was --
3  the foundation of the conversation with
4  Harvey about do you need me, e.g., do you
5  need this committee to consent to anything
6  was premised on or following the explanation
7  we both received as to what the transaction
8  was.
9      **Q.   Now, what you just testified to, are**
10 **those statements that Mr. Miller made to you or**
11 **are those are inferences that you are drawing?**
12     MS. TAGGART:  Object to form.
13     A.   I was clear in explaining to you the
14 context of his statements and then you followed
15 up and asked me what were my impressions and I
16 explained to you why I believe Harvey was
17 comfortable at the time or my understanding of
18 why Harvey was comfortable at the time because
19 of the background of our interaction just a
20 short period before the conversation.
21     **Q.   So those were your impressions, not**
22 **precisely what he said?**
23     A.   As I said to you before, it was not a
24 debate or an explanation.  Harvey told me his
25 conclusion in -- as a summation of our

Page 331

BURIAN

1
2  conversations.
3      **Q.   What did he say specifically on that?**
4      MS. TAGGART:  Objection form, asked
5  and answered.
6      A.   Define "what."  You said, What did he
7  say about that?  Define "that."
8      **Q.   What, if anything, did he say**
9  **specifically concerning whether in his view it**
10 **was necessary to have committee consent in order**
11 **to close the transaction?**
12     MS. TAGGART:  Objection, asked and
13 answered.
14     A.   The best I can do for -- as close as I
15 can get to for a quote was I don't need you.  I
16 don't care if you stay or go.
17     MR. STERN:  Go off the record.
18     THE VIDEOGRAPHER:  The time is 6:25
19 p.m., we are now off the record.
20     (Recess)
21     THE VIDEOGRAPHER:  The time is 6:25
22 p.m., we are now back on the record.
23     **Q.   We have been talking about**
24 **conversations that you had at Weil Gotshal on**
25 **the 21st going into the 22nd of September, 2008.**

Page 332

BURIAN

1
2      **Based on everything you learned about**
3  **the transaction over that weekend before the**
4  **closing, based on what you were told about**
5  **the transaction, based on what you read in**
6  **the agreements that you were given, at any**
7  **time after the closing, let's say between**
8  **September 22 and September 30, did you have a**
9  **discussion with anyone concerning whether it**
10 **would be prudent or necessary to return to**
11 **Judge Peck concerning the transaction?**
12     MS. TAGGART:  I am going to object on
13 privilege to the extent that's a discussion
14 with the committee, but if you spoke to
15 anyone outside of Houlihan and the committee
16 on that topic, you should go ahead and
17 answer.
18     A.   I don't recollect conversations with
19 third parties about going back to Peck other
20 than as someone else might have thought it was
21 an implied threat when they said things like we
22 want to understand it better, we want a list of
23 the assets we, want to understand the marks, we
24 want to know why the premark was 50 and post
25 mark was 44, 45.  So when you're pushing for

Page 333

BURIAN

1
2  that information, but I don't believe I ever
3  said the words "or else" or said, you know, we
4  are going to Judge Peck or something like that.
5      **Q.   After the closing, did you ever have**
6  **any discussion with anybody at Weil or do you**
7  **know whether Milbank had any discussion with**
8  **anybody at Weil concerning whether it would be**
9  **necessary or appropriate or warranted to return**
10 **to Judge Peck concerning the transaction?**
11     A.   Yes.
12     **Q.   What were those discussions?**
13     MS. TAGGART:  I am going to just
14 caution you not to reveal any
15 attorney/client privilege.  You can answer
16 if you communicated with someone other than
17 Milbank and the committee and Houlihan and
18 also why don't we take it through April of
19 this year.
20     A.   Well, --
21     **Q.   Let me rephrase the question.  Between**
22 **the time of the closing and November 11, 2008,**
23 **did anyone from Houlihan or Milbank have any**
24 **discussion with anybody from Weil concerning**
25 **whether it would be necessary or warranted to**

Page 334

BURIAN

1       **BURIAN**
2  **return to Judge Peck concerning the transaction**
3  **or whether it would be appropriate to appeal his**
4  **sale order?**
5       MS. TAGGART:  Objection, foundation as
6  to Milbank.
7       You can go ahead and answer.
8   A.   I don't know about Milbank.  And I
9  don't remember any nonprivileged conversation
10 with a third party regarding appeal of the sale
11 order.
12      What I -- I said yes before, but I
13 think we are miscommunicating about my yes.
14  **Q.   Well, do you recall discussions on**
15 **this subject that occurred between the time of**
16 **the closing and November 2008?**
17  A.   Again, this subject being narrowly to
18 appeal?
19  **Q.   To go back to Judge Peck or to appeal.**
20  A.   And go back to Judge Peck for what
21 reason?
22  **Q.   Well, either to seek reconsideration,**
23 **to provide him with information.  Or any other**
24 **reason you may have discussed?**
25      MS. TAGGART:  Same limitation.

Page 335

BURIAN

1       BURIAN
2   A.   I don't remember the specific dates
3  and in that November time period, I was still in
4  my trust-and-verify mode where I guess naively,
5  in retrospect, I assumed the transaction was as
6  described and no assets were taken in excess of
7  the values we were told.
8       So in that time frame, we really, my
9  focus and Houlihan's focus was to get a
10 reconciliation.  I would be surprised but I
11 can't be clear if it is in the November time
12 frame if there wasn't a nonprivileged
13 conversation where it was said in my presence
14 or said to Weil or someone else, if this is
15 not right, we have got to get those assets
16 back and that would presume an action before
17 Peck.  But it was not about appealing the
18 order because it was way after the ten-day
19 period and I can't even tell you for sure
20 that was in the November time frame.
21      MS. TAGGART:  I think that we have
22 gone over time.  I'm willing to make some
23 small accommodation.
24      MR. STERN:  Just a few more questions.
25  **Q.   Did the committee ever consider making**

Page 336

BURIAN

1       **BURIAN**
2  **a motion for reconsideration of the sale order?**
3       MS. TAGGART:  Objection and instruct
4  not to answer on privilege.
5   **Q.   Did the committee ever consider**
6  **appealing the sale order?**
7       MS. TAGGART:  Same objection and
8  instruction.
9   **Q.   Did the committee ever consider making**
10 **a motion for expedited discovery in order to**
11 **obtain information that the committee believed**
12 **it was missing?**
13      MS. TAGGART:  Same objection and
14 instruction.
15      MR. STERN:  Thank you.  No further
16 questions.
17      MS. SCHAFFER:  I don't have any
18      (Continued on next page for jurat)
19
20
21
22
23
24
25

Page 337

BURIAN

1       BURIAN
2  questions.
3       MS. TAGGART:  That concludes the video
4  record for today.  The time is now 6:32
5  p.m., we are off the record.
6
7       _____
8       SAUL BURIAN
9  Subscribed and sworn to
10 before me this     day
11 of December, 2009.
12
13 _____
14
15
16
17
18
19
20
21
22
23
24
25

Page 338

```
 1                    BURIAN
 2        INDEX:
 3   WITNESS       EXAM BY:        PAGE:
 4   S. Burian      Mr. Stern         6
 5
 6             EXHIBITS
 7   Exhibit No.              Marked
 8   Exhibit 457-B Notice of Deposition       9
 9   Exhibit 458-B Document labeled "Limited    31
10        Objection of Official
11        Committee of Unsecured
12        Creditors"
13   Exhibit 459-B Transcript dated December    48
14        22, 2008
15   Exhibit 460-B Document Bates stamped WGM   129
16        Lehman E1592 with attachments
17   Exhibit 461-B Document Bates stamped      129
18        HLHZ11913 with attachment
19   Exhibit 462-B Document Bates stamped      148
20        MTHM5739
21   Exhibit 463-B  memo dated October 6, 2008   160
22   Exhibit 464-B Document Bates stamped      173
23        LAZ-A4419 through 4424
24   Exhibit 465-B Document Bates stamped LAZ-A  173
25        4419 through 44511
```

Page 339

```
 1                    BURIAN
 2             EXHIBITS
 3   Exhibit No.              Marked
 4   Exhibit 466-B Document Bates stamped HLHZ   196
 5        35872 through 74
 6   Exhibit 467-B Document Bates stamped HLHZ   197
 7        16856 through 57
 8   Exhibit 468-B Document Bates stamped HLHZ   209
 9        28090 through 91
10   Exhibit 469-B Document Bates stamped HLHZ   209
11        00001 through 0006
12   Exhibit 470-B Document Bates stamped HLHZ   209
13        16324
14   Exhibit 471-B Document Bates stamped HLHZ   209
15        16325
16   Exhibit 472-B Document Bates stamped HLHZ   219
17        38187 through 191
18   Exhibit 473-B Document Bates stamped LBHI   248
19        4414 through 4415
20   Exhibit 474-B Document Bates stamped MTHM   248
21        5778
22   Exhibit 475-B E-mail dated September 19,    294
23        2008
24   Exhibit 476-B Document Bates stamped HLHZ   298
25        9125 through 9144
```

Page 340

```
 1                    BURIAN
 2             EXHIBITS
 3   Exhibit No.              Marked
 4
 5   Exhibit 477-B Document Bates stamped CMTE   299
 6        911
 7   Exhibit 478-B Document Bates stamped CMTE   300
 8        2527 through 278
 9   Exhibit 479-B Document Bates stamped CMTE   307
10        882
11   Exhibit 480-B Document Bates stamped HLHZ   308
12        9119 through 9120
13   Exhibit 481-B Document entitled, "Notice    313
14        of Assumption and Assignment"
15
16
17
18
19
20
21
22
23
24
25
```

Page 341

```
 1                    BURIAN
 2
 3             CERTIFICATE
 4   STATE OF NEW YORK )
 5               )ss:
 6   COUNTY OF NEW YORK)
 7        I, MARY F. BOWMAN, a Registered
 8   Professional Reporter, Certified Realtime
 9   Reporter, and Notary Public within and for
10   the State of New York, do hereby certify:
11        That SAUL BURIAN, the witness whose
12   deposition is hereinbefore set forth, was
13   duly affirmed by me and that such deposition
14   is a true record of the testimony given by
15   such witness.
16        I further certify that I am not
17   related to any of the parties to this action
18   by blood or marriage and that I am in no way
19   interested in the outcome of this matter.
20        In witness whereof, I have hereunto
21   set my hand this 17th day of December, 2009.
22
23
24        _____
          MARY F. BOWMAN, RPR, CRR
25
```

Page 342

```
1              BURIAN
2          * * *ERRATA SHEET* * *
3    NAME OF CASE:  In Re: Lehman Bros.
4    DATE OF DEPOSITION:  12/17/09
5    NAME OF WITNESS:  Saul Burian
6    Reason codes:
7       1. To clarify the record.
        2. To conform to the facts.
8       3. To correct transcription errors.
9    Page ____ Line ____ Reason____
     From _____ to_____
10
11   Page ____ Line ____ Reason____
     From _____ to_____
12
13   Page ____ Line ____ Reason____
     From _____ to_____
14
15   Page ____ Line ____ Reason____
     From _____ to_____
16
17   Page ____ Line ____ Reason____
     From _____ to_____
19   Page ____ Line ____ Reason____
     From _____ to_____
20
21   Page ____ Line ____ Reason____
     From _____ to_____
22
23
24          _____
             SAUL BURIAN
25
```

## A

**Aalto (1)**
320:4
**abbreviated (1)**
170:25
**ability (2)**
65:2,20
**able (6)**
141:18 154:4 187:2
221:21 275:10
326:6
**absence (2)**
108:25 114:23
**absolute (1)**
255:11
**absolutely (6)**
49:13 137:11 146:3
186:18 229:20,20
**accepted (1)**
88:16
**access (4)**
196:25 268:15,16
274:8
**accommodation (1)**
335:23
**accomplishing (1)**
205:5
**account (2)**
20:2 21:5
**accountants (1)**
283:15
**accounting (4)**
301:4 302:3,5 303:5
**accounts (2)**
117:23 305:24
**accrual (1)**
283:16
**accrue (1)**
283:15
**accrued (9)**
266:25 267:6 269:5
269:17 276:14
280:5,7 283:19
290:5
**accurate (14)**
29:25 30:18 32:21
35:7 36:23 37:7,14
41:21 46:19,23
47:12 145:13
256:14 278:18
**accurately (2)**
17:9 246:10
**acquire (1)**
95:7
**acquired (1)**
306:22
**acquisition (1)**
298:7
**act (1)**
63:23

**acting (1)**
318:24
**action (2)**
335:16 341:17
**actions (2)**
292:6,12
**active (4)**
11:15,19 175:20
195:8
**actively (1)**
145:25
**activities (2)**
24:16 319:20
**actual (3)**
57:22 149:22 269:20
**ad (2)**
51:17 273:3
**add (8)**
195:25 209:17 253:11
253:12 263:18,24
264:2 316:6
**added (5)**
133:20 270:9,12
319:9,9
**adding (1)**
255:7
**addition (3)**
201:24 288:11,20
**additional (5)**
46:7 264:5 265:7
266:12 288:10
**address (1)**
111:10
**addressed (2)**
126:21 164:11
**addresses (1)**
292:21
**addressing (1)**
276:17
**adequate (2)**
13:23 53:2
**adequately (1)**
13:11
**adhere (1)**
32:13
**adjournment (2)**
118:17,20
**adjustment (3)**
99:11 196:7 197:14
**administer (1)**
5:18
**Administered (1)**
1:8
**admit (1)**
252:24
**advance (5)**
90:4,10,12,18 192:5
**adversary (1)**
303:4
**advice (8)**

12:25 14:14 16:24
17:13 61:19 71:2
321:22 322:2
**advise (2)**
16:8,15
**advised (3)**
17:8 34:15 42:7
**advising (1)**
14:10
**advisor (2)**
9:14 71:20
**advisors (3)**
15:15 79:11 198:4
**advisory (2)**
14:18 15:18
**affidavit (4)**
43:16 92:22,25
259:19
**affidavits (1)**
154:25
**affiliates (1)**
87:23 88:13 91:18
**affirmed (3)**
6:20 7:16 341:13
**afternoon (4)**
153:2 219:24 220:2
308:23
**age (2)**
12:3 55:22
**agencies (2)**
112:3 222:9
**agencies-1 (1)**
233:7
**agenda (5)**
170:6 171:8,16
172:25 205:7
**aggregate (11)**
85:4,8 94:24 122:15
122:16,17,23 123:5
289:3,7,22
**aggressive (2)**
256:17 299:10
**agitation (1)**
262:6
**agree (8)**
20:2 21:9 121:25
149:9,10 255:5
325:13,20
**agreed (10)**
5:5,9,15 34:19 63:20
94:5 161:22 257:23
258:12 325:18
**agreement (80)**
21:24 28:15 42:9,23
43:7 57:2,19,22,22
58:6,8,10,12,19
59:2,5,11,13,15
60:5,10,13,18,19
61:14 63:19 66:3,6
67:4 69:24 72:25

74:19 76:17 77:2,19
83:25 84:2,5,6 87:5
87:20,24 88:9,14,18
88:19 89:9,22 91:10
91:19,23 92:14
93:17 94:10,11 95:6
96:13,14 98:15
99:15 100:11
103:14,19,20,24,25
104:3,18 121:9,11
123:18 128:14,20
136:10 138:22
209:23 210:10
258:2,9 307:15
**agreements (17)**
58:14,16,18 61:16
62:18,21 63:11 64:7
65:9 67:8,21 68:4
69:11 76:23,24
191:21 332:6
**ahead (16)**
10:8 12:14 17:19
59:20 63:15 65:17
71:3 106:19 136:17
181:5 224:20
280:22 282:17
321:16 332:16
334:7
**Akin (2)**
51:17 272:23
**al (2)**
1:8 6:8
**Alex (1)**
202:12
**allegations (1)**
39:11
**allow (1)**
92:7
**allowed (7)**
32:11 73:19,25 148:2
187:17 234:3
292:25
**allows (1)**
273:13
**all-star (1)**
14:24
**alongside (1)**
196:6
**alternative (1)**
203:11
**alternatives (4)**
200:7 204:21,22
313:10
**Alto (1)**
11:15
**Alvarez (13)**
156:25 157:6,8,15
158:17 164:19
169:19 170:12
173:11 175:9

191:15,18 201:10
**amalgam (1)**
39:22
**ambiguity (2)**
235:3 306:23
**amend (1)**
303:21
**amended (1)**
60:10
**amendment (4)**
58:9 59:6 60:15 64:9
**amount (20)**
20:21,23 21:2 42:22
43:6,22 70:20 86:6
89:14,15,19,22 93:4
94:17 95:23 131:8
162:17 181:15
238:16 310:23
**amounting (1)**
196:7
**amounts (5)**
169:6,12 270:10
283:20 290:10
310:16,24 311:5
**analyses (1)**
159:13
**analysis (5)**
68:22 69:17 70:6
76:15 152:5
**analyst (5)**
194:6 207:11 212:13
265:14 320:6
**analysts (1)**
212:14
**analyze (2)**
14:3 328:10
**and/or (3)**
237:6 315:25 320:3
**Angeles (1)**
3:21
**angry (1)**
308:25
**Ann (7)**
23:4 126:21 194:22
195:4,6,20 320:3
**announced (4)**
197:13 292:24 298:17
299:14
**announcement (2)**
90:9 326:20
**answer (173)**
11:22,23 16:18,21,23
17:4,19 22:16 25:21
27:8 30:23,24 31:2
31:4,10,15 32:10,24
32:25 35:23 37:23
40:16 41:8,9,20
43:3,24 44:12,16,18
60:25 61:21 62:12
63:6,8 64:17 65:17

65:20 66:17,23,25
67:17 68:20 69:3,21
69:23 70:9,16,25
71:3,16 72:10,14,23
73:8,9,18 74:12,14
74:22 75:14 76:18
79:7,7,12,13 80:12
81:6 83:18 84:9
92:2,5,8,12,21,24
93:13 106:10,19
110:22 113:25
114:9,21 116:23
118:22 122:2 126:3
128:18 129:7 131:6
135:24 136:17
144:24 147:21
149:4,13 150:2
151:21 152:5
153:21 160:21
161:11 162:7
163:24 164:4
167:14 174:13
175:5,5 177:6,7,13
177:15,22 178:20
179:4,5 180:21,24
181:3,4 183:24
184:4 187:21,24
190:2 201:9 216:23
228:6 231:10,16,18
237:9 242:20 252:4
252:10,16 253:11
253:12,14 262:5
277:23 280:21
281:4,19,20 282:5,7
282:16,17 285:6
287:16 297:8
298:12 303:21
316:21,23 317:13
318:12,15 321:9,13
321:17 322:7,13
323:16,24 324:13
325:19 332:17
333:15 334:7 336:4
**answered (36)**
41:8,19 67:23 69:15
103:22 106:6,9,17
109:19 121:24
122:14 123:9
136:16 146:10,19
147:3,18 166:6
176:11 181:2,23
183:9 191:24
237:23 240:18
277:13,17 282:15
289:24 300:7
301:18 303:20
318:9 329:6 331:5
331:13
**answering (19)**
22:4 86:20 136:4

139:21 181:19
203:7 231:17
232:21 252:19
280:15,25 281:10
281:14,18,25 282:6
283:2,4 287:15
**answers (7)**
154:11 184:2,4,6
188:11 240:8 281:8
**anticipated (8)**
21:7 197:13 298:8,17
299:14 302:17
303:16 304:7
**anticlimactic (1)**
51:15
**anxiety (1)**
202:18
**anxious (2)**
220:7 246:20
**anybody (31)**
22:6 56:9,14 71:9,12
80:12 134:16 140:5
143:4 148:8,9
169:22 173:3,11
174:2 175:11,14
245:16 256:2 270:3
270:8 271:11
302:15 304:6 311:3
314:16 319:21
324:2 333:6,8,24
**anymore (3)**
137:4 179:17 247:4
**anytime (1)**
92:8
**anyway (1)**
221:4
**APA (16)**
80:19,24 105:9
108:13 118:23
267:22,24 268:9,10
268:13,13,15,16,17
268:20 290:13
**apologize (4)**
34:4 212:15 216:16
327:21
**appalled (1)**
218:9
**appeal (6)**
71:4 178:16 334:3,10
334:18,19
**appealing (2)**
335:17 336:6
**appear (4)**
18:15 258:24 279:22
324:4
**appearance (1)**
6:22
**APPEARANCES (2)**
3:2 4:2
**appeared (5)**

47:8 96:21 140:10
254:5 257:20
**appears (8)**
149:20 170:23 234:12
261:22 295:11
297:18 310:14,19
**appetite (1)**
208:22
**application (1)**
25:8
**appointments (1)**
24:11
**appraisal (7)**
86:8,10 99:8,12,22
100:7,9
**appraisals (10)**
99:2,7 100:6 101:19
101:20 108:17,18
223:25 288:4,6
**apprised (4)**
37:18 38:3 76:9 182:7
**approach (1)**
153:9
**appropriate (4)**
306:18 310:23 333:9
334:3
**approval (29)**
27:22 42:4 44:24
48:18 50:17 52:9,23
68:6 69:13 70:2,20
74:21 97:19 98:12
100:21 101:13
108:11 110:12
125:22 196:19
264:21 270:16
273:18 298:5,6
302:16 312:7
313:14 318:21
**approve (1)**
198:10
**approved (3)**
46:5 50:14 298:21
**approximately (8)**
6:12 102:24 122:19
122:24 278:7 279:7
289:12 308:21
**appurtenances (1)**
101:11
**April (1)**
333:18
**arbitrary (1)**
215:21
**arched (1)**
221:10
**Archie (1)**
247:10
**area (4)**
8:14,17 16:6 285:18
**areas (1)**
11:6

**argue (1)**
288:3
**argument (5)**
273:8 306:12,25
307:6 309:22
**argumentative (10)**
22:5 77:8 103:22
135:23 136:16
180:18 184:9
229:19 279:5
282:15
**arms (1)**
13:2
**array (1)**
98:23
**arrived (1)**
241:14
**arrow (3)**
223:17,18 259:21
**article (1)**
195:18
**ascribe (1)**
293:13
**aside (4)**
162:14 216:17 297:14
308:9
**asked (71)**
22:13 41:7,18 43:13
67:22 69:15 71:14
71:16 75:23 80:16
80:24 83:11,17
84:25 93:10,11
103:21 106:5,16
109:18 118:16
121:23 122:13
123:8 136:16 140:9
142:13 143:24
144:14 146:9,18
147:3,17 149:12
151:15 156:18
164:3 166:5 173:8
177:5 183:8 189:11
189:22 190:4 191:8
191:23 198:21
203:6 237:23
240:17 245:10
248:15,18 249:24
254:13 268:9
275:25 277:9
282:14 283:9
289:23 300:6
301:17 303:19
317:9 318:12 325:5
329:5 330:15 331:4
331:12
**asking (60)**
12:8 16:14 20:4,6
21:9 35:22 39:18,23
43:14 61:10 64:5,12
65:4 69:17 70:5

75:11 85:12 93:5,6
93:7 94:25 112:5
114:3,4 121:7,7
122:3,6 127:16,20
128:25 139:18
144:22 150:8
154:18 156:6 160:8
165:9,10 173:5
177:11 178:21
188:2,15 195:13
209:6,7,8 212:8
234:9 263:24 271:6
282:20,21 300:25
303:4,13,14 324:9
324:18
**aspect (2)**
74:18 112:8
**aspects (10)**
13:9 14:4 16:4 21:16
26:4,15 47:6 77:10
82:22 323:20
**asserted (2)**
36:10 72:15
**asset (43)**
21:24 57:22 58:7,9
59:5 60:5 88:21
90:25 92:17 93:9,17
98:15 99:15 100:11
100:22 101:4,14,18
102:7,12,19 105:10
105:16,20 106:15
107:2,14,22 108:8
136:10 157:2,7
164:25 166:16
186:21 200:9
210:10 237:13
264:13,14 279:14
306:22 309:10
**assets (124)**
11:18,21 39:12,13
40:10 44:10,24
80:20 84:10,19 85:9
87:9,20 88:8 89:11
90:10 93:19 94:24
95:7,10,15,17,21
96:5,5 97:20 98:13
98:18,20,24 99:3
100:5,14,16 106:3
107:18 108:13,22
109:2 111:7 117:9
118:10 122:19
124:15,22,24
125:15 130:20
133:12,16,18 138:6
139:11,11 149:23
150:14,21 157:15
166:2 167:6 168:19
168:20,24 172:15
172:19 178:10
187:3 189:8,16

190:21,24 192:20
204:25 209:3 210:9
222:9 238:4 242:6
246:18 249:4
250:22 251:22
254:9 255:3,5,7
264:19,22 265:7
273:10,15 275:22
275:23 277:7,8
282:18 283:6
286:10,13 287:7,23
288:10,14,16,22,22
289:3 293:9,12
302:5,7 315:13,19
317:21 319:2,3,7,8
319:9,13 329:14
332:23 335:6,15
**assign (1)**
13:8
**assigned (1)**
310:17
**assignment (9)**
13:19 16:10 176:2
182:10 186:13,15
310:12,15 340:14
**assignments (1)**
175:19
**assistance (3)**
179:9,12 183:5
**assistant (1)**
22:24
**associate (2)**
22:14 320:5
**associated (4)**
61:22 63:17 107:18
288:14
**associates (1)**
23:5
**association (1)**
6:16
**assume (12)**
19:24 34:19 106:24
107:5,21 118:11,12
147:10 200:23
201:14 268:21
269:16
**assumed (22)**
39:21 42:14,17
107:11 118:25
124:16 173:18
184:14 188:10
264:9 267:20
286:13,25 287:21
289:7,21 290:20,23
291:10 294:7
310:17 335:5
**assuming (5)**
49:24 84:9 266:10
278:17 311:7
**assumption (9)**

95:16 105:17 182:10
271:18 293:25
294:5 310:12,15
340:14
**assumptions (1)**
276:13
**AST (1)**
305:18
**attach (1)**
274:21
**attached (7)**
29:15 127:2 151:18
161:24 162:4
163:17 164:18
**attaching (2)**
274:24 286:17
**attachment (4)**
126:12 150:24 295:15
338:18
**attachments (4)**
29:2,5 126:9 338:16
**attempt (9)**
49:3 100:2,8 113:15
113:17 302:19,21
303:10,15
**attempted (2)**
124:3,5
**attend (6)**
48:15 140:9 147:16
148:9,11 169:22
**attendance (1)**
53:4
**attended (5)**
12:6 48:19 50:16
123:13 169:18
**attends (1)**
159:11
**attention (10)**
79:4 144:16 170:25
180:14 181:13,16
181:18 204:7 256:3
323:20
**attitude (1)**
315:14
**attorneys (5)**
3:5,12,19 4:5 5:6
**attorney/client (4)**
70:17 179:4 217:16
333:15
**audit (1)**
326:11
**authority (1)**
26:8
**authorized (3)**
5:17 64:3 273:9
**availability (1)**
10:14
**available (14)**
12:6 36:12 70:21
81:15 90:4 121:13

186:12 202:15
203:2 311:4,7,8,19
311:20
**Avenue (3)**
2:10 3:13 6:10
**avoid (1)**
80:17
**awaiting (1)**
299:20
**aware (14)**
72:3 89:14 90:3,8,11
156:9 162:8 191:20
194:5 196:10,18
273:18,20 299:12
**awareness (1)**
162:8
**A&M (4)**
161:25 171:24 172:2
172:2
**A&M's (1)**
174:15
**A-A-L-T-O (1)**
320:4
**a.m (13)**
2:6 6:12 57:11,14
126:20 145:9,10
199:2 270:18
272:20 292:5,10
305:18
**A/R (6)**
218:23 219:2,3,4
236:18,18

————————————
**B**
————————————
**B (14)**
58:9 100:17 115:8
151:8 156:11
190:22 208:19
222:9,9 264:19
269:3 287:13
290:24 291:2
**baby (1)**
307:24
**back (108)**
18:21 19:21 23:20
24:13,24 25:12
33:15,18 35:16
36:16 37:6 41:11
47:20 48:5,12 49:6
53:9 57:15,17 66:19
66:23 86:17 93:21
97:3 101:25 118:23
121:2 130:10,12
136:23 140:11
153:5 155:17 161:8
176:5 177:24
178:18 180:20
187:3 193:15,16
206:23 208:20
209:4,10,16 213:21

218:4 219:12 220:3
224:13 226:8,17
228:19,20,24 229:7
230:14 233:17
234:5 235:22
238:22 240:6,10
241:7 242:9,14,16
242:16 243:12,21
248:17 250:23
251:6 252:18,21
270:15 276:18
277:7,16 281:12,15
286:7 294:18
302:25,25 306:15
312:5,6 314:10
317:7 318:21
320:14 322:14
324:19 325:15
326:25 327:13,20
328:4,7,14,17
331:22 332:19
334:19,20 335:16
**backed (1)**
89:17
**background (4)**
83:14 226:7 227:3
330:19
**backing (3)**
139:5,6 220:17
**backwards (1)**
220:15
**back-up (1)**
186:8
**bag (1)**
54:23
**balance (26)**
84:11 108:20 168:25
182:13 186:16
199:23 217:3,19
219:7 264:5 266:7
267:15 278:9
279:21 280:7
283:13,18 286:9,13
286:16,19 287:5
288:4,8 289:12
315:23
**balanced (5)**
95:10 96:23 275:6,21
276:11
**Ball (1)**
243:23
**bank (8)**
34:13 112:4 169:6
173:12 196:5
208:20 215:20
296:20
**banking (2)**
226:11 273:11
**bankrupt (1)**
275:10

**bankruptcy (15)**
1:2 8:24 9:2,10 14:4
62:14 63:23 107:6
110:11 117:7 199:8
273:2,21 313:11
315:2
**bankruptcy-related...**
200:22
**banks (1)**
294:9
**BAR (1)**
313:22
**Barcap (1)**
259:16
**Barclays (187)**
3:12 6:24 7:2 10:20
12:25 13:9 20:10,16
21:3,5,7 29:11
33:11 34:16,16,19
34:22 36:3,4,14
38:12 42:13,14,17
43:17,22 44:2,4,8
44:23 63:19 64:6
87:24 88:14,17
91:18,22 93:4,20,20
95:7 97:21 98:14
100:22 101:15
105:16,18 106:24
107:4,23 118:3
119:6,24 120:3,3
121:15,19 124:11
124:12,13,23 125:8
129:19 130:15,21
135:16 138:20
139:2,13,25 140:5
144:7 149:23
150:15,22 154:20
154:25 155:11
157:4,10,12,16
161:20,22,23
162:25 163:16
164:19 167:4
172:11 173:17
174:20 178:8
179:17 183:20
187:6,7,18 188:24
189:4,21,24 190:19
192:21,21 194:5
195:23 196:4
197:12 198:18
199:20 200:8
208:16,17 209:21
211:2 215:5,13
222:12 238:4,5,14
238:16 241:12
245:19 249:19
250:4,5 251:20
254:6 255:9 257:4
257:11,16 262:20
264:4 266:21,21,24

267:4,6,7,10,13
268:5,20,25 269:8
269:16,16,21,25
273:10,13,23 274:3
274:16,25 278:12
278:13 287:20
292:13 295:20
296:11 297:2 298:3
298:7,17 299:2,13
301:4,22 302:15,16
303:15,22,24 304:6
307:5 308:2,7,17
309:18 315:18
318:25 323:2
325:13
**bargain (1)**
298:3
**Barry (8)**
201:16,18 204:20
291:21,24 312:9,10
313:7
**based (32)**
23:6,9,13 31:14 32:18
35:5 53:4 66:3 71:2
72:24 88:18 89:7
110:8,18 113:17
115:11 121:8
133:12 134:3
155:10 173:12
271:20 282:11
287:3 293:12 294:2
300:21 317:16
322:9 332:2,4,5
**basically (5)**
38:11 247:6 251:19
264:2 313:7
**basis (25)**
21:14 72:17 73:20
104:11 110:12
157:9 184:20
197:16,18,18 239:9
239:15,18 242:25
248:11 259:25
298:8,18 300:16,20
300:24 301:16,24
302:16 303:15
**Bates (42)**
126:8,11 144:25
170:13,18 193:2
194:14 206:5,13,16
206:19 216:5
221:15 229:9
244:25 245:4
294:16 295:4,16,25
297:11 304:11,22
338:15,17,19,22,24
339:4,6,8,10,12,14
339:16,18,20,24
340:5,7,9,11
**Battery (1)**

4:6
**bear (2)**
290:10 294:3
**bearing (2)**
104:18 229:9
**Becker (3)**
297:20,20,21
**becoming (1)**
294:12
**bed (1)**
326:5
**bedlam (2)**
227:4 303:2
**began (1)**
49:15
**begging (2)**
111:17 144:16
**beginning (8)**
49:21,22,24 220:9
233:15 235:10
236:13 260:16
**begins (1)**
33:19
**behalf (1)**
318:24
**beleaguered (1)**
179:24
**believe (81)**
9:19 17:7 23:23 29:24
31:25 34:5,6 36:11
37:13 39:4 41:2,15
54:16 56:11,12,16
64:18 82:6 83:2
95:9 96:22 97:16
99:7 100:21 101:14
105:15 109:21
119:9 131:6,21
133:22 138:10
140:14 142:21
143:5,6 153:8 155:9
158:16 159:9
161:22 163:5
171:24 175:17
181:17 182:3,17
186:9 187:8 188:6
189:16 193:17
197:9 207:9,15
219:5,20,21 226:25
228:15 229:22
232:7 233:6 236:2,6
244:17 247:21
256:25 268:13
286:21,23 292:3,4
293:20 298:6 302:8
312:14 314:23
318:17 330:16
333:2
**believed (11)**
30:19 31:4,13 37:15
38:2 47:17 68:14

135:3 137:14
286:21 336:11
**belong (1)**
249:7
**bench (1)**
312:15
**beneath (2)**
123:20 233:4
**benefit (2)**
83:8 287:25
**benign (1)**
256:22
**Berman (1)**
11:21
**best (22)**
14:14 17:11 50:20
54:14 99:5,6,21
137:20 145:16
155:22 157:14
184:11 185:8,12
189:5 191:17
196:22 211:10,18
214:20 218:20
331:14
**better (8)**
22:2 46:4 112:25
134:12 154:20
227:14 329:24
337:17
**beyond (5)**
26:6 64:3 186:15
198:17 273:13
**Bible (2)**
51:8 55:6
**big (7)**
198:5 199:13 203:9
205:4 214:17
329:19,22
**Bill (1)**
159:22
**billed (1)**
12:9
**billion (137)**
20:12,20,22,25 21:2
30:16,19 32:7,17,22
33:7,8,13 36:21
38:3,11,14 39:3
40:22 42:13,15,18
42:22 43:5,21 44:10
44:11,24,25 85:5,17
95:15 102:24
122:17,20,24 134:5
135:5,9 160:25
161:3 162:12,13
163:4,6,18,19,20
165:4 167:2,9 168:4
168:13,18,19,20
172:18 173:4,21
174:3,23 176:7
177:4 178:5 180:11

181:10,14 182:2,8
182:18 184:17,17
188:20 190:9,10,17
192:9,17,23 196:8
197:14 223:10,14
224:13 225:19,20
225:21,24,25 227:7
228:8,9 238:3,5
239:25 241:24
242:5,6,25 251:22
253:19,23 254:8,8
254:21 255:3,7
261:11,15,21
262:19 264:23
266:9,12,15,17,20
267:19,20 273:16
275:25 276:20,24
277:5,11,20 278:4,8
278:10 279:8,12
296:13,14 301:10
301:23 307:21
317:21
**billions (1)**
183:19
**binding (6)**
59:11 62:15,17 64:19
94:23 104:6
**bit (1)**
313:5
**black (1)**
243:25
**Blackberry (3)**
24:12,18,22
**blacking (1)**
212:11
**blank (3)**
24:21 25:2 148:15
**block (3)**
113:15,15,17
**blood (1)**
341:18
**blow (2)**
112:7 250:25
**blue (5)**
215:8,9 234:22
243:22,25
**body (2)**
247:8 272:4
**Boies (5)**
2:9 3:11 4:12 6:23 7:2
**bold (2)**
160:10,11
**bond (1)**
272:25
**book (22)**
98:16,16 99:15
102:23 119:25
124:17,24 186:16
208:24 209:2 222:7
241:16 275:11,11

276:10,12 287:25
292:13,14 293:17
299:3 301:22
**booked (2)**
162:21 301:5
**booking (1)**
299:15
**bookkeeping (1)**
182:12
**books (7)**
98:17 99:16 137:23
182:14 258:4,11
280:6
**book/short (1)**
222:7
**borrowed (1)**
293:3
**bottom (19)**
46:2 85:3,11 88:4
164:18,20 172:5
220:18,22 221:15
221:23 224:8
229:11 272:18,19
296:10 297:23
305:17 310:20
**Bowman (3)**
1:17 2:11 6:16 341:7
341:23
**box (14)**
163:6,20 166:9,17
260:22 263:18,24
264:2,22 315:19
317:21 319:2,7,12
**boxes (1)**
249:7
**Brad (7)**
11:14 13:6,15 22:24
132:6 134:22
142:10
**break (17)**
57:6,9 76:13 130:3
144:12 193:9 213:2
223:21 243:5,6
283:11 284:8,12,18
285:7,17 311:24
**Brian (2)**
126:21,22
**bridge (1)**
184:22
**briefly (1)**
297:17
**bring (6)**
54:23 117:23 181:17
247:16 256:2
323:19
**bringing (2)**
180:13 181:12
**broad (5)**
157:8,17 198:2,22
215:15

**broader (1)**
183:22
**broadly (1)**
9:9
**broker (1)**
232:18
**broker/dealer (2)**
172:10 273:12
**Bros (1)**
342:3
**Brothers (4)**
1:7 3:5 6:7 172:10
**brought (2)**
79:4 274:20
**bucket (10)**
40:12 137:4 188:13
188:16 192:20
309:15,17 315:21
316:2 319:3
**buckets (3)**
100:5 183:16 188:13
**bucks (1)**
278:10
**building (6)**
143:9 147:5 148:6
215:4,5 246:14
**buildings (6)**
86:9,13,14 101:21
102:2 276:8
**bullet (1)**
172:14
**bunch (2)**
39:22 51:19
**Burian (360)**
1:12 2:8 6:1,6 7:1,14
7:20 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1,23
18:1,9 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1,6 30:1 31:1,23
32:1,14 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1,20 45:1
46:1,9 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1,5 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1

100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1,8 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1,23 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1,8 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
206:25 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1

278:1 279:1 280:1
281:1,17 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1 306:1
307:1 308:1 309:1
310:1 311:1 312:1
313:1 314:1 315:1
316:1 317:1 318:1
319:1 320:1 321:1
322:1 323:1 324:1
325:1 326:1 327:1
328:1 329:1 330:1
331:1 332:1 333:1
334:1 335:1 336:1
337:1,8 338:1,4
339:1 340:1 341:1
341:11 342:1,5,24
**burning (1)**
180:3
**business (19)**
8:15 55:19 107:19
108:4,6 141:21
160:24 161:19
202:11 269:3
273:12 275:3
288:15 307:3,4
309:22 329:11,15
329:17
**businesses (2)**
84:10 274:17
**busy (6)**
141:6 142:16 208:15
247:9 275:15 303:3
**buy (2)**
296:13 297:3

———————————————
C

**C (10)**
58:11 78:16 87:7,12
87:13,16 88:4 101:9
115:8 147:25
**CA (1)**
3:21
**cab (1)**
53:25
**calculated (1)**
301:11
**calendar (12)**
9:20,24 22:22,23 24:2
24:3,6,10,11,15,25
25:2
**call (40)**
35:13 59:18 60:23
61:18 65:13 131:11

187:16,17 188:5
194:6 205:22,25
206:3 207:14,16,18
207:21 208:2
209:20 210:14
212:3 213:22
214:24 219:11,12
219:12,22 228:19
228:20 229:25
230:3 236:5,5,6
240:6 295:21,21
296:11 302:25,25
**called (8)**
7:15 22:12 53:12
65:12 108:22
163:17 228:24
229:7
**calling (2)**
94:12 298:11
**calls (19)**
14:20 24:16 58:20
59:17 60:22 61:17
62:9 63:13 64:20
70:23 81:12 94:6
104:7 113:22
128:10 165:6,17
166:23 268:22
**camera (6)**
18:6 219:9 221:18
243:17 280:9,13
**Camille (2)**
3:16 6:25
**cancellation (1)**
38:9
**cap (3)**
95:8,9,25
**capable (1)**
14:17
**capacity (8)**
17:25 31:21 63:22
64:23 65:2 132:22
132:22 314:24
**capital (8)**
15:25 34:16 172:9
196:4,5 269:3
305:20 309:23
**capitals (1)**
15:9
**capping (1)**
95:6
**care (3)**
118:10 178:16 331:16
**careful (6)**
21:15 107:24,25
181:16 287:16
288:23
**carefully (3)**
67:8,21 251:21
**carry (3)**
24:12 54:22 203:25

**case (8)**
1:7 9:15 111:17
112:13 159:6,17
175:21 342:3
**case-in-chief (1)**
49:20
**cash (47)**
20:21,23 21:2,3 33:8
33:8,13 39:16 89:23
95:23 133:19 134:5
135:11,13,16,18
136:4,9,9 137:3
139:7 173:21
232:18 238:6
259:24 261:10
306:13,22 307:8,8,8
307:15,16,17,23,25
308:2,6,6,6 310:9
324:24 325:2,3,13
325:17,19
**categories (6)**
109:9 142:4 290:23
291:4,8,9
**category (15)**
93:24 100:22 101:4,9
101:18 102:12,21
105:16 106:15
107:14,22 108:8,10
264:13,14
**catty (1)**
178:14
**caused (1)**
84:3
**caution (1)**
333:14
**CDO (2)**
222:16 223:5
**center (2)**
145:22 243:25
**centers (1)**
101:22
**cents (1)**
279:24
**certain (19)**
11:16 16:9 21:6 42:7
70:20 102:22
106:14 120:15
121:20 187:5,6
204:6 210:15
218:22 249:20
250:8,16 257:2
322:8
**certainly (16)**
25:23 78:23 144:9
145:18 164:12
181:15 191:6
208:11 213:20
231:7 244:18
245:13 260:16
261:5 286:18

301:23
**certainty (2)**
189:17 257:3
**CERTIFICATE (1)**
341:3
**Certified (2)**
2:12 341:8
**certify (2)**
341:10,16
**cetera (2)**
143:3 275:19
**CFO (1)**
189:23
**chair (1)**
144:6
**chaired (1)**
198:6
**challenge (1)**
323:10,13,19
**challenging (1)**
288:5
**chance (6)**
158:6 194:20 226:4
239:23 240:13
314:14
**change (12)**
46:16 79:17 80:10,19
113:19 130:2
133:20 233:23
279:25 293:5
310:10 320:13
**changed (11)**
46:15 54:25 60:11,20
60:20 62:6 97:11,12
104:19 129:16
202:14
**changes (13)**
42:8,11 47:14,16,18
82:15 96:9 103:24
104:2,10,12 312:25
315:7
**changing (2)**
27:10 246:17
**Chapter (1)**
1:6
**characterization (1)**
325:21
**characterize (2)**
316:17,18
**charge (1)**
205:12
**charged (1)**
260:11
**chart (1)**
265:20
**Chase (2)**
162:21 163:6
**Chase's (1)**
162:23
**chatter (2)**

64:9 273:21
**cheap (1)**
302:9
**cheaper (1)**
243:24
**cheaply (1)**
276:5
**check (1)**
217:12
**checked (3)**
22:22,23 30:6
**cherry-pick (3)**
14:25 269:2 273:14
**chicken (1)**
14:8
**chose (1)**
17:10
**chronologically (1)**
153:19
**chronology (1)**
176:12
**circled (3)**
251:8 252:2 253:16
**circumstances (7)**
110:16 112:21 113:12
119:12 120:15
121:21 123:6
**city (3)**
7:25 8:2 214:13
**claim (1)**
72:17
**clarification (50)**
58:11 59:6 61:10
78:16 79:2,3,16
80:9,15 82:14,23
83:9 84:12,23 87:6
87:17 88:2 91:14
92:14 93:8 94:16
96:18 103:2,3,10,11
104:14,15 105:4,5,6
105:8 139:4,14
144:2 151:2,5,9
238:25 246:16
252:5,20,22 264:18
288:21 306:11
320:10,12 326:8,12
**clarifications (1)**
52:8
**clarify (5)**
80:23 252:17 317:16
318:13 342:7
**clarity (2)**
109:5 190:3
**class (2)**
94:13 99:2
**classes (4)**
97:20 98:13 133:12
133:15
**clauses (4)**
87:19,22 88:7,10

**clear (30)**
39:12 69:5 81:9 95:14
97:4 109:11 112:23
125:7,10 145:24
161:21 162:18
163:5 177:5,16
189:21 198:11
203:14 224:21
230:25 251:13
274:5 283:5 307:8
307:17 325:2 327:5
328:23 330:13
335:11
**clearance (5)**
264:21 315:19 319:2
319:7,12
**clearly (6)**
84:13,13 131:3
148:16 214:17
263:5
**Cleary (1)**
155:12
**click (1)**
302:24
**clients (2)**
186:11 322:3
**close (20)**
115:18 116:9 160:23
161:18 203:10
219:15 251:18
254:17 262:19
266:14 278:13
305:19 323:3,4
324:19 325:23,24
328:20 331:11,14
**closed (16)**
55:18,25,25 79:21
84:14 85:16 95:20
121:4 156:5 168:17
178:16 179:16
232:12 233:3
236:21 253:17
**closeout (3)**
80:20 93:19,21
**closeouts (1)**
185:5
**closing (106)**
21:4 23:17,20 33:16
34:18 48:3 52:22
53:2 54:9,14 55:17
55:21,23 56:10,19
56:25 57:18 58:13
58:23 64:13 65:5,7
66:5,9 67:6,19
68:21 69:18 74:15
78:14 79:6 82:16,17
91:11,13 92:2,9,13
113:20 114:4
123:25 124:6
125:23 129:12

135:4 139:23
143:14 146:8,12,22
146:25 147:6,8,16
147:20 148:4,5,9,12
149:6,11,17,20
150:7,9 151:16
153:13,16 155:18
176:16,23 200:3,18
257:23 270:4
278:23 286:11
287:4 289:4,8,22
290:2,4 291:5 306:5
310:23 311:5
323:10,18 324:2,3
324:11,12 326:24
327:13,15,19,22
328:3,6,11 332:4,7
333:5,22 334:16
**clothes (2)**
54:25 202:14
**CMTE (7)**
296:2 297:12 304:12
305:3 340:5,7,9
**codes (1)**
342:6
**coherent (1)**
217:3
**cold (1)**
215:20
**Coles (3)**
171:18,22,25
**collateral (26)**
20:15,15,16 21:6
39:20 40:3 88:20
90:24 91:5 92:16,20
93:2,8 132:15
133:19 151:5 161:2
162:13 163:4
173:16,20 192:4,8
192:16 257:3
293:14
**collateralize (1)**
34:22
**collateralized (3)**
34:14 222:12 226:20
**collect (1)**
181:18
**collection (1)**
51:10
**college (1)**
7:22,24
**colloquial (1)**
33:5
**colloquially (1)**
88:25
**color (3)**
215:7 233:23 235:7
**Columbia (2)**
7:25 8:7
**column (2)**

132:14,15
**columns (2)**
133:23 232:25
**combination (4)**
10:14,16 62:3 315:24
**combining (1)**
317:19
**come (17)**
19:21 23:19 36:16
50:3,3 57:17 76:14
96:19 139:22
169:17,25 205:16
209:16 249:12
285:24 303:12
326:15
**comfort (2)**
115:9 262:13
**comfortable (19)**
13:22 26:8 115:14
136:7,13 148:17
248:6 263:3 324:18
326:24 327:12,14
327:19,22 328:6
329:3,23 330:17,18
**coming (7)**
48:5 96:18 111:9
131:24 209:4
250:23 308:18
**Comisky (1)**
126:22
**commenced (1)**
42:5
**comment (6)**
231:5 269:4 276:19
277:19 308:4 310:5
**commentary (2)**
314:25 315:9
**comments (6)**
51:22 141:2,7,10,13
141:16
**commission (1)**
85:24
**Commissioners (1)**
116:10
**commitments (1)**
64:6
**committed (1)**
56:7
**committee (132)**
3:19 7:9,11,13 9:15
9:17,19 10:12 11:5
13:23,23 15:16 16:8
16:15,24 17:9,13
24:19 25:5 27:19,23
28:3,9,20,22 30:19
31:4,8,13 36:17,18
38:24 44:22 45:4,24
46:13,19 47:6,14
51:17 56:19,22
68:24 69:19 70:8,11

70:21 71:17,20,21
72:3,7,11,20 79:11
80:13,25 81:6,11,14
81:20 82:5 110:2,4
110:8,18 116:12
118:18 142:17
146:5,14 153:22
154:13 159:8,12,18
159:19 169:20
170:11 178:23
181:23 182:11
191:12,13,17 198:4
220:11 275:17
296:19,20 297:4,22
298:6,13,19 305:4,6
305:9 315:17
318:24 320:19,20
320:23 321:3,7,11
321:18,23 322:4,9
322:17,22,25 323:8
323:18 324:20
326:4,17 327:7,16
328:13,19 330:5
331:10 332:14,15
333:17 335:25
336:5,9,11 338:11
**committees (1)**
14:10
**committee's (6)**
25:9 29:10 33:21 34:7
34:9 46:15
**common (3)**
89:8 111:14 241:18
**communicated (9)**
68:23 69:18 79:9
84:16 163:13,13
164:16 214:17
333:16
**communication (3)**
220:16 303:11 321:15
**communications (7)**
22:17 27:4,8 31:14
187:25 217:16
298:12
**community (1)**
294:8
**comp (11)**
223:18,22 232:16
267:6,11 269:5,17
280:5 290:5,11,12
**company (4)**
47:17 154:3 200:15
302:3
**compare (4)**
151:17,24 169:13
189:8
**compared (4)**
185:5 231:7 249:24
255:14
**comparing (2)**

199:12 240:10
**compensation (3)**
266:25 267:25 276:15
**compilation (1)**
146:3
**compile (1)**
131:12
**complain (3)**
23:2 315:17 316:4
**complaint (1)**
316:18
**complete (7)**
37:25 124:15 132:2
155:23 170:24
174:12 326:21
**completely (3)**
78:20 180:17,19
**completeness (1)**
170:23
**completes (1)**
196:5
**completion (1)**
263:20
**complex (3)**
10:15 14:10 302:6
**complicated (2)**
10:11 258:6
**comport (1)**
186:25
**comports (1)**
220:23
**compound (3)**
46:22 68:19 279:17
**comprise (1)**
150:21
**comprised (3)**
58:18 59:2 266:18
**compromise (1)**
117:9
**compromised (1)**
329:20
**compute (1)**
310:22
**computer (1)**
16:5
**concern (14)**
19:23 21:17 109:10
118:2 142:7 154:11
202:18 209:3,5
253:22 274:15,16
294:8 318:25
**concerned (13)**
30:6 33:25 57:25
83:17 84:19 109:3,6
154:10 155:4
202:10 254:4 326:5
326:17
**concerning (51)**
22:7 26:3,22 28:3
50:6 51:6 53:3

69:23 74:18 76:22
77:2 84:4,6 101:3
114:17 125:9
127:15 128:5 129:4
132:25 133:6
151:12 157:2,15
162:5 178:24
187:10 188:25
194:6 202:24
213:17 216:18
237:19 264:21
268:20 269:8,20
298:16 311:5
312:18 320:23
321:11 324:3
326:24 331:9 332:9
332:11 333:8,10,24
334:2
**concerns (7)**
116:18 142:19 174:18
202:8 215:22
274:18 294:3
**conclude (4)**
109:22,25 110:7,17
**concluded (1)**
110:20
**concludes (1)**
337:3
**conclusion (13)**
58:21 59:17 60:23
61:18 62:9 63:14
64:21 70:24 94:7
104:8 268:23
328:10 330:25
**condition (4)**
94:4,8,9 95:6
**conditions (1)**
290:9
**conducted (1)**
127:12
**conference (10)**
82:2 145:21 147:24
148:22 185:3 188:5
205:22 207:15
245:22 275:5
**confidence (1)**
13:24
**confident (1)**
187:2
**confirm (1)**
79:22
**confirmation (2)**
85:18,20
**confirmed (3)**
81:17 83:21 182:24
**conflicted (3)**
64:23,25 65:10
**conform (1)**
342:7
**confused (8)**

118:13 140:24 184:24
230:8,15 233:16
242:15 303:21
**confusing (1)**
220:19
**confusion (11)**
34:4 39:9 131:8
182:15 210:11,12
248:3 250:3 254:3
314:7,11
**connection (17)**
25:11 72:20 91:22
116:7 130:25
138:21 139:25
146:7 147:7 197:24
198:2 199:20 251:5
273:2 324:17,23
325:4
**Connor (15)**
159:4,5 160:23
164:13 211:23,25
212:2,3,5,6,6,8,13
213:5,6
**consent (15)**
46:16 47:19 79:15
80:25 81:7,14
324:20 325:6
326:16 327:16
328:13,13,19 330:5
331:10
**consents (1)**
48:13
**consequences (8)**
111:5,25 114:24
115:16,22 116:16
116:16,17
**consider (17)**
9:16 42:4 60:3 70:11
108:24 109:15,20
109:23 119:11,14
178:23 300:16
323:8,18 335:25
336:5,9
**consideration (6)**
85:8,19 116:14,20,24
118:20
**considerations (4)**
113:5,12 114:16
117:18
**considered (4)**
122:7 197:15 296:22
297:4
**considering (1)**
72:11
**consistent (27)**
66:11 68:10 69:25
70:5 75:11 76:5,7
76:25 80:4,8,21
86:3 123:14 154:6
157:9 180:6 235:8

262:16,21 279:19
280:3 284:4 313:4
314:5 319:8 329:16
329:21
**Consulting (2)**
15:20,21
**consuming (1)**
10:15
**consumption (1)**
156:20
**contact (1)**
202:21
**contacting (1)**
162:25
**contain (1)**
95:6
**contained (2)**
128:5 255:18
**contemplated (2)**
121:18 184:14
**contemplating (2)**
72:8,20
**contemplation (3)**
122:9 123:12 255:15
**contemporaneous (1)**
220:5
**contents (2)**
171:5,7
**context (20)**
99:14 110:23 111:20
116:25 118:8 120:7
131:5 140:17 177:9
183:22 230:13
240:19 248:16
265:23 298:24
300:19 307:18
312:23 325:11
330:14
**continuation (2)**
97:13 118:24
**continue (3)**
10:7 111:17 284:24
**continued (6)**
53:25 152:12 202:21
228:23 233:16
336:18
**continuing (1)**
313:13
**contra (1)**
122:17
**contract (7)**
64:23 65:2 75:6
124:25 310:24
329:12,12
**contracts (10)**
106:23 267:9 268:21
269:2,25 270:4
283:21 290:3
310:17 311:6
**contradicted (1)**

155:5
**contras (1)**
120:8
**controlled (1)**
205:7
**controversial (1)**
294:25
**controversy (1)**
305:23
**conversation (99)**
81:7 82:4,10,10,13,19
83:8 104:16 120:7
132:5 135:2 138:8,9
142:9,22,24 200:5
211:20,21 215:16
215:17 220:19
221:11 227:6,12
228:16,17,23 229:6
229:12 230:14,15
232:2,6 233:12,14
233:15 235:2,10,11
235:12,13,16 236:3
237:9,25 239:3,13
239:13 240:11
241:8,16,17 242:2,4
242:11,13,24 246:5
246:9,11 247:7
248:13,17 255:19
260:20,21,24
261:19,24 262:3,8
263:5 264:11 266:6
278:15 301:25
303:23 307:12
308:10,15,22
312:10 314:19
317:17 319:7
324:22 325:14,15
325:20 326:2,20
328:25 329:7 330:2
330:3,20 334:9
335:13
**conversations (34)**
53:15 77:9 78:4,9,11
81:24 131:3,20,22
134:20 138:24,25
197:22 213:25
214:5 221:3 233:19
238:8 239:19
240:20 241:25
242:17 256:11
271:21 274:3 304:3
306:9 320:19 325:8
326:8,22 331:2,24
332:18
**converted (1)**
135:15
**convinced (1)**
256:9
**cooperate (1)**
250:25

**cooperation (7)**
124:9,10 183:11,13
183:17,21,25
**copied (3)**
195:14 272:9 294:20
**copy (9)**
57:2,19,21 58:5
195:18 212:17
218:2 268:17
290:13
**copying (1)**
291:24
**core (1)**
141:20
**corner (2)**
263:23 265:20
**corners (1)**
64:15
**Corp (5)**
222:16,17 223:4,7
233:9
**corporate (7)**
8:20 9:3,6 62:4 64:10
82:9 222:10
**corpus (2)**
256:13 279:10
**correct (43)**
23:14 29:4 37:16 38:6
38:16 43:8 44:13
45:2,3,25 47:12
48:10,22,24 49:2
66:5 92:17 101:22
103:6 106:18 124:6
124:7,8 125:24
153:11 168:11
182:21,23 188:22
192:17 207:25
213:12 214:14
224:10 228:18
236:9 244:5 255:21
255:25 288:11
289:8 300:5 342:8
**corrected (1)**
30:7
**correctly (1)**
133:10
**correlated (1)**
249:3
**correlates (2)**
63:23 225:22
**correlation (1)**
201:8
**costs (2)**
107:3 267:8
**counsel (19)**
6:21 22:2 46:19 59:22
71:3,15,16,20 80:13
179:13 181:22
182:5 188:2 216:24
253:2 312:15,24

318:2,19
**counseled (1)**
113:5
**counsel's (1)**
111:16
**count (3)**
284:16,17 285:13
**countervailing (1)**
113:4
**country (1)**
102:5
**COUNTY (1)**
341:6
**couple (5)**
11:19,20 213:24
302:23 308:5
**course (9)**
64:10 85:17 96:10
100:3 174:13 175:6
240:6 244:12
327:23
**court (78)**
1:2 5:20 6:15,18 9:18
32:20 36:17,18,23
42:7 47:13 58:25
63:23,24,25 64:3
65:10 68:5,17 69:12
69:25 77:2,11,13,19
80:22 85:15 86:4
95:5 96:8,12,19
97:18 98:11,25
99:10 104:11
110:11 111:11
112:17 125:4 154:6
156:10,15 179:9,20
180:7 182:4 183:23
184:16,19 186:9
205:3 221:7 246:20
249:12 268:12
269:8 274:12,13
282:4,12 302:12
310:8 313:3 315:3
324:20 326:25
327:14,20,24 328:4
328:7,12,14,17
329:16,25
**courthouse (1)**
315:16
**courtroom (4)**
36:2 52:12 312:15
313:17
**court's (7)**
179:9,12 180:13
181:13,18 183:5
323:20
**cover (3)**
66:7,7 160:2
**coverage (1)**
53:24
**covered (1)**

98:22
**Cox (1)**
247:10
**co-CEO (1)**
12:5
**create (2)**
13:13 82:15
**created (1)**
34:4
**credible (5)**
112:10 113:13 114:22
115:4,9
**credit (1)**
161:2
**creditor (2)**
46:15 47:6
**creditors (32)**
3:19 9:14 28:20,23
45:23 46:13,19
49:22 51:19 117:11
159:8 169:20
215:24 273:4
274:20 276:25
277:2,5 278:16
296:19,20 297:22
318:24 320:18,20
320:22 321:3,6
322:22,24 327:15
338:12
**crises (1)**
66:8
**crisis (1)**
154:16
**crisises (1)**
66:8
**critical (1)**
170:5
**criticize (1)**
183:22
**crossed (5)**
229:10,14 230:5
232:13 233:4
**cross-out (1)**
225:13
**crowd (1)**
314:23
**CRR (2)**
1:17 341:23
**cube (1)**
186:22
**cure (22)**
107:3 223:16 235:7
267:8,17 268:18
269:4,6,9,17,20
270:10,12 276:13
276:14 280:4,4
283:20 310:16,23
310:24 311:5
**cures (4)**
266:11 287:2 311:21

315:13
**currently (1)**
131:17
**curved (2)**
231:24 232:5
**cushion (1)**
89:10
**customary (1)**
110:10
**customer (2)**
107:19 117:23
**cut (3)**
176:11 208:25 262:25

_____
**D**

**D (8)**
87:19 88:7 102:21
104:4 105:3,7
290:24 291:2
**Dan (8)**
207:9,10,11,24 208:2
211:10,17 212:3
**Danny (5)**
272:22,22,23 273:8
274:12
**dare (1)**
316:6
**dash (1)**
233:5
**data (2)**
101:21 108:5
**date (54)**
6:3 28:24 37:7 43:14
43:17 45:10 53:24
65:21 72:3 102:23
126:10,13 129:18
129:21 133:13
134:3 145:3 150:20
150:21 156:12,16
157:25 170:15,20
178:10 184:21
185:10 193:4 194:4
194:16 206:7,15,18
206:21 215:21
216:7 221:6 245:3,6
254:15 262:9 270:4
291:16 295:6 296:3
297:13 304:13,24
310:13,24 311:6
312:6 321:19 342:4
**dated (14)**
40:19 45:8 58:8,10,12
126:20 149:18
157:23 291:13,14
310:20 338:13,21
339:22
**dates (6)**
9:21 75:5 124:18
217:13,18 335:2
**day (15)**

3:4 7:4 40:2 55:22
97:5 111:12 198:25
220:24 257:19,20
312:8 317:22
319:14 337:10
341:21
**days (5)**
149:24 183:17 202:14
259:9 324:11
**day's (1)**
260:18
**day-to-day (3)**
11:7 159:10,17
**dead (1)**
275:14
**deal (47)**
10:17 27:2 63:21
96:24 98:5 104:10
115:25 116:6,7,9
119:20 156:4
164:19 195:24
196:3,6,7 200:8,12
204:5,5 208:16,25
230:10 242:19
246:19,24 247:21
249:10,16,23
250:24 251:15
255:2,3 273:24
274:25 275:4 276:6
278:14,25 301:9
303:7 306:17,17,18
313:11
**dealer (1)**
161:2
**dealing (3)**
51:22 179:23 224:18
**deals (2)**
247:25 329:19
**dealt (1)**
180:8
**debate (3)**
272:16 328:8 330:24
**debtor (6)**
64:22,25 154:15
183:18,23 326:4
**debtors (5)**
1:9 63:19 107:6
110:25 310:22
**December (20)**
1:14 2:5 6:11 37:21
38:24 39:5,8,19
40:19 45:9,13
153:24 176:17,23
176:24 188:15,16
337:11 338:13
341:21
**decide (1)**
9:9
**decided (3)**
109:11 242:17 259:22

**decision (1)**
109:14
**decisions (3)**
179:14 322:8,18
**declaration (5)**
19:13,16 29:13,17
46:9
**declined (1)**
267:5
**deducted (1)**
237:15
**deemed (1)**
56:8
**defaults (1)**
310:16
**define (9)**
21:12 27:9 89:5
147:19 199:7
288:24 289:9 331:6
331:7
**defined (3)**
20:19,23 88:14
**defines (2)**
20:14 34:6
**defining (1)**
145:14
**definite (3)**
289:2,6,20
**definitely (7)**
55:4 143:16 213:23
216:21 236:6 261:9
313:10
**definition (22)**
18:23,24 19:4,8,9,15
19:21 20:6,10,13,23
33:3,5,6 35:2,5
39:19 87:19 88:8,25
101:25 122:18
**definitions (10)**
18:14,19 19:25 21:10
21:11,16,24 33:25
34:3 89:4
**definitive (2)**
38:19,20
**degraded (1)**
256:15
**degree (1)**
115:8
**delay (3)**
118:4,20 247:4
**deleted (1)**
103:2
**deliver (1)**
267:9
**delivered (2)**
88:16 135:12
**delivery (2)**
168:13,17
**demand (3)**
144:11 183:23 299:7

**demanded (1)**
308:25
**demanding (1)**
299:11
**deny (3)**
146:5,11,14
**department (2)**
8:20,21
**depend (1)**
203:11
**depended (1)**
283:21
**depending (1)**
169:25
**depends (1)**
62:13
**deposit (1)**
306:24
**deposition (27)**
1:12 2:8 5:16 6:2,6,9
17:22 18:4,10,10,14
21:20 22:20 24:2
25:12 26:5,21 31:7
31:7 78:17 100:12
271:23 300:3 338:8
341:12,13 342:4
**depositions (1)**
284:14
**deposits (1)**
100:17
**derivative (1)**
137:17
**derivatives (4)**
210:8,12,15,17
**derived (1)**
289:16
**describe (9)**
7:21 8:3 13:11 109:8
217:20 220:10
243:16 246:8
289:17
**described (44)**
19:13 27:2 40:2 77:10
77:13,19 78:12,12
82:16,17 98:4 99:8
99:13 100:16
104:10,12 108:21
109:16 110:6
112:18 114:7,17
116:15 123:17
126:5 136:25
140:10 154:24
168:15 183:2
184:16 185:2
238:13,14 259:6,11
266:20 276:4,16
296:12 297:2,7
329:25 335:6
**describing (4)**
39:25 84:10 96:24

176:14
**description (7)**
41:21 97:14 98:5
100:18 167:14
289:15 324:5
**descriptions (1)**
51:25
**desire (1)**
117:22
**Despins (3)**
145:6,8 305:18
**despite (2)**
113:3 116:11
**detail (11)**
38:10 50:4 77:11
78:12,13 138:23
173:9 203:6,9,25
209:11
**detailed (3)**
78:3,11 329:2
**details (13)**
83:14 190:7 198:16
203:6,16 204:6,8,23
215:18 249:15
273:8 329:13,15
**deterioration (5)**
185:4 257:18 262:23
264:10 265:8
**determination (1)**
146:2
**determine (6)**
35:22 68:9 76:3 80:7
131:10 141:18
**determined (1)**
237:15
**developed (2)**
129:3 190:5
**development (2)**
189:12 208:20
**developments (1)**
189:25
**diamond (1)**
219:17
**died (1)**
290:7
**difference (2)**
254:5 292:7
**different (33)**
11:6,7,17 12:17 24:8
27:2 31:22 37:5
44:3 102:4,6 114:7
114:10 129:5,21
133:12,15 133:17
157:18 159:13
177:2 212:6 218:18
234:11,13,14,21
235:7 243:21,24
244:2 250:2 309:20
**differential (1)**
122:25

**difficult (1)**
272:7
**difficulty (1)**
19:18
**dig (7)**
175:4 176:9,10 177:3
178:3 182:23
212:22
**diligence (6)**
117:16 123:21 214:21
263:9 274:8 323:7
**dire (7)**
111:5,24 114:24
115:16,22 116:15
116:16
**direct (6)**
26:7 41:14 65:24
117:16 170:25
237:3
**directed (1)**
282:19
**direction (4)**
19:23 155:10 178:6
182:11
**directly (12)**
26:11 77:4 117:21
136:22 151:13
155:11 156:3,22
187:18 198:23
274:9,11
**directors (2)**
10:10 12:11
**disappearing (1)**
209:4
**disclosed (2)**
82:24 85:14
**disclosure (5)**
82:20 83:3 84:3 86:4
87:3
**discount (2)**
273:15,16
**discovery (6)**
21:23 25:14 178:24
181:21 183:24
336:10
**discretion (1)**
268:20
**discuss (4)**
73:3 82:14 185:17
210:7
**discussed (16)**
77:18 162:11,13
163:3,3,22,25 164:2
164:4,12 267:12
270:13 279:15
326:12 327:10
334:24
**discussing (3)**
257:19,20 285:18
**discussion (29)**

discussion (29)
18:8 74:17,25 76:20
95:8 128:13,17
200:14 208:23
238:11,18,19
264:20 303:25
306:12,16 312:17
314:2,17 317:12
318:11 324:16,21
328:22 332:9,13
333:6,7,24
discussions (12)
46:7 47:8 77:17 83:6
123:13 144:19
213:17 305:23
306:2 323:25
333:12 334:14
disinvited (1)
143:23
disproportionate (1)
180:9
dispute (1)
165:14
disputes (1)
39:14
distinction (1)
258:8
distinguish (1)
327:9
distressed (1)
8:22
DISTRICT (1)
1:3
disturbed (1)
116:3
dive (2)
14:13 301:9
division (1)
200:10
document (102)
18:22 28:19,21 29:7
45:7 58:3 64:2,13
66:18 75:13,20
94:14,21 126:8,11
126:19 129:25
137:9 139:19
144:25 156:14
158:3,5,6,10,21
159:3 165:11,13,22
165:23,25 166:4,11
166:14 169:3,15
170:13,16,18 171:2
171:5 172:5 175:15
192:25 193:2,6
194:14,17 195:9
206:5,13,16,19
207:2 211:6 216:5,8
244:8,11,25 245:4
255:16 268:23
272:7 294:16 295:4

295:10,17,24,25
296:6 297:10,11
304:11,14,22
307:16 310:11
311:13 325:22 338:9
338:15,17,19,22,24
339:3,4,6,8,10,12,14
339:16,18,20,24
340:5,7,9,11,13
documenting (1)
278:24
documents (20)
21:25 25:19 58:24,24
59:8 61:5,23,25
63:18 64:8 66:10
67:4 75:21 85:15
115:6 145:24 146:3
155:24 186:2 207:2
doing (11)
9:3,10 22:4 68:2
117:16 141:4 163:6
197:4 215:10
246:23 248:17
dollar (26)
20:20,22,25 122:24
135:5 136:3 160:25
163:6,19,20 167:10
168:13 172:19
176:7 177:4 178:5
180:11 181:10
182:19 188:20
224:13 225:2
232:11 238:5
239:25 242:25
dollars (44)
21:2 30:16,20 32:22
38:4 39:3 40:22
42:13,15,18,22 43:6
85:5,17 99:19
102:24 122:17
162:12,13 163:4,19
181:14 182:2,8
183:19 190:9,10
192:23 196:8
197:14 238:4
251:18 254:22
262:19 266:9,15
273:16 275:25
276:20,24 277:11
277:20 288:25
296:13
doodle (1)
248:24
doodled (3)
248:20 249:5,17
double (1)
80:18
doubt (1)
279:23
download (1)

204:19
draft (4)
83:9 108:16 139:14
164:19
drafts (2)
320:9,11
dramatic (1)
42:11
drawing (1)
330:11
dream (1)
14:24
drew (1)
236:18
drinking (1)
12:22
drop (2)
53:23 294:3
dropped (7)
44:11 95:19 142:3
255:4 263:17,15,16
dropping (1)
293:23
DTC (10)
39:12 51:21 52:3
131:12 133:19,19
144:7 249:13 250:5
314:8
duly (2)
7:16 341:13
duty (1)
117:10

_____

E

E (5)
87:19 88:7 105:7
290:24 291:2
earlier (27)
33:10 40:2 89:2 104:9
141:25 155:25
176:11 191:19
192:12 220:24
228:21 233:13
237:3 242:14
253:21 254:3 269:4
274:2 288:17
299:16,21 300:3
301:14 306:6 313:6
318:11 326:9
early (12)
9:3 55:10 78:6 139:15
143:10 175:21
213:24 219:5
236:12 244:9 246:3
246:6
earnings (1)
195:25
ease (1)
9:23
easier (1)

220:4
East (1)
3:6
eat (2)
143:18 145:22
economic (1)
259:6
economics (1)
200:19
Ed (4)
295:12 296:17,18,18
education (1)
7:21
Edward (1)
297:19
effect (9)
5:19 104:4,6 114:17
226:9 246:23 263:4
313:12 324:25
effectuate (1)
259:10
effectuation (1)
298:22
effort (4)
11:10 131:10 155:14
183:4
efforts (1)
155:20
egg (1)
14:8
Ehrmann (3)
171:17,22,23
either (30)
35:14 43:24 53:13,14
56:17 70:7 85:14
99:22 102:15
136:25 137:5
148:14 156:3
157:13 159:23
177:17 186:9 188:6
196:14 198:23
203:17 208:3 214:3
250:16 258:4
267:19 275:17
286:24 324:2
334:22
elapsed (1)
311:13
eligible (1)
293:7
Emanuel (6)
3:18 7:8,11,13 30:10
45:22
embarrassing (1)
212:23
embodiment (1)
277:2
emotional (1)
52:10
employee (6)

189:24 204:13 211:24
211:25 266:11
290:6
employees (14)
112:2 114:17 116:17
118:4 159:6 212:19
235:7 267:2,21
268:2 269:18 287:2
290:6 303:22
employee-related (1)
283:14
empty (1)
233:10
ended (9)
53:11 54:3 163:6
228:17 233:12
235:5,16 240:20
263:6
endless (1)
250:24
enforcement (1)
60:14
engaged (2)
9:13 193:18
engagement (3)
9:16 11:12 12:21
enlist (1)
183:4
enormous (1)
181:14 183:17 313:8
entailed (1)
34:20
entered (1)
9:18
entire (6)
8:18 50:16 54:10
98:23 171:12 199:3
entitled (6)
32:9 281:9 285:3,5
310:11 340:13
entry (2)
164:14,15
environment (6)
100:3 140:8 154:14
173:7 260:11
313:12
Epic (1)
310:21
equal (3)
95:2,16 275:23
equities (1)
222:10
equivalent (1)
286:12
Eric (12)
11:3,14 12:10 22:25
213:11,13,13,16
214:4,18,22 291:23
Erica (4)
3:22 7:12 252:7,24

**ERRATA (1)**
342:2
**errors (1)**
342:8
**escrow (1)**
55:24
**ESQ (8)**
3:8,9,15,16,22,23,24
4:8
**essentially (1)**
120:6
**established (1)**
92:15
**estate (31)**
61:23 79:18 99:9
101:19,20 104:10
108:17 117:7,10,22
118:10,11 144:2
179:23 183:23
198:19 199:14
232:15,16 273:9
275:10 277:6 288:2
288:4,13,14 293:2
294:11 321:20
325:12 329:20
**estates (2)**
64:22 117:11
**estate's (1)**
65:2
**estimate (10)**
258:18 267:8,13
268:7,8,11 279:22
283:17 289:19
311:21
**estimated (5)**
258:16 264:22 278:18
291:3,9
**estimates (5)**
279:3,16 282:9,13
287:4
**et (4)**
1:8 6:8 143:3 275:18
**European (1)**
274:17
**evening (11)**
42:5 54:5,13 81:17
132:10 137:21
214:24 216:11,14
228:5 320:9
**event (1)**
292:10
**events (4)**
23:16 24:3,8 26:11
**even-for-even (1)**
237:4
**everybody (2)**
51:11 144:8
**exact (10)**
39:20 49:8 75:4 83:4
86:6 156:12 290:4

293:15 307:22
328:2
**exactly (35)**
14:12 38:21 47:24
49:17 54:4 75:22
78:8,10,20 85:7
109:5,8 115:8 132:8
136:24 147:19,20
150:19 154:4,20
155:24 165:9
169:24 177:14
178:8 184:18 185:9
196:17 210:5 221:8
237:2 279:24
287:16 299:8
308:20
**EXAM (1)**
338:3
**EXAMINATION (1)**
7:18
**example (4)**
85:2 86:23 123:16
173:9
**exasperated (1)**
247:13
**exceed (2)**
89:22,24
**excerpt (1)**
45:11
**excerpts (1)**
170:22
**excess (2)**
237:16 335:6
**exchange (7)**
95:21 120:6 136:5
145:5 213:10 275:6
275:21
**exchange-traded (2)**
210:8,16
**exchanging (1)**
145:23
**excited (1)**
140:7
**exciting (1)**
52:9
**excluded (1)**
173:23
**exclusion (2)**
202:5,7
**Excuse (1)**
251:24
**executed (2)**
58:11 63:12
**executing (1)**
42:9
**execution (4)**
57:21 76:4 80:17
239:2
**executives (3)**
187:6 188:24 189:4

**exercise (1)**
323:6
**exhibit (138)**
6:2 17:21 18:11 28:19
28:21 29:7 45:7,8
45:11 58:4,7,9,11
60:6 61:16 65:9
69:11 73:2 78:16,17
87:7,12,13,16 88:4
100:11,12 126:7,8
126:11 128:6 129:2
130:12 144:21,25
145:4 148:25
149:14 155:25
156:14 157:23
158:4,20 170:13,18
188:20 191:15
192:25 193:2
194:13,14,25
199:24 206:2,5,13
206:16,19 211:14
216:4,5 217:23,25
218:5 221:20
234:20 243:13,14
244:7,25 245:4
246:2 253:21,24
255:24 261:16,21
261:22 265:21
266:3 267:16
270:17 272:6 276:2
276:3 290:14,15,16
290:17,17,18
291:13,14,17 295:3
295:4,24,25 296:5
297:11,18 304:10
304:11,18,21,22
305:11 309:8
310:11,14 338:7,8,9
338:13,15,17,19,21
338:22,24 339:3,4,6
339:8,10,12,14,16
339:18,20,22,24
340:3,5,7,9,11,13
**exhibits (6)**
58:7 59:7 287:13
338:6 339:2 340:2
**existed (2)**
104:24,25
**existing (1)**
200:23
**exists (1)**
104:25
**expect (2)**
52:6 154:8
**expectation (5)**
85:13 87:2 181:24
183:10 186:18
**expected (6)**
86:2 154:8 155:7
186:23 195:25

202:10
**expedited (5)**
14:16,18 178:24
179:15 336:10
**expeditious (3)**
179:21 181:21 183:24
**experience (12)**
8:4 10:11 14:10 16:2
16:10,25 17:8 85:5
89:8 200:21 201:21
204:3
**experienced (1)**
61:7
**expertise (1)**
15:14
**explain (30)**
44:16 73:13,25 75:16
80:6 83:19 93:15
111:2 112:11 117:2
140:25 141:25
142:6 202:20
225:12 226:3
227:15 241:20,23
242:24 249:10
258:23 260:11
277:12 306:19
314:12 316:19
328:5,18,24
**explained (9)**
39:15 48:7 84:11
123:15 188:7
256:20 275:4
314:13 330:16
**explaining (4)**
115:5 253:15 260:10
330:13
**explanation (22)**
48:9 83:20,22 84:14
134:23 135:11
142:18 174:12
186:24,24 249:15
250:7 255:2 256:10
256:22 262:22
263:8 316:3 317:20
329:2 330:6,24
**explanations (1)**
155:8
**explicit (1)**
173:19
**explore (1)**
72:16
**exposure (4)**
34:17 267:13 268:5
269:9
**express (1)**
318:24
**expression (1)**
280:10
**extended (4)**
34:13 44:5 89:19

197:2
**extension (1)**
223:14
**extent (6)**
26:10 69:16 129:8
306:21,23 332:13
**Extinguish (2)**
163:18 167:17
**extra (2)**
266:10 284:3
**extraneous (1)**
117:6
**extremely (2)**
13:15 299:4
**e-mail (45)**
127:2 131:2 145:5,8
160:2,9 162:9
163:11 170:8 193:8
195:12,13,14,15
197:2 203:19
211:15,17,18 212:2
213:10 214:11
272:5,10,13,15,17
272:19,21 274:5
291:13,14,20,22,23
292:19,20 294:21
295:11 297:19
300:4 305:15,17
310:3 339:22
**e-mailed (2)**
158:24 272:2
**e-mails (7)**
21:22 25:13,15,23
158:15 272:10
305:12
**e.g (3)**
302:9 329:11 330:4
**E1592 (2)**
126:9 338:16

_____

**F**

**F (6)**
1:17 2:11 290:24
291:2 341:7,23
**face (9)**
68:4,16 69:10 76:17
76:23,24 169:12
280:10 325:3
**faced (1)**
14:13
**faces (1)**
280:14
**facetious (1)**
276:25
**facility (1)**
161:2
**fact (14)**
116:6 117:4 147:14
197:12 200:6 210:3
229:4 262:13 294:7

300:10,19 301:5,16
315:25
**factors (3)**
116:14,19 118:6
**facts (11)**
19:24,25 21:10 26:3
65:25 112:11,13
113:18 155:5 162:8
342:7
**fail (2)**
124:12 292:23
**fair (10)**
164:17 169:17 191:5
276:8 293:25
300:22 303:10,12
303:14,14
**fairly (2)**
136:7,13
**faith (1)**
258:11
**falls (1)**
176:19
**false (2)**
32:3 39:6
**familiar (5)**
16:7 47:22 296:9
302:4 304:16
**far (2)**
24:13 137:21
**fast (1)**
227:20
**faster (3)**
44:14 75:17 150:3
**fateful (1)**
47:10
**favor (2)**
141:4 278:13
**Fazio (30)**
11:14 12:18 22:25
23:11 50:14,15 51:5
51:10 53:14 126:22
132:6 134:22
138:11 142:10
143:7 170:4 207:23
244:17 245:12
256:8,20 260:25
261:5,7,14,18 262:7
299:5 319:21 320:2
**February (6)**
155:15 187:4 188:17
188:23 189:3
191:10
**Fed (64)**
18:25 19:10,19 20:8
20:11,17 21:8 30:15
31:5 32:6,17 33:3
34:13,15,21,23,24
35:2 36:5,13,20
39:2,10 40:10,21
42:11,24 43:7,15,16

43:23 44:3,6 89:9
90:3,9 130:15
133:19 138:21
140:2 160:25
161:19,24 162:5
163:18,19 167:18
168:3 200:3 208:18
209:22 222:12,15
224:25 238:6,17
251:2 264:8 287:20
292:6,12,22 293:6,7
**federal (4)**
34:12 112:2,3 116:18
**Feds (1)**
292:15
**Fed's (4)**
34:17,20 90:12
209:23
**feel (6)**
13:17 14:16 26:7
113:14 117:18
203:22
**feeling (1)**
18:6
**felt (16)**
14:2 16:9 52:11,25
64:25 73:3 115:13
145:24 148:17
179:6 182:22 183:3
187:2 203:18
235:21 297:4
**felt-like (1)**
243:23
**fending (1)**
281:4
**fiduciaries (1)**
321:21
**fiduciary (1)**
117:10
**Fife (19)**
38:20 41:14 80:21
82:8 85:21 97:10
98:17 99:9,23 125:3
125:3 143:6 184:19
185:18,22 186:4,7
244:17 245:12
**Fife's (1)**
86:4
**fight (1)**
329:18
**Figueroa (1)**
3:20
**figure (30)**
13:7 53:20 116:8
131:13 135:6 164:8
164:9,14 165:3
166:18 167:10,18
167:21 173:12
190:25 212:25
220:8,22 224:14

225:2 239:9,25
241:21,24 242:25
251:12 252:11
257:10 261:20,21
**figured (1)**
249:5
**figures (12)**
132:18,25 133:3,6
138:13 186:6
240:23,25 278:18
278:22 279:3,14
**file (2)**
154:23 208:18
**filed (10)**
35:21 41:12 58:25
154:23,24 156:10
156:15,18 270:5
311:10
**filing (8)**
5:7 9:20 58:6 85:15
176:16 188:14
294:10 311:13
**fill (1)**
166:25
**final (41)**
48:18 57:2,19 58:18
59:2,13 60:18 62:21
63:11 66:6 67:4,7
67:20 69:24 72:24
74:19 76:23,24
77:19 78:15 91:13
95:5 96:13,13 97:19
98:12 103:14,18,19
104:3,18 150:13,22
155:23 156:5,10
220:16 247:25
255:13 265:2 303:2
**finalize (4)**
143:15,16 145:19
200:15
**finalized (2)**
100:6 145:11
**finally (4)**
78:7 140:20,21
245:12
**financial (15)**
9:14 10:9 11:18 14:3
14:17 15:15,18
71:20 79:11 114:18
116:2,18 159:13
287:7 294:8
**financials (1)**
14:12
**financing (3)**
34:14 222:16 223:6
**financings (1)**
89:9
**find (14)**
15:2 75:12 90:12
167:25 175:6

216:24 239:23
240:13,22 264:7
281:5 287:13
300:24 311:16
**fine (16)**
9:12 11:24 18:18
21:14 65:22 84:12
186:19 205:14
206:4 212:24
220:14 221:12
265:18 280:23
283:17 285:9
**finish (20)**
64:5 66:14,22 86:19
86:20 97:7 122:5
177:12,21 180:21
180:24 181:4
225:18 252:8
280:16 284:9,14,19
285:3,6
**finished (2)**
248:14 277:25
**finishing (4)**
126:3 187:21,23
230:12
**fire (2)**
179:21 302:13
**firehose (1)**
12:23
**firm (23)**
8:8,13 12:4,6 15:2,19
17:11 35:20 82:11
96:6 97:20 98:13,21
149:11 155:13
197:10 235:15
256:9 270:6 272:24
283:17 284:3 320:6
**firms (1)**
15:5
**first (48)**
8:19 9:13 11:11,19,20
12:20 14:6 36:10
58:9 87:8,17 91:11
110:25 132:13,24
143:20 150:24
151:3 155:13
158:19 159:25
160:3 164:22 170:8
174:22 176:15
177:6 187:24
193:18 194:22,24
195:25 198:9
205:13 218:21
221:13 248:17
259:5 264:12 265:3
270:22 283:7 293:6
310:21 319:16,17
325:10 327:17
**fit (1)**
249:16

**five (3)**
149:24 181:14 246:11
**fixed (1)**
108:3
**fixing (1)**
86:3
**fixtures (1)**
101:11
**Flexner (5)**
2:9 3:11 4:12 6:24 7:2
**flip (1)**
293:11
**floor (3)**
3:20 145:21 245:23
**flow (1)**
164:8
**flying (1)**
264:17
**FMV (1)**
273:15
**focus (13)**
26:18,18 34:9 35:22
83:7 100:15 145:6
163:2 194:20,24
327:17 335:9,9
**focused (5)**
13:8 16:4 98:9 112:4
215:12
**focusing (13)**
34:3 38:23 76:16
83:24 86:22 120:20
125:21 135:5 162:3
164:21 207:4 238:9
251:10
**Fogarty (4)**
171:17,22,23 172:11
**Fogarty's (1)**
161:25
**folder (9)**
136:24 243:20,21
245:25 248:15
249:18 251:6
258:19 309:8
**folks (1)**
275:18
**follow (4)**
204:13,14 280:16
302:11
**followed (6)**
188:2 189:14,22
232:3 271:12
330:14
**following (8)**
103:24 141:14 256:10
317:24 324:11
327:5 328:9 330:6
**follows (2)**
7:17 228:7
**follow-up (10)**
79:25 93:11 132:5

187:13,19,22
205:22 214:21
300:25 329:8
**foot (1)**
265:24
**football (1)**
143:19
**footed (3)**
256:21,22 262:14
**footnote (12)**
30:12 31:23 32:15
35:6,15,20 37:6,13
40:5,7,18 167:13
**force (1)**
5:18
**forced (1)**
208:17
**foreign (2)**
117:24 302:2
**forget (7)**
171:25 220:25 226:12
226:14,22 229:13
307:21
**form (139)**
5:10 10:5,23 12:13
13:20 14:5,20 27:5
28:6 30:21 32:10,23
35:9 37:2 41:7,19
42:25 46:21 48:11
53:6 58:20 59:16
60:22 61:17 62:8
63:13 64:20 65:12
67:12,16,22 68:19
69:14 70:15,23 77:7
84:7,15,21 85:14
89:12,13 90:6,14,19
91:2 94:6 96:15,16
97:22,24 99:4
100:23 101:8
102:18 103:7,13,21
104:5,7,20 106:8
109:18 110:14
113:7,22 114:8
116:21 119:8
121:23 122:14
123:8 124:2 129:6
135:23 136:16
146:9,18 147:2,17
153:20 163:23
168:23 179:2
180:15 183:7 184:8
190:13 191:4
192:18 196:12,20
197:17 202:3,4
204:9,11 205:9
210:19,21 229:18
237:21,22 239:11
250:12,18 257:5
258:3 266:4 268:22
269:10,22 274:23

278:20 279:4
282:14 287:8
288:18 289:23
297:6 298:11 300:6
300:14,18 301:18
303:19 306:3
316:24 321:15
322:11,20 323:15
323:22 324:7 325:9
328:21 329:5
330:12 331:4
**formal (3)**
185:20 257:25 258:7
**formed (3)**
59:20 61:20 62:10
**former (1)**
189:23
**forming (1)**
116:11
**formulas (1)**
10:18
**forth (4)**
178:19 240:10 314:10
341:12
**forward (6)**
46:5 81:20 89:3
111:19 112:5
203:25
**forwarded (1)**
272:3
**found (7)**
85:22 182:3 210:4,5
280:17 317:23
319:21
**foundation (27)**
15:17 27:6 56:15,21
90:7,15,20 100:24
165:5 166:22
167:11,23 169:9
190:12 205:10
210:20 250:13,19
269:23 293:19
297:7 315:20 319:5
322:12 323:23
330:3 334:5
**four (9)**
64:15 133:12,15,18
162:14 202:25
207:2 270:21
293:23
**fourth (1)**
162:10
**Fox (3)**
159:20,21,22
**frame (11)**
24:7 71:19 114:3
117:15 118:7
151:16 154:18
303:9 335:8,12,20
**frames (2)**

71:6,7
**franchise (15)**
99:18 118:2 200:9
267:10 276:4,7
286:20,22 288:7,7
288:15,24 301:9
302:9 309:19
**Francisco (1)**
102:5
**Frankel (1)**
8:8
**frankly (7)**
51:14 102:8 167:25
182:2 256:18
262:12 275:8
**free (1)**
36:12
**Friday (28)**
42:5 44:9 46:4 95:18
97:6,9,10 108:19
121:11 161:24
162:23 197:3 210:3
210:6 219:5,22
220:7 233:18 236:8
236:13 250:22
259:17,17,18 265:5
270:15 312:8,18
**front (8)**
126:15 206:25 261:6
290:14,16 291:17
295:11 312:23
**fronts (1)**
82:5
**frustrated (1)**
203:4
**FTI (21)**
15:19,21,25 157:13
159:5,11,16,23,24
160:6,16 161:4,12
161:17 162:6 163:9
163:22,25 164:7
199:12 211:25
**full (8)**
19:15 149:4 182:5
192:6 215:18
238:16 299:7
314:24
**fully (5)**
37:22 59:14 60:18
61:4 154:7
**full-time (2)**
13:14 171:24
**functioning (2)**
108:5 307:2
**fund (1)**
34:20
**funded (1)**
20:12
**funds (2)**
44:5 164:9

**funny (2)**
201:7 280:14
**further (11)**
5:9,15 84:3 162:10
166:16 183:5
258:19 288:20
324:5 336:15
341:16
**fuzzy (1)**
249:15

———————————
**G**
———————————

**G (5)**
3:15 105:10,18
106:22 291:8
**gain (6)**
188:7 298:7,17
302:17 303:16
304:7
**games (2)**
43:19 143:19
**gee (2)**
40:8 278:5
**Geer (9)**
11:14 22:24 23:9,21
23:23 50:19 132:6
134:22 142:10
**Geer's (2)**
13:5 299:6
**general (3)**
50:5 78:9 314:25
**generally (17)**
22:11 35:24 52:5 71:4
112:24 122:3 136:4
141:14 142:13
178:18 191:20
192:4 208:24
210:25 274:14
319:19 327:4
**gentlemen (1)**
263:6
**getting (35)**
52:7 95:15,22 139:2
154:19 183:5,17,25
184:23 186:2 200:8
200:9 203:15,24
238:22 239:6
246:20 251:19,20
251:22 254:7,19
255:10 260:2
273:24 275:2 278:5
287:24 301:7,8
302:5,8 303:8
309:19,20
**Gilbert (3)**
295:12 296:17,17,18
297:20
**Gillen (3)**
211:23 212:5,8
**gist (2)**

208:12,13
**give (24)**
9:23 12:25 14:14 85:2
87:14 118:10
119:23 141:12
142:7 174:12
194:20 217:21,23
223:20 231:16
238:23 246:10
264:6 265:23
270:16 284:6
293:12 325:10,13
**given (30)**
25:16,19 83:18 108:9
108:15,20 131:15
135:11 146:6,15,20
146:24 147:4
149:12 153:14
192:7,11,15 196:21
199:23 200:21
208:8,10,11 216:24
231:12 244:9
302:18 332:6
341:14
**give-and-take (1)**
173:7
**giving (15)**
51:24 74:2,7 95:15
135:17,18 141:5,5
176:12 239:6 301:6
303:7 316:3 325:16
325:18
**global (2)**
178:20 302:9
**GMT (1)**
270:21
**go (95)**
10:3,8 12:14 17:19
18:19 24:13,24
25:18 37:3 41:11
54:21 55:7 59:9,20
63:15 64:3 65:17
71:3 75:17 79:18
83:22 86:17 89:5
97:3 101:25 106:19
115:25 129:19
130:12 131:12
136:17,23 144:8
147:12 148:2 149:3
152:8 153:19,24
155:17 176:5 179:8
180:20 181:5
183:11 185:9
186:15,21 190:16
193:16 209:10
210:15,17 211:3
217:17 221:12
224:20 227:2
235:17,20 240:10
242:14 249:14

250:24 252:18,21
267:3,5,15 270:15
280:22 282:3,16
285:2,8 294:6
305:16 307:9 308:7
311:9 312:6 315:10
317:2 318:21
321:16 327:6,24
328:9,12 331:16,17
332:16 334:7,19,20
**goaded (1)**
256:8
**goes (1)**
44:14 161:18 219:8
273:12
**going (187)**
13:12 17:18 19:14,22
30:22 31:6 33:10
36:3,4,13 37:18
38:4,12 39:14 40:4
41:9 45:13 46:5
52:17,25 57:6 63:3
63:6 68:18,20 69:20
70:9,14 73:7,13
74:4 76:14 79:5,6
81:10 83:7,18,22
86:5 89:3 91:24
95:20 96:18 111:18
112:22 113:14,24
115:25 117:13,16
118:23 128:9,13,21
130:20 139:12
140:16 142:6,8,17
142:20 144:2 145:6
160:21 170:21
177:19 178:23
179:3 180:5 186:3
186:19 194:19,22
194:23 198:11,12
198:13,14 199:13
205:2 208:24
210:12,13 220:6
221:7,13,14 222:21
222:25 224:13
226:19,24 228:5
231:9 238:4 242:16
242:16 246:19,24
247:16 248:5 249:4
249:4,13,14 250:4,4
251:6,14 252:23
253:5,7 254:4
256:10,18 259:10
259:13 260:12
263:3,7,10,11
266:24 267:3
269:16 272:16
273:23 274:19
275:5 277:7 278:12
278:13,23,24
280:16 283:10

284:15,17 285:7
290:3 293:11,11
294:9 298:10 299:2
301:2 302:20,25
306:13 307:6,15,24
308:19 313:2 314:7
314:10 315:12
317:4,8 318:4 321:8
322:6 323:2,3,3,7
323:11 324:8,19
325:14,23,24 326:4
326:6,14,25 327:13
327:20 328:4,7,14
328:17 331:25
332:12,19 333:4,13
**Golden (2)**
272:22,22
**Goldman (1)**
272:21
**golly (2)**
40:8 278:5
**good (17)**
7:20,23 22:5 85:16
91:8 106:25 179:17
196:6 197:13
204:14 223:17
243:4 258:11
273:24 296:14,14
301:11
**goodwill (1)**
107:17
**gosh (1)**
201:12
**Gotshal (21)**
53:13,16 56:5 73:4,5
78:7 81:8 95:4 96:7
96:11,22 97:18
98:11,24 147:5
148:18 198:7 199:2
269:7 282:12
331:24
**gotten (4)**
184:4,6 185:12 250:7
**Gottlieb (1)**
155:12
**governed (2)**
59:7 63:11
**government (3)**
112:3 292:23 293:13
**governors (2)**
116:8,10
**governs (1)**
64:14
**grabbed (2)**
36:9 247:6
**great (9)**
75:17 79:21 154:11
186:18 200:8 276:6
296:12 297:3 301:8
**greater (1)**

173:9
**green (2)**
215:8,8
**Greenfield (1)**
188:5
**gross (1)**
164:14
**grounds (2)**
152:4 217:9
**group (6)**
10:10 11:18 162:2
195:7 212:14 273:3
**groups (1)**
12:10
**grow (1)**
148:22
**guess (13)**
13:25 27:6 92:11
135:24 215:18
219:14 249:5
271:23 283:16
294:23 300:2
317:14 335:4
**Gump (2)**
51:17 272:23
**guys (6)**
199:11 246:17 262:16
263:16 310:7
326:13
**gym (1)**
54:23

---
**H**
---

**H (2)**
106:23 291:8
**hair (2)**
179:20 302:13
**haircut (14)**
89:10 90:25 92:19
165:3 166:2,12
191:2,7,16,21 237:3
237:7,8,12
**haircuts (2)**
90:4 239:7
**half (19)**
54:2 221:16,23
229:11 231:24
248:19,19,21,21
249:2,3,13,14 266:9
307:25,25 308:2,2,3
**hall (1)**
308:18
**hallway (2)**
307:13 308:11
**hallways (1)**
81:25
**hand (5)**
175:2,3 243:13
306:20 341:21
**handed (4)**

156:14 158:3 217:24
248:14
**handing (1)**
59:10
**handle (3)**
16:10 112:24 314:8
**handling (1)**
14:18
**hands (1)**
254:2
**handwriting (5)**
218:8 221:25 223:2
248:9,10
**handwritings (1)**
243:22
**handwritten (1)**
205:23
**hang (2)**
144:23 219:12
**happen (8)**
97:9 112:7 116:2
186:25 254:24
292:15 313:8,9
**happened (15)**
75:21 76:2 78:5,10
79:22 80:5,6 87:4
147:22 154:6 180:6
211:5 220:21 248:4
305:19
**happening (8)**
83:15 110:24 112:12
112:14,18,19
142:18 239:5
**happens (1)**
118:10
**happy (8)**
43:18 92:23 177:10
209:15 226:2
266:16 273:7 307:9
**hard (9)**
11:22 22:10 51:13
146:13 157:19
182:3 229:3 280:11
308:19
**Harvey (42)**
81:8 82:7,12,20
119:21 138:10
142:16,24 143:2
145:5,7,15 198:6
204:19 205:3,12,15
244:18 245:13
246:21 247:4,19
260:7,13 263:2,2
305:15,18 307:13
308:9,15 309:7
310:5 315:4,7
327:11,18 330:2,4
330:16,18,24
**heading (3)**
160:2,4,11

**headquarters (1)**
101:21
**healthy (1)**
148:24
**hear (6)**
59:24 74:8 181:7
228:4 247:23 274:7
**heard (14)**
50:12 51:11 155:6
161:16 166:11
264:12 265:3
274:12 306:9
307:18,19,19,20
323:4
**hearing (114)**
27:11,22 30:14 32:15
33:16 35:16 36:19
37:6,7 38:25 39:24
40:20 41:25 42:3,5
42:6 44:10,24 45:12
48:15,17,18 49:5,12
49:15,24,25 50:7,12
50:17 51:2,3,6,15
51:21 52:2,19 53:2
53:4,8 62:23 63:25
68:6 69:13 70:2,20
74:21 85:21 95:13
95:18 96:8 97:4,6
97:14,19 98:12
100:21 101:14
108:11 111:12
118:17,21 123:22
125:22 142:2
174:23 196:19
198:9 219:23,24
220:6,9,11,16 221:6
227:5 230:16 235:2
235:17,22,24
246:15 250:22
256:23 263:22
264:21,25 265:2,5
265:12 270:16
273:18 298:5,6
301:21 302:16
303:17,25 310:8,25
311:14 312:7
313:19,22 314:6,9
314:14 316:22
317:20,23,24
318:22,22,23
**hearings (3)**
62:19 268:12 269:12
**heavy (1)**
172:25,25
**hedge (1)**
275:11
**Hedges (2)**
3:18 7:8
**hedging (1)**
189:8

**held (6)**
2:8 6:9 18:8 93:19
136:21 259:18
**help (9)**
47:3 75:13 76:6
118:14 217:17
222:25 233:21
243:18 295:13
**helped (1)**
26:25
**helpful (4)**
13:6,16 40:14 44:17
**helps (1)**
75:17
**hereinafter (1)**
34:23
**hereinbefore (1)**
341:12
**hereof (2)**
60:11 102:23
**hereunto (1)**
341:20
**hey (14)**
117:12 239:4 247:15
247:20 254:10
262:17,19 266:8
275:13 303:6,6
309:12,24 313:8
**high (1)**
196:2
**higher (1)**
293:14
**highly (6)**
13:18 14:3 85:6
112:10 113:13
115:9
**hired (1)**
9:17
**Hirschhorn (1)**
314:9
**history (1)**
198:15
**HLHZ (18)**
193:3 194:15 206:6
206:14,17,20 216:6
295:5 304:23 339:4
339:6,8,10,12,14,16
339:24 340:11
**HLHZ11913 (2)**
126:12 338:18
**hoc (2)**
51:17 273:3
**hold (13)**
16:11 32:4 44:19 63:4
66:14,16 223:20
224:17 228:22
242:10 243:17
277:15 322:11
**holders (1)**
272:25

**holding (3)**
6:7 140:11 209:2
**HOLDINGS (1)**
1:8
**hold-your-horses (1)**
275:20
**hole (1)**
166:25
**home (8)**
54:17,21,24 55:4,8
83:22 149:13
320:13
**honestly (1)**
24:18 37:3,10 54:19
61:3 75:13 190:16
196:24 224:12
225:21 317:21
**Honor (4)**
46:3 85:16 97:11
112:16
**hoped (1)**
180:4
**horrible (1)**
202:13
**horses (1)**
274:9
**hostile (1)**
188:9
**Houlihan (114)**
8:4,9 9:13 10:3,22
15:8,21 16:2,8,9,15
16:25 17:12 18:2
22:7,9 23:5 25:15
25:23 26:6 27:18,22
28:2,13,17 31:18,18
46:9 50:15 56:9,12
68:24 69:19 70:7
80:13 126:5 127:9
128:5 129:3 130:14
133:5,22 134:9,13
134:16 135:6 137:8
137:25 138:3,14,15
139:23 140:4,21
141:8,10 143:7,14
149:16 150:6,10,12
150:16,23 151:7,11
151:17,24 152:2,6
153:12,22 155:20
156:25 157:13
160:7,17 161:5
162:6 163:22,25
164:16 166:14
169:22 173:3 176:9
177:3 178:3 187:13
193:17 195:20
207:22 211:23
212:9 244:16
245:11 255:22
271:3,12,15,17,21
271:25 299:12

300:4 305:7 311:3
311:18 314:16
321:24,25 332:15
333:17,23
**Houlihan's (4)**
16:24 129:14 132:22
335:9
**hour (1)**
54:2,3 112:21
**hours (13)**
54:18 55:8 56:5,17,23
74:5 132:4 142:15
143:10,12,13
270:21 285:14
**Hubbard (2)**
4:4 7:6
**hubbub (2)**
131:25 140:16
**huddle (5)**
199:15 312:23 314:2
314:21 315:4
**huge (2)**
140:8 302:10
**Hughes (2)**
4:4 7:5
**hundred (1)**
308:5
**hung (5)**
226:16,25 227:2,21
228:23
**hurdles (1)**
200:17
**hushed (1)**
52:11

--------
**I**
--------

**ice (1)**
186:22
**idea (9)**
44:2 47:16 80:19
128:23 167:15
191:6 249:22
262:10 298:25
**identification (25)**
6:3 28:24 45:9 126:10
126:13 145:2
157:24 170:15,20
193:4 194:16 206:7
206:15,17,20 216:7
245:3,5 291:15
295:6 296:2 297:13
304:12,24 310:13
**identified (2)**
68:8 176:6
**identify (7)**
64:24 65:8 68:3,14
69:10 73:2 295:10
**identity (1)**
84:19
**idiot (1)**

227:18
**ignore (5)**
89:3 221:2 229:13
232:3 240:11
**ignored (2)**
143:21 246:22
**III (1)**
172:7
**ill-liquid (1)**
233:10
**ill-liquids (3)**
254:23 258:5 287:11
**imagine (1)**
15:7
**imbalanced (1)**
95:12
**immaterial (1)**
46:16
**immediate (1)**
195:24
**immediately (5)**
53:11 208:6 211:2
215:25 313:19
**impact (6)**
64:16 117:5,21 120:5
195:24 292:12
**impacted (2)**
118:21 215:24
**implication (3)**
247:8 257:22 328:23
**implied (1)**
332:21
**impolite (1)**
144:10
**import (1)**
115:6
**important (16)**
81:7 98:3 134:21,24
142:22 143:24
164:6 179:7 182:8
203:23 247:10
266:5 302:11,14
313:14 321:19
**importantly (1)**
50:12
**impossible (1)**
123:10
**impression (3)**
137:6 228:25 247:11
**impressions (4)**
328:24 329:4 330:15
330:21
**improperly (1)**
181:25
**improvements (1)**
101:11
**inaccurate (4)**
32:2 39:6 41:3,16
**include (3)**
20:20 33:8,12

**included (19)**
22:23 33:7 88:20
90:24,25 109:5,9
136:5,9 144:18
168:21,22,24
173:21,22,25
249:23 262:25
267:4
**including (10)**
107:19 150:5 219:2,3
247:21 295:13,14
295:14 307:23
319:2
**inclusion (1)**
315:18
**inclusive (1)**
168:19
**income (1)**
108:3
**incomplete (1)**
130:19
**inconsistency (1)**
75:12
**inconsistent (16)**
66:11 68:5,16 69:12
73:4 74:19 75:6,8
76:5,7 77:3,6,12
80:4,8 86:25
**incorporated (1)**
62:22
**incredible (2)**
162:17 280:18
**independent (2)**
62:10 70:25
**independently (3)**
65:15 112:16 113:18
**indeterminate (4)**
129:18 133:13 150:17
150:20
**INDEX (1)**
338:2
**indicate (1)**
82:21
**indicated (7)**
30:15 32:16 35:18
36:19 39:2 40:20
41:4
**indirectly (3)**
156:4 190:2 198:24
**individual (2)**
17:24 31:21
**individuals (2)**
158:15 189:20
**inferences (1)**
330:11
**informally (1)**
193:18
**information (73)**
24:23 27:15 53:3
59:18 60:24 65:14

72:6 104:13 109:13
109:16 110:5,9,12
110:19 113:3
115:13 116:12
125:9,18,19 127:15
128:5,11 129:2,4,15
153:13 157:2,14
160:7,17 161:4,14
162:5,6 163:9
164:23 174:19
178:22 179:6,7
183:6 188:3 192:7
192:11,15 196:9,10
196:15 225:15
226:18 229:11
230:5 231:23 232:4
247:17 255:18,23
256:3 260:6,8 274:9
284:7 296:22 297:2
311:4,18 317:20
322:10,19 333:2
334:23 336:11
**informed (10)**
59:21 85:7 96:8,12
99:10 111:8 214:7
273:22 322:25
323:6
**initial (1)**
139:18
**injection (1)**
196:5
**innumerable (1)**
124:14
**inquiries (1)**
178:12
**insisted (1)**
233:16
**insofar (1)**
104:17
**insolvencies (1)**
9:4
**instance (5)**
118:14 174:21 216:22
217:3 301:8
**institutions (1)**
11:18
**instruct (26)**
30:23 32:10 67:16
68:20 69:20 70:9,15
71:15 72:9,13 73:18
73:22,22 79:7 92:12
113:24 152:4
160:21 179:3 297:8
298:12 321:9 322:7
323:16,23 336:3
**instructed (1)**
31:9
**instructing (11)**
16:20,22 30:25 31:15
69:2,22 73:11,12,17

74:11,13
**instruction (10)**
72:23 73:15,15,20,24
74:3,7,10 336:8,14
**instrument (1)**
60:12
**intangible (1)**
107:18
**integrated (4)**
59:14 60:19 61:4
94:21
**integration (1)**
16:5
**intellectual (2)**
105:11 106:22
**intended (5)**
33:12 139:24 184:18
210:15,17
**intent (1)**
287:2
**intention (2)**
253:20 307:7
**interacted (2)**
22:19 202:22
**interacting (2)**
155:10 176:3
**interaction (1)**
330:19
**interactions (1)**
326:22
**interest (1)**
36:11
**interested (1)**
341:19
**interesting (4)**
203:8,23 274:7 298:2
**interim (3)**
36:9 233:18 262:24
**internal (2)**
152:5 305:9
**internationally (1)**
111:6
**interrogatories (2)**
22:13 212:18
**interrupt (2)**
209:12,16
**interrupted (3)**
209:15 252:15 278:2
**interrupting (1)**
253:3
**interview (1)**
299:20
**interviewed (1)**
9:18
**intimately (5)**
46:10,25 47:3,5,7
**introduce (1)**
82:2
**inventory (1)**
273:14

**investigate (1)**
300:23
**investigations (1)**
301:13
**investment (6)**
196:3 215:20 226:10
273:11,14 294:9
**investor (2)**
295:21 296:11
**invitation (1)**
185:20
**invite (1)**
174:10
**invited (11)**
10:12 143:14,17
144:10,15,22
145:10,15,19,25
306:19
**involve (1)**
191:21
**involved (18)**
10:19 14:6 26:23
40:13 46:10,11,25
47:4,5,7 52:15
145:15,18 189:6,13
200:24 302:7 326:7
**involvement (3)**
48:8 175:18 176:15
**in-person (1)**
213:23
**irrelevant (4)**
103:6,8 238:8 327:8
**isolated (1)**
300:19
**isolation (1)**
301:15
**issue (20)**
60:3 85:25 109:24
141:22,23 163:21
163:24 164:3,5,11
169:25 170:2
188:25 219:6
270:14 292:18,20
295:2 309:14
329:22
**issued (3)**
47:23,24 194:5
**issues (26)**
12:23 13:3 16:6 51:20
51:23 85:22,23
117:21,24 118:21
144:3,9 157:10
159:14 165:14
170:6 173:2 174:18
179:24 183:19
204:8 215:22
226:21 309:12
323:5 328:9
**item (5)**
100:17 107:16 118:25

171:14 172:20
**items (5)**
87:21 88:9 114:15
171:9 232:19
**iterative (1)**
230:16
**I-B (1)**
275:3

_____
**J**
_____

**J (1)**
297:20
**Jack (7)**
3:15 6:23 16:14 35:13
43:10 57:5 317:15
**Jackie (2)**
271:15,20
**Jack-of-all-trades (1)**
159:11
**James (2)**
3:23 7:7
**Jeff (1)**
12:5
**Jersey (1)**
223:25
**jiggle (1)**
253:17
**Jim (32)**
119:22 131:20 132:6
140:21 142:11
161:25 201:20,22
201:25 202:9,12,18
202:18 205:17
207:14,14,16 208:3
208:19 211:20
213:11,13,17 214:5
214:23,24 225:13
228:16 232:7 236:4
237:6 303:6
**job (3)**
1:18 13:14 14:13
**joined (3)**
8:4,7,9
**Jointly (1)**
1:8
**Jones (2)**
3:4 7:4
**jottles (1)**
217:4
**JP (21)**
39:11 51:23 137:10
137:17,18 140:11
144:8,9 164:5,9
169:7 192:7,13
250:9,17,25 251:3
260:22 263:12
265:9 323:4
**JPM (1)**
259:16
**JPMC (1)**

21:5
**judge (40)**
35:12 37:12,17 38:2
38:24 39:5 40:25
45:12 46:18 48:10
52:9 70:12 73:5
74:20 76:8,10,11
79:4 82:16,17,24
84:4,17 85:7 96:24
109:12 111:16
178:24 180:8 182:7
183:11 298:23
324:4 325:15
332:11 333:4,10
334:2,19,20
**judge's (1)**
155:10
**judgment (2)**
112:9 303:13
**Julie (2)**
297:20,21
**jump (2)**
208:20 215:24
**jumping (1)**
37:4
**junior (2)**
140:22 195:7
**juniors (1)**
142:11
**jurat (1)**
336:18
**jurisdictions (1)**
117:25
**justice (1)**
215:18

_____
**K**
_____

**keep (11)**
14:22 18:6 43:14 75:5
97:25 110:21
148:24 223:2
252:23 307:17
321:18
**keeping (1)**
38:13
**keeps (1)**
27:10
**Kelly (1)**
126:21
**Kemp (1)**
4:11
**kept (3)**
33:24 38:9 148:23
**key (1)**
10:21
**kids (2)**
53:24 131:11
**Kimono (1)**
175:6
**kind (5)**

55:7 111:16 201:12
287:12 315:10
**Kirk (1)**
202:12
**Kirpalani (4)**
45:17,19 46:3 48:9
**Kirpalani's (2)**
47:12 48:5
**kitchen (1)**
148:2
**Klein (28)**
138:9 143:2 244:9
245:17,18,19,25
251:16 255:19
256:19 257:6 260:6
260:8,10,18,19
261:13,25 262:6,15
264:3 266:8 279:15
309:2,7,9,11 329:9
**knew (36)**
39:8 65:21 71:10 80:5
107:11 137:21
154:12 161:7,9
173:19 194:8,9,10
195:16 197:6 201:2
201:3,4,20,22
202:19 204:2 210:3
213:14 238:24
250:20 254:3
274:14 279:7
299:17,17,22,25
300:10 317:22
321:19
**know (262)**
11:2,20 12:22 13:3,10
14:7,12 15:8 19:4
19:25 22:10 25:16
25:19,21 26:16 27:7
27:10 28:9 31:6
32:9 33:9,11,12
37:10 39:8,18 44:4
44:4,12 45:19 49:7
50:13 51:18 52:2
53:19 54:12 55:10
55:16,25 56:5,7
61:5 62:13,16,24
65:22,25 71:6 75:14
75:22 78:10,19
79:19 80:3,6,8,16
80:22 82:7 85:23
89:17 90:22 94:20
95:14 100:3 102:11
102:13,15,16,19
103:25,25 105:23
105:24 106:2 107:2
107:9 108:20,22
111:22 112:11,17
113:16 115:17,17
115:19 116:2 118:9
118:13 126:3 127:9

130:25 131:5
137:18 141:5,16
142:15,16,16
143:21 147:7,10,14
148:5 149:19
151:23 154:19
156:7,13,15 158:10
165:4,7,8,10,12,13
165:19 166:13,20
166:24 167:9 169:5
169:10,11,16 170:2
170:3 175:2,3,6,21
177:14 178:14,20
186:9,13 190:25
194:10 196:24
197:6 198:8 199:7
199:16 200:6,9
201:7,13,15,16
203:15,21 204:12
205:15 208:23
209:18 210:5,6
211:7 212:9,10
213:19,20 214:4
215:23 219:13,15
223:12 224:12
225:5,10 226:2
227:24 229:2
231:11 232:10,20
235:11 236:15,17
238:25 241:13
246:24 247:2,5,8
248:3 249:23 250:8
250:15 251:25
253:13 254:7,15,25
255:6 257:9,15,18
259:19 262:25
263:5,9,13 265:4,10
266:3,9 269:13
270:11 271:9,11,17
273:25 275:7 276:2
277:16 280:9,13
281:5,9,13,17
286:16 288:19
290:2,4,6,8 295:21
296:25 299:22
302:8 305:25
306:25 307:5,6,14
310:8 311:9,11,12
311:15,17,23
313:13,20 314:6,22
315:13 316:17
320:2 322:12 323:7
325:16,23 329:12
329:13 332:24
333:3,7 334:8
**knowing (2)**
72:5 197:7
**knowledge (24)**
16:3 26:7 32:19 46:17
50:20 65:24 72:19

95:5 99:5,6,21
133:5 137:20
145:16 155:22
157:14 184:12
185:8,13 189:5
191:17 214:20
218:20 314:18
**knows (1)**
46:4
**Korean (1)**
208:20
**kosher (1)**
310:7
**Kramer (5)**
8:8,11,12,18,23
**Krasnow (2)**
244:20 245:15

————————————
**L**

**L (1)**
297:19
**labeled (9)**
6:5 28:19,21,25
132:14,15 164:18
172:6 338:9
**lack (12)**
109:4,4,4,15 110:5,9
110:12,19 113:3
116:12 169:8
264:16
**lacked (3)**
16:2,9 17:7
**land (1)**
199:8
**language (5)**
86:25 163:8 226:10
241:18 247:8
**large (7)**
11:2 48:19 52:6 131:8
139:12 144:5
307:23
**larger (4)**
175:15 201:24 202:24
204:8
**late (7)**
55:7 81:12 143:12,13
228:5 253:6 299:21
**launched (1)**
247:24
**law (7)**
8:2,5,24 9:2,10
155:13 272:24
**lawyer (3)**
45:22 52:3 61:8
**lawyers (10)**
50:13 78:7 82:9
143:21 187:6
278:24 288:23
314:3 329:17,18
**lawyer's (1)**

313:21
**Lazard (11)**
74:18 75:2,24 76:21
140:6 175:14,17
176:2,3 201:5
312:10
**LAZ-A (2)**
170:19 338:24
**LAZ-A4419 (2)**
170:14 338:23
**LBHI (4)**
7:4 63:19 245:2
339:18
**LBHI's (1)**
64:7
**LBI (11)**
34:15,17,20,21 87:22
88:12 91:17 111:9
160:2,11,22
**lead (1)**
164:8
**leading (4)**
210:3 250:21 323:17
324:10
**learned (3)**
203:23 208:4 332:2
**leases (6)**
101:10,24 102:2,2,4
310:17
**leave (2)**
144:11,14
**leaving (1)**
325:5
**led (3)**
140:14 142:15,21
**left (36)**
8:7,12 23:19,23 30:9
49:4,8,20 53:8 55:9
55:10 81:16 82:6,11
96:19 98:2,6 135:10
139:15 142:23
143:9,10 148:6
172:5 199:16
200:16 224:8 251:7
251:9 255:12,12
259:4 266:7 278:24
309:11 324:23
**legacy (1)**
172:2
**legal (19)**
6:14 17:12 58:21
59:17 60:23 61:5,18
62:9 63:14 64:21
65:13 70:24 84:15
94:7 104:8 148:16
268:23 321:22
322:2
**legally (2)**
56:7 59:10
**Lehman (119)**

1:7 3:5 6:7 9:15 11:2
13:4 30:15 32:5,16
35:17 36:19 39:2
40:20 41:3 42:7
43:6,15 74:17 75:2
76:21 98:17 99:16
108:2,2 111:6,7,25
114:24 116:16
117:11,22,25 118:2
124:11,19,24,25
125:4 126:9 131:3
137:15,17 138:17
138:18 140:5
143:20 144:8
151:12 158:15
159:6,17,23 160:24
169:6 171:25 172:3
172:10 174:19
178:9 185:7 186:15
189:19,23 192:22
195:8 198:5,7
199:17 200:10
208:16 209:4
212:20 215:4,12,19
229:3 232:2 239:20
241:19 255:5 258:4
258:6,10 260:23
263:15 264:22
267:2 268:12
269:18 271:12
273:2,4 274:4,19
275:18 277:2,3
280:8 283:19
292:23 293:21
294:4,10,20,21
295:22 296:13,22
297:3,5 302:9
303:22 307:3,16
308:5 315:17
318:25 338:16
342:3
**Lehman's (6)**
42:23 125:9 133:13
137:23 280:6
293:12
**lend (1)**
192:5
**lent (2)**
89:15,17
**letter (48)**
58:11 59:6 61:10
78:16 79:2,3,16
80:10,15 82:14,23
83:9 84:12,23 85:2
87:7,17 88:2 91:14
92:14 93:8 94:16
96:18 103:2,4,10,12
104:14,15 105:4,6,6
105:8 139:4,15
144:2 151:2,5,9

160:11 172:9 239:2
246:16 264:18
320:10,12 326:8,12
**letters (3)**
160:10 188:4 306:11
**let's (77)**
30:11 32:12 33:15,18
34:2,9 41:23 45:7
56:6 58:2 69:5
84:24 86:17 87:5
89:3 97:25 100:10
110:21 123:23
126:7 130:12
148:25 149:14
152:8 155:17
163:14 164:17
170:16 171:4 172:4
175:7 176:5 177:5
180:20 192:24
193:9,16 194:12
195:19 197:20
198:25 204:14
211:14 213:3 216:3
221:2,5 224:23
228:4 230:7,8,24
231:13,20 241:7
259:9 270:15
279:17 282:3,23,25
284:8,24 285:8
291:12 295:3,23
297:9 304:9 305:16
311:24 316:8 317:2
318:21 324:10
328:9 332:7
**level (4)**
164:16 180:7,12
181:11
**Leventhal (1)**
20:11
**Levin (5)**
8:8,11,12,18,23
**Lexington (3)**
2:10 3:13 6:10
**liabilities (45)**
42:14,17 89:11 95:11
95:16 96:4,5 107:12
118:11,25 119:18
120:2,11 124:16
204:13 205:2 254:8
264:9 266:10 267:2
267:20 268:11
269:15 275:8,22,23
276:12 278:9 282:9
282:19,19 283:18
284:3 286:10,14,25
287:21,21 289:7,15
289:17,21 290:20
290:23 291:10
**liability (13)**
102:8,20 107:3 123:3

163:18 167:16,17
168:3 279:14,18
280:8 282:24
283:24
**lieu (2)**
135:17 259:22
**lift (1)**
196:4
**light (3)**
83:21 112:22 141:14
**liked (3)**
143:18 145:22 148:19
**likes (1)**
190:15
**like-for-like (1)**
95:21
**limit (1)**
81:12
**limitation (1)**
334:25
**limited (8)**
28:19,22 29:10
118:18 124:8,10
287:6 338:9
**Lindsey (1)**
188:5
**line (50)**
34:14 46:3 134:5
160:9 162:12,22,22
163:2,17 165:2
166:17 167:5,17
171:16 178:4
190:14,15,22 219:8
219:9,17,18 221:9
221:10 222:24
223:8,13 224:2
231:24 232:5,11
233:4,11,14 235:4
236:18 258:20
259:7 261:11 284:9
284:19,25 285:4
342:9,11,13,15,17
342:19,21
**lines (3)**
204:24 221:19 284:14
**linguistics (1)**
302:20
**liquid (1)**
294:13
**liquidated (1)**
136:12
**liquidity (2)**
293:3,8
**list (55)**
76:19 86:17 118:25
124:15 125:14
126:6 129:18
130:19 138:20
139:10,11,19,23
140:6,23,24,25

141:3,8,8,11,17
149:22,25 150:12
150:13,19,22
151:14 155:23
156:3,5 171:8
175:25 212:19
246:18 262:17
264:19 270:4,9,10
271:3,7,8,9,15,19
271:25 272:10
288:16,22 290:19
310:24 313:5
332:22
**listed (15)**
24:11,15 93:25 107:4
108:13 119:18
120:11 134:2
137:23 158:16
169:6 261:16
271:13 290:23
292:3
**listen (6)**
125:11 212:4 254:14
254:25 283:8 306:8
**listened (1)**
144:7
**listening (3)**
87:11 125:13 308:18
**listing (1)**
130:14
**lists (14)**
13:13 68:8,13 100:13
107:20 118:25
131:12 133:18
151:12 165:3
166:18 167:18
171:17 172:11
**litigation (5)**
10:20 72:7,12,20
165:15
**little (7)**
92:3 184:24 220:18
231:21 252:24
265:16 313:5
**Livanos (5)**
127:13,14,22 128:4
261:3
**lives (1)**
23:7
**LLP (5)**
2:10 3:4,11,18 4:4
**loan (20)**
43:16,17 163:7,20
222:13,17 223:4,7
232:15 236:22
237:14,17 238:5,13
238:14 260:22
262:20 264:8
279:21 289:11
**log (2)**

22:14 217:7
**logical (1)**
154:10
**Lokey (6)**
8:4,10 9:13 15:8 18:2
46:10
**long (26)**
46:24 119:7,14
120:16,24 121:21
122:6,8 123:6
148:18 200:5
215:15 222:7 229:5
232:11 236:21
239:9,16,24 240:15
241:11 257:19,20
261:24 317:22
328:22
**longer (3)**
74:5 256:12 278:9
**longs (1)**
119:10
**look (56)**
18:6,6 24:14,18,19,25
30:11 33:15,18
38:18 47:15 58:2
60:5 66:10 84:22
87:7,12 100:10
110:23 111:10,15
112:10 120:4
123:20,20 136:23
139:3 142:4 148:25
149:14 150:11
158:5 164:17
167:14 170:6
175:15 183:21
194:18 200:12,13
206:11 209:10
211:14 213:3,7
216:2 227:23 234:6
253:17 267:15
290:13 291:18
295:16 296:9
304:16 314:23
**looked (15)**
21:25 24:5,5,10 25:7
25:24 65:15 115:10
118:19 140:24
202:12,13 270:9
297:25 300:3
**looking (41)**
11:23 18:7,23 31:23
32:14 45:16 53:21
87:6 101:9 102:21
132:13 156:23
159:25 164:25
165:24 169:2,15
171:4 176:6 190:14
195:22 203:19
209:24 218:4
231:22 234:19

235:5 236:20
245:10 251:21
254:10 265:7
275:13 290:18
291:7,7 296:4
297:18 305:11
310:14 313:3
**looks (12)**
57:24 142:4 165:24
171:15 190:15,23
212:2 216:10 222:2
223:9 272:4,20
**Lori (12)**
38:19 39:24 82:7
98:17 125:3 143:6
244:17 245:12
312:24 314:12
315:6 329:21
**Los (1)**
3:21
**losing (3)**
232:16,17 326:16
**loss (1)**
315:24
**lost (3)**
186:23 252:25 254:21
**lot (28)**
39:9 51:16 57:24
67:14 80:4,5 81:5
132:8 142:17 150:3
157:18 173:2
183:25 189:9 202:5
204:16,17 209:3
226:6 227:3 247:10
248:3 254:23
280:14 294:8 301:3
303:3 308:19
**lower (2)**
294:13 328:13
**Luc (6)**
145:5 305:15,18
308:14 314:12,15
**Luc's (1)**
310:3
**lunch (1)**
152:8
**Lynch (1)**
294:4
**L-B/something (1)**
222:3

--------

**M**

**main (9)**
82:4,9 141:23 154:2
198:3,6,18 307:12
329:9
**making (12)**
60:12 70:11 231:4,6,7
248:11 271:14
280:10,14 313:3

335:25 336:9
**manage (1)**
275:11
**management (1)**
215:11
**managing (2)**
10:10 12:11
**manila (7)**
136:24 243:20,21
245:25 249:18
251:6 309:8
**manipulation (1)**
148:16
**manner (3)**
80:21 180:6 256:17
**Marcus (2)**
271:15,20
**Marie (4)**
194:23 195:5,6,20
**mark (41)**
28:18 29:16 45:7
119:22 126:7
144:20 165:3
166:12 170:16
192:22,24 194:12
202:11 203:7 204:2
204:3 206:2 216:3
225:13 228:16
229:23 232:7,8
235:19,21 236:3,6
237:6 241:4 254:20
262:8,8 275:18
291:12,21 294:20
295:3,23 303:6
304:9 332:25
**marked (55)**
6:3 18:11 28:23 29:7
45:9 58:3,4 61:16
65:9 69:11 72:25
124:17 125:16
126:9,12,14 145:2,4
157:24 158:4
170:14,19,23 192:8
192:16 193:3
194:15,18 206:6,14
206:17,20 211:7
216:6,9 241:16
243:14 245:2,5
246:2 258:10
270:17 291:15
292:14 293:17
294:2 295:5 296:2
297:12 304:12,23
310:12 338:7 339:3
340:3
**market (9)**
132:15 134:2 137:22
138:5,13 161:3
185:4 274:7 293:25
**marketplace (1)**

294:3
**markets (5)**
15:9,25 116:2 203:10
254:23
**marking (4)**
29:2 124:23 134:3
258:5
**markings (2)**
248:6,7
**marks (41)**
124:18,20,21 125:2,5
125:9 129:20,23
130:19 131:17,19
133:13 137:9,9,19
138:16 141:23,24
150:20 156:22
167:7 169:6,7,7,11
169:13 173:13
178:9 184:20
185:10 189:12,15
189:19,25 190:4,18
192:13 239:20
241:19 293:12
332:23
**marriage (1)**
341:18
**Marsal (6)**
156:25 157:6,8,15
164:19 201:10
**Mary (5)**
1:17 2:11 6:16 341:7
341:23
**match (7)**
15:3 169:14 237:4
246:18 264:3 275:7
287:22
**matches (1)**
253:23
**material (9)**
26:2 126:25 127:2,6
149:15 150:5
213:20,21 275:20
**mathematical (2)**
286:12,16
**matter (17)**
6:7 10:14 11:3 12:12
12:15 53:10 64:2
95:25 118:8 147:13
195:8 212:20 231:3
231:11 254:14
311:15 341:19
**matters (8)**
9:7,9 10:11 26:22,23
168:8 219:16 308:6
**Matthew (1)**
175:23
**McCovsky (1)**
23:4
**mean (50)**
8:25 10:6,24 16:3

21:2,21 24:12 29:23
49:6 54:22 55:24
62:13 77:4,6,12
83:4 91:5,20 107:3
116:7 117:3 127:4
136:19 165:8,13
195:16 197:8
202:13 212:3
214:10 215:15
216:13 222:6
223:12 236:25
246:6 259:3 262:12
271:22 274:4,17
275:22 276:21
277:21 292:22
301:20 302:21
305:2,13 314:23
**meaning (2)**
214:8 286:17
**meaningful (1)**
52:12
**means (13)**
9:10 20:15 46:25
55:23 80:17 115:11
145:15 163:5 165:4
165:10,13 254:21
276:22
**meant (16)**
40:6 83:15 92:10
98:19 99:15 115:6
115:24 134:8,14,17
140:15 247:22
277:10 301:12
327:4,23
**measured (1)**
125:6
**mechanic (1)**
239:2
**mechanically (1)**
270:12
**mechanics (4)**
189:10 238:6,18
239:7
**media (1)**
315:3
**meet (4)**
10:12 22:6 111:2
156:25
**meeting (79)**
24:19 25:5 111:4
131:24 157:21
169:18 170:3,4,7,11
174:7 175:12 176:4
187:12,19,22 188:7
188:23 189:2,3,5,11
189:21 191:10,12
191:18 198:3,9,14
198:17,19 199:6,7
199:14,18 201:11
201:12,24 202:25

203:5,14,21 204:18
205:7,21 207:13
210:14 214:17,18
214:21 215:11
218:13 244:13,15
244:18,19 245:11
245:13,14,21,24
246:4 250:21
254:17 260:14
261:13 264:11
271:16 276:3,17
299:11 307:20
308:25 309:3,6
312:9 326:11,15
329:9
**meetings (22)**
24:6,15 123:12 140:9
143:24 144:6
157:10,11 159:12
185:21,24 189:23
197:22 198:23
199:5,8,19 200:25
201:6 218:19
250:24 320:18
**meltdown (2)**
111:5 313:11
**melting (3)**
186:22 215:12,14
**member (2)**
71:20 296:18
**members (6)**
10:21 11:12 12:2
171:23 305:6,9
**memo (3)**
157:23 185:14 338:21
**memory (2)**
175:20 196:21
**mentality (1)**
80:3
**mentioned (6)**
172:24 174:4,5 186:6
204:2 252:6
**merely (5)**
135:17 155:22 180:5
182:12 239:14
**Merrill (1)**
294:4
**mess (1)**
263:12
**message (2)**
145:7 292:16
**met (9)**
22:2 119:19 155:13
157:6,7 187:5
199:11,12 312:12
**Metrikin (4)**
207:9,10,24 211:18
**Michael (28)**
126:22 127:13 138:9
143:2 244:9 245:18

245:19 247:6
256:19 257:6,17
260:8,10,17,18
261:14 262:6,15
264:3 266:8 275:24
276:17,19,23
277:20 309:2,7
329:9
**mid (1)**
188:17
**middle (3)**
224:14 240:16 243:2
**midnight (1)**
270:20
**Mike (29)**
11:14 12:23 13:15
22:25 50:14,15
53:13 127:22 132:5
134:22 138:11
142:10 143:7 170:3
207:23 208:2
244:16 245:12
247:18,24 251:15
256:8 260:25 261:3
261:7 262:7,24
319:21 320:2
**Milbank (17)**
50:13 53:12 56:14,16
126:21 131:2,15
149:16 150:5,12,13
199:12 333:7,17,23
334:6,8
**Miller (37)**
82:21 95:14 99:23
119:21 138:10
142:25 143:2 145:5
145:7 149:8 185:18
194:23 195:5,6
205:12 244:19
245:13 255:20
260:7,7,9,13 305:19
308:9 309:7,9 315:4
315:5 320:3 324:17
325:8 326:23
327:11,11,18
328:18 330:10
**milling (1)**
308:19
**million (13)**
99:19,25 136:2 168:8
200:11 223:25
224:3 251:18 276:5
286:19 288:25
308:6 309:19
**mind (6)**
83:12 97:25 110:21
250:3 253:18
256:16
**minimum (1)**
275:2

**Minneapolis (6)**
23:7,8,10 292:4,7,11
**minor (1)**
212:24
**minus (1)**
296:14
**minute (2)**
222:22 306:21
**minutes (5)**
49:7 219:13 262:2,2
270:20
**mischaracterizes (5)**
67:11 104:21 183:8
204:10 287:9
**miscommunicating ...**
334:13
**mismatch (1)**
262:22
**misrepresent (2)**
182:4 217:6
**missed (3)**
51:7 52:14 220:9
**missing (4)**
39:7 163:4 168:18
336:12
**misstated (1)**
116:22
**misstatements (1)**
44:13
**misstates (4)**
113:8 180:16 191:24
278:21
**mistake (4)**
30:7 79:19 114:11
179:18
**mistakes (1)**
274:5
**misunderstanding (1)**
240:4
**MM (3)**
224:4,5 232:16
**mode (3)**
298:22,23 335:4
**modest (1)**
86:5
**modification (3)**
60:15 292:25 307:15
**modifications (1)**
326:15
**modified (5)**
93:17 103:9,11,15
105:3
**moment (6)**
18:18 19:3 52:11,12
244:22 275:20
**Monday (7)**
55:15,19 56:20 78:19
129:22 132:12
145:10 149:19
290:7

**money (4)**
179:18,19 181:15
278:16
**month (4)**
143:20 177:2 183:14
183:18
**months (1)**
11:20
**morass (1)**
249:10
**Morgan (21)**
39:11 51:23 137:10
137:17,18 140:11
144:8,9 164:5,9
169:7 192:8,13
250:9,17,25 251:3
260:22 263:12
265:9 323:5
**morning (37)**
7:20,23 10:13 54:20
55:7,11,13 56:6,13
56:19 80:15 131:7
132:12 137:22
139:8,15 143:10,12
143:13 153:8
155:25 162:23
196:16 197:4 210:6
213:24 216:11,14
216:15 219:6,22
244:10 246:15
248:2 273:25 310:4
320:13
**mother (1)**
218:9
**motion (12)**
25:10 70:12,22 72:4
154:24 176:17,17
176:18 188:15
193:19 336:2,10
**mouth (1)**
274:10
**move (11)**
28:10 45:6 56:2 112:5
123:23 186:20
197:20 199:9
227:22 259:13
297:9
**moved (2)**
33:14 270:13
**moving (7)**
76:18 81:20 125:15
125:16 220:10
238:9 279:25
**MTHM (2)**
245:5 339:20
**MTHM5739 (2)**
145:2 338:20
**muddle (1)**
315:15
**multifaceted (1)**

302:7
**multinational (1)**
215:19
**multiple (2)**
75:23 218:14
**multi-page (1)**
158:5
**mumble (3)**
226:21,22,22
**muster (1)**
326:6
**myriad (1)**
183:18
**M&A (1)**
175:19

_____

**N**
**Naftalis (1)**
8:8
**nailed (1)**
279:11
**naive (1)**
262:13
**naively (1)**
335:4
**name (6)**
6:13 108:2 265:13
302:10 342:3,5
**named (1)**
212:13
**names (4)**
22:21 205:13,13
304:17
**narrow (5)**
39:19 75:11 84:8
242:22 319:12
**narrowly (1)**
334:17
**nasty (1)**
227:2
**necessarily (3)**
20:2 77:11 230:18
**necessary (28)**
16:10 17:7 73:21
79:15 81:21 83:3
149:6,11 235:24
267:9 269:2 273:10
275:2 307:2,4
309:21,23 310:16
315:22 316:8,20
324:4 328:19
329:14 331:10
332:10 333:9,25
**need (50)**
15:4 18:21 40:16
44:16 47:18 59:24
61:6 73:16 81:18,18
83:23 97:8 99:10
101:25 103:24
106:10 128:13,20

130:2 131:5 142:18
151:23 173:9
182:25 185:14
186:21 223:20
224:21 227:14,15
243:6 246:10,24
247:4 256:9,17
263:20 284:18
307:5 325:22,22
326:16 327:2,23
328:12,12,16 330:4
330:5 331:15
**needed (19)**
12:7 13:7 34:16 48:13
48:13 73:3,15 80:25
81:14 104:13
114:15 120:4 179:7
182:23 215:24
262:6 264:4 322:9
325:6
**needs (6)**
47:14 66:22 86:19
93:15 177:21
180:23
**nefarious (2)**
256:24 260:12
**negative (8)**
107:10 120:24 122:22
196:6 197:13 275:9
296:13 301:10
**negotiate (1)**
200:17
**negotiated (10)**
165:2 166:12 174:23
176:7 177:4 178:4
182:18 210:24
247:25 326:13
**negotiation (6)**
86:6 143:25 146:2
166:2 283:22
306:12
**negotiations (11)**
28:14 46:7,11,25 47:4
47:6,9 48:8 189:6
189:12 247:3
**Neil (2)**
4:8 7:5
**neither (2)**
50:24 109:12
**nervous (7)**
155:3 174:25 176:8
182:19 212:10
220:7 265:16
**net (11)**
95:22 105:17 107:12
120:5 164:14
287:23,23,23
329:24,24,24
**netting (3)**
225:20,25 228:9

**Neuberger (1)**
11:21
**neutral (1)**
244:8
**never (29)**
28:13 66:9 96:21
114:19 126:4 133:4
137:19 157:6
164:24 165:22
166:3 179:25
184:12,17,22 191:7
191:8,16 199:8
215:22 237:8,11,24
250:6 270:24
274:25 297:16
303:23 322:21
**new (42)**
1:3,13,13 2:10,10,14
3:7,7,14,14 4:7,7
6:10,10 7:24 23:12
23:13,15,18,21
34:13,13,15,17,19
34:21 50:24 169:7
173:12 177:18,19
178:2 207:12
214:12 223:25
249:23 253:13,14
292:4 341:4,6,10
**news (2)**
85:16 195:18
**nice (1)**
15:14
**Nicholas (1)**
4:11
**night (37)**
9:20,22 15:19 46:4
53:21,25 54:18,21
54:24 55:5 80:14
110:25 131:7 132:4
132:12 133:4
135:10 136:3 141:6
162:20 168:15
180:3,4 196:22
197:9 215:2,3
218:21 236:19
246:15 264:25
265:6 276:18
299:18 315:10
317:23 320:12
**nights (1)**
185:22
**nine (1)**
293:23
**nits (1)**
217:4
**noise (7)**
51:16 142:2 226:6,22
226:22,22 227:3
**noncash (1)**
238:7

**nonevent (1)**
51:15
**nonprivileged (2)**
334:9 335:12
**nonsense (1)**
259:8
**non-Barclays-relat...**
13:3
**Nope (5)**
169:4 192:10,12
261:17 304:19
**normal (3)**
90:2 131:25 154:13
**normalcy (1)**
111:18
**Notary (2)**
2:13 341:9
**notation (2)**
248:12 251:7
**notations (2)**
244:11,12
**notch (1)**
155:3
**note (3)**
19:11 233:23 296:16
**noted (1)**
163:16
**notes (54)**
21:22 25:14,15 26:24
199:13 205:24
207:7,8,13,15 208:7
208:11 209:11,24
211:8,9,11,12,20
215:16 216:2,10,17
216:18 217:2,8
218:6,7,12,17 219:4
219:18,25 220:5,22
221:8 222:20
224:14,24 225:11
232:9 234:22,25
236:3,14 240:21
242:8 258:23 260:5
261:25 264:24
266:19 271:16
314:17
**notice (16)**
6:2 17:22 18:10 20:20
31:17 33:22 34:6
58:6 89:4 149:18,20
235:5 310:12,15
338:8 340:13
**November (6)**
154:18 333:22 334:16
335:3,11,20
**nuance (3)**
39:8 138:23 139:9
**number (65)**
6:5 10:10 18:23 20:13
20:23 21:21 57:14
85:3,21 86:3,12

95:3 99:20 100:15
125:4 130:5,9 136:3
136:6 167:25
168:21 172:6,23
173:6,20 176:15
179:24 184:25
193:14 200:24
215:22 221:15
223:9 228:12
229:10 240:3
243:11 251:25
253:16 255:13
256:7 258:12
259:20 262:14
267:19 268:14
279:19,25 280:2,8
283:14,17,25 284:2
284:5 286:6 288:10
289:11,13 290:4
294:16 301:12
307:22,24 325:7
**numbers (20)**
164:20 184:19 186:11
186:14,20 203:16
208:25 232:19
235:6 240:6 242:5,7
244:3 248:19
251:17 256:12
259:15 264:17
295:17 303:2
**nutrients (1)**
148:24

_____

**O**
**oath (1)**
5:18
**Oberkampf (3)**
3:16 6:25,25
**object (131)**
10:5,23 12:13 14:5,20
16:17 22:15 27:5
28:6 30:22 32:9,23
35:9 37:2 41:19
48:11 53:6 56:15,21
58:20 59:16 60:22
61:17 62:8,25 63:13
65:12 67:12,22
68:18 69:20 70:14
70:23 77:7 79:6
84:7,21 89:12 90:6
90:14,19 91:2,6,25
92:11 94:6 96:15
97:22 99:4 100:23
101:8 102:18 103:7
103:13,21 104:5,20
106:8 109:2,12,17
110:4,8,14,18 113:7
113:22,24 114:8
116:13 118:19
119:8 121:23

122:14 123:8 124:2
128:9 129:6 135:22
136:15 146:9,18
147:17 152:3
153:20 168:23
179:2 180:15 183:7
184:8 192:18
196:12,20 197:17
202:3 204:9,11
205:9 229:18
239:11 250:12,18
257:5 258:3 269:10
269:22 274:23
278:20 287:8
288:18 289:23
297:6 298:8,10,19
300:6,14,18,20
301:16 303:19
306:3 316:24 321:8
321:15 322:6,11
323:11,15 330:12
332:12
**objecting (7)**
110:13 113:6 114:12
115:14 197:16
298:25 300:16
**objection (118)**
13:20 15:17 17:17
28:19,22 29:3,10,13
29:18,19,25 30:2,5
30:17,21 31:24,25
33:21 34:7,10 35:11
36:17,24 37:11,21
40:18,24 41:5,7,18
41:24 42:20,25
44:22 46:21 51:18
64:20 65:3 67:9,15
71:13 72:9,13,22
73:7 80:11 89:13
92:4 96:16,25 97:24
104:7 106:5,13,16
109:18 112:19
116:21 122:13
127:3 129:12
132:20 135:22
136:15 147:2
151:23 160:19,20
163:23 165:5,17,21
166:5,22 167:11,23
169:8 184:7 190:12
190:13 191:4,23
197:19 202:4
210:19,21 237:21
237:22 240:17
266:4 268:22
269:11 279:4
282:14 288:12
293:19 298:22
300:20 301:17,18
301:24 315:20

316:13 319:5
322:20 323:22
324:7,24 325:9
328:21 329:5 331:4
331:12 334:5 336:3
336:7,13 338:10
**objections (6)**
5:10 32:11 59:3 67:14
69:14 315:11
**obligation (4)**
34:23 42:23 44:9,23
**obligations (6)**
34:20 40:9 61:6 120:2
120:18 283:14
**obnoxious (1)**
308:4
**observe (1)**
53:9
**obtain (2)**
273:11 336:11
**obvious (6)**
44:13 190:5 230:20
256:8 327:23
328:16
**obviously (16)**
22:2,10 24:13 80:23
83:11 107:4 139:3
154:22 179:13
195:20 198:21
209:11 214:10
257:7 283:20
324:23
**occasions (1)**
75:23
**occupied (1)**
148:23
**occur (4)**
26:9 99:24 113:14
205:19
**occurred (18)**
26:9 50:7 53:3 55:17
64:16 98:6 112:20
116:6 147:6,20,21
148:4,5,7 154:4
173:10 319:23
334:15
**October (25)**
78:6 143:22 154:17
156:25 157:23
169:18 170:9
175:22 176:20,21
176:25 177:2 178:3
178:11 180:20
183:4,14,18 184:3
185:16 191:11,14
193:8 212:20
338:21
**offered (1)**
202:20
**offerings (2)**

9:4 15:11
**office (6)**
23:8 196:25 197:3
207:12 299:20
**officer (4)**
5:17 159:16 195:7,7
**offices (2)**
2:9 187:5
**official (5)**
7:9 28:20,22 154:13
338:10
**offing (1)**
140:13
**off-the-record (1)**
317:17
**oh (20)**
37:22 78:3 111:8
125:25 139:17
159:21 180:17
203:8 204:12 205:8
212:7 214:15 226:9
226:11,21 234:16
264:16 277:4 305:8
322:24
**OK (81)**
9:25 17:18 20:5 25:6
33:24 34:8 41:20
62:20 63:9 64:18
67:5 74:8 81:3
83:24 88:6 89:6,6
93:13 102:9,21
104:17 113:19
115:21 118:23
137:5,8 140:23
148:20 156:4 158:2
158:19 163:9
169:17 171:3 191:9
193:25 195:3,19
204:14 207:6 210:2
210:7 212:12
214:23 215:3
216:17 218:4,25
219:3,10 220:14
221:12,22 223:8
224:2,20 226:19
230:4 231:18 232:5
234:7,16 236:7
239:21 242:4 243:6
253:12 256:24
259:8 261:7,10
266:2 267:11
271:19 272:6
277:18 284:8 288:9
299:12 309:6
321:13
**old (7)**
125:12 130:19 131:18
131:19 138:16
148:22 254:18
**Oliver (2)**

3:18 7:8
**once (3)**
13:12 52:4 188:7
**one-hour (1)**
292:7
**open (7)**
55:19 85:22 159:13
175:6 200:16
269:25 309:12
**opened (1)**
25:3
**opening (1)**
49:12
**operate (1)**
309:21
**operating (2)**
329:15,17
**operation (1)**
269:3
**operations (1)**
117:25
**opinion (3)**
59:19 61:2 298:15
**opportunities (1)**
174:11
**opportunity (21)**
18:13 123:20 146:6
146:15,16,21,24
147:4 154:14 174:9
174:14 185:17
187:9 198:18 202:9
231:19 239:8
247:17 302:18
304:5 323:9
**opposed (11)**
51:10 78:10 122:3
136:5 161:7 169:12
172:24 233:18
256:24 271:15
272:3
**opposite (2)**
77:4 119:16
**option (1)**
120:24
**options (2)**
113:2 118:17
**oral (1)**
64:8
**orally (3)**
62:7,14 172:24
**order (38)**
9:18 22:7 34:22 46:12
47:13,21,23 48:2,12
63:23,24,24 68:9
70:13,22 71:4,5
76:3 80:17,23 87:2
143:15 154:4,6
180:7 183:23 264:3
264:8 298:23 310:8
329:16 331:10

334:4,11 335:18
336:2,6,10
**orders (2)**
71:8 111:11
**ordinary (1)**
100:3
**organizational (2)**
198:3 204:18
**organized (2)**
12:10 82:2
**original (12)**
87:20 88:9 100:10
222:19,25 225:9
233:25 234:12,19
243:15,16 255:15
**originally (4)**
184:13 249:12 255:16
264:8
**originals (3)**
206:9 224:19 233:22
**outcome (1)**
341:19
**outset (1)**
10:25
**outside (7)**
64:15 69:19 79:10
153:22 215:13
315:3 332:15
**outstanding (1)**
93:4
**overnight (1)**
34:14
**over-the-counter (2)**
210:18,23
**owe (1)**
164:10
**owed (8)**
43:6,15 164:9 181:17
181:25 238:17
266:8 283:23
**owned (6)**
87:22 88:12 91:16
273:14 275:6 307:3
**ownership (1)**
120:25
**Oxford (3)**
4:8 7:5,5
**o'clock (5)**
55:6,6 235:24 273:25
326:3

**————— P —————**
**P (1)**
232:22
**package (3)**
39:10 292:24 316:7
**pad (3)**
234:10,14,16
**page (125)**
18:15,24 20:14,24

30:11 33:19 34:11
35:7 41:24 45:16
46:2 60:6 84:22
85:4,11 87:8,16,17
88:3,4,5 100:13
105:9 107:16,16
118:24,24 132:13
133:18,24 134:4,11
136:3 150:11
152:12 159:25
160:3 163:14,15
164:20,22 169:2,2
171:5,6,7 172:4,6
176:5 194:24 195:2
195:19,22 218:21
218:22,24 219:7,8
219:18 220:4,12,13
220:20 221:15,16
221:23 225:9,17
226:15,16,18
227:10,13,13,23
229:11,15 230:21
230:24 231:22
233:25 234:2,5,11
234:20,25 235:3,4,4
235:9 236:2,7,11,20
239:10,12,24 240:2
240:15,16,21 241:9
241:21,24 243:2
248:7 253:16
255:12 261:6 264:4
290:18 291:7
295:11,16 310:19
310:21 336:18
338:3 342:9,11,13
342:15,17,19,21
**pager (1)**
296:7
**pages (9)**
133:25 158:19 216:10
218:14 221:14
225:15,16 227:11
236:12
**paid (8)**
44:3 85:8,19 89:23
99:19 144:16 264:5
290:10
**paper (1)**
168:3
**par (1)**
241:3
**parachute (1)**
14:25
**paragraph (18)**
33:18,20 34:11 41:24
41:25 42:3 44:21
84:22 85:4 86:23
122:16,18 162:11
162:15,16,19 195:2
195:23

**paragraphs (1)**
194:24
**Paralegal (1)**
4:11
**paren (1)**
232:12
**parentheses (1)**
172:11
**Park (1)**
4:6
**parochial (1)**
51:20
**parsed (1)**
40:6
**parsing (1)**
40:7
**part (59)**
9:5 19:12,15 20:17
21:23 25:14 26:11
33:6 37:24 38:5,16
39:10,10,15 41:23
75:5 81:6 88:4
92:20 98:4 103:9
127:13 130:21
131:25 136:10
137:2 145:7 151:3,8
154:17 158:8,14
161:22 184:13,14
184:14 197:23
210:9 213:23 214:3
214:22 220:18
221:10,11 235:11
244:17 245:12
247:7 252:21 255:8
260:5 262:18
263:21 264:8 266:6
305:16 309:17
314:5 325:3
**participants (2)**
89:19 192:5
**participate (6)**
146:2 205:23 207:17
207:20 213:16
320:18
**participated (3)**
26:17 134:25 308:10
**participating (1)**
227:11
**particular (18)**
24:15 39:21 65:23
94:17,17 95:24 99:8
99:14 100:7 136:6
170:2 173:6 175:20
183:16 184:2
195:12 292:19
329:14
**particularity (2)**
177:15 250:20
**particularly (3)**
251:4 269:13 300:8

**parties (17)**
5:7 7:15 47:9 52:7
59:11 60:21 63:12
64:19 115:20 155:2
164:7 180:2 258:12
283:22 307:7
332:19 341:17
**partly (1)**
142:19
**partner (2)**
8:13 272:23
**partners (1)**
119:22
**parts (8)**
49:21 50:7 51:6,25
98:10 102:5 230:6
287:19
**party (5)**
46:13 60:14 117:5
174:17 334:10
**pass (1)**
233:7
**pay (2)**
43:22 75:18
**paying (1)**
266:24
**payment (1)**
223:17
**payments (4)**
223:16 268:18 269:9
269:20
**PDCF (1)**
161:2
**Peck (28)**
35:12 37:12 38:24
39:5 40:25 45:12
46:18 48:10 70:12
73:5 74:20 82:16,17
82:24 84:4,17 96:24
183:12 324:5
325:15 332:11,19
333:4,10 334:2,19
334:20 335:17
**Peck's (2)**
52:9 79:4
**pen (8)**
233:23 234:7,13,14
234:15 235:8
243:23,24
**pending (2)**
277:18 282:3
**people (52)**
11:7,16 14:24 22:9,17
22:18,21 50:11
51:16,24 52:7,10
53:12 56:7 75:23
77:21 80:5 97:16
107:5 111:21,21
112:10 114:22
115:4,9,16 140:18

140:23 144:12
145:23 158:15
169:25 182:4 190:6
200:24 201:2,3,5
202:11,12 204:16
235:21 247:10,16
267:5,14 273:22
276:6 295:12
315:12 319:22,25
**people's (1)**
117:17
**percent (6)**
138:24 229:5,7 233:9
233:9 276:11
**percolated (3)**
133:4 141:13 142:14
**percolating (1)**
142:19
**perfect (4)**
86:23 123:16 286:12
286:15
**perfectly (2)**
148:17 155:8
**performed (1)**
12:9
**period (40)**
8:19 15:16,22 23:22
24:3,17 27:25 44:5
54:10,12 68:15 69:6
69:8 72:8,12,18
77:21 78:4 125:20
125:21 153:15
155:9,18,21 176:19
176:23 178:17
197:2 199:3 228:22
235:20 254:22,24
294:2,11 306:4
324:9 330:20 335:3
335:19
**periodically (1)**
185:25
**periods (2)**
153:17 183:16
**permitted (2)**
144:4 326:11
**person (9)**
15:3 143:7 159:23
186:7 192:13
202:21 212:9 214:8
294:6
**personal (5)**
24:10 26:7 32:19
132:21 137:25
**personally (15)**
110:3,7,17 127:21,24
132:24 134:9,10
179:8 181:22
197:23 203:5
255:17 293:22
321:24

**perspective (2)**
208:21,22
**perused (1)**
158:19
**phone (8)**
24:16 214:9 225:14
226:3,8 275:17
302:22 313:5
**phrase (7)**
75:6 94:21 96:23
166:11 174:23
176:6 244:8
**phrases (1)**
210:24
**physical (3)**
55:20,22,23
**picking (1)**
268:10
**picture (3)**
203:9 204:8 205:4
**piece (4)**
52:8 136:19 168:2
220:18
**pieces (2)**
66:25 157:18
**PIM (1)**
232:18
**pitch (1)**
12:6
**pizza (1)**
143:18
**place (10)**
39:21 82:8 199:19
214:24 235:13
245:21 308:22
324:21,22,23
**placed (1)**
206:25
**places (1)**
102:6
**planned (1)**
196:5
**plausible (1)**
262:21
**play (3)**
43:19 53:24 302:20
**played (3)**
201:8 310:5 314:8
**Plaza (1)**
4:6
**please (21)**
6:18,21 32:8,8 67:13
67:13 87:14 125:14
144:21 147:19
203:20 212:18
234:6 252:7,14
271:2 283:5 284:25
285:8 316:11 318:5
**pledged (2)**
36:13,14

**plenty (1)**
231:12
**plumbing (1)**
329:10
**plus (5)**
168:20 276:13 278:6
286:25 287:21
**pocket (2)**
200:13,13
**point (54)**
13:10 17:5 45:13
50:25 52:15,21 54:8
54:18,20 55:3,5
56:25 57:18 71:10
75:19 79:20,25 80:2
85:6 87:3 91:8
100:13 121:18
131:14 140:20
148:15 154:7,22
156:13,14,17,24,24
178:15 185:21
186:17 192:19
193:19,21 199:16
202:23 204:20
208:5 213:5 221:7
228:15 245:24
254:13 265:4 306:7
307:20 312:8 313:7
318:22
**pointing (1)**
213:4
**points (3)**
172:14 174:8,9
**polite (1)**
247:14
**popcorn (3)**
145:22 148:3,24
**portfolio (21)**
30:16 31:5 32:6,17
33:4 34:23,24,25
35:3 36:5,20 39:3
39:10 40:11,21
42:12 185:4 224:7
232:17 238:6
315:24
**portion (6)**
48:20 51:21 139:12
235:9 267:7,11
**portions (1)**
78:23
**posed (1)**
180:25
**position (12)**
8:11 120:12,13,15,16
120:22 122:22
123:21 174:15
237:14 241:12
302:4
**positions (21)**
102:22 119:2,5,7,9,13

119:14,25 120:8,10
120:21 121:13,16
121:19,20,22 122:7
122:8 123:4,4,6
**positive (11)**
107:10,11 120:23
122:20,22,24 123:5
195:24 256:21
275:8 301:7
**positives (1)**
120:9
**possibility (2)**
122:12 166:10
**possible (4)**
13:11 37:4 217:13
309:5
**possibly (1)**
228:16
**post (10)**
64:13 85:24 91:11,13
92:9 254:20 262:8
317:20 323:9
332:24
**posted (2)**
21:5 306:14
**post-closing (1)**
82:20
**post-fee (1)**
86:11
**potential (2)**
267:13 268:5
**potentially (1)**
292:12
**practice (5)**
8:14,17,24 15:9
111:14
**pre (2)**
85:24 317:19
**preamble (1)**
247:19
**precise (1)**
290:4
**precisely (3)**
135:20,25 330:22
**precision (1)**
264:16
**preclosing (2)**
91:11 129:14
**predominant (1)**
243:22
**preface (1)**
116:22
**preferred (1)**
116:9
**preliminary (5)**
129:17 150:25 151:4
151:8 156:2
**premark (8)**
251:23 254:11,12
257:18 259:12,25

260:3 332:24
**premarked (4)**
17:21 251:11 253:15
254:13
**premise (1)**
275:12
**premised (1)**
330:6
**preparation (3)**
22:20 23:25 26:21
**prepare (3)**
21:19 22:7 165:23
**prepared (6)**
53:19 99:2 147:11
211:6 271:9,20
**preparing (1)**
227:4
**preponderance (1)**
283:25
**presence (3)**
149:5,10 335:13
**present (12)**
4:10 49:11,14 50:8
54:9,15 55:20 56:9
56:19 107:17
171:12 175:11
**presentation (5)**
169:19,23 170:24
171:12 191:15
**presented (2)**
119:20 170:12
**presenter (1)**
172:12
**preserve (3)**
215:25 293:3,8
**press (3)**
194:5 195:13 196:14
**pressing (1)**
173:2
**pressure (2)**
246:14 313:8
**pressured (1)**
239:4
**presume (1)**
335:16
**pretty (8)**
11:9 50:23 54:20
78:18 98:21 172:25
270:13 284:3
**pretzels (2)**
148:3,23
**prevented (1)**
203:13
**previous (10)**
114:21 201:17 204:3
221:2,10 232:3
235:3 236:12
316:21,23
**previously (7)**
58:3,4 88:15 151:19

231:25 243:13
318:10
**pre-fee (1)**
86:11
**price (2)**
99:20 292:15
**priced (2)**
210:25 294:13
**primary (1)**
160:25
**principals (1)**
142:23
**print (1)**
248:8
**prior (9)**
34:18 108:15 146:21
201:20 286:11
293:24 303:24
310:25 317:12
**priority (2)**
36:10 162:24
**privately (1)**
210:24
**privilege (30)**
16:18 22:16 30:22
70:15,17,17 72:10
72:14 74:2,7 79:8
92:7 113:23 128:15
128:16,22,24
151:23 160:20
179:3 217:7,9 234:5
321:9 322:7 323:16
323:23 332:13
333:15 336:4
**privileged (14)**
27:3,8,15 31:14 59:18
60:24 61:19 65:13
68:19 75:24 128:10
222:23 297:8
298:11
**probably (19)**
10:19 55:7 65:22
71:10 81:8 148:21
156:7,15 179:17
218:22,23 235:19
235:25 272:2 274:3
275:16 308:4 320:4
320:5
**problem (10)**
14:8 19:22 33:11 75:5
85:10 174:16
182:16 196:24
246:25,25
**problems (3)**
39:12 154:9 259:9
**procedural (2)**
117:14 118:7
**proceed (2)**
21:13 278:23
**proceeding (2)**

296:23 297:5
**proceeds (4)**
135:19 136:22,25
137:7
**process (2)**
258:6 313:23
**produced (10)**
25:15,20,21 26:25
158:17 199:25
215:16 272:8
294:15,22
**product (10)**
68:25 69:20 70:8,16
72:15,17 128:11,16
152:4 179:4
**professional (3)**
2:12 8:3 341:8
**professionals (1)**
131:11
**profit (2)**
299:3,15
**profitable (4)**
119:6,10,13 120:16
**program (3)**
292:25 293:7,13
**promise (1)**
52:3
**prompted (1)**
299:7
**properly (1)**
92:24
**property (3)**
101:10 105:11 106:22
**prophet (1)**
125:12
**proposed (1)**
273:12
**prospect (1)**
318:25
**protect (1)**
215:25
**protections (1)**
117:14
**provide (12)**
17:12 28:8,11 67:17
124:12 196:2 260:6
260:7 289:18 322:2
324:5 334:23
**provided (5)**
27:18,22 28:2,13
118:6
**providing (2)**
321:22 322:10
**provision (12)**
60:11 62:22 73:3
75:25 76:2,3,4
102:25 103:5 104:4
104:16 105:3
**provisions (2)**
79:2 80:23 267:25

**prudent (1)**
332:10
**public (7)**
2:13 9:4 15:10 90:8
156:20 295:21
341:9
**publicly (1)**
90:5
**pull (1)**
22:14
**pulled (1)**
134:25
**purchase (26)**
21:24 42:9 57:2,19,22
58:6,8,10,19 59:2,5
59:13 60:5,18 69:24
72:25 74:19 80:20
89:18 93:17 98:15
99:15 100:11
136:10 191:20
210:10
**purchased (27)**
87:8,20 88:8,20 89:21
90:25 92:17 93:9
98:24 99:2 100:14
105:10,11 106:23
108:12,21,25
122:18 172:15
210:9 277:8 286:13
288:10,16,22 289:3
319:3
**purchaser (5)**
87:23 88:13,16 91:17
301:18
**pure (1)**
288:3
**purport (1)**
262:18
**purported (4)**
63:18 112:10 185:2
247:25
**purportedly (5)**
42:10 147:6 150:14
167:3 190:19
**purporting (1)**
111:23
**purports (2)**
59:10 211:22
**purpose (7)**
28:4 34:5 157:11
198:6,7 321:10
322:18
**purposely (1)**
144:12
**purposes (6)**
20:19 67:25 68:3
79:24 257:22
293:14
**pursuant (4)**
75:21 83:16 93:21

310:7
**pushing (1)**
332:25
**put (9)**
33:22 34:2 58:2
112:12 137:10
177:9 252:16
291:17 297:14
**putting (2)**
114:13,13
**P-A-D (1)**
234:17
**p.m (26)**
130:5,9 152:9 153:3,5
193:11,14 199:2
206:23,24 214:25
224:9 243:8,11
245:8,8 270:18
286:3,6 312:2,5
317:4,7 331:19,22
337:5

---

**Q**

**quadrant (4)**
249:6 251:7 255:12
259:5
**qualification (1)**
47:11
**qualified (4)**
13:18 14:3,23 15:6
**quarter (1)**
266:11
**quarterback (1)**
11:3
**question (167)**
5:11 17:3 25:25 28:10
29:17 31:22 32:12
32:18 36:22 37:23
40:15,16,17,23 43:2
43:13 45:15 46:17
57:17 59:24 60:4
61:2,12 63:5 66:17
66:18,20,23 67:18
69:23 71:17 73:10
79:21 83:11,17 84:8
84:24 85:13 86:21
92:8,23 93:12 98:9
110:22 113:16
121:17 123:3 126:2
129:6 131:6 149:4
149:12 150:2,4
157:17 158:10
161:11 163:21
164:3 174:8,9 177:2
177:6,8,11,13,16,18
177:25 178:2
180:22,24 181:8,19
184:3 187:24
188:19 190:3 193:5
198:22 199:10

201:10 202:15
205:11 224:22
227:25 228:2,4,6,14
230:23 231:2,14,17
231:21 232:21
237:10 240:9,12
242:20,22 249:9
250:14 253:3,14,18
257:13,14 262:4
263:25 272:16
276:15 277:9,13,19
277:24 279:17
280:15,17,25 281:2
281:4,6,8,10,12,13
281:16,18,21,22,24
282:2,3,6,8,17,18
282:20,21,23,25
283:3,4,5,8 284:22
285:6,7 287:15,17
291:2 293:4 298:4
298:24 302:19
305:21 311:16
316:10,14,15 317:8
317:12,14 318:11
322:14 333:21
**questioning (1)**
285:18
**questions (43)**
22:4,13 68:8,13 75:11
75:19 76:19 79:14
86:18 115:10 132:9
151:11,15 174:21
178:4,21,25 185:17
187:10,14 188:24
226:5 231:10,15,18
259:20 261:14,19
271:2,4,7,13 284:10
284:14,20,25 285:4
300:24,25 301:13
335:24 336:16
337:2
**quick (6)**
117:15 219:12 238:7
239:3 242:4 293:11
**quicker (1)**
190:17
**quickly (5)**
37:3 227:10 242:8
270:13 273:4
**Quinn (6)**
3:18 7:7,10,12 30:9
45:22
**quite (1)**
66:2
**quorum (4)**
81:11 326:6,18 327:7
**quote (4)**
41:14 266:14 327:2
331:15
**quotes (3)**

35:16 197:7,8

**R**

**raise (2)**
187:13 306:20
**raised (5)**
118:22 157:10 174:21
175:2,3
**ran (2)**
48:21 242:7
**range (8)**
99:9 168:6,8 257:8,9
257:15 258:17
326:3
**rate (1)**
294:14
**rates (4)**
90:4,10,13,18
**ratio (1)**
196:4
**rationale (1)**
155:8
**rattled (1)**
242:5
**rattling (1)**
226:4
**reach (3)**
53:13 229:3 275:18
**reached (2)**
53:14 277:11
**reaching (1)**
81:13
**read (58)**
16:12 17:2,6 21:23
30:6 37:16 41:11
47:23 48:2 63:4
66:7,9,19,23,24
78:20,21,23 79:13
91:9,13 92:14 97:25
105:5 123:18,18
161:9 172:22
177:24 196:9 209:5
212:4 221:25
224:18,24 228:7
232:9,22 258:25
259:2 267:24 271:5
272:8,15,19 273:4,5
273:7,20 274:13
277:16 281:11,15
283:12 316:12
322:14,15 332:5
**reading (11)**
37:8 67:3 103:16
121:8,10 223:3
232:21 248:20
273:6 290:25
305:14
**real (16)**
15:4 61:23 99:9
101:19,20 108:17

182:15 232:15,15
288:2,4,13,14 293:2
294:11 329:19
**realize (2)**
161:10 179:8
**really (32)**
13:11 64:4 67:14
82:10 84:9 172:21
174:7 175:4,17
176:8,13 185:14
201:7,25 202:15
203:8,12 204:14,19
208:18 226:24
227:19 230:18
298:25 303:3
311:17 313:13
314:22 315:9,10
329:8 335:8
**Realtime (2)**
2:12 341:8
**reask (1)**
317:8
**reason (28)**
31:25 37:12 39:4 41:2
41:15 61:9 90:17
109:2,17,22 117:9
117:13 136:8 137:4
183:11 265:25
316:3 323:13
334:21,24 342:6,9
342:11,13,15,17,19
342:21
**reasonable (3)**
109:14 188:11 323:7
**reasons (2)**
74:6 168:16
**recall (41)**
29:21 49:4,11 51:5
52:21 53:17 54:14
71:25 72:5 75:4
78:20 127:6 160:6
160:16 164:22
169:3 172:20,21
193:6 195:9 196:18
201:14 202:23
218:19 224:15
229:10,24 230:2,4
264:20 265:11
270:8,25 272:13,14
292:16 308:21
311:2 312:8,12
334:14
**recap (1)**
164:19
**receive (8)**
57:18 125:17,19
150:10 157:14
178:22 193:19,21
**received (21)**
18:16 27:13,14,14

57:2,21 59:12 127:7
138:21 149:16,17
150:6,6 151:19
152:2 161:25
184:12,22 185:7
257:4 330:7
**receiving (5)**
178:19 195:18 249:20
272:13,14
**recess (15)**
49:14,17 57:12 130:7
152:11 193:12
243:9 244:24 286:4
312:3 313:17,18
317:5 318:23
331:20
**recognize (12)**
29:6 119:5 122:11
149:15 150:4 276:5
291:19,20 295:17
304:14,17 305:12
**recollect (12)**
106:21 114:10 145:18
161:16 163:12
164:15 173:5
273:19 309:24
317:24 319:12
332:18
**recollection (37)**
23:18 26:3,14,22
28:16 35:19 37:5
50:5 82:11 136:8
158:23 159:2
171:11 176:3 193:7
195:17 196:23
197:10 209:8,25
211:19 217:2
227:19 228:12
229:17 230:19
234:19,23 235:16
237:5 251:13
265:17 270:6
294:10 314:20
320:7,15
**recommend (1)**
181:22
**reconcile (6)**
131:4,16 162:18,24
173:10 175:7
**reconciliation (11)**
154:3 178:7,20 180:5
182:12,25 184:13
184:18 185:25
263:17 335:10
**reconciliations (2)**
75:25 154:19
**reconciling (1)**
164:5
**reconsideration (8)**
70:12,22 71:5,8,19

72:4 334:22 336:2
**record (64)**
6:22 17:6 18:8 19:12
43:11,12 57:11,15
62:15,19 66:24 74:2
112:13 130:6,10
152:8,10 153:6
193:11,15 206:23
206:24 225:8 228:7
228:13 243:8,12,15
244:21,23 245:8,9
252:16 283:12
284:16 285:2,11,13
285:15,17 286:3,7
311:16 312:2,5
316:12 317:2,4,7,9
317:11 318:3,4,6,10
318:14 322:15
331:17,19,22 337:4
337:5 341:14 342:7
**recorded (1)**
12:9
**recording (1)**
303:16
**records (2)**
137:24 280:6
**redacted (4)**
27:13 156:19 305:13
305:17
**reduced (1)**
163:20
**reduction (10)**
174:24 176:7 177:4
178:5 180:11
181:11 182:19
188:21 190:9,17
**reed (3)**
4:4 7:6 232:18
**refer (6)**
18:21 42:22 43:6
48:12 221:21
233:24
**reference (22)**
9:23 60:13 88:17,18
96:17 165:14
166:20 170:21
172:18 182:18
188:20 190:9
224:11 225:6 238:2
260:22 262:10
263:18,19 264:24
269:14 306:11
**referenced (1)**
251:5
**references (1)**
124:25
**referred (9)**
76:19 87:21 88:10
153:9 275:21
287:22 293:16

300:5 316:21
**referring (16)**
19:12 33:23 34:4
43:10,14 49:18
57:23 115:19
176:18 190:8
211:19 217:20
277:14 293:18,20
297:24
**refers (8)**
42:16 100:17 101:9
102:22 107:16
172:15 261:10
310:21
**reflect (4)**
218:12 228:14 231:23
257:25
**reflected (9)**
61:15 151:19 160:17
173:16 235:13
255:23 257:10,15
309:7
**reflecting (1)**
137:3
**reflection (1)**
36:23
**reflects (2)**
163:17 236:2
**refresh (4)**
26:2,21 234:18,23
**refreshed (1)**
26:13
**refused (1)**
39:12
**regard (2)**
13:16 188:4
**regarding (5)**
78:9 130:19 205:24
295:22 334:10
**Registered (2)**
2:11 341:7
**regulated (1)**
305:20
**regulator (1)**
117:4
**regulators (2)**
116:19 306:14
**regulatory (1)**
309:23
**reiterate (1)**
318:5
**relate (15)**
30:9 103:18 130:14
130:16,17 140:10
157:18 190:10,18
218:18 222:5
223:11 238:20
288:22 305:22
**related (20)**
9:6 11:21 26:10 61:25

63:18 85:23 101:21
119:25 124:18
151:14 191:2,3
207:2,3 238:24
239:24 282:18
309:18 318:19
341:17
**relates (6)**
35:15 37:6 47:20
167:10 190:15
254:11
**relating (6)**
117:24 151:5 178:4
233:17 260:14
305:24
**relation (4)**
89:11 159:7 186:5
209:22
**relationship (5)**
96:4 240:14,23
261:15,20
**relationships (1)**
200:23
**relative (1)**
17:9
**relatively (4)**
86:5 141:3 208:15
209:2
**release (3)**
194:5 195:14 196:14
**relevant (14)**
103:12 104:12,16,17
104:23 108:3 117:7
117:19 118:7
124:21 256:12
298:25 301:5
314:22
**relied (1)**
138:9
**relieved (1)**
256:20
**rely (7)**
19:14 117:17 131:17
141:20 240:5,7
274:8
**relying (2)**
115:20 230:18
**remain (3)**
103:12 145:20 148:9
**remained (1)**
150:15
**remaining (1)**
148:18
**remember (95)**
24:6 26:25 38:10,17
38:18 49:8,16 50:2
50:18 51:24 54:3,19
54:22 55:2 67:2
71:11 78:8 85:21
96:17 114:12

130:24 133:3
156:12,21 158:25
161:8 166:8,10
170:5 172:23 173:8
173:20 174:22
178:13,19 185:19
187:4 188:3,4 194:9
195:11 196:17
197:7 201:11,18
203:4 208:10
210:22 214:19
216:21 219:7,11
220:7,18 221:8
225:5,22 226:13
228:21 236:4
239:17 241:15
242:11 244:20
245:15 251:3
260:20 265:3,15
269:13 272:17
292:18,19 300:8
305:14 306:16
307:22 309:13,13
313:18,20 314:3,4
315:6 317:19,22
319:4,6,17,19 320:3
320:11 327:25
334:9 335:2
**remind (1)**
136:24
**reminded (1)**
25:4
**remote (1)**
123:11
**renewed (1)**
178:7
**reorganizations (1)**
8:16
**rep (1)**
128:2
**repeat (3)**
186:14 199:22 209:6
**repeated (1)**
186:14
**repeatedly (1)**
151:15
**repercussions (1)**
329:8
**rephrase (2)**
56:3 333:21
**replaced (2)**
103:3 105:3
**replacement (9)**
18:25 19:10,19 20:8
20:17 21:8 130:15
135:13 249:21
**replaces (1)**
105:7
**replacing (3)**
43:23 138:21 140:2

**repo (66)**
20:14,15 33:6 37:24
38:5,9,16 39:20
40:3,3,9 43:23 44:8
44:23 80:20 89:15
89:17,19 90:9,24
91:4 92:16,20 93:2
93:4,8,19,22 130:15
135:14 138:25
139:6,6 140:2
150:15 151:6 160:3
160:11,22,25
161:19 162:5
163:20 167:3,6
172:19 190:11,14
190:21 191:2 192:3
192:4,8,16 222:12
224:3 237:7,20,24
238:12,21 249:20
255:9 257:3 265:10
286:25
**report (10)**
50:6 127:14 128:4,8
161:4 182:13
188:10 208:3
320:22 321:11
**reported (10)**
1:16 51:5 160:6,16
161:7,12,14 162:6
163:10 321:3
**reporter (7)**
2:12,13 6:15,18 282:4
341:8,9
**reporting (3)**
6:14,17 322:19
**reports (3)**
53:5 159:9 251:17
**repos (4)**
89:14 120:18 131:9
131:10
**repo-but (1)**
233:5
**represent (8)**
17:11 32:22 132:19
139:24 167:22
232:20 241:3
248:23
**representation (8)**
10:4 11:5 13:22 62:17
95:9 99:18,22 101:13
**representations (6)**
63:25 113:13 115:12
116:5 117:17 154:5
**representative (9)**
17:25 26:5 50:16
56:18,22 159:11
245:20 296:19
297:21
**representatives (4)**
155:12 198:19 232:2

308:17
**represented (26)**
30:20 51:17 65:19
74:20 76:25 79:23
129:23 133:2,7
135:7,9,18 139:19
139:20 149:22
173:4,6 186:5
224:22 241:3,6,21
241:24 272:25
273:3 322:22
**representing (3)**
126:6 242:6 315:17
**represents (3)**
45:23 224:15 231:25
**reps (1)**
199:14
**repurchase (12)**
42:23 43:7 87:24
88:14,17,19 89:9,21
91:18,22 138:22
209:23
**request (9)**
154:2 178:7 179:9,11
185:9,16,20 304:3,5
**requested (3)**
124:13,14 206:9
**requests (2)**
125:8,10
**require (1)**
289:10
**required (2)**
11:9 161:20
**requiring (1)**
94:4
**requisite (1)**
10:16
**reread (5)**
17:2 282:23,25 283:6
316:10
**rescue (1)**
292:24
**Reserve (2)**
34:12 112:4
**reserved (1)**
5:11
**RESIs (19)**
244:3 248:8,18,21
249:16,20,24,24,25
250:2,3,4,5,5,9,16
251:4 262:5 314:11
**resolution (2)**
179:22 260:18
**respect (16)**
11:6 87:18 88:7 93:24
101:12 111:21
128:25 208:24
267:20 268:18
269:9 283:24
286:19,25 311:21

329:13
**respective (1)**
5:6
**respects (1)**
273:24
**respond (2)**
25:25 320:25
**responded (1)**
141:3
**response (4)**
178:15 212:18 300:23
305:15
**responses (2)**
178:12,14
**responsibilities (2)**
12:16 13:8
**responsible (2)**
11:8 266:24
**responsive (2)**
154:15 156:23
**rest (3)**
25:24 118:5 257:12
**restructuring (7)**
8:21 9:7,9 10:9 15:5
180:2 200:22
**Restructurings (1)**
8:15
**rests (1)**
200:2
**result (2)**
53:14 325:17
**resulting (1)**
42:10
**retain (1)**
24:23
**retained (7)**
15:19 17:5 110:24
130:20 192:21
198:8 299:18
**retention (7)**
16:13,15,19,23 24:20
25:7 118:4
**retrospect (6)**
15:13 33:7 65:25
111:22 275:14
335:5
**return (5)**
196:2 324:4 332:10
333:9 334:2
**returned (5)**
23:24 55:3 179:19
185:6 319:14
**reveal (3)**
59:22 321:14 333:14
**review (31)**
18:4,9,14 19:3 25:9
27:3,17,21 29:18
51:2 67:7,20 68:2
72:24 78:15,25
79:24 127:12,15

140:6 143:15,16
146:6,13,16,21
158:7 194:21 270:4
299:6 320:9
**reviewed (24)**
21:21 24:2 25:11,13
25:20 26:20 27:7
31:24 37:20 62:21
64:13 66:6,25 67:24
134:22 145:11
146:7 147:8 193:25
216:25 261:2,4
311:3,18
**reviewing (7)**
26:2 52:22 66:3 127:6
147:13 164:23
188:3
**revolved (1)**
240:20
**re-added (1)**
133:23
**Richard (1)**
245:17
**rid (1)**
287:24
**Ridings (7)**
201:16 291:21,24
292:17 312:9,10,18
**right (71)**
15:2 17:16 26:5 29:14
30:10 54:7 57:3,20
65:5,6 67:10 76:16
88:11 91:15 94:3
102:3 104:2 114:18
118:17 121:17
123:25 134:13
141:12 142:23
148:6 153:10
155:16 172:13
182:20 186:7
188:17 191:22,25
192:9 194:12
201:23 214:23,25
218:4 225:23
227:15 235:6
238:13 241:2
251:16 253:21,22
255:20,24 256:4
258:18 259:5
263:22 264:4,25
266:6 269:2 271:19
272:18 279:23
289:4,25 292:9
300:22 305:10
313:23 314:6
317:25 325:7,19
335:15
**rights (3)**
101:12 117:9 302:10
**right-hand (1)**

265:20
**rise (2)**
180:12 181:11
**risk (1)**
208:21
**Roberts (8)**
82:7 138:10 143:6,25
204:19 244:20
245:15 308:16
**role (4)**
12:18 13:5 159:7
201:8
**roles (1)**
189:7
**Roller (1)**
243:23
**roll-up (2)**
133:11,24
**room (19)**
22:4 134:25 144:14
147:5,24 148:22
195:16 198:5 201:2
204:17 229:2,2
247:9,15 280:24
284:23 306:7,10
307:11
**rooms (7)**
82:2 143:21 147:12
185:3 245:22 275:5
306:20
**rose (1)**
164:15
**roughly (4)**
53:17 251:22 253:22
307:21
**rounded (2)**
278:7 289:12
**rounding (3)**
279:23 280:2 284:2
**RPR (2)**
1:17 341:23
**Rule (1)**
25:9
**rules (4)**
32:13 67:17 71:7
302:3
**rumors (1)**
274:18
**run (3)**
179:20 275:3 302:12
**rundown (1)**
50:14
**running (5)**
111:17 164:20 180:7
226:20 228:25
**rushed (1)**
131:24

_____
**S**
**S (2)**

3:23 338:4
**Sabbath (7)**
48:21,24,25 53:9,11
54:3 319:15
**Sachs (1)**
272:21
**sake (1)**
170:22
**sale (73)**
14:4,7 27:18,22 30:14
32:15 35:16 36:18
38:25 40:20 42:4,6
42:8 44:23 46:5,12
47:22 48:2,12,15,17
48:18 49:4,12 50:13
50:16 52:23 61:14
63:10,24,25 68:6
70:2,13,19,22 72:21
74:21 89:18 101:13
108:11 109:2,17
110:4 111:12
113:15,16,17
114:23 116:13
125:22 172:10
193:19 196:19
197:16,25 198:10
273:12,22 298:5,5
298:19 300:17
302:16 303:17,24
312:7 315:18
318:21 334:4,10
336:2,6
**sales (5)**
15:10 112:24 222:17
223:4 293:24
**Sam (3)**
159:9,15,16
**San (1)**
102:5
**Sanpietro (2)**
4:13 6:13
**sat (8)**
37:7 66:9 134:22
144:6 170:4 198:4
247:18 306:7
**Saturday (17)**
46:8 53:21 54:5,13,18
54:21 55:5 80:14
131:6 196:22
250:23 254:25
265:6 290:7 317:23
320:9,12
**Saul (14)**
1:12 2:8 6:6 7:14 46:9
112:8 127:23
226:19 235:17
266:9 337:8 341:11
342:5,24
**save (1)**
273:5

**saw (14)**
25:12 26:17 164:24
166:3 182:18
196:14,17 213:4
261:5,7,9 264:18
270:24 298:20
**saying (41)**
37:5 40:5,7 44:22
61:9 66:13,15 81:17
85:15 99:23 104:22
112:6 114:22 117:5
121:14 125:7,13,17
132:7 151:22 156:2
165:25 168:3
176:22 179:21
185:3 202:7,25
227:12,13 249:17
251:25 252:11
253:20 263:6
271:16 277:4
283:13,16 288:19
303:6
**says (62)**
20:11,15,25 33:7
35:16,17 44:7 46:3
55:25 60:10 75:7,25
87:18 95:2 103:23
123:19 125:4 134:5
160:2 162:11 163:3
163:3 165:2 167:6
167:17,24 168:10
218:23 221:24
222:2,17 223:4,6,6
223:17,18,24,24
224:3,4,8,24 227:18
236:16,21 244:2
251:11 254:14
258:20 259:15,17
259:21 268:10
271:2 273:7 296:10
296:15,21 297:23
298:2 302:22
310:22
**says,3 (1)**
233:8
**Schaffer (20)**
3:8 7:3,3 89:13 96:16
97:24 158:9,13
165:21 190:13
202:3 204:11
210:21 237:22
269:11 288:12
324:7 325:9 328:21
336:17
**schedule (17)**
88:15 94:2 150:25
151:4,4,8,17,18,24
151:25 156:11,11
169:14 190:21,22
190:23,23

**schedules (22)**
59:9 61:22 63:17
143:15,17 145:11
145:16,19,23 146:6
146:21 147:8,9,11
147:13 149:15
150:5,17 152:6
156:13,17 299:6
**Schiller (5)**
2:9 3:11 4:12 6:24 7:2
**school (2)**
7:25 8:5
**scrap (1)**
242:17
**scratch (7)**
226:11,14,23 227:22
229:13 242:9
302:24
**scrawl (1)**
233:6
**screaming (1)**
125:12
**screen (1)**
172:25
**seal (1)**
156:21
**sealing (1)**
5:7
**search (1)**
66:18
**seat (1)**
144:13
**SEC (3)**
112:4 116:8 144:7
**second (23)**
60:9 87:14 141:22
151:8 171:14
188:16 194:25
195:19,22 209:12
218:21 223:20
238:23 247:6
251:24 283:7
305:14,21 310:19
317:2 318:3 325:20
327:14
**secondly (1)**
293:10
**seconds (3)**
75:18 246:11 302:23
**secret (1)**
90:18
**secretaries (1)**
308:12
**section (13)**
45:14 60:7,10 87:8,9
87:18 88:5 95:2,3
160:18,22 268:19
290:19
**sections (2)**
76:14 218:18

securities (104)
30:16 32:17 33:4,5
34:21,24,25 35:3
36:2,6,8,12,20
37:18,24 38:3,5,12
38:14,15,21 39:3
40:11,12,13,21
42:12 75:7,9 80:18
87:22 88:12 89:16
89:21,23 91:16,21
93:18,25 94:5,13
99:13 102:22
129:18 131:4,9
134:2 135:13,14,18
135:19 136:11
137:2,3,10 138:17
138:20 139:20,24
140:14,15 141:18
141:21 142:3 167:2
185:5 190:18 192:6
200:19 222:15
224:25 238:6
253:23 254:4
257:21,24 258:13
259:13 262:17
264:5,7 266:13
275:7 276:9 278:6
279:10 286:24
287:13 288:11
293:2,15 294:12
306:14,24 307:2
308:3,3 309:15,16
309:17 313:11
315:25 316:6
329:22
security (6)
36:10 120:25 131:9
136:20 179:16
307:23
see (66)
18:24 20:24 24:19
29:15 30:12 32:13
35:2 42:16,18,19
45:17 60:7 87:9,18
88:6 100:16,17
105:10,13 111:15
119:2 126:19
132:14 134:4 136:2
145:23 155:24
160:3,14 161:24
162:12 163:3,8
166:17 167:7,18
169:14 171:8,20
172:8,15 174:3
217:17 221:17
225:2 230:13,17,18
234:3 248:9 258:20
261:11 271:2,3,6,8
272:9 277:15 280:9
280:13 290:19

291:24 296:23
308:13 310:3
325:17
seeing (11)
49:7 133:3 164:22
166:8,10 169:3
193:6 195:9,11
270:25 292:16
seek (2)
71:5 334:22
seen (13)
58:15 134:11 158:7
158:21 165:22
179:25 199:24
251:17,17,19
270:23 296:6
304:15
Seery (35)
119:22 131:21,22
132:6 140:21
142:11 201:20,22
202:2 203:2 205:17
207:14,14,16 208:3
208:19 209:20
210:7,14 211:20
213:11,13,17,25
214:5,23,24 225:13
228:16 229:22
232:7 236:4 237:6
242:23 256:11
seized (3)
250:9,10,17
selected (2)
13:18,24
selecting (1)
10:4
sell (1)
273:9
seller (1)
88:16
sellers (9)
30:15 32:5,16 35:17
36:19 39:2 40:20
41:4 42:7
selling (5)
140:13 276:4,7 288:2
292:14
semblance (1)
111:18
senior (7)
11:12 12:2,3,3 36:10
180:2 215:11
sense (5)
46:14 79:20 139:7
156:19 200:7
sent (6)
21:22 93:21 149:21
150:13 205:23
272:10
sentence (6)

44:7,21 60:9 137:19
161:13 162:11
separate (7)
51:13 214:5 229:6
234:7,10 242:12
247:9
separately (2)
29:5,16
September (92)
9:24 10:2 15:22,23
21:4 23:16,17 24:4
27:25 28:2 34:12,15
42:6,10 48:17 52:18
52:22 54:6,9 56:20
58:8,10,12,25 65:8
65:16 67:6,7,19,20
68:7,15,16 69:6,9,9
70:6,10,10,18 72:2
72:2,18,19 74:16
75:3,3 76:22,22
77:25 78:2,15,22
113:20,21 114:5,5,6
119:4,12 126:20
127:7 130:13
139:16 143:11
145:9 155:19,19
156:9 160:24
188:14 193:16
195:10 196:11
197:20,24 212:20
244:10 270:5
272:20 291:13,14
292:3 298:18
299:13,14 310:20
312:7 331:25 332:8
332:8 339:22
series (2)
100:13 305:12
serious (2)
182:16 301:25
serve (1)
9:14
services (1)
12:9
SESSION (1)
153:2
set (3)
140:13 341:12,21
sets (1)
249:25
setting (1)
174:7
settled (2)
85:25 161:23
settlement (3)
29:11 154:24 176:18
set-off (1)
286:24
seven (3)
74:5 284:18 285:14

Seventh (1)
215:6
severance (16)
223:19,22 232:17
266:11,25 267:5,18
267:25 269:5,17
276:13,14 280:5
290:5,11,12
shade (2)
243:25 244:2
Shapiro (16)
119:22 202:12 203:7
204:2 225:13
228:17 229:23
232:8,8 235:19
236:3 237:6 242:23
275:18 291:21
294:20
share (1)
203:19
Shari (1)
20:11
sharing (1)
297:24
sheet (13)
108:21 114:13 165:2
199:23 217:4,19
229:9 266:7 267:15
280:7 283:13,18
342:2
Sheldon (1)
314:9
shift (1)
204:7
Shinsei (1)
296:20
shoes (2)
20:10 209:22
short (32)
8:19 57:8 119:2,5,9
119:13,25 120:12
120:13,14,20,22
121:12,16,19 122:5
122:7 123:4,4 130:3
141:4 192:3 193:9
239:3 255:7 258:9
266:13 303:11
311:24 315:10
326:2 330:20
shortfall (2)
168:13,16
shorthand (1)
259:12
shortly (6)
49:15 135:3 170:8
226:17 292:22
313:24
shorts (6)
95:19 120:17 121:4,5
232:12 236:21

show (3)
126:14 265:9 272:6
showed (5)
122:19 133:17,18
253:21 262:14
showered (1)
54:25
showing (1)
315:12
shown (1)
194:17
shuffling (1)
226:7
shy (1)
223:25
sic (1)
136:2
side (19)
33:22 34:2 164:25
166:16 167:16
225:23 235:6 264:4
266:7 279:14,14,18
282:24 283:24
284:3 286:24
290:12 313:21,21
Siegert (16)
11:3,25 22:25 23:6,15
50:22 213:11,13
214:4,12 291:23
292:2,5,11,17
293:16
sign (4)
55:24 81:19 225:2
232:11
signed (8)
5:17,19 60:13,20 61:6
184:15 255:16
298:23
significant (5)
11:9 118:3 171:16
172:7 262:23
significantly (1)
99:25
signing (1)
145:23
similar (2)
10:19 205:3
simple (4)
40:8,17 238:15
259:14
simplest (2)
185:8,13
simply (6)
36:22 121:17 123:3
162:18 294:21
311:17
single (7)
15:3 66:10 122:21
142:22 150:11
269:13 300:19

**SIPA (5)**
4:5 7:6 154:23 176:16
176:18
**SIPC (3)**
29:11 111:9 117:23
**sir (6)**
18:5 125:20 148:4
149:2 279:2 281:13
**sit (8)**
83:19 140:4,21
143:24 144:17
147:4 237:18
326:11
**sitting (11)**
35:25 37:8 39:23 67:3
81:25 127:4 143:20
166:8 174:24
203:21 317:18
**situation (3)**
14:15,19 90:2
**sixth (1)**
195:23
**size (1)**
10:17
**skills (1)**
10:16
**skip (1)**
221:13
**sleep (3)**
54:19 78:7 82:6
**sleeping (1)**
275:16
**slept (1)**
202:14
**slightly (1)**
89:15
**small (2)**
201:8 335:23
**smaller (2)**
49:21 245:22
**SNOO (1)**
196:12
**sold (2)**
135:15 136:20
**somebody (7)**
50:6 55:24 71:14
79:10 192:16
272:21 302:22
**someone's (2)**
134:3 267:8
**soon (3)**
57:6 78:14 226:5
**sorry (29)**
17:15 18:5 19:6 22:22
36:15 69:7 87:15
88:24 98:8 104:15
109:6 115:23
129:11 160:8
171:14 190:4 212:7
213:6 216:13,14

227:24 229:20
234:20 241:22
250:14,21 260:19
290:17 303:21
**sort (17)**
11:3 14:7 51:15
125:12 159:10,10
173:7 174:10
178:15 199:8,9
265:13 292:24
306:7,20 308:17,25
**sorts (3)**
12:23 39:14 47:8
**sought (1)**
60:16
**sound (4)**
227:17 271:14 318:7
318:16
**sounded (1)**
98:20
**sounds (5)**
155:16 167:24 168:2
209:19 263:11
**source (3)**
138:12 161:17 284:6
**sources (1)**
90:11
**SOUTHERN (1)**
1:3
**so-called (2)**
315:21 319:2
**space (2)**
233:3,10
**speak (7)**
97:2,23 98:7 205:17
231:19 304:6 315:5
**speaking (9)**
32:11 35:25 45:17
52:5 67:14 77:21
178:18 192:4
225:11
**speaks (2)**
94:15 268:23
**special (1)**
286:17
**specialist (1)**
6:15
**specialize (1)**
8:22
**specific (32)**
9:21 10:18 39:20
45:14 60:13 65:18
73:2 92:3 98:25
106:21 125:8,10
157:20,22 158:23
159:2 175:18
177:11 188:18
193:7 195:17
202:17 204:23
228:12 229:16

230:7 241:15 262:9
265:17 291:11
320:15 335:2
**specifically (30)**
30:11 60:6 75:4 79:14
80:24 99:17 122:2,4
122:15 130:25
135:8 138:5,7
143:23 149:5 157:7
161:12 162:9
163:12 165:12
178:13 189:11
239:17 272:14,17
273:20 319:6,11
331:3,9
**specificity (2)**
190:4 314:4
**specificness (1)**
190:3
**specifics (2)**
77:18 164:13
**specified (1)**
88:15
**specify (1)**
132:21
**speculate (1)**
165:20
**speculation (5)**
14:21 165:6,18
166:23 167:12
**speech (6)**
73:16,23 200:2 231:4
231:6,7
**speeches (1)**
231:13
**speed (3)**
11:17 117:8 322:25
**spend (2)**
301:3 303:3
**spending (1)**
185:22
**spent (5)**
9:2 144:16 198:14
**spillover (2)**
307:13 308:14
**split (5)**
8:19 12:16 248:18
250:6 307:24
**spoke (15)**
22:11,24,25,25 23:4,4
52:3 59:22 189:9
199:11 205:20,20
312:13,14 332:14
**spread (1)**
260:4
**spun (1)**
46:6
**squiggles (1)**
236:15
**squiggly (3)**

221:9,9 235:4
**ss (1)**
341:5
**stable (2)**
100:3 142:5
**stage (2)**
176:15,15
**stages (1)**
176:14
**staked (1)**
315:3
**stale (1)**
167:6
**stamped (38)**
126:8,11 144:25
170:13,18 193:2
194:14 206:5,13,16
206:19 216:5
244:25 245:4 295:4
295:25 297:11
304:11,22 338:15
338:17,19,22,24
339:4,6,8,10,12,14
339:16,18,20,24
340:5,7,9,11
**stand (1)**
309:25
**standard (2)**
47:20 328:14
**standing (1)**
310:6
**Star (3)**
159:9,15,16
**start (19)**
6:4 49:25 57:13 130:8
134:10 162:15
171:4 177:18,18,19
193:13 203:7 207:4
221:14 230:8
242:18 243:10
272:18 286:5
**started (13)**
9:8,10 155:9 176:14
199:12 220:11,21
235:23 236:14
246:12 262:4
313:19,24
**starting (7)**
7:21 8:5 46:2 143:22
218:19 233:17
305:17
**starts (1)**
162:19
**state (7)**
2:13 6:22 62:14 73:20
285:16 341:4,10
**stated (4)**
21:10 29:25 30:5 33:9
**statement (22)**
30:18 32:2,3,4,21

35:6,7 36:23 37:13
39:5,6 40:25 41:3
41:16 46:18,20,23
47:12 48:6 67:12
273:17,20
**statements (5)**
49:22 115:21 196:15
330:10,14
**states (12)**
1:2 30:14 32:15 34:11
40:19 41:24 42:3
91:16 145:9 160:23
172:9 195:23
**status (6)**
28:14,14 320:23
321:4,11 322:5
**stay (11)**
93:20 143:14,17
145:10,25 146:24
249:14 285:14,22
327:6 331:16
**stayed (2)**
142:5 144:13
**staying (2)**
134:4 250:5
**stealing (1)**
140:12
**Stearns (1)**
294:4
**step (3)**
161:20 238:18 293:6
**stepping (3)**
20:10 209:21 238:16
**Stern (76)**
3:15 6:23,23 7:19
16:16,20 30:25 31:9
31:20 32:8 35:13,15
57:8,16 67:13 69:2
69:22 72:15 73:11
73:14,21 74:4,9,13
106:12 128:23
130:2,11 144:20
152:7 153:7 158:12
158:14 170:16
177:19,23 181:2
192:24 194:12
206:2,8,11 216:3
217:10 222:19
228:13 231:3,6,12
243:6 252:7,14
253:5,9 281:9 284:9
285:10,16 291:12
294:18,25 295:23
297:9 304:9,20
311:24 316:10,25
331:17 335:24
336:15 338:4
**Steve (2)**
4:13 6:13

**stick (3)**
84:24 87:5 232:20
**STIPULATED (3)**
5:5,9,15
**stocks (1)**
287:11
**stood (4)**
97:10 125:3 314:9
319:24
**stop (5)**
10:7 152:7 233:11
252:14 253:7
**stopped (2)**
215:20 313:25
**story (2)**
263:21 302:24
**strange (1)**
174:4
**Street (2)**
3:6,20
**strengths (1)**
17:10
**structure (1)**
204:23
**structured (2)**
274:6 294:12
**struggling (1)**
286:15
**studying (1)**
67:3
**stuff (14)**
9:5 54:23 75:24
185:13 211:3 238:7
251:2 254:11 260:3
265:8 283:15 299:5
306:22 329:10
**stupid (1)**
292:14
**subject (14)**
47:11 48:8 131:9
160:9 164:2 229:4
279:25 283:22
286:8 296:11 325:8
325:11 334:15,17
**submission (1)**
32:20
**submit (1)**
46:8
**submitted (8)**
29:12,17 30:18 35:12
37:12 40:24 42:21
110:11
**subparagraph (1)**
105:7
**Subscribed (1)**
337:9
**subsequent (6)**
174:9 198:23 219:21
241:25 242:13
260:20

**subsequently (3)**
96:20 98:4 250:10
**subset (1)**
205:24
**substance (10)**
117:2 141:13 195:15
238:9 239:5 259:6
285:21 312:18,22
321:14
**substantive (1)**
214:21
**substantively (1)**
52:13
**substitute (1)**
259:24
**substituted (1)**
39:17
**substitution (2)**
136:11 139:7
**subtract (1)**
270:21
**successful (1)**
310:18
**sufficient (1)**
68:3
**sufficiently (1)**
67:24
**summaries (6)**
27:17,21 28:3,5,8,11
**summarize (1)**
113:10
**summarized (1)**
256:4
**summarizing (1)**
47:15
**summary (17)**
28:13,17 133:24
161:25 162:4
163:17 164:18
196:14 208:11,13
209:10,17 261:6,8,9
261:10 265:2
**summation (1)**
330:25
**Sunday (20)**
23:24 46:8 54:20 55:9
80:14 81:10 126:20
130:13 131:7,14
132:10,12 139:8
250:23 265:6
298:21 308:22
317:23 320:13,15
**sundown (2)**
53:21,22
**sunset (1)**
49:7
**supervised (2)**
12:12,15
**supervision (1)**
178:6

**supervisor (1)**
182:10
**supplement (1)**
60:15
**supplemented (1)**
60:11
**supply (1)**
107:19
**support (6)**
29:18 109:12 110:21
112:15 115:13
118:19
**supported (2)**
29:13 51:19
**supporting (5)**
12:24 44:11,25
111:24 114:11
**supposed (17)**
18:5 22:3 36:7 47:17
64:7 118:14 137:2
186:25 205:13
211:2 266:21 267:3
271:23 287:14,22
287:25 316:2
**sure (91)**
7:23 8:25 13:21 15:24
24:7 25:16 42:19
44:14,15 48:6 49:17
50:23 54:17,20
55:23 57:8,9 71:23
75:9 92:22 100:25
107:8 108:2,4 113:9
114:20 118:9
129:21 135:20,25
136:14,18 137:7
138:24 147:9 156:3
159:22 160:13,15
166:3,7 172:3
175:13,16 178:18
181:9 183:2 187:15
196:23 199:15
201:13,18 202:23
203:18 211:4
212:12,12 214:18
217:22 218:20
219:21 222:18,22
223:5 229:5,8 233:8
233:14,20 234:4
237:18 243:19
246:13 249:8,9
251:20 267:23
269:24 270:11
290:12 296:21
299:16,25 310:4
311:11 313:4 315:8
316:8 320:2 327:3
335:19
**surprise (2)**
319:10,11
**surprised (2)**

158:24 335:10
**surprising (1)**
168:2
**surprisingly (1)**
131:8
**Susan (2)**
3:9 7:4
**swear (4)**
6:18 51:8 55:5 219:13
**switch (1)**
220:25
**sworn (3)**
5:16,19 337:9
**symbolized (1)**
107:18
**system (5)**
114:18 116:18 137:16
137:17 293:4
**Systems (1)**
310:21
**S-B (3)**
222:4,5,5

---

**T**

**tab (4)**
132:14 256:4 290:14
290:18
**table (2)**
61:25 312:24
**tables (1)**
312:16
**Taggart (295)**
3:22 7:12,12 10:5,8
10:23 12:13 13:20
14:5,20 15:17 16:11
16:17,22 17:16
19:11 22:15 25:18
27:5 28:6 30:21
31:3,11 32:4,23,25
35:9 37:2 41:5,7,18
42:25 44:15 46:21
48:11 53:6 56:15,21
57:5 58:20 59:3,16
60:22 61:17 62:8,25
63:3,7,13 64:20
65:3,12 66:14,16,22
67:9,11,22 68:12,18
69:4,14 70:3,14,23
71:13,22 72:9,13,22
73:7,12,19,25 74:6
74:11,22 77:7,20
79:5 80:11 84:7,21
86:19 89:12 90:6,14
90:19 91:2,6,24
92:6 93:15 94:6,14
96:15,25 97:7,22
99:4 100:23 101:8
102:18 103:7,13,21
104:5,7,20 106:5,8
106:16,19 109:18

110:14 113:7,22
114:8 116:21 119:8
121:23 122:13
123:8 124:2 127:3
127:16,19,22 128:9
128:20 129:5,11
132:20 134:9
135:22 136:15
137:25 146:9,18
147:2,17 151:20
152:3 153:20
160:19 163:23
165:5,17 166:5,22
167:11,23 168:23
169:8 177:7,12,17
177:21,24 179:2
180:15,18,23 181:3
181:7,10 183:7
184:7 187:20,23
189:2 190:12 191:4
191:23 192:18
196:20 197:17
202:4 204:9 205:9
209:14,18 210:19
212:25 217:5,12,25
224:17 225:8,18
229:18 230:12,23
231:4,9,15,20
233:22 234:4
237:21,23 239:11
240:17 243:4
244:21 250:12,18
252:3,8,13,15 253:4
253:7,10 257:5
258:3 266:4 268:22
269:10,22 274:23
277:15,18 278:20
279:4 280:19 281:3
281:7,11,15,19,22
282:2,7,14 283:2,10
284:8,11,15,21
285:2,5,12,20,24
287:8 288:18
289:23 293:19
294:15,23 297:6
298:10 300:6,14,18
301:17 303:19
304:25 305:4,6,10
306:3 315:20
316:13,24 317:11
318:8,17 319:5
320:25 321:8,13
322:6,11,20 323:11
323:15,22 324:8,13
329:5 330:12 331:4
331:12 332:12
333:13 334:5,25
335:21 336:3,7,13
337:3
**take (45)**

18:18 19:3 34:17
57:6,8 60:4 100:10
116:13,19 119:23
121:4,16,19 126:17
130:3 142:7 153:23
153:25 158:5 164:6
180:4 181:16 193:9
194:18 206:11
216:2,18 218:17
222:21 235:13
245:21 270:2
279:17 283:10
284:8,18 285:7
290:3 293:21,21
294:23 311:24
314:17 324:21
333:18
**taken (10)**
49:15 95:17 103:19
181:25 219:4,19,25
283:21 318:6 335:6
**takeout (1)**
44:6
**takeover (1)**
111:6
**talk (18)**
19:19 22:9 97:8
157:12 189:24
197:5 201:25 202:9
202:11 203:2
231:21 239:7 259:9
263:22 266:22
285:20 287:12
314:15
**talked (11)**
88:25 98:18 115:19
192:12 198:16
204:21 213:24
264:19 297:16
299:5 301:14
**talking (34)**
14:22 19:18 22:24
76:15 77:23,25
85:18 86:8 88:24
97:6 98:23 103:17
124:19,21 128:24
160:9 170:7 174:11
176:24,25 188:19
191:9,11,12,14
197:7 202:18 218:3
220:12 226:8
241:18 292:18
315:8 331:23
**talks (1)**
98:15
**tangible (1)**
258:13
**Tanja (2)**
11:15 320:3
**tape (8)**

6:5 57:14 130:3,5,9
193:14 243:11
286:6
**tax (4)**
196:8 197:14 296:14
296:15
**team (29)**
10:4,22 11:13 12:2
13:18 14:2,9,17,18
14:23,24 15:7 131:3
131:21,23 132:7
171:24 201:25
202:24 205:17,25
209:21 210:8
255:22,22 256:2,23
270:4,9
**teams (2)**
198:5,7
**Tecce (3)**
3:23 7:7,7
**technical (1)**
89:18
**telephone (2)**
214:8 231:25
**tell (68)**
17:18 35:5,19,24
54:12 77:14,17
79:21 95:4 97:11,18
98:8,11,24 107:6
112:16 133:8,9
135:6,9 143:19
148:8,9 151:13
166:7 169:15,24
173:11,15 174:2
182:5 189:17 194:8
194:19 197:22
198:12 199:23
202:17 204:15
210:4 218:18
220:25 221:24
224:14 226:23
230:9 238:24 239:4
239:15 241:13
242:18 244:6,15
247:20 258:8 259:2
261:4 265:19,21
266:14 269:14
291:18 296:5 300:9
321:6 322:4,21
335:19
**telling (28)**
44:20 51:9 81:4
111:16 115:9
137:16 142:15
146:11 148:15
169:12 176:13
220:23 221:4 232:3
246:17 254:16
259:25 260:17
263:10 264:3

275:24 276:20,23
277:20 280:23
300:9 302:2 326:14
**tempter (1)**
284:22
**Ten (1)**
262:2
**ten-day (1)**
335:18
**term (9)**
18:25 20:14,22 34:6
61:4 89:18 286:18
309:14,16
**termination (1)**
36:8
**terms (16)**
12:3,4 18:20 21:13,15
42:8 47:14 60:2
61:3,13,14 64:19
116:25,25 237:20
237:24
**Testament (1)**
125:12
**testified (6)**
7:16 191:19 193:17
231:25 274:2 330:9
**Testify (1)**
165:19
**testifying (4)**
17:24 31:17,20
280:20
**testimony (23)**
28:12 48:7 104:21
113:8 116:22
128:12 145:12,14
146:23 180:16
183:8 184:5,8
191:24 204:10
230:19 231:5
278:21 280:18,20
285:21 287:9
341:14
**text (2)**
162:4 296:10
**Thank (3)**
213:4 318:18 336:15
**Thanks (1)**
297:23
**theme (2)**
313:13 319:8
**theoretically (3)**
14:23 120:22,23
**thereof (1)**
101:12
**thereto (2)**
101:12 302:10
**thicker (1)**
57:24
**thing (11)**
133:17 154:2 179:20

198:3 212:24 240:4
279:20 295:8
309:18 319:16,17
**things (58)**
12:17 15:12 21:21
22:5,11,12 25:24
26:6,16 27:12 30:5
30:8 39:22 56:2
61:24 62:2,3,14
66:11,19 68:21 70:4
81:4,5 89:5 95:11
95:19 97:11 107:5
112:22 114:22
185:23 197:4
198:17 202:6,8
203:23,24 204:17
208:15 216:21
217:2 233:17 242:7
246:16,16 249:12
252:10 256:24
258:5 259:14
271:17 287:12
293:22 308:15
319:23 327:10
332:21
**think (129)**
19:13,17 25:7,13
27:12,12,13,16 30:4
31:11 32:8 38:7
41:21 47:15 48:7
49:20 52:20 53:13
53:23 54:16,17 57:5
60:2 61:3 70:8
71:23,24 78:21 84:3
85:11 90:17,21
92:15 94:22 99:24
102:3 106:10
108:16,17,18,19
109:23 111:10,14
113:9,11 127:19
128:10,15 130:2
136:23 139:8
145:17,20 156:21
171:25 172:2
173:21,22 175:23
177:16 181:2
183:15 184:25
189:14,18 191:19
194:10 206:10
207:2 213:5,19
218:2,11 219:14
220:21 222:17
223:4,6,24 224:23
225:19,24 228:8
229:6 230:20,25
233:7 235:19
236:13 240:8
244:19 247:19,23
247:23 249:13
253:2 255:17

259:16 260:25
261:7 263:21
264:24 266:5
270:19 276:3
277:10,13,25 278:2
283:23 292:9 294:7
297:7 308:16 309:3
309:5,11 314:7,10
314:12 316:16
317:10 325:25
326:9 327:2,10
334:13 335:21
**thinking (2)**
190:20 301:3
**thinks (1)**
298:3
**third (9)**
115:20 117:4 162:11
171:4 218:23
221:14 283:22
332:19 334:10
**thought (48)**
30:7 35:20 37:16
39:24 40:12 41:22
44:7,22 45:4,5
61:11 65:21 76:8,10
79:3 82:22 83:12
84:11 92:10 93:2
98:3,20 112:6,6,25
122:10 140:16
154:9 173:24,24
181:20 208:18,19
224:22 234:16
235:23 238:15,23
239:19 245:14
259:14 266:3 276:6
279:18 280:24
318:4 327:22
332:20
**thousand (1)**
112:2
**threat (1)**
332:21
**three (16)**
37:4 58:7,16,18,24
75:18 100:4,5
162:14 176:14
189:20 225:14,16
234:24 249:25
274:3
**throw (1)**
117:13
**throwing (1)**
227:21
**Thursday (22)**
6:11 23:19,24 111:3
119:19 121:5,6
129:22 149:19
161:19 162:20
197:21,24 210:6,13

213:22 214:14,16
215:2,3 218:21
250:22
**tickler (1)**
114:13
**tie (1)**
163:15
**tied (1)**
255:13
**time (263)**
5:12 8:18,19,20 9:2
10:15,24 12:9,9,20
13:10,17 15:7,16
16:16 17:12 21:4
22:10 23:22 24:7
29:12,24 30:4,17
31:5,13,24 32:19
35:8,10,11,21 36:24
37:9,11,20 40:11,23
40:24 41:9 42:20
44:5 47:23,24,25
49:4,9,25 54:10
57:10,14 58:17,21
58:22 59:12 60:17
61:21 62:11,21,25
64:24 65:4,7 67:2,2
67:5,15,19 68:14
69:6,8 70:21 71:6,6
71:7,18,25 73:23
75:2 77:20 78:5
79:20 80:2,2 81:13
83:2,4,6,10 84:2
89:7 90:23 91:7,8,9
91:11,25 92:13
100:4,20 101:13
105:15 107:21
108:24 109:7
110:24,25 111:2
112:9 113:20 114:3
114:6 116:15
117:15 118:7 119:4
120:12 122:11
123:12 124:8,9
125:20,21 127:4,7
129:16 130:5,9
133:14 134:8,14
137:15 138:6 139:5
139:15,22 140:8,20
141:5 144:12,16
147:6,20,23 151:16
151:22,25 152:9
153:4,5,15,18,25
154:7,18,22 155:9
155:14,17,21 162:8
163:10,22 169:18
173:24 174:22
175:19 176:9,19,22
181:20,24 182:2
183:10,16 185:21
186:17 188:16

192:20 193:10,14
193:19,21 197:2,15
198:14 203:6,22
205:16 206:22
208:8 209:9 215:10
215:21 216:19
217:14 228:22
231:13 232:13
234:21 235:20,22
238:15 243:4,7,11
245:7 247:12
253:19,24 254:22
254:24 255:19
256:25 261:4
264:12 266:23
269:15 270:21
273:5 274:13
275:15 280:24
283:7,7 285:13
286:2,6 292:4 294:2
294:11 298:4
300:15,15 301:3,10
303:3,9 306:4,10
308:5 311:9,12,25
312:4 315:2 317:3,6
324:9 327:3 330:17
330:18 331:18,21
332:7 333:22
334:15 335:3,8,11
335:20,22 337:4
**times (10)**
27:2 37:5 44:3 93:10
124:14 129:21
188:14 234:24
250:2 256:7
**time-sensitive (1)**
247:14
**timing (9)**
116:25 117:8,12,19
117:20 208:21
258:20 259:12
320:16
**timing-wise (1)**
200:16
**tired (2)**
78:18 246:22
**today (17)**
6:15 17:24 22:4 28:12
70:4 127:4 151:16
180:9 184:5,11
231:8 237:18 250:6
254:17 288:17
313:15 337:4
**today's (2)**
254:12 313:13
**told (135)**
26:5 36:17,18 38:24
39:16 44:8 45:4
47:13 48:9 50:11
51:10,14,23 52:13

55:18 59:4 65:11
68:6,17 69:13 70:2
73:5 76:10,11 79:14
80:9,16,21 81:2,3
81:19,22 83:23
92:21 95:19 96:20
98:2,16 104:9 111:5
111:20 115:15
119:16,17,24 121:3
122:16 123:2,14
130:18,23 131:23
131:25 134:19
135:6,21 136:2,8,14
136:18 138:5,7,15
138:16 143:5 144:3
147:12,15 148:7,11
148:13 149:5,7,7
150:18 183:15
186:16 187:18
188:12 189:13,16
189:18 192:13,19
199:20 210:13
213:21 220:6,24
226:13,15 233:19
237:2,6,11,13,17,19
238:3 239:14 240:3
240:11 241:5 242:8
245:11 246:19
251:15,16 256:11
257:17 262:16
265:11 267:14,18
268:8 269:8 278:5
278:22,25 280:4
282:9,12 289:11
293:22 299:16
306:6 310:2 313:2,4
314:6 326:4 328:2
330:24 332:4 335:7
**Tom (8)**
82:7 138:10 143:5,25
204:19 244:20
245:14 308:16
**tomorrow (1)**
198:10
**tonight (2)**
253:6 328:3
**top (20)**
105:10 162:23 163:14
172:6 218:19
226:15,18 231:24
236:15,20 238:20
239:10 240:15
255:12 259:4,5
263:22 272:9
291:22 297:19
**topic (6)**
164:6 270:7 274:4
303:24 309:20
332:16
**topics (3)**

22:8 157:9 304:2
**total (4)**
223:14 255:9 261:20
278:6
**totality (1)**
300:21
**totalling (1)**
232:25
**totally (1)**
161:21
**tough (1)**
144:15
**TP (2)**
133:19 134:5
**track (1)**
186:21
**Tracy (2)**
3:8 7:3
**trade (4)**
161:20 162:18,24
287:11
**tradeable (4)**
276:10 287:7,10
309:15
**traded (1)**
211:2
**trading (5)**
15:10 51:23 108:3
200:10 306:15
**traditional (1)**
111:13
**transaction (143)**
11:4 12:25 13:9 16:5
18:25 19:10,20 20:9
20:12,17 21:8 23:17
27:18 28:4,17 34:18
38:13 39:25 40:8,9
42:4 46:14 59:7
61:15 62:4,6 63:10
64:14 68:10 72:21
73:6 77:13 79:21
81:20 93:16 95:10
96:9,23 99:23
104:24 110:13
111:3,22 112:5
115:5,18 117:8
120:5 130:22 135:2
150:15 154:25
155:2 161:23
163:16 164:7
166:25 167:2
172:22 174:16,17
178:16 179:15,16
182:6 184:15
187:10 189:7 194:7
197:25 198:16,20
198:21,22 199:21
200:3 203:10 205:6
213:14,18 214:6
215:13 216:19

220:6 238:15 240:5
254:18 257:23
259:7,11 264:6
274:6,10 276:11
286:9 287:3,19,24
293:24 295:22
298:9,21 299:3,15
300:21,22 301:22
302:6 303:16
312:19,22 313:2
315:23 320:24
321:5,12,20 322:5
323:3,10,14,19,21
324:6,19 325:4
326:25 327:5,13,15
327:19 328:3,6,11
328:20 330:7
331:11 332:3,5,11
333:10 334:2 335:5
**transactional (1)**
61:7
**transactions (11)**
8:22 9:3,6 14:11
64:10 110:10 160:3
160:12,23 171:17
172:7
**transaction's (1)**
42:8
**transcript (25)**
35:17 38:18 41:12
45:8,12,16 51:2
52:18,22 62:16,23
97:2,3,23 98:2,7
111:15 252:9,20
295:20 296:11
297:24,25 298:20
338:13
**transcription (1)**
342:8
**transfer (13)**
59:8 61:23 80:18
93:18 117:22
124:22 136:21
189:10 200:20
262:18 310:9
324:24 325:2
**transferred (50)**
20:16 21:7 36:3,4
37:19 38:4,8,14,16
40:10 42:12 75:7,10
84:20 87:23 88:13
91:17,21 93:22
95:22 97:21 98:14
101:10 130:21
139:13,25 140:17
140:19 141:19
149:23,25 156:7
157:16 167:4,6
168:18 173:17
178:8,9 186:12

190:19 192:21
241:12 256:13,15
259:16 268:2
276:10 288:24
299:9
**transferring (3)**
34:21 124:15 329:17
**transfers (8)**
64:16 76:16 125:5
136:22 157:3,7
183:2 251:3
**travel (1)**
235:24
**Treasury (1)**
200:4
**treated (2)**
92:16 93:9
**treatment (3)**
301:4 302:6 303:5
**trial (2)**
5:12 41:12
**tried (10)**
24:6,7 53:13 134:23
140:7 203:5 204:7
242:21 262:7
325:10
**trouble (1)**
77:15
**troubled (1)**
86:24
**troubling (1)**
299:4
**true (8)**
35:23 37:17 115:2,15
117:20 154:5 316:5
341:14
**true-up (2)**
84:13,18
**truly (1)**
75:16
**trust (7)**
112:14 114:14 115:24
116:4 123:17 153:9
263:9
**trustee (5)**
4:5 7:6 111:9 117:23
154:23
**trustees (1)**
111:7
**trust-and-verify (1)**
335:4
**try (11)**
14:13 40:15 44:14
76:18 92:23 114:9
131:13 157:20,22
170:5 212:25
**trying (34)**
11:17 12:24 13:2,7
24:9 28:10 36:15
44:13 66:17 72:16

75:16 85:2 113:9,10
131:4,12,16 163:15
164:8,13 174:12
177:7,9 188:8
200:15 220:22
227:20 251:14
254:17 265:2,10
275:17 287:15
314:12
**TSA (1)**
16:4
**TSG (2)**
6:13,16
**Tuesday (3)**
78:19 129:22 184:15
**Tully (4)**
159:4,5 212:6 213:6
**Turk (2)**
3:9 7:4
**turkey (1)**
215:20
**turn (8)**
41:23 163:14 172:4
195:19 220:4,20
230:24 299:20
**turned (8)**
65:25 185:6 226:14
229:15 246:21
247:5 263:2 322:16
**Turning (1)**
105:9
**twice (2)**
52:3 276:2
**two (29)**
12:11 21:11 26:4,15
76:13 112:25
131:20,22 134:20
158:19 162:14
188:3 189:7 194:24
219:14 221:21,4
227:10 232:19
235:7 236:12
240:23 243:21
244:3 259:8 274:2
292:8 305:19 327:9
**two-way (1)**
227:6
**tying (1)**
188:8
**Tyler (2)**
3:24 7:10
**type (3)**
24:25 179:19 190:24
**typed (5)**
205:24 208:7 211:9
211:11 272:4
**types (3)**
14:11,11 293:2
**typically (6)**
89:22,24,25 191:21

271:25 274:6
**typing (1)**
308:12
**typo (1)**
171:15

---

**U**

---

**ugly (1)**
215:7
**ultimately (9)**
10:21 85:25 103:5
121:13 149:16
150:6 269:21
290:10 325:18
**Um-hm (2)**
20:18 236:23
**unable (1)**
81:10
**unbelievably (1)**
117:15
**uncertain (6)**
101:6 102:14 105:22
105:24,25 106:4
**uncertainty (1)**
269:20
**unclear (2)**
109:7 129:22
**unconnected (1)**
167:3
**underlying (1)**
65:25
**underneath (1)**
223:16
**understand (104)**
12:24 14:14,15 17:23
18:3 19:9 20:3,8
21:11,12,18 22:3
24:9 33:2 39:16
42:21 43:2,5,21
46:24 47:3 48:6,23
49:10,10 58:17,23
59:13 60:17 61:13
62:5 63:10,16 64:6
70:19 77:5 88:19
89:8 90:23 91:4,20
92:19,22 96:7
102:25 104:13
105:6 112:8 114:20
120:10,13,14,20
121:12 123:2,19
126:24 129:8
130:14 132:18
137:8 138:19
150:16,23,24 151:7
167:21 168:12
174:6,14 187:25
190:10 227:14
233:21 236:24
238:20 248:16,22
249:3,19 251:12,15

256:18 258:15
263:8,14 266:18
267:12 268:4,19
269:7,19 279:2,13
282:11 293:17
298:2 300:25
305:22 316:5,8
321:16 332:22,23
**understandable (4)**
19:5,7,8 20:7
**understanding (71)**
19:18 31:12 35:8,25
36:11,24 61:20
62:11,20 92:9 93:12
93:23 94:22,23
95:13 96:3,3 104:23
107:25 119:19
121:8,10,15 124:23
125:14 129:3,10,13
129:14,17 132:25
133:6,9,11,21,23
134:7,14 135:12
137:12 139:10,18
141:24 154:20
165:16 188:12
192:3 198:11
207:22 211:4,5,10
211:13 213:15
241:17 255:11
258:7,11 265:24
266:23 269:14
274:10 283:25
286:11 287:18
288:23 299:8 301:6
301:20 321:4
330:17
**understandings (1)**
64:11
**understood (44)**
21:3 24:7 32:21 38:25
51:12 63:16,22 68:5
69:12,25 86:24
89:20 92:15 93:6,7
93:16 96:11 97:15
97:16 105:2 114:21
120:11 129:24
133:10 137:14
139:8,23 150:18
151:3 168:5,7,9,14
190:17 209:9 259:3
267:14 268:25
269:24 282:8 284:4
288:9 315:22
316:22
**undertake (1)**
155:20
**unencumbered (2)**
166:17 255:8
**Unfortunately (1)**
272:7

**uninformed (1)**
274:7
**uninvited (1)**
306:8
**UNITED (1)**
1:2
**University (1)**
7:25
**unknown (1)**
150:20
**unnecessary (2)**
180:10 327:8
**Unsecured (3)**
28:20,23 338:11
**update (2)**
299:8 319:23
**upper (3)**
251:7,9 265:20
**upset (1)**
246:20
**upside (3)**
224:7 232:17 249:11
**urgency (2)**
154:12 186:18
**Urquhart (2)**
3:18 7:8
**use (5)**
20:9 21:14 86:25
205:13 283:6
**useful (1)**
84:15
**usually (1)**
89:15
**U.S (2)**
273:11 275:3

---

**V**

---

**V (1)**
3:8
**vacuum (1)**
97:9
**vague (8)**
28:7 58:21 65:3 91:6
91:25 127:3 160:19
258:9
**vagueness (1)**
38:8
**valid (1)**
106:12
**valuable (4)**
118:3 121:21 122:5,8
**valuation (38)**
94:5,12 101:2,17,24
102:11 105:19
106:2,14,22 107:13
108:7,9,12,15,23,25
109:4 254:6 257:2,3
257:10,16,25 258:7
258:9 289:2,6,9,10
289:13,21 290:22

291:3,4,8,9,11
**valuations (3)**
97:20 98:13,25
**value (76)**
30:15 31:5 32:6,16
  35:18 36:19 39:2
  40:21 42:11 84:19
  89:16,20 93:3,3,6
  93:12 94:18 95:7,19
  98:16,17 99:14,15
  99:18 100:2,7,22
  101:3,15 102:23
  105:16,17,22
  106:24 107:10,22
  123:5 124:24
  132:16 134:2
  138:13 142:3,5
  161:3 186:22 192:6
  215:25 237:16
  241:3,4,11,14
  251:23 254:6,12,18
  255:4 256:14
  257:18 258:13,14
  258:16 260:3
  262:23 263:13
  264:10 265:8 276:8
  278:11 279:11
  289:16 292:12
  293:9,12,25 315:24
**values (12)**
124:17,17 137:23
  138:6 257:21
  263:13,14,16
  293:14,22 299:9
  335:7
**valuing (1)**
89:10
**variety (13)**
11:6 21:25 46:6 50:11
  102:6 115:16
  130:20 142:4 157:8
  168:16 185:23
  273:24 295:12
**various (1)**
114:22
**Varley (1)**
196:3
**vehicle (1)**
294:12
**verbalize (1)**
328:25
**verbatim (1)**
199:22
**verification (6)**
123:23,24 124:3,5
  155:20 156:6
**verify (14)**
112:14,20 114:14,14
  114:16 115:7,24,25
  116:4,5 123:17

153:10,13 154:4
**verifying (1)**
113:18
**version (2)**
150:25 156:20
**versions (1)**
156:10
**versus (1)**
122:22
**vicinity (2)**
147:22,23
**video (4)**
6:14 284:16,18 337:3
**Videographer (25)**
4:13 6:4,21 57:10,13
  130:4,8 152:9 153:4
  193:10,13 206:22
  243:7,10 244:23
  245:7 286:2,5
  311:25 312:4 317:3
  317:6 318:2 331:18
  331:21
**videotape (1)**
6:6
**view (22)**
41:13 65:18 84:15
  86:3 100:20 110:3
  113:4,5,19 114:7,7
  114:11 116:11
  149:12 179:14
  180:12 181:12
  287:6 298:13
  301:16 328:19
  331:9
**vis-a-vis (5)**
117:12,22 118:4
  287:20 329:19
**VPs (1)**
23:5

-----------------------
**W**
**wait (15)**
16:11 97:7 151:21
  187:20,20 224:17
  230:12 247:5,15
  253:4,4,4 281:3,3
  306:21
**waive (2)**
128:15,21
**waived (3)**
5:8 60:12 128:16
**waiver (1)**
60:15
**walk (6)**
144:13 145:21 200:18
  202:16 204:25
  205:4
**walked (4)**
144:5 208:17 303:8
  306:6

**walking (1)**
312:25
**want (72)**
16:11 18:18 19:23,24
  20:9 21:12,13 22:16
  37:3,10,24 41:20
  43:20 44:17 48:6
  57:6 63:7 64:4
  67:16 70:3 73:9
  74:9 86:20 100:12
  100:15 107:5,6,7
  136:17 177:14
  180:21 181:7
  183:22 184:10
  197:5 204:12 213:6
  217:5 221:25 223:2
  225:12 227:14,17
  233:24 252:17
  253:12 255:2
  258:25 265:21
  266:23 270:22
  271:5 273:5 277:22
  281:5 282:16 284:6
  285:13,16,17,22,24
  312:6 313:10
  317:16 326:21
  327:9 328:15
  332:22,22,23,24
**wanted (24)**
8:21 50:5 80:25 107:4
  108:4 116:4 144:17
  148:3 155:23
  161:19 188:9
  201:25 215:23
  220:10 247:23
  249:3 262:24
  265:19,23 305:20
  318:13 322:25
  323:5,6
**wants (2)**
153:24 271:17
**warrant (1)**
179:15
**warranted (3)**
183:4 333:9,25
**wasn't (37)**
23:3 25:3 28:9 40:6
  71:14 96:20 103:9
  116:7 132:2 136:20
  149:10 157:11
  168:20 186:21
  190:20 196:24,25
  202:8 204:15
  207:21 217:13
  227:5 230:7 231:6
  233:13 247:7,15
  258:6 302:10
  306:19 316:5,7
  325:11,14,14 327:3
  335:12

**waste (2)**
202:25 203:22
**watched (1)**
143:19
**way (31)**
15:4,5 18:7 25:12
  40:6 53:14 64:10
  90:22 97:15,16
  102:16 107:9
  109:24 112:23
  121:2 137:12 189:6
  206:8 208:19
  247:13,14 256:21
  258:10 272:8
  273:13 276:16
  293:9 298:15 311:2
  335:18 341:18
**ways (1)**
224:23
**weaknesses (1)**
17:10
**website (5)**
310:22,25 311:5,9,19
**Wednesday (20)**
9:19,22,25 10:13 25:5
  78:19 95:13 97:4,8
  97:14 110:25
  129:22 160:24
  184:16 193:17
  205:4 221:6 233:18
  250:21 296:12
**week (8)**
11:11 12:20 78:21,24
  119:12 141:25
  155:18 170:9
**weekend (15)**
44:9 47:10 51:2 52:17
  52:17,25 77:24
  104:25 266:15
  278:10 279:8
  320:17 323:17
  324:10 332:3
**weeks (1)**
293:23
**weight (4)**
52:11 274:21,24
  284:5
**Weil (72)**
38:20 53:12,16,18
  54:10,15,16,24 55:3
  55:9,10 56:5,12,23
  73:4,5 74:17,20
  75:2,24 76:21,25
  78:7 81:8,25 82:9
  95:4 96:7,11,22
  97:18 98:5,11,24
  119:20 140:5
  143:10 147:5
  148:18 150:13
  156:10 174:19

175:11 178:15
  180:3 186:10,16
  193:20 198:4,5,7
  199:2,16,18 201:3
  210:14 214:17
  229:3 245:23
  268:11 269:7 276:3
  282:11 314:3
  319:15 320:8 324:2
  331:24 333:6,8,24
  335:14
**welcome (7)**
143:18 144:18,23
  145:20,24 327:6,6
**went (28)**
7:24,25 49:19 53:15
  53:17 54:17 55:4
  82:5 95:11,11 108:5
  108:14 142:5
  149:13 150:14,22
  185:10 199:16
  206:24 245:8,9
  246:9 267:6 276:18
  288:17 315:7
  319:15 320:13
**Werbalowsky (1)**
12:5
**weren't (7)**
129:21 174:17 202:10
  203:24 250:23
  310:4 316:2
**we'll (2)**
19:17
**we're (1)**
55:25
**we've (2)**
175:3 204:13
**WGM (2)**
126:9 338:15
**whereof (1)**
341:20
**whispering (1)**
226:7
**Whiting (1)**
175:24
**Whitmer (5)**
3:24 7:10,10 206:10
  222:21
**whiz (2)**
40:8 278:5
**whoa (6)**
132:7,7,7 227:12,12
  227:13
**wild (1)**
125:13
**William (2)**
159:20,21
**willing (2)**
128:11 335:22
**willingness (1)**

**Column 1**

109:8
**Wilmington (1)**
297:22
**windfall (2)**
273:15 292:13
**window (2)**
117:14 303:11
**withdraw (1)**
177:17
**withdrawn (8)**
52:16 66:4 70:18
110:2 298:14 304:4
316:25,25
**withheld (3)**
217:9,14,15
**witness (26)**
3:12 6:19,20 7:13,15
10:6 17:15 31:19
128:18 181:9
281:10 285:9,19,22
305:2,5,8 318:8,12
318:13,15 338:3
341:11,15,20 342:5
**wont (1)**
248:20
**word (14)**
77:5 95:25 140:12,12
140:13 174:10
191:6,16 237:8
244:2 251:4 260:9
283:6 286:15
**worded (1)**
30:22
**words (33)**
19:6 24:14,22 42:19
83:15,16,24,25 84:5
84:6,9,25 85:10
86:6,22,24 116:15
123:20 137:18
148:17 165:8
210:16,22 238:19
257:2 268:10 277:4
278:17 289:18
290:9 301:20 328:2
333:3
**work (22)**
12:10 15:5,21 53:10
64:10 68:24 69:20
70:8,16 72:15,17
123:24 124:4,6
128:11,15 152:3
162:17 179:4
200:22 201:17
220:15
**worked (5)**
12:15 15:15 161:21
204:4 212:19
**working (6)**
9:8 139:11 159:6,12
159:17 185:23

**Column 2**

**works (6)**
15:4 23:7 195:6
207:11 209:18
212:14
**world (5)**
15:2,4 111:7 115:17
200:2
**worldwide (1)**
274:19
**worried (2)**
117:5 273:23
**worse (1)**
329:24
**worth (14)**
37:18 38:3 99:13,24
100:2 180:13
181:12 183:19
255:5 257:24
264:22 286:22
288:7 301:23
**worthless (2)**
200:11 327:4
**wouldn't (11)**
48:23 92:7 103:8
118:12 158:24
182:15 186:7
275:10 289:16
319:10 325:16
**wound (1)**
175:18
**wow (4)**
203:8 253:17 314:23
315:9
**wranglings (1)**
250:24
**write (8)**
64:11 182:13 185:14
188:10 227:9,18,20
245:25
**writes (3)**
292:2,5,11
**writing (4)**
60:20 202:24 216:21
248:8
**written (17)**
28:8,11,13,16 59:14
60:12,19 61:15
63:11 64:8,18 65:9
96:13 208:11
234:12,21 260:17
**wrong (18)**
66:2 79:19 184:24
190:6 221:4 226:11
229:14,17 230:6,6,9
230:9 240:4,24,25
242:9 275:12 278:3
**wrote (5)**
203:17 232:12 239:14
260:8 261:25

**Column 3**

**X**

**x (4)**
1:4,10 221:16,18

**Y**

**yada (6)**
227:5,5,5 247:3,3,3
**yeah (40)**
13:21 19:9 24:5 26:24
29:20 38:7,11 42:19
48:14 51:8 55:4
57:4 61:6 87:15
94:19 106:12
107:24 127:25
136:19 139:17
173:18 193:23
195:11 199:11
208:5 211:13
225:12 234:16
262:12,12 263:4
264:15 266:5,5
271:22 274:12
287:10 297:15
317:18 319:21
**year (3)**
24:24 195:25 333:19
**years (3)**
8:9,23 9:3
**yelled (1)**
287:14
**yelling (1)**
144:9
**Yeshiva (1)**
7:24
**yesterday (2)**
27:11 91:12
**York (35)**
1:3,13,13 2:10,11,14
3:7,7,14,14 4:7,7
6:10,10 7:25 23:12
23:13,15,18,21
34:13,13,15,17,19
34:21 50:24 169:7
173:13 207:12
214:12 292:4 341:4
341:6,10
**younger (2)**
131:11,11
**Yup (2)**
225:4 291:25

**0**

**00001 (2)**
206:14 339:11
**0006 (2)**
206:14 339:11
**074 (1)**
133:19
**08-13555(JMP) (1)**
1:7

**Column 4**

**1**

**1 (13)**
6:5 87:8,16 88:3,4
122:24 164:21
176:15 194:25
235:25 271:8 309:4
342:7
**1(a)(ii) (5)**
87:9,18 88:5 95:3
105:7
**1.02 (1)**
223:24
**1.29 (2)**
85:5,16
**1.5 (1)**
236:16
**1.7 (1)**
95:15
**1.9 (13)**
166:18 167:2 255:7
263:19,24 264:14
264:23 265:24
266:12 278:6
315:21 317:21
319:3
**1:01 (1)**
152:9
**1:30 (2)**
235:25 248:2
**1:41 (2)**
153:3,5
**10 (5)**
111:25 193:8 233:9
262:2 267:2
**10th (1)**
3:20
**10:11 (1)**
292:5
**10:28 (1)**
145:9
**10:39 (1)**
57:11
**10:51 (1)**
57:14
**100 (5)**
138:24 229:5,7
232:16 276:11
**10004-1482 (1)**
4:7
**10017-6702 (1)**
3:7
**10022 (1)**
3:14
**11 (6)**
1:6 273:25 290:18
309:4 326:3 333:22
**11:34 (1)**
126:20
**110 (2)**
223:25 232:24

**Column 5**

**1150 (1)**
232:24
**12 (11)**
30:12 31:23 32:15
35:6 37:13 40:18
55:6 112:2 118:24
118:24 326:3
**12,000 (1)**
267:2
**12/17/09 (1)**
342:4
**12:20 (1)**
130:5
**12:33 (1)**
130:9
**127.4 (1)**
227:8
**129 (2)**
338:15,17
**13 (1)**
8:9
**13.5 (1)**
60:7
**14 (1)**
8:9
**148 (1)**
338:19
**15 (2)**
34:12 262:2
**15c3 (5)**
305:24 306:11 309:10
309:13 324:24
**15.8 (1)**
162:21
**16 (3)**
18:23 34:15 58:8
**16th (2)**
24:20 42:10
**160 (1)**
338:21
**16324 (2)**
206:17 339:13
**16325 (2)**
206:20 339:15
**16856 (2)**
194:15 339:7
**17 (14)**
1:14 2:5 6:11 15:22
23:16 27:25 69:6
160:24 193:16
195:10 196:11
298:18 299:13,14
**17th (17)**
10:2,13 14:20 194:4,9
194:10,11 196:13
216:19 217:10
299:17,19,22 300:4
300:9,10 341:21
**170 (1)**
122:20

**173 (2)**
338:22,24
**18 (4)**
49:7 197:24 270:5
310:20
**18th (14)**
121:6 196:16 197:20
198:25 201:23
208:9 214:25
216:13,15 218:21
236:14 299:18,23
300:11
**189 (1)**
236:16
**19 (15)**
40:19 42:6 48:17
58:10 68:7 217:25
267:16 271:8
272:20 276:3
291:13,15 292:3
312:7 339:22
**19th (8)**
96:8,12 143:22 208:9
216:15 236:8,11
270:20
**190 (2)**
235:5 241:9
**191 (4)**
216:6 240:21 242:18
339:17
**196 (1)**
339:4
**197 (1)**
339:6

————— 2 —————
**2 (32)**
20:23 57:14 130:5
164:21 169:2 196:8
197:14 233:7 235:7
235:24 236:16
248:19,21 249:2,13
266:15 267:16,19
275:24 276:20,24
277:5,10,20 278:4
278:10 279:7
296:13,14 301:10
301:22 342:7
**2.25 (1)**
267:19
**2.3 (1)**
290:19
**2.5 (3)**
244:3 248:8 268:19
**2:30 (4)**
55:11,12,13 248:2
**2:33 (1)**
193:11
**2:43 (1)**
193:14

**20 (6)**
52:18 54:6 58:12
219:13 262:2
270:19
**20th (4)**
54:13 196:22 197:8
197:10
**20-30-B (1)**
233:3
**2008 (37)**
9:24 21:4 24:4 34:12
37:21 38:24 39:5
40:19 42:6 45:9,13
58:8,10,12 68:7
69:9 74:16 75:3
119:4,12 126:20
157:24 177:3 178:3
178:11 180:20
183:4 291:13,15
298:18 310:20
331:25 333:22
334:16 338:14,21
339:23
**2009 (8)**
1:14 2:5 6:11 187:4
188:23 189:3
337:11 341:21
**209 (4)**
339:8,10,12,14
**21 (5)**
46:3 52:18 126:20
127:7 130:13
**21st (5)**
23:24 132:11 196:16
197:9 331:25
**21st,the (1)**
137:22
**219 (1)**
339:16
**22 (30)**
21:4 23:17 28:2 45:9
45:13 52:22 54:9
56:20 58:25 67:6,19
68:15 69:9 70:10,18
72:2,18 74:16 75:3
76:22 77:25 78:15
78:22 113:20 114:5
139:16 143:11
155:19 332:8
338:14
**22nd (10)**
55:14,15,19 70:6
75:22 78:5 137:22
216:20 244:10
331:25
**220 (1)**
232:23
**222 (1)**
3:6
**225 (1)**

267:16
**23rd (1)**
75:23
**248 (2)**
339:18,20
**25 (3)**
145:9 226:20 267:17
**25A (1)**
147:24
**25B (1)**
147:24
**25th (4)**
145:21 149:18 216:11
245:23
**250 (10)**
99:19,25 200:11
223:16,17 276:5
286:19 288:6,25
309:19
**2527 (2)**
297:12 340:8
**26 (10)**
58:4 61:16 65:9 69:11
73:2 78:17 100:12
290:17,17,18
**26th (1)**
216:12
**26532 (1)**
1:18
**27th (1)**
217:11
**27.4 (3)**
222:9 225:22 242:6
**278 (2)**
297:12 340:8
**28 (2)**
20:14 172:6
**28090 (2)**
206:6 339:9
**28189 (1)**
240:16
**28190 (1)**
239:24
**294 (1)**
339:22
**298 (1)**
339:24
**299 (1)**
340:5

————— 3 —————
**3 (17)**
18:15 20:24 84:22
85:4,11 130:9
155:15 164:21
187:4 188:23 189:3
206:24 248:19,21
249:2,13 342:8
**3-6 (1)**
236:16

**3.5 (2)**
244:3 248:8
**3:03 (1)**
206:23
**3:49 (1)**
243:8
**30 (9)**
65:8,16 70:10 72:19
76:22 114:6 155:19
156:9 332:8
**30th (2)**
70:7 78:6
**30(b) (1)**
128:2
**30(b)(6) (9)**
17:22,25 22:8 31:7,17
31:18 33:22 34:6
89:4
**300 (2)**
232:23 340:7
**307 (1)**
340:9
**308 (1)**
340:11
**31 (1)**
338:9
**313 (1)**
340:13
**330 (1)**
233:2
**338-B (7)**
243:14 245:10 246:2
261:22 265:21
266:3 309:8
**35 (1)**
203:14
**350 (1)**
232:18
**35872 (2)**
193:3 339:5
**363 (1)**
112:24
**38 (4)**
163:18 167:18 168:4
168:10
**38187 (2)**
216:6 339:17
**38189 (6)**
221:15 229:10 240:2
241:21,24 243:2
**38190 (8)**
219:18 231:22 234:20
234:22 236:20
238:20 239:10
240:15
**38191 (4)**
220:12 234:11,21
235:14
**3841 (1)**
234:2

**39 (1)**
60:6

————— 4 —————
**4 (12)**
33:19 34:11 55:6
84:22 85:4 86:23
164:21 193:14
226:20 254:21
266:11,19
**4.25 (4)**
266:17,20 280:3
282:10
**4.6 (1)**
236:16
**4:00 (4)**
55:11,13 56:23,24
**4:01 (1)**
243:11
**4:04 (1)**
245:8
**4:07 (1)**
245:7
**4:57 (1)**
286:3
**41 (1)**
259:15
**41st (1)**
3:6
**42 (1)**
259:15
**43 (2)**
167:9 173:22
**43.07 (1)**
167:7
**43.1 (2)**
172:18 173:4
**44 (9)**
252:12 255:6 257:7
257:24 258:17
278:5 279:7,11
332:25
**44.4 (2)**
251:20 252:6
**44.9 (2)**
251:20 252:6
**4414 (2)**
245:2 339:19
**4415 (2)**
245:2 339:19
**4419 (2)**
170:19 338:25
**4424 (2)**
170:14 338:23
**44511 (2)**
170:19 338:25
**45 (18)**
20:12 45:16 46:2
160:25 163:19
168:6 225:20 255:6

**257:7,24 258:17**
266:8 278:6 279:7
279:11,18 282:10
332:25
**45.5 (42)**
42:15,17,22 43:5,21
44:10,24 168:8,9,22
168:25 223:14
225:21,25 228:10
232:11,11,15 235:6
236:21,22 237:13
237:14,15,15 238:3
238:5 239:9,16,18
239:24 240:15
241:2,6 254:7
262:20 279:19,24
282:10 284:2
289:10,12
**450 (1)**
233:2
**457-B (4)**
6:2 17:21 18:11 338:8
**458-B (4)**
28:21,25 29:7 338:9
**459-B (3)**
45:8,11 338:13
**46 (1)**
278:7
**460-B (7)**
126:8 148:25 149:14
151:18,25 152:2
338:15
**461 (1)**
255:24
**461-B (19)**
126:11,15,15,17,19
129:2 130:12 137:9
151:19,25 253:24
253:25 255:18
256:3 261:2,16,21
262:11 338:17
**462-B (3)**
144:25 145:4 338:19
**463 (1)**
158:4
**463-B (2)**
157:23 338:21
**464-B (7)**
170:13,21 171:2
188:20 190:8
191:15 338:22
**465-B (4)**
170:17,18,23 338:24
**466-B (3)**
193:2,5 339:4
**467-B (3)**
194:14,18 339:6
**468-B (6)**
206:5 207:3,4 208:7
211:7 339:8

**469B (1)**
207:3
**469-B (5)**
206:13 207:5,7
211:12 339:10
**47 (6)**
40:21 255:10,13
265:25 278:7,8
**47.3 (1)**
96:2
**47.4 (25)**
30:16,19 32:6,17,22
35:18 36:2,20 37:18
38:3,11,14 39:3,21
40:4 42:13 44:11,25
96:2 98:18,20,22
184:24 186:5 235:6
**47.5 (1)**
96:2
**470 (2)**
211:16,17
**470B (1)**
207:3
**470-B (3)**
206:16 211:14 339:12
**471B (1)**
207:3
**471-B (5)**
206:19 213:3,8,9
339:14
**472-B (5)**
216:5,9 218:5,7
339:16
**473-B (3)**
244:25 270:17 339:18
**474-B (3)**
245:4 272:6 339:20
**475-B (3)**
291:14,18 339:22
**476-B (4)**
295:4,7 297:25
339:24
**477-B (4)**
295:25 296:4,5 340:5
**478-B (3)**
297:11,18 340:7
**479-B (4)**
304:10,11,18 340:9
**48 (1)**
338:13
**48.4 (1)**
260:2
**480 (1)**
304:21
**480-B (3)**
304:22 305:11 340:11
**481-B (3)**
310:11,14 340:13
**49 (1)**
192:22

**49,902,000 (1)**
133:20
**49,902,924 (1)**
134:3
**49.49 (1)**
253:15
**49.7 (1)**
161:3
**49.75 (1)**
278:8
**49.9 (13)**
192:8,16 251:7,10,12
252:11 253:19
254:10,18 258:20
259:12 261:20,21

———————— **5** ————————

**5 (28)**
18:24 164:21 165:3
174:23 176:7 177:4
178:4 180:11
181:10,25 182:8,18
188:20 190:9,10,17
223:10 224:8,13
225:19,24 227:7
228:8 233:9,9
243:11 254:21
307:21
**5B (1)**
225:2
**5:00 (2)**
56:6,13
**5:10 (1)**
286:6
**5:49 (1)**
312:2
**5:55 (1)**
312:5
**50 (10)**
225:20,25 228:9
251:18,22 253:22
254:8 255:3 262:19
332:24
**50,000-foot (1)**
203:14
**50.4 (1)**
260:2
**50.6 (1)**
224:3
**50.64 (7)**
222:9 226:19 239:25
240:16 241:23
242:5,25
**50.64B (1)**
241:21
**50/50 (2)**
248:18 249:11
**500 (1)**
168:8
**57 (2)**

**194:15 339:7**
**575 (3)**
2:10 3:13 6:10
**5778 (2)**
245:5 339:21

———————— **6** ————————

**6 (8)**
20:14 41:24 100:13
157:23 199:2 286:6
338:4,21
**6th (1)**
195:2
**6:02 (1)**
317:3
**6:04 (1)**
317:6
**6:25 (2)**
331:18,21
**6:32 (1)**
337:4
**60 (1)**
25:9
**636 (1)**
133:19
**69 (2)**
122:17 184:17

———————— **7** ————————

**7 (31)**
20:20,22,25 21:2 33:7
33:8,13,18,20 34:11
105:9 134:5 135:5,9
136:2 162:11,13
163:3,6,20 168:13
168:18,19,20
173:21,22,23 174:3
253:8 261:11,15
**7th (1)**
195:2
**7.4 (3)**
259:24 260:15 261:15
**7:15 (2)**
305:18 310:4
**70 (4)**
102:24 184:17,23
186:5
**72 (1)**
255:14
**72.68 (1)**
251:9
**74 (2)**
193:3 339:5
**745 (1)**
215:6

———————— **8** ————————

**8 (6)**
30:11 35:7 107:16,16
175:22 199:2

**8.55 (5)**
259:18,20,22,24
260:14
**8:00 (3)**
56:6,13,23
**8:11 (1)**
292:10
**8:51 (1)**
272:20
**865 (1)**
3:20
**882 (2)**
304:12 340:10

———————— **9** ————————

**9 (7)**
41:24,25 42:3 44:21
214:25 236:16
338:8
**9/22/2008 (1)**
305:18
**9:00 (1)**
56:24
**9:34 (1)**
6:12
**9:35 (1)**
2:6
**90017 (1)**
3:21
**91 (2)**
206:6 339:9
**911 (2)**
296:2 340:6
**9119 (2)**
304:23 340:12
**9120 (2)**
304:23 340:12
**9125 (2)**
295:5 339:25
**9127 (1)**
295:17
**9144 (2)**
295:5 339:25
**92 (2)**
290:14,15