Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4

    --------------------------X

5

    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS            Case No. 08-13555(JMP)

     HOLDINGS, INC., et al.,    (Jointly Administered)

8

9

                 Debtors.

10   --------------------------X

11

12              VIDEOTAPED DEPOSITION

13                    OF

14              MICHAEL A. FAZIO

15             New York, New York

16           Friday, February 12, 2010

17

18

19

20

21

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CCR, RPR

25   JOB NO. 27497

Confidential

Page 2

February 12, 2010
9:31 a.m.

Videotaped deposition of MICHAEL A.
FAZIO, held at the law offices of Boies,
Schiller & Flexner, LLP, 575 Lexington
Avenue, 7th Floor, New York, New York,
before Annette Arlequin, a Certified Court
Reporter, a Registered Professional
Reporter and Notary Public of the State of
New York.

Page 3

A P P E A R A N C E S:

JONES DAY, LLP
Attorneys for Lehman Brothers, Inc.
   222 East 41st Street
   New York, New York  10017-6702
BY: TRACY V. SCHAFFER, ESQ.

BOIES, SCHILLER & FLEXNER, LLP
Attorneys for Barclays Capital
   575 Lexington Avenue - 7th Floor
   New York, New York  10022
BY: JACK G. STERN, ESQ.
   MICHELLE M. SEKOWSKI, ESQ.

QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
Attorneys for the Creditors Committee and
   Michael A. Fazio
   865 South Figueroa Street
   Los Angeles, California  90017
BY: ERICA P. TAGGART, ESQ.
   TYLER WHITMER, ESQ.
   ERIC M. KAY, ESQ.

Page 4

A P P E A R A N C E S:  (Cont'd.)

HUGHES, HUBBARD & REED, LLP
Attorneys for the SIPA Trustee
One Battery Park Plaza
New York, New York  10004-1482
BY: CARL W. MILLS, ESQ.

ALSO PRESENT:

CARLOS LOPEZ, Legal Video Specialist

Page 5

IT IS HEREBY STIPULATED AND AGREED by
and between the attorneys for the
respective parties herein, that filing and
sealing be and the same are hereby waived.
IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form
of the question, shall be reserved to the
time of the trial.
IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be sworn to
and signed before any officer authorized to
administer an oath, with the same force and
effect as if signed and sworn to before the
Court.

- oOo -

Confidential

Page 6

1        M. Fazio
2        THE VIDEOGRAPHER: This is the start
3   of tape labeled No. 1 of the videotaped
4   deposition of Michael Fazio in the matter
5   In Re Lehman.
6        This deposition is being held at 575
7   Lexington Avenue, New York, New York on
8   February 12th, 2010 at approximately 9:31
9   a.m.
10       My name is Carlos Lopez from TSG
11  Reporting, Inc. and I am the legal video
12  specialist.
13       The court reporter is Annette
14  Arlequin in association with TSG Reporting.
15  Will counsel please introduce
16  yourselves for the record.
17       MR. STERN:  Sure.
18       Jack Stern from Boies Schiller &
19  Flexner for Barclays Capital, and with me
20  today is Michelle Sekowski.
21       MS. SCHAFFER:  Tracy Schaffer from
22  Jones Day representing LBHI.
23       MR. MILLS:  Carl Mills from Hughes,
24  Hubbard & Reed representing James W.
25  Giddens, SIPA Trustee.

Page 7

1        M. Fazio
2        MS. TAGGART:  Erica Taggart with
3   Quinn, Emanuel, Urquhart, Oliver & Hedges
4   for the Committee and also the witness, and
5   I'm here with Tyler Whitmer.
6        THE VIDEOGRAPHER:  Will the court
7   reporter please swear in the witness.
8             *       *       *
9   M I C H A E L   A.   F A Z I O,  called as a
10      witness, having been duly sworn by a
11      Notary Public, was examined and testified
12      as follows:
13  EXAMINATION BY
14  MR. STERN:
15       Q.   Good morning, Mr. Fazio.
16       A.   Good morning.
17       Q.   What is your current position at
18  Houlihan?
19       A.   I'm managing director at Houlihan &
20  Lokey.
21       Q.   And was that your position in
22  September of 2008?
23       A.   That was.
24       Q.   In September 2008 did you attend the
25  hearing in the Lehman Brothers bankruptcy case

Page 8

1        M. Fazio
2   to approve the sale transaction involving
3   Barclays and Lehman?
4        A.   Can you be more specific on what
5   date?
6        Q.   That was a hearing on September 19th,
7   which was a Friday.
8        A.   Yes, I was there.
9        Q.   When you arrived at the courthouse,
10  did you have any discussions with anyone from
11  Lehman or Barclays?
12       A.   Generally, no.  It would have been
13  more discussions with the Houlihan people and
14  Milbank people at the time.
15       Q.   Do you recall that during the course
16  of that hearing there was a recess in the
17  proceeding?
18       A.   Yes.
19       Q.   Did you participate in that recess?
20       MS. TAGGART:  Object to form.
21       A.   I don't know what you mean in terms
22  of participate.
23       Q.   Let me ask you, what did you do
24  during that recess?
25       A.   I was with my partner and we would,

Page 9

1        M. Fazio
2   you know, I'd overhear some parts of
3   conversations, but I was not an active
4   participant in any of those conversations with
5   various people from the estate, Barclays or
6   whoever was participating.
7        Q.   Which partner are you referring to?
8        A.   It would have been the estate and
9   Barclays and -- the estate being Weil, Gotshal.
10       Q.   You said you were with your partner.
11       A.   That's correct.
12       Q.   Who was that?
13       A.   Saul Burian.
14       Q.   And what do you recall was said by
15  representatives of the estate during that
16  recess?
17       A.   I was not an active participant and
18  could barely overhear.  There were big crowds of
19  people that were gathered around, so I was on
20  the outskirts so I don't have an active
21  recollection of exactly what was said and who
22  was saying what to whom.
23       MR. STERN:  Let's mark as
24  Exhibit 618A, a one-page document.
25       (Deposition Exhibit 618A, Email dated

Confidential

| Page 10 | Page 11 |
|---|---|

**Page 10**

            M. Fazio
1
2       9/18/08 from Fazio to Geer, Bates stamped
3       HLHZ0016316, marked for identification, as
4       of this date.)
5   BY MR. STERN:
6       Q.   Mr. Fazio, I've put in front of you a
7   document that we've marked as Exhibit 618A.
8       Can you tell me what this is?
9       A.   It's an email from myself to Brad
10  Geer asking him to listen to the Barclays
11  investor call or have somebody listen to the
12  investor call.
13      Q.   And why did you write this email?
14      A.   I was -- I had understood that there
15  was an investor call that Barclays was having
16  and I wanted to see if we could get additional
17  information with respect to the transaction.
18      Q.   Had you listened to that call?
19      A.   No, I have not.
20      Q.   And at the time you wrote this email,
21  you had not listened to it.
22      A.   That's correct.
23      Q.   How did you learn of that call?
24      A.   I do not know, recall, how I learned
25  of the call.

**Page 11**

            M. Fazio
1
2       Q.   Do you know if Mr. Geer did in fact
3   listen to that call?
4       A.   I do not recall.
5       Q.   Did you ever get a report from him
6   concerning that call?
7       A.   No.
8       Q.   Do you recall getting a report from
9   anyone concerning the substance of that call?
10      A.   No, I do not.
11      Q.   After the September 19th hearing that
12  we just referred to, what was your next
13  involvement in connection with the
14  Barclays/Lehman sale transaction?
15      A.   I attended two full days of
16  discussion on the 20th and 21st, or yeah, that's
17  Saturday and a Sunday, that's correct.
18      Q.   And what were your primary areas of
19  activity over that weekend, you personally?
20      A.   To understand the transaction as best
21  we could, to get information with respect to the
22  transaction and the securities that were being
23  transferred and the liabilities being assumed as
24  part of the transaction.
25      Q.   What work did you do over that

| Page 12 | Page 13 |
|---|---|

**Page 12**

            M. Fazio
1
2   weekend to understand the securities being
3   transferred?
4       MS. TAGGART:  Objection.  Calling for
5   potential privilege or work product
6   information.
7       You can describe generally the
8   activities, but I caution you not to go
9   into any internal Houlihan, if there's any,
10  projects or analysis at this time.
11      THE WITNESS:  Okay.
12      A.   Can you restate the question?
13      MR. STERN:  Do you want to reread it?
14      (Question was read back as follows:
15      "QUESTION:  What work did you do over
16  that weekend to understand the securities
17  being transferred?")
18      A.   We had meetings with the debtors and
19  we had a meeting with representatives from
20  Barclays associated on the 20th and 21st
21  meetings that we had to understand that.
22      Q.   Did you review any written material
23  concerning the securities?
24      A.   I was generally involved in projects
25  at Houlihan to understand or attempt to

**Page 13**

            M. Fazio
1
2   understand the securities being transferred,
3   yes.
4       Q.   What types of written material were
5   you given?
6       MS. TAGGART:  Objection and could
7   call for privileged information.
8       I'd ask you not to reveal any, if
9   there are any, written documents that were
10  generated by Houlihan, but you should
11  answer if you were given any documents by
12  anyone such -- beyond Houlihan or your
13  lawyers, including from Lehman or Barclays
14  or any of their representatives.
15      A.   I was given no information from
16  the -- from Barclays or from Lehman with respect
17  to the transaction.
18      Q.   You were given no written information
19  concerning the securities?
20      A.   That's correct.
21      Q.   Is it your recollection that you were
22  not provided a spreadsheet of securities being
23  transferred in connection with the transaction?
24      A.   Again, not from anybody, from
25  Barclays or the estate.

Confidential

| Page 14 |
|---|

1          M. Fazio
2      Q.   Did you receive spreadsheets from any
3  other source?
4          MS. TAGGART:  It's okay.  You can
5      answer.
6      A.   I would have received information
7  from our lawyers with respect to securities
8  which represent securities that were indicated
9  to us being a detail of securities from earlier
10 in the week that were thought to being
11 transferred.
12     Q.   What did you do to analyze that
13 information?
14         MS. TAGGART:  I'm going to object to
15     the extent it calls for any internal
16     Houlihan analysis.
17         But you can describe either any
18     general tasks that you did or any
19     correspondence with anyone outside of
20     Houlihan or your attorneys.
21     A.   We had correspondence with Jim Seery,
22 with Mr. Klein, who was Barclays' investment
23 banker, with respect to the securities being
24 transferred on that, on the Friday.  It was
25 Saturday and Sunday.

| Page 15 |
|---|

1          M. Fazio
2      Q.   When you say "correspondence," do you
3  mean face-to-face meetings?
4      A.   That's correct.
5      Q.   Aside from discussions concerning the
6  securities, did you do any independent analysis
7  of the composition of those securities?
8          MS. TAGGART:  I'm going to object on
9      attorney-client and work product privilege.
10         If you did any analysis that you
11     shared with anyone other than Houlihan and
12     your attorneys, you should go ahead and
13     answer, otherwise I'd instruct you not to
14     answer any analysis that was internal
15     Houlihan or correspondence with your
16     attorneys.
17     A.   I did internal analysis.
18     Q.   Did you draw any conclusions as a
19 result of that analysis concerning the value of
20 the securities you reviewed?
21         MS. TAGGART:  You can -- hold on.
22         I'm going to object on
23     attorney-client and work product privilege
24     and instruct you not to answer.
25 BY MR. STERN:

| Page 16 |
|---|

1          M. Fazio
2      Q.   I show you next a document that we
3  previously marked as Exhibit 461B.
4          Looking at Exhibit 461B, can you tell
5  me what this is?
6      A.   It appears to be an email from Brian
7  Kelly from Milbank to myself and Ann Makowski,
8  which has detailed spreadsheets associated with
9  a list of securities that were detailed and
10 alleged to be the securities that were being
11 transferred on the -- associated with the sale.
12     Q.   Do you know who provided this
13 information to Mr. Kelly?
14     A.   I do not.
15     Q.   Did you review the attached
16 spreadsheets and information on September 21,
17 2008?
18     A.   Yes, I did.
19     Q.   What type of analysis did you do
20 concerning the securities listed in the
21 spreadsheet?
22         MS. TAGGART:  I'm going to object on
23     attorney-client and work product privilege
24     and instruct not to answer.
25 BY MR. STERN:

| Page 17 |
|---|

1          M. Fazio
2      Q.   Did you do anything to determine
3  whether there was a publicly available pricing
4  source concerning the securities listed on the
5  spreadsheet?
6          MS. TAGGART:  Object to form.
7          But you can answer.
8      A.   I had staff that reported to me do
9  some analysis with respect to the ability to get
10 prices on some of the securities in the
11 analysis, yes.
12     Q.   And what did they report to you?
13         MS. TAGGART:  I'm going to object and
14     instruct you not to answer on
15     attorney-client and work product privilege.
16 BY MR. STERN:
17     Q.   Was your staff able to obtain
18 publicly available pricing information for all
19 of the securities on the spreadsheets?
20         MS. TAGGART:  Hold on.
21         You can answer that yes or no.
22     A.   No.
23     Q.   Do you recall approximately what
24 percentage of the securities your staff was able
25 to obtain publicly available pricing information

Page 18

1          M. Fazio
2   for?
3          MS. TAGGART: I'm going to object and
4    instruct not to answer on privilege.
5   BY MR. STERN:
6      Q.   I ask you to please look at the third
7   page of this exhibit. Right there (indicating),
8   that summary sheet. It may be the second page
9   of your copy.
10     A.   It's the second page, yes.
11     Q.   The second page of the exhibit.
12        At the top it has a line that reads,
13   "Collateral" and then next to that it says,
14   "Market Value."
15        Do you see that?
16     A.   Yes, I do.
17     Q.   Is this a summary sheet that you
18   reviewed at the time that you received it?
19     A.   Yes.
20     Q.   And what was your understanding at
21   that time concerning the information reflected
22   here?
23        MS. TAGGART: Object to form.
24        I'm sorry. At what time?
25   BY MR. STERN:

Page 19

1          M. Fazio
2      Q.   At the time you received this.
3          MS. TAGGART: You can answer.
4      A.   On the Sunday that I received this,
5   and I don't know exactly what time, but my
6   understanding after having different discussions
7   with people that the market values were market
8   values associated with collateral earlier in the
9   week.
10     Q.   And were you ever told who assigned
11   those market values to the collateral?
12     A.   I was told that it came off of the
13   Lehman system earlier in the week.
14     Q.   Were you given a date earlier in the
15   week?
16     A.   I was given Monday, Tuesday time
17   periods.
18     Q.   And with respect to the line that
19   says "TP cash" and has a figure of $7 billion
20   next to that, what understanding did you have
21   concerning that information?
22     A.   There was discussion of whether or
23   not securities or cash were being transferred
24   from JPMorgan associated with the transaction,
25   and it was unclear whether securities would be

Page 20

1          M. Fazio
2   being transferred are cash and the cash was said
3   to be $7 billion. If the final securities that
4   were going over in cash in total, they were
5   looking at it and trying to figure out what
6   would be transferred. So it was indicated that
7   at the time it was $7 billion of cash they
8   thought would be being transferred.
9      Q.   And when you and others on behalf of
10   the committee learned that, did you discuss that
11   fact with anyone representing the estate?
12        MS. TAGGART: Object to form.
13        You can answer.
14     A.   We would -- we had discussions with
15   Jim Seery with respect to the transaction and
16   the securities and cash.
17     Q.   Did anybody acting on behalf of the
18   committee object that this cash was being
19   transferred in connection with the transaction?
20        MS. TAGGART: Objection. Foundation.
21        THE WITNESS: Repeat the question?
22   Sorry.
23        (Question was read back as follows:
24        "QUESTION: Did anybody acting on
25   behalf of the committee object that this

Page 21

1          M. Fazio
2   cash was being transferred in connection
3   with the transaction?")
4      A.   We were looking at the transaction as
5   a whole, so there were liabilities being assumed
6   and assets being transferred, so there was
7   discussion with respect to the transaction and
8   the components of the transaction and
9   understanding what was being transferred.
10        So since we did not have a detailed
11   schedule that people had said had been a final
12   schedule of securities or cash being
13   transferred, we had nothing to object to at that
14   time.
15     Q.   At the time you received this
16   information which reflects a transfer of cash of
17   $7 billion, was it your understanding that such
18   cash would be transferred to Barclays or had
19   been transferred to Barclays?
20        MR. MILLS: Object to the form.
21     A.   My understanding was that the estate
22   and Barclays were trying to figure out exactly
23   what securities they had and what was being
24   transferred associated with the transaction over
25   the weekend.

Page 22

1             M. Fazio
2    Q.   Were you ever told that one possible
3 approach to the transaction was that Barclays
4 would retain the $7 billion in cash?
5    A.   If the total securities were not as
6 represented, the value of the securities was not
7 as total represented, there would have to be a
8 cash component to equate to the transaction that
9 was represented court.
10    Q.   And that was cash from the LBI
11 estate, correct?
12       MS. TAGGART: Object to form.
13    A.   I'm not sure where the cash and who
14 the repository of the cash was with and the
15 rightful owner of it, but it was, from the
16 estate, cash would have been had to have come
17 from the estate for the transaction.
18    Q.   And did the committee or anybody
19 acting on behalf of the committee or anyone else
20 in attendance that weekend, to your knowledge,
21 object to the possibility that such cash would
22 be included in the transaction?
23       MS. TAGGART: Object to form and
24 foundation.
25 BY MR. STERN:

Page 23

1             M. Fazio
2    Q.   If you remember.
3    A.   The transaction was discussed as a
4 whole so individual components, since we did not
5 have a detailed schedule at all throughout this
6 of any detail which showed the final securities
7 in cash being transferred, there was nothing to
8 object to.
9    Q.   This makes reference to $7 billion in
10 cash.
11      My question is this: Did anyone, to
12 your knowledge, object to the transfer of such
13 cash over the preclosing weekend?
14       MS. TAGGART: Objection. Asked and
15 answered. Form, foundation.
16 BY MR. STERN:
17    Q.   You can answer.
18    A.   Since the transaction is taken as a
19 whole, we were not given final cash numbers or
20 securities being transferred so there was
21 nothing to object to.
22    Q.   I understand that.
23      Did anyone object, to your knowledge,
24 to the possibility that $7 billion in cash was
25 to be transferred as a part of the transaction?

Page 24

1             M. Fazio
2       MS. TAGGART: It's been now asked and
3 answered four times.
4      I object to form and foundation.
5      You can answer it one more time.
6      MR. STERN: I don't think it's been
7 answered.
8      Can you repeat the question?
9      (Question was read back as follows:
10      "QUESTION: Did anyone object, to
11 your knowledge, to the possibility that
12 $7 billion in cash was to be transferred as
13 a part of the transaction?")
14    A.   As I've stated before, since the
15 transaction as a whole, we did not have detail
16 of which securities were being transferred or
17 what cash was being transferred with the
18 securities to offset the liabilities being
19 assumed by Barclays, we did not have anything to
20 object to at the time associated with cash or
21 securities being transferred.
22    Q.   You had a summary sheet indicating
23 that $7 billion in cash was included as part of
24 the assets being transferred to Barclays.
25      And my question is this: Did anyone,

Page 25

1             M. Fazio
2 to your knowledge, object to the inclusion of
3 that cash in the transaction?
4      MS. TAGGART: Object to --
5      MR. MILLS: Objection to the form.
6      MS. TAGGART: Object to the form, to
7 the preface. It's argumentive. It's been
8 asked and answered. And also to
9 foundation.
10    A.   I believe I've answered the question
11 numerous times, but I'll answer it again for
12 you.
13      When we looked at the detail and we
14 had discussions about the detail of securities
15 and cash being transferred, we did not have a
16 final list of securities or cash being
17 transferred associated with the transaction and
18 so there was nothing to object to associated
19 with the transaction since we did not have
20 information on the final securities or cash
21 being transferred.
22    Q.   At some point did Houlihan learn that
23 the $7 billion in cash would be included in the
24 transaction?
25       MS. TAGGART: Object to foundation.

Confidential

Page 26

1                 M. Fazio
2        MR. MILLS:  Objection.
3        MS. TAGGART:  Go ahead.
4      A.   I believe that subsequently and
5   subsequent information that came out and
6   Barclays indicating that they had not received
7   the cash, it had come to light that there was
8   $7 billion that was being transferred associated
9   with the transaction that had not gotten
10  transferred that Barclays was claiming that was
11  owed to them.
12     Q.   Did the committee learn at any point
13  that the $7 billion in cash had initially been
14  transferred to Barclays but then had been
15  removed by JPMorgan?
16       MS. TAGGART:  Object to form.
17  Foundation.
18     A.   I'm not aware.
19     Q.   You don't know?
20     A.   I don't know.
21     Q.   Okay.  Going back to the time when
22  you received Exhibit 461B and saw the reference
23  to $7 billion in cash, do you have any specific
24  recollection of anyone acting on behalf of the
25  Creditors Committee telling representatives of

Page 27

1                 M. Fazio
2   Lehman or Barclays that that cash should not be
3   included in the final transaction?
4        MS. TAGGART:  Objection.  Asked and
5   answered.  Form, foundation.
6   BY MR. STERN:
7      Q.   Do you have any such recollection?
8      A.   As I have stated before, we were
9   given this sheet.  It was indicated that we did
10  not have the final securities being transferred
11  nor the cash balance associated with the
12  transaction, so there was nothing to object to
13  since we did not have the final form and
14  securities that were being transferred.
15     Q.   Putting aside the question of the
16  market value of the securities listed in
17  Exhibit 461B, did anyone indicate to you over
18  the preclosing weekend that Barclays would not
19  receive the securities listed in Exhibit 461B?
20       MS. TAGGART:  Object to form.
21     A.   There was discussion that the
22  Barclays people and the estate people were
23  trying to reconcile the exact securities that
24  were being transferred because they had to
25  reconcile what securities remained in the

Page 28

1                 M. Fazio
2   possession of Lehman, and so there was question
3   as to which securities would finally be
4   transferred associated with the transaction
5   because they had to make sure that the
6   securities were in the possession of Lehman
7   Brothers.
8      Q.   Did you have an understanding that
9   certain securities had already been transferred
10  to Barclays as of that preclosing weekend?
11     A.   At the time, I was not aware that
12  some securities might have been transferred to
13  Barclays at that time.
14     Q.   Were you familiar with the fact that
15  Barclays had replaced the Fed's financing of LBI
16  prior to the preclosing weekend?
17       MS. TAGGART:  Object to form.
18     A.   Not prior to the preclosing weekend.
19  During the weekend I became aware of
20  that, yes.
21     Q.   During the September 19th hearing, do
22  you recall Mr. Miller informing the court that
23  Barclays had replaced the Fed's financing and
24  received the securities that had been pledged to
25  the Fed?

Page 29

1                 M. Fazio
2        MS. TAGGART:  Object to form.
3   BY MR. STERN:
4      Q.   Do you recall that?
5      A.   I recall discussions over the weekend
6   about Barclays stepping into the shoes of the
7   Fed.
8        I don't remember if it was at the
9   hearing on Friday or over the weekend, but I was
10  not sure whether or not that transaction also
11  had taken place or that it was stepping into the
12  shoes and had guaranteed to step into the shoes
13  to the Fed, and whether or not the securities
14  had been transferred and whether Barclays had
15  actually paid off the Fed.  I was unaware
16  whether or not that had happened on the Friday
17  or over the weekend.
18     Q.   Over the weekend did you learn that
19  it had happened?
20     A.   There was --
21       MS. TAGGART:  Object to form.
22     A.   There was discussion that it had
23  happened, but there was still a lot of
24  reconciliations going on of what securities that
25  Barclays was getting associated with that

Confidential

---

Page 30

1          M. Fazio
2  transaction also.
3      Q.   But with respect to the securities
4  that had already been transferred, did you have
5  an understanding that this list contained in
6  Exhibit 461B reflected those securities?
7      A.   No.  I had an understanding that
8  these were securities earlier in the week, that
9  thought that Lehman had that they were being
10 transferred over to Barclays as part of the Fed
11 transaction and the whole transaction that was
12 being discussed on court on Friday.
13     Q.   You did not have an understanding
14 that the securities listed in 461B had already
15 been transferred to Barclays as a part of its
16 replacement of the Fed?
17     A.   No.
18         MS. TAGGART:  Asked and answered.
19 BY MR. STERN:
20     Q.   Okay.  At some point did you learn
21 that?
22     A.   I still to this day do not know or
23 have a detailed list from Barclays or the estate
24 of the exact securities transferred as of today
25 and the market values of those securities that

---

Page 31

1          M. Fazio
2  were being transferred on Friday, the 19th or on
3  Monday, the 21st.
4         I'm sure Monday is the 22nd.  I
5  apologize.
6      Q.   So it's your testimony that as of
7  today you still do not have a complete list of
8  the securities that Barclays received in
9  connection with its replacement of the Fed.  Is
10 that your testimony?
11     A.   The testimony and I think what I just
12 said was that we do not have a listing from
13 Barclays of all the securities that they have
14 received associated with this transaction and
15 the market value of those securities as of the
16 close of the business on the 19th.  As of today
17 we do not have that listing.
18     Q.   Did you ever receive Schedule A to
19 the Clarification Letter?
20         MS. TAGGART:  Object to form.
21         And now you're asking him personally?
22         Go ahead.
23     A.   Sorry.  Repeat the question.  I'm
24 sorry.
25     Q.   Did you ever receive Schedule A to

---

Page 32

1          M. Fazio
2  the Clarification Letter?
3      A.   I have received what has been
4  indicated to be Schedule A of the Clarification
5  Letter, yes.
6      Q.   Have you received Annex A to the
7  settlement between LBI, JPMorgan and Barclays --
8         MS. TAGGART:  Object to form.
9  BY MR. STERN:
10     Q.   -- concerning the $7 billion
11 shortfall?
12     A.   I would have to look at it to see
13 what annex A is, but I might have seen it but
14 I'd have to see it in front of me.
15     Q.   Okay.
16         MS. TAGGART:  Jack, can we take a
17 quick break?
18         MR. STERN:  Sure.
19         MS. TAGGART:  I'll just be a couple
20 minutes.
21         THE VIDEOGRAPHER:  The time is 10:04
22 a.m.  We're going off the record.
23         (Recess is taken.)
24         THE VIDEOGRAPHER:  The time is 10:07
25 a.m.  We're back on the record.

---

Page 33

1          M. Fazio
2  BY MR. STERN:
3      Q.   Focusing again on the second page of
4  Exhibit 461B, it lists a total amount there of
5  $49.9 billion.
6         Do you see that?
7      A.   Yes, I do.
8      Q.   At some point over the preclosing
9  weekend did you learn the amount of the
10 financing that Barclays had assumed in replacing
11 the Fed, the loan amount that is?
12     A.   I was told that it was $45.5 billion,
13 yes.
14     Q.   And over that preclosing weekend, did
15 you raise any questions concerning the
16 difference between that $45 billion amount and
17 this $49.9 billion amount?
18     A.   Yes.
19     Q.   With whom did you raise those
20 questions?
21     A.   I had discussions Jim Seery and
22 discussions with Mr. Klein.
23     Q.   And what did you discuss on that
24 subject with Mr. Seery?
25     A.   I discussed wanting a detailed

---

Confidential

---

Page 34

M. Fazio

1
2  listing of the collateral that was being
3  transferred associated with the transaction and
4  the market values associated with the securities
5  being transferred.
6      Q.   What types of -- withdrawn.
7          What market values did you want?
8      A.   I wanted the closing market values as
9  of September 19th.
10     Q.   From Lehman?
11     A.   Yes.
12     Q.   And did you ever discuss with
13 Mr. Seery any concern about a $5 billion
14 mismatch or difference between the $49.9 billion
15 figure on Exhibit 461B and the $45 billion
16 amount of the loan?
17         MS. TAGGART:  Object to form.
18         THE WITNESS:  Repeat the question?
19         (Question was read back as follows:
20         "QUESTION:  And did you ever discuss
21         with Mr. Seery any concern about a
22         $5 billion mismatch or difference between
23         the $49.9 billion figure on Exhibit 461B
24         and the $45 billion amount of the loan?")
25     A.   We discussed the fair value of the

---

Page 35

M. Fazio

1
2  securities being transferred associated with the
3  transaction.  It was more of a discussion of the
4  assets being transferred as opposed to the
5  $47.7 billion of securities that were supposed
6  to be transferred as part of the transaction.
7      Q.   My question focuses on the
8  $49.9 billion figure that is listed on
9  Exhibit 461B.
10         Did you have any discussion with
11 Mr. Seery concerning the difference between that
12 amount and the $45 billion amount of the loan?
13         MS. TAGGART:  Object to form.  Asked
14     and answered.
15     A.   We had discussions about the assets
16 being transferred, the liabilities being assumed
17 as part of the transaction, yes.
18     Q.   And were you able, was Houlihan able,
19 based on the information it had available to it,
20 to come to any assessment of the fair value of
21 the securities that were listed on Exhibit 461B?
22         MS. TAGGART:  You can answer that yes
23     or no or I don't know.
24     A.   No.
25     Q.   And is that because public pricing

---

Page 36

M. Fazio

1
2  information was not available concerning many of
3  the securities listed?
4          MS. TAGGART:  I'm going to object and
5      instruct not to answer on attorney-client
6      and work product privilege.
7  BY MR. STERN:
8      Q.   Approximately when over this
9  preclosing weekend did you have your discussions
10 with Mr. Seery?
11     A.   I believe it was on Sunday.  I don't
12 have a time.
13     Q.   Let me show you a document that we've
14 previously marked as Exhibit 460B.
15         MR. STERN:  We do not have many
16     copies of this given the size but...
17         (Document review.)
18 BY MR. STERN:
19     Q.   This appears to be an email from
20 David Murgio at Weil, Gotshal to Bob Moore at
21 Milbank, and it attaches two documents, two
22 Excel spreadsheets; one labeled "Schedule A" and
23 one labeled "Schedule B."
24         Did you understand in connection with
25 the closing of the sale transaction that there

---

Page 37

M. Fazio

1
2  was a Schedule A listing certain securities and
3  a Schedule B listing certain securities?
4      A.   Yes.
5      Q.   And what was your understanding of
6  what Schedule A was?
7          MS. TAGGART:  Object to form.
8  BY MR. STERN:
9      Q.   Or what Schedule A was intended to
10 be.
11         MS. TAGGART:  Same objection.
12     A.   Schedule A was and Schedule B were to
13 represent securities being transferred to
14 Barclays as part of the sale.
15     Q.   And did Houlihan do any further
16 review of Schedule A and Schedule B after the
17 closing?
18         MS. TAGGART:  I'm going to object and
19     instruct not to answer on privilege.
20 BY MR. STERN:
21     Q.   After the closing, did Houlihan have
22 any discussions with anyone representing Lehman
23 or Barclays concerning the identity or value of
24 the securities listed on Schedule A and Schedule
25 B?

---

Page 38

M. Fazio

1
2    A.    Yes.
3    Q.    When was the first such discussion
4  with representatives of Lehman?
5    A.    I don't have an exact recollection,
6  but it would have been in the week or following
7  that week, so it would have been the week of
8  September 22nd or September 29th.
9    Q.    And what was the substance of those
10  discussions with Lehman representatives?
11    A.    The substance of those discussions
12  were to attempt to get a detailed listing of the
13  securities being transferred associated with the
14  transaction, as well as the market values as of
15  the closing date.
16    Q.    And with whom did you have those
17  discussions?
18    A.    We had discussions with Paolo
19  Tonucci.  We had discussions with the A&M
20  representatives throughout the following
21  two weeks.
22    Q.    And did Houlihan in those discussions
23  express any concerns relating to the value of
24  the securities on Schedule A?
25    MS. TAGGART:  Object to form.

Page 39

M. Fazio

1
2    A.    We raised concerns of not having a
3  detailed list of the securities or the market
4  values associated with that transaction.
5    Q.    Did Houlihan do anything to itself
6  evaluate the value of the securities on the
7  Schedule A listing that Houlihan did have at
8  that time?
9    MS. TAGGART:  I'm going to object and
10    instruct not to answer on work product and
11    attorney-client privilege.
12  BY MR. STERN:
13    Q.    After the closing, did you
14  participate in any discussions with Weil,
15  Gotshal concerning the value of the securities
16  transferred to Barclays as a part of the Fed
17  replacement?
18    MS. TAGGART:  Object to form.
19    You can answer.
20    A.    I do not believe so.
21    Q.    Do you know whether anyone else from
22  Houlihan did?
23    MS. TAGGART:  Object to form.
24    Foundation.
25    A.    I do not know.

Page 40

M. Fazio

1
2    Q.    Do you know whether after the closing
3  Houlihan had any discussions with anyone acting
4  on behalf of Lehman concerning the difference
5  between the repo loan amount and the value of
6  the securities listed on the Schedule A?
7    MS. TAGGART:  Object to form.
8    A.    We had numerous conversations with
9  the Alvarez & Marsal people with respect to the
10  value of the securities and the identification
11  of those securities that were being transferred
12  as part of the transaction.
13    Q.    And your best recollection is that
14  those discussions with Alvarez took place
15  sometime after the closing?
16    A.    Yes.
17    Q.    And that would have been the week of
18  September 22nd or the week of September 29th?
19    A.    Yes.
20    Q.    Do you have any recollection one way
21  or the other concerning whether those
22  discussions began the week of September 22nd or
23  the week of September 29th?
24    A.    I believe they would have began the
25  week of September 22nd, but I don't have

Page 41

M. Fazio

1
2  specific dates.
3    Q.    And in those discussions with
4  Alvarez, did Houlihan raise any concern about a
5  $5 billion mismatch between the amount of the
6  repo loan, $45 billion, and the market value
7  listed in Exhibit 461B of $49.9 billion?
8    MS. TAGGART:  Object to form.
9    A.    We raised questions as to which
10  securities and the value of those securities
11  that were being transferred associated with the
12  transaction.
13    Q.    Did you raise any concerns relating
14  to the difference between the loan amount and
15  the value of the securities that were
16  transferred in connection with that repo
17  replacement?
18    MS. TAGGART:  Object to form.
19    A.    We were concerned with the value of
20  all the securities that were being transferred,
21  as well as the loan that was being assumed as
22  part of this transaction, yes.
23    Q.    And at that point in time after the
24  closing, did Houlihan do anything to access
25  publicly available information from Bloomberg or

Confidential

Page 42

M. Fazio

1
2  other sources concerning the value of the
3  securities on the list that you had at that
4  time?
5        MS. TAGGART: I'm going to object and
6     instruct not to answer on privilege.
7  BY MR. STERN:
8     Q.  Let me show you a document that's
9  previously been marked as Exhibit 504.
10       Do you recognize this series of
11 emails?
12    A.  Yes.
13    Q.  And what are they?
14    A.  They are emails to and from Luc
15 Despins associated with request for information
16 from Lori Fife at Weil, Gotshal.
17    Q.  Looking at the first page of this
18 exhibit at the bottom, there is an email from
19 Mr. Despins to Lori Fife copying you and
20 Mr. Geer and Mr. Bell, and he writes, "Lori,
21 this is not in connection with sealing motion,
22 although I want to know more about the schedules
23 before that issue is up before the court, but
24 rather our concern is with respect to the
25 securities which were transferred.  Houlihan has

Page 43

M. Fazio

1
2  reviewed them and cannot even come close to the
3  amount which was announced in court.  I think it
4  was $47.4 billion.  And there is also a
5  discrepancy on the liability side, although it
6  could be much smaller than the issue on the
7  asset side.  Houlihan's review would indicate
8  that the securities transferred could be worth
9  billions more than the $47.4 billion.  There may
10 very well be a logical explanation for all of
11 this, which is why the first meeting is just to
12 explore the issues."
13       You see that Mr. Despins says that
14 "Houlihan has reviewed them and cannot even come
15 close to the amount which was announced in
16 court."
17       What analysis had Houlihan done that
18 led Mr. Despins to make that comment.
19       MS. TAGGART: I'm going to object and
20    instruct not to answer on attorney-client
21    and work product privilege.
22 BY MR. STERN:
23    Q.  Mr. Despins tells Weil, Gotshal that
24 Houlihan had done an analysis of the securities.
25       Do you see that?

Page 44

M. Fazio

1
2     A.  Yes.
3     Q.  What analysis had Houlihan done?
4        MS. TAGGART:  Same objection and
5     instruction.
6  BY MR. STERN:
7     Q.  What figure for market value had
8  Houlihan arrived at as a result of its analysis?
9        MS. TAGGART:  I'm going to object and
10    instruct not to answer on privilege.
11 BY MR. STERN:
12    Q.  Mr. Despins writes, "Houlihan's
13 review would indicate that the securities
14 transferred could be worth billions more than
15 the $47.4 billion."
16       Do you see that?
17    A.  Yes, I do.
18    Q.  Do you recall how many billions more
19 Houlihan's review indicated at the time?
20       MS. TAGGART:  Objection.  And
21    instruct you not to answer on
22    attorney-client and work product
23    privileges.
24 BY MR. STERN:
25    Q.  Was Houlihan's review at the time

Page 45

M. Fazio

1
2  reflected in writing?
3        MS. TAGGART:  You can answer yes or
4     no.
5     A.  We would have had written material
6  associated with our work.
7     Q.  And that written material, according
8  to Mr. Despins, would indicate that the
9  securities transferred could be worth billions
10 more than the $47.4 billion; is that right?
11       MS. TAGGART:  I'm going to object and
12    instruct not to answer on privilege.
13 BY MR. STERN:
14    Q.  Following this series of emails, was
15 there a meeting?
16       MS. TAGGART:  Object to form.
17    A.  There were follow-up meetings
18 subsequently with the estate and -- I'll see,
19 this is October 15th.  There was always constant
20 meetings between the estate and the advisors.
21    Q.  I understand that, but with respect
22 to this specific request concerning Houlihan's
23 review indicating that the securities
24 transferred could be worth billions more than
25 the $47.4 billion, was there a follow-up

Page 46

1          M. Fazio
2    meeting?
3          MS. TAGGART:  Object to form and
4      foundation.
5      A.    I do not believe that between the
6    parties that are listed here there was a meeting
7    that was set up with respect to this email
8    chain.
9      Q.    Was there a meeting between anyone
10   else acting on behalf of the committee or anyone
11   else acting on behalf of Lehman concerning that
12   issue?
13         MS. TAGGART:  Object to form and
14     foundation.
15     A.    We would have meetings with the
16   estate on a regular basis and this was one of
17   the topics we would continually ask them to get
18   a detailed listing of the securities and the
19   market values as to the close of the business
20   on the 19th.
21     Q.    Did the estate ever provide Houlihan
22   with any information that indicated that the
23   securities transferred were not worth billions
24   more than the $47.4 billion?
25         MS. TAGGART:  Object to form.

Page 47

1          M. Fazio
2    Foundation.
3          Could you limit that at all by time?
4    BY MR. STERN:
5      Q.    Can you answer?
6          THE WITNESS:  Can you repeat the
7    question then?
8          MS. TAGGART:  Okay.  You can answer
9    yes or no to that.
10         And you can reread the question
11   again.
12         (Question was read back as follows:
13         "QUESTION:  Did the estate ever
14   provide Houlihan with any information that
15   indicated that the securities transferred
16   were not worth billions more than the $47.4
17   billion?")
18     A.    To my knowledge, I have never
19   received anything from the estate that has
20   detailed the final securities transferred and
21   the market value as of the close of business on
22   the 19th.
23     Q.    Aside from this email request and
24   whatever meetings followed from it, what did
25   Houlihan do to address any concern that it had

Page 48

1          M. Fazio
2    as a result of its review indicating that the
3    securities transferred could be worth billions
4    more than $47.4 billion?
5          MS. TAGGART:  Object to form, and
6      foundation and also privilege.
7          You should not disclose anything you
8      did either internally with Houlihan or in
9      correspondence with your counsel.
10         But if you took any actions that you
11     know of with anyone other than that, go
12     ahead and answer.
13     A.    I had numerous meetings with the
14   Alvarez & Marsal people to continually ask to
15   follow up and get information associated with
16   the transaction, including the final securities
17   that actually were transferred and the fair
18   value of those on the 19th.
19     Q.    And what types of information did you
20   receive?
21     A.    I received no final listing from
22   anybody associated with the transaction.
23     Q.    What types of information did you
24   receive?
25     A.    I received no information that had

Page 49

1          M. Fazio
2    detailed information associated with the
3    transaction.
4      Q.    I'm not asking what you did not
5    receive.
6          I'm asking what did you receive.
7      A.    All we had were discussions.  I never
8    received any of their work products associated
9    with any detailed analysis that they may have
10   been doing.
11         To the best of my knowledge, they
12   have not received a final listing either from
13   anybody associated with the transaction,
14   associated with which securities and the fair
15   market value as of the 19th.
16     Q.    Did that concern you as of late
17   September, early October of 2008?
18         MS. TAGGART:  Object to form.
19     A.    Yes.
20     Q.    What did you do about that concern?
21         MS. TAGGART:  Objection.  Form,
22     foundation.  Asked and answered.
23         And I'll make the same privilege
24     instruction.  If you have anything to add
25     of anything you did besides working

Confidential

Page 50

1          M. Fazio
2    internally at Houlihan or in communications
3    with your counsel.
4        A.   I had numerous discussions with the
5    Alvarez & Marsal people.
6        Q.   Did you feel they were not responding
7    to your concern?
8          MS. SCHAFFER:  Objection to the form.
9          MS. TAGGART:  Same objection.
10       A.   I felt that they were taking my
11   concern and my request very seriously and they
12   were trying to get the same information I was.
13       Q.   And describe for me exactly what your
14   concern was.
15          MS. TAGGART:  Object to form.
16       A.   When you have a transaction, you
17   usually have a detailed listing of every asset
18   and the assumed liabilities associated with the
19   transaction, and the fair market value of those
20   assets and liabilities.
21          We did not have this and still do not
22   have this associated with this transaction.
23       Q.   So it's your testimony that as of
24   today you still do not have that information.
25          MS. TAGGART:  Object to form.

Page 51

1          M. Fazio
2    Foundation.
3        A.   Absolutely.
4        Q.   Is there anything that you've
5    received between September 2008 and today that
6    has provided you with any more information
7    concerning the purchased assets and the assumed
8    liabilities and their respective value?
9          MS. TAGGART:  Object to form and
10          privilege as currently worded, so I'll
11          instruct not to answer on attorney-client
12          and work product.
13   BY MR. STERN:
14       Q.   Is there anything you've received
15   from parties other than the committee or counsel
16   to the committee or other people from Houlihan
17   that has provided you with that information?
18          MS. TAGGART:  Object to form.
19          MR. STERN:  Let me rephrase it.
20   BY MR. STERN:
21       Q.   Aside from communications with
22   counsel, aside from communications with
23   committee or within Houlihan, is there anything
24   that you've received since September 2008 that
25   has provided you with more information

Page 52

1          M. Fazio
2    concerning the assets purchased and the
3    liabilities assumed?  Is there anything?
4          MS. TAGGART:  Object to form.
5        A.   I may have seen information that
6    Alvarez & Marsal was working on associated with
7    some of the liabilities, the cure amounts and
8    analysis of that, but nothing with respect to
9    the detailed analysis of the securities being
10   transferred and their fair market value.
11       Q.   So it's your testimony that between
12   September of 2008 and today, you have not
13   received any further information from either
14   Lehman or Barclays concerning the assets
15   purchased and the liabilities assumed and their
16   respective values.
17          MS. TAGGART:  Objection.
18   Argumentative.
19   BY MR. STERN:
20       Q.   Is that your testimony?
21          MS. TAGGART:  I object to form.
22   Mischaracterizes the testimony.
23          If you can understand it, you can
24   answer it.
25       A.   Repeat the question.

Page 53

1          M. Fazio
2          MR. STERN:  I do have --let me just
3    before you repeat the question, I just have
4    to note for the record that these
5    objections violate the local rules, and
6    I've been very tolerant of these speaking
7    objections, but going forward I would
8    appreciate it if you would comply with the
9    local rules, Counsel.
10          MS. TAGGART:  I think I'm complying
11   with the local rules and I don't think that
12   you're supposed to be asking him to
13   reaffirm his testimony when he just
14   answered the question.
15          MR. STERN:  Can you repeat the
16   question?
17          (Question was read back as follows:
18          "QUESTION:  So it's your testimony
19   that between September of 2008 and today,
20   you have not received any further
21   information from either Lehman or Barclays
22   concerning the assets purchased and the
23   liabilities assumed and their respective
24   values?")
25          MS. TAGGART:  Same objections.

Page 54

M. Fazio

1    But you can answer.
2    A.   To date I have not received from
3  anyone a detailed listing that Barclays and
4  Lehman, the estate, have said these are the
5  final securities and these are their fair market
6  value off of the Lehman systems as of
7  September 19th, 2008, that's correct.
8    Q.   Between 2008 and today, have you
9  received any information from Barclays, either
10 directly or through a public sources or through
11 this case, concerning the purchased assets and
12 the assumed liabilities and their respective
13 values?
14    MS. TAGGART:  I'm going to object and
15    instruct not to answer on attorney-client
16    and work product privileges, especially
17    where it discusses Houlihan's analysis
18    related to this case.
19 BY MR. STERN:
20    Q.   No, my question is only whether you
21 have received anything from Barclays either
22 directly or through filings in this case or
23 public filings.
24    MS. TAGGART:  I'll stand by my

Page 55

M. Fazio

1  objection and instruction.
2  BY MR. STERN:
3    Q.   Going back to your meetings with
4  Alvarez after the closing, do you recall Alvarez
5  providing Houlihan with any information
6  concerning the Barclays replacement of the Fed
7  repo?
8    A.   I'm not sure if they've given us
9  anything with respect to the Fed repo
10 specifically.
11    We have talked about and discussed
12 the whole transaction and trying to get a whole
13 accounting for the entire transaction.
14    Q.   After the closing when you met with
15 Alvarez, did FTI participate in some of those
16 meetings?
17    A.   They would have been party to some of
18 those meetings.
19    Q.   Let's take a look at what has
20 previously been marked as Exhibit 463B.
21    Is this a document that you've seen
22 before?
23    A.   Yes, I have.
24    Q.   And when did you first see this

Page 56

M. Fazio

1  document?
2    A.   I would have seen it sometime in
3  October of 2008.
4    Q.   And skipping the first two pages and
5  looking at the remainder of the document, do you
6  know what that material is?
7    A.   It's a summary from Conor Tully,
8  associated with the transaction.
9    Q.   Looking at the third page of this
10 exhibit, you see at the bottom it says "Alvarez
11 & Marsal," on the bottom left?
12    A.   Yes.
13    Q.   And then to the right it says "Draft
14 Barclays Deal Recap"?
15    A.   Yes.
16    Q.   Do you know whether this summary was
17 prepared by Alvarez?
18    A.   I do not know.
19    Q.   Looking at this page, do you know
20 when you first received this?
21    A.   I would have received or looked at
22 this sometime in October of 2008.
23    Q.   And when you received this, did you
24 read it?

Page 57

M. Fazio

1    A.   I would have looked at it, yes.
2    Q.   And specifically the third page of
3  the document, the third page of this exhibit,
4  which has a column for "Assets" and a column for
5  "Liabilities," do you see that?
6    A.   Yes.
7    Q.   Do you recall whether you looked at
8  this at the time?
9    A.   Yes.
10    Q.   You did.
11    A.   Yes.
12    Q.   It has a line under the "Assets"
13 column that's labeled "Negotiated Mark Haircut."
14    Do you see that?
15    A.   Yes, I do.
16    Q.   What was your understanding of that
17 line at the time?
18    A.   My understanding and further
19 confirmed is that there was a detailed listing
20 of assets that were going to be transferred.
21 The company had a detailed listing which we had
22 seen previously at the time of the closing which
23 showed that the market value of the assets,
24 which were the market value that was prepared at

Page 58

1              M. Fazio
2    the beginning of the week, was substantially
3    over the market value at the end of the week,
4    and that $5 billion is a number that was an
5    approximate number of what they believed the
6    market value had declined between the beginning
7    of the week and the end of the week associated
8    with the assets.
9        Q.    And who was the "they" that you just
10   referred to?
11       A.    Jim Seery and Mr. Klein, and I would
12   imagine the other people that were working with
13   Mr. Seery and Mr. Klein.
14       Q.    And when you received this page that
15   refers to the negotiated mark haircut, did you
16   have any discussion with Alvarez concerning that
17   line?
18       A.    Absolutely. I've had discussions
19   with Alvarez in September and October associated
20   with getting a detailed listing of the assets
21   and the market value as of the close of business
22   on the 19th.
23       Q.    And what specifically did you discuss
24   with Alvarez concerning the negotiated mark
25   haircut of $5 billion?

Page 59

1              M. Fazio
2        A.    The discussion was very similar
3    consistently throughout this, which we need a
4    detail of assets and a detail of the market
5    values associated with the transaction, and the
6    value of those securities on the 19th of
7    September.
8        Q.    And what did Alvarez tell you
9    concerning this line "Negotiated Mark Haircut"?
10       A.    They did not have a detail of the
11   assets and did not have a detail of the assets
12   or the detail of the market values as of the
13   19th.
14       Q.    Under that it says, "Assets
15   transferred under repo stale marks."
16             What was your understanding of the
17   term "stale marks" when you received this?
18       A.    Stale marks referred to the marks
19   that were done at the beginning of the week
20   associated with the transaction, so it would
21   have been the Monday or Tuesday of that week
22   where the marks were done.
23       Q.    And did you discuss with Alvarez
24   after the closing, the issue of whether the
25   marks were stale?

Page 60

1              M. Fazio
2             MS. SCHAFFER: Objection to form.
3        A.    Yes, I did. I indicated, and I think
4    I've answered many times, that we have asked
5    them to get the updated marks associated with
6    the securities that were transferred.
7        Q.    And what did they tell you about
8    their ability to get updated marks from Lehman?
9        A.    They did not have the systems. The
10   systems had been transferred to Barclays and
11   Barclays had not given them an updated list of
12   the securities that were transferred and the
13   market values as of the 19th.
14       Q.    Were you seeking updated marks as of
15   September 19th?
16       A.    Yes, I was.
17       Q.    The systems at that time were still
18   under the control of Lehman, correct?
19             MS. TAGGART: Object to form.
20   Foundation.
21       A.    I do not know -- when you say under
22   the control, I do not know what you mean under
23   the control of Lehman.
24       Q.    Well, Barclays had not completed the
25   acquisition as of September 19th, correct?

Page 61

1              M. Fazio
2             MS. TAGGART: Object to form and
3    foundation.
4        A.    That's correct.
5        Q.    Did you ever find out whether Lehman,
6    that is, LBI, had updated its marks from
7    September 12th, 2008, to September 19th, 2008?
8             MS. TAGGART: Object to form and
9    foundation and potentially privileged.
10            You should disclose any information,
11   if any, that you received directly from
12   Lehman or its advisors, but if you have
13   heard any information related to this from
14   counsel, don't answer that.
15            THE WITNESS: So repeat the question.
16   Sorry.
17            (Question was read back as follows:
18            "QUESTION: Did you ever find out
19   whether Lehman, that is, LBI, had updated
20   its marks from September 12th, 2008, to
21   September 19th, 2008?")
22       A.    No, I did not find out.
23            MS. TAGGART: I think we'd like a
24   break. It's been about an hour.
25            MR. STERN: All right. You've asked

Page 62

1           M. Fazio
2    me to try to complete at a reasonable hour,
3    but if we keep on taking breaks, that's
4    going to be difficult.
5         We can take a break whenever you
6    want.
7         MS. TAGGART:  Okay.  Thank you.
8         THE VIDEOGRAPHER:  The time is 10:49
9    a.m.  We're going off the record.
10        (Recess taken.)
11        THE VIDEOGRAPHER:  The time is 10:59
12   a.m.  We're back on the record, Video No. 2.
13        MS. TAGGART:  Mr. Fazio wants to
14   clarify something for the record.
15        THE WITNESS:  For the record, I
16   wanted to clarify when we were talking
17   about Exhibit 463B and talking about the
18   third page of that exhibit, that I've seen
19   various schedules prepared.
20        I'm not sure if this is the exact
21   schedule that I have seen.  I was not on
22   this email and haven't seen the email, but
23   when we talked about transaction summaries,
24   I had seen some transaction summaries but
25   can't swear that this is the same version

Page 63

1           M. Fazio
2    that I had seen.
3    BY MR. STERN:
4         Q.   Do you recall receiving a summary of
5    the transaction from Alvarez during the week
6    after the closing?
7         A.   Not during the week after the
8    closing, no.
9         Q.   At what point?
10        A.   I would have seen when I've been
11   talking to Alvarez, things that they might have
12   been working on at the time, so I might have
13   seen a draft that looked like this.  I can't say
14   if the numbers are exactly the same at this
15   moment, but in October I think I would have seen
16   something that they would have been working on.
17        Q.   Do you have any reason to believe
18   that Alvarez would give a summary to FTI and not
19   provide you with a copy of the same summary?
20        MS. TAGGART:  Object to form.
21   Foundation.
22        A.   FTI does different things than we do,
23   so they probably give them many things
24   associated with the transaction and this whole
25   case that they don't give us.

Page 64

1           M. Fazio
2         Q.   You recall attending meetings with
3    Alvarez and FTI?
4         A.   Right.
5         Q.   After the closing, correct?
6         A.   Correct.
7         Q.   And do you recall one way or the
8    other whether you were given this summary in one
9    of those meetings?
10        A.   I do not recall receiving this
11   summary in any meeting.
12        I might have seen drafts of it that
13   they would have had, but I would not have been
14   given a copy of that.
15        Q.   You have a specific recollection that
16   you can testify to under oath that you did not
17   receive this summary in one of those early
18   meetings with Alvarez.
19        MS. TAGGART:  Objection.  Asked and
20   answered and argumentative.
21   BY MR. STERN:
22        Q.   Is that your testimony?
23        MS. TAGGART:  You know it's improper
24   for him to -- to ask him --
25        MR. STERN:  Please.

Page 65

1           M. Fazio
2         MS. TAGGART:  -- to reaffirm
3    testimony --
4         MR. STERN:  Please.
5         MS. TAGGART:  -- that he has already
6    given.
7         MR. STERN:  Counsel --
8         MS. TAGGART:  You can answer --
9         MR. STERN: -- this is not proper
10   under the local rules.
11        MS. TAGGART:  -- that question.
12   Asked and answered again.
13        MR. STERN:  Counsel, this is not
14   proper under the local rules.  You know
15   that.
16        MS. TAGGART:  Your question is not
17   proper under the local rules.
18        MR. STERN:  There's no reason to get
19   hostile.
20        Can you repeat the question.
21        (Question was read back as follows:
22   "QUESTION:  You have a specific
23   recollection that you can testify to under
24   oath that you did not receive this summary
25   in one of those early meetings with

Page 66

M. Fazio

1
2  Alvarez.  Is that your testimony?")
3       MS. TAGGART:  Same objections.
4       A.   I believe I have not taken away any
5  schedule associated, similar to this, with me
6  from any meetings with Alvarez.
7       I may have seen drafts, like I said,
8  of schedules similar to this, but I have no
9  recollection of taking this away from a meeting
10  as a final reconciliation associated with the
11  transaction.
12      Q.   Do you recall that you -- do you
13  recall specifically that you did not take away
14  such a document?
15      MS. TAGGART:  Objection to form.
16  Asked and answered.  Argumentative.
17      A.   I do not believe I have taken away a
18  copy of the schedule.
19      Q.   Is that something you discussed with
20  your counsel during the break?
21      MS. TAGGART:  Objection.
22      And I instruct not to answer.
23  BY MR. STERN:
24      Q.   During the break did you discuss your
25  testimony concerning this document?

Page 67

M. Fazio

1
2       MS. TAGGART:  Objection.
3       And I instruct not to answer.
4  BY MR. STERN:
5       Q.   During the break did your counsel
6  tell you that you should come back and correct
7  your testimony concerning this document?
8       MS. TAGGART:  Objection.
9       And I instruct not to answer.
10  BY MR. STERN:
11      Q.   Do you have any reason to believe
12  that FTI would not share with Houlihan this
13  summary that it received from Alvarez in either
14  late September or early October 2008?
15      MS. TAGGART:  Object to form.
16  Foundation.
17      You can answer.
18      THE WITNESS:  Can you repeat the
19  question?  Sorry.
20      (Question was read back as follows:
21  "QUESTION:  Do you have any reason to
22  believe that FTI would not share with
23  Houlihan this summary that it received from
24  Alvarez in either late September or early
25  October 2008?")

Page 68

M. Fazio

1
2       A.   I have no reason to believe why they
3  wouldn't share that or would share that, and we
4  share a lot of information throughout this case
5  and work very cooperatively with FTI.
6       Q.   Looking again at Exhibit 463B, do you
7  have that in front of you?
8       A.   Yes.
9       Q.   After the first two pages, which are
10  Mr. Tully's email, you see there are a number of
11  pages that at the bottom have the same label
12  "Alvarez & Marsal Draft Barclays Deal Recap"?
13      Do you see that?
14      A.   Yes.
15      Q.   And there are one, two, three, four,
16  five pages with that label.
17      Do you see that?
18      A.   Yup.
19      Q.   Is it your testimony that you did not
20  receive any of these materials in either late
21  September or early October 2008?
22      MS. TAGGART:  Objection.  Asked and
23  answered.
24  BY MR. STERN:
25      Q.   Is that your testimony?

Page 69

M. Fazio

1
2       A.   As I said, I may have seen things
3  that they were working on, but I do not recall
4  receiving a copy of these attachments, that's
5  correct.
6       Q.   You may have received them but you
7  don't recall.
8       A.   I don't recall receiving this as I
9  said.
10      Q.   So you may have received them but you
11  don't recall; is that correct?
12      MS. TAGGART:  Objection.  Asked and
13  answered.  Object to form.
14      A.   I do not believe I have received
15  these is my recollection, yes.
16      Q.   Is it your recollection that you may
17  have received them?
18      MS. TAGGART:  Object to form.  Asked
19  and answered.
20      A.   What was the question again?
21      Q.   Is it your recollection that you may
22  have received them?
23      A.   I may have seen documents that
24  Alvarez & Marsal were working on, but I do not
25  recall receiving these.

Page 70

1          M. Fazio
2     Q.   So when you testified concerning the
3   line "Negotiated Mark Haircut," was that
4   testimony accurate?
5        MS. TAGGART:  Object to form.
6     A.   I have had discussions with Alvarez
7   and have seen documents that they have produced
8   for the committee which have used those terms,
9   and I have asked various questions of Alvarez
10  throughout this case and my understanding about
11  that $5 million is still the same; with respect
12  to what they know and the line that reads "Assets
13  securities that detail the transaction and the
14  transaction value of those securities as of the
15  19th has not been given to them or us as of this
16  date as far as I'm aware.
17    Q.   So you referred to $5 million.
18       You meant $5 billion?
19    A.   $5 billion, yes.
20    Q.   In your testimony concerning this
21  document and the line that reads "Assets
22  transferred under repo stale marks," was that
23  testimony accurate?
24       MS. TAGGART:  Object to form.
25       I think you're going to have to be

Page 71

1          M. Fazio
2   more specific about what testimony you want
3   him to discuss now.
4        MR. STERN:  I don't think so.
5   BY MR. STERN:
6     Q.   Was that testimony accurate?
7     A.   All my testimony --
8        MS. TAGGART:  Object to form.
9     A.   -- is accurate, yes.
10       And with respect to stale marks, they
11  have used that term before, Alvarez & Marsal.
12    Q.   Okay.  Let me show you a document
13  that we've previously marked as Exhibit 466.
14       I'll ask you to please review that
15  and tell me what it is.
16       (Document review.)
17    A.   It's an email from Brad Geer to
18  Crayton Bell and myself.
19    Q.   And what is the attachment to it?
20    A.   Well, there's a lot of redacted
21  things, but the attachment is, it looks like it
22  says "Footnote A, securities transferred under
23  Barclays repo agreement."
24    Q.   And do you see on that document
25  there's handwritten brackets next to certain of

Page 72

1          M. Fazio
2   the figures?
3     A.   Yup.
4     Q.   Do you know whose notation that is?
5     A.   No, I do not.
6     Q.   Aside from that one document that's
7   labeled HLHZ 0035874, do you recall whether
8   anything else was attached to this email?
9     A.   I do not recall.
10    Q.   You recall earlier we referred to an
11  email that Mr. Despins sent to Weil, Gotshal
12  which referred to a review by Houlihan of
13  certain securities.
14       Can you tell me who at Houlihan did
15  that review, which people?
16       MS. TAGGART:  You can answer, but
17    answer with names only.
18    A.   Staff persons; Michael Livanos,
19  Andrew McNamara, Angela Lorenzano and there's
20  probably several others.
21    Q.   Anyone else?
22    A.   There's probably several other staff
23  people that report to those people that would
24  have been working on it.
25    Q.   And were you involved in that review?

Page 73

1          M. Fazio
2     A.   Yes.
3     Q.   And aside from yourself, were there
4   any other senior people involved in that review?
5     A.   I would have shared results with some
6   of my partners.
7     Q.   Who?
8     A.   Brad Geer primarily.
9     Q.   Saul Burian?
10    A.   Saul might have gotten a copy from
11  Brad or somebody.  I don't know.
12    Q.   What was the purpose of that review?
13       MS. TAGGART:  Objection.
14       Objection, and I'm going to instruct
15    not to answer on attorney client and work
16    product privilege.
17  BY MR. STERN:
18    Q.   Is that a review that Houlihan did in
19  anticipation of litigation concerning the sale
20  transaction?
21       MS. TAGGART:  Objection.  Calls for
22    legal conclusion.
23       I'm going to object also not to
24    answer on attorney-client and work product
25    privileges.

Confidential

Page 74

M. Fazio

1
2     MR. STERN:  So you're instructing him
3  not to answer.
4     MS. TAGGART:  Yes.
5  BY MR. STERN:
6     Q.   Is that a review that Houlihan would
7  have done for the benefit of the committee in
8  any event?
9     MS. TAGGART:  You can answer yes, no
10  or I don't know to that.
11     A.   We would have attempted to review the
12  security evaluation --
13     MS. TAGGART:  No, wait.  Stop.
14     THE WITNESS:  Go ahead.  What's your
15  question?
16     MS. TAGGART:  I want you to just
17  answer the question.
18     Read the question again.
19     (Question was read back as follows:
20     "QUESTION:  Is that a review that
21  Houlihan would have done for the benefit of
22  the committee in any event?")
23     A.   We may have.
24     Q.   Let me show you a document that we've
25  previously marked as Exhibit 464B.

Page 75

M. Fazio

1
2     These are excerpts from a
3  presentation that Alvarez gave on October 8,
4  2008, and my question is do you recall attending
5  a presentation that Alvarez gave to the
6  committee on October 8, 2008?
7     A.   I believe I was there, yes.
8     Q.   And turning to the fourth page of
9  this document, please, it's the page with the
10  Bates number ending 4447.
11     A.   Okay.
12     Q.   It's labeled Roman three "Significant
13  Transactions" at the top.
14     Do you see that?
15     A.   Yes, I do.
16     Q.   Do you recall being present for the
17  part of the presentation in which this slide was
18  reviewed?
19     And you can take a minute to review
20  it.
21     (Document review.)
22     A.   Yes.
23     Q.   And do you recall what was said by
24  the participants concerning information on this
25  slide when it was presented?

Page 76

M. Fazio

1
2     A.   To the best of my recollection,
3  Mr. Fogarty would have been giving a summary of
4  the transaction and detailing the information
5  that they had at the time, and would have gone
6  through these numbers with the committee.
7     Q.   And do you recall saying anything
8  during this part of the presentation?
9     A.   I would have said stuff during this
10  presentation as well as in privileged
11  conversations with counsel and our committee,
12  asking questions about the details and getting
13  details associated with the securities that were
14  actually transferred and their actual marks on
15  the 19th.
16     Q.   Do you recall what you actually said?
17     A.   I don't remember verbatim what I
18  said.
19     Q.   Do you recall generally?
20     A.   Generally I would have asked where
21  they stand on getting the detailed schedule of
22  assets associated with the transaction and the
23  marks on the 19th.
24     Q.   Do you recall commenting at all on
25  the line that states, "Negotiated a $5 billion

Page 77

M. Fazio

1
2  reduction"?
3     A.   We would have talked with Fogarty and
4  the estate about this many times; that these
5  were stale marks and the actual marks as
6  represented to us, the actual marks as
7  represented by Mr. Seery and Mr. Klein, the
8  actual marks had declined significantly between
9  the time of the last run and the Friday the
10  19th.
11     Q.   My question is a bit more specific
12  than that.
13     Going back in time to this meeting,
14  if you recall, did you say anything at this
15  meeting specifically concerning this line which
16  states, "Negotiated a $5 billion reduction"?
17     A.   I would have commented, like I said,
18  on the entire line and the fact that the stale
19  marks and the securities detail that we did not
20  have associated with the transaction or they
21  didn't have associated with coming up with a
22  detail mark-to-market of all the securities
23  transferred and their market values on the 19th.
24     Q.   Do you recall your specific words on
25  that subject at this meeting?

Confidential

---

Page 78

1              M. Fazio
2      A.   No, I do not.
3      Q.   Did you take any notes during the
4  meeting?
5      A.   I do not believe so.
6      Q.   Were you involved in any analysis of
7  the cure liability that Barclays had assumed?
8         MS. TAGGART:  You can answer that
9  yes, no or I don't know.
10     A.   No.
11     Q.   Do you recall attending a meeting in
12  February 2009 at these offices, Boies Schiller,
13  with representatives of Barclays Capital?
14     A.   Yes.
15     Q.   And do you recall that Mr. King and
16  Mr. Keegan from Barclays and Mr. Larocca from
17  Barclays attended that meeting?
18     A.   I believe all three were present.
19     Q.   And do you recall there was
20  discussion at that meeting concerning Barclays'
21  replacement of the Fed repo?
22     A.   Yes.
23     Q.   At that meeting were you and others
24  from Houlihan given an opportunity to ask
25  questions that you had concerning Barclays'

---

Page 79

1              M. Fazio
2  replacement of the Fed repo?
3      A.   We asked questions that we wanted to
4  ask, yes, we were given the opportunity.
5      Q.   Did Barclays refuse to answer any of
6  yours questions?
7      A.   I don't know if they refused to
8  answer any question.
9         I know that they -- we had still come
10  out of that meeting requesting significant
11  amounts of information that we did not get, so
12  if you say that we did not get information that
13  we had requested numerous times, then I would
14  say that they didn't answer all the questions.
15     Q.   I understand that there was a
16  follow-up request by the committee for
17  documents; is that right?
18     A.   That's correct.
19     Q.   Putting aside the request for
20  documents, were there any questions that you
21  posed in that meeting that the Barclays people
22  refused to answer?
23         MS. TAGGART:  Object to form.
24  Argumentative.  Asked and answered.
25         You can answer again.

---

Page 80

1              M. Fazio
2      A.   As I said, the main purpose of the
3  meeting is to get information associated with
4  the detailed schedules that we had requested
5  numerous times and have not received, so if you
6  say did they not answer a question by not giving
7  us information, I would contend that they didn't
8  answer all our questions, yes.
9      Q.   In the meeting, do you recall a
10  specific question that you or others on behalf
11  of the committee asked that Barclays did not
12  answer?
13     A.   We asked for documents and we did not
14  receive them, so I think that's a question, can
15  we get the documents, and since we haven't
16  received them, I guess that's a non-answer.
17     Q.   Well, do you recall when the
18  committee made its request for documents?
19     A.   I don't have the exact dates, no.
20  I'd have to go back to emails and requests for
21  information.
22     Q.   Subsequently Barclays did produce
23  documents to the committee.
24         Do you recall that?
25         MS. TAGGART:  Object to form.

---

Page 81

1              M. Fazio
2  Foundation.
3      A.   They have given some documents to the
4  committee, that's correct.
5         They have not answered all of my
6  questions to give me a detailed listing of every
7  security that was transferred and its market
8  value on the 19th.
9      Q.   Have you reviewed Professor
10  Pfleiderer's report in this case?
11     A.   I do not believe I have.  I'd have to
12  see it, but I don't believe so.
13     Q.   Do you recall the volume of material
14  that Barclays produced after that February 2009
15  meeting?
16         MS. TAGGART:  Object to form and
17  foundation.
18         And are you including in this
19  litigation?
20  BY MR. STERN:
21     Q.   Do you recall how many documents
22  Barclays produced voluntarily to Houlihan after
23  that February 2009 meeting?
24         MS. TAGGART:  Object to form.
25  Foundation.

---

Page 82

M. Fazio
1
2     And if you won't say that you're
3  asking something about the litigation, then
4  I have to instruct on privilege and
5  instruct not to answer.
6         Just ask before the litigation and
7  I'll let him answer, but if it gets into
8  what has he seen and talked about, what
9  production we've gotten from Barclays --
10      MR. STERN:  Please, please, Counsel,
11  Counsel, I'm not looking for speeches.
12 BY MR. STERN:
13   Q.   After the February 2009 meeting,
14 Houlihan received documents from Barclays,
15 correct?
16      MS. TAGGART:  Objection and -- still
17  objecting to form, and unless you're going
18  to limit it before the litigation, I'm
19  going to instruct not to answer on
20  privilege.
21      MR. STERN:  You're instructing him
22  not to answer whether Houlihan received
23  documents from Barclays on grounds of
24  privilege?
25      MS. TAGGART:  Well, yes, because if

Page 83

M. Fazio
1
2  you're asking --
3      MR. STERN:  Okay.  Fine.  Fine.  I
4  don't agree with that assertion or many of
5  your other assertions concerning
6  privilege but --
7      MS. TAGGART:  Are you just asking
8  whether you Barclays have given --
9      MR. STERN:  -- we can take that up
10 separately.
11      MS. TAGGART: -- him Houlihan
12 documents?
13      MR. STERN:  Please.  This is not a
14 time for us to have a colloquy.
15 BY MR. STERN:
16   Q.   After that February 2009 meeting and
17 after Barclays produced documents to the
18 committee, what did the committee do to raise
19 any follow-up questions with Barclays?
20      MS. TAGGART:  Objection.
21      And I'm going to instruct not to
22 answer if you --
23      MR. STERN:  Did --
24      MS. TAGGART:  -- to the extent --
25 hold on -- to the extent that you have

Page 84

M. Fazio
1
2  information from communication with
3  counsel.  Well, then I'm going to instruct
4  not to answer.
5  BY MR. STERN:
6    Q.   To your knowledge, did you or anyone
7  else acting on behalf of the committee raise any
8  follow-up questions with Barclays after that
9  February 2009 meeting?
10      MS. TAGGART:  You can answer that yes
11 or no.
12    A.   We have had communications through
13 the lawyers on follow-up items on a continuous
14 basis, yes.
15   Q.   And what were those questions?
16      MS. TAGGART:  Object to form.
17   A.   We have a --
18      MS. TAGGART:  Wait.
19      THE WITNESS:  Go ahead.
20      MS. TAGGART:  You mean the questions
21  that he asked the counsel or that he thinks
22  was asked of Barclays?
23      MR. STERN:  Let me ask a question.
24 BY MR. STERN:
25   Q.   What questions did the committee

Page 85

M. Fazio
1
2  raise with Barclays after the February 2009
3  meeting?
4      MS. TAGGART:  Object to form.
5  Foundation.
6      But to the extent you know what the
7  committee asked, you can answer.
8    A.   There was a memo written from counsel
9  requesting additional information associated
10 with this transaction.
11   Q.   That was a request for additional
12 documents, correct?
13   A.   That's correct.
14   Q.   Aside from that, did you or anybody
15 else acting on behalf of the committee request a
16 follow-up meeting with representatives of
17 Barclays concerning any questions that you had?
18      MS. TAGGART:  I'm going to object to
19  form, foundation and privilege.
20      You can respond whether you --
21   A.   I have not had direct conversations
22 with Barclay personnel.
23      I know our counsel has had many
24 conversations with Barclays' counsel.
25   Q.   Do you know if your counsel or

Confidential

Page 86

M. Fazio

1  M. Fazio
2  anybody from Houlihan has requested, ever
3  requested, a further meeting with Barclays after
4  that February 2009 meeting?
5       MS. TAGGART: I'm going to object to
6       form, foundation and privilege except to
7       the extent you should answer -- hold on,
8       you should answer whether you did any
9       such --
10      A.  I had no direct conversations with
11  Barclay personnel for a request of a meeting
12  with them, me and a Barclay personnel.
13      Q.  Okay.  So, in other words, you met
14  with Barclays in February 2009 and you did not
15  request any follow-up meeting with Barclays; is
16  that right?
17      MS. TAGGART: Objection.  Asked and
18      answered.  Form, foundation.
19      You should respond to what you
20      personally did if that's correct.
21      A.  And I responded numerous times to
22  you, but I'll respond again.
23      I did not have any conversations with
24  Barclay personnel for a follow-up meeting.
25      Q.  If you had open questions, why didn't

Page 87

1  M. Fazio
2  you press for a follow-up meeting with Barclays?
3       MS. TAGGART: Object to form.
4       Foundation.
5       You can answer, but don't reveal any
6       communications that you had with counsel.
7      A.  Most of my conversations were with
8  counsel with regard to this matter and I had no
9  direct conversations with Barclay, and as such,
10  I guess it's all privileged.
11      Q.  Sir, you remember attending a
12  face-to-face meeting with representatives of
13  Barclays in February 2009, correct?
14      A.  That's correct.
15      Q.  And do you recall that the Barclays
16  representatives indicated their willingness to
17  address the committee's questions?
18      A.  They had answered most of our
19  questions other than the information that we
20  requested on the detailed schedules that was
21  subject matter of the follow-up letters that
22  were sent to Barclays and yourselves.
23      Q.  And after documents were produced,
24  nobody acting on behalf of the committee, to
25  your knowledge, requested a follow-up meeting

Page 88

1  M. Fazio
2  with Barclays representatives; is that correct?
3       MS. TAGGART: Object to form,
4       foundation and privilege.
5       If you have any information that's
6       separate from your communications with
7       counsel, then you can talk about that.
8      A.  All of my conversations were with
9  counsel.
10      Q.  Putting aside your communications
11  with counsel, do you have any knowledge of any
12  request for a follow-up meeting with Barclays
13  any time after that February 2009 meeting?
14      MS. TAGGART: First, for the record,
15      I object to Mr. Stern laughing as he's
16      asking that question.
17      MR. STERN: I'm not laughing.
18      MS. TAGGART: I'm objecting to form.
19      MR. STERN: I'm not laughing.  I'm
20      asking a question.
21  BY MR. STERN:
22      Q.  Aside from your communications with
23  counsel, do you have any recollection of the
24  committee requesting a follow-up meeting with
25  Barclays?

Page 89

1  M. Fazio
2       MS. TAGGART: Okay.  You can answer
3       if you have knowledge outside of
4       communications with counsel.
5      A.  I have no knowledge outside of
6  discussions with counsel.
7      Q.  Based on the written material that
8  you received from Barclays, did you have any
9  follow-up questions to raise with Barclays?
10      MS. TAGGART: Object to form.
11      You can answer yes or no to that.
12      A.  We have many follow-up questions and
13  information requests from Barclays.
14      Q.  Did you ever suggest that there
15  should be a follow-up, face-to-face meeting with
16  Barclays in order to address those questions?
17      MS. TAGGART: Objection.  Form,
18      foundation and I'm going to instruct not to
19      privilege -- no to answer on the scope of
20      privilege if this was communication with
21      the you and your counsel.
22      If you disclosed that to someone
23      other than Houlihan and your counsel, you
24      can answer.
25      A.  All my discussions were with counsel

Page 90

1          M. Fazio
2  on this matter.
3     Q.   Well, then let me just ask about your
4  point of view.
5          Would you have found it helpful,
6  given your review of the documents that Barclays
7  provided, to have a face-to-face meeting once
8  again with Mr. King, for example, with
9  Mr. Keegan, for example?
10         MS. TAGGART:  Object to form.
11         To the extent you understand, you can
12  answer.
13    A.   I think that there's many things that
14 we have requested from Barclays, and to ask them
15 to give us that information and to have that
16 information would be very helpful, yes.
17    Q.   So in your view, it would have been
18 helpful to have had a follow-up meeting with
19 Mr. King and Mr. Keegan.
20    A.   I did not --
21         MS. TAGGART:  Object to form.
22    A.   -- say that.
23    Q.   Well, that was my question though.
24    A.   I understand that, but I --
25    Q.   Can you answer my question?

Page 91

1          M. Fazio
2     The question is --
3         MS. TAGGART:  Okay.  Now you're
4  interrupting him.
5         MR. STERN:  Let me just ask a
6  question.
7  BY MR. STERN:
8     Q.   The question is --
9         MS. TAGGART:  You have to wait till
10 he finishes his answer before you ask the
11 next question.
12         Do you have anything more to say?
13         THE WITNESS:  No.
14    A.   Go to the next question.
15    Q.   The question is, would you have found
16 it helpful at the time after receiving
17 spreadsheets and other materials from Barclays
18 to have had a follow-up, face-to-face meeting
19 with Mr. King and Mr. Keegan for example?
20         MS. TAGGART:  Object to form.  Asked
21 and answered.
22    A.   I believe we have had many
23 communications with my lawyers on what we
24 believe is best.  It's clearly more information
25 we can get from Barclays is always better

Page 92

1          M. Fazio
2  associated with this transaction.
3     Q.   Do you know of any reason, do you
4  know of any reason why the committee did not
5  request a follow-up meeting with the Barclays
6  representatives?
7         MS. TAGGART:  I'm going to object to
8  form and instruct not to answer on
9  attorney-client and work product privilege.
10 BY MR. STERN:
11    Q.   Did it concern you personally that at
12 no time after that February 2009 meeting did the
13 committee request a follow-up meeting with
14 Barclays representatives?  Did that concern you?
15         MS. TAGGART:  Objection to form and
16 I'm going to instruct not to answer on
17 privilege.
18 BY MR. STERN:
19    Q.   Do you recall that when Barclays
20 initially produced documents to the committee,
21 those documents were produced in a TIFF format?
22    A.   I don't recall what format they were
23 received in.
24    Q.   Do you recall subsequently they were
25 produced in a native format?

Page 93

1          M. Fazio
2     A.   I don't recall what formats they were
3  received in.
4         MR. STERN:  We'll mark this as the
5  next exhibit.
6         (Deposition Exhibit 619A, Email dated
7  9/22/08 from O'Donnell to various
8  individuals with attachment, Bates stamped
9  HLHZ0009061, marked for identification, as
10 of this date.)
11 BY MR. STERN:
12    Q.   Looking at Exhibit 619A, can you tell
13 me what it is?
14    A.   It's a memo from Dennis O'Donnell to
15 various people, I won't read everybody off, but
16 setting forth in connection with the committee
17 call at 1:00 p.m., an email from Houlihan Lokey
18 summarizing the current state of the
19 LBI/Barclays transaction.
20    Q.   Did you have any role in drafting the
21 email from Houlihan Lokey summarizing the
22 current state of the LBI/Barclays transaction?
23    A.   I would have reviewed it.
24    Q.   Do you know who drafted it?
25    A.   I don't recall who the principal

Page 94

1                 M. Fazio
2  author was, no.
3       Q.   Was that email prepared by Houlihan
4  in order to communicate certain facts to the
5  Creditors Committee?
6       MS. TAGGART:  Object to form.
7       A.   It would have been written to
8  summarize the current state of the transaction
9  as we knew it as of that time.
10      Q.   And was that email prepared in order
11 to provide information that the committee would
12 need in order to make a decision concerning the
13 transaction?
14      MS. TAGGART:  I'm going to instruct
15      not to answer on privilege and object to
16      form.
17 BY MS. TAGGART:
18      Q.   Do you know whether that email was
19 prepared by Houlihan Lokey in anticipation of
20 litigation concerning the LBI/Barclays
21 transaction?
22      MS. TAGGART:  I'm going to object and
23      instruct not to answer on privilege.
24 BY MR. STERN:
25      Q.   Do you know whether that email from

Page 95

1                 M. Fazio
2  Houlihan Lokey would have been sent to the
3  committee and whether the committee would have
4  needed that information in any event, whether or
5  not it was prepared in anticipation of
6  litigation?
7       MS. TAGGART:  Object to form,
8       foundation and I'm going to instruct not to
9       answer on privilege.
10 BY MR. STERN:
11      Q.   Regardless of whether there was any
12 anticipation of litigation at the time, did the
13 Houlihan Lokey email contain information that
14 the committee needed at the time in order to
15 make certain decisions?
16      MS. TAGGART:  Object to form,
17      foundation and instruct you not to answer
18      on privilege.
19      MR. STERN:  Let's mark this as the
20      next exhibit.
21      (Deposition Exhibit 620A, Email chain
22      beginning with email dated 9/21/08 from
23      O'Donnell to Bell, Bates stamped
24      MTHM00007214 through 7218, marked for
25      identification, as of this date.)

Page 96

1                 M. Fazio
2  BY MR. STERN:
3       Q.   This appears to be a series of emails
4  referring to a "Summary of the LBI Sale
5  Hearing."
6       Do you see that?
7       A.   That's the title of this, yes.
8       Q.   Looking at the second page of this
9  exhibit, does this refresh your recollection
10 that you received a copy of that Summary of the
11 LBI Sale Hearing at the time of this email?
12      (Document review.)
13      Q.   Do you see that you're copied as a
14 cc?
15      A.   I did not see my name yet, sorry.
16      Q.   It's a long list.
17      (Document review.)
18      A.   I see my name there, yes, finally.
19      Q.   Now do you recall whether the Summary
20 of the LBI Sale Hearing was sent to the
21 committee in order to communicate certain facts
22 to the committee concerning the sale hearing?
23      MS. TAGGART:  Object to form,
24      foundation.
25      I'm going to instruct not to answer

Page 97

1                 M. Fazio
2  on privilege.
3       And also note that this is a summary
4  from Milbank.
5  BY MR. STERN:
6       Q.   Same question.
7       MS. TAGGART:  Same objections and
8       instruction.
9  BY MR. STERN:
10      Q.   Regardless of the author, do you know
11 whether this Summary of the LBI Sale Hearing was
12 intended to communicate certain facts to the
13 committee concerning the sale hearing?
14      MS. TAGGART:  So same objections and
15      instructions.  Don't answer.
16 BY MR. STERN:
17      Q.   Do you know whether this summary was
18 prepared in anticipation of litigation
19 concerning the sale transaction?
20      MS. TAGGART:  Same objections and
21      instruction.
22 BY MR. STERN:
23      Q.   Do you know whether this is a summary
24 that the committee would have needed in any
25 event, without regard to whether there might be

Confidential

Page 98

M. Fazio
1
2 anticipated litigation, in order to make certain
3 decisions concerning the transaction?
4          MS. TAGGART:  Same objections and
5     instruction.
6 BY MR. STERN:
7     Q.  I'll give you a document that we
8 previously marked as Exhibit 476B, and I'll just
9 point out that in the cc line there's a lengthy
10 list of recipients and you are included as one.
11          Can you tell me what this document
12 is?
13     A.   There's a bunch of information that's
14 been redacted, but the attachment is entitled
15 "Transcript Barclays/Lehman Agreement
16 Announcement September 17th, 2008."
17     Q.   Now with respect to the information
18 that was redacted, do you know whether the
19 information consisted of a summary of the
20 transcript that was attached?
21          MS. TAGGART:  You can answer yes or
22 no or I don't know to that.
23     A.   I do not know.
24     Q.   Do you know whether the information
25 that was redacted included facts that the

Page 99

M. Fazio
1
2 committee needed to know?
3          MS. TAGGART:  You can answer yes or
4     no or I don't know.
5     A.   I don't know.
6     Q.   Do you know whether the information
7 that was redacted was information that was
8 prepared in anticipation of litigation relating
9 to the sale transaction?
10          MS. TAGGART:  I'm going to object to
11     form, foundation and instruct not to answer
12     on privilege.
13 BY MR. STERN:
14     Q.   Do you know whether the information
15 that's redacted is information that the
16 committee would have needed in any event,
17 without regard to any anticipated litigation?
18          MS. TAGGART:  I'm -- same objections
19     and instruction.
20 BY MR. STERN:
21     Q.   Do you know whether the information
22 that was redacted was information that the
23 committee needed in order to make certain
24 decisions in connection with the sale
25 transaction?

Page 100

M. Fazio
1
2          MS. TAGGART:  Same objection and
3     instruction.
4          MR. STERN:  Let's mark this as the
5     next exhibit.
6          (Deposition Exhibit 621 A, Email
7     chain beginning with email dated 9/20/08
8     from Fazio to O'Donnell with attachment,
9     Bates stamped HLHZ0027996 through 998,
10     marked for identification, as of this
11     date.)
12 BY MR. STERN:
13     Q.   I'll ask you to please review 621A
14 and tell us what it is.
15          (Document review.)
16     A.   It's an email from myself to Dennis
17 O'Donnell, Craig Bell and Brad Geer.  The
18 subject matter is Lehman/Barclays.
19     Q.   Now in the bottom email on the first
20 page Mr. Bell writes, "Here is the draft
21 Clarification Letter.  This represents Weil's
22 view of the deal and Barclays is reviewing
23 Dennis O'Donnell.  Can you please send to the
24 Houlihan team."
25          And then above you write an email to

Page 101

M. Fazio
1
2 Mr. O'Donnell, Mr. Bell and Mr. Geer.
3          In your communication which is
4 redacted here, were you commenting on the draft
5 Clarification Letter?
6          MS. TAGGART:  I'm going to object and
7     instruct not to answer on privilege.
8 BY MR. STERN:
9     Q.   In your communication, were you
10 suggesting changes to the Clarification Letter?
11          MS. TAGGART:  Same objection and
12     instruction.
13 BY MR. STERN:
14     Q.   Do you know whether before you wrote
15 your email you reviewed the draft that had been
16 provided to you?
17          MS. TAGGART:  You can answer.
18     A.   I do not know.
19     Q.   Now before the September 19th Sale
20 Hearing, did you participate in any discussions
21 with Mr. Seery, James Seery, concerning the
22 anticipated transaction?
23     A.   I believe I was party to a conference
24 call with him.
25     Q.   In that conference call, do you

Page 102

1        M. Fazio
2  recall whether Mr. Seery described to Houlihan
3  how the exchange-traded derivatives business
4  would be treated in the anticipated transaction?
5      A.   I do not recall specifically how he
6  indicated it would be treated.
7      Q.   Do you recall generally?
8      A.   I do not recall generally what he
9  would have said in that meeting with regard to
10 the exchange-traded derivatives.
11     Q.   So you have no recollection
12 concerning what Mr. Seery told you concerning
13 how the exchange-traded derivatives business was
14 going to be treated in the anticipated
15 transaction.
16     A.   We talked about the transaction in
17 general and what was going and what was staying,
18 and it was represented that all the people,
19 which would include people associated with
20 exchange-traded derivatives, were going with the
21 transaction.
22     Q.   Do you recall anything that Mr. Seery
23 told you before the Sale Hearing concerning the
24 transfer of the exchange-traded derivatives
25 business to Barclays aside from the people who

Page 103

1        M. Fazio
2  worked in the business?
3      A.   No.  I do not remember specifically,
4  no.
5        MR. STERN:  I have no further
6  questions.
7        THE VIDEOGRAPHER:  The time is 11:45
8  a.m.  We're going off the record.
9        (Time noted:  11:45 a.m.)
10
11     _____
12        MICHAEL A. FAZIO
13
14
15 Subscribed and sworn to before me
16 this    day of      2010.
17
18 _____
19
20
21
22
23
24
25

Page 104

1
2        C E R T I F I C A T E
3
4  STATE OF NEW YORK   )
5                ) ss.:
6  COUNTY OF QUEENS   )
7
8        I, ANNETTE ARLEQUIN, a Notary Public
9  within and for the State of New York, do
10 hereby certify:
11     That MICHAEL A. FAZIO, the witness
12 whose deposition is hereinbefore set forth,
13 was duly sworn by me and that such
14 deposition is a true record of the
15 testimony given by such witness.
16     I further certify that I am not
17 related to any of the parties to this
18 action by blood or marriage; and that I am
19 in no way interested in the outcome of this
20 matter.
21     IN WITNESS WHEREOF, I have hereunto
22 set my hand this 12th day of February, 2010.
23
24 -----------------------------------
25     ANNETTE ARLEQUIN, CCR, RPR

Page 105

1
2        I N D E X
3
4  Witness                    Page
5
6  MICHAEL A. FAZIO
7    MR. STERN                7
8
9  QUESTIONS INSTRUCTED NOT TO ANSWER
10     Page    Line
11       15     24
12       16     24
13       17     14
14       18     4
15       36     5
16       37     19
17       39     10
18       42     6
19       43     20
20       44     5
21       44     10
22       44     21
23
24
25

## Page 106

| 1  |                                              |
| 2  | QUESTIONS INSTRUCTED NOT TO ANSWER (Cont'd.) |
| 3  | Page    Line                                 |
| 4  |                                              |
| 5  | 45      12                                   |
| 6  | 51      11                                   |
| 7  | 54      16                                   |
| 8  | 66      22                                   |
| 9  | 67      3                                    |
| 10 | 67      9                                    |
| 11 | 73      14                                   |
| 12 | 74      2                                    |
| 13 | 82      4                                    |
| 14 | 83      21                                   |
| 15 | 84      3                                    |
| 16 | 89      18                                   |
| 17 | 92      8                                    |
| 18 | 92      16                                   |
| 19 | 94      14                                   |
| 20 | 94      23                                   |
| 21 | 95      8                                    |
| 22 | 95      17                                   |
| 23 | 96      25                                   |
| 24 | 97      8                                    |
| 25 | 97      15                                   |

## Page 107

| 1  |                                              |
| 2  | QUESTIONS INSTRUCTED NOT TO ANSWER           |
| 3  | (Cont'd.)                                    |
| 4  | Page    Line                                 |
| 5  |                                              |
| 6  | 97      21                                   |
| 7  | 98      5                                    |
| 8  | 99      11                                   |
| 9  | 99      19                                   |
| 10 | 100     3                                    |
| 11 | 101     7                                    |
| 12 | 101     12                                   |
| 13 |                                              |
| 14 | I N D E X   O F   E X H I B I T S            |
| 15 | Description                    Page          |
| 16 |                                              |
|    | Deposition Exhibit 618A, Email dated      9  |
| 17 | 9/18/08 from Fazio to Geer, Bates            |
|    | stamped HLHZ0016316                          |
| 18 |                                              |
| 19 | Deposition Exhibit 619A, Email dated     93  |
|    | 9/22/08 from O'Donnell to various            |
| 20 | individuals with attachment, Bates           |
|    | stamped HLHZ0009061                          |
| 21 |                                              |
| 22 | Deposition Exhibit 620A, Email chain     95  |
|    | beginning with email dated 9/21/08 from      |
| 23 | O'Donnell to Bell,                           |
|    | Bates stamped MTHM00007214 through 7218      |
| 24 |                                              |
| 25 |                                              |

## Page 108

| 1  |                                              |
| 2  | I N D E X   O F   E X H I B I T S (Cont'd.)  |
| 3  | Description                    Page          |
| 4  | Deposition Exhibit 621 A, Email chain    100 |
|    | beginning with email dated 9/20/08 from      |
| 5  | Fazio to O'Donnell with attachment,          |
|    | Bates stamped HLHZ0027996 through 998        |
| 6  |                                              |
| 7  |                                              |
| 8  |                                              |
| 9  |                                              |
| 10 |                                              |
| 11 |                                              |
| 12 |                                              |
| 13 |                                              |
| 14 |                                              |
| 15 |                                              |
| 16 |                                              |
| 17 |                                              |
| 18 |                                              |
| 19 |                                              |
| 20 |                                              |
| 21 |                                              |
| 22 |                                              |
| 23 |                                              |
| 24 |                                              |
| 25 |                                              |

## Page 109

| 1  |                                              |
| 2  | ERRATA SHEET FOR THE TRANSCRIPT OF:          |
| 3  | CASE NAME:  IN RE: LEHMAN BROTHERS HOLDINGS INC. |
| 4  | DATE:     FEBRUARY 12, 2010                  |
| 5  | DEPONENT:  MICHAEL A. FAZIO                  |
| 6  | Pg. Ln.  Now Reads  Should Read   Reason     |
| 7  | __ __  _____  _____  _____            |
| 8  | __ __  _____  _____  _____            |
| 9  | __ __  _____  _____  _____            |
| 10 | __ __  _____  _____  _____            |
| 11 | __ __  _____  _____  _____            |
| 12 | __ __  _____  _____  _____            |
| 13 | __ __  _____  _____  _____            |
| 14 | __ __  _____  _____  _____            |
| 15 | __ __  _____  _____  _____            |
| 16 | __ __  _____  _____  _____            |
| 17 |                                              |
| 18 | _____                             |
| 19 | MICHAEL A. FAZIO                             |
| 20 | SUBSCRIBED AND SWORN BEFORE ME               |
| 21 | THIS____DAY OF_____ 2010.              |
| 22 |                                              |
| 23 | _____                     |
| 24 | (Notary Public)                              |
| 25 | MY COMMISSION EXPIRES:_____         |

Confidential

| A | | | | |
|---|---|---|---|---|
| **ability (2)** | **alleged (1)** | 73:15,24 74:3,9,17 | **arrived (2)** | 11:23 21:5 24:19 |
| 17:9 60:8 | 16:10 | 78:8 79:5,8,14,22 | 8:9 44:8 | 33:10 35:16 41:21 |
| **able (4)** | **Alvarez (32)** | 79:25 80:6,8,12 | **aside (12)** | 50:18 51:7 52:3,15 |
| 17:17,24 35:18,18 | 40:9,14 41:4 48:14 | 82:5,7,19,22 83:22 | 15:5 27:15 47:23 | 53:23 54:13 78:7 |
| **Absolutely (2)** | 50:5 52:6 55:5,5,16 | 84:4,10 85:7 86:7,8 | 51:21,22 72:6 73:3 | **attached (3)** |
| 51:3 58:18 | 56:11,18 58:16,19 | 87:5 89:2,11,19,24 | 79:19 85:14 88:10 | 16:15 72:8 98:20 |
| **access (1)** | 58:24 59:8,23 63:5 | 90:12,25 91:10 92:8 | 88:22 102:25 | **attaches (1)** |
| 41:24 | 63:11,18 64:3,18 | 92:16 94:15,23 95:9 | **asked (26)** | 36:21 |
| **accounting (1)** | 66:2,6 67:13,24 | 95:17 96:25 97:15 | 23:14 24:2 25:8 27:4 | **attachment (7)** |
| 55:14 | 68:12 69:24 70:6,9 | 98:21 99:3,11 101:7 | 30:18 35:13 49:22 | 71:19,21 93:8 98:14 |
| **accurate (4)** | 71:11 75:3,5 | 101:17 105:9 106:2 | 60:4 61:25 64:19 | 100:8 107:20 108:5 |
| 70:4,23 71:6,9 | **amount (14)** | 107:2 | 65:12 66:16 68:22 | **attachments (1)** |
| **acquisition (1)** | 33:4,9,11,16,17 34:16 | **answered (22)** | 69:12,18 70:9 76:20 | 69:4 |
| 60:25 | 34:24 35:12,12 40:5 | 23:15 24:3,7 25:8,10 | 79:3,24 80:11,13 | **attempt (2)** |
| **acting (10)** | 41:5,14 43:3,15 | 27:5 30:18 35:14 | 84:21,22 85:7 86:17 | 12:25 38:12 |
| 20:17,24 22:19 26:24 | **amounts (2)** | 49:22 53:14 60:4 | 91:20 | **attempted (1)** |
| 40:3 46:10,11 84:7 | 52:7 79:11 | 64:20 65:12 66:16 | **asking (11)** | 74:11 |
| 85:15 87:24 | **analysis (19)** | 68:23 69:13,19 | 10:10 31:21 49:4,6 | **attend (1)** |
| **action (1)** | 12:10 14:16 15:6,10 | 79:24 81:5 86:18 | 53:12 76:12 82:3 | 7:24 |
| 104:18 | 15:14,17,19 16:19 | 87:18 91:21 | 83:2,7 88:16,20 | **attendance (1)** |
| **actions (1)** | 17:9,11 43:17,24 | **anticipated (5)** | **assertion (1)** | 22:20 |
| 48:10 | 44:3,8 49:9 52:8,9 | 98:2 99:17 101:22 | 83:4 | **attended (2)** |
| **active (3)** | 54:18 78:6 | 102:4,14 | **assertions (1)** | 11:15 78:17 |
| 9:3,17,20 | **analyze (1)** | **anticipation (6)** | 83:5 | **attending (4)** |
| **activities (1)** | 14:12 | 73:19 94:19 95:5,12 | **assessment (1)** | 64:2 75:4 78:11 87:11 |
| 12:8 | **Andrew (1)** | 97:18 99:8 | 35:20 | **attorney (1)** |
| **activity (1)** | 72:19 | **anybody (8)** | **asset (2)** | 73:15 |
| 11:19 | **Angela (1)** | 13:24 20:17,24 22:18 | 43:7 50:17 | **attorneys (8)** |
| **actual (4)** | 72:19 | 48:22 49:13 85:14 | **assets (22)** | 3:5,11,18 4:5 5:3 |
| 76:14 77:5,6,8 | **Angeles (1)** | 86:2 | 21:6 24:24 35:4,15 | 14:20 15:12,16 |
| **add (1)** | 3:21 | **apologize (1)** | 50:20 51:7 52:2,14 | **attorney-client (12)** |
| 49:24 | **Ann (1)** | 31:5 | 53:22 54:12 57:5,13 | 15:9,23 16:23 17:15 |
| **additional (3)** | 16:7 | **appears (3)** | 57:21,24 58:8,20 | 36:5 39:11 43:20 |
| 10:16 85:9,11 | **Annette (5)** | 16:6 36:19 96:3 | 59:4,11,11,14 70:21 | 44:22 51:11 54:16 |
| **address (3)** | 1:24 2:13 6:13 104:8 | **appreciate (1)** | 76:22 | 73:24 92:9 |
| 47:25 87:17 89:16 | 104:25 | 53:8 | **assigned (1)** | **author (2)** |
| **administer (1)** | **annex (2)** | **approach (1)** | 19:10 | 94:2 97:10 |
| 5:13 | 32:6,13 | 22:3 | **associated (48)** | **authorized (1)** |
| **Administered (1)** | **announced (2)** | **approve (1)** | 12:20 16:8,11 19:8,24 | 5:12 |
| 1:7 | 43:3,15 | 8:2 | 21:24 24:20 25:17 | **available (6)** |
| **advisors (2)** | **Announcement (1)** | **approximate (1)** | 25:18 26:8 27:11 | 17:3,18,25 35:19 36:2 |
| 45:20 61:12 | 98:16 | 58:5 | 28:4 29:25 31:14 | 41:25 |
| **agree (1)** | **answer (89)** | **approximately (3)** | 34:3,4 35:2 38:13 | **Avenue (3)** |
| 83:4 | 13:11 14:5 15:13,14 | 6:8 17:23 36:8 | 39:4 41:11 42:15 | 2:12 3:12 6:7 |
| **AGREED (3)** | 15:24 16:24 17:7,14 | **areas (1)** | 45:6 48:15,22 49:2 | **aware (2)** |
| 5:2,6,10 | 17:21 18:4 19:3 | 11:18 | 49:8,13,14 50:18,22 | 26:18 28:11,19 70:16 |
| **agreement (2)** | 20:13 23:17 24:5 | **argumentative (4)** | 52:6 56:9 58:7,19 | **A&M (1)** |
| 71:23 98:15 | 25:11 35:22 36:5 | 52:18 64:20 66:16 | 59:5,20 60:5 63:24 | 38:19 |
| **ahead (6)** | 37:19 39:10,19 42:6 | 79:24 | 66:5,10 76:13,22 | **a.m (8)** |
| 15:12 26:3 31:22 | 43:20 44:10,21 45:3 | **argumentive (1)** | 77:20,21 80:3 85:9 | 2:7 6:9 32:22,25 62:9 |
| 48:12 74:14 84:19 | 45:12 47:5,8 48:12 | 25:7 | 92:2 102:19 | 62:12 103:8,9 |
| **al (1)** | 51:11 52:24 54:2,16 | **Arlequin (5)** | **association (1)** | |
| 1:7 | 61:14 65:8 66:22 | 1:24 2:13 6:14 104:8 | 6:14 | **B** |
| | 67:3,9,17 72:16,17 | 104:25 | **assumed (13)** | **B (7)** |

Confidential

36:23 37:3,12,16,25
107:14 108:2
**back (17)**
12:14 20:23 24:9
26:21 32:25 34:19
47:12 53:17 55:4
61:17 62:12 65:21
67:6,20 74:19 77:13
80:20
**balance (1)**
27:11
**banker (1)**
14:23
**bankruptcy (2)**
1:2 7:25
**Barclay (5)**
85:22 86:11,12,24
87:9
**Barclays (100)**
3:11 6:19 8:3,11 9:5,9
10:10,15 12:20
13:13,16,25 14:22
21:18,19,22 22:3
24:19,24 26:6,10,14
27:2,18,22 28:10,13
28:15,23 29:6,14,25
30:10,15,23 31:8,13
32:7 33:10 37:14,23
39:16 52:14 53:21
54:4,10,22 55:7
56:15 60:10,11,24
68:12 71:23 78:7,13
78:16,17,20,25 79:5
79:21 80:11,22
81:14,22 82:9,14,23
83:8,17,19 84:8,22
85:2,17,24 86:3,14
86:15 87:2,13,15,22
88:2,12,25 89:8,9
89:13,16 90:6,14
91:17,25 92:5,14,19
100:22 102:25
**Barclays/Lehman (2)**
11:14 98:15
**barely (1)**
9:18
**based (2)**
35:19 89:7
**basis (2)**
46:16 84:14
**Bates (9)**
10:2 75:10 93:8 95:23
100:9 107:17,20,23
108:5

**Battery (1)**
4:6
**began (2)**
40:22,24
**beginning (7)**
58:2,6 59:19 95:22
100:7 107:22 108:4
**behalf (12)**
20:9,17,25 22:19
26:24 40:4 46:10,11
80:10 84:7 85:15
87:24
**believe (21)**
25:10 26:4 36:11
39:20 40:24 46:5
63:17 66:4,17 67:11
67:22 68:2 69:14
75:7 78:5,18 81:11
81:12 91:22,24
101:23
**believed (1)**
58:5
**Bell (7)**
42:20 71:18 95:23
100:17,20 101:2
107:23
**benefit (2)**
74:7,21
**best (5)**
11:20 40:13 49:11
76:2 91:24
**better (1)**
91:25
**beyond (1)**
13:12
**big (1)**
9:18
**billion (44)**
19:19 20:3,7 21:17
22:4 23:9,24 24:12
24:23 25:23 26:8,13
26:23 32:10 33:5,12
33:16,17 34:13,14
34:15,22,23,24 35:5
35:8,12 41:5,6,7
43:4,9 44:15 45:10
45:25 46:24 47:17
48:4 58:4,25 70:18
70:19 76:25 77:16
**billions (8)**
43:9 44:14,18 45:9,24
46:23 47:16 48:3
**bit (1)**
77:11

**blood (1)**
104:18
**Bloomberg (1)**
41:25
**Bob (1)**
36:20
**Boies (4)**
2:10 3:10 6:18 78:12
**bottom (5)**
42:18 56:11,12 68:11
100:19
**brackets (1)**
71:25
**Brad (5)**
10:9 71:17 73:8,11
100:17
**break (6)**
32:17 61:24 62:5
66:20,24 67:5
**breaks (1)**
62:3
**Brian (1)**
16:6
**Brothers (5)**
1:7 3:5 7:25 28:7
109:3
**bunch (1)**
98:13
**Burian (2)**
9:13 73:9
**business (8)**
31:16 46:19 47:21
58:21 102:3,13,25
103:2
_____
**C**
**C (5)**
3:2 4:2 7:9 104:2,2
**California (1)**
3:21
**call (13)**
10:11,12,15,18,23,25
11:3,6,9 13:7 93:17
101:24,25
**called (1)**
7:9
**Calling (1)**
12:4
**calls (2)**
14:15 73:21
**Capital (3)**
3:11 6:19 78:13
**Carl (2)**
4:8 6:23

**Carlos (2)**
4:13 6:10
**case (10)**
1:7 7:25 54:12,19,23
63:25 68:4 70:10
81:10 109:3
**cash (38)**
19:19,23 20:2,2,4,7
20:16,18 21:2,12,16
21:18 22:4,8,10,13
22:14,16,21 23:7,10
23:13,19,24 24:12
24:17,20,23 25:3,15
25:16,20,23 26:7,13
26:23 27:2,11
**caution (1)**
12:8
**cc (2)**
96:14 98:9
**CCR (2)**
1:24 104:25
**certain (11)**
28:9 37:2,3 71:25
72:13 94:4 95:15
96:21 97:12 98:2
99:23
**Certified (1)**
2:13
**certify (2)**
104:10,16
**chain (5)**
46:8 95:21 100:7
107:22 108:4
**changes (1)**
101:10
**Chapter (1)**
1:6
**claiming (1)**
26:10
**Clarification (6)**
31:19 32:2,4 100:21
101:5,10
**clarify (2)**
62:14,16
**clearly (1)**
91:24
**client (1)**
73:15
**close (6)**
31:16 43:2,15 46:19
47:21 58:21
**closing (16)**
34:8 36:25 37:17,21
38:15 39:13 40:2,15

41:24 55:5,15 57:23
59:24 63:6,8 64:5
**collateral (4)**
18:13 19:8,11 34:2
**colloquy (1)**
83:14
**column (3)**
57:5,5,14
**come (7)**
22:16 26:7 35:20 43:2
43:14 67:6 79:9
**coming (1)**
77:21
**comment (1)**
43:18
**commented (1)**
77:17
**commenting (2)**
76:24 101:4
**COMMISSION (1)**
109:25
**committee (48)**
3:18 7:4 20:10,18,25
22:18,19 26:12,25
46:10 51:15,16,23
70:8 74:7,22 75:6
76:6,11 79:16 80:11
80:18,23 81:4 83:18
83:18 84:7,25 85:7
85:15 87:24 88:24
92:4,13,20 93:16
94:5,11 95:3,3,14
96:21,22 97:13,24
99:2,16,23
**committee's (1)**
87:17
**communicate (3)**
94:4 96:21 97:12
**communication (4)**
84:2 89:20 101:3,9
**communications (10)**
50:2 51:21,22 84:12
87:6 88:6,10,22
89:4 91:23
**company (1)**
57:22
**complete (2)**
31:7 62:2
**completed (1)**
60:24
**comply (1)**
53:8
**complying (1)**
53:10

Confidential

**component (1)**
22:8
**components (2)**
21:8 23:4
**composition (1)**
15:7
**concern (12)**
34:13,21 41:4 42:24
47:25 49:16,20 50:7
50:11,14 92:11,14
**concerned (1)**
41:19
**concerning (51)**
11:6,9 12:23 13:19
15:5,19 16:20 17:4
18:21 19:21 32:10
33:15 35:11 36:2
37:23 39:15 40:4,21
42:4 45:22 46:11
51:7 52:2,14 53:22
54:12 55:7 58:16,24
59:9 66:25 67:7
70:2,20 73:19 75:24
77:15 78:20,25 83:5
85:17 94:12,20
96:22 97:13,19 98:3
101:21 102:12,12
102:23
**concerns (3)**
38:23 39:2 41:13
**conclusion (1)**
73:22
**conclusions (1)**
15:18
**conference (2)**
101:23,25
**confirmed (1)**
57:20
**connection (10)**
11:13 13:23 20:19
21:2 31:9 36:24
41:16 42:21 93:16
99:24
**Conor (1)**
56:8
**consisted (1)**
98:19
**consistently (1)**
59:3
**constant (1)**
45:19
**contain (1)**
95:13
**contained (1)**

30:5
**contend (1)**
80:7
**continually (2)**
46:17 48:14
**continuous (1)**
84:13
**control (3)**
60:18,22,23
**Cont'd (4)**
4:2 106:2 107:3 108:2
**conversations (11)**
9:3,4 40:8 76:11
85:21,24 86:10,23
87:7,9 88:8
**cooperatively (1)**
68:5
**copied (1)**
96:13
**copies (1)**
36:16
**copy (7)**
18:9 63:19 64:14
66:18 69:4 73:10
96:10
**copying (1)**
42:19
**correct (24)**
9:11 10:22 11:17
13:20 15:4 22:11
54:8 60:18,25 61:4
64:5,6 67:6 69:5,11
79:18 81:4 82:15
85:12,13 86:20
87:13,14 88:2
**correspondence (5)**
14:19,21 15:2,15 48:9
**counsel (31)**
6:15 48:9 50:3 51:15
51:22 53:9 61:14
65:7,13 66:20 67:5
76:11 82:10,11 84:3
84:21 85:8,23,24,25
87:6,8 88:7,9,11,23
89:4,6,21,23,25
**COUNTY (1)**
104:6
**couple (1)**
32:19
**course (1)**
8:15
**court (11)**
1:2 2:13 5:15 6:13 7:6
22:9 28:22 30:12

42:23 43:3,16
**courthouse (1)**
8:9
**Craig (1)**
100:17
**Crayton (1)**
71:18
**Creditors (3)**
3:18 26:25 94:5
**crowds (1)**
9:18
**cure (2)**
52:7 78:7
**current (4)**
7:17 93:18,22 94:8
**currently (1)**
51:10

_____

**D**

**D (3)**
105:2 107:14 108:2
**date (10)**
8:5 10:4 19:14 38:15
54:3 70:16 93:10
95:25 100:11 109:4
**dated (8)**
9:25 93:6 95:22 100:7
107:16,19,22 108:4
**dates (2)**
41:2 80:19
**David (1)**
36:20
**day (6)**
3:4 6:22 30:22 103:16
104:22 109:21
**days (1)**
11:15
**deal (3)**
56:15 68:12 100:22
**debtors (2)**
1:9 12:18
**decision (1)**
94:12
**decisions (3)**
95:15 98:3 99:24
**declined (2)**
58:6 77:8
**Dennis (3)**
93:14 100:16,23
**DEPONENT (1)**
109:5
**deposition (15)**
1:12 2:9 5:11 6:4,6
9:25 93:6 95:21

100:6 104:12,14
107:16,19,22 108:4
**derivatives (5)**
102:3,10,13,20,24
**describe (3)**
12:7 14:17 50:13
**described (1)**
102:2
**Description (2)**
107:15 108:3
**Despins (8)**
42:15,19 43:13,18,23
44:12 45:8 72:11
**detail (13)**
14:9 23:6 24:15 25:13
25:14 59:4,4,10,11
59:12 70:13 77:19
77:22
**detailed (22)**
16:8,9 21:10 23:5
30:23 33:25 38:12
39:3 46:18 47:20
49:2,9 50:17 52:9
54:4 57:20,22 58:20
76:21 80:4 81:6
87:20
**detailing (1)**
76:4
**details (2)**
76:12,13
**determine (1)**
17:2
**difference (6)**
33:16 34:14,22 35:11
40:4 41:14
**different (2)**
19:6 63:22
**difficult (1)**
62:4
**direct (3)**
85:21 86:10 87:9
**directly (3)**
54:11,23 61:11
**director (1)**
7:19
**disclose (2)**
48:7 61:10
**disclosed (1)**
89:22
**discrepancy (1)**
43:5
**discuss (8)**
20:10 33:23 34:12,20
58:23 59:23 66:24

71:3
**discussed (6)**
23:3 30:12 33:25
34:25 55:12 66:19
**discusses (1)**
54:18
**discussion (11)**
11:16 19:22 21:7
27:21 29:22 35:3,10
38:3 58:16 59:2
78:20
**discussions (30)**
8:10,13 15:5 19:6
20:14 25:14 29:5
33:21,22 35:15 36:9
37:22 38:10,11,17
38:18,19,22 39:14
40:3,14,22 41:3
49:7 50:4 58:18
70:6 89:6,25 101:20
**DISTRICT (1)**
1:3
**document (26)**
9:24 10:7 16:2 36:13
36:17 42:8 55:22
56:2,6 57:4 66:14
66:25 67:7 70:21
71:12,16,24 72:6
74:24 75:9,21 96:12
96:17 98:7,11
100:15
**documents (22)**
13:9,11 36:21 69:23
70:7 79:17,20 80:13
80:15,18,23 81:3,21
82:14,23 83:12,17
85:12 87:23 90:6
92:20,21
**doing (1)**
49:10
**draft (6)**
56:14 63:13 68:12
100:20 101:4,15
**drafted (1)**
93:24
**drafting (1)**
93:20
**drafts (2)**
64:12 66:7
**draw (1)**
15:18
**duly (2)**
7:10 104:13

Confidential

### E

**E (12)**
3:2,2 4:2,2 7:9 104:2
104:2 105:2 107:14
107:14 108:2,2
**earlier (6)**
14:9 19:8,13,14 30:8
72:10
**early (6)**
49:17 64:17 65:25
67:14,24 68:21
**East (1)**
3:6
**effect (1)**
5:14
**either (10)**
14:17 48:8 49:12
52:13 53:21 54:10
54:22 67:13,24
68:20
**email (38)**
9:25 10:9,13,20 16:6
36:19 42:18 46:7
47:23 62:22,22
68:10 71:17 72:8,11
93:6,17,21 94:3,10
94:18,25 95:13,21
95:22 96:11 100:6,7
100:16,19,25
101:15 107:16,19
107:22,22 108:4,4
**emails (5)**
42:11,14 45:14 80:20
96:3
**Emanuel (2)**
3:17 7:3
**entire (2)**
55:14 77:18
**entitled (1)**
98:14
**equate (1)**
22:8
**ERIC (1)**
3:24
**Erica (2)**
3:22 7:2
**ERRATA (1)**
109:2
**especially (1)**
54:17
**ESQ (7)**
3:8,14,15,22,23,24
4:8
**estate (20)**

9:5,8,9,15 13:25
20:11 21:21 22:11
22:16,17 27:22
30:23 45:18,20
46:16,21 47:13,19
54:5 77:4
**et (1)**
1:7
**evaluate (1)**
39:6
**evaluation (1)**
74:12
**event (5)**
74:8,22 95:4 97:25
99:16
**everybody (1)**
93:15
**exact (5)**
27:23 30:24 38:5
62:20 80:19
**exactly (5)**
9:21 19:5 21:22 50:13
63:14
**EXAMINATION (1)**
7:13
**examined (1)**
7:11
**example (3)**
90:8,9 91:19
**Excel (1)**
36:22
**excerpts (1)**
75:2
**exchange-traded (5)**
102:3,10,13,20,24
**exhibit (41)**
9:24,25 10:7 16:3,4
18:7,11 26:22 27:17
27:19 30:6 33:4
34:15,23 35:9,21
36:14 41:7 42:9,18
55:21 56:11 57:4
62:17,18 68:6 71:13
74:25 93:5,6,12
95:20,21 96:9 98:8
100:5,6 107:16,19
107:22 108:4
**EXPIRES (1)**
109:25
**explanation (1)**
43:10
**explore (1)**
43:12
**express (1)**

38:23
**extent (6)**
14:15 83:24,25 85:6
86:7 90:11

### F

**F (4)**
7:9 104:2 107:14
108:2
**face-to-face (5)**
15:3 87:12 89:15 90:7
91:18
**fact (4)**
11:2 20:11 28:14
77:18
**facts (4)**
94:4 96:21 97:12
98:25
**fair (7)**
34:25 35:20 48:17
49:14 50:19 52:10
54:6
**familiar (1)**
28:14
**far (1)**
70:16
**Fazio (114)**
1:14 2:10 3:19 6:1,4
7:1,15 8:1 9:1 10:1
10:2,6 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1,13 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1,8 101:1 102:1
103:1,12 104:11

105:6 107:17 108:5
109:5,19
**February (17)**
1:16 2:6 6:8 78:12
81:14,23 82:13
83:16 84:9 85:2
86:4,14 87:13 88:13
92:12 104:22 109:4
**Fed (13)**
28:25 29:7,13,15
30:10,16 31:9 33:11
39:16 55:7,10 78:21
79:2
**Fed's (2)**
28:15,23
**feel (1)**
50:6
**felt (1)**
50:10
**Fife (2)**
42:16,19
**Figueroa (1)**
3:20
**figure (7)**
19:19 20:5 21:22
34:15,23 35:8 44:7
**figures (1)**
72:2
**filing (1)**
5:4
**filings (2)**
54:23,24
**final (15)**
20:3 21:11 23:6,19
25:16,20 27:3,10,13
47:20 48:16,21
49:12 54:6 66:10
**finally (2)**
28:3 96:18
**financing (3)**
28:15,23 33:10
**find (3)**
61:5,18,22
**Fine (2)**
83:3,3
**finishes (1)**
91:10
**first (9)**
38:3 42:17 43:11
55:25 56:5,21 68:9
88:14 100:19
**five (1)**
68:16
**Flexner (3)**

2:11 3:10 6:19
**Floor (2)**
2:12 3:12
**focuses (1)**
35:7
**Focusing (1)**
33:3
**Fogarty (2)**
76:3 77:3
**follow (1)**
48:15
**followed (1)**
47:24
**following (3)**
38:6,20 45:14
**follows (11)**
7:12 12:14 20:23 24:9
34:19 47:12 53:17
61:17 65:21 67:20
74:19
**follow-up (21)**
45:17,25 79:16 83:19
84:8,13 85:16 86:15
86:24 87:2,21,25
88:12,24 89:9,12,15
90:18 91:18 92:5,13
**Footnote (1)**
71:22
**force (1)**
5:13
**form (82)**
5:7 8:20 17:6 18:23
20:12 21:20 22:12
22:23 23:15 24:4
25:5,6 26:16 27:5
27:13,20 28:17 29:2
29:21 31:20 32:8
34:17 35:13 37:7
38:25 39:18,23 40:7
41:8,18 45:16 46:3
46:13,25 48:5 49:18
49:21 50:8,15,25
51:9,18 52:4,21
60:2,19 61:2,8
63:20 66:15 67:15
69:13,18 70:5,24
71:8 79:23 80:25
81:16,24 82:17
84:16 85:4,19 86:6
86:18 87:3 88:3,18
89:10,17 90:10,21
91:20 92:8,15 94:6
94:16 95:7,16 96:23
99:11

Confidential

**format (3)**
92:21,22,25
**formats (1)**
93:2
**forth (2)**
93:16 104:12
**forward (1)**
53:7
**found (2)**
90:5 91:15
**foundation (34)**
20:20 22:24 23:15
24:4 25:9,25 26:17
27:5 39:24 46:4,14
47:2 48:6 49:22
51:2 60:20 61:3,9
63:21 67:16 81:2,17
81:25 85:5,19 86:6
86:18 87:4 88:4
89:18 95:8,17 96:24
99:11
**four (2)**
24:3 68:15
**fourth (1)**
75:8
**Friday (8)**
1:16 8:7 14:24 29:9
29:16 30:12 31:2
77:9
**front (3)**
10:6 32:14 68:7
**FTI (7)**
55:16 63:18,22 64:3
67:12,22 68:5
**full (1)**
11:15
**further (9)**
5:6,10 37:15 52:13
53:20 57:19 86:3
103:5 104:16

———————
**G**

**G (1)**
3:14
**gathered (1)**
9:19
**Geer (9)**
10:2,10 11:2 42:20
71:17 73:8 100:17
101:2 107:17
**general (2)**
14:18 102:17
**generally (7)**
8:12 12:7,24 76:19,20

102:7,8
**generated (1)**
13:10
**getting (5)**
11:8 29:25 58:20
76:12,21
**Giddens (1)**
6:25
**give (6)**
63:18,23,25 81:6
90:15 98:7
**given (21)**
13:5,11,15,18 19:14
19:16 23:19 27:9
36:16 55:9 60:11
64:8,14 65:6 70:15
78:24 79:4 81:3
83:8 90:6 104:15
**giving (2)**
76:3 80:6
**go (9)**
12:8 15:12 26:3 31:22
48:11 74:14 80:20
84:19 91:14
**going (46)**
14:14 15:8,22 16:22
17:13 18:3 20:4
26:21 29:24 32:22
36:4 37:18 39:9
42:5 43:19 44:9
45:11 53:7 54:15
55:4 57:21 62:4,9
70:25 73:14,23
77:13 82:17,19
83:21 84:3 85:18
86:5 89:18 92:7,16
94:14,22 95:8 96:25
99:10 101:6 102:14
102:17,20 103:8
**Good (2)**
7:15,16
**Gotshal (6)**
9:9 36:20 39:15 42:16
43:23 72:11
**gotten (3)**
26:9 73:10 82:9
**grounds (1)**
82:23
**guaranteed (1)**
29:12
**guess (2)**
80:16 87:10

———————
**H**

**H (3)**
7:9 107:14 108:2
**haircut (5)**
57:14 58:15,25 59:9
70:3
**hand (1)**
104:22
**handwritten (1)**
71:25
**happened (3)**
29:16,19,23
**heard (1)**
61:13
**hearing (14)**
7:25 8:6,16 11:11
28:21 29:9 96:5,11
96:20,22 97:11,13
101:20 102:23
**Hedges (2)**
3:17 7:3
**held (2)**
2:10 6:6
**helpful (4)**
90:5,16,18 91:16
**hereinbefore (1)**
104:12
**hereunto (1)**
104:21
**HLHZ (1)**
72:7
**HLHZ0009061 (2)**
93:9 107:20
**HLHZ0016316 (2)**
10:3 107:17
**HLHZ0027996 (2)**
100:9 108:5
**hold (4)**
15:21 17:20 83:25
86:7
**HOLDINGS (2)**
1:7 109:3
**hostile (1)**
65:19
**Houlihan (58)**
7:18,19 8:13 12:9,25
13:10,12 14:16,20
15:11,15 25:22
35:18 37:15,21
38:22 39:5,7,22
40:3 41:4,24 42:25
43:14,17,24 44:3,8
46:21 47:14,25 48:8
50:2 51:16,23 55:6
67:12,23 72:12,14

73:18 74:6,21 78:24
81:22 82:14,22
83:11 86:2 89:23
93:17,21 94:3,19
95:2,13 100:24
102:2
**Houlihan's (6)**
43:7 44:12,19,25
45:22 54:18
**hour (2)**
61:24 62:2
**Hubbard (2)**
4:4 6:24
**Hughes (2)**
4:4 6:23

———————
**I**

**identification (5)**
10:3 40:10 93:9 95:25
100:10
**identity (1)**
37:23
**imagine (1)**
58:12
**improper (1)**
64:23
**include (1)**
102:19
**included (6)**
22:22 24:23 25:23
27:3 98:10,25
**including (3)**
13:13 48:16 81:18
**inclusion (1)**
25:2
**independent (1)**
15:6
**indicate (4)**
27:17 43:7 44:13 45:8
**indicated (10)**
14:8 20:6 27:9 32:4
44:19 46:22 47:15
60:3 87:16 102:6
**indicating (5)**
18:7 24:22 26:6 45:23
48:2
**individual (1)**
23:4
**individuals (2)**
93:8 107:20
**information (69)**
10:17 11:21 12:6 13:7
13:15,18 14:6,13
16:13,16 17:18,25

18:21 19:21 21:16
25:20 26:5 35:19
36:2 41:25 42:15
46:22 47:14 48:15
48:19,23,25 49:2
50:12,24 51:6,17,25
52:5,13 53:21 54:10
55:6 61:10,13 68:4
75:24 76:4 79:11,12
80:3,7,21 84:2 85:9
87:19 88:5 89:13
90:15,16 91:24
94:11 95:4,13 98:13
98:17,19,24 99:6,7
99:14,15,21,22
**informing (1)**
28:22
**initially (2)**
26:13 92:20
**instruct (34)**
15:13,24 16:24 17:14
18:4 36:5 37:19
39:10 42:6 43:20
44:10,21 45:12
51:11 54:16 66:22
67:3,9 73:14 82:4,5
82:19 83:21 84:3
89:18 92:8,16 94:14
94:23 95:8,17 96:25
99:11 101:7
**INSTRUCTED (3)**
105:9 106:2 107:2
**instructing (2)**
74:2 82:21
**instruction (9)**
44:5 49:24 55:2 97:8
97:21 98:5 99:19
100:3 101:12
**instructions (1)**
97:15
**intended (2)**
37:9 97:12
**interested (1)**
104:19
**internal (4)**
12:9 14:15 15:14,17
**internally (2)**
48:8 50:2
**interrupting (1)**
91:4
**introduce (1)**
6:15
**investment (1)**
14:22

Confidential

**investor (3)**
10:11,12,15
**involved (4)**
12:24 72:25 73:4 78:6
**involvement (1)**
11:13
**involving (1)**
8:2
**issue (4)**
42:23 43:6 46:12
59:24
**issues (1)**
43:12
**items (1)**
84:13

---
**J**
---

**Jack (3)**
3:14 6:18 32:16
**James (2)**
6:24 101:21
**Jim (4)**
14:21 20:15 33:21
58:11
**JOB (1)**
1:25
**Jointly (1)**
1:7
**Jones (2)**
3:4 6:22
**JPMorgan (3)**
19:24 26:15 32:7

---
**K**
---

**KAY (1)**
3:24
**Keegan (4)**
78:16 90:9,19 91:19
**keep (1)**
62:3
**Kelly (2)**
16:7,13
**King (4)**
78:15 90:8,19 91:19
**Klein (5)**
14:22 33:22 58:11,13
77:7
**knew (1)**
94:9
**know (53)**
8:21 9:2 10:24 11:2
16:12 19:5 26:19,20
30:22 35:23 39:21
39:25 40:2 42:22

48:11 56:7,17,19,20
60:21,22 64:23
65:14 70:12 72:4
73:11 74:10 78:9
79:7,9 85:6,23,25
92:3,4 93:24 94:18
94:25 97:10,17,23
98:18,22,23,24 99:2
99:4,5,6,14,21
101:14,18
**knowledge (12)**
22:20 23:12,23 24:11
25:2 47:18 49:11
84:6 87:25 88:11
89:3,5

---
**L**
---

**L (1)**
7:9
**label (2)**
68:11,16
**labeled (6)**
6:3 36:22,23 57:14
72:7 75:12
**Larocca (1)**
78:16
**late (4)**
49:16 67:14,24 68:20
**laughing (3)**
88:15,17,19
**law (1)**
2:10
**lawyers (4)**
13:13 14:7 84:13
91:23
**LBHI (1)**
6:22
**LBI (9)**
22:10 28:15 32:7 61:6
61:19 96:4,11,20
97:11
**LBI/Barclays (3)**
93:19,22 94:20
**learn (4)**
10:23 25:22 26:12
29:18 30:20 33:9
**learned (2)**
10:24 20:10
**led (1)**
43:18
**left (1)**
56:12
**legal (3)**
4:13 6:11 73:22

**Lehman (30)**
1:7 3:5 6:5 7:25 8:3
8:11 13:13,16 19:13
27:2 28:2,6 30:9
34:10 37:22 38:4,10
40:4 46:11 52:14
53:21 54:5,7 60:8
60:18,23 61:5,12,19
109:3
**Lehman/Barclays (1)**
100:18
**lengthy (1)**
98:9
**Letter (6)**
31:19 32:2,5 100:21
101:5,10
**letters (1)**
87:21
**Let's (4)**
9:23 55:20 95:19
100:4
**Lexington (3)**
2:11 3:12 6:7
**liabilities (13)**
11:23 21:5 24:18
35:16 50:18,20 51:8
52:3,7,15 53:23
54:13 57:6
**liability (2)**
43:5 78:7
**light (1)**
26:7
**limit (2)**
47:3 82:18
**line (15)**
18:12 19:18 57:13,18
58:17 59:9 70:3,21
76:25 77:15,18 98:9
105:10 106:3 107:4
**list (10)**
16:9 25:16 30:5,23
31:7 39:3 42:3
60:11 96:16 98:10
**listed (12)**
16:20 17:4 27:16,19
30:14 35:8,21 36:3
37:24 40:6 41:7
46:6
**listen (3)**
10:10,11 11:3
**listened (2)**
10:18,21
**listing (16)**
31:12,17 34:2 37:2,3

38:12 39:7 46:18
48:21 49:12 50:17
54:4 57:20,22 58:20
81:6
**lists (1)**
33:4
**litigation (12)**
73:19 81:19 82:3,6,18
94:20 95:6,12 97:18
98:2 99:8,17
**Livanos (1)**
72:18
**LLP (5)**
2:11 3:4,10,17 4:4
**Ln (1)**
109:6
**loan (8)**
33:11 34:16,24 35:12
40:5 41:6,14,21
**local (6)**
53:5,9,11 65:10,14,17
**logical (1)**
43:10
**Lokey (6)**
7:20 93:17,21 94:19
95:2,13
**long (1)**
96:16
**look (3)**
18:6 32:12 55:20
**looked (5)**
25:13 56:22 57:2,8
63:13
**looking (11)**
16:4 20:5 21:4 42:17
56:6,10,20 68:6
82:11 93:12 96:8
**looks (1)**
71:21
**Lopez (2)**
4:13 6:10
**Lorenzano (1)**
72:19
**Lori (3)**
42:16,19,20
**Los (1)**
3:21
**lot (3)**
29:23 68:4 71:20
**Luc (1)**
42:14

---
**M**
---

**M (101)**

3:15,24 6:1 7:1,9 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1
**main (1)**
80:2
**Makowski (1)**
16:7
**managing (1)**
7:19
**mark (9)**
9:23 57:14 58:15,24
59:9 70:3 93:4
95:19 100:4
**marked (12)**
10:3,7 16:3 36:14
42:9 55:21 71:13
74:25 93:9 95:24
98:8 100:10
**market (31)**
18:14 19:7,7,11 27:16
30:25 31:15 34:4,7
34:8 38:14 39:3
41:6 44:7 46:19
47:21 49:15 50:19
52:10 54:6 57:24,25
58:3,6,21 59:4,12
60:13 70:12 77:23
81:7
**marks (20)**
59:15,17,18,18,22,25
60:5,8,14 61:6,20

Confidential

70:22 71:10 76:14
76:23 77:5,5,6,8,19
**mark-to-market (1)**
77:22
**marriage (1)**
104:18
**Marsal (8)**
40:9 48:14 50:5 52:6
56:12 68:12 69:24
71:11
**material (7)**
12:22 13:4 45:5,7
56:7 81:13 89:7
**materials (2)**
68:20 91:17
**matter (6)**
6:4 87:8,21 90:2
100:18 104:20
**McNamara (1)**
72:19
**mean (4)**
8:21 15:3 60:22 84:20
**meant (1)**
70:18
**meeting (46)**
12:19 43:11 45:15
46:2,6,9 64:11 66:9
77:13,15,25 78:4,11
78:17,20,23 79:10
79:21 80:3,9 81:15
81:23 82:13 83:16
84:9 85:3,16 86:3,4
86:11,15,24 87:2,12
87:25 88:12,13,24
89:15 90:7,18 91:18
92:5,12,13 102:9
**meetings (16)**
12:18,21 15:3 45:17
45:20 46:15 47:24
48:13 55:4,17,19
64:2,9,18 65:25
66:6
**memo (2)**
85:8 93:14
**met (2)**
55:15 86:13
**Michael (10)**
1:14 2:9 3:19 6:4
72:18 103:12
104:11 105:6 109:5
109:19
**Michelle (2)**
3:15 6:20
**Milbank (4)**

8:14 16:7 36:21 97:4
**Miller (1)**
28:22
**million (2)**
70:11,17
**Mills (6)**
4:8 6:23,23 21:20
25:5 26:2
**minute (1)**
75:19
**minutes (1)**
32:20
**Mischaracterizes (1)**
52:22
**mismatch (3)**
34:14,22 41:5
**moment (1)**
63:15
**Monday (4)**
19:16 31:3,4 59:21
**Moore (1)**
36:20
**morning (2)**
7:15,16
**motion (1)**
42:21
**MTHM00007214 (1)**
95:24 107:23
**Murgio (1)**
36:20

_____

**N**

**N (5)**
3:2 4:2 105:2 107:14
108:2
**name (4)**
6:10 96:15,18 109:3
**names (1)**
72:17
**native (1)**
92:25
**need (1)**
59:3 94:12
**needed (6)**
95:4,14 97:24 99:2,16
99:23
**negotiated (7)**
57:14 58:15,24 59:9
70:3 76:25 77:16
**never (2)**
47:18 49:7
**New (16)**
1:3,15,15 2:12,12,16
3:7,7,13,13 4:7,7

6:7,7 104:4,9
**non-answer (1)**
80:16
**Notary (4)**
2:15 7:11 104:8
109:24
**notation (1)**
72:4
**note (2)**
53:4 97:3
**noted (1)**
103:9
**notes (1)**
78:3
**number (4)**
58:4,5 68:10 75:10
**numbers (3)**
23:19 63:14 76:6
**numerous (7)**
25:11 40:8 48:13 50:4
79:13 80:5 86:21

_____

**O**

**O (3)**
7:9 107:14 108:2
**oath (3)**
5:13 64:16 65:24
**object (101)**
8:20 14:14 15:8,22
16:22 17:6,13 18:3
18:23 20:12,18,25
21:13,20 22:12,21
22:23 23:8,12,21,23
24:4,10,20 25:2,4,6
25:18,25 26:16
27:12,20 28:17 29:2
29:21 31:20 32:8
34:17 35:13 36:4
37:7,18 38:25 39:9
39:18,23 40:7 41:8
41:18 42:5 43:19
44:9 45:11,16 46:3
46:13,25 48:5 49:18
50:15,25 51:9,18
52:4,21 54:15 60:19
61:2,8 63:20 67:15
69:13,18 70:5,24
71:8 73:23 79:23
80:25 81:16,24
84:16 85:4,18 86:5
87:3 88:3,15 89:10
90:10,21 91:20 92:7
94:6,15,22 95:7,16
96:23 99:10 101:6

**objecting (2)**
82:17 88:18
**objection (33)**
12:4 13:6 20:20 23:14
25:5 26:2 27:4
37:11 44:4,20 49:21
50:8,9 52:17 55:2
60:2 64:19 66:15,21
67:2,8 68:22 69:12
73:13,14,21 82:16
83:20 86:17 89:17
92:15 100:2 101:11
**objections (10)**
5:7 53:5,7,25 66:3
97:7,14,20 98:4
99:18
**obtain (2)**
17:17,25
**October (11)**
45:19 49:17 56:4,23
58:19 63:15 67:14
67:25 68:21 75:3,6
**officer (1)**
5:12
**offices (2)**
2:10 78:12
**offset (1)**
24:18
**okay (13)**
12:11 14:4 26:21
30:20 32:15 47:8
62:7 71:12 75:11
83:3 86:13 89:2
91:3
**Oliver (2)**
3:17 7:3
**once (1)**
90:7
**one-page (1)**
9:24
**open (1)**
86:25
**opportunity (2)**
78:24 79:4
**opposed (1)**
35:4
**order (8)**
89:16 94:4,10,12
95:14 96:21 98:2
99:23
**outcome (1)**
104:19
**outside (3)**
14:19 89:3,5

**outskirts (1)**
9:20
**overhear (2)**
9:2,18
**owed (1)**
26:11
**owner (1)**
22:15
**O'Donnell (10)**
93:7,14 95:23 100:8
100:17,23 101:2
107:19,23 108:5
**o0o (1)**
5:17

_____

**P**

**P (5)**
3:2,2,22 4:2,2
**page (22)**
18:7,8,10,11 33:3
42:17 56:10,20 57:3
57:4 58:14 62:18
75:8,9 96:8 100:20
105:4,10 106:3
107:4,15 106:3
**pages (4)**
56:5 68:9,11,16
**paid (1)**
29:15
**Paolo (1)**
38:18
**Park (1)**
4:6
**part (14)**
11:24 23:25 24:13,23
30:10,15 35:6,17
37:14 39:16 40:12
41:22 75:17 76:8
**participant (2)**
9:4,17
**participants (1)**
75:24
**participate (5)**
8:19,22 39:14 55:16
101:20
**participating (1)**
9:6
**parties (4)**
5:4 46:6 51:15 104:17
**partner (3)**
8:25 9:7,10
**partners (1)**
73:6
**parts (1)**

Confidential

9:2
**party (2)**
55:18 101:23
**people (22)**
8:13,14 9:5,19 19:7
21:11 27:22,22 40:9
48:14 50:5 51:16
58:12 72:15,23,23
73:4 79:21 93:15
102:18,19,25
**percentage (1)**
17:24
**periods (1)**
19:17
**personally (4)**
11:19 31:21 86:20
92:11
**personnel (4)**
85:22 86:11,12,24
**persons (1)**
72:18
**Pfleiderer's (1)**
81:10
**Pg (1)**
109:6
**place (2)**
29:11 40:14
**Plaza (1)**
4:6
**please (12)**
6:15 7:7 18:6 64:25
65:4 71:14 75:9
82:10,10 83:13
100:13,23
**pledged (1)**
28:24
**point (8)**
25:22 26:12 30:20
33:8 41:23 63:9
90:4 98:9
**posed (1)**
79:21
**position (2)**
7:17,21
**possession (2)**
28:2,6
**possibility (3)**
22:21 23:24 24:11
**possible (1)**
22:2
**potential (1)**
12:5
**potentially (1)**
61:9

**preclosing (8)**
23:13 27:18 28:10,16
28:18 33:8,14 36:9
**preface (1)**
25:7
**prepared (9)**
56:18 57:25 62:19
94:3,10,19 95:5
97:18 99:8
**present (3)**
4:11 75:16 78:18
**presentation (5)**
75:3,5,17 76:8,10
**presented (1)**
75:25
**press (1)**
87:2
**previously (8)**
16:3 36:14 42:9 55:21
57:23 71:13 74:25
98:8
**prices (1)**
17:10
**pricing (4)**
17:3,18,25 35:25
**primarily (1)**
73:8
**primary (1)**
11:18
**principal (1)**
93:25
**prior (2)**
28:16,18
**privilege (35)**
12:5 15:9,23 16:23
17:15 18:4 36:6
37:19 39:11 42:6
43:21 44:10 45:12
48:6 49:23 51:10
73:16 82:4,20,24
83:6 85:19 86:6
88:4 89:19,20 92:9
92:17 94:15,23 95:9
95:18 97:2 99:12
101:7
**privileged (4)**
13:7 61:9 76:10 87:10
**privileges (3)**
44:23 54:17 73:25
**probably (3)**
63:23 72:20,22
**proceeding (1)**
8:17
**produce (1)**

80:22
**produced (8)**
70:7 81:14,22 83:17
87:23 92:20,21,25
**product (14)**
12:5 15:9,23 16:23
17:15 36:6 39:10
43:21 44:22 51:12
54:17 73:16,24 92:9
**production (1)**
82:9
**products (1)**
49:8
**Professional (1)**
2:14
**Professor (1)**
81:9
**projects (2)**
12:10,24
**proper (3)**
65:9,14,17
**provide (4)**
46:21 47:14 63:19
94:11
**provided (7)**
13:22 16:12 51:6,17
51:25 90:7 101:16
**providing (1)**
55:6
**public (7)**
2:15 7:11 35:25 54:11
54:24 104:8 109:24
**publicly (4)**
17:3,18,25 41:25
**purchased (5)**
51:7 52:2,15 53:22
54:12
**purpose (2)**
73:12 80:2
**put (1)**
10:6
**Putting (3)**
27:15 79:19 88:10
**p.m (1)**
93:17

Q

**QUEENS (1)**
104:6
**question (66)**
5:8 12:12,14,15 20:21
20:23,24 23:11 24:8
24:9,10,25 25:10
27:15 28:2 31:23

34:18,19,20 35:7
47:7,10,12,13 52:25
53:3,14,16,17,18
54:21 61:15,17,18
65:11,16,20,21,22
67:19,20,21 69:20
74:15,17,18,19,20
75:4 77:11 79:8
80:6,10,14 84:23
88:16,20 90:23,25
91:2,6,8,11,14,15
97:6
**questions (28)**
33:15,20 41:9 70:9
76:12 78:25 79:3,6
79:14,20 80:8 81:6
83:19 84:8,15,20,25
85:17 86:25 87:17
87:19 89:9,12,16
103:6 105:9 106:2
107:2
**quick (1)**
32:17
**Quinn (2)**
3:17 7:3

R

**R (3)**
3:2 4:2 104:2
**raise (8)**
33:15,19 41:4,13
83:18 84:7 85:2
89:9
**raised (2)**
39:2 41:9
**read (14)**
12:14 20:23 24:9
34:19 47:12 53:17
56:25 61:17 65:21
67:20 74:18,19
93:15 109:6
**reads (3)**
18:12 70:21 109:6
**reaffirm (2)**
53:13 65:2
**reason (8)**
63:17 65:18 67:11,21
68:2 92:3,4 109:6
**reasonable (1)**
62:2
**recall (55)**
8:15 9:14 10:24 11:4
11:8 17:23 28:22
29:4,5 44:18 55:5

57:8 63:4 64:2,7,10
66:12,13 69:3,7,8
69:11,25 72:7,9,10
75:4,16,23 76:7,16
76:19,24 77:14,24
78:11,15,19 80:9,17
80:24 81:13,21
87:15 92:19,22,24
93:2,25 96:19 102:2
102:5,7,8,22
**Recap (2)**
56:15 68:12
**receive (12)**
14:2 27:19 31:18,25
48:20,24 49:5,6
64:17 65:24 68:20
80:14
**received (46)**
14:6 18:18 19:2,4
21:15 26:6,22 28:24
31:8,14 32:3,6
47:19 48:21,25 49:8
49:12 51:5,14,24
52:13 53:20 54:3,10
54:22 56:21,22,24
58:14 59:17 61:11
67:13,23 69:6,10,14
69:17,22 80:5,16
82:14,22 89:8 92:23
93:3 96:10
**receiving (6)**
63:4 64:10 69:4,8,25
91:16
**recess (6)**
8:16,19,24 9:16 32:23
62:10
**recipients (1)**
98:10
**recognize (1)**
42:10
**recollection (17)**
9:21 13:21 26:24 27:7
38:5 40:13,20 64:15
65:23 66:9 69:15,16
69:21 76:2 88:23
96:9 102:11
**reconcile (2)**
27:23,25
**reconciliation (1)**
66:10
**reconciliations (1)**
29:24
**record (11)**
6:16 32:22,25 53:4

Confidential

Page 9

62:9,12,14,15 88:14
103:8 104:14
**redacted (8)**
71:20 98:14,18,25
99:7,15,22 101:4
**reduction (2)**
77:2,16
**Reed (2)**
4:4 6:24
**reference (2)**
23:9 26:22
**referred (6)**
11:12 58:10 59:18
70:17 72:10,12
**referring (2)**
9:7 96:4
**refers (1)**
58:15
**reflected (3)**
18:21 30:6 45:2
**reflects (1)**
21:16
**refresh (1)**
96:9
**refuse (1)**
79:5
**refused (2)**
79:7,22
**regard (4)**
87:8 97:25 99:17
102:9
**Regardless (2)**
95:11 97:10
**Registered (1)**
2:14
**regular (1)**
46:16
**related (3)**
54:19 61:13 104:17
**relating (3)**
38:23 41:13 99:8
**remainder (1)**
56:6
**remained (1)**
27:25
**remember (5)**
23:2 29:8 76:17 87:11
103:3
**removed (1)**
26:15
**repeat (11)**
20:21 24:8 31:23
34:18 47:6 52:25
53:3,15 61:15 65:20

67:18
**rephrase (1)**
51:19
**replaced (2)**
28:15,23
**replacement (7)**
30:16 31:9 39:17
41:17 55:7 78:21
79:2
**replacing (1)**
33:10
**repo (10)**
40:5 41:6,16 55:8,10
59:15 70:22 71:23
78:21 79:2
**report (5)**
11:5,8 17:12 72:23
81:10
**reported (2)**
1:24 17:8
**reporter (4)**
2:14,15 6:13 7:7
**Reporting (2)**
6:11,14
**repository (1)**
22:14
**represent (2)**
14:8 37:13
**representatives (14)**
9:15 12:19 13:14
26:25 38:4,10,20
78:13 85:16 87:12
87:16 88:2 92:6,14
**represented (6)**
22:6,7,9 77:6,7
102:18
**representing (4)**
6:22,24 20:11 37:22
**represents (1)**
100:21
**request (14)**
42:15 45:22 47:23
50:11 79:16,19
80:18 85:11,15
86:11,15 88:12 92:5
92:13
**requested (7)**
79:13 80:4 86:2,3
87:20,25 90:14
**requesting (3)**
79:10 85:9 88:24
**requests (2)**
80:20 89:13
**reread (2)**

12:13 47:10
**reserved (1)**
5:8
**respect (19)**
10:17 11:21 13:16
14:7,23 17:9 19:18
20:15 21:7 30:3
40:9 42:24 45:21
46:7 52:8 55:10
70:11 71:10 98:17
**respective (5)**
5:4 51:8 52:16 53:23
54:13
**respond (3)**
85:20 86:19,22
**responded (1)**
86:21
**responding (1)**
50:6
**restate (1)**
12:12
**result (3)**
15:19 44:8 48:2
**results (1)**
73:5
**retain (1)**
22:4
**reveal (2)**
13:8 87:5
**review (28)**
12:22 16:15 36:17
37:16 43:7 44:13,19
44:25 45:23 48:2
71:14,16 72:12,15
72:25 73:4,12,18
74:6,11,20 75:19,21
90:6 96:12,17
100:13,15
**reviewed (8)**
15:20 18:18 43:2,14
75:18 81:9 93:23
101:15
**reviewing (1)**
100:22
**right (7)**
18:7 45:10 56:14
61:25 64:4 79:17
86:16
**rightful (1)**
22:15
**role (1)**
93:20
**Roman (1)**
75:12

**RPR (2)**
1:24 104:25
**rules (6)**
53:5,9,11 65:10,14,17
**run (1)**
77:9

---
**S**

**S (4)**
3:2 4:2 107:14 108:2
**sale (17)**
8:2 11:14 16:11 36:25
37:14 73:19 96:4,11
96:20,22 97:11,13
97:19 99:9,24
101:19 102:23
**Saturday (2)**
11:17 14:25
**Saul (3)**
9:13 73:9,10
**saw (1)**
26:22
**saying (2)**
9:22 76:7
**says (7)**
18:13 19:19 43:13
56:11,14 59:14
71:22
**Schaffer (5)**
3:8 6:21,21 50:8 60:2
**schedule (25)**
21:11,12 23:5 31:18
31:25 32:4 36:22,23
37:2,3,6,9,12,12,16
37:16,24,24 38:24
39:7 40:6 62:21
66:5,18 76:21
**schedules (5)**
42:22 62:19 66:8 80:4
87:20
**Schiller (4)**
2:11 3:10 6:18 78:12
**scope (1)**
89:19
**sealing (2)**
5:5 42:21
**second (5)**
18:8,10,11 33:3 96:8
**securities (106)**
11:22 12:2,16,23 13:2
13:19,22 14:7,8,9
14:23 15:6,7,20
16:9,10,20 17:4,10
17:19,24 19:23,25

20:3,16 21:12,23
22:5,6 23:6,20
24:16,18,21 25:14
25:16,20 27:10,14
27:16,19,23,25 28:3
28:6,9,12,24 29:13
29:24 30:3,6,8,14
30:24,25 31:8,13,15
34:4 35:2,5,21 36:3
37:2,3,13,24 38:13
38:24 39:3,6,15
40:6,10,11 41:10,10
41:15,20 42:3,25
43:8,24 44:13 45:9
45:23 46:18,23
47:15,20 48:3,16
49:14 52:9 54:6
59:6 60:6,12 70:13
70:14 71:22 72:13
76:13 77:19,22
**security (2)**
74:12 81:7
**see (23)**
10:16 18:15 32:12,14
33:6 43:13,25 44:16
45:18 55:25 56:11
57:6,15 68:10,13,17
71:24 75:14 81:12
96:6,13,15,18
**seeking (1)**
60:14
**seen (19)**
32:13 52:5 55:22 56:3
57:23 62:18,21,22
62:24 63:2,10,13,15
64:12 66:7 69:2,23
70:7 82:8
**Seery (16)**
14:21 20:15 33:21,24
34:13,21 35:11
36:10 58:11,13 77:7
101:21,21 102:2,12
102:22
**Sekowski (2)**
3:15 6:20
**send (1)**
100:23
**senior (1)**
73:4
**sent (4)**
72:11 87:22 95:2
96:20
**separate (1)**
88:6

Confidential

**separately (1)**
83:10
**September (33)**
7:22,24 8:6 11:11
16:16 28:21 34:9
38:8,8 40:18,18,22
40:23,25 49:17 51:5
51:24 52:12 53:19
54:8 58:19 59:7
60:15,25 61:7,7,20
61:21 67:14,24
68:21 98:16 101:19
**series (3)**
42:10 45:14 96:3
**seriously (1)**
50:11
**set (3)**
46:7 104:12,22
**setting (1)**
93:16
**settlement (1)**
32:7
**share (5)**
67:12,22 68:3,3,4
**shared (2)**
15:11 73:5
**sheet (5)**
18:8,17 24:22 27:9
109:2
**shoes (3)**
29:6,12,12
**shortfall (1)**
32:11
**show (5)**
16:2 36:13 42:8 71:12
74:24
**showed (2)**
23:6 57:24
**side (2)**
43:5,7
**signed (2)**
5:12,14
**significant (2)**
75:12 79:10
**significantly (1)**
77:8
**similar (3)**
59:2 66:5,8
**SIPA (2)**
4:5 6:25
**Sir (1)**
87:11
**size (1)**
36:16

**skipping (1)**
56:5
**slide (2)**
75:17,25
**smaller (1)**
43:6
**somebody (2)**
10:11 73:11
**sorry (7)**
18:24 20:22 31:23,24
61:16 67:19 96:15
**source (2)**
14:3 17:4
**sources (2)**
42:2 54:11
**South (1)**
3:20
**SOUTHERN (1)**
1:3
**speaking (1)**
53:6
**specialist (2)**
4:13 6:12
**specific (10)**
8:4 26:23 41:2 45:22
64:15 65:22 71:2
77:11,24 80:10
**specifically (7)**
55:11 57:3 58:23
66:13 77:15 102:5
103:3
**speeches (1)**
82:11
**spreadsheet (3)**
13:22 16:21 17:5
**spreadsheets (6)**
14:2 16:8,16 17:19
36:22 91:17
**ss (1)**
104:5
**staff (5)**
17:8,17,24 72:18,22
**stale (8)**
59:15,17,18,25 70:22
71:10 77:5,18
**stamped (8)**
10:2 93:8 95:23 100:9
107:17,20,23 108:5
**stand (2)**
54:25 76:21
**start (1)**
6:2
**state (6)**
2:15 93:18,22 94:8

104:4,9
**stated (2)**
24:14 27:8
**states (3)**
1:2 76:25 77:16
**staying (1)**
102:17
**step (1)**
29:12
**stepping (2)**
29:6,11
**Stern (99)**
3:14 6:17,18 7:14
9:23 10:5 12:13
15:25 16:25 17:16
18:5,25 22:25 23:16
24:6 27:6 29:3
30:19 32:9,18 33:2
36:7,15,18 37:8,20
39:12 42:7 43:22
44:6,11,24 45:13
47:4 51:13,19,20
52:19 53:2,15 54:20
55:3 61:25 63:3
64:21,25 65:4,7,9
65:13,18 66:23 67:4
67:10 68:24 71:4,5
73:17 74:2,5 81:20
82:10,12,21 83:3,9
83:13,15,23 84:5,23
84:24 88:15,17,19
88:21 91:5,7 92:10
92:18 93:4,11 94:24
95:10,19 96:2 97:5
97:9,16,22 98:6
99:13,20 100:4,12
101:8,13 103:5
105:7
**STIPULATED (3)**
5:2,6,10
**Stop (1)**
74:13
**Street (2)**
3:6,20
**stuff (1)**
76:9
**subject (4)**
33:24 77:25 87:21
100:18
**Subscribed (2)**
103:15 109:20
**subsequent (1)**
26:5
**subsequently (4)**

26:4 45:18 80:22
92:24
**substance (3)**
11:9 38:9,11
**substantially (1)**
58:2
**suggest (1)**
89:14
**suggesting (1)**
101:10
**summaries (2)**
62:23,24
**summarize (1)**
94:8
**summarizing (2)**
93:18,21
**summary (23)**
18:8,17 24:22 56:8,17
63:4,18,19 64:8,11
64:17 65:24 67:13
67:23 76:3 96:4,10
96:19 97:3,11,17,23
98:19
**Sunday (4)**
11:17 14:25 19:4
36:11
**supposed (2)**
35:5 53:12
**sure (8)**
6:17 22:13 28:5 29:10
31:4 32:18 55:9
62:20
**swear (2)**
7:7 62:25
**sworn (6)**
5:11,14 7:10 103:15
104:13 109:20
**system (1)**
19:13
**systems (4)**
54:7 60:9,10,17

---

**T**

**T (4)**
104:2,2 107:14 108:2
**Taggart (164)**
3:22 7:2,2 8:20 12:4
13:6 14:4,14 15:8
15:21 16:22 17:6,13
17:20 18:3,23 19:3
20:12,20 22:12,23
23:14 24:2 25:4,6
25:25 26:3,16 27:4
27:20 28:17 29:2,21

30:18 31:20 32:8,16
32:19 34:17 35:13
35:22 36:4 37:7,11
37:18 38:25 39:9,18
39:23 40:7 41:8,18
42:5 43:19 44:4,9
44:20 45:3,11,16
46:3,13,25 47:8
48:5 49:18,21 50:9
50:15,25 51:9,18
52:4,17,21 53:10,25
54:15,25 60:19 61:2
61:8,23 62:7,13
63:20 64:19,23 65:2
65:5,8,11,16 66:3
66:15,21 67:2,8,15
68:22 69:12,18 70:5
70:24 71:8 72:16
73:13,21 74:4,9,13
74:16 78:8 79:23
80:25 81:16,24
82:16,25 83:7,11,20
83:24 84:10,16,18
84:20 85:4,18 86:5
86:17 87:3 88:3,14
88:18 89:2,10,17
90:10,21 91:3,9,20
92:7,15 94:6,14,17
94:22 95:7,16 96:23
97:7,14,20 98:4,21
99:3,10,18 100:2
101:6,11,17
**take (7)**
32:16 55:20 62:5
66:13 75:19 78:3
83:9
**taken (6)**
23:18 29:11 32:23
62:10 66:4,17
**talk (1)**
88:7
**talked (5)**
55:12 62:23 77:3 82:8
102:16
**talking (3)**
62:16,17 63:11
**tape (1)**
6:3
**tasks (1)**
14:18
**team (1)**
100:24
**tell (10)**
10:8 16:4 59:8 60:7

Confidential

67:6 71:15 72:14
93:12 98:11 100:14
**telling (1)**
26:25
**tells (1)**
43:23
**term (2)**
59:17 71:11
**terms (2)**
8:21 70:8
**testified (2)**
7:11 70:2
**testify (2)**
64:16 65:23
**testimony (23)**
31:6,10,11 50:23
52:11,20,22 53:13
53:18 64:22 65:3
66:2,25 67:7 68:19
68:25 70:4,20,23
71:2,6,7 104:15
**Thank (1)**
62:7
**things (6)**
63:11,22,23 69:2
71:21 90:13
**think (12)**
24:6 31:11 43:3 53:10
53:11 60:3 61:23
63:15 70:25 71:4
80:14 90:13
**thinks (1)**
84:21
**third (5)**
18:6 56:10 57:3,4
62:18
**thought (3)**
14:10 20:8 30:9
**three (3)**
68:15 75:12 78:18
**TIFF (1)**
92:21
**till (1)**
91:9
**time (47)**
5:9 8:14 10:20 12:10
18:18,21,24 19:2,5
19:16 20:7 21:14,15
24:5,20 26:21 28:11
28:13 32:21,24
36:12 39:8 41:23
42:4 44:19,25 47:3
57:9,18,23 60:17
62:8,11 63:12 76:5

77:9,13 83:14 88:13
91:16 92:12 94:9
95:12,14 96:11
103:7,9
**times (7)**
24:3 25:11 60:4 77:4
79:13 80:5 86:21
**title (1)**
96:7
**today (9)**
6:20 30:24 31:7,16
50:24 51:5 52:12
53:19 54:9
**told (6)**
19:10,12 22:2 33:12
102:12,23
**tolerant (1)**
53:6
**Tonucci (1)**
38:19
**top (2)**
18:12 75:13
**topics (1)**
46:17
**total (4)**
20:4 22:5,7 33:4
**TP (1)**
19:19
**Tracy (2)**
3:8 6:21
**transaction (87)**
8:2 10:17 11:14,20,22
11:24 13:17,23
19:24 20:15,19 21:3
21:4,7,8,24 22:3,8
22:17,22 23:3,18,25
24:13,15 25:3,17,19
25:24 26:9 27:3,12
28:4 29:10 30:2,11
30:11 31:14 34:3
35:3,6,17 36:25
38:14 39:4 40:12
41:12,22 48:16,22
49:3,13 50:16,19,22
55:13,14 56:9 59:5
59:20 62:23,24 63:5
63:24 66:11 70:13
70:14 73:20 76:4,22
77:20 85:10 92:2
93:19,22 94:8,13,21
97:19 98:3 99:9,25
101:22 102:4,15,16
102:21
**Transactions (1)**

75:13
**transcript (3)**
98:15,20 109:2
**transfer (3)**
21:16 23:12 102:24
**transferred (80)**
11:23 12:3,17 13:2,23
14:11,24 16:11
19:23 20:2,6,8,19
21:2,6,9,13,18,19
21:24 23:7,20,25
24:12,16,17,21,24
25:15,17,21 26:8,10
26:14 27:10,14,24
28:4,9,12 29:14
30:4,10,15,24 31:2
34:3,5 35:2,4,6,16
37:13 38:13 39:16
40:11 41:11,16,20
42:25 43:8 44:14
45:9,24 46:23 47:15
47:20 48:3,17 52:10
57:21 59:15 60:6,10
60:12 70:22 71:22
76:14 77:23 81:7
**treated (3)**
102:4,6,14
**trial (1)**
5:9
**true (1)**
104:14
**Trustee (2)**
4:5 6:25
**try (1)**
62:2
**trying (5)**
20:5 21:22 27:23
50:12 55:13
**TSG (2)**
6:10,14
**Tuesday (2)**
19:16 59:21
**Tully (1)**
56:8
**Tully's (1)**
68:10
**turning (1)**
75:8
**two (7)**
11:15 36:21,21 38:21
56:5 68:9,15
**Tyler (2)**
3:21 7:5
**type (1)**

16:19
**types (4)**
13:4 34:6 48:19,23

———————
**U**

**unaware (1)**
29:15
**unclear (1)**
19:25
**understand (13)**
11:20 12:2,16,21,25
13:2 23:22 36:24
45:21 52:23 79:15
90:11,24
**understanding (15)**
18:20 19:6,20 21:9,17
21:21 28:8 30:5,7
30:13 37:5 57:17,19
59:16 70:10
**understood (1)**
10:14
**UNITED (1)**
1:2
**updated (6)**
60:5,8,11,14 61:6,19
**Urquhart (2)**
3:17 7:3
**usually (1)**
50:17

———————
**V**

**V (1)**
3:8
**value (35)**
15:19 18:14 22:6
27:16 31:15 34:25
35:20 37:23 38:23
39:6,15 40:5,10
41:6,10,15,19 42:2
44:7 47:21 48:18
49:15 50:19 51:8
52:10 54:7 57:24,25
58:3,6,21 59:6
70:12,14 81:8
**values (17)**
19:7,8,11 30:25 34:4
34:7,8 38:14 39:4
46:19 52:16 53:24
54:14 59:5,12 60:13
77:23
**various (6)**
9:5 62:19 70:9 93:7
93:15 107:19
**verbatim (1)**

76:17
**version (1)**
62:25
**video (3)**
4:13 6:11 62:12
**VIDEOGRAPHER...**
6:2 7:6 32:21,24 62:8
62:11 103:7
**videotaped (3)**
1:12 2:9 6:3
**view (3)**
90:4,17 100:22
**violate (1)**
53:5
**volume (1)**
81:13
**voluntarily (1)**
81:22

———————
**W**

**W (2)**
4:8 6:24
**wait (3)**
74:13 84:18 91:9
**waived (1)**
5:5
**want (6)**
12:13 34:7 42:22 62:6
71:2 74:16
**wanted (4)**
10:16 34:8 62:16 79:3
**wanting (1)**
33:25
**wants (1)**
62:13
**way (3)**
40:20 64:7 104:19
**week (21)**
14:10 19:9,13,15 30:8
38:6,7,7 40:17,18
40:22,23,25 58:2,3
58:7,7 59:19,21
63:5,7
**weekend (18)**
11:19 12:2,16 21:25
22:20 23:13 27:18
28:10,16,18,19 29:5
29:9,17,18 33:9,14
36:9
**weeks (1)**
38:21
**Weil (1)**
9:9 36:20 39:14 42:16
43:23 72:11

Confidential

**Weil's (1)**
100:21
**We'll (1)**
93:4
**We're (5)**
32:22,25 62:9,12
103:8
**we've (5)**
10:7 36:13 71:13
74:24 82:9
**WHEREOF (1)**
104:21
**Whitmer (2)**
3:23 7:5
**willingness (1)**
87:16
**withdrawn (1)**
34:6
**witness (17)**
7:4,7,10 12:11 20:21
34:18 47:6 61:15
62:15 67:18 74:14
84:19 91:13 104:11
104:15,21 105:4
**worded (1)**
51:10
**words (2)**
77:24 86:13
**work (19)**
11:25 12:5,15 15:9,23
16:23 17:15 36:6
39:10 43:21 44:22
45:6 49:8 51:12
54:17 68:5 73:15,24
92:9
**worked (1)**
103:2
**working (8)**
49:25 52:6 58:12
63:12,16 69:3,24
72:24
**worth (7)**
43:8 44:14 45:9,24
46:23 47:16 48:3
**wouldn't (1)**
68:3
**write (2)**
10:13 100:25
**writes (3)**
42:20 44:12 100:20
**writing (1)**
45:2
**written (9)**
12:22 13:4,9,18 45:5

45:7 85:8 89:7 94:7
**wrote (2)**
10:20 101:14

_____

**X**

**X (7)**
1:4,10 105:2 107:14
107:14 108:2,2

_____

**Y**

**yeah (1)**
11:16
**York (16)**
1:3,15,15 2:12,12,16
3:7,7,13,13 4:7,7
6:7,7 104:4,9
**Yup (2)**
68:18 72:3

_____

**Z**

**Z (1)**
7:9

_____

**$**

**$45 (5)**
33:16 34:15,24 35:12
41:6
**$45.5 (1)**
33:12
**$47.4 (8)**
43:4,9 44:15 45:10,25
46:24 47:16 48:4
**$47.7 (1)**
35:5
**$49.9 (6)**
33:5,17 34:14,23 35:8
41:7
**$5 (11)**
34:13,22 41:5 58:4,25
70:11,17,18,19
76:25 77:16
**$7 (14)**
19:19 20:3,7 21:17
22:4 23:9,24 24:12
24:23 25:23 26:8,13
26:23 32:10

_____

**0**

**0035874 (1)**
72:7
**08-13555(JMP) (1)**
1:7

_____

**1**

**1 (1)**
6:3
**1:00 (1)**
93:17
**10 (2)**
105:17,21
**10:04 (1)**
32:21
**10:07 (1)**
32:24
**10:49 (1)**
62:8
**10:59 (1)**
62:11
**100 (2)**
107:10 108:4
**10004-1482 (1)**
4:7
**10017-6702 (1)**
3:7
**10022 (1)**
3:13
**101 (2)**
107:11,12
**11 (3)**
1:6 106:6 107:8
**11:45 (2)**
103:7,9
**12 (5)**
1:16 2:6 106:5 107:12
109:4
**12th (4)**
6:8 61:7,20 104:22
**14 (3)**
105:13 106:11,19
**15 (2)**
105:11 106:25
**15th (1)**
45:19
**16 (3)**
105:12 106:7,18
**17 (2)**
105:13 106:22
**17th (1)**
98:16
**18 (2)**
105:14 106:16
**19 (2)**
105:16 107:9
**19th (26)**
8:6 11:11 28:21 31:2
31:16 34:9 46:20
47:22 48:18 49:15
54:8 58:22 59:6,13

60:13,15,25 61:7,21
70:15 76:15,23
77:10,23 81:8
101:19

_____

**2**

**2 (2)**
62:12 106:12
**20 (1)**
105:19
**20th (2)**
11:16 12:20
**2008 (22)**
7:22,24 16:17 49:17
51:5,24 52:12 53:19
54:8,9 56:4,23 61:7
61:7,20,21 67:14,25
68:21 75:4,6 98:16
**2009 (12)**
78:12 81:14,23 82:13
83:16 84:9 85:2
86:4,14 87:13 88:13
92:12
**2010 (7)**
1:16 2:6 6:8 103:16
104:22 109:4,21
**21 (4)**
16:16 105:22 106:14
107:6
**21st (3)**
11:16 12:20 31:3
**22 (1)**
106:8
**22nd (5)**
31:4 38:8 40:18,22,25
**222 (1)**
3:6
**23 (1)**
106:20
**24 (2)**
105:11,12
**25 (1)**
106:23
**27497 (1)**
1:25
**29th (3)**
38:8 40:18,23

_____

**3**

**3 (3)**
106:9,15 107:10
**36 (1)**
105:15
**37 (1)**

105:16
**39 (1)**
105:17

_____

**4**

**4 (2)**
105:14 106:13
**41st (1)**
3:6
**42 (1)**
105:18
**43 (1)**
105:19
**44 (3)**
105:20,21,22
**4447 (1)**
75:10
**45 (1)**
106:5
**460B (1)**
36:14
**461B (13)**
16:3,4 26:22 27:17,19
30:6,14 33:4 34:15
34:23 35:9,21 41:7
**463B (3)**
55:21 62:17 68:6
**464B (1)**
74:25
**466 (1)**
71:13
**476B (1)**
98:8

_____

**5**

**5 (3)**
105:15,20 107:7
**504 (1)**
42:9
**51 (1)**
106:6
**54 (1)**
106:7
**575 (3)**
2:11 3:12 6:6

_____

**6**

**6 (1)**
105:18
**618A (4)**
9:24,25 10:7 107:16
**619A (3)**
93:6,12 107:19
**620A (2)**

_____

TSG Reporting - Worldwide    (877)-702-9580

Confidential

95:21 107:22
**621 (2)**
 100:6 108:4
**621A (1)**
 100:13
**66 (1)**
 106:8
**67 (2)**
 106:9,10

_____ **7** _____
**7 (2)**
 105:7 107:11
**7th (2)**
 2:12 3:12
**7218 (2)**
 95:24 107:23
**73 (1)**
 106:11
**74 (1)**
 106:12

_____ **8** _____
**8 (5)**
 75:3,6 106:17,21,24
**82 (1)**
 106:13
**83 (1)**
 106:14
**84 (1)**
 106:15
**865 (1)**
 3:20
**89 (1)**
 106:16

_____ **9** _____
**9 (2)**
 106:10 107:16
**9/18/08 (2)**
 10:2 107:17
**9/20/08 (2)**
 100:7 108:4
**9/21/08 (2)**
 95:22 107:22
**9/22/08 (2)**
 93:7 107:19
**9:31 (2)**
 2:7 6:8
**90017 (1)**
 3:21
**92 (2)**
 106:17,18
**93 (1)**

107:19
**94 (2)**
 106:19,20
**95 (3)**
 106:21,22 107:22
**96 (1)**
 106:23
**97 (3)**
 106:24,25 107:6
**98 (1)**
 107:7
**99 (2)**
 107:8,9
**998 (2)**
 100:9 108:5