1                          D. O'DONNELL

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5      In Re:

6                              Chapter 11

7      LEHMAN BROTHERS        Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al.,    (Jointly Administered)

9

                     Debtors.

10

       ----------------------x

11

12      VIDEOTAPED DEPOSITION OF DENNIS C. O'DONNELL

13               New York, New York

14               January 6, 2010

15

16

17

18

19

20     Reported by:

21     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

22     JOB NO. 26649

23

24

25

Page 2

```
1              D. O'DONNELL
2           January 6, 2010
3
4        Videotaped deposition of DENNIS C.
5   O'DONNELL, held at the law offices of Boies,
6   Schiller & Flexner, LLP, 575 Lexington
7   Avenue, New York, New York, before Kathy
8   S. Klepfer, a Registered Professional
9   Reporter, Registered Merit Reporter,
10  Certified Realtime Reporter, Certified
11  Livenote Reporter, and Notary Public of
12  the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
1              D. O'DONNELL
2
3        A P P E A R A N C E S :
4   JONES DAY, LLP
5     Attorneys for Lehman Brothers, Inc.
6      222 East 41st Street
7      New York, New York  10017
8   BY:  WILLIAM J. HINE, ESQ.
9
10  BOIES, SCHILLER & FLEXNER, LLP
11    Attorneys for Barclays Capital
12      575 Lexington Avenue - 7th Floor
13      New York, New York  10022
14  BY:  JACK G. STERN, ESQ.
15      JULIE NOCIOLO, Paralegal
16
17  QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
18    Attorneys for the Official Committee of
19    Unsecured Creditors
20      51 Madison Avenue
21      22nd Floor
22      New York, New York  10010
23  BY:  JAMES C. TECCE, ESQ.
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
1              D. O'DONNELL
2        A P P E A R A N C E S :  (Cont'd.)
3   HUGHES, HUBBARD & REED, LLP
4   Attorneys for the SIPA Trustee
5      One Battery Park Plaza
6      New York, New York  10004
7   BY:  CARL W. MILLS, ESQ.
8
9   MILBANK TWEED HADLEY & McCLOY, LLP
10  Attorneys for Milbank Tweed Hadley & McCloy
11  and the Witness
12      1850 K Street, NW
13      Suite 1100
14      Washington, D.C.  20006
15  BY:  DAVID S. COHEN, ESQ.
16      CONSTANCE BEVERLEY, ESQ.
17
18
19  Also Present:
20      STEVEN SANPIETRO, Legal Video Specialist
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
1              D. O'DONNELL
2        (Exhibit 498, Notice of Deposition
3   Pursuant to Rule 30(b)(6), marked for
4   identification, as of this date.)
5        THE VIDEOGRAPHER:  This is the start
6   of the tape labeled number 1 of the
7   videotaped deposition of 30(b)(6) witness
8   Dennis O'Donnell in the matter of In Re:
9   Lehman Brothers, Inc.
10       This deposition is being held at 575
11  Lexington Avenue, New York, New York, on
12  Wednesday, January the 6th, 2010, at
13  approximately 9:35 A.M.
14       My name is Steve Sanpietro from TSG
15  Reporting, Inc.  I'm the legal video
16  specialist.  The court reporter today is
17  Kathy Klepfer, in association with TSG
18  Reporting.
19       Will counsel please introduce
20  yourselves for the record.
21       MR. STERN:  Sure.  Jack Stern from
22  Boies, Schiller & Flexner for Barclays
23  Capital.
24       MR. COHEN:  David Cohen with Milbank
25  Tweed Hadley & McCloy, here on behalf of
```

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2  30(b)(6) subpoena recipient Milbank Tweed
3  Hadley & McCloy and the witness, Dennis
4  O'Donnell.
5       MR. TECCE:  James Tecce of Quinn
6  Emanuel on behalf of the Official Committee
7  of Unsecured Creditors.
8       MR. MILLS:  Carl Mills of Hughes,
9  Hubbard & Reed on behalf of the trustee,
10 James W. Giddens.
11      MR. HINE:  William Hine of Jones Day
12 on behalf of Lehman Brothers Holdings, Inc.
13      MS. BEVERLY:  Constance Beverly from
14 Milbank Tweed Hadley & McCloy on behalf of
15 Milbank Tweed Hadley & McCloy.
16      MS. NOCIOLO:  Julie Niciolo from
17 Boies, Schiller & Flexner on behalf of
18 Barclays Capital.
19      THE VIDEOGRAPHER:  Will the court
20 reporter please swear in the witness.
21            * * *
22 DENNIS C. O'DONNELL, called as a
23    witness, having been duly sworn by a Notary
24    Public, was examined and testified as
25    follows:

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2  EXAMINATION BY
3  MR. STERN:
4      Q.   Good morning, Mr. O'Donnell.
5      A.   Good morning.
6      Q.   We've marked as our first exhibit the
7  deposition notice for today.  We've marked it as
8  Exhibit 498 and I have placed that in front of
9  you.
10          I have also placed in front of you for
11 ease of reference a blank calendar for the month
12 of September 2008 because we're going to be
13 focusing largely on that period of time today.
14          Did you have an opportunity to review
15 the deposition notice that we've marked as
16 Exhibit 498 before today?
17     A.   I am reviewing it as we speak, and the
18 answer to your question is yes, I have reviewed
19 this deposition notice prior to today.
20     Q.   What did you do to prepare for today's
21 position?
22     A.   That falls into a couple of
23 categories.  I have been involved in this matter
24 for some time and was involved with the prior
25 document subpoena so, in that context, did

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2  review documents that were ultimately produced
3  prior to their production.
4       Subsequent to receipt of the 30(b)(6)
5  subpoena, I have reviewed additional documents,
6  spoken with counsel, and spent time with counsel
7  and others at Milbank reviewing the relevant
8  facts.
9      Q.   Did you have an opportunity to speak
10 with Mr. Despins?
11     A.   I have not.
12     Q.   Did you review any of Milbank's time
13 entries from the September 2008 time period?
14     A.   At what point in time does your
15 question --
16     Q.   In preparation for this deposition.
17     A.   Not in preparation for this
18 deposition, no.
19     Q.   As you know, the deposition notice
20 focuses largely on Milbank's knowledge and
21 understanding of the sale transaction and
22 elements of the sale transaction as of various
23 points in time, and I'd like to start today with
24 the point in time before the Sale Approval
25 Hearing on September 19, 2008.

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2      You recall attending the Sale Approval
3  Hearing?
4      A.   Yes, I attended the sale hearing.
5      Q.   Who else from Milbank attended that
6  hearing, if you recall?
7      A.   A number of Milbank partners and
8  associates, including Luc Despins, Dennis Dunn,
9  Paul Aronzon, Crayton Bell, myself and Evan
10 Fleck.
11     Q.   I'd like to focus on the day of the
12 Approval Hearing, start in the morning, and ask
13 whether Milbank received any briefings
14 concerning the status of the sale transaction on
15 that day.
16     A.   Since the appointment of the
17 commitment -- retention of Milbank by the
18 Committee on Wednesday, the 17th, there were a
19 number of discussions between or among Milbank
20 and the Debtors' advisors.  Whether any took --
21 whether I can segregate the ones that took place
22 on the morning of the 19th I cannot tell you
23 definitively at this point.
24     Q.   Describe for me, if you would, the
25 briefings or conversations that Milbank had

TSG Reporting - Worldwide    877-702-9580

**D. O'DONNELL**

1  **concerning the elements of the sale transaction**
2  **in the period from Milbank's retention through**
3  **to the beginning of the Sale Approval Hearing.**
4        MR. COHEN:  Does that relate to
5  briefings by the Debtors?
6        MR. STERN:  It would include briefings
7  by the Debtors, that would be Lehman, Weil
8  and Lazard, or if there were any
9  conversations with Barclays or anybody
10 acting on behalf of Barclays.
11       MR. COHEN:  But not internal
12 conferences.
13       THE WITNESS:  Understood.
14       There were two significant briefings
15 that I recall.  The first, there was a
16 meeting for all Creditors or all interested
17 parties at Lehman on the morning of the 18th
18 where attorneys from Weil and advisors to
19 the Debtors, including, I believe, people
20 from Lazard and A&M answered questions for
21 attorneys from Milbank and its -- and the
22 Committee's advisors, Houlihan and FTI, as
23 well as questions answered by a number of
24 other interested third parties.  That was

**D. O'DONNELL**

1  the first such briefing.
2        After that meeting ended, there was a
3  meeting at which only Milbank, Houlihan and
4  FTI participated with, again, Weil, I
5  believe people from A&M, and Lazard.
6     **Q.   Where did that second meeting take**
7  **place?**
8     A.   At the offices of Weil Gotshal.
9     **Q.   Where did the first meeting take**
10 **place?**
11    A.   At the offices of Weil Gotshal.
12    **Q.   Were those meetings both on September**
13 **18?**
14    A.   Yes, they were.
15    **Q.   Did Milbank receive any further**
16 **briefings or receive any further information**
17 **concerning the transaction before the sale**
18 **hearing began on the afternoon of September 19?**
19    A.   To repeat my testimony from earlier,
20 from -- from the moment of our retention through
21 the hearing, there were ongoing discussions
22 between Milbank attorneys and attorneys at Weil
23 regarding elements of the transaction or ...
24    **Q.   As of the start of the Sale Approval**

**D. O'DONNELL**

1  **Hearing, had Milbank been told that the**
2  **transaction had changed in any way from the**
3  **transaction that had originally been explained**
4  **to Milbank?**
5     A.   The transaction from Milbank's
6  perspective was a moving target through that
7  period.  There were changes that were publicly
8  disclosed and were also disclosed to Milbank
9  prior to the hearing, including those
10 memorialized in the First Amendment to the APA.
11    **Q.   Before the hearing began, what did**
12 **Milbank understand or what had Milbank been told**
13 **concerning the Fed financing of Lehman Brothers,**
14 **Inc. and Barclays' replacement of that**
15 **financing?**
16    A.   Events during this period, between
17 Wednesday and Friday, moved at a very rapid
18 pace.  Disclosures regarding the changes were
19 made to Milbank and made to others, sometimes at
20 the same time, sometimes simultaneously.
21       Whether Milbank was told anything
22 specifically about that issue prior to the
23 hearing I cannot tell you.
24    **Q.   You don't recall?**

**D. O'DONNELL**

1     A.   I don't know whether -- is the
2  question whether Milbank alone was told
3  something or whether Milbank as part of a group
4  of Creditors asking questions was told
5  something?
6     **Q.   The question really is whether Milbank**
7  **understood or knew a fact regardless of how it**
8  **was learned.**
9     A.   And the fact that they learned is what
10 again?
11    **Q.   Anything having to do with Barclays'**
12 **replacement of the Fed Repurchase Agreement with**
13 **LBI.**
14    A.   As I sit here, I don't know whether we
15 learned about that prior to the hearing or
16 during the hearing or during the period leading
17 up to the hearing, bearing in mind that the
18 hearing was scheduled to start at 4 P.M. and did
19 not start until sometime later as events
20 continued to unfold and additional changes were
21 disclosed to Milbank and the Court.
22    **Q.   By the end of the Sale Approval**
23 **Hearing, did Milbank have any understanding**
24 **concerning Barclays' replacement of the Fed**

Page 14

D. O'DONNELL

1  repo?
2      A.   Milbank knew at that point what was
3  disclosed to the Court by Weil during the
4  hearing.
5      Q.   Did Milbank have any additional
6  information beyond that?
7      A.   Again, there were ongoing discussions
8  or efforts to have discussions between Milbank
9  and Weil.  There were people in court that day.
10 There were people in the office that day seeking
11 to communicate with Weil regarding the status of
12 the transaction.
13         At what point in time we learned of
14 the role -- of the changes with respect to the
15 repo is not something I can pinpoint with
16 accuracy.
17     Q.   Okay.  At some point before the end of
18 the Sale Approval Hearing, did Milbank have an
19 understanding concerning the amount of the repo
20 loan that Barclays assumed?
21     A.   Before the end of the hearing, we --
22 we understood what I believe it was Mr. Miller
23 or Ms. Fife told the Court about the amount of
24 that loan.

TSG Reporting - Worldwide    877-702-9580

Page 15

D. O'DONNELL

1      Q.   Aside from what Mr. Miller and Ms.
2  Fife told the Court, did Milbank receive any
3  information in separate off-the-record
4  discussions?
5      A.   To the best of my knowledge, no.
6      Q.   By the end of the Sale Approval
7  Hearing, what understanding or knowledge did
8  Milbank have concerning the amount of securities
9  transferred to Barclays in connection with
10 replacing the Fed repo?
11     A.   Again, I think our knowledge would
12 have been limited to what was represented on the
13 record at the hearing.
14     Q.   Is it your testimony that Milbank was
15 not told anything about that other than what was
16 said on the record?
17     A.   Yes.
18     Q.   Now, during the course of the hearing,
19 do you recall that there was a recess?
20     A.   I recall that there were a number of
21 recesses.
22     Q.   Do you recall that there was a recess
23 towards the beginning of the hearing at which
24 lawyers from Weil explained changes in the

TSG Reporting - Worldwide    877-702-9580

Page 16

D. O'DONNELL

1  transaction?
2      A.   Yes, I recall that recess.
3      Q.   What occurred during that recess?
4          MR. COHEN:  Objection.  Vague.
5      Q.   You can answer.
6          MR. TECCE:  For the record, I just
7      wanted the record to be clear that we're
8      joining in Mr. Cohen's objections, and
9      without doing it every time that he does it,
10     to avoid clarity on the record.
11         MR. STERN:  Sure.
12     Q.   Let me rephrase the question.  What
13 was Milbank told during that first recess?
14         MR. COHEN:  Objection.  Vague.
15     A.   Milbank was told during that first
16 recess what everyone else was told during that
17 first recess.  My recollection is that, again,
18 it was Ms. Fife or Mr. Miller summarized for the
19 parties-in-interest in the courtroom
20 developments, ongoing developments, in the
21 transaction, attempting to present a summary of
22 where the deal stood at that moment in time.
23     Q.   Do you recall whether Ms. Fife made
24 the presentation or Mr. Miller made the

TSG Reporting - Worldwide    877-702-9580

Page 17

D. O'DONNELL

1  presentation?
2      A.   To the best of my recollection, it was
3  Ms. Fife who made the presentation.
4      Q.   During that recess period, did anybody
5  else address developments in the transaction?
6      A.   It was, to the best of my
7  recollection, an interactive process.  There
8  were -- I believe Lazard may also have been in
9  the courtroom.  It may have been there
10 addressing issues.  And there were others from
11 Weil on the corporate side who may have been
12 assisting Ms. Fife in making the presentation.
13     Q.   In talking about developments in the
14 transaction, did anyone on behalf of Lehman
15 discuss Barclays' replacement of the Fed repo?
16     A.   I do not remember that being the focal
17 point of any discussion during that recess.
18     Q.   Is it possible that that issue was
19 discussed?
20         MR. COHEN:  Objection.  Calls for
21 speculation.
22     A.   My recollection is that Mr. Miller had
23 told the Court, had represented to the Court,
24 and I'm not sure whether it was before or after

TSG Reporting - Worldwide    877-702-9580

Page 18

**D. O'DONNELL**

1      D. O'DONNELL
2 that recess, that Barclays was -- had taken out
3 the Fed or had replaced the Fed with respect to
4 that repo, but I don't recall whether there were
5 further statements made during that recess or
6 questions asked during that recess on that
7 point.
8     **Q. So you don't recall?**
9     A. I don't recall.
10     **Q. And do you recall whether Mr. Miller**
11 **or Ms. Fife or anybody from Lazard during that**
12 **recess discussed the amount of collateral or**
13 **securities Barclays was receiving in exchange**
14 **for taking out the Fed's financing?**
15     A. Again, in the context of that recess,
16 I don't remember that being a specific issue of
17 discussion or questioning.
18     **Q. It may have been, but you just don't**
19 **recall?**
20       MR. COHEN: Objection. Calls for
21 speculation.
22     A. I don't recall.
23     **Q. Do you recall whether during that**
24 **recess there was any discussion concerning**
25 **whether Barclays would receive as a part of the**

TSG Reporting - Worldwide   877-702-9580

Page 19

1      D. O'DONNELL
2 **transaction certain clearance box assets or**
3 **unencumbered assets?**
4     A. I also do not recall whether that
5 issue was discussed during the recess.
6     **Q. Do you recall during that recess any**
7 **person from Lehman referring to a category of**
8 **additional assets estimated by Lehman to be**
9 **worth $1.9 billion?**
10     A. Again, no recollection of that that
11 was discussed during that recess.
12     **Q. Is that a category of assets or was**
13 **the transfer of that category of assets**
14 **something Milbank knew going into the Approval**
15 **Hearing?**
16     A. It was an evolving process. The
17 Approval Hearing lasted eight hours. Whether --
18 I do not believe that Milbank knew about the
19 clearance box securities during the hearing.
20     **Q. When you say you don't believe, do you**
21 **have a firm recollection that Milbank was not**
22 **told about that category of assets, or is it**
23 **that you don't recall?**
24     A. I don't -- I believe that Milbank was
25 not told about that category of assets prior to

TSG Reporting - Worldwide   877-702-9580

Page 20

1      D. O'DONNELL
2 the hearing.
3     **Q. Okay. Did Milbank learn about that**
4 **category of assets during the hearing?**
5     A. They -- I -- they did not, to the best
6 of my knowledge, learn about that category of
7 assets during the hearing.
8     **Q. Did Milbank participate in any**
9 **discussions either before the hearing or during**
10 **the hearing concerning a category of assets**
11 **described as being worth $1.9 billion?**
12     A. To the best of my recollection, no.
13     **Q. Did anybody from Milbank take any**
14 **notes of any of the discussions on September 19**
15 **with Weil, Lazard or others concerning the**
16 **developments in the transaction?**
17     A. If any -- I did not, and I'm not aware
18 of anyone who did.
19     **Q. Did you participate in any discussions**
20 **with Weil concerning whether -- withdraw that.**
21     **When Milbank was at court on September**
22 **19 for the hearing, were there any discussions**
23 **or meetings that Milbank participated in in**
24 **which anyone complained to Weil or others about**
25 **developments in the transaction?**

TSG Reporting - Worldwide   877-702-9580

Page 21

1      D. O'DONNELL
2      MR. COHEN: Is that anyone from
3 Milbank or anyone?
4     **Q. Anyone.**
5     A. The courtroom was full. There were
6 two overflow courtrooms. There were many
7 Creditors and parties in interest there with
8 views about the transaction and the current
9 state of the transaction. Milbank I'm certain
10 heard from some of those Creditors about their
11 views.
12     **Q. Do you recall anyone complaining about**
13 **a transfer of assets estimated to be worth 1.9**
14 **billion?**
15     A. No specific -- I have no specific
16 recollection of anyone making that specific a
17 complaint.
18     **Q. Is it possible that somebody made that**
19 **complaint?**
20      MR. COHEN: Objection. Calls for
21 speculation.
22     **Q. And that you just don't recall?**
23      MR. COHEN: Same objection.
24     A. I have no specific recollection of
25 such complaint.

TSG Reporting - Worldwide   877-702-9580

Page 22

D. O'DONNELL

1
2    Q.   Do you recall that there -- do you
3    have a firm recollection that there were never
4    any such complaints?
5    A.   I don't have a firm recollection to
6    that effect either.
7    Q.   Okay.  So you don't have a firm
8    recollection one way or the other?
9    A.   Correct.
10   Q.   Okay.  What discussions, if any, did
11   Milbank participate in relating to developments
12   in the transaction -- withdrawn.
13         In the discussions leading up to and
14   at the sale hearing concerning developments in
15   the transaction, did Milbank learn anything
16   concerning the treatment of 15c3 assets or
17   regulatory capital in connection with the
18   transaction?
19   A.   To the best of my knowledge, no.
20   Q.   Do you recall whether there were any
21   discussions on that subject?
22   A.   I have no recollection or no knowledge
23   of any discussions on that topic prior to the
24   conclusion of the sale hearing.
25   Q.   When did Milbank first learn, to the

TSG Reporting - Worldwide    877-702-9580

Page 23

D. O'DONNELL

1
2    best of your recollection, that 15c3 assets or
3    regulatory capital were being considered as a
4    part of the transaction?
5    A.   To the best of my knowledge, over the
6    course of the weekend that followed the sale
7    hearing.
8    Q.   Do you have a firm recollection that
9    Milbank did not know that before the end of the
10   sale hearing?
11   A.   I have a firm recollection to that
12   effect, yes.
13   Q.   What is your best recollection
14   concerning when Milbank first learned the terms
15   of Barclays' replacement of the Fed financing?
16         MR. COHEN:  Objection.  Vague.
17   A.   I'm not certain that we -- that
18   Milbank ever learned definitively the terms of
19   that transaction.
20   Q.   At some point before the closing,
21   Milbank understood that Barclays had replaced
22   the Fed's financing, correct?
23   A.   Correct.
24   Q.   Okay.  And when did Milbank first
25   develop that understanding?

TSG Reporting - Worldwide    877-702-9580

Page 24

D. O'DONNELL

1
2    A.   Over the course of the weekend
3    following the closing.
4    Q.   Not before the end of the sale
5    hearing?
6    A.   Well, as I previously testified, I
7    believe Mr. Miller did tell the Court that in
8    fact Barclays had replaced the Fed financing, so
9    we knew that it had happened.
10        If the question is did we know the
11   terms of it, we began to understand the terms of
12   it over the course of the weekend, but I never
13   received answers to all of our questions about
14   those terms.
15   Q.   As of the Sale Approval Hearing, did
16   Milbank know that Barclays had announced
17   publicly that Barclays anticipated realizing a
18   gain on the acquisition of $2 billion after tax?
19   A.   Timeframe again?
20   Q.   As of the start of the sale hearing.
21   A.   As of the start of the sale hearing, I
22   do not believe that Milbank knew of that
23   announcement.
24   Q.   Milbank learned of that after the sale
25   hearing?

TSG Reporting - Worldwide    877-702-9580

Page 25

D. O'DONNELL

1
2    A.   I believe Milbank learned of that over
3    the course of the weekend.
4    Q.   Going into the sale hearing, did
5    Milbank know that certain bondholders believed
6    that Barclays would receive a windfall discount
7    on the transaction?
8    A.   As I previously testified, there were
9    many Creditors with many complaints about the
10   transaction.  As counsel to the Committee, we --
11   we heard from a number of those Creditors about
12   their complaints.
13   Q.   Did Milbank hear specifically from Dan
14   Golden about his analysis of the transaction and
15   the analysis of the transaction that Goldman
16   Sachs had done on his behalf?
17         MR. COHEN:  Objection.  Foundation.
18   A.   Milbank did receive from Mr. Golden an
19   e-mail forwarding an e-mail from someone at
20   Goldman Sachs raising issues of that
21   description.
22   Q.   And what do you recall those issues
23   were?
24   A.   I don't have a specific recollection
25   of the precise terms of the issues raised, but I

TSG Reporting - Worldwide    877-702-9580

7 (Pages 22 to 25)

Page 26

D. O'DONNELL

1  think they raised -- there were a number of
2  issues raised.  They were issues relating to
3  precisely what Barclays was -- what assets
4  Barclays was buying and what it was giving up to
5  get them.
6      Q.   Do you recall that Mr. Golden and
7  Goldman Sachs had concluded that Barclays would
8  receive a windfall discount of billions of
9  dollars?
10         MR. COHEN:  Objection.  Foundation.
11     A.   I don't have a specific recollection
12  that that terminology specifically was used.
13     Q.   Did Milbank do anything to assess the
14  points that Mr. Golden was making?
15     A.   Throughout this period Milbank was
16  conducting diligence on an expedited timetable
17  seeking to understand the transaction.  The
18  e-mail received from Mr. Golden was -- was part
19  of that, that overall mix.  It was taken into
20  account and was part of the reason that we were
21  seeking fuller answers about the terms of the
22  transaction.
23     Q.   You referred to two meetings at Weil
24  on the 18th.  Starting with the first meeting,

Page 27

D. O'DONNELL

1  can you tell me in general what Milbank learned
2  at that meeting concerning the transaction?
3      A.   The first meeting was a, a meeting
4  generally open to all Creditors.  Milbank did
5  not take the lead with respect to asking
6  questions or obtaining information at that
7  meeting.  To the best of my recollection, there
8  was a -- there were a whole range of questions
9  asked about many aspects of the transaction.
10  Beyond that, I can't be more specific.
11     Q.   And then you referred to a second
12  meeting.  What was discussed in that meeting?
13     A.   The second meeting, which took place
14  following the first meeting, was a -- was the
15  first sit-down meeting between the Debtors and
16  Milbank and the Committee's advisors, and it
17  covered a range of topics, including the
18  transaction.  I can't, as I sit here, I can't
19  tell you specifically what issues were raised or
20  discussed that relate to the Barclays
21  transaction, but I'm -- I can't tell you with
22  any specificity what issues were discussed.
23     Q.   I take it that, before the Sale
24  Approval Hearing, Milbank had reviewed the

Page 28

D. O'DONNELL

1  original Asset Purchase Agreement?
2      A.   It had.
3      Q.   And Milbank had reviewed the First
4  Amendment?
5      A.   It had.
6      Q.   In connection with the APA, did
7  Milbank have an understanding going into the
8  sale hearing concerning the total value of the
9  purchased assets to be transferred under the
10  original APA?
11     A.   Milbank itself did not have a specific
12  understanding or opinion with respect to the
13  value issues here.  Houlihan Lokey was the
14  Committee's financial advisor and was charged
15  with understanding and evaluating the value
16  components of the transaction.
17     Q.   Do you know whether Houlihan ever
18  developed an understanding concerning the total
19  value of the purchased assets under the APA?
20         MR. COHEN:  Objection.  Vague.
21     A.   Houlihan focused on that issue and
22  asked questions about that issue prior to and
23  after the sale hearing.
24     Q.   Did Houlihan ever provide Milbank with

Page 29

D. O'DONNELL

1  a figure representing the total value of all
2  purchased assets being transferred to Barclays
3  under the APA?
4          MR. TECCE:  I'm going to object.
5          MR. COHEN:  You can answer that yes or
6  no.  That goes into privilege and work
7  product.
8      A.   Yes.
9      Q.   It's your testimony that Houlihan had
10  a calculation representing the total value of
11  all purchased assets in the aggregate; is that
12  your testimony?
13     A.   Let me clarify.  All purchased assets,
14  including all components of the "purchased
15  asset" definition?
16     Q.   Yes.
17     A.   As I sit here I don't have a
18  recollection that Houlihan ever provided a total
19  number with respect to all purchased assets.
20     Q.   Did Milbank understand that the
21  consideration that Barclays would pay included
22  the assumption of certain liabilities?
23         MR. COHEN:  Objection.  Vague.  Under
24  which document?

Page 30

D. O'DONNELL

1    Q.   Under the APA.
2        MR. COHEN:  The original?
3    A.   The original?
4    Q.   Yes.
5    A.   Under the terms of the original APA,
6  yes, we -- Milbank understood that part of the
7  consideration would be the assumption of certain
8  liabilities.
9    Q.   Okay.  And going into the sale
10 hearing, did Milbank have a calculation for the
11 total value of all assumed liabilities under the
12 APA?
13   A.   Going into the sale hearing, Milbank
14 did not have a calculation provided by Houlihan
15 of the total value of all assumed liabilities,
16 no.
17   Q.   Did it have a calculation of the total
18 value of all assumed liabilities from any
19 source?
20   A.   Going into the sale hearing, Milbank
21 had what the Debtors represented to the Court
22 was the total value of the assumed liabilities.
23   Q.   Is it your testimony that the Debtors
24 made a representation to the Court concerning
25

TSG Reporting - Worldwide    877-702-9580

Page 31

D. O'DONNELL

1    the total value of all assumed liabilities under
2    the APA?
3        MR. COHEN:  Objection.  Vague.
4    We're talking about September 19 and
5    the original APA?
6        MR. STERN:  Yes.
7    A.   To the best of my recollection, the
8  Debtors made representations to the Court
9  regarding the cure and compensation components
10 of the assumed liabilities.
11   Q.   You understand that under the APA
12 there was a list of assumed liabilities,
13 correct?
14   A.   Correct.
15   Q.   You understand that under the APA
16 there were provisions relating to the assumption
17 of cure payments by Barclays?
18   A.   Correct.
19   Q.   And you understand that under the APA
20 there was a provision relating to compensation
21 payments by Barclays?
22   A.   Correct.
23   Q.   My question is whether at any time
24 Weil or Lehman made a representation to Milbank
25

TSG Reporting - Worldwide    877-702-9580

Page 32

D. O'DONNELL

1    concerning the total value of all assumed
2    liabilities under the APA, including the list of
3    assumed liabilities listed in the APA and cure
4    and compensation?
5    A.   The timeframe is prior to the hearing?
6    Q.   Prior to the hearing.
7    A.   To the best of my knowledge, no.
8    Q.   So, going into the hearing, Milbank
9    did not have a total figure for all purchased
10 assets and it did not have a total figure for
11 the value of all assumed liabilities; is that
12 correct?
13   A.   Correct.
14   Q.   Did Milbank at any time prior to the
15 Sale Approval Hearing suggest to Weil Gotshal
16 that the purchase agreement should include
17 valuation conditions with respect to purchased
18 assets and assumed liabilities?
19       MR. COHEN:  Objection.  Vague.
20   A.   To the best of my knowledge, Milbank
21 did not make any such suggestion prior to the
22 hearing.
23   Q.   Prior to the hearing did Milbank
24 lawyers ever suggest to Weil Gotshal that the
25

TSG Reporting - Worldwide    877-702-9580

Page 33

D. O'DONNELL

1    purchase agreement should include
2    representations and warranties concerning the
3    total value of purchased assets and the total
4    value of assumed liabilities?
5        MR. COHEN:  Objection.  Vague.
6    A.   In a limited context, in the timeframe
7  in the context of the access we had at the time,
8  no.
9    Q.   So, prior to the hearing, Milbank
10 never suggested to Weil that the purchase
11 agreement should include representations and
12 warranties concerning the total value of
13 purchased assets and the total value of assumed
14 liabilities; is that correct?
15   A.   That's correct.
16       MR. COHEN:  Objection.  Vague.
17   By "purchase agreement," are you
18 talking about the APA?
19       MR. STERN:  Yes.
20   Q.   Let me rephrase the question.  So,
21 prior to the hearing, Milbank never suggested to
22 Weil that the APA should include representations
23 and warranties concerning the total value of
24 purchased assets and the total value of assumed
25

TSG Reporting - Worldwide    877-702-9580

Page 34

D. O'DONNELL

1    D. O'DONNELL
2  liabilities; is that correct?
3      A.   That is correct.
4      Q.   Did Milbank ever suggest to Weil
5  before the Sale Approval Hearing that the APA
6  should include true-up provisions with respect
7  to the value of purchased assets or assumed
8  liabilities?
9      A.   To the best of my knowledge, no.
10     Q.   Did Milbank understand that the
11 original APA included a purchase price
12 adjustment provision?
13     A.   Yes.
14     Q.   Did Milbank understand as of the sale
15 hearing that that provision had been deleted?
16     A.   No.
17         Strike that.  I --
18     Q.   Let me rephrase the question.  Did
19 Milbank understand as of the Sale Approval
20 Hearing that that purchase price adjustment
21 provision -- withdrawn.
22         Did Milbank understand as of the Sale
23 Approval Hearing that the parties had agreed
24 that they would delete that purchase price
25 agreement -- purchase price adjustment provision
       TSG Reporting - Worldwide    877-702-9580

Page 35

D. O'DONNELL

1    D. O'DONNELL
2  from the Final Agreement?
3      MR. COHEN:  Objection.  Vague.
4      A.   Based on representations made during
5  the hearing, Milbank did understand that the
6  purchase price adjustment had been removed from
7  the deal, yes.
8      Q.   Did anyone from Houlihan at any time
9  ever communicate with Milbank -- withdrawn.
10         When Milbank learned that Barclays had
11 announced that it anticipated a $2 billion
12 after-tax gain on the transaction, what was
13 Milbank's reaction?
14         MR. COHEN:  I'm going to caution the
15 witness to not discuss either client
16 communications or internal communications.
17     A.   Over the course of the weekend,
18 Milbank did receive a copy of the announcement.
19 It reviewed it and ultimately forwarded it to
20 Houlihan to review as well.
21     Q.   Was that announcement by Barclays at
22 all inconsistent with Milbank's understanding of
23 the transaction?
24     A.   The announcement was made on September
25 17 and related to a version of the transaction
       TSG Reporting - Worldwide    877-702-9580

Page 36

D. O'DONNELL

1    D. O'DONNELL
2  that was not the version of the transaction
3  approved by the Court or under discussion over
4  the weekend, so we didn't -- Milbank did not
5  attempt to draw any comparisons between what was
6  discussed in that announcement and what was
7  approved by the Court or was under discussion
8  over the weekend.
9      Q.   Did Milbank believe that the earlier
10 transaction was irrelevant at the time of the
11 Court's approval?
12         MR. COHEN:  You can answer that yes or
13 no, but don't get into the thought process
14 or work product behind that.
15     A.   No.
16     Q.   Milbank understood that Barclays'
17 announcement related to the transaction as it
18 stood on September 17, correct?
19     A.   Based on the date on the announcement,
20 yes.
21     Q.   Okay.  Did Milbank believe the
22 Barclays announcement remained relevant as of
23 the time of the sale hearing?
24     A.   Milbank --
25         MR. COHEN:  You can answer that yes or
       TSG Reporting - Worldwide    877-702-9580

Page 37

D. O'DONNELL

1    D. O'DONNELL
2  no.
3      Q.   Withdrawn.  Did Milbank believe that
4  Barclays' September 17 announcement remained
5  relevant at any time prior to the closing?
6          MR. COHEN:  Yes or no.
7      A.   Yes.
8      Q.   So the Barclays announcement was
9  relevant?
10     A.   Prior to closing, yes.
11     Q.   Was that announcement of an
12 anticipated gain considered by Milbank to be at
13 all inconsistent with the terms of the
14 transaction as Milbank understood the
15 transaction prior to closing?
16         MR. COHEN:  You can answer that yes or
17 no.
18     A.   Can you repeat the question?
19     Q.   Sure.  Was the announcement by
20 Barclays of an anticipated acquisition gain
21 inconsistent with Milbank's understanding of the
22 transaction?
23     A.   Yes.
24     Q.   What did Milbank do to address that
25 inconsistency?
       TSG Reporting - Worldwide    877-702-9580

Page 38

**D. O'DONNELL**

1      A.  It forwarded the announcement to
2  Houlihan, who was charged with evaluating the
3  value components of the transaction.
4     **Q.  Did Milbank do anything other than**
5  **that?**
6       MR. COHEN:  You can answer yes or no.
7     A.  No.
8     **Q.  As to Barclays' announcement of an**
9  **anticipated $2 billion after-tax acquisition**
10  **gain, did Milbank ever raise any concerns with**
11  **Weil or Lazard or anyone from Lehman about that**
12  **announcement?**
13     A.  Timeframe, please?
14     **Q.  At any time.  At any time through**
15  **September 22.**
16     A.  Through closing.
17       Over the course of the weekend, we
18  were seeking answers to many questions about the
19  transaction.  I cannot tell you that -- that
20  that announcement was not brought to Weil's
21  attention.
22     **Q.  Do you have a recollection of Milbank**
23  **discussing that announcement with Weil?**
24     A.  I don't have a specific recollection

TSG Reporting - Worldwide    877-702-9580

Page 39

D. O'DONNELL

1  to that effect, no.
2     **Q.  Did Milbank make -- withdrawn.  Prior**
3  **to the closing, did Milbank have any**
4  **communications with anybody from Barclays or**
5  **representing Barclays?**
6     A.  Yes.
7     **Q.  Who?**
8     A.  One communication of which I am aware
9  is one with Mark Shapiro of Barclays.
10     **Q.  This is prior to closing.  Mark**
11  **Shapiro was with Lehman.**
12     A.  All right.
13     **Q.  And my question goes to --**
14     A.  Yeah, you're correct.
15     **Q.  -- Barclays -- we'll come back to Mark**
16  **Shapiro, but my question goes to Barclays**
17  **executives or Barclays lawyers or financial**
18  **advisors.**
19     A.  Over the course of the weekend,
20  representatives of Barclays were at Weil, and
21  Milbank did have some limited contact with
22  Barclays representatives during that period.
23     **Q.  Did Milbank ever raise any concern**
24  **with the Barclays people concerning Barclays'**

TSG Reporting - Worldwide    877-702-9580

Page 40

**D. O'DONNELL**

1  **announcement of an anticipated $2 billion**
2  **after-tax acquisition gain?**
3     A.  To the best of my knowledge, no.
4     **Q.  Why not?**
5     A.  As I've previously testified, we were
6  looking at many issues, had many unanswered
7  questions.  That announcement was one element of
8  the facts of which we were aware of that weekend
9  that we had questions about, but we did not ask
10  Barclays about it.
11     **Q.  Did Milbank not consider it**
12  **significant enough to raise with Barclays?**
13       MR. COHEN:  Objection.  Vague.
14     A.  The, again, the announcement spoke of
15  a $2 billion gain of some sorts, but it was
16  couched in accounting jargon that we at Milbank
17  did not definitively have an understanding of.
18  We forwarded it to Houlihan to investigate
19  further and tell us what they thought the
20  announcement meant.
21     **Q.  Did Milbank ever ask whether Barclays**
22  **still anticipated an acquisition gain on the**
23  **transaction in light of the further developments**
24  **in the transaction leading up to closing?**

TSG Reporting - Worldwide    877-702-9580

Page 41

**D. O'DONNELL**

1       MR. COHEN:  Did they ask Barclays that
2  question?
3       MR. STERN:  Anyone.
4     A.  Timeframe again?
5     **Q.  Anytime leading up to closing.**
6     A.  And did we ask anyone?
7     **Q.  Yes.**
8     A.  I have no specific recollection that
9  we asked anyone that question.
10     **Q.  Can you explain why Milbank would not**
11  **have asked that question?**
12       MR. COHEN:  Objection.  I will
13  instruct the witness not to answer.  That's
14  work product.
15     **Q.  Now, you referred to a conversation**
16  **with Mark Shapiro.  What do you remember about**
17  **that conversation?**
18     A.  My recollection relates to an e-mail
19  from Mark Shapiro in which Mark Shapiro told
20  Milbank and Houlihan and FTI who at Lehman they
21  should speak to about various issues.
22     **Q.  Do you recall approximately when that**
23  **e-mail was sent?**
24     A.  I believe that e-mail was sent on the

TSG Reporting - Worldwide    877-702-9580

Page 42

1                 D. O'DONNELL
2      18th of September.
3         Q.    After the sale hearing and before the
4      closing, what was Milbank's role in connection
5      with the transaction?
6              MR. COHEN:  Objection.  Vague.
7         A.    Milbank's role as counsel to the
8      Committee was to seek to undertake the diligence
9      with respect to the transaction that it had not
10     been able to undertake prior to the sale hearing
11     and desire to undertake, you know, complete
12     before closing.
13        Q.    Did Milbank understand that there was
14     a provision of the Sale Order concerning
15     Committee consent to possible changes in the
16     purchase agreement?
17             MR. COHEN:  You can answer yes or no.
18        A.    Yes.
19        Q.    Is that a provision that Milbank
20     negotiated with Weil?
21             MR. COHEN:  You can answer yes or no.
22        A.    Yes.
23        Q.    Tell me about Milbank's negotiations
24     with Weil concerning that provision of the Sale
25     Order.

        TSG Reporting - Worldwide    877-702-9580

Page 43

1                 D. O'DONNELL
2         A.    That provision of the Sale Order was
3      one of several that were -- was discussed during
4      the sale hearing and after the sale -- after the
5      Court had actually approved the hearing --
6      approved the sale and prior to entry of the
7      order.  It was anticipated that changes might be
8      made, the Debtors had represented that to the
9      Court, and the Committee wanted to ensure that
10     it had the ability to consent to any such
11     changes.
12        Q.    Who from Milbank negotiated that
13     provision?
14        A.    There were a number of Milbank
15     partners in the courtroom that day and night.  I
16     can't tell you as I sit here who took
17     responsibility for that specific provision, but
18     it was one of several Milbank partners.
19        Q.    Over the weekend leading to the
20     closing, did Milbank have any discussions with
21     Weil concerning whether the Committee's consent
22     would be required?
23        A.    Yes.
24        Q.    What were those discussions?
25        A.    The order stated that if there were

        TSG Reporting - Worldwide    877-702-9580

Page 44

1                 D. O'DONNELL
2      material modifications made to the transaction,
3      the -- both the consent of the Committee and
4      approval of the Court would be required.  As we
5      evaluated the transaction over the weekend, the
6      issue of whether any of the proposed changes
7      were material was something that came up with
8      Weil.
9         Q.    And who discussed that?
10        A.    To the best of my recollection, these
11     discussions were between Luc Despins and Harvey
12     Miller.
13        Q.    And do you know what they discussed?
14        A.    I don't believe the discussions were
15     conclusive.  It was -- the Committee was, as I
16     previously testified, conducting diligence over
17     the weekend, had questions that had not yet been
18     answered, and the issue was whether if these
19     questions could not be answered, whether any of
20     the open issues were material enough to require
21     Court approval.
22        Q.    Aside from the discussion between Mr.
23     Despins and Mr. Miller, were there any other
24     discussions between Milbank and Weil concerning
25     that issue?

        TSG Reporting - Worldwide    877-702-9580

Page 45

1                 D. O'DONNELL
2         A.    No.
3         Q.    And how did you learn what Mr. Despins
4      and Mr. Miller discussed?
5         A.    Through discussions with others at
6      Milbank.
7         Q.    Who?
8         A.    Crayton Bell.
9         Q.    Anybody else?
10        A.    No.
11        Q.    What did Mr. Bell tell you?
12        A.    Mr. Bell was present in the room when
13     these discussions took place.
14        Q.    And what did he tell you about the
15     discussions?
16        A.    That they were largely hypothetical;
17     that the question came up in the context of, if
18     these -- if the questions that remained
19     unanswered yielded certain types of answers,
20     would Court approval be required.
21        Q.    Did Mr. Bell tell you what Mr. Despins
22     said in that conversation?
23        A.    Not verbatim, no.
24        Q.    In general?
25        A.    I've already testified as to my

        TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1  general understanding of what the discussion
2  entailed.
3      Q.   Did Mr. Despins or anybody from
4  Milbank ever tell Weil that Milbank believed
5  Committee consent would be required?
6      A.   If it was definitively established
7  that there were material changes to the
8  transaction, yes.
9      Q.   When did Milbank make that assertion
10 to Weil?
11     A.   I don't have a verbatim account of the
12 discussion, but the general thrust of the
13 discussion I just recounted covered that point
14 as well.
15     Q.   And any material changes would have to
16 be reflected in the final written agreement; is
17 that right?
18     A.   Correct.
19     Q.   Was Milbank ever provided the final
20 written agreements, the Final Purchase
21 Agreement?
22          MR. COHEN:  Objection.  Vague.
23     A.   Can you be more specific as to which
24 document you're talking about?
25

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1      Q.   After the closing, did Milbank ever
2  receive the Final Purchase Agreement?
3      A.   The purchase agreement --
4      Q.   Let me define the Final Purchase
5  Agreement.
6      A.   It would be helpful, yes.
7      Q.   Because it's defined in the Sale Order
8  and then it was defined again when Milbank filed
9  these papers.
10          The final purchase --
11          MR. COHEN:  Which papers?
12          MR. STERN:  The Final Purchase
13 Agreement papers.
14          MR. COHEN:  When Milbank filed the
15 final --
16          MR. STERN:  Did I say Milbank?
17          MR. COHEN:  Yes.
18          MR. STERN:  I misspoke.  I meant Weil.
19     Q.   When Weil filed the final agreements,
20 the Final Purchase Agreement was defined as,
21 number one, the original APA; number two, the
22 First Amendment to the APA; and, number three,
23 the Clarifying Letter?
24     A.   Okay.
25

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1      Q.   That's the Final Purchase Agreement.
2  So my question is, after the closing, did
3  Milbank receive a copy of the Final Purchase
4  Agreement?
5      A.   Yes.
6      Q.   Okay.  Based on the review of that
7  Final Purchase Agreement, did Milbank have any
8  discussions with Weil concerning whether
9  Committee consent would be required?
10         MR. COHEN:  Object to the form.
11     A.   Yes.
12     Q.   What were those discussions?
13     A.   Milbank had ongoing discussions with
14 Weil after the closing about questions it had
15 about the financial components of the
16 transaction.
17     Q.   Focusing on the Final Purchase
18 Agreement, including the final Clarification
19 Letter --
20         MR. COHEN:  And the schedules?
21     Q.   Focusing on the Final Purchase
22 Agreement, including the Clarification Letter,
23 the material that Milbank had as of September
24 22, did Milbank have discussions with Weil
25

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1  concerning whether, based on the material that
2  Milbank had on September 22, there would be a
3  need for Committee consent?
4      A.   As of September 22, Milbank did not
5  have the schedules, so the substance of the
6  discussions at that point were regarding
7  Milbank's need to see the final schedules.
8      Q.   Putting aside the schedules, based on
9  the terms that were in the agreements that
10 Milbank had, did Milbank ever express to Weil on
11 September 22 that Committee consent was
12 necessary?
13     A.   No, we had no reason to because at
14 that point in time we didn't have the
15 information necessary to reach a conclusion as
16 to whether Committee consent would be required.
17     Q.   In other words, based on the face of
18 the Clarification Letter, Milbank did not
19 identify any material changes requiring
20 Committee consent?
21         MR. TECCE:  Objection to the form of
22 the question to the extent it calls for work
23 product or privileged information.
24     A.   Can you repeat the question?
25

TSG Reporting - Worldwide    877-702-9580

Page 50

D. O'DONNELL

1
2    **Q.    When Milbank received the final**
3    **Clarification Letter, did Milbank conclude based**
4    **on the face of the Clarification Letter alone**
5    **that there were material changes requiring**
6    **Committee consent?**
7         MR. COHEN: Objection.
8         MR. TECCE: Same objection.
9         MR. COHEN: Calls for privilege and
10    work product. Instruct the witness not to
11    answer.
12    **Q.    After Milbank received the final**
13    **Clarification Letter, did Milbank communicate**
14    **with Weil that Committee consent would be**
15    **required based on the terms of the Final**
16    **Clarification Letter?**
17    A.    No.
18         MR. COHEN: Objection. Vague.
19         Are you using Final Clarification
20    Letter and the September 22 documents that
21    were provided without the schedules
22    interchangeably?
23         The Clarification Letter has
24    schedules. The witness has testified that
25    on September 22, we didn't get schedules. I

TSG Reporting - Worldwide    877-702-9580

---

Page 51

D. O'DONNELL

1
2    have no idea what you mean by final
3    Clarification Letter.
4    **Q.    On September 22, Milbank received the**
5    **text of the Clarification Letter, correct?**
6    A.    Correct.
7    **Q.    Based on the text of the Clarification**
8    **Letter, did Milbank ever tell Weil that there**
9    **were material changes requiring Committee**
10    **consent?**
11    A.    No.
12    **Q.    Over the weekend before the closing,**
13    **was Milbank provided information relating to**
14    **what would become Schedule A of the**
15    **Clarification Letter?**
16    A.    Yes.
17    **Q.    What information was Milbank given?**
18    A.    Milbank was provided with drafts of
19    Schedule A.
20         MR. COHEN: Jack, is this a good time
21    for a break? I'm having a technical
22    difficulty here.
23         MR. STERN: Sure. Sure. Let's take a
24    break.
25         THE VIDEOGRAPHER: That is the end of

TSG Reporting - Worldwide    877-702-9580

---

Page 52

D. O'DONNELL

1
2    tape number 1. The time is 10:42 A.M.
3    We're now off the record.
4         (Recess.)
5         THE VIDEOGRAPHER: This is the start
6    of tape number 2. The time is now 10:55
7    A.M. We are now back on the record.
8    BY MR. STERN:
9    **Q.    Mr. O'Donnell, I have placed in front**
10    **of you a thick document that we previously**
11    **marked as Exhibit 461B. I'll ask you to review**
12    **that and then, if you can, tell me what you**
13    **understand that to be.**
14    A.    Based on my review of the document, it
15    appears to be the copy of Schedule A that was
16    provided to Milbank on September 21, 2008.
17    **Q.    That's over the weekend before the**
18    **closing?**
19    A.    Correct.
20    **Q.    Were there other schedules made**
21    **available to Milbank and Houlihan over that**
22    **weekend?**
23         MR. COHEN: Objection. Vague.
24    A.    Other copies of Schedule A?
25    **Q.    Or any schedules of purchased assets.**

TSG Reporting - Worldwide    877-702-9580

---

Page 53

D. O'DONNELL

1
2    A.    No.
3    **Q.    461B -- your testimony is that 461B is**
4    **the only spreadsheet or schedule that was made**
5    **available to Milbank and Houlihan over the**
6    **weekend?**
7    A.    Yes.
8    **Q.    And when Milbank received this, did**
9    **Milbank have any questions concerning the**
10    **information here?**
11         MR. COHEN: You can answer yes or no.
12    A.    Yes.
13    **Q.    And what questions did Milbank have?**
14         MR. COHEN: Objection. Calls for work
15    product. If you're asking for questions
16    that it had to people, not in a privileged
17    environment, like the Debtors or Barclays,
18    you can answer that, but internal
19    conversations or conversations with the
20    Committee's financial advisors I'll instruct
21    you not to answer.
22    **Q.    What questions did Milbank have of**
23    **either Lehman or Barclays' representatives**
24    **concerning the information contained in Exhibit**
25    **461B?**

TSG Reporting - Worldwide    877-702-9580

Page 54

**D. O'DONNELL**

1
2    A.   Milbank did not raise any questions
3    with any of the debtor representatives
4    concerning Exhibit 461B.
5    **Q.   Is that because that was Houlihan's**
6    **responsibility?**
7    A.   Correct.
8    **Q.   Over the weekend before the closing,**
9    **did Milbank have an understanding concerning the**
10   **amount of financing that Barclays had assumed in**
11   **stepping into the Fed's shoes?**
12   A.   As I previously testified, only to the
13   extent that that information was provided at the
14   hearing on the 19th.
15   **Q.   Milbank had no further discussion**
16   **concerning that issue over the weekend?**
17   A.   Correct.
18      MR. COHEN:  Again, only to the extent
19      that it was with people outside of the
20      privilege.
21   A.   Over the course of the weekend,
22   Milbank was seeking information about a variety
23   of topics and had directed Houlihan to do the
24   same.  So questions were being raised about
25   issues that included the amount of the Barclays

TSG Reporting - Worldwide   877-702-9580

Page 55

D. O'DONNELL

1
2    repo.
3    **Q.   Okay.  What information did Milbank**
4    **receive from Lehman or Barclays' representatives**
5    **concerning the terms of the Barclays repo?**
6    A.   Timeframe?
7    **Q.   Over the weekend before the closing.**
8    A.   At some point on Sunday, I believe,
9    late on Sunday, Milbank was provided with an
10   explanation, or proffered explanation, of the
11   relevant numbers.
12   **Q.   Who provided that explanation?**
13   A.   I believe it was provided by Michael
14   Klein.
15   **Q.   And when Mr. Klein provided that**
16   **explanation, who else was present?**
17   A.   Representatives of Houlihan and
18   Milbank.
19   **Q.   Do you recall approximately what time**
20   **of day that took place?**
21   A.   I believe it was very late in the
22   evening of Sunday, the 21st, and potentially
23   early in the morning of Monday, the 22nd.
24   **Q.   And what did Milbank learn through**
25   **that explanation?**

TSG Reporting - Worldwide   877-702-9580

Page 56

**D. O'DONNELL**

1
2    A.   That it had further questions to ask
3    and directed Houlihan to continue to investigate
4    the issues.
5    **Q.   Did Milbank tell Mr. Klein that**
6    **Milbank had further questions?**
7    A.   To the best of my recollection, the
8    conversation was one in which the
9    explanation was -- the explanation was proffered
10   and questions were asked until he left the room.
11   **Q.   What questions were asked?**
12   A.   Questions relating to the specific
13   numbers that were disclosed to Milbank and
14   Houlihan in this context.
15   **Q.   What were those numbers?**
16   A.   I don't have a specific recollection
17   of the numbers, and it was Houlihan that was
18   charged with evaluating and understanding those
19   numbers.
20   **Q.   In that discussion with Mr. Klein, did**
21   **anyone other than Mr. Klein provide any**
22   **explanation?**
23      MR. COHEN:  Objection.  Vague.
24   A.   Anyone?
25   **Q.   For example, did Mr. Miller or anybody**

TSG Reporting - Worldwide   877-702-9580

Page 57

**D. O'DONNELL**

1
2    **from Weil or Lazard participate in providing an**
3    **explanation?**
4    A.   To the best of my recollection, no.
5    **Q.   Over that weekend between the end of**
6    **the Sale Approval Hearing and the closing, were**
7    **Milbank lawyers present at Weil Gotshal?**
8    A.   Yes.
9    **Q.   Which Milbank lawyers?**
10   A.   Crayton Bell, Luc Despins, David
11   Eastlake.
12   **Q.   Anybody else?  Yourself?**
13   A.   I was not present, no.
14   **Q.   Were you present at any time over that**
15   **weekend?**
16   A.   I was not, no.
17   **Q.   What was -- what was Mr. Bell's role**
18   **over that weekend?**
19   A.   Mr. Bell is a corporate partner at
20   Milbank who was there with a hope of reviewing
21   the documents as they were revised.
22   **Q.   And do you know whether he was**
23   **provided drafts of the documents?**
24   A.   He spent a lot of time sitting and
25   waiting, but was ultimately provided with a

TSG Reporting - Worldwide   877-702-9580

Page 58

D. O'DONNELL

1 draft of the Clarification Letter, yes.
2     Q.    Do you know whether he was provided
3 more than one draft of the Clarification Letter?
4     A.    Timeframe?
5     Q.    Over the weekend between the Sale
6 Approval Hearing and the closing.
7     A.    He was provided with a draft of the
8 clarification sometime on the afternoon of
9 Saturday, the 20th, and may have seen other
10 drafts towards the end of the process on Sunday
11 night, Monday morning, but primarily he had
12 access to only the draft provided on Saturday.
13     Q.    You say he may have been provided
14 drafts on Sunday.  Do you know whether he was?
15     A.    I don't know definitively that he was
16 provided with a draft subsequent to the one that
17 he saw on Saturday.
18     Q.    You don't know one way or the other?
19     A.    I don't know one way or the other.
20     Q.    Do you know whether over that weekend
21 on Saturday and Sunday certain drafts of the
22 agreements were distributed in hard copy at
23 Weil?
24     A.    There were many people meeting at Weil
25

TSG Reporting - Worldwide    877-702-9580

Page 59

D. O'DONNELL

1 over that weekend.  It's possible that there
2 were hard copy drafts distributed to others.
3 The only draft that we received was the one
4 referenced on Saturday.
5     Q.    You don't know, however, whether Mr.
6 Bell received hard copy subsequent drafts?
7     A.    Correct.
8     Q.    So it's possible that Mr. Bell
9 received in hard copy subsequent interim drafts
10 of the Clarification Letter between Saturday and
11 the closing?
12     A.    It is --
13         MR. COHEN:  Objection.  Calls for
14 speculation.
15         You can answer.
16     A.    I don't have any specific knowledge
17 whether he did or not.
18     Q.    You can't exclude the possibility,
19 however, that Mr. Bell, while at Weil, while
20 physically present at Weil, received hard copy
21 interim drafts of the Clarification Letter,
22 correct?
23     A.    My general understanding of the course
24 of dealing that weekend was that Mr. Bell spent
25

TSG Reporting - Worldwide    877-702-9580

Page 60

D. O'DONNELL

1 a long time waiting and not receiving what he
2 needed to receive to do what he wanted to do
3 there.
4     Q.    I understand your testimony about
5 waiting, but my question is whether you know one
6 way or the other if Mr. Bell, while at Weil on
7 Sunday going into the closing, received in hard
8 copy subsequent drafts of the Clarification
9 Letter?
10         MR. COHEN:  Objection.  Asked and
11 answered.
12     Q.    Do you know that one way or the other?
13         MR. COHEN:  Same objection.
14     A.    I have no specific knowledge of that.
15     Q.    So it's possible that he did?
16         MR. COHEN:  Objection.  Calls for
17 speculation.
18     Q.    Correct?
19         MR. COHEN:  Asked and answered.
20     Q.    So it's possible that he did, correct?
21         MR. COHEN:  Same objections.
22     A.    Yes.
23     Q.    Do you know how much time Mr. Bell
24 spent at Weil over that weekend leading to the
25

TSG Reporting - Worldwide    877-702-9580

Page 61

D. O'DONNELL

1 closing?
2     A.    He was there most of Saturday and most
3 of Sunday into Monday morning.
4     Q.    And the closing was Monday morning?
5     A.    Correct.
6     Q.    Do you know how much time Mr. Despins
7 spent at Weil over that weekend leading to the
8 closing?
9     A.    He was also there most of Saturday and
10 most of Sunday into Monday morning.
11     Q.    And Mr. Eastlake?
12     A.    He was there for a period of time on
13 Sunday afternoon into -- into Monday morning.
14     Q.    Did anybody from Milbank attend the
15 closing?
16     A.    No.
17     Q.    Why not?
18     A.    The closing was electronic.  It took
19 place on the morning of the 22nd.  There was no
20 need for us to be there.
21     Q.    Was Milbank invited to attend the
22 closing?
23     A.    Yes.
24     Q.    Do you know whether certain schedules

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2  or draft schedules were reviewed at the closing?
3      A.  No.
4      Q.  You don't know?
5      A.  Correct.
6      Q.  While Mr. Bell, Mr. Despins and Mr.
7  Eastlake were at Weil over the weekend before
8  the closing, what meetings did they participate
9  in, putting aside meetings with the Committee or
10 Houlihan?
11     A.  To reiterate my testimony, they spent
12 a lot of time waiting around, but I believe on
13 Saturday they participated in a meeting that
14 included a number of the key parties, including
15 Weil and representatives of Barclays, and
16 participated in a similar meeting late in the
17 day on Sunday.
18     Q.  Did they participate in any meetings
19 in which representatives of JPMorgan Chase were
20 present?
21     A.  I believe representatives of JPMorgan
22 Chase were present at at least one of those
23 meetings.
24     Q.  Did they participate in any meetings
25 at which representatives of the DTCC were

TSG Reporting - Worldwide     877-702-9580

D. O'DONNELL

1
2  present?
3      A.  I don't have specific recollection of
4  all of the parties in these meetings, but they
5  have been described as meetings including all
6  the key parties, so I'm assuming -- I won't
7  assume.  I don't know.
8      Q.  Describe for me, if you would, the
9  Saturday meeting.
10     A.  Our role was peripheral.  It occurred
11 I believe shortly after us being provided with
12 the draft of the Clarification Letter.  We had
13 many questions about the Clarification Letter
14 and were not in a position to participate
15 productively in the meeting.
16     Q.  Did the Milbank lawyers observe the
17 meeting?
18     A.  Yes.
19     Q.  Do you know how long it lasted?
20     A.  Not precisely, no.
21     Q.  Roughly?
22     A.  An hour or so.
23     Q.  And what were the topics discussed in
24 that Saturday meeting?
25     A.  The ongoing negotiations over the open

TSG Reporting - Worldwide     877-702-9580

D. O'DONNELL

1
2  issues relating to the transaction.
3      Q.  Do you know whether there were any
4  discussions in that meeting concerning the
5  treatment of the Barclays repo?
6      A.  To the extent that that is an issue
7  reflected in the Clarification Letter, yes.
8      Q.  Do you know whether there were any
9  discussions in that meeting concerning the
10 treatment of the clearance box assets?
11     A.  Same answer.
12     Q.  Do you know whether there were any
13 discussions in that meeting concerning the
14 treatment of the 15c3 assets?
15     A.  Same answer.
16     Q.  Do you know whether there were any
17 discussions in that meeting concerning the
18 treatment of exchange-traded derivatives?
19     A.  The same answer, with the
20 qualification that my level of familiarity with
21 the meeting is not a verbatim account, but my
22 general understanding is that it related to the
23 open issues, including the Clarification Letter.
24     Q.  Turning to the late Sunday meeting,
25 can you tell me what the topics of that meeting

TSG Reporting - Worldwide     877-702-9580

D. O'DONNELL

1
2  were?
3      A.  A continuation of the Saturday
4  meeting.
5      Q.  Do you know what, if any, discussions
6  took place at the late Sunday meeting concerning
7  the treatment of the Barclays repo?
8      A.  Not specifically, no.
9      Q.  Do you know whether there were any
10 discussions at the late Sunday meeting
11 concerning how LBI and JPMorgan would handle a
12 shortfall in delivery of securities under the
13 Barclays repo?
14     A.  Again, that was one of the issues
15 under discussion over the weekend.  Whether it
16 was specifically discussed in the Sunday or
17 Saturday meeting I cannot tell you.
18     Q.  It may have been, in other words?
19     A.  Your guess is --
20         MR. COHEN:  Objection.  Calls for
21 speculation.
22     Q.  Let me just -- is it your testimony
23 that that subject would have been discussed over
24 the weekend?
25     A.  It was -- it should have been

TSG Reporting - Worldwide     877-702-9580

Page 66

D. O'DONNELL

1  discussed over the weekend.
2      Q.   Do you know whether Milbank attended
3  any meetings either on Saturday or Sunday in
4  which that issue, namely, the delivery shortfall
5  under the Barclays repo, was discussed?
6      A.   Could you be more specific about the
7  issue you're alluding to?
8      Q.   Sure.  Was there any discussion over
9  the weekend -- withdrawn.  Did Milbank
10  participate in any discussion with Lehman
11  representatives or Barclays representatives or
12  JPMorgan representatives over that weekend
13  concerning a shortfall in delivery of securities
14  to Barclays under the Barclays repo estimated to
15  be worth roughly $7 billion?
16      A.   To the best of my recollection, the
17  only discussion I have knowledge of regarding
18  that subject was that with Mr. Klein, to which I
19  referred in my earlier testimony.
20      Q.   So in the discussion with Mr. Klein,
21  that issue of the $7 billion shortfall was
22  discussed?
23      A.   Yes.
24      Q.   And what was Milbank's understanding
25  TSG Reporting - Worldwide    877-702-9580

Page 67

D. O'DONNELL

1  concerning that shortfall?
2      MR. COHEN:  Based on -- is the
3  question limited to what did Mr. Klein tell
4  you?
5      Q.   Based on what you were told over that
6  weekend.
7      A.   Again, that was part of the
8  explanation of the numbers, as to which Houlihan
9  took the lead, and it was Houlihan -- Houlihan
10  would be the best party to address what the
11  explanation was and what we thought about it.
12      Q.   Looking at Exhibit 461, if you would,
13  the second page, you see in the upper left
14  corner there is a --
15      A.   Second page?
16      Q.   It should be the third page.
17      A.   Third page.
18      Q.   You see in the upper left-hand corner
19  there's a column labeled Collateral and a column
20  labeled Market Value?
21      MR. COHEN:  Is only the first page of
22  this exhibit Bates-numbered?
23      MR. STERN:  Correct, because the
24  remainder is a spreadsheet --
25  TSG Reporting - Worldwide    877-702-9580

Page 68

D. O'DONNELL

1      MR. COHEN:  Okay.
2      MR. STERN:  -- that was produced in
3  native format.
4      Q.   So let me come back to my question.
5  You see in the upper left-hand corner there's a
6  column labeled Collateral and a column labeled
7  Market Value?
8      A.   Correct.
9      Q.   And do you see there's a row just
10  before the Total row labeled TP Cash?
11      A.   I see the line to which you are
12  referring, yes.
13      Q.   Do you see there's a figure next to
14  that of $7 billion?
15      A.   I see the $7 billion number, yes.
16      Q.   Did Milbank have any understanding
17  concerning the relationship of that figure to
18  the delivery shortfall in the Barclays repo as
19  of the weekend?
20      MR. COHEN:  You can answer that yes or
21  no.
22      A.   No.
23      Q.   Do you know whether Houlihan did?
24      MR. COHEN:  You can answer that yes or
25  TSG Reporting - Worldwide    877-702-9580

Page 69

D. O'DONNELL

1  no.
2      A.   Yes.
3      Q.   Did Milbank -- did Houlihan have an
4  understanding of the relationship between that
5  figure and the shortfall in the delivery of
6  securities under the Barclays repo?
7      A.   It was an issue at which they were
8  looking.  Whether they had reached an
9  understanding at that point in time I cannot
10  tell you.
11      Q.   So you don't know?
12      A.   I don't know.
13      Q.   Did Milbank review these market value
14  figures when Milbank received this document?
15      A.   No.
16      Q.   Why not?
17      MR. TECCE:  Objection to the form of
18  the question.
19      MR. COHEN:  I'll also object to the
20  question.  It calls for work product, and
21  instruct the witness not to answer.
22      Q.   Going back to the late Sunday meeting
23  that you described, how late in the day was that
24  meeting?
25  TSG Reporting - Worldwide    877-702-9580

**D. O'DONNELL**

1
2  A.  Are you referring to the meeting with
3  Mr. Klein?
4  **Q.  No, I'm referring to the meeting with**
5  **a number of parties, including JPMorgan.**
6  A.  I believe that meeting took place
7  shortly before the meeting with Mr. Klein.
8  **Q.  So late in the evening or early**
9  **morning?**
10  A.  Correct.
11  **Q.  And do you know who attended that**
12  **meeting?**
13  A.  Again, it's been described to me as a
14  meeting with all the key parties.  I can't tell
15  you with specificity who was there.
16  **Q.  And what discussion was there at that**
17  **meeting concerning the treatment of clearance**
18  **box assets?**
19  A.  The meeting was a continuation of the
20  ongoing discussions, and based on my
21  understanding of what transpired there, that
22  issue may have been discussed, but I don't have
23  a specific recollection that it was.
24  **Q.  Was the value of the clearance box**
25  **assets described to Milbank at any time over**

**D. O'DONNELL**

1
2  that weekend?
3  A.  No.
4  **Q.  Milbank was never given an estimate by**
5  **Lehman of the value of those assets?**
6  A.  It was Houlihan who was asking those
7  questions, so if anyone received that
8  information, it was Houlihan.
9  **Q.  And at the Sunday, this Sunday meeting**
10  **with all the key parties, was there any**
11  **discussion concerning the value of the**
12  **securities Barclays was receiving under the**
13  **Barclays Repurchase Agreement?**
14  A.  I don't have any specific knowledge
15  that that issue was discussed specifically at
16  that meeting.
17  **Q.  Was there any discussion concerning**
18  **how those securities would be treated under the**
19  **Clarification Letter?**
20  MR. COHEN:  Objection.  Vague.
21  A.  No specific knowledge as to whether
22  that issue was discussed at that meeting.
23  **Q.  Was there any discussion at that**
24  **meeting concerning the treatment of**
25  **exchange-traded derivatives?**

**D. O'DONNELL**

1
2  A.  Same answer.
3  **Q.  You don't know one way or the other?**
4  A.  I have -- I don't have specific
5  knowledge that that issue was discussed at that
6  meeting.
7  **Q.  It may have been, but you just don't**
8  **know, is that correct?**
9  A.  Correct.
10  **Q.  And was there any discussion at that**
11  **Sunday meeting concerning the treatment of the**
12  **15c3 assets?**
13  A.  Same answer.
14  **Q.  There may have been, but you don't**
15  **know?**
16  A.  Correct.
17  **Q.  When Mr. Bell reviewed whatever drafts**
18  **of the Clarification Letter he received, did he**
19  **ever communicate any comments to Lehman or**
20  **Barclays lawyers?**
21  A.  He posed questions to Lehman and
22  Barclays lawyers.
23  **Q.  Did he ever make any comments or**
24  **suggestions on the drafts?**
25  A.  No.

D. O'DONNELL

1
2  **Q.  What questions did he pose?**
3  A.  A variety of questions about the
4  evolving draft.
5  **Q.  Can you be more specific?**
6  A.  Questions relating to the key issues
7  that had changed since the execution of the
8  original APA.
9  **Q.  And what were those?**
10  A.  The primary issue related to the
11  change, the changes in the definition of
12  "purchased assets."
13  **Q.  Specifically, what were those changes**
14  **that he raised questions about?**
15  A.  Without the document in front of me,
16  it's hard to be specific about precisely the
17  questions, what questions were asked.
18  **Q.  Okay.  Let's turn, then, to Exhibit**
19  **26.  We can put 461 to the side, just to get it**
20  **out of your way.**
21  MR. COHEN:  Are we done with it?
22  MR. STERN:  I think so.
23  **Q.  Exhibit 26 is a document that was**
24  **marked in a previous deposition.  It is a Notice**
25  **of Filing of Purchase Agreement, et cetera, and**

Page 74

**D. O'DONNELL**

1  **D. O'DONNELL**
2  it includes at Exhibit A, Asset Purchase
3  Agreement, dated September 16, 2008; Exhibit B,
4  First Amendment to the Asset Purchase Agreement
5  dated September 19, 2008; and Exhibit C,
6  Executed Clarification Letter Agreement, dated
7  September 20, 2008.
8      Let's turn to Exhibit C.
9      MR. COHEN:  I think the record
10  misstated Exhibit A.  It's dated September
11  16, 2008.
12     MR. STERN:  I meant to say September
13  16.
14     Q.   Let's turn to Exhibit C.  Do you
15  recognize this document?
16     A.   Yes.
17     Q.   Is this -- is this a document that
18  Milbank received on September 22, 2008?
19     A.   Yes.
20     Q.   When Milbank received this document,
21  did Milbank identify anything in the document
22  that was inconsistent with what the Court had
23  been told at the Approval Hearing on September
24  19 and did Milbank communicate that to Weil
25  Gotshal?

TSG Reporting - Worldwide    877-702-9580

Page 75

1  **D. O'DONNELL**
2      MR. COHEN:  I would object to the
3  extent the question calls for anything other
4  than a communication to Weil Gotshal.  And
5  it's compound.
6      Q.   Let me ask it this way, because you're
7  right, it is compound.
8      After Milbank received the
9  Clarification Letter on September 22, did
10  Milbank communicate to Weil Gotshal anything
11  that Milbank had identified as being
12  inconsistent with what the Court had been told
13  at the Sale Approval Hearing?
14     A.   No.
15     Q.   After Milbank received the
16  Clarification Letter on September 22, did
17  Milbank communicate to Weil that Milbank
18  believed that Committee consent would be
19  required?
20     A.   No.
21     Q.   Now, looking at the first page of the
22  Clarification Letter under the heading Purchased
23  Assets; Excluded Assets, I'm going to turn to
24  Section 1(a)(ii), and it reads:  "with respect
25  to clauses (a), (d) and (e) of the definition of

TSG Reporting - Worldwide    877-702-9580

Page 76

1  **D. O'DONNELL**
2  'Purchased Assets' in the Original Agreement,
3  instead of the items referred to in such
4  clauses, (A) the securities owned by LBI and
5  transferred to Purchaser or its Affiliates under
6  the Barclays Repurchase Agreement (as defined
7  below) as specified on Schedule A previously
8  delivered by Seller and accepted by Purchaser;
9  (B) such securities and other assets held in
10  LBI's 'clearance boxes' as of the time of the
11  Closing, which at the close of business on
12  September 21, 2008 were as specified on Schedule
13  B previously delivered by Seller and accepted by
14  Purchaser (provided, however, that Purchaser in
15  its discretion may elect within 60 days after
16  the Closing to return any such securities to
17  LBI); provided, that no securities owned by LBHI
18  or any Subsidiary of LBHI (other than LBI and
19  other than as specified in the Agreement or
20  clause (iii) below) are Purchased Assets,"
21  capital P, capital A, "and (C) exchange-traded
22  derivatives (and any property that may be held
23  to secure obligations under such derivatives)
24  and collateralized short-term agreements."
25      With that section that I just read in

TSG Reporting - Worldwide    877-702-9580

Page 77

1  **D. O'DONNELL**
2  mind, can you tell me whether any of the issues
3  reflected here were discussed at the late Sunday
4  meeting among the key parties at Weil Gotshal?
5      MR. COHEN:  Objection.  Vague.
6      A.   No, I cannot tell you specifically
7  that this specific paragraph of the
8  Clarification Letter was discussed at that
9  meeting.
10     Q.   You don't know one way or the other?
11     A.   Correct.
12     Q.   Okay.  It may have been, but you
13  simply don't know, correct?
14     A.   Correct.
15     Q.   The paragraph I read has three
16  subsections, A, B and C, describing different
17  categories of assets.  With respect to the first
18  category, Category A, the securities transferred
19  under the Barclays repo, did Milbank have as of
20  September 22 an estimate of the value of those
21  securities?
22     MR. COHEN:  You can answer that yes or
23  no.
24     A.   Yes.
25     Q.   And what was the -- what was that

TSG Reporting - Worldwide    877-702-9580

Page 78

D. O'DONNELL

1   estimate?
2        MR. COHEN:  To the extent that that
3   estimate came from the Committee's financial
4   advisors, do not disclose that.  If the
5   estimate came from the Debtors or Barclays
6   or some public source, you can disclose it.
7        A.   As of September 22, Milbank had the
8   draft Schedule A that had been provided over the
9   weekend, and Houlihan had been diligencing that
10  schedule but had not reached conclusions as to
11  the validity of the numbers in that schedule.
12       Q.   That's Schedule 461?
13       A.   Correct.
14       Q.   That's Exhibit 461B?
15       A.   Correct.
16       Q.   With respect to Category B, the
17  clearance box assets, did Milbank as of
18  September 22 have an estimate of the value of
19  those assets?
20       MR. COHEN:  You can answer that yes or
21  no.
22       A.   Yes.
23       Q.   What was that estimate?
24       MR. COHEN:  Same caveat.  To the
25

TSG Reporting - Worldwide    877-702-9580

---

Page 79

D. O'DONNELL

1   extent it came from the Debtors, Barclays or
2   some non-privileged source, you can disclose
3   it.  To the extent it came from Houlihan or
4   one of the Committee's financial advisors,
5   I'll instruct you not to answer.
6        A.   It was $1.9 billion.
7        Q.   And with respect to Category C,
8   exchange-traded derivatives and any property
9   that may be held to secure obligations under
10  such derivatives, as of September 22, did
11  Milbank have an estimate of the value of those
12  assets?
13       MR. COHEN:  You can answer that yes or
14  no.
15       A.   Yes.
16       Q.   And what was that estimate?
17       MR. COHEN:  To the extent that it came
18  from a privileged source, I'll instruct you
19  not to answer.  If it came from a
20  non-privileged source, you can answer.
21       A.   I don't have a specific recollection
22  of what that number was.
23       Q.   Do you know whether either Barclays or
24  Lehman did provide an estimate concerning the
25

TSG Reporting - Worldwide    877-702-9580

---

Page 80

D. O'DONNELL

1   value of exchange-traded derivatives and any
2   property held to secure those derivatives as of
3   September 22?
4        A.   Yes, I believe they did.
5        Q.   Do you have any recollection of the
6   rough order of magnitude that you were given?
7        A.   I don't have a specific recollection
8   at this point.
9        Q.   Do you have a -- do you have a
10  recollection of whether it was in excess of $1
11  billion?
12       A.   My vague recollection is that it was
13  less than that.
14       Q.   Do you remember whether it was less
15  than a billion, or are you not sure?
16       A.   I'm not sure.
17       Q.   And do you know who gave you that
18  estimate?  Withdrawn.
19       Do you know who gave Milbank that
20  estimate?
21       A.   Lehman.
22       Q.   Lehman.  Do you know who from Lehman?
23       A.   No.
24       Q.   Do you know whether that estimate was
25

TSG Reporting - Worldwide    877-702-9580

---

Page 81

D. O'DONNELL

1   given to Barclays?
2        A.   I don't know.
3        Q.   Looking at page 4 under paragraph 8.
4        MR. COHEN:  This is Tab C to Exhibit
5   26?
6        MR. STERN:  Correct.
7        Q.   On page 4, paragraph 8 is labeled
8   Transfer of Customer Accounts.  Do you see that?
9        A.   Yes, I do.
10       Q.   Okay.  And I'll read it into the
11  record:  "All customer accounts of LBI other
12  than customers who are affiliates of LBI shall
13  be transferred to purchaser.  In connection
14  therewith, purchaser shall receive (1) for the
15  account of the customer any and all property of
16  any customer, including any held by or on behalf
17  of LBI, to secure the obligations of any
18  customer whose accounts are being transferred to
19  purchaser as part of the business and (2) to the
20  extent permitted by applicable law, and as soon
21  as practicable after the closing, $769 million
22  of securities as held by or on behalf of LBI on
23  the date hereof pursuant to Rule 15c3-3 of the
24  Securities Exchange Act of 1934, as amended, or
25

TSG Reporting - Worldwide    877-702-9580

Page 82

D. O'DONNELL

1
2  securities of substantially the same nature and
3  value.  Liabilities arising under seller's
4  arrangements with DTC and its affiliated
5  clearing organizations shall be excluded
6  liabilities."
7          Now, with respect to the $769 million
8  figure in that paragraph, were there any
9  discussions concerning that amount --
10         MR. STERN:  Let's go off the record
11     for a second.
12         (Discussion off the record.)
13     Q.   With respect to the $769 million
14  figure in that paragraph, were there any
15  discussions concerning that amount over the
16  weekend prior to the closing?
17         MR. COHEN:  You can answer that yes or
18     no.
19     A.   Yes.
20     Q.   And what were those discussions?
21         MR. COHEN:  You can answer that to the
22     extent that there were discussions with
23     people outside the privilege, meaning the
24     Committee, its professionals and advisors,
25     but to the extent that there were

Page 83

D. O'DONNELL

1
2  discussions among that group, I'll instruct
3  you not to answer.
4     A.   Yes, there were discussions with the
5  Debtors concerning that issue over the weekend.
6     Q.   Okay.  And what were those
7  discussions?
8     A.   To the best of my recollection, they
9  related to what portion of that $769 million
10 would go to Barclays and what portion would stay
11 with LBI.
12    Q.   Who participated in those discussions?
13    A.   I'm aware of discussions on that topic
14 between Luc Despins and Harvey Miller.
15    Q.   And in those discussions was there any
16 reference to the total amount of 15c3 assets
17 available for transfer?
18    A.   I don't have any specific recollection
19 as to that issue.
20    Q.   Do you know whether the amount of 15c3
21 assets believed at the time to be available for
22 transfer was greater than $769 million?
23        MR. COHEN:  You can answer that yes or
24    no.
25    A.   I think I should qualify my last

Page 84

D. O'DONNELL

1
2  answer and this answer by saying that I know the
3  issue of the amount of the 15c3 deposits and how
4  they would be divvied up was discussed.  I'm not
5  sure of the precise numbers at issue.  I don't
6  know whether the 769 is the total number or the
7  number that was allocated to Barclays.
8     Q.   Okay.  But there were discussions
9  between Mr. Despins and Mr. Miller concerning
10 that issue?
11    A.   Correct.
12    Q.   And do you know what was discussed
13 in -- between Mr. Despins and Mr. Miller on that
14 subject?
15    A.   That it was an open issue, subject to
16 ongoing negotiation, and Mr. Despins asked Mr.
17 Miller for a report as to the outcome of those
18 negotiations.
19    Q.   Going back to page 2 at the top, we
20 referred to that Category C, exchange-traded
21 derivatives and any property that may be held to
22 secure obligations under such derivatives, is
23 it -- is it your recollection that, separate and
24 apart from the 15c3 assets, you had an
25 estimate -- Milbank received an estimate from

Page 85

D. O'DONNELL

1
2  Lehman of the value of the exchange-traded
3  derivatives and any property that may be held to
4  secure those derivatives?
5         MR. COHEN:  Objection.  Vague.
6     A.   An estimate from whom?
7     Q.   From Lehman.
8     A.   I don't have a clear recollection one
9  way or the other.  The numbers in this paragraph
10 overlap in my recollection, so I can't
11 definitively tell you that we did receive an
12 estimate as to Category C prior to the closing.
13    Q.   So the value of Category C may have
14 been, may have been uncertain as of that time?
15    A.   Much --
16        MR. COHEN:  Objection. Calls for
17    speculation.
18    A.   Much was uncertain as of this time
19 from our perspective and from Houlihan's
20 perspective.
21    Q.   And do you know whether much was
22 uncertain from Barclays' perspective?
23        MR. COHEN:  Objection. Calls for
24    speculation.
25    A.   I have no idea what was in Barclays'

Page 86

D. O'DONNELL

1  mind.
2      Q.   Did Barclays ever express to you that
3  much was uncertain to Barclays?
4      A.   Our dealings with Barclays that
5  weekend were very limited, and in that context,
6  no.
7      Q.   So staying with this paragraph that
8  runs from page 1 to page 2, Category A, I
9  believe you told me that the estimate that you
10  had for that category is the amount reflected on
11  Exhibit 461B, correct?
12         MR. COHEN:  Objection.
13      A.   Correct.
14         MR. COHEN:  I think that misstates the
15  testimony.
16      Q.   Let me ask my question again.
17         With respect to Category A, am I
18  correct that you told me that the estimate that
19  Milbank had for that category is the amount
20  reflected on Exhibit 461B; is that correct?
21      A.   The estimate that Milbank had was that
22  provided in the draft of Schedule A circulated
23  on Sunday, the 21st.
24      Q.   And that's Exhibit 461B?

TSG Reporting - Worldwide   877-702-9580

Page 87

D. O'DONNELL

1      A.   That appears to be the case, yes.
2      Q.   And if you look at the third page of
3  Exhibit 461B, you see that lists a total figure
4  of $49.9 billion?
5      A.   Correct.
6      Q.   Okay.  And for Category B, looking
7  back to the Clarification Letter on page 1,
8  Category B, I believe you indicated the estimate
9  that Milbank had as of the closing was 1.9
10  billion; is that correct?
11      A.   Correct.
12      Q.   And for Category C, exchange-traded
13  derivatives and any property held to secure
14  those derivatives, that amount was uncertain, to
15  the best of your recollection; is that correct?
16      A.   Correct.
17         MR. STERN:  Let's take a short break.
18         THE VIDEOGRAPHER:  The time is now
19  11:48 A.M.  We're now off the record.
20         (Recess.)
21         THE VIDEOGRAPHER:  The time is now
22  12:04 P.M.  We are now back on the record.
23  BY MR. STERN:
24      Q.   Let's look back at Exhibit 26, Tab C,

TSG Reporting - Worldwide   877-702-9580

Page 88

D. O'DONNELL

1  page 5, please.  Do you see on page 5 a
2  paragraph 13 labeled Barclays Repurchase
3  Agreement?
4      A.   Yes, I see that paragraph.
5      Q.   Going back to the meetings over the
6  weekend at Weil among the key parties, do you
7  know whether the subject matter of this
8  paragraph was discussed in those meetings that
9  Milbank attended?
10         MR. COHEN:  The non-privileged
11  meetings?
12         MR. STERN:  Yes.
13      A.   As previously testified, with respect
14  to other parts of this letter, no, I don't know,
15  whether this specific paragraph was discussed in
16  those meetings.
17      Q.   Do you have any reason to believe that
18  it was not discussed at those meetings?
19      A.   I have no reason to believe that it
20  was not discussed.
21         (Exhibit 499, a document bearing Bates
22  Nos. WGM-LEHMAN-E 00002746 through 2766,
23  marked for identification, as of this date.)
24      Q.   We've handed you a document that we've

TSG Reporting - Worldwide   877-702-9580

Page 89

D. O'DONNELL

1  marked as Exhibit 499, and I'll ask you to take
2  a look at it and identify it for us, if you
3  would.
4         (Document review.)?
5      A.   I've reviewed the document.
6      Q.   Can you tell us what it is?
7      A.   It appears to be an e-mail forwarding
8  to Crayton Bell a draft of the Clarification
9  Letter on 9/19/2008.
10      Q.   Let me mark another document as the
11  next exhibit, and I'll ask you to review that
12  and identify that for me as well.
13         (Exhibit 500, a document bearing
14  HLHZ0020162 through 182, marked for
15  identification, as of this date.)
16         MR. COHEN:  Is this Exhibit 500?
17         MR. STERN:  Yes.
18         MR. COHEN:  I'll note for the record
19  Exhibit 500 appears to be three documents
20  clipped together.
21         MR. STERN:  They should be stapled
22  together.  It's all a part of one document.
23  We'll staple the exhibit.
24         (Document review.)

TSG Reporting - Worldwide   877-702-9580

Page 90

D. O'DONNELL

1    A.  I've reviewed the document.
2    **Q.  What is it?**
3    A.  It appears to be another draft of the
4    Clarification Letter forwarded to Crayton Bell
5    on Saturday afternoon, September 20.
6        (Exhibit 501, a document bearing Bates
7        Nos. WGM-LEHMAN-E 00013962 through 13982,
8        marked for identification, as of this date.)
9    **Q.  We're marking another exhibit Exhibit**
10   **501, and I'll ask you the same question after**
11   **you have a chance to review it.**
12       (Document review.)
13   A.  I've reviewed the document.
14   **Q.  Do you know what it is?**
15   A.  It appears to be an e-mail attaching
16   yet another draft of the Clarification Letter
17   forwarded by Bob Messineo to David Murgio on
18   Sunday -- on Sunday, September 21, at 12:39 P.M.
19   **Q.  Okay.  At the top, there's an**
20   **instruction from David Murgio to Ann Peterson at**
21   **Weil:  "Please print and copy 15 of each of**
22   **these and hold by your desk.  Thanks."**
23       **Do you know whether, while Mr. Bell**
24   **was at Weil on September 21, he received a copy**
25

TSG Reporting - Worldwide    877-702-9580

Page 91

D. O'DONNELL

1    **of the drafts that we marked as Exhibit 501?**
2    A.  I do not know whether Mr. Bell
3    received a copy of this draft.
4    **Q.  He may have, but you simply don't**
5    **know?**
6    A.  Correct.
7    **Q.  Okay.**
8        (Exhibit 502, a document bearing Bates
9        Nos. WGM-LEHMAN-E 00013889 through 13899,
10       marked for identification, as of this date.)
11   **Q.  We've marked another document as**
12   **Exhibit 502.  I'll ask you to take a look at it**
13   **and then I'll ask you to identify it.**
14       (Document review.)
15   A.  I've reviewed the document.
16   **Q.  Can you identify it?**
17   A.  It appears to be an e-mail from David
18   Leinwand at Cleary Gottlieb circulating another
19   draft of the Clarification Letter at 9:23 A.M.
20   on September 21.
21   **Q.  And at the top, there's an instruction**
22   **again from David Murgio to Ann Peterson:**
23   **"Please print and staple ten of these."**
24       **Do you know whether, while Mr. Bell**
25

TSG Reporting - Worldwide    877-702-9580

Page 92

D. O'DONNELL

1    **was present at Weil on September 21, he received**
2    **a copy of this material that we've marked as**
3    **Exhibit 502?**
4    A.  I do not know.
5    **Q.  You don't know one way or the other?**
6    A.  Correct.
7    **Q.  So it's possible that he did, but you**
8    **don't know?**
9    A.  Correct.
10       (Exhibit 503, a document bearing
11       Bates Nos. HLHZ0019919 through 19930, marked
12       for identification, as of this date.)
13   **Q.  We've marked another document as**
14   **Exhibit 503, and I'll ask you to review this and**
15   **identify it for us.**
16       (Document review.)
17   A.  I've reviewed the document.
18   **Q.  And what is it?**
19   A.  It appears to be an e-mail from David
20   Murgio attaching, I believe, though it's hard to
21   tell from the form of e-mail, the -- the -- a
22   copy of what purports to be the final version of
23   the Clarification Letter.
24   **Q.  Before the closing on September 22,**
25

TSG Reporting - Worldwide    877-702-9580

Page 93

D. O'DONNELL

1    **did Mr. Bell or anybody from Milbank suggest to**
2    **Weil that the final agreements should include**
3    **valuation conditions for the purchased assets**
4    **and assumed liabilities?**
5    A.  No.
6    **Q.  Before the closing on September 2,**
7    **did -- I'm sorry, before the closing on**
8    **September 22, did Mr. Bell or anyone from**
9    **Milbank suggest to Weil that the final agreement**
10   **should include a cap on the value of purchased**
11   **assets?**
12   A.  No.
13   **Q.  Before the closing on September 22,**
14   **did Mr. Bell or anybody else from Milbank**
15   **suggest to Weil that the agreement should**
16   **include a floor or limit or cap on the value of**
17   **assumed liabilities?**
18   A.  No.
19   **Q.  Before the closing on September 22,**
20   **did Mr. Bell or anybody else from Milbank**
21   **suggest to Weil that the final agreement -- the**
22   **final agreement should include representations**
23   **and warranties concerning the value of purchased**
24   **assets and the value of the consideration under**
25

TSG Reporting - Worldwide    877-702-9580

Page 94

D. O'DONNELL

1 the final agreement?
2   A.   No.
3   Q.   And before the closing on September
4 22, did Mr. Bell or anybody else from Milbank
5 suggest to Weil that the final agreement should
6 include true-up provisions with respect to the
7 value of the purchased assets or the value of
8 the consideration under the final agreement?
9   A.   No.
10   Q.   Now, when Weil made a motion for
11 approval of the sale, did Milbank review the
12 Weil Gotshal motion?
13   A.   Can you be more specific about the
14 motion you're referring to?
15   Q.   I'll hand you what has previously been
16 marked as Exhibit 440. I've handed you what has
17 previously been marked as Exhibit 440, and this
18 is Debtors' Motion to (A) Schedule a Sale
19 Hearing; (B) Establish Sales Procedures; (C)
20 Approve a Breakup Fee; and (D) Approve the Sale
21 of the Purchased Assets and the Assumption and
22 Assignment of Contracts Relating to the
23 Purchased Assets. Do you see that?
24   A.   Yes, I do.

TSG Reporting - Worldwide    877-702-9580

Page 95

D. O'DONNELL

1   Q.   Did Milbank review these papers at the
2 time they were served?
3   A.   Yes, it did.
4   Q.   What understanding did Milbank have at
5 the time concerning the extent of Barclays'
6 obligation under the original APA to make cure
7 payments?
8     MR. TECCE:  Objection.
9     MR. COHEN:  I object to the extent
10   that the question calls for legal advice,
11   privileged communications and attorney work
12   product, and instruct Mr. O'Donnell not to
13   answer with respect to those areas.
14     If you have an understanding from a
15   non-privileged source, you can speak to
16   that.
17   A.   Based on the representations made by
18 the Debtors at both the bidding procedures and
19 the Sale Hearing, we understood that the APA
20 required Barclays to make certain cure and
21 compensation payments.
22   Q.   Was it Milbank's understanding that
23 Barclays had the right, but not the obligation,
24 to take assignment of contracts and leases which

TSG Reporting - Worldwide    877-702-9580

Page 96

D. O'DONNELL

1 are -- were designated for assumption and
2 assignment by the -- by Barclays?
3     MR. COHEN:  I'll instruct Mr.
4   O'Donnell to limit his answer to
5   non-privileged sources and not reveal
6   privileged communications or attorney work
7   product in his response.
8   A.   Based on representations at the
9 hearing on the 19th and the terms of the Sale
10 Order itself, yes, that was our understanding.
11   Q.   Did Milbank understand that there
12 would be certain filings made in connection with
13 cure amounts for what were labeled Closing Date
14 Contracts?
15     MR. COHEN:  Hold for a second.
16   Give the same limitation.  Mr.
17   O'Donnell can reveal understandings that
18   Milbank may have received from
19   non-privileged sources, but internal
20   communications and attorney work product
21   should not be revealed in your answer.
22   A.   Yes, I believe that there was a
23 procedure originally prescribed in the motion
24 that was superseded by discussions amongst

TSG Reporting - Worldwide    877-702-9580

Page 97

D. O'DONNELL

1 parties on the 19th as disclosed to the Court by
2 Mr. Miller or Ms. Fife.
3   Q.   Do you know whether -- withdrawn. Did
4 Milbank review the filing that was made with
5 respect to closing date contracts when that
6 filing was made?
7     MR. COHEN:  You can answer that yes or
8   no.
9   A.   I need clarification as to what
10 specific filing you're referring to.
11   Q.   Do you know whether a filing was made
12 before the Sale Approval Hearing identifying
13 Closing Date Contracts that Barclays would
14 assume?
15   A.   Yes, I believe that there was one.
16   Q.   Did Milbank review that filing?
17     MR. COHEN:  You can answer that yes or
18   no.
19   A.   Yes.
20   Q.   Okay. Did that filing list cure
21 amounts for the Closing Date Contracts?
22     MR. COHEN:  Objection. The document
23   speaks for itself.  If you have a
24   recollection as to what was in that

TSG Reporting - Worldwide    877-702-9580

Page 98

D. O'DONNELL

1
2   document, you can answer yes or no.
3   A.  Yes, it did list cure amounts.
4   **Q.  Did Milbank add up those amounts?**
5       MR. COHEN:  Instruct the witness not
6   to answer. It's attorney work product.
7   **Q.  Was Milbank aware of the total amount**
8   **of those listed cure amounts?**
9       MR. TECCE:  Same objection. To the
10      extent that it comes from a non-privileged
11      source, you can answer.
12      A.  Based upon representations made at the
13  hearing by Mr. Miller, yes.
14      **Q.  Do you recall the total amount of the**
15  **cure payments for the Closing Date Contracts**
16  **that were listed on the filing that was made**
17  **before the Sale Approval Hearing?**
18      MR. COHEN:  So the question is do you
19      remember the number in a publicly filed
20      motion?
21      MR. STERN:  Yes.
22      MR. COHEN:  Object to the form.
23      A.  I don't remember, one, whether there
24  was a total number listed; and, if there was, I
25  don't remember what it was.

TSG Reporting - Worldwide    877-702-9580

Page 99

D. O'DONNELL

1
2       **Q.  Assuming that there was no total**
3   **number listed, did Milbank do anything to add up**
4   **the amounts that were listed?**
5       MR. COHEN:  Instruct the witness not
6   to answer on the basis of work product.
7       **Q.  Is that something Milbank could have**
8   **done at the time?**
9       MR. COHEN:  You can answer that yes or
10      no.
11      A.  Yes.
12      **Q.  Did Milbank have an understanding**
13  **that, within 60 days of the closing, there would**
14  **be a further filing with respect to designated**
15  **contracts and proposed cure amounts for those**
16  **contracts?**
17      MR. COHEN:  I instruct the witness to
18      limit his response as to Milbank's
19      understanding to any understanding it
20      received from non-privileged sources.
21      A.  Yes.
22      **Q.  And did Milbank review that filing**
23  **when it was made?**
24      MR. COHEN:  You can answer yes or no.
25      A.  Yes.

TSG Reporting - Worldwide    877-702-9580

Page 100

D. O'DONNELL

1
2       **Q.  And did Milbank total the cure amounts**
3   **that were listed in that filing?**
4       MR. COHEN:  I instruct the witness not
5   to answer on the basis of attorney work
6   product.
7       **Q.  Is that something Milbank could have**
8   **done?**
9       MR. COHEN:  You can answer yes or no.
10      A.  Yes.
11      **Q.  As of the Sale Hearing, did Milbank**
12  **understand that Barclays was assuming certain**
13  **obligations to pay certain employee benefits and**
14  **compensation?**
15      MR. COHEN:  Instruct the witness to
16      limit his response as to Milbank's
17      understanding to any understanding it
18      received from non-privileged sources.
19      A.  Yes.
20      **Q.  Based on Milbank's review of the**
21  **original APA, did Milbank understand that the**
22  **amount of Barclays' compensation obligation**
23  **would depend on the number of transferred**
24  **employees taking employment with Barclays?**
25      MR. COHEN:  I instruct the witness not

TSG Reporting - Worldwide    877-702-9580

Page 101

D. O'DONNELL

1
2   to answer on the basis of attorney work
3   product.
4       **Q.  After the closing on September 22, was**
5   **Milbank aware of the deadline by which the**
6   **Committee would need to make any motion for**
7   **reconsideration of the Sale Order?**
8       MR. COHEN:  Objection. Calls for a
9   legal conclusion.
10      A.  Yes.
11      **Q.  And what was that deadline?**
12      MR. COHEN:  Objection. Calls for a
13  legal conclusion.
14      A.  Pursuant to the rules, it would have
15  been ten days after entry of the order.
16      **Q.  Was Milbank aware after the closing or**
17  **did Milbank monitor what the final deadline**
18  **would be for appealing the Sale Order?**
19      MR. COHEN:  Objection. I instruct the
20      witness not to answer on the basis of
21      attorney work product.
22      **Q.  Was Milbank aware that a motion for**
23  **reconsideration of the Sale Order had been made?**
24      MR. COHEN:  You can answer yes or no.
25      A.  Yes.

TSG Reporting - Worldwide    877-702-9580

Page 102

D. O'DONNELL

1    Q.   And was Milbank aware of how that
2  affected the time by which parties would have to
3  appeal the Sale Order?
4        MR. COHEN:  I instruct the witness not
5  to answer on the basis of attorney work
6  product.
7    Q.   Am I correct that the Committee did
8  not object to approval of the sale transaction
9  at the September 19 Sale Approval Hearing?
10       MR. COHEN:  You can answer yes or no.
11   A.   Yes.
12   Q.   What factors did the Committee
13 consider in deciding not to object?
14       MR. COHEN:  I instruct the witness not
15 to answer on the basis of attorney-client
16 privilege and attorney work product.
17   Q.   Am I correct that the Committee did
18 not make a motion for reconsideration of the
19 Sale Approval Order?
20       MR. COHEN:  You can answer yes or no.
21   A.   Yes.
22   Q.   What factors did the Committee take
23 into consideration in determining whether or not
24 to make such a motion?

TSG Reporting - Worldwide    877-702-9580

Page 103

D. O'DONNELL

1        MR. COHEN:  I instruct the witness not
2  to answer on the basis of attorney-client
3  privilege and attorney work product.
4    Q.   Am I correct that the Committee did
5  not appeal the Sale Approval Order?
6        MR. COHEN:  You can answer yes or no.
7    A.   Yes.
8    Q.   What factors did the Committee take
9  into consideration in deciding not to appeal the
10 Sale Approval Order?
11       MR. COHEN:  I instruct the witness not
12 to answer on the basis of attorney-client
13 privilege and attorney work product.
14       (Discussion off the record.)
15       THE VIDEOGRAPHER:  That is the end of
16 tape number 2.  The time is 12:34 P.M.
17 We're now off the record.
18       (Luncheon recess.)

TSG Reporting - Worldwide    877-702-9580

Page 104

D. O'DONNELL

1        AFTERNOON SESSION
2        THE VIDEOGRAPHER:  This is the start
3  of tape number 3.  The time is now 1:20 P.M.
4  We are now back on the record.
5  DENNIS C. O'DONNELL, resumed and
6        testified as follows:
7  EXAMINATION BY (Cont'd.)
8  BY MR. STERN:
9    Q.   I'd like to go back to September 22
10 after Milbank had received the Final Purchase
11 Agreement.
12       At that point did Milbank have any
13 certainty concerning the value of the purchased
14 assets in the Final Purchase Agreement?
15   A.   No.
16       MR. TECCE:  Objection to the form of
17 the question to the extent that it asks him
18 to reveal privileged information or work
19 product.
20   Q.   At that point, did Milbank have any
21 certainty concerning the value of the
22 consideration, including assumed liabilities, in
23 the Final Purchase Agreement?
24   A.   No.

TSG Reporting - Worldwide    877-702-9580

Page 105

D. O'DONNELL

1    Q.   At that point did Milbank have any
2  certainty concerning whether the value of the
3  consideration, including purchased assets, was
4  perfectly balanced with or a wash with the value
5  of purchased assets?
6    A.   No.
7    Q.   Did Milbank believe at that point,
8  that is, September 22, after receiving the Final
9  Purchase Agreement, that there was a certain cap
10 on the value of the purchased assets in the
11 Final Purchase Agreement?
12       MR. COHEN:  Objection.  I instruct the
13 witness not to answer.  Calls for legal
14 advice and attorney work product.
15   Q.   Did Milbank believe upon receiving the
16 Final Purchase Agreement that there was a $47.4
17 billion cap on the value of purchased assets in
18 the Final Purchase Agreement?
19       MR. COHEN:  Instruct the witness not
20 to answer.  Calls for privileged
21 communications and attorney work product.
22   Q.   When Milbank received the Final
23 Purchase Agreement on September 22, did Milbank
24 have any concern that the agreement had not been

TSG Reporting - Worldwide    877-702-9580

Page 106

**D. O'DONNELL**

1  **D. O'DONNELL**
2  authorized by the Court?
3       MR. COHEN: Instruct the witness not
4  answer. Calls for privileged communications
5  and attorney work product.
6       **Q.   Did Milbank ever express to Weil after**
7  **receiving the Final Purchase Agreement on**
8  **September 22 a concern that the Final Purchase**
9  **Agreement had not been authorized by the Court?**
10      A.   In what time period?
11      **Q.   In the period September 22 through**
12  **September 30.**
13      A.   No.
14      **Q.   And on September 22 itself, upon**
15  **receiving the Final Purchase Agreement, Milbank**
16  **did not express any concern to Weil that the**
17  **Final Purchase Agreement had not been authorized**
18  **by the Court; is that right?**
19      A.   Correct.
20      **Q.   As of receiving the Final Purchase --**
21  **withdrawn. As of September 22, upon receiving**
22  **the Final Purchase Agreement, did Milbank ever**
23  **express any concern to Weil that the transaction**
24  **as reflected in the Final Purchase Agreement was**
25  **not a wash?**
         TSG Reporting - Worldwide    877-702-9580

Page 107

1       **D. O'DONNELL**
2       A.   Milbank repeated requests for access
3  to the final schedules to address that amongst
4  other issues.
5       **Q.   The final schedules are those for**
6  **Schedule A and Schedule B?**
7       A.   Correct.
8       **Q.   Based on the estimated values that**
9  **Milbank had as of that time, as of September 22,**
10  **for Schedule A and Schedule B assets, based on**
11  **that information, did Milbank ever say to Weil**
12  **that Milbank was concerned that the transaction**
13  **was not a wash?**
14      MR. COHEN: Objection. Vague as to
15  "estimated values."
16      A.   Houlihan continued to review the
17  schedules, had raised questions about the
18  schedules. We had passed on to Weil our
19  concerns and questions about the schedules.
20      **Q.   Did anybody from Milbank ever say to**
21  **anybody at Weil on September 22 that Milbank was**
22  **concerned that the Final Purchase Agreement did**
23  **not reflect a balanced transaction or a wash?**
24      MR. COHEN: Object to the form.
25      A.   Milbank had questions and raised those
         TSG Reporting - Worldwide    877-702-9580

Page 108

1       **D. O'DONNELL**
2  questions with Weil.
3       **Q.   Did anybody from Milbank ever say to**
4  **anybody at Weil on September 22 that Milbank was**
5  **concerned that the Final Purchase Agreement did**
6  **not reflect a balanced transaction or a wash?**
7       MR. COHEN: Objection. Asked and
8  answered. Object to the form.
9       A.   As previously testified, Milbank had
10  concerns and was asking questions about, amongst
11  others, those issues.
12      **Q.   Who expressed those concerns on behalf**
13  **of Milbank?**
14      A.   Timeframe?
15      **Q.   September 22.**
16      A.   On September 22, Crayton Bell
17  specifically asked for the final schedules.
18      **Q.   Aside from asking for the final**
19  **schedules, did Crayton Bell or anybody else from**
20  **Milbank express to Weil a concern that the Final**
21  **Purchase Agreement did not reflect a balanced**
22  **transaction or a wash?**
23      A.   Are we talking about after the closing
24  or prior to the closing?
25      **Q.   On September 22.**
         TSG Reporting - Worldwide    877-702-9580

Page 109

1       **D. O'DONNELL**
2       A.   The discussions with Weil on the
3  morning of the 22nd that arose out of the review
4  of the schedules may have alluded to that
5  concern.
6       **Q.   Do you know whether they did?**
7       A.   Not in the precise terms that you've
8  framed the question.
9       **Q.   Did Milbank believe as of September 22**
10  **that the final transaction was supposed to be a**
11  **balanced transaction or a wash between purchased**
12  **assets and consideration?**
13      MR. COHEN: You can answer that to the
14  extent you have a non-privileged source that
15  would reflect Milbank's belief or would have
16  informed Milbank's belief.
17      A.   Yes.
18      **Q.   What steps did Milbank take before the**
19  **closing to assure that the Final Purchase**
20  **Agreement would actually reflect a balanced**
21  **transaction between purchased assets and**
22  **consideration?**
23      MR. COHEN: Instruct the witness not
24  to answer on the basis of attorney-client
25  privilege and attorney work product.
         TSG Reporting - Worldwide    877-702-9580

Page 110

D. O'DONNELL

1     **Q.**  **What steps did Milbank take in**
2  **communicating with Weil Gotshal to assure that**
3  **the Final Purchase Agreement would actually**
4  **reflect a balanced transaction?**
5    A.  As previously testified, Milbank, in
6  conjunction with Houlihan, requested information
7  relating to Schedule A.
8     **Q.**  **Aside from requesting information, did**
9  **Milbank ever do anything to suggest that the**
10  **Final Purchase Agreement reflect a balanced**
11  **transaction?**
12
13     MR. COHEN:  I'll instruct the witness
14  to limit his response to non-privileged
15  communications or actions.
16    A.  Milbank reported to Weil that Houlihan
17  could not get comfortable with the numbers as
18  reflected in the draft of the Schedule A that
19  they had reviewed.
20     **Q.**  **What does that have to do with Milbank**
21  **suggesting changes to the Final Purchase**
22  **Agreement to assure that it would be a balanced**
23  **transaction?**
24     MR. COHEN:  Object to the form.
25    A.  Can you repeat the question?

TSG Reporting - Worldwide    877-702-9580

Page 111

D. O'DONNELL

1     **Q.**  **Did Milbank ever make any suggestions**
2  **to Weil concerning the need for representations**
3  **and warranties or valuation conditions for the**
4  **Final Purchase Agreement?**
5     MR. COHEN:  Objection.  Asked and
6  answered.
7    A.  And the answer is no.
8     **Q.**  **In the absence of those contractual**
9  **conditions, how could Milbank be assured that**
10  **the Final Purchase Agreement would provide for a**
11  **balanced transaction?**
12
13     MR. COHEN:  Hold on for a second.
14     MR. TECCE:  I'm going to object to the
15  extent that his answer involves work product
16  or attorney-client communications.
17     MR. COHEN:  I'll join that objection
18  and add it calls for speculation.
19    A.  By recourse to Houlihan and the
20  evaluation of the numbers that Houlihan was
21  undertaking.
22     **Q.**  **But I thought you told me those**
23  **figures were all uncertain at the time, isn't**
24  **that right?**
25    A.  They were, yes.  Correct.

TSG Reporting - Worldwide    877-702-9580

Page 112

D. O'DONNELL

1     **Q.**  **There was uncertainty concerning the**
2  **value of the purchased assets, correct?**
3    A.  Correct.
4     **Q.**  **There was uncertainty concerning the**
5  **value of the assumed liabilities, correct?**
6    A.  Correct.
7     **Q.**  **And Milbank had a transactional**
8  **lawyer, Crayton Bell, present at Weil before the**
9  **closing, correct?**
10    A.  Correct.
11     **Q.**  **And Mr. Bell was available to comment**
12  **on the Final Purchase Agreement, correct?**
13    A.  Correct.
14     **Q.**  **Mr. Bell knew that, in order to have a**
15  **balanced transaction, it is customary to provide**
16  **for representations and warranties and valuation**
17  **conditions, isn't that right?**
18     MR. COHEN:  Objection.  Calls for
19  speculation.
20    A.  And I don't know what Mr. Bell knew in
21  that context.
22     **Q.**  **He's a highly qualified transactional**
23  **lawyer, correct?**
24    A.  He is, yes.

TSG Reporting - Worldwide    877-702-9580

Page 113

D. O'DONNELL

1     **Q.**  **He's experienced, correct?**
2    A.  Correct.
3     **Q.**  **Do you know whether he's ever prepared**
4  **a purchase agreement providing for a balanced**
5  **transaction or a balance sheet transaction?**
6     MR. TECCE:  Objection to the form of
7  the question.
8    A.  The answer is I don't know
9  specifically, but I assume that's the case, yes.
10     **Q.**  **And do you know in those circumstances**
11  **whether Mr. Bell would know that representations**
12  **and warranties and valuation conditions were**
13  **essential in order to provide for a**
14  **contractually enforceable balanced transaction?**
15     MR. COHEN:  Objection.  Calls for
16  legal conclusion and calls for speculation.
17    A.  And nothing about this transaction was
18  traditional or customary.  From the word go, it
19  was different.  So whatever his experience, you
20  know, his expectations or experiences were with
21  respect to other transactions would not
22  necessarily be applicable to this situation.
23     **Q.**  **I see.  So it's your testimony that if**
24  **Mr. Bell knew from prior transactions that**

TSG Reporting - Worldwide    877-702-9580

Page 114

D. O'DONNELL

1 representations and warranties and valuation
2 conditions were essential to create a balanced
3 transaction, he would not apply that experience
4 to this transaction?
5        MR. COHEN: Objection. Calls for a
6    hypothetical and speculation.
7    Q.   Is that your testimony?
8    A.   He might try.
9    Q.   Did he try?
10   A.   If given the opportunity, he might
11   have tried, yes.
12   Q.   Well, did he try?
13   A.   I don't know specifically whether he
14   raised those specific -- I think I've actually
15   already testified that he did not, he did not
16   make those suggestions.
17   Q.   And was the Committee concerned that
18   the transaction be a balanced transaction?
19       MR. TECCE: Objection to the form of
20   the question. I'll instruct the witness not
21   to answer on the grounds that it will
22   disclose attorney-client communications and
23   attorney work product.
24   Q.   Well, if the Committee genuinely
25

TSG Reporting - Worldwide    877-702-9580

Page 115

D. O'DONNELL

1 believed at the time that the transaction was to
2 be a balanced transaction, wouldn't Mr. Bell
3 have made those suggestions?
4        MR. COHEN: Objection. Calls for
5    speculation.
6    A.   If given the opportunity, he might
7    have.
8    Q.   When you say "given the opportunity,"
9    what do you mean?
10   A.   As previously testified, we, over the
11   course -- Milbank over the course of that
12   weekend spent a great deal of time waiting
13   around and seeking to participate in discussions
14   that were going on around us. We did not have
15   the opportunity to participate fully in the
16   negotiations that weekend.
17   Q.   Well, Mr. Bell did receive drafts of
18   the Clarification Letter, correct?
19   A.   We know that he received a draft on
20   Saturday afternoon, yes.
21   Q.   And he may have also received drafts
22   on Sunday?
23       MR. COHEN: Objection. Calls for
24   speculation.
25

TSG Reporting - Worldwide    877-702-9580

Page 116

D. O'DONNELL

1    Q.   Correct?
2    A.   It's possible that he received drafts
3    on Sunday afternoon, yes.
4    Q.   Didn't Mr. Bell have an opportunity to
5    make his suggestions directly to the Weil
6    lawyers?
7    A.   He engaged them in discussions, or
8    attempted to engage them in discussions, but
9    since we were not fully engaged in the
10   negotiation, it was difficult for us to comment
11   effectively on the document.
12   Q.   Was it essential to the Committee's
13   decision not to object to the transaction that
14   the transaction be a wash?
15       MR. COHEN: I instruct the witness not
16   to answer on the basis of attorney-client
17   privilege and attorney work product.
18   Q.   From September 22 through September
19   30, did anybody from Milbank ever discuss with
20   anybody from Weil whether it would be necessary
21   to return to Judge Peck to address any aspects
22   of the transaction?
23   A.   No.
24   Q.   Why not?
25

TSG Reporting - Worldwide    877-702-9580

Page 117

D. O'DONNELL

1        MR. COHEN: I instruct the witness not
2    to answer on the basis of attorney-client
3    privilege and attorney work product.
4    Q.   I'd like to turn back to Exhibit 26,
5    and I believe that you testified earlier that
6    much was uncertain concerning the value of
7    purchased assets; is that correct?
8    A.   Correct.
9    Q.   And to be more precise about that,
10   let's look at the APA, the original APA, under
11   Tab A, and specifically page 6. And on page 6
12   you see there's a definition of "purchased
13   assets"?
14   A.   I see that definition.
15   Q.   And it says, "'Purchased Assets' means
16   all of the assets of Seller and its Subsidiaries
17   used in connection with the Business (excluding
18   the Excluded Assets), including," and then it
19   lists Categories (a) through (s). Do you see
20   that?
21   A.   Yes, I see that.
22   Q.   Did Milbank understand at the time
23   that the purchased assets could include assets
24   other than those specifically enumerated in
25

TSG Reporting - Worldwide    877-702-9580

Page 118

**D. O'DONNELL**

1  **D. O'DONNELL**
2  **items (a) through (s)?**
3  MR. COHEN: You can testify to the
4  extent that that understanding came from
5  non-privileged sources or means. To the
6  extent it comes from privileged sources or
7  analysis, I instruct you not to answer.
8  A. Yes.
9  **Q. Let's go through these items (a)**
10 **through (s). Item (a), the retained cash, as of**
11 **the Sale Hearing, did Milbank have any**
12 **understanding as to what the amount of that**
13 **would be?**
14 MR. COHEN: With respect to this line
15 of questioning, (a) through (s), I'll have a
16 standing instruction that you can testify as
17 to non-privileged sources of that
18 understanding, but privileged analysis or
19 sources I'll instruct you not to answer.
20 MR. STERN: Yeah, and the questions --
21 MR. COHEN: And that will apply
22 through (a) through (s).
23 **Q. Right, and the questions are intended**
24 **to ask about information derived from Lehman or**
25 **Barclays or from some other source other than a**
TSG Reporting - Worldwide    877-702-9580

Page 119

**D. O'DONNELL**

1  **D. O'DONNELL**
2  **privileged communication.**
3  A. Based on the terms of the document
4  itself, the answer is yes.
5  **Q. And what was that understanding?**
6  A. Retained cash is defined in the
7  document as an amount that is -- on page 2 of
8  the document, under Excluded Assets, to be all
9  cash, cash equivalents, bank deposits or similar
10 cash items of LBI and its subsidiaries other
11 than the $1.3 billion in cash, cash equivalents,
12 bank deposits.
13 **Q. So, as of the Sale Approval Hearing,**
14 **Milbank understood that the retained cash amount**
15 **was 1.3 billion?**
16 A. No, that's not my testimony.
17 **Q. Okay. What is your testimony?**
18 A. It's all cash other than 1.3 billion.
19 **Q. I see. And was this provision**
20 **ultimately removed in the Final Purchase**
21 **Agreement?**
22 A. Based on the terms of the
23 Clarification Letter, yes.
24 **Q. And that's something that Milbank**
25 **understood before the closing?**
TSG Reporting - Worldwide    877-702-9580

Page 120

**D. O'DONNELL**

1  **D. O'DONNELL**
2  A. Based on its review of the
3  Clarification Letter, yes.
4  **Q. Looking --**
5  MR. COHEN: Be careful in your
6  answers. You should be revealing
7  non-privileged sources, not Milbank's
8  analysis of the documents and its work
9  product.
10 **Q. Okay. Category (b), all deposits, et**
11 **cetera. As of the closing, did Milbank have any**
12 **estimate of the value of this category of**
13 **purchased assets?**
14 MR. COHEN: You can testify to the
15 extent a non-privileged source provided
16 Milbank with an estimate.
17 A. No.
18 **Q. So that was uncertain?**
19 A. Correct.
20 **Q. With respect to Category (c), the**
21 **transferred real property leases, did Milbank**
22 **receive from non-privileged sources an estimate**
23 **of the value of that category?**
24 A. No.
25 **Q. So that was uncertain as well?**
TSG Reporting - Worldwide    877-702-9580

Page 121

**D. O'DONNELL**

1  **D. O'DONNELL**
2  A. Correct.
3  **Q. Now, Category (d), was that ultimately**
4  **replaced in the Clarification Letter?**
5  **And we can look to the Clarification**
6  **Letter if you want, Tab (c), page 1.**
7  MR. COHEN: The documents are going to
8  speak for themselves. The witness should
9  not be here interpreting the contracts on
10 the fly.
11 If you have an understanding from a
12 non-privileged source where a non-privileged
13 source told you that, you can repeat that
14 information.
15 The internal Milbank analysis I'll
16 instruct you not to answer, and you should
17 not be giving your own analysis here on the
18 record in real-time.
19 **Q. Let me see if I can simplify it. Did,**
20 **upon receiving the Clarification Letter, Tab C,**
21 **did Milbank understand, based on Section**
22 **1(a)(ii) that clause (D) of the definition of**
23 **"purchased assets" was being replaced?**
24 MR. COHEN: Same instruction.
25 Do you understand the limitations?
TSG Reporting - Worldwide    877-702-9580

Page 122

1           D. O'DONNELL
2      A.   Other than as a result of privileged
3  communication or work product, no.
4      Q.   Okay.  Let's turn to Category (e).  As
5  of the Sale Hearing -- I'm sorry, let me turn
6  you back to Tab A, page 6.  Tab A, page 6, item
7  (e), "50 percent of each position in the
8  residential real estate mortgage securities."
9  As of the Sale Approval Hearing, did Milbank
10  have an estimate of the value of that category
11  of purchased assets?
12      A.   Yes.
13      Q.   And what was that estimate?
14      A.   I believe it was $6 billion.
15      Q.   $6 billion in total or 50 --
16      A.   I believe it was $6 billion in total.
17      Q.   And so 50 percent would be 3 billion?
18      A.   Yes, based on representations made at
19  the hearing on the 19th.
20      Q.   Category (f), the furniture and
21  equipment, did Milbank have an estimated value
22  for that category?
23      A.   No.
24      Q.   (g), the purchased intellectual
25  property, did Milbank have an estimate of the

TSG Reporting - Worldwide    877-702-9580

Page 123

1           D. O'DONNELL
2  value of that category of purchased asset?
3      A.   No.
4      Q.   (h), the purchased contracts, did
5  Milbank have an estimate of the value of that
6  category of purchased asset?
7      A.   No.
8      Q.   Looking at item (q) on the next page,
9  all past and present goodwill and other
10  intangible assets, did Milbank have an estimate
11  of the value of that purchased asset?
12      A.   Yes.
13      Q.   And what was the estimate that Milbank
14  had of that?
15      A.   Based on representations made at the
16  hearing, Lehman was attributing a value of $250
17  million to the goodwill of LBI.
18      Q.   As to the intangible assets, did
19  Milbank ever receive an estimate of the value of
20  intangible assets?
21      A.   No.
22      Q.   So that was uncertain?
23      A.   Correct.
24      Q.   Let's turn to page 11 of the original
25  APA, and specifically on page 11, Section 2.3 on

TSG Reporting - Worldwide    877-702-9580

Page 124

1           D. O'DONNELL
2  assumption of liabilities, do you see that?
3      A.   Yes, I do.
4      Q.   It says, "On the terms and subject to
5  the conditions set forth in this Agreement, at
6  the Closing, Purchaser shall assume, effective
7  as of the closing, and shall timely perform and
8  discharge in accordance with their respective
9  terms, the following Liabilities of Seller and
10  its Subsidiaries (collectively, the 'Assumed
11  Liabilities')."
12          Looking at Category (a), "all
13  Liabilities of Seller incurred, after the
14  Closing, in connection with the Business," did
15  Milbank have an estimate of the amount of that
16  liability?
17      MR. COHEN:  With respect to these
18  items, and if we go through all of the items
19  under 2.3, my instruction will be the same:
20      You can testify as to estimates
21  received from non-privileged sources, but
22  attorney work product or the Committee's
23  financial advisors, I will instruct you not
24  to answer as to their analysis and
25  information.

TSG Reporting - Worldwide    877-702-9580

Page 125

1           D. O'DONNELL
2      Q.   So as to category (a), did Lehman or
3  Barclays ever give you an estimate of that
4  category?
5      A.   No.
6      Q.   Okay.  As to Category (b), "all
7  Liabilities of Seller under the Purchased
8  Contracts arising after...the date on which such
9  entity commenced a voluntary case or cases under
10  Chapter 11 or Chapter 7," did Lehman or Barclays
11  ever give you an estimate of the value of that
12  assumed liability?
13      A.   No.
14      Q.   Turning to item (d), "accounts payable
15  in the Ordinary Course of Business," et cetera,
16  did Lehman or Barclays ever give you an estimate
17  of the value of that assumed liability?
18      A.   No.
19      Q.   Okay.  So that was uncertain?
20      A.   Correct.
21      Q.   Category (f), "all other Liabilities
22  to the extent related to the Business," et
23  cetera, did Lehman or Barclays ever give you an
24  estimate of that category of assumed liability?
25      A.   No.

TSG Reporting - Worldwide    877-702-9580

Page 126

D. O'DONNELL

1                    D. O'DONNELL
2    Q.   To your knowledge, did Houlihan do any
3  work to estimate the value of the assumed
4  liabilities we just went over?
5    A.   You're referring to (a), (b) and (d)?
6    Q.   (a), (b) --
7    A.   (d).
8    Q.   -- (d), (f), (h).
9       MR. TECCE:  Caution the witness not to
10  reveal any attorney-client communications or
11  any attorney work product.
12    A.   No.
13    Q.   And going back to page 6, the
14  purchased assets, did Houlihan do any work, to
15  your knowledge, to estimate the value of the
16  purchased assets described in categories (b),
17  (c), (f), (g), (h) and (q)?
18       MR. TECCE:  Same instruction.
19    A.   Other than based on privileged
20  communications, I don't know.
21    Q.   Now, at some point after the closing,
22  am I right that Milbank did receive the final
23  versions of Schedule A and Schedule B?
24    A.   Yes, you're correct.
25    Q.   And did Milbank raise any concerns

TSG Reporting - Worldwide    877-702-9580

Page 127

D. O'DONNELL

1                    D. O'DONNELL
2  about those schedules with Weil or with Barclays
3  representatives?
4    A.   Timeframe?
5    Q.   After the closing.
6    A.   Yes, Milbank did receive what
7  purported to be final versions of the schedules
8  on or about the 25th of September, forwarded
9  them to Barclays -- I mean to Houlihan, and
10  asked Houlihan to continue its diligence on
11  those documents, those schedules.
12    Q.   Do you know whether the Schedule A
13  that Milbank received on September 25 was
14  different from the spreadsheet that Milbank had
15  received over the weekend before the closing?
16       MR. COHEN:  Object to the form.
17    Q.   Or is that something that Houlihan
18  analyzed?
19    A.   That's something that Houlihan would
20  have analyzed.
21    Q.   Did Milbank ever express any concern
22  to Weil that the final schedules were different
23  from what had been described to Milbank over the
24  weekend before the closing?
25       MR. COHEN:  Objection.  Vague.

TSG Reporting - Worldwide    877-702-9580

Page 128

D. O'DONNELL

1                    D. O'DONNELL
2    A.   Milbank did ultimately raise concerns
3  with Weil about the schedules and whether the
4  numbers accorded with their understanding of the
5  deal as presented over the weekend, yes.
6    Q.   Okay.  And what did Milbank say to
7  Weil in that regard?  What were the specific
8  concerns?
9    A.   Milbank ultimately conveyed to Weil
10  the concerns that had emerged from Houlihan's
11  analysis of the schedules.
12    Q.   And what were those concerns?
13    A.   That the numbers did not add up.
14    Q.   What numbers did not add up?
15    A.   That the amount of purchased assets
16  appeared to be larger than the amount
17  represented to the Committee and to the Court in
18  connection with approval of the transaction.
19    Q.   And did the schedules, the final
20  Schedules A and B, reflect values?
21    A.   Can you clarify your question?
22    Q.   Well, did the final Schedule A and the
23  final Schedule B contain -- reflect values for
24  the assets listed on those schedules?
25    A.   Can we refer to the -- strike that.

TSG Reporting - Worldwide    877-702-9580

Page 129

D. O'DONNELL

1                    D. O'DONNELL
2    Q.   Do you know whether the final Schedule
3  A and final Schedule B had any type of value,
4  par value or otherwise?
5    A.   I believe it did have a par value
6  associated with each of the schedules.
7    Q.   Was Houlihan looking at the par value
8  when it raised its concern about the value of
9  the assets reflected on Schedules A and B?
10       MR. COHEN:  If you know.  It's beyond
11  the scope of the 30(b)(6).
12       MR. TECCE:  I'll also object to the
13  extent that it calls for work product.
14    A.   Houlihan had been directed to evaluate
15  the schedules, and Milbank was not apprized of
16  the specific methodology they were using to do
17  so.
18    Q.   Okay.  So when it comes to Houlihan's
19  analysis of the schedule, Milbank has no
20  non-privileged knowledge concerning that
21  analysis; is that right?
22    A.   That's correct.
23    Q.   I'll hand you what has previously been
24  marked as Exhibit 463B.  I'll ask you to take a
25  look at this, but my question will be whether

TSG Reporting - Worldwide    877-702-9580

Page 130

D. O'DONNELL

1  this is a document that Milbank ever received.
2
3      MR. COHEN:  Is there a Bates-numbered
4  version of this document?  What is the
5  source of it?  It's not from our production.
6      MR. STERN:  It's a -- it's a document
7  that was sent to certain Lehman people, so
8  it comes out of their e-mail, and it's also
9  a document we expect FTI to produce.
10     MR. COHEN:  So does that mean it came
11 from the Lehman production?
12     MR. STERN:  Off the record.
13     (Discussion off the record.)
14     MR. STERN:  Let's go back on the
15 record.
16     MR. COHEN:  Would you repeat your
17 question, please, or have the reporter read
18 it back?
19     MR. STERN:  I don't think I've asked
20 it yet.
21     THE WITNESS:  I'm still reviewing the
22 document.
23     Q.   After you review it, I just want to
24 ask you whether this is something Milbank ever
25 received.

TSG Reporting - Worldwide    877-702-9580

Page 131

D. O'DONNELL

1      MR. COHEN:  I think that was the
2  question.
3      (Document review.)
4      A.  I have reviewed the document, and I
5  don't believe it is an e-mail that Milbank ever
6  received.
7      Q.  Do you know whether Milbank ever
8  received any part of this document?
9      A.  I believe that Milbank may have
10 received page 2 of the attachment.
11     Q.  The Footnote A?
12     A.  Correct.
13     Q.  Did Milbank have an understanding of
14 what that page represented?
15     MR. TECCE:  Objection to the form of
16 the question.
17     Q.  Or would that have been Houlihan's
18 responsibility or FTI's responsibility?
19     A.  It would have been Houlihan or FTI's
20 responsibility.
21     Q.  At some point in October 2008, did
22 Milbank lawyers attend a presentation by Alvarez
23 & Marsal?
24     A.  You need to be more specific.
25

TSG Reporting - Worldwide    877-702-9580

Page 132

D. O'DONNELL

1
2      Q.   Let me give you a copy of a document
3  we've marked previously as Exhibit 464B.  These
4  are pages from a presentation that Alvarez gave
5  to the Creditors Committee on October 8, 2008.
6      I'll ask you -- it includes a list of
7  subjects and then it includes certain pages from
8  the presentation, and after you review it, I
9  just want to ask if that is a presentation that
10 Milbank attended.
11     MR. COHEN:  Is the exhibit the
12 truncated version of this document?
13     MR. STERN:  Yes.
14     MR. COHEN:  Do you have a copy of the
15 complete document if the witness needs to
16 see it?
17     MR. STERN:  I don't know if we have
18 one in the room, but we can get one if you
19 want.
20     MR. COHEN:  Let's see if he needs it.
21 This appears to be excerpts from a larger
22 presentation.
23     MR. STERN:  Yes, it is.
24     (Document review.)
25     A.  Can you repeat the question?

TSG Reporting - Worldwide    877-702-9580

Page 133

D. O'DONNELL

1
2      Q.   The question is whether Milbank
3  lawyers attended the presentation by Alvarez &
4  Marsal on October 8?
5      A.  Yes.
6      Q.  And who from Milbank attended that?
7      A.  This was the first of a series of
8  monthly in-person meetings with Alvarez & Marsal
9  over the course of the case.  It was likely a
10 long list of Milbank attorneys involved in
11 various aspects of the case.  I assume Dennis
12 Dunn, Luc Despins, potentially Paul Aronzon were
13 there.
14     Q.  Let's look at the fourth page of the
15 exhibit.  It has a heading at the top
16 Significant Transactions.  Do you see that?
17     A.  Yes.
18     Q.  And then item A, it says, "Sale of
19 Lehman Brothers, Inc., broker-dealers to
20 Barclays (Fogarty)," do you see that?
21     A.  I do.
22     Q.  Did Milbank lawyers attend this part
23 of the presentation?
24     A.  To the best of my recollection,
25 Milbank attorneys were present throughout the

TSG Reporting - Worldwide    877-702-9580

Page 134

D. O'DONNELL

1  presentation.
2     **Q. Did you personally attend?**
3     A. I did, yes.
4     **Q. Do you have any recollection**
5  **personally of this part of the presentation?**
6     A. I don't have any personal recollection
7  of this part of the presentation being discussed
8  at any length.
9     **Q. Under "Assets Purchased" it lists**
10 **"43.1 billion repo assets - book value per**
11 **Lehman's stale marks; negotiated a $5 billion**
12 **reduction." Do you see that?**
13    A. I do.
14    **Q. At the time did Milbank have an**
15 **understanding or was there any discussion at**
16 **this presentation concerning the statement "book**
17 **value per Lehman's stale marks; negotiated a $5**
18 **billion reduction"?**
19    MR. COHEN: Objection to the form.
20 Compound.
21    To the extent you're going to answer
22 the portion of the question that deals with
23 an understanding, then it needs to be coming
24 from a non-privileged source as opposed to

TSG Reporting - Worldwide    877-702-9580

Page 135

D. O'DONNELL

1  one of the Committee's financial advisors,
2  which may be the second part of the
3  question, which was, was there any
4  discussion at the presentation.
5     But again, I'll object to the form of
6  the question as vague.
7     **Q. So let me try to simplify it.**
8     **At this presentation did Alvarez**
9  **explain what was meant by the phrase "book value**
10 **per Lehman's stale marks"?**
11    A. Alvarez made a presentation. Various
12 members of the Alvarez team presented on various
13 topics. I don't have a specific recollection of
14 their presentation as to this topic, but
15 presumably they would have walked through this
16 slide, which probably would have been up on a
17 screen during the course of the presentation.
18    **Q. Do you have any recollection**
19 **concerning what Alvarez may have explained**
20 **concerning that phrase, "book value per Lehman's**
21 **stale marks"?**
22    A. No specific recollection, no.
23    **Q. Any general recollection?**
24    A. As I've previously testified, the

TSG Reporting - Worldwide    877-702-9580

Page 136

D. O'DONNELL

1  issue of the valuation of the assets and the
2  liabilities was an issue that we had questions
3  and concerns about. Houlihan was taking the
4  lead in that regard, and if anyone focused on
5  this issue during the meeting, it would have
6  been Houlihan.
7     **Q. Do you recall whether Houlihan did ask**
8  **questions concerning that phrase "book value per**
9  **Lehman's stale marks"?**
10    MR. COHEN: At the meeting?
11    **Q. At the meeting.**
12    A. No recollection as to whether they
13 raised questions at the meeting.
14    **Q. Okay. Did anyone at the meeting raise**
15 **any questions concerning what was meant by the**
16 **phrase "negotiated a $5 billion reduction"?**
17    A. I have no recollection of that
18 specific phrase being discussed.
19    **Q. Do you have any recollection as to**
20 **whether that phrase caused any concern on the**
21 **part of Milbank or Houlihan?**
22    MR. COHEN: Instruct the witness not
23 to answer on the basis of attorney work
24 product.

TSG Reporting - Worldwide    877-702-9580

Page 137

D. O'DONNELL

1     **Q. At the meeting with Alvarez, did**
2  **either Houlihan or Milbank express any concern**
3  **relating to that phrase "negotiated a $5 billion**
4  **reduction"?**
5     A. Express to whom?
6     **Q. To Alvarez.**
7     A. To my recollection, no.
8     **Q. Sitting here today do you know what**
9  **that phrase refers to?**
10    MR. COHEN: Objection. Beyond the
11 scope of the 30(b)(6).
12    **Q. Go ahead.**
13    A. It's highly ambiguous from my
14 perspective sitting here today. It could mean
15 one of many things.
16    **Q. What are the things it could be?**
17    MR. COHEN: Objection. Calls for
18 speculation.
19    A. And I don't think it's my role here to
20 speculate.
21    **Q. Well, I'm asking you to.**
22    MR. COHEN: You should not speculate.
23 If you know, you should answer. If you
24 don't know, you should answer you don't

TSG Reporting - Worldwide    877-702-9580

Page 138

1          D. O'DONNELL
2    know.
3      Q.   Sitting here today what, as you read
4    this phrase, "negotiated a $5 billion
5    reduction," what are your possible
6    interpretations of that phrase as you sit here
7    today?
8          MR. COHEN: Objection. Calls for
9      speculation. If you know what that means,
10     you can answer. If you don't know, answer
11     you don't know.
12     A.   This presentation was drafted by
13   Alvarez. I don't know what they meant by that
14   phrase.
15     Q.   Aside from this presentation by
16   Alvarez, have you heard that phrase before in
17   connection with the sale transaction?
18         MR. COHEN: Objection. Vague as to
19     time.
20     A.   What timeframe are you talking about?
21     Q.   At any time.
22         MR. COHEN: Objection. Overbroad.
23     A.   After Quinn assumed responsibility for
24   Barclays matters --
25         MR. TECCE: I would also like to
       TSG Reporting - Worldwide    877-702-9580

Page 139

1          D. O'DONNELL
2    caution him not to reveal the content of any
3    attorney-client communications or other work
4    product.
5      A.   Based on my reading of the 60(B)
6    Motion after the fact, yes.
7      Q.   What is your understanding of the
8    meaning of this phrase "negotiated a $5 billion
9    reduction" based on reading the Rule 60(B)
10   Motion?
11         MR. COHEN: Objection. Vague.
12     A.   Based on my after-the-fact reading of
13   the 60(B) Motion, without any independent
14   knowledge of the full investigation conducted by
15   Quinn, one of the allegation in the 60(B) Motion
16   is that there was a secretly negotiated $5
17   billion reduction in the purchase price of the
18   assets.
19     Q.   At the time that this phrase was
20   presented by Alvarez in their October 8
21   presentation, do you recall anybody in
22   attendance expressing any concern or alarm based
23   on this phrase?
24         MR. COHEN: I'll caution the witness
25     to answer as to only non-privileged
       TSG Reporting - Worldwide    877-702-9580

Page 140

1          D. O'DONNELL
2    expressions of concern or alarm. Privileged
3    communications and analysis are beyond the
4    scope of this deposition. I would instruct
5    you not to answer.
6      Q.   This is at the meeting with Alvarez.
7      A.   Based on other than privileged
8    communications, no.
9      Q.   After the presentation by Alvarez, did
10   Milbank or Houlihan, to your knowledge, have any
11   discussions with anybody acting on behalf of
12   either Lehman or Barclays concerning this
13   reference to negotiated a $5 billion reduction?
14     A.   Can you repeat the question?
15         (Record read.)
16     A.   I need the question repeated again.
17   I'm sorry.
18         (Record read.)
19     A.   As to Milbank, I don't have any
20   knowledge that this specific phrase from this
21   specific document was discussed with anyone at
22   Barclays -- at Lehman or Weil.
23     Q.   Okay. Putting aside this specific
24   phrase, and focusing on the general concept of a
25   negotiated $5 billion reduction, however you
       TSG Reporting - Worldwide    877-702-9580

Page 141

1          D. O'DONNELL
2    want to phrase that, was there ever any
3    discussion between Milbank or Houlihan on the
4    one hand, to your knowledge, and representatives
5    of Lehman or Barclays on the other hand?
6      A.   As a general matter, the discussions
7    between Milbank and Weil regarding the schedules
8    related, generally speaking, to an approximate
9    $5 billion discrepancy, yes.
10     Q.   And how was that?
11         Withdrawn. Explain that to me.
12         MR. COHEN: Objection. Vague.
13     Q.   Explain to me how the discussions
14   concerning the schedules related to a $5 billion
15   discrepancy.
16     A.   Houlihan's analysis of the schedules
17   to date or up until the point -- during the time
18   when Milbank was still involved with the matter
19   suggested that there was a mismatch between
20   assets and liabilities of approximately $5
21   billion.
22     Q.   And when did those discussions between
23   Houlihan and Weil concerning that discrepancy or
24   mismatch begin?
25     A.   In mid October 2008.
       TSG Reporting - Worldwide    877-702-9580

Page 142

D. O'DONNELL

1
2    Q.   And this reference in the Alvarez
3  presentation to negotiated $5 billion reduction,
4  is that the same concept for the same $5 billion
5  reduction referenced in the Committee's Rule 60
6  motion?
7         MR. COHEN:  Objection.  Beyond the
8    scope of the 30(b)(6) --
9    Q.   If you know.
10        MR. COHEN:  -- notice.
11        The witness is not testifying on
12    behalf of the firm on this.  The firm does
13    not represent the Committee in connection
14    with the 60(B) Motion.
15        MR. STERN:  So are you instructing him
16    not to answer?
17        MR. COHEN:  No, I'm telling you he's
18    not testifying on behalf of the firm.  You
19    can answer the question, but it's of no
20    evidentiary value for purposes of your
21    subpoena.
22        MR. TECCE:  Also, just with respect to
23    the form of the question, you're referring
24    to the presentation that was prepared by
25    A&M.

TSG Reporting - Worldwide    877-702-9580

Page 143

D. O'DONNELL

1
2    A.   As I previously testified, I have no
3  idea what A&M intended precisely by the phrase
4  in question, so I can't tell you whether it is
5  exactly the same issue that appeared later in
6  the 60(B) Motion.
7    Q.   It may be, but you don't know?
8    A.   No basis to determine.
9    Q.   One way or the other?
10    A.   Correct.
11        MR. STERN:  Let's take a short break.
12        THE VIDEOGRAPHER:  The time is now
13    2:17 P.M.  We're now off the record.
14        (Recess.)
15        (Exhibit 504, a document bearing Bates
16    Nos. MTHM0012869 through 12871, marked for
17    identification, as of this date.)
18        THE VIDEOGRAPHER:  This is the start
19    of tape number 4.  The time is now 2:24 P.M.
20    We are now back on the record.
21  BY MR. STERN:
22    Q.   I've handed you a document that we've
23  marked as Exhibit 504, and I'd ask you to take a
24  look at it.  It may make sense to read the
25  e-mail string from the back, and then I'll have

TSG Reporting - Worldwide    877-702-9580

Page 144

D. O'DONNELL

1
2  some questions.
3        I want to focus I think primarily on
4  the e-mail at the bottom of the first page, the
5  Luc Despins e-mail, 10/13, 3:47 P.M., but why
6  don't you read the whole thing.
7        (Document review.)
8    A.   I've reviewed the e-mail.
9    Q.   Okay.  Let's focus on the Luc Despins
10  e-mail October 13, 2008, 3:47 P.M. on the first
11  page, and he writes to Ms. Fife, "Lori, this is
12  not in connection with sealing motion (although
13  I want to know more about the schedules before
14  that issue is up before the Court), but rather
15  our concern is with respect to the securities
16  which were transferred.  Houlihan has reviewed
17  them and cannot even come close to the amount
18  which was announced in court (I think it was
19  $47.4 billion) and there is also a discrepancy
20  on the liability side (although it could be --
21  it could but much smaller than the issue on the
22  asset side).  Houlihan's view would indicate
23  that the securities transferred could be worth
24  billions more than $47.4 billion.  There may
25  very well be a logical explanation for all of

TSG Reporting - Worldwide    877-702-9580

Page 145

D. O'DONNELL

1
2  this, which is why the first meeting is just to
3  explore the issues."
4        Was there a meeting that followed up
5  from this e-mail?
6    A.   Yes.
7    Q.   And who attended that meeting?
8    A.   From Milbank, Matthew Barr and Evan
9  Fleck.
10    Q.   And who else?
11    A.   People from Houlihan, I believe Sol
12  Burian and/or Mike Fazio.
13    Q.   And who else attended?
14    A.   From Weil, Harvey Miller and Lori
15  Fife.
16    Q.   Who else attended the meeting, if
17  anybody?
18    A.   I think that's it.
19    Q.   And what was discussed at the meeting
20  concerning the schedules and the values in the
21  schedules?
22    A.   Mr. Despins' e-mail I think summarizes
23  the agenda for the meeting and that was the
24  substance of the discussion at the meeting.
25    Q.   Okay.  And at the meeting did Houlihan

TSG Reporting - Worldwide    877-702-9580

Page 146

D. O'DONNELL

1  
2  outline its analysis of the securities and why
3  it was concerned that the securities transferred
4  could be worth billions more than the $47.4
5  billion?
6     A.   I need to qualify my last answer to
7  suggest that I'm not sure if Houlihan was at the
8  initial meeting to which I am referring.  It may
9  have been lawyers only.
10    Q.   Was there any discussion at that
11 meeting concerning the analysis that Houlihan
12 had done?
13    A.   The whole point of the meeting as
14 outlined in Mr. Despins' e-mail was to discuss
15 Houlihan's analysis, yes.
16    Q.   And what was said about Houlihan's
17 analysis?
18    A.   In substance, what is presented in the
19 e-mail; that there was a disconnect between the
20 numbers presented at the final hearing, the
21 hearing approving the sale, and the numbers
22 disclosed in the final schedules.
23    Q.   At the meeting did anybody explain the
24 basis of Houlihan's analysis and point out what
25 the disconnection was?

TSG Reporting - Worldwide    877-702-9580

Page 147

D. O'DONNELL

1
2     MR. COHEN:  Objection.  Vague as to
3  basis.
4     MR. STERN:  I don't understand the
5  objection.
6     MR. COHEN:  Do you mean what Houlihan
7  did, the work they did, the details of their
8  work?
9     MR. STERN:  Yeah.
10    MR. COHEN:  I don't understand what
11 "basis of analysis" is.
12    MR. STERN:  That's a much better
13 question.
14    MR. COHEN:  Try it.  It's --
15    Q.   That's a much better question.  I'll
16 adopt that question.
17    A.   Not in excruciating detail, but yes,
18 that Houlihan had evaluated the schedules and
19 could not reconcile the numbers to the numbers
20 they understood to be the numbers approved by
21 the Court.
22    Q.   And what was said about the work that
23 Houlihan did and the details of their work?
24    A.   Again, since I don't believe Houlihan
25 was in attendance, it was limited to a lawyer's

TSG Reporting - Worldwide    877-702-9580

Page 148

D. O'DONNELL

1
2  summary of their understanding of Houlihan's
3  findings to date.
4     Q.   Did Houlihan reflect those findings in
5  writing?
6     A.   Not for purposes of this meeting, no.
7     Q.   So nothing in writing was presented at
8  that meeting?
9     A.   Correct.
10    Q.   And what was the -- what was the work
11 that Houlihan had done that was discussed?
12    A.   They had reviewed the schedules, which
13 are hundreds of pages long, and had conducted
14 an, essentially, a evaluation analysis of the
15 schedules to determine what the real value of
16 the assets transferred was.
17    Q.   In doing that did they -- did Houlihan
18 reference certain pricing sources for the
19 assets?
20       MR. COHEN:  I would instruct the
21 witness not to get into the details of what
22 Houlihan did.  That's work product that has
23 not been shared.
24    Q.   Well, did anybody at this meeting
25 explain the work that Houlihan had done in terms

TSG Reporting - Worldwide    877-702-9580

Page 149

D. O'DONNELL

1
2  of pricing the assets?
3     A.   I don't believe so, and the meeting
4  was intended to, as indicated in Mr. Despins'
5  e-mail, to be an initial meeting to explore the
6  issues.  It was not intended to be a full
7  working session.  If that had been the case, it
8  would have involved financial advisors from both
9  sides.
10    Q.   Okay.  Was there a subsequent -- was
11 there a follow-up meeting to this initial
12 meeting to address those issues?
13    A.   Not prior to Milbank's withdrawal from
14 involvement in these issues.
15    Q.   And when was that?
16    A.   That was in late November.
17    Q.   Late November Milbank withdrew?
18    A.   Milbank, over the course of a period
19 of time in October and November, gradually
20 transitioned responsibility for this matter to
21 Quinn.
22    Q.   And why was that?
23    A.   Out of an abundance of caution over
24 concerns that their initial questions and
25 concerns might ultimately yield a reason to

TSG Reporting - Worldwide    877-702-9580

Page 150

D. O'DONNELL

1    bring litigation with respect to the matter.  No
2    decisions or conclusions had been reached in
3    that regard, but given Milbank's representation
4    of Barclays in other contexts, we deemed it
5    prudent to involve conflicts counsel as we
6    proceeded down this path.
7        **Q.    Do you know whether there was -- does**
8    **Milbank know whether subsequent to this initial**
9    **meeting in October, whether there was a**
10   **subsequent meeting that Milbank did not attend**
11   **to address these issues?**
12       A.    Once Milbank withdrew from
13   representation of the Committee with respect to
14   these issues, we did not participate in any
15   meetings, were not apprized of meetings, were
16   not -- were not in the loop on those
17   discussions.  So the answer is no.
18       **Q.    Before Milbank withdrew from handling**
19   **these issues, did Milbank have any other**
20   **communications with Lehman representatives**
21   **concerning these issues?**
22           MR. COHEN: Objection.  Vague.
23       Other than this one e-mail and this
24   meeting?

TSG Reporting - Worldwide    877-702-9580

Page 151

D. O'DONNELL

1        MR. STERN:  Correct.
2        A.    There was an ongoing course of
3    discussions.  There were, I believe, follow-up
4    telephone calls and e-mails.
5        **Q.    And at the October meeting that you**
6    **described, the meeting attended by Mr. Barr and**
7    **Mr. Fleck and Mr. Miller and Ms. Fife, what did**
8    **Mr. Miller and Ms. Fife say at that meeting?**
9        A.    Point of clarification.  The meeting
10   I'm -- I referred to did not take place in
11   October.
12       **Q.    Ah.  When did that take place?**
13       A.    It took place on November 21, 2008.
14       **Q.    When did Milbank withdraw?**
15       A.    Quinn was fully in place as counsel on
16   this matter by the first week of December 2008.
17       **Q.    Well, thanks for the clarification.**
18       **So Luc Despins, the meeting to follow**
19   **up on Luc Despins' October 13 e-mail, takes**
20   **place on November 21; is that right?**
21       A.    Correct.
22       **Q.    Okay.  And your best recollection or**
23   **your best understanding is that it was attended**
24   **by Mr. Barr, Mr. Fleck, Mr. Miller and Ms. Fife?**

TSG Reporting - Worldwide    877-702-9580

Page 152

D. O'DONNELL

1        A.    Correct.
2        **Q.    And do you know if Houlihan was**
3    **present, or you just don't know?**
4        A.    The best of my recollection is that
5    they were not.
6        **Q.    Okay.  Were there any discussions on**
7    **these issues between Milbank on the one hand and**
8    **Weil on the other hand at any time between Mr.**
9    **Despins' October 13 e-mail and that November 21**
10   **meeting?**
11           MR. COHEN: Well, there's -- Exhibit
12   504 has an October 15 e-mail as well.
13       A.    Obviously, there was -- the e-mail in
14   question concerns a back and forth between
15   October 13 and October 15, but beyond that, yes,
16   there were additional discussions between
17   Milbank and Weil between October 15 and November
18   21.
19       **Q.    And what were those discussions?**
20       A.    The discussions took place between --
21   discussions took place between Mr. Barr and Ms.
22   Fife.  There were e-mail exchanges and phone
23   calls.
24       **Q.    And what did they discuss in their**

TSG Reporting - Worldwide    877-702-9580

Page 153

D. O'DONNELL

1    e-mails and phone calls?
2        A.    Further elaboration on the issues that
3    had been raised by Mr. Despins and further
4    efforts to schedule the in-person meeting
5    suggested by Mr. Despins.
6        **Q.    And in the further elaboration on the**
7    **issues that had been raised by Mr. Despins, what**
8    **did Mr. Barr tell Ms. Fife?**
9        A.    Well, obviously based on Ms. Fife's
10   response on Exhibit 504, specifically, the
11   response on October 13, 2008 at 11:50 P.M., she
12   was not initially receptive to our concerns, and
13   what ensued was a process to convince Weil that
14   these concerns appear to have some basis and
15   that they needed to be investigated further.
16       **Q.    And what did Mr. Barr say concerning**
17   **the basis for the concerns?**
18       A.    In the course of telephone calls
19   and -- primarily telephone calls, reiteration of
20   the basic facts here.
21       **Q.    Did he describe to Ms. Fife the**
22   **analysis that Houlihan had done?**
23       A.    Again, lawyers don't necessarily do a
24   good job of summarizing what financial advisors

TSG Reporting - Worldwide    877-702-9580

Page 154

D. O'DONNELL

1
2  do to other lawyers. Houlihan had concerns, had
3  issues, and we communicated that fact to Weil.
4      Q.   Mr. Barr I assume had access to
5  whatever analysis Houlihan had done?
6      A.   That assumes that there was a written
7  work product. I don't know if there was.
8      Q.   And what was Ms. Fife's response in
9  these subsequent discussions?
10     A.   The initial character of her response
11  is disclosed in the e-mail to which I referred.
12  She did not think it was a productive use of the
13  Committee or the Debtors' time to investigate
14  these issues further.
15     Q.   Did, at the time in October, did
16  Milbank consider contacting Barclays' counsel
17  about these issues?
18         MR. COHEN:  Objection. I'll instruct
19     the witness not to answer on the basis of
20     work product.
21     Q.   Well, at the time did Milbank do
22  anything to contact Barclays' counsel about
23  these issues?
24     A.   No.
25     Q.   At any point while Milbank was still

TSG Reporting - Worldwide    877-702-9580

Page 155

D. O'DONNELL

1
2  responsible for these matters, did anybody from
3  Milbank contact anybody acting on behalf of
4  Barclays to discuss these issues?
5      A.   Yes.
6      Q.   And when was that?
7      A.   I believe there were discussions
8  between Mr. Despins and Ms. Grandfield.
9      Q.   And when did those discussions take
10  place?
11     A.   Sometime in October.
12     Q.   And what was the substance of those
13  discussions?
14     A.   That we had concerns and unanswered
15  questions about the transaction.
16     Q.   And did Mr. Despins identify for Ms.
17  Grandfield what those concerns and unanswered
18  questions were?
19     A.   I don't know the level of detail
20  presented to Ms. Grandfield in these
21  discussions, no.
22     Q.   Did any of those concerns or
23  unanswered questions relate to a negotiated $5
24  billion reduction as referenced in the Alvarez
25  presentation?

TSG Reporting - Worldwide    877-702-9580

Page 156

D. O'DONNELL

1
2         MR. COHEN:  Object to the form.
3      A.   As previously testified, the $5
4  billion number and the mismatch was the overall
5  theme of our concern, so it's likely that that
6  number came up in those conversations.
7      Q.   And that overall theme of your concern
8  is what was expressed by Mr. Barr to Ms. Fife in
9  his discussions with her and at the November 21,
10  2008, to the best of your knowledge?
11     A.   Yes, as I previously testified, that
12  is -- that is the central thesis of our concern
13  and would have been communicated in some
14  fashion.
15     Q.   Can you pinpoint for me in time when
16  the $5 billion mismatch, the overall theme of
17  your concerns, was identified by Houlihan or
18  Milbank?
19         MR. COHEN:  Objection.
20         MR. TECCE:  Object to the form of the
21     question and to the extent that it seeks
22     attorney-client communication or attorney
23     work product.
24     A.   Based on --
25     Q.   I'm just asking for a date.

TSG Reporting - Worldwide    877-702-9580

Page 157

D. O'DONNELL

1
2      A.   Again, based on other than privileged
3  communications, no, I cannot.
4      Q.   When is the first point in time that
5  Milbank or Houlihan communicated to Weil this
6  concern about a $5 billion mismatch?
7         MR. COHEN:  Precisely $5 billion?
8      A.   On September 22 or at the end --
9  Sunday and Monday, the 21st and 22nd, and back
10  in that period, Houlihan communicated to Weil
11  that they could not get comfortable with the
12  numbers as presented in the draft schedule and
13  had, even at that stage, concerns about a
14  mismatch.
15     Q.   Okay.  So this overall theme of the $5
16  billion mismatch was addressed between Milbank
17  and Houlihan on the one hand and Weil on the
18  other hand before the closing; is that correct?
19         MR. TECCE:  Objection to the form of
20     the question.
21     A.   Whether it was $5 billion or another
22  number I cannot tell you. It was a mismatch.
23  It was in the billions. Approximately $5
24  billion is as close as I can get.
25     Q.   After the November 21 meeting between

TSG Reporting - Worldwide    877-702-9580

Page 158

**D. O'DONNELL**

1
2    **Mr. Barr and Mr. Fleck and Ms. Fife and Mr.**
3    **Miller, did Milbank have any further involvement**
4    **in the discussion of these issues?**
5        A.    During the period between November 21
6    and the first week of December, Milbank remained
7    involved and may have had further conversations
8    with Weil on these issues.
9        Q.    **Do you recall what those conversations**
10   **were?**
11       A.    I don't have any specific
12   recollections of conversations during that
13   period.
14       Q.    **At any point did Milbank or Houlihan**
15   **provide anything in writing to Weil on these**
16   **issues?**
17       A.    Other than Mr. Despins' e-mail of
18   October 13, I'm not aware of anything else in
19   writing.
20       Q.    **Now, his e-mail of October 13 also**
21   **makes reference to a discrepancy on the**
22   **liability side.  What was that?**
23       A.    That's the liability number disclosed
24   to the Court.
25           Strike that.  As I sit here, I

TSG Reporting - Worldwide    877-702-9580

Page 159

**D. O'DONNELL**

1
2    can't -- I can't describe with any precision
3    what the liability issue was at that point in
4    time.
5        Q.    **Okay.  And when he says "Houlihan's**
6    **review would indicate that the securities**
7    **transferred could be worth billions more than**
8    **47.4 billion," how many billions more than 47.4?**
9        A.    And the question is?
10       Q.    **Well, he -- Mr. Despins refers to**
11   **Houlihan's review and he says it "would indicate**
12   **that the securities transferred could be worth**
13   **billions more than the 47.4 billion," and my**
14   **question is did Houlihan or Milbank ever**
15   **communicate to Weil how many billions of dollars**
16   **more than the 47.4 billion?**
17       A.    Well, that was the question.  I mean,
18   they -- they knew -- their review to date
19   suggested that there was a mismatch in the
20   billions, but they needed access to additional
21   information, which they needed to obtain through
22   the Debtors to refine that further.
23       Q.    **And what was the additional**
24   **information that Houlihan needed from the**
25   **Debtors?**

TSG Reporting - Worldwide    877-702-9580

Page 160

**D. O'DONNELL**

1
2        A.    Again, that was information that
3    Houlihan needed.  I can't be very specific as to
4    what they needed to satisfy their own
5    methodologies, but I assume it relates to marks
6    that were available internally at Lehman.
7        Q.    **Do you know if that information was**
8    **ever provided by Lehman to Houlihan?**
9        A.    Can you repeat the question?
10       Q.    **Do you know if that information was**
11   **ever provided by Lehman to Houlihan?**
12       A.    There were discussions between
13   Houlihan and Lehman.
14           Strike that.  No, I don't.
15       Q.    **The analysis that Mr. Despins refers**
16   **to, is that an analysis with respect to Schedule**
17   **A, only, or was it analysis with respect to both**
18   **Schedule A and Schedule B?**
19       A.    I think the Committee had concerns
20   about both schedules, but I believe the
21   reference here is to Schedule A.
22       Q.    **Was there ever any follow-up**
23   **discussion between Houlihan and Milbank on the**
24   **one hand and Weil or Lehman on the other hand**
25   **concerning Schedule B?**

TSG Reporting - Worldwide    877-702-9580

Page 161

**D. O'DONNELL**

1
2        A.    Not that I have specific knowledge of.
3        Q.    **And am I correct that at no time**
4    **between the closing and the first week of**
5    **December, when Quinn Emanuel took over this**
6    **matter, did Milbank or Houlihan make an effort**
7    **to get pricing information from Barclays; is**
8    **that right?**
9        A.    Not directly, in large part because at
10   that point in time the dynamic between Barclays
11   and the Debtors was not optimal.  There were
12   ongoing disputes about access to information
13   generally which the Debtors were embroiled in,
14   and part of the reasons for obtaining
15   information at this point was difficult was the
16   fact that Barclays had control over access to
17   most of the information we needed.
18       Q.    **So you mentioned Mr. Despins'**
19   **conversation with Ms. Grandfield.  I believe**
20   **that was in October, am I right about that?**
21       A.    Correct.
22       Q.    **And did he ask Ms. Grandfield to**
23   **arrange for Barclays to provide certain**
24   **information?**
25       A.    Not to my knowledge.

TSG Reporting - Worldwide    877-702-9580

Page 162

D. O'DONNELL

1    Q.   Did anybody from Milbank or Houlihan
2  or the Debtors in this period up to the first
3  week of December ask Barclays to provide
4  information on these issues?
5    A.   Can you repeat the question?
6       (Record read.)
7    A.   As to Milbank, no.  As to Houlihan and
8  the Debtors, I cannot speak.
9    Q.   You don't know?
10   A.   I don't know.
11   Q.   Did Milbank consider it important to
12 get this information from Barclays?
13      MR. COHEN:  Objection.  I'll instruct
14   the witness not to answer on the basis of
15   attorney-client privilege and work product.
16   Q.   If Milbank had considered it important
17 to obtain this information at the time, that is,
18 before the first week of December 2008, what
19 options did Milbank have available to it in
20 order to obtain that information from Barclays?
21      MR. COHEN:  Objection.  This calls for
22   speculation, it's beyond the scope of the
23   30(b)(6) subpoena, and the witness is not
24   authorized to testify on behalf of the firm

TSG Reporting - Worldwide   877-702-9580

Page 163

D. O'DONNELL

1  as to the subject of that question.
2    Q.   Well, you say that Milbank had
3  questions concerning the value of certain
4  purchased assets.  I think that's clearly within
5  the scope of the subpoena.
6       Now, did Milbank ever send a letter to
7  anybody at Barclays or representing Barclays
8  requesting further information on that subject
9  before December 1 when Milbank withdrew?
10   A.   No.
11   Q.   Okay.  And Milbank never sought the
12 Court's assistance in seeking that information,
13 am I right about that?
14   A.   Correct.
15   Q.   As of the time that Milbank withdrew
16 and Quinn Emanuel took over, was there a
17 timeline in place for obtaining this information
18 and resolving these questions?
19      MR. COHEN:  Objection.  I'll instruct
20   the witness not to answer.  Calls for
21   privileged information and disclosure
22   protected by the Attorney Work Product
23   Doctrine.
24   Q.   Did Milbank ever express to Weil --

TSG Reporting - Worldwide   877-702-9580

Page 164

D. O'DONNELL

1  did Houlihan or Milbank ever express to Weil a
2  desire to resolve these issues within a
3  specified period of time?
4    A.   Yes.
5    Q.   And what did -- what was expressed to
6  Weil?
7    A.   As soon as possible.
8    Q.   And what was the reaction?
9    A.   It was an iterative process with Weil.
10 As previously -- as I previously testified, they
11 were not initially receptive obtaining their
12 cooperation and then obtaining what we needed
13 from them took time, took longer than we would
14 have wanted.
15   Q.   You say it was an iterative process,
16 but did you have in mind some sense of time
17 pressure, some date by which you wanted to try
18 to have these issues resolved?
19      MR. COHEN:  I'll instruct the witness
20   not to answer.  It's legal advice,
21   privileged, and attorney work product.
22   Q.   While it was an iterative --
23 withdrawn.
24      While it was an iterative process with

TSG Reporting - Worldwide   877-702-9580

Page 165

D. O'DONNELL

1  Weil, is it fair to say that, at least as early
2  as October 2008, Houlihan and/or Milbank had
3  brought to Weil's attention their concern about
4  this overall theme of a $5 billion mismatch?
5    A.   Yes.
6       MR. STERN:  I have no further
7    questions.
8  EXAMINATION BY
9  MR. COHEN:
10   Q.   Mr. O'Donnell, I have just a couple of
11 questions.
12      After lunch, you fielded a number of
13 questions that went to the value of certain
14 items, including assets and liabilities in
15 connection with the sale to Barclays.  Do you
16 recall those questions?
17   A.   Yes.
18   Q.   And you testified that the value of
19 certain assets and liabilities was uncertain.
20 Do you recall that testimony?
21   A.   Yes.
22   Q.   Would it be more accurate for you to
23 say that those values were uncertain to Milbank
24 and Houlihan?

TSG Reporting - Worldwide   877-702-9580

Page 166

1    **D. O'DONNELL**
2    A.  Yes.
3    Q.  Did you mean to imply by your answers
that the values of those assets and liabilities
4
were uncertain to anyone other than Milbank
5
and/or Houlihan?
6
7    A.  No, I did not.
8    MR. COHEN:  I have no further
9    questions.
10    MR. STERN:  Okay.  Thank you.
11    THE WITNESS:  Thank you.
12    THE VIDEOGRAPHER:  That concludes the
13    video record for today.  The time is now
14    2:57 P.M.  We are now off the record.
15            oOo
16
17
18    _____
18
DENNIS C. O'DONNELL
19
20    Subscribed and sworn to
before me this     day
21    of      2010.
22
23    _____
24
25

TSG Reporting - Worldwide    877-702-9580

---

Page 167

1    **D. O'DONNELL**
2    CERTIFICATE
3    STATE OF NEW YORK )
            : ss
4    COUNTY OF NEW YORK)
5    I, Kathy S. Klepfer, a Registered
6    Merit Reporter and Notary Public within and
7    for the State of New York, do hereby
8    certify:
9    That DENNIS C. O'DONNELL, the witness
10    whose deposition is herein before set forth,
11    was duly sworn by me and that such
12    deposition is a true record of the testimony
13    given by such witness.
14    I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18    I further certify that neither the
19    deponent nor a party requested a review of
20    the transcript pursuant to Federal Rule of
21    Civil Procedure 30(e) before the deposition
22    was completed.
23    In witness whereof, I have hereunto
24    set my hand this 6th day of December, 2010.
25    ------------------------------

TSG Reporting - Worldwide    877-702-9580

---

Page 168

1    **D. O'DONNELL**
2    INDEX
3    TESTIMONY OF D. O'DONNELL:        PAGE
4    Examination by Mr. Stern ....................  7
5    Examination by Mr. Cohen ....................  164
6
7    EXHIBITS:                    PAGE
8    Exhibit 498, Notice of Deposition Pursuant        5
9    to Rule 30(b)(6)
10    Exhibit 499, a document bearing Bates Nos.        88
11    WGM-LEHMAN-E 00002746 through 2766
12    Exhibit 500, a document bearing HLHZ0020162        89
13    through 182
14    Exhibit 501, a document bearing Bates Nos.        90
15    WGM-LEHMAN-E 00013962 through 13982
16    Exhibit 502, a document bearing Bates Nos.        91
17    WGM-LEHMAN-E 00013889 through 13899
18    Exhibit 503, a document bearing  Bates Nos.        92
19    HLHZ0019919 through 19930
20    Exhibit 504, a document bearing Bates Nos.        143
21    MTHM0012869 through 12871
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

---

Page 169

1    **D. O'DONNELL**
2    NAME OF CASE:  In re Lehman Brothers, Inc.
3    DATE OF DEPOSITION:  January 6, 2010
4    NAME OF WITNESS:  Dennis C. O'Donnell
5    Reason Codes:
6        1. To clarify the record.
        2. To conform to the facts.
7        3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
    From _____ to _____
9
    Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
    From _____ to _____
12
    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
    From _____ to _____
15
    Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
    From _____ to _____
18
    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
    From _____ to _____
21
    Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
    From _____ to _____
24
25    _____

TSG Reporting - Worldwide    877-702-9580

**A**

**ability (1)**
43:10
**able (1)**
42:10
**absence (1)**
111:9
**abundance (1)**
149:23
**accepted (2)**
76:8,13
**access (7)**
33:8 58:13 107:2
154:4 159:20
161:12,16
**accorded (1)**
128:4
**account (4)**
26:21 46:12 64:21
81:16
**accounting (1)**
40:17
**accounts (4)**
81:9,12,19 125:14
**accuracy (1)**
14:17
**accurate (1)**
165:23
**acquisition (5)**
24:18 37:20 38:10
40:3,23
**Act (1)**
81:25
**acting (3)**
10:11 140:11 155:3
**action (1)**
167:15
**actions (1)**
110:15
**add (5)**
98:4 99:3 111:18
128:13,14
**additional (7)**
8:5 13:21 14:6 19:8
152:17 159:20,23
**address (7)**
17:6 37:24 67:11
107:3 116:22
149:12 150:12
**addressed (1)**
157:16
**addressing (1)**
17:11
**adjustment (4)**
34:12,20,25 35:6
**Administered (1)**
1:8
**adopt (1)**

147:16
**advice (3)**
95:11 105:15 164:21
**advisor (1)**
28:15
**advisors (13)**
9:20 10:19,23 27:17
39:19 53:20 78:5
79:5 82:24 124:23
135:2 149:8 153:25
**affiliated (1)**
82:4
**affiliates (2)**
76:5 81:13
**afternoon (7)**
11:19 58:9 61:14 90:6
104:2 115:21 116:4
**after-tax (3)**
35:12 38:10 40:3
**after-the-fact (1)**
139:12
**agenda (1)**
145:23
**aggregate (1)**
29:12
**agreed (1)**
34:23
**agreement (65)**
13:13 28:2 32:17 33:2
33:12,18 34:25 35:2
42:16 46:17,22 47:3
47:4,6,14,21 48:2,5
48:8,19,23 71:13
73:25 74:3,4,6 76:2
76:6,19 88:4 93:10
93:16,22,23 94:2,6
94:9 104:12,15,24
105:10,12,17,19,24
105:25 106:7,9,15
106:17,22,24
107:22 108:5,21
109:20 110:4,11,22
111:5,11 112:13
113:5 119:21 124:5
**agreements (6)**
46:21 47:20 49:10
58:23 76:24 93:3
**Ah (1)**
151:13
**ahead (1)**
137:13
**al (1)**
1:8
**alarm (2)**
139:22 140:2
**allegation (1)**
139:15
**allocated (1)**
84:7

**alluded (1)**
109:4
**alluding (1)**
66:8
**Alvarez (17)**
131:23 132:4 133:3,8
135:9,12,13,20
137:2,7 138:13,16
139:20 140:6,9
142:2 155:24
**ambiguous (1)**
137:14
**amended (1)**
81:25
**Amendment (4)**
12:11 28:5 47:23 74:4
**amount (24)**
14:20,24 15:9 18:12
54:10,25 82:9,15
83:16,20 84:3 86:11
86:20 87:15 98:7,14
100:22 118:12
119:7,14 124:15
128:15,16 144:17
**amounts (8)**
96:14 97:22 98:3,4,8
99:4,15 100:2
**analysis (25)**
25:14,15 118:7,18
120:8 121:15,17
124:24 128:11
129:19,21 140:3
141:16 146:2,11,15
146:17,24 147:11
148:14 153:23
154:5 160:15,16,17
**analyzed (2)**
127:18,20
**and/or (3)**
145:12 165:3 166:6
**Ann (2)**
90:21 91:23
**announced (3)**
24:16 35:11 144:18
**announcement (21)**
24:23 35:18,21,24
36:6,17,19,22 37:4
37:8,11,19 38:2,9
38:13,21,24 40:2,8
40:15,21
**answer (90)**
7:18 16:6 29:6 36:12
36:25 37:16 38:7
41:14 42:17,21
50:11 53:11,18,21
59:16 64:11,15,19
68:21,25 69:22 72:2
72:13 77:22 78:21
79:6,14,20,21 82:17

82:21 83:3,23 84:2
84:2 95:14 96:5,22
97:8,18 98:2,6,11
99:6,9,24 100:5,9
101:2,20,24 102:6
102:11,16,21 103:3
103:7,13 105:14,21
106:4 109:13,24
111:8,15 113:9
114:22 116:17
117:3 118:7,19
119:4 121:16
124:24 134:22
136:24 137:24,25
138:10,10 139:25
140:5 142:16,19
146:6 150:18
154:19 162:15
163:21 164:21
**answered (8)**
10:21,24 44:18,19
60:12,20 108:8
111:7
**answers (6)**
24:13 26:22 38:19
45:19 120:6 166:3
**anticipated (8)**
24:17 35:11 37:12,20
38:10 40:2,23 43:7
**anybody (30)**
10:10 17:5 18:11
20:13 39:5 45:9
46:4 56:25 57:12
61:15 93:2,15,21
94:5 107:20,21
108:3,4,19 116:20
116:21 139:21
140:11 145:17
146:23 148:24
155:2,3 162:2 163:8
**Anytime (1)**
41:6
**APA (28)**
12:11 28:7,11,20 29:4
30:2,6,13 31:3,6,12
31:16,20 32:3,4
33:19,23 34:5,11
47:22,23 73:8 95:7
95:20 100:21
117:11,11 123:25
**apart (1)**
84:24
**appeal (3)**
102:4 103:6,10
**appealing (1)**
101:18
**appear (1)**
153:15
**appeared (2)**

128:16 143:5
**appears (9)**
52:15 87:2 89:8,20
90:4,16 91:18 92:20
132:21
**applicable (2)**
81:21 113:23
**apply (2)**
114:4 118:21
**appointment (1)**
9:16
**apprized (2)**
129:15 150:16
**approval (35)**
8:24 9:2,12 10:4
11:25 13:23 14:19
15:7 19:14,17 24:15
27:25 32:16 34:5,19
34:23 36:11 44:4,21
45:20 57:6 58:7
74:23 75:13 94:12
97:13 98:17 102:9
102:10,20 103:6,11
119:13 122:9
128:18
**Approve (2)**
94:21,21
**approved (5)**
36:3,7 43:5,6 147:20
**approving (1)**
146:21
**approximate (1)**
141:8
**approximately (5)**
5:13 41:23 55:19
141:20 157:23
**areas (1)**
95:14
**arising (2)**
82:3 125:8
**Aronzon (2)**
9:9 133:12
**arose (1)**
109:3
**arrange (1)**
161:23
**arrangements (1)**
82:4
**arrangements (1)**
82:4
**aside (8)**
15:2 44:22 49:9 62:9
108:18 110:9
138:15 140:23
**asked (16)**
18:6 27:10 28:23
41:10,12 56:10,11
60:11,20 73:17
84:16 108:7,17
111:6 127:10
130:19

**asking (8)**
13:5 27:6 53:15 71:6
108:10,18 137:22
156:25
**asks (1)**
104:18
**aspects (3)**
27:10 116:22 133:11
**assertion (1)**
46:10
**assess (1)**
26:14
**asset (8)**
28:2 29:16 74:2,4
123:2,6,11 144:22
**assets (92)**
19:2,3,8,12,13,22,25
20:4,7,10 21:13
22:16 23:2 26:4
28:10,20 29:3,12,14
29:20 32:11,19 33:4
33:14,25 34:7 52:25
64:10,14 70:18,25
71:5 72:12 73:12
75:23,23 76:2,9,20
77:17 78:18,20
79:13 83:16,21
84:24 93:4,12,25
94:8,22,24 104:15
105:4,6,11,18
107:10 109:12,21
112:3 117:8,14,16
117:17,19,24,24
119:8 120:13
121:23 122:11
123:10,18,20
126:14,16 128:15
128:24 129:9
134:10,11 136:2
139:18 141:20
148:16,19 149:2
163:5 165:15,20
166:4
**assignment (3)**
94:23 95:25 96:3
**assistance (1)**
163:13
**assisting (1)**
17:13
**associated (1)**
129:6
**associates (1)**
9:8
**association (1)**
5:17
**assume (7)**
63:7 97:15 113:10
124:6 133:11 154:4
160:5

**assumed (27)**
14:21 30:12,16,19,23
31:2,11,13 32:2,4
32:12,19 33:5,14,25
34:7 54:10 93:5,18
104:23 112:6
124:10 125:12,17
125:24 126:3
138:23
**assumes (1)**
154:6
**assuming (3)**
63:6 99:2 100:12
**assumption (6)**
29:23 30:8 31:17
94:22 96:2 124:2
**assure (3)**
109:19 110:3,22
**assured (1)**
111:10
**attaching (2)**
90:16 92:21
**attachment (1)**
131:11
**attempt (1)**
36:5
**attempted (1)**
116:9
**attempting (1)**
16:22
**attend (6)**
61:15,22 131:23
133:22 134:3
150:11
**attendance (2)**
139:22 147:25
**attended (13)**
9:4,5 66:3 70:11
88:10 132:10 133:3
133:6 145:7,13,16
151:7,24
**attending (1)**
9:2
**attention (2)**
38:22 165:4
**attorney (24)**
95:12 96:7,21 98:6
100:5 101:2,21
102:6,17 103:4,14
105:15,22 106:5
109:25 114:24
116:18 117:4
124:22 126:11
136:24 156:22
163:23 164:22
**attorneys (11)**
3:5,11,18 4:4,10
10:19,22 11:23,23
133:10,25

**attorney-client (12)**
102:16 103:3,13
109:24 111:16
114:23 116:17
117:3 126:10 139:3
156:22 162:16
**attributing (1)**
123:16
**authorized (4)**
106:2,9,17 162:25
**available (7)**
52:21 53:5 83:17,21
112:12 160:6
162:20
**Avenue (4)**
2:7 3:12,20 5:11
**avoid (1)**
16:11
**aware (10)**
20:17 39:9 40:9 83:13
98:7 101:5,16,22
102:2 158:18
**A&M (4)**
10:21 11:6 142:25
143:3
**A.M (5)**
5:13 52:2,7 87:20
91:20

---

**B**

**b (22)**
74:3 76:9,13 77:16
78:17 87:7,9 94:20
107:6,10 120:10
125:6 126:5,6,16,23
128:20,23 129:3,9
160:18,25
**back (20)**
39:16 52:7 68:5 69:23
84:19 87:8,23,25
88:6 104:5,10 117:5
122:6 126:13
130:14,18 143:20
143:25 152:15
157:9
**balance (1)**
113:6
**balanced (16)**
105:5 107:23 108:6
108:21 109:11,20
110:5,11,22 111:12
112:16 113:5,15
114:3,19 115:3
**bank (2)**
119:9,12
**BANKRUPTCY (1)**
1:2
**Barclays (118)**
3:11 5:22 6:18 10:10

10:11 12:15 13:12
13:25 14:21 15:10
17:16 18:2,13,25
23:15,21 24:8,16,17
25:6 26:4,5,8 27:21
29:3,22 31:18,22
35:10,21 36:16,22
37:4,8,20 38:9 39:5
39:6,10,16,17,18,21
39:23,25,25 40:11
40:13,22 41:2 53:17
53:23 54:10,25 55:4
55:5 62:15 64:5
65:7,13 66:6,12,15
66:15 68:19 69:7
71:12,13 72:20,22
76:6 77:19 78:6
79:2,24 81:2 83:10
84:7 85:22,25 86:3
86:4,5 88:3 95:6,21
95:24 96:3 97:14
100:12,22,24
118:25 125:3,10,16
125:23 127:2,9
133:20 138:24
140:12,22 141:5
150:5 154:16,22
155:4 161:7,10,16
161:23 162:4,13,21
163:8,8 165:16
**Barr (9)**
145:8 151:7,25
152:22 153:9,17
154:4 156:8 158:2
**based (34)**
35:4 36:19 48:7 49:2
49:9,18 50:3,15
51:7 52:14 67:3,6
70:20 95:18 96:9
98:12 100:20 107:8
107:10 119:3,22
120:2 121:21
122:18 123:15
126:19 139:5,9,12
139:22 140:7
153:10 156:24
157:2
**basic (1)**
153:21
**basis (20)**
99:6 100:5 101:2,20
102:6,16 103:3,13
109:24 116:17
117:3 136:24 143:8
146:24 147:3,11
153:15,18 154:19
162:15
**Bates (10)**
88:22 90:7 91:9 92:12

143:15 168:10,14
168:16,18,20
**Bates-numbered (2)**
67:23 130:3
**Battery (1)**
4:5
**bearing (13)**
13:18 88:22 89:14
90:7 91:9 92:11
143:15 168:10,12
168:14,16,18,20
**began (3)**
11:19 12:12 24:11
**beginning (2)**
10:4 15:24
**behalf (17)**
5:25 6:6,9,12,14,17
10:11 17:15 25:16
81:17,23 108:12
140:11 142:12,18
155:3 162:25
**belief (2)**
109:15,16
**believe (46)**
10:20 11:6 14:23 17:9
19:18,20,24 24:7,22
25:2 36:9,21 37:3
41:25 44:14 55:8,13
55:21 62:12,21
63:11 70:6 80:5
86:10 87:9 88:18,20
92:21 96:23 97:16
105:8,16 109:9
117:6 122:14,16
129:5 131:6,10
145:11 147:24
149:3 151:4 155:7
160:20 161:19
**believed (5)**
25:5 46:5 75:18 83:21
115:2
**Bell (36)**
9:9 45:8,11,12,21
57:10,19 59:7,9,20
59:25 60:7,24 62:6
72:17 89:9 90:5,24
91:3,25 93:2,9,15
93:21 94:5 108:16
108:19 112:9,12,15
112:21 113:12,25
115:3,18 116:5
**Bell's (1)**
57:17
**benefits (1)**
100:13
**best (27)**
15:6 17:3,7 20:5,12
22:19 23:2,5,13
27:8 31:8 32:8,21

34:9 40:4 44:10
56:7 57:4 66:17
67:11 83:8 87:16
133:24 151:23,24
152:5 156:10
**better (2)**
147:12,15
**BEVERLEY (1)**
4:16
**Beverly (2)**
6:13,13
**beyond (8)**
14:7 27:11 129:10
137:11 140:3 142:7
152:16 162:23
**bidding (1)**
95:19
**billion (55)**
19:9 20:11 21:14
24:18 35:11 38:10
40:2,16 66:16,22
68:15,16 79:7 80:12
80:16 87:5,11
105:18 119:11,15
119:18 122:14,15
122:16,17 134:11
134:12,19 136:17
137:4 138:4 139:8
139:17 140:13,25
141:9,14,21 142:3,4
144:19,24 146:5
155:24 156:4,16
157:6,7,16,21,24
159:8,13,16 165:5
**billions (9)**
26:9 144:24 146:4
157:23 159:7,8,13
159:15,20
**blank (1)**
7:11
**blood (1)**
167:16
**Bob (1)**
90:18
**Boies (4)**
2:5 3:10 5:22 6:17
**bondholders (1)**
25:5
**book (5)**
134:11,17 135:10,21
136:9
**bottom (1)**
144:4
**box (6)**
19:2,19 64:10 70:18
70:24 78:18
**boxes (1)**
76:10
**break (4)**

51:21,24 87:18
143:11
**Breakup (1)**
94:21
**briefing (1)**
11:2
**briefings (6)**
9:13,25 10:6,7,15
11:17
**bring (1)**
150:2
**broker-dealers (1)**
133:19
**Brothers (7)**
1:7 3:5 5:9 6:12 12:14
133:19 169:2
**brought (2)**
38:21 165:4
**Burian (1)**
145:12
**business (6)**
76:11 81:20 117:18
124:14 125:15,22
**buying (1)**
26:5

——————————
C
——————————
**c (27)**
1:12 2:4 3:3,23 4:2
6:22 74:5,8,14
76:21 77:16 79:8
81:5 84:20 85:12,13
87:13,25 94:20
104:6 120:20 121:6
121:20 126:17
166:18 167:9 169:4
**calculation (4)**
29:11 30:11,15,18
**calendar (1)**
7:11
**called (1)**
6:22
**calls (36)**
17:21 18:20 21:20
49:23 50:9 53:14
59:14 60:17 65:20
69:21 75:3 85:16,23
95:11 101:8,12
105:14,21 106:4
111:18 112:19
113:16,17 114:6
115:5,24 129:13
137:18 138:8 151:5
152:24 153:2,19,20
162:22 163:21
**cap (4)**
93:11,17 105:10,18
**capital (7)**
3:11 5:23 6:18 22:17

23:3 76:21,21
**careful (1)**
120:5
**Carl (2)**
4:7 6:8
**case (8)**
1:7 87:2 113:10 125:9
133:9,11 149:7
169:2
**cases (1)**
125:9
**cash (10)**
68:11 118:10 119:6,9
119:9,10,11,11,14
119:18
**categories (4)**
7:23 77:17 117:20
126:16
**category (39)**
19:7,12,13,22,25 20:4
20:6,10 77:18,18
78:17 79:8 84:20
85:12,13 86:9,11,18
86:20 87:7,9,13
120:10,12,20,23
121:3 122:4,10,20
122:22 123:2,6
124:12 125:2,4,6,21
125:24
**caused (1)**
136:21
**caution (5)**
35:14 126:9 139:2,24
149:23
**caveat (1)**
78:25
**central (1)**
156:12
**certain (21)**
19:2 21:9 23:17 25:5
29:23 30:8 45:19
58:22 61:25 95:21
96:13 100:12,13
105:10 130:7 132:7
148:18 161:23
163:4 165:14,20
**certainty (3)**
104:14,22 105:3
**CERTIFICATE (1)**
167:2
**Certified (2)**
2:10,10
**certify (3)**
167:8,14,18
**cetera (4)**
73:25 120:11 125:15
125:23
**chance (1)**
90:12

**change (1)**
73:11
**changed (2)**
12:3 73:7
**changes (17)**
12:8,19 13:21 14:15
15:25 42:15 43:7,11
44:6 46:8,16 49:20
50:5 51:9 73:11,13
110:21
**Chapter (3)**
1:6 125:10,10
**character (1)**
154:10
**charged (3)**
28:15 38:3 56:18
**Chase (2)**
62:19,22
**circulated (1)**
86:23
**circulating (1)**
91:19
**circumstances (1)**
113:11
**Civil (1)**
167:21
**clarification (45)**
48:19,23 49:19 50:3,4
50:13,16,19,23 51:3
51:5,7,15 58:2,4,9
59:11,22 60:9 63:12
63:13 64:7,23 71:19
72:18 74:6 75:9,16
75:22 77:8 87:8
89:9 90:5,17 91:20
92:24 97:10 115:19
119:23 120:3 121:4
121:5,20 151:10,18
**clarify (3)**
29:14 128:21 169:6
**Clarifying (1)**
47:24
**clarity (1)**
16:11
**clause (2)**
76:20 121:22
**clauses (2)**
75:25 76:4
**clear (2)**
16:8 85:8
**clearance (7)**
19:2,19 64:10 70:17
70:24 76:10 78:18
**clearing (1)**
82:5
**clearly (1)**
163:5
**Cleary (1)**

91:19
**client (1)**
35:15
**clipped (1)**
89:21
**close (3)**
76:11 144:17 157:24
**closing (67)**
23:20 24:3 37:5,10,15
38:17 39:4,11 40:25
41:6 42:4,12 43:20
47:2 48:3,15 51:12
52:18 54:8 55:7
57:6 58:7 59:12
60:8 61:2,5,9,16,19
61:23 62:2,8 76:11
76:16 81:22 82:16
85:12 87:10 92:25
93:7,8,14,20 94:4
96:14 97:6,14,22
98:15 99:13 101:4
101:16 108:23,24
109:19 112:10
119:25 120:11
124:6,7,14 126:21
127:5,15,24 157:18
161:4
**CLR (1)**
1:21
**Codes (1)**
169:5
**Cohen (186)**
4:15 5:24,24 10:5,12
16:5,15 17:21 18:20
21:2,20,23 23:16
25:17 26:11 28:21
29:6,24 30:3 31:4
32:20 33:6,17 35:3
35:14 36:12,25 37:6
37:16 38:7 40:14
41:2,13 42:6,17,21
46:23 47:12,15,18
48:11,21 50:7,9,18
51:20 52:23 53:11
53:14 54:18 56:23
59:14 60:11,14,17
60:20,22,25 67:3
67:22 68:2,21,25
69:20 71:20 73:21
74:9 75:2 77:5,22
78:3,21,25 79:14,18
81:5 82:17,21 83:23
85:5,16,23 86:13,15
88:11 89:17,19
95:10 96:4,16 97:8
97:18,23 98:5,18,22
99:5,9,17,24 100:4
100:9,15,25 101:8
101:12,19,24 102:5

102:11,15,21 103:2
103:7,12 105:13,20
106:3 107:14,24
108:7 109:13,23
110:13,24 111:6,13
111:17 112:19
113:16 114:6 115:5
115:24 116:16
117:2 118:3,14,21
120:5,14 121:7,24
124:17 127:16,25
129:10 130:3,10,16
131:2 132:11,14,20
134:20 136:11,23
137:11,18,23 138:8
138:18,22 139:11
139:24 141:12
142:7,10,17 147:2,6
147:10,14 148:20
150:23 152:12
154:18 156:2,19
157:7 162:14,22
163:20 164:20
165:10 166:8 168:5
**Cohen's (1)**
16:9
**collateral (3)**
18:12 67:20 68:7
**collateralized (1)**
76:24
**collectively (1)**
124:10
**column (4)**
67:20,20 68:7,7
**come (3)**
39:16 68:5 144:17
**comes (4)**
98:10 118:6 129:18
130:8
**comfortable (2)**
110:17 157:11
**coming (1)**
134:24
**commenced (1)**
125:9
**comment (2)**
112:12 116:11
**comments (2)**
72:19,23
**commitment (1)**
9:17
**Committee (36)**
3:18 6:6 9:18 25:10
42:8,15 43:9 44:3
44:15 46:6 48:10
49:4,12,17,21 50:6
50:14 51:9 62:9
75:18 82:24 101:6
102:8,13,18,23

103:5,9 114:18,25
128:17 132:5
142:13 150:14
154:13 160:19
**Committee's (11)**
10:23 27:17 28:15
43:21 53:20 78:4
79:5 116:13 124:22
135:2 142:5
**communicate (8)**
14:12 35:9 50:13
72:19 74:24 75:10
75:17 159:15
**communicated (4)**
154:3 156:13 157:5
157:10
**communicating (1)**
110:3
**communication (5)**
39:9 75:4 119:2 122:3
156:22
**communications (18)**
35:16,16 39:5 95:12
96:7,21 105:22
106:4 110:15
111:16 114:23
126:10,20 139:3
140:3,8 150:21
157:3
**comparisons (1)**
36:5
**compensation (6)**
31:10,21 32:5 95:22
100:14,22
**complained (1)**
20:24
**complaining (1)**
21:12
**complaint (3)**
21:17,19,25
**complaints (3)**
22:4 25:9,12
**complete (2)**
42:11 132:15
**completed (1)**
167:22
**components (5)**
28:17 29:15 31:10
38:4 48:16
**compound (3)**
75:5,7 134:21
**concept (2)**
140:24 142:4
**concern (19)**
39:24 105:25 106:8
106:16,23 108:20
109:5 127:21 129:8
136:21 137:3
139:22 140:2

144:15 156:5,7,12
157:6 165:4
**concerned (5)**
107:12,22 108:5
114:18 146:3
**concerning (78)**
9:14 10:2 11:18 12:14
13:25 14:20 15:9
18:24 20:10,15,20
22:14,16 23:14 27:3
28:9,19 30:25 32:2
33:3,13,24 39:25
42:14,24 43:21
44:24 48:9 49:2
53:9,24 54:4,9,16
55:5 64:4,9,13,17
65:6,11 66:14 67:2
68:18 70:17 71:11
71:17,24 72:11
79:25 82:9,15 83:5
84:9 93:24 95:6
104:14,22 105:3
111:3 112:2,5 117:7
129:20 134:17
135:20,21 136:9,16
140:12 141:14,23
145:20 146:11
150:22 153:17
160:25 163:4
**concerns (23)**
38:11 107:19 108:10
108:12 126:25
128:2,8,10,12 136:4
149:24,25 152:15
153:13,15,18 154:2
155:14,17,22
156:17 157:13
160:19
**conclude (1)**
50:3
**concluded (1)**
26:8
**concludes (1)**
166:12
**conclusion (5)**
22:24 49:16 101:9,13
113:17
**conclusions (2)**
78:11 150:3
**conclusive (1)**
44:15
**conditions (8)**
32:18 93:4 111:4,10
112:18 113:13
114:3 124:5
**conducted (2)**
139:14 148:13
**conducting (2)**
26:17 44:16

**conferences (1)**
10:13
**conflicts (1)**
150:6
**conform (1)**
169:6
**conjunction (1)**
110:7
**connection (13)**
15:10 22:17 28:7 42:4
81:14 96:13 117:18
124:14 128:18
138:17 142:13
144:12 165:16
**consent (14)**
42:15 43:10,21 44:3
46:6 48:10 49:4,12
49:17,21 50:6,14
51:10 75:18
**consider (4)**
40:12 102:14 154:16
162:12
**consideration (10)**
29:22 30:8 93:25 94:9
102:24 103:10
104:23 105:4
109:12,22
**considered (3)**
23:3 37:12 162:17
**Constance (2)**
4:16 6:13
**contact (3)**
39:22 154:22 155:3
**contacting (1)**
154:16
**contain (1)**
128:23
**contained (1)**
53:24
**content (1)**
139:2
**context (8)**
7:25 18:15 33:7,8
45:17 56:14 86:6
112:22
**contexts (1)**
150:5
**continuation (2)**
65:3 70:19
**continue (2)**
56:3 127:10
**continued (2)**
13:21 107:16
**contracts (12)**
94:23 95:25 96:15
97:6,14,22 98:15
99:15,16 121:9
123:4 125:8

**contractual (1)**
111:9
**contractually (1)**
113:15
**control (1)**
161:16
**Cont'd (2)**
4:2 104:8
**conversation (5)**
41:16,18 45:22 56:8
161:19
**conversations (8)**
9:25 10:10 53:19,19
156:6 158:7,9,12
**conveyed (1)**
128:9
**convince (1)**
153:14
**cooperation (1)**
164:13
**copies (1)**
52:24
**copy (16)**
35:18 48:4 52:15
58:23 59:3,7,10,21
60:9 90:22,25 91:4
92:3,23 132:2,14
**corner (3)**
67:15,19 68:6
**corporate (2)**
17:12 57:19
**correct (90)**
22:9 23:22,23 31:14
31:15,19,23 32:13
32:14 33:15,16 34:2
34:3 36:18 39:15
46:19 51:5,6 52:19
54:7,17 59:8,23
60:19,21 61:6 62:5
67:24 68:9 70:10
72:8,9,16 77:11,13
77:14 78:14,16 81:7
84:11 86:12,14,19
86:21 87:6,11,12,16
87:17 91:7 92:7,10
102:8,18 103:5
106:19 107:7
111:25 112:3,4,6,7
112:10,11,13,14,24
113:2,3 115:19
116:2 117:8,9
120:19 121:2
123:23 125:20
126:24 129:22
131:13 143:10
148:9 151:2,22
152:2 157:18 161:3
161:21 163:15
169:7

**couched (1)**
40:17
**counsel (9)**
5:19 8:6,6 25:10 42:7
150:6 151:16
154:16,22
**COUNTY (1)**
167:4
**couple (2)**
7:22 165:11
**course (18)**
15:19 23:6 24:2,12
25:3 35:17 38:18
39:20 54:21 59:24
115:12,12 125:15
133:9 135:18
149:18 151:3
153:19
**court (33)**
1:2 5:16 6:19 13:22
14:4,10,24 15:3
17:24,24 20:21 24:7
30:22,25 31:9 36:3
36:7 43:5,9 44:4,21
45:20 74:22 75:12
97:2 106:2,9,18
128:17 144:14,18
147:21 158:24
**courtroom (4)**
16:20 17:10 21:5
43:15
**courtrooms (1)**
21:6
**Court's (2)**
36:11 163:13
**covered (2)**
27:18 46:14
**Crayton (8)**
9:9 45:8 57:10 89:9
90:5 108:16,19
112:9
**create (1)**
114:3
**Creditors (10)**
3:19 6:7 10:17 13:5
21:7,10 25:9,11
27:5 132:5
**CRR (1)**
1:21
**cure (12)**
31:10,18 32:4 95:7,21
96:14 97:21 98:3,8
98:15 99:15 100:2
**current (1)**
21:8
**customary (2)**
112:16 113:19
**customer (5)**
81:9,12,16,17,19

**customers (1)**
81:13

───────────────

**D**

**d (178)**
1:1 2:1 3:1 4:1 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1,25 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1,21 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1,3,22 122:1
123:1 124:1 125:1
125:14 126:1,5,7,8
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1,3
169:1
**Dan (1)**
25:13
**date (21)**
5:4 36:19 81:24 88:24

89:16 90:9 91:11
92:13 96:14 97:6,14
97:22 98:15 125:8
141:17 143:17
148:3 156:25
159:18 164:18
169:3
**dated (4)**
74:3,5,6,10
**David (8)**
4:15 5:24 57:10 90:18
90:21 91:18,23
92:20
**day (12)**
3:4 6:11 9:11,15
14:10,11 43:15
55:20 62:17 69:24
166:20 167:24
**days (3)**
76:15 99:13 101:15
**deadline (3)**
101:5,11,17
**deal (4)**
16:23 35:7 115:13
128:5
**dealing (1)**
59:25
**dealings (1)**
86:5
**deals (1)**
134:23
**debtor (1)**
54:3
**Debtors (23)**
1:9 9:20 10:6,8,20
27:16 30:22,24 31:9
43:8 53:17 78:6
79:2 83:5 94:19
95:19 154:13
159:22,25 161:11
161:13 162:3,9
**December (7)**
151:17 158:6 161:5
162:4,19 163:10
167:24
**deciding (2)**
102:14 103:10
**decision (1)**
116:14
**decisions (1)**
150:3
**deemed (1)**
150:5
**define (1)**
47:5
**defined (5)**
47:8,9,21 76:6 119:6
**definition (6)**
29:16 73:11 75:25

117:13,15 121:22
**definitively (6)**
9:23 23:18 40:18 46:7
58:16 85:11
**delete (1)**
34:24
**deleted (1)**
34:15
**delivered (2)**
76:8,13
**delivery (5)**
65:12 66:5,14 68:19
69:6
**Dennis (11)**
1:12 2:4 5:8 6:3,22
9:8 104:6 133:11
166:18 167:9 169:4
**depend (1)**
100:23
**deponent (1)**
167:19
**deposition (18)**
1:12 2:4 5:2,7,10 7:7
7:15,19 8:16,18,19
73:24 140:4 167:10
167:12,21 168:8
169:3
**deposits (4)**
84:3 119:9,12 120:10
**derivatives (14)**
64:18 71:25 76:22,23
79:9,11 80:2,3
84:21,22 85:3,4
87:14,15
**derived (1)**
118:24
**describe (4)**
9:24 63:8 153:22
159:2
**described (8)**
20:11 63:5 69:24
70:13,25 126:16
127:23 151:7
**describing (1)**
77:16
**description (1)**
25:21
**designated (2)**
96:2 99:14
**desire (2)**
42:11 164:3
**desk (1)**
90:23
**Despins (32)**
8:10 9:8 44:11,23
45:3,21 46:4 57:10
61:7 62:6 83:14
84:9,13,16 133:12
144:5,9 145:22

146:14 149:4
151:19,20 152:10
153:4,6,8 155:8,16
158:17 159:10
160:15 161:18
**detail (2)**
147:17 155:19
**details (3)**
147:7,23 148:21
**determine (2)**
143:8 148:15
**determining (1)**
102:24
**develop (1)**
23:25
**developed (1)**
28:19
**developments (9)**
16:21,21 17:6,14
20:16,25 22:11,14
40:24
**different (4)**
77:16 113:20 127:14
127:22
**difficult (2)**
116:11 161:15
**difficulty (1)**
51:22
**diligence (4)**
26:17 42:8 44:16
127:10
**diligencing (1)**
78:10
**directed (3)**
54:23 56:3 129:14
**directly (2)**
116:6 161:9
**discharge (1)**
124:8
**disclose (4)**
78:5,7 79:3 114:23
**disclosed (9)**
12:9,9 13:22 14:4
56:13 97:2 146:22
154:11 158:23
**disclosure (1)**
163:22
**Disclosures (1)**
12:19
**disconnect (1)**
146:19
**disconnection (1)**
146:25
**discount (2)**
25:6 26:9
**discrepancy (5)**
141:9,15,23 144:19
158:21

discretion (1)
76:15
discuss (6)
17:16 35:15 116:20
146:14 152:25
155:4
discussed (35)
17:20 18:12 19:5,11
27:13,21,23 36:6
43:3 44:9,13 45:4
63:23 65:16,23 66:2
66:6,23 70:22 71:15
71:22 72:5 77:3,8
84:4,12 88:9,16,19
88:21 134:8 136:19
140:21 145:19
148:11
discussing (1)
38:24
discussion (31)
17:18 18:17,24 36:3,7
44:22 46:2,13,14
54:15 56:20 65:15
66:9,11,18,21 70:16
71:11,17,23 72:10
82:12 103:15
130:13 134:16
135:5 141:3 145:24
146:10 158:4
160:23
discussions (67)
9:19 11:22 14:8,9
15:5 20:9,14,19,22
22:10,13,21,23
43:20,24 44:11,14
44:24 45:5,13,15
48:9,13,14,25 49:7
64:4,9,13,17 65:5
65:10 70:20 82:9,15
82:20,22 83:2,4,7
83:12,13,15 84:8
96:25 109:2 115:14
116:8,9 140:11
141:6,13,22 150:18
151:4 152:7,17,20
152:21,22 154:9
155:7,9,13,21 156:9
160:12
disputes (1)
161:12
distributed (2)
58:23 59:3
DISTRICT (1)
1:3
divvied (1)
84:4
Doctrine (1)
163:24
document (60)

7:25 29:25 46:25
52:10,14 69:15
73:15,23 74:15,17
74:20,21 88:22,25
89:5,6,11,14,23,25
90:2,7,13,14 91:9
91:12,15,16 92:11
92:14,17,18 97:23
98:2 116:12 119:3,7
119:8 130:2,4,6,9
130:22 131:4,5,9
132:2,12,15,24
140:21 143:15,22
144:7 168:10,12,14
168:16,18,20
documents (9)
8:2,5 50:20 57:21,23
89:20 120:8 121:7
127:11
doing (2)
16:10 148:17
dollars (2)
26:10 159:15
draft (19)
58:2,4,8,13,17 59:4
62:2 63:12 73:4
78:9 86:23 89:9
90:4,17 91:4,20
110:18 115:20
157:12
drafted (1)
138:12
drafts (16)
51:18 57:23 58:11,15
58:22 59:3,7,10,22
60:9 72:17,24 91:2
115:18,22 116:3
draw (1)
36:5
DTC (1)
82:4
DTCC (1)
62:25
duly (2)
6:23 167:11
Dunn (2)
9:8 133:12
dynamic (1)
161:10
D.C (1)
4:14

_____
E
_____

e (7)
3:3,3 4:2,2 75:25
122:4,7
earlier (4)
11:20 36:9 66:20
117:6

early (3)
55:23 70:8 165:2
ease (1)
7:11
East (1)
3:6
Eastlake (3)
57:11 61:12 62:7
effect (3)
22:6 23:12 39:2
effective (1)
124:6
effectively (1)
116:12
effort (1)
161:6
efforts (2)
14:9 153:5
eight (1)
19:17
either (8)
20:9 22:6 35:15 53:23
66:4 79:24 137:3
140:12
elaboration (2)
153:3,7
elect (1)
76:15
electronic (1)
61:19
element (1)
40:8
elements (3)
8:22 10:1 11:24
Emanuel (4)
3:17 6:6 161:5 163:17
embroiled (1)
161:13
emerged (1)
128:10
employee (1)
100:13
employees (1)
100:24
employment (1)
100:24
ended (1)
11:3
enforceable (1)
113:15
engage (1)
116:9
engaged (2)
116:8,10
ensued (1)
153:14
ensure (1)
43:9

entailed (1)
46:3
entity (1)
125:9
entries (1)
8:13
entry (2)
43:6 101:15
enumerated (1)
117:25
environment (1)
53:17
equipment (1)
122:21
equivalents (2)
119:9,11
errors (1)
169:7
ESQ (6)
3:8,14,23 4:7,15,16
essential (3)
113:14 114:3 116:13
essentially (1)
148:14
Establish (1)
94:20
established (1)
46:7
estate (1)
122:8
estimate (38)
71:4 77:20 78:2,4,6
78:19,24 79:12,17
79:25 80:19,21,25
84:25,25 85:6,12
86:10,19,22 87:9
120:12,16,22
122:10,13,25 123:5
123:10,13,19
124:15 125:3,11,16
125:24 126:3,15
estimated (6)
19:8 21:13 66:15
107:8,15 122:21
estimates (1)
124:20
et (5)
1:8 73:25 120:10
125:15,22
evaluate (1)
129:14
evaluated (2)
44:5 147:18
evaluating (3)
28:16 38:3 56:18
evaluation (2)
111:20 148:14
Evan (2)

9:9 145:8
evening (2)
55:22 70:8
events (2)
12:17 13:20
evidentiary (1)
142:20
evolving (2)
19:16 73:4
exactly (1)
143:5
Examination (5)
7:2 104:8 165:9 168:4
168:5
examined (1)
6:24
example (1)
56:25
excerpts (1)
132:21
excess (1)
80:11
exchange (2)
18:13 81:25
exchanges (1)
152:23
exchange-traded (8)
64:18 71:25 76:21
79:9 80:2 84:20
85:2 87:13
exclude (1)
59:19
excluded (4)
75:23 82:5 117:19
119:8
excluding (1)
117:18
excruciating (1)
147:17
Executed (1)
74:6
execution (1)
73:7
executives (1)
39:18
exhibit (58)
5:2 7:6,8,16 52:11
53:24 54:4 67:13,23
73:18,23 74:2,3,5,8
74:10,14 78:15 81:5
86:12,21,25 87:4,25
88:22 89:2,12,14,17
89:20,24 90:7,10,10
91:2,9,13 92:4,11
92:15 94:17,18
117:5 129:24 132:3
132:11 133:15
143:15,23 152:12
153:11 168:8,10,12

168:14,16,18,20
**EXHIBITS (1)**
168:7
**expect (1)**
130:9
**expectations (1)**
113:21
**expedited (1)**
26:17
**experience (2)**
113:20 114:4
**experienced (1)**
113:2
**experiences (1)**
113:21
**explain (6)**
41:11 135:10 141:11
141:13 146:23
148:25
**explained (3)**
12:4 15:25 135:20
**explanation (12)**
55:10,10,12,16,25
56:9,9,22 57:3 67:9
67:12 144:25
**explore (2)**
145:3 149:5
**express (11)**
49:11 86:3 106:6,16
106:23 108:20
127:21 137:3,6
163:25 164:2
**expressed (3)**
108:12 156:8 164:6
**expressing (1)**
139:22
**expressions (1)**
140:2
**extent (25)**
49:23 54:13,18 64:6
75:3 78:3 79:2,4,18
81:21 82:22,25 95:6
95:10 98:10 104:18
109:14 111:15
118:4,6 120:15
125:22 129:13
134:22 156:21
**e-mail (32)**
25:19,19 26:19 41:19
41:24,25 89:8 90:16
91:18 92:20,22
130:8 131:6 143:25
144:4,5,8,10 145:5
145:22 146:14,19
149:5 150:24
151:20 152:10,13
152:14,23 154:11
158:17,20
**e-mails (2)**

151:5 153:2

———————————
**F**
**f (4)**
122:20 125:21 126:8
126:17
**face (2)**
49:18 50:4
**fact (6)**
13:8,10 24:8 139:6
154:3 161:16
**factors (3)**
102:13,23 103:9
**facts (4)**
8:8 40:9 153:21 169:6
**fair (1)**
165:2
**falls (1)**
7:22
**familiarity (1)**
64:20
**fashion (1)**
156:14
**Fazio (1)**
145:12
**Fed (9)**
12:14 13:13,25 15:11
17:16 18:3,3 23:15
24:8
**Federal (1)**
167:20
**Fed's (3)**
18:14 23:22 54:11
**Fee (1)**
94:21
**fielded (1)**
165:13
**Fife (18)**
14:24 15:3 16:19,24
17:4,13 18:11 97:3
144:11 145:15
151:8,9,25 152:23
153:9,22 156:8
158:2
**Fife's (2)**
153:10 154:8
**figure (9)**
29:2 32:10,11 68:14
68:18 69:6 82:8,14
87:4
**figures (2)**
69:15 111:23
**filed (4)**
47:9,15,20 98:19
**filing (11)**
73:25 97:5,7,11,12,17
97:21 98:16 99:14
99:22 100:3

**filings (1)**
96:13
**final (74)**
35:2 46:17,20,21 47:3
47:5,11,13,16,20,21
48:2,4,8,18,19,22
49:8 50:2,12,15,19
51:2 92:23 93:3,10
93:16,22,23 94:2,6
94:9 101:17 104:11
104:15,24 105:9,12
105:17,19,23 106:7
106:8,15,17,20,22
106:24 107:3,5,22
108:5,17,18,20
109:10,19 110:4,11
110:21 111:5,11
112:13 119:20
126:22 127:7,22
128:19,22,23 129:2
129:3 146:20,22
**financial (10)**
28:15 39:18 48:16
53:20 78:4 79:5
124:23 135:2 149:8
153:25
**financing (7)**
12:14,16 18:14 23:15
23:22 24:8 54:10
**findings (2)**
148:3,4
**firm (10)**
19:21 22:3,5,7 23:8
23:11 142:12,12,18
162:25
**first (31)**
7:6 10:16 11:2,10
12:11 16:14,16,18
22:25 23:14,24
26:25 27:4,15,16
28:4 47:23 67:22
74:4 75:21 77:17
133:7 144:4,10
145:2 151:17 157:4
158:6 161:4 162:3
162:19
**Fleck (5)**
9:10 145:9 151:8,25
158:2
**Flexner (4)**
2:6 3:10 5:22 6:17
**floor (3)**
3:12,21 93:17
**fly (1)**
121:10
**focal (1)**
17:17
**focus (3)**
9:11 144:3,9

**focused (2)**
28:22 136:5
**focuses (1)**
8:20
**focusing (4)**
7:13 48:18,22 140:24
**Fogarty (1)**
133:20
**follow (1)**
151:19
**followed (2)**
23:6 145:4
**following (3)**
24:3 27:15 124:9
**follows (2)**
6:25 104:7
**follow-up (3)**
149:11 151:4 160:22
**Footnote (1)**
131:12
**form (19)**
48:11 49:22 69:18
92:22 98:22 104:17
107:24 108:8
110:24 113:7
114:20 127:16
131:16 134:20
135:6 142:23 156:2
156:20 157:19
**format (1)**
68:4
**forth (3)**
124:5 152:15 167:10
**forwarded (6)**
35:19 38:2 40:19 90:5
90:18 127:8
**forwarding (2)**
25:19 89:8
**Foundation (2)**
25:17 26:11
**fourth (1)**
133:14
**framed (1)**
109:8
**Friday (1)**
12:18
**front (4)**
7:8,10 52:9 73:15
**FTI (4)**
10:23 11:5 41:21
130:9
**FTI's (2)**
131:19,20
**full (3)**
21:5 139:14 149:6
**fuller (1)**
26:22
**fully (3)**

**focused (2)**
115:16 116:10 151:16
**furniture (1)**
122:20
**further (22)**
11:16,17 18:5 40:20
40:24 54:15 56:2,6
99:14 153:3,4,7,16
154:14 158:3,7
159:22 163:9 165:7
166:8 167:14,18

———————————
**G**
**g (3)**
3:14 122:24 126:17
**gain (8)**
24:18 35:12 37:12,20
38:11 40:3,16,23
**general (9)**
27:2 45:24 46:2,13
59:24 64:22 135:24
140:24 141:6
**generally (3)**
27:5 141:8 161:13
**genuinely (1)**
114:25
**Giddens (1)**
6:10
**give (6)**
96:17 125:3,11,16,23
132:2
**given (9)**
51:17 71:4 80:7 81:2
114:11 115:7,9
150:4 167:13
**giving (2)**
26:5 121:17
**go (9)**
82:10 83:10 104:10
113:19 118:9
124:18 130:14
137:13
**goes (3)**
29:7 39:14,17
**going (20)**
7:12 19:14 25:4 28:8
29:5 30:10,14,21
32:9 35:14 60:8
69:23 75:23 84:19
88:6 111:14 115:15
121:7 126:13
134:22
**Golden (5)**
25:14,18 26:7,15,19
**Goldman (3)**
25:15,20 26:8
**good (4)**
7:4,5 51:20 153:25
**goodwill (2)**
123:9,17

**Gotshal (11)**
11:9,12 32:16,25 57:7
74:25 75:4,10 77:4
94:13 110:3
**Gottlieb (1)**
91:19
**gradually (1)**
149:19
**Grandfield (5)**
155:8,17,20 161:19
161:22
**great (1)**
115:13
**greater (1)**
83:22
**grounds (1)**
114:22
**group (2)**
13:4 83:2
**guess (1)**
65:19

**H**

**h (3)**
123:4 126:8,17
**Hadley (6)**
4:9,10 5:25 6:3,14,15
**hand (11)**
94:16 129:23 141:4,5
152:8,9 157:17,18
160:24,24 167:24
**handed (4)**
88:25 94:17 143:22
**handle (1)**
65:11
**handling (1)**
150:19
**happened (1)**
24:9
**hard (8)**
58:23 59:3,7,10,21
60:8 73:16 92:21
**Harvey (3)**
44:11 83:14 145:14
**heading (2)**
75:22 133:15
**hear (1)**
25:13
**heard (3)**
21:10 25:11 138:16
**hearing (88)**
8:25 9:3,4,6,12 10:4
11:19,22 12:2,10,12
12:24 13:16,17,18
13:19,24 14:5,19,22
15:8,14,19,24 19:15
19:17,19 20:2,4,7,9
20:10,22 22:14,24

23:7,10 24:5,15,20
24:21,25 25:4 27:25
28:9,24 30:11,14,21
32:6,7,9,16,23,24
33:10,22 34:5,15,20
34:23 35:5 36:23
42:3,10 43:4,5
54:14 57:6 58:7
74:23 75:13 94:20
95:20 96:10 97:13
98:13,17 100:11
102:10 118:11
119:13 122:5,9,19
123:16 146:20,21
**HEDGES (1)**
3:17
**held (11)**
2:5 5:10 76:9,22
79:10 80:3 81:17,23
84:21 85:3 87:14
**helpful (1)**
47:7
**hereof (1)**
81:24
**hereunto (1)**
167:23
**highly (2)**
112:23 137:14
**Hine (3)**
3:8 6:11,11
**HLHZ0019919 (2)**
92:12 168:19
**HLHZ0020162 (2)**
89:15 168:12
**hold (3)**
90:23 96:16 111:13
**Holdings (2)**
1:8 6:12
**hope (1)**
57:20
**Houlihan (90)**
10:23 11:4 28:14,18
28:22,25 29:10,19
30:15 35:8,20 38:3
40:19 41:21 52:21
53:5 54:23 55:17
56:3,14,17 62:10
67:9,10,10 68:24
69:4 71:6,8 78:10
79:4 107:16 110:7
110:16 111:19,20
126:2,14 127:9,10
127:17,19 129:7,14
131:20 136:4,7,8,22
137:3 140:10 141:3
141:23 144:16
145:11,25 146:7,11
147:6,18,23,24
148:4,11,17,22,25

152:3 153:23 154:2
154:5 156:17 157:5
157:10,17 158:14
159:14,24 160:3,8
160:11,13,23 161:6
162:2,8 164:2 165:3
165:25 166:6
**Houlihan's (13)**
54:5 85:19 128:10
129:18 131:18
141:16 144:22
146:15,16,24 148:2
159:5,11
**hour (1)**
63:22
**hours (1)**
19:17
**Hubbard (2)**
4:3 6:9
**Hughes (2)**
4:3 6:8
**hundreds (1)**
148:13
**hypothetical (2)**
45:16 114:7

**I**

**idea (3)**
51:2 85:25 143:3
**identification (7)**
5:4 88:24 89:16 90:9
91:11 92:13 143:17
**identified (2)**
75:11 156:17
**identify (8)**
49:20 74:21 89:3,13
91:14,17 92:16
155:16
**identifying (1)**
97:13
**iii (1)**
76:20
**imply (1)**
166:3
**important (2)**
162:12,17
**include (12)**
10:7 32:17 33:2,12,23
34:6 93:3,11,17,23
94:7 117:24
**included (4)**
29:22 34:11 54:25
62:14
**includes (3)**
74:2 132:6,7
**including (17)**
9:8 10:20 12:10 27:18
29:15 32:3 48:19,23
62:14 63:5 64:23

70:5 81:17 104:23
105:4 117:19
165:15
**inconsistency (1)**
37:25
**inconsistent (5)**
35:22 37:13,21 74:22
75:12
**incurred (1)**
124:13
**independent (1)**
139:13
**INDEX (1)**
168:2
**indicate (3)**
144:22 159:6,11
**indicated (2)**
87:9 149:4
**information (39)**
11:17 14:7 15:4 27:7
49:16,24 51:13,17
53:10,24 54:13,22
55:3 71:8 104:19
107:11 110:7,9
118:24 121:14
124:25 159:21,24
160:2,7,10 161:7,12
161:15,17,24 162:5
162:13,18,21 163:9
163:13,18,22
**informed (1)**
109:16
**initial (6)**
146:8 149:5,11,24
150:9 154:10
**initially (2)**
153:13 164:12
**instruct (39)**
41:14 50:10 53:20
69:22 79:6,19 83:2
95:13 96:4 98:5
99:5,17 100:4,15,25
101:19 102:5,15
103:2,12 105:13,20
106:3 109:23
110:13 114:21
116:16 117:2 118:7
118:19 121:16
124:23 136:23
140:4 148:20
154:18 162:14
163:20 164:20
**instructing (1)**
142:15
**instruction (6)**
90:21 91:22 118:16
121:24 124:19
126:18
**intangible (3)**

123:10,18,20
**intellectual (1)**
122:24
**intended (4)**
118:23 143:3 149:4,6
**interactive (1)**
17:8
**interchangeably (1)**
50:22
**interest (1)**
21:7
**interested (3)**
10:17,25 167:17
**interim (1)**
59:10,22
**internal (5)**
10:12 35:16 53:18
96:20 121:15
**internally (1)**
160:6
**interpretations (1)**
138:6
**interpreting (1)**
121:9
**introduce (1)**
5:19
**investigate (3)**
40:19 56:3 154:13
**investigated (1)**
153:16
**investigation (1)**
139:14
**invited (1)**
61:22
**involve (1)**
150:6
**involved (6)**
7:23,24 133:10
141:18 149:8 158:7
**involvement (2)**
149:14 158:3
**involves (1)**
111:15
**in-person (2)**
133:8 153:5
**irrelevant (1)**
36:10
**issue (33)**
12:23 17:19 18:16
19:5 28:22,23 44:6
44:18,25 54:16 64:6
66:5,8,22 69:8
70:22 71:15,22 72:5
73:10 83:5,19 84:3
84:5,10,15 136:2,3
136:6 143:5 144:14
144:21 159:3
**issues (43)**

17:11 25:20,22,25
26:3,3 27:20,23
28:14 40:7 41:22
44:20 54:25 56:4
64:2,23 65:14 73:6
77:2 107:4 108:11
145:3 149:6,12,14
150:12,15,20,22
152:8 153:3,8 154:3
154:14,17,23 155:4
158:4,8,16 162:5
164:3,19

**item (5)**
118:10 122:6 123:8
125:14 133:18

**items (7)**
76:3 118:2,9 119:10
124:18,18 165:15

**iterative (4)**
164:10,16,23,25

**J**

**J (1)**
3:8

**Jack (3)**
3:14 5:21 51:20

**James (3)**
3:23 6:5,10

**January (4)**
1:14 2:2 5:12 169:3

**jargon (1)**
40:17

**job (2)**
1:22 153:25

**join (1)**
111:17

**joining (1)**
16:9

**Jointly (1)**
1:8

**Jones (2)**
3:4 6:11

**JPMorgan (5)**
62:19,21 65:11 66:13
70:5

**Judge (1)**
116:22

**Julie (2)**
3:15 6:16

**K**

**K (1)**
4:12

**Kathy (4)**
1:21 2:7 5:17 167:5

**key (7)**
62:14 63:6 70:14
71:10 73:6 77:4

88:7
**Klein (10)**
55:14,15 56:5,20,21
66:19,21 67:4 70:3
70:7

**Klepfer (4)**
1:21 2:8 5:17 167:5

**knew (10)**
13:8 14:3 19:14,18
24:9,22 112:15,21
113:25 159:18

**know (101)**
8:19 13:2,15 23:9
24:10,16 25:5 28:18
42:11 44:13 57:22
58:3,15,16,19,20,21
59:6 60:6,13,24
61:7,25 62:4 63:7
63:19 64:3,8,12,16
65:5,9 66:3 68:24
69:12,13 70:11 72:3
72:8,15 77:10,13
79:24 80:18,20,23
80:25 81:3 83:20
84:2,6,12 85:21
88:8,15 90:15,24
91:3,6,25 92:5,6,9
97:4,12 109:6
112:21 113:4,9,11
113:12,21 114:14
115:20 126:20
127:12 129:2,10
131:8 132:17 137:9
137:24,25 138:2,9
138:10,11,13 142:9
143:7 144:13 150:8
150:9 152:3,4 154:7
155:19 160:7,10
162:10,11

**knowledge (28)**
8:20 15:6,8,12 20:6
22:19,22 23:5 32:8
32:21 34:9 40:4
59:17 60:15 66:18
71:14,21 72:5 126:2
126:15 129:20
139:14 140:10,20
141:4 156:10 161:2
161:25

**L**

**labeled (9)**
5:6 67:20,21 68:7,7
68:11 81:8 88:3
96:14

**large (1)**
161:9

**largely (3)**
7:13 8:20 45:16

**larger (2)**
128:16 132:21

**lasted (2)**
19:17 63:19

**late (12)**
55:9,21 62:16 64:24
65:6,10 69:23,24
70:8 77:3 149:16,17

**law (2)**
2:5 81:21

**lawyer (2)**
112:9,24

**lawyers (15)**
15:25 32:25 39:18
57:7,9 63:16 72:20
72:22 116:7 131:23
133:3,22 146:9
153:24 154:2

**lawyer's (1)**
147:25

**Lazard (8)**
10:9,21 11:6 17:9
18:11 20:15 38:12
57:2

**LBHI (2)**
76:17,18

**LBI (12)**
13:14 65:11 76:4,17
76:18 81:12,13,18
81:23 83:11 119:10
123:17

**LBI's (1)**
76:10

**lead (3)**
27:6 67:10 136:5

**leading (7)**
13:17 22:13 40:25
41:6 43:19 60:25
61:8

**learn (6)**
20:3,6 22:15,25 45:3
55:24

**learned (10)**
13:9,10,16 14:14
23:14,18 24:24 25:2
27:2 35:10

**leases (2)**
95:25 120:21

**left (2)**
56:10 67:14

**left-hand (2)**
67:19 68:6

**legal (8)**
4:20 5:15 95:11 101:9
101:13 105:14
113:17 146:21

**Lehman (45)**
1:7 3:5 5:9 6:12 10:8
10:18 12:14 17:15

19:7,8 31:25 38:12
39:12 41:21 53:23
55:4 66:11 71:5
72:19,21 79:25
80:22,23,23 85:2,7
118:24 123:16
125:2,10,16,23
130:7,11 133:19
140:12,22 141:5
150:21 160:6,8,11
160:13,24 169:2

**Lehman's (5)**
134:12,18 135:11,21
136:10

**Leinwand (1)**
91:19

**length (1)**
134:9

**letter (44)**
47:24 48:20,23 49:19
50:3,4,13,16,20,23
51:3,5,8,15 58:2,4
59:11,22 60:10
63:12,13 64:7,23
71:19 72:18 74:6
75:9,16,22 77:8
87:8 88:15 89:10
90:5,17 91:20 92:24
115:19 119:23
120:3 121:4,6,20
163:7

**let's (16)**
51:23 73:18 74:8,14
82:10 87:18,25
117:11 118:9 122:4
123:24 130:14
132:20 133:14
143:11 144:9

**level (2)**
64:20 155:19

**Lexington (3)**
2:6 3:12 5:11

**liabilities (35)**
29:23 30:9,12,16,19
30:23 31:2,11,13
32:3,4,12,19 33:5
33:15 34:2,8 82:3,6
93:5,18 104:23
112:6 124:2,9,11,13
125:7,21 126:4
136:3 141:20
165:15,20 166:4

**liability (8)**
124:16 125:12,17,24
144:20 158:22,23
159:3

**light (1)**
40:24

**limit (5)**

93:17 96:5 99:18
100:16 110:14

**limitation (1)**
96:17

**limitations (1)**
121:25

**limited (6)**
15:13 33:7 39:22 67:4
86:6 147:25

**line (13)**
68:12 118:14 169:8,9
169:11,12,14,15,17
169:18,20,21,23

**list (6)**
31:13 32:3 97:21 98:3
132:6 133:10

**listed (8)**
32:4 98:8,16,24 99:3
99:4 100:3 128:24

**lists (3)**
87:4 117:20 134:10

**litigation (1)**
150:2

**Livenote (1)**
2:11

**LLP (6)**
2:6 3:4,10,17 4:3,9

**loan (2)**
14:21,25

**logical (1)**
144:25

**Lokey (1)**
28:14

**long (4)**
60:2 63:19 133:10
148:13

**longer (1)**
164:14

**look (9)**
87:3,25 89:3 91:13
117:11 121:5
129:25 133:14
143:24

**looking (10)**
40:7 67:13 69:9 75:21
81:4 87:7 120:4
123:8 124:12 129:7

**loop (1)**
150:17

**Lori (1)**
144:11 145:14

**lot (2)**
57:24 62:12

**Luc (9)**
9:8 44:11 57:10 83:14
133:12 144:5,9
151:19,20

**lunch (1)**

165:13
**Luncheon (1)**
103:19

**M**

**Madison (1)**
3:20
**magnitude (1)**
80:7
**making (3)**
17:13 21:16 26:15
**mark (7)**
39:10,11,16 41:17,20
41:20 89:11
**marked (22)**
5:3 7:6,7,15 52:11
73:24 88:24 89:2,15
90:9 91:2,11,12
92:3,12,14 94:17,18
129:24 132:3
143:16,23
**market (3)**
67:21 68:8 69:14
**marking (1)**
90:10
**marks (6)**
134:12,18 135:11,22
136:10 160:5
**marriage (1)**
167:16
**Marsal (3)**
131:24 133:4,8
**material (11)**
44:2,7,20 46:8,16
48:24 49:2,20 50:5
51:9 92:3
**matter (10)**
5:8 7:23 88:8 141:6
141:18 149:20
150:2 151:17 161:6
167:17
**matters (2)**
138:24 155:2
**Matthew (1)**
145:8
**McCLOY (6)**
4:9,10 5:25 6:3,14,15
**mean (8)**
51:2 115:10 127:9
130:10 137:15
147:6 159:17 166:3
**meaning (2)**
82:23 139:8
**means (3)**
117:16 118:5 138:9
**meant (6)**
40:21 47:19 74:12
135:10 136:16

138:13
**meeting (88)**
10:17 11:3,4,7,10
26:25 27:3,4,4,8,13
27:13,14,15,16
58:25 62:13,16 63:9
63:15,17,24 64:4,9
64:13,17,21,24,25
65:4,6,10,17 69:23
69:25 70:2,4,6,7,12
70:14,17,19 71:9,16
71:22,24 72:6,11
77:4,9 136:6,11,12
136:14,15 137:2
140:6 145:2,4,7,16
145:19,23,24,25
146:8,11,13,23
148:6,8,24 149:3,5
149:11,12 150:10
150:11,25 151:6,7,9
151:10,19 152:11
153:5 157:25
**meetings (19)**
11:13 20:23 26:24
62:8,9,18,23,24
63:4,5 66:4 88:6,9
88:12,17,19 133:8
150:16,16
**members (1)**
135:13
**memorialized (1)**
12:11
**mentioned (1)**
161:18
**Merit (2)**
2:9 167:6
**Messineo (1)**
90:18
**methodologies (1)**
160:5
**methodology (1)**
129:16
**Michael (1)**
55:13
**mid (1)**
141:25
**Mike (1)**
145:12
**Milbank (354)**
4:9,10 5:24 6:2,14,15
8:7 9:5,7,13,17,19
9:25 10:22 11:4,16
11:23 12:2,5,9,13
12:13,20,22 13:3,4
13:7,22,24 14:3,6,9
14:19 15:3,9,15
16:14,16 19:14,18
19:21,24 20:3,8,13
20:21,23 21:3,9

22:11,15,25 23:9,14
23:18,21,24 24:16
24:22,24 25:2,5,13
25:18 26:14,16 27:2
27:5,17,25 28:4,8
28:12,25 29:21 30:7
30:11,14,21 31:25
32:9,15,21,24 33:10
33:22 34:4,10,14,19
34:22 35:5,9,10,18
36:4,9,16,21,24
37:3,12,14,24 38:5
38:11,23 39:3,4,22
39:24 40:12,17,22
41:11,21 42:13,19
43:12,14,18,20
44:24 45:6 46:5,5
46:10,20 47:2,9,15
47:17 48:4,8,14,24
48:25 49:3,5,11,11
49:19 50:2,3,12,13
51:4,8,13,17,18
52:16,21 53:5,8,9
53:13,22 54:2,9,15
54:22 55:3,9,18,24
56:5,6,13 57:7,9,20
61:15,22 63:16 66:3
66:10 68:17 69:4,14
69:15 70:25 71:4
74:18,20,21,24 75:8
75:10,11,15,17,17
77:19 78:8,18 79:12
80:20 84:25 86:20
86:22 87:10 88:10
93:2,10,15,21 94:5
94:12 95:2,5 96:12
96:19 97:5,17 98:4
98:7 99:3,7,12,22
100:2,7,11,21 101:5
101:16,17,22 102:2
104:11,13,21 105:2
105:8,16,23,24
106:6,15,22 107:2,9
107:11,12,20,21,25
108:3,4,9,13,20
109:9,18 110:2,6,10
110:16,20 111:2,10
112:8 115:12
116:20 117:23
118:11 119:14,24
120:11,16,21
121:15,21 122:9,21
122:25 123:5,10,13
123:19 124:15
126:22,25 127:6,13
127:14,21,23 128:2
128:6,9 129:15,19
130:2,24 131:6,8,10
131:14,23 132:10

133:2,6,10,22,25
134:15 136:22
137:3 140:10,19
141:3,7,18 145:8
149:17,18 150:9,11
150:13,19,20
151:15 152:8,18
154:16,21,25 155:3
156:18 157:5,16
158:3,6,14 159:14
160:23 161:6 162:2
162:8,12,17,20
163:3,7,10,12,16,25
164:2 165:3,24
166:5
**Milbank's (21)**
8:12,20 10:3 12:6
35:13,22 37:21 42:4
42:7,23 49:8 66:25
95:23 99:18 100:16
100:20 109:15,16
120:7 149:13 150:4
**Miller (22)**
14:23 15:2 16:19,25
17:23 18:10 24:7
44:12,23 45:4 56:25
83:14 84:9,13,17
97:3 98:13 145:14
151:8,9,25 158:3
**million (6)**
81:22 82:7,13 83:9,22
123:17
**Mills (3)**
4:7 6:8,8
**mind (4)**
13:18 77:2 86:2
164:17
**mismatch (10)**
141:19,24 156:4,16
157:6,14,16,22
159:19 165:5
**misspoke (1)**
47:19
**misstated (1)**
74:10
**misstates (1)**
86:15
**mix (1)**
26:20
**modifications (1)**
44:2
**moment (2)**
11:21 16:23
**Monday (7)**
55:23 58:12 61:4,5,11
61:14 157:9
**monitor (1)**
101:17
**month (1)**

7:11
**monthly (1)**
133:8
**morning (14)**
7:4,5 9:12,22 10:18
55:23 58:12 61:4,5
61:11,14,20 70:9
109:3
**mortgage (1)**
122:8
**motion (18)**
94:11,13,15,19 96:24
98:20 101:6,22
102:19,25 139:6,10
139:13,15 142:6,14
143:6 144:12
**moved (1)**
12:18
**moving (1)**
12:7
**MTHM0012869 (2)**
143:16 168:21
**Murgio (4)**
90:18,21 91:23 92:21

**N**

**N (2)**
3:3 4:2
**name (3)**
5:14 169:2,4
**native (1)**
68:4
**nature (1)**
82:2
**necessarily (2)**
113:23 153:24
**necessary (3)**
49:13,16 116:21
**need (9)**
49:4,8 61:21 97:10
101:6 111:3 131:25
140:16 146:6
**needed (9)**
60:3 153:16 159:20
159:21,24 160:3,4
161:17 164:13
**needs (3)**
132:15,20 134:24
**negotiated (13)**
42:20 43:12 134:12
134:18 136:17
137:4 138:4 139:8
139:16 140:13,25
142:3 155:23
**negotiation (2)**
84:16 116:11
**negotiations (4)**
42:23 63:25 84:18

115:17
**neither (1)**
167:18
**never (6)**
22:3 24:12 33:11,22
71:4 163:12
**New (19)**
1:3,13,13 2:7,7,12 3:7
3:7,13,13,22,22 4:6
4:6 5:11,11 167:3,4
167:7
**Niciolo (1)**
6:16
**night (2)**
43:15 58:12
**NOCIOLO (2)**
3:15 6:16
**non-privileged (22)**
79:3,21 88:11 95:16
96:6,20 98:10 99:20
100:18 109:14
110:14 118:5,17
120:7,15,22 121:12
121:12 124:21
129:20 134:25
139:25
**Nos (10)**
88:23 90:8 91:10
92:12 143:16
168:10,14,16,18,20
**Notary (3)**
2:11 6:23 167:6
**note (1)**
89:19
**notes (1)**
20:14
**notice (8)**
5:2 7:7,15,19 8:19
73:24 142:10 168:8
**November (10)**
149:16,17,19 151:14
151:21 152:10,18
156:9 157:25 158:5
**number (32)**
5:6 9:7,19 10:24
15:21 25:11 26:2
29:20 43:14 47:22
47:22,23 52:2,6
62:14 68:16 70:5
79:23 84:6,7 98:19
98:24 99:3 100:23
103:17 104:4
143:19 156:4,6
157:22 158:23
165:13
**numbers (20)**
55:11 56:13,15,17,19
67:9 78:12 84:5
85:9 110:17 111:20

128:4,13,14 146:20
146:21 147:19,19
147:20 157:12
**NW (1)**
4:12

---

**O**

**object (18)**
29:5 48:11 69:20 75:2
95:10 98:22 102:9
102:14 107:24
108:8 110:24
111:14 116:14
127:16 129:12
135:6 156:2,20
**objection (78)**
16:5,15 17:21 18:20
21:20,23 23:16
25:17 26:11 28:21
29:24 31:4 32:20
33:6,17 35:3 40:14
41:13 42:6 46:23
49:22 50:7,8,18
52:23 53:14 56:23
59:14 60:11,14,17
65:20 69:18 71:20
77:5 85:5,16,23
86:13 95:9 97:23
98:9 101:8,12,19
104:17 105:13
107:14 108:7 111:6
111:17 112:19
113:7,16 114:6,20
115:5,24 127:25
131:16 134:20
137:11,18 138:8,18
138:22 139:11
141:12 142:7 147:2
147:5 150:23
154:18 156:19
157:19 162:14,22
163:20
**objections (2)**
16:9 60:22
**obligation (3)**
95:7,24 100:22
**obligations (5)**
76:23 79:10 81:18
84:22 100:13
**observe (1)**
63:16
**obtain (3)**
159:21 162:18,21
**obtaining (5)**
27:7 161:14 163:18
164:12,13
**obviously (2)**
152:14 153:10
**occurred (2)**

16:4 63:10
**October (23)**
131:22 132:5 133:4
139:20 141:25
144:10 149:19
150:10 151:6,12,20
152:10,13,16,16,18
153:12 154:15
155:11 158:18,20
161:20 165:3
**office (1)**
14:11
**offices (3)**
2:5 11:9,12
**Official (2)**
3:18 6:6
**off-the-record (1)**
15:4
**Okay (38)**
14:18 20:3 22:7,10
23:24 30:10 36:21
47:25 48:7 55:3
68:2 73:18 77:12
81:11 83:6 84:8
87:7 90:20 91:8
97:21 119:17
120:10 122:4 125:6
125:19 128:6
129:18 136:15
140:23 144:9
145:25 149:10
151:23 152:7
157:15 159:5
163:12 166:10
**OLIVER (1)**
3:17
**Once (1)**
150:13
**ones (1)**
9:21
**ongoing (9)**
11:22 14:8 16:21
48:14 63:25 70:20
84:16 151:3 161:12
**oOo (1)**
166:15
**open (5)**
27:5 44:20 63:25
64:23 84:15
**opinion (1)**
28:13
**opportunity (7)**
7:14 8:9 114:11 115:7
115:9,16 116:5
**opposed (1)**
134:25
**optimal (1)**
161:11
**options (1)**

162:20
**order (19)**
42:14,25 43:2,7,25
47:8 80:7 96:11
101:7,15,18,25
102:4,20 103:6,11
112:15 113:14
162:21
**Ordinary (1)**
125:15
**organizations (1)**
82:5
**original (14)**
28:2,11 30:3,4,6 31:6
34:11 47:22 73:8
76:2 95:7 100:21
117:11 123:24
**originally (2)**
12:4 96:24
**outcome (2)**
84:17 167:17
**outline (1)**
146:2
**outlined (1)**
146:14
**outside (2)**
54:19 82:23
**overall (6)**
26:20 156:4,7,16
157:15 165:5
**Overbroad (1)**
138:22
**overflow (1)**
21:6
**overlap (1)**
85:10
**owned (2)**
76:4,17
**O'Donnell (185)**
1:1,12 2:1,5 3:1 4:1
5:1,8 6:1,4,22 7:1,4
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1,9 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1

79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1,13 96:1,5,18
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1,6 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
165:11 166:1,18
167:1,9 168:1,3
169:1,4

---

**P**

**P (5)**
3:3,3 4:2,2 76:21
**pace (1)**
12:19
**page (43)**
67:14,16,17,18,22
75:21 81:4,8 84:19
86:9,9 87:3,8 88:2,2
117:12,12 119:7
121:6 122:6,6 123:8
123:24,25 126:13
131:11,15 133:14
144:4,11 168:3,7
169:8,9,11,12,14,15
169:17,18,20,21,23
**pages (3)**
132:4,7 148:13
**papers (4)**
47:10,12,14 95:2
**par (3)**
129:4,5,7
**paragraph (12)**
77:7,15 81:4,8 82:8
82:14 85:9 86:8
88:3,5,9,16
**Paralegal (1)**

3:15
**Park (1)**
4:5
**part (17)**
13:4 18:25 23:4 26:19
26:21 30:7 67:8
81:20 89:23 131:9
133:22 134:6,8
135:3 136:22 161:9
161:14
**participate (12)**
20:8,19 22:11 57:2
62:8,18,24 63:14
66:11 115:14,16
150:15
**participated (5)**
11:5 20:23 62:13,16
83:12
**parties (15)**
10:18,25 21:7 34:23
62:14 63:4,6 70:5
70:14 71:10 77:4
88:7 97:2 102:3
167:15
**parties-in-interest (1)**
16:20
**partner (1)**
57:19
**partners (3)**
9:7 43:15,18
**parts (1)**
88:15
**party (2)**
67:11 167:19
**passed (1)**
107:18
**path (1)**
150:7
**Paul (2)**
9:9 133:12
**pay (2)**
29:22 100:13
**payable (1)**
125:14
**payments (5)**
31:18,22 95:8,22
98:15
**Peck (1)**
116:22
**people (11)**
10:20 11:6 14:10,11
39:25 53:16 54:19
58:25 82:23 130:7
145:11
**percent (2)**
122:7,17
**perfectly (1)**
105:5
**perform (1)**

124:7
**period (18)**
7:13 8:13 10:3 12:8
12:17 13:17 17:5
26:16 39:23 61:13
106:10,11 149:18
157:10 158:5,13
162:3 164:4
**peripheral (1)**
63:10
**permitted (1)**
81:21
**person (1)**
19:7
**personal (1)**
134:7
**personally (2)**
134:3,6
**perspective (5)**
12:7 85:19,20,22
137:15
**Peterson (2)**
90:21 91:23
**phone (2)**
152:23 153:2
**phrase (19)**
135:10,21 136:9,17
136:19,21 137:4,10
138:4,6,14,16 139:8
139:19,23 140:20
140:24 141:2 143:3
**physically (1)**
59:21
**pinpoint (2)**
14:16 156:15
**place (18)**
9:21 11:8,11 27:14
45:13 55:20 61:20
65:6 70:6 151:11,13
151:14,16,21
152:21,22 155:10
163:18
**placed (3)**
7:8,10 52:9
**Plaza (1)**
4:5
**please (7)**
5:19 6:20 38:14 88:2
90:22 91:24 130:17
**point (31)**
8:14,24 9:23 14:3,14
14:18 17:18 18:7
23:20 46:14 49:7,15
55:8 69:10 80:9
104:13,21 105:2,8
126:21 131:22
141:17 146:13,24
151:10 154:25
157:4 158:14 159:3

161:10,15
**points (2)**
8:23 26:15
**portion (3)**
83:9,10 134:23
**pose (1)**
73:2
**posed (1)**
72:21
**position (3)**
7:21 63:14 122:7
**possibility (1)**
59:19
**possible (11)**
17:19 21:18 42:15
59:2,9 60:16,21
92:8 116:3 138:5
164:8
**potentially (2)**
55:22 133:12
**practicable (1)**
81:22
**precise (4)**
25:25 84:5 109:7
117:10
**precisely (5)**
26:4 63:20 73:16
143:3 157:7
**precision (1)**
159:2
**preparation (2)**
8:16,17
**prepare (1)**
7:20
**prepared (2)**
113:4 142:24
**prescribed (1)**
96:24
**present (16)**
4:19 16:22 45:12
55:16 57:7,13,14
59:21 62:20,22 63:2
92:2 112:9 123:9
133:25 152:4
**presentation (27)**
16:25 17:2,4,13
131:23 132:4,8,9,22
133:3,23 134:2,6,8
134:17 135:5,9,12
135:15,18 138:12
138:15 139:21
140:9 142:3,24
155:25
**presented (8)**
128:5 135:13 139:20
146:18,20 148:7
155:20 157:12
**pressure (1)**
164:18

**presumably (1)**
135:16
**previous (1)**
73:24
**previously (22)**
24:6 25:8 40:6 44:16
52:10 54:12 76:7,13
88:14 94:16,18
108:9 110:6 115:11
129:23 132:3
135:25 143:2 156:3
156:11 164:11,11
**price (6)**
34:11,20,24,25 35:6
139:17
**pricing (3)**
148:18 149:2 161:7
**primarily (3)**
58:12 144:3 153:20
**primary (1)**
73:10
**print (2)**
90:22 91:24
**prior (28)**
7:19,24 8:3 12:10,23
13:16 19:25 22:23
28:23 32:6,7,15,22
32:24 33:10,22 37:5
37:10,15 39:3,11
42:10 43:6 82:16
85:12 108:24
113:25 149:13
**privilege (11)**
29:7 50:9 54:20 82:23
102:17 103:4,14
109:25 116:18
117:4 162:16
**privileged (18)**
49:24 53:16 79:19
95:12 96:7 104:19
105:21 106:4 118:6
118:18 119:2 122:2
126:19 140:2,7
157:2 163:22
164:22
**probably (1)**
135:17
**procedure (2)**
96:24 167:21
**procedures (2)**
94:20 95:19
**proceeded (1)**
150:7
**process (8)**
17:8 19:16 36:13
58:11 153:14
164:10,16,25
**produce (1)**
130:9

**produced (2)**
8:2 68:3
**product (42)**
29:8 36:14 41:15
49:24 50:10 53:15
69:21 95:13 96:8,21
98:6 99:6 100:6
101:3,21 102:7,17
103:4,14 104:20
105:15,22 106:5
109:25 111:15
114:24 116:18
117:4 120:9 122:3
124:22 126:11
129:13 136:25
139:4 148:22 154:7
154:20 156:23
162:16 163:23
164:22
**production (3)**
8:3 130:5,11
**productive (1)**
154:12
**productively (1)**
63:15
**Professional (1)**
2:8
**professionals (1)**
82:24
**proffered (2)**
55:10 56:9
**property (9)**
76:22 79:9 80:3 81:16
84:21 85:3 87:14
120:21 122:25
**proposed (2)**
44:6 99:15
**protected (1)**
163:23
**provide (9)**
28:25 56:21 79:25
111:11 112:16
113:14 158:15
161:23 162:4
**provided (27)**
29:19 30:15 46:20
50:21 51:13,18
52:16 54:13 55:9,12
55:13,15 57:23,25
58:3,8,13,14,17
63:11 76:14,17 78:9
86:23 120:15 160:8
160:11
**providing (2)**
57:2 113:5
**provision (12)**
31:21 34:12,15,21,25
42:14,19,24 43:2,13
43:17 119:19

**provisions (3)**
31:17 34:6 94:7
**prudent (1)**
150:6
**public (4)**
2:11 6:24 78:7 167:6
**publicly (3)**
12:8 24:17 98:19
**purchase (54)**
28:2 32:17 33:2,11,18
34:11,20,24,25 35:6
42:16 46:21 47:3,4
47:5,11,13,21 48:2
48:4,8,18,22 73:25
74:2,4 104:11,15,24
105:10,12,17,19,24
106:7,8,15,17,20,22
106:24 107:22
108:5,21 109:19
110:4,11,21 111:5
111:11 112:13
113:5 119:20
139:17
**purchased (50)**
28:10,20 29:3,12,14
29:15,20 32:10,18
33:4,14,25 34:7
52:25 73:12 75:22
76:2,20 93:4,11,24
94:8,22,24 104:14
105:4,6,11,18
109:11,21 112:3
117:8,13,16,24
120:13 121:23
122:11,24 123:2,4,6
123:11 125:7
126:14,16 128:15
134:10 163:5
**purchaser (8)**
76:5,8,14,14 81:14,15
81:20 124:6
**purported (1)**
127:7
**purports (1)**
92:23
**purposes (2)**
142:20 148:6
**pursuant (5)**
5:3 81:24 101:14
167:20 168:8
**put (1)**
73:19
**putting (3)**
49:9 62:9 140:23
**P.M (11)**
13:19 87:23 90:19
103:17 104:4
143:13,19 144:5,10
153:12 166:14

**Q**
**qualification (1)**
64:20
**qualified (1)**
112:23
**qualify (2)**
83:25 146:6
**question (61)**
7:18 8:15 13:3,7
16:13 24:10 31:24
33:21 34:18 37:18
39:14,17 41:3,10,12
45:17 48:3 49:23,25
60:6 67:4 68:5
69:19,21 75:3 86:17
90:11 95:11 98:18
104:18 109:8
110:25 113:8
114:21 128:21
129:25 130:17
131:3,17 132:25
133:2 134:23 135:4
135:7 140:14,16
142:19,23 143:4
147:13,15,16
152:15 156:21
157:20 159:9,14,17
160:9 162:6 163:2
**questioning (2)**
18:17 118:15
**questions (58)**
10:21,24 13:5 18:6
24:13 27:7,9 28:23
38:19 40:8,10 44:17
44:19 45:18 48:15
53:9,13,15,22 54:2
54:24 56:2,6,10,11
56:12 63:13 71:7
72:21 73:2,3,6,14
73:17,17 107:17,19
107:25 108:2,10
118:20,23 136:3,9
136:14,16 144:2
149:24 155:15,18
155:23 163:4,19
165:8,12,14,17
166:9
**Quinn (8)**
3:17 6:5 138:23
139:15 149:21
151:16 161:5
163:17

**R**
**R (2)**
3:3 4:2
**raise (7)**
38:11 39:24 40:13

54:2 126:25 128:2
136:15
**raised (13)**
25:25 26:2,3 27:20
54:24 73:14 107:17
107:25 114:15
129:8 136:14 153:4
153:8
**raising (1)**
25:20
**range (2)**
27:9,18
**rapid (1)**
12:18
**reach (1)**
49:16
**reached (3)**
69:9 78:11 150:3
**reaction (2)**
35:13 164:9
**read (10)**
76:25 77:15 81:11
130:17 138:3
140:15,18 143:24
144:6 162:7
**reading (3)**
139:5,9,12
**reads (1)**
75:24
**real (3)**
120:21 122:8 148:15
**realizing (1)**
24:17
**really (1)**
13:7
**Realtime (1)**
2:10
**real-time (1)**
121:18
**reason (17)**
26:21 49:14 88:18,20
149:25 169:5,8,9,11
169:12,14,15,17,18
169:20,21,23
**reasons (1)**
161:14
**recall (33)**
9:2,6 10:16 12:25
15:20,21,23 16:3,24
18:4,8,9,10,19,22
18:23 19:4,6,23
21:12,22 22:2,20
25:22 26:7 41:23
55:19 98:14 136:8
139:21 158:9
165:17,21
**receipt (1)**
8:4
**receive (19)**

11:16,17 15:3 18:25
25:6,18 26:9 35:18
47:3 48:4 55:4 60:3
81:15 85:11 115:18
120:22 123:19
126:22 127:6
**received (39)**
9:13 24:13 26:19 50:2
50:12 51:4 53:8
59:4,7,10,21 60:8
69:15 71:7 72:18
74:18,20 75:8,15
84:25 90:25 91:4
92:2 96:19 99:20
100:18 104:11
105:23 115:20,22
116:3 124:21
127:13,15 130:2,25
131:7,9,11
**receiving (10)**
18:13 60:2 71:12
105:9,16 106:7,15
106:20,21 121:20
**receptive (2)**
153:13 164:12
**recess (22)**
15:20,23 16:3,4,14,17
16:18 17:5,18 18:2
18:5,6,12,15,24
19:5,6,11 52:4
87:21 103:19
143:14
**recesses (1)**
15:22
**recipient (1)**
6:2
**recognize (1)**
74:15
**recollection (58)**
16:18 17:3,8,23 19:10
19:21 20:12 21:16
21:24 22:3,5,8,22
23:2,8,11,13 25:24
26:12 27:8 29:19
31:8 38:23,25 41:9
41:19 44:10 56:7,16
57:4 63:3 66:17
70:23 79:22 80:6,8
80:11,13 83:8,18
84:23 85:8,10 87:16
97:25 133:24 134:5
134:7 135:14,19,23
135:24 136:13,18
136:20 137:8
151:23 152:5
**recollections (1)**
158:12
**reconcile (1)**
147:19

**reconsideration (3)**
101:7,23 102:19
**record (31)**
5:20 15:14,17 16:7,8
16:11 52:3,7 74:9
81:12 82:10,12
87:20,23 89:19
103:15,18 104:5
121:18 130:12,13
130:15 140:15,18
143:13,20 162:7
166:13,14 167:12
169:6
**recounted (1)**
46:14
**recourse (1)**
111:19
**reduction (12)**
134:13,19 136:17
137:5 138:5 139:9
139:17 140:13,25
142:3,5 155:24
**Reed (2)**
4:3 6:9
**refer (1)**
128:25
**reference (7)**
7:11 83:16 140:13
142:2 148:18
158:21 160:21
**referenced (3)**
59:5 142:5 155:24
**referred (8)**
26:24 27:12 41:16
66:20 76:3 84:20
151:11 154:11
**referring (9)**
19:7 68:13 70:2,4
94:15 97:11 126:5
142:23 146:8
**refers (3)**
137:10 159:10 160:15
**refine (1)**
159:22
**reflect (10)**
107:23 108:6,21
109:15,20 110:5,11
128:20,23 148:4
**reflected (8)**
46:17 64:7 77:3 86:11
86:21 106:24
110:18 129:9
**regard (3)**
128:7 136:5 150:4
**regarding (7)**
11:24 12:19 14:12
31:10 49:7 66:18
141:7
**regardless (1)**

13:8
**Registered (3)**
2:8,9 167:5
**regulatory (2)**
22:17 23:3
**reiterate (1)**
62:11
**reiteration (1)**
153:20
**relate (3)**
10:5 27:21 155:23
**related (9)**
35:25 36:17 64:22
73:10 83:9 125:22
141:8,14 167:15
**relates (2)**
41:19 160:5
**relating (11)**
22:11 26:3 31:17,21
51:13 56:12 64:2
73:6 94:23 110:8
137:4
**relationship (2)**
68:18 69:5
**relevant (5)**
8:7 36:22 37:5,9
55:11
**remainder (1)**
67:25
**remained (4)**
36:22 37:4 45:18
158:6
**remember (7)**
17:17 18:16 41:17
80:15 98:19,23,25
**removed (2)**
35:6 119:20
**repeat (10)**
11:20 37:18 49:25
110:25 121:13
130:16 132:25
140:14 160:9 162:6
**repeated (2)**
107:2 140:16
**rephrase (3)**
16:13 33:21 34:18
**replaced (5)**
18:3 23:21 24:8 121:4
121:23
**replacement (2)**
12:15 13:13,25 17:16
23:15
**replacing (1)**
15:11
**repo (17)**
14:2,16,20 15:11
17:16 18:4 55:2,5
64:5 65:7,13 66:6
66:15 68:19 69:7

77:19 134:11
**report (1)**
84:17
**reported (2)**
1:20 110:16
**reporter (8)**
2:9,9,10,11 5:16 6:20
130:17 167:6
**Reporting (2)**
5:15,18
**represent (1)**
142:13
**representation (4)**
30:25 31:25 150:4,14
**representations (15)**
31:9 33:3,12,23 35:4
93:23 95:18 96:9
98:12 111:3 112:17
113:12 114:2
122:18 123:15
**representatives (16)**
39:21,23 53:23 54:3
55:4,17 62:15,19,21
62:25 66:12,12,13
127:3 141:4 150:21
**represented (6)**
15:13 17:24 30:22
43:8 128:17 131:15
**representing (4)**
29:2,11 39:6 163:8
**Repurchase (4)**
13:13 71:13 76:6 88:3
**requested (2)**
110:7 167:19
**requesting (2)**
110:9 163:9
**requests (1)**
107:2
**require (1)**
44:20
**required (9)**
43:22 44:4 45:20 46:6
48:10 49:17 50:15
75:19 95:21
**requiring (3)**
49:20 50:5 51:9
**residential (1)**
122:8
**resolve (1)**
164:3
**resolved (1)**
164:19
**resolving (1)**
163:19
**respect (30)**
14:15 18:3 27:6 28:13
29:20 32:18 34:6
42:9 75:24 77:17

78:17 79:8 82:7,13
86:18 88:14 94:7
95:14 97:6 99:14
113:22 118:14
120:20 124:17
142:22 144:15
150:2,14 160:16,17
**respective (1)**
124:8
**response (8)**
96:8 99:18 100:16
110:14 153:11,12
154:8,10
**responsibility (7)**
43:17 54:6 131:19,19
131:21 138:23
149:20
**responsible (1)**
155:2
**result (1)**
122:2
**resumed (1)**
104:6
**retained (3)**
118:10 119:6,14
**retention (3)**
9:17 10:3 11:21
**return (2)**
76:16 116:22
**reveal (5)**
96:6,18 104:19
126:10 139:2
**revealed (1)**
96:22
**revealing (1)**
120:6
**review (34)**
7:14 8:2,12 35:20
48:7 52:11,14 69:14
89:5,12,25 90:12,13
91:15 92:15,17
94:12 95:2 97:5,17
99:22 100:20
107:16 109:3 120:2
130:23 131:4 132:8
132:24 144:7 159:6
159:11,18 167:19
**reviewed (17)**
7:18 8:5 27:25 28:4
35:19 62:2 72:17
89:6 90:2,14 91:16
92:18 110:19 131:5
144:8,16 148:12
**reviewing (4)**
7:17 8:7 57:20 130:21
**revised (1)**
57:21
**right (14)**
39:13 46:18 75:7

95:24 106:18
111:24 112:18
118:23 126:22
129:21 151:21
161:8,20 163:14
**RMR (1)**
1:21
**role (6)**
14:15 42:4,7 57:17
63:10 137:20
**room (3)**
45:12 56:10 132:18
**rough (1)**
80:7
**roughly (2)**
63:21 66:16
**row (2)**
68:10,11
**RPR (1)**
1:21
**Rule (6)**
5:3 81:24 139:9 142:5
167:20 168:9
**rules (1)**
101:14
**runs (1)**
86:9

─────────────

**S**

**s (11)**
1:21 2:8 3:3 4:2,15
117:20 118:2,10,15
118:22 167:5
**Sachs (3)**
25:16,20 26:8
**sale (72)**
8:21,22,24 9:2,4,14
10:2,4 11:18,25
13:23 14:19 15:7
22:14,24 23:6,10
24:4,15,20,21,24
25:4 27:24 28:9,24
30:10,14,21 32:16
34:5,14,19,22 36:23
42:3,10,14,24 43:2
43:4,4,6 47:8 57:6
58:6 75:13 94:12,19
94:21 95:20 96:10
97:13 98:17 100:11
101:7,18,23 102:4,9
102:10,20 103:6,11
118:11 119:13
122:5,9 133:18
138:17 146:21
165:16
**Sales (1)**
94:20
**Sanpietro (2)**
4:20 5:14

**satisfy (1)**
160:4
**Saturday (16)**
58:10,13,18,22 59:5
59:11 61:3,10 62:13
63:9,24 65:3,17
66:4 90:6 115:21
**saw (1)**
58:18
**saying (1)**
84:2
**says (5)**
117:16 124:4 133:18
159:5,11
**schedule (34)**
51:14,19 52:15,24
53:4 76:7,12 78:9
78:11,12,13 86:23
94:19 107:6,6,10,10
110:8,18 126:23,23
127:12 128:22,23
129:2,3,19 153:5
157:12 160:16,18
160:18,21,25
**scheduled (1)**
13:19
**schedules (42)**
48:21 49:6,8,9 50:21
50:24,25 52:20,25
61:25 62:2 107:3,5
107:17,18,19
108:17,19 109:4
127:2,7,11,22 128:3
128:11,19,20,24
129:6,9,15 141:7,14
141:16 144:13
145:20,21 146:22
147:18 148:12,15
160:20
**Schiller (4)**
2:6 3:10 5:22 6:17
**scope (6)**
129:11 137:12 140:4
142:8 162:23 163:6
**screen (1)**
135:18
**sealing (1)**
144:12
**second (9)**
11:7 27:12,14 67:14
67:16 82:11 96:16
111:13 135:3
**secretly (1)**
139:16
**section (4)**
75:24 76:25 121:21
123:25
**secure (7)**
76:23 79:10 80:3

81:18 84:22 85:4
87:14
**securities (24)**
15:9 18:13 19:19
65:12 66:14 69:7
71:12,18 76:4,9,16
76:17 77:18,21
81:23,25 82:2 122:8
144:15,23 146:2,3
159:6,12
**see (26)**
49:8 67:14,19 68:6,10
68:12,14,16 81:9
87:4 88:2,5 94:24
113:24 117:13,15
117:20,22 119:19
121:19 124:2
132:16,20 133:16
133:20 134:13
**seek (1)**
42:8
**seeking (7)**
14:11 26:18,22 38:19
54:22 115:14
163:13
**seeks (1)**
156:21
**seen (1)**
58:10
**segregate (1)**
9:21
**Seller (6)**
76:8,13 117:17 124:9
124:13 125:7
**seller's (1)**
82:3
**send (1)**
163:7
**sense (2)**
143:24 164:17
**sent (3)**
41:24,25 130:7
**separate (2)**
15:4 84:23
**September (69)**
7:12 8:13,25 11:13,19
20:14,21 31:5 35:24
36:18 37:4 38:16
42:2 48:24 49:3,5
49:12 50:20,25 51:4
52:16 74:3,5,7,10
74:12,18,23 75:9,16
76:12 77:20 78:8,19
79:11 80:4 90:6,19
90:25 91:21 92:2,25
93:7,9,14,20 94:4
101:4 102:10
104:10 105:9,24
106:8,11,12,14,21

107:9,21 108:4,15
108:16,25 109:9
116:19,19 127:8,13
157:8
**series (1)**
133:7
**served (1)**
95:3
**session (2)**
104:2 149:7
**set (3)**
124:5 167:10,24
**Shapiro (6)**
39:10,12,17 41:17,20
41:20
**shared (1)**
148:23
**sheet (1)**
113:6
**shoes (1)**
54:11
**short (2)**
87:18 143:11
**shortfall (7)**
65:12 66:5,14,22 67:2
68:19 69:6
**shortly (2)**
63:11 70:7
**short-term (1)**
76:24
**side (5)**
17:12 73:19 144:20
144:22 158:22
**sides (1)**
149:9
**significant (3)**
10:15 40:13 133:16
**similar (2)**
62:16 119:9
**simplify (1)**
121:19 135:8
**simply (2)**
77:13 91:5
**simultaneously (1)**
12:21
**SIPA (1)**
4:4
**sit (6)**
13:15 27:19 29:18
43:16 138:6 158:25
**sitting (4)**
57:24 137:9,15 138:3
**situation (1)**
113:23
**sit-down (1)**
27:16
**slide (1)**
135:17

**smaller (1)**
144:21
**Sol (1)**
145:11
**somebody (1)**
21:18
**soon (2)**
81:21 164:8
**sorry (3)**
93:8 122:5 140:17
**sorts (1)**
40:16
**sought (1)**
163:12
**source (14)**
30:20 78:7 79:3,19,21
95:16 98:11 109:14
118:25 120:15
121:12,13 130:5
134:25
**sources (12)**
96:6,20 99:20 100:18
118:5,6,17,19 120:7
120:22 124:21
148:18
**SOUTHERN (1)**
1:3
**speak (6)**
7:17 8:9 41:22 95:16
121:8 162:9
**speaking (1)**
141:8
**speaks (1)**
97:24
**specialist (2)**
4:20 5:16
**specific (45)**
18:16 21:15,15,16,24
25:24 26:12 27:11
28:12 38:25 41:9
43:17 46:24 56:12
56:16 59:17 60:15
63:3 66:7 70:23
71:14,21 72:4 73:5
73:16 77:7 79:22
80:8 83:18 88:16
94:14 97:11 114:15
128:7 129:16
131:25 135:14,23
136:19 140:20,21
140:23 158:11
160:3 161:2
**specifically (16)**
12:23 25:13 26:13
27:20 65:8,16 71:15
73:13 77:6 108:17
113:10 114:14
117:12,25 123:25
153:11

**specificity (2)**
27:23 70:15
**specified (4)**
76:7,12,19 164:4
**speculate (2)**
137:21,23
**speculation (17)**
17:22 18:21 21:21
59:15 60:18 65:21
85:17,24 111:18
112:20 113:17
114:7 115:6,25
137:19 138:9
162:23
**spent (7)**
8:6 57:24 59:25 60:25
61:8 62:11 115:13
**spoke (1)**
40:15
**spoken (1)**
8:6
**spreadsheet (3)**
53:4 67:25 127:14
**ss (1)**
167:3
**stage (1)**
157:13
**stale (5)**
134:12,18 135:11,22
136:10
**standing (1)**
118:16
**staple (2)**
89:24 91:24
**stapled (1)**
89:22
**start (11)**
5:5 8:23 9:12 11:25
13:19,20 24:20,21
52:5 104:3 143:18
**Starting (1)**
26:25
**state (4)**
2:12 21:9 167:3,7
**stated (1)**
43:25
**statement (1)**
134:17
**statements (1)**
18:5
**STATES (1)**
1:2
**status (2)**
9:14 14:12
**stay (1)**
83:10
**staying (1)**
86:8

**stepping (1)**
54:11
**steps (2)**
109:18 110:2
**Stern (45)**
3:14 5:21,21 7:3 10:7
16:12 31:7 33:20
41:4 47:13,17,19
51:23 52:8 67:24
68:3 73:22 74:12
81:7 82:10 87:18,24
88:13 89:18,22
98:21 104:9 118:20
130:6,12,14,19
132:13,17,23
142:15 143:11,21
147:4,9,12 151:2
165:7 166:10 168:4
**Steve (1)**
5:14
**STEVEN (1)**
4:20
**stood (2)**
16:23 36:18
**Street (2)**
3:6 4:12
**strike (4)**
34:17 128:25 158:25
160:14
**string (1)**
143:25
**subject (9)**
22:21 65:23 66:19
84:14,15 88:8 124:4
163:2,9
**subjects (1)**
132:7
**subpoena (6)**
6:2 7:25 8:5 142:21
162:24 163:6
**Subscribed (1)**
166:20
**subsections (1)**
77:16
**subsequent (9)**
8:4 58:17 59:7,10
60:9 149:10 150:9
150:11 154:9
**subsidiaries (3)**
117:17 119:10 124:10
**Subsidiary (1)**
76:18
**substance (4)**
49:6 145:24 146:18
155:12
**substantially (1)**
82:2
**suggest (10)**
32:16,25 34:4 93:2,10

93:16,22 94:6
110:10 146:7
**suggested (5)**
33:11,22 141:19
153:6 159:19
**suggesting (1)**
110:21
**suggestion (1)**
32:22
**suggestions (5)**
72:24 111:2 114:17
115:4 116:6
**Suite (1)**
4:13
**summarized (1)**
16:19
**summarizes (1)**
145:22
**summarizing (1)**
153:25
**summary (2)**
16:22 148:2
**Sunday (27)**
55:8,9,22 58:11,15,22
60:8 61:4,11,14
62:17 64:24 65:6,10
65:16 66:4 69:23
71:9,9 72:11 77:3
86:24 90:19,19
115:23 116:4 157:9
**superseded (1)**
96:25
**supposed (1)**
109:10
**sure (11)**
5:21 16:12 17:25
37:19 51:23,23 66:9
80:16,17 84:5 146:7
**swear (1)**
6:20
**sworn (3)**
6:23 166:20 167:11

_____
**T**
_____
**Tab (7)**
81:5 87:25 117:12
121:6,20 122:6,6
**take (20)**
11:7,10 20:13 27:6,24
51:23 87:18 89:2
91:13 95:25 102:23
103:9 109:18 110:2
129:24 143:11,23
151:11,13 155:9
**taken (2)**
18:2 26:20
**takes (1)**
151:20

**talking (6)**
17:14 31:5 33:19
46:25 108:23
138:20
**tape (6)**
5:6 52:2,6 103:17
104:4 143:19
**target (1)**
12:7
**tax (1)**
24:18
**team (1)**
135:13
**Tecce (22)**
3:23 6:5,5 16:7 29:5
49:22 50:8 69:18
95:9 98:9 104:17
111:14 113:7
114:20 126:9,18
129:12 131:16
138:25 142:22
156:20 157:19
**technical (1)**
51:21
**telephone (3)**
151:5 153:19,20
**tell (30)**
9:22 12:24 24:7 27:2
27:20,22 38:20
40:20 42:23 43:16
45:11,14,21 46:5
51:8 52:12 56:5
64:25 65:17 67:4
69:11 70:14 77:2,6
85:11 89:7 92:22
143:4 153:9 157:22
**telling (1)**
142:17
**ten (2)**
91:24 101:15
**terminology (1)**
26:13
**terms (19)**
23:14,18 24:11,11,14
25:25 26:22 30:6
37:13 49:10 50:15
55:5 96:10 109:7
119:3,22 124:4,9
148:25
**testified (21)**
6:24 24:6 25:8 40:6
44:16 45:25 50:24
54:12 88:14 104:7
108:9 110:6 114:16
115:11 117:6
135:25 143:2 156:3
156:11 164:11
165:19
**testify (5)**

118:3,16 120:14
124:20 162:25
**testifying (2)**
142:11,18
**testimony (18)**
11:20 15:15 29:10,13
30:24 53:3 60:5
62:11 65:22 66:20
86:16 113:24 114:8
119:16,17 165:21
167:12 168:3
**text (2)**
51:5,7
**Thank (2)**
166:10,11
**thanks (2)**
90:23 151:18
**theme (5)**
156:5,7,16 157:15
165:5
**therewith (1)**
81:15
**thesis (1)**
156:12
**thick (1)**
52:10
**thing (1)**
144:6
**things (2)**
137:16,17
**think (17)**
15:12 26:2 73:22 74:9
83:25 86:15 114:15
130:19 131:2
137:20 144:3,18
145:18,22 154:12
160:19 163:5
**third (4)**
10:25 67:17,18 87:3
**thought (4)**
36:13 40:20 67:12
111:22
**three (3)**
47:23 77:15 89:20
**thrust (1)**
46:13
**time (76)**
7:13,24 8:6,12,13,14
8:23,24 12:21 14:14
16:10,23 31:24
32:15 33:8 35:8
36:10,23 37:5 38:15
38:15 49:15 51:20
52:2,6 55:19 57:14
57:24 60:2,24 61:7
61:13 62:12 69:10
70:25 76:10 83:21
85:14,18 87:19,22
95:3,6 99:8 102:3

103:17 104:4
106:10 107:9
111:23 115:2,13
117:23 134:15
138:19,21 139:19
141:17 143:12,19
149:19 152:9
154:13,15,21
156:15 157:4 159:4
161:3,10 162:18
163:16 164:4,14,17
166:13
**timeframe (10)**
24:19 32:6 33:7 38:14
41:5 55:6 58:5
108:14 127:4
138:20
**timeline (1)**
163:18
**timely (1)**
124:7
**timetable (1)**
26:17
**today (11)**
5:16 7:7,13,16,19
8:23 137:9,15 138:3
138:7 166:13
**today's (1)**
7:20
**told (22)**
12:2,13,22 13:3,5
14:24 15:3,16 16:14
16:16,17 17:24
19:22,25 41:20 67:6
74:23 75:12 86:10
86:19 111:22
121:13
**top (4)**
84:19 90:20 91:22
133:15
**topic (3)**
22:23 83:13 135:15
**topics (5)**
27:18 54:23 63:23
64:25 135:14
**total (30)**
28:9,19 29:2,11,19
30:12,16,18,23 31:2
32:2,10,11 33:4,4
33:13,14,24,25
68:11 83:16 84:6
87:4 98:7,14,24
99:2 100:2 122:15
122:16
**TP (1)**
68:11
**traditional (1)**
113:19
**transaction (85)**

8:21,22 9:14 10:2
11:18,24 12:3,4,6
14:13 16:2,22 17:6
17:15 19:2 20:16,25
21:8,9 22:12,15,18
23:4,19 25:7,10,14
25:15 26:18,23 27:3
27:10,19,22 28:17
35:12,23,25 36:2,10
36:17 37:14,15,22
38:4,20 40:24,25
42:5,9 44:2,5 46:9
48:17 64:2 102:9
106:23 107:12,23
108:6,22 109:10,11
109:21 110:5,12,23
111:12 112:16
113:6,6,15,18 114:4
114:5,19,19 115:2,3
116:14,15,23
128:18 138:17
155:15
**transactional (2)**
112:8,23
**transactions (3)**
113:22,25 133:16
**transcript (1)**
167:20
**transcription (1)**
169:7
**transfer (5)**
19:13 21:13 81:9
83:17,22
**transferred (15)**
15:10 28:10 29:3 76:5
77:18 81:14,19
100:23 120:21
144:16,23 146:3
148:16 159:7,12
**transitioned (1)**
149:20
**transpired (1)**
70:21
**treated (1)**
71:18
**treatment (9)**
22:16 64:5,10,14,18
65:7 70:17 71:24
72:11
**tried (1)**
114:12
**true (1)**
167:12
**true-up (2)**
34:6 94:7
**truncated (1)**
132:12
**trustee (2)**
4:4 6:9

**try (6)**
114:9,10,13 135:8
147:14 164:18
**TSG (2)**
5:14,17
**turn (8)**
73:18 74:8,14 75:23
117:5 122:4,5
123:24
**Turning (2)**
64:24 125:14
**Tweed (6)**
4:9,10 5:25 6:2,14,15
**two (4)**
10:15 21:6 26:24
47:22
**type (1)**
129:3
**types (1)**
45:19

———————
           U
———————
**ultimately (8)**
8:2 35:19 57:25
119:20 121:3 128:2
128:9 149:25
**unanswered (5)**
40:7 45:19 155:14,17
155:23
**uncertain (14)**
85:14,18,22 86:4
87:15 111:23 117:7
120:18,25 123:22
125:19 165:20,24
166:5
**uncertainty (2)**
112:2,5
**understand (23)**
12:13 24:11 26:18
29:21 31:12,16,20
34:10,14,19,22 35:5
42:13 52:13 60:5
96:12 100:12,21
117:23 121:21,25
147:4,10
**understanding (43)**
8:21 13:24 14:20 15:8
23:25 28:8,13,16,19
35:22 37:21 40:18
46:2 54:9 56:18
59:24 64:22 66:25
68:17 69:5,10 70:21
95:5,15,23 96:11
99:12,19,19 100:17
100:17 118:4,12,18
119:5 121:11 128:4
131:14 134:16,24
139:7 148:2 151:24
**understandings (1)**

96:18
**understood (11)**
10:14 13:8 14:23
23:21 30:7 36:16
37:14 95:20 119:14
119:25 147:20
**undertake (3)**
42:8,10,11
**undertaking (1)**
111:21
**unencumbered (1)**
19:3
**unfold (1)**
13:21
**UNITED (1)**
1:2
**Unsecured (2)**
3:19 6:7
**upper (3)**
67:14,19 68:6
**URQUHART (1)**
3:17
**use (1)**
154:12

———————
           V
———————
**vague (28)**
16:5,15 23:16 28:21
29:24 31:4 32:20
33:6,17 35:3 40:14
42:6 46:23 50:18
52:23 56:23 71:20
77:5 80:13 85:5
107:14 127:25
135:7 138:18
139:11 141:12
147:2 150:23
**validity (1)**
78:12
**valuation (7)**
32:18 93:4 111:4
112:17 113:13
114:2 136:2
**value (77)**
28:9,14,16,20 29:2,11
30:12,16,19,23 31:2
32:2,12 33:4,5,13
33:14,24,25 34:7
38:4 67:21 68:8
69:14 70:24 71:5,11
77:20 78:19 79:12
80:2 82:3 85:2,13
93:11,17,24,25 94:8
94:8 104:14,22
105:3,5,11,18 112:3
112:6 117:7 120:12
120:23 122:10,21
123:2,5,11,16,19
125:11,17 126:3,15

129:3,4,5,7,8
134:11,18 135:10
135:21 136:9
142:20 148:15
163:4 165:14,19
**values (7)**
107:8,15 128:20,23
145:20 165:24
166:4
**variety (2)**
54:22 73:3
**various (5)**
8:22 41:22 133:11
135:12,13
**verbatim (3)**
45:23 46:12 64:21
**version (5)**
35:25 36:2 92:23
130:4 132:12
**versions (2)**
126:23 127:7
**video (3)**
4:20 5:15 166:13
**VIDEOGRAPHER...**
5:5 6:19 51:25 52:5
87:19,22 103:16
104:3 143:12,18
166:12
**videotaped (3)**
1:12 2:4 5:7
**view (1)**
144:22
**views (2)**
21:8,11
**voluntary (1)**
125:9

———————
           W
———————
**W (2)**
4:7 6:10
**waiting (5)**
57:25 60:2,6 62:12
115:13
**walked (1)**
135:16
**want (7)**
121:6 130:23 132:9
132:19 141:2 144:3
144:13
**wanted (5)**
16:8 43:9 60:3 164:15
164:18
**warranties (8)**
33:3,13,24 93:24
111:4 112:17
113:13 114:2
**wash (8)**
105:5 106:25 107:13
107:23 108:6,22

109:11 116:15
**Washington (1)**
4:14
**way (14)**
12:3 22:8 58:19,20
60:7,13 72:3 73:20
75:6 77:10 85:9
92:6 143:9 167:16
**Wednesday (3)**
5:12 9:18 12:18
**week (5)**
151:17 158:6 161:4
162:4,19
**weekend (49)**
23:6 24:2,12 25:3
35:17 36:4,8 38:18
39:20 40:9 43:19
44:5,17 51:12 52:17
52:22 53:6 54:8,16
54:21 55:7 57:5,15
57:18 58:6,21 59:2
59:25 60:25 61:8
62:7 65:15,24 66:2
66:10,13 67:7 68:20
71:2 78:10 82:16
83:5 86:6 88:7
115:13,17 127:15
127:24 128:5
**Weil (107)**
10:8,19 11:5,9,12,23
14:4,10,12 15:25
17:12 20:15,20,24
26:24 31:25 32:16
32:25 33:11,23 34:4
38:12,24 39:21
42:20,24 43:21 44:8
44:24 46:5,11 47:19
47:20 48:9,15,25
49:11 50:14 51:8
57:2,7 58:24,25
59:20,21 60:7,25
61:8 62:7,15 74:24
75:4,10,17 77:4
88:7 90:22,25 92:2
93:3,10,16,22 94:6
94:11,13 106:6,16
106:23 107:11,18
107:21 108:2,4,20
109:2 110:3,16
111:3 112:9 116:6
116:21 127:2,22
128:3,7,9 140:22
141:7,23 145:14
152:9,18 153:14
154:3 157:5,10,17
158:8,15 159:15
160:24 163:25
164:2,7,10 165:2
**Weil's (2)**

38:21 165:4
**went (2)**
126:4 165:14
**we'll (2)**
39:16 89:24
**we're (8)**
7:12 16:8 31:5 52:3
87:20 90:10 103:18
143:13
**we've (10)**
7:6,7,15 88:25,25
91:12 92:3,14 132:3
143:22
**WGM-LEHMAN-...**
88:23 90:8 91:10
168:11,15,17
**whereof (1)**
167:23
**William (2)**
3:8 6:11
**windfall (2)**
25:6 26:9
**withdraw (2)**
20:20 151:15
**withdrawal (1)**
149:13
**withdrawn (11)**
22:12 34:21 35:9 37:3
39:3 66:10 80:19
97:4 106:21 141:11
164:24
**withdrew (5)**
149:17 150:13,19
163:10,16
**witness (48)**
4:11 5:7 6:3,20,23
10:14 35:15 41:14
50:10,24 69:22 98:5
99:5,17 100:4,15,25
101:20 102:5,15
103:2,12 105:14,20
106:3 109:23
110:13 114:21
116:16 117:2 121:8
126:9 130:21
132:15 136:23
139:24 142:11
148:21 154:19
162:15,24 163:21
164:20 166:11
167:9,13,23 169:4
**word (1)**
113:19
**words (2)**
49:18 65:18
**work (50)**
29:7 36:14 41:15
49:23 50:10 53:14
69:21 95:12 96:7,21

98:6 99:6 100:5
101:2,21 102:6,17
103:4,14 104:19
105:15,22 106:5
109:25 111:15
114:24 116:18
117:4 120:8 122:3
124:22 126:3,11,14
129:13 136:24
139:3 147:7,8,22,23
148:10,22,25 154:7
154:20 156:23
162:16 163:23
164:22
**working (1)**
149:7
**worth (8)**
19:9 20:11 21:13
66:16 144:23 146:4
159:7,12
**wouldn't (1)**
115:3
**writes (1)**
144:11
**writing (4)**
148:5,7 158:15,19
**written (3)**
46:17,21 154:6

**X**
**x (2)**
1:4,10

**Y**
**Yeah (3)**
39:15 118:20 147:9
**yield (1)**
149:25
**yielded (1)**
45:19
**York (19)**
1:3,13,13 2:7,7,12 3:7
3:7,13,13,22,22 4:6
4:6 5:11,11 167:3,4
167:7

**$**
**$1 (1)**
80:11
**$1.3 (1)**
119:11
**$1.9 (3)**
19:9 20:11 79:7
**$2 (5)**
24:18 35:11 38:10
40:2,16
**$250 (1)**
123:16

**$47.4 (4)**
105:17 144:19,24
146:4
**$49.9 (1)**
87:5
**$5 (23)**
134:12,18 136:17
137:4 138:4 139:8
139:16 140:13,25
141:9,14,20 142:3,4
155:23 156:3,16
157:6,7,15,21,23
165:5
**$6 (3)**
122:14,15,16
**$7 (4)**
66:16,22 68:15,16
**$769 (5)**
81:22 82:7,13 83:9,22

**0**
**00002746 (2)**
88:23 168:11
**00013889 (2)**
91:10 168:17
**00013962 (2)**
90:8 168:15
**08-13555(JMP) (1)**
1:7

**1**
**1 (8)**
5:6 52:2 81:15 86:9
87:8 121:6 163:10
169:6
**1(a)(ii) (2)**
75:24 121:22
**1.3 (2)**
119:15,18
**1.9 (2)**
21:13 87:10
**1:20 (1)**
104:4
**10/13 (1)**
144:5
**10:42 (1)**
52:2
**10:55 (1)**
52:6
**10004 (1)**
4:6
**10010 (1)**
3:22
**10017 (1)**
3:7
**10022 (1)**
3:13
**11 (4)**

1:6 123:24,25 125:10
**11:48 (1)**
87:20
**11:50 (1)**
153:12
**1100 (1)**
4:13
**12:04 (1)**
87:23
**12:34 (1)**
103:17
**12:39 (1)**
90:19
**12871 (2)**
143:16 168:21
**13 (8)**
88:3 144:10 151:20
152:10,16 153:12
158:18,20
**13899 (2)**
91:10 168:17
**13982 (2)**
90:8 168:15
**143 (1)**
168:20
**15 (4)**
90:22 152:13,16,18
**15c3 (8)**
22:16 23:2 64:14
72:16 83:16,20 84:3
84:24
**15c3-3 (1)**
81:24
**16 (3)**
74:3,11,13
**164 (1)**
168:5
**17 (3)**
35:25 36:18 37:4
**17th (1)**
9:18
**18 (1)**
11:14
**18th (3)**
10:18 26:25 42:2
**182 (2)**
89:15 168:13
**1850 (1)**
4:12
**19 (8)**
8:25 11:19 20:14,22
31:5 74:5,24 102:10
**19th (5)**
9:22 54:14 96:10 97:2
122:19
**1934 (1)**
81:25
**19930 (2)**

92:12 168:19

**2**
**2 (9)**
52:6 81:20 84:19 86:9
93:7 103:17 119:7
131:11 169:6
**2.3 (2)**
123:25 124:19
**2:17 (1)**
143:13
**2:24 (1)**
143:19
**2:57 (1)**
166:14
**20 (2)**
74:7 90:6
**20th (1)**
58:10
**20006 (1)**
4:14
**2008 (20)**
7:12 8:13,25 52:16
74:3,5,7,11,18
76:12 131:22 132:5
141:25 144:10
151:14,17 153:12
156:10 162:19
165:3
**2010 (6)**
1:14 2:2 5:12 166:21
167:24 169:3
**21 (13)**
52:16 76:12 90:19,25
91:21 92:2 151:14
151:21 152:10,19
156:9 157:25 158:5
**21st (3)**
55:22 86:24 157:9
**22 (38)**
38:16 48:25 49:3,5,12
50:20,25 51:4 74:18
75:9,16 77:20 78:8
78:19 79:11 80:4
92:25 93:9,14,20
94:5 101:4 104:10
105:9,24 106:8,11
106:14,21 107:9,21
108:4,15,16,25
109:9 116:19 157:8
**22nd (5)**
3:21 55:23 61:20
109:3 157:9
**222 (1)**
3:6
**25 (1)**
127:13
**25th (1)**
127:8

**26 (5)**
73:19,23 81:6 87:25
117:5
**26649 (1)**
1:22
**2766 (2)**
88:23 168:11

**3**
**3 (3)**
104:4 122:17 169:7
**3:47 (2)**
144:5,10
**30 (2)**
106:12 116:20
**30(b)(6) (9)**
5:3,7 6:2 8:4 129:11
137:12 142:8
162:24 168:9
**30(e) (1)**
167:21

**4**
**4 (4)**
13:19 81:4,8 143:19
**41st (1)**
3:6
**43.1 (1)**
134:11
**440 (2)**
94:17,18
**461 (3)**
67:13 73:19 78:13
**461B (10)**
52:11 53:3,3,25 54:4
78:15 86:12,21,25
87:4
**463B (1)**
129:24
**464B (1)**
132:3
**47.4 (4)**
159:8,8,13,16
**498 (4)**
5:2 7:8,16 168:8
**499 (3)**
88:22 89:2 168:10

**5**
**5 (3)**
88:2,2 168:8
**50 (3)**
122:7,15,17
**500 (4)**
89:14,17,20 168:12
**501 (4)**
90:7,11 91:2 168:14
**502 (4)**

91:9,13 92:4 168:16
**503 (3)**
92:11,15 168:18
**504 (5)**
143:15,23 152:13
153:11 168:20
**51 (1)**
3:20
**575 (3)**
2:6 3:12 5:10

---
**6**

**6 (8)**
1:14 2:2 117:12,12
122:6,6 126:13
169:3
**6th (2)**
5:12 167:24
**60 (3)**
76:15 99:13 142:5
**60(B) (6)**
139:5,9,13,15 142:14
143:6

---
**7**

**7 (2)**
125:10 168:4
**7th (1)**
3:12
**769 (1)**
84:6

---
**8**

**8 (5)**
81:4,8 132:5 133:4
139:20
**88 (1)**
168:10
**89 (1)**
168:12

---
**9**

**9/19/2008 (1)**
89:10
**9:23 (1)**
91:20
**9:35 (1)**
5:13
**90 (1)**
168:14
**91 (1)**
168:16
**92 (1)**
168:18