Page 1

1                     N. PURCELL

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

10                  Debtors.
    ----------------------x

11

12

13

14      VIDEOTAPED DEPOSITION OF NOEL PURCELL

15               New York, New York

16              January 13, 2010

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 27089

| | Page 2 | | | Page 4 |
|---|---|---|---|---|
| 1 | N. PURCELL | | 1 | N. PURCELL |
| 2 | January 13, 2010 | | 2 | |
| 3 | | | 3 | A P P E A R A N C E S:  (Cont'd.) |
| 4 | VIDEOTAPED deposition of NOEL | | 4 | |
| 5 | PURCELL, taken pursuant to Rule 30(b)(6), | | 5 | HUGHES, HUBBARD & REED, LLP |
| 6 | held at the law offices of Boies, | | 6 | Attorneys for the SIPA Trustee |
| 7 | Schiller & Flexner, LLP, 575 Lexington | | 7 | One Battery Park Plaza |
| 8 | Avenue, New York, New York, before Kathy | | 8 | New York, New York  10004-1482 |
| 9 | S. Klepfer, a Registered Professional | | 9 | BY:  CARL W. MILLS, ESQ. |
| 10 | Reporter, Registered Merit Reporter, | | 10 | |
| 11 | Certified Realtime Reporter, Certified | | 11 | STROOCK & STROOCK & LAVAN, LLP |
| 12 | Livenote Reporter, and Notary Public of | | 12 | Attorneys for the Witness and |
| 13 | the State of New York. | | 13 | Mizuho Corporate Bank, Ltd. |
| 14 | | | 14 | 180 Maiden Lane |
| 15 | | | 15 | New York, New York  10038-4982 |
| 16 | | | 16 | BY:  CLAUDE G. SZYFER, ESQ. |
| 17 | | | 17 | |
| 18 | | | 18 | |
| 19 | | | 19 | Also Present: |
| 20 | | | 20 | STEVEN SANPIETRO, Legal Video Specialist |
| 21 | | | 21 | LISA J. HAYES, Mizuho Corporate Bank, Ltd. |
| 22 | | | 22 | |
| 23 | | | 23 | |
| 24 | | | 24 | |
| 25 | | | 25 | |

| | Page 3 | | | Page 5 |
|---|---|---|---|---|
| 1 | N. PURCELL | | 1 | N. PURCELL |
| 2 | A P P E A R A N C E S: | | 2 | THE VIDEOGRAPHER:  This is the start |
| 3 | | | 3 | of the tape labeled number 1 of the |
| 4 | JONES DAY, LLP | | 4 | videotaped deposition of 30(b)(6) witness |
| 5 | Attorneys for Lehman Brothers, Inc. | | 5 | Noel Purcell, in the matter of In Re: |
| 6 | 222 East 41st Street | | 6 | Lehman Brothers Holdings, Inc. |
| 7 | New York, New York  10017-6702 | | 7 | This deposition is being held at 575 |
| 8 | BY:  JENNIFER L. DEL MEDICO, ESQ. | | 8 | Lexington Avenue, New York, New York, on |
| 9 | | | 9 | Wednesday, January 13th, 2010 at |
| 10 | BOIES, SCHILLER & FLEXNER, LLP | | 10 | approximately 9:32 A.M. |
| 11 | Attorneys for Barclays Capital | | 11 | Counselors' appearances have been |
| 12 | 575 Lexington Avenue - 7th Floor | | 12 | noted on the record.  Will the court |
| 13 | New York, New York  10022 | | 13 | reporter please swear in the witness. |
| 14 | BY:  JACK G. STERN, ESQ. | | 14 | * * * |
| 15 | | | 15 | NOEL PURCELL, called as a |
| 16 | QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP | | 16 | witness, having been duly sworn by a Notary |
| 17 | Attorneys for the Creditors Committee | | 17 | Public, was examined and testified as |
| 18 | 865 Figueroa Street, 10th Floor | | 18 | follows: |
| 19 | Los Angeles, California  90017 | | 19 | EXAMINATION BY |
| 20 | BY:  ERICA P. TAGGART, ESQ. | | 20 | MR. STERN: |
| 21 | TYLER WHITMER, ESQ. | | 21 | Q.   Good morning, Mr. Purcell. |
| 22 | - and - | | 22 | A.   Good morning. |
| 23 | 51 Madison Avenue, 22nd Floor | | 23 | Q.   You understand that you're here today |
| 24 | New York, New York  10010 | | 24 | as a representative of the Creditors Committee? |
| 25 | BY:  JAMES C. TECCE, ESQ. | | 25 | A.   I do. |

2 (Pages 2 to 5)

Page 6

N. PURCELL
1
2     Q.    And do you understand that the topics
3  that we plan to cover relate to the sale
4  transaction involving Lehman and Barclays --
5     A.    I do.
6     Q.    -- from September 2008?
7     A.    Yes.
8     Q.    And you understand that the topics
9  relate to the Committee's understanding and
10  evaluation of that transaction?
11     A.    I do.
12     Q.    When was the Committee first formed,
13  to the best of your recollection?
14     A.    "When formed," you mean?
15     Q.    When did the Committee first start to
16  conduct business?
17     A.    The Committee was formed on September
18  17, 2008, with our first meeting that morning to
19  begin to select the professionals.
20     Q.    I placed in front of you a blank
21  calendar for the month of September 2008 because
22  we'll be focusing largely on that time period.
23          Do you understand that on September
24  19, there was a hearing in the Bankruptcy Court
25  concerning approval of the sale transaction?

Page 7

N. PURCELL
1
2     A.    I do.
3     Q.    Can you tell me from the period when
4  the Committee was formed through the time of
5  that Approval Hearing what the Committee did in
6  order to understand and evaluate the sale
7  transaction?
8     MR. SZYFER:  Objection to form.
9     A.    On September 17, the Committee took
10  most of the day to put together a professional
11  team.  So for most of that day and that evening
12  up until about 11:30 that night, there really
13  wasn't much discussion about the business
14  aspects of Lehman Brothers.  It was more putting
15  together the administrative function of the
16  team.
17          Late that evening, there was a
18  discussion amongst the team, which included the
19  Milbank lawyers and the U.C.C. who were there at
20  the time, some of their representatives and the
21  U.C.C., including Stroock & Stroock & Lavan and
22  the attorneys for some of the other parties on
23  the U.C.C., about some of the urgent natures
24  within Lehman Brothers' estate.
25          That included a number of different

Page 8

N. PURCELL
1
2  aspects of the estate, funding issues, liquidity
3  issues, and that included things like sale of
4  certain assets, but we went into no detail that
5  evening.  We didn't have much detail to discuss.
6          Over the next two days, there was
7  several calls back and forth, I don't believe we
8  got together directly, to discuss a whole host
9  of issues within the estate.  One of those
10  issues was the Barclays transaction and what it
11  was that we knew about the Barclays transaction
12  at that point in time.
13     Q.    In this period from the 17th through
14  the 19th, did the Committee members themselves
15  have any direct contact with the parties to the
16  sale transaction?
17     A.    Can you define "parties"?
18     Q.    Yes.  Lehman on the one hand and
19  Barclays on the other hand and their respective
20  lawyers and financial advisors.  So that would
21  mean, basically, you know, Lehman executives,
22  Barclays executives, Weil Gotshal, Lazard.
23     A.    No.
24     Q.    And my --
25     A.    I'm sorry.

Page 9

N. PURCELL
1
2     Q.    I'm sorry.  And my question goes to
3  whether the Committee members themselves had any
4  direct contact with those parties.
5     A.    No.
6     Q.    The Committee's contact with those
7  parties was through its professionals; is that
8  right?
9     A.    Yes, it was.
10     Q.    Would the same be true for the period
11  from the 19th through the closing of the sale
12  transaction on September 22?
13     MS. TAGGART:  Object to form.
14     MR. SZYFER:  And when you say "the
15     same," you're talking about the Committee's
16     contact was through its professionals with
17     those parties that you listed in the
18     question before?
19     MR. STERN:  Sure.  Yes.
20     Q.    Let me spell it out so that the record
21  is clear.
22          Did the Committee in the period from
23  the 19th through the closing of the sale
24  transaction on September 22 have any direct
25  contact with the parties to the sale

3 (Pages 6 to 9)

Page 10

```
               N. PURCELL
 1
 2  transaction?
 3      A.   No.
 4      Q.   All the Committee's contacts were done
 5  through its professionals?
 6      A.   Yes.
 7      Q.   And in the period from the 17th
 8  through to the closing to the 22nd, when the
 9  Committee sought to raise questions or express
10  its views concerning the transaction, am I
11  correct that that was also done through the
12  Committee's professionals?
13      A.   Yes.
14      Q.   In the period from the 17th through
15  the closing on the 22nd, was there any
16  information concerning the sale transaction that
17  the Committee got independent of what it learned
18  from its professionals?
19      MS. TAGGART:  Object to form.
20      Q.   To the best of your recollection.
21      A.   No.
22      Q.   So, in the period from the 17th
23  through the 22nd, to the best of your
24  recollection, the Committee did not receive
25  information concerning the sale transaction
```

Page 11

```
               N. PURCELL
 1
 2  independent of what it learned from its
 3  professionals; is that correct?
 4      MS. TAGGART:  Object to form.
 5      A.   Yes.
 6      Q.   Now, after the closing -- now, after
 7  the closing on September 22, 2008, and going
 8  into the end of September and the month of
 9  October, did the Committee have any direct
10  contact with Alvarez & Marsal concerning the
11  transaction?
12      A.   Yes.
13      Q.   And what was that contact?
14      A.   In early October, if I remember
15  correctly, there was a meeting of the Unsecured
16  Creditors Committee together with various
17  representatives of the estate, Alvarez & Marsal,
18  Brian Marsal and some of his team to discuss all
19  the urgent factors that were going on in the
20  estate and what they knew at that time.
21      Q.   Do you recall who attended that
22  presentation from the Creditors Committee?
23      MR. SZYFER:  Object to the form.
24      A.   I believe all of the standing
25  Unsecured Creditor Committee members were there.
```

Page 12

```
               N. PURCELL
 1
 2  I think that's it.  Yeah.
 3      Q.   Do you recall who else was at that
 4  presentation outside of Creditors Committee
 5  members?
 6      And I'm just asking for your best
 7  recollection.  I realize it as was a long time
 8  ago.
 9      A.   Sure.  I think various counsel
10  representing members of the U.C.C. directly.
11  For my benefit, Mark Speiser from Stroock &
12  Stroock & Lavan was there.  I believe Michael
13  Hawkins from Covington & Burling was there
14  representing Julie Becker.  I believe, and I
15  can't remember who specifically from Houlihan,
16  but I believe Houlihan & Lokey representatives
17  were there.  FTI representatives were there,
18  together with Milbank counsel.
19      Q.   Do you recall whether anybody from
20  Weil Gotshal attended that presentation?
21      A.   I don't recall.
22      Q.   One way or the other?
23      A.   One way or the other.
24      Q.   Do you recall whether anybody from
25  Lazard attended that presentation?
```

Page 13

```
               N. PURCELL
 1
 2      A.   I don't recall one way or the other.
 3      Q.   Other than the Alvarez presentation in
 4  early October, in this period after the closing
 5  on September 22 through the end of October 2008,
 6  to the best of your recollection, did the
 7  Committee members have any direct contact with
 8  any of the parties to the transaction or their
 9  professionals?
10      A.   By "direct," can you define "direct"
11  for me?
12      Q.   By "direct," I mean a situation like
13  the Alvarez presentation, where the Committee
14  was speaking directly or was hearing directly
15  from Alvarez as opposed to communicating through
16  its counsel or financial professionals.  Does
17  that help?
18      A.   Yes.
19      Q.   Okay.
20      A.   No, I do not believe so.
21      Q.   So, other than the Alvarez
22  presentation in early October, in this period
23  from September 22 through the end of October
24  2008, to the best of your recollection, the
25  Committee did not have direct contact with the
```

Page 14

N. PURCELL

1
2  parties to the transaction or their
3  representatives; is that your best recollection?
4      A.   Yes.
5      MR. SZYFER:  Just to be clear, Mr.
6  Stern, are you counting Alvarez & Marsal as
7  a representative of one of the parties since
8  Alvarez & Marsal is, in a sense, working for
9  Lehman?
10     MR. STERN:  Yes.
11     MR. SZYFER:  Okay.  I just want to
12  make sure that you understand that
13  clarification.
14     A.   Can you restate the question with that
15  clarification, please?
16     Q.   Sure.  So, other than the Alvarez
17  presentation in early October, in this period
18  from September 22, 2008, through the end of
19  October 2008, to the best of your recollection,
20  is it correct that the Committee did not have
21  direct communications with the parties to the
22  transaction or their representatives?
23     A.   Yes.
24     (Exhibit 519B, a document bearing
25  Bates Nos. CMTE0007889 through 8244, marked

Page 15

N. PURCELL

1
2  for identification, as of this date.)
3      (Discussion off the record.)
4      THE VIDEOGRAPHER:  The time is now
5  9:49 A.M.  We are now back on the record.
6  BY MR. STERN:
7      Q.   Mr. Purcell, looking at Exhibit 519B,
8  if you could review this document which was
9  produced to us by the Committee and tell me if
10  you understand what it is or if you recall what
11  it is.
12     A.   Looks to be a series of e-mails
13  between members of the Committee and Committee
14  counsel, regarding exactly what I don't know --
15  portions of it are redacted -- referencing
16  certain calls, including the Neuberger Committee
17  call at 9:30 on 10/16.
18     Q.   And after the series of e-mails, there
19  is a page that in the upper left says DTC074.
20  Do you see that?
21     A.   I do.
22     Q.   Do you know what this page is?
23     A.   I do not.
24     MR. STERN:  Let me mark this as the
25  next exhibit.

Page 16

N. PURCELL

1
2      (Exhibit 520B, a document bearing
3  Bates Nos. CMTE0001047 through 1049, marked
4  for identification, as of this date.)
5      Q.   I'll ask you to please read through
6  that and then I'll have some questions for you
7  about it.
8      (Document review.)
9      A.   Okay, Mr. Stern.
10     Q.   Have you ever seen Exhibit 520B before
11  today?
12     A.   No, I have not.
13     Q.   Did you review it in preparing for
14  today's deposition?
15     A.   No, I did not.
16     Q.   Before I get to the specifics of 520B,
17  let me ask you a general question.  In the
18  period from September 17 through the closing of
19  the sale transaction on September 22, what
20  factors did the Committee consider in evaluating
21  whether to object to the sale transaction?
22     MR. SZYFER:  Object to the form.
23     MS. TAGGART:  I'm going to object to
24  the form and I'm also going to instruct not
25  to answer on privilege on that basis, on

Page 17

N. PURCELL

1
2  work product and attorney-client.
3      Q.   Turning to Exhibit 520B, if you look
4  on the page that bears the Bates number ending
5  1048 in the bottom half of that page, there's an
6  e-mail from -- and I'm not sure I'm going to
7  pronounce this correctly -- Nitin Bajpai.  Do
8  you see that?
9      A.   I do.  I don't know how to pronounce
10  his name either.
11     Q.   Do you know who that is, Bajpai?
12     A.   I do not.
13     Q.   Was Shinsei International at any point
14  a member of the Creditors Committee?
15     A.   I don't know Shinsei's -- the exact
16  entity that Shinsei represented within its
17  organization of the Committee.  I don't know the
18  exact term.  I do not believe Shinsei
19  International is that entity.
20     Q.   Was there any Shinsei entity -- and
21  that's S-H-I-N-S-E-I -- was there any Shinsei
22  entity that at any time was a member of the
23  Creditors Committee?
24     A.   Yes.
25     Q.   Did Shinsei at some point cease to

Page 18

N. PURCELL

1
2 become a member of the Creditors Committee?
3        MR. SZYFER:  And are you now -- are
4 you referring to the Shinsei entity that Mr.
5 Purcell has mentioned or are you just
6 discussing Shinsei International or any
7 generic Shinsei entity?
8        Q.   Well, what is the Shinsei entity, to
9 the best of your knowledge, that is a member of
10 the Creditors Committee?
11       A.   I only know it as Shinsei.
12       Q.   Okay.  Did Shinsei ever cease to
13 become a member of the Creditors Committee?
14       A.   Yes.
15       Q.   And when did that happen?
16       A.   I believe Shinsei resigned from the
17 Committee in early December 2009.
18       Q.   Shinsei was a member of the Creditors
19 Committee in September 2008, correct?
20       A.   Yes.
21        MS. TAGGART:  Object to form.
22       Q.   Do you know who Nitin Bajpai is?
23       A.   I do not.
24       Q.   Do you know who Sally Rocker is?
25       A.   I do not.

Page 19

N. PURCELL

1
2       Q.   Who -- do you know who Ed Gilbert is?
3       A.   Yes, I do.
4       Q.   And who is he?
5       A.   Mr. Gilbert was the representative for
6 Shinsei who interacted with the U.C.C.
7       Q.   Turning to the page that ends with the
8 Bates number 1048, and the e-mail that's
9 reflected here is being sent Saturday, September
10 20, 2008, 12:32 A.M.  It states in the second
11 paragraph towards the middle, "The current
12 stance of the U.C.C. is not to object, as there
13 does not appear to be a viable option, and the
14 judge seems determined to move the process along
15 and to approve the sale, even while he
16 acknowledges that there is insufficient
17 information, but cites the necessity to preserve
18 financial stability as an overriding concern."
19        Do you see that?
20       A.   I do.
21       Q.   To your knowledge, at any time between
22 September 17 and the closing on September 22 did
23 the Committee take into consideration in
24 evaluating the sale transaction whether there
25 was a viable option?

Page 20

N. PURCELL

1
2        MR. SZYFER:  Objection to the form.
3       A.   The Committee looked at the entire
4 transaction and the lack of data supporting all
5 facts of the transaction as a problem.  Options
6 and who else might be a possible buyer was also
7 a concern, as all other assets -- all other
8 aspects of this transaction were.
9       Q.   In considering the lack of data
10 supporting all facts of the transaction to be a
11 problem, did the Committee consider whether it
12 should object on that basis?
13        MS. TAGGART:  Object on form,
14 privilege, and I'm going to instruct not to
15 answer on attorney-client and work product
16 privileges.
17       Q.   Did the Committee ever object to the
18 sale transaction based on what you referred to
19 as the lack of data?
20       A.   Object?  Can you define "object"?
21       Q.   Did the Committee ever tell Judge Peck
22 that it objected to the transaction because of
23 the lack of data?
24        MS. TAGGART:  Object to form.
25       A.   And when you mean "Committee," you

Page 21

N. PURCELL

1
2 mean the direct Committee members or you mean
3 the Committee advisors?
4       Q.   The Committee in whatever way it
5 communicated with the Court.
6       A.   I believe the Committee indicated to
7 Judge Peck on a number of occasions that we were
8 troubled with the fact that we didn't have all
9 the details of the transaction.  If you consider
10 that an objection from your defined term, then
11 we objected.
12       Q.   Did the Committee, to your knowledge,
13 ever object to the sale transaction before Judge
14 Peck?
15        MS. TAGGART:  Object to form.
16       A.   Again, the "Committee" meaning its
17 advisors or the Committee?
18       Q.   The Committee appeared before Judge
19 Peck through its counsel, correct?
20       A.   Yes.
21       Q.   Okay.  To your knowledge, did the
22 Committee's counsel ever indicate to the Court
23 that the Committee objected to the sale
24 transaction?
25       A.   I do not believe the Committee

6 (Pages 18 to 21)

Page 22

1          N. PURCELL
2  formally objected to the transaction.  The
3  Committee certainly expressed its concerns about
4  the details of the transaction and the lack
5  thereof.
6      Q.    But the Committee did not object; is
7  that right?
8          MS. TAGGART:  Objection.  Asked and
9  answered.
10     A.    Formally, no.
11     Q.    And in light of the concerns that you
12 just described, why did the Committee not
13 object?
14         MS. TAGGART:  Objection --
15         MR. SZYFER:  Objection.
16         MS. TAGGART:  -- to form and to
17     privilege, and I'm going to instruct not to
18     answer on attorney-client and work product
19     privileges.
20     Q.    In deciding not to object, despite the
21 Committee's concerns about lack of information,
22 did the Committee take into consideration the
23 lack of a viable option?
24         MS. TAGGART:  Same objections and same
25     instructions.  So I'm instructing not to

Page 23

1          N. PURCELL
2      answer on privileges.
3      Q.    In deciding not to object, despite the
4  Committee's concerns about lack of information,
5  did the Committee take into consideration any
6  concerns about preserving financial stability?
7          MS. TAGGART:  Same objections and same
8      instruction.
9      Q.    Before the transaction closed on
10 September 22, did the Committee ever consider
11 taking any action to block the closing?
12         MS. TAGGART:  I'm going to -- same
13     objections and instruction.  So I'm going to
14     instruct you not to answer on privileges.
15     Q.    In deciding not to object to the
16 transaction, did the Committee ever take into
17 consideration the effect on the
18 debtor-in-possession financing for Lehman if the
19 transaction did not go through?
20         MS. TAGGART:  Same objections and
21     instruction.
22     Q.    In deciding not to object to the sale
23 transaction, did the Committee ever take into
24 consideration the views of various government
25 agencies?

Page 24

1          N. PURCELL
2          MS. TAGGART:  I'm going to object and
3  instruct on that basis.  If you want to ask
4  questions about what input they had about
5  various government agencies, there may be
6  information we would allow.
7      Q.    What did the Committee know about the
8  views of various government agencies concerning
9  the sale transaction?
10         MS. TAGGART:  And let me explain our
11     position on this.  We are willing to have
12     him testify about the Committee's
13     understanding on this issue, but not the
14     communications to the extent it came from
15     counsel, but I would ask an agreement that
16     that not be a waiver to any privilege to the
17     extent that that issue was discussed among
18     counsel.
19         So if I can have that agreement, then
20     he can answer that question.
21         MR. STERN:  I'm not going to engage in
22     this kind of a negotiation on the record.
23     I'm just going to ask my questions and you
24     can either instruct him not to answer,
25     object, or let him answer.

Page 25

1          N. PURCELL
2      Q.    What did the Committee know about the
3  views of various government agencies concerning
4  the sale transaction?
5          MS. TAGGART:  Okay.  Then I'm going to
6      object and give this instruction, which is,
7      in light of the fact that counsel for
8      Barclays will not agree to say that it's not
9      a waiver, and I understand that some of the
10     information came to you through counsel, why
11     don't you only say if you received any
12     information that was not from your
13     professionals and not from counsel that was
14     about the issue of the views of various
15     government agencies concerning the sale
16     transaction.
17         So if you received information about
18     the views of various government agencies
19     concerning the sale transaction from someone
20     other than your professionals and your
21     counsel, you should answer.
22     A.    We did not receive any information
23 about various government agencies and their
24 views on this transaction from counsel or from
25 any other -- any other position.

7 (Pages 22 to 25)

Page 26

N. PURCELL

1
2    Q.    Did the Committee have a view as to
3    whether the Court would approve the transaction
4    even if the Committee did object?
5        MS. TAGGART:  And I'm going to object
6    and instruct not to answer unless there has
7    been some view that was given from the
8    Committee to someone directly to someone in
9    the public, such as the Court or someone
10    outside of counsel and the professionals.
11        But if it was just an internal
12    Committee view that was not expressed on
13    that issue to someone outside of the counsel
14    and the professionals, then I instruct you
15    not to answer the question.
16    A.    Could you repeat the question, please?
17    Q.    Did the Committee have a view as to
18    whether the Court would approve the transaction
19    even if the Committee did object?
20    A.    No.
21    Q.    The front page of Exhibit 520B, the
22    bottom half, there's an e-mail dated Saturday,
23    September 20, and it says 1:25.  In the first
24    paragraph, last sentence, it states, "Even if
25    the U.C.C. had objected, all indications were

Page 27

N. PURCELL

1
2    that the judge would have ruled against it and
3    executed the transaction."
4        Do you recall that view being
5    expressed within the Committee?
6        MS. TAGGART:  I'm going to object and
7        instruct not to answer on work product and
8        attorney-client privilege.
9    Q.    The next line states, "Whether there
10    is a chance to challenge this transaction
11    further or overturn it is something we can
12    discuss with the U.C.C. counsel tomorrow.  I
13    would be doubtful that we could."  Do you see
14    that?
15    A.    I do.
16    Q.    Okay.  Do you recall whether the
17    Committee considered whether to challenge the
18    transaction or seek to overturn it at any point
19    before the closing on September 22?
20        MS. TAGGART:  I'm going to object and
21        instruct not to answer on attorney-client
22        and work product privileges.
23    Q.    Did the Committee at any time before
24    the closing on September 22 have any
25    understanding concerning what the consequences

Page 28

N. PURCELL

1
2    would be for the DIP financing of Lehman if the
3    sale transaction was not completed?
4        MS. TAGGART:  I'm going to object and
5        instruct not to answer on attorney-client
6        and work product privileges.
7    Q.    Did the Committee, in deciding whether
8    to object to the transaction, take into
9    consideration the consequences for the DIP
10    financing?
11        MS. TAGGART:  Same objection and
12        instruction.
13    Q.    In the period before the closing of
14    the transaction, was the Committee aware of any
15    facts that the Committee viewed as reasons not
16    to object to the transaction?
17        MS. TAGGART:  I'm going to object and
18        instruct not to answer on privilege.
19        Can we take a break?
20        MR. STERN:  Just before we do, just
21    before we do, I just want to clarify.
22    You're going to instruct the witness not to
23    answer questions concerning the Committee's
24    knowledge of certain facts; is that right?
25        MS. TAGGART:  I'm going to instruct

Page 29

N. PURCELL

1
2    not to answer about the considerations and
3    decisions that were made.  That's based on
4    work product and attorney-client privilege.
5    It's my understanding as a factual matter
6    that those decisions were made as part of in
7    discussions with counsel and its
8    professionals and was -- and was work
9    product and, thus, attorney-client.
10        As far as the facts that were learned,
11    he can testify to any facts that were
12    communicated to directly to the Committee
13    through any public source.  As you know,
14    most of the facts came through counsel.
15        We are willing to let him testify
16    about the understanding that came from all
17    sources but so long as there is not an
18    argument that that waives privilege because,
19    as you understand, most of the basis for
20    that was communications that came from
21    counsel.
22        MR. STERN:  So if I ask about facts
23    that the Committee learned through counsel,
24    and if I agree that by asking those
25    questions there's no waiver, you will allow

Page 30

N. PURCELL

1           N. PURCELL
2  him or not answer -- you will allow him to
3  answer?
4        MS. TAGGART: Yes. And to be clear,
5  if you say what was the Committee's
6  understanding at certain times and on
7  certain issues, he can testify about the
8  Committee's understanding that came from all
9  sources so long as you don't -- agree that
10 that's not a waiver as to the
11 communications, yes, we would allow those
12 questions.
13       MR. STERN: I'll agree on that limited
14 basis and then ask my questions.
15       Do you need to take a break?
16       MS. TAGGART: Yeah.
17       MR. STERN: Okay.
18       MS. TAGGART: Thank you.
19       THE VIDEOGRAPHER: The time is now
20 10:20 A.M. We are now off the record.
21       (Recess.)
22       THE VIDEOGRAPHER: The time is now
23 10:26 A.M. We are now back on the record.
24 BY MR. STERN:
25    Q.  Picking up from the last colloquy and

Page 31

1           N. PURCELL
2  going back to Exhibit 520B, at the top of the
3  first page of 520B, the first e-mail, which
4  appears to be sent Saturday, September 20, 6:03
5  A.M., says that if the sale was not approved,
6  the DIP would have been due, and if someone
7  hadn't provided a new DIP, the entire stake of
8  the Asset Management Unit could have been
9  foreclosed on. Then it goes on and says "no
10 other DIP lender was forthcoming."
11       What facts was the Committee aware of
12 before closing of the sale transaction
13 concerning what would happen to the DIP
14 financing if the sale transaction was not
15 completed?
16       MS. TAGGART: I'm going to object and
17 instruct not to answer. I understand, given
18 our previous discussion, I should probably
19 explain.
20       He can describe his understanding of
21 the sales transaction regarding facts. Your
22 question I think is going to what might
23 happen in the future, which is analysis, not
24 just facts, such as what is the DIP
25 financing right now. So I am still

Page 32

1           N. PURCELL
2  instructing not to answer on attorney-client
3  and work product to that question.
4     Q.  What facts did the Committee know
5  about the DIP financing before the sale
6  transaction closed?
7        MS. TAGGART: Object to form. I will
8  allow you to answer. Please don't disclose
9  any communications that happened with
10 counsel, but you can testify to any facts,
11 if any, that the Committee had on that
12 question, which is about DIP financing
13 before the sale transaction closed.
14    A.  I don't believe the Committee had any
15 official understanding of the DIP facility
16 transaction.
17    Q.  Did the Committee have any
18 understanding of the facts concerning the
19 positions of various government agencies with
20 respect to the sale transaction?
21       MS. TAGGART: Object to form, but you
22 can answer, to the extent you understand it,
23 with that same instruction: Don't reveal
24 communications with counsel.
25    A.  I don't believe the Committee had any

Page 33

1           N. PURCELL
2  official facts regarding the government
3  agencies' position.
4     Q.  Did the Committee have any
5  understanding of the facts concerning whether
6  any bidder other than Barclays had submitted a
7  bid?
8        MS. TAGGART: You can answer.
9     A.  I don't believe the Committee had any
10 official knowledge of any other bidders, either
11 positively or negatively.
12    Q.  Did the Committee have any knowledge
13 of facts concerning whether the Court was
14 determined to move the process along and approve
15 the sale?
16       MS. TAGGART: Objection. And I'm
17 going to instruct not to answer on
18 privilege. I don't think that that's a
19 fact; that's more asking for analysis.
20    Q.  Well, you saw in Exhibit 520B that
21 Shinsei made reference to that, correct?
22       MS. TAGGART: Object to form.
23    A.  I see that someone from Shinsei
24 indicated that, yes.
25    Q.  Okay. And did you see that Shinsei

Page 34

```
              N. PURCELL
 1
 2   noted that the Court was concerned with the
 3   necessity to preserve financial stability as an
 4   overriding concern?
 5        MS. TAGGART:  Object to form.
 6     A.   Can you point me, counsel, in the
 7   e-mail to where it says that?
 8     Q.   Sure.  Do you see at the bottom of the
 9   second page of Exhibit 520B that Shinsei states
10   as follows:  "The current stance of the U.C.C.
11   is not to object, as there does not appear to be
12   a viable option, and the judge seems determined
13   to move the process along and to approve the
14   sale, even while he acknowledges that there is
15   insufficient information, but cites the
16   necessity to preserve financial stability as an
17   overriding concern"?
18        MS. TAGGART:  Is the question --
19        MR. SZYFER:  Objection.
20        MS. TAGGART:  -- just does he see it?
21        MR. SZYFER:  Objection to the form.
22     Q.   Do you see that statement by Shinsei?
23     A.   I do see that statement from Nitin
24   Bajpai of Shinsei, yes, Shinsei International.
25     Q.   Do you recall any discussions within
```

Page 35

```
              N. PURCELL
 1
 2   the Committee, not involving counsel, concerning
 3   those points?
 4        MR. SZYFER:  Which points?
 5        MR. STERN:  The points we just read
 6     from this e-mail.
 7        MS. TAGGART:  Okay.  So you can answer
 8     so long -- was there a discussion with the
 9     Committee that didn't involve any counsel on
10     that subject, and for now just answer yes or
11     no to that.
12        MR. SZYFER:  And are you just
13     referring to the sentence you just read or
14     other questions that you have asked
15     regarding this e-mail, Mr. Stern?
16        MR. STERN:  I think it's clear.
17        MS. TAGGART:  Then object to form.
18        MR. SZYFER:  Yeah, I don't think it
19     is.  Object to form.
20     A.   No.
21     Q.   To the best of your knowledge, at any
22   point before the closing did the Committee
23   consider that it should not object to the sale
24   because, as the Shinsei e-mail states, there
25   does not appear to be a viable option and the
```

Page 36

```
              N. PURCELL
 1
 2   judge seems determined to move the process along
 3   and to approve the sale, even while he
 4   acknowledges that there is insufficient
 5   information, but cites the necessity to preserve
 6   financial stability as an overriding concern?
 7        MS. TAGGART:  Object to form and
 8     instruct not to answer on attorney-client
 9     and work product privileges.
10     Q.   At any point before the closing, did
11   the Committee consider that it should not object
12   to the sale because, as the Shinsei e-mail
13   states, no other bidder submitted a bid, and
14   even if the U.C.C. had objected, all indications
15   were that the judge would have ruled against it
16   and executed the transaction?
17        MS. TAGGART:  Object to form and
18     instruct not to answer on privilege.  And
19     really I think this is a standing objection
20     about why the Committee made the decision
21     that it did.  That position, that legal
22     position, is now on the record both to the
23     Court and in our motions.
24        What was the considerations behind
25     that is privileged, and I do think it's a
```

Page 37

```
              N. PURCELL
 1
 2   waste of the time to keep asking that same
 3   question.
 4     Q.   At any point before the closing, did
 5   the Committee consider that it should not object
 6   to the sale because, as the Shinsei e-mail
 7   states, if the sale was not approved, the DIP
 8   would have been due, and if someone hadn't
 9   provided a new DIP, the entire stake of the
10   Asset Management Unit could have been
11   foreclosed?
12        MS. TAGGART:  Same objection.  Same
13     instruction.
14        (Exhibit 521B, a document bearing
15     Bates Nos. CMTE0000577 through 580, marked
16     for identification, as of this date.)
17     Q.   Before we turn to 521B, and I'll give
18   you a chance to review it, let me ask this:  In
19   deciding whether to object to the sale
20   transaction, did the Creditors Committee take
21   into consideration any information or any
22   factors that the Committee obtained through any
23   source other than its counsel and its financial
24   advisors?
25        MS. TAGGART:  I'm going to object as
```

TSG Reporting 877-702-9580

Page 38

N. PURCELL

1
2    worded considering the preface about what
3    went into the determination to object to the
4    sale.
5        If you, Mr. Stern, would like to ask
6    whether the Creditors Committee had
7    information from any source other than its
8    counsel or its financial advisors, I would
9    allow that question.
10       MR. STERN: Ms. Taggart, I think you
11   know that the rules do not allow this type
12   of speaking objection. If you have an
13   objection to the form, please state it, but
14   these kinds of speaking objections are
15   really inappropriate.
16       Can you repeat the question?
17       (Record read.)
18       MS. TAGGART: I'm going to object to
19   form and instruct not to answer as worded
20   for the reasons I stated before.
21   Q.   In deciding whether to object to the
22   sale transaction, did the Creditors Committee
23   have information from any source other than its
24   counsel or its financial advisors?
25       MS. TAGGART: I have to give the same

Page 39

N. PURCELL

1
2    instruction and objection, but it's really
3    to the preface. I do think that there's
4    information that you could get if you
5    dropped that preface. That's obviously up
6    to you. To that question I'm instructing
7    not to answer.
8    Q.   In relation to the sale transaction,
9    did the Committee have information from any
10   source other than its counsel or its financial
11   advisors?
12       MS. TAGGART: I'm going to object to
13   form for vagueness, but you can answer that.
14   A.   Can you repeat the question, please?
15   Q.   In relation to the sale transaction,
16   did the Committee have information from any
17   source other than its counsel or its financial
18   advisors?
19   A.   No.
20   Q.   Why don't you take a moment to read
21   what we have marked as Exhibit 521B.
22       (Document review.)
23   A.   I've read it, Mr. Stern.
24   Q.   Can you identify this document for us?
25   A.   Yes, I can.

Page 40

N. PURCELL

1
2    Q.   What is it?
3    A.   It's an e-mail I sent to Committee
4    members on Friday, September 26, 2008, at 10:42
5    A.M.
6    Q.   Aside from your own counsel at
7    Stroock, did you copy any other counsel?
8    A.   I don't believe I did.
9    Q.   And what was the purpose of this
10   communication?
11   A.   To express to the Committee members
12   directly my personal frustration with the lack
13   of information that the Committee had in making
14   decisions within the estate.
15   Q.   Okay. You write that, "During the
16   past week, Lehman and its related entities,
17   together with their advisors, have engaged in a
18   fire sale disposition of several assets,
19   representing billions of dollars of value to the
20   Creditors of the Debtor entity. We were told by
21   all parties involved that the sale of the
22   following entities had to be consummated
23   immediately or risk losing some or all of the
24   value of the assets for the Creditors."
25       And do you see that you list various

Page 41

N. PURCELL

1
2    entities below that, including the
3    broker-dealer?
4    A.   I do.
5    Q.   And when you refer to the
6    broker-dealer, are you referring to the sales
7    transaction involving Barclays that the Court
8    approved?
9    A.   I am.
10   Q.   And what, to the best of your
11   recollection, were you told as to why the sale
12   of the broker-dealer had to be consummated
13   immediately or risk losing some or all of the
14   value of that asset?
15       MS. TAGGART: I'm going to object and
16   give the following instruction: Please do
17   not reveal anything that you were told by
18   your financial advisors or your counsel. If
19   you were told or passed on information about
20   what was told through parties such as Lehman
21   or Barclays or other public sources, you can
22   reveal that.
23   A.   There were no other sources of
24   information I had other than our advisors on
25   those issues.

Page 42

N. PURCELL

1
2     Q.    And what did your advisors tell you
3  concerning whether the sale of the broker-dealer
4  had to be consummated immediately or risk losing
5  some or all of the value of that asset?
6         MS. TAGGART:  Objection.  I'm going to
7  instruct not to answer on privilege.
8     Q.    Further down in the e-mail, you write,
9  "During the very hurried meetings we had in
10 person and via conference call late last week
11 regarding the Lehman broker-dealer, we were
12 given a variety of reasons by our own
13 professionals as to why our strategy should be
14 to essentially abstain from any vote either way
15 on the sale to Barclays."  Do you see that?
16    A.    I do.
17    Q.    What reasons are you referring to?
18        MS. TAGGART:  I'm going to instruct
19 not to answer on privilege.
20    Q.    You then write, "One of the major
21 reasons, among many, was simply a lack of
22 clarity on a number of salient points in the
23 sale agreement.  Our position was understood and
24 agreed to by all members of the Committee, and a
25 unanimous vote was provided in favor of that

Page 43

N. PURCELL

1
2  strategy for that asset."
3         Do you see that?
4     A.    I do.
5     Q.    You refer to the major reasons, among
6  many.  What were those various reasons?
7         MS. TAGGART:  I'm going to object and
8  instruct not to answer on attorney-client
9  and work product privileges.
10    Q.    Did the Committee consider what you
11 refer to as a lack of clarity to be a reason to
12 refrain from objecting or a reason to object?
13        MS. TAGGART:  I'm going to object and
14 instruct not to answer on privilege as
15 described before.
16    Q.    Before the Lehman bankruptcy case,
17 what experience did you have in connection with
18 other bankruptcy matters?
19        MS. TAGGART:  You mean him personally,
20 Mr. Purcell?
21        MR. STERN:  Yes.  Yes.
22    A.    I have managed the debt assets for
23 three separate institutions in a number of
24 bankruptcies over a 20-year career.
25    Q.    And over that 20-year career, was it

Page 44

N. PURCELL

1
2  your experience, your own experience, that lack
3  of information would generally be a reason for a
4  party to object to a transaction rather than to
5  refrain from objecting?
6         MR. SZYFER:  Object to the form.
7         And Mr. Purcell, to the extent that
8  answering that question would require you to
9  disclose any attorney-client communications
10 from any of those previous Chapter 11
11 bankruptcy experiences, I would instruct you
12 not to answer.
13    A.    Based upon that instruction, I have no
14 comment on that.
15    Q.    Well, as you looked at the
16 Barclays/Lehman transaction, did you consider
17 lack of information to be a reason not to object
18 or a reason to object?
19        MS. TAGGART:  I'm going to object and
20 instruct not to answer on privilege.
21    Q.    I'm just asking for your own
22 perspective.
23        MS. TAGGART:  If you have some
24 independent perspective that was not
25 informed by counsel, such as if you formed

Page 45

N. PURCELL

1
2  it before speaking to counsel, you can do
3  that.  If your considerations on this issue
4  is all made in your deliberations with the
5  Committee and counsel, I would instruct you
6  not to answer.
7     A.    Based upon that instruction, I have no
8  opinion on that.
9     Q.    Well, aside from lack of information
10 or, to use your words, lack of clarity, were
11 there other facts or factors that the Committee
12 considered in its unanimous vote to essentially
13 abstain on the sale to Barclays?
14        MS. TAGGART:  Objection and instruct
15 not to answer on privilege.
16    Q.    Aside from lack of information or lack
17 of clarity, did the Committee know of any other
18 facts or factors that had any bearing on its
19 unanimous vote to essentially abstain on the
20 sale to Barclays?
21        MS. TAGGART:  Same objection and
22 instruction.
23    Q.    Turning to the second page of Exhibit
24 521B, it states, "while I fully respect the
25 nature of the melting ice cube scenarios that

12  (Pages 42 to 45)

Page 46

N. PURCELL

1  continue to be put in front of us."
2      When you refer in that clause to
3  "melting ice cube scenarios," what are you
4  referring to?
5      A.   I'm referring to the asset disposition
6  within the estate.
7      Q.   And what was the melting ice cube
8  scenario?
9      MS. TAGGART:  I'm going to object and
10      instruct not to answer unless there is
11      something other than your correspondence
12      with counsel that gave you further detail
13      about what that melting ice cube scenario
14      was.
15      A.   Based upon that instruction, I have no
16  answer.
17      MR. STERN:  This is the next exhibit.
18      MS. TAGGART:  We just have a small
19      clarification for the record.
20      THE WITNESS:  One clarification.  I
21      believe earlier, Mr. Stern, you asked me
22      were there any other attorneys who were CC'd
23      on this e-mail, and my apologies, but Martin
24      Feinberg, who is at BCC here, is an in-house

Page 47

N. PURCELL

1  counsel from Mizuho Corporate Bank.
2      Q.   Which is your company?
3      A.   Yes, it is.
4      (Exhibit 522B, a document bearing
5      Bates Nos. CMTE0000571 through 574, marked
6      for identification, as of this date.)
7      Q.   Before we turn to 522B, were there any
8  facts that the Committee was aware of that the
9  Committee considered to be reasons not to object
10  to the sale transaction?
11      MS. TAGGART:  Objection and instruct
12      not to answer.
13      Q.   All right.  Let's look at 522B, and
14  I'll ask you to look at this and then identify
15  it for us, please.
16      (Document review.)
17      A.   After reviewing it, the document, this
18  is an e-mail string between myself and David Yu
19  from Metropolitan Life and David and it appears
20  to be Committee members as well as Committee
21  advisors.
22      Q.   And you sent him an e-mail September
23  22 it looks like 2:19 A.M. AST, and you write,
24  "Hi, David.  Prior to tomorrow's call, you and I

Page 48

N. PURCELL

1  should have a quick call.  We are thinking alike
2  on the issues and want to hear your thoughts on
3  some items.  Would you be available to talk
4  later in the A.M.?"
5      When you wrote "we are thinking alike
6  on the issues," what issues were you referring
7  to?
8      A.   I don't remember.
9      Q.   Did you ever have a follow-up call
10  with Mr. Yu?
11      A.   I don't remember.
12      Q.   I'm going to give you a document that
13  has previously been marked as Exhibit 476B.  To
14  start, I would just like you to -- it's a
15  lengthy document, so to start, I would like you
16  to glance at it and tell me if you recall seeing
17  this before and if you can tell me what it is,
18  and then I may point you to some specific
19  sections in the attachment.
20      (Document review.)
21      A.   Okay, Mr. Stern, what's your question?
22      Q.   Do you know what this is?
23      A.   Appears to be an e-mail from Ed
24  Gilbert at Shinsei Bank to various members of

Page 49

N. PURCELL

1  the Unsecured Committee and advisors, and it
2  says here in the subject, "Transcript of
3  Barclays/Lehman Agreement Announcement, 17
4  September '08."
5      Q.   And you see there's a transcript of a
6  September 17 call attached?
7      A.   By "call," you mean a question and
8  answer session?  I believe so.
9      Q.   Yes.  In assessing the sale
10  transaction, what role did the information
11  reflected in this document play?
12      MS. TAGGART:  Objection and
13      instruction not to answer.
14      Q.   Did the Committee review the
15  information in this document before the sale
16  transaction closed?
17      MS. TAGGART:  You mean every member?
18      I object to form, but you can answer.
19      A.   I see that Ed Gilbert sent it to the
20  members of the Committee.  I can't say if each
21  Committee member reviewed it.
22      Q.   Okay.  Did you review it?
23      A.   At that time?
24      Q.   Yes.

Page 50

N. PURCELL

1         N. PURCELL
2      A.   I don't recall reviewing this, no.
3      Q.   I'm not going to take you through
4   every aspect of the attachment, but I do want to
5   ask you some specific questions relating to some
6   of the information on the second page of the
7   transcript, which is the Bates number ending
8   9128.
9         Do you see that page?
10     A.   I do.
11     Q.   Look at the third paragraph.  I'll
12  just read it.  It states, and this is Mr. Varley
13  speaking: "The acquisition of the core of old
14  Lehman's based around the U.S. broker-dealer
15  operations, we have acquired the associated
16  infrastructure.  We will be taking on about
17  10,000 employees.  We are acquiring trading
18  assets with a current statemented value of $72
19  billion in trading liabilities with the current
20  estimated value of $68 billion, for a cash
21  consideration of $250 million."
22         Do you see that?
23     A.   Yes, I do.
24     Q.   Do you know whether the Committee
25  considered the $72 billion figure and the $68

Page 51

N. PURCELL

1   billion figure to be relevant to the final
2   transaction that was closed on September 22?
3         MS. TAGGART:  Object to form.  I would
4      instruct -- instruct not to answer on
5      privilege as currently worded.
6      Q.   Did the Committee know, as of the
7   closing of the sale transaction, whether the
8   final transaction involved the acquisition of
9   trading assets with a current estimated value of
10  $72 billion?
11         MS. TAGGART:  You can answer.
12         MR. SZYFER:  Object to the form.
13     A.   The Committee understood, or believed
14  we understood, certain aspects of the
15  transaction.  Whether it was $72 billion or not
16  at that point I don't recall.
17     Q.   So you don't recall one way or the
18  other?
19     A.   I don't recall whether $72 billion was
20  the number used at that time.  The numbers have
21  moved substantially throughout the case.
22     Q.   What do you recall about how the
23  numbers moved substantially?
24         MS. TAGGART:  Objection and a limited

Page 52

N. PURCELL

1   instruction on privilege.  You can explain
2   your answer, just don't reveal any
3   communications.  But if you want to explain
4   the facts known over time, to the extent you
5   understand the question, you should answer.
6      A.   What numbers are you speaking of?
7      Q.   Well, did you have an understanding
8   that, with respect to the trading assets that
9   Barclays would acquire, the numbers had moved
10  substantially from September 17 through the time
11  of closing on September 22?
12         MS. TAGGART:  Object to form.
13     A.   I believe -- and let me ask, when you
14  say "you," you mean the Committee, correct?
15     Q.   You and the Committee.
16     A.   I believe the Committee understood
17  that there was questions regarding the asset
18  value, the liability value, what was made up of
19  those various positions, and that the numbers
20  were being quoted differently at different times
21  leading up to the closing of the sale.
22     Q.   Did the Committee understand that,
23  between September 17 and September 22, there had
24  been changes in the trading assets that Lehman

Page 53

N. PURCELL

1   had available to transfer to Barclays?
2         MS. TAGGART:  Object to form.
3      A.   Can you repeat the question?
4      (Record read.)
5      A.   I would say the Committee understood
6   aspects of the sale were moving.  Whether we
7   understood at the time details specifically as
8   to the trading assets or any other aspect of the
9   transaction, I would say no, we didn't.
10     Q.   And despite that lack of
11  understanding, the Committee decided to abstain
12  or not object to the sale transaction; is that
13  correct?
14         MS. TAGGART:  Object to form and
15     instruct not to answer on privilege.
16     Q.   Did the Committee understand that the
17  figures that Lehman had presented earlier in the
18  week concerning trading assets available to
19  transfer to Barclays had changed by the time of
20  the Approval Hearing?
21         MS. TAGGART:  Object to form, but you
22     can answer.
23     A.   The Committee did not understand the
24  value of those assets, who determined the

Page 54

N. PURCELL

1
2  number, as you quoted, of those assets, and why,
3  if in fact they did change, they did change.
4      Q.   Did the Committee understand that
5  Lehman had indicated that the value of the
6  trading assets available to transfer to Barclays
7  had changed in the period from September 16 to
8  the time of the Approval Hearing on September
9  19?
10      MS. TAGGART:  Object to form.
11      A.   I do not recall at the time who was
12  quoted as using the value of those assets.
13      Q.   So you don't recall one way or the
14  other whether, as of the Approval Hearing, the
15  Committee understood that Lehman had indicated
16  the value of the trading assets available to
17  transfer to Barclays had changed?
18      MS. TAGGART:  Object to form.
19      Q.   Is that your testimony?
20      A.   I don't recall whether the Committee
21  understood it was Lehman quoting values for the
22  assets or what was available for trading at that
23  time.
24      Q.   Do you recall whether the Committee
25  understood that, between September 16 and

Page 55

N. PURCELL

1
2  September 19, there was a change in the value of
3  trading assets available to transfer to
4  Barclays?
5      MS. TAGGART:  Object to form.
6      A.   The Committee wasn't formed on the
7  16th, so it couldn't have been for the 16th.  If
8  you mean between the 17th, when we were formed,
9  and the 19th, during that period of time, again,
10  the facts available to the Committee were
11  minimal on the transaction.  So I don't know if
12  the Committee understood at that point
13  specifically who was making the statement that
14  these assets were available for transfer,
15  whether it be Lehman or someone else.
16      Q.   Staying with the same page of this
17  Exhibit 476B, below the paragraph we just read,
18  skipping the next paragraph, it states, "We also
19  mentioned in our announcement," do you see that?
20      A.   Yes, I do.
21      Q.   "We also mentioned in our announcement
22  today that certain of our shareholders have
23  expressed support for the transaction and an
24  interest in increasing their shareholdings in
25  Barclays.  In fact, the transaction is capital

Page 56

N. PURCELL

1
2  ratio accretive without additional equity
3  issuance.  And the source of that accretion is
4  the negative goodwill from the transaction,
5  which amounts to about $2 billion -- 2 billion
6  U.S. dollars post tax."  Do you see that?
7      A.   I do.
8      Q.   Before the Committee decided to
9  abstain or not object to the sale transaction,
10  was the Committee aware of this announcement by
11  Barclays?
12      A.   I see that Ed Gilbert sent this
13  announcement by e-mail to the Committee members.
14  I'm not sure if any Committee member read this
15  prior to it, so therefore, I'm not sure whether
16  we were aware of this announcement prior to the
17  sale closing.
18      Q.   Did any Committee member express any
19  concern about the fact that Barclays had
20  announced that it anticipated to realize a $2
21  billion after-tax acquisition gain?
22      MS. TAGGART:  I'm going to object and
23  instruct you should only answer if there was
24  some communication that was outside of
25  counsel and the Committee deliberations it

Page 57

N. PURCELL

1
2  had with counsel and its professionals.  But
3  if there was some outside communication on
4  that topic, you should testify about it.
5      A.   Based upon that instruction, I do not
6  believe there was any outside discussion outside
7  of counsel on this issue.
8      THE VIDEOGRAPHER:  The time is now
9  11:10 A.M.  We are now off the record.
10      (Recess.)
11      THE VIDEOGRAPHER:  This is the start
12  of tape number 2.  The time is now 11:22
13  A.M.  We are now back on the record.
14  BY MR. STERN:
15      Q.   Let me show you a document we
16  previously marked as Exhibit 478B.
17      A.   Mr. Stern, are we done with 476B?
18      Q.   For the time being.
19      A.   Okay.
20      MR. SZYFER:  Do you have any
21  additional copies, Mr. Stern?
22      MR. STERN:  I'm sorry?
23      (Document handed to Mr. Szyfer.)
24      MR. SZYFER:  Great.  Thanks.
25      Q.   Okay.  If you would look at Exhibit

Page 58

```
1              N. PURCELL
2   478B, Mr. Purcell, and tell me if you've ever
3   seen this before?
4       A.   Yes, I have.
5       Q.   And do you see at the top there's an
6   e-mail exchange between Gilbert and Becker, and
7   Gilbert writes, "Julie, you are welcome.
8   Interesting to understand what a bargain
9   Barclays thinks it has."  Do you see that?
10      A.   I do see that, yes.
11      Q.   Do you recall any discussion within
12  the Committee concerning what a bargain Barclays
13  thought it had?
14          MS. TAGGART:  I'm going to object and
15      instruct not to answer for any discussions
16      that happened when the Committee was with
17      counsel present.  If the Committee had any
18      discussions on that topic without any
19      counsel present, you can answer.
20      A.   I don't recall having any discussions
21  on this topic outside of counsel.
22      Q.   Do you recall whether the Committee
23  was aware of the fact that Barclays had
24  announced it anticipated realizing a gain on the
25  acquisition?
```

Page 59

```
1              N. PURCELL
2          MS. TAGGART:  Object to form.  You can
3      testify whether you heard a fact, if you
4      call it a fact, Barclays had announced it
5      anticipated realizing a gain on the
6      acquisition.
7          Object to form.
8          MR. STERN:  Can you repeat the
9      question?
10         (Record read.)
11      A.   I don't remember if the official
12  Committee was aware that Barclays had announced
13  that, as discussed previously, that Gilbert had
14  sent an e-mail to the Committee indicating their
15  announcement on the 17th, but I'm not aware who
16  read that or when it was read, if it was read at
17  all.
18      Q.   Let me show you what we've marked
19  previously as Exhibit 477B.  I'll ask you to
20  look at that and tell me if you've ever seen it
21  before.
22      A.   I don't believe I've ever seen this
23  before.
24      Q.   The subject line reads "Barclays
25  investor call transcript from Wednesday where
```

Page 60

```
1              N. PURCELL
2   they described how great the Lehman buy
3   is/negative 2 billion goodwill after tax."
4          Do you see that?
5       A.   I do.
6       Q.   And do you recognize that as the same
7   information reflected in the transcript that we
8   reviewed earlier?
9          MS. TAGGART:  Object to form.
10      Foundation.
11      A.   When you say "recognize," what do you
12  mean?
13      Q.   Do you have any understanding as to
14  whether this is referring to the same
15  information that was reflected in the transcript
16  that we reviewed earlier?
17      A.   Since I've never seen this before and
18  never discussed it with Mr. Gilbert that I'm
19  aware of, I don't -- I can't say whether this
20  relates to that or whether it relates to some
21  other information that Mr. Gilbert might have
22  had at that time.
23      Q.   And in Mr. Gilbert's e-mail message to
24  Jacob, he says, "We will make sure this
25  information is considered in the Lehman
```

Page 61

```
1              N. PURCELL
2   proceeding."  Do you see that?
3       A.   I do see what he said, yes.
4       Q.   Was there any discussion among
5   Committee members concerning whether the
6   information the Committee had concerning
7   Barclays' anticipated gain should be considered
8   in the Lehman proceeding?
9          MS. TAGGART:  Objection to form and
10      privilege.  I instruct you not reveal any
11      answer that would include discussions with
12      the Committee and its counsel.  If you have
13      some discussion of the Committee members
14      outside of counsel, you can answer.
15      A.   I don't remember having a conversation
16  outside Committee counsel about this issue.
17          MR. STERN:  Let's mark this as the
18      next exhibit.
19          (Exhibit 523B, a document bearing
20      Bates Nos. CMTE0005337 through 5339, marked
21      for identification, as of this date.)
22      A.   Thank you.
23      Q.   I've placed in front of you a document
24  that we've marked as Exhibit 523B.  I would like
25  you to look at it and identify it, if you would,
```

Page 62

N. PURCELL

1  please.
2  (Document review.)
3  A.  I have looked at it. I can't identify
4  it.
5  Q.  Okay. You can -- you've never seen it
6  before?
7  A.  I saw this in preparation for this
8  meeting today, but I can't identify it.
9  Q.  Okay. So, aside from your preparation
10  for the deposition, you had not seen this
11  document before today?
12  A.  I don't recall seeing this at any time
13  prior to the preparation.
14  Q.  Okay. Do you know when this document
15  was provided to the Committee?
16  A.  I don't know that it was provided to
17  the Committee; and, if it was, I don't recall
18  when it was provided.
19  Q.  Do you know whether any information
20  concerning this document was communicated to the
21  Committee?
22  MS. TAGGART:  That's just a yes or a
23  no answer. You can answer yes or no to that
24  question.
25

Page 63

N. PURCELL

1  A.  No.
2  Q.  Do you know whether any information
3  reflected in this document was discussed with
4  the Committee?
5  MS. TAGGART:  Object to form.
6  You can answer yes or no to that.
7  A.  Can you give me the question again,
8  please?
9  (Record read.)
10  A.  No, I don't know.
11  Q.  Let me show you a document that we
12  have previously marked as Exhibit 463B.
13  A.  Thank you.
14  Q.  And my question about this is going to
15  be whether you -- whether this document was ever
16  given to the Committee. So why don't you take a
17  moment to review it, and that will be my
18  question.
19  (Document review.)
20  A.  Mr. Stern, would you like me to read
21  the entire document or would you just --
22  Q.  If you could look at it and tell me if
23  you've ever seen it before, that will be
24  helpful. If you've ever seen it before other
25

Page 64

N. PURCELL

1  than in preparing for this deposition.
2  A.  I do not recall seeing this prior to
3  preparing for the deposition.
4  Q.  Okay. I just want to turn to the
5  third page of the exhibit, and you see in the
6  upper left --
7  A.  Mr. Stern, I'm sorry, you're referring
8  to the Asset and Liability page that's marked
9  number 1?
10  Q.  Yes. Yes. Exactly. Exactly.
11  And I just want to ask, there's a line
12  under the left column Assets, there's a line
13  that says Repo Assets and there's a line that
14  says Negotiated Mark Haircut. Do you see that?
15  A.  I do.
16  Q.  Do you recall this information? Well,
17  withdrawn.
18  Did the Committee at some point in
19  October receive information concerning a
20  negotiated mark haircut of $5 billion?
21  MS. TAGGART:  Object to form.
22  You can answer yes or no to the extent
23  you understand.
24  A.  Are you referring to this document
25

Page 65

N. PURCELL

1  here or in any document or in any form of
2  information?
3  Q.  In any way did -- did the Committee in
4  October of 2008 receive any information from a
5  source other than counsel concerning a
6  negotiated mark haircut of $5 billion?
7  MS. TAGGART:  Object to form.
8  Q.  Or a $5 billion reduction from book
9  value in connection with the sale transaction?
10  MS. TAGGART:  Object to -- object to
11  form, and I would instruct not to answer not
12  only to your communications with counsel but
13  with your professionals.
14  MR. STERN:  Well, I think --
15  Q.  Let me rephrase the question. Aside
16  from counsel or the Committee's financial
17  advisors, did the Committee, in September or
18  October of 2008, receive any information
19  concerning a negotiated mark haircut or a
20  reduction from book value of $5 billion?
21  MS. TAGGART:  Object to form.
22  A.  Specifically during the period of
23  September 2008 and October of 2008, I can't
24  remember if we were told by any source other
25

17 (Pages 62 to 65)

Page 66

N. PURCELL

1
2 than counsel or anyone else about a $5 billion
3 mark.
4     Q.    Turning back to the exhibit and the
5 line that reads "negotiated mark haircut" and
6 has a figure 5.0 next to that, do you see that?
7     A.    I do.
8     Q.    As you sit here today, do you have any
9 understanding concerning what that refers to?
10    A.    No.
11    Q.    Let me show you a document that we've
12 previously marked as Exhibit 464B.  This is an
13 excerpt of a larger presentation, but I'm only
14 going to focus on parts of the overall
15 presentation.
16         If you would just look at this and
17 tell me if you recall seeing any part of this
18 and what it relates to.
19         (Document review.)
20    A.    I do recall seeing this.
21    Q.    And what is it?
22    A.    It appears to be a report from Alvarez
23 & Marsal to the Unsecured Creditors Committee
24 regarding various aspects of the estate as of
25 October 8, 2008.

Page 67

N. PURCELL

1
2     Q.    Okay.  And if you would turn to the
3 third page of the exhibit.
4     A.    Yes.
5     Q.    At the top it says "Significant
6 Transactions," and then it says: "A.  Sale of
7 Lehman Brothers, Inc./Broker Dealer to Barclays
8 (Fogarty)."  Do you know who Fogarty is?
9     A.    Mr. Fogarty works for Alvarez &
10 Marsal.
11    Q.    And aside from this presentation, did
12 you ever have any communications with Mr.
13 Fogarty?
14         MS. TAGGART:  You can answer that yes
15 or no.
16    A.    No.
17    Q.    Below that heading, there are bullet
18 points and there's an arrow that says Assets
19 Purchased.  It reads, "43.1 billion repo assets,
20 and then it states the following:  "Book value
21 per Lehman stale marks; negotiated a $5 billion
22 reduction."
23         When this refers to "book value per
24 Lehman stale marks" and "negotiated a $5 billion
25 reduction," what do you understand this to be

Page 68

N. PURCELL

1
2 referring to?
3         MS. TAGGART:  Object to form.
4 Foundation.
5     A.    I'm not sure what this refers to.
6     Q.    And at the time that you attended the
7 presentation, do you recall any discussion
8 concerning these points?
9     A.    The points specifically about the $5
10 billion reduction?
11    Q.    Yes.
12    A.    I don't recall specific discussions on
13 that point.
14    Q.    Do you recall any general discussions
15 on that point at this presentation?
16    A.    No.
17    Q.    And you don't know what that refers
18 to?
19    A.    I do not.
20    Q.    Do you recall whether any member of
21 the Committee at that presentation raised any
22 concerns relating to that statement, "negotiated
23 a $5 billion reduction"?
24         MR. SZYFER:  Object to the form.
25    A.    We referred to at that meeting on

Page 69

N. PURCELL

1
2 October 8?
3     Q.    Yes.
4     A.    I don't recall.
5     Q.    Do you recall whether after that
6 meeting any member of the Committee raised any
7 concerns about a negotiated $5 billion
8 reduction?
9         MS. TAGGART:  I'm going to object and
10 instruct not to answer on privilege.
11         (Exhibit 524B, a document bearing
12 Bates No. CMTE0007889 through 7891, 8241
13 through 8247, and 7892 through 7894, marked
14 for identification, as of this date.)
15    A.    Mr. Stern, you don't have an October
16 2008 calendar for my review?
17    Q.    Sorry.
18    A.    Okay.  Had to ask.
19    Q.    If you would look at this Exhibit 524B
20 and tell me if you know what it is.
21         (Document review.)
22    A.    Can you repeat the question, sir?
23    Q.    Yes.  Do you know what this document
24 is?
25    A.    When you say "document," you mean

Page 70

N. PURCELL

1
2 everything within the staple?  There's a series
3 of documents here.
4     Q.   Yes.  Yes.
5     A.   It appears to be an e-mail string for
6 various references and various issues together
7 with what appears to be a filing in the Lehman
8 case and other attachments.
9     Q.   Okay.  Turning to the other
10 attachments, I want to focus on two pages, and
11 I'll refer to the Bates numbers at the bottom.
12 The first would be the Bates number that ends
13 8245.  That has a series of figures on it with a
14 column A and a column B.  Do you see that?
15     A.   I do.
16     Q.   Do you know what those figures
17 represent?
18     A.   I do not.
19     Q.   Turning ahead, if you could flip three
20 pages ahead -- actually, four pages, to the
21 Bates number 7893, there's a box with columns
22 labeled G and H.  Do you see that?
23     A.   I do.
24     Q.   Do you know what those figures
25 represent?

Page 71

N. PURCELL

1
2     A.   No.
3     MR. SZYFER:  For the record, Mr.
4 Stern, just looking at Exhibit 524B, the
5 Bates numbers aren't sequential.  It starts
6 off 7889, 7890 and then goes to 91, and then
7 it goes to 8241 through to 47 and then back
8 to 7892.  Is this how this was produced, or
9 did you guys put this together?
10     MR. STERN:  No, my understanding is
11 that this is the way it came to us, but I
12 can't absolutely represent this.  I think
13 there are some materials within this
14 document as it was produced to us that were
15 omitted because of their length, but my
16 understanding is that we got things in this,
17 in this way.
18     Q.   From the time that the Committee was
19 formed on September 17 through the closing of
20 the sale transaction on September 22, from time
21 to time did the Committee receive written
22 reports concerning information relating to the
23 sale transaction?
24     MS. TAGGART:  You can answer yes or
25 no.

Page 72

N. PURCELL

1
2     A.   Can you define "written reports,"
3 please?
4     Q.   Well, did the Committee ever receive
5 e-mails or memos from its counsel or from its
6 financial advisors providing information, facts
7 concerning the sale transaction?
8     A.   Yes, I believe they provided
9 information.
10     Q.   And do you recall the nature of the
11 facts that they reported to the Committee?
12     MS. TAGGART:  I'm going to object and
13 instruct not to answer as currently worded.
14 Again, if you want to just discuss what
15 facts or understanding he and the Committee
16 knew at a specific period of time without
17 reference to where it came from, we're
18 willing to allow those questions as
19 previously described.
20     Q.   Well, from September 17 through the
21 closing of the sale transaction, what were the
22 facts that the Committee had concerning the
23 assets that would be transferred to Barclays as
24 a part of the sale?
25     MS. TAGGART:  Object to form, but you

Page 73

N. PURCELL

1
2 can answer.  Please don't describe the
3 communications, but you can describe the
4 facts as addressed in that question.
5     A.   I don't recall the specific facts.
6     Q.   Between September 17th and the closing
7 of the sale transaction on September 22, what
8 facts did the Committee have concerning the
9 liabilities that Barclays would assume as part
10 of the transaction?
11     A.   I don't recall the specific
12 liabilities.
13     Q.   Before the sale transaction closed on
14 September 22, what facts did the Committee have
15 concerning Barclays' replacement of the Fed's
16 financing of LBI?
17     MS. TAGGART:  Object to form.
18     A.   When you -- when you say "facts," what
19 do you mean?
20     Q.   What information did the Committee
21 have concerning Barclays' replacement of the Fed
22 repo as of --
23     MS. TAGGART:  Object to form.
24     Q.   -- as of the sale closing?
25     A.   It was our understanding that as part

19 (Pages 70 to 73)

Page 74

N. PURCELL

1          N. PURCELL
2  of the transaction Barclays would step into the
3  Fed's funding role.
4      Q.   And did the Committee understand that,
5  in general, in such repos the value of the
6  securities transferred would generally exceed
7  the value of the cash provided for those
8  securities?
9          MS. TAGGART:  Object to form.
10      A.   I don't believe I remember exactly
11  whether the Committee understood that point.
12      Q.   What facts did the Committee have
13  before the closing of the sale transaction
14  concerning the market value of the securities
15  transferred to Barclays in connection with that
16  repo replacement?
17          MS. TAGGART:  Object to form.
18      A.   Again, I don't remember the specific
19  facts.
20      Q.   Do you remember generally the facts?
21      A.   Can you repeat your question?
22      Q.   What facts did the Committee have
23  before the closing concerning the market value
24  of the securities transferred to Barclays under
25  the repo?

Page 75

N. PURCELL

1          N. PURCELL
2      A.   What general facts?
3      Q.   Yes.
4      A.   I believe the Committee understood
5  that the transaction itself included the sale of
6  some real estate, some securities, the transfer
7  of certain individuals in return for
8  liabilities.  What those liabilities were I
9  can't recall.
10      Q.   Did the Committee, as of the closing,
11  have any certainty concerning the value of the
12  assets Barclays was acquiring?
13      A.   No.
14      Q.   As of the closing, did the Committee
15  have any certainty concerning the value of the
16  consideration, including assumed liabilities,
17  that Barclays was providing?
18          (Continued on the next page to include
19      the jurat.)
20
21
22
23
24
25

Page 76

N. PURCELL

1          N. PURCELL
2          MS. TAGGART:  Object to form.
3      A.   No.
4          MR. STERN:  I have no further
5  questions.
6          MS. TAGGART:  I have no questions.
7  Okay.
8          MR. STERN:  Off the record.
9          THE VIDEOGRAPHER:  That concludes the
10  video record for today.  The time is 11:51 A.M.
11
12          oOo
13
14
15
16
17
18
19      _____
    NOEL PURCELL
20
21  Subscribed and sworn to
    before me this    day
22  of      2010.
23
    _____
24
25

Page 77

N. PURCELL

1          N. PURCELL
2          CERTIFICATE
3  STATE OF NEW YORK )
               : ss
4  COUNTY OF NEW YORK)
5      I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9      That NOEL PURCELL, the witness whose
10  deposition is herein before set forth, was
11  duly sworn by me and that such deposition is
12  a true record of the testimony given by such
13  witness.
14      I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18      I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23      In witness whereof, I have hereunto
24  set my hand this 13th day of January, 2010.
25      -------------------------------

Page 78

```
 1              N. PURCELL
 2              INDEX
 3   WITNESS:          EXAMINATION BY        PAGE
 4   N. PURCELL        Mr. Stern            5
 5
 6   EXHIBITS:                      PAGE
 7   Exhibit 519B, a document bearing Bates Nos.    14
 8   CMTE0007889 through 8244
 9   Exhibit 520B, a document bearing Bates Nos.    16
10   CMTE0001047 through 1049
11   Exhibit 521B, a document bearing Bates Nos.    37
12   CMTE0000577 through 580
13   Exhibit 522B, a document bearing Bates Nos.    47
14   CMTE0000571 through 574
15   Exhibit 523B, a document bearing Bates Nos.    61
16   CMTE0005337 through 5339
17   Exhibit 524B, a document bearing Bates No.     69
18   CMTE0007889 through 7891, 8241 through 8247,
19   and 7892 through 7894
20
21
22
23
24
25
```

Page 79

```
 1              N. PURCELL
 2   NAME OF CASE:  In Re:  Lehman Brothers Holdings, Inc.
 3   DATE OF DEPOSITION:  January 13, 2010
 4   NAME OF WITNESS:  Noel Purcell
 5   Reason Codes:
 6      1. To clarify the record.
        2. To conform to the facts.
 7      3. To correct transcription errors.
 8   Page _____ Line _____ Reason _____
     From _____ to _____
 9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25       _____
```

21 (Pages 78 to 79)

**A**

**absolutely** 71:12
**abstain** 42:14
  45:13,19 53:12
  56:9
**accretion** 56:3
**accretive** 56:2
**acknowledges**
  19:16 34:14 36:4
**acquire** 52:10
**acquired** 50:15
**acquiring** 50:17
  75:12
**acquisition** 50:13
  51:9 56:21 58:25
  59:6
**action** 23:11 77:15
**additional** 56:2
  57:21
**addressed** 73:4
**Administered** 1:8
**administrative**
  7:15
**advisors** 8:20 21:3
  21:17 37:24 38:8
  38:24 39:11,18
  40:17 41:18,24
  42:2 47:22 49:2
  65:18 72:6
**after-tax** 56:21
**agencies** 23:25 24:5
  24:8 25:3,15,18
  25:23 32:19 33:3
**ago** 12:8
**agree** 25:8 29:24
  30:9,13
**agreed** 42:24
**agreement** 24:15
  24:19 42:23 49:4
**ahead** 70:19,20
**al** 1:8
**alike** 48:2,6
**allow** 24:6 29:25
  30:2,11 32:8 38:9
  38:11 72:18
**Alvarez** 11:10,17
  13:3,13,15,21
  14:6,8,16 66:22

67:9
**amounts** 56:5
**analysis** 31:23
  33:19
**Angeles** 3:19
**announced** 56:20
  58:24 59:4,12
**announcement**
  49:4 55:19,21
  56:10,13,16 59:15
**answer** 16:25 20:15
  22:18 23:2,14
  24:20,24,25 25:21
  26:6,15 27:7,21
  28:5,18,23 29:2
  30:2,3 31:17 32:2
  32:8,22 33:8,17
  35:7,10 36:8,18
  38:19 39:7,13
  42:7,19 43:8,14
  44:12,20 45:6,15
  46:11,17 47:13
  49:9,14,19 51:5
  51:12 52:3,6
  53:16,23 56:23
  58:15,19 61:11,14
  62:24,24 63:7
  64:23 65:12 67:14
  69:10 71:24 72:13
  73:2
**answered** 22:9
**answering** 44:8
**anticipated** 56:20
  58:24 59:5 61:7
**anybody** 12:19,24
**apologies** 46:24
**appear** 19:13 34:11
  35:25
**appearances** 5:11
**appeared** 21:18
**appears** 31:4 47:20
  48:24 66:22 70:5
  70:7
**approval** 6:25 7:5
  53:21 54:8,14
**approve** 19:15 26:3
  26:18 33:14 34:13
  36:3

**approved** 31:5 37:7
  41:8
**approximately**
  5:10
**argument** 29:18
**arrow** 67:18
**aside** 40:6 45:9,16
  62:10 65:16 67:11
**asked** 22:8 35:14
  46:22
**asking** 12:6 29:24
  33:19 37:2 44:21
**aspect** 50:4 53:9
**aspects** 7:14 8:2
  20:8 51:15 53:7
  66:24
**assessing** 49:10
**asset** 31:8 37:10
  41:14 42:5 43:2
  46:6 52:18 64:9
**assets** 8:4 20:7
  40:18,24 43:22
  50:18 51:10 52:9
  52:25 53:9,19,25
  54:2,6,12,16,22
  55:3,14 64:13,14
  67:18,19 72:23
  75:12
**associated** 50:15
**assume** 73:9
**assumed** 75:16
**AST** 47:24
**attached** 49:7
**attachment** 48:20
  50:4
**attachments** 70:8
  70:10
**attended** 11:21
  12:20,25 68:6
**attorneys** 3:5,11,17
  4:6,12 7:22 46:23
**attorney-client**
  17:2 20:15 22:18
  27:8,21 28:5 29:4
  29:9 32:2 36:8
  43:8 44:9
**available** 48:4 53:2
  53:19 54:6,16,22

55:3,10,14
**Avenue** 2:8 3:12,23
  5:8
**aware** 28:14 31:11
  47:9 56:10,16
  58:23 59:12,15
  60:19
**A.M** 5:10 15:5
  19:10 30:20,23
  31:5 40:5 47:24
  48:5 57:9,13
  76:10

**B**

**B** 70:14
**back** 8:7 15:5 30:23
  31:2 57:13 66:4
  71:7
**Bajpai** 17:7,11
  18:22 34:24
**Bank** 4:13,21 47:2
  48:25
**bankruptcies** 43:24
**bankruptcy** 1:2
  6:24 43:16,18
  44:11
**Barclays** 3:11 6:4
  8:10,11,19,22
  25:8 33:6 41:7,21
  42:15 45:13,20
  52:10 53:2,20
  54:6,17 55:4,25
  56:11,19 58:9,12
  58:23 59:4,12,24
  61:7 67:7 72:23
  73:9,15,21 74:2
  74:15,24 75:12,17
**Barclays/Lehman**
  44:16 49:4
**bargain** 58:8,12
**based** 20:18 29:3
  44:13 45:7 46:16
  50:14 57:5
**basically** 8:21
**basis** 16:25 20:12
  24:3 29:19 30:14
**Bates** 14:25 16:3
  17:4 19:8 37:15

47:6 50:7 61:20
  69:12 70:11,12,21
  71:5 78:7,9,11,13
  78:15,17
**Battery** 4:7
**BCC** 46:25
**bearing** 14:24 16:2
  37:14 45:18 47:5
  61:19 69:11 78:7
  78:9,11,13,15,17
**bears** 17:4
**Becker** 12:14 58:6
**believe** 8:7 11:24
  12:12,14,16 13:20
  17:18 18:16 21:6
  21:25 32:14,25
  33:9 40:8 46:22
  49:9 52:14,17
  57:6 59:22 72:8
  74:10 75:4
**believed** 51:14
**benefit** 12:11
**best** 6:13 10:20,23
  12:6 13:6,24 14:3
  14:19 18:9 35:21
  41:10
**bid** 33:7 36:13
**bidder** 33:6 36:13
**bidders** 33:10
**billion** 50:19,20,25
  51:2,11,16,20
  56:5,5,21 60:3
  64:21 65:7,9,21
  66:2 67:19,21,24
  68:10,23 69:7
**billions** 40:19
**blank** 6:20
**block** 23:11
**blood** 77:16
**Boies** 2:6 3:10
**book** 65:9,21 67:20
  67:23
**bottom** 17:5 26:22
  34:8 70:11
**box** 70:21
**break** 28:19 30:15
**Brian** 11:18
**Broker** 67:7

broker-dealer 41:3
41:6,12 42:3,11
50:14
Brothers 1:7 3:5
5:6 7:14,24 67:7
79:2
bullet 67:17
Burling 12:13
business 6:16 7:13
buy 60:2
buyer 20:6

**C**

C 3:2,25 4:3
calendar 6:21
69:16
California 3:19
call 15:17 42:10
47:25 48:2,10
49:7,8 59:4,25
called 5:15
calls 8:7 15:16
capital 3:11 55:25
career 43:24,25
CARL 4:9
case 1:7 43:16
51:22 70:8 79:2
cash 50:20 74:7
CC'd 46:23
cease 17:25 18:12
certain 8:4 15:16
28:24 30:6,7
51:15 55:22 75:7
certainly 22:3
certainty 75:11,15
CERTIFICATE
77:2
Certified 2:11,11
certify 77:8,14,18
challenge 27:10,17
chance 27:10 37:18
change 54:3,3 55:2
changed 53:20 54:7
54:17
changes 52:25
Chapter 1:6 44:10
cites 19:17 34:15
36:5

Civil 77:21
clarification 14:13
14:15 46:20,21
clarify 28:21 79:6
clarity 42:22 43:11
45:10,17
CLAUDE 4:16
clause 46:3
clear 9:21 14:5
30:4 35:16
closed 23:9 32:6,13
49:17 51:3 73:13
closing 9:11,23
10:8,15 11:6,7
13:4 16:18 19:22
23:11 27:19,24
28:13 31:12 35:22
36:10 37:4 51:8
52:12,22 56:17
71:19 72:21 73:6
73:24 74:13,23
75:10,14
CLR 1:24
CMTE0000571
47:6 78:14
CMTE0000577
37:15 78:12
CMTE0001047
16:3 78:10
CMTE0005337
61:20 78:16
CMTE0007889
14:25 69:12 78:8
78:18
Codes 79:5
colloquy 30:25
column 64:13
70:14,14
columns 70:21
comment 44:14
Committee 3:17
5:24 6:12,15,17
7:4,5,9 8:14 9:3
9:22 10:9,17,24
11:9,16,22,25
12:4 13:7,13,25
14:20 15:9,13,13
15:16 16:20 17:14

17:17,23 18:2,10
18:13,17,19 19:23
20:3,11,17,21,25
21:2,3,4,6,12,16
21:17,18,23,25
22:3,6,12,22 23:5
23:10,16,23 24:7
25:2 26:2,4,8,12
26:17,19 27:5,17
27:23 28:7,14,15
29:12,23 31:11
32:4,11,14,17,25
33:4,9,12 35:2,9
35:22 36:11,20
37:5,20,22 38:6
38:22 39:9,16
40:3,11,13 42:24
43:10 45:5,11,17
47:9,10,21,21
49:2,15,21,22
50:24 51:7,14
52:15,16,17,23
53:6,12,17,24
54:4,15,20,24
55:6,10,12 56:8
56:10,13,14,18,25
58:12,16,17,22
59:12,14 61:5,6
61:12,13,16 62:16
62:18,22 63:5,17
64:19 65:4,18
66:23 68:21 69:6
71:18,21 72:4,11
72:15,22 73:8,14
73:20 74:4,11,12
74:22 75:4,10,14
**Committee's** 6:9
9:6,15 10:4,12
21:22 22:21 23:4
24:12 28:23 30:5
30:8 65:17
**communicated**
21:5 29:12 62:21
**communicating**
13:15
**communication**
40:10 56:24 57:3
**communications**

14:21 24:14 29:20
30:11 32:9,24
44:9 52:4 65:13
67:12 73:3
company 47:3
completed 28:3
31:15 77:22
concern 19:18 20:7
34:4,17 36:6
56:19
concerned 34:2
concerning 6:25
10:10,16,25 11:10
24:8 25:3,15,19
27:25 28:23 31:13
32:18 33:5,13
35:2 42:3 53:19
58:12 61:5,6
62:21 64:20 65:6
65:20 66:9 68:8
71:22 72:7,22
73:8,15,21 74:14
74:23 75:11,15
concerns 22:3,11
22:21 23:4,6
68:22 69:7
concludes 76:9
conduct 6:16
conference 42:10
conform 79:6
connection 43:17
65:10 74:15
consequences
27:25 28:9
consider 16:20
20:11 21:9 23:10
35:23 36:11 37:5
43:10 44:16
consideration
19:23 22:22 23:5
23:17,24 28:9
37:21 50:21 75:16
considerations
29:2 36:24 45:3
considered 27:17
45:12 47:10 50:25
60:25 61:7
considering 20:9

38:2
consummated
40:22 41:12 42:4
contact 8:15 9:4,6
9:16,25 11:10,13
13:7,25
contacts 10:4
continue 46:2
Continued 75:18
Cont'd 4:3
conversation 61:15
copies 57:21
copy 40:7
core 50:13
Corporate 4:13,21
47:2
correct 10:11 11:3
14:20 18:19 21:19
33:21 52:15 53:14
79:7
correctly 11:15
17:7
correspondence
46:12
counsel 12:9,18
13:16 15:14 21:19
21:22 24:15,18
25:7,10,13,21,24
26:10,13 27:12
29:7,14,21,23
32:10,24 34:6
35:2,9 37:23 38:8
38:24 39:10,17
40:6,7 41:18
44:25 45:2,5
46:13 47:2 56:25
57:2,7 58:17,19
58:21 61:12,14,16
65:6,13,17 66:2
72:5
Counselors 5:11
counting 14:6
COUNTY 77:4
court 1:2 5:12 6:24
21:5,22 26:3,9,18
33:13 34:2 36:23
41:7
cover 6:3

**Covington** 12:13
**Creditor** 11:25
**Creditors** 3:17
  5:24 11:16,22
  12:4 17:14,23
  18:2,10,13,18
  37:20 38:6,22
  40:20,24 66:23
**CRR** 1:24
**cube** 45:25 46:4,8
  46:14
**current** 19:11
  34:10 50:18,19
  51:10
**currently** 51:6
  72:13

### D
**data** 20:4,9,19,23
**date** 15:2 16:4
  37:16 47:7 61:21
  69:14 79:3
**dated** 26:22
**David** 47:19,20,25
**day** 3:4 7:10,11
  76:21 77:24
**days** 8:6
**Dealer** 67:7
**debt** 43:22
**Debtor** 40:20
**Debtors** 1:9
**debtor-in-posses...**
  23:18
**December** 18:17
**decided** 53:12 56:8
**deciding** 22:20
  23:3,15,22 28:7
  37:19 38:21
**decision** 36:20
**decisions** 29:3,6
  40:14
**define** 8:17 13:10
  20:20 72:2
**defined** 21:10
**DEL** 3:8
**deliberations** 45:4
  56:25
**deponent** 77:19

**deposition** 1:14 2:4
  5:4,7 16:14 62:11
  64:2,4 77:10,11
  77:21 79:3
**describe** 31:20 73:2
  73:3
**described** 22:12
  43:15 60:2 72:19
**despite** 22:20 23:3
  53:11
**detail** 8:4,5 46:13
**details** 21:9 22:4
  53:8
**determination** 38:3
**determined** 19:14
  33:14 34:12 36:2
  53:25
**different** 7:25
  52:21
**differently** 52:21
**DIP** 28:2,9 31:6,7
  31:10,13,24 32:5
  32:12,15 37:7,9
**direct** 8:15 9:4,24
  11:9 13:7,10,10
  13:12,25 14:21
  21:2
**directly** 8:8 12:10
  13:14,14 26:8
  29:12 40:12
**disclose** 32:8 44:9
**discuss** 8:5,8 11:18
  27:12 72:14
**discussed** 24:17
  59:13 60:18 63:4
**discussing** 18:6
**discussion** 7:13,18
  15:3 31:18 35:8
  57:6 58:11 61:4
  61:13 68:7
**discussions** 29:7
  34:25 58:15,18,20
  61:11 68:12,14
**disposition** 40:18
  46:6
**DISTRICT** 1:3
**document** 14:24
  15:8 16:2,8 37:14

39:22,24 47:5,17
  47:18 48:13,16,21
  49:12,16 57:15,23
  61:19,23 62:3,12
  62:15,21 63:4,12
  63:16,20,22 64:25
  65:2 66:11,19
  69:11,21,23,25
  71:14 78:7,9,11
  78:13,15,17
**documents** 70:3
**dollars** 40:19 56:6
**doubtful** 27:13
**dropped** 39:5
**DTC074** 15:19
**due** 31:6 37:8
**duly** 5:16 77:11

### E
**E** 3:2,2 4:3,3
**earlier** 46:22 53:18
  60:8,16
**early** 11:14 13:4,22
  14:17 18:17
**East** 3:6
**Ed** 19:2 48:24
  49:20 56:12
**effect** 23:17
**either** 17:10 24:24
  33:10 42:14
**EMANUEL** 3:16
**employees** 50:17
**ends** 19:7 70:12
**engage** 24:21
**engaged** 40:17
**entire** 20:3 31:7
  37:9 63:22
**entities** 40:16,22
  41:2
**entity** 17:16,19,20
  17:22 18:4,7,8
  40:20
**equity** 56:2
**ERICA** 3:20
**errors** 79:7
**ESQ** 3:8,14,20,21
  3:25 4:9,16
**essentially** 42:14

45:12,19
**estate** 7:24 8:2,9
  11:17,20 40:14
  46:7 66:24 75:6
**estimated** 50:20
  51:10
**et** 1:8
**evaluate** 7:6
**evaluating** 16:20
  19:24
**evaluation** 6:10
**evening** 7:11,17 8:5
**exact** 17:15,18
**exactly** 15:14 64:11
  64:11 74:10
**EXAMINATION**
  5:19 78:3
**examined** 5:17
**exceed** 74:6
**excerpt** 66:13
**exchange** 58:6
**executed** 27:3
  36:16
**executives** 8:21,22
**exhibit** 14:24 15:7
  15:25 16:2,10
  17:3 26:21 31:2
  33:20 34:9 37:14
  39:21 45:23 46:18
  47:5 48:14 55:17
  57:16,25 59:19
  61:18,19,24 63:13
  64:6 66:4,12 67:3
  69:11,19 71:4
  78:7,9,11,13,15
  78:17
**EXHIBITS** 78:6
**experience** 43:17
  44:2,2
**experiences** 44:11
**explain** 24:10
  31:19 52:2,4
**express** 10:9 40:11
  56:18
**expressed** 22:3
  26:12 27:5 55:23
**extent** 24:14,17
  32:22 44:7 52:5

64:23
**e-mail** 17:6 19:8
  26:22 31:3 34:7
  35:6,15,24 36:12
  37:6 40:3 42:8
  46:24 47:19,23
  48:24 56:13 58:6
  59:14 60:23 70:5
**e-mails** 15:12,18
  72:5

### F
**facility** 32:15
**fact** 21:8 25:7
  33:19 54:3 55:25
  56:19 58:23 59:3
  59:4
**factors** 11:19 16:20
  37:22 45:11,18
**facts** 20:5,10 28:15
  28:24 29:10,11,14
  29:22 31:11,21,24
  32:4,10,18 33:2,5
  33:13 45:11,18
  47:9 52:5 55:10
  72:6,11,15,22
  73:4,5,8,14,18
  74:12,19,20,22
  75:2 79:6
**factual** 29:5
**far** 29:10
**favor** 42:25
**Fed** 73:21
**Federal** 77:20
**Fed's** 73:15 74:3
**Feinberg** 46:25
**Figueroa** 3:18
**figure** 50:25 51:2
  66:6
**figures** 53:18 70:13
  70:16,24
**filing** 70:7
**final** 51:2,9
**financial** 8:20
  13:16 19:18 23:6
  34:3,16 36:6
  37:23 38:8,24
  39:10,17 41:18

65:17 72:6
**financing** 23:18
28:2,10 31:14,25
32:5,12 73:16
**fire** 40:18
**first** 6:12,15,18
26:23 31:3,3
70:12
**Flexner** 2:7 3:10
**flip** 70:19
**Floor** 3:12,18,23
**focus** 66:14 70:10
**focusing** 6:22
**Fogarty** 67:8,8,9
67:13
**following** 40:22
41:16 67:20
**follows** 5:18 34:10
**follow-up** 48:10
**foreclosed** 31:9
37:11
**form** 7:8 9:13
10:19 11:4,23
16:22,24 18:21
20:2,13,24 21:15
22:16 32:7,21
33:22 34:5,21
35:17,19 36:7,17
38:13,19 39:13
44:6 49:19 51:4
51:13 52:13 53:3
53:15,22 54:10,18
55:5 59:2,7 60:9
61:9 63:6 64:22
65:2,8,12,22 68:3
68:24 72:25 73:17
73:23 74:9,17
76:2
**formally** 22:2,10
**formed** 6:12,14,17
7:4 44:25 55:6,8
71:19
**forth** 8:7 77:10
**forthcoming** 31:10
**Foundation** 60:10
68:4
**four** 70:20
**Friday** 40:4

**front** 6:20 26:21
46:2 61:23
**frustration** 40:12
**FTI** 12:17
**fully** 45:24
**function** 7:15
**funding** 8:2 74:3
**further** 27:11 42:8
46:13 76:4 77:14
77:18
**future** 31:23

G
**G** 3:14 4:16 70:22
**gain** 56:21 58:24
59:5 61:7
**general** 16:17
68:14 74:5 75:2
**generally** 44:3 74:6
74:20
**generic** 18:7
**Gilbert** 19:2,5
48:25 49:20 56:12
58:6,7 59:13
60:18,21
**Gilbert's** 60:23
**give** 25:6 37:17
38:25 41:16 48:13
63:8
**given** 26:7 31:17
42:12 63:17 77:12
**glance** 48:17
**go** 23:19
**goes** 9:2 31:9 71:6
71:7
**going** 11:7,19 16:23
16:24 17:6 20:14
22:17 23:12,13
24:2,21,23 25:5
26:5 27:6,20 28:4
28:17,22,25 31:2
31:16,22 33:17
37:25 38:18 39:12
41:15 42:6,18
43:7,13 44:19
46:10 48:13 50:3
56:22 58:14 63:15
66:14 69:9 72:12

**Good** 5:21,22
**goodwill** 56:4 60:3
**Gotshal** 8:22 12:20
**government** 23:24
24:5,8 25:3,15,18
25:23 32:19 33:2
**great** 57:24 60:2
**guys** 71:9

H
**H** 70:22
**haircut** 64:15,21
65:7,20 66:5
**half** 17:5 26:22
**hand** 8:18,19 77:24
**handed** 57:23
**happen** 18:15
31:13,23
**happened** 32:9
58:16
**Hawkins** 12:13
**HAYES** 4:21
**heading** 67:17
**hear** 48:3
**heard** 59:3
**hearing** 6:24 7:5
13:14 53:21 54:8
54:14
**HEDGES** 3:16
**held** 2:6 5:7
**help** 13:17
**helpful** 63:25
**hereunto** 77:23
**Hi** 47:25
**Holdings** 1:8 5:6
79:2
**host** 8:8
**Houlihan** 12:15,16
**HUBBARD** 4:5
**HUGHES** 4:5
**hurried** 42:9

I
**ice** 45:25 46:4,8,14
**identification** 15:2
16:4 37:16 47:7
61:21 69:14
**identify** 39:24
47:15 61:25 62:4

62:9
**immediately** 40:23
41:13 42:4
**inappropriate**
38:15
**include** 61:11
75:18
**included** 7:18,25
8:3 75:5
**including** 7:21
15:16 41:2 75:16
**increasing** 55:24
**independent** 10:17
11:2 44:24
**INDEX** 78:2
**indicate** 21:22
**indicated** 21:6
33:24 54:5,15
**indicating** 59:14
**indications** 26:25
36:14
**individuals** 75:7
**information** 10:16
10:25 19:17 22:21
23:4 24:6 25:10
25:12,17,22 34:15
36:5 37:21 38:7
38:23 39:4,9,16
40:13 41:19,24
44:3,17 45:9,16
49:11,16 50:6
60:7,15,21,25
61:6 62:20 63:3
64:17,20 65:3,5
65:19 71:22 72:6
72:9 73:20
**informed** 44:25
**infrastructure**
50:16
**input** 24:4
**institutions** 43:23
**instruct** 16:24
20:14 22:17 23:14
24:3,24 26:6,14
27:7,21 28:5,18
28:22,25 31:17
33:17 36:8,18
38:19 42:7,18

43:8,14 44:11,20
45:5,14 46:11
47:12 51:5,5
53:16 56:23 58:15
61:10 65:12 69:10
72:13
**instructing** 22:25
32:2 39:6
**instruction** 23:8,13
23:21 25:6 28:12
32:23 37:13 39:2
41:16 44:13 45:7
45:22 46:16 49:14
52:2 57:5
**instructions** 22:25
**insufficient** 19:16
34:15 36:4
**interacted** 19:6
**interest** 55:24
**interested** 77:17
**Interesting** 58:8
**internal** 26:11
**International**
17:13,19 18:6
34:24
**investor** 59:25
**involve** 35:9
**involved** 40:21
51:9
**involving** 6:4 35:2
41:7
**in-house** 46:25
**issuance** 56:3
**issue** 24:13,17
25:14 26:13 45:3
57:7 61:16
**issues** 8:2,3,9,10
30:7 41:25 48:3,7
48:7 70:6
**is/negative** 60:3
**items** 48:4

J
**J** 4:21
**JACK** 3:14
**Jacob** 60:24
**JAMES** 3:25
**January** 1:16 2:2

5:9 77:24 79:3
**JENNIFER** 3:8
**JOB** 1:25
**Jointly** 1:8
**JONES** 3:4
**judge** 19:14 20:21
  21:7,13,18 27:2
  34:12 36:2,15
**Julie** 12:14 58:7
**jurat** 75:19

**K**

**Kathy** 1:24 2:8
  77:5
**keep** 37:2
**kind** 24:22
**kinds** 38:14
**Klepfer** 1:24 2:9
  77:5
**knew** 8:11 11:20
  72:16
**know** 8:21 15:14,22
  17:9,11,15,17
  18:11,22,24 19:2
  24:7 25:2 29:13
  32:4 38:11 45:17
  48:23 50:24 51:7
  55:11 62:15,17,20
  63:3,11 67:8
  68:17 69:20,23
  70:16,24
**knowledge** 18:9
  19:21 21:12,21
  28:24 33:10,12
  35:21
**known** 52:5

**L**

**L** 3:8
**labeled** 5:3 70:22
**lack** 20:4,9,19,23
  22:4,21,23 23:4
  40:12 42:21 43:11
  44:2,17 45:9,10
  45:16,16 53:11
**Lane** 4:14
**largely** 6:22
**larger** 66:13
**late** 7:17 42:10

**Lavan** 4:11 7:21
  12:12
**law** 2:6
**lawyers** 7:19 8:20
**Lazard** 8:22 12:25
**LBI** 73:16
**leading** 52:22
**learned** 10:17 11:2
  29:10,23
**left** 15:19 64:7,13
**legal** 4:20 36:21
**Lehman** 1:7 3:5 5:6
  6:4 7:14,24 8:18
  8:21 14:9 23:18
  28:2 40:16 41:20
  42:11 43:16 52:25
  53:18 54:5,15,21
  55:15 60:2,25
  61:8 67:7,21,24
  70:7 79:2
**Lehman's** 50:14
**lender** 31:10
**length** 71:15
**lengthy** 48:16
**Let's** 47:14 61:17
**Lexington** 2:7 3:12
  5:8
**liabilities** 50:19
  73:9,12 75:8,8,16
**liability** 52:19 64:9
**Life** 47:20
**light** 22:11 25:7
**limited** 30:13 51:25
**line** 27:9 59:24
  64:12,13,14 66:5
  79:8,9,11,12,14
  79:15,17,18,20,21
  79:23
**liquidity** 8:2
**LISA** 4:21
**list** 40:25
**listed** 9:17
**Livenote** 2:12
**LLP** 2:7 3:4,10,16
  4:5,11
**Lokey** 12:16
**long** 12:7 29:17
  30:9 35:8

**look** 17:3 47:14,15
  50:11 57:25 59:20
  61:25 63:23 66:16
  69:19
**looked** 20:3 44:15
  62:4
**looking** 15:7 71:4
**looks** 15:12 47:24
**Los** 3:19
**losing** 40:23 41:13
  42:4

**M**

**Madison** 3:23
**Maiden** 4:14
**major** 42:20 43:5
**making** 40:13
  55:13
**managed** 43:22
**Management** 31:8
  37:10
**mark** 12:11 15:24
  61:17 64:15,21
  65:7,20 66:3,5
**marked** 14:25 16:3
  37:15 39:21 47:6
  48:14 57:16 59:18
  61:20,24 63:13
  64:9 66:12 69:13
**market** 74:14,23
**marks** 67:21,24
**marriage** 77:16
**Marsal** 11:10,17,18
  14:6,8 66:23
  67:10
**Martin** 46:24
**materials** 71:13
**matter** 5:5 29:5
  77:17
**matters** 43:18
**mean** 6:14 8:21
  13:12 20:25 21:2
  21:2 43:19 49:8
  49:18 52:15 55:8
  60:12 69:25 73:19
**meaning** 21:16
**MEDICO** 3:8
**meeting** 6:18 11:15

62:9 68:25 69:6
**meetings** 42:9
**melting** 45:25 46:4
  46:8,14
**member** 17:14,22
  18:2,9,13,18
  49:18,22 56:14,18
  68:20 69:6
**members** 8:14 9:3
  11:25 12:5,10
  13:7 15:13 21:2
  40:4,11 42:24
  47:21 48:25 49:21
  56:13 61:5,13
**memos** 72:5
**mentioned** 18:5
  55:19,21
**Merit** 2:10 77:6
**message** 60:23
**Metropolitan**
  47:20
**Michael** 12:12
**middle** 19:11
**Milbank** 7:19
  12:18
**million** 50:21
**MILLS** 4:9
**minimal** 55:11
**Mizuho** 4:13,21
  47:2
**moment** 39:20
  63:18
**month** 6:21 11:8
**morning** 5:21,22
  6:18
**motions** 36:23
**move** 19:14 33:14
  34:13 36:2
**moved** 51:22,24
  52:10
**moving** 53:7

**N**

**N** 1:1 2:1 3:1,2 4:1
  4:3 5:1 6:1 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1

18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1 46:1 47:1
  48:1 49:1 50:1
  51:1 52:1 53:1
  54:1 55:1 56:1
  57:1 58:1 59:1
  60:1 61:1 62:1
  63:1 64:1 65:1
  66:1 67:1 68:1
  69:1 70:1 71:1
  72:1 73:1 74:1
  75:1 76:1 77:1
  78:1,4 79:1
**name** 17:10 79:2,4
**nature** 45:25 72:10
**natures** 7:23
**necessity** 19:17
  34:3,16 36:5
**need** 30:15
**negative** 56:4
**negatively** 33:11
**negotiated** 64:15
  64:21 65:7,20
  66:5 67:21,24
  68:22 69:7
**negotiation** 24:22
**neither** 77:18
**Neuberger** 15:16
**never** 60:17,18
  62:6
**new** 1:3,15,15 2:8,8
  2:13 3:7,7,13,13
  3:24,24 4:8,8,15
  4:15 5:8,8 31:7
  37:9 77:3,4,7
**night** 7:12
**Nitin** 17:7 18:22
  34:23
**Noel** 1:14 2:4 5:5
  5:15 76:19 77:9

79:4
**Nos** 14:25 16:3
37:15 47:6 61:20
78:7,9,11,13,15
**Notary** 2:12 5:16
77:6
**noted** 5:12 34:2
**number** 5:3 7:25
17:4 19:8 21:7
42:22 43:23 50:7
51:21 54:2 57:12
64:10 70:12,21
**numbers** 51:21,24
52:7,10,20 70:11
71:5

**O**

**object** 9:13 10:19
11:4,23 16:21,22
16:23 18:21 19:12
20:12,13,17,20,20
20:24 21:13,15
22:6,13,20 23:3
23:15,22 24:2,25
25:6 26:4,5,19
27:6,20 28:4,8,16
28:17 31:16 32:7
32:21 33:22 34:5
34:11 35:17,19,23
36:7,11,17 37:5
37:19,25 38:3,18
38:21 39:12 41:15
43:7,12,13 44:4,6
44:17,18,19 46:10
47:10 49:19 51:4
51:13 52:13 53:3
53:13,15,22 54:10
54:18 55:5 56:9
56:22 58:14 59:2
59:7 60:9 63:6
64:22 65:8,11,11
65:22 68:3,24
69:9 72:12,25
73:17,23 74:9,17
76:2
**objected** 20:22
21:11,23 22:2
26:25 36:14

**objecting** 43:12
44:5
**objection** 7:8 20:2
21:10 22:8,14,15
28:11 33:16 34:19
34:21 36:19 37:12
38:12,13 39:2
42:6 45:14,21
47:12 49:13 51:25
61:9
**objections** 22:24
23:7,13,20 38:14
**obtained** 37:22
**obviously** 39:5
**occasions** 21:7
**October** 11:9,14
13:4,5,22,23
14:17,19 64:20
65:5,19,24 66:25
69:2,15
**offices** 2:6
**official** 32:15 33:2
33:10 59:11
**Okay** 13:19 14:11
16:9 18:12 21:21
25:5 27:16 30:17
33:25 35:7 40:15
48:22 49:23 57:19
57:25 62:6,10,15
64:5 67:2 69:18
70:9 76:7
**old** 50:13
**OLIVER** 3:16
**omitted** 71:15
**oOo** 76:12
**operations** 50:15
**opinion** 45:8
**opposed** 13:15
**option** 19:13,25
22:23 34:12 35:25
**Options** 20:5
**order** 7:6
**organization** 17:17
**outcome** 77:17
**outside** 12:4 26:10
26:13 56:24 57:3
57:6,6 58:21
61:14,16

**overall** 66:14
**overriding** 19:18
34:4,17 36:6
**overturn** 27:11,18

**P**

**P** 3:2,2,20 4:3,3
**page** 15:19,22 17:4
17:5 19:7 26:21
31:3 34:9 45:23
50:6,9 55:16 64:6
64:9 67:3 75:18
78:3,6 79:8,9,11
79:12,14,15,17,18
79:20,21,23
**pages** 70:10,20,20
**paragraph** 19:11
26:24 50:11 55:17
55:18
**Park** 4:7
**part** 29:6 66:17
72:24 73:9,25
**parties** 7:22 8:15
8:17 9:4,7,17,25
13:8 14:2,7,21
40:21 41:20 77:15
**parts** 66:14
**party** 44:4 77:19
**passed** 41:19
**Peck** 20:21 21:7,14
21:19
**period** 6:22 7:3
8:13 9:10,22 10:7
10:14,22 13:4,22
14:17 16:18 28:13
54:7 55:9 65:23
72:16
**person** 42:10
**personal** 40:12
**personally** 43:19
**perspective** 44:22
44:24
**Picking** 30:25
**placed** 6:20 61:23
**plan** 6:3
**play** 49:12
**Plaza** 4:7
**please** 5:13 14:15

16:5 26:16 32:8
38:13 39:14 41:16
47:16 62:2 63:9
72:3 73:2
**point** 8:12 17:13,25
27:18 34:6 35:22
36:10 37:4 48:19
51:17 55:12 64:19
68:13,15 74:11
**points** 35:3,4,5
42:22 67:18 68:8
68:9
**portions** 15:15
**position** 24:11
25:25 33:3 36:21
36:22 42:23
**positions** 32:19
52:20
**positively** 33:11
**possible** 20:6
**post** 56:6
**preface** 38:2 39:3,5
**preparation** 62:8
62:10,14
**preparing** 16:13
64:2,4
**present** 4:19 58:17
58:19
**presentation** 11:22
12:4,20,25 13:3
13:13,22 14:17
66:13,15 67:11
68:7,15,21
**presented** 53:18
**preserve** 19:17
34:3,16 36:5
**preserving** 23:6
**previous** 31:18
44:10
**previously** 48:14
57:16 59:13,19
63:13 66:12 72:19
**prior** 47:25 56:15
56:16 62:14 64:3
**privilege** 16:25
20:14 22:17 24:16
27:8 28:18 29:4
29:18 33:18 36:18

42:7,19 43:14
44:20 45:15 51:6
52:2 53:16 61:10
69:10
**privileged** 36:25
**privileges** 20:16
22:19 23:2,14
27:22 28:6 36:9
43:9
**probably** 31:18
**problem** 20:5,11
**Procedure** 77:21
**proceeding** 61:2,8
**process** 19:14
33:14 34:13 36:2
**produced** 15:9 71:8
71:14
**product** 17:2 20:15
22:18 27:7,22
28:6 29:4,9 32:3
36:9 43:9
**professional** 2:9
7:10
**professionals** 6:19
9:7,16 10:5,12,18
11:3 13:9,16
25:13,20 26:10,14
29:8 42:13 57:2
65:14
**pronounce** 17:7,9
**provided** 31:7 37:9
42:25 62:16,17,19
72:8 74:7
**providing** 72:6
75:17
**public** 2:12 5:17
26:9 29:13 41:21
77:6
**Purcell** 1:1,14 2:1,5
3:1 4:1 5:1,5,15
5:21 6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1,7 16:1 17:1
18:1,5 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1

30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1,20 44:1
44:7 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1,2
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1,19
77:1,9 78:1,4 79:1
79:4
**Purchased** 67:19
**purpose** 40:9
**pursuant** 2:5 77:20
**put** 7:10 46:2 71:9
**putting** 7:14

**Q**

**question** 9:2,18
14:14 16:17 24:20
26:15,16 31:22
32:3,12 34:18
37:3 38:9,16 39:6
39:14 44:8 48:22
49:8 52:6 53:4
59:9 62:25 63:8
63:15,19 65:16
69:22 73:4 74:21
**questions** 10:9 16:6
24:4,23 28:23
29:25 30:12,14
35:14 50:5 52:18
72:18 76:5,6
**quick** 48:2
**QUINN** 3:16
**quoted** 52:21 54:2
54:12
**quoting** 54:21

**R**

**R** 3:2 4:3
**raise** 10:9

**raised** 68:21 69:6
**ratio** 56:2
**read** 16:5 35:5,13
38:17 39:20,23
50:12 53:5 55:17
56:14 59:10,16,16
59:16 63:10,21
**reads** 59:24 66:5
67:19
**real** 75:6
**realize** 12:7 56:20
**realizing** 58:24
59:5
**really** 7:12 36:19
38:15 39:2
**Realtime** 2:11
**reason** 43:11,12
44:3,17,18 79:5,8
79:9,11,12,14,15
79:17,18,20,21,23
**reasons** 28:15
38:20 42:12,17,21
43:5,6 47:10
**recall** 11:21 12:3
12:19,21,24 13:2
15:10 27:4,16
34:25 48:17 50:2
51:17,18,20,23
54:11,13,20,24
58:11,20,22 62:13
62:18 64:3,17
66:17,20 68:7,12
68:14,20 69:4,5
72:10 73:5,11
75:9
**receive** 10:24 25:22
64:20 65:5,19
71:21 72:4
**received** 25:11,17
**Recess** 30:21 57:10
**recognize** 60:6,11
**recollection** 6:13
10:20,24 12:7
13:6,24 14:3,19
41:11
**record** 5:12 9:20
15:3,5 24:22
30:20,23 36:22

38:17 46:20 53:5
57:9,13 59:10
63:10 71:3 76:8
76:10 77:12 79:6
**redacted** 15:15
**reduction** 65:9,21
67:22,25 68:10,23
69:8
**REED** 4:5
**refer** 41:5 43:5,11
46:3 70:11
**reference** 33:21
72:17
**references** 70:6
**referencing** 15:15
**referred** 20:18
68:25
**referring** 18:4
35:13 41:6 42:17
46:5,6 48:7 60:14
64:8,25 68:2
**refers** 66:9 67:23
68:5,17
**reflected** 19:9
49:12 60:7,15
63:4
**refrain** 43:12 44:5
**regarding** 15:14
31:21 33:2 35:15
42:11 52:18 66:24
**Registered** 2:9,10
77:5
**relate** 6:3,9
**related** 40:16 77:15
**relates** 60:20,20
66:18
**relating** 50:5 68:22
71:22
**relation** 39:8,15
**relevant** 51:2
**remember** 11:14
12:15 48:9,12
59:11 61:15 65:25
74:10,18,20
**repeat** 26:16 38:16
39:14 53:4 59:8
69:22 74:21
**rephrase** 65:16

**replacement** 73:15
73:21 74:16
**repo** 64:14 67:19
73:22 74:16,25
**report** 66:22
**reported** 1:23
72:11
**reporter** 2:10,10,11
2:12 5:13 77:6
**reports** 71:22 72:2
**repos** 74:5
**represent** 70:17,25
71:12
**representative** 5:24
14:7 19:5
**representatives**
7:20 11:17 12:16
12:17 14:3,22
**represented** 17:16
**representing** 12:10
12:14 40:19
**requested** 77:19
**require** 44:8
**resigned** 18:16
**respect** 32:20 45:24
52:9
**respective** 8:19
**restate** 14:14
**return** 75:7
**reveal** 32:23 41:17
41:22 52:3 61:10
**review** 15:8 16:8,13
37:18 39:22 47:17
48:21 49:15,23
62:3 63:18,20
66:19 69:16,21
77:19
**reviewed** 49:22
60:8,16
**reviewing** 47:18
50:2
**right** 9:8 22:7
28:24 31:25 47:14
**risk** 40:23 41:13
42:4
**RMR** 1:24
**Rocker** 18:24
**role** 49:11 74:3

**RPR** 1:24
**Rule** 2:5 77:20
**ruled** 27:2 36:15
**rules** 38:11

**S**

**S** 1:24 2:9 3:2 4:3
77:5
**sale** 6:3,25 7:6 8:3
8:16 9:11,23,25
10:16,25 16:19,21
19:15,24 20:18
21:13,23 23:22
24:9 25:4,15,19
28:3 31:5,12,14
32:5,13,20 33:15
34:14 35:23 36:3
36:12 37:6,7,19
38:4,22 39:8,15
40:18,21 41:11
42:3,15,23 45:13
45:20 47:11 49:10
49:16 51:8 52:22
53:7,13 56:9,17
65:10 67:6 71:20
71:23 72:7,21,24
73:7,13,24 74:13
75:5
**sales** 31:21 41:6
**salient** 42:22
**Sally** 18:24
**SANPIETRO** 4:20
**Saturday** 19:9
26:22 31:4
**saw** 33:20 62:8
**says** 15:19 26:23
31:5,9 34:7 49:3
60:24 64:14,15
67:5,6,18
**scenario** 46:9,14
**scenarios** 45:25
46:4
**Schiller** 2:7 3:10
**second** 19:10 34:9
45:23 50:6
**sections** 48:20
**securities** 74:6,8,14
74:24 75:6

see 15:20 17:8
    19:19 27:13 33:23
    33:25 34:8,20,22
    34:23 40:25 42:15
    43:3 49:6,20 50:9
    50:22 55:19 56:6
    56:12 58:5,9,10
    60:4 61:2,3 64:6
    64:15 66:6 70:14
    70:22
seeing 48:17 62:13
    64:3 66:17,20
seek 27:18
seen 16:10 58:3
    59:20,22 60:17
    62:6,11 63:24,25
select 6:19
sense 14:8
sent 19:9 31:4 40:3
    47:23 49:20 56:12
    59:14
sentence 26:24
    35:13
separate 43:23
September 6:6,17
    6:21,23 7:9 9:12
    9:24 11:7,8 13:5
    13:23 14:18 16:18
    16:19 18:19 19:9
    19:22,22 23:10
    26:23 27:19,24
    31:4 40:4 47:23
    49:5,7 51:3 52:11
    52:12,24,24 54:7
    54:8,25 55:2
    65:18,24 71:19,20
    72:20 73:6,7,14
sequential 71:5
series 15:12,18
    70:2,13
session 49:9
set 77:10,24
shareholders 55:22
shareholdings
    55:24
Shinsei 17:13,16,18
    17:20,21,25 18:4
    18:6,7,8,11,12,16

18:18 19:6 33:21
    33:23,25 34:9,22
    34:24,24 35:24
    36:12 37:6 48:25
Shinsei's 17:15
show 57:15 59:18
    63:12 66:11
Significant 67:5
simply 42:21
SIPA 4:6
sir 69:22
sit 66:8
situation 13:12
skipping 55:18
small 46:19
sorry 8:25 9:2
    57:22 64:8 69:17
sought 10:9
source 29:13 37:23
    38:7,23 39:10,17
    56:3 65:6,25
sources 29:17 30:9
    41:21,23
SOUTHERN 1:3
speaking 13:14
    38:12,14 45:2
    50:13 52:7
Specialist 4:20
specific 48:19 50:5
    68:12 72:16 73:5
    73:11 74:18
specifically 12:15
    53:8 55:13 65:23
    68:9
specifics 16:16
Speiser 12:11
spell 9:20
ss 77:3
stability 19:18 23:6
    34:3,16 36:6
stake 31:7 37:9
stale 67:21,24
stance 19:12 34:10
standing 11:24
    36:19
staple 70:2
start 5:2 6:15 48:15
    48:16 57:11

starts 71:5
state 2:13 38:13
    77:3,7
stated 38:20
statement 34:22,23
    55:13 68:22
statemented 50:18
states 1:2 19:10
    26:24 27:9 34:9
    35:24 36:13 37:7
    45:24 50:12 55:18
    67:20
Staying 55:16
step 74:2
Stern 3:14 5:20
    9:19 14:6,10 15:6
    15:24 16:9 24:21
    28:20 29:22 30:13
    30:17,24 35:5,15
    35:16 38:5,10
    39:23 43:21 46:18
    46:22 48:22 57:14
    57:17,21,22 59:8
    61:17 63:21 64:8
    65:15 69:15 71:4
    71:10 76:4,8 78:4
STEVEN 4:20
strategy 42:13 43:2
Street 3:6,18
string 47:19 70:5
Stroock 4:11,11
    7:21,21 12:11,12
    40:7
subject 35:10 49:3
    59:24
submitted 33:6
    36:13
Subscribed 76:21
substantially 51:22
    51:24 52:11
support 55:23
supporting 20:4,10
sure 9:19 12:9
    14:12,16 17:6
    34:8 56:14,15
    60:24 68:5
swear 5:13
sworn 5:16 76:21

77:11
Szyfer 4:16 7:8
    9:14 11:23 14:5
    14:11 16:22 18:3
    20:2 22:15 34:19
    34:21 35:4,12,18
    44:6 51:13 57:20
    57:23,24 68:24
    71:3
S-H-I-N-S-E-I
    17:21

T
Taggart 3:20 9:13
    10:19 11:4 16:23
    18:21 20:13,24
    21:15 22:8,14,16
    22:24 23:7,12,20
    24:2,10 25:5 26:5
    27:6,20 28:4,11
    28:17,25 30:4,16
    30:18 31:16 32:7
    32:21 33:8,16,22
    34:5,18,20 35:7
    35:17 36:7,17
    37:12,25 38:10,18
    38:25 39:12 41:15
    42:6,18 43:7,13
    43:19 44:19,23
    45:14,21 46:10,19
    47:12 49:13,18
    51:4,12,25 52:13
    53:3,15,22 54:10
    54:18 55:5 56:22
    58:14 59:2 60:9
    61:9 62:23 63:6
    64:22 65:8,11,22
    67:14 68:3 69:9
    71:24 72:12,25
    73:17,23 74:9,17
    76:2,6
take 19:23 22:22
    23:5,16,23 28:8
    28:19 30:15 37:20
    39:20 50:3 63:17
taken 2:5
talk 48:4
talking 9:15

tape 5:3 57:12
tax 56:6 60:3
team 7:11,16,18
    11:18
TECCE 3:25
tell 7:3 15:9 20:21
    42:2 48:17,18
    58:2 59:20 63:23
    66:17 69:20
term 17:18 21:10
testified 5:17
testify 24:12 29:11
    29:15 30:7 32:10
    57:4 59:3
testimony 54:19
    77:12
Thank 30:18 61:22
    63:14
Thanks 57:24
thereof 22:5
things 8:3 71:16
think 12:2,9 31:22
    33:18 35:16,18
    36:19,25 38:10
    39:3 65:15 71:12
thinking 48:2,6
thinks 58:9
third 50:11 64:6
    67:3
thought 58:13
thoughts 48:3
three 43:23 70:19
time 6:22 7:4,20
    8:12 11:20 12:7
    15:4 17:22 19:21
    27:23 30:19,22
    37:2 49:24 51:21
    52:5,11 53:8,20
    54:8,11,23 55:9
    57:8,12,18 60:22
    62:13 68:6 71:18
    71:20,21 72:16
    76:10
times 30:6 52:21
today 5:23 16:11
    55:22 62:9,12
    66:8 76:10
today's 16:14

**told** 40:20 41:11,17
41:19,20 65:25
**tomorrow** 27:12
**tomorrow's** 47:25
**top** 31:2 58:5 67:5
**topic** 57:4 58:18,21
**topics** 6:2,8
**trading** 50:17,19
51:10 52:9,25
53:9,19 54:6,16
54:22 55:3
**transaction** 6:4,10
6:25 7:7 8:10,11
8:16 9:12,24 10:2
10:10,16,25 11:11
13:8 14:2,22
16:19,21 19:24
20:4,5,8,10,18,22
21:9,13,24 22:2,4
23:9,16,19,23
24:9 25:4,16,19
25:24 26:3,18
27:3,10,18 28:3,8
28:14,16 31:12,14
31:21 32:6,13,16
32:20 36:16 37:20
38:22 39:8,15
41:7 44:4,16
47:11 49:11,17
51:3,8,9,16 53:10
53:13 55:11,23,25
56:4,9 65:10
71:20,23 72:7,21
73:7,10,13 74:2
74:13 75:5
**Transactions** 67:6
**transcript** 49:3,6
50:7 59:25 60:7
60:15 77:20
**transcription** 79:7
**transfer** 53:2,20
54:6,17 55:3,14
75:6
**transferred** 72:23
74:6,15,24
**troubled** 21:8
**true** 9:10 77:12
**Trustee** 4:6

**turn** 37:17 47:8
64:5 67:2
**Turning** 17:3 19:7
45:23 66:4 70:9
70:19
**two** 8:6 70:10
**TYLER** 3:21
**type** 38:11

___

**U**

**unanimous** 42:25
45:12,19
**understand** 5:23
6:2,8,23 7:6 14:12
15:10 25:9 29:19
31:17 32:22 52:6
52:23 53:17,24
54:4 58:8 64:24
67:25 74:4
**understanding** 6:9
24:13 27:25 29:5
29:16 30:6,8
31:20 32:15,18
33:5 52:8 53:12
60:13 66:9 71:10
71:16 72:15 73:25
**understood** 42:23
51:14,15 52:17
53:6,8 54:15,21
54:25 55:12 74:11
75:4
**Unit** 31:8 37:10
**UNITED** 1:2
**Unsecured** 11:15
11:25 49:2 66:23
**upper** 15:19 64:7
**urgent** 7:23 11:19
**URQUHART** 3:16
**use** 45:10
**U.C.C** 7:19,21,23
12:10 19:6,12
26:25 27:12 34:10
36:14
**U.S** 50:14 56:6

___

**V**

**vagueness** 39:13
**value** 40:19,24
41:14 42:5 50:18

50:20 51:10 52:19
52:19 53:25 54:5
54:12,16 55:2
65:10,21 67:20,23
74:5,7,14,23
75:11,15
**values** 54:21
**variety** 42:12
**various** 11:16 12:9
23:24 24:5,8 25:3
25:14,18,23 32:19
40:25 43:6 48:25
52:20 66:24 70:6
70:6
**Varley** 50:12
**viable** 19:13,25
22:23 34:12 35:25
**video** 4:20 76:10
**VIDEOGRAPH...**
5:2 15:4 30:19,22
57:8,11 76:9
**videotaped** 1:14
2:4 5:4
**view** 26:2,7,12,17
27:4
**viewed** 28:15
**views** 10:10 23:24
24:8 25:3,14,18
25:24
**vote** 42:14,25 45:12
45:19

___

**W**

**W** 4:9
**waiver** 24:16 25:9
29:25 30:10
**waives** 29:18
**want** 14:11 24:3
28:21 48:3 50:4
52:4 64:5,12
70:10 72:14
**wasn't** 7:13 55:6
**waste** 37:2
**way** 12:22,23 13:2
21:4 42:14 51:18
54:13 65:4 71:11
71:17 77:16
**Wednesday** 5:9

59:25
**week** 40:16 42:10
53:19
**Weil** 8:22 12:20
**welcome** 58:7
**went** 8:4 38:3
**we'll** 6:22
**we're** 72:17
**we've** 59:18 61:24
66:11
**whereof** 77:23
**WHITMER** 3:21
**willing** 24:11 29:15
72:18
**withdrawn** 64:18
**witness** 4:12 5:4,13
5:16 28:22 46:21
77:9,13,23 78:3
79:4
**worded** 38:2,19
51:6 72:13
**words** 45:10
**work** 17:2 20:15
22:18 27:7,22
28:6 29:4,8 32:3
36:9 43:9
**working** 14:8
**works** 67:9
**write** 40:15 42:8,20
47:24
**writes** 58:7
**written** 71:21 72:2
**wrote** 48:6

___

**X**

**x** 1:4,10

___

**Y**

**Yeah** 12:2 30:16
35:18
**York** 1:3,15,15 2:8
2:8,13 3:7,7,13,13
3:24,24 4:8,8,15
4:15 5:8,8 77:3,4
77:7
**Yu** 47:19 48:11

___

**$**

**$2** 56:5,20

**$250** 50:21
**$5** 64:21 65:7,9,21
66:2 67:21,24
68:9,23 69:7
**$68** 50:20,25
**$72** 50:18,25 51:11
51:16,20

___

**0**

**08** 49:5
**08-13555(JMP)** 1:7

___

**1**

**1** 5:3 64:10 79:6
**1:25** 26:23
**10th** 3:18
**10,000** 50:17
**10/16** 15:17
**10:20** 30:20
**10:26** 30:23
**10:42** 40:4
**10004-1482** 4:8
**10010** 3:24
**10017-6702** 3:7
**10022** 3:13
**10038-4982** 4:15
**1048** 17:5 19:8
**1049** 16:3 78:10
**11** 1:6 44:10
**11:10** 57:9
**11:22** 57:12
**11:30** 7:12
**11:51** 76:10
**12:32** 19:10
**13** 1:16 2:2 79:3
**13th** 5:9 77:24
**14** 78:7
**16** 54:7,25 78:9
**16th** 55:7,7
**17** 6:18 7:9 16:18
19:22 49:4,7
52:11,24 71:19
72:20
**17th** 8:13 10:7,14
10:22 55:8 59:15
73:6
**180** 4:14
**19** 6:24 54:9 55:2
**19th** 8:14 9:11,23

55:9

**2**

**2** 56:5 57:12 60:3
79:6
**2:19** 47:24
**20** 19:10 26:23 31:4
**20-year** 43:24,25
**2008** 6:6,18,21 11:7
13:5,24 14:18,19
18:19 19:10 40:4
65:5,19,24,24
66:25 69:16
**2009** 18:17
**2010** 1:16 2:2 5:9
76:22 77:24 79:3
**22** 9:12,24 11:7
13:5,23 14:18
16:19 19:22 23:10
27:19,24 47:24
51:3 52:12,24
71:20 73:7,14
**22nd** 3:23 10:8,15
10:23
**222** 3:6
**26** 40:4
**27089** 1:25

**3**

**3** 79:7
**30(b)(6)** 2:5 5:4
**30(e)** 77:21
**37** 78:11

**4**

**41st** 3:6
**43.1** 67:19
**463B** 63:13
**464B** 66:12
**47** 71:7 78:13
**476B** 48:14 55:17
57:17
**477B** 59:19
**478B** 57:16 58:2

**5**

**5** 78:4
**5.0** 66:6
**51** 3:23

**519B** 14:24 15:7
78:7
**520B** 16:2,10,16
17:3 26:21 31:2,3
33:20 34:9 78:9
**521B** 37:14,17
39:21 45:24 78:11
**522B** 47:5,8,14
78:13
**523B** 61:19,24
78:15
**524B** 69:11,19 71:4
78:17
**5339** 61:20 78:16
**574** 47:6 78:14
**575** 2:7 3:12 5:7
**580** 37:15 78:12

**6**

**6:03** 31:4
**61** 78:15
**69** 78:17

**7**

**7th** 3:12
**7889** 71:6
**7890** 71:6
**7891** 69:12 78:18
**7892** 69:13 71:8
78:19
**7893** 70:21
**7894** 69:13 78:19

**8**

**8** 66:25 69:2
**8241** 69:12 71:7
78:18
**8244** 14:25 78:8
**8245** 70:13
**8247** 69:13 78:18
**865** 3:18

**9**

**9:30** 15:17
**9:32** 5:10
**9:49** 15:5
**90017** 3:19
**91** 71:6
**9128** 50:8