Page 1

1

2                     UNITED STATES BANKRUPTCY COURT

3                     SOUTHERN DISTRICT OF NEW YORK

4        - - - - - - - - - - - - - - - - - - - - - -x

5        In Re:

6                                    Chapter 11

7        LEHMAN BROTHERS          Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al,    (Jointly Administered)

9                      Debtors.

10       - - - - - - - - - - - - - - - - - - - - - -x

11

12               DEPOSITION OF JONATHAN HUGHES

13                     New York, New York

14                     January 15, 2010

15

16       Reported by:

17       MARY F. BOWMAN, RPR, CRR

18       JOB NO. 27056

19

20

21

22

23

24

25

1

2

3

4

5                    January 15, 2010

6                    10:15 a.m.

7

8          Deposition of JONATHAN HUGHES, held at

9    the offices of Hughes, Hubbard & Reed, LLP, One

10   Battery Park Plaza, New York, New York, before

11   Mary F. Bowman, a Registered Professional

12   Reporter, Certified Realtime Reporter, and

13   Notary Public of the State of New York and New

14   Jersey.

15

16

17

18

19

20

21

22

23

24

25

1                        J. HUGHES

2        A.     I did, yes.

3        Q.     What did you do?

4        A.     I spoke to a number of people,

5   including those that I have mentioned, including

6   other employees of Barclays, to try to establish

7   whether, in fact, they were there.

8        Q.     And is there anyone else that you

9   learned was present?

10       A.     I can't now recall any additional

11   names.

12              MR. STERN:  Can we go off the record

13         for just a second.

14              MR. MAGUIRE:  Certainly.

15              (Discussion held off the record)

16              MR. MAGUIRE:  So counsel is just going

17         to give us a list.

18              MR. STERN:  Yes.  Mr. Hughes'

19         recollection is correct, and in addition, in

20         preparing for this deposition, we learned

21         that for Barclays, Gerard LaRocca was

22         present at the very beginning of the

23         hearing, but he left early in anticipation

24         of the possibility of needing to prepare for

25         a closing.

Page 10

1                          J. HUGHES

2            The individuals from Cleary were

3    Victor Lewkow, Lindsee Granfield, Lisa

4    Schweitzer, Joel Moss, Seth Kleinman.

5            In addition, there were attorneys from

6    Sullivan & Cromwell present, Rob Lacy, Jay

7    Clayton, Hydee Feldstein, Elizabeth Summers,

8    Ken Myers.

9            And I believe that's the complete

10   list.

11       Q.    Sir, what was Mr. Klein's role in

12   attending the sale hearing?

13       A.    I'm not sure he had a specific role

14   with respect to the hearing, but he had been,

15   throughout the course of that week and in the

16   period following the hearing, both an advisor to

17   Barclays and also one of the principal

18   negotiators of the transaction from the

19   Barclays' perspective.

20       Q.    And what about Mr. Cox's role?

21       A.    Mr. Cox was also one of the principal

22   negotiators of the transaction.  So again, would

23   have had an actual interest to be there.

24       Q.    And what about Mr. White?

25       A.    Mr. White was one of my colleagues in

1                         J. HUGHES

2     the legal function who was one of the legal

3     advisors to Barclays on the transaction.

4         Q.    And is the same true of Mr. Kaplan?

5         A.    Correct.

6         Q.    Can you tell me what you have learned

7     in terms of what explanations were made at the

8     sale hearing off the record about the

9     transaction?

10        A.    Are you asking me if I recall or if I

11    have learned that there were some off-the-record

12    descriptions of the transaction at the sale

13    hearing?

14        Q.    Yeah.  If I understood your earlier

15    answers correctly, you weren't personally

16    present.

17        A.    Correct.

18        Q.    The question is, what information does

19    Barclays have as to what was said off the record

20    at the sale hearing?

21        A.    Right.  My understanding is that there

22    was at one point in the proceedings an

23    off-the-record description, as you say, provided

24    to the assembled mass.  Whether it was aimed at

25    the entirety of the assembled mass of

1                         J. HUGHES

2      population, I don't know.

3               I believe it did include a

4      presentation, so to speak, of Weil Gotshal's

5      meaningful thoughts about certain aspects of the

6      transaction, and that that presentation -- or

7      the presentation included representatives of

8      Lehman, Weil Gotshal, the creditors committee,

9      the trustee, and possibly others who were also

10     in attendance.

11         Q.    And who gave that presentation?

12         A.    I believe it was Lori Fife who was a

13     partner or is a partner at Weil Gotshal, I

14     believe.

15         Q.    Anyone in addition to Ms. Fife?

16         A.    I don't think that I have ascertained

17     with any certainty that anybody else made any

18     representations.  It's possible that there were

19     other partners of Weil Gotshal that also

20     participated in it.  But the recollections are

21     not all abundantly clear.

22         Q.    But the efforts that you have gone to

23     as Barclays' designated 30(b)(6) representative

24     are that Barclays is not aware of anyone else

25     who spoke other than Ms. Fife in this

Page 13

1                        J. HUGHES

2       off-the-record presentation?

3            A.    There are some recollections that

4       Michael Klein may have also discussed certain

5       aspects of the transaction with similar

6       groupings.  Whether it was part of that same

7       presentation or whether it was different, I

8       haven't been able to establish.

9            Q.    Anyone other than Ms. Fife and

10      Mr. Klein?

11           A.    Not that I'm aware of.

12           Q.    Did you speak with Mr. Klein about any

13      off-the-record discussion?

14           A.    I have spoken to Mr. Klein about that,

15      yes.

16           Q.    And what did he tell you?

17           A.    I think it's fair to say his

18      recollection was not precise, which is why a

19      moment ago I mentioned that not all

20      recollections were clear.

21           Q.    Can you tell me what is the best

22      recollection that you were able to get as to

23      what Mr. Klein had said?

24           A.    It is hard, it is hard to be clear

25      about it, because I would be repeating what were

1                      J. HUGHES

2       answers from Mr. Klein that weren't sufficiently

3       certain for me to be able to represent exactly

4       what it is that he had said.

5            Q.    If you could tell me what you were

6       told.  I understand there may be some

7       uncertainties, but just tell me what it is that

8       you were told about what he said, whether he

9       told you or anybody else remembers him saying

10      it.

11           A.    The best that I could say is that

12      while Mr. Klein didn't have a strong

13      recollection of the events, that the -- there

14      was a recollection that he had referred to

15      certain changes to some aspects of the

16      negotiations that had happened earlier in the

17      week, and that Mr. Klein had described some of

18      those to people at court at that time, during

19      that after -- late afternoon, early evening.

20           Q.    Who had that recollection?

21                MR. STERN:  Hold on for a second.

22                I don't want you to intrude on the

23           conversations that Mr. Hughes had in

24           preparing for this deposition.  You can ask

25           him about the facts that he learned, but I

1                          J. HUGHES

2          don't think you're entitled to know who told

3          him precisely what.

4                  So I'll allow you to testify to facts

5          that you learned, as best you can recall

6          them, but not to the conversations that you

7          had in preparation for the deposition.

8                  MR. MAGUIRE:  Well, I think it is a

9          fact as to who has a recollection, so I

10         think if the witness -- that's a factual

11         thing.  That's not a legal advice or

12         opinion.  So I think I am entitled to know

13         who had the recollection.

14                 MR. STERN:  So what is the question?

15     Q.     So the question is, when you testified

16     about the recollection that somebody had, who

17     was the person who had that recollection?

18                 MR. STERN:  I'll allow you to answer

19         that, if you remember.

20     A.     My best recollection is that Lindsee

21     Granfield and Jason White recalled some form of

22     discussion.  That's about as much as I can

23     remember from the various discussions that I

24     have had on the topic.

25                 And as I say, those recollections were

Page 16

J. HUGHES

1

2    uncertain, and as you can observe, my own

3    recollections are uncertain.

4         Q.    I just wanted to get the extent of

5    what information you were able to get in that

6    regard.

7         A.    I understand.

8         Q.    Did anyone recall what changes

9    Mr. Klein referred to?

10        A.    Again, with the same proviso as to

11   certainty, there were references to, principally

12   references to agreements made earlier that

13   Friday between Lehman Brothers and Barclays with

14   respect to what was subsequently termed

15   clearance box assets, as a very convenient

16   summary label, and another convenient summary

17   label, some 15c3 assets, each of which had been

18   the topic of discussions throughout the course

19   of the day.

20        Q.    And when you say with the same proviso

21   as to certainty of recollection, what do you

22   mean?

23        A.    I mean that because they were -- each

24   of those items were thought to be part of what

25   Mr. Klein may have described to people at court,

1                           J. HUGHES

2       and that those -- that very description was not

3       certainly recollected that they are -- by

4       definition, the content of the description was

5       not certainly recollected.

6           Q.     Is what you gathered that certain

7       people thought those two subjects are what

8       Mr. Klein may have spoken about, or do they

9       actually recall that he had spoken about each of

10      those subjects?

11          A.     The latter.

12          Q.     And what did people recall him saying

13      about clearance boxes?

14          A.     That there had been a discussion and

15      an agreement about the clearance box assets, and

16      most importantly, I think, that Lehman Brothers

17      had represented to Barclays that there were

18      assets in what were termed the clearance boxes,

19      which assets were unencumbered assets of Lehman

20      Brothers, which were earlier in the day

21      identified as being capable of being delivered

22      in the transaction to Barclays.

23          Q.     And who recalled Mr. Klein saying all

24      that?

25          A.     The people that I have mentioned, so I

Page 18

1                           J. HUGHES

2      think Lindsee Granfield and Jason White.

3           Q.    And did Lindsee Granfield and Jason

4      White make clear to you that was a recollection,

5      a clear recollection that they had?

6           A.    Again, as I said earlier, I wouldn't

7      describe their recollections as certain

8      recollections, but that was my impression.

9           Q.    I'm sorry.  Your impression was --

10          A.    That they recalled, first of all, a

11     description of some facets of the transaction by

12     Mr. Klein, but -- and that that included

13     reference to the clearance box assets.

14          Q.    Did they tell you who was present when

15     Mr. Klein made his, I'll call it presentation?

16          A.    No.  Save that they thought it took

17     place at court.

18          Q.    Did anyone tell you that Mr. Klein

19     referred to any other changes in the

20     transaction?

21          A.    As I mentioned a moment ago, I think

22     it included the 15c3 assets.  I don't recall

23     that it included anything else.  So that's

24     possible that it did, but I don't recall

25     anything else.

1                         J. HUGHES

2          Q.    Did anyone tell you that they recalled

3    Mr. Klein saying anything about margin?

4          A.    No.

5          Q.    Did anyone tell you that they recalled

6    Mr. Klein saying anything about clearing fund?

7          A.    No.

8          Q.    Is there anything else that anyone

9    told you they recalled Mr. Klein saying at the

10   sale hearing?

11         A.    Not that I recall.

12         Q.    Is there anything else that was --

13   leaving aside Lori Fife's presentation for right

14   now, is there anything else that you understand

15   was said off the record in court other than what

16   you have told us about Mr. Klein?

17         A.    No.

18         Q.    Can you tell us, please, what you

19   understand Lori Fife said off the record?

20         A.    The best I've been able to establish

21   is that Ms. Fife referred to some of her earlier

22   descriptions with respect to the transaction, by

23   which I mean descriptions made at the hearing

24   which preceded the sale hearing, namely on the

25   17th of September, and that she, both off the

Page 37

1                          J. HUGHES

2     number comprised.

3          Q.    And is Barclays in a position to

4     provide any understanding as to what it believed

5     comprised the 47.4 billion dollars that was

6     represented to the court at the sale hearing?

7                MR. STERN:  Objection to the form.

8          Are you talking about speculation or --

9                MR. MAGUIRE:  No.  I'm asking him did

10         Barclays have an understanding at the sale

11         hearing.

12               MR. STERN:  I thought he has already

13         answered that, but go ahead.

14         A.    My understanding was that Ms. Fife was

15    describing or explaining to the court changes in

16    the valuations of long positions which she

17    previously described.  Whether that was a

18    description by Ms. Fife that was limited to

19    that, I don't know.

20         Q.    And your preparation for this

21    deposition has not shed any additional light on

22    that from the people you have spoken to at

23    Barclays?

24         A.    From the people I have spoken to at

25    Barclays, their recollections are consistent

Page 38

1                        J. HUGHES

2      with what I have just said.  I have not had the

3      opportunity to speak to Ms. Fife or Mr. Miller,

4      so I can't say with certainty what was in her

5      mind when she presented the number.

6          Q.    I'm only asking for Barclays'

7      understanding.

8              MR. STERN:  Should we take a short

9          break for five minutes?  Do you want to

10          finish a line of questions?

11              MR. MAGUIRE:  That's fine, we can take

12          a break now.  Now is fine.

13              (Recess)

14      BY MR. MAGUIRE:

15          Q.    Sir, is Barclays aware of any

16      disclosure to the court of any profit or gain

17      that Barclays anticipated it would make from the

18      sale transaction?

19              MR. STERN:  Are you talking about

20          September 19?

21              MR. MAGUIRE:  Yes.

22          A.    On September the 19th, I'm not aware

23      of anybody identifying to the court a gain, nor

24      am I aware that anybody who made any

25      representations to the court was in a position

Page 39

1                              J. HUGHES

2       to know one way or another whether Barclays

3       would have had a gain.

4              I do think there were objections at

5       that hearing based on the notion that Barclays

6       would make a windfall profit from the

7       transaction.  There were some meaningful

8       complaints, for want of a better word, made on

9       behalf of creditors, I believe, that identified

10      to the court a strong likelihood that Barclays

11      would make what in their description was a

12      windfall profit, and I believe that the judge

13      heard those complaints and dismissed them as

14      being insignificant in light of the importance

15      of the transaction and the importance of

16      approving the transaction, among other things,

17      for the benefit of the estate, creditors,

18      customers.

19             And I believe also that the court felt

20      that it was not relevant whether or not that

21      windfall profit did or did not exist.  Even if

22      it did, I think that the judge explained that

23      there was a greater need in light of the turmoil

24      in the markets at that point in time.  But as I

25      mentioned, in particular for the benefit of the

Page 40

1                          J. HUGHES

2     estate and the creditors.

3          Q.    At the time of the sale hearing, did

4     Barclays expect to make a gain on the closing of

5     the transaction?

6          A.    Sorry, could you just repeat, at which

7     point in time?

8          Q.    At the sale hearing.

9          A.    At the sale hearing, yes, I believe

10    so.  I believe in fact we had even made the

11    public announcement that we would make a -- that

12    we expected to make a meaningful accounting gain

13    on the transaction.

14         Q.    And when you say the public

15    announcement, you are referring to the

16    announcement and analyst call on the 17th?

17         A.    Yes.

18         Q.    In the course of that analyst call,

19    Mr. Varley described the deal as having been

20    derisked.  Do you recall that?

21         A.    I don't recall that specific term, no.

22         Q.    Did Barclays understand the sale to

23    have been derisked?

24         A.    I'm not sure I understand what you

25    mean by derisked.

Page 41

1                           J. HUGHES

2          Q.     Did you participate in the analyst

3     call?

4          A.     No, no, I did not.

5          Q.     I'll represent to you that on the

6     call, Mr. Varley said, and I quote, "What we

7     have taken is a portfolio of trading assets and

8     liabilities that are first of all derisked, and

9     secondly, those that need to support the ongoing

10    parts of the business that we have acquired."

11               Is it Barclays' understanding that

12    that was a true and correct statement?

13               MR. STERN:  I am going to object.  I

14          think you can ask your questions however you

15          want, Bill, but I think in fairness to the

16          witness, if you are going to quote from

17          something, he should be allowed to review

18          it.

19               But subject to that, if you can

20          answer.

21          A.     I've no reason to believe that what

22    Mr. Varley may have said was inaccurate.  I

23    haven't spoken to Mr. Varley about that or

24    indeed any portion of his involvement in order

25    to prepare for this deposition.

Page 125

1                          J. HUGHES

2      that collateral.

3              I believe there were many, many

4      communications from the OCC and indeed back from

5      the trustee that record that understanding among

6      those parties, that all of that collateral, in

7      whatever form, was to go to Barclays.  I believe

8      that what was ultimately signed -- sorry, the

9      terms ultimately signed and encapsulated in the

10     transfer and assumption agreement not only did

11     establish the agreement for the transfer of all

12     of that margin, but was consistent with the

13     broader agreement that had already been reached

14     among the parties and which everybody at that

15     point plainly was aware of.

16             So the TAA, as you described it, was

17     at a slightly greater level of detail than had

18     been mentioned in the APA, but was entirely

19     consistent with it, and I think was, as it

20     related to the OCC, the effective document that

21     it needed to properly transfer collateral that

22     was previously with LBI in connection with

23     its -- held by LBI in connection with its

24     business as an FCM to Barclays.

25          Q.    Did the TAA add any assets that

Page 126

1                               J. HUGHES

2       were -- to the sale that Barclays was taking?

3                    MR. STERN:   I am going to instruct the

4           witness not to answer this, because again,

5           you're calling for an interpretation of the

6           TAA.   Your 30(b)(6) topic calls for

7           information concerning the negotiation and

8           drafting of the TAA.   I don't believe it

9           calls for interpretation of the TAA.

10                   So I'll instruct you not to answer.

11                   If you want to ask him questions about

12          the course of the negotiation and drafting

13          of that document, that's fine.

14          Q.      In entering into the TAA, did Barclays

15      intend to obtain any assets that it was not

16      already obtaining under the APA?

17          A.      I think in discussing through its

18      representatives the terms of the APA, Barclays'

19      intention was to insure that there was nothing

20      in that agreement inconsistent with the

21      acquisition of the business that it had already

22      agreed to acquire.   And I think that best

23      describes Barclays' intention at the time.

24          Q.      So I guess I'm still trying to

25      understand, when entering into it, did Barclays

Page 127

1                          J. HUGHES

2    intend that there were any assets that it would

3    get at the OCC that Lehman had at the OCC that

4    Barclays was not already acquiring under the

5    APA?

6              MR. STERN:  I think again this calls

7         for an interpretation of both the APA and

8         the TAA.  So I am going instruct the witness

9         not to answer.

10             If you ask him questions about

11        communications and negotiations concerning

12        the TAA, that I think is consistent with

13        your 30(b)(6) topic number 20.

14        Q.    And I take it you're following your

15   counsel's advice?

16        A.    Yes.

17        Q.    Is Barclays aware of any disclosure

18   that Barclays made to the creditors committee

19   concerning the amount of margin that was being

20   transferred to Barclays as a result of the sale?

21        A.    I'm not aware of actual disclosures by

22   Barclays to the creditors committee to that

23   effect.  It is possible, though I don't know

24   with any certainty, that representatives of the

25   creditors committee were involved in or part of,

Page 128

1                          J. HUGHES

2      participated in or were present at discussions

3      during the closing weekend relating to margin or

4      collateral held in connection with the

5      derivatives business.

6              But I am not aware of any specific

7      communication, as I said, of the type you

8      described.  Nor indeed have I asked that

9      question in preparing for today.

10         Q.    Are you aware of any such disclosure

11     to the trustee?

12         A.    When you say such disclosure, will you

13     do me the favor of repeating how you define

14     disclosure?

15         Q.    Any disclosure by Barclays of the

16     amount of margin that was being conveyed to

17     Barclays under the sale?

18         A.    And to what time period are you

19     referring?

20         Q.    This is anytime prior to the closing.

21         A.    It's possible that there were

22     communications referring to valuations, but I'm

23     not aware that Barclays made any representation

24     to anybody about how much margin there may have

25     been or in what form it may have -- or what form

Page 129

1                          J. HUGHES

2      it may have taken, because I don't think at that

3      point Barclays was able to establish precisely

4      either the total or the form.

5              I should also say, that given what I

6      have already said about what would be

7      surprising, indeed shocking, about the transfer

8      of the business that did not include all of the

9      margin in whatever form, that it wouldn't then I

10     think have appeared as a likely important part

11     of the discussion.

12             But it is possible that there were

13     estimations of related values that had been

14     provided by Lehman during the course of the

15     week.  It's possible that there had been, you

16     know, discussion with respect to those values,

17     possible that the trustee was involved in or

18     had -- had sight of some of those estimations of

19     value.

20             But again, I think in common with all

21     other valuations, not only were they, as I have

22     said I think a number of times, extremely

23     uncertain, they were also, again as I have said

24     many times, provided by Lehman, and they weren't

25     Barclays' numbers and Barclays' estimations.

Page 130

1                           J. HUGHES

2          Q.     I'll show you a document previously

3     marked as Exhibit 19.  So you will see on both

4     the assets and the liability side the term

5     "derivatives" appears.

6          A.     Yes.

7          Q.     In each case, the same number applies,

8     which is 4 and a half billion dollars.

9          A.     Yes.

10         Q.     Did that number include, either

11    column, any margin?

12         A.     I don't know.

13         Q.     Have you done anything to check

14    whether that was the case?

15         A.     No.

16         Q.     If you wanted to determine whether

17    this 4 and a half billion dollar number includes

18    margin, who would you turn to?

19         A.     I'm tempted to make a joke, but I

20    won't.

21                I really don't know, because I don't

22    know who -- I don't know who composed this

23    document.  I believe it is a document that was

24    produced, put together and produced at some

25    point by somebody at Lehman Brothers, but I