Page 240

1

2                    UNITED STATES BANKRUPTCY COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5        In Re:

6                                   Chapter 11

7        LEHMAN BROTHERS         Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al,    (Jointly Administered)

9                    Debtors.

10       ------------------------x

11

12               DEPOSITION OF JONATHAN HUGHES

13                    New York, New York

14                    February 4, 2010

15

16       Reported by:

17       MARY F. BOWMAN, RPR, CRR

18       JOB NO. 27335

19

20

21

22

23

24

25

Page 241

1

2

3

4

5                    February 4, 2010

6                      9:40 a.m.

7            Deposition of JONATHAN HUGHES, held at

8       the offices of Jones Day, LLP, 222 East 41st

9       Street, New York, New York, before Mary F.

10      Bowman, a Registered Professional Reporter,

11      Certified Realtime Reporter, and Notary Public

12      of the State of New York and New Jersey.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 256

J. HUGHES

1    contract provision.  So I am going to

2    instruct you not to answer this.

3          MR. GAFFEY:  You didn't instruct him

4    not to answer the last one, Jack.

5          MR. STERN:  Let's go forward and see

6    what you're trying to accomplish.

7          MR. GAFFEY:  What I am trying to

8    accomplish is to find out whether the last

9    answer, which you did not instruct him not

10   to answer, also applies to Cleary Gottlieb.

11   That's what I am trying to find out.

12         MR. STERN:  Is there another question?

13   Q.    Were the standards that governed

14   Cleary's activities under 7.2 any different from

15   the standards that applied to Mr. Klein?

16         MR. STERN:  Can you answer that

17   without interpreting the contract?

18   A.       Without seeking to interpret the

19   contract, Cleary Gottlieb had authority to

20   represent Barclays at the time.  Whether or not

21   it -- any representative of Cleary Gottlieb

22   discussed with others any aspect of the

23   transaction at that particular point in time, I

24   don't know.

Page 257

1                               J. HUGHES

2          Q.    So you don't know if Lindsee Granfield

3     or anyone else from Cleary Gottlieb spoke to

4     anyone assembled in the courtroom during the

5     off-the-record portion of the day about the

6     transaction?

7          A.    I don't know --

8                MR. STERN:  Anyone includes Lehman

9          representatives?

10         Q.    Do you understand the question?

11         A.    I do understand the question.  I

12    think -- I don't recall whether Lindsee

13    Granfield spoke to anybody.  I'm not aware that

14    any other representative of Cleary Gottlieb did

15    speak to anybody at the time.

16         Q.    All right, fine.  So I just want to

17    push a bit for Barclays' best knowledge of who

18    was speaking to who during this off-the-record

19    discussion.

20               Ms. Fife spoke to some people about

21    changes in the transaction, correct?

22         A.    I believe so, yeah.

23         Q.    And did Mr. Miller speak to people

24    about changes in the transaction?

25         A.    I don't know the answer to that.

Page 258

1                          J. HUGHES

2        Q.    Did anyone from Cleary Gottlieb speak

3   to people about changes in the transaction?

4        A.    I think I just said, I don't now

5   recall whether Lindsee Granfield did.  I'm not

6   aware whether anybody else at Cleary Gottlieb

7   did.  I believe there were other people present

8   who were not members of Cleary Gottlieb or

9   representatives of Barclays but were

10  representatives of Lehman Brothers who may also

11  have spoken to people at the time.

12           But as I said a little while ago, the

13  recollections of the people from Barclays who

14  were present are not really sufficiently clear

15  for me to be able to tell you what was said by

16  whom during that recess.

17       Q.    So is Barclays able to say whether

18  anyone said anything in the off-the-record

19  session that was different or additional to what

20  Ms. Fife said on the record about the changes in

21  the transaction?

22       A.    Again, as I said earlier, the

23  recollections of the people present from

24  Barclays are not detailed, but generally

25  consistent in the sense that their recollections

Page 259

1                          J. HUGHES

2       of what was said during the recess was roughly

3       consistent with what was said subsequently on

4       the record.

5          Q.    Another topic that you testified in

6       about in the earlier session of your deposition

7       covered at some length the inclusion of assets

8       in the clearance box, 15c3 assets, as well -- I

9       identify that just for sort of so we can be a

10      little efficient just moving into the topic.

11             At one point, at several points, you

12      expressed in your prior deposition some

13      disagreement with the use of the term

14      "additional assets" with regard to the clearance

15      box assets, 15c3 and exchange-traded

16      derivatives.  Do you recall that?

17             MR. STERN:  Objection to the form.

18         A.    I don't recall using that particular

19      language.  I do recall that I testified

20      previously that the transaction, both in

21      concept -- let me start again.

22             The transaction, at its commencement,

23      during all of the negotiations, and in its

24      description to the court, was a sale and

25      purchase of the business.  That term "business"

Page 260

1                           J. HUGHES

2      was defined in the APA and it was to include all

3      of the assets except to the extent they were

4      excluded.  And that being the case, any of the

5      assets that were used in the business of Lehman

6      Brothers North America were assets that were

7      going to be sold and purchased in the

8      transaction.

9                So to that extent, if there was a

10     reference to a particular asset that was already

11     in the business, then I think -- then in those

12     circumstances, I think your question or your

13     preface would be accurate.

14          Q.    So would it be accurate to say that

15     there were additional categories of securities

16     and other assets set forth in the clarification

17     letter?  Would that be an accurate statement?

18                MR. STERN:  Objection.

19          A.    No.

20          Q.    Would it be accurate to say that the

21     clarification letter amended the APA?

22          A.    I would not say that it amended the

23     APA.  I would say that it clarified certain

24     aspects of the APA, but it didn't -- it didn't

25     amend the deal.

Page 261

1                          J. HUGHES

2        Q.    So that would be an inaccurate

3    statement to describe the clarification letter

4    as having amended the APA?

5              MR. STERN:  Objection to the form.

6        A.    I don't think I said that either.  I

7    think I said I wouldn't describe it in that way.

8    It may be I'd have to look again at the actual

9    language used in the clarification letter to see

10   if it was so -- if that term was used.

11             But substantively, it was a negotiated

12   method of describing changes during the course

13   of the week that needed to be documented.  Those

14   changes were to different aspects of the

15   transaction, but not to the essence of the sale

16   and purchase.

17       Q.    So isn't it a fact that the reason the

18   clearance box, 15c3 and other assets were

19   included in the clarification letter was because

20   LBI said it was unable to deliver to Barclays

21   assets that were originally intended to be sold

22   under the APA?

23       A.    I -- well, there are a number of

24   aspects to your question which are -- are not

25   described in the way that I would describe them.

Page 275

1                              J. HUGHES

2      as the Barclays repurchase agreement."

3                Do you see that?

4      A.    I do see that.

5      Q.    Is that an accurate description of the

6      repurchase agreement?

7      A.    I don't think it is describing the

8      repurchase agreement.

9      Q.    Well, --

10     A.    It is referring to the repurchase

11     agreement.

12     Q.    Take a look if you would at -- keep

13     your finger on page 5, but go back to page 1 of

14     the clarification agreement.

15     A.    Yup.

16     Q.    And you see in paragraph 1A(ii), a

17     reference to the Barclays repurchase agreement,

18     "as defined below."  Do you see that?

19     A.    I do see that language, yes.

20     Q.    Now, go back to paragraph 13.  Take

21     the time you need to go back through the letter,

22     but go back to paragraph 13 and tell me, please,

23     whether the definition below that's referred to

24     in paragraph 1 is the definition found in

25     paragraph 13 where the phrase "Barclays

Page 276

1                          J. HUGHES

2       repurchase agreement" is in quotes and

3       underlined.

4              MR. STERN:  Objection.

5          Q.    Is that the definition of the Barclays

6       repurchase agreement?

7              MR. STERN:  Objection to the form.

8          A.    I think that the expression used in

9       paragraph 1A(ii) then leads you to the same

10      defined term.  Does that describe all of the

11      relevant terms of what is here referred to as

12      the Barclays repurchase agreement?  I don't

13      think it does because there is a lot of other

14      documents that define what that repurchase

15      agreement actually was.

16         Q.    OK, fair point.  At its elemental

17      level, in referring to paragraph 13, was the

18      repurchase agreement an agreement between

19      Barclays as purchaser and LBI?

20             MR. STERN:  Now we are getting into a

21             topic -- you can answer this, but we have

22             not designated Mr. Hughes as a witness on

23             topics relating to the repurchase agreement.

24             If you are asking in relation to the

25             clarification letter, I think you can answer

Page 277

1                          J. HUGHES

2       that.

3               So do you need to hear the question

4       again.

5               (Record read)

6               MR. STERN:  Objection to the form.

7       A.      The repurchase agreement was between

8    LBI and Barclays, but there were other parties

9    to the repurchase agreement.

10      Q.      For example, Bank of New York as

11   collateral agent, correct?

12              MR. STERN:  Objection to the form.

13      A.      Bank of New York did act as a

14   collateral agent.  JP Morgan also had acted

15   previously as a collateral agent.

16      Q.      The Barclays repurchase agreement

17   referred to in paragraph 13 included Bank of New

18   York -- I will get to JP Morgan, but let me put

19   my question.  The Barclays repurchase agreement

20   referred to in paragraph 13 included Bank of New

21   York as collateral agent, yes?

22      A.      Bank of New York acted as a collateral

23   agent for Barclays in the sense that as

24   securities were transferred by LBI, using JP

25   Morgan which held the collateral, those

1                      J. HUGHES

2    transfers were made to Barclays and Bank of New

3    York was to hold the collateral for Barclays.

4        Q.    Earlier in the week when there had

5    been the Fed repo, JP Morgan had been collateral

6    agent in the Lehman Fed repurchase agreement,

7    correct?

8        A.    That's correct.

9        Q.    When the assets in that Fed repo were

10   transferred into the Barclays repo, it was a

11   repo between Barclays, LBI and Bank of New York

12   as the collateral agent, is that what you are

13   describing?

14            MR. STERN:  Objection to the form.

15       A.    No, what I am trying to describe for

16   you, the role that Bank of New York played.

17   Bank of New York held the collateral for

18   Barclays after it had been transferred by LBI

19   through JP Morgan to Barclays.

20       Q.    And Bank of New York held the

21   collateral as Barclays' agent, correct?

22       A.    Yes.

23       Q.    Now, the clarification letter in

24   paragraph 1 changes the definition of purchased

25   assets from the definition contained in the

Page 279

```
 1                      J. HUGHES
 2    original asset purchase agreement, is that
 3    correct?
 4              MR. STERN:  You can take a look at the
 5       original.
 6       A.    Could you repeat your question.
 7       Q.    Paragraph 1 of the clarification
 8    letter changes the definition of "purchased
 9    assets" from the definition in the asset
10    purchase agreement, isn't that right?
11       A.    I don't think it is right to say that.
12    I think it identifies different assets that,
13    when compared to the original APA, described
14    different assets that are included within the
15    definition and also identifies certain assets
16    previously included in the definition were no
17    longer included within the definition.
18              But I think the definition is not
19    altered.
20       Q.    Would you take a look at the first,
21    introductory paragraph of the clarification
22    letter if you would.  And in particular, read
23    through to yourself, please, the penultimate
24    sentence in that paragraph beginning this letter
25    agreement.
```

Page 300

1                              J. HUGHES

2      included within those references.  Whether, in

3      fact, they were intended to be so included, I

4      don't know.  But just reading the document

5      today --

6           Q.    The words "repurchase agreement"

7      appear in there, yes?

8           A.    The words appear there, but also I

9      think in substance, it's referring -- because it

10     in part refers to securities that are owned by

11     LBI, then the repo securities would, I think

12     come within that description.

13          Q.    And further up in that paragraph,

14     above the use of the word "repo," it refers to

15     the -- to long positions.  Do you see that?

16     That's just for point of reference in the

17     document.

18          A.    I do.  I did read "long positions,"

19     yes.  I can't find it now but I did read it.

20          Q.    It says, "It being understood the long

21     positions referred to in clause D of purchased

22     asset does not have a book value of

23     approximately 70 million."  Do you see that?

24          A.    I see that, yes.

25          Q.    Does this refresh your recollection,

Page 301

1                      J. HUGHES

2   Barclays' recollection as to whether by 5 p.m.

3   on Friday -- withdrawn.

4              Is it a fact that at or around 5

5   o'clock in the evening on Friday the 19th, the

6   parties are still talking about the long

7   positions as they were originally referred to in

8   the asset purchase agreement?

9              MR. STERN:  Objection to the form.

10       You really need to read the whole black

11       line.

12       A.    Well, I don't think it does reflect

13   that, no.  I think what it reflects is that

14   whoever was wielding the pen in that particular

15   moment thought to refer to long positions.  By

16   that time, the parties I believe had already

17   agreed that the aspect of the transaction that

18   the phrase "long positions" refers to was no

19   longer relevant to the agreement, and by that

20   time, it had already been agreed between the

21   parties that the securities that formed part of

22   the repo would be transferred or were -- let me

23   say it again, were already identified as being

24   transferred within the sale.

25              But the fact that there is a reference

Page 302

1                          J. HUGHES

2    to long positions in this document doesn't

3    necessarily reflect the actual agreement of the

4    parties at that time.

5              Again, the -- as you were good enough

6    to acknowledge, things are moving apace.  It

7    was, I believe, quite difficult for the lawyers

8    drafting documents to be at one precise same

9    point in time as the negotiators acting on

10   behalf of Barclays and Lehman.  Naturally, they

11   were doing their best to reflect at any one

12   point in time what they thought was then the

13   agreement.  Thankfully one has a closing so at

14   some point, one gets the time when things are at

15   the same place.

16        Q.    In a 363 sale, you also get to the

17   point where you need the judge's approval?  I

18   mean, that comes before the closing?

19              MR. STERN:  Objection to the form.

20        You are asking a legal opinion.

21        Q.    Withdrawn.

22              Do you know if the agreement,

23   regardless of the drafting, the state of the

24   drafting at the time, do you know if the

25   agreement to identify assets included in the

Page 303

1                         J. HUGHES

2    Barclays repurchase agreement had been made

3    before the end of the sale hearing?

4         A.    I think they had, yes. Not least

5    because they were assets used in the business

6    and the business, as we have previously

7    discussed, had been identified.

8         Q.    Let me show you, Mr. Hughes, what has

9    previously been marked as Deposition Exhibit 36

10   and ask you please to turn to -- the Bates

11   numbers are cut off on my copy.  So I am going

12   to have to ask you to turn again to the first

13   page through to the first black line page in

14   that document.  Are you there?

15        A.    I am.

16        Q.    And again, I want to go to the portion

17   of the letter that discusses purchased assets,

18   that's paragraph 1?

19        A.    Yup.

20        Q.    Again, in the interest of efficiency,

21   let me tell you what I want to know and then I

22   will put a question to you, all right?  You will

23   see, as you look to the black line, that

24   reference we saw in Exhibit 35 to the long

25   positions and book value is black lined out, and

Page 304

J. HUGHES

1

2    what has been inserted here is a reference to,

3    among other things, is a reference to the

4    securities in the Barclays repurchase agreement.

5    Do you see where we are?

6        A.    No.

7        Q.    Take a look at 1A(ii) on the black

8    line.  And you will see inserted in there, the

9    phrase "plus the securities owned by LBI and

10   either, A, pledged to purchaser or affiliates

11   under the Barclays prepurchase agreement as

12   defined above as specified in the schedule

13   previously delivered by seller to purchaser or

14   affiliates or," and then there is more language.

15   Do you see that piece?

16       A.    I do see that piece.

17       Q.    Would you over leaf to the next page,

18   the black line, you see what that language

19   substitutes for is the provision we were

20   discussing a moment ago referring to the long

21   positions in the prior draft.

22       A.    Well, whether it substitutes or not, I

23   don't know.  Some of the language that you

24   referred to in Exhibit 35 has been deleted.

25   That, I agree with.

Page 305

1                          J. HUGHES

2          Q.    Now, if you would look at the cover

3    page of the entire document, you will see it is

4    an e-mail from Robert Messineo at Weil, sent

5    Saturday, September 20 at 2:39 p.m.  Do you see

6    that?

7          A.    That's what the cover sheet says, yes.

8          Q.    Does Barclays have any knowledge as to

9    whether the language concerning securities

10   contained in the repurchase agreement was put in

11   any draft of the clarification letter prior to

12   the time reflected on this e-mail?

13         A.    Well, --

14         Q.    Let me withdraw that and try to be a

15   little plainer and I can move on to the next

16   topic.  There are a series of clarification

17   letters.  I will represent to you this is the

18   first time we have seen in any clarification

19   letters that we have seen the use of that

20   particular language about the securities in the

21   repo.

22              MR. STERN:  Except that you have a

23         previous draft that refers to an Exhibit A,

24         so I'm not exactly sure.

25              MR. GAFFEY:  I will do it the long

1                         J. HUGHES

2     might be coming with the transaction, but the

3     precise moments during the course of the week

4     when those agreements were finally reached, I

5     couldn't tell you exactly.

6          Q.    Put those aside.  Thank you.  Mark

7     that please.

8               (Exhibit 582B, Objection of Barclays

9          Capital to Motion by Official Committee of

10         Unsecured Creditors marked for

11         identification, as of this date.)

12         Q.    Mr. Hughes, I have put before you what

13    we have marked as deposition Exhibit 582B.  It

14    is the objection of Barclays Capital to Motion

15    by Official Committee of Unsecured Creditors of

16    Lehman Brothers Holdings Inc., et al., pursuant

17    to 11 USC Section 105(a) and Hague Convention

18    (28 USC, Section 1781) filed by Barclays'

19    counsel on or around December 7, 2009.  And I

20    would like you to turn your attention if you

21    would to -- you ought to read paragraphs 1 and

22    the beginning of paragraph 2.  I want you to

23    have 1 for context and my questions will be

24    about paragraph 2.

25              Let me know when you have had a chance

Page 329

1                    J. HUGHES

2   to read through those two paragraphs, please.

3        A.    I've read through to the end of

4   paragraph 2.

5        Q.    OK.  The statement within paragraph 2

6   that says as follows, "In fact, this court was

7   never told that the transaction necessarily

8   would be flat with assets perfectly equal to

9   liabilities.  Rather, the information given to

10  this court made clear that:  A, Barclays would

11  pay 250 million plus the appraised value of the

12  real estate to acquire all assets used in the

13  business for which no total valuation was given

14  in the contract or otherwise."  Do you see that

15  clause or that phrase?

16       A.    I do.

17       Q.    Now, what information was given to the

18  court, was disclosed to the court that made

19  clear that Barclays was paying 250 million plus

20  the appraised value of the real estate to

21  acquire all assets used in the business?  Let me

22  withdraw that question.

23            Is it Barclays' view that it paid 2 --

24  that it was obligated to pay 250 million plus

25  the value of the real estate to acquire all

Page 330

1                          J. HUGHES

2      assets used in the business irrespective of the

3      value of the assets?

4                  MR. STERN:  Objection to the form.

5          A.      Could you repeat the question?

6          Q.      Is it Barclays' view that it paid 250

7      million, it was obligated to pay 250 million

8      plus the value of the real estate to acquire all

9      assets used in the business, irrespective of the

10     value of the assets?

11                 MR. STERN:  Objection to the form.

12         A.      I think it is Barclays' position that

13     we promulgated to give those things and --

14     together with giving up the 45 million of cash

15     repo and together with taking on certain

16     liabilities, and in return for that, Barclays

17     was to receive all of the assets used in the

18     business and at no point did anybody ever reach

19     an actual valuation with respect to those

20     assets.

21                 So to that extent, there was a -- the

22     actual valuation of the assets was not, at the

23     end of the day, I wouldn't say it wasn't

24     relevant, but it was not determinative of the

25     transaction.

Page 331

1                              J. HUGHES

2              In other words, because nobody had the

3      ability to finally determine the valuation of

4      each and every asset used in the business, it

5      was nevertheless understood that each of those

6      assets would be transferred.  So to that extent,

7      the assets were to be transferred irrespective

8      of that value.

9              I should --

10             MR. STERN:  There is no question,

11         there is no question.

12         Q.    Is there anything you wanted to add?

13         A.    I just want to add one thing to that;

14     that is, that I believe that that was also the

15     understanding of the advisors to Lehman Brothers

16     and I believe that that is actually the

17     testimony of the advisors to Lehman Brothers.

18         Q.    So back to Barclays' view as opposed

19     to other people's testimony, Barclays' view, it

20     was Barclays' view that the court -- is it

21     Barclays' testimony that the court was told that

22     all the assets in Lehman's business, except

23     excluded assets, would be transferred to

24     Barclays regardless of what they were worth?

25             MR. STERN:  Objection to the form.

Page 332

1                    J. HUGHES

2          You can answer.

3      A.    I think that the court was told that

4   all of the assets used in the business were to

5   be transferred and I think the court was also

6   told that it was not feasible to give a value

7   with respect to those assets.  It was also --

8   the court was also told that it was wrong to

9   await valuations for each and every one of those

10  assets prior to making the final sale order.

11          And I believe the court was given from

12  time to time estimations of value with respect

13  to certain assets and certain liabilities and

14  the court made its ruling having heard all of

15  those things.

16     Q.    Did the estimations you referred to

17  make clear to the court that the estimated value

18  of the financial assets Barclays was acquiring

19  would exceed the estimated value of the

20  liabilities associated with those assets?

21     A.    I don't know whether the court

22  conducted a detailed, mathematical analysis at

23  that point in time.

24          I do believe the court was told that

25  all valuations were estimates.  I believe the

Page 333

1                        J. HUGHES

2    court also heard objections which were plain in

3    suggesting that Barclays was gaining more assets

4    than it should gain and more assets than,

5    therefore, the liabilities were that it was

6    taking on.  And that the court rejected those

7    objections.  From that I conclude -- not what

8    the court concludes -- but I concluded that the

9    court was told that it was possible that the

10   assets would exceed liabilities.

11        Indeed, it is also I think correct to

12   say that Barclays' view that there would be a

13   greater number of assets acquired than

14   liabilities was a matter of public record, at

15   least two days prior to that sale hearing.  And

16   I think that it was therefore apparent or

17   capable of being apparent to everybody in the

18   court that that was the case.

19        Q.    Now, other than the objection, the

20   objections that you referred to, was -- and

21   these matters of public record, was there any

22   other information that would have made clear to

23   the court that the estimated value of the

24   financial estimates Barclays was acquiring would

25   exceed the estimated value of the liabilities of

Page 334

1                            J. HUGHES

2       those assets, other than the objections and the

3       public record?

4                  MR. STERN:  Objection to the form.

5              Asked and answered.

6                  You can answer again.

7       A.    Again, I believe there was sufficient

8       information presented by Weil Gotshal to the

9       court with respect to both assets and

10      liabilities from which the court could reach the

11      conclusion that you described.

12                 Whether, in fact, the court exercised

13      or engaged in that mathematical exercise, again,

14      I can't say.

15      Q.    And what are you specifically

16      referring to when you refer to the information

17      that Weil Gotshal supplied?  I am talking about

18      the statements made at the hearing on the 17th

19      and the 19th --

20      A.    In part, yes.

21      Q.    And the contents of the sale motion?

22      A.    In part, yes.

23      Q.    Anything else?

24      A.    When you say contents of the sale

25      motion, what would you include in that?

Page 335

1                          J. HUGHES

2          Q.     The written motion that Lehman filed

3     on Wednesday the 17th.

4          A.     I'm not sure of the full content of

5     that was to be honest with you.

6          Q.     I'm really only looking for sources.

7     There is the written motion, there is the

8     hearing on the 17th, there is the hearing on the

9     19th.  Other than those three possible sources,

10    do you know of any other source where Weil

11    Gotshal would have given that information to the

12    court?

13         A.     I think there were other

14    representations made to the court after the 19th

15    which, in Barclays' view, evidence what was

16    plain at the time of the hearing.

17         Q.     When did that take place?  You are

18    referring to the December settlement hearings?

19         A.     I'm referring to the clarification

20    letter.  I'm referring to the subsequent

21    proceedings before the court, including the

22    December JP Morgan settlement hearing, the Bay

23    Harbor proceedings, and the like.

24         Q.     Prior to the issuance of the sale

25    order, let's use that point.  Apart from the

1                          J. HUGHES

2        issuance of the sale order?

3                   MR. STERN:  Objection to the form.

4                   You can answer.

5                   Can you read the question again.

6                   (Record read)

7        A.    I think there were aspects of the

8        press release and the call with analysts that

9        covered the same topic -- some of the same

10       topics that were also covered during

11       presentations to the court.

12                  Whether the descriptions matched or

13       were directly similar, I couldn't say without

14       comparing the two.

15       Q.    Mr. Hughes, I am putting before you

16       the press release, a press release which

17       previously has been marked as Exhibit 344A.  Is

18       that the press release that you are referring

19       to?

20       A.    It looks like it, yeah.

21       Q.    Can you tell me where in that press

22       release I would find the information that would

23       inform me that the estimated value of the

24       financial assets Barclays was acquiring would

25       exceed the estimated value of the liabilities

Page 339

1                          J. HUGHES

2       associated with those assets?

3           A.    I should preface my answer by saying

4       this press release, because it was dated 17th of

5       September, referred to aspects of the

6       transaction which were different on September 17

7       as compared to later in the week.

8           Q.    Just let me follow up on that a little

9       bit.  Did that change over the week?  Did

10      whether or not Barclays would receive assets

11      that exceeded the estimated value of the

12      liabilities associated with those assets, did

13      that concept change in between the signing of

14      the APA on the 16th and the sale hearing?

15          A.    The concept did not change.  How the

16      difference was made up ultimately did change

17      because it was described earlier in the week by

18      reference to certain portions of the transaction

19      and later in the week, it was described by

20      reference to different portions of the

21      transaction.  But the concept of there being a

22      difference between assets and liabilities never

23      changed.

24          Q.    The concept of the gain for Barclays

25      never changed?

1                        J. HUGHES

2        A.    Correct.

3        Q.    Let me go back to the press release.

4    Could you tell me where in the press release I

5    find the information that gives me notification

6    of the concept that there would be a gain for

7    Barclays in the transaction?

8        A.    There is reference to, in paragraph 2,

9    to the acquisition of trading assets with a then

10   estimated value of approximately 72 billion

11   dollars.  And liabilities with a then-estimated

12   value of approximately 68 billion dollars.

13            There are then references to other

14   assets and other payments and other features of

15   the then intended transaction which I think made

16   plain that the amount of assets acquired would

17   be greater than the amount of liabilities

18   acquired.

19       Q.    And that --

20       A.    So hopefully that answers the

21   question.  Does it specifically state language

22   in the terms of your question, no.  But it is

23   clear larger amounts of assets were to be

24   acquired than liabilities.

25       Q.    And anyplace else other than that

1                          J. HUGHES

2       section --

3                   MR. STERN:  Objection to the form.

4          Q.     -- from which the fact or inference

5       can be made of a gain for Barclays?

6                   MR. STERN:  Objection to the form.

7          A.     Well, I think I would include the

8       other aspects of my prior answer because I think

9       one has to take the whole of the -- whole of the

10      statement to fully understand what the intention

11      then was to be expressed.

12         Q.     And the delta between assets and

13      liabilities that's described in paragraph 2 of

14      the press release, does that take into account

15      the assumption of liabilities by Barclays for

16      compensation and cure?

17         A.     I don't know whether those specific

18      numbers then included estimates for comp and

19      cure, nor do I know whether it included then all

20      of the assets.  I think -- it is hard for me to

21      recall that, not least because, as I think you

22      know, the transaction that was being described

23      in this statement is -- it includes

24      descriptions, which as I said earlier, are very

25      different, very different from the description

Page 342

1                           J. HUGHES

2       that is ultimately or that describe the ultimate

3       transaction.

4               So what was specifically included or

5       intended to be included at this point, I

6       couldn't say exactly.

7          Q.    So if Judge Peck had seen this press

8       release by the time of the sale hearing, it

9       wouldn't be describing the deal before him

10      anyway, is that right?

11              MR. STERN:  Objection to the form.

12         A.    There would be aspects of the

13      transaction that had changed and some of those

14      aspects I believe were described, though I

15      believe not all of the aspects or all of the

16      changes were described.  But as we -- as I

17      previously said in answer to one of your earlier

18      questions, the concept of Barclays deriving a

19      gain on the transaction did not change.

20              It was never Barclays' intention to do

21      a transaction other than one which yielded a

22      gain and I believe it was apparent to --

23      throughout the discussions that that would be

24      the outcome.

25              I don't think -- I mean, this series

Page 343

1                          J. HUGHES

2      of questions you prefaced with a reference to an

3      earlier exhibit, there was mention of the word

4      "flat."  At no point in time was there ever

5      discussion that a transaction would be flat,

6      that there would be any match between assets and

7      liabilities.  That was never a portion of the

8      discussion ever.

9          Q.    By discussion, you mean discussion

10     with the court?

11         A.    I mean with anybody.

12         Q.    Let's focus in on the court.  Was

13     there ever a discussion with the court to that

14     effect?

15         A.    That would be flat, no.

16         Q.    Was there ever discussion with the

17     court that there would be a day one gain for

18     Barclays?

19              MR. STERN:  Objection to the form.

20         A.    I didn't recall anybody using that

21     specific expression, but as I said earlier, it

22     was clear to the court that all of the assets in

23     the business were to be transferred.  What there

24     were -- there were strident objections made

25     during the course of the hearing that Barclays

Page 344

1                       J. HUGHES

2      was getting a windfall, that the transaction

3      shouldn't be finalized while some documentation

4      with respect to it remained outstanding, and the

.5     court rejected those objections as we have also

6      discussed earlier.

7              What was actually presented to the

8      court was the result of the, you know, the

9      judgment of Weil Gotshal and they described what

10     they felt was relevant to be described.  So my

11     belief is the court did know and understand what

12     it needed to understand to reach the conclusion

13     it reached.

14        Q.    Is it your view that the court knew

15     that Barclays was going to make a gain on day

16     one?

17              MR. STERN:  Objection to the form,

18         asked and answered.

19              You can answer it again.

20        A.    I don't think I can say it differently

21     from what I have already said.  I don't know

22     what was in the court's mind specifically.

23              I can tell you what I have told you

24     about what I heard and what I believe was said

25     by reference to the transcript, by reference to

Page 345

1                    J. HUGHES

2    other documents that you also mentioned.

3        Q.    And that's by reference to the sale

4    motion, the two hearings, the press release and

5    the analyst call?

6              MR. STERN:   Objection, asked and

7         answered.

8        Q.    Anything else?

9              MR. STERN:   Objection, asked and

10        answered.

11       A.    I think I have answered the question.

12   The only part of it I think is worth repeating

13   is there were specific objections raised that

14   deal with your question, by which I mean there

15   were specific objections raised with the court

16   in which complainants suggested that Barclays

17   was getting much more by way of assets and value

18   than it was giving or taking on as liabilities.

19              The necessary implication of that was

20   that Barclays was to acquire more in assets than

21   it was giving up in liabilities, which would

22   necessarily yield some form of gain.  Whether

23   the court understood that to be an accounting

24   gain is a very different question and I don't

25   know whether the court made any judgment about

Page 346

1                         J. HUGHES

2    an accounting gain.

3         Q.    So there was enough information in

4    Barclays' view for the court to discern that

5    there was a gain for Barclays of some kind out

6    of the transaction, correct?

7              MR. STERN:  Objection to the form.

8              Let me hear the question again.

9              (Record read)

10        A.    I believe so.

11        Q.    Was there --

12        A.    Whether it is relevant or not, I don't

13   know.  Because as I say, the court was concerned

14   to approve the sale of a business as had been

15   described on, you know, I think in very clear

16   detail.

17        Q.    Was there enough information in

18   Barclays' view for the court to discern that the

19   Lehman assets being transferred in the sale of

20   the business were being transferred irrespective

21   of their value?

22        A.    I think I answered that question

23   earlier.

24        Q.    I'm not sure you did.  Could I ask you

25   for an answer to it here?  Was there enough

Page 347

1                           J. HUGHES

2      information in Barclays' view for the court to

3      discern that the Lehman assets being transferred

4      in the sale of the business were being

5      transferred irrespective of their value?

6                MR. STERN:  Objection, asked and

7           answered.

8           A.    I think the answer is yes, in the way

9      that I described earlier.

10               MR. STERN:  Let's take a short break

11          if we can.  I don't know if and when you are

12          planning to break for lunch.  I don't know

13          if it is soon.

14               MR. GAFFEY:  I couldn't promise you I

15          would be done before lunch.  Do you want to

16          eat now?

17               MR. STERN:  Let's take just a couple

18          minutes.

19               THE WITNESS:  I'm happy to take two

20          minutes.

21               (Recess)

22          Q.    In the brief that I showed you before,

23      Mr. Hughes, in paragraph 2, it is an Exhibit

24      582B.  The statements we have been talking about

25      are prefaced with the sentence, "In fact, this

1                          J. HUGHES

2        court was never told the transaction necessarily

3        would be flat with assets perfectly equal to

4        liabilities."

5               In Barclays' view is the concept of a

6        flat exchange of assets and liabilities

7        inconsistent with the existence of an accounting

8        gain?

9               MR. STERN:  I am going to object to

10           the form.

11              You can answer it if you understand

12           the question.

13       A.     I should certainly preface my answer

14       by saying I'm not an accountant and so I can't

15       give you an answer which is necessarily correct,

16       if the answer requires real accounting

17       knowledge.  With that proviso, I think the

18       answer is yes.

19              I should also add that it was an

20       imperative for Barclays in conducting this

21       transaction that there would be a sufficient

22       difference between the two, that Barclays would

23       yield a gain in order that it be a capital

24       accretive transaction.

25       Q.     It was imperative that a gain be in

Page 349

J. HUGHES

1
2   existence on the first day?

3       A.    Yes.

4       Q.    Was the fact of that imperative that

5   there be a first day gain for Barclays disclosed

6   to the court?

7       A.    Again, as I think I answered

8   previously, the court was told the detail

9   relevant to the transaction, that Harvey Miller

10  and his colleagues at Weil Gotshal understood

11  what were relevant and subsequently confirmed

12  were relevant to the court's assessment of the

13  transaction.

14      Q.    And apart from the judgment about what

15  was relevant or not, as a fact, was Barclays

16  aware --

17          MR. STERN:  I don't think he has

18      completed his answer.

19      Q.    I am sorry, did I interrupt you?

20          THE WITNESS:  I have.

21          MR. STERN:  You have?  I am sorry.

22      Q.    As a matter of fact, was the court

23  told that it was imperative for Barclays to make

24  a first day gain?

25      A.    Not that I am aware.

Page 350

1                         J. HUGHES

2        Q.    Was it a condition of the agreement

3    that Barclays make a first day gain?

4        A.    It was a precondition for Barclays.

5        Q.    Was that precondition embodied

6    anywhere in the asset purchase agreement or the

7    clarification letter?

8        A.    To the extent that it delivered --

9    those agreements delivered that gain, yes.

10       Q.    Was there a point where Barclays said

11   it would not close if it did not achieve a first

12   day gain?

13             MR. STERN:   Objection to the form.

14       A.    I don't think Barclays used that

15   expression, but Barclays did make it plain

16   during the course of the negotiations that

17   without being able to satisfy itself with

18   respect to the relative valuations of assets and

19   liabilities, it may well not close the

20   transaction.

21       Q.    Did Barclays allow that it would -- it

22   may well not close the transaction on Friday the

23   19th when it expressed its concern about the

24   value of the assets in the repo?

25       A.    Again, whether that specific language

Page 351

1                      J. HUGHES

2   was used, I don't know, but that was the -- that

3   was the intimation, yes.

4        Q.    And was it because Barclays expressed

5   its concern about insufficient value in the

6   assets that it was getting that 15c3 and

7   clearance box assets and exchange-traded

8   derivatives were added to the deal?

9             MR. STERN:  Objection to the form.

10       A.    I think I have already answered that

11  question at length.  Your grouping of

12  exchange-traded derivatives with clearance box

13  assets and 15c3 is entirely inappropriate.

14       Q.    Take the exchange-traded derivatives

15  out.  Just with respect to 15c3 and clearance

16  box assets?

17       A.    They were not added, as I have already

18  answered.

19       Q.    Were they identified in order to make

20  up a shortfall between what Barclays wanted and

21  what it thought it was going to get under the

22  transaction?

23       A.    I think I have answered that question,

24  too.

25       Q.    I don't think you have.  We have used

Page 369

1                          J. HUGHES

2           Did Barclays talk to FSA about whether

3      or not the sale transaction would result in a

4      gain for Barclays?

5      A.    I believe Barclays had discussions

6      with the FSA to inform the FSA about the detail

7      of the transaction, that the FSA would need to

8      draw its own conclusions about the impact of the

9      transaction for Barclays, as distinct from the

10     detail of the transaction itself and whether it

11     was a good transaction and whether it was going

12     to make Barclays money or not.

13           I believe that FSA's natural focus was

14     to understand the impact of the transaction on

15     Barclays as a whole given that its principal

16     role in that context is to regulate Barclays as

17     a banking institution.

18     Q.    So to that end, did Barclays provide

19     to the FSA copies of the asset purchase

20     agreement?

21     A.    I don't know which documents

22     specifically were given to the FSA.  I think

23     some documents were, I know were given to FSA.

24     Whether they included the asset purchase

25     agreement itself, I'm not sure.

Page 370

1                          J. HUGHES

2          Q.    Would your answer be the same with

3    respect to copies of the transcripts of the

4    hearings on the 17th and the 19th and the

5    clarification letter?

6          A.    By which do you mean -- I'm not sure

7    whether they were, in fact, given over, yes, the

8    answer would be the same.

9                MR. GAFFEY:   That is an area that we,

10               just on an instruction level, Jack, want to

11               deal with.   Chris Green sent us a list of

12               Bates numbers which purport to be the

13               documents responsive to the parties'

14               requests for communications with the FSA and

15               none of them include the deal documents

16               which is a question we would like to know,

17               if they were submitted.   So I would need a

18               witness or some follow-up on the document

19               basis.

20               MR. STERN:   We will check.

21               MR. GAFFEY:   Can we mark this please.

22               THE WITNESS:   Can I ask my counsel a

23               question.

24               MR. GAFFEY:   Sure.

25               (Exhibit 583B, document Bates stamped

1                         J. HUGHES

2       BCI-EX(S) 53519 through 25 marked for

3       identification, as of this date.)

4       Q.    Do you want to add anything or not?

5       A.    No.

6       Q.    Mr. Hughes, I've put before you a

7   document we have marked as deposition Exhibit

8   583B, bearing Bates numbers BCI EX(S) 00053519

9   through 53525.  And this appears, sir, to be an

10  e-mail from John Varley to the Hector Sants or

11  Santos?

12      A.    Sants.

13      Q.    Of FSA entitled "Press Release" and

14  attached is a copy of a press release we spoke

15  about a while ago.

16      A.    Yup.

17      Q.    Do you recognize it to be such?

18      A.    I do.

19      Q.    And for what reason did Barclays

20  submit the press release to Hector Sants of FSA?

21      A.    I'm not sure definitively, but there

22  are at least two reasons why I think it likely.

23  First of all, a release of this form would have

24  been required to have been shared with the FSA

25  by reason of U.S. regulations.

Page 372

1                          J. HUGHES

2          Q.    Simply because it is a press release?

3          A.    Yes, yes, in the sense that it

4    contains information which is of relevance to a

5    UK-regulated entity and statements made to the

6    public with respect to that are required to be

7    shared with the FSA.

8                Hector Sants is the chief executive of

9    the FSA, and I would imagine that in any event,

10   something of this level of interest would be

11   something that John Varley as the group chief

12   executive would likely also want to share with

13   Hector Sants in any event.  What, in fact, John

14   and Hector may have discussed at the time with

15   respect to this, I don't know.

16         Q.    Do you know if the transcript of the

17   analyst call we spoke about before was submitted

18   by Barclays to FSA?

19         A.    I don't know the answer to that.

20         Q.    Would the transcript, would a

21   transcript of an analyst call be a public

22   statement of the type that FSA would expect to

23   receive as Barclays regulator?

24         A.    I don't know the answer to that.  I

25   hesitate because I think I probably should know

1                    J. HUGHES

2    the answer to that because it is really a

3    question of English law and not a question of

4    anything else.

5            But I'm not sure that he would be

6    required in the same way as a press release

7    because by its nature, the transcript I think is

8    an internal document that is recording a public

9    event.  The public event would have been

10   available and -- but whether the transcript

11   would be required to be shared, I don't know.

12       Q.    That's the reason I ask, because when

13   we spoke about that before, you referred to two

14   public record events.  One was the press release

15   and the other was the analyst call.  So is the

16   analyst call sufficiently a public record event

17   that a record of it would need be submitted to

18   your regulator?

19       A.    I don't know that a record of the

20   event needs to be submitted.  It is, in fact, a

21   public event, so that typically, there is an

22   opportunity for a variety of people to dial in.

23   Whether there was, in fact, a need to disclose

24   any subsequent record of it, I couldn't tell

25   you.

1                          J. HUGHES

2          Q.    Let me back up a bit in time.  When

3   the access to the analyst call is published, how

4   is it published?

5          A.    My recollection of the basis upon

6   which these things are arranged is dim and

7   distant, so I couldn't tell you.

8          Q.    What I really want to know is how

9   would FSA know it could dial into the analyst's

10  call?

11         A.    Again, I don't know.

12         Q.    I'm afraid my English education takes

13  us as far as freeing Roman slaves so we would

14  have to defer to you.

15         A.    Apparently that was a good thing.

16              (Exhibit 584B, document Bates stamped

17         BCI EX(S) 23915 through 17 with attachment

18         marked for identification, as of this date.)

19         Q.    Mr. Hughes, I have put before you what

20  we have marked as Exhibit 583B.  The document

21  bearing Bates numbers BCI EX(S) 23 -- 584, beg

22  your pardon.

23              I put before you what we have marked

24  as 584B bearing Bates numbers BCI EX(S) 0023915

25  through 917 and then attached to it are two

Page 407

1                          J. HUGHES

2      correspondence -- to what correspondence were

3      you referring?

4          A.     Specifically to some e-mail exchanges

5      which were primarily directed from the OCC to

6      the trustee or from the OCC's external lawyers

7      to the trustee, the trustee's representatives

8      and a number of the other interested parties

9      which I believe were made available to either

10     representatives of the creditors committee or to

11     its advisors during the course of that weekend.

12              Again, as I said earlier, I couldn't

13     be absolutely sure that the creditors committee

14     did see those, but that was my understanding,

15     that they were made available at that time.

16         Q.     And when you say made available, do

17     you mean that they were initially distributed to

18     the committee or its representatives or somehow

19     otherwise made accessible to them?

20         A.     I think I mean the latter because I

21     don't know whether -- I can't recall now

22     whether, in fact, either representatives of the

23     committee or its advisors were included in the

24     e-mail chains that contained the information

25     that I am referring to.

1                          J. HUGHES

2          Q.    To be clear, Barclays does not have an

3    understanding of a specific meeting where the

4    creditors committee or its representatives were

5    present where the topic of exchange-traded

6    derivatives was discussed, is that correct?

7               MR. STERN:  Objection to the form.

8          You mean between Barclays the committee?

9          Q.    No, I mean a meeting involving Lehman,

10   Barclays -- a meeting involving Lehman or

11   Barclays where the committee was present.

12         A.    As I mentioned a moment ago, I believe

13   that the creditors committee or its

14   representatives or its external advisors were

15   present during most of the weekend and there

16   were, I think, discussions during the course of

17   that weekend relating to margin and the

18   exchange-traded derivatives.

19              I couldn't specify a particular moment

20   at which I could say either representatives of

21   the committee and Barclays or I should say or

22   advisors to the committee and Barclays were both

23   present and that specific topic was being

24   discussed.

25              I should add that while it is not a

Page 409

1                           J. HUGHES

2     discussion, there were agreements that were

3     shared during the course of that weekend among

4     interested parties that related to -- also to

5     these topics and my belief also were those

6     agreements were made available to the creditors

7     committee.

8              So I have in mind a -- I think there

9     were three agreements in total that referred in

10    part to these topics.  And they included a

11    collateral agreement, transfer and assumption

12    agreement and the clarification letter, all of

13    which have something to say about these issues

14    and I believe that they were all also made

15    available to representatives of the committee

16    and the committee's advisors during the course

17    of the weekend.

18        Q.    But apart from your understanding that

19    they were made available, you're not aware of

20    them actually specifically being distributed to

21    members of the committee or their advisors, is

22    that correct?

23        A.    That's correct.

24        Q.    And the same with respect to the

25    meetings either among Lehman and Barclays and

Page 410

1                          J. HUGHES

2      the committee, other than the fact that you

3      believe the committee had access to those

4      meetings, you are not aware of any specific

5      meeting where exchange-traded derivatives was

6      discussed, correct?

7                  MR. STERN:  Objection to the form.

8            The question -- you are asking a very broad

9            question here.  You are not aware of any

10           specific meeting where exchange-traded

11           derivatives was discussed?

12           Q.    Where the creditors committee was

13     present.  Apologies.

14           A.    The creditors committee and its

15     representatives were present during one very

16     lengthy meeting which took place either on the

17     Saturday or the Sunday which meeting took place

18     in fits and starts, so to speak.  In other

19     words, it commenced, continued for a period,

20     there were recesses, and the relevant parties

21     resumed on more than one occasion.

22                  It is possible that during that

23     lengthy meeting, exchange-traded derivatives

24     were discussed.  To be fair, I can't recall

25     specifically whether it was, but it is, it's

1                          J. HUGHES

2      possible during that lengthy meeting.  I'm not

3      aware of any other specific meeting where I

4      could say definitively, the creditors committee

5      was there, and there was an actual discussion on

6      this topic that I could recount to you.

7           Q.    During that weekend, at any time prior

8      to the closing on the 22nd of September, did

9      Barclays receive any information from Lehman

10     concerning the amount of cash or securities that

11     Lehman maintained at the exchanges for its

12     derivatives business?

13          A.    I believe there were communications

14     between Lehman and representatives of Barclays

15     on that topic, but I don't believe there was any

16     point prior to the closing which Lehman was able

17     to give Barclays any accurate or reliable

18     indication of what the amount of cash or

19     securities there might be at any exchange.

20          Q.    Do you know who participated in those

21     discussions?

22          A.    From Barclays, I think there were

23     communications and discussions between --

24     involving Liz James, Al Hodge, possibly others.

25     Who was involved from the Lehman side, I

Page 412

1                          J. HUGHES

2       couldn't recall.

3           Q.     And do you have an understanding as to

4       what the sum and substance of those

5       conversations were?

6           A.     At a high level, they were in part an

7       attempt by Barclays to ascertain what, in fact,

8       the exchange-traded derivative business of

9       Lehman represented because from the beginning of

10      that week of the 15th, it had been agreed that

11      Barclays was to acquire all of the

12      exchange-traded derivatives business, and

13      naturally, Barclays was interested to ascertain

14      what that might mean in terms of actual

15      positions, be they futures or options positions

16      and actual margin held to support those

17      positions or held in connection with those

18      positions.

19              So in essence, they were attempts by

20      Barclays to establish facts and figures with

21      respect to that.  Though as I say, I believe

22      that prior to closing, we were not able to get

23      information that was reliable in any way to

24      allow us to satisfy ourselves exactly what those

25      positions were.

Page 413

1                           J. HUGHES

2          Q.    Understanding your point about the

3     reliability of the information, do you recall or

4     do you have an understanding if any specific

5     amounts were discussed during those meetings?

6          A.    I don't know of specific numbers

7     discussed that relate back to your earlier

8     question about cash and securities.  There had

9     been some information provided by Lehman

10    Brothers which indicated certain levels of

11    assets and liabilities and that may have also

12    referred to particular holdings at particular

13    exchanges or clearing houses.  But beyond -- but

14    I couldn't recall specific numbers or specific

15    details for you right now.

16         Q.    Do you have an understanding as to who

17    from Lehman provided that information?

18         A.    I would have to refer back to some of

19    the e-mail exchanges between people like Liz

20    James and Al Hodge as I mentioned earlier.  As

21    Mr. Stern mentioned earlier, there may also be

22    discussions between Cleary Gottlieb and Sullivan

23    & Cromwell and their opposite numbers advising

24    Lehman Brothers because certainly a good -- you

25    know, some portion of the negotiation and

Page 414

1                           J. HUGHES

2    discussions relating to the exchange-traded

3    business for Barclays were handled by Cleary

4    Gottlieb and possibly also assisted by Sullivan

5    & Cromwell.

6        Q.    Do you have an understanding as to

7    whether or not Barclays received information

8    from the actual exchanges themselves at any

9    point prior to the closing about the amount of

10   cash and/or securities that Lehman maintained

11   with those exchanges?

12       A.    It's possible that Liz James or Al

13   Hodge or others associated with Barclays'

14   futures and options business had discussions

15   with exchanges or clearing houses.  I

16   couldn't -- I couldn't recall any of those for

17   you now.  I think we did learn of information

18   coming from the CME, in particular with respect

19   to its takeover of certain assets of Lehman

20   Brothers that were held at the CME on behalf of

21   the CME prior to closing.

22            And there were communications with the

23   OCC, as I have said, with respect to all of the

24   assets that the OCC was holding.

25            Again, all of which were or the

1                          J. HUGHES

2       pertinent parts of which were ultimately

3       recorded in the agreements that I mentioned

4       earlier.  Whether there are other specific

5       discussions with other exchanges or other

6       clearing houses, I can't now recall.

7            Q.    Do you recall with any more

8       specificity the timing of Barclays' receipt of

9       the information from the CME?

10           A.    I couldn't say with certainty when we

11      first received that information, but I believe

12      it was before the closing.

13           Q.    How about from the OCC?

14           A.    Again, the first communication, I

15      couldn't necessarily pinpoint.  But there were

16      certainly communications from and to the OCC, I

17      would say from the 19th through into the Sunday,

18      possibly into the early hours of Monday morning

19      on the 22nd.  But I think certainly from the

20      19th through to Sunday, there were

21      communications that we both participated in and

22      were aware of.

23           Q.    Do you recall with respect to the OCC

24      whether an amount was discussed of the cash

25      and/or securities that the OCC was maintaining

Page 416

1                          J. HUGHES

2    with respect to Barclays was discussed?

3         A.    I'm not sure whether specific numbers

4    were discussed.  But what I do recall is that

5    there was a very clear discussion on e-mail and

6    there were clear discussions among our

7    representatives about the transfer, the

8    agreement to transfer all of the collateral,

9    whatever its amount, and any property associated

10   with the exchange-traded derivatives business,

11   and I recall that the OCC particularly was

12   concerned to establish that all of those assets,

13   cash, securities, whatever form of property were

14   to be transferred, and they were very keen

15   indeed urgent in seeking the relevant parties'

16   agreement to those transfers which, as I have

17   said, were ultimately recorded in the agreements

18   that I have touched on earlier.

19        Q.    How about from the CME?  Were amounts

20   discussed in the conversations with the CME?

21        A.    I seem to recall a number of the

22   takeover of assets of roughly 700.  But I --

23   million, but I could be wrong about that number.

24   Roughly 700 million.  It may be in the 800

25   million, but something of that order was the

Page 417

1                              J. HUGHES

2        amount I believe seized by the CME of collateral

3        that had been held I think on the 17th by LBI,

4        which may, I think, also have been part of the

5        reason why the OCC was so keen to get agreement

6        among all the parties about what should happen

7        to the collateral that it was holding, both to

8        insure that it transferred those assets properly

9        to Barclays, but also understood itself what its

10       legal and -- what its position would be with

11       respect to Barclays and that margin and the open

12       contracts that would be connected with that

13       margin.

14            Q.     Can we go back to Exhibit 582B which

15       is the objection of Barclays Capital Inc. to the

16       motion filed by the committee.  Mr. Hughes, can

17       I direct your attention to page 7 of this

18       document.

19            A.     Yup.

20            Q.     Paragraph 14, can you read paragraph

21       13 and 14 for me please under the subheading,

22       "The documents sought are irrelevant."

23            A.     I've read it.

24            Q.     And paragraph 14, the sentence, the

25       paragraph begins, "The FSA documents are

Page 418

1                          J. HUGHES

2      similarly irrelevant to the creditors

3      committee's claims.  The FSA letter

4      requests/seeks 10 categories of documents, the

5      first four of which seek documents relating to

6      the 'initial Barclays purchase proposal,' a

7      proposal by Barclays to purchase LBI and related

8      entities that did not go forward and that this

9      court was never asked to approve."

10            Do you see that sentence?

11      A.    I do.

12      Q.    What's your understanding of the

13      initial Barclays purchase proposal that's

14      referred to in paragraph 14?

15      A.    I think I would have to look at the

16      request to be sure what it refers to.

17      Q.    Well, --

18      A.    I don't have before me the FSA letter

19      request, so I don't know what it is actually

20      seeking.

21            MR. STERN:  Is that the prebankruptcy

22      deal?

23            MR. TECCE:  Yes.

24      Q.    Let me ask you this way, Mr. Hughes,

25      prior to the sale transaction which is at issue

Page 419

1                          J. HUGHES

2       in this litigation, was Barclays engaged in

3       negotiations in August or September of 2008 to

4       acquire Lehman Brothers in a transaction prior

5       to the sale transaction that was the subject --

6       that is the subject of this litigation?

7           A.      There was a discussion -- there were

8       discussions during the weekend prior to the 15th

9       to acquire a much -- to do a much bigger

10      transaction and to acquire potentially the whole

11      of Lehman Brothers.

12          Q.      That's the -- those are the

13      discussions I'm asking about now.

14          A.      So prebankruptcy, yes.

15          Q.      Can we call that the prebankruptcy

16      transaction?   I understand that it wasn't

17      consummated, but can we refer to it just for

18      ease of convenience?

19          A.      Sure.

20          Q.      With respect to the prebankruptcy

21      transaction, generally what is your

22      understanding of the structure of that

23      transaction?   Had it been consummated, what the

24      structure of the transaction would have been?

25          A.      At a very high level, it was -- the

Page 420

1                    J. HUGHES

2      transaction being considered was the acquisition

3      by Barclays of all of the assets and liabilities

4      of the Lehman Brothers Holdings Group, at a very

5      high, summary level.  That's essentially what it

6      was about.

7          Q.    And was -- and generally why did

8      that -- why was that transaction not ultimately

9      consummated?

10         A.    I think there were a number of

11     reasons, included among which were Barclays'

12     views that to -- to consummate that sort of

13     transaction would have involved -- that would

14     have required a substantial degree of financial

15     support and would have required -- without

16     which -- it would have been an inappropriate

17     transaction to conclude from the perspective of

18     Barclays as a regulated bank and from the

19     perspective of its shareholders.

20             So I think there were a lot of other

21     reasons, but fundamentally, it needed financial

22     support of a type that was not available to be

23     able to conclude the transaction.

24         Q.    Was the transaction reviewed by

25     Barclays regulators, the Financial Services

Page 421

1                          J. HUGHES

2      Authority?

3          A.    I don't know if it was reviewed by the

4      FSA.   I think that there were communications

5      between Barclays and the FSA about it.   I'm not

6      aware that any transaction was ever submitted to

7      the FSA for its consideration.   There were

8      aspects of it I think were discussed.

9          Q.    And what's your understanding of the

10     sum and substance of the communications between

11     Barclays and the FSA concerning that

12     transaction?

13         A.    I think in sum, Barclays described

14     some of the key elements of the transaction in

15     order to meet its regulatory obligations to --

16     or I should say its obligations to its principal

17     regulator and I believe there were discussions

18     regarding the impact the transaction might have

19     upon Barclays as a regulated entity.

20         Q.    Do you have an understanding of what

21     specifically was provided to the FSA by Barclays

22     with respect to that transaction, in terms of

23     actual written documents or materials?

24         A.    I'm not aware of the detail of all of

25     the communications.   I think in earlier

Page 422

1                          J. HUGHES

2     depositions and in earlier disclosures, some of

3     those documents and some of those discussions

4     have been referred to.  For example, I think

5     John Varley gave testimony with respect to some

6     of those discussions and I believe some

7     documents have been disclosed by Barclays.  The

8     full detail of them, I couldn't tell you.

9          Q.    And were there communications -- what

10    was the manner of the communications, meaning

11    were they by phone, electronic mail?  Were they

12    in-person meetings?

13         A.    I think they probably included all

14    three of those types of communications at one

15    stage or another.

16         Q.    What is the period of time that they

17    took place during the month of -- let me

18    rephrase the question.

19              Were the communications during the

20    month of September or were they at any point

21    prior to that?

22         A.    I'm not aware of communications prior

23    to or I would say the 12th of September.  It's

24    possible that there may have been communications

25    before that, but I'm not -- I'm not aware of