Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,   (Jointly Administered)

9

               Debtors.

10

      ----------------------x

11

12

13

14     VIDEOTAPED DEPOSITION OF MARY ALICE KORYCKI

15                New York, New York

16                February 4, 2010

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 27495

1

2              February 4, 2010

3

4        VIDEOTAPED deposition of MARY ALICE

5     KORYCKI, held at the law offices of Boies,

6     Schiller & Flexner, LLP, 575 Lexington

7     Avenue, New York, New York, before Kathy

8     S. Klepfer, a Registered Professional

9     Reporter, Registered Merit Reporter,

10    Certified Realtime Reporter, Certified

11    Livenote Reporter, and Notary Public of

12    the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    M. Korycki

2   Mike Fazio, Jim Sirris.  There were a couple

3   other people there.  I don't remember, don't

4   recall everyone who was there, though.

5        Q.    Would that be Jim Seery?

6        A.    Seera, I believe that's how you

7   pronounce it, yes.

8        Q.    Who is a former Lehman executive?

9        A.    Oh, no.

10       Q.    Are you talking about somebody

11  different?

12       A.    You know, I take that back.  I

13  don't -- there was some other -- I'm talking

14  about someone else that wasn't a former Lehman

15  executive.  I don't recall his name off the top

16  of my head.

17       Q.    Okay.  Do you know where the person

18  was from?

19       A.    I want to say it was an FTI person and

20  there was a Houlihan person.

21       Q.    Is Mike Fazio the Houlihan person

22  you're referring to?

23       A.    Yes.

24       Q.    So this was a meeting with people from

25  Alvarez & Marsal and Houlihan and FTI, who were

1                        M. Korycki

2    both representatives of the Creditors Committee,

3    correct?

4        A.    Correct.

5            I just want to clarify.  There was a

6    lot going on in the early days, so I don't

7    recall every -- everyone's names.  There was a

8    lot of people to meet.

9        Q.    Sure.  I understand.

10           I'm going to go ahead and show you

11   another set of notes while we're still talking

12   about these.  I want to give it a little more

13   context.

14           Let me show you a document that's been

15   previously marked as 563B.  And do you recognize

16   that document?

17       A.    Yes.

18       Q.    Now, are those your notes from a

19   meeting that occurred on September 29, 2008?

20       A.    Yes.

21       Q.    Okay.  Do you know, the meeting that

22   is reflected in the notes, your first set of

23   notes, which is Exhibit 579A, do you know if the

24   meeting reflected in the 579A notes occurred

25   before or after the meeting, the 9/29 meeting?

1                          M. Korycki

2      A.    I believe this 9/29 meeting occurred

3    first and then the 579A occurred second.

4      Q.    Okay.

5      A.    If I recall correctly.

6      Q.    Okay.  Do you believe they were

7    roughly close in time?

8      A.    A couple weeks, yes.

9      Q.    Within a couple weeks?

10      A.    Within a couple weeks, yes.

11      Q.    And as a general matter, did Alvarez &

12    Marsal try to share information it learned about

13    the transaction with the Creditors Committee and

14    their representatives?

15          MR. TAMBE:  Objection to the form of

16      the question.

17      A.    You know, I was just honestly taking

18    notes.  I don't ...

19      Q.    Okay.  Let's look -- looking at 579,

20    please, which is the meeting with Houlihan and

21    FTI, at the top right-hand corner there's a box

22    that says "Transcript from Weil; Lori Fife;

23    Judge said."  Then it says "preliminary order."

24          Am I reading that correctly so far?

25      A.    Yes.

Page 20

1                          M. Korycki

2       Q.    What does the rest say there?

3       A.    "Stipulate come back to court."

4       Q.    Okay.  And do you know what this is

5   referring to?

6       A.    Again, I was just really just jotting

7   down things that people were saying.

8       Q.    I understand, but just your -- I'm

9   just asking for your best recollection based

10  upon your notes and your recollection of the

11  meeting what -- what it is that's being

12  described there.  We all take notes in shorthand

13  sometimes, so I'm just trying to understand what

14  it is you're conveying by writing down these

15  notes.

16      A.    The transcript -- it was to get a

17  transcript of -- I believe there was a court

18  hearing, so to get a transcript of that court

19  hearing from Weil.

20      Q.    Okay.  And what was the purpose of

21  getting that transcript, as discussed in the

22  meeting?

23      A.    Someone at the meeting had said, just,

24  I believe, just pointed -- made a comment to get

25  the transcript and I wrote it down as something

1                           M. Korycki

2      to do.

3          Q.      Okay.   You have no recollection of the

4      purpose or point of getting the transcript?

5          A.      No, I don't remember.

6          Q.      Do you remember what -- was it telling

7      Alvarez to get the transcript?

8          A.      Again, it came up in the meeting to

9      get a transcript of the hearing -- of the

10     hearing.   I don't recall exactly.

11         Q.      All right.   And but do you know if it

12     was Alvarez telling FTI and Houlihan to get a

13     transcript or FTI or Houlihan telling Alvarez to

14     get a transcript?

15         A.      I don't remember.

16         Q.      The second enumerated point there in

17     that box says, "Source of market value 9/18."

18     Am I reading that correctly?

19         A.      Yes.

20         Q.      And what was the issue that was

21     discussed there?

22         A.      I don't remember.

23         Q.      Do you recall any discussion about

24     market values of securities in this meeting?

25         A.      It was brought up.   I don't remember

Page 41

1                         M. Korycki

2              "Billion."  Does that say, "52.4

3     billion 85 percent of 52.4 billion"?

4         A.     That's what it says, yes.

5         Q.     Is that referring to a statement by

6     someone that 85 percent of the repo collateral

7     was covered by Bloomberg numbers?

8              Strike that.  Does that refresh your

9     recollection at all on the reference to the left

10    of that concerning, "Bloomberg number of

11    transactions covered.  85 percent in value"?

12             MR. TAMBE:  Objection to the form of

13        the question.

14        A.     I don't remember what that was

15    referring to.

16        Q.     Let's go ahead and take a look at your

17    other set of notes, please.

18             MR. TAMBE:  563B.

19             MR. THOMAS:  563B.

20        Q.     And again, these are notes of a

21    meeting that you attended on September 29, 2008;

22    is that correct?

23        A.     Correct.

24        Q.     And can you tell me who was at that

25    meeting?

Page 42

1                         M. Korycki

2        A.     Jim Fogarty, Rod Miller, David Coles,

3   and I have written down here Alex and Paolo.  I

4   believe they were there.

5        Q.     Rod Miller -- sorry.

6        A.     There were other people there.  I

7   don't recall everyone who was in that meeting,

8   though.

9        Q.     What organizations were the other

10  people from?

11       A.     The people that I did not mention?

12       Q.     Yes.

13       A.     They would have been A&M and I -- I

14  don't recall if there were any other Lehman

15  employees there.

16       Q.     And Rod Miller is from Weil Gotshal?

17       A.     Weil Gotshal, yes.

18       Q.     And the second line, does that say,

19  "Barclays agreement - Clarification Agreement,

20  addendum to APA"?

21       A.     Yes.

22       Q.     Have you ever seen the clarification

23  agreement?

24       A.     Yes.

25       Q.     And have you had a chance to read that

Page 43

1                          M. Korycki

2    document?

3         A.    I, at the time, I flipped through it.

4    I have not read it recently.

5         Q.    Okay.  What was the purpose of this

6    meeting on the 29th?

7         A.    I believe it was to get an

8    understanding of the Barclays transaction from

9    Alex and Paolo.

10        Q.    And do you recall if anyone else at

11   the meeting was taking notes?

12        A.    I don't remember.

13        Q.    Were you told to be the scrivener,

14   note-taker for this meeting?

15        A.    I wasn't told.  It was just something

16   that I ended up doing.

17        Q.    And you have no recollection of

18   whether anyone else in the room was taking

19   notes?

20        A.    We did have a flip board, someone was

21   writing on that, one of those things that stand

22   up.  Someone wrote on that for everyone to see,

23   but I don't recall if anyone else was taking

24   notes in the meeting, no.

25        Q.    Do you know if anything was done with

Page 44

1                          M. Korycki

2      the flip board?  Was that -- that information

3      written on the flip board preserved in any way?

4           A.     I have a copy of it, yes.

5           Q.     And can you describe what it is, the

6      document?  Like how many pages is it?  Is it a

7      PowerPoint or --

8           A.     It's a one-pager, and I have on 563B,

9      page 3, the top half of the page with the boxes,

10     it looks somewhat -- I pretty much -- it's

11     pretty much what's right there.

12          Q.     Okay.  When you say you have it, you

13     have it on a, what, separate piece of paper

14     somewhere?

15          A.     Right.  It's about -- it's one of

16     those pages that are this big, so ...

17          Q.     Okay.  And how was that -- was that

18     used as just a graphic during the meeting?

19          A.     It was just to lay out what was being

20     spoken at the meeting to try to put a diagram so

21     everyone can see and understand.

22          Q.     Was it prepared before the meeting or

23     was it prepared as the meeting went along?

24          A.     As the meeting went along.

25          Q.     And who actually wrote on it, prepared

Page 45

1                           M. Korycki

2      it?

3           A.      Al Lakhani was writing.  He's from

4      Alvarez & Marsal.

5           Q.      And it's just one page, one sheet?

6           A.      Yes.

7                MR. TAMBE:  You guys have it.

8           Q.      Prior to this meeting, had you had any

9      communications or been involved in any meetings

10     or phone calls with any of the Lehman executives

11     or ex-Lehman executives?

12          A.      No.

13          Q.      On the first page of your notes, about

14     five or six lines down, does that say, "Repo

15     sell to -- sell to you securities.  Agree to buy

16     back."  And then "sent 44 billion"; am I reading

17     that correctly?  Something after -- what is

18     before "44 billion"?

19          A.      It says "S.E.C."

20          Q.      Okay.  Does that say "sent S.E.C. 44

21     billion"?

22          A.      That's what it says.

23          Q.      And then the "to B," is that "to

24     Barclays"?

25               MR. TAMBE:  Object to the form of the

Page 46

                         M. Korycki

1

2      question.

3      A.      I don't recall what "B" meant.

4      Q.      Okay.  Do you recall what "H" meant?

5      A.      No.

6      Q.      The -- then it says, "DTC 074, 900

7   plus 300 equals 1.2 billion."  Do you recall

8   what that's referring to?

9      A.      DTC 074 is a file that I had received.

10     Q.      Okay.  And that's a -- is that a file

11  containing certain securities that were to be

12  transferred as -- to Barclays as part of the

13  transaction?

14            MR. TAMBE:  Objection to the form of

15     the question.

16     A.      It's a file I believe that contains

17  securities.  Whether it was supposed to be

18  transferred to Barclays or not, I don't know.

19     Q.      You don't -- you have no idea whether

20  that was supposed to be transferred to Barclays?

21     A.      No.

22     Q.      Do you understand that to be a file

23  associated with securities that were in Lehman's

24  clearing box?

25     A.      I don't know if they were in the

Page 47

1                          M. Korycki

2    clearing box.

3        Q.      Could you please give me your general

4    understanding of the sale transaction in terms

5    of assets and liabilities transferred as part of

6    the transaction?

7        A.      I know that --

8                MR. SHELLEY:   Objection to the form of

9        the question.

10       A.      Can you just ask that again?  I don't

11   know exactly what you're asking.

12       Q.      Can you just, as you understand the

13   sale transaction, can you describe just

14   generally at a high level what assets and

15   liabilities were conveyed to Barclays as part of

16   the transaction?

17               MR. SHELLEY:   Same objection.

18       A.      As I stated previously, I wasn't

19   involved in the whole transaction that happened.

20       Q.      Okay.  But can you nonetheless give me

21   your understanding of the transaction?

22       A.      I understand that assets and

23   liabilities went over.

24       Q.      Wasn't it an important part of

25   Alvarez's work, as I think we discussed earlier,

Page 51

1                         M. Korycki

2         Q.    Then it says, "Lead sheet Barclays."

3    Does that say, "Lead sheet Barclays collateral."

4         A.    I believe that's what it says, yes.

5         Q.    And what is a lead sheet?

6         A.    I believe that refers to another

7    document I put together.  It was referring to

8    the top sheet of that document.

9         Q.    What did you use to put that document

10   together?  What was the basis of that document,

11   the other document?

12        A.    The basis of what document are you

13   referring to?

14        Q.    The lead sheet that you just referred

15   to.

16        A.    So I received files and just basically

17   put together a summary of the totals from those

18   files.

19        Q.    I'm going to go ahead and give you a

20   couple more documents.  We're going to stay on

21   your notes for a while, but just in case it's

22   helpful to refer to these other ones.

23              Let me show you a document previously

24   marked as 564B.  Do you recognize that document?

25        A.    Yes.

Page 52

1                         M. Korycki

2        Q.    Would you describe what it is, please?

3        A.    It's a lead sheet that basically has a

4    description of types of securities on the left,

5    and the amounts on the right are just linked to

6    the totals from supporting files.

7        Q.    And when did you prepare this

8    document?

9              MR. SHELLEY:  Object to the form.

10       A.    I don't recall the date.

11       Q.    Did you prepare this document?

12       A.    You're referring to 564B?

13       Q.    Yes.

14       A.    I did prepare it, yes.

15       Q.    Okay.  Is that your handwriting on it?

16       A.    Yes.

17       Q.    Now, there's a reference in the 529

18   notes to lead sheet.  Do you believe the lead

19   sheet was in existence when you wrote that in

20   your notes and you're referring to it, or was

21   that a note to go in the future and create a

22   lead sheet?

23       A.    You're referring to the 56 --

24       Q.    564B, yes.  In your notes --

25       A.    What notes are you referring to?

Page 53

1                          M. Korycki

2        Q.     Of the 9/29 meeting.

3               MR. TAMBE:   563B.

4        A.     It says, "Lead sheet Barclays

5   collateral."  That lead sheet -- I don't know if

6   this was the same exact one, but, yes, I did

7   have a lead sheet prepared at that time.

8        Q.     So at the time of your 5/29 meeting

9   notes, you had some lead sheet prepared and

10  that's what your reference in your notes to lead

11  sheet is to?

12       A.     Yes.  Again, I don't remember if it's

13  the same exact one, though.

14       Q.     I understand.

15              Okay.  Going back to your notes,

16  Exhibit 563B, the next to the "44, Barclays

17  collateral," you see there's a 28. something and

18  a 58.4?

19       A.     Yes.

20       Q.     Is it your understanding that they

21  were settled, or the total of 44 marked

22  collateral was settled some through the DTC and

23  some through the Fed?

24              MR. TAMBE:   Object to the form of the

25       question.

Page 54

1                     M. Korycki

2       A.    Again, you say "understanding."  I was

3   just putting this lead sheet together.  I didn't

4   have an understanding of what the numbers

5   actually meant.

6       Q.    Is it fair to assume that someone at

7   the meeting didn't just say the numbers, they

8   would have explained what the numbers meant and

9   why they were saying them?

10      A.    The files had "Fed settled" and "DTC

11  settled" on them.  I don't -- other than what

12  they said on the files, that's all I knew.

13      Q.    Okay.  The -- but when you write it

14  down, the distinction between the two is

15  referring to the "Fed settled" and the "DTC

16  settled," right?

17            MR. TAMBE:  Object to the form.

18      A.    I'm referring to -- can you just be a

19  little more clear?  Referring to the two what?

20      Q.    When you have 44 and then you have the

21  28. something and 54.4 something, are you saying

22  that you had two separate files that you said

23  the Fed settled and the DTC and that those add

24  up to the 44?

25      A.    I had two files that add -- one tied

Page 55

1                          M. Korycki

2    to the 28 and one tied to the 15.

3        Q.    Okay.  So the "44" is adding those up?

4        A.    Yes.

5        Q.    Underneath that you have -- is that

6    "unencumbered"?

7        A.    I can't -- can't make out my own

8    handwriting.

9        Q.    Do you understand that to be referring

10   to the unencumbered assets?

11             MR. TAMBE:  Objection to the form.

12       A.    Again, I -- I can't make out what it

13   says.

14       Q.    Are you familiar with the term

15   "unencumbered" in this connection with respect

16   to assets?

17       A.    No.

18       Q.    Next to that it says the "1.3."  I

19   assume that that's 1.3 billion; is that right?

20       A.    It would be 1.3 billion, yes.

21       Q.    Okay.  And then there's "1.0 billion"?

22       A.    Yes.

23       Q.    Does the "1.0 billion" relate back to

24   the "Friday transfers BoNY records agreed"?

25             MR. TAMBE:  Objection to the form of

Page 56

1                    M. Korycki

2      the question.

3      A.    I don't recall what it was referring

4      to.

5      Q.    You seem to have underneath -- above

6      the lead sheet reference, you have the 074 file

7      of about 1.2 billion, you have the "Friday

8      transfers," and then you have "Monday file to

9      go."

10                 Is that breaking out the clearance box

11     assets basically into three tranches?

12                 MR. TAMBE:    Objection to the form of

13         the question.

14     A.    Again, I don't -- I don't know if they

15     were related to the clearing box.    They were

16     just files that I was being sent to try to put

17     together some summary for people to understand.

18     Q.    Okay.    In any event, you have three

19     files or groups of securities there, and then

20     underneath you have the numbers 1.3 and then

21     1.0, and then you have a blank, which would seem

22     to relate to the "Monday file to go," which

23     hasn't gone yet.

24                 Is it your understanding that those

25     numbers are referring to the three numbers,

Page 57

1                         M. Korycki

2    including the bank, are referring up above to

3    the three files or groups of securities?

4              MR. TAMBE:  Object to the form of the

5        question.

6        A.    No, that's not -- no.

7        Q.    It's not?

8        A.    No.

9        Q.    Do you have a different understanding?

10       A.    Yes.

11       Q.    What is your understanding?

12       A.    The "Monday file to go," I don't

13   recall exactly.  It may have been I was getting

14   a revised file.  I don't -- it's not -- it's

15   not -- the three don't relate to the three

16   below.

17       Q.    Do you have any idea what the numbers

18   below relate to then?

19              MR. TAMBE:  Which numbers?

20       Q.    The 1.3 and the 1.0 and the blank?

21              MR. SHELLEY:  Objection to the form of

22        the question.

23       A.    I don't recall.  I just --

24       Q.    Down below that it says "sort

25   subtotals" and is that "muni, CS"?  Am I reading

Page 58

1                        M. Korycki

2    that right?

3        A.      Yes.

4        Q.      What are "muni" and "CS"?

5        A.      I believe they were just examples of

6    what was in the file.

7        Q.      Which file is that?

8        A.      I don't recall exactly which file it

9    was referring to.

10       Q.      Do you recall why it was wanted or

11   needed to sort the subtotals?

12       A.      No.

13       Q.      And it has Roman numeral III,

14   "Exhibits Detailed File."  Do you know what

15   that's referring to?

16       A.      The lead sheet had some exhibits.  I

17   believe that's what it was referring to.

18       Q.      And then below in the left-hand column

19   it says "Richard."  And who is that referring

20   to?

21       A.      This is something else that I had to

22   take care of.  It has nothing to do with

23   Barclays transaction.

24       Q.      To the far right column it says, "Get

25   approval to" something "puts."  Am I reading

Page 84

1                          M. Korycki

2    2, correct?

3         A.    I believe so, yes.

4         Q.    And then the third grouping is, "B-1

5    and B-2 to move.  Takes time.  Have to ask DTC

6    to do."  Did I read that correctly?

7         A.    Yes.

8         Q.    And then the value there is 984,

9    whether that be millions or whatever.  It says

10   984; is that right?

11        A.    Yes.

12        Q.    And then down below you use the

13   mathematical symbol for "the sum of" 1, 2, 3

14   equals 2.3 less 0.6 equals 1.7 billion.  Did I

15   read that correctly?

16        A.    Yes.

17        Q.    So what was being described was, in

18   this meeting with Weil and Lehman officials

19   involved with negotiating the transaction, was

20   that, in addition to the repo collateral, other

21   assets would be transferred to Barclays include

22   these three groupings of unencumbered box

23   assets?

24             MR. SHELLEY:  Objection.  No

25        foundation.

Page 85

1                        M. Korycki

2              MR. MILLS:  Objection.

3        A.    Again, these were notes that I took at

4   the meeting.  They were topics that came up at

5   the meeting.

6        Q.    Is that your -- but what I described,

7   is that your understanding of what this is and

8   what is reflected in your notes?

9              MR. TAMBE:  Objection to the form.

10   Asked and answered.

11        A.    Again, I don't have a full

12   understanding of all the notes that were taken.

13        Q.    But is that -- is that your general

14   understanding of what is being described here,

15   the assets that were conveyed to Barclays, and

16   there was various groups of assets and those

17   were being described at the meeting?

18              MR. TAMBE:  Objection to form.

19              MR. MILLS:  Objection.

20              MR. SHELLEY:  Objection.  Asked and

21   answered.

22        A.    I think I covered this previously,

23   that I believed these were assets that went over

24   to Barclays.

25        Q.    As part of the sale transaction?

Page 86

1                          M. Korycki

2        A.     Yes.

3        Q.     Then the third item there, does that

4   say, "769 million securities pledged with JPM

5   segregated account 15(c)-3?

6        A.     That's what it says.

7        Q.     Do you recall that being part of the

8   assets that were conveyed to Barclays as part of

9   the sale transaction?

10       A.     I don't recall.

11       Q.     And the last line is, "Building in New

12  York.   Two centers New Jersey"; is that right?

13       A.     That's what it says.

14       Q.     Turning the page, it said -- says,

15  "first repo with" -- should that be "Fed Monday,

16  September 15"?

17       A.     I don't recall what it -- what it was

18  meant to be.

19       Q.     Does it literally say, "First repo

20  with Feb., Monday 9/15"?

21       A.     That's what it reads, yes.

22       Q.     And do you believe that "Feb." there

23  should have been "Fed"?

24       A.     Again, I don't -- I don't recall.

25       Q.     Further down, does that say, "45

Page 87

1                          M. Korycki

2      billion with Fed, extinguished liability"?

3          A.     That's what it says.

4          Q.     And the next line is "1.75 billion"?

5          A.     That's what it says.

6          Q.     And those are added up to 46.75 on the

7      left side?

8          A.     Yes.

9          Q.     What is being described here at the

10     meeting?

11         A.     Again, I was taking notes.  We were

12     talking about the assets -- or, not we.  They

13     were talking about the assets and liabilities.

14     I don't have a full understanding of what was

15     going on.

16         Q.     At this point you were part of a group

17     at Alvarez that was trying to work up a

18     post-Barclays sale transaction balance sheet,

19     correct?

20         A.     That is correct.

21         Q.     Was one reason for this meeting

22     getting this information to work up that balance

23     sheet?

24         A.     I wasn't the one that set up the

25     meeting.  I don't know what the purpose of the

Page 88

1                    M. Korycki

2    meeting was.

3         Q.    About halfway down, it says, "Took hit

4    for .76."  Do you have any understanding what

5    that's referring to?

6         A.    I don't recall.

7         Q.    Then it says, "1.5 cure period"; is

8    that what it says?

9         A.    Yes.

10        Q.    And then "cure period" has 1.6 below.

11             Do you have any understanding what

12   those numbers are referring to?

13        A.    I don't, no, I don't recall.

14        Q.    Further down it says, "Paid 38 cash to

15   buy 42.9 billion assets.  Lehman value different

16   valuation.  5.1."  Am I reading that correctly?

17        A.    That's what's written here, yes.

18        Q.    And underneath the "42.9 billion

19   assets," does that say "38 valued assets"?

20        A.    That's what it says.

21        Q.    Do you recall there being discussions

22   at this meeting about there being a different

23   valuation of Lehman assets and the difference

24   between those valuations being approximately $5

25   billion?

Page 89

1                          M. Korycki

2        A.     I -- I don't recall.

3        Q.     You have no recollection of --

4   whatsoever of any discussion about any

5   difference between the marked value of Lehman

6   securities and the actual value of those

7   securities at this meeting?

8               MR. SHELLEY:   Objection.   Asked and

9        answered.

10       A.     Again, I don't -- I don't recall.

11       Q.     Do you know who at the meeting is

12  describing this difference in valuation?

13       A.     I don't recall.

14       Q.     Do you recall anyone asking questions

15  of anyone at Lehman or Weil about this $5

16  billion difference in valuation?

17       A.     Again, I don't remember.

18       Q.     Do you recall any discussion of marks

19  being stale or needed to be updated in this

20  meeting?

21       A.     I don't remember.

22       Q.     Down below it says "1.9 unencumbered

23  securities"; is that correct?

24       A.     That's what it says.

25       Q.     And then "769 securities from lockup";

1                          M. Korycki

2    is that correct?

3         A.    That's what it says.

4         Q.    Turning the page, can you describe the

5    chart that's at the top half of the page, top

6    third of the page, and what that is?

7         A.    Left-hand side is the assets and

8    right-hand side is liabilities.

9         Q.    Is this -- is this something you would

10   have written down that was presented at the

11   meeting, or is this your own work?

12        A.    No, I wrote this down.  It's not my

13   own work.

14        Q.    Do you recall who presented this

15   information?

16        A.    I don't remember.

17        Q.    Do you recall, was there anything in

18   written -- like the flip sheet that had this

19   information, or was this all just oral, orally

20   presented?

21        A.    I don't remember.

22        Q.    Under "Assets" you see the 38 billion

23   plus the 5 billion equals 43.1 billion?

24        A.    Yes.

25        Q.    Is that reference or reflect the same

Page 98

1                         M. Korycki

2    together?

3         A.    I received the Excel files to put this

4    together.  I didn't have any discussions with --

5    on what the Excel files meant.

6         Q.    Did the Excel files say that these are

7    assets that were transferred to Barclays?

8         A.    I don't recall them saying that, no.

9         Q.    So where would you have learned that

10   information from?

11              MR. TAMBE:  Objection to form.

12        A.    I didn't know that they were actually

13   transferred to Barclays.  I -- I was sent the

14   files and this is -- and asked to put together a

15   summary of what the totals on each of those

16   files.

17        Q.    But I think earlier you said your

18   understanding was this was what was transferred

19   to Barclays, right?

20        A.    I did say that, yes.

21        Q.    So was this understanding in part

22   based upon meeting like the one you had with

23   Weil and Lehman Brothers?

24              MR. TAMBE:  Are you talking about the

25        9/29 meeting?

1                    M. Korycki

2          MR. THOMAS:  Yes.

3          MR. TAMBE:  So it's not just Weil and

4     Lehman.  You've got Alex Kirk and Paolo

5     Tonucci there, right?  Who are now with

6     Barclays.

7          MR. THOMAS:  They're Lehman people.

8          MR. TAMBE:  Who are now at Barclays at

9     the time of that meeting.  Are you

10    deliberately saying -- misleading her as to

11    who was at the meeting?

12         MR. THOMAS:  Are you nuts?  I mean,

13    really, are you nuts?  We used the term

14    "Lehman" for the Lehman current or former

15    employees that worked on the deal throughout

16    the deposition.

17         MR. TAMBE:  So we're talking about the

18    same meeting, the 9/29 meeting?

19         MR. THOMAS:  Yes.

20    A.     Can you repeat your question?

21    Q.     Sure.  You're doing -- I just really

22    want to know what the basis of your information

23    was for preparing a sheet listing assets

24    transferred from Lehman to Barclays, and it

25    can't just be Excel files of numbers.  It must

Page 100

1                          M. Korycki

2    be more than that.

3              So what is your basis of knowledge as

4    to what's included in the description of assets

5    transferred to Barclays.  Is it discussions or

6    meetings with Weil?  Is it communication with

7    Weil?  Is it your own independent review of the

8    contract documents?  What went into that

9    understanding?

10             MR. SHELLEY:  Objection to form.

11             MR. TAMBE:  Objection to form.

12             MR. SHELLEY:  Objection.  Compound.

13        A.   Again, I was sent Excel files and told

14   to summarize them and put a lead sheet together

15   for them.  That -- I didn't have any

16   discussions.  I didn't have an understanding of

17   what was in the files.

18        Q.   Okay.  Let's look at some of your

19   notes on Exhibit 564B.  There's a line that says

20   "Total - Transferred Under Repo Agreement," and

21   originally it was 44 billion something and then

22   it says "less 1.035 billion," I believe, and

23   that adds up to 43 billion something.  Is that

24   right?

25        A.   That's -- that's the way it reads.

Page 101

1                      M. Korycki

2       Q.    Okay.  And the less -- the reason why

3    there was the 1.035 billion backed out of there

4    was because, while that was transferred at the

5    same time as the repo collateral, it was not

6    transferred -- or, strike that.

7            The 1.035 billion was backed out

8    because it was not part of the repo collateral;

9    is that correct?

10               MR. TAMBE:  Objection to form.

11               MR. MILLS:  Objection to form.

12      A.    I don't -- I don't know why it was

13   backed out.

14      Q.    You have -- as you sit here today, you

15   have no idea why it was backed out, why you

16   backed it out of the 44 billion?

17               MR. TAMBE:  Objection.  Asked and

18       answered.

19      A.    I don't know why it was backed out.

20      Q.    Do you think you knew at the time why

21   it was backed out?

22      A.    No, I don't believe so.

23      Q.    Do you think someone told you to back

24   it out?

25      A.    Someone -- someone had told me to back

Page 102

1                           M. Korycki

2    it out and that's why I did it, yes.

3        Q.     But you don't have a recollection of

4    why they told you to back it out?

5        A.     No.

6        Q.     Do you know who told you to back it

7    out?

8        A.     I don't remember.

9        Q.     Okay.  Underneath the circled $43

10   billion, after the backout, does that say,

11   "delivered as repo"?

12       A.     That's what it says.

13       Q.     And is that -- do you understand that

14   $43 billion valuation is based upon marks

15   associated with that repo collateral?

16       A.     I don't have an understanding.  My

17   knowledge is that the Fed settled plus your DTC

18   settled less your 1035.

19             I'm just doing math here.  That's all.

20   I don't have an understanding.

21       Q.     Then you have, further down, you have,

22   "Friday transfers, 9/19 part of unencumbered

23   box"?  Is that -- am I reading that correctly,

24   interpreting that correctly?

25       A.     I believe U -- "UB" meant unencumbered

1                          M. Korycki

2      "Negotiated Mark Haircut," and then "Assets

3      Transferred Under Repo ('Stale' Marks)" and has

4      the 43 billion, 38 billion and 5 billion, do you

5      understand -- is it your understanding that's

6      the same $5 billion valuation delta that's being

7      referred to in the Creditors Committee

8      presentation?

9          A.    I believe so, yes.

10         Q.    And does -- has anything refreshed

11     your recollection as to whether the -- that $5

12     billion delta valuation is the same $5 billion

13     difference that was described to you in your

14     meeting with Weil and former Lehman executives

15     as reflected in your notes of that meeting?

16         A.    No.

17         Q.    Other than this valuation delta

18     between what is referred to here as stale marks

19     and the 38 billion, are you aware of any other

20     differences or deltas between Lehman marks and

21     values ascribed to those assets for purposes of

22     the CL transaction?

23             MR. TAMBE:   Object to the form of the

24         question and foundation.

25         A.    Again, I was merely compiling and

Page 147

1                         M. Korycki

2    reformatting a lot of this data.  I'm not aware

3    of anything else.

4         Q.    Switching topics a little bit, did you

5    ever have occasion to investigate or do any

6    analysis of cure or other payment liabilities

7    associated with contracts as part of the sale

8    transaction?

9              MR. SHELLEY:  Objection to the form.

10        A.    Can you ask me the question again?

11        Q.    Yes.  It wasn't phrased very well.

12   Let me just start off with a document instead.

13   Let me show you a document we'll mark as 580A.

14             (Exhibit 580A, a document bearing

15        Bates Nos. AM004949 through 4950, marked for

16        identification, as of this date.)

17        Q.    Do you recognize this e-mail chain?

18        A.    Yes.

19        Q.    This is an e-mail sent to you.  At the

20   top, it's sent to you by Steve Cohn at Alvarez

21   on October 2, 2008?

22        A.    Yes.

23        Q.    The first, earliest in time e-mail in

24   the chain appears to be an e-mail from you to

25   Mr. Cohn also on October 2, 2008, where you

Page 148

1                          M. Korycki

2      write, "We had a meeting yesterday with FTI and

3      Houlihan.  They are requesting the breakout of

4      the estimated cure amount of $2.25 billion from

5      the Barclays transaction.  Do you have the

6      detail behind the $2.25 billion that we could

7      include as support to do our recap scenario."

8      Do you see that?

9          A.    Yes.

10         Q.    The first question is, this meeting

11     yesterday, which would be October 1, with FTI

12     and Houlihan, would that be the meeting

13     reflected in your one page of notes which is

14     Exhibit 579A?

15         A.    Yes.

16         Q.    And that makes sense timewise.  The

17     meeting with Houlihan and FTI would have been a

18     day or two after the meeting with Weil and the

19     former Lehman executives about the details of

20     the Barclays sale transaction?

21         A.    Yes.  Just to refer -- you referred to

22     former Lehman executives.  I don't know what

23     their title was at the time of the meeting.

24         Q.    Right.

25         A.    I wasn't --

Page 149

1                    M. Korycki

2      Q.    It's referring to Mr. Kirk and Mr.

3  Tonucci, and whether they were still technically

4  with Lehman or not with Lehman at the time,

5  they're either Lehman or former Lehman

6  executives.

7      A.    Okay.   I just wanted to clarify.

8      Q.    That doesn't change any of your

9  earlier answers?

10     A.    No.   No.

11     Q.    So, on October 1 you had this meeting

12 with FTI and Houlihan and you discussed a number

13 of things as reflected in your notes, and they

14 ask for further detail and a breakout of the

15 estimated cure amounts in connection with the

16 Barclays transaction, is that right?   Just based

17 on what is said at AM4950.

18     A.    Just to clarify, I don't know if they

19 asked for it or if it -- I don't recall how it

20 actually came up.

21     Q.    When it says, "They are requesting the

22 breakout of the estimated cure amount of 2.25

23 billion," do you understand that to be referring

24 to FTI and Houlihan?

25     A.    I'm reading that again.   I would

Page 150

1                          M. Korycki

2     assume that it's FTI and Houlihan, yes.

3          Q.    Going back to the first page of

4     Exhibit 580A, you seem to be tasked with finding

5     out more information about the cure amount and

6     the breakout and the backup detail behind it; is

7     that right?

8          A.    That is correct.

9          Q.    And what did you do to find out the

10    breakup and detail behind the estimated cure

11    amount associated with the Barclays transaction?

12         A.    I don't recall exactly.  I believe I

13    spoke to Bill Fox after I received this e-mail

14    on how to go about it.

15         Q.    And do you recall how you ended up

16    going about it, investigating the cure amount?

17         A.    I don't recall.  No, I don't recall.

18         Q.    I'm going to show you a document we'll

19    mark as 581A.

20               (Exhibit 581A, a document bearing

21         Bates Nos. AM4948, marked for

22         identification, as of this date.)

23         Q.    Do you recognize this as an e-mail

24    from a Bill Fox at Alvarez to yourself dated

25    October 3, 2008?

Page 151

1                          M. Korycki

2        A.      Yes.

3        Q.      And here Bill writes, "Please contact

4    Lehman/Barclays person who might have your

5    answer on cure amount - Patrick Costa."  Did you

6    in fact contact Mr. Costa?

7        A.      I don't recall contacting him, no.

8        Q.      Do you recall talking to anyone about

9    this issue?

10       A.      Other than Bill Fox and Al Lakhani, I

11   don't recall any conversations about it.

12       Q.      Well, after being tasked with finding

13   the detail and breakout of the estimated cure

14   amount, can you identify any steps that you took

15   to find that information out?

16              MR. TAMBE:  Object to the form of the

17       question.

18       A.      I don't recall.

19       Q.      Do you recall whether you did in fact

20   try to find out the requested information that

21   you were tasked with gathering?

22       A.      I don't, I don't recall.

23       Q.      Do you recall whether it may have --

24   you may have been -- I mean, if you were tasked

25   with doing this, wouldn't you have done it,