Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------x

     In Re:                    Chapter 11

5    LEHMAN BROTHERS            Case No. 08-13555 (JMP)

     HOLDINGS, INC., et al.,    (Jointly Administered)

6    -----------------------------)

7

8        * * * HIGHLY CONFIDENTIAL * * *

9         DEPOSITION OF PHILIP E. KRUSE

10            New York, New York

11         Thursday, December 17, 2009

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 26533

22

23

24

25

Page 2

1

2

3

4

5          December 17, 2009

6          9:32 a.m.

7

8

9          HIGHLY CONFIDENTIAL videotaped

10     deposition of PHILIP E. KRUSE, held at

11     the offices of Boies Schiller & Flexner,

12     LLP, 575 Lexington Avenue, New York, New

13     York, pursuant to Notice, before Francis

14     X. Frederick, a Certified Shorthand

15     Reporter, Registered Merit Reporter and

16     Notary Public of the States of New York

17     and New Jersey.

18

19

20

21

22

23

24

25

1              P. KRUSE - HIGHLY CONFIDENTIAL

2    just -- I'm trying to be careful as to what

3    you're asking.

4         Q.   Okay.  The claim is that your

5    current knowledge of the value of the fed repo

6    collateral is privileged work product.

7              MR. TAMBE:  No, that's not the

8              position and that's why we're running

9              into trouble here.  You can have an

10             understanding as to --

11             MR. THOMAS:  No, I asked him what

12             his current understanding was and he

13             said --

14             MR. TAMBE:  And there was an

15             objection to that question.

16             MR. THOMAS:  But he said it would

17             have to be biased upon privilege worked.

18             MR. TAMBE:  And the reason there

19             was an objection to that question is you

20             seem to be trying to get at is there

21             independent valuation done by LBHI or

22             A&M independent of information.  There's

23             lots of information on the record about

24             values ascribed to that collateral.  On

25             and before the closing date.  That's

1           P. KRUSE - HIGHLY CONFIDENTIAL

2       certainly within their understanding as

3       to values ascribed by others.  Okay.  Go

4       ahead.

5           MR. THOMAS:  I'm not trying to --

6       I know there's nominal marks that exist

7       that he might have read in a paper or

8       something else like that.  I'm asking if

9       Alvarez, prior to -- independent of what

10      is being claimed as work product made

11      any effort to value that collateral, the

12      fed repo collateral.

13      A.     No, we did not.

14      Q.     Okay.  What was Alvarez's

15  understanding as to the value of the fed

16  collateral prior to doing this work product

17  with counsel?

18      A.     Any understanding we had about

19  values ascribed to the collateral would have

20  been gained post closing and in connection

21  with the gathering of data so that we

22  understood the securities that were

23  transferred in connection with the

24  transaction.

25      Q.     And as you sit here today can you

Page 103

1           P. KRUSE - HIGHLY CONFIDENTIAL

2    tell me what that understanding was in terms

3    of the amount of the fed repo collateral?

4           A.    I think it would be more

5    appropriate or perhaps more safe, rather than

6    having me misstate a number, I'm thinking of

7    e-mails that I know some of the A&M people

8    were gathering the data and I think those

9    documents represent what our early

10   understanding was of the ascribed values.

11          Q.    Okay.  After the sale closed, what

12   was the purpose of your trying to get an

13   understanding of the value of the assets that

14   had been transferred?  Yours being Alvarez's.

15          A.    It was really from the perspective

16   of capturing the data that we thought was

17   going to be necessary for us to administer the

18   estate and understanding what was estate

19   assets, what was not estate assets.  I think

20   there was some thought early on that we would

21   try to do a reconciliation of the securities

22   that were transferred, ensure that nothing was

23   transferred that should not have been

24   transferred under the deal.

25               That effort was not really

1           P. KRUSE - HIGHLY CONFIDENTIAL

2    feasible based on the information available to

3    us in that first quarter of the administration

4    of the estate.

5           But the context was ensuring we

6    had the data in hand while it was fresh in

7    everybody's mind as to what was transferred in

8    the deal.

9           Q.    Let me show you a document we'll

10   mark as 461A.

11          (Deposition Exhibit 461A, document

12          bearing production numbers AM 004503

13          through AM 004595, marked for

14          identification as of this date.)

15   BY MR. THOMAS:

16          Q.    Is this a document that you've

17   seen before?

18          A.    Yes.  I've seen this.

19          Q.    And when did you see it?

20          A.    When did I see it?

21          Q.    Yes.

22          A.    I would have first seen it pretty

23   much contemporaneous with the date of this,

24   October 8th, or the day or two before.

25          Q.    And can you describe what the

Page 105

1              P. KRUSE - HIGHLY CONFIDENTIAL

2     document is, please.

3          A.    It is a Powerpoint dec assembled

4     by Alvarez & Marsal to report to the Unsecured

5     Creditors Committee on this date of October

6     8th.  It was sort of a guide for communication

7     to the Unsecured Creditors at that point.

8          Q.    And why was Alvarez & Marsal

9     relaying this information to the Creditors

10    Committee?

11         A.    It was in the context of the

12    Creditors Committee is an important

13    constituent that we serve in the

14    administration of the estate and giving them

15    an early download as to our activities and how

16    we're getting ramped up and getting ready to

17    best serve our role as a chief restructuring

18    officer.

19         Q.    If I could ask you to turn to page

20    28, please.

21         A.    (Witness complies.)

22              MR. ROTHMAN:  The Bates number or

23         the page?

24              MR. THOMAS:  That's the page

25         number.  The Bates number is AM 4531.

1            P. KRUSE - HIGHLY CONFIDENTIAL

2        Q.    And let me just ask, who would

3    have prepared this document?

4        A.    Who physically prepared it?

5        Q.    Yes.  Or determined what went into

6    the document.

7            MR. TAMBE:  Object to the form.

8        Go ahead.

9        A.    The document as a whole would have

10   been a joint effort.  I had some participation

11   in a slide or two here as well.  So, you know,

12   depending on who you see as the leader or the

13   discussion leader on a given subject that's

14   likely the person who directed the

15   preparation.  The physical preparation was

16   probably somebody working underneath that

17   particularly person.

18       Q.    Did Alvarez work with anyone at

19   Lehman or Lazard or anyone other than Alvarez

20   to pull this information together?

21       A.    Not to my knowledge.

22       Q.    Do you know who would have

23   prepared the information that appears on page

24   28 of the document?

25       A.    I would presume Jim Fogarty was

Page 120

1                P. KRUSE - HIGHLY CONFIDENTIAL

2                    MR. TAMBE:  He's given you his

3           answer.  And he's mentioned the GFS data

4           now.  So what else do you want him to

5           talk about?  He's told you the bases for

6           his understanding.

7                    MR. THOMAS:  I want to make sure

8           we close that out.

9      BY MR. THOMAS:

10          Q.    So at this time, the time of this

11     document, at the time you were making your

12     presentation to the Creditors Committee, is it

13     fair to say that Alvarez believed the Lehman

14     marks were stale?

15                   MR. TAMBE:  Objection to the form

16          of the question.

17          A.    No.  I don't think that's a fair

18     characterization.  I think this was the

19     recitation of something that was communicated

20     to us.  I don't think we were making a

21     qualitative assessment that it was accurate or

22     inaccurate.  We were simply communicating

23     information to a key constituent of ours.

24          Q.    Do you know who communicated that

25     to Alvarez?

Page 121

1                P. KRUSE - HIGHLY CONFIDENTIAL

2          A.    I don't know specifically because

3    I didn't get a chance to get a hold of Jim

4    Fogarty in the last couple of days.  He would

5    be the better person to ask.  But I infer from

6    the documents I've seen Ian Lowitt or somebody

7    that worked with Ian Lowitt.

8          Q.    Okay.  You're aware that --

9          A.    I'm sorry.  Did I say Ian Lowitt?

10         Q.    Yes.

11         A.    I believe it was Paolo Tonucci.

12         Q.    You're aware that Barclays did not

13   believe that the marks of the repo collateral

14   were still accurate as of the time of closing,

15   correct?

16         A.    I'm sorry.  Am I aware sitting

17   here today that Barclays doesn't believe those

18   marks were accurate?

19         Q.    Right.

20         A.    I understand that is an assertion,

21   yes.

22         Q.    Okay.  In any event, Alvarez

23   understood and communicated to the Committee

24   that there was a difference in the value of

25   the repo assets ascribed for purposes of the

Page 122

1              P. KRUSE - HIGHLY CONFIDENTIAL

2      sales transaction and -- between that and

3      the -- what's referred to here as the stale

4      marks.  The nominal marks on the fed repo

5      collateral.

6                   MR. TAMBE:  Objection to the form

7           of the question.

8           A.    Sorry.  I lost the train of that

9      question.  Could you repeat it?

10          Q.    Okay.  Alvarez understood and

11     conveyed to the Committee at this time that

12     there was a difference between the Lehman

13     marks and the -- of the repo collateral and

14     the value of the repo collateral ascribed to

15     the repo collateral for purposes of the sale

16     transaction by the parties.

17                  MR. TAMBE:  Object to the form of

18          that question.

19          A.    I think we've gone over this.  You

20     know, I think the words communicate that

21     concept.  I'm not necessarily agreeing that we

22     accepted it at the time as being -- you know,

23     I take this as Jim was relaying information

24     that we had come to understand through others

25     at that point.  I don't think we were making a

1              P. KRUSE - HIGHLY CONFIDENTIAL

2      qualitative judgment at that point that it's

3      right, wrong, or otherwise.

4          Q.    Well, putting aside whether it's

5      correct or not, that's what was being

6      conveyed, though; that there was this

7      difference between the old Lehman marks and

8      the parties' valuation of the repo collateral

9      for purposes of the sale transaction.  That's

10     what the reduction is referring to, correct?

11             MR. TAMBE:  Object to the form of

12         the question.

13         A.    If I understand that correctly

14     that's probably a fair characterization.

15         Q.    Okay.  Let me ask it open ended.

16     What is the reduction that's -- the $5 billion

17     reduction referring to there?

18         A.    What is it referring to?

19         Q.    Yes.

20         A.    Well, it's referring to apparently

21     a negotiated difference between the value

22     which the assets were acquired versus the way

23     they were characterized prior to the

24     transaction.

25         Q.    And Alvarez would have tried to

Page 124

1              P. KRUSE - HIGHLY CONFIDENTIAL

2     make its presentation to the Creditors

3     Committee as accurate as it could, correct?

4          A.    Yeah.  We were certainly trying to

5     convey accurate information to the committee.

6          Q.    And Alvarez also understood that

7     the -- if you look at the next bullet point --

8     that the sale transaction conveyed to Barclays

9     the unencumbered box?

10         A.    Yes.

11         Q.    And is the unencumbered box

12    referring to the clearance box assets?

13              MR. TAMBE:  Object to the form.

14         Go ahead.

15         A.    Is unencumbered box relating to

16    the -- unencumbered box I think refers to

17    unencumbered collateral that was transferred

18    that wasn't -- that didn't have a lien on it

19    prior to the transaction.

20         Q.    Would you take a look back at the

21    clarification letter, please.

22         A.    (Witness complies.)

23         Q.    And if you would look at

24    Section -- paragraph 1(a)(ii)(B).

25         A.    Yes.

1              P. KRUSE - HIGHLY CONFIDENTIAL

2      though, is was that Alvarez's understanding at

3      the time that Barclays was entitled to either

4      the 769 million of the 15(c)(3) securities if

5      permitted by law or if not permitted by law

6      securities of substantially the same nature

7      and value?

8           A.    I'm not even sure I would go that

9      far.  In the context of what we were trying to

10     accomplish at this time, you know, the

11     intricacies of customer property and things

12     that were probably under the purview at that

13     time of LBI wouldn't have been a particular

14     focus of ours.  Obviously, it's here in the

15     document that was provided to us.  The degree

16     to which Alvarez & Marsal focused on this or

17     really thought about it or considered it, I

18     wouldn't presume anything beyond that it's

19     here on the document.

20          Q.    Is it your understanding at least

21     that that's what Weil was telling you was part

22     of the deal?

23          A.    Well, I think the document speaks

24     for itself in terms of where it came from and

25     what it says.

Page 154

1           P. KRUSE - HIGHLY CONFIDENTIAL

2           Q.    So as part of its -- about how

3    many people at Alvarez were working on this

4    effort to try to assess the transfers, the

5    deal, during this period of time?

6                 MR. TAMBE:  Objection to the form

7           of the question.

8           A.    Difficult for me to characterize

9    numbers of people.  It was a substantial part

10   of our effort at that point.  I think as it

11   relates to Barclays in particular, our focus

12   was on, you know, bearing in mind, of course,

13   that the business and all of its systems, its

14   records, all of its systems, and substantially

15   all of its employees were being moved over to

16   Barclays.  The TSA, the Transition Services

17   Agreement, was the primary focus of ours as it

18   related to Barclays at the time.  And so the

19   numbers of people -- there's within this

20   October 8th dec I think there's some depiction

21   of the numbers of people that we were gearing

22   up with at that time.  But a substantial

23   portion of those people were involved in this

24   effort across multiple asset classes and

25   multiple teams that I think is probably best

1           P. KRUSE - HIGHLY CONFIDENTIAL

2     portrayed in this document at that time as

3     opposed to me trying to recite that for you.

4           Q.    When Alvarez became aware of the

5     discount that we discussed and was in the

6     presentation to the Creditors Committee, did

7     Alvarez take any action or do anything with

8     respect to the fact that there was a discount

9     or a difference between the agreed value of

10    the repo collateral and certain marks?

11          MR. TAMBE:  Objection to the form.

12          A.    No, again, I would characterize,

13    you know, what we were doing at this time

14    relaying information that had been given to us

15    in connection with that transaction to our UCC

16    constituency.  Some aspects of which they may

17    have known more than we did at the time

18    because they had perhaps people involved as

19    the deal was happening that weekend whereas we

20    did not.  Did we take action?  This was not a

21    priority at the time.  We were not -- again,

22    as it relates to Barclays, the TSA was our

23    primary focus.  Getting ourselves in a

24    position where we could run the wind-down of

25    this enormously large operation in a competent

Page 156

1                P. KRUSE - HIGHLY CONFIDENTIAL

2      way, that was our focus.

3           Q.    Did anyone at the Committee

4      express any surprise that there was a

5      difference between the agreed value of the

6      marks as part of the transaction and some

7      prior Lehman marks?

8                MR. TAMBE:  Objection to form.

9           A.    At this meeting?  I think I

10     covered that.

11          Q.    At the meeting -- okay.  Let's try

12     it without the meeting.

13          A.    I was not at the meeting so I

14     can't offer any insight.

15          Q.    You tricked me.

16                Okay.  At any time to your

17     knowledge.

18          A.    Just to clarify, I was not at any

19     part of the meeting so I can't offer any

20     insight.

21          Q.    At any time, to your knowledge.

22          A.    At any time did -- I'm sorry.  I

23     just want to make sure I got your question

24     straight.  I've lost track.

25          Q.    At any time did anyone, to your

1            P. KRUSE - HIGHLY CONFIDENTIAL

2    knowledge, from the Committee express, you

3    know, surprise about the fact that there was a

4    difference in the value of the fed repo

5    collateral agreed to by the parties for

6    purposes of the deal and the -- some nominal

7    prior Lehman marks?

8            MR. TAMBE:  Objection to form.

9        A.    You mean people sitting on the

10    Committee?  I didn't have a lot of

11    communication with people sitting on the

12    Committee.

13        Q.    That may be so but are you aware

14    of anyone on the Committee expressing surprise

15    about the fact that there was this delta?

16        A.    Not that I'm aware.  Again, there

17    may have been communications I'm not aware of.

18        Q.    Are you aware of anyone else who

19    expressed surprise or indicated that that was

20    news to them?  Anyone at Alvarez or LBHI or

21    anyone at this period of time?

22            MR. TAMBE:  Objection to form.

23        A.    My recollection during the first

24    quarter of our administration of the estate,

25    there was a gentleman from Houlihan, I believe

Page 158

1              P. KRUSE - HIGHLY CONFIDENTIAL

2    Mike Fazio, who I think primarily indirectly

3    through others I understood that he was

4    expressing some concerns about the economics

5    of the deal and whether it was ultimately in

6    the best interest of the estate to have the

7    deal done as it was papered.  I -- you know.

8         Q.    Can you think of anything else

9    other than that?

10        A.    Not that I recall.

11        Q.    Was Mr. Fazio's expression of

12   concern more general or particularly with

13   respect to there being a delta between the

14   agreed value of the -- we'll call it the

15   discount as you've used the term.

16        A.    My best recollection is that Mr.

17   Fazio was either -- attended or had heard

18   firsthand about a meeting that I know has been

19   depicted in the prior discovery Sun -- I

20   believe it was Sunday night before the deal

21   was closed Monday morning, where -- and I was

22   in the deposition of Michael Klein who

23   acknowledged that he had a depiction of the --

24   a very high-level depiction of the deal that

25   was written on the back of a manila envelope

Page 159

1              P. KRUSE - HIGHLY CONFIDENTIAL

2      that was shown to Mike and/or others at

3      Houlihan.

4              I remember Mike telling us that

5      they, meaning as advisors to the Unsecured

6      Creditors Committee, had been asked -- had

7      asked Barclays and Lehman people for the

8      details behind the difference between the

9      marked values and what was determined to be

10     the negotiated value as depicted on that

11     envelope.  And they were very unhappy with the

12     fact that they had never gotten any details.

13     They were promised the details at the time and

14     they never got them.  And I think that was

15     part of what was underlying their concerns

16     about the economics of the deal.

17          Q.    So they were aware of the delta

18     but they wanted to get details about the delta

19     further explained.

20          A.    Sure.  If you're a fiduciary for

21     the estate and you're aware of that you'd like

22     to have empirical knowledge, empirical

23     evidence of how it was derived rather than

24     just, you know, somebody saying it was

25     negotiated.

Page 160

1          P. KRUSE - HIGHLY CONFIDENTIAL

2          Q.     The sale transaction didn't

3    require the deal to be a wash, did it?

4               MR. TAMBE:  Objection to form of

5          the question.

6          A.     The sale transaction didn't

7    require the deal to be a wash?

8          Q.     Okay.  I'll rephrase that.  Are

9    you familiar with the term "wash"?

10         A.     Yes.

11         Q.     What does that term mean to you?

12         A.     Well, in the context I know where

13   you're coming from, it's assets essentially

14   equalled liabilities.  And there was little to

15   no exchange of economic value in the deal.

16         Q.     Okay.  And little to no exchange

17   of economic value, can you explain to me?

18         A.     Yeah.  Wash assets equal

19   liabilities, that's how I'm trying to give my

20   understanding of what that concept means.

21         Q.     It was never your understanding

22   there was something that sale transaction

23   documents required that assets match

24   liabilities; is that correct?

25         A.     I don't think it was ever --

Page 161

1              P. KRUSE - HIGHLY CONFIDENTIAL

2              MR. TAMBE:   Objection to form of

3        the question.

4        A.    I don't have any basis to think it

5   was characterized as -- in that way in the

6   sale documents.  Although I would point out

7   that the Asset Purchase Agreement dated

8   October 16th, and I think this is depicted in

9   our Rule 60 papers, it really does -- the end

10  result of that appears to be assets equal

11  liabilities as it relates to the securities

12  and the comp and cure obligations being

13  assumed.  And then you've got an additional

14  element of consideration if you want to look

15  at it that way by virtue of, you know, other

16  liabilities being assumed.

17       Q.    Have you done an analysis of the

18  initial Asset Purchase Agreement to determine

19  what the actual liabilities would have been

20  and what the assets would have been?

21       A.    Well, what I'm describing I think

22  is depicted in our Rule 60(b) motion.  I can

23  picture it now.  There's a little table in the

24  motion that depicts $70 billion of long

25  positions, 69 billion of short positions,