Page 1

1        IN THE UNITED STATES BANKRUPTCY COURT

2        FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

     In re:                )

5                          ) Chapter 11

     LEHMAN BROTHERS        ) Case No. 08-13555(JMP)

6    HOLDINGS, INC., et al, ) (Jointly Administered)

                            )

7              Debtors.  )

     ----------------------)

8

9

10

11

12          30(b)(6) DEPOSITION OF

13    CLEARY GOTTLIEB STEEN & HAMILTON LLP

14                    by

15           VICTOR I. LEWKOW

16           New York, New York

17      Wednesday, February 10, 2010

18

19

20

21

22

23    Reported by:

24    MAYLEEN CINTRON, RMR, CRR

25    JOB NO. 28226

1

2

3

4                         February 10, 2010

5                         10:02 a.m.

6

7

8            30(b)(6) DEPOSITION OF CLEARY

9    GOTTLIEB STEEN & HAMILTON LLP, by VICTOR I.

10   LEWKOW, held at the offices of Cleary

11   Gottlieb Steen & Hamilton LLP, 450 Park

12   Avenue, New York, New York, pursuant to

13   Notice, before MayLeen Cintron, a Registered

14   Merit Reporter, Certified Realtime Reporter,

15   and Notary Public of the State of New York.

16

17

18

19

20

21

22

23

24

25

1                    -Lewkow-

2          Q.   Okay.

3          A.   As far as I can tell, they stopped

4    on Sunday, people went home and saw their

5    families.  And I got a call Monday morning,

6    "Well, can you come up to Lehman Brothers?

7    We're going to see if we can do a deal.  If

8    they did file as they said they would" -- we

9    thought they would -- "they filed in

10   Chapter 11 and now want to see whether or not

11   there's something we can do to purchase" --

12   you know, I don't remember how it was

13   described to me in that initial call.

14              But, "Can you come up to Lehman

15   Brothers?"

16              MR. MORAG:  Mr. Lewkow, let me

17        caution you on privilege.  I think you

18        just said the gist to the conversation,

19        which is sufficient for these purposes.

20         Q.   You came back?

21         A.   I went up to Lehman Brothers.

22         Q.   Let's just talk about the period

23   when you came back.  In the negotiations that

24   began then, what steps, if any, were taken to

25   accommodate Barclays' view that the Lehman

Page 19

1                    -Lewkow-

2   marks were substantially overstated, to use

3   your term?

4             MR. MORAG:  Objection.  Vague.

5        A.    Yeah.  I guess -- I don't know what

6   you mean by "accommodate."  And the word --

7   you also used the word "the view."  I think

8   that view -- I did mention the newspaper.

9             MR. MORAG:  I think we need a

10        break.

11             (Whereupon, a recess was taken

12        from 10:22 a.m. to 10:25 a.m.)

13  BY MR. GAFFEY:

14        Q.    In the negotiations that took place

15  in connection with the transaction that's

16  brought us here today, Mr. Lewkow, were there

17  discussions, to your knowledge, between the

18  folks at Barclays and the folks at Lehman

19  about Barclays' view that the assets of Lehman

20  were overstated on its books?

21             MR. MORAG:  Object to the form.

22        A.    Yes.  As to certain assets.

23        Q.    Can you tell me what you know with

24  regard to those discussions?

25        A.    As I stated in my declaration,

Page 20

1                    -Lewkow-

2    Barclays, was my understanding, that Barclays'

3    trading and/or financial folks had been

4    provided certain information about the trading

5    positions; that it was contemplated that

6    Barclays would assume as part of an

7    acquisition of the business of substantially

8    all of the business.

9              And in the course of that, Barclays

10   had -- Barclays people had reached the view

11   that there were very significant -- that the

12   aggregate carrying value that they had been

13   furnished by Lehman was substantially higher

14   than Barclays believed was appropriate that

15   Monday or Tuesday.

16        Q.   And by "aggregate carrying value",

17   do you mean Lehman's book value?

18        A.   It's my -- I'm not an accountant,

19   as you know.  I'm a lawyer.  It is my

20   understanding that for an entity such as

21   Lehman, they are supposed to -- under

22   regulatory accounting principles, maybe

23   generally accepted accounting principles, I

24   don't know.  But as a general matter,

25   broker-dealers mark their portfolio to market

Page 21

1                    -Lewkow-

2  on a daily basis.  And I believe that means

3  their book value is effectively adjusted each

4  day.  To the extent that a balance sheet is

5  prepared, the balance sheet is prepared based

6  on those marks.

7       Q.   So when you use the phrase

8  "aggregate carrying value," were you referring

9  to Lehman's books marked to market in that

10  manner?

11            MR. MORAG:  Object to the form.

12            MR. HUME:  Objection, asked and

13       answered.

14       A.   I think I've got nothing more to

15  say on that.

16       Q.   What did you mean to say when you

17  said "aggregate carrying value"?

18       A.   The value -- what I hear people

19  refer to as "the marks."  What they were being

20  marked at on the books of Lehman by Lehman.

21       Q.   And in the negotiations of the

22  transaction, were any steps taken to address

23  Barclays' concern that the aggregate carrying

24  value was substantially higher than it should

25  have been?

Page 22

1                      -Lewkow-

2           MR. HUME:  Objection.  Vague.

3           MR. MORAG:  Objection.  Asked and

4      answered.

5      A.   I have -- I've told you -- I have

6      nothing to add to my answer.

7      Q.   Well, I'm afraid that's not going

8      to work, so I do need an answer to the

9      question.

10     A.   Your question asked in the

11     negotiations.  I don't -- I don't -- if you

12     mean in the negotiations of the transaction, I

13     think my answer would be no, as I have said in

14     my declaration and in my statement.

15           Barclays was furnished information

16     which led it to believe that Lehman's marks

17     were not correct and overstated the value of

18     assets, and was -- Barclays was not prepared

19     to do a deal with -- where they were

20     overstated marks on the Lehman books of large

21     amounts.

22     Q.   So if Barclays was not prepared to

23     do a deal where there were overstatements on

24     Lehman's books of large amounts, what did

25     Barclays do to address that concern in order

Page 23

1                    -Lewkow-

2     to conclude a transaction?

3          A.   Barclays made -- made its

4     position -- made its view of the marks, that

5     they were overstated substantially, clear to

6     Lehman people and urged -- my understanding,

7     they urged Lehman to take a fresh look at the

8     values that they were carrying them on on

9     their books because it was at a crazy world,

10    and it was something that Lehman should take a

11    fresh look at to -- to both deal with the

12    passage of time and information.

13              I don't know what -- you know, in

14    my declaration, I mention an example that was

15    mentioned in a broad public -- "public" is the

16    wrong statement.  With both sides present,

17    including lawyers, including me -- of the

18    example of a particular position where

19    Barclays had a junior position of -- junior

20    tranche position from the same issuer, same

21    type of security, and was carrying it --

22              I'm sorry.  Barclays had a senior

23    position and was carrying it at a bigger

24    discount to par than Lehman was carrying the

25    junior position.  And those are -- you know,

Page 24

-Lewkow-

1    I'm sure there were other examples.  That was

2    the one that was easy to explain to us lawyers

3    as evidencing why Barclays believed Lehman

4    needed to take a fresh look at what it -- how

5    it was carrying certain portions of the

6    portfolio on its books and whether or not they

7    needed to revise their marks.

8        Q.   Did the level at which Lehman was

9    carrying its assets on the books affect the

10   price which Barclays was willing to pay on the

11   transaction?

12           MR. MORAG:  Object to form.

13       A.   I think it affected their

14   willingness to do the deal.  The price was

15   what was in the Agreement where we acquired

16   certain assets, acquired certain liabilities,

17   agreed to make certain payments, assumed a

18   certain level of obligations.

19           We were buying a business as a

20   whole; the purchase price was the whole

21   transaction.  We were not -- no one from

22   Barclays went into this to buy a portfolio; it

23   was to buy substantially all the assets of a

24   business.

Page 25

1                   -Lewkow-

2        Q.    Describe for me, if you would, the

3    price that Barclays paid in that purchase.

4        A.    At what time, sir?

5        Q.    Good point.  Describe for me the

6    price that Barclays agreed to pay for that

7    business on September 16, 2008?

8            MR. HUME:  I'm going to just object

9        to the extent that it calls for

10        interpretation of the contract which he

11        hasn't been shown.

12            (Discussion off the record.)

13        Q.    I think the question on the table,

14    Mr. Lewkow, is:  Will you describe for me the

15    price that Barclays agreed to pay for that

16    business on September 16, 2008?

17            MR. MORAG:  Objection.  To the

18        extent it calls for a legal

19        interpretation of the contract.  If you

20        recall generally the terms.

21        A.    Look, I think the contract is the

22    contract.  Without having it in front of me, I

23    may omit certain things.  But in general

24    terms, my recollection is that under the Asset

25    Purchase Agreement as signed late on the 16th

1                      -Lewkow-

2    effort to allocate into buckets in this

3    document.

4         Q.   Do you recall if the use of the

5    word "amend" was a deliberate drafting choice?

6              MR. MORAG:  Objection.

7              MR. GAFFEY:  That's a bad question.

8         Let me withdraw that question.

9         Q.   Do you recall if the word "amend"

10   was added at some point during exchanging

11   drafts of the Clarification Letter?

12        A.   I would need to see all the drafts

13   to be sure.  But my recollection is yes.

14        Q.   Okay.  I'm going to show you the

15   draft, so I'm not going to ask you to

16   speculate and pinpoint.

17              Do you recall any discussions

18   between the party, that is between Lehman and

19   Barclays or their representatives, about

20   adding the word "amend" to the Clarification

21   Letter?

22        A.   I have a vague recollection that

23   with the very first draft of the Clarification

24   Letter, which was prepared very quickly by

25   someone -- and I don't know which side --

Page 50

1                    -Lewkow-

2    after the Asset Purchase Agreement had been

3    signed and filed with the Court on Wednesday

4    morning, that the original first draft was a

5    page or two and it clearly was truly nothing

6    other than clarification.  And so that the

7    first draft did not use the word "amendment."

8              At some later point, as things got

9    more complicated and things were happening, it

10   became -- there was discussion that we should

11   add the word "amend."  That is my

12   understanding.

13        Q.   Do you recall who was involved in

14   those discussions?

15        A.   People from Cleary Gottlieb and

16   people from Weil Gotshal, and probably Simpson

17   Thacher.

18        Q.   Do you have a more specific memory

19   of which people?  I know it was a pretty

20   tumultuous week.  But do you recall who in

21   particular was involved in those discussions?

22        A.   It was more in the direct

23   conversations between -- I think most of the

24   conversations on the Clarification Letter were

25   on Barclays side between some combination,

Page 68

1                    -Lewkow-

2        extent it would reveal a privilege from

3        Barclays.

4               MR. GAFFEY:  As to when?

5               MR. HUME:  Well, you assumed

6        when --

7               MR. GAFFEY:  It is attorney --

8               MR. HUME:  It was terminated.  What

9        does terminated mean?

10               MR. GAFFEY:  It means ended.

11        A.   It's a legal... If you want to ask

12    the question -- can I talk to counsel for

13    Barclays and my counsel?

14        Q.   Sure.  Absolutely.

15               (Whereupon, a recess was taken

16        from 11:49 a.m. to 11:52 a.m.)

17        A.   Before the break you asked me a

18    question about did there come a time of

19    learning about the termination of the repo.

20               Of course, the repo did terminate,

21    as I understand it, when we closed on Monday,

22    but I assume that's not what you're asking.

23        Q.   It is not.

24        A.   There did come a time over the

25    weekend, I don't recall whether it was

Page 69

1                    -Lewkow-

2    Saturday or Sunday, where we did learn -- I

3    think I was reminded in preparing for the

4    deposition, that it was -- we initially

5    learned it when we were copied, or not copied

6    and then forwarded on an e-mail from Sullivan

7    & Cromwell who was co-counsel with us for

8    Barclays, and/or to -- to Weil, that there had

9    been an inadvertent notice given to Barclays

10   by folks in the -- I don't know who, but

11   someone at Barclays had sent a notice of

12   termination of the repo at some point, I

13   believe late Friday, and that that was done in

14   error and should be undone.

15            So if that's what you're asking

16   about, you've heard what my recollection is.

17        Q.   It is.  Let me show you what's

18   previously been marked as Exhibit 27.

19            Have you seen that document before,

20   sir?

21            (Witness reviewing document.)

22        A.   No, I don't believe I have.

23        Q.   You learned about the inadvertent

24   termination of the repo over the weekend; is

25   that right?

Page 80

1                    -Lewkow-

2        answer the question.

3              MR. GAFFEY:  Okay.

4              THE WITNESS:  Can I hear the

5        question?

6              MR. MORAG:  The one that you were

7        prepared to answer.

8              MR. GAFFEY:  I rephrased it.  But

9        let's read it back.

10             THE WITNESS:  Let's hear the last

11       question.

12             (Record read as follows:

13       "Question: Were there discussions

14       between Barclays and Cleary Gottlieb

15       about implications under the Bankruptcy

16       Code in connection with the termination

17       of the repo?  Again, yes or no,

18       please.")

19       A.    To the best of my knowledge, no.

20       Q.    What needed to be corrected, then,

21  in connection with the termination of the

22  repo?  Do you know?

23       A.    That it was in error.  It wasn't

24  supposed to be terminated.  I think I was told

25  that it would create a monstrous obligation to

Page 113

                   -Lewkow-

1

2       A.   My recollection is that on

3 Wednesday and Thursday the goal had been to

4 have a Clarification Letter that we could

5 submit to the Court.  The process was taking a

6 longer time than anyone would have hoped,

7 through no one's fault since everybody

8 operated in good faith to try to get it done.

9          But then on -- so it was already

10 moving slowly.  And by Friday, it was my

11 understanding that Lehman and Barclays

12 officials both learned that there were

13 substantial assets that Barclays -- that the

14 agreement contemplated -- the Asset Purchase

15 Agreement contemplated that Barclays was going

16 to receive as part of its acquisition of

17 basically -- issue with only specified

18 exceptions, basically all of the assets of the

19 business.  And there were a lot less -- in

20 terms of financial assets that it turned out

21 there were going to be a lot fewer than that

22 Lehman was going to be able to deliver.

23         And that had led to discussions

24 that took place during the day Friday -- I

25 don't know exactly when they started and when

Page 114

1                    -Lewkow-

2      they ended.  I don't know if they were in

3      person or over the phone -- between not the

4      lawyers, between representatives of Barclays

5      and representatives of Lehman.  And that was

6      going on until very shortly before the Court

7      hearing began.

8              So while it had been contemplated

9      the day before that we would try to have a

10     proposed form of, or maybe an actual form, I

11     don't recall which, of Clarification Letter to

12     provide to the Court, that events made that

13     impossible.

14         Q.   Now, I take it that between the

15     time of this draft marked as Exhibit 35 and

16     the finalizing of the Clarification Letter on

17     Monday, the signing of the Clarification

18     Letter on Monday, other changes are made.  We

19     will get to those, but I just want to

20     establish the fact that changes were made over

21     the weekend, correct?

22             MR. HUME:  Objection, vague.

23         Changes to what?

24             MR. GAFFEY:  To the Clarification

25         Letter.

Page 115

1                     -Lewkow-

2          A.    Changes to the draft Clarification

3     Letter were made that are reflected in the

4     final Clarification Letter that was signed,

5     yes.

6          Q.    And some of those changes were made

7     over the weekend, Saturday the 20th and Sunday

8     the 21st, correct?

9          A.    New drafts were being prepared and

10    changes to the prior draft were therefore

11    made, correct.

12         Q.    Now, the discussions that you

13    learned had taken place on Friday morning

14    between non-lawyers for Lehman and Barclays

15    that you referred to a moment ago --

16         A.    Morning or early afternoon.  I'm

17    not sure which.

18         Q.    Was it your understanding that

19    those discussions were to include assets in

20    the deal, to make up for assets that Lehman

21    had not been able to deliver?

22              MR. MORAG:  Objection to form.

23         A.    Let me -- I think, I was told --

24    and now I want to carefully describe how I was

25    told it.  But I was told it twice about the

1                -Lewkow-

2    conversation.  I'm doing this and I'm looking

3    at my counsel and Barclays counsel, so they'll

4    caution me, I think.

5                But I was told substantially the

6    same.  And to the extent there's differences,

7    I don't remember which is which and what was

8    the difference.  I was told twice about the

9    results of the conversations that I just

10   alluded to that took place between Barclays

11   representatives and Lehman representatives

12   during the day Friday before the Court

13   hearing.

14               I arrived at the courthouse shortly

15   before the Court was supposed to convene for

16   this case.  And while I was still outside the

17   courtroom, having arrived -- while I was still

18   outside -- not outside the courtroom, outside

19   the courthouse.  While I was still outside the

20   Customs House, another car arrived, or taxi

21   and out came several Barclays representatives,

22   including Michael Klein.

23               Michael Klein, I may have said,

24   what's going on or what happened or something

25   like that --

Page 117

1                    -Lewkow-

2           MR. HUME:  Why don't I interject.

3           THE WITNESS:  Okay.  I don't have

4      to stay with that.

5           MR. HUME:  To the extent --

6           THE WITNESS:  Let me jump ahead.

7      Let me just jump ahead.  Go ahead.

8           MR. HUME:  Just so the record is

9      clear, to the extent Barclays

10     representatives communicated to you in

11     a privileged setting facts that they

12     later communicated in a way that is not

13     privileged, you should disclose --

14          THE WITNESS:  The latter.

15          MR. HUME:  Be careful, but disclose

16     only what was not privileged.

17 BY MR. GAFFEY:

18     Q.   On that point, I want you to go

19 back to what was next in a minute.  But Klein

20 is there.  Who else was there?  Anybody non

21 Barclays was there?

22     A.   Not downstairs, no.

23     Q.   So it was Barclays people and you?

24     A.   I had a conversation, and he

25 summarized the results of the conversation.

Page 118

1            -Lewkow-

2            We then all went to the courtroom,

3    which was a zoo, if I can use that technical

4    term.  And I was near the front of the

5    courtroom near the well.

6            I was sitting on -- I managed to

7    get a seat which not many of us did -- on the

8    side.  I can't remember if there was a jury

9    box in that courtroom or not.  If so, I was

10   just in the chairs just inside what would have

11   been a jury box and next to the table at which

12   Weil Gotshal as debtor's counsel was sitting.

13           And there was a conversation that

14   took place that -- of, you know, somewhere

15   between four and eight people, I can't -- I

16   think it was at least five people, six people,

17   including Michael Klein, myself, Lori Fife,

18   and a few other people.  And it may -- among

19   those other people may have been -- I don't

20   think Harvey Miller was one of them.  I'm not

21   100 percent certain.  I believe that one of

22   them may have included, one or more of them

23   may have been Lehman Brothers business folks

24   or representatives, or Lazard representatives.

25   I'm not sure.  I don't remember.

1          -Lewkow-

2          The only three people I am sure of

3     were present were Michael Klein, Lori Fife and

4     me.  There may have been somebody else from

5     Barclays there as well, like Archie Cox.  I

6     just don't remember.

7          And Michael repeated it enough --

8     as I said in the beginning, I don't recall

9     which conversation is which.  And they were in

10    all, to the extent I can recall, they covered

11    the same topic and were consistent with each

12    other and I'm sure he used different words and

13    the like.  But he repeated what he had told me

14    outside 30 or 40 or 50 minutes earlier, or 15

15    or 10 or whatever.

16         Q.   What did he say?

17         A.   I thought you'd ask that.

18              He reported -- and I had -- he

19    reported that it turned out that Lehman and

20    Barclays had both -- officials had both

21    learned in the prior 24 hours that a number of

22    categories of assets that Lehman had told

23    Barclays and agreed before the Asset Purchase

24    Agreement had been signed and were covered by

25    the Asset Purchase Agreement, as to categories

1                    -Lewkow-

2    -- specifically specified categories.

3              And of course, as you know,

4    Barclays was to get under the Asset Purchase

5    Agreement, except for specified excluded

6    assets, we were supposed to get all assets

7    used in the business.  But there were certain

8    assets, including financial assets that were

9    included within that universe but were also --

10   and so that Barclays had been led to believe

11   were going to be delivered.  That would be

12   true whether or not they were also articulated

13   as within the including language that follows

14   in the definition of "Purchased Assets."

15             But -- so it's the same universe

16   either way.  But certain of those assets,

17   which we have been told were among the assets

18   that Barclays would be getting would not --

19   were not available to be transferred to us.

20   That they either did not own or they had

21   double counted or they were subject to liens

22   in favor of third parties and they could not

23   be delivered.  And so he reported that.

24             And he said that this was -- and

25   again, I believe there may have been a Lehman

Page 121

1                    -Lewkow-

2    person standing there, but I can't tell you

3    who, or a Lazard person, and that he had

4    created real issues as to whether the deal

5    could be due -- doable.

6              He went on to describe a number of

7    things that had come out as further

8    investigation as to facts as well as further

9    discussions and negotiations as to what to do,

10   as to whether this deal could be saved and

11   whether there would be no deal and there would

12   be no one to purchase the assets and to

13   purchase the business and leave the creditors

14   to a liquidation scenario.

15             But he reported on a number of

16   things.  First of all, that two category of

17   assets should have been identified that could

18   have been included in assets that Lehman used

19   in the business and, therefore, should be

20   coming to Barclays pursuant to the Asset

21   Purchase Agreement, which had not been

22   specifically ever mentioned or focused on by

23   Barclays.  And that those helped to some

24   extent mitigate the shortfall that I just

25   described based on what we had known.

Page 122

1                     -Lewkow-

2          So, we had learned things that

3    reduced the pool of assets that were worth --

4    substantially all the assets that we were

5    getting.  But that there were two categories

6    of assets that were within what we were

7    getting that we had not focused on and that

8    Lehman had not told us about were within the

9    pool of assets that Lehman had available for

10   transfer, that they could transfer and would

11   transfer pursuant to the deal.

12          And those, those two categories

13   were the 15c3-3 reserve account or something

14   like that.  I'm not sure "reserve" is the

15   right account.  And where I was told -- I

16   remember often this one being told the precise

17   number, but I don't remember what number it

18   is.  But it was slightly over a billion-seven

19   in -- and I believe he said in security, but

20   he may -- he may not have been that specific.

21          And the second was assets in what I

22   was told was something called the clearance

23   box about -- again, I may have been given a

24   more specific number but this one is less

25   vivid in my mind, of approximately two billion

Page 123

1                        -Lewkow-

2    of assets, and that these assets were

3    available and would be transferred by Lehman

4    as part of the transfer of essentially all the

5    assets that they were going to be giving us.

6              I was also told of some discussions

7    of changes that needed to be made to the deal

8    because that didn't -- the identification of

9    those assets, of additional -- those assets

10   that would be transferred as part of the deal

11   didn't solve by any means the entirety of the

12   problem that had been learned by both sides as

13   to other assets that could not be transferred.

14             And that certain changes to the

15   deal were going to be made.

16             One was -- and that first, another

17   negative change in the deal from Barclays's

18   perspective in that there was a -- there was

19   in the Asset Purchase Agreement a concept

20   of -- I forget what the word was.  "Retained

21   cash."  It was a very strangely drafted

22   clause.  Because retained cash was Lehman's

23   cash that Barclays would get and in a sense it

24   was retained because it would be retained for

25   use in the business that we were effectively

Page 124

1                    -Lewkow-

2    purchasing all the assets of, and certain --

3    and assuming certain specified liabilities.

4              And so I was told that the fact

5    that Lehman would receive the -- Lehman would

6    transfer the so-called retained cash was

7    dropping away and that Barclays would not get

8    that cash.  I believe -- I believe I was told

9    that they just didn't have free cash sitting

10   around, but I don't remember precisely what

11   words were used.  I don't remember precisely

12   what the words were on any, any of these.

13   This is my recollection and paraphrase of what

14   he told the group in the well in the courtroom

15   before the hearing started with a half a dozen

16   or so people.

17             He also talked about a favorite

18   topic, the RESIs, and that it turned out --

19   wait a second.  Hold on a second.  -- no.  I

20   don't think -- I withdraw that.  I don't think

21   there is anything about the RESIs.

22             He reported that another change

23   that needed to be made that the parties had

24   agreed to orally was to eliminate the

25   provision that I testified about earlier in

1                   -Lewkow-

2    response to some -- some of your questions

3    that provided that if Barclays sold certain of

4    the financial positions within one year and

5    made a profit, that certain amounts of

6    additional consideration or compensation would

7    be paid to -- to Lehman, that that provision

8    had also -- would be deleted.

9              That -- let me just think if there

10   was anything else that I can recall.  That's

11   my recollection.

12             MR. GAFFEY:  Do you want to take a

13        lunch break?

14             MR. MORAG:  Yes.  I believe it's

15        available.

16

17        (Luncheon recess taken at 1:10 p.m.)

18

19                  - - -

20

21

22

23

24

25