Page 1

```
 1
 2              UNITED STATES BANKRUPTCY COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4     ------------------------x
 5     In Re:
 6                              Chapter 11
 7     LEHMAN BROTHERS           Case No. 08-13555(JMP)
 8     HOLDINGS, INC., et al.,   (Jointly Administered)
 9
                     Debtors.
10
       ------------------------x
11
12
13
14            DEPOSITION OF MARTY MALLOY
15                 New York, New York
16                  March 1, 2010
17
18
19
20
21
22
23     Reported by:
24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25     JOB NO. 28684
```

1

2          March 1, 2010

3          9:43 A.M.

4

5       Deposition of MARTY MALLOY,

6   held at the law offices of Jones Day,

7   LLP, 222 East 41st Street, LLP, New

8   York, New York, before Kathy S. Klepfer,

9   a Registered Professional Reporter,

10  Registered Merit Reporter, Certified

11  Realtime Reporter, Certified Livenote

12  Reporter, and Notary Public of the State

13  of New York.

14

15

16

17

18

19

20

21

22

23

24

25

1         M. Malloy

2    Q.   You say in paragraph 3, "Rather, I was
3 simply reporting to Mr. LaRocca the nominal
4 value BONY had assigned to the collateral it had
5 received in connection with the September 18,
6 2008 repo transaction."
7         Do you see that sentence?
8    A.   I do.
9    Q.   I know everybody was busy that week,
10 but was that the purpose of your task in
11 preparing 144A, to give that information to Mr.
12 LaRocca?
13        MR. GREEN:  Object to the form.
14   A.   Yes, it was.  The purpose of this was
15 to see how much additional collateral we got in
16 that Friday morning because of the shortfall the
17 Thursday night.  That was the purpose of the
18 e-mail.
19   Q.   And in the next sentence of paragraph
20 3, you say you were "referring to a BONY
21 document" that you had received "shortly
22 before."  Do you see that?
23   A.   Yes.
24   Q.   What was the BONY document you were
25 referring to in your declaration?

1           M. Malloy

2      A.    We had received BONY documents during
3 that previous day in order to look at the
4 valuations, and then I called the collateral
5 operations managers those Fridays to get the
6 latest information.
7      Q.    So when you prepared 144A, you
8 extracted figures from the BONY document, as you
9 say in your declaration, but also you extracted
10 relevant figures from your verbal communications
11 with others?
12           MR. GREEN:  Object.
13      Q.    Correct?
14      A.    Correct.
15           MR. GREEN:  Object to the form.
16      Q.    And the verbal communication that you
17 had with others, did they give you information
18 that was different from that available to you in
19 the BONY document you referring to in your
20 declaration?
21           MR. GREEN:  Object to the form.
22           Do you remember?
23           THE WITNESS:  Well, yes, because the
24      collateral had changed.  We got additional
25      collateral in on that Friday.

1          M. Malloy

2      Q.    So in paragraph 3 of your declaration
3  where you say, "Referring to a BONY document I
4  had received shortly before, I extracted the
5  relevant figures and performed some mathematical
6  calculations adding up the numbers provided by
7  BONY and subtracting the $45 million that
8  Barclays had advanced," in addition to what you
9  described there, the calculations you did were
10 also dependent on other information; is that
11 right?
12         MR. GREEN:  Object to the form.
13     A.    Specifically, I started with the
14 valuations from the Thursday night.
15     Q.    Yes.
16     A.    And then updated it with the Friday's
17 figures, the BONY statements from the Thursday
18 night which we had received, which was a day
19 old, and then the Friday valuations.
20     Q.    And the Friday valuations you
21 understood also to be derived from BONY
22 valuations, correct?
23     A.    Yes.
24     Q.    They were not the result of any
25 internal valuation done by Barclays personnel?

1           M. Malloy

2      A.   No.

3      Q.   So the calculations that you prepared
4 in Exhibit 144A derive entirely from BONY's
5 marks, correct?

6      A.   That is correct.

7      Q.   And you took the information you had
8 about the BONY marks and you put together a
9 calculation of what you describe in your e-mail
10 as excess collateral; is that right?

11          MR. GREEN:  Object to the form.

12     A.   In the e-mail, yes.

13     Q.   And the excess collateral, the number
14 on paragraph 144A is 7.19; that's billions,
15 correct?

16     A.   That number is in billions.

17     Q.   And so the calculations that you
18 performed or the calculations you put together
19 based on the BONY marks indicated there was
20 excess collateral of 7.19 billion in the repo,
21 correct?

22          MR. GREEN:  Object to the form.

23     A.   Based on the BONY marks, but the other
24 issue that we had is none of this collateral was
25 reconciled, so this was the best estimate that

1           M. Malloy
2  we had at that point in time.
3       Q.    I would be grateful if I could just
4  have an answer to the question I actually asked,
5  which is the calculations that you put in
6  Exhibit 144A were based solely on BONY marks,
7  correct?
8       A.    Correct.
9       Q.    And the calculations you did in 144A
10 based solely on BONY markets indicated excess
11 collateral of 7.19 billion, correct?
12            MR. GREEN:  Object to the form.
13      A.    Yes.
14      Q.    And you transmitted that information
15 about excess collateral of 7.19 billion,
16 according to the BONY marks, to Messieurs
17 LaRocca and King, correct?
18      A.    Yes.
19      Q.    And you refer in your e-mail to a
20 spreadsheet, "I will send Jackie a spreadsheet
21 as well for Gerard," do you see that?
22      A.    I do.
23      Q.    Did you prepare such a spreadsheet?
24      A.    As I recall, yes.
25      Q.    Do you know if it still exists?

1           M. Malloy
2      A.   I don't know.
3      Q.   Okay. When was the last time you saw
4  that spreadsheet?
5      A.   That Friday.
6      Q.   Did you transmit that spreadsheet by
7  e-mail or by some other mechanism?
8      A.   I believe by e-mail.
9      Q.   And who was the Jackie you refer to in
10 that sentence?
11     A.   It was the -- Jackie Stanley.
12     Q.   And what was Jackie Stanley's job?
13     A.   She's an administrative assistant.
14     Q.   And do you know if Jackie has a copy
15 of the spreadsheet that you refer to here?
16          MR. GREEN: Object to the form.
17     A.   I don't know.
18          MR. GAFFEY: Again, Chris, I don't
19     think that spreadsheet has been produced, so
20     I would make the same request for its
21     production.
22     Q.   Now, do you know if the -- well, you
23 performed no independent valuation of the
24 collateral in the repo at this point, correct?
25     A.   That's correct.

1                    M. Malloy

2   preparing that e-mail, I conducted no

3   independent valuation and made no effort to

4   validate BONY's numbers, which in any event I

5   believed to be a preliminary list."  Do you see

6   that sentence?

7         A.    I do.

8         Q.    Did anyone else at the time that you

9   prepared the e-mail, or in connection with

10  preparing the e-mail, had anyone else done an

11  independent valuation?

12        A.    I don't see how we could because all

13  of the collateral wasn't booked.

14        Q.    And in the next sentence of that

15  paragraph, you say that "many of the securities

16  to which BONY assigned nominal values were

17  highly illiquid and would have required

18  substantial analytical work to value

19  accurately."  Do you see that portion of the

20  sentence?

21        A.    I do.

22        Q.    Did you have any discussions with Mr.

23  LaRocca or Mr. King about that topic at the time

24  that you sent this e-mail?

25        A.    I remember discussing with Mr. LaRocca

Page 38

1      M. Malloy

2  as the securities came through that there was

3  corporate bond inventory in there, and corporate

4  bond valuations were very subject at that point,

5  they were very liquid.

6      Q.   Did you have any discussions with Mr.

7  LaRocca about any of the buckets of securities

8  that come over being large positions that would

9  have required some sort of liquidity discount?

10         MR. GREEN:   Object to the form.

11     A.   In the Fed transfer, not specifically,

12 no, not that I can recall.

13     Q.   Were there any particular corporate

14 bonds that you discussed with Mr. LaRocca that

15 would require closer analysis to arrive at a

16 valuation?

17         MR. GREEN:   Object to the form.

18     A.   No, it was more that asset class at

19 that point in time was under tremendous stress.

20     Q.   In any of --

21     A.   Unlike equities, which are more

22 liquid.

23     Q.   In any of your conversations with Mr.

24 LaRocca, did you talk about any particular, by

25 name, any particular of the securities in the

1      M. Malloy

2  repo as opposed to talking about them by asset

3  class?

4      MR. GREEN: Object to the form.

5      A.    In the Fed repo, not that I recall,

6  no.

7      Q.    Now, further into that sentence in

8  paragraph 4, that is, the second -- I'm sorry,

9  the third sentence in paragraph 4, you refer to

10 substantial analytical work and you say that was

11 "work that BONY had simply not had time to do."

12     What's the basis of that statement?

13 How do you know BONY didn't have time to do it?

14     A.    That was really more referring to the

15 getting us the accurate statements of everything

16 that was in there. The only reason I know it

17 wasn't able to do was we didn't shut the whole

18 process till I think it was like 2 o'clock in

19 the morning, so all of the reporting didn't come

20 out -- until I think it was a couple hours out

21 of the normal end-of-day business. It was two

22 hours delayed.

23     Q.    So when you refer in your declaration

24 to "work that BONY simply had not had time to

25 do," we should understand you to be referring to

1           M. Malloy

2    the work of getting you the documents, getting

3    you the information?

4           MR. GREEN:  Object to the form.

5       Q.  As opposed to time to perform

6    valuations that were contained in that

7    information?

8       A.  Well, they're related.  If you don't

9    have all of the collateral in there, your

10   valuation is off.

11      Q.  Well, in that sentence you, again, in

12   the whole sentence, and I don't mean to break it

13   up, but -- let me read the whole thing into the

14   record:  "To the contrary, given that many of

15   the securities to which BONY assigned nominal

16   values were highly illiquid and would have

17   required substantial analytical work to value

18   accurately -- work that BONY had simply not had

19   time to do -- I did not believe that the BONY

20   numbers represented an accurate assessment of

21   what the collateral was worth."

22          Do you see that?

23      A.  Yes.

24      Q.  When you put this in your declaration,

25   was that meant to be a statement about the

Page 41

1           M. Malloy
2  values that BONY assigned or, as I think you
3  have just described, BONY hadn't had time to get
4  you full collateral lists?
5           MR. GREEN:  Object to the form.  You
6      mischaracterized his testimony.
7      A.   This piece, when I was assigning the
8  nominal values -- it's twofold.  So number one
9  is all the collateral so that these high-level
10 numbers which is what I was looking at, right --
11     Q.   Yes.
12     A.   -- is what's representative.  And
13 that's in two forms:  One, the overall
14 collateral that you're going to be getting in,
15 and yes, the valuation that they were applying.
16          So it's twofold, number one, it's all
17 the collateral that actually came in and then
18 updating all those prices on the Bank of New
19 York component, because we were running two
20 hours late, I had no knowledge of even those
21 valuation numbers, which we don't use in our
22 systems, were -- were refreshed due to the late
23 nature of the process.  I couldn't tell if they
24 had updated all their prices or other collateral
25 came in.

1          M. Malloy

2     Q.   To go back to the sentence that's in
3 your declaration, are you describing in that
4 sentence the process of updating the prices, or
5 are you saying that BONY didn't have time to get
6 you an accurate -- a complete collateral list?
7          MR. GREEN: Object to the form.
8     A.   In this statement, in this particular
9 sentence, the price.
10    Q.   How do you know that BONY had not had
11 time to do the pricing?
12    A.   As I stated earlier, based on the fact
13 that everything was backed up, I could not rely
14 upon the fact that everything was accurate.
15    Q.   Did you have any conversations with
16 anyone at BONY about whether they had time to do
17 the pricing at the time that you prepared
18 Exhibit 144A?
19    A.   Not that I recall.
20    Q.   Did you talk to anyone who had talked
21 to BONY about whether they had time to do the
22 pricing?
23         MR. GREEN: Object to the form of the
24    question.
25    A.   Not specifically, not pricing that I

Page 43

1      M. Malloy

2  recall.

3      Q.   So could you tell me what is the basis
4  for your statement in your declaration that BONY
5  did not have time to do the pricing?  What's the
6  information source that gave you the ability to
7  swear to the truth of that?

8      A.   The fact that we could not have
9  verified all that information.

10     Q.   That's a different question, sir.  The
11 question is how did you know, how were you able
12 to say in your declaration that BONY did not
13 have time to do valuations?

14          MR. GREEN:  I think he's answered.

15     Q.   What's the source of that information?

16          MR. GREEN:  I think he's answered your
17     question, Bob.

18          MR. GAFFEY:  I don't think he has.

19          MR. GREEN:  I think he has.

20     Q.   You can answer the question.

21          MR. GREEN:  Object to the form.

22     A.   In relating to this specific e-mail,
23 right, what I was referring to in this statement
24 is the fact that analytical work could not have
25 been done based on the late nature that we

Page 44

1           M. Malloy
2  actually put in place that following morning.
3  That's what I was referring to in that
4  statement.
5       Q.   You've explained to me how it would
6  take Barclays some time to do its analytical
7  work to arrive at pricing that it wanted. I'm
8  asking a different question. I'm asking you,
9  what's the basis of your statement that BONY
10 simply had not had time to do that? How do you
11 know that that's true?
12          MR. GREEN:  Object to the form. Asked
13     and answered.
14      Q.  The answers are about Barclays. I'm
15 asking about BONY. How do you know BONY didn't
16 have time to do it?
17          MR. GREEN:  The statement is they did
18     not have the time to do the work accurately.
19          MR. GAFFEY:  The statement says what
20     it says. You don't have to explain it to
21     him. What I want is the basis of this
22     information in this statement, under penalty
23     of perjury, that BONY did not have time.
24          MR. GREEN:  You don't need to hammer
25     on about "under penalty of perjury." He

1           M. Malloy

2      understands he signed the declaration under

3      penalty of perjury.

4      Q.     So what's the basis of your knowledge,

5  sir, that BONY did not have time to do

6  valuations?

7           MR. GREEN:   He has given that to you,

8      Bob.

9      A.     At the time I wrote this e-mail, we

10  did not have all of the relevant information

11  from Bank of New York.  I was simply referring

12  to the timing delay in which to get all of the

13  information from Bank of New York.  It was not

14  to complete, as I understood it, talking to

15  the -- talking to the collateral people coming

16  back for when I put this in place.

17     Q.     And when you got the information from

18  BONY, it had BONY's pricing on it, correct?

19          MR. GREEN:   Object to the form.

20     A.     That Friday?

21     Q.     Whenever it came in on the Thursday or

22  Friday, it came in with pricing, yes?

23     A.     Yes.

24     Q.     And the pricing was pricing assigned

25  to it by BONY, correct?

08-13555-mg    Doc 7669-5    Filed 03/18/10    Entered 03/18/10 21:50:25    Exhibit 69
Pg 18 of 20

Page 46

1           M. Malloy
2      A.   Yes.
3      Q.   So it's fair to say that, at least by
4 the time BONY got you the information, BONY had
5 time to arrive at its own version of the pricing
6 of the collateral, correct?
7           MR. GREEN: Object to the form of the
8      question.
9      A.   They produced statements. I don't
10 know how accurate -- I was suspect of the
11 accuracy at that time given, again, the delay
12 that we had in the processing.
13     Q.   Did you get any information from BONY
14 that did not contain pricing, that only had
15 nominals?
16     A.   I don't know because I did not receive
17 those statements on that Friday.
18     Q.   Did you ask anybody if that was so?
19 Do you know one way or the other?
20          MR. GREEN: Object to the form of the
21     question.
22     A.   No.
23     Q.   When you referred in paragraph 4 to
24 securities that were "highly illiquid," did you
25 have any particular securities in mind?

Page 47

1              M. Malloy

2      A.    No, just more of the corporate bonds
3  that were under stress at the time.
4      Q.    Again, that's more by asset class than
5  by any particular issue, any particular bond,
6  yes?
7      A.    For the Fed repo, that's correct.
8      Q.    To your knowledge, sir, was -- I may
9  have touched on this before.  I just want to ask
10 this to set the topic for the next few
11 questions.
12           After Barclays got the collateral, did
13 it conduct a valuation of its own?
14           MR. GREEN:  Object to the form.  Asked
15     and answered.
16     A.    As the normal course of business,
17 Barclays does make a valuation of the
18 collateral.
19     Q.    Do you know if with respect to the
20 particular collateral in the repo we've been
21 talking about it followed that normal course of
22 business, it did that?
23           MR. GREEN:  Object to the form.  Asked
24     and answered.
25     A.    I do not know because I did not book

1           M. Malloy
2   the collateral.
3        Q.   So if I were to ask you how long it
4   took to prepare valuations for the repo
5   collateral, would you know?
6             MR. GREEN:  Object to the form.
7        A.   No.
8        Q.   Were you involved in that process at
9   all?
10       A.   No, other than just getting, you know,
11  the data, you know, to the appropriate folks.
12       Q.   So you sent the data out.  I'm at the
13  other end.  Are you at any point where you get
14  the valuations back?
15       A.   No.
16       Q.   Have you ever spoken to anyone at
17  Barclays about that topic outside the presence
18  of your lawyers?
19       A.   No.
20       Q.   Do you have any knowledge as to how,
21  if at all, the Barclays valuations differed from
22  the BONY valuations?
23       A.   I don't know.
24       Q.   Do you know if they did?
25       A.   I knew we had a lot of reconciliation