Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   -------------------------------x

    In Re:                    Chapter 11

5   LEHMAN BROTHERS            Case No. 08-13555 (JMP)

    HOLDINGS, INC., et al.,    (Jointly Administered)

6   -----------------------------)

7

8       * * * HIGHLY CONFIDENTIAL * * *

9        DEPOSITION OF BRYAN MARSAL

10          New York, New York

11        Tuesday, December 22, 2009

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 26534

22

23

24

25

1

2

3

4

5                    December 22, 2009

6                    10:04 a.m.

7

8

9            HIGHLY CONFIDENTIAL videotaped

10     deposition of BRYAN MARSAL, held at the

11     offices of Boies Schiller & Flexner,

12     LLP, 575 Lexington Avenue, New York, New

13     York, pursuant to Notice, before Francis

14     X. Frederick, a Certified Shorthand

15     Reporter, Registered Merit Reporter and

16     Notary Public of the States of New York

17     and New Jersey.

18

19

20

21

22

23

24

25

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     last name now.  I'm at a loss.  But the chief

3     administrative officer.  He gave me a briefing

4     Thursday -- I believe Thursday or Friday of

5     that week on what the transaction looked like.

6          Q.     And -- is it Berkenfeld?

7          A.     Berkenfeld.  Excuse me.  Yes.

8     Steven Berkenfeld.

9          Q.     And that was on Thursday or Friday

10    of that week?

11         A.     Yeah.  Yes.

12         Q.     And did he go through the assets

13    that were being sold and the liabilities being

14    assumed?

15         A.     Really, no.  He went through a

16    very -- very much an overview, which was the

17    company was assuming -- Barclays was assuming

18    liabilities consisting of debt that it --

19    secured debt.  Unsecured payables and

20    unsecured bonus accrual liability.  In

21    exchange for that there was going to be an

22    exchange of an equal amount -- equal value of

23    assets.  I think they referred to the

24    transaction as a push.  It was the assets

25    would equal the liabilities.

1          B. MARSAL - HIGHLY CONFIDENTIAL

2          Q.    At any point did you review any of

3    the sale contract documents?

4          A.    No.

5          Q.    Are you aware of any requirement

6    in the sale agreement for the deal to somehow

7    be, as you say, a push?

8               MR. GAFFEY:  Excuse me one second.

9               (Pause on the record.)

10              MR. GAFFEY:  Object to the form.

11          Can you put a time period on that, Todd,

12          so I can know whether I have a privilege

13          I have to assert.

14              MR. THOMAS:  Well, I just want to

15          ask it as a factual question.

16              MR. GAFFEY:  That's not a time

17          period.  I need a -- we have a privilege

18          waiver agreement that goes up to

19          September 30, as you know.  If it's

20          anything he learned after that, I'm

21          going to instruct him not to answer on

22          the grounds of privilege.  If it's

23          before that, that's within our waiver

24          and I'll let him answer.

25              MR. THOMAS:  If it's just a fact

1       B. MARSAL - HIGHLY CONFIDENTIAL

2       of whether he believes there's something

3       in the contract that requires it to be a

4       push, you're not going to let him answer

5       that?

6               MR. GAFFEY:  I'm not going to let

7       him answer anything he's learned from

8       conversations with counsel after

9       September 30th.  If you put a time

10      period on it before September 30, we

11      don't have any problem here.  And then

12      you can follow up and I can make a more

13      focused privilege assertion if I need

14      to.

15              MR. THOMAS:  Sure.  Well, we'll

16      break it down.

17              MR. GAFFEY:  Okay.  Thanks.

18  BY MR. THOMAS:

19      Q.      Before September 30th, did you

20  have any knowledge as to whether there was any

21  requirement for a push that was in the sale

22  documents?

23      A.      The only conversation that I can

24  recall was with Steven Berkenfeld.  And that

25  discussion was his description of the

Page 15

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     transaction as assets equaling liabilities.

3     And my concern, again, about the whole

4     transaction, since we were excluded from its

5     review, was making sure we had access to

6     the -- you know, to the technology base that

7     was also being transferred.  And my focus was

8     5 percent about the transaction and 95 percent

9     about the access to the technology -- I mean,

10    to the information base.

11         Q.    So you specifically recall in that

12    conversation Mr. Berkenfeld saying that the

13    assets were going to equal liabilities?

14         A.    Yes.

15         Q.    Okay.  What else do you

16    specifically recall about his description of

17    the deal?

18         A.    It was, like I said, it was very

19    brief.  That was not our purview so we were

20    specifically excluded from those negotiations

21    when -- and people who were having those

22    negotiations missed appointments to debrief us

23    on their areas of involvement.

24         Q.    Can you recall anything else

25    specific about the conversation with

1        B. MARSAL - HIGHLY CONFIDENTIAL

2    Mr. Berkenfeld other than that assets were

3    supposed to equal liabilities?

4        A.    The assurances that there would be

5    access to the technology and the information

6    through a TSA.  And that in order to -- in

7    order to ensure that that access was made, I

8    should assign one of my people to make sure

9    that the TSA was done in such a way as to

10   provide that access.

11       Q.    Um-hum.  Did Mr. Berkenfeld

12   provide you with any description of the assets

13   that were being transferred?

14       A.    No.

15       Q.    Wouldn't that be relevant to what

16   you needed to know?

17            MR. GAFFEY:  Object to the form.

18       You can answer.

19       A.    Well, again, the -- we were not

20   involved with the negotiation of the

21   transaction.  My assumption was that this

22   transaction involved securities because of the

23   cash position of the company, we were told

24   that the cash position of the company was

25   pretty low, pretty desperate.

1          B. MARSAL - HIGHLY CONFIDENTIAL

2               So my conclusion was that the

3    value that was being given was not in the form

4    of cash.  So the only other alternative would

5    have been securities or property.

6          Q.    You said that there was a carveout

7    for a couple of transactions, one of which was

8    the sale to Barclays in which Alvarez & Marsal

9    was not involved; is that right?

10         A.    Yes.

11         Q.    And can you describe what you mean

12   by --

13         A.    Well, the other carveout was the

14   Newburger Burnham transaction which was being

15   pursued at the time.  There was an active

16   auction taking place, and so for us to intrude

17   in that auction was not deemed to be sensible

18   either.

19         Q.    Was that carveout with respect to

20   the Barclays sale in writing somewhere?

21         A.    I don't know if it was in writing.

22   I don't know if it was in writing.  We were

23   told that that is -- those two transactions

24   are going forward and that really you need to

25   focus on -- you need to focus on the wind-down

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     of the company exclusive of those two

3     transactions because the plan was to go

4     forward with both transactions as soon as

5     possible.

6          Q.    And who told you that?

7          A.    Steve Berkenfeld.

8          Q.    Anyone other than Steve Berkenfeld

9     say anything that you took as a carveout

10    for --

11         A.    Well, the others didn't make the

12    meetings that we had with them.  So he was the

13    only one that made the meetings.

14         Q.    Okay.  So when you refer to a

15    carveout, you're referring to something that

16    Steve Berkenfeld told to you personally?

17         A.    Yes.  Steve Berkenfeld said these

18    are two areas that you should not focus your

19    attention on.  These are transactions which

20    are going forward.  You should focus on the

21    company post these two transactions happening.

22         Q.    Did he ever say it in terms of you

23    must not be involved in those or was it just

24    that shouldn't be your focus?

25         A.    No.  Should not be your focus.

1        B. MARSAL - HIGHLY CONFIDENTIAL

2        Q.    Okay.  And when did he tell you

3    that?

4        A.    In the -- only -- during the week

5    of -- back to the 15th.  During that week the

6    only one we had contact with was Steve

7    Berkenfeld that was on the negotiating team.

8        Q.    Do you know which day of the week

9    that was?  Was that part of your Thursday or

10   Friday conversation?

11       A.    I would suspect it was Wednesday

12   or Thursday-ish.

13       Q.    Okay.  And what was your reaction

14   to him saying that you don't need to focus on

15   that because those deals are going forward?

16       A.    It was described as a transaction

17   that was happening and that it was well along

18   and that it was not something that we should

19   focus our attention on.  Focus on the assets

20   that are remaining.

21       Q.    Did that seem reasonable to you?

22       A.    Yes.

23       Q.    Did he explain why the transaction

24   was going forward or needed to go forward?

25       A.    Well, both transactions were going

1          B. MARSAL - HIGHLY CONFIDENTIAL

2    when we went upstairs, we basically sat in the

3    conference room for five hours pretty much by

4    ourselves.

5              We were given the form of the

6    company's 10-K and told to look at it.  So we

7    spent the first day really looking at the 10-K

8    because everybody else was busy.  Part of the

9    team was busy working on the transactions,

10   either the Barclays or the Newburger Burnham,

11   and the other part of the team was pretty much

12   paralyzed.  They were just in a state of shock

13   that this had happened.

14             And so the first couple of days,

15   you know, there was very little productivity.

16   It was mostly getting up to speed on the

17   businesses and trying to talk to HR and

18   getting an organization chart.

19             But people didn't really have time

20   for us that first week.  They were all busy

21   trying to transfer -- HR was trying to

22   transfer people.  You know, what will the

23   Barclays transaction look like, how will we

24   transfer those people over to Barclays.  So

25   that was their focus.  So getting them to give

1          B. MARSAL - HIGHLY CONFIDENTIAL

2    us org charts was not possible.

3          The financial team did not make

4    themselves available I think until Thursday or

5    Friday of that week, and that was like -- they

6    were so exhausted that they really couldn't

7    provide us much in the way of support.

8    Everything was we'll do it after the fact.

9    We're just too tired right now to help answer

10   any questions.

11         So the first week was -- Monday

12   through Thursday was pretty much a wash, a

13   wash-out.  I mean, there was just not people

14   available.

15        Q.    When you showed up at Lehman that

16   week, at that point in time how did Lehman

17   mark the value of the securities that they

18   held?

19        A.    Didn't have a clue.  We didn't

20   have information so we did not have a clue.

21   That was what the technology -- our interest

22   in the technology was.  If you knew -- we had

23   to capture the transactions.  We had to

24   capture the assets.  We had to try and capture

25   the most recent marks.  There was no further

1          B. MARSAL - HIGHLY CONFIDENTIAL

2    updating of the marks after the filing.  So we

3    were pretty much in limbo.  That was exactly

4    what we were concerned about.

5          Q.    And when you say no further

6    updating of the marks, were the last values

7    that you had for the securities held by, for

8    example, LBI, would they have been from the

9    week before filing for bankruptcy?

10              MR. GAFFEY:  Objection to form.

11         A.    No.  The values were mostly -- I

12   mean, some of the transactions are marked

13   every day.  So you had some transactions that

14   would eventually be available from the 12th of

15   September, but most of the assets were really

16   as of quarter end.  Some of them were June

17   30th, 2008 and some of them were August, and

18   those would have been the -- I mean, they were

19   all over the map.

20              And, again, that's part of the

21   problem.  We did not have an updated asset

22   list.  We didn't even know what we owned.  We

23   didn't know what we owned and we didn't

24   know -- we didn't know what the value was of

25   it and we couldn't find a -- we didn't have an

Page 24

1              B. MARSAL - HIGHLY CONFIDENTIAL

2     information system where we could have access

3     to that, which was the biggest concern.  Which

4     is, again, that's really what the concern was

5     as it relates to this transaction.

6          Q.    So, for LBI's assets, some of

7     their assets you may have had -- the most

8     recent marks you would have had or that Lehman

9     would have had would have been as of September

10    12 and some of the most recent -- for other

11    assets the marks would be not as recent as

12    September 12; is that right?

13              MR. GAFFEY:  Object to the form.

14         You can answer.

15         A.    Well, again, we're talking about

16    LBHI and the 19 subsidiaries that filed

17    bankruptcy.  LBI was in a state of chaos.  So

18    I don't have a clue what was going on at LBI

19    but that, as you know, was not even -- that

20    wasn't even our purview.  That's the

21    broker/dealer, LBI.

22         Q.    Was it your purview before the

23    receivership, the trusteeship --

24         A.    No.

25         Q.    -- of LBI?

1          B. MARSAL - HIGHLY CONFIDENTIAL

2          A.    No.   It was always -- the

3    broker/dealer was going to be governed by the

4    SIPA trustee.   There was going to be a

5    different receiver for that.   And, in essence,

6    we were going to be receiver for everything

7    else other than that.

8               And there was negotiations going

9    on.   As you know, assets and subsidiaries

10   moved out of the LBI broker/dealer into the

11   realm of LBHI in conjunction, working together

12   to maximize the recovery value of the assets.

13   That's why that was all going on.

14              So we were fully anticipating that

15   LBI would be seeking bankruptcy at some time

16   in the near future, and that's what the game

17   plan was in terms of Weil Gotshal working with

18   counsel.

19         Q.    And the -- are you familiar --

20   you're aware that part of the Barclays

21   transaction involved the sale of certain long

22   positions, securities, correct?

23         A.    I'm -- like I said, depending on

24   when.   I mean, today I understand a lot about

25   the transaction.   At the time my knowledge of

Page 26

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     the transaction was really two-fold.  It was

3     this transaction assets -- asset values are

4     going to cover liabilities.  We will be no

5     worse off, no better off.  It's a push.  And

6     you will have access to -- even though you're

7     selling the data centers and you're

8     transferring all of the software and all of

9     the access to those systems, you will have a

10    TSA in place which will permit you to take an

11    inventory of your assets, to value your assets

12    on a real-time basis so that you can know what

13    you got.

14          Those were the two focuses of the

15    Barclays transaction.  The actual securities

16    wasn't -- that wasn't on my radar screen.

17    Q.    Let me go ahead and show you a

18    document that we'll mark as 482.

19          (Deposition Exhibit 482, January

20          29, 2009 341 Meeting of Creditors

21          transcript, marked for identification as

22          of this date.)

23    BY MR. THOMAS:

24    Q.    And let me ask you to turn to page

25    18, please.

Page 52

1          B. MARSAL - HIGHLY CONFIDENTIAL

2          "Interesting details from this and other

3          reports:"  And then it goes on to talk.

4          A.    Yeah.  I mean, this is just sort

5     of like interesting but not relevant.  The

6     relevant part was the first and the second

7     paragraph of this e-mail.  The third was

8     tid-bits of information, gossip that he heard

9     in Akin Gump and pieces of information he got.

10    From where I don't know.  You'll have to ask

11    him that question.

12          But the key parts of this e-mail,

13    as I was indicating, is the TSA, is the first

14    paragraph.  We got to get the TSA, we got to

15    get the technology services agreement done, we

16    got to get that information.  And Bob Hershan

17    saying, Well, what are we going to do with the

18    people.  We got to tell the people what their

19    status is when they move over to the new

20    employer.

21          So the first and second was really

22    the thrust.  The rest of this is just, Oh, by

23    the way, this is what I've heard.

24          Q.    You referred to it as gossip and

25    just what he heard --

1          B. MARSAL - HIGHLY CONFIDENTIAL

2          A.      Just interesting points.

3          Q.      But do you know what his source of

4     information was and how he got it?

5          A.      I do not know the source of

6     information for these three, no.

7          Q.      Under the first bullet point there

8     where it says $200 million price reduction and

9     then it continues on, lower price reduction

10    rationale now conveying to Barclays

11    47.4 billion of securities and 45.5 billion of

12    liabilities for a net value of 1.9 billion.  A

13    change from the earlier 72 billion in

14    securities and 68 billion of liabilities for a

15    net value of 4 billion.

16               Do you see that?

17         A.      Um-hum.  Yes.

18         Q.      So that's not consistent with the

19    deal being a push, is it?

20               MR. GAFFEY:  Objection to the

21         form.

22         A.      I don't know what that all means

23    to him.  Maybe you can decipher that.  To this

24    day I don't know what this means.

25         Q.      Did it cause you any -- did any of

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     those numbers cause you any concern about the

3     deal that was being negotiated?

4          A.    No.   No, what caused me concern

5     was the first point, which is the TSA.   To the

6     extent that I have access to the information

7     and the transaction information, I can

8     reinstruct whatever has happened.   That's my

9     focus at this point in the crisis.

10         Q.    The last bullet point on the page,

11    he writes, Mr. Fogarty writes, "Well said.

12    Daniel Golden of Akin Gump.   Clients holding

13    about 9 billion in bonds.   'We believe this

14    was a flawed sales process.   It benefits

15    Barclays and the federal government but not

16    the creditors of this estate'."

17              Did that -- reading that did you

18    have any reaction to that or being concerned

19    about not benefiting the creditors of the

20    estate?

21         A.    Did I have a reaction to Danny

22    Golden's representing a client saying this

23    client doesn't think he's getting paid enough

24    money for something?   Yeah, my reaction is

25    I -- that's pretty typical of what Danny

Page 55

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     Golden would say.

3          Q.     Well, it's also Mr. Fogarty saying

4     well said.   This is Mr. Fogarty's comment on

5     this.

6          A.     Yeah.

7          Q.     Did that cause you to question --

8          A.     You know, my concern was not that

9     this -- this transaction was done for a whole

10    host of reasons and those reasons were done --

11    were obviously in the minds of the people who

12    were negotiating it at the time.   It wasn't

13    for me to question whether Barclays got a good

14    deal or didn't get a good deal.   What was was

15    I wanted to make sure that we would have

16    access to the information, to the technology

17    to reconstruct the transactions surrounding

18    this estate.   The actual transaction with

19    Barclays was really not -- that was not,

20    again, under my purview.   Interesting to know,

21    but not relevant.   The first item is the

22    relevant item to me.

23          Q.     So even if Barclays was getting a

24    good deal, that wouldn't be relevant to you at

25    this time?

Page 56

1          B. MARSAL - HIGHLY CONFIDENTIAL

2          A.    No.   Barclays getting a good deal,

3     I mean, it's all in the eyes of the beholder.

4     I mean, because Danny Golden or Jim Fogarty

5     don't believe it's a good deal, I mean, I'm

6     not negotiating the deal.   I don't know the

7     pros and cons, the pluses and minuses, nor do

8     they.   What I knew is I could not manage this

9     estate unless I had the fact base and the

10    information and the TSA.

11         Q.    You mentioned the deal was done

12    for a host of reasons.   Could you describe

13    ·what those reasons were?

14         A.    Well, it was described in court.

15    I mean, you had a national emergency, is what

16    was described I think by Harvey Miller when he

17    presented this to the judge, a national

18    economic crisis going on.   You had employee

19    jobs trying to be retained.   You had customer

20    custodial accounts that you were trying to be

21    responsible to those people who would have

22    been locked down had they not been able to get

23    their cash out of this company.

24              Those were the reasons that were

25    given in the court.   I was aware of those

Page 82

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     starts at the bottom of the page and contains

3     a description of the Barclays sales

4     transaction.

5          Do you see that?

6          A.    I'm sorry.  Which one are you

7     referring to?  Which memo are you --

8          Q.    The earliest e-mail in time which

9     begins at the bottom of the first page, that

10    is from Mr. Fogarty dated September 26.

11         A.    Yes.  This wasn't to me.  This was

12    to Jim Fogarty -- or was it -- did he e-mail

13    me?  Yeah, I guess I'm on circulation.

14         Okay.  I'm sorry.  What was your

15    question?

16         Q.    Okay.  I was just pointing your

17    attention.  Do you recognize this as an e-mail

18    to you from Jim Fogarty dated September 26?

19         A.    I do not but I have no reason to

20    believe it is not.

21         Q.    If you turn the page -- have you

22    had a chance to review this e-mail?

23         A.    Yes.  I just read it.

24         Q.    Okay.  And the e-mail is generally

25    describing the Barclays sales transaction; is

1       B. MARSAL - HIGHLY CONFIDENTIAL

2    that correct?

3       A.    Yes.   Um-hum.

4       Q.    Okay.   For instance, on the second

5    page, near the top it says Schedule A, a list

6    of securities transferred under the Barclays

7    repo agreement and then it refers 44 billion

8    in collateral.

9            Do you see that?

10      A.    Yes.

11      Q.    And the discussion goes on and two

12   paragraphs down he writes, "Check my thinking

13   but the 44 billion is match booked through the

14   unwind of the repo."

15           Do you see that?

16      A.    Yes.

17      Q.    What is your understanding of what

18   he meant by that?

19      A.    I don't know what that means.

20           MR. GAFFEY:   Objection to the

21      form.   You can answer.

22      A.    I do not know what that means.

23      Q.    Okay.   "And thus we transferred

24   net long value of 2.3 billion plus whatever is

25   to be transferred Monday out of the agreed --

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     everything in the unencumbered box."

3               Did you then or do you now have an

4     understanding of what he's referring to?

5          A.    Do not know now and, I mean, I'm

6     hopeful of gaining through the information I'm

7     going to get eventually in this case to be

8     able to answer that question, yes.

9          Q.    And just specifically the

10    reference to net long value of 2.3 billion, do

11    you have an understanding of what he's saying

12    in terms of --

13         A.    No.

14         Q.    Do you recall if you -- when you

15    got this if you didn't understand it would you

16    have asked someone about it?

17         A.    No.  I mean, this was, again, a

18    pretty low priority item from my perspective.

19    I mean, the issues were not -- this is a

20    transaction which we were not -- this was not

21    within our purview.  It was a transaction

22    which would im -- to the extent that there

23    were problems with this transaction, as long

24    as we preserved the data, as long as we

25    understood what was transferred around, if

1        B. MARSAL - HIGHLY CONFIDENTIAL

2    there were mistakes at the end of that day

3    that preservation of that data would permit us

4    to come back and to sit down and to talk about

5    this.

6            From my perspective, this was a

7    transaction that was a done deal.  What I

8    needed to focus on was the TSA.  I needed to

9    focus on access to information and once we got

10   that information we could reconstruct anything

11   we needed to reconstruct against any of the

12   clearing banks, against any transaction that

13   took place within the 90-day time period of

14   the bankruptcy filing.

15       Q.    Was that your view, that you could

16   basically just consider these issues up

17   through 90 days and figure out --

18       A.    No, back 90 days from the filing.

19       Q.    Okay.  Sorry.

20            Do you recall any follow-up with

21   Mr. Fogarty or anyone else concerning the

22   substance of what he's conveying to you here?

23       A.    Again, during the first period

24   following the proceeding, the most important

25   issues that we had to deal with was the

Page 86

1           B. MARSAL - HIGHLY CONFIDENTIAL

2     preservation of the data, was getting access

3     to the inventory of assets, dealing with those

4     key melting assets that we had.  And as you

5     may or may not recall, I don't know to what

6     extent you got to know the testimony, there

7     was just a slew of creditors who wanted

8     information.  Where's the status of my

9     transaction.  And the judge insisted upon

10    trying to help these people to the best of our

11    abilities to try and get the information that

12    they were requesting.

13          So we were in a period of -- that

14    period of this was followed by -- and, by the

15    way, during this period, just as an aside, the

16    only discussions we had with Barclays was not

17    about whether this transaction was good or bad

18    or whether they'd given us adequate securities

19    or whatever the issues you've raised earlier.

20    The issue was always in all the meetings we

21    had with Jonathan and others, of Barclays, was

22    relating to the TSA, relating to the

23    technology -- relating to the accounting

24    information.

25          And, in fact, it wasn't until

1          B. MARSAL - HIGHLY CONFIDENTIAL

2    mid-November when we -- when Jonathan saw the

3    complaint that we had drafted that we were

4    going to bankruptcy court with it that we

5    caught the attention of senior management.

6    And senior management basically apologized for

7    the fact that there were parts of Barclays

8    which we're trying to protect the integrity of

9    their system but were indifferent to the

10   commitments that had been made by Barclays

11   senior management.

12            And Barclays in mid-November did a

13   complete turn-around.  They became very

14   cooperative with us following our threatening

15   to take them before Judge Peck for violation

16   of the TSA.  And then really -- until that

17   information started to flow, we didn't have

18   accounting information.  We didn't have

19   records.  We didn't have -- we didn't have a

20   lot of the information that we later got which

21   was in the -- which was really in the late

22   December, early January time frame which is

23   when we were able to shift gears to another

24   part of this which is to start to ask

25   questions about what had happened, what was

Page 88

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     going on here, because the numbers were not

3     jiving with what -- the numbers that we had

4     been provided.

5          Q.     Mr. Fogarty goes on a little

6     further down under a few thoughts.  The first

7     bullet point and about mid way through that

8     bullet point -- well, the full bullet point,

9     "After you guys spend a little time with these

10    things we should probably arrange a call with

11    the Barclays guys, a/k/a former Lehman, the

12    guys at the table early Monday morning were

13    apparently Paolo and Alex Kirk and Weil, to

14    make sure we all understand these details and

15    make sure these are disseminated appropriately

16    through Barclays so there is no confusion

17    about what stuff be ours and to ensure

18    appropriate security controls which the TSA

19    requires they keep."

20             Was it important for you

21    operationally to make sure you understood as

22    soon as possible which assets had been

23    transferred to Barclays and which had stayed

24    with Lehman?

25             MR. GAFFEY:  Object to the form.

1        B. MARSAL - HIGHLY CONFIDENTIAL

2        A.    It was important for us to get

3   access to the accounting information.  And

4   we -- and part of that account information we

5   would capture what assets were transferred or

6   not transferred.  It would be essential that

7   we capture that information.

8        Q.    Including the information about

9   what was transferred as part of the

10  transaction and what wasn't.

11       A.    Yes.  Yes.  Yes.

12       Q.    Okay.

13            (Deposition Exhibit 492, document

14       bearing production numbers

15       BCI-EX-(S)-00021769 through

16       BCI-EX-(S)-00021771, marked for

17       identification as of this date.)

18  BY MR. THOMAS:

19       Q.    Let me show you a document we'll

20  mark as 492.

21       A.    Um-hum.

22            (Document review.)

23       Q.    This appears to be an e-mail chain

24  dated September 28th, 2008.  And appears that

25  you're a recipient at least on the early

1          B. MARSAL - HIGHLY CONFIDENTIAL

2    e-mails although not the last most recent one

3    in time.

4               Do you see that?

5        A.    Yes.

6        Q.    And no reason to believe you

7    didn't get this e-mail.

8        A.    Correct.

9        Q.    The earliest in time is an e-mail

10   from Rod Miller to Jim Fogarty, yourself, and

11   a number of other people concerning the 15c3-3

12   account progress LBI funds.

13              Do you see that?

14       A.    Yes.

15       Q.    Mid way through this e-mail he

16   says -- asks, "Were you able to make a headway

17   on the 1 billion of the 15c3-3 cash at Wells

18   Fargo?"

19              Do you see that?

20       A.    Yes.

21       Q.    Do you recall what the issue was

22   there?

23       A.    No.

24       Q.    Do you recall that 15c3-3

25   securities were transferred to Barclays as

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     part of the transaction?

3          A.    I didn't -- I have no -- I had no

4     idea at this time what 15c3-3 even meant.

5          Q.    Okay.

6          Do you recall any discussions

7     or -- discussions with Wells Fargo about

8     those --

9          A.    I didn't have any discussions with

10    them and I don't recall having discussions

11    with Wells Fargo with Steve Cohn.  Steve Cohn

12    is the treasurer.

13         Q.    Okay.  Let me show you another

14    document we'll mark as 493.

15              (Deposition Exhibit 493, document

16         bearing production numbers AM 001695

17         through AM 00167 with attachment, marked

18         for identification as of this date.)

19         MR. GAFFEY:  Todd, the first three

20         pages of this are Bates numbered but the

21         remainder are not.  Is there any reason

22         for that?

23         MR. KRISBERGH:  I believe because

24         they were produced in native format they

25         won't be Bates stamped but they are

1          B. MARSAL - HIGHLY CONFIDENTIAL

2          attachments.

3               MR. GAFFEY:  That's the attachment

4          to the native format.

5               MR. KRISBERGH:  Yeah.

6               MR. THOMAS:  I'm told those are

7          the attachments.  I think they're the

8          attachments.  I'm not going to ask about

9          the attachments though so...

10               MR. GAFFEY:  Okay.

11     BY MR. THOMAS:

12          Q.    Do you recognize this as a

13     September 29th, 2008 e-mail from Jim Fogarty

14     to a number of people at Alvarez including

15     yourself?

16          A.    I don't recall this document but I

17     believe it to be a document that was sent to

18     me.

19          Q.    Okay.  Mr. Fogarty writes, "I

20     believe this is the final securities

21     collateral file.  We discussed securities to

22     move on Monday.  Looks like another

23     .3 billion.  This is on top of the 2.3 billion

24     in prior files for a total of 2.6 billion in

25     addition to the unwind of the 44 billion repo

Page 93

1          B. MARSAL - HIGHLY CONFIDENTIAL

2    with Barclays."

3               Do you see that?

4         A.    Yes.

5         Q.    Do you remember this issue that's

6    being discussed with respect to these

7    transfers?

8         A.    No.

9         Q.    Do you know why Mr. Fogarty was

10   following these issues?

11        A.    You'd have to ask Jim.  It would

12   be good order to try and gather this

13   information.  I mean, I would say he would try

14   to gather this information.  But this again

15   was not a priority at this point in time.

16              Gathering this information to act

17   upon it at another point in time would be I

18   think common sense but this was not his

19   priority.  His priority at this time was the

20   TSA and shortly thereafter the derivatives

21   booked.

22        Q.    But, again, even for operational

23   purposes it's important to know which assets

24   were transferred over to Barclays and which

25   weren't.

Page 94

1        B. MARSAL - HIGHLY CONFIDENTIAL

2        A.    Well, these were LBI assets.  As

3    you undoubtedly know, these were LBI assets

4    and these were not -- the LBI assets were not

5    under our purview.  So this was interesting to

6    know but this is for another day so that we

7    could sit back and find out what the heck

8    happened with this transaction.  As long as we

9    captured the data and captured the information

10   that was priority number one.  Acting upon it

11   was not priority one.

12       Q.    Well, putting aside acting on it,

13   when you try to -- there's a lot of e-mails

14   we've looked at, documents, discussing

15   assessing parts of the Barclays transaction.

16   The fact that it was -- involved LBI assets

17   that still had a big impact on the LBHI

18   estate, correct?  The transaction.

19       A.    It had an impact on the estate,

20   yes.

21       Q.    I mean, it was important to the

22   estate.

23       A.    I view LBI as ultimately an asset

24   of the -- any positives would flow up to the

25   holding company level, yes.

Page 95

1          B. MARSAL - HIGHLY CONFIDENTIAL

2          Q.      So even if there were LBI assets

3    that went over, it's still important for LBHI

4    holding company to understand what assets went

5    over?

6          A.      Ultimately -- yeah, ultimately we

7    intend to go through -- the same forensic

8    activity that we went through on LBH we intend

9    to go through on LBI.  So the preservation of

10   the data.  But the most immediate was -- the

11   most immediate problem was the preservation of

12   the data, not to take action; not to

13   second-guess what was going on on other fronts

14   but to save that data so that we could review

15   what happened on those other fronts.

16         Q.      But it was also to understand the

17   sales transaction and what assets and

18   liabilities went over and which stayed,

19   correct?

20         A.      Yes.  Yes.

21         Q.      Let me go ahead and show you the

22   next document which is 494.  Maybe.

23              (Pause on the record.)

24              MR. THOMAS:  Let's go off the

25         record for a moment, please.

Page 96

1          B. MARSAL - HIGHLY CONFIDENTIAL

2                THE VIDEOGRAPHER:   The time is

3      11:51.  We are going off the record.

4                THE CHAIRMAN:   The time is 11:59.

5      We are back on the record.

6      BY MR. THOMAS:

7          Q.    Let me show you a document that

8      we've previously marked as 464A.

9                (Document review.)

10         Q.    And this is an e-mail chain with

11     attachments from Bill Gordon at Alvarez to a

12     number of other folks at Alvarez dated

13     September 29th, 2008.  Does that appear to be

14     accurate to you?

15         A.    Yeah, I -- yes.  It wasn't

16     addressed to me, though.

17         Q.    Right.  I see that.

18               And would you remind me, what was

19     Bill Gordon working on at this --

20         A.    He was head of the TSA team.

21         Q.    Okay.  And the subject line of

22     this e-mail chain is Here is all we have at

23     the moment that makes an effort to describe

24     what Barclays got and didn't get.

25               And looking at this, do you

Page 97

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     understand this -- well, first of all,

3     there's -- the original e-mail appears to be

4     from Glenn West on the second page.

5               Do you see that?

6          A.     Yeah.   Right.   On the first page

7     it says Glenn West to Weil Gotshal.

8          Q.     Weil Gotshal, right.

9          A.     Right.

10         Q.     And then you have Weil Gotshal --

11    Weil Gotshal sending the information to a

12    number of people at Alvarez & Marsal including

13    J. McCarthy --

14         A.     To Jack McCarthy, head of the

15    proprietary investments team and Daniel

16    Ehrmann, head of the international team.

17         Q.     Um-hum.   This is a description of

18    what Barclays got and didn't get as part of

19    the sale transaction provided to Alvarez &

20    Marsal from Weil Gotshal; is that right?

21               MR. GAFFEY:   Object to the form.

22    Foundation.

23         A.     Yes.

24         Q.     And if you would turn to the third

25    page, please, with the Bates stamp number

1        B. MARSAL - HIGHLY CONFIDENTIAL

2    with your understanding that as part of the

3    sales transaction Barclays was to receive

4    those assets?

5        A.    No idea.

6              MR. GAFFEY:   Objection to form.

7        Q.    No idea.

8        A.    No idea.

9        Q.    Can I ask you to turn to the APA,

10    please.   Which is one of the first documents I

11    showed you.

12        A.    (Witness complies.)

13        Q.    And if you would turn to page 6 of

14    that document, please.

15        A.    (Witness complies.)

16        Q.    To the definition of Purchased

17    Assets.

18              Do you see that?

19        A.    Yes.

20        Q.    Do you know or have an opinion as

21    to whether the exchange-traded derivatives --

22    well, strike that.

23              As to whether the 769 million in

24    15c3 securities or securities substantially of

25    that same nature and value were --

1          B. MARSAL - HIGHLY CONFIDENTIAL

2          A.    Todd, I have no idea.  I didn't

3     see this document and I didn't see the last

4     one.  So my -- my ability to answer that

5     question -- I don't know whether this 767 or

6     whatever you're saying it is relates to some

7     other 767.

8          Q.    Okay.

9          A.    This was -- again, this is not a

10    transaction which -- I feel a little like a

11    dope because, you know, what you've got to

12    understand here is this transaction was not

13    something that was in question during this

14    period of time.  This was only in -- this only

15    became to light into the early part of 2009.

16              So this whole period 2008, this

17    was not a -- this transaction would be a

18    transaction which one day would see the light

19    of day, one day would be analyzed, and there

20    would be a forensic activity to seeing what

21    happened here.

22              But from my perspective during

23    this critical period this was not a priority.

24    This was was not on my radar screen.

25         Q.    So your approach was to --

Page 113

1          B. MARSAL - HIGHLY CONFIDENTIAL

2              MR. GAFFEY:  For the record I

3          object to you're asking him for an

4          opinion which I didn't get to say a

5          moment ago.  He's not here as an expert.

6          Q.    So from your perspective

7     addressing issues about which assets were

8     transferred and not transferred and their

9     values and whether it was a good deal or bad

10    deal was something that would be put off for a

11    later period of time to be --

12         A.    Not the subject of a good or bad

13    deal.  I didn't think that was my

14    responsibility to determine whether it was a

15    good deal or bad deal.  It would be my

16    responsibility to determine whether or not the

17    benefit of the bargain was realized by all

18    parties.  That's what I would put off to

19    another day.  I would never reopen the

20    transaction because it was a good or bad deal.

21    The court determined that based on a whole

22    host of factors that were reviewed at the

23    time.  No, that would not have been my -- that

24    would not have been my approach.

25              But to know what -- I mean,

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     clearly, we wanted to know whether or not the

3     cash which was priming the operating pump

4     which was the sale of the headquarters

5     building, the sale of the data centers, that

6     cash was important to us.  That cash was

7     important to us as to what assets were

8     transferred.  Again, we were told that assets

9     were transferred equal to liabilities that

10    were transferred.  And we basically assumed

11    that was correct.  There was no issue to be --

12    to be challenged at that point in time.  And

13    never did I want to get into a situation where

14    was this a good or bad deal.

15         Q.     In terms of whether the parties

16    received the benefit of the bargain or not,

17    that would be based on the terms of the

18    agreement they entered, correct?

19         A.     The assets equalled the

20    liabilities.  That's what I had been

21    represented.  The assets were supposed to

22    be -- the asset value -- I shouldn't say

23    assets -- the asset value were supposed to

24    equal the liabilities being assumed.  That was

25    the benefit of the bargain that Berkenfeld had

Page 115

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     told me we had struck.

3          Q.    Well, when you say the parties

4     received the benefit of the bargain, shouldn't

5     it be -- shouldn't that benefit be measured

6     based upon the agreement they signed and

7     entered?

8               MR. GAFFEY:   Object to the form.

9          A.    Well, I didn't review the

10    agreement.   I didn't review the agreements.  ·I

11    mean, what I was told was this was an excluded

12    transaction, not for your purview.   The

13    transaction will have an impact, though, on

14    the rest of the estate and we're giving you

15    assurances that there will be a TSA prepared

16    which will provide you with the assurances you

17    need to access.

18               As to the transaction, itself,

19    what I was told was there'll be a -- there

20    will be -- assets will be left with the --

21    with Barclays equal to the liabilities being

22    assumed.

23         Q.    Now, when you say excluded

24    transaction, again you're just referring to

25    Mr. Berkenfeld's comment to you --

Page 116

1          B. MARSAL - HIGHLY CONFIDENTIAL

2          A.      Correct.

3          Q.      -- that other things should be

4     your focus as opposed to --

5          A.      Well, no.   Yes, I mean, it was

6     Berkenfeld -- it was Berkenfeld on both of

7     those transactions.   He was the only one

8     available.   Bart McDade was not available

9     because they were all working on the

10    transaction.   My assumption was that

11    Berkenfeld who signed the agreement was

12    speaking for Bart McDade and others.

13         Q.      But did he ever say that?

14         A.      Berkenfeld said what I said, yeah.

15         Q.      But did he ever say that he was

16    speaking for Bart McDade?

17         A.      You know, he said he was speaking

18    for the company.   He was speaking for the

19    company as to what the -- for me to be -- I

20    mean, I was being hired to do -- to be

21    focusing on the wind-down of the estate

22    excluding those two transactions which were

23    under way and I was not to be -- I was not to

24    put myself in the middle of those transactions

25    because they were on the verge of closing.

Page 117

1          B. MARSAL - HIGHLY CONFIDENTIAL

2    That's what he said.

3               And, I mean, he said that

4    everything else you should be focusing your

5    attention on the residual estate.

6         Q.    And you actually recall him saying

7    he was speaking on behalf of the company when

8    he said your focus should be elsewhere?

9         A.    No.  I don't recall whether he

10   said it was on behalf of the company but the

11   inference was since he was signing the

12   agreement to hire Alvarez & Marsal and myself

13   that he must be speaking for the company.

14        Q.    And no one else from the company

15   like Bart McDade or anyone else --

16        A.    I didn't meet with Bart McDade

17   until after the transaction had occurred.

18        Q.    But, in any event, no one other

19   than Mr. Berkenfeld indicated to you that your

20   focus should be elsewhere.

21        A.    No.  That's Berkenfeld.  Steve

22   Berkenfeld was the one who indicated.

23        Q.    Okay.  Now, in -- do you think the

24   parties should be held to the terms of the

25   agreement that they entered?

1          B. MARSAL - HIGHLY CONFIDENTIAL

2               MR. GAFFEY:  Object to the form.

3          A.    As a matter of -- again, I mean,

4      I'm not being controversial.  The deal -- the

5      benefit of the bargain which I was told about

6      is evidently very different than the deal

7      which was ultimately inked.

8          Q.    Well, Mr. Berkenfeld had told you

9      a different description according to your

10     testimony than the deal that was ultimately

11     inked.  But I'm asking in terms of the parties

12     being held to the benefit of the bargain,

13     shouldn't that be the contract that they

14     ultimately agreed to enter?

15              MR. GAFFEY:  Object to the form.

16         You can answer.

17         A.    I would say -- you know, as a

18     philosophical matter if you strike a bargain

19     you live by it, whatever that bargain was.  If

20     that bargain was -- you know, I mean, that's

21     the crux of this argument, though, was what

22     was this bargain.

23         Q.    And so the bargain -- what was

24     struck as the bargain is normally reflected in

25     the terms of the contract the two sides sign,

Page 119

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     correct?

3               MR. GAFFEY:  Objection.

4          A.    I would -- I mean, my idea of a

5     bargain is whether there's a contract signed

6     or not.  If you and I have a deal, that's what

7     I'm going to live by.  It happens to be if

8     you're going to paper it, sure.  But, I mean,

9     that was -- you know, in the wild, wild west

10    they might shoot you if you say a bargain is

11    only a bargain if you have it signed up.

12               But my idea was this was -- the

13    idea was that this was a transaction which was

14    supposed to have assets equalling liabilities

15    assumed.  That's what I believe and as I

16    recall that's what Berkenfeld told me and

17    that's what my team I think believed.

18         Q.    Okay.  In this situation do you

19    think each party should just live with the

20    terms of the agreement that they signed and

21    entered?

22               MR. GAFFEY:  Objection.

23         A.    If that agreement was -- if that

24    agreement was as I indicated, yes.  Because

25    then I think it would have been -- I would

1          B. MARSAL - HIGHLY CONFIDENTIAL

2          A.    I do not know -- I mean, I do not

3     know what the basis of this $5 billion

4     reduction is.  I believe that there are

5     separate...

6          Q.    What do you understand the

7     discount in your motion to be referring to?

8          A.    I'd have to look at the motion

9     again but -- as to what you're speaking about.

10         Q.    Okay.  Let me go ahead and mark

11    this as 495.

12              (Deposition Exhibit 495, Debtor's

13         Rule 60 Motion, marked for

14         identification as of this date.)

15    BY MR. THOMAS:

16         Q.    A copy of LBI's Rule 60 motion in

17    this matter.  And you're welcome to look at as

18    much or as little as you want but I'm going to

19    direct your attention to paragraph 91.

20         A.    91, okay.

21              (Document review.)

22         A.    Okay.  Would you like me to read

23    beyond 91?

24         Q.    Well, again, you're welcome to

25    read more but the sentence in here I want to

Page 168

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     draw your attention to is, "Later that day,

3     pursuant to the repurchase agreement, Barclays

4     forwarded to LBI approximately $45 billion in

5     cash and LBI was to post collateral valued at

6     approximately $50 billion in securities

7     reflecting an approximate $5 billion discount

8     or haircut in the value of LBI's collateral."

9          And then in paragraph 100 there's

10    a reference to "The undisclosed decision to

11    use the repurchase agreement to deliver the

12    discount conveniently solved the problem."

13         Do you see that?

14    A.    Um-hum.

15    Q.    And then again on paragraph 104

16    there's testimony about -- excuse me.  It

17    reads, "Lowett was not the only witness to

18    concede that the repurchase agreement was

19    employed to ensure that Barclays got its extra

20    $5 billion."

21         Do you see that?

22    A.    Yes.

23    Q.    So is the $5 billion that Lehman

24    is concerned about, the discount that they're

25    concerned about in their motion, is that the

Page 169

1        B. MARSAL - HIGHLY CONFIDENTIAL

2    difference between what Lehman now believes to

3    be the correct value of the repo collateral

4    and the amount at which it was valued for

5    purposes of the deal?

6            MR. GAFFEY:   Objection to the

7        form.

8        A.    Well, I mean, again, if you're

9    asking me the question about this presentation

10   that was done in October when the words stale

11   marks -- if you're asking me what I -- the

12   interpretation that I draw from this

13   presentation, the presentation when it said

14   stale marks, that would tell me that the marks

15   were old.  The marks were out of date.  And

16   that the value of the collateral had actually

17   deteriorated $5 million that they were

18   receiving.  That's what I would have

19   interpreted this -- that's what I actually

20   interpreted this as which would have made

21   sense to me given the market conditions that

22   there had been a drop in the value of the

23   securities.

24       Q.    And by stale marks meaning that

25   after September 12th the marks were being

Page 170

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     updated throughout that week of chaos and

3     so --

4          A.    Yes.

5          Q.    So the stale marks would refer to

6     the marks that were just on the books from the

7     preceding week before bankruptcy.

8               MR. GAFFEY:   Object to the form.

9          You can answer.

10         A.    Yes.

11         Q.    Okay.  And your understanding of

12    this was that the parties agreed that those

13    marks were stale and there needed to be some

14    type of updated valuation of those assets?

15              MR. GAFFEY:   Object to the form.

16         You can answer.

17         A.    Yes.  My understanding was -- is

18    that the parties had negotiated based on an

19    updated assessment, their assessment of the

20    value of the securities, and that that's what

21    this had represented, that there had been a

22    deterioration in the securities during this

23    period of time, during the market chaos.

24         Q.    And the parties had gotten

25    together, both sides, that week and sat down

Page 171

1          B. MARSAL - HIGHLY CONFIDENTIAL

2   and discussed how to value those assets.

3          A.    At this time that's what I

4   believed.  Yes.  As of October 8th that's what

5   I believed.

6          Q.    Okay.  And so isn't it -- what do

7   you believe differently now?

8          A.    I don't believe that's what

9   happened.  I believe that there was a built-in

10  gain in this transaction.  And I don't believe

11  a built-in gain means a push.

12         Q.    And do you still believe that the

13  marks were stale in the sense that the ones on

14  the books were from the preceding week?

15         A.    Yes.  I believe that if -- that

16  you would update the value of the securities.

17  And that in that kind of a market you would

18  have to update the securities and if the last

19  marks you had were based on Friday, the 12th,

20  my assumption would be that now the problem is

21  the market could have deteriorated in some

22  securities and improved in other securities.

23  For example, governments would go up in that

24  period and other securities might go down.

25              So that made sense to me that

Page 172

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     there was a drop in the value of the overall

3     portfolio.

4          Q.     Couldn't some -- some could go up,

5     some could come down but it's likely the

6     overall portfolio value was --

7          A.     Was down by 5 billion.  Yes.

8     That's what interpreted by this.

9          Q.     Right.  And do you still believe

10    that the parties got together and tried to

11    address the stale mark problem by putting an

12    updated value on the securities that were --

13         A.     Yeah.

14         Q.     You do.

15         A.     I believe that they attempted to

16    do that.  That's what's been represented.

17         Q.     And do you believe that was a good

18    faith effort to try to update the value of

19    those securities?

20              MR. GAFFEY:  Objection to the

21         form.  You can answer.

22         A.     I don't know the definition of

23    good faith effort.  They attempted to put a

24    value on these securities.  And as I

25    indicated, I mean, what I'd like to do is to

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     inspect what was actually done.  I'd like to

3     understand the underpinnings of that before

4     anybody gets accused of any impropriety or any

5     breach of fiduciary.  I just don't have the

6     facts.  That's all I'm looking for.  I'm not

7     going to accuse anybody until I get the facts.

8          Q.    Okay.  Do you fault in any way the

9     way they went about trying to update those

10    stale marks in that environment of the time?

11    I mean, should they have done something they

12    didn't do?

13         A.    I mean, I would speculate as to

14    the -- I would have done it differently but

15    that's me.  I mean, that's my opinion and it's

16    worth nothing in this argument.

17         Q.    How would you have done it

18    differently?

19              MR. GAFFEY:  Object to the form.

20         You can answer.

21         A.    I would have attempted to -- I

22    would have attempted to identify what the

23    values were CUSIP by CUSIP that I was placing

24    on it.  And I would have attempted to provide

25    myself with some type of a reasonable cushion

1          B. MARSAL - HIGHLY CONFIDENTIAL

2    would take it out of a push situation.

3          So my question to you is why

4    didn't you reference the fact that it's

5    supposed to be a push in connection with the

6    liabilities being less than you thought they

7    would be?

8          A.    Push was already -- I mean, the

9    underlying assumption was we did a

10   transaction -- we did a transaction involving

11   a hundred on one side, a hundred to fair value

12   on the other side, and the assumption of a

13   hundred billion dollars of liabilities.

14          The issue was not about the push.

15   The issue was about, hey, did we make an

16   honest mistake in what we were estimating.

17   Did that happen.  Did we just blow this thing

18   because of the craziness of the times.

19          And that separate and apart of

20   from that came the next question which was was

21   the hundred in assets really a hundred in

22   assets.  That's the second part of this thing.

23          I don't know if that's still

24   confusing but it just never came across our

25   mind that that wasn't the transaction.  That's

1           B. MARSAL - HIGHLY CONFIDENTIAL

2     what we thought the transaction was.

3           Q.     But you never went and read the

4     transaction documents.

5           A.     Well, no.  Then we proceeded to go

6     and say to Weil Gotshal what happened here.

7     You got to talk to Harvey.  What happened

8     here?  How come this is not reflected -- how

9     come the board say one -- believes one thing,

10    the court believes one thing -- the same

11    thing, the creditors believe one thing and

12    suddenly there's documents that show up

13    something completely different.  We don't get

14    it.  So there must have been an honest mistake

15    made by people here.  And that's what this was

16    about.  And it never got anywhere because

17    instead what we got back was read your

18    documents.  That's at which point we hired

19    Jones Day.

20           We don't want to jump to -- trust

21    me, the last thing we want to do is attack

22    Barclays, the source of all our information.

23    The source of our transaction services

24    agreement.  The last thing we want to do is go

25    after Barclays.

1          B. MARSAL - HIGHLY CONFIDENTIAL

2          Q.    I mean, can you see Barclays'

3    position where they've announced that it was

4    going to be a gain publicly and there's

5    nothing in a document about it being a push

6    and they --

7          A.    But we all know that there's a

8    purchase accounting gain in there.  We all

9    agree with that.  That wasn't -- we weren't

10   attacking the purchase accounting gain.  That

11   wasn't -- that's not -- that wasn't the part

12   of the gain that we questioned.

13         Q.    And what precisely is the part of

14   the gain that you question?

15               MR. GAFFEY:  Object to the form.

16         A.    Well, in this letter --

17               MR. GAFFEY:  You have to give me a

18         chance, Bryan.

19               THE WITNESS:  Excuse me.

20               MR. GAFFEY:  Object to the form.

21         You can answer.

22         A.    In this letter we addressed the

23   two parts of the gain which was the bonus

24   accrual.  Trying to understand did your gain

25   come out of bonus accrual?  Did your gain come

Page 208

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     out of cure amounts?  Can you give us the

3     information and tell us what you actually

4     spent on these things?

5               And we basically got back, No, I

6     can't give you that information.

7          Q.     And is it your understanding --

8     your sense when you're writing this letter

9     about cure amounts, that under the terms of

10    the agreement that there was some amount of

11    cure that Barclays was obligated to pay?

12         A.     My belief was they had assumed the

13    current liabilities at the time of the

14    closing.  They had assumed the current

15    liabilities which were -- which was this cure

16    liability amount.  That if they didn't assume

17    those, if those liabilities turned out to be

18    inflated, then it was a mistake made by all

19    parties.  It was a windfall.  But you and I

20    didn't bargain for that.

21         Q.     Did you understand that Barclays

22    didn't have an obligation to assume any

23    contracts and that it would only be

24    responsible for cure amounts with respect to

25    contracts that it at its total discretion

Page 209

1          B. MARSAL - HIGHLY CONFIDENTIAL

2     elected to assume?

3               MR. GAFFEY:  Objection to the

4          form.  You can answer.

5          A.     I'm just telling you what we

6     believed the transaction was was it was 2 plus

7     billion set aside for cure liabilities.  And

8     there was 2 plus billion set aside for

9     severance and bonuses.  And this letter asked

10    what did you spend.  And the response was it's

11    irrelevant.  There's no relevancy to that

12    question.  Because that isn't the transaction.

13              And what I'm telling you is that

14    was the transaction that some of us believed

15    we had done.  The board, the court, Harvey

16    Miller, me.  But yet the management didn't

17    sign that agreement.  But the management are

18    the same management that seems to have gone to

19    Barclays.  So curiously enough we are

20    confused.

21         Q.     And if it's a fact that the

22    contract, the agreements between the parties

23    could provide that Barclays has the discretion

24    to assume contracts and is not liable for cure

25    payments unless it assumes -- decides to