Page 1

1                           H. MILLER

2              UNITED STATES BANKRUPTCY COURT

3              SOUTHERN DISTRICT OF NEW YORK

4       - - - - - - - - - - - - - - - - - - - - - x

5       In Re:

6                                   Chapter 11

7       LEHMAN BROTHERS          Case No. 08-13555(JMP)

8       HOLDINGS, INC., et al.,     (Jointly Administered)

9

                        Debtors.

10

        - - - - - - - - - - - - - - - - - - - - - x

11

12

13

14       VIDEOTAPED DEPOSITION OF HARVEY R. MILLER

15                   New York, New York

16                   January 7, 2010

17

18

19

20

21

22

23      Reported by:

24      KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25      JOB NO. 26535

1              H. MILLER

2           January 7, 2010

3

4           VIDEOTAPED deposition of HARVEY R.

5     MILLER, held at the law offices of Weil,

6     Gotshal & Manges, LLP, 767 Fifth

7     Avenue, New York, New York, before Kathy

8     S. Klepfer, a Registered Professional

9     Reporter, Registered Merit Reporter,

10    Certified Realtime Reporter, Certified

11    Livenote Reporter, and Notary Public of

12    the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    H. MILLER

2    with overflows.  There was a Clarification

3    Letter which was being worked on, and we were

4    hoping that the Clarification Letter would get

5    to the courthouse sometime at the beginning of

6    the commencement of the hearing or during the

7    hearing.

8              So my partner Lori Fife was at 745

9    Seventh Avenue.  She was involved in those

10   discussions, and she got down to the courthouse

11   probably around 3, a little bit after 3.  The

12   Clarification Letter was not completed, and what

13   we proposed was that we would orally present to

14   the assemblage the essence of the Clarification

15   Letter.  And Judge Peck agreed, and he went into

16   his chambers and Ms. Fife spoke to the

17   assemblage in the courtroom and described what I

18   believe were the essentials of the Clarification

19   Letter.  And that went on, I don't know, half

20   hour, 35 minutes, 40 minutes.  And my best

21   recollection is the hearing must have started

22   around 4 P.M., and it went from 4 P.M. to about

23   12:01 A.M. on the 20th.

24              I guess that Judge Peck announced his

25   decision just about midnight, and somehow the

1                          H. MILLER

2    order of approval got dated September 19th,

3    although I always thought it was two or three

4    minutes after midnight.  He heard all the

5    objections.  Mr. McDade testified.  There were

6    proffers of the direct testimony of Mr. McDade

7    and Mr. Ridings and both of them were subjected

8    to cross-examination.

9            And Judge Peck orally delivered his

10   opinion and approved the sale, and basically he

11   said words to the effect that he did not see any

12   other alternative, this was a way of preserving

13   10,000 jobs, approximately 10,000 jobs, and to

14   realize a value that otherwise would

15   substantially erode.

16           So the closing, once the sale -- I

17   don't think the order was entered till about --

18   well, let me go back.  After he issued his

19   order, he got up, he got off the bench, as I

20   recall, and for the first time in my history as

21   a practicing lawyer, I never saw this happen

22   before, the entire audience in the courtroom got

23   up and started applauding.

24           And as I remember, he sort of blushed,

25   but in any event, he said that if we wanted to,

1                          H. MILLER

2    he would stay around for an hour or two and

3    enter the order because there were modifications

4    being made to the order and to accommodate

5    objections that had been made.  And that took

6    about an hour, an hour and a half.  So,

7    actually, the order wasn't finalized and

8    submitted to chambers until around 1:30 A.M. or

9    something like that.

10            And the arrangements were made to

11   start the closing the following morning --

12   not the following, that morning.  I don't know

13   what time it started in the morning.  It

14   probably started around 9 A.M. is my guess.  I

15   wasn't here Saturday morning or until late in

16   the afternoon.

17            And the hearing was going on.  Some of

18   it I think was in this room.  This entire floor

19   was devoted to the Lehman closing, and that

20   closing went from starting whatever time they

21   started on Saturday.  I have learned in 50 years

22   of practice if you give time to lawyers, they

23   will fill the time, and basically it was to

24   close and consummate before the opening of the

25   market Monday morning.

1                         H. MILLER

2              And the process was very difficult.

3     There were many people here from Lehman and from

4     Barclays and I think DTCC was represented.  We

5     invited the representatives of the Creditors

6     Committee to be at the closing and to

7     participate fully in the closing, and Luc was

8     here and I think other people from Milbank

9     Tweed.

10             The Committee had hired FTI as a

11    financial advisor and Houlihan Lokey as

12    financial advisors, and their representatives

13    were here throughout the weekend.

14             The closing got -- transaction got

15    very difficult on Sunday because of a dispute

16    between Barclays and JPMorgan in connection with

17    the clearing account and transactions between

18    Barclays and JPM, and as a consequence of that,

19    the Federal Reserve Bank got involved, I think

20    the S.E.C. was involved, and I think it had to

21    do with $7 billion, something equal to $7

22    billion.

23             And finally, I think with the help of

24    the Federal Reserve, a delegation from Chase --

25    or, from JPM came to the closing.  My

1                       H. MILLER

2    recollection is it was Steve Cutler, who was

3    general counsel of JPM, a group from the

4    whatever division handled the clearing account,

5    the tri-party loan transactions, Hal Novikoff

6    from Wachtell Lipton.  He wasn't here, he was on

7    the phone.  Heidi Miller, who I think was the

8    CFO or a very senior officer at JPM was on the

9    phone, and there were people from the Fed.

10            There were a lot of people from

11   Washington that were on the phone.  And there

12   was an open conference line, I can't remember,

13   it may have been in this room or it may have

14   been down the hall, to find out what the issue

15   was, what was going to hold up this transaction.

16            It had actually been surfaced either

17   Friday or Wednesday, and during the court

18   hearing when the attorney for JPM said there

19   were outstanding issues with Barclays that

20   hadn't been resolved and would have to be

21   resolved if JPM was going to open up on Monday,

22   the 22nd, for clearing accounts and transfers.

23            So we all congregated in this room

24   with 18 people, I think there were 18 people on

25   the conference line, to try and find out what

1                        H. MILLER

2              And when he was pressed why, he said

3    because -- and he had a piece of paper in his

4    hand -- the securities that JPM was going to

5    release to Barclays in his view were simply not

6    worth $7 billion.  And he particularly alluded

7    to one security called the Racers, R-A-C-E-R-S,

8    which had an attributed value of $5 billion,

9    which he said wasn't worth anything close to $5

10   billion.

11             And Steve Cutler was -- I don't know

12   whether he had left and come back, but he was

13   here, and there was some dialogue.  It went on

14   for relatively short period of time, and Steve

15   Cutler said, "Okay, let's stop.  We're not

16   making any progress.  I'll tell you what we'll

17   do.  Barclays" -- I mean, "JPM will keep the

18   securities and give Barclays $7 billion in

19   cash."  And that was like the last major hurdle.

20             The last remaining thing from my

21   perspective was that Barclays did not want to

22   formally close until they got official

23   notification from the title company that the

24   deed to 745 Seventh Avenue had been filed in the

25   appropriate recording office, so we were all

Page 28

1                          H. MILLER

2    waiting in the conference room for a phone call

3    from the title company.

4              And that came in I think just before

5    the market opened.  And that was the closing.

6    And then people collapsed and the clean-up crews

7    started coming in to clean up because there was

8    another transaction starting right then to sell

9    the Neuberger Berman assets.

10             And I went home and went to sleep.

11        Q.    Thank you.  At the time that the

12   Clarification Letter was finally completed --

13   and let me ask, when was that time?

14        A.    Over the weekend.

15        Q.    Over the weekend.

16        A.    I can't say precisely.  There was a

17   Clarification Letter that was -- I wouldn't say

18   completed -- drafted that actually got to the

19   courthouse, but my partner Tom Roberts reviewed

20   it and said that it wasn't correct.  So it was

21   over the weekend.  It was -- it was signed on

22   the 22nd, I think.

23        Q.    The Clarification Letter, when you say

24   it was gotten to the courthouse, you mean gotten

25   to the courthouse on Friday during that hearing,

1                    H. MILLER

2    during that long hearing?

3        A.    I think a box came down late in the

4    hearing.

5        Q.    Who got copies of the Clarification

6    Letter that weekend?

7        A.    I believe, and I don't have personal

8    knowledge of it, everybody who was at the

9    closing.

10       Q.    And that included members of the

11   Creditors Committee and their representatives?

12       A.    They -- the members -- well, the

13   representatives of the Creditors Committee, let

14   me put it that way.  I don't remember if there

15   was an actual member here.  Were here throughout

16   the closing till about, I may be off by an hour

17   or so, until about 4, 3 to -- someplace between

18   3 A.M. and 5 A.M.

19             Houlihan Lokey, and I believe it was

20   Sol Burian and Mike Fazio and FTI -- his first

21   name is Michael -- were all here, and at some

22   point between 3 and 5 A.M., they basically said

23   that they were leaving and said, "Everything's

24   fine, and going forward, if it's okay with you,

25   it's okay with us."

1                    H. MILLER

2          It was right after a somewhat heated

3    discussion about the 15c3-3 account which took

4    place in the hallway down the -- down, halfway

5    down the floor here.

6      Q.    And what was that discussion?

7      A.    Barclays took the position that the

8    15c3-3 account, which is a collateral account

9    for the benefit of customers that is subject to

10   oversight or supervision by the S.E.C., goes

11   with the customer accounts; that if you're

12   buying all the customer accounts, you get the

13   15c3 account.

14         Our position was that wasn't

15   necessarily true, that wasn't the custom in the

16   industry, and it wasn't entitled to 15c3

17   account, which was collateral for customers and

18   couldn't be moved anyway without S.E.C.

19   approval.

20         And there was a discussion about that.

21   I think Michael Klein, who was advising

22   Barclays, got into that discussion.  We were

23   standing out by the reception down the hallway,

24   and Sol Burian, Mike Fazio and I think Michael

25   from FTI was also there, in which we were

1                          H. MILLER

2      arguing over this.  And this was, you know, this

3      was pretty close to closing time.

4          Q.    On what day?

5          A.    This was the morning of the 2 --

6      Monday morning.

7          Q.    This is -- this is Sunday night/Monday

8      morning, after midnight?

9          A.    Oh, this was I'm saying 3, 4 A.M.

10     Monday morning.  I think at that point in time

11     almost everything else had been cleared up and

12     the resolution was -- like all major closings,

13     you have some adjustments -- there was a letter

14     which had been obtained or approved by the

15     S.E.C. in connection with what was thought to be

16     another transaction before the September 12th to

17     release the 15c3-3 account.  And I think it was

18     in connection with possibly a sale of all of

19     Lehman without any bankruptcy or anything, and

20     in that letter a list of what was in the

21     account.  And in the account was cash, PAIB

22     securities, which I can't -- at the time I knew

23     what the acronym meant, but I don't know what it

24     means now, of some 400 million, odd million

25     dollars, PAIB securities and other securities.

1                       H. MILLER

2    the chain on Exhibit 20 is an e-mail from Martin

3    Kelly to Ian Lowitt, copied to Paolo Tonucci,

4    dated September 16 at 5:10 A.M., do you see

5    that, sir?

6        A.    Yes, I do.

7        Q.    Did you have conversations with Mr.

8    Kelly in that period you described to us before

9    the break of the 15th overnight into the 16th

10   while the negotiations were going on?

11       A.    I never met Mr. Kelly.

12       Q.    As a general matter, as I understand

13   your testimony this morning, the negotiation of

14   the economic terms of the deal were done by the

15   businesspeople, not by the lawyers; is that

16   right?

17       A.    That's correct.

18       Q.    And the economic terms that were

19   negotiated by the businesspeople were

20   communicated to the Weil Gotshal lawyers who

21   were responsible for drafting the Asset Purchase

22   Agreement, correct?

23       A.    Essentially, yes.

24       Q.    And the economic terms that the

25   businesspeople negotiated were communicated, as

1                          H. MILLER

2    necessary, to you or Ms. Fife as the principal

3    Weil Gotshal lawyer standing up at the hearings

4    on the 17th and the 19th, is that correct?

5              MR. BOISE:  Object to the form.

6        A.    I would say it was broader than that.

7    Communicated to the people who were working on

8    the Asset Purchase Agreement and then probably,

9    in turn, to us.

10       Q.    And none of Weil Gotshal's activities

11   on the 15th -- for the week of the 15th through

12   the 19th included any independent assessment of

13   the values being discussed with respect to the

14   assets being transferred; is that correct?

15             MR. BOISE:  Objection.

16       A.    That is correct.

17       Q.    Directing your attention back to

18   Exhibit 20, Mr. Miller.

19       A.    Yes.

20       Q.    You see that it -- let me read it,

21   portions of it, into the record:  "Well, it took

22   all night and lots of back and forth, but the

23   deal is done and ready for the board.  Final

24   price did not change meaningfully - approx a 5b

25   all in economic loss versus our marks and 3.6

Page 79

1                    H. MILLER

2      billion of resi assets left behind."

3            Do you see that portion of the --

4      A.    I do.

5      Q.    And were you or anyone else at Weil

6  Gotshal privy to any discussions concerning a

7  negotiated -- a negotiation of an overall $5

8  billion loss versus Lehman's marks?

9      A.    I don't believe so.

10     Q.    Were you or anyone else at Weil

11 Gotshal involved in any discussions concerning a

12 negotiated discount that Lehman on the one hand

13 agreed to give to Barclays on the other from

14 Lehman's book values?

15           MR. BOISE:  Objection.

16     A.    No, I never heard the expression

17 "discount."  I did sit in a room listening to

18 groups talk about the marks and the different

19 opinions on the marks.

20     Q.    Did it come to your attention in any

21 way, sir, prior to the time that you described

22 the transaction to Judge Peck on the 17th, one

23 way or the other, that there was a negotiated

24 agreement for Lehman to give Barclays a $5

25 billion discount from Lehman's marks as part of

Page 80

1                          H. MILLER

2    this transaction?

3              MR. BOISE:   Objection.

4       A.     No.

5       Q.     If you could turn your attention,

6    please, Mr. Miller, to Exhibit 21.

7       A.     Yes.

8       Q.     Actually, I beg your pardon.   Could

9    you go back to 20 for just one second.

10      A.     Sure.

11      Q.     Thank you.   Also, in 20, Mr. Miller,

12   there is a -- let me read another sentence from

13   Mr. Kelly's e-mail:   "Also, an extra 1 billion

14   of comp beyond our accrual and assumption of all

15   trade payables in LBI and LBHI."   Do you see

16   that, sir?

17      A.     I do.

18      Q.     Did you -- was it communicated to you

19   or anyone else at Weil Gotshal, sir, prior to

20   the time you described the transaction to Judge

21   Peck on the 17th, that there had been a write-up

22   of the amounts shown on Lehman's books accrued

23   for compensation for the purposes of the

24   transaction?

25             MR. BOISE:   Objection.

1                    H. MILLER

2       A.    You're using the expression a

3    "write-up"?

4       Q.    Yes, sir.

5       A.    No, I never heard of anybody talking

6    about a write-up.  The figures on comp and also

7    the figure on the assumption of executory

8    contracts was always a very contingent figure.

9    Thus, nobody knew what contracts were going to

10   be assumed and how many employees Barclays would

11   ultimately keep.

12      Q.    The estimates were made in the first

13   instance by Lehman personnel, correct?

14      A.    That's correct.

15      Q.    Do you know who within Lehman made

16   those estimates?

17      A.    No, I do not.

18      Q.    Did you ever speak to Mr. Kelly at or

19   around -- at or before the time you described

20   the transaction to Judge Peck?

21      A.    I don't believe I've ever spoken with

22   Mr. Kelly.

23      Q.    Okay.  Did you -- when you -- the

24   estimates that we're talking about for

25   compensation --

1                          H. MILLER

2         A.    Very much like the, if you want to

3    call them negotiations, discussions between JPM,

4    JPMorgan, and Barclays, there were discussions

5    going on with representatives of DTCC.    There

6    were representatives of the LBI trustee here for

7    a good portion of the weekend also.

8         Q.    Did you participate in the

9    negotiations of the DTCC letter?

10        A.    No.

11              MR. BOISE:  By "you," do you mean him

12        personally or Weil Gotshal?

13        Q.    You personally.

14        A.    No.

15        Q.    Are you aware of whether anyone from

16   Weil Gotshal personally participated in any of

17   the negotiations from the DTCC letter?

18        A.    Not to any great extent.

19        Q.    Did you see the DTCC letter anytime

20   prior to the closing?

21        A.    It was -- I don't recall seeing a

22   document.  It was sort of described --

23   periodically there were sort of -- everybody,

24   everybody got together in one room and there was

25   sort of an overall report on what was happening,

1                    H. MILLER

2   but I don't recall ever seeing a document.

3       Q.    When you say "an overall report," what

4   do you recall of the overall report that you

5   obtained?

6       A.    A status report.  Are we making

7   progress?  Are we going to be able to close?

8       Q.    And did you ultimately understand that

9   progress was being made?

10      A.    The reports were progress was being

11  made.  As I said before, the big hurdle was JPM

12  and Barclays, and when that was resolved, things

13  started really moving towards a closing.

14      Q.    And beyond understanding the progress

15  ultimately -- at different times was or was not

16  made, and ultimately was made, did you have any

17  further or deeper or other participation in any

18  of the negotiations with the DTCC letter?

19           MR. BOISE:  Objection.

20      A.    No.

21      Q.    And the same, I assume, is your answer

22  with respect to as a Weil 30(b)(6) witness?

23      A.    Correct.

24           MR. MAGUIRE:  Thank you, sir.  I have

25      no further questions.

1                         H. MILLER

2    EXAMINATION BY

3    MR. TECCE:

4         Q.    Good afternoon, Mr. Miller.

5         A.    Good afternoon.

6         Q.    My name is James Tecce.  I'm an

7    attorney at Quinn Emanuel.  We are special

8    counsel to the Creditors Committee.  I'll be

9    very brief, sir.  I just have a few questions

10   for you.

11              The closing of the sale transaction

12   took place over the weekend of September 20 to

13   21; is that correct?

14        A.    Saturday, Sunday and Monday morning,

15   yes.

16        Q.    And the closing took place at Weil

17   Gotshal; is that correct?

18        A.    That is correct.

19        Q.    Okay.  And was the closing a single

20   meeting or was it a series of meetings that were

21   taking place simultaneously?

22        A.    A series of meetings.  This entire

23   floor was consumed with meetings.

24        Q.    And do you have an understanding, sir,

25   as to whether or not Creditors Committee

Page 101

1                          H. MILLER

2    representatives were allowed to participate in

3    all the meetings that were taking place in

4    connection with the closing?

5        A.    To the best of my knowledge, they were

6    allowed to participate in every meeting.

7        Q.    Do you know whether there were any

8    meetings that they were not allowed to

9    participate?

10       A.    I'm not aware of any meetings -- oh,

11   yeah.  They probably weren't allowed into the

12   Barclays Room.

13       Q.    The -- early in the morning of Sunday,

14   September 21, I believe you mentioned that you

15   were present when the Creditors Committee

16   representatives left; is that correct?

17       A.    That was the morning -- Monday

18   morning, not Sunday morning.

19       Q.    Monday morning, I'm sorry.

20             And I believe that you said that one

21   of them said to you, "If it's okay with you,

22   it's okay with us"; is that correct?

23       A.    Yes.

24       Q.    And who was it that said that to you?

25       A.    I believe it was Sol Burian, and it

1                          H. MILLER

2    was later affirmed by Luc Despins.

3         Q.    And what did Mr. Despins say to you?

4         A.    "If you guys are satisfied with it,

5    we're satisfied."

6              MR. TECCE:  Okay.  I have no further

7         questions.  Thank you.

8              MR. BOISE:  I have a few questions,

9         but maybe it would be useful just to take a

10        quick break, like about ten minutes.  I

11        think my questions will be no longer than

12        ten minutes.

13             THE VIDEOGRAPHER:  The time is now

14        12:41 P.M.  We are now off the record.

15             (Recess.)

16             THE VIDEOGRAPHER:  The time is now

17        12:53 P.M.  We are now back on the record.

18   FURTHER EXAMINATION BY

19   MR. BOISE:

20        Q.    Mr. Miller, let me ask you to look at

21   Exhibit 20, 21 and 517, which were the exhibits

22   that counsel used with you in their

23   cross-examination.

24        A.    Just give me one minute.

25             20, 21?

Page 103

1                          H. MILLER

2       Q.     20, 21 and 517.   517 is the

3  Transaction Summary.

4       A.     Okay.

5       Q.     Is there anything in Exhibits 20, 21

6  or 517 that is inconsistent with your

7  understanding at the time that you made the

8  representations that you did to the Court and

9  the motion that you made to the Court on

10 September 19?

11      A.     No.

12             MR. GAFFEY:   Objection to the form.

13             MR. TECCE:   Join in the objection.

14             MR. MAGUIRE:   Objection to form.

15      Q.     Let me direct your attention to

16 Exhibit 444.

17      A.     Yes.

18      Q.     Which is a declaration of Ms. Shari

19 Leventhal, and in particular, let me direct your

20 attention to paragraph 12.

21      A.     Yes.

22      Q.     Where it says that, "In connection

23 with the repo agreement, LBI was to provide

24 Barclays with approximately 49.7 billion in

25 securities in return for the $45 billion in cash

Page 104

1                    H. MILLER

2    funded by Barclays.  This ratio was consistent

3    with the ratio of cash to securities used in the

4    New York Fed's Repurchase Agreement with LBI on

5    the night of September 17."  Do you see that?

6        A.    I do.

7        Q.    And was that consistent with your

8    understanding on September 19, 2008?

9        A.    It is.

10       Q.    Let me ask you next to look at Exhibit

11   460A.

12       A.    460A.  Yes.

13       Q.    And this document in the middle of the

14   first page indicates it was first sent to an

15   Arthur Bruhmuller and that Mr. Bruhmuller then

16   forwarded it on to a number of people.  Do you

17   see that?

18       A.    Yes, I do.

19       Q.    Can you identify for the record who

20   Mr. Bruhmuller was?

21       A.    Only from the e-mail, that he is with

22   Lazard.  Mr. Flores is with Lehman, and -- I

23   don't know how to pronounce his name --

24   Descoteaux was with Lazard.

25       Q.    And Lazard was the advisors to the

Page 110

1                        H. MILLER

2        A.     That's what the document reflects,

3    yes.

4        Q.     Let me ask you to look next at Exhibit

5    516.

6                (Exhibit 516, a document bearing Bates

7        Nos. MTHM0000139 through 147 with

8        attachment, marked for identification, as of

9        this date.)

10       A.     Yes.

11       Q.     And this is an e-mail from David

12   Murgio to Brian Kelly?

13       A.     Correct.

14       Q.     Dated September 21, 2008, correct?

15       A.     That's correct.

16       Q.     And you've already identified, I

17   think, David Murgio as being at Weil; is that

18   correct?

19       A.     That is correct.

20       Q.     And Brian Kelly was at Milbank; is

21   that correct?

22       A.     That's correct.

23       Q.     And Milbank was representing the

24   Creditors Committee; is that correct?

25       A.     He was the attorney.  And the other

Page 111

                              H. MILLER

1

2    party to the e-mail was Mike Fazio, who was at

3    Houlihan Lokey.

4         Q.     And if you look at the second page,

5    you see a smaller version of the chart that we

6    looked at earlier showing the market value --

7         A.     Yes.

8         Q.     -- of the repo collateral at $49.9

9    billion, correct?

10        A.     That seems to be identical to the

11   earlier exhibit that you showed me this morning.

12        Q.     Now, is there anything that I've shown

13   you in Exhibit 516, 509, 507 or 460A that is in

14   any way inconsistent with the understanding that

15   you had at the time that Weil Gotshal made the

16   motion to approve the sale on September 19,

17   2008?

18             MR. TECCE:  Objection to the form of

19        the question.

20             MR. GAFFEY:  Join the objection.

21        A.     And that's -- just could you repeat

22   the exhibit numbers, please?

23        Q.     Sure.  Exhibit 516, 507, 509 --

24             MR. POLKES:  Let's do this, I'm sorry,

25        one at a time here.

1                          H. MILLER

2        A.    507, okay.

3        Q.    509.

4        A.    Okay.

5        Q.    516.

6        A.    Okay.

7        Q.    And 460A.

8        A.    The only reservation I would have is

9   if we were apprized of a, quote, discount,

10  whatever that means, in 50 -- 460A, would have

11  brought that to the attention of the court.

12       Q.    And this is the bulk discount that

13  you're referring to?

14       A.    Yes.  I'm not sure what it means, but

15  if there was a discount, we would have to know

16  more about it.

17       Q.    Did you understand at the time that

18  there were discussions between Barclays and

19  Lazard that the marks on the securities that

20  were involved were uncertain and different

21  people had different views as to them?

22       A.    I wouldn't call that a discount.

23       Q.    If the Lehman marks were reduced

24  because Barclays thought either that they were

25  stale or that conditions had changed, would you

1                          H. MILLER

2      call that a discount?

3          A.    No.

4          Q.    If the Lehman marks were reduced

5      because Barclays prevailed in its view that the

6      number should be lower, would you consider that

7      a discount?

8                (Continued on the next page to include

9          the jurat.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 114

1                         H. MILLER

2    A.    No.

3          MR. BOISE:  I have no more questions.

4          MR. GAFFEY:  Nothing further.

5          MR. MAGUIRE:  Nothing further.  Thank

6    you.

7          MR. TECCE:  Nothing further.  Thank

8    you.

9          THE WITNESS:  Thank you all.

10         THE VIDEOGRAPHER:  That concludes the

11   video record for today.  The time is now

12   1:07 P.M.  We are now off the record.

13                       oOo

14

15

16

                    _____

                    HARVEY R. MILLER

17

18   Subscribed and sworn to

     before me this     day

19   of          2010.

20

     _____

21

22

23

24

25