Rough Transcript

Page 1

1
2               BANKRUPTCY COURT
3         SOUTHERN DISTRICT OF NEW YORK
4
      ------------------------------X
5
      In Re:
6                                    Chapter 11
7     LEHMAN BROTHERS                Case No. 08-13555(JMP)
8     HOLDINGS, INC., et al.,        (Jointly Administered)
9
10                 Debtors.
      ------------------------------X
11
12
13              RULE 30(b)(6)
14           VIDEOTAPED DEPOSITION
15                  OF
16             BARRY W. RIDINGS
17            New York, New York
18         Friday, January 15, 2010
19
20
21
22
23
      Reported by:
24    ANNETTE ARLEQUIN, CCR, RPR
      JOB NO. 27090
25

Rough Transcript

Page 2

1
2
3
4
5           January 15, 2010
6             9:12 a.m.
7
8        RULE 30(b)(6) videotaped deposition
9    of BARRY W. RIDINGS, held at the law
10   offices of Boies, Schiller & Flexner, LLP,
11   575 Lexington Avenue, 7th Floor, New York,
12   New York, before Annette Arlequin, a
13   Certified Court Reporter, a Registered
14   Professional Reporter and Notary Public of
15   the State of New York.
16
17
18
19
20
21
22
23
24
25

Page 20

1    Ridings
2    by any chance?
3        A.    Yes.
4        Q.    Who did?
5        A.    I did.
6        Q.    All right.  Does this reflect that
7    you received this schedule on 9/18?
8        A.    Yes.
9        Q.    If you look at the assets listed
10   there on the left side of the schedule, it
11   provides for none of the intangible assets
12   associated with the business sold to Barclays,
13   does it?
14       A.    No.
15       Q.    If you compare the totals for those
16   assets on page 4543 to the next page, 4544,
17   which is dated 9/16/08 at the top on the right
18   side.
19             Do you see that?
20       A.    Yes.
21       Q.    You see there is a change in the
22   estimate of the assets from $62.7 billion on the
23   9/18 balance sheet to $57.9 billion on the
24   September 18th draft balance sheet, correct?
25             MR. CARDEN:  Objection to form.

1                    Ridings
2          MR. DAKIS: Same objection.
3     A.   Yes.
4     Q.   Does this change reflect the downward
5  values that you were referring to earlier in
6  your testimony?
7          MR. CARDEN: Objection to form.
8          MR. DAKIS: Join in the objection.
9     A.   Just to be clear, the second page,
10 544, again, there's a date on the upper right
11 corner, but it appears to be set up roughly
12 similar to the first page that had my notes on
13 it.
14         There's one or two very slight
15 variations and obviously there are no headers
16 and it has a different date on it, and I believe
17 that SB is Steve Berkenfield's initials.
18    Q.   Right.
19    A.   But again, you can get the same point
20 that you're making on the first page, that in
21 those couple of days there was dramatic
22 decreases in the price of securities.
23    Q.   Turning again to what is not on page
24 4543 under "Assets," I asked you whether there
25 were intangible assets associated with the

1                    Ridings
2  business that was being sold to Barclays that
3  are not reflected there and I believe you said
4  that is correct.
5       A.    Yes.
6       Q.    And to explore that briefly, there's
7  no reflection of purchased fixtures, fittings or
8  software listed among the assets there, correct?
9       A.    That's correct.
10      Q.    There are no transferred properties
11 leases listed there; isn't that right?
12      A.    Correct.   There are no fixed assets
13 either.
14      Q.    There are no fixed assets either.
15            A bit later on I'm going to take you
16 to a larger balance sheet and return to this
17 subject.
18            On the question of a wash, which I
19 mentioned a few minutes ago, did Lazard proffer
20 to the court at any time that this transaction
21 was to be a wash?
22      A.    No.
23      Q.    Did you in fact believe on
24 September 19th that this transaction was going
25 to be a wash?

1                Ridings
2      A.   Again, just to be clear what you mean
3 by wash, because that's not a term I've been
4 using, but that everything sold equals
5 everything purchased.
6      Q.   That's right.
7      A.   No.
8      Q.   Let me ask you to turn to the next
9 exhibit, I'm going to hold this one off because
10 we're going to return to this, which is 562A, a
11 six-page set of news articles distributed in
12 Lazard on September 18, 2008.
13           Do you see that?
14      A.   Yes.
15      Q.   And I'm just going to ask you about
16 the last page.
17      A.   The very last page?
18      Q.   The very last page of that exhibit,
19 which is part of a Reuters report.
20           You will see that by turning the page
21 before just to understand the context of what
22 I'm going to ask you to look at.
23           And this is a report on the impending
24 sale.  The second full paragraph on the last
25 page of 5628 says, "The deal would also lift

Rough Transcript

Page 24

1         Ridings
2    Barclays' capital ratio even before the bank
3    completes a planned capital injection alongside
4    the deal because of a negative goodwill
5    adjustment from the deal amounting to about
6    $2 billion after tax."
7         Do you see that?
8    A.   Yes.
9    Q.   Does Barclays' statement on
10   September 17th as reported here by Reuters that
11   it expected to record a multibillion dollar
12   acquisition gain on the transaction, is that
13   statement inconsistent in any way with your
14   proffer in testimony to the court on
15   September 19th?
16        MR. CARDEN: Objection to form.
17        MR. DAKIS: Same objection.
18        MR. ROTHMAN: Join in the objection.
19   A.   Again, my proffer didn't speak to how
20   Barclays is going to account for a transaction
21   and I don't know how Barclays accounted for the
22   transaction.
23        But my proffer was that this was the
24   highest and best alternative that we had. In
25   fact the only alternative that we had.

Page 25

1        Ridings

2    Q.   As the Reuters article reports,
3 Barclays made an announcement of this gain,
4 anticipated gain, two days before the hearing.
5        Is that a surprise to you that
6 Barclays anticipated a gain on this acquisition?
7        MR. DAKIS: Objection to the form.
8 BY MR. SCHILLER:
9    Q.   As of September 19th.
10       MR. CARDEN: Objection to form.
11       MR. DAKIS: Objection.
12       MR. ROTHMAN: Objection.
13   A.   It's not a surprise to me, but it's
14 Barclays' accounting, so again, I'm not going to
15 put a lot of relevance on the U.K. accounting
16 for this.
17   Q.   To your knowledge, there was no
18 limitation on whether Barclays could profit from
19 this trade, correct?
20       MR. CARDEN: Objection to form.
21       MR. DAKIS: Same objection.
22       MR. ROTHMAN: Join in the objection.
23   A.   That's correct.
24       Just to be clear, if Barclays lost
25 money on this transaction, it would have been

Rough Transcript

Page 26

1              Ridings
2    the end of the U.S. capital markets.
3         Q.   Let me ask you to turn to the next
4    exhibit, 377A, which is Barclays' disclosed
5    acquisition gain on this transaction. The
6    document was generated in February of 2009.
7              If you look at page 5844, you see the
8    valuation by Barclays of the financial assets
9    that it had purchased on September 22nd
10   amounting to $50 billion?
11        A.   Yes.
12        Q.   .160?
13             And it goes on below that to list
14   some of the other assets, some of which we
15   discussed earlier; intangibles, real estate,
16   fixtures, fittings and software.
17             Do you see that?
18        A.   Yes.
19        Q.   And that leaves a total of
20   $53,540,000,000 of assets acquired in the
21   transaction, correct?
22        A.   Yes.
23        Q.   And then if you return to the first
24   page of Exhibit 377A and you address line 39,
25   the gain on acquisition, you see that Barclays

Rough Transcript

Page 27

1             Ridings
2  recognized a gain of approximately $4.2 billion
3  on the acquisition, correct?
4      A.    Yes.
5      Q.    And is the gain that was recognized
6  as reported here inconsistent in any way with
7  your understanding of the sale on which you
8  proffered testimony on September 19, 2008?
9            MR. CARDEN:  Objection.
10           MR. DAKIS:  Objection.
11           MR. ROTHMAN:  Objection to the form.
12     A.    I don't think it's inconsistent.
13 It's just something different, the way Barclays
14 accounts for this.
15     Q.    Are you generally familiar with the
16 Rule 60 motion that was filed by Lehman in this
17 proceeding?
18     A.    In a very high-level fashion, yes.
19     Q.    And in terms of your high-level
20 review of the motion, you understand that it was
21 not filed by Weil, Gotshal, correct?
22     A.    That's right.
23     Q.    Based on everything that you know as
24 of today, do you believe your proffer in
25 testimony to the court on September 19th was