Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------x

In Re:

                    Chapter 11

LEHMAN BROTHERS     Case No. 08-13555(JMP)

HOLDINGS, INC., et al,  (Jointly Administered)

            Debtors.

------------------------------x


DEPOSITION OF EDWARD J. ROSEN

New York, New York

February 19, 2010


Reported by:

MARY F. BOWMAN, RPR, CRR

JOB NO. 28461

1
2
3
4
5             February 19, 2010
6             9:35 a.m.
7
8        Deposition of EDWARD J. ROSEN, held at
9   the offices of Cleary, Gottlieb, Steen &
10  Hamilton, LLP, One Liberty Plaza, New York, New
11  York, before Mary F. Bowman, a Registered
12  Professional Reporter, Certified Realtime
13  Reporter, and Notary Public of the State of New
14  York and New Jersey.
15
16
17
18
19
20
21
22
23
24
25

1  ROSEN
2  was to do it as simply and clearly as possible
3  and not resurrect language that might have
4  been -- for other reasons raised issues in
5  people's minds for reasons unrelated to the
6  point that was intended to be conveyed here,
7  clarified here.
8      Q.   By inserting the parenthetical, did
9  you mean anything different from what you say in
10 your declaration, paragraph 5 was documenting
11 the business deal?
12          MR. MORAG:  Object to the form.
13     Q.   In other words, did you mean anything
14 different in the language in the parenthetical
15 from the earlier language that had been removed?
16          MR. HUME:  Objection, I think you are
17     really calling for him to interpret the
18     contract now.
19          MR. MAGUIRE:  No, no, I am asking what
20     he meant at the time.
21     A.   What I will say is that I meant to
22 express the thought reflected in the markup, but
23 I didn't parse, because I didn't have time to
24 parse the differences in the wording.  And this
25 was intended to pick up everything in a shorter

1                              ROSEN
2    and more concise formulation.
3        Q.    Do you know how much in value terms
4    this parenthetical picked up?
5            MR. MORAG:  Objection to the form.
6        Q.    In other words, do you know how much
7    property there actually was that was held to
8    secure obligations under such derivatives?
9            MR. HUME:  The question is whether he
10       knows today?
11       Q.    Did you know at the time what the
12   dollar amount of that was?
13           MR. MORAG:  And I object, lack of
14       foundation.
15           Go ahead.
16       A.    I did not know the precise number, no.
17       Q.    Did you have a general understanding?
18       A.    I would have assumed it was a
19   significant amount of, significant amount of
20   money.  Lehman was a very significant, one of
21   the largest investment banks.  They had a very
22   significant business, and I would have assumed
23   that with a significant business would come
24   significant customer property to margin the
25   proprietary and customer activities that were

1                        ROSEN

2      going on.

3              So the bigger it was, the more

4      concerned I was about it.

5          Q.   Did you understand that the customer

6      margin was in the billions of dollars?

7          A.   I didn't have specific knowledge of

8      it, but it wouldn't surprise me to hear that.  I

9      expected it to be a large number.

10         Q.   Did you understand what the

11     proprietary margin was that was in the billions

12     of dollars?

13         A.   I would have expected it to be of that

14     kind of magnitude, but I didn't know exactly

15     what it was.

16         Q.   Do you know whether the folks at Weil

17     had an understanding as to how much property was

18     picked up by the parenthetical?

19              MR. MORAG:  Object to the form and

20         foundation.

21         A.   All I'll say about that is that they

22     had more ready access to that information

23     through their client than we had.

24         Q.   What about the trustee, do you know

25     whether the trustee had any knowledge about the

1               ROSEN

2    amount of the property that was the subject of

3    that parenthetical?

4        A.    I can't speak to the state of mind of

5    the trustee, but I assume that as part of this,

6    the trustee was looking at what was there.

7        Q.    Is your answer the same with respect

8    to the creditors committee?

9        A.    I've had no direct interaction with

10   them, the creditors committee, such that I can

11   recall.

12            MR. MAGUIRE:  We will mark as

13       Exhibit 623 a document dated September 19,

14       2008, Bates stamped GCGSH0002699 through

15       700.

16            (Exhibit 623, document Bates stamped

17       CGSH0002699 through 700 marked for

18       identification, as of this date.)

19       A.    Can I back up a second to your

20   previous question?  In terms of what the trustee

21   and Weil knew about the amount of the margin,

22   they would have known -- they were copied on

23   e-mails which -- from OCC just in the context of

24   OCC that suggested that just the pays and

25   collects from -- for the Monday would have been

1         ROSEN

2    on the order of several hundreds of millions of

3    dollars, which would have suggested an

4    extraordinarily large amount of positions and

5    therefore margin associated with them.

6              So they could have inferred that it

7    would be an extremely significant amount of

8    margin.

9         Q.   When you refer to the pays and

10   collects, what are you referring to?

11        A.   The accounts are marked on a periodic

12   basis by the clearinghouse, and it was sort of

13   what additional flows are coming in or going out

14   between the clearinghouse and the clearing

15   member as a result of the changes in the marks

16   or the exercises of contracts or whatever other

17   activity is being conducted in the account.

18        Q.   And what's a pay?

19        A.   Well, it depends on what your

20   perspective is, but some amounts are paid by the

21   clearinghouse to the clearing member, and there

22   are amounts that are paid, so if you are

23   receiving the funds, you are the collect, and if

24   you are paying the funds, you're the pay.

25        Q.   Do you know whether the trustee or

1                 ROSEN

2 Weil actually received any information

3 concerning pays or collects at the OCC prior to

4 the closing?

5     A.    I believe they were copied on e-mail

6 correspondence from the OCC, but that may be a

7 misrecollection, but I believe there was a lot

8 of correspondence including another e-mail that

9 referred to a billion dollars and that confirmed

10 that OCC was going to transfer all of that to

11 Barclays, as we would have all expected.

12     Q.    And did you receive any response to

13 Exhibit 623?

14     A.    I don't have a clear recollection of a

15 specific response to this except that the SEC,

16 after this interim exchange of communications

17 regarding DTCC, stepped up to support the

18 transaction, so presumably if they had had a

19 problem, they would have raised it in connection

20 with their support of the transaction.

21     Q.    We will mark as Exhibit 624 a document

22 Bates stamped DTCC 00126 through 00198.

23        (Exhibit 624, document Bates stamped

24        DTCC 00126 through 00198 marked for

25        identification, as of this date.)