Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4    --------------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS           Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al,    (Jointly Administered)

9              Debtors.

10   --------------------------x

11

12          DEPOSITION OF CONOR P. TULLY

13              New York, New York

14              February 10, 2010

15

16   Reported by:

17   MARY F. BOWMAN, RPR, CRR

18   JOB NO. 27496

19

20

21

22

23

24

25

Page 2

1
2
3
4
5              February 4, 2010
6                 9:40 a.m.
7
8          Deposition of CONOR P. TULLY, held at
9    the offices of Boies Schiller & Flexner, LLP,
10   575 Lexington Avenue, New York, New York, before
11   Mary F. Bowman, a Registered Professional
12   Reporter, Certified Realtime Reporter, and
13   Notary Public of the State of New York and New
14   Jersey.
15
16
17
18
19
20
21
22
23
24
25

1         TULLY
2  of Alvarez's function was really to kind of
3  figure out what was left, how to monetize that.
4  So you could say indirectly, it was more what
5  was left, not what was sold that was the focus
6  of the meeting.  It wasn't -- to my knowledge, I
7  don't think that John Suchow was very involved
8  in the transaction, if at all.
9      Q.    After initial meeting, at some point
10 did you have a meeting with Alvarez or people
11 from Lehman in which there was a discussion
12 concerning aspects of the sale transaction?
13     A.    It is hard to say.  I mean, the sale
14 transaction, just so you -- we didn't really get
15 into the role of Houlihan and the role of FTI,
16 but they were very bifurcated.
17          Our role was kind of the operations
18 wind-down, the IT, looking at the retention
19 plan, sort of bankruptcy administration type
20 roles, and then we also got, were getting
21 involved -- got involved in certain work streams
22 like real estate and derivatives, et cetera.
23          Houlihan's role was transactions,
24 anything and everything transactions.  So they
25 were charged with reviewing the Barclays

Page 15

TULLY

1
2  transaction or involved to some degree, you
3  know, reviewing certain major asset sales.
4  There was something called R3 that was being
5  sold around that time. The transaction may have
6  been in the works previously and they were
7  vetting it from the committee's perspective to
8  figure out if it still made sense.
9         So to answer your question, I mean
10 maybe there were certain discussions that, you
11 know, where we had some talk of the transaction.
12 But at that time, the transaction was the
13 transaction and it didn't really matter to me
14 what it was.
15    Q.   At some point after this initial
16 meeting, did you have any discussions with
17 Alvarez or former Lehman executives concerning
18 Barclays' replacement of the Fed repo?
19    A.   Yes, I believe that was the subject of
20 this e-mail. That came up in the context of
21 trying to understand JP Morgan's role in this
22 whole situation. There was some discussion of
23 the fact that, it was said in this e-mail, that
24 there was a Fed repo that Barclays stepped into
25 or partially repaid. I don't really know the

1                    TULLY

2    exact specifics of it. But those -- that

3    meeting on October 3, that topic certainly came

4    up.

5        Q.    Do you recall whether that topic was

6    discussed in any prior meeting, either on

7    October 1 or any earlier date?

8        A.    I can't really say. I don't believe

9    so.

10       Q.    You don't recall?

11       A.    I don't recall.

12       Q.    For what reason were you inquiring

13   about matters involving JP Morgan Chase?

14             WITNESS' ATTORNEY: Objection to form.

15             It is OK, you can answer.

16       A.    We were trying -- well, one piece of

17   my role, a very significant piece, I don't know

18   that I mentioned it, was we were doing cash

19   management. So we were trying to -- in any

20   bankruptcy case, cash, understanding your cash

21   position on the day of filing and what it is

22   going to be going forward is imperative.

23             So JP Morgan Chase was their bank,

24   obviously. You know, I was somewhat shocked at

25   the fact that the moment I walked in there, I

1  TULLY
2  couldn't get a cash balance, what is your total
3  cash. That question was a question that
4  probably took a week or two to answer.
5      Q.  And why did it take so long to answer?
6  Were you given an explanation as to why it took
7  so long to answer?
8      A.  Yes.
9      Q.  What was the explanation?
10     A.  That Chase had, quote/unquote, shut
11 down the systems, turned off the screens, things
12 like that.
13     Q.  Were you told when that first
14 occurred?
15     A.  I don't recall exactly, but I think it
16 was a few days after the bankruptcy. I don't
17 have a perfect recollection of the timing.
18     Q.  Did you participate in any discussions
19 with Alvarez or Lehman executives concerning the
20 estimate of cure payments that Lehman had
21 presented in connection with the sale
22 transaction?
23     A.  Yes. I believe that was a -- in any
24 bankruptcy scenario where there is a sale and
25 there is an assumption and assignment of

1             TULLY
2  contracts, we want to make sure that's a
3  controlled process and people are tracking it.
4  Lehman, being such a big entity, the fact that
5  there was an LBHI Chapter 11 proceeding, as well
6  as an LBI proceeding seemed to complicate that
7  matter.  We wanted to -- the conversations I had
8  I recall were that we wanted to make sure we
9  were staying on top of the people who were
10 trying, supposed to be monitoring that process,
11 that LBHI had a process in place that two years
12 later and we don't have a situation where a
13 contract was assumed by Barclays and paid,
14 presumably, and then this party files a claim in
15 the bankruptcy.
16            So that was the context.  And there
17 were discussions and we had a meeting on it.  I
18 think that was probably mid October or
19 something.  I don't know.
20      Q.    What was FTI's focus with respect to
21 cure payments?
22            WITNESS' ATTORNEY:  Object to form.
23      A.    The focus was, as I said, to insure
24 that claims weren't actually double counted.
25      Q.    Did FTI do anything or ask any

1           TULLY
2  questions relating to the cure estimate that
3  Lehman had provided in connection with the sale
4  transaction?
5           WITNESS' ATTORNEY:  Object to form and
6       foundation.
7       A.    I don't recall asking for -- maybe we
8  did ask for, you know, substantiation of that
9  where did you get such -- the cure number,
10 whatever that cure number was that was stated.
11 But I don't recall ever getting into any depth
12 on it or receiving any sort of information that
13 would have led me to believe that's a good or
14 bad number.
15      Q.    What work did FTI do to analyze the
16 actual cure payments that were being made in
17 connection with the Lehman bankruptcy?
18          WITNESS' ATTORNEY:  I am going to
19      object and -- on attorney/client and work
20      product privilege.
21          You can describe in a general way what
22      FTI was doing, but don't get into the
23      substance of any communications that you
24      gave the committee or specifics with FTI.
25      You can say what the general project was

1             TULLY

2       related to cure payments if you know at FTI.

3       A.    OK.  I think our work was principally,

4   as I mentioned before, trying to understand

5   whether or not there was a process in place

6   whereby Barclays, LBI and LBHI were all somehow

7   communicating so that we didn't have the

8   situation I mentioned before of creditors coming

9   in -- I think the bar date was 12 or 13 months

10  later.  The claims bar date was obviously much

11  later and we wanted to, as I mentioned, insure

12  that there wasn't a situation where there was no

13  control over the payments being made such that

14  creditors could assert a claim while they were

15  already paid.

16      Q.    Did FTI do anything to review the

17  public filings concerning cure payments relating

18  to closing date contracts or designated

19  contracts?

20          WITNESS' ATTORNEY:  You can answer

21      that yes or no.  We will take it from there.

22          THE WITNESS:  OK.

23      A.    Yes.

24      Q.    And that information was available on

25  the Epiq website, is that correct?