Page 1

```
 1            HIGHLY CONFIDENTIAL - JOHN VARLEY                1
 2              UNITED STATES BANKRUPTCY COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4     - - - - - - - - - - - - - - - - - -
 5    In Re:
                         Chapter 11
 6
 7    LEHMAN BROTHERS    Case No. 08-13555(JMP)
      HOLDINGS, INC. et al., (Jointly Administered)
 8
 9                       Debtors.
10     - - - - - - - - - - - - - - - - - - - - -
11                    HIGHLY CONFIDENTIAL
12                 DEPOSITION OF JOHN VARLEY
13                Thursday, September 3, 2009
14                     At:  12:00 pm
15                       Taken at:
16                        Barclays
                     1 Churchill Place
17                        London
                      United Kingdom
18
19    Reported by: AILSA WILLIAMS
      Certified LiveNote Reporter
20
21
22
23
24
25
```

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - JOHN VARLEY      2 |
| 2 | A P P E A R A N C E S |
| 3 | JONES DAY, LLP |
| | Attorneys for Lehman Brothers, Inc. |
| 4 | 222 East 41st Street |
| | New York, NY 10017-6702 |
| 5 | BY: JAYANT W. TAMBE, ESQ |
| | BRIDGET CRAWFORD, ESQ |
| 6 | |
| | BOIES, SCHILLER & FLEXNER, LLP |
| 7 | Attorneys for Barclays Capital and the Witness |
| 8 | 5301 Wisconsin Avenue N.W |
| | Washington D.C 20015 |
| 9 | BY: JONATHAN M. SHAW |
| 10 | QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP |
| 11 | Attorneys for the Creditors Committee |
| | 16 Old Bailey |
| 12 | London, United Kingdom, EC4M 7EG |
| | BY: MATTHEW BUNTING, ESQ. |
| 13 | |
| | HUGHES, HUBBARD & REED, LLP |
| 14 | Attorneys for the SIPA Trustee |
| | 1775 I Street, N.W |
| 15 | Washington D.C. 20006-2401 |
| | BY: JOHN F. WOOD |
| 16 | Also Present: |
| 17 | PHILIP E. KRUSE: Alvarez & Marsal |
| 18 | GREG BARDEN: Jones Day |
| 19 | DEBORAH COOPER: Barclays |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
 1              HIGHLY CONFIDENTIAL - JOHN VARLEY                12
 2   potential avenues, of which Lehman was one.
 3              This was, as I say, a high level
 4   strategic review, where the premise was: If it
 5   should become possible to do a transaction with
 6   Lehmans, do you, the board feel, as I the Chief
 7   Executive feel, that this would be a good way of
 8   implementing the strategy?
 9        Q.    And at that June 2008 discussion were
10   any materials submitted to the board analyzing
11   Lehman's business and the nature of that
12   opportunity?
13        A.    You may well need to refresh my memory
14   on that point.  I presume that there were some
15   board materials tabled at that time but I don't
16   have a clear recollection of what they were, but
17   as an example we might have tabled for the board:
18   This is what the Lehman's business looks like.
19   Here is public disclosure relating to Lehman's.
20   This is where its people are.  This is where its
21   earnings are derived from, and so on.
22        Q.    I can't refresh your recollection on
23   that.  I don't think we have any materials from
24   that time period.  The reason I ask the question
25   is that type of discussion with the board, where
```

```
                                                          Page 13
1             HIGHLY CONFIDENTIAL - JOHN VARLEY              13
2      it got to that level of specifics, Lehman was
3      discussed, that would have been done with the
4      benefit of at least some written materials?
5           A.   I should not indulge in idle speculation
6      and I have a fallible memory.
7           Q.   You have been well trained for the
8      deposition.  Go ahead.
9           A.   So, if I then go to in a sense the more
10     proximate to the transaction part of your
11     question --
12          Q.   So we left June behind?
13          A.   We left June behind, and I do not recall
14     precisely whether between June and the middle
15     of September there was any -- there was certainly
16     no lengthy discussion of the Lehman opportunity at
17     the one board meeting that took place between June
18     and mid-September, but certainly it is possible I
19     think that we may have said that the Lehman
20     situation appeared to be deteriorating.  Then, and
21     again I don't have precise recall, there were
22     various board discussions in the run up to
23     a telephone meeting of the board that we had on
24     the Sunday.
25          Q.   The Sunday before the bankruptcy filing?
```

                                                                    Page 14

 1              HIGHLY CONFIDENTIAL - JOHN VARLEY                         14
 2       A.   Yes, so I think I am talking about
 3   Sunday 14 September, I believe, and I think there
 4   may also have been a further telephone meeting of
 5   the board on the Tuesday or the Wednesday,
 6   probably the Tuesday, given that we made, as you
 7   know, an announcement on the Wednesday.
 8       Q.   Let's take those two events in turn.
 9   The Sunday board meeting, by Sunday 14 September
10   you already had a due diligence team that was
11   doing a fairly deep dive into Lehman's books.
12   Correct?
13       A.   We did.
14       Q.   And you had made some initial I guess
15   conclusions about assets that you found attractive
16   and assets that you did not want to purchase at
17   all.  Is that fair?
18       A.   Well, we had concluded some initial due
19   diligence and had a point of view.  If I can just
20   back up for one moment, it will be a convenience,
21   if you are prepared to allow it, for me to refer
22   to the transaction that we were looking at on the
23   Saturday and the Sunday as Lehman one.
24       Q.   That would be helpful.
25       A.   The transaction that we announced on

Page 15

1          HIGHLY CONFIDENTIAL - JOHN VARLEY            15
2   Wednesday as Lehman two and the transaction that
3   we implemented as Lehman three.
4       Q.   That is very helpful.
5       A.   If that helps.
6       Q.   No, that is very helpful.
7       A.   The due diligence that we were doing at
8   the back end of the week before the bankruptcy
9   filing, that due diligence was aimed at Lehman
10  one.  We had identified a number of areas where we
11  felt that the valuations applied by Lehmans to
12  their balance sheet were optimistic.  Now, you
13  will conclude whether that coincides with your
14  description, but that would be my description.
15      Q.   Let's drill down a little bit more,
16  because my understanding is not only you had
17  identified these assets where you found Lehman's
18  valuations to be optimistic, maybe overly so, but
19  you had then taken the next step of listing them
20  as excluded assets in any contemplated
21  transaction?
22      A.   Um hum.
23      Q.   Is that fair?
24      A.   What we did, and here I am recalling
25  a set of conversations that we had with the US

1  HIGHLY CONFIDENTIAL - JOHN VARLEY                    16

2  administrations in its various guises, we

3  indicated that we would not be able to, we would

4  not be prepared to proceed with Lehman one if

5  certain assets came with the Lehman one

6  transaction.

7      Q.   Just to be clear on the record, you are

8  talking about discussions you had with the US

9  Government, about the role the US Government might

10 play, if any, in the Lehman one transaction?

11     A.   Yes.

12     Q.   And you were discussing a backstop or

13 some kind of a Government facility that would in

14 effect cover the risk of loss on those assets that

15 you would exclude from your transaction?

16     A.   As I recall it, we were looking at two

17 particular areas.  One was a set of assets that we

18 didn't want to acquire, and two was the

19 guaranteeing for the period between announcement

20 and closing, which could have been a period of

21 several months, the guaranteeing of the trading

22 liabilities of Lehman's through that period.

23          In a sense we were indifferent to how those

24 particular steps were procured, whether by the US Government

25 as principal or whether by the US Government as agent with

1    HIGHLY CONFIDENTIAL - JOHN VARLEY                           17

2    other principals, but we were clear going into the Lehman

3    one transaction that the Lehman one transaction, if it would

4    be executed by Barclays, would have to have those features.

5        Q.    And the period of time that you

6    described between signing up the agreement and the

7    closing of the transaction, was that a function of

8    the approvals that you needed to obtain from your

9    shareholders?

10       A.    Partly, but partly regulatory approvals

11   and partly the sheer complexity of a transaction

12   of that size.  I mean, my recollection is that the

13   Lehman's balance sheet was, you know, two-thirds

14   of a trillion dollars.  There was a lot of

15   complexity in it.  Any transaction involving such

16   an acquisition takes time to close, as you know.

17       Q.    I just want to drill down this

18   two-thirds of a trillion dollars number, just

19   because there is a lot of zeros that end up flying

20   around here.  That is what, $600 billion?

21       A.    My recollection is that the Lehman

22   balance sheet on the Friday night before Lehman

23   went into administration, the gross balance sheet

24   was about $670 billion.

25       Q.    And the Lehman one transaction that you

```
                                                          Page 37
 1          HIGHLY CONFIDENTIAL - JOHN VARLEY                37
 2   the need to have a substantial discount.
 3       Q.   Do you recall a discussion on Friday,
 4   the 19th, where some of the folks that report to
 5   you reported to you that maybe there was not
 6   enough cushion or delta because of the assets that
 7   in fact had been transferred over, and therefore
 8   there was a need to obtain additional assets?  Do
 9   you recall any discussion like that?
10       A.   I don't, no.
11       Q.   Do you know whether Barclays acquired
12   any assets other than the assets that were
13   transferred from the Fed repo to Barclays?
14       A.   I don't know whether we did or whether
15   we didn't.  I would be surprised if we did.
16            (Exhibit 338A marked for identification)
17       Q.   This is number 338A.  I have placed
18   before you a document marked 338A.  It is a real
19   short e-mail.  If you can just let me know when
20   you are done reviewing it, we can talk about it
21   briefly.
22       A.   Thank you, yes.
23       Q.   This is an e-mail to you from Jeff Rosen
24   at Lazard.  Do you see that?
25       A.   Yes.
```

```
                                                              Page 38
1              HIGHLY CONFIDENTIAL - JOHN VARLEY                  38
2          Q.   Is Jeff Rosen someone you had been
3    communicating with over the weekend in connection
4    with the Lehman one transaction?
5          A.   My recollection is imperfect.  We have
6    a number of advisers.  Lazards, of whom Jeffrey is
7    a senior director, often advised us on
8    transactions.  Actually, my recollection is that
9    we did not engage them or seek their advice on
10   this transaction, but as you will know that
11   doesn't always prevent investment bankers trying
12   to advise you on a transaction.
13         Q.   So there is no mystery, Lazards was an
14   adviser to Lehman in the transaction.
15         A.   Um hum.
16         Q.   Does that help your recollection?
17         A.   It would certainly confirm that we
18   didn't retain them ourselves.
19         Q.   That is why I am just trying to figure
20   out why Mr. Rosen is contacting you and
21   Mr. Diamond directly on the morning that Lehman
22   filed for bankruptcy.
23         A.   Because he is the relationship lead
24   under Bruce Waserstein at Lazard, and in the
25   ordinary course of any three-month period he would
```

```
                                                        Page 39
 1            HIGHLY CONFIDENTIAL - JOHN VARLEY              39
 2   quite often ring me to talk about what is going on
 3   in the market, and this was such a call.
 4        Q.   Okay.  Do you recall having a discussion
 5   with Mr. Rosen following this e-mail?
 6        A.   Do you know, I don't think I did have
 7   a conversation with him actually.
 8        Q.   Do you remember having a conversation
 9   with anyone else from Lazards in connection with
10   the Lehman transaction?
11        A.   I don't.
12             (Exhibit 339A marked for identification)
13        Q.   Sir, I have placed before you a one page
14   document marked Exhibit 339A.  Take a moment to
15   look at it, let me know when you are done.
16        A.   Thank you.
17        Q.   Do you recognize this as an e-mail that
18   you sent to I guess the senior leaders at the bank
19   announcing the Lehman two transaction?
20        A.   I recognize it as a communication that
21   I sent to the senior leaders of the group.  It was
22   not announcing a Lehmans two transaction.  It was
23   indicating the possibility of a Lehmans two
24   transaction.
25        Q.   In the second paragraph of your
```

Page 40

1       HIGHLY CONFIDENTIAL - JOHN VARLEY                    40

2   announcement you make a reference to the

3   "opportunity to purchase what we regard as the

4   good parts of the investment bank (including

5   people, infrastructure and licenses) without

6   having to take on any exposure to the bad parts".

7   Do you see that?

8       A.   I do see that, yes.

9       Q.   Was that basically the formula you

10  followed in coming up with the Lehman two

11  transaction?

12      A.   Although I didn't do it explicitly

13  there, what I was seeking to do, remember that

14  they had been hearing in the media about the

15  Lehman one transaction, was to juxtapose Lehman

16  one and Lehman two, in other words this was

17  a transaction which was smaller, where we could be

18  more selective.  That was the point that I was

19  seeking to make by that remark.

20          MR. SHAW:  Is this a logical time for

21  five minutes?

22          MR. TAMBE:  Yes, we can break now.

23                  (A short break).

24          (Exhibit 340A marked for identification).

25      Q.   I have handed you a 2-page document

```
                                                              Page 41
 1             HIGHLY CONFIDENTIAL - JOHN VARLEY                  41

 2   marked Exhibit 340A.  Take a moment to review it,

 3   let me know when you are done.

 4        A.   Thank you.

 5        Q.   This is an e-mail to you from Mark

 6   Merson.  Do you see that?

 7        A.   Yes, it is, yes.

 8        Q.   This was in preparation for the call

 9   that you had with analysts on 17 September,

10   correct?

11        A.   Correct.

12        Q.   This collection of bullet points, are

13   these issues that you had discussed with

14   Mr. Merson to develop this list of talking points?

15        A.   No, I had not.

16        Q.   So this is something that he would have

17   prepared for your review?

18        A.   Yes.

19        Q.   He says in the introduction to his

20   e-mail: "John, as we agreed..."

21        A.   Um hum.

22        Q.   Had you had a discussion with Mr. Merson

23   about the points he was going to address in this

24   draft?

25             MR. SHAW:  Asked and answered.
```