1          HIGHLY CONFIDENTIAL - A. KIRK

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                        Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

              Debtors.

10

     ----------------------x

11

12          * * * HIGHLY CONFIDENTIAL * * *

13          DEPOSITION OF ALEX KIRK

14             New York, New York

15             August 31, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24545

1    HIGHLY CONFIDENTIAL - A. KIRK

2    August 31, 2009

3    9:30 a.m.

4

5    HIGHLY CONFIDENTIAL deposition

6    of ALEX KIRK, held at Jones Day, LLP,

7    222 East 41st Street, LLP, New York,

8    New York, before Kathy S. Klepfer, a

9    Registered Professional Reporter,

10    Registered Merit Reporter, Certified

11    Realtime Reporter, Certified Livenote

12    Reporter, and Notary Public of the State

13    of New York.

14

15

16

17

18

19

20

21

22

23

24

25

1            HIGHLY CONFIDENTIAL - A. KIRK

2       A.    I don't remember the transfer date, to

3   be honest with you.  I worked there till the

4   first week of November.

5       Q.    First week of November '08?

6       A.    Yes.

7       Q.    What positions did you hold at

8   Barclays?

9       A.    I didn't have a position at Barclays.

10      Q.    Was there -- I know it was sort of

11  tumultuous times.  Was there any break in

12  between leaving Lehman and going to Barclays, or

13  did you just sort of start working at Barclays

14  at the end of the Lehman --

15      A.    Whenever the actual HR records

16  transferred.

17      Q.    Okay.  Did you have a written

18  employment agreement with Barclays?

19      A.    No.

20      Q.    Was any written employment agreement

21  ever offered to you by Barclays?

22      A.    No.

23      Q.    Would you describe to me your

24  compensation package at Lehman -- withdrawn.

25            What was your compensation arrangement

1          HIGHLY CONFIDENTIAL - A. KIRK

2     for Lehman when you returned in July of '08?

3          A.    I would, when I returned, I would

4     receive salary.

5          Q.    And what was the salary?

6          A.    It was supposed to be $400,000, but

7     through an administrative mistake, I got paid

8     $225,000.

9          Q.    And what was your salary at Barclays?

10         A.    The same.

11         Q.    Did you have any arrangements or

12    agreements for a bonus at Lehman?

13         A.    No.

14         Q.    Did you have any arrangements or

15    agreements for a bonus at Barclays?

16         A.    Yes.

17         Q.    What were those?

18         A.    Let me clarify.

19         Q.    Sure.

20         A.    About two weeks after I arrived at

21    Lehman, I was granted, without a request --

22    maybe two or three weeks, I don't remember the

23    exact time -- equity under a program they had

24    started that spring.  They were granting equity

25    to a lot of the senior executives, and I was

1                HIGHLY CONFIDENTIAL - A. KIRK

2      granted I think it was 750,000 shares of Lehman

3      equity.

4          Q.    And what were your bonus arrangements

5      or agreements with Barclays?

6          A.    About the end of October, I reached

7      out to Bart McDade suggesting that perhaps

8      Barclays could pay me a bonus before I left.

9      About a week later, they informed me that they

10     would pay me $15 million in two separate

11     installments.

12         Q.    And were those installments to be paid

13     on the first and second anniversary of your

14     Barclays tenure; was that the arrangement?

15         A.    No, it was November 15th and

16     February -- sometime in February.

17         Q.    Did you receive either of those

18     payments?

19         A.    Yes.

20         Q.    The first one, I take it?

21         A.    Both.

22         Q.    Both, okay.

23              Why did you leave Barclays?

24         A.    I had -- because I wanted to leave the

25     sell side of the business, broadly, and move to

1              HIGHLY CONFIDENTIAL - A. KIRK

2      the buy side of the business.

3          Q.     Could you explain to me what you mean

4      by that?

5          A.     Meaning I wanted to go work as a

6      principal in a hedge fund or a money management

7      firm.

8          Q.     Did you do that?

9          A.     I'm in the process of setting up a

10     firm right now.

11         Q.     Before you went to work at Barclays,

12     before the end of Lehman, had you had any

13     discussions with anyone at Barclays about the

14     prospects of working there after the Lehman sale

15     was concluded?

16         A.     I was approached by Bob Diamond to see

17     if I was interested in a job, broadly, as

18     opposed to a specific job.  I told him I wasn't.

19         Q.     Pardon me?

20         A.     I was not.

21         Q.     And when were you approached by Bob

22     Diamond?

23         A.     At some point within the first week or

24     two that they were -- I would say probably that

25     week that they were negotiating to buy the firm.

1            HIGHLY CONFIDENTIAL - A. KIRK

2    If not that week, the week after.

3        Q.    Okay.   We're going to spend a lot of

4    time today talking about the negotiations on

5    that point, so let me take this point to frame

6    out some dates.

7            I put before you a blank calendar

8    which may help you with days of the week that

9    we'll talk about, but when you talk about the

10   week in which there were negotiations, could you

11   tell me what week or weeks you're talking about?

12       A.    The week of September -- Monday,

13   September 15th through Friday, you know, through

14   Sunday, September 21st.

15       Q.    And at what point during that week did

16   Mr. Diamond talk to you about coming to work for

17   Barclays?

18       A.    I don't remember if it was that week

19   or the following week.

20       Q.    Again, just to give us a time point,

21   the transaction we're talking about closed on

22   September 22.   Do you recall if it was before or

23   after the closing?

24       A.    I don't recall.

25       Q.    Was it just you and Mr. Diamond in the

1          HIGHLY CONFIDENTIAL - A. KIRK

2     conversation?

3          A.     Yes.

4          Q.     And apart from this conversation with

5     Mr. Diamond, had you had discussions with anyone

6     about going to work for Barclays?

7          A.     No.

8          Q.     And when you had the discussion with

9     Mr. Diamond, did he talk to you about a

10    compensation package?

11         A.     No.

12         Q.     When did you first talk to anyone at

13    Barclays about a compensation package?

14         A.     First conversation I had with anybody

15    at Barclays was the meeting I sat down with Rich

16    Ricci where he told me what the

17    severance/compensation packet bonus would be,

18    which was in late October.

19         Q.     Had you had any conversations with any

20    of your fellow Lehman employees about the topic

21    of compensation at Barclays?

22         A.     Bart McDade.

23         Q.     Can you describe that conversation

24    with Mr. McDade?

25         A.     Yes.  Several of my colleagues were --

1          HIGHLY CONFIDENTIAL - A. KIRK

2    who had signed employment agreements were

3    resigning from the firm and receiving large

4    payouts upon their leaving the firm, and I

5    suggested to Bart that it would be fair if I was

6    treated in a similar way, despite not having a

7    written contract.

8        Q.    And what did Mr. McDade say to you?

9        A.    He said he agreed and he would talk to

10   Barclays about that.  He was on point for those

11   sorts of issues with Barclays.

12       Q.    Do you know if he did talk to anyone

13   at Barclays about you in that regard?

14       A.    I assume he did.

15       Q.    And why do you assume that?

16       A.    Because they approached me with a

17   deal --

18       Q.    Was the conversation --

19       A.    -- a couple weeks later.

20       Q.    I beg your pardon.

21             Was the conversation with Mr. McDade

22   during the week of the negotiations between the

23   15th and the 22nd?

24       A.    No, it was sometime in late October.

25       Q.    Did you have conversations with anyone

1              HIGHLY CONFIDENTIAL - A. KIRK

2     at Lehman during that week, the 15th through the

3     22nd?

4         A.    No.

5         Q.    Let me just put a full question so

6     that we have a clear record, okay?

7         A.    Yeah.

8         Q.    Did you have conversations with anyone

9     during the week of the 15th to the 22nd about

10    compensation that would be paid to you at

11    Barclays after the 22nd?

12        A.    No.

13        Q.    I think you referred a moment ago to

14    people receiving payouts when you left the firm.

15    What firm were you referring to?

16        A.    Barclays.

17        Q.    And who were those people you were

18    referring to?

19        A.    Mike Gelband was one.  I believe

20    Kaushik Amin was another.

21        Q.    Anyone else?

22        A.    Not that I recall directly.

23              I'm sorry.  Yeung Lee was another.

24        Q.    Anyone else?

25        A.    That's all I can recall.  There were

1             HIGHLY CONFIDENTIAL - A. KIRK

2    many people leaving Barclays at that time.

3        Q.    Just as a general matter, when you say

4    there were many people leaving Barclays, are you

5    referring to former Lehman employees --

6        A.    Yes.

7        Q.    -- who transferred?

8        A.    Yes.

9        Q.    And then left Barclays?

10       A.    Yes.

11       Q.    And if you know, sir, why were these

12   people who were leaving Barclays, Gelband, for

13   example, receiving payouts from Barclays on

14   their departure?

15            MR. HUME:  Objection.  Calls for

16       speculation.

17       A.    I don't know.

18       Q.    Why did you get payments in the

19   amounts that you did from Barclays having worked

20   there for such a short period of time?

21            MR. KELLEY:  I'll make the same

22       objection.

23       Q.    You can answer, I think.

24       A.    I don't know.

25       Q.    Did you talk to anybody about that?

1          HIGHLY CONFIDENTIAL - A. KIRK

2      A.     No.

3      Q.     Were you surprised to receive payments

4   in that amount from Barclays, having worked

5   there for such a short period of time?

6      A.     No.

7      Q.     I may have been a bit confused about

8   the time periods, but when you said you were to

9   be paid 15 million by -- actually, just remind

10  me, when did you leave Barclays?

11     A.     November, first week.

12     Q.     When we talked about the bonus to be

13  paid to you, the $15 million in total, I think

14  you had told me it would be paid in November and

15  then in February?

16     A.     Yes.  Uh-huh.

17     Q.     You left before the February payment

18  would have come due, correct?

19     A.     Yes.

20     Q.     Do you know why they paid you the

21  second piece?

22     A.     It was agreed that they would pay me.

23     Q.     When was it agreed?  At the time you

24  left or at some time before that?

25     A.     When I was leaving, as long as I

1            HIGHLY CONFIDENTIAL - A. KIRK

2    didn't compete with them or solicit their

3    employees for six months, I was paid -- I would

4    be paid those amounts of money.

5        Q.    Was the non-compete/non-solicitation

6    in a written agreement?

7        A.    Yes.

8        Q.    Did you have a written agreement

9    concerning your departure from Barclays?

10       A.    Yes.

11       Q.    That went beyond the non-compete

12   and -- withdraw.  That's a terrible question.

13            When did you sign the written

14   agreement with Barclays?

15       A.    Sometime in November.

16       Q.    Do you have a copy of that agreement?

17       A.    I do.

18       Q.    Did you bring it with you?

19       A.    No.

20            Unless you brought it.

21            MR. ENRIGHT:  No.

22            MR. GAFFEY:  Just for the record, I

23       should say I think it's probably called for

24       by the subpoena.  We don't have to have a

25       colloquy about it now.  I just want to make

Page 20

1          HIGHLY CONFIDENTIAL - A. KIRK

2      my record.

3          I think it was called for by the

4      subpoena.  I also think it would be called

5      for by our document request to Barclays.

6          MR. HUME:  I think it's from November,

7      a different kind of agreement.  That's the

8      only reason.  We'll look for it.

9          MR. GAFFEY:  If you could, and if --

10         Can we go off the record for a minute?

11         (Discussion off the record.)

12   BY MR. GAFFEY:

13     Q.    Now, when you met, Mr. Kirk, with

14   Mr. Hume or people from his firm, did you talk

15   about events during a time period other than the

16   time you were employed by Barclays?

17         MR. KELLEY:  Objection.  Privileged.

18         MR. GAFFEY:  I think I can inquire to

19     find out -- a yes or no will tell me whether

20     or not I can press on the privilege point.

21     Q.    If you just answer yes or no.

22         MR. KELLEY:  No, I'll make the same

23     objection.

24     Q.    When did you meet with the lawyers for

25   Barclays?

Page 27

HIGHLY CONFIDENTIAL - A. KIRK

1    trying to coordinate due diligence with our

2    principals and the rest of the street, meaning

3    Goldman Sachs, Citigroup, First Boston, et

4    cetera, around the value of those assets which

5    they were going to make a loan to the spun-off

6    company.

7        Q.    And were Barclays personnel involved

8    in that process?

9        A.    Not in the due diligence process, no.

10       Q.    Were you in touch with Barclays

11   personnel about this due diligence process?

12       A.    There were some joint meetings that

13   were arranged between Goldman Sachs and

14   Citigroup as point for the street and Barclays

15   and Lehman Brothers together.  Barclays

16   personnel were obviously in those meetings.

17       Q.    To your knowledge, at any point in

18   that period from Friday to Sunday were people

19   from Barclays given an opportunity to review

20   Lehman's books for due diligence purposes?

21       A.    Yes, I believe they continued to do

22   due diligence over the weekend.

23       Q.    And did you have any involvement in

24   that project, that process, giving access to

1          HIGHLY CONFIDENTIAL - A. KIRK

2    Lehman's books to personnel from Barclays?

3         A.    I don't recall specifically, but

4    probably.  We were down at the Federal Reserve

5    in rooms across the hallway.

6         Q.    During the period from Friday, the

7    12th, through Sunday, the 14th, were you dealing

8    with any particular people at Barclays who you

9    could name?

10        A.    Archibald Cox.  Bob Diamond.  Rich

11   Ricci.  Michael Klein, as their agent.

12        Q.    Anyone else?

13        A.    Those are the ones I recall.

14        Q.    And was there a principal -- were

15   there a group of people you would describe as

16   the principal negotiators for Lehman?  Again,

17   I'm in the 12th through the 14th.

18        A.    Mark Shafir, who was head of M&A; Bart

19   McDade, who was president; and via telephone,

20   Dick Fuld.

21        Q.    Anyone else you would characterize,

22   that you would describe as Lehman's principal

23   negotiators?

24        A.    I was the advisor.  I believe,

25   although I don't know for sure, I don't have any

1                HIGHLY CONFIDENTIAL - A. KIRK

2    direct knowledge, but I have secondhand

3    knowledge that Skip McGee was involved.

4         Q.    Anyone else?

5         A.    That's all I know.

6         Q.    What's the basis of your secondhand

7    knowledge that McGee was involved?

8         A.    Mark Shafir would call Skip from the

9    Federal Reserve.

10        Q.    After that transaction failed, did

11   there come a time when you learned that

12   negotiations had begun again between Barclays

13   and Lehman?

14        A.    Late Sunday night sometime between 11

15   and 2 in the morning.

16        Q.    Would you describe that to me?  How

17   did you learn it?  Where were you when you

18   learned it?

19        A.    I believe I was in Bart McDade's

20   office, and he mentioned that Barclays had --

21   they had had contact with Barclays and Barclays

22   was interested -- "they" meaning Dick himself,

23   Skip and Barclays was interested in pursuing an

24   acquisition of the U.S. businesses of Lehman

25   Brothers.

Page 53

1          HIGHLY CONFIDENTIAL - A. KIRK

2        A.    I vaguely recall having a conversation

3    with him.

4        Q.    Let's go to the early morning of

5    Friday, the 19th.  You spoke a moment ago about

6    getting a call from Mr. McDade.  Shafir's quit.

7    He asked for your help, can you come to meet

8    with him in the morning.  Did you do that?

9        A.    Yes.

10        Q.    And where was the meeting?

11        A.    It was a -- I believe it was in my

12    office.

13        Q.    In your office, sir?

14        A.    Yes.

15        Q.    Who was in attendance?

16        A.    Ian Lowitt, Chris O'Meara, Gerry

17    Reilly, Paolo Tonucci.  I think that was it.

18        Q.    Was Mr. McDade there?

19        A.    I don't believe, no, I don't believe

20    he was there.

21        Q.    Now, in your conversation with

22    Mr. McDade the night before, he had told you

23    Shafir quit, he told you he needed your help,

24    you offered to come in, he said come in in the

25    morning, if I remember your testimony right, and

Page 54

1          HIGHLY CONFIDENTIAL - A. KIRK

2     that's not what governs, that's basically the

3     topics you covered with McDade on Thursday

4     night.

5               So here you are in a meeting with

6     Lowitt, O'Meara, Reilly and Tonucci.  Do you

7     learn more at the meeting about the nature of

8     the help that you're going to have to give?

9          A.     They broadly outlined the first

10    transaction.  That was a quick summary.  Then we

11    discussed an issue that had come up earlier that

12    morning around JPMorgan as our clearing bank

13    shutting down Lehman's DTC account and what

14    effect that would have on the transaction as

15    planned.

16         Q.     Now, you referred to -- you said they

17    broadly outlined the first transaction.  By the

18    Friday morning, is it your understanding there's

19    a second transaction, a subsequent transaction?

20         A.     By the time we had this meeting --

21         Q.     Uh-huh.

22         A.     -- it was my view, my opinion, that

23    there would have to be a reworking of the

24    transaction because a vast majority of those

25    securities that had been planned for transfer

1           HIGHLY CONFIDENTIAL - A. KIRK

2   were held at JPMorgan.  There was a -- and

3   JPMorgan had a dispute of some sort about the

4   transfer of the repo with Barclays, which was

5   described to me by Mike Keegan, and in addition

6   to that, they shut down Lehman's -- they closed

7   down Lehman's DTC account, which led me to

8   believe that JPMorgan would not cooperate and

9   transfer the aforementioned securities to

10  Barclays on that Friday.

11          Q.    When had you spoken to Mike Keegan?

12          A.    I got up and I went to the office

13  about 5 A.M. and I ran into him about 5:30 in

14  the morning.

15          Q.    Had you met Mr. Keegan before?

16          A.    I had met him the week before during

17  the due diligence process.

18          Q.    So you say "they," that's some

19  combination of Lowitt, O'Meara, Reilly and

20  Tonucci, broadly outlined the first transaction

21  to give you a quick summary?

22          A.    Yes.

23          Q.    How did they summarize -- tell me what

24  you remember about their broad outline of the

25  first transaction, the quick summary that they

Page 56

1        HIGHLY CONFIDENTIAL - A. KIRK

2    gave you.

3        A.    They summarized it as a purchase of

4    the building, purchase of assets, and an

5    assumption of this 4 billion, 4 and a quarter

6    billion dollars in liabilities.

7            That discussion ended very quickly

8    because of my belief that that transaction,

9    given what had just transpired -- what I had

10   learned from Keegan and the action that JPMorgan

11   had taken, that I believe that they would act as

12   a hostile party towards the closing of this

13   transaction and that whatever had taken place

14   before was irrelevant.

15       Q.    Did Mr. Tonucci tell you anything

16   other than there was an assumption of

17   liabilities in an approximate amount of 4 and a

18   quarter billion for compensation of payables?

19       A.    No.

20       Q.    Did you have any knowledge as to how

21   that number came to be determined?

22       A.    No.  I was not concerned with that

23   part of the transaction.

24       Q.    I'm sort of away from the Friday

25   meeting for a moment.

Page 65

1              HIGHLY CONFIDENTIAL - A. KIRK

2       Q.     Anyone else?

3       A.     Ian was there as well, I'm pretty

4    sure.

5       Q.     Was Tonucci there?

6       A.     I don't remember.

7       Q.     Do you recall whether or not with

8    regard to which ones there were, do you recall a

9    bigger meeting than that, or is this the

10   assembly of people that you remember?

11      A.     It was an assembly of no more than ten

12   people total.

13            MR. GAFFEY:  Can we go off the record

14      for a minute?

15            (Discussion off the record.)

16            (Recess; Time Noted:  10:59 A.M.)

17            (Time Noted:  11:09 A.M.)

18   BY MR. GAFFEY:

19      Q.     We were, before the break, we were at

20   this Friday morning meeting, and so I want to go

21   through in as much detail as I can what happened

22   at that meeting and who said what.

23            I have a general sense that the JPM

24   problem has arisen.  Did you have a sense, was

25   there any discussion about the JPM problem being

Page 66

HIGHLY CONFIDENTIAL - A. KIRK

1

2      related in any way to the Repurchase Agreement

3      with Barclays?

4           A.    Yes.

5           Q.    Describe that for me.  What was your

6      understanding?

7           A.    So, to be clear, I'm not an expert,

8      was not an expert on repo, so I was learning

9      things for the first time that day that I didn't

10     understand how they actually worked prior to

11     that.  So I got what was a cursory as opposed to

12     a detailed explanation of the issue, but as I

13     understood it from the way that Mike Keegan

14     explained it to me was that the Fed had been

15     providing a repo for Lehman Brothers earlier in

16     the week of approximately $50 billion, that the

17     Fed had made it known that they wanted to be

18     repaid on that repo, and that Barclays had

19     agreed to assume that repo obligation from the

20     Fed.  Without that financing the firm would have

21     collapsed the next morning.

22               So the way it was explained to me was,

23     during the transfer of those -- that loan and

24     the collateral associated with that loan, there

25     were many pieces of collateral that Barclays

1             HIGHLY CONFIDENTIAL - A. KIRK

2    could not value, so they did not accept them in

3    transfer from the Fed.  And mechanically, it was

4    explained to me the way that worked was, in a

5    tri-party repo, the Fed transferred all of the

6    positions to JPMorgan and then JPMorgan began

7    transferring those positions upon the receipt of

8    money from Barclays transferred money, and then

9    they would transfer the positions that secured

10   that repo.

11             And at some point during that process,

12   Barclays became very uncertain as to some

13   percentage of that collateral, I don't recall

14   the exact amount, but it was a large number,

15   maybe as much as, you know, 20 percent of the

16   collateral, and when Barclays didn't accept

17   those positions, they, by definition, just got

18   left at JPMorgan.

19             They -- so JPMorgan was left with

20   collateral that they were not comfortable with

21   but Barclays would not accept, so -- and

22   JPMorgan, I guess they attempted to negotiate

23   but couldn't get that negotiation done.

24        Q.    Who was the "they" who attempted to

25   negotiate?

1          HIGHLY CONFIDENTIAL - A. KIRK

2      A.     That JPMorgan and Barclays attempted

3  to negotiate, but they couldn't complete a

4  negotiation for a transfer of that collateral.

5      Q.     And when you say Keegan's explanation,

6  I take it you're talking about the conversation

7  you had with Keegan before the meeting?

8      A.     Yes.

9      Q.     Okay.

10     A.     The 5:30 in the morning.

11     Q.     And did Keegan give you any level of

12  detail about why Barclays was uncertain about

13  some percentage of that collateral?

14     A.     It was collateral that they didn't --

15  was either they didn't have the expertise to

16  value or was not transparent, meaning that there

17  were financing vehicles that Lehman set up that

18  went into the repo that you couldn't look

19  through to what was in those financing vehicles.

20     Q.     And did Mr. Keegan give you any

21  information about what that collateral was, what

22  type of securities?

23     A.     He didn't know.

24     Q.     Well --

25     A.     In some cases he didn't know.   In

Page 69

1          HIGHLY CONFIDENTIAL - A. KIRK

2    other cases it was, yes, it was illiquid and

3    either high-yield or defaulted or consumer

4    mortgage securities that were the ones he could

5    identify that were very hard to value.

6          Q.     I'm hearing this in two categories,

7    and I want to be sure you and I are on the same

8    page.  There's a component of this collateral

9    that's hard to value and there's a component

10   that is not transparent, which may also make it

11   hard to value --

12         A.     Yes.

13         Q.     -- but some of it's transparent and

14   hard to value?

15         A.     Yes.

16         Q.     Okay.  Did he identify any particular

17   categories of hard-to-value securities?  I get

18   it, high-yield or mortgage-backed, but did he --

19         A.     Distressed.

20         Q.     Did he use the term "racers" at all?

21         A.     That was the non-transparent category.

22         Q.     Okay.  Tell me what Mr. Keegan said to

23   you about racers.

24         A.     "What are they?"

25         Q.     Anything else?

1          HIGHLY CONFIDENTIAL - A. KIRK

2      A.    "And what's in them?"  I said, "I

3    don't know."  I then went and -- Paolo Tonucci,

4    I directed him to Paolo, who would be able to

5    tell him what was in those various financing

6    vehicles.

7      Q.    Do you know what Paolo Tonucci then

8    spoke to Mr. Keegan about?

9      A.    I don't know.

10     Q.    Did Mr. Keegan say anything else about

11   racers other than he didn't know what they were?

12     A.    He asked how would I find out.

13     Q.    Did Mr. Keegan say anything to you

14   that, in sum or substance, compared the assets

15   that Barclays had agreed to buy in the first

16   transaction, to use your term, and the assets

17   that were in the repo that were the subject of

18   this transfer problem?

19     A.    He summarized it as it was a very

20   different and riskier category of assets.

21     Q.    Was anyone else present when

22   Mr. Keegan and you had this early morning

23   conversation?

24     A.    No.

25     Q.    Did you understand from Mr. Keegan, in

Page 71

1          HIGHLY CONFIDENTIAL - A. KIRK

2    sum or substance, whether he had spoken to

3    others at Lehman about this problem by the time

4    he had spoke to you?

5          A.    I understood I was the first person he

6    had explained it to, at Lehman that he had

7    explained it to.

8          Q.    When you spoke to him and about this

9    topic, did you let him know that there was a

10   Friday meeting planned with -- that you had been

11   asked to come to an early morning meeting by

12   Mr. McDade?

13         A.    Yes.

14         Q.    And did you tell him you'd get back to

15   him after that meeting to see if there was a

16   solution to this problem?

17         A.    Yes.

18         Q.    So, in the course of that meeting, now

19   we've got the JPM issue, it's been identified,

20   you've had the first transaction outlined to you

21   broadly, the JPM problem --

22         A.    Right.

23         Q.    -- has been also described.  What

24   happens next?

25         A.    I'm sorry, so where -- what time of

1          HIGHLY CONFIDENTIAL - A. KIRK

2     day are we now?

3          Q.    I'm sorry.  I've got you back at the

4     Friday meeting with -- we're back at the Friday

5     meeting with Bart, yourself, Klein --

6          A.    Okay.

7          Q.    -- Ricci and Keegan.

8          A.    Yeah.

9          Q.    Okay.

10         A.    So at that meeting I walk through -- I

11    summarized the issues, as I understand them, for

12    this dispute with Barclays.  I inform Barclays

13    that those executives -- that JPMorgan had shut

14    down Lehman's DTC account, and I made the

15    supposition that that would make it impossible

16    to complete the transaction as contemplated.

17         Q.    And what, if anything, did Mr. McDade

18    have to say about those topics?

19         A.    He said he agreed with me.

20         Q.    Did you speak first in outlining the

21    issues?

22         A.    Yes.

23         Q.    And how did Klein, Ricci and Keegan or

24    any combination of those three men react to that

25    news?

Page 73

1                  HIGHLY CONFIDENTIAL - A. KIRK

2        A.     There was some question as to, well,

3    what do we do now?  I suggested that the only

4    reasonable course of action would be to proceed

5    with the transaction substituting the repo

6    assets, the assets that Barclays had lent

7    against, for all the other securities that had

8    been contemplated in the transaction and leave

9    the rest of the transaction as was.

10       Q.     So if I understand this -- I want to

11   make sure I understand this correctly.  Your

12   suggestion was to take the assets that were the

13   subject of the first transaction roughly

14   outlined in that schedule?

15       A.     Yeah.

16       Q.     And instead of transferring that body

17   of assets, transfer the body of assets that are

18   in the repo, correct?

19       A.     Yes.

20       Q.     Maybe I'm not understanding.  Is the

21   problem here, doesn't it involve the assets that

22   are in the repo?  Hasn't Mr. Keegan told you

23   that Barclays is uncertain about some components

24   of the repo collateral?

25       A.     So, again, the issue was that it was

1              HIGHLY CONFIDENTIAL - A. KIRK

2       my view that JPMorgan would not transfer one

3       dollar of one asset unless they got whatever

4       they wanted in a negotiation from Barclays or

5       anybody else, and even then they wouldn't -- it

6       didn't appear that they would do anything but be

7       hostile, having shut down our DTC account, which

8       is a, I mean, that's a colossal nightmare.  You

9       know, you've got tens of billions of dollars of

10      securities supposed to settle a regular way that

11      you've been transacting with your clients, and

12      every single one of them fails -- both sides,

13      buys and sells.

14           Q.    How is JPM in a position to shut down

15      Lehman's?

16           A.    They're our clearing bank.

17                 So it was, again, my supposition,

18      which was confirmed by, you know, the senior

19      finance staff and Bart and then finally the

20      Barclays guys, that, you know, JPMorgan should

21      be viewed as not going to cooperate.  And

22      Barclays was attempting to reach JPMorgan and

23      never got a return call, was my understanding.

24      I was told that by probably Gerard LaRocca or

25      Keegan, one of them, and hence, you know, the

Page 75

1                HIGHLY CONFIDENTIAL - A. KIRK

2     only assets that could participate in any way in

3     this transfer were ones that Barclays had held

4     in custody at their clearing bank, Bank of New

5     York, and potentially any assets at Lehman that

6     were unencumbered and were held away from

7     JPMorgan.

8          Q.    So, again, forgive me if I'm thick

9     here, but is the problem with JPMorgan --

10    withdrawn.

11              When you talk about the assets that

12    Barclays had at Bank of New York, those were

13    assets within the repo?

14         A.    Yes.

15         Q.    Within the Barclays repo, yes?

16         A.    Yes.

17         Q.    Do you know the amount, the value of

18    the assets that were at Bank of New York within

19    the Barclays repo?

20         A.    I didn't know that.  I didn't know the

21    amount or the value of those assets.

22         Q.    Okay.  And again, so we're clear, you

23    didn't know at the time or you don't remember

24    now, or both?

25         A.    I didn't know at the time.

Page 110

1                HIGHLY CONFIDENTIAL - A. KIRK

2    don't recall what the whole -- I recall 15c3.  I

3    recall this 1.9 billion because I was sitting

4    there with the list and I said, "Gee, what is

5    15c3?"  So I recall those two.  I don't recall

6    if there were other categories discussed during

7    that meeting.

8        Q.    You said a moment ago that Lowitt,

9    when he reported on the 15c3 piece, he put that

10   at about 1.9 billion?

11       A.    That was the marked value.

12       Q.    Of marked value.  And that there was

13   some value, but -- of what was in the box, but

14   he didn't know what it was?

15       A.    It was some value in 15c3, but he

16   didn't know how much there would be.

17       Q.    So when that meeting ended, did you

18   have, whether you remember the number or not

19   today, did you have a sense of what the total

20   additional value was between the 15c3 and the

21   contents of the box?

22       A.    No.

23       Q.    Was there any plan made to calculate

24   that number?

25       A.    I think Ian was putting together a

1            HIGHLY CONFIDENTIAL - A. KIRK

2    schedule that he would communicate to Bart

3    with -- there was a, first of all, in that

4    discussion there was a wrap-up of this is what

5    the deal looks like.  It's got the 45 billion,

6    it's got the, on the asset side, it's got this

7    1.9, it's got 15c3, it may have had, you know,

8    other components to it.

9            Bart agreed, Ian and Bart agreed that

10   these were the components on the assets side.

11   It had the assumed liabilities.  They agreed

12   that those were the assumed liabilities that

13   were going to agree, I don't remember the exact

14   numbers, and they said, okay, do we have an

15   agreement?  Barclays said yes.  Ian was going to

16   go codify that, I believe, and talk to Bart.

17           Bart was in a car with Weil lawyers on

18   his way to bankruptcy court.  That's why he

19   wasn't in the room.

20       Q.    When you say Ian was going to go away

21   and codify that, you mean put the schedules

22   together?

23       A.    I think so, yes, that's what I mean.

24       Q.    Did Mr. Klein say anything about this

25   process adding additional value for Barclays?

Page 112

1          HIGHLY CONFIDENTIAL - A. KIRK

2      A.     No, not adding additional value.  He

3   didn't comment on that.

4      Q.     Did Klein make any recommendation in

5   your hearing as to whether Barclays should or

6   should not accept this deal?

7      A.     Klein recommended that they accept the

8   deal if -- when they got the additional, all the

9   additional collateral.

10     Q.     I don't mean this to be sarcastic.  I

11  just can't come up with another way of phrasing

12  it.

13          We're looking around for all this

14  additional value and your memory is not clear on

15  whether there was a target or not?

16     A.     Yeah.

17     Q.     Framed that way, what was the project

18  here?  Was it to go find everything else and

19  turn it over, or was it to find some, some

20  identifiable bucket of value until Barclays

21  said, yeah, that's enough?  Do you see the

22  distinction I'm making?

23     A.     Yes, it's -- the project was the

24  second, not the first.

25     Q.     Okay.  So the idea was there would be

Page 113

1            HIGHLY CONFIDENTIAL - A. KIRK

2    some value left in Lehman; it was just a

3    question of finding enough additional value to

4    make Barclays still close?

5        A.    Yeah.    And that project was Ian's

6    project, not mine.    I wasn't -- I was an

7    observer to this part of the process.

8        Q.    What was Ian's manner in this meeting?

9    I mean, it's a tough week for everybody, but

10   what's his demeanor?

11       A.    He hadn't slept in a week, so he was a

12   little harried.

13       Q.    Did Ian identify other potential

14   sources of additional value that he had looked

15   at apart from the box and 15c3?

16       A.    He --

17            MR. HUME:    Objection.    Asked and

18       answered.

19       Q.    You can answer.

20       A.    No, he, as I said, he may have, but I

21   didn't -- I don't remember.

22       Q.    You don't remember, then, any

23   particular other sources that he might have

24   discussed?

25       A.    No, I don't.

Page 114

1          HIGHLY CONFIDENTIAL - A. KIRK

2              (Discussion off the record.)

3   BY MR. GAFFEY:

4       Q.    While we're pulling a couple of

5   documents out, Mr. Kirk, let me see if I can get

6   the rest of, you know, the blocks of your day.

7              This meeting ends.  Lowitt is given

8   the task of codifying -- your word -- you know,

9   getting a list together?

10      A.    Yes.

11      Q.    What do you do next?

12      A.    I just go back to my office.  Sit

13  there silently, stunned.

14      Q.    Maybe try to get some sleep?

15      A.    Yeah.

16      Q.    Do you have any role or involvement in

17  this asset collection process we've been talking

18  about after this point?

19      A.    No.

20      Q.    Did you go to the hearing?

21      A.    No.

22      Q.    Did anyone render reports to you from

23  the hearing --

24      A.    Yes.

25      Q.    -- as to what was going on?

Page 121

1              HIGHLY CONFIDENTIAL - A. KIRK

2       identification, as of this date.)

3       Q.    I have put before you, Mr. Kirk, a

4    three-page document.  I'll ask you to take a

5    look through it sufficiently to tell me whether

6    you've seen it before.

7       A.    Yes, I've seen it.

8       Q.    Did you see it at or around the time

9    that it's -- of September 19 at 6:16 A.M.?

10   That's the date at the top.

11      A.    Yes.

12      Q.    And was this sent to you -- was it

13   your understanding this was sent to you to

14   prepare for that Friday meeting we've been

15   talking about?

16      A.    It was one, one of the documents that

17   I assumed we would review.

18      Q.    Okay.  And do you recall --

19            MR. HUME:  Are you marking it as an

20      exhibit?

21            MR. GAFFEY:  Yes, I did, Hamish.  It's

22      316.

23            MR. HUME:  I'm sorry.

24      Q.    Do you recall reviewing it at the

25   Friday meeting?

Page 122

1                    HIGHLY CONFIDENTIAL - A. KIRK

2         A.    No, I actually don't recall reviewing

3    this.

4         Q.    Let me just direct your attention,

5    sir, to the third page -- well, to the second

6    page.  You'll see that that's a balance sheet

7    that's attached to the e-mail and then referred

8    to in the second e-mail.

9         A.    Yes.

10        Q.    Do you know who prepared this balance

11   sheet?

12        A.    I don't know specifically who prepared

13   it, but it would have been prepared by

14   accounting.

15        Q.    Okay.  And --

16        A.    Well, the e-mail seems to indicate

17   Martin -- somebody who worked for Martin Kelly

18   had prepared it.

19        Q.    And within the balance sheet, sir, the

20   fifth column that's entitled Transaction

21   Adjustments, do you see that?

22        A.    Yes.

23        Q.    Do you know what that column

24   represents, what the entries in that column are

25   meant to represent?

1              HIGHLY CONFIDENTIAL - A. KIRK

2        A.    Only from reading it.

3        Q.    I don't want you just to guess from

4   the face of the document.

5        A.    No.

6        Q.    Do you recall any discussion of

7   transaction adjustments?

8        A.    No.

9        Q.    And in particular, if you could take a

10  look at the last page of the document, I would

11  ask you to take a look at the Transaction

12  Adjustments column where it says 2 billion and

13  1.645 billion, are you with me?

14       A.    Uh-huh.

15       Q.    And you'll see that those relate to,

16  if you read across to the left, items Bonus

17  Payable and Cure Payments?

18       A.    Uh-huh.

19       Q.    And if you read across with me on the

20  Cure Payments line, you'll see, as of 8/31/08,

21  the number 701 is there, you with me?

22       A.    Uh-huh.

23       Q.    And then as of 9/17/08, 605?

24       A.    Uh-huh.

25       Q.    And then there's a transaction