Page 1

1        HIGHLY CONFIDENTIAL - D. PETRIE

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                            Chapter 11

7    LEHMAN BROTHERS         Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

              Debtors.

10

     ----------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF DAVID PETRIE

14           New York, New York

15           August 26, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24293

1          HIGHLY CONFIDENTIAL - D. PETRIE

2               August 26, 2009

3                 9:29 a.m.

4

5          HIGHLY CONFIDENTIAL deposition

6     of DAVID PETRIE, held at Jones Day

7     LLP, 222 East 41st Street, New York

8     New York, before Kathy S. Klepfer

9     a Registered Professional Reporter

10    Registered Merit Reporter, Certified

11    Realtime Reporter, Certified Livenote

12    Reporter, and Notary Public of the

13    State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

1          HIGHLY CONFIDENTIAL - D. PETRIE

2      appears there's a duplicate page.  The

3      handwriting's different, but 873 and 874

4      appear to be the same page.

5          Q.    So we'll circle back and talk a little

6  bit more about that.  876, the very last page of

7  this exhibit, do you recognize that page?

8          A.    Yes.

9          Q.    Is that your handwriting?

10         A.    No.

11         Q.    What do you recognize that page as?

12         A.    I recognize this page as a relatively

13  broad attempt at a timeline.

14         Q.    And you said it was not your

15  handwriting, correct?

16         A.    That is correct.

17         Q.    Do you know whose handwriting it is?

18         A.    Yes.

19         Q.    Whose?

20         A.    Gerard LaRocca.

21         Q.    Do you know if this document, this

22  last page, page 876, was something that you

23  found in your files or your notes?

24         A.    Yes.

25         Q.    Okay.  Tell me about it.  How did

1           HIGHLY CONFIDENTIAL - D. PETRIE

2     Mr. LaRocca's handwritten rough outline show up

3     in your notes?

4          A.    Gerard LaRocca and I at different

5     times throughout that week had spoken, and I

6     don't remember the exact timing of when this was

7     written.

8          Q.    And it's your understanding that this

9     page, page 876, the last page of this exhibit,

10    was a document prepared by Mr. LaRocca in or

11    about that week that we've been talking about,

12    the week of September 15th through 22nd of 2008?

13         A.    Yes.

14         Q.    If I just understand what's being

15    described here, there are basically two types of

16    financing being described here, correct?

17              MR. SHAW:  Objection.  Foundation.

18         A.    It appears, yes, to have two types of

19    financing being discussed.

20         Q.    And it describes day-by-day in the

21    columns the status of each of those types of

22    financing, correct?

23              MR. SHAW:  Objection.  Foundation.

24         A.    I don't believe "status" is perhaps

25    the right word.

1          HIGHLY CONFIDENTIAL - D. PETRIE

2      Q.      What's the word you'd use?

3      A.      Tuesday, we meet with the Fed and

4  we're asked -- Barclays is being asked to take

5  the Fed out of the Lehman financing.  It says a

6  "status" on the bottom, meaning where -- what

7  we're being requested to do by the Fed, being

8  told what to do by the Fed.

9          Wednesday, Barclays prepares to

10 execute on that request by the Fed.  Thursday,

11 we begin on that execution that was requested by

12 the Fed.

13     Q.      And there's dollar amounts associated

14 with the Thursday entries, do you see that?

15     A.      Yes, I see several dollar amounts.

16     Q.      And the items that you were describing

17 appear on the same line or row as the heading

18 "Fed Facility" in the left-hand side, do you see

19 that?

20     A.      Yes.

21     Q.      Above that there's another row, which

22 is titled "Barclays Tries to Assist LB by

23 Providing Liquidity Through Collateralized

24 Repo," do you see that?

25     A.      I see it.

1          HIGHLY CONFIDENTIAL - D. PETRIE

2          Q.    And then under Monday, Tuesday,

3     Wednesday and Thursday, there are numbers that

4     appear there, do you see that?

5          A.    Yes.

6          Q.    And do you understand that as being

7     the amount of the tri-party repo that Barclays

8     had on with Lehman during the first four days of

9     that week, the week of September 15th?

10         A.    You said four days.

11         Q.    Monday, Tuesday, Wednesday, Thursday.

12         A.    There's only three days noted here.

13         Q.    Okay.  There's a Thursday there, is

14    there not?

15         A.    Okay, the number being zero.

16         Q.    Right.

17         A.    Yes, so four days.

18         Q.    So you have my question in mind?

19         A.    Can you repeat it?

20         Q.    Before we talk about the number of

21    days out of question.

22               (Record read.)

23         A.    These numbers seem to be accurate as

24    to the tri-party between Barclays and Lehman.

25         Q.    And if I understand the information

Page 55

1          HIGHLY CONFIDENTIAL - D. PETRIE

2     contained in that row that we've been looking

3     at, that tri-party repo is reduced to zero by

4     Thursday, correct?

5          A.     This document says zero, that's

6     correct.

7          Q.     And that's your recollection of what

8     happened, right?

9          A.     Yes.

10         Q.     And on Thursday, it's also the day

11    that Barclays funds the replacement for the Fed

12    repo, correct?

13         A.     May I clarify --

14         Q.     Sure.

15         A.     -- your statement?

16                Thursday is the day that we were

17    executing at the behest of the Fed to remove

18    them from the funding of Lehman Brothers.

19         Q.     And you do so by funding a repo that

20    replaces the Fed repo, correct?

21         A.     That was the intention, correct.

22         Q.     On this last page of Exhibit 272, in

23    the "Fed Facility" row under "Thursday" there

24    are three items that appear, do you see that?

25         A.     Yes.

1          HIGHLY CONFIDENTIAL - D. PETRIE

2    of the page, if you could just decipher what

3    those first two lines are that begin "JPM"?

4        A.    "JPM," dollar sign, "needs cash and

5    then release to LBI buckets."

6        Q.    And was that your understanding, that

7    JPM had to be paid to satisfy the Fed repo

8    before it would release the collateral to LBI?

9        A.    I would explain it in this way.

10       Q.    Okay.

11       A.    To complete the Fed trade where

12    Barclays would receive only the Fed collateral,

13    given that JPMorgan was the custodian for Lehman

14    Brothers, Barclays would send the cash first to

15    JPMorgan on behalf of Lehman and then JPMorgan

16    would receive the assets from the Federal

17    Reserve that would then come to Barclays, i.e.,

18    the Fed transaction.

19       Q.    Okay.  Two lines below where you were

20    just reading, it says, "2 percent for 9/30," do

21    you see that?

22       A.    I see it.

23       Q.    What does that mean?

24       A.    It's discussing the terms as in rate

25    and termination date for the repo trade.

Page 93

1              HIGHLY CONFIDENTIAL - D. PETRIE

2         Q.    And the next line below that?

3         A.    The next line below that reads,

4    "Haircut charged will be implied."

5         Q.    What does that mean?

6         A.    Given that the Fed had extended

7    funding for Lehman assets, the Fed employed its

8    own haircut schedule for those assets.  Given

9    that Barclays had been asked by the Fed and we

10   were undertaking taking the Fed out of their

11   lending of money to Lehman Brothers for those

12   specific assets, when we would receive those

13   assets versus the cash that we were lending to

14   Lehman, the collateral that we would receive,

15   which would be at this point identical to what

16   the Fed had been funding on that Thursday, the

17   haircuts would be implied because they had

18   already been applied to the Lehman loans.

19        Q.    Were there assets that the Fed was

20   funding against that Barclays did not want to

21   acquire?

22              MR. SHAW:  Objection.  Foundation.

23        A.    No.

24        Q.    All right.  Then you got four items at

25   the bottom of page -- the middle of page 857

Page 94

1          HIGHLY CONFIDENTIAL - D. PETRIE

2    numbered 1 through 4.  Could you just describe

3    those for me and tell me what you were capturing

4    by those four points?

5          A.    Would you like me to just read them

6    first to you?

7          Q.    Sure, you can read them first.

8          A.    Number 1, "Lehman to 855.  Program

9    tonight/test 8 A.M.  No later."

10         Q.    What does that mean?

11         A.    855 is a, you could call it a

12   depository or an account, sorry, that was opened

13   up at JPMorgan for Barclays, meaning Barclays'

14   account number 855.

15         Q.    All right.  Next item?

16         A.    Number 2, "Money goes whenever people

17   ready," meaning --

18         Q.    Okay, next item?

19         A.    3, "Goal 11 A.M. completion."

20         Q.    Next line?

21         A.    "47 billion versus 54 billion cap," in

22   parentheses, "Spike was 7 billion."

23         Q.    What does that mean?

24         A.    Every institution on Wall Street has a

25   cap, an intraday cap, as to how much they can be

Page 111

1                HIGHLY CONFIDENTIAL - D. PETRIE

2     her summary?

3          A.     I've just now read it.

4          Q.     And is it consistent with your

5     recollection of those transactions?

6          A.     It is consistent with my recollection,

7     although parts of it I wasn't privy to previous

8     to receiving this e-mail.

9          Q.     What parts of it were you not privy to

10    prior to receiving this e-mail?

11         A.     On paragraph 1, in regards to the

12    tri-party and rehypothecation issues.

13         Q.     Anything else?

14         A.     In bold, the, "A list of Cusips to be

15    excluded has been provided to ensure collateral

16    we are not purchasing is excluded in this

17    matter" is something I'd be ignorant of.

18         Q.     And just so I understand your answer,

19    you were not aware until you saw this e-mail

20    that a list of Cusips to be excluded had been

21    provided to ensure the collateral that Barclays

22    was not purchasing was excluded from the

23    transfer, correct?

24         A.     Well, as noted before, we only wanted

25    to take the Fed collateral, and the way that she

Page 112

1           HIGHLY CONFIDENTIAL - D. PETRIE

2    writes this is worded a bit differently than my

3    understanding, but I can't speak for Teri Scott

4    and how -- what she meant by that statement.

5        Q.    Go to the next substantive e-mail in

6    this chain.  It's the e-mail that begins at the

7    bottom of page 1 over to page 2 from John Haley

8    to Teri Scott and others.  Have you had a chance

9    to look at that e-mail?

10       A.    I'll read it right now.

11       Q.    Okay.

12             (Document review.)

13       A.    Okay.

14       Q.    You'll see in John Haley's e-mail, the

15   description that begins on page 1, carries over

16   on to page 2.  Do you see that, the various

17   items that are listed there?

18       A.    Yes, I do.

19       Q.    Is it your understanding that,

20   following the repo on the 18th, on the morning

21   of the 19th, that was in fact the position of

22   the collateral and cash held by Barclays on the

23   Barclays repo?

24       A.    I can see that John Haley has produced

25   an e-mail to attempt to break down the types of

1           HIGHLY CONFIDENTIAL - D. PETRIE

2    collateral that we received.

3           Q.    Is that consistent with your

4    recollection of what happened that evening into

5    the Friday?

6           A.    My recollection is in dollar terms.

7    We received 42.7-ish billion dollars worth of

8    collateral and got $7 billion in cash to

9    complete the Fed repo trade.  This breakdown

10   from John Haley is something I wouldn't be able

11   to comment on.  I don't know if it's correct or

12   not.

13          Q.    The very first e-mail at the top of

14   page 1, the short e-mail, I don't know if you've

15   read it.  Have you?

16          A.    Not yet.

17          Q.    Just read it and let me know when

18   you're done.

19                (Document review.)

20          A.    I've read it.

21          Q.    That's another e-mail from Teri Scott,

22   do you see that?

23          A.    Yes.

24          Q.    In the middle of her e-mail, she

25   writes, "Ops. had to pull all the collateral

Page 114

1        HIGHLY CONFIDENTIAL - D. PETRIE

2   allocated to London, and we're therefore over

3   our unsecured limit by $1.9 billion."  Do you

4   see that?

5        A.    I see that.

6        Q.    Do you have an understanding as to

7   what that means?

8        A.    No.

9        Q.    Do you have any understanding as to

10  what the phrase "collateral allocated to London"

11  means?

12       A.    No.

13       Q.    The next sentence reads, "Part of this

14  overage can also be attributed to EFG, as they

15  were unsecured by 1 billion."  Do you see that?

16       A.    Yes.

17       Q.    What does EFG mean?

18       A.    Equity Finance Group.

19       Q.    And do you have an understanding as to

20  what this sentence means?

21       A.    Yes.  During the normal course of

22  business, there can be, especially during this

23  volatile time period in September, there can be

24  large valuations intraday in regards to the

25  value of collateral, and I take this sentence as

1        HIGHLY CONFIDENTIAL - D. PETRIE

2    to meaning that, due to there being a valuation

3    change in collateral normally held by EFG, that

4    they needed additional billion-dollar loan from

5    PLC, which wouldn't be unusual.

6        Q.    When we were talking earlier about

7    John Haley's e-mail at the bottom of page 1 over

8    to page 2, you said that you thought about the

9    repo in some dollar terms, and you said $42

10   billion and change in collateral, do you

11   remember that?

12       A.    Yes.

13       Q.    Okay.  That $42 billion in change in

14   collateral value, what is your --

15       A.    You said 42 billion change?

16       Q.    $42 billion and change.  It's 42 point

17   something, right?

18       A.    Oh, okay.  Yes.

19       Q.    Where did that value come from, the

20   value that you have in your mind?

21       A.    The value of 42.7, approximately,

22   $42.7 billion would have come from, as assets

23   moved from JPMorgan to the Bank of New York

24   during the Fed trade, the valuations would come

25   from the Bank of New York.

Page 151

1                HIGHLY CONFIDENTIAL - D. PETRIE

2        A.     In Barclays' books and records, you

3   have to characterize these assets being held in

4   a price that is a starting price from whence you

5   held them.

6        Q.     Okay.  And you understand this e-mail

7   as saying that those prices should be the BONY

8   prices, correct?

9        A.     I can't speak for Stephen Sell.

10       Q.     That's what the e-mail said.  Do you

11  read that?  Do you understand the e-mail as

12  saying that?

13       A.     It appears that's what he's saying.

14       Q.     And do you know, based on how these

15  trades were booked to the Barclays system,

16  whether they in fact were booked to the BONY

17  prices on day one?

18       A.     I don't know.

19       Q.     Who would know that?

20       A.     I would suggest speaking to Stephen

21  Sell.

22       Q.     You said many, many times today that

23  there was a lot of volatility that week.  If it

24  was up to you, what -- what day's prices should

25  have been used to book these assets when they

Page 152

1          HIGHLY CONFIDENTIAL - D. PETRIE

2    were booked in Barclays' books?

3          MR. SHAW:  Objection to form.

4    A.     If it was up to me, at what prices

5    should the assets that came over from the Fed

6    repo trade been booked at; am I characterizing

7    your question correctly?

8    Q.     Not quite.  What day's prices would

9    you have used?

10         MR. SHAW:  Objection to form.

11   Q.     Thursday's prices?  Friday's prices?

12   Monday's price?

13         MR. SHAW:  Objection to form.

14   A.     I'm not an accountant, so I wouldn't

15   know what day to use.

16   Q.     But you run the repo desk, right?

17   A.     Right, for financing --

18   Q.     You need to know what you have on your

19   assets so you know what you financed, right?

20   You need to have some sense of what prices

21   you're going to use?

22   A.     For financing the positions, it would

23   be current market value.

24   Q.     So you'd use the prices of the day you

25   got the assets into your books?

Page 153

1          HIGHLY CONFIDENTIAL - D. PETRIE

2               MR. SHAW:  Objection to form.

3      A.     Buying a security and financing a

4  security, the price that you paid for the

5  security versus where you finance that security

6  can differ to the extent of market volatility.

7      Q.     A lot of things can differ, okay?  Do

8  you have any procedures or rules that you follow

9  when you get securities and you lend money?  Are

10  you required to follow any particular pricing

11  convention or methodology?

12               MR. SHAW:  Objection to form,

13          foundation, and vague as to who the "you" is

14          in that question.

15      Q.     You, Mr. Petrie.  Is there a problem

16  with "you"?  Is it unclear to you as to who the

17  "you" is in my question?

18      A.     I'm glad you clarified it, meaning my

19  attorney.

20               In running a repo desk, every day you

21  come into a new day where the market has moved

22  up or down, and you use, you can only use,

23  whatever market value of the securities that are

24  within Barclays Capital to raise cash.

25      Q.     And where Barclays is using a

Page 154

1          HIGHLY CONFIDENTIAL - D. PETRIE

2      tri-party arrangement and there's a custodian

3      and the custodian has assigned prices to those

4      securities, are you required to use those

5      prices?

6               MR. SHAW:   Objection to form.

7          Foundation.

8          A.     Bank of New York, being our custodian,

9      prices our securities, and when we lend those

10     securities, the value that we lend those

11     securities at is the money that we're able to

12     borrow to finance the firm.

13         Q.     And whose values do you use, Bank of

14     New York's values or your values?

15         A.     Bank of New York's.

16         Q.     Thank you.   I have placed before you a

17     two-page document previously marked Exhibit

18     147A.  Take a moment to review the document.

19     Let me know when you're done.

20              (Document review.)

21         A.     Okay.   I've finished it.

22         Q.     Have you seen this document before

23     today?

24         A.     No.

25         Q.     There's a reference in the first

1        HIGHLY CONFIDENTIAL - D. PETRIE

2   e-mail at the top of page 1 to $1.9 billion of

3   additional collateral.  Do you see that?

4        A.    Yes, I see it.

5        Q.    Do you recall having any discussions

6   with anyone on or after the 19th of September

7   about $1.9 billion of additional collateral?

8        A.    No.

9        Q.    I have handed you a document marked

10  144A.  Take a moment to look at that document.

11  Let me know when you're done.

12       A.    I'm finished.

13       Q.    There's a forward of an e-mail on this

14  exhibit, and the e-mail is from Marty Malloy to

15  Gerard LaRocca and others.  Do you see that?

16       A.    Yes.

17       Q.    Okay.  Who's Marty Malloy?

18       A.    Marty Malloy is a managing director in

19  the Collateralized Finance Group.

20       Q.    And in terms of seniority, how does he

21  fit in with Mr. Dearlove and others we have

22  discussed?

23       A.    He's a senior member of the Barclays

24  team, so relatively on par.

25       Q.    There's a CC shown on his e-mail,

Page 156

1              HIGHLY CONFIDENTIAL - D. PETRIE

2      Jacqui Stanley-Johns.  Do you see that?

3          A.    I see that.

4          Q.    Is that a name you're familiar with?

5          A.    No.

6          Q.    And you see the subject line of this

7      e-mail, "Totals For the Fed Facility

8      Collateral," do you see that?

9          A.    I see that.

10         Q.    And are you familiar with this

11     calculation that appears below in his e-mail?

12         A.    No.

13         Q.    You haven't seen that before today?

14         A.    No, I have not.

15              MR. TAMBE:  Let me take a short break.

16              (Recess; Time Noted:  3:22 P.M.)

17              (Time Noted:  3:31 P.M.)

18     BY MR. TAMBE:

19         Q.    Mr. Petrie, were you involved at all

20     in helping Barclays' auditors account for the

21     value of the securities that were purchased in

22     the Lehman/Barclays transaction?

23         A.    No.

24         Q.    I'm showing you what's previously been

25     marked as Exhibit 86B.  Just take a look at it