Page 1

1           HIGHLY CONFIDENTIAL - R. RICCI

2           UNITED STATES BANKRUPTCY COURT

3           SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                           Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

            Debtors.

10

      ----------------------x

11

12         * * *HIGHLY CONFIDENTIAL* * *

13         DEPOSITION OF RICH RICCI

14            New York, New York

15           September 8, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24547

1          HIGHLY CONFIDENTIAL - R. RICCI

2               September 8, 2009

3                  9:56 a.m.

4

5          HIGHLY CONFIDENTIAL deposition

6     of RICH RICCI, held at Jones Day,

7     LLP, 222 East 41st Street, New York,

8     New York, before Kathy S. Klepfer,

9     a Registered Professional Reporter,

10    Registered Merit Reporter, Certified

11    Realtime Reporter, Certified Livenote

12    Reporter, and Notary Public of the

13    State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

1                HIGHLY CONFIDENTIAL - R. RICCI

2    buying a balance sheet, if that's where you're

3    headed, but really buying, you know, a series of

4    assets and assuming some liabilities and, you

5    know, starting on that premise.

6        Q.    Was there any conversation at that

7    time concerning whether or not Barclays was

8    prepared for the acquisition of the Lehman

9    assets to have an adverse impact on its capital?

10       A.    We were clear, given the uncertain

11   environment as an organization, that we did not

12   want to pursue a transaction that could have

13   negative impacts on our capital.

14       Q.    And with whom did you have that

15   conversation or series of conversations?

16       A.    I would have had that conversation

17   with John Varley, with Mr. Diamond, Patrick

18   Clackson, with Michael Klein.

19       Q.    Anyone else?

20       A.    Not that I can recall.

21       Q.    Would Mr. Keegan have known that it

22   was the intention of Barclays not to have an

23   adverse impact on its capital in the acquisition

24   of assets from Lehman Brothers?

25               MR. HUME:  Objection.  Lacks

1        HIGHLY CONFIDENTIAL - R. RICCI

2        foundation.

3        A.      Mr. Keegan could possibly have been

4    aware.

5        Q.      What about Mr. King?

6                MR. HUME:  Same objection.

7        A.      I don't know if Mr. King knew or not.

8        Q.      Now, after you had that conversation

9    with Mr. Klein and you talked in these general

10   subjects, assets, people and buildings, what did

11   you do concerning the Lehman transaction?

12       A.      I don't recall, actually.

13       Q.      Okay.  Did you stay at the offices of

14   Barclays throughout the day?

15       A.      I went over to Lehman Brothers'

16   offices at some point in the day, yes.

17       Q.      Why did you go over to Lehman?

18       A.      We were negotiating with Lehman which

19   assets we may purchase and which liabilities we

20   may assume.

21       Q.      When you say "we"?

22       A.      Barclays Group.

23       Q.      Okay.  Were you in those

24   conversations?

25       A.      I was in -- I was in conversations

1          HIGHLY CONFIDENTIAL - R. RICCI

2    with the Barclays side.  Not directly on the

3    Lehman's, with the Lehman people.

4          Q.    Okay.  Am I correct that the people

5    with whom you would have had conversations as to

6    which assets Barclays was interested in

7    purchasing and at what prices would have been

8    Mr. King and Mr. Keegan?

9          A.    Mr. King, Mr. Keegan, Mr. Clackson.

10         Q.    All right.  Did you give them any

11   instructions at that time as to what assets they

12   ought to be considering and at what prices they

13   should consider?

14         A.    At that time during the week, again,

15   we were very concerned with all the uncertainty

16   in the market and the potential risk we were

17   taking to ensure that we, whatever assets we did

18   take, were taken at the appropriate price.  That

19   would have been my steer.

20         Q.    And by "appropriate price," you mean a

21   price at which their acquisition would not have

22   had an adverse impact upon the capital at

23   Barclays, correct?

24         A.    No.

25         Q.    What do you mean?

Page 29

1          HIGHLY CONFIDENTIAL - R. RICCI

2      A.    The appropriate price would have been

3   the best estimate of market value given all the

4   uncertainty in the market.

5      Q.    Did you give them that instruction on

6   Monday?

7      A.    I believe I did.

8      Q.    And did you give them any parameters

9   of any kind concerning how they should evaluate

10  what the appropriate price was?

11     A.    They know their desks and their books

12  better than I do.  I didn't give them any

13  specific instructions on how to value the

14  assets.

15     Q.    Do you know if on Monday they were

16  looking at specific Lehman assets or only

17  classes of assets, or both?

18          MR. HUME:  Objection.  Vague.

19     A.    I don't recall if they were looking at

20  classes, you know, at general classes of assets

21  or they had gotten down to the detail that

22  quickly.

23     Q.    Did you advise them one way or the

24  other as to whether they should look at specific

25  assets as opposed to classes of assets on that

1          HIGHLY CONFIDENTIAL - R. RICCI

2     Monday?

3          A.    I didn't advise them specifically, no.

4     Certainly understanding their books, they would

5     have wanted to look at some point at individual

6     assets.

7          Q.    There's a concept of Risk-weighted

8     assets, correct?  Does that mean anything to

9     you?

10         A.    Yes.

11         Q.    Okay.  Was there any instruction given

12    to them concerning the nature of the assets that

13    they should consider on a risk-weighted basis?

14         A.    I don't recall.  Not from me.

15         Q.    At any time during your discussions

16    with the Barclays team, was there any discussion

17    about the relative risk associated with specific

18    assets or with specific assets or classes of

19    assets?

20         A.    Risks associated with assets?

21         Q.    Uh-huh, on a risk-weighted basis.

22         A.    On a risk-weighted basis?

23         Q.    Yes.

24         A.    I don't recall specifics.

25         Q.    Okay.  At any point on that Monday did

1              HIGHLY CONFIDENTIAL - R. RICCI

2    you have any conversations with anybody as to

3    how much additional capital Barclays would need

4    in order to acquire those portions of Lehman

5    that it was considering taking in?

6         A.    I recall sometime on the Monday I

7    think that there was a first estimate of an

8    estimate of a number of additional capital we

9    might need in the broker-dealer to support an

10   acquisition of assets.

11        Q.    Do you remember what that number was?

12        A.    No, I don't.

13        Q.    Do you remember who came up with it?

14   Let me strike that.

15             Do you remember who told you the

16   number?

17        A.    No, not precisely.

18        Q.    You didn't, in any event, I take it,

19   come up with that number?

20        A.    No.

21        Q.    Do you have any recollection of what

22   the number was?

23        A.    Not that I recall.

24        Q.    I think I'm right that during this

25   time period there was a four-hour difference

Page 42

1          HIGHLY CONFIDENTIAL - R. RICCI

2       Q.    Article IX refers to a financial

3    schedule.  Do you see that reference?

4       A.    Page 34?

5       Q.    It's page 35, actually, I think, in

6    the fifth line.  Do you see the reference to a

7    financial schedule?

8       A.    Let me get there.

9             Yes.

10      Q.    Okay.  Do you recall having seen the

11   financial schedule referred to in Article IX of

12   the APA?

13      A.    I don't recall.

14      Q.    I show you what's previously been

15   marked as Exhibit 19, Mr. Ricci.  Have you ever

16   seen that schedule before?

17      A.    I don't recall seeing it.

18      Q.    Do I take it that you don't know one

19   way or the other whether this is the schedule

20   referred to in Article IX?

21      A.    That's correct.

22      Q.    Now, when you saw the draft of the APA

23   prior to its execution -- strike that.  When you

24   saw the definition of "purchased assets" in the

25   APA prior to its execution, did it reference

Page 43

1          HIGHLY CONFIDENTIAL - R. RICCI

2   that the assets that were being acquired

3   approximated $70 billion?

4        A.    What page is it on?

5        Q.    Page 6.

6        A.    Yes.

7        Q.    Okay.  Did that number ever change in

8   any of the drafts of the APA that you saw?

9        A.    I don't recall.

10       Q.    That $70 billion reflects a discount

11  off of the Lehman marks as of that time,

12  correct?

13            MR. HUME:  Objection.  Vague.

14       A.    I don't recall.

15       Q.    Do you recall that the assets that

16  Barclays agreed to purchase on Monday, the 15th,

17  or Tuesday, the 16th, were priced at a discount

18  off of Lehman's marks?

19            MR. HUME:  Objection.  Vague and

20       ambiguous.  Off of which marks?

21            MR. CARDEN:  Those would be Lehman's

22       marks.  That's what was in the question.

23            MR. HUME:  As of what time?  It's not

24       clear because it's not clear what time.

25       Marks as of when?

1           HIGHLY CONFIDENTIAL - R. RICCI

2    BY MR. CARDEN:

3        Q.    With that assistance, Mr. Ricci, go

4    ahead and answer the question.

5        A.    We didn't purchase a balance sheet, so

6    we purchased a series of assets and assumed a

7    series of liabilities.  The purchase of the

8    assets, any marks on those assets would have

9    been reflective of what we believed the fair

10   price for those assets was.  I can't speak for

11   what was on Lehman's books.

12       Q.    I'm just asking what you know.  Do you

13   know whether or not the prices at which Barclays

14   agreed to purchase those assets reflected a

15   discount off of Lehman's marks for those assets?

16       A.    The timing of the question is

17   important because if we were working off a

18   Lehman balance sheet of Friday night or Lehman

19   accounts of Friday night, if we were valuing

20   those on Monday, the world collapsed.  There

21   would have been, you know, significant

22   write-downs in any assets.

23       Q.    My question is a different one, Mr.

24   Ricci.  You either know it or you don't know it.

25           The question is do you know that the

Page 45

1                HIGHLY CONFIDENTIAL - R. RICCI

2      prices at which Barclays was agreeing to

3      purchase the assets reflected in the Asset

4      Purchase Agreement which are given at

5      approximately $70 billion reflect a discount off

6      of whatever Lehman marks existed as of that

7      time?

8           A.    As of what time, sir?

9           Q.    As of the time that this was executed,

10     sir.

11               MR. HUME:  Objection.  Lacks

12          foundation as to what that date is.

13          A.    I can't speak for every single asset,

14     but in order to try to answer your question, if

15     there -- given what I know about the timing of

16     when we first started looking at their assets

17     versus when this agreement was signed, I would

18     think there would have been a discount, yes, of

19     Lehman assets -- the Lehman marks on their

20     assets, yes.

21          Q.    I'm just talking about the marks.  I'm

22     not talking about what Barclays thinks they're

23     worth.  I'm only talking about whether it

24     reflected a discount off of Lehman marks.

25               MR. SCHILLER:  He can hear you.  Don't

Page 46

1          HIGHLY CONFIDENTIAL - R. RICCI

2      raise your voice.

3          MR. CARDEN:  Just so the record is

4      clear, I didn't raise my voice.  I don't

5      think anyone around the table will say so.

6      So whatever purpose you intended by that is

7      really irrelevant.

8          MR. SCHILLER:  I was just reacting to

9      you.

10     Q.    Please continue.  I speak softly, Mr.

11     Ricci, so if it comes up a notch, perhaps it may

12     seem loud.

13         Did you make any instructions to Mr.

14     Keegan or Mr. King about valuing the assets that

15     were being acquired by Barclays at a price so as

16     to, if you will, cover the liabilities being

17     assumed by Barclays?

18     A.    I don't understand the question.

19     Q.    Well, Barclays was assuming some

20     liabilities in this transaction, wasn't it, sir?

21     A.    Yes.

22     Q.    How much were those liabilities, do

23     you remember?

24     A.    At this point in the transaction, I

25     don't remember.

Page 47

1         HIGHLY CONFIDENTIAL - R. RICCI

2     Q.   The initial transaction on that Monday

3 would have had Barclays acquiring certain short

4 positions, wouldn't it?

5     A.    Yes.

6     Q.   Do you recall that those short

7 positions were estimated at approximately 69

8 billion?

9        MR. HUME: Objection. Asked and

10     answered.

11     A.    I don't recall what they were.

12     Q.    Look at page 12, sir.

13     A.    Of the APA?

14     Q.    Yes.

15     A.    Okay.

16     Q.    Do you recall that?

17     A.    No.

18     Q.    Okay. Do you recall at the time the

19 APA was executed how much the asset -- pardon

20 me -- how much the liabilities being assumed by

21 Barclays were?

22        MR. HUME: Objection. Asked and

23     answered.

24     A.    At the time that this APA was

25 executed?

Page 124

1             HIGHLY CONFIDENTIAL - R. RICCI

2      Barclays' standpoint was at a price to give

3      Barclays a cushion, wasn't it?

4             MR. HUME:  Objection.  Vague and

5          ambiguous.

6      Q.     In terms of market movements?

7      A.     That depends on the asset.

8      Q.     Was it --

9      A.     Depends if they were illiquid assets

10     or there were market prices.  We were trying to

11     do our best to determine what the right and

12     appropriate price was.

13     Q.     Let's just take the liquid assets for

14     a moment.  Was it the case that the prices that

15     Barclays was prepared to pay for the Lehman

16     assets on Monday set by Barclays so as to

17     achieve a cushion against market risk during

18     that time period?

19            MR. HUME:  Objection.  It lacks

20         foundation and you have asked this question

21         already.

22     A.     Again, the instructions were to buy

23     the assets at an appropriate price.  The

24     appropriate price would reflect either, you

25     know, market price or the illiquidity premium,

Page 125

1    HIGHLY CONFIDENTIAL - R. RICCI

2    if they weren't liquid assets, and that was the

3    instruction that was given.

4        Q.    How did you intend for Barclays to

5    have the cushion you described it needed to be

6    accomplished in the purchase of those assets?

7        A.    There were several ways to achieve it,

8    we had hoped.  One was to ensure that in any

9    price we were paying for assets, particularly

10   illiquid prices, illiquid assets, of which there

11   were a lot, that we had an appropriate liquidity

12   premium in our price.

13            Secondly, as I've already testified,

14   on the comp and the cure payments, we had hoped

15   that we could pay less than what we had assumed

16   but recognize that we might have to assume

17   those.  And also, we had intangible assets, that

18   is, you know, accounting function that might

19   help create some cushion.  Those were the big

20   components.

21       Q.    Did you provide a percentage for the

22   liquidity risk that you described?

23       A.    No.

24       Q.    Did you ask Mr. Keegan or Mr. King

25   what such -- what an appropriate liquidity

1          HIGHLY CONFIDENTIAL - R. RICCI

2     percentage would be?

3          A.     No.

4          Q.     Which assets in particular are you

5     referring to as having been illiquid in

6     connection with the initial Lehman transaction

7     on Monday and Tuesday?

8          A.     As I recall, there was -- there was

9     some mortgages which were certainly illiquid.  I

10    don't remember what type of real estate may have

11    been on there.  I don't recall any specifics

12    beyond that.

13         Q.     I'm going to --

14         A.     But they were very illiquid markets at

15    the time.

16         Q.     I'm sorry.

17         A.     That's okay.

18         Q.     I'm show you what's been marked

19    Exhibit 19.  I realize you haven't seen that

20    before, but there has been testimony that's the

21    schedule that's referred to in Article IX of the

22    APA.  There is a list of assets on the left-hand

23    column.  You see that?  Starts with "government"

24    and has 40 billion there?

25         A.     Uh-huh.

Page 144

1          HIGHLY CONFIDENTIAL - R. RICCI

2     purchase the $70 billion of assets contemplated

3     in Lehman 2 and also take the assets that were

4     supporting the Fed repo, were you?

5          A.    Best I recall, the reason that we

6     weren't was really the failure to identify those

7     assets in what you refer to as transaction 2

8     rather than a conscious decision to say we're

9     going to do one versus the other.

10         Q.    Okay.  Now, on the morning of the

11    19th, you testified that you were concerned as

12    to whether or not Barclays had sufficient assets

13    for its protection, right?

14         A.    Yes.

15         Q.    Did you talk to anybody about that

16    concern?  Did you take any action?

17         A.    I would have spoken certainly to Mr.

18    LaRocca, I would have spoken to Mr. Clackson,

19    and I would have spoken to Mr. Klein as to my

20    concerns around securing, you know, assets

21    appropriate for our protection.

22         Q.    Did you talk to anybody at Lehman

23    about that, about your concern?

24         A.    I don't know if I talked particularly

25    about the concern.  I certainly would have had

Page 145

1              HIGHLY CONFIDENTIAL - R. RICCI

2      conversations about other assets.

3          Q.    On Friday morning, Barclays had laid

4      out 45 billion, correct?

5          A.    Correct.

6          Q.    You were concerned about Barclays

7      being protected, which means you wanted a

8      certain quantum of assets in order for it to be

9      at least made whole, right?

10         A.    I wanted as much protection I could

11     get given the uncertainties in the market, yes.

12         Q.    Did you have in your own mind a target

13     for how much in assets you believed it was

14     necessary over and above the $45 billion that

15     you had outlaid for Barclays to be protected?

16              MR. HUME:  Objection.  Asked and

17         answered before lunch several times.

18         A.    I didn't have a specific number in

19     mind.

20         Q.    Did you have a general number?

21         A.    I didn't have a general number in

22     mind.  Again, my instructions have been

23     consistent to make sure that any assets we were

24     taking were at the appropriate values, and I was

25     also hopeful that the estimates that had been

Page 146

1          HIGHLY CONFIDENTIAL - R. RICCI

2     made for comp and cure payments through

3     leveraging, you know, Barclays' platforms, we

4     might be able to underspend to create some

5     cushion.  But it was an environment where

6     valuations were very, very, very difficult and

7     uncertain, I think as evidenced by the fact that

8     we didn't determine the final valuation of these

9     transactions until February of '09.

10         Q.   ·But you weren't relying on Friday

11    morning about the possibility that Barclays

12    could underspend on the comp and the cure pieces

13    in order to develop the cushion that you wanted

14    Barclays to have, were you?

15         A.   We were looking at various scenarios

16    that might estimate what a possible cushion

17    might be.  It clearly, in that environment, was

18    so uncertain that you couldn't bid on anything,

19    but we were running some scenarios that we

20    thought might give us enough comfort that we

21    could execute the transaction with some sense of

22    cushion.

23         Q.   Did the scenarios involve both an

24    element of how little you might be able to spend

25    on comp and cure plus what discounts you might

1          HIGHLY CONFIDENTIAL - R. RICCI

2  be able to purchase certain assets at?  What

3  were the components of the scenarios?

4       A.    We, by the Friday, the 19th, we had,

5  you know, again, we were hopeful that we could,

6  you know, leverage other Barclays' platforms or

7  find other ways to underspend.

8          We were also, you know, ensuring that

9  when we were pricing assets, for instance, on

10  the illiquid side, that we were factoring in an

11  appropriate liquidity premium that might give us

12  some protection if we couldn't move the assets.

13       Q.    Let me try again to ask what I meant

14  to ask a little while ago.  On Friday morning,

15  it was not your view that Barclays' possible

16  ability to underspend on comp and cure was what

17  you were going to rely on for coming up with a

18  cushion to protect Barclays Capital by itself?

19          MR. HUME:  Object to the form of the

20       question.

21       A.    We were looking at it in pieces.  So,

22  again, I didn't have a particular number in

23  mind.  We needed to make sure that, in the very

24  uncertain environment, we would have purchased

25  assets recognizing that uncertain environment,

Page 156

1          HIGHLY CONFIDENTIAL - R. RICCI

2      you thought were necessary to provide Barclays

3      the cushion to protect its capital at that time,

4      correct?

5          A.    Not that I recall.

6          Q.    Maybe it's me not understanding it,

7      but I'm trying to -- let me ask it this way.

8      Strike that.

9              On Friday morning, you took a view

10     that you didn't have sufficient cushion,

11     correct?

12         A.    Uh-huh.  Yes.

13         Q.    And I think it follows that you

14     necessarily had to take a view as to how much

15     cushion would have been sufficient, am I

16     correct?

17         A.    Is that a question?

18         Q.    Yes.  Am I correct?

19         A.    Again, there was incredible

20     uncertainty.  I was now looking at a transaction

21     which had been signed on Tuesday, which didn't

22     look like a lot of those assets were going to

23     arrive.  We had problems getting collateral for

24     the $45 billion we had outlaid to the Fed.

25     Markets were getting worse.  I felt I needed as

1              HIGHLY CONFIDENTIAL - R. RICCI

2     much as I could get to protect the firm.

3        Q.    Okay.

4        A.    And I wasn't sure what Lehman had

5     left.

6        Q.    Okay.

7        A.    Didn't know there was anything left.

8        Q.    All right.  What did you do to try to

9     determine how much Lehman left that could be

10    transferred to Barclays?

11       A.    I believe I instructed Mr. Klein to

12    see if Lehman had any other assets.

13       Q.    Did you tell anybody on Friday morning

14    that if Barclays were unable to come up with

15    additional assets, that it would not go through

16    with the transaction?

17       A.    I don't -- I recall certainly having

18    those thoughts.  I can't recall if I said that

19    to anyone specifically.

20       Q.    And by "additional assets," I meant

21    additional Lehman assets, you understood?

22       A.    Additional Lehman assets, yes.

23       Q.    Did anybody at Lehman's object to

24    Barclays trying to identify additional assets

25    that could be transferred to it in connection

1           HIGHLY CONFIDENTIAL - R. RICCI

2   with the transaction?

3       A.    Not that I recall.

4       Q.    At any point did anybody at Lehman

5   suggest that Barclays was being piggish?

6       A.    I remember having a conversation with

7   Alex Kirk after we had tried to seek more

8   assets, and I expressed some discomfort to Alex

9   that I still didn't think we had enough assets,

10  and he said there's nothing left.  And I said

11  something like to him, well, fine, we're not

12  going to be -- we're not going to be pigs and go

13  after every last nickel.  We'll try to get

14  comfortable with what you have given us, and if

15  that's the case, we're done.

16      Q.    So is it fair to say that Barclays

17  stopped looking for additional Lehman assets

18  when Mr. Kirk said there was nothing else left

19  to transfer to Barclays?

20      A.    I recall saying to Alex that -- he was

21  very worried that we were going to walk because

22  we had asked for more assets, they had given us

23  what we could, he was worried we were going to

24  walk, and I said, okay, if this is it, if this

25  is all we can find before we go to court, you

Page 159

1            HIGHLY CONFIDENTIAL - R. RICCI

2   know, we'll take it, we'll take the chance, but

3   we won't kill the deal over looking for more

4   assets.

5        Q.   So, based on that conversation with

6   Mr. Kirk, Barclays stopped looking for

7   additional Lehman assets, correct?

8        A.   I believe that's correct.

9        Q.   Do you remember when on Friday that

10  was?  That would be Friday, the 19th of

11  September?

12       A.   I don't recall.  It was certainly -- I

13  think it was Friday afternoon, but I couldn't be

14  specific.

15       Q.   Was the search for additional Lehman

16  assets going on during the same time that the

17  court hearing was taking place on Friday

18  afternoon and into the evening?

19       A.   Not that I recall.  I recall that we

20  had -- we had searched for the assets before the

21  court hearing and that that was the end of it.

22       Q.   Again, you didn't go to court that

23  day?

24       A.   Did not go to court.

25       Q.   Who did go to court for Barclays,

Page 160

1           HIGHLY CONFIDENTIAL - R. RICCI

2     apart from its counsel?

3         A.    Michael Klein.   Jonathan Hughes.   I'm

4     not sure who else.

5         Q.    Now, do you recall what additional

6     assets were identified by Lehman on that Friday,

7     the 19th of September, which were transferred to

8     Barclays?

9         A.    The final deal included the repo

10    assets, they included the buildings, they

11    included the exchange-traded derivatives and the

12    associated collateral, they included the

13    unencumbered assets that were sitting in the

14    boxes at the very -- at the clearing agencies,

15    and they included the 15c3 moneys or equivalent

16    securities to 15c3 moneys.

17        Q.    When you talked about the collateral

18    supporting the exchanged-traded derivatives, was

19    that collateral in the transaction as of Friday

20    the 19th, in your view?

21        A.    That -- the exchanged-traded

22    derivatives were in the transaction at the

23    beginning, and as far as I was concerned, yes,

24    they were in the transaction on the Friday

25    night, yes.

Page 161

1          HIGHLY CONFIDENTIAL - R. RICCI

2     Q.     I'm not talking about the

3  exchange-traded derivatives themselves.

4     A.     The collateral, yes.

5     Q.     I'm talking about the margin.

6     A.     Yes.  Yes.

7     Q.     It's your view that the margin for

8  those positions was in the deal from the

9  beginning?

10    A.     Yes.  Absolutely.  You wouldn't take

11  the positions and not take the collateral

12  because you yourself have a collateral call the

13  first day.

14    Q.     Do you recall there having been an

15  amendment to the language of the agreement over

16  the weekend to make certain or to include the

17  collateral supporting those positions?

18    A.     No.  As I recall, the language

19  associated with the --

20          Are you referring to the clarification

21  letter?

22    Q.     Yes.

23    A.     The original -- the clause that was in

24  the original APA that contained the derivatives

25  and the associated collateral, that clause had