1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            September 17, 2008

            4:28 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1   HEARING re Debtor's Motion Pursuant to Section 1015(b) of the

2   Federal Rules of Bankruptcy Procedure Requesting Joint

3   Administration of Chapter 11 Cases

4

5   HEARING re Motion for an Order Pursuant to Section 105(a) of

6   the Bankruptcy Code Directing that Certain Orders in the

7   Chapter 11 Case of Lehman Brothers Holdings Inc. be Made

8   Applicable to LB 745 LLC

9

10  HEARING re Debtor's Motion Pursuant to Section 105(a) of the

11  Bankruptcy Code and Bankruptcy Rule 1015(c) and 9007 Seeking

12  Authority to Implement Certain Notice and Case Management

13  Procedures

14

15  HEARING re Debtor's Motion to (a) Schedule a Sale Hearing; (b)

16  Establish Sales Procedures; (c) Approve a Breakup Fee; and (d)

17  Approve the Sale of the Purchased Assets and the Assumption and

18  Assignment of Contracts Relating to the Purchased Assets

19

20  HEARING re Motion for Order (i) Authorizing Debtor to Obtain

21  Post-Petition Financing Pursuant to Sections 363 and 364 of

22  Bankruptcy Code; (ii) Granting Liens and Superpriority Claims

23  to Post-Petition Lenders Pursuant to Section 364 of Bankruptcy

24  Code; and (iii) Scheduling Final Hearing

25  Transcribed by:  Lisa Bar-Leib

20

1   dealer finds itself.  It is absolutely essential, Your Honor,

2   that the purchaser have the protections of Section 363 of the

3   Bankruptcy Code.  The transaction, Your Honor, would

4   contemplate providing continued employment for almost 10 to

5   12,000 employees as part of this transaction for some period of

6   time.  Some employees will be continued for much longer periods

7   of time but it will allow a transition, Your Honor.

8           So, how was the transaction structured?  It was

9   structured, Your Honor, so that the two debtors would be

10  selling certain assets pursuant to Section 363 and in

11  connection with the broker dealer, Your Honor, in a very

12  unique -- and I don't think I've ever seen it done before.

13  There would be at a point in time, as the transaction moves

14  forward to conclusion, the commencement of a proceeding under

15  the Securities Investor Protection Act.  And a designated

16  trustee would be appointed immediately and there would be, in

17  effect, Your Honor, concurrent hearings before Your Honor, I

18  believe, both in the SIPC proceeding and in the Chapter 11

19  cases for approval of the sale.  In effect, we have used the

20  expression, Your Honor, of forward the pre-pack SIPC

21  proceedings.  And I have to inform Your Honor that what has

22  gone on in the last four or five days -- it seems like one long

23  day -- is complete cooperation with the regulators, the

24  Securities and Exchange Commission, the Federal Reserve Bank

25  and the Securities Investor Protection Corporation, to agree on

21

1    a format which would accomplish the purpose of preserving all

2    these interests.  And why is that so important, Your Honor?  I

3    hate to use the analogy of a melting ice cube.  It's been used

4    too often.  So I'm just going to say this is a wasting asset.

5    It is extremely fragile and sensitive.  And it's because of

6    that that people have been working around the clock.  And it is

7    because of that, Your Honor, that the time, and we recognize

8    the time element is so tight that we are basically asking Your

9    Honor to set a -- sign a -- enter a sales procedure order which

10   will set up a hearing on late Friday afternoon.  And the

11   coordination to get the time for the hearing on Friday

12   afternoon is very complex because it has to resonate with the

13   regulators.  It has to be sufficient to allow the transfer of

14   all these accounts at the close of the market.  And this

15   includes not only securities accounts, Your Honor, but

16   commodities futures accounts which is a very complex area.

17          It is a very complex transaction.  As Your Honor

18   knows, the papers weren't filed till 6 a.m. this morning.  The

19   negotiations -- and I want to tell you negotiations, Your

20   Honor, never stopped.  People never went to sleep to get this

21   transaction.  And why did they do that?  Because of the

22   sensitivity of this transaction.  And, Your Honor, just the

23   delay from yesterday, when Your Honor was kind enough to give

24   us a hearing date yesterday, to today has had negative

25   inferences by a great many people.  Is there ever going to be a

22

1  hearing on this?  That's why, Your Honor, we have come forward

2  today.  We want to go forward.  And I would point out, Your

3  Honor, we are not asking for any real substantive relief today

4  with respect to the sale motion.  We are asking Your Honor to

5  set a hearing for Friday afternoon.  And the only sensitive --

6  I'll call it somewhat sensitive issue is the approval of the

7  breakup fee.

8          Now, Your Honor, we are talking about a transaction

9  that has, as I said, many, many parts.  But looking at it from

10  the net of this transaction, there will be approximately

11  1,700,000,000 dollars yielded out of this transaction.

12          UNIDENTIFIED SPEAKER:  A billion.

13          MR. MILLER:  I'm sorry?

14          UNIDENTIFIED SPEAKER:  A billion.

15          MR. MILLER:  You know, I always think of Senator

16  Dirksen, Your Honor.  He said a billion here and a billion

17  there.  Pretty soon you're talking about real money.

18          THE COURT:  Well, you're talking about real money

19  here.

20          MR. MILLER:  Absolutely, Your Honor.  And so we have

21  1,700,000,000 dollars.  There has been an enormous effort put

22  into this by the prospective purchaser, Barclays Capital, Your

23  Honor.  And in the negotiations, quite properly, with all of

24  the efforts that they have put into it, there was a request --

25  I should say a request, almost a demand, for a breakup fee.

23

1 And there were negotiations in respect of that amount.  And

2 what it came out to be, Your Honor, was a proposed breakup fee

3 of a hundred million dollars plus reimbursement of expenses of

4 up to twenty-five million dollars.

5     THE COURT:  May I ask you a question --

6     MR. MILLER:  Yes, sir.

7     THE COURT:  -- about how to equate that breakup fee

8 and expense reimbursement with the purchase price?  And I've

9 attempted to assess the notional value of the transaction

10 because in addition to the 1.7 billion dollars, there's a

11 reference to 1.5 billion dollars in cure amounts and possibly

12 as much as 2.5 billion dollars in certain employee related --

13     MR. MILLER:  Yes, sir.

14     THE COURT:  -- severance expenses which may or may

15 not be triggered.  For purposes of my evaluating the fairness

16 of the overall proposed breakup fee and expense reimbursement

17 as a percentage of the transaction, not that I need to do that

18 but frequently Courts are viewed as approving breakup fees

19 within a certain market range.  How should I view the fair

20 value of the overall transaction?

21     MR. MILLER:  I think, Your Honor, if you start with

22 the billion seven hundred million dollars, which is the cash

23 component, as Your Honor obviously read in the papers, there

24 will be an exposure for 2.5 billion dollars in connection with

25 the retention of these 10 to 12,000 employees.

24

1     In addition to that, Your Honor, in connection with

2     the assumption and assignment of contracts, the cure amounts

3     and other payments in connection with the contracts, are

4     estimated to be a billion five hundred million dollars.  So we

5     have four billion dollars right there, Your Honor.

6     In addition, Your Honor, the purchaser is paying 250

7     million dollars for the goodwill of LBI.  So there you have

8     4,250,000,000 dollars in that respect, Your Honor.

9     And then, Your Honor, in the interim, LBI has entered

10    into an arrangement with the prospective purchaser where

11    there's a repo agreement in which they are backing up and

12    allowing these repos to be settled and to be financed.  In

13    addition, if this goes forward, there will be a support

14    agreement for this interim period of two or three days where

15    Barclays Capital will be on premises, will be offering

16    oversight and in the sole discretion, may be willing to advance

17    some monies in the interim period.

18    So the problem we had, Your Honor, there are so many

19    different elements in this transaction that to do the usual

20    calculation of whether it should be two percent, three percent,

21    etcetera, became enormously complex during the course of the

22    proceedings.  As Your Honor knows, as these transactions go up

23    in value, very often the breakup fee goes up in value.  And

24    this -- if Your Honor just took the 1.7, I would say to Your

25    Honor, it's above three percent, clearly above three percent.

VERITEXT REPORTING COMPANY

25

1    THE COURT:  I know.  I did the calculation.

2    MR. MILLER:  Yes, Your Honor.  But this is -- again,

3    I have to use the expression, this is such a unique

4    transaction.  And there's been so much effort and there is so

5    much exposure.  Senior executives at Barclays likewise, like

6    the rest of us slaves, never went to sleep from Sunday right

7    through last night.

8        So, I think, Your Honor, there's an extra quota of

9    consideration that has to be given in connection with this

10   transaction.  And I would also bear in mind, Your Honor, that

11   what are the prospects of a competitive bid.  This is such a

12   fragile asset.  And it is not an asset that people did not know

13   was for sale.  For months now, Lehman Brothers has been

14   pursuing strategic alternatives.  The market has known that

15   aspects of Lehman, or even all of Lehman, were available for

16   purchase or investment.  So that -- I'm not going to call it

17   shopworn  Your Honor, but that the public, the financial

18   markets knew that these assets were for sale.  And we had a

19   benefit, Your Honor.  We were lucky because Barclays had been

20   negotiating to acquire Lehman.  Unfortunately, that was one of

21   the things that might have been but never turned into fruition.

22   But as the part of that process, at least they had some

23   familiarity.  And that was not a long negotiation either, Your

24   Honor.  It was two days, basically.  Unfortunately, because of

25   various regulations in the UK, that transaction could not have

26

1    gone forward.  So we start at least with somebody who had some

2    knowledge.  Otherwise, Your Honor, this wasting asset might

3    have been wasted.  And unfortunately, Your Honor, and I'm not

4    trying to do the sale hearing now -- in court with us is Mr.

5    McDade, Herbert McDade, who is the president and chief

6    operating officer who, if he had to testify, Your Honor, would

7    testify that if this transaction is not approved, Friday night

8    there will be nobody in the building.  And it will just

9    disappear.

10           So, I want to repeat, Your Honor.  We're not asking

11   for a ruling on the sale today, Your Honor.

12           THE COURT:  Well, let me just deal procedurally with

13   what's before me.  And I know that you're in effect starting

14   with the sale procedures motion.

15           MR. MILLER:  Yes, sir.

16           THE COURT:  I was in early this morning and those

17   papers didn't make it to the ECF system until sometime after

18   7:30 --

19           MR. MILLER:  Yes.

20           THE COURT:  -- I didn't see them until about then.

21   And knowing the way those lawyers who don't work all night

22   behave, they often don't get to their offices until sometime

23   later than that.  I have some concerns which I would like you

24   to address on the record.  Recognizing that this is an

25   absolutely extraordinary transaction with extraordinary

27

1  importance to the capital markets globally, I still need to

2  deal with fundamental due process issues.

3            MR. MILLER:  Yes, sir.

4            THE COURT:  And I would like you to comment -- and

5  I'm not inviting objections on this basis.  I'm just saying I

6  have a concern as to the adequacy of notice as to the substance

7  of the transaction for purposes of basic constitutional due

8  process.

9            MR. MILLER:  Yes, sir.

10           MR. DESPINS:  Your Honor, I'm sorry to interrupt.  I

11 never do that but I thought that Mr. Miller was making

12 introductory remarks and therefore I wanted him to finish.  But

13 on this issue, Your Honor -- first of all, let me introduce

14 myself.  Luc Despins with my partner, Dennis Dunne, from

15 Milbank Tweed, proposed counsel for the official creditors'

16 committee.

17           THE COURT:  That's okay.  Debtors' counsel is

18 proposed counsel, too.

19           MR. DESPINS:  Your Honor, we -- the committee has

20 concerns regarding -- I want to make sure the Court hears us on

21 that request.  Clearly, we're not going to have a prolonged

22 argument over this but we request, and the committee wanted us

23 to request, a short adjournment until tomorrow morning so that

24 we can actually get up to speed and have an informed discussion

25 or -- or maybe not because maybe this is all -- maybe

28

1    everything that's going to be approved by the Court is

2    perfectly appropriate.  But we want a short adjournment until

3    tomorrow morning.  We were retained no more than forty minutes

4    ago, Your Honor.  And this -- through no fault of the debtor.

5    This has nothing to do and we're not faulting the debtor in any

6    way.  It's just that -- happened that way.  But it's also

7    outside of our control.

8         So perhaps, in that context, Mr. Miller could, while

9    addressing your remarks, also address our request for a short

10   adjournment until your earliest convenience tomorrow, Your

11   Honor.

12        THE COURT:  Okay.  I'm sure he'll do that.  But my

13   introduction to Mr. Miller was less about whether this hearing

14   should be held at another time and more about dealing with the

15   timing imperatives that confront the Court.  I think everybody

16   needs to understand that I am personally disposed to doing

17   everything within my power to accommodating this transaction

18   within the limits of the law, the procedural rules and

19   fundamental due process.  And all I am asking Mr. Miller to

20   address right now is my ability within my discretion, which is

21   remarkably broad, particularly at a time like this, to do

22   something extraordinary.

23        MR. MILLER:  Your Honor, we could not agree with you

24   more about it being extraordinary.  And I want to assure Your

25   Honor that we were very cognizant of the due process arguments.

1    And if we had the luxury of an asset that would stay in place

2    or a group of assets that would stay in place and would still

3    be there two weeks from now, we clearly would have done the

4    normal process of getting a sale procedures order entered,

5    having a period of time for people to get -- do whatever due

6    diligence they wanted to do.  Our problem, and what we have

7    discussed at length, Your Honor, could we possibly do that and

8    still have a transaction?  Would the purchaser stand by during

9    that period?  And what would happen during that period?  The

10   consensus among all of the business people, Your Honor, and the

11   professionals was there would be nothing to sell in two weeks.

12   This is really and truly a wasting asset.

13           So what we have tried to do, Your Honor, and as I

14   have said to Mr. Despins, we will stay up all night with him

15   and explain this transaction.  Again, the only issue that Your

16   Honor has to decide today which has any significance at all is

17   the breakup fee.  I'm not talking about the DIP.  And set the

18   hearing.  I know Your Honor came in early because Your Honor

19   expected to find the motion papers here.

20           THE COURT:  Actually, I expected to find those papers

21   last evening.  But it's all right.

22           MR. MILLER:  I have to tell Your Honor, modern

23   technology is not all that it's cracked up to be.

24           THE COURT:  I know.

25           MR. MILLER:  And trying to get some stuff through a

30

1   computer is not so easy and to a printer.  And there was a lot

2   of frustration and a number of statements "Well, I'm about to

3   commit suicide" but we didn't let that happen.

4           So we took that into recognition, Your Honor.  And we

5   have sent them their websites.  We have given as much publicity

6   as we can possibly give to this, Your Honor.  And as I say

7   again, Your Honor, if it wasn't the unique nature of these

8   assets, the sensitivity of these assets and what has happened

9   in the marketplaces -- one of the purposes of doing this

10  transaction, Your Honor, is to try and soothe the markets and

11  to -- it'd be a counter force to the volatility that's going

12  on.  I don't know if Your Honor has a screen in your office,

13  but if you watched what's happening to the market today, it's

14  dangerous.

15          THE COURT:  Unfortunately, I was too busy to look at

16  any screens and I don't want to find out later.  But don't tell

17  me now, please.

18          MR. MILLER:  I'm not going to tell Your -- it would

19  depress Your Honor to know what's going on out there in the

20  marketplace.  So we have taken that into account and we have

21  also taken into account, Your Honor, the extremely unique

22  circumstances that we find ourselves in.  This is -- I don't

23  want to compare it to some -- in a small case, Your Honor, that

24  you and I may have been involved in twenty years ago where you

25  had a boat of salmon sitting out on the harbor and the company

31

1   in Chapter 11 had no money to unload it.  That's the kind --

2   this is such a perishable asset that if we don't take this

3   action, due process -- nothing will matter.  And I think, Your

4   Honor, everybody who has been involved -- and with due

5   deference to Mr. Despins and Mr. Dunne.  They haven't been

6   fully briefed on it.  But every other party who's been involved

7   has recognized that problem, including Your Honor, the

8   Securities and Exchange Commission, the Securities Investor

9   Protection Corporation and the Federal Reserve Bank.

10          Your Honor -- I have to tell Your Honor, there wasn't

11  an intention to file so quickly except what happened over the

12  past weekend.  We would have had more time to deal with these

13  problems.  And we understand what Your Honor is under in

14  connection with due process.  But this has been so notorious.

15  I mean, we have filled up newspapers, we have filled up CNBC

16  and CNN with stories.  We only got pushed off last night by

17  AIG.  We would have liked to have had a portion of the eighty-

18  five billion dollars but we couldn't get it.  So I think, Your

19  Honor, the proceeding is notorious.

20          THE COURT:  I'm going to take judicial notice of the

21  fact that we have a packed courtroom where we have people

22  standing and we have an overflow courtroom, the fact that there

23  are parties represented by experienced and sophisticated

24  counsel, as evidence that there's no question that parties-in-

25  interest and parties who are just plain interested know about

32

1   today's hearing.  And I've also had an opportunity to

2   understand through the press and television and the internet at

3   least some of the proposed terms and conditions of the

4   transaction.  I think for that reason, I am inclined to

5   conclude that while this is unusual, and should not be viewed

6   as a precedent, I believe that here due process is satisfied

7   simply by virtue of the fact that we're all here together and

8   that we know what we're talking about.

9           MR. MILLER:  I would only add to what Your Honor said

10  that yesterday was the organizational meeting called by the

11  Office of the United States Trustee which was in a ballroom at

12  the Park Lane Hotel in New York City.  And if Your Honor had

13  been in that room, Your Honor would have seen an overflow

14  audience of people standing all through the hallway.  So this

15  is a known situation, as Your Honor has pointed out.  So we

16  really support Your Honor's ruling that there is adequate due

17  process.

18          THE COURT:  Okay.  So we've gotten over that hurdle.

19  Now, we have Mr. Despins request on behalf of the newly formed

20  committee that has newly retained counsel to put this over for

21  a hearing tomorrow.  I want to just comment that I have some

22  issues with respect to that because of my own calendar.  But I

23  will attempt to address that if, in fact, after hearing

24  argument, if that's necessary, we need to adjust the timing.

25  But is this the time to debate that question?  Or would counsel

33

1    benefit from a chance to confer?  I'm prepared to do it either

2    way.

3            MR. MILLER:  Your Honor, I think --

4            THE COURT:  My only sense of this, based upon your

5    presentation, is that while I am sensitive to the needs of the

6    creditors' committee to have as much time as possible to

7    prepare whatever papers it may choose to file, including papers

8    in support of the transaction for that matter, I am also

9    conscious of the time line that you have outlined.  And what I

10   consider to be the imperative that this transaction, if it is

11   to be approved, be approved before the end of the week.  As a

12   result, the request not yet argued by Mr. Despins that this be

13   put over, that is, this aspect of today's hearing be put over

14   till tomorrow morning, raises in my mind an additional due

15   process question which is that the sale procedures and the sale

16   hearing are even closer together than they would be if I were

17   to approve the sale procedures today.  So that while we take

18   away from the committee's time to respond to this procedural

19   motion by approving it, if I do, today, we also take away from

20   everybody's time to address the merits of the transaction if I

21   approve it tomorrow instead of today.  So, that's the conundrum

22   that I face.

23           I am inclined not to grant the proposed request for

24   an adjournment for multiple reasons but I also don't wish to

25   cut off argument unnecessarily.  The multiple reasons include

34

1   the following:   one, I have a calendar tomorrow morning which

2   includes a number of other cases.  And, at least in this court,

3   every case, regardless of size, is entitled to access to the

4   Court.  And some of the cases that I'm hearing tomorrow are

5   quite large.  Secondly, I believe that this very fast track

6   case needs to be addressed in an extraordinary way.  And for

7   that reason, while I would, under ordinary circumstances, be

8   very sensitive to the request of committee counsel to have

9   additional time, and I've been in that spot myself when I was

10  in practice, I think that to delay the approval of the sale

11  procedures would send an intolerably awkward message to the

12  world.  And I'm not prepared to preside over the delivery of

13  such a message.  I believe that we should maintain the schedule

14  that we're on recognizing that it imposes some burdens on the

15  parties who need to appear and be heard.  But I will also state

16  that for purposes of the sale hearing, I will be

17  extraordinarily liberal in allowing parties the ability to

18  object if they wish to at the very last minute as soon as we

19  call the hearing because I think that's also consistent with

20  due process.

21          MR. MILLER:   Your Honor, we have no objection to

22  that.  As far as we're concerned, Your Honor, you can extend

23  the objection date to the hour before whatever the time of the

24  hearing will be on Friday.

25          THE COURT:   Since you offered that, that's what we'll

35

1    do.

2              MR. MILLER:  Very good, Your Honor.

3              MR. DESPINS:  Your Honor, normally and with short

4    deadlines like this, we -- I should say, sometimes the Court

5    dispenses with the filing of an objection, frankly.  We can

6    make the arguments at the hearing.

7              THE COURT:  As far as I'm concerned, every party-in-

8    interest who has a legitimate need to express a position on the

9    record will be free to do so at the sale hearing regardless of

10   whether papers have been filed of record consistent, however,

11   with providing some fair notice to the debtor of the kinds of

12   arguments that are going to be asserted.  I don't think that

13   this is appropriately to be designed as a hearing by surprise.

14   So, as long as there is adequate notice, I think that would

15   work.

16             MR. MILLER:  Absolutely, Your Honor.  And anybody who

17   has an interest, Your Honor, can contact my office.  We will

18   spend the time to explain things.  We will set up meetings.  We

19   are very sensitive to the due process argument, Your Honor.

20   And I agree with Your Honor.  Anybody who has a statement to

21   make, if it's a substantive statement, we'd appreciate a little

22   notice of what it's going to be but it can be oral without any

23   problems.

24             THE COURT:  I think you're entitled to that notice.

25   And I guess I'll be the only one surprised by what happens.