1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


       Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          September 19, 2008

          4:36 PM


B E F O R E :

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2  HEARING re Debtor's Motion for an Order Pursuant to Section 105

3  of the Bankruptcy Code Confirming Status of Citibank Clearing

4  Advances

5

6  HEARING re Debtor's Motion to (a) Schedule a Sale Hearing; (b)

7  Establish Sales Procedures; (c) Approve a Breakup Fee; and (d)

8  Approve the Sale of the Purchased Assets and the Assumption and

9  Assignment of Contracts Relating to the Purchased Assets

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Lisa Bar-Leib

42

1    determination being made in the order with respect to the

2    validity of the guaranties.  There is no provision in the order

3    with respect to setoffs.  Your Honor, we would rest on the

4    motion and request that the relief be granted.

5         THE COURT:  There are no objections that have been

6    filed but this was an emergency motion.  The courtroom is

7    packed.  This is, for all practical purposes, a clone of the

8    very same relief that was granted the other day in favor of

9    JPMorgan Chase.  Let me just verify that there are no

10   objections.  Mr. Despins?

11        MR. DESPINS:  Good afternoon, Your Honor.  Luc

12   Despins with Milbank Tweed with my partner Dennis Dunne and

13   also Paul Aronson.  Could we have -- not to indispose counsel

14   but could we have until the -- just an hour while the other

15   matter is proceeding so that we can confer with counsel just to

16   make sure that everything is not problematic?  We don't think

17   there will be a problem, Your Honor, but we just would like a

18   little bit of time to --

19        THE COURT:  Well, candidly, the reason that we're

20   doing this now is to dispose of something that was presumed to

21   be noncontroversial.

22        MR. DESPINS:  And I think --

23        THE COURT:   There's nothing that you've said that

24   tells me that it is controversial.  But what I'm going to do is

25   approve it subject to your review of the form of order to

43

1    satisfy yourself that the relief being granted to Citibank is

2    as represented of like type to the relief that was granted to

3    JPMorgan Chase.  Is that fair?

4              MR. DESPINS:  That's fine, Your Honor.

5              THE COURT:  Fine.  That's what we'll do.

6              MR. KRASNOW:  Thank you, Your Honor.

7              THE COURT:  You may approach, if that's what you're

8    doing.  I can't really tell.  Frankly, with so many people in

9    the courtroom, whenever I see the movement this way, I get a

10   little concerned.  Mr. Miller?

11             MR. MILLER:  Good afternoon, Your Honor.  It's sort

12   of difficult to believe, Your Honor, this is the fifth day of

13   this case.  In terms of hours, I think we're in the sixth

14   month.  In any event, Your Honor, as we described last

15   Wednesday, there are a lot of moving parts to this transaction.

16   And they've been moving with great velocity over the last days

17   since Wednesday.  And as a consequence, Your Honor, there has

18   had to be some major changes in the transaction.  And

19   unfortunately, they weren't finalized until about a half hour

20   ago.  What I would propose, Your Honor, is that if Your Honor

21   will give us a recess for approximately a half hour so we can

22   explain orally to this audience --

23             THE COURT:  Excuse me for one moment.  Excuse me.

24             MR. MILLER:  Going back, Your Honor, a recess for a

25   half hour so that we can orally explain to this audience the

44

1    nature of those changes and the significance.  We think that

2    will expedite the hearing.  One other thing, Your Honor, if I

3    might add, a large number of objections, Your Honor, relate to

4    cure amounts on the assumption and assignment of the executory

5    contracts, etcetera.  The way it was set up, Your Honor, is

6    that if you did not object to the cure amount today, you were

7    bound by the cure amount.  We're making a change in that, Your

8    Honor.  All rights to object to the cure amounts and to

9    whatever resolution comes out of that, Your Honor, we are

10   extending to October 3 so that there's no -- if you have a

11   motion or an objection based on the cure amounts, you need not

12   be concerned about it today.

13          THE COURT:  Does that mean that if there is a cure

14   objection that hasn't been filed prior to the commencement of

15   today's hearing that there's effectively a broad-based

16   extension for all such parties to file objections --

17          MR. MILLER:  That is my impression, Your Honor.

18          THE COURT:  -- on or before the 3rd of October?

19          MR. MILLER:  That's my impression, Your Honor.

20          THE COURT:  And is there any provision for a hearing

21   in connection with disputes regarding cure amounts?

22          MR. MILLER:  Only if the parties don't come to an

23   agreement.

24          THE COURT:  Fine.

25          MR. MILLER:  Thank you, Your Honor.  So I think that

45

1    if people have objections based upon that, they should be

2    somewhat relieved.

3         THE COURT:  All right.  And I'm sure if there are

4    questions during the break, they'll approach you or your

5    partners.

6         MR. MILLER:  Thank you, Your Honor.

7         THE COURT:  I think if a half hour is what you think

8    you need --

9         MR. MILLER:  Yes.

10        THE COURT:  -- why don't we say 5:15 with the

11   understanding that time has proven to be very flexible here in

12   the past this week.  And it may turn out that we'll need a

13   little bit more time.  But let's make that the holding time and

14   if there's a need for more, somebody should just knock on my

15   chambers door and let me know what's required.

16        MR. MILLER:  Thank you, Your Honor.

17        THE COURT:  Okay.  We're adjourned until 5:15

18   provisionally.

19        (Recess from 4:43 p.m. until 5:41 p.m.)

20        THE COURT:  Please be seated.  I find myself in the

21   unusual position of being perhaps the only person in the

22   courtroom who doesn't know what everybody else knows because I

23   didn't hear what you told everybody.  Do you want to tell me

24   anything?

25        MR. MILLER:  Somehow, Your Honor, we knew you were

46

1    going to ask that question.  So --

2            THE COURT:  I hate to be that predictable.

3            MR. MILLER:  There is a document -- maybe it'd be

4    better, Your Honor, if we do it orally.

5            THE COURT:  Fine.

6            MR. MILLER:  My partner, Ms. Fife, will do that.  And

7    with some assistance from Ms. --

8            THE COURT:  Let me just check on something because --

9    and this is purely technical.  During the first phase of the

10   hearing, I was told that those people who are listening in

11   spillover courtrooms had a very hard time hearing me.  I'm

12   having some difficulty as compared with our last hearing with

13   the amplification coming out of the podium.  And I just want to

14   make sure that we're not suffering system overload.  Okay.

15   That's on.  And let me also make the announcement, whenever

16   anyone speaks for the record, this is always true here, but

17   given the number of people, please identify yourself before

18   speaking.

19           MS. FIFE:  Thank you, Your Honor.  Lori Fife from

20   Weil Gotshal & Manges on behalf of the debtors.  Let me try to

21   summarize the changes that were made to the transaction.  In

22   terms of the economic changes, they result largely because of

23   the markets, unfortunately.  And from the time that the

24   transaction was actually entered into till now, the markets

25   dropped and the value of the securities dropped as well.

47

1          So, originally, we were selling assets that had a

2     value of seventy -- approximately seventy billion dollars.  And

3     today, Your Honor, we're only selling assets that have a value

4     of 47.4 billion dollars.

5          Barclays is assuming liabilities, however, of 45.5

6     billion dollars in connection with those assets.  So that has

7     not changed from the original transaction.  There was an upside

8     sharing in the original transaction.  There was going to be a

9     true-up twelve months later on and that has been eliminated

10    from this transaction.

11         Barclays is still agreeing to pay the cure amounts on

12    any leases that it assumes or that we assume and assign to it.

13    Barclays is also agreeing to the same employee compensation

14    arrangements.  And it is also agreeing to pay the 250 million

15    dollars of goodwill to LBI.

16         With respect to the real estate assets, Your Honor,

17    that was -- we had said at the last hearing, I believe, it was

18    approximately a billion dollars.  Since that time, an appraisal

19    has come in and it is below that amount.  The contact had a

20    provision which allowed the purchaser really to purchase the

21    building at the appraised amount.  So we have some negotiations

22    to go, but I believe that the purchase price will come down by

23    approximately a hundred million dollars.

24         There were two other real estate properties also

25    which we received appraisals for which, similarly, were lower

48

1   than we had anticipated, unfortunately.  So I think,

2   cumulatively, we're expecting that the purchase price will come

3   down by a hundred to maybe 200 million dollars for the real

4   estate.

5           Some other changes that were made to the contracts

6   affect what are called purchase assets and what are excluded

7   assets.  There was some confusion as to which subsidiaries, if

8   any, were being sold.  And we've clarified in a clarification

9   letter which we're hoping to finalize and actually present to

10  Your Honor whenever it comes down here.  But in that letter,

11  we're going to clarify that the only subsidiaries that are

12  being purchased by Barclays are Lehman Brothers Canada Inc.,

13  Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA.

14  The latter two subsidiaries that I just referred to relate to a

15  business that is called PIM, or Private Investment Management

16  Business, which is a business that was not part of the original

17  deal but is now being purchased by Barclays.

18          THE COURT:  For no additional consideration?

19          MS. FIFE:  That's correct, Your Honor.

20          THE COURT:  And what's that business worth?

21          MS. FIFE:  It's essentially just people, Your Honor.

22  It's the high net worth individual brokerage business.  And

23  it's really just the people who are in those offices.

24          THE COURT:  And their rolodexes.

25          MS. FIFE:  And their rolodexes, exactly.  The

49

1    customer accounts were being transferred anyway.

2         There was a change that was made to the license of

3    the Lehman Brothers' name.  It was perpetual.  It is now two

4    years but we don't really believe that that's a problem.  The

5    IMD business, which is essentially Neuberger Berman and some

6    other related entities, will have a perpetual license to use

7    the name.

8         There was a provision in the old agreement pursuant

9    to which the parties were sharing the residential real estate

10   mortgages.  There is no longer that provision.  Barclays was

11   required to post collateral, actually this morning, in order to

12   get DTC to open up trading.  And that collateral was posted --

13   the residential real estate mortgages was posted to DTC.

14   Pursuant to this transaction, Barclays is taking over and

15   guaranteeing all of those transactions.  And they are assuming

16   the risk related to those transactions so that collateral will

17   remain with Barclays.

18        THE COURT:  What's the aggregate value of the posted

19   collateral?

20        MS. FIFE:  One second, Your Honor.

21        (Pause)

22        MS. FIFE:  Your Honor, I'm not -- excuse me?  There

23   are 300,000 trades but we're not sure the value of the

24   collateral.  Perhaps during the rest of the hearing we can find

25   that amount out for Your Honor.

50

1       THE COURT:  Okay.  I'm not entirely sure I'm

2   understanding the overall impact of the change in the sharing

3   of the residential mortgage collateral and whether or not that

4   constitutes a benefit to the estate or a detriment to the

5   estate.  Which do you think it is?

6       MS. FIFE:  It's hard to tell.  It depends on which

7   way those trades come out.  But we believe it's a benefit to

8   the estate because it allowed trading to continue this morning

9   because DTC and NASDAQ were unwilling to allow Lehman to

10  continue trading without this posting of collateral which was

11  very important to the company, obviously.  So we were able to

12  work out this arrangement whereby Barclays would stand behind

13  the trades.  It is the debtors' belief that it's a necessary

14  part of the transaction.

15      THE COURT:  Okay.  And I realize I'm asking a lot of

16  questions about things that may have been fully explained when

17  I was in chambers, but Barclays' undertaking to stand behind,

18  as you put it, this posted collateral, how is that documented?

19  And what happens in the event that the transaction that we're

20  now talking about is not approved or is delayed?

21      MS. FIFE:  It was documented in the First Amendment

22  to the asset purchase agreement, which we actually do have and

23  if the transaction is not consummated -- I'm actually not sure

24  of the answer, Your Honor.  I'm sorry.  I believe Barclays is

25  liable.  Oh, okay.  So, I'm advised by my partner that if the

51

1    transaction's not consummated then the transactions -- all the

2    trades come back to Lehman, and Lehman is then responsible for

3    them.  Excuse me for one second, Your Honor.

4        (Pause)

5            MS. FIFE:  I'm being told that if the liabilities are

6    less than the collateral then the excess collateral comes back

7    to Lehman.

8            THE COURT:  And if the liabilities are greater?

9            MS. FIFE:  We have no further obligation.

10           THE COURT:  Okay.

11           MS. FIFE:  We also modified the agreement -- would

12   you like the representative from DTC to explain that in more

13   detail, Your Honor?

14           THE COURT:  Mr. Hirshon, I'd be happy to hear from

15   you.

16           MR. HIRSHON:  Good afternoon, Your Honor.  Nice to be

17   before you.  Sheldon Hirshon, Proskauer Rose, representing the

18   composite -- the trust clearing corporations.  Your Honor, the

19   essence of the transaction is to move all of the accounts

20   seamlessly from Lehman to Barclays.  What DTC does is the

21   plumbing of that and handles all of the details in the settling

22   of the trades.

23           THE COURT:  Is that how they describe themselves?

24           MR. HIRSHON:  That's how I describe them because

25   until Sunday, I didn't understand any of this.  But it is what

52

1    spigots get turned on and off and how the pipeline is filled

2    and then emptied.  So each day -- there are several different

3    clearinghouses.  And each day the trades are matches and then

4    either a net number goes to Lehman or from Lehman to DTC or any

5    of its clearing companies.  There was a depository that holds

6    all of the securities.  The residential mortgages that you've

7    heard about that were going to be split fifty/fifty are in the

8    DTC registry.  We hold them now.  They are there.  Originally,

9    the idea for the original transaction was to split those

10    fifty/fifty between Barclays and the estate.  But in order to

11    facilitate the settlement of these accounts, the additional

12    fifty percent was needed so that DTC would not be at risk for

13    the settlement.  So the --

14        THE COURT:  So this modification principally is for

15    the benefit of your client?

16        MR. HIRSHON:  Correct.  And for the transaction,

17    because without it trading would have stopped.  There would be

18    no business to sell because there would have been no -- no

19    trades cleared today.  So it was to facilitate the transaction

20    as a friend to the transaction that this was done so that the

21    business continues to operate today.  Now, the arrangement is

22    that the whole six billion dollars of residential mortgages

23    will be there and subject to settlement.  But the anticipation

24    is that once all these claims settle, the trades that are from

25    Wednesday through Monday settle, there will not be a need for

53

1    all of that collateral.  So what the amendment to the APA says

2    is that the fifty percent will be returned, as long as it's

3    there.  If something really terrible happens in the world and

4    the settlements don't work and we have to use that collateral,

5    then there will be nothing to return.  But the anticipation is

6    that if the world remains somewhat stable that the fifty

7    percent that was now transferred to Barclays will be

8    transferred back to Lehman.  That is the expectation.

9              THE COURT:  All right.  I appreciate that

10   explanation.

11             One comment before you continue, Ms. Fife.  I'm just

12   once again hearing the Geiger counter.  And we are connected to

13   two extra courtrooms and I know that there are people

14   participating at various occasions by telephone through

15   CourtCall.  And I'm hearing increased static on the line.  So,

16   I'm just going to request everybody who is participating in

17   this hearing, whether by telephone or in person, who has an

18   electronic device to shut it off.  And if you're on the phone,

19   since you're just listening, please mute your phone.

20             MS. FIFE:  Thank you, Your Honor.  I'll continue

21   going through some of the changes, if that's okay.  There was a

22   provision in a deal originally which required the debtors to

23   transfer 700 million dollars in cash to Barclays.  And that is

24   no longer the case.  There's no cash that's being transferred

25   to Barclays.

54

1          In addition, there was a provision in the contract

2    where Barclays was going to purchase a company called Eagle

3    Energy Management and they are no longer going to purchase that

4    entity.

5          We clarified, because a number of creditors had some

6    concerns during the -- yesterday we had a meeting with the

7    creditors and they were asked some questions regarding

8    intercompany claims.  We made it very clear in this

9    clarification that we are not transferring any intercompany

10   payables or receivables.  Those remain with the particular

11   entities.

12         There was a reference in the agreement to a mortgage

13   that was on the 745 Seventh Avenue property.  And as it turned

14   out, Your Honor, there is no mortgage on that property.  So we

15   deleted that reference.  There was a 500 million dollar

16   promissory note made by 745 in favor of an affiliate which will

17   be repaid and extinguished.

18         Those are the major changes to the transaction.

19   There were some other clarifications that we made but I don't

20   consider them material, Your Honor.

21         THE COURT:  I still consider 500 million dollars

22   material, though.

23         MS. FIFE:  Yes.

24         THE COURT:  So, the money that's due an affiliate,

25   what affiliate is that?  And as a result of the payment, how

55

1    does that impact the overall realization to the estate?

2              MS. FIFE:  Umm --

3              THE COURT:  Maybe it doesn't.

4              MS. FIFE:  Yeah.  I don't think it does, Your Honor.

5    We still anticipate that the full purchase price will be paid

6    to 745 and then transferred up to the holding company and the

7    note will be extinguished -- I'm sorry?  Yeah.  It already has

8    been extinguished.

9              THE COURT:  Okay.

10             MS. FIFE:  Do you have any further questions, Your

11   Honor?

12             THE COURT:  I may have some as we proceed.  It's hard

13   for me to tell, based upon this helpful oral presentation, how

14   the deal has moved in terms of material changes and whether or

15   not those changes affect, in any way, the objectors and whether

16   or not these are changes that make the objectors happy or sad.

17             MS. FIFE:  Right.

18             THE COURT:  It's unclear to me at the moment because

19   I haven't had a chance to reflect on it and I don't know what

20   documents have been prepared that will clarify this.  But I'm

21   confident that as the evening progresses, I'll learn more.

22             MS. FIFE:  Yes.  We're hopeful that we'll have the

23   documents so that everyone can look at them.  And just one

24   other thing I wanted to point out to Your Honor, we are keeping

25   approximately twenty million dollars -- twenty billion dollars

56

1  of assets in LBI that are not being transferred.  So those

2  assets will have value and inure to the benefit to the SIPC

3  estate.  Okay?

4          THE COURT:  Thank you for that.

5          MS. FIFE:  I'm now going to turn it over to Mr.

6  Miller.

7          MR. MILLER:  Your Honor, I don't think it's necessary

8  to repeat that we did make another change in connection with

9  the time to object to cure amounts which was in --

10         THE COURT:  I remember you said that before.  One

11 thing I do want to take care of as a piece of unfinished

12 business from before the break.  And that's the creditors'

13 committee's position with regard to the Citibank comfort order.

14         MR. DESPINS:  Your Honor, there was a reason why

15 there was some -- we couldn't address it is 'cause our

16 conflicts counsel was going to look at those issues.  Susheel

17 Kirpalani is here and he will address that, Your Honor.

18         MR. KIRPALANI:  Good evening, Your Honor.  Susheel

19 Kirpalani of Quinn Emanuel for the creditors' committee.  Your

20 Honor, it's been represented to us that this is the same type

21 of relief that was requested with respect to the Chase motion.

22         THE COURT:  It was represented to me as well.

23         MR. KIRPALANI:  Yes, Your Honor.  It appears that the

24 language is the same.  The Chase motion -- or the Chase order

25 dealt with securities and cash.  And so the language is a

57

1  little bit different.  It talks about how the pre-petition

2  amounts are -- or the post-petition amounts are secured by as

3  opposed to have an allowable setoff right.  And while I agree

4  that's not a distinction with a difference, the one thing

5  that's not clear to me from the Chase motion is the mutuality

6  issue.  I apologize, but the timing is such that I've been

7  getting e-mails from my office.  If I could just ask the

8  debtors, was there no mutuality issue in the Chase motion and

9  the same issue here?  Meaning that in the Chase motion, was it

10  clear that the accounts and the obligations were both owed by

11  the same entity and the same thing is true here?  Or are we

12  relying on a contract exception to mutuality?

13          MR. KRASNOW:  Your Honor, both as to the JPMorgan

14  Chase agreements, so too as with respect to the Citibank

15  agreements, Holdings is the guarantor.  And it is Holdings'

16  collateral which was at issue in both instances.  So, other

17  than JPMorgan Chase dealing with securities and cash, although

18  as to the Holdings company, it was just cash, as I recall, with

19  respect to Citibank, it is just cash.  So in all material

20  respects, the orders are identical, Your Honor.

21          THE COURT:  I'm satisfied.  Are you?.

22          MR. KIRPALANI:  Yes, Your Honor.

23          THE COURT:  Good.

24          MR. KRASNOW:  Thank you.

25          MR. KIRPALANI:  Thank you, Your Honor.

58

1          THE COURT:  The order will be entered.

2          MR. KRASNOW:  Your Honor, may I be excused?  I think

3   that was my only --

4          THE COURT:  I'm sorry?

5          MR. KRASNOW:  I think that was my only business here.

6   Should I be excused?

7          THE COURT:  You mean, you don't want to stay?  Sure,

8   you may be excused.

9          MR. KRASNOW:  Thank you, Your Honor.

10          MR. MILLER:  Good evening, Your Honor.

11          THE COURT:  Good evening.

12          MR. MILLER:  You know, Your Honor, as I was sitting

13   here listening to what was going on, it occurred to me that the

14   way we do business today is so different from the way we used

15   to do business.

16          THE COURT:  It could be you.

17          MR. MILLER:  It could be me.  I had trouble getting

18   through security today.

19          THE COURT:  Do you have anything on in your pocket?

20          UNIDENTIFIED SPEAKER:  Are you radioactive?

21          MR. MILLER:  I think my flak jacket, Your Honor.  I

22   think that's it.  These decisions, Your Honor, are being made

23   almost in split second timing.  One has to think about the

24   decisions that were made in connection with the bailout at Bear

25   Stearns.  How much time was devoted to that?  The decision to

59

1    open access to the Primary Dealer Credit Facility at the

2    Federal Bank to support the banking industry, to commit the

3    federal government to what might be hundreds of billions of

4    dollars to save Fannie Mae and Freddie Mac and to have the

5    government advance eighty-five billion dollars to save AIG.

6    And now, Your Honor, within the space of maybe a few days for

7    the government to adopt a variation of the Resolution Trust

8    Company or the Reconstruction Finance Corporation to save the

9    economy and the welfare of the people who are dependent upon a

10   stable economy.

11          The tragedy of Lehman, Your Honor, is part and parcel

12   of the design to preserve and stabilize financial markets.

13   Access to federal funding to maintain the business of Lehman

14   Brothers incorporated the need to put Lehman Brothers Holdings

15   Inc. into Chapter 11 as part of a plan to move that sensitive

16   business of LBI to a qualified buyer as soon as possible.  A

17   buyer who meets the qualifications necessary to operate such a

18   business -- which is a universe, I might add, Your Honor, that

19   is only limited to a few possible candidates.  In making those

20   decisions that the government or parties involved wait for

21   ordered reports, appraisals, physical inventories, a review of

22   each and every document relating to the transaction, I think,

23   Your Honor, the answer is no.  They had to do what was

24   necessary to protect the greater good and not to lose the

25   forest for the trees.

60

1          Clearly, our economy was and is dependent upon those

2     decisions and sole decisions which would come in the future few

3     weeks.  The decisions affected and would affect millions of

4     people.  In the case of Lehman, it affects directly the 25,000

5     employees whose futures became extremely clouded because of the

6     events of last weekend.

7          The future of many of those people hangs in the

8     balance in connection with the transaction before the Court.

9     If it's not approved, no one can predict with any certainty the

10    consequences other than to note that there will be additional

11    turmoil and thousands of transactions will be suspended.  The

12    volatility and distress of the liquidation of collateral

13    positions will be unmatched in history.  The unemployment rolls

14    for the metropolitan area will increase dramatically, not to

15    mention the financial losses incurred by ordinary people who

16    would be prejudiced by their inability to reach their accounts.

17         Expedition, Your Honor, is mandatory.  Events move

18    with the velocity that almost defies comprehension.  In this

19    kind of world, form cannot be exalted over substance.  The

20    substance of this transaction is to continue a business for the

21    benefit of the general economy, the employees whose lives are

22    at stake and to fit a small piece into the jigsaw puzzle of

23    maintaining a stable economy.  We cannot take the risk of

24    rejecting this transaction because of ambiguities, the lack of

25    a piece of paper to support every element of the assets to be

61

1    transferred, the lack of definition as to particular items.  We

2    have to think and we have to act in the same manner that the

3    decisions were made by the government and others over the past

4    week to expend billions and billions of dollars to shore up the

5    economy.  Lehman is here because it was necessary to assure

6    LBI's access to the support of the Federal Reserve Bank and the

7    SEC support and to allow LBI access to the window to support

8    the transactions that were pending before there was a run on

9    the bank.  To dissipate that effort, by rejecting a transaction

10   that is intended to save jobs, protect customers and enable a

11   relatively smooth transition of the LBI business and bring

12   value to all involved, would be a miscarriage of justice and

13   detrimental to the national interest.

14           Since the hearing last Wednesday, and in the space of

15   roughly twenty-four hours, Your Honor, there have been a number

16   of significant events.  Yesterday, the Chicago Mercantile

17   Exchange unilaterally decided to close out all of Lehman's

18   positions on that exchange.  That closeout resulted in a loss

19   to Lehman of approximately 1.6 billion dollars.  Earlier this

20   afternoon, Your Honor, the Securities Investor Protection

21   Corporation initiated a proceeding under the Securities

22   Investor Protection Act in the United States District Court for

23   the Southern District of New York.

24           THE COURT:  Excuse me, Mr. Miller.  You're being

25   interrupted, as is this entire proceeding, by someone who's on

62

1    the telephone who's whispering into the courtroom.  As I said

2    at the outset, everybody who is listening on the phone, mute

3    your phone.  Everybody who has an electronic device, find it

4    and shut it off or throw it away.

5              MR. MILLER:  Your Honor, as I was saying, this

6    afternoon the Securities Investor Protection Corporation

7    initiated a proceeding under the Securities Investor Protection

8    Act in the United States District Court for the Southern

9    District of New York.  Mr. James Giddens, an attorney and

10   experienced SIPC trustee, has been appointed as trustee in the

11   SIPC proceeding.  LBI consented to the commencement of the SIPC

12   proceeding.  And during the past few days, Mr. Giddens was

13   provided with information concerning the state of affairs at

14   LBI and the need for expedition and support of the sale

15   transaction.  Mr. Giddens is a recognized SIPC trustee and a

16   man of great talent, Your Honor.  He recognized the

17   extraordinary nature of what is occurring and, unusual for a

18   SIPC proceeding, SIPC and the trustee have agreed that trading

19   in customer accounts --

20             THE COURT:  Sorry.  Technical difficulties.

21             MR. MILLER:  In that SIPC proceeding, Your Honor, the

22   trustee and SIPC have agreed that trading in customer accounts

23   may continue in the ordinary course of business rather than be

24   suspended as is usual in a SIPC proceeding.  SIPC and the

25   trustee have expended extraordinary efforts in an extraordinary

63

1  case to protect the public customers and ensure stability and

2  preservation of customer interests.  Their actions are to be

3  commended, Your Honor.  And I believe, Your Honor, that the

4  SIPC proceeding has been referred, I hope, to Your Honor.

5       THE COURT:  I've seen Judge Lynch's order.  I have a

6  certified copy of it and the order includes a decretal

7  paragraph removing those proceedings to this court.  I'm

8  satisfied that the seal is in fact genuine and I'm prepared to

9  proceed with full authority.

10      MR. MILLER:  And, Your Honor, Mr. Giddens is here

11  with Mr. Kevin (sic) Caputo from SIPC and the president of

12  SIPC, Your Honor, Mr. Stephen Harbeck who's sitting in the jury

13  box.

14      THE COURT:  Gentlemen, welcome.

15      MR. GIDDENS:  Thank you, Your Honor.

16      MR. MILLER:  Barclays, Your Honor, has extended the

17  sale to enable this extraordinary transaction and hopefully to

18  be consummated.  Yesterday, as Your Honor has heard, Barclays

19  basically stepped into the shoes of the Federal Reserve in

20  connection with the Primary Dealer Credit Facility as to the

21  45.5 billion dollars Lehman borrowed last Monday and received

22  the collateral that Lehman had posted in connection therewith.

23      Because of the circumstances this week, Your Honor,

24  the operations of LBI have resulted in approximately 300,000

25  sales, which is very significant.  In addition, Your Honor,

64

1    because of the administration proceeding in the United Kingdom

2    for LBIE and the freezing of all of the assets of LBI that were

3    in the possession of LBIE, which I believe, Your Honor, stands

4    for Lehman Brothers England, relating to repo financings, the

5    result is that we were unable -- or LBI is unable to deliver to

6    Barclays the assets that were originally intended under the

7    APA.    That's one of the reasons, Your Honor, for the amendments

8    that we heard about earlier today.

9         There are many moving parts in what we are trying to

10   do, many of which are beyond the control of Lehman or Barclays

11   as market forces operate to affect the value of the transaction

12   and the assets.    Enormous problems did arise in connection with

13   clearing transactions that have caused a number of

14   modifications to the transaction.    The necessity of assuring

15   DTC and other clearing institutions who will not expose

16   themselves to additional liability of some kind has been

17   enormously time consuming.

18        It's because of that, Your Honor, that we have heard

19   about these changes.    But if Your Honor will look at the basic

20   agreement, the amount of cash consideration will be relatively

21   the same except for the issues with respect to the value of the

22   real estate.    The 250 million dollars being paid for the

23   goodwill of LBI will go to LBI.    The real estate, 745 Seventh

24   Avenue, and the two data centers in New Jersey, that's with a

25   variation, Your Honor, and there's some negotiation to be done

65

1    with Barclays in connection with that.  And so there might be a

2    decrease of that one billion four fifty that we talked about on

3    Wednesday to something in the area of a billion three to a

4    billion three fifty, in that area.

5         THE COURT:  Let me break in with respect to that

6    issue --

7         MR. MILLER:  Sure.

8         THE COURT:  -- because it's something that concerns

9    me.  I read most of the objections --

10        MR. MILLER:  Yes, sir.

11        THE COURT:  -- and there were a lot of them.  And I

12   may have missed some that came in late.  But none of them

13   picked up the issue that concerned me.  As I view the

14   transaction, and I need your help in telling me if I'm seeing

15   it incorrectly, most of the value is attributed to the real

16   estate.  But there has been no traditional marketing effort for

17   the real estate.  Instead, the real estate represents a tie-in

18   to the sale of the broker dealer assets and the preservation of

19   markets and employment.  One of the things that I think you may

20   need to get over for purposes of today's evidentiary hearing,

21   in terms of the showing you need to make, is that the

22   transaction as it relates to the real estate in particular is

23   fair value.

24        I know nothing about this appraisal.  I don't know

25   who commissioned it.  I don't know who the appraiser is.  I

66

1    don't know if he or she is in court.  But I am, frankly,

2    concerned that we're all hearing -- and maybe others heard it

3    earlier but I'm hearing it only now -- that there is this

4    negative variance in the assumed value of the real estate.  And

5    I find that troublesome.

6              MR. MILLER:  Yes, sir.  We will try to deal with

7    that, Your Honor.  Now, Your Honor, in connection with going

8    forward in the transaction, I don't know what order Your Honor

9    wants to go in, whether you want to hear oral statements of

10   objections or should we move right to the evidentiary hearing?

11             THE COURT:  Well, one of the things I'd like to do,

12   and it's really to verify something, I don't recall seeing an

13   objection from the official creditors' committee.  And I don't

14   know, as a result of that, whether the committee supports the

15   transaction, has issues with respect to the transaction or has

16   given you notice of whatever objections they might have.  So it

17   seems to me that because of the expedited nature of today's

18   proceeding, we agreed Wednesday that written objections were

19   not necessary and, particularly, not necessary in the case of

20   the committee which had just been formed.  I'd like to know

21   what the status is as it relates to that important

22   constituency.

23             MR. MILLER:  Mr. Despins informed me, Your Honor,

24   before the hearing -- I'm losing my voice -- that the committee

25   will not object to the transaction but does not support it.  So

67

1    they're not affirmatively -- I think not affirmatively going to

2    stand up and say --

3              MR. DESPINS:  Why don't I address that, Your Honor?

4              MR. MILLER:  Sure.

5              THE COURT:  I think that would be helpful.

6              MR. MILLER:  Don't change your position.

7              MR. DESPINS:  Good afternoon, Your Honor.  Luc

8    Despins with Milbank Tweed, proposed counsel for the committee.

9    I'm here with my partners, Paul Aronson and Dennis Dunne.  The

10   headline is we are not objecting, Your Honor, but although

11   we'll have some minor comments to the form of order, which we

12   don't need to detain the court order at this point.  And the

13   reason we're not objecting is really based on the lack of a

14   viable alternative.  And, Your Honor, we're still a little bit

15   puzzled by the statement by Mr. Miller that we're not

16   affirmatively supporting.  And that's correct.  We're not

17   affirmatively supporting the transaction, Your Honor, because

18   there has been insufficient time for us to really do all the

19   due diligence that we would feel should be done to take that

20   next step of saying yes, this is the best deal and we're

21   supportive actively.  We've met with the debtor.  They've been

22   very cooperative.  I don't want to imply that they have not

23   been but we have not had time to test the assumptions and do

24   all the due diligence we would normally do.  So that is, Your

25   Honor, the distinction.

68

1    The second message, Your Honor, which is not directed

2    at Your Honor but really at the debtor and, generally, at also

3    regulators, is that the committee, although we're not objecting

4    to this transaction, we understand we're dealing with

5    extraordinary circumstances, as Your Honor has described.  The

6    committee fully expects that after this, we're going to go back

7    to what I would call --

8        THE COURT:  A more conventional model?

9        MR. DESPINS:  Yes.  Business as usual for Chapter 11,

10   if you will, Your Honor.  The committee feels very strongly and

11   wanted me to say that they recognize the extraordinary nature

12   of what's going on here but they feel their duties are to pre-

13   petition creditors, not to the market participants, not to the

14   economy at large or other participants in those markets.  And I

15   think that that's very important and it's very important to the

16   committee that I convey that message, again, not to Your Honor,

17   but really to the debtor and other parties in this case.  So

18   that is where we stand, Your Honor.

19       THE COURT:  I appreciate that.  And it lifts the fog

20   over at least that aspect of the case.  And I'm grateful for

21   the comment.  Has there been any --

22       MR. MILLER:  Your Honor, we --

23       THE COURT:  Has there been any resolution by

24   agreement of any of the other objections?  Or are they all live

25   at this point --

69

1        MR. MILLER:  As far as --

2        THE COURT:  -- except for the cure amounts perhaps?

3        MR. MILLER:  As far as I know, Your Honor, I have to

4    say, Your Honor, there wasn't really time.  They were cascading

5    through the electronic filing at such a rate, it was almost

6    impossible to keep up with them.

7        THE COURT:  I know.

8        MR. MILLER:  And so, with people dedicated to doing

9    the clarification of the APA -- of the asset purchase

10   agreement, there really wasn't an adequate amount of time.  As

11   Mr. Despins says, Your Honor, this is such an exceptional

12   circumstance, I would feel relieved to get back to the ordinary

13   Chapter 11 process.  It would be good for everybody's health.

14   But this is just an unusual situation.  And while I understand

15   the committee's views and the parochial views as to general

16   unsecured creditors, we are facing a bigger picture and a very

17   difficult severe picture for everybody involved.  And in

18   addition to the people in this courtroom, Your Honor, the

19   telephone is going -- just I can't tell you the rapidity of

20   calls from people, where's -- how can I get my securities?

21   This is my pension fund.  And so on.  This is a tragedy, Your

22   Honor.  And maybe we missed the RTC by a week.  That's the real

23   tragedy, Your Honor.

24       THE COURT:  That occurred to me as well.

25       MR. MILLER:  So I defer to Your Honor as to the

70

 1 | procedure for going forward. Should we have -- I would waive

 2 | opening statements at this point, Your Honor, since I've

 3 | already made mine.

 4 | THE COURT: Well, I propose the following. And I

 5 | think you've made your opening statement. I would propose the

 6 | following. I would like to hear -- I'm not sure what the right

 7 | time for that is -- from counsel for the SIPC trustee or the

 8 | SIPC trustee, beyond the fact that we've commenced a case, and

 9 | understand a little bit more about how that parallel proceeding

10 | that is happening as we speak, in conjunction with the sale

11 | process, truly does tie together with what we're now doing.

12 | And I think that it would be useful for me to have an

13 | evidentiary record that supports the sale motion. Once that

14 | record is made, either through proffer or live testimony, based

15 | upon the willingness of objectors to do it through proffer --

16 | and if they object, that's fine. We can have witnesses. I

17 | think it would be useful then to move on to the merits of the

18 | objections and deal with the legal issues that confront us.

19 | MR. MILLER: Yes, Your Honor. Mr. Caputo from SIPC

20 | is here with us today.

21 | THE COURT: Fine. Before he gets up, let me just

22 | confirm that what I have -- often what I say is acceptable to

23 | people when they hear it. But -- at least when I'm sitting

24 | here. But is what I have outlined consistent with your views?

25 | MR. MILLER: Whatever you say, Your Honor, is

96

1          Mr. McDade would testify that he first became
2     involved with this particular transaction Monday morning --
3     last Monday morning, I guess that was September 15, at 7 a.m.
4     in the morning.  Since that time, he has been in constant
5     contact with senior management and Lehman's outside advisors
6     regarding the status and progression of the negotiations.  The
7     negotiations leading up to the Barclays' transaction have been
8     at arm's length, objective, aggressively pursued by Barclays
9     and difficult, to say the least, Your Honor.
10         He would testify that since the collapse of Bear
11    Stearns and a subsequent takeover by JPMorgan, the Federal
12    Reserve Bank has made financing available to broker-dealers in
13    what is colloquially referred to as the window.
14         After the broker-dealer settles its trade at the
15    close of business, the clearing bank returns the collateral,
16    which Lehman then transfers to the Federal Reserve in exchange
17    for financing until the opening of business the next day.  That
18    process, as the liquidity of Lehman's deteriorated, no longer
19    became possible.
20         He would testify that in the climate of today's
21    market, a potential buyer of the broker-dealer business could
22    not operate without having access to the PDCF, the Primary
23    Dealer Credit Facility.  That facility is not available to all
24    broker-dealers.  Rather, it is available only to a limited
25    number of financial institutions who could meet the rules and

97

1    regulations of the Federal Reserve in respect thereof.  And

2    that, Your Honor, is probably less than a dozen institutions.

3            He would testify that during the period of stress and

4    strain, the week before this week, Lehman attempted to interest

5    the Bank of America in an acquisition of Lehman's, and that,

6    unfortunately, did not come to fruition.  At the same time, it

7    was negotiating an acquisition by Barclays of the Lehman

8    business.  And that negotiation led to what I might call an

9    agreement that was subject to the -- he would testify it was

10   subject to the regulators throughout the world, and,

11   unfortunately, it became clear that that agreement could not be

12   consummated.

13           And immediately after that announcement was made, he

14   would testify that he and other officers of Lehman were called

15   to the Federal Reserve Bank in New York to meet with the

16   Federal Reserve Bank representatives, the SEC, and the United

17   States Treasury to deal with the problem confronting Lehmans.

18   And those meetings, he would testify, took place, Your Honor,

19   Sunday morning and ran into the late evening of that day.  In

20   which it was made perfectly clear that it was necessary for the

21   protection of the public and the financial markets in an effort

22   to placate the public markets, or at least stabilize the

23   situation, that it is in the best interest of all parties that

24   Lehman Brothers Holdings Inc. commence a Chapter 11 proceeding.

25   And that it maintain, for LBI, access to the so-called window.

98

1    And it was in that context, he would testify, that LBI was

2    enabled to go forward, at least for the past week.

3           He would also testify, Your Honor, Barclays, unlike

4    some of the larger and healthier financial institutions that

5    might qualify for access to the PDCF, does not have a North

6    American broker-dealer operation of this scale.  Therefore, the

7    sale is a national extension of Barclays' business.  Barclays

8    would have access to the PDCF and also will assume Lehman's

9    broad spectrum broker-dealer license.

10          Not only is this sale a good match economically but

11   it saves the jobs of thousands of employees and avoids losses

12   that could total in the hundreds of billions of dollars.

13          He would further testify, Your Honor, that he is

14   familiar with the asset purchase agreement, that he

15   participated in all of the negotiations involved in the asset

16   purchase agreement.  And that those negotiations from time to

17   time broke out into different teams, but he was the team leader

18   for Lehman.

19          He would testify that the asset purchase agreement

20   provides for the sale of the North American broker-dealer

21   business of LBI, which includes banking and capital markets

22   business in addition to numerous other divisions.

23          The Seventh Avenue headquarters is being transferred

24   to Barclays, in addition to the various offices located

25   throughout the United States, that are integral to the broker-

99

1    dealer business.  The value of the real estate being

2    transferred to  Barclays pursuant to the transaction is subject

3    to negotiation with respect of the appraised values.  That the

4    building on Seventh Avenue is subject to an appraisal which has

5    been provided to Barclays.  And that appraisal is in the area

6    of 900 million dollars to 100 million dollars.  And that the

7    appraisal was done by CB Richard Ellis.  And it was prepared

8    for the other debtor in this case, LB 745 LLC and Barclays

9    Capital Inc.  And it is a voluminous appraisal of the

10   properties which we will offer into evidence at the appropriate

11   time, Your Honor.

12           And that he would also testify that an appraisal of

13   the two data centers was also directed and that CB Richard

14   Ellis was also engaged to undertake that appraisal.  And that

15   appraisal has established the value for the purpose of the

16   negotiations, Your Honor.  And as pointed out earlier in the

17   proceeding, those values have come in at slightly less -- I

18   shouldn't say slightly, less than was originally projected.

19           So that was a very negotiated term, and the reason

20   for the transfer of these properties, Your Honor, is that they

21   are integral to the smooth transition of the businesses.

22           Barclays will also assume exposure for the employees

23   that accept offers of employment, which is estimated to have a

24   value of approximately -- an exposure of approximately two

25   billion dollars.

100

1      Barclays is also assuming the cure amounts relating

2   to contracts and leases that will be assumed pursuant to the

3   asset purchase agreement.  And that has a potential exposure,

4   Your Honor, of 1.5 billion dollars that he would testify to.

5      Barclays is also paying the real estate transfer

6   taxes, which are estimated to be approximately thirty million

7   dollars.

8      Mr. McDade would testify that the financial community

9   has known that Lehman has been under stress for some time.

10  Certainly, going back to the time that Bear Sterns was bailed

11  out.  Potential purchasers have known that Lehman has been

12  searching for a buyer since well before the Chapter 11 case

13  commenced.  And that those ethics, those strategic alternatives

14  that were being pursued involved parts of Lehman as well as the

15  whole of Lehman.  And that the notoriety attached to that did

16  not produce any interested parties other than the ones I

17  mentioned -- he mentioned.

18      During the meeting at the Federal Reserve Bank last

19  week, Bank of America, JPMorgan, Merrill Lynch and Barclays

20  were all present, showing interest in the broker-dealer assets.

21  It was clear to each party that if Lehman was unable to reach a

22  deal it would most likely have to commence cases under Chapter

23  11 of the Bankruptcy Code.  That would not only have an adverse

24  impact upon their businesses but also upon the international

25  markets.

1        He would testify that since the commencement of the

2    Chapter 11 case, Lehman's senior management and its advisors

3    have not undertaken an intensive marketing of the business and

4    the assets to be sold.  But instead focused on reaching an

5    agreement with the most eligible interested buyer for these

6    assets.

7        That notwithstanding the lack of a specific program

8    for marketing, the sale of Lehman's broker-dealer business has

9    been known worldwide.  And, yet, he would say nobody has

10    expressed an interest to step into the shoes of -- excuse me,

11    step into the shoes of Barclays, Your Honor.

12        Lehman has not received any other interest since the

13    commencement of the Chapter 11 cases.  If Lehman was approached

14    by another potential buyer that he would consider the offer,

15    provided that the company had sufficient liquidity to operate

16    the business without jeopardizing customer accounts.  That has

17    not happened, Your Honor.  So it is almost academic.

18        Mr. McDade would testify, Your Honor, that if the

19    sale with Barclays is consummated, customer accounts would

20    continue on a seamless, uninterrupted basis and trading would

21    continue on a normal basis, thereby maintaining the billions of

22    dollars in value.

23        At the same time, the jobs of thousands of employees

24    would be saved and will be entitled to substantial benefits

25    from Barclays in the form of compensation, bonuses and

102

1    severance payments that are based upon the employee's prior

2    performance while with Lehman.

3             He would testify to the consummation of the

4    transactions makes available a greater pool of assets to the

5    debtors' estates, because the exposure under Lehman Holdings

6    guarantee to the broker-dealer will be substantially less.  If

7    the transaction does not close today or over this weekend, Your

8    Honor, Mr. McDade would testify that the effect on the broker-

9    dealers business and on Lehman Holdings would be devastating.

10   First, the failure to consummate the transaction would cause

11   default under the DIP facility and require Lehman Holdings to

12   repay the outstanding amounts under that facility.

13            He would testify that the liabilities in the hundreds

14   of billions of dollars would be triggered against Lehman

15   Holdings which would in turn deplete the property available to

16   distribution to creditors.  It would adversely affect the

17   debtors other nondebtor subsidiaries to the extent they have

18   any value.

19            He would testify, Your Honor, that if the transaction

20   is not consummated, it will result in the largest failure of a

21   broker-dealer in the history of the United States and will

22   cripple the credit markets for some time to come.

23            He would further testify, Your Honor, that the shock

24   of this transaction not being consummated in the public markets

25   could be immeasurable and could ignite a panic in the financial

106

1   than that today?

2   A.   Materially less -- again, I have not seen the final

3   documents in terms of the appraisal.

4   Q.   Okay.  With respect to the appraisals of those two

5   buildings in New Jersey, again, has that appraised value,

6   although it's an unknown to you, do you know whether that

7   appraised value has been agreed upon between Barclays and --

8   A.   No, it has not, to be negotiated.

9   Q.   Okay.  Is it your understanding, sir, that with respect to

10  the transfer of these real estate assets to Barclays that there

11  is any broker fee involved?

12  A.   My understanding is from the negotiation, again, that a

13  suggested broker fee was part of the negotiation to take place,

14  yes.

15  Q.   And do you know what the magnitude of that suggested

16  broker fee is?

17  A.   I do not.

18  Q.   Okay.  Do you have any approximate idea of what it might

19  be?  Are we talking tens of millions, fifty million or do we

20  not know?

21  A.   I do not know.

22  Q.   Okay.  Is it your understanding, sir, that there actually

23  will be a broker fee payable to a broker as a result of the

24  transfer of these assets?

25  A.   There is not an individual broker involved.

107

1    Q.    So there is no actual broker fee that will be paid, but

2    value will be deducted from the appraised value for the benefit

3    of Barclays, is that correct?

4    A.    That's correct.

5    Q.    Sir, just to switch gears and to talk about the businesses

6    that are being sold from LBI to Barclays, are there any

7    businesses remaining at LBI that are not being transferred to

8    Barclays?

9    A.    No.

10   Q.    And with respect to the contracts that are associated with

11   each of the various businesses that are being acquired by

12   Barclays, do each of those contracts also reside at LBI?

13   A.    The contracts with respect to the underlying products?

14   Q.    Let's start more broadly, the contracts with respect to

15   the running of each of those businesses, generally?

16   A.    I'm not quite certain I understand the specifics of the

17   question.  The assets of those business units, the people of

18   the business units will be moving to Barclays.  The individual

19   businesses have different assets and securities and

20   derivatives, obviously, that they're responsible for trading.

21   The contracts, themselves, in terms of the business units, I'm

22   not certain I understand the question.

23   Q.    Okay.  Are the trading contracts with respect to the

24   various products that each of those businesses operates in, are

25   those contracts going to the purchaser?

VERITEXT REPORTING COMPANY

212-267-6868                                                    516-608-2400

108

1   A.   The specific question has yet to be determined, given the

2   dynamic nature and speed of which we're operating.  Each of the

3   individual businesses will enter into a series of very quick

4   next steps to determine how we actually transact in each of

5   those business units going forward.

6   Q.   And who will determine which of those contracts go to the

7   purchaser and which of those contracts stay behind?  Will that

8   be something in Barclays' discretion, or is that Lehman's

9   decision?

10   A.   That will be a mutual process.

11   Q.   And is it your understanding, sir, that all of the

12   contracts that are to be negotiated, in terms of whether they

13   stay or whether they go, are contracts that reside at LBI?  Or

14   are any of those contracts that reside at other Lehman

15   entities?

16   A.   LBI.

17   Q.   And, sir, can you also please confirm if it is your

18   understanding that the purchased assets do not include

19   Neuberger Berman or any of its assets?

20   A.   Yes, I affirm that.

21   Q.   Okay.  Sir, are you aware of whether -- do you know what a

22   closing balance sheet is?

23   A.   Yes, I do.

24   Q.   Okay.  And do you know whether a closing balance sheet was

25   prepared in connection with this transaction?

1   A.   I am not aware of that.

2   Q.   Okay.  Assuming that one was not, do you have any

3   understanding of why one was not?

4   A.   The speed of which we're operating.

5   Q.   Well, in the absence of a closing balance sheet having

6   been prepared, can you please describe for the Court how it is

7   that the debtor determined that fair value was being realized

8   for the sale of these assets?

9   A.   For the assets?

10   Q.   Yes.

11   A.   The individual assets on the balance sheet, the trading

12   inventory was bottoms up, meaning individual line item detail

13   processed through all of our individual risk business units in

14   coordination with the normal finance professionals who are

15   incorporated into the valuation process.

16   Q.   Did the debtors have any form of valuations of any of the

17   assets that are being transferred?

18   A.   Sorry?

19   Q.   Does Lehman have any valuations -- internal valuations of

20   any of the assets that are being transferred to Barclays?

21   A.   Absolutely.  There are many complex securities involved.

22   Many different models that we use to evaluate those securities.

23   Q.   And so, sir, is it your testimony then that a valuation

24   was conducted within Lehman of all of the assets that are being

25   transferred to Barclays?  When was that conducted?

110

1    A.   Portfolio moved during the week, but that was conducted

2    all last evening.  All through and up to the arrangement -- the

3    agreement today.

4    Q.   And, sir, was it the case that at the time of the meeting

5    that took place with creditors this past Wednesday, LBI had

6    approximately --

7              MR. MILLER:  Excuse me, Your Honor, Thursday.

8              MR. QURESHI:  I apologize, it was Thursday.

9              THE COURT:  I'll take that as an objection to the

10   question, and it's sustained.

11   Q.   Am I correct, sir, in understanding that at that time

12   creditors were told that LBI had approximately 1.3 billion

13   dollars in cash?

14   A.   That's correct.

15   Q.   Okay.  And at that time, the deal was that 700 million of

16   those funds would go to Barclays, and the remaining 600 million

17   would stay at LBI?

18   A.   That's correct.

19   Q.   And what is the cash balance at LBI today?

20   A.   It's virtually nil.

21   Q.   Where did it go?

22   A.   To the CME.  Liquidation of the CME trades.  And to all

23   the other clearing banks involved in processing of the

24   transactions this week.

25   Q.   Sir, since the time that the agreement was first entered

111

1    into with Barclays early in the week, are you aware of any

2    affirmative efforts of having been undertaken on behalf of

3    Lehman to shop these assets to any other potential purchasers?

4    A.   The assets, specifically, the inventory assets?

5    Q.   The assets being acquired by Barclays or any subset of

6    those?

7    A.   No.  Nor -- no.

8         MR. QURESHI:  Your Honor, may I have one moment,

9    please?

10        THE COURT:  Sure.

11   Q.   Sir, are you familiar, generally, with the terms of the

12   DIP financing agreement?

13   A.   Generally.

14   Q.   Okay.  Is it your understanding that if the transaction

15   with Barclays does not close, that that would constitute a

16   default under the DIP?

17   A.   Thirty days to repay.  It's thirty days to repay.

18   Q.   So it would trigger a thirty-day repayment of it?

19   A.   Yes.

20   Q.   Okay.

21        MR. QURESHI:  Thank you, Your Honor, that's all I

22   have.

23        THE COURT:  Is there anyone else who wishes to

24   examine the witness?

25        MR. ROSNER:  Your Honor, if you can see me, I'm right

112

1    here.  I'd like to --

2             THE COURT:  Well, Mr. Bienenstock is ahead of you.

3    So you're going to have to move to a position where you can

4    both be seen and heard.

5             Mr. Bienenstock, it's your turn.

6             MR. BIENENSTOCK:  Thank you, Your Honor.

7    CROSS-EXAMINATION

8    BY MR. BIENENSTOCK:

9    Q.   Good evening, Mr. McDade.

10   A.   Good evening.

11   Q.   My name is Martin Bienenstock, representing the Walt

12   Disney Company.  Yesterday, I understand that you were at the

13   information session at Weil Gotshal?

14   A.   That's correct.

15   Q.   And I want to confirm some information given there.

16   Pursuant to the proposed asset purchase agreement here, the

17   businesses that are being -- the Lehman businesses being

18   transferred to Barclays are as follows:  Tell me if I'm

19   incorrect, I'll read one at a time.  Investment Banking?

20   A.   Correct.

21   Q.   Fixed Income?

22   A.   Correct.

23   Q.   North American Operations?

24   A.   Correct.

25   Q.   Credit?

113

```
 1    A.    Correct.

 2    Q.    Lending?

 3    A.    Correct.

 4    Q.    Municipal Bonds?

 5    A.    Yes.

 6    Q.    Commodities?

 7    A.    Correct.

 8    Q.    High Yield?

 9    A.    Yes.

10    Q.    Derivatives?

11    A.    Yes.

12    Q.    Government Bonds?

13    A.    Yes.

14    Q.    Interest rates derivatives?

15    A.    Yes.

16    Q.    High grade credit?

17    A.    Yes.

18    Q.    Cash and credit derivatives?

19    A.    Yes.

20    Q.    Money market?

21    A.    Yes.

22    Q.    Commercial paper?

23    A.    That's the same.

24    Q.    Commercial lending?

25    A.    Commercial lending, if you mean the leverage finance
```

124

1    order to make an assessment as to whether to go forward with a

2    transaction?

3    A.    I'm not specifically aware of anything that they asked for

4    that we could not provide.

5    Q.    Are you aware of whether they asked for or were given

6    information regarding intercompany transactions?

7    A.    I'm not aware specifically.

8    Q.    Does that include intercompany payables?

9    A.    Again, not aware specifically.

10    Q.    And intercompany receivables as well?

11    A.    Yes, sir.

12    Q.    Okay.  Are you aware today if there's an intercompany

13    payable to what I'll call LB -- do you know what I mean by

14    LBIE?

15    A.    Yes.

16    Q.    Are you aware today whether there's an intercompany

17    payable to LBIE by either of the debtor entities?

18    A.    Yes.

19    Q.    How much is it?

20    A.    Approximately five billion.

21    Q.    And where did that one arise?

22    A.    I'm sorry?

23    Q.    Where did that -- I'm sorry.  Where did that intercompany

24    payable arise?  From where did that intercompany payable arise?

25    A.    I think it's a series of transactions.  I'm not aware of

125

1    the specifics.

2    Q.   Are you aware of any of the specifics?

3    A.   No.

4    Q.   Not a single one?

5    A.   With respect to the intercompany?

6    Q.   With respect to the intercompany payable from these

7    debtors to LBIE?

8    A.   I know the notional amount.

9    Q.   Okay.

10   A.   Five billion.

11   Q.   Do you know if money was transferred from LBIE to the

12   debtor entities on Friday, the last week?

13   A.   I'm not involved in the day-to-day process of financing

14   the firm.

15   Q.   But my question was whether you were aware of that?

16   A.   No, I'm not specifically aware.

17   Q.   Have you read anything about that?

18   A.   Absolutely.

19   Q.   You have read something about that?

20   A.   Have I read it in the media, is that what you're referring

21   to?

22   Q.   Yes.

23   A.   Yes.

24   Q.   And you did testify that you were at the meeting yesterday

25   at Weil Gotshal?

126

1    A.    I was at an afternoon session.  My understanding is there

2    was more than one session.

3    Q.    And these questions were asked as to the intercompany

4    payable, correct?

5    A.    Uh-huh.

6    Q.    And do you recall whether --

7              THE COURT:  You have to answer with more than a nod

8    of the head.  Thanks.

9              THE WITNESS:  Sorry.

10   Q.    And do you recall whether this information that I'm asking

11   now was given yesterday at the information center?

12   A.    It was not given yesterday.

13   Q.    Which debtor entity owes that money to LBIE?

14   A.    LBI is a payable to LBIE.

15   Q.    And what about Holdings?

16   A.    LBIE is a payable to LB Holdings.

17   Q.    And how much is that?

18   A.    Eight billion.

19   Q.    And do you know what that's derived from?

20   A.    No.

21   Q.    Did you do an audit of the -- I'm sorry.  Has an audit

22   been accomplished of the securities that are to be transferred

23   to Barclays under the proposed transactions?

24   A.    If you mean an audit by external valuation process?

25   Q.    By identification of the securities?

VERITEXT REPORTING COMPANY

127

1   A.   Absolutely, line by line.

2   Q.   I think during your proffer it was stated that you are

3   familiar with the contract.  I assume that means you don't know

4   every line but you are generally familiar with the contract

5   that's before the Court today, is that a fair statement?

6   A.   Yes.

7   Q.   Are you aware of the closing conditions under the

8   contract?

9   A.   I believe so.

10   Q.   Are they all satisfied as of today, subject to the entry

11   of an order by this Court?

12   A.   With respect to all those that I have knowledge of, yes.

13   Q.   And I think there was a question, but I just want to be

14   clear.  There is a closing condition regarding eight employees

15   signing up agreements, is that correct?

16   A.   That is correct.

17   Q.   And I might have missed this before, and have all of those

18   eight employees been signed up?

19   A.   We expect no issues with respect to the employment

20   services needs to close.

21   Q.   Okay.  So as of sitting here right now, that condition has

22   not been met?

23   A.   We expect no issues.

24   Q.   For the record, it's a yes or no and I just want to make

25   it clear on the record?

VERITEXT REPORTING COMPANY

128

1    A.   I do not have the specific information with respect to

2    either the exact number of those participants or with respect

3    to Barclays' view as to whether that would be waived if,

4    indeed, that became an issue.

5              MR. ROSNER:   Okay.   I have nothing further, Your

6    Honor.   Thank you.

7              THE COURT:   Okay, thank you.   Is there anyone else

8    that wishes to examine Mr. McDade?   Come forward.   Please state

9    your name and identity of the client that you're here to

10   represent.

11             MR. BYRNE:   Yes, Your Honor, good afternoon.   Larry

12   Byrne from Linklaters.   Linklaters, Your Honor, represents the

13   administrators who have been appointed to supervise the

14   insolvency of four Lehman Brothers entities in the U.K. and in

15   Europe.

16             THE COURT:   These are the Pricewaterhouse people?

17             MR. BYRNE:   Yes, Your Honor.

18             THE COURT:   Okay.

19             MR. BYRNE:   So we act for Pricewaterhouse who are now

20   the insolvency administrators in the U.K. for these four Lehman

21   Brothers entities who are affiliates of subsidiaries of the

22   debtors.

23             THE COURT:   Okay.   You may proceed with your

24   questions.

25   CROSS-EXAMINATION

129

1    BY MR. BYRNE:

2    Q.   Good evening, Mr. McDade.  The hour's late, so I have just

3    a few questions for you following up on the previous questions.

4         You referred to an intercompany payable in the amount of

5    five billion and an intercompany payable in the amount of eight

6    billion.  Do you know when those payables first arose or came

7    into existence?

8    A.   No, I do not.

9    Q.   When did you first become aware of them?

10        MR. MILLER:  Excuse me, Your Honor.  I'm not quite

11   sure I understand how that relates to whether the sale should

12   be approved or not.  It seems to be the administrator in London

13   is trying to find out information concerning whether it has a

14   claim against this estate, what's going to happen to that

15   claim.  It doesn't go to this transaction.

16        THE COURT:  Well, let me observe that I have read a

17   number of objections that have raised questions concerning

18   whether this transaction, if approved, would affect the ability

19   of parties-in-interest, including the Pricewaterhouse foreign

20   representatives, I'll call them for these purposes, in being

21   able to pursue a claim for recovery in this estate of the eight

22   billion dollars that, according to the objection that I read,

23   was allegedly swept from LBIE on Friday, a week ago, to the

24   accounts of LBH.  And that didn't come back to LBIE on Monday

25   presumably as a consequence of the bankruptcy filing.  And so I

130

1   don't know that this goes to the reasonableness of the debtors'

2   business judgment in proposing that this transaction be

3   approved this evening, as much as it goes to the legal affect

4   of such approval in light of the ambiguities -- alleged

5   ambiguities and vagueness -- the alleged vagueness of the asset

6   purchase agreement and the various documents that have been

7   offered up to parties-in-interest.

8           So with that, I overrule your comment and will permit

9   the examination.

10          MR. BYRNE:   Thank you, Your Honor.   May I proceed?

11          THE COURT:   Yes.

12  BY MR. BYRNE:

13  Q.   When did you first become aware of these two intercompany

14  payables, the eight billion, the five billion, apart from press

15  reports?

16  A.   I followed up post the session that we had yesterday to

17  make sure I had the information.

18  Q.   And what information did you learn as a result of that

19  follow-up?

20  A.   The previous statements that I made with respect to the

21  nominal amounts.

22  Q.   I'm not sure I understand what you're saying.

23  A.   LBI has a payable to LBIE.   LBIE has a payable to LBH.

24  Those are the figures and data that I researched.

25  Q.   And following up to confirm those figures and data, what

131

1    is it that you looked at?

2    A.    I looked at a summary finance document from one of our

3    senior finance officers.

4    Q.    That's an internal document at Lehman?

5    A.    That's correct.

6    Q.    And who is the senior finance officer that had prepared

7    that?

8    A.    I don't know who prepared the document.   The interaction I

9    had was with a gentleman named Chris O'Meara.

10   Q.    I'm sorry, I couldn't hear you.

11   A.    Chris O'Meara.

12            MR. BYRNE:   Your Honor, I don't think I have any

13   further questions at this time.   I would like an opportunity

14   either now or later just to clarify a couple of things you said

15   with respect to the PWC administrator's position.   Because

16   they're actually not objecting to this transaction.

17            THE COURT:   Oh, great.   I assumed because you were

18   asking questions that you were getting in the way of it.

19            MR. BYRNE:   No, not at all, Your Honor, we just

20   wanted clarification based on the questions that were asked

21   earlier.   You may not have seen, because it did not get

22   electronically filed until shortly before the hearing, what the

23   administrators have filed, which is a response to the proposed

24   settlement, not an objection.   And we say in the first line of

25   that response that the administrators have no objections to the

132

1    approval of this transaction this evening.

2            There are some clarifications we're going to seek,

3    but we can do that later in the proceeding with the Court's

4    permission.

5            THE COURT:  Fine.  The only thing I read was the

6    declaration that was filed.  In order to triage the preparation

7    for this hearing, I read things that I thought would be

8    helpful.

9            MR. BYRNE:  Right.  We have a declaration from the

10   PWC administrator --

11           THE COURT:  That's what I read.

12           MR. BYRNE:  Okay.  I think the transaction details

13   you're describing might have been in someone else's objection,

14   not in ours.

15           THE COURT:  If I misstated the facts it's because I

16   didn't understand --

17           MR. BYRNE:  Understood, Your Honor.  I have nothing

18   further at this time, Your Honor.

19           THE COURT:  Okay.  Is there anyone else that would --

20   Ms. Granfield?

21           MS. GRANFIELD:  Good evening, Your Honor.  Lindsay

22   Granfield, Cleary Gottlieb Steen & Hamilton, LLP on behalf of

23   Barclays Capital.

24           Odd procedural posture.  I think that there's going

25   to be very able -- probably not too long an able redirect by

133

1    the debtor. And that might make it unnecessary for me to ask

2    any questions. And, in fact, if there was a short recess, I

3    might be able to confer with Mr. Miller on what he planned to

4    cover and not make it necessary for me to ask any questions.

5         THE COURT: Well, before taking that welcomed recess,

6    because I think people are probably ready for one, let me just

7    confirm that there is no one else, other than yourself, at this

8    moment, has an interest in asking any further questions of Mr.

9    McDade?

10        MS. GRANFIELD: Very good, Your Honor.

11        THE COURT: I see no one moving in the direction of

12   the podium, and I see no one indicating an interest in asking

13   questions. So I'm going to assume that you are the last

14   possible questioner on cross. And since its now about ten

15   minutes to 8 in the evening and it is warm, and many people are

16   standing, I'm going to propose that we take a break until 8:15.

17   And we'll resume at that time.

18        MS. GRANFIELD: Thank you, Your Honor.

19        (Recess from 7:48 p.m. until 8:45 p.m.)

20        THE COURT: Be seated, please.

21        MR. MILLER: Once again, good evening, Your Honor.

22   Harvey Miller for the debtors.

23        Your Honor, in the interest of expedition, I would

24   offer into evidence the asset purchase agreement among Lehman

25   Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC and

134

1    Barclays Capital, Inc. dated as of September 16, 2008 and the

2    first amendment to the asset purchase agreement among the same

3    parties, Your Honor, dated September 19, 2008.

4            THE COURT:  Is there any objection to the admission

5    of the evidence of those two documents?

6            UNIDENTIFIED SPEAKER:  Yeah.  No, I haven't seen it.

7            UNIDENTIFIED SPEAKER:  We haven't been given a copy

8    even.

9            UNIDENTIFIED SPEAKER:  Same, Your Honor.

10           UNIDENTIFIED SPEAKER:  Your Honor, we would have the

11   additional objection of it's unclear whether this even

12   represents the final asset purchase agreement or whether terms

13   are made to be negotiated.

14           THE COURT:  I don't think it needs to represent the

15   final.  It's a document that -- assuming the first one is a

16   document everybody's seen, the second one is the only document

17   that may be subject to reasonable objection.  And whether or

18   not it is, in fact, the document that would govern the closing

19   is irrelevant to its admissibility.  That objection is

20   overruled.

21           As far as the amendment, I'm certainly interested in

22   seeing it.  I'm sure others are as well.  How many copies are

23   there?  Or are there copies?

24           MR. MILLER:  As I said last time, Your Honor, modern

25   technology is not what it's all cracked up to be.  Your Honor,

135

1   I have --

2        THE COURT:  I would also note that copies of a

3   document, while a courtesy of counsel, are not a condition to

4   admissibility.  And if an offer of proof is made as to the

5   authenticity of the document, the fact that it is what it

6   purports to be, which is the second amendment, I'm prepared to

7   admit it notwithstanding the fact that copies are not

8   available, recognizing that there is an objection that is a

9   reasonable one that all other parties to the transaction need

10   to see a copy at some point so they have reasonable notice.

11        MR. MILLER:  Your Honor, I would make an offer of

12   proof that this is a document.  This represents the asset

13   purchase agreement that's dated as of September 16, 2008, which

14   was attached or filed at 6 a.m., or whatever it was, in the

15   morning, a couple of days ago with a lot of interlineations.

16   This is a clean draft -- a clean copy, Your Honor.  This is the

17   execution -- a copy of the execution copy.

18        THE COURT:  It is the hand-marked copy typed so that

19   the edits that we saw in handwriting are now incorporated in

20   full font?

21        MR. MILLER:  That is correct, Your Honor.

22        THE COURT:  Okay.

23        MR. MILLER:  I would represent, Your Honor, that the

24   first amendment to the asset purchase agreement, which consists

25   of exactly four pages, dated September 19 -- and this is a copy

136

1    of the execution copy of that document, Your Honor, which

2    clarifies certain provisions in the asset purchase agreement,

3    and, Your Honor, is part of -- an integral part of the

4    agreement and is signed on behalf of Lehman Brothers Holdings,

5    Lehman Brothers Inc., LB 745 and Barclays Capital.

6            THE COURT:  May I simply ask if the witness who's on

7    the witness stand is familiar with that document or had

8    anything to do with its execution, it might be in a position to

9    further authenticate it?

10           MR. MILLER:  May I approach, Your Honor?

11           THE COURT:  Yes.

12   REDIRECT EXAMINATION

13   BY MR. MILLER:

14   Q.   Mr. McDade, are you familiar with the fact that a first

15   amendment was made to the asset purchase agreement?

16   A.   Yes, I am.

17   Q.   The document which I have shown you, have you seen that

18   document before?

19   A.   Yes, I have.

20   Q.   Are you familiar with that document?

21   A.   Yes, I am.

22   Q.   Is that the first amendment to the asset purchase

23   agreement?

24   A.   Yes, it is.

25   Q.   That was executed on behalf of the debtors?

168

1          Since Wednesday, when the debtors were freed to go

2     out and shop these particular assets -- you've heard Mr.

3     Ridings testify that he took no affirmative steps to do so.

4          We believe this was a flawed sale process with

5     respect to these assets, a process that appears only to benefit

6     Barclays and the federal government but not the creditors of

7     this estate.

8          Perhaps as importantly, Your Honor, as I'm sure the

9     Court is aware, the economic landscape seems to have changed

10    over the last two days.  Yesterday, the U.S. Treasury and the

11    Federal Reserve Board have begun discussions about a potential

12    bailout of financial institutions by the government agreeing to

13    buy distressed mortgages and distressed real estate assets of

14    these financial institutions.  Just the hint of that potential

15    bailout has sent the equity of those financial institutions who

16    would be the beneficiary of that bailout soaring.

17         And, yet, the debtors and the Fed seem content or

18    determined that nothing get in the way of this transaction.

19    There is no attempt to determine, based upon the latest events,

20    whether Lehman can be a beneficiary of that potential bailout

21    or whether, in fact, as a result of that potential bailout, the

22    assets to be purchased under this transaction haven't increased

23    significantly in value.

24         And, yet, there has been no renegotiation of a sales

25    price.  In fact, there has been a renegotiation of the sales

VERITEXT REPORTING COMPANY

169

1   price.  It's been a downward renegotiation, as Mr. Ridings

2   testified with respect to the real estate assets.

3           There is no final form of agreement to be approved by

4   this Court.  We had a forty-minute session with counsel for the

5   debtors where they outlined to the parties in the courtroom

6   suggested changes.  There's no writing.  There's no opportunity

7   for parties-in-interest to review that.  The first amendment,

8   frankly, was just handed out, and that's been around for a

9   couple of days, I'm told.

10          And, yet -- I'm sorry, since this morning?

11  Apparently they don't know how long it's been around.

12          THE COURT:  Mr. Golden, given the pace of this

13  transaction, days merge for all of us and I don't think that's

14  a fair comment.

15          MR. GOLDEN:  I'm sorry, Your Honor.  You know,

16  everybody's frustrated:  the parties, the debtors, the

17  governmental agencies, but so, too, are the creditors.

18          Going forward with this transaction this evening will

19  not allow anybody to assess whether this proposed bailout

20  legislation or any other restructuring alternatives,

21  restructuring alternatives that are very familiar to this

22  Court, such as a debt-for-equity swap of the 150 billion

23  dollars of securities at the holding company, could be a better

24  alternative for the creditors of the holding company.

25          There has simply been no credible evidence adduced at

170

1    this hearing that the price that Barclays is paying for these

2    assets represents fair value.  The appraisals are not in

3    evidence.  All you've heard is Mr. Miller discuss the contents

4    of the appraisals.  There's no other testimony or evidence that

5    suggests the other assets being purchased by Barclays

6    represents fair value or an attempt to maximize value for

7    creditors.

8              I simply think, Your Honor, for whatever reason, the

9    debtor has failed to meet its burden with respect to the

10   appropriateness of the sale.  We have heard the dire

11   consequences as to what will occur or may occur if this

12   transaction is not approved, but we have not heard credible,

13   cogent testimony as to whether the proposed purchase price

14   represents a fair value for these assets.

15             THE COURT:  Mr. Golden, in effect, you're asking me

16   to weigh your speculation against their speculation.  What

17   you're asking me to do is to weigh the fact that the markets

18   have turned because of the RTC-type announcement made last

19   night against the palpable, potential, devastating damage to

20   the markets to be caused if this transaction is not approved.

21   You've offered no affirmative evidence.  Why should I give any

22   weight whatsoever to your argument?

23             MR. GOLDEN:  Your Honor, I'm not asking you to allow

24   me to superimpose my business judgment versus the debtors'

25   business judgment.  But it is not my burden, it is not the

171

1   burden of the ad hoc noteholders with respect to this

2   transaction, it is the debtors' burden.  And they have not,

3   likewise, adduced any credible evidence as to what will happen

4   if this transaction is not approved this evening.

5         And, Your Honor, what we think, based upon the facts

6   and circumstances as we understand them, that this situation --

7         THE COURT:  You weren't listening to Mr. Ridings'

8   proffer, apparently.  Because in unrebutted testimony he

9   indicated through the proffer that the markets, in effect,

10  would tank.  Your cross-examination didn't even touch that

11  subject.

12        MR. GOLDEN:  Your Honor, you're right.  We did not

13  cross-examine that.  Frankly, I don't believe that Mr. Ridings

14  could credibly testify as to what would happen if these -- if

15  this particular transaction was not consummated this evening.

16        We think, Your Honor, that what this situation cries

17  out for is a denial without prejudice, but really a brief

18  delay.  Not a delay for weeks or months, but a delay so as to

19  determine once and for all, has, in fact, every viable

20  alternative been considered in order to maximize the value for

21  assets.

22        I said to the Court on Wednesday -- as we sat here on

23  Wednesday and as I sit here this evening, we don't know whether

24  this transaction represents the best viable option for these

25  assets.  And we can't know this because we believe there was an

172

1   inappropriate and flawed marketing process with respect to

2   these assets.

3          A brief delay would have several beneficial effects

4   in our view.  We'd allow the parties to finally negotiate a

5   final asset purchase agreement --

6          MR. MILLER:  Excuse me, Your Honor.  Is Mr. Golden

7   testifying?

8          THE COURT:  I think what Mr. Golden is doing is

9   converting his argument into what amounts to a request that I

10  not approve the transaction this evening so that more time can

11  be spent to evaluate transactional alternatives, or

12  alternatively, to evaluate whether or not this transaction, as

13  it has evolved at the last minute, may, in fact, be the best

14  transaction.  That's my interpretation.  I don't consider this

15  to be testimony, I consider it to be an argument.

16         MR. GOLDEN:  Thank you, Your Honor.

17         THE COURT:  Have I understood your argument?

18         MR. GOLDEN:  You have, perfectly.

19         THE COURT:  Thank you.

20         MR. GOLDEN:  If we were to have a brief delay, Your

21  Honor, as I said, there would be several benefits that could be

22  achieved.  A final form of agreement could be finally agreed to

23  and produced and put into evidence.  What's been put into

24  evidence to date is an agreement that's not final with material

25  terms left to be negotiated.  So, frankly, I don't know exactly

175

1   consider it, I denied it.

2       MR. GOLDEN:  We think the appropriate course of

3   action, Your Honor, is to issue a denial of the motion without

4   prejudice so as to allow the process to unfold in a way that's

5   a little bit more transparent, a little bit more conducive to

6   allow parties -- all parties-in-interest to understand once and

7   for all whether this represents the highest and best value with

8   respect to these transactions.  Thank you.

9       THE COURT:  Thank you, Mr. Golden.

10      MR. NOVIKOFF:  Good evening, Your Honor.  Howard

11  Novikoff, Wachtell, Lipton, Rosen & Katz on behalf of JPMorgan

12  Chase Bank N.A.

13      Your Honor, we are not here to urge the Court not to

14  act tonight.  We think Your Honor should act tonight.  And we

15  appreciate the speed with which the parties have been moving.

16      We are here and we filed a limited objection because

17  we are concerned that there's a lack of clarity in at least two

18  significant respects and the way that the order affects

19  JPMorgan.  And there is one matter not requiring relief of the

20  Court but a matter we do want to bring to the Court's

21  attention.

22      First, as Your Honor may recall from argument on

23  Tuesday, JPMorgan is Lehman's major clearing bank.  In that

24  role, it maintains literally hundreds of clearing, operating,

25  settlement and other accounts.  And in that role it makes

176

1    advances against securities collateral on a daily basis.

2         As of this morning, the amount of the advances, Your

3    Honor, was approximately 23.2 billion dollars. Against which,

4    JPMorgan is holding collateral.

5         In addition, Your Honor, JPMorgan is a major

6    counterparty with Lehman and various types of what we refer to

7    as Safe Harbor transactions, such as security lending

8    arrangements, repurchase agreements, ex-contracts and other

9    similar agreements. And with respect to many of those it also

10   holds collateral and holds setoff rights. And, as Your Honor

11   heard in detail on Tuesday, we have a guarantee from LBHI,

12   which is secured by collateral, which LBHI values at

13   approximately 17.9 billion dollars.

14        We have heard that as part of the purchased assets,

15   the debtor -- excuse me, Barclays is seeking to purchase 47.4

16   billion of securities. While we've been given that as a

17   number, we don't know, there's simply a lack of clarity as to

18   whether any of those securities are securities that are held by

19   JPMorgan as collateral as I just described.

20        A difficulty with the order, Your Honor, if that was

21   the intent, is it does not provide for any payment to JPMorgan

22   for that collateral. And in view of the fact I described

23   collateral -- collateral securing obligations of over forty

24   billion dollars, saying we would have access to a pool of 1.7

25   billion, along with everybody else chasing that pool, would not

177

1   be very satisfactory.

2           I have sought clarification and I believe obtained

3   clarification from Barclays.  That, in fact, they are not

4   seeking or are not treating as purchased assets any of those --

5   any of the collateral that JPMorgan is holding for that.  And I

6   would like that stated on the record, otherwise we need to

7   correct the order.

8           THE COURT:  You're going to have to move to a

9   microphone, and state your name.

10          MS. GRANFIELD:  Good evening.  Lindsee Granfield from

11  Cleary, Gottlieb, Steen & Hamilton LLP for Barclays Capital.

12          It's our understanding that with respect to the

13  purchase assets in this transaction that they do not include

14  the assets that JPMorgan is holding as its collateral.

15          THE COURT:  Is that satisfactory?

16          MR. NOVIKOFF:  I believe she stated it's Cleary

17  Gottlieb's understanding.  I'd like to know if that is after

18  consultation with the client.

19          MS. GRANFIELD:  That is.

20          MR. NOVIKOFF:  The second, as I mentioned, Your

21  Honor, that JPMorgan is a major counterparty in various Safe

22  Harbor contracts.  The proposed order contains an injunctive

23  provision which affects the debtors' rights in property of the

24  estate.  It involves an ability on the part of Barclays to

25  choose contracts in the future for assignment and assumption.

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

178

```
 1    And in the latest version it contains an incomplete protection

 2    for Safe Harbor contracts.  I would just like a clarification

 3    to the effect that -- and I suspect there may be other parties

 4    looking for this, that nothing in the proposed sale order

 5    affects any right of JPMorgan under or with respect to any

 6    securities contract, commodities contract, forward contract,

 7    repurchase agreement, swap agreement or master netting

 8    agreement, and I use each of those terms as defined in the

 9    Bankruptcy Code, Your Honor, to exercise any contractual right.

10    And I use that term as well.  Contractual right is defined in

11    the relevant sections of the Bankruptcy Code.  Of a kind

12    described in Sections 362(b)(6),(7),(17) or (27), 362(o) and

13    Sections 555, 556, 559, 560, or 561 of the Bankruptcy Code.

14    I've intentionally done it, Your Honor, in that way by making

15    direct reference to the Bankruptcy Code terms.  And we were

16    looking just for a clarification and understanding.  But that

17    is the effect of the order so as not to affect the Safe Harbor

18    contracts.

19              THE COURT:  We need a clarification, confirmation?

20              MR. NOVIKOFF:  I need confirmation.  And that one, I

21    believe I need from both, the debtor and Barclays, Your Honor.

22              MR. MILLER:  Debtor has no objections.

23              MR. NOVIKOFF:  Okay.  Now --

24              THE COURT:  Do we have it, I don't think so.

25              MR. NOVIKOFF:  And just to be clear I'm looking for
```

1    that as it relates to the proposed sale order.  There was an

2    order entered today commencing the SIPC liquidation which had

3    limited effects, and I'm not challenging that.  I'm just

4    talking in terms of anything added by the proposed sale order.

5    That does not deal with secured party rights, secured netting

6    rights.

7             MS. GRANFIELD:  Mr. Novikoff had pointed out that the

8    section that had been added to the sale order went through a

9    lot of the Safe Harbor terms.  That may be just a mistake,

10   didn't add in every single section of the code that people

11   usually colloquially refer to as the Safe Harbors.  So with

12   respect to those few things that weren't added to the order, we

13   recognize that the Safe Harbors exist.  And we understand that

14   we are not purchasing the things that are either his collateral

15   or that we can stop the Safe Harbors from being affected.

16            THE COURT:  Let me clarify what you just said because

17   we're talking about the form of order and the impact of the

18   order, if any, on what we were globally talking about the

19   universe at Safe Harbor provisions, as those terms are

20   generally understood in the Bankruptcy Code to deal with repo

21   swaps, forward contracts, securities contracts and the like.

22   And by making the statement that I just made, I am not

23   intending to leave anything out.

24            I simply want to confirm, as Mr. Novikoff has sought

25   to confirm, that it is intended that those provisions, to the

180

1    extent applicable outside of bankruptcy are, in fact, all

2    governing.  And that nothing in the sale order is intended to

3    impair, in any respect, those contractual rights.

4           MS. GRANFIELD:  Yes, Your Honor.

5           THE COURT:  Thank you.

6           MR. NOVIKOFF:  Thank you, Your Honor.  And then the

7    one point I needed to inform Your Honor concerning -- as I've

8    mentioned, JPMorgan maintains literally hundreds of accounts

9    for Lehman Brothers Inc.  And they continue, through the day

10   today, to continue operating those accounts.  During the course

11   of the day, it was either Lehman Brothers or the SIPC trustee

12   that, during the course of the day, was the owner of those

13   accounts.

14          At this point, we are not sure whether Barclays

15   intends to use those accounts on Monday or not.  We believe

16   that they will, in fact, need to use those accounts in order to

17   continue their operations.  There will be a complication in

18   that when securities and cash hit those accounts on Monday, we

19   are not going to know, unless somebody tells us, whether those

20   securities and cash belong either to Barclays or to the SIPC

21   trustee; that is, are they attributable to assets that have

22   been purchased by Barclay or they have not.

23          So between now and then we are perfectly willing to

24   work with the SIPC trustee and Barclays to create a protocol so

25   that we can get instructions in how to deal with that, but we

181

1    have to get that resolved or we will not be in a position to

2    operate those accounts. Also, Your Honor heard that DTC, the

3    clearing organization, insisted and negotiated heavily during

4    the day and received potentially billions of dollars of

5    collateral to protect it against the possibility of liability,

6    overdrafts, etcetera, with respect to its clearing operations.

7              In the ordinary course, JPMorgan also picks up those

8    type of obligations. Indeed, last night, picked up -- they had

9    to make a fail advance to allow clearing to go forward of over

10   seven billion dollars. If our accounts are going to be used to

11   effect a smooth transition until Barclays has its accounts set

12   up with another institution, we're going to have to work with

13   them and with SIPC to make sure that -- whether it's a

14   guarantee, an indemnity, or some other procedures are put in

15   place so that JPMorgan is not at risk for providing that

16   transition. Again, we are willing to work with them over the

17   weekend to make sure that works. If, in fact, they have other

18   accounts that they can use on Monday other than ours, we're

19   delighted to do that. But we did want Your Honor to know that

20   that's something that has to be resolved from our perspective,

21   and it is not resolved yet.

22             THE COURT: Thank you for that. And let me clarify

23   that the statements you've just made with regard to transition

24   issues that are quite significant from the perspective of

25   JPMorgan Chase are not issues that affect the Court, but they

182

1   are rather closing issues that must be addressed in order to

2   effect an orderly transition.  Correct?

3              MR. NOVIKOFF:  That's correct, Your Honor.  We are

4   not seeking relief from the Court on those issues, but if we

5   fail to reach agreement I did not want JPMorgan's credibility,

6   or, frankly, my firm's credibility, to be affected because we

7   didn't let you know that those issues existed.

8              THE COURT:  Thank you.

9              MR. NOVIKOFF:  Thank you.

10             THE COURT:  Mr. Sabin?

11             MR. SABIN:  Your Honor, I know the hour is late.

12  I'll be very brief.  There is but one issue remaining, I

13  believe, that is not yet resolved and it arises in connection

14  with that part of this transcript, if you will, when it becomes

15  a transcript, that otherwise was raised in ours, and that is

16  related to the small amount, allegedly, of IP assets that do

17  not belong to any of the debtors that we do not believe this

18  Court has jurisdiction to sell free and clear.  So assuming we

19  can solve it by drafting in the order, and assuming that's

20  acceptable to the debtors and purchaser, hopefully we could

21  schedule those assets, we could define them in the appropriate

22  places, carve them out from the relief otherwise with respect

23  to the balance of the purchase assets, which are assets of the

24  debtors.  If that can be done then the entirety of our concerns

25  and our limited objection of the Harbinger funds would be

183

1  resolved.

2  THE COURT:  All right.  I hear that argument, and I

3  don't know if anybody on the debtors' side, as a matter of law

4  or as a matter of structure, would argue that notwithstanding

5  what Mr. Sabin has said it may be possible for those IP assets

6  to be transferred free and clear.  I'll be the first to admit

7  that I don't know, based on this record, anything about where

8  the IP resides.  And my best recollection of the statements

9  made by Lori Fife is that she wasn't so sure where, within the

10  corporate structure, those assets reside.  So based on the

11  record, I think it would be hard to override Mr. Sabin's

12  concern, but I'm not eliminating the possibility that the

13  debtor could make such an argument, and it sounds like it's a

14  drafting issue.

15  MS. GRANFIELD:  Your Honor, it's not a drafting

16  issue, quite.

17  THE COURT:  You're going to have to talk by a

18  microphone.

19  MS. GRANFIELD:  I'm sorry.

20  THE COURT:  Then you're going to have to make an

21  argument --

22  MS. GRANFIELD:  No, I understand, Your Honor.

23  THE COURT:  -- as to how, as a matter of bankruptcy

24  law, assets that are not residing within this debtor or its

25  property-owning affiliate can be the subject of a free and

184

1    clear order.

2          MS. GRANFIELD:  No, I understand.  I understand the

3    argument and Your Honor's view.  Obviously, a few things in

4    terms of our ability to schedule those assets -- it may be

5    drafting and you're right.  We can see on a recess or as we're

6    trying to do an order, whether we can come to agreement or not.

7    But to say that we don't want to be put into a position of the

8    proverbial death by a thousand cuts, where Barclays --

9          THE COURT:  I think I'm in that position right now.

10         MS. GRANFIELD:  -- you know, where Barclays obviously

11   has made a tremendous effort in trying to get to a position to

12   be able to close this transaction, so we'll see, Your Honor.

13   But I just wanted to not be too quick, and I understand the

14   legal argument and Your Honor's view -- but too quick that it's

15   just a drafting --

16         THE COURT:  If you want to think about an argument

17   that would permit this Court to convey nondebtor property free

18   and clear, I'm certainly receptive to creativity.  But I think

19   that at this hour, it may really be a drafting issue or an

20   issue of risk assessment.

21         MS. GRANFIELD:  No, I think it's the latter.  So we'd

22   have to -- it's really just having the ability to talk to the

23   client.  And we'll have to make a decision in terms of,

24   obviously, the deal was we're buying the assets free and clear.

25   But we'll leave that to the recess.

185

1          THE COURT:  Well, I think it was Mr. Miller who

2    mentioned that 10:45 was a witching hour.  And I haven't heard

3    all the objectors.  So absent a miracle, I think it's going to

4    be hard to make that deadline.

5          MR. MILLER:  I didn't understand that PWC was

6    objecting, Your Honor.  I thought we went through that earlier

7    today.

8          MR. FLICS:  Your Honor, Martin Flics of Linklaters

9    for the administrators.  Just as Mr. Novikoff and some others

10   have had some important clarifying points, we do as well.  And,

11   in fact, the first point may relate to the very last point that

12   was just addressed.  These businesses have, for many years,

13   operated as one.  And what is being proposed tonight is

14   something very ambitious.  And as we've indicated, we do not

15   oppose it.  But it is very ambitious.  It is the complete

16   separation of these businesses that have operated as one.

17          The asset purchase documents, as we have pointed out

18   in our response and in the declaration, do not do a perfect job

19   of effecting that separation.  There are a number of issues

20   that need to be addressed.  Those issues are important not only

21   to the European entities, but as we've heard in the last round

22   of discussion, they're probably important to the debtors as

23   well, in effecting the sale.  For example, there is

24   intellectual property and IT all over the enterprise that is

25   shared.  Some of that intellectual property is owned by

186

1    European entities and is used by the American entities.

2            That intellectual property surely cannot be

3    transferred tonight.  Those entities and administration surely

4    cannot have their property compelled to be transferred.  I

5    assume no one would dispute that.  On the other hand, equally,

6    there are assets owned by the U.S. entities that are used in

7    the European business.  There are client contracts that are

8    shared.  There are source codes that are shared.  There are

9    issues of confidentiality and access to source code.  There's

10   various ownership rights in the IT and in the process.

11           There are a lot of issues that are very important to

12   both sides.  These issues have not yet been addressed.  And

13   they need to be addressed.  During the course of the last

14   couple of days, we have communicated a number of the points to

15   Weil Gotshal and to the debtor.  We have made our points in our

16   responsive pleading.  We understand that some of them may have

17   been addressed in the proposed amendment, but we don't know.

18   We understand that others have not, but we don't know which

19   have been and which have not been.

20           We are prepared to accept a representation and

21   confirmation that all of the issues that we have set forth in

22   our response and in our declaration will be negotiated in good

23   faith, expeditiously.  As I said, they're very important to the

24   administrators, and we think they're also important to the

25   estate.   There are issues of our access to books and records

187

1     that we think we have a reasonable right, not to mention a

2     statutory obligation, to review, and all of the proprietary

3     information that is shared across the IT and intellectual

4     platforms.  So as to the first of the two issues that I wanted

5     to address this evening, I would like to know -- we're not

6     going to negotiate those standing here, for sure.

7                THE COURT:  Certainly not in my presence.

8                MR. FLICS:  And I'm certainly not capable of doing

9     so.  But we have had representations informally from people in

10    the course of this evening that they are prepared to do so.  We

11    will accept that representation as a means of going forward

12    with the --

13               THE COURT:  Are you also reserving rights in respect

14    to that representation?

15               MR. FLICS:  -- we are absolutely reserving rights in

16    the event that we are not able to achieve a satisfactory

17    resolution on the issues that we have put of record.

18               THE COURT:  Do I understand that your principal

19    concern relates to the very same intellectual property rights

20    that we were talking about moments ago, or is it different?

21               MR. FLICS:  Actually, I have no idea.  All I know is

22    that they have mentioned cryptically intellectual property of

23    nondebtor, and there is some issue about its ability to be

24    transferred.  That happens to be an issue because I know that

25    the European entities hold some intellectual property that is

197

1  the debtors but not subsidiaries, I don't have a problem.  And

2  then my client would not be enjoined pursuant to the paragraph

3  on -- there is a paragraph in here enjoining parties against

4  bringing claims that you're not supposed to bring or that are

5  sold free and clear.

6          But if "or any enterprise of the debtors" is

7  interpreted as subsidiaries of the debtors, then we run into

8  the issue that Your Honor started to discuss earlier.  What is

9  the authority for a creditor of a nondebtor to be told that its

10 business was transferred free and clear of liens, claims,

11 interest, successor liability?  Now, if Mr. Miller is right, or

12 his suggestion turns out to be true of a possibility that the

13 businesses of the subsidiaries were not transferred, fine, then

14 presumably the action may not be meritorious unless there's

15 another good theory.  And there are other theories besides

16 successor liability.

17         But, again, we're not asking Your Honor, and it's not

18 before Your Honor tonight to decide whether creditors of the

19 nondebtor subsidiaries who have causes of action as a result of

20 this have meritorious ones or not.  I'm here on the black-

21 letter law, for all the reasons in our objection, which I will

22 spare Your Honor and not repeat, because I know you read them,

23 however quickly.  I know Your Honor understood them.  We think

24 they're compelling and ironclad.  But I'm not going to repeat

25 them.  For all those reasons, we don't think this language, "or

1    any enterprise of the debtors", can be interpreted to mean

2    subsidiaries of the debtors within the contours of the law.

3    Cannot do, this was overreaching, if that's what this means.

4    And this can be fixed either by striking the words "or any

5    enterprise of the debtors", or simply Your Honor saying -- Your

6    Honor issues this order, even though the drafting was proposed

7    by others, saying when you sign this you don't intend that

8    enterprise means subsidiaries of the debtors.  It's as simple

9    as that.

10            THE COURT:  I'm going to give others an opportunity

11   to comment on this point, because I know from experience that

12   the no successor liability provision is more often than not of

13   extraordinary importance to the purchaser.  And if the

14   purchaser is willing, through counsel, to confirm that "or any

15   enterprise of the debtor" is as that term is used in paragraph

16   10(c) of the order, is not intended to extend to any subsidiary

17   of the debtors, that confirmation or an edit that's consistent

18   with that confirmation would seem to satisfy you.  Correct?

19            MR. BIENENSTOCK:  Yes.  I just have to say, and I

20   apologize for the repetition, that this is where we just have

21   to rely on the Court.  Of course, a purchaser will want all the

22   protection it can get.  This -- regardless of its desire -- I

23   mean, if I'm the purchaser, why wouldn't I say no, I want that

24   to mean subsidiary.  Of course I would say that.

25            THE COURT:  No, the problem with --

199

1          MR. BIENENSTOCK:  But it's illegal.

2          THE COURT:  -- I don't want, at the moment, without

3    hearing from purchasers' counsel, to start to comment on my

4    interpretation of this language at this hour.  But I could do

5    so.  And I don't want to do that without knowing what position

6    the purchaser takes with respect to it.  I'm offering that up

7    as an opportunity.  Otherwise, I may say some things that you

8    might not want to hear.

9          MR. BIENENSTOCK:  Thank you.

10         MS. GRANFIELD:  Good evening, again, Your Honor.

11   Lindsee Granfield, Cleary, Gottlieb, Steen & Hamilton, LLP, on

12   behalf of Barclays Capital.  The problem -- I have no problem

13   with Mr. Bienenstock's first point, but the coupling of the two

14   do cause a problem because, essentially, I see the parties to

15   the asset purchase agreement are the debtors.  Those parties,

16   up until the time that the trustee came in, controlled their

17   subsidiaries.  These are, I think, all wholly owned

18   subsidiaries or for the most part wholly owned subsidiaries.

19   The trustee came in, exercising his control in terms of his

20   business judgment to exercise his control here.

21         With respect to claims that in their exercising their

22   control over the subsidiaries that there should be an

23   allocation of the purchase price with respect to what's

24   happening here, you know, obviously, I agree with Mr.

25   Bienenstock, that doesn't affect the purchaser, and so we have

200

1   no objection to it. But if he's saying he wants his cake and

2   he wants to eat it too, which is he wants to make claims

3   against the proceeds, like everyone's just agreed, and now he

4   wants to keep open the ability not just to question the

5   business judgment of the controlling parties of the

6   subsidiaries in entering into the transaction, but he wants to

7   leave Barclays open. Barclays is making this transaction

8   possible to claims by subsidiary creditors that Barclays is a

9   successor and Barclays, after having had to renegotiate this

10  deal many times over the last few days, lost the 700 million

11  dollars in cash it was originally going to receive, lost other

12  benefits under the deal. No, we can't agree to that. And I

13  would have to go talk to my clients about how strongly we feel

14  about that. But if it were up to me, that would be it. That

15  would be the final cut.

16          THE COURT: Okay. Now, I know what you think.

17          UNIDENTIFIED SPEAKER: Your Honor, you ready for the

18  next objector or --

19          THE COURT: Well, we sort of have a pregnant pause

20  here. This is an unresolved issue, and I don't mean to

21  diminish the significance of it by describing it as a drafting

22  point because it's not. The problem with the language as it's

23  presently drafted is that it's wildly ambiguous. The term

24  enterprise is not defined. And in common parlance it could

25  include joint ventures, other business activities. It's not

201

1   limited to nor does it address subsidiaries, it's actually far

2   broader.  And I suppose it was made as broad as it was made

3   deliberately.

4          I don't know what the term is intended to convey in

5   terms of its meaning.  Nor do I believe, based upon my looking

6   at it for the first time and not hearing any discussion as to

7   what was the intent in the drafting of it, that I'm in a

8   position now to do what Mr. Bienenstock has asked me to do,

9   which is to do God's work.

10          I believe that if it's left as it is, without further

11  definition, that we'll be revisiting this another day.  And I

12  certainly don't want to invite further potentially burdensome

13  litigation over the point.  Nor do I have any idea as to

14  whether or not what we're talking about is a theoretical

15  discussion, which I'm happy to engage in at any hour, or a

16  practical discussion involving meaningful rights of Walt Disney

17  Company.  Based upon the pleadings filed by Mr. Bienenstock on

18  behalf of his client who is still objecting and the questioning

19  that he has presented of witnesses this evening, it's apparent

20  that he is doing what he can do to protect claims against an

21  identified counterparty.  I don't know what those claims are at

22  the moment in terms of their net value, and I don't need to

23  know.

24          For purposes of this order, however, I'm going to

25  need to look at it very carefully because this is one

202

1  highlighted example of provisions in a sale order that I had

2  not had a chance to review, partly because it's now 10:33 and

3  because I haven't had a chance yet to review the order although

4  I promise I will do so as expeditiously as I can and given the

5  fact that there is an objector waiting in the wings --

6  actually, it is a wing over there, we're not getting this done

7  before 10:45. That's apparent. I'm going to make the

8  following suggestion, and I'm not trying to delay anything.

9  I'm going to hear all the objections this evening. I'm going

10 to hear the debtors' response to those objections, and I think

11 that Mr. Miller, or any other member of his team that he

12 designates, is entitled to speak to the Court while all of this

13 is fresh. But it's also clear to me that assuming I rule, and

14 I'm going to rule one way or the other this evening, in favor

15 of the transaction and an order needs to be entered, I think

16 that everybody should be spending a little bit more time than

17 we have this evening since it's no longer critical in terms of

18 timing to make sure that language issues, such as the issue

19 identified by Mr. Bienenstock, are addressed to the

20 satisfaction of everyone involved in the transaction.

21         I have reserved, just in case it might be needed,

22 this courtroom for tomorrow morning at 10 a.m. I'm not

23 suggesting that it's going to be necessary for anybody to come

24 back. But in the same way that parties mentioned to me that

25 10:45 this evening was a time that I might take into

1   consideration, I wanted you to know that I didn't have any idea

2   one way or the other as to how long this hearing would last or

3   how much time would be required to address the many objections

4   that float in, particularly at the last minute.  So to the

5   extent that it's not critically important to the transaction

6   that an order be entered this evening, I'm going to suggest

7   that time be spent to make sure that it's right and that I've

8   had a chance to consider it fully so it can be entered tomorrow

9   morning, assuming that I approve the transaction.  That's my

10  comment with respect to this language point.  Mr. Rosner?

11          MR. ROSNER:  Thank you, Your Honor.

12          MS. GRANFIELD:  I apologize, Your Honor.  I apologize

13  to Mr. Rosner.

14          THE COURT:  Once again, for record purposes, I just

15  think you're too far away from the mike unless you speak at the

16  podium.

17          MS. GRANFIELD:  I apologize, Your Honor, and I

18  apologize to counsel.  Just --

19          THE COURT:  This is Lindsee Granfield speaking on

20  behalf of Barclays.

21          MS. GRANFIELD:  Lindsee Granfield speaking on behalf

22  of Barclays.  I wanted to -- just because obviously we did not

23  have an opportunity to respond in writing to the different

24  arguments or Mr. Bienenstock's writing just if I may, or if

25  it's all right with Your Honor, I'd like to cite and I'd like

204

1    to hand up to Your Honor the order authorizing a similar

2    transaction in the Refco Chapter 7 case where exactly the same

3    language on successor liability was used, if that is

4    permissible?

5         THE COURT:  It's permissible but it's completely

6    unnecessary.

7         MS. GRANFIELD:  Okay.

8         THE COURT:  And I suggest that whatever language

9    appears in any other order is of no significance to me.  Just

10   because something was entered in another case because it wasn't

11   picked up by a parting interest who was concerned about it does

12   not, to me, influence this outcome.

13        MS. GRANFIELD:  Very well, Your Honor.

14        MR. ROSNER:  Thank you, Your Honor.  David Rosner,

15   Kasowitz, Benson, Torres & Friedman on behalf of the Bay Harbor

16   Entities.  And to state something obvious, there's clearly some

17   momentum behind this takeover of this company and we recognize

18   that.  And we recognize that in making our objection, and we

19   recognize that there are some very important human elements to

20   the transaction that I know in the dollars and cents world of

21   bankruptcy sometimes people do lose sight of and I think that

22   on all sides here nobody has lost sight of them and I think

23   that they are important.

24        One of the main arguments, and I understood

25   Mr. Golden when he said it and I thought it was right even

205

1   though it may not be the most appealing thing to say but it is

2   right that this global markets argument is not really directly

3   on point as to what is being done in front of Your Honor in

4   terms of this estate and what is happening to creditors.

5   Though I understand that the Court does take a macro view of

6   certain things, but one of the arguments in favor is that

7   getting this deal done will build confidence in the market and

8   that's kind of just been taken as a given, almost, by many of

9   the parties here.  People can look at the way this transaction

10  actually got created and determine whether Barclays' behavior,

11  whether the position that Lehman found itself in, whether that

12  is market confidence building or if that is detrimental to the

13  market, nobody really knows.  And as I think we've seen over

14  the last couple of weeks, nobody really knows a lot about when

15  people make moves -- people in positions of power make moves

16  that they think are going to stabilize.  Perhaps they are

17  really unstabilizing.  But what you're being asked for here to

18  do today is to be a federal court granting its imprimatur on a

19  transaction where we know -- and the PWC as the administration

20  of a U.K. entity has submitted a declaration that eight billion

21  dollars was transferred from the U.K. entity into the United

22  States rendering that entity unable to trade, delisted,

23  insolvent and that money disappeared and that money is gone.

24  And by money, I mean money and securities.  Now, I will

25  respectfully disagree with you, Your Honor, on some things that

206

1    you have said and we have heard tonight.  Unquestionably, you

2    wear the robe and this is your courtroom and you make the call.

3         THE COURT:  No, this is our courtroom.  It's not my

4    courtroom.  This is the people's courtroom, but I'm not

5    Judge Wapner.

6         MR. ROSNER:  Clearly, Your Honor.  Clearly.

7         THE COURT:  This is -- I'm serious about this.  I

8    feel very strongly that we're here for a public purpose and my

9    name just happens to be on the door.

10        MR. ROSNER:  I appreciate that, Your Honor, very

11   much.  And what I will say is that I do respectfully disagree

12   with Your Honor as to whether this process comports with due

13   process as it's understood under the Bankruptcy Code and as

14   it's understood under the Constitution.  It's an important

15   point.  It is one that has been discussed tonight to some

16   degree but it is one that Your Honor did speak to quite

17   directly earlier, and I took those points and I just want to

18   state for the record that our view is that the eight billion

19   dollars has not been investigated.  Nobody knows how that

20   happened.  Nobody knows who knew about that transfer.  Nobody

21   knows whether -- and by nobody here in our people's court, I'm

22   including Your Honor as saying nobody knows that, because Your

23   Honor certainly doesn't know because no one has been able to

24   present evidence to Your Honor as to who was involved in the

25   transfer and --

207

1          THE COURT:  I'm having a problem with this argument

2     right now, so you might as well know it rather than continue

3     it.  I don't understand the relevance of this.  I understand

4     that it's a big number, it's a huge number.  And I understand

5     that you've asked questions of Mr. McDade about his knowledge

6     of the transaction, and he didn't provide a lot of information.

7     And I paid attention to the fact that he didn't provide a lot

8     of information.  But it made no impact on me because I'm

9     confident I'm going to learn a lot about this in the course of

10    this case.  The question that I have for you, and you're

11    pressing this point now, is what does this have to do with

12    whether or not it is in the best interest of this estate to

13    approve this particular transaction which is the only available

14    transaction tonight?  What does this have to do with what we're

15    here to consider?

16          MR. ROSNER:  What it has to do with, Your Honor, is

17    akin to what you were talking about, about the terms of the

18    order, is that if you approve this sale and if you permit an

19    order to be entered like this sale order then all those

20    securities that were transferred from the U.K. to the U.S. are

21    now going to be transferred to Barclays and that will be it.

22    And anybody's rights --

23          THE COURT:  I thought this was a cash sweep.  Is this

24    a securities sweep?

25          MR. ROSNER:  As I understood, there are going to be

228

1    putting this off is somehow a plus for the markets?  Was that

2    your assertion?

3           MR. ANGELICH:  Indeed, Your Honor.  It may very well

4    be.  This week we've seen an improvement in the markets.  There

5    has been an opportunity for stabilization for --

6           THE COURT:  I'm sorry, but I've been down this road

7    with other arguments in terms of relative speculation and I

8    think I addressed it with Mr. Golden when he was pressing me

9    hard on that very same point.  So I've heard it, and I will

10   consider it.

11          MR. ANGELICH:  Thank you, Your Honor.

12          THE COURT:  Is there anyone else in the courtroom who

13   wishes to be heard?  All right.  We go to the telephone list

14   and I'm not sure how many people who are participating by phone

15   are objectors.  Please identify yourself and speak up.

16          MR. KADEN:  Good evening, Your Honor.  It's Greg

17   Kaden at Goulston & Storrs on behalf of two clients,

18   Interactive Data Corporation and 125 High Street, L.P., each of

19   which filed an objection.  I'll start with Interactive Data

20   Corporation.

21          Some of my objections have been -- or reservations of

22   rights, so to speak, have been raised already so I'll try to

23   make it brief and hopefully incorporate the concessions that

24   have been made in response to those similar objections.

25          Interactive Data Corporation, to begin with, along

229

1   with its affiliates, provide data and related services to the

2   debtors and their affiliates, pursuant to a global services

3   agreement.  The global services agreement sets forth universal

4   terms and conditions for the specific projects that Interactive

5   undertakes for the debtors and affiliates.  Now, those specific

6   projects are governed by other agreements called schedules.

7   But the schedule is subject to all of the terms and conditions

8   of the global services agreement.

9          Now Interactive compared -- in the limited time that

10  we have, compared the agreements that the debtors proposed to

11  assume and assign against its own books and records but simply

12  has not been able to determine, with any certainty, which

13  agreements the debtors intend to assume and assign.

14          With that said, we would first ask that the debtors

15  and Barclay work with Interactive to determine which contracts

16  are being assumed and assigned.  I believe that the parties

17  have already undertaken to do that, but given that I've been a

18  little bit handicapped on the phone, I just want to make sure

19  that we have confirmation of that for the record.

20          MR. MILLER:  Yes, sir.

21          THE COURT:  I don't know if you heard Mr. Miller but

22  I believe he confirmed it.

23          MR. KADEN:  Okay.  Is that the case?

24          THE COURT:  Yes, that is the case.

25          MR. KADEN:  All right.  Moving on then, Interactive

230

1   believes that the global services agreement must be assumed and

2   assigned together with any schedule that Barclay is purchasing.

3   That's because they're interrelated and we think that the

4   global services agreement provides the master terms and

5   conditions for the schedules.  It actually got intertwined with

6   the schedules.  So we respectfully request either that the

7   parties agree to that proposition on the record, namely that

8   the schedules can't be assumed without the global services

9   agreement also being assumed.  Or if we can't get that granular

10  at this point, simply confirmation of the issue can be tabled

11  for purposes of today's hearing, without prejudice to

12  Interactive's right to raise the issue post-closing.

13          THE COURT:  Is there anybody here in a position to

14  comment with regard to that statement?

15          MR. MILLER:  Not the debtors, Your Honor.

16          MS. GRANFIELD:  Lindsee Granfield, Cleary Gottlieb

17  Steen & Hamilton, LLP on behalf of Barclays Capital.  I think

18  we indicated to the Courtroom, when Your Honor was out of the

19  courtroom, that in working through the issues of the assumed

20  contracts, that we would seek to resolve those issues.  The

21  contracts that are the closing contracts, we are asking Your

22  Honor to find are assumed because with respect to many of them

23  they are needed to operate.  For instance, the Lehman space on

24  Seventh Avenue and the trading floors there, and other

25  infrastructure in many, many different places.  And therefore

231

1   not to have -- or to have some cloud would be a problem.

2          But having said that, in terms of trying to work out

3   with the counterparties to assume contracts, are there issues

4   about identification?  Is there an issue that -- what's the

5   full contract?  We obviously realize we have to live within the

6   bounds of 365 in terms of assuming a full contract, can't break

7   up the contract, have to pay the cure cost.  Plus, in terms of

8   any accrued amounts, when we assume the contract, even if

9   accrued amounts aren't due yet but then the due date comes up,

10  that's going to be for our account.  So that's pretty much the

11  comfort I can give at this time.

12         THE COURT:  You don't have to agree that's sufficient

13  but that's all you're getting.

14         MR. KADEN:  Pardon me, Your Honor.

15         THE COURT:  I said, you don't have to agree right now

16  that that's sufficient but I've heard what she said and I think

17  that's all you're getting in court this evening.  Is that

18  satisfactory?

19         MR. KADEN:  I guess it's not satisfactory to the

20  extent that these documents are -- the two agreements are

21  physically separate documents.  So, to the extent we're talking

22  about assuming all the benefits of one contract, if we can

23  agree that it's one contract, then of course we have no

24  objection.  But we just don't know whether the debtors or the

25  Barclays will have an issue that these are, in fact, separate

232

1    contracts and they don't actually go hand in glove together as

2    part of the assumption and the assignment.

3           So I guess it could be a moot point that we can't

4    even tell whether it's in on the list.  For all we know the

5    master agreement already is on the list.  But I guess, to the

6    extent I popped a hole into the current circumstances, I would

7    like to reserve the right to raise the argument, with respect

8    to the global services agreement, that that also must come

9    along with any assumption and assignment of the schedules.

10          To the extent that we can't consensually agree or

11   indeed to the extent that the global services agreement isn't

12   already sitting on the schedules to be assumed and assigned or

13   a different name that we simply just can't identify for our

14   books and records.

15          THE COURT:  I'm not sure how to say goodbye but I

16   think we're done with what you had to say.  I didn't mean to

17   make light of what you said, it's just that you're on the phone

18   and nobody said anything and I think we're done with what you

19   had to say.  Anything more?

20          MR. KADEN:  I'll move on, then.  Finally, although

21   Interactive has determined the cure amount under its contract

22   to, at least the amount scheduled by the debtors, which is

23   596,792 dollars and, I guess, six cents.  We think it may be

24   more.  However, since the debtors have already scheduled 596K

25   as an undisputed cure amount, we'd have to immediately pay this

233

1    as an undisputed cure without prejudice to Interactive's right

2    to argue after discussion.  Hopefully we can reach a consensual

3    resolution but they will argue, post-closing, that additional

4    cure is required.  And I want to make sure that that argument

5    is reserved under Mr. Miller's general postponement of cure

6    objections but also to clarify that any undisputed cure amount,

7    if we agree, as we believed in the 596,000 dollars will be

8    immediately paid as part of the closing.

9            THE COURT:  I'm not going to say anything in response

10   to that.  Whoever wants to respond, please do?

11           MS. GRANFIELD:  Lindsee Granfield, Cleary Gottlieb

12   for Barclays Capital.  The proposed order is providing that to

13   the extent -- well, that the cure amounts will be paid as soon

14   as practicable on the earlier of the consent of the party to

15   the cure amount on the schedule, the deemed consent of the

16   party because they don't object on October 3rd or after your

17   Court's determination of the cure amount after dispute.

18           So no, we can't agree that again another party wants

19   to have its cake and eat it too, that if there's a dispute

20   about the amount we either reach agreement, get paid as soon as

21   practicable or Your Honor will determine it.

22           THE COURT:  That sounds perfectly consistent with due

23   process and I think everybody can agree that that's so, even

24   this briefly into the case.  There'll be an opportunity to be

25   paid an amount that you agree.  If you don't object you'll get

234

1    the deemed amount and if there's a problem there'll be a

2    hearing.

3              MR. KADEN:  Fair enough, Your Honor.  Thank you.

4              If I can move on now to my second client, which is

5    125 High Street.

6              THE COURT:  What time zone are you in?

7              MR. KADEN:  What time zone?

8              THE COURT:  Yes.

9              MR. KADEN:  I'm in the Eastern Time Zone.

10             THE COURT:  Okay.  Well, then you know how late it

11   is.  I wish you'd expedite -- I don't mean anything by this but

12   we've really been going for a long time.  It's a very, very hot

13   courtroom and we have a tremendous amount of work to do before

14   we can all go to sleep.  So I really ask you to limit your

15   remarks if you can.

16             MR. KADEN:  Okay, I will.  I'll get to the main

17   issues and many of them have already been raised.  So I will

18   try to be as brief as possible and I apologize and I appreciate

19   the Court's indulgence.

20             I would like the same confirmation that the prior

21   landlord has asked for, that the rights of my landlord at 125

22   High, under the lease, with respect to any sublease back to the

23   debtors are preserved consistent with the terms of the lease.

24             I think it was already confirmed on the record for

25   the other landlord but I want to make sure that that same

235

1   confirmation as to that the lease says what it says with

2   respect to treatment of subleases and that there's no attempt

3   here being made to overrun the provisions of the lease with

4   respect to subleasing, if there is a sublease contemplated on

5   this matter.

6          MS. GRANFIELD:  With all due respect to counsel, I

7   have no idea what your lease says or what its terms are.  And

8   so I can't confirm to you anything at this moment.  But I can

9   confirm that we'll have to live with what 365 gives us in terms

10  of rights.  That's all I can give you at this moment.

11         MR. KADEN:  Fair enough.

12         THE COURT:  Does that do it?

13         MR. KADEN:  The same confirmation as to year-end

14  reconciliations with respect to 125 High, if the year

15  interrupts, to the extent that they're payable under the lease,

16  that those provisions will be honored as well?

17         THE COURT:  Counsel, let me tell you what I think is

18  happening here, and you can't see what's going on in the

19  courtroom, which puts you at a disadvantage.  You're doing a

20  really effective job of being tenacious and pressing your

21  points but I don't think you're winning them.  I think that all

22  you're doing is getting reservations of rights, which is about

23  as much as you can expect at this hour.

24         And I'm also going to acknowledge, both to you and to

25  everybody in the courtroom that I'm getting tired.  I've been

236

1   on the bench for a long time and I've been trying to

2   concentrate in a very important hearing and I think we have to

3   stop talking about these issues.

4           MR. KADEN:  Fair enough, Your Honor.  I apologize.

5           THE COURT:  There's no reason to apologize.  This is

6   an important hearing and you have clients to represent.  I'm

7   just telling you that if you were watching what's going on you

8   would realize that you're losing me.  I can't pay attention to

9   what you're saying and I'm trying to.

10          MR. KADEN:  Okay.  So then with that I will take your

11  cue and close my arguments there.

12          THE COURT:  Thank you.

13          MR. HAYES:  Your Honor, one more telephone objection

14  that'll take about thirty seconds.

15          THE COURT:  Where are you?

16          MR. HAYES:  My name is Dion Hayes, I'm with

17  McGuireWoods.  I represent Toronto Dominion Bank, also Eastern

18  Time Zone.

19          THE COURT:  Are you in New York City?

20          MR. HAYES:  No, sir.

21          THE COURT:  Okay, then I'll listen to you.

22          MR. HAYES:  We have significant claims, Your Honor,

23  against Holdings LBI and certain LBI subsidiaries.  We filed,

24  essentially, a joinder in Mr. Bienenstock's objection that he

25  filed on behalf of RBS.  We join in his comments that he

237

1   articulated earlier with respect to paragraphs 4 and 10 of the

2   order.  I haven't seen the order unfortunately but as it was

3   described in the hearing earlier, we share his objections to

4   those provisions.  Thank you, Judge.

5          THE COURT:  Okay.  Thank you.

6          MR. ROESCHENTHALER:  Your Honor, this is Mike

7   Roeschenthaler, also for McGuireWoods in the Eastern Time Zone.

8   I represent Access Data Corp and CNX Gas Company.  Briefly,

9   Your Honor, Access Data Corp, based on the representations made

10  by counsel for the debtor about asserting late claims or

11  rejection of claims, at this point we're fine with that,

12  subject to our right to assert those claims because we -- the

13  claim of Access Data is about ten times what has been listed by

14  the debtor.

15         And for CNX Gas Company, our claim related to EU

16  Energy and based on representations by the debtor earlier, that

17  is no longer part of the sale.  If that's the case, then we

18  have no objection to the sale going forward.

19         THE COURT:  Thank you.

20         MR. ROESCHENTHALER:  Thank you, Your Honor.

21         THE COURT:  Is there anyone else on the phone?  Okay.

22  Then you can mute your lines.

23         It's now 11:30 and what I said I meant, I'm kind of

24  exhausted.  But I think that it's also important for us to get

25  through this.  I recognize that many of the people who are

238

1    sitting out there have not eaten and haven't had a break in a

2    while and I think due process also includes no cruel and

3    inhuman punishment.  And so I think that it may be timely,

4    before I hear from the debtors and/or also from the purchaser,

5    to take a fifteen minute break so everybody can refresh

6    themselves a little bit.

7          So since it's already as late as it is, it might as

8    well be a little bit later and let's take a fifteen minute

9    break and I'll see you at 11:45.

10         (Recess from 11:30 till 11:45 p.m.)

11         THE COURT:  Be seated, please.  Mr. Miller?

12         MR. MILLER:  Good evening again, Your Honor.  And

13   given the lateness of the hour, Your Honor, I expect to be

14   exceedingly brief, Your Honor.  There have been an awful lot of

15   objectors who have stood at the lectern and it's, sort of, hard

16   after listening to twenty odd people, to remember all of the

17   comments that were made and objections that were made.  But

18   there's one basic theme, Your Honor, that has gone through the

19   statements by Mr. Golden, Mr. Rosner and some others.  That

20   apparently there is the ability to stop everything, take two or

21   three weeks or maybe two or three months, while we explore

22   every possible alternative.  And there is no recognition, Your

23   Honor, that we have a patient that is hemorrhaging on the

24   operating table and there is no intensive care ward for this

25   patient.

239

1          Things have happened, Your Honor, in the last two

2    days.  First of all, we have a SIPC proceeding, Your Honor.  A

3    trustee has been appointed for SIPC and the assets of LBI are

4    under the jurisdiction of that proceeding.  They're gone, Your

5    Honor.  And as it was pointed out in the testimony today, there

6    are 639,000 accounts with a value of something like 138 billion

7    dollars that are sitting now waiting transfer.  And if this

8    sale doesn't go through, Your Honor, those accounts are going

9    to be stuck.  And they're going to be stuck for months and

10   months.

11         Mr. Golden says that he protects the interest of

12   creditors.  I would say, Your Honor, the debtor is protecting

13   the interest of creditors.  If this transaction doesn't go

14   through, Your Honor, LBI is out of business.  It already is --

15   will be in a SIPC liquidation proceeding.

16         There is no money at LBHI.  The DIP loan will become

17   due, 200 million dollars, as payable.  Look what happened

18   yesterday, Your Honor.  The CME closed us out and we took a

19   loss of one billion, six hundred million dollars.  This

20   administration is finished if this transaction is not

21   completed, Your Honor.

22         It's a shame, Your Honor, that the 7,000 people who

23   are waiting for transfers today in various computer points

24   throughout the country, did not get what they expected to.  And

25   I'm not being critical of anybody, Your Honor; everybody has a

240

1    right to express their views.  But we are in a situation in

2    which we have a fragile asset that can't.  This is not a case

3    where you can sit and go out and explore every single

4    opportunity.  And in that connection I might say, Your Honor,

5    that for months, certainly going back to the collapse of Bear

6    Sterns and before that, Lehman has been deleveraging.  It has

7    been participating in every effort to deleverage its balance

8    sheet.

9          It got down to -- let me call it the final round,

10    where there only were two possibilities:  the Bank of America

11    and Barclays.  And the Bank of America went off and did

12    something else.  Barclays -- that transaction was unable to be

13    consummated.  So in the exercise of good business judgment,

14    management and the board of directors turned to get the best

15    transactions they could get in the limited time.

16          And, Your Honor, there aren't many candidates that

17    could do this.  You needed somebody with the kind of capital,

18    credit standing of Barclays.  There aren't that many people out

19    there.  And you can't go around and cherry pick these assets,

20    Your Honor.  This is an integrated operation.

21          So what is happening, Your Honor, we are protecting

22    the customers.  There's testimony on the record, Your Honor, as

23    to what the consequences would be if this transaction doesn't

24    go forward.  Both Mr. Ridings and Mr. McDade have indicated

25    there won't be anybody in the building.  If there's no

241

1   assurance of an ongoing operation for the LBI employees, which

2   are most of the employees in 745 Seventh Avenue, they're not

3   going to stay there, Your Honor.  These are people who have

4   bills that they have to meet, they need employment.  They need

5   some element of certainty.  They're all expecting, and I'm not

6   putting any pressure on Your Honor, they're all expecting that

7   Your Honor will rule --

8             THE COURT:  The pressure is already there, Mr.

9   Miller.

10            MR. MILLER:  I'm sorry?

11            THE COURT:  The pressure is already there.

12            MR. MILLER:  Thank you, Your Honor.

13            THE COURT:  Not from you.

14            MR. MILLER:  No, no.  I was looking for that woman.

15   There is pressure on everybody, Your Honor.  I mean, I was just

16   saying to somebody, here we are sitting in a courtroom at 5

17   minutes after 12, and we've been here for a long time, and that

18   is evidence of the concern that everybody has.  And I

19   understand the issues, Your Honor.  As we said on the very

20   first day, this is an extraordinarily exceptional case.  There

21   is so much at stake here.  And if we miss this opportunity we

22   are talking about a wholesale liquidation with all of the

23   consequences that come out of that liquidation.  And people can

24   speculate as to what's going to happen.

25            I mean, I was a little shocked at Vanguard, who

242

1    happens to be a competitor of Neuberger, saying don't close

2    this.  It'll be a good thing for the marketplace, for somebody

3    maybe.  So I think that argument, Your Honor, just doesn't

4    carry water.

5            Now I would turn, just for a minute, Your Honor, to

6    the LBIE thing, which is confusing this whole matter.  I point

7    out, Your Honor, LBIE went into administration before the

8    Chapter 11 case was filed.  And PWC froze all transactions

9    immediately and it became the administrator.  So those

10   transactions were frozen.

11           Now, what we're talking about, Your Honor, is eight

12   billion or five billion, whatever it might be, Your Honor, that

13   was a cash sweep.  Cash, we're not transferring any cash to

14   Barclays, that's out of the agreement.  So if Mr. Rosner or

15   somebody else has a claim, they can assert a claim.  It has

16   nothing to do with this transaction.

17           And I would also point out, Your Honor, that PWC as

18   the administrator is not opposing the sale.  In fact, they're

19   supporting the sale.  They're just reserving their rights and

20   they should reserve their rights.  If they have a claim, this

21   is all going to be investigated.  But we have to look at the

22   bigger picture, Your Honor, what happens if we don't close this

23   transaction.  And Mr. Ridings testified, Mr. McDade testified

24   as to the consequences that will affect these estates.  We

25   cannot reverse what has already happened.

243

1    And in the short period from Wednesday to Friday,

2    notwithstanding that Your Honor approved the sale procedures,

3    we lost the confidence of the market.  And if you don't approve

4    this transaction, Your Honor, LBI is finished as an operating

5    business.  It will not add any value to anybody.  And all we

6    will have left, Your Honor, is a winding down estate and

7    holdings.  And if that building is empty, Your Honor, it won't

8    be worth 900 million dollars because that's the nature -- that

9    appraisal that we got assumed a value with the building in use.

10    So the dangers here, Your Honor, are extraordinary.

11    This is a good transaction, Your Honor.  We spent a lot of time

12    listening to landlords.  All of those issues, Your Honor, are

13    minor and will be resolved in one way or the other.  Either

14    Your honor will decide them or there will be mutual

15    arrangements and agreements among the parties.

16    The drafting of the order, I think, Your Honor, if we

17    all sit down in good faith we will come up with an order.  I

18    think we will come up with an order tonight if Your Honor were

19    to approve this transaction.

20    THE COURT:  I'm prepared to stay here for as long as

21    it takes if you're prepared to stay here for as long as it

22    takes.

23    MR. MILLER:  Your Honor, I can't think of a better

24    place to be.

25    THE COURT:  Do you want to order pizza?  How do you

244

1   want to nourish yourself between now and the entry of the

2   order?

3            MR. MILLER:  With pepperoni?

4            THE COURT:  Whatever you want.

5            MR. MILLER:  I agree with Mr. Bienenstock -- maybe

6   let me rethink that.  Your Honor, I would stay without food.  I

7   think that's a good thing.  And I would lock all of the

8   latrines.  I'm sorry; I withdraw that remark, Your Honor.

9            THE COURT:  Unfortunately, it's on the record of this

10  proceeding.

11           MR. MILLER:  And, Your Honor, the proceeds of the

12  sale, the 250 million dollars, is going to the SIPC trustee,

13  the one billion 290 million dollars is going to the estate.

14  There is a creditors' committee.  Those proceeds are safe.

15  Hopefully, we're going to go into the more conventional

16  procedures of Chapter 11.

17           I don't want to use the melting ice cube.  It's

18  already half melted, Your Honor.  The steps have had happened,

19  the things that have happened since Wednesday, make it

20  imperative that this sale be approved.  In the interest of all

21  of the stakeholders, including Mr. Golden's clients, they will

22  benefit by this, Your Honor, because if the alternative

23  happens, there will be very little to distribute to creditors,

24  if anything.

25           So we submit to Your Honor that this sale should be

245

1    approved and should be approved tonight.  And we should get the

2    orders entered and get the transfers done before there's any

3    other prejudice and harm.  Thank you, Your Honor.

4              THE COURT:  Thank you, Mr. Miller.

5              MS. GRANFIELD:  Really brief, Your Honor, because I

6    won't tread over any ground that Mr. Miller just went over.

7    The importance, if Your Honor is so disposed to approve the

8    transaction of staying here, getting the order done and getting

9    it entered tonight, my client wanted me to express to you the

10   importance is really not only in terms of the operations, the

11   moving of the money, the preserving of the value for this

12   estate, but the importance in terms of staying here and get it

13   done tonight is really with respect to the employees who we've

14   already heard many times have really had a horrible week.  They

15   have had a bit of hope in terms of being able to return to a

16   more business as usual.  And we're really concerned if they

17   don't wake up tomorrow and see that not only has it been

18   approved but the order's been entered and we're moving forward

19   towards closing.

20             Just generally, with respect to the objections,

21   Barclays Capital cannot pay out the sums that have been put on

22   the record tonight and subject itself to collateral attack.

23   It's not doing this transaction to paint a bullseye on its back

24   for every subsidiary creditor, landlord, fund that wants to

25   figure out who's a deep pocket, oh, Barclays is doing this deal

246

1   so it's one of the three or four deep pockets that could have

2   and so we're going to reward by miring it in collateral

3   litigation.  If there's really any chance of that, it won't

4   happen.  And this will all be for naught.  So we do have to

5   keep our eye on that ball.

6          And then finally, Your Honor, in the proffer of some

7   of the testimony tonight, and this had been said before, and it

8   may have been the belief of the parties who had said it, but

9   it's important with respect to Barclays and its relationship

10  with regulators in the U.K. that we wanted to make a pointed

11  statement that it has not only been the U.S. regulators that

12  have really gone above and beyond to try and facilitate this

13  transaction.  But the regulators in the United Kingdom have

14  done so as well.  And there was speculation, really, that maybe

15  the U.K. regulators had some to do with not having the prior

16  transaction that was worked on last week come to fruition.  And

17  it turns out that's not the case.  It really was not a

18  regulatory issue but just a question of the structure of the

19  transaction would have required Barclays to have a

20  shareholder's vote in order to do the transaction and that just

21  was not going to happen with the precipitous terrible things

22  that were happening at the time.  And so, we just wanted to

23  correct the record with respect to that.  And with that, I'll

24  turn it over to others.

25          MR. BIENENSTOCK:  May I respond for a moment, Your

247

1  Honor?

2          THE COURT:  Yes, you may.

3          MR. BIENENSTOCK:  I just want to point out that,

4  number one, we all understand the importance of the

5  transaction.  And it's very easy for a party sponsoring it to

6  say, and I won't do it unless you give me something illegal, so

7  give it to me, Judge.  I'd like to point Your Honor to some

8  evidence Your Honor admitted, the contract.  Nowhere in that

9  contract does it say they need an order that's free and clear

10  of successor liability from creditors of non-debtor

11  subsidiaries.  Nowhere.  This is just overreaching and gambling

12  that Your Honor feels this is so important that you'll do

13  something illegal so they'll close tonight.  Thanks.

14          THE COURT:  It's my job to do what the law permits in

15  the exercise of my discretion.  This week, more than any other

16  week since I was appointed to the bench, I have felt the

17  awesome power of this job.  And it's now Saturday morning.

18  I've given a lot of thought the objections.  I reviewed each

19  one that I could get.  They were flying in this afternoon one

20  after another.  And I categorized them in my mind and

21  considered carefully whether it was permissible for me as a

22  judge in this district to approve a transaction this momentous

23  on such an extraordinarily fast schedule.  And I gave

24  consideration to the due process considerations that have been

25  articulated in objections both orally and in writing.  And I

248

1    have concluded that this is really not a question of due

2    process being denied.  This is a question of due process being

3    pursued in good faith by all parties to the transaction, even

4    the objectors.  It is a testament to the importance of this

5    transaction that this courtroom is still packed.  I have no

6    idea what's going on in the overflow rooms.  This is not an

7    ordinary Chapter 11 case.

8         This is not simply approving the transaction because

9    Mr. Miller is putting pressure on me to do so.  This is not

10   approving the transaction because I know it's the best

11   available transaction.  I have to approve this transaction

12   because it's the only available transaction.

13        I believe that one of the remarkable aspects of our

14   Bankruptcy Code, as it has evolved, is its remarkable

15   flexibility to different circumstances.  The lawyers who are

16   appearing before me this evening are truly among the best and

17   the brightest in the field.  And some have participated in the

18   evolution of bankruptcy as a field, nationally and

19   internationally.  We must close this deal this weekend not

20   because the markets demand it, although that's certainly a part

21   of it.  Lehman Brothers became a victim.  In effect, the only

22   true icon to fall in the tsunami that has befallen the credit

23   markets.  And it saddens me.  I feel that I have a

24   responsibility to all the creditors, to all of the employees,

25   to all of the customers and to all of you.  Arguments have been