1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555 (JMP)

   08-01420 (JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

  Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

  Debtor.

- - - - - - - - - - - - - - - - - - - -x

    United States Bankruptcy Court

    One Bowling Green

    New York, New York


    December 22, 2008

    10:14 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1

2 I.   UNCONTESTED MATTERS:

3 HEARING re Debtors' Motion for Entry of Order Pursuant to

4 Sections 105 and 363 of the Bankruptcy Code and Federal Rules

5 of Bankruptcy Procedure 2002, 6004, and 9019 (i) Authorizing

6 Lehman Brothers Holdings Inc. to Enter into a Settlement

7 Agreement with Certain French Affiliates Relating to

8 Intercompany Claims, (ii) Authorizing Lehman Brothers Holdings

9 Inc. to Vote Its Shares in French Affiliate to Approve Sale of

10 Substantially All of the Assets of and Voluntary Dissolution of

11 Such Affiliate and (iii) Granting Certain Related Relief

12

13 HEARING re LBHI's Motion, Pursuant to Sections 105(a) and 365

14 of the Bankruptcy Code, for Authorization to Assume

15 Administrative Services Agreement with Aetna

16

17 HEARING re LBHI's Motion, Pursuant to Sections 105(a) and 365

18 of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, for

19 Authorization to Reject Prescription Drug Program Master

20 Agreement with Medco

21

22 II.   CONTESTED MATTERS:

23 HEARING re Motion for Relief from Stay Motion of OMX Timber

24 Finance Investments II, L.L.C. For Limited Relief from the

25 Automatic Stay

32

1   both JPMorgan Chase, of course, and Barclays will walk away

2   from any of those claims they would have against the estate and

3   that's a significant benefit.

4           THE COURT:  Okay.  Thank you.  Is there anyone else

5   who wishes to speak in support of this proposed settlement?

6           MR. MILLER:  If Your Honor please, Harvey Miller, on

7   behalf of the Chapter 11 debtors.  I don't rise, Your Honor, in

8   the context of support but rather no objection.  This is a

9   compromise and settlement, Your Honor, in which the Chapter 11

10  debtors have a very significant interest.  Just to give Your

11  Honor some background, LBI, the SIPC debtor, has substantial

12  collateral which was posted with JPMorgan Chase.  In connection

13  with the resolution of claims that JPMorgan Chase may have

14  against the LBI estate, the Chapter 11 debtors and, in

15  particular, Your Honor, LBHI likewise posted a considerable

16  amount of collateral security consisting of cash and

17  securities.  As the claim of the bank against LBI is processed

18  and settled, Your Honor, and that collateral is used to settle

19  that claim, if that collateral is insufficient then JPMorgan

20  Chase will look to the collateral that LBHI has posted.  So

21  there was a very significant interest in this transaction, Your

22  Honor.  And we spent a considerable amount of time with the

23  SIPC trustee, with the staff, with the former Lehman people in

24  going through the facts relating to this transaction.  And it's

25  very significant, Your Honor, because in addition to the

33

1      transfer of the securities which are alluded to as having a

2      value, at some point in time, of 5.7 billion dollars in round

3      figures.   The assertion in the declarations is that those

4      securities are now worth substantially less than 5.7 billion

5      dollars.   But to make up what is facially the seven billion

6      dollars, an additional one billion 250 million dollars of cash

7      is going over to Barclays if you approve the settlement.   And

8      that was very significant, Your Honor, to the Chapter 11

9      debtors and Mr. Marsal.   And I can't tell you, Your Honor, how

10     much time we have spent on this with the cooperation of Mr.

11     Giddens as the trustee.

12          There are still facts, Your Honor, that have to be

13     determined.   So when Mr. Kobak refers to the facts stated in

14     declarations as being uncontradicted, we understand the spirit

15     of the settlement, Your Honor.   We understand what was to be

16     contemplated and to be performed under the asset purchase

17     agreement.   And this is within the spirit of that agreement.

18          However, Your Honor, we were very concerned that

19     something would occur in this compromise and settlement which

20     would preclude future discovery, future determination, that

21     perhaps some assets were transferred to Barclays that may not

22     have been transferred to Barclays (sic) and, as Your Honor

23     knows, this is tripartheid settlement and there may be some

24     relationships with JPMorgan Chase in which LBHI and the related

25     Chapter 11 debtors may have some claims, or they may not have

34

1    some claims.  But we were very concerned, Your Honor, in the

2    shortness of time between the filing of this motion and the

3    time to do some discovery and, as I said, Your Honor, a lot of

4    discovery, informal discovery, was done, Your Honor, the

5    considerations were raised with Mr. Giddens as the trustee,

6    raised with Mr. Novikoff as the attorney for JPMorgan Chase.

7    And as I understand it, even though Mr. Kobak refers to the

8    facts alleged in the declarations as being uncontradicted, all

9    rights are reserved by all parties as I understand the order.

10   And there is nothing in this that presents collateral estoppel

11   with a binding effect in any future proceedings.  So when Your

12   Honor mentioned in the future, there is still a great deal of

13   work being done by the unsecured creditors' committee in

14   looking to the transfer of assets from all of the Chapter 11

15   debtors and LBI to Barclays.

16          So I don't think, Your Honor, as I understand the

17   order, that that kind of discovery, the assertion of claims in

18   the future, if there are any claims, are precluded by the

19   approval of this compromise and settlement.  And it's on that

20   basis, Your Honor, that the Chapter 11 debtors do not object to

21   this compromise and settlement.

22          THE COURT:  Fine.  Thank you very much.

23          MR. MILLER:  Thank you.

24          THE COURT:  And I'd like others who are parties to

25   the settlement to confirm that what you've just said is their

35

1    understanding as well.  If it's not, I want to know what

2    differences may exist.

3            MR. SCHILLER:  Jonathan Schiller for Barclays

4    Capital.  That is our understanding and we confirm what Mr.

5    Miller has brought before Your Honor.

6            We have some other points but I believe the reserved

7    ones should be heard first --

8            THE COURT:  Okay.

9            MR. SCHILLER:  -- with Your Honor's permission.

10           MS. LEVENTHAL:  Good morning, Your Honor.  Shari

11   Leventhal for the Federal Reserve Bank of New York.  The

12   salient facts of how this settlement came to be are set forth

13   in my declaration.  And as has been stated a number of times

14   are not being contested here today.  Of course, if you have any

15   questions, Your Honor, I'm prepared to address those.  But if

16   not, I would like to note again that the Federal Reserve Bank

17   of New York believes that the interest of fairness dictate that

18   this settlement should be approved.  And I'd like to highlight

19   a few of the reasons why.

20           Barclays stepped in as the only party willing and

21   able to purchase LBI's assets.  Your Honor acknowledged that in

22   approving the asset purchase agreement.  Part of that ability

23   included the ability to step into the Fed's shoes and fund

24   LBI's payroll and operations.  And Barclays did this on the

25   night of September 18th.  The plan was for Barclays and LBI to

36

1    execute or reverse repo transactions whereby Barclays would

2    fund LBI to the tune of seven billion dollars.  And -- I'm

3    sorry, to the tune of forty-five billion dollars and received

4    49.7 billion dollars in securities.  Because of the operational

5    difficulties that I highlighted in my declaration, that reverse

6    repo transaction changed.  And, in fact, Barclays paid thirty-

7    nine billion dollars and received 42.7 billion dollars in

8    securities.  The seven billion dollar differential went into an

9    account at JPMorgan Chase for Barclays but somehow it ended up

10   in LBI's account and didn't remain in Barclays' account.  Those

11   funds were Barclays' on the night of September 18th, the early

12   morning of September 19th.  And as the Court noted, this was

13   the transaction that was contemplated in the asset purchase

14   agreement.

15          As Mr. Kobak noted, the estate could face a claim

16   here in excess of seven billion dollars.  By our calculations,

17   I believe the interest on seven billion dollars is something in

18   the range of around thirty-five million dollars a month.  So if

19   this settlement is not approved, we're talking about a sizeable

20   cash claim against the estate.  And, in fact, what the estate

21   gains here is it has 5.7 billion dollars in cash remaining in

22   the estate in exchange for giving up securities that have a

23   value that's been noted both in the declarations and here today

24   as being far less than that.

25          Seven billion dollars is a lot of money at any time.

37

1    But it's particularly so in the current economic climate.  The

2    parties with the Federal Reserve's assistance have been working

3    diligently to reach a resolution of this matter.  And while the

4    delay in bringing this matter to the Court may seem to negate a

5    sense of urgency, as Mr. Kobak and Mr. Caputo noted, there is a

6    continuing and substantial market risk that the securities are

7    going to decline.  And it's important, therefore, that the

8    settlement be approved as expeditiously as possible.  As the

9    host country supervisor for Barclays, we believe it's important

10   that Barclays get its money.  In conversations with the FSA,

11   the home country regulator, they believe the same.  And,

12   therefore, we ask Your Honor that the settlement be approved as

13   soon as possible.  Thank you.

14           THE COURT:  Thank you.

15           MR. NOVIKOFF:  Good morning, Your Honor.  Harold

16   Novikoff, Wachtell, Lipton, Rosen & Katz on behalf of JPMorgan

17   --

18           THE COURT:  Good morning.

19           MR. NOVIKOFF:  -- Chase Bank, N.A.  Good morning,

20   Your Honor.  We are a party to and support the settlement

21   that's currently before the Court.  As has been noted, this is

22   essentially designed to achieve what was intended by the

23   parties to occur during the period on September 18th and 19th

24   to complete a delivery of securities that was intended at that

25   time which, largely due to operational issues, simply did not

38

1    occur.

2          JPMorgan's interest in this matter are largely

3    aligned with those of LBI and, indirectly, with the LBHI estate

4    in that all of us have an interest in maximizing the value of

5    the collateral pool that is held by JPMorgan to cover the

6    obligations owing to it by LBI, particularly, those arising

7    from the clearance advances pre-petition.  These securities, if

8    they are not delivered to Barclays Capital, remain in that

9    collateral pool and would essentially have to be liquidated in

10   order to achieve a payment and realize their value.  In looking

11   at it, we believe that, from JPMorgan's economic perspective,

12   which, as I noted, is aligned with those of the two estates, we

13   feel it is far better at this point to deliver those

14   securities, the entire settlement consideration here to

15   Barclays Capital, than to retain those derived value from them

16   but run a risk of -- a serious risk of a claim which could

17   result in seven billion plus of real value going to Barclays

18   Capital.

19         With respect to the timing, Your Honor, we believe

20   that any further delay here is potentially harmful.  As I

21   noted, these securities right now are shown as property of LBI

22   in which JPMorgan holds a security interest.  These securities

23   are not like fine wine.  They do not improve over time in an

24   adverse market.  Particularly, many of these are mortgage-

25   backed securities and they have been going down in value while

39

1   we've been putting the settlement into place.  We would like to

2   know now, I'm sure Barclays would like to know now, whether

3   this transaction will be allowed to go forward.  These

4   securities were set aside at some time in October to allow this

5   transaction to happen.  The reality is, is the value during

6   that period of time, is the reality is the value of the

7   securities have gone down and we've got a market which, as Your

8   Honor knows, is quite volatile.  And there can be further drops

9   in value.  We want this to go forward now.  We do not believe

10  it should be held up by any tangential issues where, at this

11  point, parties want to find additional information about the

12  overall sales transaction.

13          We confirm Your Honor's understanding that what is

14  being done here is we are approving a settlement agreement.

15  There will not be any collateral estoppel or other similar

16  effects.  As to the facts laid out in the declarations or

17  otherwise in the order or the motion, we are approving a

18  transaction.  People would remain free to pursue claims if they

19  feel that there is something in the overall sales transaction

20  which gives rise to a claim.

21          Essentially, what we're doing here at this point,

22  Your Honor, is allowing a portfolio of securities and proceeds

23  of sales of securities that previously have been set aside at

24  this point to move.  Nobody's going to lose the record of what

25  moved or how it got there.

40

1      I would have more, Your Honor, to say about the Royal

2   Bank objection although I understand that objection is going to

3   be withdrawn and would reserve time if, in fact, my

4   understanding is incorrect.

5      THE COURT:  Fine.

6      MR. NOVIKOFF:  Thank you, Your Honor.

7      THE COURT:  Thank you, Mr. Novikoff.

8      MR. SCHILLER:  Your Honor, briefly, Jonathan Schiller

9   again on behalf of Barclays.  The order that the trustee has

10  put before you and which we've reviewed and to which Mr. Miller

11  referred preserves rights, as Mr. Novikoff just explained.

12  What will be final, Your Honor, is your approval of the

13  settlement agreement and the intended transfer of the

14  settlement securities and the settlement payment to Barclays.

15  Your Honor has heard from both the Fed and JPMorgan about the

16  risk of these securities in the marketplace.  We have put

17  before you through Gerard LaRocca, chief administrative officer

18  of Barclays -- and Mr. LaRocca is here this morning, Your

19  Honor.

20      THE COURT:  Good morning, Mr. LaRocca.

21      MR. SCHILLER:  In support of the motion to shorten

22  time, I just want to draw the Court's attention to the second

23  paragraph of Mr. LaRocca's declaration there where he said

24  insofar as a settlement agreement contemplates the transfer to

25  Barclays of those securities that remain from the Fed portfolio

41

1    that were originally intended to be transferred to Barclays

2    pursuant to the transaction described in the declarations that

3    accompany the motion before you, Barclays has been exposed and

4    continues to be exposed to continued market risk associated

5    with these securities at a time when the markets have been

6    experiencing and considerable risk.

7              We regard the creditor committee objection, Your

8    Honor, as not germane to your decision whether to accept this

9    motion and approve the settlement.  They want to exhume

10   information related back to the sale.  That is not pertinent

11   and does not bear upon the question before you today.  Thank

12   you, Judge.

13             THE COURT:  Mr. Schiller, before you --

14             MR. SCHILLER:  Yes.

15             THE COURT:  -- sit down, you may not be the right

16   person to answer this question and Mr. LaRocca might be.  And I

17   just want you to know that before we close the record as to

18   this aspect of this morning's agenda, I would like greater

19   clarity than I currently have on a valuation question.  And

20   this is not just addressed to you.  It's addressed to anybody

21   who can answer it.  I believe, if I'm understanding the

22   transaction correctly, that the working premise of it is that

23   the 1.25 billion dollars in cash consideration, which is going

24   to Barclays, upon approval, along with the securities that have

25   been identified, is intended to compensate Barclays for the

VERITEXT REPORTING COMPANY

42

1   diminution in value over time of those securities such that

2   Barclays is receiving the same seven billion dollars in value,

3   assuming it's approved today and consummated tomorrow, that it

4   would have received if the transaction had been consummated as

5   contemplated in September.  Am I right in understanding that?

6   That's a premise that I have.  I just want to confirm it.  And

7   then assuming that's correct, I want to know what the current

8   value of the transaction is.

9           MR. SCHILLER:  It's a bit different than that, Judge.

10  The cash component is designed to address the liquidation of

11  certain securities from the Federal portfolio that occurred.

12  And it makes up for that portion of the securities.

13          THE COURT:  As of what date?

14          MR. SCHILLER:  As of the date --

15          THE COURT:  I mean, recog --

16          MR. SCHILLER:  -- the settlement agreement was

17  entered.  The liquidation occurred after the 19th and the

18  values were established at the time the parties agreed in their

19  settlement.

20          THE COURT:  I'm still not clear on this.  And I know

21  a lot of people have spent a lot of time on it.  I'm just

22  trying to understand the basic math that is supposed to equal

23  seven billion.  It's 1.25 billion in cash plus a basket of

24  securities equals seven billion, is that right?

25          MR. SCHILLER:  That is, as Mr. Miller said, that's

43

1    the facial value.  All the parties before you believe that the

2    current value of those securities is below that.  And that's

3    why it would be a benefit to the estate to resolve it on this

4    basis.

5           THE COURT:  Understood.  And I take it that while

6    everybody represents, and I accept the representations, that

7    this is a net benefit to the estate, no one is prepared on

8    today's record to quantify what that benefit is.

9           MR. SCHILLER:  Well, the evidence before you, Judge,

10   submitted by the Fed by Mr. Moore is that the Federal

11   securities, and I quote, "would be substantially less than the

12   50.62 billion".  And that in paragraph 6 of his affidavit, he

13   relates that the subject of the motion is going to be

14   substantially less than the difference.  And he does the math

15   there.  The precise value today of the securities in the Fed

16   portfolio, I can't make a representation other than agreeing

17   with Mr. Moore that the values have declined and are

18   substantially below the seven billion dollar value.

19          THE COURT:  Okay.  All that I was really trying to

20   get a sense of -- and it may be that the parties involved in

21   this would prefer not to sharpen their pencils on this and

22   prefer the record to speak for itself that it's substantially

23   less and allow me to use my own powers of interpretation to

24   assume that means a lot of money.  But I don't know what we're

25   talking about in terms of the order of magnitude.  It may be

44

1    that I don't need to know that.  But missing from the equation

2    of determining that this is a 9019 settlement that warrants

3    approval is the quantification of what that benefit actually

4    is.  It may be that parties would prefer that that not be part

5    of the public record.  I'd like to know it.  And I'd be

6    prepared to learn it through an in camera submission.

7              MR. SCHILLER:  Very well, Your Honor.  I would just

8    add to that that the trustee, of course, with Deloitte, has

9    looked at this as has Mr. Moore to make their representation to

10   you.  It doesn't offer the precision of the value that you're

11   asking but it is testimony as to that number being less than

12   the full value of the settlement.

13             THE COURT:  I understand.  I simply trying to get

14   some sense.  In a universe in which we're talking about seven

15   billion dollars which is quite a lot of money --

16             MR. SCHILLER:  Yes, sir.

17             THE COURT:  -- I'm trying to understand what, in

18   fact, is the value of what is being transferred to Barclays

19   today.

20             MR. SCHILLER:  If I may just take one minute, because

21   it's an important question, confer with my client and Mr.

22   LaRocca and see if there's something that we can throw a light

23   on publicly at this point in time for you.

24             THE COURT:  That would be helpful.

25        (Pause)

VERITEXT REPORTING COMPANY

45

1          MR. SCHILLER:  Your Honor, we are prepared to proffer

2     through Mr. LaRocca off the record in camera the value of the

3     securities that Barclays assigned on the night of the 19th.

4          THE COURT:  Fine.  Thank you.  Is there anyone else

5     who wishes to speak in support of the proposed settlement?  All

6     right.  Let's hear from anyone who wishes to speak against it.

7          MR. KIRPALANI:  Good morning, Your Honor.  Susheel

8     Kirpalani from Quinn Emanuel on behalf of the official

9     committee of unsecured creditors of the Chapter 11 debtors.

10          THE COURT:  Good morning.

11          MR. KIRPALANI:  Your Honor, first of all, I want to

12     thank you for letting me be heard at least to outline what our

13     position is.  I appreciate the offer to include in the proposed

14     form of order language and all the representations that this

15     would not be collateral estoppel.  But I did want to explain to

16     the Court, and I won't take up too much of Your Honor's time,

17     exactly why did the committee feel it so necessary to appear on

18     this particular settlement if, in fact, all rights are reserved

19     and if, in fact, there's not supposed to be any collateral

20     damage -- or, hopefully not damage but collateral estoppel.

21          Your Honor, I think the issues -- Your Honor knows

22     better than I -- from the Friday night when you approved the

23     sale going forward were thereafter spun into a whole variety of

24     additional discussions and negotiations into Saturday and

25     Sunday.  And we did submit the declaration of Mr. Saul Burian

46

1    from Houlihan Lokey who was intimately involved in those

2    negotiations.  The sale order itself made the creditors'

3    committee a party, if you will, to the transaction in the sense

4    that it couldn't be changed without the creditors' committee's

5    consent, even an immaterial change.

6          The transaction, Your Honor, did change.  It changed

7    and you heard about the changes.  Your Honor yourself probably

8    sees the numbers in the affidavit and went back and looked at

9    your transcript and said that wasn't exactly the numbers that I

10   remember being told on the Friday.  At least that's the

11   learning process I've gone through.  And so, the question that

12   we had when this has come before the Court in an emergency

13   basis order to show cause three months after the transaction is

14   these new numbers.  If they're not footing with the numbers

15   that were told to the creditors' committee during the weekend,

16   why is that?  And what are the right numbers?  Because as of

17   that late Sunday night, early Monday morning, our financial

18   advisors were told that, look, this is the transaction that has

19   to close.  These are the numbers -- they're actually given a

20   manila folder, which I photocopied here, that has all of the

21   numbers that Mr. Burian outlined in his declaration.  And it's

22   for these reasons we need to go forward.  Don't worry.  There

23   will be a reconciliation post-closing.

24         And so, here we are, three months hence and we assume

25   that parties are busy, there's a lot of other things that need

47

1    to happen in the estate and we're not faulting anybody for

2    that.  But then when we see three declarations submitted by

3    various parties to some settlement agreement that, although I

4    say it's tangential, it was part and parcel of the transaction,

5    Your Honor.  I mean, I'm not going to use a microscope and say

6    that this is something separate than the sale transaction.

7    When we see declarations that have different numbers, different

8    understandings than what people were told, we agree with the

9    Court's comments that these aren't rounding errors.  These are

10   billions of dollars.  And Your Honor mentioned that seven

11   billion dollars is a lot of money.  I would posit that five

12   billion dollars is also a lot of money.  And one of the major

13   changes from that weekend was the securities or the assets that

14   were being transferred to Barclays would need to be trued up

15   that the value from Ms. Fife's comments on that Friday up until

16   Sunday had gotten even worse than the 47.4 and that they have

17   actually decreased now to forty-four or forty-five billion

18   dollars.  And Mr. Burian goes through that in his declaration.

19        And so, our request was simply that in addition to

20   the language that Your Honor sees in the court order that by

21   mid-January, at least, there be a final reconciliation of this

22   mess of transactions.  There are a lot of smart people who

23   worked on it.  But not everything -- in fact, close to nothing

24   has come to light.  And while we understand that the creditors'

25   committee sits in the Chapter 11 case and this is the SIPA

48

1    proceeding, we thought someone should bring it to the Court's

2    attention that Your Honor, I can tell from your questions, are

3    asking, how do I know what the values are or who ascribed the

4    value, as of what date, these are all the same types of

5    questions that we've been asking.  And we thought it's

6    important to bring it to the Court's attention because,

7    frankly, at the end of the day, Your Honor lowers the gavel and

8    says this is a fair deal or not a fair deal.  But without the

9    right information or without understanding how numbers kept

10   changing, I think it gives us a little bit of pause, Your

11   Honor.  And if what everybody in this courtroom is telling me

12   is we want to get on with the agenda and you've made your

13   point, all rights are reserved, all I would say is if the

14   parties could agree to provide us with the information rather

15   than force us to go through the hoops of filing a Rule 2004

16   against three different entities, yeah, that would be, I think,

17   the most efficient way to proceed.

18        It's not that the information doesn't exist.  The

19   declarants are relying on something when they're making

20   statements about assumed liabilities and asset values of

21   particular dates.  When people market to market securities, we

22   want to make sure they didn't stick their finger in the air and

23   say, hmm, five billion dollars additional assets, please,

24   Lehman Brothers.  And that's our concern.  If everything turns

25   out that it was a frenzied time but that, in fact, was the

49

1   market to market value as of that weekend and the transaction

2   was permitted to close and had to close to save the various

3   jobs that we're very happy that they did save, then that would

4   be fine.  But there are major discrepancies between what we

5   were told that weekend and what's being put forth here today.

6   Now, I understand none of that is part of the factual record

7   which is comforting.  When we filed our objection, that was not

8   the case but I think that's now been made very clear.  And what

9   we have asked is, and we asked them on Friday, could we please

10  get some final reconciliation of the numbers and Houlihan Lokey

11  will work with Deloitte and work with Barclays.  And the

12  problem we face, which, I think, Your Honor has heard in other

13  contexts is the critical people on Lehman Brothers' side don't

14  work at Lehman Brothers anymore.  And so, it's difficult that

15  they were the ones who were assisting in the consummation of

16  the transaction.  They're not there anymore when the questions

17  are to be asked.  And we just want to get the final answer,

18  Your Honor.  That's really all we want.

19          THE COURT:  When you asked the question on Friday

20  about getting together and trying to work cooperatively to get

21  to the bottom of all this, was there a response?

22          MR. KIRPALANI:  Their response was we'll give you the

23  language in the order and that's it.  This morning, the parties

24  did tell me that they would be happy to look at the list, it's

25  five items, look at the list that Houlihan helped me put

50

1    together and we can talk about it sometime in mid-January.  You

2    know, I guess, that's where we are.  They said they don't think

3    it's appropriate for the Court to have to order them to comply

4    and I said you're just causing us to file a motion to do that.

5    It's hard to argue that the information shouldn't be made

6    available.  But, I guess, that's probably where we are.  We'd

7    have to file something if they don't give us the information.

8            THE COURT:  All right.  I'll just make the general

9    comment.  It's not a ruling and I'm not ordering anybody to do

10   anything because there's nothing before me that leads to the

11   entry of an order at least at this point other than an order

12   with respect to the settlement agreement itself.

13           It's obviously in the best interest of orderly case

14   administration that information be shared as promptly as it can

15   be consistent with the other conflicting obligations that the

16   financial advisors and lawyers have in this massive case with

17   enormously complicated issues.

18           Nonetheless, I consider it to be important for us to

19   get to what I'll call closure with respect to the basics of the

20   transaction that was approved by order entered September 20th.

21   And this motion with respect to the settlement agreement is a

22   reasonable platform on which to address some of these issues

23   because while this is not fairly to be characterized as a

24   cleanup item, it's a very significant matter.  It does draw all

25   of our attention back to what happened in September.  And I

51

1    think it important that there be reasonably prompt resolution

2    of outstanding questions that the committee may have on the

3    subject.  I would hope that it's not necessary for the

4    committee to have to file 2004 requests in order to get the

5    information that it seeks which seems to be reasonable and

6    consistent with its mandate.

7         As it relates to the issue of standing that has been

8    alluded to during the course of this hearing and in your own

9    remarks at the outset, by making this comment, I am not making

10   any judgment as to the standing of the creditors' committee

11   appointed in the LBHI case to participate actively and directly

12   in the LBI case.  But it is apparent to me that the transaction

13   that was approved on September 20th was approved by means of

14   two orders, one entered in the LBHI case and one entered in the

15   LBI case.  It is reasonable for the creditors' committee which

16   represents substantial creditor interest in LBHI to have access

17   to information so that it can fulfill its functions in the LBHI

18   case.

19        Additionally, it appears to me reasonable for the

20   LBHI committee not just in the context of what's before me now

21   but in other settings to be a party in interest for purposes of

22   major transactions affecting the LBI case.

23        This does not constitute a ruling with respect to

24   standing.  I do, however, note that these cases operate off the

25   same agenda, very frequently have overlapping agenda items and