1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555 (JMP)

      08-01420 (JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

    Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

    Debtor.

- - - - - - - - - - - - - - - - - - - -x

        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        February 11, 2009

        10:01 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

I.  UNCONTESTED MATTERS:

HEARING re Case Conference: (A) Presentation of Proposed International Case Protocol; (B) Examiner's Proposed Work Plan

HEARING re Application to Employ Jenner & Block LLP as Counsel to the Examiner

HEARING re Examiner's Motion for an Order Directing the Production of Documents and Authorizing the Examinations of the Debtors' Current and Former Officers, Directors and Employees, and Other Persons and Entities

HEARING re Motion of Green Tree Servicing LLC for Bank Order Pursuant to Sections 105(d)(2)(A) and 365 of the Bankruptcy Code Directing Debtor Lehman Brothers Holdings Inc. to Assume Flow Subservicing Agreement and, in the Interim, for Order Granting Adequate Protection Pursuant to Section 364(c) of the Bankruptcy Code

HEARING re The Midwest Independent System Operators Motion for (I) Relief from the Automatic Stay to Exercise Setoff Rights Pursuant to Section 553 of the Bankruptcy Code and (II) Other Related Relief

September 22nd.

Those transfers were reversed. And what that meant is that the securities that were kind of in motion on their way to other receiving brokers, were brought back by the CNS system that is administered by DTC and its subsidiaries. And those securities came to rest, or the ones that are the subject of this motion, came to rest in essentially two places. First, DTC detained two groups of -- what we've described in the motion as two groups of securities. One is the Exhibit A securities, which remain in the possession of DTC. And the second in that category are the Exhibit C securities that were detained and then liquidated by DTC. And as another category, there came into the position of the LBI account, another body of securities that has been described in the motion as the Exhibit B securities.

Again, when the dust settled, it turned out that Barclays needed the Exhibit A securities and the Exhibit C securities to satisfy claims of customers whose accounts had been transferred. So the settlement, broadly considered, tries to put us in the situation that would have prevailed if those ACATs securities had reached their intended destination on September 22nd, and in the following days.

And to make that happen, two things need to occur. The Exhibit A securities that remain in the possession of DTC must go to Barclays to be reunited with the customer accounts

62

1  that they are associated with. With respect to the Exhibit C
2  securities which have been liquidated, those need to be bought
3  back in if the customer claims are going to be satisfied. And
4  we have some rough numbers to discuss in connection with that
5  buy-in. And the way the agreement expresses the buy-in, it's
6  called a make-whole payment, which will go to Barclays and then
7  be used to buy the securities back.
8      The formal value of the securities on the 22nd was
9  approximately 221 million dollars. Those securities were
10 liquidated over the next couple of weeks. Proceeds were
11 garnered in the amount of about 197 million dollars. And for
12 clarification of what's in the 9019 application, those proceeds
13 were applied to debts owing from LBI to DTC, debts resulting
14 from the clearance and settlement activity on September 22nd
15 and the following days.
16     Based on estimates that have occurred over the course
17 of the ensuing months up to last Friday, it's believed that the
18 current cost of buying them back will be about 170 million
19 dollars. So if -- there are, of course, no guarantees. The
20 market can move again. But if that estimate holds, the result
21 will be a saving of approximately 26 or 27 million dollars for
22 the estate, comparing the buyback cost with the proceeds that
23 were credited, in effect, to the trustee's account at DTC.
24     Your Honor, we received two limited objections and
25 comments on this proposed settlement, one from the debtor. And

```
                                                              63
 1   as a result of communications we've had, further information
 2   and explanation that's been provided, that objection has been
 3   withdrawn.
 4             THE COURT:  The debtor objection has been withdrawn.
 5   That I saw this morning on the docket.
 6             MR. WILTENBURG:  Yes.
 7             THE COURT:  What's the status of the creditors'
 8   committee?
 9             MR. WILTENBURG:  The creditors' committee didn't
10   style its response as an objection but reflected the fact that
11   communication was occurring and was expected to continue to
12   occur.  And I hope I'll be able to report that the result has
13   been satisfaction of the committee's concerns.
14             THE COURT:  I think we're about to find that out.
15   What's the committee position?
16             MR. TECCE:  Good morning, Your Honor.  James Tecce of
17   Quinn Emmanuel on behalf of the committee.  With the
18   representations made on the record by Mr. Wiltenburg, our
19   information requests have been answered.  And we had asked that
20   that be presented on the record, and it has.  That resolves our
21   first objection -- or our first concern, rather.  Our second
22   concern was just that the reservation of rights of the
23   committee and the LBHI estates that appeared in the first
24   settlement resolution with Chase back in December, that the
25   same reservation of rights appear in connection with this
```

64

1 settlement with the same force and effect.

2 As the Court knows, we're investigating the sale
3 transaction. We want to make sure that we have the same
4 reservation that we obtained previously. And that was our
5 second concern.

6 THE COURT: That's fine. I remember that reservation
7 of rights, and you still have it as far as I'm concerned.

8 MR. TECCE: Thank you very much.

9 MR. MILLER: And the debtor also, Your Honor. The
10 debtor?

11 THE COURT: You have it, too, Mr. Miller.

12 MR. MILLER: Thank you.

13 THE COURT: Thank you.

14 MR. WILTENBURG: Indeed, Your Honor, the form of
15 order that's been tendered to the Court incorporates a parallel
16 provision to the one that was entered on the prior occasion.
17 So on that basis, Your Honor, I would request that the
18 settlement be approved.

19 THE COURT: The settlement is approved.

20 MR. WILTENBURG: Your Honor, the next item on the
21 agenda is the trustee's motion pursuant to Bankruptcy Code
22 Section 365(d)(4) for extension of the trustee's time to assume
23 or reject unexpired leases of nonresidential real property.
24 And the Court is aware of the history of this. There were
25 originally, I believe, six leases that were scheduled as leases

1  as to which this extension of the assume and reject deadline
2  was sought. We had discussions and issues with one of the
3  landlords with respect to that list. And it is the landlord of
4  certain property located at 555 California Street in San
5  Francisco.
6      And the issue that's been presented on the objection
7  of that landlord, Your Honor, I think, as you'll see in the
8  papers, we feel misconceives the effect of the Court's prior
9  orders approving the asset sales to Barclays, and especially
10  the portions approving the assumption and assignment of certain
11  executory contracts. The Second Circuit tells us that there
12  must be notice, a hearing and an order as a prerequisite to the
13  assumption of executory contracts. That just didn't occur
14  here.
15      There is no order of the Court that contemplates an
16  assumption without assignment of this particular contract. For
17  whatever reason -- I don't have insight into the minds of the
18  negotiating parties -- they chose, after the sale hearing had
19  occurred in this Court, to take that lease out of the scheme of
20  leases that would be assumed and assigned, and kind of changed
21  the rules as to that one, foreseeing an assumption in
22  connection with a sublease instead of assumption and
23  assignment.
24      That's a much different thing than had been noticed
25  prior to that sale hearing. It's a different thing than the

66

1   Court approved in the sale approval order that had been
2   entered, I think, originally on the 19th of September.
3            THE COURT:  20th.
4            MR. WILTENBURG:  20th.  Your Honor, the papers review
5   the legal arguments of the parties.  I think we've tried to
6   state the sequence of events and the applicable legal
7   doctrines.  If the Court has any questions, I'd be glad to
8   address them.
9            THE COURT:  No, I've reviewed the papers and I've
10  reviewed the applicable case law.  And I'm fairly well prepared
11  to deal with this now.
12           MR. WILTENBURG:  With that, I'll cede the podium to
13  counsel for the landlord.
14           THE COURT:  Let me ask you, before you cede the
15  podium, you've talked about the deemed assumption issue in
16  connection with the sale order, which you obviously say
17  shouldn't govern here under the Burger Boys' authority from the
18  Second Circuit.  However, you haven't given me an argument why
19  the time should be extended under 365(d)(4), at least you
20  haven't done so orally on today's record.  I assume that you
21  stand on your papers with respect to that?
22           MR. WILTENBURG:  I do, Your Honor.  And I don't
23  believe the landlord has joined issue on that point.  That is,
24  they're approaching this from a different point of view and I
25  think not including that the legal standard applicable to