IN THE HIGH COURT OF JUSTICE  
QUEENS BENCH DIVISION

Folio 2009  
Financial Services Authority  
Clive Adamson  
First witness statement

IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975

AND IN THE MATTER OF THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

AND IN THE MATTER OF A CIVIL PROCEEDING NOW PENDING BEFORE THE UNITED STATES BANKRUPTCY COURT, SOUTHERN DISTRICT OF NEW YORK IN THE MATTER OF

Lehman Brothers Holdings Inc *et al* (Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered)

*and*

Lehman Brothers Inc (SIPA Proceedings Case No. 08-01420) (JMP)

---

### WITNESS STATEMENT OF CLIVE ADAMSON

---

I, **CLIVE ADAMSON**, Director of the Financial Services Authority (the "FSA"), 25 The North Colonnade, Canary Wharf, London, E14 5HS, **WILL SAY AS FOLLOWS:**

1. I am employed by the FSA as the Director of its Major Retail Groups Division ("MRGD"). As such, I am responsible for the regulation of Barclays Bank PLC and the consolidated supervision of its wider group (for convenience referred to as "Barclays" throughout this statement).

2. I joined the FSA in April 2001 as a Senior Advisor supporting the FSA's banking supervisors. In April 2008 I became the Acting Director of MRGD and in July I became the Director. As its name suggests, MRGD is responsible for regulating the

1

very largest retail operators, including all the high street banks such as Barclays and the largest insurance companies.

3. Save where otherwise indicated, I make this statement from matters within my own knowledge, and by reference to certain documents in this case.

4. The purpose of this statement is to provide evidence on behalf of the FSA in support of its submission that this Court should not enforce the Letter of Request sent to it by the United States Bankruptcy Court for the Southern District of New York.

The FSA

5. It may be helpful at this stage if I set out briefly some background to the FSA. The FSA is perhaps an unusual type of regulator. It is an independent non-governmental body, in that it is a private company limited by guarantee formed under the Companies Acts, but its functions have been conferred on it by statute. Under the Financial Services and Markets Act 2000 ("FSMA"), with effect from 1 December 2001, the FSA has been the sole regulator of the UK's financial services industry, which includes banks. Under FSMA the FSA has the power to charge fees to those it regulates, so is not financed out of general taxation. Currently, the FSA employs the equivalent of about 3,020 staff full-time staff, of which about 1,260 are employed in the Divisions responsible for the supervision of regulated firms (of which there are currently about 28,000).

6. Section 2(1) of FSMA sets out that the FSA must, in exercising its functions, act (so far as is reasonably possible) in a way that is compatible with the regulatory objectives. Those objectives (set out in section 2(2) of FSMA) and amplified by sections 3 to 6 of FSMA are as follows:

   a. maintaining confidence in the financial system;

   b. promoting public understanding of the financial system;

   c. securing the appropriate degree of protection for consumers; and

2

    d. reducing the extent to which it is possible for a business which is regulated, or which ought to be regulated but is not, to be used for a purpose connected with financial crime.

7. Section 2(4) of FSMA sets out some general functions of the FSA. Briefly, these are:

    a. making rules under FSMA (considered as a whole);

    b. preparing and issuing codes under FSMA (considered as a whole);

    c. in relation to the giving of general guidance (considered as a whole); and

    d. determining the general policy and principles by reference to which it performs particular functions.

8. Section 2(3) of FSMA provides that, in carrying out those general functions, the FSA must have regard to eight further principles, three examples of which are:

    a. the need to use its resources in the most efficient and economic way (section 2(3)(a));

    b. the responsibilities of those who manage the affairs of authorised persons (section 2(3)(b)); and

    c. the principle that a burden or restriction which is imposed on a person, or on the carrying on of an activity, should be proportionate to the benefits, considered in general terms, which are expected to result from the imposition of that burden or restriction (section 2(3)(c)).

9. Aside from the general functions set out above, the FSA is also responsible for:

    a. supervising regulated firms to ensure that their actions are in accordance with FSA rules and that they continue to satisfy the Threshold Conditions for authorisation (discussed further below) ; and

    b. taking enforcement action against regulated firms for breaching those rules.

The FSA's ongoing supervision of regulated firms – a risk-based approach

3

10. There are just over 28,000 regulated firms in the UK. The FSA recognises that it has limited resources and that as a result it would not be possible to seek to supervise all regulated firms on a day-to-day basis. It therefore seeks to target its resources in the most effective way possible so as to achieve the best result, adopting a risk-based approach to supervision. As a general principle, we supervise regulated firms according to the risks they present to our statutory objectives (set out in paragraph 6 above). We assess risks in terms of their impact (the scale of the effect these risks will have on consumers and the market if they were to happen) and probability (the likelihood of a particular issue occurring). The risks are assessed using the FSA's ARROW risk assessment framework (ARROW stands for "Advanced Risk-Responsive Operating framework"). The result of an ARROW assessment is to place firms into one of three categories according to the impact they have on consumers and the FSA's statutory objectives: high impact, medium impact and low impact.

11. All firms classed as "high impact" and "medium impact" following an ARROW Assessment will be "relationship-managed". A firm which is "relationship-managed" will typically have one, or more, supervisors specifically assigned to it on a continuous basis, who will act as the firm's main point of contact in the FSA. The very largest firms (such as Barclays) have a team of supervisors assigned to them, all of whom are responsible for providing supervisory oversight and who will have regular daily contact with the firm concerned. High impact firms are subject to "close and continuous" supervision, which in general terms involves an ongoing schedule of contacts with the firm by the supervisory team throughout a given period, supplemented by a range of frequent ad hoc contacts on a wide range of regulatory issues. If a firm is assessed as "low impact" it does not have a relationship manager; its primary contact with the FSA will be through our Firm Contact Centre.

12. A key feature of the regulatory framework set up by FSMA is that, in order to become and remain authorised, each firm has to satisfy what are called the Threshold Conditions as set out in Schedule 6 to FSMA. For present purposes, the most relevant Threshold Condition is that a firm has to maintain "resources" which must "be adequate in relation to the regulatory activities that [the firm] seeks to carry on, or carries on." The resources referred to include financial resources but extend beyond these to include the firm's human resources and its systems of internal controls.

4

13. In the context of the Barclays acquisition of Lehmans in September 2008, the FSA's main focus was the impact of the acquisition on Barclays' financial resources, in particular on its core Tier 1 ratio, and the need to fund Lehman's continuing liquidity obligations in the U.S. until any transaction had been completed. Put simply, the core Tier 1 ratio is the ratio of high-quality capital (mainly ordinary shares and eligible resources) to the bank's assets (mainly loans) calculated on a risk-weighted basis.

14. In the first, unsuccessful transaction, Barclays was to buy the shares of Lehman Brothers Holdings Inc, the group's parent company. In the second, successful transaction, Barclays bought the assets and liabilities of Lehman Brothers Incorporated, the US broker-dealer business within the group, and certain other assets. In addition to assessing the impact of the transactions on Barclays, the FSA also had regulatory responsibilities in relation to a Lehman European sub-group, of which the main UK-regulated business was Lehman Brothers International Europe ("LBIE").

15. The Committee, in the Schedule to the Letter of Request, have referred to Barclays' "application" to acquire Lehman. I will return to this point later below, but here I will describe the process that is generally followed where a person (who may or may not be regulated by the FSA) intends to acquire a regulated firm. Before making the acquisition, Part XII FSMA requires the acquirer to give notice of intention so to do to the FSA. There is a form of notice for this on the FSA's external website at the following link:

http://www.fsa.gov.uk/pages/Doing/Regulated/Notify/Control/index.shtml

The FSA then has a period of up to 60 working days in which to decide whether or not to object to the acquisition (based on criteria set out in Part XII FSMA). In addition, where the acquirer is another regulated firm, depending on the size and regulatory implications of the intended acquisition, the FSA would usually carry out an analysis of the acquirer's own continuing ability to meet the Threshold Conditions, to ensure that the acquisition would not undermine the financial and other resources of the acquirer. Had Barclays reached the point where it had decided to acquire the shares of Holdings, Barclays would have been required to notify the FSA under Part XII FSMA of its intention to become the new owner of LBIE, and the FSA would also have carried out a Threshold Conditions analysis of Barclays.

**The FSA's objections**

16. The FSA's objections to the application by the Committee are dealt with in the following order:-

   i) The confidentiality regime under section 348 FSMA.

   ii) The lack of relevance and the position of Barclays.

   iii) Lack of specificity and comments on the 10 classes of document requested by the Committee.

   iv) Impact of disclosure on effective supervision.

   v) Redaction and other practical objections.

**The confidentiality regime under section 348 FSMA**

17. I am advised that two of the conditions to be met, in order for information to be regarded as "confidential" under section 348 are that first, it must relate to the business or other affairs of any person and second, it must have been received by the FSA under or for the purposes of FSMA.

18. In relation to the first condition, the FSA was involved in a large number of exchanges with Barclays in relation to the two transactions, at various levels of seniority in both organisations. In the course of those exchanges the FSA received information from Barclays relating to its business or other affairs, as would be expected in a major acquisition, for example, how Barclays intended to fund the acquisition, the Lehman assets it wanted to keep and those it did not want to acquire and Barclays' calculations of the impact of the acquisition on its regulatory financial position.

18 In relation to the second condition, the reason why the FSA received information about the acquisitions from Barclays was so that the FSA could assess whether, if either of them were to be completed, Barclays would continue to meet the Threshold Conditions for authorisation. Carrying out such an assessment is a core function of the FSA under FSMA.

19. I am also advised that, under section 348 FSMA, confidential information may be disclosed, if the person who provided it to the FSA and, if different, the person to whom it relates, give their consent. While the question of Barclays consenting to the FSA disclosing confidential information to the Committee has been raised with the firm, no consent has been received by the FSA from Barclays as at the date of this statement.

**Relevance and the position of Barclays in the US litigation**

20. I am advised that a condition which this Court would expect to be met before ordering compliance with a Letter of Request is that the documents to be produced by the recipient should amount to evidence relevant to the issues in the litigation proceeding in the overseas jurisdiction.

21. The FSA is not a party to the litigation between the Committee and Barclays in the US courts, so does not have a detailed understanding of the issues in the proceedings. I have nevertheless read the witness statement of Marc A Becker filed on behalf of the Committee. In paragraph 26, Mr Becker summarises the objective of the US litigation as being to: "unravel the representations made by and to Barclays in the course of its acquisition of [Lehman's] Broker-Dealer business, and to resolve the consequences of the enormous gulf between what the United States Bankruptcy Court thought Barclays was gaining from the Sale Transaction, and what it in fact (by its own admission) gained from the Sale Transaction.".

22. I have also read what I am advised are the relevant pages (120 to 131) of the transcript of the hearing of the Committee's application to Judge Peck in New York on 17 December 2009. Copies of these pages are exhibited to this statement marked "CA 1". It appears from page 126 lines 7 to 9 that Barclays has agreed to disclose to the Committee any formal correspondence it had with the FSA at the time. Later, at page 129 lines 5 to 6, Barclays say they "have provided extensive discovery including all [their] work papers."

23. To return to Mr Becker's summary, this makes it clear that the US litigation involves a comparison between what Barclays told the US courts about the proposed acquisition and what it in fact acquired from Lehman. As Barclays have agreed to give the Committee discovery of the documents which Barclays possess recording what they

7

told the FSA, I find it difficult to understand why requiring the FSA to search for copies of such documents can fairly be regarded as a reasonable request for <u>evidence</u>. In addition, in relation to the parts of the Letter which refer to the FSA's "analysis", "internal notes", "evaluation" and "final evaluation", it is difficult to see how documents or parts of documents which record the FSA's internal deliberations (as distinct from the FSA's documents or parts of documents which record information received from Barclays), carried out for different, regulatory purposes, could be relevant to the question of what representations Barclays made to the US courts.

**Lack of specificity and some comments on the documents requested**

24. Apart for the relevance issue addressed above, I am also advised that a Letter of Request should be directed to the production of specific documents which are known to exist, or the existence of which can reasonably be inferred.

25. I believe that some of the items in the schedule attached to the Letter do not meet this test:

(i) Items 1 to 4 refer to Barclays' "application" for the FSA's approval of the Initial Barclay's Purchase Proposal ("IBPP") and the FSA's various actions following receipt of the application. Had the Committee waited until it had reviewed the documents disclosed or to be disclosed by Barclays, the Committee would have appreciated that Barclays made no application, in the sense of a formal notice as described in paragraph 15 above. There was therefore no work following receipt of such a notice for the FSA to carry out. The documents requested do not therefore exist.

Instead, in view of the speed at which the IBPP had to be considered, if it was to be successful, the FSA received a few documents which Barclays had prepared for its Board or for other internal purposes, for example, a copy of a Powerpoint slide pack to the Board dated 12 September 2008 (a copy or the existence of which I believe Barclays has already disclosed to the Committee). As would be expected, this information was then the subject of analysis and discussion within the FSA, and of meetings, conversations and exchanges of e-mails between Barclays and the FSA. A number of people were involved in the process and there is no particular e-mail chain which captures it all. Because the IBPP aborted at a stage when no definitive proposal

had been agreed by Barclays' Board or been put to the FSA by Barclays, there was no transaction for the FSA to approve.

I would add here that the fact that the FSA received documents from Barclays which had been prepared for Barclays' Board brings out an assumption which underlies the Committee's Letter to the FSA. This must be that, within the FSA's internal documents, are records of what the FSA was told by Barclays which are inconsistent not only with what Barclays told the US Bankruptcy court but also with what Barclays' executives told their own Board. Based on my own dealings with Barclays, I believe that this is inherently unlikely.

(ii) Item 5 refers to a meeting between Barclays and the FSA regarding the Sale Transaction said to have taken place on 19 September 2008 (corrected from 22 September). My staff have reviewed the FSA's files for Barclays on the MRGD section of the FSA's electronic filing system for 19 and 22 September but have found no record of a meeting with Barclays on this subject on those dates. I therefore believe that the documents requested do not exist.

(iii) Item 6 makes the assumption that Barclays sent one reply to the matters raised by Mark Wharton in his letter of 23 September 2008. My staff have reviewed the FSA's electronic files for Barclays but have not located a single response to this letter, although I believe the issue raised in this letter were followed up in various ways.

(iv) Item 7 appears to me to be open-ended in terms of time period, as it would catch any discussions the FSA had with Barclays about the impact of the acquisition on its regulatory capital position in the period from September 2008 to date. As would be expected, in view of the work international regulators are doing to strengthen the capital of the larger banks, the FSA had and continues to have frequent exchanges with Barclays about capital, at various level of seniority in both organisations. In order to locate any discussions about the impact of the Lehman acquisition on Barclays' regulatory capital, limited to MRGD's files on Barclays, would require the FSA to carry out a substantial disclosure-type exercise.

To expand on this point, my staff carried out a search of the files for Barclays on the MRGD section of the FSA's electronic filing system, using "Lehman" as the search term and starting from 1 September 2008. The search generated a list of 69 pages of

9

links to underlying documents. With an average of 15 links to an A 4 page, that produces about 1035 documents containing "Lehman".

(v) In relation to item 8, I would note that, as the FSA communicated its non-objection of the Lehman acquisition to Barclays on the same day, that is, 16 September 2008, I believe no documents of these types exist.

(vi) In relation to items 9 and 10, I believe that these requests also lack specificity, and reflect a lack of understanding about how the FSA regulates the UK's largest banking groups. The requests suggest that information is provided to the FSA by a firm, the FSA analyses it, reaches a conclusion then moves on to another subject. In fact the regulatory process is much more iterative and multi-faceted. For important subjects, such as Barclays' regulatory capital and the Lehman acquisition, a number of aspects have been under consideration at any one time. Further, such aspects can be considered over extensive periods of time. It would impose a substantial burden on the FSA to require it to review the very substantial volume of its exchanges with Barclays, to see whether or not the FSA had prepared an "evaluation" of Barclays 2008 Results Announcement or an "analysis" or "final evaluation" of the Sale Transaction. These descriptions do not identify specific documents or even classes of documents.

**Impact of disclosure on effective supervision**

26. I believe there are certain ways in which disclosure of the FSA's analysis, opinions, views and internal working documents about Barclays to the Committee would be harmful to the FSA's functions under FSMA. These are:

(i) decrease in the amount of information voluntarily provided by firms; and

(ii) permitting firms to assess the FSA's regulatory intentions.

<u>A decrease in the amount of information voluntarily provided by firms</u>

27. Of central importance to the manner in which the FSA carries out its risk-based approach to supervision is the fact that firms engage with the FSA in a constructive dialogue as part of an ongoing working relationship. In my judgment, the disclosure of the FSA's internal views of the larger banks it regulates, such as Barclays, would damage that relationship, leading to less co-operation between such firms and the FSA

on a day-to-day basis. Given that the FSA's approach to regulation relies on a degree of co-operation between regulated firms and the FSA in the context of the supervisory relationship, its regulatory functions would be likely to be significantly prejudiced as a result.

28. It is only right to point out at this stage that there are various provisions in the FSA Handbook of rules and guidance which require firms to provide it with information in a number of different ways. Firstly, there are specific rules within the FSA Handbook which require firms to provide certain information to the FSA at specified intervals (for example, Chapter 16 of the Supervision Manual requires firms to make regular returns relating to the capital and liquidity they hold and to provide other information relating to their business). However, whilst these specific rules will often only apply in respect of particular categories of firm, all firms are subject to Principle 11 of the FSA's "Principles for Businesses", which provides:

> *"A firm must deal with its regulators in an open and cooperative way, and must disclose to the FSA appropriately anything relating to the firm of which the FSA would reasonably expect notice."*

29. Whilst Principle 11 is, understandably, widely drafted, in my experience firms often share information with the FSA which they are not required to do under Principle 11 (because that information is not something of which the FSA would generally expect notice. Regulated firms will often provide information to the FSA on a voluntary basis to assist the FSA in taking appropriate decisions if supervisors are aware of the specific circumstances pertaining to the firm's business. In fact, such disclosure over and above the requirements of Principle 11 (although it will not often be expressed as such by the firm) is extremely valuable to the FSA, because information supplied by firms on such a basis will often inform the FSA's approach to the supervision of that firm generally. In addition, the FSA may become aware, as a result of voluntary disclosure by firms, of issues which (taken by themselves) are relatively minor, but which disclose information relating to the firm's existing business, or its intentions for that business, which give rise to wider supervisory concerns.

30. Firms may also provide information to the FSA on a voluntary basis because they wish to ascertain the FSA's views on a course of action, or a proposed course of action (e.g.

11

a new product or business proposition). Knowledge of the course of action a regulated firm is proposing to adopt is important to the FSA for two reasons. Firstly, it assists the FSA in resource planning, by permitting the FSA to allocate supervisory resources where they are most needed (particularly the case if the firm's proposals are of concern to the FSA). Secondly, it may inform the FSA's ongoing supervisory relationship with the firm, for the reasons set out in the preceding paragraph.

31. Were the FSA's views on the information voluntarily supplied by firms to be disclosed in proceedings brought by private litigants against them, firms would become much less willing to supply such information (particularly where it related to significant business propositions). As a result, the FSA would lose a valuable source of information to inform not only the allocation of its resources, but also its ongoing supervision of the firms concerned.

32. The quality of the FSA's decision-making is inextricably linked to the quality and amount of information it receives. Were the voluntary flow of information from regulated firms to the FSA set out above to reduce, the quality of the FSA's decision-making would necessarily suffer.

Permitting firms and the market to assess the FSA's regulatory intentions

33. The disclosure in litigation of the FSA's internal views about the firms it regulates would be likely to have an adverse impact in two other ways.

34. In addition, this Court may be aware that the past two and a half years, since the failure of Northern Rock Plc, has seen an enormous amount of market (and wider public) interest in the financial condition of the UK's major banking groups, including Barclays. There was last year intense interest in whether or not the Government would become a shareholder in Barclays, as happened with the Royal Bank of Scotland group. I am concerned that disclosure of the FSA's internally-created information about Barclays' regulatory financial condition, in circumstances where that information might ultimately become public, could spark further comment and speculation about not only Barclays' financial strength, but also the strength of other UK banks. This is of particular concern, given that Barclays remains one of the UK's "clearing" banks. I therefore believe that disclosure of the FSA's internal views etc would be harmful to

the UK's banking sector at a time when financial markets world-wide are still in a fragile state.

35. Further, disclosure would be likely to permit firms (not limited to the firm to which the FSA's views related) to ascertain the FSA's regulatory priorities, thereby permitting them to anticipate the FSA's actions. This would be likely to lead to firms being able tailor their approach to the FSA accordingly, rather than focusing on effective compliance with the FSA's requirements.

**Redaction and other practical issues**

36. I am advised that the Committee may suggest to this Court that the FSA could be required to redact, or blank out, in any potentially disclosable documents, any information which is subject to the restriction on disclosure in section 348 FSMA. If made, I believe that the burden this suggestion would impose on the FSA would not be justified by the poor quality of the information which would remain as a result of the exercise. This is because, on the one hand, the FSA would have to carefully review each potentially relevant document, to assess what information should be redacted, which would be a time-consuming exercise. On the other hand, the remaining information would, to a large extent, be limited to information which the FSA had itself created (as opposed to having received it from Barclays or another source). This would include the FSA's views, opinions and analyses, but excluding from those views etc any "received" information which might be included or embedded within the FSA's internally-created information. I believe that the usefulness and indeed comprehensibility of the redacted information, in the absence of the underlying information on which it is based, would significantly reduce its value as evidence. That must be even more the case in the context of litigation in which the representations made by Barclays to the US Bankruptcy court is of central importance.

37. The FSA would also be faced with real practical difficulties if it were to be required to carry out a search for documents responsive to a disclosure request in the terms of the Schedule to the Letter of Request. Consideration of the potential and actual acquisitions of Lehman by Barclays resulted in an intense but relatively short period of activity within the FSA. A large number of staff from across the FSA were involved – not just the Barclays' supervisors, but also the Lehman supervisors, a number of

members of senior management and specialist areas such as lawyers and prudential risk analysts. I have explained in paragraph 25(iv) above how many documents held on MRGD's section of the FSA's electronic filing system would need to be reviewed. If other areas of the FSA had to review their files, the burden would increase materially.

I believe that the facts stated in this witness statement are true.

Signed: _____
**CLIVE ADAMSON**

Date: January 19th, 2010

14

IN THE HIGH COURT OF JUSTICE QUEENS BENCH DIVISION

Folio 2009
Financial Services Authority
Clive Adamson
First witness statement

**IN THE MATTER OF** THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975

**AND IN THE MATTER OF** THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

**AND IN THE MATTER OF** A CIVIL PROCEEDING NOW PENDING BEFORE THE UNITED STATES BANKRUPTCY COURT, SOUTHERN DISTRICT OF NEW YORK IN THE MATTER OF

Lehman Brothers Holdings Inc *et al* (Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered)

*and*

Lehman Brothers Inc (SIPA Proceedings Case No. 08-01420) (JMP)

---

**WITNESS STATEMENT OF CLIVE ADAMSON**

---