UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                                                           :
In re                                                      :  Chapter 11 Case No.
                                                           :
LEHMAN BROTHERS HOLDINGS INC.,                             :  08-13555 (JMP)
*et al.*,                                                  :
                                                           :  (Jointly Administered)
                            Debtors.                       :
---------------------------------------------------------- x

# REPORT OF
# ANTON R. VALUKAS, EXAMINER

|  |  |
|---|---|
|  | Jenner & Block LLP |
|  | 353 N. Clark Street |
|  | Chicago, IL 60654-3456 |
|  | 312-222-9350 |
|  |  |
|  | 919 Third Avenue |
|  | 37th Floor |
|  | New York, NY 10022-3908 |
|  | 212-891-1600 |
| March 11, 2010 | *Counsel to the Examiner* |

**VOLUME 5 OF 9**

Section III.B: Avoidance Actions

Section III.C: Barclays Transaction

a process on September 15 and 16 in which Barclays went through the LBI securities and estimated values.[7864]

As the discussions regarding the securities progressed, Martin Kelly and Paolo Tonucci were preparing schedules of assets and liabilities pertaining to the transaction, which were used in the negotiations.[7865] Several versions of the schedules were created.[7866] The last schedule is dated September 16, 2008 at 11:18 a.m., and includes a handwritten notation "9/16/08 Final," with the initials "SB" underneath.[7867] "SB" is Steven Berkenfeld, who made the handwritten notes.[7868] Berkenfeld, head of the Legal, Compliance and Audit Division at Lehman, characterized the schedule as "the final schedule of the estimate of assets and liabilities that would be transferred over" to Barclays.[7869] The final schedule is reproduced below:

---

[7864] Transcript of deposition testimony of Stephen King, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 10, 2009, at pp. 27-33.

[7865] Transcript of deposition testimony of Steven Berkenfeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 6, 2009, at pp. 34-37, 47; *see also* e-mail from James Walker, Barclays, to Martin Kelly, Lehman, *et al.* (Sept. 17, 2008) [LBEX-DOCID 464234] (referring to "attached balance sheet [that] was used by the LEH side in the overnight discussions of Monday"), Schedule (Sept. 16, 2008) [BCI-EX-00115595]; Schedule (Sept. 16, 2008) [BCI-CG00033789].

[7866] E-mail from Patrick Clackson, Barclays, to Bill Castell, Barclays, *et al.* (Sept. 16, 2008) [BCI-EX-(S)-00023848]; Final Schedule (Sept. 16, 2008) [BCI-CG00033742].

[7867] Lehman Final Balance Sheet (Sept. 16, 2008) [BCI-CG00033742]; transcript of deposition testimony of Steven Berkenfeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 6, 2009, at p. 48 (explaining why two versions of the schedule bear his initials and the word "final").

[7868] Transcript of deposition testimony of Steven Berkenfeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 6, 2009, at pp. 47-48.

[7869] *Id.* at p. 49; *see* transcript of deposition testimony of Ian T. Lowitt, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 20, 2009, at p. 80 (testifying that the schedule was designed to track the assets and liabilities that Barclays would take); transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 53-

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Gov & Ag | $40.0 | ST Borrowings | $0.0 |
| Commercial Paper | 1.1 | Gov & Ag | 21.0 |
| Mortgages | 2.7 | Commercial Paper | 0.0 |
| Total Corp Debt | 4.9 | Mortgages | 0.0 |
| Corp Equity | 8.8 | Corp Debt | 2.1 |
| Derivatives | 4.5 | Corp Equities | 6.3 |
| Cash | 0.7 | Derivatives | 4.5 |
| **Total** | **$62.7** | **Total** | **$33.9** |
| Collateralized ST Agr | 10.0 | Collateralized ST Fund | 34.5 |
| Receivables | 0.0 | Payables | 0.0 |
| Other Assets | 0.0 | Deposits | 0.0 |
| Inv In Con Subs | 0.0 | Due to Subs | 0.0 |
| Due From Subs | 0.0 | Sub Notes | 0.0 |
| **Total** | **10.0** | **Total** | **34.5** |
| | | **Total** | **68.4** |
| | | Cure pmt | 2.25 |
| | | Comp | 2.0 |
| **Adj. Total Assets** | **$72.65** | **Total** | **$72.65** |

Witnesses interviewed by the Examiner have different impressions of whether the sale transaction was supposed to be a "wash" (other than $250 million for the goodwill). For example, Thomas Roberts of Weil described the sale transaction, as closed, as very similar to the transaction contemplated in the APA.[7870] Roberts indicated that both deals entailed (1) Barclays' acquisition of assets and liabilities at a "wash"; (2) the purchase of the 745 Seventh Ave. headquarters and other real estate assets at appraised values; (3) the payment of $250 million for goodwill; and (4) job protection

---

55 (testifying that the schedule represented a summation of the liabilities that Barclays would assume and the assets it would acquire).

[7870] Examiner's Interview of Thomas A. Roberts, Apr. 28, 2009.

2136

for roughly 10,000 employees for 90 days.[7871] Roberts stated that Barclays eventually bought the assets and liabilities generally at a wash, albeit in a smaller amount than originally contemplated. The "final schedule" of assets and liabilities dated September 16 circulated in connection with the transaction showed an equal amount of financial assets and liabilities being transferred to Barclays,[7872] as did the manila folder used by Michael Klein during the closing weekend to sketch out the terms of the transaction for the Creditors Committee.[7873]

James Seery indicated, however, that the sale transaction was intended to maintain the broker/dealer enterprise value.[7874] In Seery's mind, the transaction did not involve the concept of a "wash" sale or transfer of a balanced book of assets and liabilities; rather, he viewed the transaction to simply involve the purchase of all securities positions (no matter the value) relating to the broker/dealer business.[7875] Seery indicated that when the Debtors and Barclays reached an agreement on Tuesday, September 16, all of the parties understood that the population of long and short positions would change before the transaction closed because, among other things, counterparties were closing out their trades with LBI.[7876] Seery indicated that he did not know, however, whether there was an agreement concerning what would happen if the

---

[7871] *Id.*
[7872] Lehman, Final Balance Sheet (Sept. 16, 2008) [BCI-CG00033742].
[7873] Michael Klein, consultant retained by Barclays, Notes on Folder [Deposition Exhibit 338B].
[7874] Examiner's Interview of James P. Seery, Jr., Nov. 12, 2009, at p. 2.
[7875] *Id.*
[7876] *Id.*

discussion among Weil lawyers either late Sunday night or Monday morning about whether it was necessary to take the letter back to Judge Peck for further approval, and that they concluded it was not necessary to do so, because the letter did not change the deal that was presented to the Court.[8176]

Miller also testified that the Creditors Committee consented to the transaction that closed on Monday, September 22.[8177] According to Miller, as the Creditors Committee's legal and financial advisors left Weil between 3:00 a.m. and 5:00 a.m. on Monday, September 22, Burian advised him that: "[e]verything's fine, and going forward, if it's okay with you, it's okay with us," and Despins said, "[i]f you guys are satisfied with it, we're satisfied.[8178]

Burian advised the Examiner that, following a conference call with the Creditors Committee late on Sunday night, the Creditors Committee advisors left Lehman.[8179] Burian stated that as they left, he and Despins approached Miller, and Burian advised

---

*Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 327-29 (testifying that Miller advised him that he did not need Creditors Committee consent).
[8176] Transcript of deposition testimony of Harvey R. Miller, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Jan. 7, 2010, at p. 49; *see also* transcript of deposition testimony of James P. Seery, Jr., *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at p. 156 (testifying that the Creditors Committee's advisors approved the transaction).
[8177] Transcript of deposition testimony of Harvey R. Miller, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Jan. 7, 2010, at pp. 29, 101-02.
[8178] *Id.*
[8179] Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 8.

Miller that the Creditors Committee was not signing off on the deal, even though everything Burian had heard "sounded okay."[8180]

Despins also advised the Examiner that the Creditors Committee never consented to the transaction that closed on Monday.[8181] According to Despins, in the early morning hours of Monday, the Creditors Committee legal and financial advisors departed Lehman's offices following a conference call with the Creditors Committee.[8182] Despins advised the Examiner that, as the Creditors Committee advisors left Lehman, they made it very clear to Miller and Roberts that the Creditors Committee was not consenting to the transaction.[8183] Despins explained that the advisors deliberately left the closing to prevent their presence from being interpreted as consent.[8184]

Over the early morning hours on Monday, Barclays, Lehman, JPMorgan and the SIPA Trustee reached sufficient consensus to close the sale and finalize the remaining sale documents, including the Services and Settlement Agreement and the Clarification Letter.[8185] The Clarification Letter modified the agreement between Barclays and Lehman in several ways. The Clarification Letter deleted from the definition of "Purchased Assets" the approximately $70 billion in "Long Positions" and added:

---

[8180] *Id.*
[8181] Examiner's Interview of Luc Despins, Nov. 23, 2009, at p. 2.
[8182] *Id.*
[8183] *Id.*
[8184] *Id.*
[8185] E-mail from Michael Klein, consultant retained by Barclays, to Rich Ricci, Barclays, *et al.* (Sept. 22, 2008) [BCI-EX-00080663]; Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 14.

(1) the securities specified on "Schedule A," which were the securities that had been transferred to Barclays in connection with the Replacement Transaction,[8186] (2) $1.9 billion in unencumbered assets specified on "Schedule B,"[8187] (3) exchange-traded derivatives and collateralized short term agreements,[8188] (4) LBI's customer accounts and related assets,[8189] (5) $769 million of LBI's excess 15c3-3 securities,[8190] (5) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA,[8191] and (6) the prime brokerage business and accounts.[8192] In addition, the Clarification Letter terminated the repo agreement executed in connection with the Replacement Transaction.[8193]

The sale transaction between Barclays and Lehman closed around 8:00 a.m. on Monday morning.[8194] Sometime before 8:00 a.m., the deed to 745 Seventh Avenue was recorded. Barclays wired the money for the buildings to Lehman, and wired $250 million to DTCC to collateralize Lehman trades that were in the process of clearing.[8195]

---

[8186] Clarification Letter, at p. 1 (¶ 1(a)(ii)(A)).
[8187] *Id.* at pp. 1-2 (¶ 1(a)(ii)(B)).
[8188] *Id.* at p. 2 (¶ 1(a)(ii)(C)).
[8189] *Id.* at p. 4 (¶ 8).
[8190] *Id.*
[8191] *Id.* at p. 2 (¶ 1(a)(iii)).
[8192] *Id.* at p. 2 (¶ 1(a)(iv)).
[8193] *Id.* at p. 5 (¶ 13).
[8194] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 14; Examiner's Interview of Lindsee P. Granfield and Robert Davis, March 3, 2009, at p. 4.
[8195] *Id.*

### (3) December 2008 Settlement Between Trustee, Barclays and JPMorgan

Following the closing of the sale transaction, Barclays discovered that JPMorgan had moved the $7 billion advanced in connection with the Replacement Transaction and applied it against LBI's box loan. Barclays and JPMorgan engaged in an intense series of discussions, mediated in part by the FRBNY, and in December 2008, reached a settlement of their disputes. That settlement was memorialized in a Settlement Agreement among Barclays, JPMorgan and the SIPA Trustee.[8196] The Settlement Agreement provided that JPMorgan would deliver to Barclays: (1) the LBI securities that had been pledged to the FRBNY on Wednesday evening, September 17, and which JPMorgan retained when it locked down LBI's accounts on Friday, September 19 (those securities were identified on Annex A to the Settlement Agreement); and (2) $1.25 billion in cash from LBI's account at JPMorgan to compensate it both for undelivered FRBNY program securities that had been liquidated by JPMorgan, and the decline in the value of the undelivered securities that JPMorgan did not liquidate.[8197]

\* \* \*

To assist the parties and the Court, the Examiner has set forth this narrative of the facts he has developed relating to the sale transaction. However, in light of the pending litigation between the Debtors, the SIPA Trustee and the Creditors Committee,

---

[8196] Settlement Agreement among JPMorgan, Barclays, and the SIPA Trustee, at pp. 2-3, Docket No. 387, *In re Lehman Bros. Inc.*, No. 08-01420 (Bankr. S.D.N.Y. Dec. 5, 2008).
[8197] *Id.*