Page 1

1          HIGHLY CONFIDENTIAL - M. KELLY

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    -----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

              Debtors.

10

     -----------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF MARTIN KELLY

14          New York, New York

15          August 18, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24042

1          HIGHLY CONFIDENTIAL - M. KELLY

2                  August 19, 2009

3                    9:30 a.m.

4

5          HIGHLY CONFIDENTIAL deposition

6      of MARTIN KELLY, held at Jones

7      Day, LLP, 222 East 41st Street,

8      New York, New York, before Kathy S.

9      Klepfer, a Registered Professional

10     Reporter, Registered Merit Reporter,

11     Certified Realtime Reporter, Certified

12     Livenote Reporter, and Notary Public

13     of the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

1        HIGHLY CONFIDENTIAL - M. KELLY

2      Q.    By whom are you currently employed?

3      A.    By Barclays Capital.

4      Q.    How long have you been employed there?

5      A.    Since late September of '08.

6      Q.    And what's your title at Barclays

7 Capital?

8      A.    I'm a Managing Director and I'm the

9 Chief Financial Officer in the Americas.

10     Q.    And is that the position you have held

11 since you joined Barclays in September of '08?

12     A.    No, it's not.  No, my --

13     Q.    Go ahead.

14     A.    My title has remained the same.  My

15 position changed in March, and upon going into

16 Barclays from Lehman, I had three different

17 positions.  The first was the Financial

18 Controller for Barclays Capital on an interim

19 basis, and that was a London-based position.

20 Second position was the head of Finance for

21 Structured Capital Markets.

22     Q.    Also in London?

23     A.    Also in London.  The third position

24 was head of Americas Financial Decision Support.

25     Q.    Financial Decision Support?

1          HIGHLY CONFIDENTIAL - M. KELLY

2     A.    Support, yeah.

3     Q.    Was that in London or in the Americas?

4     A.    That was an Americas-based role.

5     Q.    Are you based in New York?

6     A.    I am.  I have remained living in New

7  York.  I commuted to London for that period of

8  time between September and March.

9     Q.    Okay.

10    A.    I should also say that, in addition to

11 being CFO of the Americas now, I retained the

12 second of those three positions, so I remain

13 head of Finance for Structured Capital Markets

14 today.

15    Q.    And prior to your employment by

16 Barclays Capital, by whom were you employed?

17    A.    By Lehman Brothers.

18    Q.    For approximately what period of time

19 were you employed by Lehman Brothers?

20    A.    I was employed from approximately

21 August 2000 through approximately May 2005, and

22 then from January 2006 until September 2008.

23    Q.    And what did you do during the

24 interval between your two stints at Lehman?

25    A.    I was not employed.

1          HIGHLY CONFIDENTIAL - M. KELLY

2          A.      Paolo was as involved -- well, Paolo

3     was very involved in the transaction.

4          Q.      In the e-mail, Mr. Kelly, you say in

5     the first sentence, "Well it took all night and

6     lots of back and forth, but the deal is done and

7     ready for the board."  You see that sentence?

8          A.      Yes.

9          Q.      And had you been involved all night?

10    I know you said you went home for -- after dawn,

11    so I'm trying to figure out were you there, you

12    know, were you involved all night?

13         A.      I was there until this point in time.

14         Q.      I didn't hear that.

15         A.      Sorry.  I was there until this point

16    in time.

17         Q.      And this e-mail is sent at

18    approximately 5:10 A.M. on the morning of the

19    16th, and you had been there continually all

20    night until you sent the e-mail?

21         A.      I'd been in the office continually,

22    yes.

23         Q.      And you say there that there had been

24    lots of back and forth.  What did you mean when

25    you wrote to Mr. Lowitt and Mr. Tonucci that

1          HIGHLY CONFIDENTIAL - M. KELLY

2     there was lots of back and forth?

3          A.     I recall a series of discussions

4     negotiating the values of the assets to be sold

5     and -- including the real estate assets.

6          Q.     In addition to the real estate assets,

7     what, generally speaking, what type of assets?

8          A.     Generally speaking, the inventory of

9     securities that was being sold to Barclays.

10          Q.     And you go on in your e-mail to write,

11     "Final price did not change meaningfully -

12     approx. a 5B," 5 billion, "all in economic loss

13     versus our marks and 3.6B of resi assets left

14     behind."  Do you see that sentence?

15          A.     Yes.

16          Q.     Okay.  When you refer to the final

17     price not changing meaningfully, can you explain

18     to me what you meant when you wrote that to

19     Mr. Kelly and Mr. Lowitt?

20          A.     To Mr. Tonucci and Mr. Lowitt.

21          Q.     I beg your pardon, to Mr. Tonucci and

22     Mr. Lowitt.

23          A.     I don't recall.

24          Q.     Do you recall having knowledge of some

25     back and forth about what the final price would

Page 46

1          HIGHLY CONFIDENTIAL - M. KELLY

2    be?

3         A.    There were conversations throughout

4    the night on prices of different components of

5    the transaction.

6         Q.    When you say "different components of

7    the transaction," are you talking about the real

8    estate and, generally speaking, the inventory of

9    securities?

10        A.    Correct.

11        Q.    When you wrote, "Approx. a 5 billion

12   all in economic loss versus our marks," what did

13   you mean by that?

14        A.    I recall that the 5 billion represents

15   the difference between the negotiated price and

16   the values of those assets on Lehman's books.

17        Q.    So was the agreement, as you

18   understood it, to give Barclays a $5 billion

19   discount off the values of those assets as shown

20   on Lehman's books?

21             MR. HUME:  Objection, vague.

22             MR. BERNSTEIN:  Objection.

23        A.    No.

24        Q.    Please describe for me what you meant

25   when you said there would be a 5 billion

1        HIGHLY CONFIDENTIAL - M. KELLY

2    economic loss versus the marks?

3         MR. BERNSTEIN:  Objection.  Asked and

4      answered.

5      A.    The 5 billion represents or

6    represented the difference between the

7    negotiated sales price and the value of the

8    assets on Lehman's books prior to the sale.

9      Q.    Forgive me for being a little slow,

10   but the Lehman -- the assets are carried on

11   Lehman's books at a total of X, correct?  And

12   the agreement was to sell them to Barclays for 5

13   billion less than X, is that what you mean?

14     A.    Well, the 5 billion represents a sum

15   of Xs and a sum of Ys negotiated

16   portfolio-by-portfolio.

17     Q.    On a sort of sum-total level?  The sum

18   total is the securities are carried at X and the

19   deal is to sell them for 5 billion less than the

20   total of X, correct?

21     A.    Well, the 5 billion was a consequence

22   of a series of discussions conducted at a

23   portfolio level.

24     Q.    Describe those discussions as best you

25   can.  Tell me everything you remember about

Page 48

1              HIGHLY CONFIDENTIAL - M. KELLY

2    those discussions conducted at portfolio level.

3        A.    I did not participate in those

4    discussions.  Those discussions were occurring

5    throughout the course of the night.  My

6    recollection is that a Lehman representative and

7    a Barclays representative being experts in those

8    particular asset classes were discussing the

9    contents of the portfolio and negotiating an

10   appropriate value for the assets to be sold.

11       Q.    Who were the Lehman representatives or

12   representatives and the Barclays representative

13   or representatives you just referred to?

14       A.    There were a series of discussions

15   occurring simultaneously, so I don't -- I don't

16   know all of the representatives.  I do recall

17   Eric Felder and Stephen King representing Lehman

18   and Barclays respectively.  I'm not aware of who

19   was negotiating other asset classes.

20       Q.    There were people negotiating other

21   asset classes, you just don't remember who they

22   were?

23       A.    That's my understanding, yes.

24       Q.    And what asset class or classes, to

25   your knowledge, were Mr. Felder and Mr. King

Page 64

HIGHLY CONFIDENTIAL - M. KELLY

1

2      A.      It wasn't a single room.   It was a

3   series of conversations between different

4   representatives of Lehman and Barclays.

5      Q.      And these are the conversations about

6   the different asset classes that you were

7   telling me about before the break?

8      A.      Yes.

9      Q.      And I take it there were also

10   conversations about other terms of the deal

11   apart from the $5 billion overall loss versus

12   Lehman's marks, right?   Comp, for example,

13   compensation?

14      A.      Could you repeat that question,

15   please?

16      Q.      Well, you talked before the break

17   about adjusting the marks on various asset

18   classes and different people being involved in

19   those conversations.

20           Putting that aside for a moment, there

21   were other topics that were the subject of back

22   and forth, right, like compensation terms in the

23   agreement, yes?

24      A.      Well, I think the conversations that I

25   referred to are not centered on adjusting the

Page 65

1            HIGHLY CONFIDENTIAL - M. KELLY

2    marks, they were centered on what was an

3    appropriate sale price for the assets being

4    sold.

5        Q.    When you say it was an appropriate

6    sale price for the assets being sold, is

7    there -- what was your sense of whether it was

8    appropriate to sell the assets for 5 billion

9    less than Lehman showed them on their books?

10            MR. BERNSTEIN:  Objection.  No

11        foundation.

12       A.    I wasn't part of those negotiations.

13       Q.    Did you have a view?  Did you think

14   Barclays got a pretty good deal?

15            MR. BERNSTEIN:  Objection.  Compound.

16       A.    I don't have a view.

17       Q.    Did you have a view at the time?

18       A.    No, I didn't.

19       Q.    Did you have any reason at the time to

20   believe that the marks at which Lehman carried

21   those assets were inaccurate?

22       A.    No.

23       Q.    Did you have any understanding as to

24   why those marks would be marked down by $5

25   billion to achieve the sale price to Barclays?

1        HIGHLY CONFIDENTIAL - M. KELLY

2            MR. BERNSTEIN:  Objection.  No

3       foundation.

4       A.    As I previously mentioned, the $5

5   billion was an aggregation across a series of

6   portfolios.

7       Q.    Uh-huh.  Did you have an

8   understanding, sir, that the agreement, the

9   pricing of the agreement was that Barclays would

10  pay Lehman 5 billion less than Lehman had

11  thought the assets were worth?

12      A.    My understanding was that the

13  negotiated sales price across all those asset

14  portfolios resulted in a $5 billion,

15  approximately $5 billion loss to Lehman relative

16  to its marks at that time.

17      Q.    And Lehman's marks at that time were,

18  as far as you knew, maintained in a way that

19  they were Lehman's best view of the value of

20  those assets across those classes, correct?

21          MR. BERNSTEIN:  Objection.  No

22      foundation.

23      A.    The values were determined in

24  accordance with valuation policies and under

25  U.S. GAAP.

Page 67

1          HIGHLY CONFIDENTIAL - M. KELLY

2          Q.     So, to go back to whether you had a

3     view at 5:10 A.M. when you sent this e-mail to

4     Mr. Lowitt and Mr. Tonucci, did you have a view

5     about whether Barclays was getting a good deal

6     paying 5 billion less than Lehman was carrying

7     these assets for on its books?

8          A.     No.

9          Q.     Did you ever express a view to

10    anybody?

11         A.     No.

12         Q.     Did anybody express any view to you?

13         A.     No.

14         Q.     As you sit here now, do you think

15    Barclays got a pretty good deal?

16              MR. BERNSTEIN:  Objection.  That's not

17         a factual question.  That's calling for his

18         opinion, and I don't think he's being

19         compensated as an expert.

20              MR. GAFFEY:  I'll take the answer and

21         worry about admissibility later.

22         Q.     You can answer the question.

23         A.     I don't have a view.

24         Q.     Now, in response to your e-mail,

25    Mr. Lowitt responds, "You are a hero.  Well

Page 68

1          HIGHLY CONFIDENTIAL - M. KELLY

2     done.  Ian."  Do you see that?

3          A.    Yes.

4          Q.    Did you have a sense that Ian thought

5     you were in some part responsible for the terms

6     of the transaction that you described in your

7     e-mail?

8          A.    No.

9          Q.    Did you wonder why Ian was describing

10    you as a "hero"?

11         A.    I don't recall thinking about it.

12         Q.    Do you recall asking him about it?

13         A.    No.

14         Q.    And when Ian says, "Well done," did

15    you have a sense that your boss was telling you

16    you had done a good job in coming up with these

17    terms?

18         A.    I don't have a view on that.

19         Q.    Did you have a sense at the time when

20    you got a "well done" from your boss about the

21    terms of a contract you described, that he

22    thought you were responsible for those terms?

23              MR. BERNSTEIN:  Objection asked and

24         answered, but --

25         A.    No.

Page 106

1    HIGHLY CONFIDENTIAL - M. KELLY

2    with regard to whole classes of securities as

3    opposed to the particular securities within that

4    class?

5    MR. BERNSTEIN:  Objection.  Vague and

6    ambiguous.

7    A.    My recollection is that sales prices

8    were negotiated for individual classes of

9    assets.

10    Q.    By class, not by the individual

11    components of that class, yes?

12    A.    By class, yes.

13    Q.    And if you can go back to the schedule

14    that's attached to Exhibit 196 on the asset side

15    of the schedule, government and agencies,

16    commercial paper, mortgages, do you see where I

17    am?

18    A.    Yes.

19    Q.    Are those the asset classes that were

20    being discussed?

21    A.    They were.  I'm not sure there was a

22    separate discussion for each line item, but they

23    were the asset classes in aggregate that were

24    being discussed.

25    Q.    Okay.  You're not sure there was a

1              HIGHLY CONFIDENTIAL - M. KELLY

2    separate negotiation with respect to each of the

3    six classes of securities that are described

4    here?  I'm excluding cash.

5         A.    I'm not sure if it was six separate

6    meetings or some lesser number.

7         Q.    And did the asset values ascribed to

8    these classes of securities reflect the

9    aggregate $5 billion all in economic loss versus

10   Lehman's marks?

11             MR. BERNSTEIN:  Objection.  Vague and

12        ambiguous.

13        A.    Can you repeat the question, please?

14             (Record read.)

15        A.    Can you repeat the question again,

16   please?

17             (Record read.)

18        A.    The $5 billion economic loss was a

19   consequence of the negotiated sales price for

20   each of these classes of assets.

21        Q.    Could you answer the question I asked

22   you?  Is it reflected in this financial

23   schedule?  Is that $5 billion loss shown in this

24   schedule?

25        A.    What's the question, please?

Page 108

1        HIGHLY CONFIDENTIAL - M. KELLY

2        Q.    Is the $5 billion loss shown on the

3    schedule you're holding in your hands?

4             MR. HUME:  Objection.  Vague.

5        A.    I'm not sure I understand the question

6    when you say "reflected."

7        Q.    As far as you know, sir, for these

8    asset classes, exclusive of cash, were they

9    shown on Lehman books at an amount higher than

10   $62 billion at or about the time this schedule

11   was prepared?

12       A.    My understanding is yes, they were, in

13   aggregate.

14       Q.    Were they $5 billion higher; is that

15   your understanding?

16       A.    Approximately $5 billion higher.

17            MR. GAFFEY:  It would be a good time

18       to take a lunch break.  I'm starting to move

19       on to another topic.

20            (Luncheon Recess; Time Noted:  12:27

21       P.M.)

22

23

24

25

Page 109

1        HIGHLY CONFIDENTIAL - M. KELLY

2            AFTERNOON SESSION

3        (Time Noted:  1:38 P.M.)

4   MARTIN KELLY, resumed and

5        testified further as follows:

6   EXAMINATION BY (Cont'd.)

7   MR. GAFFEY:

8        Q.    Mr. Kelly, I have a couple more

9   questions about Exhibit 136A.  That's your

10  e-mail that we talked about a bit this morning.

11           This morning you mentioned that you

12  were -- you saw different sets of people dealing

13  with different asset classes.  My question to

14  you is who added it up to $5 billion for you to

15  put in that e-mail?

16       A.    I don't recall.

17       Q.    Did you?

18       A.    I don't recall myself doing it.

19       Q.    Do you have any recollection of who it

20  was who conveyed to you the fact that it was $5

21  billion in total?

22       A.    No.

23       Q.    Do you have any recollection of who

24  conveyed to you that it was an extra 1 billion

25  of comp beyond Lehman's accrual?

Page 110

1    HIGHLY CONFIDENTIAL - M. KELLY

2    A.    The conversation with comp was with

3    Bart McDade and that conversation referred to

4    compensation being agreed at $2 billion.

5    Q.    And in reflecting on the fact that it

6    was Bart McDade who told you that it was a $2

7    billion agreement with respect to comp, does

8    that refresh your recollection as to whether

9    perhaps it was Mr. McDade who told you the $5

10   billion total for the economic loss?

11   A.    No.

12   Q.    Do you have a recollection as to

13   whether it was one or more than one person who

14   conveyed to you the information that you

15   collected in this e-mail that you sent out to

16   Mr. Lowitt and Mr. Tonucci?

17   A.    No, I don't.

18   Q.    I asked you a bit this morning about a

19   conversation with Mr. Shapiro and this is a

20   loose end or two I need to follow up on, but did

21   you talk to Mr. Shapiro about what the deal was

22   before you sent this e-mail out?

23   A.    Well, there were many aspects of the

24   transaction, and as I mentioned, I participated

25   in a meeting where certain aspects of the

1              HIGHLY CONFIDENTIAL - M. KELLY

2      included Mark Shapiro and Mark Shafir and

3      Michael Klein whereby the value of the real

4      estate assets was debated, as was the commission

5      for -- oh, as was a reasonable commission that

6      would relate to such a sale.

7          Q.    The commission relating to the real

8      estate aspect of the sale, yes?

9          A.    Correct.

10         Q.    Okay.  My questions go to the other

11     assets, to the securities, the various classes

12     of securities we've been discussing.

13              Did you see a similar debate take

14     place about the overall economic loss Lehman

15     would bear against its marks?

16         A.    No.

17         Q.    As you sit here today, do you have any

18     knowledge at all, sir, about the negotiating

19     process that went into what turned out to be an

20     aggregate $5 billion all in economic loss versus

21     Lehman's marks?

22         A.    Nothing beyond what I've already

23     described today.

24         Q.    Was there a point where you did know

25     more?  I'm trying to figure out how much of it

1               HIGHLY CONFIDENTIAL - M. KELLY

2      may be lapsed memory and how much you knew at

3      the time.

4               Was there a time when you did know

5      more about a negotiating process concerning the

6      overall economic loss against Lehman's marks?

7      A.     I -- I don't believe so.

8      Q.     Okay.  If you wanted an answer to who

9      would know about a haggling or a negotiating

10     process concerning the overall loss to Lehman's

11     marks, who would you ask?

12     A.     Sorry, can you repeat the question,

13     please?

14               (Record read.)

15     A.     I would start with Bart McDade as the

16     person who I understood to be leading the

17     negotiations for Lehman.

18     Q.     And who else would you ask?  You would

19     start with Mr. McDade.  Who else would you ask?

20     A.     I would ask the two individuals, the

21     two bankers to the transaction, Mark Shapiro and

22     Mark Shafir.

23     Q.     Can we go back to the balance sheet

24     that was attached to the financial schedule

25     that's attached to Exhibit 196, and directing

1          HIGHLY CONFIDENTIAL - M. KELLY

2     your attention to the liability side of that

3     financial schedule, and in particular,

4     Mr. Kelly, down to the lower right-hand corner

5     where it refers to cure payment and comp, do you

6     see that?

7          A.     Yes.

8          Q.     What was the source of the 2.25 number

9     for cure payment?

10         A.     I don't recall.

11         Q.     Did you ever know?  Was there a time

12    when you did know what the source of the 2.25

13    for cure payment was?

14         A.     I don't know.

15         Q.     Do you have any idea as you sit here

16    today what the -- how the assessment cure

17    payment came to 2.25?

18         A.     No.

19         Q.     Is it your understanding that the

20    entries on the liability side of this schedule

21    for cure payment for comp represent liabilities

22    that Barclays was going to assume in the

23    transaction?

24              MR. HUME:  Objection.  Vague.

25         A.     Can you repeat the question, please?

Page 117

1              HIGHLY CONFIDENTIAL - M. KELLY

2              (Record read.)

3      A.    My recollection is that these amounts

4    were initial estimates of liabilities that

5    Barclays was to assume.

6      Q.    Well, the comp number of 2 billion was

7    an agreed number, correct?

8      A.    Yes, that was my understanding.

9      Q.    And it was your understanding that the

10   2 billion comp number that was agreed was a

11   billion dollars over the accrual that Lehman

12   carried on its books for comp, correct?

13     A.    It was approximately a billion dollars

14   over the cash component of the accrual.

15     Q.    And do you know how anybody went about

16   estimating the amount for cure payment?  How did

17   that number come to be on this schedule?

18     A.    No.

19     Q.    Do you know if the 2.25 billion that's

20   estimated for cure payment on there bore any

21   relation to the actual potential liability for

22   trade payables that Lehman had at the time?

23     A.    Sorry.  Can you repeat the question,

24   please?

25              (Record read.)

Page 118

1          HIGHLY CONFIDENTIAL - M. KELLY

2      A.    At what point in time?

3      Q.    At the time that this was prepared.

4   It's dated September 16, 2008, 11:18 A.M.

5      A.    No.

6      Q.    No, you don't know or, no, it didn't?

7            Sorry, the question might have got

8   lost in there.

9      A.    Can you ask the question again,

10  please?

11     Q.    I'll put another question.

12           Do you know if the 2.25 billion number

13  for cure payment reflected on the liability side

14  of this schedule dated September 16, 2008 bore

15  any relation to the actual potential liability

16  for trade payables that Lehman had on its books

17  at the time?

18           MR. BERNSTEIN:  Objection.  Asked and

19      answered.

20     A.    I'm sorry, I need the question again.

21           (Record read.)

22     A.    No.

23     Q.    You don't know or it didn't bear a

24  relation to the amount accrued?

25     A.    I think the question was "do you

HIGHLY CONFIDENTIAL - M. KELLY

1

2    know."

3        Q.    You're telling me you don't know, is

4    that right?

5        A.    Correct.

6        Q.    Okay.  What, if any, connection was

7    there, sir, between the figures on this

8    financial schedule and the pricing of the

9    transaction as it was agreed by the 16th of

10   September?

11       A.    This schedule was intended to reflect

12   an initial estimate of the assets to be acquired

13   and the liabilities to be assumed, and my

14   understanding is that the agreed price was

15   negotiated based on an agreement as to the price

16   of each of these individual items.

17       Q.    And the agreed price was based on the

18   estimates, on the estimates in this schedule?

19       A.    I don't know.

20       Q.    Were you asked to put this schedule

21   together?

22       A.    I don't recall.

23       Q.    Were you involved in putting this

24   schedule together?

25       A.    Yes.

Page 132

1          HIGHLY CONFIDENTIAL - M. KELLY

2     Q.    Do you recall generally?

3     A.    Sometime during that week.

4     Q.    Beginning or the end of the week?

5     A.    I don't recall.

6     Q.    No recollection at all?

7     A.    No.

8     Q.    Could it have been -- it wasn't right

9  after you wrote your e-mail at 5:10, right?

10    A.    I don't recall.

11    Q.    Was there a target quantity of such

12 assets that needed to be identified?

13    A.    Not that I was aware of.

14    Q.    Were you aware at the time whether

15 there was a target people were trying to reach

16 of such assets?

17    A.    Not that I was aware of.

18    Q.    Do you have a sense of what the -- my

19 term -- the shortfall was between the amount of

20 assets that needed to be made up?

21    A.    No.

22    Q.    Did you have a sense of that at the

23 time?

24    A.    I don't recall.

25    Q.    Did the -- again, I'm back at the

Page 133

1          HIGHLY CONFIDENTIAL - M. KELLY

2    financial schedule -- did the assumption of

3    liabilities for comp and cure change at any

4    point over that week?

5              MR. HUME:  Objection.  Vague.

6        A.    I don't recall that the accrual for

7    comp changed throughout the course of that week.

8        Q.    It stayed at 2 billion?

9        A.    That's my recollection.

10       Q.    What about the accrual for cure, did

11   that change during the week, over the course of

12   the week?

13       A.    My recollection is that the estimate

14   for the cure payment did change.

15       Q.    How did it change?

16       A.    Can you rephrase the question?

17       Q.    Did it go up?  Did it go down?

18       A.    The estimate went down.

19       Q.    By how much did it go down?

20       A.    My recollection is that the estimate

21   reduced to approximately a billion dollars.

22       Q.    To a billion dollars or by a billion

23   dollars?

24       A.    To approximately $1 billion.

25       Q.    And who calculated -- who made the

1          HIGHLY CONFIDENTIAL - M. KELLY

2    necessary calculations to reduce that estimate

3    from 2 and a quarter to $1 billion?

4         A.    I don't recall.

5         Q.    Why was it reduced from 2 and a

6    quarter to $1 billion?

7         A.    It was reduced after a review of the

8    schedule that Ian, Ian Lowitt, and I undertook

9    at some point during that week whereby we

10   observed that the estimated liability appeared

11   to be high relative to the expense run rate of

12   the firm.

13        Q.    And was it you and Mr. Lowitt who made

14   that determination that it was high relative to

15   the expense run rate?

16        A.    My recollection is that it was Ian and

17   I that made that observation.

18        Q.    And at what point in the week did you

19   and Mr. Lowitt make that observation?  Early in

20   the week?  Late in the week?

21        A.    I can't recall.

22        Q.    Was it before Friday of the week?

23        A.    I believe it was before Friday, but

24   I'm not certain.

25        Q.    And when you made that determination,

Page 135

1              HIGHLY CONFIDENTIAL - M. KELLY

2     did you or Mr. Lowitt communicate it to anyone?

3          A.     Yes.  Ian and I spoke with Bart.

4          Q.     Tell me the circumstances under which

5     you spoke to Bart and everything that you can

6     remember about the conversation.

7                 MR. BERNSTEIN:  Objection.  Compound.

8          A.     Can you ask one question at a time,

9     please?

10         Q.     When did you speak to Bart?

11         A.     I don't recall the date, the day

12    specifically, but it was shortly after observing

13    that the accrual appeared high.

14         Q.     Where were you when you spoke to Bart?

15         A.     I recall that we met in Bart's office.

16         Q.     Bart was in the office, too?

17         A.     We met with Bart.

18         Q.     In his office?

19         A.     Correct.

20         Q.     And Ian Lowitt was in the office with

21    you and Bart, correct?

22         A.     That's my recollection.

23         Q.     Was anyone else present in the office

24    with you and Bart and Ian Lowitt?

25         A.     I don't believe so.

1          HIGHLY CONFIDENTIAL - M. KELLY

2          Q.    Tell me what you said, what Mr. Lowitt

3     said, and what Mr. McDade said in that meeting.

4          A.    My recollection is that I explained

5     the observation that we had, meaning that the

6     liability estimate appeared high relative to the

7     run rate.  I don't recall what Ian said in that

8     meeting.  And I recall Bart's reaction to that

9     as being:  We just left a billion dollars on the

10    table.

11         Q.    Are those the words that Mr. McDade

12    used?

13         A.    Words to that effect.  I can't -- I

14    can't say that they were specifically the words.

15         Q.    As best you can -- we'll work from

16    there, but as best you can, tell me the words

17    that he used, as best you remember.

18         A.    They are the words as best I can.

19         Q.    And what did you say in response to

20    him saying that?

21         A.    I don't recall if there was a

22    succeeding conversation.

23         Q.    When you had this conversation with

24    Bart, did you show him any analysis or documents

25    of any kind reflecting your view that the

Page 137

HIGHLY CONFIDENTIAL - M. KELLY

1  liability for cure was high -- withdrawn.

3          Did you show him any documents to
4  explain your point at that meeting?

5      A.    I don't think so.

6      Q.    Had you prepared any documents that
7  led to you coming to that conclusion?

8      A.    I don't recall.

9      Q.    Did you prepare any documents that
10  reflected that conclusion?

11      A.    I don't recall.

12      Q.    Did you ever cause a financial
13  schedule similar to the one in front of you to
14  be prepared that reflected that change?

15      A.    I believe it was reflected on a -- on
16  a later version of this schedule.

17      Q.    Do you know what the schedule -- if
18  that schedule or one like it was used at the
19  closing of the transaction on September 22?

20          MR. BERNSTEIN:  Objection.  Vague and
21      ambiguous.

22      A.    I wasn't at the closing, so no.  No, I
23  don't know, to answer the question.

24      Q.    Did you ever ask anyone if an amended
25  schedule was used when the transaction was

1              HIGHLY CONFIDENTIAL - M. KELLY

2      closed?

3          A.    I don't recall.

4          Q.    I'm showing you, sir, what was marked

5      at a previous deposition as Exhibit 19, and if

6      you compare that to the schedule that's attached

7      to Exhibit 196, sir, you'll see that it's the

8      same except for an annotation at the top

9      right-hand corner.  Take a moment to satisfy

10     yourself that that's so, would you, please?

11              (Document review.)

12         A.    I agree with that.

13         Q.    Okay, you agree with that.  Have you

14     ever seen this version that was previously

15     marked as Exhibit 19, the one with the

16     handwritten annotation in the upper right-hand

17     corner?

18         A.    At what point in time?

19         Q.    Ever before today.

20         A.    I need a minute with my lawyers,

21     please.

22         Q.    I prefer you answer the question,

23     unless there's a privilege issue.

24              Can you answer the question?

25              MR. BERNSTEIN:  Maybe if we can modify

1              HIGHLY CONFIDENTIAL - M. KELLY

2        A.      Yeah, that appears that there's no

3    difference between the two.

4        Q.      Hence, a flat result in the "Loss and

5    Gain" column, yes?

6        A.      Yes, as a derivation of that.

7        Q.      All right.  Now, can you tell me what

8    the 5.25 at the bottom of the "Loss/Gain" column

9    is meant to show?

10       A.      I believe it was intended to show the

11   loss on sale -- sorry, the estimated loss on

12   sale to Lehman of the transaction.

13       Q.      Now, down at the bottom left-hand

14   corner of these notes, sir, there are a series

15   of debits shown, "Cash," "Comp," "Payables," and

16   "Shorts," do you see that?

17       A.      Yes.

18       Q.      And a credit for a $65 billion long

19   position, you see that?

20       A.      Yes.

21       Q.      And then the last entry there is "DR,"

22   debit less on sale, 5.75?

23       A.      Yes.

24       Q.      You with me?

25       A.      Yes.

Page 228

1        HIGHLY CONFIDENTIAL - M. KELLY

2        Q.    What is that meant to indicate?

3        A.    Well, I believe it's intended to

4    represent the loss on sale to Lehman of the

5    transaction.  However, it doesn't correspond

6    with the 5.25 figure above.

7        Q.    You're kind of at my next question.

8    Can you account the difference -- for the

9    difference between the loss on sale to Lehman of

10   2.25 billion in the "Loss/Gain" column and the

11   loss on sale to Lehman at the bottom of 5.75?

12       A.    No, I can't.

13       Q.    The only thing I can suggest, sir, is

14   there's a debit without a figure in there for

15   cash.  Would that somehow account for the

16   difference?  You see where I am in DR cash item?

17           MR. BERNSTEIN:  Objection.  No

18       foundation.

19       A.    I don't know.

20       Q.    Okay.  Now, having gone through this

21   page, does this refresh your recollection at all

22   about the setting in which you were making these

23   notes at the time and the circumstances under

24   which you were making them?

25       A.    No, it doesn't.

Page 229

1          HIGHLY CONFIDENTIAL - M. KELLY

2          Q.    Is it fair to say that the -- now I'm

3     back in the "Loss/Gain" column, the 5.25 loss to

4     Lehman.  Did that calculate -- is it fair to say

5     that's primarily a function of the difference

6     between the book value of the inventory and the

7     value negotiated -- and the negotiated value in

8     the contract for the securities?

9          MR. HUME:  Objection.  Vague and

10     ambiguous.

11          A.    It may.  It may.  It likely accounts

12     for the difference based on these estimates at

13     this point in time.

14          Q.    Now, would you turn two pages later in

15     these notes.  I'm at Bates page 115171.

16          I'm going to need a little more help

17     with your handwriting here.  Is that your

18     handwriting on the page?

19          A.    Yes.

20          Q.    Can you tell me what that says in the

21     top center?  Looks to me like it says "what

22     locked up"?  You see where I am?

23          A.    Yes.

24          Q.    Can you read that top -- that entry at

25     the top center of the page, please?

1        HIGHLY CONFIDENTIAL - M. KELLY

2        A.    It says, "What locked up?  How much

3   to" -- I can't make out the next word, and then

4   it looks like it says "rep. to calculation."

5        Q.    I guess we could both struggle that

6   word that you can't read, but let me just

7   suggest, does that say "reserve" or "recover"?

8        A.    I don't think so.

9        Q.    Okay.

10       A.    I think the second to last word is an

11  "S."

12       Q.    Okay.  Let's not both guess at it and

13  we'll both go find our elementary school

14  teachers and they can talk about our

15  handwriting.

16       A.    That's fair.

17       Q.    There's some names on here, including

18  Gary Romain.  See that?

19       A.    Yes.

20       Q.    Having looked at this portion, does

21  this refresh your recollection as to the

22  circumstances under which you took these notes,

23  made these notes?

24       A.    Well, it would appear to be after the

25  Monday night because there's a reference to

1            HIGHLY CONFIDENTIAL - M. KELLY

2    Alvarez on the top right.

3        Q.    Okay.  And why does that tell you

4    that's after the Monday night?

5        A.    I don't believe we had any

6    conversations about or with Alvarez until after

7    the Monday night.

8        Q.    Okay.  And had you had conversations

9    with Gary Romain before the Monday night?

10       A.    Yes.

11       Q.    Now, below that is an entry that

12   says -- just tell me if I'm reading this

13   correctly -- "Ian, 15c3 lockup calc"; is that

14   right?

15       A.    Yes.

16       Q.    Getting better at your handwriting.

17            What is that a reference to?

18       A.    I believe that's a reference to funds

19   segregated under the 15c3 requirement.

20       Q.    Now, I want to go back generally,

21   without regard to the notes, to this topic we

22   talked about before about looking for available

23   assets to transfer over to Barclays.  15c3 is

24   what sort of triggers that topic.

25            Did you assist in the search for