# EXHIBIT 121

# DEPOSITION EXHIBIT 28

**From:** Lillian Raben

**Sent:** Wednesday, September 17, 2008 4:48 PM

**To:** archie.cox@barclayscapital.com; sberkenf@lehman.com; mark.shapiro@lehman.com; michaelklein@miachaelsklein.com; michaelsklein@mail.com; michael.lubowitz@weil.com; thomas.roberts@weil.com; david.murgio@weil.com; robert.messineo@weil.com; jfinley@stblaw.com; ecooper@stblaw.com

**Cc:** Victor I LEWKOW; David LEINWAND; Duane MCLAUGHLIN

**Subject:** Draft of Letter

**Attach:** 1949604_2(Clarifying Letter under APA).DOC

Attached please find a draft of the clarification letter for your review and comments. Please note that in the interest of time we are circulating this draft simultaneously to our client, and it remains subject to their review and comment.

Best regards,

Lillian

Lillian Raben
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2347 | f: +1 212 225 3999
www.clearygottlieb.com | lraben@cgsh.com


EXHIBIT
28
MC 8/6/09

FIDENTIAL

*CGSH Draft – September 17, 2008*

*[Letterhead of Barclays]*

September 17, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the meaning of certain provisions of the Agreement and is binding on the parties hereto upon its execution and delivery.

1.    Business. The Purchased Assets will include the equity in (or, at the option of Purchaser, the assets of) the direct or indirect Canadian subsidiary of LBHI that holds the broker-dealer license for the Canadian operations of the Business.

2.    License. With respect to the investment banking and capital markets businesses of Seller and its Subsidiaries conducted outside the United States and Canada (but without limiting the term of the license granted with respect to the IMD Business), the license to use the Licensed Marks granted pursuant to Section 8.9 is limited to a term of 2 years from the Closing Date. The licenses pursuant to Section 8.9 are not assignable or sublicensable (provided that such licenses are assignable and sublicensable to the extent expressly stated in Section 8.9 with respect to the IMD Business).

3.    Long Positions. The Long Positions that are part of Purchased Assets include any proceeds from such Long Positions, any transfer, sale or disposition thereof or any assets purchased therewith (which shall be cash or cash equivalents or similar type of assets), as well as any derivative, swap, hedge, repo or similar arrangement in respect of any such Long Position and any proceeds from such derivative, swap, hedge, repo or arrangement. The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives. The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

1

FIDENTIAL

4.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

5.    Residential Real Estate Mortgage Securities.  To facilitate the 50% split of residential real estate mortgage securities referred to in clause (e) of the definition of Purchased Assets and clause (k) of the definition of Excluded Assets, Purchaser will acquire non-agency residential mortgage backed securities (which are therefore considered Purchased Assets) and Seller will retain ABS, CDO, CLO, VFN, franchise loan, student loan, scratch and dent, second lien, and reverse mortgage backed securities (which are therefore considered Excluded Assets), in each case as will be further allocated by the parties.

6.    Derivatives Business.  *[Note to B:  We do not believe clarification is clarification needed regarding what is included and not included in clause (l) of the definition of Excluded Assets and clause (d) of the definition of Purchased Assets (including after the clarification in paragraph 2 above), except as to any OTC derivatives (non-exchange traded derivatives) that are to be included within the Long Position, but Barclays to advise.]*

7.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).  *[Do we need a more extensive and formal guarantee provision?]*

8.    Retained Cash.  The amount of $1.3 billion in clause (b) of "Excluded Assets" is $700 million.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank.]*

2

FIDENTIAL

BCI-CG00011049

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LB 745 LLC

By: _____
Name:
Title:

Signature Page to Amendment 1 to
Asset Purchase Agreement

IDENTIAL

# DEPOSITION EXHIBIT 29

| | |
|---|---|
| MIME-Version: | 1.0 |
| Date: | Tue, 24 Mar 2009 21:43:27 -0500 |
| Content-Type: | text/html;charset="windows-1252" |
| Content-Transfer-Encoding: | quoted-printable |

**From** david.murgio@weil.com [david.murgio@weil.com]
:

**Sent:** Thursday, September 18, 2008 4:45 AM (GMT)

**To:** Berkenfeld, Steven [sberkent@lehman.com]

**Cc:** jfinley@stblaw.com [jfinley@stblaw.com]; robert.messineo@weil.com [robert.messineo@weil.com]; michael.lubowitz@weil.com [michael.lubowitz@weil.com]; jane.mcdonald@weil.com [jane.mcdonald@weil.com]; Naomi.Munz@weil.com [Naomi.Munz@weil.com]; rod.miller@weil.com [rod.miller@weil.com]

**Subject:** Fw: Comments to Clarification Letter

**Attach:** Clarification Letter_#1916861.DOC;Clarification Letter_#1916861.DOC

---

Steve-

# REDACTED

Regards,

David

---

David Murgio
Weil, Gotshal & Manges LLP
787 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com

----- Forwarded by David Murgio/NY/WGM/US on 09/18/2008 12:37 AM -----

David Murgio/NY/WGM/US



EXHIBIT
29
EC 8/6/09

10284821

09/18/2008 12:26 AM

To
LRaben@cgsh.com

cc
dleinwand@cgsh.com, dmclaughlin@cgsh.com, ecooper@stblaw.com, jfinley@stblaw.com,
vlewkow@cgsh.com, michael.lubowitz@weil.com, robert.messineo@weil.com, Jane
McDonald/NY/WGM/US@WGM, Naomi Munz/NY/WGM/US@WGM, Thomas
Roberts/NY/WGM/US@WGM

Subject
Comments to Clarification Letterl.nk
<Notes://0N/256TL7007GDE15/3254TD7F59F9E7E365256i3200656E77DB062342i7035bA68525/4C7
0072660E>


Lillian-

Please find attached our preliminary comments to the Clarification Letter.  Please note that our client has
not reviewed this and, therefore, it is subject to any comments they may have.

Regards.

David


_____
David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel:  (212) 310 8764
Fax: (212) 310 8007
e-mail:  david.murgio@weil.com

10284821

*WGM Comments – September 17, 2008*

*[Letterhead of Barclays]*

September 17, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and is binding on the parties hereto upon its execution and delivery.

1.   <u>Purchased Assets</u>. Included in the Purchased Assets is the equity of Lehman Brothers Canada, Inc.

2.   <u>IMD Business</u>. Included in the IMD Business is the asset management business, the alternatives – private equity business and the private investment management business.

3.   <u>Excluded Assets</u>. Included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities.

4.   <u>License</u>. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or the unwinding of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable to the extent expressly stated in Section 8.9 with respect to the IMD Business.

5.   <u>Long Positions</u>. The Long Positions that are part of Purchased Assets include any proceeds from such Long Positions, including proceeds resulting from any transfer, sale or disposition thereof or any assets purchased therewith, as well as proceeds of or from any derivative, swap, hedge, repo or similar arrangement in respect of any such Long Position (whether, in each case, such proceeds are in the form of cash, cash equivalents or similar type of

1

10279828

assets). The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives. The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

6.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.    [Residential Real Estate Mortgage Securities. To facilitate the 50% split of residential real estate mortgage securities referred to in clause (e) of the definition of Purchased Assets and clause (k) of the definition of Excluded Assets, Purchaser will acquire non-agency residential mortgage backed securities (which are therefore considered Purchased Assets) and Seller will retain ABS, CDO, CLO, VFN, franchise loan, student loan, scratch and dent, second lien, and reverse mortgage backed securities (which are therefore considered Excluded Assets), in each case as will be further allocated by the parties.]

8.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

9.    Retained Cash. The amount of $1.3 billion in clause (b) of "Excluded Assets" is $700 million.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank.]*

2

10279828

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LB 745 LLC

By: _____
Name:
Title:

10279828

CGSH Draft WGM Comments – September 17, 2008

[Letterhead of Barclays]

September 17, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the meaning of intention of the parties with respect to certain provisions of the Agreement and is binding on the parties hereto upon its execution and delivery.

1.    Business.  The Purchased Assets will include the equity in (or, at the option of Purchaser, the assets of) the direct or indirect Canadian subsidiary of LBHI that holds the broker-dealer license for the Canadian operations of the Business.

1.    Purchased Assets.  Included in the Purchased Assets is the equity of Lehman Brothers Canada, Inc.

2.    IMD Business.  Included in the IMD Business is the asset management business, the alternatives – private equity business and the private investment management business.

3.    Excluded Assets.  Included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities.

4.    License.  With The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries conducted outside the United States and Canada (but without limiting the term of the license granted with respect to the IMD Business), the license to use the Licensed Marks granted pursuant to Section 8.9 is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or the unwinding of any operations or businesses of Seller or any of its Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable (provided, except that such licenses are assignable and sublicensable to the extent expressly stated in Section 8.9 with respect to the IMD Business).

1

10279830

~~3.~~ 5. **Long Positions.** The Long Positions that are part of Purchased Assets include any proceeds from such Long Positions, including proceeds resulting from any transfer, sale or disposition thereof or any assets purchased therewith ~~(which shall be cash or cash~~ ~~equivalents or similar type of assets)~~, as well as proceeds of or from any derivative, swap, hedge, repo or similar arrangement in respect of any such Long Position ~~and any proceeds from such~~ ~~derivative, swap, hedge, repo or arrangement~~ (whether, in each case, such proceeds are in the form of cash, cash equivalents or similar type of assets). The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives. The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

~~4.~~ 6. **Subordinated Notes of LBI.** The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

5. 7. **[Residential Real Estate Mortgage Securities.** To facilitate the 50% split of residential real estate mortgage securities referred to in clause (e) of the definition of Purchased Assets and clause (k) of the definition of Excluded Assets, Purchaser will acquire non-agency residential mortgage backed securities (which are therefore considered Purchased Assets) and Seller will retain ABS, CDO, CLO, VFN, franchise loan, student loan, scratch and dent, second lien, and reverse mortgage backed securities (which are therefore considered Excluded Assets), in each case as will be further allocated by the parties.~~ 6. Derivatives Business.~~ ~~[Note to B: We do not believe clarification is clarification needed regarding what is included~~ ~~and not included in clause (l) of the definition of Excluded Assets and clause (d) of the definition~~ ~~of Purchased Assets (including after the clarification in paragraph 2 above), except as to any~~ ~~OTC derivatives (non-exchange traded derivatives) that are to be included within the Long~~ ~~Position, but Barclays to advise.~~]

~~7.~~ 8. **Breakup Fee.** 745 is jointly and severally liable with LBHI and LBI for
· Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order). ~~[Do we need a more extensive and formal guarantee provision?]~~

~~8.~~ 9. **Retained Cash.** The amount of $1.3 billion in clause (b) of "Excluded Assets" is $700 million.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank.]*

2

10279830

3

3

10279830

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

10279830

Document comparison done by DeltaView on Thursday, September 18, 2008 12:16:27 AM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1916861/1 |
| Document 2 | pcdocs://ny2/1916861/2 |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | Count |
|---|---|
| Insertions | 22 |
| Deletions | 20 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 48 |

10279830

# DEPOSITION EXHIBIT 30

| From: | Keller, Andy R [akeller@stblaw.com]. | Sent:9/18/2008 6:43 PM. |
|---|---|---|
| To: | Berkenfeld, Steven [sberkenf@lehman.com]. | |
| Cc: | . | |
| Bcc: | . | |
| Subject: | FW: REVISED Clarification Letter. | |

From: Dowd, Patrick M
Sent: Thursday, September 18, 2008 2:49 PM
To: Keller, Andy R; Ericson, John C; Chisling, Brian; Finley, John G; Geller, Marcy G; Brown, Alvin H;
Lowandowski, Edgar
Cc: Martelli, Peter
Subject: FW: REVISED Clarification Letter

Revised Clarification Letter from Cleary.

From: Martelli, Peter
Sent: Thursday, September 18, 2008 2:46 PM
To: Dowd, Patrick M
Subject: FW: REVISED Clarification Letter

Can you get this around to the entire team.

From: Cooper, Elizabeth A
Sent: Thursday, September 18, 2008 2:42 PM
To: Martelli, Peter
Subject: FW: REVISED Clarification Letter

**EXHIBIT**

30

FK 8/6/09

From: David LEINWAND [mailto:dleinwand@cgsh.com]
Sent: Thursday, September 18, 2008 2:39 PM;
To: david.murgio@weil.com; Cooper, Elizabeth A; jane.mcdonald@weil.com; Finley, John G;
michael.lubowitz@weil.com; Naomi.Munz@weil.com; robert.messineo@weil.com;
thomas.roberts@weil.com; archia.cox@barclayscapital.com; richard.smith3@barcap.com;
iain.mackinnon@barcap.com; jonathan.hughes@barclayscapital.com
Cc: Duane MCLAUGHLIN; Edward J ROSEN; Lisa M SCHWEITZER; Robert P DAVIS; Dana G
FLEISCHMAN; James A DUNCAN; Corey M Goodman; Elena V Romanova; Lillian Raben; Esther Farkas;
Lindsee GRANFIELD; Victor I LEWKOW;
Subject: REVISED Clarification Letter

Attached for your review is a revised version of the clarification letter. The marked copy reflects changes
made to the WGM draft of September 17. Please note that this draft currently is being reviewed internally at

CGSH, has not yet been reviewed by Barclays and is subject to further change.

David Leinwand
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2838 | f: +1 212 225 3999
<http://www.clearygottlieb.com/> www.clearygottlieb.com | <mailto: dleinwand@cgsh.com>
dleinwand@cgsh.com

This message is being sent from a law firm and may contain

confidential or privileged information. If you are not

the intended recipient, please advise the sender

immediately by reply e-mail and delete this message and

any attachments without retaining a copy.

*~~WGM~~CGSH Comments – September ~~17,~~18, 2008(230pm)*

*[Letterhead of Barclays]*

September ~~17,~~18, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI" or "Holdings"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and is binding on the parties hereto upon its execution and delivery.

1.      Purchased Assets.  Included in the Purchased Assets is the equity of Lehman Brothers Canada, Inc.

2.      IMD Business.  Included in the IMD Business is the asset management business, the alternatives – private equity business and the private investment management business.  **[To be confirmed by Barclays]**

3.      ~~Excluded Assets.  Included in the Excluded Assets are the~~**Certain Government Securities.  The** mortgage servicing rights for Ginnie Mae guaranteed securities **shall be Excluded Assets.  Purchased Assets shall include the government securities trading and mortgage trading operations of the LBI (but mortgage securities only to the extent referred to below)**.

4.      **Purchased Assets and Assumed Liabilities.  Other than assets purchased directly from LBI and 745 pursuant to the terms of the Agreement, the only assets of Holdings or Subsidiaries of Seller that shall constitute Purchased Assets are assets of Holdings or such Subsidiaries to the extent used in the conduct of the Business as the Business was conducted on the date of the Agreement, and in no event shall Purchased Assets include any financial assets of Holdings or such Subsidiaries.  Other than liabilities of LBI and 745 that are assumed by Purchaser directly from LBI or 745 pursuant to the terms of the Agreement, no liabilities of Holdings or any Subsidiary of Seller shall constitute Assumed Liabilities, except to the extent such liabilities arise directly from a Purchased Asset, and in no event shall any financial liabilities of Holdings or such**

1

**Subsidiaries constitute Assumed Liabilities. Any liability that is not expressly assumed pursuant to the terms of the Agreement, shall constitute an Excluded Liability.**

       **5.**    License. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) ~~or the unwinding of any operations or businesses of Seller or any of its Subsidiaries~~). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable to the extent expressly stated in Section 8.9 with respect to the IMD Business.

       ~~5.~~   ~~Long Positions~~**6.**    **Financial Assets and Liabilities**. The Long Positions that are part of Purchased Assets include any proceeds from such Long Positions, including proceeds resulting from any transfer, sale or disposition thereof or any assets purchased therewith, as well as proceeds of or from any derivative, swap, hedge, repo or similar arrangement in respect of any such Long Position (whether, in each case, such proceeds are in the form of cash, cash equivalents or similar type of assets). The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives **(except exchange-traded derivatives as contemplated by the Agreement and this letter)**. The reference to "government securities" in the definition of Long Positions includes securities of any government agency. **Subject to Section 8 below, the only financial assets that shall constitute Purchased Assets are the financial assets reflected on Exhibit A, and the only financial liabilities that shall constitute Assumed Liabilities are the liabilities set forth on Exhibit A. It is acknowledged that the values of assets set forth on Exhibit A reflect Seller's marks as of the date and time set forth on Exhibit A and that the face and nominal amount of such assets may be different than such marks.**

       ~~6.~~**7.**    Subordinated Notes of LBI. The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

       ~~7.~~   ~~[8.~~Residential Real Estate Mortgage Securities. To facilitate the ~~50%~~ split of residential real estate mortgage securities referred to in clause (e) of the definition of Purchased Assets and clause (k) of the definition of Excluded Assets, Purchaser will acquire non-agency residential mortgage backed securities (which are therefore ~~considered~~ Purchased Assets) and Seller will retain ABS, CDO, CLO, VFN, franchise loan, student loan, scratch and dent, second lien, and reverse mortgage backed securities (which are therefore ~~considered~~ Excluded Assets), in each case as will be further allocated by ~~the parties.]~~agreement of the parties. **Any further allocation of such assets agreed to by the parties pursuant to this Section 8 shall be deemed to be an amendment to Exhibit A.**

       ~~8.~~**9.**    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

2

9. ~~Retained Cash.   The amount of $1.3 billion in clause (b) of "Excluded Assets" is $700 million.~~ **10.   Retained Cash.   "Retained Cash" as referred to in the Agreement is meant to refer to the cash, cash equivalents and bank deposits that are being acquired by Purchaser as Purchased Assets.  Retained Cash shall be in the amount of $700 million (not $1.3 billion) and shall be adjusted as contemplated by Section 6 above.**

**11.   Derivatives.  It is acknowledged and agreed that the exchange-traded derivatives reflected on Exhibit A shall be Purchased Assets and no over-the-counter derivatives shall be Purchased Assets.**

**12.   Intercompany Obligations.  Except as expressly contemplated by the Agreement or Section 4 above with respect to assets used in the conduct of the Business, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables of Seller and its Subsidiaries.**

**13.   Certain Assets and Obligations.  The Sale shall include all prime brokerage accounts and securities lending operations of the Business.  The Sale shall include all repo agreements reflected on Exhibit A.  All customer accounts shall be transferred to the Purchaser at Closing and no such accounts shall be liquidated in the Sale.**

**14.   Eagle.  The reference to "Eagle Energy Management LLC" in clause (p) of "Purchased Assets" is instead a reference to "Eagle Energy Partners I L.P."  Any liabilities or obligations of Eagle Energy Partners I L.P. or any of its Subsidiaries to LEH or any of its Subsidiaries are Excluded Liabilities within Section 2.4(g) of the Agreement and, upon the occurrence of the Closing, any and all such obligations shall no longer be due and payable and shall be forgiven in their entirety.  Purchaser shall have the right, prior to the occurrence of the Closing, by delivery of a written notice to Seller, to not acquire Eagle Energy Partners I L.P., in which case it shall be an Excluded Asset.**

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts together constitute the same agreement.


*[Remainder of page intentionally left blank.]*


3

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

# DEPOSITION EXHIBIT 31

**Unknown**

**Sent:** Tuesday, March 24, 2009 10:43 PM

| | |
|---|---|
| **From:** | david.murgio@weil.com [david.murgio@weil.com] |
| **Sent:** | Thursday, September 18, 2008 11:40 PM (GMT) |
| **To:** | vlewkow@cgsh.com [vlewkow@cgsh.com]; dleinwand@cgsh.com [dleinwand@cgsh.com] |
| **Cc:** | jfinley@stblaw.com [jfinley@stblaw.com]; akeller@stblaw.com [akeller@stblaw.com]; Berkenfeld, Steven [sberkenf@lehman.com]; michael.lubowitz@weil.com [michael.lubowitz@weil.com]; robert.messineo@weil.com [robert.messineo@weil.com]; thomas.roberts@weil.com [thomas.roberts@weil.com] |
| **Subject:** | REVISED Clarification Letter |
| **Attach:** | Clarification Letter_#1916861.DOC |

Please find attached a draft Clarification Letter for us to discuss at our call. As you will see, we have incorporated some of the items you suggested, but not all.

Also, we would like to push back our call to 8:45, rather than 8:30.

Please use the following call-in info.

1-800-782-1473
Code: 6977339

Lastly, if you could distribute this to your team internally, I would appreciate it.

Thanks.

David

---

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153Link <Notes://852567E70070DE15>
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com



10279029

*WGM Comments  September 18, 2008   7:30 pm*

*[Letterhead of Barclays]*

September [___], 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4326

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets. The Purchased Assets means all of the assets of Seller used in connection of the Business (excluding the Excluded Assets), including the items set forth in clauses (a) through (s). Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc. and (b) the government securities trading and mortgage trading operations of LBI (but mortgage securities only to the extent referred to below).

2.    IMD Business. Included in the IMD Business is the asset management business, the alternatives  private equity business and the private investment management business.

3.    Excluded Assets. Included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsiaries.

4.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. [The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or the unwinding of any operations or businesses of Seller or any of its Subsidiaries).] The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business, (ii) to Seller's Subsidiaries and (iii) to the purchaser of any

1

10279862

other businesses of Seller and its Subsidiaries solely in conection with the continued operations and/or unwinding of such businesses.

5.      Long Positions.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives.  The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

6.      Subordinated Notes of LBI.  The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.      [Residential Real Estate Mortgage Securities.  To facilitate the 50% split of residential real estate mortgage securities referred to in clause (e) of the definition of Purchased Assets and clause (k) of the definition of Excluded Assets, Purchaser will acquire non-agency residential mortgage backed securities (which are therefore considered Purchased Assets) and Seller will retain ABS, CDO, CLO, VFN, franchise loan, student loan, scratch and dent, second lien, and reverse mortgage backed securities (which are therefore considered Excluded Assets), in each case as will be further allocated by the parties.]

8.      Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

9.      Excluded Cash Assets and Retained Cash.   All cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries are Excluded Assets, other than the "Retained Cash," which is a Purchased Asset.  The "Retained Cash" is $700 million in cash, cash equivalents, bank deposits or similar cash items (rather than $1.3 billion), plus the cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions.

10.     9/16/08 Balance Sheet.  Included in "Excluded Assets" are all of the categories of assets valued at "0" on the balance sheet printed at 11:18 AM on 9/16/08 and initialed "SB," which was previously provided to Purchaser.  (such balance sheet, the "9/16/08 Balance Sheet").  Included in "Excluded Liabilities" are all of the categories of liabilities valued at "0" on the 9/16/08 Balance Sheet.

11.     [Derivatives.  It is acknowledged and agreed that the exchange-traded derivatives reflected on Exhibit A shall be Purchased Assets and no over-the-counter derivatives shall be Purchased Assets.]

13.     [Certain Assets and Obligations.  The Sale shall include all prime brokerage accounts and securities lending operations of the Business, other than those that are part of the IMD Business.  The Sale shall include all repo agreements reflected on Exhibit A.  All customer accounts shall be transferred to the Purchaser at Closing and no such accounts shall be liquidated in the Sale.]

2

10279862

14.    [Intercompany Obligations. Except as expressly contemplated by the Agreement [or Section 4 above] with respect to assets used in the conduct of the Business, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables of Seller and its Subsidiaries.]

15.    [Eagle Entergy. Included in the Purchased Assets are the equity interests or assets (at the election of the Purchaser prior to the entry of the Sale Order) of Eagle Energy Partners I, L.P. (rather than Eagle Energy Management LLC), and the assets of the energy marketing and services business of Lehman Brothers Commodity Services, Inc.] [Purchaser shall have the right, prior to the Closing, by delivery of a written notice to Seller, not to acquire Eagle Energy Partners I, L.P. and the assets of the energy marketing and services business of Lehman Brothers Commodity Services, Inc.]

16.    Schedule 12.3.  All references to Schedule 12.3 are deleted.

17.    [Schedule 9.1(c).]

18.    Subleases.  Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement

3

10279862

equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 11 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 11 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)     If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the

4

10279862

underlying lease in connection with the execution and delivery of the applicable sublease agreement.

19.     Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

20.     745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

21.     Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank.]*

5

10279862

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LB 745 LLC

By: _____
Name:
Title:

10279862

# DEPOSITION EXHIBIT 32

| | |
|---|---|
| **From:** | Hughes, Jonathan: Legal (NYK) |
| **Sent:** | Friday, September 19, 2008 7:14 AM |
| **To:** | Ricci, Rich: Barclays Capital; Keegan, Mike : Barclays Capital; Clackson, Patrick: Finance (LDN); Mahon, John: Markets (LDN); King, Linda: GFRM (LDN); Cox, Archie: Barclays Capital (NYK) |
| **Subject:** | FW: Clarifying Letter |
| **Attachments:** | Clarification Letter_#1916861.DOC; Clarification Letter_#1916861.DOC; Real Estate Schedules_#1917608.XLS |

Jonathan Hughes
Global General Counsel
Barclays Capital
Tel:   + (1) 212 412 3519 or +44 (0)207 773 4154
Cell:   + (1) 646 236 3129
Email: jonathan.hughes@barclayscapital.com

---

**From:** White, Jason: Legal (NYK)
**Sent:** Friday, September 19, 2008 7:09 AM
**To:** Hughes, Jonathan: Legal (NYK)
**Subject:** Fw: Clarifying Letter

---

**From:** Smith, Richard: Legal (NYK)
**To:** White, Jason: Legal (NYK); Weiner, Jessica: Legal (NYK); Kern-Martin, Guy: Legal (NYK); Jimenez, Emilio: Legal (NYK); Kaplan, Alan: Legal (NYK); 'serotad@sullcrom.com'
**Sent:** Fri Sep 19 06:40:20 2008
**Subject:** FW: Clarifying Letter

---

**From:** Victor I LEWKOW [mailto:vlewkow@cgsh.com]
**Sent:** Friday, September 19, 2008 6:16 AM
**To:** Smith, Richard: Legal (NYK)
**Subject:** Fw: Clarifying Letter

--------------------
Victor Lewkow
Cleary Gottlieb Steen & Hamilton LLP
Tel: (212) 225-2370
Fax: (212) 225-3999



EXHIBIT
_52_

---

**From:** david.murgio
**Sent:** 09/19/2008 04:21 AM AST
**To:** Victor LEWKOW
**Cc:** akeller@stblaw.com; David LEINWAND; Duane MCLAUGHLIN; jfinley@stblaw.com; Robert DAVIS; lori.fife@weil.com;

1

IGHLY CONFIDENTIAL

michael.lubowitz@weil.com; robert.messineo@weil.com; David.Herman@weil.com
Subject: Re: Clarifying Letter

Sorry, I forgot to attached the corrected Schedules.  My understanding is that these schedules merely correct a typo and (I believe) the Cleary real estate team has reviewed them.

Regards.

David

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com

David Murgio/NY/WGM/US

09/19/2008 03:36 AM

To vlewkow@cgsh.com
cc dleinwand@cgsh.com, dmclaughlin@cgsh.com, rdavis@cgsh.com, lfinley@stblaw.com, akeller@stblaw.com, Robert Messineo/NY/WGM/US@WGM, Lori Fife/NY/WGM/US@WGM, Michael Lubowitz/NY/WGM/US@WGM

Subject Clarifying LetterLink

Please find attached the redraft of the Clarifying Letter.

Regards.

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com

This message is being sent from a law firm and may contain
confidential or privileged information.  If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

2

BCI-EX-00059914

*WGM Comments – September 19, 2008 – 2:30 am*

[*Letterhead of Barclays*]

September [__], 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets. The Purchased Assets means all of the assets of Seller used in connection of the Business (excluding the Excluded Assets), including the items set forth in clauses (a) through (s) of the definition of "Purchased Assets." Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage trading operations of LBI (but mortgage securities only to the extent referred to below) and (c) all prime brokerage accounts and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business).

2.    IMD Business. For purposes of this Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business. As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business and Purchased Assets include the private investment management business (other than the CTS (Corporate Cash) business). In connection with Section 9.1(c) of the Agreement, the Purchaser shall establish a retention program for certain employees of the private investment management business (other than the CTS (Corporate Cash) business).

3.    Excluded Assets. Included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman European entities in administration. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsiaries. The reference to "third

1

NY2:\1916861\05\15325051\DOC\73683.1037

IGHLY CONFIDENTIAL

BCI-EX-00059915

parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.

4.    Assumed Liabilities.  Clause (a) of the definition of "Assumed Liabilities" consists of all Liabilities of Seller incurred by Purchaser, after the Closing, in connection with the Business. Nothing in this Paragraph 4 is intended to modify Section 8.12 of the Agreement.

5.    License.  All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or the unwinding of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business, (ii) to Seller's Subsidiaries and (iii) to the purchaser of any other businesses of Seller and its Subsidiaries solely in connection with the winding up of any such businesses.

6.    Long Positions.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (other than exchange-traded derivatives as specific in clause (d) of the definition of "Purchased Assets"). The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

7.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

8.    [Residential Real Estate Mortgage Securities.  To facilitate the division of residential real estate mortgage securities referred to in clause (e) of the definition of Purchased Assets and clause (k) of the definition of Excluded Assets, Purchaser will acquire non-agency residential mortgage backed securities and manufactured housing securities (which are therefore considered Purchased Assets) and Seller will retain HELOC, ABS, CDO, CLO, VFN, franchise loan, student loan, [scratch and dent], second lien, and reverse mortgage backed securities (which are therefore considered Excluded Assets), in each case as will be further allocated by the parties.]

9.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

10.    Excluded Cash Assets and Retained Cash.  All cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries are Excluded Assets, other than the "Retained Cash," which is a Purchased Asset. The "Retained Cash" is $700 million in cash, cash equivalents, bank deposits or similar cash items (rather than $1.3 billion), plus the cash

2

BCI-EX-00059916

amount received from closing out Long Positions, less the cash amount expended to close out Short Positions.

11.    Payables, Deposits and Receivables.  No payables or deposits shall be Assumed Liabilities, except to the extent relating to a Purchased Contract.  No receivables shall be Purchased Assets, except to the extent relating to a Purchased Contract.

12.    Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement, the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables, payables or other obligations of Seller or its Subsidiaries.

13.    Eagle Energy as Excluded Asset.  The equity interests and assets of Eagle Energy Management LLC, including the assets of the energy marketing and services business of Lehman Brothers Commodity Services, Inc., are Excluded Assets (rather than Purchased Assets).

14.    Schedule 12.3.  Following the Closing, the parties shall reasonably agree to an allocation of the purchased price (including the Assumed Liabilities) among the Purchased Assets and set forth such allocation on a Schedule 12.3.

15.    Risk of Loss of Artwork.  During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork was not lost or damaged.

16.    Records.  The records referred to in Section 8.7 include all Documents that are Purchased Assets.  The joint administrators of the Lehman European entities are parties to which records and personnel be made available in accordance with the terms of Section 8.7.

17.    Subleases.  Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within

3

GHLY CONFIDENTIAL

BCI-EX-00059917

a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease

4

HIGHLY CONFIDENTIAL

agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)     If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.     <u>Deferred Transfers</u>.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.     <u>745 Seventh Avenue</u>.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

20.     <u>Prorations</u>.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.     <u>Schedules</u>.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New

5

GHLY CONFIDENTIAL

BCI-EX-00059919

York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank.]*

6

HIGHLY CONFIDENTIAL

BCI-EX-00059920

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

GHLY CONFIDENTIAL

BCI-EX-00059921

*WGM Comments - September ~~18,~~ 19, 2008 - ~~7~~ 2:30 ~~pm~~ am*

[*Letterhead of Barclays*]

September [__], 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and is binding on the parties hereto upon its execution and delivery.

1.   Purchased Assets. The Purchased Assets means all of the assets of Seller used in connection of the Business (excluding the Excluded Assets), including the items set forth in clauses (a) through (s). of the definition of "Purchased Assets." Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc. ~~and~~, Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage trading operations of LBI (but mortgage securities only to the extent referred to below) and (c) all prime brokerage accounts and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business).

2.   IMD Business. ~~Included in~~For purposes of this Agreement, the IMD Business is~~consists of~~ the asset management business,~~and~~ the alternatives – private equity business and~~businesses of Seller and the Subsidiaries, but~~ not the private investment management business.~~—~~ of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business. As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business and Purchased Assets include the private investment management business (other than the CTS (Corporate Cash) business). In connection with Section 9.1(c) of the Agreement, the Purchaser shall establish a retention program for certain employees of the private investment management business (other than the CTS (Corporate Cash) business).

3.   Excluded Assets. Included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman European entities in administration. Included in clause (h) of the definition of "Excluded

1

NY2:\1916861\09\13250X!.DOC\73681.1037
NY3:1916861\03\13250X!.DOC\73681.1037

Assets" are life insurance policies owned by Seller and its Subsaries. The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.

4.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists of all Liabilities of Seller incurred by Purchaser, after the Closing, in connection with the Business. Nothing in this Paragraph 4 is intended to modify Section 8.12 of the Agreement.

5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. [The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or the unwinding of any operations or businesses of Seller or any of its Subsidiaries).] The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business, (ii) to Seller's Subsidiaries and (iii) to the purchaser of any other businesses of Seller and its Subsidiaries solely in conection connection with the continued operations and/or unwinding of winding up of any such businesses.

5. 6.    Long Positions. The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (other than exchange-traded derivatives as specific in clause (d) of the definition of "Purchased Assets"). The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

6. 7.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7. 8.    [Residential Real Estate Mortgage Securities. To facilitate the 50% split division of residential real estate mortgage securities referred to in clause (e) of the definition of Purchased Assets and clause (k) of the definition of Excluded Assets, Purchaser will acquire non-agency residential mortgage backed securities and manufactured housing securities (which are therefore considered Purchased Assets) and Seller will retain HELOC, ABS, CDO, CLO, VFN, franchise loan, student loan, [scratch and dent], second lien, and reverse mortgage backed securities (which are therefore considered Excluded Assets), in each case as will be further allocated by the parties.]

8. 9.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

9. 10.    Excluded Cash Assets and Retained Cash. All cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries are Excluded Assets, other than the "Retained Cash," which is a Purchased Asset. The "Retained Cash" is $700 million in cash,

2

HIGHLY CONFIDENTIAL

BCI-EX-00059923

cash equivalents, bank deposits or similar cash items (rather than $1.3 billion), plus the cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions.

10.    9/16/08 Balance Sheet.  Included in "Excluded Assets" are all of the categories of assets valued at "0" on the balance sheet printed at 11:18 AM on 9/16/08 and initialed "SB," which was previously provided to Purchaser. (such balance sheet, the "9/16/08 Balance Sheet").  Included in "Excluded Liabilities" are all of the categories of liabilities valued at "0" on the 9/16/08 Balance Sheet.

11.    [Derivatives. It is acknowledged and agreed that the exchange traded derivatives reflected on Exhibit A shall be Purchased Assets and no ever the counter derivatives shall be Purchased Assets.]

13.    [Certain Assets and Obligations.  The Sale shall include all prime brokerage accounts and securities lending operations of the Business, other than those that are part of the IMD Business.  The Sale shall include all repo agreements reflected on Exhibit A.  All customer accounts shall be transferred to the Purchaser at Closing and no such accounts shall be liquidated in the Sale.]

11.    Payables, Deposits and Receivables.  No payables or deposits shall be Assumed Liabilities, except to the extent relating to a Purchased Contract.  No receivables shall be Purchased Assets, except to the extent relating to a Purchased Contract.

14.    [12. Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement [or Section 4 above] with respect to assets used in the conduct of the Business or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or, payables or other obligations of Seller and or its Subsidiaries.]

15.    [Eagle Entergy.  Included in the Purchased Assets are the equity interests or assets (at the election of the Purchaser prior to the entry of the Sale Order) of Eagle Energy Partners I, L.P. (rather than Eagle Energy Management LLC), and

13.    Eagle Energy as Excluded Asset.  The equity interests and assets of Eagle Energy Management LLC, including the assets of the energy   marketing and services business of Lehman Brothers Commodity Services, Inc.] [Purchaser shall have the right, prior to the Closing, by delivery of a written notice to Seller, not to acquire Eagle Energy Partners I, L.P. and the assets of the energy marketing and services business of Lehman Brothers Commodity Services, Inc.]

16.    Schedule 12.3.  All references to Schedule 12.3 are deleted., are Excluded Assets (rather than Purchased Assets).

14.    Schedule 12.3.  Following the Closing, the parties shall reasonably agree to an allocation of the purchased price (including the Assumed Liabilities) among the Purchased Assets and set forth such allocation on a Schedule 12.3.

3

GHLY CONFIDENTIAL

BCI-EX-00059924

15. **Risk of Loss of Artwork.** During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork was not lost or damaged.

16. **Records.** The records referred to in Section 8.7 include all Documents that are Purchased Assets. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

17. ~~[Schedule 9.1(e).]18~~ **Subleases.** Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 of any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be

4

HIGHLY CONFIDENTIAL

BCI-EX-00059925

extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces.  Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph ~~11~~18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph ~~11~~18 below.  In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)     If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

~~19~~18.     Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a

5

GHLY CONFIDENTIAL

BCI-EX-00059926

Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property that is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g)

20.19. 745 Seventh Avenue. The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

21.20. Prorations. Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.     Schedules. Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank.]*

6

HIGHLY CONFIDENTIAL

BCI-EX-00059927

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above.


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

GHLY CONFIDENTIAL

BCI-EX-00059928

Document comparison done by DeltaView on Friday, September 19, 2008 3:11:36 AM

| Input: | |
|--------|--|
| Document 1 | pcdocs://ny2/1916861/4 |
| Document 2 | pcdocs://ny2/1916861/5 |
| Rendering set | Standard |

| Legend: | |
|---------|--|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | Count |
|-------------|-------|
| Insertions | 53 |
| Deletions | 44 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 103 |

HIGHLY CONFIDENTIAL

BCI-EX-00059929

# DEPOSITION EXHIBIT 614A

REDACTED

From: "Summers, Elisabeth Stuart" [summerse@sullcrom.com]
Sent: 09/19/2008 05:34 AM AST
To: Victor LEWKOW; "'michaelklein@michaelsklein.com'"
<michaelklein@michaelsklein.com>; Robert DAVIS; Duane MCLAUGHLIN; David
LEINWAND; "'lori.fife@weil.com'" <lori.fife@weil.com>;
"'jacqueline.marcus@weil.com'" <jacqueline.marcus@weil.com>
Cc: "Serota, Daniel" <SerotaD@sullcrom.com>; "Feldstein, Hydee R."
<feldsteinh@sullcrom.com>; "Clayton III, W. Jay" <ClaytonW@sullcrom.com>;
"Lacy, Robinson B." <Lacyr@sullcrom.com>; "Raisler, Kenneth"
<Raislerk@sullcrom.com>; "Gilberg, David" <GilbergD@sullcrom.com>; "Eitel,
Mitchell" <Eitelm@sullcrom.com>; "Myers, Ken S." <myersk@sullcrom.com>;
"Fernandez, Angel D." <fernandeza@sullcrom.com>; "Jackson, Matthew"
<Jacksonm@sullcrom.com>; "'Richard.Smith3@barclayscapital.com'"
<Richard.Smith3@barclayscapital.com>; "Jonathan.Hughes@barclayscapital.com"
<Jonathan.Hughes@barclayscapital.com>; "'Jason.White@barclayscapital.com'"
<Jason.White@barclayscapital.com>; "erin.mansfield@barclayscapital.com"
<erin.mansfield@barclayscapital.com>
Subject: Clarifying Letter/First Amendment- S&C Comments re: DTC issue

Dear all,

Attached please find our comments to the clarifying letter which comments
solely address (1) the purchase price holdback stemming from the DTC issue, and
(2) to restyle this document as a First Amendment, rather than a side letter.

Kindly note that in the interest of time, the attached is circulated
simultaneously to our client and accordingly remains subject to further
internal and client comment and review. Additionally, substantive comments with
respect to the other aspects of this document will come under separate cover.



EXHIBIT

6944

2-10-10

Please forward this email as appropriate.

Best regards,

Liz


Elisabeth Summers
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Phone: (212) 558-4774
Fax:  (212) 558-3588
Email: summerse@sullcrom.com
  - NY12533-#230264-v1-Rider_to_First_Amendment_to_APA.DOC - S&C Comments 9-19 to Clarifying
Letter.pdf

### RIDER 6-A

22.    Holdback. Notwithstanding any other provision of the APA or this Agreement (including Section 3.2 and Section 12.2 of the APA), the Purchaser shall retain a portion of the Purchase Price equal to two hundred fifty million dollars ($250,000,000) to secure the LBI obligations that the Purchaser has been required to guaranty to (i) the Depository Trust Clearing Corporation ("DTCC") and its Subsidiaries, (ii) the Depository Trust Company ("DTC"), (iii) the National Securities Clearing Corporation ("NSCC"), and (iv) the Fixed Income Clearing Corporation ("FICC"). All Assumed Liabilities shall be for the account of the Purchaser and shall not be charged against the Holdback.
All Excluded Liabilities shall be charged against the Holdback and no intercompany liabilities for the account of LBHI and/or any LBHI Affiliate shall be required to be paid by the Purchaser.

NY12533:230264.1

CONFIDENTIAL

CGSH00020703

*Style as a 1st Amendment*

~~CGSH~~ **WGM** *Comments – September 18, 2008~~(230 – 7:30 pm)~~*

S&C
9/19/08
~5:15am

[Letterhead of Barclays]    Rider 1-A

Rider 1-B

September ~~18,[   ],~~ 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

*Global Δ " this letter agreement" to "this Agreement"*

*Globally update Section numbering and check for Section cross-references.*

global Δ
Original

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBH" or "Holdings"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and is binding on the parties hereto upon its execution and delivery.

1. Certain Definitions

of the definition of "Purchased Assets in the original Agmt"

1. **Purchased Assets.** Included in the Purchased Assets is the Purchased Assets means all of the assets of Seller used in connection of the Business (excluding the Excluded Assets), including the items set forth in clauses (a) through (s). Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc. and (b) the government securities trading and mortgage trading operations of LBI (but mortgage securities only to the extent referred to below).

wide moving into its Section

2. **IMD Business.** Included in the IMD Business is the asset management business, the alternatives – private equity business and the private investment management business. [To be confirmed by Barclays]

The definition of "IMD Business" in Section 1.1 of the Orig. Agmt is hereby deleted in its entirety and replaced with the following: "

" means

Of Seller and its Subsidiaries ?

3. ~~Certain Government Securities.~~ The Excluded Assets. ~~Included in the Excluded Assets are~~ the mortgage servicing rights for Ginnie Mae guaranteed securities shall be Excluded Assets. Purchased Assets shall include the government securities trading and mortgage trading operations of the LBI (but mortgage securities only to the extent referred to below). Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsiaries.

The definition of Excluded Assets is hereby amended to include the following: "(r)

is hereby amended to include

(li)

4. ~~Purchased Assets and Assumed Liabilities. Other than assets purchased directly from LBI and 745 pursuant to the terms of the Agreement, the only assets of Holdings or such Subsidiaries of Seller that shall constitute Purchased Assets are assets of Holdings or such Subsidiaries to the extent used in the conduct of the Business as the Business was conducted on the date of the Agreement; and in no event shall Purchased Assets include any financial assets of Holdings or such Subsidiaries. Other than liabilities of LBI and 745 that are assumed by~~

all

1

CONFIDENTIAL                                                                CGSH00020704

RIDER 1-A

EXECUTION COPY / Draft line

*First Amendment to*

# ASSET PURCHASE AGREEMENT

## AMONG

## LEHMAN BROTHERS HOLDINGS INC.

## LEHMAN BROTHERS INC.

## LB 745 LLC

## AND

## BARCLAYS CAPITAL INC.

Dated as of September 16, 2008

79    ← NOTE:
This amendment
will need to be
filed on Friday.

*RIDER I-B*

*First Amendment to*

## ASSET PURCHASE AGREEMENT

**19**

ASSET PURCHASE AGREEMENT, dated as of September 16, 2008 (this "**Agreement**"), among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation ("**LBHI**"), **LEHMAN BROTHERS INC.**, a Delaware corporation ("**LBI**" and, together with LBHI, the "**Seller**"), **LB 745 LLC**, a Delaware limited liability company ("**745**"), and **BARCLAYS CAPITAL INC.**, a Connecticut corporation ("**Purchaser**").

*Seller, 745 and Purchaser are parties to the APA, dated as of September 16, 2008 (the "APA"), by and among Seller, 745 and Purchaser*

### WITNESSETH:

~~WHEREAS, LBHI is a debtor in possession under title 11 of the United States Code; 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "Bankruptcy Court") (Case No. [08-13555]) (the "Bankruptcy Case");~~

WHEREAS, the Seller ~~and its Subsidiaries presently conduct the~~ ~~Business~~; *, 745 and the Purchaser desire to amend the APA as set forth below*

WHEREAS, Seller and 745 desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller and 745, pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein; and

WHEREAS, an Affiliate of Purchaser has agreed to provide to LBHI a debtor-in-possession facility (the "**DIP Facility**") and has agreed to provide to LBI certain other financing;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

### ARTICLE I

### DEFINITIONS

1.1    Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms

1

CONFIDENTIAL

CGSH00020706

*[handwritten: Original]*

Purchaser directly from LBI or 745 pursuant to the terms of the Agreement, no liabilities of
Holdings or any Subsidiary of Seller shall constitute Assumed Liabilities, except to the extent
such liabilities arise directly from a Purchased Asset, and in no event shall any financial
liabilities of Holdings or such Subsidiaries constitute Assumed Liabilities. Any liability that is
not expressly assumed pursuant to the terms of the Agreement, shall constitute an Excluded
Liability. 5. License. **All marks containing the words "LEHMAN" or "LEHMAN
BROTHERS" assigned under the Agreement shall be considered Licensed Marks under
Section 8.9 of the Agreement.** [The license to use the Licensed Marks granted pursuant to
Section 8.9 of the Agreement with respect to the investment banking and capital markets
businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date
(without limiting the term of the license granted for use in connection with the IMD Business
(including in respect of investment funds)). **or the unwinding of any operations or businesses
of Seller or any of its Subsidiaries.**] The licenses pursuant to Section 8.9 are not assignable or
sublicensable, except that such licenses are assignable and sublicensable to the extent expressly
stated in Section 8.9 with respect to the (i) for use in connection with IMD Business **or any
portion of the IMD Business (ii) to Seller's Subsidiaries and (iii) to the purchaser of any
other businesses of Seller and its Subsidiaries solely in conection with the continued
operations and/or unwinding of such businesses.**

*[handwritten right margin: † of the Original Agreement]*

6.    Financial Assets and Liabilities. The Long Positions that are part of
Purchased Assets include any proceeds from such Long Positions, including proceeds resulting
from any transfer, sale or disposition thereof or any assets purchased therewith, as well as
proceeds of or from any derivative, swap, hedge, repo or similar arrangement in respect of any
such Long Position (whether, in each case, such proceeds are in the form of cash, cash
equivalents or similar type of assets)5.    Long Positions. The Purchased Assets and
Assumed Liabilities include hedges placed on the Long Positions that are entered into after the
date of the Agreement and before Closing, but will not include any other types of hedges or
derivatives (except exchange-traded derivatives as contemplated by the Agreement and this
letter). The reference to "government securities" in the definition of Long Positions includes
securities of any government agency. Subject to Section 8 below, the only financial assets that
shall constitute Purchased Assets are the financial assets reflected on Exhibit A, and the only
financial liabilities that shall constitute Assumed Liabilities are the liabilities set forth on Exhibit
A. It is acknowledged that the values of assets set forth on Exhibit A reflect Seller's marks as of
the date and time set forth on Exhibit A and that the face and nominal amount of such assets may
be different than such marks.

7.6.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI
and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities
associated with such subordinated notes therefore are Excluded Liabilities.

8.7.    [Residential Real Estate Mortgage Securities. To facilitate the **50%** split
of residential real estate mortgage securities referred to in clause (e) of the definition of
Purchased Assets and clause (k) of the definition of Excluded Assets, Purchaser will acquire
non-agency residential mortgage backed securities (which are therefore **considered** Purchased
Assets) and Seller will retain ABS, CDO, CLO, VFN, franchise loan, student loan, scratch and
dent, second lien, and reverse mortgage backed securities (which are therefore **considered**
Excluded Assets), in each case as will be further allocated by agreement of the parties. Any

~~further allocation of such assets agreed to by the parties pursuant to this Section 8 shall be deemed to be an amendment to Exhibit A.~~ the parties.]

9. 8.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under ~~the~~ Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

10. 9.    Excluded Cash Assets and Retained Cash. ~~"Retained Cash" as referred to in the Agreement is meant to refer to the~~ All cash, cash equivalents and bank deposits that are being acquired by Purchaser as Purchased Assets.  Retained Cash shall be in the amount of $700 million (not $1.3 billion) and shall be adjusted as contemplated by Section 6 above.  , bank deposits or similar cash items of Seller and its Subsidiaries are Excluded Assets, other than the "Retained Cash," which is a Purchased Asset. The "Retained Cash" is $700 million in cash, cash equivalents, bank deposits or similar cash items (rather than $1.3 billion), plus the cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions.

10A.    9/16/08 Balance Sheet. Included in "Excluded Assets" are all of the categories of assets valued at "0" on the balance sheet printed at 11:18 AM on 9/16/08 and initialed "SB-2" which was previously provided to Purchaser. (such balance sheet, the "9/16/08 Balance Sheet").   Included in "Excluded Liabilities" are all of the categories of liabilities valued at "0" on the 9/16/08 Balance Sheet.

11.    [Derivatives. It is acknowledged and agreed that the exchange-traded derivatives reflected on Exhibit A shall be Purchased Assets and no over-the-counter derivatives shall be Purchased Assets.12. Intercompany Obligations.  Except as expressly contemplated by the Agreement or Section 4 above with respect to assets used in the conduct of the Business, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables of Seller and its Subsidiaries.]

*[handwritten left margin: and referenced in Clause (d) of the definition of Purchased Assets]*

13.    [Certain Assets and Obligations. The Sale shall include all prime brokerage accounts and securities lending operations of the Business, other than those that are part of the IMD Business. The Sale shall include all repo agreements reflected on Exhibit A. All customer accounts shall be transferred to the Purchaser at Closing and no such accounts shall be liquidated in the Sale.]

*[handwritten right margin: We assume that the business people have begun support this Exhibit]*

14.    ~~Eagle.  The reference to "Eagle Energy Management LLC" in clause (p) of "Purchased Assets" is instead a reference to "Eagle Energy Partners I L.P."  Any liabilities or obligations of Eagle Energy Partners I L.P. or any of its Subsidiaries to LEH or any of its Subsidiaries are Excluded Liabilities within Section 2.4(g) of the Agreement and, upon the occurrence of the Closing, any and all such obligations shall no longer be due and payable and shall be forgiven in their entirety.  Purchaser shall have the right, prior to the occurrence of the Closing, by delivery of a written notice to Seller, to not acquire Eagle Energy Partners I L.P., in which case it shall be an Excluded Asset.~~[Intercompany Obligations. Except as expressly contemplated by the Agreement [or Section 4 above] with respect to assets used in the conduct of the Business, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables of Seller and its Subsidiaries.]

3

CONFIDENTIAL                                                    CGSH00020708

15.    [Eagle Entergy. Included in the Purchased Assets are the equity interests or assets (at the election of the Purchaser prior to the entry of the Sale Order) of Eagle Energy Partners L.L.P. (rather than Eagle Energy Management LLC), and the assets of the energy marketing and services business of Lehman Brothers Commodity Services, Inc.] [Purchaser shall have the right, prior to the Closing, by delivery of a written notice to Seller, not to acquire Eagle Energy Partners L.L.P. and the assets of the energy marketing and services business of Lehman Brothers Commodity Services, Inc.]

16.    Schedule 12.3. All references to Schedule 12.3 are deleted.

17.    [Schedule 9.1(c).]

18.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based

4

NY2:\1916861\03\16326004\15325004\.DOC\73683.1037

upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g. segregation) including the right to relocate such employees within the applicable premises and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 11 below, and (ii) with respect to each Sublease Property other than the SF Property to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 11 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

_____ (c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply

5

CONFIDENTIAL                                                    CGSH00020710

in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

19.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

20.    745 Seventh Avenue. The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

21.    Prorations. Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank]*

RIDER 6-A

22.   Holdback. Notwithstanding any other provision of the APA or this Agreement
(including Section 3.2 and Section 12.2 of the APA), the Purchaser shall retain a portion
of the Purchase Price equal to two hundred fifty million dollars ($250,000,000) to secure
the LBI obligations that the Purchaser has been required to guaranty to (i) the Depository
Trust Clearing Corporation ("DTCC") and its Subsidiaries, (ii) the Depository Trust
Company ("DTC"), (iii) the National Securities Clearing Corporation ("NSCC"), and (iv)
the Fixed Income Clearing Corporation ("FICC").  All Assumed Liabilities shall be for
the account of the Purchaser and shall not be charged against the Holdback.
All Excluded Liabilities shall be charged against the Holdback and no intercompany
liabilities for the account of LBHI and/or any LBHI Affiliate shall be required to be paid
by the Purchaser.

NY12533:230264.1

CONFIDENTIAL

CGSH00020712

RIDER S-1

~~Sincerely,~~

**BARCLAYS CAPITAL INC.**

By: _____
Name:
Title:

← move to be the last signature block on the page

~~Agreed to and accepted as of the date first written above:~~

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____
Name:
Title:

**LEHMAN BROTHERS INC.**

By: _____
Name:
Title:

**LB 745 LLC**

By: _____
Name:
Title:

align to the right.

First

Signature Page to Amendment to
Asset Purchase Agreement
NY2:\1916861\03\15375020\1537504\.DOC\73683.1037

RIDER S-1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Steven Berkenfeld
Title: Vice President

LEHMAN BROTHERS INC.

By: _____
Name: Steven Berkenfeld
Title: Managing Director

LB 745 LLC

By: _____
Name:
Title:

BARCLAYS CAPITAL INC.

By: _____
Name: Gerard LaRocca
Title: Chief Executive Officer

Asset Purchase Agreement

CONFIDENTIAL

CGSH00020714

# DEPOSITION EXHIBIT 33

**Administrator**

Sent: Tuesday, March 24, 2009 10:40 PM

| | |
|---|---|
| **From:** | Keller, Andy R [akeller@stblaw.com] |
| **Sent:** | Friday, September 19, 2008 1:20 PM (GMT) |
| **To:** | Berkenfeld, Steven [sberkenf@lehman.com]; Bailey, Emma [ebailey@lehman.com] |
| **Subject:** | FW: CGSH comments on Clarifying Letter |
| **Attach:** | Comments on Letter.pdf |

From: Robert P DAVIS [mailto:rdavis@cgsh.com]
Sent: Friday, September 19, 2008 9:01 AM
To: robert.messineo@weil.com; vlewkow@cgsh.com; dleinwand@cgsh.com; dmclaughlin@cgsh.com; rdavis@cgsh.com; Finley, John G; Keller, Andy R; Martelli, Peter; david.murgio@weil.com; michael.lubowitz@weil.com; David.Herman@weil.com; Serota, Daniel; Feldstein, Hydee R.; Clayton III, W. Jay, Lacy, Robinson B.; Raisler, Kenneth; Gilberg, David; Eitel, Mitchell; Myers, Ken S.; Fernandez, Angel D.; Jackson, Matthew; 'Richard Smith@barclayscapital.com'; Jonathan.Hughes@barclayscapital.com; 'Jason.White@barclayscapital.com'; erin.mansfield@barclayscapital.com; 'michaelklein@michaelsklein.com'; Summers, Elisabeth Stuart; archie.cox@barclayscapital.com; 'lori.fife@weil.com'; 'jacqueline.marcus@weil.com'
Subject: Comments on Clarifying Letter

attached is a combined mark up of our comments to the latest weil draft of the clarifying letter, which we plan to discuss shortly.

b

Robert P. Davis
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2670 | f: +1 212 225 3999 | m: +1 646 894 3878
<http://www.clearygottlieb.com/> www.clearygottlieb.com | <mailto: rdavis@cgsh.com> rdavis@cgsh.com

This message is being sent from a law firm and may contain

confidential or privileged information. If you are not

the intended recipient, please advise the sender

immediately by reply e-mail and delete this message and

any attachments without retaining a copy



10284801

*[Handwritten top-left annotation:]* Purchased Intellectual Property including Intellectual Property Rights, Software and Technology Worldwide that are used in, related to, or otherwise necessary for the counterparties business.

*[Handwritten top-right annotation:]* CGSH 9/19

WGM Comments – September 19, 2008 – 2:30 am

*[Handwritten:]* 8 Am

[Letterhead of Barclays]

September [   ], 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

*[Handwritten annotation, upper-right box:]* The ~~these~~ items referred in clause (d) of "Purchased Assets" includes only that items owned by (b) and any other affiliate of LBI and any subsidiary relating to the customers relating to short-term positions of LBI

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and is binding on the parties hereto upon its execution and delivery.

*[Handwritten:]* primarily    in each case    as necessary for the operation of the Business

1.    Purchased Assets. The Purchased Assets means all of the assets of Seller used in connection of the Business (excluding the Excluded Assets), including the items set forth in clauses (a) through (s) of the definition of "Purchased Assets." Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage trading operations of LBI (but mortgage securities only to the extent referred to below) and (c) all prime brokerage accounts and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business).

*[Handwritten:]* repos    ?

2.    IMD Business. For purposes of ~~the~~ the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business. As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business and Purchased Assets include the private investment management business (other than the CTS (Corporate Cash) business). ~~In connection with Section 9.1(e) of the Agreement, the Purchaser shall establish a retention program for certain employees of the private investment management business (other than the CTS (Corporate Cash) business).~~

*[Handwritten:]* all the Business

3.    Excluded Assets. Included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman ~~European entities~~ in administration. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. The reference to "third

*[Handwritten:]* affiliates    (d)

NY2:\1916861\05\153210\.DOC\73683.1037

1

10286514

*[handwritten: Clause (i) of the definition of "Assumed Liabilities" includes only those assets owned by LBI and not any other Affiliate of LBI]*

parties" in clause (i) of the definition of "Excluded Assets" includes any person, including
Affiliates of Seller.

*[handwritten: Solely]* 4.    Assumed Liabilities.  Clause (a) of the definition of "Assumed Liabilities"
consists of all Liabilities to be incurred by Purchaser, after the Closing, in connection with
the Business.  Nothing in this Paragraph 4 is intended to modify Section 8.12 of the Agreement. *[handwritten: in connection with the winding up]*

5.    License.  All marks containing the words "LEHMAN" or "LEHMAN
BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section
8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of
the Agreement with respect to the investment banking and capital markets businesses of Seller
and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the
term of the license granted for use in connection with the IMD Business including in respect of
investment funds) or the unwinding of any operations or businesses of Seller or any of its
Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable, except
that such licenses are assignable and sublicensable (i) for use in connection with IMD Business
or any portion of the IMD Business, (ii) to Seller's Subsidiaries and (iii) to the purchaser of any
other businesses of Seller and its Subsidiaries solely in connection with the winding up of any
such businesses. *[handwritten: (conf)]* *[handwritten: to Seller's Subsidiaries]*

6.    Long Positions.  The Purchased Assets and Assumed Liabilities include
hedges placed on the Long Positions that are entered into after the date of the Agreement and
before Closing, but will not include any other types of hedges or derivatives (other than
exchange-traded derivatives as specifie in clause (d) of the definition of "Purchased Assets").
The reference to "government securities" in the definition of Long Positions includes securities
of any government agency. *[handwritten: (specified)]* *[handwritten: but not over the counter derivatives such as TBA's and spot and forward currency contracts]*

7.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI
and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities
associated with such subordinated notes therefore are Excluded Liabilities.

8.    [Residential Real Estate Mortgage Securities.  To facilitate the division of
residential real estate mortgage securities referred to in clause (c) of the definition of Purchased
Assets and clause (k) of the definition of Excluded Assets, Purchaser will acquire non-agency
residential mortgage backed securities and manufactured housing securities (which are therefore
considered Purchased Assets) and Seller will retain HELOC, ABS, CDO, CLO, VFN, franchise
loan, student loan [scratch and dent], second lien, and reverse mortgage backed securities
(which are therefore considered Excluded Assets), in each case as will be further allocated by the
parties.] *[handwritten: ? ]* *[handwritten: 7    7]*

9.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for
Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement
(each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

10.    Excluded Cash Assets and Retained Cash.  All cash, cash equivalents,
bank deposits or similar cash items of Seller and its Subsidiaries are Excluded Assets, other than
the "Retained Cash," which is a Purchased Asset.  The "Retained Cash" is $700 million in cash,
cash equivalents, bank deposits or similar cash items (rather than $1.3 billion), plus the cash

2

10286514

*[handwritten: or between or among any Seller and/or any Subsidiary of LBHI]*
*[handwritten: LBHI or]*
*[handwritten: Nothing herein shall affect rights or obligations under the Transaction Services Agreement]*

amount received from closing out Long Positions, less the cash amount expended to close out Short Positions.

11. **Payables, Deposits and Receivables.** *[handwritten: resulting from]* No payables or deposits shall be Assumed Liabilities, except to the extent relating to a Purchased Contract. No receivables shall be Purchased Assets, except to the extent relating to a Purchased Contract.

12. **Intercompany Obligations.** Except as expressly contemplated by this *[handwritten: respectively]* Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables, payables or other obligations of Seller or its Subsidiaries. *[handwritten: (in its bankruptcy)]*

13. **Eagle Energy as Excluded Asset.** The equity interests and assets of Eagle Energy Management LLC, including the assets of the energy marketing and services business of Lehman Brothers Commodity Services, Inc., are Excluded Assets (rather than Purchased Assets).

14. **Schedule 12.3.** Following the Closing, the parties shall reasonably agree to an allocation of the purchased price (including the Assumed Liabilities) among the Purchased Assets and set forth such allocation on a Schedule 12.3.

15. **Risk of Loss of Artwork.** During such period that Purchaser has the right *[handwritten: loss based on the insured]* to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork was not lost or damaged.

16. **Records.** The records referred to in Section 8.7 include all Documents that are Purchased Assets. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

17. **Subleases.** Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within

*[handwritten: Holdback?]*
*[handwritten: S&C sent around language last night.]*

10286514

a commercially reasonable period of time following the Closing Date, negotiate in good
faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to
both Purchaser and Seller and subject to the terms of the applicable underlying lease,
pursuant to which a portion of the demised premises under such underlying lease (such
portion of the premises to be agreed upon by the parties) shall be subleased to (A) with
respect to the SF Property, the Purchaser, and (B) with respect to the LA Property,
Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of
Seller) or any person who purchases the IMD Business (provided that the entity entering
into the sublease agreement as a subtenant shall be reasonably acceptable to the
Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and
the tenant under such sublease being referred to as the "Subtenant"), in each case, upon
such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided
that (1) the Subtenant shall pay rent and other charges under such sublease agreement
equal to its proportionate share of the rent and other charges payable by the Sublandlord
to the landlord under the underlying lease (which proportionate share shall be based upon
the relative square footage of the subleased space in proportion to the square footage of
the overall demised space under the underlying lease), (2) the term of the sublease
agreement shall be a period commencing on the Closing Date and ending on the day
immediately preceding the expiration date of the underlying lease (as the same may be
extended pursuant to the terms of the underlying lease), (3) any alterations or
modifications which the Sublandlord and Subtenant mutually agree need to be made to
the demised premises in order to segregate the subleased space from the remainder of the
demised premises under the underlying lease shall be performed by the Sublandlord and
the cost thereof (including the cost of any plans and specifications, drawings, permits,
licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and
Subtenant in proportion to the square footage of their respective spaces.  Prior to the
execution and delivery of the sublease agreement for a particular Sublease Property,
subject to reasonable security procedures and giving due regard to regulatory
considerations (e.g., segregation) including the right to relocate such employees within
the applicable premises, and for a commercially reasonable period after the Closing Date,
(i) with respect to the SF Property, to the extent that Transferred Employees occupied any
portion of the SF Property prior to Closing, such Transferred Employees shall be
permitted to continue to occupy and use the SF Property to the same extent and for the
same purposes as the SF Property was occupied by such Transferred Employees prior to
the Closing; provided, that the foregoing shall be subject to Purchaser's ability to
substitute a substantially similar number of new employees of Purchaser for any such
Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each
Sublease Property other than the SF Property, to the extent that Excluded Employees
occupied any portion of such Sublease Property prior to Closing, such Excluded
Employees shall be permitted to continue to occupy and use such Sublease Property to
the same extent and for the same purposes as such Sublease Property was occupied by
such Excluded Employees prior to the Closing; provided, that the foregoing shall be
subject to Seller's ability to substitute a substantially similar number of new employees
of Seller for any such Excluded Employees as provided in Paragraph 18 below.  In each
case described in clauses (i) and (ii) above, no rent or other payments shall be made to the
party which is the tenant under the underlying lease until execution and delivery of the
applicable sublease agreement at which time all rent calculated under the sublease

4

agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.    Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

20.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New

5

10286514

York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank]*

6

10286514

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:


LEHMAN BROTHERS INC.

By: _____
Name:
Title:


LB 745 LLC

By: _____
Name:
Title:

10286514

# DEPOSITION EXHIBIT 34

**Administrator**

Sent: Tuesday, March 24, 2009 10:40 PM

| | |
|---|---|
| **From:** | Keller, Andy R [akeller@stblaw.com] |
| **Sent:** | Friday, September 19, 2008 4:34 PM (GMT) |
| **To:** | Berkenfeld, Steven [sberkenf@lehman.com] |
| **Subject:** | FW: LEHMAN– Barclays: Current Draft of Clarifying / Amendatory Letter |
| **Attach:** | Clarification Letter_#1916861.DOC;Clarification Letter_#1916861.DOC |

From: robert.messineo@weil.com [mailto:robert.messineo@weil.com]
Sent: Friday, September 19, 2008 12:09 PM
To: vlewkow@cgsh.com; dleinwand@cgsh.com; dmclaughlin@cgsh.com; rdavis@cgsh.com; summerse@sullcrom.com;
archie.cox@barclayscapital.com; Finley, John G; Keller, Andy R; 'lori.fife@weil.com'; 'jacqueline.marcus@weil.com';
david.murgio@weil.com; michael.lubowitz@weil.com; harvey.miller@weil.com
Subject: LEHMAN– Barclays: Current Draft of Clarifying / Amendatory Letter
Importance: High

Please see the current draft. The exhibit must be revised to reflect the latest deal with DTC; this is being distributed separately.
A copy marked to show the changes made from the last draft we distributed is attached.
Please distribute to others who should have it.

Marked copy:

Robert L. Messineo
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Telephone = 212-310-8835
Telecopy = 212-833-3862



10279028

*WGM Comments – September 19, 2008 – Noon*

*[Letterhead of Barclays]*

September [   ], 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn:  Steven Berkenfeld, Esq.
Facsimile:  (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements of the parties stated therein and shall amend the Agreement to the extent necessary so as to be consistent with this letter, and is binding on the parties hereto upon its execution and delivery.

1.  **Purchased Assets**. The Purchased Assets means all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), including the items set forth in clauses (a) through (s) of the definition of "Purchased Assets." Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage trading operations of LBI (but mortgage securities only to the extent referred to below) and (c) all prime brokerage accounts, repos and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business). The categories of securities referred to in clause (d) of the "Purchased Assets" definition in the Agreement include only securities in such categories owned by LBI and not any other affiliate of LBI and only collateralized short-term agreement relating to short-term positions of LBI. Purchased Intellectual Properties includes Intellectual Property Rights, Software and Technology, wherever in the world held by Holdings or any of its Subsidiaries, that are used or necessary for the conduct by Purchaser of the Business.

2.  **IMD Business**. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business. As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business and Purchased Assets and the Business include the private investment management business (other than the CTS (Corporate Cash) business) ("PIM"). The employees

1

10279850

of PIM of the Closing Date shall become Transferred Employees and will be entitled to benefits on a basis consistent with that provided by Section 9.1 of the Agreement for other Transferred Employees, all in accordance with the terms and conditions of such sections, and, for purposes of Section 9.1(c), the Purchaser shall establish a retention program for Transferred Employees of PIM, substantially comparable to the retention program for other Transferred Employees contemplated by Section 9.1, the cost of which shall be in addition to the cost referred to in Section 9.1.

3.    **Excluded Assets**.  Included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman companies that have or do come under governmental conservatorship or administration. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries.  Clause (i) of the definition of "Assumed Liabilities includes only liabilities associated with assets owned by LBI and not assets owned by any Affiliate of LBI. The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.

4.    **Assumed Liabilities**.  Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser, after the Closing, in connection with the Business.  Nothing in this Paragraph 4 is intended to modify Section 8.12 of the Agreement.

5.    **License**.  All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or a purchaser of any other businesses of Seller and its Subsidiaries, solely, for use in connection with the winding up of any such businesses.

6.    **Long Positions**.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (other than exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" but not over-the-counter derivatives such as TBAs, other than TBA MS, and spot and forward currency contracts).  The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

7.    **Subordinated Notes of LBI**.  The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

2

10279850

8.    <u>Residential Real Estate Mortgage Securities</u>. To facilitate the division of residential real estate mortgage securities referred to in clause (e) of the definition of Purchased Assets and clause (k) of the definition of Excluded Assets between Purchaser and Seller, Purchaser will acquire non-agency residential mortgage backed securities and manufactured housing securities (which are therefore considered Purchased Assets) and Seller will retain HELOC, ABS, CDO, CLO, VFN, franchise loan, student loan, [scratch and dent], second lien, and reverse mortgage backed securities (which are therefore considered Excluded Assets), in each case as will be further allocated by the parties.

9.    <u>Breakup Fee</u>. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

10.    <u>Excluded Cash Assets and Retained Cash</u>. All cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries are Excluded Assets, other than the "Retained Cash," which is a Purchased Asset. The "Retained Cash" is $700 million in cash, cash equivalents, bank deposits or similar cash items (rather than $1.3 billion), plus the cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions.

11.    <u>Payables, Deposits and Receivables</u>. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

12.    <u>Intercompany Obligations</u>. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations, respectively, of Seller or its Subsidiaries or between or among any Seller or any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

13.    <u>Eagle Energy as Excluded Asset</u>. The equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets).

14.    <u>Schedule 12.3</u>. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

15.    <u>Risk of Loss of Artwork</u>. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

3

10279850

16.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

17.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the

4

10279850

execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.    _Deferred Transfers_. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real

5

10279850

Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

20.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Arrangements Regarding DTCC.  The parties have agreed to the arrangements with respect to accounts maintained by LBI with DTCC set forth on Exhibit I hereto.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank.]*

6

10279850

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

10279850

**The following is based on an earlier preliminary draft and does not reflect the current agreement in principle; it is included only to facilitate inclusion of the final version.**

### EXHIBIT I: Liabilities Related to Clearing Securities Trades (DTCC)

(a)    Assumed Liabilities shall include Assumed Depositary Liabilities and Excluded Liabilities shall include Excluded Depositary Liabilities (each as defined below).

(b)    On September 19, 2008, Purchaser informed DTC that, if it is selected as the successful bidder to acquire the Business, Purchaser will guaranty the open trades and amounts due to DTCC on the accounts and subaccounts that have on deposit of DTCC which roll up into the 0074 Accounts, effective as of the opening of the trading day on Monday, September 21, 2008, in an aggregate net amount not to exceed $250 million.

(c)    Sections 3.2 and 3.3 of the Agreement shall hereby be amended and restated in their entirety as follows:

3.2    Payment of Cash Amount.  On the Closing Date, Purchaser shall pay to Seller an amount equal to the Cash Amount, less $250 million, which shall be paid by wire transfer of immediately available funds into an account designated by Seller.

3.3    Adjustments.

(a)    As soon as practicable, Seller shall determine, and notify Purchaser of, the amount of the Excluded Depositary Liabilities.  On the Business Day following the date on which Seller notifies Purchaser of such amount, Purchaser shall pay to Seller an amount equal to $250 million, less the Excluded Depositary Liabilities,[1] which shall be paid by wire transfer of immediately available funds into an account designated by Seller; provided, however, that, if the Excluded Depositary Liabilities equals or exceeds $250 million, Purchaser shall not be required to pay any amount to Seller pursuant to this Section 3.3(a) [and Purchaser shall be entitled to a credit in the amount of such excess against amounts payable by Purchaser to Seller under the Transition Services Agreement].  The amount of any payment to be made pursuant to this Section 3.3(a) shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to the rate of interest published from time to time by the *Wall Street Journal* as the "prime rate" at JP Morgan Chase during the period from the Closing Date to the date of payment.  Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of three hundred sixty five (365) days and the actual number of days elapsed.

(b)    Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including

---

[1] Can this amount be calculated with certainty?  Consider whether dispute resolution provisions are necessary.

8

10279850

repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof). Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss. If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (i) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (ii) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3(b)). For purposes of this Section 3.3(b), the time value of money shall be disregarded and no interest shall be deemed earned.

3.4    Definitions. For purposes of this Article III, the terms set forth below shall have the following definitions:

(a)    "074 Accounts" means ██████████████████████████ of DTCC prior to the Closing ██████████████████████████████████

(b)    "Assumed Depositary Liabilities" means the net amount of all Depositary Liabilities incurred in respect of trades made subsequent to the Closing on 074 Accounts ██████████████████████████

(c)    "Depositary Liabilities" means Liabilities of LBHI and its Subsidiaries to DTCC in respect of 074 Accounts.

(d)    "DTCC" means the Depositary Trust & Clearing Corporation.

(e)    "Excluded Depositary Liabilities" means all net amount of all Depositary Liabilities, other than Assumed Depositary Liabilities. Excluded Depositary Liabilities shall include Depositary Liabilities incurred in respect of (A) trades made prior to the Closing on all 074 Accounts and (B) trades made subsequent to the Closing on 074 Accounts that constitute Excluded Assets.

9

10279850

### Section 3.2 & 3.3 Escrow Alternative

3.2    **Payment of Cash Amount.** On the Closing Date, Purchaser shall pay (a) $250 million of the Cash Amount to the Escrow Agent and (b) the remainder of the Cash Amount to Seller, each of which shall be paid by wire transfer of immediately available funds into an account designated by the Escrow Agent or Seller, as applicable.

3.3    **Adjustments.**

(a)    As soon as practicable, Seller shall determine, and notify the Escrow Agent of, the amount of the Excluded Depositary Liabilities. On the Business Day following the date on which Seller notifies the Escrow Agent of such net amount, the Escrow Agent shall pay, by wire transfer of immediately available funds into an account designated by Seller or Purchaser, as applicable:

(i)    to Purchaser an amount equal to the Excluded Depositary Liabilities; and

(ii)    to Seller the remainder of the Escrow Funds.

provided; however, that, if the Excluded Depositary Liabilities equals or exceeds $250 million, the Escrow Agent shall pay to Purchaser all $250 million of Escrow Funds [and Purchaser shall be entitled to a credit in the amount of such excess against amounts payable by Purchaser to Seller under the Transition Services Agreement]. The amount of any payment to be made pursuant to this Section 3.3(a) shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to the rate of interest published from time to time by the *Wall Street Journal* as the "prime rate" at JP Morgan Chase during the period from the Closing Date to the date of payment. Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of three hundred sixty five (365) days and the actual number of days elapsed.

(b)    Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof). Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss. If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (i) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (ii) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus

10

10279850

one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3(b)). For purposes of this Section 3.3(b), the time value of money shall be disregarded and no interest shall be deemed earned.

11

10279850

*WGM Comments – September 19, 2008 – 2:30 am Noon*

[*Letterhead of Barclays*]

September [___], 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements of the parties stated therein and shall amend the Agreement to the extent necessary so as to be consistent with this letter, and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets.  The Purchased Assets means all of the assets of Seller used in connection primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), including the items set forth in clauses (a) through (s) of the definition of "Purchased Assets." Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage trading operations of LBI (but mortgage securities only to the extent referred to below) and (c) all prime brokerage accounts, repos and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business). The categories of securities referred to in clause (d) of the "Purchased Assets" definition in the Agreement include only securities in such categories owned by LBI and not any other affiliate of LBI and only collateralized short-term agreement relating to short-term positions of LBI. Purchased Intellectual Properties includes Intellectual Property Rights, Software and Technology, wherever in the world held by Holdings or any of its Subsidiaries, that are used or necessary for the conduct by Purchaser of the Business.

2.    IMD Business.  For purposes of this the Agreement, the IMD Business consists of the asset management and the alternatives – private equity business of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business. As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business and Purchased Assets and the Business include the private investment management business (other than the CTS (Corporate Cash) business) In connection with

I

10279851

~~Section 9.1(e) of the Agreement~~ ("PIM"). The employees of PIM of the Closing Date shall become Transferred Employees and will be entitled to benefits on a basis consistent with that provided by Section 9.1 of the Agreement for other Transferred Employees, all in accordance with the terms and conditions of such sections, and, for purposes of Section 9.1(c), the Purchaser shall establish a retention program for certain employees of the private investment management ~~business (other than the CTS (Corporate Cash) business).~~ Transferred Employees of PIM, substantially comparable to the retention program for other Transferred Employees contemplated by Section 9.1, the cost of which shall be in addition to the cost referred to in Section 9.1.

3.    **Excluded Assets.** Included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman ~~European entities in~~ companies that have or do come under governmental conservatorship or administration. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its ~~Subsiaries~~ Subsidiaries. Clause (i) of the definition of "Assumed Liabilities includes only liabilities associated with assets owned by LBI and not assets owned by any Affiliate of LBI. The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.

4.    **Assumed Liabilities.** Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities ~~of Seller~~ incurred by Purchaser, after the Closing, in connection with the Business. Nothing in this Paragraph 4 is intended to modify Section 8.12 of the Agreement.

5.    **License.** All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or the ~~unwinding~~ in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business; and (ii) to Seller's Subsidiaries and ~~(iii) to the~~ or a purchaser of any other businesses of Seller and its Subsidiaries, solely, for use in connection with the winding up of any such businesses.

6.    **Long Positions.** The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (other than exchange-traded derivatives as ~~specifie~~ specified in clause (d) of the definition of "Purchased Assets" but not over-the-counter derivatives such as TBAs, other than TBA MS, and spot and forward currency contracts). The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

7.    **Subordinated Notes of LBI.** The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

2

10279851

8.     [Residential Real Estate Mortgage Securities.  To facilitate the division of residential real estate mortgage securities referred to in clause (e) of the definition of Purchased Assets and clause (k) of the definition of Excluded Assets between Purchaser and Seller, Purchaser will acquire non-agency residential mortgage backed securities and manufactured housing securities (which are therefore considered Purchased Assets) and Seller will retain HELOC, ABS, CDO, CLO, VFN, franchise loan, student loan, [scratch and dent], second lien, and reverse mortgage backed securities (which are therefore considered Excluded Assets), in each case as will be further allocated by the parties.]

9.     Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

10.     Excluded Cash Assets and Retained Cash.  All cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries are Excluded Assets, other than the "Retained Cash," which is a Purchased Asset.  The "Retained Cash" is $700 million in cash, cash equivalents, bank deposits or similar cash items (rather than $1.3 billion), plus the cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions.

11.     Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent relating to resulting from a Purchased Contract.  No receivables shall be Purchased Assets, except to the extent relating to resulting from a Purchased Contract.

12.     Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables, or payables or other obligations, respectively, of Seller or its Subsidiaries or between or among any Seller or any of LBHI or any Subsidiary of LBHI.  It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

13.     Eagle Energy as Excluded Asset.  The equity interests and assets of Eagle Energy Management LLC Lehman Brothers Commodity Services, Inc., including the equity of as well as the assets of the energy marketing and services business of Lehman Brothers Commodity Services, Inc., Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets).

14.     Schedule 12.3.  Following the Closing, the parties shall reasonably agree to an allocation of the purchased purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 12.1 to be signed by the parties.

15.     Risk of Loss of Artwork.  During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent

3

10279851

~~with the insured~~ appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork ~~was~~had ~~not~~ ~~been~~ lost or damaged.

16.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

17.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and

4

10279851

the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent

5

10279851

and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 19.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

20.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Arrangements Regarding DTCC.  The parties have agreed to the arrangements with respect to accounts maintained by LBI with DTCC set forth on Exhibit I hereto.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank.]*

6

10279851

Sincerely,

**BARCLAYS CAPITAL INC.**

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____
Name:
Title:

**LEHMAN BROTHERS INC.**

By: _____
Name:
Title:

**LB 745 LLC**

By: _____
Name:
Title:

10279851

The following is based on an earlier preliminary draft and does not reflect the current agreement in principle; it is included only to facilitate inclusion of the final version.

### EXHIBIT I: Liabilities Related to Clearing Securities Trades (DTCC)

(a)    Assumed Liabilities shall include Assumed Depositary Liabilities and Excluded Depositary Liabilities shall include Excluded Depositary Liabilities (each as defined below).

(b)    On September 19, 2008, Purchaser informed DTC that, if it is selected as the successful bidder to acquire the Business, Purchaser will guaranty the open trades and amounts due to DTCC on the accounts and subaccounts that were in the name of DTCC which roll up into the 0074 Accounts, effective as of the opening of the trading day on Monday, September 21, 2008, in an aggregate net amount not to exceed $250 million.

(c)    Sections 3.2 and 3.3 of the Agreement shall hereby be amended and restated in their entirety as follows:

3.2    Payment of Cash Amount.  On the Closing Date, Purchaser shall pay to Seller an amount equal to the Cash Amount, less $250 million, which shall be paid by wire transfer of immediately available funds into an account designated by Seller.

3.3    Adjustments.

(a)    As soon as practicable, Seller shall determine, and notify Purchaser of, the amount of the Excluded Depositary Liabilities.  On the Business Day following the date on which Seller notifies Purchaser of such amount, Purchaser shall pay to Seller an amount equal to $250 million, less the Excluded Depositary Liabilities,¹ which shall be paid by wire transfer of immediately available funds into an account designated by Seller, provided, however, that, if the Excluded Depositary Liabilities equals or exceeds $250 million, Purchaser shall not be required to pay any amount to Seller pursuant to this Section 3.3(a) [and Purchaser shall be entitled to a credit in the amount of such excess against amounts payable by Purchaser to Seller under the Transition Services Agreement].  The amount of any payment to be made pursuant to this Section 3.3(a) shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to the rate of interest published from time to time by the *Wall Street Journal* as the "prime rate" at JP Morgan Chase during the period from the Closing Date to the date of payment.  Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of three hundred sixty five (365) days and the actual number of days elapsed.

(b)    Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including

_____

1 Can this amount be calculated with certainty?  Consider whether dispute resolution provisions are necessary.

8

10279851

repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof). Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss. If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (i) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (ii) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3(b)). For purposes of this Section 3.3(b), the time value of money shall be disregarded and no interest shall be deemed earned.

3.4    Definitions. For purposes of this Article III, the terms set forth below shall have the following definitions:

(a)    "074 Accounts" means [illegible] of DTCC [illegible]

(b)    "Assumed Depositary Liabilities" means the net amount of all Depositary Liabilities incurred in respect of trades made subsequent to the Closing on 074 Accounts [illegible]

(c)    "Depositary Liabilities" means Liabilities of LBHI and its Subsidiaries to DTCC in respect of 074 Accounts.

(d)    "DTCC" means the Depositary Trust & Clearing Corporation.

(e)    "Excluded Depositary Liabilities" means all net amount of all Depositary Liabilities, other than Assumed Depositary Liabilities. Excluded Depositary Liabilities shall include Depositary Liabilities incurred in respect of (A) trades made prior to the Closing on all 074 Accounts and (B) trades made subsequent to the Closing on 074 Accounts that constitute Excluded Assets.

9

## Section 3.2 & 3.3 Escrow Alternative

3.2    Payment of Cash Amount.  On the Closing Date, Purchaser shall pay (a) $250 million of the Cash Amount to the Escrow Agent and (b) the remainder of the Cash Amount to Seller, each of which shall be paid by wire transfer of immediately available funds into an account designated by the Escrow Agent or Seller, as applicable.

3.3    Adjustments.

(a)    As soon as practicable, Seller shall determine, and notify the Escrow Agent of, the amount of the Excluded Depositary Liabilities.  On the Business Day following the date on which Seller notifies the Escrow Agent of such net amount, the Escrow Agent shall pay, by wire transfer of immediately available funds into an account designated by Seller or Purchaser, as applicable:

(i)    to Purchaser an amount equal to the Excluded Depositary Liabilities; and

(ii)    to Seller the remainder of the Escrow Funds.

provided, however, that, if the Excluded Depositary Liabilities equals or exceeds $250 million, the Escrow Agent shall pay to Purchaser all $250 million of Escrow Funds (and Purchaser shall be entitled to a credit in the amount of such excess against amounts payable by Purchaser to Seller under the Transition Services Agreement).  The amount of any payment to be made pursuant to this Section 3.3(a) shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to the rate of interest published from time to time by the *Wall Street Journal* as the "prime rate" at JP Morgan Chase during the period from the Closing Date to the date of payment.  Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of three hundred sixty five (365) days and the actual number of days elapsed.

(b)    Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof).  Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss.  If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (i) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (ii) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus

10

10279851

one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3(b)). For purposes of this Section 3.3(b), the time value of money shall be disregarded and no interest shall be deemed earned.

11

10279851

Document comparison done by DeltaView on Friday, September 19, 2008 12:03:48 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1916861/5 |
| Document 2 | pcdocs://ny2/1916861/6 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 67 |
| Deletions | 23 |
| Moved from | 2 |
| Moved to | 2 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 94 |

10279851

# DEPOSITION EXHIBIT 35

**Unknown**

**Sent:** Tuesday, March 24, 2009 10:43 PM

| | |
|---|---|
| **From:** | david.murgio@weil.com [david.murgio@weil.com] |
| **Sent:** | Friday, September 19, 2008 9:15 PM (GMT) |
| **To:** | PDowd@stblaw.com [PDowd@stblaw.com]; pmartelli@stblaw.com [pmartelli@stblaw.com]; Berkenfeld, Steven [sberkenf@lehman.com]; akeller@stblaw.com [akeller@stblaw.com]; jfinley@stblaw.com [jfinley@stblaw.com]; vlewkow@cgsh.com [vlewkow@cgsh.com]; dleinwand@cgsh.com [dleinwand@cgsh.com]; feldsteinh@sullcrom.com [feldsteinh@sullcrom.com]; ClaytonW@sullcrom.com [ClaytonW@sullcrom.com]; Richard.Smith3@barcap.com [Richard.Smith3@barcap.com]; Jonathan.Hughes@barcap.com [Jonathan.Hughes@barcap.com]; Genirs, Kevin [Kevin.Genirs@lehman.com]; lori.fife@weil.com [lori.fife@weil.com]; michael.lubowitz@weil.com [michael.lubowitz@weil.com]; robert.messineo@weil.com [robert.messineo@weil.com]; rod.miller@weil.com [rod.miller@weil.com]; Shai.Waisman@weil.com [Shai.Waisman@weil.com]; james.grogan@weil.com [james.grogan@weil.com]; jane.mcdonald@weil.com [jane.mcdonald@weil.com]; harvey.miller@weil.com [harvey.miller@weil.com] |
| **Subject:** | Revised Clarification Letter |
| **Attach:** | Clarification Letter #1916861.DOC;Clarification Letter #1916861.DOC |

Please find attached a revised version of the Clarification Letter reflecting our conversation this afternoon. The blackline is marked to reflect changes from the draft previously circulated by Cleary.

Regards,

David

---

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel:  (212) 310 8764
Fax: (212) 310 8007
e-mail:  david.murgio@weil.com



**EXHIBIT**

35

depobook.com

*WGM Draft  September 19, 2008  5:00 pm*

## BARCLAYS CAPITAL INC.

September ___, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements of the parties stated therein and shall amend the Agreement to the extent necessary so as to be consistent with this letter, and is binding on the parties hereto upon its execution and delivery.

I.       Purchased Assets; Excluded Assets.

(a)      The Purchased Assets means all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), including the items set forth in clauses (a) through (d) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets," plus, with respect to securities of LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto; it being understood that the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 million. The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short agreements relating to short positions of LBI. Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage trading operations of LBI and (c) all prime brokerage accounts, and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business). Purchased Intellectual Properties includes Intellectual Property Rights, Software and Technology, wherever in the world held by Holdings or

1

NY2:\1916841\09\15426W1.DOC\73683.1057

any of its Subsidiaries, that are primarily used or necessary for the conduct by Purchaser of the Business and for conduct of the commodities business. For the avoidance of doubt, the Business includes the Sellers' commodities business.

(b)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of LBHI and its Subsidiaries. In lieu of the assets referred to in clause (k) of the definition of "Excluded Assets," the following shall be Excluded Assets: All of the investments held by Sellers or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement (as hereinafter defined). Also included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business. As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and Purchased Assets and the Business include the private investment management business (other than the CTS (Corporate Cash) business. The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the private investment management business of Seller (the "PIM Business") in the pool of Transferred Employees. Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(c). The Purchased Assets include forgivable notes issued by the Transferred Employees of the PIM Business to Seller. Purchaser agrees to pay any proceeds it receives in respect of such notes to Seller if and when received.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser, after the Closing, in connection with the

2

10279863

Business. Nothing in this Paragraph 4 is intended to modify Section 8.12 of the Agreement and no Liabilities described in clause (i) shall be "Assumed Liabilities."

4.   License.  All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or a purchaser of any other businesses of Seller and its Subsidiaries, in each case solely for use in connection with the winding up of any such businesses.

5.   Long Positions.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (other than exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" and TBA MS, but not any other over-the-counter derivatives such as spot and forward currency contracts). The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

6.   Subordinated Notes of LBI.  The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.   Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.   Certain Cash Proceeds.  Any cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions, before the Closing, shall be delivered to Purchaser.

11.   Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

12.   Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations, respectively, of Seller or its Subsidiaries or between or among any Seller or any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

3

10279863

13.    Schedule 12.3.  Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

14.    Barclays Repurchase Agreement.  At the Closing, Purchaser and its Affiliates will release Seller and its Subsidiaries from any obligation under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates.

15.    Risk of Loss of Artwork.  During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

16.    Records.  The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail.  The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

17.    Subleases.  Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

    (a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

    (b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering

4

10279863

into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has

5

10279863

recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement. Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.     Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.     745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

1.1     20.     Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.     Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.     Definition of Contract.  Contract shall not include swap agreements.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

6

10279863

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above.


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

10279863

*CGSH\WGM  Comments\Draft  September 19, 2008  5:00 4:30pm*

[*Letterhead of Barclays*]
## BARCLAYS CAPITAL INC.

September [    ], 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn:  Steven Berkenfeld, Esq.
Facsimile:  (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc ("Purchaser").  Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement.  This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements of the parties stated therein and shall amend the Agreement to the extent necessary so as to be consistent with this letter, and is binding on the parties hereto upon its execution and delivery.

      1.      Purchased Assets; Excluded Assets.

      (a)      The Purchased Assets means all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), including the items set forth in clauses (a) through (d) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets;," plus, with respect to securities of LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto, it being understood that the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 million. The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short agreements relating to short positions of LBI.  Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage trading operations of LBI (but mortgage securities only to the extent referred to below) and (c) all prime brokerage accounts, and repurchase agreementandagreement and securities lending operations of the Business (for the avoidance of doubt, other than those

1

NY2  1906\D\971\GS\#\DOC7\663\1087

10279864

that are part of the IMD Business). The categories of securities referred to in clause (d) of the "Purchased Assets" definition in the Agreement include only securities in such categories owned by LBI and not any other affiliate of LBI and with respect to collateralized short-term agreements, only those collateralized short-term agreements relating to short-term positions of LBI. Purchased Intellectual Properties includes Intellectual Property Rights, Software and Technology, wherever in the world held by Holdings or any of its Subsidiaries, that are primarily used or necessary for the conduct by Purchaser of the Business and for conduct of the commodities business. For the avoidance of doubt, the Business includes the Sellers' commodities business.

(b)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of LBI I and its Subsidiaries. In lieu of the assets referred to in clause (k) of the definition of "Excluded Assets," the following shall be Excluded Assets: All of the investments held by Sellers or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement (as hereinafter defined). Also included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business. As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and Purchased Assets and the Business include the private investment management business (other than the CTS (Corporate Cash) business) ("PIM"). The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the private investment management business of Seller (the "PIM Business") in the pool of Transferred Employees. Accordingly, additional amounts shall be paid as bonuses in accordance with Section 9.1(c), and the employees of the PIM business Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM

2

10279864

Business will be treated in a manner consistent with the principles set forth in Section 9.1(c).
The Purchased Assets include forgivable notes issued by the Transferred Employees of the PIM
Business to Seller. Purchaser agrees to pay any proceeds it receives in respect of such notes to
Seller if and when received.

3. ~~Excluded Assets.~~ Included in the Excluded Assets are (a) the mortgage
servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman
companies (other than Seller or 745) that have or do come under governmental conservatorship
or administration. Included in clause (h) of the definition of "Excluded Assets" are life insurance
policies owned by Seller and its Subsidiaries. Clause (i) of the definition of "Assumed
Liabilities includes only liabilities associated with assets owned by LBI and not assets owned by
any Affiliate of LBI. The reference to "third parties" in clause (i) of the definition of "Excluded
Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of the Agreement is
hereby amended to remove the following clause: "other than customer account insurance
supplemental to SIPC coverage included in the Business." 4.     Assumed Liabilities.   Clause
(a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by
Purchaser, after the Closing, in connection with the Business. Nothing in this Paragraph 4 is
intended to modify Section 8.12 of the Agreement; and no Liabilities described in clause (i) shall
be "Assumed Liabilities."

5.4.    License.  All marks containing the words "LEHMAN" or "LEHMAN
BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section
8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of
the Agreement with respect to the investment banking and capital markets businesses of Seller
and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the
term of the license granted for use in connection with the IMD Business (including in respect of
investment funds) or in connection with winding up of any operations or businesses of Seller or
any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable,
except that such licenses are assignable and sublicensable (i) for use in connection with IMD
Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or a purchaser of
any other businesses of Seller and its Subsidiaries, in each case solely for use in connection with
the winding up of any such businesses.

6.5.    Long Positions.  The Purchased Assets and Assumed Liabilities include
hedges placed on the Long Positions that are entered into after the date of the Agreement and
before Closing, but will not include any other types of hedges or derivatives (other than
exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" and
TBA MS, but not any other over-the-counter derivatives such as spot and forward currency
contracts). The reference to "government securities" in the definition of Long Positions includes
securities of any government agency.

7.6.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI
and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities
associated with such subordinated notes therefore are Excluded Liabilities.

8.     Residential Real Estate Mortgage Securities.  To facilitate the division of
residential real estate mortgage securities referred to in clause (e) of the definition of Purchased

3

10279864

Assets and clause (k) of the definition of Excluded Assets between Purchaser and Seller, Purchaser will acquire non-agency residential mortgage backed securities and manufactured housing securities (which are therefore considered Purchased Assets) and Seller will retain HELOC, ABS, CDO, CLO, VFN, franchise loan, student loan, [scratch and dent]; second lien; and reverse mortgage backed securities (which are therefore considered Excluded Assets), in each case as will be further allocated by the parties. [What is happening with scratch and dent?]

9.7.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

10.    Excluded Cash Assets and Retained Cash.    All cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries are Excluded Assets, other than the "Retained Cash," which is a Purchased Asset. The "Retained Cash" is $700 million in cash, cash equivalents, bank deposits or similar cash items (rather than $1.5 billion), plus the$. Certain Cash Proceeds.    Any cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions, before the Closing, shall be delivered to Purchaser.

11.    Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

12.    Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations, respectively, of Seller or its Subsidiaries or between or among any Seller or any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

13.    Eagle Energy as Excluded Asset.  The equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). 14.   Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

14.    Barclays Repurchase Agreement.  At the Closing, Purchaser and its Affiliates will release Seller and its Subsidiaries from any obligation under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates.

15.    Risk of Loss of Artwork.  During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent

4

10279864

with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

16.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

17.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the

5

10279864

demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of

6

10279864

Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.    745 Seventh Avenue. The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

1.1    20.    Prorations. Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.    Schedules. Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Arrangements Regarding DTCC. The parties have agreed to the arrangements with respect to accounts maintained by LBI with DTCC set forth on Exhibit I hereto. [Will provide comments on revised version reflecting agreement in principal when provided]

21.    Definition of Contract. Contract shall not include swap agreements.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank.]*

7

10279864

Sincerely,

BARCLAYS CAPITAL INC.

By:
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By:
Name:
Title:


LEHMAN BROTHERS INC.


By:
Name:
Title:


LB 745 LLC


By:
Name:
Title:


NY2 1919861 08 1325 08 08 1325 00 DOC 2368 1 057

10279864

**The following is based on an earlier preliminary draft and does not reflect the current agreement in principle; it is included only to facilitate inclusion of the final version.**

EXHIBIT I: Liabilities Related to Clearing Securities Trades (DTCC)

(a)    Assumed Liabilities shall include Assumed Depositary Liabilities and Excluded Liabilities shall include Excluded Depositary Liabilities (each as defined below).

(b)    On September 19, 2008, Purchaser informed DTC that, if it is selected as the successful bidder to acquire the Business, Purchaser will guaranty the open trades and amounts due to DTCC on the accounts and subaccounts that were in the draft of DTCC which roll up into the 0074 Accounts, effective as of the opening of the trading day on Monday, September 21, 2008, in an aggregate net amount not to exceed $250 million.

(c)    Sections 3.2 and 3.3 of the Agreement shall hereby be amended and restated in their entirety as follows:

3.2    Payment of Cash Amount.  On the Closing Date, Purchaser shall pay to Seller an amount equal to the Cash Amount, less $250 million, which shall be paid by wire transfer of immediately available funds into an account designated by Seller.

3.3    Adjustments.

(a)    As soon as practicable, Seller shall determine, and notify Purchaser of, the amount of the Excluded Depositary Liabilities.  On the Business Day following the date on which Seller notifies Purchaser of such amount, Purchaser shall pay to Seller an amount equal to $250 million, less the Excluded Depositary Liabilities,[1] which shall be paid by wire transfer of immediately available funds into an account designated by Seller; provided, however, that, if the Excluded Depositary Liabilities equals or exceeds $250 million, Purchaser shall not be required to pay any amount to Seller pursuant to this Section 3.3(a) [and Purchaser shall be entitled to a credit in the amount of such excess against amounts payable by Purchaser to Seller under the Transition Services Agreement].  The amount of any payment to be made pursuant to this Section 3.3(a) shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to the rate of interest published from time to time by the *Wall Street Journal* as the "prime rate" at JP Morgan Chase during the period from the Closing Date to the date of payment.  Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of three hundred sixty-five (365) days and the actual number of days elapsed.

(b)    Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including

_____

[1] Can this amount be calculated with certainty?  Consider whether dispute resolution provisions are necessary.

9

10279864

repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof). Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss. If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (i) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (ii) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3(b)). For purposes of this Section 3.3(b), the time value of money shall be disregarded and no interest shall be deemed earned.

3.4    Definitions. For purposes of this Article III, the terms set forth below shall have the following definitions:

(a)    "074 Accounts" means [all accounts and subaccounts in the draft of DTCC, prior to the Closing, that roll up into LBI's Account No. 9074.]

(b)    "Assumed Depositary Liabilities" means the net amount of all Depositary Liabilities incurred in respect of trades made subsequent to the Closing on 074 Accounts that constitute Purchased Assets.

(c)    "Depositary Liabilities" means Liabilities of LBHI and its Subsidiaries to DTCC in respect of 074 Accounts.

(d)    "DTCC" means the Depositary Trust & Clearing Corporation.

(e)    "Excluded Depositary Liabilities" means all net amount of all Depositary Liabilities, other than Assumed Depositary Liabilities. Excluded Depositary Liabilities shall include Depositary Liabilities incurred in respect of (A) trades made prior to the Closing on all 074 Accounts and (B) trades made subsequent to the Closing on 074 Accounts that constitute Excluded Assets.

10

10279864

## Section 3.2 & 3.3 Escrow Alternative

3.2    Payment of Cash Amount.  On the Closing Date, Purchaser shall pay (a) $250 million of the Cash Amount to the Escrow Agent and (b) the remainder of the Cash Amount to Seller, each of which shall be paid by wire transfer of immediately available funds into an account designated by the Escrow Agent or Seller, as applicable.

3.3    Adjustments.

(a)    As soon as practicable, Seller shall determine, and notify the Escrow Agent of, the amount of the Excluded Depositary Liabilities.  On the Business Day following the date on which Seller notifies the Escrow Agent of such net amount, the Escrow Agent shall pay, by wire transfer of immediately available funds into an account designated by Seller or Purchaser, as applicable:

(i)    to Purchaser an amount equal to the Excluded Depositary Liabilities; and

(ii)    to Seller the remainder of the Escrow Funds.

provided, however, that, if the Excluded Depositary Liabilities equals or exceeds $250 million, the Escrow Agent shall pay to Purchaser all $250 million of Escrow Funds [and Purchaser shall be entitled to a credit in the amount of such excess against amounts payable by Purchaser to Seller under the Transition Services Agreement].  The amount of any payment to be made pursuant to this Section 3.3(a) shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to the rate of interest published from time to time by the *Wall Street Journal* as the "prime rate" at JP Morgan Chase during the period from the Closing Date to the date of payment.  Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of three hundred sixty-five (365) days and the actual number of days elapsed.

(b)    Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof).  Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss.  If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (i) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (ii) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3(b)).  For

11

10279864

purposes of this Section 3.3(b), the time value of money shall be disregarded and
no interest shall be deemed earned.

12

10279864

Document comparison done by DeltaView on Friday, September 19, 2008 5:10:19 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1916861/8 |
| Document 2 | pcdocs://ny2/1916861/9 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | Count |
|---|---|
| Insertions | 35 |
| Deletions | 64 |
| Moved from | 11 |
| Moved to | 11 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 121 |

10279864