Case No. 08-CV-08869 (DLC)
Case No. 08-CV-08914 (DLC)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

*In re* LEHMAN BROTHERS HOLDINGS, INC, et al., *Debtor.*

BAY HARBOUR MANAGEMENT, L.C., et al., *Appellants,*

v.

LEHMAN BROTHERS HOLDINGS, INC., et al., *Appellees.*

*Appeal From The United States Bankruptcy Court*

*For the Southern District of New York*

Case No. 08-13555 (jointly administered)

## APPELLANTS' OPENING BRIEF

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David S. Rosner, Esq.
Andrew K. Glenn, Esq.
Ronald R. Rossi, Esq.
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Fax: (212) 506-1800

*Counsel for Appellants*
*Bay Harbour Management L.C., Bay Harbour Master Ltd.,*
*Trophy Hunter Investments, Ltd., BHCO Master, Ltd.,*
*MSS Distressed & Opportunities 2 and Institutional Benchmarks*

## TABLE OF CONTENTS

Page

I.     STATEMENT OF BASIS OF APPELLATE JURISDICTION ............................... 1

II.    STATEMENT OF THE ISSUES TO BE PRESENTED ON APPEAL
       AND APPLICABLE STANDARD OF APPELLATE REVIEW ........................... 1

III.   STATEMENT OF THE CASE ................................................................................. 2

       A. Nature of the Case ...................................................................................... 2

       B. ·Statement of Relevant Facts ..................................................................... 5

          1.  Lehman's Collapse and Bankruptcy Filing .................................. 5

          2.  Lehman Proposes To Sell Its North American Investment
              Banking Operations and Certain Commercial Real Estate
              To Barclays Two Days After Filing Its Petition............................ 6

          3.  Lehman Brothers International (Europe) Advises The
              Bankruptcy Court That $8 Billion In Securities And Cash
              Was Misappropriated By The Debtors .......................................... 9

          4.  Bay Harbour Objects to the Sale ................................................ 11

          5.  The Securities Investor Protection Corporation Seeks
              Protection For LBI's Customers.................................................. 12

          6.  The Sale Hearing .......................................................................... 13

       C. Disposition by the Bankruptcy Court. ..................................................... 15

       D. The Appeal. ............................................................................................... 17

IV.    SUMMARY OF ARGUMENT ........................................................................... 18

V.     ARGUMENT ....................................................................................................... 22

       A. The Bankruptcy Court Erred in Concluding That Barclay's
          Was a Purchaser In Good Faith Pursuant to Section 363
          of The Bankruptcy Code. ......................................................................... 22

       B. The Bankruptcy Court Erred In Concluding That The Sale
          Complied With The Due Process Clause Of The Fifth Amendment
          Of The United States Constitution. .......................................................... 25

C.  The Bankruptcy Court Erred In Concluding, Pursuant To
    Bankruptcy Code Sections 105(a) And 363(f), That The Sale
    To Barclays Was Approved Free And Clear Of Liabilities. ............................ 28

CONCLUSION............................................................................................................. 30

## TABLE OF AUTHORITIES

Page

**Cases**

City of New York v. N.Y., N.H. & Hartford R.R., 344 U.S. 293, 297 (1953) ................. 25

Goldberg v. Kelly, 397 U.S. 254, 270 (1970) ..................................................................... 26

Greene v. McElroy, 360 U.S. 474, 496 (1959) .................................................................... 26

In re Abbotts Dairies, Inc., 788 F.2d 143, 147 (3d Cir. 1986) ........................................... 22

In re Aneco Elec. Constr., Inc., 377 B.R. 338, 342 (Bankr. M.D. Fla. 2006) .................. 29

In re Arch Wireless, 332 B.R. 241, 252 (Bankr. D. Mass. 2005) ....................................... 25

In re Colony Hill Assoc., 111 F.3d 269, 273 (2d Cir. 1997) ................................................ 2

In re Dinova, 212 B.R. 437, 443 (B.A.P. 2d Cir. 1997) ..................................................... 26

In re First Central Fin. Corp., 377 F.3d 209, 212 (2d Cir. 2004) ........................................ 2

In re Lady H Coal Co., 199 B.R. 595, 605 (Bankr. W. Va. 1996) ............................... 28-29

In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) ..................................................... 21

In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 8 (1st Cir. 1993) .................. 22-23

In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995) ................................................ 28

In re Stilwell, 120 F.2d 194 (2d Cir. 1941) ......................................................................... 26

Licensing by Paolo v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d Cir. 1997) ................ 22

Massa v. Addona (In re Massa), 187 F.3d 292, 296 (2d Cir. 1999) ................................... 26

Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) ......................... 25

Reliable Elec. Co. v. Olson Constr. Co., 726 F.2d 620, 623 (10th Cir. 1984) ............. 25-26

Silverman v. K.E.R.U. Realty Corp., In re Allou Distrib., Inc.
379 B.R. 5, 39 (Bankr. E.D.N.Y. 2007) .......................................................................... 29

T.C. Investors v. Joseph (In re M Capital Corp.),
290 B.R. 743 (B.A.P. 9th Cir. 2003) ................................................................................ 25

TeseMilner v. TPAC, LLC In re TicketPlanet.com,
313 B.R. 46, 48 (Bankr. S.D.N.Y. 2004) ........................................................................ 29

Thomas v. Namba (In re Thomas),
    287 B.R. 782, 785 (B.A.P. 9th Cir. 2002) ..................................................... 24

United States v. United States Gypsum Co.,
    333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 746 (1948) ....................................... 23

W. Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus.),
    43 F.3d 714, 721 (1st Cir. 1994) ..................................................................... 25

**Statutes**

11 U.S.C. § 363(b) ....................................................................................... 21, 28

11 U.S.C. § 363(f) ........................................................................................... 28

11 U.S.C. § 541 .............................................................................................. 29

Fed. R. Bankr.P. 8013 ........................................................................................ 2

**Constitutional Provisions**

U.S. CONST. amend. V ...................................................................................... 25

**Other Authorities**

3 COLLIERS ON BANKRUPTCY ¶ 363.11 (15th Ed. Rev. 2008) ........................................... 25

## I.    STATEMENT OF BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear this appeal

of a final order under 11 U.S.C. §§ 105(a), 363 and 365 and Federal Rules of Bankruptcy

Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased

Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment

of Executory Contracts and Unexpired Leases in Case No. 08-13555 (JMP) and a final

order Approving, and Incorporating by Reference for the Purpose of this Proceeding, an

Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers

Holdings, Inc. Chapter 11 Proceeding in each of Case Nos. 08-01419 and 08-01420(JMP)

[Bankruptcy Court Docket No. 258, Case No. 08-01419 Docket No. 2, and Case No. 08-

1420 Docket No. 3][1] (collectively the "Sale Orders"), entered on September 20, 2008, by

the United States Bankruptcy Court for the Southern District of New York (the

"Bankruptcy Court").

## II.    STATEMENT OF THE ISSUES TO BE PRESENTED ON APPEAL AND APPLICABLE STANDARD OF APPELLATE REVIEW

The Statement of the issues presented on appeal and applicable standards of

appellate review are as follows.

1.    Whether the Bankruptcy Court erred in its conclusion in the Sale Orders

that Barclays Capital, Inc. ("Barclays") was a purchaser in good faith pursuant to

section 363 of title 11, United States Code (the "Bankruptcy Code").

2.    Whether the Bankruptcy Court erred in concluding in the Sale Orders that

the sale pursuant to the Orders complied with the Due Process clause of the Fifth

---

[1]  All references to the "Bankruptcy Court Docket" refers to the docket in Chapter 11
Case No. 08-13555 (JMP).

Amendment of the United States Constitution where there was no ability for the

Bankruptcy Court and for parties in interest, including Appellants, to determine

whether Barclays was a purchaser in good faith pursuant to section 363 of the

Bankruptcy Code.

3.    Whether the Bankruptcy Court erred in approving a sale free and clear of

liabilities to Barclays, an entity that the Bankruptcy Court could not have concluded to

be a purchaser in good faith under section 363 of the Bankruptcy Code.

In deciding the above questions, this Court may review the Bankruptcy Court's

conclusions of law *de novo*, and may reverse its findings of fact where they are clearly

erroneous. See Fed. R. Bankr.P. 8013; In re Colony Hill Assoc., 111 F.3d 269, 273 (2d

Cir. 1997); In re First Central Fin. Corp., 377 F.3d 209, 212 (2d Cir. 2004).

## III.    STATEMENT OF THE CASE

The following is Bay Harbour's Statement of the Case, in the form required under

Rule 8010(a)(1)(D) of the Federal Rules of Bankruptcy Procedure. The facts specifically

relevant to this appeal are set forth, infra, in the Statement of Relevant Facts.

### A.    Nature of the Case

This appeal arises from the bankruptcy case of Lehman Brothers Holdings Inc.

("LBHI") and LB 745 LLC ("LB 745") (collectively, the "Debtors" and, together with

their non-debtor affiliates, "Lehman"). LBHI filed for relief under Chapter 11 of the

Bankruptcy Code on or about September 15, 2008 (the "Petition Date"). LB 745 filed a

voluntary chapter 11 petition a day later on September 16, 2008. Since those dates,

several Lehman affiliates have filed bankruptcy.

2

This appeal is brought by Bay Harbour Management L.C., Bay Harbour Master Ltd., Trophy Hunter Investments, Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2 and Institutional Benchmarks (collectively, "Bay Harbour" or "Appellants"). Bay Harbour Master, Ltd., Trophy Hunter Investments, Ltd. and BHCO Master, Ltd are investment funds. MSS Distressed & Opportunities 2 and Institutional Benchmarks are managed accounts that formerly maintained prime brokerage accounts with Lehman Brothers Inc. ("LBI"), a registered broker-dealer and non-debtor subsidiary of LBHI, and Lehman Brothers International (Europe) ("LBIE"), Lehman's principal trading company, and broker-dealer, within Europe, that now have been assumed and assigned to Barclays. Bay Harbour is a creditor of LBI and counterparty to contracts with LBHI and LBIE and now with Barclays.

The events that give rise to this appeal moved at light speed through the Bankruptcy Court. A mere four days after Lehman, the fourth largest investment bank in the United States, filed bankruptcy, and a mere two days after Debtors sought to sell Lehman's North American investment banking and capital markets operation and supporting infrastructure, including its Manhattan and headquarters building, to Barclays (the "Barclays Sale" or "Sale"), the Bankruptcy Court approved the sale even though there was no real indication of what was being sold and for what nor transparency into the so-called sales "process."

On the day of the Sale hearing, just after Debtors informally announced material sale modifications to three overflowing courtrooms so that Appellants could neither hear nor comprehend what was now being sold, LBIE's Joint Administrators, in a written filing, disclosed the results of their preliminary investigation. The Joint Administrators'

3

investigation had identified more than $8 billion in cash and assets that had been
siphoned from LBIE, Lehman's London brokerage, as part of an $8 billion asset transfer
orchestrated by Debtors (the "Defalcated Funds"), such that, after Debtors initiated their
midnight bankruptcy filing, the Defalcated Funds were effectively "trapped." LBIE's
Joint Administrator further advised the Bankruptcy Court that because, according to
Debtors, LBI had negligible cash left at the Petition Date, it was likely that the Defalcated
Funds had been disbursed to third parties in the days and hours before Debtors
commenced their bankruptcy proceeding. As a result of the Debtors' misappropriation of
the $8 billion in cash and assets, LBIE's creditors would potentially be deprived of
billions of dollars in recoveries.

Bay Harbour, who had substantial amounts of assets on deposit at LBIE in its
customer account, filed an objection to the sale on the basis of what little information it
had, arguing, in part, that the Bankruptcy Court should not find that Barclays is a good
faith purchaser, among other reasons, without first determining whether some or all of the
Defalcated Funds had been manipulated by Debtors to prop up LBI for sale or otherwise
used for the Debtors' and its affiliates' (other than LBIE) operations.

At the Sale hearing, which took place without actual notice of material terms and
pre-Sale transactions and where it continued to be a challenge to even hear the
proceedings much less understand the constant modifications to the Sale, the Bankruptcy
Court left unanswered all questions pertaining to the fate of the Defalcated Funds,
Barclays' involvement in the $8 billion transfer and whether Barclays knew about or
benefited from this $8 billion transfer. Notwithstanding, after hearing no evidence from
any Barclays' representative, where LBIE's assertion that the Debtors had

4

misappropriated more than $8 billion went unrebutted, and having allowed no discovery,
the Bankruptcy Court nevertheless held that Barclays was a good faith purchaser under
section 363 of the Bankruptcy Code on little more than the testimony of a single Lehman
witness read into the record by counsel.

Given the unprecedented, rushed, and unconstitutional Sale process in the
Bankruptcy Court -- a process the Bankruptcy Court itself admitted "could never be
deemed a precedent for future cases" -- it was impossible for any creditor or the
Bankruptcy Court to make a meaningful assessment of whether Barclays was a good faith
purchaser entitled to take title to the Purchased Assets free and clear. This Court must
overturn the Bankruptcy Court's good faith finding and remand for further proceedings.

## B.   Statement of Relevant Facts

### 1.   Lehman's Collapse and Bankruptcy Filing.

After more than 150 years of continuous operations, Lehman, the fourth largest
investment bank in the United States, collapsed overnight. *Affidavit of Ian T. Lowitt
Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New
York in Support of First-Day Motions and Applications* [Bankruptcy Court Docket No. 2]
at ¶¶5 and 20-31. While Lehman's collapse occurred during an unprecedented period of
distress in the financial markets, its demise can be directly traced to its disastrous
decision to take highly-leveraged investment gambles on domestic subprime residential
mortgages and structured credit products. (Id. ¶¶20-31.) When the market value of
these thinly traded and largely illiquid asset classes began to plummet, as compared to
their stated value as pledged collateral, Lehman's secured lenders steeply discounted

5

them causing Lehman severe liquidity problems in a rapidly tightening credit market. (Id. ¶23.)

Lehman's loss of liquidity caused it to go into an economic death spiral. (Id. ¶¶20-31.) Unable to access the capital markets, Lehman was forced to use its own cash to fund transactions and, as its cash dwindled, it became ever increasingly difficult for Lehman to operate. (Id. ¶24.) As a result of Lehman's liquidity problems, a number of major credit agencies put Lehman's credit ratings on negative watch and warned of potential multiple downgrades. (Id.) At the same time, Lehman's assets continued to diminish in value, mark to market obligations eroded its balance sheet, and its stock price plummeted. (Id. ¶27.) As market confidence in Lehman's ability to continue as a going concern all but evaporated, Lehman desperately tried to save itself through a sale, restructuring or a Federal bailout. (Id. ¶¶27-30.)

Ultimately, the Federal government passed on providing Lehman with emergency Federal funding, and Lehman filed for Chapter 11 under the Bankruptcy Code. (Id. ¶¶30-31.)

2.  **Lehman Proposes To Sell Its North American Investment Banking Operations and Certain Commercial Real Estate To Barclays Two Days After Filing Its Petition.**

Two days after the Petition Date, on Wednesday, September 17, 2008, the Debtors filed the *Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets* [Bankruptcy Court Docket #60] (the "Sale Procedures Motion"). The Sales Procedure Motion sought (among other relief) the Court's authorization and approval of the sale of

6

the "Purchased Assets" free and clear of all liens, claims, encumbrances, and interests, and the assumption and assignment of certain pre-petition contracts and unexpired leases relating to the Purchased Assets. (Id. ¶¶26-27.) In the Sale Procedures Motion, Debtors requested expedited approval of the Sale arguing that, as a result of Lehman's profound instability in the marketplace, "it is urgent to sell the Purchased Assets now or face material disruption of their value." (Id. ¶11.)

Pursuant to the terms of the Barclays Sale, which were first filed with the Bankruptcy Court on September 17, 2008, Barclays agreed, subject to the Bankruptcy Court's and other regulatory approvals, to purchase the North American investment banking and capital markets operations and supporting infrastructure of LBI. (Id. ¶¶ 9-10 and 14.) Barclays proposed to pay $250 million for LBI's investment banking operations, which included hundreds of thousands of customer accounts holding hundreds of billions of assets, and another approximately $1.45 billion to buy LBI's New York headquarters building and certain of its data centers. (Id.) In essence, Barclays was buying some commercial real estate and giving a fraction of a cent "tip" to the estates when viewed against Lehman's over $600 billion in liabilities. In seeking the Bankruptcy Court's approval of its Sale Procedures Motion, Debtors stressed that time was of the essence due to the alleged rapidly wasting nature of LBI's assets. (Id. at ¶6.)

Later that day, only hours after the Sale Procedures Motion was docketed, the Bankruptcy Court held a hearing and set the Barclays sale hearing for Friday, September 19, 2008, a scant 48 hours after Debtors initially sought Bankruptcy Court approval of the Barclays Sale and with the terms in flux. *Transcript Of Hearing Held On September 17, 2008 At 4:28 PM* [Bankruptcy Court Docket #352] (the "Sale Procedures Hearing Tr.")

7

at 105:24-106:4.  During the Sale Procedures Motion hearing, Debtors' counsel commented upon the rapid pace of the negotiations between Debtors and Barclays and described the proposed Sale as "a complex transaction with many moving parts" that was evolving by the hour.  (Sale Procedures Hearing Tr. 19:6-8.)

As Debtors' counsel further explained, Barclays had not approached the proposed Sale from scratch but had some "familiarity" with Lehman as it had been negotiating to acquire all of Lehman shortly before the Petition Date but had ultimately decided to take a pass on enquiring all of Lehman's assets and operations.  (Sale Procedures Hearing Tr. 25:19-26:2.)  Neither Barclays nor Lehman provided any further information regarding Barclays conduct in obtaining this "familiarity", in walking from the transaction, and in re-engaging once Lehman was in extremis.

In seeking expedited approval of the Sale, Debtors' counsel argued that LBI was a "wasting asset" that was "extremely fragile and sensitive."  (Sale Procedures Hearing Tr. 21:4-5.)  Debtors further claimed that if the Sale was not approved by Friday evening, "there will be nobody in the [LBI] building.  And [the transaction] will just disappear." (Sale Procedures Hearing Tr. 26:3-9.)  The Bankruptcy Court characterized the proposed Sale as "an absolutely extraordinary transaction with extraordinary importance to the capital markets globally," but failed to point to any evidence in the record that supported its assertion.  (Sale Procedures Hearing Tr. 26:24-27:1.)  Indeed, with respect to the proposed Sale, there was no "capital markets" issue, global or otherwise, that had any bearing on the question of whether the proposed Sale was or was not in the best interest of Lehman or its creditors or whether Barclays was a good faith purchaser.

8

Against the context of the Bankruptcy Court's own view that the expeditious

closing of the Barclays Sale was somehow of worldwide concern to the continued

functioning of the capital markets, it glossed over due process concerns, particularly the

extremely short notice period and lack of information regarding the Defalcated Funds.

(Sale Procedures Hearing Tr. 26:24-27:2.)  The Debtors responded in part by contending

that, while mindful of the due process arguments, they did not have an asset that would

still be here in two weeks and thus could not afford to provide creditors and other

interested parties any time to conduct any necessary due diligence.  (Sale Procedures

Hearing Tr. 28:23-29:19.)  The best Debtors could do was make themselves available

over the next day or two to answer questions. (Sale Procedures Hearing Tr. 28:23-29:19.)

Though Lehman's counsel pledged to be available around the clock to answer

questions and to provide data regarding the Barclays Sale, (Sale Procedures Hearing Tr.

41:23-25.), in fact, they held one meeting at 3:00 pm the day before the Sale hearing

where they solicited questions.  Appellants attended and asked about the $8 billion

transfer but Lehman offered no information in response.

3.    **Lehman Brothers International (Europe) Advises
      The Bankruptcy Court That $8 Billion In Securities
      And Cash Was Misappropriated By The Debtors.**

On the Friday, September 19, 2008, the day of the Barclays Sale hearing, the Joint

Administrators of LBIE, who had taken over LBIE's operations only days earlier

pursuant to British insolvency laws, filed papers with the Bankruptcy Court advising that

its "preliminary investigation" had "revealed evidence of substantial transfers of

securities out of LBIE which merit close investigation." *Declaration of Dan Yoram

Schwarzmann* at ¶25 [Bankruptcy Court Docket No. 223] (the "Schwarzmann Dec.")  As

9

LBIE's Joint Administrators explained, "[a]s the market lost confidence in the Lehman Group in recent weeks, many of its clients in the prime brokerage business began to transfer their securities from the Lehman Group to other prime brokers." (Id.) According to LBIE, the expatriated securities "were typically transferred from LBIE to LBI, the U.S. broker-dealer, then to another Lehman Group entity located in Luxembourg, and from there to a new prime broker." (Id. at ¶26.)

They further explained that, thereafter, "funds to reimburse LBIE in respect of the securities and any margin posted in connection with the client accounts were to flow from the new prime broker back through the chain of Lehman entities [including LBI] to LBIE." (Id.) The Joint Administrators' preliminary investigation, which was just a few days old, had revealed, however, that while funds were transferred from the new prime brokers through the Luxemborg entity to LBI, the funds were never sent by LBI back to LBIE. (Id.) As a result, LBIE's Joint Administrators had identified "more than $8 billion in such funds" that are due to LBIE from LBI but that LBIE does not hold. (Id.)

LBIE's Joint Administrator advised the Bankruptcy Court that "transfers of this magnitude could have a significant effect on the creditors of LBIE, potentially depriving them of billions of dollars in recoveries." (Id. ¶27.) And that, because Debtors' counsel informs LBIE that LBI had negligible cash left at the Petition Date, "it is likely that the funds referred to above have been disbursed to third parties in the days before these proceedings were commenced." (Id.) Accordingly, the Joint Administrators requested that the proposed Sale not serve as an impediment with respect to LBIE's right to potentially proceed against third parties to recover some or all of the Defalcated Funds. (Id.)

10

4.    **Bay Harbour Objects to the Sale.**

On the day of the Barclays Sale hearing, with what little information it had, Bay

Harbour filed an objection to the Sale. *Objection of Bay Harbour Management L.C., Bay*

*Harbour Master Ltd., Trophy Hunter Investments Ltd., BHCO Master, Ltd., MSS*

*Distressed & Opportunities 2 and Institutional Benchmarks to the Debtors' Motion to (A)*

*Schedule a Sale Hearing, (B) Establish Sale Procedures, (C) Approve a Break-up Fee;*

*and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of*

*Contracts Relating to the Purchased Assets* [Bankruptcy Court Docket No. 175] (the

"Bay Harbour Objection") In it, Bay Harbour explained that it dealt with LBI employees

in its prime brokerage relationship and believed that its cash and securities safely would

be held for its account. (Id. ¶3.) Nonetheless, despite repeated assurances of the integrity

of the cash and securities deposited with LBI and LBIE, Bay Harbour's cash and

securities, which were indisputably Bay Harbour's and not LBI's or LBIE's property,

appeared to have been siphoned from London to the United States as part of the above-

described transfer of the Defalcated Funds and then "trapped" by the midnight

bankruptcy filing by the Sellers. (Id.)

Bay Harbour's objection also pointed out that, as of the Barclays Sale hearing, the

Debtors did not dispute the transfer of the Defalcated Funds from the United Kingdom

operations or that no consideration had been provided by LBI (or any else) in return. (Id.

¶4.) Nor was there any dispute that neither Debtors nor anyone else had disclosed the

fate of the Defalcated Funds; nor disclosed whether Barclays knew about, benefited from

or was otherwise involved with the transfer of the Defalcated Funds. (Id.)

11

Thus, as Bay Harbour further pointed out, even while LBIE has raised serious unanswered questions regarding LBI's misappropriation of the Defalcated Funds, the Barclays Sale contemplated that Barclays was to receive a substantial portion of securities held by the Debtor and LBI as a good faith purchaser who takes free and clear, without any investigation into Barclays' role in the transfer of the Defalcated Funds. (Id. ¶¶5-6.) Consequently, while it was possible that some of the assets being sold to Barclays derived from the Defalcated Assets, or that the transfer of the Defalcated Funds was manipulated to prop up LBI for sale or to fund the operations of the Debtors' and their affiliates' (other than LBIE), or that Barclays otherwise benefited from the transfer, or that Barclays prior termination of negotiations caused the transfer, the Court nonetheless was being asked to provide its good faith seal of approval to Barclays without having provided any creditor or person in interest even a single minute, much less adequate time, to determine whether Barclays was or was not complicit. (Id. at ¶¶5-8.)

5.      **The Securities Investor Protection Corporation Seeks Protection For LBI's Customers.**

On September 19, 2008, a few hours before the Sale hearing, the United States District Court for the Southern District of New York entered an order, at the request of the Securities Investor Protection Corporation ("SIPC"), placing LBI in liquidation under the Securities Investor Protection Act of 1970 (the "SIPA Proceeding"). (Sale Orders at ¶E.) This Court then transferred the SIPA Proceeding to the Bankruptcy Court, which now oversees, separately, (i) the Debtors' Chapter 11 Cases, and (ii) the SIPA Proceeding.

6.   **The Sale Hearing.**

In the late afternoon on Friday, September 19, 2008, the Bankruptcy Court

conducted the Barclays Sale hearing that concluded shortly past midnight on Saturday,

September 20, 2008. *Transcript of Hearing Held on 9/19/2008 at 4:36 pm* [Bankruptcy

Court Docket No. 318] (the "Barclays Sale Hearing Tr.") During the Barclays Sale

hearing, the Debtors proffered testimony from two witnesses, neither of whom was able

to offer any substantive testimony regarding LBIE's sworn statements concerning the

misappropriation of the Defalcated Funds. (Barclays Sale Hearing Tr. 207:4-207:15.)

Barclays did not offer a single witness on any topic.

Counsel for Bay Harbour was afforded an opportunity to cross-examine Debtors'

witnesses and to present argument in support of Bay Harbour's objection. In so doing,

Bay Harbour's counsel pointed out that the misappropriation of the Defalcated Funds had

not been investigated and that, as a result, nobody, including the Bankruptcy Court, knew

about the circumstances giving rise to the transfer, including who was involved or who

stood to benefit. (Barclays Sale Hearing Tr. 206:11-206:25.)

In direct response, the Bankruptcy Court said that it "paid attention" to the fact

that little or no evidence concerning the misappropriation of the Defalcated Funds had

been presented but that it "made no impact" on the Bankruptcy Court because the

Bankruptcy Court "was confident" it would learn a lot about the issue during the course

of the Debtors' bankruptcy case. (Barclays Sale Hearing Tr. 207:1-207:10.) The

Bankruptcy Court went on to suggest that the questions surrounding the misappropriation

of the Defalcated Funds had no direct bearing on the question of whether it was in the

13

best interest of Debtors' estate to approve the Barclays Sale. (Barclays Sale Hearing Tr. 207:10-207:15.)

Counsel for Bay Harbour responded by pointing out that, because Barclays was seeking to cut off any rights aggrieved parties had to trace their ownership of the Defalcated funds back to them, the questions surrounding the misappropriation of the Defalcated Funds had a direct bearing on the Bankruptcy Court's consideration and approval of the Barclays Sale. And that, moreover, because the Debtors could not sell what they did not own and Barclays could not, in good faith, take what it helped misappropriate, no clean title to the Purchased Assets should pass until the questions raised by LBIE's Joint Administrator earlier that day had been investigated. (Barclays Sale Hearing Tr. 209:2-213:16.)

The Court disagreed, stating that all Bay Harbour was doing "is asserting on behalf of your client a claim derivative of the claim that the administrators would make. And you know what? I don't know if it's right. So because we are approaching 11:00 at night and dealing with no evidence with respect to the underlying premise of your argument I think it's time to move on." (Barclays Sale Hearing Tr. 213:11-213:16.) In response, Bay Harbour reiterated that no matter how many times Bay Harbour's share of the Defalcated Funds were moved within the various companies that comprised Lehman, those Funds still remained Bay Harbour's property and could not be sold. (Barclays Sale Hearing Tr. 213:18-213:25.)

In addition to rejecting Bay Harbour's argument that, given the total lack of investigation into the misappropriation of the Defalcated Funds, the Debtors should not be allowed to convey clean title to what they do not own and that Barclays should not be

14

provided clean title to property it might have been complicit in misappropriating, the
Bankruptcy Court also expressly rejected Bay Harbour's argument that Debtors had
failed to meet their burden of proof demonstrating that Barclays was a good faith
purchaser. (Barclays Sale Hearing Tr. 215:6-215:15.)

In so doing, the Bankruptcy Court expressly found that "ample" evidence
established that the Barclays Sale "was an arm's length transaction" that had been
"negotiated aggressively" in "two stages after the deal fell apart." The Bankruptcy Court
described the negotiations as "brisk" and noted that the negotiating parties were
"concerned about the markets" and thus conducted the negotiations and Sale approval
process "at breakneck speed." (Barclays Sale Hearing Tr. 215:23-216:8.) As further
evidence of the good faith nature of the Barclays Sale, the Bankruptcy Court pointed out
that there had been further negotiation and compromise concerning the sale price of the
commercial real estate that was being sold to Barclays. (Id.)

C.    **Disposition by the Bankruptcy Court.**

At the close of the September 19, 2008 Barclays Sale hearing (which extended
into the early morning hours of September 20), the Court approved the Barclays Sale,
subject to modifications made on the record at the hearing, by an opinion read into the
record and approval orders entered in the Chapter 11 Cases and in the SIPA Proceeding.
By so doing, the Bankruptcy Court expressly overruled Bay Harbour's objection, which
had been filed with the Court that day, and found, among other things, that Barclays was
a good faith purchaser under section 363 of the Bankruptcy Code and as such was
entitled to take the Purchased Assets free and clear of any liabilities.

In ultimately overruling the dozens of Sale objections, including Appellants', it is
evident that the Bankruptcy Court believed that it had no choice but to approve the sale
immediately because of concerns about the global economy and that these generalized
concerns overshadowed the specific issues raised by Bay Harbour and other objectors.
The hearing transcript is peppered with the Bankruptcy Court's own ipse dixit findings
regarding the significance of the Sale. Thus, for example, the Bankruptcy Court found,
without citation to any evidence in the record, that:

- the Sale was "so significant" to the [capital] markets and the United States
  economy and to the world economy (Barclays Sale Hearing Tr. 84:10-
  84:12.);
- "palpable, potential, devastating damage to the markets [would] be caused
  if this transaction is not approved" (Barclays Sale Hearing Tr. 170:16-
  170:20.);
- "[w]e must close this deal this weekend not because the markets demand
  it, although that's certainly a part of it. Lehman Brothers became a victim.
  In effect, the only true icon to fall in the tsunami that has befallen the
  credit markets" (Barclays Sale Hearing Tr. 248:20-248:23.);
- "[w]hat we're doing is unheard of but imperative" (Barclays Sale Hearing
  Tr. 250:11-250:12.);
- "the consequences of not approving this transaction could prove to be
  truly disastrous" (Barclays Sale Hearing Tr. 250:16-250:18.);
- "The harm to the . . . national economy and the global economy could
  prove to be incalculable" (Barclays Sale Hearing Tr. 250:20-250:21.);
- "But I also know that this is so exceptional relative to the experience that I
  have both as a bankruptcy lawyer and judge to know that it could never be
  deemed a precedent for future cases unless someone could argue that there
  is a similar emergency. It's hard for me to imagine a similar emergency"
  (Barclays Sale Hearing Tr. 251:21-252:2.).

The Bankruptcy Court's belief that it needed to close the Barclays Sale that night or risk

further economic chaos, calls into serious question the Bankruptcy Court's ability to

consider whether, in rushing forward, it was objectively assessing evidence to determine

the best interests of Lehman's creditors, who had been largely excluded from any

16

meaningful participation in the process, and whether Barclays was a good faith
purchaser.[2]

## D.   The Appeal.

On September 20, 2008, the Bankruptcy Court entered the Sale Orders. The
following day, on September 21, 2008, Bay Harbour filed a Notice of Appeal, which was
amended the following day. *Amended Notice of Appeal - Corrected Notice of Appeal
filed by David M. Friedman on behalf of BHCO Master Ltd, Bay Harbour Management
LC, Bay Harbour Master Ltd., Institutional Benchmarks, MSS Distressed &
Opportunities 2, Trophy Hunter Investments Ltd.* [Bankruptcy Court Docket No. 262]
Thereafter, on October 1, 2008, Bay Harbour filed a Designation of Record and
Statement of Issues Presented on Appeal. *Designation of Record and Statement of Issues
Presented on Appeal from Orders of the Bankruptcy Court Entered September 20, 2008
filed by David S. Rosner on behalf of BHCO Master Ltd, Bay Harbour Management LC,
Bay Harbour Master Ltd., Institutional Benchmarks, MSS Distressed & Opportunities 2,
Trophy Hunter Investments Ltd.* [Bankruptcy Court Docket No. 502]  On October 10,
2008, LBHI filed, as amended, its Statement of Issues Presented on Appeal and
Counterdesignation of Additional Items To Be Included in the Record on Appeal.
*Lehman Brothers Holdings Inc. et al.'s Amended Statement of Issues Presented on
Appeal and Counterdesignation of Additional Items to be Included in the Record on
Appeal in Connection with the Appeal of Bay Harbour Management L.C., Bay Harbour
Master Ltd. et al. from Orders of Bankruptcy Court Entered September 20, 2008*

---

[2] It cannot be gainsaid then or now that the "sale" of Lehman, or any other recent major
action in the financial world (i.e. non-bankruptcy sale of Bear Stearns, FDIC takeovers,
bank mergers, TARP, etc.), provided a net benefit or harm to the nation's economy.

17

[Bankruptcy Court Docket No. 801] On October 13, 2008, Barclays filed its Statement

of Issues Presented on Appeal and Counterdesignation of Additional Items To Be

Included in the Record on Appeal. *Barclays Capital, Inc. 's Statement of Issues Presented*

*on Appeal and Counterdesignation of Additional Items to be Included in the Record on*

*Appeal in Connection with the Appeal of Bay Harbour Management L.C., Bay Harbour*

*Master Ltd. et al. from Orders of Bankruptcy Court Entered September 20, 2008, dated*

*October 13, 2008* [Bankruptcy Court Docket No. 897]

## IV.   SUMMARY OF ARGUMENT

The Sale Orders grant Barclays extraordinary relief and, in the process, run

roughshod over the statutory protections afforded creditors under both the Bankruptcy

Code and the United States Constitution. In seeking approval of the Barclays Sale, on

two days' notice and without allowing creditors any opportunity to conduct discovery or

meaningfully to investigate the Sale process, the Debtors argued that an extremely

expedited Sale was necessary purportedly to stabilize confidence in the marketplace, save

jobs, and minimize Debtors' losses. However laudable these goals, they are not relevant

to a Section 363 sale transaction and cannot come at the expense of fundamental due

process or innocent prime brokerage customers, such as Bay Harbour, who have been

potentially defrauded out of billions of dollars.

It is uncontroverted that, on the day of the Barclays Sale Hearing, LBIE, in a

sworn declaration, advised the Court that, shortly before the Petition Date, Debtors

misappropriated more than $8 billion dollars by transferring securities and cash out of

LBIE prime brokerage accounts without providing any consideration in return. LBIE's

disclosure of the findings of its preliminary investigation regarding the transfer of the

18

Defalcated Funds, only hours before the Bankruptcy Court was to conduct a hearing to
approve a Sale that contemplated that Barclays, as a good faith purchaser who takes free
and clear, was to receive a substantial portion of securities held by the Debtor and LBI,
should have been sufficient to halt proceedings in a United States Federal Court to ensure
that the court was not approving the misappropriation of assets belonging to third parties,
not the Debtors. At a minimum, a Federal Court should not be a party, not only to further
transfers, but to a finding absolving a potentially complicit party of any liability for
having caused or benefited from the transfer.

Here, the Bankruptcy Court, after being appraised by LBIE that the Defalcated
Funds had been misappropriated by Debtors and additional funds might yet be missing,
did not even give a moment's pause before it went stampeding ahead with a Sale that it
asserted the world was depending upon it to close. Consequently, the adequacy of the
due process afforded creditors, like Bay Harbour, whose future rights potentially to
recover these assets from Barclays were about to be eliminated in ways expressly
prohibited by the Bankruptcy Code, failed to meet Constitutional muster.

Not surprisingly, in approving the Barclays Sale later that same evening, the
Bankruptcy Court, who neither conducted any investigation of its own nor allowed any
creditor the opportunity to take any discovery, ignored the elephant in the room that was
the Defalcated Funds issue. Instead, the Bankruptcy Court, even while allowing that the
misappropriation of the Defalcated Funds raised serious questions, simply decided that
the questions could be left for another day as the Bankruptcy Court deemed these
questions to have no bearing on its consideration of whether Barclays was a good faith

19

purchaser. The Bankruptcy Court's statement assumes the conclusion that Barclays was not involved with, nor had knowledge of, the Defalcated Funds.

The primary question before the Court on appeal is whether the Bankruptcy Court committed reversible error by finding that Barclays is a good faith purchaser where the question of whether Barclays, who had been in negotiations with Lehman regarding the purchase of all or some of Lehman's assets both shortly before and immediately after the Petition Date, knew about, benefited from or was otherwise involved in the transfer of the Defalcated Funds went uninvestigated and unanswered during the two-day notice period provided for in the Barclays Sale process. In refusing to even consider whether the Defalcated Funds question implicated Barclays' status as a good faith purchaser, the Bankruptcy Court committed three reversible errors.

First, by failing to consider Barclays' potential status as a good faith purchaser in light of uncontroverted evidence in the record regarding the misappropriation of the Defalcated Funds, the Bankruptcy Court erred when it concluded that Barclays was a good faith purchaser pursuant to Section 363 of the Bankruptcy Code. Quite simply, the Bankruptcy Court, having found ample smoke in the record, should not have then held that there was no underlying fire without first allowing for meaningful discovery into the facts. The Bankruptcy Court's finding that Barclays was a good faith purchaser, which is premature at best and ignores critical evidence raising serious doubts about its propriety, should not be left to stand.

20

Second, even accounting for the so-called extraordinary circumstances
surrounding the Barclays Sale,[3] the Bankruptcy Court nevertheless committed reversible
error by violating the due process clause of the Fifth Amendment of the Constitution. By
rendering a good faith finding, after a two-day notice period, without allowing any
potentially aggrieved creditor an opportunity to take discovery or conduct an
investigation regarding Barclays' complicity, role or involvement in the transfer and
dissipation of the Defalcated Funds, the Bankruptcy Court deprived interested parties the
meaningful opportunity to be heard that substantive due process requires.

Third, the Bankruptcy Court erred in finding, pursuant to Bankruptcy Code
Sections 105(a) and 363(f), that the Barclays Sale was free and clear of liabilities to
Barclays. It is axiomatic that only bona fide good faith purchasers are entitled to a
finding that they are taking assets free and clear. Because the record, when considered in
its totality, does not support the Bankruptcy Court's good faith purchaser finding, unless
and until a meaningful investigation is made and it is established that Barclays had no
role in nor derived no benefit from the misappropriation and dissipation of the Defalcated
Funds, the Bankruptcy Court's free and clear finding must be reversed and the Sale Order
remanded for further proceedings.

---

[3] Few, if any, sales under § 363(b) of the Bankruptcy Code are not postured as
"extraordinary" and the circumstances "exigent". See In re Lionel Corp., 722 F.2d 1063,
1071 (2d Cir. 1983) (holding that "the rule we adopt requires that a judge determining a §
363(b) application expressly find from the evidence presented before him at the hearing a
good business reason to grant such an application").

21

## V.    ARGUMENT

### A.    The Bankruptcy Court Erred in Concluding
That Barclay's Was a Purchaser In Good Faith
Pursuant to Section 363 of The Bankruptcy Code.

The United States Court of Appeals for the Second Circuit has held that the

"[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of

the sale proceedings" and that "where there is a lack of such integrity, a good faith

finding may not be made." Licensing by Paolo v. Sinatra (In re Gucci), 126 F.3d 380,

390 (2d Cir. 1997). A purchaser's good faith is precluded by a showing of "fraud,

collusion between the purchaser and other bidders or the trustee, or an attempt to take

grossly unfair advantage of other bidders." Id. at 390; see also In re Abbotts Dairies,

Inc., 788 F.2d 143, 147 (3d Cir. 1986) (same). The good-faith analysis thus focuses on

"the purchaser's conduct in the course of the bankruptcy proceedings" and includes "the

purchaser's actions in preparation for and during the sale itself." In re Gucci, 126 F.3d at

390. Here, any such analysis necessarily would have required that the Bankruptcy Court

consider Barclays conduct in originally considering a purchase of Lehman's entire

business, its decision to walk away from that proposed deal, and its conduct in returning

to the negotiating table after Lehman's financial condition and bargaining power had

substantially deteriorated.

While "good faith" is not defined by Section 363 of the Bankruptcy Code, most

courts have adopted a traditional equitable definition of "one who purchases the assets for

value, in good faith, and without notice of adverse claims." In re Gucci at 390 (emphasis

added); In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 8 (1st Cir. 1993) ("a good

faith purchaser 'is one who buys property in good faith and for value, without knowledge

of adverse claims'") (emphasis added). Here, under the traditional equitable definition of

"good faith," the Bankruptcy Court's finding that Barclays was a good faith purchaser

who purchased the assets "*without notice of adverse claims*" cannot withstand scrutiny.

By refusing to allow any meaningful inquiry into the question of whether Barclays had

any role in, or knowledge regarding, the misappropriation of the Defalcated Funds, the

Bankruptcy Court had no evidentiary basis to support its conclusion that Barclays

purchased the assets without knowledge that some or all of the Defalcated Funds were

being conveyed to them or had been used to prop up LBI in contemplation of its Sale.

The Bankruptcy Court's factual findings that the transaction was at "arm's

length" and "aggressively negotiated" cannot cure the fatal defect in its good faith

holding, which did not address the adverse claims issue. The evidence relied on by the

Bankruptcy Court to support its good faith finding says nothing about whether, in light of

the unrebutted evidence concerning the Defalcated Funds, Barclays had notice that the

Debtors did not own some or all of the assets it was selling, and thus could not convey

clean title, or had used these Defalcated Funds to prop up LBI or otherwise support the

Sale. See United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525,

542, 92 L. Ed. 746 (1948) (holding that "a finding is clearly erroneous when although

there is evidence to support it, the reviewing court on the entire evidence is left with the

definite and firm conviction that a mistake has been committed").

Here, once LBIE raised the Defalcated Funds issue before approval of the Sale,

the Bankruptcy Court had two choices. It could have allowed interested parties an

opportunity to conduct a substantive inquiry into whether Barclays was at all complicit in

the misappropriation and dissemination of the Defalcated Funds thus enabling the

23

Bankruptcy Court to decide the good faith question based on record evidence. Or, failing
that, it could have approved the Sale but reserved its holding on the good faith question
until such time as an investigation was completed. See Thomas v. Namba (In re
Thomas), 287 B.R. 782, 785 (B.A.P. 9th Cir. 2002) ("a bankruptcy court may, in the
absence of a well-developed factual record, prefer to take the cautious approach of either
refusing to make 'good faith' findings or limiting remarks about 'good faith' to the
nonspecific observation that the court has no reason to doubt that the parties are
proceeding in 'good faith.'").

Unfortunately, perhaps misguided by a stated obligation to the "global capital
markets," rather than fealty to the Bankruptcy Code and Lehman creditor interests, the
Bankruptcy Court took neither of the above courses. Rather, the Bankruptcy Court
ignored the serious issues raised by Appellants and LBIE and determined that these same
issues had nothing to do with its own evaluation of Barclays' conduct as Purchaser or its
approval of the Barclays Sale. As much as the Bankruptcy Court, in light of the
professed emergent circumstances, might have wanted to believe Barclays had conducted
itself in good faith, the Bankruptcy Court committed reversible error when it foreclosed
any factual investigation into Barclays' conduct and then issued findings based on its
own speculation that Barclays was not complicit in or a beneficiary of the
misappropriation of the Defalcated Funds.

Moreover, the Bankruptcy Court had nothing but speculation to go on because
Barclays presented not a scintilla of evidence before or during the Sale hearing regarding
its own conduct throughout the course of its negotiations with Lehman. By substituting
its own speculation for credible, admissible evidence, the Bankruptcy Court improperly

24

relieved Barclays of its and the Debtors' burden of proof. See 3 COLLIERS ON

BANKRUPTCY ¶ 363.11 (15th Ed. Rev. 2008)(burden of proof to show good faith is on the

proponent of good faith and may not be assumed) (citing T.C. Investors v. Joseph (In re

M Capital Corp.), 290 B.R. 743 (B.A.P. 9th Cir. 2003)).

### B.    The Bankruptcy Court Erred In Concluding That
The Sale Complied With The Due Process Clause
Of The Fifth Amendment Of The United States Constitution.

A court cannot make a binding finding of fact without providing litigants notice

and a meaningful opportunity to be heard. See U.S. CONST. amend. V.  The fundamental

rules of due process apply with equal force to bankruptcy proceedings.  "The normal

operation of the Bankruptcy Code . . . is predicated on the satisfaction of constitutional

standards of due process."  In re Arch Wireless, 332 B.R. 241, 252 (Bankr. D. Mass.

2005).  The notice required by due process is "notice reasonably calculated under all the

circumstances, to apprise interested parties of the pendency of the action and afford them

an opportunity to present their objections."  Mullane v. Cent. Hanover Bank & Trust Co.,

339 U.S. 306, 314 (1950).  "The statutory command for notice embodies a *basic principle

of justice - that a reasonable opportunity to be heard must precede judicial denial of a

party's claimed rights*."  City of New York v. N.Y., N.H. & Hartford R.R., 344 U.S. 293,

297 (1953) (emphasis added); W. Auto Supply Co. v. Savage Arms, Inc. (In re Savage

Indus.), 43 F.3d 714, 721 (1st Cir. 1994) ("Bankruptcy Code § 102(1) [requiring

appropriate notice and appropriate hearing] is founded in fundamental notions of

procedural due process").  "Specifically, the reorganization process depends upon all

creditors and interested parties being properly notified of all vital steps in the proceeding

so they may have the opportunity to protect their interests."  Reliable Elec. Co. v. Olson

25

Constr. Co., 726 F.2d 620, 623 (10th Cir. 1984); In re Stilwell, 120 F.2d 194 (2d Cir.
1941) (same).

    The parties in interest, including Appellant, were not afforded due process to
conduct discovery into the background of the Barclays Sale, and there was thus no basis
for the Bankruptcy Court to give Barclays good faith purchaser protection. Cf. Greene v.
McElroy, 360 U.S. 474, 496 (1959) ("[W]here governmental action seriously injures an
individual, and the reasonableness of the action depends on fact findings, the evidence
used to prove the Government's case must be disclosed to the individual so that he has an
opportunity to show that it is untrue.") (quoted with approval in Goldberg v. Kelly, 397
U.S. 254, 270 (1970)). Rather, Appellants were provided a scant two-days' notice to
digest a complex, rapidly evolving Sale and were afforded no opportunity whatsoever to
conduct an investigation, even after one of Debtors' affiliates raised serious questions
regarding Debtors' and Barclays' conduct in connection with the Sale.

    The Second Circuit has noted that "[t]he opportunity for a creditor to participate
in bankruptcy proceedings is of obvious importance." Massa v. Addona (In re Massa),
187 F.3d 292, 296 (2d Cir. 1999). Indeed, the Second Circuit has said that it will "'look
to the totality of the circumstances' in determining whether a creditor was adequately
apprised of the proceeding." Id. at 297; see also In re Dinova, 212 B.R. 437, 443 (B.A.P.
2d Cir. 1997) ("One circumstance to consider is whether the alleged inadequacy of notice
prejudiced the aggrieved party. Another circumstance is whether notice was given in
time for the aggrieved party to take meaningful action in response to the impending
deprivation of rights.") (citations omitted).

Here, the Bankruptcy Court, at the Sale Procedures hearing, noted that it was

struggling with maintaining the proper balance between the need to approve the Sale on

an incredibly expedited basis and the need to provide interested parties substantive due

process. (Sale Procedures Hearing Tr. 26:20-28:22.)  Whatever equipoise the Bankruptcy

Court had struck at the Sale Procedures hearing between the need to proceed

expeditiously and the need to provide meaningful process, that balance was thrown when,

a day or so later, LBIE advised the Bankruptcy Court, in an unrebutted declaration, that

the Debtors had misappropriated the Defalcated Funds. (Schwarzmann Dec. ¶¶25-27.)

Indeed, once the $8 billion went missing, a substantial portion of which is

comprised of funds and assets held by LBIE as a prime-broker for the account of others,

the Bankruptcy Court, to ensure that interested and potentially aggrieved parties were

provided substantive due process, should have either delayed confirmation of the Sale

until some investigation into the Defalcated Funds could be completed or, failing that,

approved the Sale but reserved its finding on the question of whether Barclays was a

good faith purchaser. Instead, the Court, after foreclosing all opportunity for aggrieved

parties to develop the evidence through discovery, held, in part, that Barclays was entitled

to a good faith purchaser finding because there was no evidence in the record (even

though none could have been proffered without discovery), tending to establish that it had

anything to do with the misappropriation of the Defalcated Funds. (Barclays Sale

Hearing Tr. 215:18-216:18.)

However, substantive due process compels that a potentially aggrieved party be

provided a meaningful opportunity to discover relevant evidence before a court concludes

that there is an absence of evidence supporting its claimed rights. And it was Barclays

27

and the Debtors who bore the affirmative burden of proving good faith; not Appellants to disprove it. Here, having neither provided aggrieved parties with an opportunity to conduct an investigation nor reserved judgment on the question of whether Barclays was a good faith purchaser, the Bankruptcy Court failed to provide substantive due process thus precluding it from finding that Barclays was a good faith purchaser.

> C.    **The Bankruptcy Court Erred In Concluding, Pursuant To Bankruptcy Code Sections 105(a) And 363(f), That The Sale To Barclays Was Approved Free And Clear Of Liabilities.**

Although there may be exigencies justifying the sale of property *validly owned by the Debtor*, those exigencies do not justify selling assets that are not property of the estate and without a factual investigation into title and transfer. The unprecedented pace of the Barclays Sale, the lack of disclosure of the facts leading up to the Barclays Sale, and the broad scope of the transaction precluded parties in interest from conducting appropriate and meaningful factual investigation through discovery.

Section 363 of the Code authorizes a trustee in bankruptcy to sell property of the estate. 11 U.S.C. § 363(b)(1). Under section 363(f) of the Code, the trustee is further permitted to sell the property free and clear of interests in the property. 11 U.S.C. § 363(f). However, courts have held that such sales "are subject to review on appeal as to whether the purchaser acted in 'good faith'" under Section 363(m). See In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995) (remanding for the purpose of determining whether the purchaser acted in "good faith").

Moreover, "[t]he well established rule that sales within a bankruptcy proceeding occur free and clear of any interest is founded upon the principle that good faith purchasers receive good title to the property and that any claims against the property

28

attach to the proceeds." In re Lady H Coal Co., 199 B.R. 595, 605 (Bankr. W. Va. 1996);
see also In re Aneco Elec. Constr., Inc., 377 B.R. 338, 342 (Bankr. M.D. Fla. 2006)
(same). Whatever the scope of definition of "interest", however, it is axiomatic that only
a good faith purchaser can receive good title. Id.

As discussed supra, the Bankruptcy Court's finding that Barclays is a good faith
purchaser is premature at best and flat out wrong at worst and, in addition, it violates
Appellants' substantive due process rights as it was rendered without providing
potentially aggrieved parties a reasonable opportunity to conduct the type of factual
investigation necessary to allow them to meaningfully be heard. Because the good faith
purchaser finding was made in error, the Bankruptcy Court's free and clear finding
similarly must fall.[4]

Here, the Defalcated Funds apparently include funds from customer accounts at
LBIE. LBI indisputably acted as agent for customers and promised to maintain the
customer's accounts pursuant to the prime brokerage agreement. Now, after Bay

---

[4] Debtors can only sell assets to which it has good title and that are property of the estate.
11 U.S.C. § 541. The Debtor cannot sell assets owned by third parties, nor can it sell
assets subject to a constructive trust because they are not property of the estate as a matter
of law. Indeed, New York law provides that a constructive trust arises against an entity
that, by fraud or by abuse of confidence, or by commission of a wrong or other form of
unconscionable conduct, artifice, concealment, or questionable means, either has
obtained or holds the legal right to property which in equity and in good conscience it
ought not to hold. Silverman v. K.E.R.U. Realty Corp., In re Allou Distrib., Inc. 379
B.R. 5, 39 (Bankr. E.D.N.Y. 2007); TeseMilner v. TPAC, LLC In re TicketPlanet.com,
313 B.R. 46, 48 (Bankr. S.D.N.Y. 2004). Without any investigation into the transfer of
the Defalcated Funds, it cannot be determined whether Barclays, by fraud or by abuse of
confidence, or by commission of a wrong or other form of unconscionable conduct,
artifice, concealment, or questionable means, unjustly enriched itself by acquiring assets
rightly belonging to potentially defrauded customers such as Bay Harbour.

29

Harbour deposited funds with LBI and LBIE in reliance on that promise, Barclays has

been unjustly enriched to the extent that the Defalcated Funds have been transferred to

Barclays free and clear of all associated claims. Because there was no evidentiary or

equitable basis for the Bankruptcy Court's finding that Barclays is a good faith purchaser,

the Bankruptcy Court erred in approving the Sale free and clear of any liability to

Barclays.

## CONCLUSION

Based on the foregoing, Bay Harbour respectfully requests that the Court reverse

the Bankruptcy Court's finding that Barclays was a purchaser in good faith pursuant to

section 363 of the Bankruptcy Code and remand for further proceedings.


Dated: New York, New York
　　　　November 14, 2008


　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　KASOWITZ, BENSON, TORRES
　　　　　　　　　　　　　　　& FRIEDMAN LLP


　　　　　　　　　　　　By:　/s/ David S. Rosner
　　　　　　　　　　　　　　　　David S. Rosner (DR-4214)
　　　　　　　　　　　　　　　　Andrew K. Glenn (AG-9934)
　　　　　　　　　　　　　　　　Ronald R. Rossi (RR-9423)

　　　　　　　　　　　　　　1633 Broadway
　　　　　　　　　　　　　　New York, New York  10019
　　　　　　　　　　　　　　(212) 506-1700

　　　　　　　　　　　　　　Attorneys for Appellants

30