UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------x

| | |
|---|---|
| In re | : Chapter 11 Case No. |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*,: 08-13555 (JMP) | |
| | : |
| Debtors. | : (Jointly Administered) |

-----------------------------------------------x

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION | : |
| CORPORATION, | : |
| Plaintiff | : Adversary Proceeding No. |
| v. | : 08-01419(JMP) |
| | : 08-01420 (JMP) |
| LEHMAN BROTHERS INC., | : |
| Debtor. | : |

-----------------------------------------------x

| | |
|---|---|
| BAY HARBOUR MANAGEMENT, L.C., *et al.*, | : |
| Appellants | : Case No. 08-CV-08869 (DLC) |
| v. | : Case No. 08-CV-08914 (DLC) |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*,: | |
| Appellees. | : |

-----------------------------------------------x

---

## ANSWERING BRIEF OF LEHMAN BROTHERS HOLDINGS INC., *et al.* IN OPPOSITION TO BAY HARBOUR APPEAL

---

*Harvey R. Miller*
*Michele J. Meises*
  *Of Counsel*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

*Attorneys for Lehman Brothers*
*Holdings Inc., et al., as Debtors and*
*Debtors in Possession--Appellees*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT .................................................................................... 1

ISSUES PRESENTED.................................................................................................... 4

STANDARD OF APPELLATE REVIEW..................................................................... 4

STATEMENT OF THE CASE........................................................................................ 5

PROCEEDINGS BELOW............................................................................................ 10

ARGUMENT................................................................................................................ 16

I.    THE BANKRUPTCY COURT DID NOT COMMIT A PLAIN ERROR OF
      LAW OR MAKE A CLEARLY ERRONEOUS FINDING THAT THE SALE
      WAS MADE IN GOOD FAITH BY BARCLAYS, LBHI, AND LBI .............. 16

II.   THE APPEAL FROM THE ORDERS SHOULD BE DENIED
      AS MOOT.............................................................................................................. 27

      A.    Appellate Jurisdiction Is Limited to the Issue
            Of Good Faith Under 11 U.S.C. § 363(m)
            Even If Other Meritorious Issues Are Raised............................................ 27
      B.    The Bay Harbour Appeal Should Be Denied
            Under the Doctrine of Equitable Mootness ............................................. 30

III.  THE BANKRUPTCY COURT DID NOT COMMIT A PLAIN ERROR
      OF LAW OR ABUSE ITS DISCRETION IN AUTHORIZING AND
      APPROVING THE SALE TO BARCLAYS ....................................................... 33

      A.    The Due Process Requirements Were
            Satisfied Given the Unique Circumstances............................................... 33
      B.    The Sale to Barclays Was Justified.......................................................... 37

CONCLUSION............................................................................................................. 40

## TABLE OF AUTHORITIES

**Cases**                                                                                      Page(s)

*255 W. 4th St. Realty Corp. v. Nisselson,* Nos. 95 Civ. 7218,
96 Civ. 4177, 1997 WL 154052 (S.D.N.Y. Apr. 2, 1997).............................................39

*In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143 (3d Cir. 1986)...............................................24 n.9

*Allstate Ins. Co. v. Hughes,* 174 B.R. 884 (S.D.N.Y. 1994).........................................................31

*Anderson v. Bessemer City,* 470 U.S. 564 (1985).........................................................................5

*In re Andy Frain Servs. Inc.,* 798 F.2d 1113 (7th Cir. 1986).............................................27, 38

*Anheuser-Busch, Inc. v. Miller (In re Stadium Mgmt., Inc.),* 895 F.2d 845 (1st Cir. 1990)..........30

*Apex Oil Co. v. Vanguard Oil & Serv. Co. (In re Vanguard Oil & Serv. Co.),*
88 B.R. 576 (E.D.N.Y. 1988) ................................................................................................. 36-37

*Baker v. Latham Sparrowbush Assocs.,* 72 F.3d 246 (2d Cir. 1995).............................................34

*BC Brickyard Assocs., Ltd. v. Ernst Home Ctr., Inc. (In re Ernst Home Ctr., Inc.),*
221 B.R. 243 (B.A.P. 9th Cir. 1998)..............................................................................................32

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),*
722 F.2d 1063 (2d Cir. 1983).........................................................................................................37

*In re Drexel Burnham Lambert Group Inc.,* 995 F.2d 1138 (2d Cir. 1993)....................................34

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.),* 10 F.3d 944 (2d Cir. 1993)..............31

*Gulf States Exploration Co. v. Manville Prods. Corp.*
*(In re Manville Prods. Corp.),* 896 F.2d 1384 (2d Cir. 1990) ..................................................... 4-5

*In re Haven Eldercare, LLC,* 390 B.R. 762 (Bankr. D. Conn. 2008)............................................37

*Hazelbaker v. Hope Gas, Inc. (In re Rare Earth Minerals),* 445 F.3d 359 (4th Cir. 2006) ..........29

*Hower v. Molding Sys. Eng'g Corp.,* 445 F.3d 935 (7th Cir. 2006)..............................................20

*Inwood Labs. Inc. v. Ives Labs., Inc.,* 456 U.S. 844 (1982)..............................................................5

*Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs.*
*(In re Colony Hill Assocs.),* 111 F.3d 269 (2d Cir. 1997)............................................. 16-18, 24, 28

*Kassover v. Gibson*, No. 02 Civ. 7978, 2003 WL 21222341, at *2
(S.D.N.Y. May 27, 2003), *aff'd*, 98 Fed. Appx. 30 (2d Cir. 2004) .......................................... 31-33

*Kenton County Bondholders Comm. v. Delta Air Lines, Inc.*
*(In re Delta Air Lines, Inc.)*, 374 B.R. 516 (S.D.N.Y. 2007) .............................................. 30-31, 33

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 105 F.3d 837 (2d Cir. 1997) ..................... 27-29

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380
(2d Cir. 1997) ..........................................................................................5, 16-17, 24 n.9, 29-30, 37

*Made In Detroit, Inc. v. Official Comm. of Unsecured Creditors*
*(In re Made In Detroit, Inc.)*, 414 F.3d 576 (6th Cir. 2005) ........................................................20

*Meisirow v. Duggan*, 240 F.2d 751 (8th Cir. 1957).....................................................................23

*In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005).............................................30

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ...................................................................................34

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)...............................................34

*N.Y.. Prop. Holding Corp. v. District 65, United Auto. Aerospace & Agric.*
*Implement Workers of Am. (In re Dist. 65, United Auto. Aerospace & Agric.*
*Implement Workers of Am.)*,184 B.R. 196 (S.D.N.Y. 1995) .................................................30 n.12

*Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v.*
*Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*,
988 F.2d 322 (2d Cir. 1993)..................................................................................................... 30-31

*Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*,
846 F.2d 1170 (9th Cir. 1988) ...............................................................................................24 n.9

*In re Perona Bros., Inc.*, 186 B.R. 833 (D.N.J. 1995)............................................................28 n.11

*Ready v. Rice*, Civ. Nos. L-05-3358, L-05-3398, 2006 WL 4550188
(D. Md. Sept. 26, 2006) ...............................................................................................................24

*In re Rock Indus. Mach. Corp.*, 572 F.2d 1195 (7th Cir. 1978).......................................... 16, 22-23

*In re Sasson Jeans, Inc.*, 90 B.R. 608 (S.D.N.Y. 1988)..................................................................18

*In re Sax*, 796 F.2d 994 (7th Cir. 1986) .................................................................................. 28-30

*Sw. Prods., Inc. v. Durkin (In re S.W. Prods., Inc.)*, 144 B.R. 100 (B.A.P. 9th Cir. 1992)...........32

*In re Tempo Tech. Corp.*, 202 B.R. 363 (D. Del. 1996) ....................................................19, 26, 33

*Thomas v. Mamba (In re Thomas)*, 287 B.R. 782 (B.A.P. 9th Cir. 2002)...............................24 n.9

*United States v. Salerno*, 932 F.2d 117 (2d Cir. 1991).....................................................................29

*United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948).....................................................................5

*Weingarten v. Nostat, Inc. v. Serv. Merch. Co.*, 396 F.3d 737 (6th Cir. 2005) ..............................29

*Willemaın v. Kivitz*, 764 F.2d 1019 (4th Cir. 1985).........................................................................16

## Statutes

11 U.S.C. § 101(31) ............................................................................................................................14

11 U.S.C. § 105..................................................................................................................................10

11 U.S.C. § 363........................................................................................................ 3, 10, 24 n.9, 28-29

11 U.S.C. § 363(b) ....................................................................................................27, 27 n.10, 29

11 U.S.C. § 363(m) ..................................................................................................... 14-15, 27-30

11 U.S.C. § 363(n) ..............................................................................................................................14

11 U.S.C. § 364(c)(1)..........................................................................................................................10

11 U.S.C. § 365..................................................................................................................................10

11 U.S.C. § 1102..................................................................................................................................5

11 U.S.C. § 1107(a) .............................................................................................................................5

11 U.S.C. § 1108..................................................................................................................................5

15 U.S.C. § 78aaa ................................................................................................................................3

## Rules

Fed. R. Bankr. P. 2002........................................................................................................................10

Fed. R. Bankr. P. 6004........................................................................................................................10

Fed. R. Bankr. P. 6006 ................................................................................................................. 10

Fed. R. Bankr. P. 8013 ................................................................................................................... 4

Fed. R. Bankr. P. 9014 ................................................................................................................. 10

**Legislative History**

H.R. Rep. No. 95-959, at 344 ...................................................................................................... 28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
In re                                                        : Chapter 11 Case No.
                                                             :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,: 08-13555 (JMP)
                                                             :
                          Debtors.                           : (Jointly Administered)
---------------------------------------------------------x
SECURITIES INVESTOR PROTECTION               :
CORPORATION,                                                 :
                                                             :
                          Plaintiff                          : Adversary Proceeding No.
v.                                                           : 08-01419(JMP)
                                                             : 08-01420 (JMP)
LEHMAN BROTHERS INC.,                                        :
                          Debtor.                            :
---------------------------------------------------------x
BAY HARBOUR MANAGEMENT, L.C., *et al.*,   :
                          Appellants                         : Case No. 08-CV-08869 (DLC)
v.                                                           : Case No. 08-CV-08914 (DLC)
                                                             :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,:
                          Appellees.                         :
---------------------------------------------------------x

### ANSWERING BRIEF OF LEHMAN BROTHERS HOLDINGS INC., *et al.* IN OPPOSITION TO BAY HARBOUR APPEAL

#### PRELIMINARY STATEMENT

This appeal involves the financial collapse of the world's fourth largest independent investment banking and financial services enterprise. Lehman Brothers Holdings Inc. ("LBHI" or "Debtor") is the parent corporation of numerous subsidiaries and affiliates that together constituted the global Lehman enterprise ("Lehman"). On September 15, 2008, after weeks of market turmoil and the denial of financial support by the federal government, without any advance planning, LBHI commenced the largest chapter 11 case in the history of the United States in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). The consolidated assets and

liabilities of LBHI and its subsidiaries and affiliates exceed $600 billion.    The chapter

11 case was referred to the Honorable James M. Peck, United States Bankruptcy Judge.

The unintended consequences of the filing affected the global financial

markets and economy.    It was the spark that ignited a financial crisis that continues

unabated.    It has resulted in Lehman-related insolvency proceedings in many foreign

countries, including administrative proceedings under the insolvency laws of the United

Kingdom initiated by Lehman Brothers Inc. (Europe) ("LBIE"), a subsidiary of LBHI,

that operated as its major European investment banking and capital markets entity.

In an effort to preserve, protect, and realize value from its assets, at 7:00

a.m. on September 15, 2008, LBHI entered into negotiations with Barclays Capital Inc.

("Barclays") for the sale of Lehman's North American investment banking and capital

markets businesses, primarily consisting of the business of its registered broker/dealer

subsidiary, Lehman Brothers Inc. ("LBI").    These negotiations occurred in the dire

conditions resulting from the commencement of the chapter 11 case, the contracting

liquidity of LBI, and the collapse of the global enterprise.    On September 16, 2008,

LBHI and Barclays executed an Asset Purchase Agreement ("APA") for the sale of the

North American businesses ("Sale") pursuant to section 363 of title 11, United States

Code ("Bankruptcy Code").    The APA contemplated that the Sale of the LBI assets

would be approved and authorized in proceedings to be commenced by the Securities

Investor Protection Corporation ("SIPC") under the Securities Investor Protection Act of

1970, as amended ("SIPA").    15 U.S.C. § 78aaa *et seq.*

By orders of the Bankruptcy Court, each dated September 19, 2008 and

entered September 20, 2008, in the chapter 11 and SIPA cases ("Orders"), after an

2

extended joint evidentiary hearing, the Sale, pursuant to section 363 of the Bankruptcy
Code, was authorized and approved.    On September 22, 2008, the Sale was
consummated, the Sale assets ("Purchased Assets") were transferred to Barclays, and
almost 10,000 Lehman employees became employees of Barclays.

Bay Harbour Management L.C., Bay Harbour Master Ltd., Trophy Hunter
Investments, Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2, and
Institutional Benchmarks (collectively, "Bay Harbour" or "Appellants"), investment
funds that maintained prime brokerage accounts with LBIE and LBI, appeal from the
Orders.    Bay Harbour vigorously objected to the Sale procedures approved by the
Bankruptcy Court on September 17, 2008 and likewise objected to and opposed the Sale
during the extended evidentiary hearing that began on September 19, 2008 at
approximately 4:00 p.m. and concluded at approximately 12:41 a.m. on September 20,
2008.

Bay Harbour did not seek to stay the Sale; instead, it knowingly stood by
while this extremely large, complex transaction involving the transfer of billions of
dollars of securities and the accounts of hundreds of thousands of public customers of
LBI was consummated.    Bay Harbour has attempted to circumvent its failure to seek a
stay by arguing that Barclays is not a good faith purchaser.    It has failed, however, to
rebut the admitted evidence below that fully supported the litigated finding made by the
Bankruptcy Court that the Sale was an arm's-length, extensively negotiated transaction
made in good faith by Barclays, LBHI, and the SIPA Trustee for LBI.

The Bay Harbour appeal seeks to reverse the Sale and revoke a mammoth
consummated transaction that has been materially beneficial to the economic

stakeholders of LBHI and its affiliated chapter 11 debtors ("Debtors") and the hundreds
of thousands of LBI's public customers as well as the almost 10,000 employees who
were transferred from LBI to Barclays.   The Sale involved the transfer of billions of
dollars of securities.   Since consummation there have been multiples of transactions by
unrepresented entities that have occurred in a very active, volatile market.

        Bay Harbour, a customer of LBIE, wants to turn the world topsy turvy
and, in effect, put Humpty Dumpty back together.   It cannot be done!

        The Bay Harbour appeal is statutorily and equitably moot and singularly
devoid of merit.   The Orders should be affirmed in all respects.

        This brief is submitted on behalf of LBHI in opposition to the Bay
Harbour appeal.

### ISSUES PRESENTED

1.     In the face of uncontroverted evidence of intensive, aggressive,
arm's-length negotiations of the Sale, did the Bankruptcy Court commit a plain error of
law or make a clearly erroneous finding that the Sale was made in good faith by Barclays,
LBHI, and LBI?

2.     Is the appeal from the Orders moot by reason of (a) Appellants'
failure to seek and obtain a stay of execution of the Orders and (b) the consummation of
the sale to Barclays?

### STANDARD OF APPELLATE REVIEW

        In connection with appeals from a bankruptcy court, a district court
reviews a bankruptcy court's conclusions of law *de novo.*   Findings of fact made by a
bankruptcy court are reviewed under the clearly erroneous standard and, therefore, may
not be set aside unless clearly erroneous. Fed. R. Bankr. P. 8013; *Gulf States Exploration*

     4

*Co. v. Manville Prods. Corp. (In re Manville Prods. Corp.)*, 896 F.2d 1384, 1388 (2d Cir.
1990). A determination that a particular finding is "clearly erroneous" means the
reviewing court is left with the definite and firm conviction that a mistake has been made.
*United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). Where there are two
permissible views of the evidence, the choice between them cannot be clearly erroneous.
*Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 857-58 (1982). This is true even when the
finding of fact is based on documentary evidence. *Anderson v. Bessemer City,* 470 U.S.
564, 575 (1985). Whether a purchaser acted in good faith is a mixed question of law and
fact. *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997).

### STATEMENT OF THE CASE

The salient and pertinent facts are:

On September 15, 2008 ("Commencement Date"), LBHI commenced a
case under chapter 11 of the Bankruptcy Code. [CD-1; CD-9][1] LBHI is authorized to
operate its business and manage its properties as a debtor in possession pursuant to
sections 1107(a) and 1108 of the Bankruptcy Code. On September 17, 2008, the United
States Trustee for the Southern District of New York ("U.S. Trustee") appointed a
statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy
Code ("Creditors' Committee"). [CD-23]

On September 19, 2008, in contemplation of the Sale, SIPC initiated a
proceeding under SIPA against LBI in the United States District Court for the Southern
District of New York. The SIPA case was referred to the Bankruptcy Court for

---

[1] All references to LBHI's Amended Statement of Issues Presented on Appeal and
Counterdesignation of Additional Items to be Included in the Record on Appeal in
Connection with the Appeal of Bay Harbour shall be referred to herein as "CD-__."

administration. [CD-35 at 8]    James Giddens, Esq. was appointed as the SIPA Trustee

("SIPA Trustee") and is administering the liquidation of LBI. [CD-35]

Prior to the Commencement Date, Lehman was the fourth largest

investment bank in the United States.    For most of the 158 years of its existence,

Lehman was a leader in the global financial markets. [CD-2 at 2]    LBI, a subsidiary of

LBHI, was a registered broker/dealer. [D-1 at 2; CD-21 at 2][2]

Lehman was materially affected by conditions in the global financial

markets and the worldwide economy. [CD-2 at 7]    For most of 2008, particularly after

the federal "bailout" of the Bear Stearns Companies in March 2008, Lehman operated in

an extremely volatile, unfavorable global business environment, characterized by a

continuing contraction of liquidity in the credit markets, significantly depressed equity

markets, an unfavorable spread in certain fixed income securities as compared to the end

of the 2007 fiscal year, and declining asset values. [CD-2 at 7]

The combination of low levels of liquidity and the requirement that

financial companies such as Lehman deleverage their balance sheets resulted in

downward pressure on financial asset prices. [CD-2 at 8]    These economic conditions

depressed valuations of Lehman's inventory positions as well as transactional volumes

and market activity levels in which Lehman's capital markets and investment banking

business segments operated. [CD-2 at 8]    Ultimately, the instability in the financial and

credit markets caused significant liquidity problems and credit downgrades for Lehman.

[CD-2 at 8-9]    Despite attempts by central banks to bolster the financial system, the

value of broad asset classes, particularly domestic subprime residential mortgages and

---

[2] All references to Appellants' Designation of Record and Statement of Issues Presented
on Appeal shall be referred to herein as "D-__."

structured credit products, continued to erode and remain thinly traded. [CD-2 at 8]
Lehman purchased or invested in many of its assets using secured credit facilities, and
LBI financed its clearing activities with tri-party repurchase agreements primarily with
JPMorgan Chase. When the market value of the assets pledged to support such
financings began to deteriorate, secured lenders applied "haircuts" or discounts to
proposed pledged assets. [CD-2 at 8] The devaluation of Lehman's pledged assets had
an adverse impact on borrowing availability and, thus, its liquidity. The lenders'
demands for additional collateral security drained Lehman's liquidity and ability to
continue to operate its business. [CD-2 at 9] These occurrences led to a chain reaction
of adverse economic consequences that imperiled Lehman's ability to maintain normal
business operations. [CD-2 at 9]

Faced with deteriorating financial conditions, LBHI's Board of Directors
and management explored various options to restructure operations, reduce leverage and
overall cost structure, and improve performance. [CD-2 at 9; CD-45 at 25] Unfortunately,
Lehman's September 10 earnings announcement failed to calm the market and concerns
about Lehman's viability. [CD-2 at 10] Ultimately, it became virtually impossible for
Lehman to continue its normal business operations and settle securities transfers. [CD-2
at 10] Lehman was unable to implement initiatives to improve its liquidity. [CD-2 at 10]

Lehman's liquidity crisis prompted a series of meetings during the
weekend of September 12-14, 2008, among Lehman's senior management, officials from
the Federal Reserve Bank of New York ("FRBNY"), the heads of major financial
institutions, and other governmental units. [CD-2 at 11] Ultimately, Lehman was told
there would be no "bailout" for Lehman. Rather, representatives of FRBNY, the U.S.

Treasury, and the Securities and Exchange Commission ("SEC") made it clear that their

preference was that LBHI should commence a chapter 11 case before midnight on

September 14, 2008.   During the evening of that day, the Board of Directors of LBHI

met and after extended discussion and, in particular, consideration of the comments made

to it by SEC Chairman Christopher Cox as well as the General Counsel of FRBNY, the

Board resolved to accede to the clearly stated preference of the federal authorities and

authorized the commencement of a chapter 11 case by LBHI. [CD-31 at 15]

The chapter 11 petition of LBHI was filed with the Bankruptcy Court at

1:45 in the morning of September 15, 2008. [CD-1]   As LBI was not qualified to be a

debtor under chapter 11 of the Bankruptcy Code, SIPC was notified of the events that had

occurred, and LBI's business was allowed to continue, subject to oversight by the SEC

and SIPC, with limited access to borrowing from the FRBNY. [CD-60]

During the early morning of September 15, 2008, Barclays, which had

previously sought to acquire Lehman, communicated to LBHI that it desired to acquire

Lehman's North American investment banking and capital markets businesses.   At 7:00

a.m. on September 15, 2008, negotiations with Barclays began at LBHI's headquarters.

The negotiations culminated in the APA to sell to Barclays the North American

investment banking and capital markets businesses of LBI and certain related assets of

LBHI for an aggregate cash purchase price of approximately $1.7 billion, including $250

million for the goodwill of LBI, plus the assumption by Barclays of certain obligations

and expenses of LBI. [D-1 at 4-6]   Pursuant to the Sale:

- Barclays would assume ownership of substantially all LBI's operations,
  including the assumption of the Seller's[3]  liabilities under assumed

---

[3]  Capitalized terms not defined herein have the meaning ascribed thereto in the APA.

contracts and the performance of the Seller's obligations as to securities
and other transactions. [D-1 at 5]

- Customer accounts would be transferred to Barclays. [D-1 at 5]
- Barclays would assume substantial liabilities relating to LBI's employees,
agreeing to offer employment to approximately 10,000 LBI employees for
ninety days with severance packages to employees terminated earlier, with
a cost estimated at approximately $2.5 billion. [D-1 at 9]
- A Barclays affiliate would provide interim debtor in possession financing
to the Debtors in the amount of $200 million to enable the Debtors to
preserve their business until the closing of the Sale. [CD-21]

On September 16, 2008, LBHI, LBI, LB 745 LLC, and Barclays entered

into the Asset Purchase Agreement ("Original APA"), pursuant to which Barclays agreed

to purchase, acquire, and assume from the Seller all the Purchased Assets and Assumed

Liabilities (as defined in the Original APA). [D-77]    On September 19, 2008, the First

Amendment to the Original APA was executed ("First Amendment"). [D-78] Thereafter,

on September 20, 2008, the parties executed a clarification letter to further clarify their

intentions as to the Original APA ( "Clarification Letter").    The Original APA, First

Amendment, and Clarification Letter collectively constitute the APA. [CD-41]

It was contemplated that the APA might be subject to competitive bidding.

[CD-29 at 9]    The APA provided that the Seller would pay Barclays a break-up fee in an

amount equal to $100 million plus up to $25 million for expense reimbursement

following the date of consummation of a Competing Bid, provided Barclays did not

materially breach the APA. [D-1 at 7]

To effectuate the Sale and provide Barclays with the protections it sought

under section 363 of the Bankruptcy Code, the APA contemplated that, prior to the

hearing before the Bankruptcy Court to consider approval of the Sale, LBI would consent

to the commencement of a case under SIPA and that, in such proceeding, the SIPA

Trustee would consent to the Sale and obtain an order in that proceeding approving such
consent and the Sale. [D-1 at 5]

### PROCEEDINGS BELOW

On September 17, 2008, LBHI filed a motion ("Motion"), pursuant to
sections 105, 363, 364(c)(1), and 365 of the Bankruptcy Code and Bankruptcy Rules
2002, 6004, 6006, and 9014, for (A) an order (i) scheduling a final sale hearing with
respect to the APA ("Sale Hearing"); (ii) approving procedures for the conduct of the
Sale; and (iii) approving a break-up fee ("Procedures Order"); and (B) an order
authorizing and approving the Sale of the Purchased Assets pursuant to section 363 of the
Bankruptcy Code, free and clear of all liens, claims, encumbrances, and interests and the
assumption and assignment of certain prepetition executory contracts and unexpired
leases relating to the Purchased Assets to Barclays or the Successful Bidder. [D-1] The
Motion stated that time was of the essence because of the extreme circumstances and that
the value of the Purchased Assets was diminishing with each day they were subject to the
vagaries and vicissitudes of the marketplace and the impact of LBHI's bankruptcy. [D-1
at 3] LBHI notified the SEC, FRBNY, and SIPC of the need for immediate approval of
the Sale by the SIPA Trustee and of the exceptional circumstances and actions necessary
to preserve the value of the Purchased Assets and assist in the stabilization of the
financial markets. [D-1 at 5-6]

A hearing was held to consider the Procedures Order on September 17,
2008 ("Procedures Hearing"). [C-85] Bay Harbour and others objected to the proposed
procedures, which were affirmatively supported by the SEC, FRBNY, and SIPC. Based
on the testimony and evidence adduced at the Procedures Hearing, the Bankruptcy Court

overruled the objections and approved the Procedures Order on September 17, 2008.

[CD-29] The Bankruptcy Court found that good and ample cause existed to shorten the

applicable notice periods in the Federal Rules of Bankruptcy Procedure and that the

> Debtors' estates will suffer immediate and irreparable harm
> if the preliminary relief requested in the . . . Motion is not
> granted on an expedited basis consistent with the provisions
> set forth [t]herein.

[CD-29 at 3]

Recognizing the immense sensitivity and potential loss of value that might

occur, Bankruptcy Judge Peck scheduled the Sale Hearing for September 19, 2008, at

4:00 p.m. [CD-29 at 5] He stated that "given the wasting nature of the Purchased Assets

and the exigent circumstances," notice of the Motion and Sale Hearing given by e-mail,

facsimile, FedEx, or other overnight delivery to the following entities would constitute

"due and sufficient notice": (i) the U.S. Trustee; (ii) attorneys for Barclays; (iii) attorneys

for the Creditors' Committee; (iii) creditors holding the thirty largest claims; (iv) Rock-

Forty-Ninth LLC; (v) all entities known to have asserted any lien, claim, interest, or

encumbrance on the Purchased Assets; (vi) all non-Debtor parties to Closing Date

Contracts; (vii) the U.S. Attorney's office; (viii) the United States Department of Justice;

(ix) the SEC; (x) the FRBNY; (xi) SIPC; (xii) the IRS; (xiii) the Commodity Futures

Trading Commission ("CFTC"); and (xiv) all parties who filed a notice of appearance.

[CD-29 at 7] The Procedures Order permitted objections to the Motion to be interposed

by the conclusion of the Sale Hearing, including oral objections. [CD-29 at 5]

The Sale Hearing commenced during the late afternoon of September 19,

2008. Bankruptcy Judge Peck's courtroom was filled to capacity and overflowed to two

additional courtrooms. Bay Harbour and numerous others filed and prosecuted objections

to the Sale. The Bay Harbour objection asserted that because Bay Harbour maintained

prime brokerage accounts with LBI and LBIE, it was possible that its alleged cash and

securities might be included in the Sale as they "appear[] to have been siphoned from

London (LBIE) to the United States as part of an $8 billion transfer" ("European Funds")

and "then 'trapped' by the midnight bankruptcy of the Sellers." [D-2 at 3]   Bay Harbour

asserted that the Motion did not disclose the fate of the European Funds or whether

Barclays knew about or benefited from the purported transfer of the European Funds or

otherwise was involved. [D-2 at 3]   Notably, the objection stated: "Bay Harbour is not

alleging that it was.   It is alleging that neither it nor this Court knows." [D-2 at 3]

The Joint Administrators appointed in the United Kingdom for LBIE had

filed a response to the Motion, dated September 19, 2008, which stated they supported

the Sale [D-10 at 2], but requested clarifying language in the Original APA and order

approving the Sale to reserve their rights to pursue the recovery of any funds that might

have been transferred from LBIE to LBI or LBHI. [D-10 at 8]   To address these

concerns, LBHI and Barclays made clear, at the Sale Hearing and in the Clarification

Letter, that none of the assets of Subsidiaries of LBHI (other than assets of LBI) would

be included in the definition of Purchased Assets, except as specifically provided in the

APA, and that cash would be removed from the definition of Purchased Assets. [CD-41]

By the time the Sale Hearing was conducted, the value of the securities to

be transferred to Barclays declined from $72 billion at the beginning of that week to

$47.4 billion and the liabilities to be assumed by Barclays declined from $68 billion to

$45.5 billion. [CD-44 at 46-47]   Appraisals obtained as to the real property being sold to

Barclays reflected lower values than the original $1.5 billion that was projected. [CD-44

at 47, 139]   As a result, the cash portion of the purchase price payable and ultimately

received by LBHI was reduced to $1.29 billion. [CD-44 at 139]

The Sale Hearing, which the Bankruptcy Judge described as the "most

momentous bankruptcy hearing [he] ever sat through," commenced on September 19,

2008. [CD-44]   Bankruptcy Judge Peck approved the Sale after hearing the evidence and

the parties over seven hours, stating:

> I am completely satisfied that I am fulfilling my
> duty as a United States bankruptcy judge in approving this
> transaction and in finding that there is no better or
> alternative transaction for these assets, [and] that the
> consequences of not approving a transaction could prove to
> be truly disastrous.   And those adverse consequences are
> meaningful to me as I exercise this discretion.   The harm
> to the debtor, its estates, the customers, creditors, generally,
> the national economy and the global economy could prove
> to be incalculable.

[CD-44 at 250]   The Sale Hearing concluded at 12:41 a.m. on September 20, 2008 [CD-

44 at 257]

The order approving the Sale (the "Sale Order") was entered on

September 20, 2008.   Concurrently, the Bankruptcy Court entered an order approving

the Sale in the SIPA Proceeding, which (i) incorporated by reference the Sale Order in

the SIPA Proceeding and (ii) authorized the SIPA Trustee to consummate the Sale on

behalf of LBI. [D-80; D-81]   In the Sale Order, the Bankruptcy Court made the

following findings, among others:

- "[I]n light of the exigent circumstances of these cases and the wasting
  nature of the Sellers' assets, due, proper, timely, adequate and sufficient
  notice of the Motion, the Sale Hearing and the transactions set forth in the
  Purchase Agreement . . . has been provided . . . ." [D-74 at 2]

- "The Debtors' estates will suffer immediate and irreparable harm if the
  relief requested in the Motion is not granted on an expedited basis . . .

particularly given the wasting nature of the Purchased Assets." [D-74 at 3]

- "A reasonable opportunity to object and to be heard with respect to the proposed Sale, the Motion and the relief requested therein has been given, in light of the exigent circumstances in these cases, to all interested persons and entities . . . ." [D-74 at 4]

- "[T]he immediate consummation of the Sale with the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates, particularly given the wasting nature of the Purchased Assets." [D-74 at 5]

- "The Sale must be approved and consummated promptly in order to preserve the viability of the businesses subject to the [S]ale as going concerns, to maximize the value of the estates. Time is of the essence in consummating the Sale." [D-74 at 11]

The Bankruptcy Court also specifically found that the *Sale was made in*

*good faith by Barclays, LBHI, and LBI*:

- "The Purchase Agreement was negotiated, proposed and entered into by the Sellers and the Purchaser without collusion, in *good faith* and from arm's-length bargaining positions. The Purchaser is not an 'insider' of the Debtors, as that term is defined in Bankruptcy Code section 101(31). Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under Bankruptcy Code section 363(n). Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders." [D-74 at 5] (emphasis added).

- The Purchaser is a *good faith* Purchaser of the Purchased Assets within the meaning of Bankruptcy Code section 363(m) and is, therefore, entitled to all of the protections afforded thereby. The Purchaser has proceeded in *good faith* in all respects in connection with this proceeding." [D-74 at 5-6] (emphasis added).

In approving the Sale, the Bankruptcy Court ordered, inter alia:

The transactions contemplated by the Purchase Agreement are undertaken by Purchaser without collusion and in *good faith*, as that term is used in Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of Closing Date Contracts)

> with Purchaser, unless such authorization is duly stayed
> pending such appeal prior to the Closing Date. *Purchaser*
> *is a good faith Purchaser of the Purchased Assets*, and is
> entitled to all of the benefits and protections afforded by
> Bankruptcy Code section 363(m).

[D-74 at 18-19] (emphasis added).   Notably, the Sale Order also provides:

> Time is of the essence in closing the transactions
> referenced herein, and the Debtors and the Purchaser intend
> to close the Sale as soon as practicable. *Any party*
> *objecting to this Order must exercise due diligence in* filing
> an appeal and *pursuing a stay, or risk its appeal being*
> *foreclosed as moot.*

[D-74 at 22] (emphasis added).

Immediately after the Sale Order was entered, in the very early morning

hours of September 20, 2008, the process of closing the Sale began.   SIPC had already

begun transferring assets from approximately 630,000 LBI customer accounts to

Barclays' accounts, which enabled customers to continue to have access to their property.

[CD-44 at 76-77]   The SIPA Trustee was authorized to operate the business of LBI to

complete the settlements of pending transactions and take other appropriate actions in

connection with such accounts until 6:00 p.m. on September 23, 2008, to provide for the

orderly transfer of customer accounts and related property. [CD-60 at 7-8]

On September 21, 2008, before the Sale was consummated, Bay Harbour

filed a notice of appeal from the Orders. [D-75; D-76; D-81; D-84]   Bay Harbour did not

make any attempt to seek a stay of the Orders pending appeal.

On September 22, 2008, the Sale was consummated. [CD-41 at 2]. On that

date, LBHI and Barclays entered into a Transition Services Agreement, pursuant to which

Barclays agreed to provide to LBHI and its affiliates certain services, use of facilities, and

other assistance on a transitional basis, and LBHI agreed to provide to Barclays

reciprocal obligations.  LBHI gave notice of the filing of the APA that was approved by

the Sale Order, which attached the APA, including the Clarification Letter, and notified

parties that the Sale had been consummated. [CD-41]  The securities and trading

positions that were transferred to Barclays under the APA are set forth in Schedules A

and B to the Clarification Letter. [CD-51]

## ARGUMENT

I.

## THE BANKRUPTCY COURT DID NOT COMMIT A PLAIN ERROR OF LAW OR MAKE A CLEARLY ERRONEOUS FINDING THAT THE SALE WAS MADE IN GOOD FAITH BY BARCLAYS, LBHI, AND LBI

Based on the uncontroverted testimony and the evidence presented at the

Procedures Hearing and the Sale Hearing, the Bankruptcy Court did not commit a plain

error of law or make a clearly erroneous finding that the Sale was made in good faith by

Barclays, LBHI, and LBI.

Courts "have adopted a traditional equitable definition for the meaning of

good faith:  'one who purchases the assets for value, in good faith and without notice of

adverse claims.'"  *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390

(2d Cir. 1997) (quoting *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985)).    The

United States Court of Appeals for the Second Circuit has concluded that the good faith

of a purchaser "is shown by the integrity of his conduct during the course of the sale

proceedings; where there is a lack of such integrity, a good faith finding may not be

made."  *Id.*   The misconduct that could destroy a buyer's status as a good faith

purchaser typically involves "fraud, collusion between the purchaser and other bidders or

the trustee, or an attempt to take grossly unfair advantage of other bidders.'"   *Id.*

(quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *Kabro*

*Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269,

276 (2d Cir. 1997) (same).    The focus of the good faith analysis is on the purchaser's

conduct in the course of the bankruptcy proceedings, including the purchaser's actions in

preparation of and during the sale itself.    *Gucci*, 126 F.3d at 390.    Thus, the good faith

requirement "prohibits fraudulent, collusive actions specifically intended to affect the

sale price or control the outcome of the sale."    *Id.*

        Bay Harbour has failed to substantiate any fraud or collusion on the part of

Barclays or, indeed, LBHI and LBI, to establish a lack of good faith or, indeed, clearly

erroneous finding of good faith by the Bankruptcy Court.    Rather, Bay Harbour

speculates that the purported transfer of the European Funds somehow may have been

used to "prop up LBI for sale" or benefit Barclays. (Br. at 12.)    There was no proof that

any transfer from LBIE was made other than unsupported media stories.    The Joint

Administrators did not contend that any such transfer occurred.    Indeed, there has never

been a scintilla of evidence that there was any such transfer.    Consequently, the

Bankruptcy Court purposely declined to hold up the extremely precarious Sale because of

an unfounded, unsupported allegation of a nonexistent transfer.

        Appellate courts in this Circuit have held that a bankruptcy court did not

err in finding a buyer purchased property in good faith where there was pressure to

conclude a sale expeditiously as well as full disclosure to the bankruptcy court of the

relevant facts.    For example, in *Colony Hill*, 111 F.3d at 276-78, the Second Circuit

concluded that the evidence supported finding the buyer purchased property in good faith

even though the buyer's bid was less than that of a potential bidder who failed to submit a

timely bid, because (i) the assets had been unsaleable during the first four years of the

bankruptcy; (ii) the purchase agreement was structured to accommodate the competing

interests that made the assets unsaleable; (iii) the creditors wanted the certainty of

knowing the successful bidder would see the sale through to closing; (iv) all relevant

facts regarding the parties' bids and positions were disclosed to the bankruptcy court; and

(v) there was pressure to conclude the sale expeditiously.   *See also In re Sasson Jeans,*

*Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (court was "hard pressed" to find lack of good

faith when challenged relationship between purchaser and debtor was fully disclosed).

Contrary to Bay Harbour's contentions, the record demonstrates that

Barclays acted in good faith.   The prospects for a competitive bid were slim.   LBHI

had been pursuing strategic alternatives for months prior to the Sale, and potential

purchasers were aware that LBHI had been searching for a buyer well before the

Commencement Date. [CD-44 at 100]   During the week preceding the Commencement

Date, LBHI attempted to interest the Bank of America in an acquisition and likewise

attempted to negotiate an acquisition by Barclays, but neither of these transactions came

to fruition.[4]  [CD-44 at 97]   LBHI was compelled to commence its chapter 11 case

shortly thereafter at the urging of federal regulators and because "its assets were rapidly

depreciating and [it] could not raise additional liquidity." [CD-44 at 143]

Although the market was aware that the Lehman enterprise was available

for purchase or investment, the universe of entities qualified to purchase LBI was very

limited. [CD-44 at 101]   Undisputed testimony presented at the Sale Hearing

---

[4] Bay Harbour's suggestion that Barclays walked away from this deal prior to the Commencement
Date and returned to the negotiating table after the Commencement Date
so that it could misappropriate the European Funds (Br. at 22) should be rejected as
nothing but unsupported hyperbole speculation.   Not only was the transaction that was
being negotiated prior to the Commencement Date wholly different from the subject Sale,
but also Barclays did not cause the commencement of the LBHI chapter 11 case.

demonstrated that any potential buyer of the broker-dealer business needed access to the

Primary Dealer Credit Facility of the FRBNY to operate the LBI business, which only is

available to a "limited number of financial institutions who could meet the rules and

regulations of the [FRBNY] in respect thereof." [CD-44 at 96-97]   There were "few

potential purchasers for this business because any buyer must meet regulatory

requirements, have sufficient capital and have the strategic capability to operate the

business from day one." [CD-44 at 143]   As the attorney for the FRBNY stated,

> the sale process was widely reported, and what was also
> widely reported [was] that there weren't that many possible
> bidders.   The number is very small.   The number that
> met the requirements in terms of financial capability and
> regulatory qualifications – we're not talking twenties, tens
> even.   We're talking *one or two*.

[CD-45 at 64-65] (emphasis added).

Of this extremely small universe, not one came to the Sale Hearing with a

better offer [CD-44 at 101, 144] even though parties in interest were provided with an

opportunity to top Barclays's bid.   *See, e.g., In re Tempo Tech. Corp.*, 202 B.R. 363,

370 (D. Del. 1996) ("Without a sizable pool of potential buyers, with only one buyer

willing to negotiate terms of a purchase, and the [d]ebtor's severe cash flow predicament,

the bankruptcy court did not err when it approved the sale" and found it was negotiated in

good faith).   Moreover, it was not controverted at the Sale Hearing that Lehman was

"facing pressure and constraints from regulators and agencies," including the FRBNY,

SEC, and CFTC, to "consummate a sale of the broker-dealer business, no later than

[September 19] so that there is a seamless transition to preserve the business." [CD-44 at

93]   The proffered testimony also showed LBI's customers were "in a state of panic.

Vendors were threatening to stop providing services.    Lehman is experiencing severe internal pressures. . . .    Employees have and will continue to defect." [CD-44 at 93-94]

Bay Harbour has chosen to ignore these facts.    It relies on conclusory allegations as to the illusory transfer of $8 billion from LBIE to LBI that lacks any substance or support in the record.    Bay Harbour has failed to satisfy its burden of proof. It has not produced an iota of evidence demonstrating bad faith on the part of Barclays, LBHI, or LBI.    *See Hower v. Molding Sys. Eng'g Corp.*, 445 F.3d 935, 939 (7th Cir. 2006) (burden is on party alleging bad faith on appeal or seeking reconsideration of good faith finding; court refused to find bankruptcy judge erred in finding good faith "[i]n the absence of any admissible evidence of bad faith"); *Made In Detroit, Inc. v. Official Comm. of Unsecured Creditors (In re Made In Detroit, Inc.)*, 414 F.3d 576, 582 (6th Cir. 2005) (affirming finding of good faith purchaser where appellants "failed to cite any evidence in the record to establish that the process of selling the [p]roperty was tainted by fraud or collusion" and there was "no direct evidence to support" appellants' allegations). As the Bankruptcy Court correctly observed,

> [T]here's absolutely nothing in the record, Mr. Rosner, about even what we're talking about [the purported $8 billion transfer].    This is a reference to news articles that appeared, speculation in the press.    Having read some articles about myself lately, I know that there are a lot of things in the press that are just plain wrong.
>
> . . . .    The reason I make this point is that just because there is scuttlebutt about something doesn't mean it's properly before me.    And it's a huge amount of money,[5] and it's a matter of great significance and I'm confident that it will be addressed.

---

[5]  Bay Harbour admitted that it did not have a claim for the entire $8 billion of European Funds and, in response to the Bankruptcy Court's inquiry, refused to make public the amount of its claim, if any, against LBHI or any Lehman entity. [CD-44 at 214]

[CD-44 at 208]

Bay Harbour's objection to the Sale hinges on the Joint Administrators'

purported "preliminary investigation" of the transfer of the European Funds even though

the Joint Administrators (i) supported the Sale and (ii) indicated that the transfer of the

European Funds, if it had occurred, was in the ordinary course of business.    The Joint

Administrators recognized that,

> •    as part of its global treasury management, the Lehman
> Group operated a 'cash sweep' system [pursuant to which],
> at the end of each trading day, cash in all of the companies
> within the Lehman Group was transferred to LBHI.    At
> the start of each trading day, LBHI would transfer cash to
> each of the Lehman Group companies to enable them to
> meet their cash requirements during that day.

[D-10 at 3].    The Joint Administrators also recognized that, as the market lost

confidence in Lehman, many clients of LBIE transferred their securities to other prime

brokers:

> [T]he securities were typically transferred from LBIE to
> LBI, the U.S. broker-dealer, then to another Lehman Group
> entity located in Luxembourg, and from there to the new
> prime broker.    What was supposed to happen next was
> that the funds to reimburse LBIE in respect of the securities
> and any margin posted in connection with the client
> accounts were to flow from the new prime broker back
> through the chain of Lehman entities to LBIE.    But in
> many cases, it appears, that did not happen.    The Joint
> Administrators' understanding so far is that those funds
> were transferred from the new prime broker through the
> Luxembourg entity to LBI.    It seems the funds never
> reached LBIE.

[D-10 at 14-15].

Despite the foregoing, Bay Harbour has mysteriously concluded that

Barclays was not a purchaser in good faith, notwithstanding that LBHI's statements and

the Clarification Letter made it abundantly clear that the European Funds, if they existed,

were not sold to Barclays.[6]   Specifically, the Clarification Letter states that Excluded

Assets are "any cash, cash equivalents, bank deposits or similar cash items of Seller and

its Subsidiaries."   Bay Harbour has ignored the Joint Administrators' statement at the

Sale Hearing that

> a matter that makes the issue easier for us with respect to
> the purchaser . . . is that no cash was being transferred to
> the purchaser.   To the extent that there were substantial
> amounts, that might have raised some issue as to [the
> source of the cash].   But since there is not, that is probably
> not an issue for the purchaser.

[CD-44 at 189]   Furthermore, in their response to the Motion, the Joint Administrators

stated it is "likely" that the European Funds "have been disbursed to third parties in the

days before these proceedings were commenced." [D-10 at 15]   In the face of the record

below, it is hard to understand how Bay Harbour can in good faith argue that the

European Funds were used to "prop up" the Sale or were sold to Barclays.[7]

The European Funds, if any, were not part of the Sale.   Therefore,

Barclays did not have "notice of adverse claims," as Bay Harbour asserts. (Br. at 22-23.)

The requirement that a good faith purchaser take without notice of adverse claims "has

meant that the purchaser must have no 'actual knowledge of the defects in the title (*to the*

*assets bought*), or knowledge of such facts and circumstances as would have put a man of

ordinary circumspection upon inquiry.'"   *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195,

---

[6]  As such, Bay Harbour's constructive trust argument (Br. at 29 n.4) equally lacks merit.

[7]  That the Bankruptcy Court correctly decided not to hold up the Sale in light of the Joint
Administrators' "preliminary investigation" is bolstered by facts disclosed at a status
conference held before the Bankruptcy Court on October 16, 2008.   At that conference,
LBHI's Chief Restructuring Officer and LBHI's attorney informed the Bankruptcy Court
that LBIE is indebted to LBHI in the amount of approximately $8 billion, and LBI is
indebted to LBIE in the amount of approximately $2.3 billion.   In other words, there is a
net debt payable from LBIE to LBHI.

1198 (7th Cir. 1978) (emphasis added) (quoting *Meisirow v. Duggan*, 240 F.2d 751, 758
(8th Cir. 1957)).   This element typically is an issue when the purchaser seeks to
extinguish adverse claims to title of which the purchaser had no actual or constructive
notice at the time of the sale.   *See id.*   There is no corollary requirement, however, that
the purchaser have no knowledge of any alleged irregularities in the sale.   *See id.* at
1199 (rejecting argument that good faith purchaser must have "no knowledge of any
alleged irregularities in the sale from which he derives his title"; purchaser's learning of
objection to sale at hearing, giving purchaser actual knowledge of basis of objection and
potential appeal, does not prevent good faith status).[8]

   The Bankruptcy Court "totally disagree[d]" with, and "reject[ed]
completely," Bay Harbour's assertion that LBHI failed to satisfy its burden of
demonstrating that Barclays was a purchaser in good faith. [CD-44 at 215]   Patently, the
Bankruptcy Court did not commit a plain error by finding that the admitted evidence
demonstrated that the Sale was conducted in good faith because (i) the negotiations "were
at arm's length, difficult and aggressively negotiated by the parties"; (ii) the APA was the
"result of good faith negotiations"; (iii) the parties "worked around the clock to finalize"
the APA because time was of the essence; (iv) the business "would not survive without
an immediate infusion of new liquidity"; and (v) the parties "exchanged numerous bids
and asks and turned drafts of the agreement countless times." [CD-44 at 144, 215-16]

   All relevant facts regarding the Sale were disclosed to the Bankruptcy
Court. [CD-44, CD-45]   As the Second Circuit stated, "[a]lthough full disclosure to the

---

[8]   In response to the Joint Administrators' concern that the Sale Order would limit their
ability to pursue claims against third parties, the Bankruptcy Court stated it "trust[s] that
the [Sale Order] is not intended to cut off rights against any parties other than Barclays."
[CD-44 at 190]

bankruptcy court may not always neutralize conduct that would otherwise constitute bad faith, disclosure should certainly weigh heavily in a bankruptcy court's decision on that issue." *Colony Hill*, 111 F.3d at 277 (evidence supported finding buyer purchased property in good faith where "all relevant facts regarding the parties' bids and positions were disclosed to the bankruptcy court").

Bay Harbour's argument that the Sale should not have gone forward until the completion of discovery regarding the alleged transfer of the European Funds was unrealistic, unknowing, and properly denied by the Bankruptcy Court. The Purchased Assets were eroding in value. [CD-44 at 92-93]   Evidence at the Sale Hearing demonstrated that if the Sale was not "immediately consummated . . . there will be little or nothing to sell." [CD-44 at 143]   Indeed, the SEC stated at the Procedures Hearing that "extraordinary efforts" were made by the SEC, FRBNY, SIPC, and CFTC to get the transaction "to a point where the firm would be in a position to still be available [September 19] for a sale." [CD-45 at 66]   *See, e.g., Ready v. Rice*, Civ. Nos. L-05-3358, L-05-3398, 2006 WL 4550188, at *3 (D. Md. Sept. 26, 2006) (property's "fast-deteriorating condition called for a prompt sale").[9]

---

[9]  Bay Harbour suggests that the Bankruptcy Court could have reserved its good faith finding until the investigation of the European Funds has been completed based on dicta in *Thomas v. Mamba (In re Thomas)*, 287 B.R. 782 (B.A.P. 9th Cir. 2002).   The Ninth Circuit Bankruptcy Appellate Panel was able to make this statement because the Ninth Circuit does not require that a finding of good faith be made at the time of the sale hearing in contrast to the law in the Third Circuit.   *Compare Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*, 846 F.2d 1170 (9th Cir. 1988) (bankruptcy court not required to make explicit finding of good faith) *with In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986) (bankruptcy court required to make good faith finding).   The Second Circuit has not "squarely faced this issue," but has observed that "[b]ankruptcy courts routinely make a finding of good faith at the time of the § 363 sale approval."   *Gucci*, 126 F.3d at 389-90.

As the attorney for the Depository Trust & Clearing Corporation stated at

the Sale Hearing, "to keep the market stabilized and have an opening on Monday where

Barclays can trade as if it were Lehman, we need to have this transaction approved today

. . . ." [CD-44 at 80-81]    Testimony introduced at the Sale Hearing demonstrated that, if

the Sale did not close on September 19 or that weekend,

> the effect on the broker-dealers business and on Lehman
> Holdings would be devastating.    First, the failure to
> consummate the transaction would cause default under the
> DIP facility and require Lehman Holdings to repay the
> outstanding amounts under that facility.
>
> [L]iabilities in the hundreds of billions of dollars
> would be triggered against Lehman Holdings which would
> in turn deplete the property available to distribute to
> creditors.    It would adversely affect the [D]ebtors['] other
> nondebtor subsidiaries to the extent they have any value.
>
> [I]f the transaction is not consummated, it will
> result in the largest failure of a broker-dealer in the history
> of the United States and will cripple the credit markets for
> some time to come.
>
> [T]he shock of this transaction not being
> consummated in the public markets could be immeasurable
> and could ignite a panic in the financial condition that we
> now face in the United States.

[CD-44 at 102-03]    Similarly, the attorney for the FRBNY stated,

> [w]e believe that the. . . time line that's been in place here
> is what is necessary, what is required under these very, very
> unique circumstances.    We're looking, in terms of our
> mandate, at financial stability here, and it is vitally
> important that this transaction go forward as quickly as
> possible in order to preserve the financial stability that, at
> this point, is already very fragile.

[CD-45 at 65]

LBI could not survive absent approval of the Sale.    Moreover, the

likelihood of finding another qualified purchaser was nonexistent.    The record

demonstrates that the Purchased Assets were shopped prior to the Commencement Date,

but "Lehman was not successful in reaching an agreement with any [financial institution]

as to a support for continued operations." [CD-44 at 95, 145]   The only transaction

available was the proposal by Barclays, as the Bankruptcy Court recognized:

> I'm. . . satisfied, based upon what I have heard, that there is
> effectively one logical purchaser for these assets.   That
> purchaser has already identified itself, has been identified
> publicly to the markets, has been identified publicly to the
> employees and represents the continuity for this operation.

[CD-45 at 74]   *Cf. In re Tempo Tech. Corp.*, 202 B.R. 363, 370 (D. Del. 1996)

(bankruptcy court did not err in finding purchaser and debtor consummated sale in good

faith where record showed bankruptcy court considered that, "combined with the

[d]ebtor's cash crunch, the lack of other companies engaged in th[e] industry weighed

heavily in justifying an expeditious sale. . . as a going concern.").

Based on the unrebutted testimony at the Sale Hearing, the Bankruptcy

Court correctly concluded that it

> heard ample evidence. . . that would support good faith
> findings here.   This was an arm's length transaction,
> negotiated aggressively.   [I]t arose in two stages after the
> deal fell apart.   At the end of the weekend they restarted it,
> it was brisk, everybody was concerned about the markets,
> this is all going at a breakneck speed but in terms of good
> faith, everything that I heard was indicative of arm's
> length, good faith, aggressive negotiations.   And, in fact,
> what occurred this evening in court with respect to the fair
> value of the real estate is a further concrete example of that
> negotiation.

[CD-44 at 215-16]

In the perspective of the facts and unique circumstances demonstrated, it

was self-evident that the immediate consummation of the Sale to Barclays was the only

viable option to enable public customer accounts and trading to continue on an

uninterrupted basis and preserve billions of dollars in value for public customers.

Manifestly, the Bankruptcy Court did not abuse its discretion or commit a plain error of

law in finding that the Sale was made in good faith on the part of LBHI and Barclays.

The finding of good faith made by the Bankruptcy Court is not clearly erroneous.

II.

### THE APPEAL FROM THE ORDERS SHOULD BE DENIED AS MOOT

·       Bay Harbour elected not to seek a stay of the Sale, but stood by as the Sale

was fully consummated by the parties.   Consequently, the appellate jurisdiction of this

Court is limited to the issue of whether Barclays is a good faith purchaser.   The

remainder of the issues raised by Bay Harbour must be denied as moot under section

363(m) of the Bankruptcy Code and the doctrine of equitable mootness.

A.      Appellate Jurisdiction Is Limited to the Issue
        Of Good Faith Under 11 U.S.C. § 363(m)
        Even If Other Meritorious Issues Are Raised

The failure to obtain a stay of a sale of assets under section 363(b) of the

Bankruptcy Code[10]  to a good faith purchaser renders an appeal from the order

authorizing and approving the sale moot.   *See, e.g., Licensing by Paolo, Inc. v. Sinatra*

*(In re Gucci)*, 105 F.3d 837, 839 (2d Cir. 1997); *In re Andy Frain Servs., Inc.*, 798 F.2d

1113 (7th Cir. 1986).   Under section 363(m) of the Bankruptcy Code:

> The reversal or modification on appeal of an
> authorization under subsection (b) . . . of this section of a
> sale . . . of property does not affect the validity of a sale or
> lease under such authorization to an entity that purchased
> or leased such property in good faith, whether or not such

---

[10]  Section 363(b) provides, in pertinent part:  "The trustee, after notice and a hearing,
may use, sell, or lease, other than in the ordinary course of business, property of the estate
. . . ."   11 U.S.C. § 363(b).

> entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).   The legislative history provides that section 363(m) "protects good

faith purchasers of property. . . from a reversal on appeal of the sale authorization, unless

the authorization for the sale and the sale itself were stayed pending appeal."   H.R. Rep.

No. 95-959, at 344.

The Second Circuit has made it clear that, once a bankruptcy sale has been

consummated, section 363 deprives courts of jurisdiction to review the sale, except on the

limited issue of whether the sale was made to a good faith purchaser:

> Our appellate jurisdiction over an *unstayed* sale order
> issued by a bankruptcy court is *statutorily limited* to the
> narrow issue of whether the property was sold to a good
> faith purchaser.

*Gucci*, 105 F.3d at 839 (emphasis added); *see also Kabro Assocs. of W. Islip, LLC v.*

*Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 273 (2d Cir. 1997)

(because appellant failed to obtain a stay before closing of sale, all of appellant's

arguments are moot except for claim that purchaser was not good faith purchaser).[11]

The Second Circuit also has made clear that "*regardless of the merit of an*

*appellant's challenge to a sale order*, [an appellate court] may neither reverse nor modify

the judicially-authorized sale if the entity that purchased or leased the property did so in

good faith and if no stay was granted."   *Gucci*, 105 F.3d at 840 (emphasis added); *see*

*also In re Sax*, 796 F.2d 994, 997 (7th Cir. 1986) ("Section 363(m) does not say that the

---

[11]   Bay Harbour cites *In re Perona Brothers, Inc.*, 186 B.R. 833 (D.N.J. 1995) for the
appropriateness of remand to determine whether a purchaser acted in good faith.   But in
that case, the district court remanded because the bankruptcy court "did not make a
finding of 'good faith' at the sale[] [hearing] as to the purchaser's behavior."   *Id.* at 836.
As such, *Perona* is inappropriate.

sale must be *proper* under § 363(b); it says that the sale must be *authorized* under § 363(b). . . [I]t matters not whether the authorization was correct or incorrect.").

The rule "limiting appellate jurisdiction over unstayed sale orders to the issue of good faith furthers the policy of finality in bankruptcy sales" and "assists the bankruptcy court in securing the best price for a debtor's assets." *Gucci*, 105 F.3d at 840; *see also Hazelbaker v. Hope Gas, Inc. (In re Rare Earth Minerals)*, 445 F.3d 359, 363 (4th Cir. 2006) ("An asset that provides a near-certain guarantee of litigation and no guarantee of ownership is likely to have a low sale price; by removing these risks, § 363(m) allows bidders to offer fair value for estate property."); *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) ("Section 363(m) maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property."); *United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (section 363(m) furthers policy of finality and assists bankruptcy courts in maximizing price for assets sold).

The limitation on appellate jurisdiction also recognizes an appellate court "may be powerless to undo or rewrite the terms of [a] consummated sale." *Gucci*, 105 F.3d at 840. The Second Circuit noted that the absence of a stay "has the effect of precluding [an appellate court] from reviewing. . . issues, other than the good faith of the purchaser, if the sale has closed in the interim." *Id.*; *see also Weingarten v. Nostat, Inc. v. Serv. Merch. Co.*, 396 F.3d 737, 741-42 (6th Cir. 2005). Thus, where a sale under section 363(b) has been consummated, courts have held that an appeal challenging the sale was moot even though the appeal may have raised other meritorious arguments. *See, e.g.,*

*Gucci*, 126 F.3d at 392-93; *Salerno*, 932 F.2d at 123; *Anheuser-Busch, Inc. v. Miller (In re Stadium Mgmt., Inc.)*, 895 F.2d 845, 847 (1st Cir. 1990); *Sax*, 796 F.2d at 997.

The applicable principle of law is clear.    Bay Harbour did not seek a stay of the Orders.    The Sale has been consummated, and thousands and thousands of transactions have occurred since September 22, 2008, the consummation date, that are irreversible and cannot be undone.    Therefore, having failed to establish a lack of good faith, the Bay Harbour appeal must be denied as moot under section 363(m) of the Bankruptcy Code.

B.    The Bay Harbour Appeal Should Be Denied
      Under the Doctrine of Equitable Mootness

Even if the Court determines that the Bankruptcy Court erred in finding Barclays was a good faith purchaser, making section 363(m) inapplicable,[12] the appeal should be denied under the doctrine of equitable mootness. A bankruptcy appeal may be denied under this doctrine, "'even though effective relief could conceivably be fashioned, [if] implementation of that relief would be inequitable.'"    *Kenton Cty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 374 B.R. 516, 522 (S.D.N.Y. 2007) (quoting *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005) (quoting *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*, 988 F.2d 322, 325 (2d Cir. 1993) ("*Chateaugay I*"))).    The Second Circuit observed that this

---

[12] *See N.Y. Prop. Holding Corp. v. Dist. 65, United Auto. Aerospace & Agric. Implement Workers of Am. (In re Dist. 65, United Auto. Aerospace & Agric. Implement Workers of Am.)*, 184 B.R. 196, 200 (S.D.N.Y. 1995) ("Under § 363(m), only where the sale was done in bad faith can it be reviewed or modified absent a stay.").

principle is "especially pertinent in bankruptcy proceedings, where the ability to achieve

finality is essential to the fashioning of effective remedies." *Chateaugay I* at 326.

The Second Circuit also has recognized that the doctrine of equitable

mootness applies in two situations:    "when an unstayed order has resulted in a

'comprehensive change in circumstances,' and when a reorganization is 'substantially

consummated.'"    *Delta* at 522 (quoting *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888

(S.D.N.Y. 1994) (quoting *Chateaugay I* at 325)).    This presumption only can be

overcome if all of the following five factors (the "*Chateaugay* Factors") are met:

> (a) the court can still order some effective relief; (b) such
> relief will not affect the re-emergence of the debtor as a
> revitalized corporate entity; (c) such relief will not unravel
> intricate transactions so as to knock the props out from
> under the authorization for every transaction that has taken
> place and create an unmanageable, uncontrollable situation
> for the Bankruptcy Court; (d) the parties who would be
> adversely affected by the modification have notice of the
> appeal and an opportunity to participate in the proceedings;
> and (e) the appellant pursue[d] with diligence all available
> remedies to obtain a stay of execution of the objectionable
> order. . . if the failure to do so creates a situation rendering
> it inequitable to reverse the orders appealed from."

*Id.* (quoting *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 952-

53 (2d Cir. 1993) ("*Chateaugay II*")).

Courts have applied these five equitable considerations when considering

the issue of equitable mootness in the context of a "comprehensive change of

circumstances," *Delta* at 522, including in the sale context, *see, e.g., Kassover v. Gibson*,

No. 02 Civ. 7978, 2003 WL 21222341, at *2 (S.D.N.Y. May 27, 2003)(appeal from order

approving settlement agreement and stock purchase agreement creating new entity was

equitably moot where appellant had opportunity to apply for stay prior to consummation

of merger but elected not to exercise such right, resulting in comprehensive change of

circumstances that could not be deconstructed), *aff'd*, 98 Fed. Appx. 30 (2d Cir. 2004)
(applying *Chateaugay II* factors in affirming equitable mootness).

        The Bay Harbour appeal is equitably moot because (i) Bay Harbour did
not elect to seek a stay of the Orders; (ii) the Orders were not stayed; (iii) the Sale has
been consummated; (iv) hundreds of thousands of customer accounts have been
transferred to Barclays; (v) customer accounts have changed and new transactions
undertaken by customers and changes in the positions of the parties have occurred
involving billions of dollars that, if reversed, would create an unimaginable,
uncontrollable situation; (vi) parties who would be affected are not parties to the appeal;
(vii) Bay Harbour failed to act diligently and seek all available remedies; and (viii) it
would be extremely inequitable to reverse the Orders.

        It is incontrovertible that a comprehensive change in circumstances has
occurred.   Bay Harbour cannot demonstrate that effective relief can be molded that
would not "knock the props out from under the authorization for every transaction that
has taken place" and "create an unmanageable, uncontrollable situation for the
Bankruptcy Court."   Bay Harbour cannot satisfy the *Chateaugay* Factors.   *See Sw.
Prods., Inc. v. Durkin (In re S.W. Prods., Inc.)*, 144 B.R. 100, 105 (B.A.P. 9th Cir. 1992)
(effective relief was not possible because it would overturn aspects of sale affecting
rights of third parties); *BC Brickyard Assocs., Ltd. v. Ernst Home Ctr., Inc. (In re Ernst
Home Ctr., Inc.)*, 221 B.R. 243, 247-48 (B.A.P. 9th Cir. 1998) (appeal dismissed as moot
in light of complexity of concluded transaction and impracticality and unfairness that
would result if transaction were unwound).   Thousands of persons who are now dealing
with Barclays or other financial services firms would be prejudiced and adversely

NY2:\1939069\08\15K7108!.DOC\58399.0003         32

affected by any reversal of the Orders.   *See Delta*, 374 B.R. at 524 ("Courts have found

that the effect on creditors who are not party to an appeal . . . weighs in favor of finding

an appeal moot."). Finally, Bay Harbour has not presented any defense as to why it did

not seek a stay of the Orders.   *Kassover*, 2003 WL 21222341, at *3 ("Appellant had an

opportunity to apply for a stay. . . but elected not to exercise that right.   Consequently, a

comprehensive change in circumstances occurred that cannot now be deconstructed . . .

."). The fact that the closing of the Sale occurred quickly after the Orders were

approved did not foreclose Bay Harbour from attempting to obtain a stay of the Orders.

*See Delta*, 374 B.R. at 525 (rapid closing did not "foreclose the appellants from making

strenuous objections before the Bankruptcy Court and indeed seeking a stay," providing

"no basis for entertaining an appeal that cannot result in equitable or effective relief").

Bay Harbour knew that if it intended to challenge the Orders on appeal for

any issue other than good faith, section 363(m) as well as the equitable mootness doctrine

required it to obtain a stay.   Nevertheless, Bay Harbour chose to ignore the applicable

statutory provision and principle of law and must accept the consequences of its decision.

*See, e.g., Tempo*, 202 B.R. at 374.   The Orders should be affirmed.

III.

## THE BANKRUPTCY COURT DID NOT COMMIT A PLAIN ERROR OF LAW OR ABUSE ITS DISCRETION IN AUTHORIZING AND APPROVING THE SALE TO BARCLAYS

The Orders should be affirmed on the merits.

A.   The Due Process Requirements
Were Satisfied Given the Unique Circumstances

Bay Harbour posits that the Bankruptcy Court committed error in

determining that the process and the approval of the Sale was compliant with the Due

Process Clause.    This argument is frivolous and properly may be characterized as a Hail
Mary Pass in football vernacular.

              The United States Supreme Court has repeatedly emphasized the
flexibility of the due process requirement.    *See Morrissey v. Brewer*, 408 U.S. 471, 481
(1972) ("It has been said so often by this Court and others as not to require citation of
authority that due process is flexible and calls for such procedural protections as the
particular situation demands.").    Specifically, an "elementary and fundamental
requirement of due process. . . is notice reasonably calculated, *under all the
circumstances* to apprise interested parties of the pendency of the action and afford them
an opportunity to present their objections."    *Mullane v. Cent. Hanover Bank & Trust
Co.*, 339 U.S. 306, 314 (1950) (emphasis added); *see also Baker v. Latham Sparrowbush
Assocs.*, 72 F.3d 246, 254 (2d Cir. 1995) ("If a party receives actual notice that apprises it
of the pendency of the action and affords an opportunity to respond, the due process
clause is not offended."); *In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138,
1144 (2d Cir. 1993) ("the Due Process Clause requires the best notice practical under the
circumstances").    The Supreme Court recognized that the constitutional requirements
will have been satisfied if notice was given with "due regard for the practicalities and
peculiarities of the case."    *Mullane*, 339 U.S. at 314-15.

              The record demonstrates that notice was more than adequate in the
circumstances. It is evidenced by the three overflowing courtrooms of interested persons
and, importantly, the active participation by Bay Harbour and others who presented their
objections and arguments to the Bankruptcy Court.    Indeed, Bay Harbour's attorneys
cross-examined Bart McDade, the President of LBHI, concerning the Sale. [CD-44 at

121-28]    LBHI gave "as much publicity as [they could ] possibly give" to the Sale. [CD-

45 at 30]    At the September 17, 2008 Procedures Hearing, the Bankruptcy Court stated:

> I'm going to take judicial notice of the fact that we have a
> packed courtroom where we have people standing and we
> have an overflow courtroom, the fact that there are parties
> represented by experienced and sophisticated counsel, as
> evidence that there's no question that parties-in-interest and
> parties who are just plain interested know about today's
> hearing.   And I've also had an opportunity to understand
> through the press and television and the internet at least
> some of the proposed terms and conditions of the
> transaction.   I think for that reason, I am inclined to
> conclude that while this is unusual, and should not be
> viewed as a precedent, I believe that here due process is
> satisfied simply by virtue of the fact that we're all here
> together and that we know what we're talking about.

[CD-45 at 31-32]    Similarly, at the Sale Hearing, the Bankruptcy Court stated:    "I

believe that for due process purposes we are all here with, perhaps cobbled together

notice, but it's notice." [CD-44 at 84]

For purposes of the Sale Hearing, the Bankruptcy Court decided to be

"extraordinarily liberal in allowing parties the ability to object if they wish to at the very

last minute as soon as we call the hearing because. . . that's also consistent with due

process." [CD-45 at 34]   Almost ninety objections or responses to the Motion were filed

with the Bankruptcy Court. [CD-56]

At both the Procedures Hearing and the Sale Hearing, the Bankruptcy

Court emphasized it was extremely cognizant of due process limitations.   At the

Procedures Hearing, the Bankruptcy Court repeated several times that it "need[ed] to deal

with fundamental due process issues" and could only approve the Sale "within the limits

of the law, the procedural rules and fundamental due process," notwithstanding that "this

is an absolutely extraordinary transaction with extraordinary importance to the capital

markets globally." [CD-45 at 26-27, 28]   At the Sale Hearing on September 19, 2008,

after more than seven hours of testimony and argument, the Bankruptcy Court stated:

> I... considered carefully whether it was permissible for me
> as a judge in this [D]istrict to approve a transaction this
> momentous on such an extraordinarily fast schedule.   And
> I gave consideration to the due process considerations that
> have been articulated in objections both orally and in
> writing.   And I have concluded that this is really not a
> question of due process being denied.   This is a question
> of *due process being pursued* in good faith by all parties to
> the transaction, even the objectors.   It is a testament to the
> importance of this transaction that this courtroom is still
> packed.

[CD-44 at 247-48] (emphasis added).   In light of the exceptional circumstances before

it, the Bankruptcy Court correctly concluded that the Due Process Clause was satisfied.

Bay Harbour argues that its due process rights were violated because the

Bankruptcy Court refused to grant its request to delay approval of the Sale until it could

complete discovery regarding the transfer of the European Funds.   The argument is

based on the assertion that the Joint Administrators "raised serious questions regarding

Debtors' and Barclays' conduct in connection with the Sale." (Br. at 26.)   Bay Harbour

elects to be oblivious to the fact that the Joint Administrators did not object to the Sale,

but supported the Sale. [D-10 at 2]   Bay Harbour actively participated in both the

Procedures Hearing and the Sale Hearing and had ample opportunity to try to make a

case for delay.   It failed to demonstrate cause for delay.   As a consequence, the

Bankruptcy Court correctly rejected the arguments of Bay Harbour.

The due process rights of Bay Harbour were not violated.   *See, e.g., Apex*

*Oil Co. v. Vanguard Oil & Serv. Co. (In re Vanguard Oil & Serv. Co.)*, 88 B.R. 576, 580

(E.D.N.Y. 1988) (bankruptcy court acted within its discretion in approving sale despite

objection to improper notice where delay in accepting purchaser's offer risked decreasing

value of all assets in estate and appellant failed to demonstrate how it was materially

prejudiced by alleged due process violation); *In re Haven Eldercare, LLC*, 390 B.R. 762,

769 (Bankr. D. Conn. 2008) (under "unique and extraordinary circumstances," cause

existed for shortening to two days the twenty-day notice period to approve sale to credit

bidder where debtors were in "financial extremis," value of assets was deteriorating,

debtors were unable to find cash purchaser to bring into auction process, and there was

"no credible evidence to support a claim that additional notice might materially enhance

the outcome for any. . . constituency").

B.    The Sale to Barclays Was Justified

A sale of a substantial part of a debtor's estate outside the ordinary course

of business may be conducted if there is a good business reason to support it.    *Licensing*

*by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *Comm. of*

*Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir.

1983).    The Bankruptcy Court properly found there was a clear business justification for

the Sale.

The record demonstrates that the Sale to Barclays was the only available

transaction for the sale assets.    Barclays was the only entity capable of purchasing the

broker-dealer business because it was the only entity that was supported by the

regulators, capable of delivering customer accounts to safe harbors, and prepared to close

the transaction.

The Sale was designed to continue LBI's broker-dealer business for the

benefit of the public customers, the general economy, and thousands of employees.    Had

the Bankruptcy Court not approved the Sale, the consequences would have been dire.

The prejudices and harm resulting from the stranding of hundreds of thousands of

customer accounts and the complete breakdown of all transactions defy imagination.
The record establishes that "[a]bsent approval of the Barclays' transaction, the broker-
dealer business would discontinue as a going concern and adversely impact the credit
markets on a global scale in ways that are immeasurable." [CD-44 at 93] ✝ The Sale was
necessary to provide certainty to parties and counterparties of hundreds of thousands of
transactions and provide comfort to public customers and others. [CD-44 at 73-74]
Immediately prior to the Sale, the broker-dealer business did not have sufficient capital to
service its customer accounts to enable such accounts to be transferred to another broker-
dealer in the ordinary course of business. [CD-44 at 94]    As the broker-dealer business
was dependent on financing from LBHI, the failure of LBHI would have terminated the
ability to service its customer accounts, the market value of which was in the hundreds of
billions of dollars. [CD-44 at 94]    Absent the Sale, the broker-dealer would have had no
realistic choice but to close down its operations, resulting in billions of dollars of losses
and damages. [CD-44 at 94]

                The Purchased Assets were deteriorating rapidly.    If the Sale had not
been consummated immediately, there would have been virtually no assets left to
purchase.    *Cf. In re Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (affirming
sale order where lower court "under very difficult circumstances, showed great concern
for salvaging [debtor] and protecting the jobs of its numerous employees").    The
evidence below showed that the Sale enabled almost 10,000 Lehman employees to have a
chance at continued employment with Barclays. [CD-44 at 101-02]    In addition, the Sale
"made available a greater pool of assets to the [D]ebtors' estates, because the exposure

under Lehman Holdings['] guarantee to the broker-dealer will be substantially less."
[CD-44 at 102]

In approving the Sale, the Bankruptcy Court took note of the cooperation
among parties in interest "including the [C]reditors' [C]ommittee [to have] gotten to the
point of at least acquiescing because the transaction is so significant to the markets, to the
employees, to the U.S. economy, to the world economy." [CD-44 at 84]

The record demonstrates that the Purchased Assets had substantially
greater value as a going concern than if they were sold piecemeal and that not one entity
other than Barclays "showed up with an interest in the assets as a whole,"
notwithstanding the "tremendous publicity." [CD-44 at 144]    The fact that no higher or
better offers were made prior to the Sale Hearing indicates that the purchase price paid by
Barclays was the highest price the market would support.    *See, e.g., 255 W. 4th St.*
*Realty Corp. v. Nisselson*, Nos. 95 Civ. 7218, 96 Civ. 4177, 1997 WL 154052 (S.D.N.Y.
Apr. 2, 1997).    The evidence demonstrated that, if the Sale was not approved,

> [t]he costs to Lehman and counterparties, as pending
> transactions unwind, [would] run into the many billions of
> dollars.    Counterparties [would] be required to liquidate
> their collateral positions, which [could] entail a wholesale
> dumping of the collateral into the marketplace with the
> attendant erosion of values.    The deficiencies that
> counterparties [could] incur [would] result in massive
> claims against the assets of the Lehman estates.    Ten to
> twelve thousand employees may not find any employment.
> Any failure to consummate [could] potentially cause a
> major shock to the financial system.

[CD-44 at 146]    Bay Harbour must disagree with the foregoing conclusion as it labors
under the mistaken belief that "sav[ing] jobs. . . and minimize[ing the] Debtors' losses. . .
are not relevant to a [s]ection 363 sale transaction." (Br. at 18.)

After a careful consideration and deliberation of the exceptional

circumstances before it, the Bankruptcy Court observed that the Sale was an

"extraordinary example of the flexibility that bankruptcy affords under circumstances

such as this.   It's an example that creative minds working diligently day and night even

under the worst of circumstances can create remarkably complicated transactions that

preserve value.   I am proud to have been part of that process." [CD-44 at 252]

### CONCLUSION

The Orders should be affirmed in all respects.

Dated: New York, New York
December 12, 2008

/s/ Harvey R. Miller
Harvey R. Miller
Michele J. Meises

WEIL, GOTSHAL & MANGES LLP
Attorneys for Lehman Brothers
Holdings Inc., *et al.*, as Debtors and
Debtors in Possession - Appellees

767 Fifth Avenue
New York, New York 10153
Telephone:   (212) 310-8000

## CERTIFICATE OF SERVICE

I, Christopher A. Stauble, certify under penalty of perjury that I am over the age of eighteen and am not a party to the above-captioned proceeding.   On December 12, 2008, I caused to be served by facsimile and FedEx a true and correct copy of the foregoing ANSWERING BRIEF OF LEHMAN BROTHERS HOLDINGS INC., *et al*. IN OPPOSITION TO BAY HARBOUR APPEAL upon the parties that are listed below.

Kasowitz, Benson, Torres
& Friedman LLP
Attorneys for Bar Harbour (appellant)
1633 Broadway
New York, NY 10019
Attn.: Ronald Rossi, Esq.
        David S. Rosner, Esq.
        Andrew K. Glenn, Esq.
Facsimile:   212-506-1800

Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, New York 10004
Attn:   Andrew D. Velez-Rivera, Esq.
Facsimile:   212-668-2255

Hughes Hubbard & Reed LLC
Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation
of Lehman Brothers Inc.
One Battery Park Plaza
New York, New York 10004
Attn:   Sarah L. Cave, Esq.
Facsimile:   212-422-4726

Milbank, Tweed, Hadley & McCloy LLP
Attorneys for Official Committee of Unsecured Creditors
1 Chase Manhattan Plaza
New York, New York 10005
Attn:   Dennis F. Dunne, Esq.
        Wilbur F. Foster, Jr., Esq.
Facsimile:   212-530-5219

and

601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017
Attn:   Paul Aronzon, Esq.
        Gregory A. Bray, Esq.
Facsimile:   213-629-5063

Cleary Gottlieb Steen & Hamilton LLP
Attorneys for Barclays Capital, Inc.
One Liberty Plaza
New York, New York   10006
Attn:   Lindsee P. Granfield, Esq.
        Lisa M. Schweitzer, Esq.
Facsimile:   212-225-3999

Sworn to before me this
12th day of December 2008

/s/ Nicole Aliseo
NICOLE ALISEO
Notary Public, State of New York
No. 01AL6186782
Qualified in Richmond County
Commission Expires May 12, 2012