**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————————————— )
                                  )
In re: LEHMAN BROTHERS HOLDINGS INC., et al., Debtors. )   Cases No.
                                  )   08-cv-08869 (DLC)
BAY HARBOUR MANAGEMENT, L.C., et al., Appellants, )   08-cv-08914 (DLC)
                                  )
              v.                  )
                                  )
LEHMAN BROTHERS HOLDINGS INC., et al., Appellees. )
                                  )
                                  )
                                  )
———————————————————————————————— )

## APPELLEE BARCLAYS CAPITAL INC.'S MEMORANDUM OF LAW IN OPPOSITION TO BAY HARBOUR ET AL.'S APPEAL

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for Barclays Capital Inc.*

Of Counsel:

Lindsee P. Granfield
Lisa M. Schweitzer

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................. ii

I.    STATEMENT OF THE ISSUES PRESENTED ON APPEAL AND
      THE APPLICABLE STANDARD OF APPELLATE REVIEW.......................... 2

II.   STATEMENT OF THE CASE................................................................. 3

      A.    Nature Of The Case And Disposition Below.............................................. 3

      B.    Statement Of Facts.................................................................................. 5

            1.    Procedural History ........................................................................ 5

            2.    The Sale Procedures Hearing............................................................ 6

            3.    The Sale Hearing............................................................................ 9

III.  SUMMARY OF ARGUMENT .............................................................. 19

IV.   ARGUMENT........................................................................................... 22

      A.    This Appeal Is Moot As Barclays Is A Purchaser in Good Faith,
            And The Sale Has Been Irreversibly Consummated .................................. 22

            1.    Section 363(m) Of The Bankruptcy Code Moots All Issues
                  Other Than The Question Of Whether Barclays Was A Good
                  Faith Purchaser.............................................................................. 22

            2.    The Evidentiary Record Amply Supports The Finding
                  That Barclays Is A Good Faith Purchaser......................................... 24

      B.    Even If Appellants' Further Issues On Appeal Were Not Moot,
            They Would Lack Merit ............................................................................ 31

            1.    The Bankruptcy Court Correctly Concluded That Creditors
                  Were Afforded Adequate Procedural Due Process Under
                  The Circumstances In Connection With The Sale............................. 31

            2.    The Sale Of Assets To Barclays Free And Clear Of
                  Liabilities Cannot Be Reversed Since Barclays
                  Is A Good Faith Purchaser.............................................................. 38

CONCLUSION............................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 102(1)(B)(ii) .................................................................................................... 36

11 U.S.C. § 363(b)(2) ........................................................................................................ 35-36

11 U.S.C. § 363(m) ............................................................................................................ 22

15 U.S.C. § 78fff(b) ........................................................................................................... 3

Fed. R. Bankr. P. 2002(a) ................................................................................................. 34

Fed. R. Bankr. P. 9006(c)(1) ............................................................................................. 34

Fed. R. Bankr. P. 9006(c)(2) ............................................................................................. 34

Fed. R. Evid. 201(b) .......................................................................................................... 8


**Cases**

Bosiger v. US Airways,
510 F.3d 442 (4th Cir. 2007) ............................................................................................. 33

Edwards v. Golden Guernsey Dairy Co-Op,
962 F.2d 641 (7th Cir. 1992) ............................................................................................. 31

EEOC v. Knox-Schillinger (In re Transworld Airlines, Inc.),
322 F.3d 283 (3d Cir. 2003) .............................................................................................. 38

Howard v. Grinage,
82 F.3d 1343 (6th Cir. 1996) ............................................................................................. 37

In re Am. HomePatient, Inc.,
420 F.3d 559 (6th Cir. 2005) ............................................................................................. 24

In re Chateaugay Corp.,
10 F.3d 944 (2d Cir. 1993) ................................................................................................ 24

In re Coated Sales, Inc.,
No. 89 Civ. 3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) ........................... 23, 24, 31

In re Colarusso,
382 F.3d 51 (1st Cir. 2004) ............................................................................................... 22

In re Delta Air Lines, Inc.,
  374 B.R. 516 (S.D.N.Y. 2007)............................................................................................ 24

In re Haven Eldercare, LLC,
  390 B.R. 762 (Bankr. D. Conn. 2008) ............................................................................. 34-35

In re Karta Corp.,
  342 B.R. 45 (S.D.N.Y. 2006)............................................................................................ 24

In re Lionel Corp.,
  722 F.2d 1063 (2d Cir. 1983)............................................................................................ 26

In re Medaglia,
  52 F.3d 451 (2d Cir. 1995)............................................................................................... 31

In re Metromedia Fiber Network, Inc.,
  416 F.3d 136 (2d Cir. 2005).............................................................................................. 24

In re Oyster Bay Cove, Ltd.,
  161 B.R. 338 (Bankr. E.D.N.Y 1993)................................................................................ 39

In re Perona Bros., Inc.,
  186 B.R. 833 (D.N.J. 1995) ............................................................................................. 39

In re Rock Indus. Mach. Corp.,
  572 F.2d 1195 (7th Cir. 1978) ......................................................................................... 28

In re Sasson Jeans, Inc.,
  90 B.R. 608 (S.D.N.Y 1988).............................................................................................. 25, 29

In re Savage Indus.,
  43 F.3d 714 (1st Cir. 1994)............................................................................................... 37

In re Vanguard Oil,
  88 B.R. 576 (E.D.N.Y. 1988) ........................................................................................... 33

In re WestPoint Stevens, Inc.,
  333 B.R. 30 (S.D.N.Y. 2005)............................................................................................ 39

In re Zyprexa Prods. Liab. Lit.,
  549 F. Supp. 2d 496 (E.D.N.Y. 2008) .............................................................................. 8

Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs.
  (In re Colony Hill Assocs.), 111 F.3d 269 (2d Cir. 1997).................................................. 28-29

Licensing by Paolo, Inc. v. Sinatra (In re Gucci),
  105 F.3d 837 (2d Cir. 1997)............................................................................................. 3, 22

Licensing by Paolo, Inc. v. Sinatra (In re Gucci),
126 F.3d 380 (2d Cir. 1997)....................................................................................    3, 22-23, 25, 28

Matter of General Insecticide Co., Inc.,
403 F.2d 629 (2d Cir. 1968)....................................................................................    33

Mullane v. Cent. Hanover Bank & Trust Co.,
339 U.S. 306 (1950)....................................................................................    31, 33, 36

Schupak v. Dutch Inn of Orlando, Ltd. (In re Dutch Inn of Orlando, Ltd.),
614 F.2d 504 (5th Cir. 1980) ....................................................................................    28

Thomas v. Namba (In re Thomas),
287 B.R. 782 (B.A.P. 9th Cir. 2002)....................................................................................    29

United States v. Salerno,
932 F.2d 117 (2d Cir. 1991)....................................................................................    23

United States v. U. S. Gypsum Co.,
333 U.S. 364 (1948)....................................................................................    25

Zinke v. Harbison-Fischer Mfg. Co.,
97 B.R. 155 (E.D.N.Y. 1989) ....................................................................................    35

**Other Authorities**

3 COLLIER BANKRUPTCY CODE (2008 ED.)....................................................................................    36

Appellee Barclays Capital Inc. ("Barclays") respectfully submits this memorandum of law in opposition to the appeal by Bay Harbour Management L.C., Bay Harbour Master Ltd., Trophy Hunter Investments, Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2 and Institutional Benchmarks (collectively "Appellants") from the following orders (the "Appealed Orders" or "Sale Orders") entered on September 20, 2008:

(1) Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, entered in the Chapter 11 bankruptcy case stylized as In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555, Dkt. No. 258;[1] and

(2) Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings Inc. Chapter 11 Proceeding, entered in the Securities Investor Protection Act cases stylized as Securities Investor Protection Corp. v. Lehman Brothers Inc., Adversary Proceeding No. 08-01419,[2] Dkt. No. 3, and Adversary Proceeding No. 08-01420, Dkt. No. 2.[3]

---

[1]   Citations to the docket in Chapter 11 bankruptcy case No. 08-13555 will be abbreviated herein as "B. Dkt."

[2]   Adversary Proceeding No. 08-01419 was duplicative of Adversary Proceeding No. 08-01420, and Adversary Proceeding No. 08-01419 was closed on October 1, 2008. See Order Directing the Closing of Adversary Proceeding, Adversary Proceeding No. 08-01419, Dkt. No. 6. Because Appellants have designated on appeal the order entered in No. 08-01419, Barclays does so as well out of an abundance of caution.

[3]   Citations to the docket in proceeding No. 08-01420 will be abbreviated herein as "SIPA Dkt."

## I.    STATEMENT OF THE ISSUES PRESENTED ON APPEAL AND THE
APPLICABLE STANDARD OF APPELLATE REVIEW[4]

The issues presented on appeal are as follows:

1.    Whether this appeal is moot under section 363(m) of the Bankruptcy Code
where (a) the court below found Barclays was a purchaser in good faith, (b) Appellants failed to
seek a stay of the Appealed Orders pending appeal, and (c) the sale to Barclays has closed and
cannot be reversed?

2.    Whether the district court should affirm the Bankruptcy Court's detailed
findings of fact that the Purchaser engaged in a good faith, arms-length negotiation, without
collusion – which are subject to review only for clear error and which as a matter of law entitle
Barclays to protection as a purchaser in good faith under section 363(m) of the Bankruptcy
Code?

3.    Whether the Bankruptcy Court was correct in concluding that the sale
effectuated by the Appealed Orders complied with the Due Process clause of the Fifth
Amendment where the court (a) found that the parties provided adequate notice of the sale in
light of the exigent circumstances and the wasting nature of the debtors' assets, and (b) provided
a reasonable opportunity under the circumstances for parties, including Appellants, to be heard
and object?

4.    Whether the Bankruptcy Court, having concluded that there was ample
evidence to find Barclays to be a purchaser in good faith, properly approved the sale free and
clear of liabilities to Barclays pursuant to section 363(f) of the Bankruptcy Code?

---

[4]     Barclays does not dispute Appellants' statements regarding the basis of appellate jurisdiction,
although we note that Appellants did not identify with any particularity which Appellants hold
claims against which Lehman entities. See Appellants' Br. at 3.

2

The Bankruptcy Court's factual findings with respect to Barclays' status as a good
faith purchaser are reviewable only for clear error. Licensing by Paolo, Inc. v. Sinatra (In re
Gucci) ("Gucci II"), 126 F.3d 380, 390 (2d Cir. 1997). The remaining two questions presented
for review – whether the proceedings below comported with due process and whether the
Bankruptcy Court properly approved the sale free and clear of interests pursuant to section 363(f)
– are moot pursuant to section 363(m) of the Bankruptcy Code. Licensing by Paolo, Inc. v.
Sinatra (In re Gucci) ("Gucci I"), 105 F.3d 837, 838 (2d Cir. 1997). To the extent that the Court
were to, despite their mootness, reach the merits of these questions, the Court should review the
findings of fact for clear error and the legal conclusions de novo. Gucci II, 126 F.3d at 390.

## II.    STATEMENT OF THE CASE

### A.    Nature Of The Case And Disposition Below

This appeal arises out of the collapse of Lehman Brothers in September 2008 and
the sale of assets to Barclays that was approved by the United States Bankruptcy Court for the
Southern District of New York (the "Bankruptcy Court") following the commencement of
Chapter 11 bankruptcy proceedings by Lehman Brothers Holdings Inc. ("LBHI"), and its
affiliate LB 745 LLC ("745"), and the commencement of a Securities Investor Protection Act
("SIPA") proceeding against Lehman Brothers Inc.,[5] ("LBI" and, together with LBHI and 745,
the "Debtors"),[6] the fourth largest investment bank in the United States, the week of September
15, 2008.[7]

---

[5]    While LBI's SIPA proceeding was commenced under the Securities Investor Protection Act, see
       Complaint and Application of the Securities Investor Protection Corp., SIPC v. Lehman Brothers
       Inc., 08-CV-8119 (GEL), Dkt. No. 1 (hereinafter "SIPC Compl."), the Act incorporates the
       provisions of the Bankruptcy Code to the extent consistent with the Act. See 15 U.S.C. § 78fff(b).

[6]    Debtors, together with their non-debtor affiliates, will be referred to herein as "Lehman."

[7]    The Statement of Facts (Section II.B. infra) contains record citations for the relevant facts
       discussed herein.

3

On September 20, 2008, the Bankruptcy Court entered orders in the Debtors' cases approving the sale transaction, conveying the assets to Barclays free and clear of liens and other interests, and finding Barclays to be a good faith purchaser under section 363(m) of the Bankruptcy Code.

Appellants now rely on gross speculation and innuendo in an attempt to attack the Sale Orders, and particularly to question whether Barclays is a good faith purchaser under section 363(m) of the Bankruptcy Code. Appellants' arguments simply lack merit, both under the relevant law and based on the uncontested evidence presented to the Bankruptcy Court.

While the sale was conducted on an expedited timeframe, as permitted under the Bankruptcy Code and Rules, Appellants do not dispute the substantial evidence in the record that Lehman's severe liquidity crisis led to a "death spiral" that caused the Debtors to seek court protection and the immediate sale of certain of their rapidly wasting assets. In addition to not worsening the disintegration of the financial markets generally, the sale to Barclays – a rigorously negotiated, arm's length transaction – benefited the Debtors' estates and their creditors through the payment of over $1 billion in cash consideration, the employment of over 9,000 Lehman employees at least on a temporary basis, the assumption of certain liabilities associated with the purchased assets, and the avoidance of claims against the Debtors' estates from transactions that otherwise would have been terminated. Appellants also do not challenge the evidence that various regulators pushed for an immediate closing of the sale transaction, or that any delay in approving the sale would not have resulted in the identification of any higher or better offers to buy Lehman's assets and, to the contrary, would have resulted in a further loss of value and could have caused Lehman to lose the Barclays sale transaction.

4

Instead Appellants focus their criticism of the sale process on an alleged

insufficient investigation of $8 billion in funds that were purportedly missing from the Lehman

Brothers International Europe ("LBIE") administrator's estate in the United Kingdom, and the

Debtors' sale of their assets to Barclays free and clear of any claims related to such allegedly

"missing" funds. However, this argument is a red herring. First, the only non-speculative

evidence before the Bankruptcy Court showed that LBIE's concerns (whether or not ultimately

valid) related to the whereabouts of certain cash, not securities, and that Lehman was not

transferring its general cash accounts to Barclays. Second, Appellants' admitted interest in the

LBIE funds arises from their status as LBIE customers, which interest is derivative of that of

LBIE at best. The administrators of the LBIE estate did not oppose the sale to Barclays or the

granting of an order conveying the assets "free and clear" of such claims under section 363(f) of

the Bankruptcy Code.

As the record below supports, and the Bankruptcy Court properly found, Barclays

is a good faith purchaser, and the notice of the sale and material sale terms was sufficient under

the circumstances. Appellants' remaining arguments are moot under section 363(m) of the

Bankruptcy Code.

B.    **Statement Of Facts**

1.    **Procedural History**

Starting in 2008, Lehman began to face an adverse global business environment

due to several factors including slowing economic growth worldwide and a decline in consumer

and business confidence. See Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local

Bankruptcy Rules for the S.D.N.Y. in Support of First-Day Motions and Applications, B. Dkt.

No. 2, (the "Lowitt Aff.") at ¶¶ 20-21. The instability in the financial and credit markets that

followed this decline caused significant liquidity problems for Lehman, which in turn created a

5

"chain reaction of adverse economic consequences," id. ¶¶ 23-24, and, as Appellants recognized, caused it to go into an "economic death spiral." Appellants' Br. at 6. Despite efforts to stave off the crisis, negative rumors about Lehman's viability continued, and its rapidly increasing liquidity problems led LBHI to file a Chapter 11 bankruptcy proceeding on September 15, 2008 (the "Petition Date") to "preserve its assets and maximize value for the benefit of all stakeholders." Lowitt Aff. ¶ 31. On September 16, 2008, 745 also filed for bankruptcy and the cases were consolidated in the Bankruptcy Court before the Honorable James Peck.[8]

On September 17, 2008, LBHI and 745 moved the Bankruptcy Court to establish procedures to govern the prospective sale of certain of Lehman's assets to Barclays, pursuant to an Asset Purchase Agreement dated September 16, 2008 (the "APA"), and to schedule a hearing to approve the sale pursuant to section 363 of the Bankruptcy Code (the "Sale"). See Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Related to the Purchased Assets, B. Dkt. No. 60, (the "Sale Motion"). LBHI and 745 sought approval of a shortened sale notice period because "[t]ime [was] of the essence" in order to "avoid [further] erosion of the value of [the Debtors'] [a]ssets" due to the liquidity crisis facing the company. See Sale Motion ¶¶ 6-12, 21; see also Lowitt Aff. ¶¶ 23-30.[9]

### 2. The Sale Procedures Hearing

On September 17, 2008, the Bankruptcy Court conducted a hearing to approve the sale procedures in courtrooms and overflow rooms packed with interested parties and spectators

---

[8] On September 19, 2008, the Securities Investor Protection Corporation ("SIPC") initiated a proceeding under the Securities Investor Protection Act to administer the assets of the LBI broker-dealer business and to effectuate the sale of assets in the SIPA proceeding. See SIPC Compl. at 5-10; Adversary Proceeding Nos. 08-01419, 08-01420. These cases were referred to Judge Peck.

[9] A motion to approve the sale in the SIPA proceeding was filed on September 19, 2008. SIPA Dkt. No. 2.

6

(the "Sale Procedures Hearing"). At the Sale Procedures Hearing, counsel for LBHI and 745

urged the Bankruptcy Court to approve an expedited schedule for the Sale based on the

undisputed proffered testimony of Lehman's Chief Operating Officer, Herbert McDade, that if a

proposed Sale were not approved by September 19, 2008, Lehman would disappear as a going

concern. Tr. Of Hrg. Held On Sept. 17, 2008, B. Dkt. No. 352, (the "Sale Proc. Hrg. Tr.") at

26:6-9; see also id. at 31:2 (describing LBHI's assets as "perishable"). Lehman's counsel

asserted that Lehman's assets were "wasting" in nature, akin to a "melting ice cube." See id. at

21:3-4. Representatives of various governmental and regulatory agencies including the

Securities and Exchange Commission, the Federal Reserve Bank of New York, and the

Commodities Futures Trading Commission, as well as the United States Trustee for the Southern

District of New York, reaffirmed the urgency of Lehman's "very fragile" financial situation and

the need for the Sale to occur by the end of that week to avoid grave consequences in the U.S.

financial markets. Id. at 65:5-12, 65:24-25; 66:2-67:5, 67:13-22, 69:15-22.

        During the Sale Procedures Hearing Judge Peck directly considered "fundamental

due process issues" to ensure that notice of the substance of the proposed transaction was

"adequa[te] . . . for purposes of basic constitutional due process." Id. at 26:23-27:2, 27:4-8.

Relying on LBHI's representation to the court that financial markets participants had known for

months that Lehman's assets were for sale, and that the proceedings were notorious because they

had been given "as much publicity as [they could]," and taking judicial notice of the packed

courtroom, Judge Peck found that "there's no question that parties-in-interest and parties who are

just plain interested know about today's hearing." Id. at 25:8-18, 30:4-14, 31:10-19, 31:20-32:1.

See also id. at 32:1-4 (noting press coverage of proposed transaction terms).[10] Thus, he found

---

[10]    Under Rule 201 of the Federal Rules of Evidence, a court may take judicial notice of facts that are
"either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of

7

that for purposes of the Sale Procedures Hearing "due process is satisfied," id. at 32:6-8, and

that, because of the urgency of the matter, he was "satisfied . . . that . . . this bid procedure

package, in one form or another, must be approved today." Id. at 72:11-17.

           The Bankruptcy Court entered an order[11] approving the sale procedures that found

that "good cause exist[ed] to shorten the . . . notice periods" for the proposed Sale, that LBHI and

745's estates would "suffer immediate and irreparable harm if the . . . relief requested [were] not

granted on an expedited basis," and that the notice of the sale motion given by the LBHI and 745

"constitute[d] due and sufficient notice thereof given the wasting nature" of their assets.  Sale

Procedures Order ¶¶ C-E.  The Sale Procedures Order required that notice of the proposed Sale

(including the proposed APA) be sent to creditors and parties in interest, id. ¶ 12, and scheduled

the sale hearing for September 19, 2008 (the "Sale Hearing").  Id. ¶ 7.[12]  Judge Peck allowed all

interested parties to file written or oral objections to the proposed Sale at any time up to the Sale

Hearing.  See id. ¶ 7.

---

accurate and ready determination by resort to sources whose accuracy cannot reasonably be
questioned."  See Fed. R. Evid. 201(b).  Facts that are the subject of ample news coverage, such as
the conditions of global financial markets and the financial situation of Lehman, are routinely
subject of judicial notice.  See e.g., In re Zyprexa Prods. Liab. Lit., 549 F. Supp. 2d 496, 501
(E.D.N.Y. 2008) (noting that "[j]udicial notice can be taken of . . . press releases and news articles
and published analyst reports in determining what the market knew").

[11]   See Order (I) Approving the Break-Up Fee and Expense Reimbursement, (II) Certain Matters
Relating to Competing Bids, if Any, (III) Approving the Form and Manner of Sale Notices and
(IV) Setting the Sale Hearing Date in Connection with the Sale of Certain of the Debtors' Assets,
B. Dkt. No. 88, (the "Sale Procedures Order").

[12]   See also Affidavit of Service of Regina Amporfro of Epiq Bankruptcy Solutions LLC, dated Sept.
19, 2008, B. Dkt. No. 242 (affirming that copy of Sale Procedures Order was served on all required
parties on September 17, 2008); Affidavit of Service of Robert Saraceni of Epiq Bankruptcy
Solutions LLC, dated Sept. 19, 2008, B. Dkt. No. 239 (affirming that Notice of Sale Hearing was
served on all required parties on September 18, 2008).

8

### 3.    The Sale Hearing

#### Need For Quick Sale And Sale Terms

At the Sale Procedures Hearing, Lehman's counsel offered to be available on a 24-hour basis to answer questions about the transaction.  See Sale Proc. Hrg. Tr. at 41:23-25.  On September 18, 2008, Lehman's counsel held a public conference in their New York offices to explain the terms of the proposed APA and the assumption of contracts and unexpired leases. Appellants attended this meeting.  See Tr. of Sale Hrg. Held on Sept. 19, 2008, B. Dkt. No. 318, (the "Sale Hrg. Tr.") at 212:1-3.  No party, including Appellants, served any formal discovery requests with respect to the Sale Motion, whether requests for documents or deposition notices, on Barclays (or on any other party) prior to the Sale Hearing.

Despite the Debtors' compliance with the terms of the Sale Procedures Order and the ample opportunities for interested parties to be apprised of the terms of the proposed Sale, Appellants filed objections to the Sale on the grounds that, inter alia, the proceedings did not comply with constitutional due process requirements.[13]  Specifically, Appellants argued that the Bankruptcy Court could not find that Barclays is a good faith purchaser, because creditors had not been given "a reasonable time to enable parties in interest to conduct meaningful discovery into the underlying facts."  Appellants' Obj. ¶ 18.  Of course, Appellants did not attempt to take any discovery from Barclays before September 17 or September 19, 2008.

On the afternoon of September 19, 2008, after the commencement of the LBI SIPA proceeding, Judge Peck held the Sale Hearing, which again occupied several packed

---

[13]    See Objection of Bay Harbour Management L.C., et al., to the Debtors' Motion to (A) Schedule a Sale Hearing, (B) Establish Sale Procedures, (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets, B. Dkt. No. 175, (hereinafter "Appellants' Obj.").

9

courtrooms, and lasted from 4:36 p.m. until after midnight on the morning of September 20.[14] At the start of the hearing and throughout, the Debtors explained changes to the proposed APA, including an hour-long discussion off the record, followed by a re-explanation of the terms to the Bankruptcy Court. Sale Hrg. Tr. at 45:17-19, 46-55. The fundamental terms of the proposed Sale, i.e., the sale of assets related to LBHI's broker-dealer business and certain real estate assets, were unchanged. The primary changes, noted on the record, included a purchase price decrease for the real estate assets based on appraisal results, and that cash was no longer being transferred to Barclays as the Debtors no longer held such cash. See id. at 47:16-23, 53:21-25. Creditors were permitted to further clarify the sale terms throughout the Sale Hearing, including through the cross-examination of a senior LBHI executive and of an experienced financial advisor retained by Lehman to provide advice with respect to the Sale. See, e.g., id. at 200 (explaining that liabilities of LBI's subsidiaries were not transferred); 112-114 (clarifying which of Lehman's business were being transferred to Barclays under the APA, through cross-examination of senior LBHI official); 147-150 (clarifying employment and closing provisions of APA through cross-examination of financial advisor); 220-21 (clarifying BATS Holding, Inc. stock not being sold); 226 (clarifying Eagle Energy Partners assets excluded); 232-33 (clarifying procedures for payment of disputed cure amounts). In the context of considering the objections of certain creditors, including Appellants, that due process was not satisfied because the terms of the proposed Sale were not understood, see, e.g., id. at 82:25-83:8, the Bankruptcy Court acknowledged the numerous opportunities given for creditors to clarify terms of the APA and lodge objections, and found that due process considerations were thus satisfied. Id. at 84:15-21.

---

[14]    Although Appellants now suggest that it may have been difficult for them to hear during this hearing, see Appellants' Br. at 4, they did not raise any such concern at any time during the Sale Hearing, where their counsel was present and indeed cross-examined one of Lehman's witnesses. See Sale Hrg. Tr. at 25:9-19, 121:20-24.

10

The Debtors also proffered additional testimony regarding the need to close the
transaction immediately, including the testimony of Herbert McDade, a member of LBHI's
Operations Committee for over 25 years and its current Chief Operating Officer, that "as each
hour has passed and uncertainty is prolonged, investor's faith in the market has weakened the
value of Lehman's business and it has rapidly deteriorated." Id. at 92:25-93:2.[15] The Debtors'
situation was therefore "critical" and "[i]f the transaction does not close today or over this
weekend, . . . the effect on the broker-dealers business and on Lehman Holdings would be
devastating[.]" Id. at 93:3-4; 102:6-9. Through the proffer, McDade also testified that Lehman
faced significant regulatory pressure to finalize the Sale that day in order to preserve the
business, that the broker-dealer customers were threatening to take their business elsewhere in
panic, that vendors were threatening to stop providing services needed for day-to-day operations,
and that employees were literally walking out the door. Id. at 93:20-94:4, 95:7-18. Attorneys for
Appellants, as well as for other parties, then cross-examined Mr. McDade on a variety of issues,
including his understanding of specific provisions of the APA. See id. at 103-131, 136-138.

The Debtors also proffered the testimony of Barry W. Ridings, the head of the
capital markets group at Lazard, who had been retained by the Debtors to offer banking and
financial advice regarding a potential sale. Id. at 142:4-7. Mr. Ridings reiterated that nothing
would be left of Lehman if the Sale were not approved expeditiously. See id. at 143:17-19. Mr.
Ridings explained that all parties involved had been "work[ing] around the clock" to work out
the details of the Sale because "time was of the essence," and that no other party had shown

---

[15]    The direct testimony was read into the record through a proffer by Debtors' counsel at the Sale
Hearing, while any party wishing to do so cross-examined the witnesses live. Sale Hrg. Tr. 91:10-
131:11; 136:12-138:21; 140:13-155:8.

11

interest in purchasing Lehman. Id. at 144:6-9; 144:18-24. Mr. Ridings' testimony was also subject to cross-examination. See id. at 147-155.[16]

In approving the sale transaction, Judge Peck specifically addressed due process considerations in light of the expedited sale process, noting that due process has been "pursued in good faith by all parties[.]" See Sale Hrg. Tr. at 247:14-248:7. Judge Peck recognized that shortening the notice period from 20 days to two days between the Sale Procedures Hearing and the Sale Hearing was "unheard of but imperative" given the wasting nature of Lehman's assets, see id. at 250:10-12, and concluded emphatically that to delay approval of the Sale in search for an alternative "would be reckless." Id. at 249:18. The order approving the Sale similarly found that adequate and sufficient notice was given to interested parties "in light of the exigent circumstances . . . and the wasting nature of [the Debtors'] assets." Order Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, B. Dkt. No. 258, (the "Sale Order") at ¶ C.

### Evidence Barclays Is A Good Faith Purchaser Under Section 363 Of The Bankruptcy Code

At the Sale Hearing, the Debtors' witnesses and counsel also explained the history of the sale process and course of negotiations leading up to the proposed Sale. Prior to the bankruptcy, Lehman had looked for a buyer for several months without success. See Sale Hrg.

---

[16]    In addition to the regulatory agencies that appeared before the court at the Sale Procedures Hearing, SIPC, through its lawyer, urged the court to approve the sale in a swift manner, stating that the sale needed to close "[a]s soon as possible" in order to provide security to the Debtors' customers and to "provide[] comfort to the markets." Id. at 73:14-74:1. Moreover, the Official Creditors' Committee appointed in the Lehman bankruptcy cases did not object to the speed in which the transaction was approved given the "extraordinary circumstances" presented. Id. at 68:3-5. Judge Peck noted that objectors had "offered no affirmative evidence" to contradict the evidence that the markets would suffer "devastating damage" if the transaction were not approved quickly. Id. at 170:15-171:11.

Tr. at 100:8-17. Mr. McDade explained that negotiations for the sale of most of the Debtors' assets in which the Federal Reserve Bank of New York and several other regulatory bodies participated began on the weekend prior to the Sale Hearing (i.e., September 13 and 14), and that they involved only two interested parties, Bank of America and Barclays. See Sale Hrg. Tr. at 97:3-98:9, 119:4-6, 123:11-20. Importantly, it became clear that few parties had expressed interest in purchasing the Debtors' assets; as counsel for the Federal Reserve of New York pointed out, "[t]he number [of possible bidders] that met the requirements in terms of financial capability and regulatory qualifications . . . [was] one or two." Sale Proc. Hrg. Tr. at 65:1-65:4.[17] The initial pre-bankruptcy negotiations with Barclays failed, but on Monday, September 15, following LBHI's bankruptcy filing, Barclays and the Debtors began a second round of negotiations, which led to the proposed APA. Sale Hrg. Tr. at 119:4-6. The Bankruptcy Court, relying on this evidence, concluded it was "satisfied . . . that there is effectively one logical purchaser for these assets," Sale Proc. Hrg. Tr. at 73:22-23, and that holding off the Sale in hopes that a higher bidder would show up was "speculation." Sale Hrg. Tr. at 228:7.

The terms of the proposed APA were "negotiated . . . at arm's length and in good faith," with "[e]ach party represented by sophisticated counsel." Sale Motion ¶ 39. The Debtors proffered Mr. McDade's testimony that he had been involved in all of the negotiations leading to the APA, see Sale Hrg. Tr. at 98:14-16, and that those negotiations had been "at arm's length, objective, aggressively pursued by Barclays and difficult[.]" Id. at 96:7-9. They further proffered the testimony of Mr. Ridings, who was intimately involved in all stages of the negotiations that led to the proposed APA, and described the "negotiations [as] at arm's length, difficult and aggressively negotiated, [and] that the asset purchase agreement is the result of

---

[17]    Counsel for the Official Creditors' Committee also acknowledged a "lack of a viable alternative" to the Sale. Sale Hrg. Tr. at 67:13-14.

13

good faith negotiations." Id. at 144:3-5. In addition, Mr. Ridings noted that Barclays was "the
highest and best offer for [the Debtors'] assets," id. at 145:25, and that the transaction "serve[d]
the best interest of the creditors, the public and the nation and that it was negotiated in good faith
and at arm's length by both parties." Id. at 147:3-5.[18]

        In overruling objections to the sufficiency of a good faith showing, Judge Peck
noted that he had "heard ample evidence . . . that would support good faith findings," that "[t]his
was an arm's length transaction, negotiated aggressively," and that "everything . . . was
indicative of arm's length, good faith, aggressive negotiations." Id. at 215:21-216:4. At no time
did Appellants or any other creditors seek to cross-examine the Debtors' witnesses on the
reasons Barclays did not consummate a transaction outside of bankruptcy.

        The Bankruptcy Court also heard throughout the proceedings virtually
uncontroverted representations about the importance of the Sale to the Debtors, their creditors
and to global financial markets generally. Specifically, the Debtors' counsel represented that the
transaction "would protect the public interest, stabilize the public markets and offer some
assurance to employees," Sale Proc. Hrg. Tr. at 18:21-22, and that not approving the Sale would
result in market turmoil, thousands of transactions being suspended, volatility and distress
resulting from liquidation of the Debtors' collateral positions, unemployment for thousands in
the New York City metropolitan area, and financial losses by ordinary people with Lehman
accounts. See Sale Hrg. Tr. at 60-61.[19] Mr. McDade noted that if the transaction were not

---

[18]     The Debtors' counsel exemplified the arm's length nature of the negotiations by detailing how the
         Debtors and Barclays had agreed to split the difference between their two respective appraisals of
         certain real estate. See id. at 138:23-139:12.

[19]     Given these representations, made at the Sale Procedures Hearing, regarding the importance of the
         Sale for global capital markets, Appellants' assertion that the record of that hearing did not support
         that conclusion, see Appellants' Br. at 8, or that the urgent need for a sale was the product of the
         Bankruptcy Court's "own view," id. at 9, is patently inaccurate. Moreover, as noted previously,

14

consummated, it would result in the largest failure of a broker-dealer in United States history and
could "ignite a panic in the financial condition" of the country. See id. at 102:25-103:1.  In
addition, Mr. Ridings proffered that if the Sale were not approved, "Lehman would be forced to
sell discreet [sic] assets for a fraction of the value that w[ould] be realized" from the Sale. Id. at
144:22-24. Finally, the Bankruptcy Court heard evidence that Barclays assumed billions in
liabilities and agreed to pay cure amounts on leases and contracts it assumed, that the Debtors
received over $1 billion in cash, that 9,000 jobs were saved for at least 90 days, and that certain
customer accounts were saved from being frozen indefinitely. See id. at 47:5-15; 114:23-25;
239:5-10; 244:11-13. Given this evidence, the Bankruptcy Court found that "the consequences
of not approving a transaction could prove to be truly disastrous" and that "[t]he harm to the
debtor, its estates, the customers, creditors, generally, the national economy and the global
economy could prove to be incalculable." Id. at 250:16-21.[20]

In addition, as noted previously, several regulatory agencies, fiduciaries, and
interested entities urged approval of the Sale. Specifically, the Sale was supported by (1) the
Federal Reserve Bank of New York, which called the Sale necessary to "preserve . . . financial
stability," see Sale Proc. Hrg. Tr. at 65:5-12, (2) the Securities and Exchange Commission, who
"strongly support[ed] this very, very important transaction . . . in the strong interests of the
investing public," see id. at 65:24-66:1, (3) the Securities Investor Protection Corporation, Sale
Hrg. Tr. at 75-79, (4) the Commodity Futures Trading Commission, Sale Proc. Hrg. Tr. at 69:15-

---

see supra at n. 10, the Bankruptcy Court had ample basis to take judicial notice of the turmoil
facing global financial markets due to Lehman's extremis.

[20]   Contrary to Appellants' suggestion, Appellants' Br. at 16, the record contains abundant testimony,
summarized here, regarding the importance of the Sale for the value of the Debtors' assets not just
for global financial markets.

15

22, and (5) the United States Trustee, Sale Proc. Hrg. Tr. at 67:8-22.[21]  The Official Creditors'

Committee also did not object to the Sale. Sale Hrg. Tr. at 67:7-68:7.

Appellants raised an objection regarding the sufficiency of the good faith showing

because of the issue of the so-called "Defalcated Funds," arguing that the lack of investigation

with respect to funds purportedly transferred by LBIE precluded a finding that Barclays was a

good faith purchaser, but offered no evidence to substantiate their allegations. See Sale Hrg. Tr.

at 206:10-25, 209:2-12, 211-218. In addition, Appellants did not serve any discovery requests on

Barclays (or any other party) before September 17 when the Sale Procedures Order was entered,

or September 19, 2008, when the Sale Hearing commenced.

In this regard, the joint administrators appointed for LBIE (the "Joint

Administrators"), Lehman's UK affiliate and principal broker-dealer for its European operations,

filed a response (not an objection) to the Sale Motion and a Declaration of Dan Yoram

Schwarzmann, one of the Joint Administrators, addressing the LBIE funds. See Resp. of the

Joint Administrators, B. Dkt. No. 219, ("Joint Administrators' Resp.") & Decl. of Dan Yoram

Schwarzmann, B. Dkt. No. 223, ("Schwarzmann Decl."). The Schwarzmann Declaration

describes certain intercompany transfers of securities and cash, and notes the Joint

Administrators' prior investigations and its intent to continue to investigate the disposition of

certain funds (i.e., cash, not securities) that purportedly were owed to LBIE. Schwarzmann Decl.

¶¶ 26-27.[22]  Counsel to the Joint Administrators confirmed at the Sale Hearing that because "no

---

[21]  At the Sale Hearing, Judge Peck incorporated into the record the statements made by the regulatory
agencies that spoke at the Sale Procedures Hearing. See Sale Hrg. Tr. at 157:21-25.

[22]  Appellants attempt to confuse this issue by complaining in their brief that the Bankruptcy Court
should not have approved the Sale based on the fact that securities were being transferred to
Barclays which potentially did not belong to LBI, despite the Joint Administrators' statement that
the securities transferred from LBIE to LBI had already been transferred to a Luxembourg broker-
dealer, see Joint Administrators' Resp. ¶¶ 34-36, and thus could not have been in the possession of
LBI. See, e.g., Appellants' Br. at 19 (complaining about the "misappropriation of assets belonging

16

cash was being transferred to the purchaser[,]" the issue of the cash owed to LBIE "[was]

probably not an issue for the purchaser," and that they did not oppose the sale of assets to

Barclays free and clear of all claims and interests.  Sale Hrg. Tr. at 131:12-16, 188:7-189:23;

Joint Administrators' Resp. ¶ 1. The Bankruptcy Court similarly concluded that the allegations

regarding cash of LBIE (whether or not ultimately true) were not relevant to the Barclays Sale,

see Sale Hrg. Tr. at 207:1-15, because, as per the Debtors' representations, LBI had no cash left

as of the day of the Sale Hearing, id. at 110:11-24 (McDade's testimony), and thus no cash was

being transferred to Barclays under the proposed Sale, see id. at 53:21-25, 242:5-16.[23]

Appellants, by contrast, offered no evidence to refute any of these findings, but merely

speculated on the basis of news articles that assets worth up to $8 billion had been transferred

from LBIE to LBI on the weekend preceding the Debtors' bankruptcy filing. See Appellants'

Obj. ¶ 3. Tellingly, Appellants conceded that they did not know whether Barclays would benefit

under the proposed Sale from the transfer of these so-called "Defalcated Funds," see id. ¶ 4, and

never alleged any bad faith by Barclays.  Accordingly, the Bankruptcy Court found that, "as far

as [Appellants'] arguments are concerned and those of others who have talked about the

sweeping of cash out of the European operations on the Friday before the filing here . . . I'm

satisfied that given the fact that Barclays is not taking cash and the only thing that came in to the

debtor from Europe was cash that in practical terms we should be safe." Sale Hrg. Tr. at 252:25-

253:8.

---

to third parties" allegedly involved in the Barclays Sale).  Appellants' bald, unsubstantiated
assertion is directly contradicted by the facts in the record.

[23]    Mr. McDade further testified in his cross-examination that he was aware that LBI has a payable to
LBIE in the amount of approximately $5 billion and that LBIE has a payable to LBHI in the
amount of $8 billion, although he conceded he did not know the source or nature of these payables.
See Sale Hrg. Tr. at 125:6-23.

17

The Sale Order

Satisfied with the record on the importance and value of the Sale to the Debtors, the need for exigency, and Barclays' good faith, the Bankruptcy Court approved the Sale at the conclusion of the Sale Hearing and entered the Sale Order on September 20, 2008. In the Sale Order, the court reiterated its good faith finding noting that the APA "was negotiated, proposed and entered into by the Sellers and the Purchaser without collusion, in good faith and from arm's length bargaining positions[,]" Sale Order ¶ J, that "the Purchaser ha[d] proceeded in good faith in all respects in connection with this proceeding[,]" id. ¶ K, and that "[t]he transactions contemplated by the Purchase Agreement [were] undertaken by Purchaser without collusion and in good faith, as that term is used in Bankruptcy Code section 363(m)." Id. ¶ 18. The Sale Order conveyed the assets to Barclays "free and clear of all Liens, claims . . ., encumbrances, obligations, liabilities, contractual commitments, rights of first refusal or interests of any kind or nature whatsoever," pursuant to section 363(f) of the Bankruptcy Code. Id. ¶¶ N, 4. An order was entered in the LBI SIPA proceeding incorporating the findings and relief granted in the Sale Order. See SIPA Dkt. No. 3.

Appellants filed a notice of appeal on September 21, 2008, B. Dkt. No. 261, and amended it the next day, B. Dkt. No. 262, but did not seek a stay of the Sale Orders. The Sale closed on the morning of September 22.[24] This appeal followed.[25]

---

[24]    See Notice of Filing of Purchase Agreement Approved by Order Under 11. U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (a) the Sale of the Purchased Assets Free and Clear of Liens and Other Interests and (b) Assumption and Assignment of Executory Contracts and Unexpired Leases, B. Dkt. 280, (the "Sale Consummation Notice") at 2.

[25]    On October 1, 2008, Appellants filed a designation of record and statement of issues presented on appeal, B. Dkt. No. 502, SIPA Dkt. No. 45. On October 10, LBHI filed, as amended, its own statement of issues presented on appeal and counter-designation of items to be included in the appeal record, B. Dkt. No. 801, SIPA Dkt. No. 91, and the LBI Trustee filed a statement joining

18

## III.    SUMMARY OF ARGUMENT

The extraordinary circumstances surrounding Debtors' bankruptcy and the subsequent Sale to Barclays required that the court below approve the Sale within the small window of opportunity in order to preserve the value of the wasting assets being sold, Sale Hrg. Tr. at 92:25-94:4, and to cushion the impact of the "largest failure of a broker-dealer in the history of the United States." Id. at 102:20-21. With the strong support of the Debtors, all relevant regulators and agencies, and without objection from the Official Creditors' Committee, the court approved the Sale to the only qualified purchaser willing to buy certain of Lehman's assets – Barclays. By doing so, Debtors recognized substantial value that would have otherwise disappeared and were relieved of billions of dollars in liabilities.

The court below heard and overruled Appellants' arguments raised in this appeal, and amply considered the issue of the so-called "Defalcated Funds" and found it to be irrelevant since no cash – the only asset potentially belonging to LBIE or its customers that had been alleged to be at issue – was being transferred to Barclays as part of the Sale. Despite urging by Appellants to delay approval of the Sale, Judge Peck found that to delay the Sale even by a single day could be "truly disastrous" and to do so would be "reckless." Id. at 250:17-18; 249:18.

Appellants' appeal of the Sale Orders is an attempt to reap the benefits of the Sale, while also attempting to preserve the ability to go after Barclays for claims they (or more properly the LBIE administrators) may have against the Debtors, not Barclays. This Court simply cannot allow this, because it would contravene an important policy of bankruptcy law

LBHI's designation of issues presented on appeal. SIPA Dkt. No. 97. Barclays filed its own statement and counter-designation on October 13. B. Dkt. No. 897, SIPA Dkt. No. 111.

19

favoring the finality of bankruptcy sales through limited appellate review of consummated transactions, and moreover because Appellants' arguments have no merit.

Under section 363(m) of the Bankruptcy Code, the only reviewable issue Appellants have raised in this appeal is whether Barclays was a good faith purchaser. Appellants failed to seek a stay of the Sale Order pending appeal, and as such the Sale was irreversibly consummated nearly three months ago. Appellants failed to meet their burden of demonstrating that Barclays was not a good faith purchaser. As such, Barclays is afforded the protection of section 363(m) of the Bankruptcy Code, and all other issues Appellants raised – including whether the Sale comported with due process requirements and whether the findings below transferring assets to Barclays free and clear of liabilities under section 363(f) were properly supported – are moot.

The Bankruptcy Court properly concluded that Barclays is a good faith purchaser entitled to the protection of section 363(m) since it found as a matter of fact that the Sale was achieved "without collusion, in good faith and from arm's length bargaining positions." Sale Order ¶ J. This Court may only reverse these findings of fact if the Bankruptcy Court committed clear error, which it did not. Appellants' arguments challenging the sufficiency of evidence supporting the good faith finding that raise questions about the Defalcated Funds, and Barclays' reasons for not entering into a sale agreement with Lehman prior to its bankruptcy are simply unsubstantiated speculation dismissed by the court below. While there is no evidence in the record to support any theory that Barclays acted in bad faith, there is ample evidence to support the finding that Barclays acted in good faith. Accordingly, this Court should affirm the finding that Barclays is a good faith purchaser and dismiss Appellants' remaining issues as moot.

If the Court were to reach the merits of Appellants' due process argument – which it should not since the argument is moot – the Court should conclude that the Sale comported with the Due Process clause of the Fifth Amendment in all respects. Appellants were provided notice "reasonably calculated under all the circumstances" to apprise them of the terms of the proposed Sale; in fact Appellants attended information sessions regarding the Sale, and raised their objections and obtained clarification at the Sale Hearing, including through the cross-examination a witness. The court below was justified in expediting the Sale, as it was permitted to do under the Bankruptcy Code and Rules without violating due process, because any delay would have caused a serious demise, if not elimination, of the value of the Debtors' assets. Appellants have failed to provide any legal support – because there is none – for their argument that they were entitled to a delay in order to satisfy due process requirements. Indeed, while arguing about discovery, Appellants did not serve any discovery on Barclays or other parties prior to the Sale Hearing.

Finally, the Sale Order authorized transfer of the Debtors' assets to Barclays free and clear of all liabilities pursuant to section 363(f) of the Bankruptcy Code. The Bankruptcy Court's ability to make such a transfer promoted the interest of the Debtors' estates as well as creditors of those estates (such as Appellants) in obtaining the highest value for its assets. As part of the protections afforded by section 363(m) of the Bankruptcy Code, which Barclays is entitled to as a good faith purchaser, challenges to the validity of the free and clear transfer are moot and the relief granted below cannot be reversed on appeal.

## IV.    ARGUMENT

### A.    This Appeal Is Moot As Barclays Is A Purchaser In Good Faith, And The Sale Has Been Irreversibly Consummated

#### 1.    Section 363(m) Of The Bankruptcy Code Moots All Issues Other Than The Question Of Whether Barclays Is A Good Faith Purchaser

Appellants did not seek a stay in connection with this appeal, and the Sale closed

on September 22, 2008. As a result, this Court's review of the relief granted under the Sale

Orders is limited to reviewing for clear error the Bankruptcy Court's finding that Barclays is a

good faith purchaser. Gucci I, 105 F.3d at 838 ("[Courts] have no jurisdiction to review an

unstayed sale order once the sale occurs, except on the limited issue of whether the sale was

made to a good faith purchaser."). Therefore, no other issues raised by Appellants should be

reviewed on this appeal, de novo or otherwise, as section 363(m) of the Bankruptcy Code

renders them moot.

Finality in bankruptcy sales is a paramount principle, which is embodied by

section 363(m) of the Bankruptcy Code.

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m) (emphasis added). This principle "reflects the salutary policy of affording

finality to judgments approving sales in bankruptcy by protecting good faith purchasers, the

innocent third parties who rely on the finality of bankruptcy judgments in making their offers

and bids." In re Colarusso, 382 F.3d 51, 62 (1st Cir. 2004) (citation omitted). The certainty and

finality provided by section 363(m) is intended to "maximize[] the purchase price of assets" and

remove a chilling on the bids of potentially interested parties because "without th[e] assurance of

22

finality, purchasers could demand a large discount for investing in a property that is laden with
the risk of endless litigation as to who has rights to estate property." Gucci II, 126 F.3d at 387
(appellate review of unstayed sale orders is limited in order to promote maximization of the
value of assets sold in bankruptcy). See also United States v. Salerno, 932 F.2d 117, 123 (2d Cir.
1991) (noting that purchasers are likely to make discounted purchase offers to the detriment of
the bankruptcy estate if the risk exists that litigation could result in losing the purchased assets
and any investments made since the sale). Section 363(m) thus protects good faith purchasers
like Barclays from challenges like this one.

        Appellants did not seek a stay of the Sale Order pending this appeal, even though
they had opportunity to do so since they attended the Sale Hearing and filed their notice of
appeal prior to the consummation of the Sale. See Appellants' Notice of Appeal, B. Dkt. No.
262; Sale Consummation Notice, at 2. The proposed and final Sale Order lifted any automatic
stay that might apply stating that "time was of the essence," and further advised that any party
wishing to appeal should diligently pursue a stay or "risk its appeal being foreclosed as moot."
Sale Motion Ex. 3 (proposed order) ¶ 28; Sale Order ¶ 29. No party raised with the Bankruptcy
Court, at the Sale Hearing or otherwise, that it should grant a stay of its Sale Order. As such, the
only issue that this Court may consider on appeal is whether the Bankruptcy Court committed
clear error in finding that Barclays was a good faith purchaser (which as discussed below it did
not). See In re Coated Sales, Inc., No. 89 Civ. 3704 (KMW), 1990 WL 212899, *2 (S.D.N.Y.
Dec. 13, 1990) (dismissing appeal challenging sufficiency of notice of sale and evidentiary basis
for bankruptcy court findings as moot where good faith purchaser finding was not clearly
erroneous). Appellants' remaining arguments – including their due process arguments and
challenge to sufficiency of the Bankruptcy Court's findings supporting its approval of the Sale

free and clear of claims under section 363(f) – which attempt to circumvent the protections

afforded under section 363(m), are thereby moot and should be dismissed.[26]

## 2.    The Evidentiary Record Amply Supports The Finding
## That Barclays Is A Good Faith Purchaser

      Appellants do not dispute that absent a showing of "fraud, collusion between the

purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other

bidders," as a matter of law, this Court is compelled to uphold the finding that Barclays, as

purchaser, acted in good faith. See Appellants' Br. at 22 (citing Gucci II, 126 F.3d at 390); see

also Coated Sales, 1990 WL 212899, at *2 (appellants have the burden to demonstrate conduct

that constitutes bad faith). The Bankruptcy Court heard ample and unchallenged evidence that

supports its finding that the APA "was negotiated, proposed and entered into by the Sellers and

the Purchaser without collusion, in good faith and from arm's-length bargaining positions." Sale

---

[26]    The doctrine of equitable mootness (generally applied in other contexts given section 363(m)) also
would dictate dismissal of this appeal. A bankruptcy appeal may be dismissed as equitably moot
when "though effective relief could conceivably be fashioned, implementation of that relief would
be inequitable.'" In re Metromedia Fiber Network, Inc., 416 F.3d 136, 143 (2d Cir. 2005) (citing
In re Chateaugay Corp., 988 F.2d 322, 325 (2d Cir. 1993)). The Second Circuit has recognized that
"bankruptcy appeals may be equitably moot in two situations: when an unstayed order has resulted
in a 'comprehensive change in circumstances,' and when a reorganization is 'substantially
consummated.'" In re Delta Air Lines, Inc., 374 B.R. 516, 522 (S.D.N.Y. 2007) (internal citations
omitted); In re Chateaugay Corp., 10 F.3d 944, 952 (2d Cir. 1993) (hereinafter "Chateaugay II").
Courts also consider whether "the relief requested would affect . . . the rights of parties not before
the court." In re Am. HomePatient, Inc., 420 F.3d 559, 563 (6th Cir. 2005). Here, all of these
considerations weigh in favor of dismissing the appeal since the closing of the Sale has resulted in
a comprehensive change in circumstances for the Debtors, Barclays and the Debtors' creditors, as
well as third parties in the financial markets not before the Court. Undoing the sale would "unravel
intricate transactions so as to 'knock the props out from under the authorization of every
transaction that has taken place' and 'create an unmanageable, uncontrollable situation for the
Bankruptcy Court.'" Chateaugay II, 10 F.3d at 953 (internal citation omitted).

    Moreover, while in some circumstances an appeal may not be per se equitably moot if an appellant
fails to seek a stay, see id., courts will favor dismissing an appeal as equitably moot where an
appellant does not either seek a stay or an expedited appeal. See, e.g., In re Metromedia, 416 F.3d
at 144-45; see also In re Karta Corp., 342 B.R. 45, 53 (S.D.N.Y. 2006). In this case, the Sale Order
instructed interested parties to diligently pursue a stay, see Sale Order ¶ 29, and although
Appellants filed a notice of appeal before consummation of the Sale, see B. Dkt. No. 261, they did
not seek a stay with the Bankruptcy Court or this Court, nor did they seek an expedited appeal.

Order ¶ J (emphasis added). See also id. ¶ K ("[t]he Purchaser has proceeded in good faith in all

respects in connection with this proceeding"); id. ¶ 18 ("[t]he transactions contemplated by the

Purchase Agreement are undertaken by Purchaser without collusion and in good faith, as that

term is used in Bankruptcy Code section 363(m)"); Sale Procedures Order ¶ G (finding that the

Break-Up Fee and Expense Reimbursement was "negotiated by the parties and their respective

advisors at arms' length and in good faith"); Sale Hrg. Tr. at 215:23-216:4 (Judge Peck stating

that "[t]his was an arm's length transaction, negotiated aggressively . . . in terms of good faith,

everything that I heard was indicative of arm's length, good faith, aggressive negotiations.").

            Appellants do not present any evidence that these findings of fact are clearly

erroneous – which they must to upset the Bankruptcy Court's conclusion that Barclays is a "good

faith [p]urchaser . . . entitled to all of the benefits and protections afforded by Bankruptcy Code

section 363(m)." Sale Order ¶ 18. See, e.g., Gucci II, 126 F.3d at 390 (findings of fact in good-

faith purchaser determination can only be set aside if lower court committed "clear error"); see

also In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y 1988) ("Bankruptcy Court's findings of

fact are reviewed with extreme deference on appeal"); United States v. U. S. Gypsum Co., 333

U.S. 364, 395 (1948) (requiring appellate court to form a "definite and firm conviction that a

mistake has been committed" to reverse a lower court's findings). Instead of pointing to

evidence that contradicts the good faith findings, Appellants argue that the Bankruptcy Court (1)

was required to consider why the negotiations between the Debtors and Barclays prior to the

bankruptcy filing did not result in an agreement, and (2) lacked the evidentiary basis to conclude

that "Barclays purchased the assets without knowledge that some or all of the Defalcated Funds

were being conveyed to them or had been used to prop up LBI in contemplation of its Sale."

Appellants' Br. at 23. These arguments have no merit.

First, there is nothing in the record suggesting any bad faith by Barclays that resulted in the pre-bankruptcy negotiations being unsuccessful. Two Lehman representatives involved in the negotiations testified that the negotiations took place in two phases, Sale Hrg. Tr. at 97:3-98:9; 147:22-148:3, and both witnesses testified that the negotiations were conducted in good faith. Id. at 96:6-9; 144:2-5; 147:1-5. Although counsel for Appellants had the opportunity to cross-examine these witnesses, and in fact cross-examined Mr. McDade, they did not adduce any evidence, or even attempt to explore their baseless conjecture as to whether the negotiations fell apart for any reason related to their speculations as to possible bad faith by Barclays. Id. at 121:23-128:4. Speculation cannot be the basis for an appellate challenge. In re Lionel Corp., 722 F.2d 1063, 1071-72 (2d Cir. 1983) (burden is on the objector to produce some evidence respecting its objections). Appellants cite no law that shifts to proponents of good faith the burden to disprove unsubstantiated speculation.

Second, the Bankruptcy Court amply considered the issue of the alleged LBIE Funds, and properly determined that even if such transfers were proven to have occurred, (which they were not at the Sale Hearing), the issue has no bearing on whether Barclays is a good faith purchaser. The court heard Appellants' objections and took evidence on the subject (and in fact overruled the Debtors' objection to its relevancy). See Sale Hrg. Tr. at 129:10-130:9 (allowing counsel for the Joint Administrators to cross-examine on the topic of payables due between LBI and LBIE given the "number of objections that have raised questions" concerning the $8 billion dollars allegedly due to LBIE). The evidence and arguments before the Bankruptcy Court provided it with ample basis to conclude Barclays was entitled to the protections afforded to good faith purchasers under the Bankruptcy Code, including the conveyance of the Debtors' assets free and clear of all claims and interests. The LBIE Joint Administrators – the parties

26

08-13555-mg   Doc 7673-17   Filed 03/18/10   Entered 03/18/10 22:34:09   Exhibit 142
Pg 32 of 45

closest to the relevant facts – did not oppose relief as they were concerned with the disposition of

certain cash and the Debtors proposed to transfer securities and other property, but not their own

cash, to Barclays. Id. at 53:20-25, 188:7-190:8.[27]

On the basis of the record, primarily comprised of conjecture and unsupported

allegations by Appellants, the court overruled Appellants' objection to the Sale, finding that it

was "satisfied that given the fact that Barclays is not taking cash and the only thing that came in

to the debtor from Europe was cash that in practical terms we should be safe."[28] Sale Hrg. Tr. at

253:5-8. See also Sale Consummation Notice Ex. C, Executed Clarification Letter Agreement

¶ 1(c) ("cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries"

excluded from assets being sold). The court also found that Lehman was the sole and lawful

owner of the assets sold to Barclays. Sale Order ¶ N. Appellants' suggestion that the

Bankruptcy Court also should have investigated the securities transferred to Barclays is contrary

to the concerns raised at the Sale Hearing by the LBIE Joint Administrators.[29]

---

[27] In fact, the Joint Administrators expressed their support for the sale. Sale Hrg. Tr. at 131:12-
132:18; Joint Administrators' Resp. ¶ 1.

[28] Appellants state in their brief that what was swept from LBIE to LBI was both cash and securities,
see Appellants' Br. at 18-19. The record on this point demonstrates that the customer securities
swept to LBI from LBIE were transferred to another prime broker before the Petition Date, and at
best LBI owes cash to LBIE, not securities. The record, therefore, contains no support for any
speculation that securities transferred to Barclays were either legal or equitable property of LBIE or
LBIE's customers. Schwarzmann Decl. ¶ 26; see also Sale Hrg. Tr. at 124:16-20; 126:13-18 (LBIE
has a payable to LBHI in the amount of $8 billion and LBI has a payable to LBIE in the amount of
$5 billion). LBI had negligible cash left at the Petition Date, and by the date of the Sale Hearing,
any remaining cash had been used to liquidate the trades with the Chicago Mercantile Exchange
and other clearing banks. Id. at 110:11-24. Thus, Appellants' argument that assets sold to
Barclays were subject to a constructive trust, see Appellants' Br. at 29 n.4, fails since as a threshold
matter, Appellants had no legal or equitable interest in assets sold to Barclays. Neither case cited
by Appellants suggests a contrary result.

[29] Despite having investigated and raising the issue of the transfer of funds and securities through the
Lehman entities, the Joint Administrators did not raise any concerns that Barclays was involved at
all, let alone in bad faith, in these transfers. Schwarzmann Decl. ¶¶ 8, 25-27.

Thus, Appellants' argument that Barclays had notice of an adverse claim fails since Barclays and the Bankruptcy Court had substantial reasons based on the evidence presented, to conclude that the assets being sold belonged to the Debtors. See e.g., Gucci II, 126 F.3d at 392-93 (holding that purchaser did not act in bad faith by purportedly buying more than the estate owned where purchaser had a "colorable claim" that assets belonged to the estate). Indeed, the only allegations related to cash, and the deal, as described at the Sale Hearing, would not result in cash being transferred to Barclays. See Sale Hrg. Tr. at 53:20-25. A claim of ownership made before the Bankruptcy Court as part of an objection to a sale is not notice of an adverse claim that would negate good faith purchaser status. Schupak v. Dutch Inn of Orlando, Ltd. (In re Dutch Inn of Orlando, Ltd.), 614 F.2d 504, 506 (5th Cir. 1980) (rejecting argument that purchaser acted in bad faith and dismissing appeal where Bankruptcy Court overruled objection at sale hearing that, pursuant to a sale agreement, third party was entitled to the subject property); In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1199 (7th Cir. 1978) (holding that notice of an adverse claim is "something more than knowledge of another party's objections to the bankruptcy sale procedures" or the "grounds for the appeal") (citations omitted).[30] Further, whatever "notice" Barclays had of any issues regarding LBIE cash was fully known to the Bankruptcy Court and the court still found Barclays to be a good faith purchaser. See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269,

---

[30]    Taking Appellants' argument to its logical conclusion would mean that a purchaser who takes assets free and clear of liens authorized by section 363(f) of the Bankruptcy Code can never be a good faith purchaser, since the purchaser would necessarily have had notice of an "adverse claim" against the property which was extinguished by the sale. This would be a nonsensical result and eviscerate the protections for purchasers under the Bankruptcy Code.

277 (2d Cir. 1997) (disclosure to the bankruptcy court of facts that might otherwise question good faith should "weigh heavily" in the court's decision on good faith finding).[31]

Aside from their unsubstantiated speculations, Appellants have pointed to no evidence – because there is none – that contradicts the Bankruptcy Court's finding that Barclays is a good faith purchaser, which is fatal to their attempt to reverse the court's findings. See, e.g., id. at 277-78 (affirming sale order where appellant failed to demonstrate that the bankruptcy court erred in finding good faith purchaser); Sasson Jeans, 90 B.R. at 610 ("heavy" burden on the appellant to show that good faith findings are clearly erroneous). To the contrary, there is ample evidence in the record to support the good faith findings, and the Bankruptcy Court "totally disagree[d]" when Appellants argued that there was insufficient evidence to support a good faith finding. Sale Hrg. Tr. at 215:16-23 (Bankruptcy Court: "I try to listen with great care to the evidence that's being put into the record to support findings, and I heard ample evidence both in the McDade and in the Ridings proffer that would support good faith findings here."). While Appellants suggest the Bankruptcy Court should have deferred making a good faith finding, their own cited case recognizes that while a bankruptcy court may defer its good faith findings, "[a] bankruptcy court that does have a proper evidentiary basis for a finding of 'good faith' is, of course, entitled to do so as part of the sale process." Thomas v. Namba (In re Thomas), 287 B.R. 782, 785 (B.A.P. 9th Cir. 2002) (remanding for a good faith finding where none had been made by the Bankruptcy Court).

The evidentiary record the court relied on included the proffered direct and live cross-examination testimony of two witnesses who were present during the negotiations. See

---

[31]   Neither case cited by Appellants for the proposition that notice of an adverse claim negates good faith discusses or turns on the fact of notice of an adverse claim. Appellants' Br. at 22 (citing Gucci II, 126 F.3d at 390; In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 8 (1st Cir. 1993)). In both cases, an appeal of a sale to a good faith purchaser was unsuccessful.

Sale Hrg. Tr. at 96:7-8 (Mr. McDade would testify that "negotiations leading up to the Barclays'

transaction have been at arm's length, objective, aggressively pursued by Barclays . . ."); id. at

147:2-5 (Mr. Ridings would testify "this sale transaction should be approved because it serves

the best interests of the creditors, the public and the nation and that it was negotiated in good

faith and at arm's length by both parties."). The court also witnessed a "concrete example" of

the good faith negotiation when Barclays and the Debtors agreed during the Sale Hearing to split

the difference between different real estate appraisal values. Id. at 138:23-140:6; 216:4-7. See

also Sale Motion ¶ 39 (representing that agreement was negotiated at arm's length and in good

faith by parties represented by sophisticated counsel). Contrary to Appellants' bald assertion, the

court had more than "speculation to go on." Appellants' Br. at 24. Indeed, the parties relying on

speculation are Appellants, not the Bankruptcy Court. The burden to present evidence of good

faith was indeed met.[32] Given all the evidence supporting the good faith finding and the absence

of any disputing it, there is simply no basis for this Court to conclude that this finding was

clearly erroneous. As such, Appellants' remaining arguments are moot.

---

[32]  Appellants argue that Barclays did not present evidence of its conduct during negotiations since it
did not offer its own witnesses, and thus failed to meet its burden of proof as the "proponent of
good faith." Appellants' Br. at 24-25 (citing 3 COLLIER ON BANKRUPTCY ¶ 363.11 (15th Ed. Rev.
2008) and T.C. Investors v. Joseph (In re M Capital Corp.), 290 B.R. 743 (B.A.P. 9th Cir. 2003)).
The authorities relied on by Appellants (neither of which are binding on this Court) do not stand for
the proposition that witnesses who testify as to the purchaser's good faith must be representatives
of the purchaser. Rather, they held that a good faith finding cannot be assumed where – unlike
here – there is no evidence in the record as to the purchaser's conduct. Moreover, the Debtors, who
presented witnesses, were the "proponent of good faith" here since their Sale Motion requested that
the Court make a good faith finding. Sale Motion ¶ 39. Appellants offer no argument as to why
the objective testimony of McDade and Ridings at the Sale Hearing – the credibility of which went
unchallenged – is somehow inferior to the would be testimony of a representative of Barclays.
Moreover, Appellants never raised this issue below.

**B.**     **Even If Appellants' Further Issues On Appeal Were Not Moot,
          They Would Lack Merit**

   **1.**     **The Bankruptcy Court Correctly Concluded That Creditors Were
            Afforded Adequate Procedural Due Process Under The
            Circumstances In Connection With The Sale**

Appellants' argument that the Bankruptcy Court could not have concluded that

Barclays was a good faith purchaser because Appellants "were not afforded due process to

conduct discovery into the background of the Barclays Sale," see Appellants' Br. at 26, is both

baseless and moot. As discussed above, since Barclays is a good faith purchaser under section

363(m), Appellants' due process arguments are moot and the Court should not consider them.

See, e.g., Edwards v. Golden Guernsey Dairy Co-Op, 962 F.2d 641, 645 (7th Cir. 1992)

(mooting under 363(m) a due process-based appeal of a sale order, holding that "issue [of] what

happens [on appeal] when the . . . debtor in possession fails to make the required notice . . . is

controlled by the policy of finality illustrated by section 363(m) . . ."); Coated Sales, 1990 WL

212899, at *2 (dismissing appellate challenge to adequacy of notice and information of a

bankruptcy sale as moot). The due process argument also is unavailing because it implies a right

to an investigation that does not exist under the Due Process Clause of the Fifth Amendment. In

this case procedural due process was satisfied.

As a threshold matter, the parties agree that the Due Process Clause of the Fifth

Amendment requires "notice reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action and afford them an opportunity to present their

objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (emphasis

added and internal citations omitted). Moreover, it is undisputed that these procedural

requirements apply in the context of bankruptcy proceedings. See, e.g., In re Medaglia, 52 F.3d

451, 455 (2d Cir. 1995) (applying Mullane in bankruptcy context); see also Appellants' Br. at 25.

31

In this case, however, Appellants have not demonstrated that these standards were not met. As
the Bankruptcy Court found during the Sale Procedures Hearing, procedural due process was
satisfied because the hearing was widely publicized and noticed, and parties in interest were
present and able to present objections. See Sale Proc. Hrg. Tr. at 31:20-32:8. Moreover,
Appellants were undisputedly notified of the time and place of the Sale Hearing, were able to
object to the terms of the proposed Sale in writing as well as orally, see Appellants' Obj.; Sale
Hrg. Tr. at 215:6-15, 204-228, and were allowed to cross-examine the Debtors' witnesses. Id. at
121-128. It is also undisputed that the Debtors made every possible effort to explain the terms of
the proposed Sale to interested parties, as demonstrated by the meeting held at the Debtors'
counsel's offices in New York the day before the Sale Hearing, by the one hour off-the-record
explanation of terms during the Sale Hearing, and by the reading of the main terms of the
proposed Sale on the record at the Sale Hearing itself. Id. at 45:16-19, 54:5-8, 110:4-10, 211:21-
212:3. As counsel for SIPC put it, the Debtors demonstrated "extraordinary cooperation," and
proved to be "always available" for questions by interested parties. Id. at 76:1-5. Thus, the
Bankruptcy Court held that due process was satisfied because adequate notice was given of the
essential sale terms.[33]

The mere fact that only two days elapsed between approval of the Sale Procedures
on September 17 and approval of the Sale itself on September 19 is not sufficient to demonstrate

---

[33]  Because Appellants do not dispute that they had notice of the Sale Hearing, their repeated citations
to decisions reversing discharges of claims following the approval of a bankruptcy reorganization
plan are unhelpful to their due process argument. See Appellants' Br. at 25-26 (citing City of New
York v. N.Y., N.H. & Hartford R.R., 344 U.S. 293, 297 (1953); In re Savage Indus., 43 F.3d 714,
721 (1st Cir. 1994); Reliable Elec. Co. v. Olson Constr. Co., 726 F.2d 620, 623 (10th Cir. 1984); In
re Stilwell, 120 F.2d 194 (2d Cir. 1941); In re Arch Wireless, 332 B.R. 241 (Bankr. D. Mass.
2005)). These cases deal generally with challenges to discharges where the aggrieved party
received no notice of a hearing on the proposed reorganization plan, not, as this case does, with a
situation in which the complaining party was undisputedly given notice of a hearing to approve a
sale under section 363, appeared and offered arguments against the relief granted.

32

that procedural due process was not satisfied in light of the rapid deterioration of the value of the

Debtors' assets during the time and the need to close the Sale quickly. While due process

requires "afford[ing] a reasonable time for those interested to make their appearance," Mullane,

339 U.S. at 314 (internal citation omitted), the question of whether due process is satisfied in an

expedited proceeding must be answered by looking at "the practicalities and peculiarities of the

case." Id. As Appellants recognize, this inquiry depends on the "totality of the circumstances"

presented. Appellants' Br. at 26 (citing Massa v. Addona, 187 F.3d 292, 297 (2d Cir. 1999)).

Courts have interpreted such due process standards flexibly in the bankruptcy context. Bosiger

v. US Airways, 510 F.3d 442, 451 (4th Cir. 2007).

             Under the totality of the circumstances analysis, an expedited sale may be

justified if a delay would cause substantial deterioration of a debtor's assets and/or loss of

employment for the Debtors' workers. For instance in In re Vanguard Oil & Service Co., Inc.,

the District Court affirmed the sale of a debtor's real estate assets over an objection that the

procedures may have violated the Due Process Clause, in part because "[a] delay in accepting

[the purchaser's] offer arguably risked decreasing the value of all the assets involved in the

Debtor's estate." 88 B.R. 576, 580 (E.D.N.Y. 1988); see also Matter of General Insecticide Co.,

Inc., 403 F.2d 629, 630 (2d Cir. 1968) (Bankruptcy Act case holding that the statutory notice

period could be dispensed with entirely when an advantageous sale would be lost and the value

of assets would depreciate substantially if notice were given). Here, the Bankruptcy Court heard

unchallenged evidence from regulatory agencies, the Debtors' Chief Operating Officer and

counsel, and a financial advisor, that if the Sale were not approved expeditiously, the assets

being bought would deteriorate, Lehman would have to sell its assets at a fraction of their value,

it would cause unemployment for about 9,000 people in the New York City metropolitan area,

and a freeze of its customers' assets. See, e.g., Sale Proc. Hrg. Tr. at 31:1-3, 55:17-56:1, 65:5-11, 67:13-22; Sale Hrg. Tr. at 92:25-93:5, 93:13-19, 95:7-12, 144:6-9, 239:1-10; 250:24. These circumstances amply justify an expedited sale process under the Due Process Clause.

Moreover, the challenged procedures at all times complied with Bankruptcy Rules applicable to the timing of a section 363 sale. Specifically, Bankruptcy Rule 2002(a)(2) provides that for a proposed sale under section 363 all creditors are entitled to "at least 20 days' notice by mail," but allows a shorter notice period if "the court for cause shown shortens [it]." Fed. R. Bankr. P. 2002(a); see also Fed. R. Bankr. P. 9006(c)(1) (providing that a "court for cause shown may in its discretion with or without motion or notice order [an applicable time] period reduced").[34] Courts have found good cause to shorten the notice period when the value of the debtor's assets is in peril, when the sale is intended to preserve the value of the debtor's business and jobs for its employees, when a debtor has diligently pursued all alternatives, and when a purchaser wishes to expedite a sale to avoid unnecessary costs or delays.

The decision in In re Haven Eldercare, LLC is illustrative of these principles, where in that case, a health-services provider filed for bankruptcy and operated as a debtor-in-possession while actively seeking a purchaser for substantially all its assets. 390 B.R. 762, 765-66 (Bankr. D. Conn. 2008). After several potential buyers walked away from putative sales, the DIP-financing provider threatened to terminate financing immediately. Id. at 766. Thereafter, the debtor found a new willing buyer amongst its creditors and filed a motion for emergency approval of the proposed sale within two days of that motion; creditors were given notice of this

---

[34]    This is contrasted with certain acts for which Rule 9006 provides that the notice period may not be shortened. See Fed. R. Bankr. P. 9006(c)(2) (providing that reduction of time is not permitted for taking certain actions under the Bankruptcy Rules, such as for filing proofs of claim, the scheduling of a creditors meeting or motions for the extension of credit or use of cash collateral). Thus, the Bankruptcy Rules are explicitly designed to give the Bankruptcy Court discretion to shorten the notice period for hearings on section 363 sale motions.

emergency motion and an opportunity to present their objections at the sale hearing. Id. at 767.
The sale was approved after the expedited hearing and certain creditors appealed, objecting to
the shortening of the 20-day period to two days. Id. at 769. The court found that good cause
existed to shorten the notice period because, based on the evidence offered at the sale hearing,
"[t]he Debtors [were] in financial extremis and [were] facing the inability to operate their
business [within days,] . . . [because] the Debtors [had] been engaged in an active, ongoing sale
process [and because] . . . [t]here [was] no credible evidence to support a claim that additional
notice might materially enhance the outcome for any case constituency." Id. at 769-70. Thus,
the court concluded that, "[i]n light of the continued deterioration of the value of the Debtors
assets, and the track record of marketing to date, there [was] no support for [extending the time
for the sale]." Id. at 770. See also Zinke v. Harbison-Fischer Mfg. Co., 97 B.R. 155, 158
(E.D.N.Y. 1989) (holding that the bankruptcy judge did not abuse his discretion by shortening
the sale notice period of Rule 2002(a) because, "an equally good offer for the [debtor's real
estate] property might not be forthcoming").

        Appellants do not appear to dispute that, guided by this case law, the shortened
period complied with Rule 2002(a)(2), nor could they. Here, the Bankruptcy Court
unquestionably had good cause to shorten the 20-day notice period to two days, given the
undisputed and convincing evidence of (1) the wasting nature of the Debtors' assets, (2) the
desire to consummate a sale to preserve the assets' value and keep people employed, (3) the
support of governmental agencies to consummate the Sale quickly, (4) the Debtors' diligence in
seeking out potential buyers, and (5) the imperative need for a sale to infuse confidence into the
Debtors' business and financial markets generally. See Sale Hrg. Tr. at 250:8-12.[35]

---

[35]    It is also beyond dispute that the Sale complied with all other applicable bankruptcy statutory
        provisions. Bankruptcy Code section 363 requires notice and a hearing before approval of sale not

Unable to argue that the Bankruptcy Court erred in finding there was a need for an expedited sale, Appellants argue unpersuasively that the proceedings should have been delayed for an unspecified and perhaps lengthy period of time, "until some investigation into the Defalcated Funds could be completed." Appellants' Br. at 27. Appellants cite to no case that supports their proposed course of action. On the contrary, given the extremely dire situation faced by Lehman, and the strong evidence regarding the need for an expedited sale, Appellants' argument that due process required the Bankruptcy Court to delay approval of the Sale on speculative allegations ignores the Supreme Court's instruction that "[a] construction of the Due Process Clause which would place impossible or impracticable obstacle in the way could not be justified." Mullane, 339 U.S. at 313-14.[36]

Additionally, Appellants make the novel and perplexing argument that their due process rights were violated because they were not granted some undefined right to discovery, complaining that they were not "afforded [any] opportunity whatsoever to conduct an investigation." Appellants' Br. at 26; see also id. at 27 (arguing that "substantive due process compels that a potentially aggrieved party be provided a meaningful opportunity to discover relevant evidence "). Specifically, Appellants argue that they should have been allowed to investigate the issue of the so-called "Defalcated Funds." Id. at 27. However, Appellants did not

---

in the ordinary course of business. See 11 U.S.C. § 363(b)(2). Nonetheless, section 102(1) and the legislative history thereto contemplate that a hearing may be eliminated all together in cases of an emergency. See 11 U.S.C. § 102(1)(B)(ii); 3 COLLIER BANKRUPTCY CODE (2008 ED.), at 79 (providing that, "[i]n very limited circumstances there will be insufficient time for a hearing to be commenced before an action is taken") (citing 124 Cong. Rec. H 11,090 (Sept. 28, 1978); S 17,407 (Oct. 6, 1978)).

[36]    The only cases cited by Appellants that apply the totality of the circumstances test are inapposite. See Appellants' Br. at 26 (citing In re Massa, 187 F.3d 292, 296 (2d Cir. 1999); In re Dinova, 212 B.R. 437, 443 (B.A.P. 2d Cir. 1997)). These cases deal with circumstances in which the aggrieved party received no notice of the hearing in question; neither case addresses the question of whether the time given between the receipt of the notice and the day the hearing in question was held satisfied the totality of the circumstances test.

serve any discovery on Barclays, or to Barclays' knowledge on any other party, prior to the Sale

Hearing. Appellants' argument conveniently ignores the Bankruptcy Court's finding that

because the proposed Sale did not involve the transfer of cash, the issue of whether cash was

missing was not relevant for purposes of the Sale. See Sale Hrg. Tr. at 207:1-3. Appellants do

not identify any legal authority that interprets the Due Process Clause to guarantee a right to

conduct an investigation related to the transfer of funds not germane to a transaction, in

preparation for a hearing on the terms and fairness of that transaction. Nor do Appellants

recognize that their ability to pursue issues related to those funds throughout the course of the

proceedings, as the Bankruptcy Court acknowledged, see id. at 207:8-10, is sufficient to address

any procedural due process rights they may have with regards to their allegations concerning

LBIE funds.[37]

      In summary, Appellants have provided no legal foundation for the argument that

they were entitled under the Due Process Clause to conduct an investigation into the facts of a

cash transfer before the adjudication of the merits of an unrelated sale. Moreover, because the

shortened sale period was justified under the Due Process Clause as well as applicable

Bankruptcy Rules when viewed in the context of the totality of the circumstances, including the

financial extremis facing the Debtors and the evidenced need for a quick sale, the Bankruptcy

Court's approval of the Sale on an expedited basis is unassailable.

---

[37]   Appellants' use of the words "substantive due process," see, e.g., Appellants' Br. 27, 28, reflects a
misunderstanding of the two distinct components of the Due Process Clause. As one court
explained, "a procedural due process limitation, unlike its substantive counterpart, does not require
that the government refrain from making a substantive choice to infringe upon a person's life,
liberty, or property interest. It simply requires that the government provide 'due process' before
making such a decision . . . . Substantive due process . . . serves the goal of preventing
'governmental power from being used for purposes of oppression,' regardless of the fairness of the
procedures used." Howard v. Grinage, 82 F.3d 1343, 1349 (6th Cir. 1996) (internal citation
omitted). As Appellants appear to concede by their citation to In re Savage Industries, Inc., 43
F.3d 714, 721 (1st Cir. 1994), see Appellants' Br. at 25, their due process claim here is procedural
at best.

### 2.    The Sale Of Assets To Barclays Free And Clear Of Liabilities Cannot Be Reversed Since Barclays Is A Good Faith Purchaser

The Bankruptcy Court, in approving the Sale to Barclays, found that Lehman was the sole and lawful owner of the assets sold to Barclays,[38] and vested Barclays with good title to those assets "free and clear of all Liens, claims . . . (including, without limitation, successor liability claims), encumbrances, obligations, liabilities, contractual commitments, rights of first refusal or interests of any kind or nature whatsoever[.]" Sale Order ¶ N (emphasis added). The Bankruptcy Court found that the assets could be sold free and clear of such interests because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code permitting such a sale had been satisfied. Id. ¶ Q.

A bankruptcy court's power to sell assets free and clear of liabilities further promotes the objective of obtaining the highest and best price for a debtor's assets. EEOC v. Knox-Schillinger (In re Transworld Airlines, Inc.), 322 F.3d 283, 292-93 (3d Cir. 2003) (affirming sale free and clear of claims). As the cases cited by Appellants recognize, creditors' interests are protected in these sales because any claims against the property sold attach to the proceeds. Appellants' Br. at 28-29 (citing In re Lady H. Coal Co., 199 B.R. 595, 605 (S.D.W.Va. 1996); In re Aneco Elec. Constr., Inc., 377 B.R. 338, 342 (Bankr. M.D. Fla. 2006)).[39] Appellants are not entitled at this stage to reap the benefits of the Sale (which they did not attempt to stay and could not practically be unwound) and preserve the right to proceed against Barclays for any claims they (or the LBIE administrators) may have against the Debtors.

---

[38]    The order excluded certain intellectual property rights that may have been owned by entities other than Lehman.

[39]    In both cases cited by Appellants the court held that creditors could not assert claims against the purchaser who took free and clear of claims pursuant to section 363(f) of the Bankruptcy Code, but only against the proceeds of the sale. These cases do not advance Appellants' argument since the issue on appeal is not whether Appellants may have claims against the Debtors.

38

As discussed above, Barclays is a good faith purchaser and the Sale process comported in all respects with due process. As such, "unstayed aspects of the transaction – including the transfer free and clear of the purchased assets – . . . [which] have been effected . . . are moot." In re WestPoint Stevens, Inc., 333 B.R. 30, 40 (S.D.N.Y. 2005) (holding that appellant's challenge to the bankruptcy court's determination that the assets could be sold free and clear, was moot by virtue of consummated sale to good faith purchaser); see also In re Oyster Bay Cove, Ltd., 161 B.R. 338, 342-43 (Bankr. E.D.N.Y 1993) (holding that lienholder, if not properly noticed of sale, only had claim against the estate, not against the innocent purchaser who bought property free and clear of liens). The Perona decision, relied on by Appellants, is inapposite as there the court did not make any finding regarding the purchaser's good faith. In re Perona Bros., Inc., 186 B.R. 833, 836-40 (D.N.J. 1995). In this case, where such findings may have been made and are amply supported by the record, Appellants are foreclosed from challenging the transfer to Barclays free and clear of liabilities.

39

## CONCLUSION

For the foregoing reasons, Barclays respectfully requests that the Court affirm the

Bankruptcy Court's finding that Barclays was a good faith purchaser pursuant to section 363 of

the Bankruptcy Code, and dismiss the remaining issues as moot.

Dated:   New York, New York
      December 12, 2008

                    Respectfully submitted,

                    CLEARY GOTTLIEB STEEN & HAMILTON LLP

                    By:   /s/ Lindsee P. Granfield
                          Lindsee P. Granfield
                          Lisa M. Schweitzer

                    One Liberty Plaza
                    New York, New York 10006
                    (212) 225-2000

                    *Attorneys for Barclays Capital Inc.*