KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Robert M. Schmidt
Elise Scherr Frejka
Lauren M. Macksoud

*Attorneys for CME Group Inc*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                          :
In re                                     :       Chapter 11
                                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :       Case No. 08-13555 (JMP)
                                          :
                        Debtors.          :       (Jointly Administered)
                                          :
------------------------------------------------------------X

### REQUEST OF CME GROUP INC. TO MAINTAIN THE CONFIDENTIALITY OF CERTAIN DOCUMENTS PRODUCED BY CME GROUP INC. TO THE EXAMINER PURSUANT TO CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER

CME Group Inc. ("CME Group") respectfully requests entry of an order maintaining the confidentiality of the identity of bidders revealed in three documents produced by CME Group to Anton R. Valukas, Esq., the examiner (the "Examiner") appointed for Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors") in the above-captioned bankruptcy cases, pursuant to the Confidentiality Stipulation and Protective Order Between the Examiner and CME Group (the "Confidentiality Order"). [Docket No. 6641] CME Group makes this request in response to the Examiner's recently stated intent to disclose the confidential documents and all information contained therein in the Report of Examiner (the "Examiner Report"). In support of this request, CME Group respectfully states as follows:

## Preliminary Statement

CME Group's concern in this matter is maintaining the integrity of the markets for which its subsidiaries, including Chicago Mercantile Exchange, Inc. ("CME"), act as self-regulatory organizations ("SROs"). To accomplish this, CME Group requests that three documents produced to the Examiner, and designated as confidential pursuant to the Confidentiality Order, not be made public. Those three documents reveal detailed bid information, including bidder names, from an auction for exchange-traded futures and options contracts in LBI's house (or proprietary) accounts, conducted by CME in its capacity as an SRO and pursuant to its emergency powers. CME Group has asked the Examiner to redact bidder names from the confidential documents, but the Examiner has refused. Complying with this request would not thwart the intent and purpose of the Examiner Report, as no compelling need to reveal bidder names has been identified. Indeed, the Examiner has concluded that no "colorable claims" exist against CME or the winning bidders (much less those firms whose bids were rejected). See Examiner Report at 1842. Moreover, revelation of such non-public, confidential transactional information would be contrary to applicable law and fundamental precepts of the U.S. futures markets.

## Background

### A.    The CME Group Exchanges and CME Clearing

1.    CME Group operates four exchanges: (1) CME, (2) The Board of Trade of the City of Chicago, Inc. ("CBOT"), (3) New York Mercantile Exchange, Inc. ("NYMEX"), and (4) Commodity Exchange, Inc. ("COMEX," and together with CME, CBOT, and NYMEX, the "CME Group Exchanges"). Each of the CME Group Exchanges is registered with the U.S. Commodity Futures Trading Commission ("CFTC") as a designated contract market ("DCM").

2

In addition, CME is registered with the CFTC as a derivatives clearing organization ("DCO").

2.      The CME Group Exchanges offer a wide range of benchmark products available across all major asset classes, including futures and options on futures based on interest rates, equity indexes, foreign exchange, energy, metals, agricultural commodities, and alternative investment products. The CME Group Exchanges serve the hedging, risk management, and trading needs of their global customer base by facilitating transactions through the CME Globex electronic trading platform, open outcry trading facilities in New York and Chicago, as well as through privately negotiated transactions.

3.      CME Clearing (which is a division of CME) acts as the central counterparty for all contracts listed by the CME Group Exchanges – i.e., in the clearing process, through a process of novation, CME guarantees the creditworthiness of the buyer to each seller of a futures contract and the seller to each buyer. CME Clearing handles more than 90 percent of all futures and options on futures contracts traded in the United States, holds in excess of $90 billion in collateral on deposit to support open positions of clearing members and their customers, and routinely moves billions of dollars per day among market participants.

4.      The CME Group Exchanges are SROs and are responsible for ensuring the integrity of transactions cleared by CME Clearing. In this Congressionally mandated role, the CME Group Exchanges' goals are to operate fair markets that foster price discovery and the hedging of economic risks in an efficient, self-regulated environment, under the regulatory oversight of the CFTC and subject to the Commodity Exchange Act, 7 U.S.C. § 1, et seq. ("CEA"), and CFTC regulations promulgated thereunder. In addition, as SROs, the CME Group Exchanges maintain rule books which have been harmonized, to the extent possible, to provide a common regulatory framework for market users.

**B.    Auction Of Open Positions in LBI's House Accounts**

5.     On September 15, 2008, as a result of issues regarding the financial condition of

LBI and its parent company (Lehman Brothers Holdings, Inc.), CME Group's Chief Executive

Officer, President, Chairman of the Board, Chairman of the Clearing House Risk Committee,

and President of the Clearing House, under the authority of CME Rule 975 and NYMEX Rule

9.06A, unanimously agreed that LBI would be directed to liquidate the open positions in its

house accounts (i.e., accounts belonging to LBI or its affiliates).  LBI, however, failed to

substantially reduce (and, in some cases, increased) its positions and failed to advise CME

Clearing of an affirmative liquidation plan.[1]

6.     Therefore, in accordance with its rules, CME took emergency action to ensure the

orderly functioning of the markets and conducted an auction to secure bids for the purchase of

some or all of the open positions in LBI's house accounts.[2]  CME conducted the auction on an

expedited basis, and portions of the open positions in LBI's house accounts were sold and

transferred to three separate bidders on September 18, 2008.  CME was in contact with CFTC

staff throughout the week of September 15, 2008 and sent written notice to the CFTC of this

emergency action on September 25, 2008.[3]

---

[1]    LBI did arrange the sale of certain energy contracts in its house accounts to another firm, but it did not find a buyer for the remaining positions in its house accounts.

[2]    Where it could be done without having a negative effect on the markets, CME liquidated portions of the open positions in LBI's house accounts through open outcry and/or Globex.  However, as noted in the Examiner Report, "CME believed it would not be prudent to conduct an open market liquidation of LBI's positions because of the size and complexity of the positions, as well as the credit and execution risk that would be associated with such a large open market liquidation." Examiner Report at 1845.

[3]    The Examiner's Report recognizes that the CME's decision to order liquidation of LBI's position was taken "in its regulatory, not private, capacity." Examiner Report at 1868.  The CME acted under express authority granted by the CEA to "promulgate rules for the emergency liquidation of open positions in the market, which rules the CME implemented when ordering the liquidation of LBI's positions." Id. at 1869.  "The point" of CME's actions was to "wind down LBI's positions . . . without substantially disrupting the market." Id.

4

7.    CME did not reveal to third parties, including those who were asked to participate in the auction of LBI's house portfolio: (a) the identities of the other bidders, (b) the number of bidders asked to participate in the auction, (c) the nature of the bids submitted (e.g., whether the bids were for all of the open positions or certain buckets thereof), or (d) the identity of the winning bidders. Such confidentiality was essential to ensure that the auction accomplished CME's objectives to fairly and swiftly take action to prevent disruption to the market and protect all other market participants, the clearing members of the CME Group Exchanges, and CME Clearing.

## C.    Production Of Documents To The Examiner

8.    Commencing on September 15, 2008, the Debtors commenced voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

9.    On January 16, 2009, the Bankruptcy Court entered an Order Directing the Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code (the "Examiner Order"), and the Examiner Order, inter alia, ordered (i) the United States Trustee for the Southern District of New York (the "U.S. Trustee") to appoint an examiner (the "Examiner"), and (ii) the Examiner to conduct an investigation into certain specified matters and to perform certain duties set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code (collectively, the "Examiner Investigation").

10.    On January 19, 2009, pursuant to the Examiner Order, the U.S. Trustee appointed Anton R. Valukas as Examiner and the Bankruptcy Court approved the appointment by Order dated January 20, 2009.

11.    In late 2009, the Examiner requested that CME Group (on behalf of the CME

5

Group Exchanges) produce certain documents relating to LBI and CME Clearing's auction of the open positions in LBI's house accounts.

12.     The Examiner and CME Group entered in a Confidentiality Stipulation and Protective Order which was approved by the Bankruptcy Court on January 13, 2010 [Docket No.: 6641].

13.     CME Group produced, in good faith, several hundred pages of responsive materials to the Examiner. In making this production, CME Group relief upon the terms of the Confidentiality Order and marked several documents – including the three documents now at issue – as confidential.

14.     On February 8, 2010, the Examiner filed the Examiner Report under seal pending resolution of confidentiality issues with CME Group and numerous other parties. [Docket No. 7540] The Examiner notified CME Group that the Examiner wanted to use in the Examiner Report, and therefore make public, six documents consisting of a total of eight pages (the "Confidential Documents") that CME Group designated as confidential.[4] CME Group objected to the use of four of the Confidential Documents and was able to resolve with the Examiner its objection with respect to one such document (by agreeing to redact certain bank-account information). CME Group offered a compromise position with respect to the remaining three Confidential Documents, which the Examiner rejected.

15.     The Confidential Documents now at issue contain the names of those firms that CME invited to submit bids as part of the auction of the open positions in LBI's house accounts,

---

[4]   The Confidential Documents at issue are CME 4750-51, CME 4767, and CME 8753. CME Group does not object to the removal of the confidential designation from document number CME 7959 or CME 8217. In exchange for the Examiner agreeing to redact certain bank account information, CME Group will consent to the removal of the confidential designation from CME 8754-55. Copies of these documents, redacted in good faith by CME Group to protect the confidential information discussed herein, are collectively attached hereto as Exhibit A.

together with bid amounts offered either for the entire portfolio or certain baskets of positions.

16.    On March 11, 2010, the Examiner filed the Examiner Report and redacted certain portions thereof containing and referencing the Confidential Documents, pending a further hearing before the Bankruptcy Court and in accordance with the Order to Establish a Procedure to Unseal The Examiner's Report, to Establish a Briefing Schedule to Resolve Remaining Confidentiality Issues, and to Establish a Procedure to Provide Access to Documents Cited in the Examiner's Report. [Docket Nos. 7531, 7530]

## Argument

### A.    The Bankruptcy Code Permits the Court to Maintain the Confidentiality of Commercial Information

17.    Section 107(a) of the Bankruptcy Code evidences Congress's desire to preserve the public's right of access to judicial records in bankruptcy proceedings. 11 U.S.C. § 107(a). This right of public access to court records, however, is not absolute. 2 Collier on Bankruptcy ¶ 107.01, at 107-2 (15th ed. 1993); see also In re Georgetown Steel Co., LLC, 306 B.R. 542, 546 (Bankr. D.S.C. 2004).

18.    Section 107(b) of the Bankruptcy Code creates a statutory exception to section 107(a). See In re Barney's Inc., 201 B.R. 703 (Bankr. S.D.N.Y. 1996). Section 107(b) provides, in relevant part, that:

> (b)    On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may-
>
>    (1)    protect an entity with respect to a trade secret or confidential research, development, or commercial information; or
>
>    (2)    protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

19.    Through section 107(b), Congress mandates the protection of certain types of

7

information, including "confidential commercial information." Such commercial information is

defined as that "information which would cause an unfair advantage to competitors by providing

them information as to the commercial operations of the debtor." Video Software Dealers

Assoc. v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 27 (2d Cir. 1994). It is

designed to protect "business entities from disclosure of information that could reasonably be

expected to cause the entity commercial injury." In re Global Crossing Ltd., 295 B.R. 720, 725

(Bankr. S.D.N.Y. 2003). Accordingly, bankruptcy courts pursuant to section 107(b): have

precluded public disclosure of timelines for the required sale of the debtor's assets under a DIP

financing agreement (In re Farmland Indus., Inc., 290 B.R. 364 (Bankr. W.D. Mo. 2003)); have

protected the identification of key employees and the specific amounts proposed to be paid to

retain them as employees of the debtor (In re Georgetown Steel Co., LLC 306 B.R. 542 (Bankr.

D.S.C. 2004)); and have sealed certain financial projections and proposed distribution allocations

to creditors contained in a draft of a plan of reorganization provided to a committee (In re Lomas

Financial Corp., 1991 WL 21231 at *1 (S.D.N.Y. February 11, 1991)).

      20.     Confidential commercial information is information which, if disclosed, would

cause substantial economic harm to the competitive position of the entity from whom the

information was obtained. See e.g., Allnet Communication Services, Inc. v. Federal

Communications Commission, 800 F.Supp. 984, 988 (D.D.C. 1992). The entity asserting

confidentiality has the burden of showing that the privilege applies to a given set of documents.

See In re Grand Jury Investigation, 974 F.2d 1068, 1070 (9th Cir. 1992). The claim must be

expressly made and supported by a sufficient description of the nature of the documents,

communications, or things not produced so as to enable the demanding party to contest the

claim. Id. Here, the Confidential Documents were produced to the Examiner pursuant to the

terms of the Confidentiality Order. Now, notwithstanding that executed Confidentiality Order, the Examiner seeks to have the documents publically filed with the Bankruptcy Court in conjunction with the Examiner Report.

21.    The CME Group Exchanges operate under the conditions of confidentiality and non-disclosure of market participants' transactional information, including but not limited to the identity of who submitted particular bids or offers and engaged in particular transactions. This tradition of confidentiality is a fundamental precept of the U.S. futures markets. Market participants generally do not know who is on the opposite side of the transactions they clear through CME or other futures exchanges. In each instance, trades are novated to CME through the clearing process and through that novation, CME becomes the ultimate counterparty to both sides of the trade.

22.    Release of the identity of market participants, in conjunction with their bids, offers, or other transactional information, would have a serious detrimental effect on the CME Group Exchanges' markets. For example, if market participants knew that a bid or offer were coming from a firm with a large number of positions that had to be liquidated, they would factor that information into their opposing bids or offers. For reasons such as this, portions of the CEA and certain rules and policies of the CME Group Exchanges are designed to ensure that identities of market participants in conjunction with their transactional information remain confidential.

9

B.    **The Bidder Names and Transactional Information Contained in the
Confidential Documents are Commercial Information
that Should Be Protected From Disclosure to the Public**

23.    Principles of confidentiality apply with special force to the documents at issue

here.

24.    The contents of the winning and losing bids combined with each bidder's identity

– as disclosed in the three Confidential Documents at issue – constitute the "business

transactions or market positions of any person" that are protected from public disclosure by

section 8(a)(1) of the CEA, 7 U.S.C. § 12(a)(1).  That information was made available to the

Examiner pursuant to lawful process, and expressly subject to the Confidentiality Order.  The

bidders in the auctions conducted by CME had a reasonable expectation that their bids and any

resulting business transactions or market positions would remain confidential, except to the

extent and for the limited purposes that the CEA permits disclosure.  The CEA does not provide

an exemption from the non-disclosure provision based on the passage of time or the ability to

demonstrate that the information continues to have particularized value.

25.    Furthermore, the CME Group Exchanges have promulgated rules to ensure

confidentiality of market participants' transactional information, including bids and offers.  CME

Rule 532, for example, requires that:

> No person shall disclose another person's order to buy or sell except to a
> designated Exchange official or the CFTC, and no person shall solicit or
> induce another person to disclose order information. . . .  No person shall
> take action or direct another to take action based on non-public order
> information, however acquired.

Additionally, CME Group has established a Confidentiality Policy for the Market Regulation

Department and the Clearing House Audit Department (both of which have certain SRO

responsibilities and access to non-public information of market participants), which prohibits

employees from disclosing or disseminating, inter alia, clearing member position data, financial

10

information, or detailed transaction data. As these rules and policies indicate, the CME Group

Exchanges operate under express confidentiality requirements and public disclosure of market

participants' trading information is prohibited.

26.     In transacting on the CME Group Exchanges, market participants rely on the

presumption that their trading information will be kept confidential. Disclosure of the

information they provide to CME Clearing (either directly or by virtue of transacting on the

CME Group Exchanges) on the assumption and condition of confidentiality would result in CME

breaching its own obligations to its market participants, and undermine the fundamental premise

of anonymity in the futures markets. Additionally, if the names of the bidders were revealed in

conjunction with their bid amounts and the portions of LBI's house portfolio on which they bid,

the bidders in that auction would be disadvantaged because their bidding strategies would be

known to other bidders and market participants. This could have a chilling effect on potential

bidders' willingness to participate in any similar auctions CME may need to conduct in the

future, and may have a negative effect on bid amounts. Accordingly, disclosure of the

confidential information would result in harm to the integrity of the U.S. futures markets, CME's

market participants and CME's business operations and would have a deleterious impact on

CME's ability to provide systemic-risk containment in future periods of market turmoil.

27.     The core business of the CME Group Exchanges is to provide a market for the

trading of futures and options on futures contracts. These types of contracts are provided

additional consideration under what is known as the safe harbor provisions of the Bankruptcy

Code. Pursuant to section 556 of the Bankruptcy Code, counterparties to, among others, futures

and commodities contracts are immunized from the automatic stay as it applies to termination of

such contracts. The purpose of the safe harbor provisions is to ensure that the futures and

11

commodities markets remain liquid and are not affected by a market participant's bankruptcy. In drafting the safe harbor provisions, Congress acknowledged the importance of protecting the liquidity of these financial markets. Disclosure of market participant information such as that requested by the Examiner could undermine the ability of the CME Group Exchanges to provide market functionality, stability, and engage in emergency action as necessary to protect market liquidity when faced with the financial instability of a clearing member. CME's ability to act within the scope of its permitted authority as a CFTC registered and regulated DCM and DCO must be preserved without risk of interference. Public disclosure of market participants' transactional information is contrary to this purpose. Accordingly, CME Group respectfully requests that the Confidentiality Order remain in place and that the Examiner's request for release of the three Confidential Documents at issue be denied.

**CME Group Proposed Resolution**

28.    CME Group is aware that, to date, certain information regarding CME's auction of LBI's house portfolio has been made public. In no instance, however, have the names of bidders in conjunction with their specific bid information (i.e., dollar amounts and portions of LBI's house portfolio bid upon) been publicly revealed.

29.    CME Group has proposed that the Examiner redact bidder names from the three Confidential Documents at issue (using instead descriptive terms such as "Bidder 1," "Bidder 2," etc.), which would mask the identity of bidders and not thwart the intent and purpose of the Examiner's Report to provide the public with access to information about the Debtors. The Examiner has rejected this proposal, and has not offered any compelling reason as to why the Confidential Documents in question need to be made public in a non-redacted form. If the Examiner were to accept CME Group's proposal, CME Group would not oppose the use of the

12

three Confidential Documents (with bidder names redacted) in the Examiner Report.  In fact,

information with respect to the winning bids – without bidder names – appears in one of the six

Confidential Documents to which CME Group has not objected.

WHEREFORE, for all of the foregoing reasons, the CME Group respectfully requests

that this Court enter an Order directing the Examiner to redact the Examiner Report as set forth

herein and granting such other and further relief as is just and proper.

Dated: New York, New York
      March 19, 2010

                    KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: _____
           Robert M. Schmidt
           Elise Scherr Frejka
           Lauren M. Macksoud
           1177 Avenue of the Americas
           New York, New York 10036
           Telephone: (212) 715-9100
           Facsimile: (212) 715-8000

           *Attorneys for CME Group Inc.*

KL2 2643763.2

13

EXHIBIT A

From:       Taylor, Kim
Sent:       Monday September 15, 2008 3 03 PM
To:         kamm@lehman com
Cc:         Doar, Tim, Michaels, Dale
Subject:    Additional Bids for the Lehman house positions

Below are the additional bids for the Lehman house portfolio in addition to the one you saw this morning:

This morning's bid:
Complete portfolio:  $1,685,000,000 (expired)

Bid #2:
Fixed Income: $115,000,000
Ags (including ethanol) & Meats: $120,000,000
Currencies: $6,000,000
Equities: $100,000,000
Energy & Metals: $575,000,000 .          **REDACTED**
Total: $916,000,000

Bid #3:
Fixed Income (Treasuries, ED's, and Fed funds only):  $235,000,000
Above excluding options: $11,000,000
        has stated that this bid has expired since the market is now closed
No bids yet on any other parts of the portfolio

Bid #4:
Complete portfolio: $1,984,885,367 equal to the total margin required in the acct

Potential Bid #5
A fifth bidder is still interested in the energy portfolio, but is not yet ready to bid

Kaushi –

Please let us know if you would like to proceed further with any of these bids and we can arrange for you to be put in touch with
the bidder.

If you have any additional questions, please feel free to follow up with any one of us.

Dale Michaels – 312-930-3062
Tim Doar – 312-930-3162

Kim

**KIM TAYLOR**
Managing Director and President
Clearing Division

T 312 930 3156
F 312 634 1553
kim taylor@cmegroup com

**CME Group**
A CME/Chicago Board of Trade Company

1

CME 4750

CONFIDENTIAL

20 South Wacker Drive
Chicago, Illinois 60606
www.cmegroup.com

CME 4751

From:       Michaels, Dale [Dale.Michaels@cmegroup.com]
Sent:       Monday, September 15, 2008 4:51 PM
To:         *Clearing House Senior Mgmt; *Clearing House Risk
Subject:    RE: Lehman House Bids

Updated info on          **REDACTED**

Below are the bids for the Lehman house portfolio:

**REDACTED**

Complete portfolio:  $1,685,000,000

**REDACTED**

Fixed Income: $115,000,000
Ags (including ethanol) & Meats: $120,000,000
Currencies: $6,000,000
Equities: $100,000,000
Energy & Metals: $575,000,000
Total: $916,000,000

**REDACTED**

Fixed Income (Treasuries, ED's, and Fed funds only): $235,000,000
Above excluding options: $11,000,000
          · has stated that this bid has expired since the market is now closed
Energy & Commodity (including all CBT and CME Ags): $500,000,000, with a variance of $100,000,000 on that price

**REDACTED**

Energy & Metals: $1,260,000 equal to the margin for the house energies and metals

**REDACTED**     is still interested in the energy portfolio, but is not yet ready to bid

REDACTED

| | | |
|---|---|---|
| FX | $ | 6,000,000 |
| Rates | $ | 240,000,000 |
| Equities | $ | 800,000,000 |
| Aga/AI | $ | 95,000,000 |
| CME Total | $ | 1,141,000,000 |
| NYM Total | $ | |
| Total Bid | | |

| | | |
|---|---|---|
| CME Total | All | |
| NYM Total | All | |
| Total Bid | $ | 1,846,999,000 |

| | | |
|---|---|---|
| CME Total | $ | |
| NYM Total | $ | 335,000,000 |
| Total Bid | $ | 335,000,000 |

| Breakdown | | |
|---|---|---|
| Energy | $ | 734,000,000 |
| Equities | $ | 497,000,000 |
| I-Rates | $ | 293,000,000 |
| FX | $ | 10,000,000 |

| Quadrant | Span Risk | ANOV | Total | Party | Concession | |
|---|---|---|---|---|---|---|
| Equities | $737,443,448 | $4,867,513 | $732,575,936 | | $ | 450,000,000 |
| Rates | $129,949,964 | -$93,489,665 | $223,439,629 | | $ | 240,000,000 |
| FX | $11,482,836 | $3,710,625 | $7,772,211 | | $ | 6,000,000 |
| Energy (NYM) | $260,947,206 | -$372,413,215 | $633,360,421 | | $ | 335,000,000 |
| Age | $55,230,535 | $4,547,636 | $50,682,898 | | $ | 57,000,000 |
| Net Gas | $129,270,361 | -$482,100,427 | $611,370,788 | | $ | 140,000,000 |
| Total | $1,324,324,350 | -$934,877,532 | $2,259,201,882 | Total Bids | $ | 1,228,000,000 |

| Amount to Be Moved | |
|---|---|
| NOV + Bids | |
| $ | 2,162,877,532 |

| Risk Minus Cocession |
|---|
| $96,324,350 |

REDACTED

CONFIDENTIAL

CME 8753

From:        mdawley
Sent:        Thursday, September 18, 2008 12 16 PM
To:          Doar, Tim, michele gold@lehman com
Cc:          Kobida, Michael, Michaels, Dale, Taylor, Kim
Subject:     RE NYMEX nat gas trade between Lehman and Goldman

Agreed

From:     Doar, Tim [mailto:Tim.Doar@cmegroup.com]
Sent:     Thursday, September 18, 2008 1:14 PM
To:       michele.gold@lehman com; Dawley, Michael
Cc:       Kobida, Michael; Michaels, Dale; Taylor, Kim
Subject:  NYMEX nat gas trade between Lehman and Goldman

Mike Dawley: Goldman
Michele Gold: Lehman

This is to confirm final details with each of Lehman and Goldman of the nat gas trade done between Goldman and Lehman, with trade terms originally specifying "Tuesday's close". Original terms were as follows:

Option value $482,104,458.98
Risk margin and other consideration $140,000,000
Total consideration: $622,104,458.98

Due to bulk transfer requirements in the NYMEX system, the futures trades in the portfolio had to be entered at Wednesday's close, with the options in at zero premium. The difference in futures variation between Tuesday and Wednesday we calculate to be a "Pay" of $82,654,310.00. Since Lehman funded the variation to Clearing, this amount is to be deducted from the original consideration to be paid to Goldman.

Final revised consideration, taking into account the $82,654,310 in variation: $539,450,148.98

We have released the trades to match in NYMEX Clearing, and will pay $539,450,148.98 to Goldman, from Lehman's cash collateral retained with Clearing, for value today.

Thanks
Tim


**Tim Doar, Managing Director, Risk Management**
**CME Group**
20 South Wacker Drive
Chicago, Illinois 60606
(312) 930-3162 - Phone
(312) 930-3187 - Fax
(312) 446-2962 - cell
*At CME, Customers Mean Everything. To let us know how we are doing, please call the CME Customer Feedback Line at (866) 652-1132, or send us an e-mail at customerfeedback@cme com.*


**CONFIDENTIAL**                                    1                              **CME 7959**

From:        Doar, Tim
Sent:        Thursday, September 18, 2008 6 39 PM
To:          gparagha@lehman com, michael nielsen@lehman com
Cc:          Taylor, Kim
Subject:     Lehman house auction and money moves

The CME conducted an auction of Lehman's house, proprietary portfolio today for CME/CBOT/NYMEX/COMEX markets. The monies shown below moved to the firms with the best bids for the portfolios shown:

|  | NOV | bid | total net moved to other firms |
|---|---|---|---|
| Cme/cbot Equities | 4,867,513 | 450,000,000 | 445,132,487 |
| Cme/cbot rates | -93,489,665 | 240,000,000 | 333,489,665 |
| CME fx | 3,710,625 | 6,000,000 | 2,289,375 |
| CME/cbot ag: | 4,547,638 | 57,000,000 | 52,452,362 |
| Nymex nat gas on 9/17) | -482,100,427 | 57,345,690 | 539,446,117 (this portfolio was actually auctioned off by the firm itself |
| Nymex other | -372,413,215 | 335,000,000 | 707,413,215 |

Total cash collateral moved: 2,080,223,221

**Tim Doar, Managing Director, Risk Management**
**CME Group**
20 South Wacker Drive
Chicago, Illinois 60606
(312) 930-3162 - Phone
(312) 930-3187 - Fax
(312) 446-2962 - cell
*At CME, Customers Mean Everything. To let us know how we are doing, please call the CME Customer Feedback Line at (866) 652-1132, or send us an e-mail at customerfeedback@cme com.*

1

CME 8217

**Kobida, Michael**

| | |
|---|---|
| **From:** | mdawley |
| **Sent:** | Thursday, September 18, 2008 12:18 PM |
| **To:** | Doar, Tim |
| **Cc:** | Kobida, Michael; Michaels, Dale; Taylor, Kim |
| **Subject:** | RE: NYMEX nat gas trade between Lehman and Goldman |

Please wire the USD $ 539,450,148.98 to the following a/c

ABA:            021000021
BANK NAME:   JP MORGAN CHASE          **REDACTED**
CITY:           NEW YORK
A/C #:
ENTITY NAME: GOLDMAN SACHS & CO., NEW YORK

Thanks

---

**From:** Doar, Tim [mailto:Tim.Doar@cmegroup.com]
**Sent:** Thursday, September 18, 2008 1:14 PM
**To:** michele.gold@lehman.com; Dawley, Michael
**Cc:** Kobida, Michael; Michaels, Dale; Taylor, Kim
**Subject:** NYMEX nat gas trade between Lehman and Goldman

Mike Dawley: Goldman
Michele Gold: Lehman

This is to confirm final details with each of Lehman and Goldman of the nat gas trade done between Goldman and Lehman, with trade terms originally specifying "Tuesday's close". Original terms were as follows:

Option value $482,104,458.98
Risk margin and other consideration $140,000,000
Total consideration: $622,104,458.98

Due to bulk transfer requirements in the NYMEX system, the futures trades in the portfolio had to be entered at Wednesday's close, with the options in at zero premium. The difference in futures variation between Tuesday and Wednesday we calculate to be a "Pay" of $82,654,310.00. Since Lehman funded the variation to Clearing, this amount is to be deducted from the original consideration to be paid to Goldman.

Final revised consideration, taking into account the $82,654,310 in variation: $539,450,148.98

We have released the trades to match in NYMEX Clearing, and will pay $539,450,148.98 to Goldman, from Lehman's cash collateral retained with Clearing, for value today.

Thanks
Tim

1

CONFIDENTIAL                                                    CME 8754

**Tim Doar, Managing Director, Risk Management**
**CME Group**
20 South Wacker Drive
Chicago, Illinois 60606
(312) 930-3162 - Phone
(312) 930-3187 - Fax
(312) 446-2962 - cell
*At CME, Customers Mean Everything. To let us know how we are doing, please call the CME Customer Feedback Line at (866) 652-1132, or send us an e-mail at _customerfeedback@cme.com_.*

2

CONFIDENTIAL

CME 8755