*Hearing Date and Time: April 14, 2010 at 10:00 A.M.*
*Objection Deadline: March 19, 2010 at 5:00 P.M.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                  :

In re                                              :        Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :       Case No. 08-13555 (JMP)

                    Debtors.            :        (Jointly Administered)

-------------------------------------------------------------X

**DECLARATION OF KIMBERLY S. TAYLOR IN SUPPORT OF REQUEST OF CME GROUP INC. TO MAINTAIN THE CONFIDENTIALITY OF CERTAIN DOCUMENTS PRODUCED BY CME GROUP INC. TO THE EXAMINER PURSUANT TO <u>CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER</u>**

      KIMBERLY S. TAYLOR makes this declaration under 28 U.S.C. § 1746, and states the following:

      1.     I am the President of the Clearing House Division ("<u>CME Clearing</u>") of Chicago Mercantile Exchange Inc. ("<u>CME</u>").  CME is a subsidiary of CME Group Inc. ("<u>CME Group</u>"). I joined CME Clearing in 1989 and have held a variety of positions, including President since January 1, 2004, Managing Director, Risk Management (previously Senior Vice President under CME's former title structure) from October 1998 to December 2003, Vice President from January 1996 to January 1998, and Senior Director from July 1994 to December 1996.

      2.     I submit this declaration (the "<u>Declaration</u>") in support of the request of CME Group to protect from public disclosure certain documents containing, <u>inter alia</u>, the names of participants in an auction conducted by CME Clearing of house (or proprietary) accounts maintained by Lehman Brothers Inc. ("<u>LBI</u>"), as a clearing member, at (a) CME, (b) The Board of Trade of the City of Chicago, Inc. ("<u>CBOT</u>"), (c) New York Mercantile Exchange, Inc. ("<u>NYMEX</u>"), and (d) Commodity Exchange, Inc. ("<u>COMEX</u>," and together with CME, CBOT, and NYMEX, the "<u>CME Group Exchanges</u>").  Unless otherwise stated in this Declaration, I have

personal knowledge of the facts hereinafter set forth.

## The CME Group Exchanges and CME Clearing

3.     Each of the CME Group Exchanges is registered with the U.S. Commodity Futures Trading Commission ("CFTC") as a designated contract market.  In addition, CME is registered with the CFTC as a derivatives clearing organization.

4.     The CME Group Exchanges offer a wide range of benchmark products available across all major asset classes, including futures and options on futures based on interest rates, equity indexes, foreign exchange, energy, metals, agricultural commodities, and alternative investment products.  The CME Group Exchanges serve the hedging, risk management, and trading needs of our global customer base by facilitating transactions through the CME Globex electronic trading platform, open outcry trading facilities in New York and Chicago, as well as through privately negotiated transactions.

5.     CME Clearing (which is a division of CME) acts as the central counterparty for all contracts listed by the CME Group Exchanges – i.e., in the clearing process, through a process of novation, CME guarantees the creditworthiness of the buyer to each seller of a futures contract and the seller to each buyer.  CME Clearing handles more than 90 percent of all futures and options on futures contracts traded in the United States, holds in excess of $90 billion in collateral on deposit to support open positions of clearing members and their customers, and routinely moves billions of dollars per day among market participants.

6.     The CME Group Exchanges are self-regulatory organizations ("SROs") and are responsible for ensuring the integrity of all transactions cleared by CME Clearing.  In this Congressionally mandated role, our goal is to operate fair markets that foster price discovery and the hedging of economic risks in an efficient, self-regulated environment, overseen by the CFTC.

7. The CME Group Exchanges are under the regulatory oversight of the CFTC and are subject to the Commodity Exchange Act, 7 U.S.C. § 1, et seq. ("CEA"), and CFTC regulations promulgated thereunder. In addition, as SROs, the CME Group Exchanges maintain rule books (the "Exchange Rulebooks") which have been harmonized, to the extent possible, to provide a common regulatory framework for market users.

## Auction of Open Positions in LBI's House Accounts

8. On September 15, 2008, as a result of issues regarding the financial condition of LBI and its parent company (Lehman Brothers Holdings, Inc.), CME Group's Chief Executive Officer, President, Chairman of the Board, Chairman of the Clearing House Risk Committee, and President of the Clearing House, under the authority of CME Rule 975 and NYMEX Rule 9.06A, unanimously agreed that LBI would be directed to liquidate the open positions in its house accounts (i.e., accounts belonging to LBI or its affiliates). LBI, however, failed to substantially reduce (and, in some cases, increased) its positions and failed to advise CME Clearing of an affirmative liquidation plan.[1]

9. Therefore, in accordance with its rules, CME took emergency action to ensure the orderly functioning of the markets and conducted an auction to secure bids for the purchase of some or all of the open positions in LBI's house accounts.[2] CME conducted the auction on an expedited basis, and portions of the open positions in LBI's house accounts were sold and transferred to three separate bidders on September 18, 2008. (A separate auction process took place on September 15, 2008 but was called off when it appeared that another firm would be

---

[1] LBI did arrange the sale of certain energy contracts in its house accounts to another firm, but it did not find a buyer for the remaining positions in its house accounts.

[2] Where it could be done without having a negative effect on the markets, CME Clearing liquidated portions of the open positions in LBI's house accounts through open outcry and/or Globex.

3

purchasing the entirety of LBI's business, including its house accounts.)  CME was in contact with CFTC staff throughout the week of September 15, 2008 and sent written notice to the CFTC of this emergency action on September 25, 2008.

11. CME kept confidential and did not reveal to market participants, including those firms invited to submit bids on LBI's house portfolio: (a) the identities of the other bidders, (b) the number of bidders asked to participate in the auction, (c) the nature of the bids submitted (e.g., whether the bids were for all of the open positions or certain buckets thereof), or (d) the identity of the winning bidders.  Such confidentiality was essential to ensure that the auction accomplished CME's objectives to fairly and swiftly take action to prevent disruption to the market and protect CME Clearing, the clearing members of the CME Group Exchanges, and all other market participants.

**Production Of Documents to the Examiner**

11. Commencing on September 15, 2008, Lehman Brothers Holdings, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") commenced voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

12. On January 16, 2009, the Bankruptcy Court entered an Order Directing the Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code (the "Examiner Order"), and the Examiner Order, inter alia, ordered (i) the United States Trustee for the Southern District of New York (the "U.S. Trustee") to appoint an examiner (the "Examiner"), and (ii) the Examiner to conduct an investigation into certain specified matters and to perform certain duties set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code

4

(collectively, the "Examiner Investigation"). [Docket No. 2569]

13.     On January 19, 2009, pursuant to the Examiner Order, the U.S. Trustee appointed Anton R. Valukas as Examiner and the Bankruptcy Court approved the appointment by Order dated January 20, 2009. [Docket Nos. 2570, 2583]

14.     The Examiner requested that CME Group (on behalf of the CME Group Exchanges) produce certain documents relating to LBI and CME Clearing's auction of the open positions in LBI's house accounts.

15.     The Examiner and CME Group entered in a Confidentiality Stipulation and Protective Order which was approved by the Bankruptcy Court on January 13, 2010 (the "Confidentiality Order") [Docket No. 6641].

16.     CME Group produced, in good faith, several hundred pages of materials to the Examiner. In making this production, CME Group relied upon the terms of the Confidentiality Order and marked several documents – including the three documents now at issue – as confidential.

17.     On February 8, 2010, the Examiner filed the Report of the Examiner (the "Examiner Report") under seal pending resolution of confidentiality issues with CME Group and numerous other parties. [Docket No. 7540]. The Examiner notified CME Group that the Examiner wanted to use in the Examiner Report six documents consisting of eight pages (the "Confidential Documents") that CME Group designated as confidential.[3] CME Group objected to the use of four of the Confidential Documents and was able to resolve with the Examiner its objection with respect to one such document (by agreeing to redact certain bank-account

---

[3] The Confidential Documents at issue are CME 4750-51, CME 4767, and CME 8753. CME Group does not object to the removal of the confidential designation from document number CME 7959 and CME 8217. In exchange for the Examiner agreeing to redact certain bank account information, CME Group will consent to the removal of the confidential designation from document CME 8754-55.

5

information).  CME Group offered a compromise position with respect to the remaining three Confidential Documents, which the Examiner rejected.

18. The Confidential Documents now at issue contain the names of those firms that CME invited to submit bids as part of the auction of the open positions in LBI's house accounts, together with bid amounts offered either for the entire portfolio or certain baskets of positions.

19. On March 11, 2010, the Examiner filed the Examiner Report and redacted certain portions thereof containing and referencing the Confidential Documents, pending a further hearing before the Bankruptcy Court and in accordance with the Order to Establish a Procedure to Unseal the Examiner's Report, to Establish a Briefing Schedule to Resolve Remaining Confidentiality Issues, and to Establish a Procedure to Provide Access to Documents Cited in the Examiner's Report [Docket Nos. 7531, 7530].

**CME Group Objection to Release of Documents
Containing Bidder Identities and Bid Information**

20. CME Group objects to the release of the names of auction participants, in conjunction with submitted bids, as a matter of public policy and statutory interpretation.  CME Group has proposed that, for purposes of his Report, the Examiner redact the names of the auction participants from the three Confidential Documents at issue.  This would sufficiently mask the identity of bidders but not thwart the intent and purpose of the Examiner Report to provide the public with access to information about the Debtors.  In exchange for the Examiner adopting this recommendation, CME Group would not oppose the release of the bid information. (In fact, information with respect to the winning bids – without bidder names – appears in one of the six Confidential Documents to which CME Group is not objecting.)

21. CME Clearing and the CME Group Exchanges operate under conditions of confidentiality and non-disclosure with respect to market participants' trading information,

6

including information with respect to bids and offers.  Indeed, such confidentiality is a fundamental precept of the U.S. futures markets, where bids and offers (whether on our open-outcry trading facilities or on the Globex platform) are submitted on an anonymous basis, without the names of the ultimate buyers and sellers being revealed.

22. Section 8(a)(1) of the CEA provides, in relevant part, that the CFTC may not:

> …publish data and information that would separately disclose the <u>business transactions</u> or <u>market positions</u> of any person and trade secrets or <u>names of customers</u>.

7 U.S.C. § 12(a)(1) (emphasis added).

23. CME Clearing and the CME Group Exchanges are subject to the CEA and are generally prohibited from disclosing the names of market participants, the details of business transactions in our markets, or the market positions of any person.  This prohibition on disclosure is mandatory and critical to the functioning of the U.S. futures markets.

24. The Exchange Rulebooks contain similar limitations.  For example, CME Rule 532 provides:

> No person shall disclose another person's order to buy or sell except to a designated Exchange official or the CFTC and no person shall solicit or induce another person to disclose order information . . . .  No person shall take action or direct another to take action based on non-public order information, however acquired.

The requirement of confidentiality extends to CME Group employees as well.  For example, CME Group has established a Confidentiality Policy for the Market Regulation Department and Clearing House Audit Department (both of which have certain SRO responsibilities and access to non-public information of our market participants), which prohibits employees from disclosing or disseminating, <u>inter alia</u>, clearing member position data, financial information, or detailed transaction data.  As these rules and policies indicate, CME operates under express

7

confidentiality requirements and public disclosure of market participants' trading information is prohibited.

25.    In transacting on the CME Group Exchanges, market participants rely on the presumption that their trading information will be kept confidential.  Disclosure of the information they provide to CME (either directly or by virtue of transacting on the CME Group Exchanges) on the assumption and condition of confidentiality would result in CME breaching its own obligations to its market participants, and undermine the fundamental premise of anonymity in the futures markets.  Additionally, if the names of the bidders were revealed in conjunction with their bid amounts and the parts of LBI's house portfolio on which they bid, the bidders at that auction would be disadvantaged because their bidding strategies would be known to other bidders and market participants.  This could have a chilling effect on potential bidders' willingness to participate in any similar auctions CME may have to conduct in the future, and may have a negative effect on bid amounts.  Accordingly, disclosure of the confidential information would result in harm to the integrity of the U.S. futures markets, CME's market participants and CME's business operations and would have a deleterious impact on CME's ability to provide systemic-risk containment in future periods of market turmoil.

* * * *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Chicago, Illinois
March 19, 2010

_____
Kimberly S. Taylor

KL2 2643019.5