

Futures Industry Association
2001 Pennsylvania Ave. NW
Suite 600
Washington, DC 20006-1823

202.466.5460
202.296.3184 fax
www.futuresindustry.org

March 25, 2010

The Honorable James M. Peck
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004

    Re:    <u>Lehman Brothers Holdings Inc., et al., – Case No. 08-13555</u>

Dear Judge Peck:

    The Futures Industry Association ("FIA") respectfully submits this letter in support of the request of the CME Group Inc. ("CME Group") that the names of the actual bidders, in conjunction with their specific bids in the CME Group's September 2008 auction of open positions of Lehman Brothers, Inc. ("LBI"), remain confidential and not be publicly revealed. A copy of this letter is being docketed with the Clerk's Office for inclusion in the docket.

    FIA is a principal spokesperson for the commodity futures and options industry. FIA's regular membership is comprised of approximately 30 of the largest futures commission merchants ("FCMs") in the United States. Among its associate members are representatives from virtually all other segments of the futures industry, both national and international. Reflecting the scope and diversity of its membership, FIA estimates that its members effect more than eighty percent of all customer transactions executed on United States designated contract markets.

    FIA understands that the CME Group requests that the names of bidders in conjunction with their specific bid information (*i.e.,* dollar amounts and portions of LBI's house portfolio bid upon) not be publicly revealed. CME Group therefore has requested that, before the Examiner releases certain documents that the CME Group provided to him pursuant to a confidentiality agreement, the Examiner redact bidder names (using instead descriptive terms such as "Bidder 1," "Bidder 2," etc.) in order to mask the identity of actual bidders and their connection to a specific bid.

    FIA's interest in the confidentiality issues arising out of the CME Group's emergency action in 2008 to auction the LBI positions embraces four interrelated concerns: (1) protection of futures trading customers, (2) protection of FIA members' own financial risks as futures market participants, (3) protection of the financial soundness of futures exchanges and derivatives clearing organizations ("DCOs"), and (4) preservation of fair and orderly futures trading for price discovery and hedging of financial risks. All of those concerns are implicated if the public disclosure of the identities of the actual bidders in the CME Group's auction could hinder the use

The Honorable James M. Peck
March 25, 2010
Page 2

or effectiveness of future auctions or any other remedies available to futures exchanges and DCOs to minimize harm from market emergencies.

The regulated futures markets have a critical role in the American economy by providing (1) price discovery by which legions of companies – many of which may not even trade futures – price their commodities and commercial transactions, and (2) a means for hedging financial risks. DCOs are the financial bedrock for the safety and soundness of futures trading. For every United States exchange-traded futures contract, there is a DCO that becomes a party to and guarantor of performance on the contract. This guarantee is perceived as effectively removing "counterparty risk" from futures trading – *i.e.*, the risk that a counterparty to a futures contract will not perform when contractually required. Given their important role in futures markets, DCOs are required to be registered with the Commodity Futures Trading Commission ("CFTC") and are subject to the CFTC's full regulatory oversight and broad enforcement powers.

A DCO is comprised of large FCMs that pool their capital to capitalize the DCO. The DCO's capital serves as the pool of assets that can be called upon to satisfy the DCO's guarantee of performance on futures contracts if the persons entering into a futures contract and their own intermediaries/guarantors all renege on their contractual obligations. Accordingly, the bankruptcy or insolvency of a clearing member of a DCO directly impairs the capital of the DCO and will put greater demands on the capital of all other DCO members, if the DCO is required to make good on its futures contract guarantees. Further, the risk that a bankrupt or insolvent clearing member will default on a large proprietary futures position, as happened with LBI, escalates the risk of defaults by other futures market participants, with potential systemic consequences for all futures market participants and the American economy as a whole.

The effectiveness of a DCO's emergency powers and remedies is critical to both its financial safety and soundness and the futures market's well-being because in a market emergency they often can be both the first and principal lines of defense against a broad financial meltdown. For these reasons, the FIA's membership and its FCM clearing members in particular have strong interests in preserving the effectiveness of every DCO's emergency powers and remedies to quickly end market disruptions and emergencies. If any of those powers or remedies is impaired for any reason, the potential adverse consequences can be immense. In this connection, it is true that, owing to the diligent oversight of United States futures markets by the CFTC and the futures industry's self-regulatory organizations ("SROs") and DCOs, futures market emergencies have rarely occurred. However, when emergencies do occur, swift and decisive action can be necessary to avoid serious harm to futures market participants and American businesses, workers and consumers. Futures market emergencies rarely, if ever, involve simple solutions or risk of only modest financial consequences.

The Lehman bankruptcy risked enormous harm to futures market participants, all companies that rely on futures trading for price discovery, and the American economy in general. It threatened to result in defaults on the massive futures market positions of LBI which in turn could have led to additional defaults by others and significant panic throughout United States

The Honorable James M. Peck
March 25, 2010
Page 3

futures and securities markets. Absent the CME Group's swift and decisive emergency action, that deleterious outcome might have occurred.

The FIA respectfully submits that any determination that might unnecessarily compromise the use or effectiveness of any form of emergency action or remedy available to an SRO and DCO – including, but not limited to, an auction – is not in the public's interest. It is the judgment of the FIA that, in weighing the interests here of public disclosure versus preservation of the confidentiality of the identities of the actual bidders for specific bids, the balance is properly struck in favor of preserving confidentiality in order to avoid compromising the effectiveness of SRO and DCO emergency powers and remedies. The FIA recognizes that neither the Examiner nor the CME Group can say with certainty the precise effect disclosure of the actual bidders' identities here would have on the effectiveness of future emergency actions. The FIA, however, based on its long experience in working to improve futures trading markets, firmly believes that, in the circumstances presented here, the public disclosure of the actual bidders' identities with their specific bids risks damaging the effectiveness of an SRO's and a DCO's emergency powers. The FIA believes that avoiding such risk far outweighs the minimal, if any, purported public benefit from public disclosure.

Disclosure of bidders' identities could likely become a disincentive for futures traders to participate in emergency auctions in the future and would undermine the effectiveness of any such auction and an SRO's and a DCO's willingness to conduct one. The feature of anonymous trading in futures markets is one of the critical underpinnings for the proper functioning and success of futures markets. Its critical importance is reflected in Congress's specifically providing in Section 8(a)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 12(a)(1), an express prohibition against public disclosure by the CFTC of "business transactions or market positions of any person," except in specific circumstances enumerated in the statute. Indeed, Congress also has provided in Section 9(a)(5) of the CEA, 7 U.S.C. § 13(a)(5), express criminal penalties for wilful violation of Section 8(a)(1). Consistent with Section 8(a)(1), when futures market disputes are litigated, courts typically order that any futures position data subpoenaed from the CFTC (which maintains such data in reports filed by large traders) be kept confidential by the litigants and in many instances the identities of the reporting traders are redacted from the documents produced to the litigants.

Given the centrality of anonymous trading to futures trading, any bidder in the CME Group's auction would have entered the process secure in the belief that its identity and association with specific bids would remain confidential. To eliminate that premise for future auctions by now publicly disclosing the bidders' identities as associated with specific bids could dissuade many, if not all, traders from participating in future auctions. Such would materially weaken the remedies available to CME Group and all other SROs and DCOs in market emergencies to minimize harm to futures customers, FCMs and the American economy.

The FIA also respectfully submits that the CME Group's judgment of what measures could burden the effectiveness of emergency remedies is entitled to significant deference. Its

The Honorable James M. Peck
March 25, 2010
Page 4

various exchanges collectively constitute the preeminent futures exchange in the world, and it is not unreasonable to assume that virtually any futures market emergency – even those originating on other exchanges or in other countries – will affect its markets. It has not only a financial interest, but also a regulatory interest as an SRO and a DCO, to ensure to the extent possible that emergency actions are properly and effectively employed to minimize financial harm to everyone whose businesses and lives are affected by futures pricing. And its decisions and actions in exercising emergency powers are subject to the full oversight and enforcement powers of the CFTC.

The Examiner's legal "default" position favoring disclosure fails to provide a convincing case that public disclosure provides any substantial public benefit that outweighs the risk of harm to the public in future emergency actions. He argues (at page 6 of his Response) that the Court may safely discount any potential adverse consequences for future SRO and DCO emergency actions from the disclosure of bidders' identities because it is "pure speculation" that there would ever be "another Lehman" type of potential market calamity. The FIA knows too well the significant financial and legal difficulties confronted in past futures market emergencies and respectfully suggests that history tells us that it would be unwise to decide this important issue on the assumption that market emergencies are forever a thing of the past.

The Examiner cites only one purported benefit of public disclosure – to aid hypothetical persons, if any, who might wish to challenge the auction in a court action. The premise that such persons or any colorable claims exist, however, would seem to be contradicted by (1) the Examiner's thorough analysis and specific conclusion that no colorable claim against CME Group and the bidders exists and (2) the absence of any threat of claims against the CME Group by the CFTC, which apparently was informed of the CME Group's actions throughout the auction process.

For the foregoing reasons, the FIA respectfully submits that the Court should grant the CME Group's request that the names of bidders in conjunction with their respective specific bid information (*i.e.,* dollar amounts and portions of LBI's house portfolio bid upon) not be publicly revealed and therefore that the Examiner be required in releasing any confidential documents to redact bidder names (using instead descriptive terms such as "Bidder 1," "Bidder 2," etc.) in order to mask the identity of actual bidders and their connection to a specific bid.

Respectfully submitted,

*[signature]*

John M. Damgard
President
Futures Industry Association

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2010, I caused to be served two (2) true and correct copies of the foregoing letter to The Honorable James M. Peck from John M. Damgard, President of the Futures Industry Association, via United States first-class mail, postage prepaid, to each of the following:

The Honorable James M. Peck
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
Attn: Robert L. Byman, Esq.

Jenner & Block LLP
919 Third Avenue, 37th Floor
New York, New York 10022-3908
Attn: Patrick J. Trostle, Esq.
*Attorneys for the Examiner*

Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Richard P. Krasnow, Esq.
Lori R. Fife, Esq.
Shai Y. Waisman, Esq.
Jacqueline Marcus, Esq.
*Attorneys for the Debtors*

The Office of the United States Trustee
for the Southern District of New York
33 Whitehall Street, 21st Floor
New York, New York 10004
Attn: Andy Velez-Rivera, Esq.,
Paul Schwartzberg, Esq.
Brian Masumoto, Esq.
Linda Riffkin, Esq.
Tracy Hope Davis, Esq.

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Attn: Dennis F. Dunne, Esq.
Dennis O'Donnell, Esq.
Evan Fleck, Esq.
*Attorneys for the Official Committee of Unsecured Creditors*

Global Media Counsel
731 Lexington Avenue
New York, New York 10022
Attn: Charles J. Glaser, Jr., Esq.
*Attorneys for Bloomberg L.P.*

Lowenstein Sandler PC
1251 Avenue of the Americas
18th Floor
New York, NY 10022
Attn: Michael S. Etkin, Esq.
S. Jason Teele, Esq.

Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068

Cohen Milstein Sellers & Toll PLLC
150 East 52nd Street, 30th Floor
New York, New York 10022
Attn: Joel P. Laitman, Esq.
Christopher Lometti, Esq.
Daniel B. Rehns, Esq.
Kenneth M. Rehns, Esq.
*Attorneys for Lead Counsel for Plaintiff in Mortgage Backed Securities Litigation*

Bernstein Litowitz Berger & Grossman LLP
1285 Avenue of the Americas
New York, New York 10019
Attn: Max Berger, Esq.

Bernstein Litowitz Berger & Grossman LLP
12481 High Bluff Drive
Suite 300
San Diego, CA 92130
Attn: David R. Stickney, Esq.
Elizabeth P. Lin, Esq.

Barroway Topaz Kessler Meltzer & Check LLP
280 King of Prussia Road
Radnor, PA 19087
Attn: John A. Kehoe, Esq.
Benjamin J. Hinerfeld, Esq.
*Bankruptcy Counsel to Lead Plaintiffs*

_____
Barbara B. Wierzynski
General Counsel
Futures Industry Association
2001 Pennsylvania Avenue, N.W., Suite 600
Washington, DC 20006
(202) 466-5460