# EXHIBIT A

JPY 35,000,000,000

**SEVEN-YEAR CREDIT AGREEMENT**

Dated as of May 31, 2007

AMONG

LEHMAN BROTHERS HOLDINGS INC.
as BORROWER

THE LENDERS NAMED HEREIN
as LENDERS

MIZUHO CORPORATE BANK, LTD.
as MANDATED LEAD ARRANGER

LEHMAN BROTHERS JAPAN INC.
as JOINT-ARRANGER
AND

MIZUHO CORPORATE BANK, LTD.
as AGENT

# TABLE OF CONTENTS

Page

## ARTICLE I  Definitions

SECTION 1.01.  Defined Terms. ...................................................................1
SECTION 1.02.  Terms Generally...............................................................11
SECTION 1.03.  Accounting Terms.............................................................11
SECTION 1.04.  [Intentionally left blank] ..................................................11

## ARTICLE II  The Credits

SECTION 2.01.  Commitments. ..................................................................11
SECTION 2.02.  Loan. ...............................................................................12
SECTION 2.03.  Drawdown Receipt............................................................12
SECTION 2.04.  Obligations and Rights of Finance Parties...........................12
SECTION 2.05.  [Intentionally left blank] ..................................................12
SECTION 2.06.  [Intentionally left blank] ..................................................12
SECTION 2.07.  Administrative Fees and Arrangement Fee...........................12
SECTION 2.08.  Books and Accounts. ........................................................13
SECTION 2.09.  Interest on Loan. ..............................................................13
SECTION 2.10.  Default Interest.................................................................13
SECTION 2.11.  Alternate Rate of Interest. .................................................14
SECTION 2.12.  Maturity of Loan. .............................................................14
SECTION 2.13.  Prepayment. .....................................................................14
SECTION 2.14.  Increased Costs. ...............................................................14
SECTION 2.15.  Mitigation, Illegality. .......................................................15
SECTION 2.16.  Compensation. ..................................................................17
SECTION 2.17.  Pro Rata Treatment. ..........................................................18
SECTION 2.18.  Sharing of Setoffs. ............................................................18
SECTION 2.19.  Payments. .........................................................................19
SECTION 2.20.  Application of Payments.....................................................20
SECTION 2.21.  Taxes.................................................................................21

## ARTICLE III  Representations and Warranties

SECTION 3.01.  Organizational Status.........................................................22
SECTION 3.02.  Power and Authority..........................................................22
SECTION 3.03.  No Violation......................................................................23
SECTION 3.04.  Consents; Governmental Approvals.....................................23
SECTION 3.05.  Financial Statements; Financial Condition. ..........................23
SECTION 3.06.  Litigation..........................................................................24
SECTION 3.07.  True and Complete Disclosure............................................24
SECTION 3.08.  Use of Proceeds; Margin Regulations..................................24
SECTION 3.09.  Tax Returns and Payments.................................................24

SECTION 3.10.  ERISA. ...................................................................24
SECTION 3.11.  Subsidiaries ...........................................................25
SECTION 3.12.  Compliance with Laws, Statutes, etc. ........................25
SECTION 3.13.  Investment Company Act. .........................................25
SECTION 3.14.  Public Utility Holding Company Act. ..........................25
SECTION 3.15.  No Default. .............................................................25
SECTION 3.16.  Pari Passu. .............................................................26
SECTION 3.17.  Exchange Membership; License; Registrations.............26

### ARTICLE IV  Conditions of Lending

SECTION 4.01.  Conditions Precedent to Effectiveness.........................26
SECTION 4.02.  Conditions Precedent to the Drawdown ........................27

### ARTICLE V  Affirmative Covenants

SECTION 5.01.  Information Covenants...............................................28
SECTION 5.02.  Books, Records and Inspections. ...............................30
SECTION 5.03.  Maintenance of Insurance. ........................................30
SECTION 5.04.  Corporate Franchises. ..............................................30
SECTION 5.05.  Compliance with Laws, Statutes, etc. ........................30
SECTION 5.06.  Maintenance of Ownership. .......................................31
SECTION 5.07.  Net Capital Deficit. ..................................................31
SECTION 5.08.  Payment of Taxes....................................................31
SECTION 5.09.  SIPA. .....................................................................31
SECTION 5.10.  Pari Passu. .............................................................31
SECTION 5.11.  ERISA. ...................................................................31
SECTION 5.12.  Business. ...............................................................32

### ARTICLE VI  Negative Covenants

SECTION 6.01.  Liens......................................................................32
SECTION 6.02.  Consolidation, Merger, Sale of Assets, etc....................32
SECTION 6.03.  Tangible Net Worth. .................................................33
SECTION 6.04.  Loss of Memberships; Registrations, Licenses. ............33
SECTION 6.05.  Limitation on Restrictions on Significant Subsidiary Dividends and Other
                Distributions..........................................................33

### ARTICLE VII  Events of Default

SECTION 7.01.  Payments. ...............................................................34
SECTION 7.02.  Representations, etc. ................................................34
SECTION 7.03.  Covenants. ..............................................................34
SECTION 7.04.  Default Under Other Agreements. ...............................34

SECTION 7.05.  Bankruptcy, etc. ...................................................................................35
SECTION 7.06.  ERISA. ...............................................................................................36
SECTION 7.07.  Judgments. .........................................................................................36
SECTION 7.08.  Net Capital. ........................................................................................36
SECTION 7.09.  SIPA. ..................................................................................................36
SECTION 7.10.  Broker-Dealer Registration; etc. .......................................................36
SECTION 7.11.  Change of Control ..............................................................................37

ARTICLE VIII  The Agent and Arrangers

ARTICLE IX  [Intentionally left blank]

ARTICLE X  Miscellaneous

SECTION 10.01. Notices. ..............................................................................................42
SECTION 10.02. Waivers; Amendments. .....................................................................43
SECTION 10.03. Payments on Business Days. .............................................................44
SECTION 10.04. Governing Law; Jurisdiction; Consent to Service of Process. ............44
SECTION 10.05. Expenses; Indemnification. ...............................................................45
SECTION 10.06. Survival of Agreement, Representations and Warranties, etc. ............46
SECTION 10.07. Assignments and Participations. .......................................................46
SECTION 10.08. Severability. .......................................................................................48
SECTION 10.09. Cover Page, Table of Contents and Section Headings. ......................48
SECTION 10.10. Counterparts. .....................................................................................49
SECTION 10.11. Entire Agreement. .............................................................................49
SECTION 10.12. WAIVER OF JURY TRIAL. .............................................................49
SECTION 10.13. [Intentionally left blank] ...................................................................49
SECTION 10.14. Confidentiality. ..................................................................................49
SECTION 10.15. Conversion of Currencies. ................................................................50
SECTION 10.16. Customer Identification. ....................................................................51
SECTION 10.17. Clarification of Intention of the Required Lenders. ...........................51
SECTION 10.18. Loss of Documents and Exemption from Liabilities. .........................52

<u>Exhibits</u>

Exhibit A        Form of Drawdown Notice
Exhibit B        Form of Drawdown Receipt
Exhibit C        Form of Assignment and Acceptance
Exhibit D-1    Form of Opinion of LEHMAN BROTHERS HOLDINGS INC In-House Counsel
Exhibit D-2    Form of Opinion of LEHMAN BROTHERS HOLDINGS INC In-House Counsel
Exhibit D-3    Form of Opinion of Anderson, Mori & Tomotsune
Exhibit E        Litigation
Exhibit F        Officer's Certificate

<u>Schedule</u>

Schedule 2.01  Term Loan Commitments

SEVEN-YEAR CREDIT AGREEMENT dated as of May 31, 2007, among LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation (the "Borrower"); the lenders listed in Schedule 2.01 (such lenders and all other persons constituting lenders from time to time in accordance with Section 10.07(d) being referred to herein as the "Lenders"); MIZUHO CORPORATE BANK, LTD., as the lead arranger (the "Mandated Lead Arranger"); LEHMAN BROTHERS JAPAN INC., as the Joint-Arranger (the "Joint-Arranger"; and the Mandated Lead Arranger and the Joint-Arranger collectively being referred to herein as the "Arrangers"), and MIZUHO CORPORATE BANK, LTD. New York Branch, as administrative agent (the "Agent") for the Lenders.

The Borrower has requested that the Lenders extend credit on a term loan credit basis on the date hereof, in order to enable the Borrower to borrow a principal amount of JPY 35,000,000,000. The proceeds of such borrowing are to be used for working capital and general corporate purposes of the Borrower and its Subsidiaries. The Lenders are willing to extend such credit on the terms and subject to the conditions herein set forth. Accordingly, the Borrower, the Lenders, the Arrangers and the Agent agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01.Defined Terms. As used in this Agreement, the following terms shall have the meanings specified below:

"Administrative Fees" shall have the meaning assigned to such term in Section 2.07(a).

"Affiliate" shall mean with respect to any Person, any other Person directly or indirectly controlling (including, but not limited to, all directors and officers of such person), controlled by, or under direct or indirect common control with such Person. A Person shall be deemed to control a corporation if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such corporation, whether through the ownership of voting securities, by contract or otherwise.

"Agent" shall have the meaning assigned to such term in the preamble hereto, including its successor.

"Agent Account" means the following account held by the Agent:

2

Bank/Branch:      Mizuho Corporate Bank, Ltd., Tokyo
Swift Code:       MHCBJPJT
Account Type:     Inter Office Foreign Currency YEN (Yen
Settlement Account)
Account Name:     Mizuho Corporate Bank, Ltd., New York
Branch (Swift: MHCBUS33)
Account Number:   0802050
Ref:              LEHMAN BROTHERS Seven-Year Credit
Agreement Dated as of May 31, 2007

"Agreement" shall mean this Seven-Year Credit Agreement, as the same shall be amended, supplemented or otherwise modified from time to time.

"Applicable Creditor" shall have the meaning assigned to such term in Section 10.15(b).

"Arrangers" shall have the meaning assigned to such term in the preamble hereto, including each successor.

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an assignee, and accepted by the Agent pursuant to Section 10.07(e), in the form of Exhibit C.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States.

"Borrower" shall have the meaning assigned to such term in the preamble hereto.

"Borrowing Date" shall mean June 8, 2007 or any other date on which the Lenders make the Loan to the Borrower pursuant to Section 2.01.

"Business Day" shall mean any day not a Saturday, Sunday or legal holiday, on which commercial banks in New York City, London or Tokyo are authorized or required by law to remain closed.

"Closing Date" shall mean the date of this Agreement (Tokyo time).

"Code" shall mean, at any date, the United States Internal Revenue Code of 1986 and the regulations promulgated and the judicial and administrative decisions rendered under it, all as the same may be in effect at such date.

3

"Consolidated Assets" shall mean, as to any Person, the assets of such Person and its Subsidiaries determined on a consolidated basis in accordance with U.S. GAAP.

"Consolidated Net Worth" shall mean, as to any Person, the Net Worth of such Person and its Subsidiaries determined on a consolidated basis after appropriate deduction for any minority interests in Subsidiaries in accordance with U.S. GAAP.

"Consolidated Subsidiaries" shall mean, as to any Person, all Subsidiaries of such Person that are consolidated with such Person for financial reporting purposes in accordance with U.S. GAAP.

"Consolidated Tangible Net Worth" shall mean, as to any person, the Consolidated Net Worth of such person and its Subsidiaries less the amount of all intangible items, including, without limitation, goodwill, franchises, licenses, patents, trademarks, trade names, copyrights, service marks, brand names, write-ups of assets and any unallocated excess costs of investments in Subsidiaries over equity in underlying net assets at dates of acquisition all determined in accordance with U.S. GAAP.

"Contingent Obligations" shall mean, as to any Person, any obligations of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the holder of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (iv) in connection with any Rate Swap Agreement, or (v) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof, provided, however, that the term Contingent Obligations shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligations shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligations are made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Credit Event" shall mean the making of any Loan.

"Designated Subsidiary" shall mean (i) any of the Borrower's Consolidated Subsidiaries the Consolidated Net Worth of which constitutes at least 5% of the Borrower's Consolidated Net Worth or (ii) any Significant Subsidiary.

4

The symbol "$" shall mean the lawful currency of the United States.

"Drawdown Notice" shall have the meaning set forth in Section 2.02.

"Drawdown Receipt" shall have the meaning set forth in Section 2.03.

"Eligible Assignee" shall mean (a) a financial institution organized under the laws of the United States, or any state thereof, and having combined capital and surplus of at least $500,000,000; (b) a financial institution organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development, or a political subdivision of any such country, and having combined capital and surplus of at least $500,000,000, or the equivalent in other currency or currencies; or (c) a Person engaged in the business of commercial banking that is a Subsidiary of the Lender or of a Person of which the Lender is a Subsidiary so long as the Lender satisfies the requirements of clause (a) or (b) of this definition.

"ERISA" shall mean, at any date, the Employee Retirement Income Security Act of 1974 of the United States, and the regulations promulgated and rulings issued thereunder, all as the same may be in effect at such date.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan, or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is reasonably expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" shall mean any of the events described in Article VII.

5

"Examining Authority" shall mean the Examining Authority, as such term is defined in Rule 15c3-1, adopted by the SEC under the Securities Exchange Act of 1934, as amended, of any Subsidiary or the relevant examining authority of any Subsidiary under the laws of any relevant jurisdiction.

"Exchange" shall mean The New York Stock Exchange, Inc.

"Finance Party" shall mean the Lenders, the Arrangers and the Agent.

"Financial Officer" of any corporation shall mean its chief financial officer, principal accounting officer, controller, treasurer or any assistant treasurer.

"Foreign Pension Plan" means any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States by the Borrower or any one or more of its Subsidiaries primarily for the benefit of employees of the Borrower or such Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"Increased Cost" shall mean: (a) an additional or increased cost; (b) a reduction in the rate of return from the Loan or on its overall capital; or (c) a reduction of an amount due and payable under this Agreement, which is incurred or suffered by a Lender but only to the extent attributable to that Lender having entered into this Agreement or funding or performing its obligations under this Agreement.

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness (including principal interest, Fees and charges) of such Person for borrowed money, or with respect to deposits or advances of any kind, or for the deferred purchase price of property or services, (ii) the face amount of all letters of credit issued for the account of such Person and all drafts drawn thereunder, (iii) all indebtedness secured by any Lien on any property owned by such Person, whether or not such liabilities have been assumed by such Person, (iv) the aggregate amount required to be capitalized under leases under which such Person is the lessee, (v) all obligations of such person evidenced by bonds, debentures, notes or similar instruments, and (vi) all Contingent Obligations of such Person. Anything herein to the contrary notwithstanding, Indebtedness shall not at any time include any obligation or liability arising from a Repo Transaction except for the then Aggregate Deficit Amount. As used herein, "Aggregate Deficit Amount" shall mean, at any time, the excess of (i) the aggregate amount of payment obligations for which such person is then liable under its Repo Transactions with one or more counterparties (other than Subsidiaries of such person) minus (ii) the then aggregate value of the collateral then securing all such payment obligations.

6

"Information Memorandum" shall mean the Confidential Information Memorandum dated May, 2007, distributed to certain Lenders in connection with this Agreement.

"Interest Payment Date" shall mean (a) the 8th day of September of 2007, (b) thereafter the 8th day of December, March, June and September of each year, and (c) the Maturity Date (as the final Interest Payment Date) or, if it is not a Business Day, the immediately following Business Day, unless that day falls in the next calendar month, in which case it shall be the immediately preceding Business Day.

"Interest Period" shall mean (a) the 3-month period commencing from and including the Borrowing Date and ending on but excluding the immediately following Interest Payment Date or (b) the 3-month period commencing from and including the prior Interest Payment Date and ending on but excluding the next following Interest Payment Date; provided, however, that in the event the Interest Period as determined by clause (b) above would extend beyond the Maturity Date, such Interest Period shall end on and including the Maturity Date.

"Joint Arranger" shall have the meaning assigned to such term in the preamble hereto, including its successor.

"Judgment Currency" shall have the meaning assigned to such term in Section 10.15(b).

"Lenders" shall have the meaning assigned to such term in the preamble hereto.

"LIBO Rate" shall mean, with respect to any Interest Period, the rate appearing on Page 3750 on the Telerate Screen or the corresponding page on its successor for deposits in Yen for three month period at approximately 11:00 a.m., London time, two London Business Days prior to the commencement of such Interest Period.

"Lien" shall mean any mortgage, charge, hypothecation, assignment, encumbrance, deposit arrangement (excluding deposits made with exchanges, depositories or clearing corporations in the ordinary course of business) pledge, lien (statutory or other) or other security interest securing any obligation of any person, or any other agreement or arrangement having a similar effect (provided that a right of set-off shall only constitute a Lien for the purposes of this Agreement if it is created or utilised to effect a flawed asset or an arrangement equivalent to a security interest).

"Loan" shall mean a loan made by a Lender pursuant to Section 2.01.

"London Business Day" shall mean any day not a Saturday, Sunday or other day on which commercial banks in London are authorized or required by law to remain closed.

"Mandated Lead Arranger" shall have the meaning assigned to such term in the preamble hereto, including its successor.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Change" shall mean any material adverse change in the business, operations, property, assets or condition (financial or otherwise) of the Borrower and its Subsidiaries taken as a whole, or any such change which could reasonably be expected materially to impair the Borrower's ability to perform its payment obligations hereunder or its obligations under Article V or VI hereof.

"Maturity Date" shall mean June 8, 2014 or such earlier date on which the Obligations of Borrower become due and payable pursuant to Article VII.

"Multiemployer Plan" shall mean any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

"NASD" shall mean the National Association of Securities Dealers, Inc., or any other self-regulatory organization that succeeds to the functions thereof.

"Net Capital Rule" shall mean Rule 15c3-1, adopted by the SEC under the Securities Exchange Act of 1934, as amended.

"Net Worth" shall mean, as to any Person, the sum of its capital stock, capital in excess of par or stated value of shares of its capital stock, retained earnings (or accumulated deficit) and any other account which, in accordance with U.S. GAAP, constitutes stockholders equity, excluding any treasury stock.

"New Lender" shall have the meaning assigned to such term in Section 10.07(a).

"New York Courts" shall mean the Supreme Court of the State of New York sitting in New York County and the United States District Court for the Southern District of New York, and any appellate court from any thereof.

"Non-U.S. Regulated Broker-Dealer" shall mean any broker-dealer which is not regulated in the United States, but which is regulated by a relevant regulatory authority or authorities similar to the SEC, the Commodities Futures Trading Commission, the Exchange or NASD in a jurisdiction other than the United States.

8

"Obligations" shall mean all amounts, direct or indirect, contingent or absolute, of every type or description, and at any time existing, owing to the Agent or any Lender pursuant to the terms of this Agreement.

"Original Financial Statements" shall mean the audited financial statements of the Borrower for the year ended 30 November 2006.

"Other Taxes" shall have the meaning assigned to such term in Section 2.21(c).

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA (and any successor thereto).

"Person" shall mean any natural person, corporation, division of a corporation, business trust, joint venture, association, company, partnership, limited liability company or government, or any agency or political subdivision thereof.

"Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Rate Swap Agreement" shall mean any rate swap agreement, basis swap, forward rate agreement, commodity swap, index swap, interest rate option, forward foreign exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option and any other similar agreement (including any option to enter into the foregoing).

"Register" shall have the meaning assigned to such term in Section 10.07(d).

"Regulated Broker-Dealer" shall mean any broker-dealer that is regulated by the SEC, the Commodities Futures Trading Commission, NASD, the Exchange, or any other similar relevant regulatory authority in any relevant jurisdiction, or authorized under the Financial Services Act of 1986 (United Kingdom) or any other similar act, rule or law in any relevant jurisdiction.

"Regulation U" shall mean Regulation U of the Board, as the same is from time to time in effect, and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board, as the same is from time to time in effect, and all official rulings and interpretations thereunder or thereof.

"Repo Transaction" shall mean a repurchase agreement, reverse repurchase agreement, sale buyback or buy sellback agreement or securities lending and borrowing agreement.

"Required Lenders" shall mean, at any time, Lenders holding in the aggregate exceed 50.1% of the total Loan outstanding at such time.

"Responsible Officer" shall mean the Chief Executive Officer, the Chief Financial Officer, the Chief Legal Officer, the Treasurer, the Global Head of Asset and Liability Management, the Controller or the General Counsel of the Borrower, or any other legal or treasury officer of the Borrower primarily responsible for administering this Agreement.

"Restricted Margin Stock" shall mean at the time of determination thereof, all of the Margin Stock owned by the Borrower and its Subsidiaries to the extent the value of such Margin Stock does not exceed 25% of the value of the total assets of the Borrower and its Subsidiaries, determined on a consolidated basis, subject to the restrictive arrangements contained in Sections 6.01 and 6.02.

"SEC" shall mean the Securities and Exchange Commission of the United States or any successor thereto.

"SIPA" shall mean the Securities Investor Protection Act of 1970, as amended from time to time.

"SIPC" shall mean the Securities Investor Protection Corporation established under SIPA.

"Significant Subsidiary" shall mean any Subsidiary with assets greater than or equal to 7.5% of the Consolidated Assets of the Borrower. For the purposes of this definition, the Consolidated Assets of the Borrower or any of its Subsidiaries at any time shall be determined on the basis of the most recent financial statements delivered at or prior to such time pursuant to Section 5.01 (or the financial statements referred to in Section 3.05 if financial statements have not been theretofore delivered pursuant to Section 5.01).

"Solvent Liquidation" in respect of a Significant Subsidiary shall mean a solvent liquidation, solvent re-organization or other solvent restructuring of such Subsidiary, whereby all liabilities of such Subsidiary are extinguished or assumed by the owner or owners of the capital stock of such Subsidiary to which the assets of such Subsidiary are transferred in connection with such transaction (and the creditworthiness of such owner or owners, after giving effect to such transaction, is at least equal to the creditworthiness of such Subsidiary immediately prior to such transaction), in any such case, other than in connection with the occurrence of any of the events referred to in Section 7.05.

10

"Subsidiary" of any Person shall mean and include (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (ii) any partnership, association, joint venture or other entity in which such Person directly or indirectly through Subsidiaries, has more than a 50% equity interest at the time. Subsidiary shall in any event exclude any Person which would otherwise be a Subsidiary but the interests in which were acquired in an investment banking transaction and are being held for resale.

"Tax" shall mean any tax, levy, impost, duty or other charge or withholding of a similar nature (including any related penalty, interest or addition thereto).

"Tax Credit" shall mean a credit against any Tax or any relief or remission for Tax (or its repayment).

"Tax Deduction" shall mean a deduction or withholding for or on account of Tax from a payment under this Agreement.

"Tax Payment" shall mean a payment made by the Borrower to a Finance Party in any way relating to a Tax Deduction or under any indemnity given by the Borrower in respect of Tax under this Agreement.

"Term Loan Commitment" shall mean, with respect to each Lender, the commitment of such Lender to make a term loan to the Borrower in the amount set forth in Schedule 2.01 hereto, as the same may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"Transferee" shall have the meaning assigned to such term in Section 10.07(g).

"United States" shall mean the United States of America.

"Unrestricted Margin Stock" shall mean all of the Margin Stock owned by the Borrower and its Subsidiaries which is not Restricted Margin Stock.

"U.S. GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time..

"U.S. Regulated Broker-Dealer" shall mean any broker-dealer that is regulated by the SEC, the Commodities Futures Trading Commission, the Exchange, NASD, or any other similar relevant regulatory authority in the United States.

"Voting Stock" shall mean the shares of capital stock and any other securities of a person entitled to vote generally for the election of directors or any other securities (including, without limitation, rights and options), convertible into, exchangeable into or exercisable for, any of the foregoing (whether or not presently exercisable, convertible or exchangeable).

"Withdrawal Liability" shall have the meaning assigned to such term under Part I of Subtitle E of Title IV of ERISA.

"Yen" and "JPY" shall mean the lawful currency of Japan.

SECTION 1.02.Terms Generally.  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of and Exhibits and Schedules to this Agreement unless the context shall otherwise require.

SECTION 1.03.Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with U.S. GAAP consistent (except for such inconsistencies as are concurred in by the Borrower's independent registered public accounting firm) with those applied in the preparation of the financial statements referred to in Section 3.05, and all financial data submitted pursuant to this Agreement shall be prepared in accordance with U.S. GAAP, except as otherwise expressed herein.

SECTION 1.04. [Intentionally left blank]

ARTICLE II

The Credits

SECTION 2.01.Commitments.  Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make a Yen term loan to the Borrower on the Borrowing Date, in the amount of each such Lender's Term Loan Commitment.  Each Lender's Term Loan Commitment, as in effect on the date of this Agreement, is set forth opposite its respective name in Schedule 2.01.

12

SECTION 2.02.Loan.  Subject to the Agent having received a written Drawdown Notice substantially in the form of Exhibit-A from an authorized officer of the Borrower by not later than 11:00 a.m. (New York time) on the third Business Day prior to the Borrowing Date, each of the Lenders shall, at its cost, make its Term Loan Commitment amount available to the Agent for the Borrower by remittance to the Agent Account, not later than 11:00 a.m. (New York time) on the Borrowing Date.  The Agent shall promptly remit such money to the account designated in writing by the Borrower.  The Loan shall be deemed to have been made by the Lender(s) when such money is credited to the account designated by the Borrower.  The Drawdown Notice shall be effective on receipt and shall be irrevocable.

SECTION 2.03.Drawdown Receipt.  Upon receipt of the Loan proceeds pursuant to Section 2.02, the Borrower shall immediately submit to the Agent a Drawdown Receipt substantially in the form of Exhibit-B describing the amounts and the details of the Loan.  In the event the Agent receives such receipt, it shall submit in a timely fashion a copy thereof to the Lenders.

SECTION 2.04.Obligations and Rights of Finance Parties.  The obligations of each of the Finance Parties under this Agreement are several.  Failure of a Finance Party to carry out its obligations does not relieve any other Finance Party of its obligations under this Agreement.  No Finance Party is responsible for the obligations of any other Finance Party under this Agreement.  The rights of a Finance Party under this Agreement are independent and separate.  A Finance Party may, except as otherwise stated in this Agreement, separately enforce its rights.

SECTION 2.05.[Intentionally left blank]

SECTION 2.06.[Intentionally left blank]

SECTION 2.07.Administrative Fees and Arrangement Fee.

(a)  The Borrower agrees to pay the Agent, for its own account, fees (the "Administrative Fees") at the times and in the amounts agreed upon in a separate fee letter and to pay the Mandated Lead Arranger, for its own account, fees (the "Arrangement Fee") on the Closing Date in the amount agreed upon in a separate fee letter.

(b)  All Administrative Fees and Arrangement Fee shall be paid on the dates due, in immediately available funds, to the Agent and the Mandated Lead Arranger, respectively.  Once paid in accordance with this Section 2.07, none of the Administrative Fees or the Arrangement Fee shall be refundable under any circumstances in the absence of manifest error.

13

SECTION 2.08. Books and Accounts.

(a) Each Lender shall, and is hereby authorized by the Borrower to, maintain in accordance with its usual practice records evidencing the Indebtedness of the Borrower to such Lender hereunder from time to time, including the amounts of, and the Interest Periods applicable to, the Loan made by such Lender from time to time and the amounts of interest paid to such Lender from time to time in respect of the Loan.

(b) The entries made in the records maintained pursuant to paragraph (a) of this Section 2.08 and in the Register maintained by the Agent pursuant to Section 10.07(d) shall be prima facie evidence of the existence and amounts of the obligations of the Borrower to which such entries relate; provided, however, that the failure of any Lender or Agent to maintain or to make any entry in such records or the Register, as applicable, or any error therein, shall not in any manner affect any obligation of the Borrower to repay the Loan or otherwise perform the obligations in accordance with the terms of this Agreement.

SECTION 2.09. Interest on Loan. (a) Subject to the provisions of Sections 2.10 and 2.11, the Loan shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the LIBO Rate for the Interest Period in effect for such borrowing plus 0.27% per annum.

(b) Interest on the outstanding Loan shall be payable in arrears on each Interest Payment Date applicable to such Loan except as otherwise provided in this Agreement. The applicable LIBO Rate for each Interest Period or day within an Interest Period shall be determined by the Agent, and such determination shall be conclusive absent manifest error. The Agent shall promptly advise the Borrower and each Lender of such determination.

(c) If a JPY amount resulting from any calculation herein has a fraction of less than JPY 1, such fraction shall be rounded down to the nearest JPY. The calculation of the interest amounts to be distributed to each Lender shall be made in accordance with the following: (i) for amounts to be distributed to each Lender other than the Agent, any amount less than one yen shall be rounded down, and (ii) for amounts to be distributed to a Lender who is also appointed as the Agent, the same shall be the difference between the aggregate amounts to be distributed to all Lenders and aggregate of the amounts distributed to other Lenders. Except for the cases under the above paragraph, all calculations of fractions less than JPY 1 that are required under this Agreement shall be made in the manner the Agent deems appropriate.

SECTION 2.10. Default Interest. Overdue principal, fees and other amounts payable and, to the extent permitted by law, overdue interest in respect of each Loan shall bear interest at a rate per annum equal to the LIBO Rate in effect from time to time plus 2%, provided that no Loan shall bear

14

interest after maturity (whether by acceleration or otherwise) at a rate per annum less than 2% plus the rate of interest applicable thereto at maturity.

SECTION 2.11.Alternate Rate of Interest. In the event, and on each occasion, two London Business Days prior to the commencement of any Interest Period the Agent shall have determined that (i) Yen deposits are not generally available in the London interbank market or that (ii) reasonable means do not exist for ascertaining the applicable LIBO Rate, or the Required Lenders shall have determined that the rates at which such deposits are being offered will not adequately and fairly reflect the cost to the Lenders of making or maintaining its Loan during such Interest Period, as the case may be, the Agent shall, as soon as practicable thereafter, give written or telecopy notice of such determination to the Borrower and the applicable Lenders. In the event of any such determination, until the Agent shall have advised the Borrower and the applicable Lenders that the circumstances giving rise to such notice no longer exist, the Loan shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at the rate per annum at which deposits in Yen for value on the first day of such Interest Period with a maturity comparable to such Interest Period are offered by the Agent in the London interbank market at approximately 11:00 am (London time) two London Business Day prior to the commencement of such Interest Period. Each determination by the Agent hereunder shall be conclusive absent manifest error.

SECTION 2.12.Maturity of Loan.  The Loan under this Agreement shall mature, and the principal amount thereof shall be due and payable (together with interest accrued thereon), on the Maturity Date.

SECTION 2.13.Prepayment. (a)  The Borrower shall have the right at any time and from time to time to prepay the Loan, in whole or in part (but, if in part, in a minimum of JPY500,000,000 or any such larger sum which is an integral multiple of JPY100,000,000), upon written or telecopy notice to the Agent before 10:00 a.m., New York time, five (5) Business Days prior to prepayment.

(b)  Each notice of prepayment shall specify the prepayment date and the principal amount to be prepaid and shall be irrevocable. All prepayments under this Section 2.13 shall be subject to Section 2.16 but otherwise without premium or penalty. All prepayments under this Section 2.13 shall be accompanied by accrued interest on the principal amount being prepaid to but not including the date of prepayment.

SECTION 2.14.Increased Costs. (a)  Except as provided below in this Section 2.14, the Borrower must pay to any Lender the amount of any Increased Cost incurred by that Lender as a result of: (i) the introduction of, or any change in, or any change in the interpretation,

15

administration or application of, any law or regulation; or (ii) compliance with any law or regulation, made after the date of this Agreement; or (iii) at any time, that any Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to the Loan (other than any increased cost or reduction in the amount received or receivable resulting from the imposition of or a change in the rate of taxes imposed on the overall net income of such Lender by the laws of the jurisdiction in which such Lender is organized or in which the principal office or applicable lending office of such Lender is located, including but not limited to capital and franchise taxes so imposed and other similar charges) because of any change since the date of this Agreement in any applicable law, governmental rule, regulation, guideline, order or request (whether or not having the force of law) or in the interpretation or administration thereof by any authority charged with the interpretation or administration thereof and including the passage of any new law or the issuance of any governmental rule, regulation, guideline, order or request (such as, for example, but not limited to, a change in official reserve requirements).

(b)  The Borrower shall not be required to make any payment for an Increased Cost to the extent that the Increased Cost is: (i) compensated for under another provision of this Agreement or would have been but for an exception to such provision; (ii) a tax on the overall net income of a Lender;  (iii) attributable to a Lender willfully failing to comply with any law or regulation; or (iv) attributable to the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement ('Basel II').

(c)  A Lender intending to make a claim for an Increased Cost must notify the Agent of the event giving rise to the claim, following which the Agent shall promptly notify the Borrower.  Such Lender shall, as soon as practicable after a demand by the Agent, provide a certificate confirming the amount of the claim.

SECTION 2.15.Mitigation, Illegality.  (a)  Each Finance Party must, in consultation with the Borrower, take all reasonable steps to mitigate any circumstances which arise and which result or would result in: (i) any Tax Payment or Increased Cost being payable to a Lender; (ii) such Finance Party being able to exercise any right of prepayment and/or cancellation under this Agreement by reason of any illegality; or (iii) such Finance Party incurring any cost of complying with the minimum reserve requirements of the Bank of Japan or comparable governmental authority, including transferring its rights and obligations under this Agreement.

16

(b) Despite the reasonable steps as prescribed in the previous sentence which were taken by each Finance Party, at any time, that the making or continuance of the Loan has become unlawful by compliance by such Lender in good faith with any law, governmental rule, regulation, guideline or order (or would conflict with any such governmental rule, regulation, guideline or order not having the force of law but with which such Lender customarily complies even though the failure to comply therewith would not be unlawful), or has become impracticable as a result of a contingency occurring after the date of this Agreement that adversely affects the London interbank Yen market, then, and in any such event, the Agent shall (x) promptly give written notice to the Borrower of such determination and (y) within fifteen (15) Business Days of the date on which such event no longer exists, give written notice to the Borrower of such cessation (which notice in each case the Agent shall promptly transmit to each of the other Lenders). Thereafter the Borrower shall pay to the Agent on behalf of the affected Lender, within fifteen (15) Business Days of written demand therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its reasonable opinion shall determine) as shall be required to compensate such Lender for any increased costs or reductions in amounts receivable hereunder (a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent manifest error, be final and conclusive and binding upon all parties hereto).

(c) At any time that any Loan is affected by the circumstances described in Section 2.14 (a) or Section 2.15 (b), the Borrower may (and in the case of a Loan affected pursuant to Section 2.15 (b) shall) either prepay such Loan in full or, upon at least three (3) Business Days' prior written notice to the Agent, require the affected Lender to convert such Loan into a Loan bearing interest at a rate mutually agreed upon between the Borrower and such affected Lender, provided that if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.15 (c) and such rate must be agreed upon by the Borrower and all such affected Lenders.

(d) Section 2.15 (a) above does not in any way limit the obligations of the Borrower under this Agreement. The Borrower agrees to indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of any step taken by it under this Section. A Finance Party is not obliged to take any step under this Section if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

(e) No term of this Agreement will: (i) interfere with the right of any Finance Party to arrange its affairs (Tax or otherwise) in whatever manner it thinks fit; (ii) oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it in respect of Tax or the extent, order and manner of any claim;

17

or (iii) oblige any Finance Party to disclose any information relating to its affairs (Tax or otherwise) or any computation in respect of Tax.

SECTION 2.16. Compensation. The Borrower shall pay to the Agent, for the account of each Lender, within ten (10) Business Days of such Lender's written request (which request shall set forth the basis for requesting such compensation and a reasonably detailed calculation of any amount such Lender is entitled to receive pursuant to this Section), compensation for all reasonable losses, costs, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Loans) which such Lender may sustain:

(i) if for any reason (other than a default by such Lender or the Agent, as the case may be) a Borrowing does not occur on the date specified therefor in a notice of borrowing (whether or not withdrawn by the Borrower or deemed withdrawn pursuant to Section 2.14 or Section 2.15;

(ii) if any repayment or prepayment of any of its Loans occurs on a date that is not the last day of an Interest Period applicable thereto;

(iii) if any prepayment of any of its Loans (a) is not made on any date specified in a notice of prepayment given by the Borrower or (b) is made without the Borrower having given a notice of prepayment; or

(iv) as a consequence of any action taken pursuant to Section 2.15(c).

(v) any failure by the Borrower to prepay the Loan hereunder after irrevocable notice of such prepayment has been given pursuant to Section 2.13

(vi) any default in payment or prepayment of the principal amount of the Loan or any part thereof or interest accrued thereon, as and when due and payable (at the due date thereof, whether by scheduled maturity, acceleration, irrevocable notice of prepayment or otherwise), including, in each such case, any loss or reasonable expense sustained or incurred or to be sustained or incurred in liquidating or employing deposits from third parties acquired to effect or maintain such Loan or any part thereof.

Such loss or reasonable expense prescribed in this Section 2.16 shall include an amount equal to the excess, if any, as reasonably determined by such Lender, of (a) its cost of obtaining the funds for the Loan being paid or prepaid (assumed to be the LIBO Rate) for the period from the date of such payment or prepayment to the last day of the Interest Period for such Loan over (b) the amount of interest (as reasonably determined by such Lender) that would be realized by such Lender in reemploying the funds so paid or prepaid for such period or Interest Period, as the case may be. A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 and explaining in reasonable detail the basis for calculating such amount or amounts (provided that no Lender shall be required to match or trace deposits funding such Loan) shall be delivered to the Agent for further delivery to the

18

Borrower not later than 5:00 p.m. (New York time) (c) on the second Business Day prior to the proposed date of such repayment, in the case of voluntary prepayment pursuant to Section 2.13(a), or (d) on the fifth Business Day from the date of such payment or repayment, in all other cases, and shall be conclusive absent manifest error.

Calculation of all amounts payable to a Bank under this Section 2.16 shall be made as though that Lender had actually funded its relevant Loan through the purchase of a deposit bearing interest at the LIBO Rate in an amount equal to the amount of that Loan, having a maturity comparable to the relevant Interest Period; provided, however, that each Lender may fund each of its Loans in any manner it sees fit and the foregoing assumption shall be utilized only for the calculation of amounts payable under this Section 2.16.

SECTION 2.17. Pro Rata Treatment. Except as required or permitted under Section 2.15 or 10.07, each payment or prepayment of principal of and each payment of interest on the Loan, shall be allocated pro rata among the Lenders in accordance with the respective principal amounts of their outstanding Loan after giving effect to any payment or prepayment of such Loan.

SECTION 2.18. Sharing of Setoffs. Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower, or by any other means except pursuant to Section 2.15 or 10.07, obtain payment (voluntary or involuntary) in respect of the Loan under this Agreement, then:

(a)  such Lender (the "Paying Lender") shall promptly pay to the Agent the full amount or, as the case may be, an amount equal to the equivalent of the full amount so received or recovered after deducting any expenses incurred by the Paying Lender in obtaining such amount;

(b)  as between the Borrower and the Paying Lender, the Borrower shall remain or again become indebted to such Paying Lender hereunder with respect to such amount paid to the Agent by such Paying Lender pursuant to Section 2.18(a), as if no receipt or recovery had been made, to the extent of an amount equal to (i) the amount so paid minus (ii) the amount distributed back to such Paying Lender in connection with such receipt or recovery pursuant to Section 2.18(c); and

(c)  the Agent shall treat the amount so paid as if it were a payment by the Borrower on account of amounts due from the Borrower hereunder for distribution to the Paying Lender and each of the other Lenders in the proportions in which the Paying Lender and the other Lenders would have been entitled to receive such amount had it been paid by the Borrower to the Agent hereunder; provided that:

19

(i) a Paying Lender, which shall have commenced or joined (as a plaintiff) in an action or proceeding in any court or arbitration to recover sums due to it under this Agreement and pursuant to a settlement or compromise of that action or proceeding shall have received any amount, shall not be required to share any proportion of that amount with a Lender that has notice of such action or proceeding and the legal right to, but does not, join such action or proceeding or commence and diligently prosecute a separate action or proceeding to enforce its rights in the same or another court or arbitration proceeding; and

(ii) every payment and adjustment made pursuant to this Section 2.18 shall be subject to the condition that if the amount (or any part thereof) is subsequently required to be repaid by the Paying Lender to the Borrower or any third person, as the case may be, the Agent (if it holds the same) and each of the Lenders that has received any part thereof from the Agent shall repay such amount (or the relevant part) to the Paying Lender together with such amount (if any) as is necessary to reimburse the Paying Lender the appropriate portion of any interest it shall have been obliged to pay when repaying such amount as aforesaid and the adjustments pursuant to this Section 2.18 shall be canceled.

SECTION 2.19. Payments. (a) The Borrower shall make each payment (including principal of or interest on the Loan or other amounts) hereunder and each other payment under this Agreement that is not specified in paragraph (b) below, to the Agent Account not later than 11:00 a.m., Tokyo time, on the date when due, in Yen in immediately available funds, without setoff or counterclaim. In order to make such payment, the Borrower shall issue a payment order, for the due value date, by close of the Business Day (New York time) immediately preceding such due date. If such payments are delayed, such payments shall be deemed to have been made on the date when the relevant amount is credited to the Agent Account. All charges and other costs incurred in relation to such delayed payments shall be borne by the Borrower. The Agent will promptly distribute to each Lender its ratable share of each such payment received by the Agent for the respective accounts of the Lenders. If the date for any payment of principal is extended by operation of law or otherwise, interest thereon shall be payable for such extended time.

(b) Unless the Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Lenders hereunder that the Borrower will not make such payment in full, the Agent may assume that the Borrower has made such payment in full to the Agent on such date and the Agent may, in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent that the Borrower shall not have so made such payment, each Lender shall repay to the Agent forthwith on

20

demand such amount distributed to such Lender together with interest thereon, for each day from the date on which such amount is distributed to such Lender until the date on which such Lender repays such amount to the Agent, at the rate per annum at which one-day deposits in Yen are offered to the Agent in the Tokyo interbank market for such day.

(c) Notwithstanding any provision of this Agreement to the contrary, any remittance costs incurred by a paying Borrower or paying Lender under this Agreement shall be for the account of such paying Borrower or such paying Lender.

SECTION 2.20. Application of Payments.

(a) After a Default, any payments received by the Agent shall be applied towards the categories of the Borrower's obligations under this Agreement in the following order:

(i) **first**, towards payment of any unpaid fees (including Administrative Fees), and costs and expenses of the Agent payable under this Agreement;

(ii) **secondly**, towards payment of any unpaid fees, costs and expenses payable by the Borrower under this Agreement (other than those referred to in (i) above);

(iii) **thirdly**, towards payment of any default interest under Section 2.10;

(iv) **fourthly**, towards payment of any accrued interest due but unpaid under this Agreement; and

(v) **fifthly**, towards payment of any principal due but unpaid under this Agreement.

With respect to the category in which a shortfall occurs, the amount available shall be applied *pro rata* to each of the obligations of the Borrower in such category.

(b) The Agent shall distribute in the order of Section 2.20 (a) (iii) to (v) and pro rata to the Lenders the amounts received by the Agent to be applied towards the Borrower's obligations under this Agreement, after deducting the amounts provided for in Section 2.20 (a) (i) and (ii).

21

Notwithstanding the provisions in Section 2.20 (a) each Lender may apply the amounts received from the Borrower as it deems fit, if the obligations of the Borrower have been accelerated under Article VII.

If the payment by the Borrower is not made by the due date, the Agent shall be released from the obligation to proceed with the distribution set forth in this Section 2.20 (b) on such due date.

SECTION 2.21.Taxes. The following provisions shall be for the benefit of and apply to the Finance Parties:

(a) The Borrower must make all payments to be made by it under this Agreement without any Tax Deduction, unless a Tax Deduction is required by law. If the Borrower or a Lender is aware that the Borrower must make a Tax Deduction (or that there is a change in the rate or the basis of a Tax Deduction), it must promptly notify the Agent. The Agent must then promptly notify the affected parties to this Agreement. If a Tax Deduction is required by law to be made by the Borrower or the Agent, the amount of the payment due from the Borrower will be increased to an amount which (after making the Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required. If the Borrower is required to make a Tax Deduction, the Borrower must make the minimum Tax Deduction allowed by law and must make any payment required in connection with that Tax Deduction within the time allowed by law. Within 30 days of making either a Tax Deduction or a payment required in connection with a Tax Deduction, the Borrower must deliver to the Agent for the relevant Finance Party an original receipt (or certified copy thereof), or if unavailable, such other evidence satisfactory to that Finance Party (acting reasonably) that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority. The Borrower is not required to make an increased payment to a Lender under this Section 2.21 (a) for a Tax Deduction, if the Borrower is able to demonstrate that the payment could have been made to the Lender without the Tax Deduction had that Lender co-operated in completing any procedural formalities necessary for the Borrower to obtain authorisation to make that payment without a Tax Deduction or a Tax Deduction at a lower rate.

(b) Except as provided below, the Borrower must indemnify a Finance Party against any loss or liability which that Finance Party (in its absolute discretion) determines will be or has been suffered (directly or indirectly) by that Finance Party for or on account of Tax in relation to a payment received or receivable (or any payment deemed to be received or receivable) under this Agreement. This Section 2.21 (b) does not apply to any Tax assessed on a Finance Party under the laws of the jurisdiction in which: (i) that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party has an office and is treated as resident for tax purposes; or (ii) that Finance Party's office is located in respect of amounts received or receivable in that jurisdiction, if that Tax is imposed on or calculated by reference to the net income received or receivable by that Finance Party. However, any payment

22

deemed to be received or receivable, including any amount treated as income but not actually received by the Finance Party, such as a Tax Deduction, will not be treated as net income received or receivable for this purpose. A Finance Party making, or intending to make, a claim under this Section 2.21.(b) must promptly notify the Borrower of the event which will give, or has given, rise to the claim.

(c) If the Borrower makes a Tax Payment and the relevant Finance Party (in its absolute discretion) determines that a Tax Credit is attributable to that Tax Payment; and it has obtained, certified and fully retained that Tax Credit on an affiliated group basis, the Finance Party must pay an amount to the Borrower which that Finance Party determines (in its absolute discretion) will leave it (after that payment) in the same after-tax position as it would have been if the Tax Payment had not been required to be made by the Borrower.

(d) The Borrower must pay and indemnify each Finance Party against any stamp duty ("inshizei"), registration or other similar Tax payable in connection with the entry into, performance or enforcement of this Agreement, except for any such Tax payable in connection with the entry into an Assignment in the form of Exhibit C.

(e) Any amount (including costs and expenses) payable under this Agreement by the Borrower is exclusive of any consumption tax ("shohizei") or any other Tax of a similar nature which might be chargeable in connection with that amount. If any such Tax is chargeable, the Borrower must pay to the Finance Party (in addition to and at the same time as paying that amount) an amount equal to the amount of that Tax. The obligation of the Borrower under Section 2.21 (e) (i) above will be reduced to the extent that the Finance Party determines (acting reasonably) that it is entitled to repayment or a credit in respect of the relevant Tax.

(f) Except as provided below, each Lender which is not a U.S. person (as such term is defined in Section 7701(a)(30) of the Code) must supply to the Agent two duly executed U.S. Internal Revenue Service Forms W-8BEN or W-8ECI (as appropriate) to enable payments to be made to that Lender under this Agreement without, or with a reduced rate of, any deduction or withholding in respect of any Tax in the United States. A Lender must comply with its obligations under this Section 2.21 (f) as soon as practicable after the date it becomes a party. A Lender is not obliged to supply any form under this Section 2.21 (f) if it is unable to do so by reason of any change after the date of this Agreement in (or in the interpretation, administration or application of) any law or regulation or any published practice or concession of any relevant taxing authority.

23

## ARTICLE III

### Representations and Warranties

In order to induce the Lenders to enter into this Agreement and to make the Loans provided for herein, the Borrower makes the following representations and warranties to, and agreements with, the Lenders, all of which shall survive the execution and delivery of this Agreement and the making of the Loans:

SECTION 3.01. Organizational Status.  Each of the Borrower and its Significant Subsidiaries (i) is a duly organized and validly existing corporation in good standing under the laws of the jurisdiction of its incorporation and (ii) has the power and authority to own its property and assets and to transact the business in which it is engaged; each of the Borrower and its Significant Subsidiaries is duly qualified as a foreign corporation and is in good standing in each jurisdiction where the ownership, leasing or operation of property or the conduct of its business requires such qualification except where the failure to be so qualified would not be likely to result in a Material Adverse Change.

SECTION 3.02. Power and Authority.  The Borrower has the corporate power and authority to execute, deliver and perform the terms and provisions of this Agreement and to borrow hereunder and has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement and borrowing by it.  The Borrower has duly executed and delivered each of this Agreement, and this Agreement constitutes its valid and binding obligations enforceable in accordance with its respective terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether the issue of enforceability is considered in a proceeding in equity or at law).

SECTION 3.03. No Violation.  Neither the execution, delivery or performance by the Borrower of this Agreement, nor compliance by it with the terms and provisions hereof, will (nor will the use of the proceeds of the Loans in any material respect) (i) contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or governmental instrumentality by which the Borrower or any of its material properties or assets is bound, (ii) conflict or be inconsistent with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the material property or assets of the Borrower pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement, loan agreement or any other material agreement,

24

contract or instrument to which the Borrower is a party or by which it or any of its material property or assets is bound or to which it may currently be subject or (iii) violate any provision of the Certificate of Incorporation or By-Laws of the Borrower.

SECTION 3.04.Consents: Governmental Approvals. No consent of any Person, including, without limitation, stockholders and creditors of the Borrower, and no order, consent, approval license, authorization or validation of, or filing, recording or registration with, or exemption by (except as have been obtained or made prior to the Closing Date and which remain in full force and effect), any governmental or public body or authority, or any subdivision thereof, is required to authorize, or is required in connection with, (i) the execution, delivery and performance of this Agreement, (ii) the legality, validity, binding effect or enforceability of this Agreement or (iii) the borrowing hereunder by the Borrower.

SECTION 3.05.Financial Statements: Financial Condition. The consolidated audited statement of financial condition, and the related consolidated statements of income, changes in stockholders' equity and cash flows, of the Borrower and its Consolidated Subsidiaries as of November 30, 2006, and the consolidated audited statement of financial condition, and the related consolidated statements of income, changes in stockholders' equity and cash flows, of the Borrower and its Consolidated Subsidiaries for the fiscal years ended November 30, 2005 and 2004, heretofore furnished to each of the Lenders, fairly present in all material respects the consolidated financial condition, and the consolidated results of the operations, of the Borrower and its Consolidated Subsidiaries as of the respective dates of such financial statements and for the respective periods covered. All such financial statements have been prepared in accordance with U.S. GAAP, consistently applied. From November 30, 2006 to the Closing Date, there has been no Material Adverse Change.

SECTION 3.06.Litigation. Except as set forth in the latest report of the Borrower delivered pursuant to Section 6.01(d) or (e) hereof or as disclosed on Exhibit B delivered on the Closing Date hereof, there are no actions, suits or proceedings pending or, to the best knowledge of the Borrower, threatened, (i) with respect to this Agreement or (ii) that have resulted or, in the best judgment of the Borrower, are reasonably likely to result in a Material Adverse Change.

SECTION 3.07.True and Complete Disclosure. All factual information (taken as a whole) heretofore or contemporaneously furnished by or on behalf of the Borrower in writing to the Agent or any Lender (including without limitation all information concerning the Borrower contained in this

Agreement) for purposes of or in connection with this Agreement or any transaction contemplated herein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of the Borrower in writing to the Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

SECTION 3.08.Use of Proceeds; Margin Regulations. All proceeds of each Loan shall be used by the Borrower for general corporate purposes. Neither the making of any Loan nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation U or X, nor will any part of the proceeds of any Loan be used, directly or indirectly, to purchase or carry any Margin Stock in violation of Regulation U.

SECTION 3.09.Tax Returns and Payments. Each of the Borrower and its Significant Subsidiaries has filed all material tax returns to be filed by it and has paid all material income taxes payable by it which have become due pursuant to such tax returns and all other material taxes and assessments payable by it which have become due, other than those not yet delinquent and except for those contested in good faith and for which adequate reserves have been established in accordance with U.S. GAAP. Each of the Borrower and its Significant Subsidiaries has paid, or has provided adequate reserves in accordance with U.S. GAAP (in the good faith judgment of the management of the Borrower) for the payment of, all material federal and state income taxes applicable for all prior fiscal years and for the current fiscal year to the date hereof.

SECTION 3.10.ERISA.

(a) Domestic Plans. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Change. The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the current fair market value of the assets of such Plan by an amount that could reasonably be expected to result, individually or in the aggregate, in a Material Adverse Change, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of

26

the assets of all such underfunded Plans by an amount that could reasonably be expected to result, individually or in the aggregate, in a Material Adverse Change.

(b) Foreign Plans. Each Foreign Pension Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders, and neither the Borrower nor any of its Subsidiaries has incurred any obligation in connection with the termination of or withdrawal from any Foreign Pension Plan, which, in either case, could reasonably be expected to result in a Material Adverse Change. The present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan which is required by applicable law to be funded determined as of the end of the Borrower's most recently ended fiscal year on the basis of actuarial assumptions did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities by an amount that could reasonably be expected to result in a Material Adverse Change.

SECTION 3.11.Subsidiaries. The definition of the Significant Subsidiary correctly sets forth Significant Subsidiaries of the Borrower as of the Closing Date.

SECTION 3.12.Compliance with Laws, Statutes, etc. Each of the Borrower and its Significant Subsidiaries is in compliance with all applicable laws, statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), except such noncompliance as would not, in the aggregate, be reasonably likely to cause a Material Adverse Change.

SECTION 3.13.Investment Company Act. The Borrower is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended, is not required to be registered thereunder and is not so registered.

SECTION 3.14.Public Utility Holding Company Act. The Borrower is not a "holding company," or a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company" within the meaning of the Public Utility Holding Company Act of 1935, as amended.

SECTION 3.15.No Default. No event has occurred and is continuing, or would result from the making of a Loan then requested hereunder, that constitutes or would constitute an Event of Default.

SECTION 3.16.Pari Passu. Under applicable laws in force at the date hereof, the claims and rights of the Lenders and the Agent against the

27

Borrower under this Agreement will not be subordinate to, and will rank at least pari passu in all respects with, the claims and rights of any other senior unsecured creditors of the Borrower except as limited by applicable law.

SECTION 3.17.Exchange Membership; Licenses; Registrations.

(a) Exchange and NASD. Each Significant Subsidiary of the Borrower that is a U.S. Regulated Broker-Dealer is a member organization in good standing of the Exchange and NASD and is in compliance with all of the rules, regulations, orders and requirements thereof and of the SEC other than noncompliance that could not reasonably be expected to cause a Material Adverse Change, and the SEC has not revoked its broker-dealer registration.

(b) Other Exchanges and Associations. Each Regulated Broker-Dealer which is a Significant Subsidiary is a member in good standing of any relevant securities exchange and/or self-regulatory association in the jurisdiction in which it is located and/or doing business, has all material licenses and other governmental authorizations necessary to conduct its business in the ordinary course, and is in compliance with all of the rules, regulations, orders and requirements thereof and of any relevant regulatory authority in such jurisdiction other than noncompliance that could not reasonably be expected to cause a Material Adverse Change, and the relevant government regulatory agency has not revoked its broker-dealer registration.

ARTICLE IV

Conditions of Lending

SECTION 4.01.Conditions Precedent to Effectiveness. This Agreement shall become effective on the Closing Date subject to the satisfaction or waiver of the following conditions precedent:

(a) Execution of Agreement. The Borrower, the Agent, Arrangers and each of the Lenders shall have signed a copy of this Agreement (whether on the same or different copies) and shall have delivered the same to the Agent at the New York Office of the Agent.

(b) Opinions of Counsel. The Agent shall have received an opinion, or opinions, addressed to the Agent and each of the Lenders and dated the Closing Date, from (i) Masaki Kanehyo, counsel to the Borrower, in the form of Exhibit D-1 hereto, (ii) Barrett DiPaolo, counsel to the Borrower, in the form of Exhibit D-2 hereto, and (iii) Anderson Mori & Tomotsune, counsel to the Finance Parties, in the form of Exhibit D-3.

28

(c) <u>Payment of Fees.</u> All fees, costs and expenses, and all other compensation contemplated by this Agreement, due to the Agent or the Lenders (including, without limitations, reasonable legal fees and expenses for which invoices have been delivered at least two (2) Business Days prior to the Borrowing Date) shall have been paid to the extent due by such time as separately agreed in the Fee Letter.

(d) <u>Corporate Proceedings.</u>

(i) <u>Corporate Documents.</u> On the Closing Date, the Agent shall have received from the Borrower a certificate, dated the Closing Date, signed by the Responsible Officer of the Borrower, and attested to by the Secretary or any Assistant Secretary of the Borrower, in the form of Exhibit F with appropriate insertions, together with copies of the Certificate of Incorporation and By-Laws of the Borrower and the resolutions of the Borrower referred to in such certificate, and all the foregoing shall be reasonably satisfactory to the Agent.

(ii) <u>Other Documents.</u> All documents and instruments to be delivered by the Borrower in connection with the transactions contemplated by this Agreement shall be reasonably satisfactory in form and substance to the Agent, and the Agent shall have received all information and copies of all certificates, documents and papers, including good standing certificates and any other records of corporate proceedings and governmental approvals, if any, that the Agent reasonably may have requested in connection therewith, such documents and papers where appropriate to be certified by proper corporate or governmental authorities.

(e) <u>Change in Condition.</u> No Material Adverse Change shall have occurred since November 30, 2006.

(f) <u>No Default: Representations and Warranties.</u> (i) There shall exist no Event of Default and (ii) all representations and warranties contained herein shall be true and correct in all material respects (or, if any such representation or warranty is expressly stated to have been made as of a specific date, such representation or warranty shall be true and correct as of such specific date).

SECTION 4.02. <u>Conditions Precedent to the Drawdown.</u> The obligation of each Lender to make the Loan is subject at the time of the Drawdown Notice with respect to such Loan and the time of such drawdown to the satisfaction or waiver of the following conditions precedent:

(a) <u>Effectiveness.</u> The Closing Date shall have occurred.

(b) <u>No Default; Representations and Warranties.</u> At the time of each drawdown and also after giving effect thereto (i) there shall exist no Event of Default and (ii) all representations and warranties contained herein (except for the representations and warranties contained in the last sentence of Section 5.05) shall be true

and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such drawdown (or, if any such representation or warranty is expressly stated to have been made as of a specific date, such representation or warranty shall be true and correct as of such specific date).

        (c) <u>Drawdown Notice</u>. Prior to the drawdown of the Loan, the Agent shall have received a Drawdown Notice with respect thereto.

The acceptance of the benefits of each drawdown shall constitute a representation and warranty by the Borrower to each of the Lenders that all the conditions specified in Section 4.02(b) exist as of that time.

## ARTICLE V

### Affirmative Covenants

        The Borrower covenants and agrees that on and after the Closing Date and thereafter for so long as this Agreement is in effect and until the Loans, together with interest, Administrative Fees, Arrangement Fees and all other obligations incurred hereunder are paid in full, unless the Required Lenders shall otherwise consent in writing:

        SECTION 5.01.<u>Information Covenants.</u> The Borrower will furnish to the Agent (who shall promptly provide copies to each Lender):

        (a) <u>Quarterly Financial Statements</u>. No later than the earlier of (x) 75 days after the close of each of the first three quarterly accounting periods in each fiscal year of the Borrower and (y) 30 days after the Quarterly Report (as defined below) shall be required to be filed with the SEC pursuant to the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), the unaudited consolidated statements of financial condition of the Borrower and its Consolidated Subsidiaries as of the last day of such quarterly period and the related consolidated statements of income for such quarterly period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period in each case setting forth comparative figures for the related periods in the prior fiscal year (the "<u>Quarterly Report</u>"), all of which shall be prepared in accordance with U.S. GAAP, consistently applied (except that such financial statements need not contain certain footnotes that would be required by U.S. GAAP), and shall be certified by the Responsible Officer of the Borrower, subject to normal year-end audit adjustments.

        (b) <u>Annual Financial Statements</u>. No later than the earlier of (x) 120 days after the close of each fiscal year of the Borrower and (y) 30 days after the Annual Report (as defined below) shall be required to be filed with the SEC pursuant to the Exchange Act, the consolidated audited statements of financial condition of the Borrower and its Consolidated Subsidiaries as of the last day of such fiscal year and the related consolidated audited statements of income and changes in stockholders' equity

and cash flows for such fiscal year in each case setting forth comparative figures for the prior fiscal year (the "Annual Report"), all of which shall be prepared in accordance with U.S. GAAP, consistently applied, and shall be certified by independent certified public accountants of recognized national standing.

(c) Officer's Certificate. At the time of each delivery of the financial statements provided for in Section 5.01(a) and (b), a certificate of the Responsible Officer of the Borrower setting forth in reasonable detail the calculations required to establish whether the Borrower was in compliance with the provisions of Section 6.03 at the end of such fiscal quarter or year, as the case may be, and stating that as of the date of such financial statements, no Event of Default has occurred and is continuing or, if any Event of Default has occurred and is continuing, specifying the nature and extent thereof and the action that the Borrower has taken or proposes to take with respect thereto.

(d) Notice of Default or Litigation. Promptly, and in any event within three (3) Business Days after any Responsible Officer obtains knowledge thereof, notice of (i) the occurrence of any event that constitutes an Event of Default (which notice shall state that such notice is a "notice of default"), (ii) any litigation, arbitration or governmental proceeding or proceeding by any regulatory authority having jurisdiction over the Borrower or any of its Significant Subsidiaries pending (x) against the Borrower or any of its Significant Subsidiaries that, in the best judgment of the Borrower, is reasonably likely to cause a Material Adverse Change or (y) with respect to this Agreement and (iii) any other event specific to the Borrower or any of its Significant Subsidiaries that is not a matter of general public knowledge that, in the best judgment of the Borrower, is reasonably likely to cause a Material Adverse Change.

(e) Other Reports and Filings. Promptly, copies of all reports on Form 8-K, 10-K or 10-Q and proxy materials that the Borrower or any Significant Subsidiary shall file with the SEC (including such copies of reports reflecting any changes in the Borrower's trade name, principal business address or chief executive officer).

(f) Other Information. From time to time, such other information or documents (financial or otherwise) as the Agent or any Lender may reasonably request, provided that compliance with any information request made pursuant to this paragraph after the submission by the Borrower of a Drawdown Notice in respect of any Loan shall not be a condition precedent to such Loan.

Notwithstanding any other provision of this Agreement, it is understood and agreed that the Borrower's obligations to provide any such financial statement, accountant's report, certification or other report described in Section 5.01 (a), (b) or (e) to the Agent shall be fully complete and satisfied by electronic filing of such documents described in Section 5.01 (a), (b) or (e) with the SEC, made publicly available so that the Agent can access and obtain them directly, without any obligation from the Borrower to take any other

action, and the Borrower or any third party reporting service providing such notification of availability thereof by email to the representatives of the Agent.

SECTION 5.02. Books, Records and Inspections. The Borrower will, and will cause each of its Significant Subsidiaries to, keep proper books of record and account in which full, true and correct entries in conformity with U.S. GAAP (or the local analog thereof, as applicable, in the case of Significant Subsidiaries not incorporated in the United States) and all material requirements of law shall be made of all dealings and transactions in relation to its business and activities. The Borrower will permit officers and designated representatives of the Agent to visit and inspect, under guidance of officers of the Borrower, any of the properties of the Borrower, and, subject to applicable law, to examine the financial and accounting records of the Borrower or its Significant Subsidiaries and discuss the affairs, finances and accounts of the Borrower or such Significant Subsidiaries with, and be advised as to the same by, its officers, all at such reasonable times and intervals, upon reasonable prior notice to the Borrower and to such reasonable extent as the Agent may request; provided that compliance with any request made pursuant to this sentence after the submission by the Borrower of a Drawdown Notice in respect of any Loan shall not be a condition precedent to such Loan. At the reasonable request of any Lender, the Agent will provide such Lender with any information given to the Agent in the course of such examination or discussion.

SECTION 5.03. Maintenance of Insurance. The Borrower will, and will cause each of its Significant Subsidiaries to, insure its business and assets with insurance companies or underwriters to such an extent and against such risks as, in the reasonable judgment of the Borrower, prudent companies of similar size and engaged in a similar business are normally insuring.

SECTION 5.04. Corporate Franchises. The Borrower will, and will cause each of its Significant Subsidiaries to, preserve and keep in full force and effect, and will do or cause to be done, all things necessary to so preserve and keep in full force and effect, its existence and all permits, rights or other authorizations required or necessary for the conduct of its or their business, except to the extent the failure to so do could not reasonably be expected to result in a Material Adverse Change; provided, however, that nothing in this Section 5.04 shall prevent (i) the withdrawal by the Borrower or any of its Subsidiaries in any jurisdiction where such withdrawal is not reasonably likely to cause a Material Adverse Change, (ii) the dissolution, liquidation, merger, sale or other disposition or any Subsidiary other than a Significant Subsidiary or (iii) any dissolution, liquidation, merger, sale or other disposition permitted under Section 6.02 hereof.

32

SECTION 5.05.Compliance with Laws, Statutes, etc. The Borrower will, and will cause each of its Significant Subsidiaries to, comply with all applicable laws, statutes, regulations, and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), except such non-compliances as are not reasonably likely, in the aggregate, to cause a Material Adverse Change.

SECTION 5.06.Maintenance of Ownership. Except as otherwise permitted by Section 6.02, the Borrower shall continue to: (i) own directly, free and clear of any Lien, not less than 80% of the Voting Stock of Lehman Brothers Inc.; and (ii) own, directly or indirectly, free and clear of any Lien, not less than 80% of the Voting Stock of each other Significant Subsidiary (or, in the case of any Subsidiary that shall have become a Significant Subsidiary after the Closing Date, such lesser percentage of the Voting Stock of such Subsidiary as shall have been owned by the Borrower at the time such Subsidiary became a Significant Subsidiary).

SECTION 5.07.Net Capital Deficit. The Borrower shall give prompt written notice to the Agent and the Lenders if (a) any Significant Subsidiary of the Borrower that is a U.S. Regulated Broker-Dealer reports to the SEC a net capital deficit as defined in the Net Capital Rule or (b) any other Regulated Broker-Dealer which is a Significant Subsidiary of the Borrower reports to the relevant regulatory authority in any relevant jurisdiction a net capital deficit (or the equivalent) as defined in any rule, regulation, order or requirements of such regulatory authority regarding net capital or capital adequacy requirement, and the Borrower shall deliver to the Agent and the Lenders a copy of any such report.

SECTION 5.08.Payment of Taxes. The Borrower will pay and discharge, and will cause each of its Significant Subsidiaries to pay and discharge, all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims relating to taxes which, if unpaid, might become a Lien or charge for an aggregate amount of $125,000,000 (or the equivalent in any other currency or currencies) or more upon any properties of the Borrower or any of its Significant Subsidiaries, (i) except where such tax, assessment, charge, levy or claim that is being contested in good faith and by appropriate proceedings and (ii) as to which adequate reserves are established in accordance with U.S. GAAP.

33

SECTION 5.09. SIPA. The Borrower shall cause each Significant Subsidiary of the Borrower that is a U.S. Regulated Broker-Dealer to file all reports and information required pursuant to SIPA and promptly pay when due all or any part of an assessment made upon it pursuant to SIPA.

SECTION 5.10. Pari Passu. The Borrower shall ensure that the claims and rights of the Lenders and the Agent against the Borrower under this Agreement will not be at any time subordinate to, and will rank at all times at least <u>pari passu</u> in all respects with, the claims and rights of any other senior unsecured creditors of the Borrower except as limited by applicable law.

SECTION 5.11. ERISA. As soon as possible and, in any event, within 15 days after the Borrower knows of the occurrence of an ERISA Event that could result in a liability that is reasonably likely to exceed $125,000,000, the Borrower will give written notice of such occurrence to the Agent. Such notice shall be accompanied by a statement of the Responsible Officer of the Borrower setting forth details of such occurrence and stating what action the Borrower or the ERISA Affiliate proposes to take with respect thereto. In addition to any certificates or notices delivered to the Agent pursuant to the first sentence of this Section 5.11, copies of any material notices received by the Borrower, any Subsidiary or any ERISA Affiliate (i) from any governmental agency with respect to any Plan having aggregate unfunded liabilities in excess of $125,000,000 and (ii) from any government agency, plan administrator, sponsor or trustee with respect to any Multiemployer Plan having aggregate unfunded liabilities in excess of $125,000,000 shall be delivered to the Agent no later than 15 days after the later of the date such notice has been filed with the Internal Revenue Service or received by the Borrower or the Subsidiary or the ERISA Affiliate.

SECTION 5.12. Business. Subject to Section 6.02, the Borrower will, and will cause its Significant Subsidiaries to, continue to engage in businesses of the same general type as the businesses in which the Borrower and its Significant Subsidiaries are engaged as of the Closing Date.

ARTICLE VI

Negative Covenants

The Borrower covenants and agrees that on and after the Closing Date and thereafter for so long as this Agreement is in effect and until such time as the Loans, together with interest, Administrative Fees, Arrangement Fees and all other obligations incurred hereunder and thereunder, are paid in full:

34

SECTION 6.01.Liens.  The Borrower will not, and will not permit any Designated Subsidiary to, directly or indirectly, create, issue, assume, incur or guarantee any Indebtedness which is secured by a Lien on any of the present or future common stock of a Designated Subsidiary (other than any Unrestricted Margin Stock).

SECTION 6.02.Consolidation, Merger, Sale of Assets, etc. The Borrower will not, and will not permit any Significant Subsidiary to, wind up, liquidate or dissolve its affairs or enter into any merger, consolidation or other combination or convey, sell, lease or otherwise dispose of all or a substantial portion of its property or assets (any such conveyance, sale, lease or other disposition, a "Disposition"), except that:

(a) the Borrower or any Significant Subsidiary may make sales of assets (including securities and commodities owned) in the ordinary course of business;

(b) any Significant Subsidiary may make Dispositions to the Borrower;

(c) any Significant Subsidiary may make Dispositions to another Subsidiary which is (or, after giving effect to any such Disposition, will be) a Significant Subsidiary (x) the Voting Stock of which is owned, directly or indirectly, by the Borrower in at least the same percentage as the Voting Stock of the Significant Subsidiary making such Disposition is owned, directly or indirectly, by the Borrower or (y) at least 80% of the Voting Stock of which is owned, directly or indirectly, by the Borrower;

(d) any Significant Subsidiary may enter into a Solvent Liquidation;

(e) the Borrower may enter into a merger, consolidation or other combination if the Borrower is the surviving corporation and no Event of Default shall have occurred and be continuing after giving effect to such merger, consolidation or other combination; and

(f) a Significant Subsidiary may enter into a merger, consolidation or other combination if the Borrower or a Subsidiary of the Borrower is the surviving corporation and no Event of Default shall have occurred and be continuing after giving effect to such merger consolidation or other combination;

provided that this Section 6.02 shall not apply to assets or property of the Borrower or of its Significant Subsidiaries which is Unrestricted Margin Stock.

SECTION 6.03. Tangible Net Worth. The Borrower shall not permit its Consolidated Tangible Net Worth at any time to be less than $7.0 billion.

SECTION 6.04. Loss of Memberships; Registrations; Licenses. The Borrower shall not, at any time, permit (i) any Significant Subsidiary which is a U.S. Regulated Broker-Dealer as of the Closing Date to cease to be a member organization in good standing of the Exchange or the NASD or to fail to maintain all material licenses and other governmental authorizations necessary to conduct its business in the ordinary course, unless such Significant Subsidiary is subject to a merger, sale or consolidation permitted under Section 6.02 and the surviving entity is a U.S. Regulated Broker-Dealer which is a member organization in good standing of the Exchange or the NASD and maintains all material licenses and other governmental authorizations necessary to conduct its business in the ordinary course, and (ii) Lehman Brothers Inc. to fail to maintain its government dealer registration.

SECTION 6.05. Limitation on Restrictions on Significant Subsidiary Dividends and Other Distributions. The Borrower will not, and will not permit any of its Significant Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Significant Subsidiary to (i) to pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Borrower or any Significant Subsidiary of the Borrower, or pay any Indebtedness owed to the Borrower or a Significant Subsidiary of the Borrower, (ii) make loans or advances to the Borrower or (iii) transfer any of its properties or assets to the Borrower, except for such encumbrances or restrictions existing under or by reasons of (w) applicable law or regulation (including, without limitation, any regulation of a securities or commodities exchange or any other self-regulatory organization having jurisdiction over the Borrower or any of its Significant Subsidiaries), (x) this Agreement, (y) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or a Significant Subsidiary of the Borrower and (z) solely in the case of any transfer of properties referred to in clause (iii) above, restrictions imposed by any agreement relating to Indebtedness to the extent such restrictions apply only to property or assets securing such Indebtedness.

ARTICLE VII

Events of Default

SECTION 7.01. Payments. The Borrower shall (i) default in the payment when due of any principal of any Loan or (ii) default and such

default shall continue unremedied for three (3) or more Business Days in the
payment when due of any interest on any Loan or (iii) default, and such
default shall continue unremedied for ten (10) or more Business Days in the
payment when due of any Administrative Fees, Arrangement Fees or any
other amounts owing hereunder; or

SECTION 7.02.Representations, etc.  Any representation,
warranty or statement made by or on behalf of the Borrower herein or in any
certificate delivered pursuant hereto shall prove to be untrue or misleading in
any material respect on the date as of which made or deemed made, unless the
circumstances giving rise to such representation being incorrect or misleading
are remedied within 15 Business Days of the earlier of the Agent giving
written notice to the Borrower, and the Borrower becoming aware thereof.; or

SECTION 7.03.Covenants.  The Borrower shall (i) default in
the due performance or observance by it of any term, covenant or agreement
contained in Sections 5.01(d), 5.06, 5.07, or Article VI, or (ii) default in the
due performance or observance by it of any term, covenant or agreement
(other than those referred to in Section 7.01 or 7.02 or clause (i) of this
Section 7.03) contained in this Agreement and such default shall continue
unremedied for a period of 15 days after written notice to the Borrower by the
Agent; or

SECTION 7.04.Default Under Other Agreements.  (i)  The
Borrower or any of its Significant Subsidiaries shall (A) default in any
payment of any Indebtedness (other than Indebtedness incurred under this
Agreement) having an aggregate principal amount of $125,000,000 (or the
equivalent in any other currency or currencies) or more beyond the period of
grace (not to exceed 30 days), if any, provided in the instrument or agreement
under which such Indebtedness was created or (B) default in the observance or
performance of any agreement or condition relating to any Indebtedness (other
than Indebtedness incurred under this Agreement) or contained in any
instrument or agreement evidencing, securing or relating thereto, or any other
event shall occur or condition shall exist, the effect of which default or other
event or condition is to cause any such Indebtedness to become due prior to its
stated maturity in the aggregate amount of $125,000,000 (or the equivalent in
any other currency or currencies) or more; or (ii) any Indebtedness of the
Borrower or any of its Significant Subsidiaries in the aggregate amount of
$125,000,000 (or the equivalent in any other currency or currencies) or more
shall be declared to be due and payable, or required to be prepaid other than
by regularly scheduled required prepayment, prior to the stated maturity
thereof, or (iii) any Indebtedness of any Subsidiary of the Borrower which is
not a Significant Subsidiary shall be declared to be due and payable, or
required to be prepaid other than by regularly scheduled required prepayment,

37

prior to the stated maturity thereof if such declaration or requirement could reasonably be expected to result in a Material Adverse Change; provided that this Section 7.04 shall not be effective as to a default arising solely as a result of any restrictive provision relating to any sale, pledge or other disposition of Margin Stock contained in any lending agreement to which any Lender or "affiliate" thereof (as defined in Regulation U) is a party and provided further, that (i), (ii) and (iii) above shall not apply with respect to any Indebtedness related to a Repo Transaction unless the Repo Transaction is owed by the Borrower and (x) the relevant counterparty has made demand for payment for the Repo Transaction and the Borrower is not contesting in good faith its obligation to pay such Repo Transaction by appropriate proceedings or other appropriate actions (which may include entering into negotiations in good faith with the relevant counterparty) or (y) the non-performance of the Repo Transaction by the Borrower has, or is reasonably likely to result in, a Material Adverse Change; or

SECTION 7.05. Bankruptcy, etc. The Borrower or any of its Significant Subsidiaries shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy", as now or hereafter in effect, or any successor thereto (the "Bankruptcy Code"); or an involuntary case is commenced against the Borrower or any of its Significant Subsidiaries, and the petition is not controverted within 20 days, or is not dismissed within 60 days, after commencement of the case; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of the Borrower or any of its Significant Subsidiaries, or the Borrower or any of its Significant Subsidiaries commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Borrower or any of its Significant Subsidiaries, or there is commenced against the Borrower or any of its Significant Subsidiaries any such proceeding which remains unstayed or undismissed for a period of 60 days, or the Borrower or any of its Significant Subsidiaries is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or the Borrower or any of its Significant Subsidiaries suffers any appointment of any custodian or the like for it or any substantial part of its property to continue undischarged or unstayed for a period of 60 days; or the Borrower or any of its Significant Subsidiaries makes a general assignment for the benefit of creditors; or any corporate action is taken by the Borrower or any of its Subsidiaries for the purpose of effecting any of the foregoing; or

SECTION 7.06. ERISA. (i) An ERISA Event shall have occurred that, when taken together with all other ERISA Events that have

38

occurred, could reasonably be expected to result in a Material Adverse
Change; or (ii) a contribution required to be made to a Foreign Pension Plan
has not been timely made, and there shall result from such event the
imposition of a lien, the granting of a security interest, or a liability or a
material risk of incurring a liability which lien, security interest or liability, is
reasonably likely, individually or in the aggregate, to cause a Material
Adverse Change; or

SECTION 7.07.Judgments. One or more judgments or decrees
shall be entered against the Borrower or any of its Significant Subsidiaries
involving in the aggregate for the Borrower and its Significant Subsidiaries a
liability (not paid or fully covered by insurance) of $125,000,000 (or the
equivalent in any currency or currencies) or more, and all such judgments or
decrees shall not have been vacated, discharged or stayed or bonded pending
appeal within 30 days after the entry thereof; or

SECTION 7.08.Net Capital. Any Significant Subsidiary of the
Borrower which is a U.S. Regulated Broker-Dealer fails to maintain net
capital in excess of that required by the Net Capital Rule, and such failure is
not remedied within 5 days thereof; or any Significant Subsidiary of the
Borrower which is a Non-U.S. Regulated Broker-Dealer fails to maintain net
capital or capital (or the equivalent) in excess of that required by any similar
rule, regulation or requirement (including any capital adequacy requirement)
of the relevant regulatory authority or authorities in any relevant jurisdiction,
and such failure is not remedied within 5 days thereof; or

SECTION 7.09.SIPA. SIPC shall apply for a decree
adjudicating that customers of any Significant Subsidiary of the Borrower that
is a U.S. Regulated Broker-Dealer are in need of protection under SIPA.
Which decree is not dismissed within ten (10) days; or

SECTION 7.10.Broker-Dealer Registration; etc. The SEC or
any other relevant regulatory authority under any relevant jurisdiction shall
have suspended or revoked the broker-dealer registration of any Significant
Subsidiary or the Examining Authority shall have suspended and failed to
reinstate within 10 days or revoked the Borrower's or any Significant
Subsidiary's membership as a member of the Examining Authority; or

SECTION 7.11.Change of Control. Any person or persons
acting in concert obtains the majority voting control of the Borrower;

then, and in any such event, and at any time thereafter, if any Event of Default shall then
be continuing, the Agent with the consent of the Required Lenders may and, upon the
written request of the Required Lenders, shall by written notice to the Borrower, take any
or all of the following actions, without prejudice to the rights of the Agent, any Lender to

enforce its claims against the Borrower (provided that, if an Event of Default specified in Section 7.05 shall occur with respect to the Borrower, the result which would occur upon the giving of written notice by the Agent to the Borrower as specified in clauses (i) and (ii) below shall occur automatically without the giving of any such notice): (i) declare the total Term Loan Commitment terminated, whereupon the Term Loan Commitment of each Lender shall forthwith terminate immediately and any Administrative Fees payable pursuant to Section 2.07 shall forthwith become due and payable without any other notice of any kind; (ii) declare the principal of and any accrued interest in respect of all Loans and all obligations owing hereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and (iii) take any other action, whether at law or at equity, which it deems necessary or advisable.

## ARTICLE VIII

### The Agent and Arrangers

In order to expedite the various transactions contemplated by this Agreement, Mizuho Corporate Bank, Ltd. is hereby appointed to act as the Agent on behalf of the Lenders. Each of the Lenders hereby irrevocably authorizes and directs the Agent to take such action on behalf of such Lender under the terms and provisions of this Agreement, and to exercise such powers hereunder as are specifically delegated to or required of the Agent by the terms and provisions hereof, together with such powers as are reasonably incidental thereto. The Agent is hereby expressly authorized on behalf of the Lenders, without hereby limiting any implied authority, and agrees to take, the following actions, subject to the terms and conditions of this Agreement: (a) to receive on behalf of each of the Lenders any payment of principal of or interest on the Loan outstanding hereunder and all other amounts accrued hereunder paid to such Agent, and to distribute to each Lender its proper share of all payments so received as soon as practicable; (b) to give notice promptly on behalf of each of the Lenders to the Borrower of any Event of Default specified in this Agreement of which the Agent has actual knowledge acquired in connection with its agency hereunder; and (c) to distribute promptly to each Lender copies of all notices, agreements and other material as provided for in this Agreement as received by the Agent.

The obligations of the Agent hereunder are only those expressly set forth herein. Without limiting the generality of the foregoing, the Agent shall not be required to take any action with respect to any Event of Default, except as expressly provided in Article VII.

None of the Agent, the Arrangers nor any of their respective directors, officers, employees or agents shall be liable to any Lender as such for any action taken or omitted by any of them hereunder except for its, his or her own gross negligence or willful misconduct, or be responsible for any statement, warranty or representation herein

40

or the contents of any document delivered in connection herewith (including, without limitation, the Information Memorandum) or be required to ascertain or to make any inquiry concerning the performance or observance by the Borrower of any of the terms, conditions, covenants or agreements of this Agreement. The Agent or the Arrangers shall not be responsible to the Lenders for the due execution, genuineness, validity, enforceability or effectiveness of this Agreement or any other instrument to which reference is made herein. The Agent shall in all cases be fully protected in acting, or refraining from acting, in accordance with written instructions signed by the Required Lenders or, to the extent expressly provided herein, all or any of the Lenders, and, except as otherwise specifically provided herein, such instructions and any action taken or failure to act pursuant thereto shall be binding on all the Lenders. The Agent shall, in the absence of knowledge to the contrary, be entitled to rely on any paper or document believed by it in good faith to be genuine and correct and to have been signed or sent by the proper person or persons. None of the Agent, the Arrangers nor any of their respective directors, officers, employees or agents shall have any responsibility to the Borrower on account of the failure or delay in performance or breach by any Lender of any of its obligations hereunder or to any Lender on account of the failure of or delay in performance or breach by any other Lender or the Borrower of any of their respective obligations hereunder or in connection herewith. The Agent may execute any and all duties hereunder by or through agents or employees and shall be entitled to advice of legal counsel, independent public accountants and other experts selected by it with respect to all matters arising hereunder and shall not be liable for any action taken, or omitted to be taken or suffered in good faith by it in accordance with the advice of them.

Mizuho Corporate Bank, Ltd. shall have the same right and powers under this Agreement as any other Lender and may exercise or refrain from exercising the same as though it were not the Agent. The Agent and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Affiliate thereof as if it were not an Agent.

Each Lender agrees (i) to reimburse the Agent in the amount of such Lender's pro rata share (based on its share of the Loan hereunder) of any expenses reasonably incurred for the benefit of the Lenders by the Agent, including reasonable counsel fees and compensation of agents and employees paid for services rendered on behalf of the Lenders, not reimbursed by the Borrower and (ii) to indemnify and hold harmless the Agent and any of its directors, officers, employees or agents, on demand, in the amount of its pro rata share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against it in its capacity as an Agent or any of them in any way relating to or arising out of this Agreement or any action taken or omitted by it or any of them under this Agreement, to the extent not reimbursed by the Borrower; provided, however, that no Lender shall be liable to the Agent or any director, officer, employee or agent thereof for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs,

expenses or disbursements resulting from the gross negligence or wilful misconduct of the Agent or any of its directors, officers, employees or agents or arising out of events occurring after the date such Lender ceases to be a party hereto.

Subject to the appointment and acceptance of a successor to the Agent as provided in this paragraph, the Agent may resign (the "Resigning Agent") at any time by notifying the Lenders and the Borrower. Upon any such resignation of the Agent, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no successor shall have been appointed as set forth above and shall have accepted such appointment within 30 days after the Resigning Agent gives notice of its resignation, the Resigning Agent may appoint a successor on behalf of the Lenders, which successor shall be a bank with an office in Tokyo or New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Agent, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the Resigning Agent, and the Resigning Agent shall be discharged from its duties and obligations hereunder. The Administrative Fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After any resignation of the Agent hereunder, the provisions of this Article and Section 10.05 shall continue in effect for the benefit of such Resigning Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agent, the Arrangers or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent, the Arrangers or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder.

The Borrower, the Agent and each Lender acknowledge and agree that the Arrangers, in their capacity as such, shall have no duties or responsibilities under this Agreement. Nothing herein constitutes the Arrangers as a trustee or fiduciary of any other person.

42

## ARTICLE IX

[Intentionally left blank]

## ARTICLE X

## Miscellaneous

SECTION 10.01.Notices. (a) Notices and other communications provided for herein (except as otherwise provided in this Agreement) shall be in writing and shall be delivered or mailed (or in the case of telegraphic communication, delivered by telecopy, graphic scanning or other telegraphic communications equipment) addressed,

(i) if to the Borrower, to it at 1301 Avenue of the Americas, New York, NY 10019, USA, Attention: Treasurer (Telecopy No. 212-520-0563; E-mail: Credit_Facility_Notice@lehman.com); with a copy to Lehman Brothers Japan Inc. as provided in clause (ii) below;

(ii) if to Lehman Brothers Japan Inc., to it at Roppongi Hills Mori Tower, 31st Floor, 6-10-1, Roppongi, Minato-ku, Tokyo 106-6131, Japan, Attention: Treasurer (Telecopy No. 81-3-4582-5060; Telephone Confirm 81-3-6440-5060);

if to Mizuho Corporate Bank, Ltd., New York Branch as Agent,  17th Floor,1800 Plaza 10 Jersey City, NJ 07311
Attention: Loans Administration/ Betty Ali (Fax: 201 626-9935; Tel: (201) 626-9280)

(iii) if to a Lender, to it at its address (or telecopy number) set forth in Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender became a party hereto.

(b) Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Agent and the applicable Lender. The Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c) All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt, in each case addressed to such party as provided in Section 10.01(a) or in accordance with the latest unrevoked direction from such party.

43

Notices required or permitted to be delivered by telecopy shall be deemed received upon receipt by the sender of an answerback and notices required or permitted to be delivered by mail shall be deemed received upon confirmation of receipt by telephone.

(d) Any notices given under or in connection with this Agreement shall be in English. All other documents provided under or in connection with this Agreement shall be:

(i) in English, or;

(ii) if not in English, accompanied by a certified English translation and, in this case, the English translation shall prevail unless the document is a statutory or other official document.

SECTION 10.02. Waivers; Amendments. (a) No failure or delay of the Agent or any Lender or the Borrower in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agent and the Lenders hereunder are cumulative and not exclusive of any rights or remedies which they would otherwise have. No waiver of any provision of this Agreement or any of the exhibits hereto nor consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be authorized as provided in paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances. Each Lender shall be bound by any amendment, modification, waiver or consent authorized as provided herein.

(b) Neither this Agreement nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders; provided that no such agreement shall (i) increase the principal amount of the Loan of any Lender without the written consent of such Lender, (ii) reduce the principal amount of the Loan or reduce the rate of interest thereon, without the written consent of each Lender affected thereby, (iii) postpone the Maturity Date of the Loan, or any date for the payment of any interest payable hereunder, or reduce the amount of, or waive or excuse any such payment, without the written consent of each Lender, (iv) change Sections 2.17 or 2.18 in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (v) change any of the provisions of this Section 10.02 or the percentage set forth in the definition of "Required Lenders" specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of

44

each Lender ; or (vi) change any provision of Section 7.01 provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent without the prior written consent of the Agent. Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by the Borrower, the Required Lenders and the Agent if at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on the Loan made by it and all other amounts owing to it or accrued for its account under this Agreement.

SECTION 10.03.Payments on Business Days. Should any payment to be made hereunder become due and payable on a day other than a Business Day, such payment may be made on the next succeeding Business Day and such extension of time shall in such case be included in computing interest, if any, in connection with such payment; provided that, if as a result of such extension of time, such payment would otherwise be due and payable in the following calendar month, then such payment shall become due and payable on the immediately preceding Business Day.

SECTION 10.04.Governing Law; Jurisdiction; Consent to Service of Process. (a) THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF JAPAN.

(b) The Borrower and each Lender hereby irrevocably and unconditionally submits, for itself and its property, to the fullest extent permitted by applicable law, (i) to the nonexclusive jurisdiction of the Tokyo District Court and (ii) to the nonexclusive jurisdiction of the New York Courts, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined, to the extent permitted by law, in the Tokyo District Court and/or the New York Courts. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower or its properties in the courts of any jurisdiction.

(c) The Borrower and each Lender hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section 10.04. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

45

(d) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.01(a). By execution of this Agreement, the Borrower irrevocably designates and appoints Lehman Brothers Japan Inc., at its address set forth in Section 10.01(a), as its authorized agent upon which process may be served in any action or proceeding arising out of or relating to this Agreement. Nothing in this Agreement will affect the right of any party hereto or thereto to serve process in any other manner permitted by law.

SECTION 10.05. Expenses; Indemnification. (a) The Borrower agrees: (i) whether or not the transactions herein contemplated are consummated, to pay all reasonable out-of-pocket costs and expenses (x) of the Arrangers and the Agent in connection with the negotiation, preparation, execution and delivery of this Agreement, including the extension thereof and the documents and instruments referred to herein and any amendment, waiver or consent relating hereto (including, without limitation, the reasonable fees and disbursements of Anderson Mori & Tomotsune), provided that this Section 10.05 (a)(i)(x) does not extend to participations or assignments pursuant to Section 10.07 and (y) of the Agent and each of the Lenders in connection with the enforcement or preservation of this Agreement and the documents (other than assignment or participation agreements) and instruments referred to herein (including, without limitation, the reasonable fees and disbursements of counsel) for the Agent and for each of the Lenders; (ii) to pay and hold each of the Lenders and the Agent harmless from and against any and all present and future stamp and other similar taxes with respect to the foregoing matters and save each of the Lenders and the Agent harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to such Lender or the Agent) to pay such taxes; and (iii) to indemnify the Agent and each Lender, its Affiliates, officers, directors, employees, representatives and agents (each, an "Indemnified Person") from and hold each of them harmless against any and all losses, liabilities, claims, damages or expenses (including, without limitation, the reasonable fees and disbursements of counsel) reasonably incurred by any of them as a result of, or arising out of, or in any way related to, or by reason of, (x) any investigation, litigation or other proceeding (whether or not the Agent or any Lender is a party thereto, and whether brought by the Borrower or a third party) related to the entering into and/or performance of this Agreement or the use of the proceeds of any Loans hereunder, or (y) any settlement entered into in connection with the foregoing to the extent such settlement has been consented to by the Borrower, which consent shall not be unreasonably withheld; provided that the Borrower shall not be required to indemnify any Person in respect of any losses, liabilities, claims, damages or expenses to the extent arising from the gross negligence or willful misconduct of such Person or such Person's Affiliate, officer, director, employee or agent or such Affiliate's officer, director, employee or agent.

46

(b)  Notwithstanding anything herein to the contrary, the Borrower shall only be required to pay or reimburse the fees and expenses of a single team of counsel (which may include lead counsel and additional firms retained as special counsel) for the Agent and the Lenders in connection with any enforcement or preservation of rights or exercise of remedies covered by this Section 10.05 or any investigation, litigation or other proceeding or any settlement in connection therewith covered by this Section 10.05, except that the Borrower shall be required to pay or reimburse the fees and expenses of separate counsel for any Lender if (i) such Lender determines in good faith that being represented by the same counsel as the Agent and other Lenders would or could reasonably be expected to adversely affect such Lender or (ii) counsel for the Agent or such other Lenders believes that representation of such Lender would constitute a potential conflict of interest or constitutes a conflict of interest within the meaning of applicable lawyer codes.  Notwithstanding the above, the Borrower shall pay and reimburse the fees and expenses of any counsel retained by any Lender in the event of a Default under Section 7.01 or 7.05.

SECTION 10.06.Survival of Agreement, Representations and Warranties, etc.  All warranties, representations and covenants made by the Borrower herein or in any certificate or other instrument delivered by the Borrower or on its behalf in connection with this Agreement shall be considered to have been relied upon by the Lenders.  The Lenders' rights and remedies in respect of such warranties, representations and covenants shall survive the making of the Loan herein contemplated regardless of any investigation made by any Lender or on its behalf and shall continue in full force and effect so long as any amount due or to become due hereunder is outstanding and unpaid.  No warranty or representation made or deemed made as of any date pursuant to any Section of this Agreement shall be deemed by reason of this Section 10.06 to have been made or deemed made as of any other date.  The provisions of Sections 2.14, 2.16, 2.21 and 10.05 shall survive (in accordance with the respective terms thereof and subject to the respective limitations set forth therein) the consummation of the transactions contemplated hereby, the repayment of the Loan and interest thereon.

SECTION 10.07.Assignments and Participations.

(a)  Successors and Assigns; Participations.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided that the Borrower may not assign or transfer any of its rights or obligations hereunder without the prior written consent of the Lenders.  Each Lender may at any time grant participations in any of its rights hereunder (x) to a Affiliate of a Lender or (y) with the prior written consent of the Borrower (such consent not to be unreasonably withheld or delayed), to a commercial bank, other financial institution, mutual fund, trust fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or

other financial assets that is not an Affiliate of a Lender, _provided_ that in the case of any such participation, the participant shall not have any rights under this Agreement (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation, except that the participant shall be entitled to the benefits of Sections 2.14 or 2.21 of this Agreement to the extent that such Lender would be entitled to such benefits if the participation had not been entered into or sold and, in the case of Section 2.21, to the extent provided in that Section, and _provided further_, that no Lender shall transfer, grant or assign any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement except to the extent such amendment or waiver would extend the final scheduled maturity of the Loan in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees payable hereunder(except in connection with a waiver of the applicability of any post-default increase in interest rates), or reduce the principal amount thereof, or increase such participant's participating interest in the Loan over the amount thereof then in effect (it being understood that a waiver of any Event of Default or of a mandatory reduction in the aggregate Loan, or a mandatory prepayment, shall not constitute a change in the terms of the Loan), or consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement, _provided further_ that nothing in this Section 10.07 shall prevent or prohibit any Lender from pledging its rights under this Agreement and/or its Loans hereunder to a Federal Reserve Bank or the Bank of Japan.

(b) _Assignments_. Notwithstanding the foregoing, with the prior written consent of the Borrower and the Agent (such consents not to be unreasonably withheld or delayed in the case of any assignment to an Eligible Assignee), any Lender may assign all or a portion (in an amount equal to at least JPY100,000,000 and shall be in an amount which is an multiple integral of JPY50,000,000 (or the remaining balance thereof, if less)) of its outstanding Loans and Term Loan Commitment and its rights and obligations hereunder to an Affiliate of a Lender or an Eligible Assignee each of which assignees agrees to become a party to this Agreement as a Lender whether prior to or after the initial Credit Event by executing an assignment agreement substantially in the form of Exhibit C hereto (adapted, to the extent necessary, in the case of an assignment after the Maturity Date), appropriately completed (an "Assignment Agreement") with the assigning Lender, and obtaining a fixed date stamp immediately after the date of the Assignment Agreement, _provided_ that, in each case, (i) if such assignment occurs on or prior to the Maturity Date, at such time Schedule 2.01 shall be deemed to have been modified to reflect the Loan amount of such new Lender and of the existing Lenders, (ii) the Agent shall have received at the time of each such assignment from either the assigning or assignee Lender the payment of a nonrefundable assignment fee of JPY 500,000, and (iii) such Affiliate of a Lender or Eligible Assignee will be subject to the provisions of Section 2.21. To the extent of any assignment pursuant to this Section 10.07(b), the assigning Lender shall be relieved of its obligations hereunder with respect

48

to its assigned Loan amount. Anything to the contrary herein notwithstanding, no consent by the Borrower or the Agent shall be required in the case of any assignment to an Affiliate of a Lender.

(c) Representations by Lenders. Each Lender initially party to this Agreement hereby represents, and each Person that becomes a Lender pursuant to an assignment permitted by this Section 10.07 will, upon its becoming party to this Agreement, represent that it is a commercial lender, other financial institution, mutual fund, trust fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets which makes and/or invests in loans in the ordinary course of its business and that it will make or acquire Loans for its own account in the ordinary course of such business.

(d) The Agent shall maintain at its address referred to in Section 10.01(a) a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders and the amount of the Loan participated by each Lender from time to time (the "Register"). The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, the Agent and the Lenders may treat each person whose name is recorded in the Register as (and each such person shall constitute) a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e) Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an Eligible Assignee, an administrative questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above and the written consent to such assignment, the Agent shall, if such Assignment and Acceptance has been completed and is in the form of Exhibit C pursuant to paragraph (b) above, (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register.

SECTION 10.08. Severability. In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, to the fullest extent permitted by law, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 10.09. Cover Page, Table of Contents and Section Headings. The cover page, Table of Contents and Section headings used herein are for convenience of reference only, are not part of this

49

Agreement and are not to affect the construction of or be taken into consideration in interpreting this Agreement.

SECTION 10.10.Counterparts. This Agreement may be signed in any number of counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one contract, and shall become effective when copies hereof which, when taken together, bear the signatures of each of the parties hereto shall have been received by the Agent. Delivery of an executed counterpart of a signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 10.11.Entire Agreement. This Agreement, including the exhibits hereto, constitute the entire agreement and understanding of the parties hereto with respect to this Agreement and the subject matter hereof and thereof and the transactions contemplated hereby and thereby (all such subject matter and transactions being, collectively, the "Contemplated Transactions"), and supersede in all respects any and all prior oral or written agreements and understandings relating to this Agreement or the Contemplated Transactions, except, in each case, to the extent otherwise expressly agreed by the Borrower and the Agent in writing or to the extent otherwise expressly provided in this Agreement.

SECTION 10.12.WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 10.13.[Intentionally left blank]

SECTION 10.14.Confidentiality. (a) Each of the Finance Parties hereby agrees to keep (and to cause its employees, agents, attorneys, accountants and other professional advisors to keep) confidential the information provided to it by or on behalf of the Borrower or its Subsidiaries

50

pursuant to or in connection with this Agreement, except that such
information may be disclosed (i) solely in connection with the performance of
the transactions contemplated by this Agreement, or for audit or internal audit
or control purposes, to (A) its and its Affiliates' directors, officers, employees
who have a need to know such information and agents, including accountants,
legal counsel and other professional advisors (it being understood that such
information may be disclosed to the Finance Parties' Affiliates only if the
persons to whom such disclosure is made expressly agree to keep the
disclosed information confidential) or (B) to the Finance Parties, (ii) to any
assignee, participant, proposed assignee or proposed participant of such
Lender, in accordance with and subject to the limitations set forth in
Section 10.07(h), (iii) to the extent requested by any regulatory authority
(including any self-regulatory body) in Japan or any other jurisdiction having
jurisdiction over such Arranger, the Agent or such Lender, as applicable, or
required by applicable laws or regulations of Japan or any other jurisdiction
having jurisdiction over it or by any subpoena or similar legal process of
Japan or any other jurisdiction having jurisdiction over it binding upon such
Finance Party, as applicable, provided however, that if any such disclosure is
required by any subpoena or similar legal process, the relevant Finance Party
will, to the extent permitted and reasonably possible under the circumstances,
provide the Borrower with prompt notice of such requirements so that the
Borrower may seek a protective order or other appropriate remedy, and the
relevant Finance Party will furnish only that portion of any information that
they are advised by counsel is legally required or otherwise is deemed
reasonably necessary, (iv) in connection with the exercise of any remedies
under this Agreement or the enforcement of rights hereunder and thereunder,
(v) with the consent of the Borrower or (vi) to the extent such information
(A) is on the date hereof, or at or before the time of such disclosure becomes,
publicly available other than as a result of a breach by any person of the
obligation set forth in this Agreement or any other agreement entered into by
the Agent or such Lender in connection herewith or therewith or (B) at or
before the time of such disclosure becomes available to the Agent, any Lender
or their Affiliates on a nonconfidential basis from a source other than the
Borrower or their Subsidiaries, which source is not known to the recipient of
such information to have breached a confidentiality agreement with the
Borrower or their Subsidiaries in respect of such information.

(b)  In furtherance of the foregoing, each of the Lenders and the
Agent agrees that its right to request any information pursuant to Section 5.01 or to avail
itself of the provisions of Section 5.02 is subject to its agreement that it will continue to
comply with the requirements of this Section 10.14.

SECTION 10.15. Conversion of Currencies.  (a) If, for the
purpose of obtaining judgment in any court, it is necessary to convert a sum

51

owing hereunder in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b)  The obligations of the Borrower in respect of any sum due to any party hereto or any holder of the obligations owing hereunder (the "Applicable Creditor") shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than Yen, be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase Yen with the Judgment Currency; if the amount in Yen so purchased is less than the sum originally due to the Applicable Creditor in Yen, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Applicable Creditor against such loss and if the Yen amount so purchased exceeds the sum originally due to the Applicable Creditor, such Applicable Creditor agrees to remit to the Borrower such excess. The obligations of the Borrower contained in this Section 10.15 shall survive the termination of this Agreement and the payment of all other amounts owing hereunder.

SECTION 10.16.Customer Identification.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the US Act or the Japan Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of each Borrower and other information that will allow such Lender to identify the Borrower in accordance with the US Act or the Japan Act.

SECTION 10.17. Clarification of Intention of the Required Lenders.  The clarification of the intention of the Required Lenders shall follow the procedures described below:

(a)  If a Lender deems that any event which requires the instructions of the Required Lenders in this Agreement has occurred, such Lender may give notice to the Agent to request the clarification of the intention of the Required Lenders.

(b)  The Agent shall, upon receipt of a notice described in the preceding item, immediately give to all Lenders notice to seek the clarification of the intention of the Required Lenders.

52

(c) Each Lender shall, upon receipt of the notice described in the preceding item, make its decision on the relevant event and inform the Agent of such decision within reasonable period which the Agent deems appropriate.

(d) If a decision of the Required Lenders is made pursuant to the preceding three items, the Agent shall immediately notify the Borrower and all Lenders of such decision as the instruction by the Required Lenders.

If the Agent deems that any event which requires the clarification of the intention of the Required Lenders occurs, other than in the case of this Section 10.17, the Agent may give to all Lenders notice to seek such clarification. In such case, procedures to be taken after giving the notice shall follow the provisions of items (b) through (d) of this Section 10.17.

SECTION 10.18.  Loss of Documents and Exemption from Liabilities.  If any documents furnished by the Borrower to the Agent or the Lenders are lost, destroyed or damaged for any reason, the Borrower shall, if practicable, upon request of the Agent forthwith prepare substitute documents and shall furnish the same to the Agent for the Lenders. If the Agent and the Lenders confirm, with due care, the identity of signature of the representative of the Borrower used in the transactions hereunder with their internally authorized signature from time to time, certified by the certificate prescribed in Section 4.01 (d) (i), the Borrower shall indemnify the Lenders and the Agent for all damages, losses or expenses which any of them may incur as a result of forgery, alteration or theft of their signature.

IN WITNESS WHEREOF, the parties hereto have caused a counterpart of this Agreement to be duly executed by their duly authorized officers as of the day and year first above written.

**LEHMAN BROTHERS HOLDINGS INC.,**

as Borrower,

By _____

Name: Paolo Tonucci
Title:  Treasurer

Finally Executed in New York, USA

LEHMAN BROTHERS JAPAN INC.,

as Joint-Arranger,

By      _____

Name: Akio Katsuragi
Title:  Managing Director

Executed in Tokyo, JAPAN

**MIZUHO CORPORATE BANK, LTD.,**

as Mandated Lead Arranger, Lender and Agent,

By

東京都千代田区丸の内1丁目3番3号
株式会社みずほコーポレート銀行
代表取締役 齋藤 宏

Name:
Title:

Executed in Tokyo, JAPAN

**AOZORA BANK, LTD.**, as Lender,

東京都千代田区九段南一丁目3番1号
株式会社 あおぞら銀行
代表取締役 能見公

By

Name: Kimikazu Noumi
Title: Representive Director

Executed in Tokyo, JAPAN

**THE CHUO MITSUI TRUST & BANKING CO.**
**LTD.,** as Lender,

By _R. Hayashi_

Name: Ryutaro Hayashi
Title: General Manager

Executed in Tokyo, JAPAN

**SHINKIN CENTRAL BANK,** as Lender,
東京都中央区京橋３丁目８番１号

By　信 金 中 央 金 庫
代表理事 中 平 学 典

Name:
Title:

Executed in Tokyo, JAPAN

**THE HIROSHIMA BANK, LTD.,** as Lender,

By

東京都中央区日本橋1丁目13番1号

Name: 広島銀行東京支店

Title: 執行役員　支店長　山下　晴基

Executed in Tokyo, JAPAN

THE BANK OF IWATE, LTD., as Lender

東京都中央区 日本橋本町四丁目4番2号
株式会社岩手銀行東京営業部

By _____
執行役員
東京営業部長    佐藤 重俊

Name:
Title:

Executed in Tokyo , JAPAN

THE 77 BANK, LTD., as Lender,

仙台市青葉区中央三丁目3番20号
株式会社七十七銀行

By  常務取締役 小林英文

Name:  Hidefumi Kobayashi
Title:  General Manager,
         Treasury Division
Executed in Sendai, JAPAN

**THE SHONAI BANK, LTD.**, as Lender,

山形県鶴岡市本町一丁目9番7号

株式会社荘内銀行

By    代表取締役 町 田    睿

Name:
Title:

Executed in Yamagata, JAPAN