WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard L. Levine
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
| | |
|---|---|
| In re | :  **Chapter 11 Case No.** |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | :  **08-13555 (JMP)** |
| | : |
| **Debtors.** | :  **(Jointly Administered)** |

------------------------------------------------------------------x

**NOTICE OF THE DEBTORS' MOTION PURSUANT TO SECTIONS 105(A)**
**AND 363 OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO PURCHASE**
**AND SELL NOTES ISSUED BY CERTAIN SPECIAL PURPOSE VEHICLES**
**THAT ARE PARTY TO TRANSACTIONS WITH CERTAIN DEBTORS**

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman
Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases
(together, the "Debtors") for authorization to purchase and sell notes issued by certain special
purpose vehicles that are party to certain transactions with certain of the Debtors, all as more
fully set forth in the Motion, will be held before the Honorable James M. Peck, United States
Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House,
Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on
**April 20, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall
be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy
Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,
shall set forth the name of the objecting party, the basis for the objection and the specific grounds
thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order
M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy
Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in
Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing
format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the
chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,
Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn: Lori R. Fife, Esq., Richard L. Levine, Esq. and Robert J. Lemons, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; and (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Evan Fleck, Esq., and Dennis O'Donnell, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases, so as to be so filed and received by no later than **April 13, 2010 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: March 30, 2010
      New York, New York

                          /s/ Robert J. Lemons
                          Lori R. Fife
                          Richard L. Levine
                          Robert J. Lemons

                          WEIL, GOTSHAL & MANGES LLP
                          767 Fifth Avenue
                          New York, New York 10153
                          Telephone: (212) 310-8000
                          Facsimile: (212) 310-8007

                          Attorneys for Debtors
                          and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard L. Levine
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

------------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(A) AND 363**
**OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO PURCHASE**
**AND SELL NOTES ISSUED BY CERTAIN SPECIAL PURPOSE VEHICLES**
**THAT ARE PARTY TO TRANSACTIONS WITH CERTAIN DEBTORS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

    Lehman Brothers Holdings Inc ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully

represent:

### **Preliminary Statement[1]**

    1.  Prior to the Commencement Date, the Debtors (in such capacity, the

"Lehman Counterparties") entered into swap or other derivative agreements (the "Derivative

---

[1] Capitalized terms used but not defined in the Preliminary Statement shall have the meaning ascribed to them in subsequent sections of this Motion.

Agreements") and/or loan agreements (the "<u>Loan Agreements</u>" and, collectively with the Derivative Agreements, the "<u>Transaction Agreements</u>") with various special purpose vehicles (the "<u>SPVs</u>").  The SPVs then issued notes or securities to third parties (the "<u>Notes</u>") in a variety of scenarios.  Certain Notes are secured by the applicable SPV's interest in Derivative Agreements and other Collateral.  The SPVs' obligations to perform on the Transaction Agreements are also secured by the Collateral.   Other SPVs entered into Loan Agreements with the Debtors in order to provide a levered return to the holders of Notes.  Finally, certain of the SPVs with which the Debtors entered into Transaction Agreements issued equity or other interests to a separate SPV, which issued the relevant Notes to third parties.

    2.  Certain of the SPVs, Indenture Trustees and/or holders of Notes ("<u>Noteholders</u>") have asserted that, as a result of a purported event of default under the Derivative Agreements based on the Debtors' chapter 11 cases, the Debtors' rights to payment pursuant to the Derivative Agreements are subordinated to rights of Noteholders to payment.  As more fully described below, one of the Debtors, Lehman Brothers Special Financing Inc. ("<u>LBSF</u>"), in response to such assertions, has been embroiled in litigation and other dispute resolution efforts with SPVs, their directors and officers ("<u>Directors and Officers</u>"), Indenture Trustees and, in limited cases, Noteholders (collectively, "<u>Transaction Parties</u>") to enforce its rights and realize a full recovery on certain Derivative Agreements.  These efforts have been successful in some respects.  For example, in *Lehman Brothers Special Financing Inc. v. BNY Corporate Trustee Services Limited*, 422 B.R. 407, 420 (Bankr. S.D.N.Y. 2010) (the "<u>BNY Decision</u>"), the Court granted summary judgment to LBSF on the grounds that such subordination violated the *ipso facto* principles in the Bankruptcy Code.  However, continuing solely on a litigation path with respect to disputes with Transaction Parties, particularly due to

differing contract terms and factual settings and the potential for inconsistent rulings between this Court and courts in foreign jurisdictions, results in a substantial amount of cost and risk for the Debtors' estates.

3.      The Debtors also have been involved in various dispute resolution efforts and litigation, including in foreign jurisdictions, with Transaction Parties over the Debtors' inability to recover the amounts due to them under the relevant Transaction Agreements resulting from the Transaction Parties' inability and/or unwillingness to liquidate the Collateral and assets owned by the SPVs.  As a result of inaction on the part of these Transaction Parties, the SPVs have become highly illiquid and the Debtors have been unable to monetize the value of and recover on their Transaction Agreements.  Continued inaction by the Transaction Parties may result in a deterioration in value of the assets owned by the SPVs.

4.      Accordingly, the Debtors now seek approval to employ alternative methods to try to resolve their disputes with Transaction Parties and/or otherwise maximize recovery on their Transaction Agreements while minimizing the time, effort, cost and risk associated with litigation.  Specifically, the Debtors seek entry of an Order that would allow them, without further order of the Court, to purchase Notes (and/or participations in Notes)[2] issued by SPVs with which one or more of the Debtors is a Lehman Counterparty or which wholly own separate SPVs with which one or more of the Debtors is a Lehman Counterparty ("Purchased Notes").  The Order would also permit the Debtors, after purchasing Notes, to exercise all rights and remedies as a holder of the Purchased Notes and, where the Debtors deem it in the best interest of their estates, to sell Purchased Notes to maximize their recoveries.  Such purchases (and sales) of Notes would serve as an alternative mechanism for the Debtors to seek

---

[2] The term Notes, as used in this Motion, shall hereinafter include participations in such Notes.

to resolve their disputes with Transaction Parties, hedge litigation risk, and maximize the value of their Transaction Agreements and their returns from the SPVs.

5.     The Debtors seek the authority to purchase Notes for a number of reasons, one or more of which may be applicable to any particular SPV Note Transaction.  *First*, the Debtors believe that, as a consequence of the results of litigation among the Debtors and certain Transaction Parties regarding the Debtors' rights to priority payment under their Derivative Agreements, and the possibility of the Debtors obtaining similar results in litigation with other Transaction Parties, the current market price of Notes issued by certain SPVs is less than the value of the Collateral securing the repayment of the Notes.  By purchasing the requisite amount of certain Notes issued by such SPVs at a discount and becoming the controlling Noteholder with respect to the issuing SPVs, the Debtors may be able to direct the liquidation of the applicable Collateral, redeem the Notes at the value of the applicable Collateral, and avoid the risk, time and expense of litigation, thus realizing a net gain on their investment in the Notes and maximizing recovery from such SPVs.

6.     *Second*, if the Debtors purchase the requisite amount of certain Notes issued by certain SPVs, the Debtors may be able to direct the Indenture Trustee to settle litigation with the Debtors related to the relevant SPV.  This result would avoid the time, expense and risk of continued litigation and allow the Debtors to recover on their Derivative Agreements. (Even if the Debtors are not able to direct settlement as controlling Noteholders, their ability to recover on Purchased Notes should facilitate a settlement between the Debtors and Transaction Parties, as the Debtors could take into account their recovery on the Purchased Notes above the Purchase Price in negotiating their return under the Derivative Agreements.)

7.     *Third*, with respect to SPVs in which the Debtors are or may become involved in litigation with respect to their Derivative Agreements, acquisition of the Notes issued by such SPVs may serve as a hedge against the Debtors' litigation risk.  This reason is also based on the Debtors' belief that certain Notes are trading at a discount as a result of the Noteholders' litigation risk associated with redemption of the Notes.  In some cases, the price that the Debtors would pay to purchase such Notes could be less than the value of the Collateral securing the Notes due to such litigation risk, which would yield a net recovery for the Debtors on the Notes if a sufficient amount of Notes was purchased, even if litigation was not pursued by the Debtors.  But even if the Debtors do not acquire a sufficient amount of Notes to justify abandoning or avoiding litigation with respect to the relevant Derivative Agreements, the purchase of Notes could still provide the Debtors an effective hedge to minimize any losses they may incur on such Derivative Agreements if they do not prevail in litigation.

8.     *Fourth*, with respect to certain SPVs with which the Debtors have entered into Transaction Agreements on which the Debtors are unable to recover due to inaction by current Noteholders to redeem their Notes, the purchase and redemption by the Debtors of the requisite amount of Notes issued by a particular SPV may enable the Debtors to direct the liquidation of Collateral and underlying assets of a particular SPV and any subsidiaries.  Such a liquidation could potentially create sufficient liquidity to satisfy amounts owed to the Debtors pursuant to the Purchased Notes and the Transaction Agreements with the SPV in a manner that may both preserve the value of such underlying assets and expedite the time and manner of repayment to the Debtors.  Furthermore, since the Debtors may be able to purchase such Notes at a discount due to the inability of current Noteholders to redeem the Notes and recover value from the issuing SPV, the Debtors may achieve a profit on Purchased Notes.

9. To further protect the interests of the Debtors and their estates, the Debtors seek the ability to sell Purchased Notes to hedge against the risk that they are not able to purchase the requisite amount of Notes to direct a liquidation of Collateral securing such Notes or settlement of litigation, or where they are not otherwise able to negotiate a settlement. In these situations, the ability to sell the Notes will give the Debtors the flexibility to maximize their recovery. In addition, the Debtors may find themselves in a situation where they would be able to realize a significant return through an immediate sale of particular Purchased Notes and should be provided the flexibility to dispose of such Notes if they determine, in their business judgment, that an immediate sale would maximize value for the Debtors and their estates.

10. While the Debtors will continue their SPV litigation and other dispute resolution efforts where necessary, allowing the Debtors to avoid potential litigation or settle existing litigation by purchasing and/or selling Notes in accordance with procedures described herein should maximize the net recovery to the Debtors from Transaction Agreements and the SPVs. Allowing the Debtors to purchase and sell such Notes without having to seek an order of the Court authorizing each transaction will minimize the expense of filing separate motions for each such transaction and allow the Debtors to take advantage of market opportunities. The Debtors believe, in their sound business judgment, that in some situations the risk associated with the purchase or sale of the Notes will be considerably less than the risk and cost of engaging Transaction Parties in one-off litigations in this Court and/or foreign jurisdictions, and in some situations the purchase of Notes may be the only feasible method of forcing a liquidation of a highly illiquid and significant position in an SPV. The Debtors seek authorization to use their business judgment for the benefit of their estates in such situations. Thus, the relief requested by this Motion is appropriate and necessary to facilitate the realization of value of the Debtors'

interest in the Transaction Agreements and the SPVs for the benefit of the Debtors' estates and creditors.

## Background

11. Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), the Debtors commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12. On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

13. On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA is administering LBI's estate.

14. On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583], the Court approved the U.S. Trustee's appointment of the Examiner.

**<u>Jurisdiction</u>**

15.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**<u>Relief Requested</u>[3]**

16.     By this Motion, the Debtors seek authorization pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code to establish the procedures described below by which they may (i) purchase, either in the open market or through private negotiations with current Noteholders, Notes issued by SPVs with which the Debtors are party to Transaction Agreements or by SPVs that are the holder of equity or other interests in separate SPVs with which the Debtors are party to Transaction Agreements; (ii) exercise all rights and remedies afforded them as holders of Purchased Notes; and (iii) sell Purchased Notes to third parties (collectively, the "<u>SPV Note Transactions</u>").

**The Debtors' Interest in the Transaction Agreements,<br>
<u>Related Litigation, and the Contemplated SPV Note Transactions</u>**

17.     Prior to the commencement of their chapter 11 cases, the Debtors entered into Transaction Agreements with various SPVs created to issue Notes in one or more series or classes, the performance of which Notes was linked to the value and performance of underlying assets or transactions, including the Transaction Agreements.  The Notes typically were issued pursuant to an indenture, trust agreement, loan agreement or similar document (the "<u>Issuance Document</u>" and, together with the Transaction Agreements and any and all other documents related to the Notes, the "<u>Governing Documents</u>").  The Notes as well as the Debtors' rights under the Transaction Agreements are secured by collateral (the "<u>Collateral</u>") including, *inter*

---

[3] Capitalized terms used in the Relief Requested section but not yet defined shall have the meaning ascribed to them in subsequent sections of this Motion.

*alia*, the applicable SPV's interest in the Transaction Agreements between the Debtors and the SPV and, in some cases, loans, bonds or other assets acquired by the issuing SPV. The Collateral for the Notes is held on behalf of Noteholders and the Debtors, as secured parties in respect of their Transaction Agreements, typically by a trustee (the "<u>Indenture Trustee</u>"), or as otherwise set forth in the applicable Governing Documents.

18.     Pursuant to the terms of certain of the Governing Documents, the Debtors' rights in the Collateral take priority over those of the Noteholders, and the Debtors are entitled to receive all amounts due and payable on the related Derivative Agreements on each payment date before any distributions are made to Noteholders. However, under the terms of the Governing Documents, if an "Event of Default" occurs on the part of Debtors under the Derivative Agreements, there is a modification to the priorities of payment by the SPV such that the Noteholders' rights to receive payments from the SPV are superior to those of the Debtors. The filing of a bankruptcy petition by the Debtors is such an "Event of Default." Accordingly, following the commencement of the Debtors' chapter 11 cases, many of the SPVs declared an Event of Default and terminated their respective Derivative Agreements with the Debtors. Furthermore, in certain cases, at the direction of the requisite Noteholders, Indenture Trustees liquidated the Collateral and distributed the proceeds to the Noteholders before making any payments to the Debtors, purportedly pursuant to the modified priority of payments set forth in the Governing Documents based on the Debtors' chapter 11 cases. In those instances, the Debtors typically did not receive any payments, as the amounts due to the Noteholders exceeded the available funds; if the Debtors did receive a payment, it was substantially less than what they would have received had their superior rights in the Collateral been honored. To preserve their

interests in such Derivative Agreements, the Debtors have commenced or participated in a number of litigations or other dispute resolution efforts.

19. One of the Debtors, LBSF, has litigated successfully in this Court its position that the provisions of a Governing Document purportedly modifying LBSF's priority of payment under the respective Derivative Agreements solely because of the commencement of a bankruptcy case is an unenforceable *ipso facto* clauses which violates the automatic stay imposed by section 362(a) of the Bankruptcy Code. *See, e.g.*, *Lehman Brothers Special Financing Inc. v. BNY Corporate Trustee Services Limited*, 422 B.R. 407, 420 (Bankr. S.D.N.Y. 2010) (the provisions of an agreement "purporting to modify LBSF's right to a priority distribution solely as a result of a chapter 11 filing constitute unenforceable *ipso facto* clauses" and that "any attempt to enforce such provisions would violate the automatic stay").

20. While the Debtors intend, for the benefit of their estates and creditors, to continue to enforce their rights to, and priority of, payment under Governing Documents, including pursuing litigation against parties who threaten to violate or have already violated the automatic stay and *ipso facto* principles by purportedly modifying the Debtors' right to priority payment under their Derivative Agreements, these efforts are not without significant cost and risk to the Debtors' estates. The sheer number of these transactions, the complex nature of the applicable Governing Documents, the magnitude of the Debtors' interest in the Derivative Agreements, the potential precedential value of any legal determinations, and potential jurisdictional issues make this type of litigation particularly expensive, time consuming, and risky. The proposed SPV Note Transactions provide the Debtors with a means of preserving the value of the Derivative Agreements and extracting value from the SPVs without incurring all the

time commitment, cost and risk of litigation, by purchasing and/or selling Notes and exercising their right and remedies as holders of Purchased Notes, as more fully explained below.

21.     To be clear, in this Motion, the Debtors are not asking the Court to find the provisions of any Governing Documents that purport to modify the Debtors' payment priority to be unenforceable *ipso facto* clauses or to find that there has been a violation of the automatic stay, nor are the Debtors asking this Court to permit them to purchase Notes when such purchase would be impermissible under the terms of the Transaction Documents or to make any determinations regarding what rights the Debtors may have vis-à-vis Indenture Trustees, Directors and Officers, or any other party under the Governing Documents upon becoming a Noteholder; rather, the Debtors are seeking relief that would provide them with an alternative means to seek to maximize their recovery on the Transaction Agreements for the benefit of their estates and creditors by purchasing and selling Notes and exercising whatever rights they may have under the Governing Documents.[4]

22.     Prior to the Commencement Date, the Debtors in the ordinary course of business actively traded, and exercised their rights as holders of, notes similar to the Notes the Debtors seek authority to acquire and sell in this Motion.  The Debtors seek authority by this Motion to continue to enter into such transactions, subject to the procedures set forth in this Motion, without the need for obtaining Court approval for each such transaction.  While the Debtors believe that the contemplated SPV Note Transactions constitute transactions in the ordinary course of business not requiring notice or a hearing under section 363(c) of the Bankruptcy Code, it is out of an abundance of caution and for the purpose of providing full disclosure to their creditors that the Debtors filed this motion.

---

[4] The Debtors reserve all rights including, without limitation, the right to challenge any purported modification of the Debtors' rights to priority payment under the Governing Documents.

23.     Absent the relief requested in this Motion, the Debtors may be required to seek specific Court approval prior to each proposed SPV Note Transaction.  Filing individual pleadings with respect to each SPV Note Transaction, sending notice of each proposed SPV Note Transaction to every party entitled to receive notice in these cases, and holding individual hearings to approve same would be expensive, time-consuming, cumbersome, and highly inefficient and may cause the Debtors to miss attractive market opportunities.

24.     Accordingly, this Motion sets forth various guidelines and procedures the Debtors propose to implement with respect to their entry into SPV Note Transactions.  These procedures have been developed in consultation with the advisors to the Creditors' Committee.  The Debtors believe that it will be efficient and cost effective for their estates and creditors if they are authorized to undertake SPV Note Transactions under the terms and conditions outlined in this Motion as opposed to being required to file individual motion.

**The SPV Note Transaction Procedures**

25.     The Debtors hope to settle their disputes regarding Transaction Agreements consensually and maximize their recovery as quickly and economically as possible.  Nevertheless, the Debtors will, as appropriate, continue to pursue through litigation and other dispute resolution efforts their rights to payment and their claims against Transaction Parties that have violated (or may violate) the automatic stay by purporting to subordinate the Debtors' rights to payment priority under their Derivative Agreements on the basis of the unenforceable *ipso facto* provisions in the Governing Documents, as well as litigate against other claims brought against the Debtors by Transaction Parties challenging the Debtors' right to payment under their Transaction Agreements.  To minimize the need to litigate such disputes with Transaction Parties and spare their estates the attendant costs and risks, however, the Debtors seek authority to enter

into SPV Note Transactions pursuant to the following procedures (the "<u>SPV Note Transaction Procedures</u>"):

> a.     All proposed SPV Note Transactions will be reviewed by an approval committee (the "<u>SPV Note Transactions Committee</u>") established by the Debtors. The financial advisors to the Creditors' Committee (the "<u>Advisors</u>") will receive notice of, and may attend, all meetings of the SPV Note Transactions Committee (each a "<u>SPV Note Transactions Meeting</u>")[5] and will have access to the personnel of the Debtors involved in evaluating the proposed SPV Note Transactions.

> b.     With respect to all proposed SPV Note Transactions, the Debtors will provide (i) e-mail notification to the Advisors of any SPV Note Transactions Meeting regarding the approval of an SPV Note Transaction not later than one (1) Business Day prior to such meeting (or at such later time as may be agreed by the Advisors), which email must contain the material terms of the proposed SPV Note Transaction and (ii) an information package (the "<u>Information Package</u>") as soon as practicable but not less than five (5) Business Days prior to the SPV Note Transactions Meeting (or at such later time as may be agreed by the Advisors) that will consist of (a) the Governing Documents pursuant to which the relevant Notes were issued, and (b) market data, valuation inputs, models and assumptions used by the Debtors to prepare their analysis for the SPV Note Transactions Committee that relate to and were used to determine the value of the relevant Notes and adjustments thereto.

> c.     Informal discussions among the Debtors and the Advisors relative to prospective SPV Note Transactions will commence no later than five (5) Business Days (or at such later time as may be agreed by the Advisors) prior to the relevant SPV Note Transaction Meeting.

> d.     If the amount proposed to be paid by the Debtors to a Noteholder for the purchase of Notes (the "<u>Purchase Price</u>") in an SPV Note Transaction is greater than $25,000,000, the Debtors may enter into such SPV Note Transaction only if (i) the Creditors' Committee, a subcommittee, or other designee thereof consents in writing before the SPV Note Transaction is executed or (ii) upon Court approval.

> e.     The Debtors may enter into an SPV Note Transaction involving a Purchase Price less than or equal to $25,000,000 only (i) if (a) at least one (1) representative of the Advisors attends the portion of the SPV Note Transactions

---

[5] The SPV Note Transactions Committee and SPV Note Transactions Meetings may, respectively, consist of the same members and the same meetings regarding the assumption, assignment, and termination of derivative contracts pursuant to the order dated December 16, 2008 [Docket No. 2257], authorizing the Debtors to establish procedures for the settlement or the assumption and assignment of prepetition derivative contracts.

Meeting during which the proposed SPV Note Transaction was discussed and approved, and (b) the Advisors do not object within six (6) business hours, herein defined as the hours between 9:00 a.m. and 5:00 p.m. (Prevailing Eastern Time) on Business Days, after receipt of e-mail notification of the SPV Note Transactions Committee's approval of such SPV Note Transaction, (ii) with the written consent of the Creditors' Committee, a subcommittee, or other designee thereof, or (iii) upon Court approval.

f.      The Debtors may enter into an SPV Note Transaction involving the sale of a Purchased Note only if (i) the Creditors' Committee, a subcommittee, or other designee thereof consents in writing before the SPV Note Transaction is scheduled to be executed or (ii) upon Court approval.

g.      The Debtors will provide updates to the Creditors' Committee regarding (i) the number of SPV Note Transactions that have been consummated and (ii) the Purchase Price and sale price of Purchased Notes received by the Debtors, as applicable, on a transaction-by-transaction basis in connection with such SPV Note Transactions promptly following the request by the Creditors' Committee or its Advisors.

h.      The Debtors and the Creditors' Committee reserve all rights and remedies with respect to the SPV Note Purchase Procedures and may seek to amend such upon Court approval.

i.      The Debtors' ability to carry out the actions set forth in the foregoing procedures shall not override any applicable notice, consent or other rights that any third parties may have pursuant to agreements with the Debtors.

j.      Nothing in the foregoing procedures will prevent the Debtors, in their sole discretion, from (i) seeking, upon notice and hearing, the Court's approval of any proposed SPV Note Transaction, including on an expedited basis, (ii) pursuing any and all claims and rights of action, through litigation or otherwise, that the Debtors may have against any Transaction Party or (iii) exercising any and all rights and remedies as holders of any Notes (including Purchased Notes).

26.      The Debtors respectfully submit that the proposed SPV Note Transaction Procedures represent the exercise of sound business judgment and are fair and appropriate.

## Sound Business Reasons Support
## the Debtors' Decision to Enter into SPV Note Transactions

27.      The Debtors request authorization pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code to enter into SPV Note Transactions in consultation with the Creditors' Committee and without further order of this Court in accordance with the SPV Note

Transaction Procedures.  Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  When considering a transaction outside the ordinary course of business, courts in the Second Circuit, and others, require that such transaction be based upon the sound business judgment of the debtor.  *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper* (*In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986).

28.     It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.  *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

29.     The Debtors believe that SPV Note Transactions are actions in the ordinary course of business under section 363(c) of the Bankruptcy Code, not requiring notice or a hearing.  Even to the extent that such transactions are deemed to be outside of the ordinary course of business, the Debtors have nevertheless determined, in the exercise of their sound business judgment, that entering into such SPV Note Transactions, in given circumstances, will represent the most effective and efficient method of protecting, preserving and maximizing recovery on the Debtors' interests in the Transaction Agreements and the SPVs.

30.     As reflected in the Declaration of Daniel Ehrmann, dated March 30, 2010, in support of the Motion, annexed hereto as Exhibit A (the "Ehrmann Declaration"), ample business justifications support the Motion.  By entering into SPV Note Transactions, the Debtors will seek to avoid some of the cost, time, risk and uncertainty associated with protracted litigation with certain Transaction Parties regarding the purported reversal of the Debtors' priority as a result of the commencement of their chapter 11 cases.  While this Court recently held favorably for LBSF in the BNY Decision, it acknowledged the "complexity of the underlying financial structures," and the "unique" issues that were the subject of the litigation. *Id.* at 422.  The outcome of almost any litigation, let alone one dealing with controversial issues, "unsettled subject matter," and defendants seeking relief against the Debtors in foreign jurisdictions, is replete with uncertainty and risk.  See *id.*  Additionally, the Debtors are currently facing litigation in foreign jurisdictions and are engaged in other dispute resolution efforts with Transaction Parties who are unable to effect a liquidation of Collateral and assets of issuing SPVs and who are challenging the Debtors' rights to amounts owed under the related Transaction Agreements.  The SPV Note Transactions are intended to provide the Debtors a method of efficiently and economically resolving disputes with Transaction Parties and

minimizing the significant cost and risk associated with litigation of these disputes in this Court and in foreign jurisdictions.

31.     Prior to entering into any particular SPV Note Transaction, the Debtors will exercise their business judgment to evaluate the benefits and risks of the proposed purchase or sale of Notes on a case by case basis to determine the amount and value of Notes, if any, they should purchase or sell with respect to a particular SPV, in light of the purpose for which they intend to purchase or sell the Notes.

32.     The Debtors believe that resolution of the disputes with Transaction Parties through some SPV Note Transactions may yield a recovery at least equal to, if not greater than, the recovery the Debtors would expect to receive through successful litigation in their capacity as Lehman Counterparties.  For instance, with respect to certain SPVs with which the Debtors are party to Derivative Agreements, the Debtors believe that they will be able to purchase Notes from Noteholders at a discounted price that reflects the appropriate risk and exposure to the Noteholders from a ruling by the Court on the Debtors' right to priority payment under its Derivative Agreements in the Debtors' favor if the dispute were to be litigated.  Since the current holders' litigation risk will be built into the Purchase Price of such Notes, the Debtors expect to purchase the Notes at a discount, which the Debtors expect will produce a net gain for the Debtors upon redemption, as the liquidation value of the Notes would not be subject to discount associated with litigation risk.   If the Debtors believe that they will be able to purchase a controlling Noteholder position with respect to such SPVs and will then have the discretion to direct liquidation of the Collateral underlying the Notes, and the redemption thereof, the Debtors may determine in their business judgment, that they will be able to produce an expected net

recovery on the SPV Note Transaction that is at least equal to, if not greater than, the Debtors' expected net recovery on their Derivative Agreement.

33.     SPV Note Transactions may, in some situations, also give the Debtors the ability to direct settlement by Indenture Trustees of litigation between the Debtors and Transaction Parties where the Debtors are able to acquire a requisite Noteholder position and, where such direction is not feasible, increased leverage to negotiate a favorable and expeditious settlement of disputes with Transaction Parties, since the Debtors could consider any return on their Notes in conjunction with any return on their Derivative Agreements.

34.     If the Debtors are able to acquire requisite Noteholder positions with respect to certain issuing SPVs, they would determine, in their business judgment, whether they would receive a greater return by (i) directing the Indenture Trustee to liquidate the Collateral securing the Notes, the proceeds of which the Debtors would expect will be above the discounted value at which they were able to purchase the Notes, or (ii) directing the Indenture Trustee to settle the litigation with the Transaction Parties, providing a return to the Debtors on the Derivative Agreement.

35.     Furthermore, the acquisition of Notes may serve as a hedge to the risk that the Debtors will not prevail in litigation with certain Transaction Parties.  Since the Debtors would receive a return on Purchased Notes if Transaction Parties prevail in litigation because Noteholders receive payment prior to the Debtors under their Derivative Agreements, holding and recovering on those Purchased Notes would mitigate any losses that would be incurred by the Debtors on the Derivative Agreements.  The SPV Note Transactions provide the Debtors an avenue of recovery as Noteholders where they may not otherwise be able to recover as Lehman Counterparties.

36.     The SPV Note Transactions also may enable the Debtors, in some cases, to maximize the value of Transaction Agreements on which the Debtors are currently unable to recover as a result of inaction by Noteholders to redeem their Notes to effect a liquidation of the Collateral and assets of issuing SPVs.  If the Debtors believe that they will be able to acquire a sufficient amount of Notes to direct the liquidation of the Collateral and assets of an issuing SPV, the Debtors may determine in their business judgment that such liquidation may result in sufficient liquidity to allow the Debtors to monetize and fully realize the value of their otherwise illiquid positions in the SPV and maximize the value of their Transaction Agreements and their return from the SPV.  Given that the Debtors may be able to purchase these Notes at a discount due to the inability of current Noteholders to redeem their Notes, the Debtors may be able to realize a positive recovery on their redemption of Purchased Notes as well, yielding additional value for the Debtors, their estates and their creditors.

37.     Once the Debtors purchase Notes through an SPV Note Transaction, the SPV Note Transaction Procedures provide the Debtors the flexibility to sell Purchased Notes where such sale, in the Debtors' business judgment, would be advantageous to the Debtors and their estates.  After purchasing Notes, the Debtors may determine that they can realize immediate and significant recovery on the Purchased Notes through the sale of the Notes to a third party. The Debtors' ability to sell Purchased Notes will help the Debtors to manage their interests in the SPVs more effectively by giving them the flexibility to purchase Notes in situations in which they believe (but do not know for certain) that such purchase will enable them to reach settlements with existing Noteholders, hedge against the risk that they are unable to direct a liquidation or settlement of litigation, or otherwise negotiate a settlement with recalcitrant

Transaction Parties.  The ability to sell Purchased Notes provides the Debtors with the needed flexibility to maximize recoveries.

38.     Prior to effecting an SPV Note Transaction, the Debtors will evaluate at least the following risks:  (i) the Debtors may not be able to obtain, or determine the amount and/or value of Notes needed to obtain, a sufficient amount or value of Notes to direct the liquidation of the underlying Collateral and/or assets of the issuing SPV and its subsidiaries, if any, due to either unwillingness of current Noteholders to sell their Notes to the Debtors or the Debtors' inability to identify Noteholders; (ii) the Debtors may not be able to obtain, or determine the amount and/or value of Notes needed to obtain, a sufficient amount or value of Notes to direct an Indenture Trustee to settle litigation; (iii) the relevant Transactions Parties may not comply with the Debtors' direction to liquidate Collateral and/or assets, or settle existing litigation; (iv) some SPV Note Transactions may implicate limitations imposed by applicable securities laws; (v) the value obtained from liquidation of Collateral and/or assets of an issuing SPV may be insufficient to repay the Debtors' Purchased Notes an amount in excess of the price at which the Debtors purchased the Notes; (vi) there may be a downturn in the value of the Notes subsequent to the Debtors' acquisition thereof; and (vii) remaining Noteholders may continue to litigate with the Debtors regarding their rights to payment under the Transaction Agreements after the Debtors' acquisition of Notes.

39.     By evaluating the benefits and risks of proposed SPV Note Transactions on a case by case basis, the Debtors will be able to use their business judgment to determine the best method to maximize the value of their Transaction Agreements and recovery from the various SPVs to which the Debtors are Lehman Counterparties.

40.     For the foregoing reasons, the Debtors' ability to enter into SPV Note Transactions in accordance with the SPV Note Transaction Procedures is in the best interest of their estates and creditors and represents a reasonable exercise of their business judgment. Accordingly, the relief requested in the Motion should be granted.

### Notice

41.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

42.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: March 30, 2010
New York, New York

/s/ Robert J. Lemons
Lori R. Fife
Richard L. Levine
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## Exhibit A


## Ehrmann Declaration

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard L. Levine
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                     :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.* | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |
| | : | |

-----------------------------------------------------------------x

**DECLARATION OF DANIEL EHRMANN IN SUPPORT OF**
**DEBTORS' MOTION PURSUANT TO SECTIONS 105(A) AND 363**
**OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO PURCHASE**
**AND SELL NOTES ISSUED BY CERTAIN SPECIAL PURPOSE VEHICLES**
**THAT ARE PARTY TO TRANSACTIONS WITH CERTAIN DEBTORS**

Pursuant to 28 U.S.C. § 1746, I, Daniel Ehrmann, declare:

1.      I am over the age of 18 years and make these statements based on my own personal knowledge, my review of the business records of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases (collectively with LBHI, the "Debtors") and/or my consultation with employees of the Debtors. If called to testify, I could testify to the truth of the matters set forth herein.

2.      I submit this declaration in support of the *Debtors' Motion Pursuant to Sections 105(a) and 363 of the Bankruptcy Code for Authorization to Purchase and Sell Notes*

*Issued by Certain Special Purpose Vehicles that Are Party to Certain Transactions with Certain Debtors* (the "Motion") filed concurrently herewith.[1]

3.     I am a Managing Director with Alvarez & Marsal North America, LLC, the Chief Restructuring Officer to the Debtors pursuant to an Order of this Court dated December 17, 2008.  I was assigned to the Lehman matter in September 2008.  I serve as co-head of the derivatives group for the Debtors;  in that capacity, I am responsible for all derivatives-related matters.

4.     I am familiar with the various types of agreements entered into by the Debtors with SPVs and the various Governing Documents governing the issuance of Notes by the SPVs and the transactions among the Debtors, SPVs and other Transaction Parties.  I am also familiar with the various litigations and other dispute resolution efforts previously taken, and currently being taken or considered, by the Debtors against Transaction Parties to enforce the Debtors' rights and preserve their interests.  Many of these disputes pertain to efforts by Transaction Parties to subordinate the Debtors' rights to priority payment under their Derivative Agreements to payments to Noteholders as a result of an alleged event of default based on the commencement of the Debtors' chapter 11 cases.  Others of the disputes pertain to the Debtors' efforts to recover amounts due to them under various Transaction Agreements resulting from certain Transaction Parties' inability and/or unwillingness to liquidate the respective Collateral and assets of certain SPVs.  The investigation, negotiation, and dispute resolution efforts relating to these disputes have resulted in a substantial amount of cost, time and risk for the Debtors' estates.  I have reviewed the Motion, and after consultation with various employees of the Debtors and counsel and other advisors, I believe the Debtors'

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion.

decision to try to maximize the range of tools available to the Debtors to try to resolve their disputes with Transaction Parties and maximize recoveries pursuant to the procedures described in the Motion is supported by sound business reasons and is in the best interests of the Debtors, their estates and creditors.

**The Transaction Agreements and Disputes with Transaction Parties**

5.      Prior to the commencement of the Debtors' chapter 11 cases, the Debtors entered into Transaction Agreements with various SPVs, which then issued Notes to third parties.  Other SPVs entered into Loan Agreements, pursuant to which the Debtors loaned funds to provide a levered return to the holders of Notes.  Finally, certain SPVs with which the Debtors entered into Transaction Agreements issued equity or other interests to a separate SPV, which then issued the relevant Notes to third parties.  Such Notes and the SPVs' obligations to the Debtors under the Transaction Agreements are secured by Collateral, which (in the case of Notes) may include the applicable SPV's interest in the Transaction Agreements and which is held on behalf of Noteholders and the Debtors typically by an Indenture Trustee, or as otherwise set forth in the applicable Governing Documents.

6.      Pursuant to the terms of certain Governing Documents, the Debtors' rights in the respective Collateral take priority over those of the Noteholders, and the Debtors are entitled to receive all amounts due and payable on the Derivative Agreements on each payment date before any distributions are made to Noteholders.  However, if there is an "Event of Default," including the filing of a bankruptcy petition by the Debtors, the terms of certain of the Governing Documents provide for a modification to the priorities of payment by the SPV such that the Noteholders' rights to receive payments from the SPV are superior to those of the Debtors.

7.      Accordingly, following the commencement of the Debtors' chapter 11 cases, many SPVs declared an Event of Default based on the filing of the Debtors' chapter 11 cases and terminated their respective Derivative Agreements with the Debtors.  Furthermore, in certain cases, at the direction of the requisite Noteholders, Indenture Trustees liquidated the Collateral and distributed the proceeds to the Noteholders before making any payments to the Debtors, purportedly pursuant to the modified priority of payments set forth in the Governing Documents based on the Debtors' chapter 11 cases.  In those instances, the Debtors typically did not receive any payments, as the amounts due to the Noteholders exceeded the available funds; if the Debtors did receive a payment, it typically was substantially less than what they would have received had their superior rights in the Collateral been honored.  As a result, the Debtors have commenced or participated in a number of litigations or other dispute resolution efforts with Transaction Parties.  These efforts, given, among other things, the sheer number of transactions, the complex nature of the applicable Governing Documents, and the magnitude of the Debtors' interest in the Derivative Agreements, have been particularly expensive and time consuming.

8.      The Debtors have been involved in separate dispute resolution efforts and litigations, including in foreign jurisdictions, with other Transaction Parties over the Debtors' failure to receive the amounts due to them under the relevant Transaction Agreements resulting from the Transaction Parties' inability to liquidate the Collateral and assets underlying the SPVs.

**SPV Note Transactions**

9.      Authorization to enter into SPV Note Transactions will enable the Debtors pursue strategies designed to minimize the time, effort, cost and risk associated with

litigation of disputes with Transaction Parties, maximize the Debtors' recovery on their

Transaction Agreements, and hedge litigation risk in some cases. In some situations, the risk

associated with the purchase or sale of the Notes will be considerably less than the risk and

cost of engaging Transaction Parties in one-off litigations, and in some situations the purchase

of Notes may be the only feasible method of liquidating a highly illiquid and significant

position in an SPV. Prior to entering into any particular SPV Note Transaction, the Debtors

will evaluate the benefits and risks of the proposed purchase or sale on a case by case basis to

determine the amount/value of Notes, if any, they should purchase or sell with respect to a

particular SPV, in light of the purpose for which they intend to purchase or sell the Notes.

   10. The Debtors believe that, as a consequence of the results of litigation to

date among the Debtors and certain Transaction Parties regarding the Debtors' rights to

priority payment under their Derivative Agreements, and the possibility of the Debtors

obtaining similar results in litigation with other Transaction Parties, the current market price

of Notes issued by certain SPVs is less than the value of the Collateral securing the repayment

of the Notes. If the Debtors are able to purchase the requisite amount of certain Notes issued

by such SPVs, the Debtors may be able to direct the liquidation of the Collateral underlying

the Notes, redeem the Notes at the value of the Collateral securing the Notes, avoid the risk,

time and expense of litigation, and realize a net gain on their investment in the Notes and

maximize recovery from such SPVs.

   11. In other cases, if the Debtors are able to purchase the requisite amount

of certain Notes issued by certain SPVs, the Debtors may be able to direct the Indenture

Trustee to settle litigation with the Debtors related to the relevant SPV. This result would

avoid the time, expense and risk of continued litigation and allow the Debtors to recover on

their Derivative Agreements.  Even if the Debtors are not able to direct settlement as

controlling Noteholders, their ability to recover on Purchased Notes should facilitate more

favorable settlements between the Debtors and Transaction Parties, as the Debtors could take

into account their recovery on the Notes above the Purchase Price in negotiating their return

under the Derivative Agreements.

12.     With respect to SPVs in which the Debtors are or may become

involved in litigation with respect to their Derivative Agreements, acquisition of the Notes

issued by such SPVs may serve as a hedge to the Debtors' litigation risk.  In some cases, the

price that the Debtors would pay to purchase such Notes could be less than the value of the

Collateral securing repayment of the Notes due to the litigation risk to Noteholders, which

would yield a net recovery for the Debtors on the Notes if a sufficient amount of Notes was

purchased, even if litigation is not pursued by the Debtors.  But even if the Debtors do not

acquire a sufficient amount of Notes to justify abandoning or avoiding litigation with respect

to the relevant Derivative Agreements, the purchase of Notes could still provide the Debtors

an effective hedge to minimize any losses they may incur on such Derivative Agreements if

they do not prevail in litigation by allowing the Debtors to realize some recovery on their

Purchased Notes.

13.     With respect to certain SPVs with which the Debtors have entered into

Transaction Agreements on which the Debtors are unable to recover due to inaction by

current Noteholders to redeem their Notes, if the Debtors are able to purchase and redeem the

requisite amount of Notes issued by a particular SPV, the Debtors may be able to direct the

liquidation of Collateral and underlying assets of the SPV and any subsidiaries.  This would

potentially create sufficient liquidity to satisfy amounts owed to the Debtors in a manner that

may both preserve the value of such underlying assets and expedite the time and manner of repayment to the Debtors.  Furthermore, since the Debtors may be able to purchase such Notes at a discount due to the inability of current Noteholders to redeem the Notes and recover value from the issuing SPV, the Debtors may receive a positive distribution on Purchased Notes, yielding additional value for the Debtors, their estates and their creditors.

14.     The ability to sell Purchased Notes will further protect the Debtors' interests in the Transaction Agreements by allowing them to hedge against the risk that they are not able to purchase the requisite amount of Notes to direct a liquidation or settlement of litigation, or where they are not otherwise able to negotiate a settlement.  In these situations, the ability to sell the Notes will give the Debtors the flexibility to maximize their recovery.  In addition, the Debtors may find themselves in a situation where they would be able to realize a significant return through an immediate sale of particular Purchased Notes that would maximize value for the Debtors and their estates.

15.     It is therefore my belief that it is in the best interests of the Debtors, their estates, and their creditors for the Debtors to have the authority to enter into SPV Note Transactions in accordance with the procedures set forth in the Motion, as the Debtors would

be able, in certain situations, to avoid potential litigation, settle existing litigation, and/or maximize recovery from their Transaction Agreements and the SPVs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 30th day of March 2010.

/s/ Daniel Ehrmann

Daniel Ehrmann

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------x
In re                                  :        **Chapter 11 Case No.**
                                       :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :        **08-13555 (JMP)**
                                       :
                      **Debtors.**      :        **(Jointly Administered)**
----------------------------------------------------------------------x

### ORDER GRANTING DEBTORS' MOTION PURSUANT TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO PURCHASE AND SELL NOTES ISSUED BY CERTAIN SPECIAL PURPOSE VEHICLES THAT ARE PARTY TO TRANSACTIONS WITH CERTAIN DEBTORS

Upon the motion, dated March 30, 2010 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors"), pursuant to sections 105(a) and

363(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") for authorization to

purchase and sell notes issued by certain special purpose vehicles that are party to certain

transactions with certain Debtors, all as more fully described in the Motion; and upon the

declaration of Daniel Ehrmann, dated March 30, 2010, in support of the Motion; and the Court

having jurisdiction to consider the Motion and the relief requested therein in accordance with 28

U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the

Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984

(Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a

core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided in accordance with the procedures set forth in the amended order entered February 13,

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion.

2009 governing case management and administrative procedures [Docket No. 2837] to (i) the

United States Trustee for the Southern District of New York; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; and (vi) all parties who have

requested notice in these chapter 11 cases, and it appearing that no other or further notice need be

provided; and a hearing having been held to consider the relief requested in the Motion; and the

Court having found and determined that the relief sought in the Motion is in the best interests of

the Debtors, their estates and creditors, and all parties in interest and that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

> ORDERED that the Motion is GRANTED; and it is further

> ORDERED that, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy

Code, the Debtors are authorized to enter into and consummate SPV Note Transactions in

accordance with the following SPV Note Transaction Procedures:

a. All proposed SPV Note Transactions will be reviewed by an approval committee (the "SPV Note Transactions Committee") established by the Debtors. The financial advisors to the Creditors' Committee (the "Advisors") will receive notice of, and may attend, all meetings of the SPV Note Transactions Committee (each a "SPV Note Transactions Meeting")[2] and will have access to the personnel of the Debtors involved in evaluating the proposed SPV Note Transactions.

b. With respect to all proposed SPV Note Transactions, the Debtors will provide (i) e-mail notification to the Advisors of any SPV Note Transactions Meeting regarding the approval of an SPV Note Transaction not later than one (1) Business Day prior to such meeting (or at such later time as may be agreed by

---

[2] The SPV Note Transactions Committee and SPV Note Transactions Meetings may, respectively, consist of the same members and the same meetings regarding the assumption, assignment, and termination of derivative contracts pursuant to the order dated December 16, 2008 [Docket No. 2257], authorizing the Debtors to establish procedures for the settlement or the assumption and assignment of prepetition derivative contracts.

the Advisors), which email must contain the material terms of the proposed SPV Note Transaction and (ii) an information package (the "Information Package") as soon as practicable but not less than five (5) Business Days prior to the SPV Note Transactions Meeting (or at such later time as may be agreed by the Advisors) that will consist of (a) the Governing Documents pursuant to which the relevant Notes were issued, and (b) market data, valuation inputs, models and assumptions used by the Debtors to prepare their analysis for the SPV Note Transactions Committee that relate to and were used to determine the value of the relevant Notes and adjustments thereto.

c. Informal discussions among the Debtors and the Advisors relative to prospective SPV Note Transactions will commence no later than five (5) Business Days (or at such later time as may be agreed by the Advisors) prior to the relevant SPV Note Transaction Meeting.

d. If the amount proposed to be paid by the Debtors to a Noteholder for the purchase of Notes (the "Purchase Price") in an SPV Note Transaction is greater than $25,000,000, the Debtors may enter into such SPV Note Transaction only if (i) the Creditors' Committee, a subcommittee, or other designee thereof consents in writing before the SPV Note Transaction is executed or (ii) upon Court approval.

e. The Debtors may enter into an SPV Note Transaction involving a Purchase Price less than or equal to $25,000,000 only i) if (a) at least one (1) representative of the Advisors attends the portion of the SPV Note Transactions Meeting during which the proposed SPV Note Transaction was discussed and approved, and (b) the Advisors do not object within six (6) business hours, herein defined as the hours between 9:00 a.m. and 5:00 p.m. (Prevailing Eastern Time) on Business Days, after receipt of e-mail notification of the SPV Note Transactions Committee's approval of such SPV Note Transaction, (ii) with the written consent of the Creditors' Committee, a subcommittee, or other designee thereof, or (iii) upon Court approval.

f. The Debtors may enter into an SPV Note Transaction involving the sale of a Purchased Note only if (i) the Creditors' Committee, a subcommittee, or other designee thereof consents in writing before the SPV Note Transaction is scheduled to be executed or (ii) upon Court approval.

g. The Debtors will provide updates to the Creditors' Committee regarding (i) the number of SPV Note Transactions that have been consummated and (ii) the Purchase Price and sale price of Purchased Notes received by the Debtors, as applicable, on a transaction-by-transaction basis in connection with such SPV Note Transactions promptly following the request by the Creditors' Committee or its Advisors.

h. The Debtors and the Creditors' Committee reserve all rights and remedies with respect to the SPV Note Purchase Procedures and may seek to amend such upon Court approval.

i. The Debtors' ability to carry out the actions set forth in the foregoing procedures shall not override any applicable notice, consent or other rights that any third parties may have pursuant to agreements with the Debtors.

j. Nothing in the foregoing procedures will prevent the Debtors, in their sole discretion, from (i) seeking, upon notice and hearing, the Court's approval of any proposed SPV Note Transaction, including on an expedited basis, (ii) pursuing any and all claims and rights of action, through litigation or otherwise, that the Debtors may have against any Transaction Party or (iii) exercising any and all rights and remedies as holders of any Notes (including Purchased Notes).

and it is further

ORDERED that the Debtors are authorized to execute such documents or other instruments and carry out all other actions as may be necessary to effectuate any SPV Note Transaction in accordance with this Order; and it is further

ORDERED that this Order shall not obligate or require the Debtors to enter into any SPV Note Transaction, nor shall this Order preclude the Debtors from commencing litigation in connection with the Transaction Agreements and SPVs and/or settling or compromising any claim upon further application to the Court; and it is further

ORDERED that this Order shall not modify or limit any orders previously entered by this Court, including, without limitation, any orders relating to Derivative Agreements; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: April __, 2010
New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE