Hearing Date and Time: **April 26, 2010 at 10:00 a.m.**
Objection Deadline: **April 19, 2010 at 4:00 p.m.**

| | |
|---|---|
| **JONES DAY** | **HUGHES HUBBARD & REED LLP** |
| Robert W. Gaffey | William R. Maguire |
| 222 East 41st Street | One Battery Park Plaza |
| New York, New York  10017 | New York, New York 10004 |
| | |
| *Attorneys for Debtors* | *Attorneys for James W. Giddens, as Trustee for the* |
| *and Debtors in Possession* | *SIPA Liquidation of Lehman Brothers Inc.* |

**QUINN EMANUEL URQUHART
OLIVER & HEDGES**
James C. Tecce
51 Madison Ave
22nd Floor
New York, NY 10010

*Attorneys for Official Committee
of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x
                                                             :
In re:                                                       :    Chapter 11
                                                             :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :    Case No. 08-13555 (JMP)
                                                             :
                    Debtors.                           :    (Jointly Administered)
                                                             :
                                                             :
                                                             :
                                                             :
--------------------------------------------------------------x
                                                             :
In re:                                                       :    SIPA Proceeding
                                                             :
LEHMAN BROTHERS INC.,                          :    Case No. 08-01420 (JMP)
                                                             :
                    Debtor.                            :
                                                             :
--------------------------------------------------------------x

**NOTICE OF HEARING OF MOTION *IN LIMINE* FOR AN ORDER EXCLUDING THE
EXPERT TESTIMONY OF PROFESSOR PAUL PFLEIDERER**

**PLEASE TAKE NOTICE** that a hearing on the Motion *In Limine* For An Order

Excluding the Expert Testimony of Professor Paul Pfleiderer (the "Motion"), filed by Lehman

Brothers Holdings Inc. ("LBHI"), James W. Giddens (the "Trustee"), as trustee for the SIPA

liquidation of Lehman Brothers Inc., and the Official Committee of Unsecured Creditors of

Lehman Brothers Holdings Inc. and its affiliated debtors and debtors-in-possession (the

"Committee," collectively, the "Movants"), will be held before the Honorable James M. Peck,

United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton

Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the

"Bankruptcy Court"), on **April 26, 2010, at 10:00 a.m.** (the "Hearing").

      **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion

shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local

Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of

the objecting party, the basis for the objection and the specific grounds thereof, shall be filed

with the Bankruptcy Court electronically in accordance with General Order M-242 (which can

be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing

system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document

Format (PDF), Microsoft Word, or any other Windows-based word processing format (with two

hard copies delivered directly to Chambers), and shall be served upon: (i) the Chambers of the

Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601;

(ii) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn: Robert W. Gaffey,

William J. Hine, Jayant W. Tambe, and Todd R. Geremia), and Weil Gotshal & Manges LLP,

767 Fifth Avenue, New York, New York 10153 (Attn: Richard P. Krasnow, Lori R. Fife, Shai Y.

Waisman, and Jacqueline Marcus), attorneys for the Debtors; (iii) the Office of the United States

Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New

York 10004 (Attn: Andy Velez-Rivera, Paul Schwartzberg, Brian Masumoto, Linda Riffkin, and

Tracy Hope Davis); (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza,

New York, New York 10005 (Attn: Dennis F. Dunne, Dennis O'Donnell, and Evan Fleck) and

Quinn Emanuel Urquhart Oliver & Hedges, LLP, 51 Madison Avenue, 22nd Floor, New York,

New York 10010 (Attn: Susheel Kirpalani and James C. Tecce), attorneys for the official

committee of unsecured creditors appointed in these cases; (v)  Hughes Hubbard & Reed, LLP,

One Battery Park Plaza, New York, New York 10004 (Attn: William R. Maguire, Neil Oxford,

and Seth D. Rothman), attorneys for the SIPA Trustee; (vi) Securities Investor Protection

Corporation, 805 Fifteenth Street, N.W., Suite 800, Washington, DC 20005 (Attn: Kenneth J.

Caputo, Esq.); (vii) Jenner & Block LLP, 919 Third Avenue, 37th Floor, New York, New York

10022-3908 (Attn: Anton R. Valukas, Vincent E. Lazar, Robert L. Byman, David C. Layden, and

Patrick J. Trostle) attorneys for the examiner; and (viii) Boies, Schiller & Flexner LLP, 575

Lexington Avenue, 7th Floor, New York, New York 10022 (Attn: Jonathan D. Schiller, Hamish

P.M. Hume, and Jack G. Stern), attorneys for Barclays Capital Inc., so as to be filed and received

no later than **April 19, 2010 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection

Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted or denied upon

default.

Dated: New York, New York
      April 2, 2010

Respectfully submitted,

| | |
|---|---|
| ___/s/ Robert W. Gaffey_____ | ___/s/ William R. Maguire_____ |
| JONES DAY | HUGHES HUBBARD & REED LLP |
| Robert W. Gaffey | William R. Maguire |
| Jayant W. Tambe | Seth D. Rothman |
| William J. Hine | Neil J. Oxford |
| Todd R. Geremia | One Battery Park Plaza |
| 222 East 41st Street | New York, New York 10004 |
| New York, New York  10017 | (212) 837-6000 (telephone) |
| (212) 326-3939 (telephone) | (212) 422-4726 (facsimile) |
| (212) 755-7306 (facsimile) | maguire@hugheshubbard.com |
| rwgaffey@jonesday.com | |
| | |
| *Attorneys for Debtors* | *Attorneys for James W. Giddens, as Trustee* |
| *and Debtors in Possession* | *for the SIPA Liquidation of Lehman* |
| | *Brothers Inc.* |

___/s/ James C. Tecce_____
QUINN EMANUEL URQUHART OLIVER &
HEDGES
Susheel Kirpalani
James C. Tecce
51 Madison Ave 22nd Floor
New York, New York 10010
212 849-7000 (telephone)
212 849-7100 (facsimile)
jamestecce@quinnemanuel.com

Erica P. Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

*Attorneys for Official Committee of Unsecured*
*Creditors*

**JONES DAY**  
Robert W. Gaffey  
222 East 41st Street  
New York, New York  10017  

Attorneys for Debtors  
and Debtors in Possession  

**HUGHES HUBBARD & REED LLP**  
William R. Maguire  
One Battery Park Plaza  
New York, New York 10004  

Attorneys for James W. Giddens, as Trustee for the  
SIPA Liquidation of Lehman Brothers Inc.  

**QUINN EMANUEL URQUHART  
OLIVER & HEDGES**  
James C. Tecce  
51 Madison Ave  
22nd Floor  
New York, NY 10010  

Attorneys for Official Committee  
of Unsecured Creditors  

**UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                           :
In re:                                     :   Chapter 11
                                           :
LEHMAN BROTHERS HOLDINGS INC., et al.,     :   Case No. 08-13555 (JMP)
                                           :
               Debtors.                    :   (Jointly Administered)
                                           :
                                           :
                                           :
                                           :
-------------------------------------------------------------x
                                           :
In re:                                     :   SIPA Proceeding
                                           :
LEHMAN BROTHERS INC.,                      :   Case No. 08-01420 (JMP)
                                           :
               Debtor.                     :
                                           :
-------------------------------------------------------------x
```

## MOTION *IN LIMINE* FOR AN ORDER EXCLUDING THE EXPERT TESTIMONY OF PROFESSOR PAUL PFLEIDERER

TO THE HONORABLE JAMES M. PECK,  
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers Inc., and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. and its affiliated debtors and debtors-in-possession (the "Committee," collectively, the "Movants"), by and through their undersigned counsel, hereby move for the entry of an order, pursuant to Federal Rule of Evidence 702, excluding the testimony of Professor Paul Pfleiderer.

## INTRODUCTION

1.     Movants respectfully move this Court to exclude the expert report and testimony of Professor Paul Pfleiderer, one of Barclays' proffered expert witnesses, from the record upon which the pending Rule 60 Motions will be decided.  Prof. Pfleiderer opines that (1) Barclays did not receive a $5 billion discount on the large portfolio of securities (the "Repo Collateral")[1] it acquired in connection with the Asset Purchase Agreement, as amended (the "Sale Transaction"); (2) the parties did not negotiate a $5 billion discount from the inception of the Sale Transaction; and (3) Barclays purportedly undertook substantial "risks" in entering into the Sale Transaction, Barclays adequately accounted for its gain upon acquisition, and that the Court's findings concerning the benefits of the Sale Transaction were reasonable.  These opinions lack the rigor and reliability required of expert testimony, trample on the Court's province to weigh the evidence and find facts, and will not assist the Court in resolving the issues on the pending Rule 60 Motions.  Prof. Pfleiderer's testimony should be excluded pursuant to Fed. R. Evid. 702.

---

[1]    For the Court's convenience, this motion uses the term "Repo Collateral" as defined in Prof. Pfleiderer's expert report, which is attached hereto as Exhibit A.  The term refers to the approximately 12,000 distinct securities relating to the Repurchase Transaction between Lehman Brothers, Inc. and the Federal Reserve (the "Fed Repo") and which were purchased by Barclays.

2

2.      On whether Barclays received a $5 billion discount, Prof. Pfleiderer opines that the value of the Repo Collateral Barclays actually received was only slightly in excess of the amount paid by Barclays to assume the Repo from the Federal Reserve.  But Prof. Pfleiderer offers this "valuation" opinion without having conducted *any* independent valuation of the Repo Collateral; instead, he merely reviewed what Barclays did and has judged it to be "reasonable." Under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), an expert must undertake a verifiable, independent analysis—not simply regurgitate the analysis of the party that hired him and declare it adequate.  Moreover, even if it were somehow permissible for Prof. Pfleiderer merely to bless Barclays' valuation as "reasonable" without undertaking an independent valuation—and it is not—Prof. Pfleiderer is not qualified to do so because he is not an expert on the valuation of most of the asset classes of the approximately 12,000 distinct securities ("CUSIPs") that comprise the Repo Collateral.  (*See* Argument, Section I, *below*.)

3.      On whether Barclays negotiated a $5 billion discount off Lehman's book value that was not disclosed to the Court, Prof. Pfleiderer strays far beyond whatever expertise he does have and into the province of the Court.  He unabashedly weighs the evidence, makes credibility determinations, and ultimately opines that there was no such discount.  That, of course, is the Court's role—not something for a financial economist to do—as Prof. Pfleiderer expressly acknowledged when he testified:  "I don't think it is my role as an expert to make judgments about credibility."  Pfleiderer Tr. at 96:5-97:24 (attached hereto as Exhibit B).  (*See* Argument, Section II, *below*.)

4.      Finally, Prof. Pfleiderer identified the type and extent of the "risks" that Barclays purportedly assumed in entering into the Sale Transaction, Barclays' accounting gain at acquisition of the assets transferred through the Sale Transaction, and the reasonableness of the

Court's findings concerning the benefits of the Sale Transaction.  Not only does Prof. Pfleiderer

once again stray beyond the role of an expert here—this time sitting in judgment of the Court's

own work—but his analysis of these issues will not assist the Court in deciding the pending Rule

60 Motions because he does not address the core issues before the Court concerning whether the

Sale Transaction as executed comports with the transaction that was disclosed to and approved

by the Court.  (*See* Argument, Section III, *below*.)

5.      Prof. Pfleiderer does not provide admissible expert testimony that will assist the

Court in deciding these Rule 60 Motions.  Movants accordingly request that the Court exclude

Prof. Pfleiderer's testimony from the record and the upcoming hearing.

## BACKGROUND

6.      Prof. Pfleiderer is a finance professor.  In his report, submitted January 8, 2010,

Prof. Pfleiderer purports to offer a number of opinions about valuation, accounting, and

economic issues relating to Barclays' purchase of certain assets from LBHI, LB 745 LLC, and

LBI pursuant to the Sale Transaction.  *See* Pfleiderer Report, ¶¶ 1-2 (attached hereto as Exhibit

A).  Prof. Pfleiderer was effectively hired by "staff" at the Finance Scholars Group in October

2009, a month after Movants' Rule 60(b) motions were filed.  *See* Pfleiderer Tr. at 103:6-104:4,

306:25-307:23, 308:5-310:2.  Prof. Pfleiderer had never worked with the Finance Scholars

Group before.  *Id*. at 104:5-107:5, 307:24-308:4.  Over the course of approximately three

months, he spent about 150 hours on this matter before submitting his report.  *Id*. at 310:3-8.

7.      Prof. Pfleiderer was not asked to, and did not, conduct an independent CUSIP-by-

CUSIP valuation of the securities Barclays acquired in the Sale Transaction.  *Id*. at 40:3-43:24,

46:4-15.  Instead, he reviewed Barclays' data almost exclusively, spoke with some Barclays

employees over the telephone (but did not take and has not produced a single note from any such

conversation), and purportedly reviewed the procedures Barclays followed when making its post-

closing valuation adjustments in its acquisition accounting.  *Id*. at 81:10-21, 82:16-83:14,

260:11-262:22.  Based on this review, Prof. Pfleiderer concluded that Barclays' valuation of the

securities it acquired and its procedures were "reasonable," although he did not, and could not,

provide any analysis or opinion concerning Barclays' valuation of any specific CUSIP.  *Id*. at

107:6-110:16, 318:20-323:14.

        8.      Prof. Pfleiderer did not analyze the transaction that was disclosed to and approved

by the Court, but nonetheless he offers the following opinions concerning the transaction that

actually occurred:

- Barclays valued the Repo Collateral at $45.5 billion, and thus there was no $5 billion discount in the Fed Replacement Transaction.  *See* Pfleiderer Report § II, ¶¶ 7-72.

- There was no $5 billion discount at inception of the Sale Transaction.  *See id.* § III, ¶¶ 73-91.

- Barclays assumed several risks in engaging in the Sale Transaction, and thus the Day 1 gain Barclays reported is misleading and could have been wiped out shortly thereafter.  *See id.* § IV, ¶¶ 92-108.

- It was not unreasonable, nor should it have been unexpected, for Barclays to report a gain in its acquisition accounting.  *See id.* § V, ¶¶ 109-121.

- There were benefits of the Sale Transaction, and therefore the gain was "reasonable."  *See id.* § VI, ¶¶ 121-135.

        9.      Prof. Pfleiderer describes himself as a financial economist.  Pfleiderer Tr. at 92:5-

24, 183:14-25, 345:23-346:20.  His primary experience since 1977 is in academia.  *Id*. at 100:7-

101:14.  He has no trading experience and has never worked in an investment bank or financial

institution.  *Id*. at 67:13-18.  Although he is a part owner of Quantal International, which

develops risk models for portfolios of equity securities (*i.e.*, stocks), he does not have experience

working with most of the several different asset classes of debt securities Barclays acquired from

Lehman in the Sale Transaction.  Nor were any of Quantal's models used in this engagement.  *Id*.

at 100:20-103:5.  Indeed, although Prof. Pfleiderer opines on Barclays' valuation of the securities

it acquired in the Sale Transaction, he lacks familiarity with certain key pricing models Barclays

used in its valuation.  *Id*. at 32:20-33:16, 38:18-39:17.  Prof. Pfleiderer also has no practical or

expert experience with the repurchase transactions on which he opines.  *Id*. at 67:10-12, 67:18-

23.

## ARGUMENT

10.     Federal Rule of Evidence 702 permits a court to admit expert evidence only if the

"knowledge, skill, experience, training, or education" qualifies the witness as an expert in the

relevant subject matter, ***and then*** only if "(1) the testimony is based upon sufficient facts or data,

(2) the testimony is the product of reliable principles and methods, and (3) the witness has

applied the principles and methods reliably to the facts of the case."  FED. R. EVID. 702.

11.     Rule 702 "establishes a standard of evidentiary reliability" for expert testimony.

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993).[2]  Under this standard, "where

such testimony's factual basis, data, principles, methods, or their application are called

sufficiently into question, the trial judge must determine whether the testimony has a reliable

basis in the knowledge and experience of the relevant discipline."  *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 149 (1999) (alteration and citation omitted).  "[I]t is critical that an

expert's analysis be reliable *at every step*."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d

256, 267 (2d Cir. 2002) (emphasis added).

12.     To apply this standard, the "court should undertake a rigorous examination of the

facts on which the expert relies, the method by which the expert draws an opinion from those

---

[2]    Rule 702 and related *Daubert* principles are applied regularly in bankruptcy proceedings.  *See, e.g.*, *In re Iridium Operating LLC*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007) (Peck, J.); *In re Worldcom, Inc.*, 371 B.R. 33 (Bankr. S.D.N.Y. 2007).

facts, and how the expert applies the facts and methods to the case at hand." *Id.* When there is

not "a sufficiently rigorous analytical connection between [an expert's] methodology and the

expert's conclusions," *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005), such that

an expert's data or methodology "are simply inadequate to support the conclusions reached,

*Daubert* and Rule 702 *mandate* the exclusion of that unreliable opinion testimony," *Amorgianos*,

303 F.3d at 266 (emphasis added).

13.     Prof. Pfleiderer's opinions fail to meet these standards in this case.  His analysis

and methodology demonstrate not just a lack of rigor, but a lack of independence.  Instead of

conducting his own valuation of the Repo Collateral, Prof. Pfleiderer merely accepted Barclays'

valuation on faith and then tried to justify that with his unverifiable conclusion that it appeared

"reasonable" to him.  Additionally, Prof. Pfleiderer relied heavily on support staff when

formulating his opinions, but remains deeply unfamiliar with exactly what analysis they did and

how they did it—or even if they did it at all—notwithstanding that his conclusions necessarily

rest upon what this staff did.  Prof. Pfleiderer also lacks expertise to offer expert testimony on the

value of the Repo Collateral.  And he offers several opinions to support Barclays' after-the-fact

justification for the windfall it received in the Sale Transaction that will not assist the Court on

the pending Rule 60 Motions.

14.     As detailed below, Prof. Pfleiderer's opinions in this case are lacking the

"rigorous analytical connection" between methodology and conclusions that *Daubert* demands,

he lacks the requisite expertise, and his opinions will not help the Court.  His testimony should,

accordingly, be excluded.[3]

---

[3]  In *Iridium*, the Court found Prof. Pfleiderer's analysis and opinions to be helpful.  That is of course not a basis to
admit his testimony in this case.  Also, Prof. Pfleiderer may well be accomplished in his area of expertise and his
opinions helpful where he conducts an independent analysis—as he apparently did in *Iridium*.  But in this case,

## I.   PROF. PFLEIDERER'S OPINION CONCERNING THE EXISTENCE OF A $5 BILLION DISCOUNT THROUGH THE REPO COLLATERAL IS INADMISSIBLE

15.    Prof. Pfleiderer's opinions concerning whether there was a $5 billion discount in the valuation of the Repo Collateral are inadmissible.  He concludes that this discount does not exist because "the Repo Collateral was worth *at most* the approximately $45.5 billion at which Barclays accounted for it in its 2008 Results Announcement summary" of the transaction. Pfleiderer Report, ¶ 5(a) (emphasis in original).  But Prof. Pfleiderer's conclusion, and the "methodology" he used to arrive at it, cannot withstand scrutiny under the standards for admitting expert testimony.

### A.   Prof. Pfleiderer Simply Validates Barclays' Valuation Without Independently Verifying It

16.    Prof. Pfleiderer's opinion, far from being based on a reliable methodology as *Daubert* requires, is based on no methodology at all.  He and staff simply "kicked the tires" on Barclays' accounting analysis of the deal, and then gave Barclays' valuation the Professor's stamp of approval. [4]  Indeed, ultimately, Prof. Pfleiderer never even opines that he agrees with

---

(continued…)

Prof. Pfleiderer does not have the necessary background and expertise to give the opinions he does and, most significantly, he did not conduct any independent analysis of the matters upon which he opines.  In *Iridium*, Prof. Pfleiderer valued the equity and debt of one company, a much simpler task than validating the valuation of thousands of complex securities across multiple asset classes as he purports to do here.  Moreover, Prof. Pfleiderer has done here exactly what he testified in *Iridium* would be inappropriate.  There, he testified how important it is to take into account *all* available, relevant information and not just information from the company itself, as he has done here:  "The analysts had projections, Iridium had projections, Coopers and Lybrand developed a bank case and those were different.  And so one looks at the entire range and takes into account all of the projections. *What you would not do is say let me go and pick one and put 100% weight on that*, be it low or be it high, you would look at the entire record and factor in that information."  *In re Iridium Operating LLC*, No. 01-02952-JPM (Bankr. S.D.N.Y.) (2/27/07 Hearing Tr. 35:18-24 (Docket No. 192); emphasis added).

[4] Prof. Pfleiderer was hired in October to produce a report that was issued in early January, but it is apparent that the staff at the Finance Scholars Group – none of whom have been proffered as expert witnesses in this matter – were the driving force behind his analysis.  As he testified, "it was my understanding that people at the Finance Scholars Group had already received data and organized it and were set up to analyze things."  Pfleiderer Tr. 308:21-309:19.  Indeed, Barclays had retained the Finance Scholars Group before it retained Pfleiderer.

Barclays' valuation; rather, he concludes only that it was "reasonable."  His process of checking Barclays' analysis was also casual at best, with Prof. Pfleiderer often assuming something was correct instead of verifying it, or relying solely on staff without bothering to learn or check the details of their work.

17.    This "methodology," to the extent it can be called that, is thoroughly inadequate to support Prof. Pfleiderer's conclusion that the Repo Collateral could not have been worth more than the value Barclays assigned to it.  "An expert who simply regurgitates what a party has told him" provides inadmissible testimony.  *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009).  Similarly, "heavy reliance on [the client's] subjective view, without analysis of the basis for that party's conclusion, is wholly insufficient to survive" a challenge to admissibility.  *Playtex Prods., Inc. v. Procter & Gamble Co.*, No. 02 Civ. 8046, 2003 WL 21242769, at *10 (S.D.N.Y. May 28, 2003).  Indeed, "[w]here an expert fails to verify the accuracy of data upon which the expert . . . renders an opinion, the resultant analysis and opinion are inherently unscientific[,] requiring exclusion of such evidence under *Daubert*."  *Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp. 2d 413, 446 (W.D.N.Y. 2005).

18.    Prof. Pfleiderer's opinion suffers from precisely these flaws.  In approving Barclays' valuation of the Repo Collateral, Prof. Pfleiderer never did his own valuation of the approximately 12,000 CUSIPs at issue.  Nor did he validate Barclays' valuation for each CUSIP.  *See, e.g.*, Pfleiderer Tr. at 40:3-41:24 ("But if you're asking did I spend ten minutes looking at each row times 10,000 or 12,000, I obviously didn't do that."); *see also id.* at 33:6-16 (admitting having never used Intex, the pricing service used by Barclays).  By his own explanation, all Prof. Pfleiderer did was look at Barclays' spreadsheets, "scrolling down the rows, looking at the procedures, . . . looking at how they were constructed."  *Id.* at 40:3-41:24.  And not only could

9

Prof. Pfleiderer not recall a *single* CUSIP for which he disagrees with Barclays' valuation, *id.* at

107:6-109:2, but he also testified that "it would be rather presumptuous for me to say that

Barclays[,] who is marking this at the actual sale that they realized[,] is wrong," *id.* at 107:11-

110:16.  *See also id.* at 261:8-262:10 ("If you talk about replicating this analysis[,] what I would

assume that that would entail is simply going out and looking at these CUSIPs and getting this

information[,] and I have no reason to believe that this information is incorrect . . . . *So I'm not*

*sure what the value of replication would be here*." (emphasis added)).  For Prof. Pfleiderer to

think it "rather presumptuous" to give an opinion about whether Barclays "is wrong" captures, in

his own words, an utter lack of the independence essential to admissible expert testimony.  *See,*

*e.g.*, *Arista*, 608 F. Supp. 2d at 424; *Playtex*, 2003 WL 21242769, at *10.

> 19.    Not only does Prof. Pfleiderer refuse even to entertain that Barclays' valuation

was wrong, but he emphatically does not offer an opinion that Barclays' valuation was correct.

He has made clear that his opinion is only that, considered in the "aggregate[]" and without

considering "every particular" valuation separately, Barclays' actions were "reasonable":

> > ***I am certainly not offering the opinion that if one goes***
> > ***CUSIP by CUSIP, that I agree with every particular [Barclays]***
> > ***mark.***  I looked at a process, I looked at the fact that extreme care
> > was taken in the development of these, that
> > PricewaterhouseCoopers had audited this.
> >
> > And I came to a conclusion that this [Barclays valuation]
> > provided a good upper bound as to what the realizable value of this
> > would be in an orderly but quick, fairly quick sale of this
> > inventory.
> >
> > . . . ***I haven't gone and said here's a CUSIP that I would***
> > ***disagree with because that wasn't the process.  I looked at***
> > ***aggregates***, I looked at marks that were being placed by BoNY and
> > the adjustments that were made and found that those were
> > reasonable estimates of what could be achieved in an orderly exit.
> > And that's my conclusion.

Pfleiderer Tr. at 321:21-323:14 (emphasis added).

20.     One example of Prof. Pfleiderer's refusal to take a stance on Barclays' exact valuations is his evaluation of Barclays' decision to mark Lehman-issued warrants and Lehman-issued equity-link notes down to zero.  As he explained:  "I neither agree nor disagree with [Barclays'] marking them all the way down to zero.  I certainly agree that they should be significantly marked down.  Whether you mark them down to zero or two cents or five cents is not something I would offer an opinion about without doing some more due diligence." Pfleiderer Tr. at 320:16-321:3.  But he never did that requisite work, nor is he aware of what discussions, if any, his staff might have had with Barclays about the issue.  *See id.* at 321:4-20. Nevertheless, Prof. Pfleiderer concluded that the Repo Collateral was worth at most the value that Barclays assigned to it.

21.     This is not a verifiable expert opinion, but an unsupported, and therefore inadmissible, conclusion that simply rubber-stamps the analysis of the party who hired him for this engagement.  On this ground alone, Prof. Pfleiderer's opinion concerning the existence of a $5 billion discount in the Sale Transaction is inadmissible.

**B.      Separate Staff Did Much of the Work Underlying Prof. Pfeiderer's Conclusions, And He Is Not Familiar With What They Did**

22.     Separate from Prof. Pfleiderer's lack of independence from Barclays, his unfamiliarity with the work done by the staff at the Finance Scholars Group is another reason his opinion is unreliable.

23.     Barclays retained the Finance Scholars Group before it retained Prof. Pfleiderer. And, as Prof. Pfleiderer repeatedly made clear at his deposition, the staff at the Finance Scholars Group did much of the work and he does not even know exactly what they did:

- "I would have to check with my staff who looked at lots of pricing sources and lots of information, did a number of checks.  And I – I'm not going to say that that was not done because it may very well have been done.  So I don't know."  Pfleiderer Tr. at 38:23-39:11.

11

- "Now, I don't know, it may be the case that my staff working on this did check some of that, but I personally did not." *Id.* at 118:14-120:17.

- "If that exercise was done, it may have been done by staff. They were asked to analyze this." *Id.* at 156:25-157:11.

- "I did not [see a copy of an offering memorandum] personally. Staff working at my direction may have. But I didn't personally." *Id.* at 208:13-18.

- "[Q.] Other than Googling, what other due diligence did they do [on a specific CUSIP]? A. I have to, again, ask them. I know that this was looked at rather intensely." *Id.* at 223:19-22.

- "Again, I would have to ask staff. They assembled a lot of information. I don't believe that they did an independent analysis, but perhaps on the next break I can ask again." *Id.* at 220:14-22.

- "I personally did not [ask Barclays about their methodology]. But my recollection is fairly strong that my staff working at my direction did." *Id.* at 264:23-265:23.

24.    Because Prof. Pfleiderer does not even understand how the staff at the Finance Scholars Group arrived at their recommendations, he cannot possibly know if errors in their methods skewed their views, or if facts that they deemed unimportant actually are important. The Court and Movants are also unable to verify certain methodological points with Prof. Pfleiderer, because he does not know what methods were used by the Finance Scholars Group. With his staff doing much of his analysis, Prof. Pfleiderer's distance from the data precludes "a sufficiently rigorous analytical connection," *Nimely*, 414 F.3d at 396, between his conclusions and the underlying methodology, rendering it unreliable. *See Worldcom*, 371 B.R. at 42-43 (finding an expert's opinion unreliable when the underlying survey data was collected "not by [the expert] but by his research assistant," and the expert, despite having "a general discussion with the assistant who would conduct the survey," "was unaware as to how the universe of entities and individuals to be contacted was defined or compiled").

### C.    Prof. Pfleiderer Failed to Consider Information That Could Contradict His Conclusions

25.    An opinion is also unreliable when an expert forms it "without even endeavoring to obtain and consider all the available and relevant information." *Li v. Aponte*, No. 05 Civ. 6237, 2009 WL 1285928, at *7 (S.D.N.Y. May 5, 2009). This is yet another flaw in Prof. Pfleiderer's opinion.

26.    In concluding that Barclays' valuation is reasonable, Prof. Pfleiderer also reasoned that JPMorgan Chase, Bank of New York Mellon ("BoNY"), and Lehman Brothers all had *unreasonable* valuations. He gives Barclays' valuation his stamp of approval largely because he believes Barclays followed its own internal policies and procedures, which he also deemed reasonable.[5] But Prof. Pfleiderer never reviewed *or even requested* the pricing policies and procedures of the other three institutions. *See* Pfleiderer Tr. at 171:7-172:7.

27.    So too, although PricewaterhouseCoopers' ("PwC") audit of Barclays' numbers was "certainly a factor" in Prof. Pfleiderer's conclusion that Barclays' valuation is reasonable, *id.* at 124:15-23, he did not speak with anyone at PwC when preparing his report. Nor was he aware whether PwC checked Barclays' prices for each CUSIP. *See id.* at 1124:24-125:14, 260:25-261:7.

28.    Further, when Prof. Pfleiderer observed a roughly $500 million difference between the BoNY price and the Barclays price for the Pine CUSIP, he (i) did not speak with anyone at Barclays to determine what might be causing this massive disparity, (ii) did not review the terms of the Pine security, (iii) did not consider the creditworthiness of the credits underlying

---

[5]    Nothing in Barclays' policies and procedures concerns the process of calculating a liquidity discount, or the specifics of how Barclays actually priced the individual CUSIPs at issue, both issues far more important to soundness of Barclays' valuation of the Repo Collateral.

the CLO, and (iv) did not know if the staff at the Finance Scholars Group did any of this.  *See id.* at 213:21-216:25.  All Prof. Pfleiderer and the external staff did was review what Barclays had written about Pine in its own files, perhaps review Pine data on a Lehman database acquired by Barclays (the GFS system) (although Prof. Pfleiderer is not sure if they even did this), and look for information about the Pine CUSIP on Google.  *See id.* at 217:2-220:22.  This is a remarkably cursory analysis of a $500 million disparity and yet another sign of the lack of rigor that renders Pfleiderer's opinion thoroughly unreliable.

29.    Indeed, had Prof. Pfleiderer conducted his analysis with the degree of rigor that *Daubert* requires, his reliance materials would have included pricing models—including inputs and outputs and assumptions made—offering materials, and other underlying information about each security Barclays valued.  But, as his list of reliance materials reveals, he did not review any of these materials.  *See* Pfleiderer Report, Revised App. II (attached hereto as Exhibit C).

* * *

30.    In sum, Prof. Pfleiderer's methodology is riddled with flaws.  Instead of conducting an independent valuation of the Repo Collateral, he merely waved his expert wand and deemed Barclays' valuation reasonable.  In doing so, he relied heavily on staff with whom he had not worked previously, whom Barclays hired before they hired Prof. Pfleiderer, and, who "may or may not have" conducted analysis in critical areas of which Prof. Pfleiderer has no knowledge.  Even with the staff's help, however, Prof. Pfleiderer did not rest his opinion on anything more than a conclusory assertion that Barclays' policies and procedures were reasonable.  And, he never reviewed or even asked for the corresponding policies and procedures of the other parties to have valued the Repo Collateral; he just rubber-stamped the Barclays numbers.

31.     Prof. Pfleiderer's opinion that there was no $5 billion discount in the Repo

Collateral lacks rigor and reliability and should, therefore, be excluded.

## II.    PROF. PFLEIDERER IS ALSO UNQUALIFIED TO GIVE EXPERT TESTIMONY ABOUT THE VALUE OF THE REPO COLLATERAL

32.     Even if it were proper for Prof. Pfleiderer merely to bless Barclays' valuation of

the Repo Collateral without undertaking his own independent valuation—and it is not—he is not

qualified to sign off on Barclays' valuation because he is not an expert on the valuation of most

of the asset classes of the securities at issue.

33.     To give expert testimony, a witness must have the "knowledge, skill, experience,

training, or education" to give an expert opinion in the relevant area.  FED. R. EVID. 702.  A court

"may properly conclude that witnesses are insufficiently qualified despite the relevance of their

testimony because their expertise is too general or too deficient."  *Stagl v. Delta Air Lines, Inc.*,

117 F.3d 76, 81 (2d Cir. 1997).

34.     That Prof. Pfleiderer is a professor of finance and considers himself a financial

economist does not make him an expert in valuing the Repo Collateral or validating Barclays'

valuation of it.  *See* Pfleiderer Tr. at 92:5-24, 183:14-25, 345:23-346:20; Pfleiderer Report, App.

I.  Prof. Pfleiderer has no trading experience and has never even worked in an investment bank

or financial institution.  *See* Pfleiderer Tr. at 67:13-17.  Indeed, Professor Pfleiderer could not

himself value, or validate the value of, a significant portion of the Repo Collateral because he

does not have personal experience with the pricing model that Barclays used, called "Intex," to

value securitized products within the Repo Collateral.  *See id.* at 32:20-33:16; 38:18-39:17; Dep.

Ex. 637A (attached hereto as Exhibit D).  Despite this lack of any pertinent experience, Prof.

Pfleiderer says that he is an expert in valuing the many specific classes of securities comprising

the Repo Collateral.  But that task is sufficiently complex that Movants split it among four

different experts, because no one of them had the level of expertise necessary to value securities

across *all* the asset classes comprising the Repo Collateral.

35.    Prof. Pfleiderer is not only unqualified to opine on the value of the various asset

classes that comprise the Repo Collateral, but he also has no practical experience with repos.  He

has never worked with a repo transaction, has never before testified about one, and has never

written a peer-reviewed paper about repo transactions.  *See* Pfleiderer Tr. at 67:10-12, 67:18-23.

The most he can say about his experience with repos is that they "may have been" a topic

mentioned in a paper he once wrote about financing more generally.  *Id.* at 67:24-68:8.

36.    Prof. Pfleiderer also acknowledges that he is "not a regulator" and "not a CPA."

*Id.* at 89:13-90:17.  In his own words, he has an ability merely to "determine whether some basic

accounting principles have been followed."  *Id.* at 90:18-91:4.  But this sort of basic knowledge

does not make him an expert in valuing these complex securities or validating Barclays'

valuation of them, which is what Prof. Pfleiderer purports to do.

37.    In sum, "[t]here is no nexus between his credentials and the subject matter of his

testimony."  *Worldcom,* 371 B.R. at 42.  Prof. Pfleiderer's experience is far too general to make

him an expert in the valuation of approximately 12,000 distinct securities across multiple assets

classes when he has no specific experience that suits him to this task.  *See, e.g.*, *Smith v. Herman

Miller, Inc.*, No. CV-03-5358(CPS), 2005 WL 2076570, at *3 (E.D.N.Y. Aug. 26, 2005)

(doubting the ability of a witness with "general engineering expertise" to give expert testimony

about defective furniture designs, because "there is no evidence that [he] has ever designed

furniture, studied furniture design, published papers or lectured on the subject, or worked for a

company that designed furniture"); *Barban v. Rheem Textile Sys., Inc.*, No. 01-CV-8475 (ILG),

2005 WL 387660, at *4 (E.D.N.Y. Feb. 11, 2005) (rejecting, in a case involving the design of a

laundry press, the expert testimony of an "engineering consultant" because he "has never designed a machine of any kind, and has never worked with laundry machines in any capacity that bears on the conclusions he reaches").

38.     The value of Prof. Pfleiderer's opinion to the Court rests upon his qualifications. Only with specific "knowledge, skill, experience, training, or education" qualifying him to value the Repo Collateral can Prof. Pfleiderer "assist the trier of fact" in understanding complex questions specific to the value of the Repo Collateral.  FED. R. EVID. 702.  Prof. Pfleiderer lacks such expertise.  And so, on this separate ground, his opinions concerning the value of the Repo Collateral should be excluded.

## III.    PROF. PFLEIDERER OFFERS SEVERAL OTHER OPINIONS WHICH SHOULD BE EXCLUDED ON THE BASIS THAT THEY ARE UNRELIABLE AND IRRELEVANT TO DETERMINING ANY FACT AT ISSUE

39.     Prof. Pfleiderer offers a series of opinions to provide a purported after-the-fact justification for Barclays' windfall, including that the parties did not—on his review of the evidence—negotiate a $5 billion discount at the inception of the Sale Transaction; that Barclays assumed certain "risks" in entering into the Sale Transaction; the adequacy of Barclays' accounting for its gain on acquisition; and the reasonableness of the Court's findings concerning the benefits of the Sale Transaction in connection with approving the Sale Order.  None of these opinions is admissible, however, because Prof. Pfleiderer purports to usurp the Court's role in making credibility determinations and even to sit in judgment of the Court's own findings. Moreover, Prof. Pfleiderer's analysis of the Sale Transaction that actually closed does not address the critical issues on these Rule 60 Motions concerning whether the Sale Transaction was accurately disclosed to the Court.

A.    **Prof. Pfleiderer's Opinion That There Was No $5 Billion Discount at the Inception of the Sale Transaction is Improperly Based on His Weighing of the Evidence and Credibility Determinations**

40.    Prof. Pfleiderer opines that there was no $5 billion discount at the inception of the Sale Transaction. *See* Pfleiderer Report, § 3, ¶¶ 73-91. Prof. Pfleiderer reviewed deposition testimony in forming this opinion and notes that the discount's initial presence "has been flatly denied by deponents." Pfleiderer Report, ¶ 76. To support this view, though, Prof. Pfleiderer weighed and discounted documentary and testimonial evidence indicating that the $5 billion discount *was* present at the inception of the sales transaction. He ignored, for example, balance sheets reflecting the discount, as well as deposition testimony from Tonucci and other former Lehman employees that confirms the presence of this $5 billion discount. *See* Pfleiderer Tr. at 294:8-298:20.

41.    Prof. Pfleiderer claims that he engaged in this exercise of crediting certain pieces of evidence and excluding others because he just could not reconcile it all on what he characterized as a "confused record." *See id.* at 96:5-97:24 ("It is obviously a somewhat confused record because people are saying different things and have different recollections, and that's why I felt for some of the conclusions I read, it was useful to look at the actual information that was there that wasn't going to be based on people's recollections."). But weighing conflicting evidence and deciding what evidence to credit is decidedly the province of *the Court*, not an expert. *See, e.g.*, *Dibella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) ("[E]xpert witnesses may not testify based on their personal view of the veracity of a lay witness's testimony."). Prof. Pfleiderer acknowledged this himself: "I don't think it is my role as an expert to make judgments about credibility." Pfleiderer Tr. at 96:5-97:24. But he also acknowledges that is *exactly what he is doing* with this opinion. *See id.* at 94:14-95:14 ("Q: Is

18

any part of any opinion that you are offering in this matter based on your views of the credibility of witnesses?  A: I think the answer to that almost has to be yes.").

42.     In addition to making credibility determinations that he has no special expertise to make, Prof. Pfleiderer ignored several sources of information for determining if the $5 billion discount was present at the Sale Transaction's inception.  For example, he looked at GFS data from September 12, 2008, but ignores GFS data from September 15, 2008, just one day before the inception of the sale transaction.  *See id.* at 300:17-301:14.  He also chose not to talk to the individuals who had testified that this discount was always present, even though many of the key witnesses on this issue are current Barclays employees.  *See id.* at 298:21-300:16.

43.     Prof. Pfleiderer's opinion that there was no $5 billion discount at the Sale Transaction's inception should, accordingly, be excluded, because it is based on his weighing of the evidence and on credibility determinations that are not the province of an expert witness.

**B.     Prof. Pfleiderer's Other Opinions Do Not Address the Issues Before the Court on These Rule 60 Motions**

44.     Prof. Pfleiderer also gives opinions about (i) the "risks" that Barclays assumed in entering into the Sale Transaction; (ii) Barclays' accounting gain on acquisition of the assets transferred through the Sale Transaction; and (iii) the reasonableness of the Court's findings concerning the benefits of the Sale Transaction in approving the Sale Order.  Pfleiderer Report, §§ IV-VI, ¶¶ 92-135.  These opinions are offered for the ulterior and improper purpose of supporting Barclays' after-the-fact justifications for the massive windfall it received through the Sale Transaction.  But they have no bearing on the central issues before the Court on the Rule 60 motions: whether Barclays received more assets than were approved by the Court or paid less for those assets than was represented to the Court.  Prof. Pfleiderer's opinions on these issues should thus be excluded because they will not assist the Court in deciding the Rule 60 motions.

45.    Expert testimony is admissible only insofar as it "will assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702.  The Supreme Court in *Daubert* referred to this as the "fit" requirement; that is, expert opinion must fit with the issues before the trier of fact, and if it does not, it is not admissible.  *See Daubert*, 509 U.S. at 591 ("Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance.  'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful' . . . . The consideration has been aptly described . . . as one of 'fit.'" (citations omitted)); *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 66 n.5 (2d Cir. 1997); *Bazile v. City of New York*, 215 F. Supp. 2d 354, 365 (S.D.N.Y. 2002) (finding that proffered expert testimony in employment discrimination case that did not competently assess whether discriminatory animus motivated defendant's conduct "does not fit the facts of the case" and was accordingly inadmissible).

46.    The type and extent of the risks that Barclays assumed in purchasing these assets is simply irrelevant.  Rather, the assets Barclays actually purchased, and whether those assets and their known value were fully and accurately disclosed to the Court in connection with the motion to approve the Sale Order, is what is at issue on these motions.  Prof. Pfleiderer's opinions concerning Barclays' "risks" in entering into the Sale Transaction therefore do not meet the "fit" requirement for expert testimony.

47.    Prof. Pfleiderer's opinions concerning Barclays' $4.2 billion accounting gain on acquisition also do not meet this requirement.  Pfleiderer Report, § V, ¶¶ 109-121.  Ultimately, Prof. Pfleiderer opines that "given the risks for Barclays, market conditions, and other relevant considerations, it was not unreasonable nor should it have been unexpected for Barclays to report an accounting gain on its acquisition of LBI's North American broker-dealer businesses."

Pfleiderer Report, ¶¶ 119, 121.  But, again, the purported "reasonableness" and "fairness" to Barclays of its gain on acquisition in light of the risks it purportedly assumed has no bearing on whether the Sale Transaction as executed comports with the transaction that was disclosed to and approved by the Court.

48.    Finally, in Section VI of his report, Prof. Pfleiderer opines that "[a]fter analyzing this Transaction and the events that led up to it, reviewing the record compiled to date, and considering the Movants' claims and my own analysis of those claims, my opinion is that the Court's findings about the benefits of approving the Transaction were reasonable when made and have been borne out by events."  Pfleiderer Report, ¶ 134.  An expert witness does not, as an initial matter, properly sit in judgment of Movant's claims and the reasonableness of this Court's findings.  So this opinion will not help the Court in any way.  *See, e.g., Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98 Civ. 8272, 2003 WL 22272587, at *8 (S.D.N.Y. Oct. 2, 2003) (excluding expert testimony that purported to opine on whether plaintiff's allegations stated a claim and evaluate deposition testimony, because such testimony "invade[s] the province of the court"); *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 191 (S.D.N.Y. 2006) ("Expert testimony that merely states a legal conclusion must be excluded.")

49.    Moreover, that the Court acknowledged certain benefits of the Sale Transaction at the time the Court approved it does not provide justification for Barclays to receive more assets than were approved by the Court or to pay less for those assets than was represented to the Court. Whether Barclays received more assets and paid less for them than was disclosed to the Court in connection with the proceedings to approve the Sale Transaction are among the core issues on these Rule 60 motions.  Prof. Pfleiderer's opinions about whether the Court made accurate

21

findings about the benefits of the Transaction are neither helpful, nor within any expert's

province, and should therefore be excluded.

## NOTICE

50.     No trustee has been appointed in the chapter 11 cases.  Movants have served

notice of this motion in accordance with the procedures set forth in the order entered on February

13, 2009 governing case management and administrative procedures for the chapter 11 cases

[Chapter 11 Docket No. 2837] and the order entered on November 7, 2008 governing case

management and administrative procedures for the SIPA proceeding [SIPA Docket No. 240] on

(i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue

Service; (iv) the United States Attorney for the Southern District of New York; (v) the Securities

Investor Protection Corporation; (vi) counsel for Barclays; and (vii) all parties who have

requested notice in these proceedings.  Movants submit that no other or further notice need be

provided.

## CONCLUSION

Movants respectfully request that the Court (a) enter an order substantially in the

form attached hereto as Exhibit E, granting the relief requested herein; and (b) grant such other

and further relief to the Movants as the Court may deem proper.

Dated:  New York, New York
        April 2, 2010

                                Respectfully submitted,


   ___/s/ Robert W. Gaffey_____          ___/s/ William R. Maguire_____
JONES DAY                                 HUGHES HUBBARD & REED LLP
Robert W. Gaffey                          William R. Maguire
Jayant W. Tambe                           Seth D. Rothman
William J. Hine                           Neil J. Oxford
Todd R. Geremia                           One Battery Park Plaza
222 East 41st Street                      New York, New York 10004
New York, New York  10017                 (212) 837-6000 (telephone)
(212) 326-3939 (telephone)                (212) 422-4726 (facsimile)
(212) 755-7306 (facsimile)                maguire@hugheshubbard.com
rwgaffey@jonesday.com

*Attorneys for Debtors*                   *Attorneys for James W. Giddens, as Trustee*
*and Debtors in Possession*               *for the SIPA Liquidation of Lehman*
                                          *Brothers Inc.*


   ___/s/ James C. Tecce_____
QUINN EMANUEL URQUHART OLIVER &
HEDGES
Susheel Kirpalani
James C. Tecce
51 Madison Ave 22nd Floor
New York, New York 10010
212 849-7000 (telephone)
212 849-7100 (facsimile)
jamestecce@quinnemanuel.com

Erica P. Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

*Attorneys for Official Committee of Unsecured*
*Creditors*