# EXHIBIT A

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

# Expert Report of Professor Paul Pfleiderer

in the matter of

**In Re:  Lehman Brothers Holdings Inc.,** *et al.***, Debtor**

**and**

**In Re:  Lehman Brothers Inc., Debtor**

January 8, 2010

Volume 1 of 2

EXHIBIT

633 A

2-23-10

Contains Highly Confidential Information

## TABLE OF CONTENTS

I.    **Executive Summary** .................................................................................................. 1

    A.    Qualifications and Assignment ......................................................................... 1

    B.    Summary of Opinions ........................................................................................ 2

    C.    Overview of the Remainder of This Report .................................................... 4

II.   **Alleged $5 Billion Discount in the Fed Replacement Repo** ............................... 4

    A.    Overview of the Fed Replacement Repo ......................................................... 6

    B.    What Barclays Lent............................................................................................ 9

    C.    What Barclays Received .................................................................................. 10

        *i.    Identifying transferred positions* .............................................. 14

        *ii.    Valuing transferred positions* ................................................... 16

        *iii.    Lehman, JP Morgan Chase, and Bank of New York marks* ..... 22

        *iv.    Barclays "exit price" marks* ...................................................... 29

        *v.    Aggregate value of transferred positions* ................................ 37

    D.    Ex Post Assessment of Profits from Trading Assets Acquired from LBI ........... 41

    E.    Conclusion ........................................................................................................ 45

III.  **Alleged $5 Billion Discount at Inception** ........................................................... 45

    A.    Estimated Transaction Balance Sheet as of September 16, 2008 ................ 47

    B.    Updated Transaction Balance Sheet as of September 17, 2008 .................. 51

    C.    Conclusion ........................................................................................................ 53

IV.   **Risks Arising from the Acquisition** ..................................................................... 54

    A.    Information Risk ............................................................................................... 54

    B.    Market Risk....................................................................................................... 56

    C.    Business and Strategic Risks ........................................................................... 60

    D.    Conclusion ........................................................................................................ 62

V.    **Barclays' Accounting Gain on the Acquisition** ................................................. 63

    A.    Key Documents Summarizing the Acquisition from an Accounting Perspective ...................................................................................................... 64

Contains Highly Confidential Information

B.    Recap of the Acquisition Based on Barclays' 2008 Results Announcement Summary of the Acquisition ...................................................................64

C.    Barclays' Accounting Gain on the Acquisition Does Not Indicate That Barclays Obtained a Secret or Unfair Discount ...................................70

VI.    **Benefits of the Acquisition** ...................................................................**72**

A.    Benefits for the LBHI and LBI Estates, Lehman Creditors, and Lehman Customers ................................................................................ 73

B.    Public Benefits ................................................................................ 77

C.    Conclusion ....................................................................................... 77

**Appendix One:**        **Resume of Professor Paul Pfleiderer** ...................................**79**

**Appendix Two:**        **List of Documents and Other Materials Reviewed and Considered** ..............................................................................**84**

**Appendix Three:**      **Asset Types Transferred to Barclays** ....................................**103**

**Appendix Four:**       **Information on Selected Securities Transferred to Barclays**.............**106**

**Appendix Five:**       **Exhibits** .................................................................................**118**

Exhibit 1:    Positions Comprising the Collateral Transferred to Barclays in the Fed Replacement Repo .......................................................................119

Exhibit 2:    Positions Included in "Trading Portfolio Assets" that Were Not Transferred to Barclays in the Fed Replacement Repo ...................... 121

Exhibit 3:    Sample of "Short Names" of Securities in the Repo Collateral.............. 122

Exhibit 4:    "Stickiness" in GFS Marks for Level III Securities................................ 125

Exhibit 5:    "Stickiness" in GFS Marks for Level II Securities................................ 127

Exhibit 6:    Comparison of Indicated Values Using BoNY Marks To Indicated Values Using Barclays Marks for Selected Individual Positions and Groups of Similar Positions ....................................................... 130

Exhibit 7:    Updated Transaction Balance Sheet (Assets Only) Based on "LBI BS_917_V with Adjustment.xls"................................................131

Exhibit 8:    Summary of Bank Acquisitions that Resulted in Negative Goodwill .... 132

Contains Highly Confidential Information

## I.    Executive Summary

### A.    Qualifications and Assignment

1.    My name is Paul Pfleiderer.  I am the C.O.G. Miller Distinguished Professor of Finance at the Graduate School of Business at Stanford University.  I also am Professor of Law (by courtesy) at Stanford Law School, Stanford Graduate School of Business Trust Faculty Fellow for 2009-2010, and Co-Director of the Wealth Management Executive Program at Stanford.  Appendix One to this report is a copy of my current resume, which provides additional information about my training, employment history, teaching, research, publications, and prior testimonies.

2.    I have been retained by Boies, Schiller, and Flexner LLP, Counsel for Barclays Capital Inc. ("Barclays"), to analyze certain economic, financial, accounting, and valuation issues arising in this matter.[1]  The issues I analyzed and the opinions I express in this report all relate to a voluntary exchange (the "Acquisition" or "Transaction") between Barclays and Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), and LB 745 LLC ("LB 745" and, together with LBHI and LBI, "Lehman") as a result of which Barclays acquired the North American broker-dealer businesses of LBI (the "Businesses"), Lehman's world

---

[1] This matter involves three motions before the Court brought by three Movants:  (a) a Motion for an Order . . . Modifying the September 20, 2008 Sale Order and Granting Other Relief (the "Debtor's Motion") brought by the bankruptcy estate of LBHI (the "Debtor"); (b) a Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b) (the "Trustee's Motion") brought by James W. Giddens (the "Trustee") as trustee for the SIPA liquidation of LBI; and (c) a Motion . . . for Relief from Order . . . Authorizing and Approving . . . Sale of Purchased Assets Free and Clear of Liens and Other Interests . . . (the "Committee's Motion") brought by the Official Committee of Unsecured Creditors of LBHI (the "Creditors' Committee").

Contains Highly Confidential Information

headquarters building, and two data centers.[2]  I have been asked to analyze issues related to the structure and pricing of the Acquisition, the risks associated with the Acquisition, the valuation of certain assets and liabilities transferred to Barclays as part of the Acquisition, and the benefits of the Acquisition for the LBHI and LBI estates, for Lehman's creditors and customers, and for the general public.  I also was asked to analyze the accuracy and thoroughness of Barclays' accounting for the Transaction, as set forth in its 2008 Results Announcement and further detailed in work papers and files supporting the summary of the Transaction contained in that Announcement.[3]

3.      I am being compensated for my work on this matter at my standard hourly rate, which is $700 per hour.  I am being assisted by consultants at Finance Scholars Group, who are working at my direction and are being compensated at their standard hourly rates.

**B.    Summary of Opinions**

4.      In this subsection, I provide a brief summary of the major opinions I hold regarding the issues I examined.  My opinions are based on the facts of this case as I now understand them and on the analyses described in the remainder of this report.  My work on this case is continuing, and I reserve the right to revise or augment the findings and opinions set forth here in the event that additional information relevant to the issues I examined becomes available, in response to questions raised in my deposition, to take into account or reply to analyses presented by experts retained by the Movants, or for other reasons.

---

[2] The terms of the Acquisition were negotiated in the days immediately following LBHI's filing for bankruptcy on September 15, 2008.  Following a hearing that began on Friday, September 19 (the "Sale Hearing"), the Transaction was approved by this Court the next day, and then closed on Monday, September 22, 2008.

[3] I am not a CPA and did not examine and do not opine as to whether Barclays' accounting for its acquisition of LBI's North American broker-dealer businesses complied with applicable accounting principles.  So far as I am aware, Movants have not asserted that Barclays failed to comply with these principles or that Barclays' auditor, PriceWaterhouseCoopers, failed to audit Barclays' acquisition accounting as required by generally accepted auditing standards, nor, to the best of my knowledge, is there any basis for doing so.

Contains Highly Confidential Information

5.    The following statements constitute a brief summary of my primary opinions as of the date of this report:[4]

   a.  *Alleged $5 billion discount in assets actually received in the Transaction*:  Most of the assets that Barclays received in the Transaction consisted of a large inventory of trading portfolio securities it acquired when it replaced the Federal Reserve Bank of New York as LBI's primary source of financing on Thursday, September 18, 2008 (the "Repo Collateral") and advanced LBI $45 billion in cash.  The Movants contend that the Repo Collateral that Barclays received was worth $50 billion or more and that the Fed Replacement Repo was in effect a sale to Barclays of the Repo Collateral at a secret $5 billion discount.  That contention is incorrect; the Repo Collateral was worth *at most* the approximately $45.5 billion at which Barclays accounted for it in its 2008 Results Announcement summary of the Acquisition.  Thus, there was no $5 billion discount in the Fed Replacement Repo transaction.

   b.  *Risks associated with the Acquisition*:  Barclays' acquisition of LBI's North American broker-dealer businesses entailed immense financial and business risks for Barclays.

   c.  *Barclays' reported accounting gain on the Acquisition*:  Given the risks for Barclays, market conditions, and other relevant considerations, it was not unusual, unexpected, or unreasonable for Barclays to report an accounting gain on its acquisition of LBI's North American broker-dealer businesses.  To the contrary, two days before the Court's September 19, 2008, Sale Hearing, Barclays announced publicly that it expected the Transaction to generate day one negative goodwill of approximately $2 billion, post-tax.  The fact that Barclays reported an accounting gain on the Acquisition does not indicate that Barclays received a secret or unfair discount on the Repo Collateral, nor does it imply that Barclays earned an unexpected or unreasonable profit from the Transaction.

   d.  *Benefits of the Acquisition*:  Barclays' acquisition of LBI's North American broker-dealer businesses was expected to benefit, and with high probability did benefit, the LBHI and LBI estates, Lehman's creditors, and Lehman's customers. The Acquisition also has generated significant public benefits.  Had Barclays not acquired the Businesses, whether because no agreement could be struck or because approval of the Transaction had been withheld by the Court, it is virtually certain that the LBHI and LBI estates, Lehman's creditors, Lehman's customers, and public financial markets all would have been worse off.

---

[4]  These statements are a summary of my primary opinions only.  I set forth a number of related or subsidiary opinions on a wide range of issues throughout this report, some of which may not be captured or reflected in this summary.

Contains Highly Confidential Information

e.  *Accounting for the Acquisition*:  Barclays' 2008 Results Announcement and supporting work papers and files (which I understand have been produced in this litigation in response to requests from the Movants) provide a thorough and accurate accounting for the Acquisition.[5]  These materials show what assets Barclays received (or expects to receive[6]) as a result of the Transaction, what liabilities Barclays assumed as a result of the Transaction, and the values Barclays assigned to these assets and liabilities for financial accounting purposes.  These materials also provide sufficient data and analytical support to establish that the values Barclays assigned to the acquired assets and assumed liabilities approximated their fair values at the time of the Acquisition with reasonable precision.

### C.    Overview of the Remainder of This Report

6.    The remainder of this report is organized in six sections.  Sections II and III address two aspects of the alleged $5 billion discount, namely, whether Barclays received a $5 billion discount in the Repo Collateral, and whether Barclays negotiated or maneuvered for a secret $5 billion discount from inception of the Transaction.  Section IV examines risks to which Barclays was exposed when it entered into the Transaction.  Section V focuses on Barclays' accounting for the Acquisition, and Section VI discusses the benefits of the Transaction for the LBHI and LBI estates, for Lehman's creditors and customers, and for the general public.

## II.    Alleged $5 Billion Discount in the Fed Replacement Repo

7.    The Movants assert that Barclays received a $5 billion "discount" on certain financial assets and a corresponding "windfall profit" as a result of its acquisition of LBI's North American broker-dealer businesses.  The Debtor, for example, asserts that the Transaction "was structured to give Barclays an immediate and enormous windfall profit [because c]ertain Lehman

---

[5] I use the phrase "accounting for the Acquisition" to mean a detailed description or characterization of the Transaction. I do not examine and do not express an opinion as to whether this accounting complied with applicable accounting standards.

[6] As I explain below, Barclays contends that some assets that Barclays acquired in the Transaction have not yet been delivered to Barclays.

Contains Highly Confidential Information

executives agreed to give Barclays an undisclosed $5 billion discount . . . ."[7]  The Movants claim further that the alleged secret discount was effected, ultimately, through a repurchase agreement entered into by LBI and Barclays on Thursday, September 18, 2008 (the "Fed Replacement Repo").[8]  Thus, according to the Debtor, "By mid-week, certain Lehman and Barclays executives decided that . . . the better way to deliver the discount to Barclay's [sic] would be to terminate the executory Repurchase Agreement . . . .  Changing the deal in this way orchestrated an exchange of $50 billion in securities for a payment of only $45 billion, thus giving Barclay's [sic] the agreed upon $5 billion undisclosed discount."[9]

8.     I disagree with the Movants' assertions and find their characterizations of the Acquisition and its implementation both inaccurate and misleading.[10]  Based on the facts and analyses set forth in this section, I conclude that Barclays did not receive a $5 billion discount, secret or otherwise, through the Fed Replacement Repo.  Instead, and contrary to the Movants' assertions, the Repo Collateral pledged to Barclays in the Fed Replacement Repo, including the securities and cash ultimately received in Barclays' December settlement with JP Morgan Chase and LBI, was worth at most approximately $45.5 billion, or about 1% more than the $45 billion in cash that Barclays paid out as part of the Fed Replacement Repo.[11]

---

[7] Debtors Motion, page 3.

[8] Barclays agreed to enter into this repurchase transaction at the request of the Federal Reserve Bank of New York, which had provided funding to LBI for three days after LBHI's bankruptcy filing but was unwilling to provide funding for LBI on a longer term basis. *See* Leventhal Declaration at ¶¶ 6–7.

[9] Debtors Motion, pages 5–6.

[10] I also disagree with the Movants' claim that the alleged secret discount was an element of the contemplated transaction from inception. I examine and analyze facts related to this assertion in the next section.

[11] Importantly, Barclays did not acquire LBI's trading portfolio securities in a separate, stand-alone transaction, but instead acquired these assets as part of a bundle of assets and liabilities associated with LBI's North American broker-dealer businesses. Barclays' acquisition of LBI's trading portfolio securities was a major component of the larger Transaction, but did not constitute the *entirety* of the Transaction. To be clear, the facts and analyses set forth in this section and elsewhere in this report show not only that there was no $5 billion discount in the Fed Replacement Repo, but also that there was no $5 billion discount hidden *anywhere* in the Transaction. As discussed

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

### A.    Overview of the Fed Replacement Repo

9.    I focus first and foremost on the transaction *as implemented* and on the Movants' claim that Barclays not only sought, but in fact received, $50 billion in securities for $45 billion in cash, through the mechanism of the Fed Replacement Repo. To assess the validity of this claim, I examined what Barclays paid to LBI in the Fed Replacement Repo and compared this to the value of what Barclays actually received back from LBI in the Fed Replacement Repo. I conclude that, by any reasonable standard, the value of the securities and cash Barclays received in the Fed Replacement Repo was not $50 billion, as the Movants assert, or even close to $50 billion. Instead, the fair value of the securities (and cash) Barclays received in the Fed Replacement Repo was, *at most*, approximately $500 million (or about one percent) more than $45 billion.[12]

10.    It is an important fact that Barclays did not acquire the Repo Collateral in a separate, standalone transaction, but instead acquired these assets as part of a larger bundle of assets and liabilities associated with LBI's North American broker-dealer businesses. This means, first, that there was no separate identifiable "price" paid by Barclays for the trading portfolio securities and, second and more specifically, that the $45 billion that Barclays lent to LBI in the Fed Replacement Repo should not be viewed as the "price" Barclays paid for the Repo Collateral. Nonetheless, the Movants frame their assertion that there was a $5 billion

---

below, for sound economic reasons, Barclays did earn and report an accounting gain on the overall Acquisition, but this gain was not secret, unusual, or unreasonable, and is not evidence of any secret discount or of an unreasonable or unusual profit in either the Transaction overall or in the Fed Replacement Repo component of the overall Transaction. See Section V for a further discussion of Barclays' accounting gain on the Acquisition.

[12] My conclusion as to the maximum value of the securities and cash Barclays received in the Fed Replacement Repo reflects the difficult market conditions that prevailed at the time of the Transaction, but does not take into account any "bulk purchase" adjustment and is not a "fire sale" valuation. Factoring in considerations related to the size of the Transaction and the special market conditions prevalent at the time would lead to a valuation of what Barclays actually received in the Fed Replacement Repo below the $45.5 billion value set forth here.

Expert Report of Professor Paul Pfleiderer                                                    Page 6

Contains Highly Confidential Information

secret discount in the Transaction primarily in terms of the Fed Replacement Repo, explicitly claiming that Barclays bought $50 billion of securities for a cash payment of only $45 billion. Because the Movants frame their claim in this way, I begin my analysis of the overall Transaction by examining the elements of the Fed Replacement Repo — i.e., what Barclays lent and what Barclays received — despite the risk that this narrow perspective distorts and mischaracterizes the overall Transaction.[13]

11.    Even viewed in isolation, as if it were a separate transaction rather than a component of a larger transaction, the Fed Replacement Repo was *not* a source of a $5 billion profit for Barclays. Instead, it was a transaction that no other commercial entity would have entered into,[14] and a transaction that made sense only in the context of the broader Transaction, i.e., Barclays' acquisition of LBI's North American broker-dealer businesses, including not just

---

[13] An analogy may illustrate how the Movants' narrow focus on the Fed Replacement Repo distorts and mischaracterizes the Transaction. Suppose an entrepreneur purchases a small retail business with an inventory worth an estimated $300,000. Suppose further that the buyer acquires not only this inventory but also the business's established name, its extensive customer list, and the right to hire the store's experienced manager, all of which have an estimated value of $100,000. Now suppose the buyer agrees to pay $280,000 in cash to be used to pay off a $280,000 bank loan to the business secured by the inventory and to pay the owner additional cash of $70,000 to complete the transaction. All in, one could say that the buyer paid $350,000 for assets worth $400,000; alternatively, one could say that the buyer paid $70,000 for a business with net assets of $120,000. (Either way, the buyer would report a gain on the acquisition of $50,000.) But, based on these facts, one *cannot* say that the buyer paid $280,000 for the inventory, or that the buyer got a $20,000 discount on the inventory, or that the buyer paid less than "fair value" for the inventory.

[14] Mr. Marsal agrees that the Fed Replacement Repo appears on its face to be commercially untenable. "I've never seen a secured lender on the eve of bankruptcy take out another secured lender with inadequate collateral which is what you're suggesting. Unvalued collateral. Difficult to value collateral. That would be silly in sophisticated banking terms. You wouldn't ever get there." [Marsal, page 238.] Oddly, Mr. Marsal concludes from this conundrum that the Repo Collateral must have been liquid and must have had excess value in it: "Barclays is a sophisticated — a very sophisticated, very savvy player . . . . Do I believe there was ever any issue with the value of that collateral with the securities against secured loan? It never crossed my mind. Because a savvy institution like that, there is no way you would ever do this transaction if that was an issue. You would have gotten the CUSIPs — you would have gotten all the information you need before you're going to lend $45 billion. Are you kidding me? Anything that could have broken the bank are you telling me they did not have a pretty good handle on what was there in the way of value? Inconceivable. That's inconceivable. So the issue in my mind was never the issue of the securities value. I assumed that one would wash against the other. I assume there was real value there." Mr. Marsal appears to ignore the more reasonable explanations, namely, that (a) the positions that Barclays actually received on September 18 were materially different from (and only a portion of) the positions it expected to receive, and (b) Barclays entered into the Fed Replacement Repo only because the NYFRB required it do so in order to complete the larger Transaction.

Contains Highly Confidential Information

the Repo Collateral, but also other financial assets, employees, customers, intangible assets, and so on.[15]

12.    As I show below, in the Fed Replacement Repo, Barclays lent $45 billion of *riskless* assets (i.e., cash) to LBI, a troubled subsidiary of a bankrupt parent, in return for approximately $45 billion of *risky* assets (with no recourse to any other LBI or LBHI assets). Such a loan, in isolation, simply is not economically tenable.  If the risky assets rise in value, the borrower will repay the loan (with interest).  But if the assets fall in value the borrower can default on the loan and leave the lender with potentially massive losses.[16] This, of course, is why the "collateral value" of securities acceptable to the lender in a commercial repo transaction (i.e., the loan amount) is less than the value of the securities (or in other words, why the value of the securities pledged in a repo transaction are subject to a "haircut").  It also is why highly risky securities — which comprised a significant portion of the securities ultimately transferred to Barclays in the Fed Replacement Repo — typically are not acceptable or eligible collateral for a repo loan.

13.    The facts and analyses I summarize in the remainder of this section show that there was virtually no "haircut" in the Fed Replacement Repo, i.e., no significant difference between the amount of Barclays' loan ($45 billion) and the value of the assets pledged against the loan.  So far as I am aware, there is no dispute that Barclays entered into the Fed

---

[15] Stephen King makes this point in his deposition, expressing the opinion that "under any normal circumstances, Barclays did not think that the lending of 45 billion dollars against this portfolio of securities was a transaction which it would have done absent the Lehman business acquisition." King Tr. at 120.

[16] Conceivably, although not practically, the interest rate on this highly unusual repo loan could have been set sufficiently high to induce Barclays to lend under these terms.  But the interest rate on the Fed Replacement Repo was only 4% and, in any case, it is my understanding that Barclays chose to (or had to) write off even this interest (approximately $20 million). A spreadsheet in the PriceWaterhouseCoopers work papers identified in footnote 49 below recalculates interest on the Fed Replacement Repo transaction for four days at 4%, "without exception," but notes that the "interest receivable is not on the opening balance sheet [because] Barclays will not be getting paid for that receivable."

Contains Highly Confidential Information

Replacement Repo only because the Federal Reserve insisted that it do so as a condition of supporting the Transaction. The Fed Replacement Repo was a high risk transaction for Barclays; it is not surprising that it was not initiated by Barclays, but was instead a transaction that Barclays effectively was required to enter into to complete the Acquisition of the Businesses. Indeed, I doubt that Barclays or any other commercial lender would have willingly entered into a repo transaction on these terms and under these circumstances on a stand-alone basis.

14.    In the remainder of this section, I establish that there was no $5 billion discount, secret or otherwise, in the Fed Replacement Repo. To do so, I first report what Barclays paid in the Fed Replacement Repo. I then establish what Barclays received in the Fed Replacement Repo and the fair value of what Barclays received.

**B.    What Barclays Lent**

15.    One of the few numbers about which there is no dispute in this matter (so far as I am aware) is the amount of cash that Barclays transferred to LBI on September 18, 2008. As described by Shari Leventhal, Assistant General Counsel and Senior Vice President at the Federal Reserve Bank of New York ("FRBNY), "Beginning in the afternoon of September 18, Barclays initiated the process of transferring $45 billion in cash to LBI to fund LBI overnight. A series of funds transfers were made using the Fedwire Funds Service, which is operated by the Federal Reserve Banks. By early evening, the entire sum of $45 billion in cash had been transferred by Barclays to LBI."[17]

16.    Barclays wired a first payment of $5 billion to Bank of New York ("BoNY"), its custodian for the Fed Replacement Repo, on the morning of September 18. In return for this first payment, Barclays expected Lehman to deliver to BoNY securities with a marked value of

---

[17] Leventhal Declaration at ¶11.

Contains Highly Confidential Information

approximately $5 billion.[18] This did not happen. Instead, Lehman delivered securities that everyone agrees (so far as I know) had an aggregate value well below $5 billion, perhaps as little as $2 billion.[19] Needless to say, this caused considerable, and understandable, consternation. Nonetheless, Barclays fulfilled its side of the Fed Replacement Repo agreement and, before receiving any additional securities, wired an additional $40 billion to BoNY for the benefit of Lehman in a series of nearly simultaneous transfers.[20]

### C.    What Barclays Received

17.    What precisely Barclays received in return for its $45 billion in cash on September 18, 2008, was, initially, a matter of great uncertainty, as was the value of what Barclays received (i.e., the value of the Repo Collateral). This uncertainty arose from multiple sources. First, on September 18, and for some time thereafter, there was considerable uncertainty as to exactly what specific positions had been transferred to Barclays.[21] Ultimately, as discussed below, through a detailed reconciliation and accounting process, Barclays has identified the exact positions (i.e., CUSIPs and quantities) that it received from the Fed Replacement Repo. But that process was not completed — indeed, by any reasonable expectation, could not have been completed — on the day of the Fed Replacement Repo.

---

[18] Since Barclays was "replacing" emergency (collateralized) repo financing that the FRBNY had provided earlier in the week to prevent LBI's immediate collapse, the expectation was that securities held by JP Morgan Chase as custodian for the FRBNY's funding of LBI would be transferred to BoNY as collateral for Barclays' replacement repo funding. In fact, only a portion of the Fed repo collateral was transferred to Barclays. To fill this shortfall, additional LBI securities from outside the Fed repo collateral were pledged to Barclays (thus becoming part of the Repo Collateral), leaving a gap believed at the time to be about $7 billion. I discuss the $7 billion "cash, but not ultimately cash" that filled this gap in some detail below.

[19] *See, e.g.*, Deposition of James Hraska, *In re: Lehman Brothers Holdings, Inc., et al.*, No. 08-13555 (JMP) (S.D.N.Y. Aug. 14, 2009), at 77:20 – 80:12.

[20] A set of "Payment Details" reports in the PriceWaterhouseCoopers work papers identified in footnote 49 below document six wire transfers on September 18, 2008, totaling $45.0 billion.

[21] For example, in the recollection of Stephen King, "By Friday we started to realize there are securities that we thought we were going to take delivery of that we haven't, and there were securities [being transferred to Barclays] that we have never seen before." King Tr. at 91-92.

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

Second, on September 18 and for some time thereafter, there also was considerable uncertainty as to the value of many of the specific positions that had been transferred to Barclays. Certainly, "marks" had been assigned to virtually all of the securities represented in the portfolio that had been transferred over to Barclays by one or more of the parties involved in the transfer (Lehman, JP Morgan Chase, Bank of New York, and/or Barclays), at least as of some date near the date of the Fed Replacement Repo.[22] However, the quality and timeliness of the marks for many of the securities comprising the Repo Collateral were highly questionable, for reasons I discuss below.

Third, a major component of what Barclays anticipated receiving in return for its $45 billion[23] — namely, $7 billion of "cash" that Lehman supposedly put up to fill the undisputed gap between the securities that were supposed to be transferred to Barclays on September 18 and the securities Lehman actually was able to transfer on that date — turned out not to be cash, but instead was a "claim" for $7 billion, subject to legal dispute. The actual value of this claim became determinable only on or about December 22, 2008, more than three months after the initiation of the Fed Replacement Repo, upon consummation of the December settlement among Barclays, JP Morgan Chase, and LBI. What quickly became clear, however, was that this presented an additional source of transaction risk for Barclays, which should be weighed (without the benefit of hindsight) in any assessment of the Transaction.

---

[22] It is useful to distinguish between "marks," "quotes," and "prices." Economists generally use the word "price" to refer to amounts received or paid (per unit) in observed (or at least observable) transactions. A quote is an expressed willingness to buy or to sell at a *proposed* price. The price quotation in an expressed willingness to buy is a "bid" or "bid price," while the price quotation in an offer to sell is an "offer" or "offer price," also referred to as an "ask" or "ask price." A mark is a per-unit amount that is used to value a position. The mark used to value a specific security on a given day for a particular purpose may be based on or set equal to an observable price, if available, or based on or set equal to a bid price or an offer price or some point between the two, assuming quotes are available. Where reliable prices are not available and credible quotes are not forthcoming, a mark must be based on an estimate of value, generally derived from a model or some other analysis of value.

[23] To be clear, I am referring here to what Barclays anticipated receiving in the Fed Replacement Repo as the repo was being implemented and after learning that it would not be receiving all of the securities that had been pledged to the FRBNY.

Contains Highly Confidential Information

18.    A number of executives involved in the transfer of assets to Barclays pursuant to the Fed Replacement Repo have commented on the extreme uncertainty surrounding this transfer. For example, Stephen King testified in his deposition as follows:[24]

"... we obviously were extremely worried on the Friday [September 19]. We were very worried on Wednesday and Thursday. We had a population of securities and we were very worried that those really might not be worth 45 billion dollars.

"We were even more worried over Thursday night and into Friday that now we just had a list of stuff that we had no idea whether it was worth what we just lent against it. So there was lots of discussion of whether there was adequate collateral or how — actually, no one really talked about whether there was adequate collateral. It was just how much the collateral was worth."

19.    Messages in emails (as distinct from the attachments to those emails, which I discuss next) among the participants on Thursday, September 18, and subsequent days contain a range of estimates of the aggregate value of the positions transferred to Barclays on that day. In my view, none of these "email estimates" is a reliable indicator of the aggregate fair value of what Barclays received in the Fed Replacement Repo, for a variety of reasons. In many cases, the source of or basis for an aggregate valuation in an email cannot be discerned from the email or from other sources, and one cannot identify with reasonable certainty which positions are being valued, which marks are being used to value the positions, or the quality and timeliness of those marks. Moreover, even where the source of or basis for an aggregate valuation cited in an email can be determined, there virtually always remain important questions (discussed below) as to the quality and timeliness of the marks at which many of the securities at issue were valued. Such estimates of value expressed in the body of an email message are not the kind of data on

---

[24] King Tr. at 181.

Contains Highly Confidential Information

which economists and accountants rely in their professional work, and particularly not when there is better evidence of value available.

20.    As the participants worked to complete the Fed Replacement Repo transaction, many spreadsheets with lists of securities passed among the participants.  I myself or staff working at my direction have reviewed and studied many of these spreadsheets generated on or shortly after September 18.  Because of the size and complexity of the Fed Replacement Repo and the difficult conditions under which it was being implemented, none of these contemporaneous spreadsheets, in isolation, provides a definitive accounting of the population of positions that were transferred to Barclays in the Fed Replacement Repo, nor do they provide a reliable indicator of the aggregate value of the transferred positions.  Instead, the specific positions reported on such lists are subject to further confirmation and reconciliation and the marks used to value reported positions are of dubious quality and timeliness.  Consequently, none of the spreadsheet lists produced on or about September 18 provides a reliable basis for determining the aggregate value of the Repo Collateral.

21.    In addition to reviewing relevant email traffic and related attachments regarding the value of what Barclays received in the Fed Replacement Repo, I or others working at my direction have also read the deposition testimony of participants in the transaction who were questioned on this topic.  Not surprisingly, the recollections of various participants as to the aggregate value of the positions transferred to Barclays in the Fed Replacement Repo are imprecise and sometimes at odds.  Given the stressful conditions prevailing during the week of the Fed Replacement Repo and the passage of more than a year since the events at issue, it is probably to be expected that relevant deposition testimony, taken as a whole, does not provide a reliable indicator of the aggregate value of the transferred positions.

Contains Highly Confidential Information

22.    Given that neither participants' recollections nor contemporaneous emails, spreadsheets, and documents, answer the question at hand with clarity or reliability, I sought to find a way to establish the aggregate fair value of what Barclays received in the Fed Replacement Repo independent of these recollections and other sources. To do so, I had to resolve two major sets of questions. First, I had to determine, or identify, a reliable listing of the positions that in fact were transferred to Barclays as part of the Fed Replacement Repo. Related to this, I had to determine an appropriate way to characterize what Barclays received to fill the "$7 billion gap" that developed on September 18 — i.e., how to characterize a promise of cash that turned out not to be cash. Second, I had to determine, or identify, reliable marks for valuing the transferred positions. I now discuss these two important issues in turn.

*i.    Identifying transferred positions*

23.    As I indicated already, I myself and staff working at my direction reviewed and studied a large number of spreadsheet listings of positions from various times and sources, which we thought had the potential to shed light on what specific positions actually transferred to Barclays in the Fed Replacement Repo. I myself and staff working at my direction also interviewed a number of persons with knowledge of the transferred positions. Based on this investigative work, I believe that certain work papers and files developed by Barclays' finance function in the months following the Fed Replacement Repo are the best source for identifying the transferred positions with precision. As I discuss below, a major purpose of Barclays' efforts in constructing these work papers and files was to prepare an accounting summary of the Acquisition (i.e., an "Acquisition Balance Sheet") for inclusion in Barclays' financial reports, including its 2008 Results Announcement. Ultimately, Barclays' accounting summary of the Acquisition included an aggregate value for "trading portfolio assets" received in the

Contains Highly Confidential Information

Acquisition. In my opinion, the detailed lists of positions corresponding to this "trading portfolio assets" line item in Barclays' final Acquisition Balance Sheet provides an appropriate, comprehensive, and accurate *starting point* for identifying the positions transferred to Barclays pursuant to the Fed Replacement Repo. Importantly, these lists identify and include not only the positions Barclays received in September of 2008, which appear on the agreed "Schedule A" filed with the Court on September 30, 2008, but also positions Barclays received in its settlement with JP Morgan Chase in December of 2008.

24.     To avoid confusion, I note that one of Barclays' two detailed lists containing its valuations of the specific positions comprising the trading portfolio assets acquired in the overall Transaction (the one for "initial inventory") includes positions *not* received in connection with the Fed Replacement Repo. This is because this list includes certain positions (a relatively small portion of the total portfolio) that Barclays received not pursuant to the Fed Replacement Repo, but as part of the larger overall Acquisition. Specifically, the detailed lists enumerating the positions included in the "trading portfolio assets" line item in the Acquisition Balance Sheet include certain positions that were part of the so-called "unencumbered clearance box" or "Schedule B" assets received by Barclays as part of the overall Transaction, but not as part of the Fed Replacement Repo. These positions must be removed from the lists of positions comprising the full universe of acquired trading portfolio assets to produce a list of the positions Barclays received in the Fed Replacement Repo.

25.     After this adjustment, the set of remaining positions from the detailed lists constitutes an accurate and reliable accounting of the specific positions received by Barclays in return for its $45 million cash payment to LBI on September 18, 2008. Exhibit 1 (which is part

Contains Highly Confidential Information

of Appendix Five to this report)[25] is a listing of the securities (identified by unique CUSIPs and by abbreviated names) that comprise the Repo Collateral, presented in two parts.[26]  Part A of Exhibit 1 lists the positions comprising the "initial inventory" that was transferred to Barclays, as part of the Fed Replacement Repo, on or shortly after September 18.  Part B of Exhibit 1 lists the positions comprising the "JPM inventory," i.e., positions that were transferred to Barclays on December 22 as part of Barclays' settlement with JP Morgan Chase.  (For completeness, I report in Exhibit 2 those positions included on the lists of securities comprising the trading portfolio assets line item of Barclays' Acquisition Balance Sheet that were *not* part of the Repo Collateral.)  The positions in Part A of the Exhibit — representing 10,750 distinct CUSIPs (for positions with positive value based on Barclays' marks) — and in Part B of the Exhibit — representing 1,032 distinct CUSIPs (again for positions with positive value), with some overlap with Part A[27] — constitute, to the best of my understanding, the complete set of positions (CUSIPs, with quantities), other than cash, that Barclays received in return for its $45 billion payment in the Fed Replacement Repo.

     *ii.*     *Valuing transferred positions*

    26.    I turn next to the issue of valuing the Repo Collateral, or equivalently, choosing marks to assign to the positions comprising this collateral portfolio.  As background for this discussion, it may be useful to stress the complexity involved in valuing all of the elements of a portfolio as large and diverse as the portfolio that was transferred to Barclays in the Fed Replacement Repo, especially under the difficult market conditions that prevailed in the days and

---

[25] All exhibits referenced in this report are presented together as Appendix Five at the end of the report.

[26] In most cases, only short and sometimes cryptic names like those in Exhibit 3 are reported in the available lists of securities.

[27] In a small number of instances, Barclays received batches of the same security in both the initial inventory and the JPM inventory, which results in a small overlap between these two lists.

Contains Highly Confidential Information

weeks surrounding LBHI's bankruptcy filing. Appendix Three provides a listing of generic asset types in the Repo Collateral, where the securities represented in the collateral portfolio are classified by type based on Bloomberg classifications. The transferred securities are spread across some 60 different Bloomberg security types, including common stock (2,686 CUSIPs), "US Government" (380 CUSIPs), "Private CMO Other" (394 CUSIPs), "REIT" (81 CUSIPs), "MBS Balloon" (5 CUSIPs), and "Closed-End Fund" (88 CUSIPs). Even at this high level of aggregation, it is clear that the positions transferred to Barclays in the Fed Replacement Repo constituted a very complex and heterogeneous portfolio of securities.

27.    Exhibit 3 is a sample of the abbreviated (and often cryptic) names assigned to the transferred securities at issue here. From even a cursory review of these names, it is clear that the Repo Collateral was made up of a wide range of different types of securities. These ranged from "on the run" Treasury securities, which typically trade in a deep and liquid market, to many different types of obscure and exotic positions, the markets for which are thin even in the best of times and for which there is no readily available pricing source. No doubt, some of the positions that transferred to Barclays were relatively easy to value, because reliable and timely prices and/or quotes were available for them even under the stressed market conditions of September 2008. However, many other transferred positions, including many large positions, were in securities that did not trade in liquid markets or, in many cases, were not trading at all in September and October of 2008.

28.    Market conditions in September 2008 were among the most challenging since the Great Depression. Importantly for the present discussion, this was a particularly difficult time for valuing securities. Trading in some secondary markets, such as the market for many kinds of

Contains Highly Confidential Information

auction rate securities, had ceased completely.[28] There simply were no trades in these markets, which meant that no actual transaction prices were being reported. There often were no credible bids, either, as potential buyers "sat on the sidelines." Trading in many other markets was infrequent and sporadic. For a wide swath of securities, there were some, but relatively few, actual trades and, consequently, relatively few reported transaction prices.[29] This thin or sporadic trading calls into question the quality of the price information or "signal" conveyed by the price in any given reported trade. If the reported trade price is a "one-off" price from a single transaction, is that price a reliable indicator of value, or was it influenced by unusual and unique circumstances? In a thin market, it often is difficult to know the answer to this question. Thus, given the prevailing market conditions in September of 2008, and especially following LBHI's bankruptcy filing, it simply was not possible at the time (and still is not possible today) to establish accurate marks for a large portion of the securities listed in Exhibit 1 on the basis of actual trades and observed prices, or even on the basis of credible quotes.

29.     As one indicator of the extent to which the positions in Exhibit 1 could be marked based on observable prices, I searched Bloomberg for actual transaction prices on or shortly after September 18, 2008.[30] I found that Bloomberg reported an observed transaction price for

---

[28] I discuss some examples of auction rate securities that were included in the Repo Collateral, and Barclays' valuation of them, in Appendix Four.

[29] As I discuss later, this also meant that the spreads between bid and ask prices for many types of securities were unusually large during this time period.

[30] Bloomberg is widely recognized as the premier source of pricing data and other information about securities and trading activity in US and international financial markets. According to the product website, Bloomberg is "employed by over 300,000 professionals in central banks, investment institutions, commercial banks, government offices and agencies, law firms, corporations and news organizations around the world." They cover "over 5 million financial instruments" and provide "the most comprehensive and advanced set of financial data, real time market coverage, news, analytic tools, portfolio solutions, and research." Market data crosses "all asset classes, [including] Equities, Futures, Options, Fixed Income and Currency Markets and others" and provides "connectivity to more than 350 exchanges." *See* Bloomberg, "About Bloomberg: Product Data," *available at* http://about.bloomberg.com/product_data.html (visited Dec. 31, 2009) *AND* "About Bloomberg: Product Equities," *available at* http://about.bloomberg.com/product_equities.html (visited Dec. 31, 2009).

Contains Highly Confidential Information

September 22, 2008, for only 5,719 of the 10,743 CUSIPs for the positions that transferred to Barclays in the "initial inventory" of trading portfolio assets acquired from LBI — or just over 53%.[31] Bloomberg "recognizes" most of the remaining CUSIPs — Bloomberg identifies only 288 of the remaining 5,024 CUSIPs as "invalid" — but does not capture or report any price for these CUSIPs on that day. The fact that actual prices were not available for so many CUSIPs might not be a major concern if these all were minor positions, accounting for relatively little of the overall value of the acquired trading portfolio assets. But this is not the case. Using Barclays' "exit price" marks (which I discuss below), I find that the CUSIPs/positions for which Bloomberg reports no observable prices for September 22, 2008, account for almost 40% of the aggregate value of the securities that transferred to Barclays in the "initial inventory of trading portfolio assets.[32]

30.    Bloomberg is widely recognized for the breadth of its pricing data. However, as a check on the analysis just reported, I performed the same analysis using a second price reporting service, Standard & Poor's Capital IQ. I found that Capital IQ reports a price for September 22, 2008, for only 3,783 of the 10,743 CUSIPs/positions that transferred to Barclays in the Fed Replacement Repo — or just over 35%. Using Barclays' "exit price" marks, as I did above, I find that the CUSIPs/positions for which Capital IQ reports no price account for almost 40% of the aggregate value of the securities that transferred to Barclays in the Fed Replacement Repo.

31.    Because some securities are "priced" by Capital IQ that are not "priced" by Bloomberg, combining these two sources expands the coverage somewhat. Between the two,

---

[31] Obviously, having a Bloomberg price is better than not having a Bloomberg price. But even where a Bloomberg price is available, if the market is "thin," that price may not accurately reflect the true value of the security in question.

[32] As indicated above, in a thin market with only sporadic trading, the reporting of an observable price for a given security in Bloomberg does not mean that that price is a good indicator of value. Thus, 60% is a cap on the portion of the Fed Replacement Repo Transferred Positions that can be valued reliably based on actual prices.

Contains Highly Confidential Information

Bloomberg and Capital IQ report observed prices (which may be from just one trade) for just under 60% of the CUSIPs represented in the Repo Collateral, which means that, for more than 40% of those CUSIPs, no reported price is available from these two sources for September 22, 2008. The value of positions for which no price is reported in either Bloomberg or Capital IQ for September 22, 2008, is more than 23% of the total fair value of the Repo Collateral (again using Barclays' exit price marks). This means that Repo Collateral positions with a value of between $9 billion and $10 billion cannot be marked on the basis of observed prices.[33]

32.    These results establish that determining appropriate marks for the securities transferred to Barclays was not and could not have been a simple mechanical process of pulling data from vendor price databases. Furthermore, given the absence or paucity of trading in many of the securities at issue, it is unlikely that gathering quotes from quotation systems would significantly contribute to the marking process. LBI's own books confirm that many of the securities in its inventory were, by nature, difficult to price. Among LBI's record-keeping systems is a system called the "Global Funding System" ("GFS"), which I understand served as a central warehouse for pricing and other data from multiple special purpose database systems also used by LBI.[34] Certain daily reports generated by GFS have been produced in this litigation, which I understand cover most of LBI's trading inventory. Among the fields in these reports is a field that identifies CUSIPs/positions by their "Fair Value Level."[35] These Levels correspond to a standard accounting categorization of securities according to the ease or difficulty with which

---

[33] Again, even where a reported price is available from a vendor, for a security traded in a thin market, this price may not be a good indicator of value. Thus, the total value of difficult-to-value positions in the Repo Collateral likely was considerably larger than $10 billion, especially given the near shut-down of markets for many different types of securities in the wake of LBHI's bankruptcy filing.

[34] There is some inconsistency within Lehman itself regarding the "GFS" acronym. While some deposition transcripts and documents produced in this matter indicate that the "GFS" refers to the "Global Funding System" of Lehman, other such sources indicate it refers to the "Global Finance System."

[35] A relatively small number of positions (or line items) have no indicator in this field.

Expert Report of Professor Paul Pfleiderer                                                Page 20

Contains Highly Confidential Information

they can be valued. In this scheme, Level I represents assets that can be valued based upon "quoted prices"[36] for identical instruments traded in active markets; Level II represents assets for which quoted prices from deep markets are not available, but that can be valued based upon quoted prices for similar instruments traded in active markets, based upon quoted prices for similar or identical instruments in markets that are not active, or using model-based techniques for which all significant assumptions are observable in the market; and Level III represents assets that can be valued only by using model-based techniques that use at least one significant assumption not observable in the market.[37] Based on LBI's GFS report for September 12, 2008 (the last trading day before LBHI's bankruptcy filing), 4,072 of LBI's positions were categorized as Level I, 19,859 were categorized as Level II, and 2,128 were categorized as Level III.[38] Based on the aggregate values for these 26,059 positions (using LBI's marks as of September 12, 2008), I find that 20.9% of the total value of LBI's inventory was in Level I assets, 72.9% of total value was in Level II assets, and 6.2% of total value was in Level III assets.[39]

33.    The results of the analyses reported in this subsection lead to a number of important conclusions, especially in light of the volatile and rapidly deteriorating conditions in

---

[36] It is my understanding that this term, as used in the relevant accounting literature, refers to actual transaction prices reported by data providers such as Bloomberg, rather than to quotes, i.e., bid prices and offer prices.

[37] This system of classifying assets parallels that ordinarily used by the Financial Accounting Standards Board ("FASB"). *See* Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" (Sept. 2006, as amended 2008), at FAS157-10 to FAS157-12; Judith Burns, "SEC Gives Firms More Leeway in Pricing Asset-Backed Issues," *Wall Street Journal* (Mar. 31, 2008), at C7.

[38] Collectively, the Level I, II, and III entries sum to 26,059 positions. However, there were also 535 entries on the September 12, 2008 GFS report for which no "Fair Value Level" was given. Adding these 535 "blank" entries to the number of Level I, II, and III positions yields 26,594, which is the total number of positions reflected in the GFS report detail. The percentages reported in the remainder of this discussion are based only on values for those 26,059 entries for which "Fair Value Level" information was available. *See* "BA: B-S Detailed Exposure Report (Cross System) – 12 Sep 2008," Bates No. BCI-EX 00185186.xls (Sept. 12, 2008) (hereinafter "Sept. 12, 2008 GFS Exposure Report").

[39] *See* Sept. 12, 2008 GFS Exposure Report. Valuation percentages are based on reported data for the "Long Inventory, TD @ MV" variable for the 26,059 positions identified as Level I, II, or III. Aggregate "Long Inventory, TD" market value for these positions totaled $51.01 billion. *Ibid.*

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

financial markets in September of 2008. First, valuing the individual positions in the Repo Collateral with reasonable precision was not a simple, mechanical process. Rather, because of the nature of many of the positions and because of conditions in financial markets, valuing these positions necessarily was difficult, subjective, and time-consuming. Second, valuing the Repo Collateral positions with reasonable precision required, in many cases, (a) a thorough understanding of very complex instruments, (b) an ability to model complex securities of many different types and structures, and (c) detailed information on the underlying collateral (e.g., default rates on the home equity loans packaged into a home equity line of credit ("HELOC") backed collateralized mortgage obligation, or "CMO") or other sources of value (e.g., the creditworthiness of the specific commercial borrowers whose loans had been packaged into a collateralized loan obligation, or "CLO") supporting a particular complex security. Third, because financial market conditions were changing rapidly, the economic outlook was bleak and deteriorating, and the prices of most types of securities were unusually volatile, any valuation of the Repo Collateral positions as of one date, even if reasonably precise for that date, could become stale and highly inaccurate in a matter of hours.

34.     With these concerns in mind, I turn now to an assessment of three sets of marks that possibly might be used as a basis for determining the fair value of the Repo Collateral positions.

*iii.*     *Lehman, JP Morgan Chase, and Bank of New York marks*

35.     Many factors made the accurate marking of any but the most liquid of securities extremely difficult in September of 2008. To begin with, the nature of some of the securities included in the Repo Collateral and the circumstances surrounding the Fed Replacement Repo and the broader LBI-Barclays Transaction made marking the positions transferred to Barclays in

Contains Highly Confidential Information

the Fed Replacement Repo particularly difficult. Despite these difficulties, to assess the value of the securities Barclays received in the Fed Replacement Repo (and evaluate the Movants' assertion of a $5 billion discount), I needed to determine best estimates of what I will call "fair value" marks for the securities that comprise the Repo Collateral.[40]  I began my efforts to identify reasonable fair value marks by analyzing three sets of marks available in the record that conceivably might be used to determine the fair value of the Fed Replacement Repo transferred positions.

36.    Because broker-dealers are required to mark their assets daily for certain regulatory purposes and also because custodians for repo agreements must assign marks to the collateral they hold on behalf of the parties to repo agreements, there can be and often are different marks available for a given set of collateral assets.  In the case at hand, there are three distinct sets of marks available in the record from dates within a few days of the date on which the Transaction closed.  These are as follows:[41]

- Marks from Lehman's Global Funding System, available in the record daily from September 12, 2008, though September 30, 2008;

- Marks assigned to various CUSIPs by JP Morgan Chase in its role as custodian for the FRBNY's loans to LBI on Monday, Tuesday, and Wednesday (September 15-17, 2008); and

- Marks assigned to various CUSIPs by Bank of New York in its role as custodian for Barclays' Fed Replacement Repo loan to LBI.

---

[40] I use the term "fair value" because applicable accounting standards required Barclays to mark the assets it received to "fair value" as of acquisition for purposes of its acquisition accounting.  Because the applicable accounting standards do not permit recognition of some economically important factors such as the sheer size (and consequent illiquidity) of the positions, which in this case would have made the "fair value" of many positions difficult or impossible to realize in an actual sale, these "fair values" likely overstate the actual economic value of the acquired trading assets and should be viewed as stating an upper bound on the range of actual economic value.

[41] Also available in the record are marks developed and used by Barclays in the course of developing fair values for financial reporting purposes.  I examine Barclays' marks in the next subsection.

Contains Highly Confidential Information

37.    I investigated and analyzed these alternative sets of marks from various perspectives to assess whether any of them provide a reliable basis for valuing the Repo Collateral positions.[42]  In this subsection I explain why I conclude that the Lehman marks, the JP Morgan Chase marks, and the BoNY marks, whether used separately or together, do not provide a reliable basis for valuing the Repo Collateral.[43]  In the next subsection, I compare the quality and timeliness of the marks developed by Barclays to the Lehman, JP Morgan Chase, and BoNY marks reviewed here.

38.    To assess the quality of the Lehman marks contained in the GFS system, I examined certain patterns through time in the prices contained in this system.  I focused on Level II and Level III assets and attempted to ascertain to what extent these marks had been updated after Friday, September 12, 2008.  Deposition testimony on this subject is ambiguous, with some deponents expressing the belief that Lehman's marks were not updated after September 12 and others asserting that Lehman's marks were, in fact, kept up to date after LBHI's bankruptcy filing and into the week of September 15, 2008.

39.    My analysis of the prices recorded in GFS revealed significant "stickiness" in the marks for Level II and Level III securities in the GFS reports going forward from September 12, 2008.  Exhibit 4 reports LBI net long inventory positions in Level III securities with an indicated value greater than $20.0 million, as recorded in GFS as of September 12, 2008, for which there

---

[42] I also considered whether it would be feasible and informative to attempt to develop entirely new marks for the securities comprising the Fed Replacement Repo Transferred Positions and to re-value these positions *de novo*.  For reasons I discuss later in this section, I believe this approach would not significantly improve our understanding of the Fed Replacement Repo.  However, I reserve the right to pursue this approach if future developments in this litigation cause me to change this assessment.

[43] In theory at least, the set of GFS marks should include marks (but of uncertain quality and timeliness) for all of the securities represented in the Repo Collateral.  The JP Morgan Chase marks and BoNY marks together also should cover all of these securities, but it is not necessarily the case that either the JP Morgan Chase marks or the BoNY marks on their own would provide full coverage of all of the Repo Collateral positions.

Contains Highly Confidential Information

was either no price adjustment after September 12, or at most one adjustment after September 12 (typically a single downward adjustment from the 12th to the 15th, with no subsequent adjustment). Exhibit 5 reports LBI inventory positions of Level II assets that met these same criteria, namely, positions with relatively large indicated values and at most one price adjustment after September 12. As Exhibits 4 and 5 demonstrate, the marks for significant portions of LBI's Level III securities, and even Level II securities, were not adjusted or updated after Friday, September 12; marks for even larger portions of LBI's Level III and Level II securities were not adjusted or updated after Monday, September 15. This observed level of "stickiness" — understandable under the circumstances and given the chaotic market conditions prevailing at the time — is inconsistent with the hypothesis that Lehman's marks were being reliably updated during the week of September 15.

40.    It has been widely reported and confirmed by deposition testimony that trading activity at LBI ground nearly to a halt the week of September 15, as did other normal business activities at Lehman. Many Lehman employees including traders were understandably more focused on their own personal situations than on their usual business tasks. This evidence, together with my analysis of stickiness in the marks in the GFS reports, confirms a reasonable inference regarding the marking process at Lehman Brothers after Friday, September 12, namely, that Lehman's marks were not reliably updated after that date. Given market conditions and the fact that the Fed Replacement Repo was not in place until Thursday, September 18, and that the Transaction did not close until Monday, September 22, I conclude that the Lehman marks do not provide useful information for determining the value of the Repo Collateral at acquisition.

41.    I next consider the marks assigned to various positions by JP Morgan Chase and BoNY in their roles as custodians for "tri-party" repurchase transactions during the week of

Contains Highly Confidential Information

September 15. Assigning marks is a necessary element of the services these banks provide as tri-party repo custodians. Both banks maintain procedures and pricing groups that enable them to provide this marking service quickly and with the level of accuracy required by their roles in tri-party repos, at least under normal conditions, for normal commercial tri-party repos, and for the types of securities that typically are eligible as collateral in tri-party repos. However, these were not normal times. The FRBNY's repo loans to LBI (earlier in the week) and Barclays' Fed Replacement Repo were not normal repurchase agreements, but instead were much larger and more complex, and a significant number of the securities in the Fed Replacement Repo transferred positions were not normally eligible to serve as collateral in commercial tri-party repos. All three of these factors significantly call into question any presumption that the JP Morgan Chase marks or the BoNY marks were accurate or necessarily provide the best, or even a sound basis, for assessing the value of the positions in the Repo Collateral.

42.     Having analyzed JP Morgan Chase's marks and the BoNY's marks for many of the esoteric and illiquid securities transferred in the Fed Replacement Repo, I conclude that many of them were in fact inaccurate, often significantly so.[44] This is not surprising, since many of these positions could not have been reliably marked in the brief time available to those institutions.

43.     Stephen King, as head of Barclays' Principal Mortgage Trading Group ("PMTG"), was responsible for managing the "on-boarding" of most or all of the Repo Collateral positions, for valuing at least some of the positions that were transferred to Barclays, and, ultimately, for hedging, to the extent possible, the risks associated with the on-boarded

---

[44] See the information on the marking of specific positions in the Repo Collateral in Appendix Four. As Appendix Four makes clear, I also have identified significant concerns about the quality of Lehman's own marks for some of these esoteric and illiquid securities, in addition to the concerns about their timeliness discussed above.

Contains Highly Confidential Information

positions. Mr. King characterized the "stuff" he and his group were directly responsible for valuing as follows:

> Mortgage backed [securities]. Unfortunately banks have a tendency of using mortgage and mortgage-backed securities to mean anything that isn't obviously something else. So it isn't just mortgages. It is CDOs, it is manufactured housing, it is franchise loans. It is a lot of stuff. Because you notice it doesn't obviously fit into any of those other categories, so it is stuff.

> Because it is stuff, some of it you would have no idea from the CUSIP or even the description whether it was a performing or nonperforming security, a senior obligation or a junior obligation. You would actually have to go to Bloomberg, or if in some cases it wasn't listed on Bloomberg, go to a trader and say what is this.[45]

Mr. King and his team were experienced, informed, and active participants in the relevant markets, such as they were, for mortgage backed securities and other "exotics," yet they had difficulty even identifying some of the securities in the Repo Collateral transferred positions. There is every reason to believe that JP Morgan Chase and BoNY, in their roles as custodians, had no better insight and were no better informed than (and more likely were not as well informed as) Mr. King and his team. Thus, it is virtually certain that both JP Morgan Chase and Bank of New York encountered significant problems in characterizing, understanding, and marking at least some of the securities that comprised the Repo Collateral. Given that JP Morgan Chase had just a few days to understand and mark at least the positions backing the FRBNY's loans to LBI earlier in the week, and that BoNY had just one day (at most) to understand and mark the positions backing the Barclay's Fed Replacement Repo loan to LBI on Thursday, it is highly likely that at least some of their marks were, at a minimum, imprecise.

---

[45] King Tr. at 48.

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

44.    Mr. King addressed exactly this point in his deposition, commenting on JP Morgan Chase's marks for mortgage and mortgage-backed assets, which are the securities with which he is most familiar and knowledgeable:

> And some of those are very obvious mistakes as well. Because JP doesn't know any more than we do what some of the securities are. Sometimes it says, if I don't know what it is, mark it at par, but it may actually be worth zero, and that's the reason why that number comes out so wrong, because these are so complicated securities.[46]

45.    Testimony of key participants in Barclays' valuation process provides further insight into the nature of the marking process applied to Lehman's assets. Stephen King, then a Barclays Managing Director and, as mentioned above, head of the Principal Mortgage Trading Group at Barclays, played a key role in developing the Barclays marks. According to Mr. King, all he cared about, as he developed marks for the Lehman assets was "what was a reasonable assessment for the value of the assets and ultimately what was the risk that we were going to have to manage." As stated in his deposition testimony:

> Q.    Did you come to some conclusions about the accuracy of Lehman's marks when you were looking at all these asset groups?

> A.    It is a peculiar way to describe it, did we come up with some assessment of the accuracy of Lehman's marks. In some respects I could say I didn't care about Lehman's marks. I cared about what was a reasonable assessment for the value of the assets and ultimately what was the risk that we were going to have to manage.[47]

46.    I conclude from the above analyses that none of the three sets of marks discussed in this subsection — the marks in Lehman's GFS system; JP Morgan Chase's custodial marks; and BoNY's custodial marks — provides a reliable basis for valuing the positions comprising the Repo Collateral.

---

[46] King Tr. at 202.

[47] King Tr. at 26.

Contains Highly Confidential Information

iv.     *Barclays "exit price" marks*

47.     In this section, I report the results of my investigation into, and examination of, the marks developed by Barclays for valuing assets acquired in the Transaction for financial reporting purposes. I first discuss the process by which these marks were developed and finalized by valuation professionals at Barclays over the course of several months. Then I examine how and where Barclays' marks differ from BoNY marks, both at the aggregate level and for selected individual securities or sets of securities.

48.     I will refer to the set of marks I consider in this subsection as the Barclays "exit price" marks. They are the marks, adjusted where appropriate to the equivalent of "bid" quotes, which, when multiplied by the quantities constituting the Repo Collateral positions, result in the value for "trading portfolio assets" reported on Barclays' 2008 Results Announcement summary of the Acquisition. The key focus of my analysis is whether or not these marks provide an appropriate basis for determining the value of the securities Barclays received in the Fed Replacement Repo.[48]

49.     Efforts to anticipate what an acquisition balance sheet might look like began before the Transaction closed on Monday, September 22. Part of Barclays' effort to develop a final Acquisition Balance Sheet was an effort to establish appropriate marks for determining the

---

[48] I have also examined Barclays' valuations of the "unencumbered clearance box" securities that it has received or to which it lays claim. Few of these securities were liquid; most are highly illiquid and esoteric. According to Alex Kirk, who was global head of Lehman's principal businesses at the time of the Transaction, "there was a reason why there was nobody financing those [unencumbered] assets and it was because they were the most illiquid and the hardest to value securities that Lehman Brothers owned on its balance sheet." Kirk Tr., page 106. Barclays used the same methodology to value these securities as of acquisition that it used to value the Repo Collateral. As discussed below, I find that methodology reasonable and appropriate and to have produced reliable "fair values" of the Repo Collateral. As applied to these clearance box assets, I also find that methodology reasonable and appropriate and to have produced reliable "fair values." Again, I emphasize that, due to applicable accounting rules, the "fair values" do not take into account some economically important factors such as the sheer size (and consequent illiquidity) of the positions, which in this case would have made the "fair value" of many positions difficult or impossible to realize in an actual sale.

Contains Highly Confidential Information

"fair value" of the assets (and also the liabilities) acquired by Barclays in the Transaction. This program of work led to the Barclays exit price marks that I analyze in this subsection.

50.    I have reviewed the deposition testimony of Gary Romain, chief technical accountant at Barclays, and of others who have been questioned about the development of Barclays' Acquisition Balance Sheet or the marks use to value assets recognized on that balance sheet. In addition, I and staff working at my direction interviewed Mr. Romain and several other participants in this program of work leading to the Acquisition Balance Sheet, to gain a thorough understanding of the process by which the Barclays exit price marks were developed. I and my support staff also have reviewed work papers developed by Barclays in the course of this work, as well as certain PriceWaterhouseCoopers work papers and files produced by Barclays in this litigation.[49]

51.    Based on this investigative work, I believe the following are key aspects of the process by which Barclays developed exit price marks:

1) Development of the Barclays exit price marks was the responsibility of the finance group, which drew on the expertise and gathered relevant information from trading desk personnel and product control group personnel.

2) The procedures and processes used to develop and test these exit price marks were the same as the procedures and processes that Barclays uses for similar purposes in the normal course of its business.

3) In the normal course of business, these "marking" procedures and processes are the subject of extensive review by numerous regulatory bodies. In addition, I have examined Barclays normal marking policies and procedures and find them to be reasonable, appropriate, and likely to produce reliable results.

---

[49] The work papers and files I refer to here were contained in Barclays document production in response to Document Request No. 3 of the Trustee's, Debtor's, and Creditors' Committee's First Set of Requests for Production, dated October 30, 2009 (BCI-EX-00247453 to BCI-EX-00295654).

Contains Highly Confidential Information

4) Employees in the finance group and employees in the product control group have no financial interest in the outcome of their work. The objective of their efforts is to identify accurate "fair value" marks; whether the marks they assign to positions are high or low has no impact on or relevance to these employees' performance reviews or compensation.

5) Trading desk (or "front office") marks were an input into the formation of the Barclays exit price marks, but traders otherwise had little or no involvement in the determination of the marks used to value the Repo Collateral positions for financial accounting purposes.

6) In addition to front office marks, the process of marking the Repo Collateral positions also drew on all other reasonably available and relevant data, including price data and quotes from multiple sources. Where possible and appropriate, actual reported prices were the basis for exit price marks. In other cases, bids were gathered from appropriate sources and formed the basis for exit price marks.

7) Where neither price data nor bid quotes of reasonable quality and credibility were available, vendor pricing models and various "bottom up" analyses were used to estimate fair value marks.

8) Where appropriate, but only where appropriate,[50] mid-point marks were adjusted to bid levels by applying "liquidity haircuts" to mid-point marks. These liquidity haircuts were intended to approximate the difference between mid-point prices and bid quotes, and were based on extensive analysis of bid quotes, ask quotes, and actual prices.

9) Adjustments of mid-point marks to bid-quote levels was intended to assure that the valuations used in Barclays' financial statements were computed at "exit prices" that reflected what Barclays likely would receive in an orderly sale of the assets in question, as I understand is required by applicable accounting standards.

10) Barclays' exit price marks were not further adjusted to reflect the size of the individual positions comprising the Repo Collateral or the size of the total portfolio of financial assets acquired by Barclays in the Transaction, nor were these marks adjusted to "fire sale" levels. It is my understanding that neither of these types of adjustment would have been permitted by applicable accounting standards. I note, however, that adjustments to reflect these factors would be appropriate when determining the actual economic — as distinct from accounting — value of these assets. Under the circumstances here, these factors would, as I discuss below, lead to the

---

[50] For example, where marks were based on bid quotes, no further adjustment was necessary (or made) to establish exit price marks.

Contains Highly Confidential Information

conclusion that the accounting valuation reported by Barclays overstates the actual, economic value of the assets that Barclays acquired in this transaction.

11) Whether Barclays' exit price marks were high or low had certain accounting and regulatory consequences, but for the most part did not affect the economic benefits of the Transaction. Relatively high marks would have the accounting effect of increasing the reported accounting gain on the Acquisition, but would lead to lower reported gains (or profits) when the positions were closed out. Relatively low marks, on the other hand, would have the accounting effect of reducing the reported accounting gain on the Acquisition, but would lead to higher reported gain (or profits) when the positions were closed out. Thus, so far as I have been able to determine, Barclays had no institutional incentive to set exit price marks high or low, although it is my understanding that a valuation low enough to make the transaction dilutive could have had adverse regulatory consequences.

12) PriceWaterhouseCoopers conducted an extensive audit of Barclays' final summary of the Acquisition, which included extensive investigation and testing of Barclays exit price marks.

52.    As mentioned above, analysts from Barclays' Product Control Group ("PCG") played a major role in the marking process described above. A key function of PCG is "price testing," i.e., ensuring the accuracy, integrity, and lack of bias with regard to the marks assigned to inventory positions in the normal course of business.[51] The price testing process at Barclays is described in detail in a series of internal statements summarizing the firm's "Price Testing Policy."

53.    To assess further the quality and timeliness of the Barclays exit price marks, I compared these marks to the BoNY custodial marks discussed above. I did this first for large aggregations of securities — i.e., all residential mortgage-backed securities, all corporate

---

[51] Assigning marks on a daily basis is the responsibility of front office traders. It is my understanding that PCG focuses on determining marks used for purposes of preparing monthly financial statements and also monitors traders' daily marking to assure the integrity of these marks.

Contains Highly Confidential Information

obligations, and so on.[52] Table 1 reports the differences, for large aggregations of securities in

the Repo Collateral, between aggregate values based on the BoNY marks and aggregate values

based on Barclays exit price marks.

TABLE 1
DIFFERENCES BETWEEN INDICATED VALUES USING CUSTODIAL MARKS
AND INDICATED VALUES USING BARCLAYS EXIT PRICE MARKS, BY "DESK"
(INITIAL INVENTORY ONLY)

|  | Indicated Value at Custodial Marks ($ billions) | Barclays Value Mid-Point Marks ($ billions) | Delta (percent) | Barclays Value at Exit Price Marks ($ billions) | Delta (percent) |
|---|---|---|---|---|---|
| RMBS | 13.906 | 13.077 | -5.96 | 12.620 | -9.24 |
| Corporate Bonds | 1.395 | 1.399 | +0.26 | 1.399 | +0.26 |
| Emerging Markets | 0.266 | 0.269 | +1.45 | 0.261 | -1.59 |
| Equities | 9.892 | 9.725 | -1.68 | 9.343 | -5.55 |
| Rates | 15.789 | 15.480 | -1.96 | 14.991 | -5.05 |
| PMTG | 3.789 | 2.628 | -30.65 | 2.075 | -45.23 |
| Total | 45.037 | 42.579 | -5.46 | 40.690 | -9.65 |

54.     The results in Table 1 provide important insight into the process used by Barclays

to develop exit price marks, and the results of that process.  First, I note that the differences

between values using BoNY (mid-point) marks and Barclays exit price marks are not uniform

across asset classes; Barclays did not simply write down the BoNY marks by a fixed percentage

across all securities in the Repo Collateral.  In fact, for both corporate bonds as a class and

---

[52] The grouping of assets in this table reflects the assignment of positions to different trading desks at Barclays for
evaluation.

Contains Highly Confidential Information

emerging markets as a class, positions in the Repo Collateral had a *higher* aggregate value using Barclays mid-point marks than those same positions had using BoNY mid-point marks, and for corporate bonds as a class the aggregate value at Barclays' exit price marks exceeded their aggregate value at BoNY mid-point marks. This, in my view, is evidence of the integrity of the process that generated Barclays exit price marks. Second, the overall pattern in the value differences in Table 1 seems eminently reasonable. The differences are larger for higher risk and less liquid asset classes, and lower for lower risk and more liquid asset classes. The largest differences arise from positions evaluated by PMTG; this is sensible and to be expected, since PMTG was tasked with evaluating unusual, unique, exotic, and difficult-to-characterize positions, which are, of course, the positions most difficult to mark accurately quickly, most affected by the difficult conditions in financial markets in September 2008, least likely to have been familiar to BoNY, and most likely to trade in thin markets or not to trade at all.[53]

55.    In addition to the asset-class level analysis summarized in Table 1, I also compared values determined by Barclays exit price marks to values determined by BoNY marks for selected individual positions and groups of similar positions. I focused this comparison on the marks associated with individual positions and groups of similar positions that give rise to large aggregate differences in indicated values. In other words, I examined positions and groups of similar positions that were major contributors to the overall gap between BoNY's marking of the Repo Collateral and Barclays' marking of the Repo Collateral. Exhibit 6 summarizes these differences for a selection of individual positions and groups of similar positions.

56.    The more granular data presented in Exhibit 6 support the conclusions I drew from the more aggregated results in Table 1 above: The differences between values using BoNY

---

[53] However, as my review of specific positions in Appendix Four shows, trading in thin or "frozen" markets was not limited to positions evaluated by PMTG.

Expert Report of Professor Paul Pfleiderer                                                                    Page 34

Contains Highly Confidential Information

(mid-point) marks and Barclays exit price marks are not uniform across different assets or groups of assets; even among these mostly difficult-to-mark positions, Barclays did not simply write down the BoNY marks by a fixed percentage across all positions. Instead, the overall pattern in the value differences in Exhibit 6 is consistent with a discriminating and diligent effort to assess what values Barclays was likely to realize upon disposing of the acquired positions in an orderly sale in the difficult markets that prevailed in the fall of 2008.

57.     I next examined a number of the specific positions and groups of positions identified in Exhibit 6 in more detail, to assess whether the specific characteristics of the positions explained and supported Barclays exit price marks as opposed to BoNY marks. My work in this area is continuing, but I present some preliminary findings in Appendix Four: Information on Selected Positions Transferred to Barclays. Among the positions I examine in Appendix Four are certain high-risk varieties of collateralized mortgage obligations (namely, interest-only CMOs and inverse interest-only CMOs), Giants Stadium notes (which were auction rate securities), Pine CCS (a CDO collateralized by whole loans), certain insurance-related notes (also auction rate securities), and Lehman-issued warrants and equity-linked notes ("ELNs"). While my investigation of individual positions and groups of similar positions is on-going, I have formed three preliminary conclusions based on work completed to date. First, for many positions of significant indicated value in the Repo Collateral, there is no generally recognized pricing source available and, in fact, there is surprisingly little information available in the public domain (e.g., from the SEC, or from financial websites, or in the financial press) or even from proprietary (i.e., available for purchase) sources of financial information. Second, some of the specific securities included in the Repo Collateral (with significant indicated values) represent extremely complex claims on cash flows from bundles of underlying assets that themselves are

Contains Highly Confidential Information

complex, opaque, and hard to assess. Third and finally, based on my initial work, there appears to be strong support and justification for the differences between Barclays' exit price marks and BoNY's marks.

58.    This analysis leads me to conclude that the best available source for marks for valuing the assets Barclays received in the Fed Replacement Repo (and the Transaction as a whole) is the detailed worksheets prepared by Barclays to identify exit price marks. I discuss the market value of the assets Barclays received in the Fed Replacement Repo, using these marks, in the next subsection.

59.    Importantly, there are additional factors that may be relevant to understanding the economics of the Transaction that are not reflected in exit/bid prices developed by Barclays. These are not "fire sale" prices, nor are these "bulk" prices that take into account either the size of individual positions or the overall size of the transaction. (As I mentioned before, it is my understanding that applicable accounting rules do not allow these factors to be taken into account for purposes of developing "fair value" estimates of asset values of the type set forth in Barclays' acquisition accounting statement.) These factors, had they been taken into account, would have led to lower marks and to a lower assessment of the value of the trading assets acquired by Barclays. Importantly, these considerations would be relevant to an economic assessment of what Barclays received. Thus, the "fair value" valuation of the securities and assets Barclays received from Lehman in the Fed Replacement Repo at Barclays exit price marks is an upper bound on the reasonably estimated value of those assets.

60.    Before turning to the indicated value of the Repo Collateral, I should note that I also considered the feasibility of developing an entirely new set of marks, completely independent of any of the available sources. I determined that it is highly unlikely that such a

Contains Highly Confidential Information

procedure would lead to better marks than the marks developed by Barclays.  Rather, such a procedure could in the end produce *less* reliable marks for several reasons.  First, there is no reason to believe that better information is available today than was available in the fall and winter of 2008 (and into 2009) when the Barclays exit price marks were developed.  To the contrary, few analysts today, if any, would have the data or the "feel for the market" that Barclays was able to tap a year ago as it developed its exit price marks.  Second, as I indicated above, Barclays exit price marks were developed in the normal course of business, for financial accounting purposes only.  In my experience, it is usually is preferable, where possible, to rely on "source" business data rather than data developed solely for litigation purposes.  At a minimum, given the integrity of Barclays' marking process, discussed above, it seems appropriate to attach significant weight to Barclays exit price marks.  Third and finally, the practical difficulties of developing an entirely new set of marks, independent of those available in the record, are immense.  One of the main reasons there is controversy that gives rise to the present litigation is that many of the securities in the Repo Collateral had characteristics that made them extremely difficult to value given the market conditions prevailing as of and after the close of the Transaction.  Any analyst attempting to develop entirely new marks for these positions would be confronted with precisely the difficulties that Barclays had to work through in developing exit price marks and preparing its Acquisition Balance Sheet in the fall of 2008.

     *v.*     *Aggregate value of transferred positions*

61.     The preceding discussion sets the stage for determining the aggregate value of the Repo Collateral.  In this section, based on the analysis above, I report the indicated value of the Repo Collateral, using the list of transferred positions compiled by Barclays for financial

Contains Highly Confidential Information

reporting purposes and the "exit price" marks developed by Barclays to determine the fair value of those positions for financial reporting purposes.

62.    Table 2 below summarizes the aggregate indicated value of the transferred positions constituting the Repo Collateral. As reported in Table 2, the initial inventory of trading portfolio securities acquired by Barclays in September of 2008, including securities acquired in the Fed Replacement Repo and securities acquired as part of the larger Transaction, had a value, computed at clean mid-point marks, of $42,605.0 million. The additional inventory of trading portfolio securities that Barclays acquired as a result of its settlement with JP Morgan Chase in December of 2008 had a value, also computed at clean mid-point marks, of $3,917.9 million. Adding these two components together, adjusting the valuations from mid-point marks to exit-price marks, and adding interest accrued on the assets as of the Transaction date, the fair value of *all* of the trading portfolio assets acquired by Barclays in the overall Transaction was $44,781.4 million. Subtracting the value of the unencumbered clearance box (non-Repo) assets included in this total, along with the portion of accrued interest attributable to these assets, I conclude that the fair value of the trading portfolio securities acquired in the Fed Replacement Repo was $43,995.8 million. Finally, I add the $1,550.0 million of cash that Barclays received in the Fed Replacement Repo.[54] On this basis, I conclude that the aggregate "fair value" of all of the assets that Barclays received in the Fed Replacement Repo (including securities and cash, in September 2008 and December 2008) was, by this accounting, $45,545.8 million.

---

[54] This comprises the $1.25 billion in cash received in the JP Morgan settlement and $300 million that represented matured portions of the Fed Repo collateral.

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

TABLE 2
AGGREGATE VALUE OF ASSETS RECEIVED FROM THE FED REPLACEMENT REPO

|  | Aggregate Value ($ millions) |
|---|---|
| Initial inventory at Barclays mid-price marks | 42,605.0 |
| JPMC inventory at Barclays mid-price marks | 3,917.9 |
| Adjustment to Barclays exit-price/bid marks | (2,086.5) |
| Accrued interest on trading portfolio assets | 345.0 |
| Subtotal: Fair value of all trading portfolio assets | 44,781.4 |
| Less: Schedule B assets included in the above (at Barclays exit-price/bid marks) | (778.9) |
| Less: Accrued interest on Schedule B assets included in the above | (6.7) |
| Subtotal: Fair value of transferred securities | 43,995.8 |
| Cash received with initial inventory | 300.0 |
| Cash received in JPMC settlement | 1,250.0 |
| Total: Fair value of all assets received | 45,545.8 |

63.     In closing this section, I note again that this "fair value" valuation of the assets Barclays acquired in the Fed Replacement Repo does not reflect several economically justified adjustments that likely would reduce the indicated economic value of the assets Barclays acquired in the Fed Replacement Repo well below $45,545.8 million. First, this "fair value" valuation of these assets does not reflect any discount for the size of the individual positions comprising the Repo Collateral,[55] some of which were massive, nor does the valuation reflect the

---

[55] Stephen King explains in his deposition why holding large positions of individual assets can reduce their economic value. He states "8 billion dollars worth of equities doesn't trade at where those marks are. A good example would be, we had cash equities where the amount of the cash equity that we owned represented 400 days of the historical trading volume. That means if we would have traded as much of that stock as trades every day for the last 400 days, we still couldn't get out of our position. But still, the last mark, last penny of stock that traded was

Expert Report of Professor Paul Pfleiderer                                    Page 39

Contains Highly Confidential Information

size of the overall portfolio of trading assets acquired by Barclays. These considerations are relevant to an economic valuation; but it is my understanding that applicable accounting rules do not permit any "bulk discount" adjustment to fair value. Second, the $45,545.8 million "fair value" valuation does not apply any "fire sale" discount to any of the transferred positions. It is my understanding that Barclays did not want or intend to hold the Repo Collateral for the long term, but instead planned to dispose of the positions in a rapid, but orderly sale as market conditions permitted. Barclays almost certainly was particularly eager to sell off certain large, illiquid, and difficult-to-hedge positions; arguably for these positions, something closer to "fire sale" prices provides a better estimate of the economic value of the positions to Barclays than do unadjusted bid prices. Finally, this valuation makes no adjustment for the unusual risk characteristics of the $7.0 billion "cash, but ultimately not really cash" component of the assets Barclays actually held in the days and weeks immediately following the Fed Replacement Repo. While this claim ultimately was settled for cash and securities valued by Barclays at approximately $5.0 billion, it is likely that the "market value" of this claim in the final days of September 2008, if such a concept has any meaning at all for a claim for which there really was no market, was much less than $5.0 billion.[56]

64.     As explained above, in my judgment, the fair value of the assets Barclays actually received in its settlement with JP Morgan Chase is a reasonable proxy for the fair value of this

---

where we had to mark that position. It took us a year at that point to get out of those positions, and many of them therefore by construction every time we sold them took a loss every time. 300 million dollars of loss or whatever it was in the end, but every time we sold we were selling at a discount to the published mark. Easy to provide, put the published mark into that spreadsheet. The desk estimates were an attempt to then say, we have taken that, you know, where the exchange, such and such, and we assume it is going to cost us an additional 300 million dollars to bid side for us to be able to sell them." See Deposition of Stephen King, *In re: Lehman Brothers Holdings Inc., et al.*, Case No. 08-13555 (JMP) (SDNY Jan. 29, 2009), at 124:22-125:7.

[56] For this very reason, for financial accounting purposes, Barclays ultimately valued this claim based on the cash and securities actually received in December 2008.

Contains Highly Confidential Information

element of the Fed Replacement Repo assets. But this almost certainly is an upper limit on the
fair value of this claim as of the date of the Transaction; there was no market for this claim, so
far as I am aware, and it seems highly unlikely that any disinterested investor would have paid $5
billion to acquire it. For all of these reasons, in my opinion, the $45,545.8 million "fair value"
valuation of the Repo Collateral is an upper limit on the true economic value of those positions.

### D.   Ex Post Assessment of Profits from Trading Assets Acquired from LBI

65.   Any assessment of the post-acquisition profitability of the Businesses that
Barclays acquired from LBI on September 22, 2008, is necessarily a rough approximation. As
Barclays stated in its 2008 Results Announcement, "The acquired business has been integrated
into the corresponding existing business lines and there is no reliable basis for allocating post-
acquisition results between the acquirer and the acquiree."[57] Nonetheless, for purposes of this
litigation, Barclays has prepared a memo summarizing available information as to the results of
sales (or in some cases re-valuations) of trading portfolio securities. In this final subsection, I
consider to what extent, if any, this ex post assessment sheds light on the issues discussed herein
and more particularly on the Movants' claims that Barclays received a $5 billion secret discount
when it acquired these trading portfolio securities from LBI.

66.   As a general matter, one must use ex post outcomes with considerable care.
Consider, for example, the sale of a classic automobile in a private transaction for, say,
$100,000. Suppose this same auto is put up for auction six months later and sells for $200,000.
What, if anything, does this say about whether the buyer in the original transaction paid fair
value for the car six months ago? On its own, this ex post outcome says little to nothing about
that question. The car could have increased in value because of a general rise in the value of

---

[57]Barclays PLC 2008 Results Announcement, page 95.

Expert Report of Professor Paul Pfleiderer                                        Page 41

Contains Highly Confidential Information

classic cars or because of a substantial and unforeseeable increase in the demand for the specific type of car that was purchased.

67.    Despite these concerns, I reviewed the ex post profitability assessment prepared by Barclays to determine the extent to which it illuminates important issues in this case.  In my opinion, under the special circumstances here, this assessment does in fact convey useful information about important issues in this case.  What makes the ex post assessment of profitability useful in this case is that Barclays sought to hedge the serious market risk exposures arising from its acquisition of the trading portfolio securities almost immediately upon acquiring the portfolio.[58] This put in place a workable mechanism, admittedly an imperfect mechanism, for distinguishing between ex post profits (or losses) attributable to market movements occurring after the close of the Transaction and ex post profits (or losses), if any, embedded in the positions because Barclays exit-price marks were systematically low (or high).

68.    As I have indicated above, Barclays moved to hedge the market risks inherent in the trading portfolio that it acquired from LBI immediately upon recognizing or confirming its exposure. It did so, initially at least, through broad "portfolio" hedges, as opposed to using one-on-one, position-by-position hedges.  For this and other reasons, hedging of these exposures by Barclays undoubtedly was incomplete and imperfect.  Still, to the extent that Barclays was able to hedge its exposures, this provides a means of separating out market movements from initial conditions.  Consider the implications of the Movants' assertion that Barclays exit price marks were discounted and artificially low, resulting in an aggregate value for the acquired trading portfolio securities some $5 billion less than their true value.  If there really were such a hidden discount in Barclays' acquisition-date valuation of the trading portfolio securities, then the

---

[58] *See* King Tr. at 89 ("Q.:  The plan was to hedge the portion you needed to hedge and then sell the securities later?  A.: Yeah.").

Contains Highly Confidential Information

eventual sales of these securities should have been extraordinarily profitable (in an amount approximating $5 billion). Moreover, the hedges that Barclays put in place should have locked in a substantial portion of those gains; if prices moved against Barclays' underlying acquired positions in the months following the Transaction, gains on the hedges would offset market losses on the underlying positions, allowing Barclays to reap the hidden $5 billion gain. On the other hand, if prices moved favorably for Barclays' underlying acquired positions, then market gains on the underlying positions would be offset by losses on the hedges, and Barclays again would reap just the hidden $5 billion gain allegedly embedded in the initial values of those positions.

69. Because of this hedging, at least to the extent it was effective, Barclays' ex post assessment of its gains and losses on the acquired trading portfolio positions — including gains and losses on related hedges — can be viewed as a "test" of the Movants' claim that Barclays understated the value of the trading portfolio assets it acquired in the Transaction.

70. At Barclays exit price marks, Barclays acquired approximately $44.4 billion of trading portfolio securities, including some positions that were not part of the Repo Collateral. Barclays' ex post analysis, which I summarize in Table 3 below, seeks to identify gains and losses on this portfolio of assets, including gains and losses on related hedges.

Contains Highly Confidential Information

TABLE 3
IDENTIFIED GAINS AND LOSSES ON ACQUIRED TRADING PORTFOLIO SECURITIES
(INCLUDING GAINS AND LOSSES ON HEDGES)

| | Assets ($ billions) | Gains / (Losses) ($ billions) |
|---|---|---|
| Assets Auctioned to Trading Desks | 7.2 | (0.160) |
| Agency Mortgages | 13.0 | 0.140 |
| Emerging Markets | 0.3 | - |
| Munis | 0.6 | 0.003 |
| Rates – Agencies | 9.8 | (0.034) |
| Rates – Treasuries | 5.8 | - |
| Equities – Convertibles | 0.5 | (0.059) |
| PTMG -- Corporate Credit | 1.2 | 0.065 |
| PMTG – Illiquid Assets in LLCA | 0.7 | 0.204 |
| PMTG – Illiquid Assets in LiiL | 3.9 | (0.080) |
| PMTG – Cash and Other Equity Products | 1.4 | (0.028) |
| Total | 44.4 | 0.051 |

71.    By this ex post accounting, Barclays has had a gain on the acquired positions and related hedges of approximately $51 *million*.[59] This is just 1% of the gain that one would expect Barclays to have reaped if the Movants' assertion of a hidden $5 billion discount were true.[60] The results of this ex post accounting are consistent with my earlier findings and provide more evidence showing that Barclays exit price marks were, in the aggregate, accurate and can be used as an appropriate and reliable basis for valuing the Repo Collateral.

---

[59] Given the magnitude of the portfolio of trading assets Barclays acquired in the Transaction and the approximations involved in this calculation, a gain of $51 million is not meaningfully distinguishable from no gain at all.

[60] All else equal, one would expect Barclays to have realized a gain upon disposing of the acquired assets (and closing out related hedges) approximately equal to the alleged "hidden discount" of $5 billion were such a discount actually present.

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

### E.    Conclusion

72.    I conclude that Barclays did not receive a $5 billion discount on the inventory of trading portfolio securities (the "Repo Collateral") it acquired when it replaced the Federal Reserve Bank of New York as LBI's primary source of financing on Thursday, September 18, 2008.

### III.    Alleged $5 Billion Discount at Inception

73.    The Movants claim that the alleged (but in fact non-existent) $5 billion secret discount in the Repo Collateral had its origins in the early stages of the negotiations. They assert, in other words, that there was a secret $5 billion discount built into the Transaction from inception. Since the facts show there was no $5 billion discount as the Transaction was implemented via the Thursday repurchase agreement, whether or not there was an agreed $5 billion discount at inception may be a moot point. For completeness, however, I show in this section that the alleged discount at inception most likely did not exist.[61]

---

[61] I take the Movants' assertion seriously, and show analytically that there almost certainly was no $5 billion discount at inception. But I also note that, in an important sense, the assertion just is not plausible on its face. To see this, suppose that Barclays really did secretly and fraudulently understate the value of the financial assets it was acquiring from LBI by $5 billion. If it had done so (and the evidence shows it did not), it was done in an extraordinarily forthright manner, in full public view. First, even though there was no reason do to so, Barclays allowed to be included in the Asset Purchase Agreement a description and approximate valuation of the trading assets it would be acquiring: "government securities, commercial paper, corporate debt, corporate equities, exchange traded derivatives, and collateralized short term agreements with a book value as of the date hereof of approximately $70 billion." Surely Barclays understood that Lehman would have to include, and in fact did include, a copy of the APA in a Form 8-K Report filed with the U.S. Securities and Exchange Commission immediately upon consummation of the Transaction. Second, the third sentence in Barclays' press release announcing the Acquisition, dated September 17, 2008, stated that "Barclays will acquire trading assets with a current estimated value of . . . US$72 billion . . ." and this fact was repeated in Barclays' conference call with analysts later in the day. If these publicly-disclosed values really were understated by $5 billion, Barclays had set itself up, in a very public way, for an extraordinary problem, namely, what to do with the $5 billion gain it would realize, mostly in the fourth quarter, as it sold off these assets. How could Barclays not realize that a distortion of this magnitude, made in full public view, would come back to haunt it in a matter of months? Viewed in this light, in my opinion, the Movants' assertion of a secret $5 billion discount from inception is implausible.

Expert Report of Professor Paul Pfleiderer                                   Page 45

Contains Highly Confidential Information

74.    In analyzing this allegation, it is important to distinguish between two possible meanings of the term "discount," as applied to the "approximately $70 billion" in Long Positions in the definition of Purchased Assets in the APA.    When I review the pending motions, deposition testimony, and relevant documents, it often is unclear whether the term "discount" is intended to refer to (a) a reduction from a Lehman mark of a particular date *to market value* or (b) a negotiated reduction *below market value*.    But this is an important distinction.    There is a significant difference between (i) an agreement that "Long Positions" valued at $75 billion at Lehman's existing marks at the time of the negotiation actually were worth only approximately $70 billion and (b) an agreement that "Long Positions" actually worth $75 billion would be described as being worth only $70 billion.

75.    As I discuss below, there is reason to question whether, as of September 16, 2008, even Lehman's *marked values* for the Long Positions were actually $5 billion higher than the "approximately $70 billion" number stated in the APA.

76.    I am aware of no evidence supporting the contention that the *actual value* of the Long Positions was $5 billion higher than the $70 billion description in the APA.    That contention has been flatly denied by deponents, including Mr. McDade, Mr. Keegan, and Mr. King.    That contention is also inconsistent with internal documents circulated within Barclays showing that it intended to book the Long Positions at approximately $70 billion, and not at any higher valuation.[62]

---

[62] I note, in this connection, that the Movants cite to a September 16, 2008, presentation to the Barclays Board which states that there are $75 billion in assets in the transaction as support for their contention.  [See "Board Deck" included in Exh. 342A.]  The testimony suggests that the numbers in this document were preliminary.  In any event, however, an examination of that presentation shows that the $75 billion number includes $6.5 billion in mortgage securities which are a category of securities not included in the APA's definition of the approximately $70 billion in Long Positions.

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

### A.    Estimated Transaction Balance Sheet as of September 16, 2008

77.    A key element of the Movants' argument is that a one-page balance sheet referenced once in the APA (which I refer to hereafter as the "Estimated Transaction Balance Sheet"), but not attached to or incorporated into the APA, "materially understated the value of the assets" that the parties anticipated would be transferred over to Barclays in the Acquisition.[63] Elsewhere the Movants claim that the Estimated Transaction Balance Sheet "deliberately understated by $5 billion the amount shown on Lehman's books for the assets."[64]   In sum, according to the Movants, the "9/16/08 Financial Schedule [i.e., the Estimated Transaction Balance Sheet] — upon which the Sale Transaction was based and described to the Court — distorted the facts.  It understated by at least $5 billion the consideration [i.e., assets] Barclays was receiving in the Sale Transaction . . . ."

78.    As support for this claim, the Movants quote bits of testimony about the Estimated Transaction Balance Sheet from the depositions of Steven Berkenfeld, Martin Kelly, and Ian Lowitt.  The testimony of these deponents regarding the origin, development, and meaning of the Estimated Transaction Balance Sheet is imprecise.  Although I have my doubts about whether, taken as a whole and sensibly interpreted, this testimony supports the Movants' assertion, testing the validity of that assertion need not come down to how I or anyone else reads the testimony of these witnesses.  Instead, the assertion can be tested directly, by comparing the figures cited in the Estimated Transaction Balance Sheet to corresponding values reported on LBI's own books and records.

---

[63] The Estimated Transaction Balance Sheet appears as Exhibit 19 to the deposition of Steven Berkenfeld and is reproduced at page 30 of the Debtor's Motion.  *See* Deposition of Steven Berkenfeld, *In re: Lehman Brothers Holdings, Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 6, 2009), at Exhibit 19; Debtor's Motion, page 30.

[64] Debtor's Motion, page 31.

Contains Highly Confidential Information

79.    I present just such a comparison in Table 4 below. The list of assets and values on the left-hand-side ("LHS") is taken directly from the Estimated Transaction Balance Sheet, which the Movants assert is distorted and understates the values of LBI's assets. The list of assets and values on the right-hand-side ("RHS") is, to the best of my knowledge, a statement of LBI's inventory of financial assets, as recorded on its books on September 12, 2008.[65]

TABLE 4

COMPARISON OF ESTIMATED TRANSACTION BALANCE SHEET (SEPTEMBER 16, 2008) TO LBI BALANCE SHEET, BY GAAP ASSET TYPE (SEPTEMBER 12, 2008)

| Estimated Transaction Balance Sheet (Sept. 16, 2008) | | LBI Balance Sheet, by GAAP Asset Type (Sept. 12, 2008) | |
|---|---|---|---|
| Assets | ($ billions) | Net Long Inventory | ($ billions) |
| Governments and Agencies | 40.00 | Total Governments and Agencies | 39.17 |
| Commercial Paper | 1.10 | CDs and Other Money Market Instruments | 1.01 |
| Mortgages | 2.70 | Total Mortgages and Mortgage Backed | 6.56 |
| Total Corporate Debt | 4.90 | Total Corporate Obligations and Spot | 5.14 |
| Corporate Equity | 8.80 | Total Corporate Stocks and Options | 8.43 |
| Derivatives | 4.50 | Total Derivatives and Other Contr. | 4.84 |
| Cash | 0.70 | | -- |
| Total | 62.70 | Total | 65.15 |

---

[65] The list of assets and values on the right-hand-side of Table 4 are from a spreadsheet workbook, which has been produced in this matter, entitled "2008-09-16_0723 – Here's the summary for the 12th.xls." This workbook is composed of two worksheets (i.e., has two "tabs"), one named "LBI Summary" and the second named "Detail." The "LBI Summary" worksheet has in its upper left hand corner the title, "Lehman Brothers, Inc.; Balance Sheet by GAAP Asset Type; 9/12/08"; it reports LBI's "net long inventory" in six categories, which I have reproduced on the right-hand-side of the table above.

Contains Highly Confidential Information

80.    While I cannot be certain that this particular spreadsheet was the direct source for the Estimated Transaction Balance Sheet, the spreadsheet does provide a means of testing the Movants' assertion that "the value of the classes of securities listed on the 9/16/08 Financial Schedule was understated on the schedule by $5 billion" and "deliberately understated by $5 billion the amount shown on Lehman's books for the assets." For three of the six categories for which we can make a direct comparison (the LBI Inventory does not report "cash"), the values included on the Estimated Transaction Balance Sheet (those on the LHS of Table 4) are *higher* than the corresponding values on the LBI Inventory as of September 12, 2008. Moreover, the only category for which the Estimated Transaction Balance Sheet value is significantly below the corresponding LBI Inventory value is "Mortgages" / "Total Mortgages and Mortgage Backed." But this difference almost certainly reflects the agreement, explicitly stated in the APA, before it was amended and clarified, that Barclays would accept only 50% of LBI's mortgage assets.

81.    One can further test the Movants' assertion that the value of the assets on the Estimated Transaction Balance Sheet were understated by comparing the aggregate value of the assets listed thereon to the aggregate value of the assets listed on the LBI Inventory for September 12, 2008, after two adjustments are made to compare "apples to apples." As a first adjustment, I replace the $6.36 billion of "mortgages and mortgage backed" assets by 50% of this value, or $3.18 billion; this reduces the aggregate value of assets listed on the LBI Inventory for September 12, 2008 $61.87 billion, which rounds, of course, to $61.9 billion. Next, I deduct the value of cash from the aggregate value of the assets shown on the Estimated Transaction Balance Sheet, since cash does not appear in the LBI Inventory values. This makes the aggregate value of the assets listed on the Estimated Transaction Balance Sheet $62.0 billion. Far from being distorted and understated by $5 billion, the aggregate asset value on the

Contains Highly Confidential Information

Estimated Transaction Balance Sheet is almost identical to the aggregate asset value recorded on Lehman's books at Lehman's marks.[66]

82.    As mentioned above, the Estimated Transaction Balance Sheet is referenced once in the Asset Purchase Agreement, but is not attached to or incorporated into the APA.  Instead, the APA refers to approximations to the "book value" of certain LBI assets ("long positions") and associated liabilities to be included in the Transaction, but without defining the term "book value."  Furthermore, to the best of my knowledge, "book value" does not have a definite meaning in this context, such that a financial professional would understand it, as the Movants apparently do, to be synonymous with the "marked" value of the assets and liabilities on Lehman's books as of any arbitrary date and without regard to the quality and timeliness of Lehman's marks on such date.  Rather, the interpretation of "book value" offered by Bart McDade, President of Lehman Brothers at the time of the Transaction, as the value of the assets and liabilities to which the parties mutually agreed in their negotiations, appears reasonable and appropriate.[67]

---

[66] To confirm that the LBI, Inventory by GAAP Asset Type discussed in this subsection accurately reflected the net long inventory balances on LBI's books as of September 12, 2008 staff working at my direction acquired from Barclays a GFS report which I understand captures all LBI positions as of that date.  From the detailed information in that report (a spreadsheet with more than 200,000 line items, approximately 59,000 of which have net balance sheet values of $100 or more), my support staff independently calculated the net inventory values for the asset classes listed in Table 4, and found values that closely approximated the values listed on the RHS of Table 4.  This again confirms that the values in the Estimated Transaction Balance Sheet did not distort or understate the asset values on Lehman's books.

[67] "Q.: So it's your view that Exhibit 19, that schedule, reflected the book value of the assets of Lehman that were to be transferred in the deal?  MR. HUME: Objection. Asked and answered.  Q. You can answer it.  A. I can answer?  Again, I'd repeat, maybe I don't understand the specifics of your question, the market -- the securities were last marked on Friday, the 12th, to the best of my knowledge.  The process, in terms of the bottoms-up between the two firms to recognize a value of assets to be purchased, was done over the course of the 15th and 16th, prices had changed dramatically in the marketplace.  So your specific question, using the term "book value," I would agree that the book value, if you're describing what our traders and the Barclays traders came up with, I would agree that that's one and the same, this is the book value." McDade Tr. at 69-70.

Contains Highly Confidential Information

### B.    Updated Transaction Balance Sheet as of September 17, 2008

83.    Further evidence and confirmation that the Estimated Transaction Balance Sheet was not distorted, and that there was no secret $5 billion discount applied to the values of the assets to be transferred to Barclays, comes from a series of emails and attachments related to an effort to construct a "post transaction" LBI balance sheet.[68] These emails, dated September 18, 2008, and their attachments show an *expected* transfer of certain categories of assets — specifically, the asset categories listed above, with the exception of mortgages, for which only 50% are expected to be transferred — to Barclays at Lehman's book values, without any discount whatsoever.

84.    The several attachments to these emails are slightly different versions of the same spreadsheet (with virtually identical numbers); one email describes its attachment as "a draft balance sheet for LBI both pre and post transaction" and another email describes its attachment as "a cut at the balance sheet that stays and [what] is transferred to Barclays." Several of the emails stress that the "numbers are still being finalized, so it is obviously subject to change."

85.    For simplicity, I will cite here only "LBI BS_917_V with adjustment.xls," the printed version of which bears the title, "Lehman Brothers, Inc.; Balance Sheet as of September 17, 2008; ($ in millions)." The asset side of this spreadsheet (the format of which has been slightly modified for ease of presentation) is reproduced as Exhibit 7 to this report. The first two columns of numbers on this spreadsheet, (A) and (B), report LBI's assets as of "08/31/08" and

---

[68] *See* Email from Brett Beldner, PWC, to Richard Krasnow, Weil Gotshal & Manges, re: "LBI Draft Balance Sheet," Bates No. LBHI 004083 (Sep. 19, 2008).

*See* Email from David Descoteau, Lazard, to Barry Ridings et al., Lazard NYC, re: "LBI_BS_917_V with adjustment.xls," Bates No. LAZ-C-00050306 (Sep. 19, 2008).

*See* Email from Martin Kelly, Lehman Brothers, to David J. Coles et al., re: "Consolidating Balance Sheet," Bates Nos. LBHI_SEC07940_92774-927779 (Sep. 19, 2008).

Contains Highly Confidential Information

"09/17/08." These columns show not just the assets expected to be transferred to Barclays, but all of LBI's assets a (including those to be retained by LBI). There is no indication whatsoever that the numbers reported in these columns are anything other than LBI's "book" values for its assets, and no indication whatsoever that these asset values have been discounted in any way.

86.    To the right in Exhibit 7 there are two columns headed "Balance Sheet Transferred" and "Balance Sheet Remaining." Thus, as the emails themselves indicate, the analyst who prepared this worksheet is summarizing how the transaction is expected to be effected. He or she appears to be reporting, or estimating, what assets are expected to be transferred to Barclays and at what values as of September 17, 2008. In effect, the column headed "Balance Sheet Transferred" is an "Updated Transaction Balance Sheet," revised and updated to take into account changes in Lehman's positions and changes in Lehman's marks (to whatever extent those marks have been updated).

87.    The asset values shown for "Financial Instr. & Other Inventory Positions Owned" as of September 17, 2008, in column (B) of Exhibit 7, are slightly different from the asset values listed in the Estimated Transaction Balance Sheet discussed above, and on the LBI Inventory for September 12, 2008, also discussed above, but all three sources appear to represent the same categories of assets in LBI's inventory. As shown in column (B), the total value of LBI's Inventory Positions Owned on September 17 was $59.3 billion. Column (D) of Exhibit 7 shows the assets expected to be transferred to Barclays. After reducing the value of "mortgages and asset-backed securities" by 50% for comparability, the aggregate value of the six asset classes (other than cash) listed in Table 2 above, as of September 17, 2008, is $56.3 billion, compared to $60.0 billion for these same categories of assets on the Estimated Transaction Balance Sheet.

Contains Highly Confidential Information

While not conclusive, this result is not easily reconciled with the Movants' claim that the asset values on the Estimated Transaction Balance Sheet were significantly *understated*.

88.     Unlike the Estimated Transaction Balance Sheet referenced in the APA, which stands in isolation, here we can directly compare the values on the Re-Estimated Transaction Balance Sheet to the corresponding values on Lehman's books since both are reported in the same spreadsheet. What one sees in making this comparison is an exact match of the values on the Updated Transaction Balance Sheet with the values on Lehman's books as of September 17, 2008, with the exception of "mortgages and mortgage-backed sec," for which the value on the Updated Transaction Balance Sheet is exactly one-half of the value on Lehman's books.

89.     If there had been any secret $5 billion discount applied to the assets to be transferred to Barclays on the September 16 (a proposition inconsistent with the evidence discussed above), that discount was gone by September 17, at least according to this Updated Transaction Balance Sheet.

### C.    Conclusion

90.     The evidence I have analyzed is inconsistent with the proposition that Barclays negotiated or otherwise arranged to acquire securities from LBI at a substantial, but undisclosed discount. Instead, the parties to the Transaction seem to have relied heavily on values drawn directly from LBI's own books and records as they sought to summarize a complex transaction.

91.     The facts and analyses in the previous section establish that there was no secret $5 billion discount in the Fed Replacement Repo. The facts and analyses discussed in this section are inconsistent with the proposition that there was a secret $5 billion discount in the Transaction from inception.

Contains Highly Confidential Information

## IV.    Risks Arising from the Acquisition

92.    I turn next to a brief review of the risks that Barclays assumed when it acquired LBI's North American broker-dealer businesses. The acquisition of LBI's North American broker-dealer businesses entailed enormous risks for Barclays, which can be grouped into three broad categories: (a) information risk, (b) market and price risk, and (b) business and strategic risk. I discuss each of these categories of risk in the next three subsections.

### A.    Information Risk

93.    I use the phrase "information risk" to refer to uncertainties arising from two sources. The first source of information risk is the unavoidable fact that information in a complex transaction like this is always imperfect. For example, it is virtually impossible for an investor to know with 100% accuracy the creditworthiness of every borrower behind every mortgage packaged into a given mortgage-backed security. The second source of information risk arises from information asymmetry, i.e., the fact that, in most transactions, the seller has more information about the item being sold than does the buyer. For the reasons set forth next, both of these sources of information risk were particularly important and problematic in Barclays' acquisition of LBI's North American broker-dealer businesses.

94.    The set of assets transferred from LBI to Barclays on September 22, 2008, was among the largest, most complex, and most difficult to understand set of assets ever transferred from one financial institution to another. This applies not only to the financial assets transferred to Barclays as part of the Transaction, but also to the non-financial assets transferred to Barclays. As noted above, the transferred financial assets included more than 10,000 different securities of virtually every type imaginable, thousands of which were traded thinly (if traded at all), largely unknown in the financial community, and opaque (in the sense that very little information about

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

them was readily available to anyone other than their originator and their holder). There are reasons to doubt how well Lehman understood some of these securities, much less other investors and analysts (including Barclays prior to the Transaction). Similarly, with respect to the non-financial assets transferred to Barclays, there also were immense informational difficulties. For example, the value of LBI's customer base, given LBHI's failure and the extraordinarily difficult conditions in financial markets in September of 2008, was extremely uncertain. Similarly, the value of the "Lehman" name also was uncertain, as were the value of Lehman's headquarters building and Lehman's workforce.[69] For all of these reasons, there can be no doubt that both Lehman and Barclays were working with imperfect and incomplete information as they negotiated and effected the Transaction. This imperfect and incomplete information exposed both parties to risk.

95.    Obviously, though, the difficulties posed by imperfect and incomplete information were not symmetric, or of equal magnitude, for the two parties. Whatever the informational uncertainties from Lehman's point of view, they were orders of magnitude greater for Barclays. Indeed, through the summer of 2008 and until just days before the Transaction, Barclays had been trying to "size up" Lehman Brothers as a possible acquisition from publicly available information, e.g., analysts' reports, annual reports, SEC filings, and similar sources. As useful as these sources may be for certain purposes, they do not provide anywhere near the detailed and comprehensive information and data available to the senior executives of Lehman Brothers. When Barclays finally did get access to internal information and data from Lehman just prior to and while negotiating the terms of the Transaction, Lehman already was in a state of

---

[69] As I discuss in a later subsection, it is not hard to imagine scenarios in which the acquired Businesses simply dissipated into thin air.

Contains Highly Confidential Information

crisis. Consequently, due diligence that normally would take at least weeks and often months had to be completed in days.

96.    This meant that the information available to the two parties was massively asymmetric, with Lehman knowing much, much more about, for example, the financial positions likely to be transferred to Barclays upon consummation of the Transaction.[70] Economists have long recognized that whenever information is asymmetric, the party with less information is exposed to serious and difficult-to-manage risks. Of course, anyone who has considered buying a used car recognizes the same thing.

**B.    Market Risk**

97.    I use the phrase "market risk" to refer to the panoply of financial risks to which Barclays was exposed as a result of the large long positions it took on as part of its acquisition of the Businesses. These financial risks included price risk, credit risk, liquidity risk, counterparty risk, and operational risk, among others.

98.    Price risk arises from volatility in the values of financial instruments and affects virtually all financial assets other than cash.[71] Price risk is observable in the case of instruments that trade in liquid markets, and can be seen in the daily fluctuations in reported transaction prices. But securities that trade in thin markets or do not trade at all also are subject to price risk, even though the risk is not readily observed in reported prices. In this subsection I provide one (conservative) measure of the price risk to which Barclays was exposed when it acquired LBI's inventory of trading securities.

---

[70] I do not mean to imply that Lehman was at all devious or uncooperative with regard to information transfer, but simply to recognize that the two parties were in very different positions.

[71] Among the lessons of the current financial crisis is that even near-cash assets like money market funds expose investors to price risk; this was demonstrated when the Reserve Fund, one of the largest and most well established money market funds "broke the buck" following (and apparently because of) LBHI's bankruptcy filing.

Contains Highly Confidential Information

99.     The extraordinarily high level of volatility in the prices of financial assets in the wake of LBHI's bankruptcy filing is well known. Given the size of the portfolio of financial assets Barclays acquired from LBI, it necessarily exposed itself to considerable price risk. To quantify this risk by one very conservative measure, I began by identifying all of the CUSIPs/positions in the inventory of trading securities acquired by Barclays for which Bloomberg reported prices on each of the trading days between September 12, 2008, and September 22, 2008, inclusive. I then computed the aggregate value of LBI's positions in these securities on September 12, 2008 and on each of the subsequent days, based on the Bloomberg prices. From this, I was able to calculate daily percentage changes in the aggregate values of those positions for which Bloomberg reported prices, both in total and for groups of securities.[72] These daily changes provide a conservative measure of the riskiness of the entire portfolio of trading assets acquired by Barclays in the Transaction, to the extent that the securities for which Bloomberg is less likely to report prices are less liquid and higher risk than the securities for which Bloomberg does report prices. Had it been possible to include these securities in the analysis, the observed daily swings in asset prices likely would have been larger.

100.    Results of this analysis are summarized in Table 5 below.

---

[72] This analysis is based on reported prices only, and does not take into account additional changes in "exit price" values attributable to changing bid-ask spreads. Using Bloomberg prices for this purpose obviously does not imply that Bloomberg prices are appropriate marks for other valuation purposes, and in particular does not imply that Bloomberg prices should be used to value the Repo Collateral.

Contains Highly Confidential Information

TABLE 5
PERCENTAGE CHANGE IN ASSET PRICES, SEPTEMBER 12 THROUGH 22, 2008
(BASED ON AVAILABLE BLOOMBERG REPORTED PRICES OF REPO COLLATERAL SECURITIES)

| | Percentage Change in Asset Prices | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| From Date: | 9/12 | 9/15 | 9/16 | 9/17 | 9/18 | 9/19 | 9/12 | 9/12 |
| To Date: | 9/15 | 9/16 | 9/17 | 9/18 | 9/19 | 9/22 | 9/17 | 9/22 |
| Corporation Obligations (111 CUSIPs) | -11.5 | -1.3 | -4.3 | -1.4 | 3.3 | -0.7 | -16.4 | -15.4 |
| Emerging Markets (35 CUSIPs) | -1.6 | -1.7 | -1.0 | 1.2 | 1.2 | -0.2 | -4.3 | -2.3 |
| Equities (2,347 CUSIPs) | -4.8 | 0.9 | -4.2 | 4.2 | 4.3 | -3.3 | -7.9 | -3.2 |
| PMTG (76 CUSIPs) | 0.1 | 0.0 | 0.1 | -0.3 | -0.1 | 0.3 | 0.2 | 0.0 |
| Rates (788 CUSIPs) | 1.9 | -0.6 | 0.2 | -0.7 | -1.6 | -0.3 | 1.5 | -1.0 |
| RMBS (2,043 CUSIPs) | 0.2 | -0.3 | 0.2 | -0.3 | -0.7 | 0.0 | 0.0 | -0.8 |
| All Desks (5,400 CUSIPs) | -1.2 | 0.0 | -1.4 | 1.1 | 0.8 | -1.3 | -2.6 | -2.0 |

Note: Figures above are based on Bloomberg-reported prices of the Repo Collateral securities for which Bloomberg prices were available each day.

101.    These results provide some insight into the degree of (incremental) price risk to which Barclays was exposed as a result of the Transaction.  For all of the assets included in this analysis, the absolute value of the daily percentage change in their aggregate value was greater

Expert Report of Professor Paul Pfleiderer                    Page 58

Contains Highly Confidential Information

than 1.0% for four of these six days. On a portfolio of financial assets with a starting value of $45 billion, this implies a daily loss exposure of $500 million or more. Furthermore, over the six trading days starting on September 12, the cumulative percentage change in the aggregate value of these assets (using Bloomberg prices) was -2.6%, and over the three trading days starting on September 12, the percentage change was -2.0%. On a portfolio with a starting value of $45 billion, these percentage changes imply a multi-day exposure of approximately $1 billion or more.[73]

102.    Barclays could and in fact did try to hedge the market risks discussed above. However, hedging complex risks is difficult and imperfect even under normal conditions, and it was made more difficult by the prevailing market conditions here. First, operationally, Barclays had to assess the risks of the portfolio of securities it had received. For some of the securities it received, this was not unusually difficult, but many of the securities Barclays received were exotic and unfamiliar. In at least some cases, Barclays had to rely on personnel at LBI to gain even a rudimentary understanding of the risks of particular securities. This meant that whatever hedging Barclays was able to put in place involved significant "basis risk," i.e., risk that price on which a hedge was based would not move in close parallel to the price of the underlying asset. Second, many of the instruments and mechanisms that a financial institution would use to hedge complex market risks during normal times were simply not available to Barclays in the weeks and months following its acquisition of the Businesses. Third, because of a flight to quality in

---

[73] As noted above, both the Estimated Transaction Balance Sheet and Lehman's books indicated that LBI's net long inventory of trading assets (excluding short term agreement balances not captured in Lehman's GFS system) was approximately $60 billion as of September 12, 2008 at Lehman's marks. Taking into account a) the indicated declines in the average prices of relatively high-quality and liquid assets discussed here, b) the aggressiveness of Lehman's marks, as noted at least by some observers, and c) the relatively high weighting of LBI's portfolio in higher risk and less liquid assets and in assets directly or indirectly tied to Lehman's creditworthiness, it is not unreasonable to believe that LBI suffered a trading portfolio loss in the first few days following LBHI's bankruptcy filing in the range of $5 billion, compared to LBI's marks on September 12, 2008.

Contains Highly Confidential Information

the weeks after LBHI's bankruptcy, what hedging opportunities remained available to Barclays were extraordinarily expensive. Thus, I conclude that even after hedging, the Transaction likely exposed Barclays to a very significant level of price risk (or a combination of price risk and basis risk) in the weeks following the Transaction.

103.    Price risk is only one element of the overall market risk to which Barclays was exposed as a result of the Transaction. I do not try to quantify these additional market risks, but do note that Barclays was exposed to, for example, massive credit risk arising from the deteriorating financial strength of many of the credits underlying the complex structured products included in the trading assets portfolio it acquired from LBI, and extraordinary liquidity risk arising from deteriorating conditions in financial markets, including the "flight to safety," which sapped liquidity from the markets for all but the safest of financial assets. In sum, even with heroic efforts to shed or hedge the price risk Barclays was assuming with the securities taken on as part of the Acquisition, Barclays remained exposed to extraordinarily high levels of market risk for some period of time as a result of and following the closing of the Transaction.

### C.    Business and Strategic Risks

104.    The information risks and market risks associated with Barclays' acquisition of the Businesses were indeed substantial, but perhaps even more substantial were the business and strategic risks associated with the Acquisition. It is not hard to imagine a scenario, following the closing of the Transaction, in which (a) the Lehman customers whose accounts were transferred to Barclays migrated to other broker-dealers or simply cut back on their use for financial services, (b) the best of the thousands of Lehman employees who joined Barclays took jobs elsewhere (and took their customers and relationships with them), and (c) integrating two very different cultures proved contentious and unsuccessful. In other words, there was some

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

possibility, difficult to quantify but certainly not negligible, that the LBI broker-dealer businesses acquired by Barclays would simply dissipate into thin air, leaving Barclays with an expensive but underemployed work force and an expensive but nearly empty headquarters building, not to mention a severely bruised reputation. Had this happened and had financial markets not started to stabilize in 2009, Barclays could have incurred massive losses from its acquisition of LBI's North American broker dealer operations, and could have found its strategy for joining the top ranks of global financial institutions in tatters.

105.    Barclays surely was keenly aware of the business and strategic risks of the Transaction. Indeed, just one year before the Transaction with LBI, Barclays had attempted, but failed, to acquire Dutch bank ABN AMRO, which in 2007 was one of the largest banks in Europe with operations in 63 countries. Barclays first announced its intention to acquire ABN AMRO in April 2007. After a consortium led by Royal Bank of Scotland ("RBS") submitted a higher competing bid, Barclays raised its offer in July 2007 to €67.5 billion. But Barclays' bid was still short of the RBS consortium's offer, and Barclays ultimately withdrew its bid for ABN AMRO in October 2007, clearing the way for the RBS-led consortium's bid to go through. The consortium then proceeded with its planned dismemberment of ABN AMRO, with Fortis acquiring ABN AMRO's Dutch and Belgian operations, Banco Santander acquiring ABN AMRO's banking operations in Brazil and Italy, and RBS acquiring ABN AMRO's wholesale division and all other operations, including those in Asia.

106.    Barclays "near miss" in the ABN AMRO bidding proved (ex post) to be fortunate and provided a vivid lesson in the business and strategic risk of a large acquisition in the financial services industry in perilous times. In April 2008 RBS announced the largest rights issue in British corporate history, aiming to raise £12billion in new capital in part to shore up its

Contains Highly Confidential Information

reserves following the purchase of ABN AMRO. In October 2008, in the turmoil following Lehman's collapse, the British government was forced to inject capital into RBS, acquiring 58% of the bank's common shares, and in January 2009 RBS announced a loss of £28 billion. Reportedly, £20 billion of this loss was due to ABN AMRO. Today, the British government owns 70% of the common shares of RBS.

107.    Fortis fared no better than RBS. In July 2008, Fortis' Chief Executive Officer resigned after the ABN AMRO acquisition had depleted Fortis' capital. The total worth of Fortis, as reflected by its stock value, was at that time only one-third of what it had been before the ABN AMRO acquisition, and just under the value it had paid just months earlier for the Benelux operations of ABN AMRO. Like RBS, Fortis, too, lost its independence in the wake of the ABN AMRO acquisition. Today, all Fortis operations in the Netherlands, including those parts of ABN-AMRO that Fortis acquired, are controlled by the Dutch government.

**D.    Conclusion**

108.    The Transaction posed significant risks to Barclays that extended far beyond the day one results. Recognition of these risks is important to any evaluation of the Transaction as is recognition of the potentially misleading effect of focusing only on the day one results of the Transaction. For example, given the impossibility of liquidating on day one or even over several days at anything but fire-sale prices, or perfectly hedging against market risk, the enormous volume of trading assets acquired in the Transaction means that any day-one gain on acquisition could have been wiped out or turned into a day-two loss.

Contains Highly Confidential Information

V.    **Barclays' Accounting Gain on the Acquisition**

109.   I understand that part of the relief that the Creditors Committee seeks is an accounting of the Transaction. In my view, there is no need for a further accounting, because Barclays' 2008 Results Announcement summary of the Acquisition and related work papers and files provide a thorough and detailed description of the Transaction. These materials show what assets Barclays received (or expects to receive[74]) as a result of the Transaction, what liabilities Barclays assumed as a result of the Transaction, and the values Barclays assigned to these assets and liabilities for financial accounting purposes. Furthermore, these materials also provide sufficient data and analytical support to establish that the values Barclays assigned to the acquired assets and assumed liabilities approximated their "fair values" at the time of the Acquisition with reasonable precision.[75]

110.   My opinion is based on my examination, assisted by staff working at my direction, of the summary of the Acquisition contained in Barclays' 2008 Results Announcement and the work papers and files that support that summary. I and staff working at my direction also have interviewed Gary Romain, head of technical accounting at Barclays Capital, to gain a better understanding the methods, procedures, and processes by which Barclays developed its accounting summary of the Acquisition.

---

[74] In total, Barclays' acquisition accounting reflects approximately $3 billion in assets recognized but not yet received. In addition, my understanding is that assets with a value of approximately $765 million that have not yet been received were identified after the filing of Barclays' acquisition summary in February, 2009. *See* Exh. 399A and related deposition testimony by Gary Romain at Romain Tr., pp 105-109 and 117-119.

[75] It is important again to emphasize that, because applicable accounting standards do not permit the "fair value" assigned to the assets acquired to reflect several factors that should be considered to determine the actual economic value of the trading assets — the lion's share of the total assets — that Barclays acquired, the acquisition accounting reflects an upper limit on the true economic value of what Barclays acquired in the Transaction. *See* ¶ [69] *supra*.

Expert Report of Professor Paul Pfleiderer                                                                Page 63

Contains Highly Confidential Information

**A.    Key Documents Summarizing the Acquisition from an Accounting Perspective**

111.    The overview of the transaction that I present below is based primarily on the gross acquisition balance sheet ("GAB") underlying Barclays' reported transaction accounting, which provides additional information useful to understand the financial structure of the transaction.[76] In addition, I have relied on additional work-product prepared by Barclays for this litigation which differentiates — as the gross acquisition balance does not — between trading assets received in connection with the Fed Replacement Repo and those received as clearance box assets.[77]

**B.    Recap of the Acquisition Based on Barclays' 2008 Results Announcement Summary of the Acquisition**

112.    In this section, I present a recap of the acquisition based on Barclays' 2008 Results Announcement summary of the Acquisition and the materials supporting that summary.

113.    The assets that Barclays acquired are most usefully considered as falling within two broad categories: (a) the non-financial and customer assets and (b) the trading assets. The non-financial and customer assets include real estate assets (GAB lines 32 and 33) and customer assets (GAB lines 21 & 22) with offsetting liabilities (GAB lines 56, 57, and 43). In addition, about 49.5% of Barclays' declared $4.2 billion gain on acquisition is related to the combination of the approximately $1.45 billion ledger entry for intangibles (GAB line 34), the approximately $530 million ledger entry for fixtures, fittings, software, and the like (GAB line 36), and miscellaneous assets totaling approximately $100 million (GAB lines 31 and 35).

---

[76] Exh. 377A, page 3, is a printed version of this gross acquisition balance sheet.

[77] This additional work product is contained in an Excel workbook entitled "Sched B LehOBS 5.xls." I refer to this work product elsewhere in this report as Barclays' "Schedule B breakout analysis."

Contains Highly Confidential Information

114.    The remainder of the assets shown on Barclays' acquisition accounting statement are trading assets consisting of the following:  The collateral (and cash) acquired in the Fed Replacement Repo transaction (including everything received in the December Settlement with J.P Morgan) was valued at acquisition at approximately $45.546 billion.  The clearance box assets delivered to Barclays to date (including accrued interest) were valued at acquisition at approximately $785.6 million. Those two entries together are among the assets included in GAB lines 15 and 27 and are further broken out in Barclays' Schedule B Breakout Analysis.[78] Additional clearance box assets not yet received were valued at acquisition at approximately $707 million (GAB line 13).  The $769 million in securities not yet received but to be delivered pursuant to paragraph 8 of the Clarification Letter were valued at acquisition at approximately $769 million (GAB line 17).  The exchange-traded derivatives accounts were valued at acquisition at a net of approximately $2.4 billion, comprising gross assets of approximately $6.1 billion (GAB lines 16, 20, & 25) and offsetting liabilities of approximately $3.7 billion (GAB lines 42 & 44).[79]  It is my understanding that Barclays was unable to get reliable or complete information about the exchange-traded derivatives at the time of the transaction, and therefore made much more limited estimates at that time as to whether there may be any value included in the exchange-traded derivatives.  Because Barclays lacked reliable information about the exposure associated with the derivatives, it was taking a significant risk in agreeing to acquire both the assets and the liabilities associated with those derivatives — as it turned out, by taking that risk, Barclays ended up recording a net gain on those derivatives.  Taken together, the Repo Collateral, the clearance box assets, and the 15c3 asset add up to a total of approximately $47.8

---

[78] See fn 77.

[79] This $6.1 billion gross asset number includes certain margin collateral not yet received by Barclays.