Contains Highly Confidential Information

billion. If the net value of the exchange-traded derivatives and associated collateral is added to this (a net value about which Barclays lacked information at the time of the transaction and realized only by taking the risk when acquiring those assets with limited information), then the total value of the financial assets booked on the acquisition balance sheet is approximately $50.2 billion.

115.    On the liability side, Barclays paid $45 billion in cash in connection with the Fed Replacement Repo (GAB line 40); made compensation-related payments and commitments totaling approximately $2 billion (GAB lines 45 & 52); made cure payments of approximately $238 million (GAB line 41 shows $220 million; Mr. Romain testified that subsequent payments increased this amount); paid $250 million in cash to the DTC (GAB line 55); and paid the assessed value of the real estate, which was approximately $1.3 billion (GAB lines 56 & 57). Those liabilities total approximately $48.8 billion. Although, as I have discussed above, it is somewhat misleading to unpack what was a unitary transaction and attempt to match up particular sets of assets and liabilities, I have done so in order to address some of the points that the Movants appear to be trying to make.

116.    Specifically, the Movants appear to assert that the Transaction was supposed to be more or less a wash in the sense that the financial liabilities plus the estimated cure and compensation liabilities would roughly equal the value of the financial assets. Without agreeing that this fairly describes the agreed Transaction, I analyze how the final results stack up against that concept. Excluding the $1.3 billion cost of the buildings and the $250 million paid to the DTC (which the Movants appear to attribute to the non-financial assets purchased by Barclays) Barclays "paid" approximately $47.2 billion — comprising the $45 billion cash payment in connection with the Fed Replacement Repo, approximately $2 billion in compensation-related

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

payments and commitments, and approximately $238 million in cure payments for the financial assets. In addition, Barclays assumed the liabilities associated with the LBI exchange-traded derivatives accounts, which I will initially treat separately below. In exchange, Barclays was to receive financial assets worth approximately $47.8 billion — comprising $45.546 billion worth of Fed Replacement Repo collateral, $1.492 billion worth of clearance box assets, and $769 million in other securities — plus exchange-traded derivatives accounts that as of the Sale Hearing (and, for that matter, as of the Closing) were of unascertainable value. Setting to one side, for the moment, the exchange-traded derivatives accounts, if one analyzes the financial assets and liabilities by characterizing the $47.2 billion that Barclays "paid" (summarized above) for the $47.8 billion worth of financial assets consisting of the Repo Collateral, Clearance Box Assets, and 15c3-03 Assets, then the difference between those assets and liabilities is only approximately 1.2% — which is very close to a mathematical wash. Given the extraordinary level of uncertainty which prevailed that week, that is closer to a "wash" than anyone could reasonably have expected at the time given the uncertainty on both the asset and liability sides of the transaction.

117. In the previous paragraph, I set the exchange-traded derivatives accounts to one side because they represent a different kind of asset for at least two reasons. First, they were a Purchased Asset that included liabilities directly associated with them: by acquiring the exchange-traded derivatives, Barclays acquired "out of the money" positions and settlement obligations, as well as any "in the money" positions and any margin collateral deposited in the accounts. Thus, if the value of the exchange-traded derivatives is to be included in the analysis, then the value of those liabilities and risks also must be included. Second, Barclays appears to have been unable to get any reliable information before the closing as to the potential liability

Contains Highly Confidential Information

and asset values associated with taking on the exchange-traded derivatives accounts. Barclays neither knew *nor could have known or even roughly estimated* the net value of these accounts as of the time of the Sale Hearing. As it turned out, the exchange-traded derivatives accounts had a net day-one value *to Barclays* of approximately $2.4 billion, and could thus be viewed to have contributed to that portion of Barclays' day-one gain not attributable to the non-financial assets. But that is an ex post measurement of value; ex ante, there was no way to tell what, if any, value they would have to Barclays or what, if any, effect they would have on Barclays' acquisition accounting.[80] In my opinion, given the uncertainty surrounding the value of these accounts at the time, and given the risks Barclays took on by assuming all the liabilities and settlement obligations associated with these accounts, it was reasonable for Barclays to receive the benefit of the unknown value associated with these accounts. Moreover, if LBI had not transferred the exchange-traded derivatives accounts to Barclays, there was a significant risk that some or all of the net value in those accounts would have been lost. As Lehman's counsel informed the Court at the Sale Hearing, the day before that hearing the Chicago Mercantile Exchange had closed out all of Lehman's positions on that exchange, resulting in a loss to Lehman of $1.6 billion.[81] And, on the night before the Closing, the OCC *warned that:  "If the transaction does not close tonight*, OCC would need to immediately liquidate and close out the LBI accounts and is preparing to do so."[82]  Had the OCC and the other exchanges, clearing corporations, or custodians liquidated and closed out LBI's accounts, it could reasonably have been expected to

---

[80] *See, e.g.*, Sept. 22, 2008 3:30 p.m. EST email chain from S. King to L. James, T. Stack, A. Kaplan, D. Joshi, S. McKenna, J. Hughes, and N. Moreira: "[i]t is clear that [Lehman] has absolutely no idea what its [OCC] risk position is. We know it is between 2bn short and 4bn long. They do not know what has been booked to what entity. We cannot see. We are now 4 days into making zero progress on this with them."

[81] Sept. 19, 2008 Hearing Tr., page 61.

[82] Sept. 21, 2008 4:03 p.m. email from McDaniel to Rosen.

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

result in the loss of most or all of any net value in those accounts, or even in deficits that would have become claims against LBI.

118.    Finally, in addition to analyzing the exchange-traded derivatives accounts separately (as above), I have analyzed all of the financial assets and liabilities together. On the one hand (again, adopting for purposes of this analysis the Movants' concept that the $250 million in cash and the payments for the Buildings should be excluded from consideration), Barclays paid $45 billion in cash and assumed liabilities for cure and compensation obligations under the contract, *plus* the liabilities and settlement obligations associated with the exchange-traded derivatives.[83]    On the other hand, Barclays received assets that were of highly indeterminate value at the time of the transaction, but that were ultimately determined to have had a "fair value" of $50.2 billion.  Under the uncertain and emergency circumstances of this transaction, and given the illiquid nature — and highly uncertain values — of huge portions of the inventory received, that difference between the assets and the liabilities reflects a reasonable gain on the acquisition.  Stated differently, I do not believe that, absent the Transaction, it would have been reasonable at the time, or is reasonable now, to believe that Lehman would have received greater value in a liquidation of the assets purchased by Barclays.  To the contrary, the contemporaneous conclusion that Lehman would not receive greater value for those assets in a liquidation was well founded and reasonable.  Thus, as I discuss further below, given the substantial uncertainty about the value, and even the identity, of the assets and certain of the liabilities, Barclays' reported gain is reasonable, unsurprising, and fair to the Sellers.[84]    It is also

---

[83] As I note above, this is a potentially misleading way to view the Transaction.

[84] Again, I note that, as discussed above, due to factors that the applicable accounting rules do not permit to be taken into account, the actual economic value of the Trading Portfolio Securities to Barclays was less than the reported accounting valuation.

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

consistent even with the Movants' conception of the Transaction as roughly a "wash" in which the financial assets would roughly equal the financial liabilities plus cure and compensation.

### C.    Barclays' Accounting Gain on the Acquisition Does Not Indicate That Barclays Obtained a Secret or Unfair Discount

119.    The Movants attempt to depict Barclays' announcement of an accounting gain on the Acquisition as something nefarious, and as confirmation that Barclays somehow benefited unfairly from the Acquisition.  For example, according to the Debtor's Motion, "Given what has now been revealed in discovery [e.g., the alleged undisclosed discount and the alleged significant and intentional inflation of the consideration Barclays was to pay], it is not particularly surprising that, in February 2009, Barclays announced it had enjoyed a gain of $4.2 billion 'on acquisition' of the Lehman assets.  This immediate gain . . . was attributable to '*[t]he excess of the fair value of net assets acquired over consideration paid . . . on acquisition.*'"  [Dramatic bold italics added by Debtors.]  In fact, given the risks for Barclays, market conditions, and other relevant considerations, it was not unreasonable nor should it have been unexpected for Barclays to report an accounting gain on its acquisition of LBI's North American broker-dealer businesses.[85]

120.    Barclays' acquisition of LBI's North American broker-dealer operations was not unique in generating negative goodwill and an accounting gain on acquisition for the buyer.  In fact, because of difficulties in valuing the assets held by financial institutions, because of the great uncertainty in financial markets, and because of the dire outlook for the financial institutions generally, negative goodwill and an accounting gain on acquisition were common features of transactions involving financial institutions in 2008 and early 2009.  Exhibit 8 shows

---

[85]  In the footnote on acquisitions in its 2008 Results Announcement, Barclays summarized four different acquisitions it completed in 2008, including its LBI acquisition.  Barclays reported negative goodwill and an accounting gain on three of these four acquisitions.

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

that similar results obtained in a number of transactions in the financial services industry in 2008 and 2009. Indeed, Barclays publicly announced two days before the September 19, 2008, Sale Hearing that it expected the transaction to result in a day-one accounting gain of $2 billion, post-tax.[86]

121.   Given the risks for Barclays, market conditions, and other relevant considerations, it was not unusual, unexpected, or unreasonable for Barclays to report an accounting gain on its acquisition of LBI's North American broker-dealer businesses.   Contrary to the Movants' assertions, Barclays' reported accounting gain on the Acquisition does not in any way imply that Barclays paid less than Lehman would have received in a liquidation of the financial assets acquired in the Transaction.   To the contrary, as explained above, it is unreasonable to believe that Lehman could have received more in a liquidation, and it would have been especially unreasonable to conclude this at the time of the transaction, given the uncertain and illiquid nature of a huge portion of the assets being transferred.   Moreover, the proposition that any rational bidder would have paid more under these circumstances — given the risk and uncertainty inherent in the Transaction — is in my view untenable and inconsistent with the observed fact that no other bidder offered to do so.

---

[86] The Movants have contended that the transaction described in the original APA — as distinct from the Transaction actually consummated — was intended to be a "wash" with the assets Barclays was to receive "basically equivalent" to the liabilities it would assume. Given the uncertainty as to the identity and the value of the financial assets and liabilities generally described in the original APA even as of September 16, absent a post-closing true-up mechanism, it would be impossible for anyone reasonably to conclude that the transaction outlined in the APA would with certainty, or even probably, be a "wash" three days later at the anticipated closing. Moreover, the transaction in its entirety as outlined in the APA cannot fairly be characterized as a "wash."

Contains Highly Confidential Information

## VI.    Benefits of the Acquisition

122.    The potential benefits of the Transaction, both private and public, were clear to many interested parties and informed observers.  For example, the Federal Reserve Bank of New York supported the transaction, "[r]ecognizing that Barclays' offer provided an opportunity for an orderly transfer of thousands of customer accounts, as well as the possibility of preserving the jobs of thousands of LBI employees."[87]  The SEC also supported the Transaction.  According to SEC Chairman Christopher Cox, the announcement that Barclays intended to acquire the business and assets of Lehman Brothers, Inc., was "welcome news for every one of Lehman's customers.  If approved by the court, customers will be able to look forward to an immediate transition of their accounts.  Even before the transaction is completed, they will benefit because the broker-dealer and 10,000 Lehman employees will be able to continue their work with clarity about their future, and with greater funding resources for the broker-dealer's operations."[88]  The U.S. Commodity Futures Trading Commission also was supportive; according to the Commission's acting chairman, Walt Lukken, "Today's purchase by Barclays provides for an orderly transfer of customer accounts — this is a strong and positive development for the customers of Lehman's futures business."[89]

123.    Throughout the sale approval process, the Sellers, their counsel, their bankers, their regulators, and other interested parties unequivocally represented to the Court that the Transaction with Barclays was the best alternative — better than no transaction and better than any alternative transaction — for Lehman, its employees, and its creditors.  The analysis in this

---

[87] Leventhal Declaration at ¶7.

[88] "Statement on Proposed Acquisition of Lehman Brothers, Inc., by Barclays," SEC Press Release, September 17, 2008.

[89] "CFTC Statement Regarding Barclays Purchase of Lehman Futures Business," Commodity Futures Trading Commission Press Release No. 5552-08, September 20, 2008.

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

section shows that these views were informed and reasonable and, with high probability, have proved accurate. In addition, Barclays' acquisition of the Businesses was reasonably considered likely to have, and almost certainly had and continues to have, significant public benefits, ranging from the preservation of jobs in New York City and elsewhere to freeing up resources at the Federal Reserve and Treasury at a time when both institutions were stretched extremely thin. In addition, and perhaps most important, the Transaction was reasonably believed likely to have, and likely had, a calming effect on global financial markets at a critical time of substantial threat to the viability of these markets. In hindsight, with financial markets now appearing to be stabilized and in an economy that appears to be recovering, it is easy to forget or minimize the risks in September 2008 of a total collapse of financial markets with extremely serious consequences including the possibility of a depression.

**A.    Benefits for the LBHI and LBI Estates, Lehman Creditors, and Lehman Customers**

124.    To say that the days leading up to September 16, 2008, were stressful and difficult days for LBHI and LBI and for their creditors and customers is an understatement. Extensive reporting on the events of the weekend before indicates that LBHI had no reasonable alternative to filing for bankruptcy. Furthermore, since LBI's funding was integrated with LBHI, a filing by LBHI necessarily meant that LBI could continue to operate only with extraordinary support (which initially came from the NY Fed). By all accounts, the firm had no cash, and no ability to pay operating costs. Thus the outlook was for an immediate collapse of LBI and an immediate cessation of all activity by LBI as a broker-dealer.

125.    In essence, what the Transaction did was to prevent an immediate collapse of LBI and substitute an orderly transition of much of the firm into Barclays and allow for an orderly winding down of the rest. For obvious reasons, it is hard to assess with precision how this

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

orderly transition would have compared to a free fall that, fortunately, did not occur. But it is certainly fair to conclude, as I do, that the contemporaneous belief that the Transaction would be beneficial in this regard was reasonable.

. 126.    Statements by Bryan Marsal, the restructuring professional appointed to serve as Lehman's Chief Restructuring Officer, confirm my assessment. So far as I know, Mr. Marsal has not addressed the additional costs that a "free fall" of LBI would have entailed. But he has assessed the additional costs arising from the "free fall" of LBHI, in part by contrasting the outcome of LBHI's "free fall" with the transition of Bear Stearns into JP Morgan Chase. Mr. Marsal states as follows:

> "After we did our due diligence, after we started to understand the assets, the inventory of assets and the realistic value of the assets, the structure, and we understood what the bankruptcy completions [sic] were, the question was raised by a reporter, you know, why does this situation contrast so much versus Bear Sterns [sic]; was this so much worse than Bear Sterns [?]"[90]

Mr. Marsal believes that the answer to this question is that LBHI was allowed to collapse, while Bear Stearns' was merged into JP Morgan Chase:

> "[T]he only reason this [LBHI's demise] is going to be so much worse than Bear Sterns [sic] was an orderly transfer to J.P. Morgan. This was a free-fall bankruptcy."[91]

Mr. Marsal then was asked the difference in cost between a "free fall" and an orderly transition into another firm:

> "And they said what's the cost of that difference in treatment? The answer was $50 to $75 billion, based on discussions that I had internally with my teammates, what do you think the answer to that question would be, $50 to $75 billion. That's the whole consensus of this."[92]

---

[90] Transcript of 341 Meeting of Creditors, *In re: Lehman Brothers Holdings Inc., et al.*, Case No. 08-13555 (JMP) (SDNY Jan. 29, 2009), pages 124-125.

[91] 341 Meeting of Creditors Tr., Jan. 29, 2009, page 125.

[92] 341 Meeting of Creditors Tr., Jan. 29, 2009, page125.

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

Elsewhere Mr. Marsal makes clear that this was not just his personal opinion, but in fact reflected the informed views of his team of professionals:

> "[W]e went around the room and we wanted to get an assessment on what the loss was going to be, based on the loss had we had an orderly versus the free fall that we've experienced, and everyone around the table felt comfortable saying $50 to $75 billion based on what they knew about the portfolio was a comfortable if not low estimate of the cost."[93]

127.    Mr. Marsal also explained the consequences of a collapse on security prices and the sellers' proceeds from sales. —According to the *Wall Street Journal*, "Mr. Marsal also criticized the way Lehman sold off assets. The unplanned bankruptcy pushed down prices for Lehman assets in an already depressed market."[94]  Barclays sold off the assets it acquired in the Transaction over several months, in a reasonable orderly process. But for the Transaction it is highly likely that this sell off would have occurred in a more hectic setting, which means, as Mr. Marsal acknowledges and as common sense suggests, that proceeds from sales would likely have been considerably less than Barclays received.

128.    Indeed, given the market conditions, the significant uncertainty regarding asset values (and even asset identity), the reasonable perception that any transaction needed to be completed within days of the bankruptcy filing, the consequent inability to do more than minimal due diligence for a transaction of this size and complexity, and the risks inherent in investing tens of billions of dollars in securities and the financial services industry in the face of some of the worst economic conditions since the Great Depression, no rational purchaser would have paid more for the assets that Barclays purchased than Barclays did based on what was known and

---

[93] 341 Meeting of Creditors Tr., Jan. 29, 2009, page 110.

[94] Jeffrey McCracken, "Lehman's Chaotic Bankruptcy Filing Destroyed Billions in Value," *Wall Street Journal* (Dec. 29, 2008).

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

knowable at the time. That no competing bidders offered to do so was unsurprising at the time, and it continues to be unsurprising now given all the factors discussed above.

129.    Furthermore, it is my view that it was reasonable to believe at the time, and is reasonable to conclude today, that the fire-sale which would have ensued absent the Transaction would have been worse for creditors and other interested parties.

130.    The benefits of the Transaction for LBI's customers have been acknowledged by the SIPA Trustee, who wrote: "The Account Transfers allowed former LBI account holders to access billions of dollars of assets held in hundreds of thousands of LBI accounts promptly following the largest broker-dealer liquidation filing in history."[95] According to the Trustee, the account transfers to Barclays benefitted approximately 85,000 individual account holders and involved the transfer of customer cash and securities valued at nearly $43.2 billion.[96]

131.    The transfer of accounts to Barclays (and others) was accomplished "with only minimal disruption," but was not entirely without problems, in part because some securities were not available for delivery due to assertion of liens by custodial banks or other causes. According to the Trustee, "to maintain market stability . . . Barclays sold or transferred, at [customers'] request, securities appearing on their Barclays statements, even though the Trustee had not yet transferred those securities to Barclays."[97] This accommodation by Barclays was a further benefit to LBI customers.

---

[95] Trustee's Second Interim Report for the Period May 30, 2009 through November 11, 2009, page 7. The Account Transfers to which the Trustee refers include the transfer of LBI Private Investment Management customer accounts to Barclays, the transfer of Private Asset Management (Neuberger Berman) customer accounts to a management group, and the transfer of prime brokerage accounts.

[96] Trustee's Second Interim Report, page 9.

[97] Trustee's Second Interim Report, page 9.

Expert Report of Professor Paul Pfleiderer

Page 76

Contains Highly Confidential Information

132.    The Movants themselves either urged the Court to approve the Transaction or, in the case of the Creditors Committee, did not oppose it "based on the lack of a viable alternative."[98]

### B.    Public Benefits

133.    At the conclusion of the Sale Hearing, Judge Peck approved the Transaction, stating that:[99]

> "I am completely satisfied that I am fulfilling my duty as a United States bankruptcy judge in approving this transaction and in finding that there is no better or alternative transaction for these assets, that the consequences of not approving a transaction could prove to be truly disastrous. And those adverse consequences are meaningful to me as I exercise this discretion. The harm to the debtor, its estates, the customers, creditors, generally, the national economy and global economy could prove to be incalculable.

> "Moreover, it's not just about avoiding harm. Approving the transaction secures whether for ninety days or for a lifelong career employment for 9,000 employees at Lehman, and holds together an operation the value of which is really embedded in the talent of the employees, their knowledge, their relationship, their expertise and their ability to create value to the economy."

134.    After analyzing this Transaction and the events that led up to it, reviewing the record compiled to date, and considering the Movants' claims and my own analysis of those claims, my opinion is that the Court's findings about the benefits of approving the Transaction were reasonable when made and have been borne out by events.

### C.    Conclusion

135.    Barclays' acquisition of LBI's North American broker-dealer businesses was reasonably expected to benefit, and with high probability did benefit, the Estates, Lehman's creditors, and Lehman's customers. The Acquisition also was reasonably expected to generate,

---

[98] Sept. 19, 2008 Hearing Tr., page 67.

[99] Sept. 19, 2008 Hearing Tr., page 250.

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

and has in fact generated, significant public benefits. Had Barclays not acquired the Businesses, whether because no agreement could be struck or because approval of the Transaction had been withheld by the Court, it is virtually certain that the LBHI and LBI estates, Lehman's creditors, and Lehman's customer all would have been worse off. And it was certainly reasonable to reach that conclusion at the time.

Paul Pfleiderer

Contains Highly Confidential Information

APPENDIX ONE


RESUME OF PROFESSOR PAUL PFLEIDERER

# PAUL PFLEIDERER, Ph.D.

**OFFICE**

Graduate School of Business
Stanford University
Stanford, CA 94305-5015
(650) 723-4495
(650) 725-6152 (FAX)
pfleiderer_paul@gsb.stanford.edu (email)

**HOME**

897 Newell Road
Palo Alto, CA 94303
(650) 323-2708

## UNDERGRADUATE STUDIES

Yale University, BA, Economics, 1976

## GRADUATE STUDIES

Yale University, Ph.D., Economics, 1982
Field of Concentration:
    Financial Economics
Other Fields:
    Economics of Information
    Econometrics
Thesis:
    "Private Information, Price Variability and Trading Volume," a consideration of the role heterogeneous private information plays in conditioning volume and price movements in a rational expectations model.
Thesis Committee:
    Stephen A. Ross
    Philip Dybvig
    Lawrence Weiss

## EXPERIENCE

2004–present    C. O. G. Miller Distinguished Professor of Finance, Graduate School of Business, Stanford University

1996–2004    William F. Sharpe Professor of Financial Economics, Graduate School of Business, Stanford University

1992–1995    Professor of Finance, Graduate School of Business, Stanford University

| 1986–1992 | Associate Professor of Finance, Graduate School of Business, Stanford University |
| 1981–1985 | Assistant Professor of Finance, Graduate School of Business, Stanford University |
| 1979–1981 | Research Assistant for Professor Stephen Ross, Yale University |
| 1977–1980 | Research Assistant for Professor John M. Quigley, Yale University |
| 1979 | Teaching Assistant, Yale University, Department of Economics, Graduate Level Microeconomics course |

## HONORS AND AWARDS

NSF grant, 1993–1995 (with Anat Admati).

Q-Group grant (with Anat Admati), 1989.

Prize for the best paper published in the first volume of the *Review of Financial Studies*, for "A Theory of Intraday Trading Patterns: Volume and Price Variability" (with Anat Admati), 1987.

Co-winner of NYSE Prize for the best paper in the RFS-WFA-NYSE Market Microstructure Symposium, 1990 for "Sunshine Trading and Financial Market Equilibrium" (with Anat Admati).

Robert M. and Anne T. Bass Fellowship, AY 1987–88 and 1989–90.

Recipient of Batterymarch Fellowship, Academic year 1988–89.

Graduated from Yale University Magna Cum Laude with distinction in major field of economics.

Phi Beta Kappa from Yale College.

## PUBLICATIONS AND RESEARCH PAPERS

"A Note on the Effect of Costs Changes on Prices" in the *Journal of Political Economy*, February 1983, pp. 182–185, with Jeremy Bulow.

"Interpreting the Factor Risk Premia in the Arbitrage Pricing Theory" in the *Journal of Economic Theory*, February 1985, pp. 191–195, with Anat Admati.

"Delegated Portfolio Management" in the *Journal of Economic Theory*, June 1985, pp. 1–25, with Sudipto Bhattacharya.

"A Monopolistic Market for Information" in the *Journal of Economic Theory*, July 1986, pp. 400–438, with Anat Admati.

"On Timing and Selectivity" in the *Journal of Finance*, July 1986, pp. 715–730, with Anat Admati, Sudipto Bhattacharya and Stephen A. Ross.

"Viable Allocations of Information in Financial Markets" in the *Journal of Economic Theory*, Vol. 43, October 1987, pp. 76–115, with Anat Admati.

"A Theory of Intraday Trading Patterns: Volume and Price Variability" in the *Review of Financial Studies*, Vol. 1, March 1988, pp. 3–40, with Anat Admati.

"Selling and Trading on Information in Financial Markets" in the *American Economic Review*, Papers and Proceeding, May 1988, pp. 96–103, with Anat Admati.

"Direct and Indirect Sale of Information" in *Econometrica*, Vol. 58, July 1990, pp. 901–928, with Anat Admati.

"Divide and Conquer: A Theory of Intraday and Day-of-the-Week Mean Effects" in the *Review of Financial Studies*, Vol. 2, 1989, pp 189–223, with Anat Admati.

"Sunshine Trading and Financial Market Equilibrium" in the *Review of Financial Studies*, Vol. 4, 1991, pp. 443–482, with Anat Admati.

"Underestimation of Portfolio Insurance and the Crash of October 1987" in the *Review of Financial Studies*, Spring, 1992, pp. 35–63, with Allan Kleidon and Charles Jacklin.

"Trading on Information in Financial Markets" in *The New Palgrave Dictionary of Money and Finance*, 1993, with Anat Admati.

"Trading Volume" in *The New Palgrave Dictionary of Money and Finance*, 1993, with Anat Admati.
"Robust Financial Contracting and the Role of Venture Capitalists," *Journal of Finance*, June, 1994, with Anat Admati.

"Large Shareholder Activism, Risk Sharing, and Financial Market Equilibrium," *Journal of Political Economy*, 1994, with Anat Admati and Josef Zechner.

"Should Firms Use Derivatives to Manage Risk?," in *Risk Management: Problems and Solutions*, McGraw Hill (William H. Beaver and George Parker, eds.1995), with David Fite.

"Does it All Add Up? Benchmarks, and the Compensation of Active Portfolio Managers," *Journal of Business*, 1997, with Anat Admati.

"Forcing Firms to Talk: Externalities and Financial Disclosure Regulation," *Review of Financial Studies*, 2000, with Anat Admati.

"Broadcasting Opinions with an Overconfident Sender," *International Economic Review*, 2004, with Anat Admati.

"The Wall Street Walk and Shareholder Activism: Exit as a Form of Voice" (with Anat Admati), Review of Financial Studies, 2009.

"The Volume of Trade and The Variability of Prices: A Framework for Analysis in Noisy Rational Expectations Equilibria," Working paper, 1984.

"The Role of Country and Industry Effects in Explaining Global Stock Returns," Working paper, 1997, with Terry Marsh.

"Why Nasdaq Market Makers Use Even-Eighths Quotes: A Model of Quote Clustering in Dealer Markets," Working paper, 1998, with Allan Kleidon.

"The 2008-2009 Financial Crisis: Risk Model Transparency and Incentives," Working paper, 2009, with Terry Marsh.

"Increased-Liability Equity: A Proposal to Improve Capital Regulation of Large Financial Institutions," Working paper, 2009, with Anat Admati.

## RESEARCH IN PROGRESS

"Governance with Diverse Shareholders and Hedging" (with Anat Admati and Chester Spatt)

"Disclosure by Informed Large Shareholders, Voting, and Corporate Decisions" (with Anat Admati)

"Misrepresentation and Penalties in Financial Disclosure" (with Anat Admati)

## PRIOR TESTIMONIES

*In re Broadcom Corp. Securities Litigation* (C. Dist. Cal.)

*Unsecured Creditors Committee of Iridium v. Motorola, Inc.* (Bankr.)

*In the Matter of the Arbitration Between Margo Piscevich, et al. v. Associated Securities Corp., et al.* (NASD Dispute Resolution)

*In re iXL Enterprises, Inc., Initial Public Offering Securities Litigation* (S.D.N.Y.)

Contains Highly Confidential Information

APPENDIX TWO

LIST OF DOCUMENTS AND OTHER MATERIALS REVIEWED AND CONSIDERED

**Bates Number Documents**

BCI-EX 00185186

HHR_00000194

HHR_00000195

HHR_00000196

HHR_00000491

HHR_00000492

HHR_00000493

HHR_00000685

HHR_00000686

HHR_00000687

HHR_00001774-HHR_00001775

HHR_00001776

HHR_00001777

HHR_00006310-HHR_00006312

HHR_00006313-HHR_00006480

LAZ-C-00050306

LBHI 004083

LBHI 004083

LBHI_SEC07940_92774-927779

MTHM0000139

MTHM0000140

BCI000002-BCI015744

BCI-EX-00185186

JPM-BARCAP0000001 -- JPM- BARCAP0003898.TXT (with gaps)

JPM-60(b)00003982 - JPM-60(b)00005917.XLS (with gaps)

JPM-BARCAP0000001 -- JPM- BARCAP0003898.TIF (with gaps)

JPM-BARCAP0000001 -- JPM- BARCAP0003844.XLS (with gaps)

Contains Highly Confidential Information

**Deposition Transcripts**

Deposition of Alastair Blackwell, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 7, 2009).

Deposition of Alex Kirk, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 31, 2009).

Deposition of Archibald Cox, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 11, 2009).

Deposition of Bart McDade, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 2, 2009).

Deposition of Bryan Marsal, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 22, 2009).

Deposition of Daniel Joseph Fleming, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 28, 2009).

Deposition of David Petrie, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 26, 2009).

Deposition of Eric Jonathan Felder, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Jul. 31, 2009).

Deposition of Gary Romain, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 10, 2009).

Deposition of Gerard LaRocca, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 19, 2009).

Deposition of Hugh McGee, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 10, 2009).

Deposition of Ian Lowitt, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 20, 2009).

Deposition of James B Kobak Jr., *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 7, 2009).

Deposition of James Hraska, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 14, 2009).

Deposition of James Seery, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 3, 2009).

Deposition of Jasen Yang, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 4, 2009).

Deposition of Jerry del Missier, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 1, 2009).

Contains Highly Confidential Information

Deposition of John Coghlan, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No.
08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 13, 2009).

Deposition of John Rodefeld, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No.
08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 27, 2009).

Deposition of John Varley, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-
13555 (JMP) (Bankr. S.D.N.Y. Sep. 3, 2009).

Deposition of John Varley, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-
13555 (JMP) (Bankr. S.D.N.Y. Sep. 11, 2009).

Deposition of Mark J. Shapiro, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No.
08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 7, 2009).

Deposition of Martin Kelly, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-
13555 (JMP) (Bankr. S.D.N.Y. Aug. 18, 2009).

Deposition of Martin Kelly, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-
13555 (JMP) (Bankr. S.D.N.Y. Nov. 20, 2009).

Deposition of Michael Klein, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No.
08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 12, 2009).

Deposition of Mike Keegan, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No.
08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 28, 2009).

Deposition of Nancy Denig, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-
13555 (JMP) (Bankr. S.D.N.Y. Aug. 21, 2009).

Deposition of Paolo Tonucci, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No.
08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 14, 2009).

Deposition of Patrick Clackson, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No.
08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 4, 2009).

Deposition of Paul Exall, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-
13555 (JMP) (Bankr. S.D.N.Y. Aug. 27, 2009).

Deposition of Philip E. Kruse, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No.
08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 17, 2009).

Deposition of Rich Ricci, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-
13555 (JMP) (Bankr. S.D.N.Y. Sep. 8, 2009).

Deposition of Robert Azerad, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No.
08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 17, 2009).

Deposition of Robert Edward Diamond Jr., *In re: Lehman Brothers Holdings Inc., et al.,
Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 11, 2009).

Deposition of Saul Burian, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-
13555 (JMP) (Bankr. S.D.N.Y. Dec. 17, 2009).

Contains Highly Confidential Information

Deposition of Stephen King, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 10, 2009).

Deposition of Steven Berkenfeld, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 6, 2009).

**Deposition Exhibits**

| | | | |
|---|---|---|---|
| Exhibit 1 | Exhibit 26 | Exhibit 51 | Exhibit 73B |
| Exhibit 2 | Exhibit 27 | Exhibit 52 | Exhibit 74B |
| Exhibit 3 | Exhibit 28 | Exhibit 53 | Exhibit 75B |
| Exhibit 4 | Exhibit 29 | Exhibit 54 | Exhibit 76B |
| Exhibit 5 | Exhibit 30 | Exhibit 55A | Exhibit 77B |
| Exhibit 6 | Exhibit 31 | Exhibit 55B | Exhibit 78B |
| Exhibit 7 | Exhibit 32 | Exhibit 56A | Exhibit 79B |
| Exhibit 8 | Exhibit 33 | Exhibit 56B | Exhibit 80B |
| Exhibit 9 | Exhibit 34 | Exhibit 57A | Exhibit 81B |
| Exhibit 10 | Exhibit 35 | Exhibit 57B | Exhibit 82 |
| Exhibit 11 | Exhibit 36 | Exhibit 58B | Exhibit 83B |
| Exhibit 12 | Exhibit 37 | Exhibit 59B | Exhibit 84B |
| Exhibit 13 | Exhibit 38 | Exhibit 60B | Exhibit 85B |
| Exhibit 14 | Exhibit 39 | Exhibit 61B | Exhibit 86B |
| Exhibit 15 | Exhibit 40 | Exhibit 62B | Exhibit 87B |
| Exhibit 16 | Exhibit 41 | Exhibit 63B | Exhibit 88B |
| Exhibit 17 | Exhibit 42 | Exhibit 64B | Exhibit 89B |
| Exhibit 18 | Exhibit 43 | Exhibit 65B | Exhibit 90B |
| Exhibit 19 | Exhibit 44 | Exhibit 66B | Exhibit 91B |
| Exhibit 20 | Exhibit 45 | Exhibit 67B | Exhibit 92B |
| Exhibit 21 | Exhibit 46 | Exhibit 68B | Exhibit 93B |
| Exhibit 22 | Exhibit 47 | Exhibit 69B | Exhibit 94B |
| Exhibit 23 | Exhibit 48 | Exhibit 70B | Exhibit 95B |
| Exhibit 24 | Exhibit 49 | Exhibit 71B | Exhibit 96B |
| Exhibit 25 | Exhibit 50 | Exhibit 72B | Exhibit 98 |

Contains Highly Confidential Information

| | | | |
|---|---|---|---|
| Exhibit 99 | Exhibit 130 | Exhibit 148B | Exhibit 171A |
| Exhibit 100 | Exhibit 131 | Exhibit 149A | Exhibit 172A |
| Exhibit 101 | Exhibit 132 | Exhibit 149B | Exhibit 173A |
| Exhibit 102 | Exhibit 133 | Exhibit 150A | Exhibit 174 |
| Exhibit 103 | Exhibit 134 | Exhibit 150B | Exhibit 175 |
| Exhibit 104 | Exhibit 135 | Exhibit 151A | Exhibit 176 |
| Exhibit 105 | Exhibit 136A | Exhibit 151B | Exhibit 177 |
| Exhibit 106 | Exhibit 136B | Exhibit 152A | Exhibit 178 |
| Exhibit 107 | Exhibit 137A | Exhibit 152B | Exhibit 179 |
| Exhibit 108 | Exhibit 137B | Exhibit 153A | Exhibit 180 |
| Exhibit 109 | Exhibit 138A | Exhibit 153B | Exhibit 181 |
| Exhibit 110 | Exhibit 138B | Exhibit 154A | Exhibit 182 |
| Exhibit 111 | Exhibit 139A | Exhibit 154B | Exhibit 183 |
| Exhibit 112 | Exhibit 139B | Exhibit 155A | Exhibit 184 |
| Exhibit 113 | Exhibit 140A | Exhibit 155B | Exhibit 185 |
| Exhibit 114 | Exhibit 140B | Exhibit 156A | Exhibit 186 |
| Exhibit 115 | Exhibit 141A | Exhibit 156B | Exhibit 187 |
| Exhibit 116 | Exhibit 141B | Exhibit 157A | Exhibit 188 |
| Exhibit 117 | Exhibit 142A | Exhibit 158A | Exhibit 189 |
| Exhibit 118 | Exhibit 142B | Exhibit 159A | Exhibit 190 |
| Exhibit 119 | Exhibit 143A | Exhibit 160A | Exhibit 191 |
| Exhibit 120 | Exhibit 143B | Exhibit 161A | Exhibit 192 |
| Exhibit 121 | Exhibit 144A | Exhibit 162A | Exhibit 193 |
| Exhibit 122 | Exhibit 144B | Exhibit 163A | Exhibit 194 |
| Exhibit 123 | Exhibit 145A | Exhibit 164A | Exhibit 195 |
| Exhibit 124 | Exhibit 145B | Exhibit 165A | Exhibit 196 |
| Exhibit 125 | Exhibit 146A | Exhibit 166A | Exhibit 197 |
| Exhibit 126 | Exhibit 146B | Exhibit 167A | Exhibit 198 |
| Exhibit 127 | Exhibit 147A | Exhibit 168A | Exhibit 199 |
| Exhibit 128 | Exhibit 147B | Exhibit 169A | Exhibit 200 |
| Exhibit 129 | Exhibit 148A | Exhibit 170A | Exhibit 201 |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| | | | |
|---|---|---|---|
| Exhibit 202 | Exhibit 233 | Exhibit 264 | Exhibit 287A |
| Exhibit 203 | Exhibit 234 | Exhibit 265 | Exhibit 287B |
| Exhibit 204 | Exhibit 235 | Exhibit 266 | Exhibit 288B |
| Exhibit 205 | Exhibit 236 | Exhibit 267 | Exhibit 289B |
| Exhibit 206 | Exhibit 237 | Exhibit 268 | Exhibit 290B |
| Exhibit 207 | Exhibit 238 | Exhibit 269 | Exhibit 291B |
| Exhibit 208 | Exhibit 239 | Exhibit 270 | Exhibit 292B |
| Exhibit 209 | Exhibit 240 | Exhibit 271 | Exhibit 293B |
| Exhibit 210 | Exhibit 241 | Exhibit 272 | Exhibit 294A |
| Exhibit 211 | Exhibit 242 | Exhibit 273 | Exhibit 294B |
| Exhibit 212 | Exhibit 243 | Exhibit 274 | Exhibit 295A |
| Exhibit 213 | Exhibit 244 | Exhibit 275 | Exhibit 295B |
| Exhibit 214 | Exhibit 245 | Exhibit 276 | Exhibit 296A |
| Exhibit 215 | Exhibit 246 | Exhibit 277 | Exhibit 296B |
| Exhibit 216 | Exhibit 247 | Exhibit 278 | Exhibit 297A |
| Exhibit 217 | Exhibit 248 | Exhibit 279A | Exhibit 297B |
| Exhibit 218 | Exhibit 249 | Exhibit 279B | Exhibit 298A |
| Exhibit 219 | Exhibit 250 | Exhibit 280A | Exhibit 298B |
| Exhibit 220 | Exhibit 251 | Exhibit 280B | Exhibit 299A |
| Exhibit 221 | Exhibit 252 | Exhibit 281A | Exhibit 299B |
| Exhibit 222 | Exhibit 253 | Exhibit 281B | Exhibit 300A |
| Exhibit 223 | Exhibit 254 | Exhibit 282A | Exhibit 300B |
| Exhibit 224 | Exhibit 255 | Exhibit 282B | Exhibit 301A |
| Exhibit 225 | Exhibit 256 | Exhibit 283A | Exhibit 301B |
| Exhibit 226 | Exhibit 257 | Exhibit 283B | Exhibit 302A |
| Exhibit 227 | Exhibit 258 | Exhibit 284A | Exhibit 302B |
| Exhibit 228 | Exhibit 259 | Exhibit 284B | Exhibit 303A |
| Exhibit 229 | Exhibit 260 | Exhibit 285A | Exhibit 303B |
| Exhibit 230 | Exhibit 261 | Exhibit 285B | Exhibit 304A |
| Exhibit 231 | Exhibit 262 | Exhibit 286A | Exhibit 304B |
| Exhibit 232 | Exhibit 263 | Exhibit 286B | Exhibit 305A |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| | | | |
|---|---|---|---|
| Exhibit 305B | Exhibit 333 | Exhibit 358A | Exhibit 388B |
| Exhibit 306A | Exhibit 334 | Exhibit 359A | Exhibit 389A |
| Exhibit 306B | Exhibit 335 | Exhibit 360A | Exhibit 389B |
| Exhibit 307A | Exhibit 336 | Exhibit 361A | Exhibit 390A |
| Exhibit 307B | Exhibit 337A | Exhibit 362A | Exhibit 390B |
| Exhibit 308A | Exhibit 337B | Exhibit 363A | Exhibit 391A |
| Exhibit 308B | Exhibit 338A | Exhibit 364A | Exhibit 391B |
| Exhibit 309B | Exhibit 338B | Exhibit 365A | Exhibit 392A |
| Exhibit 310B | Exhibit 339A | Exhibit 366A | Exhibit 392B |
| Exhibit 311B | Exhibit 339B | Exhibit 367A | Exhibit 393A |
| Exhibit 312B | Exhibit 340A | Exhibit 368A | Exhibit 393B |
| Exhibit 313B | Exhibit 341A | Exhibit 369A | Exhibit 394A |
| Exhibit 314B | Exhibit 342A | Exhibit 370A | Exhibit 394B |
| Exhibit 315B | Exhibit 343A | Exhibit 371A | Exhibit 395A |
| Exhibit 316 | Exhibit 344A | Exhibit 372A | Exhibit 395B |
| Exhibit 317 | Exhibit 345A | Exhibit 373A | Exhibit 396A |
| Exhibit 318 | Exhibit 346A | Exhibit 374A | Exhibit 396B |
| Exhibit 319 | Exhibit 347A | Exhibit 375A | Exhibit 397A |
| Exhibit 320 | Exhibit 348A | Exhibit 376A | Exhibit 397B |
| Exhibit 321 | Exhibit 349B | Exhibit 377A | Exhibit 398A |
| Exhibit 322 | Exhibit 350B | Exhibit 378 | Exhibit 399A |
| Exhibit 323 | Exhibit 351A | Exhibit 379 | Exhibit 400A |
| Exhibit 324 | Exhibit 351B | Exhibit 380 | Exhibit 401A |
| Exhibit 325 | Exhibit 352A | Exhibit 381 | Exhibit 402A |
| Exhibit 326 | Exhibit 352B | Exhibit 382 | Exhibit 403A |
| Exhibit 327 | Exhibit 353A | Exhibit 383 | Exhibit 404A |
| Exhibit 328 | Exhibit 353B | Exhibit 384 | Exhibit 405A |
| Exhibit 329 | Exhibit 354A | Exhibit 385 | Exhibit 406A |
| Exhibit 330 | Exhibit 355A | Exhibit 386 | Exhibit 407A |
| Exhibit 331 | Exhibit 356A | Exhibit 387 | Exhibit 408A |
| Exhibit 332 | Exhibit 357A | Exhibit 388A | Exhibit 409A |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| | | | |
|---|---|---|---|
| Exhibit 410A | Exhibit 439 | Exhibit 463B | Exhibit 484 |
| Exhibit 411A | Exhibit 440 | Exhibit 464A | Exhibit 485 |
| Exhibit 412A | Exhibit 441 | Exhibit 464B | Exhibit 486 |
| Exhibit 412b | Exhibit 442 | Exhibit 465A | Exhibit 487 |
| Exhibit 413A | Exhibit 443 | Exhibit 465B | Exhibit 488 |
| Exhibit 413B | Exhibit 444 | Exhibit 466A | Exhibit 489 |
| Exhibit 414B | Exhibit 445 | Exhibit 466B | Exhibit 490 |
| Exhibit 415B | Exhibit 446 | Exhibit 467A | Exhibit 491 |
| Exhibit 416B | Exhibit 447 | Exhibit 467B | Exhibit 492 |
| Exhibit 417B | Exhibit 448 | Exhibit 468A | Exhibit 493 |
| Exhibit 418B | Exhibit 449 | Exhibit 468B | Exhibit 494 |
| Exhibit 419B | Exhibit 450 | Exhibit 469A | Exhibit 495 |
| Exhibit 420B | Exhibit 451 | Exhibit 469B (color) | Exhibit 496 |
| Exhibit 421B | Exhibit 452 | Exhibit 469B | Exhibit 497 |
| Exhibit 422B | Exhibit 453 | Exhibit 470A | |
| Exhibit 423B | Exhibit 454 | Exhibit 470B | |
| Exhibit 424 | Exhibit 455 | Exhibit 471B | |
| Exhibit 425 | Exhibit 456 | Exhibit 472B (color) | |
| Exhibit 426 | Exhibit 457A | Exhibit 472B | |
| Exhibit 427 | Exhibit 457B | Exhibit 473B | |
| Exhibit 428 | Exhibit 458A | Exhibit 474B | |
| Exhibit 429 | Exhibit 458B | Exhibit 475B | |
| Exhibit 430 | Exhibit 459A | Exhibit 476B | |
| Exhibit 431 | Exhibit 459B | Exhibit 477B | |
| Exhibit 432 | Exhibit 460A | Exhibit 478B | |
| Exhibit 433 | Exhibit 460B | Exhibit 479B | |
| Exhibit 434 | Exhibit 461A | Exhibit 480B | |
| Exhibit 435 | Exhibit 461B | Exhibit 481B | |
| Exhibit 436 | Exhibit 462A | Exhibit 482 | |
| Exhibit 437 | Exhibit 462B | Exhibit 483 | |
| Exhibit 438 | Exhibit 463A | | |

Contains Highly Confidential Information

**Legal Filings**

Affidavit of Daniel McIsaac, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Oct. 5, 2009).

Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 14, 2008).

Affidavit of Service, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 15, 2009).

Appendix to Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief: Volume I, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

Appendix to Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief: Volume II, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

Appendix to Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief: Volume III, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

Appendix to Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief: Volume IV, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

Appendix to Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief: Volume V, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

Appendix Volume I to Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a) Fed. R. Civ. P. 60(b) and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. § 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustees Motions for an Order Under Rule 60(b) to Modify Sale Order, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y.).

Appendix Volume II to Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a) Fed. R. Civ. P. 60(b) and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. § 105(a), 363, and 365 and Federal Rules

Expert Report of Professor Paul Pfleiderer                                                              Page 92

Contains Highly Confidential Information

of Bankruptcy Procedure 2002, 6004, and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustees Motions for an Order Under Rule 60(b) to Modify Sale Order, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y.).

Appendix Volume III to Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a) Fed. R. Civ. P. 60(b) and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. § 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustees Motions for an Order Under Rule 60(b) to Modify Sale Order, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y.).

Assumption and Assignment of Contracts Relating to the Purchased Assets, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 19, 2008).

Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 15, 2009).

Debtor's Reply in Further Support of its Motion for an Order, Pursuant to Fed.R.Bankr.P.2004, Authorizing Discovery from Barclays Capital, Inc., *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. June 23, 2009).

Debtors' First Rule 30(b)(6) Deposition Notice to Barclays on Issues Pertaining to Exchange-Traded Derivatives and Exchange Deposits Under the Asset Purchase Agreement, *In re: Lehman Brothers* Holdings Inc., et al., Debtors., Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 04, 2009).

Debtors' Motion to (A) Schedule A Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 17, 2008).

Debtors' Second Rule 30(b)(6) Deposition Notice to Barclays on Issues Relating to the Transfer of Assets, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug 4, 2009).

Debtors' Second Rule 30(b)(6) Deposition Notice to Barclays on Issues Relating to the Transfer of Assets, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug 4, 2009).

Contains Highly Confidential Information

Debtors' Third Rule 30(b)(6) Deposition Notice to Barclays on Issues Pertaining to Exchange-Traded Derivatives and Exchange Deposits, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 12, 2009).

Declaration of James B. Kobak Jr. in Support of The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively for Certain Limited Relief Under Rule 60(b), *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Sep. 15, 2009).

Declaration of Saul E. Burian in Support of Limited Objection of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. to SIPA Trustee's Motion Under 11 U.S.C. § § 105 and 363 and Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement , *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Dec. 19, 2008).

Declaration of Shari D. Leventhal in Support of Trustee's Motion for Entry of an Order Approving a Settlement Agreement, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

Declaration of William R. Maguire in Support of The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively for Certain Limited Relief Under Rule 60(b), *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Sep. 15, 2009).

Exhibits to Order, Pursuant to Fed. R. Bankr. P. 2004, Authorizing Discovery from Barclays Capital, Inc., *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. May 18, 2009).

Hearing Transcript (excerpt), *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 17, 2008).

Hearing Transcript, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 19, 2008).

Hearing Transcript, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Jun. 24, 2009).

JP Morgan Chase Subpoena in a Case Under the Bankruptcy Code, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Oct. 27, 2009).

Letter to Honorable James M. Peck, United States Bankruptcy Judge, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Sep. 15, 2009).

Motion of Debtor and Debtor in Possession for an Order Pursuant to Fed R. Bankr.P.2004, Authorizing Discovery From Barclays Capital, Inc., *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. May 18, 2009).

Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006 Authorizing and Approving (A) Sale of Purchased

Contains Highly Confidential Information

Assets Free and Clear of Liens and Other Interests and (B) Assumptions and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Sep. 15, 2009).

Motion Under 11 U.S.C. § § 105 and 363 and Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Dec. 5, 2008).

Notice of Hearing on the Trustee's Motion for Relief Pursuant to the Sale Order or Alternatively, for Certain Limited Relief Under Rule 60(b), *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Sep. 15, 2009).

Objection of Barclays Capital Inc. to Debtors' Motion for an Order Under Rule 2004 Authorizing Discovery of Barclays Capital Inc., *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. June 5, 2009).

Objection to Motion of the Debtors, Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3), for Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice Thereof and Approval of the Proof of Claim Form, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. June 11, 2009).

Order Under 11 U.S.C. § § 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchase)) Assets Free An)) Clear of Liens and Other Interests An)) (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 19, 2009).

Order Under 11 U.S.C. § § 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 17, 2008).

Scheduling Order Concerning Certain Motions Filed by LBHI, SIPA Trustee and Creditors Committee, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Oct. 27, 2009).

The Trustee's Joinder in Debtors' Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 15, 2009).

The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Sep. 15, 2009).

Contains Highly Confidential Information

The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively for Certain Limited Relief Under Rule 60(b), *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Sep. 15, 2009).

The Trustee's, Debtors' and Creditors' Committee's Second Set of Requests for Production of Documents and Things, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Dec. 23, 2009).

Trustee's First Interim Report for the Period September 19, 2008 through May 29, 2009, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y.).

Trustee's Second Interim Report for the Period May 30, 2009 through November 11, 2009 *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y.).

**Publicly Available Documents**

Databases

Bloomberg LP

Capital IQ

Newspaper Articles, Business Commentary

"CFTC Statement Regarding Barclays Purchase of Lehman Futures Business," *Commodity Futures Trading Commission Press Release* (Sep. 20, 2008).

"North American Leisure Deal of the Year 2007 – Meadowlands Stadium: Split Decision," *Project Finance Magazine* (Feb. 2008).

"Statement on Proposed Acquisition of Lehman Brothers, Inc., by Barclays," *SEC Press Release* (Sep. 17, 2008).

Aaron Kuriloff and Michael McDonald, "NFL's Giants Redeeming $100 Million in Auction Debt (Update3)," *Bloomberg Online*, (April 15, 2008).

Jeffrey McCracken, "Lehman's Chaotic Bankruptcy Filing Destroyed Billions in Value," *Wall Street Journal* (Dec. 29, 2008).

Judith Burns, "SEC Gives Firms More Leeway in Pricing Asset-Backed Issues," *Wall Street Journal* (Mar. 31, 2008).

Liz Rappaport, "Firms Fight Banks Over Billions in Frozen Notes," *Wall Street Journal* (Jan. 2, 2010).

Contains Highly Confidential Information

Publications by Organizations

Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 157, *Fair Value Measurements* (Sept. 2006, as amended 2008), at FAS157-10 to FAS157-12.

Barclays PLC, *Results Announcement 2008* (Feb. 9, 2009).

Lehman Brothers, *Equity Linked Notes: An Introduction* (April 2001).

Webpages

Bloomberg, "About Bloomberg: Product Data," *available at* http://about.bloomberg.com/product_data.html (visited Dec. 31, 2009).

Bloomberg, "About Bloomberg: Product Equities," *available at* http://about.bloomberg.com/product_equities.html (visited Dec. 31, 2009).

**Other Miscellaneous Documents**

Barclays Capital, *Fixed Income Credit Products - Price Testing Policy* (Dec. 2008).

Barclays Capital, *Global Finance Credit Products - Price Testing Policy* (Aug. 2008).

Barclays Capital, *Product Control - Price Testing Policy V 1.2* (May 2009).

Gary Romain, Barclays Capital, "Lehman Acquisition Assets Summary – Post acquisition gains and losses for acquired inventory" (Jan. 2010).

PwC work papers contained in Barclays' document production in response to Document Request No. 3 of The Trustee's, Debtor's, and Creditors' Committee's First Set of Requests for Production of Documents and Things, dated October 30, 2009 (BCI-EX-00247453 – BCI-EX-00295654).

Document titled "Lehman OBS IPV Valuation Methodology_3.doc," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009).

E-mail from Duane McLaughlin to David Murgio et al., re: "Schedules A and B for Filing – FINAL" (Sep. 29, 2008) *with attached excel workbook.*

Email from James McDaniel to Edward Rosen, re: "Understandings relating to the transfer of LBI's accounts at OCC" (Sep. 21, 2008).

Email from Michael McGarvey to Francis Pearn and Gerard Reilly, re: "Here's the summary from the 12[th]" (Sep. 16, 2008 14:23 GMT) *attaching* LBI Balance Sheet by GAAP Asset Type workbook.

E-mail from Michael McGarvey to Gerard Reilly et al., re: "CUSIP Transferred to Barclays Master File" (Sep. 22, 2008 GMT 17:37) *with seven attached excel workbooks.*

Email from Stephen King to Liz James et al., re: "no subject" (Sep. 22, 2008).

Contains Highly Confidential Information

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 12 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt912.xls," (Sep. 12, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 15 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt915.xls," (Sep. 15, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 16 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt916.xls," (Sep. 16, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 17 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt917.xls," (Sep. 17, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 18 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt918.xls," (Sep. 18, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 19 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt919.xls," (Sep. 19, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 22 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt922.xls," (Sep. 22, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 30 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt930.xls," (Sep. 30, 2008).

Spreadsheet titled "Acquisition Detail (PWC Day1) 09-22 Final Nu5.xls," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009).

Spreadsheet titled "Acquisition Detail (PWC Day1) 09-22 Final Nu5.xls," *attached to* E-mail from Sean Teague to Karen Hong, re: "Lehman P1 - (near) complete" (Feb. 5, 2009).

Spreadsheet titled "GR Long Island - Acquisition Balance Sheet 28.01.2009.xls," *attached to* Email from Andrew Daly to Gary Romain, re: "GR Long Island - Acquisition Balance Sheet 28.01.2009.xls" (Feb. 5, 2009).

Spreadsheet titled "LBI_BS_917_V with adjustment.xls," *attached to* Email from David Descoteau, Lazard, to Barry Ridings et al., Lazard NYC, re: "LBI_BS_917_V with adjustment.xls," Bates No. LAZ-C-00050306 (Sep. 19, 2008).

Spreadsheet titled "Lehman Asset P_3 12-22-2008_(JPM) Final 2.xls," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009).

Spreadsheet titled "New LBI Firm Asset List A 12312008 v2.xls," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009).

Spreadsheet titled "New LBI Firm Asset List B 12312008 (B.1) v6.xls," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009).

Email from Daniel Long to Jasen Yang et al., re: "Proj LI 9/19 collateral file" (Sep. 19, 2008) *attaching* "Master List_unique 6_44pm.xls."

Email from Daniel Long to Marty Malloy et al., re: "Master list of the DTC and Fed Wire from Lehman on 9-18" (Sep. 19, 2008) *attaching* "Master List.xls."

Email from David Petrie to Daniel Long et al., re: "Master List_unique_mod.xls" (Sep. 19, 2008) *attaching* "Master List_unique_mod.xls."

Contains Highly Confidential Information

Email from Duane McLaughlin to David Murgio et al., re: "Schedules A and B for Filing" (Sep. 29, 2008) *with attached "Schedule A" and "Schedule B" spreadsheets.*

Email from Edwin Lee to Doug Warren et al., re: "LBI Files" (Sep. 19, 2008) *attaching* "LBI Short and Long Inventory Detail (Corp Debt) excl Eq division Corp Debt.xls," "lbi-unknown-red-flag.xls," "lbi-converts.xls," "lbi-em.xls," "lbi-europe.xls," and "lbi-unknown."

Email from Gary Romain to James Walker et al., re: "Balance sheet" (Sep. 21, 2008) *attaching* "Long Island – Acquisition Summary.xls."

Email from Gary Romain to James Walker et al., re: "Draft acquisition balance sheet" (Sep. 25, 2008) *attaching* "Long Island – Acquisition Balance Sheet.xls."

Email from Gary Romain to Kim Cunningham et al., re: "Balance Sheet" (Nov. 10, 2008) *attaching* "Long Island – Acquisition Balance Sheet.xls."

Email from Gary Romain to Patrick Clackson et al., re: "OBS" (Jan. 27, 2009) *attaching* "Long Island – Acquisition Balance Sheet.xls."

Email from Gary Romain to TJ Gavenda et al., re: "LI balance sheet with uncertainties" (Oct. 25, 2008) *attaching* "Long Island – Acquisition Balance Sheet.xls."

Email from Gerard LaRocca to Mike Keegan, re: "Totals for the Fed Facility Collateral" (Sep. 19, 2008) *with attachment.*

Email from James Hraska to John Rodefeld et al., re: "Repo Trade" (Sep. 20, 2008) *attaching* "BarCap collateral-09.18.08.jh.xls."

Email from James Hraska to Nancy Denig et al., re: "Purchased & Excluded Mortgage Asset Files" (Sep. 18, 2008) *attaching* "Excluded Mortgage Assets 09-17-2008.xls."

Email from James Hraska to Robert Azerad et al., re: "Financing Facility Schedule" (Sep. 22, 2008) *attaching* "Tri09192008 (3).xls," "BarCap collateral-09.18.08.jh.xls," "barcap pldg 09 22 08 dtc-only.xls."

Email from Jasen Yang to Daniel Long and Hogan Chen, re: "Complete position of Lehman collateral" (Sep. 20, 2008) *attaching* "Lehm pos 9-19.xls."

Email from Jasen Yang to Daniel Long, re: "Urgent - Schedules" (Oct. 14, 2008) *with three untitled workbooks.*

Email from Jasen Yang to Eric Yoss et al., re: "Lb" (Sep. 21, 2008) *attaching* "Lehm Position 2008-09-19 (Thurs Close)(Sun 1030AM).xls."

Email from Jasen Yang to Gerard LaRocca et al., re: "Urgent - Schedules" (Sep. 26, 2008) *attaching* "Barclays Financing Collateral List (Barc Ops) 09-20-2008.xls", "Friday transfers BONY records agreed.xls", and "DTC 074 and 636 AVAILABLE COLL.xls."

Email from Jasen Yang to James Walker., re: "Lb" (Sep. 21, 2008) *attaching* "Lehm Position 2008-09-19 (Thurs Close) (Sun 1030AM).xls."

Email from Jasen Yang to John Haley et al., re: "Complete position of Lehman collateral" (Sep. 20, 2008) *attaching* "Copy of lehman9-18pos.xls," "Lehman Pledged Collateral.xls," "Residual

Contains Highly Confidential Information

N24 Box 13.5 Million.csv," "PDCF bzw689 11909+ Bill.csv." "Remaining MOP – 210 Mill.csv" and "BZW948-38854095571-85.csv."

Email from Jasen Yang to Nathaniel Hartley et al., re: "Master List_unique (2).xls" (Sep. 19, 2008) *attaching* "Master List_unique 2pm.xls."

Email from Jasen Yang to Robert Azerad et al., re: "Financing Facility Schedule" (Sep. 22, 2008) *attaching* "Barclays Financing Collateral.xls."

Email from Jason Yang to Eric Yoss et al., re: "Lb" (Sep. 21, 2008) *attaching* "Lehm Position 2008-09-19 (Thurs Close) (Sun 1030 AM).xls."

Email from Jason Yang to James Walker et al., FW: "Lb" (Sep. 21, 2008) *attaching* "Lehm Position 2008-09-19 (Thurs Close) (Sun 1030 AM).xls."

Email from John Diagostini to Jim Beckenhaupt et al., re: "PDCF" (Sep. 19, 2008) *attaching* "Market Value PDCF.xls."

Email from John Grenier to Chris O'Meara, re: "Final Balance Sheet" (Sep. 18, 2008) *attaching* "bs5.xls."

Email from John Grenier to Tim Sullivan, re: "Balance Sheet Iterations" (Sep. 18, 2008) *attaching* "Consolidated Balance Sheets.pdf."

Email from John Haley to Daniel Long, re: "Bony_Price 9-19 clean.xls" (Sep. 22, 2008) *attaching* "Bony_Price 9-19 clean.xls."

Email from John Rodefeld to Gerard LaRocca, re: "Purchase & Excluded Mortgage Asset Files" (Sep. 29, 2008) *attaching* "Excluded Mortgage Assets 09-17-2008.xls."

Email from Keith Kochie to John Haley et al., re: "Lehman Deal Collateral 9-19 EOD" (Sep. 20, 2008) *attaching* "LEHMAN PDCF BZW689 – 9-19.csv," "N24 LEHMAN Residual 9-19.csv," "MOP – LEHMAN Residual 9-19.csv," "Tri-Email:[OTBGZ_20080919.Z].

Email from Marie Stewart to Laura Faviano, re: "systems/process write ups for MTS, ITS, ADP and DBS" (Dec. 09, 2008) *attaching* "MTS Financing Narrative.doc," and "MTS Inventory Close Narrative.doc."

Email from Nathaniel Hartley to Jasen Yang, re: "Master List_unique (2).xls" (Sep. 19, 2008) *attaching* "Master List_unique (2).xls."

Email from Paolo Tonucci to David Petrie et al., re: "Box Positions" (Sep. 22, 2008) *attaching* *untitled spreadsheet.*

Email from Paolo Tonucci to Stephen King, re: "Non Actionable Box as of 0918.xls" (Sep. 19, 2008) *attaching* "Non Actionable Box as of 0918.xls."

Email from Ricky Policke to John Haley, re: "no subject" (Sep. 18, 2008) *attaching* "fed-091608.xls."

Email from Robert Azerad to Jasen Yang et al., re: "Financing Facility Schedule" (Sep. 22, 2008) *attaching* "Barclays Financing Collateral List (Barc Ops) 09-20-2008.xls."

Email from Ryan Babcock to Jasen Yang, re: "PMTG Haircut Summary (09-21-2008).xls" (Sep. 21, 2008) *attaching* "PMTG Haircut Summary (09-21-2008).xls."

Contains Highly Confidential Information

Email from Sean Teague to Andrew Pickett et al., re: "Pine CCS – memo and supporting pricing documentation-" (Jan. 14, 2009) *attaching* "PINE CCS LTD[1].-October 2008.pdf," "bfm239C.jpg," "Pine CCS BBF.gif," "Pine CCS BBG Rating History.gif," "PineII.xls," and "Pine CCS Valuation Memo (PCG)."

Email from Sean Teague to Jasen Yang et al., re: "Proj LI 9/19 collateral file" (Sep. 19, 2008) *attaching* "Master List_unique 2pm PT.xls."

Email from Sean Teague to Jeannie Chang et al., re: "Updated: Lehman at close audit – Price testing for rates" (Feb. 24, 2009).

Email from Sean Teague to Jonathan Shaw and Gary Romain, re: "Urgent Request" (Jan. 06, 2010) *attaching* "Sched B-Inventory LehOBS 6.xls."

Email from Stephen King to Jason Yang, Fw: "Fed and DTC 9-18 (3).xls" (Sep. 18, 2008) *attaching* "Fed and DTC 9-18 (3).xls."

Email from to Ricky Policke to John Haley, (Sep. 18, 2008) *attaching* "fed-091608.xls."

Email from Usmanpatel Biradar to John Haley and Steven Rosenthal re: "Bony extract" (Sep. 22, 2008) *attaching* "market_val.zip."

Email from Victor I Lewkow to Gerard LaRocca et al., re: "Non Actionable Box" (Sep. 21, 2008) *attaching* "Non Actionable Box as of 0918.xls."

Excel Version of files attached to email from Mary Korycki to James Fogarty et al., (Sep. 29, 2008) *titled* "Exhibit A-1, A-2 – Barclays Financing Collateral List.xls", "Exhibit B-1, B-2, B-3 – DTC 074 and 636 AVAILABLE COLL," "Exhibit B-4 – Friday transfers BONY records agreed," "Exhibit B-5 – 636 Collateral," and "Exhibit B-6 – Schedule B Final."

Email from Duane Mclaughlin to David Murgio et al., re: "Schedules A and B for Filing" (Sep. 29, 2008) *with attached "Schedule A" and "Schedule B" spreadsheets.*

Workbook of Unpurchaseable securities titled "Book1.xls."

Workbook titled "(September 19th $1.035).xls."

Workbook titled "(September 29th - 636).xls."

Workbook titled "(September 30th 074).xls."

Workbook titled "(September 30th 074-equity).xls."

Workbook titled "6. 12-16-2008 JPM Settlement.xls."

Workbook titled "Copy of Lehman Schedule July 2009_2.xls."

Workbook titled "DocReq122809.xls."

Workbook titled "DTC Collateral Lehman Marks.xls."

Workbook titled "Fed and DTC 9-18 (3).xls."

Workbook titled "Fed cusips cob 9.16.xls."

Workbook titled "fed-091608.xls."

Workbook titled "Final  Lehman Position File v1.xls."

Contains Highly Confidential Information

Workbook titled "LBI Short and Long Inventory Detail (Corp Debt) excl Eq division Corp Debt.xls."

Workbook titled "lbi-converts.xls."

Workbook titled "lbi-em.xls."

Workbook titled "lbi-europe.xls."

Workbook titled "lbi-unknown.xls."

Workbook titled "lbi-unknown-red-flag.xls."

Workbook titled "LEH Collateral Rodefeld 5101 & 7256.xls."

Workbook titled "LEH Haircut File 9-22.xls."

Workbook titled "Lehman Intangible asset and amortization__Final.xls."

Workbook titled "Market Value PDCF.xls."

Workbook titled "Sched B LehOBS 5.xls."

Contains Highly Confidential Information

## APPENDIX THREE

### ASSET TYPES TRANSFERRED TO BARCLAYS

| Security Type (per Bloomberg) | Count | Market Value ($) [1] Sept. 22, 2008 |
|---|---|---|
| ABS Home | 27 | 29,653,767 |
| ABS Other | 138 | 386,292,283 |
| Adjustable, Convertible to Fixed | 1 | 14,100 |
| Adjustable | 105 | 237,237,043 |
| Adjustable, OID | 1 | 9,880,000 |
| ADR | 169 | 560,692,726 |
| Agency ABS Other | 2 | 651,399 |
| Agency CMO FLT | 38 | 427,677,557 |
| Agency CMO INV | 27 | 81,276,478 |
| Agency CMO IO | 347 | 768,931,696 |
| Agency CMO Other | 149 | 1,012,447,610 |
| Agency CMO PO | 214 | 1,638,712,495 |
| Agency CMO Z | 16 | 53,563,468 |
| Basket WRT | 1 | - |
| CF | 6 | 641,358,622 |
| Closed-End Fund | 88 | 38,489,382 |
| CMBS | 76 | 271,641,937 |
| Common Stock | 2,686 | 5,531,020,176 |
| CPI Linked | 1 | 38,000 |
| Domestic MTN | 175 | 411,691,381 |
| Equity WRT | 54 | 693,346 |
| ETP | 138 | 1,624,824,194 |
| Euro MTN | 4 | 20,948,213 |
| | | (continued on next page) |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| Security Type (per Bloomberg) | Count | Market Value ($) [1]<br>Sept. 22, 2008 |
|---|---|---|
| Euro-Dollar | 22 | 25,023,677 |
| Fixed | 301 | 98,069,886 |
| Fixed, OID | 125 | 22,137,099 |
| Floating | 1 | 750 |
| GDR | 3 | 8,293 |
| Global | 329 | 1,821,841,389 |
| Inter. Appreciation, OID | 1 | 605,900 |
| Ltd Partnership | 68 | 558,599,690 |
| MBS 10yr | 48 | 34,126,078 |
| MBS 15yr | 659 | 1,959,125,312 |
| MBS 20yr | 166 | 415,067,033 |
| MBS 30yr | 1,832 | 4,527,357,468 |
| MBS ARM | 134 | 891,404,118 |
| MBS Balloon | 5 | 395,019 |
| MBS Other | 164 | 1,213,405,644 |
| Misc. | 7 | 3,555,664 |
| NY Registered Shares | 2 | 4,864,241 |
| Private Placement | 156 | 1,088,373,174 |
| Private | 11 | 11,729,655 |
| Private Comp. | 3 | - |
| Private CMO Floating | 183 | 476,504,578 |
| Private CMO Inverse | 1 | 3,099,649 |
| Private CMO Interest Only | 122 | 123,478,028 |
| | | (continued on next page) |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| Security Type (per Bloomberg) | Count | Market Value ($) [1] Sept. 22, 2008 |
|---|---|---|
| Private CMO Other | 394 | 463,063,281 |
| Private CMO Principal Only | 24 | 15,886,521 |
| Public | 174 | 127,044,377 |
| REIT | 81 | 120,649,228 |
| Right | 2 | - |
| Royalty Trust | 8 | 317,197 |
| Tracking Stock | 5 | 8,874,412 |
| Unit | 22 | 92,712,099 |
| U.S. Domestic | 504 | 3,577,436,771 |
| U.S. Government | 380 | 10,791,323,954 |
| Yankee | 26 | 69,454,201 |
| Zero Coupon | 2 | 4,269 |
| Zero Coupon, OID | 18 | 34,571,763 |
| N/A (Field Not Applicable) | 9 | 147,842 |
| N/A (Invalid Security) | 288 | 540,862,983 |
| **Grand Total** | **10,743** | **42,868,857,116** |

Sources: Spreadsheet titled "Acquisition Detail (PWC Day1) 09-22 Final Nu5.xls," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009); Bloomberg.

Contains Highly Confidential Information

APPENDIX FOUR

INFORMATION ON SELECTED SECURITIES TRANSFERRED TO BARCLAYS

In this appendix, I briefly summarize available information about selected securities or groups of similar securities acquired by Barclays in the Transaction. The indicated values of most of these securities based on Barclays exit price marks for September 22, 2008, differ significantly from indicated values based on BoNY's marks for September 19, 2008. While my investigation of individual positions and groups of similar positions is on-going, I have formed three preliminary conclusions based on work completed to date:

- First, for many positions of significant indicated value in the Repo Collateral, there is no generally recognized pricing source available and, in fact, there is surprisingly little information available in the public domain (e.g., from the SEC, or from financial websites, or in the financial press) or even from proprietary (i.e., available for purchase) sources of financial information.

- Second, virtually all of the specific securities included in the Repo Collateral (with significant indicated values) for which there are significant differences between Barclays' exit price marks and BoNY's marks represent extremely complex claims on cash flows from bundles of underlying assets that themselves are complex, opaque, and hard to assess.

- Third, based on my initial work, there appears to be strong support and justification for the differences between Barclays' exit price marks and BoNY's marks.

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

I begin this appendix by analyzing several sets of similar securities that Barclays sold shortly after closing the Transaction. These sales allow a direct comparison of BoNY's marks (and in some but not all cases, Barclays' marks) to actual results obtainable in the marketplace in late September of 2008. I then present information on a number of additional positions that contribute significantly to the overall difference between the indicated value of the Repo Collateral based on BoNY's marks and the indicated value of the Repo Collateral based on Barclays exit price marks.

1. **Collateralized ALT-A mortgage obligations issued by Structured Adjustable Rate Mortgage Loan Trust**

The initial inventory acquired by Barclays in the Transaction included positions in 125 different CMOs issued by the Structured Adjustable Rate Mortgage Loan Trust. All are identified in the detailed listing of initial inventory as "US Non-Agency CMOs" backed by ALT-A mortgages (of various vintages). Altogether, at BoNY marks, these positions had an aggregate indicated value of $237.7 million.

Because these positions were sold off quickly, Barclays did not finalize September 22 exit price marks for these positions, but instead valued them for financial accounting purposes at their actual sales value. However, before selling the positions, Barclays had estimated preliminary mid-point marks for these positions as of September 19; the indicated value of the positions at Barclays' preliminary mid-point marks was $197.1 million, which is a reduction of about 20% from the indicated value using BoNY marks.[100]

---

[100] Barclays typically reduced mid-point prices for ALT-A mortgage backed securities by 10% or 15% to adjust them to exit prices, with the size of the adjustment varying across different types of ALT-A products. Thus, had Barclays prepared September 22 exit price marks for these securities, they likely would have been at least 10% lower than these preliminary mid-point marks for September 19.

Contains Highly Confidential Information

Barclays sold all of these positions shortly after the close of the Transaction for total proceeds of $80.2 million, or only about one-third of their indicated value based on BoNY's marks.

## 2. Asset backed securities backed by ALT-A HELOCs issued by Lehman XS Trust

The initial inventory acquired by Barclays in the Fed Replacement Repo included positions in 65 different asset backed securities issued by the Lehman XS Trust. All are identified in the detailed listing of initial inventory as "US ABS Home Equity" backed by ALT-A home equity lines of credit (of various vintages). Altogether, at BoNY marks, these positions had an aggregate indicated value of $171.1 million.

Because these positions were sold off quickly, Barclays did not finalize September 22 exit price marks for these positions, but instead valued them for financial accounting purposes at their actual sales value. However, before selling the positions, Barclays had estimated preliminary mid-point marks for these positions as of September 19; the indicated value of the positions at Barclays' preliminary mid-point marks was $139.8 million, a reduction of about 20% from the indicated value using BoNY marks.

Barclays sold all of these positions shortly after the close of the Transaction for total proceeds of $86.9 million, or just over one-half of their indicated value based on BoNY's marks.

## 3. US Agency collateralized mortgage obligations (Sequentials, PACs, and VADMs)

The initial inventory acquired by Barclays in the Fed Replacement Repo included positions in 65 different CMOs issued by various agencies (Freddie Mac, Ginnie Mae, Federal Home Loan banks, and other) identified in the detailed listing of initial inventory as "US Agency

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

CMO (Sequentials, PACs, and VADMs). Altogether, at BoNY marks, these positions had an aggregate indicated value of $856.1 million.

Although these positions were sold off quickly, Barclays had estimated preliminary mid-point marks for the positions as of either September 19 or September 22.[101] The indicated value of the positions at Barclays' preliminary mid-point marks was $810.8 million, a reduction of about 5% from the indicated value using BoNY marks. Barclays also developed September 22 exit price marks for these positions, by reducing mid-point marks to bid marks. The indicated value of these positions using Barclays' exit price marks was $729.8 million.

Barclays sold all of these positions shortly after the close of the Transaction for total proceeds of $798.1 million. Thus, this sale was completed for proceeds about 7% below the indicated value of the positions at BoNY marks, but approximately mid way between BoNY's marks and Barclays exit price marks. For financial accounting purposes, Barclays used the proceeds from the sale, rather than its lower preliminary estimate of value.

## 4. US Agency CMOs (Complex Floater, Interest Only and Inverse Interest Only)

In its complaint in a recent fraud action (unrelated to this matter), the SEC described some of the "myriad varieties [of CMOs], each with its own yield, price volatility, and risk characteristics." According to the SEC,

"Inverse floaters are variable rate securities with a coupon that is inversely related to a short-term interest rate index, typically the London Interbank Offered rate ("LIBOR"). As the index's interest rates rise, the Inverse Floater's interest payment falls, and vice versa. Inverse Floaters can have poor liquidity and erratic pricing. Inverse Floaters purchased for a premium (i.e., at a price over par) or sold before maturity present price risk to investors (i.e., the investor can lose their original investment).

---

[101] It is not possible to tell with certainty from the detailed support for the initial inventory whether these mid-point marks are for September 19 or September 22.

Contains Highly Confidential Information

"IOs are risky securities because they have no principal component and pay investors solely from the interest payments on the mortgage pool underlying a MBS. IOs are sensitive to market interest rate changes. When market rates fall, homeowners tend to prepay their loans, thereby reducing the number of mortgages available in the underlying pool to make interest payments. If enough mortgages underlying an IO prepay, the entire tranche may 'expire' early, resulting in a loss for investors who had not already recouped their initial investment through interest payments.

"Inverse IOs are a hybrid of Inverse Floaters and IOs. Like IOs, Inverse IOs have no principal component and investors are paid solely from the underlying MBS' interest payments. Like Inverse Floaters, the interest payment for Inverse IOs moves in the opposite direction of a specific short-term interest rate index. In all but limited interest rate environments . . . Inverse IOs display the negative characteristics of both Inverse Floaters and IOs; their price is sensitive to changes in the market interest rate and investors risk losing their investment."

The SEC characterized these types of CMOs as "among the riskiest available," "largely illiquid," and "only suitable for sophisticated investors with a high-risk investment profile." The initial inventory acquired by Barclays in the Fed Replacement Repo included positions in 350 different CMOs identified as "complex floater," "IO," or "Inverse IO," with an aggregate custodial value of $1.196 billion. Reflecting the risk and liquidity characteristics of these instruments, Barclays valued these positions using mid-point marks at $0.774 billion (35.29% below the indicated value at BoNY marks); and reduced this indicated value by another 10% (to $0.697 billion) to establish an indicated value at exit price marks. Given the relevant risks and liquidity issues, Barclays exit-price marks were reasonable and appropriate.

## 5. Lehman-issued warrants and Lehman-issued equity-linked notes

In the initial inventory acquired from LBI, Barclays acquired approximately $203 million of Lehman-issued warrants and Lehman-issued equity-linked notes, valued at custodial marks.

Contains Highly Confidential Information

Because the values of these instruments are closely related to Lehman's own creditworthiness, Barclays wrote off the entire value of these securities.

Lehman's global equity derivatives group produced an introduction to equity linked notes in April of 2001. According to this introduction, "An Equity Linked Note (ELN) is an instrument that provides investors fixed income like principal protection together with equity market upside exposure." An ELN is "structured by combining the economics of a long call option on equity with a long discount bond position"; it is "a debt instrument that differs from a standard fixed income security in that the coupon is based on the return of a single stock, basket of stocks or equity index (the 'underlying equity').

Lehman's introduction to ELNs emphasizes their "significant upside opportunity" and "principal protection feature" and asserts that ELNs "may be appropriate for conservative and risk-averse equity investors or fixed income investors with a long-term bullish view on the equity market." But the instruments are not without risk. Among the "additional considerations" cited in Lehman's introduction is "Creditworthiness of the Issuer. Investors should consider the ability of ELN issuers to repay the principal and interest, if any, at maturity. This will be based n the issuer's credit quality."

As indicated above, Barclays valued Lehman-issued warrants and equity-linked notes at zero for financial accounting purposes. To assess the reasonableness of this devaluation, I gathered daily data on the prices of other direct obligations of LBHI immediately preceding and following LBHI's bankruptcy filing. The prices of these instruments were surprisingly resilient through September 12, but typically lost somewhere between 80% and 90% of their value immediately following LBHI's filing. Given that Lehman-issued ELNs and warrants depend on the creditworthiness of LBHI (or related entities) in much the same way as these direct

Contains Highly Confidential Information

obligations, and given the lack of ready buyers for these securities following LBHI's bankruptcy, this write off of the BoNY-marks indicated value of Lehman-issued equity linked notes and warrants was reasonable and appropriate.

## 6. Giants Stadium Bonds

The initial inventory acquired by Barclays in the Transaction included positions in four related notes issued to provide funding for a new Meadowlands stadium, a joint venture between the New York Giants and the New York Jets. The stadium was financed by $1.3 billion of bond debt, which was shared equally by the two teams ($650 million each). The bonds issued by the Giants had maturity dates of 2029, 2037 and 2047,[102] and consisted of seven series of auction rate securities with interest rates to be set every month.[103] According to Barclays' position detail spreadsheets, Barclays valued the Giants auction rate securities it acquired, for accounting purposes, at their indicated values using BoNY's marks (which ranged from about $10 per $100 of face value to about $44 per $100 of face value), without further downward adjustment.

Markets for auction rate securities encountered severe difficulties beginning early in 2008, with increasing numbers of auctions "failing." These difficulties continued through 2008, and these markets have yet to revive. Since auctions had been the primary mechanism by which holders could reduce (or increase) their holdings, these auction failures made it difficult to for holders of auction rate securities to dispose of their positions.

Conditions in markets for auction rate securities made these securities particularly difficult to value. Some analysts argued that investors who could hold for the long term

---

[102] Project Finance Magazine, February 2008 Deals of the Year – North American Leisure Deal of the Year, Meadowlands Stadium: Split decision.

[103] Aaron Kuriloff and Michael McDonald, NFL's Giants Redeeming $100 Million in Auction Debt (Update3), www.bloomberg.com, last updated April 15, 2008 18:22 EDT.

Contains Highly Confidential Information

eventually would be paid in full; the crisis in auction rate markets was said to be an issue of lack of liquidity rather than deteriorating creditworthiness of the borrowers. But for Barclays purposes, the issue was not what the value of these securities might be in the long run assuming a return to normal conditions, but the value of the positions in an orderly sale under current conditions. Given conditions in the markets for auction rate securities, Barclays exit-price marks were reasonable and appropriate.

### 7. Insurance-related asset backed securities

This section focuses on two related CUSIPs: 45804VAA2 and 45805AAA7 (referred to herein as 'VAA2 and 'AAA7 respectively.) These securities are identified in Lehman's GFS reports as Level III assets, i.e. as securities that can be valued only using unobservable assumptions. According to its books, LBI held non-trivial long positions in these securities of $53 million and $37 million, respectively, on September 12, 2008 (at GFS marks). The 'AAA7 CUSIP and par value appear on the list of securities comprising the Fed Replacement Repo collateral, while the 'VAA2 CUSIP and par value appear on the list of securities transferred to Barclays as part of the December settlement.

Barclays valued the 'VAA2 position (on LBI's books at more than $53 million) at $14.5 million, and valued the 'AAA7 position (on LBI's books at almost $38 million) at $9.9 million. For the two positions combined, this difference in value is approximately 70%. That difference was fully justified by the nature of the securities and the conditions in the markets in which they traded (or more precisely, would have traded if the markets had not been frozen).

I begin by noting that there were no changes in the "clean prices" for these two CUSIPs as reported in LBI's GFS reports for 9/12 through 9/30. Instead, LBI carried these two positions

Contains Highly Confidential Information

on its books at the same value from 9/12 through 9/30. 'VAA2 was recorded with a par value of 58,000,000, a price of 0.922, and a "gross long inventory" value of $53,192,905, with no revisions from 9/12 to 9/30. 'AAA7 was recorded with a par value of 41,500,000, a price of 0.922, and a gross long inventory value of $37,952,309, also with no revisions.

Additional quantities of both 'AAA7 and 'VAA2 show up on Schedule B (4,500,000 and 700,000 of par value respectively). These quantities are not reported on the GFS reports, but are included in the quantities of these two CUSIPs valued by Barclays in preparing the Acquisition Balance Sheet.

The 'AAA7 and 'VAA2 CUSIPs appear to be two of a group of closely related CUSIPs classified on Barclays' position detail spreadsheets as "life insurance" assets. On September 12, 2008, LBI held long positions in approximately 15 different securities (i.e., CUSIPs) from this group. The two CUSIPs examined here represent the largest positions, but others were significant as well. Altogether, LBI's gross long inventory value for its combined holdings of these securities was $166.5 million. Interestingly, all of these securities had exactly the same clean price in GFS every day from 9/12 - 9/30, namely 0.922, which is inconsistent with the hypothesis that Lehman was updating marks daily into the week of 9/15.

Listed below are the "product names" for this group of related securities from GFS, with the product names of 'VAA2 and 'AAA7 listed first and second. Most are classified in GFS as corporate bonds, but three are classified as money market instruments. Many of the product names include one or more of the words "Insurance," "Money Market," and "Auction"

| | |
|---|---|
| Insurance note cap mm notes | corpbond |
| Insurance note capital mm | corpbond |
| Inc money market sec ser2003-328 day auction | corpbond |
| Inc money market sec ser2003-328 day auction | corpbond |

Contains Highly Confidential Information

| | |
|---|---|
| Inc money market sec ser2003-128 day auction | corpbond |
| Rivermont inc | moneymkt |
| Rivermont inc | moneymkt |
| Rivermont inc 2006-3 | moneymkt |
| Inc money market sec ser2003-2 | corpbond |
| Inc money market sec ser2003-2 | corpbond |
| Inc money market sec ser2003-428 day auction | corpbond |
| Inc money market sec ser2003-428 day auction | corpbond |
| Inc money market sec ser2003-528 day auction | corpbond |
| Inc money market sec ser2003-628 day auction | corpbond |
| Inc money market sec ser2003-628 day auction | corpbond |
| Insurance note cap mm note | corpbond |
| Insurance note cap mm note | corpbond |
| Insurance note capital mm | corpbond |
| Insurance note capital mm | corpbond |

At least some of these securities are associated with the name "Insurance Note Capital MMS RL III 2006-x" where x has a value from 1 to 5. This name and the information above suggest that these are structured notes providing financing related to insurance products or activities issued in 2006. Based on publicly available information, at least some of them are auction rate securities (the markets for which completely froze up early in 2008 and continued to be largely frozen today).

The reference to "RL III" in the name above probably refers to River Lake Insurance Company III, which is a nearly-invisible entity owned by or associated with Genworth Life and Annuity Insurance Company, which is a subsidiary of Genworth Financial (which trades on the NYSE under the symbol GNW). Genworth is today, and was three years ago, a major US and international insurance and wealth management company. Between then and now, however, it experienced a near death episode. From above $36 per share in May 2007, its stock price had fallen to $15.25 on 9/15, then fell to $7.60 on 9/29, and then fell to $0.90 on 11/17.

Contains Highly Confidential Information

These securities may have been "credit enhanced" with some kind of support from FGIC, a monoline insurer (like MBIA and AMBAC). Monoline insurers were in very serious trouble in September 2008, and their deterioration sharply reduced whatever value their credit enhancement may have contributed to securities like the ones we are discussing.

Considering these factors, securities backed by Genworth and related entities — with or without credit enhancement by a troubled monoline insurer — were appropriately accorded a low valuation as of September 22, 2008.

## 8. Pine CCS CLO

Pine CCS was a large CLO collateralized by a portfolio of whole loans. According to Bloomberg, Pine was issued in May 2008, with Lehman Brothers serving as the lead manager. The face value of the original issue was $1.025 billion, and the *entire* face value transferred to Barclays in the initial inventory. I have found no evidence that this security ever traded in a public market. Moreover, given that Lehman held the entire face value at the time of the Transaction, it is highly likely that this security was never traded at all, even in a private exchange.

Bank of New York valued the transferred position in Pine at $914,983,902. However, this valuation appears to have been based on an erroneous "factor" (i.e., the percentage of face value actually outstanding); after adjustment for this error, the value of this position at BoNY's mid-point marks should have been $809,467,804. After extensive review and analysis (documented by Barclays' analysts and submitted to PriceWaterhouseCoopers for review) Barclays revalued this position at $571,480,646 at mid-point marks, and at $428,610,484 at exit price marks.

Contains Highly Confidential Information

An internal Barclays valuation memo, prepared by Barclays's Product Control Group, explains the basis for Barclays conclusions as to value at exit price marks:

"'Based on the initial analysis performed by Independent Valuations, the Pine CCS pool of assets was suspect (further confirmed by the attached 10-08 Trustee Report). The portfolio appears to be loans that Lehman was unable to sell individually so in turn they were securitized. When looking through the portfolio you will notice that 12 positions make up 2/3rd of the portfolio which results in highly concentrated risk. The largest position, Archstone, is ~20% of the portfolio based on principal. At the time of the Lehman acquisition, the CMBS market was basically frozen. On September 16th, S&P downgraded all the tranches to CC Rating (Pine CCS Ltd. A-1 CC A- / Pine CCS Ltd. A-2 CC A-  / Pine CCS Ltd. B CC B) as it related to the Lehman bankruptcy. This all contributed to the PCG PT valuation.

"Overall view was that based on (a) the factors relating to the pool composition along with (b) the high concentration and (c) recent downgrade to CC, PCG PT determined a px of $56 was reasonable to which a haircut of 75% of MV should be applied for market and legal uncertainty."

Barclays "due diligence" in marking this unique asset appears thorough and appropriate and justifies Barclays' conclusion as to value at exit price marks.

Contains Highly Confidential Information

APPENDIX FIVE

EXHIBITS

Contains Highly Confidential Information

EXHIBIT 1

POSITIONS COMPRISING THE COLLATERAL TRANSFERRED TO BARCLAYS

IN THE FED REPLACEMENT REPO

PART A – INITIAL INVENTORY

**Exhibit 1, Part A is contained in**

**Volume 2: Trading Portfolio Assets - Position Detail**

Contains Highly Confidential Information

EXHIBIT 1

POSITIONS COMPRISING THE COLLATERAL TRANSFERRED TO BARCLAYS

IN THE FED REPLACEMENT REPO

PART B – JPM INVENTORY

**Exhibit 1, Part B is contained in**

**Volume 2: Trading Portfolio Assets - Position Detail**

Contains Highly Confidential Information

EXHIBIT 2

POSITIONS INCLUDED IN "TRADING PORTFOLIO ASSETS" THAT WERE NOT TRANSFERRED

TO BARCLAYS IN THE FED REPLACEMENT REPO

**Exhibit 2 is contained in**

**Volume 2: Trading Portfolio Assets - Position Detail**

Contains Highly Confidential Information

EXHIBIT 3

SAMPLE OF "SHORT NAMES" OF SECURITIES IN THE REPO COLLATERAL

ABN AMRO MORTGAGE CORP SERIES 2003-7 CLASS A1
Aid-Israel 11-Z 0.0 15 Nov 2009 Rg
Aig 5.6 18 Oct 2016 Rg
ARGENT SECURITIES INC SERIES 2006-M1 CLASS A2B
BANC OF AMERICA MORTGAGE SECURITIES INC SERIES 2003-H CLASS 1A1
BEAR STEARNS ADJUSTABLE RATE MORTGAGE TRUST SERIES 2002-11 CLASS 1A2
Bowater Cana 7.95 15 Nov 2011 Rg
Burlington N 3.0 01 Jan 2047 Rg
CALIFORNIA EARTHQUAKE AUTHORITY
California S 4.25 01 May 2034
CHASE FUNDING MORTGAGE LOAN ASSET-BACKED CERTS SERIES 2003-5 CL 1A4
CIT GROUP HOME EQUITY LOAN TRUST SERIES 2002-1 CLASS AF6
COUNTRYWIDE ASSET-BACKED CERTIFICATES SERIES 2006-5 CLASS 2A2
COUNTRYWIDE HOME LOAN MORTGAGE PASS THROUGH TRUST SERIES 2003-60 CL 2A1
CS FIRST BOSTON MORTGAGE SECURITIES CORP SERIES 2004-AR3 CLASS 5A1
CS FIRST BOSTON MORTGAGE SECURITIES CORPORATION SERIES 2004-AR3 CLASS 3A1
CSAB MORTGAGE BACKED TRUST SERIES 2006-2 CLASS M1
DISGEN 6.22 01 Aug 2038
FFCB 4.875 11 Jan 2016 Rg
FFCB 5.3 23 Dec 2024 Rg
FGH0 6.00 POOL - H01527
FGLMC 5.50 POOL - G02408
FGLMC 6.00 POOL - G02586
FHAR 5.662 POOL - 1G1293
FHL3311 VF
FHL3339 IF
FHL3339 NO
FHLB 4.25 11 Jun 2010 Rg
FHLB 5.5 15 Jul 2036 Rg
FHLBDN 0.0 01 Oct 2008 Rg
FHLMC 5.0 18 Apr 2017 Rg
FHLMC 6.0 15 Jun 2011 Rg
FHS 244 IO
FHS 244 PO
FICS 06 Apr 2013 Coupon Rg
Financing Corporation 1 11 May 2012 Coupon Rg
Fir Un 8.04 01 Dec 2026 Rg

Contains Highly Confidential Information

FIRST HORIZON ALTERNATIVE MORTGAGE SECURITIES SERIES 2006-AA6 CLASS 1A2

FNAR 5.163 POOL – 976646

FNAR 5.253 POOL – 889027

FNCI 4.50 POOL – 906552

FNCT 6.50 POOL - 257185

Fndn 0.0 09 Oct 2008 Rg

FNM07030 QI

FNM07054 HO

FNM07067 PO

FNMA 23 Mar 2028 Principal Rg

FNMA 3.25 09 Apr 2013 Rg

FNMA 4.125 15 Apr 2014 Rg

FNUK 6.00 POOL - 950303

Ford COB2 6.0 20 Mar 2014 MTN Rg

G2SF 5.00 POOL - 003840

G2SF 7.00 POOL - 004087

GE-WMC MORTGAGE SECURITIES LLC SERIES 2005-2 CLASS A2C

Gmac 6.75 01 Dec 2014 Rg

GMAC MORTGAGE CORPORATION LOAN TRUST SERIES 2003-GH1 CLASS A5

GNM07031 BI

GNM07031 BO

GNSF 6.00 POOL - 617754

GNSF 7.00 POOL - 676386

GREENPOINT MANUFACTURED HOUSING SERIES 2001-1 CLASS IA

GSR MORTGAGE LOAN TRUST SERIES 2004-2F CLASS 14A1

ILSMED 2.993 16 Sep 2024

IMPAC CMB TRUST SERIES 2003-8 CLASS 2A1

INC Money Market Secs FRN 31 Dec 2033 144a

INDYMAC RESIDENTIAL ASSET BACKED TRUST SERIES 2005-D CLASS AII3

KFW GMTN 4.375 15 Mar 2018 MTN Rg

LB-UBS COMMERCIAL MORTGAGE TRUST SERIES 2007-C2 CLASS A3

Lehman Bros Holdings Inc BSKT 0 19 Feb 2010 MTN Rg

Lehman Bros Holdings Inc FRN 02 Jun 2023 MTN Rg

LEHMAN BROTHERS HOLDINGS INC

LEHMAN STRUCTURED SECURITIES CORPORATION SERIES 2005-1 CLASS A1

LEHMAN XS TRUST SERIES 2005-2 CLASS 2A1A

LEHMAN XS TRUST SERIES 2006-17 CLASS WF11

LEHMAN XS TRUST SERIES 2006-4N CLASS A1A

Maryland Health & Higher Educational Facilities Carnegie 01 Oct 2037

MDUHGR 4.352 28 May 2024

MOSENV 9.975 01 Dec 2022

New York State Housing Finance 1500 Lex Ave 15 May 2034

Contains Highly Confidential Information

NJSMFH 4.75 01 May 2010
NOMURA ASSET ACCEPTANCE CORPORATION SERIES 2006-AF2 CLASS 1A1
NYC 5.0 01 Mar 2023
NYSCTT 3.732 15 Mar 2021
OPTEUM MORTGAGE ACCEPTANCE CORP SERIES 2006-1 CLASS 1A1A
Pepsiamerica 5.0 01 Jan 2018
PERMANENT FINANCING PLC SERIES 8 CLASS 3A
RENAISSANCE HOME EQUITY LOAN TRUST SERIES 2005-2 CLASS AF4
Residential Capital Corp 9.625 15 May 2015 144a
RFC 15 Oct 2013 Coupon Rg
SDGGEN 7.125 01 Jun 2032
SOUHSG 5.5 01 May 2036
SOUHSG 6.02 01 Oct 2035
STRUCTURED ADJUSTABLE RATE MORTGAGE LOAN TRUST SERIES 2004-2 CLASS 2A
STRUCTURED ADJUSTABLE RATE MORTGAGE LOAN TRUST SERIES 2005-18 CLASS 9A1
STRUCTURED ADJUSTABLE RATE MORTGAGE LOAN TRUST SERIES 2007-5 CLASS 3A2
STRUCTURED ASSET SECURITIES CORP SERIES 2002-5A CLASS 3A
STRUCTURED MORTGAGE ASSET RESIDENTIAL TRUST SERIES 1992-5B CLASS G
TERWIN MORTGAGE TRUST SERIES 2005-14HE CLASS AF2
T-strip 15 Aug 2009 Coupon Rg
T-strip 15 May 2019 Coupon Rg
T-strip 15 May 2022 Coupon Rg
T-strip 15 Nov 2018 Coupon Rg
T-strip 15 Nov 2023 Coupon Rg
Tva 4.875 15 Dec 2016 Rg
Tva 5.98 01 Apr 2036 Rg
UST I/L 2.375 Inflation-Linked 15 Jan 2017 Rg
WACHOVIA BANK COMMERCIAL MORTGAGE TRUST SERIES 2003-C8 CLASS A3
WACHOVIA BANK COMMERCIAL MORTGAGE TRUST SERIES 2007-C30 CLASS A3
WAMU MORTGAGE PASS THROUGH CERTIFICATES SERIES 2003-AR8 CLASS A
WAMU MORTGAGE PASS THROUGH CERTIFICATES SERIES 2003-AR8 CLASS B1
William Lyon 7.5 15 Feb 2014 Rg
XLCAP E 6.5 Fix/Float Perpetual Rg
YORMED 2.993 01 Jul 2021

Contains Highly Confidential Information

EXHIBIT 4

"STICKINESS" IN GFS MARKS FOR LEVEL III SECURITIES

| Product | Product Name | Security Type | Gross Long Inventory ($) 9/12/08 | Clean Market Price | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 9/12/08 | 9/15/08 | 9/16/08 | 9/17/08 | 9/18/08 | 9/19/08 | 9/22/08 |
| 149484XAA6 | CEAGO 2007-1A A1 CEAGO ABD CDO | Mortgage | 367,979,690 | 0.435 | 0.345 | 0.345 | 0.345 | 0.345 | 0.345 | 0.345 |
| 50181QAP3 | LCOR ALEXANDRIA LLC | Corpbond | 88,621,021 | 0.117 | 0.117 | 0.117 | 0.117 | 0.117 | 0.117 | 0.117 |
| 76827RAA9 | INSURANCE NOTE CAP TAXABLE MMS | Corpbond | 65,142,196 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| 45864VAA2 | INSURANCE NOTE CAP MM NOTES | Corpbond | 53,192,905 | 0.914 | 0.914 | 0.914 | 0.914 | 0.914 | 0.914 | 0.914 |
| 11134DAD9 | AMERFUN BROADHOLLOW FDG LLC BROADHOLLOW FUNDING LLC | Mortgage | 47,812,500 | 0.900 | 0.830 | 0.830 | 0.830 | 0.830 | 0.830 | 0.830 |
| 45804QAA3 | INC MONEY MARKET SEC SER2003-428 DAY AUCTION | Corpbond | 47,570,104 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| 45804HAA6 | RIVERMONT INC | Moneymkt | 41,982,577 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| 1US887748 | FLOATEL INTERNATIONAL LTD | Equity | 40,967,264 | 2.000 | 2.000 | 2.000 | 2.000 | 2.000 | 2.000 | 2.000 |
| 00764PAU4 | AERCO 2A A3 AERCO LTD | Mortgage | 40,936,026 | 0.808 | 0.750 | 0.750 | 0.750 | 0.750 | 0.750 | 0.750 |
| 86363BAD7 | SASC 2007-RM1 M2 STRUCTURED ASSET SECURITIES CO | Mortgage | 40,131,146 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 |
| 45805AAA7 | INSURANCE NOTE CAPITAL MM | Corpbond | 37,952,309 | 0.914 | 0.914 | 0.914 | 0.914 | 0.914 | 0.914 | 0.914 |
| 05366VAA6 | ACAP 2000-1A A1 AVIATION CAPITAL GROUP TRUST | Mortgage | 34,059,994 | 0.846 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 |
| 25857BAA4 | DOUBLE OAK CAPITAL TRUST I 28 DAY AUCTION | Corpbond | 33,862,870 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| 73771NAA1 | POTOMAC TRUST CAP 04-VI | Corpbond | 27,570,097 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| 73771AAA3 | POTOMAC TRUST CAPITAL MM SEC | Corpbond | 27,238,909 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| 39350SV90 | GTMH 99-2A5 ASSETBK LOAN GREENTREE MANUFACTURED HSG | Mortgage | 27,027,811 | 0.938 | 0.790 | 0.790 | 0.790 | 0.790 | 0.790 | 0.790 |
| 92922FZD3 | WAMU 2004-RP1 2A WAMU MORTGAGE PASS THROUGH CER | Mortgage | 25,946,674 | 0.925 | 0.925 | 0.925 | 0.925 | 0.925 | 0.925 | 0.925 |
| 86363BAF2 | SASC 2007-RM1 M3 STRUCTURED ASSET SECURITIES CO | Mortgage | 24,503,196 | 0.740 | 0.740 | 0.740 | 0.740 | 0.740 | 0.740 | 0.740 |
| 922219AB6 | VARICK STRUCTURED ASSET FUND LTD FRN 20351101 SERIES# 1A 144A | Mortgage | 23,729,342 | 0.626 | 0.626 | 0.626 | 0.626 | 0.626 | 0.626 | 0.626 |
| 14984XAC2 | CEAGO 2007-1A A2 CEAGO ABD CDO | Mortgage | 23,596,848 | 0.300 | 0.300 | 0.300 | 0.300 | 0.300 | 0.300 | 0.300 |

(continued on next page)

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| Product | Product Name | Security Type | Gross Long Inventory ($) 9/12/08 | Clean Market Price | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 9/12/08 | 9/15/08 | 9/16/08 | 9/17/08 | 9/18/08 | 9/19/08 | 9/22/08 |
| 76827RAB7 | INSURANCE NOTE CAP TAX MMS04-2 | Corpbond | 23,089,160 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| 45804SAA9 | INC MONEY MARKET SEC SER2003-628 DAY AUCTION | Corpbond | 22,833,628 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| 73771WAA1 | POTOMAC TRUST CAP 04-X | Corpbond | 22,608,905 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| 86363AAA5 | SASC 2006-S4 A STRUCTURED ASSET SECURITIES CO | Mortgage | 22,558,219 | 0.500 | 0.500 | 0.500 | 0.500 | 0.500 | 0.500 | 0.500 |
| 73771QAA4 | POTOMAC TRUST CAPITAL MM SEC | Corpbond | 22,233,708 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| 058521AG0 | BALLANTYNE TAXABLE NOTES A3B | Corpbond | 21,602,138 | 0.763 | 0.763 | 0.763 | 0.763 | 0.763 | 0.763 | 0.763 |
| 047468AC7 | ATHILON CAPITAL CORP NOTES SERIES A CORP | Corpbond | 21,320,997 | 0.767 | 0.767 | 0.767 | 0.767 | 0.767 | 0.767 | 0.767 |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

EXHIBIT 5

"STICKINESS" IN GFS MARKS FOR LEVEL II SECURITIES

| Product | Product Name | Security Type | Gross Long Inventory ($) 9/12/08 | Clean Market Price | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 9/12/08 | 9/15/08 | 9/16/08 | 9/17/08 | 9/18/08 | 9/19/08 | 9/22/08 |
| 100891588 | GNMA 3/1 ARM 891588 | Mortgage | 222,447,219 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| 53957DAF0 | LIMAA 2008-1A A2 LOCAL INSIGHT MEDIA FINANCE LL | Mortgage | 134,333,333 | 0.680 | 0.600 | 0.600 | 0.600 | 0.600 | 0.600 | 0.600 |
| 9633SWFU2 | WHISTLEJACKET CAPITAL LLC IN DEFAULT | Corpbond | 123,375,040 | 0.995 | 0.995 | 0.995 | 0.995 | 0.995 | 0.995 | 0.995 |
| 38CTRK70 | LEHMAN MUN TR RCPTS VAR STS FLT-TR-SER 2008-F2W RELATED TOPHLDEPH PA HOS & HIGH 17175 64R/MD 3 10 11/15/23 | Munibond | 118,819,350 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 3BCGXD30 | GIANTS STADIUM LLC AUC28 | Moneymkt | 118,526,977 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 3BCGXD10 | GIANTS STADIUM LLC AUC28 | Moneymkt | 118,401,464 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 3BCGXD20 | GIANTS STADIUM LLC AUC28 | Moneymkt | 118,400,956 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 3BCYWQ10 | LEHMAN MUN TR RCPTS VARIOUS FLT-TR SER 2008-P29W REL TO ALASKA INDL DEV & EXPT AUTH RER/MD 2 15 04/01/2034 | Munibond | 117,295,719 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 29852440 | GEORGETOWN UNIVERSITY SERIES A | Moneymkt | 113,450,513 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| G0969HAA2 | BLHV 2006-1A A1 REG-S BELLE HAVEN ABS CDO LTD | Mortgage | 106,826,030 | 0.650 | 0.550 | 0.550 | 0.550 | 0.550 | 0.550 | 0.550 |
| 52519M205 | LEHMAN BROS / FIRST TR INCOME OPPORTUNITY FD MONEY MKT PFD N/A 09/17/2008 @ 3.622 | Equity | 86,044,000 | 0.980 | 0.980 | 0.980 | 0.980 | 0.980 | 0.980 | 0.980 |
| 53957DAD5 | LIMAA LRS NT 144A 3C7 LOCAL INSIGHT MEDIA FINANCE LL | Mortgage | 76,033,997 | 0.842 | 0.720 | 0.720 | 0.720 | 0.720 | 0.720 | 0.720 |
| 254839179 | DISTRICT OF COLUMBIA 28 DAY SAVER | Moneymkt | 73,940,261 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| 3BCKFP70 | LEHMAN MUN TR RCPTS VAR STS FLOATER TRS SER K34W REG D RELATED TO MASS ST R/MD 2 25 05/01/2037 | Munibond | 67,501,784 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 53352RAA6 | MSHLC 2007-1 A MSDWCC HELOC TRUST | Mortgage | 64,522,924 | 0.715 | 0.680 | 0.680 | 0.680 | 0.680 | 0.680 | 0.680 |
| 361856ER4 | GMACM 2006-HE1 A GMAC MORTGAGE CORP LOAN TRUST | Mortgage | 56,839,609 | 0.665 | 0.605 | 0.605 | 0.605 | 0.605 | 0.605 | 0.605 |

(continued on next page)

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| Product | Product Name | Security Type | Gross Long Inventory ($) 9/12/08 | Clean Market Price | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 9/15/08 | 9/16/08 | 9/17/08 | 9/18/08 | 9/19/08 | 9/22/08 | 9/12/08 |
| 5395TDAG8 | LIMAA 2008-1A B LOCAL INSIGHT MEDIA FINANCE LL | Mortgage | 56,516,854 | 0.480 | 0.400 | 0.400 | 0.400 | 0.400 | 0.400 | 0.400 |
| 52524PAG7 | LXS 2007-6 3A1 LEHMAN XS TRUST | Mortgage | 56,074,350 | 0.810 | 0.810 | 0.810 | 0.810 | 0.810 | 0.810 | 0.810 |
| 52524NAC1 | LBFRC 2007-LLFA A2 LEHMAN BROTHERS FLOATING RATE | Mortgage | 53,090,844 | 0.883 | 0.883 | 0.883 | 0.883 | 0.883 | 0.883 | 0.883 |
| 3BCGXD00 | GIANTS STADIUM LLC AUC28 | Moneymkt | 53,000,198 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 001383DN5 | AIG MATCHED FUNDING CORP | Corpbond | 50,047,569 | 0.996 | 0.996 | 0.996 | 0.996 | 0.996 | 0.996 | 0.996 |
| 373109BL0 | GEORGETOWN UNIVERSITY SER B SAVRS | Moneymkt | 49,905,400 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| 33321260 | CINCINNATI GAS ELECT COMP PROJ | Moneymkt | 46,000,191 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 3BB2YG50 | LEHMAN MUN TR RCPTS VAR STS FLOATER TRS SER K41W REG D RELATED TO CALIF SUTTER HLTH R/MD 2.13 11/15/46 | Munibond | 43,160,000 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 05821AB1 | BALLANTYNE 2006-1A A2A BALLANTYNE RE PLC | Mortgage | 40,759,616 | 0.740 | 0.660 | 0.660 | 0.660 | 0.660 | 0.660 | 0.660 |
| 254839J87 | DISTRICT OF COLUMBIA | Moneymkt | 37,951,202 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| 31474560 | UNIVERSITY MED CHARLESTON B SAVRS | Moneymkt | 36,751,178 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 89147U209 | TORTOISE ENERGY CAP CORP MONEY MKT PFD SER I N/A 10/06/2008 @ 4.976 | Equity | 36,432,000 | 0.990 | 0.990 | 0.990 | 0.990 | 0.990 | 0.990 | 0.990 |
| 53089250 | NEKTAR THERAPEUTICS SUB NT R/MD 3.25 09/28/2012 | Corpbond | 34,757,538 | 69.50 | 69.50 | 69.50 | 69.50 | 69.50 | 69.50 | 69.50 |
| 37295770 | ABILENE TEX HEALTH FACILITY DEV CORP SER-B-SAVRS | Moneymkt | 32,700,341 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 3BCZGJ40 | LEHMAN MUN TR RCPTS VAR STS FLOATER-TR SER 2007-P123W RELTTO UNIVERSITY CALIF REGTS R/MD 2.60 05/15/43 | Munibond | 32,000,686 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 373109BJ5 | GEORGETOWN UNIVERSITY SER A SAVRS | Moneymkt | 31,748,862 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| 52521VAF9 | LBSBC 2007-2 2A3 LEHMAN BROTHERS SMALL BALANCE | Mortgage | 31,344,000 | 0.750 | 0.750 | 0.750 | 0.750 | 0.750 | 0.750 | 0.750 |
| 31397MRZ2 | FNR 2008-76 GF FANNIE MAE | Mortgage | 30,108,083 | 1.002 | 1.002 | 1.002 | 1.002 | 1.002 | 1.002 | 1.002 |

(continued on next page)

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| Product | Product Name | Security Type | Gross Long Inventory ($) 9/12/08 | Clean Market Price | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 9/15/08 | 9/12/08 | 9/15/08 | 9/12/08 | 9/15/08 | 9/12/08 | 9/15/08 | 9/12/08 | 9/15/08 |
| 3BDPGK70 | IDAHO HSG & FIN ASSN SINGLE VAR RATE BONDS 08 SER B-1(AMT) | Munibond | 30,000,213 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 964041AE7 | WHITE MARLIN CDO LTD FRN 20140922 SERIES# 1A 144A | Mortgage | 28,121,866 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 |
| 37011850 | ILLINOIS HEALTH FACILITIES ROCKFORD 94-SAVRS | Moneymkt | 27,650,809 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 36155780 | UNIVERSITY MED & DENTISTRY NJ | Moneymkt | 27,251,559 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 31474590 | UNIVERSITY MED CHARLESTON A SAVRS | Moneymkt | 26,851,178 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 31103150 | CHATTANOOGA TN | Moneymkt | 24,900,181 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 486606205 | KAYNE ANDERSON MLP INVT CO AUCTION RATE PFD SECS SER D N/A 09/18/2008 @ 4.688 | Equity | 23,862,000 | 0.970 | 0.970 | 0.970 | 0.970 | 0.970 | 0.970 | 0.970 | 0.970 | 0.970 |
| 34483850 | NY INSTITUTE OF TECHNOLOGY | Moneymkt | 23,551,347 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 3BCXDS20 | LEHMAN MUN TR RCPTS VAR FLT TR SER 2008-F100W RELATED TO MONTANA ST HEALTH FAC AUTH FACR/MD 3 20/08/01/2014 | Munibond | 22,375,574 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 36242DJW4 | GSMPS 2004-4 2A1 GSMPS MORTGAGE LOAN TRUST | Mortgage | 22,276,710 | 0.920 | 0.920 | 0.920 | 0.920 | 0.920 | 0.920 | 0.920 | 0.920 | 0.920 |
| 3BCWHR90 | LEHMAN MUN TR RCPTS VARIOUS FLT-TR SER 2008-P13W REL TO LOUISIANA PUB FACS AUTH REV R/MD 2 45 05/15/2027 | Munibond | 21,775,000 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 5252ANAE7 | LBFRC 2007-LLFA A3 LEHMAN BROTHERS FLOATING RATE | Mortgage | 21,171,924 | 0.838 | 0.838 | 0.838 | 0.838 | 0.838 | 0.838 | 0.838 | 0.838 | 0.838 |
| 29016160 | ILLINOIS COLLEGE OF OPTOMETRY SAVRS | Moneymkt | 21,050,540 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 7611TLAC7 | RLT 2008-AH2 M2 RESIDENTIAL LOAN TRUST | Mortgage | 21,021,114 | 0.953 | 0.953 | 0.953 | 0.953 | 0.953 | 0.953 | 0.953 | 0.953 | 0.953 |
| 37114230 | CAPITAL TR AGY FLA MULTIFAMILYFLTG RATE TR RCPTIS-F 7 REG D R/MD 3 20 11/01/2036 | Munibond | 20,655,838 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 3BB2YG40 | LEHMAN MUN TR RCPTS VAR STS RI TRS SER K41W 144A RELATED TO CALIF SUTTER HLTH R/MD 10.85 11/15/2046 | Munibond | 20,551,510 | 95.21 | 95.21 | 95.21 | 95.21 | 95.21 | 95.21 | 95.21 | 95.21 | 95.21 |
| 3BCZFX40 | LEHMAN MUN TR RCPTS VARIOUS STFLOATER-TR SER 2007-K90W REL ATTO ST JOSEPH CNTY IND HOSP AUT R/MD 3 47 08/15/2046 | Munibond | 20,250,582 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 61532XBN5 | MONUMENTAL GLOBAL FUNDING III | Corpbond | 20,090,294 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| 31397MRV1 | FNR 2008-76 EF FANNIE MAE | Mortgage | 20,032,889 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| 32028GAE5 | FFML 2006-FF15 A5 FIRST FRANKLIN MORTGAGE LOAN A | Mortgage | 20,003,734 | 0.570 | 0.570 | 0.570 | 0.570 | 0.570 | 0.570 | 0.570 | 0.570 | 0.570 |

Contains Highly Confidential Information

EXHIBIT 6

COMPARISON OF INDICATED VALUES USING CUSTODIAL MARKS TO INDICATED VALUES USING BARCLAYS MARKS
FOR SELECTED INDIVIDUAL POSITIONS AND GROUPS OF SIMILAR POSITIONS

| Asset or Asset Type | Number of CUSIPs | Indicated Value at Custodial Marks ($ million) | Indicated Value at Barclays Exit Price Marks ($ million) | Difference (%) |
|---|---|---|---|---|
| Agency Pools (FHLMC 30 yr) | 297 | 1,719.4 | 1,674.5 | -2.6 |
| Agency CMO (Interest Only) | 240 | 876.7 | 549.9 | -37.3 |
| Agency CMO (Inverse Interest Only) | 109 | 319.3 | 146.6 | -54.1 |
| FHA (SASC 07-3 2A2) | 1 | 20.2 | 18.2 | -10.0 |
| Agency (SASC 07-3 1A2) | 1 | 34.3 | 30.9 | -10.0 |
| Agencies - Tennessee Valley Authority | 11 | 1,046.5 | 959.8 | -8.3 |
| Treasuries – UDS  Ust Note | 8 | 4,454.1 | 4,363.9 | -2.0 |
| Agencies – USD FNMA | 88 | 1,921.3 | 1,784.7 | -7.1 |
| Agencies – USD FHLB | 113 | 2,107.6 | 1,989.4 | -5.6 |
| Munis – USD DISGEN | 6 | 60.3 | 51.5 | -14.6 |
| US Non-Agency CMO (SARM Loan Trust) | 125 | 237.7 | 80.2 | -66.2 |
| US ABS Home Equity – Lehman XS Trust | 67 | 171.1 | 86.9 | -49.2 |
| US Non-Agency CMO – Lehman XS Trust | 125 | 178.4 | 82.6 | -53.7 |
| CLO Mezz (Pine CCS) | 1 | 915.0 | 428.6 | -53.2 |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

EXHIBIT 7

UPDATED TRANSACTION BALANCE SHEET (ASSETS ONLY) BASED ON "LBI BS_917_V_WITH ADJUSTMENT.XLS"

Lehman Brothers, Inc.
Balance Sheet as of September 17, 2008
($ in millions)

| ASSETS | (A) 8/31/2008 | (B) 9/17/2008 | (C) Adjustments | (D) Balance Sheet Transferred | (E) Balance Sheet Remaining | (F) Purchase Agreement |
|---|---|---|---|---|---|---|
| Cash & Cash Equivalents | $ 268 | $ 412 | $ - | $ 412 | $ - | $ 700 |
| Cash & Securities Segregated and on Deposit | 8,550 | 4,740 | - | - | 4,740 | - |
| Governments & Agencies | 30,225 | 37,214 | - | 37,214 | - | 40,000 |
| Total Commercial Paper & Other MMkt Instruments | 1,158 | 958 | - | 958 | - | 1,100 |
| Mortgages and Asset-Backed Securities | 6,499 | 5,972 | - | 2,986 | 2,986 | 2,700 |
| Total Corporate Debt & Other | 5,422 | 4,839 | - | 4,839 | - | 4,900 |
| Total Corporate Equities | 9,256 | 6,758 | - | 6,758 | - | 8,800 |
| Derivatives & Other Contract Agreements | 2,758 | 3,566 | - | 3,566 | - | 4,500 |
| Total Securities & Other Financial Instruments Owned | 55,318 | 59,307 | - | 56,321 | 2,986 | 62,000 |
| Collateralized Short-Term Agreements | 155,876 | 30,337 | - | 30,337 | - | 10,000 |
| Receivables and Other Assets | 14,746 | 30,237 | - | 76 | 30,161 | - |
| Investments in Consolidated Subsidiaries | 1,924 | 1,592 | - | - | 1,592 | - |
| Due from Subsidiaries | 65,634 | 56,176 | 1,383 | - | 57,559 | - |
| TOTAL ASSETS | $ 302,316 | $ 182,802 | $ 1,383 | $ 87,146 | $ 97,039 | $ 72,700 |

Page 131

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

EXHIBIT 8

SUMMARY OF BANK ACQUISITIONS THAT RESULTED IN NEGATIVE GOODWILL

| Date of Acquisition | 09/25/2008 | 12/31/2008 | 01/16/2009 | 01/30/2009 | 02/06/2009 | 03/16/2008 | 10/06/2008 |
|---|---|---|---|---|---|---|---|
| Acquirer | JPMorgan | PNC Bank /2 | Lloyds Banking Group /3 | Community Bankers Trust | WestAmerica | JPMorgan /6 | BNP Paribas /7 |
| Target | WaMu | National City | HBOS | Suburban Federal Savings /4 | County Bank /5 | Bear Stearns | Fortis |
|  | ($ millions) | ($ millions) | (£ millions) | ($ millions) | ($ millions) | ($ millions) | (€ millions) |
| Total Purchase Price | 1,938 | 6,133 | 7,787 | - | - | 1,373 | 14,500 |
| Book Value of Target's Net Assets | 30,916 | 10,536 | 22,936 | 45 | 59 | 11,352 | - |
| Adjustments | (20,343) | (4,403) | (3,976) | (24) | (10) | (1,008) | - |
| Fair Value of Net Assets Acquired | 10,573 | 6,133 | 18,960 | 21 | 49 | 10,344 | 15,315 |
| Negative Goodwill: /1 |  |  |  |  |  |  |  |
| Total | (8,635) | - | (11,173) | (21) | (49) | (8,971) | (815) |
| Allocated to Non-financial Assets | 8,054 | - | - | - | - | 605 | - |
| Remaining from the Transaction | (581) | - | (11,173) | (21) | (49) | (8,366) | (815) |

Notes:
/1  Accounting for acquisitions is governed by SFAS 141. In accordance with SFAS 141, "negative goodwill" is created when the fair value of the net assets acquired exceeds the purchase price. As prescribed by SFAS 141, nonfinancial assets acquired that are not held-for-sale are written down against that negative goodwill. The negative goodwill that remains after writing down nonfinancial assets is recognized as an extraordinary gain.

/2  PNC first reported this transaction in its 2008 10-K filing. Since the transaction occurred on Dec. 31, 2008, it had no effect on the annual financial statements. However, at the time initially reported, PNC's disclosures revealed that the adjustments to the assets to reflect fair value totaled $3,066 million, which initially resulted in negative goodwill of $1,337 million. In its1Q2009 10-Q filing, PNC disclosed that new information on the purchased assets and liabilities revealed the need for additional adjustments to reflect fair value. These adjustments totaled $1,337 million, so PNC did not report any negative goodwill on this transaction.

/3  Amounts in millions of British pounds sterling. "Adjustments" include £(3,917) for preferred shares and £(1,300) million for minority interests.

/4  Purchased from the FDIC acting as the Receiver of the Target bank. The Community Bankers Trust ("CBT") 10-Q form of May 11, 2009 does not provide the BV of the target's net assets. Bank of Essex, a wholly owned subsidiary of CBT, bid negative $45 million for the assets and liabilities assumed. For consistency with the disclosures in the table, this is presented as a positive $45 million book value. The $23.74 million adjustments to reflect FV of net assets acquired are presented as a reduction of the BV of the target's net assets, in order to conform with the disclosures in the CBT 10-Q filing (at pp. 2, 14-15).

/5  Purchased from the FDIC acting as the Receiver of the Target bank.

/6  Figures are according to the JPMorgan 8-K filing of April 16, 2008. In subsequent SEC filings, JPMorgan made adjustments to its original disclosure regarding the Bear Stearns transaction. In its 10-Q for the quarter ended June 30, 2009, JPMorgan adjusted the Total Purchase Price and Fair Value of net assets acquired to $1,496 and $611 million, respectively. As a result of these adjustments, JPMorgan recognized goodwill of $885 million instead of negative goodwill of $8,366 million as originally disclosed. The table presents transaction information as originally disclosed. The acquisition was apparently amended on March 24, 2008.

/7  Amounts in millions of Euros.