JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
William J. Hine

*Attorneys for Debtors
and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                          :
In re:                                    :    Chapter 11
                                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :    Case No. 08-13555 (JMP)
                                          :
                    Debtors.              :    (Jointly Administered)
                                          :
                                          :
                                          :
                                          :
                                          :
-------------------------------------------------------------x
                                          :
In re:                                    :    SIPA Proceeding
                                          :
LEHMAN BROTHERS INC.,                     :    Case No. 08-01420 (JMP)
                                          :
                    Debtor.               :
                                          :
-------------------------------------------------------------x

### NOTICE OF FILING OF UNSEALED DEBTOR'S REPLY BRIEF
### IN FURTHER SUPPORT OF ITS RULE 60 MOTION AND RELATED
### APPENDIX OF EXPERT REPORTS

**PLEASE TAKE NOTICE** that on March 18, 2010, Lehman Brothers Holdings, Inc. (the

"Debtor") filed Debtor's Reply Brief in Further Support of its Motion for an Order, Pursuant to

FED. R. CIV. P. 60 and FED. R. BANKR. P. 9024, Modifying the September 20, 2008 Sale

Order and Granting Other Relief and in Opposition to Barclays' Motion to Enforce the Sale

Order and Secure Delivery of all Undelivered Assets (Docket No. 7641), ("Debtor's Reply

Brief") and three volumes of related appendixes (Docket Nos. 7642, 7643, and 7644).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Confidentiality Stipulation

and Protective Order Between the Examiner, Debtors, Trustee, the Official Committee of

Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Committee") and Barclays Capital

Inc. (Docket No. 4524) (the "Protective Order"), portions of Debtor's Reply Brief and Appendix

Volume VII were filed under seal and, therefore, were electronically filed in redacted form only.

**PLEASE TAKE FURTHER NOTICE** that certain information and exhibits contained

in the redacted version of Debtor's Reply Brief and Appendix Volume VII have been

subsequently either de-designated confidential/highly-confidential or there is no longer a need to

seal or redact references to those documents maintaining their confidential/highly confidential

designations.

**PLEASE TAKE FURTHER NOTICE** that the Debtor hereby files Debtor's Reply

Brief and Appendix Volume VII containing the information and exhibits in an unredacted form.

Dated: New York, New York
April 5, 2010

Respectfully submitted,

/s/ William J. Hine
JONES DAY
Robert W. Gaffey
Jayant W. Tambe
William J. Hine
222 East 41st Street
New York, New York  10017
(212) 326-3939 (telephone)
(212) 755-7306 (facsimile)
wjhine@jonesday.com

*Attorneys for Debtors*
*and Debtors in Possession*

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:   (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
William J. Hine

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 |
| Debtors. | (Jointly Administered) |
| ------------------------------------------------------------- | |
| In re: | SIPA Proceeding |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| Debtor. | |

**DEBTOR'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR AN
ORDER, PURSUANT TO FED. R. CIV. P. 60 AND FED. R. BANKR. P. 9024,
MODIFYING THE SEPTEMBER 20, 2008 SALE ORDER AND GRANTING OTHER
RELIEF AND IN OPPOSITION TO BARCLAYS' MOTION TO ENFORCE THE SALE
ORDER AND SECURE DELIVERY OF ALL UNDELIVERED ASSETS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

    A.    The Post-Hearing Amendments Through The "Clarification Letter" Were
Never Approved by the Court .............................................................. 3

    B.    The Deal Was Described To The Court And The Lehman Boards As A
Balanced Exchange Or A "Wash" ........................................................ 9

    C.    The Failure to Disclose Barclays' Day One Gain ................................ 16

    D.    The Undisclosed $5 Billion Discount From Book Value ..................... 20

    E.    The Misuse Of The Repurchase Agreement To Deliver The Discount .............. 24

    F.    Barclays' Alleged Risk ........................................................................ 28


SUPPLEMENTAL STATEMENT OF FACTS ........................................................ 30

    A.    Recent Discovery Supplements and Confirms LBHI's Claims ........................ 30

        1.    In-Court Statements Framed the Sale Transaction as a "Wash" or a
Balanced Deal for Lehman .................................................. 30

        2.    Critical Features of the Deal Were Never Disclosed to the Court .......... 32

        3.    Recently Developed Evidence Confirms LBHI's Claims ...................... 33

    B.    Barclays' Factual Recharacterizations Are Inconsistent and Inaccurate ............. 36

        1.    Barclays' contention that Debtor's assets were being purchased
"irrespective of their value" .................................................. 36

        2.    Barclays' contention that nothing in the Asset Purchase Agreement
"required" the Sale Transaction to be a "balanced" deal ........................ 39

        3.    Barclays' contention that the Sale Transaction was never intended
to be a "wash" because it involved a sale of a business ........................ 40

        4.    Barclays' contention that nothing in the Asset Purchase Agreement
or related documents creates a contractual "cap" on the value of
assets ............................................................................... 41

        5.    Barclays' contention that the $5 billion discount embedded in the
Sale Transaction was neither a "secret" nor a "discount" ...................... 42

# TABLE OF CONTENTS
(continued)

Page

6.     Barclays' contention that the Repo Collateral actually received by
       Barclays was worth at most $45.5 billion and thus there was no $5
       billion discount in the Fed Repo Transaction ......................................... 45

7.     Barclays' contention that parties could not have intended to use the
       September 18 Repurchase Agreement to deliver the $5 billion
       discount because the New York Federal Reserve Bank insisted that
       this transaction be put in place ................................................................ 48

8.     Barclays' contention that the Clarification Letter made no material
       changes to the deal and it was not necessary to seek approval from
       the Court ................................................................................................... 50

9.     Barclays' contention that Miller and Ridings concluded that
       Lehman's former executives acted in good faith ...................................... 53

10.    Barclays' contention that the assets added to the Sale Transaction
       by the Clarification Letter were not "additional assets" .......................... 57

11.    Barclays' contention that everyone knew Barclays expected to
       make a multi-billion dollar, first day, gain on the Sale Transaction ........ 59

12.    Barclays' contention that the bonus and contract cure liabilities
       were always understood only as "rough estimates" ................................. 62

C.     Since the September 22, 2008 Closing, Barclays Has Tried To Forestall
       Any Inquiry Into the Sale Transaction .................................................... 63

       1.     Alvarez & Marsal Was Retained to Administer the LBHI Estate ........... 63

       2.     Barclays' Lack of Cooperation In Providing Information to the
              Estate ....................................................................................................... 64

       3.     LBHI Could Not Comprehensively Study the Sale Transaction In
              Late 2008 ................................................................................................. 67

       4.     The December 2008 Settlement Provided No New Information to
              LBHI ......................................................................................................... 69

       5.     The Bay Harbour Appeal Involved Unrelated Claims ............................. 72

       6.     Alvarez & Marsal Began Noticing Discrepancies in LBHI's Books ...... 75

       7.     Barclays' February 2009 Disclosure of its "Gain" on the Sale
              Transaction ............................................................................................... 75

## TABLE OF CONTENTS
(continued)

Page

8.      In Light of Barclays' Recalcitrance, A&M and LBHI Began
        Focusing on the Terms of the Sale Transaction ...................................... 76

9.      LBHI Retained Special Counsel to Press this Issue With Barclays ......... 77

10.     LBHI's Rule 2004 Discovery and the Rule 60(b) Motions ..................... 78

ARGUMENT ................................................................................................ 79

I.      THE MANIFEST FAILURE TO DISCLOSE MATERIAL TERMS AND
        AMENDMENTS WARRANTS RELIEF UNDER RULE 60 ....................... 79

II.     LBHI IS ENTITLED TO THE RELIEF IT SEEKS UNDER RULE 60 ........ 82

        A.      LBHI Is Entitled to Relief Under Rule 60(b)(1) Due to Multiple Mistakes
                of Fact by Various Entities ................................................................ 83

        B.      Separately, LBHI Is Entitled to Relief Under Rule 60(b)(2) Based on
                Newly Discovered Evidence ............................................................... 89

                1.      The newly discovered evidence relates to facts in existence at the
                        time of the Sale Hearing and the closing of the Sale Transaction .......... 90

                2.      LBHI was "justifiably ignorant" of this new evidence until
                        recently, and without Rule 2004 discovery it would not have found
                        it ................................................................................................ 91

                3.      Barclays' factual recharacterizations do not alter this conclusion ........... 92
                        (a)     The Discount .............................................................. 92

                        (b)     The Plan to Use a Repo Default To Convey The Discount ......... 93

                        (c)     The Inflated Liabilities and Barclays' Failure To Pay $2
                                Billion In Bonuses To Former Lehman Employees ................... 93

                        (d)     The September 19 Asset Grab .................................... 94

                4.      Barclays' legal authorities do not bar Rule 60(b)(2) relief ..................... 95

        C.      Separately, LBHI Is Entitled to Relief Under Rules 60(b)(3) and 60(b)(6)
                Based on Innocent or Intentional Misrepresentations Made to the Court ......... 100

        D.      Separately, LBHI Is Entitled to Relief Under Rules 60(b)(3), 60(b)(6) and
                60(d) for Fraud by Certain Individuals or Entities or Fraud on the Court ......... 101

## TABLE OF CONTENTS
(continued)

                                                                                                  **Page**

E.      The Relief LBHI Seeks Is Authorized Under Rule 60 Which Is the
        Appropriate Vehicle For Addressing These Concerns ...................................... 103

        1.      The Relief Movants Seek Is Consistent With Rule 60 .......................... 103

        2.      Courts Need Not Find Bad Faith To Grant Rule 60(b) Relief .............. 104

F.      Bankruptcy Code Sections 549, 550 and 559 Provide for this Relief .............. 106

        1.      Barclays' Assertions As to Section 549 Are Strained and
                Unsupported ........................................................................................ 106

        2.      Barclays' Section 559 Arguments Fare No Better ................................ 108

III.    BARCLAYS' ATTEMPT TO AVOID THE MERITS OF THE RULE 60
        MOTIONS THROUGH VARIOUS PRECLUSION THEORIES IS MERITLESS ..... 113

        A.      LBHI's Rule 60 Motion Was Filed Within a Reasonable Time Given the
                Circumstances Surrounding This Complex Bankruptcy ................................... 113

                1.      LBHI Acted Diligently and Responsibly In Investigating the Issues
                        and Filing Its Rule 60 Motion Under Extraordinary Circumstances ..... 114

                2.      Barclays' Evasion and Misconduct Delayed LBHI's Motion ............... 119

                3.      Equitable Considerations Warrant Finding the Motion Timely ............ 120

                4.      Barclays Has Not Shown that It Has Suffered Any Undue
                        Prejudice As A Result of the Timing of LBHI'S Rule 60 Motion ........ 122

        B.      Barclays' Estoppel and Similar Theories Provide No Basis For Avoiding
                the Merits of the Pending Rule 60 Motions ..................................................... 123

                1.      Barclays Studiously Avoids Any Mention of the Representations It
                        Made to the Court in the December 2008 Settlement ............................ 124

                2.      The Mandate Rule, As Applied to the *Bay Harbour* Appeal, Does
                        Not Bar LBHI's Rule 60 Motion or Its Contentions Therein ................ 127

                        (a)     The District Court's Mandate in *Bay Harbour* Does Not
                                Address the Claims Raised By LBHI in its Rule 60 Motion ..... 127

                        (b)     The Mandate Rule Does Not Bar Claims LBHI Could
                                Have, But Did Not, Raise In the *Bay Harbour* Appeal ............. 131

## TABLE OF CONTENTS
(continued)

**Page**

    (c)    Recognized Exceptions to the Mandate Rule Allow For
LBHI to Raise the Arguments and Claims in its Rule 60
Motion ...................................................................................... 134

    (d)    Barclays' Judicial, Equitable Estoppel and Waiver
Arguments Are Equally Without Merit .................................... 136

C.    Barclays' Self-Serving Public Policy Arguments Miss the Point ...................... 139

D.    Barclays' Constitutional Argument Is Without Merit ....................................... 140

CONCLUSION ................................................................................................................. 143

# TABLE OF AUTHORITIES

**Page**

CASES

*Alpern v. UtiliCorp United, Inc.*,
  84 F.3d 1525 (8th Cir. 1996) ............................................................92

*Anderson v. Cryovac, Inc.*,
  862 F.2d 910 (1st Cir. 1988) ............................................................100

*Andresakis v. State of Connecticut*,
  No. 96-9467, 1997 WL 383456 (2d Cir. July 9, 1997) .................................89 n.70

*Andrulonis v. United States*,
  26 F.3d 1224 (2d Cir. 1994) .........................................................89 n.70

*Arista Records LLC v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009) ................................................96 n.74

*Associated Builders & Contractors v. Mich. Dep't. of Labor and Econ. Growth*,
  543 F.3d 275 (6th Cir. 2008) .......................................................122 n.95

*Aviall, Inc. v. Ryder Sys., Inc.*,
  110 F.3d 892 (2d Cir. 1997) ............................................................133

*Barrett v. Thomas*,
  809 F.2d 1151 (5th Cir. 1987) .........................................................131

*Bear, Stearns & Co. v. 1109580 Ontario, Inc.*,
  409 F.3d 87 (2d Cir. 2005) ........................................................126 n.96

*Burrell v United States*,
  467 F. 3d 160 (2d Cir. 2006) .....................................................132 n.101

*Calyon New York Branch v. Am. Home Mortgage Corp.*
  379 B.R. 503 (Bankr. D. Del. 2008) ...................................................112

*Cappillino v. Hyde Park Cent. Sch. Dist.*,
  135 F.3d 264 (2d Cir. 1998) .......................................................122 n.95

*Carlisle Ventures, Inc. v. Banco Español de Credito, S.A.*,
  No. 94 CV 5835(RCC), 2001 WL 185134 (S.D.N.Y. Feb. 23, 2001) ..................135

*Center v. Hampton Affiliates, Inc.*,
  66 N.Y.2d 782 (1985) .....................................................96 n.74, 97 n.75

*Chiulli v. Internal Rev. Serv.*,
  No. 03 Civ. 6670, 2006 WL 3008084 (S.D.N.Y. Oct. 20, 2006) ..................................119 n.94

*Cobos v. Adelphi Univ.*,
  179 F.R.D. 381 (E.D.NY. 1998) ..........................................................................................88 n.68

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
  722 F.2d 1063 (2d Cir. 1983)................................................................................................3, 80

*Compudyne Corp. v. Shane*,
  453 F. Supp. 2d 807 (S.D.N.Y. 2006) ...............................................................................96 n.74

*Conway v. Chem. Leaman Tank Lines, Inc.*,
  644 F.2d 1059 (5th Cir. 1981) ..................................................................................................131

*Crocker v. Piedmont Aviation, Inc.*,
  49 F.3d 735 (D.C. Cir. 1995) ...........................................................................................132, 135

*DeBartolo Corp. v. Fla. Gulf Coast Bldg & Constr. Trades Council*,
  485 U.S. 568 (1988)......................................................................................................142 n.109

*DeWeerth v. Baldinger*,
  38 F.3d 1266 (2d Cir. 1994)..........................................................................128, 131, n.99, 135

*Dolan v. City of Tigard*,
  512 U.S. 374 (1994)........................................................................................................141 n.108

*E. Enters. v. Apfel*,
  524 U.S. 498 (1998)......................................................................................................140, 141

*Edwards v. Golden Guernsey Dairy Co-op (In re Edwards)*,
  962 F.2d 641 (7th Cir. 1992) ..................................................................................................105

*Fitzgerald v. Field*,
  No. 98-7574, 1999 WL 177278 (2d Cir. Mar. 26, 1999)....................................................88 n.68

*Gen. Elec. Capital Corp. v. Armadora, S.A.*,
  37 F.3d 41 (2d Cir. 1994) ...............................................................................................127 n.97

*Gertz v. Robert Welch, Inc.*,
  680 F.2d 527 (7th Cir. 1982) ..................................................................................................128

*Hughes v. Washington*,
  389 U.S. 290 (1967)......................................................................................................141, 142

*Humbles v. Reuters Am., Inc.*,
  No. cv-4895, 2006 WL 2547069 (E.D.N.Y. Aug. 31, 2006).............................................119 n.94

NYI-4250276

*Indep. Petroleum Assoc. of Am. v. Babbitt*,
   235 F.3d 588 (D.C. Cir. 2001) .........................................................................128

*In re 310 Assocs.*,
   346 F.3d 31 (2d Cir. 2003)...................................................................114 n.89

*In re Alan Gable Oil Dev. Co.*,
   No. 91-1526, 1992 WL 329419 (4th Cir. Nov. 12, 1992) ...................................105

*In re Au Natural Restaurant, Inc.*,
   63 B.R. 575 (Bankr. S.D.N.Y. 1986) .................................................................80

*In re Bradlees Stores, Inc.*,
   291 B.R. 307 (S.D.N.Y. 2003)................................................................89 n.70

*In re Carlton Concrete Corp.*,
   No. 08-CV-242, 2008 WL 4443233 (E.D.N.Y. Sept. 26, 2008) ..................87 n.65

*In re CBI Holding Co.*
   529 F.3d 432 (2d Cir. 2008).......................................................................96, 97, 99

*In re Chrysler*,
   576 F.3d 108 (2d Cir. 2009).....................................................................45 n.41

*In re Crazy Eddie Sec. Litig.*,
   802 F. Supp. 804 (E.D.N.Y. 1992) .................................................................97

*In re Delaware & Hudson Ry. Co.*,
   124 B.R. 169 (D. Del. 1991)............................................................................80

*In re Emergency Beacon Corp.*,
   666 F.2d 754 (2d Cir. 1981)....................................................................81, 86

*In re Exaeris, Inc.*,
   380 B.R. 741 (Bankr. D. Del. 2008) ........................................................45 n.41

*In re Geneva Pharm. Tech. Corp.*
   Nos. 98 Civ. 861 (DLC), 99 Civ. 3607 (DLC), 2005 WL 2132438
   (S.D.N.Y. Sept. 6, 2005) ............................................................................128

*In re Gucci*,
   126 F. 3d 380 (2d Cir. 1997)..................................................................106 n.84

*In re Highland Fin. Corp.*,
   216 B.R. 109 (Bankr. S.D.N.Y. 1997) ......................................................135, 136

*In re Hyler*,
   No. 04-32952, 2009 WL 2849129 (Bankr. N.D. Cal. Apr. 22, 2009) ...........87 n.65

NYI-4250276

*In re Intermagnetics Am., Inc.*,
926 F.2d 912 (9th Cir. 1991) ......................................................................82 n.62

*In re Int'l Fibercom, Inc.*,
503 F.3d 933 (9th Cir. 2007) ....................................................................114, 119

*In re Ionosphere Clubs, Inc.*,
85 F.3d 992 (2d Cir. 1996).....................................................................138 n.105

*In re JameswayCorp.*,
No. 93 B 43697, 1995 Bankr. LEXIS 267 (S.D.N.Y. Mar. 7, 1995).............87 n.65

*In re Lawrence*,
293 F.3d 615 (2d Cir. 2002)........................................81, 82, 119 n.94, 138 n.105

*In re Maxwell Newspapers, Inc.*,
170 B.R. 549 (S.D.N.Y. 1994).....................................................................82 n.62

*In re Med. Software Solutions*,
286 B.R. 43 (Bankr. D. Utah 2002) ..................................................................80

*In re Mid-Atl. Fuels, Inc.*,
121 B.R. 207 (Bankr. S.D. W.Va. 1990) ..........................................................114

*In re Naron & Wagner, Chartered*,
88 B.R. 85 (Bankr. D. Md. 1988) .....................................................................81

*In re New England Mut. Life Ins. Co. Sales Practices Litig.*,
204 F.R.D. 6 (D. Mass. 2001)........................................................................114

*In re New York Trap Rock Corp.*,
42 F.3d 747 (2d Cir. 1994)..............................................................................80

*In re N. Broadway Funding Corp.*,
34 B.R. 620 (Bankr. E.D.N.Y. 1983)...........................................................89 n.70

*In re O'Brien Envtl. Energy, Inc.*,
188 F.3d 116 (3d Cir. 1999)...........................................................................122

*In re Phar-Mor, Inc. Sec. Litig.*,
900 F. Supp. 784 (W.D Pa. 1995).....................................................................96

*In re Rickel & Assocs., Inc.*,
272 B.R. 74 (Bankr. S.D.N.Y. 2002)............................................................82 n.62

*In re Rome Family Corp.*,
407 B.R. 65 (Bankr. Vt. 2009).....................................................................82 n.62

ix

*In re RVP, Inc.*,
  269 B.R. 851 (Bankr. D. Ind. 2001)...................................................................120

*In re Santec Corp.*,
  49 B.R. 59 (Bankr. D. N.H. 1985) .......................................................................80

*In re Summit Ventures, Inc.*,
  161 B.R. 9 (D. Vt. 1992)..........................................................................105, 106

*In re Westpoint Stevens, Inc.*,
  333 B.R. 30 (S.D.N.Y. 2005).........................................................................45 n.41

*In re Wilde Horse Enters., Inc.*,
  136 B.R. 830 (Bankr. C.D. Ca. 1991) ..................................................................80

*In re Wilmington Hospitality*,
  No. 01-19401, 2003 WL 21011689 (Bankr. E.D. Pa. Apr. 18, 2003) ............87 n.65, 104 n.81

*Int'l Controls Corp. v. Vesco*,
  556 F.2d 665 (2d Cir. 1977)......................................................................114 n.89

*In the Matter of Vitta*,
  409 B.R. 6 (Bankr. E.D.N.Y. 2009).................................................................114 n.89

*Karara v. Univ. of Denver*,
  No. 93-1087, 1993 WL 371386 (10th Cir. Sept. 23, 1993) ............................................87 n.65

*Kavorkian v. CSX Transp., Inc.*,
  117 F.3d 953 (6th Cir. 1997) ...............................................................128, 131 n.99

*Kirwan v. Vanderwerf*,
  164 F.3d 1175 (8th Cir. 1999) ..................................................................114, 123

*Kosakow v. New Rochelle Radiology Assocs.*,
  274 F.3d 706 (2d Cir. 2001)......................................................................138 n.105

*Kozlowski v. Coughlin*,
  871 F.2d 241 (2d Cir. 1989)........................................................................89 n.70

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994)..............................................................................140 n.107

*Lasky v. Control Prods. Corp.*,
  804 F.2d 250 (3d Cir. 1986).........................................................................83

*Leonard v. Lowe's Home Ctrs., Inc.*,
  83 Fed. Appx. 402 (2d Cir. 2003) ................................................................114 n.89

x

*Londsdorf v. Seefeldt,*
   47 F.3d 893 (7th Cir. 1995) ..........................................................................100

*Louisville Bedding Co. v. Pillowtex Corp.,*
   455 F.3d 1377 (Fed. Cir. 2006)..............................................................104 n.81

*Lucille v. City of Chicago,*
   1995 WL 606926 (7th Cir. Nov. 15, 1995)...............................................104 n.81

*Marder's Nurseries v. Hopping,*
   171 A.D.2d 63 (2d Dep't 1991) ...............................................................51 n.46

*Marshall v. Monroe & Sons, Inc.,*
   615 F.2d 1156 (6th Cir. 1980) ........................................................................83

*Matter of Embrace Sys. Corp.,*
   178 B.R. 112 (Bankr. W.D. Mich. 1995)..........................................................80

*Matura v. United States,*
   189 F.R.D. 86 (S.D.N.Y. 1999) ...............................................................88 n.68

*Merrill Lynch & Co. v. Allegheny Energy. Inc.,*
   500 F.3d 171 (2d Cir. 2007).....................................................................51 n.46

*Myers v. Martin (In re Martin),*
   91 F.3d 389 (3d Cir. 1996)......................................................................3, 80

*Narumanchi v. Am. Home Assurance Co.,*
   Nos. 05 6523 cv, 06 4734 cv, 2009 WL 754768 (2d Cir. Mar. 24, 2009)...................126 n.96

*Nemaizer v. Baker,*
   793 F.2d 62 (2d Cir. 1986)......................................................................89 n.70

*New Hampshire v. Maine,*
   532 U.S. 742 (2001)...............................................................................136 n.104

*N.L.R.B. v. Catholic Bishop of Chicago,*
   440 U.S. 490 (1979)...............................................................................142 n.109

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
   129 S.Ct. 2504 (2009)..............................................................................142 n.109

*Official Unsecured Creditor's Comm. of LWD, Inc. v. K&B Capital, LLC (In re LWD, Inc.),* 332 B.R. 543 (Bankr. W.D. Ky. 2005) .......................................................82

*Oneida Indian Nation of N.Y. v. County of Oneida,*
   214 F.R.D. 83 (N.D.N.Y. 2003)..................................................................133

xi

*OSRecovery, Inc. v. One Groupe Int'l, Inc.*,
  462 F.3d 87 (2d Cir. 2006) ......................................................................127 n.97

*Pierce Assocs., Inc. v. Nemours Foundation*,
  865 F.2d 530 (3d Cir. 1989) ................................................................................114

*Pierre v. Bernuth Lembcke Co.*,
  20 F.R.D. 116 (S.D.N.Y. 1956) ...........................................................................120

*Pratt v. Philbrook*,
  109 F.3d 18 (1st Cir. 1997) ..................................................................................122

*Rand Int'l Leisure Prods., Ltd. v. TekSource, L.C.*,
  No. 97 CV 0319, 1998 WL 372356 (E.D.N.Y. July 2, 1998) ......................103 n.80

*Robinson v. E.P. Dutton & Co.*,
  45 F.R.D. 360 (S.D.N.Y. 1968) .......................................................................119 n.94

*Rosenshein v. Kleban*,
  918 F. Supp. 98 (S.D.N.Y. 1996) ....................................................................136 n.104

*Scherer v. City of New York*,
  No. 03 Civ. 8445, 2007 WL 2710100 (S.D.N.Y. Sept. 7, 2007) .................103 n.80

*Seese v. Volkswagenwerk, A.G.*,
  679 F.2d 336 (3d Cir. 1982) ............................................................................132 n.101

*Sejman v. Warner-Lambert Co. Inc.*,
  845 F.2d 66 (4th Cir. 1088) ................................................................................131

*Smith v. Jackson Tool & Die, Inc.*,
  426 F.2d 5 (5th Cir. 1970) ..................................................................................119

*Smith v. Widman Trucking & Excavating, Inc.*,
  627 F.2d 792 (7 th Cir. 1980) .............................................................................122

*Standard Oil Co. of California v. United States*,
  429 U.S. 17 (1976) ........................................................................................135, 136

*State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada*,
  374 F.3d 158 (2d Cir. 2004) ............................................................................132 n.102

*Stefanopoulous v. City of New York*,
  No. 07-cv-1045, 2008 WL 4820558 (2d Cir. Nov. 5, 2008) .................................86

*Stevens v. City of Cannon Beach*,
  510 U.S. 1207 (1994) ............................................................................................142

xii

*UCAR Int'l Inc. v. Union Carbide Corp.,*
  No. 00CV1338, 2004 WL 137073 (S.D.N.Y. Jan. 26, 2004) .........................................96 n.74

*U.S. v. Int'l Bhd. of Teamsters,*
  247 F.3d 370 (2d Cir. 2001)...........................................................................88 n.68, 90

*U.S. v. One (1) Douglas A-26B Aircraft,*
  662 F.2d 1372 (11th Cir. 1981) ...........................................................................100

*United States v. Argentina,*
  No. 06-1989-cr, 2008 WL 510556 (2d Cir. 2008) ................................................134

*United States. v. Baus,*
  834 F.2d 1114 (1st Cir. 1987)...........................................................................119

*United States v. Bryce,*
  287 F.3d 249 (2d Cir. 2002)...........................................................................128

*United States v. Cirami,*
  563 F.2d 26 (2d Cir. 1977)...................................................................103 n.80, 128

*United States v. Minicone,*
  994 F.2d 86 (2d Cir. 1993)...........................................................................128

*United States  v. Salerno,*
  932 F.2d 117 (2d Cir. 1991)...........................................................................106 n.84

*United States v. Stanley,*
  54 F.3d 103 (2d Cir. 1995)...................................................................132 n.101, 135

*United States v. Zvi,*
  No. 01-1011, WL 1586536 (2d Cir. 2001) ................................................132 n.101

*Venture Indus. Corp. v. Autoliv ASP, Inc.,*
  457 F.3d 1322 (Fed. Cir. 2006)...................................................................113, 120, 122

*W. Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus, Inc.),*
  43 F.3d 714 (1st Cir. 1994)...........................................................................81

*W. Helicopter Servs., Inc. v. Rogerson Aircraft Corp.,*
  777 F. Supp. 1543 (D. Or. 1991) ...........................................................................92

*Whimsicality, Inc. v. Rubie's Costume Co. Inc.,*
  836 F. Supp. 112 (E.D.N.Y. 1993) ...................................................................135, 136

*Whitaker v. Associated Credit Servs., Inc.,*
  946 F.2d 1222 (6th Cir. 1991) ...........................................................................83

*Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art,*
   No. 08-1300, 2009 WL 1269439 (2d Cir. May 7, 2009) ...............................................127 n.97

## STATUTES

BANKRUPTCY CODE § 101(47) ............................................................................................111, 112

BANKRUPTCY CODE § 105 ...........................................................................................................81

BANKRUPTCY CODE § 363 ................................................................................................... *passim*

BANKRUPTCY CODE § 549 ...........................................................................................................81

BANKRUPTCY CODE § 550 .........................................................................................................106

BANKRUPTCY CODE § 559 ................................................................................................... *passim*

## OTHER AUTHORITIES

FED. R. BANKR. P. RULE 2002 ......................................................................................................1

FED. R. BANKR. P. RULE 2004 ............................................................................................ *passim*

FED. R. BANKR. P. RULE 6004 ......................................................................................................1

FED. R. BANKR. P. RULE 6006 ......................................................................................................1

FED. R. BANKR. P. RULE 9024 ......................................................................................................1

FED. R. CIV. P. RULE 60 ...................................................................................................... *passim*

FED. R. CIV. P. RULE 60(b) .................................................................................................. *passim*

FED. R. CIV. P. RULE 60(b)(1) ...............................................................................................83, 86

FED. R. CIV. P. RULE 60(b)(2) ...............................................................................................89, 90

FED. R. CIV. P. RULE 60(b)(3) .............................................................................................101, 103

FED. R. CIV. P. RULE 60(b)(6) .......................................................................................102, 103, 104

FED. R. CIV. P. RULE 60(c)(1) ...................................................................................................113

FED. R. CIV. P. RULE 60(d) .......................................................................................................101

MOORE'S FEDERAL PRACTICE § 60.24[1] ....................................................................................83

MOORE'S FEDERAL PRACTICE § 60.21[4][e] ...............................................................................101

MOORE'S FEDERAL PRACTICE § 60.41[3] ....................................................................................83

NYI-4250276

MOORE'S FEDERAL PRACTICE § 60.65[1]....................................................................113, 120, 123

NYI-4250276

Lehman Brothers Holdings Inc. respectfully submits this reply brief (i) in further support of its motion, pursuant to Rule 60 of the Federal Rules of Civil Procedure made applicable to bankruptcy cases by Rule 9024 of the Federal Rules of Bankruptcy Procedure, for an order modifying the Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008 (the "Sale Order"), and (ii) in opposition to the Motion of Barclays Capital Inc. To Enforce the Sale Order and Secure Delivery of All Undelivered Assets, dated January 29, 2010.[1]

## **INTRODUCTION**

1.      Barclays' response to the Rule 60 motions studiously avoids the critical and inescapable fact that this Court was not told about billions of dollars in unauthorized and undisclosed changes to the Sale Transaction it actually approved.  The Court was (i) presented with an Asset Purchase Agreement that described a sale of approximately $70 billion "book value" of securities; and (ii) informed that there would be offsetting liabilities assumed by Barclays of approximately $69 billion, plus additional liabilities for bonuses and contract cure of between $3.5 and $4.0 billion.  Extensive discovery authorized by this Court has now revealed that (a) contrary to the terms of the Asset Purchase Agreement, the "negotiated" sale price for the assets had nothing to do with "book value" and contained an embedded $5 billion gain for Barclays that was not disclosed; (b) many of the "liabilities" the Court was told Barclays would

---

[1]  In the interest of avoiding duplicative briefing, LBHI also incorporates herein by reference the substantive arguments raised in the briefs filed by the SIPA Trustee and the Creditors' Committee.  In particular, LBHI adopts and incorporates herein the Trustee's arguments in opposition to Barclays' Argument Point I (Barclays Opp. ¶¶ 336-441) and LBHI opposes Barclays' Motion to Enforce the Sale Order and Secure Delivery of All Undelivered Assets on that basis and based on arguments raised here.  Contrary to Barclays' assertions (*see, e.g.,* Barclays Opp. ¶¶ 4, 47, 334, 362-369), LBHI does not concede in any way the validity of the legal or factual arguments Barclays makes in opposition to the contractual arguments raised in the Trustee's moving papers.

"assume" were illusory or inflated and were not paid in full; (c) the September 18 Repurchase

Agreement was used, without disclosure to the Court, as a vehicle to deliver the $5 billion

embedded gain to Barclays; and (d) undisclosed alterations to the Asset Purchase Agreement,

which Barclays now claims entitles it to billions of dollars of additional assets, were effected

*after* the Sale Hearing, in a so-called "Clarification Letter," without the Court's approval.  While

Barclays later admitted a "day-one" accounting gain on acquisition of the Lehman assets of $4.2

billion, that disclosure understates Barclays' day-one gain by billions.  When correctly valued,

the assets Barclays acquired (or claims to have acquired) exceed the consideration Barclays

actually paid by over $11 billion.  (A. 202 [Zmijewski Report] ¶ 11 (Opinion 2).)[2]  Indeed,

Barclays' windfall immediately upon acquisition was about $13 billion greater than the $1.85

billion benefit to the Estate disclosed at the September 19 Sale Hearing.  (*Id*.)  In the face of this

irrefutable evidence, Barclays now asks the Court to ignore the skewed disclosures made to it in

September 2008 and to bless undisclosed discounts and post-hearing material changes made

without Court review.

2.    Adopting the course that Barclays urges would give parties free rein to

fundamentally change the terms of a Section 363 sale after the Court has approved it, thus

rendering the Court's proceedings irrelevant.  Barclays has now said as much.  Although the

Court was never told about Barclays' windfall, Barclays' General Counsel recently testified that

the Court should have "felt that it was not relevant whether or not" a "windfall profit did or did

not exist."  (BCI Ex. 70 [Hughes] 38:15-40:2.)[3]  In essence, in a proceeding under Section 363 of

---

[2]   The report of Movants' expert, Dr. Mark Zmijewski, Professor at the University of Chicago Booth Graduate School of Business, dated March 15, 2010, is cited herein as "Zmijewski Report."

[3]   References to "BCI Ex." are to the appendix of exhibits Barclays submitted with its Opposition. References to "A. __" are to the appendix of exhibits LBHI submitted with its Rule 60 Motion, as supplemented with further exhibits by this reply.  All abbreviations and citation formats used in this brief are the same as in LBHI's moving papers.  LBHI's moving brief is cited here as "LBHI Mot."  Barclays' opposition is cited as "Barclays Opp." and exhibits thereto as "BCI Ex."

2

the Bankruptcy Code, where disclosure is the critical component, Barclays argues that proper

disclosure was irrelevant and demands a retroactive license to enjoy a different deal than the one

the Court approved.

3.      The course Barclays urges is contrary to established law.  As the Second Circuit

has stated:  "The key to the reorganization Chapter … is disclosure."  *Comm. of Equity Sec.*

*Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2d Cir. 1983).  Specifically,

"[t]he import of Section 363 is that a trustee is prohibited from acting unilaterally.  [T]his

schema is intended to protect both debtors and creditors (as well as trustees) by subjecting a

trustee's actions to *complete disclosure* and review by the creditors of the estate and by the

bankruptcy court."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (emphasis

added).

4.      In this case, these established tenets were not followed.  The failure to disclose all

material terms and, worse, the failure to bring to the Court post-Sale Order amendments resulted

in a transaction being consummated that was very different from the transaction described to the

Court.

### A.    The Post-Hearing Amendments Through The "Clarification Letter" Were Never Approved by the Court

5.      Barclays contends that billions in additional assets added to the deal beginning on

September 19, 2008 were not in fact "additional" because, although no one ever mentioned it,

they were covered by the Asset Purchase Agreement from the outset.  (Barclays Opp. ¶¶ 31, 179.)

In this vein, Barclays says the Clarification Letter did not actually amend the Asset Purchase

Agreement because it "reflected the terms that were agreed before the Sale Hearing, and ... was

clearly part of the [Asset] Purchase Agreement approved by this Court, as specified in the Sale

Order."  (*Id.* ¶ 37.)  This contention defies common sense and the terms of the letter itself.  If it

3

were true, there would have been no need for a "Clarification Letter" at all, much less one that expressly said it "amends" the Asset Purchase Agreement and made substantial changes to, among other things, the definition of "Purchased Assets."[4]  (A. 32 [Clarification Letter].)

6.      Barclays treatment of the Clarification Letter also suffers an infirmity that infects Barclays' entire opposition:  No one told the Court about these billions in assets or the wholesale changes made to the Sale Transaction.  This lapse is made worse by the fact that, at least according to Barclays, deals among the executives concerning those assets were concluded before the Sale Hearing even started, all the more reason they should have been disclosed to the Court.  (Barclays Opp. ¶¶ 68-72; A. 153 [Hughes II] 269:6-15; 274:7-15; 311:21-312:15.)

7.      In addition, Barclays' contentions that no assets were added and the Clarification Letter was not an amendment are directly contrary to assertions it previously made to this Court. When Barclays sought to prevent Rule 2004 discovery from going forward, it said exactly the opposite:

> It has repeatedly been disclosed that Barclays was entitled to receive *additional categories of securities and other assets set forth in the Clarification Letter, which amended the APA.*

(BCI Ex. 43 [Barclays Rule 2004 Obj.] ¶ 52 (emphasis added).)  Barclays also told the Court:

> Accordingly, as reflected in the Clarification Letter, there was a concerted effort to identify *additional assets* to transfer to Barclays as alternatives to those that could not be delivered as contracted for in the *original APA*

(*Id.* (emphasis added).)

8.      Now that discovery has brought the truth to light, Barclays has tried to jettison these factual positions.  So Barclays' General Counsel and 30(b)(6) witness on the topic now

---

[4]  Barclays' outside counsel at Cleary Gottlieb has acknowledged that the Clarification Letter was, in fact, an amendment and that it changed the definition of Purchased Assets.  (A. 156 [Lewkow] 47:20-49:2; 52:25-53:15; 62:6-19.)  Barclays' General Counsel, however, contended at his recent deposition that, despite the plain language of the letter, it did neither.  (A 153 [Hughes II] 260:20-261:16; 278:23-279:19.)

flatly rejects the exact statements Barclays made to the Court in June, when it wanted to prevent discovery:

> Q:    So would it be accurate to say that there were *additional categories of securities and other assets set forth in the clarification letter*?  Would that be an accurate statement?
>
> A:    No.
>
> Q:    Would it be accurate to say that the *clarification letter amended the APA?*
>
> A:    I would not say it amended the APA.  I would say it clarified certain aspects of the APA, but it didn't – it didn't amend the deal.

(A. 153 [Hughes II] 260:14-25 (objections omitted; emphasis added).)

      9.    Barclays' position about the undisclosed asset grab also is internally inconsistent. On one hand, Barclays asserts that the assets added to the deal on September 19th were not "additional" because they were within the scope of the Asset Purchase Agreement.  (Barclays Opp. ¶¶ 31-32, 179.)  On the other hand, Barclays contends in the same papers that they were "other assets" delivered to "make up for a shortfall."  (Barclays Opp. ¶¶ 140-141.)  The contradiction in this position has made it impossible for Barclays to keep its story straight. Barclays' General Counsel has rejected precisely that proposition:

> Q:    Were the assets listed in the clarification letter included to make up for a shortfall of some kind?
>
> A:    No.

(A. 153 [Hughes II] 263:22-25.)  Conversely, he also testified that "additional assets to the ones that previously had been described [in the Asset Purchase Agreement were …] identified so that Barclays could reach a view as to whether assets it was going to be receiving were similar in some sense to the value that was represented to be being delivered with respect to some of those assets previously."  (A. 153 [Hughes II] 264:3-16.)

5

10.     Thus, Barclays' position is exposed for what it is:  An effort to have it both ways. It wants the Court to find, from the perspective of assessing whether Lehman turned over to Barclays more assets than the Court authorized, that the deal was just fine "irrespective of what their value was."  (Barclays Opp. ¶¶ 40, 630.)  But to excuse Barclays' grab for billions in "other" or "additional" assets, it wants the Court to find that values mattered.

11.     To disguise this contradiction, Barclays distorts the facts concerning the Clarification Letter and the amendments it made to the Asset Purchase Agreement.  Barclays' outside counsel has agreed that the purpose of the Clarification Letter included to "amend" the Asset Purchase Agreement.  (A. 156 [Lewkow] 47:20-48:5; *see also id.* at 48:6-49:3.)  In fact, the term "amend" was added to the Clarification Letter on September 19, the same day Lehman executives were, to use Barclays' terminology, "scrambling" to find additional assets to transfer. (BCI Ex. 63 [Diamond] 129:11-130:1; *see also* A. 175 [Dep. Ex. 34] at 13 (draft Clarification Letter, dated September 19, showing blacklined addition of the term "amend").)  This was a deliberate choice.  According to Barclays' outside counsel, "[a]t some later point, as things got more complicated and things were happening, it became – there was discussion that we should add the word 'amend.'"  (A. 156 [Lewkow] 49:14-50:12.)

12.     Despite this concession of its own lawyer, Barclays still asserts that the Clarification Letter did not change the deal that was presented to the Court.  (Barclays Opp. ¶ 37.) This is just not credible.  On its face, the misnamed Clarification Letter *says* that it "amends in certain respects" the provisions of the Asset Purchase Agreement.  (A. 32 [Clarification Letter] at 1.)  And among the amendments it made was a wholesale change to the definition of "Purchased Assets" about which no one said a word to the Court.  (*Id.* at 1-2; *see* A. 156 [Lewkow] 62:6-19 (acknowledging the Clarification Letter changed the definition of "Purchased Assets").)

6

13.     Similarly, among the amendments the letter made without Court approval was in Paragraph 13, which was designed to rescind the prior termination of the September 18 Repurchase Agreement.  (*See* LBHI Mot. ¶¶ 120-122.)  By rescinding the termination of the September 18 Repurchase Agreement, Barclays was evading the effect of Section 559 of the Bankruptcy Code and positioning itself to receive all of the billions of dollars in excess repo collateral over and above the $45 billion it had advanced to Lehman.  However Barclays' outside counsel at Cleary had expressly affirmed at the Sale Hearing that the Sale Order was not intended to impair such safe harbor provisions, including Section 559 in any respect.  (*See* BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 179:7-181:3.)  And, critically, by evading Section 559 unilaterally and not seeking the Court's approval, Barclays avoided informing the Court that this maneuver facilitated the exchange of $50 billion in Lehman assets in return for only $45 billion from Barclays.

14.     These fundamental changes were not made until *after* the Sale Hearing was over and *after* the Sale Order had been issued.  (*See* A. 83 [Dep. Ex. 36] at 24622-3 (9/20 draft changing definition of "Purchased Assets"); A. 183 [Dep. Ex. 580B] (9/21 e-mail transmitting "language from Barclays for the letter re the unwinding of the Barclays repurchase").)  Undeterred, Barclays persists with the fiction that the Clarification Letter, which its lawyer has testified "did not yet exist" during the Sale Hearing (A. 156 [Lewkow] 52:25-54:10), was "clearly approved by the Sale Order."  (Barclays Opp. ¶ 33.)[5]  In this regard, Barclays is careful to say that the Clarification Letter "was filed publicly in Court."  (Barclays Opp. ¶ 31.)  But it is

---

[5]  In fact, there was a draft Clarification Letter circulating at the time of the Sale Hearing, which tracked to some extent the disclosures Ms. Fife made on September 19 about changes in the deal.  (*Compare* BCI Ex. 49 [LBHI Docket No. 318] at 46:19-74 (comments of Ms. Fife about drops in value) *with* A. 181 [Dep. Ex. 35] (blacklined WGM Draft of 9/19/08 at 5 p.m.  describing reduction in "Long Position").)  This draft was e-mailed to the lawyers.  (BCI Ex. 364 [Lewkow Dec.] ¶ 11.)  But the draft was not shown or described to the Court and, in any event, major changes were made to it the next day.

7

just as careful *not* to say the letter was only filed *after* the closing, and then only as one of

several exhibits to the Asset Purchase Agreement, with no commentary at all about the pivotal

changes it made to the deal.

15.     The Court itself has noted that it did not see the Clarification Letter at the hearing

or separately approve it.  At a hearing on August 11, 2009 (on a matter unrelated to the Rule 60

Motions) the Court observed:

> We've had a lot of hearings that have touched on the sale to
> Barclays, both contemporaneously and after the fact, and the
> clarification letter obviously will speak for itself and it's not in
> evidence other than through judicial notice at this point, but it is
> my recollection that it was entered into after closing, during the
> business days that followed, and that it was never the subject of a
> separate motion for court approval.  To the extent that it was
> somehow obliquely referenced in transaction documents doesn't
> necessarily mean that it's the subject of a formal court order.

(A. 169 [LBHI Docket No. 4929], 8/11/09 Tr. at 107:12-21.)

16.     Barclays offers no good reason for the fact that the Clarification Letter was not

shown to the Court before the parties acted on it at the September 22 closing.  Barclays suggests

that it was important for the deal to close before the markets opened on that Monday.  (*See*

Barclays Opp. ¶¶ 132, 173.)  This, of course, does not explain why in a transaction of this

magnitude, when the Court held a hearing until past midnight on September 20, no effort was

made to reach the Court on an urgent basis before the closing to tell it about these major changes

to the deal.  In fact, the Court had expressly *announced* it would be available in the courthouse

on Saturday, September 20, if it proved necessary to "have a further hearing to flush-out on-

going issues concerning the form of the [Sale] Order."  (BCI Ex. 49 [LBHI Docket No. 318],

9/19/08 Tr. at 217:19-218:3 ("And anybody's who's interested can show up.").)

8

17.     Instead, Barclays offers the "expert" testimony of Anthony Saunders, who

purports to be able to predict what would have happened had the deal not closed.  Even Dr.

Saunders, however, conceded that the closing could have taken place as late as Wednesday,

September 24, without his dire predictions coming true.  (A. 160 [Saunders] 18:4-20:17.)  One of

Barclays' lawyers on the deal, Mr. Rosen of Cleary Gottlieb, acknowledged that the deal could

have closed on Tuesday.  (A. 159 [Rosen] 222:3-12.)  Rather than confront this failure to

disclose, Barclays asserts that Lehman's counsel made the decision not to tell the Court, as if that

could substitute for the Court's approval.  (Barclays Opp. ¶ 182 (citing BCI Ex. 87 [Miller]

48:14-49:15).)  Barclays' counsel, in any event, concedes that its own lawyers joined in the ill-

advised decision to forge ahead with a changed deal without the Court's knowledge.  (A. 156

[Lewkow] 131:7-133:24.)  While these irrefutable facts may explain why some of those involved

now defensively opine that the Clarification Letter was somehow meaningless because in their

view Barclays was supposed to get everything regardless of asset value, those *post hoc*

rationalizations do not explain why no one told the Court that was the plan or brought the

Clarification Letter to its attention before they acted on it.

**B.     The Deal Was Described To The Court And The Lehman Boards As A
        Balanced Exchange Or A "Wash"**

18.     To support its position that the value of what it took in the transaction was

irrelevant, Barclays places unjustified weight on a snippet of deposition testimony from Harvey

Miller, Debtor's counsel at the Sale Hearing, who purportedly would agree now that the Sale

Transaction was supposed to be a transfer of the Debtor's assets "irrespective of what their value

was." (Barclays Opp. ¶ 40 (citing BCI Ex. 87 [Miller] 50:18-51:6).)[6]  Even if that testimony

---

[6]  In a similar vein, Barclays offers sound bites from the deposition of Barry Ridings of Lazard in which Mr.
Ridings expressed the opinion that he had no reason to believe the "people at Lehman who were dealing with
Barclays" were not acting in good faith (Barclays Opp. ¶ 8); he did not "think" the deal was structured as a "precise

9

reflects Mr. Miller's retrospective view of the transaction as it was ultimately implemented it

describes neither the deal the Lehman Boards authorized nor the deal Mr. Miller described to the

Court at the time.  Moreover, discovery has revealed that asset values most certainly mattered to

Barclays.  Barclays' President Mr. Diamond assured his board that the deal would have sufficient

billions in profit for Barclays that it would be "capital accretive" and would require no new

regulatory capital to be sequestered because of the asset value Barclays would receive.  (*See*

LBHI Mot. ¶¶ 28-37.)  In fact, Mr. Diamond said he did not have authority to make any other

deal.  (BCI Ex. 63 [Diamond] 61:8-24; 82:15-83:5; 91:9-15.)

19.    Nothing said in any proceeding before the Court suggested such an embedded

gain for Barclays or that Lehman was transferring assets "irrespective of what their value was."

In fact, on September 17, 2008, the Court specifically asked Mr. Miller how the Court "should ...

view the fair value of the overall transaction."  (BCI Ex. 48 [LBHI Docket No. 352], 9/17/08

Tr. at 23:19-20.)  The Court was not told then, as Barclays tells it now, that it should approve the

overall transaction "irrespective" of asset values, although that would have been quite simple to

say if it were so.  Mr. Miller, however, told the Court "[i]t is a very complex transaction" that

would net the estate $1.7 billion.  (*Id.* at 22:8-11.)  And Mr. Miller answered the Court's question

---

(continued…)

wash" (*id.* ¶ 15); "[i]f Barclays lost money on this transaction, it would have been the end of the U.S. capital markets" (*id.* ¶ 18); and he did not think there were any "secret discussions" because at the time Barclays thought Lehman's marks were overstated.  (*Id.* ¶ 23)  None of this, however, supports the proposition that the value of Lehman's assets were "irrelevant" to the deal.

Riding's testimony is irrelevant.  There is not a scrap of evidence to suggest that Mr. Ridings had anything to do with negotiating the economic terms of the deal, documenting it, or making the necessary disclosures to the Court.  (*See* BCI Ex. 92 [Ridings] 29:9-23, 31:10-25, 38:3-13, 42:22-43:18, 46:21-47:11, 58:23-59:8, 59:6-10, 64:2-7.)  Barclays' reliance on Mr. Ridings' view that it would have been the "end of the US capital markets" if Barclays had lost money in the transaction, as if the US market cared about Barclays' loss or profit on the transaction, not only is hyperbolic and unsupported, but it also fails to address the issue of disclosure to the Court.  Indeed, it is essentially the argument that the Court's informed approval was not necessary because, with consequences so potentially dire, Barclays and Lehman were free to make any deal they wanted after the hearing.  Of course, that is baseless and does not excuse the failure to provide full disclosure in the first place.  (*Cf.* A. 160 [Saunders] 41:12-42:3, 45:15-46:7 (Barclays' expert testifying that the market did not care what the terms of the Sale Transaction were or if Barclays suffered a loss).)

about value with a detailed response based on the Asset Purchase Agreement and consistent with

the 9/16/08 Financial Schedule, in which he described the value of the offsetting liabilities to be

assumed and added in the cash to be paid.[7]  Specifically, Mr. Miller said:

> MR. MILLER:  I think, Your Honor, if you start with the billion
> seven hundred million dollars [the amount paid for real estate
> assets], which is the cash component, … there will be an exposure
> for 2.5 billion in connection with the retention of these 10 to
> 12,000 employees.  In addition to that, Your Honor, in connection
> with the assumption and assignment of contracts, the cure amounts
> and other payments in connection with the contracts, are estimated
> to be a billion five hundred million dollars.  So we have four
> billion dollars right there, Your Honor.  In addition, Your Honor,
> the purchaser is paying 250 million dollars for the goodwill of LBI.
> So there you have 4,250,000,000 dollars in that respect, Your
> Honor.

(*Id.* at 23:21-24:8; *see also id.* at 36:8-12.)

20.    If, instead of giving the Court this description of value, Mr. Miller had said that

values were irrelevant, he would have directly contradicted his own client.  Lehman's CEO Bart

McDade, who actually made the deal testified unequivocally that the deal he made was to be "in

balance," with Barclays getting assets roughly equivalent to assumed liabilities.  (LBHI Mot. ¶

36; *see* BCI Ex.85 [McDade] 160:8-20, 216:23-217:23.)[8]  This deposition testimony was

consistent with testimony Mr. McDade gave at the Sale Hearing, where he described an on-going

assessment of "individual assets on the balance sheet" when asked to describe "how it is that the

debtor determined that fair value was being realized for the sale of [its] assets[.]"  (BCI Ex. 49

[LBHI Docket No. 318], 9/19/08 Tr. at 109:5-110:3.)  Similarly, Steven Berkenfeld, the senior

---

[7] The Asset Purchase Agreement itself described the asset value of the "Long Positions" against which
these liabilities were to match.  (*See* A. 30 [APA] § 1.1(d) (definition of Purchased Assets).)

[8] Moreover, if Barclays as it now suggests really was paying $250 million for all the non-excluded assets
"irrespective of value," nothing could have been more necessary than to value those assets for the Court and
Lehman's creditors so the imbalance in such a transaction would have been disclosed.  The parties recognized this
truth at the time because they included a valuation of the Long Positions and the Short Positions in the Asset
Purchase Agreement and also spoke about valuation to the Court on both September 17 and 19.  Further, the Court
was told the $250 million was being paid for "goodwill."  (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at
47:14-15.)

Lehman executive who signed the Asset Purchase Agreement (*see* LBHI Mot. ¶ 41), testified at

his deposition that the deal was one where assets were supposed to at least match liabilities.  He

said "My understanding of the transaction is that, on acquisition, as reflected in the Asset

Purchase Agreement, it was not intended that Barclays would have an immediate excess value in

the assets they were bringing over."  (A. 2 [Berkenfeld] 112:7-25; *see* LBHI Mot. ¶¶ 41-46

(collecting Berkenfeld testimony).)

21.      Had Mr. Miller told the Court the deal was for a transfer of all of Lehman's assets

"irrespective of what their value was," it also would have surprised the Lehman Boards.  The

transaction the Lehman Boards authorized to be submitted to the Court was described to the

boards as "[f]or LBI ... a wash – with Barclays assuming liabilities, including employee

liabilities and contract cure amounts, basically equivalent to the assets."  (A. 39 [9/16/08 Lehman

Board Minutes] at 4.)   In this regard, the Examiner reports that Thomas Roberts (a Weil partner

who attended the board meeting) indicated in an interview in April 2009 that the transaction

entailed "Barclays acquisition of assets and liabilities at a 'wash'[.]"  (A. 172 [Examiner's

Report] at 2136.)

22.      Finally, we respectfully suggest that if the Court had been told at the Sale Hearing

that  the Sale Transaction was an asset transfer "irrespective" of value it would have prompted

close inquiry from the Court.  Throughout, the Court on multiple occasions asked questions or

made observations indicating its concern that the debtor was receiving appropriate value for its

assets.  (*E.g.*, BCI Ex. 48 [LBHI Docket No. 352], 9/17/08 Tr. at 23:7-20 (asking "how to equate

the break up fee and expense reimbursement with the purchase price" and "[h]ow should I view

the fair value of the overall transaction"), 47:1-6 ("... when considering the notional value of the

transaction, assumed liabilities are very often included for determining the overall value"); BCI

Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 48:18 (inquiring about consideration to be given

for addition of PIM business), 50:1-5 (inquiring whether change concerning residential mortgage

collateral "constitutes a benefit to the estate or a detriment to the estate"), 54:18-22 (commenting

that the Court considered "$500 million dollars to be material"), 65:8-66:5 (expressing view that

it was "troublesome" that there had been no "traditional marketing effort for the real estate.")

23.    Barclays sat silent at the hearing while Mr. Miller described the balance of assets

and assumed liabilities to the Court, but evidence revealed in discovery shows that Barclays

knew even then that the numbers the Court was given for assumed liabilities were grossly

inflated.  In fact, although the lawyers did not know it, Barclays planned on the inflation and,

even before the first hearing, was already totaling up its gain.  On the morning of Tuesday,

September 16th, Barclays internally quantified its "comp" obligations at only $1.3 billion

although Mr. Miller told the Court the next day it was $2 billion.  (*See* A. 178 [BCI-Ex-(S)-

00211046] (9/16/08 email from B. Wang to J. Walker, attaching acquisition summary).)  Mr.

Ricci confirmed Barclays' view of these compensation obligations in his deposition, when he

testified that Barclays only intended to pay $1.35 billion for such liabilities, not the contracted

for $2 billion.  (BCI Ex. 91 [Ricci] 38:21-39:11.)  In addition, on the morning of Tuesday,

September 16th, Barclays was valuing its likely contract cure obligations at only $200 million, or

lower.  The next day, however, it sat mute while Mr. Miller told the Court those liabilities could

be as much as $1.5 billion.  (*See* A. 174 [BCI-Ex-(S)-00210900] (9/16/08 Barclays' email

confirming it expected to pay about $200 million in cure liabilities, *i.e.*, "external funding"); *see*

*also* A. 185 [BCI-EX- (S)-00207822] (Barclays' "Long Island Acquisition Summary,"

calculating "cure payment" liability at ".14" or $140 million); LBHI Mot. ¶¶ 63-65.)

13

24.     At his deposition, Barclays' General Counsel, Jonathan Hughes, tried to justify

Barclays' silence with the improbable assertion that Barclays was forbidden from addressing the

Court.  (BCI Ex. 70 [Hughes] 89:6-92:18; *see also* Barclays Opp. ¶¶ 163, 601.)  This is nonsense.

First, the section of the Asset Purchase Agreement Mr. Hughes cited simply does not say that.

(*See* A. 30 [APA] § 7.2.)  Second, Barclays' counsel *did* address the Court.[9]  Third, Barclays'

principal counsel for the Sale Transaction acknowledged they had a duty to speak if they knew

the deal had not been accurately described to the Court.  (A. 156 [Lewkow] 126:25-128:24 ("If I

thought [the Court] was being misled I obviously would have, as was [Ms.] Granfield who was

my partner who I was sitting next to, we would have either ... addressed the Court directly or

would have talked to Weil Gotshal and asked them to make appropriate other statements to the

Court.").)

25.     Barclays also puts stock in another sound bite from Mr. Miller's deposition, to the

effect that the Sale Transaction was not a "balance sheet deal."  (Barclays Opp. ¶ 497 (citing BCI

Ex. 87 [Miller] 57:12-17, 50:14-51:6).)  Again, the inference Barclays seeks to draw from this

testimony – that assets could be given away without Court approval – cannot be correct.  It

would, again, have put Mr. Miller directly at odds with his client's view of the Sale Transaction.

26.     The deal was *based* on a balance sheet.  Berkenfeld signed the 9/16/08 Financial

Schedule, a balance sheet, which he described as follows:

> Q:      The estimate of the asset values in here [*i.e.,* the 9/16/08
> Financial Schedule] was the estimate upon which the transaction
> was based, correct?
>
> A:      The estimate of the assets was an estimate of assets that
> would be transferred over.  At that point in time, the belief of the
> assets that would be transferred over to Barclays kind of as

---

[9]  (*See* BCI Ex. 48 [LBHI Docket No. 352], 9/17/08 Tr. at 75:23-81:16, 99:1-102:4; BCI Ex. 49 [LBHI
Docket No. 318], 9/19/08 Tr. at 132:21-133:18, 177:10-19, 179:7-180:4, 183:5-184:25, 199:10-200:15, 203:12-
204:13, 230:16-233:21, 235:6-10, 245:5-246:24.)

NYI-4250276

> guidance for what was meant in the Asset Purchase Agreement
> when there was a reference to Purchased Assets.

(BCI Ex. 55 [Berkenfeld] 50:15-24; *see also id.* at 78:16-79:3.)  Mr. McDade expressly affirmed

the importance of the 9/16/08 Financial Schedule to the Sale Transaction:

> Q:      Does [the 9/16/08 Financial Schedule] bear any relation to
> the transaction that was agreed as of the 16th of September?
>
> A:      Yes.
>
> Q:      Okay.  What relation does it bear?
>
> A:      Significant relation.
>
> Q:      Could you describe that to me?
>
> A:      The deal contemplated an assumption of liabilities and the
> acquiring of assets, and this represents the summation of those two
> components of the transaction.

(BCI Ex. 85 [McDade] 54:10-20.)

27.    Barclays' board was also told it was a balance sheet acquisition.  (*See* A. 190

[Dep. Ex. 581B] (9/16/08 Barclays Board minutes ¶ 3 ("Business Being Acquired … The

balance sheet acquired consisted of $45 billion of illiquid assets and $30 billion of less liquid

assets.")).)  And Barclays' Group Chief Executive Mr. Varley, testifying about what he called

"Lehman 2," *i.e.,* the transaction that was the subject of the Sale Motion,[10] acknowledged that the

"balance sheet" Barclays acquired had a built-in imbalance in Barclays' favor, *i.e.*, a discount:[11]

> Q:      And the acquisition of the balance sheet also gave you an
> opportunity to get that delta that would help offset some of the
> liabilities you were taking on?

---

[10]  Mr. Varley described the deal the parties were negotiating before the bankruptcy as "Lehman 1," the
deal set out in the Asset Purchase Agreement as "Lehman 2" and the deal the parties actually consummated as
"Lehman 3."  (BCI Ex. 99 [Varley] 14:14-15:3.)

[11]  Similarly, in his deposition, Richard Ricci, Barclays COO, admitted that on Friday, September 19, he
told Alex Kirk, Lehman's head of Principal Investing that  "we're not going to be pigs and go after every last
nickel."  (*See* LBHI Mot. ¶ 108; BCI Ex. 91 [Ricci] 158:4-159:8.)  If, as Barclays now contends, this was not an
asset sale and it merely bought Lehman's North American business excluding certain specified assets, such a
statement would not have been necessary.  Barclays either was entitled to "every last nickel" or it was not, as Ricci
recognized at the time.

15

> A:    Well, I don't see it quite in that way.  What I would say is
> that *given that we wanted to acquire the balance sheet, we then
> wanted to ensure there was an appropriate discount.*  So I would
> not accept the way you have described it.  I think about it and
> thought about it at the time the way I have just described it to you.

(BCI Ex. 99 [Varley] 113:22-114:8 (emphasis added).)[12]

### C.    The Failure to Disclose Barclays' Day One Gain

28.    To disguise the lack of disclosure to the Court, Barclays engages in revisionist

history, asserting that it was "no secret" and "publicly announced" that the deal was structured so

Barclays would have an immediate gain the moment the deal closed.  (Barclays Opp. ¶ 17.)  Here

again Barclays relies on sound bites, quoting Mr. Miller's statement that he "assumed that

Barclays was not making this acquisition for the purpose of taking a loss."  (*Id.* (citing BCI

Ex. 87 [Miller] 64:20-65:6).)

29.    This begs the question.  No one suggests that Barclays did not intend, over time,

to profit from the Sale Transaction.  Indeed, when it opposed discovery earlier in these

proceedings, that is *exactly* what Barclays misleadingly told the Court had occurred.  Specifically,

rather than admit the existence of a massive day one gain, Barclays said *then* that the reason for

its announced $4.2 billion gain was "the acquired businesses have performed well and have

generated an accounting gain [but that] has no bearing on the adequacy of consideration when

the transaction closed."  (A. 43 [Barclays' Rule 2004 Obj., June 5, 2009] ¶ 56.)  Discovery later

revealed that representation to be false.  Good post-closing "performance" had nothing to do

---

[12]    Barclays' outside counsel acknowledged that the phrase "balance sheet transaction is not a term of art"
and gave his view of the term "balance sheet transaction" to mean there is a sale of a business and "a representation
by the seller as to the value as of signing" and a "pre or post closing price ... adjustment[ ]."  (A. 156 [Lewkow] 7:4-
23, 8:3-9:3.)  While Barclays now says this was not a "balance sheet" deal, the parties spent vast amounts of time
before closing assessing the values to be transferred, with a pre-closing adjustment of those values that Lehman's
counsel Ms. Fife described to the Court expressly at the Sale Hearing on September 19.  (BCI Ex. 49 [LBHI Docket
No. 318], 9/19/08 Tr. at 46:19-48:17.)  And, although the parties later dropped it, the Asset Purchase Agreement
also had a provision for a post-closing "Adjustment to Cash Amount" that turned on values Barclays might realize
on post-closing sale of transferred assets.  (A. 30 [APA] § 3.3.)

16

with Barclays' gain; it was the result of a built in "buffer"[13] of billions of dollars that gave

Barclays an immediate, day one, gain.[14]

30.    That truth having come out, Barclays has changed its story, *now* arguing the

embedded first day gain was "publicly announced."  That is not true, either, but the real point is

that no one told this Court that Barclays would have such a massive gain on day one.  (*See* LBHI

Mot. ¶¶ 37-38.)  The embedded gain was known only to a small group of Lehman employees

who were planning to join Barclays as soon as the Sale Transaction closed.  But it was not

known to other key Lehman officers or the Lehman Boards that approved the Sale Transaction,

much less "publicly announced."  Berkenfeld, the man who signed the APA for Lehman,

testified he did not "believe at the time when [he] signed this agreement that the intent of the

agreement was to deliver assets with a material embedded gain to them, to Barclays."  (BCI Ex.

55 [Berkenfeld] 122:17-123:2; *see also id.* at 110:23-111:21; BCI Ex. 85 [McDade] 157:4-9;

LBHI Mot. ¶¶ 41-46.)

31.    Nor was the Court told about an embedded gain for Barclays.  As a substitute for

such disclosure, Barclays points to two out-of-court statements, *i.e.*, (i) a call its executives had

with some analysts in London on September 17 in which the deal was described as "capital

accretive" and (ii) a September 17 press release describing "capital ratios."  Barclays has

acknowledged in recent testimony that these two items constitute the sum total of its so-called

disclosure.  (A. 153 [Hughes II] 332:18-346:10.)  Neither mentioned the assumed liabilities the

Court was told were integral to the transaction.  (A. 46 [9/17/08 Analyst Call Tr.]; A. 177 [Dep.

---

[13]  "Buffer" is the term Mr. Varley used to describe the spread between what Barclays gave and what it
received.  (BCI Ex. 100 [Varley] 137:20-138:11.)

[14]  The true "buffer" in value on day one was, in fact, much larger than the $4.2 billion Barclays reported as
its acquisition accounting gain in February 2009.  When the securities transferred to Barclays (as well as the
additional securities Barclays seeks) are valued appropriately, the actual "buffer" built into the transaction -- but
never disclosed to the Court -- was well over $11 billion in Barclays' favor.  (A. 202 [Zmijewski Report] ¶ 11
(Opinion 2).)

17

Ex. 344A]; *see* A. 153 [Hughes II] 341:12-20 ("I don't know whether those specific numbers

then included estimates for comp and cure, nor do I know whether it included then all of the

assets").)  Nor did they refer to the terms of the Asset Purchase Agreement.  Most importantly,

neither was submitted or even mentioned to the Court.[15]

32.    And even if the press release or a transcript of the analyst call *had* been submitted

to the Court, they would not have provided adequate disclosure.  As Barclays has acknowledged,

these statements "include[d] descriptions which ... are very, very different from the description

that is ultimately or that describe the ultimate transaction."  (A. 153 [Hughes II] 341:12-342:6;

*see also id.* at 342:7-16 (acknowledging that, even if the Court had seen the press release by the

time of the Sale Hearing, "[t]here would be aspects of the transaction that had changed and some

of those aspects I believe were described, though I believe not all of the aspects or all of the

changes were described").)  So knowing the Court was not told about the massive gain hidden in

the deal, Barclays resorts to the assertion that the Court should have figured it out anyway,

although the Court was informed at one point that the Lehman estate would net $1.7 billion in

the transaction.  (BCI Ex. 48 [LBHI Docket No. 352], 9/17/08 Tr. at 22:8-11.)[16]  Barclays'

General Counsel, while contending that it was "capable of being apparent" that Barclays would

have a day one gain, also testified "whether, in fact, the court exercised or engaged in the

mathematical exercise ... I cannot say."  (A. 153 [Hughes II] 333:15-18, 334:12-14; *see also id.*

at 332:16-333:10 (does not know if the Court did "a detailed mathematical analysis" but

"concluded that the court was told it was possible that the assets would exceed liabilities").)

---

[15]  In this regard, when asked if the Court had been invited to hear the analyst call, Barclays' General Counsel answered: "I think you would have to ask [the Court] that question."  (A. 153 [Hughes II] 337:7-22.)  This was in keeping with the testimony of Barclays' President during Rule 2004 discovery who, when asked if the Court had been told that the deal had to be "capital accretive," answered "I have never had a discussion with Judge Peck." (BCI Ex. 63 [Diamond] 66:13-24.)

[16]  When Daniel Golden, counsel for an ad hoc noteholders committee, referenced Mr. Miller's statement to the Court that the transaction would yield $1.7 billion to the estate, no one representing Lehman or Barclays corrected him.  (BCI Ex. 48 [LBHI Docket No. 352], 9/17/08 Tr. at 50:2-51:4.)

18

33.     The same Barclays that told this Court in June 2009 that its gain was attributable to good post-closing "perform[ance]" *now* says that it was (i) "imperative that a gain be in existence on day one" and (ii) "a precondition for Barclays" that there be an immediate excess of assets over liabilities.  (A. 153 [Hughes II] 347:22-349:3, 350:10-20; *see id.* at 342:18-19 ("the concept of Barclays deriving a gain on the transaction did not change"); *see also* Barclays Opp. ¶¶ 104-113.)  Once again, no one said a word about any such "imperative" or "pre-condition" to the Court, and the Asset Purchase Agreement, of course, said nothing of the kind.  Barclays' General Counsel conceded, as Barclays' 30(b)(6) witness:

> Q:    As a matter of fact, was the court told that it was imperative for Barclays to make a first day gain?
>
> A:    Not that I am aware.

(A. 153 [Hughes II] 349:22-25.)  Barclays also has conceded that no one addressing the Court was in a *position* to disclose Barclays' embedded gain:

> Q:    Sir, is Barclays aware of any disclosure to the court of any profit or gain that Barclays anticipated it would make from the sale transaction?
>
> A:    On September 19th, I'm not aware of anybody identifying to the court a gain, nor am I aware that anybody who made any representations to the court was in a position to know one way or the other whether Barclays would have a gain . . . .

(BCI Ex. 70 [Hughes] 38:15-39:3 (non-responsive portion of answer and objection omitted).) This concession is all the more remarkable when compared to the testimony of Barclays' President Bob Diamond that Barclays' board demanded a gain as a condition of his authority to make any deal at all.  (BCI Ex. 63 [Diamond] 86:14-87:5 ("the asset liability mismatch had to have a mismatch in favor of positive capital accretion or we weren't authorized to do the deal").)

34.     Perhaps most remarkably, Barclays' General Counsel testified that Barclays "believ[ed] also that the court felt it was not relevant whether or not that windfall profit did or

19

did not exist." (BCI Ex. 70 [Hughes] 38:15-39:21.)[17] Thus, Barclays' essential theory is based

on the dubious premise that, in a bankruptcy court, in a Section 363 sale transaction, it is

irrelevant whether the purchaser of debtor's assets gained a "windfall" at the expense of creditors

and the Court does not need to be informed about such a gain.  That, of course, is not the law.

(*See infra* Argument, Point I.)

### D.    The Undisclosed $5 Billion Discount From Book Value

35.    In its moving papers, LBHI demonstrated that, without ever disclosing it to the

Court, Lehman's Boards or Lehman's lawyers, certain Lehman executives (all of whom were

offered lucrative jobs at Barclays) agreed from the start to build an embedded gain into the deal

for Barclays.  They agreed to transfer assets to Barclays for $5 billion *less* than Lehman's book

value, even though the Asset Purchase Agreement explicitly denominated the "value" attributed

to those assets as Lehman's then-current "book value."  (LBHI Mot. ¶¶ 4-9, 20-47.)  The $70

billion "book value" in the Asset Purchase Agreement submitted to the Court was false.  It

actually was a negotiated price reflecting a $5 billion difference between what Lehman thought

the assets were worth and what Barclays was willing to pay for them.  (LBHI Mot. ¶¶ 50-55.)

According to the unrefuted testimony of Lehman CFO Ian Lowitt, Lehman's book value

reflected Lehman's view of the accurate value of the assets and was $5 billion higher than the

$70 billion "book value" set forth in the Asset Purchase Agreement.  (BCI Ex. 83 [Lowitt] 41:8-

42:16; *see also id.* at 42:17-43:22.)

---

[17]  Barclays did agree that the Court needed at least some information about the economics of the deal:

> Q:    Did Barclays believe that the Court could not approve the sale without knowing what the, at least on an estimated basis, what the total value of the assets were that Barclays was acquiring?
>
> A:    I think I agree with that, actually.

(BCI Ex. 70 [Hughes] 102:20-103:5 (counsel's commentary omitted).)  Barclays, however, obviously preferred that the Court be kept on a "need to know" basis.  (*Id.* at 104:23-105:6 ("If by full disclosure you mean disclosure of what the Court needed to know with respect to those assets and liabilities, my answer is yes.").)

20

36.    In a clumsy effort to make this discount from Lehman's book value disappear, Barclays argues that Lehman's book values *should* have been lower, because they were "stale and overstated" and needed to be "adjusted" to Barclays' view of "fair market value."  (Barclays Opp. ¶ 21.) [18]  This effort to substitute Barclays' view of fair value for Lehman's book value once again ignores the central issue: disclosure to the Court.  Barclays does not even try to show that the Court was told in any fashion that the real agreement was to transfer the assets at a negotiated price below Lehman's book value.  It would have been an easy thing to disclose if the lawyers had known about it, but the lawyers were never told about the discount.  Hence, the Court was told the deal was based on Lehman's book value, although it was not.  (LBHI Mot. ¶¶ 20-47, 69-78.).

37.    Discovery from Barclays has also confirmed that the use of the term "book value" to describe assets was a deliberate choice.  Barclays' outside counsel has recently acknowledged that the term "book value" was added to the Asset Purchase Agreement pursuant to "joint instructions by lawyers from Cleary Gottlieb ... and Weil and Simpson."  (BCI Ex. 364 [Lewkow Dec.] ¶ 8; *see* A. 156 [Lewkow] 40:23-44:5 (the inclusion of "book value" came from Lehman).) [19]  Even Barclays' General Counsel has acknowledged that Barclays "must have" agreed to the use of the term "book value" because it "signed an agreement that had that expression in it."  (A. 153 [Hughes II] 355:19-23.)

---

[18]    Barclays' contention that it was paying fair market value for these assets is also inconsistent with its new found assertion that everyone expected Barclays to make a day one profit on the transaction.  A purchase at fair market value, by definition, means that the buyer is receiving assets whose value is equal to the consideration it is giving up.  There is no inherent gain in that aspect of the deal, and when the $3.5-$4.0 billion in liabilities Barclays was supposed to assume are taken into account, it is hard to see how Barclays could have expected the deal to be immediately "capital accretive" or profitable.

[19]    The documentary record also confirms that the choice of phrasing was deliberate.  The phrase "$70 billion book value as of the date hereof" was added by hand the night before the Asset Purchase Agreement was submitted to the Court.  (A. 176 [Dep. Ex. 518].)  That version, with the same handwritten annotations, was submitted to the Court on the Sale Motion.  (A. 148(A) [LBHI Docket No. 60], Ex. 2.)

21

38.    Still, Barclays, whose General Counsel has now testified that Barclays never "felt that particular expression was of great consequence" (A. 153 [Hughes II] 355:24-356:2), stood silently by while the Court was given an Asset Purchase Agreement that intentionally (but falsely) described the assets as having a $70 billion "book value."  (*See* A. 30 at 6.)  Mr. Hughes testified that Barclays was not "offend(ed) by the description, although he admitted it was a "negotiated" number:

> If that was to be described by Lehman Brothers as Lehman Brothers' book value, that was one way to describe it.  And that description didn't offend Barclays' understanding of the *appropriate valuation or negotiated valuation with respect to those assets at the time*.

(A. 153 [Hughes II] 356:3-20 (emphasis added).)

39.    Thus, Barclays *admits* that the $70 billion described in the Asset Purchase Agreement was, in fact, a "negotiated valuation" $5 billion below Lehman's book value.  This confirms the basis for Debtor's motion.  (*See* LBHI Mot. ¶¶ 20-38; *see also* BCI Ex. 83 [Lowitt] 41:8-11 (Lehman's books "fairly reflected the value of the assets according to how they were trading at the time"), 42:17-43:2 (stating that Barclays was going to purchase a substantial block of assets for less than Lehman had on its books), 45:8-17; BCI Ex. 75 [Kelly] 66:7-16 ("My understanding was that the negotiated sales price across all those asset portfolios resulted in a $5 billion, approximately $5 billion loss to Lehman relative to its marks at the time"), 46:11-16; 143:14-144:2, 153:5-18, 158:21-159:12; BCI Ex. 85 [McDade] 55:12-18 ("[t]his reflects the market price or the price agreed to by the individuals, the sellers and the buyers").)[20]

---

[20] Ignoring this testimony from Kelly, Lowitt and Tonucci, each of whom admitted the $5 billion discount, and ignoring documents corroborating their testimony, Barclays' expert on valuation issues Professor Pfleiderer concludes that based on his reverse engineering of Lehman's books there was no mark down of Lehman's assets and hence "the alleged discount at inception most likely did not exist."  (BCI Ex. 341 [Pfleiderer Report] ¶¶ 73-91.)   In this respect, Professor Pfleiderer's conclusion is contrary to the evidence and flatly conflicts with Barclays' argument that not only did such a "buffer" exist, but it was imperative to Barclays' entry into the Asset Purchase Agreement.   In any event, the data upon which Professor Pfleiderer purports to base his opinion simply does not support his conclusions.  (A. 202 [Zmijewski Report] ¶ 11 (Opinions 1, 2, 7 and 8).)

22

40.    Because the undisclosed reduction from Lehman's book value cannot be refuted, Barclays tries a different tack.  It asserts that the false statement in the Asset Purchase Agreement must have been evident to all, because Barclays "said ... all the time" that Lehman's marks were too high.  (Barclays Opp. ¶¶ 22-23 (citing BCI Ex. 92 [Ridings] 31:10-16, 38:14-23, 39:11-17).)  That may have been said to someone, but no one said it to the Court.  In any event, even if Barclays was on record that it believed Lehman's marks were too high, that would have been all the more reason to tell the Court and the public that the deal was not priced using Lehman's "book value" but instead was at a lower, negotiated, number.  Indeed, if Lehman's marks were too aggressive, as Barclays says, a deal based on those high marks indicated a *benefit* to the estate, not, as the false description kept from view, a transfer of assets for less than the higher Lehman marks.[21]

41.    Similarly, Barclays asserts that there is nothing "newly discovered" about the discount.  That, of course, does not excuse the failure to inform the Court and the lawyers about it.  (Barclays Opp. ¶ 23.)  And the argument also misses the point.  Barclays does not even try to address the substantial evidence that the discount was known only to a small group of people, all of whom either already worked for Barclays or planned to do so after the deal closed.  Kelly's e-mail describing it was sent only to Lowitt, Tonucci and Reilly, all of whom were joining Barclays.  (A. 37.)  No one at Weil Gotshal was told about it.  (BCI Ex. 87 [Miller] 111:12-112:11.)  Numerous Lehman executives in the center of activity during the sale were not told about it.  (LBHI Mot. ¶¶ 40-41 (collecting citations).)

---

[21]   Recent discovery has confirmed that neither Weil Gotshal nor Cleary Gottlieb were involved in negotiating the economic terms of the deal; they simply documented what their clients told them (BCI Ex. 87 [Miller] 77:12-78:16; A. 156 [Lewkow] 13:23-14:5.)  Mr. Miller testified that, had he been told of a discount, he would have informed the Court.  (BCI Ex. 87 [Miller] 111:12-112:11.)  Mr. Lewkow, from Cleary, testified that he believed Lehman, having "listened to Barclays views" had changed its marks to "reflect[ ] those judgments by Lehman as to the proper marking of assets or liabilities," but he had "no way of knowing" if that were so.  (A. 156 [Lewkow] 37:23-38:14. 39:19-40:3; *see also* LBHI Mot. ¶¶ 39-47.)

23

42.      Rather than address this unrefuted evidence, Barclays points fingers at outsiders to the deal, who joined the fray only *after* the deal closed, and claims they should have deduced the hidden flaws in the Sale Transaction from hints of their existence.  (Barclays Opp. ¶¶ 24-26.) These include Alvarez & Marsal ("A&M"), who were expressly instructed to stay away from negotiation of the Sale Transaction.  (BCI Ex. 84 [Marsal] 16:11-19:20.)  As set out below in detail, A&M was appointed to manage the estate after substantially all of Lehman's employees, including the senior executives involved in the Sale Transaction, had left for Barclays.  (*See* ¶¶ 99, 109-121, *infra*.)  A&M had access to no real information, and Barclays again stood silent when they asked for it.  (*See* ¶¶ 109-137, *infra*.)

### E.      The Misuse Of The Repurchase Agreement To Deliver The Discount

43.      Barclays purports to dispute with a *non sequitur* Movants' showing that the September 18 Repurchase Agreement was misused as a mechanism to deliver the undisclosed discount to Barclays.  (*See* LBHI Mot. ¶¶ 95-104.)  Specifically, Barclays asserts that "it was the *New York Fed*, not Barclays or Lehman, which insisted that Barclays take over that repo position."  (Barclays Opp. ¶ 27 (emphasis in original).)

44.      This is another feint.  There is no proof, or even a suggestion, that the New York Fed instructed Lehman and Barclays to orchestrate a maneuver that on the termination of the repo enabled Barclays to keep the financing haircut of, conveniently, approximately $5 billion, all without telling the Court.  (*See* LBHI Mot. ¶¶ 88-94.)  Nor is there any evidence that the New York Fed instructed the parties to ignore the plain language of Section 559 of the Bankruptcy Code, which, as Barclays knew, required that such excess collateral be put back into the estate. (*See* A. 155 [Kaplan] 42:22-44:7.)  And the New York Fed did not instruct that the Court be kept in the dark about the fact that, by September 18, the Repurchase Agreement had functionally

24

replaced the Asset Purchase Agreement as the substantive transaction between Lehman and

Barclays.  As Lehman CFO Lowitt testified, but nobody mentioned to the Court:

> Q:    The deal ultimately becomes giving Barclays the collateral
> that's in the repo, yes?
>
> A:    The deal was that Barclays would keep the collateral that
> was in the repo, and those were the assets that Barclays was going
> to take as part of the transaction.

(BCI Ex. 83 [Lowitt] 47:9-16; *see id.* at 135:17-136:10, 138:18-139:3); BCI Ex. 98 [Tonucci]

32:4-34:18.)

45.    Discovery taken since the Rule 60 Motions were filed has confirmed one of the

reasons no one told the Court about this maneuver:  No one told the lawyers about it before the

Sale Order was issued.  The lawyers knew virtually nothing about the September 18 Repurchase

Agreement, and nothing at all about its termination, when they attended the Sale Hearing

because the inside negotiators did not tell them about it.  Mr. Miller has confirmed that Weil

Gotshal played no role in negotiating or documenting the September 18 Repurchase Agreement.

(BCI Ex. 87 [Miller] 83:22-84:12.)  Mr. Lewkow confirmed that Cleary Gottlieb was not

involved "at all" in structuring or documenting the repo.  (A. 156 [Lewkow] 66:3-21.)

46.    In fact, Mr. Lewkow recently testified that the Weil and Cleary lawyers involved

in the Sale Transaction did not learn about the termination of the September 18 Repurchase

Agreement until the weekend after the Sale Hearing.  (A. 156 [Lewkow] 66:3-21, 67:19-69:16;

*see id.* at 69:28-76:19, 81:15-21, 83:5-21.)[22]  Barclays' lawyers have also testified that, even then,

there was *no discussion* between the lawyers for Lehman and Barclays about the Bankruptcy

Code Section 559 implications of the terminated repo; the only discussions about this were

---

[22]  This doubtless explains the readiness of Barclays' outside counsel to affirm to the Court, when asked,
that safe harbor provisions such as Section 559 were not going to be impaired by the Sale Order.  (BCI Ex. 49
[LBHI Docket No. 318], 9/19/08 Tr. at 179:16-180:5.)  It does not, however, excuse the failure to inform the Court
when it became apparent the very next day that the situation had changed and Section 559 was, in fact, at issue.

internal Barclays discussions.  (A. 156 [Lewkow] 72:19-73:3; *see also* A. 155 [Kaplan] 17:6-18:12, 21:16-22:16, 33:21-35:15, 37:11-14, 44:19-23, 50:12-51:7.)[23]

47.     Barclays had an obvious incentive to keep the issue to itself.  If the lawyers were sent back to Court to ask for permission to ignore Section 559, which required excess collateral to be returned to the debtor, they would have had to explain that Barclays was going to keep approximately $50 billion in collateral when it had advanced only $45 billion to Lehman in the Repurchase Agreement.  This, in turn, would have exposed the undisclosed $5 billion discount for Barclays that had been built into the deal from the very beginning.  The failure to bring to the Court's attention the role the repo had come to play in the transaction, and in particular its use to deliver that "buffer" to Barclays, kept this pivotal issue under wraps.

48.     Barclays' alternative strategy is to contend that it "never actually received $49.7 billion in repo collateral," offering instead its lower internal, post-Sale Transaction, assessment of the purported "fair value for accounting purposes."  (Barclays Opp. ¶ 28; *see id.* ¶ 29 ("it took Barclays months to properly value the illiquid assets it received ....").)  This is yet another diversion.  However Barclays decided to lower those values after the closing, the fact is that Barclays own agent, Bank of New York ("BoNY"), valued the repo collateral at approximately $45 billion at the time of the Sale Transaction itself, and Lehman agreed to give an additional $7 billion in cash to make up for additional repo collateral that was not successfully delivered at the time.  (LBHI Mot. ¶¶ 88-104; A. 189 [Dep. Ex. 86B]; A. 188 [Dep. Ex. 641A]; A. 103 [Dep. Ex.

---

[23] At least some members of Barclays' legal team had previously focused on the statutory issue, however, and recognized that Court approval was required to avoid the implications of Section 559.  (*See* A. 180 [Dep. Ex. 631] (Cleary correspondence with the SEC about code provisions relating to terminated repos, including Section 559, and proposing language for "the Order"); A. 159 [Rosen] 211:7-216:10 (Cleary partner testifying about the correspondence and identifying "the Order" as "the Sale Order").)

26

83B]; A. 182 [Dep. Ex. 275].)[24]  It was within the scope of BoNY's duties to value the collateral.

(*See* ¶¶ 9201, *infra*; *see also* A. 153 [Hughes II] 276:16-278:22 (describing BoNY's role as

Barclays' collateral agent in the September 18 Repurchase Agreement); BCI Ex. 73 [Keegan]

41:22-42:20 ("They're our agent"); BCI Ex. 72 [Rodefeld] 153:25-154:15 ("Bank of New York,

being our custodian, prices our securities, and when we lend those securities, the value that we

lend those securities at is the money that we're able to borrow to finance this firm;" and "Q: And

whose values do you use, Bank of New York's values or your values?  A: Bank of New

York's."); BCI Ex. 89 [Petrie] 52:17-54:6 (Typically, custodial agents assign values in repo

transactions; Barclays would challenge values from time to time, but agents' values were "rules

of the road.").)  Thus, Barclays is bound to the value its own agent gave the collateral.[25]

49.    The fact is that Barclays took the collateral in at the BoNY marks.  (*See* A. 103

[Dep. Ex. 83B] (Barclays' 9/21/08 email: "I've received agreement/consensus [sic] from Stephen

King and James Walker … We should book based on the price within the BoNY file, at least for

Day 1."); A. 184 [Dep. Ex. 587B].)  Using the values its agent applied to the collateral, Barclays

itself calculated its gain at $7.19 billion in "excess collateral."  (A. 77); *see* A. 157 [Malloy]

19:2-23:13, 36:11-22 (author of calculation affirming its accuracy); A. 75 (Barclays' "haircut

summary" showing "7.17" billion netted for Barclays); LBHI Mot. ¶ 99 (collecting sources).)  It

is therefore insufficient for Barclays, simply because it decided it did not like its agent's

---

[24]  BoNY's valuation does not include the $7 billion cash/securities.  Therefore, using BoNY's valuation of over $45 billion, and adding the $7 billion (which Barclays later received in the December 2008 Settlement), means that Barclays received over $52 billion in repo collateral.  (A. 77 [Dep. Ex. 144A].)

[25]  Barclays and its expert, Professor Pfleiderer, contend that the Court should just ignore the BoNY values because the collateral securities were complex and BoNY could not possibly have valued approximately $50 billion of such collateral within one day.  (BCI Ex. 341 [Pfleiderer Report] ¶ 43.)  What Barclays' expert fails to mention, presumably because he has no expertise in the area of repurchase agreements, is that BoNY alone acted as custodial agent for over $1.5 ***trillion*** of overnight repo transactions on a daily basis, serving as the single largest such institution in the $2.5 trillion overnight repo market.  In that role, BoNY routinely was required to process, manage and value every conceivable type of repo collateral and generally had to do so within a day.  (A. 199 [Expert Report of John Schneider] ¶¶ 27-28.)  Valuing the repo collateral in connection with the Lehman Barclays transaction was nothing out of the ordinary for BoNY.

27

valuation at the time of the closing, to offer its own, lower, post-closing valuations as proof of anything at all.[26]

50.    In any event, Barclays' post-sale accounting for the transaction does not accurately value the securities Lehman transferred to Barclays.  Contrary to Barclays' contention that the actual value of the repo collateral was $45.5 billion, or only $500 million in excess of the $45 billion repo loan (Barclays Opp. ¶ 137), a more thorough analysis reveals that Barclays has understated the value of those securities by $5 billion as of the effective date for the transfer of those securities under the Asset Purchase Agreement -- 12:01 a.m. September 22, 2008.  (A. 202 [Zmijewski Report] ¶ 11 (Opinion 1); *see* A. 30 [APA] § 4.01.)  Professor Pfleiderer's opinions in this regard are of no help to the Court because he merely parrots Barclays' internal valuations without independently valuing a single one of the over 10,000 distinct securities at issue.  Indeed, he readily conceded that he had no opinion as to whether he agreed or disagreed with Barclays' valuation as to any particular security.  (A. 158 [Pfleiderer] 323:2-14.)

## F.    Barclays' Alleged Risk

51.    Purportedly to justify the failure to obtain Court approval for critical aspects of the deal that gave Barclays its first day windfall, Barclays asserts that its gain was "far from guaranteed" and that it took major risks in the deal.  (Barclays Opp. ¶¶ 42-46, 74, 112, 316-318.)  First, this once more ignores the central disclosure issue.  If the Court had been told an enormous "buffer" or "mismatch" between assets and liabilities had been built into the deal to protect Barclays from downside risk, Barclays argument might make sense.  But, absent such disclosure, the assertion boils down to just a hindsight excuse for failure to make full disclosure.

---

[26]  Barclays' real problem here is that it apparently was unhappy with its agent's valuations, so although repo collateral is valued by the collateral agent as a matter of course, Barclays decided to re-value the collateral later, on its own and after the sale.  (*See e.g.* BCI Ex. 73 [Keegan] 41:6-42:16; BCI Ex. 77 [King] 111:7-113:19 (complaining that "the securities at the BoNY marks were atrociously mismarked" and describing how Barclays calculated its own, internal valuations differently).)

28

52.    Second, the facts indicate that Barclays' "risks" had been removed.  Mr. Varley,

Barclays' Group Chief Executive, said in the analysts call that the deal had been "de-risked"

because "we were able to establish the marks."  (A. 46 [9/17/08 Analyst Call Tr.] at 2-4.)

Internally, Barclays' board was told the same thing and Mr. Diamond testified that he lacked

authority from his board to agree to anything except a capital accretive deal; there had to be a

"mismatch in favor of positive capital accretion" for Barclays.  (A. 35 [9/16/08 Barclays Board

presentation] ¶ 3; BCI Ex. 63 [Diamond] 86:14-87:5.)  Barclays' internal analyses also show it

well understood there would be billions in gains from the moment the deal closed.  (LBHI Mot.

¶¶ 33-36.)  In fact, when it compared the assumed liabilities in the 9/16/08 Financial Schedule

(from which the representations to the Court were derived) to the liabilities Barclays actually

*planned* to assume, Barclays calculated on September 16, 2008 a gain of $2.9 billion.  (*See* A.

179; *see also* A. 174 (9/16/08 email on "Long Island Balance Sheet" calculating a "negative

goodwill" of $3 billion).)

53.    None of this supports Barclays' assertion that it entered into a deal fraught with

risk.  And the assertion is just not true, since the liabilities the Court was told Barclays would

assume were deliberately inflated, the value of the assets Barclays was taking were understated

from the beginning, and billions were added to the deal out of the Court's sight to make sure

Barclays had no risk at all.[27]  (LBHI Mot. ¶¶ 50-78.)[28]  So when Mr. Miller told the Court the

transaction would net the estate $1.7 billion, Barclays knew otherwise but said nothing.

---

[27]  Because the evidence demonstrates conclusively Barclays' complete confidence at the time that it would
walk off with a massive first day gain, Barclays avoids that evidence and instead relies on Mr. Ridings' retroactive
commentary that "[i]f Barclays lost money on this transaction, it would have been the end of the U.S. capital
markets."  (Barclays Opp. ¶ 18 (citing BCI Ex. 92 [Ridings] 25:24-26:2.)  While dramatic, this comment is
meaningless.  Mr. Ridings, of course, was not privy to Barclays' knowledge that the inflated assumed liability
numbers and hidden "buffer" for Barclays made its gain at the expense of creditors a foregone -- but completely
undisclosed -- conclusion.

[28]  If, as Barclays now asserts the September 19 asset grab merely represented an identification of assets to
which it was entitled under the Asset Purchase Agreement to provide it comfort it still would realize a "day one

29

54.     In sum, and as explained further below, Barclays' opposition is built on sand. The Court was not told, among other things, about (1) the overstatement of the amounts Barclays was to assume in bonus and cure liabilities; (2) the discount from the "book value" described in the Asset Purchase Agreement; (3) the central role the September 18 Repurchase Agreement played in delivering that agreed "buffer" to Barclays; (4) the embedded day one gain Barclays now says was "imperative" to the deal; (5) the grab for billions in additional assets that took place on September 19, 2008; and (6) the amendments effected in the never-submitted Clarification Letter that enabled these maneuvers.  Whether these happened by mistake, by design, or a combination of both, relief under Rule 60 is warranted.

## SUPPLEMENTAL STATEMENT OF FACTS

55.     We summarize below the evidence upon which the Rule 60 motion was based and then discuss the evidence uncovered in discovery taken after the motions were filed.  This additional discovery confirms Movants' showing in their opening papers about what happened during the week of September 15, 2008.

### A.     Recent Discovery Supplements and Confirms LBHI's Claims

#### 1.     In-Court Statements Framed the Sale Transaction as a "Wash" or a Balanced Deal for Lehman

56.     During the September 17 and 19 hearings, and in written submissions regarding the Sale Transaction, the Court was provided information about the type and value of the assets and liabilities to be transferred to Barclays.  As set forth in LBHI's Rule 60 Motion:

---

(continued…)

profit," then it appears to be saying that without such comfort that it would have refused to close, although it was bound by the Asset Purchase Agreement to do so.  Barclays has admitted as much.  (A. 153 [Hughes II] 350:10-351:3.)  This was not revealed to the Court.  Nor does Barclays state the basis upon which it could have walked away from its legal obligations under the Asset Purchase Agreement to buy Lehman's assets.

NYI-4250276

- The Asset Purchase Agreement memorialized the sale to Barclays of securities with a stated "book value" of $70 billion, certain real estate, and other assets of unspecified value, in exchange for Barclays' assuming liabilities with a book value of $69 billion and other liabilities for bonuses and contract cures, paying the appraised value for the real estate (estimated at $1.7 billion) and $250 million in cash. (A. 30 [APA] §§ 1.1, 2.3, 3.1.)  The deal also included a "true-up" clause whereby Lehman would receive up to another $750 million if the securities transferred to Barclays increased in value by a specified amount over the ensuing year.  (*Id.* § 3.3; *see* LBHI Mot. ¶¶ 70-78.);

- At the September 17 hearing, in response to the Court's question about how it should "value" the proposed transaction, Mr. Miller detailed the consideration to be paid, consisting of $250 million in cash plus Barclays' assuming $2.5 billion in bonus liabilities and approximately $1.5 billion in contract cure liabilities and said $1.7 billion would be netted for the estate.  The Court approved a $125 million break-up fee based on Mr. Miller's description of the net benefit to the estate, including his suggestion that the break-up fee was approximately 2% of the total price.  (BCI Ex. 48 [LBHI Docket No. 352], 9/17/08 Tr. at 22:8-11, 23:19-24:25, 36:8-13; *see* LBHI Mot. ¶¶ 81-83.);

- At the September 19 hearing, Mr. Miller told the Court there were changes to the deal.  His partner, Lori Fife, described those changes as:  (i) the value of the assets being sold had dropped from $70 billion to $47.4 billion, (ii) the value of the liabilities Barclays was going to assume had dropped to $45.5 billion, (iii) the true-up provision was eliminated, but (iv) Barclays was still going to assume the same cure and employment compensation amounts, and (v) Barclays was still going to pay $250 million for the goodwill of LBI.  (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 47:1-15; *see* LBHI Mot. ¶¶ 84-87.)  Ms. Fife also noted that the real estate had been appraised and its price adjusted downward by $200 million.  (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 47:16-48:4.);[29]

- Ms. Fife described "other changes" to the deal, none of which were portrayed as significantly altering the financial figures previously presented despite the Court's admonition that $500 million would be "material."  (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 53:20-54:22.);[30]

---

[29]  As set forth in the Expert Report of Harrison J. Goldin, dated March 15, 2010, these representations to the Court implied a net benefit to the Estate of $1.85 billion.  (Trustee Ex. 35 to Maguire Decl. [Expert Report of Harrison J. Goldin] at 7-9.)

[30]  Ms. Fife alluded generally to contractual changes concerning "purchased" and "excluded" assets (to be embodied in a clarification letter).  The only specifics she gave involved three Lehman subsidiaries added to the sale for no additional consideration; changes concerning licensing of Lehman marks; Barclays was to receive 100% of the residential mortgages because it had posted collateral to open up trading by the DTC (although Lehman was to receive back any excess collateral); no cash was being transferred to Barclays; Barclays was no longer buying Eagle Energy Management; no intercompany payables or receivable were being transferred; and a reference to a mortgage was deleted.  (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 48:5-54:20.)

31

- In his proffer of the direct testimony Bart McDade, Lehman's CEO, would give in support of the Sale Transaction, Mr. Miller reaffirmed some of these figures, in particular Barclays' assumption of $2.0 billion in bonuses and potentially $1.5 billion in cure liabilities (*id.* at 100:22-101:4). Mr. Miller did not know those numbers were inflated, but Barclays, and a few Lehman executives headed for jobs at Barclays, knew. (*See* LBHI Mot. ¶¶ 39-47, 59-69, 83.);

- On his cross examination, Mr. McDade provided detail about how the Debtor ensured it was receiving fair value, through a line by line valuation of assets. (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 109:5-110:3.); and

- No disclosures were made at either hearing, or by any other means, about the role of the September 18 Repurchase Agreement, the $5 billion discount, the search for additional assets on September 19, or *any* of the terms of the Clarification Letter (a draft of which existed at the time of the hearing but which was never presented for Court approval). (*See* BCI Exs. 48-49; BCI Ex. 70 [Hughes] 82:13-84:21; LBHI Mot. ¶¶ 79-87, 95, 118-122.)

57.     Even after the changes described to the Court on September 19, the essentially balanced nature of the deal remained. After stating that values of the assets and liabilities had declined by about the same amounts, Ms. Fife remarked, "So that has not changed from the original transaction." (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 47:1-15.) As of September 19, based on the disclosures made to the Court, Barclays appeared to be getting $47.4 billion in assets in exchange for its assuming (i) $45.5 billion in liabilities related to those assets plus (ii) another $3.5-$4.0 billion in bonus and cure liabilities. This still made it appear that the deal would provide a net benefit to Lehman.[31]

### 2.     Critical Features of the Deal Were Never Disclosed to the Court

58.     The in-court statements did not disclose critical events going on outside the courtroom, many of them unknown to the lawyers. Between September 15, 2008 and the closing:

---

[31]     Barclays apparently contends that it should be able to add to this calculation 50% of the residential mortgages (which Barclays now values at $3 billion) to arrive at an asset valuation in excess of $50 billion. (Barclays Opp. ¶ 197.) What Barclays' after-the-fact arithmetic overlooks is that (i) no such addition ever was put before the Court (ii) to the contrary, when asked about the value of the "resis" in the context of the First Amendment and the backstop of DTC obligations thereunder, Ms. Fife stated she was "not sure [of] the value of the collateral" (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 49:8-25) and (iii) had Ms. Fife further investigated the composition of the $47.4 billion figure she reported to the Court, she would have discovered -- and been able to advise the Court -- that the $47.4 billion figure included all the "resis" transferred to Barclays as part of the repo collateral. (A. 202 [Zmijewski Report] ¶ 11 (Opinion 6), ¶¶ 38-40.)

32

- Executives at Lehman, including Lowitt, Kelly and Tonucci, had agreed to give Barclays a $5 billion discount from the values Lehman had assigned the securities on its books, although Lowitt conceded Lehman's marks accurately reflected Lehman's view of the value of those assets.  (*See* LBHI Mot. ¶¶ 20-38.);

- These executives planned to write-down Lehman's books after the fact, to reflect what Barclays said it would pay, not a real "book value," to retrofit this negotiated discount into Lehman's books.  (*See* LBHI Mot. ¶¶ 51-58, 100.);

- The amounts of the bonus and cure liabilities the Court was told Barclays would assume were actually, and quite deliberately, inflated by billions of dollars.  (*See* LBHI Mot. ¶¶ 59-78.);

- After the Fed insisted Barclays enter into what became the September 18 Repurchase Agreement, these executives planned to use a default under that agreement to deliver the $5 billion buffer to Barclays, thereby obviating the need to retroactively write down Lehman's books because the Repurchase Agreement would be used instead to deliver the discount.  (*See* LBHI Mot. ¶¶ 95-104.);

- Neither Lehman's lawyers, nor Berkenfeld, Lehman's signatory of the transaction documents, was told of this $5 billion discount, the intent to write down Lehman's books or the planned repo default.  (*See* LBHI Mot. ¶¶ 39-47.);

- On Friday, September 19, Lehman executives searched for billions more in assets to add to the deal in response to Barclays' threat not to close without them.  (*See* LBHI Mot. ¶¶ 105-117.);

- Through material changes to the Asset Purchase Agreement, added by the Clarification Letter following issuance of the Sale Order, the parties added another $5 billion in assets to the Sale Transaction for no additional consideration and without informing the Court.  (*See* LBHI Mot. ¶¶ 118-126.); and

- By inserting another new provision into the "Clarification Letter" over the weekend, the parties terminated the September 18 Repurchase Agreement in a maneuver designed to add the excess repo collateral to the definition of Purchased Assets in the Asset Purchase Agreement, thereby violating express provisions of the Bankruptcy Code that address terminated repos; this delivered the undisclosed $5 billion buffer to Barclays by orchestrating an exchange of approximately $50 billion in assets for only $45 billion without telling the Court.  (*See* LBHI Mot. ¶ 121.)

### 3.    Recently Developed Evidence Confirms LBHI's Claims

59.    All of the above has been confirmed by additional discovery that has taken place since the Motions were filed.  In particular:

NYI-4250276

- Mr. Miller, testifying on behalf of Weil Gotshal, confirmed that no one from his firm was ever told of the $5 billion discount (BCI Ex. 87 [Miller] 79:5-19, 85:18-23) or the planned repo default (*id.* at 85:6-11), and no one at Weil Gotshal had any involvement in valuing Lehman's securities, including the collateral posted under the September 18 Repurchase Agreement.  (*Id.* at 78:10-16; 84:8-12.)  Miller never spoke to Kelly or Lowitt, the architects of the discount (*id.* at 81:18-22; 83:11-17) and he testified that had he been told of any discount, he would have told the Court.  (*Id.* at 111:12-112:16.);

- Mr. Ridings, Lazard's Rule 30(b)(6) witness, confirmed that neither he nor anyone from his team attended any meetings where the marking of Lehman's securities was discussed.  (BCI Ex. 92 [Ridings] 29:9-23.)  Ridings was not involved in all of the negotiation meetings.  (*Id.* at 31:10-16, 32:2-12.)  When he was shown Reilly's email suggesting a repo default as a means to deliver the "discount" to Barclays, Ridings said he was unfamiliar with the document, did not understand it, and did not "recall negotiations where people said I want a bulk sale discount."  (*Id.* at 42:5-43:18.);

- A Barclays' Rule 30(b)(6) witness, its General Counsel Jonathan Hughes, confirmed that the disclosures made to creditors during a recess in the September 19th hearing were no different from those Ms. Fife presented to the Court.  (A. 153 [Hughes II] 247:12-17, 248:4-25, 258:17-259:4.)  Mr. Miller confirmed this.  (BCI Ex. 87 [Miller] 76:9-14.)  Hence, the only supplemental information available to anyone was the incomplete information Ms. Fife gave to the Court;

- Barclays documents confirm that, while Barclays sat mute in Court, it knew that the "comp" and "cure" liability figures given to the Court were inflated, and relied on that inflation in calculating an expected $2.9 billion gain on the transaction.  (A. 179 [BCI-EX-(S)-00211334-35] (9/17/08 Barclays email attaching "Long Island Acquisition Summary"); *see* A. 174 [BCI-EX-(S)-00210900-902] (9/16/08 Barclays email confirming it expected to make $3.0 billion in negative goodwill for only $250 million consideration); A. 173 (9/16/08 Barclays email attaching "Long Island Draft Proforma Structure & Steps" presentation).);

- Alvin Brown, the attorney charged with drafting Section 9.1 of the Asset Purchase Agreement, confirmed that bonuses and severance were treated differently and that is why only bonuses are addressed in Section 9.1(c) (which references the 9/16/08 Financial Schedule) and other compensation such as severance in Section 9.1(b) (which does not refer to that schedule).  (A. 30; BCI Ex. 57 [Brown] 8:4-10, 20:2-22, 27:18-21.);

- Documents recently produced by Barclays' auditor, PriceWaterhouseCoopers, confirm that Barclays knew the Asset Purchase Agreement required $2 billion to be spent on bonuses.  (A. 195 (1/23/09 PwC email discussing Barclays' obligation to pay $2 billion in bonuses); A. 196 (1/26/09 PwC email to Mr. Kelly discussing same).); and

- Barclays' internal documents confirm that it has paid only $1.55 billion in bonuses to former Lehman employees. (BCI Ex. 64 [Exall] 108:11-109:9; A. 137.)[32]

60.     In addition, Barclays' opposition offers *no* evidence refuting any of the following:

- Lowitt's, Kelly's and Tonucci's admissions about the $5 billion discount, the plan to mark down Lehman's books, their later plan to use a repo default to pass this discount to Barclays, and Barclays' instructions to add more assets to the deal. (LBHI Mot. ¶¶ 20-27, 50-58, 95-104.) Lowitt, Kelly and Tonucci are now all Barclays executives. All three have submitted declarations in support of Barclays' opposition. All three have remained silent on these key issues. (*See* BCI Exs. 365 [Lowitt Dec.], 362 [Kelly Dec.], 369 [Tonucci Dec.].)

- Lowitt's testimony that Lehman's marks were accurate as of September 16, the day the Asset Purchase Agreement was dated. (*See* LBHI Mot. ¶¶ 20-27.) Lowitt's declaration makes no mention of this. (BCI Ex. 365 [Lowitt Dec.].) Nor do the Lowitt, Kelly or Tonucci declarations say that Lehman's marks were overly aggressive or stale, as Barclays now asserts. (BCI Exs. 365, 362, 369.)

- Berkenfeld's testimony that the 9/16/08 Financial Schedule was used as guidance for what was to be transferred to Barclays under the Asset Purchase Agreement (LBHI Mot. ¶ 51) and McDade's, Lowitt's and Kelly's testimony that the schedule reflected negotiated numbers (not book value) for such assets. (*Id.* ¶¶ 52-58; *see* BCI Ex. 75 [Kelly] 105:25-108:16, 120:5-11; A. 45.);

- The testimony and documents of Barclays' President Diamond, and its Group Chief Executive Varley, confirming that Barclays expected an enormous day one gain from the beginning and demanded a discount off the value of Lehman's assets to make sure it got one. (*See* LBHI Mot. ¶¶ 28-38.);

- The testimony and documents of Barclays employees confirming that Barclays never had any intention of paying the entire amounts of assumed liabilities that had been represented to the Court. (*See* LBHI Mot. ¶¶ 59-68; A. 54; BCI Ex. 91 [Ricci] 52:25-54:15 ("We were hoping … we wouldn't have to pay all of it"); A. 65; A. 54; A. 73; A. 71.); *see also* A. 178 [BCI-Ex-(S)-00211046] (9/11/08 Barclays email attaching acquisition summary spreadsheet); A. 174 [BCI-Ex-(S)-00210900-01] (9/16/08 Barclays email confirming it expected to make $3 billion in negative goodwill for only $250 million consideration); A. 185 [BCI-EX-(S)-00207822] at 2 (Barclays' "Long Island Acquisition Summary," calculating cure liabilities at ".14" or $140,000,000).); and

---

[32]     In a September 23 email, Mr. Exall, the Barclays executive in charge of paying bonuses to former Lehman personnel, put the "guaranteed bonus" (GB) pool at "$1.4 bn" and said "[s]pending more than $1.4 bn is dilutive to current negative goodwill calculation." (A. 191 [BCI-EX-(S)-00228642-44] (confirming that Barclays knew the bonus figure provided to the Court was inflated by $600 million); A. 185 [BCI-EX-(S)-00207822] at 5 (Barclays' "Long Island Acquisition Summary," calculating "cure payment" liability at ".14" or $140 million).)

NYI-4250276

- Lowitt's and Kelly's testimony and documents showing there was an intentional write up of Lehman's accrual for compensation and cure.  (*See* LBHI Mot. ¶¶ 60-62; A. 37.)

### B.    Barclays' Factual Recharacterizations Are Inconsistent and Inaccurate

61.    Faced with these indisputable facts, Barclays offers diversions from the central disclosure issue, that are inconsistent and misleading.

### 1.    Barclays' contention that Debtor's assets were being purchased "irrespective of their value."  (Barclays Opp. ¶¶ 56-62, 193, 194-203.)

62.    This assertion simply ignores the facts and defies common sense.  In essence, it means that Barclays paid $250 million for all of Lehman's assets without regard for their value. The Sale Transaction was based on a "balance sheet" covering assets selected by Barclays and offsetting liabilities included in the deal, *i.e.,* the 9/16/08 Financial Schedule (A. 31).[33]  In fact, Mr. McDade testified at the Sale Hearing that although "closing balance sheet" was not prepared due to "the speed of which we're operating," detailed and specific valuations of the assets being transferred to Barclays were conducted throughout the week.  (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 109:21-111:3.)  The parties also spent countless hours trying to value the assets and liabilities in the Sale Transaction.  Barclays' opposition concedes as much.  (*See* Barclays Opp. ¶¶ 65-66, 131-36.)

63.    In addition, the balance sheet embodied in the 9/16/08 Financial Schedule was central to the transaction, as confirmed by recently-produced Barclays' internal documents, including a spreadsheet prepared the very next day and reviewed by Barclays' key financial personnel, including Messrs. Clackson and Romain.  (A. 179 (9/17/08 Barclays email attaching

---

[33]  Why Barclays purchased any assets at all deserves consideration.  It easily could have purchased the building, back office operations, trademarks and intellectual property, and recruited Lehman's employees if all it wanted to do was buy "the business."  The explanation offered by Barclays that the assets are necessary to Lehman's operations is not convincing.  One of its primary negotiators, Mr. Klein, testified "one of the discussions was, well, maybe we just don't have a transaction that has any assets at all.  I mean, this is a business purpose.  If the assets are getting taken by others in different ways, just do a business deal."  (BCI Ex. 79 [Klein] 86:3-8.)  Hence, the real reason Barclays took assets was because the price was steeply discounted, guaranteeing an immediate gain.

36

"Long Island Acquisition Summary") at BCI-EX-(S)-00211334-35.)  The spreadsheet shows

"negative goodwill" of "2.75" including accounting for a "bonus accrual" of only "1.30."  (*Id.*)

This shows that Barclays knew on September 17 of a built-in gain, and that the $2.0 billion

"comp" accrual on the 9/16/08 Financial Schedule was inflated by at least $700 million.  In

addition, while Barclays tries to portray the 9/16/08 Financial Schedule as meaningless, the e-

mail chain shows how Barclays directly compared the inflated liabilities on the 9/16/08 Financial

Schedule with what they knew was the truth.  The e-mail says:

> [T]his is completion balance sheet from draft docks, LI side not
> Barcap, gives the final split – **neg goodwill from this method is
> the sum of 2.25+2 = 4.25 – 1.35 (a/cing liab) = 2.9**

(*Id.* (emphasis added).)  This is a *direct* comparison of Barclays' internal calculations with the

compensation and cure liabilities shown on the 9/16/08 Financial Schedule (*i.e.*, "2.25+2"), and

shows Barclays knew those liabilities were inflated.  (*See* A. 174 at BCI-EX-(S)-00210900-902

(9/16/08 Barclays email confirming it expected to make $3.0 billion in negative goodwill for

consideration of only $250 million); A. 173 at 2 (9/16/08 Barclays pro forma balance sheet

stating "Baltimore [Barclays] may assume liabilities with lower fair value than the assets

acquired generating negative goodwill").)[34]

64.    The record is replete with assessments of the values of assets and liabilities to be

transferred.  For example, in a conference call with analysts, Barclays discussed the due

diligence it had done and how it was able, as a result, to value and choose the assets being

acquired.  (A. 46 at 3; *see id.* at 4 ("we got to choose which inventory came with the deal"; "we

had just completed 72 hours of due diligence on every position … and we were able to establish

the marks"); *see also* A. 190 [Dep. Ex. 581B] (Barclays 9/16/08 Board minutes, ¶ 3: "The assets

---

[34]    Barclays' reliance on the 9/16/08 Financial Schedule in this regard demonstrates the disingenuous
nature of Barclays' asserting in its opposition that "[t]here is in fact no version of any September 16, 2008 financial
schedule that was initialed by an officer of Barclays, as referenced in § 9.1(c) of the APA."  (Barclays Opp. ¶ 92.)

acquired had been marked to market by Barclays Capital to confirm the valuation. The balance sheet acquired consisted of $45 billion of liquid assets and $30 billion of less liquid assets.").) If – as Barclays now contends – the value of the assets did not matter, these efforts would not have been needed. Moreover, as Barclays has itself told this Court, it demanded more assets in the deal on September 19 precisely *because* the value of the September 18 Repurchase Agreement collateral transferred to Barclays, according to Barclays, was inadequate. (Barclays Opp. ¶¶ 133-41.) If the balance of assets and liabilities did not matter, this justification is senseless.

65.    Barclays' contention that the Sale Transaction was a deal for the "sale of a business" is merely a mantra that does not support the notion that asset values in that business did not matter. In fact, Barclays picked the best, most risk-free, assets (*e.g.,* refusing certain mortgage backed assets, and other risky securities) and limited, to the extent possible without alienating the Court or creditors, the liabilities it was to assume. (A. 46 at 2-3, 6-7 (Varley: "we have been very deliberate in our choice [of assets]"); BCI Ex. 99 [Varley] 63:14-22 ("we had created an appropriate delta between asset and liability values"); *see also* BCI Ex. 91 [Ricci] 125:4-20 (Barclays created a "cushion" in the deal); BCI Ex. 73 [Keegan] 27:3-30:19.) Thus, the balance sheet nature of the deal was integral to transferring Lehman's broker dealer business to Barclays.

66.    Moreover, Barclays' "sale of a business" rationale presents further internal inconsistencies. Barclays contends that everything it received constituted assets "used in connection with the Business" and that purportedly justifies the transfer of all the repo collateral and all the additional assets to Barclays regardless of asset value. However, the agreement the Court was asked to approve was structured as an Asset Purchase Agreement. Internally, Barclays' board was told about "assets acquired." (A. 190 [Dep. Ex. 581B] (9/16/08 Barclays

38

Board minutes) ¶ 3.)  Indeed, the contention is undercut by Barclays' own testimony.  Its Head of

Principal Credit Trading Mr. Keegan testified it was an asset purchase.  He said this about a

conversation he had with Lehman's Eric Felder:

> And he said to me something to the effect, Well, I didn't realize
> that you couldn't take them, that we could leave stuff behind.  *I
> said, Yeah, this is going to be an asset purchase.  It's not going to
> be the purchase of a company.*  So we can leave whatever we want
> behind.

(BCI Ex. 73 [Keegan] 72:14-20; *see id.* at 70:22-74:24; *see* Barclays Opp. ¶ 138 (citing Mr.

Ricci's September 18 email to Mr. Klein: "Big issues today on bal sheet versus what we thought

we bought.").)

### 2.  Barclays' contention that nothing in the Asset Purchase Agreement "required" the Sale Transaction to be a "balanced" deal.  (*See* Barclays Opp. ¶¶ 11-13, 63-65, 73-74.)

67.      This contention is premised on Barclays' assertion that "[t]he APA did not

provide total valuations for either the Purchased Assets or the Assumed Liabilities."  (Barclays

Opp. ¶ 11.)  That is wrong.  The Asset Purchase Agreement valued the Long and Short Positions

to be transferred at Lehman's book values.  (A. 30 [APA] at 6, 12.)[35]  Berkenfeld's testimony

that the 9/16/08 Financial Schedule was "guidance for what was meant in the Asset Purchase

Agreement when there was a reference to purchased assets" is unrebutted.  (BCI Ex. 55

[Berkenfeld] 50:15-24.)  The numbers Mr. Miller provided when the Court asked how to value

the transaction trace directly back to that 9/16/08 Financial Schedule.  (LBHI Mot. ¶ 82.)  That

schedule provided "comp" and "cure" numbers of $4.25 billion, which were liabilities Mr. Miller

told the Court on September 17th that Barclays would be assuming (although he reduced the cure

figure and increased the comp figure for some reason).  The discussion in the Sale Motion about

---

[35]   It also put an unambiguous $2 billion value on the bonus liability Barclays agreed to assume, by express
reference to the 9/16/08 Financial Schedule.  (A. 30 [APA] § 9.1(c); A. 31 [9/16/08 Financial Schedule].)

the requested break-up fee was premised on that valuation of the deal.  (BCI Ex. 11 [Sale Motion]

¶¶ 16-18; *see also* BCI Ex. 48 [LBHI Docket No. 352], 9/17/08 Tr. at 24:18-25:1 (calculating

break up fee as percentage of $1.7 billing netted to the estate).)  And Ms. Fife confirmed those

values in her September 19 presentation.  (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at

47:1-15; LBHI Mot. ¶ 85.)  To now contend that, because the agreement provided no "total

valuations," asset values were irrelevant to obtaining the Court's approval is a distortion.  And

even if Barclays' contention that the Asset Purchase Agreement itself did not expressly "require"

the deal to be a "wash" were credited, it is irrelevant to the critical point:  Whether the Court, the

Lehman Boards and creditors were told otherwise and approved the deal based on what they

were told.

> **3.     Barclays' contention that the Sale Transaction was never intended to be a "wash" because it involved a sale of a business.  (*See* Barclays Opp. ¶¶ 11-13, 44-45, 56-64, 67-72, 145-157.)**

68.     This rationalization, designed to escape from one disclosure problem, walks

Barclays into another one.  Hoping to show the Sale Transaction was never intended to be a

"wash," Barclays contends that there were other intangible assets transferred to Barclays, and

that $2 billion of its gain on acquisition was from those assets.  (Barclays Opp. ¶ 44; *see also id.*

¶¶ 68-72 (asserting values for other assets in the transaction).)  If that is so, however, then *that*

embedded value for Barclays should have been disclosed to the Court, as it was clearly material.

At the very least, the Court should have been told about $2 billion in intangibles being sold to

Barclays (Barclays Opp. ¶¶ 44, 72), if, in fact, that was what they were worth.

69.     Moreover, the assertion is fundamentally inconsistent with Barclays' explanation

for the Friday asset grab *i.e.*, to make up for the purported fact that Lehman had not transferred

sufficient value to Barclays.  (Barclays Opp. ¶¶ 140-144.)  Once again, Barclays cannot have it

both ways.  Either the asset grab was to make up for a supposed "shortfall" in the repo collateral,

NYI-4250276

in which case, through self help, Barclays secured the buffer embedded in the deal from the beginning. Or it was to ensure that these "other" business assets were included, in which case this material aspect of the deal was not properly disclosed to the Court.

**4.    Barclays' contention that nothing in the Asset Purchase Agreement or related documents creates a contractual "cap" on the value of assets. (*See* Barclays Opp. ¶¶ 40, 50, 191-203.)**

70.    This is another strawman. What the transaction documents and related disclosures to the Court plainly established was a *de facto* limitation. Framing the sale as a balanced deal, and seeking the Court's approval of it on that basis, effectively capped the differential between the value of assets transferred to and liabilities assumed by Barclays, thereby foreclosing a day one profit for Barclays.[36] While everyone recognized that in those tumultuous times it was difficult to value assets and liabilities with precision, these Motions are not brought because there was a slight discrepancy. They are brought because there was a prearranged multi-billion dollar gain for Barclays, arising from the difference between what it paid and what it received, which was not disclosed to the Court and was inconsistent with representations made to the Court.

71.    Barclays' self-serving statement that it never would have agreed to a "wash" transaction does not alter this conclusion. (*See* Barclays Opp. ¶ 16.) Even if true, this skirts the key question: whether the Court was led to believe the transaction reflected an exchange of roughly equivalent assets and liabilities. At no point was the Court told Barclays would only close the deal if it was "capital accretive." The Asset Purchase Agreement specified the conditions to closing, and that was not one of them. (A. 30 [APA] Art. IV.) And Barclays stood

---

[36] The same is true of the Lehman Boards' approval of the sale. The Boards were expressly told the deal was a "wash" as to the LBI assets and they approved the sale as described to them. (A. 39 at 4.) Accordingly, the Lehman Boards' grant of authority to close the deal extended only so far as the deal effectively constituted a "wash." This effectively capped the differential between assets and liabilities that Lehman was allowed to transfer to Barclays, and any deal effected under different terms was without Board authority.

41

mute while Mr. Miller and Ms. Fife described the net "value" of the deal to the Lehman estate.

(BCI Ex. 48 [LBHI Docket No. 352], 9/17/08 Tr. at 22:8-24:17, 36:8-12; BCI Ex. 49 [LBHI

Docket No. 318], 9/19/08 Tr. at 47:1-48:4, 54:12-22.)[37]

> **5.**   **Barclays' contention that the $5 billion discount embedded in the Sale
> Transaction was neither a "secret" nor a "discount."  (See Barclays Opp.
> ¶¶ 21-26, 28-29, 41, 48, 69-70, 76-86, 204-209.)**

72.   Barclays contends that the discount in the Sale Transaction was "not a discount

*from* fair market value, but rather an attempt to adjust from stale Lehman marks *to* fair market

value."[38]  (Barclays Opp. ¶ 21 (emphasis in original).)  This *admits* the existence of a discount

from the Lehman "book value" the Court was told was the basis of the deal.  The Asset Purchase

Agreement expressly used the term "book value" not "market value."  (A. 30 [APA] at 6, 12.)

What Barclays now admits is that the negotiators actually decided to effect the sale at a price *less*

than Lehman's book value.  Nothing in the Asset Purchase Agreement, or in any disclosure to

the Court, revealed that the sale was based on such a lower, negotiated price.[39]  Separately,

Barclays' contention that there was nothing secret about this "discount" (Barclays Opp. ¶¶ 21-23)

is belied by the unrefuted testimony of the lawyers and the senior executives who said they knew

nothing about it.  (*See, e.g.,* BCI Ex. 87 [Miller] 79:10-80:4, 84:13-85:23; A. 156 [Lewkow]

19:23-21:20; LBHI Mot. ¶ 40 (collecting citations); *id.* ¶ 41.)

---

[37]   Barclays' position is not helped by its citation to the distressed sales of Bear Stearns, HBOS,
Washington Mutual and Fortis (Barclays Opp. ¶¶ 16 n. 9, 105), since none of those sales took place under U.S.
Bankruptcy Court supervision and none required disclosures to such court.

[38]   Given Varley's testimony, the prices at which Barclays was acquiring the securities were not believed
by Barclays to be "market" valuations.  Otherwise, the transaction would not have been capital accretive as Barclays
now claims it had to be, unless it was relying on the undisclosed values of other intangible assets hidden in the Asset
Purchase Agreement and not valued for the Court and creditors.  (*See* BCI Ex. 99 [Varley] 34:13-37:2, 47:18-48:3,
63:2-22, 70:6-71:2; BCI Ex. 100 [Varley] 135:18-137:19.)

[39]   As Barclays itself asserts in its papers, where the negotiated terms in a contract are unambiguous there is
no basis for ignoring them or relying on extrinsic evidence to interpret or alter them.  (Barclays Opp. ¶¶ 340-344.)
Thus, where the contract used the term "book value" there was no cause for the Court to read this as anything but
book value, and not a hint in the record that it should do otherwise.

NYI-4250276

73.     Thus, Barclays argues that A&M and Lazard, both outsiders to the negotiations of

economic terms, should have figured it out.  (Barclays Opp. ¶¶ 23-26, 589.)  As noted below (*see*

¶¶ 109-121, *infra*), however, A&M was called in at the last minute to administer the LBHI estate

and was told not to involve itself in the Sale Transaction.  A&M struggled for months to get a

handle on the assets and liabilities left in the estate, its computer and accounting systems, and

eventually to try to understand what had happened in the Sale Transaction.  It was only after

Barclays refused to provide information that A&M had to focus its efforts on the value of assets

and liabilities transferred to Barclays.  And even then it ultimately required Court-ordered Rule

2004 discovery to get Barclays to relinquish the information.  To now argue that A&M knew

about the discount based on one document, the import of which no one at A&M could have

understood at the time, is disingenuous at best.  Likewise, Lazard's access to information on the

values of specific asset classes was even more limited since its role was simply to try to locate

alternate buyers for Lehman.  To try to ascribe to Lazard knowledge of this write down of

Lehman's book value based solely on a stray email that used the phrase "bulk discount"

(Barclays Opp. ¶ 77; *see also id.* ¶ 273) is meritless.  Mr. Ridings testified he did not recall any

discussion of a "bulk discount."  (BCI Ex. 92 [Ridings] 42:5-43:18.)

74.     Barclays also argues that, because repo transactions typically include excess

collateral posted against a cash transfer, everyone should have figured out that, *contrary* to

normal practice and the Bankruptcy Code, Barclays would keep the excess value in the repo,

thus using the repo as the mechanism to deliver the discount secretly embedded in the Sale

Transaction.  (Barclays Opp. ¶¶ 27-28.)  Once again, no one told the Court during the September

17 and 19 hearings about the role the repo *played* in the transaction, much less about the delivery

of excess collateral to Barclays.  So there is no basis to ascribe this type of detailed

understanding to the Court.

75.     Moreover, under Section 559, Barclays should have recouped only the amount of

the repo loan to Lehman and the excess repo collateral should have gone to the estate.  To avoid

disclosure to the Court about the delivery of excess collateral to Barclays, the repo was privately

"rescinded" without notice to the Court based on a clause Barclays inserted in the Clarification

Letter after the Sale Hearing.  Thus, Barclays avoided informing the Court about the buffer that

had been embedded in the deal from the outset and the use of the repo to deliver it.  If the Court

had been told about the termination of the repo, and its retroactive rescission, the lawyers would

have had to explain why Barclays was keeping $50 billion in securities in return for only $45

billion.

76.     Finally, Barclays contends that the parties "knew that the Purchase Agreement

provided for 'all' of these assets [*i.e.*, the repo collateral] to be Purchased Assets."  (Barclays

Opp. ¶ 28.)  This again is belied by the parties' own conduct.  If everyone knew, there would

have been no need to change the definition of Purchased Assets in the Clarification Letter to

encompass the repo assets.  And it does not solve the problem posed by Section 559 of the

Bankruptcy Code, which precluded Barclays from keeping excess collateral.  As to the ultimate

value of the collateral, that just goes to whether Barclays succeeded in collecting the original

discount or whether its September 19 asset grab was an additional taking over and above the

discount.  If the repo really was worth billions less than expected, the additional asset grab gave

the unapproved discount *back* to Barclays.  If it was worth $52.19 billion, just as Barclays valued

it based on the value its collateral agent supplied,[40] then Barclays got both the undisclosed discount plus billions more.

**6.    Barclays' contention that the Repo Collateral actually received by Barclays was worth at most $45.5 billion and thus there was no $5 billion discount in the Fed Repo Transaction.  (*See* Barclays' Opp. ¶ 137.)**

77.    Even as Barclays now admits that a "buffer" was always imperative to the deal, Barclays also argues that the repo collateral was not the source of its acquisition accounting gain, allegedly because that collateral was worth, at most, $45.5 billion.  (Barclays Opp. ¶ 137; *see also* BCI Ex. 341 [Pfleiderer Report] ¶ 5(a).)  Barclays' argument is premised entirely, however, on its accounting for financial reporting purposes of the value of the securities it acquired from Lehman.  That accounting did not value the repo collateral as of the relevant date and time.  Instead, for financial accounting purposes, Barclays valued the collateral at various later dates, some as late as December 22, 2008.  To value the securities transferred by Lehman, the repo collateral must be valued as of the date and time specified in the Asset Purchase Agreement for the transfer.

78.    Section 4.1 of the Asset Purchase Agreement provides that "[u]nless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the closing date."  (A. 30 [APA] § 4.1.)[41]  That

---

[40]  (*See* A. 77; *see also* A. 157 [Malloy] 19:2-23:13, 36:17-22; LBHI Mot. ¶ 99.)

[41]  As a matter of law, Section 363 contemplates that the value of the transaction must be considered as of the date of the transaction itself.  *See In re Westpoint Stevens, Inc.*, 333 B.R. 30, 33-34 (S.D.N.Y. 2005) (bankruptcy court entered 363 sale order that "determined the value of the Securities ... as of the closing date of the sale transaction," where a portion of the Securities were part of the sale transaction and another portion was to partially satisfy lenders' claims); *In re Exaeris, Inc.*, 380 B.R. 741, 744-45 (Bankr. D. Del. 2008) (declining to approve 363 sale where there was "no evidence upon which the Court can make an informed decision on the relationship of the sale price to the value of the assets being sold" and thus "lack[ed] information necessary to determine whether or not the Sale represent[ed] a sound business purpose"); *In re Chrysler*, 576 F.3d 108, 117 (2d Cir. 2009) ("a bankruptcy judge should consider 'such relevant factors as the proportionate value of the asset to the estate as a whole'") (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

45

was the point at which Barclays assumed the risk of loss and the appropriate time for measuring

the value of the assets transferred, not weeks or months later.  For much of the repo collateral,

the only relevant prices and valuation available at 12:01 a.m. on Monday, September 22, 2008

were the prices reported as of the close of business on Friday September 19, 2008, which was

also the date of the confirmation hearing and the date by which a significant portion of the

Schedule A assets and many of the Schedule B assets had physically been transferred to

Barclays' custodial agent, the Bank of New York.  (*Id.*; A. 197 [Expert Report of John Garvey]

¶¶ 18-30.)

79.     Ignoring the clear language of the Asset Purchase Agreement, Barclays chose

instead to value much of the repo collateral at prices as of the close of business on September 22,

2008, thereby improperly shifting to Lehman the decline in the value of those assets after the

Closing.  (A. 202 [Zmijewski Report] ¶ 11; *see also* A. 197 [Expert Report of John Garvey]; A.

198 [Expert Report of John Olvany]; A. 200 [Expert Report of Joseph Schwaba]; A. 201 [Expert

Report of Mark Slattery].)  Barclays valued still other assets as of late September 30, 2008, and

some as late as December 22, 2008.  (*Id.*)[42]  Barclays' accounting valuation also understates the

value of the assets because Barclays engaged in various valuation adjustments that systematically

and pervasively depressed the valuations for entire classes of securities.  These valuation

adjustments were baseless.  Most of the securities at issue are neither illiquid nor particularly

---

[42]     Particularly inappropriate in this regard was Barclay's valuation as of December 22, 2008 of the Annex
A Securities, *i.e.*, the securities that were the subject of Barclays December 2008 settlement with JP Morgan and
others.  First, the December Settlement specifically related to securities that Barclays claimed were undelivered by
JP Morgan but related to the September 18 repo transaction, and which Barclays itself valued, for purposes of its
settlement discussion, as "cash/securities" worth $7 billion.  (A. 77.)  Second, Barclays elected to settle its claims
with JP Morgan in exchange for the delivery of these securities *plus* cash in the amount of $1.25 billion "to partially
account for ... the decline in value of the settlement securities since September 19, 2008."  (A. 151 [LBI Docket No.
387] ¶ 20.)  Having negotiated and received compensation for the purported decline in value of the securities,
Barclays now seeks to "double-count" the post-closing date decline in the value of the Annex A securities by using
that lower accounting value to calculate the value of repo collateral.  When the Annex A collateral is valued as of
the appropriate valuation date, September 19, 2008, it shows that Barclays has undervalued the these securities by
about $1.65 billion.  (A. 202 [Zmijewski Report] ¶ 11 (Opinions 1 and 3), ¶ 31.)

difficult to value.[43]  As set forth more fully in the accompanying expert report of Dr. Mark

Zmiejewski, Barclays has undervalued the repo collateral by $5 billion.  (A. 202 [Zmijewski

Report] ¶ 11 (Opinion 1) and materials cited therein.)  When the repo collateral securities –

referred to as Schedule A and Annex A securities – are properly valued, Barclays' day-one gain

on acquisition exceeds $9 billion.[44]

80.     Barclays' contention is also undercut by recent testimony.  It has always, of

course, been in Barclays' interest to depress the value of the repo collateral it received to hide the

embedded "buffer" or to justify the September 19 asset grab (or both).  In fact, testimony

recently taken in this action has revealed that it was engaging in this activity on the morning of

the Sale Hearing.  James Seery, formerly Lehman's Global Head of Fixed Income, Loans,

testified on March 3, 2010 that the Lehman book values for the repo collateral on September 19,

2008 were approximately $50.6 billion.  Barclays expressed a generalized concern, without

specificity, about the value of the collateral it was receiving.  Consequently, Lehman traders

were instructed to calculate reduced *liquidation* prices for the collateral, below Lehman's market

values.  This reduced the total "valuation" by approximately $5 billion, to $45.5 billion.  This

artificial reduction was used to justify the Friday asset grab, including the addition of

approximately $1.9 billion in unencumbered assets, on the specious ground (based on the

liquidation prices) that values had fallen below what Barclays wanted to receive if it was to close.

---

[43]  Barclays' arguments that the repo collateral was difficult to value (Barclays Opp.  ¶¶ 28-29, 40, 60, 127) is refuted by its Chief Financial Officer Chris Lucas, and its valuation expert Professor Pfleiderer.  Mr. Lucas, on September 17, 2008, announced in the Barclays analyst call that "out of a total of $72.7 [billion] which is a net number, *the vast majority of those assets are quoted equity Government and Agency Paper, CP money market instruments and derivatives* and a relatively sizeable cash and matured book."  (A. 46 [9/17/08 Analyst Call Tr.] at 3 (emphasis added).)  Likewise, Professor Pfleiderer admitted that, for securities representing over 77% of the repo collateral value, price quotes were available on Bloomberg and Standard & Poor's Capital I, two publicly accessible securities pricing services.  (BCI Ex. 341 [Pfleiderer Report] ¶ 31; A. 158 [Pfleiderer] 164:8-24].)

[44]  Indeed, when all the assets Barclays has received (or claims a right to have received as of the Closing Date) are valued properly, Barclays' day-one gain on acquisition exceeds $11 billion.  (A. 202 [Zmijewski Report] ¶ 11 (Opinion 2).)

47

Notes Seery made at the time add these two components to total $47.4 billion, indicating that when Ms. Fife gave that number to the Court at the Sale Hearing it was not, as her presentation suggested, because of a dip in market values.  It was because (unbeknownst to Ms. Fife) the value had been artificially reduced to a lower "liquidation" value.  (*See* A. 161 [Seery II] 270:21-271:23, 278:20-279:3; *see also* A. 193 [Dep. Ex. 666] (excerpt from Seery's notes showing reduction of repo collateral to $45.5, leaving a total "haircut" of $7.17 billion); Creditors Committee Brief, Pt. II.A.7.)

81.    By focusing narrowly on the repo collateral, Barclays' valuation expert, Professor Pfleiderer, conveniently overlooks the substantial additional value Barclays received and claims a right to receive.  As set forth in the expert report of Dr. Zmijewski, when the overall transaction as consummated is properly valued, Barclays day-one gain on acquisition exceeds $11 billion.  (A. 202 [Zmijewski Report] ¶ 11 (Opinion 2).)  That is more than $13 billion in excess of the $1.85 billion benefit to the Estate disclosed at the September 19 Sale Order hearing. (*Id.*)

**7.    Barclays' contention that parties could not have intended to use the September 18 Repurchase Agreement to deliver the $5 billion discount because the New York Federal Reserve Bank insisted that this transaction be put in place.  (*See* Barclays Opp. ¶¶ 27, 118-122.)**

82.    This assertion is meaningless.  The fact that the Fed insisted on being replaced as a provider of overnight financing is undisputed.  This means only that the Lehman executives who had agreed to the $5 billion discount, and were planning to write down Lehman's books after the fact, were able to avoid going through that illegitimate exercise by going through another illegitimate exercise, using the September 18 Repurchase Transaction as an alternative method to deliver the undisclosed discount.  (*See* LBHI Mot. ¶¶ 88-104.)

48

83.     This is confirmed by evidence Barclays does not refute, including the unrebutted

evidence that a "default on the repo" was identified by the business people as the "best" method

to deliver the discount rather than putting it "in the sale price tomorrow," *i.e.*, at the Sale Hearing.

(LBHI Mot. ¶ 98 (quoting A. 58).)  Nor does Barclays refute the evidence that the business

people knew full well that there was no provision in the Asset Purchase Agreement for such a

maneuver.  (LBHI Mot. ¶¶ 100-104; *see* A. 55 (per Reilly: "I went through all docs and did not

see reference to the price haircut"; and per Lowitt: "Since not in contract hard to see what to

do.").)

84.     This use of the September 18 Repurchase Agreement to deliver the discount

remained a secret until it was revealed in discovery.  The only disclosure made to the Court

about the September 18 Repurchase Agreement was a few stray comments that provided no real

information other than to describe it as overnight financing.  (BCI Ex. 48 [LBHI Docket No.

352], 9/17/08 Tr. at 23:21-24:25 ("LBI has entered into an arrangement with the prospective

purchaser where there's a repo agreement in which they are backing up and allowing these repos

to be settled and to be financed."), 69:24-71:13 ("We have a company, Barclays, which is

supporting the operations of LBI right now with a repo credit agreement so they can settle the

transaction."); BCI Ex. 49 [LBHI Docket No. 318] 9/19/08 Tr. at 63:16-22 ("Yesterday, as Your

Honor has heard, Barclays basically stepped into the shoes of the Federal Reserve in connection

with the Primary Dealer Credit Facility as to the 45.5 billion dollars Lehman borrowed last

Monday and received the collateral that Lehman had posted in connection therewith.").)  Indeed,

when Ms. Fife outlined for the Court changes in the deal, she never once mentioned the

September 18 Repurchase Agreement.  (*Id.* at 46:19-48:17.)  Although it was not known to Weil

Gotshal and not disclosed to the Court, the repo had, by that Friday, become the central facet of

49

the deal.  (LBHI Mot. ¶¶ 95-96, 101-104; *see* BCI Ex. 83 [Lowitt] 47:9-16, 138:18-139:3; BCI

Ex. 98 [Tonucci] 32:4-34:18.)

> **8.      Barclays' contention that the Clarification Letter made no material changes to the deal and it was not necessary to seek approval from the Court.  (*See* Barclays Opp. ¶¶ 31-39, 163-173, 178-183, 210-231, 443.)**

85.      With this, Barclays is in effect contending it had a license to do whatever it

wanted to change the deal after the parties left the courtroom, *i.e.*, that because the Sale Order

referred to an unseen "Clarification Letter," no further Court approval was required for any

amendments the letter made, regardless of their scope.  The Sale Order, however, only allowed

for the Purchase Agreement to be "modified, amended or supplemented" if "such modification,

amendment or supplement does not have a material adverse effect on the Debtors' estates and

has been agreed to between the Committee, the Debtors and the Purchaser."  ( BCI Ex. 16 [Sale

Order] ¶ 25.)  The Sale Order did not contemplate the then-unseen Clarification Letter as a

license to amend; it described a letter "clarifying and supplementing" the Asset Purchase

Agreement, not amending it.  (*Id.* at 1; *see* A. 153 [Hughes II] 260:20-261:16.)

86.      Moreover, Barclays assumes away the real issue:  Whether the Clarification Letter

made material changes to the deal over and above what the Court had approved.  The Court was

never asked to decide this question, because it was not shown the Clarification Letter before the

closing.  Ms. Fife told the Court that a letter was being prepared to clarify aspects of the deal

(BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 48:5-17), but the Court was never shown

even a draft.[45]  However, it took several more days of negotiation and significant changes to

finalize the Clarification Letter.  And after it was finalized the letter was not submitted to the

---

[45]  In fact, a draft had been brought to the courtroom before the hearing ended.  (*See* BCI Ex. 87 [Miller] 28:11-29:4; BCI Ex. 364 [Lewkow Dec.] ¶ 11; A. 156 [Lewkow] 109:4-110:5.)  After being told about changes in the deal, the Court stated during the Sale Hearing, "... I don't know what documents have been prepared that will clarify this.  But I'm confident that as the evening progresses, I'll learn more."  Ms. Fife responded, "Yes.  We're hopeful that we'll have the documents so that everyone can look at them."  (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 55:18-23.)

Court for approval before the closing.  It was just quietly filed after the closing, without any

explanation, as an exhibit among the closing papers.  (A. 32 [LBHI Docket No. 280]

(Clarification Letter filed on 9/22/08 as Exhibit C).)

87.     Barclays' suggestion that the Clarification Letter did not amend anything is

meritless.  On its face, the Clarification Letter says it "amends the [Asset Purchase] Agreement

in certain respects, and is binding on the parties hereto upon its execution and delivery."  (A. 32

[Clarification Letter] at 1.)  Similarly, Mr. Lewkow, one of Barclays' lawyers, described the

Clarification Letter as "amending" the APA in the declaration he submitted in Barclays'

opposition papers.  (BCI Ex. 364 [Lewkow Dec.] ¶ 11; *see also* A. 156 [Lewkow] 47:20-50:12,

51:15-52:19.)  Until September 19, when the repo default had occurred and the asset grab began,

the letter had not used the term.  The parties added the term "amends" to a draft of the letter on

September 19 because, as Mr. Lewkow put it, "things got more complicated and things were

happening[.]"  (A. 156 [Lewkow] 50:8-12; A. 175 [Dep. Ex. 34] (9/19/08 email from A. Keller

to S. Berkenfeld attaching draft Clarification Letter).)

88.     The changes made to the Sale Transaction pursuant to the Clarification Letter

were material and they were made out of the Court's view.  Among other things, the letter

completely changed the definition of "Purchased Assets."  (*Compare* A. 30 [APA] at 6-8 *with* A.

32 [Clarification Letter] ¶ 1; *see also* A. 156 [Lewkow] 62:6-19 (acknowledging changes in

definition of purchased assets).)  In a transaction whose central purpose was the sale of those

Purchased Assets, changing their definition was, on its face, material and the Court should have

been informed of it.[46]  In the Clarification Letter, the parties completely eliminated the term

---

[46]     *See Merrill Lynch & Co. v. Allegheny Energy. Inc.,* 500 F.3d 171, 183 (2d Cir. 2007) (finding, in a fraud
context, that misrepresentations of fact about values in an asset purchase agreement were material); *see also, e.g.,
Marder's Nurseries v. Hopping,* 171 A.D.2d 63, 69 (2d Dep't 1991) (describing "extent of the property to be
conveyed" as a "material term" of context for sale of real estate).

51

"Long Positions" -- *i.e.*, the term defining the approximate $70 billion in assets being transferred

to Barclays -- and specifically added instead categories of assets that had not previously been

mentioned in any documents shown to the Court or at any point during the Sale Hearing.  These

material changes were made on the afternoon of Saturday, September 20, after the Sale Hearing

had ended.  (A. 83 (9/20/08 e-mail from Messineo (Weil Gotshal) to Lewkow (Cleary),

transmitting clean and blacklined drafts showing changes in the definition of Purchased

Assets).)[47]

89.     The Clarification Letter also made material changes addressing the September 18

Repurchase Agreement that, based simply on the size of that transaction, should have been

brought to the Court's attention.  Specifically, on September 21, the Sunday following the Sale

Hearing, Barclays' counsel at Sullivan & Cromwell circulated a provision to "rescind" the

termination of the September 18 Repurchase Agreement, *i.e.*, the provision that was the

mechanism for delivering the repo "haircut" to Barclays without Court approval.  (A. 183 [Dep.

Ex. 580B] (9/21/08 e-mail with "[l]anguage from Barclays for the letter re the unwinding of the

[B]arclays repurchase").)  This provision made its way into the final Clarification Letter signed

on Monday, September 22.  (A. 32 ¶ 13.)  Because it involved the transfer of some $50 billion in

assets, the provision was clearly material, but it was never mentioned to the Court.

90.     In the end, the decision not to return to the Court to explain the Clarification

Letter was, at the very least, an egregious mistake.  The "Clarification Letter" made much more

than mere "clarifications."  Barclays' after-the-fact explanation for not going back to the Court,

that Mr. Miller testified there were not even any discussions about this issue, would not rectify

---

[47]     Even as to the one new asset category for which a  monetary value was assigned, the so-called 15c3-3
assets (*see* A. 32 [Clarification Letter] at 4), that value was $769 million, a number which on its own was obviously
material, especially given the Court's express admonition that it considered $500 million to be material in the
transaction.  (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 54:21-22.)

the error.  (Barclays Opp. ¶¶ 182-183; BCI Ex. 87 [Miller] 32:2-15.)  In any event, Barclays'

outside counsel has acknowledged that it was privy to the decision not to seek the Court's

approval of the Clarification Letter.  (*See* A. 156 [Lewkow] 129:23-134:3.)  Lacking critical

information -- including the values of the assets, the inflation of liabilities -- counsel could not

possibly have made an informed judgment about whether additional Court approval was required.

(*See* BCI Ex. 87 [Miller] 76:15-89:9.)  The lawyers knew little, if anything about the

September 18 Repurchase Agreement.  Weil Gotshal had not been involved in it.  (BCI Ex. 87

[Miller] 83:24-84:12.)  Neither had Cleary.  (A. 156 [Lewkow] 66:3-23.)  Weil Gotshal also did

not know of any plan to use the Repurchase Agreement as a mechanism to deliver a discount.

(BCI Ex. 87 [Miller] 85:2-11.)  Weil Gotshal did not know anything about the discount that had

been agreed at the outset.  (BCI Ex. 87 [Miller] 79:5-80:4, 84:13-85:23.)  Nor did Weil Gotshal

know the liabilities had been inflated.  (BCI Ex. 87 [Miller] 80:11-82:20.)  And the lawyers for

both sides did not know the September 18 Repurchase Agreement had been terminated until the

weekend after the Sale Hearing.  (A. 156 [Lewkow] 67:19-70:4.)  Weil and Cleary never even

*discussed* whether the termination of the Repurchase Agreement had any implications under

Section 559 the Bankruptcy Code.  (A. 153 [Hughes II] 312:16-316:25, 319:7-321:5; A. 156

[Lewkow] 72:19-74:5, 81:25-82:8; A. 155 [Kaplan] 44:19-23, 50:12-51:7.)

> **9.**   **Barclays' contention that Miller and Ridings concluded that Lehman's former executives acted in good faith.  (*See* Barclays Opp. ¶¶ 6-10.)**

91.    Quite apart from the fact that Mr. Miller's and Mr. Riding's opinions about

whether others acted in good faith are not admissible or dispositive, this contention overstates

their testimony. [48]  Even Barclays concedes that Mr. Miller testified only that his September 19th

---

[48]  In an effort to buttress this weak showing, Barclays also offers the allegedly "expert" opinion of Alan Johnson, a compensation consultant, that, because the executives who simultaneously negotiated the transaction with Barclays while cutting their own employment deals with Barclays were paid the going rate, he found no evidence of "bad faith." (BCI Ex. 339 [Johnson Report] at 4, 12; *see also* Barclays Opp. ¶ 89 (citing BCI Ex. 339

presentation to the Court was appropriate "based upon the information which we were given and the assumption that everyone at Lehman was acting in good faith." (Barclays Opp. ¶ 7 (citing BCI Ex. 87 [Miller] 59:18-60:7).) And Mr. Ridings testified only that he still believes there were no better alternative transactions at the time, and to date he, personally, has seen no proof of bad faith. (Barclays Opp. ¶ 8 (citing BCI Ex. 92 [Ridings] 49:13-50:3).) Mr. Ridings did not testify as to the adequacy of disclosure made to the Court about the terms of the deal, either in Court or at his deposition. Nor would he be qualified to do so.[49]

92.    Similarly, Messrs. Miller's and Ridings's present-day views about the value of the assets and liabilities transferred to Barclays are not dispositive of anything. Mr. Miller testified that neither he nor anyone else at Weil Gotshal was involved in negotiating the business terms of

---

(continued…)

[Johnson Report] at 7-9).) This, too, is makeweight. As Mr. Johnson readily -- and quite appropriately -- conceded, he has no pertinent expertise in this area:

> Q: . . . [W]here you've addressed an issue of whether there's a potential conflict of interest ... have you ever been asked to render an opinion as to whether it can be discerned from the arrangement whether people were acting in bad faith?
>
> A: No.
>
> Q: Have you ever been asked in that scenario to discern from the arrangement whether people are committing fraud?
>
> A: No.
>
> Q: Have you ever been asked ... to discern whether people are breaching fiduciary duty?
>
> A: No
>
> Q: Have you ever been asked in that scenario whether people are aiding and abetting a breach of fiduciary duty?
>
> A: No.
>
> Q: Do you consider yourself an expert in any of those four areas?
>
> A: No.

(A. 154 [Johnson] 16:10-17:8; *see also id.* at 50:15-54:15, 143:3-16.)

[49]    Thus, Barclays' assertion that "Mr. Ridings reviewed the accounting gain recorded by Barclays on the Sale, and confirmed that it was not inconsistent with his understanding of the Sale" (Barclays Opp. ¶ 20) is misleading and irrelevant. He did not review this gain at the time of the Sale Hearing, so to the extent Barclays is trying to suggest contemporaneous knowledge, that is plain wrong. Moreover, Mr. Ridings has no knowledge of how Barclays accounted for the gain, nor has he ever had detailed knowledge of the economics of the Sale Transaction, as revealed in Rule 2004 discovery, otherwise he would have been able to look for bidders on a deal with a multi-billion embedded gain to potential acquirers.

54

the deal, valuing securities or assets transferred to Barclays, discussing discounts, negotiating the

September 18 Repurchase Agreement, or preparing any schedules or financial statements relating

to the deal.  (BCI Ex. 87 [Miller] 76:15-89:9.)  Thus, Mr. Miller knew only what he had been

told about these issues and, to the extent information was not disclosed to Lehman's lawyers at

the time, his testimony is of no probative value.  (*Id.*; BCI Ex. 55 [Berkenfeld] 31:5-13 ("[Weil]

needed to document what was being told to them by the business people."), 70:10-71:18, 72:9-

73:17.)  Ridings had no greater access to information about valuation and the deal terms.  (BCI

Ex. 92 [Ridings] 29:9-23 (Lazard not involved in valuing assets), 31:10-25, 32:5-13, 33:15-34:8

(not aware of discount), 38:3-13, 39:24-40:22, 42:22-43:18, 46:21-47:11 (no specific knowledge

about repo haircut), 58:23-59:10 (no knowledge of discount), 63:21-64:7 (no understanding of

value of assets sold).)

93.    Moreover, in critical respects Miller's and Ridings's second hand recollections

about the economic terms conflict with Bart McDade, Lehman's CEO and principal negotiator.

If anyone from the Lehman side had the most complete picture of the economics of the deal, it

was Mr. McDade.[50]  Indeed, Mr. Miller proffered Mr. McDade at the September 19 hearing as

Lehman's sole witness on such issues.  Mr. Ridings was proffered only to discuss the possibility

of securing an alternate deal.  To the extent Miller's and Ridings' testimony about the economics

of the deal now conflict with that of McDade, Mr. McDade's view should govern.  He made the

deal; the lawyers merely documented it.

94.    This is most apparent with respect to whether the Sale Transaction was intended

or presented as a "wash" and whether Lehman, or those speaking on its behalf to the Court,

---

[50]  Even Barclays admits that McDade's testimony should be given great weight.  (*See* Barclays Opp. ¶ 81.)

understood that Barclays would be making a huge first day profit on the sale.[51]  While Mr. Miller

recently "essentially" agreed with a suggestion by Barclays' counsel that Lehman's assets "were

being purchased irrespective of what their value was" (Barclays Opp. ¶ 40 (citing BCI Ex. 87

[Miller] 50:18-51:16)), Mr. McDade testified without equivocation that under the agreement he

negotiated the assets sold and liabilities assumed were supposed to be equal.  (LBHI Mot. ¶¶ 36,

38 (citing BCI Ex. 85 [McDade] 216:23-217:23, 185:20–186:5, 107:3-11, 160:2-20).)  In short,

if Miller's or Ridings's post-motion views about the deal now differ from the unvarnished

testimony Mr. McDade gave before (i) these motions were filed and (ii) aspects of the deal were

called into question, they either got it wrong at the time or now recall it incorrectly.

95.     Barclays' reliance on Mr. Miller's recent testimony is further called into question

by the contemporaneous actions of his colleagues at Weil Gotshal.  While, Mr. Miller testified he

never heard the term "wash" used until "very recently" (Barclays Opp. ¶ 14; BCI Ex. 87 [Miller]

60:12-21), his partners heard the term at the time.  Mr. Roberts, and Weil partners Lori Fife and

David Lubowitz all attended the Lehman board meeting when the proposed deal was expressly

described as a "wash" as to LBI.  (A. 39.)  All three were given an opportunity to review the

minutes of that meeting.  (See A. 186 [WGM-LEHMAN-E-00021493-21506] (10/18/08 email

from R. Miller to T. Roberts and M. Lubovitz attaching minutes).)  None of them commented on

or changed the reference to a "wash" in the minutes.  (See A. 39 [Final Minutes] at 4.)  In fact,

Mr. Lubowitz offered changes in the paragraph *referring* to the "wash," but he left the reference

to a "wash" unchanged.  (A. 187 [WGM 00021559-21581] at 21574 (10/29/08 email from M.

---

[51] Mr. Ridings does not even go this far.  He merely said that he did not understand the deal to have been structured as a "precise wash."  (Barclays Opp. ¶ 15 (citing BCI Ex. 92 [Ridings] 17:5-10).)  That is not surprising given his limited role in negotiating and memorializing the terms of the transaction.  Nor is it easy to see how a witness could knowledgeably agree with the use of the term "precise wash," a phrase carefully chosen by Barclays' counsel to elicit the hoped-for denial.  Moreover, Ridings said nothing about how the deal was presented to the Court, the Lehman Boards or creditors.  Thus, he provides no relevant evidence on the key issue.

Lubovitz to R. Miller attaching minutes).)  And according to Mr. Marsal (Lehman's current CEO)

Mr. Roberts has told him the deal was a "push," *i.e.,* a synonym for "wash," where assets

matched liabilities.  (BCI Ex. 84 [Marsal] 129:14-130:6, 150:24-155:9; *see id.* at 12:12-25,

14:19-15:14, 136:5-137:3.)  As the Examiner has noted in his recent report, Mr. Roberts

described the deal to the Examiner in an April 2009 interview as a "wash."  (A. 172 [LBHI

Docket No. 7531] at 2136-37 (excerpt from Examiner's Report).)

> **10.      Barclays' contention that the assets added to the Sale Transaction by the
> Clarification Letter were not "additional assets."  (*See* Barclays Opp. ¶¶ 118-
> 144, 184-190.)**

96.      Barclays now asserts no "additional assets" were added to the deal through the

Clarification Letter, but rather the parties merely "identified" assets Barclays should have gotten

anyway.  (BCI Ex. 70 [Hughes] 33:21-35:23; Barclays Opp. ¶¶ 118-144, 184-190.)  As

demonstrated above, this contention is flatly contrary to positions Barclays took in this case in

June 2009, when it tried to thwart discovery and its General Counsel's testimony about the issue

is a blunt attempt to jettison that prior inconvenient position.  (*See supra* ¶¶ 85-90.)

97.      Barclays' new position about the additional assets, as articulated in its opposition

papers and through Mr. Hughes strategic testimony, also is inconsistent.  On the one hand,

Barclays asserts that the additional assets were not "additional" because they were always within

the ambit of the Asset Purchase Agreement and, according to Hughes at least, merely identified

on Friday, September 19.  (*See* above; *see also* A. 153 [Hughes II] 263:8-21 ("[I]f by 'additional'

you mean they were previously not part of the business, then I would disagree with you.  If by

the use of the word 'additional' you mean additionally described, then they were additionally

described; in addition to other assets, they were described."); *see also id.* at 269:16-270:7 ("I

would consider them added only in the sense that they were described and they hadn't previously

been described.").)

98.     Out of the other side of its mouth, however, Barclays contends in its opposition papers on this motion that the Friday assets were "other LBI assets" that had to be delivered to "make up for the shortfall." (Barclays Opp. ¶ 141.)  This position, at least, squares with the prior testimony.  For example in describing that search for additional assets, Michael Klein (one of Barclays's primary negotiators) admitted that he had been sent back to "find more assets" because there was a shortfall.  (*See* BCI Ex. 79 [Klein] 85:3-87:17.)  Similar testimony was given by others involved in the asset addition exercise.  (*See* LBHI Mot. ¶¶ 105-117; BCI Ex. 78 [Kirk] 100:10-104:9; BCI Ex. 85 [McDade] 165: 22-170:6; BCI Ex. 98 [Tonucci] 54:24-58:6 ; BCI Ex. 69 [Hraska] 44:12-21; BCI Ex. 56 [Blackwell] 142:4-144:13.)

99.     Thus, Barclays' assertion that the additional assets were not "additional" is hobbled by its own contradictions.  Barclays now contends the letter did *not* set forth "additional categories of securities and other assets." (A. 153 [Hughes II] 260:14-19.)  But in its Rule 2004 opposition Barclays admitted the Clarification Letter set forth "additional categories of securities and other assets."  (BCI Ex. 43 [Barclays Rule 2004 Obj.] ¶ 52).  Barclays now argues the Sale Transaction was not a "balance sheet deal" and the assets were transferred "irrespective of their value." (Barclays Opp. ¶ 40 (citing BCI Ex. 87 [Miller] 50:18-51:6).)  But Barclays also contends that it was entitled to assurances that it was "going to be receiving [assets that] were similar in ... value that was represented to being delivered with respect to some of those assets previously." (A. 153 [Hughes II] 263:22-264:16.)  Barclays now argues the assets listed in the Clarification Letter were added to "make up for this shortfall." (Barclays Opp. ¶ 141.)  But its own Rule 30(b)(6) witness contends that the assets listed in the Clarification Letter were *not* included for that purpose. (A. 153 [Hughes II] 263:22-25.)

58

100.     Moreover, Barclays' contention that the value of this collateral later declined (*e.g.*, as of September 30, as it now argues) misses the point.  What happened to the assets *after* Barclays took title is irrelevant to determining whether Barclays had any right to insist on these additional assets at the time.  The Asset Purchase Agreement provided that Barclays took all right, title and interest in the transferred assets at 12:01 a.m. on September 22, 2008, the Closing Date.  (A. 30 [APA] at 15.)  At that point, the BoNY values applied.  How Barclays changed them later is irrelevant.

**11.     Barclays' contention that everyone knew Barclays expected to make a multi-billion dollar, first day, gain on the Sale Transaction.  (*See* Barclays Opp. ¶¶ 17-20, 74, 104-113, 278-279.)**

101.     This argument is belied by Barclays' own statements.  On September 16, 2008, Lehman issued its press release in which it announced its proposed sale of "substantially all of the North American businesses and operating assets" of LBI and related assets of LBHI for "consideration consisting of assumed liabilities, $250 million in cash and certain contingent considerations."  (A. 162 [Lehman Press Release] at 2.)  The press release contained no details as to the identity or value of the assets being sold or the liabilities Barclays was to assume, and it made no mention of any discount or built-in profit for Barclays.  (*Id.*)

102.     At about the same time, Barclays issued it own press release, which was no more specific about purchased assets than the Lehman release.  Barclays said it "will acquire trading assets with a current estimated value of £40bn (US$72bn) and trading liabilities with a current estimated value of £38bn (US$68bn) for a cash consideration of £0.14bn (US$0.25bn)."  (BCI Ex. 109 [Barclays Press Release] at 1.)  While it noted a spread between the long and short positions, Barclays' press release never mentioned the additional assumed liabilities for compensation and cure which more than covered that spread.  Nor did it disclose any discount or built-in profit for Barclays.  (*Id.*)

59

103.    Barclays' other quasi-public statements were no more edifying.  On September 17, 2008, at the conference call with analysts, John Varley and other Barclays officers spoke about the deal.  Varley reiterated that Barclays was "acquiring trading assets with a current estimated value of 72 billion dollars and trading liabilities with a current estimated value of 68 billion dollars for a cash consideration of 250 million dollars."  (A. 46 [9/17/08 Analyst Call Tr.] at 2.)  He said that the transaction "is capital ratio accretive without additional equity issuance" due to "the negative goodwill from the transaction, which amounts to about 2 billion US dollars post tax."  (*Id.*)  No one explained, however, how Varley's figures were derived.  Varley did not specify the purchased assets or mention the off-setting liabilities Barclays had agreed to assume for compensation and contract cures.  (*Id.*)  He did say that Barclays had selected the particular assets it was acquiring and was confident it was valuing them properly.  (*Id.* at 3-4.)  When asked whether it was a "coincidence" that Barclays was "acquiring assets that are roughly, a similar kind of size to the client receivables on the Lehman book," Varley cryptically remarked:

> [t]here is no coincidence in this transaction if you see what I mean.
> We have had, the circumstances in which we have been able to
> execute the transaction, mean that we have been able to be very
> deliberate in choosing either pro or con.  So there isn't serendipity
> or coincidence in the transaction.  The transaction is structured as
> we wanted it to be.  It is of course subject to Court approval and
> we are respectful of the Court.  But we have been very deliberate
> in our choices here.

(A. 46 [9/17/08 Analyst Call Tr.] at 6-7.)  Meanwhile, behind closed doors, Barclays was essentially guaranteeing a profit to its own Board.  (*See* LBHI Mot. ¶ 33; A. 36 [Board Presentations].)

104.    Barclays' argument that its gain was publicly announced rests solely on these two out-of-court statements.  (A. 153 [Hughes II] 330:6-346:10.)  The two documents did nothing of the kind.  First, there is no evidence that Barclays or anyone else ever alerted the Court as to

these alleged "disclosures" or invited the Court to listen in on the analyst call.[52]  (A. 153 [Hughes

II] 337:2-338:14, 342:7-346:10.)  Second, these out-of-court statements were incomplete on their

face.[53]

105.    Similarly, Barclays' citation to the testimony of Mr. Miller to the effect he

assumed Barclays would "make money on the deal" (Barclays Opp. ¶¶ 17-18 (citing BCI Ex. 87

[Miller] 64:20-65:6)) is inapposite.  Mr. Miller never said he knew Barclays would make a multi-

billion dollar gain immediately.  Mr. Hughes has conceded Mr. Miller was not "in a position to

know one way or the other[.]"  (BCI Ex. 70 [Hughes] 38:15-39:3.)  If for some reason Mr. Miller

did mean to say he knew about a first day gain then his comments are inconsistent with the views

of his client, who never contemplated an immediate, embedded gain for Barclays.  (LBHI Mot.

¶¶ 36-38.)[54]  For example, shown Barclays' February 2009 earnings announcement and asked if

a gain for Barclays was contemplated by the deal, Mr. McDade testified, "No, absolutely not."

(BCI Ex. 85 [McDade] 157:16-158:20, 216:23-217:23 (first day equity for Barclays would not

be consistent with the deal he made); LBHI Mot. ¶¶ 38; 42-44 (citing Berkenfeld to the same

effect).)

---

[52]  Indeed, as noted in LBHI's Rule 60 Motion, record evidence suggests Barclays' president, Mr. Diamond, wanted to use the press release to manipulate the Court in case it saw the release.  (*See* LBHI Mot. ¶ 80; *see also* A. 49 ("[i]t is very important to the bankruptcy court to see the larger number.  It is not credible and very harmful I think!! [t]o be seen trying to show lower.").)

[53]  The fact that Barclays said in its press release the transaction would be "capital accretive" and would reflect $2 billion in after tax "negative goodwill" does not change this conclusion.  Even if these statements had been shared with the Court, they were not specific enough to have made any difference.  Barclays put no temporal limits on its assertions, so it could have considered the deal "capital accretive" over an extended time period for all any reader could tell.

[54]  Thus, it surely must be the case that had Mr. Miller known at the time that Barclays would be making a multi-billion dollar first day gain he would have so informed the Court.

NYI-4250276

**12.    Barclays' contention that the bonus and contract cure liabilities were always understood only as "rough estimates."  (*See* Barclays Opp. ¶¶ 30, 87-103, 259-271, 280-302.)**

106.    This is similar to the position Barclays took in opposing Rule 2004 discovery, where it argued that these liabilities figures were always considered merely estimates and Barclays had no obligation to assume any of them.  (*See* BCI EX. 43 [Barclays Rule 2004 Obj.] ¶ 24.)  As LBHI showed in seeking Rule 2004 discovery, however, there was nothing "estimated" or voluntary about Barclays' liability for bonuses.  Section 9.1(c) of the Asset Purchase Agreement is mandatory.  It expressly required Barclays to assume $2.0 billion in bonus liabilities, *i.e.*, the amount shown on the 9/16/08 Financial Schedule.  (A. 30 [APA] § 9.1(c) (Barclays "*shall* … pay each Transferred Employee an annual bonus …;" "Such bonuses *shall* be awarded … so that the aggregate amount awarded *shall* equal the Accrued 08 FY Liability").)[55] In fact, recently produced documents show that Barclays' auditors at PricewaterhouseCoopers confirmed with Barclays' head of human resources that the full $2 billion shown on the 9/16/08 Financial Statement was supposed to be paid for bonuses, and other forms of compensation were to be paid separately.  (*See* A. 195 (1/23/09 PwC email discussing Barclays' obligation to pay $2 billion in bonuses); A. 196 (1/26/09 email from M. Guarnuccio to M. Kelly: "We discussed this with HR (Paul Exall) back in September and it was confirmed to us then that the $2 billion was only for bonus and the severance amounts to be paid were separate").)  Exall later admitted, however, that only $1.55 billion was actually paid.  (*See* LBHI Mot. ¶ 10, 64; BCI Ex. 64 [Exall] 108:11-109:9; Barclays Opp. ¶¶ 300-301 (Barclays now contending it paid $1.66 billion in bonuses).)

---

[55]    Indeed, in September, 2008, when Barclays Chief Financial Officer Clackson discovered that the $2 billion had to be paid, he complained that he had been counting on a lower amount to secure the negative goodwill Barclays had been anticipating from the transaction.  (A. 54;  *see also* BCI Ex. 91 [Ricci] 35:6-38:13, 52:25-54:15, 125:4-20; A. 65; A. 54; A. 73; LBHI Mot. ¶ 63.)

107.    And while the $1.5 billion contract cure number Mr. Miller presented to the Court

was described as an estimate, the Court was never told it was a grossly inflated "estimate."  No

one had told that to Mr. Miller, so he could not tell the Court that the "estimate" had no honest

basis.  Barclays, however, knew that the number was inflated.  On September 16, Barclays was

estimating its actual cure obligations to be only $200 million.  (*See* A. 174 [BCI-Ex-(S)-

00210900] (9/16/08 Barclays email); *see also* LBHI Mot. ¶¶ 63-65.)  Even if both of these

liability figures were supposed to be just "estimates", the Court was never told they were so

"rough" that the $1.5 billion in contract cure liabilities was actually likely to be as low as only

$200 million (the amount Barclays planned to pay) or $238 million, the amount Barclays

actually paid.  Nor was the Court told that the $2.0 in bonus liabilities might really be as low as

$1.3 billion (the amount Barclays was planning to pay on September 16) or $1.55 billion, the

amount Barclays actually paid.

**C.    Since the September 22, 2008 Closing, Barclays Has Tried To Forestall Any Inquiry Into the Sale Transaction**

108.    Barclays seeks to preclude scrutiny of the merits based on various preclusion

theories, including untimeliness and estoppel, based primarily on activities that took place after

the closing.  The facts presented here relate to those defenses.  (*See* Argument Pt. III, below.)

**1.    Alvarez & Marsal Was Retained to Administer the LBHI Estate**

109.    On or about September 19, 2008, a few days after LBHI's bankruptcy filing,

Bryan Marsal, a principal of Alvarez & Marsal ("A&M"), was retained by LBHI to act as its

Chief Restructuring Officer.  (BCI Ex. 84 [Marsal] 6:9-10:2.)  Marsal was instructed by

Berkenfeld that A&M was to focus on the myriad restructuring issues facing LBHI and not to get

involved in the Sale Transaction with Barclays.  (*Id.* at 10:3-13:4, 17:6-20:10, 115:3-116:14.)

Accordingly, A&M had no role in negotiating or examining the Sale Transaction.  (*Id.* at 16:11-

63

17:5, 115:3-118:7 ("[Berkenfeld told me] I was not to put myself in the middle of those

transactions because they were on the verge of closing."), 127:15-129:3.)

110. A&M's necessary main priority was to capture data it could later use for the

overall administration of this complex estate. (*Id.* at 95:2-15 ("the most immediate problem was

the preservation of data, not to take action; not to second-guess what was going on on other

fronts but to save that data so we could review what happened on those other fronts").) Because

virtually everyone knowledgeable about Lehman's operations had moved to Barclays, those left

to administer the estate were faced with a monumental task just in understanding the business

and preparing to administer what was left. (BCI Ex. 81 [Kruse] 154:2-156:2; BCI Ex. 84

[Marsal] 23:5-24:5, 25:19-26:16, 53:25-54:9, 84:14-85:14, 88:5-89:7, 92:19-93:21, 111:20-

114:14; BCI Ex. 67 [Fogarty] 14:25-15:9, 17:5-19, 22:2-8, 23:3-14.)

111. Marsal recounted the difficulties facing LBHI after the Sale Transaction and its

forced dependence on Barclays for information:

> [W]hat happened here is that shortly after the transaction occurred,
> 10,000 employees moved across the street to work at Barclays, in
> essence, and I was left with a very – I was left with a squad of
> legal department, a compliance department and some tax people.
> And we had to rebuild out of those ashes … the people who had
> the institutional knowledge, [were] the people who were at
> Barclays.

(BCI Ex. 84 [Marsal] 29:10-31:16, *see id. at* 20:11-22:14 (Lehman in "total chaos" at the time).)

## 2. Barclays' Lack of Cooperation In Providing Information to the Estate

112. Because of these unique circumstances, a workable Transition Services

Agreement ("TSA") was a key priority for A&M. (*Id.* at 10:3-11:13, 15:24-16:10, 37:12-38:11;

BCI Ex. 81 [Kruse] 154:2-156:2 (The TSA … was the primary focus of ours as it related to

Barclays at the time."); BCI Ex. 67 [Fogarty] 25:6-8, 29:19-30:2.) A TSA was agreed upon and

Barclays was obliged, among other things, to provide to LBHI "certain services, use of facilities

and other assistance on a transitional basis" (A. 164 [TSA] at 1) to allow the LBHI estate to

operate and wind down.  (*See id.* at 3-5.)  This was supposed to include access to historical data,

computerized systems, books and records, and former Lehman facilities and personnel, who

were required to provide "reasonable cooperation and assistance."  (A. 164 [TSA] § 3.04; *see id.*

§§ 2.01-03, 3.01, 3.05, 3.07-08, 3.12.)

113.    Notwithstanding these contractual obligations, Barclays' lack of cooperation in

the aftermath of the Sale Transaction threatened the administration of the LBHI estate:

> There was a very difficult process we had for getting any
> information from Barclays.  I think I referred earlier in my
> testimony to extraordinarily difficult circumstances in getting
> Barclays to execute under the TSA. … We were at Barclays mercy
> in terms of needing their employees, their systems, their
> information, their insight.  That was the focus, the immediate most
> important focus for us early on in the administration of the estate.
> If we didn't get that right a lot of things were going to go wrong.
> That was the priority.  We weren't focusing on the Barclays deal at
> that stage.  It would have been in my mind irresponsible to put an
> emphasis on that versus the higher priority of getting the
> information in hand that we needed to [ad]minister and run the
> estate.

(BCI Ex. 81 [Kruse] 239:2-240:5; *see id.* at 240:19-241:25; BCI Ex. 67 [Fogarty] 57:5-58:12,

88:22-94:15.)

114.    Barclays' refusal to cooperate eventually got to the point in late 2008 that the

LBHI estate prepared to sue Barclays for breach of the TSA.  As Phil Kruse, from A&M,

described it:

> We weren't getting information openly from Barclays.  Shortly
> after the time that we got the … CUSIP level detail of what came
> over, there were repeated problems in performance under the TSA.
> It almost resulted in a lawsuit being filed.  I mean, … we had the
> lawsuit drafted and it was going to be served if we didn't get
> cooperation.  That's the degree to which the performance or the
> lack of performance under the TSA was a concern of ours. … the
> entire process was breaking down under which we needed to
> administer to the estate because of what we felt was the failure to

65

> perform under the TSA by Barclays. … To put an emphasis at that
> stage on looking back at a deal, again, that was not the focus at the
> time.  It evolved to be a focus.  But we weren't focusing on that in
> the first quarter.

(BCI Ex. 81 [Kruse] 240:19-241:25; *see* BCI Ex. 84 [Marsal] 30:8-31:16; BCI Ex. 88

[O'Donnell] 161:3-17 (describing disputes between Debtors and Barclays about access to

information).)  It was not until late 2008, under the threat of such a lawsuit, that Barclays began

to provide some information A&M needed, albeit months after closing.  (BCI Ex. 84 [Marsal]

85:20-88:4.)

115.    While A&M was engaged in some efforts early on to try to ascertain what assets

had been transferred to Barclays, it did not revisit the negotiations of the Sale Transaction.

Rather, it attempted, based on very limited information, to understand what remained in the

estate and what had left.  (*See* BCI Ex. 81 [Kruse] 217:14-218:15, 219:15-23 ("our focus was not

on the [Sale T]ransaction … itself.  It was on help[ing] us understand the assets and liabilities we

need to be focused on as we begin to administer the wind-down of this estate."), 219:15-220:22,

228:2-20, 200:3-21 ("our mission was to administer the wind-down of the Lehman Brothers

estate.  You've got to know what assets are yours in order to begin that process.").)  The problem

remained, however, that no one was left at Lehman who was involved in negotiating the Sale

Transaction or who had a grasp on its terms, let alone details as to which securities had been

transferred at what price.  Everyone with that knowledge now worked for Barclays and they

provided little useful information.  In late 2008 the accounting systems at Lehman were not even

in place that would have allowed the estate to try to value the assets that had been transferred to

Barclays.  (BCI Ex. 84 [Marsal] 35:14-38:25 ("No accounting system was up.").)

116.    When asked about these early attempts to review schedules and lists of securities

associated with the Sale Transaction, Mr. Kruse testified:

> It was really from the perspective of capturing the data that we
> thought was going to be necessary for us to administer the estate
> and understanding what was estate assets, what was not estate
> assets. I think there was some thought early on that we would try
> to do a reconciliation of the securities that were transferred, ensure
> that nothing was transferred that should not have been transferred
> under the deal. That effort was not really feasible based on the
> information available to us in that first quarter of the
> administration of the estate. But the context was ensuring we had
> the data in hand while it was fresh in everybody's mind as to what
> was transferred in the deal.

(BCI Ex. 81 [Kruse] 103:11-104:8; *see also id.* at 138:15-139:3.)

### 3.   LBHI Could Not Comprehensively Study the Sale Transaction In Late 2008

117.   Given this struggle to collect data and understand what had happened in this

extraordinary bankruptcy, a comprehensive investigation of the Sale Transaction was not

possible.   At that point, the fourth quarter of 2008, the administrators of the LBHI estate had no

reason to suspect that such an investigation was even warranted in light of the disclosures made

to the Court and the Lehman Boards about the Sale Transaction.  As Mr. Kruse testified:

> There was never a comprehensive attempt for us to fully evaluate
> the totality of the deal and the economics of the deal until we
> started a forensic focus on it in January 2009.  So the idea that we
> knew, you know, or focused on this issue at some point prior to
> that, I think that's wrong.  There were a lot of other priorities that
> we were dealing with and this just wasn't anywhere near the early
> priorities in that first quarter of the administration of the estate.
> We were gathering facts early on just to lock it down what went
> over, what didn't go over.  We weren't in any way attempting to
> comprehensively evaluate the Barclays deal in the first quarter of
> the administration.

(BCI Ex. 81 [Kruse] 235:15-238:25; *see* BCI Ex. 84 [Marsal] 84:14-86:4, 111:23-114:14.)

118.   Discrete pieces of information began to dribble out of Barclays during late 2008,

but estate administrators and creditors were not yet in a position to understand the import of this

information, and did not have a complete picture.  For example, during this period A&M

periodically reported to the Creditors' Committee and tried to keep it apprised of developments.

67

In one such meeting, James Fogarty, from A&M, presented some of the fragments of information A&M had obtained from various sources about the Sale Transaction. None of those sources, however, included a comprehensive debriefing by Barclays or former Lehman executives about the terms of the transaction. Thus, A&M's reviews during this period were necessarily hampered by this lack of information. (See BCI Ex. 67 [Fogarty] 57:21-58:9, 88:22-91:21.) Even so, Barclays now points to Fogarty's inclusion on one October 2008 slide of the phrase "43.1 billion repo assets, book value per Lehman stale marks, negotiated a $5 billion reduction" (BCI Ex. 131 at 28) as purported evidence that A&M fully understood the deal. (Barclays Opp. ¶¶ 24, 274-75, 550-551.)

119.    Fogarty told those at the presentation, however, that he had no clear understanding of what this entry meant, let alone an understanding of the entirety of the transaction. (BCI Ex. 67 [Fogarty] 119:15-19.) He was just passing along pieces of information A&M had received. (Id. at 113:9:115:17, 116:23-118:4, 122:10-123:21, 125:9-126:19.) No one at A&M had been told at the time of the $5 billion discount on Lehman's assets reflected in Martin Kelly's September 16 email, nor did they have any idea how this related to the September 18 Repurchase Agreement. (See LBHI Mot. ¶¶ 39-47.)[56] No one at A&M had a complete understanding of the Sale Transaction at the time, and none of them could have interpreted this reference on Fogarty's slide as indicating a built in profit for Barclays. (BCI Ex. 84 [Marsal] 166:5-177:22 (he thought it referred to market price declines during the week of September 15, and not the "discount" negotiated by Lehman executives and Barclays); BCI Ex. 81 [Kruse]

---

[56] Fogarty speculated at deposition that the "reduction" noted in his slide may have related to the haircut under the September 18th Repurchase Agreement and a dispute he understood the parties were having about the value of the collateral posted for that transaction. (BCI Ex. 67 [Fogarty] 119:15-121:6 (referring to the dispute involving assets held by JPMC that led to the December Settlement).) But Fogarty testified repeatedly that he had no understanding of the Sale Transaction at this early date – or even at any time thereafter. (See id. at 20:22-22:8, 23:3-14, 27:20-28:5, 40:5-45:15, 48:4-11 ("I didn't fully understand the transaction, we were – I was never sure of anything in that transaction"), 49:21-53:17, 57:21-61:13 ("My understanding of things kept changing along the way."), 65:25-66:9, 67:4-12, 68:4-10, 92:7-15, 94:2-15, 129:25-132:22.)

104:9-108:16 (he thought, but did not know, the slide reflected A&M receiving some

information as to outdated marks being reduced).)

120.    In any event, through 2008 and into the first quarter of 2009, A&M and those few

left behind at LBHI had no reason to suspect the Sale Transaction was anything other than what

the Court and Lehman Boards had been told, *i.e.*, a balanced deal:

> The assets equaled the liabilities.  That's what I had been
> represented.  The assets were supposed to be – the asset value – I
> shouldn't say assets – the asset  value was supposed to equal the
> liabilities being assumed.  That was the benefit of the bargain that
> Berkenfeld had told me we had struck.

(BCI Ex. 84 [Marsal] 114:15-115:2; *see id.* at 115:3-22, 118:23-121:25, 126:5-130:22, 133:7-

135:24; BCI Ex. 88 [O'Donnell] 109:9-17 (Milbank had similar understanding at closing time);

BCI Ex. 74 [Keller] 94:13-95:2 (Simpson Thacher & Bartlett, Lehman's counsel, understood that

"assets equals liabilities").)  Marsal's only exposure to the terms of the Sale Transaction prior to

closing was short briefings from Mr. Berkenfeld and Mr. Roberts, from Weil Gotshal, both of

whom told him it was an exchange in which the assets transferred to Barclays were equal to the

liabilities it was to assume.  (BCI Ex. 84 [Marsal] 11:14-15:14, 151:6-152:16.)

### 4.    The December 2008 Settlement Provided No New Information to LBHI

121.    In December of 2008, a few months after the closing but still in the midst of the

estate's struggle to gather data, the Trustee (on behalf of the LBI estate), JP Morgan and

Barclays entered into a Settlement Agreement concerning collateral for the September 18th

Repurchase Agreement (the "December 2008 Settlement").  LBHI was not a party to this

settlement agreement, nor was it involved in negotiating its terms.  (BCI Ex. 84 [Marsal] 140:2-

141:14 ("I didn't know about this disagreement among Barclays and JP Morgan until well into

the end of the quarter.  And then I still … don't know what this dispute is between these guys.");

BCI Ex. 72 [Karp] 152:2-18 (Deloitte was precluded from sharing information with A&M by

69

confidentiality agreement with JP Morgan).)[57]  Barclays claimed it was owed $7 billion in

connection with the repurchase agreement, while JP Morgan asserted claims against assets it held

on LBI's behalf.  After lengthy discussions the parties resolved this dispute.

122.    On December 5, 2008, the Trustee sought approval of the December 2008

Settlement (the "Settlement Motion").  And on December 19, 2008, the Creditors' Committee

objected, alleging discrepancies between the facts reported in the Settlement Motion and facts

recounted in court concerning the Sale Transaction.  (*See* BCI Ex. 37 [LBI Docket No. 453] ¶ 18.)

Based upon its limited access to pertinent information, at the hearing on the Settlement Motion,

LBHI's counsel explained to the Court that, among other things, there were questions about

assets transferred to Barclays and that discovery might be needed.  (BCI Ex. 50 [LBHI Docket

No. 2420], 12/22/08 Tr. at 32:12-34:21; *see also id.* at 45:11-49:18.)[58]  The Court agreed that

additional factual inquiry was warranted about assets transferred to Barclays.  (*Id.* at 45:11-

49:18.)  Barclays' counsel concurred.  Counsel for all settling parties, including Barclays,

assured those present that such investigation would not be foreclosed:

> We confirm Your Honor's understanding that what is being done
> here is we are approving a settlement agreement.  There will not be
> any collateral estoppel or other similar effects .... People would
> remain free to pursue claims if they feel there is something in the
> overall sales transaction which gives rise to a claim.

---

[57]  In fact, efforts were made to keep LBHI in the dark about it.  (*See* LBHI Mot. ¶ 126.)

[58]  These questions were prompted in part by filings made by the parties to the December 2008 Settlement in support of their motion, including a declaration signed by Shari Leventhal of the New York Federal Reserve Bank (who, unbeknownst to LBHI, apparently had some role in brokering the settlement and claimed first hand knowledge of the value of the securities in dispute).  In her declaration, Leventhal explained for the first time some of the negotiating history leading to the settlement, the terms of the settlement, and in that context represented, among other things, that LBI had provided approximately $49.7 billion in securities to Barclays under the September 18 Repurchase Agreement.  (BCI Ex. 30 [Leventhal Dec.] ¶¶ 11-12.)  At this time, LBHI still did not know that Barclays had not actually assumed the full $3.5-4.0 billion in liabilities for compensation and cure, as had been represented to the Court.  So at this time, the Leventhal Declaration was not a red flag for the estate indicating something was wrong with the Sale Transaction.  Rather, these figures just became part of the confusing mix of limited information available to LBHI in late 2008.

NYI-4250276

(BCI Ex. 50 [LBHI Docket No. 2420], 12/22/08 Tr. at 39:13-20; *see id.* at 24:25-25:3, 34:10-21

(Mr. Miller: LBHI does not object because "there is nothing in this that presents collateral

estoppel with a binding effect in any future proceeding"), 34:24-35:5 (Mr. Schiller: confirming

Barclays' agreement), 40:8-19 (Mr. Schiller: affirming above reservation of rights), 41:7-12,

45:13-20.)

123.    Based in part on this assurance, the Court approved the December 2008

Settlement.  (*See* A. 151 [LBI Docket No. 387]; Annex A [LBI Docket No. 403]; BCI Ex. 50

[LBHI Docket No. 2420], 12/22/08 Tr. at 58:11-18 (Court's approval was "based on the record

and the representations that have been made including the comments confirming that the

settlement is not to have collateral estoppel impact that would preclude further investigation of

the circumstances surrounding the original sales transaction between the estates and Barclays

Capital approved by order entered September 20th"); *see id.* at 60:6-9.)  Under the settlement,

Barclays received $1.257 billion in cash and certain securities whose value was not revealed in

the proceedings.  (A. 151 [LBHI Docket No. 387] ¶ 19; *see also* BCI Ex. 50 [LBHI Docket No.

2420], 12/22/08 Tr. at 21:20-22:2.)

124.    From the perspective of those administering the LBHI estate, the dispute and

assets in issue under the December 2008 Settlement were a mystery and not the focus of their

efforts.  (*See* BCI Ex. 81 [Kruse] 231:20-232:22 ("[In December 2008,] we were learning

probably new things at that point about the 7 billion.  I think there was a fair amount of

confusion on our part what really happened and there's still some confusion, I'm not sure the

record is completely clear on how and why JPM kept the 7 billion …").)  And in connection with

the Court's approval of the settlement the LBHI estate relied on Barclays' assurances, stated in

open court including from its counsel Mr. Schiller, that the approval would have no preclusive

effect on LBHI's position regarding the Sale Transaction or potential future claims.  (*See* BCI Ex. 50 [LBHI Docket No. 2420], 12/22/08 Tr. at 24:25-25:3, 34:10-21, 34:24-35:5, 40:8-19, 41:7-12, 45:13-20.)  In fact, the Court itself noted there remained unanswered questions about the transaction, and urged Barclays to supply information to answer them:

> I consider it to be important for us to get to what I'll call closure with respect to the basics of the transaction that was approved by order entered September 20th.  And this motion with respect to the settlement agreement is a reasonable platform on which to address some of these issues because while this is not fairly to be characterized as a cleanup item, it's a very significant matter.  It does draw all of our attention back to what happened in September.  And I think it important that there be reasonably prompt resolution of outstanding questions that the committee may have on the subject.  I would hope that it's not necessary for the committee to have to file 2004 requests in order to get the information that it seeks which seems reasonable and consistent with its mandate.

(BCI Ex. 50 [LBHI Docket No. 2420], 12/22/08 Tr. at 50:18-51:6.)

### 5. The Bay Harbour Appeal Involved Unrelated Claims

125.    Separately, on December 12, 2008, as the estate continued to gather information, one creditor appealed the denial of its objection as to select aspects of the Court's Sale Orders. The objections were unrelated to the issues raised in the Rule 60 Motions.  Rather, Bay Harbour's appeal concerned about $8 billion it claimed should have been transferred from LBI back to LBIE, a Lehman subsidiary in separate U.K. insolvency proceedings.  (*See* A. 165 [LBHI Docket No. 502] (appellant's statement of issues on appeal).)  Fearful these funds might go to Barclays, Bay Harbour objected at the Sale Hearing.  (*See* A. 163 [LBHI Docket No. 175] (Bay Harbour's objections); *see also* BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 204:14-218:25.)  The Court denied the objection, concluding that the funds had no bearing on the Sale Transaction and Bay Harbour had presented no evidence to support its claims.  (*Id.* at 204:14-218:25, 247:14-253:25.)

72

126.    Bay Harbour challenged the Court's finding that Barclays was a good faith purchaser under Section 363 of the Bankruptcy Code only with regard to its supposed misappropriation of the so-called "Defalcated Funds," the only transfer at issue on the appeal.  It argued that Bay Harbour's due process rights had been violated by refusing to allow it to take discovery and conduct an investigation.  Neither the terms of the Sale Transaction itself nor the issues raised by the Rule 60 Motions was ever the subject of Bay Harbour's objections or its appeal.

127.    Barclays took several positions in opposition to the appeal that are inconsistent with arguments it now raises in response to the Rule 60 Motions.  For example, in response to the appeal, Barclays relied on the disclosures made at the Sale Hearing, arguing (contrary to its Rule 2004 opposition) that the transaction had not changed significantly from that in the original Asset Purchase Agreement that Bay Harbour had been shown two days earlier:

> The fundamental terms of the proposed Sale, i.e., the sale of assets
> related to LBHI's broker-dealer business and certain real estate
> assets, were unchanged.  The primary changes, noted on the record,
> included a purchase price decrease for the real estate assets based
> on appraisal results, and that cash was no longer being transferred
> to Barclays as the Debtors no longer held such cash.

(BCI Ex. 35 [*Bay Harbour* Docket No. 10] Barclays Mem. at 10.)  Barclays also argued that the Court "heard evidence that Barclays assumed billions in liabilities and agreed to pay cure amounts on leases and contracts it assumed" and that no cash was being transferred in the deal (*id.* at 15, 17, 19, 27, 37), representations it now appears to disavow.  Barclays then relied on Mr. McDade's testimony as evidence of its good faith (*id.* at 26, 29-30 & n.32 (arguing McDade's credibility went "unchallenged")), although Barclays now seeks to distance itself from Mr. McDade's understanding of the balanced nature of the deal.  (Barclays Opp. ¶¶ 242-45.) Barclays argued that "the only reviewable issue" on Bay Harbour's appeal was "whether

73

Barclays was a good faith purchaser" (BCI Ex. 35 [*Bay Harbour* Docket No. 10] Barclays Mem.

at 20) and not the validity of the sale (*id.* at 20-24), although Barclays now suggests all aspects of

the Sale Transaction were in issue on the appeal.  (*See, e.g.,* Barclays Opp. ¶¶ 442-497, 502-504,

616-617.)

128.    On December 12, 2008, LBHI also submitted a brief in opposition to the appeal in

which it argued that it was not plain error for the Court to find good faith and that Bay Harbour's

due process right had not been violated.  Unlike Barclays, however, LBHI's arguments were not

inconsistent with its position here.  Barclays points to the fact that in its appellate papers LBHI

stated that "[b]y the time the Sale Hearing was conducted, the value of the securities to be

transferred to Barclays declined from $72 billion at the beginning of that week to $47.4 billion

and the liabilities to be assumed by Barclays declined from $68 billion to $45.5 billion."  (BCI

Ex. 33 [*Bay Harbour* Docket No. 9] LBHI Ans. Br. at 12.)[59]  But these numbers merely

comported with the description Ms. Fife gave on September 19, 2008 before discovery revealed

there was much the lawyers had not been told.

129.    And there is nothing untoward with LBHI having argued against Bay Harbour's

assertion that there was no record evidence that Barclays was a good faith purchaser.  Bay

Harbour had failed to present any such evidence.  (BCI Ex. 33 [*Bay Harbour* Docket No. 9]

LBHI Ans. Br. at 17-27.)  At the time, LBHI did not have access to the information (being

hoarded by Barclays at that time) that later showed certain Lehman officers had breached duties

they owed to Lehman and that Barclays aided and abetted those breaches.  At the very least,

LBHI took no position in the appeal inconsistent with its recently learning that mistakes were

made in the September 2008 disclosures to the Court.

---

[59]  This was undoubtedly derived from Weil Gotshal's review of the transcript for the September 19th
hearing where Ms. Fife described the proposed Sale Transaction in these terms.  (BCI Ex. 49 [LBHI Docket No.
318], 9/19/08 Tr. at 46:20-47:15; *see also* LBHI Mot. ¶¶ 86-87.)

NYI-4250276

6.    **Alvarez & Marsal Began Noticing Discrepancies in LBHI's Books**

130.    A&M first began taking a closer look at the Sale Transaction toward the end of December 2008 when, as it worked on year end matters, it saw discrepancies between the amounts of liabilities left with the LBHI estate and those it had expected, based on disclosures made in Court, would remain.  (BCI Ex. 81 [Kruse] 165:9-23; BCI Ex. 84 [Marsal] 144:17-145:10.)  LBHI began "coming to some realization that the liabilities that were on the book for comp and call it cure liabilities appear[ed] to be much lower than the amounts that were presumed to be the effective liabilities in the deal."  (BCI Ex. 81 [Kruse] 165:15-20, 233:9-20 ("toward the end of December 2008 when our finance team was finalizing the closing of the filing date books and records.  Issues started to bubble up about the amount of the liabilities for comp and to some extent for cure as well."), 168:6-17; 202:16-25, 207:24-208:8; BCI Ex. 84 [Marsal] 133:7-135:2.)  After noticing these discrepancies, A&M formed a team in January 2009 to look into the Sale Transaction.  (BCI Ex. 81 [Kruse] 165:23-166:5, 190:16-25, 68:3-8 (A&M did not "undertake a comprehensive review of the transaction until January of 2009").)

7.    **Barclays' February 2009 Disclosure of its "Gain" on the Sale Transaction**

131.    While the forensic team was starting its work, on February 9, 2009, Barclays announced its results for the year ending December 31, 2008.  (A. 130(B).)  Barclays announced it made a £2.262 billion (approximately $4.2 billion at the time) gain on its acquisition of Lehman's North American business.  (A. 130(B) at 95; *see* LBHI Mot. ¶ 13.)  The Barclays Results Announcement stated that the gain was "on acquisition," meaning it was an immediate profit for Barclays and not one resulting from its operating the former Lehman business.

132.    This gave the Estate the first real indication that the Sale Transaction as closed may not have been the "wash" or "push" described to the Court, the Lehman Boards, the

creditors, and A&M but instead may have provided undisclosed benefits to Barclays.  As Marsal testified:

> [w]e were told [the Sale Transaction] was a push.  The creditors were told it was a push.  We think the bankruptcy judge was told it was a push . . . .  And [when we asked for information] all we got was stonewalled . . . .  And then it was followed by the fact that in the first quarter along comes some bravado from somebody indicating – at Barclays that they made a profit on the transaction of umpteen dollars.  We said, well, wait a minute.  Nobody talked about a profit, a built-in profit.  Where is that built-in profit?  But all of this dialogue, none of this happened until the middle of the first quarter.

(BCI Ex. 84 [Marsal] 136:14-137:18.)  This release prompted A&M to begin examining the assets and liabilities that had been transferred to Barclays.  (*Id.* at 144:17-145:10.)

### 8. In Light of Barclays' Recalcitrance, A&M and LBHI Began Focusing on the Terms of the Sale Transaction

133.    Right after Barclays issued its Results Announcement, the LBHI estate asked Barclays for information.  Barclays stonewalled.  On February 19, 2009, LBHI wrote Barclays requesting information about its payments of the bonus and contract cure amounts (the "February 19 Letter").  (A. 166 [LBHI Docket No. 3596] Rule 2004 Mot., Ex. B.); *see also* BCI Ex. 81 [Kruse] 209:8-21, 233:5-234:5; BCI Ex. 84 [Marsal] 196:5-211:3.)  The February 19 Letter stated that LBHI had conducted "a preliminary review of the accrual for bonuses as of August 31, 2008, and it appears that the consolidated global accrual on the books of LBHI as of that date was only $1.3 billion."  (A. 166 [LBHI Docket No 3596] Rule 2004 Mot., Ex. B.)  The letter requested a meeting with Barclays and supporting documentation to explain the amounts paid, or to be paid, by Barclays.  (*Id.*; BCI Ex. 84 [Marsal] 196:5-211:3.)

134.    On February 23, 2009, Barclays responded, stating that it purportedly wanted to avoid addressing queries on a piecemeal basis, but actually providing no answers at all.  (A. 166 [LBHI Docket No. 3596] Rule 2004 Mot., Ex B.)  Barclays did not agree to meet with LBHI

76

about the bonus and cure liabilities. (*Id.*) Barclays did not provide LBHI any supporting

documentation or analysis. (*Id.*) To the contrary, Barclays was dismissive of attempts to even

look into these issues. (BCI Ex. 84 [Marsal] 133:7-135:2 (testifying that Barclays' General

Counsel said "It's irrelevant whether a mistake was made or not. The deal's the deal."), 208:21-

209:20.) This rebuff prompted LBHI to retain special counsel. (*Id.* at 143:9-145:10.) [60] It also

caused A&M to begin looking at the value of assets transferred to Barclays, although that proved

difficult given the paucity of information and institutional knowledge available to LBHI even

then. (*Id.* at 161:10-162:20, 186:16-187:24.)

### 9.    LBHI Retained Special Counsel to Press this Issue With Barclays

135.    In late March 2009, LBHI's retained Special Counsel to push for information

from Barclays. After an initial investigation of the limited available facts, on April 13, 2009,

LBHI's counsel wrote to Barclays to follow up on the requests in LBHI's February 19 Letter (the

"April 13 Letter"). (A. 166 [LBHI Docket No. 3596] Rule 2004 Mot., Ex. C.)

136.    In response, Barclays' again stonewalled, its counsel characterizing this as "an

unnecessarily burdensome and confrontational approach in these circumstances." (A. 166 [LBHI

Docket No. 3596] Rule 2004 Mot., Ex. D.) Barclays stated the requests in the April 13 Letter

addressed topics the Examiner was investigating and asserted that a "simultaneous and

duplicative investigation by [LBHI] will interfere with [Barclays'] ability to respond to the

Examiner in a timely and complete manner." (*Id.*) Barclays did not agree to provide LBHI any

materials or to make available any former Lehman employees. (*Id.*)

---

[60] Counsel for the Creditors' Committee also had been discouraged from pursuing similar questions by
Weil Gotshal because, allegedly, there was nothing they could do about it. (A. 194 [Dep. Ex. 504] (email from Ms.
Fife to Milbank: "I really am at a loss to figure out why you and the other committee professionals are spending so
much time on the Barclays sale. What could you or anyone for that matter do even if it turned out that the assets
turned out to be greater? As you know, the sale has been consummated which effectively moots out any relief you
might be seeking."); BCI Ex. 88 [O'Donnell] 143:22-154:14.)

137.    On April 24, 2009, LBHI's counsel requested copies of any documents Barclays produced to the Examiner, and again requested that Barclays provide the documents called for in the April 13 Letter.  (A. 166 [LBHI Docket No. 3596] Rule 2004 Mot., Ex. E.)  Barclays did not provide, or agree to provide, any such documents.  Instead, on May 13, 2009, Barclays said it would provide only some of the requested discovery and some "aggregate" data, but it would neither commit to any deadlines for doing so nor specify what it would produce.  (A. 166 [LBHI Docket No. 3596] Rule 2004 Mot. ¶ 28.)

### 10.    LBHI's Rule 2004 Discovery and the Rule 60(b) Motions

138.    Accordingly, on May 18, 2009, LBHI moved for an order authorizing Rule 2004 discovery concerning the Sale Transaction.  (A. 166 [LBHI Docket No. 3596] Rule 2004 Mot.)  The Committee and Trustee joined in LBHI's Motion.  ([LBHI Docket No. 3778]; [LBHI Docket No. 4074].)  Barclays opposed the requested discovery.  (BCI Ex. 43 [LBHI Docket No. 3776].)

139.    In its opposition, Barclays asserted that the Estate's "potential claims have no merit and the Estate already has access to any information is reasonably could need."  (BCI Ex. 43 [LBHI Docket No. 3776] Barclays Rule 2004 Obj. ¶¶ 2; *see* 19, 35, 55.)  Barclays wrongly asserted that A&M "participated directly" in negotiations from September 15 through the closing. (*Id.* at ¶¶ 19, 54.)  As to discrepancies concerning bonus and cure amounts, Barclays argued (as it does again on this motion) it was not required to make such payments (*id.* at ¶ 2), and that the amounts had always been just "estimates."  (*Id.* ¶¶ 2, 9-15; *see* A. 168 [LBHI Docket No. 4183], 6/24/09 Tr. at 43:5-11.)  Barclays argued discovery would be unduly burdensome and inappropriate, in part, because "Barclays faced a considerable risk that many of the assets it acquired would turn out to be worth far less than Lehman represented."  (BCI Ex. 43 [Barclays Rule 2004 Obj.] ¶ 44.)

78

140.    On June 25, 2009, over Barclays' objection, the Court granted the Rule 2004

Motion, authorizing discovery from Barclays.  (A. 167 [LBHI Docket No. 4164].)  Through July,

August and early September of 2009, LBHI, the Trustee and the Committee conducted extensive

and expedited discovery relating to the topics noted in the Rule 2004 Motion.  The Movants

reviewed and analyzed over 327,000 pages of documents received on a piecemeal basis from

Barclays, and an additional 11,000 pages from third parties.  The Movants deposed thirteen

former Lehman employees to whom LBHI no longer had access and ten Barclays employees

involved in the Sale Transaction.  They also deposed or interviewed multiple third party

witnesses, including Klein and McDade.

141.    The last deposition was taken on Saturday, September 12, 2009, of Mr. Klein, one

of Barclays' principal negotiators.  Three days later, on September 15, 2009, LBHI filed its Rule

60 Motion.  It did so in compliance with the one-year deadline under Rule 60(c)(1), as LBHI had

previewed to the Court at the June 24, 2009 hearing.  (*See* A. 168 [LBHI Docket No. 4183],

6/24/09 Tr. at 38:16-41:3.)

## ARGUMENT

## I.    THE MANIFEST FAILURE TO DISCLOSE MATERIAL TERMS AND AMENDMENTS WARRANTS RELIEF UNDER RULE 60

142.    Barclays' invitation to the Court to disregard the manifest lack of adequate

disclosure of the real terms of the Sale Transaction and the unauthorized post-Sale Order

amendments to the transaction the Court approved is contrary to established law.  Given the

multiple instances where material facts were not disclosed to the Court, relief under Rule 60 is

well warranted.

143.    Proper and complete disclosure is the key element of reorganization and Section

363 sales.  Without it, the statutory scheme breaks down and the goals of chapter 11 are

frustrated.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d

1063, 1070 (2d Cir. 1983); *Matter of Embrace Sys. Corp.,* 178 B.R. 112, 125 (Bankr. W.D. Mich.

1995) (citing *Lionel*; "the key to chapter 11 reorganization is proper disclosure"); *In re Wilde*

*Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Ca. 1991) ("Of course, the court and the

creditors can only make an 'articulated business' judgment regarding the prudence of the sale

where there has been a full disclosure of the details of the proposed sale by its proponent."); *see*

*generally  In re New York Trap Rock Corp.*, 42 F.3d 747, 754 (2d Cir. 1994) (undisclosed

agreements "deprive the selling debtor of full market value.").  Specifically, "[t]he import of

Section 363 is that a trustee is prohibited from acting unilaterally.  [T]his schema is intended to

protect both debtors and creditors (as well as trustees) by subjecting a trustee's actions to

*complete disclosure* and review by the creditors of the estate and by the bankruptcy court."

*Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (emphasis added).  Therefore,

the proposed terms of a Section 363 sale must be properly and completely disclosed to the court

and creditors.  *See, e.g., In re Med. Software Solutions*, 286 B.R. 43, 439-40 (Bankr. D. Utah

2002) (requiring "full disclosure of the sale terms" as requirement for approval of Section 363

sale); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 177, 180 (D. Del. 1991) (approving sale

where "full terms" are disclosed).

144.    The disclosure of unclear or imprecise terms is insufficient.  *See In re Au Natural*

*Restaurant, Inc*., 63 B.R. 575, 580 (Bankr. S.D.N.Y. 1986) (noting lack of evidentiary record and

"unclear and inconsistent terms contained in the transaction" as grounds for denying sale); *In re*

*Santec Corp*., 49 B.R. 59, 60 (Bankr. D. N.H. 1985) ("the precise terms and conditions of the

sale agreement are necessary to a decision on approval of a sale;" denying approval of sale where

agreement was not finalized).  Indeed, some courts have said that the information provided in

80

connection with a Section 363 sale should serve as the "functional substitute" for the "adequate

information" requirement imposed for chapter 11 disclosure statements.  *See In re Naron &*

*Wagner, Chartered*, 88 B.R. 85, 89 (Bankr. D. Md. 1988) ("For a Chapter 11 preconfirmation

sale of all or substantially all of a debtor's assets, appropriate notice should be a functional

substitute for the adequate information which would be contained in a disclosure statement

concerning the proposed transaction."); *see also W. Auto Supply Co. v. Savage Arms, Inc. (In re*

*Savage Indus, Inc.),* 43 F.3d 714, 720 n.9 (1st Cir. 1994).

145.    Consequently, where complete disclosure is not made to the court in connection

with a Section 363 sale, relief from the order approving the sale is appropriate in various forms,

including pursuant to Sections 105 and 549 of the Bankruptcy Code, or pursuant to Federal Rule

60.  S*ee, e.g., Lawrence v. Wink (In re Lawrence),* 293 F.3d 615, 624 (2d Cir. 2002); *In re*

*Emergency Beacon Corp.*, 666 F.2d 754, 760 (2d Cir. 1981).  For example, in *In re Lawrence*,

the Second Circuit stated that Rule 60(b) relief would be appropriate if a Section 363 purchaser

withheld material information from the Court at the time of the sale.  There, the bankruptcy court

approved the sale by the estate of shares it held in MTI for $2.25 per share.  293 F.3d at 618.

Within a month, the share price jumped to $9.87 after a public announcement that MTI had

developed a new product.  Movants challenged the sale order, arguing the purchasers had

fraudulently concealed this information.  *Id.* at 619.  The Bankruptcy Court observed that, "if

there were misrepresentations at the time of the sale, this Court approved such sale not fully

knowing all the salient facts."  *Id.* at 624.[61]  These facts, the Second Circuit observed, "are

---

[61]  Despite this observation, the Bankruptcy Court dismissed debtors' action because it did not construe the
action as a motion pursuant to 60(b)(3).  *Id.* at 625 n. 8.  The Second Circuit reversed, concluding that the action
should have been construed as a Rule 60(b)(3) motion, and remanded so that the Bankruptcy Court could decide the
motion.  *Id.* at 625-26.

81

precisely the types of facts under which Rule 60(b)(3) relief is appropriate." *Id.* at 625.[62]   Other

cases are in accord.  *See, e.g., Official Unsecured Creditor's Comm. of LWD, Inc. v. K&B

Capital, LLC (In re LWD, Inc.),* 332 B.R. 543, 551-56 (Bankr. W.D. Ky. 2005) (debtor and

purchaser failed to adequately disclose transfer of valuable asset, which allowed purchaser to

obtain this asset for inadequate consideration, and requiring purchaser to compensate estate for

such asset), *aff'd*, 340 B.R. 363 (W.D. Ky. 2006), *app. dismissed*, 335 Fed. Appx. 523 (6th Cir.

Jun 19, 2009).

146.    Here, the failure to disclose was manifest.  The Court was never told about the

discount, the role of the Repurchase Agreement to deliver the discount, or the addition of billions

of dollars in additional assets to the Sale Transaction.  Hence, the deal as consummated was very

different from the deal approved.  Under such circumstances, modification of the Sale Order

Rule 60 should be granted to restore the transaction to the one the Court actually approved on the

record submitted to it.

## II.    LBHI IS ENTITLED TO THE RELIEF IT SEEKS UNDER RULE 60

147.    As explained in LBHI's Motion, the transfer of billions of dollars in value from

the Lehman estates was accomplished by undisclosed and material changes made to the Sale

Transaction after issuance of the Sale Order through the Clarification Letter.  To the extent these

changes were "authorized" by the Sale Order based on an incomplete and distorted record, LBHI

is entitled to relief from that order under Rule 60.

---

[62]    *See also In re Intermagnetics Am., Inc.*, 926 F.2d 912, 917 (9th Cir. 1991) (sale order should be set aside
under Rule 60(b) where officer's declaration on which it was premised constituted fraud on the court); *In re Rickel
& Assocs., Inc.*, 272 B.R. 74, 88-90 (Bankr. S.D.N.Y. 2002) (Rule 60(b)(3) satisfied where purchaser's failure to
disclose provision in warrant resulted in materially understating to the court the value of assets being sold); *In re
Maxwell Newspapers, Inc.*, 170 B.R. 549, 550 (S.D.N.Y. 1994) (vacating settlement under Rule 60(b)(3) because
motion seeking its approval contained material omissions); *In re Rome Family Corp.*, 407 B.R. 65, 80 (Bankr. Vt.
2009) (allowing further briefing on Rule 60 motion because if "hidden asset" had been identified at the sale hearing
it likely "would have triggered an inquiry by the Court as to the adequacy of the sale price").

148.    LBHI has moved for relief under four separate subsections of Rule 60:

- (b)(1) – mistake, inadvertence or excusable neglect (LBHI Mot. ¶¶ 145-158);

- (b)(2) – newly discovered evidence (LBHI Mot. ¶¶ 159-161);

- (b)(3) and (b)(6) – innocent or intentional misrepresentation by either an opposing party or anyone else (LBHI Mot. ¶¶ 162-166); and, alternatively

- (b)(3), (b)(6) and (d) – fraud by an adverse party, and other party, or fraud on the Court (LBHI Mot. ¶¶ 167-170).

149.    To prevail on this motion, LBHI need not prove that it is entitled to relief under all of these sections, it must show only that it satisfies one of the above criteria and that it has a meritorious claim.  *See* James W. Moore, MOORE'S FEDERAL PRACTICE § 60.24[1] (3d ed. 2009) (citing *Davis v. Musler*, 713 F.2d 907, 915 (2d Cir. 1983) and others); LBHI Mot. ¶¶ 139-144.) That determination is left to the discretion of the Court, which may consider equitable principles in granting relief.  *See, e.g., Lasky v. Cont'l Prods. Corp.*, 804 F.2d 250, 256 (3d Cir. 1986); *Marshall v. Monroe & Sons, Inc.*, 615 F.2d 1156, 1160 (6th Cir. 1980); *Whitaker v. Associated Credit Servs., Inc.*, 946 F.2d 1222, 1224 (6th Cir. 1991).

### A.    LBHI Is Entitled to Relief Under Rule 60(b)(1) Due to Multiple Mistakes of Fact by Various Entities

150.    As LBHI explained in its moving papers, Rule 60(b)(1) allows for relief from court orders premised on a mistake or inadvertence by any party, non-parties, and even the Court. (LBHI Mot. ¶¶ 145-158); *see* Fed. R. Civ. P. 60(b) advisory committee's note; MOORE'S FEDERAL PRACTICE § 60.41[3].  In this case, there were, at least, material mistakes made by several entities, all supporting the need for relief under Rule 60(b)(1).[63]

---

[63]  When the evidence is reviewed in terms of scienter, motive, opportunity, justification, excuse and any number of other considerations, the Court could very well determine that these "mistakes" were more than that, which might justify findings of bad faith, breach of fiduciary duty, misrepresentation or even fraud.  For purposes of this section, however, we assume the most innocent of explanations for all these discrepancies, *i.e.*, we assume they were mere mistakes.

151.    Among other disclosures made to the Court at the September 17 and 19 hearings

that were, at the least, mistakes:

- To the extent the deal was designed to generate a multi-billion dollar day one gain
  for Barclays, it was a mistake to portray it in Court, to the Lehman Boards, and in
  the Asset Purchase Agreement as a balanced deal;

- There was at least a fundamental disconnect between the use of the term "book
  value" in the Asset Purchase Agreement and the lower negotiated price for the
  assets and liabilities being transferred;

- The $5 billion discount described by Lowitt, Kelly and Tonucci gave rise to
  multiple mistakes, including (i) not disclosing it to the Court, the Lehman Boards,
  creditors, or Weil Gotshal, (ii) not reflecting it in the Asset Purchase Agreement,
  (iii) planning on later writing down the books without telling the Court, and (iv)
  planning to use an intentional repo default to deliver the discount;

- The September 18 Repurchase Agreement gave rise to even more mistakes,
  including not explaining its role in the Sale Transaction to the lawyers, the Court,
  the Lehman Boards and creditors, failing to consider the implications of Section
  559 when this repo was terminated, not telling the lawyers about the termination
  until after the Sale Hearing and not bringing the issue to the Court when the repo
  termination issue surfaced to the lawyers on September 20; and

- Significant mistakes were made as to the value of liabilities Barclays was to
  assume for bonuses and contract cures.  The $3.5-4.0 billion disclosed to the
  Court proved to be enormously overstated, especially as to contract cures.

152.    Similarly, it was at least a mistake for the parties to have assumed that no material

changes were made to the deal as a result of the Clarification Letter, executed two days after the

Sale Order and only after extensive further negotiations.  At the very least, it was a mistake not

to have investigated this issue fully to completely understand the changes being made.  And it

was surely a mistake not to seek the Court's guidance to determine whether additional approvals

were required, especially when the Court had made clear it was available over the weekend if

further hearings were needed.

153.    The parties also made what were, at least, serious mistakes concerning

disclosures to their respective Boards.  The Lehman Boards were told that the deal was a "wash."

NYI-4250276

The Barclays' Board, on the other hand, was told it would generate substantial gain on day one. Diamond testified he had no authority to do a deal without a gain. McDade testified the deal he made contemplated no gain at all. The two CEOs' diametrically opposed views of the deal shows, at a minimum, that someone was mistaken about core aspects of the transaction.

154.    Other crucial mistakes were made by individuals involved in negotiating and consummating the deal, and those mistakes distorted the disclosures made to the Court. For example, while Mr. McDade understood the deal was a "wash" with no day one profit for Barclays, Barclays claims Mr. Miller and Mr. Ridings had a different understanding. If that is so, then Lehman's advisers were not fully informed about the deal (or misunderstood its terms), and it was not possible for them to make accurate disclosure, especially when those familiar with the $5 billion discount, the intent to write down Lehman's books, and the use of the repo default did not tell the lawyers about these things.

155.    Also, of course, someone made egregious mistakes in estimating the contract cure liabilities presented to the Court. Even Barclays cannot dispute that someone, made what was, at the very least, a huge error in estimating these liabilities as $1.5 billion ($2.25 billion in the 9/16/08 Financial Schedule) when the actual amount ended up being $238 million. Even as to the bonuses Barclays was required to pay to former Lehman employees, the parties were on different pages. Lehman understood that Barclays would be paying $2.0 billion in bonuses (not including severance and other forms of compensation). (*See, e.g.,* BCI Ex. 57 [Brown] 25:13-21.) Barclays was planning to pay only around $1.3 billion in all forms of compensation. (BCI Ex. 91 [Ricci] 37:17-39:18; BCI Ex. 181.) So someone was mistaken, by at least $700 million.

156.    In the end, it is not necessary to determine whether these were more than innocent mistakes. For purposes of this motion, it is sufficient for LBHI to show, as it has, that

NYI-4250276

fundamental mistakes were made.  This alone provides ample grounds for granting the relief

LBHI seeks.  Barclays raises several arguments to the contrary, none of which withstands

scrutiny.  (*See* Barclays Opp. ¶¶ 570-581.)  First, Barclays contends that only "excusable

litigation mistakes" and mistakes of law and fact by the judge can be redressed under Rule

60(b)(1).  (*id.* ¶ 570.)  This misstates the law.  In the Second Circuit, relief under Rule 60(b)(1)

"has been invoked to remedy the *mistake of a party* or his representatives."  *In re Emergency

Beacon Corp.* 666 F.2d 754, 759 (2d Cir. 1981) (emphasis added); *see also Stefanopoulous v.

City of New York*, No. 07-cv-1045, 2008 WL 4820558, *1 (2d Cir. Nov. 5, 2008) (same).[64]

157.    Second, Barclays contends that "unilateral" mistakes regarding the "negotiation

and comprehension" of transaction documents provide no basis for relief under this Rule.

(Barclays Opp. ¶¶ 571-73.)  This just assumes away the core issue that, even putting to one side

whatever disconnect there was between the parties, *the Court* was not fully informed of all

material aspects of the transaction.  In any event, critical mistakes here were, in fact, mutual.

Similarly, there was at least a mutual mistake as to the impact of Section 559 and the insertion of

paragraph 13 into the Clarification Letter.  Both sides failed to see this statutory prohibition

initially, and even after Barclays' counsel spotted the issue over the weekend, they never raised it

with Lehman's counsel and no one disclosed it to the Court.  There was also at least a mutual

mistake as to the search for additional assets.  Lehman executives thought they were filling a

"shortfall" in repo collateral.  But Barclays' General Counsel now says that was not the case,

although some of Barclays' own executives apparently thought so at the time.  In short, there are

mistakes all around, and they were not "unilateral."

---

[64]    Even under the Tenth Circuit case Barclays cites, the claims LBHI asserts in its Rule 60 Motion are
cognizable because they constitute "excusable litigation mistakes."  Because certain LBHI employees, including
LBHI's main negotiator, Bart McDade, did not know the deal was not to be balanced, he proffered testimony in
favor of the deal as he understood it, not of the actual terms of the deal.

158.    Third, Barclays asserts that mistakes caused by Weil Gotshal not understanding the Sale Transaction are no basis for relief.  (Barclays Opp. ¶ 572.)[65]  This comes with ill grace when most of the "mistakes" Barclays claims Weil Gotshal made were the result of Barclays and former Lehman executives (now working for Barclays) not explaining aspects of the deal to Weil Gotshal.  Moreover, mistakes by Weil Gotshal in presenting the deal to the Court were observed by Barclays and its counsel, but left uncorrected as Barclays stood silent.[66]

159.    Fourth, Barclays argues that under New York law contracts cannot be reformed for unilateral mistake.  (Barclays Opp. ¶ 573; *see id.* ¶¶ 535-549.)  This misses the very point of the Rule 60 Motions.  LBHI does not seek to reform the operative contract here, it seeks only to modify the Sale Order so Barclays will be held to the contract the Court actually approved.  LBHI seeks to modify the Sale Order only to eliminate unauthorized changes made to the deal, not to change the underlying Asset Purchase Agreement or parts of the Clarification Letter that were legitimately approved, *i.e.*, the parts that made no material changes.

160.    This relates to Barclays' other misleading assertion that LBHI has not shown that complete disclosure would have changed the outcome.  (Barclays Opp. ¶¶ 559-569.)  LBHI is

---

[65]  Relatedly, Barclays' contention that this motion is premised on "carelessness and ignorance" by Lehman and its counsel (Barclays Opp. ¶ 581) fails for the reasons noted here, and the cases Barclays cites are easily distinguished.  *See In re Carlton Concrete Corp.*, No. 08-CV-242, 2008 WL 4443233, at *5-6 (E.D.N.Y. Sept. 26, 2008 (rejecting Rule 60(b)(1) relief where moving party received court order but admittedly failed to carefully review it); *Karara v. Univ. of Denver*, No. 93-1087, 1993 WL 371386, *1-2 (10th Cir. Sept. 23, 1993) (movant not entitled to Rule 60 relief to overturn settlement entered into after four years of litigation where movant argued that he entered settlement because he improperly relied on two psychologist's opinions that he did not have emotional distress claim, but later found a psychologist who supported his claim).

[66]  Barclays cites cases in which courts have rejected Rule 60(b)(1) relief based upon an allegation of a unilateral mistake.  However, none of these cases involve an attorney who presented a deal under mistaken terms to the court in front of an adversary who was aware that the presentation included mistaken information about the deal.  *See In re Hyler*, No. 04-32952, 2009 WL 2849129, *3 (Bankr. N.D. Cal. Apr. 22, 2009) (movant sought Rule 60(b) relief based on his own misunderstanding of court-ordered stipulation); *In re Wilmington Hospitality*, No. 01-19401, 2003 WL 21011689 (Bankr. E.D. Pa. Apr. 18, 2003) (whether third party may modify stipulation should be heard in state court where proceedings currently stayed); *In re JameswayCorp.*, No. 93 B 43697, 1995 Bankr. LEXIS 267, * 7 (S.D.N.Y. Mar. 7, 1995) (movant not entitled to Rule 60(b) relief based on fact that document it should have consulted "fell through the cracks" before negotiating cure payment).

87

not seeking to change the outcome of the Sale Hearing, nor eliminate the Sale Order.  Rather,

LBHI is seeking to modify the Sale Order to enforce the transaction the Court actually approved,

and not the one Barclays and a few Lehman executives consummated without authority and out

of the Court's view.  This Motion does not, as Barclays contends, present a choice between

LBHI making a sale (on any terms) or some apocalyptic alternative in which LBHI would have

been able to make no sale at all.  The operative choice here is between the transaction that closed

on September 22 and the one that should have closed based on what was described to the

Court.[67]  No one disputes that, in September 2008, Lehman and the country were in difficult

financial straits.  The question presented by this Motion is not whether the Court would have

approved the deal anyway had it known of the terms on which the parties closed the transaction.

That assertion (which Barclays appears to champion) is not only speculation based on hindsight,

but it arrogantly assumes parties can usurp the Court's approval process when they think they

know better than the Court and, if later questioned, secure retroactive approval for their actions.

That is not the law.[68]

---

[67]  In that regard, Barclays contends that the Court should bless the Barclays' windfall because, according to Barclays' acquisition accounting, its gain was "less than 10 percent of the value of the assets acquired." (Barclays Opp. ¶ 568.)  This grossly understates the value of the acquired assets.  (*See* A. 202 [Zmijewski Report] ¶ 11 (Opinion 2).)  Barclays' adjusted gain -- over $10.2 billion -- amounts to nearly 20% of the value of the financial assets acquired.  (*Id.*)  Moreover, none of Barclays' cases support its contention that this Court should approve a windfall of this magnitude simply because the consideration Barclays paid amounted to "75 percent or more of the appraised value of the assets purchased out of bankruptcy." (Barclays Opp. ¶ 568.)  None of Barclays' cases involves a situation where, as here, the true economics of the transaction were hidden from the Court.  This Court was not advised that the proposed transaction would result in an immediate day-one gain on acquisition of over $11 billion.  Quite to the contrary, the information disclosed to the Court indicated a net benefit to the Estate of $1.85 billion.  (Trustee Ex. 35 to Maguire Decl. [Expert Report of Harrison J. Goldin] at 7-9.)  Barclays' contention that the over $13 billion swing in value should nonetheless be accepted by the Court sidesteps this lack of full disclosure and ignores the Court's clear admonition that $500 million was material to this transaction.  (BCI Ex. 49 [LBHI Docket No. 318], 9/19/08 Tr. at 54:18-22.)

[68]  The cases Barclays cites on this score (Barclays Opp. ¶¶ 559-560) are inapposite.  They merely stand for the unremarkable proposition that absent a movant showing extraordinary circumstances or that the mistakes, newly discovery evidence or frauds in question were material, a court should not grant Rule 60 relief.  In *Cobos v. Adelphi Univ.*, 179 F.R.D. 381, 388-89 (E.D.N.Y. 1998), relief was denied because the movant offered no evidence of extraordinary circumstances.  In *Fitzgerald v. Field*, No. 98-7574, 1999 WL 177278, at *2 (2d Cir. Mar. 26, 1999), the alleged fraud on the court was immaterial because it involved only factual issues when the court's decision turned on a question of law.  In *Matura v. United States*, 189 F.R.D. 86, 89 (S.D.N.Y. 1999), the mistake in issue occurred after the court issued its decision so it could not have affected that decision.  And in *United States v. Int'l*

88

161.    Fifth, Barclays asserts there can be no mistake when there was acknowledged
uncertainty as to market conditions and the value of securities.  (Barclays Opp. ¶ 574.)[69]  But
hard values were given in the transaction documents and presentations to the Court.  Moreover,
LBHI's motion is premised on misrepresentations as to the balanced nature of the deal and the
failure to disclose material changes made after the Sale Order was issued.  Lehman is not trying
to retrade the deal, as Barclays asserts repeatedly.[70]  Rather, LBHI seeks Rule 60 relief so it can
enforce the deal the Court approved.

**B.      Separately, LBHI Is Entitled to Relief Under Rule 60(b)(2) Based on Newly
Discovered Evidence**

162.    Barclays contends that some of the evidence on which LBHI bases its Rule 60
Motion was not "newly discovered."  (Barclays Opp. ¶¶ 582-97.)[71]  Not only is this wrong as a
factual matter, but Barclays' contention is contrary to applicable law.

---

(continued…)

*Bhd. of Teamsters*, 247 F.3d 370, 395-96 (2d Cir. 2001), the court denied Rule 60 relief because the movant could
not show the perjured testimony in issue was "material" and that other available evidence was sufficient to support
the finding of breach of fiduciary duty.  The cases Barclays cites in footnote 193 are no different.  In the end, they
are all distinguishable because, unlike in those cases, LBHI has shown that the mistakes, newly discovered evidence,
and misrepresentations in issue here were material to the Court's decision to issue the Sale Order.  Indeed, at the
Sale Hearing the Court asked questions about valuation, indicating that it thought that material to its mandate.

[69]  This contention as to market conditions also makes no sense since the parties were not issuing
representations or warranties or otherwise contracting as to the condition of the markets.

[70]  Barclays contends that Movants' claims do not involve mistake, but rather an attempt to retrade the deal.
(Barclays Opp.  ¶¶ 575-576.)  To support its assertion, Barclays cites (1) cases in which Movants either sought Rule
60(b) relief based on hindsight that they could have gotten a better deal or should have entered into a more
advantageous settlement, *see e.g., Andrulonis v. United States,* 26 F.3d 1224, 1235 (2d Cir. 1994); *Andresakis v.
Conn.*, No. 96-9467, 1997 WL 383456, at *3 (2d Cir. July 9, 1997);  *Kozlowski v. Coughlin*, 871 F.2d 241, 246 (2d
Cir. 1989); *Nemaizer v.Baker*, 793 F.2d 62 (2d Cir. 1986); (2) cases in which the moving party could have found out
all relevant facts but made a choice not to fully explore the issues;  *see In re N. Broadway Funding Corp.*, 34 B.R.
620, 622 (Bankr. E.D.N.Y. 1983); or (3) cases in which there was clearly no mistake at all.  *See In re Bradlees
Stores, Inc.*, 291 B.R. 307, 312 (S.D.N.Y. 2003) (no mistaken belief that third party was paying the Debtors' pre-
July 1992 worker's compensation because the third party had been doing so for more than two years without
objection).

[71]  Barclays' contentions on this score are irrelevant to those portions of LBHI's Rule 60(b) motion brought
under subsections (b)(1), (b)(3), (b)(6), and (d).  Contrary to Barclays' suggestion, newly discovered evidence is not
a threshold which motions under all Rule 60 subsections must clear.  One can move based on mistake, for example,
even if the basis for that motion was not newly discovered.  In other words, even if Barclays were right about the
provenance of the evidence here, LBHI's entire motion can be heard under these other subsections of Rule 60.

NYI-4250276

163.    To constitute newly discovered evidence under Rule 60(b)(2), the movant must show that (i) the evidence was of facts that existed at the time of the trial or other dispositive proceeding, (ii) the movant was justifiably ignorant of the evidence despite due diligence, (iii) the evidence is admissible and probably would have changed the outcome, and (iv) the evidence is not merely cumulative or impeaching. *See U.S. v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001). The evidence on which LBHI bases its motion meets this test.

### 1.    The newly discovered evidence relates to facts in existence at the time of the Sale Hearing and the closing of the Sale Transaction

164.    The newly discovered evidence featured in LBHI's Motion relates to both the terms of the deal and the inaccurate and incomplete disclosures made to the Court and the Lehman Boards concerning it. A partial listing of this evidence is summarized here:

- Testimony from Lowitt, Kelly and Tonucci that Lehman agreed to give Barclays a $5 billion discount off Lehman's marks; they planned to write down Lehman's books to reflect this; when the September 18 Repurchase Agreement presented itself they planned to use an intentional default to grant the discount to Barclays; and the "comp" and "cure" figures in the 9/16/08 Financial Schedule (and disclosed to the Court) were substantially inflated. (LBHI Mot. ¶¶ 20-28, 59-68, 95-104.);

- Testimony by Berkenfeld that despite bring a drafter of, and Lehman's signatory to, the Asset Purchase Agreement, he was unaware of any discount off Lehman's marks, the planned write down of Lehman assets, or the repo default; and he understood the deal to be essentially balanced. (LBHI Mot. ¶¶ 41-47, 70-71.);

- McDade's testimony confirming the Sale Transaction was supposed to be a balanced deal and that it was never intended that Barclays would make a multi-billion dollar gain on acquisition. (LBHI Mot. ¶¶ 36, 38.);

- Documents and testimony from Barclays employees confirming, by contrast, that Barclays viewed it as "imperative" and expected all along to make a huge gain on acquisition, told its board the deal would be "capital accretive," secured a discount on Lehman's assets, and never intended to pay all the bonus and cure liabilities disclosed to the Court. (LBHI Mot. ¶¶ 28-35, 63-65.);

- Documents and testimony confirming that what Barclays ended up paying in bonus and contract cure liabilities was much less than the Court was told it would pay. (LBHI Mot. ¶¶ 64-65, 151-54, 155-58.); and

90

- Evidence regarding breaches of fiduciary duty, such as the testimony confirming that Lowitt signed an employment agreement with Barclays even before the Sale Transaction closed, and was under contract to Barclays even while he was directing a hunt by Lehman for additional assets to add to the deal for Barclays. (LBHI Mot. ¶¶ 18 n.6, 106-110.)

165.    All this and more was uncovered only after the Court, over Barclays' objections, had to order Barclays to submit to Rule 2004 discovery.  It is flat wrong for Barclays to argue this evidence was not newly discovered when Barclays itself had to be ordered to produce it over the last few months.[72]

### 2. LBHI was "justifiably ignorant" of this new evidence until recently, and without Rule 2004 discovery it would not have found it

166.    LBHI was not in possession of the evidence supporting its Rule 60 motion until recently, and its justifiable ignorance of it has several bases rooted in the fact that LBHI was dependent on Barclays for virtually all information about what had taken place in the Sale Transaction.  First, some of the evidence supporting LBHI's motion, *i.e.*, the discount, planned asset write down and expected repo default, was known to only a small group of Lehman employees, all now Barclays executives.  Second, LBHI had no access after the closing of the Sale Transaction to its former employees -- thousands of whom moved to Barclays -- so it could not have effectively interviewed them to get this evidence, even if they had been inclined to provide it voluntarily.  Third, LBHI had only limited access to its own books and records, employee emails and transaction documentation, which had been transferred to Barclays after the Sale Transaction.  Fourth, no one left at LBHI had enough knowledge of the Sale Transaction to understand what to look for or what might be in dispute.

---

[72]  Barclays contends that evidence concerning Barclays' failure to pay $2.0 billion in bonuses does not relate to a fact "in existence at the time of trial."  (Barclays Opp. ¶ 597.)  This is a sleight of hand.  The evidence confirms Barclays' intent "at the time of trial" not to pay the amount represented to the Court as well as Barclays' failure to correct those representations made "at the time of trial."

91

167.    In addition, Barclays was obstructionist about providing information concerning

the Sale Transaction, and in the end it took Rule 2004 discovery to force Barclays to provide the

information that became the basis for LBHI's Rule 60 Motion.  For months, Barclays had

withheld information that might suggest to the administrators of the LBHI estate that they should

look into this deal in greater detail.  And, given all the other problems A&M was forced

immediately to address to protect creditors and the estate, there simply was not enough time for

LBHI to assemble and analyze the limited information it did have.  *See, e.g., Alpern v. UtiliCorp

United, Inc.*, 84 F.3d 1525, 1536 (8th Cir. 1996) (Rule 60(b) motion was timely despite movants

possessing the newly discovered evidence because they "lacked sufficient time to analyze and

submit the evidence" in the earlier proceeding); *W. Helicopter Servs., Inc. v. Rogerson Aircraft

Corp.*, 777 F. Supp. 1543, 1545 (D. Or. 1991) (despite evidence having been disclosed earlier,

Rule 60(b) motion was timely because movant had been diligent in pursuing discovery).

168.    For these and other reasons, this evidence could not have been discovered by

LBHI at the time the Sale Order was issued, or even shortly thereafter.  It took extensive, Court

ordered, Rule 2004 discovery just to frame the issues so LBHI could determine whether it had

claims, let alone prove them.

### 3.    Barclays' factual recharacterizations do not alter this conclusion

169.    Instead of addressing the new evidence, Barclays mischaracterizes it:

### (a)    The Discount

170.    Arguing there is no new evidence relating to the "undisclosed $5 billion

discount," Barclays says that its view that Lehman's marks were outdated and inaccurate was

known to all at the time of the Sale Transaction.  (Barclays Opp. ¶ 589.)  That is not true, but

even if it were, awareness of Barclays' views in this regard would not have revealed the agreed

$5 billion discount that LBHI first learned about in the Rule 2004 discovery.  In August 2009,

92

Lowitt testified that Lehman's marks on its books were accurate as of September 16, 2008, but revealed that Barclays was given a discount off those marks anyway.  In other words, the discount did not correct outdated marks, it involved discounting marks that Lehman viewed as accurate at the time.  Moreover, many people *never* knew about this discount, including the lawyers and senior key executives.

### (b)    The Plan to Use a Repo Default To Convey The Discount

171.    Barclays argues that "[t]here is no new evidence regarding the fact that Barclays was entitled to receive the full amount of the Repo Collateral."  (Barclays Opp. ¶ 588.)  It claims the new evidence concerns only the fact that "the Repo collateral ... was supposed to have marks of over $49 billion -- which was almost $5 billion higher than the $45 billion repo loan made by Barclays -- reflecting a 'haircut'."  (*Id.* ¶ 591; *see id.* ¶¶ 592-94.)

172.    But the new evidence revealed in the Rule 2004 discovery was that a $5 billion "block discount" was agreed to *before* Barclays ever agreed to "step into the shoes" of the New York Fed.  The repo default became the conduit through which that discount was conveyed to Barclays.  This information initially came from the email of Gerard Reilly, who died at the end of 2008, suggesting that defaulting on the repo could be the best way to make the block discount happen (A. 58) and the August 20, 2009 testimony of Lowitt confirming this.  (BCI Ex. 83 [Lowitt] 136:11-138:4.)

### (c)    The Inflated Liabilities and Barclays' Failure To Pay $2 Billion In Bonuses To Former Lehman Employees

173.    Barclays argues that "[t]here is no 'new evidence' regarding the so-called inflated liabilities," asserting that "the estimates for the compensation and cure liabilities were higher than was 'accrued' on the estimated LBI balance sheets" and was "available at the time." (Barclays Opp. ¶ 596.)  This is baseless.  Without Kelly's testimony on August 18, 2009 -- and

93

his begrudging admissions that the liabilities were deliberately inflated -- that fact would have stayed hidden.[73]  Kelly's notations and spreadsheets, without his explanation of them, did not disclose this fact.  Similarly, Lowitt's testimony in August 2009 revealed for the first time that the $2 billion accrual for compensation was not derived from Lehman's books, but was in fact an "agreed" number between Lehman and Barclays, among other evidence.  (*See* ¶ 60, *supra*; LBHI Mot. ¶ 61.)  And Barclays' internal communications showing it had no intention of paying the amount of bonus and cure liabilities represented to the Court only came to light during discovery.  Similarly, Barclays' failure to pay the full $2 billion in bonuses, which LBHI could not have known until months after the deal closed, and would not have discovered at all without Rule 2004 discovery, simply confirms this intentional inflation of liabilities.  (*See* Barclays Opp. ¶ 597.)

### (d)    The September 19 Asset Grab

174.    Barclays argues "[t]here is no new evidence regarding the so-called additional assets" and that they are all set forth in the Clarification Letter.  (Barclays Opp. ¶ 589.)  This misstates evidence.  The new evidence does not concern the *existence* of those assets, but rather their value, the scramble to include them in the deal, Barclays' threat not to close otherwise, and the fact that the transaction was no longer balanced as a result.  All of this was first revealed in Court-ordered discovery.  Lowitt revealed for the first time on August 20, 2009 the instructions he received to find more assets to give to Barclays.  (BCI Ex. 83 [Lowitt] 60:10-69:14.)  Kirk testified on August 31, 2009 about steps taken in the September 19 asset grab that were not known before.  (BCI Ex. 78 [Kirk] 100:10-109:9.)  Klein, Barclays' advisor, revealed for the first time on September 12, 2009, that he had been sent back by Barclays expressly to demand

---

[73]  (*See* LBHI Mot. fns. 15, 25, 32, 36.)

additional value on September 19.  (BCI Ex. 79 [Klein] 85:3-87:17.)  Barclays does not address

any of this, arguing instead that these internal demands and actions were somehow already

known but not pointing to any competent proof that they were.

### 4.    Barclays' legal authorities do not bar Rule 60(b)(2) relief

175.    Knowing the conflicted Lehman executives did not disclose what they should

have disclosed, Barclays contends that LBHI is charged with the knowledge of its former

employees so nothing here can be newly discovered.  (Barclays Opp. ¶¶ 585-86; *see also id.* ¶¶

509-516 (same argument as to mandate rule exception).)  This ignores key facts and well-settled

law of the adverse-interest exception.

176.    First, this argument does not apply to the reams of significant evidence that was

always in Barclays' exclusive possession or in the possession of third parties, including

Barclays' documents and the testimony of its employees and advisers showing Barclays had no

intention of paying all the bonus and cure liabilities described to the Court; its internal

understanding that the deal was not balanced; the presentations made to its board showing it

would yield a huge and immediate gain; its valuations of the assets and liabilities in the repo

transaction; and its own documents concerning the asset grab.  Barclays does not contest that this

evidence is all newly discovered, and it alone is enough to satisfy the requirements of Rule

60(b)(2) and render moot any discussion of the adverse interest exception in this regard.

177.    Second, Barclays' misstates the applicable test with its contention that the

"adverse interest" exception to the general imputation rule cannot apply because, even though

the former Lehman executive at issue may have had conflicts of interest, they did not "totally

abandon" Lehman's interests.  (*See* Barclays Opp. ¶¶ 585-586, 509-516.)  This is demonstrated

by the case Barclays cites, *In re CBI Holding Co.*[74]  In *CBI Holding*, the bankrupt debtor asserted

claims against Ernst & Young ("E&Y") for failing to conduct a proper audit, which purportedly

would have detected the misconduct in question.  529 F.3d 432, 442-43 (2d Cir. 2008).  E&Y

argued that such misconduct should be imputed to CBI and that the "adverse interest" exception

did not apply because, although the executive profited from the fraud, CBI also derived a benefit

from the misconduct.  *Id.* at 442.  In ultimately holding for CBI, the Second Circuit examined the

"adverse interest" exception in alleged mixed motive cases.

178.    The court noted that "the 'total abandonment' standard looks principally to the

intent of the managers engaged in misconduct."  *Id.* at 451 (citing *Capital Wireless Corp. v.

Deloitte & Touche*, 627 N.Y.S.2d 794 (3d Dep't 1995) ("[T]he issue [is] whether

mismanagement of [the company] was the vehicle by which [the manager] *intended* to advance

his own interest or whether it was simply incidental to his continued efforts to retain some

economic viability in the company.") (emphasis added by Second Circuit).)  Thus, evidence that

the company itself "actually benefited" from the manager's fraud does not mean the adverse

interest exception necessarily does not apply.  *Id.* at 451-52.  The test is whether the "true

motive" behind the managers' conduct was to benefit themselves, as opposed to the company.  *Id.*

The Second Circuit quoted from *In re Phar-Mor, Inc. Sec. Litig.*, 900 F. Supp. 784, 787 (W.D Pa.

---

[74]  Barclays' other cases (Barclays Opp. ¶¶ 585-86) are not factually on point.  In *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 152 n.19 (S.D.N.Y. 2009), it was "undisputed" that the employees in issue acted at the direction of the company's marketing department in furtherance of the "Defendants' collective goal to attract infringement-minded users to their service" – thus, the company's interests were being served by the employees.  *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 824-25 (S.D.N.Y. 2006) was decided at the motion to dismiss stage, and therefore the court was bound to assume the validity of the allegations that Shane was acting for the benefit of the corporations in question and could not apply the adverse inference exception at that stage in the proceedings.  Similarly, in *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 785 (1985), the court simply recognized that "conclusory allegations" alone were not enough to support invoking the adverse interest exception.  And in *UCAR Int'l Inc. v. Union Carbide Corp.*, No. 00CV1338, 2004 WL 137073, at *10-17 (S.D.N.Y. Jan. 26, 2004), the court refused to apply the adverse inference exception because the company had plead guilty to crimes that embodied the same conduct for which it was trying to sue its former executives.  Under those circumstances and applying principles of *in pari delicto*, the company could not argue that the executives were not acting in the company's interest, since it had participated in the misconduct in question.

1995), in which the court held that the exception could apply in a mixed motive case where a "reasonable trier of fact could conclude that the *true motive* of the wrongdoers was the preservation of their employment, salaries, ... and reputations ...." *CBI Holding*, 519 F.3d at 451 (citing *Capital Wireless Corp. v. Deloitte & Touche*, 627 N.Y.S.2d 794, 797 (3d Dep't 1995) (finding a triable issue in applying the adverse interest exception: although the "fraud generated much needed financing for plaintiff and forestalled its bankruptcy," the wrongdoer might still have totally abandoned the company's interest); *In re Crazy Eddie Sec. Litig.*, 802 F. Supp. 804, 818 (E.D.N.Y. 1992) ("The fact that some of the embezzled money was put back into the corporation to help inflate sales and facilitate public offerings is not inconsistent with an abandonment by . . . [m]anagement of the corporation's interests.").

179.    In other words, contrary to Barclays' assertion, the test is not whether the former Lehman officers in question were "acting primarily for [their] principal" (Barclays Opp. ¶ 511 (misconstruing *Center v. Hampton Affiliates, Inc.*)),[75] it is whether their concern was to benefit themselves and their colleagues.  And in this case there is ample evidence on this issue.  It is now known that a number of senior Lehman employees had divided loyalties, such that they did not disclose the negotiated discount, the plan to write down Lehman's marks, or the planned repo default to Lehman's lawyers, its boards and its other executives.  Lowitt, for example, sat silently while the deal was described as a "wash" to the Lehman boards, although he had seen and read only a few hours before Kelly's email about the deal involving a "5b all in economic loss versus our marks" and inflated accruals.  (LBHI Mot. ¶ 49.)  Two days later, Lowitt was under contract

---

[75] Barclays' case *Center v. Hampton Affiliates* does not even squarely address the adverse interest exception in mixed motive cases.  Instead, the court determined that the movant had presented no more than conclusory assertions that the agent had a conflict of interest and therefore the court's denial of summary judgment on that basis was appropriate.  *Center*, 66 N.Y.2d at 785-86.  In short, the Court of Appeals never really addressed or applied the proper test for this exception, it merely held that the movant had made an insufficient showing to even require such analysis.

to Barclays when he was leading the effort to add even more assets to the deal.  His loyalties were so divided by then that he was even taking direction from Barclays' Ricci in connection with this search.  And Lowitt is just one example of such misconduct.  Kelly, who wrote up the inflated compensation and cure estimates, was also on his way to his next career at Barclays.  Similarly, while the Lehman Board was told about eight executives negotiating such agreements, it was not told about the key role some of them had in pricing the deal.

180.    The fact that those and other Lehman employees were not loyal to Lehman is confirmed by their actions, arguments made in Court, and testimony presented in this case.  Although as Lehman officers they owed fiduciary duties to Lehman, they owed no duties to other employees, their subordinates or superiors, the financial markets, or even the U.S. economy as a whole.  Their job was to act in the best interests of Lehman only, not to secure their own future employment, or employment for colleagues, or act to protect other institutions.  Their actions and testimony, however, show that saving their own jobs and the jobs of their friends was their main concern.[76]  Under these circumstances, Lehman cannot be charged with their knowledge as the interests of these executives were clearly adverse to that of LBHI and its creditors.

181.    Barclays does not even attempt to apply the correct analysis.  It does not come forward with any evidence as to the motives underlying the acts of these employees, other then to proffer after-the-fact, self-serving declarations saying their motives were pure.  But as Barclays' own case shows, conclusory statements like that cannot carry the day.  *See Center*, 66 N.Y.2d at 785.  Moreover, Barclays offers only more conclusory assertions as evidence of the benefits Lehman apparently received from the misconduct of certain of its former executives.

---

[76]  (*See* BCI Ex. 65 [Felder] 38:15-42:2 ("And then I wanted to make sure that most importantly, that I was going to be able to bring – that the people in the credit business at Lehman, I was going to be able to make sure they had jobs. . . ."); BCI Ex. 86 [McGee] 29:21-32:19 ("[] I'm not going to hold this deal up, I'm not going to hold up saving 11,000 jobs, I'm fine.  I agree. I'm in.").)

Barclays asserts that Lehman "avoided a potentially catastrophic liquidation of LBI, which would have triggered massive losses" and that assets were preserved, contracts and liabilities were assumed, thousands of jobs were saved, and further market meltdown was avoided.[77] (Barclays Opp. ¶ 515; *see id.* at ¶ 516.)

182.    This variation on "no harm, no foul" is not the test and, by suggesting it is, Barclays ignores the central point of hearings to review a Section 363 sale: disclosure to ensure the protection of assets and creditors.  Barclays nowhere addresses whether the value of the assets it took over and above that approved by the Court outweighed these supposed benefits. Nor does Barclays show that Lehman would not have received such supposed benefits if extra assets were not added to the deal after Court approval.  Barclays cannot even show that other bidders, armed with the knowledge of a built-in day-one gain worth billions of dollars, might not have appeared to outbid Barclays for these same assets.  In that case, the benefit Barclays espouses can only be considered illusory.  *See CBI Holding*, 529 F.3d at 453 (finding appellees suggestion of benefits to the corporation illusory in light of financial circumstances at the time). Indeed, Barclays' own "expert" admitted that the market benefits cited here would have occurred no matter what terms Lehman agreed to with Barclays, just so long as some deal was done.  (A. 160 [Saunders] 13:13-19:11; 26:19-42:10.)  And both Barclays' expert and its outside counsel have conceded the deal could have closed later in the week.  (A. 160 [Saunders] 18:4-20:17; A. 159 [Rosen] 220:17-222:12.)  There simply was no legitimate reason not to go to Court for disclosure of the true deal terms, and, under the adverse interest exception, there is no basis here for imputing knowledge of those terms to LBHI.

---

[77]    These latter two are not even benefits to the estate, but rather societal benefits or benefits to the former Lehman executives in question and their colleagues.

### C.   Separately, LBHI Is Entitled to Relief Under Rules 60(b)(3) and 60(b)(6) Based on Innocent or Intentional Misrepresentations Made to the Court

183.   As explained in LBHI's moving papers, Rule 60(b)(3) allows for relief based on fraud or misrepresentation by an adverse party, while Rule 60(b)(6) provides for similar relief based on fraud or misrepresentation by anyone else.  ((LBHI Mot. ¶¶ 162-163) (citing case law).)[78]  Claims of fraud, misrepresentations or misconduct under Rule 60(b) can include unintentional acts, not just misrepresentations or omissions prompted by scienter.  *See Londsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995); *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988); *U.S. v. One (1) Douglas A-26B Aircraft*, 662 F.2d 1372, 1374 n.6 (11th Cir. 1981). Thus, to prevail under this ground for relief, LBHI need not show scienter or bad faith.

184.   Barclays raises several contentions in response that are off base.  In particular, Barclays confuses LBHI's Adversary Complaint with its Rule 60 Motion.  Notably, Barclays cites no authority for the overreaching proposition it appears to advance, that for some reason the Movants' adversary complaints must mirror their Rule 60 grounds for relief.[79]  The two pleadings here also have distinct purposes.  In its Adversary Complaint, LBHI asserts claims for which it seeks affirmative recovery (*e.g.,* damages, return of assets, and other forms of relief) from Barclays.  In its Rule 60 Motion, LBHI raised several grounds justifying its request for

---

[78]   Thus, Barclays' contention that it is not an "opposing party" and therefore Rule 60(b)(3) does not apply (Barclays Opp. ¶¶ 598-99) is irrelevant.  The misrepresentations at issue here are covered collectively by subsections (b)(3) and (b)(6), no matter who made them.  For this reason, Barclays' attempt to distinguish LBHI's cases on this basis fails.  LBHI does not allege that Barclays was an "opposing party" at the time of the Sale Hearing.  It cites (b)(3) to illustrate that when combined with (b)(6), these provisions of Rule 60 cover all the misconduct at issue without regard to the party affiliation of the miscreant.  However, Barclays was effectively adverse to LBHI in the December Settlement Motion, to which LBHI was not a party and to the extent it gave Barclays assets that otherwise would have belonged to LBHI.  Thus, to the extent Barclays or its counsel made misrepresentations in securing LBHI's consent to that settlement or the Court's approval, they would be covered by Rule 60(b)(3).  These could include, for example, Mr. Schiller's express assurances on the record that the settlement motion would have no collateral estoppel effect (*see* ¶ 122, *supra*) and any misrepresentations made to Weil Gotshal in explaining the settlement to LBHI.

[79]   Similarly, contrary to Barclays' suggestion (Barclays Opp. ¶ 603), LBHI's aiding and abetting breach of fiduciary duty claims are not at issue under its Rule 60 motion.  Such claims will be heard as part of the adversary proceeding to follow this motion, as Barclays so stipulated and the Court has so ordered.  (*See* A. 170 [LBHI Docket No. 5636] ¶ 1.)

limited relief from the Sale Order, principally to remove discrete language from the order to

allow LBHI to pursue its claims in the Adversary Complaint.  It is therefore no surprise that

LBHI asserts "misrepresentation" and "misconduct" under Rule 60(b)(3) and (b)(6) but does not

assert a claim for misrepresentation in its Adversary Complaint.  And if it prevails on its Rule 60

motion (on any ground), LBHI can secure the relief is seeks through its claims in the adversary

proceeding.  Barclays' attempt to trip up LBHI's Rule 60 motion with this procedural argument

(Barclays Opp. ¶¶ 602-03) is misplaced.

### D.  Separately, LBHI Is Entitled to Relief Under Rules 60(b)(3), 60(b)(6) and 60(d) for Fraud by Certain Individuals or Entities or Fraud on the Court

185.    As noted in LBHI's Motion, to the extent the Court finds these mistakes or

innocent misrepresentations insufficient grounds for Rule 60 relief, it could grant relief under the

fraud-based provisions of Rule 60.  (LBHI Mot. ¶¶ 167-170.)  This also could include "fraud on

the court" which includes "egregious conduct involving a corruption of the judicial process

itself."  CHARLES ALAN WRIGHT, ET AL., 11 FEDERAL PRACTICE AND PROCEDURE § 2870 (2d ed.

1995); *see also* MOORE'S FEDERAL PRACTICE § 60.21[4][e].  Fraud on the court is not limited to

cases where a party commits fraud; it covers fraud on the court by anyone.  Nor does a party

have to benefit from the misdeed for there to be a fraud on the court.  *See* MOORE'S FEDERAL

PRACTICE § 60.21[4][e].

186.    Evidence developed during discovery supports a finding of scienter and fraud

under these principles.  In deciding a fraud-based claim, the Court should evaluate, in addition to

the disclosure failures noted above, the following evidence of scienter, bad faith and breach of

duty:

- Although the Lehman Boards were told that eight key executives would be negotiating their employment agreements with Barclays while negotiating the Sale Transaction, the Boards were never told some of these individuals would be actively involved in setting the price for the deal;

101

- The Lehman Boards were not told of the roles Kelly, Tonucci and others (who were not part of the so-called "Elite 8") would play in the negotiations while they discussed their future employment with Barclays;

- Lowitt, Lehman's CFO, signed his employment contract with Barclays before the closing of the Sale Transaction, at a time when he was supervising a search for additional assets to be added to the deal, and taking instructions from his future employer, Mr. Ricci from Barclays, at the time;

- Certain Lehman executives whose roles had not been disclosed to the Boards agreed to give Barclays a $5 billion discount off the value of Lehman's assets, they intended to write down those assets on Lehman's books, they planned to use an intentional default under the September 18 Repurchase Agreement to provide that discount to Barclays;

- McDade (presented to the Boards as a disinterested negotiator), Berkenfeld (the drafter and signatory of the agreements), Miller (counsel charged with presenting the deal to the Court) and Ridings (charged with trying to shop the deal to other potential buyers) were not told key valuation aspects of the deal, including the intention to write down Lehman's assets, the intended default under the September 18 Repurchase Agreement, and the value of assets added to the deal without discussion;

- While the Lehman Boards were being told the deal was a "wash" with assets being transferred roughly matching liabilities Barclays was to assume, the Barclays Board was being told the exact opposite, i.e. the deal was "capital accretive" and would generate considerable profit for Barclays; and

- While the Court was told Barclays would be assuming approximately $3.5-4.0 billion in bonus and contract cure liabilities, certain Lehman executives, and Barclays knew those numbers were inflated; Barclays knew it never intended to pay anything close to those amounts.

Should the Court move beyond the issue of mistake or innocent misrepresentation, all these facts, among others, could support a finding of bad faith or breach of fiduciary duty (and aiding and abetting same), or fraud on the Court.

187.    Notably avoiding the merits of these fraud-based allegations (and running from any discussion of whether there may have been fraud on the court here), Barclays argues only that Rule 60(b)(6) is a "catch-all" that covers only claims that do not fall under the other provisions of Rule 60.  But there is nothing inappropriate in LBHI pleading alternative grounds

for relief under Rule 60. The point is that, to the extent the Court deems LBHI's contentions

under the other subsections of Rule 60 to fail, it can still provide relief under these fraud-based

subsections. None of Barclays' cases precludes alternative pleading. Nor do they require

dismissal of these fraud-based claims merely because the facts supporting them overlap to some

extent with those at issue under other sections of the Rule.[80]

### E.   The Relief LBHI Seeks Is Authorized Under Rule 60 Which Is the Appropriate Vehicle For Addressing These Concerns

#### 1.   The Relief Movants Seek Is Consistent With Rule 60

188.   Through its Rule 60 Motion, LBHI asks the Court to modify select provisions of

the Sale Order and to grant other relief the Court deems appropriate. This is precisely the type of

relief Rule 60 allows. The Rule provides great flexibility and a panoply of remedies to a court

seeking to correct problems resulting from a prior order. (*See* LBHI Mot. ¶¶ 139-144.) Barclays,

however, complains that Movants are improperly seeking affirmative relief, *i.e.*, damages,

through their Rule 60 motions. (Barclays Opp. ¶¶ 526-530.) Ultimately, once the Sale Order is

modified, Movants will seek the return of their assets through the adversary complaints they filed

on November 16, 2009. But in their Rule 60 Motions, Movants seek only to modify the Sale

Order, an appropriate form of relief for such motions.

189.   The fact that some issues raised in Movants' adversary complaints are being heard

as part of the Rule 60 motions is no surprise to Barclays. On October 27, 2009, this Court

entered a stipulated scheduling order providing that "[t]o the extent the [adversary] complaints

---

[80]   What the cases Barclays cites illustrate is that relief will not be based on Rule 60(b)(6) where the basis for Rule 60 relief falls only under clauses (1) – (5) of Rule 60. *See Scherer v. City of New York*, No. 03 Civ. 8445, 2007 WL 2710100, at *4 (S.D.N.Y. Sept. 7, 2007); *Rand Int'l Leisure Prods., Ltd. v. TekSource, L.C.*, No. 97 CV 0319, 1998 WL 372356, at *2 (E.D.N.Y. July 2, 1998) ("grounds asserted for relief pursuant to Rule 60(b)(6) must be other than those recognized in clauses (1) through (5) of the rule…."). This makes it impossible for a movant to circumvent the pleading and timeliness requirements of Rule 60(b)(1)-(5) by choosing to bring their motion under Rule 60(b). *See Rand Int'l Leisure Prods., Ltd.*, 1998 WL 372356, at *2 (movant "cannot avoid Rule 60(b)(2)'s requirements of materiality and due diligence by reasserting the same claims under Rule 60(b)(6)"); *see also United States v. Cirami*, 535 F.2d 736, 740 (2d Cir. 1976). However, these cases do not prohibit pleading in the alternative.

contain claims that are already made as part of the Rule 60 Motions, those claims shall be resolved pursuant to the schedule set forth in this order for resolving the Rule 60 Motions." (A. 170 [LBHI Docket No. 5636] ¶ 1.) In fact, Barclays *requested* this consolidation of the two types of proceedings, claiming a desire to promote efficiency and speed up the entire process.

190. Barclays also argues that Rule 60 does not apply because courts may not modify contracts. (Barclays Opp. ¶¶ 531-540.)[81] LBHI, however, is not asking the Court to modify a contract.[82] It is asking the Court to modify the Sale Order. Barclays also suggests that LBHI seeks to remedy its own decision to act or fail to act. (Barclays Opp. ¶¶ 502-08, 532.) Again, that is not a fair reading of LBHI's Motion, which simply seeks to get Barclays to live up to the deal the Court approved. This argument by Barclays is a strained attempt to shoehorn these facts into case law addressing very different concerns.[83]

### 2. Courts Need Not Find Bad Faith To Grant Rule 60(b) Relief

191. Barclays erroneously claims that relief under Rule 60(b) is barred because LBHI allegedly has not proven that Barclays acted in bad faith. (Barclays Opp. ¶¶ 522-524.) However,

---

[81] Even the cases Barclays cites do not support this blanket rule. They simply illustrate that Rule 60(b) should not be used to reform contracts *solely* where a party in hindsight, seeks a contract with more favorable terms. *See In re Wilmington Hospitality LLC*, No. 01-19401, 2003 WL 21011689, *4 (Bankr. E.D. Pa. April 18, 2003) (refusing to modify stipulation in the absence of "fraud, mutual mistake, or in exceptional cases, a unilateral mistake coupled with the other parties, knowing silence") (quotation omitted); *Lucille v. City of Chicago*, 1995 WL 606926, at *1 (7th Cir. Nov. 15, 1995) (affirming district court's refusal to revise settlement agreement under Rule 60(b)(6) to increase benefits to plaintiff where plaintiff failed to argue that there was any flaw with the judgment); *Louisville Bedding Co. v. Pillowtex Corp.*, 455 F.3d 1377, 1380-81 (Fed. Cir. 2006) (party's calculated risk in entering settlement agreement does not meet "exceptional or extraordinary" circumstances required under Rule 60(b)(6)). As noted, LBHI is not asking for this kind of relief so these cases are inapposite.

[82] Barclays' contractual modification cases (Barclays Opp. ¶¶ 535-537) fare no better. None of them addresses the Court's authority to modify its own sale order to enforce the contract it approved when the parties consummated a deal the Court did not approve, thereby secretly denuding the estate of valuable assets.

[83] The one case on which Barclays relies for this point, holds only that Rule 60(b) cannot be *solely* used to remedy a party's voluntary failure to take action. *See, e.g., Brummerstedt v. Am. Airlines*, No. 91 c 8382, 1994 WL 530807, at * 1 (N.D. Ill. Sept. 29, 1994) (party cannot use Rule 60 to rectify its own blunder in failing to file a stipulation or draft order of dismissal within 60 days per court order). LBHI is not trying to do that here. Rather, it is seeking to enforce the deal it agreed to and the Court approved.

104

there is nothing in Section 363(m), the statute upon which Barclays relies, or in the authorities

Barclays cites requiring LBHI to make such a showing.  Section 363 (m) provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

(11 U.S.C. § 363(m) (2008).)

192.    By its own terms, Section 363(m) applies to an "appeal" and not to modification

of a sale order under Rule 60(b).  *See Edwards v. Golden Guernsey Dairy Co-op (In re Edwards),*

962 F.2d 641, 644 (7th Cir. 1992) ("[S]ection 363(m) merely protects the bona fide purchaser

during the  period – that is, pending appeal – in which he otherwise would have no protection

against the rescission of a judicial order approving the sale, and does not address the scope of

collateral relief.").  While purchasers like Barclays have argued that Section 363(m) forecloses

collateral attack on final sale orders, in addition to appeals, that argument has repeatedly been

rejected by modern case law.  *See id.*  "[T]o hold otherwise would be to make collateral relief

under Rule 60(b) effectively unavailable against an entire category of bankruptcy court orders, a

result that could not be reconciled ... with Fed. R. Bankr. P. 9024," which makes Rule 60

applicable in bankruptcy court.  *In re Alan Gable Oil Dev. Co.*, No. 91-1526, 1992 WL 329419,

at *4 (4th Cir. Nov. 12, 1992).

193.    The few cases on which Barclays relies are distinguishable.  In arguing that

Section 363(m) bars a direct attack on the sale order absent a showing of bad faith, Barclays

relies on *In re Summit Ventures, Inc.*, 161 B.R. 9 (D. Vt. 1992), a case that bears no resemblance

to this one.  In *Summit Ventures*, the court held that a sale order could not be vacated upon the

emergency motion of an unsecured creditor who claimed he did not have notice of the auction

and wanted to make a better offer. *Id.* at 9-10. The court rejected this argument, finding there was no abuse of discretion in the court's confirming the sale because the auction process was fair and the purchaser who bid did so in good faith. *Id.* at 11. The court's holding neither rested solely on the finding of good faith, nor did it establish a rule that Section 363(m) bars Rule 60 relief.

194.    Barclays' further argues "[t]hat the reason Section 363(m) applies to Rule 60(b) attacks ... is to afford purchaser [is] of a debtor's assets an 'assurance of finality' with respect to 'who has the rights to the estate property'." (Barclays Opp. ¶ 524 (*quoting In re Gucci*, 126 F. 3d 380, 387 (2d Cir. 1997).) However, *Gucci* deals with Section 363(m) in the context of an appeal. Rule 60 is not even mentioned in that opinion, so it cannot support Barclays' assertion here.[84] In sum, there is no requirement that Movants prove Barclays acted in bad faith to be granted Rule 60 relief.

**F.    Bankruptcy Code Sections 549, 550 and 559 Provide for this Relief**

**1.    Barclays' Assertions As to Section 549 Are Strained and Unsupported**

195.    In arguing against LBHI's Section 549 and 559 claims, Barclays recycles arguments it makes elsewhere, none of which advances its position. (Barclays Opp. ¶¶ 611-670.)[85] For example, Barclays contends the mandate rule bars these claims, apparently because the Clarification Letter existed at the time of the *Bay Harbour* appeal. (*Id.* ¶¶ 616-617.) As

---

[84]    Barclays also relies on *United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991), to support its contention that Section 363(m) applies to Rule 60 motions to afford purchasers finality with respect to property ownership. However, just like *In re Gucci*, 126 F.3d 380, *Salerno* does not discuss the applicability of Section 363(m) to Rule 60 motions; nor does the case even mention Rule 60.

[85]    Barclays' initial definitional contention that because the Court signed the Sale Order it "authorized" all the changes in the Clarification Letter and therefore as a matter of law Section 549 cannot apply (Barclays Opp. ¶¶ 611-612) is both circular and illogical. In effect, Barclays is arguing that the Court has no authority to address (under Rule 60 and Section 549) conduct that violates both the spirit and letter of its own Sale Order because the Court issued the Sale Order in the first place. In other words, as long as one can conceive of some argument whereby their conduct was supposedly "authorized" under the order, the Court is barred from examining that interpretation, no matter how strained. The Court's authority in this regard is not so restrained.

NYI-4250276

explained below, Barclays has no basis for this argument.  The terms of the Sale Transaction and

Clarification Letter were not part of the district court's mandate.  The *Bay Harbour* court

therefore did not "necessarily decide" anything at issue in these Rule 60 Motions.

196.    Contrary to Barclays' contentions, LBHI is not challenging the Court's

procedures at the Sale Hearing or the fact that Sale Order it incorporates by reference an

unfinished Clarification Letter.  (Barclays Opp. ¶¶ 618-630.)  As noted, LBHI brings this Motion

to address material changes to the deal made after the Sale Order was issued.  This is a disclosure

issue, not a challenge to the Court's procedures or its authority to act.  The fact that counsel for

both parties determined not to bring these changes back to the Court (Barclays Opp. ¶¶ 625-630)

does not alter this conclusion.  (*See* ¶¶ 88-90, *supra*.)

197.    Barclays also illogically contends that Paragraphs 3 and 25 of the Sale Order

(which bars material changes to the Asset Purchase Agreement) do not apply to changes made by

the Clarification Letter, because (i) that unfinished and unseen letter was mentioned in the Sale

Order, and (ii) therefore the order could not have been addressing changes made to the deal over

the following weekend.  This is a circular argument.  The Sale Order does not specify that the

Clarification Letter is exempt from its prohibition on *post hoc* material changes.  It is contrary to

the plain language of the Sale Order to argue that such post-closing changes were exempt merely

because they were made in a letter that had not yet been finalized, but to which the Court

referred in its order.  The means by which the changes were made is irrelevant.  It is their

materiality and lack of Court approval that matters.

198.    Barclays also argues that LBHI cannot seek modification of select portions of the

Sale Order, as this amounts to a partial rescission of the underlying contract.  Like its argument

against contract modifications, Barclays' contention misses the point.  Again, LBHI is not

seeking to partially rescind or modify the Asset Purchase Agreement or the deal the Court

approved. LBHI wants to modify the Sale Order to eliminate the material changes made to the

deal after the Court had approved it. And the Court certainly has authority to modify its own

orders to effect the agreement it approved.[86]

### 2.    Barclays' Section 559 Arguments Fare No Better

199.    Barclays again tries to assert the mandate rule, various estoppel and waiver

theories, a supposed lack of newly discovered evidence, and untimeliness as a basis for not airing

LBHI's Section 559 claim. (Barclays Opp. ¶ 649.) This fails for the reasons noted elsewhere in

this brief. (*See* ¶¶ 208-257, *infra*.) Barclays also argues that the Sale Order itself precludes

application of Section 559. (Barclays Opp. ¶ 650.) But it hard to see how that is possible when

the issue (or even the existence of the September 18 Repurchase Agreement, its role in

conferring the undisclosed discount, or its termination) was never presented to the Court in the

first place.

200.    Next, Barclays asserts that Section 559 is moot because the parties agreed all the

repo collateral would be conveyed to Barclays. (Barclays Opp. ¶¶ 652-659.) Even if this were

true, Barclays cites no authority for the proposition that parties can simply agree without any

Court knowledge or approval that a provision of the Bankruptcy Code does not apply to them. If

that were the case, then there should have been no need for them to include Paragraph 13 in the

---

[86]    The cases Barclays cites in this section are not to the contrary. (Barclays Opp. ¶ 645 n.212.) None of
them even involves Rule 60 of the Court's authority thereunder. They all merely stand for the inapplicable rule that
when a non-severable contract is rescinded it is completely, not partially, rescinded. But LBHI's Motion does not
seek rescission of the Asset Purchase Agreement at all or even the Sale Order. It seeks a modification of that order
and enforcement of the contract the Court approved. None of the cases cited by Barclays remotely suggests that the
Court does not have the authority to modify its own orders. Such a holding would effectively eviscerate Rule 60,
which was designed for this very purpose. Moreover, Barclays' contention in footnote 212 that Lehman should not
be allowed to keep the consideration it received and refuse to comply with the Clarification Letter must be a slip of
the tongue. While Lehman received due consideration for the assets properly to be transferred under the Asset
Purchase Agreement, it got no additional consideration for the assets added to the deal under the Clarification Letter.
If there is a basis for disallowing the unauthorized portions of the Clarification Letter, that is it. Finally, the *Terry
Oilfield Supply* case Barclays cites (Barclays Opp. ¶ 447) is inapposite for the same reason, LBHI is not seeking to
rewrite any contract here, it is seeking to enforce the agreement the Court approved.

Clarification Letter.  Its only purpose was to "rescind" the prior repo termination, to evade Section 559 and to do so in a manner that avoided Court review.  There is no authority for the idea that private parties can, without Court approval, contract around such statutory protections afforded creditors such as Section 559, which is expressly designed to bar "excess" assets from leaving an estate.

201.    Barclays also contends that, in any event, there was no "excess" collateral here, as the value of the securities supposedly had declined in value from the $49.9 billion originally agreed to.  As a factual proposition, that is incorrect.  Barclays own agent, BoNY, valued that collateral at the $45 billion range and Barclays brought that collateral onto its own books at that figure, plus $7 billion.  (A. 77.)  Barclays is bound by the value assigned by its agent and by its own conduct in this regard.  Moreover, the portion of the statute Barclays cites sinks its contention.  As Barclays notes, the "excess" repo collateral is calculated based on a "generally recognized source or the most recent or the most recent closing bid quotation from such a source ...."  11 U.S.C. § 559.  In this case, Barclays argues there was no easily ascertainable market value for most of these securities, and therefore the only "generally recognized source" for such prices was the disinterested, collateral agents employed by Barclays and Lehman.  Using the $45 billion BoNY marks and $7 billion in cash, means the excess collateral was about $7 billion -- even more than the amount of the undisclosed discount agreed to by Barclays and select Lehman executives early in the week.  (A. 77 [Dep. Ex. 144A].)

202.    Third, Barclays argues that LBHI is somehow bound by a release signed by the Trustee in connection with the December 2008 Settlement.  (Barclays Opp. ¶¶ 663-668.)

Barclays can cite to no authority establishing that LBHI is bound by a release it never signed, which was part of a settlement to which it was not a party.[87]

203.    Moreover, Barclays' contentions as to the scope of the release contained in the December 2008 Settlement are wrong.  The release is very narrow and limited only to claims relating to "the Subject Funds, the Replacement Transaction or the Delivered Securities."  (BCI Ex. 9 [Settlement Ag.] ¶ 4(d).)  The Movants' Section 559 claims do not relate to "the Subject Funds," (defined as the $7 billion in cash transferred by LBI to an account at JPMorgan on September 19, 2008 (*id.* ¶ D)), or to the "Delivered Securities," (defined as the securities that were delivered on September 18, 2008 (*id.* ¶ E)), or to the "Replacement Transaction" (defined in the Settlement Agreement (*id.* ¶ A)), because the Section 559 claims in issue here do not relate to the transaction in which Barclays provided funding in exchange for securities, but instead to Barclays' failure to comply with a statutory obligation to return excess collateral to the estate following termination of the September 18 Repurchase Agreement.  The reference to the "Replacement Transaction" in the release cannot be read to cover everything related in any way to that repurchase agreement because that would render the terms "Subject Funds" and "Delivered  Securities" mere surplusage.  Moreover, as noted, at the December 2008 Settlement Hearing, all of the parties, including Barclays, made clear that the settlement was a way to complete delivery of the repo collateral, and had nothing to do with the Sale Transaction or any subsequent events related thereto.  (BCI Ex. 50 [LBHI Docket No. 2420], 12/22/08 Tr. at 20:6-

---

[87]    Barclays' contentions as to the release barring derivative claims is wrong.  Barclays cites no authority for its naked assertion that "[t]he Committee and the Debtor do not have a Section 559 claim of their own to bring; rather, any conceivable Section 559 claim they have is derivative of the Trustee's rights ...."  (Barclays Opp. ¶ 666.) LBHI's claims relating to the repo collateral are not derived from the repo agreement itself, rather they are based on Barclays and a few executives taking assets from within the LBHI estate and transferring them to Barclays under cover of the repo transaction.  Barclays confuses a contractual claim with LBHI's right to seek the return of assets improperly taken from the estate.  For this reason, and others, the cases Barclays cites are inapposite.  (*Id.*)  None of them addresses the use of a repo to funnel assets out of a bankruptcy estate without disclosure, or the attempt to use a release to bar independent claims belonging to a party that did not sign the release.

15, 33:18-34:21, 39:13-25, 40:9-11, 41:7-11.)  The Trustee had no reason to release Sale

Transaction or Section 559 claims to help Barclays resolve its claim against JP Morgan Chase.

204.    Lastly, Barclays contends that Section 559 does not apply to the September 18

Repurchase Agreement, arguing that it is not a "repurchase agreement" under Section 101(47) of

the Bankruptcy Code.  (Barclays Opp. ¶¶ 669-670.)   Barclays argues that an agreement cannot

be a repurchase agreement if it provides for the repurchase of both assets specifically identified

in Section 101(47)(A)(i) along with other assets.  (*Id.*)  This is contrary to both the plain text of

the Bankruptcy Code and the purpose behind these statutory provisions.

205.    The statutory definition of "repurchase agreement" includes an "agreement . . .

which provides for the transfer of one or more" of the assets listed in Section 101(47)(A)(i) as

well as their repurchase on demand or on a date certain less than one year after the initial transfer.

11 U.S.C. § 101(47)(A)(i).  Barclays does not contest that the September 18 Repurchase

Agreement provides for the transfer of assets of the kind listed in Section 101(47)(A)(i), or that

they are to be repurchased less than a year after the transfer.  Since the September 18 Repurchase

Agreement meets these two statutory criteria it is a "repurchase agreement" under this section of

the Bankruptcy Code.  *See, e.g., United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)

("[W]here ... the statute's language is plain, the sole function of the courts is to enforce it

according to its terms" (quotation omitted).)

206.    Instead of addressing the statute, Barclays contends without citation to any

authority that the September 18 Repurchase Agreement does not satisfy the Section 101(47)

criteria because some other assets that do not fall under Section 101(47)(A)(i) were also

transferred under that agreement.  This is not only inconsistent with the statutory text, but

contravenes the purpose of Sections 101(47) and 559 of the Bankruptcy Code.  Section 559

modifies the automatic stay and the prohibitions on enforcement of *ipso facto* clauses with

respect to "repurchase agreements" as defined in Section 101(47).  Congress enacted these

provisions because liquidity is essential to the repurchase agreement market, and the repurchase

agreement market is essential for the proper working of the broader financial markets.  *See*

*Calyon New York Branch v. Am. Home Mortgage Corp. (In re Am. Home Mortgage Corp.*),

379 B.R. 503, 512 (Bankr. D. Del. 2008) (Section 559 and other provisions were adopted to

bolster liquidity in the repurchase agreement market, which is used by the Federal Reserve to

affect monetary policy and is the main method by which U.S. government securities transactions

are financed).  This clear purpose militates in favor of an interpretation that would not exclude an

agreement from the definition of "repurchase agreement," and thus delay the termination and

liquidation of such agreements, simply because it provides for the transfer of other assets, as well.

207.    Moreover, the Master Repurchase Agreement between Barclays and Lehman

confirms that Section 559 applies to the September 18 Repurchase Agreement.  The Master

Repurchase Agreement provides, in pertinent part, that "[i]t is understood that either party's right

to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise

any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such

Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as

amended."  (BCI Ex. 8 [Dep. Ex. 117, Master Repurchase Ag.] ¶ 19(b).)  The September 19th

termination letter issued by Barclays expressly cites paragraph 11 of the Master Repurchase

Agreement, which addresses "Events of Default," as a basis for the termination of the September

18 Repurchase Agreement.  (A. 68 [Dep. Ex. 27].)  And Alan Kaplan's declaration, submitted by

Barclays (BCI Ex. 358 ¶ 3), confirms that the September 18 Repurchase Agreement was effected

pursuant to the parties' Master Repurchase Agreement.  In the end, Barclays can hardly deny the

applicability of Section 559 to the September 18 Repurchase Agreement or its termination by

Barclays.

## III.    BARCLAYS' ATTEMPT TO AVOID THE MERITS OF THE RULE 60 MOTIONS THROUGH VARIOUS PRECLUSION THEORIES IS MERITLESS

208.    Despite professing that it wants "full disclosure" of what happened here (Barclays

Opp. ¶ 46), Barclays advances arguments aimed at avoiding the merits, offering strained theories

of untimeliness, estoppel and preclusion to prevent review of legitimate questions concerning

this complex, and rapidly concluded transaction.

### A.    LBHI's Rule 60 Motion Was Filed Within a Reasonable Time Given the Circumstances Surrounding This Complex Bankruptcy

209.    Rule 60 motions must be brought within a "reasonable time."  Fed. R. Civ. P.

60(c)(1); MOORE'S FEDERAL PRACTICE § 60.65[1].[88]  What constitutes a "reasonable time" for

this purpose depends on the facts and circumstances of each case, as interpreted within the

Court's discretion.  *Id.*; *see also id.* § 60.22[1] ("The decision as to whether relief should be

granted (under Rule 60(b)) is committed to the sound discretion of the court.").

210.    In exercising their discretion, courts look to a number of factors, including the

complexity of the proceedings, the availability of relevant information, the presence of

extraordinary circumstances, the diligence of the movant, equitable considerations, prejudice to

the opposing party, the reasons for any delay in filing the motion, and whether the opposing

party caused or contributed to such delay.  *See, e.g.,* MOORE'S FEDERAL PRACTICE § 60.65[1]

(citations omitted); *Venture Indus. Corp. v. Autoliv ASP, Inc.*, 457 F.3d 1322, 1328 (Fed. Cir.

2006) (factors include "length and circumstances of delay in filing, prejudice to opposing party

---

[88]   Rule 60 imposes an additional one-year limitation period for motions under subdivisions (b)(1), (b)(2) and (b)(3).  *See* Fed. R. Civ. P. 60(c)(1).  Barclays concedes that LBHI's September 15, 2009 motion was filed within one year of the Court's September 20, 2008 Sale Order.  (Barclays Opp. ¶ 541.)  Accordingly, that additional timeliness requirement was indisputably met and therefore need not be addressed in this reply brief.

113

by reason of the delay, and circumstances warranting equitable relief") (quotation omitted);

*Kirwan v. Vanderwerf*, 164 F.3d 1175, 1177-78 (8th Cir. 1999) (listing similar factors).[89]

### 1.    LBHI Acted Diligently and Responsibly In Investigating the Issues and Filing Its Rule 60 Motion Under Extraordinary Circumstances

211.    Where, as here, the bankruptcy and transactions at issue are extremely complex, Rule 60 motions are not untimely merely because they are brought months after the order being challenged. *See, e.g., Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530, 548 (3d Cir. 1989) (Rule 60(b) motion filed 364 days after final judgment was not untimely because this was a "particularly complex matter" adjudicated "with considerable haste"); *In re Int'l Fibercom, Inc.*, 503 F.3d 933, 945 (9th Cir. 2007) (two-year delay was reasonable under "extraordinary circumstances"); *In re New England Mut. Life Ins. Co. Sales Practices Litig.*, 204 F.R.D. 6, 11-12 (D. Mass. 2001); *In re Mid-Atl. Fuels, Inc.*, 121 B.R. 207, 211 (Bankr. S.D. W.Va. 1990).[90]

212.    In this case, complexities abound.  As Mr. Marsal noted, LBHI was deprived of the entirety of its institutional knowledge about both the Sale Transaction and LBHI's operations.

---

[89]   As an initial matter, Barclays attempts to recharacterize LBHI's claims so it can argue for a shorter limitations period.  Contrary to Barclays' assertions (Barclays Opp. ¶¶ 543-545), LBHI's Motion is not based on an alleged judicial mistake of law or fact, such that they should have been brought at the same time as an appeal. Rather, as noted above, LBHI's motion is premised on misrepresentations or omissions about facts.  Contrary to Barclays' recharacterizations, LBHI does not contend that the Court committed error in approving the Sale Transaction (i) before the Clarification Letter was finalized, (ii) without all the assets being appraised, or (iii) without a "true-up" clause.  (Barclays' Opp. ¶ 543.)  LBHI alleges material mistakes in disclosures made to the Court and in changing the deal after the Court approved it.  For that reason, Barclays reliance on *Leonard v. Lowe's Home Ctrs., Inc.*, 83 Fed. Appx. 402 (2d Cir. 2003); *In re 310 Assocs.*, 346 F.3d 31 (2d Cir. 2003); *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 670 (2d Cir. 1977); and *In the Matter of Vitta*, 409 B.R. 6 (Bankr. E.D.N.Y. 2009), is misplaced.  In none of those cases was material mistakes by the parties even in issue (they all involve alleged judicial mistakes), nor did any of them involve the parties making material changes to the deal after issuance of a sale order.

[90]   The cases cited by Barclays for the proposition that LBHI has a heightened burden in justifying its delay in filing its motion (Barclays Opp. ¶¶ 546-48), do not help Barclays on this score.  Unlike this case, the movants in the *Amoco Overseas*, *Simon*, *PRC Harris*, *Gouldbourne*, and *Richard* cases offered no reasonable explanations as to why their motions had been delayed.  Here, LBHI has set forth a detailed explanation as to the timing of its motion. (*See* ¶¶ 108-141, *supra*.)  In *Amoco* and *PRC Harris*, the Court denied the movants' Rule 60 motions, in part, because they could show no extraordinary circumstances justifying their delay.  That is not the case here.  In *LaBarbera*, the motion was deemed untimely because of the movant's "conscious decision to delay" – again, not what happened here.  And in *Sloan* and *Westmark*, the movants could not show excusable neglect in filing their motions where their attorneys made procedural mistakes in not bringing them on time.  No such mistakes were made here.  In short, unlike all of these cases, the length of time it took to file LBHI's Motion was due to the extraordinary circumstances associated with LBHI losing access to virtually all relevant information and former employees and Barclays' recalcitrance in providing the requisite information.

114

(BCI Ex. 84 [Marsal] 29:10-31:7, 20:11-22; BCI Ex. 81 [Kruse] 154:2-156:2.)  LBHI lost access

to all the key executives responsible for negotiating and consummating the sale of assets to

Barclays.  (*Id.*)  LBHI had little to no access (in part because of Barclays' misconduct) to

documents and systems the estate needed to analyze the Sale Transaction.  (BCI Ex. 81 [Kruse]

239:2-241:25, 29:10-30:9.)  A&M spent the first months just trying to figure out what assets

were left in LBHI and how to continue the business operations while the estate was wound up.

(BCI Ex. 84 [Marsal] 23:5-24:5, 25:19-26:13, 84:14-85:14, 88:5-89:7, 93:9-21, 111:23-114:14.)

In short, A&M was brought in to administer an estate that was in "chaos."  (BCI Ex. 84 [Marsal]

20:11-22.)

213.    The complexity and magnitude of Lehman's remaining businesses made A&M's

job in evaluating the Sale Transaction particularly difficult.  The Sale Transaction entailed the

transfer of tens of thousands of securities and accounts to Barclays, and just trying to assemble

the CUSIP list of such securities (which had been in numerous accounts and other repositories)

took teams of professionals months to complete.  (A. 4 [Clackson] 25:8-26:6.)  To this day,

disputes remain as to the accuracy of some of the lists.  (BCI Ex. 69 [Hraska II] 49:25-50:9; A. 3

[Blackwell] 151:5-152:17.)  The valuation of such securities was, and remains, an even more

complex undertaking.  (A. 16 [Kirk] 80:22-81:15; BCI Ex. 85 [McDade] 25:6-27:7, 27:21-29:8.)

Employee retention concerns and operational problems added yet another layer of complexity.

(BCI Ex. 55 [Berkenfeld] 210:9-211:16; BCI Ex. 78 [Kirk] 80:22-81:15.)  Looking back, it is

laudable that the LBHI estate was able to assemble the information and testimony for its Rule 60

Motion in the short time it did.

214.    Barclays cannot legitimately dispute this.  Barclays itself has touted the

complexity and uniqueness of these circumstances in various contexts, *e.g.*, opposing the *Bay*

*Harbour* appeal, and fighting Rule 2004 discovery.  (*See, e.g.,* BCI Ex. 35 [*Bay Harbour* Docket

No. 10] at 7, 12, 15; [LBHI Docket No. 3776] ¶¶ 45.)  Barclays has even cited these difficult and

unique circumstances in bringing its own Rule 60 motions in this case.  ([LBHI Docket No. 7410]

¶¶ 65-67, 233.)  Barclays should not now be heard to argue that the claims in the pending Rule

60(b) Motions were easy to investigate or that LBHI's investigation was unduly delayed.

Moreover, except to object to any discovery at all, Barclays stood silently by during the June 24,

2009 hearing on LBHI's request for Rule 2004 discovery and made no objection to LBHI's

suggestion that it might have to file a Rule 60(b) motion to seek the relief it now requests.  (*See*

A. 168 [LBHI Docket No. 4183], 6/24/09 Tr. at 38:16-41:3, 47:11-25.)

215.    To substitute for the full disclosure that should have been made at the Sale

Hearing, Barclays now points to fragments of information that peeked above the surface after the

transaction, and argues it placed LBHI on notice of its claims.  (Barclays Opp. ¶ 551.)  Barclays

asserts LBHI must have known of the undisclosed $5 billion discount incorporated into the

original Asset Purchase Agreement based on an entry about a $5 billion "negotiated reduction"

from Lehman's "stale marks" on a chart prepared in October by A&M (*id. citing* BCI Ex. 131),

while A&M was in the first few weeks of trying to manage the post-transaction chaos of the

estate, without knowledgeable personnel or data.  But, as Fogarty explained in his deposition, he

noted to those at the October meeting that he did not understand the Sale Transaction sufficiently

to understand this reference to a reduction.  (BCI Ex. 67 [Fogarty] 119:15-19; *see also id.* at

21:2-23:14, 28:2-5, 40:5-45:15, 48:4-11 ("I didn't fully understand the transaction, we were – I

was never sure of anything in that transaction"), 49:21-53:17, 57:21-61:13 ("My understanding

of things kept changing along the way."), 65:24-9, 92:7-15, 94:2-15, 129:24-132:22.)  This

reference in his presentation only raised questions to which Barclays provided no answers.  (*Id.* at 113:22-115:17, 116:23-118:4, 122:10-126:18.)[91]

216.    Barclays also contends that LBHI's Motion is untimely because LBHI knew the terms of the Clarification Letter at the time of the closing and that the letter contained no "valuation estimate" or "valuation cap."  (Barclays Opp. ¶ 550.)  As noted above (*see* ¶¶ 70-71, *supra*), this "valuation cap" strawman is irrelevant to LBHI's claims.  LBHI and the Court were told the Sale Transaction was to be a balanced deal, with transferred assets and liabilities being roughly equal.  Due to the complex nature of the transaction and Lehman's business operations, as well as Barclays' reluctance to provide information, it took months to figure out that the transaction that closed differed materially from that presented to the Court and the Lehman Boards.  And this was not apparent from the face of the Clarification Letter.  Nor was this letter, which effectively amended the deal, ever explained to the Court.  The fact that LBHI saw the document at the time of the closing is no basis for concluding it was placed on notice of any of the claims it raises here.

217.    Finally, Barclays contends that LBHI knew at the time of the closing of its claims relating to compensation and cure liabilities.  (Barclays Opp. ¶¶ 553-557.)  Not only does Barclays misstate LBHI claims as to these issues,[92] but it also assumes that LBHI had a handle

---

[91]    Contrary to Barclays' recasting of Mr. Kruse testimony on this score (Barclays Opp. ¶ 551), both Marsal and Kruse, from A&M, thought this slide referred to a reduction made on certain of Lehman's outdated marks during the week of September 15th.  (*See* BCI Ex. 84 [Marsal] 166:11-177:22; BCI Ex. 81 [Kruse] 104:9-108:16.)  Neither had enough information at the time to connect this to the "discount" they knew nothing about (*See* LBHI Mot. ¶¶ 20-47), or to later efforts to effect the discount through the September 18th Repurchase Agreement and ultimately through the Clarification Letter and termination of the Repurchase Agreement.  (*See* LBHI Mot. ¶¶ 88-104, 118-122.)  Nor did the Creditors Committee counsel have any clear understanding of this reference or why there appeared to be a "mismatch" between assets and liabilities in connection with the proposed transaction.  (Barclays Opp. ¶ 551.)  This mismatch caused the Committee to ask questions, which Barclays avoided answering.  (*See, e.g.,* BCI Ex. 67 [Fogarty] 113:22-115:17, 116:23-118:4, 122:10-126:18.)

[92]    Contrary to Barclays' suggestion, LBHI does not assert a contractual claim as to the cure liabilities Barclays assumed.  Rather, the vast overestimation presented to the Court as to the cure liabilities Barclays was supposed to assume as part of the Sale Transaction is presented in the Rule 60 motions as evidence of disclosure violations (and perhaps bad faith) concerning the value of the deal and its balanced nature.  The fact that Barclays

on all the other assets and liabilities transferred to Barclays at the time of the closing such that

LBHI could assess their value in light of information that has since come to light. At the time,

however, LBHI had no idea that Barclays had no intention of assuming the $3.5-4.0 billion in

bonus and cure liabilities as had been represented to the Court. At the time, LBHI did not have

enough data to assess what Barclays had done as to its bonus obligations under Paragraph 9.1(c)

of the Asset Purchase Agreement. Indeed, as noted above, A&M was still struggling with that

question up until the time the Court ordered Rule 2004 discovery. (*See* ¶¶ 133-137, *supra*.)[93]

218.    Barclays' reference to the fact that LBHI's advisers received unexplained

spreadsheets referring cryptically to "transaction adjustments" for cure and compensation

payments (Barclays Opp. ¶ 555, n. 190) is misleading. These advisers could not have gleaned

from this document that Barclays would later fail to live up to the assurances provided to the

Court that it would assume some $3.5-4.0 billion in such liabilities. And LBHI's advisers were

in no position at the time to know that these "transaction adjustments" actually reflected

deliberate inflation of cure and compensation liabilities. Kelly's testimony about these otherwise

inapplicable notations was necessary to reveal what they meant.

219.    In the end, LBHI took a responsible and thoughtful approach to seeking discovery,

assessing the information and testimony received in that discovery, and then bringing this well-

supported motion within the time limit Rule 60 requires. While mindful of the one-year

_____

(continued…)

eventually disclosed the actual cure liability figure some time later, did not provide enough information for LBHI to
have brought this motion. Indeed, it would have been irresponsible for LBHI to have done so on that basis alone.
Rather, this was one snippet of information that began to leak out in the post-closing period that, over several
months, led A&M to begin to question the accuracy of the statements made to the Court and the Lehman Boards.

[93]    Thus, Barclays' assertion that LBHI "had access to the Lehman systems that allowed them to analyze
the Lehman accrual for compensation payments and trade payables" (Barclays Opp. ¶ 556) is wrong. Even if LBHI
had complete access to those systems after the closing, they would not have shown what Barclays actually paid, only
what Lehman had accrued on its books before the transaction. At most, these systems gave A&M bits of
information that (many months after closing) allowed it to ask Barclays for information as to what it had actually
paid in these liabilities. (*See* BCI Ex. 44 [LBHI Docket No. 4067] Ex. 3, Ankalkoti Decl. ¶¶ 4-9.)

118

limitation under Rule 60, LBHI knew, and continues to appreciate, that the stakes were too high

and the issues raised of such importance to creditors, the Lehman estates, the Court, and even to

Barclays to have filed a motion before conducting a proper investigation.  LBHI and the other

movants completed their discovery, analyzed what they had learned and then very promptly filed

their motions less than a year after the Sale Order was entered.  Their actions were reasonable

under the circumstances.

### 2.    Barclays' Evasion and Misconduct Delayed LBHI's Motion

220.    Where, as here, a party opposing a Rule 60 motion has itself contributed to or

caused delay in filing that motion, such party cannot argue that the motion was untimely.  *See*

*Int'l Fibercom, Inc.*, 503 F.3d at 945 (Rule 60 motion was timely where "the delay resulted from

[opponent's] own conduct"); *United States. v. Baus*, 834 F.2d 1114, 1123 (1st Cir. 1987) ("It

would result in manifest unfairness to deny relief to the [movants] on account of their failure to

seek Rule 60(b)(6) relief prior to the government's 1985 collection effort, when: (1) the

government lulled the guarantors into delaying through its promises, (2) the government itself

delayed two years ..., and (3) the government apparently breached its obligations under the

settlement agreement."); *see also In re Woods*, 173 F.3d 770, 780-81 (10th Cir. 1999); *Smith v.*

*Jackson Tool & Die, Inc.*, 426 F.2d 5, 7-8 (5th Cir. 1970).[94]

221.    Barclays was complicit in the underlying misrepresentations and omissions which

disguised that the transaction that closed on September 22 differed materially from that which

---

[94]    And while Barclays cites cases for the proposition that the finality of bankruptcy court orders generally should be respected (Barclays Opp. ¶ 549), its lead case recognizes that it is often appropriate to grant Rule 60 relief when facts and been fraudulently withheld from the parties and the court.  *See, e.g., In re Lawrence*, 293 F.3d 615, 622-26 (2d Cir. 2002) (vacating district court's denial of motion and directing it to reconsider movants' fraud based allegations under Rule 60(b)(3)).  The *Humbles* case Barclays cites is inapplicable because there was no allegation there that any facts were withheld or not known to the movant, who delayed 18 months in filing its motion.  *See Humbles v. Reuters Am., Inc.*, No. cv-4895, 2006 WL 2547069 (E.D.N.Y. Aug. 31, 2006).  For the same reason, the *Chiulli* and *Robinson* cases Barclays cites (Barclays Opp. ¶ 552) are inapposite because, unlike here, the movants in those cases clearly knew all relevant facts at the time the order being challenged was issued.  *See Chiulli v. Internal Rev. Serv.*, No. 03 Civ. 6670, 2006 WL 3008084 (S.D.N.Y. Oct. 20, 2006); *Robinson v. E.P. Dutton & Co.*, 45 F.R.D. 360, 362 (S.D.N.Y. 1968).

had been presented to the Court for approval.  (*See* LBHI Mot. ¶¶ 1-15, 20-126.)  Barclays and

its counsel sat silently through all the court hearings and did not (or, as to the uninformed

lawyers, could not) try to correct these misstatements and omissions presented to the Court.

Barclays did not have any intention of paying all the liabilities it heard described to the Court

(*see id.* ¶¶ 10, 11, 60-65), and expected that it would make a huge profit on the deal, while it

listened to the Court and others being led to believe that was not the case.  (*See id.* ¶¶ 34-38, 48,

80-84.)  Barclays' failure to correct these misimpressions makes Barclays complicit in any

mistake or other misconduct at issue here, all of which helped make things exceedingly difficult

(as expected) for the movants to unravel after the fact.

222.    Barclays also obstructed efforts by the LBHI estate to secure information and

access to its former employees with relevant institutional knowledge.  This tactic delayed by

many months LBHI's ability to gather data.  Barclays engaged in further obstruction of LBHI's

efforts to examine apparent discrepancies it had begun to notice as to the liabilities Barclays was

supposed to assume for bonuses and contract cures.  Indeed, it was Barclays' obstruction that led

to LBHI retaining outside counsel, Rule 2004 discovery, and ultimately this Rule 60 Motion.

(BCI Ex. 84 [Marsal] 132:16-135:2.)

### 3.    Equitable Considerations Warrant Finding the Motion Timely

223.    Equitable considerations should also be considered in deciding whether a Rule

60(b) motion is timely.  *See* MOORE'S FEDERAL PRACTICE § 60.65[1]; *Venture Indus. Corp.*, 457

F.3d at 1328.  Courts long have recognized that Rule 60 is "a grand reservoir of equitable power

to do justice in a particular case."  *Pierre v. Bernuth Lembcke Co*, 20 F.R.D. 116, 117 (S.D.N.Y.

1956) (citation omitted).  *See also In re Kirwan*, 164 F.3d at 1177-78 (in Rule 60(b) context,

"[g]eneral equitable principles govern the exercise of discretion"); *In re RVP, Inc.*, 269 B.R. 851,

854 (Bankr. D. Ind. 2001) ("the length of the delay and also the reason for the delay are subject

to the Court's equitable evaluation under all relevant circumstances").

224.     Here, not only did LHBI act reasonably in bringing the Motion when it did, but

equity favors allowing LBHI's Rule 60 Motion to be adjudicated on the merits, not denied on

timeliness grounds.  Third party creditors played no role in negotiating the Sale Transaction,

making material changes to the deal, valuing the assets or liabilities transferred to Barclays, or

consummating the sale.  They were forced to stand to the side while select former officers of

Lehman sold off to Barclays the company's crown jewels, leaving less for creditors whose

claims are being pursued in this bankruptcy.  Indeed, the misconduct alleged in the Motion

(including not disclosing a potential multi-billion dollar overnight gain) may have chilled other

bidders who may have been willing to pay more for the Lehman assets sold to Barclays.  (*See

e.g.,* A. 192 [Ex. 520B] at CMTE0001049 (9/20/08 email stating that Shinsei International

Limited should consider whether there was an opportunity to bid on Lehman).)  To follow the

path Barclays suggests -- ignore the merits because it took time for the truth to emerge -- would

be the height of unfairness.  The Court, parties and non-parties all have an interest in getting this

right.

225.     The Court also has an interest in ensuring that misconduct, mistakes or

incompetence do not get rewarded, as Barclays would have it.  Here, it appears certain

individuals breached fiduciary duties they owed to Lehman and its shareholders.  It also appears

that Barclays aided and abetted those breaches.  At the very least, these individuals were either

asleep at the switch, innocently mistaken, or perhaps overwhelmed by circumstances.  In any

event, such acts, whether intentional or inadvertent, should not go uncorrected, especially where

the persons and entities reaped enormous profits thereby.

### 4.    Barclays Has Not Shown that It Has Suffered Any Undue Prejudice As A Result of the Timing of LBHI'S Rule 60 Motion

226.    To find a Rule 60(b) motion untimely, the party opposing the motion must show it has been unduly prejudiced by the supposed delay in filing the motion.  *See Venture Indus. Corp.*, 457 F.3d at 1328 (Rule 60(b) motion was timely because "Venture makes no colorable claim that it was prejudiced by Autoliv's delay").  The possibility that the opposing party might lose the motion is not prejudice.  *See Pratt v. Philbrook*, 109 F.3d 18, 22 (1st Cir. 1997) ("it is always prejudicial for a party to have a case reopened after it has been closed advantageously by an opponent's default."); *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 798 (7 th Cir. 1980) (party opposing Rule 60(b) motion alleged no prejudice other than possibility of having to return money to which it believed it was entitled, not prejudice caused by delay); *In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 127-28 (3d Cir. 1999) ("prejudice is not merely the loss of an advantageous position, but must be something more closely tied to the merits of the issue" such as "loss of available evidence, increased potential for fraud or collusion, or substantive reliance on the judgment") (quotation omitted).  Nor can an opposing party point to loss of a windfall previously conferred upon it as evidence of prejudice.  *In re O'Brien Envtl. Energy, Inc.*, 188 F.3d at 128 (finding "no real prejudice" where the "only prejudice that would result … would be the reorganized debtor's loss of a windfall").[95]

227.    Barclays argues that it is prejudiced by LBHI's Motion because it has already consummated the Sale Transaction, hired employees, assumed greater market risks and changed its corporate structure.  (Barclays Opp. ¶ 558.)   These assertions do not constitute undue

---

[95]  *See also Cappillino v. Hyde Park Cent. Sch. Dist.*, 135 F.3d 264, 266 (2d Cir. 1998) (appellant "offered no evidence that the length of time it took Ms. Cappillino to hire another attorney and to bring here Rule 60(b) motion constituted undue delay or caused any prejudice"); *Associated Builders & Contractors v. Mich. Dep't. of Labor and Econ. Growth*, 543 F.3d 275, 279 (6th Cir. 2008) (Rule 60(b) motion was timely because, *inter alia*, appellee "has not pointed to any prejudice that the alleged delay caused it to suffer").

122

prejudice here, however.  Neither LBHI nor any of the other Movants is seeking to unwind the

Sale Transaction or have Barclays return the business to the Lehman estates.  All Movants

understand and accept that the transaction cannot be reversed.  Rather, LBHI and the other

Movants seek only the value of the windfall Barclays improperly received as a result of the sale.

(LBHI Mot. ¶ 15.)  Barclays should retain the assets it legitimately acquired and it can continue

to operate this business.  In other words, Barclays should retain the benefit of the bargain it

struck and that the Court actually approved.  That cannot be prejudicial to Barclays.

228.    Finally, other than speculating about possibly faded memories and discarded

documents (Barclays Opp. ¶ 558), Barclays has made no showing that its ability to gather

evidence or adequately present its opposition to this motion had been prejudiced by the time it

took to investigate and file it.  Since the closing, Barclays has had unfettered access to relevant

documents and witnesses.  Indeed, with the former Lehman executives and employees on

Barclays' payroll, and all of Lehman's records in its possession, Barclays had all the information

at issue here.  If any party has been unfairly prejudiced, it has been the Movants, who sought for

months to get relevant information and were denied access by Barclays until the Court compelled

Barclays to disgorge it, which, as noted above, is another reason why Barclays protestations

about the timeliness of this Motion should be rejected.

**B.    Barclays' Estoppel and Similar Theories Provide No Basis For Avoiding the
Merits of the Pending Rule 60 Motions**

229.    The preclusion theories that Barclays invokes as an attempt to justify not

examining the merits of the questions presented by the Rule 60 Motions have no application here.

(Barclays Opp. ¶¶ 449-520.)

123

### 1. Barclays Studiously Avoids Any Mention of the Representations It Made to the Court in the December 2008 Settlement

230.    Noticeably absent from Barclays' preclusion arguments is any mention of the December 2008 Settlement Motion.  As explained above, in December 2008, the Court considered the proposed settlement of an ongoing dispute between LBI, Barclays and JP Morgan, concerning some $7 billion that Barclays claimed it was supposed to have received under the September 18 Repurchase Agreement.  After months of discussions, the parties reached a compromise and sought the Court's approval of their settlement.

231.    The Creditors' Committee objected to the settlement, however, based on questions that had arisen concerning assets transferred to Barclays under the Sale Transaction, and in particular because there appeared to have been changes made to the deal over the weekend following the Court's approval.  (*See* BCI Ex. 50 [LBHI Docket No. 2420], 12/22/08 Tr. at 45:11-50:7.)  The Committee raised possible inconsistencies between the transaction that closed on September 22 and that which previously had been portrayed to the Court.  (*Id.* at 46:7-10 (referring to the Leventhal Declaration, (BCI EX. 30 [LBI Docket No. 387] Ex. 2):  "Your Honor yourself probably sees the numbers in the affidavit and went back and looked at your transcript and said that wasn't exactly the numbers that I remember being told on the Friday."), 46:14-16 ("If they're not footing with the numbers that were told to the creditors' committee during the weekend, why is that?  And what are the right numbers?"), 47:7-9 ("When we see declarations that have different numbers, different understandings than what people were told, we agree with the Court's comments that these aren't rounding errors."), 47:12-18 (noting need to reconcile numbers relating to the closed transaction with those presented by Ms. Fife at the September 19 hearing), 49:4-5 ("there are major discrepancies between what we were told that weekend and what's being put forth here today").)  The Committee noted that the limited information

124

available at the time raised questions about "what the values are or who ascribed the value, as of what date" and whether "this is a fair deal or not a fair deal." (*Id.* at 48:3-8.) The Committee argued for discovery to clear up these questions and noted that Barclays was in sole possession of the required information. (*Id.* at 48:8-50:7.)

232.    The Estate had similar concerns. Mr. Miller, speaking on behalf of LBHI, said "we were very concerned that something would occur in this compromise and settlement which would preclude future discovery, future determination, that perhaps some assets were transferred to Barclays that [should] not have been transferred to Barclays ...." (BCI Ex. 50 [LBHI Docket No. 2420], 12/22/08 Tr. at 33:18-22.) He noted that "there is still a great deal of work being done by the unsecured creditors' committee in looking to the transfer of assets from all of the Chapter 11 debtors and LBI to Barclays." (*Id.* at 34:12-15.) Only because the proposed order confirming the December 2008 Settlement did not bar such future discovery or claims related thereto, LBHI did not object to the settlement. (*Id.* at 34:16-21.) The Trustee also expressed concern that its investigation into potential claims relating to the Sale Transaction and the transfer of assets to Barclays would not be precluded by approval of the settlement. (*See id.* at 20:10-21, 24:25-25:3 ("the trustee himself intends to investigate some of these matters").)

233.    In response, counsel for all parties to the settlement, including Barclays, provided explicit assurances to the Court that the proceedings concerning the December 2008 Settlement would have no collateral estoppel effect. (BCI Ex. 50 [LBHI Docket No. 2420], 12/22/08 Tr. at 39:13-20; *see id.* at 24:19-25:3, 34:10-21, 34:24-35:5, 40:8-19, 41:7-12, 45:13-20.) In direct contravention of those assurances, Barclays now cites to, among other things, the December 2008 hearing transcript and the Settlement Agreement (Barclays Opp. ¶¶ 246-256, 482, 489), arguing that these show LBHI was aware of the value of the repo collateral and therefore is in

some way estopped from asserting a claim as to the $5 billion discount.  On its face, this flouts

the assurances on which the Court expressly relied in approving the settlement.  For this reason,

Barclays should not now be allowed to invoke anything at issue in the December 2008

proceedings to preclude the relief requested in this Motion.

234.    Moreover, if there is any estoppel effect, it operates against Barclays here.[96]  The

question of whether the Committee or anyone else should have known, as of December 2008,

everything about the terms of the Sale Transaction or the value of assets and liabilities

transferred to Barclays was presented to the Court at the December 22 hearing, and the Court

determined that further discovery was needed, meaning that there was not enough information on

the subject available to the Movants at the time.  Barclays participated in that hearing and raised

no objections to this discovery or to the positions taken by the Committee, LBHI or the Trustee

as to the existence of discrepancies in the numbers that had been presented to the Court.  By its

counsel assuring the Court there would be no preclusion of future claims, however, Barclays got

its hands on the settlement proceeds without having to allow for the additional discovery that the

Court said was necessary.

235.    In sum, the very principles of judicial and equitable estoppel that Barclays

invokes preclude Barclays from taking positions now contrary to the assurances its counsel

provided at the December 2008 hearing (on which the Court and LBHI relied) or its counsel's

---

[96]  Principles of collateral estoppel preclude a party from relitigating an issue once it has been "actually and necessarily" determined by a court of competent jurisdiction.  *Narumanchi v. Am. Home Assurance Co.*, Nos. 05 6523 cv, 06 4734 cv, 2009 WL 754768, at *2 (2d Cir. Mar. 24, 2009) (quotation omitted).  A party seeking to invoke the doctrine must show:  (1) the identical issue was raised in a previous proceeding, (2) the issue was actually litigated and decided in the previous proceeding, (3) the party against whom the doctrine is being invoked had a full and fair opportunity to litigate the issue, and (4) resolution of the issue was necessary to support a valid and final judgment on the merits.  *Bear, Stearns & Co. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005) (citation omitted).  In addition, the court must satisfy that applying the doctrine would be fair under the circumstances.  *See id.* (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979) and *Blonder-Tongue Labs, Inc. v. Univ. of Ill.*, 402 U.S. 313, 325 (1971)).  In this case, the issue of whether there was ample information available to the Movants to allow them to fully understand the Sale Transaction and the values of assets and liabilities transferred to Barclays has been litigated and decided against Barclays, despite Barclays' repeated attempts to relitigate this same issue.

acquiescence in the Court's determination as to the inadequacy of information available to the

Movants.  Barclays' own cases so hold.  (*See* Barclays Opp. ¶¶ 462-63, 470-72.)  In particular,

the doctrines of both judicial and equitable estoppel bar Barclays from securing the benefits of

the December Settlement based on the assurances it provided and its not opposing the positions

taken by LBHI and the Committee, and now reversing course and arguing that there was enough

information all along to know all the nuances of the Sale Transaction, the Clarification Letter,

the September 18 Repurchase Agreement and other issues that Movants were able to understand

for the first time only after Rule 2004 discovery. [97]

### 2. The Mandate Rule, As Applied to the *Bay Harbour* Appeal, Does Not Bar LBHI's Rule 60 Motion or Its Contentions Therein

236.    Barclays contends that the "mandate rule" bars LBHI's Rule 60 challenge to the

Sale Order because LBHI could have raised these issues during the *Bay Harbour* appeal, but did

not.  (Barclays Opp. ¶¶ 449-452.)  The *Bay Harbour* appeal concerned different issues, however

and Barclays misapplies the mandate rule.

### (a) The District Court's Mandate in *Bay Harbour* Does Not Address the Claims Raised By LBHI in its Rule 60 Motion

237.    The mandate rule is one branch of the law of the case doctrine.  It provides that

"[w]hen an appellate court has once decided an issue, the trial court, at a later stage in the

litigation, is under a duty to follow the appellate court's ruling on that issue." *United States v.

Cirami*, 563 F.2d 26, 32 (2d Cir. 1977) (citations omitted).  A trial court therefore may not

---

[97] *See, e.g., Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art*, No. 08-1300, 2009 WL 1269439, at *1 (2d Cir. May 7, 2009) ("The doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding … A party wishing to invoke judicial estoppel must show that (1) the party against whom estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner.") (quotation omitted); *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 462 F.3d 87, 94 n.3 (2d Cir. 2006) ("a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely on it; 2) and the other party reasonably relies upon it; 3) to her detriment") (quotation omitted); *Gen. Elec. Capital Corp. v. Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir. 1994) (similar elements under New York state law).

NYI-4250276

reconsider or modify a prior decision that has been ruled on by the appellate court. *See United States v. Minicone*, 994 F.2d 86, 89 (2d Cir. 1993).

238.    As the Second Circuit has noted, however, there is a corollary to this rule, *i.e.*, "the trial court may consider matters not expressly or implicitly part of the decision of the court of appeals." *Cirami*, 563 F.2d at 33 (citation omitted) (issues raised in Rule 60(b) motion were not barred by appellate court's earlier decision); *Minicone*, 994 F.2d at 89 ("if an issue was not part of the appellate decision, a trial court may consider the matter") (citation omitted). Therefore, issues that were not "necessarily" decided by the appellate court are not barred from further litigation in the trial court. *See DeWeerth v. Baldinger*, 38 F.3d 1266, 1271 (2d Cir. 1994) (trial court could decide Rule 60(b) motion because appellate panel "did not necessarily reject [appellant's] arguments" raised by such motion); *Kavorkian v. CSX Transp., Inc.*, 117 F.3d 953, 959 (6th Cir. 1997) ("The rule of mandate is 'limited to those issues that were necessarily decided in the earlier appeal.'") (citation omitted).

239.    In determining what issues remain open for litigation, the trial court "should look to both the specifics of the dictates of the remand order as well as the broader 'spirit of the mandate.'" *United States v. Bryce*, 287 F.3d 249, 253 (2d Cir. 2002) (citations omitted); *see also Geneva Pharm. Tech. Corp.*, Nos. 98 Civ. 861(DLC), 99 Civ. 3607(DLC), 2005 WL 2132438, at *3 (S.D.N.Y. Sept. 6, 2005). Issues that were not "cleanly raised" in the prior appeal are not part of the mandate binding the trial court in later proceedings. *See Indep. Petroleum Assoc. of Am. v. Babbitt*, 235 F.3d 588, 597 (D.C. Cir. 2001) (mandate rule did not cover question not before or decided by appellate court, even by implication). "Thus, it is critical to determine what issues were actually decided in order to define what is the 'law' of the case." *Gertz v. Robert Welch,*

128

*Inc.*, 680 F.2d 527, 532-33 (7th Cir. 1982) ("[w]hile a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues").

240.    Here, the issues presented by LBHI's Rule 60 Motion were never presented to or adjudicated in the *Bay Harbour* appeal, nor could they be considered to fall within the "spirit" of the mandate issued by the district court.  LBHI's Rule 60 Motion asserts arguments concerning inadequate disclosures made to this Court about the Sale Transaction from the outset and the fact that the transaction that closed differed materially from that presented to the Court.  None of these issues was presented to or decided, even by implication, by the district court in the *Bay Harbour* appeal.  (*See* BCI Ex. 27 [*Bay Harbour* Docket No. 7]; BCI Ex. 27 [*Bay Harbour* Docket No. 17]; BCI Ex. 41 [*In re Lehman Bros. Holdings, Inc.*, 415 B.R. 77, 79 n. 3 (S.D.N.Y. 2009)] (appellants "were not challenging on appeal the sale to Barclays but only that term of the sale which gave Barclays the assets free and clear of liens").)  That appeal (and the limited appellate record on it) dealt only with two discrete issues raised by an objector who claimed that certain funds had been improperly transferred from LBIE to LBI *i.e.*, whether (i) *Bay Harbour* was deprived of its due process rights in being denied discovery concerning the Defalcated Funds, and (ii) the Court had an adequate record at the time of the Sale Hearing on which to conclude that Barclays was purchasing assets, including possibly the Defalcated Funds, free and clear of liens.  (*In re Lehman Bros.*, 415 B.R. at 80, *see also id.* at 79 n.3)  LBHI has raised neither of these questions in its Rule 60 Motion, a fact that Barclays does not dispute.[98]  Indeed, LBHI's moving papers expressly state at the outset that "LBHI does not question the procedures

---

[98]    Barclays makes the illogical assertion, however, that because the District Court affirmed the bankruptcy court's determination as to Bay Harbour's notice and opportunity to be heard, that somehow meant it held "there was adequate disclosure of the terms of the deal." (Barclays Opp. ¶ 458.)  Not only is Barclays estopped from making this argument (*see* ¶¶ 234-235, *supra*), but it has no basis under case law regarding the mandate rule.  Barclays has made no showing that the District Court actually or even implicitly made findings as broad as Barclays asserts.  The District Court made findings only as to Bay Harbour's notice and opportunity, and made none as to the disclosure of the terms of the Sale Transaction.  That broader issue simply was not before the District Court.

129

followed by the Court or the need for expedition given the difficult economic circumstances in which Lehman found itself a year ago." (LBHI Mot. ¶ 1.)

241.    Barclays' principal contention appears to be that the *Bay Harbour* appeal considered whether Barclays was a "good faith purchaser" and the LBHI Motion implicates the same concept. (Barclays Opp. ¶ 457.) But LBHI's Motion does not question whether Barclays was a good faith purchaser as to parts of the Sale Transaction actually presented to and approved by the Court. LBHI challenges only the additional, undisclosed and unapproved, aspects of the deal with respect to which Barclays has never been determined (by either this Court or in the proceedings in connection with the *Bay Harbour* appeal) to have been a good faith purchaser. LBHI is challenging aspects of the transaction that were not properly approved by the Court in the first instance, and therefore were outside the scope of the Sale Order from the start. The Court has never made a determination as to whether Barclays was a good faith purchaser with respect to the parts of the deal about which the Court was not told.

242.    Moreover, the *Bay Harbour* appeal dealt with the concept of "good faith purchaser" only with respect to the record before the Court at the time of the Sale Hearing and only in connection with the Defalcated Funds. The district court in *Bay Harbour* therefore did not "necessarily decide" that Barclays was a "good faith purchaser" for all purposes. The only issues "cleanly raised" in the appeal were the Defalcated Funds and the Court's procedures

during the Sale Hearing concerning these funds.[99]  There is no basis for expanding the letter or

the "spirit" of district court's mandate beyond those issues actually raised and decided.[100]

### (b)    The Mandate Rule Does Not Bar Claims LBHI Could Have, But Did Not, Raise In the *Bay Harbour* Appeal

243.    Barclays contends that the mandate rule bars litigation of anything that could have

been raised in the prior appeal.  (Barclays Opp. ¶¶ 449-460.)  According to Barclays, LBHI

could have raised, but did not, issues concerning the Sale Order that it now challenges when the

district court was considering whether Barclays was a good faith purchaser with respect to the

Defalcated Funds.  (Barclays Opp. ¶¶ 449, 452, 454.)  But once again, Barclays goes too far

trying to shoehorn a waiver argument into the mandate rule.

244.    Barclays is, first of all, simply wrong.  The mandate rule does not bar subsequent

litigation of questions that "might have been decided that were not," but only those that questions

that were actually decided or decided by necessary implication.  *See Sejman v. Warner-Lambert

Co. Inc.*, 845 F.2d 66, 69 (4th Cir. 1088) ("Although the doctrine applies both to questions

actually decided as well as to those decided by 'necessary implication,' it does not reach

'questions which might have been decided but were not.'") (citation omitted); *Barrett v. Thomas*,

809 F.2d 1151, 1154 (5th Cir. 1987) ("A district court is not precluded from acting on a matter

neither before nor acted upon by the appeals court."); *Conway v. Chem. Leaman Tank Lines, Inc.*,

---

[99]    Even more overreaching is Barclays' contention that the mandate rule applies because LBHI supposedly argued that "the APA – *including the Clarification Letter and its schedules* – fully disclosed each of the assets that would be transferred to Barclays."  (Barclays Opp. ¶ 456; *see also id.* ¶ 456.)  This mischaracterizes LBHI's appellate brief and it misses the point.  The scope of the mandate rule is determined, not by what the parties argued, but rather by what the District Court "necessarily decided."  *Kavorkian*, 117 F.3d at 959; *see also DeWeerth*, 38 F.3d at 1271.  And, as noted above, the District Court did not necessarily decide anything about the disclosure of the terms of the deal other than as it related to the "Defalcated Funds" being pursued by Bay Harbour.

[100]    Barclays' reliance on the *Marlar* and *W.T. Grant* cases for this argument (Barclays Opp. ¶ 504) is a mystery.  Neither of these have anything to do with questions of bad faith or the mandate rule as applied to such questions.  Rather, the *W.T. Grant* case simply bars a creditor who failed to join an appeal of the bankruptcy court's decision cannot get a second bite at the apple after the time to file its own appeal has expired.  20 B.R. 186, 190 (S.D.N.Y. 1982).  And in *Marlar*, the defendant's right had expressly been decided by an earlier appeal, and therefore she was bound by that decision.  Neither of these support Barclays' position that the mandate of the district court in *Bay Harbour* extends beyond issues it necessarily decided to include issues raised in the Rule 60 Motions.

644 F.2d 1059, 1062 (5th Cir. 1981) ("[T]he doctrine of the law of the case applies only to the

issues decided, not to all those presented for decision but left unanswered.") (internal quotation

omitted).[101]

245.    Moreover, the waiver doctrine espoused by Barclays generally applies only as

against an appellant who fails to raise an issue on appeal.  It does not operate to preclude an

appellee.  *See Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739-41 (D.C. Cir. 1995) (holding

that law of the case doctrine did not bar litigation of issues that "could have been but were not

challenged on an earlier appeal").[102]  In *Crocker*, the court discussed the "plainly weak[]" waiver

rule as it applied to a statute of limitation defense that Piedmont could have raised, but did not

raise, in a prior appeal, where Piedmont was an appellee.  *Id.* at 740.  The court noted that

Piedmont's status as an appellee raised unique concerns about applying the mandate rule because

"Crocker [the appellant], not Piedmont, defined the battleground on the first appeal, raising

issues having nothing whatever to do with the statute of limitations."  *Id.*  The court explained

the reasons why an appellee should not be deemed to have waived issues or arguments that it did

not raise as alternative bases for affirmance:

---

[101] Barclays' cases are not to the contrary.  *See, e.g., Burrell v United States*, 467 F. 3d 160, 165 (2d Cir. 2006) ("if an issue was not part of the appellate decision, a trial court may consider the matter"); *United States v. Stanley*, 54 F.3d 103, 107 (2d Cir. 1995) ("The district court … retains discretion under the mandate rule to reconsider, on remand, issues that were not 'expressly or implicitly' decided by this Court."); *United States v. Zvi*, No. 01-1011, WL 1586536, at *2 (2d Cir. 2001) (recognizing that appellant could raise issues that had not be previously addressed on his first appeal as long as they likely would have changed the outcome of that appeal).  The *Fine*, *Fogel*, and *Rodriguez* decisions do not address this issue.  And in *Seese v. Volkswagenwerk, A.G.*, 679 F.2d 336, 337 (3d Cir. 1982), the court merely held that the mandate rule foreclosed rehearing of the underlying claims based on changes in the law after the issuance of the appellate court's mandate.  That question has no relevance here. In the end, no authority cited by Barclays holds that the mandate of an appellate court extends beyond the issues it "necessarily decided" in issuing its prior decision.

[102] Barclays' cases do not help it (Barclays Opp. ¶¶ 473-474), as it cites only to cases finding no waiver at all, a failure to preserve an issue for appeal by objecting at the trial court, or a waiver on the part of the appellant, not the appellee.  None of Barclays' cases hold that an appellee can be deemed to have waived arguments it did not need to bring in defending an appeal.  *See, e.g., State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158 (2d Cir. 2004); *United States v. Zvi*, No. 01-1011, WL 1586536 (2d Cir. 2001).  Barclays' citation to *Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506, 1515 (11th Cir. 1987) (Barclays Opp. ¶ 453) is misplaced for the same reason.  Contrary to Barclays' suggestion, that case dealt with appellants not being allowed to change their mind after succeeding on appeal.  But LBHI was not the appellant in *Bay Harbour*.  Even so, LBHI has not changed its mind here, it wants only to enforce the deal it agreed to and the Court approved.  So the other cases cited by Barclays to that effect (*id.* ¶ 453) are not on point either.

> While there are clear adjudicative efficiencies created by requiring appellants to bring all of their objections to a judgment in a single appeal rather than *seriatim* (the *only* context in which we have ever before now applied the waiver doctrine), forcing appellees to put forth every conceivable alternative ground for affirmance might increase the complexity and scope of appeals more than it would streamline the progress of the litigation. While an appellant must persuade the court to overturn a district court ruling, it enjoys the offsetting procedural benefit of filing both the opening and reply briefs. On the other hand, an appellee presenting alternative grounds for affirmance and facing a potential application of the waiver doctrine must also attack an adverse district court ruling, but without the offsetting advantage of being able to file a reply brief.

*Id.* at 740-41.

246.    In this case, the *Bay Harbour* appellants, not the LBHI estate, framed the limited scope of their appeal. Barclays, LBHI, and the SIPA Trustee merely responded to those specific issues, and they appropriately did so with arguments directed solely to the issues on appeal, thereby avoiding a blunderbuss adjudication that would have been inefficient and wasteful. LBHI had no obligation to raise all the issues it now presents in its Rule 60 Motion.

247.    Indeed, a case Barclays previously cited (but now avoids) reinforces why the waiver doctrine is not applicable here. *See Oneida Indian Nation of N.Y. v. County of Oneida*, 214 F.R.D. 83, 94-95 (N.D.N.Y. 2003). That case held: "An issue is not considered waived, … if a party did not, at the time of the purported waiver, have *both* an *opportunity and* an *incentive* to raise it … on appeal." *Id.* at 94 (quoting *United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002)); *see also Aviall, Inc. v. Ryder Sys., Inc.*, 110 F.3d 892, 898 (2d Cir. 1997) ("when there has been no review even though an appeal has been taken, it is equivalent to the party not having had an opportunity to appeal, and prevents the challenged decision from becoming the law of the case"). In *Oneida*, the court recognized that "[w]hether there is a waiver depends *not … on counting* the *number* of *missed opportunities* … to raise an issue, but on *whether* the

party had *sufficient incentive* to raise the issue in prior proceedings."  214 F.R.D. at 94 (quoting

*Quintieri*, 306 F.3d at 1229).  And the court ruled that the defendants had "almost no incentive"

to raise the prejudgment interest issue in the prior appeal because at the time their liability was

"anything but certain," *id.* at 95, and therefore the waiver rule did not bar them from raising this

damages issue later.  *Id.* (defendants were free to raise issues that became "newly relevant" after

an appellate decision).

248.    This same analysis shows why Barclays' waiver argument is without merit.  In

*Bay Harbour*, LBHI had no incentive (or even an opportunity, given its lack of information at the

time) to raise the issues it now presents in its Rule 60 Motion.  There was no need or rational

reason to raise questions in the *Bay Harbour* appeal about the $5 billion discount, the September

18 Repurchase Agreement, the Clarification Letter, inflated assumed liabilities, or any other

aspects of the deal not in issue on that narrowly focused appeal.  There was nothing to suggest

any connection between these aspects of the deal and the Defalcated Funds.  Nor has Barclays

offered any explanation as to why LBHI might have wanted to raise these issues in response to

Bay Harbour's argument when Barclays itself did not do so in its appellate papers.  Those

aspects of the transaction were simply not before the court, which was examining only the

procedures employed by the bankruptcy court as to Bay Harbour's claims.

### (c)    Recognized Exceptions to the Mandate Rule Allow For LBHI to Raise the Arguments and Claims in its Rule 60 Motion

249.    Even assuming for the sake of argument that mandate rule were to apply to certain

issues raised in the Rule 60 motions, there is an established exception to it where, as here, newly

discovered evidence would have altered the appellate court's decision.  *See United States v.*

*Argentina*, No. 06-1989-cr, 2008 WL 510556, at *1 (2d Cir. 2008) (recognizing "an exception to

the mandate rule for 'cogent' and 'compelling' reasons such as … 'the availability of new

evidence.'") (citations omitted); *cert. denied, Argentina v. United States*, 128 S. Ct. 2916 (2008);

*In re Highland Fin. Corp.*, 216 B.R. 109, 114 (Bankr. S.D.N.Y. 1997) (Bernstein, J.) (noting

three exceptions to mandate rule, including the "need to ... prevent manifest injustice" and "the

availability of substantially different evidence at the trial on remand"); *see also United States v.*

*Stanley*, 54 F.3d 103, 108 (2d Cir. 1995) (recognizing but finding inapplicable this exception);

*Carlisle Ventures, Inc. v. Banco Español de Credito, S.A.*, No. 94 CV 5835(RCC), 2001 WL

185134, at *2-3 (S.D.N.Y. Feb. 23, 2001) (same).  Importantly, this exception "interlocks with

the principle, under Fed. R. Civ. P. 60(b)(2), that a district court may grant relief from a

judgment, even after it has been affirmed, based upon newly discovered evidence." *Highland*

*Financial*, 216 B.R. at 114 (citations omitted).[103]

250.    This exception gives effect to the common sense notion that issues which were

not part of the appellate record in the first place could not fall within the gambit of the mandate

rule and therefore can be litigated in later proceedings before the trial court.  *See, e.g., Standard*

*Oil Co. of California v. United States*, 429 U.S. 17, 18 (1976) ("the appellate mandate relates to

the record and issues then before the court, and does not purport to deal with possible later

events").  As one court noted, in deciding that a Rule 60(b) motion was not barred by the

mandate rule:

> If a party meets the requirements of any of the subsections of Rule
> 60(b), particularly on the basis of facts and other evidence not part
> of the record before either the district or appellate court, a district
> court may vacate the judgment even though the appellate court
> previously reached the merits of the issue to be reopened.

*Whimsicality, Inc. v. Rubie's Costume Co. Inc.*, 836 F. Supp. 112, 116 (E.D.N.Y. 1993); *see also*

*DeWeerth*, 38 F.3d at 1270.

---

[103]    The cases Barclays cites (Barclays Opp. ¶ 505) are not to the contrary.  They merely hold that the
newly discovered evidence must be material and, in fact, newly discovered.

135

251.    This exception clearly applies here.  As noted above (*see* ¶¶ 164-174, *supra*),

there is newly discovered evidence that was not before this Court or the district court at the time

of the *Bay Harbour* appeal.  This new evidence has given rise to the pending Rule 60 motions.

A comparison of this new evidence with the thin record before the district court in *Bay Harbour*

shows at the very least that the evidence on these motions is "substantially different" from that

presented to the district court, *Highland Financial Corp.*, 216 B.R. at 114, and therefore there is

ample basis for applying this exception to the mandate rule.  Moreover, this new evidence could

not have formed part of the district court's mandate because the mandate was issued months

before this new evidence was even uncovered.  *See Standard Oil Co. of California*, 429 U.S. at

18.  This alone is reason to reject Barclays' overly expansive reading of the mandate rule.  *See*

*Whimsicality, Inc.*, 836 F. Supp. at 116.

### (d)    Barclays' Judicial, Equitable Estoppel and Waiver Arguments Are Equally Without Merit

252.    Relying on principles of judicial estoppel, Barclays makes essentially the same

argument as under the mandate rule, contending that LBHI is barred from bringing its Motion

based on the fact that it sought approval of the Sale Order.  (Barclays Opp. ¶ 461.)  This

argument, too, is wrong.[104]

253.    First, Barclays asserts that in the *Bay Harbour* appeal, LBHI fought off objections

that Barclays was underpaying for assets, the Court was not aware of all assets being transferred,

---

[104]    In essence, Barclays is asserting that Rule 60 relief is foreclosed for anyone who moves for approval of a Section 363 sale or participates in closing the transaction.  That is not what the rule says, and Barclays cites no authority for the notion that the doctrine of judicial estoppel has the effect of writing Rule 60 out of the Federal Rules.  (Barclays Opp. ¶¶ 462-463.)  Barclays' cases do not support its expansive interpretation of this doctrine. None of them even addresses Rule 60, which, like the judicial estoppel doctrine, is designed to protect the integrity of the judicial process.  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  As the court in *Rosenshein v. Kleban*, 918 F. Supp. 98, 104 (S.D.N.Y. 1996), a case cited by Barclays, noted:  "the integrity of the bankruptcy system depends on full and honest disclosure," which is exactly what LBHI is contending here.  In that regard, the Supreme Court warned against trying to "establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel."  *New Hampshire,* 532 U.S. at 750.  Rather, the doctrine is to be used to effect equity and protect the integrity of the courts, not in the overreaching manner asserted by Barclays.

and the transaction should not have been approved because all the terms were not finalized. (Barclays Opp. ¶ 464.)  This again, greatly overstates the scope of the appeal, in which these questions were addressed *only* as to the Defalcated Funds.  Making arguments with respect to those funds only does not mean LBHI was taking positions in support of the Sale Order as a whole and for all purposes.  More importantly, LBHI is not now making the arguments that Barclays says LBHI made in the *Bay Harbour* appeal LBHI is not arguing in this Motion that Barclays did not pay enough, but seeking to force Barclays to comply with the deal the Court approved instead of helping itself to extra assets.  Nor is LBHI challenging the Court's awareness of the assets being transferred, it is arguing that the only assets that should be transferred were those disclosed to the Court and not those added after the Sale Order.  Likewise, LBHI is not questioning whether all the terms were finalized, *i.e.*, LBHI is not arguing that a clarification letter is not proper under any circumstances.  Rather, it seeks to uphold the Clarification Letter to the extent it did not make material changes to the deal, changes the Court never had a chance to consider or approve.

254.    Second, Barclays contends that because LBHI advocated for the Court to approve the Asset Purchase Agreement, including the Clarification Letter, it is estopped from taking a different position now.  But, far from taking a different position now, LBHI just wants the deal to be the same as that presented to and approved by the Court.  Likewise, Barclays says that because LBHI argued that the Sale Order was in the Debtor's best interest, it is barred from challenging it now.  But LBHI is not arguing that the Sale Transaction as it was described was not in Lehman's best interest at the time; the undisclosed extras caused harm.  And while LBHI argued in the *Bay Harbour* appeal that the transaction documents were valid (Barclays Opp. ¶ 466), it does not dispute that in its Motion.  Indeed, LBHI wants the deal actually reflected in the

137

Asset Purchase Agreement to be enforced, but without the material changes to the deal effected

after issuance of the Sale Order.

255.    Turning next to equitable estoppel, Barclays contends that because it relied on the

terms of the transaction documents, LBHI is now equitable estopped from bringing its claims.

(Barclays Opp. ¶¶ 469-472.)[105]  This turns on its head the premise underlying Rule 60 and a

party's right to appeal.  If Barclays' position were adopted, no one could ever appeal or seek a

modification to a sale order once the transaction closed.  Barclays presents no authority for this

overreaching proposition.

256.    Moreover, LBHI also relied on the terms of the transaction documents and the

representations made to the Court, and LBHI irreversibly changed its position based on that

reliance.  All LBHI seeks to do now is enforce the deal that was presented to the Court and that it

approved, without the material changes Barclays and a few Lehman executives made outside the

Court's vision.  If anything, equitable estoppel favors LBHI under these circumstances.  Even if

it loses the Motion, Barclays will retain the Lehman assets and business it properly purchased,

with Court approval, and which are already making profits for Barclays.  It would ultimately be

required to return only the windfall it was never entitled to keep in the first place.  LBHI, on the

other hand, has sold off its crown jewels, based on representations made in transaction

---

[105]  The cases Barclays cites on this issue help LBHI.  (Barclays Opp. ¶ 470-71.)  *In re Lawrence*, 293 F.3d 615 (2d Cir. 2002), does not even address equitable estoppel, but it holds in the Rule 60 context that the desire for finality in bankruptcy sale orders should not bar review of such orders when "[t]he alleged fraud was not, and could not with due diligence have been, discovered during the original Sale Order proceeding."  *Id.* at 625-26 (remanding for further proceedings in light of newly discovered evidence).  In *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999-1000 (2d Cir. 1996), the Second Circuit recognized that bankruptcy courts are "essentially [] court[s] of equity" and therefore a party that accepts the benefits of a contract is estopped from renouncing its burdens.  Thus, having accepted the benefits of the Asset Purchase Agreement, including the assets Lehman transferred to it, Barclays is estopped from trying to add more assets to the deal without paying for them.  And while *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 725 (2d Cir. 2001) states the general elements of the doctrine of equitable estoppel, the opinion  involved only claims under the Family Medical Leave Act and neither Rule 60 nor a Section 363 sale.  Even then, Barclays overstates its holding, asserting that "[e]quitable estoppel applies even if the party that induced reliance acted without any intent to deceive."  (Barclays Opp. ¶ 470.)  That is true only where, unlike here, that party "makes a definite misrepresentations " or omission and "had reason to believe that other party would rely upon it . . . ."  *Kosakow*, 274 F.3d at 726.  Barclays identifies neither of these elements with respect to LBHI.

138

documents and in Court. If it is precluded from asserting its claims, it has no further recourse, and its creditors will be out billions of dollars. It is therefore LBHI that will suffer the injustice here if its claims are not heard.

257.    Finally, Barclays argues that LBHI could have objected to the Sale Order at the time it was issued, but chose not to and should therefore be barred from bringing its Rule 60 Motion. (Barclays Opp. ¶¶ 473-474.) This is nonsensical. Once again, this overreaching argument effectively eviscerates the protections afforded by Rule 60. Under Barclays' theory, if one does not object at the time of the Sale Order, he waives his right to Rule 60 relief. That limitation is found nowhere in the rule or applicable case law. Moreover, Barclays cites no authority for the proposition that a company whose employees either breached fiduciary duties or, at the very least, withheld material information from senior management and the Board, somehow could effect a "knowing" waiver while not in possession of all relevant information.[106] Indeed, given McDade's view of the Sale Transaction as a balanced deal which included no day-one profit for Barclays, (*see* LBHI Mot. ¶ 36), Barclays cannot credibly contend that Lehman's CEO was in possession of enough information to make an informed waiver. And the Lehman Boards were told the deal was a "wash," so it is hard to fathom how they were in a position to effect a knowing waiver either.

### C.    Barclays' Self-Serving Public Policy Arguments Miss the Point

258.    Finally, Barclays argues that the public policy favoring the finality of bankruptcy sale orders means that the Court should not grant the relief the Movants' seek. (Barclays Opp. ¶¶

---

[106] The *Quinones*, *J.H.Cohn*, *Garfinkle*, *Byrd*, *New River*, and *Kjeldahl* cases cited by Barclays (Barclays Opp, ¶¶ 473-474) all involved knowing waivers based on a full understanding of the facts and claims in issue. None of them holds that a party from whom material information has been withheld nevertheless waived its rights or claims. None of those cases even involves Rule 60 or the authority that the rule confers of the Court to modify its own orders in light of newly discovered information that was withheld from the Court at the time it issued the order. And none of them involved circumstances, like those here, in which the party asserting a claim (or its counsel) was misled by material misrepresentations or omissions in open court, in Board meetings or in documents.

517-520.)  According to Barclays, this is particularly important in times of financial crisis,

otherwise potential buyers will shy away from Section 363 sales.  (*Id.* ¶ 519.)  Not only is this

pure speculation, it ignores the possibility that, had potential buyers for Lehman assets been told

there was a $5 billion discount and potential multi-billion dollar day-one gain built into the deal,

they may have expressed interest in the deal and the estate may have garnered an even higher

price for its assets.  Respecting finality for finality's sake makes no sense.  Ensuring a fair and

adequately disclosed sale process, so as to protect the rights of creditors, is the real imperative

here and it is embedded in the Code.

259.    Indeed, it is not the finality of bankruptcy sales that is threatened here, it is the

right and ability of bankruptcy courts to review and approve such sales -- on an accurate and

complete record.  The Court's approval process is to protect creditors whose rights may be

prejudiced by the actions of individuals or entities with greater access to information and the

mechanics of the transaction.  That approval process, and the disclosure it requires to be

effective, was subverted in this case.  The pending Rule 60 Motions will, if anything, help to

repair the damage done by the fundamentally flawed disclosure and post-Sale Order misconduct

that took place here.

### D.    Barclays' Constitutional Argument Is Without Merit

260.    Barclays argues that granting the relief Movants' seek would violate the Due

Process and Takings Clauses of the United States Constitution.[107]    (Barclays Opp. ¶¶ 686-87.)

These arguments are baseless.

---

[107]    Barclays states that granting the Rule 60 Motions would violate the Due Process Clause of the
Constitution, but Barclays provides no legal support for this assertion nor does it explain how it would "be deprived
of life, liberty or property" through state action.  U.S. Const. amend. V. The cases Barclays cites only examine
alleged takings or mention due process in passing.  *See E. Enters. v. Apfel*, 524 U.S. 498, 537-58 (failing to address
due process claim); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) (noting only that "the Due Process
Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation").

140

261.     The Fifth Amendment provides: "nor shall private property be taken for public

use, without just compensation."  U.S. Const. amend. V; *see also E. Enters. v. Apfel*, 524 U.S.

498, 522-524 (1998) ( "The aim of the [Takings] Clause is to prevent the government from

forcing some people alone to bear public burdens which, in all fairness and justice, should be

borne by the public as a whole.").  The fundamental protection that the Takings Clause provides

to private parties is a shield from uncompensated government intrusion onto private property,

whether it be a physical intrusion or a regulation that forces a private party to be responsible for

economic costs that more appropriately be shouldered by the public.[108]

262.     Barclays cannot identify any state action that would violate the Takings Clause.

The Movants are neither the state, nor a state agency.  Even the few cases on which Barclays

relies make clear that its constitutional arguments are inappropriate where no state  action is at

issue.  *See, e.g., Apfel*, 524 U.S. at 537-38; *Hughes v. Washington*, 389 U.S. 290, 298 (1967).

Recognizing this deficiency, Barclays asserts that granting relief to Movants would violate the

Takings Clause and Due Process Clause because they "protect against the imposition of

retroactive liability that violates 'settled expectations' and 'reasonable, investment-backed

expectations.'"  (Barclays Opp. ¶¶ 687.)  As Barclays describes it, such constitutional claims

would apply to any contract claim between private parties.  This is not true.  One of the three

factors courts have used to determine whether an unconstitutional governmental taking has

occurred is "the extent to which the regulation interferes with the claimant's reasonable

investment-backed expectations."  *Apfel*, 524 U.S. at 518.  The case law in no way suggests that

this is the only factor and, thus, that the Takings Clause always applies to protect "reasonable-

---

[108]  *See, e.g., Apfel*, 424 U.S. at 538 (statute imposing severe, disproportionate, extremely retroactive
economic burden on former coal operator violates Takings Clause); *Dolan v. City of Tigard*, 512 U.S. 374, 383
(1994) (government requirement that petitioner dedicate part of property in floodplain for improvement of a storm
drainage system is an unconstitutional taking).

141

investment backed expectations" even in situations that lack a governmental attempt to take property.

263.    It is untenable to argue that granting Movants' Rule 60 motions would somehow constitute a state "taking" of Barclays' property via "legislation." Realizing this, Barclays claims that "there is authority that [the Due Process and Takings Clauses] likewise protect against judicial action that retroactively takes property in a manner inconsistent with settled expectations of the legal rights to property in question." (Barclays Opp. ¶ 687.) However, the cases to which Barclays cites hold only that just as the *state* may not take private property without just compensation through legislation, the *state* may not take private property without just compensation through the courts. *Hughes*, 389 U.S. at 298 (involving state attempt to take plaintiff's property); *Stevens v. City of Cannon Beach*, 510 U.S. 1207 (1994) (same). Again, the state is not seeking any relief from Barclays here.

264.    Barclays further argues that the Court should not grant the Rule 60 Motions based on the "doctrine of 'constitutional avoidance'" which Barclays asserts "holds that a court should not interpret provisions of law in a manner that might raise constitutional concerns." (Barclays Opp. ¶ 687.) But this is just a prudential practice of avoiding interpreting statutes that raise constitutional issues when another interpretation is available.[109] Nothing in the Rule 60 Motions invokes this doctrine, as the Movants do not ask the Court to modify the Sale Order on constitutional grounds or in any manner that would put a statute in tension with the constitution.

---

[109]    *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S.Ct. 2504, 2513 (2009) (under the principle of constitutional avoidance, "normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case"). Barclays' cases confirm this. *See DeBartolo Corp. v. Fla. Gulf Coast Bldg & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"); *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 500 (1979) ("Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available").

142

## CONCLUSION

For the foregoing reasons and the reasons set forth in LBHI's moving submission, LBHI

respectfully requests that the Court issue an order modifying the Sale Order as indicated in

LBHI's Motion and granting such other relief as the Court deems just and proper.

Dated: March 18, 2010
      New York, New York

Respectfully submitted,

Robert W. Gaffey
Jayant W. Tambe
William J. Hine
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939

ATTORNEYS FOR DEBTOR AND DEBTOR
IN POSSESSION

143