# A. 198

**Contains Highly Confidential Information**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | Case No. 08-013555 |
| Debtors. | (Jointly Administered) |

**EXPERT REPORT OF JOHN J OLVANY**

**MARCH 15, 2010**

**Contains Highly Confidential Information**

# TABLE OF CONTENTS

**Page**

I. Introduction.................................................................................................................1

II. Summary of Qualifications.........................................................................................2

III. Summary of Opinion.................................................................................................3

IV. Opinion and Base Thereof.........................................................................................3

   A.   BARCLAYS UNDERVALUED THE GIANTS STADIUM BONDS BY OVER $349 MILLION...............................................................................................3

      1.   Description of the Giants Stadium Bonds ........................................................ 4

      2.   The Sale of the Giants Stadium Bonds to Barclays and Barclays' Alternatives as the Holder of the Giants Stadium Bonds....................................................... 5

      3.   The Correct Valuation of the Giants Stadium Bonds....................................... 8

      4.   Barclays' Errors in Valuing the Giants Stadium Bonds................................ 10

   B.   BARCLAYS UNDERVALUED THE CORPORATE BONDS BY NEARLY $29 MILLION......................................................................................................11

      1.   Background and Introduction to Analysis of Corporate Bond Pricing ...... 12

      2.   Barclays Misapplied Third Party Pricing It Obtained.................................. 13

   C.   BARCLAYS UNDERVALUED THE COVERED BONDS BY OVER $3 MILLION..............................................................................................16

**Contains Highly Confidential Information**

## LIST OF EXHIBITS AND APPENDICES

Exhibit I:        List of CUSIPs valued

Exhibit II:       Valuation Results by CUSIP

Exhibit III:      Valuation Results by Desk


Appendix I:    Curriculum Vitae

Appendix II:   Documents Considered

Appendix III: Methodology

**Contains Highly Confidential Information**

## I.    INTRODUCTION

1.      This report is submitted by John J. Olvany, Senior Advisor with Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc., which specializes in applying accounting, economics, and finance to business consulting, legal, and regulatory issues.  I discuss my qualifications in more detail in Section II and present my curriculum vitae in Appendix I.

2.      I have been asked by Movant's counsel to value certain corporate securities Barclays' acquired as part of the Sale Transaction, including the Giants Stadium LLC Project Revenue Bonds Series 2007A (Auction Rate Securities) Subseries 2007A-4, 2007A-5,2007A-6, and 2007A-7 ("Giants Stadium Bonds"). [1]  As part of this analysis, I reviewed Barclays' methodologies, procedures, and data used to value these same corporate securities and reviewed Barclays' valuation expert Professor Paul Pfleiderer's January 8, 2010 report (the "Pfleiderer Report") which accepts Barclays' methodologies, procedures, and data in their entirety without independently valuing them. I reserve the right to supplement my analysis in response to any newly produced evidence or in rebuttal to any further opinions offered by Barclays' witnesses.  I also reserve the right to do a more comprehensive CUSIP-by-CUSIP valuation, if necessary, of those securities I did not independently value for purposes of my report.

3.      Navigant Economics (Chicago Partners) charges an hourly rate of $500 for my time.  Other Navigant Economics (Chicago Partners) professionals, working under my direction and supervision, assisted in my analyses and Navigant Economics (Chicago

---

[1] I submit this report on behalf of (a) Lehman Brothers Holdings, Inc. (the "Debtor" or "LBHI", (b) James W. Giddens, as Trustee for the Securities Investor Protection Act Liquidation of Lehman Brothers Inc. (the "Trustee"); and (c) the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. and its affiliated debtors and debtors in possession (the "Creditors' Committee," together with LBHI and the Trustee, the "Movants") in connection with Movants' motions filed under. Federal Rule of Civil Procedure 60(b) (the "Rule 60(b) Motions").  In the Rule 60(b) Motions, Movants' seek relief from the Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008 (the "Sale Order").  In the Sale Order, the Court approved the sale (the "Sale Transaction") of certain assets of LBHI, LB 745 LLC, and Lehman Brothers Inc. ("LBI," and together with LB 745 LLC and LBHI, the "Sellers," and together with LBHI's various other foreign and domestic affiliates, "Lehman") to Barclays Capital Inc. ("Barclays") in accordance with the terms set forth in an Asset Purchase Agreement, dated September 16, 2008 ("Asset Purchase Agreement") and related agreements, modifications and purported "clarification[s]" thereof.

---

Expert Report of John J Olvany                    Page 1

**Contains Highly Confidential Information**

Partners) was or will be compensated for their work at their customary hourly rates.  Our compensation is not contingent in any way upon the outcome of this matter.

4.      The remainder of the report is organized as follows.  In Section II, I summarize my qualifications. In Section III, I summarize my opinion. In Section IV, I provide the base for my opinion

II.      <u>**SUMMARY OF QUALIFICATIONS**</u>

5.      After graduating from Williams College in 1982 with a degree in Political Science, I began my career in the fixed income markets.  For over 22 years, I was an active participant in the global credit markets in New York, Tokyo, and Chicago.   Most recently, I was a Managing Director and Senior Manager of the Institutional Sales and Trading Group for the Chicago Office of Morgan Stanley.  In that capacity, I managed all compliance matters for the fixed income division and supervised a team of sales professionals trading all classes of fixed income products with institutional investors, such as pension funds, banks, insurance companies, investment advisers, and hedge funds.  In the last 17 years of my career in finance, my work was concentrated in the global corporate credit markets trading bonds, loans, structured products, and derivatives. As a credit salesperson, I bought and sold all credit products, including high yield corporate bonds, investment grade corporate bonds, and derivatives. More specifically, I have bought and sold corporate bonds similar to those I have valued in this matter.

6.      My present position is Senior Advisor at Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting Inc. Navigant Economics specializes in consulting in the areas of accounting, economics, and finance.  My main area of expertise is in the fixed income credit markets, especially corporate securities.  I have not authored any publications within the last ten years.  My curriculum vitae also lists the expert testimony I have given within the last four years.

**Contains Highly Confidential Information**

### III.    SUMMARY OF OPINION

7.    In this section of my report, I summarize my opinion.  In the remaining sections of the report, I provide the substance of the facts and opinion on which I expect to testify, and the basis for this opinion.  If I receive additional data, facts or information, I will review, evaluate, and analyze these additional data, facts or information as they become available, including, but not limited to, the report(s) of experts in this matter.  I may modify or supplement my report as necessary to reflect any additional information that I receive.

> **Opinion:**  Barclays has undervalued the Giants Stadium bonds as well as the corporate and covered bonds that it acquired from Lehman Brothers Holding, Inc. and Lehman Brothers, Inc. by at least $381,439,055.

### IV.    OPINION AND BASE THEREOF

8.    The following table summarizes the results of my valuation analysis.  The details of my valuations are discussed below in sections A, B, and C.

| TABLE 1 | | | | |
|---|---|---|---|---|
| Value Difference for Corporate and Covered Bonds | | | | |
| Bond Type | Number of Bonds | Correct Valuation | Barclays Value | Valuation Difference |
| Giants Stadium LLC Project Revenue Bonds | 4 | $408,325,000 | $58,995,135 | $349,329,865 |
| Corporate Bonds (Exc. Giants Stadium LLC) | 16 | $298,058,457 | $269,092,447 | $28,966,009 |
| Covered Bonds | 2 | $296,626,594 | $293,483,414 | $3,143,180 |
| Total | 22 | $1,003,010,051 | $621,570,996 | $381,439,055 |

### A.    BARCLAYS UNDERVALUED THE GIANTS STADIUM BONDS BY OVER $349 MILLION

9.    I conducted an independent valuation of the four Giant Stadium Bonds.  Barclays' valuation of the Giants Stadium Bonds totaled $58,995,135, or $349,329,864 less than my independent valuation.[2]  This $349,329,864 difference represents the

---

[2] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

**Contains Highly Confidential Information**

magnitude of Barclays' undervaluation of the Giant Stadium Bonds at the time of the Sale Transaction.

1.    <u>Description of the Giants Stadium Bonds</u>

10.    As part of the Sale Transaction, Barclays acquired four Giants Stadium Bonds with a total principal amount of $408,325,000 and a final maturity date of April 4, 2047.  These four bonds were part of a $650,000,000 bond offering that included a total of seven different bonds or subseries ("Subseries" or "Tranche").[3]

11.    The Giants Stadium Bonds were issued by Giants Stadium LLC ("Giants") to finance the costs of developing and constructing a new open air stadium at the Meadowlands Sports Complex in New Jersey ("Stadium").[4]  The Giants is a special purpose entity, separate from the New York Football Giants, Inc., formed to construct and operate the Stadium.

12.    The Giants Stadium Bonds are Auction Rate Securities ("ARS").  The coupon rate for each Sub-series or Tranche is determined by an auction process.[5]  Until its bankruptcy filing, LBI conducted the auction which set the coupon rate for these bonds.[6] Following Lehman's bankruptcy filing, Goldman Sachs was appointed as broker-dealer for the Giants Stadium Bonds.[7]  At the option of the Giants, the Giants Stadium

---

[3] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, Cover Page and p.6.

[4] Giants Stadium LLC Project Revenue Bonds, Series 2007A (Auction Rate Securities) Overview: "The Series 2007A Bonds (defined below) are being issued by Giants Stadium LLC, a New Jersey limited liability company (the "Issuer") in part to finance a portion of the costs of the design, development, construction and operation of a new, approximately 82,000 seat, open-air National Football League ("NFL") stadium, including related concession areas and other improvements (the "Stadium"), which will be used by New York Football Giants, Inc., owner and operator of the New York Giants professional football team (such entity and team each being referred to as the "Giants"), and New York Jets LLC, owner and operator of the New York Jets professional football team (such entity and team each being referred to as the "Jets"), for their Respective NFL home games."

[5] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 51, "Auction Rate Securities- Interest."

[6] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, "Auction Rate Securities-Broker-Dealers; Broker-Dealer Agreements."

[7] "Goldman Sachs to act as broker dealer," November 14, 2008, available at, http://www.giants.com/news/giants_stadium_llc/story.asp?story_id=31900-.

---

Expert Report of John J Olvany          Page 4

**Contains Highly Confidential Information**

Bonds were subject to redemption at a redemption price equal to the principal amount plus accrued and unpaid interest on the Interest Payment Date at the end of every 28 day Auction Period.[8]

13.    At the time of the initial offering of Giants Stadium Bonds, Lehman Brothers entered into a fixed/floating interest rate swap with the Giants with a notional value of $408,325,000 and a termination date of April 4, 2047, set to coincide with the bond maturities.[9]  Under the terms of the swap, Lehman paid a floating rate set by the auctions every 28 days to Giants, while Giants paid a fixed rate of 6.1885% to a Lehman Brother subsidiary, Lehman Brothers Special Financing ("LBSF").[10]  As a result, the Giants fixed their interest cost on the financing at 6.1885% even though the Giants Stadium Bonds themselves would have a variable rate as determined by the auction process.

14.    As stated in the Offering Memorandum:

The Lehman Swap Agreements are intended to hedge the interest rate risk on the Series 2007 A-4 Bonds, Series 2007 A-5 Bonds, Series 2007 A-6 Bonds and the Series 2007 A-7 Bonds (the "Lehman Related Bonds") by providing for payments to the issuer based on the actual rate on the Lehman Related Bonds…[11]

2.    The Sale of the Giants Stadium Bonds to Barclays and Barclays' Alternatives as the Holder of the Giants Stadium Bonds

15.    An ARS auction is deemed to have failed when a sufficient amount of bidders do not participate in the periodic auction. In the case of the Giants Stadium

---

[8] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 11, "Optional Redemption."

[9] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 26 – 28, "The Swap Transactions : The Lehman Swap Agreements."

[10] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 28, "The Lehman Swap Agreements" and Amended and Restated Confirmation, August 16,2007 (Global ID 3286267).

[11] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 28, "The Lehman Swap Agreements."

---

**Contains Highly Confidential Information**

Bonds, auction failure triggers a reset of the coupon to a failed coupon rate, a rate set at 22% or the maximum allowable rate by law, whichever is lower.[12]

16.    Prior to filing bankruptcy, Lehman held $408,325,000 of Giants Stadium Bonds in the following four sub-series: 2007-A4, 2007-A5, 2007-A6 and 2007-A7.[13]  The coupon history of these bonds shows rate setting from 2.825% to 3.494% between February and September 2008.[14] During this period, both parties to the swap performed according to the agreed terms as the Giants paid Lehman the fixed rate of 6.1885% and Lehman paid the Giants the coupon rate received from the Giants Stadium Bonds each period.

17.    After closing of the Sale Transaction, Barclays took possession of the four Giants Stadium Bonds, but did not step into and assume Lehman's position in the swap agreement with Giants.  Giants had already terminated the swap agreement on September 18, 2008, but were obligated to continue paying the coupon rate set at each auction, regardless of the rate, without receiving that same rate from the swap with Lehman.[15]

18.    As the holder of the Giants Stadium Bonds, Barclays could either bid in the auction at any interest rate they were willing to receive each period or make their $408,325,000 principal amount of securities available for sale to other bidders.  It is well documented that there were few bidders for auction rate securities at this point in time.

---

[12] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, "(Bidding by Broker-Dealers…"*Auction Failure"* (which occurs if there are insufficient clearing bids and results in the auction rate being set at the Maximum Interest Rate))";  First Supplemental Indenture of Trust Dated as of August 1, 2007 to Indenture of Trust Dated as of August 1, 2007 Relating to Project Revenue Bonds, Series 2007A Offering Circular, Definitions and Other Provisions of General Application : "Maximum Interest Rate" shall mean the lesser of 22% per annum and the maximum rate of interest permitted by applicable law.

[13] See BCI-EX-00099519 (Dep. Ex. 86B)( providing inventory details); BCI-EX-(S)-00213995 (Dep. Ex. 641A) (same).

[14] Bloomberg: Giants Stadium Corporate Bond Description page (Floating Rate History).

[15] Giants Stadium LLC Proof of Claim, Court Claim Number 316, filed September 22, 2009). Letter from Giants Stadium LLC regarding Statement pursuant to Section 6(d) of ISDA Master Agreement (FGIC-insured) (October 2, 2008) ("Pursuant to our notice, September 18, 2008 (the "Notice") the Early Termination Date for the Transaction under the Agreement is September 18, 2008 and you are the Defaulting Party.").

---

**Contains Highly Confidential Information**

Nevertheless, as the holder, Barclays had a number of attractive alternatives at subsequent rate setting auctions, including:

i.   Offering their securities for sale to another bidder at any rate lower than the maximum rate of 22%, thereby redeeming the full principal amount;

ii.  Electing to bid to hold the entire position at any rate up to a maximum rate of 22%;

iii. Electing to bid for a portion of the position at any rate up to a maximum rate of 22% while offering the balance of their securities to any potential bidder willing to bid at any rate up to a maximum of 22%.

19.    Barclays could receive rates as high as 22% for each period those bonds were either not redeemed by Giants or other potential bidders did not submit bids lower than Barclays in the auctions.  In either scenario where the bonds were redeemed, Barclays would receive the full principal value.

20.    It is also highly likely that Barclays was aware of the Giants willingness to redeem the bonds in the event of extremely high periodic coupon rate.  According to Barclays' trading records and publically available sources, the Giants did in fact redeem many, and possibly all of the remaining notes held by Barclays at the full principal value between April 28, 2009 and May 21, 2009.[16]  The Giants also had redeemed $100,000,000 of the bonds on April 15, 2008.[17]  The Giants likely took these actions to avoid high interest costs resulting from the lack of sufficient bidders willing to hold these securities at these rates.[18]  Additionally, Barclays reduced its holdings of Giants Stadium Bonds by $102,000,000 between September 19, 2008 and December 31, 2008 and recorded a gain of $349,329,865.[19]

---

[16] BCI-EX-00297526 (Barclays Trading Data); BCI-EX-00297526-00297541 (Bloomberg Security Descriptions and Corporate Actions).

[17] "NFL's Giants Redeeming $100 million in Auction Debt" by Aaron Kuriloff and Michael McDonald, Bloomberg.com, April 15, 2008.

[18] Bloomberg: Giants Stadium Corporate Bond Description page (Floating Rate History).

[19] BCI-EX-00297320 (supporting "Post Sale Transaction gains and losses for acquired inventory"); BCI-EX-00295932-BCI-EX-00295933(Dep. Ex 533A) (showing a reduction of the four Giants Stadium Bonds held by 12/31/2008 of $102,000,000 and a gain of $349,329,865). The actual

**Contains Highly Confidential Information**

3.     The Correct Valuation of the Giants Stadium Bonds

21.     In order to arrive at a proper valuation of the Giants Stadium Bonds, I assessed the financial condition of the Giants at the time of the Sale Transaction.  On September 17, 2008, just prior to Barclays' acquisition of the Giants Stadium Bonds on September 22, 2008, Moody's Investor Service published an investment grade rating for the Giants and deemed the outlook to be stable.[20] In its assessment of Giants' financial condition, among other items, Moody's cited the investor protection of a 6 to 12 month debt service reserve fund and the significant amount of long-term contractually obligated revenue sources sufficient to pay approximately 80% of pledged project revenues.[21]  A debt service reserve fund requires that Giants maintain cash sufficient to make timely interest payments for the next 6 to 12 months.  Given the breakdown of the ARS market, investor protective measures are especially important because they permit bond holders to be certain of interest payments regardless of auction outcomes.  In addition to the long-term contractual revenue sources, and the debt service reserve fund, Moody's cited the additional benefit of "two major football teams with well-established franchises."[22]  In addition to Moody's assessment, the Giants themselves stated their "strong underlying credit" in the weeks immediately following the closing of the Sale Transaction.[23]

22.     Based on the Giants' option to redeem, incentive to refinance, and its financial condition, I determined that the Giants were able to pay high periodic coupon rates or redeem the Giants Stadium Bonds either in full or partially every period.

---

transactions between September 19, 2008 and December 31, 2008 that resulted in these gains were not produced in discovery.

[20] Moody's Investor Service Rating Action September 17, 2008, "Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC; Underlying Outlook is Stable."

[21] Ibid.

[22] Ibid.

[23] Giants Stadium LLC Proof of Claim, Court Claim Number 316, filed on October 22, 2008; stamped as Letter from Giants Stadium LLC regarding Statement pursuant to Section 6(d) of ISDA Master Agreement (FGIC-insured) October 2, 2008: "it is important to note that the stadium project is at this time on budget and a strong underlying credit…"

---

**Contains Highly Confidential Information**

23.    Establishing Barclays' ability to set a high periodic coupon rate up to 22% on all four Giants Stadium Bonds and Giants' ability to meet its financial obligation to pay the periodic interest payments is the first step toward valuation of these bonds. The remaining step for valuation is to determine how long the Giants would be willing to pay the high coupon or, alternatively, when would they refinance the Giants Stadium Bonds held by Barclays.

24.    Based on the Giants' previous actions with other failed auctions, I have valued the securities under various redemption scenarios.[24]    Given the Giants' prior actions, the investment grade credit rating and profile of the project, it is reasonable to conclude that the Giants would use their option to redeem the bonds now. As discussed above, the Giants did redeem the notes Barclays held at the full principal value between April 28, 2009 and May 21, 2009.[25]

25.    It is my opinion that a reasonable market participant would have expected the Giants Stadium Bonds to be refinanced and repaid at par, and I have valued them accordingly.    I priced the bonds at various rates from up to 16% with a variety of redemption timing scenarios.[26]    All the redemption and coupon rate scenarios resulted in valuations of *at least* the full principal value.

26.    It is plausible that market conditions for ARS could be expected to change, and that other potential buyers would be willing to bid for the Giants Stadium Bonds.    Under these conditions, Barclays would also receive full principal value if the new investor's bid was lower than Barclays' and the bids were sufficient to purchase all the bonds held by Barclays.[27]    In this scenario, the value of the bonds would be of equal value as if redeemed by the Giants.

---

[24] "NFL's Giants Redeeming $100 million in Auction Debt" by Aaron Kuriloff and Michael McDonald, Bloomberg.com, April 15, 2008.

[25] BCI-EX-00297526 (Barclays Trading Data); BCI-EX-00297526-00297541- (Bloomberg Security Descriptions and Corporate Actions).

[26] November 19, 2008, Email from Sean Teague to Paul Copson within document Bates- stamped PwC-BarCapWP_00022935.

[27] BCI-EX-00297320 (supporting "Post Sale Transaction gains and losses for acquired inventory"); BCI-EX-00295932-BCI-EX-00295933(Dep Ex 533A), (showing a reduction of the four Giants Stadium Bonds held by 12/31/2008 of $102,000,000 and a gain of $349,329,865). The actual

---

Expert Report of John J Olvany        Page 9

**Contains Highly Confidential Information**

27.    Based on my thorough review of the Giants Stadium Bonds deal documentation and my experience in operating in the ARS market during 2008, I valued the four Giants Stadium Bonds at $408,325,000 on September 19, 2008.  Barclays valued these same securities at $58,995,135, or $349,329,864 less than my independent valuation.[28]  This $349,329,864 difference represents the extent to which the Barclays underestimated the value of the Giant Stadium Bonds at the time of the Sale Transaction.

### 4.    Barclays' Errors in Valuing the Giants Stadium Bonds

28.    In valuing the Giants Stadium Bonds, Barclays used the prices provided by its custodian, Bank of New York ("BoNY"), of $10.01, $10.04, $10.09 and $43.94 on a principal face amount of $100 each.[29]  Barclays utilized the custodial value based on BoNY prices in the absence of vendor pricing from any of its primary sources.[30]  It is understandable that vendor pricing was not available for these securities because none of them are public securities and it was well known in the financial markets that the auction rate securities market was not functioning as it had historically.   However, it was unreasonable for Barclays to accept these deeply discounted prices for a group of securities rated investment grade by Moody's on September 17, 2008, only a few days prior to Barclays' valuation date.  Moreover, the Giants had demonstrated their ability to pay debt service and willingness to redeem the securities at full principal face amount of $100.[31]  Prior to accepting a deeply discounted price of this magnitude, Barclays should have undertaken further due diligence and review to understand the various characteristics of the securities. In fact, on October 31, 2008, Barclays increased its

---

transactions between September 19, 2008 and December 31, 2008 that resulted in these gains were not produced in discovery.

[28] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[29] Securities Listing and Pricing Sources.xls, embedded file within PwC-BarCapWP_00022935; BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[30] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[31] Moody's Investor Service-Ratings Action (September 17, 2008), "Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC; Underlying Outlook is Stable";NFL's Giants Redeeming $100 million in Auction Debt," by Aaron Kuriloff and Michael McDonald, Bloomberg.com, April 15, 2008.

---

**Contains Highly Confidential Information**

marks from $10.01, $10.04, and $10.09 to $75 for three bonds and from $43.94 to $80 for an increase in valuation of $249,898,615.[32] On December 31, 2008, Barclays increased the valuation yet again to full value for all four bonds, an increase of $349,329,865.[33]

29.    In reaching his conclusion that Barclays' valuation of the Giants Stadium Bonds was reasonable in "an orderly sale under current conditions," Professor Pfleiderer has not provided sufficient reliance materials that would have been necessary to reach the conclusion that the prices provided by BoNY were reasonable.[34] It does not appear that Professor Pfleiderer reviewed any offering memoranda or any other documents specifically related to these securities, including the Moody's report which published an underlying investment grade rating for the Giants Stadium Bonds despite Moody's downgrade of the Financial Guaranty Insurance Company ("FGIC") to non-investment grade, which guaranteed the Giants Stadium Bonds.[35] The only documents produced by Professor Pfleiderer were articles in the financial press discussing the financing, which did not demonstrate adequate due diligence in reaching these conclusions. Additionally, with regard to the Giants Stadium Bonds, Professor Pfleiderer stated that:

> I just can't remember the particular things that were done with respect to these as opposed to other sets of securities.[36]

## B.    BARCLAYS UNDERVALUED THE CORPORATE BONDS BY NEARLY $29 MILLION.

30.    I conducted an independent valuation of 16 corporate bonds that were included in the Sale Transaction. In my opinion, these bonds had a market value of $298,058,457 on September 19, 2008. Barclays valued these securities at $269,092,447,

---

[32] PwC-BarCapWP_00022935; (Additional Assets- "Giants Stadium-Description of Movement").

[33] BCI-EX-00295932-BCI-EX-00295933, (Dep. Ex. 533A); BCI-EX-00297320.

[34] Expert Report of Paul Pfleiderer, January 8,2010, Volume 1. Appendix 4 at 114.

[35] Moody's Investor Service-Ratings Action September 17.2008 "Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC; Underlying Outlook is Stable."

[36] Professor Pfleiderer Deposition, February 23, 2010, at 316:23-25.

**Contains Highly Confidential Information**

$28,966,009 less than the correct valuation.[37] This $28,966,009 difference represents Barclays' undervaluation of these securities at the time of the Sale Transaction.

31.    Barclays received a portfolio of corporate bonds as part of the Sale Transaction. This portfolio included a wide variety of corporate bonds, including securities paying interest on a fixed schedule, securities paying interest on a floating schedule based on a pre-determined formula, and hybrid securities paying interest on a combination of both. In addition, the portfolio included investment-grade[38] and non-investment-grade bonds issued by foreign and domestic companies.

1.    Background and Introduction to Analysis of Corporate Bond Pricing

32.    Corporate Bonds are traded in private transactions between a dealer and an investor or between two dealers. Trades for many corporate bonds are reported within 15 minutes of the transaction and included in Trade Reporting and Compliance Engine ("TRACE") database which is supported by the Financial Industry Regulatory Authority ("FINRA") and regulated by the Securities and Exchange Commission ("SEC"). Details of actual transactions are available for many corporate bonds. However, due to the infrequent trading of these securities, at times, alternative approaches must be considered in valuing corporate bonds.

33.    Using actual transaction data from the TRACE database, I initially researched whether there was actual September 19, 2008 transaction data for these 16 corporate bonds. My analysis of actual transaction data only considered comparable transactions for either the investment grade or non-investment grade corporate bonds.[39]

34.    Where actual transaction price data was unavailable, I valued these 16 corporate bonds using a discounted cash flow analysis, which determines the stream of cash flows due from a bond and discounts them to account for the time value of money,

---

[37] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[38] Issues rated BBB- (S&P/Fitch) or Baa3 (Moody's) or higher by major credit rating services are generally considered investment grade.

[39] My valuation of investment grade bonds only considered transactions greater than $3 million and for non-investment grade bonds transactions greater than $500,000.

**Contains Highly Confidential Information**

the risk of default, and other possible market factors. Barclays apparently did not attempt to value any bonds in the portfolio by any method other than external pricing sources.[40]

35.     Using available market sources to determine the risk-free interest rate term structure and default probability curve, I generated model bond prices for the relevant specified dates using a state of the art bond pricing model. This methodology assigns weights to each of the cash flows, which reflect the survival probability of receiving the expected cash flow from the issuer. In particular, the model determines the likelihood of timely repayment of principal and interest and the likelihood of default.

36.     Using my methodology of valuing the corporate bonds on September 19, 2008, I valued 16 corporate bonds at $298,058,457. Barclays' valuation for these securities is $28,966,009 less than my independent valuation.[41] This $28,966,009 difference represents the extent of Barclays' undervaluation of these securities. Consistent with Barclays' methodology described below, I did not reduce the valuation of the corporate bonds to reflect liquidity conditions in the market.

2.     Barclays Misapplied Third Party Pricing It Obtained

37.     In arriving at a valuation for the corporate securities, Barclays calculated its valuation using the ***lowest*** price provided to it by pricing sources. Barclays elected to follow this practice regardless of the number of prices provided by its sources.[42] In addition, Barclays did not evaluate the reliability of the low price in the context of the other prices provided for that security. The low price was used regardless of the range of prices between the highest and lowest price provided by its sources or its proximity to the average price that could have been calculated by Barclays. If only one price was provided for a security, that single price was utilized to value the entire position in that

---

[40] Barclays' valuation methodology resulted in mistakes that undervalued some bonds in the portfolio. For example, Barclays gave no value to a high yield bond issued by Intelsat Bermuda Ltd at the time of the Sale Transaction. Barclays increased the valued of its Intelsat Bermuda bond to $8,400,000 at December 31, 2008. I valued the bonds as of September 19, 2008, at $10,602,670. (BCI-EX-00099519) (Dep. Ex 86-B);(BCI-EX-(S)-00213995) (Dep-Ex-641A); (BCI-EX-00297320).

[41] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[42] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

**Contains Highly Confidential Information**

security. Finally, Barclays did not adjust its valuations for liquidity or use a reliable actual transactional date from TRACE.

38.    Table 2, below, demonstrates that if Barclays used the average price provided by its third party pricing source instead of the lowest price, the value of the corporate bond portfolio would be higher by $20,289,948.

| TABLE 2<br>Third Party Valuation Differences | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Bonds with at Least Two Prices | | | |
| Total CUSIPs Analyzed | Average Quantity of Prices per Bond | Bonds with Single Price | Bonds with No Price | Percent not in Sort | Bonds with at Least Two Prices | Total Market Value with Min | Market Value Difference, Min to Avg | Market Value Difference, Min to Max | Percent Change from Min to Avg | Percent Change from Min to Max |
| 517 | 2.69 | 54 | 83 | 26.50% | 380 | $1,179,308,003 | $20,289,948 | $21,790,857 | 1.72% | 1.85% |

39.    By utilizing the lowest price provided for each corporate bond, Barclays valued the entire corporate bond portfolio at the lowest price possible.  This method would seek out prices that are erroneous, defensive, or otherwise unreliable, but Barclays did not make any effort to eliminate prices that may have been reported by its sources that were unreasonable or unreliable in the context of the other prices provided to them. Where Barclays obtained multiple prices significantly above a single low price, Barclays ignored clear evidence that the lowest price was unreliable based on these other prices.

40.    Finally, while Barclays used third party pricing sources, it chose not to use the only actual transaction data available for corporate securities from the TRACE database.[43] Barclays did not use this data source which is based on actual market transactions and not on price information obtained from dealers' trading books or other third party sources.

---

[43] The reported trade volume is capped at $1 million for high yield and unrated bonds and at $5 million for investment grade bonds; Since the final implementation on July 1, 2005, reporting any transaction in qualifying corporate bonds is obligatory for broker-dealers and follows a set of rules approved by the Securities and Exchange Commission (SEC) where all transactions must be reported within 15 minutes of the transaction time. "SEC Approves Amendments to TRACE Rule 6230 to Reduce the Reporting Period to #0 minutes on October 1,2004, and to 15 minutes on July 1, 2005" available at http://www.finra.org/web/groups/industry/@ip/@reg/@notice/documents/notices/p006136.pdf.

**Contains Highly Confidential Information**

41.     In his report, Professor Pfleiderer acknowledges that Barclays generally used the minimum quoted price provided by third party sources to value corporate bonds.[44] Professor Pfleiderer apparently accepted this methodology, based on a general view obtained from his staff's conversations with Barclays' representatives regarding falling market prices.  Specifically Professor Pfleiderer states; "the notion was within the time period that they were looking at, prices were falling."[45]  In fact, Professor Pfleiderer acknowledges that discussions "about falling prices" may not have even related to corporate bonds where the valuations were based on minimum prices provided by third parties:

> But that may have been a discussion on corporate or it may have been a discussion on some other group of assets. But I do recall that there was justification for taking the minimum based upon the fact that markets were falling at the time.[46]

42.     In his deposition, Professor Pfleiderer admits that he did not review Barclays' policy for valuing corporate securities to determine whether using minimum prices to value securities was appropriate.[47]

43.     In accepting Barclays' valuation, Professor Pfleiderer accepts the lowest possible valuation for this entire portfolio of assets without any analysis of the portfolio on a CUSIP by CUSIP basis.  The general policy of utilizing the minimum price of third party provider is unreasonable because no market participant in the corporate bond market would attempt to exit his position at the minimum price available in the corporate bond or any other market.  A rational investor would not sell assets at the minimum price quoted in the market.  Instead, it is customary to get prices from multiple sources and sell to the highest bidder, not the lowest.

---

[44] Professor Pfleiderer Deposition, February 23, 2010, at 27: 20.

[45] Professor Pfleiderer Deposition, February 23, 2010, at 265:8-10, at 276:24, 277:1-25.

[46] Professor Pfleiderer Deposition, February 23, 2010, at 265:8-10, 265:13-18.

[47] Professor  Pfleiderer Deposition, February 23, 2010, at 264:16, 264-22.

**Contains Highly Confidential Information**

C.    **BARCLAYS UNDERVALUED THE COVERED BONDS BY OVER $3 MILLION**

44.    I conducted an independent valuation of two covered bonds included in the Transaction.  In my opinion, these bonds had a September 19, 2008 market value of $296,626,594.  Barclays valued these same securities at $293,483,413, $3,143,180 less than my valuation.   This difference represents Barclays' undervaluation of these securities at the time of the Sale Transaction.

45.    Some of the largest positions of corporate securities transferred to Barclays are a sub-category of bonds commonly referred to as Covered Bonds.  Covered Bonds are debt obligations of banks that offer investors two levels of protection from loss of principal.  Generally issued by European banks, they are backed by a special pool of collateral, typically high grade mortgages that remain on the bank's balance sheet, and the general credit of the issuer.  Though backed by mortgages, covered bonds are not subject to amortization or prepayment because the pools are managed, i.e. prepayments are replaced by comparable assets.   The dual protection offered by covered bonds distinguishes them from both senior unsecured debt and asset-backed securities.[48]

46.    Due to their additional protections, covered bonds are valued with significantly lower risk premiums than the senior unsecured obligations of the same issuer.  To value these instruments, I applied the pricing convention used for the deep and liquid U.S. Agency debenture market. This pricing convention is used for the U.S. debenture market because of the minimal default probability recognized by market participants.

47.    The U.S. agency debenture market is priced relative to the matched maturity U.S. dollar swap curve.  Similarly, I valued European bank issued U.S. dollar covered bonds based on secondary market spreads for comparable securities acquired from contemporaneous market research.   This methodology is consistent with the methodology followed by market participants in the U.S. agency, sovereign and supranational bond markets.

---

[48] BIS Quarterly Review (September 2007).

Expert Report of John J Olvany          Page 16

**Contains Highly Confidential Information**

48.     Using my methodology of valuing the covered bonds with contemporaneous data sources specific to this category of highly-rated corporate securities, I valued the two covered bonds at $296,626,594. Even after reducing this value by the same 5% discount that Barclays used to account for the liquidity conditions in the covered bond market, Barclays' valuation was $3,143,180 less, which reflects Barclays' undervaluation of these securities at the time of the Sale Transaction.

49.     In arriving at a valuation for the covered bonds, Barclays calculated an average of two pricing sources also used to provide prices for the U.S. Treasuries and Agency securities. After calculating the average of the prices received, Barclays reduced the valuation by 5%, presumably as a liquidity discount. Due to the depth of contemporaneous market information, my valuations are only 1.12% different from Barclays' after including the same reduction for liquidity.

50.     The total amount of covered bonds in the portfolio was $375,475,000, including a covered bond issued by a Spanish Bank, Banco Bilbao Vizcaya Argentari, S.A. (CUSIP 05946KAA9) that was the 12th largest position in the entire portfolio of 1,182 which included U.S. Government and Agency securities. Despite the size of this portfolio and particularly the size of one of the positions relative to the portfolio, the Pfleiderer Report did not analyze any of this asset group and instead viewed it as the same as the U.S. Agency Securities portfolio. The lack of discussion or analysis put toward valuing these securities in the Pfleiderer Report is indicative of the lack of review conducted for the Pfleiderer Report in arriving at an opinion on the reliability of the Barclays' valuation of the portfolio of securities included in the Sale Transaction.

**Contains Highly Confidential Information**

Submitted by

John J. Olvany

March 15, 2010

**Contains Highly Confidential Information**

**Appendix I**

**Curriculum Vitae**

# JOHN J. OLVANY

30 South Wacker Drive, Chicago IL 60606
john.olvany@naviganteconomics.com
(312) 251-5200
_____

## CURRENT EMPLOYMENT

**NAVIGANT ECONOMICS, Chicago IL**                    **December 2008-Present**
**Senior Advisor**

## PROFESSIONAL EXPERIENCE

**CHILTON PARTNERS LLC, Wilmette, IL**                    **September 2008-Present**
**Founder and Managing Partner**
Provide consulting services for disputes and investigations in financial services sector. Primarily focused on litigation support regarding fixed income securities and derivatives including mortgage-backed securities, structured products, credit default swaps, corporate bonds, and collateralized debt obligations.

**MORGAN STANLEY, Chicago, IL**                    **2000-2008**
**Managing Director**, **Institutional Securities Group**
*Head of Chicago Institutional Fixed Income Distribution Office*
Managed and supervised team of thirteen sales professionals trading fixed income products with more than 100 investors including pension funds, banks, insurance companies, investment advisors, and hedge funds.

Products traded by team included residential mortgage backed securities, corporate bonds, structured products, CDOs, and government and agency securities

Monitored Legal and Compliance matters across all major product areas of fixed income including futures and derivatives.

Responsibilities included oversight of marketing materials and valuation distribution for all fixed income products to entire client base.

*Senior Credit Sales Professional*
Provided senior sales coverage for institutional client base of hedge funds, insurance companies, banks, and asset managers.

Traded all fixed income products with primary concentration in credit products including corporate bonds, credit default swaps, credit index and CDOs.

Developed and executed portfolio strategies and trade recommendations by utilizing firm's trading, research, and analytic resources.

Negotiated and executed complex distressed portfolio liquidations to maximize value for client and minimize firm's principal risk in turbulent market conditions.

Expert Report of John J Olvany

**Contains Highly Confidential Information**

# PROFESSIONAL EXPERIENCE (CONTINUED)

***Senior Manager of Institutional Sales and Trading Group-Midwest Region***
Acted as Cross-Divisional Relationship Manager for Morgan Stanley with key Midwest institutional clients including Principal Financial, Allstate, Nationwide, and Aegon.

Coordinated with other business units in Chicago (Private Wealth Management, Investment Banking, Prime Brokerage, and Institutional Equity) in matters relating to Institutional Fixed Income Products and assisted with cross-selling of products and services.

**CREDIT SUISSE FIRST BOSTON**, **Chicago, IL**                    **1996-2000**

**Executive Director**, **Fixed Income Sales**
Responsible for fixed income sales relationships with institutional client base of Insurance Companies, Pension Funds and Asset Managers located in the Midwest
Executed transactions in corporate bonds, derivatives, and securitized products including CMOs, ABS, CMBS, structured notes and CDOs.

**MORGAN STANLEY, Chicago, IL**          **1991-1996 Vice President, Fixed Income Sales**

Responsible for fixed income sales relationships with institutional client base of Insurance Companies, Pension Funds, Banks and Asset Managers.
Executed transactions in corporate bonds, derivatives, and securitized products including Index and Fund-linked notes, CMOs, ABS, CMBS, and CDOs.
Traded the first generation of collateralized debt obligations, including CBOs backed by high yield bonds.

**CONTINENTAL ILLINOIS BANK, Chicago, IL**                    **1989-1991**
**Vice President, Capital Markets Group**
Senior market maker for Long Intermediate Treasury Securities.
Traded with Central Banks, Asset Managers, Regional Banks and Arbitrage Funds.

**S.G. WARBURG, Tokyo, Japan**                    **1986-1989**
**Vice President, U.S. Treasury Dealer Desk**
Tokyo Representative of U.S. Treasury Dealer

# TESTIMONIAL AND CONSULTING EXPERIENCE

- Authored three expert reports and testified before the London Court of International Arbitration in the matter between fixed income relative value hedge fund and its administrator.                    **September 2008-June 2009**
- Authored expert report for Grand Court of the Cayman Islands in the matter between Phoenix Meridian Equity Limited vs. Lyxor Asset Management S.A., a wholly owned subsidiary of Societe Generale and Scotiabank & Trust (Cayman) Limited
  Cause Number 311 of 2007                    **June 2009**

**Contains Highly Confidential Information**

## TESTIMONIAL AND CONSULTING EXPERIENCE (CONTINUED)

- Consulted with Respondent's counsel prior to arbitration before Financial Industry Regulatory Authority (FINRA) in matter between several institutional investors and a global bank.                                                                                    **March-April 2009**
- Authored expert report for United States District Court Southern District of New York in a matter between Securities and Exchange Commission v. Jon-Paul Rorech and Renato Negrin (Civil Action No. 09-CIV-4329)                                    **February 2010**

## EDUCATION
**B.A., Political Science, Williams College, Williamstown, MA                                    1982**

## REGISTRATIONS
Series 7, 9, 10 and 63

Expert Report of John J Olvany

Contains Highly Confidential Information

Appendix II
Documents Relied Upon

## Documents in the Record

### Depositions

| Deponent | Date |
|---|---|
| Gary Romain | 9/10/2009 |
| Gary Romain | 1/13/2010 |
| Paul Pfleiderer | 2/23/2010 |

### Deposition Exhibits

| Exhibit | Beginning Bates | Ending Bates |
|---|---|---|
| 86B - Summary of the numbers for Schedules A and B provided to auditors | BCI-EX 00099519 | BCI-EX 00099521 |
| 495 - Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, dated Sept. 15, 2009 | | |
| 533A - Lehman Acquisition Assets Summary | BCI-EX-00295932 | BCI-EX-00295933 |
| 633A - Expert Report of Prof. Paul Pfleiderer, Volume 1 | | |
| 634A - Expert Report of Prof. Paul Pfleiderer, Volume 2 | | |
| 641A - Email from Sean Teague to Tal Litvin, et al., Feb. 12, 2009, re: "Acquisition Balance Sheet," (with attachments). | BCI-EX-(S)-00213990 | BCI-EX-(S)-00213996 |

## Other Documents

| Description | Beginning Bates | Ending Bates |
|---|---|---|
| Giants Stadium Contributing Pricing Factors | BCI-EX_00297331 | |
| Post Sale Transaction Gains & Losses for Acquired Inventory | BCI-EX-00297320 | |
| Bloomberg screen shots, Giants Stadium Bonds | BCI-EX-00297526 | BCI-EX-00297541 |
| Email from Sean Teague to Paul Copson | PwC-BarCapWP_00022935 | |
| Additional Assets -"Giants Stadium - Description of Movements" | PwC-BarCapWP_00023300 | |
| Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular | | |
| Giants Stadium LLC Proof of Claim, Court Claim Number 316, filed on Oct. 17, 2008 | | |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006, dated Sept. 15, 2009 | | |
| Review of Barclay's Capital Price Testing Methodology and Framework | | |
| The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), dated September 15, 2009 | | |
| The Trustee's Adversary Complaint, dated Nov. 16, 2009 | | |

## Documents that are Publicly Available

Bank of International Settlements (BIS) Quarterly Review (September 22, 2008)
Bloomberg LP Data
http://www.finra.org/web/groups/industry/@ip/@reg/@notice/documents/noticse/p006136.pdf
http://www.giants.com/news/giants_stadium_llc/story.asp?story_id=31900-
NFL's Giants Redeeming $100 million in Auction Debt
Port Authority Auction Bonds Reset at 8% After Surge, Bloomberg.com
The Port Authority of new York and New Jersey, Press Release No. 24-2008

## Other Documents Not Cited in the Record and Not Publicly Available

Barclay's Capital Live Data Pull
BT Bulk DD - MABondTicker 09 28 2009 (Spread)
CDS 19-09-2008+12-22-2008
Mabon Ticker 091908
Mabon Ticker 092208

**Contains Highly Confidential Information**

**Appendix III**

**Methodology and Data Used**

**<u>Giants Stadium</u>**

1.    Due to the lack of a pricing model for securities with coupon rates set by an auction process and uncertainty of expected future cash flows based on the willingness and ability of Giants to fully redeem the securities at face value or extend the securities each period, I constructed a model to value the securities with the assistance of my staff working at my direction.

2.    To price the bonds, I used the default forecasts embedded in the Credit Default Swap ("CDS") spreads to discount the expected cash flows on each Giants Stadium Bond.  The actively traded CDS market is a recognized by market participants as a market based indicator of default and survival probability in the fixed income market. No published pricing of CDS spreads is available for Giants Stadium. However, CDS prices on comparable Baa3 credits provide a proxy for valuing the Giants Stadium bonds. Due to the lack of observable CDS pricing, I increased the comparable CDS spreads significantly.

3.    I then discounted each cash flow received from the Giants Stadium bonds using the LIBOR curve plus a spread obtained from the CDS market and added to the LIBOR rates. Although the scheduled timing of these cash flows is known, the number of payments is not because Giants can choose to redeem. Using a 16% coupon rate for the Giants Stadium Bonds, well below the maximum possible coupon of 22%, I discounted the monthly cash flow using a discount rate incorporating LIBOR and a survival

Expert Report of John J Olvany

**Contains Highly Confidential Information**

probability for each period.  I then calculated prices for each period over the next two years.  Finally, I analyzed the redemption scenario for each period using various discount rates and concluded that the Giants Stadium Bonds' value would never be less than the full principal amount.

4.       Alternatively, I analyzed scenarios where the bonds would default at the end of each period and the investor would either receive the cash flow of each coupon period or some recovery rate for their investment.  In each instance, this method provided similar valuations in excess of par.

### Corporate Bonds

5.       The heart of corporate bond valuation is discounted cash flow analysis: determining the stream of cash flows due and discounting them to account for the time value of money, the risk of default, and other possible market factors.  Discounts are applied using an interest rate term structure[1] and an adjustment for credit risk determined through appropriate survival probability, or equivalent default probability.

6.       Credit risk can be handled either by adjusting the cash flows or the discount factors.  I applied the more widely used method of adjusting the bond cash flows, using the survival probability to determine the bond's value.

7.       To determine the market based inputs for corporate bond cash flow survival probability, I observed the CDS prices across a range of maturities. CDS price data documents the way traders accounted for the risk that the issuer of a bond defaults,

---

[1] Per standard industry convention, I have used LIBOR rates to represent the interest rate term structure.

Expert Report of John J Olvany

**Contains Highly Confidential Information**

i.e. a company. CDS closing price data was obtained from Markit Group Ltd., Bloomberg

and Barclays Capital Live.

8.       The interest rate data and bond cash flow descriptions for each individual

bond were sourced from Bloomberg. Prices implied by default probabilities from the

credit default swap market and actual bond prices are distinct; this difference is

commonly referred to as the "basis."  In order to adjust for this basis, I relied on Morgan

Stanley data from contemporaneously published research reports.[2]  When I did not have

the basis for individual bonds, I relied upon the credit default swap basis provided by

Morgan Stanley for the industry Bloomberg classified the bond within.

9.       If a specific corporate bond cash flow was dependent on optional

redemption by the issuer or changes in the coupon rate based on a predetermined

formula, I valued the optional features.

10.       I valued the corporate bonds using the CDS data and basis.  I checked my

results by calculating an option adjusted spread for each security from the prices derived

from the CDS data and basis pricing.  I found the results obtained from both methods to

be consistent.

**<u>Covered Bonds</u>**

11.       In addition to the interest rate data gathered from Bloomberg for the September,

19, 2008 valuation of the corporate bonds, I used contemporaneous market research

available from Barclays Capital Live to determine primary and secondary market trading

levels for the covered bond sector of the corporate bond market. The research provided

---

[2] The credit default swap basis defines the relationship in pricing between the corporate bond and credit
derivatives market.

Expert Report of John J Olvany

**Contains Highly Confidential Information**

pricing information for covered bonds issued by numerous banks in North America and Europe.

12.    The bond description information available for each covered bond from Bloomberg was imported into the pricing model. Using contemporaneous pricing for interest rates and the market spreads observed, I calculated prices for these securities. To test these results, I compared the valuation of these securities to other highly rated securities such as U.S. agency debentures and sovereign bonds.    The results were consistent.

Expert Report of John J Olvany

| Asset Class | CUSIP |
|---|---|
| **Corporate Bonds** | 413627AY6 |
| | 656533AA4 |
| | 962166BP8 |
| | 80927GAH9 |
| | 52517PK59 |
| | 00386SAE2 |
| | 026874BU0 |
| | 52517PA35 |
| | 52517PYN5 |
| | 458204AD6 |
| | 89354FAE1 |
| | G46715AD3 |
| | 00254ECN0 |
| | 026874BR7 |
| | 48121CA97 |
| | 06739GAD1 |
| **Covered Bonds** | 05946KAA9 |
| | 40411EAA6 |
| **Giants Stadium LLC** | 374593AL5 |
| | 374593AM3 |
| | 374593AN1 |
| | 374593AP6 |
| **Corporate Bond** | **16** |
| **Covered Bond** | **2** |
| **Giants Stadium LLC** | **4** |
| **Total Sum** | **22** |

Expert Report of John J Olvany

Exhibit II         08-13555-mg    Doc 8062-4    Filed 04/05/10    Entered 04/05/10 16:50:26    Appendix      Contains Highly Confidential Information

Volume VII - A.198    Pg 32 of 33

| Asset Class | CUSIP | Chicago Partners Bid Value 09/19/08 | Barclays Bid Value | Difference between Chicago Partners and Barclays Values (bid to bid) |
|---|---|---|---|---|
| **Corporate Bonds** | 413627AY6 | 50,964,636.617 | 45,126,579.375 | 5,838,057.242 |
| | 656533AA4 | 54,409,412.587 | 49,715,318.385 | 4,694,094.202 |
| | 962166BP8 | 57,115,313.390 | 56,719,949.955 | 395,363.435 |
| | 80927GAH9 | 28,920,783.211 | 26,244,893.237 | 2,675,889.974 |
| | 52517PK59 | 4,227,300.000 | 5,736,150.265 | (1,508,850.265) |
| | 00386SAE2 | 19,122,918.601 | 18,122,337.505 | 1,000,581.096 |
| | 026874BU0 | 10,747,241.000 | 10,865,932.838 | (118,691.838) |
| | 52517PA35 | 2,898,006.250 | 4,178,002.235 | (1,279,995.985) |
| | 52517PYN5 | 2,707,052.500 | 4,417,693.566 | (1,710,641.066) |
| | 458204AD6 | 10,602,669.702 | 0.000 | 10,602,669.702 |
| | 89354FAE1 | 13,789,751.526 | 11,829,659.250 | 1,960,092.276 |
| | G46715AD3 | 6,803,836.080 | 6,825,648.750 | (21,812.670) |
| | 00254ECN0 | 5,010,610.000 | 5,072,856.300 | (62,246.300) |
| | 026874BR7 | 8,404,635.942 | 4,216,784.850 | 4,187,851.092 |
| | 48121CA97 | 12,924,304.250 | 11,002,532.676 | 1,921,771.574 |
| | 06739GAD1 | 9,409,985.160 | 9,018,108.258 | 391,876.902 |
| **Covered Bonds** | 05946KAA9 | 260,281,000.000 | 258,337,209.750 | 1,943,790.250 |
| | 40411EAA6 | 36,345,594.000 | 35,146,203.753 | 1,199,390.248 |
| **Giants Stadium LLC** | 374593AL5 | 118,400,000.000 | 11,848,524.800 | 106,551,475.200 |
| | 374593AM3 | 118,400,000.000 | 11,892,688.000 | 106,507,312.000 |
| | 374593AN1 | 118,525,000.000 | 11,964,980.225 | 106,560,019.775 |
| | 374593AP6 | 53,000,000.000 | 23,288,942.000 | 29,711,058.000 |
| **Corporate Bond** | **16** | 298,058,456.816 | 269,092,447.445 | 28,966,009.372 |
| **Covered Bond** | **2** | 296,626,594.000 | 293,483,413.503 | 3,143,180.498 |
| **Giants Stadium LLC** | **4** | 408,325,000.000 | 58,995,135.025 | 349,329,864.975 |
| **Total Sum** | **22** | 1,003,010,050.816 | 621,570,995.972 | 381,439,054.844 |

Expert Report of John J Olvany

### Summary of Valuation Differences for Corporates as Distinguished by Exhibit 86-B
### (amounts in millions of dollars)

| | Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | Olvany 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
|---|---|---|---|---|
| **Residential Mortgage Backed Securities** | | | | |
| **Corporate Bonds** | 16 | $280 | $654 | $373 |
| **Emerging Markets** | 3 | $37 | $40 | $3 |
| **Equities** | | | | |
| **Rates** | 2 | $293 | $297 | $3 |
| **Principal Mortgage Trading Group** | 1 | $11 | $13 | $2 |
| **Total** | **22** | **$622** | **$1,003** | **$381** |

Expert Report of John J Olvany