# A. 199

Contains Highly Confidential Information

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| _____X | | |
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors, | : | |
| _____X | | |

**JOHN J. SCHNEIDER EXPERT REPORT**

**March 15, 2010**

Contains Highly Confidential Information

## Table of Contents

I.    INTRODUCTION ............................................................................................................... 4

II.    SUMMARY OF QUALIFICATIONS ................................................................................ 4

III.    SUMMARY OF OPINIONS ............................................................................................. 5

IV.    OPINIONS ....................................................................................................................... 7

V.    THE TRI-PARTY REPO MARKET IS BOTH EXTENSIVE AND WELL-DEVELOPED ...................................... 13

   A.    Tri-party Repo Definition and Market History ............................................................ 13

   B.    Tri-party Repo Market Size and Participants ............................................................... 16

   C.    Tri-party Repo Collateral Types ................................................................................. 16

   D.    The Accuracy of Custodial Marks Has Implications for Custodian Risk and Regulatory
Scrutiny ................................................................................................................................. 19

Contains Highly Confidential Information

List of Appendices

APPENDIX I: MATERIALS RELIED UPON ............................................................................................... 24

APPENDIX II: CURRICULUM VITAE ...................................................................................................... 25

Contains Highly Confidential Information

## I.    INTRODUCTION

1.    This report is submitted by John Schneider, a Managing Director at Navigant Consulting Inc.  I discuss my qualifications in more detail in section II and present my curriculum vitae in Appendix I.

2.    I have prepared this report at the request of Counsel for Movants to set forth the subject matters on which I expect to testify, the substance of the facts and opinions on which I expect to testify, and a summary of the foundations for each opinion.[1]

3.    Navigant Consulting Inc. charges an hourly rate of $580 for my time.  Other Navigant Consulting Inc. professionals working under my direction and supervision assisted in my analysis and were or will be compensated for their work at their customary hourly rates.  This compensation is not contingent upon the substance of my testimony or the outcome of this matter.

4.    The remainder of this report is organized as follows.  I summarize my opinions in Section III and in section IV, I provide basis for my opinions.

## II.    SUMMARY OF QUALIFICATIONS

---

[1] This report concerns three motions before the court: 1) Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order, September 15, 2008.
2) The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), September 15, 2009.
3) Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, September 15, 2009.

Contains Highly Confidential Information

5.      My Present position is Managing Director at Navigant Consulting Inc.  I earned my B.S. in accounting from the University of Scranton and an Executive MBA degree from Boston University. I am a Certified Public Accountant licensed in the State of Pennsylvania.

6.      For over 23 years, I have worked with financial services companies designing and evaluating governance and control environments. I have been invited to speak at numerous industry events and I have published articles on developing compliance programs and various regulatory matters.

7.      My experience at Navigant Consulting Inc., Brown Brothers Harriman & Co. and Citibank focused on the custodial activities performed and the control environments designed to mitigate the inherent business risks.  Specifically, my work was performed in both an audit and compliance capacity, which provided me an opportunity to develop risk, governance, control and regulatory expertise.  I have had specific experience in reviewing securities lending and repo transactions and the related policies, processes and controls designed and implemented to mitigate the inherent risks associated with the contractual commitment to provide custodial and valuation services, including the documentation of eligible securities, the processes in place to ensure that only appropriate collateral is accepted on behalf of lenders and the adequacy of valuation processes and a firm's ability to mark collateral in accordance with contractual obligations and internal policies.  My experience is described in more detail in my curriculum vitae, which is attached as Appendix 1.


III.    **SUMMARY OF OPINIONS**

8.      Based on the information available to me, the following is a summary of my opinions with regards to the elements of this matter I was engaged to review. My work on this matter

Contains Highly Confidential Information

continues and I reserve the right revise the opinions set forth in this report based on additional relevant information that is made available.

9.      Bank of New York/Mellon ("BoNY") and JP Morgan Chase Bank, N.A. ("JPM"), control the vast majority of the tri-party repurchase custodial business in the U.S., and have developed the capacity to value all types of collateral received under tri-party arrangements on behalf of the parties to those arrangements.[2] If BoNY and JPM were unable to accurately mark hard to value complex securities, they would be exposed to undue business risk and would not be recognized as industry leading tri-party repo agents.

10.      Additionally, pursuant to their contractual obligations and the requirements imposed on tri-party repo agents by the Federal Reserve Bank of New York ("NY Fed"), BoNY and JPM had a duty to mark the collateral securing the repo Barclays plc (Barclays) assumed from the NY Fed. Furthermore, the parties to the Tri-Party Agreements clearly agreed to: (1) have BoNY and JPM act as custodians and Tri-Party Agents; and (2) accept BoNY's and JPM's collateral valuations under each Tri-Party Agreement.

11.      BoNY and JPM were capable of and in fact had a duty to determine collateral values. Therefore, BoNY and JPM collateral 'marks'[3] should not be summarily dismissed as unreliable.

---

[2] Federal Reserve Bank of New York, Repurchase and Reverse Repurchase Transactions [hereinafter *Repurchase and Reverse Repurchase Transactions*], *available at* http://www.newyorkfed.org/aboutthefed/fedpoint/fed04.html (last visited Mar. 15, 2010) ("In a tri-party repo, both parties to the repo must have cash and collateral accounts at the same tri-party agent, which is by definition also a clearing bank. The tri-party agent will ensure that collateral pledged is sufficient and meets eligibility requirements, and all parties agree to use collateral prices supplied by the tri-party agent").

[3] Report of Professor Paul Pfleiderer (Jan. 8, 2010) [hereinafter *Pfleiderer Report*] at 11, note 22. A 'mark' is a per-unit amount that is used to value a position. The mark used to value a specific security on a given day for a particular purpose may be based on or set equal to an observable price, if available, or based on or set equal to a bid price or an offer price or some point between the two, assuming quotes are available. Where reliable prices are not available and credible quotes are not forthcoming, a mark must be based on an estimate of value, generally derived from a model or some other analysis of value.

12.    Prof. Pfleiderer's assertion that BoNY and JPM did not have the capability to accurately value the collateral, and therefore, their values should be dismissed as unreliable and is not supported by the facts.[4]

## IV.    OPINIONS

13.    In his expert report, Prof. Pfleiderer concludes that:

> "none of the three sets of marks discussed in this subsection — the marks in Lehman's GFS system; JP Morgan Chase's custodial marks; and BNY/Mellon's custodial marks — provides a reliable basis for valuing the positions comprising the Repo Collateral."[5]

14.    In support of his conclusion, Prof. Pfleiderer makes certain assumptions that BoNY and JPM did not have adequate insight into the collateral to be able to assign marks and accurately calculate values for the collateral:

> "***There is every reason to believe*** that JP Morgan Chase and BoNY, in their roles as custodians, had no better insight and were no better informed than (and more likely were not as well informed as) Mr. King[6] and his team. Thus, *it is virtually certain* that both JP Morgan Chase and Bank of New York encountered significant problems in characterizing, understanding, and marking at least some of the securities that comprised the Repo Collateral. Given that JP Morgan Chase had just a few days to understand and mark at least the positions backing the FRBNY's loans to LBI earlier in the week, and that BoNY had just one day (at most) to understand and mark the positions backing the Barclay's Fed Replacement Repo loan to LBI on Thursday, *it is highly likely* that at least some of their marks were, at a minimum, imprecise."[7]

15.    Prof. Pfleiderer did not perform any independent analysis of the custodian banks' pricing processes, specifically (i.e., policies, procedures, fair value models, market data vendors, ability to leverage internal market making activities and accompanying system and applications used to

---

[4] *Id.* at ¶46.

[5] *Id.*

[6] Stephen King, as head of Barclays' Principal Mortgage Trading Group ("PMTG"), was responsible for managing the "on-boarding" of most or all of the Repo Collateral positions, for valuing at least some of the positions that were transferred to Barclays, and, ultimately, for hedging, to the extent possible, the risks associated with the on-boarded positions.

[7] *Pfleiderer Report, supra,* at ¶ 43 (emphasis added).

Contains Highly Confidential Information

mark collateral) and BoNY and JPM's operations in particular to support his above opinion. Without at least some understanding of JPM's and BoNY's pricing processes, Prof. Pfleiderer cannot possibly know or have a basis for assuming whether these institutions had insight into the appropriate marks for collateral or the level of accuracy of the collateral marks.

16.    In fact, Prof. Pfleiderer did not even thoroughly read the contracts governing JPM's or BoNY's role as Tri-Party Repo agent:

> Q. Do you have any understanding with respect to JPMorgan Chase what the scope was of their contractual duties to value securities as custodial agent?
>
> A. Not in the basis of a thorough reading of a contract, no.
>
> Q. Same question for Bank of New York. Do you have an understanding as to what their contractual duties were to value securities as a custodial agent?
>
> A. Not on the basis of a thorough reading of the contract, no.
>
> Q. Did you ask for a copy of J.P. Morgan's securities pricing policies?
>
> A. I personally did not, and I don't know whether staff working in my direction did or did not.
>
> Q. How about Bank of New York, did you ask to see their pricing policies?
>
> A. Same answer as before.
>
> Q. You did not?
>
> A. I did not. And it may or may not be the case that staff working in my direction had looked at that.
>
> Q. In the course of your work, you don't recall ever seeing such policies from J.P. Morgan or Bank of New York for this assignment?
>
> A. I'm pretty sure I did not see any policies. I've looked at Barclays policies, but I don't believe I've seen either J.P. Morgan or Bank of New York policies.[8]

---

[8] Deposition of Professor Paul Pfleiderer (Feb. 23, 2010), 170:19-172:2.

John Schneider Expert Report

17.     It is clear is that Prof. Pfleiderer did not take the necessary steps to become sufficiently educated as to the duties of JPM and BoNY under the relevant contracts or their capabilities with respect to valuation of collateral securing Repo transactions. Accordingly, Prof. Pfleiderer could not have had enough information to make any determination as to JPM's or BoNY's valuation capabilities, and he was not in a position to form an opinion as to the reliability of their collateral marks.

18.     According to the contracts that govern the repurchase agreements, a Tri-Party Repurchase Agent has a duty to value the collateral and the parties to the Tri-Party Agreement agree to use collateral marks supplied by the tri-party repo agent. The NY Fed has set out the responsibilities of tri-party repo agents in each repo agreement:

> Fed repos are done via tri-party settlement, which means that the Fed and the primary dealers use a tri-party agent to manage the collateral. In a tri-party repo, both parties to the repo must have cash and collateral accounts at the same tri-party agent, which is by definition also a clearing bank. The *tri-party agent will ensure that collateral pledged is sufficient and meets eligibility requirements, and all parties agree to use collateral prices supplied by the tri-party agent.*[9] [emphasis added]

19.     Other authorities have described a tri-party repo agent's duties, as follows:

> "The triparty clearing bank provides cash and collateral custody accounts for parties to the repo deal and collateral management services. These services include ensuring that pledged collateral meets the cash lenders' requirements, pricing collateral, ensuring collateral sufficiency…[10]" [emphasis added]

---

[9] *Repurchase and Reverse Repurchase Transactions, supra.*
[10] Tobias Adrian, Christopher R. Burke  & James J. McAndrews, *The Federal Reserve's Primary Dealer Credit Facility*, Current Issues in Economics & Finance, Volume 15, No. 4, (Aug. 2009) [hereinafter *The Federal Reserve's Primary Dealer Credit Facility*] (emphasis added).

Contains Highly Confidential Information

20.    BoNY and JPM, as tri-party repo agents and custodians, had a contractual relationship
with each party to the custody agreement.[11] Non-discretionary custodial activities are governed
by such contractual relationships, according to the Office of the Comptroller of the Currency.[12]

21.    Repurchase and custodial agreements normally specify, but are not limited to, the
following standardized terms important to regulatory views of proper process and procedures for
review of repurchase contracts for propriety and completeness, including:

- Terms of transaction initiation, confirmation and termination;
- Provisions for payments and transfers of securities;
- Requirements for segregation of collateral securities;
- Acceptable types and maturities of collateral securities;
- Initial acceptable margin for collateral securities of various types and maturities;
- Margin maintenance and collateral repricing provisions;
- Provisions for collateral substitution;
- Rights to interest and principal payments;
- Events of default and the rights and obligations of the parties;
- Required disclosures for transactions in which the seller retains custody of purchased securities;
- Disclosures required by regulatory agencies; and
- Persons authorized to transact business for the depository institution and its counterparty.[13]

22.    In practice, since 1995, most repurchase agreements are based upon standardized
contracts available at the Securities Industry and Financial Markets Association (SIFMA),
formerly known as the Bond Market Association.[14] The Custodial Undertaking in Connection
with Master Repurchase Agreement, by and among, Barclays Plc (buyer), Lehman Brothers Inc.

---

[11] Office of the Comptroller of the Currency, Administrator of National Banks, Comptroller's Handbook, Asset Management, Custody Services (2002) at 1-2 [hereinafter *Comptroller's Handbook*].

[12] *Id.*

[13] Federal Financial Institutions Examination Council, Repurchase Agreements of Depository Institutions With Securities Dealers and Others; Notice of Modification of Policy Statement, 63 Fed. Reg. 6935-38 (Feb. 11, 1998) [hereinafter *Repurchase Agreements of Depository Institutions*].

[14] The Bond Market Association & International Securities Market Association, TBMA/ISMA Global Master Repurchase Agreement (2000 Version) [hereinafter *TBMA/ISMA Global Master Repurchase Agreement*], *available at* http://archives1.sifma.org/agrees/global_master_repurchase_agreement.pdf (last visited Mar. 15, 2010).

(seller) and The Bank of New York Mellon (custodian), generally reflects these standardized terms.

23.     Under the relevant agreement between BoNY, Barclays Plc and Lehman Brothers Inc., (the BoNY "Tri-Party Agreement")[15] BoNY had a duty to determine the market value of securities, and in accordance with the agreement, notify the buyer and seller of any margin deficit, or excess.[16]

24.     Additionally, each party to the BoNY tri-party agreement agreed that BoNY had the discretion to mark collateral and in the event that BoNY could not, "obtain the price of a particular Security from such pricing information services on any Business Day, the Market Value shall be as determined by Custodian [BoNY] in the reasonable exercise of its discretion…[17]".

25.     James Hraska, the Lehman executive in charge of transferring collateral, confirmed his understanding that BoNY was Barclay's agent and custodian under the repo:

> A. There were two tri-party agents involved. There was Chase, who was a tri-party agent, who held our collateral with the Fed that we had pledged to the Federal Reserve, and then, in effecting the transaction, according to the tri-party terms, there was Bank of New York, who was the agent for Barclays.
>
> Q. I see reference in some of the documents to BoNY tri-party?
>
> A. Uh-huh.
>
> Q. Is that the tri-party we're -- is that the transaction we're talking about?
>
> A. Yes, that's correct. We moved the assets from JPChase, who was our tri-party agent, to Bank of New York, who was, as I mentioned, Barclays' agent.[18]

26.     Prof. Pfleiderer agrees that BoNY had a duty to mark the collateral when he states that:

---

[15] Custodial Undertaking in Connection with Master Repurchase Agreement, By and Among, Barclays Plc (buyer), Lehman Brothers Inc. (seller) and The Bank of New York Mellon (custodian) [hereinafter *Tri-Party Agreement*].
[16] *Tri-Party Agreement*, § 6 (A)(i)-(ii).
[17] *Tri-Party Agreement*, §1, (K), "Market Value of Securities."
[18]  Deposition of James Hraska (Aug. 14, 2009), at 39: 9-24.

assigning marks is a necessary element of services these banks provide as tri-party repo custodians…that both banks [JPM and BoNY] maintain procedures and pricing groups that enable them to provide this marking service quickly and with the level of accuracy required by their roles in tri-party repos for the types of securities typically eligible as collateral in tri-party repos at least under normal conditions, for normal commercial tri-party repos.[19]

27.    BoNY and JPM are the two tri-party repo agents that control the vast majority of the tri-party repurchase custodial business in the United States and as discussed above, as tri-party Agents, they are responsible for marking collateral values each day (and sometimes intra-day) to ensure that the collateral is sufficient to secure the loans in accordance with their agreements and accompanying eligible securities schedules. As such, BoNY and JPM are required to have and maintain valuation capabilities to: (1) fulfill their contractual obligations; and (2) remain the dominant commercial tri-party repo agents serving the U.S. market.

28.    In March 2008, the overall US repo market was $4.5 trillion. At peak levels in 2008 tri-party repos represented a significant majority of the repo market, when over US$2.8 trillion in securities were being financed through tri-party repo transactions, many with very short maturities, and involving the daily transfer of nearly the full amount of associated cash and securities on the accounts of one or the other of the two tri-party "clearing banks": Bank of New York Mellon (BNY) and JPMorgan Chase (JPM)."[20] As of September 2007, the Bank of New York handled some $1.5 trillion in tri-party balances each day."[21]

---

[19] *Pfleiderer Report, supra,* at ¶41.
[20] Federal Reserve Bank of New York, Progress Report, Task Force on Tri-Party Repo Infrastructure Payments Risk Committee (Dec. 22, 2009) [hereinafter *Progress Report*], *available at* http://www.newyorkfed.org/prc/report_091222.pdf (last visited Mar. 15, 2010).
[21] The Bank of New York Mellon, Increasing Tri-Party Repo and Securitization Transparency: A Roundtable Discussion, (2008) [hereinafter *Increasing Tri-Party Repo and Securitization Transparency*], *available at* http://www.bankofny.com/CpTrust/data/Tri_Party_Roundtable_Brochure.pdf (last visited Mar. 15, 2010).

Contains Highly Confidential Information

## V.    THE TRI-PARTY REPO MARKET IS BOTH EXTENSIVE AND WELL-DEVELOPED

### A.   Tri-party Repo Definition and Market History

29.    According to the NY Fed, "…a tri-party repo transaction involves three parties: a cash lender (the investor), a borrower that will provide collateral against the loan, and a tri-party clearing bank. The tri-party clearing bank provides cash and collateral custody accounts for parties to the repo deal and collateral management services. These services include ensuring that pledged collateral meets the cash lenders' requirements, pricing collateral, ensuring collateral sufficiency, and moving cash and collateral between the parties' accounts."[22]

30.    In a repurchase, or "repo", transaction, an investor can borrow cash for a short period from another party, using securities as collateral for the loan. Investors with large portfolios of securities can thus lend these out and earn a return over time.[23]

31.    According to the NY Fed, "there are two main types of settlement methods for repos: tri-party and "delivery vs payment" or DVP. Fed repos are done via tri-party settlement, which means that the Fed and the primary dealers use a tri-party agent to manage the collateral. In a tri-party repo, both parties to the repo must have cash and collateral accounts at the same tri-party agent, which is by definition also a clearing bank. The tri-party agent will ensure that collateral pledged is sufficient and meets eligibility requirements, and all parties agree to use collateral prices supplied by the tri-party agent."[24]

---

[22] *Repurchase and Reverse Repurchase Transactions, supra.*

[23] Financial Times Lexicon, "repo," *available at* http://lexicon.ft.com/term.asp?t=tri-party-repo (last visited Mar. 15, 2010).

[24] *Repurchase and Reverse Repurchase Transactions, supra.*

32.    The "tri-party repo has two important credit risk characteristics. First, it protects the creditor by taking margin from a borrower and lodging repo securities with a bank that has explicitly agreed to hold the securities for the benefit of the creditor. If the borrower fails to honor its repurchase commitment, the creditor can instruct the bank to sell the securities and apply the proceeds to satisfy its claim for repayment. Second, tri-party repo protects the borrower because the bank retains possession of the repo securities during the term of the repo, so the borrower can recover the securities promptly upon tender of the repurchase price. Thus, tri-party repo resolves the conflict inherent in conventional repos that borrowers and creditors cannot both be insulated from credit risk simultaneously."[25]

33.    One of the operational benefits of tri-party repos is that, regardless of the term of the loan, the clearing bank unwinds the transaction each morning, returning the cash to the investor's account and the collateral to the borrower's account. Then at the end of the day, the borrower pledges qualifying collateral back to the deal, which once priced in that day's marking process, determined as eligible, and deemed sufficient to meet the terms of the deal by the clearing bank, is moved to the investor's account while the cash is placed in the borrower's account. In this way, no specific collateral is committed for more than overnight. This arrangement allows borrowers to pledge whatever eligible collateral they have on hand each day, thus enabling them to manage their securities portfolios more effectively.[26]

34.    The securities loaned and the collateral provided are marked to market daily. When collateral exceeds the required margin the excess may be returned to the borrower. Alternatively, when the collateral value is less than the required margin, the borrower must provide additional

---

[25] Federal Reserve Bank of New York, *The Evolution of Repo Contracting Conventions in the 1980s*, 12 ECON. POL'Y REV. (May 2006), *available at* http://www.newyorkfed.org/research/epr/06v12n1/0605garb.html (last visited Mar. 15, 2010).
[26] *Repurchase and Reverse Repurchase Transactions, supra.*

collateral. The parties will stipulate who is responsible for safekeeping the collateral; the lending agent bank is often selected for the job. Some borrowers may require that the collateral be kept with an independent third party. The party safekeeping the collateral may do that alone, or it may also be responsible for pricing the assets, making margin calls, and collecting income. Responsibilities should be clearly set out in the agency agreement.[27]

35.    An important implication of this daily unwinding, however, is that the counterparty risk for the investor shifts from its repo counterparty to the tri-party clearing bank, and the clearing bank becomes exposed to the borrower. Overnight, the cash investor has the borrower's collateral in its account and the borrower has the cash. If the borrower defaults overnight— say, by filing for bankruptcy—the lender has the collateral in its account and thus is covered and the clearing bank is not affected. Once the collateral and cash are returned in the morning, however, the clearing bank, which has extended credit to the borrower to finance the original collateral purchase, becomes exposed to the borrower. Consequently, the clearing bank needs to determine each morning if it is comfortable accepting the exposure to the borrower that the reversal of the transaction will create.[28]

36.    Thus, the importance of a tri-party repo agent's valuation capabilities are not simply to protect the repo borrower and lender as part a contractual obligation, but also to protect the Tri-Party Repurchase Agent's *own* balance sheet and regulatory capital while they are exposed to the borrower during the daily unwinding process.

---

[27] *Comptroller's Handbook, supra,* at 33.
[28] *Repurchase and Reverse Repurchase Transactions, supra.*

Contains Highly Confidential Information

### B.  Tri-party Repo Market Size and Participants

37.     In September 2008, "outstanding tri-party repos [on US markets] totaled $2.5 trillion," of a total of roughly $4.4 trillion total US repo market.[29] Individual repo sellers (borrowers) routinely financed more than US$ 100 billion in securities via the tri-party mechanism. The largest single firm exposure peaked at more than US$ 400 billion.[30]

### C.  Tri-party Repo Collateral Types

38.     The "Eligible Security Schedules to the Custodial Undertaking in Connection with Master Open Market Agreement (PCDF), Schedule of Eligible Securities, Bank of New York Mellon"[31] (the "Schedules") govern the types of collateral available to the Lehman repo. In general, the Schedules list these types of securities, along with their corresponding haircuts (or margin percentage), as eligible:

- Direct Obligations of the U.S. Treasury;
- Direct Obligations of the Federally Related Entities (see schedule for further, detailed listing);
- Agency and Private Label Mortgage-Backed Securities Passthroughs and CMOS; and
- Municipal Securities, Corporate Securities, Asset Backed Securities (including CDOs, CBOs, CLOs), International Agencies, Money Market Instruments, Whole Loans, Equities and Equity Derivatives

39.     Such asset classes are common to tri-party repo markets. Tri-party repo was already a well accepted market a decade ago. As early as March 2000, the president of the then Bond Market Association ("BMA") wrote a letter to the NY Fed to maintain their participation in the market, begun as an emergency measure used to address financial crises in the late 1990s, noting: "The industry is increasingly moving toward tri-party repo as the preferred settlement

---

[29] *The Federal Reserve's Primary Dealer Credit Facility, supra.*
[30] *Progress Report, supra.*
[31] BCI-EX-00297249.

Contains Highly Confidential Information

method for its funding operations. This move is largely driven by the cost savings benefits inherent in tri-party repo (as opposed to Delivery versus Payment ("DVP") repo), the increased ease of execution of repo trades done on a tri-party basis, as well as the possession and control of collateral in a separate custodial account."[32]

40.    The BMA then recommended the NY Fed maintain its expansion of acceptable collateral. The BMA strongly supported the expansion in 2000 of the "securities eligible as collateral in the repurchase transactions undertaken by the FRBNY in the management of banking system reserves. In particular, the expansion of eligible collateral to encompass structured agency securities and adjustable rate mortgage pass-through securities was viewed by the dealer community as an extremely positive development." BMA urged the NY Fed to expand acceptable collateral to (i) agency securities; (ii) passthrough mortgage securities; (iii) commercial and multifamily mortgage-backed securities; (iv) REMICS; (v) corporate securities; and (vi) asset backed securities.[33]

41.    By 2005, "nontraditional" collateral had already become a substantial portion of primary dealers' repo transactions. According to economists at the NY Fed, by January 2005, "less liquid" collateral – consisting of corporate securities, as well as mortgage-backed and asset-backed securities – accounted for roughly 47 percent of primary dealers' repo transactions. By January 2006, that proportion reached around 48 percent; by January 2007, it was 50 percent; and by January 2008, it approached 55 percent. The market peaked at just below 60 percent

---

[32] Memorandum from the Bond Market Association regarding Continuation of FRBNY's Ability to Engage in Tri-party Repo, to Peter R. Fisher, Executive Vice President, Markets Group, Federal Reserve Bank of New York, (Mar. 14, 2000).
[33] *Id.*

John Schneider Expert Report

Contains Highly Confidential Information

toward the end of 2008, falling after the Lehman crisis to a low of roughly 45 percent, but rebounding quickly to almost 50 percent.[34]

42.     Far from being new or esoteric, therefore, nontraditional or illiquid collateral had been commonly acceptable in tri-party repo arrangements both in private and Central Bank markets for well over a decade at the time of the Lehman bankruptcy, and comprised a substantial portion of the market in the US since at least 2005.

43.     A pillar of the repo and tri-party repo market is the concept that collateral must be at least equal to the amount loaned. In particular, the "acquisition of a repurchase agreement may be deemed to be an acquisition of the underlying securities, provided the obligation of the seller to repurchase the securities from the investment company is Collateralized Fully…"Collateralized fully" in the case of a repurchase agreement means, among other things, that the value of the securities collateralizing the repurchase agreement (reduced by the transaction costs (including loss of interest) that the investment company reasonably could expect to incur if the seller defaults) is, and during the entire term of the repurchase agreement remains, at least equal to the Resale Price provided in the agreement."[35] The definition put forth in the Investment Company Act demonstrates the foundation of the Repo transaction; namely, that collateral must equal the amount loaned. The tri-party repo agent must, therefore, ensure it has developed adequate processes to monitor the value of pledged collateral or risk the inability to conduct business as an agent.

---

[34] *The Federal Reserve's Primary Dealer Credit Facility, supra.*
[35] Investment Company Act of 1940 at Rule 5b-3.

Contains Highly Confidential Information

### D.  The Accuracy of Custodial Marks Has Implications for Custodian Risk and Regulatory Scrutiny

44.    For banking law purposes, the authority of national banks to engage in custody activities like those involved in tri-party repo derives from the general business of banking and incidental powers language in 12 U.S.C. § 24. The Supreme Court has recognized that this authority is a broad grant of power to engage in the business of banking and that the concept evolved over time as business practices developed and changed.[36]

45.    The custody activities of national banks developed from providing safekeeping and settlement services to customers for a fee, and historically were viewed as permissible incidental activities under 12 U.S.C. § 24 often were in conjunction with the delivery of fiduciary services.[37] The OCC has indicated that it does not treat non-discretionary custodial activities as fiduciary, and that those activities are authorized under 12 U.S.C. § 24.[38] Services traditionally provided include the settlement, safekeeping, and reporting of customers' marketable securities and cash. A custodian also may invest cash balances as directed, collect income, process corporate actions, price securities positions, and provide recordkeeping services.

46.    A custodian acts only as an agent of the related parties. A custodian typically does not have discretion to select the investment vehicles. Instead, standing instructions in the custody agreement usually direct that selection.[39] The OCC goes to great lengths to spell out specifically that the custodian is not a trustee, and "generally is not subject to the strict fiduciary standards

---

[36] See Nationsbank v. Variable Annuity Life Ins. Co., 513 U.S. 251 (1995).

[37] Comptroller's Handbook, supra, at 1-2.

[38] See, e.g., Office of the Comptroller of the Currency Interpretive Letter No. 769 from Julie L. Williams, Chief Counsel, to John H. Huffstutler, Senior Vice President and Chief Regulatory Counsel, Bank of America National Trust and Savings Association (Jan. 28, 1997), available at http://www.occ.treas.gov/interp/mar97/int769.pdf; 61 Fed. Reg. at 68545. [hereinafter OCC Interpretive Letter #769]

[39] See Nationsbank v. Variable Annuity Life Ins. Co., 513 U.S. 251 (1995).

Contains Highly Confidential Information

that govern the relationship between a trustee and beneficiary."[40] Nonetheless, "a custodian may perform functions that are fiduciary in nature. For example, a custodian exercising discretion in managing a securities lending cash collateral pool would be acting in a fiduciary capacity and must comply with the relevant provisions of 12 C.F.R. 9."[41]

47.    Custody relationships are, therefore primarily contractual in nature and are essentially directed agencies. The customer is the principal, and the custodian is the agent. The custody agreement, itself, therefore is important as a risk management tool. A well-specified custody agreement should "clearly establish the custodian's duties and responsibilities." Custody agreements should be "standardized when possible, and any deviations from the standardized agreement should be reviewed prior to acceptance."[42]

48.    As discussed previously, industry standard repurchase and custody agreements normally specify, but are not limited to:

- Terms of transaction initiation, confirmation and termination;
- Provisions for payments and transfers of securities;
- Requirements for segregation of collateral securities;
- Acceptable types and maturities of collateral securities;
- Initial acceptable margin [haircuts] for collateral securities of various types and maturities;
- Margin [haircut] maintenance and collateral repricing provisions;
- Provisions for collateral substitution;
- Rights to interest and principal payments;
- Events of default and the rights and obligations of the parties;
- Required disclosures for transactions in which the seller retains custody of purchased securities;
- Disclosures required by regulatory agencies; and
- Persons authorized to transact business for the depository institution and its counterparty.[43]

---

[40] *OCC Interpretive Letter #769, supra.*
[41] *Comptroller's Handbook, supra,* at 11.
[42] *Comptroller's Handbook, supra*, at 1-2, 8.
[43] *Repurchase Agreements of Depository Institutions, supra.*

Contains Highly Confidential Information

49.    In practice, most repurchase agreements since 1995 have been based upon standardized contracts available at the Securities Industry and Financial Markets Association (SIFMA), formerly known as the Bond Market Association.[44]

50.    As custody services are contractual in nature, a bank must ensure compliance with the provisions of all applicable agreements.[45] Typically, the custodian marks securities to market daily in both securities lending and tri-party repurchase agreements. Such marking is an integral part of the contractual arrangements that control the risk assumed by both lender and borrower.

> When collateral exceeds the required margin, the excess may be returned to the borrower. Alternatively, when the collateral value is less than the required margin, the borrower must provide additional collateral. The parties will stipulate who is responsible for safekeeping the collateral; the lending agent bank is often selected for the job. Some borrowers may require that the collateral be kept with an independent third party. The party safekeeping the collateral may do that alone, or it may also be responsible for pricing the assets, making margin calls, and collecting income. Responsibilities should be clearly set out in the agency agreement.[46]

51.    12 C.F.R. 12 establishes minimum recordkeeping and confirmation requirements for securities transactions handled by national banks. The regulation also requires that banks establish policies and procedures covering supervision of securities transactions.[47] Effective internal controls are essential to a bank's management of the risks found in custody services.[48] The rights and the obligations of a pledge of a certificated security or of a claimant to a security interest in a security or security entitlement are determined by Uniform Commercial Code

---

[44]  *TBMA/ISMA Global Master Repurchase Agreement, supra.*
[45] *Comptroller's Handbook, supra,* at 4.
[46] *Comptroller's Handbook, supra,* at 33.
[47] *Comptroller's Handbook, supra,* at 10.
[48] *Comptroller's Handbook, supra,* at 6.

("UCC") Articles 8 and 9. Although UCC Article 9 requires that "the secured party shall keep the collateral identifiable," fungible collateral may be commingled.[49]

52.　　Still, the above are primarily compliance and reputational risk issues, not fundamental credit risk issues. Nonetheless, as discussed above, a custodian can expose itself to credit risk at various stages of the tri-party repurchase operational process.

53.　　In particular, credit risk is taken on by the custodian when the tri-party repurchase agreement is unwound and recast each day. "Overnight, the cash investor has the borrower's collateral in its account and the borrower has the cash. If the borrower defaults overnight— say, by filing for bankruptcy—the lender has the collateral in its account and thus is covered and the clearing bank is not affected. Once the collateral and cash are returned in the morning, however, *the clearing bank, which has extended credit to the borrower to finance the original collateral purchase, becomes exposed to the borrower*. Consequently, the clearing bank needs to determine each morning if it is comfortable accepting the exposure to the borrower that the reversal of the transaction will create.[50]

54.　　Credit risk also arises in custodial activities when a counterparty does not fulfill its contractual part of a transaction and the bank has to extend or commit its funds to complete the transaction.[51] "In several highly publicized cases in the mid-1990s banks absorbed significant losses from the management of cash collateral to protect customer relationships and their own reputations."[52]

55.　　Sale and repurchase agreements where the credit risk remains with the bank receive a Basel Credit Conversion Factor (referred to in the industry as a CCF) of 100%. Hence, clearing

---

[49] UCC Article 9, *available at* http://www.law.cornell.edu/ucc/9/9-207.html (last visited Mar. 15, 2010).
[50] *The Federal Reserve's Primary Dealer Credit Facility, supra* [emphasis added].
[51] *Comptroller's Handbook, supra*, at 44.
[52] *Comptroller's Handbook, supra*, at 35.

Contains Highly Confidential Information

banks subject to Basel--Like requirements--such as BoNY and JPM--tend to have stringent policies and procedures regarding both investment credit risk and counterparty credit risk evaluation that figure into their assessment an implementation of valuation and haircut processes.

56.    Accordingly, BoNY describes its capabilities as follows: "The Bank of New York Mellon's underlying infrastructure… is based on a proprietary collateral management system designed to efficiently handle all asset types denominated in any currency and targeted toward a global customer base. It can process a wide array of transaction types, including tri-party repurchase agreements, portfolio swaps, *collateralized* loans, swap collateralization deals and more."[53]

57.    It is my conclusion therefore that both BoNY and JPM were well qualified to value the collateral at issue.  Moreover, they were obligated contractually and under applicable law and regulation to maintain adequate processes and safeguards to be able to do so under the time constraints that are present in this market.

Submitted by

John Schneider

March 15, 2010

---

[53] *Increasing Tri-Party Repo and Securitization Transparency, supra.*

Contains Highly Confidential Information

Appendix I

Documents Relied Upon

## Documents in the Record

### Depositions

| Deponent | Date |
|---|---|
| James Hraska | 8/14/2009 |
| Paul Pfleiderer | 2/23/2010 |

### Deposition Exhibits

495 - Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, Sept. 15, 2009

633A - Expert Report of Prof. Paul Pfleiderer, Volume 1

634A - Expert Report of Prof. Paul Pfleiderer, Volume 2

## Other Documents

| Description | Beginning Bates | Ending Bates |
|---|---|---|
| Eligible Security Schedules to the Custodial Undertaking in Connection with Master Open Market Agreement (PCDF), Schedule of Eligible Securities, Bank of New York Mellon, | BCI-EX-00297249 | |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006, dated Sept. 15, 2009 | | |
| The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), Sept. 15, 2009 | | |

## Documents that are Publicly Available

61 Fed. Reg. at 68545.

Custodial Undertaking in Connection with Master Repurchase Agreement, By and Among, Barclays Plc (buyer), Lehman Brothers Inc. (seller) and The Bank of New York Mellon (custodian).

Federal Financial Institutions Examination Council, Repurchase Agreements of Depository Institutions With Securities Dealers and Others; Notice of Modification of Policy Statement, 63 Fed. Reg. 6935-38 (Feb. 11, 1998).

Federal Reserve Bank of New York, Progress Report, Task Force on Tri-Party Repo Infrastructure Payments Risk Committee (Dec. 22, 2009), *available at* http://www.newyorkfed.org/prc/report_091222.pdf (last visited Mar. 15, 2010).

Federal Reserve Bank of New York, Repurchase and Reverse Repurchase Transactions, *available at* http://www.newyorkfed.org/aboutthefed/fedpoint/fed04.html (last visited Mar. 15, 2010).

Federal Reserve Bank of New York, *The Evolution of Repo Contracting Conventions in the 1980s* , 12 Econ. Pol'y Rev. (May 2006), *available at* http://www.newyorkfed.org/research/epr/06v12n1/0605garb.html (last visited Mar. 15, 2010).

Financial Times Lexicon, "repo," *available at* http://lexicon.ft.com/term.asp?t=tri-party-repo (last visited Mar. 15, 2010).

Investment Company Act of 1940 at Rule 5b-3.

Memorandum from the Bond Market Association regarding Continuation of FRBNY's Ability to Engage in Tri-party Repo, to Peter R. Fisher, Executive Vice President, Markets Group, Federal Reserve Bank of New York, (Mar. 14, 2000).

Nationsbank v. Variable Annuity Life Ins. Co., 513 U.S. 251 (1995).

Office of the Comptroller of the Currency Interpretive Letter No. 769 from Julie L. Williams, Chief Counsel, to John H. Huffstutler, Senior Vice President and Chief Regulatory Counsel, Bank of America National Trust and Savings Association (Jan. 28, 1997), *available at* http://www.occ.treas.gov/interp/mar97/int769.pdf.

Office of the Comptroller of the Currency, Administrator of National Banks, Comptroller's Handbook, Custody Services (Jan. 2002).

The Bank of New York Mellon, Increasing Tri-Party Repo and Securitization Transparency: A Roundtable Discussion, (2008), *available at* http://www.bankofny.com/CpTrust/data/Tri_Party_Roundtable_Brochure.pdf (last visited Mar. 15, 2010).

The Bond Market Association & International Securities Market Association, TBMA/ISMA Global Master Repurchase Agreement (2000 Version, *available at* http://archives1.sifma.org/agrees/global_master_repurchase_agreement.pdf (last visited Mar. 15, 2010).

Tobias Adrian, Christopher R. Burke & James J. McAndrews, *The Federal Reserve's Primary Dealer Credit Facility* , 15 Current Issues in Econ. & Fin. 6 (Aug. 2009.

UCC Article 9, *available at* http://www.law.cornell.edu/ucc/9/9-207.html

Contains Highly Confidential Information

APPENDIX II: CURRICULUM VITAE



**John J. Schneider, CPA**

**John J. Schneider, CPA**
Managing Director

**Navigant Consulting**
101 Federal Street
27th Floor
Boston, MA 02110

617-748-8317 Main
617-261-0268 Fax

jjschneider
@navigantconsulting.com

**Education**
B.S., Accounting
University of Scranton
Scranton, PA

M.B.A. – Executive Program,
Boston University
Boston, MA

**Current Position**
John J. Schneider is a Managing Director in the Boston office of Navigant Consulting.

Mr. Schneider is a financial service executive with 23 years of compliance, risk management, operational redesign and internal audit experience in investment management, capital markets, and banking.

**Professional Experience**

*Navigant Consulting, Inc., Boston, MA (2003-Present)*
Managing Director – Regulatory Advisory Services

Managing Director with Navigant Consulting with over 23 years of experience in investment management, banking, capital markets.

- Lead the Regulatory Advisory Services practice, which has required coordinating teams to service over 100 engagements for Mutual Funds, Hedge Funds, Private Equity, Broker Dealers, Banking, and Managed Accounts organizations.
- Provided oversight to teams responsible for evaluating the methodologies employed to distribute unrealized losses for certain impaired assets and process in-kind distributions of collateral maintained for Securities Lending clients.
- Lead a team responsible for evaluating and analyzing the efficacy of controls designed to comply with regulation SHO.
- Advised clients on establishing and refining governance structures to achieve the appropriate level of oversight and risk mitigation.
- Developed methodologies for risk assessing and testing AML programs in accordance with the requirements of the Patriot Act.

Contains Highly Confidential Information

- Created the methodologies for developing and implementing compliance programs for mutual fund complexes and investment advisors pursuant to 38a-1 and 206(4)-7.
- Managed teams responsible for performing Anti-Money Laundering reviews, providing management with advice to improve compliance policies, procedures and processes.
- Managed teams responsible for analyzing subscription and redemption activity for late trading and market timing.

Representative Clients
- JPMorgan Investment Advisors, Inc
- Janus Capital Management
- Prudential Investments with the Jennison Dryden Funds & Strategic Partners Funds
- Apollo Management with the Apollo Investment Corporation (a Business Development Company under the Investment Company Act of 1940)
- Apollo Capital Management with the Strategic Value Fund (onshore/offshore)
- Babson Capital Management, LLC.


*Brown Brothers Harriman & Co., Boston, MA (1998-2003)*

Vice President – Regional Audit Director

Managed professional teams in Boston and New York covering Investment Management and Investor Services, which represented 60% of the overall audit services. Specific responsibilities included:

- Developing and employing a risk-based financial, technology and operational audit plan for the US and Europe.
- Coordinating audit activities performed by the external auditors for SAS70 and year-end financial reviews.
- Ensuring the Firm's preparedness and coordinating external regulatory reviews conducted by the SEC, NYSE and State Bank examiners (New York, Massachusetts, and Pennsylvania).
- Evaluated the implementation of a Securities Lending program for custody clients.
- Member of several senior management oversight committees: Sarbanes-Oxley Committee, Know Your Customer Committee, Inter-Office Coordinating

Contains Highly Confidential Information

Committee, and the BBH Funds Steering Committee. These committees were designed to monitor business model design and reengineering efforts, within the Firm.

- Advising the partnership on the cost versus benefits, compliance requirements and risks associated with the firm's products and services.

### *Selected Achievements:*

- Gained 10% efficiency in completing the audit plan year over year during the first three years of managing the audit team.
- Partnered with management on several business initiatives including the development and implementation of Know Your Customer and credit polices, Sarbanes-Oxley, BBH Firm Authorities, self-assessments and risk management.
- Evaluated and developed policies, procedures and strategic systems initiatives for compliance with Know Your Customer, Anti-Money Laundering and Patriot Act requirements. Led an executive committee in the evaluation and approval of a firm-wide Anti-Money Laundering system, compliance resources, and business line oversight requirements. Active participation on the Firm-wide Compliance Committee and several subcommittees designed to provide recommendations and strategic solutions for compliance requirements.
- Developed and implemented a comprehensive quarterly certification process in response to Sarbanes-Oxley requirements. Developed policies and procedures for performing quarterly self-assessments, formed a Due Diligence Committee and standard certification letters for the different service levels provided to clients.
- Led a firm-wide initiative to analyze current practices, assess peer practices, and develop, present, and implement a global approach for the establishment, delegation and on-going support for monitoring and controlling internal and external authorities. Presentations and working groups were developed for information gathering, education, and communication of the philosophy, principles, and status of the project.
- Performed several consultative projects at the request of the partnership to provide recommendations for cost reduction, enhance control effectiveness, and improve operational efficiencies. In certain instances, the implemented recommendations resulted in cost reductions

Contains Highly Confidential Information

of $200K-300K. Other initiatives resulted in a reduction of independent audit fees ($10K-50K per engagement).

*Citibank, N.A., New York, NY (1989-1998)*
  *Vice President – Global Investments and Investment*

*Finance Products Compliance Manager*

- Created the compliance function for the monitoring and supervision of Investment products globally.
- Advised management on regulatory issues and coordinated the infrastructure development of new products and business initiatives.
- Established compliance procedures for a Section 20 broker/dealer.
- Coordinated the development and supervision of structured derivative products.
- Developed procedures for the risk management of derivative and complex structured products.
- Developed procedures for compliance with the Interagency guidelines (e.g., Know Your Customer, Anti-Money Laundering, Suitability, Investment Objective Setting).
- Created policies and procedures for various Investment Finance activities, including fair lending, global real estate and risk management.

Vice President – Audit Manager

- Promoted and rotated through business areas providing a significant product exposure: World Wide Security Services (1989-1991), Global Cash Management and Corporate Financial Control (1991-1992), Global Trade Finance (1993-1995), and Private Banking Group International Quality Delivery/Technology (1995-1996).
- Designed, planned, and coordinated financial, technology and operational audits.
- Prepared audit plans and programs setting forth scopes, objectives, and budgets.
- Evaluated business practices and controls resulting in appropriate recommendations to senior management.
- Managed 6-8 staff auditors.
- Chaired a committee (10 professionals) that performed testing and training of Audit Methodology and Corporate Audit Software for a region of 173 auditors.

Contains Highly Confidential Information

*Scholastic Inc., Lyndhurst, NJ (1988-1989)*
<u>Senior Auditor</u>

Coordinated and participated on financial, operational, and technology reviews with the external auditors (Arthur Young). Performed weekly cash flow analyses for funding purposes.

*Price Waterhouse, Morristown, NJ (1987-1988)*
<u>Staff Auditor</u>

Responsible for audit and compilation assignments for diversified clientele with sales ranging from $3 to $70 million. Specifically, these responsibilities included the review and analysis of internal controls, balance sheet, profit and loss statements, and physical inventory observations.

*Deposition/Testifying Experience:*

C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, and its partners, affiliates, subsidiaries
and related entities v. Man Financial Inc, Thomas Gilmartin, Sep Alavi, William Wambach, Timothy Braun, Jody Mcmillan, James Zamora and Monica Rodriguez

*Published Articles:*

Texas Hedge Fund Association Newsletter - Six Steps to Help Six Key Steps to Help Private Fund Advisors Prepare for Regulatory Change - November 11, 2009
Complinet - Six Steps to Help Private Fund Advisors Prepare for Regulatory Change - November 10, 2009
Compliance Week - Risk and Regulation Roundtable Discussion Summary - October 9, 2009
Risk Management Association Journal - How Increased Regulation Will Impact Market Participants - May 1, 2009
NCI Investigations Quarterly - The Risk Management Paradox - March 25, 2009
KYC360.com - Risk Management Paradox - April 13, 2009
Navigant Consulting - Due Diligence: Expectations in a Rapidly Changing World - April 1, 2009

Contains Highly Confidential Information

Complinet - Reputation is Everything: How to Protect Your Reputation and Shore up investor Confidence - March 13, 2009

US Banker - Impact of Regulation on Credit Default Swaps Editorial - November 15, 2008

Strategic Finance – Finding Your Compliance Sweet Spot – August 2007

Strategic Finance - Falling into Line - May 2006

MFA Reporter - Annual Compliance Reviews: Lessons Learned - May 2006

MFA Reporter - FAQs - Hedge Fund Advisor Compliance & New SEC registration Rule of April 2005