# A. 202

**Contains Highly Confidential Information**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS HOLDINGS, INC.*, et al.,*

        Debtors.

Chapter 11

Case No. 08-13555

(Jointly Administered)

Expert Report of

Mark E. Zmijewski

March 15, 2010

**Contains Highly Confidential Information**

# TABLE OF CONTENTS

I.  Introduction ........................................................................................................................ 1

II.  Summary of Qualifications ................................................................................................. 2

III.  Summary of Opinions ........................................................................................................ 3

IV.  Opinions ............................................................................................................................. 9

    A.  Results of Movants' Independent Valuations of Repurchase
    Agreement Securities Documenting Barclays' Undervaluation of
    These Securities ............................................................................................................. 9

        1.  Valuation of Equities ............................................................................................ 11

        2.  Valuations of Navigant Economics (Chicago Partners) Valuation
        Experts ................................................................................................................. 13

    B.  The Pfleiderer Report's Failure to Compare the Court-Approved
    Transaction to the Transaction That Actually Occurred – The
    Barclays Windfall ........................................................................................................ 13

    C.  Effect of Alternate Marks on the Value of Assets in the Initial
    Inventory and JPM Inventory and Specifically on the Value of the
    Repo Collateral ............................................................................................................ 17

        1.  Effect of Using December 22, 2008 as the Date to Value Certain
        Assets Acquired in the Sale Transaction rather than the Date
        Barclays Had Ownership of Those Assets ........................................................... 17

        2.  The Effect of Using Lehman, BoNY, and JPMorgan Price Marks
        to Value the Assets Received and Barclays Windfall as Calculated
        by the Pfleiderer Report ...................................................................................... 19

    D.  Analysis of Lehman's Mortgages Acquired by Barclays ........................................... 22

    E.  Pfleiderer Report's Opinions (in Section II) Regarding the "Alleged
    $5 Billion Discount in the Fed Replacement Repo" Are Flawed and
    Unsupported ................................................................................................................. 24

        1.  The Pfleiderer Report's Opinion Regarding the "Price" of the Repo
        Portfolio is Flawed and Incorrect ....................................................................... 25

        2.  The Pfleiderer Report Inappropriately Rejects Considering
        Contemporaneous Valuations of "the Repo Collateral" Contained
        in Email Communications, Email Attachments, and Deposition
        Testimony ............................................................................................................. 26

        3.  The Pfleiderer Report's Rejection of the Lehman, BoNY, and
        JPMorgan Price Marks to Value the Repo Collateral Is Flawed and
        Unsupported ......................................................................................................... 27

        4.  The Pfleiderer Report's Ex-Post Analysis Is Flawed and
        Unsupported ......................................................................................................... 38

Contains Highly Confidential Information

# TABLE OF CONTENTS

5.  The Pfleiderer Report's Analysis in Appendix Four Is Flawed and Unsupported ................................................................................................ 41

6.  Overall Conclusion Regarding the Opinions in Section II of the Pfleiderer Report .......................................................................................... 49

F.  Pfleiderer Report's Opinions in Section III Related to the "Alleged $5 Billion Discount at Inception" Are Flawed and Unsupported ................................. 50

G.  Pfleiderer Report's Opinions in Section IV Related to "Risks Arising from the Acquisition" Are Flawed .......................................................... 52

H.  Pfleiderer Report's Opinions in Section V Related to "Barclays' Accounting Gain on the Acquisition" Are Flawed.................................... 55

1.  Pfleiderer Report's Flawed Analysis in Exhibit 8 ........................................... 56

2.  The Pfleiderer Report is Flawed Regarding the Term *Book Value*.................. 57

I.  Pfleiderer Report's Opinions in Section VI Related to "Benefits of the Acquisition" Are Flawed ........................................................................... 57

**Contains Highly Confidential Information**

# LIST OF EXHIBITS AND APPENDICES

## EXHIBITS

Exhibit A-1:    Undervaluation of Equity by Barclays as of September 19, 2008

Exhibit A-2:    Summary of Valuations of Experts

Exhibit B-1:    Calculation of Barclays Windfall

Exhibit B-2:    Calculation of Barclays Windfall – from Barclays' Acquisition Gain/Negative Goodwill, As Reported

Exhibit C-1:    Alternative Valuations of JPM Inventory Using Barclays 9-30 Exit Price Marks and JPM Custodial Price Marks

Exhibit C-2A:    Alternative Valuations of Initial Inventory Using Barclays 9-19 Exit Price Marks and BoNY Custodial Price Marks

Exhibit C-2B:    Alternative Valuations of Selected Securities in the Initial Inventory Using Barclays 9-19 Exit Price Marks and BoNY Custodial Price Marks

Exhibit C-3:    Excess of the "Fair Value of All Assets Received" over $45 Billion of the Federal Reserve/Barclays Repurchase Agreement Assets

Exhibit D-1:    Lehman "Mortgage and Mortgage Backed" Assets Acquired by Barclays

Exhibit E-1:    September 18, 19, and 20, 2008, Valuations of Federal Reserve/Barclays Repurchase Agreement Assets in Various Documents

Exhibit E-2:    Pricing coverage of Initial Inventory in Bloomberg, Capital IQ, and Interactive Data

Exhibit E-3:    Frequency of Price Changes in GFS from September 12 through September 19, 2008

Exhibit E-4:    Sample of Securities Discussed in Pfleiderer Report Appendix 4 Represents Less than 9% of Assets in the Initial Inventory

Exhibit F-1:    Incomplete Coverage in GFS for Initial and JPM Inventory on September 12, 2008

## APPENDICES

Appendix I:    Mark E. Zmijewski Curriculum Vitae

Appendix II:    Documents Relied Upon

**Contains Highly Confidential Information**

## I.    INTRODUCTION

1.    This report is submitted by Mark E. Zmijewski, the Leon Carroll Marshall Professor of
Accounting and Deputy Dean at The University of Chicago Booth Graduate School of Business.
I am also a founder and principal of Navigant Economics (Chicago Partners), a subsidiary of
Navigant Consulting, Inc., which is an economics consulting firm that specializes in the
application of accounting, economics, and finance to business consulting, legal, and regulatory
issues.  I discuss my qualifications in more detail in Section II and present my curriculum vitae
in Appendix I.

2.    I have been asked by counsel for the Movants to review and respond to the report of
Barclays' valuation expert, Professor Paul Pfleiderer, dated January 8, 2010 (the "Pfleiderer
Report"), which does not independently value any of the securities at issue, but accepts Barclays'
methodologies and procedures, and uses Barclays' data almost exclusively, and to render any
opinions that I form about that report, and analyze certain other related issues.[1,2]  In preparing
this report, I have reviewed various documents related to this issue, as cited in the text and
footnotes in this report and exhibits and/or Appendix II.[3]

---

[1] I submit this report on behalf of (a) Lehman Brothers Holdings, Inc. (the "Debtor" or "LBHI"); (b) James W.
Giddens, as Trustee for the Securities Investor Protection Act Liquidation of Lehman Brothers Inc. (the "Trustee");
and (c) the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. and its affiliated debtors
and debtors in possession (the "Creditors' Committee," and together with LBHI and the Trustee, the "Movants") in
connection with Movants' motions filed under Federal Rule of Civil Procedure 60(b) (the "Rule 60(b) Motions").  In
the Rule 60(b) Motions, Movants seek relief from the Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal
Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets
Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and
Unexpired Leases, dated September 19, 2008 and signed on September 20, 2008, (the "Sale Order").  In the Sale
Order, the Court approved the sale (the "Sale Transaction") of certain assets of LBHI, LB 745 LLC, and Lehman
Brothers Inc. ("LBI," and together with LB 745 LLC and LBHI, the "Sellers," and together with LBHI's various
other foreign and domestic affiliates, "Lehman") to Barclays Capital Inc. ("Barclays") in accordance with the terms
set forth in an Asset Purchase Agreement, dated as of September 16, 2008, ("Asset Purchase Agreement" or "APA",
(Deposition Exhibit 1)) and related agreements, modifications and purported "clarification[s]" thereof.  I note that
the Asset Purchase Agreement (Deposition Exhibit 1) was modified by the First Amendment to the Purchase
Agreement (Deposition Exhibit 24) and the "Clarification Letter" (Deposition Exhibit 25).  The Debtor, the Trustee,
and the Creditors' Committee each filed complaints against Barclays in November 2009.

[2] According to paragraph 2 of the Pfleiderer Report, he was asked to analyze:  (i) "issues related to the structure and
pricing of the Acquisition"; (ii) "the risks associated with the Acquisition"; (iii) "the valuation of certain assets and
liabilities transferred to Barclays as part of the Acquisition"; (iv) "the benefits of the Acquisition for the LBHI and
LBI estates, for Lehman's creditors and customers, and for the general public"; and (v) "the accuracy and
thoroughness of Barclays' accounting for the Transaction."

[3] If I receive additional data, facts, or information, I will review, evaluate, and analyze these additional data, facts, or
information as they become available, including, but not limited to, the report(s) of experts in this matter.  I may
modify or supplement my report as necessary in response to any newly produced evidence or in rebuttal to any

---

**Contains Highly Confidential Information**

## II.    <u>SUMMARY OF QUALIFICATIONS</u>

3.       I specialize in the areas of accounting, economics, and finance as they relate to financial analysis, security analysis, and valuation.  I have been on the faculty of The University of Chicago Booth School of Business since 1984.  Currently, I am the Leon Carroll Marshall Professor of Accounting (since 1999) and Deputy Dean (since 1996) at The University of Chicago Booth School of Business.  I am also a founder and principal of Chicago Partners, a subsidiary of Navigant Consulting, Inc., an economics consulting firm that specializes in the application of accounting, economics, and finance to business consulting, legal, and regulatory issues.

4.       I was awarded my B.S. in 1976, my M.B.A. in 1981, and my Ph.D. with a major in accounting and minors in economics and finance in 1983, all from the State University of New York at Buffalo.  In addition to my positions on the faculty of the University of Chicago, I have taught at the State University of New York at Buffalo and at York University in Toronto, Canada.  I am the former Associate Dean for Ph.D. Studies and former Executive Director of the Center for Research in Securities Prices at The University of Chicago Booth School of Business.

5.       I have been an Associate Editor of The Accounting Review, and I have been on the Editorial Boards of both the Journal of Accounting Research and The Accounting Review.  In my research, I focus on firm valuation and the ways in which various capital market participants use information to value firms.  I have published various articles in academic journals in the area of accounting as it relates to financial economics.  In my teaching and consulting activities, I focus on (among other things) financial accounting, financial analysis, security analysis, firm valuation, solvency, lost profits calculations, and other damages analyses.  In my analyses of such issues, I regularly review and assess a company's strategies, business models, business plans, tactical plans (such as marketing plans and production plans), and external data related to these strategies, models, and plans.

6.       I have worked – either as a consultant or an expert – on issues that include the following: measuring marginal costs and profits; revenue recognition; assessing bankruptcy and solvency; preparing and assessing business plans; measuring interest rates and rates of returns; valuing

---

further opinions offered by Barclays' witnesses.  I also reserve the right to do a more comprehensive CUSIP-by-CUSIP valuation, if necessary, of those securities I did not independently value in preparing my report.

**Contains Highly Confidential Information**

companies, parts of companies, synergies/efficiencies, and intangible assets – such as patents – using widely accepted valuation methodologies and capital market assessments; assessing the effect of information disclosures on security prices; and measuring damages using widely accepted valuation methodologies and capital market assessments, in a variety of litigation contexts and industries.

7.      Navigant Economics (Chicago Partners) charges an hourly rate of $940 for my time. Other Navigant Economics (Chicago Partners) professionals, working under my direction and supervision, assisted in my analyses and Navigant Economics (Chicago Partners) was or will be compensated for their work at their customary hourly rates. Our compensation is not contingent in any way upon the outcome of this matter.

8.      My qualifications, including my publications and my testimonial experience within the last four years, are detailed in my curriculum vitae, which is attached to this report in Appendix I.

## III.    <u>SUMMARY OF OPINIONS</u>

9.      As detailed in Section IV of my report, the conclusions and opinions throughout the Pfleiderer Report are generally unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently. The lack of appropriate and reasonable analyses, and the insufficient support and foundation, results in flawed and inappropriate conclusions and opinions. Further, the Pfleiderer Report contains various conclusions and opinions that should not be considered in the economic analysis of the Movants' claims.

10.     This section contains my overall opinions, including (i) Barclays' undervaluation of certain assets transferred to it in the Sale Transaction; (ii) quantification of the mortgage securities Barclays acquired from Lehman; and (iii) opinions related to the Pfleiderer Report.

11.     My analysis of Barclays' valuation of certain securities acquired in the Sale Transaction and of the Pfleiderer Report results in the following conclusions:

Contains Highly Confidential Information

**Opinion 1:** Movants engaged valuation experts with expertise in valuing certain types of securities that are at issue in this matter.[4]  These securities are assets in the Initial Inventory and the JPM Inventory, but do not include other assets at issue in this matter. Based on my analyses and the analyses of Movants' valuation experts, I show that Barclays undervalued these securities by at least $5.112 billion as of September 19, 2008.[5, 6]  (*See* Section IV.A. and Exhibit A-2.)  I summarize Barclays' undervaluation below:

---

[4] *See* expert reports of Mr. John Olvany, Mr. Mark Slattery, and Mr. Joseph Schwaba, dated March 15, 2010.

[5] The securities valued are captured by the following specific line items in BCI-EX-00115843 (Deposition Exhibit 377A) and BCI-EX-00109154 (Deposition Exhibit 88B), hereinafter referred to as "Barclays Opening Balance Sheet": (i) "Initial Inventory – PCG mid", which is comprised of the securities listed by CUSIP in BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A), hereinafter referred to as "Initial Inventory;" and (ii) "JPM Inventory – PCG mid" is comprised of the securities listed by CUSIP in Annex A BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A), hereinafter referred to as "JPM Inventory."  These line items represent (a) the Repo Collateral, as defined in the Pfleiderer Report,  which includes (i)  the securities listed on Schedule A to the Clarification Letter ("Schedule A") transferred by Lehman to Barclays on September 18, 2008 (Pfleiderer Report ¶5. a.) through the repurchase agreement referred to as "Repurchase Agreement" or "Fed Replacement Repo"), and (ii) the securities listed on Annex A ("Annex A") to the Settlement Agreement between JPMorgan Chase ("JPMorgan"), Barclays, and the Trustee, dated December 5, 2008 (the "Settlement Agreement" (Deposition Exhibit 205)); and, (b) some of the clearance box securities on Schedule B to the Clarification Letter ("Schedule B").

Within the data presented in Initial Inventory and JPM Inventory, there are 11,938 CUSIPs (11,845 unique CUSIPs) in the Initial and JPM Inventories.  There are 10,743 CUSIPs (10,704 unique CUSIPs) in the Initial Inventory and 1,195 CUSIPs (1,195 unique CUSIPs) in the JPM Inventory.

These files reference "PCG" marks.  "PCG" refers to Barclays' Product Control Group, which "focuses on determining marks used for purposes of preparing monthly financial statements and also monitors traders' daily marking to assure the integrity of these marks."  (Pfleiderer Report, ¶52 and footnote 51).

I use the term "Repo Collateral" as it is defined in the Pfleiderer Report:  " . . . inventory of trading portfolio securities [Barclays] acquired when it replaced the Federal Reserve Bank of New York as LBI's primary source of financing on Thursday, September 18, 2008 (the 'Repo Collateral')."  (Pfleiderer Report, ¶5. a.)  Table 2 of the Pfleiderer Report sets forth what is included within the term.  The Pfleiderer Report uses the term "Schedule B breakout analysis" to describe certain assets removed from its analysis of the Repo Collateral. (Pfleiderer Report, footnote 77).

[6] Movants' valuation experts utilized third-party pricing data (Bloomberg, FactSet, Capital IQ, and Interactive Data) to value 4,515 securities, and Bank of New York/Mellon ("BoNY") marks were used to value 1,520 of the 11,938 CUSIPs included in the Initial Inventory and JPM Inventory.

---

**Contains Highly Confidential Information**

| Summary of Barclays' Undervaluation of Initial and JPM Inventory (amounts in billions of dollars) | |
| --- | --- |
| Residential Mortgage Backed Securities | $0.941 |
| Corporate Bonds | $0.366 |
| Emerging Markets | $0.003 |
| Equities | $0.541 |
| Rates | $0.631 |
| Principal Mortgage Trading Group | $0.974 |
| | |
| JPM Inventory (Annex A Assets) | $1.657 |
| Total Barclays' Undervaluation | $5.112[7] |

**Opinion 2:**  In simple terms, in the Rule 60(b) Motions, Movants claim that, based on the Court-approved transaction, Barclays received more assets than were approved by the Court in the Sale Transaction, paid less for those assets than was represented to the Court, and thus, benefited from the Sale Transaction beyond what was approved by the Court (the "Barclays Windfall").[8]  The Pfleiderer Report fails to compare the Court-approved transaction to the transaction that actually occurred, and thus, should not be considered in the economic analysis of the Movants' overall claims.  Using the Movants' valuation experts to value the Lehman financial assets acquired by Barclays and assuming a Court-approved Sale Transaction that included a payment of $1.850 billion by Barclays to Lehman, the Barclays Windfall is at least $13.051 billion.  (*See* Section IV.B and Exhibit B-1.)  I summarize these calculations below:

---

[7] $0.186 billion of this amount results from undervaluation of CUSIPs contained in "Sched B LehOBS 5.xls," referred to as "Schedule B breakout analysis" in the Pfleiderer Report.  (Pfleiderer Report, footnote 77).

[8] *See* Movants' Rule 60(b) Motions.

**Contains Highly Confidential Information**

| **Summary of Barclays Windfall** | |
| --- | --- |
| | Value ($ Billions) |
| **Assets** | |
| Total Financial Assets on Barclays Opening Balance Sheet | 50.165 |
| Adjusted for: Unrecognized, Undelivered Assets | 0.775 |
| Adjustment to Valuation of OCC Assets (net of liabilities) | 0.103 |
| *Adjusted Barclays Opening Balance Sheet and Claimed Assets* | 51.043 |
| Adjustment for Barclays' Undervaluation | 5.112 |
| *Adjusted Total Financial Assets* | 56.155 |
| Non Financial Assets | 2.085 |
| *Adjusted Total Assets Acquired* | 58.239 |
| | |
| **Reported Cash Consideration and Liabilities Assumed** | |
| Total on Barclays Opening Balance Sheet | 47.474 |
| Adjusted Comp (severance subtracted) | (0.450) |
| Adjusted Cure | 0.014 |
| *Adjusted Cash Consideration and Liabilities Assumed* | 47.038 |
| | |
| **Adjusted Acquisition Gain/Negative Goodwill** | 11.201 |
| | |
| **Net Transaction Value to Barclays[9]** | (1.850) |
| | |
| **Barclays Windfall[10]** | 13.051 |

**Opinion 3:**   In reviewing documents and testimony related to Barclays' acquisition accounting, I have determined Barclays used a December 22, 2008 closing price to account for the JPM Inventory.  I calculate the effect of Barclays using December 22, 2008 closing prices to value the JPM Inventory instead of the time of the Sale Transaction.[11]  My analyses document that Barclays' undervaluation is at least $1.657 billion.  (*See* Section IV.C and Exhibit C-1.)

---

[9] See expert report of Harrison J. Goldin dated March 15, 2010 (the "Goldin Report") describing the net value of the transaction to Barclays.

[10] I am assuming that all of these amounts reflect the same concept of value.

[11] The majority of the Repo Collateral was transferred to Barclays on the evening of September 18, 2008. (Declaration of Shari D. Leventhal, Federal Reserve Bank of New York, ¶¶11-15 (Deposition Exhibit 444).)  The Sale Hearing occurred on September 19, 2008.  (Hearing Transcript, September 19, 2008.)  The Sale Order was approved in the early hours of September 20, 2008.  (Hearing Transcript, September 19, 2008 and Sale Order [Docket No. 258].)  Paragraph 4.1 of the APA states:  "Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder

**Contains Highly Confidential Information**

**Opinion 4:**  The Pfleiderer Report provides insufficient foundation to reject, for purposes of valuing the Repo Collateral, contemporaneous marks from JPMorgan and Bank of New York/Mellon ("BoNY"), who were the tri-party collateral agents in the Fed Repo and Fed Replacement Repo, respectively.[12, 13]  Using the BoNY and JPMorgan price marks to value these securities, Barclays underpaid for assets it acquired from Lehman in the Fed Replacement Repo by at least $4.418 billion.  (*See* Section IV.C and Exhibit C-3.)

**Opinion 5:**  Using Barclays' own calculations, Barclays underpaid for assets it acquired from Lehman in the Fed Replacement Repo by at least $545.8 million.[14]  (*See* Section VI.C and Exhibit C-3.)

**Opinion 6**:  A comparison of the mortgages in the Global Funding System ("GFS") as of September 16, 2008 totaling approximately $6 billion and the schedules setting forth the positions transferred to Barclays demonstrate that Barclays actually received more than two-thirds of the value of all Lehman mortgages in GFS.[15]  The custodial valuation as of September 19, 2008 of the Lehman mortgages acquired by Barclays is $4.034 billion,

---

shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date." (Deposition Exhibit 1).  I was advised by Movants' Counsel to utilize September 19, 2008, ("Barclays Windfall Date") as the valuation date in this matter.

[12] I use the terms "marks," "quotes," and "prices" herein consistent with their definitions in footnote 22 of the Pfleiderer Report.

[13] "JPMorgan Chase is a leading global financial services firm with assets of $2 trillion and operations in more than 60 countries. The firm is a leader in investment banking, financial services for consumers, small business and commercial banking, financial transaction processing, asset management, and private equity." (http://www.jpmorganchase.com/corporate/About-JPMC/about-us.htm, last visited March 3, 2010.)

BoNY is the Bank of New York Mellon which ". . . is a leading asset management and securities services company, uniquely focused to help clients manage and move their financial assets and succeed in the rapidly changing global marketplace. Headquartered in New York, The Bank of New York Mellon has $22.3 trillion in assets under custody or administration and $1.1 trillion under management." (http://www.bnymellon.com/about/index.html, last visited March 3, 2010.)

[14] *See* Pfleiderer Report, Table 2.

[15] GFS "served as a central warehouse for pricing and other data from multiple special purpose database systems also used by LBI." (Pfleiderer Report, ¶32.)  It is also sometimes referred to as Global Finance System, Global Financing System, or Global Financial System.  Of the 11,938 CUSIPs transferred to Barclays, 8,468 were included in GFS.  (*See* Exhibit E-3.)

---

**Contains Highly Confidential Information**

which represents 67.1% of the $6.014 billion value of all Lehman mortgages in GFS as of September 16, 2008.  (*See* Section IV.D and Exhibit D-1.)

**Opinion 7:**  Section II of the Pfleiderer Report provides insufficient foundation and analyses and fails to use accepted and consistent methodologies to support the opinions that there was no $5 billion discount in the Fed Replacement Repo.  Barclays does not present its own independent expert valuation to substantiate the conclusion that ". . . the Repo Collateral was worth *at most* the approximately $45.5 billion at which Barclays accounted for it in its 2008 Results Announcement summary of the Acquisition."[16]  (*See* Section IV.E.)

**Opinion 8:**  The opinion in Section III of the Pfleiderer Report that ". . . the Movants' assertion of a secret $5 billion discount from inception is implausible" is flawed and lacks foundation.[17]  To the contrary, Movants' assertion of a $5 billion discount from inception is possible.  (*See* Section IV.F.)

**Opinion 9:**  The Pfleiderer Report argues in Section IV that Barclays' "… immense financial and business risks …" should be considered in an economic analysis of Movants' claims.[18]  As I explain and document below, and as acknowledged in the Pfleiderer Report, Barclays was aware of these risks when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall.[19]  (*See* Section IV-G.)

**Opinion 10:**  The Pfleiderer Report erroneously concludes in Section V that "[t]he fact that Barclays reported an accounting gain on the Acquisition does not indicate that Barclays received a secret or unfair discount on the Repo Collateral, nor does it imply

---

[16] Pfleiderer Report, ¶5. a.

[17] Pfleiderer Report, footnote 61, p. 45.

[18] Pfleiderer Report, ¶5. b.

[19] Deposition of Robert Edward Diamond, Jr., September 11, 2009, 52:22-53:8, 53:20-22, 54:4-6, 59:12-18.  Mr. Diamond is president of Barclays PLC and chief executive of the investment banking and investment management businesses.  (*Id*. at 7:14-20.)

Deposition of John Varley, September 3, 2009, 24:17-20.  Mr. Varley is Chief Executive Officer of Barclays.  (*Id*. at 5:14-15.)

**Contains Highly Confidential Information**

that Barclays earned an unexpected or unreasonable profit from the Transaction."[20]  This argument is not supported by appropriate and reasonable analyses.  Based on the Court approved Sale Transaction as described in the Goldin Report, Barclays' accounting gain on the Sale Transaction is consistent with and indicates a Barclays Windfall.  (*See* Section IV-H.)

**Opinion 11:**  The Pfleiderer Report argues that certain potential benefits from the transaction should be considered in an economic analysis of Movants' claims.[21]  As I explain and document below, to the extent such benefits resulted from the transaction, the Court and others attending the Sale Hearing acknowledged these types of benefits when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall.  (*See* Section IV-I.)

**Opinion 12:**  The Pfleiderer Report argues that without Barclays' acquisition of Lehman, "… it is virtually certain that the LBHI and LBI estates, Lehman's creditors, Lehman's customers, and public financial markets all would have been worse off."[22]  As I explain and document below, to the extent there were benefits to the transaction, the Court and others acknowledged them when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall.  (*See* Section IV-I.)

## IV.    OPINIONS

### A.  RESULTS OF MOVANTS' INDEPENDENT VALUATIONS OF REPURCHASE AGREEMENT SECURITIES DOCUMENTING BARCLAYS' UNDERVALUATION OF THESE SECURITIES

12.    In this section, I discuss the basis for the following opinion:

**Opinion 1:**  Movants engaged valuation experts with expertise in valuing certain types of securities that are at issue in this matter.[23]  These securities are assets in the Initial

---

[20] Pfleiderer Report, ¶5. c.

[21] Pfleiderer Report, ¶5. d.

[22] Pfleiderer Report, ¶5. d.

[23] *See* expert reports of Mr. John Olvany, Mr. Mark Slattery, and Mr. Joseph Schwaba dated March 15, 2010.

---

**Contains Highly Confidential Information**

Inventory and the JPM Inventory, but do not include other assets at issue in this matter. Based on my analyses and the analyses of Movants' valuation experts, I show that Barclays undervalued these securities by at least $5.112 billion as of September 19, 2008.

13.    The Respondents did not engage any experts to independently value *any* of the securities at issue in this matter.  The Pfleiderer Report inappropriately argues in favor of such a decision by Respondents, concluding that other independent valuations are not useful to assess the valuation of these assets:  "… it is highly unlikely that such a procedure would lead to better marks than the marks developed by Barclays.  Rather, such a procedure could in the end produce *less* reliable marks for several reasons."[24]  As I explain below, none of the reasons in the Pfleiderer Report should be considered in an economic analysis and quantification of the Barclays Windfall.  The Pfleiderer Report's reasoning is unsupported by the facts, and such a view eliminates an important process of economic discovery that occurs when experts engaged by each side in the litigation have an opportunity to present their views and comment on the views of the opposing side's experts.

14.    Movants chose to engage valuation experts with expertise in valuing specific types of securities.  I am the Movants' expert on equities.[25]  The Movants' other valuation experts are Mr. John Olvany, Mr. Mark Slattery, and Mr. Joseph Schwaba.[26]  Counsel for the Movants asked these experts, based on their individual expertise, to provide a valuation of securities in the Initial Inventory.  Together, Navigant Economics (Chicago Partners) experts valued all securities in the Initial Inventory.

15.    Consistent with the valuation approach used by Barclays to value securities in its Opening Balance Sheet, experts valued these securities to reflect "fair value" as defined by International Accounting Standard 39 and Statement of Financial Accounting Standards No.

---

[24] Pfleiderer Report, ¶60.

[25] In addition, for the value of the JPM (Annex A) Inventory, I calculate the JPMorgan value as of September 19, 2008, that I discuss below in Sections IV.C and IV.E of my report.

[26] *See* expert reports of John Olvany, Mark Slattery, and Joseph Schwaba dated March 15, 2010 for valuation.  *See also* expert report of Mr. John Garvey dated March 15, 2010 for discussion regarding adjustments of values from mid to bid.

**Contains Highly Confidential Information**

157.[27, 28]  Movants assert that the appropriate valuation date is September 19, 2008, which is the valuation date used by the experts.[29]

## 1.  Valuation of Equities

16.     In this section, I describe the valuation of the equities.  These securities consist of 4,028 CUSIPs, which Barclays valued at $9.343 billion, after adjusting the values to bid prices (exit price marks).[30, 31]  Barclays also valued these securities as of September 19, 2008 but did not make the bid price adjustment.  The Barclays September 19, 2008 value of these securities without the bid price adjustment is $10.015 billion, of which $1.163 billion (11.6%) of these securities are convertible securities and the remainder, $8.852 billion (88.4%) are non-convertible equities.[32]

17.     Barclays used its September 22, 2008 prices for its opening balance sheet valuation.[33]  Barclays used these prices for the convertible securities without any adjustment.  For the non-convertible equities, Barclays applied a factor to adjust these prices to bid prices (exit price marks).  Barclays explained its adjustment approach in an email to its auditor dated December 12, 2008:

---

[27] *See* expert report of John Garvey dated March 15, 2010 (discussing the valuation approach used by Barclays in its Opening Balance Sheet and the related accounting standards, PwC's audit of Barclays Opening Balance Sheet, and the opinions on book value and the analysis of negative goodwill contained in the Pfleiderer Report).

[28] International Accounting Standard 39 *Financial Instruments: Recognition and Measurement,* ("IAS 39").  *See* expert report of John Garvey, dated March 15, 2010.

Statement of Financial Accounting Standards No. 157 *Fair Value Measurements,* ("SFAS 157").  *See* expert report of John Garvey dated March 15, 2010.

[29] Based on instructions from Movants' Counsel, I have utilized September 19, 2008, as the valuation date in this matter.

[30] Pfleiderer Report, Table 1.

[31] "Committee on Uniform Securities Identification Procedures is a body which provides identifying numbers for U.S. and Canadian securities." (http://glossary.reuters.com/index.php/CUSIP_Numbers, last visited February 22, 2010).

[32] Initial Inventory.

[33] Initial Inventory.  *See* BCI-EX-00218503 (email from Marcus Morton of Barclays to Jon Holloway of PWC, dated December 12, 2008, and with subject line, "RE: Lehman Equity Portfolio").

---

**Contains Highly Confidential Information**

The values that we receive for the Equity prices are based on last traded. For simplicity we have assumed that these are mids and so we need to make an adjustment to move these to the bid side of the market. A more conservative assumption would be that the prices are offers (which is [sic] a rapidly falling market is probably more realistic) which would obviously lead to a larger adjustment. Based on an analysis of the securities we were able to obtain bid/offer spreads for about 2100 of the 3700 securities which had an average bid/offer of 2.64%. This again would be a conservative estimate as the securities with a quoted bid offer would most likely be the most liquid and hence trading at the tightest spreads.[34]

18.    I conservatively adopt the Barclays approach as described in this email. I use Barclays' valuation of the equities as of September 19, 2008, which are the end of day prices and not adjusted to bid prices (exit price marks). I adjust the Barclays September 19, 2008 valuation of the non-convertible equities to bid prices (by using a liquidity adjustment) in the following way. For 2,106 (56.4%) of the non-convertible equity CUSIPs, which represents 88% ($7.787 billion out of $8.852 billion) of the September 19, 2008 value of the non-convertible equities, I was able to obtain Bloomberg prices as of that date.[35, 36] I estimate the exit price using the simple average percentage bid-ask spread of the 2,106 non-convertible equity CUSIPs for which Bloomberg data are available on September 19, 2008.[37]

---

[34] *See* BCI-EX-00218503 (email from Marcus Morton of Barclays to Jon Holloway of PWC, dated December 12, 2008, and with subject line, "RE: Lehman Equity Portfolio"). Barclays also describes a similar approach to adjust its valuation of these securities to exit price marks based on the December 18, 2008, and September 22, 2008, pricing. (BCI-EX-00255172).

[35] Barclays classifies 4,028 CUSIPs as Equities. I restrict the sample for calculation in the following steps. First, I eliminate all convertible equities, which leaves 3,731 CUSIPs. Then, I select CUSIPs with non-negative bid price, ask price, and last price from Bloomberg, leaving 2,295 CUSIPs. Further restricting to CUSIPs with non-negative bid-ask spread, there are 2,253 CUSIPs. The final sample set is the 2,106 CUSIPs for which the ratio of the bid-ask spread to the PCG 9-19 price is ≤ 50%.

[36] My percentage coverage of 88% is similar to the percentage coverage of 86.1% that Barclays collected in December 18, 2008, for these securities. (*See* BCI-EX-00255172).

[37] I conservatively adopt the Barclays approach to measure the bid-ask spread percentage, which appears to be the difference between the ask price and bid price divided by last price. (BCI-EX-00255172). Barclays used the simple average bid-ask spread percentage. Because the distribution of this percentage has some large positive values and a skewed distribution (the minimum ratio is bounded by zero and the maximum ratio is not bounded), the median ratio is a more appropriate measure of central tendency. The median bid-ask spread percentage for September 19 is 0.24% versus the average of 1.48%. In addition, if the actual holdings (e.g., shares) differs based on the bid-ask spread percentage, the weighted average is the more appropriate measure. The weighted average bid-ask spread percentage for September 19 is 0.41%.

**Contains Highly Confidential Information**

19.    I show the effect of using the Barclays September 19, 2008 valuation in Exhibit A-1.
Barclays September 19, 2008 valuation of the equity securities is $10.015 billion.  My
adjustment from last price to bid price is $0.131 billion, resulting in an adjusted September 19,
2008 valuation of $9.884 billion.  Barclays September 22 exit price market valuation is $9.343
billion, resulting in a difference of $0.541 billion.  This amount, $0.541 billion, represents an
increase in the "fair value of all assets received" and thus the amount of the excess of the "fair
value of all assets" received over $45.0 billion.[38]

### 2.  Valuations of Navigant Economics (Chicago Partners) Valuation Experts

20.    The other valuation experts conducted valuations of a subset of securities included in the
Barclays inventory.  See the individual expert reports for further explanation of their selection
process.  I show the results of the valuations from these experts in Exhibit A-2.  See Panel A of
the exhibit for Movants' expert John Olvany's valuation results.  See Panel B of the exhibit for
Movants' expert Mark Slattery's valuation results.  See Panel C of the exhibit for Movants'
expert Joseph Schwaba's valuation results.  See Panel D of the exhibit for my valuation results
for equities in the Initial Inventory and the JPM Inventory.  I aggregate the valuations of all
valuation experts in Panel E of Exhibit A-2.

### B.  THE PFLEIDERER REPORT'S FAILURE TO COMPARE THE COURT-APPROVED TRANSACTION TO THE TRANSACTION THAT ACTUALLY OCCURRED – THE BARCLAYS WINDFALL

21.    In this section, I discuss the basis for the following opinion:

**Opinion 2:**  In simple terms, in the Rule 60(b) Motions, Movants claim that, based on the
Court-approved transaction, Barclays received more assets than were approved by the
Court in the Sale Transaction, paid less for those assets than was represented to the Court,
and thus, benefited from the Sale Transaction beyond what was approved by the Court
(the "Barclays Windfall").[39]  The Pfleiderer Report fails to compare the Court-approved
transaction to the transaction that actually occurred, and thus, should not be considered in
the economic analysis of the Movants' overall claims.  Using the Movants' valuation

---

[38] I use "fair value of assets received" consistent with its usage in the last line in Table 2 of the Pfleiderer Report.

[39] *See* Movants' Rule 60(b) Motions.

Contains Highly Confidential Information

experts to value the Lehman financial assets acquired by Barclays and assuming a Court-approved Sale Transaction that included a payment of $1.850 billion by Barclays to Lehman, the Barclays Windfall is at least $13.051 billion.

22.    In the Rule 60(b) motions, Movants claim that "(i) material components of the transaction were not disclosed to the Court before and at the Sale Hearing; and (ii) the transaction that purported to close on September 22, 2008 differed materially from the transaction explained to and approved by the Court at the Sale Hearing."[40]

23.    Thus, based on the Movants' allegations, the appropriate measurement of the Barclays Windfall for a particular type of asset is a comparison of the value disclosed to the Court to the value Barclays received.  The Pfleiderer Report does not analyze the Court-approved Sale Transaction – for example, what the Court approved with respect to the assets included in the acquisition and how those assets were to be valued.  Thus, no opinion or conclusion in the Pfleiderer Report addresses or rebuts or can rebut the Movants' overall claim that, based on the Court-approved transaction, Barclays acquired more assets than it should have acquired, paid less than it should have paid for those assets, and received a benefit from the Sale Transaction that was not known or approved by the Court ("Movants' Overall Claim").  As a result, the Pfleiderer Report should not be considered in the economic analysis of the Movants' Overall Claim.

24.    As I discuss above, Movants engaged valuation experts with expertise in valuing certain types of securities that are at issue in this matter.  These securities are assets in the Initial Inventory and the JPM Inventory, but do not include other assets at issue in this matter.  I have made a comparison of the fair value of total assets received by Barclays to the net value of the transaction to Barclays ("Net Transaction Value") as represented to the Court.[41]  As I show in Exhibit B-1, Barclays opening balance sheet shows that it acquired various Lehman financial assets with an opening balance sheet value of $50.165 billion.[42]  In addition, as I understand

---

[40] Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, September 15, 2009, ¶1.  (Deposition Exhibit 495).

[41] I understand that the Net Transaction Value presented at the Sale Hearing is $1.85 billion.  *See* expert report of Harrison J. Goldin dated March 15, 2010.

[42] Pfleiderer Report, ¶114 (without rounding).

**Contains Highly Confidential Information**

from Counsel for the Movants, Barclays is claiming $775 million in additional financial assets from Lehman.[43]  I have also adjusted the Options Clearing Corporation ("OCC") assets, shown net of liabilities, by $103 million which reflects an acquisition date of September 19, 2008.[44]  Moreover, based on my analyses and the analyses of these valuation experts, I show that Barclays' valuation of the Initial Inventory and JPM Inventory was undervalued by at least $5.112 billion (*see* Section IV-A).[45]  This results in a value of the financial assets acquired by Barclays of at least $56.155 billion as of September 19, 2008.[46]

25.    In addition, Barclays acquired certain non-financial assets from Lehman.  The opening balance sheet value of these assets is $2.085 billion (*see* Exhibit B-1).  I exclude the real estate value in this exhibit because the amount paid for those assets is not at issue in this matter and is assumed to be equal to the amount paid.[47]  However, Exhibit B-1 shows that other non-financial assets acquired from Lehman are valued at $2.085 billion.  Thus, even ignoring the real estate assets, adding in the $2.085 billion value of non-financial assets increases the value of the assets acquired by Barclays to at least $58.239 billion.

---

[43] Mr. Romain notes additional undelivered, unrecognized assets totaling $765 million in collateral related to Lehman affiliates' futures accounts ($460 milion), OCC margin ($80 million), and unencumbered clearance box assets ($162 million) and other principal and interest ($63 million) (Deposition Exhibit 549A, p. 4).  In his typewritten notes prior to his 2010 deposition, Mr. Romain updates the Lehman affiliate amount to $470 million (Deposition Exhibit 534A, p. 8).  After updating for this change, I calculate additional undelivered, unrecognized assets totaling $775 million (470+162+80+63).

[44] I have reviewed the memorandum regarding the valuation of the OCC trading liabilities (BCI-EX-(S)-00110233-8) and note the use of a mid value on September 22, 2008 and an adjustment to bid using data from September 19, 2008.  In order to be consistent, I have adjusted the mid value to September 19, 2008 using the associated native file (bci-ex-(s)-00110231.accdb).  The resulting difference lowers the mid value trading liability by $103 million.  I also reviewed the $2.3 billion of OCC related assets as presented on the Barclays Opening Balance Sheet.  I determined they reflect the balance on 9/19/08 by reviewing an email dated 9/21/2008 attaching a 9/18/08 OCC statement detailing cash of $1.082B, letters of credit of $0.252B and treasuries with a market value of $0.977B for a total 9/18/08 balance of just over $2.3B (BCI Exhibit 263 (BCI-EX-(S)-00131273-318 at 303 through 306)).

[45] I have applied a liquidity adjustment to the JPMorgan price marks; however, JPMorgan's price marks may already reflect exit prices and not need such an adjustment.  If the liquidity adjustment is not needed, this value would increase to $5.504 billion.  In addition, Movants' valuation experts have noted that Barclays was typically aggressive in its discounting; therefore, by using Barclays' liquidity adjustments, my estimates of the value of the financial assets acquired by Barclays is conservative.  (*See* expert reports of Mr. John Olvany, Mr. Mark Slattery, and Mr. Joseph Schwaba, dated March 15, 2010).

[46] *See* footnote 11.

[47] As outlined in paragraph 4 of the Clarification Letter between Barclays and Lehman dated September 20, 2008, consideration for 745 Seventh Avenue, the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center was determined to be $1.29 billion after consideration of "available appraisal information."  (Deposition Exhibit 25).

---

**Contains Highly Confidential Information**

26.     As I show in the exhibit, the consideration originally reported by Barclays for these assets (cash consideration and liabilities assumed) is $47.474 billion.  This consideration consists of the $45.0 billion Repo liability, a cure payment of $224 million, a compensation liability of $2.0 billion, and cash consideration of $250 million.[48]  I have adjusted the compensation liability to $1.55 billion and cure costs to $238 million.[49]  Thus, Barclays had, as of September 19, 2008, an excess value of assets acquired over consideration paid of at least $11.201 billion.

27.     I understand that, according to the Court-approved Sale Transaction, Barclays would have paid $1.85 billion in consideration above the value of the assets received.[50]  Thus, the Barclays Windfall is at least $13.051 billion (*see* the last line in Exhibit B-1).[51]

---

[48] As stated in the Barclays Opening Balance Sheet.

[49] Cure payment of $238 million provided by Counsel for Movants.  (BCI Exhibit 171 attaching BCI-EX-00077272-86).

Compensation liability of $1.55 billion provided by Counsel for Movants.  I have reviewed Deposition Exhibit 280B and the Deposition of Paul Exall.  I note several items that are not related to bonuses on Deposition Exhibit 280B including severance of $314 million (Deposition Exhibit 280B), "ISP" awards to compensate for loss of value during 2009 Barclays ownership and associated taxes of $58 million (Deposition Exhibit 280B; Deposition of Paul Exall, August 27, 2009, 141:20-144:12), an acquisition buyout linked to future service and performance with Barclays and associated taxes of $56 million (Deposition Exhibit 280B), and miscellaneous payroll items totaling $12 million (Deposition Exhibit 280B).  If the Court were to determine that these items were excluded from the compensation associated with the asset sale to Barclays, the compensation liability would be reduced from $2 billion to approximately $1.55 billion (2-0.314-0.058-0.056-0.012).

[50] *See* expert report of Harrison J. Goldin dated March 15, 2010.

[51] The estimated gain of $13.051 billion reflects the Barclays reported goodwill of $4.17 billion (Barclays Opening Balance Sheet)  adjusted for the exclusion of Barclays transaction costs including deferred taxes, stamp duty and acquisition costs totaling $0.605 billion ($0.531 + $0.032 + $0.042, respectively) (Barclays Opening Balance Sheet), the exclusion of certain compensation amounts as represented by Movants' Counsel ($0.45 billion), reduced by the slight increase in cure costs from $224 million (Barclays Opening Balance Sheet) to $238 million (BCI Exhibit 171 attaching BCI-EX-00077272-86.) or (-$0.014 billion), the addition of certain unrecognized, undelivered assets demanded by Barclays and as represented by Movants' counsel ($0.775 billion), the adjustment to the valuation of OCC assets (net of liabilities) discussed above ($0.103 billion), and the addition of the Barclays Undervaluation ($5.112 billion).  Considered together $13.051 = 4.17 + 0.605 + 0.45 - 0.014 + 0.775 + 0.103 + 5.112 – (1.850)).  (*See* Exhibit B-2).

**Contains Highly Confidential Information**

C.  EFFECT OF ALTERNATE MARKS ON THE VALUE OF ASSETS IN THE
INITIAL INVENTORY AND JPM INVENTORY AND SPECIFICALLY ON THE
VALUE OF THE REPO COLLATERAL

28.    In this section, I discuss the basis for the following opinions:

**Opinion 3:**  In reviewing documents and testimony related to Barclays' acquisition
accounting, I have determined Barclays used a December 22, 2008 closing price to
account for the JPM Inventory.  I calculate the effect of Barclays using December 22,
2008 closing prices to value the JPM Inventory instead of the time of the Sale
Transaction.[52]  My analyses document that Barclays' undervaluation is at least $1.657
billion.

**Opinion 4:**  The Pfleiderer Report provides insufficient foundation to reject, for purposes
of valuing the Repo Collateral, contemporaneous marks from JPMorgan and BoNY, who
were the tri-party collateral agents in the Fed Repo and Fed Replacement Repo,
respectively.  Using the BoNY and JPMorgan price marks to value these securities,
Barclays underpaid for assets it acquired from Lehman in the Fed Replacement Repo by
at least $4.418 billion.

**Opinion 5:**  Using Barclays' own calculations, Barclays underpaid for assets it acquired
from Lehman in the Fed Replacement Repo by at least $545.8 million.

1.    Effect of Using December 22, 2008 as the Date to Value Certain Assets
Acquired in the Sale Transaction rather than the Date Barclays Had
Ownership of Those Assets

29.    I understand that Barclays has taken the position that the appropriate date to value the
JPMorgan Inventory (Annex A) is December 22, 2008.  According to the Pfleiderer Report, "The
actual value of this claim became determinable only on or about December 22, 2008, more than
three months after the initiation of the Fed Replacement Repo, upon consummation of the
December settlement among Barclays, JP Morgan Chase, and LBI."[53]

---

[52] See footnote 11.

[53] Pfleiderer Report, ¶17.

**Contains Highly Confidential Information**

30.    Movants have taken the position that September 19, 2008 is the appropriate date to value these securities for the purpose of this matter.[54]  In Exhibit C-1, I present the value of the JPMorgan inventory based on certain price marks as of various dates from September 17 to December 22, 2008.  According to JPMorgan price marks on September 17, the JPM Inventory had a value of $5.994 billion (column [C] of Exhibit C-1).[55]  I do not have JPMorgan price marks for September 19, 2008.  I calculate JPMorgan values using the JPMorgan values for September 17, adjusted by the change in clean price marks in GFS from September 17 to September 19 (column [D] of Exhibit C-1).[56]  To be conservative, I adjust the calculated JPMorgan September 19 value to incorporate Barclays' liquidity adjustment, which results in a value for the JPM Inventory of $5.397 billion (column [E] of Exhibit C-1).[57]

31.    When compared with Barclays' $3.740 billion valuation of the assets in Annex A on December 22, 2008 (column [A] of Exhibit C-1), the analysis shown in Exhibit C-1 documents that Barclays' valuation for these assets is understated based on the alternative price marks.  The amount of the undervaluation is at least $1.657 billion.

---

[54] *See* footnote 11.

[55] The $5.99 billion represents the value for the securities listed in Annex A.  (JPM Inventory).  It is separate from and excludes the $1.25 billion in cash that was also transferred as part of the Settlement Agreement.  (Deposition Exhibit 205; Hearing Transcript, December 22, 2008, 42:10-12).

The JPMorgan price marks in JPM Inventory were labeled as JPMorgan price marks as of September 30, 2008. However, after comparing these marks to the JPM files that Barclays received on September 18, 2008 with September 17, 2008 JPM Price Marks in an email from Ricky Policke of Lehman to John Haley of Barclays, I find the overall difference between the two marks is $2.04 out of $5.99 billion.  I conclude that the JPMorgan price marks in JPM Inventory must be the marks as of September 17, 2008 and not September 30, 2008.

[56] For CUSIPs overlapping between BCI-EX-(S)-00213996.xls and the GFS data, with positive trade date position and positive Clean Market Price on September 17 and September 19, I obtain the JPM 9-19 value by applying the percentage change in GFS prices from the 17th to the 19th to the JPM 9-17 value.

I also obtain an average price change by Barclays asset class using these CUSIPs, weighted by the JPM 9-17 value. For CUSIPs in BCI-EX-(S)-00213996.xls but not in the GFS data sample, I calculate the JPM 9-19 value by applying the weighted average price change by asset class to the JPM 9-17 value.

[57] To adjust "JPM Calculated Custodial Price Marks 9-19-08" to "JPM Calculated Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08", I take the liquidity adjustment from the "Liquidity" tab in BCI-EX-(S)-00213996.xls. I take the liquidity adjustment under the column heading "Liq Haircut", matching against each CUSIP by the column "Sub Type" in the "Liquidity" tab. I calculate the "JPM Calculated Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08" by multiplying the liquidity adjustment by "JPM Calculated Custodial Price Marks 9-19-08".  For the Equity asset class, I take the liquidity adjustment provided in BCI-EX-00255172 (0922 Equities Bid-Offer) of 4.32% and multiply one minus this adjustment by the respective Custodial and Barclays Mid-Point Price Marks on the dates specified.

---

**Contains Highly Confidential Information**

      2.   The Effect of Using Lehman, BoNY, and JPMorgan Price Marks to Value the
          <u>Assets Received and Barclays Windfall as Calculated by the Pfleiderer Report</u>

32.     In Section IV.E of my report, I document that the Pfleiderer Report's rejection of the

Lehman, BoNY, and JPMorgan price marks lacks foundation and support of adequate analysis.

In this section of my report, I reproduce Table 1 and Table 2 in the Pfleiderer Report and

document the value of the Initial Inventory using these alternative price marks.  Since Movants

assert that the appropriate valuation date is September 19, 2008, I present my calculations for

September 19, 2008.[58]  This analysis shows that using these alternative price marks increases

Barclays Windfall by as much as $6.821 billion.

33.     In Exhibit C-2A, I present an exhibit similar to Table 1 in the Pfleiderer Report, which

presents the value of the Initial Inventory based on certain price marks.  I present this valuation

as of September 19, 2008.  In addition to reproducing the valuations in the Pfleiderer Report, I

present alternative valuations based on Barclays calculated exit prices marks on September 19,

2008 and BoNY custodial price marks with Barclays' liquidity adjustment.[59]  In Exhibit C-2B, I

present an exhibit similar to Exhibit 6 in the Pfleiderer Report, which presents the value of

certain selected securities.[60]

34.     Exhibit C-2A shows that as of September 19, the BoNY price marks with Barclays

liquidity adjustment value the Initial Inventory at roughly $43.0 billion (column [D]).  However,

Barclays calculated exit price marks value the same portfolio at $41.145 billion (column [B]).  In

addition, Barclays recorded the value of the portfolio in its Opening Balance Sheet at $40.690

billion (column [A]).  Exhibit C-2B documents that for the selected assets, Barclays' price marks

are lower than BoNY price marks on September 19, 2008.

---

[58] See footnote 11.

[59] To adjust "BoNY Custodial Price Marks 9-19-08" to "BoNY Custodial Price Marks with Barclays Liquidity
Adjustment 9-19-08", I take the liquidity adjustment from the "Liquidity" tab in BCI-EX-(S)-00213995.xls.  I take
the liquidity adjustment under the column heading "Liq Haircut", matching against each CUSIP by the column "Sub
Type" in the "Liquidity" tab.  I calculate the "BoNY Custodial Price Marks with Barclays Liquidity Adjustment 9-
19-08" by multiplying the liquidity adjustment by "BoNY Custodial Price Marks 9-19-08".  For the Equity asset
class, I take the liquidity adjustment provided in BCI-EX-00255172 (0922 Equities Bid-Offer) of 4.32% and
multiply one minus this adjustment by the respective Custodial and Barclays Mid-Point Price Marks on the dates
specified.

[60] I used a series of filters to reproduce the figures in Pfleiderer Report Exhibit 6 and used the same filters for the
analysis based on alternative price marks.

---

**Contains Highly Confidential Information**

35.    In Exhibit C-3, I present an exhibit similar to Table 2 in the Pfleiderer Report, which presents the calculation of the "fair value of transferred securities" and the "fair value of all assets received" based on certain price marks.  In addition to reproducing the calculation in the Pfleiderer Report using Barclays price marks, I present alternative calculations of this value based on Exhibits C-1 and C-2A.  I present the calculation of the value of transferred securities using the Barclays price marks as presented in Table 2 in the Pfleiderer Report, alternative Barclays price marks, BoNY price marks, and JPMorgan price marks.

36.    Table 2 of the Pfleiderer Report is entitled "Aggregate Value of Assets Received From the Fed Replacement Repo" and summarizes the components of the transferred positions and cash received.[61]  I have included the data from Pfleiderer Report Table 2 in the first column of Exhibit C-3.  Table 2, as represented in the Pfleiderer Report, relies upon Barclays' valuations prepared for financial reporting purposes.[62]  The fair value of transferred securities is derived by valuing the transferred inventory at Barclays' exit price/bid marks ($42,605M + 3,917.9M - 2,086.5M), adding accrued interest ($345M), and subtracting the clearance box assets included in the transferred inventory which are unrelated to the Repo ($778.9M + 6.7M of associated interest).[63, 64]  The Pfleiderer Report then adds the cash proceeds of securities liquidated prior to transfer that were not included in the transferred inventory outlined above ($300M + $1,250M).[65]

---

[61] Pfleiderer Report, ¶¶62-63.

[62] Pfleiderer Report, ¶61.

[63] Transferred inventory at Barclays' exit price/bid marks is computed as follows:  $42,605M is identified as "Initial Inventory – PCG Mid" in Barclays Opening Balance Sheet.  Initial Inventory identifies slightly different amounts, $42,579M in BCI-EX-00099519 (Deposition Exhibit 86B) and $42,566M in BCI-EX-(S)-00213995 (Deposition Exhibit 641A).  $3,917.9M is identified as "JPM Inventory – PCG Mid" in Barclays Opening Balance Sheet.  JPM Inventory identifies a slightly different amount, $3,916.3M.  Gary Romain also references these documents as support for Barclays Opening Balance Sheet in his declaration dated January 26, 2010.  The reduction of $2,086M reflects the adjustment to exit price marks for both the Initial Inventory and the JPM Inventory (Barclays Opening Balance Sheet).  This adjustment is also shown separately with each group of inventory in Initial and JPM Inventory.

Accrued interest and clearance box assets identified in Romain Declaration, January 26, 2010, ¶18 (BCI Exhibit 357).

[64] A clearance box is defined as ". . . an account at either a depository or a custodial bank into which securities can be moved into or out of." (Deposition of James Hraska, January 15, 2010, 7:10-15).

[65] Mr. Romain states that the $300 million reflects "matured securities within the repo collateral on Schedule A." (Romain Declaration, January 26, 2010, ¶18 (BCI Exhibit 357)).

---

Considered together, the result is total asset value of $45,545.8M.  In Exhibit C-3, I have added a comparison of this value to the repurchase agreement liability of $45B to determine excess collateral of $545.8M.[66]  In the Court proceedings on September 19, 2008, the Court stated that "I still consider 500 million dollars material . . ."[67]  Under this standard of materiality, the Barclays Windfall as calculated using Barclays' valuations and the Pfleiderer Report's methodology would be considered material.

37.    Exhibit C-3 shows that the aggregate value of assets received from the Fed Repo presented in the Pfleiderer Report is $45.546 billion, the lowest of the values.  I use calculated exit price marks with the conservative liquidity adjustment from BoNY and JPMorgan to value the Initial and JPM Inventory, respectively, resulting in an aggregate asset value of more than $49 billion and a $4.418 billion excess of the "Fair Value of All Assets Received" over $45 billion.[68]  Replacing the calculated exit price marks with custodial price marks from BoNY and

---

$1,250M cash proceeds from the December Settlement Agreement.  (Settlement Agreement, ¶1(a).  (Deposition Exhibit 205)).  *See also* Hearing Transcript, December 22, 2008, 42:10-12.

[66] I compare the fair value of all assets received to $45.0 billion, consistent with the Pfleiderer Report's comparison of the amounts in Table 2 to this amount in ¶8 of the Pfleiderer Report.

[67] Hearing Transcript, September 19, 2008, 54:21-22.

[68] I calculate the "Initial inventory at Barclays mid-price marks" by aggregating the Custodial or Barclays Mid-Point Price Marks at the respective dates based on the BoNY or Barclays MV columns from the asset type tabs in Initial Inventory.

I calculate the "JPM inventory at Barclays mid-price marks" by aggregating the Custodial or Barclays Mid-Point Price Marks at the respective dates based on the columns "JP MV" and "PCG MV 09-30" from the "Portfolio 3" tab in JPM Inventory.  Note that while JPM Inventory uses the "JP MV" to calculate the "30-Sep JP Value", these marks are equal to the JPM Price Marks as of 9-17; refer to footnote 55 for a detailed explanation. Also refer to footnote 56 for the calculation of the JPM 9-19 values.

I calculate the "Adjustment to Barclays exit-price/bid marks" by using the liquidity adjustments given for the respective Exit Price Marks in Initial Inventory and JPM Inventory.  When the liquidity adjustments are not provided in these excel files, I adjust the respective Custodial and Barclays Mid-Point Price Marks to Exit Price Marks by taking the liquidity adjustment from the "Liquidity" tab in Initial Inventory and JPM Inventory.  I take the liquidity adjustment under the column heading "Liq Haircut", matching against each CUSIP by the column "Sub Type" in the "Liquidity" tab.  I calculate the Exit Price Marks by multiplying the liquidity adjustment by the respective Custodial and Barclays Mid-Point Price Marks on the dates specified. The liquidity haircut value in Exhibit C-3 is given by subtracting the value based on the mid-point price marks from the calculated value based on the exit price marks.  For the Equity asset class, I take the liquidity adjustment provided in BCI-EX-00255172 (0922 Equities Bid-Offer) of 4.32% and multiply one minus this adjustment by the respective Custodial and Barclays Mid-Point Price Marks on the dates specified.

I calculate the "Schedule B assets included in the above" by using the file Sched B LehOBS 5 [BCI-EX-00295934].xls.  I follow the calculations in the Pfleiderer Report to calculate the assets in Schedule B that are not present in the Repo Collateral.  The value in column "MV 09-22 w. haircut" from the "Detail" tab of the file BCI-

---

**Contains Highly Confidential Information**

JPMorgan on September 19, the total asset value is $51.821 billion and a $6.821 billion excess of the "Fair Value of All Assets Received" over $45 billion.[69]  As shown in the exhibits in this section, the Pfleiderer Report consistently presents the lowest valuation across alternative marks.

### D.  ANALYSIS OF LEHMAN'S MORTGAGES ACQUIRED BY BARCLAYS

38.    In this section, I discuss the basis for the following opinion:

> **Opinion 6**:  A comparison of the mortgages in the Global Funding System ("GFS") as of September 16, 2008 totaling approximately $6 billion and the schedules setting forth the positions transferred to Barclays demonstrate that Barclays actually received more than two-thirds of the value of all Lehman mortgages in GFS.[70]  The custodial valuation as of September 19, 2008 of the Lehman mortgages acquired by Barclays is $4.034 billion, which represents 67.1% of the $6.014 billion value of all Lehman mortgages in GFS as of September 16, 2008.

39.    At the request of Movants' Counsel, I analyzed the Lehman mortgages and mortgage backed securities ("Mortgages") acquired by Barclays in the Sale Transaction.  I identified a series of three emails from Clement Bernard (Lehman – FID Chief Financial Officer) to Barclays employees including Stephen King (Barclays – Managing Director and head of PMTG) and Jasen Yang (Barclays – Director of PMTG).[71]  These emails include eight Excel file attachments.

---

EX-00295934.xls is the amount subtracted from the Repo Collateral.  Based on the analysis in BCI-EX-00295934.xls, for each CUSIP, I assign a "Non-Repo Collateral" percentage as the ratio of the amount subtracted from the Repo Collateral to the Barclays 9-22 Exit Price Marks (for non-Equities as classified by Barclays) and as the ratio of the amount subtracted to the Barclays 9-22 Mid-Point Price Marks (for Equities as classified by Barclays).  I calculate the "Schedule B assets included in the above" based on the "Non-Repo Collateral" percentage by multiplying this percentage, on a CUSIP level, by the respective Custodial and Mid-Point Price Marks on the dates specified to obtain the portion of the inventory not in the Repo Collateral.  To comport with the analysis in BCI-EX-00295934.xls, I make two further adjustments for the equity CUSIPs.  For all equities, I reduce the amount in "Schedule B assets included in the above" by a liquidity haircut of 1.084%.  For 28 equity CUSIPs, the amount subtracted from the Repo Collateral equals the CUSIP's notional value; for these CUSIPs, I calculate the "Schedule B assets included in the above" by reducing the original notional by the liquidity haircut of 1.084%.

[69] I note that both these values are consistent with the contemporaneous documents presented in Exhibit E-1.

[70] *See* footnote 15 (describing the role of GFS).

[71] Clement Bernard is identified in the report of Anton R. Valukas, Examiner in re Lehman Brothers Holdings, Inc. et al, Chapter 11 Case No. 08-13555 (JMP), Volume 7, Appendix 3, Key Individuals, page 2.  Stephen King's position is identified in the Deposition of Stephen King, September 10, 2009, 8:23-9:9.  Jasen Yang's position is identified in the Deposition of Gary Romain, September 10, 2009, 139:6-14.

---

**Contains Highly Confidential Information**

These files were grouped by asset type and state that they are the "9/16 Inventory."[72]  One of the emails attached a file that identified assets as "Mortgages and Mortgaged Backed."[73]  As I show in the first line in Exhibit D-1, this inventory list contains 3,913 CUSIPs and has a total "long inventory" value equal to $6.014 billion.[74]  The $6.0 billion amount is the same as the amount listed for mortgages on a number of Lehman balance sheets the week of September 15.[75, 76]

40.     To analyze the mortgages acquired by Barclays, I first aggregated the valuations at CUSIP level.[77]  I then searched for CUSIPs with a positive trading position in Barclays' Initial Inventory and JPM Inventory.  I identified 1,720 of the 3,913 Lehman CUSIPs in the Barclays' Initial and JPM Inventory.  Using the GFS valuation of Net Long Inventory in the Mortgages file, the value of the CUSIPs transferred was $4.226 billion (*see* the third line of Exhibit D-1).[78]  Since the number of securities for the CUSIPs acquired by Barclays may not be the same as the total number of securities in GFS, I used the BoNY September 19, 2008 valuation for securities in Schedules A and B and the JPMorgan adjusted September 19, 2008 valuation for securities in Annex A.  Using this valuation for the Mortgages, the value of the CUSIPs transferred was $4.034 billion, which is 67.1% of the total value of the Lehman Mortgages (4.034/6.014).  The Barclays Opening Balance Sheet valuation of the Mortgages it acquired from Lehman is $2.266 billion, which is 37.7% of the total value of the Lehman Mortgages (2.266/6.014).

---

[72] BCI-EX-(S)-00200952-BCI-EX-(S)-00200962 at 52 (includes 3 emails and 8 Excel files).

[73] BCI-EX-(S)-00200952-BCI-EX-(S)-00200962 at 54 and 57.

[74] To measure this value without accrued interest (i.e., "clean value,"), I include the CUSIPs with strictly positive trade date positions.  I adjust "Net Long" value to remove the impact of accrued interest by multiplying this value by a ratio of the clean price to the dirty price.  The "Net Long" field represents the sum of two data fields labeled "Gross Long Inventory TD @ MV" and "Long Intraco Netdown TD @MV."   These are identical names to the fields the Pfleiderer Report aggregates to determine Net Long Inventory Value as of 9/12/08 in Table IV of the Pfleiderer Report.

[75] In Barclays' Opposition to the Rule 60(b) Motions ("Barclays Opposition"), Barclays asserts that the value of 50% of Lehman's residential mortgage securities are estimated to be worth from $2.7 billion to $3.6 billion, notes in an associated footnote that court testimony placed the value of the entire portfolio at $6 billion, and notes in another footnote it may have received some with the Repo Collateral.  (Barclays Opposition, ¶69 and footnotes 46 and 209).

[76] Deposition Exhibit 509; Deposition Exhibit 200.

[77] In cases where real-world CUSIP was unavailable, I combined data with identical ISINs or product numbers.  For purposes of this analysis, I will use the term CUSIP to refer to any of these identifiers.

[78] Of the amount acquired, $1.91 billion appear in the Barclays Initial Inventory and $2.32 billion appear in the JPM Inventory (not shown in the exhibit).

---

**Contains Highly Confidential Information**

E.  PFLEIDERER REPORT'S OPINIONS (IN SECTION II) REGARDING THE
"ALLEGED $5 BILLION DISCOUNT IN THE FED REPLACEMENT REPO"
<u>ARE FLAWED AND UNSUPPORTED</u>

41.    In this section, I discuss the basis for the following opinion:

**Opinion 7:**  Section II of the Pfleiderer Report provides insufficient foundation and
analyses and fails to use accepted and consistent methodologies to support the opinions
that there was no $5 billion discount in the Fed Replacement Repo.  Barclays does not
present its own independent expert valuation to substantiate the conclusion that ". . . the
Repo Collateral was worth *at most* the approximately $45.5 billion at which Barclays
accounted for it in its 2008 Results Announcement summary of the Acquisition."[79]

42.    The Pfleiderer Report opines in Section II and Appendix Four on issues related to the
"Alleged $5 Billion Discount in the Fed Replacement Repo."

43.    These opinions are, for reasons I explain below, unsupported by appropriate and
reasonable analyses based on accepted methodologies, scientific methods, and accepted
principles, applied reliably and consistently.

44.    In sum, the Pfleiderer report opines:

- Barclays did not receive a $5 billion discount, secret or otherwise, through the Fed
  Replacement Repo[;] . . . the Repo Collateral pledged to Barclays in the Fed
  Replacement Repo . . . was worth at most approximately $45.5 billion, or about 1%
  more than the $45 billion in cash that Barclays paid out as part of the Fed
  Replacement Repo.[80]

- [T]he value of the securities and cash Barclays received in the Fed Replacement Repo
  was not $50 billion, as the Movants assert, or even close to $50 billion.  Instead, the
  fair value of the securities (and cash) Barclays received in the Fed Replacement Repo
  was, at most, approximately $500 million (or about one percent) more than $45
  billion.[81]

---

[79] Pfleiderer Report, ¶5. a.

[80] Pfleiderer Report, ¶8 (". . . the Repo Collateral pledged to Barclays in the Fed Replacement Repo, including the
securities and cash ultimately received in Barclays' December settlement with JP Morgan Chase and LBI, was worth
at most approximately $45.5 billion . . .").

[81] Pfleiderer Report, ¶9.

**Contains Highly Confidential Information**

45.    Professor Pfleiderer arrives at these opinions after concluding:

- "[T]he Lehman marks, the JP Morgan Chase marks, and the BoNY marks, whether used separately or together, do not provide a reliable basis for valuing the Repo Collateral."[82]

- "Barclays normal marking policies and procedures" are "reasonable, appropriate, and likely to produce reliable results."[83]

- [I]t is highly unlikely that developing an entirely new set of marks, completely independent of any of the available sources "would lead to better marks than the marks developed by Barclays."[84]

1.    The Pfleiderer Report's Opinion Regarding the "Price" of the Repo Portfolio is Flawed and Incorrect

46.    The Pfleiderer Report erroneously asserts:

It is an important fact that Barclays did not acquire the Repo Collateral in a separate, standalone transaction, but instead acquired these assets as part of a larger bundle of assets and liabilities associated with LBI's North American broker-dealer businesses. This means, first, that there was no separate identifiable "price" paid by Barclays for the trading portfolio securities and, second and more specifically, that the $45 billion that Barclays lent to LBI in the Fed Replacement Repo should not be viewed as the "price" Barclays paid for the Repo Collateral.[85]

47.    This opinion is not meaningful in evaluating or rebutting Movants' Overall Claim. The Sale Transaction approved by the Court was based on certain representations of value for the assets being purchased and the liabilities being assumed by Barclays. The Repo Collateral was part of the $47.4 billion of trading assets the Court was told Barclays was purchasing in the transaction.[86] Thus, the Pfleiderer Report's illustration in footnote 13 is not analogous at all, and examining the Repo Collateral is appropriate in the context to evaluate Movants' Overall Claim.

---

[82]  Pfleiderer Report, ¶37.

[83]  Pfleiderer Report, ¶51.

[84]  Pfleiderer Report, ¶60.

[85]  Pfleiderer Report, ¶10.

[86]  Although I am not aware of anyone at the hearing on September 19, 2008 specifically referring to the Repo Collateral within the $47.4B of assets being transferred (Hearing Transcript, September 19, 2008, 47:1-4), there was a reference to the $45.5B of liabilities assumed "in connection with those assets" (*Id.* at 47:5-8). During the hearing, the $45.5B liability is identified as the former amounts owed to the Federal Reserve Bank in connection with their Primary Dealer Credit Facility (*Id.* at 63:18-22).

**Contains Highly Confidential Information**

> 2.  The Pfleiderer Report Inappropriately Rejects Considering Contemporaneous
> Valuations of "the Repo Collateral" Contained in Email Communications,
> Email Attachments, and Deposition Testimony

48.    The Pfleiderer Report inappropriately rejects considering contemporaneous documents
and subsequent deposition testimony to establish the value of the Repo Collateral.  The report
states:

> Messages in emails … among the participants on Thursday, September 18, and
> subsequent days contain a range of estimates of the aggregate value of the positions
> transferred to Barclays on that day.  In my view, none of these "email estimates" is a
> reliable indicator of the aggregate fair value of what Barclays received in the Fed
> Replacement Repo, … Such estimates of value expressed in the body of an email
> message are not the kind of data on which economists and accountants rely in their
> professional work, and particularly not when there is better evidence of value available.[87]

49.    The Pfleiderer Report offers no evidence to support this assertion.  Contrary to this view,
it is clearly acceptable, reasonable, and appropriate for experts to consider and use such
information when conducting an economic analysis and forming expert opinions.  Experts
naturally do not accept this information on face value but rather analyze it in various ways,
consider the source, the context, and compare the information to other information; however, it is
inappropriate to simply ignore this type of contemporaneous information without foundation.

50.    The Pfleiderer Report argues that the relevance of contemporaneous information and feel
for the market are reasons to rely on Barclays' exit price marks: "First, there is no reason to
believe that better information is available today than was available in the fall and winter of 2008
(and into 2009) when the Barclays' exit price marks were developed.  To the contrary, few
analysts today, if any, would have the data or the 'feel for the market' that Barclays was able to
tap a year ago as it developed its exit price marks."[88]  However, these same arguments could be
made to support using the Lehman, BoNY, JPMorgan, and contemporaneous sources of third
party prices instead of using Barclays' exit price marks.  The Pfleiderer Report offers no
evidence that the information used by Barclays was better or Barclays' analysts had a better feel
for the market relative to the information used by and analysts working at Lehman, BoNY,
JPMorgan at the date of the Sale Transaction.

---

[87] Pfleiderer Report, ¶19.

[88] Pfleiderer Report, ¶60.

**Contains Highly Confidential Information**

51.     The Pfleiderer Report similarly states that "Given the stressful conditions prevailing during the week of the Fed Replacement Repo and the passage of more than a year since the events at issue, it is probably to be expected that relevant deposition testimony, taken as a whole, does not provide a reliable indicator of the aggregate value of the transferred positions."[89]  The Pfleiderer Report provides no foundation for this conclusion other than purportedly "stressful conditions" in the fall of 2008 and "passage of more than a year," which is neither acceptable nor sufficient foundation to ignore the deposition statements of individuals involved in the specific issues and events under investigation.  Again, experts regularly consider such information.  Thus, such information should be considered.

52.     In Exhibit E-1, I have prepared a summary of observations made by various people at Lehman, Barclays, the Federal Reserve Bank and others regarding the asset value of the Federal Reserve/Barclays Repurchase Agreement Assets from September 18 through September 20, 2008.[90]  Estimates of the Federal Reserve/Barclays Repurchase Agreement Assets during this period range from $49.0 billion to $52.3 billion.  The values of Federal Reserve/Barclays Repurchase Agreement Assets in excess of $45.0 billion range from $4.0 billion to $7.3 billion.[91]

> ### 3.  The Pfleiderer Report's Rejection of the Lehman, BoNY, and JPMorgan Price Marks to Value the Repo Collateral Is Flawed and Unsupported

53.     After inappropriately rejecting any consideration of statements in contemporaneous emails and email attachments as well as deposition testimony of the individuals involved in the transaction, the Pfleiderer Report also inappropriately rejects four of the five alternative valuation sources that might be used to value these securities.  The Pfleiderer Report rejects the Lehman marks, the Bank of New York ("BoNY") marks, the JPMorgan marks, and any subsequent assessments made by anyone else thereafter, including experts testifying in this

---

[89] Pfleiderer Report, ¶21.

[90] "The Federal Reserve Bank of New York is one of 12 regional Reserve Banks which, together with the Board of Governors in Washington, D.C., make up the Federal Reserve System. The Fed, as the system is commonly called, is an independent governmental entity created by Congress in 1913 to serve as the central bank of the United States. It is responsible for formulating and executing monetary policy, supervising and regulating depository institutions, providing an elastic currency, assisting the federal government's financing operations, and serving as the banker for the U.S. government."  (http://www.newyorkfed.org/aboutthefed/whatwedo.html, last visited March 5, 2010).

[91] I compare the values of the repurchase agreement assets to $45.0 billion, consistent with the Pfleiderer Report's comparison of the amounts in Table 2 to this amount in ¶8.

---

**Contains Highly Confidential Information**

matter. According to the Pfleiderer Report, only the "Barclays exit price marks" are reasonable to use to value these securities. On this point, the Pfleiderer Report states: ". . . the best available source for marks for valuing the assets Barclays received in the Fed Replacement Repo (and the Transaction as a whole) is the detailed worksheets prepared by Barclays to identify exit price marks." [92]

54.    As I explain below, these conclusions and opinions are unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.

### a.  Incorrect Conclusion from the Analysis of Available Prices

55.    In an attempt to describe the complexity of the securities transferred to Barclays, the Pfleiderer Report examines the availability of prices on September 22, 2008. The Report concludes that prices are available for more than three quarters of the Repo Collateral: ". . . Bloomberg and Capital IQ report observed prices (which may be from just one trade) for just under 60% of the CUSIPs represented in the Repo Collateral . . . The value of positions for which no price is reported in either Bloomberg or Capital IQ for September 22, 2008, is more than 23% of the total fair value of the Repo Collateral . . ." [93]

56.    The fact that prices do not exist for 23% of the value of these securities (based on Barclays' exit price marks), however, affects Lehman, BoNY, JPMorgan, and Barclays equally. This analysis provides no support for rejecting the Lehman, BoNY and JPMorgan price marks in favor of the Barclays price marks. Yet, the Pfleiderer Report states, "[t]hese results establish that determining appropriate marks for the securities transferred to Barclays was not and could not have been a simple mechanical process of pulling data from vendor price databases." [94]

57.    In Exhibit E-2, I present the results of my analysis of prices available on September 19, 2008 and September 22, 2008. On September 19, 2008, prices were available for 7,165 (or 66.7%) of the 10,743 CUSIPs considered in the Pfleiderer Report that were associated with

---

[92] Pfleiderer Report, ¶58.

[93] Pfleiderer Report, ¶31.

[94] Pfleiderer Report, ¶32.

---

**Contains Highly Confidential Information**

positions transferred to Barclays in the Initial Inventory, representing $32.025 billion (or 78.7%) of the Initial Inventory at Barclays Opening Balance Sheet valuation (at exit price marks). Of these, 99.99% of the value of "emerging markets" assets, over 99% of "equity," over 97% of "rates," and over 85% of "corporate" bonds at Barclays Opening Balance Sheet valuation (at exit price marks) are represented within the Bloomberg or Capital IQ data.[95] On September 22, 2008, prices were available for 7,159 (or 66.6%) of the CUSIPs. The prices capture $31.963 billion (or 78.6%) of the Initial Inventory at Barclays Opening Balance Sheet valuation (at exit price marks), with 99.99% of emerging markets assets, over 98% of equity, over 97% of rates, and almost 85% of corporate bonds represented. The Pfleiderer Report dismissed vendor prices based on the fact that less than 23% of the initial inventory at Barclays Opening Balance Sheet value was not represented.

58.    Expanding the sample by including Interactive Data collected via Bloomberg along with the data available from Bloomberg and Capital IQ, on September 19, 2008, prices were available for 7,998 (or 74.4%) of the CUSIPs, representing $35.359 billion (or 86.9%) of the Initial Inventory at Barclays Opening Balance Sheet value (at exit price marks). Specifically, the data captures $9.291 billion (or 73.6%) and $0.792 billion (38.2%) of the Initial Inventory at Barclays Opening Balance Sheet valuation (at exit price marks) for RMBS and Principal Mortgage Trading Group, respectively.[96, 97]

### b. Pfleiderer Report's Analysis Rejecting Lehman Price Marks is Flawed and Inadequate

59.    The first contemporaneous source of price marks rejected in the Pfleiderer Report is Lehman's own marks. The source of these marks is GFS. Most CUSIPs/contracts in GFS include an indicator for market/valuation classification. According to the Pfleiderer Report, most

---

[95] "Rates" refers to treasury and agency securities traded both by Lehman's fixed income group and Barclays Capital. (Deposition of Jasen Yang, September 4, 2009, 17:16-21; Deposition of Eric Felder, July 31, 2009, 12:22-13:5).

[96] A "Residential Mortgage Backed Security is a Mortgage Backed Securities that are backed by loans secured with residential rather than commercial property." (http://www.duke.edu/~charvey/Classes/wpg/bfglosr.htm#residential_mortgage_backed_securities, last visited February 22, 2010).

[97] Principal Mortgage Trading Group [PMTG] is an internal trading and risk management group at Barclays. (Deposition of Stephen King, September 10, 2009, 9:5-19, 10:18-23).

---

**Contains Highly Confidential Information**

of these assets were Level II (73%) category assets; however, approximately 21% of these assets were Level I assets (assets that can be valued based on quoted prices for the identical instruments traded in active markets).[98, 99]

60.     The Pfleiderer Report rejects using all of the Lehman price marks because of conflicting deposition testimony about whether or not Lehman updated its price marks after September 12, 2008 and an analysis of the "stickiness" of the prices (observed price changes) of the Level II and Level III assets.  While the Pfleiderer Report does not identify the conflicting testimony it relies on in rejecting Lehman's price marks, some conflicting testimony occurred at Mr. McDade's deposition.  Mr. McDade (Lehman – President) initially stated that he believed Lehman's price marks were stale on September 15, but then admitted that Mr. Kelly (Lehman – Global Financial Controller) and Mr. Lowitt (Lehman – Co-Global Chief Administrative Officer) would have better knowledge of that issue.[100, 101]  Ian Lowitt, Lehman's former Chief Financial Officer, stated in his deposition:

> The assets that were on Lehman's books were, particularly LBI, were securities, and securities are priced based on, you know, market sources, and our books and records were accurate.[102]
>
> . . .
>
> I think that it is important to reflect that the marks that we had on our books were accurate, which I believe was the case…[103]

---

[98] Pfleiderer Report, ¶32.

[99] Level II category assets are assets that can be valued based on quoted prices for similar instruments traded in active markets or prices for similar or identical instruments in markets that are not active or using model-based techniques for which all significant assumptions are observable in the market.  (Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" (September 2006, as amended 2008), at ¶22-31).

[100] Deposition of Bart McDade, September 2, 2009, 77:4-10.

[101] Bart McDade was President of Lehman Brothers, then employed by Barclays for three months to aid in the transition. (Deposition of Bart McDade, September 2, 2009, 7:18-8:12).

Martin Kelly was the Global Financial Controller for Lehman at the time of the acquisition. After the acquisition, Kelly became the Financial Controller for Barclays Capital and is now a Managing Director and Chief Financial Officer in the Americas for Barclays. (Deposition of Martin Kelly, August 18, 2009, 8:8-12:2).

Ian Lowitt was the Co-Global Chief Administrative Officer for Lehman before the acquisition, and Chief Operating Officer of Barclays Wealth Americas after the acquisition. (Deposition of Ian Lowitt, August 20, 2009, 8:18-11:7).

[102] Deposition of Ian Lowitt, August 20, 2009, 41:17-21.

---

**Contains Highly Confidential Information**

61.     As I show in Exhibit E-3, Lehman's price marks were not as "sticky" as the Pfleiderer Report claims. Exhibits 4 and 5 of the Pfleiderer Report selected a subset of the Level II and Level III securities and show daily price marks for these securities. While the Pfleiderer Report states, "My analysis of the prices recorded in GFS revealed significant 'stickiness' in the marks for Level II and Level III securities going forward from September 12, 2008," the Pfleiderer Report provides no scientific or statistical tests upon which to form that conclusion.[104] In fact, Lehman continued to update many prices throughout the week.

62.     Exhibit E-3 shows the percentage of CUSIPs in the GFS system with price changes from September 12, 2008 – September 19, 2008, and the percentage of market value for CUSIPs for which a price change was observed during that period.[105] 8,468 CUSIPs in the Initial and JPM inventory exist on all days in GFS. Throughout the week, clean market prices of 79% of the 8,468 CUSIPs changed at least once, which represents 79% of value based on Barclays Opening Balance Sheet valuation (at exit price marks). Clean market prices of 52% of the 8,468 CUSIPs changed every day during this week, which represents 64% of the value based on Barclays Opening Balance Sheet valuation (at exit price marks). Clean market prices of 77% of the 8,468 CUSIPs changed value at least twice during the week. This implies that 23% of the CUSIPs changed value at most once. The sample of CUSIPs in Pfleiderer Report Exhibit 4 and 5 includes only securities with at most one price change from September 12 to 22 of 2008, which are only 23% of the CUSIPs.

---

[103]Deposition of Ian Lowitt, August 20, 2009, 42:17-43:18.

[104] Pfleiderer Report, ¶39.

[105] A CUSIP is included if it is present in GFS on all days from September 12, 2008 to September 19, 2008. A CUSIP is said to be present in GFS if it has a numeric or missing price on a given day. All price change analysis in this table is based on the clean market price as given in GFS. I calculate price changes for only those dates which have strictly positive prices. If a CUSIP's price is missing on a given trading date, it is set to the previous day's price for the purposes of comparison. When multiple prices are observed for a CUSIP on a given day, the price is taken to be the average of the observed prices. If data is available from multiple source systems within the GFS, a price change observed in any of the source systems is considered a change on that day for the CUSIP.

The Total Inventory value for Barclays Opening Balance Sheet Valuation (at Exit Price Marks) is shown at $44,430 million. This value is $6 million lower than what is shown in Exhibit C-3 at $44,436 million ($46,522.9M - 2,086.5M) (Pfleiderer Report Table 2). This $6 million reflects the difference on Barclays Opening Balance Sheet at Exit Price Marks and what is provided in JPM Inventory.

---

**Contains Highly Confidential Information**

63.     The Pfleiderer Report fails to consider, much less analyze, this information in reaching the conclusion that Lehman's marks were sticky, and therefore provides insufficient foundation and insufficient and incomplete analyses to conclude that all of the information in the Lehman marks should be ignored.

### c.  Flawed and Inadequate Analysis Rejecting the JPMorgan and BoNY Price Marks

64.     The Pfleiderer Report also rejects two other contemporaneous sources of price marks: the JPMorgan price marks and the BoNY price marks.  JPMorgan was the custodian or collateral agent for the Federal Reserve Bank of New York and BoNY was the custodian or collateral agent for Barclays.[106]  The Pfleiderer Report rejects using all of the BoNY and all of the JPMorgan price marks even though these "…banks maintain procedures and pricing groups that enable them to provide this marking service quickly and with the level of accuracy required by their roles in tri-party repos, …" because these "…were not normal repurchase agreements, but instead were much larger and more complex, and a significant number of the securities … were not normally eligible to serve as collateral in commercial tri-party repos."[107]  The Pfleiderer Report also discusses the limited amount of time both BoNY and JPMorgan had to mark the assets.[108]  Lastly, the Pfleiderer Report states it has analyzed the JPMorgan and BoNY marks for many of the esoteric and illiquid securities and refers the reader to Appendix Four of that report.

65.     The Pfleiderer Report provides insufficient foundation and insufficient and incomplete analyses to conclude that all of the information in both the BoNY and JPMorgan marks should be ignored.[109]  First, JPMorgan's marks are not analyzed or even mentioned anywhere in

---

[106] *See* expert report of Joseph R. Mason, PhD. dated March 15, 2010.

[107] Pfleiderer Report, ¶41.  Further, at the Pfleiderer deposition, the deponent admits that he did not review any of the custodial agreements or the underlying policies for security valuations.  (Deposition of Paul Pfleiderer, February 23, 2010, 170:12-172:7).

[108] Pfleiderer Report, ¶42.  I make note of the testimony from Barclays personnel regarding the lack of accuracy of BoNY's price marks including remarks by Stephen King, Barclays Managing Director and Head of the Portfolio Mortgage Trading Group and Jasen Yang, Director of the Portfolio Mortgage Trading Group.  (Deposition of Stephen King, September 10, 2009, 111:16-112:9; Deposition of Jasen Yang, September 4, 2009, 31:16-32:17, 61:17-62:20).

[109] In the Pfleiderer deposition, the deponent does not recall a single CUSIP, or security, or class of securities for which the BoNY or JPMorgan price marks were inaccurate.  (Deposition of Paul Pfleiderer, February 23, 2010, 169:19-170:11).

**Contains Highly Confidential Information**

Appendix Four.[110]  Second, as I explain below, the analysis in Appendix Four is not systematic and it is unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.

### d. Flawed and Inadequate Analysis Supporting Barclays' Exit Price Marks

66.    The justification in the Pfleiderer Report for using Barclays "exit price marks" is similarly unfounded, unsupported, and contains no systematic analysis.  The Pfleiderer Report begins its justification for using Barclays' exit price marks by providing twelve "key aspects" of the Barclays process used to develop its exit price marks.[111]  The Pfleiderer Report makes an overall statement, "…I have examined Barclays normal marking policies and procedures and find them to be reasonable, appropriate, and likely to produce reliable results."[112]  However, the Pfleiderer Report provides no information or analysis of the key aspects of the process and the marking policies and procedures used at Lehman, BoNY, and JPMorgan, or that one bank used better procedures and processes than another bank.[113]  Further, while procedures and policies are naturally important, in the end, it is the execution of procedures and policies and not the procedures and policies themselves that results in the price.  Without appropriate execution, it is not possible for procedures and policies to be "likely to produce reliable results."  Thus, this conclusion and opinion lacks foundation.

---

[110] One of the CUSIPs in the JPM Inventory was included in Appendix Four.  *See* additional discussion below regarding Appendix Four.

[111] Pfleiderer Report, ¶51.

[112] Pfleiderer Report, ¶51. 3.

[113] For example, the Pfleiderer Report provides no reason to conclude that the quality of Barclays' professionals and its Product Control Group ("PCG") was higher than the quality of the professionals and valuation groups at Lehman, BoNY, and JPMorgan; further, the processes at all of these banks were subject to review by regulatory bodies.  At the Pfleiderer deposition, the deponent admits that he did not review any of the custodial agreements or the underlying policies for security valuations (Deposition of Paul Pfleiderer, February 23, 2010, 170:12-172:7).  At the Pfleiderer deposition, the deponent states that when he interviewed Barclays employees they "….seemed to have a quick answer to or they seemed to be able to address the level of detail of question that I was posing and other people were posing on the phone call.  So that in itself gave me additional comfort beyond what I could see in the spreadsheets and everything else that a lot of effort and thoughtful appraisal had gone into the – into the process." (Deposition of Paul Pfleiderer, February 23, 2010, 86:22-87:7).

67.    On incentives, the Pfleiderer Report states, "… so far as I have been able to determine,
Barclays had no institutional incentive to set exit price marks high or low, although it is my
understanding that a valuation low enough to make the transaction dilutive could have had
adverse regulatory consequences."[114]  Although the Pfleiderer Report does not define
"institutional incentive," a gain on the acquisition (higher values) increases the amount of
Barclays' equity, which may be useful in financing the company or meeting regulatory capital
requirements; on the other hand, lower value results in higher earnings in future periods.[115]  Once
the company has sufficient capital, compensation contracts may provide incentives to understate
the value of the assets to enhance future performance.  I note that Barclays recently attributed its
improved 2009 performance in part to the Lehman acquisition:  "During 2009, we increased our
income substantially.  Barclays Capital had a very strong year across all global franchises, in
particular as its businesses in North America started to reap the benefits of the Lehman
acquisition and integration."[116, 117]

---

[114] Pfleiderer Report, ¶51. 11.

[115] At its conference call with analysts on September 17, 2008, Barclays announced that the Lehman acquisition
would improve its capital ratios:  ". . . the transaction is capital ratio accretive without additional equity issuance.
And the source of that accretion is the negative goodwill from the transaction, which amounts to about $2b post
tax."  (BCI Exhibit 112,Thomson StreetEvents Transcript of 9/17/08 Barclays Plc Analyst Call, p. 3.).  The
following day, several analyst reports commented on the impact of the acquisition on Barclays' capital requirements.
Analysts from Fox-Pitt Kelton issued a report that stated:

> . . . The deal would be capital ratio accretive even before the extra USD1bn  raising, as there is USD2bn
> negative goodwill post tax.  So the extra capital being raised of 'at least' USD1bn is to allow for Barclays'
> 'expansive' outlook.

> This is a positive development for Barclays and will lift the quoted 1H08 equity Tier 1 capital ratio to
> around 6.75% from 6.30% (after capital raising), which looks adequate in a UK sector context.

> The company raised GBP4.5bn in July, raising its 1H08 equity Tier 1 to a pro forma level of 6.3%.  At the
> time, the company said that half the capital raised would be used to expand the business and half to raise its
> capital ratios above its longer term target of 5.25%.  The company says there is no change to the 5.25%
> longer term target equity Tier 1 ratio but reiterates that it will run ahead of this for some time during the
> current period of financial market and economic uncertainty.  (BCI Exhibit 113).

Analysts from Societe Generale Cross Asset Research stated:

> Our initial work indicates . . . the bank's core Tier I capital ratio should be comfortably ahead of the bank's
> 5.25% target on the back of:  minimal additional RWAs of £15bn, negative goodwill ($3,750m) and the
> capital injection.  (BCI Exhibit 114).

[116] Barclays PLC 2009 Results Announcement, p. 4.

---

**Contains Highly Confidential Information**

68.    As discussed above, some of Barclays' exit price marks were set at the sale price for certain securities sold between September 22 and September 30, 2008.  While we do not have the details of the conditions under which each of these securities or blocks of securities were sold, it is possible that they were sold at either "fire sale" prices or with a "block or bulk" discount.  The Pfleiderer Report acknowledges that, to the extent the securities were sold at fire sale or block/bulk discount prices, the sale prices would have been lower than an orderly sale of these securities.[118]  Thus, Barclays' exit price marks would be lower (biased) relative to what I understand was approved by the Court in the Sales Order; and thus, Barclays' exit price marks would be inappropriate and biased to use to measure the difference between the value Barclays was to receive based on the Court approved Sale Transaction and the value Barclays received (Barclays Windfall).

69.    The Pfleiderer Report claims that "PriceWaterhouseCoopers [*sic*] conducted an extensive audit of Barclays' final summary of the Acquisition, which included extensive investigation and testing of Barclays exit price marks."[119]  The Report, however, provides no citations to documents or other evidence that PricewaterhouseCoopers ("PwC") used additional or special audit procedures that would result in an "extensive" audit, and it provides no citations to documents or other evidence that PwC tested Barclays' exit price marks.[120]  Review of the PwC documents that the Pfleiderer Report relies on indicates that PwC did not conduct extensive investigation or testing of Barclays' exit price marks.  In fact the PwC documents that the Pfleiderer Report relies upon indicate that PwC's testing of Barclays' exit price marks was limited and used Bloomberg and S&P as pricing benchmarks.  There was no evidence that PwC prepared any independent valuation models or algorithms to test Barclays' exit price marks.  The

---

[117] "Barclays Capital Inc. (BCI or BarCap) is the investment banking division of Barclays Bank PLC. . . . Barclays Capital provides large corporate, government and institutional clients with a full spectrum of solutions to their strategic advisory, financing and risk management needs."
(http://www.barcap.com/About+Barclays+Capital/Our+Firm/Our+Firm, last visited March 3, 2010).

[118] Pfleiderer Report, ¶¶ 59, 51. 10, and 63.

[119] Pfleiderer Report, ¶51. 12.

[120] PwC was Barclays' external auditor.  (Barclays 2008 Form 20-F; p. 177).  PwC is defined as "Price Waterhouse Coopers International Limited (PwCIL) or any of its member firms, such as PwC LLP in the U.S. and PwC UK in the United Kingdom." (http://www.pwc.com/us/en/index.jhtml, last visited March 5, 2010)

---

**Contains Highly Confidential Information**

Pfleiderer Report's conclusion that PwC conducted an "extensive investigation and testing of Barclays exit price marks" is flawed and without foundation.[121]

70.    Numerous PwC documents were produced after the Pfleiderer Report was prepared. These documents include "(1) documents from the section of the electronic PwC LLP audit workpaper database related to the work performed in connection with the Lehman acquisition, (2) external workpaper documents corresponding to those electronic workpapers, and (3) emails collected from seven custodians for the time period between September 12, 2008 and March 31, 2009."[122]  While these additional documents indicate that PwC performed certain procedures, it is unclear whether performed extensive investigation and testing.[123]

71.    The Pfleiderer Report attempts to provide some empirical evidence supporting the use of Barclays' exit price marks.  In Table 1 and Exhibit 6, the Pfleiderer Report compares BoNY marks to Barclays' exit price marks.  First, if the Pfleiderer Report is correct and the BoNY marks are not a reliable basis for valuing these assets, then it is unclear how the BoNY marks can be useful to assess the reliability of Barclays' exit price marks.[124]  Ignoring that issue, the Pfleiderer Report considers it important that Barclays' exit price marks are not uniformly different from (a constant percentage of) the BoNY marks, that the Barclays exit price market for certain security classifications (corporate bonds and emerging markets) are, in aggregate, larger than the BoNY marks, and that the differences are larger for higher risk and less liquid assets. According to the Pfleiderer Report, this "is evidence of the integrity of the process that generated Barclays exit price marks" and "the overall pattern in the value differences … is consistent with a discriminating and diligent effort to assess what values Barclays was likely to realize upon disposing of the acquired positions in an orderly sale …"[125]

---

[121] *See* expert report of John Garvey dated March 15, 2010.

[122] Letter from Martine M. Beamon (Davis Polk & Wardwell LLP) to William J. Hine, dated February 12, 2010, describing the PwC production to include documents bearing production numbers PwC-BarCap 00000001 – 00128004.

[123] *See* expert report of John Garvey dated March 15, 2010.

[124] Pfleiderer Report, ¶54.

[125] Pfleiderer Report, ¶¶54 and 56.

**Contains Highly Confidential Information**

72.    The analysis uses data that, according to the Pfleiderer Report, is not reliable and ignores actual prices for the subset of securities for which prices exist.  However, the absence of a uniform difference across types of securities does not represent meaningful evidence.  Had Barclays used a constant percentage adjustment within a type of security and increased that percentage based on risk and liquidity, we would observe the same results.  Further, the securities that are more difficult to value potentially have greater variability in the underlying data inputs; thus, it is no surprise that the differences are larger for these securities.  This evidence provides no information about the "integrity of the process" or the "discriminating and diligent effort."

73.    The Pfleiderer Report again points to the analysis in Appendix Four for additional support for Barclays' exit price marks; however, as I explain below, the analysis in Appendix Four is not systematic and it is unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.

e.    **Inadequate Support for Rejecting Additional Independent Price Marks**

74.    The Pfleiderer Report attempts to argue that other independent valuations – such as valuations performed by experts testifying in this matter – are not useful to assess the valuation of these assets, "… it is highly unlikely that such a procedure would lead to better marks than the marks developed by Barclays.  Rather, such a procedure could in the end produce *less* reliable marks for several reasons."[126]  None of the "reasons" attempting to support this opinion should be considered in an economic analysis and quantification of the Barclays Windfall.  The Pfleiderer Report provides no evidence that the Barclays analysts' "feel for the market" was unbiased and better than an analyst would have today for that time period.

75.    Further, the Pfleiderer Report ignores the detailed expert review process in a litigation – that is, the experts on both sides – Respondents and Movants in this matter – must provide complete documentation underpinning any opinions (for example, valuations) and each side's expert has the opportunity to challenge the other side's expert – for example, challenge the other

---

[126] Pfleiderer Report, ¶60.

**Contains Highly Confidential Information**

side's models, data, inputs, and calculations.  Barclays' exit price marks have not been subjected to such a detailed expert review process.  Respondents chose to not have their experts participate in such a process; however, given that these assets were, according to the Pfleiderer Report, "extremely difficult to value," such a detailed expert review process can result in a more reliable valuation.[127]

76.     The Pfleiderer Report's opinion that ". . . it is highly unlikely that such a procedure [developing an independent valuation] would lead to better marks than the marks developed by Barclays" is unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.[128]

### 4.    The Pfleiderer Report's Ex-Post Analysis Is Flawed and Unsupported

77.     The Pfleiderer Report uses a flawed and unsupported ex-post analysis of Barclays' alleged gains and losses (*see* Table 3 in that Report) – conducted by Barclays itself for the purpose of this matter – to conclude that as of the date of that analysis, Barclays did not have a gain that was "…meaningfully distinguishable from no gain at all." [129]  Generally, this type of ex-post analysis – evaluating a price or mark based on a subsequent sale of the security – is inappropriate.  The Pfleiderer Report acknowledges that "ex-post" analysis should be used with care.[130]  Below, I show that the Barclays ex-post analysis is unsupported, flawed, and biased.  I also show that the use of this ex-post analysis in the Pfleiderer Report is flawed and unsupported; thus the opinions and conclusions related to the ex-post analysis in the Pfleiderer Report are flawed and unsupported.

78.     By Barclays' own admission in statements made in its 20-F Report filed with the U.S. Securities and Exchange Commission, Barclays states that it integrated the Lehman assets with its other assets and the calculation of profits related to the Lehman assets is impracticable and not reliable:

---

[127] Pfleiderer Report, ¶60.

[128] Pfleiderer Report, ¶60.

[129] Pfleiderer Report, footnote 59.

[130] Pfleiderer Report, ¶¶65-66.

**Contains Highly Confidential Information**

> It is impracticable to disclose the profit or loss of the acquired Lehman Brothers North American businesses since the acquisition date. The acquired business has been integrated into the corresponding existing business lines and there is no reliable basis for allocating post-acquisition results between the acquirer and the acquiree.[131]

79.    While Barclays disclosed publicly that the calculation of profits related to the Lehman assets is impracticable and not reliable, it took a different view for the purposes of this matter. Barclays' prepared "a memo summarizing available information as to the results of sales (or in some cases re-valuations) of trading portfolio securities."[132]  The source of this memo is Exhibit 533A.[133]  Barclays submitted this exhibit in conjunction with the deposition of Mr. Romain taken on January 13, 2010.[134]  In his deposition, Mr. Romain revealed at least three flaws in the calculations in this exhibit:

- First, these calculations are based largely on internal transfers of these securities from the central trading desk to other trading desks: "The following list captures the available P&L information for the $37.2bn of assets that were transferred from the central book internally to a Barclays trading desk.  The difference between the $37.2bn of assets transferred internally and the $44.3bn of assets noted above relates primarily to external sales of cash equity positions directly from the central book."[135]  Thus, the underpinnings of more than 80% of these calculations are Barclays' internal re-valuations and not third party arms-length transactions.  Further, Barclays provided no information about the types, amounts, third parties, dates, and so forth of the specific securities sold.[136]

- Second, Barclays used estimates to prepare this exhibit:

---

[131]  Barclays PLC, Barclays Bank PLC 2008 20-F filing to the U.S. Securities and Exchange Commission, p. 236.

[132]  Pfleiderer Report, ¶65.

[133]  Letter dated February 6, 2010 from Mr. Davenport to Ms. Carrero.

[134]  Mr. Romain is a Barclays employee and the head of technical accounting and private equity finance.  He was involved in the accounting for the Lehman acquisition, and preparing the acquisition balance sheet and related disclosure in SEC Form 6-K.  (Deposition of Gary Romain, September 10, 2009, 12:16-18, 17:10-24).

[135]BCI-EX-00295932, (Deposition Exhibit 533A).

[136]BCI-EX-00295932 (Deposition Exhibit 533A).

---

**Contains Highly Confidential Information**

> It is the results of an exercise which we performed. To be clear, to try and do this is not easy and it does reflect quite a number of assumptions because all of this inventory was commingled in trading books. . . . I didn't do the detailed work, but there was some assumptions around . . . the allocation of hedges, the allocation of total P&L in a book between Lehman acquired and legacy where there are, you know, very similar assets which are in the same book.[137]

- Third, Barclays offset any gains and losses in this exhibit with its hedge positions. However, these hedge positions are not hedge positions taken for specific securities or CUSIPs. For accounting purposes, Barclays follows a specific identification process of mapping its securities and hedged positions: "When a financial instrument is designated as a hedge, the Group formally documents the relationship between the hedging instrument and hedged item as well as its risk management objectives and its strategy for undertaking the various hedging transactions."[138] Barclays provided no such documentation and it appears that it did not follow this process for the purposes of preparing this exhibit; rather, it allocated hedges on a book of securities.[139]

80.    The Pfleiderer Report acknowledges that it is only the degree to which Barclays' hedging was effective that allows one to even consider using such an ex-post analysis.[140] However, later in the report when discussing the Barclays' market risk from the Sale Transaction, the Pfleiderer Report explains how difficult and expensive hedging was, particularly around the time of the Sale Transaction and when Barclays was receiving securities with which it was unfamiliar.[141]

81.    As I discuss above, it is my understanding that Barclays' exit price marks were set at the sale price for certain securities sold between September 22 and September 30, 2008.[142] PMTG assets sold in that time frame were valued at the sale price. By using sale prices in its acquisition

---

[137] Deposition of Gary Romain, January 13, 2010, 177: 17-178:8.

[138] Barclays PLC, Barclays Bank PLC 2008 20-F filing to the U.S. Securities and Exchange Commission, p. 183.

[139] Deposition of Gary Romain, January 13, 2010, 177:15-182:24.

[140] *See* Pfleiderer Report ¶¶67-68.

[141] *See* Pfleiderer Report ¶¶102-103.

[142] Initial Inventory.

**Contains Highly Confidential Information**

balance sheet, Barclays' net gains or losses would not be reported as gains or losses on its income statement. Instead, the net gains or losses would be included in the calculation of goodwill. This misstates the net gains in Barclays' ex-post analysis. This analysis is flawed and incomplete.

82.     Exhibit 533A, which is the basis of the ex-post analysis in the Pfleiderer Report, is mostly the result of internal transfers and internal revaluation (and not third-party transactions) and is based on unknown estimates and inputs. In addition, for such an analysis to be informative, the securities must be appropriately hedged and, according to the Pfleiderer Report, these hedges were imperfect. Thus, the ex-post analysis in the Pfleiderer Report is flawed and unsupported and, as a result, the opinions and conclusions related to the ex-post analysis in the Pfleiderer Report are flawed and unsupported.

5.     The Pfleiderer Report's Analysis in Appendix Four Is Flawed and <u>Unsupported</u>

83.     Appendix Four of the Pfleiderer Report purports to summarize available information about selected securities or groups of similar securities acquired by Barclays. Appendix Four acknowledges that the values of most of the securities based on Barclays' exit price marks for September 22, 2008 "differ significantly from indicated values based on BoNY's marks for September 19, 2008."[143]  Neither Appendix Four nor other sections of the Pfleiderer Report, however, provide foundation and analysis to conclude that all of the BoNY marks should be rejected and Barclays' exit price marks should be used.

**a.  Flawed and Inadequate Analysis**

84.     Appendix Four analyzes "several sets of similar securities that Barclays sold shortly after closing the Transaction."[144]  First, this type of analysis – evaluating a price or mark based on a subsequent sale of the security – is inappropriate (see my above discussion of the ex-post analysis in the Pfleiderer Report). The Pfleiderer Report acknowledges this point when

---

[143] Pfleiderer Report, p. 106.

[144] Pfleiderer Report, p. 107.

**Contains Highly Confidential Information**

discussing the use of "ex-post" analysis.[145]  Even ignoring this flawed type of analysis, however, the implementation of the analysis in the Pfleiderer Report is also flawed.

85.    In Appendix Four, section 1 to section 3, the Pfleiderer Report presents three examples of securities that were acquired in the Sale Transaction and subsequently sold by Barclays – the sale of 125 collateralized ALT-A mortgage obligations issued by Structured Adjustable Rate Mortgage Loan Trust, 67 asset backed securities backed by ALT-A HELOCs issued by Lehman XS Trust, and 65 U.S. agency collateralized mortgage obligations.[146]  In Exhibit E-4, I present the value of each of these types of securities using the BoNY price marks, the Barclays price marks (as discussed in Appendix Four), and the price at which these securities were sold.[147]  As

---

[145] Pfleiderer Report, ¶¶65-66.

[146] ALT-A is a ". . . classification of mortgages where the risk profile falls between prime and subprime. The borrowers behind these mortgages will typically have clean credit histories, but the mortgage itself will generally have some issues that increase its risk profile. These issues include higher loan-to-value and debt-to-income ratios or inadequate documentation of the borrower's income." (http://www.investopedia.com/terms/a/alt-a.asp, last visited March 14, 2010).  I understand "loan-to-value" to be "[a] lending risk assessment ratio that financial institutions and others lenders examine before approving a mortgage. Typically, assessments with high LTV ratios are generally seen as higher risk and, therefore, if the mortgage is accepted, the loan will generally cost the borrower more to borrow or he or she will need to purchase mortgage insurance." (http://www.investopedia.com/terms/l/loantovalue.asp, last visited March 14, 2010).

 "Asset-backed securities are debt instruments secured against assets or cash flows from items such as car loans, credit card debt, mortgage loans, aircraft leases or royalty payments. The assets are pooled or bundled together and used as collateral for the issue of debt instruments in a process known as securitization. A special purpose vehicle (SPV) is formed to carry out the securitization and pay back the company that owned the assets. The removal of the assets from a company's balance sheet and the money it receives for them may improve its credit rating and reduce the capital it needs."  (http://glossary.reuters.com/index.php/ABS, last visited February 23, 2010).

 HELOC refers to a Home Equity Line of Credit, which is defined as a ". . . line of credit extended to a homeowner that uses the borrower's home as collateral. Once a maximum loan balance is established, the homeowner may draw on the line of credit at his or her discretion. Interest is charged on a predetermined variable rate, which is usually based on prevailing prime rates."  (http://www.investopedia.com/terms/h/homeequitylineofcredit.asp, last visited February 22, 2010).

[147] The figures for the collateralized ALT-A mortgage obligations issued by Structured Adjustable Rate Mortgage Loan Trust were obtained via the PMTG tab from the Initial Inventory file using a filter on Issuer (column G) for text beginning with "Structured Adjustable Rate Mortgage Loan Trust".

The figures for the asset backed securities backed by ALT-A HELOCs issued by Lehman XS Trust were obtained via the PMTG tab from the Initial Inventory file using a filter on Issuer (column G) for "Lehman XS Trust" at the front of the field, then an additional filter on Asset Type (column I) for "US ABS Home Eq".

The figures for the U.S. agency collateralized mortgage obligations (sequentials, PACs, and VADMs) were obtained via the RMBS tab from the Initial Inventory file using a filter on Type (column D) for "US Agency CMO" and an additional filter on Subtype (column E) for "Sequentials, PACs, and VADMs" and an adjusted filter which ignores all items with zero in Sales Price Field (column Y).

---

**Contains Highly Confidential Information**

shown in Exhibit E-4, the securities discussed in the Pfleiderer Report account for a very small portion of the securities in Initial inventory.  There are a total of 257 securities in the Pfleiderer Report's examples, which account for 2.4% of the total number of securities in the Initial Inventory.  These securities have an aggregate value of $1.265 billion based on BoNY marks on September 19, 2008, which is only 2.8% of the total value of all securities in the Initial Inventory.

86.     In addition, the Pfleiderer Report's use of Barclays' exit price marks is biased.  Barclays' exit price marks used information that was not knowable as of September 22, 2008 to value at least some subset of the securities.  For the JPM Inventory, Barclays used its exit prices on December 22, 2008, which is three month after the September 22, 2008.[148]  It is my understanding that Barclays' exit price marks were set at the sale price for certain securities sold between September 22 and September 30, 2008.  The spreadsheets that contain the Barclays' exit price marks used in its Opening Balance Sheet indicate that 828 of 1,981 PMTG and PMTG II securities in the Initial Inventory that were sold between September 22 and September 30 were reported at sale values in the Opening Balance Sheet.[149]  While we do not have the details of the conditions under which each of these securities or blocks of securities were sold, it is possible that they were sold at either "fire sale" prices or with a "block or bulk" discount.  The Pfleiderer Report provides some, albeit limited, information to understand the potential effect of using sales prices from subsequent sales of securities for the value of the securities on Barclays's Opening Balance Sheet.  The Pfleiderer Report provides no foundation or support for using fire sale or block discounted prices or values for the purposes of a comparison to the Sale Transaction approved by the Court.

87.     The flawed implementation in this section of the Pfleiderer Report is the same flawed implementation that plagues much of the Report; that is, the Report selects a subset of data that

---

[148] Mr. Romain stated in his declaration that "[t]he assets transferred to Barclays in the December settlement with JP Morgan and LBI consisted of $1.25 billion in cash and securities that Barclays valued at $3,741 million measured as of the December 22,2008 date of receipt."  (Declaration of Gary Romain, January 26, 2010, ¶19 (BCI Exhibit 357)).

[149] Mr. Romain stated in his declaration that Barclays' ". . . total valuation of all inventory actually transferred in September 2008, which includes both the Schedule A repo collateral securities as well as the Schedule B clearance box assets (Bates number BCI-EX-00099519). . . . indicated that Barclays valued the total inventory of securities actually received in September 2008 at $40,690 million. The amount included in the acquisition balance sheet was $40,695m after adjusting for immaterial rounding items. . . "  (Declaration of Gary Romain, January 26, 2010, ¶18 (BCI Exhibit 357)).

**Contains Highly Confidential Information**

supports an opinion or conclusion and ignores the remaining data.  Thus, it does not provide a comprehensive and thorough analysis of an issue.  As discussed above, I show in Exhibit E-4, using Barclays' exit price marks, the value of these securities is only 2.2% of the value of the securities at issue.

### b.   Flawed and Inadequate Analysis of Other Securities in Appendix Four

88.    The remainder of Appendix Four (sections 4.4-4.8) contains unsupported opinions about Barclays' exit price marks for five securities – (i) US Agency CMOs (Complex Floater, Interest Only and Inverse Interest Only), (ii) Lehman-issued warrants and Lehman-issued equity-linked notes, (iii) Giants Stadium Bonds, (iv) Insurance-Related asset backed securities, and (v) Pine CCS CLO.[150, 151]  The Pfleiderer Report concludes that the Barclays exit price mark is

---

[150] CMOs are Collateralized Mortgage Obligations and are defined as ". . . a type of mortgage-backed security (MBS). They are bonds with claims to cash flows from pools of residential mortgages. The payments of principal and interest on the mortgages are allocated to different tranches of the CMO by a complex structure. Each tranche may have different principals, coupon rates and maturity dates."
(http://glossary.reuters.com/index.php/CMO, last visited February 23, 2010).

"A floater is a bond whose interest rate varies with the interest rate of another debt instrument, e.g., a bond that has the interest rate of the Treasury bill +.25%."  (http://www.bloomberg.com/invest/glossary/bfglosf.htm#floater, last visited February 22, 2010).

"Interest Only is a tranche of a CMO or similar instrument whose owner receives only the interest or some part of the interest paid on mortgages in the underlying pool."
(http://www.amex.com/servlet/AmexFnDictionary?pageid=display&titleid=3425, last visited February 22, 2010).

"Inverse Floater is a derivative instrument whose coupon rate is linked to the market rate of interest in an inverse relationship." (http://www.bloomberg.com/invest/glossary/bfglosi.htm, last visited February 22, 2010).

A warrant is a "derivative security that gives the holder the right to purchase securities (usually equity) from the issuer at a specific price within a certain time frame." (http://www.investopedia.com/terms/w/warrant.asp, last visited March 3, 2010).

"Equity-Linked Note (ELN) is a security that combines the characteristics of a zero- or low-coupon bond or note with a return component based on the performance of a single equity security, a basket of equity securities, or an equity index. In the latter case, the security is typically called an equity index-linked note. Equity-linked notes come in a variety of styles. The minimum return may be zero with all of what would normally be an interest payment going to pay for upside equity participation. Alternatively, a low interest rate may be combined with a lower rate of equity participation. The participation rate in the underlying equity instrument may be more or less than dollar for dollar over any specific range of prices. The participation may be open ended (the holder of the note participates proportionately in the upside of the underlying security or index, no matter how high it goes), or the equity return component may be capped. Other things equal, a capped return is associated with a higher rate of participation up to the cap price." (http://www.amex.com/servlet/AmexFnDictionary?pageid=display&titleid=2397, last visited February 22, 2010).

**Contains Highly Confidential Information**

appropriate to use for each of these securities; however, as I explain above, each of these opinions is unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.

89.    First, as I show in Exhibit E-4, using Barclays' exit price marks, the value of these securities is only 3.0% of the value of the securities at issue.  The analysis in the Pfleiderer Report concerning the US Agency CMOs (Complex Floater, Interest Only and Inverse Interest Only) securities entails an overview of this type of security and cites the riskiness of these types of securities.  An overview of this type of security is merely a description and, of course, provides no foundation to support the appropriateness of Barclays' exit price marks (in absolute terms or relative to other marks).  The relative riskiness of these securities also provides no foundation to support the appropriateness of Barclays' exit price marks (in absolute terms or relative to other marks) as long as the other marks (Lehman, BoNY) also included appropriate risk adjustments for the riskiness of this type of security.  The Pfleiderer Report cites U.S. Securities and Exchange Commission documents identifying the riskiness of these securities; thus, it appears that the riskiness was known to Barclays and to Lehman and BoNY.  The

---

A CLO is a Collateralized Loan Obligation, which is defined as ". . . a security backed by a pool of commercial or personal loans, structured so that there are several classes of bondholders with varying maturities, called tranches. Similar in structure to Collateralized Mortgage Obligations." (http://www.bloomberg.com/invest/glossary/bfglosc.htm#collateralized_loan_obligation, last visited February 23, 2010).

[151] The figures for U.S. agency CMOs (complex floater, interest only and inverse interest only) were obtained via the RMBS tab from the Initial Inventory file using a filter on Subtype (column E) for "Complex Floater", "IO", or "Inverse IO" and an adjusted filter which ignores all items with zero in the Sales Price Field (column Y) for only "Complex Floater."

The figures for Lehman-issued warrants and Lehman-issued equity-linked notes were obtained via the EQTY-930old tab from the Initial Inventory file using a filter on Tested? (column L) for "Lehman Issued Untested" and "Lehman Issued Warrants Untested".

The figures for Giants stadium bonds were obtained via the Corps tab from the Initial Inventory file from all line items with text "Giant" in column A.

The figures for insurance-related asset backed securities were obtained via the Corps tab from Initial Inventory for CUSIP 45805AAA7. These amounts are reported in Exhibit E-4 and are based on a $46 million notional amount. The other CUSIP in this category is CUSIP 45804VAA2 found in the Portfolio 3 tab of the JPM Inventory file. For this CUSIP, the JPM custodial mark for 9-17-08 was $53.0 million, Barclays (PCG) 12-22-08 mid-point mark was $14.5 million, and Barclays (PCG) 12-22-08 exit price mark was $14.4 million.

The figures for Pine CCS CLO were obtained via the PMTG II tab from the Initial Inventory file using a filter on Issuer (column F) for "Pine CCS" and a filter on Asset Type (column C) for "CLO".

---

**Contains Highly Confidential Information**

Pfleiderer Report does not review (and therefore did not test) the valuation model and inputs used by Barclays to value this type of security; it did not compare the valuation model and inputs used by BoNY or Lehman to the Barclays model and inputs.[152]  The Pfleiderer Report provides no foundation or support for the conclusion that, "[g]iven the relevant risks and liquidity issues, Barclays exit-price marks were reasonable and appropriate."[153]

90.    The analysis in the Pfleiderer Report concerning the Lehman-issued warrants and Lehman-issued equity-linked notes entails an overview of this type of security and an analysis for prices of "other direct obligations of LBHI immediately preceding and following LBHI's bankruptcy filing."[154]  The Pfleiderer Report provides no information that identified the specific securities examined in this analysis; how similar these securities were to the securities at issue; whether the analysis included all such securities or a selected subset, and, if a subset, how the subset was selected; the sources of the prices; the frequency of the prices; the volume traded; or any other information other than a broad observation that these securities "lost somewhere between 80% and 90% of their value immediately following LBHI's filing."[155]  Barclays' exit price marks assigned a zero value to these securities, apparently ignoring evidence employed in the Pfleiderer Report that these assets should be valued at 10% to 20%.  The Pfleiderer Report does not review (and therefore did not test) the valuation model and inputs used by Barclays to value this type of security; it did not compare the valuation model and inputs used by BoNY or Lehman to the Barclays model and inputs.[156]  Thus, the Pfleiderer Report has no foundation or support to conclude that, "this write off of the BoNY-marks indicated value of Lehman-issued equity linked notes and warrants was reasonable and appropriate."[157]

---

[152] In the Pfleiderer deposition, when asked about the liquidity discount applied to these securities, the deponent states that he cannot recall any specific analyses that were performed but notes that PwC has reviewed these calculations.  (Deposition of Paul Pfleiderer, February 23, 2010, 260:3-262:10).

[153] Pfleiderer Report, p. 110.

[154] Pfleiderer Report, p. 111.

[155] Pfleiderer Report, p. 111.

[156] In the Pfleiderer deposition, the deponent states that his recollections are also "a bit hazy" with regard to any discussion or regarding the valuation of these securities.  He agrees that the asset should be significantly marked down but cannot offer a more precise value without conducting additional due diligence.  (Deposition of Paul Pfleiderer, February 23, 2010, 317:15-321:3).

[157] Pfleiderer Report, p. 112.

---

**Contains Highly Confidential Information**

91.     The analysis in the Pfleiderer Report concerning the Giants Stadium Bonds entails an overview of this type of security and a discussion of the auction rate securities market.  The Pfleiderer Report states that such securities could have had more value for long-run investors, "… investors who could hold for the long term eventually would be paid in full; the crisis in auction rate markets was said to be an issue of lack of liquidity rather than deteriorating creditworthiness of the borrowers."[158]  The Pfleiderer Report rejects that view but provides no support for rejecting it, "But for Barclays purposes, the issue was not what the value of these securities might be in the long run assuming a return to normal conditions, but the value of the positions in an orderly sale under current conditions."[159]  The Pfleiderer Report does not review (and therefore did not test) the valuation model and inputs used by Barclays to value this type of security; it did not compare the valuation model and inputs used by BoNY or Lehman to the Barclays model and inputs.[160]  The Pfleiderer Report provides no foundation or support for the conclusion that, "Given conditions in the markets for auction rate securities, Barclays exit-price marks were reasonable and appropriate."[161]

92.     The analysis in the Pfleiderer Report concerning the insurance-related asset backed securities entails a discussion of the possible identification of these securities and the pricing of these securities in the GFS system.  The Pfleiderer Report speculates that some of these securities are auction rate securities and some might be related to certain insurance companies or types of insurance companies.  This speculation provides no foundation to support the appropriateness of Barclays' exit price marks (in absolute terms or relative to other marks) as long as the other marks (Lehman, BoNY) also had similar information to that of Barclays.  The Pfleiderer Report does not review (and therefore did not test) the valuation model and inputs used by Barclays to value this type of security; it did not compare the valuation model and inputs used by BoNY or Lehman to the Barclays model and inputs.  The Pfleiderer Report provides no

---

[158] Pfleiderer Report, pp. 112-113.

[159] Pfleiderer Report, p. 113.

[160] In the Pfleiderer deposition, the deponent admits there was "some focus on these bonds by people at Barclays" but cannot be certain that he is not confusing this security with Pine.  He does recall that his staff did a "fair amount of due diligence" and there were some discussions, none of which he could recall.  (Deposition of Paul Pfleiderer, February 23, 2010, 315:8-318:19.)

[161] Pfleiderer Report, p. 113.

**Contains Highly Confidential Information**

foundation or support for the conclusion that, "[c]onsidering these factors, securities backed by Genworth and related entities — with or without credit enhancement by a troubled monoline insurer — were appropriately accorded a low valuation as of September 22, 2008."[162]

93.     The analysis in the Pfleiderer Report concerning the Pine CCS CLO entails an overview of this type of security, concluding that these securities were not traded, and a review of (and partially quoted) a Barclays' valuation memorandum.  The Pfleiderer Report does not review (and therefore did not test) the valuation model and inputs used by Barclays to value this type of security; it did not compare the valuation model and inputs used by BoNY or Lehman to the Barclays model and inputs.[163]  Further, the quotation from the Barclays valuation memorandum in the Pfleiderer Report itself indicates that Barclays gave a "haircut" of 75% to its own value without foundation from a model or empirical analysis:

> Overall view was that based on (a) the factors relating to the pool composition along with (b) the high concentration and (c) recent downgrade to CC, PCG PT determined a px of $56 was reasonable to which a haircut of 75% of MV should be applied for market and legal uncertainty.[164]

94.     The Pfleiderer Report provides no foundation or support for the conclusion that, "Barclays 'due diligence' [Pine CCS] in marking this unique asset appears thorough and appropriate and justifies Barclays' conclusion as to value at exit price marks."[165]

### c.  Conclusion

95.     Based on the analysis in Appendix Four of that report, the Pfleiderer Report claims to have "…examined a number of the specific positions and groups of positions … in more detail, to assess whether the specific characteristics of the positions explained and supported Barclays exit price marks as opposed to BoNY marks."[166]  As I document above, the securities examined represent only 5.2% of the Barclays Opening Balance Sheet value at issue.  Further, the opinions

---

[162] Pfleiderer Report, p. 116.

[163] *See* expert report of John Olvany dated March 15, 2010.

[164] Pfleiderer Report, p. 117.

[165] Pfleiderer Report, p. 117.

[166] Pfleiderer Report, ¶57.

Contains Highly Confidential Information

and conclusions in this section of the Pfleiderer Report are not supported by an independent valuation of the securities at issue, nor are they supported by an acceptable empirical analysis and testing of the assumptions.

> 6.    Overall Conclusion Regarding the Opinions in Section II of the Pfleiderer Report

96.    As I show above, the various opinions and conclusions in the Pfleiderer Report relating to rejecting the use of each and every valuation or price mark other than the Barclays' exit price marks are flawed and unsupported.  I begin by discussing the Pfleiderer Report's flawed opinion about the "price" of the Repo Collateral.  Next, I respond to the Pfleiderer Report's flawed and unsupported rejection of valuations of the Repo Collateral contained in contemporaneous emails, email attachments, and depositions.  Third, I evaluate the Pfleiderer Report's flawed and unsupported rejection of the Lehman, BoNY, and JPMorgan price marks to value the Repo Collateral.  Fourth, I examine the Pfleiderer Report's flawed and unsupported ex-post analysis.  Finally, I evaluate the Pfleiderer Report's flawed and unsupported analysis in Appendix Four.  These factors should not be considered in the economic analysis of the Movants' claims.

97.    Thus, the opinion in the Pfleiderer Report that "Based on the facts and analyses set forth in this section, I conclude that Barclays did not receive a $5 billion discount, secret or otherwise, through the Fed Replacement Repo"[167] is, for reasons I explain above, unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.  The Pfleiderer Report admits that Barclays received a $500 million discount in stating that "… the Repo Collateral pledged to Barclays in the Fed Replacement Repo, including the securities and cash ultimately received in Barclays' December settlement with JP Morgan Chase and LBI, was worth at most approximately $45.5 billion…"[168]

---

[167] Pfleiderer Report, ¶8.

[168] Pfleiderer Report, ¶8.

**Contains Highly Confidential Information**

F.  PFLEIDERER REPORT'S OPINIONS IN SECTION III RELATED TO THE
"ALLEGED $5 BILLION DISCOUNT AT INCEPTION" ARE FLAWED AND
UNSUPPORTED

98.      In this section, I discuss the basis for the following opinion:

**Opinion 8:**  The opinion in Section III of the Pfleiderer Report that ". . . the Movants'
assertion of a secret $5 billion discount from inception is implausible" is flawed and lacks
foundation.[169]  To the contrary, Movants' assertion of a $5 billion discount from
inception is possible.

99.      Among the opinions expressed in Section III of the Pfleiderer Report is the following:  ".
. . in my opinion, the Movants' assertion of a secret $5 billion discount from inception is
implausible."[170]

100.     To support its conclusion, the Pfleiderer Report analyzes GFS data as of September 12,
2008 and compares the Net Long Inventory values of LBI's holdings to the September 16, 2008
Balance Sheet.[171]  (*See* Pfleiderer Report, Table 4).  This analysis is flawed for the reasons
described below.  In addition, the Pfleiderer Report ignores the deposition testimony and other
documents that contradict this conclusion.[172]

101.     Pfleiderer Report Table 4 relies on GFS data that does not identify the CUSIPs used to
compute a total Net Long Inventory value of $65.16 billion.[173]  Using the most complete CUSIP-
level information available on September 12, 2008, I identify CUSIPs in GFS with a positive

---

[169] Pfleiderer Report, footnote 61, p. 45.

[170] Pfleiderer Report, footnote 61, p. 45.

[171] The "September 16, 2008 Balance Sheet" refers to Deposition Exhibit 19, which was referenced in the APA
(Deposition Exhibit 1).

[172] Deposition Exhibit 20; Deposition of Martin Kelly, August 18, 2009, 46:11-17, 66:7-16; Deposition of Ian
Lowitt, August 20, 2009, 41:8-42:16, 43:12-22, 138:18-139:3; Deposition of Paolo Tonucci, August 14, 2009,
27:18-29:14.

[173] The Pfleiderer Report relies on BCI-EX-(S)-00213951.xls, an excel file that contains a summary tab and a detail
tab.  The detail tab of this spreadsheet omits any references to CUSIPs or products.  (*See* Pfleiderer Report, footnote
65).

---

**Contains Highly Confidential Information**

trade position in Exhibit F-1.[174]  I then compare these CUSIPs to the CUSIPs included in
Barclays Opening Balance Sheet.  7,893 out of the 11,938 CUSIPs, which is 66% of the CUSIPs,
or $26.691 billion of the $44.430 billion, which is 60% of the value, in Barclays Opening
Balance Sheet in the Initial and JPM Inventory on September 12, 2008 were present in GFS.
Thus, the analysis in the Pfleiderer Report cannot be conclusive for the Lehman assets received
by Barclays.

102.    Contrary to the Pfleiderer Report's conclusion, it is possible that a $5 billion discount
existed at inception of the transaction.  As support for its conclusion, the Pfleiderer Report states:

> If these publicly-disclosed values really were understated by $5 billion, Barclays had set
> itself up, in a very public way, for an extraordinary problem, namely, what to do with the
> $5 billion gain it would realize, mostly in the fourth quarter, as it sold off these assets.
> How could Barclays not realize that a distortion of this magnitude, made in full public
> view, would come back to haunt it in a matter of months?[175]

103.    There are several flaws in the Pfleiderer Report's rationale.  First, it was not possible to
identify the performance of Lehman, or the gains/losses Barclays would realize on the sale of
Lehman's trading inventory, in Barclays' publicly disclosed financial statements.  As Barclays
stated in its disclosure of the acquisition in its SEC Form 20-F:

> It is impracticable to disclose the profit or loss of the acquired Lehman Brothers North
> American businesses since the acquisition date.  The acquired business has been
> integrated into the corresponding existing business lines and there is no reliable basis for
> allocating post-acquisition results between the acquirer and the acquiree.[176]

104.    After the acquisition, Lehman's performance was therefore indistinct from that of
Barclays' existing operations.  Second, a $5 billion gain would be recognized in the fourth
quarter of 2008 only if the assets were perfectly hedged.  The Pfleiderer Report admits that

---

[174] *See* BCI-EX-00297253 (Detailed Exposure Report 9-12.xlsx).  The Net Long Inventory of the CUSIP level detail
in this file sums to $62.36 billion.  The Net Long Inventory in the support materials from Table IV of the Pfleiderer
Report uses a different aggregation than CUSIP ("2008-09-16_0723 – Here's the summary for the 12th.xls" (BCI-
EX-(S)-00213951.xls)) and totaled $65.16 billion.  I further note that the Pfleiderer Report includes an additional
file at the CUSIP level for September 12, 2008 (BCI-EX-00297155.xls) in which the Net Long Inventory value is
$54.6 billion.

[175] Pfleiderer Report, footnote 61, p. 45.

[176] Barclays PLC, Barclays Bank PLC 2008 20-F filing to the U.S. Securities and Exchange Commission, p. 236.

---

**Contains Highly Confidential Information**

Barclays' hedging of the portfolio was "incomplete and imperfect."[177] Therefore, any gain or loss recognized in the fourth quarter would be affected by market movements after the acquisition date, resulting in recognition of a different gain or loss.[178] Finally, Barclays' analysis of its gains and losses on the sale of Lehman inventory through December 31, 2008 indicated that only $7 billion of assets were sold to external parties.[179] The remainder of the trading inventory was transferred internally to Barclays' trading desks. In addition, as discussed above, this analysis is flawed because Barclays recorded certain assets at their sale prices in the Opening Balance Sheet. By using sale prices in its acquisition balance sheet, Barclays' net gains would not be reported as gains on its income statement. Instead, the net gains would be included in goodwill. It is unclear if a $5 billion discount at inception would be revealed in this analysis.

105.    The Pfleiderer Report's opinions regarding the existence of a $5 billion discount at the inception of the Sale Transaction are flawed and unsupported.

### G.    PFLEIDERER REPORT'S OPINIONS IN SECTION IV RELATED TO "RISKS ARISING FROM THE ACQUISITION" ARE FLAWED

106.    In this section, I discuss the basis for the following opinion:

**Opinion 9:** The Pfleiderer Report argues in Section IV that Barclays' "… immense financial and business risks …"[180] should be considered in an economic analysis of Movants' claims. As I explain and document below, and as acknowledged in the Pfleiderer Report, Barclays was aware of these risks when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall. [181]

---

[177] Pfleiderer Report, ¶¶68 and 102.

[178] Barclays' analysis of its gains and losses on the sale of Lehman inventory through December 31, 2008 indicated that not all assets were hedged. (Deposition Exhibit 533A (BCI-EX-00295932-BCI-EX-00295933)).

[179] Deposition Exhibit 533A (BCI-EX-00295932-BCI-EX-00295933).

[180] Pfleiderer Report, ¶5. b.

[181] Deposition of Robert Edward Diamond, Jr., September 11, 2009, 52:22-53:8, 53:20-22, 54:4-6, 59:12-18. Mr. Diamond is president of Barclays PLC and chief executive of the investment banking and investment management businesses. (*Id*. at 7:14-20.)

Deposition of John Varley, September 3, 2009, 24:17-20. Mr. Varley is Chief Executive Officer of Barclays. (*Id*. at 5:14-15.)

---

**Contains Highly Confidential Information**

107.    Section IV of the Pfleiderer Report includes the following among its opinions:

> The acquisition of LBI's North American broker-dealer businesses entailed enormous
> risks for Barclays, which can be grouped into three broad categories: (a) information risk,
> (b) market and price risk, and (b) [*sic*] business and strategic risk. . . . The set of assets
> transferred from LBI to Barclays on September 22, 2008, was among the largest, most
> complex, and most difficult to understand set of assets ever transferred from one financial
> institution to another. . . . There are reasons to doubt how well Lehman understood some
> of these securities, much less other investors and analysts (including Barclays prior to the
> Transaction). . . . [T]here can be no doubt that both Lehman and Barclays were working
> with imperfect and incomplete information as they negotiated and effected the
> Transaction.  This imperfect and incomplete information exposed both parties to risk.[69]
> (footnote 69:  "As I discuss in a later subsection, it is not hard to imagine scenarios in
> which the acquired Businesses simply dissipated into thin air."). . .[182]

108.    Information risk, market and price risk, and business and strategic risk generally arise in
varying degrees in most acquisitions.  The Pfleiderer Report itself acknowledges Barclays'
knowledge of the business and strategic risks of the transaction:

> Barclays surely was keenly aware of the business and strategic risks of the Transaction.
> Indeed, just one year before the Transaction with LBI, Barclays had attempted, but failed,
> to acquire Dutch bank ABN AMRO, which in 2007 was one of the largest banks in
> Europe with operations in 63 countries.  Barclays first announced its intention to acquire
> ABN AMRO in April 2007.  After a consortium led by Royal Bank of Scotland ("RBS")
> submitted a higher competing bid, Barclays raised its offer in July 2007 to €67.5 billion.
> But Barclays' bid was still short of the RBS consortium's offer, and Barclays ultimately
> withdrew its bid for ABN AMRO in October 2007, clearing the way for the RBS-led
> consortium's bid to go through.  The consortium then proceeded with its planned
> dismemberment of ABN AMRO, with Fortis acquiring ABN AMRO's Dutch and Belgian
> operations, Banco Santander acquiring ABN AMRO's banking operations in Brazil and
> Italy, and RBS acquiring ABN AMRO's wholesale division and all other operations,
> including those in Asia.

> Barclays "near miss" in the ABN AMRO bidding proved (ex post) to be fortunate and
> provided a vivid lesson in the business and strategic risk of a large acquisition in the
> financial services industry in perilous times. . . .[183, 184]

---

[182] Pfleiderer Report, ¶¶92 and 94.

[183] Pfleiderer Report, ¶¶105-106.

[184] "'EUR' or '€' is the ISO 4217 currency code for Euro." (http://www.bloomberg.com/invest/glossary/bfglose.htm,
last visited March 5, 2010).

---

**Contains Highly Confidential Information**

109.    Michael Klein, a consultant working with Barclays involved in the negotiations,

described Barclays' awareness of risks:

> …It was very clear that the Barclays organization hoped to be an acquirer of Lehman if
> that was an achievable event.  However, they were extremely mindful from the beginning
> that there was an enormous amount of asset problems within the Lehman balance sheet,
> that that grouping of assets would not be party to anything that they could purchase.
> Secondly, they were incredibly mindful that they would be risking what they had built
> over the past decade, both reputationally and businesswise and that is kind of a
> transaction with this kind of integration that they hadn't done before.[185]

110.    Barclays' September 16, 2008 board discussion materials included the following

description of "three primary risks outstanding:"

> ➢  If we do not get a fixed price from the major investors . . . before announcement,
>    we take the risk that the share issuance raises less than the $3.4bn current market
>    value of these shares.
>
> ➢  We have performed accelerated due diligence and there will be a number of loose
>    ends upon separation from Long Island [Lehman] (e.g. continuation of Group
>    Services)
>
> ➢  We will be subject to a US legal process which is unpredictable[186, 187]

111.    The Pfleiderer Report describes multiple risks arising to Barclays and Lehman as a result

of the Sale Transaction.  However, the Pfleiderer Report's discussion of these risks is flawed.

Barclays was aware of these risks at the time of the Sale Hearing and Sale Transaction, and

Barclays would have considered these risks when agreeing to the Court approved Sale

Transaction.[188]  Such risks, however, do not provide justification for Barclays benefiting from

the Lehman acquisition by receiving more assets than were approved by the Court or paying less

for those assets than was represented to the Court.

---

[185] Deposition of Michael Klein, September 12, 2009, 18:16-19:6.

[186] Deposition Exhibit 378, p. 2.

[187] Project Long Island was Barclays' project name for Barclays acquisition of Lehman. (Deposition of Rich Ricci,
September 8, 2009, 113:7-13).

[188] *See* BCI Exhibit 112 - Thomson StreetEvents transcript of 9/17/08 Barclays Plc analyst call, p. 3.

**Contains Highly Confidential Information**

### H. PFLEIDERER REPORT'S OPINIONS IN SECTION V RELATED TO "BARCLAYS' ACCOUNTING GAIN ON THE ACQUISITION" ARE FLAWED

112.    In this section, I discuss the basis for the following opinion:

**Opinion 10:**  The Pfleiderer Report erroneously concludes in Section V that "[t]he fact that Barclays reported an accounting gain on the Acquisition does not indicate that Barclays received a secret or unfair discount on the Repo Collateral, nor does it imply that Barclays earned an unexpected or unreasonable profit from the Transaction."[189]  This argument is not supported by appropriate and reasonable analyses.  Based on the Court approved Sale Transaction as described in the Goldin Report, Barclays' accounting gain on the Sale Transaction is consistent with and indicates a Barclays Windfall.

113.    The Pfleiderer Report's opinions related to Barclays' accounting gain on the Sale Transaction include, but are not limited to:

. . . Barclays' 2008 Results Announcement summary of the Acquisition and related work papers and files provide a thorough and detailed description of the Transaction. . . . Furthermore, these materials also provide sufficient data and analytical support to establish that the values Barclays assigned to the acquired assets and assumed liabilities approximated their "fair values" at the time of the Acquisition with reasonable precision.

. . .

. . . In my opinion, given the uncertainty surrounding the value of these accounts [exchange-traded derivatives] at the time, and given the risks Barclays took on by assuming all the liabilities and settlement obligations associated with these accounts, it was reasonable for Barclays to receive the benefit of the unknown value associated with these accounts. . . .

. . . given the substantial uncertainty about the value, and even the identity, of the assets and certain of the liabilities, Barclays' reported gain is reasonable, unsurprising, and fair to the Sellers.[84] . . . [*See* footnote 84:  ". . . due to factors that the applicable accounting rules do not permit to be taken into account, the actual economic value of the Trading Portfolio Securities to Barclays was less than the reported accounting valuation."]

. . . In fact, given the risks for Barclays, market conditions, and other relevant considerations, it was not unreasonable nor should it have been unexpected for Barclays to report an accounting gain on its acquisition of LBI's North American broker-dealer businesses.

. . .

---

[189] Pfleiderer Report, ¶5. c.

. . . Barclays' reported accounting gain on the Acquisition does not in any way imply that Barclays paid less than Lehman would have received in a liquidation of the financial assets acquired in the Transaction. [certain footnotes omitted][190]

The Pfleiderer Report's analysis of the accounting gain on the acquisition is flawed. In this matter, the "reasonableness" and "fairness" of the gain should only be evaluated in the context of the transaction approved by the Court.

114.    The Pfleiderer Report attempts to rationalize Barclays' accounting gain because of the risk of the transaction to Barclays and the market conditions at the time. As discussed above, the transaction approved by the Court reflected the risks inherent in the transaction. Likewise, the Court-approved transaction reflected the market conditions at the time. Further, the comparison of the terms of the Sale Transaction to the amount that Lehman would realize in a liquidation of its assets (which typically is less than would be realized in the sale of a going concern such as the Sale Transaction) is not meaningful. The Pfleiderer Report's justification for Barclays' accounting gain is flawed.

### 1.  Pfleiderer Report's Flawed Analysis in Exhibit 8

115.    The Pfleiderer Report continues to divert attention from an economic analysis and quantification of the Barclays Windfall with the opinion that " negative goodwill and an accounting gain on acquisition were common . . . Exhibit 8 shows that similar results [were] obtained in a number of transactions in the financial services industry in 2008 and 2009."[191]

116.    The fact that other transactions resulted in negative goodwill has nothing to do with whether or not the Sale Transaction as executed comports with the transaction approved by the Court. In addition, Exhibit 8 presents a narrow and undefined sample section process. Exhibit 8 contains data from seven selected transactions in the financial industry, all of which show zero or negative goodwill. In two of these transactions (Suburban Federal Savings Bank and County Bank), the targets were purchased from the FDIC out of receivership for no consideration.[192]

---

[190] Pfleiderer Report, ¶¶109, 117-119, and 121.

[191] Pfleiderer Report, ¶120.

[192] The FDIC is the Federal Deposit Insurance Corporation, which is defined as ". . . a federal institution that insures bank deposits." (http://www.bloomberg.com/invest/glossary/bfglosf.htm#federal_deposit_insurance_corporation, last visited February 23, 2010).

**Contains Highly Confidential Information**

117.    Further, the Pfleiderer Report fails to mention that Exhibit 8 is not a systematic analysis.[193]  The Pfleiderer Report does not define "common" in its opinion above.  It doesn't analyze or evaluate the frequency of financial institution transactions with negative goodwill or accounting gains on acquisition.  While the Pfleiderer Report doesn't define what it means by "early 2009," I assume it means the first quarter of 2009.  A query of Thomson Reuters mergers and acquisitions database yielded 331 transactions involving 100% acquisitions of financial institutions during 2008 and the first quarter of 2009 where either the target or acquirer was located in the U.S. or the United Kingdom.[194]  The Pfleiderer Report does not describe how the seven transactions in Exhibit 8 were selected from among the 331 transactions.  This sample is not representative of financial institution acquisitions during the specified time period.

2.    The Pfleiderer Report is Flawed Regarding the Term *Book Value*

118.    In paragraph 82, the Pfleiderer Report states:  "[f]urthermore, to the best of my knowledge, 'book value' does not have a definite meaning in this context, such that a financial professional would understand it, as the Movants apparently do, to be synonymous with the 'marked' value of the assets and liabilities on Lehman's books as of any arbitrary date and without regard to the quality and timeliness of Lehman's marks on such date."  This statement is flawed.  Book value is a known term among financial professionals.  In fact, the Pfleiderer Report itself uses the term *book value* in its Exhibit 8, where it includes "Book Value of Target's Net Assets" in computing negative goodwill.  See the expert report of John Garvey for further discussion of the flaws in the Pfleiderer Report's opinions regarding the definition of *book value*.[195]

I.    PFLEIDERER REPORT'S OPINIONS IN SECTION VI RELATED TO "BENEFITS OF THE ACQUISITION" ARE FLAWED

119.    In this section, I discuss the basis for the following opinions:

---

[193] Aside from the methodological problems with this analysis, there are several flaws in the data contained in Exhibit 8 that render it unreliable.  For example, the data for the PNC Bank/National City transaction has been revised to reflect a $428 million gain.  (PNC Financial Services Group, Inc., SEC Form 10-Q, September 30, 2009, p. 68).

[194] Email from Anton Bisquera, Thomson Reuters On Demand, dated Thursday, March 11, 2010, 12:28 PM.

[195] *See* expert report of John Garvey dated March 15, 2010.

**Opinion 11:**  The Pfleiderer Report argues that certain potential benefits from the transaction should be considered in an economic analysis of Movants' claims.[196]  As I explain and document below, to the extent such benefits resulted from the transaction, the Court and others attending the Sale Hearing acknowledged these types of benefits when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall.

**Opinion 12:**  The Pfleiderer Report argues that without Barclays' acquisition of Lehman, "… it is virtually certain that the LBHI and LBI estates, Lehman's creditors, Lehman's customers, and public financial markets all would have been worse off."[197]  As I explain and document below, to the extent there were benefits to the transaction, the Court and others acknowledged them when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall.

120.    In Section VI, the Pfleiderer Report contains the following conclusions, among others:

> Barclays' acquisition of LBI's North American broker-dealer businesses was reasonably expected to benefit, and with high probability did benefit, the Estates, Lehman's creditors, and Lehman's customers.  The Acquisition also was reasonably expected to generate, and has in fact generated, significant public benefits. Had Barclays not acquired the Businesses, whether because no agreement could be struck or because approval of the Transaction had been withheld by the Court, it is virtually certain that the LBHI and LBI estates, Lehman's creditors, and Lehman's customer [*sic*] all would have been worse off. . . .[198]

121.    The Pfleiderer Report's opinions in Section VI are flawed and do not address an economic analysis and quantification of the Barclays Windfall.  To the extent there were benefits to Barclays, Lehman's customers and employees, and the global financial markets as a result of the transaction, the benefits were acknowledged by Barclays and the Court in advance of the Sale Order.  In a September 17, 2008 press release, Barclays described the transaction:

---

[196] Pfleiderer Report, ¶5. d.

[197] Pfleiderer Report, ¶5. d.

[198] Pfleiderer Report, ¶135.

**Contains Highly Confidential Information**

The Acquisition will combine two strong client franchises and product offerings, with the potential to create significant value for Barclays shareholders. The Lehman Brothers businesses are a highly complementary fit for Barclays investment banking business, Barclays Capital. The combined business will be a premier global investment bank with an increased presence in the US and an enhanced product offering. Among other benefits, the combination of the two businesses will:

- confirm Barclays Capital as a leading debt capital markets house globally;

- have a top 3 position in the US capital markets, the largest in the world;

- extend Barclays Capital's range of investment banking products, with the addition of Lehman Brothers strong US M&A and equity capital markets franchises; and

- strengthen Barclays Capital's hedge fund franchise through the addition of prime brokerage and cash equity capabilities.[199]

122.    In its conference call with analysts on September 17, 2008, Barclays described the benefits it expected to receive from the Sale Transaction:

> The acquisition of these businesses and assets significantly enhances Barcap's position in the United States, by a transaction that is de-risked by excluding the overwhelming majority of Lehman risk assets. Before moving on this opportunity, we satisfied ourselves as to the fit between the two capital markets businesses in terms of activities and culture. And the enlarged business will, of course, be part of IBIM, reporting to Bob.

> The transaction meets our financial tests with significant margin for error. We expect it to be immediately economic profit positive. We expect it to be accretive to earnings on an ongoing basis in the first year, including the impact of equity raising. And the return on investment is very high.

> . . . The acquisition transforms our position in the largest global capital market. . . .

> . . . Within the US broker dealer, one of the most exciting businesses, which you will appreciate, is the cash equities business. It's an absolute machine. It's extremely profitable. Gerry Donini and the team that run it have been there for a long time, year after year. It's got completely integrated research, sales, investment banking. It's fantastic. . . .

> . . . [T]his is a really unique, interesting opportunity. If you step back and look at the two organizations, Barclays Capital, which has done extremely well over the last 11 years, it has real scale and depth in UK, Europe, Middle East, Africa and into Asia. Lehman has the same type of scale and depth even more in the US, but not in those areas. If you look at it from a geographic point of view, it's a good balance. And their US heft and depth is just what we're looking for.

> . . .

---

[199] Barclays PLC and Barclays Bank PLC, SEC Form 6-K, September 17, 2008, pp. 4-5.

**Contains Highly Confidential Information**

. . . And it's no coincidence that we've chosen the businesses that we have chosen to grow in the United States through time because we feel we have competitive advantage in them. And in our Capital Markets business it's very clear to us that the competitive advantage of Barclays Capital will be significantly amplified by this deal.[200]

123. Barclays also described the public benefits expected to be achieved from the Sale Transaction:

. . . there is an opportunity here which we can execute on it, achieves a number of things. It achieves, potentially, good returns for our shareholders through time. It creates a level of certainty about a big business in the market, which I think is good for the system. It creates a much greater level of certainty for Lehman's clients in the United States. It creates a certainty for the people of Lehman's. And I very much hope that the Court will conclude that it's very much in the interest of creditors, but that is their deliberation and we respect it.[201]

124. In his deposition, John Varley (Barclays – Group Chief Executive and board member) described the goals of the Lehman acquisition:[202]

So there were two things we were seeking to do through the Lehman transaction. One was to increase significantly the size of the investment banking business in the biggest capital market in the world, and second to increase our exposure to the United States, because the United States is the biggest generator of economic profit in the financial services industry today.

Those two broad strategic thrusts caused us to identify this as an opportunity of strategic advancement.[203]

125. To the extent there were benefits of the transaction, the Court was fully aware of these benefits when it approved the Sale Order. As also acknowledged in the Pfleiderer Report, at the Sale Hearing, the Court described the benefits of the transaction as follows:

I am completely satisfied that I am fulfilling my duty as a United States bankruptcy judge in approving this transaction and in finding that there is no better or alternative transaction for these assets, that the consequences of not approving a transaction could prove to be truly disastrous. And those adverse consequences are meaningful to me as I

---

[200] BCI Exhibit 112 - Thomson StreetEvents transcript of 9/17/08 Barclays Plc analyst call, pp. 3, 7, 11, and 17.

[201] BCI Exhibit 112 - Thomson StreetEvents transcript of 9/17/08 Barclays Plc analyst call, p. 20.

[202] Deposition of John Varley, September 3, 2009, 5:13-15 and 7:10-25.

[203] Deposition of John Varley, September 3, 2009, 10:8-16.

**Contains Highly Confidential Information**

exercise this discretion.  The harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable.

Moreover, it's not just about avoiding harm.  Approving the transaction secures whether for ninety days or for a lifelong career employment for 9,000 employees at Lehman, and holds together an operation the value of which is really embedded in the talent of the employees, their knowledge, their relationship, their expertise and their ability to create value to the economy.[204]

126.    The Court and Barclays were aware of these benefits and considered them when the Court approved the Sale Transaction.  Such benefits, however, do not provide justification for Barclays benefiting from the Lehman acquisition by receiving more assets than were approved by the Court or paying less for those assets than was represented to the Court.

---

[204] Hearing Transcript, September 19, 2008, 250:13-251:3.

**Contains Highly Confidential Information**

Submitted by

_____

Mark E. Zmijewski

March 15, 2010

**Contains Highly Confidential Information**

# APPENDIX I

# MARK E. ZMIJEWSKI
# (ZME-YEV-SKI)

Principal                                                 Graduate School of Business
Chicago Partners (A Subsidiary of Navigant Consulting)    University of Chicago
30 S. Wacker Drive, Suite 3100                            450 N. Cityfront Plaza Drive
Chicago, Illinois  60606                                  Chicago, Illinois  60611
Telephone: (312) 251-5200                                 Telephone: (312) 464-8757
Facsimile: (312) 251-5201                                 Facsimile: (312) 464-8759

## ACADEMIC EMPLOYMENT

Graduate School Of Business, The University Of Chicago

*Leon Carroll Marshall Professor of Accounting*, (1999 – present)
*Deputy Dean*, (1996 - present)
*Professor of Accounting*, (1992 - 1999)
*Associate Dean for Ph.D. Studies*, (1995 - 1996)
*Executive Director, Center for Research in Securities Prices* (CRSP), (1992 - 1998)
*Associate Professor of Accounting*, (1988 - 1992)
*Assistant Professor of Accounting*, (1984 - 1988)

## EDUCATION

B.S.       (Concentration-Accounting), State University of New York at Buffalo,
           Management, 1976
M.B.A.     (Concentration-Accounting), State University of New York at Buffalo, 1981
Ph.D.      (Major – Accounting, Minors – Economics and Finance), State University of New
           York at Buffalo, 1983

## PREVIOUS ACADEMIC EMPLOYMENT

*Assistant Professor of Accounting*, State University of New York at Buffalo (1980 - 1984)
*Course Director*, York University (1979 - 1982)
*Teaching Assistant*, State University of New York at Buffalo (1977 - 1980)

## AWARDS AND HONORS

*Business Information Professional of the Year – Education,* Beta Alpha Psi - (2007)
*Hillel J. Einhorn Excellence in Teaching Award*, The Executive MBA Program, University
   of Chicago Graduate School of Business (1999)

Contains Highly Confidential Information

*Emory Williams Award for Excellence in Teaching*, The University of Chicago (1988)
*Competitive Manuscript Award*, American Accounting Association (1984)
Beta Alpha Psi, Honorary Accounting Society (1981)
Beta Gamma Sigma, Honorary Business Society (1980)

## GRANTS

Research Grant, SEC and Financial Reporting Institute, 1985
University Fellowship, State University of New York at Buffalo, 1979
Graduate Fellowship, State University of New York at Buffalo, 1976 - 1978

## RESEARCH PUBLICATIONS

"How Useful Are *Wall Street Week* Stock Recommendations?" with P. Griffin and J. Jones, *Journal of Financial Statement Analysis*, Fall, 1995.

"Contemporaneous Announcements of Dividends and Earnings," with R. Leftwich, *Journal of Accounting, Auditing, and Finance*, Autumn, 1994.

"The Relative Informativeness of Accounting Disclosures in Different Countries," with A. Alford, J. Jones, R. Leftwich, *Journal of Accounting Research*, Supplement, 1993.

"Extensions and Violations of the Statutory SEC Form 10-K Filing Requirements," with A. Alford and J. Jones, *Journal of Accounting and Economics*, 1993.

"SEC Form 10-K/10-Q Reports and Annual Reports to Shareholders: Reporting Lags and Squared Market Model Prediction Errors," with P. Easton, 1993, *Journal of Accounting Research*, Winter, 1993.

"Cross-Sectional Variation in the Stock Market Response to the Announcement of Accounting Earnings," with P. Easton, *Journal of Accounting and Economics*, 1989.

"An Evaluation of Alternative Proxies for the Market's Expectation of Earnings," with L. Brown, P. Griffin, and R. L. Hagerman *Journal of Accounting and Economics*, 1987.

"Security Analyst Superiority Relative to Univariate Time-Series Models in Forecasting Quarterly Earnings," with L. Brown, P. Griffin, and R. Hagerman, *Journal of Accounting and Economics*, 1987.

"The Effect of Labor Strikes on Security Analysts' Forecast Superiority and on the Association between Risk-Adjusted Stock Returns and Unexpected Earnings," with L. Brown, *Contemporary Accounting Research*, 1987.

Contains Highly Confidential Information

"Estimating Models with Binary Dependent Variables:  Some Theoretical and Empirical Observations," with G. Gessner, W. Kamakura, N. Malhotra, *Journal of Business Research*, 1987.

"Methodological Issues Related to the Estimation of Financial Distress Prediction Models," *Journal of Accounting Research*, 1984.

## RESEARCH PUBLICATIONS (con't)

"The Association Between the Magnitude of Quarterly Earnings Forecast Errors and Risk-Adjusted Stock Returns,"  with R. L. Hagerman and P. Shah, *Journal of Accounting Research*, 1984.

"An Income Strategy Approach to the Positive Theory of Accounting Policy Setting/Choice," with R. L. Hagerman, *Journal of Accounting and Economics*, 1981.  Reprinted in, *The Economics of Accounting Policy Choice*, 1992, edited by Ray Ball and Clifford Smith, Jr., (McGraw Hill Corporation, New York, NY).

"A Test of Accounting Bias and Market Structure:  Some Additional Evidence," with R. L. Hagerman, *Review of Business and Economic Research*, 1981.

"Some Economic Determinants of Accounting Policy Choice," with R. L. Hagerman, *Journal of Accounting and Economics*, 1979.

## TEACHING AND OTHER PUBLICATIONS

"Accounting and Disclosure Issues in Structured Finance," with Keith Bockus and W. Dana Northcut, in *Corporate Aftershock:  The Public Policy Lessons from the Collapse of Enron and Other Major Corporations*, C.L. Culp and W.A. Niskanen, eds., 2003.

"Discovery and the Financial Analyst," with Roger Hickey, *Litigation Services Handbook*, January, 1995.

Comments on "Earnings Forecasting Research:  Its Implications for Capital Markets Research," *International Journal of Forecasting*.

*The Phish Corporation:  A Practice Case in Managerial Accounting*, with R. Derstine, R. Huefner, and S. Gunn, 1991, (McGraw-Hill Corporation, New York, NY).

"Predictive Value of Accounting Information," with P. Griffin, in *Usefulness to Investors and Creditors of Information Provided by Financial Reporting*, Second Edition, edited by P. Griffin (Financial Accounting Standards Board, 1987).

Contains Highly Confidential Information

**DISSERTATION COMMITTEES**

Sandip Madan, University of Chicago, current, Member
Keith Bockus, University of Chicago, 1998, Co-Chairperson
Beverly Walther, University of Chicago, 1995, Member
Howard Bunsis, University of Chicago, 1993, Co-Chairperson
Phillip Berger, University of Chicago, 1992, Member
Stuart Essig, University of Chicago, 1991, Member
Sherri Jarrell, University of Chicago, 1991, Member
Andrew Alford, University of Chicago, 1990, Chairperson

**DISSERTATION COMMITTEES (con't)**

Mark Lang, University of Chicago, 1990, Member
Laureen Maines, University of Chicago, 1990, Member
Walter Teets, University of Chicago, 1988, Member
Siew Teoh, University of Chicago, 1988, Member
Kirsten Ely, University of Chicago, 1988, Member
M. Daniel Beneish, University of Chicago, 1987, Member
Pat O'Brien, University of Chicago, 1986, Member
W. Forbes Cavanagh, State University of New York at Buffalo, 1985, Member

**COURSES TAUGHT**

Financial Accounting (SUNY/Buffalo, University of Chicago, U. S. Business School in
    Prague)
Managerial Accounting (SUNY/Buffalo, York University)
Corporate Finance (SUNY/Buffalo, York University)
Advanced Financial Accounting, Mergers and Acquisitions (SUNY/Buffalo, University of
    Chicago)
Chicago Approach to Portfolio Management (University of Chicago)
Security Market and Financial Statement Analysis (University of Chicago, Bocconi University)
Cases in Financial Strategy (University of Chicago)

**UNIVERSITY ACTIVITIES**

Accounting Advisory Counsel - State University of New York at Buffalo, 1993-1995
Faculty facilitator - Leadership, Education, and Development (LEAD) Program, University of
    Chicago, Graduate School of Business, 1989, 1991
Dean's Advisory Committee on MBA Students and Curriculum, University of Chicago, 1988
Executive Director, Management Development Council, State University of New York at
    Buffalo, 1981-1984
Advisor, Center for Management Development, State University of New York at Buffalo,
    1979-1980

**Contains Highly Confidential Information**

## EDITORIAL SERVICE AND BOARDS

*The Accounting Review*, Associate Editor, 1993 - 1997
*Journal of Accounting Research*, Editorial Board, 1988 - 1993
*The Accounting Review*, Editorial Board, 1985 - 1987

## AD HOC REFEREE

*Journal of Accounting, Auditing, and Finance*
*The Accounting Review*
*Contemporary Accounting Research*
*The Financial Review*
*Journal of Accounting and Economics*
*Journal of Accounting Research*
*Journal of Banking and Finance*
*Journal of Business*
*Journal of Forecasting*
*International Journal of Forecasting*
*Management Science*

## PROFESSIONAL ORGANIZATIONS

The American Accounting Association
The American Finance Association

## BUSINESS CONSULTING EXPERIENCE

Worked as consultant or expert on issues including:

- Measuring damages in a variety of litigation contexts and industries
- Measuring marginal, incremental, variable, direct costs and profits
- Revenue recognition
- Assessing bankruptcy and solvency
- Preparing and assessing business plans
- Measuring interest rates and rates of returns, and risk
- Valuing and assessing the valuation of companies and parts of companies, including valuing synergies/efficiencies and intangible assets
- Forecasting and assessing the forecasts of companies and parts of companies, including valuing synergies/efficiencies and intangible assets
- Assessing the effect of information disclosures on security prices and damages in securities litigation cases
- Assessing solvency likelihood in "ability-to-pay" cases

Contains Highly Confidential Information

Applied expertise in a broad range of industries including:

- Computer hardware and software
- Credit card and credit card security
- Banking
- Securities companies
- Cameras and film
- Retail (electronics, vitamins, bakery, software, pharmacy, lumber)
- Automobile
- Real estate investment funds
- Airline
- Steel
- Cosmetics
- Energy
- Railroad
- Online education
- Pharmaceutical
- Heavy industrial equipment
- Telecommunications
- Chemical
- Diapers

## DEPOSED OR TESTIFIED IN LAST FOUR YEARS

**Grupo Modelo, S.A.B. de C.V., Diblo, S.A. de C.V., and Controlling Shareholders Thereof (The United Mexican States and the Kingdom of Spain) Claimants v. Anheuser-Busch Companies, Inc., Anheuser-Busch International, Inc., and Anheuser-Busch International Holdings, Inc. (The United States of America) Respondents.** Arbitration under the Arbitration Rules of the United Nations Commission on International Trade Law. Report filed May 4, 2009; Rejoinder Report filed July 2, 2009; Arbitration testimony August 12, 2009.

**In Re American International Group, Inc. Securities Litigation.** United States District Court Southern District of New York, Master File No. 04 Civ. 8141 (JES) (AJP). Affidavit filed August 4, 2009; Deposition testimony August 9, 2009.

**County of Milwaukee, Employees' Retirement System of the Milwaukee, and Pension Board, Employees' Retirement System of the County of Milwaukee vs. Mercer Human Resources Consulting, Inc. f/k/a William M. Mercer Incorporated.** United States District Court Eastern District of Wisconsin, No. 06-0-0372. Report filed September 6, 2007; Deposition testimony November 9, 2007; trial testimony May 14, 2009.

Contains Highly Confidential Information

**Unionbancal Corporation and Subsidiaries vs United States of America.** United States Court of Federal Claims.  Case No. 06-587T. Report filed January 9, 2009; Deposition testimony March 17, 2009.

**Hexion Specialty Chemicals, Inc., Nimbus Merger Sub, Inc., Apollo Investment Fund Iv, L.P., Apollo Overseas Partners Iv, L.P., Apollo Advisors Iv, L.P., Apollo Management Iv, L.P., Apollo Investment Fund V, L.P., Apollo Overseas Partners V, L.P., Apollo Netherlands Partners V (A) L.P., Apollo Netherlands Partners V (B) L.P., Apollo German Partners V. Gmbh & Co. Kg, Apollo Advisors V, L.P., Apollo Management V, L.P., Apollo Investment Fund Vi, L.P., Apollo Overseas Partners Vi, L.P., Apollo Overseas Partners (Delaware) Vi, L.P., Apollo Overseas Partners (Delaware 892) Vi, L.P., Apollo Overseas Partners (Germany) Vi, L.P., Apollo Advisors Vi, L.P., Apollo Management Vi, L.P., Apollo Management, L.P., And Apollo Global Management, Llc., Plaintiffs, v. Huntsman Corp., Defendant.**  In the Court of Chancery of the State of Delaware.  Case No. 3841-VCL.  Deposition Testimony September 3, 2008; Trial Testimony September 12, 2008.

**International Garden Products, Inc. v. Langeveld International Holdings, Inc. No. 116001668.** Arbitration deposition testimony November 18, 2008; Arbitration testimony November 16 and 18, 2008.

**In Re: Tyco International, Ltd., Securities Litigation.**  United States District Court for the District Of New Hampshire, MDL Docket No. 02-1335-B.  Affidavit filed October 19, 2007.

**Calgon Carbon Corporation v. Potomac Capital Investment Corporation, a Delaware corporation; Potomac Electric Power Company, a District of Colombia and Virginia Corporation; Progress Capital Holdings, Inc., a Florida Corporation; and Florida Progress Corporation, a Florida corporation.**  United States District Court for the Western District of Pennsylvania.  No. 98CV72.  Rebuttal Report filed February 29, 2000; Deposition testimony May 25-26, 2000; Rebuttal Report filed August 17, 2006; Deposition testimony January 3, 2007; Deposition testimony used in trial January 19, 2007.

**Breed Technologies, Inc. v. AlliedSignal, Inc.** Tenth Judicial District of Polk County, Florida, Case No. G-99-2478.  Report filed May 31, 2005; deposition testimony July 26, 2005; trial testimony March 16, 2006.

**Torchmark Corporation v. KPMG Peat Marwick LLP.**  United States Circuit Court of Jefferson County, Alabama, Civil Action No. CV 03 3315.  Report filed March 1, 2005; deposition testimony October 11, 2005

**Contains Highly Confidential Information**

# APPENDIX II
# DOCUMENTS RELIED UPON

**Documents in the Record**

**Depositions**

| Deponents | Date |
|---|---|
| Eric Fekler | 7/31/2009 |
| Steven Berkenfeld | 8/6/2009 |
| Paolo Tonucci | 8/14/2009 |
| Martin Kelly | 8/18/2009 |
| Ian Lowitt | 8/20/2009 |
| Paul Exall | 8/27/2009 |
| Bart McDade | 9/2/2009 |
| John Varley | 9/3/2009 |
| Jasen Yang | 9/4/2009 |
| Rich Ricci | 9/8/2009 |
| Gary Romain | 9/10/2009 |
| Stephen King | 9/10/2009 |
| Robert Diamond | 9/11/2009 |
| Michael Klein | 9/12/2009 |
| Gary Romain | 1/13/2010 |
| James Hraska | 1/15/2010 |
| Paul Pfleiderer | 2/23/2010 |

**Deposition Exhibits**

| Exhibit | | Beginning Bates | Ending Bates |
|---|---|---|---|
| 1 | Asset Purchase Agreement, dated Sept. 16, 2008 | | |
| 19 | Transaction Balance Sheet | | |
| 20 | Email string including Martin Kelly, Ian Lowitt, and Paolo Tonucci | 132841 | |
| 24 | First Amendment to the Asset Purchase Agreement | | |
| 25 | Clarification Letter, dated Sept. 20, 2008 | | |
| 86B | Initial Inventory, Schedule A and B Assets | BCI-EX-00099519 | BCI-EX-00099521 |
| 87B | JPM Inventory, Annex A Assets | BCI-EX-00108700 | |
| 88B | Barclays' Acquisition Balance Sheet | BCI-EX-00109154 | BCI-EX-00109161 |
| 139B | Email from James Hraska to John Rodefeld and others | BCI-EX-00009798 | BCI-EX-00010368 |
| 144A | Email from Gerard LaRocca to Mike Keegan | BCI 000580 | |
| 151A | Email from Robert Azerad to Paolo Tonucci | | |
| 152A | Email from Brett Beltner to Martin Kelly | | |
| 177 | Email from Alastair Blackwell to Alex Crepeau and others | | |
| 200 | Interim Transaction Balance Sheet with Lowitt Handwritten Notes | BCI-EX-00115141 | |
| 203 | Email from Marty Malloy to Gerard LaRocca and Stephen King | BCI-EX-00000080 | |
| 204 | Email from Gerard LaRocca to Mike Keegan | BCI-EX-00000081 | |
| 205 | Order Approving Settlement Agreement, Case No. 08-01420, Settlement Agreement, dated Dec. 5, 2008 | | |
| 208 | Email from Robert Azerad to Gerard LaRocca | BCI 006119 | BCI 006646 |
| 215 | Email from John Rodefeld to Teri Scott and others | BCI-EX-(S)-00034528 | BCI-EX-(S)-00034529 |
| 224 | Email from Anthony Stucchio to Alastair Blackwell and others | | |
| 235 | Email from James Hraska to Paolo Tonnaci | | |
| 274 | Email from Teri Scott to Jonathon Stone and others | BCI-EX-(S)-00038010 | BCI-EX-(S)-00038013 |
| 280B | Spreadsheet outlining elements of $2.0B compensation expense | BCI-EX-00077287 | |
| 281A | Email from John Haley to Teri Scott and others | BCI-EX-(S)-00047924 | BCI-EX-(S)-00047926 |
| 349B | Email from Paolo Tonucci to Jason Yang and Stephen King (with attachments) | BCI-EX-00070958 | BCI-EX-00070961 |
| 377A | Barclays' Opening Balance Sheet | BCI-EX-00115843 | BCI-EX-00115846 |
| 378 | Email from Haworth to Clackson | BCI-EX-(S)-00023787 | BCI-EX-(S)-00023788 |
| 444 | Declaration of Shari D. Leventhal, in Support of Trustee's Motion For Entry of an Order Approving a Settlement Agreement | | |
| 495 | Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, dated Sept. 15, 2009 | | |
| 506 | Email from Miller to Messineo and others (with truncated attachment) | WGM-LEHMAN-E 00006125 | WGM-LEHMAN-E 00006127 |
| 509 | Email from Kelly to Krasnow, re: "LBI BS_917_V with adjustment.xls.," dated Sept. 18, 2009 | LBHI 013444 | |
| 516 | Email from Murgio to Kelly and Fazio (with attachments) | MTHM0000139 | MTHM0000147 |
| 533A | Lehman Acquisition Assets Summary | BCI-EX-00295932 | BCI-EX-00295933 |
| 534A | Romain Preparation Notes for January 13 Deposition | | |
| 537A | Email from Stephen King to Jerry del Missier and others (with attachment) | BCI-EX-(S)-00078976 | |
| 549A | Email from Romain to Guarnuccio | BCI-EX-00218489 | BCI-EX-00218492 |
| 633A | Expert Report of Prof. Paul Pfleiderer, Volume 1, dated Jan. 8, 2010 | | |
| 634A | Expert Report of Prof. Paul Pfleiderer, Volume 2, dated Jan. 8, 2010 | | |
| 641A | Email from Sean Teague to Tal Litvin | BCI-EX-(S)-00213990 | BCI-EX-(S)-00213996 |

---

Expert Report of Mark E. Zmijewski                                                                    Page 70

**Contains Highly Confidential Information**

# APPENDIX II
## DOCUMENTS RELIED UPON

BCI Opposition Brief Exhibits

| Exhibit | | Beginning Bates | Ending Bates |
|---|---|---|---|
| 112 | Barclays Analyst Call, dated Sept. 17, 2008 | | |
| 113 | Fox-Pitt Kelton, "A lucky deal," dated Sept. 18, 2008 | | |
| 114 | Societe General Cross Asset Research, dated Sept. 18, 2008 | | |
| 171 | Letter to Jones Day regarding Compensation and Cure and attaching BCI-EX-00077272-286. | BCI-EX-00077272 | BCI-EX-00077286 |
| 263 | Email from Pearn to Stack, dated Sept. 21, 2008 (with attachment) | BCI-EX-(S)-00131273 | BCI-EX-(S)-00131318 |
| 357 | Declaration of Gary Romain, dated January 26, 2010 | | |

Other Documents

| Description | Beginning Bates | Ending Bates |
|---|---|---|
| Options Portfolio - Six Tables (prices and position) & | bci-ex-(s)-00110231 | |
| Two Queries (summarized market values and variances) | | |
| Email from MacGoey to Morton - Opening BS Valuation Work | BCI-EX-(S)-00110233 | BCI-EX-(S)-00110238 |
| Email from Clement to Walker, Morton, Yang, and King, dated Sept. 18, 2008 | BCI-EX-(S)-00200952 | |
| GFS - Corporate Stocks & Options | BCI-EX-(S)-00200953 | |
| Email from Clement to Walker, Morton, Yang, and King, dated Sept. 18, 2008 | BCI-EX-(S)-00200954 | |
| GFS - Corporate Obligations & Spot | BCI-EX-(S)-00200955 | |
| GFS - Corporate Stocks | BCI-EX-(S)-00200956 | |
| GFS - Mortgages and Mortgage Backed Securities | BCI-EX-(S)-00200957 | |
| Email from Clement to Walker, Morton, Yang, and King, dated Sept. 18, 2008 | BCI-EX-(S)-00200958 | |
| GFS - CD's & Other Money Market Instr. | BCI-EX-(S)-00200959 | |
| GFS - CD's & Other Money Market Instr. | BCI-EX-(S)-00200960 | |
| GFS - Corporate Obligations & Spot Commodities | BCI-EX-(S)-00200961 | |
| GFS - Governments & Agencies | BCI-EX-(S)-00200962 | |
| Lehman Brothers Inc., Balance Sheet by GAAP Asset Type, dated Sept. 12, 2008 | BCI-EX-(S)-00213951 | |
| JPM Inventory | BCI-EX-(S)-00213996 | |
| Email from James Hraska to Robert Azerad and Jasen Yang (with attachment) | BCI-EX-(S)-00214006 | BCI-EX-(S)-00214010 |
| Initial Inventory, Schedule A and Schedule B Assets | BCI-EX-00099519 | |
| JPM Inventory, Annex A Assets | BCI-EX-00108700 | |
| Native file version of Exhibit 377A or 88B | BCI-EX-00109154 | |
| Initial Inventory, Schedule A and B assets | BCI-EX-00213995 | |
| JPM Inventory, Annex A Assets | BCI-EX-00213996 | |
| Email from Morton to Holloway, dated Dec. 12, 2008 | BCI-EX-00218502 | BCI-EX-00218503 |
| Equity Bid-Offer Calculation, dated Sept. 22, 2008 | BCI-EX-00255172 | |
| Position and Price Data | BCI-EX-00255173 | |
| Sched B LehOBS 5 | BCI-EX-00295934 | |
| GFS - Detailed Exposure Report (Cross System), dated Sept. 12, 2008 | BCI-EX-00297155 | |
| GFS - Detailed Exposure Report (Cross System), dated Sept. 15, 2008 | BCI-EX-00297156 | |
| GFS - Detailed Exposure Report (Cross System), dated Sept. 16, 2008 | BCI-EX-00297157 | |
| GFS - Detailed Exposure Report (Cross System), dated Sept. 17, 2008 | BCI-EX-00297158 | |
| GFS - Detailed Exposure Report (Cross System), dated Sept. 18, 2008 | BCI-EX-00297159 | |
| GFS - Detailed Exposure Report (Cross System), dated Sept. 19, 2008 | BCI-EX-00297160 | |
| GFS - Detailed Exposure Report dated Sept. 12, 2008 | BCI-EX-00297253 | |
| Email from Ray Stancil to J. Hraska and others (with attachment) | JPM-BARCAP0003541 | JPM-BARCAP0003542 |
| BCI Rule 60 Opposition and Undelivered Assets Brief, dated Jan. 29, 2010 | | |
| Debtors' Adversary Complaint, dated Nov. 16, 2009 | | |
| Expert Report of Harrison J. Goldin, dated Mar. 15, 2010 | | |
| Expert Report of John J. Schneider, dated Mar. 15, 2010 | | |
| Expert Report of John Olvany, dated Mar. 15, 2010 | | |
| Expert Report of John P. Garvey, dated Mar. 15, 2010 | | |
| Expert Report of Joseph R. Mason, dated Mar. 15, 2010 | | |
| Expert Report of Joseph Schwaba, dated Mar. 15, 2010 | | |
| Expert Report of Mark Slattery, dated Mar. 15, 2010 | | |
| Hearing Transcript, dated Sept. 19, 2008 | | |
| Hearing Transcript, dated Dec. 22, 2008 | | |
| Letter from Beamon (Davis Polk) to Hine, dated Feb. 12, 2010 | | |
| Letter from Davenport to Carrero, dated Feb. 6, 2010 | | |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers | | |
| Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), | | |
| and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, | | |
| and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006, | | |
| dated Sept. 15, 2009 | | |
| Official Committee of Unsecured Creditors' Adversary Complaint, dated Nov. 16, 2009 | | |
| Report of Anton R. Valukas, Examiner in re Lehman Brothers Holdings, Inc. et al, | | |
| Chapter 11 Case No. 08-13555 (JMP), Volume 7, Appendix 3, Key Individuals | | |
| The Trustee's Adversary Complaint, dated Nov. 16, 2009 | | |
| The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain | | |
| Limited Relief Under Rule 60(b), dated Sept. 15, 2009 | | |

**Contains Highly Confidential Information**

# APPENDIX II
# DOCUMENTS RELIED UPON

**Documents that are Publicly Available**

ABS - http://glossary.reuters.com/index.php/ABS

ALT-A - http://www.investopedia.com/terms/a/alt-a.asp

Barclays PLC - 2008 Annual Report

Barclays PLC - 2009 Results Announcement

Barclays PLC and Barclays Bank PLC - 2008 20-F

Barclays PLC and Barclays Bank PLC - 2008 6-K, filed on Sept. 17, 2008

BCI - http://www.barcap.com/About+Barclays+Capital/Our+Firm

BNY Mellon - http://www.bnymellon.com/about/index.html

CLO - http://www.bloomberg.com/invest/glossary/bfglosc.htm#collateralized_loan_obligation

CMO - http://glossary.reuters.com/index.php/CMO

CUSIP - http://glossary.reuters.com/index.php/CUSIP_Numbers

ELN - http://www.amex.com/servlet/AmexFnDictionary?pageid=display&titleid=2397

EUR - http://www.bloomberg.com/invest/glossary/bfglose.htm

FDIC - http://www.bloomberg.com/invest/glossary/bfglosf.htm#federal_deposit_insurance_corporation

FED - http://www.newyorkfed.org/aboutthefed/whatwedo.html

FLOATER - http://www.bloomberg.com/invest/glossary/bfglosf.htm#floater

HELOC - http://www.investopedia.com/terms/h/homeequitylineofcredit.asp

IAS 39 - "Financial Instruments: Recognition and Measurement"

Interest only - http://www.amex.com/servlet/AmexFnDictionary?pageid=display&titleid=3425

Invers Floater - http://www.bloomberg.com/invest/glossary/bfglosi.htm

JPMorgan Chase & Co. - 2008 10-K, filed on Mar. 2, 2009

JPMorgan Chase & Co. - http://www.jpmorganchase.com/corporate/About-JPMC/about-us.htm

Loan-to-value - http://www.investopedia.com/terms/l/loantovalue.asp

PNC Financial Services Group Inc. - 10-Q for the period ending Sept. 30, 2009, filed on Nov. 6, 2009

PwC - http://www.pwc.com/us/en/index.jhtml

RMBS - http://www.duke.edu/~charvey/Classes/wpg/bfglosr.htm#residential_mortgage_backed_securities

SFAS 157 - "Fair Value Measurements," September 2006

Warrant - http://www.investopedia.com/terms/w/warrant.asp

WestAmerica Bancorporation - 2008 8-K, filed on Feb. 6, 2009

**Other Documents Not Cited in the Record and Not Publicly Available**

Bloomberg LP Data

Capital IQ Data

Email from Antonio Bisquera to Erik Himan March 11, 2010

Email from Policke to Haley (with attachments) "RE Collateral file," dated Sept. 18, 2008

Interactive Data

Contains Highly Confidential Information

# Exhibit A-1
## Undervaluation of Equity by Barclays as of September 19, 2008

|  | ($ Billions) |  |
|---|---|---|
| Value of Equity Based on Barclays (PCG) 9-19 Mid-Point Price Marks | $10.015 | [A] |
| Liquidity Adjustment to Barclays (PCG) 9-19 Mid-Point Price Marks using Bloomberg Data | (0.131) | [B] |
| Value of Equity on 9-19 with Liquidity Adjustment Calculated using Bloomberg Data | 9.884 | [C]=[A]+[B] |
| Value of Equity Based on Barclays (PCG) 9-22 Exit Price Marks | 9.343 | [D] |
| Undervaluation of Equity by Barclays | **$0.541** | [E]=[C]-[D] |

Notes:
The liquidity discount factor is 1.48%.  It is a simple average of the ratio of the difference between Bloomberg ask and bid prices to PCG 9-19 prices.
The liquidity discount factor is only applied to the non-convertible equities, which is $8.852 billion for Barclays (PCG) 9-19 Mid-Point Valuation.

Sources:
BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData).

## Exhibit A-2
### Summary of Valuations of Experts

| ($ Millions) | Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | Chicago Partners' Valuation Experts' 9-19-2008 Valuation (At Exit Price Marks) | Valuation Difference (Barclays' Undervaluation) |
|---|---|---|---|---|
| | | [A] | [B] | [B] - [A] |
| **Panel A - Valuations of Expert John Olvany:** | | | | |
| Residential Mortgage Backed Securities | | | | |
| Corporate Bonds | 16 | $280.3 | $653.7 | $373.4 |
| Emerging Markets | 3 | 36.8 | 39.7 | 2.9 |
| Equities | | | | |
| Rates | 2 | 293.5 | 296.6 | 3.1 |
| Principal Mortgage Trading Group | 1 | 11.0 | 12.9 | 1.9 |
| Total | 22 | 621.6 | 1,003.0 | 381.4 |
| **Panel B - Valuations of Expert Mark Slattery:** | | | | |
| Residential Mortgage Backed Securities | 3,834 | $12,620.0 | $13,560.8 | $940.8 |
| Corporate Bonds | 501 | 1,118.6 | 1,111.1 | (7.5) |
| Emerging Markets | 69 | 224.6 | 224.2 | (0.4) |
| Equities | | | | |
| Rates | 1,154 | 14,506.8 | 14,982.6 | 475.8 |
| Principal Mortgage Trading Group | 1,109 | 2,064.2 | 3,035.9 | 971.6 |
| Total | 6,667 | 30,534.2 | 32,914.6 | 2,380.4 |
| **Panel C - Valuations of Expert Joseph Schwaba:** | | | | |
| Residential Mortgage Backed Securities | | | | |
| Corporate Bonds | | | | |
| Emerging Markets | | | | |
| Equities | | | | |
| Rates | 26 | $191.2 | $343.3 | $152.1 |
| Principal Mortgage Trading Group | | | | |
| Total | 26 | 191.2 | 343.3 | 152.1 |
| **Panel D - Valuations of Expert Mark Zmijewski:** | | | | |
| Equities (Initial Inventory) | 4,028 | $9,343.3 | $9,884.0 | $540.7 |
| JPM Inventory | 1,195 | 3,739.7 | 5,397.1 | 1,657.3 |
| Total | 5,223 | 13,083.0 | 15,281.1 | 2,198.0 |
| **Panel E - Summary of Valuations of Experts** | | | | |
| Initial Inventory | | | | |
| Residential Mortgage Backed Securities | 3,834 | $12,620.0 | $13,560.8 | $940.8 |
| Corporate Bonds | 517 | 1,398.9 | 1,764.9 | 366.0 |
| Emerging Markets | 72 | 261.4 | 263.9 | 2.5 |
| Equities | 4,028 | 9,343.3 | 9,884.0 | 540.7 |
| Rates | 1,182 | 14,991.5 | 15,622.6 | 631.1 |
| Principal Mortgage Trading Group | 1,110 | 2,075.2 | 3,048.8 | 973.6 |
| Subtotal for Initial Inventory | 10,743 | 40,690.3 | 44,144.9 | 3,454.6 |
| JPM Inventory | 1,195 | 3,739.7 | 5,397.1 | 1,657.3 |
| Total | 11,938 | 44,430.0 | 49,542.0 | 5,111.9 |

Sources:
Expert report of John Olvany dated March 15, 2010; Expert report of Mark Slattery dated March 15, 2010; Expert report of Joseph Schwaba dated March 15, 2010.

# Exhibit B-1
## Calculation of Barclays Windfall

| | Value ($ Billions) |
|---|---|
| **Assets** | |
| Total Financial Assets on Barclays Opening Balance Sheet[1] | $50.165 |
| Adjusted for: Unrecognized, Undelivered Assets[2] | 0.775 |
| Adjustment to Valuation of OCC Assets (net of liabilities)[3] | 0.103 |
| *Adjusted Barclays Opening Balance Sheet and Claimed Assets* | 51.043 |
| Adjustment for Barclays' Undervaluation (See Exhibit A-1) | 5.112 |
| *Adjusted Total Financial Assets* | 56.155 |
| Non Financial Assets | 2.085 |
| *Adjusted Total Assets Acquired* | 58.239 |
| **Reported Cash Consideration and Liabilities Assumed** | |
| Total on Barclays Opening Balance Sheet | 47.474 |
| Adjusted Comp (severance subtracted)[4] | (0.450) |
| Adjusted Cure[5] | 0.014 |
| *Adjusted Cash Consideration and Liabilities Assumed* | 47.038 |
| **Adjusted Acquisition Gain/Negative Goodwill** | 11.201 |
| **Net Transaction Value[6] to Barclays** | (1.850) |
| **Barclays Windfall** | $13.051 |

Notes:

[1] Reported in the Pfleiderer Report in Paragraph 114, without rounding.

[2] Mr. Romain notes additional undelivered, unrecognized assets totaling $765 million in collateral related to Lehman affilitates futures accounts ($460M), OCC margin ($80M), unencumbered clearance box assets ($162 million) and other principal and interest ($63 million) (Deposition Exhibit 549A, p. 4). In his typwritten notes prior to his 2010 deposition, Mr. Romain updates the Lehman affiliate amount to $470 million (Deposition Exhibit 534A, p. 18). After updating for this change, the additional undelivered, unrecognized assets total $775 million.

[3] Trading liabilities at the OCC were determined using mid-point price marks at 9-22-08 and an adjustment to bid price marks based on 9-19-08 (BCI-EX-(S)-00110233-8). I have adjusted the mid-point price mark to reflect a consistent 9-19-08 valuation date for both the mid-point and exit price marks using the native file (bci-ex-(s)-00110231.accdb).

[4] See report for details at Paragraph 26.

[5] BCI Exhibit 171 attaching BCI-EX-00077272 –BCI-EX-00077286 less Cure as represented on BCI-EX-00115843 (Deposition Exhibit 377A) and BCI-EX-00109154 (Deposition Exhibit 88B) for Barclays Opening Balance Sheet.

[6] Expert Report of Harrison J. Goldin, dated March 15, 2010.

All other items from BCI-EX-00115843 (Deposition Exhibit 377A) and BCI-EX-00109154 (Deposition Exhibit 88B) for Barclays Opening Balance Sheet.

Sources:

BCI-EX-00115843 (Deposition Exhibit 377A) and BCI-EX-00109154 (Deposition Exhibit 88B) for Barclays Opening Balance Sheet; BCI Exhibit 171 attaching BCI-EX-00077272-286 (July 16, 2009, Letter to Jones Day regarding Compensation and Cure); Pfleiderer Report (Paragraph 114); Deposition Exhibit 549A (Email from Romain to Guarnuccio at PWC); Deposition Exhibit 534A (Romain typewritten notes for January 13, 2010 deposition); BCI-EX-(S)-00110233-8 (Email from MacGoey at PWC to Marcus Morton, Barclays, attaching Valuation Memo for options (ETO) portfolio), bci-ex-(s)-00110231.accdb.

Contains Highly Confidential Information

Exhibit B-2

## Calculation of Barclays Windfall

## from Barclays' Acquisition Gain/Negative Goodwill, as Reported[1]

|  | Value ($ Billions) |
|---|---|
| Barclays' Negative Goodwill, as Reported[1] | $4.170 |
| Transaction Costs, including Deferred Taxes[1] | 0.605 |
| Difference in Compensation Expense[2] | 0.450 |
| Difference in Cure Costs[3] | (0.014) |
| Barclays' Negative Goodwill, as Adjusted | 5.211 |
| Unrecognized, Undelivered Assets[4] | 0.775 |
| Adjustment to Valuation of OCC Assets (net of Liabilities)[5] | 0.103 |
| Adjustment for Barclays' Undervaluation | 5.112 |
| Adjusted Acquisition Gain/Negative Goodwill | 11.201 |
| Net Transaction Value[6] to Barclays | (1.850) |
| Barclays Windfall | $13.051 |

Notes:

[1] As presented in BCI-EX-00115843 (Deposition Exhibit 377A) and BCI-EX-00109154 (Deposition Exhibit 88B) for Barclays Opening Balance Sheet.

[2] See report for details at Paragraph 26.

[3] Cure as represented on Barclays Opening Balance Sheet less BCI Exhibit 171 attaching BCI-EX-00077272 –BCI-EX-00077286.

[4] Mr. Romain notes additional undelivered, unrecognized assets totaling $765 million in collateral related to Lehman affilitates futures accounts ($460M), OCC margin ($80M), unencumbered clearance box assets ($162 million) and other principal and interest ($63 million) (Deposition Exhibit 549A, p. 4). In his typwritten notes prior to his 2010 deposition, Mr. Romain updates the Lehman affiliate amount to $470 million (Deposition Exhibit 534A, p. 18). After updating for this change, the additional undelivered, unrecognized assets total $775 million.

[5] Trading liabilities at the OCC were determined using mid-point price marks at 9-22-08 and an adjustment to bid price marks based on 9-19-08 (BCI-EX-(S)-00110233-8). I have adjusted the mid-point price mark to reflect a consistent 9-19-08 valuation date for both the mid-point and exit price marks using the native file (bci-ex-(s)-00110231.accdb).

[6] Expert Report of Harrison J. Goldin, dated March 15, 2010.

Sources:

BCI-EX-00115843 (Deposition Exhibit 377A) and BCI-EX-00109154 (Deposition Exhibit 88B) for Barclays Opening Balance Sheet; BCI Exhibit 171 attaching BCI-EX-00077272-286 (July 16, 2009, Letter to Jones Day regarding Compensation and Cure); Deposition Exhibit 549A (Email from Romain to Guarnuccio at PWC); Deposition Exhibit 534A (Romain typewritten notes for January 13, 2010 deposition); BCI-EX-(S)-00110233-8 (Email from MacGoey at PWC to Marcus Morton, Barclays, attaching Valuation Memo for options (ETO) portfolio), bci-ex-(s)-00110231.accdb.

Contains Highly Confidential Information

## Exhibit C-1

### Alternative Valuations of JPM Inventory Using Barclays 9-30 Exit Price Marks and JPM Custodial Price Marks

| Asset Class ($ Billions) | Original Notional Amount | Number of CUSIPs | Barclays Opening Balance Sheet Valuation (At Exit Price Marks) | Barclays (PCG) Exit Price Marks 9-30-08 | JPM Custodial Price Marks 9-17-08 | JPM Calculated Custodial Price Marks 9-19-08 | JPM Calculated Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08 |
|---|---|---|---|---|---|---|---|
| RMBS | $1.242 | 37 | $0.027 | $0.023 | $0.027 | $0.027 | $0.026 |
| Corporate Bonds | 2.440 | 247 | 1.646 | 1.936 | 2.199 | 2.034 | 2.034 |
| Emerging Markets | 0.035 | 10 | 0.033 | 0.037 | 0.040 | 0.041 | 0.040 |
| Equities | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Rates | 0.030 | 14 | 0.023 | 0.030 | 0.030 | 0.030 | 0.030 |
| Principal Mortgage Trading Group | 16.153 | 887 | 1.815 | 1.988 | 3.697 | 3.658 | 3.268 |
| Principal (Matured deals) | | | 0.196 | | | | |
| **Total JPM Inventory** | **19.900** | **1,195** | **3.740** | **4.014** | **5.994** | **5.789** | **5.397** |
| | | | **[A]** | **[B]** | **[C]** | **[D]** | **[E]** |
| Difference between Barclays Opening Balance Sheet Valuation (at Exit Price Marks) and respective columns | | | | [B]-[A] | [C]-[A] | [D]-[A] | [E]-[A] |
| | | | | 0.274 | 2.255 | 2.049 | 1.657 |

Sources:
BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; Policke, Ricky. "RE Collateral file." Email to John Haley of Barclays with attachments, 18 Sept. 2008; Lehman GFS system data (BCI-EX-00297158.xls and BCI-EX-00297160.xls).

Contains Highly Confidential Information

## Exhibit C-2A

### Alternative Valuations of Initial Inventory Using Barclays 9-19 Exit Price Marks and BoNY Custodial Price Marks

| Asset Class ($ Billions) | Original Notional Amount | Number of CUSIPs | Barclays Opening Balance Sheet Valuation (At Exit Price Marks) | Barclays (PCG) Calculated Exit Price Marks 9-19-08 | BoNY Custodial Price Marks 9-19-08 | BoNY Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08 |
|---|---|---|---|---|---|---|
| RMBS | $42.170 | 3,834 | $12.620 | $12.620 | $13.906 | $13.379 |
| Corporate Bonds | 2.421 | 517 | 1.399 | 1.423 | 1.395 | 1.395 |
| Emerging Markets | 0.301 | 72 | 0.261 | 0.263 | 0.266 | 0.258 |
| Equities | 2.453 | 4,028 | 9.343 | 9.633 | 9.892 | 9.515 |
| Rates | 16.214 | 1,182 | 14.991 | 15.024 | 15.789 | 15.294 |
| Principal Mortgage Trading Group | 29.563 [1] | 1,110 | 2.075 | 2.183 | 3.789 | 3.145 |
| **Total Initial Inventory** | **93.124** | **10,743** | **40.690** | **41.145** | **45.037** | **42.985** |
| | | | [A] | [B] | [C] | [D] |
| | | | | | | |
| Difference between Barclays Opening Balance Sheet Valuation (at Exit Price Marks) and respective columns | | | | [B]-[A] | [C]-[A] | [D]-[A] |
| | | | | 0.455 | 4.347 | 2.295 |

Notes:
This discussion is related to Pfleiderer Report Table 1.
[1] BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory reports the Principal Mortgage Trading Group's Original Notional as $24.520 billion using the sum of the factored notional amount in the "Current Face" column in tab "PTMG" in BCI-EX-00099519.xls.  I use the sum of the original notional from the "Orig Notl" column in tab "PTMG" in BCI-EX-00099519.xls, which is $29.563 billion.

Sources:
BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData).

## Exhibit C-2B

### Alternative Valuations of Selected Securities in the Initial Inventory
### Using Barclays 9-19 Exit Price Marks and BoNY Custodial Price Marks

| Asset or Asset Type ($ Millions) | Number of CUSIPs | Barclays Opening Balance Sheet Valuation (At Exit Price Marks) | Barclays (PCG) Calculated Exit Price Marks 9-19-08[1] | BoNY Custodial Price Marks 9-19-08 | BoNY Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08[1] |
|---|---|---|---|---|---|
| Agency Pools (FHLMC 30 yr) | 297 | $1,674.5 | $1,674.5 | $1,719.4 | $1,702.2 |
| Agency CMO (Interest Only) | 240 | 549.9 | 549.9 | 876.7 | 789.0 |
| Agency CMO (Inverse Interest Only) | 109 | 146.6 | 146.6 | 319.3 | 287.3 |
| FHA (SASC 07-3 2A2) | 1 | 18.2 | 18.2 | 20.2 | 18.2 |
| Agency (SASC 07-3 1A2) | 1 | 30.9 | 30.9 | 34.3 | 30.9 |
| Agencies - Tennessee Valley Authority | 11 | 959.8 | 966.5 | 1,046.5 | 994.2 |
| Treasuries – USD Ust Note | 8 | 4,363.9 | 4,370.8 | 4,454.1 | 4,449.6 |
| Agencies – USD FNMA | 88 | 1,784.7 | 1,791.9 | 1,921.3 | 1,825.3 |
| Agencies – USD FHLB | 113 | 1,989.4 | 1,981.0 | 2,107.6 | 2,002.2 |
| Munis – USD DISGEN | 7 | 52.1 | 52.1 | 61.1 | 61.1 |
| US Non-Agency CMO (SARM Loan Trust) | 125 | 80.2 | 168.3 | 237.7 | 203.6 |
| US ABS Home Equity – Lehman XS Trust | 67 | 86.9 | 122.6 | 171.1 | 150.4 |
| US Non-Agency CMO – Lehman XS Trust | 93 | 82.6 | 100.9 | 178.4 | 151.8 |
| CLO Mezz (Pine CCS) | 1 | 428.6 | 428.6 | 915.0 | 686.2 |
| **Total** | **1161** | **12,248.4** | **12,402.9** | **14,062.7** | **13,352.0** |

Notes:

This discussion is related to Pfleiderer Report Exhibit 6. All calculations in Exhibit C-2B follow the methodology in Pfleiderer Report Exhibit 6.

[1] See Exhibit C-2A for the details of the liquidity adjustment calculation.

Sources:

BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory.

Expert Report of Mark E. Zmijewski

# Exhibit C-3

## Excess of the "Fair Value of All Assets Received" over $45 Billion
## of the Federal Reserve/Barclays Repurchase Agreement Assets

| Assets<br>($ Millions) | Pfleiderer<br>Report Table 2<br>(Barclays<br>Opening<br>Balance Sheet<br>Valuation) | Barclays (PCG)<br>Exit Price Marks<br>Initial Inventory:<br>using 9-19-08<br>Price Marks<br>JPM Inventory:<br>using 9-30-08<br>Price Marks | Custodial Calculated<br>Exit Price Marks<br>Initial Inventory:<br>using BoNY 9-19-08<br>Price Marks<br>JPM Inventory:<br>using JPM 9-19-08<br>Price Marks | Custodial Price Marks<br>Initial Inventory:<br>using BoNY 9-19-08<br>Price Marks<br>JPM Inventory:<br>using JPM 9-19-08<br>Price Marks |
|---|---|---|---|---|
| Initial inventory at Barclays mid-price marks | $42,605.0 | $42,927.5 | $45,037.1 | $45,037.1 |
| JPM inventory at Barclays mid-price marks | 3,917.9 | 4,317.0 | 5,788.7 | 5,788.7 |
| Subtotal at Barclays Mid-Price Marks | 46,522.9 | 47,244.5 | 50,825.7 | 50,825.7 |
| Adjustment to Barclays exit-price/bid marks | (2,086.5) | (2,085.1) | (2,443.4) | 0.0 |
| Accrued interest on trading portfolio assets | 345.0 | 345.0 | 345.0 | 345.0 |
| Subtotal:  Fair Value of All Trading Portfolio Assets | 44,781.4 | 45,504.4 | 48,727.3 | 51,170.7 |
| Less:   Schedule B assets included in the above | (778.9) | (873.0) | (852.2) | (892.9) |
| Less:   Accrued interest on Schedule B assets included in the above | (6.7) | (6.7) | (6.7) | (6.7) |
| Subtotal: Fair Value of Transferred Securities | 43,995.8 | 44,624.7 | 47,868.4 | 50,271.2 |
| Cash received with initial inventory | 300.0 | 300.0 | 300.0 | 300.0 |
| Cash received in JPM settlement | 1,250.0 | 1,250.0 | 1,250.0 | 1,250.0 |
| **Total Assets: Fair Value of All Assets Received** | 45,545.8 | 46,174.7 | 49,418.4 | 51,821.2 |
| **Federal Reserve/Barclays Repurchase Agreement Liability** | 45,000.0 | 45,000.0 | 45,000.0 | 45,000.0 |
| **Excess of the "Fair Value of All Assets Received" over $45 Billion** | 545.8 | 1,174.7 | 4,418.4 | 6,821.2 |

Sources:
BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory, BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; Policke, Ricky. "RE Collateral file." Email to John Haley of Barclays with attachments, 18 Sept. 2008; Lehman GFS system data (BCI-EX-00297158.xls and BCI-EX-00297160.xls); BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData); BCI-EX-00297090 (Sched B Inventory LehOBS 6).

Contains Highly Confidential Information

# Exhibit D-1

## Lehman "Mortgage and Mortgage Backed" Assets Acquired by Barclays

|  | Number of CUSIPs | Value ($ Billions) |
|---|---|---|
| Total CUSIPs and Valuation in GFS as of 9-16-08[1] | 3,913 | $6.014 |
| CUSIPs Not Acquired by Barclays | (2,193) | (1.788) |
| CUSIPs Acquired by Barclays | 1,720 | 4.226 |
| Percentage of CUSIPs and Value Acquired by Barclays | 44.0% | 70.3% |
| Custodial Calculated Valuation at Exit Price Marks of Acquired Mortgages as of 9-19-08[2] |  | 4.034 |
| As a Percentage of Above Valuation in GFS as of 9-16-08 |  | 67.1% |
| Barclays Opening Balance Sheet Valuation at Exit Price Marks of Acquired Mortgages |  | 2.266 |
| As a Percentage of Above Valuation in GFS as of 9-16-08 |  | 37.7% |

Notes:

[1] I adjust the GFS Net Long Inventory value to remove the impact of interest by multiplying by a ratio of the clean price to the dirty price. The sum of Net Long inventory value in this file before this adjustment is $6.080 billion.

[2] I obtain the Custodial Calculated Exit Value by using BoNY 9-19-08 for assets in Schedule A and B, and JPM 9-19-08 adjusted for Annex A assets. See Exhibit C-1 for the calculation of the JPM 9-19 value.

Sources:

BCI-EX-(S)-00200957.xls; BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory, BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; Lehman GFS system data (BCI-EX-00297158.xls and BCI-EX-00297160.xls).

# Exhibit E-1

## September 18, 19, and 20, 2008, Valuations of
## Federal Reserve/Barclays Repurchase Agreement Assets in Various Documents

| Valuation Date | Asset Valuation ($ Billions) | Asset Value in Excess of $45 B ($ Billions) | Source | |
|---|---|---|---|---|
| 9/18/2008 | $49.77 | $4.77 | Email from Ray Stancil to J. Hraska and others (with attachment) | JPM-BARCAP0003541 |
| 9/18/2008 | 49.70 | 4.70 | Declaration of Shari Leventhal | Deposition Exhibit 444 |
| 9/18/2008 | 49.70 | 4.70 | December 22, 2008, Court Transcript at page 36 | |
| 9/18/2008 | 49.00 | 4.00 | December 22, 2008, Court Transcript at Page 19 | |
| 9/18/2008 | 52.32 | 7.32 | Email from Stephen King to Jerry del Missier and others (with attachment) | Deposition Exhibit 537-A, BCI-EX-(S)-00078976 |
| 9/19/2008 | 52.19 | 7.19 | Email from Marty Malloy to Gerard LaRocca and Stephen King [1] | Deposition Exhibit 203, BCI-EX-00000080 |
| 9/19/2008 | 49.90 | 4.90 | Email from Paolo Tonucci to Jason Yang and Stephen King (with attachment)[2] | Deposition Exhibit 349B, BCI-EX-00070958-961 |
| 9/19/2008 | 49.60 | 4.60 | Email from John Rodefeld to Teri Scott and others | Deposition Exhibit 215, BCI-EX-(S)-00034528-9 |
| 9/19/2008 | 49.60 | 4.60 | Email from John Haley to Teri Scott and others [3] | Deposition Exhibit 281A, BCI-EX-(S)-00047924-6 |
| 9/19/2008 | 49.09 | 4.09 | Email from Stephen King to Jerry del Missier and others (with attachment) | Deposition Exhibit 537-A, BCI-EX-(S)-00078976 |
| 9/20/2008 | 49.00 | 4.00 | Email from Robert Azerad to Paolo Tonucci, at message from Robert Azerad to Martin Kelly and others at 10:27 [4] | Deposition Exhibit 151A |

**Range of Asset Value in Excess of $45 B: $4 Billion to $7.32 Billion**

Notes:

[1] This estimate was then sent by Gerard LaRocca to Mike Keegan (Deposition Exhibit 144A - BCI 000580, Deposition Exhibit 204 - BCI-EX-00000081).

[2] This estimate was identified in multiple documents and has been consolidated into a single estimate for this exhibit.  Several of these documents, including Deposition Exhibit 349B, attached listings of CUSIPs.  (Deposition Exhibit 235, Deposition Exhibit 139B, Deposition Exhibit 506, Deposition Exhibit 516, BCI-EX-(S)-00214006).

[3] This estimate was also identified in Deposition Exhibit 274 - BCI-EX-(S)-00038010-3.

[4] The email from Robert Azerad to Martin Kelly and others at 10:27 on 9/20/08 was attached to other emails including Deposition Exhibit 177, Deposition Exhibit 224, and Deposition Exhibit 152A.

Contains Highly Confidential Information

## Exhibit E-2
### Pricing Coverage of Initial Inventory in Bloomberg, Capital IQ, and Interactive Data

> "…Bloomberg and Capital IQ report observed prices (which may be from just one trade) for just under 60% of the CUSIPs represented in the Repo Collateral, which means that, for more than 40% of those CUSIPs, no reported price is available from these two sources for September 22, 2008. The value of positions for which no price is reported in either Bloomberg or Capital IQ for September 22, 2008, is more than 23% of the total fair value of the Repo Collateral (again using Barclays' exit price marks)." (Pfleiderer Report ¶31)

| ($ Billions) | Number of CUSIPs | Barclays Opening Balance Sheet Valuation (at Exit Price Marks) | Data Available from Bloomberg and Capital IQ[1] By CUSIP | | By Barclays Opening Balance Sheet Valuation (at Exit Price Marks) | | Data Available from Bloomberg, Capital IQ, and Interactive Data[1] By CUSIP | | By Barclays Opening Balance Sheet Valuation (at Exit Price Marks) | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | [1] | [2] | [3] | [3]/[1] | [4] | [4]/[2] | [5] | [5]/[1] | [6] | [6]/[2] |
| **September 19, 2008** | | | | | | | | | | |
| All Asset Classes | 10,743 | $40.690 | 7,165 | 66.7% | $32.025 | 78.7% | 7,998 | 74.4% | $35.359 | 86.9% |
| RMBS | 3,834 | 12.620 | 2,529 | 66.0% | 6.500 | 51.5% | 3,105 | 81.0% | 9.291 | 73.6% |
| Corporate Bonds | 517 | 1.399 | 423 | 81.8% | 1.191 | 85.1% | 423 | 81.8% | 1.191 | 85.1% |
| Emerging Markets | 72 | 0.261 | 70 | 97.2% | 0.261 | 100.0% | 70 | 97.2% | 0.261 | 100.0% |
| Equities | 4,028 | 9.343 | 3,043 | 75.5% | 9.268 | 99.2% | 3,043 | 75.5% | 9.268 | 99.2% |
| Rates | 1,182 | 14.991 | 970 | 82.1% | 14.556 | 97.1% | 970 | 82.1% | 14.556 | 97.1% |
| Principal Mortgage Trading Group | 1,110 | 2.075 | 130 | 11.7% | 0.249 | 12.0% | 387 | 34.9% | 0.792 | 38.2% |
| **September 22, 2008** | | | | | | | | | | |
| All Asset Classes | 10,743 | $40.690 | 7,159 | 66.6% | $31.963 | 78.6% | 7,991 | 74.4% | $35.296 | 86.7% |
| RMBS | 3,834 | 12.620 | 2,529 | 66.0% | 6.500 | 51.5% | 3,104 | 81.0% | 9.289 | 73.6% |
| Corporate Bonds | 517 | 1.399 | 422 | 81.6% | 1.180 | 84.3% | 422 | 81.6% | 1.180 | 84.3% |
| Emerging Markets | 72 | 0.261 | 70 | 97.2% | 0.261 | 100.0% | 70 | 97.2% | 0.261 | 100.0% |
| Equities | 4,028 | 9.343 | 3,039 | 75.4% | 9.220 | 98.7% | 3,039 | 75.4% | 9.220 | 98.7% |
| Rates | 1,182 | 14.991 | 970 | 82.1% | 14.556 | 97.1% | 970 | 82.1% | 14.556 | 97.1% |
| Principal Mortgage Trading Group | 1,110 | 2.075 | 129 | 11.6% | 0.246 | 11.8% | 386 | 34.8% | 0.789 | 38.0% |

Note:
[1] Data from Bloomberg, Capital IQ, and Interactive Data collected by Chicago Partners. A CUSIP's price is considered covered by Bloomberg if there exists a last price or bid price. A CUSIP's price is considered covered by Capital IQ if there exists a close price. A CUSIP's price is considered covered by Interactive Data if there exists a price. Interactive Data prices were collected via the Bloomberg interface.

Sources:
Barclays PCG market value from BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData).

Expert Report of Mark E. Zmijewski

Contains Highly Confidential Information

## Exhibit E-3
### Frequency of Price Changes in GFS from September 12 through September 19, 2008

| | Total Number of CUSIPs | | Percentage of Total CUSIPs in GFS with Price Changes | | | | |
|---|---|---|---|---|---|---|---|
| | For the Initial and JPM Inventory | Present on All Trading Days in GFS | On At Least 1 Trading Day | On At Least 2 Trading Days | On At Least 3 Trading Days | On At Least 4 Trading Days | On All 5 Trading Days |
| All Asset Classes | 11,938 | 8,468 | 79% | 77% | 70% | 62% | 52% |
| RMBS | 3,871 | 3,854 | 80% | 79% | 70% | 66% | 51% |
| Corporate Bonds | 764 | 488 | 66% | 59% | 52% | 46% | 41% |
| Emerging Markets | 82 | 46 | 74% | 72% | 70% | 67% | 65% |
| Equities | 4,028 | 1,501 | 96% | 95% | 94% | 94% | 89% |
| Rates | 1,196 | 702 | 79% | 79% | 78% | 78% | 76% |
| Principal Mortgage Trading Group | 1,997 | 1,877 | 69% | 64% | 51% | 25% | 20% |

| | Total Barclays Opening Balance Sheet Valuation ($ Billions) (At Exit Price Marks) | | Percentage of Barclays Opening Balance Sheet Valuation (At Exit Price Marks) for CUSIPs in GFS with Price Changes | | | | |
|---|---|---|---|---|---|---|---|
| | For the Initial and JPM Inventory | Present on All Trading Days in GFS | On At Least 1 Trading Day | On At Least 2 Trading Days | On At Least 3 Trading Days | On At Least 4 Trading Days | On All 5 Trading Days |
| All Asset Classes | $44.430 | $37.155 | 79% | 77% | 75% | 73% | 64% |
| RMBS | 12.647 | 12.633 | 83% | 83% | 81% | 79% | 61% |
| Corporate Bonds | 3.045 | 1.906 | 62% | 56% | 52% | 43% | 39% |
| Emerging Markets | 0.295 | 0.114 | 80% | 76% | 76% | 74% | 71% |
| Equities | 9.343 | 4.900 | 100% | 100% | 99% | 99% | 94% |
| Rates | 15.015 | 14.609 | 75% | 75% | 74% | 73% | 71% |
| Principal Mortgage Trading Group | 3.890 | 2.992 | 58% | 40% | 30% | 18% | 12% |
| Principal (Matured Deals) | 0.196 | | | | | | |

Note:
The analysis in this table is related to the material in Pfleiderer Report Exhibits 4 and 5.

Sources:
Lehman GFS system data (BCI-EX-00297253.xls, BCI-EX-00297156.xls, BCI-EX-00297157.xls, BCI-EX-00297158.xls, BCI-EX-00297159.xls, BCI-EX-00297160.xls); BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData).

## Exhibit E-4

### Sample of Securities Discussed in Pfleiderer Report Appendix 4
### Represents Less than 9% of Assets in the Initial Inventory

| Securities ($ Millions) | | Number of CUSIPs | Indicated Value Using Various Price Marks | | | |
|---|---|---|---|---|---|---|
| | | | BoNY Custodial Price Marks 9-19-08 | Barclays (PCG) Mid-Point Price Marks 9-19-08 | Barclays Opening Balance Sheet Valuation (At Exit Price Marks) | Barclays (PCG) Sale Value 9-30-08 |
| **Securities from Pfleiderer Report Appendix 4.1 - 4.3** | | | | | | |
| Collateralized ALT-A Mortgage Obligations Issued by SARM Loan Trust | | 125 | $237.7 | $197.1 | $80.2 | $80.2 |
| Asset Backed Securities Backed by ALT-A HELOCs Issued by Lehman Trust | | 67 | 171.1 | 139.8 | 86.9 | 86.9 |
| US Agency Collateralized Mortgage Obligations (Sequentials, PACs, and VADMs) | | 65 | 856.1 | 810.8 | 729.8 | 798.1 |
| **Subtotal** | **[A]** | **257** | **1,264.8** | **1,147.7** | **896.8** | **965.2** |
| **Securities from Pfleiderer Report Appendix 4.4 - 4.8** | | | | | | |
| US Agency CMOs (Complex Floater, Interest Only and Inverse Interest Only) | | 350 | $1,208.6 | $781.7 | $703.5 | $761.9 |
| Lehman-Issued Warrants and Lehman-Issued Equity-linked Notes | | 135 | 203.0 | 0.0 | 0.0 | 0.0 |
| Giants Stadium Bonds | | 4 | 59.0 | 59.0 | 59.0 | N/A |
| Insurance-Related Asset Backed Securities | | 1 | 11.0 | 11.0 | 11.0 | N/A |
| Pine CCS CLO | | 1 | 915.0 | 571.5 | 428.6 | N/A |
| **Subtotal** | **[B]** | **491** | **2,396.6** | **1,423.1** | **1,202.1** | **761.9** |
| **All Securities from Pfleiderer Report Appendix 4.1 - 4.8** | **[C]** | **748** | **3,661.5** | **2,570.8** | **2,098.9** | |
| **All Securities from Initial Inventory** | **[D]** | **10,743** | **45,037.1** | **42,927.5** | **40,690.3** | |
| **Percentage of All Securities from Initial Inventory** | | | | | | |
| Securities from Pfleiderer Report Appendix 4.1 - 4.3 | [A]/[D] | 2.4% | 2.8% | 2.7% | 2.2% | |
| Securities from Pfleiderer Report Appendix 4.4 - 4.8 | [B]/[D] | 4.6% | 5.3% | 3.3% | 3.0% | |
| Securities from Pfleiderer Report Appendix 4.1 - 4.8 | [C]/[D] | 7.0% | 8.1% | 6.0% | 5.2% | |

Note:
The Pfleiderer Report identifies the amounts which are shaded gray. See report for details.

Sources:
All securities in this table are referenced in BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory. CUSIP 45804VAA2 (included in the Pfleiderer Report in Insurance-Related Asset Backed Securities) is also sourced in BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory.

# Exhibit F-1

## Incomplete Coverage in GFS for Initial and JPM Inventory on September 12, 2008

| Asset Class ($ Billions) | CUSIPs From Barclays Opening Balance Sheet | | | CUSIPs from Barclays Opening Balance Sheet in GFS | | | |
|---|---|---|---|---|---|---|---|
| | Original Notional Amount | Number of CUSIPs | Barclays Opening Balance Sheet Valuation (at Exit Price Marks) | Number of CUSIPs in GFS | Long Inventory Value in GFS | Barclays Opening Balance Sheet Valuation (at Exit Price Marks) | Percentage of Total Barclays Opening Balance Sheet Valuation (at Exit Price Marks) |
| RMBS | $43.412 | 3,871 | $12.647 | 3,200 | $11.519 | $10.579 | 84% |
| Corporate Bonds | 4.861 | 764 | 3.045 | 358 | 1.998 | 1.293 | 42% |
| Emerging Markets | 0.336 | 82 | 0.295 | 29 | 0.055 | 0.073 | 25% |
| Equities | 2.453 | 4,028 | 9.343 | 1,940 | 6.692 | 5.670 | 61% |
| Rates | 16.244 | 1,196 | 15.015 | 526 | 8.271 | 6.630 | 44% |
| Principal Mortgage Trading Group | 45.717 | 1,997 | 3.890 | 1,840 | 5.683 | 2.447 | 63% |
| Principal (Matured deals) | | | 0.196 | | | | |
| **Total Inventory** | **113.024** | **11,938** | **44.430** | **7,893** | **34.219** | **26.691** | **60%** |

Sources:
BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory, BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; BCI-EX-00297253 (Lehman GFS system data); BCI-EX-00255172 (0922 Equities Bid-Offer).