# BCI Exhibit 485

1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 08-13555

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS, INC., et al.

9

10           Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14                  United States Bankruptcy Court

15                  One Bowling Green

16                  New York, New York

17

18                  October 16, 2008

19                  11:19 AM

20

21   B E F O R E:

22   HON. JAMES M. PECK

23   U.S. BANKRUPTCY JUDGE

24

25

2

1

2   HEARING re Order Scheduling Initial Case Conference

3

4   HEARING re Debtors' Motion Pursuant to Rule 1015(b) of the

5   Federal Rules of Bankruptcy Procedure Requesting Joint

6   Administration of Chapter 11 Cases

7

8   HEARING re Motion for Order Pursuant to Section 105(a) of the

9   Bankruptcy Code Directing that Certain Orders and Other

10  Pleadings Entered or Filed in the Chapter 11 Cases of

11  Affiliated Debtors be Made Applicable to Recently Filed Cases

12

13  HEARING re Debtors' Application Pursuant to Sections 327(a) and

14  328(a) of the Bankruptcy Code for an Interim Order Authorizing

15  the Employment and Retention of Weil, Gotshal & Manges LLP as

16  Attorneys for the Debtors, Nunc Pro Tunc to the Commencement

17  Date

18

19  HEARING re Motion Pursuant to Sections 105(a) and 363(b) of the

20  Bankruptcy Code for an Interim Order Authorizing the Debtors to

21  (A) Retain Alvarez & Marsal North America, LLC to Provide the

22  Debtors a Chief Restructuring Officer and Additional Personnel;

23  (B) to Appoint the Chief Restructuring Officer Nunc Pro Tunc to

24  the Commencement Date; and (C) to Schedule a Final Hearing

25

3

1

2   HEARING re Debtors' Application Pursuant to Sections § 327(a)

3   and § 328(a) of the Bankruptcy Code for Authorization to Employ

4   and Retain Curtis, Mallet-Prevost, Colt & Mosle LLP as

5   Conflicts Counsel for the Debtors, Nunc Pro Tunc, to the Date

6   of its Engagement

7

8   HEARING re Motion of Shinsei Bank, Limited for the Entry of an

9   Order Approving Specified Information Blocking Procedures and

10   Permitting Trading of Claims Against the Debtor Upon

11   Establishment of a Screening Wall

12

13   HEARING re Motion of Metropolitan Life Insurance Company for

14   Entry of an Order Approving Specified Information Blocking

15   Procedures and Permitting Trading of Claims Against the

16   Debtor Upon Establishment of a Screening Wall

17

18   HEARING re Motion of AEGON USA Investment Management, LLC for

19   Entry of an Order Approving Specified Information Blocking

20   Procedures and Permitting Trading of Claims Against the Debtor

21   Upon Establishment of s Screening Wall

22

23

24

25

4

1

2    HEARING re Debtors' Motion Pursuant to Sections 105(a) and 366

3    of the Bankruptcy Code to (i) Approve the Debtors' Proposed

4    Form of Adequate Assurance of Payment; (ii) Establish

5    Procedures for Resolving Objections by Utility Companies; and

6    (iii) Prohibit Utilities from Altering, Refusing, or

7    Discontinuing Service

8

9    HEARING re Motion for Relief from Stay for an Order Lifting or

10   Modifying the Automatic Stay filed by William Kuntz

11

12   HEARING re Amended Motion for Appointment of Equity committee

13

14   HEARING re Joint Motion of the Debtors and Barclays Capital Inc

15   for Entry of an Order Authorizing to File Under Seal Certain

16   Schedules to the Asset Purchase Agreement, dated September 29,

17   2008, with Exhibit A (Proposed Order)

18

19   HEARING re Motion of the Harbinger Funds for Leave to Conduct

20   Rule 2004 Discovery of Debtor Lehman Brothers Holdings Inc.

21

22

23

24

25

5

1

2    HEARING re Motion of Newport Global Opportunities Fund LP,

3    Newport Global Credit Fund (Master) L.P., PEP Credit Investor

4    L.P. and Providence TMT Special Situations Fund L.P. for Leave

5    to Conduct Rule 2004 Discovery of Debtor Lehman Brothers

6    Holdings Inc. and Other Entities

7

8    HEARING re LB R3 HOLDING SETTLEMENT & REDEMPTION TRANSACTION -

9    Debtors' Motion for Entry of Order Pursuant to Sections 105,

10    363, and 365 of the Bankruptcy Code and Federal Rules of

11    Bankruptcy Procedure 2002, 6004, 6006, and 9019 (i)

12    Approving Equity Interests Purchase Agreement; (ii) Authorizing

13    Debtors to Compromise, Settle, and Release Related Claims; and

14    (iii) Granting Certain Related Relief

15

16    HEARING re Eagle Energy Partners I L.P. Transaction - Debtors'

17    Motion for Entry of an Order Pursuant to Sections 363 and 365

18    of the Bankruptcy Code and Federal Rules of Bankruptcy

19    Procedure 6004, 6006 and 9019 Authorizing Lehman Brothers

20    Holdings Inc. to (A) Enter into a Partnership Interests

21    Purchase Agreement; (B) Compromise and Release a Portion of an

22    Intercompany Loan; and (C) Assign the Remainder of Such

23    Intercompany Loan to Purchasers

24

25

6

1

2    HEARING re Sale of Lehman's Investment Management Division

3    Transaction - Debtors' Motion to (A) Establish Sales

4    Procedures; (B) Approve a Seller Termination Fee and a

5    Reimbursement Amount; and (C) Approve the Sale of the Purchased

6    Assets and the Assumption and Assignment of Contracts Relating

7    to the Purchased Assets

8

9    HEARING re Debtors' Motion Pursuant to Sections 105(a), 345(b),

10   363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy

11   Rules 6003 and 6004 (A) for Authorization to (i) Continue Using

12   Existing Centralized Cash Management System, as Modified; (ii)

13   Honor Certain Pre-petition Obligations Related to the Use of

14   the Cash Management System; and (iii) Maintain Existing Bank

15   Accounts and Business Forms; (B) for an Extension of Time

16   to Comply with Section 345(b) of the Bankruptcy Code, and (c)

17   to Schedule a Final Hearing

18

19   HEARING re Debtor's Motion for Order: (i) Authorizing Debtor to

20   Obtain Post-petition Financing Pursuant to Sections 363 and 364

21   of Bankruptcy Code; (ii) Granting Liens and Superpriority

22   Claims to Post-petition Lenders Pursuant to Section 364 of

23   Bankruptcy Code; and (iii) Scheduling Final Hearing

24

25   Transcribed by:  Lisa Bar-Leib

7

```
 1
 2    A P P E A R A N C E S :
 3    WEIL, GOTSHAL & MANGES LLP
 4         Attorneys for Debtors
 5         767 Fifth Avenue
 6         New York, NY 10153
 7
 8    BY:   HARVEY R. MILLER, ESQ.
 9          SHAI WAISMAN, ESQ.
10          LORI R. FIFE, ESQ.
11          RICHARD P. KRASNOW, ESQ.
12          ALFREDO R. PEREZ, ESQ.
13          JOHN W. LUCAS, ESQ.
14
15    HUGHES HUBBARD & REED LLP
16         Attorneys for James W. Giddens, SIPC Trustee
17         One Battery Park Plaza
18         New York, NY 10004
19
20    BY:   JAMES B. KOBAK, JR.
21          JEFFREY S. MARGOLIN, ESQ.
22          DAVID W. WILTENBURG, ESQ.
23          JAMES W. GIDDENS, ESQ.
24
25
```

```
 1

 2    SECURITIES INVESTOR PROTECTION CORPORATION

 3         Senior Associate General Counsel

 4         805 15th Street, N.W.

 5         Suite 800

 6         Washington, DC 20005

 7

 8    BY:   KENNETH J. CAPUTO, ESQ.

 9

10    MILBANK, TWEED, HADLEY & MCCLOY LLP

11         Attorneys for the Official committee of Unsecured

12          Creditors

13         One Chase Manhattan Plaza

14         New York, NY 10005

15

16    BY:   LUC A. DESPINS, ESQ.

17         DENNIS F. DUNNE, ESQ.

18         DENNIS C. O'DONNELL, JR.

19         PAUL ARONZON, ESQ.

20         EVAN R. FLECK, ESQ.

21

22

23

24

25
```

```
 1

 2   CLEARY GOTTLIEB STEEN & HAMILTON LLP

 3        Attorneys for Barclays Capital Inc.; Luke Barefoot

 4        One Liberty Plaza

 5        New York, NY 10006

 6

 7   BY:  LINDSEE P. GRANFIELD, ESQ.

 8        LISA M. SCHJWEITZER, ESQ.

 9        THOMAS J. MOLONEY, ESQ.

10        AVRAM E. LUFT, ESQ.

11

12   CLEARY GOTTLIEB STEEN & HAMILTON LLP

13        Attorneys for Hellman & Friedman

14        One Liberty Plaza

15        New York, NY 10006

16

17   BY:  JAMES L. BROMLEY, ESQ.

18

19   FEDERAL RESERVE BANK OF NEW YORK

20        Assistant General Counsel and Senior Vice President

21        33 Liberty Street

22        New York, NY 10045

23

24   BY:  SHARI LEVENTHAL, ESQ.

25
```

10

```
 1
 2   UNITED STATES SECURITIES AND EXCHANGE COMMISSION
 3        3 World Financial Center
 4        New York, NY 10279
 5
 6   BY:   ALISTAIRE BAMBACH, ESQ.
 7         DAN GALLAGHER, ESQ.
 8         NEAL JACOBSON, ESQ.
 9
10   UNITED STATES DEPARTMENT OF JUSTICE
11        Office of the United States Trustee
12        33 Whitehall Street
13        Suite 2100
14        New York, NY 10004
15
16   BY:   TRACY HOPE DAVIS, ESQ.
17         ANDREW D. VELEZ-RIVERA, ESQ.
18         LINDA A. RIFFKIN, ESQ.
19         DIANA G. ADAMS, U.S. TRUSTEE
20
21
22
23
24
25
```

```
 1

 2   AKIN GUMP STRAUSS HAUER & FELD LLP

 3         Attorneys for the Informal Noteholders Group

 4         590 Madison Avenue

 5         New York, NY 10022

 6

 7   BY:   DANIEL H. GOLDEN, ESQ.

 8         ABID QURESHI, ESQ.

 9         MICHAEL S. STAMER, ESQ.

10         PHILIP C. DUBLIN, ESQ.

11

12   STUTMAN, TREISTER & BLATT

13         Attorneys for Baubost Group

14         1901 Avenue of the Stars

15         12th Floor

16         Los Angeles, CA 90067

17

18   BY:   ERIC D. WINSTON, ESQ.

19

20   ALLEN & OVERY LLP

21         Attorneys for HSBC Bank USA Inc.

22         1221 Avenue of the Americas

23         New York, NY 10020

24

25   BY:   DANIEL GUYDER, ESQ.
```

12

```
 1

 2   ARENT FOX LLP

 3         Attorneys for The Vanguard Group

 4         1675 Broadway

 5         New York, NY 10019

 6

 7   BY:   ROBERT M. HIRSH, ESQ.

 8         DAVID DUBROW, ESQ.

 9

10   BINGHAM MCCUTCHEN LLP

11         Attorneys for Harbinger Capital Partners Special

12          Situations Fund, L.P. and Harbinger Capital Master

13          Fund I, Ltd.

14         150 Federal Street

15         Boston, MA 02110

16

17   BY:   SABIN WILLETT, ESQ.

18         RHEBA RUTKOWSKI, ESQ.

19

20

21

22

23

24

25
```

13

```
 1
 2   BINGHAM MCCUTCHEN LLP
 3        Attorneys for Harbinger Capital Partners Special
 4         Situations Fund, L.P. and Harbinger Capital Master
 5         Fund I, Ltd.
 6        399 Park Avenue
 7        New York, NY 10022
 8
 9   BY:   JEFFREY S. SABIN, ESQ.
10
11   BINGHAM MCCUTCHEN LLP
12        Attorneys for MetLife Insurance Company
13        399 Park Avenue
14        New York, NY 10022
15
16   BY:   ERIN H. MAUTNER, ESQ.
17
18   BLANK ROME LLP
19        Attorneys for Thomson Reuters
20        The Chrysler Building
21        405 Lexington Avenue
22        New York, NY 10174
23
24   BY:   EDWARD J. LOBELLO, ESQ.
25
```

14

```
 1

 2   BROWN RUDNICK LLP

 3        Attorneys for Newport Global Opportunity Fund; and PEP

 4         Credit Investor Fund LLP; and Provident IMT SP

 5        Seven Times Square

 6        New York, NY 10036

 7

 8   BY:   DAVID J. MOLTON, ESQ.

 9         ANDREW S. DASH, ESQ.

10

11   CADWALADER, WICKERSHAM & TAFT LLP

12        Attorneys for Citibank

13        One World Financial Center

14        New York, NY 10261

15

16   BY:   JESSICA L. FINK, ESQ.

17

18   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

19        Attorneys for NYSE Euronext

20        101 Park Avenue

21        New York, NY 10178

22

23   BY:   JERROLD L. BREGMAN, ESQ.

24         STEVEN J. REISMAN, ESQ.

25
```

15

```
 1
 2   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
 3        Conflict Counsel for the Debtors
 4        101 Park Avenue
 5        New York, NY 10178
 6
 7   BY:   LYNN P. HARRISON 3RD, ESQ.
 8
 9   COLE, SHOTZ, MEISEL, FORMAN & LEONARD, P.A.
10        Attorneys for FHLB Pittsburgh
11        900 Third Avenue
12        16th Floor
13        New York, NY 10022
14
15   BY:   LAURENCE MAY, ESQ.
16
17   DECHERT LLP
18        Attorneys for Russell Investments
19        1095 Avenue of the Americas
20        New York, NY 10036
21
22   BY:   GLENN E. SIEGEL, ESQ.
23
24
25
```

16

```
 1

 2   DRINKER BIDDLE & REATH LLP

 3        Attorneys for Allianz Global Advisors

 4        500 Campus Drive

 5        Florham Park, NJ 07932

 6

 7   BY:   ROBERT K. MALONEY, ESQ.

 8

 9   HAHN & HESSEN LLP

10        Attorneys for Avista Corporation and Powerex Corp.

11        488 Madison Avenue

12        New York, NY 10022

13

14   BY:  ROSANNE THOMAS MATZAT, ESQ.

15

16   JONES DAY

17        Attorneys for EDF Trading

18        222 East 41st Street

19        New York, NY 10017

20

21   BY:   RICHARD H. ENGMAN, ESQ.

22

23

24

25
```

17

```
 1
 2   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
 3        Attorneys for Bay Harbour Management L.C.; Bay Harbour
 4         Master Ltd.; Trophy Hunter Investments, Ltd., BHCO
 5         Master, Ltd.; MSS Distressed & Opportunities 2 and
 6         Institutional Benchmarks
 7        1633 Broadway
 8        New York, NY 10019
 9
10   BY:   DAVID M. FRIEDMAN, ESQ.
11         DAVID S. ROSNER, ESQ.
12         ANDREW K. GLENN, ESQ.
13
14   KAYE SCHOLER LLP
15        Attorneys for Wells Fargo Bank, N.A.; Wells Fargo & Co.;
16         and Bank of America, N.A.
17        425 Park Avenue
18        New York, NY 10022
19
20   BY:   SCOTT D. TALMADGE, ESQ.
21         ANA M. ALFONSO, ESQ.
22         MADLYN G. PRIMOFF, ESQ.
23
24
25
```

18

```
 1
 2   KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
 3        Attorneys for Elliott Associates, L.P., Elliott
 4         International, L.P. and the Liverpool Limited
 5         Partnership
 6        551 Fifth Avenue
 7        18th Floor
 8        New York, NY 10176
 9
10   BY:   MATTHEW J. GOLD, ESQ.
11
12   KRAMER LEVIN NAFTALIS & FRANKEL LLP
13        Attorneys for Bank of New York Mellon as Indenture
14         Trustee
15        1177 Avenue of teh Americas
16        New York, NY 10036
17
18   BY:   P. BRADLEY O'NEILL, ESQ.
19        AMY COHEN, ESQ.
20
21
22
23
24
25
```

19

```
 1
 2   LINKLATERS LLP
 3        Attorneys for Joint Administrators of Lehman Brothers
 4         International Europe
 5        1345 Avenue of the Americas
 6        New York, NY 10105
 7
 8   BY:   LAWRENCE BYRNE, ESQ.
 9         MARTIN N. FLICS, ESQ.
10
11   LOVELLS LLP
12        Attorneys for Lloyds TSB
13        590 Madison Avenue
14        New York, NY 10022
15
16   BY:   MATTHEW P. MORRIS, ESQ.
17
18   LOWENSTEIN SANDLER P.C.
19        Attorneys for Energy Co.
20        65 Livingston Avenue
21        Roseland, NJ 07068
22
23   BY:   MICHAEL S. ETKIN, ESQ.
24
25
```

20

```
 1
 2   MUNSCH HARDT KOPF & HARR, P.C.
 3        Attorneys for Ad Hoc committee of Bondholders
 4        3800 Lincoln Plaza
 5        500 North Akard Street
 6        Dallas, TX 75201
 7
 8   BY:   RUSSELL L. MUNSCH, ESQ.
 9         RAYMOND J. URBANIK, ESQ.
10
11   OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
12        230 Park Avenue
13        New York, NY 10169
14
15   BY:   STEVEN B. SOLL, ESQ.
16
17   PENSION BENEFIT GUARANTY CORPORATION
18        Office of the Chief Counsel
19        1200 K Street, N.W.
20        Washington, DC 20005
21
22   BY:   ISRAEL GOLDOWITZ, ESQ.
23         SARA B. EAGLE, ESQ.
24
25
```

21

```
 1
 2   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
 3        Special Counsel for Creditors' committee
 4        51 Madison Avenue
 5        22nd Floor
 6        New York, NY 10010
 7
 8   BY:   SUSHEEL KIRPALANI, ESQ.
 9
10   REED SMITH LLP
11        Attorneys for AEGON USA Investment Management, LLC.
12        599 Lexington Avenue
13        New York, NY 10022
14
15   BY:   MICHAEL J. VENDITTO, ESQ.
16        J. ANDREW RAHL, JR.
17        PAUL A. RACHMUTH, ESQ.
18
19   ROPES & GRAY LLP
20        Attorneys for R3 Capital Management LLC
21        1211 Avenue of the Americas
22        New York, NY 10036
23
24   BY:   KEITH H. WOFFORD, ESQ.
25
```

22

```
 1

 2   ROPES & GRAY LLP

 3        Attorneys for Bain Capital Partners

 4        1211 Avenue of the Americas

 5        New York, NY 10036

 6

 7   BY:   MARK I. BANE, ESQ.

 8

 9   SALANS

10        Attorneys for Svenska Handelsbanken

11        Rockefeller Center

12        620 Fifth Avenue

13        New York, NY 10020

14

15   BY:   CLAUDE D. MONTGOMERY, ESQ.

16

17   SEWARD & KISSEL LLP

18        One Battery Park Plaza

19        New York, NY 10004

20

21   BY:   JOHN R. ASHMEAD, ESQ.

22

23

24

25
```

23

```
 1
 2    SHEARMAN & STERLING LLP
 3         Attorneys for Bank of America Securities
 4         599 Lexington Avenue
 5         New York, NY 10022
 6
 7    BY:   JAMES L. GARRITY, ESQ.
 8          DAVID LAGUARDIA, ESQ.
 9          NED S. SCHODEK, ESQ.
10
11    THOMPSON & KNIGHT LLP
12         Attorneys for Crossmark Investments Advisers, L.P.;
13          Crossmark Corporate Advisers, L.P.; Crossmark
14          Cornerstone Partners, L.P.; Financial Analytics, L.P.;
15          Crossmark Investment Company, L.P.; Crossmark Corporate
16          Investors, L.P.; and Crossmark Corporate
17          Investors II, L.P.
18          1722 Routh Street
19          Suite 1500
20          Dallas, TX 75201
21
22    BY:   DAVID M. BENNETT, ESQ.
23
24
25
```

24

```
 1
 2    THOMPSON & KNIGHT LLP
 3          Attorneys for Crossmark Investments Advisers, L.P.;
 4           Crossmark Corporate Advisers, L.P.; Crossmark
 5           Cornerstone Partners, L.P.; Financial Analytics, L.P.;
 6           Crossmark Investment Company, L.P.; Crossmark Corporate
 7           Investors, L.P.; and Crossmark Corporate
 8           Investors II, L.P.
 9          919 Third Avenue
10          39th Floor
11          New York, NY 10022
12
13    BY:   IRA L. HERMAN
14
15    TROUTMAN SANDERS LLP
16          Attorneys for New South Federal Savings Bank; and PT Bank
17           Negara Indonesia
18          The Chrysler Building
19          405 Lexington Avenue
20          New York, NY 10174
21
22    BY:   PAUL H. DEUTCH, ESQ.
23
24
25
```

25

```
 1

 2   TUCKER ARENSBERG

 3        Attorneys for FHLB Pittsburgh

 4        1500 One PPG Place

 5        Pittsburgh, PA 15222

 6

 7   BY:   GARY P. HUNT, ESQ.

 8         BEVERLY W. MANNE, ESQ.

 9         MICHAEL STAUBER, ESQ. (TELEPHONICALLY)

10         MICHAEL SHINER, ESQ. (TELEPHONICALLY)

11

12   DEWEY & LEBOEUF, LLP

13        Attorneys for CAPCO Holdings Inc.

14        One Embarcadero Center

15        Suite 400

16        San Francisco, CA

17

18   BY:   RAINA KIM, ESQ.

19         (TELEPHONICALLY)

20

21

22

23

24

25
```

                                                                26

```
 1
 2   WACHTELL, LIPTON, ROSEN & KATZ
 3        Attorneys for JPMorgan Chase Bank, N.A.
 4        51 West 52nd Street
 5        New York, NY 10019
 6
 7   BY:   HAROLD S. NOVIKOFF, ESQ.
 8         PHILIP MINDLIN, ESQ.
 9         AMY R. WOLF, ESQ.
10
11   VINSON & ELKINS LLP
12        Attorneys for Shinsei Bank, Limited
13        666 Fifth Avenue
14        26th Floor
15        New York, NY 10103
16
17   BY:   DOV KLEINER, ESQ.
18
19
20
21
22
23
24
25
```

27

```
 1
 2    WILLKIE FARR & GALLAGHER LLP
 3          Attorneys for Fir Tree; Royal Charter Properties; Avantam
 4           Partners; Oppenheimer Funds
 5          787 Seventh Avenue
 6          New York, NY 10019
 7
 8    BY:   ROGER NETZER, ESQ.
 9          DAN C. KOZUSKO, ESQ.
10          SHELLEY C. CHAPMAN
11
12    HOLLAND & KNIGHT LLP
13          Attorneys for Lehman Executives
14          195 Broadway
15          New York, NY 10007
16
17    BY:   SANDRA E. MAYERSON, ESQ.
18
19    PEITZMAN, WEG & KEMPINSKY LLP
20          Attorneys for Avista Corporation and Powerex Corp.
21          10100 Santa Monica Blvd., Suite 1450
22          Los Angeles, CA 90067
23
24    BY:  DAVID B. SHEMANO, ESQ.
25          (TELEPHONICALLY)
```

28

```
 1
 2   CHAPMAN AND CUTLER LLP
 3        Attorneys for US Bank, N.A.
 4        111 West Monroe Street
 5        Chicago, IL 60603
 6
 7   BY:   JAMES E. SPIOTTO, ESQ.
 8         (TELEPHONICALLY)
 9
10   MCGUIREWOODS LLP
11        Attorneys for Meridian Comp of New York d/b/a CHD
12         Meridian Healthcare; Toronto-Dominion Bank
13        One James Center
14        901 East Cary Street
15        Richmond, VA 23219
16
17   BY:   DION W. HAYES, ESQ.
18         JOSEPH S. SHEERIN, ESQ.
19         (TELEPHONICALLY)
20
21
22
23
24
25
```

29

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  Mr. Miller, good

3    morning.

4            MR. MILLER:  Good morning, Your Honor.  Harvey Miller

5    with Weil Gotshal & Manges on behalf of the debtors.  Once

6    again, Your Honor, this is the first omnibus hearing in this

7    case and we are now completing our fifth week of

8    administration.  And once again, Your Honor, on behalf of all

9    parties involved, we appreciate the Court's efforts to

10   accommodate the needs of this epic saga and we recognize the

11   long journey Your Honor's had to get here today.

12           Your Honor, before we get into the agenda, it was my

13   understanding that Your Honor wanted to have a status

14   conference as to the state of the estate at this point.

15           THE COURT:  Yes.

16           MR. MILLER:  So if I may proceed with that, Your

17   Honor.  And I thought, Your Honor, in the context of where we

18   are that some history has to be alluded to in connection with

19   the commencement of these Chapter 11 cases.  And if I may, Your

20   Honor -- if I may approach, Your Honor, we've prepared an

21   organization chart of Lehman Brothers --

22           THE COURT:  You may approach.

23           MR. MILLER:  -- that may be of some help to you.

24           THE COURT:  I'm interested in seeing it.  Thank you.

25           MR. MILLER:  And we have the copies for other

1    parties.

2          The chart, Your Honor, is a simplified version of the

3    Lehman Brothers Holdings, Inc. enterprise.  And the entities

4    that are listed in red, Your Honor, are entities which are

5    currently under some type of judicial administration or

6    supervision, either an administration process in the U.K. or

7    receivership action in another foreign jurisdiction.  And the

8    entities that are in the sort of purplish color, Your Honor,

9    are entities that were sold to Barclays as part of the Barclays

10   transaction.  And that's the first page of the organization

11   chart, Your Honor.  And I might say, Your Honor, this is an

12   attempt to consolidate almost 4,000 different entities.  And

13   there are notes on the second page that related to each of the

14   entities.  And the third page, Your Honor, is an organizational

15   chart which is directed to Lehman Brother's Inc. which is the

16   broker dealer.

17          So with that in reference, Your Honor, let me just

18   begin by saying that Lehman was a massive business with

19   consolidated assets of over six billion dollars and liabilities

20   of at least that amount.  There was a global business that

21   operated on a twenty-four/seven basis with hundreds of

22   thousands of transactions occurring each day at the speed of

23   light moving billions of dollars.  On a worldwide basis, Lehman

24   employed 25,163 employees on September 15, 2008, the date of

25   the commencement of these proceedings.

1              Bankruptcy was not in contemplation, Your Honor, of

2     the Lehman enterprise.  However, the week of September 8th,

3     2008 was horrendous for Lehman exacerbated by contracting

4     liquidity as clearing banks demanding collateral security,

5     spreads widening, decreasing market capitalization, potential

6     downgrades and a crippling loss of confidence on the part of

7     Lehman account holders and counterparties.  Nevertheless, it

8     was believed at that time, Your Honor, that a transaction with

9     the Bank of America or, alternatively, with Barclays would

10    occur.  Unfortunately, the Bank of America went radio silent

11    during Saturday, September 13th.  The proposed Barclays

12    transaction, Your Honor, collapsed during the morning of

13    September 14, 2008.  But even at that point, there was

14    confidence that a transition process would evolve with the

15    assistance of the Federal Reserve or the U.S. Treasury that

16    would enable Lehman to continue and operate in the ordinary

17    course at least to close out the transactions and its business

18    in an orderly manner.

19             There was no substantive consideration of bankruptcy

20    as a Lehman option until the evening of Friday, September 12

21    and even at that time, it was considered a remote possibility.

22    The events of Sunday, September 14, 2008, were dramatic.  They

23    involved negotiations with the Federal Reserve Bank of New

24    York, the Treasury and the SEC.  It culminated in the rejection

25    by the Federal Reserve and the Treasury to provide -- let me

1    call it a bailout to Lehman.  Indeed, it was recommended that

2    Lehman immediately convince its board of directors to authorize

3    the commencement of a Chapter 11 case.  There was a decision, I

4    believe, that failed to realize the consequences of what would

5    occur.  A decision that is comparable in its monumental lack of

6    foresight to the federal government's reaction to the Katrina

7    catastrophe.  That is the way it will be recorded in the

8    history books because, like Churchill said, I may have to write

9    one of the books.

10            As the Court stated, Lehman Brothers became a victim,

11    in effect the only true icon to fall in the tsunami that had

12    befallen the credit markets.  The board of directors met that

13    night and ultimately passed a resolution authorizing the

14    commencement of the voluntary Chapter 11 case by Lehman

15    Brothers Holdings Inc. that was filed on September 15 in the

16    wee hours of that morning.

17            There was no preplanning.  The result was trauma and

18    dislocation as the shocks of bankruptcy caused the fourth

19    largest independent banker to suddenly stop operating in its

20    normal fashion.  The LBHI Chapter 11 case was preceded by the

21    commencement of administration proceedings in the United

22    Kingdom of Lehman Brothers Inc. Europe.  And the appointment of

23    members of PWC as the joint administrators for what I will

24    refer to, Your Honor, as LBIE.  LBIE was the critical hub for

25    the European operations and an integral part of the worldwide

1    financial reporting system.  There were approximately 5600

2    employees at LBI on September 15th.  As a result of the

3    appointment of the administrators, there was a lockdown at LBIE

4    and the system stopped.

5         In the context of what happened on September 15th in

6    the morning, at 7 a.m. in the morning, negotiations resumed

7    with Barclays Capital Inc. in an effort to try and salvage

8    value, protect customers, and also to provide for the transfer

9    of customer accounts and provide employment and continue the

10   broker dealer business.  Those negotiations which began at 7

11   a.m. on the 15th, Your Honor, ultimately evolved into the

12   creation of a structure that would accomplish those ends so

13   that there would be a sale to Barclays of certain assets and

14   there would be a companion proceeding initiated against Lehmans

15   Brothers Inc., the broker dealer under the Securities Investor

16   Protection Act where a Securities Investor Protection Act

17   trustee would be appointed and we would coordinated the two

18   proceedings so as to effect a sale which resulted in the

19   hearings that occurred before Your Honor during the week of the

20   15th.

21        While this was happening, Your Honor, the foreign

22   proceedings in which administrators were appointed or judicial

23   supervision occurred caused a breakdown of the financial

24   reporting system both in the U.K. and in Asia.  The immediate

25   need was for protection of the value of the assets.  The

1    negotiation and execution of an asset purchase agreement

2    occurred on September 16, 2008.  There were many moving parts

3    as circumstances and market conditions changed. The scene on

4    the 30th and 31st floors of 745 Seventh Avenue resembled bedlam

5    as hundreds of professionals converged and negotiated.  The

6    businesses sold to Barclays consisted of the U.S. and Canadian

7    investment banking and capital markets businesses that

8    encompassed fixed income and equities cash trading business,

9    brokerage dealing, trading and advisory businesses, investment

10   banking operations, LBI's business as a future's commission

11   merchant, LBI's commodity's business, government securities

12   trading operations, mortgage banks securities trading

13   operations of LBI but not any securities of such nature held by

14   the seller except as otherwise specified in the asset purchase

15   agreement, the PIM, or private investment management business,

16   and the building at 745 Seventh Avenue and two data centers.

17         Consideration for the purchase price of the LBI

18   business was 250 million dollars representing the goodwill of

19   that business and 1,000,290,000 dollars to Lehman Brothers

20   Holdings Inc. for the other businesses sold and the real estate

21   known as 745 Seventh Avenue and the two data centers.

22         Purchased assets are defined in the asset purchase

23   agreement as (1)all of the assets of seller used primarily in

24   the business or necessary for the operation of the business in

25   each case excluding the excluded assets; (2)none of the assets

1    or subsidiaries of LBHI other than assets at LBI except as

2    otherwise specifically provided.  There was also executed

3    thereafter, Your Honor, pursuant to the asset purchase

4    agreement, a transition services agreement which is dated as of

5    September 22, 2008.  In that agreement, the purchase of

6    Barclays Capital agreed to extend to LBHI entities the use of

7    facilities and other assistance on a transitional basis as set

8    forth in that agreement which also imposed upon Lehman

9    reciprocal obligations and duties.  The implementation of the

10   transition services agreement is a difficult process, Your

11   Honor, because of all of the things which have happened since

12   the commencement of this case.  And there will be more about

13   that after, Your Honor.

14          Immediately prior to the commencement of the SIPA

15   proceeding, Your Honor, an agreement was reached to transfer

16   all of the LBI subsidiaries before the consummation of the

17   sale.  This was consistent with the commencement of the

18   proceedings under the Securities Investor Protection Act of

19   1970 and the appointment of a SIPA trustee.  This was part of

20   the coordination of keeping the business operating and trying

21   to preserve value, Your Honor.  The transfer of the LBI

22   subsidiaries was for the purpose to enable the continued

23   efficient and expeditious administration of their businesses

24   with the cooperation of the SIPA trustee.  And if Your Honor

25   will look at the third page of the organizational chart, all of

1    the entities on the first line starting with "Lehman Brothers

2    Derivative Products" across the line, all of those entities,

3    the stock was transferred to another Lehman Brothers entity,

4    Lehman Alley, and the consideration for the transfers was a

5    note issued to LBI by the LBHI subsidiaries to which the

6    subsidiaries were transferred.  The note, which is a pick note,

7    "equals the fair market value of the LBI subsidiaries at the

8    time of transfer and would be determined by an independent

9    valuation to be completed by Lazard Ltd. pursuant to an agreed

10   upon methodology with the SIPA trustee.  Pursuant to the note,

11   LBI will receive one hundred percent of the net cash proceeds

12   from the sale of assets of LBI subsidiaries as provided in the

13   note.  The note bears interest at the rate of eight percent per

14   annum and is secured by the equity of those subsidiaries."  And

15   that was all, Your Honor, negotiated with the SIPA trustee.

16            THE COURT:  When was that done?  When did that

17   happen?

18            MR. MILLER:  Before the commencement of the SIPA

19   proceeding, Your Honor.

20            THE COURT:  Immediately before.

21            MR. MILLER:  Immediately before.  That morning, as I

22   recall it, Your Honor.  The SIPA proceeding, as I remember, was

23   about midday, 1:00 or thereabouts.

24            THE COURT:  On the 19th.

25            MR. MILLER:  On the 19th, Your Honor.  The closing of

1    the Barclays sale, as Your Honor may vividly recall at about

2    12:30 a.m. in this courtroom, the sale was approved and

3    immediately thereafter, took about an hour to get the order

4    entered, immediately thereafter the closing transactions began.

5    And in that connection, I should note, Your Honor, that the

6    United States trustee appointed a creditors' committee on

7    September 17th.  The committee immediately went into

8    organization and action and representatives of the committee,

9    their counsel and their financial advisors, Houlihan Lokey and

10   FDI, attended a good portion of the closing transactions which

11   began very early in the morning on the 20th of September.  What

12   we contemplated would be a simple neat little closing turned

13   out to take two full days, Your Honor.  And I found out when

14   you pick a time that you must close by, and someone said 7 a.m.

15   Monday morning before the markets opened, somehow the

16   transaction consumes all of the time.  So from early morning on

17   Saturday the 20th without any break at all right through 7 a.m.

18   Monday morning, the closing transaction moved forward.  And it

19   was effected, Your Honor, by the changing market conditions

20   which affected values and other difficulties which occurred in

21   connection with clearing transactions and in connection with

22   Depository Trust Company.

23        On Sunday afternoon, the 21st, Your Honor, there were

24   some serious difficulties.  The Federal Reserve and the SEC and

25   other governmental agencies became involved.  There were a

1   great many conferences to resolve differences with the clearing

2   agencies or clearing entities.  And that was not cleared up,

3   Your Honor, until about 5 a.m. Monday morning.  It was a very

4   difficult closing, Your Honor.  We made it by 7 a.m. and the

5   transaction went forward.  While all of this was going on, Your

6   Honor, more and more foreign proceedings were being instituted.

7   And Lehman's financial systems, Your Honor, worked perfectly

8   when the company was in operation.  When the company stopped

9   operating, the systems became, to some extent, dysfunctional

10  because they were all integrated.  And when the U.K. went down

11  you could not access those records and a lot of records there.

12  When Asia went down, the same thing happened.  So the system,

13  in effect, disintegrated.  And it's been difficult to reset the

14  system so that you can really get information the way Lehman

15  did when it was operating.  And that has been a continuing

16  problem that we're working on.

17          THE COURT:  This sounds like a prelude to your cash

18  management motion.

19          MR. MILLER:  Yes, sir.  It's involved in that.  Now,

20  Your Honor, on the evening of September 14th, late in the

21  evening, I might say, it was clear that given what was

22  happening with people picking up their belongings and leaving

23  and great uncertainty as to what was going to happen with

24  Lehman and the entire enterprise, it was clear that there was a

25  need for a very experienced personnel to deal with the

1    bankruptcy issues, the turnaround issues, etcetera.  And it was

2    at that point that the company selected Alvarez & Marsal to

3    function in that capacity and Mr. Brian Marsal, one of the co-

4    founders of Alvarez & Marsal, was selected to act as the chief

5    restructuring officer.  And Mr. Marsal, Your Honor, is in court

6    today with us and other members of his team.

7         Starting on Monday morning, the Alvarez & Marsal team

8    came on in force to start to try and organize what I can only

9    describe, Your Honor, as what might have been called a chaotic

10   situation with a great deal of uncertainty as to what was the

11   effect of the filing of the Chapter 11 case.  The role of

12   Alvarez & Marsal has been critical in bringing order to this

13   process, Your Honor.  The collapse of the integrated financial

14   reporting systems has had enormous impact.  Prior to the

15   Chapter 11, I mentioned the total number of employees, Your

16   Honor.  Of that 25,160 employees 13,710 were residents in the

17   United States.  1100 employees had been terminated in the two

18   weeks preceding the commencement of the case.  The current

19   state, as a result of the Barclays transaction, Your Honor,

20   approximately 9100 plus employees became employees of Barclays

21   Capital Inc.  The IMD division, the investment management

22   division of Lehman employs approximately 1,912 employees.  And

23   that, really, Your Honor, is almost like a separate unit.  It

24   includes the Neuberger Berman entities and that Neuberger

25   entity enterprise was never totally integrated into the Lehman

40

1    enterprise.  They had their own employees and so on.

2         Mortgage servicing had another 1,596 employees.  And

3    what has happened since September 15th, Your Honor, is Barclays

4    has taken possession of 745 Seventh Avenue and it is now the

5    Barclays Capital building.  About a week or ten days ago, the

6    Lehman -- I'll call it Lehman legacy -- moved out of the

7    building with the A&M team and moved to 1271 Avenue of the

8    Americas which was another Lehman office.  Of the Lehman

9    employees that have not gone to work for Barclays and are now

10   working at Lehmans, the legacy company under the direction of

11   the CRO, now number 164 persons.  And most of those persons,

12   Your Honor, are primarily legal and treasury.

13        One of the big difficulties, Your Honor, is that the

14   traders and others who were involved in the day to day business

15   of moving securities and so on are not employees of Lehman.

16   And this is a monumental task in connection with the resolution

17   of derivative transactions which are a very peculiar animal.

18        THE COURT:  This raises a question in my mind as to

19   how Mr. Marsal and his colleagues are able to access

20   institutional knowledge.  How do you do that?

21        MR. MILLER:  I'm going to get there, Your Honor.  I'm

22   going to get there.

23        THE COURT:  Okay.

24        MR. MILLER:  Okay?  So what has happened, Your Honor,

25   is A&M has about a hundred to 125 people working with the

1    legacy people.  The intention of Mr. Marsal is to recruit and

2    increase the workforce to approximately 450 people with the

3    bulk to be dedicated to derivatives, the bulk of the new

4    employees.  The organization for the administration of the

5    Chapter 11 cases contemplates -- and what has been done is that

6    A&M employees have been divided into teams.  There are, one, an

7    asset divestiture team.  And this team is responsible for the

8    loan book, the derivatives book, private equity, proprietary

9    portfolio, overseas assets, domestic banks, real estate

10   portfolio, tax refunds and receivables, aircraft, hardware and

11   other.  Then there is operational teams.  And these operational

12   teams include the following:  orders and claims, treasury and

13   accounting, wind-down transition, data preservation, forensic

14   review, IT interdependency.  And there are various senior

15   people assigned to each of those teams, Your Honor.  And one of

16   the first -- I'll get to this in just a minute, Your Honor.

17   The complexities of administration and enormous firefights that

18   have resulted, there are approximately 1.5 million derivative

19   transactions.  In the U.S., over a million derivative

20   transactions involving approximately 8,000 counterparties.

21   Many of those counterparties, Your Honor, under their -- is the

22   agreements elected to create and elected to declare an event of

23   default, the event of default being the commencement of the

24   Chapter 11 case by LBHI as the guarantor of the transaction.

25   This, Your Honor, is, I think, is the International Swaps and

1    Derivatives Association.

2              THE COURT:  I'm familiar with the term.

3              MR. MILLER:  So that there was an event of default on

4    the 15th.  Each one of the counterparties declared September

5    16th as the early termination date.  And approximately 600 to

6    700,000 of those contracts, Your Honor, have been terminated.

7    And essentially, I might say, Your Honor, with the exception of

8    but a few, every movant for a Rule 2004 examinations is a

9    counterparty who terminated a Swap or other derivative

10   transaction.  And in many of these cases, after the early

11   termination date, the counterparty has elected to value the

12   collateral that was posted with Lehman and come up either with,

13   in all of these cases, with a net claim against Lehman.  In the

14   case, for example, like we used Harbinger for an example, Your

15   Honor.  There were two transactions.  They were liquidated out

16   and they ended up with net claims against Lehman.

17             Now, there's a question, Your Honor, as tot he

18   valuation of the collateral which is something that will have

19   to be gone into later on in the administration of these cases.

20   The difficulties of administration, Your Honor, have been the

21   demands by individuals for specific information as to their

22   accounts.  It's been complicated by the disintegration of the

23   systems.  The stored data, Your Honor, and I am not an expert

24   on this stuff at all, are equal to two petabytes.  I'm told

25   that's supposed to be very impressive.

1          THE COURT:  I think that you've communicated

2    something that neither you understand nor I understand.  So

3    it's not -- I gather it's a lot of data.

4          MR. MILLER:  I'm told that, Your Honor.

5          THE COURT:  Okay.

6          MR. MILLER:  And over 2700 applications -- and Mr.

7    Marsal's team has told me there's no staple solution where you

8    just push a button and material comes out.  There are literally

9    hundreds of inquiries and e-mails coming in on an hourly basis

10   over the first four weeks.

11         THE COURT:  Well, let me stop you for a second --

12         MR. MILLER:  Sure.

13         THE COURT:  -- because I can't tell if I should be

14   very concerned about this report or comforted by this report.

15   Should I be comforted that Mr. Marsal has this massive hard-to-

16   manage pile of data under control?  Or is it so massive that it

17   requires a tremendous amount of work in accordance with the

18   strategies and allocated personnel that you have described.  I

19   can't tell whether this is a good report or negative report.

20         MR. MILLER:  That's the climax, Your Honor.  No.

21   This is a good report, Your Honor.

22         THE COURT:  Oh, okay.

23         MR. MILLER:  Okay?  I may not be effective in

24   conveying that message but I hope we get there.  What I'm

25   trying to say, Your Honor, is the first three weeks were really

44

1    difficult, very difficult.  And I think we all owe a debt

2    gratitude to the effort which the Alvarez & Marsal team have

3    put in and the fact that all of these people have been working

4    around the clock to get control of this process.  And we are

5    beginning to see -- we are now moving, Your Honor, from the

6    kingdom of perpetual darkness into the light.

7          THE COURT:  It's a very vivid image.  Let me go to

8    one point of light.

9          MR. MILLER:  Sure.

10          THE COURT:  And this is a comment which I'm going to

11    make in the context of the status report but it may foreshadow

12    some of the things coming up at me, a portion of the agenda

13    that involves contested motion practice.  It's obvious that

14    there are any number of parties in interest who are

15    counterparties to swap transactions or entities that had prime

16    brokerage relationships with Lehman or other businesses that

17    have claims against Lehman that have expressed through the 2004

18    discovery which is before me a strong desire to get the facts

19    and if the facts aren't available through the debtors'

20    fiduciaries, they want the opportunity to pursue a 2004

21    discovery and get the answers themselves.

22          Are you able to tell me or is Mr. Marsal able to tell

23    me anything about his ability to respond within a particular

24    period of time to these reasonable information requests?

25          MR. MILLER:  Yes, sir.  What I'm trying to emphasize,

```
 1    Your Honor, and what Mr. Marsal would emphasize if he were

 2    standing in my place, is this is a really, an atypical case, a

 3    case without any preplanning, a case which had a high level of

 4    chaos the first week.  Order is being obtained out of this

 5    process, Your Honor.  What we had tried to say to people

 6    seeking information is give us an opportunity to put the

 7    organization in place, to get the records, to get the

 8    information that we can share with everybody.  And we have been

 9    sharing information, Your Honor, as we have been accumulating

10    it.  Some of it is preliminary.  But we've been sharing it with

11    the creditors' committee.  Now, in a case of this size, Your

12    Honor, you can't have fifteen, twenty, thirty-five 2004

13    examinations.

14             THE COURT:  Well, I don't want to --

15             MR. MILLER:  Okay.

16             THE COURT:  --convert this into --

17             MR. MILLER:  All right.  But I want to ask you a

18    question, Your Honor.

19             THE COURT:  -- what amounts to a preview of that

20    argument unless it can be resolved in the context of what we're

21    now talking about.  And I'm guessing it won't be.  What I

22    really am looking for in the context of the status --

23             MR. MILLER:  Yes, Your Honor.  We --

24             THE COURT:  -- conference portion of this

25    presentation is whether Mr. Marsal, and I'd be happy to hear
```

46

1    from him, is able to rationally predict when he and his staff

2    will have sufficient control over the data that would, perhaps

3    not with the ease of pushing a button but with some relative

4    ease, can respond to particularized requests for information.

5              MR. MILLER:  Your Honor, as a matter of fact, we had

6    this discussion yesterday.  We had a series of meetings

7    yesterday.  And our best guestimate, and I'm calling it a

8    guestimate, Your Honor, is with all the efforts of the IT team

9    as put into place and we are negotiating protocols with the UK

10   administrators so that we can share information and, as Your

11   Honor knows, the Rule 2004 examination that the creditors'

12   committee special counsel wants to take, that's been continued

13   to November 5th because we're trying to work out a protocol on

14   that one.  The estimate, Your Honor, and Mr. Marsal can speak

15   for himself, is that in forty-five to sixty days, we should be

16   in a position where we can answer specific inquiries.  And

17   that's a goal, Your Honor.  But again, using the type of

18   phrase, two petabytes, that's a lot of information that we have

19   to get.  And the biggest issue here, Your Honor, is the

20   derivatives contracts.  We have to know what's in the inventory

21   in derivative contracts.  We have to know what is the value of

22   the collateral in connection with those.  And there are a lot

23   of problems about valuation because the market was changing

24   every day.  And the mark to market is not the easiest thing in

25   the world.  And then to find out whether it's a net claim or we

1    have money owed to us.  Now, we are having difficulty, Your

2    Honor, that everybody that owes us money is not too anxious to

3    pay.  Everybody we owe money to is sending us wire

4    instructions.  It's a little bit different depending what side

5    you're on.

6         But let me just tell you, there are four guiding

7    principles that have been adopted by the chief restructuring

8    officer and permeates the entire system.  And one, Your Honor,

9    is preserve, capture and store key data such that we can

10   reconstruct transactions and events.  Two, address immediate

11   buyers impacting asset values and claims.  Three, identify and

12   retain teams to work the problems.  Four, determine pre-

13   bankruptcy events giving rise to causes of action or mitigation

14   of claims.

15        Now, in the context of this emergency situation that

16   we've been working, Your Honor, the first three are the highest

17   priorities.  And number one is the preservation of data.  And

18   just yesterday, we had a meeting with Barclays Capital.  We

19   have to implement a transition services agreement in a broader

20   scale, Your Honor, so that we can have access to systems that

21   are now under the control of Barclays.  And that's a project.

22   But we made progress yesterday.  All of these things are being

23   dealt with, Y our Honor, on a daily basis.  And as I said, the

24   conclusion was that in forty-five to sixty days, we will be

25   able to answer specific inquiries.

1           Now, in fact, one of the joinders to one of the

2     motions, we found out some information last night and told him

3     where his account was.  Most of these accounts are one off swap

4     agreements, Your Honor.  And the question is what happened in

5     the liquidation of the collateral relating to that swap

6     agreement.  Now, that's a specific area -- I don't know how

7     that translates -- I don't want to argue the motion now -- how

8     that translates into this broad, broad discovery.  But we're

9     cognizant of the issue.  And we are -- Mr. Marsal is and his

10    team are working diligently to get to that position.  There's a

11    whole team that is working on reconstructing -- I shouldn't say

12    reconstructing, resuscitating the systems.  And there's going

13    to be a bankrupt data center for all of this.  And that's not a

14    long time, forty-five to sixty days in a case of this size,

15    Your Honor.  And as Your Honor knows, there has been --

16    additional Chapter 11 cases have been filed.  There are now

17    seventeen debtors.  Most of the derivative transactions, Your

18    Honor, not entirely all of them but most of them were with

19    Lehman Brothers Special Finance Inc. which was a debtor which

20    was filed on October 3.  That particular entity, Your Honor,

21    was filed because one of the guiding principles was to preserve

22    value and protect the assets.  So if there was an entity that

23    might be subject to attachment or it might be subject to

24    seizure of assets then the decision was made -- you have to

25    file that before something happens.

49

1           In other cases, where you could take action to

2    protect the assets before it dissipated such as, I will tell

3    you, the Indian back office processing center.  Mr. Marsal and

4    his team got involved right away.  It was a very difficult

5    situation.  The employees there were forming their own group.

6    There were offers -- they were going to offer themselves to

7    another entity.  They got involved right away and we did a

8    transaction where the purchase price is going to be seventy

9    million dollars, a good portion of which will go to LBHI.

10          So continuing through this effort, Your Honor, was

11   having to make a determination should a particular entity be

12   put into Chapter 11.  And that resulted in the seventeen

13   entities that are now there.

14          THE COURT:  Can you tell me whether or not with the

15   exception of those entities whose filings might be mandated by

16   a party to a transaction such as the proposed transaction for

17   IMD, are there any entities that are currently in the departure

18   lounge and ready to file that I should know about or that

19   you're prepared to publicly declare?

20          MR. MILLER:  Not as of today, Your Honor.  Most of

21   the protective actions have been done, unfortunately, Your

22   Honor, in the case of LBSF, the special financing entity, there

23   were monies on deposit in that bank, JPMorgan Chase was the

24   banker for that entity and there was a state court proceeding

25   in which the Bank of America was attempting to, in effect, get

50

1    an attachment on that account.  And there was an order entered
2    in that proceeding, not quite a restraining order but leaving
3    the account undiminished.  And under New York State law, the
4    bank decided it had a right to set off those accounts.  And it
5    set off those accounts and we've reached an agreement with the
6    bank that it will hold those monies separate, not apply them
7    until there's a final accounting.  That company, Your Honor,
8    had a relationship with Chase on a derivative transaction and
9    Chase is in the process of liquidating the collateral in the
10   account.  It'll be settled someday.  And either the 500 million
11   dollars in round figures that were in that account will be
12   applied to that deficit or it will be returned.  So we have
13   that agreement in writing with the bank and the bank has been
14   very cooperative in that respect, Your Honor.
15           But, unfortunately, LBSF, Your Honor, has zero
16   dollars.  And that was the counterparty to all these other
17   counterparties in these swap transactions.  Then, of course,
18   LBHI is alleged to be the guarantor in relation to all those
19   swaps.
20           So the team that has been working is to preserve the
21   values, preserve the data, deal with the firefights and get an
22   organization stabilized.  And the difference between September
23   16th, Your Honor, and Monday of this week is really dramatic.
24   We now have an organization which I would say is humming.  They
25   know what they're objectives are.  They're moving forward.

1    Information is being developed.  We had a six and a half hour

2    meeting last week, Your Honor, with the creditors' meeting in

3    which there was good give and take, there's been a good

4    relationship with the creditors' committee.

5         This is not the typical Chapter 11 case, Your Honor,

6    where you have old management and a creditors' committee and

7    you're fighting for control.  The management today is Mr.

8    Marsal who reports to the board of directors, Your Honor.  And

9    the board of directors, I have to point out to Your Honor, has

10   ten members.  Nine of them are independent, not employees of

11   Lehman.  Nine independent directors.  And Mr. Marsal I think

12   is -- he can speak for himself, Your Honor, has met with them,

13   I think, at least once every week.  They're on top of the

14   situation.  He reports to them.  That's the only body he

15   reports to.  He is technically -- I would say not even

16   technically, Your Honor.  He is an independent impartial

17   objective administrator of this estate.  And, I have to say

18   this again, he has brought order out of this chaos.

19        The difficulty, Your Honor, is that we now have a

20   small workforce, just 160 people, the A&M people and now we

21   have this attempt to go out and recruit people, 200 of whom,

22   Your Honor, we want to put into -- he wants to put into the

23   derivative section.  That is the most complex.  The rest of the

24   information is going to start coming in on a regular basis.

25   Maybe we will get to the point where you can press a button and

52

1   the information will come up.  But we're not there yet.

2        So, since September 15th, Your Honor, we've done the

3   Barclays sale.  We have on the calendar today the proposed sale

4   of the IMD division.

5        THE COURT:  The procedures for that sale.

6        MR. MILLER:  I'm sorry, Your Honor.  To approve the

7   procedures for that sale.  We have on the calendar for today

8   two proposed sales, one of Eagle Energy and the other one of

9   R3.  And as I said, Your Honor, we have sold the back office

10  processing center in India to Nomura for a gross sales price of

11  seventy million dollars.  And we are in the process of

12  establishing protocols with the PWC joint administrators, the

13  Japanese supervisors of that company.  We have a protocol in

14  effect, an informal -- maybe we will reduce it to writing with

15  the SIPA trustee.  We've worked very closely with the SIPA

16  trustee.  And I would purport, Your Honor, that there is this

17  forensic unit which is going to turn its attention to a review

18  of all pre-Chapter 11 transactions.  We have three grand jury

19  investigations, Eastern District of New York, Southern District

20  of New York and the District of New Jersey.  A number of

21  people, I think the number is around twelve, Your Honor, have

22  already been subpoenaed to appear before those grand juries.

23  There's a state attorney general investigation.  So there are

24  huge demands that are being made but they're being coped with,

25  Your Honor.  They're being dealt with in seriatim.  Information

1    is going out.  A great deal of information, Your Honor, has

2    been furnished to the creditors' committee.  It's been a very

3    active participant in that.

4            Currently now, Your Honor, the estates hold in excess

5    of three billion dollars.  And I have to say, Your Honor, in

6    connection with some of the statements that were made at the

7    time of the filing of the Chapter 11 cases and in connection

8    with the Barclays sale, maybe people didn't realize this, Your

9    Honor, but Lehman operated basically under a very basic

10   corporate structure in U.S. businesses.  You have Lehman

11   Brothers Holdings Inc. at the top as the holding company.  And

12   basically, Your Honor, as the bank.  So you had all these

13   entities.  And every day cash was swept up to the holding

14   company.  And in the morning, the holding company disbursed

15   cash as needed.  Even though these were corporate entities, it

16   was basically operating -- I would have to say, Your Honor, it

17   was out trying on a preliminary basis almost as one ball of

18   wax.  LBI was the major paymaster --

19           THE COURT:  You don't really want to say that in this

20   hearing, do you?

21           MR. MILLER:  I withdraw that, Your Honor.  I said

22   it's a very preliminary matter, Your Honor.  I don't know where

23   that's going to go.  I really don't know.  That's the

24   investigation --

25           THE COURT:  Well, just for what it's worth, given

54

1    what you described as the chaotic circumstances surrounding the

2    filing and the fact that the chief restructuring officer is

3    only now in the process -- I'm not saying he's taking more time

4    than he should.  It's a huge job -- but only now in the process

5    of developing the strategies for getting full control over the

6    business.  I don't think on this record we should say anything

7    one way or the other that might be later quoted as a cause for

8    or against possible substantive consolidation.  And I don't --

9              MR. MILLER:  I don't mean to prejudge --

10             THE COURT:  I don't know that you were making any

11   such suggestion.  But it certainly caught my attention.

12             MR. MILLER:  I would limit it, Your Honor, just to

13   the way cash was managed in the system.  Most of the employees

14   were LBI employees.  And most of them used to get their W-2s --

15             THE COURT:  But you also have said pretty clearly in

16   the cash management motion that there were accounting entries

17   made reflecting the --

18             MR. MILLER:  Yes.

19             THE COURT:  -- debits and credits, those parties that

20   owed money, those parties that were entitled to money.  And

21   that at the end of whatever period of sweeping and paying out

22   money, there was some appropriate reconciliation based upon

23   properly maintained books and records.

24             MR. MILLER:  Absolutely, Your Honor.

25             THE COURT:  That I don't view as apropos of a single

1    ball of wax.  But it's your comment.

2              MR. MILLER:  No.  I --

3              THE COURT:  And you're either stuck with it or you

4    can retract it.  Up to you.

5              MR. MILLER:  I take Your Honor's advice.  I retract

6    it.  And I would confirm, Your Honor, there were debits and

7    credits made and accounting systems were maintained to show

8    intercompany transactions.  There's no doubt about that, Your

9    Honor. And --

10             THE COURT:  What I understood you to be saying is

11   that for cash management purposes, and we're not talking about

12   that motion now, but there was a reference to -- it was either

13   LBHI or LBI -- I, frankly, don't recall which -- served as the

14   "paymaster" --

15             MR. MILLER:  Yes.

16             THE COURT:  -- with respect to the various payments

17   to be made on behalf of the enterprise.  And if that's what

18   you're referencing, I accept that as not one ball of wax but

19   simply a cash management protocol.

20             MR. MILLER:  That's what I was referencing, Your

21   Honor.  But I would like to make just a comment, Your Honor,

22   because ever since the hearing on approving the sales

23   procedures in connection with Barclays, there's been a great to

24   do about the alleged 8.48 billion dollar alleged transfer on

25   the eve of bankruptcy from LBIE to LBHI which was referrred to,

1   I think, in the declaration as one of the administrators of

2   LBIE.  On a preliminary basis, Your Honor, there is no evidence

3   of any kind whatsoever that there was anything unusual or

4   outside the ordinary course of business --

5          THE COURT:  But is there evidence that the eight

6   billion dollars was, in fact, transferred from London to New

7   York on September 12th?

8          MR. MILLER:  No, Your Honor.  No.  The facts, as we

9   have them today, and, again, Your Honor, subject to

10  confirmation, is that LBIE is actually indebted to LBHI for

11  approximately eight billion dollars.  And LBI, Lehman Brothers

12  Inc., is indebted to LBIE for approximately 3.4 billion

13  dollars.  And if you netted those figures, there's still a net

14  payable from LBIE to LBHI.  Now, you've got to put that in the

15  context, Your Honor, that in the regular course of conduct, the

16  sweeps did occur.  And then the accounting entries were made.

17  Now, as I said before, Your Honor, on September 12th,

18  bankruptcy was not considered an option to Lehman.  People were

19  still working and preparing for completion and settlement of

20  trades on Monday the 15th and also arranging for the transfer

21  of funds.  That was stopped dead, Your Honor, on the 15 --

22  actually, on the 14th.  LBI closed down, there was a lockdown

23  on all systems in London.  Transactions that were supposed to

24  go forward on the 15th did not occur because of the bankruptcy,

25  Your Honor.  Those trades were not concluded.  Now, that's not

1    to say, Your Honor, that there was a bundle of money or a

2    bundle of securities that were going to move.  Remember, this

3    is all electronic.

4            So there are a lot of transactions, Your Honor, I'm

5    sure that got caught in the filing and got caught in the

6    administration proceedings and got caught in the appointment of

7    judicial supervision in the other offices.  And that's just

8    unfortunately, Your Honor, the consequences of a bankruptcy.

9    If there had been a bailout, that would not have occurred or

10   probably would not have occurred.  But that's what happened,

11   Your Honor.

12           And there's been a lot of talk, Your Honor, about the

13   alleged 1.3 billion dollars that initially was supposed to

14   be -- I shouldn't say be but it was on a balance sheet for LBI

15   on September 16 -- or 15.  And when we got to the actual Friday

16   when Your Honor approved the sale, the terms of the sale

17   changed and there was no cash going to Barclays.  What had

18   happened there, and we alluded to it and maybe superficially at

19   the hearing, is on Wednesday night, the CME, the Chicago

20   Mercantile Exchange, closed out all of LBI's transactions.  And

21   that cost about a billion two hundred thousand dollars of

22   posted margin.  So that ate up almost all of that billion

23   three.  The balance of the monies, I am told, Your Honor, and

24   again, this is all preliminary, was taken by Citibank in

25   connection with margin payments as the clearing bank for

1    commodities transactions.  And all during that week, Your

2    Honor -- and that was a terrible week, the market was going

3    down, values were disappearing.  And when we go to the closing,

4    there was no billion three hundred million dollars.  The only

5    money at LBI, and the SIPA trustee can tell us that also, was

6    in the 15C3-3 account which was the reserve account for

7    protection of customers.  And in that account, there was a

8    billion dollars in cash and there was 700 odd million dollars

9    in securities for customers.  And then there was another

10   account for broker customers which had about 460 odd million

11   dollars in it.  And as part of the Barclays closing, because

12   Barclays was taking the customer accounts, they got the 700 odd

13   million dollars in securities.  The one billion dollars in cash

14   and the 400 odd billion dollars in securities is still in the

15   15C3-3 account and can't be released until the SEC authorizes a

16   release.  And if it is released, it will go to the SIPA

17   trustee.  So that's what happened to that money, Your Honor.

18          There are ongoing issues, Your Honor, with JPMorgan

19   Chase on reconciling the ultimate closeouts.  That's a problem

20   for another day, Your Honor.

21          So, in conclusion on my status report, Your Honor,

22   let me say this.  Maybe the word "chaos" was an extremely

23   emotional word.  It was a difficult situation.  None of the

24   employees anticipated that there would be a bankruptcy.  There

25   was a lot of uncertainty.  And in the period of, I would say,

59

1    Your Honor, less than four weeks, with the tremendous

2    contribution of Mr. Marsal and the A&M team, we now have a

3    functioning organization, an organization that is retrieving

4    information, putting it in proper form for distribution.  We've

5    had a very active creditors' committee which has been extremely

6    helpful in getting this organization in shape so that we are

7    now moving into what I hope, Your Honor, is a return to

8    normality.  Is it the end of abnormality?  I can't say that,

9    Your Honor.  But it is certainly the beginning of the end of

10   abnormality.  We are moving in the right direction.

11            THE COURT:  Well, you're talking about the beginning

12   of normality in a bankruptcy case.

13            MR. MILLER:  Yes, sir.

14            THE COURT:  Not the beginning of normality in the

15   sense of what this business was.

16            MR. MILLER:  No, sir.

17            THE COURT:  We're really talking about being able to

18   progress without the kinds of emergencies that characterize the

19   first thirty days of the bankruptcy.

20            MR. MILLER:  Exactly, Your Honor.  That's what

21   we're --

22            THE COURT:  Okay.  Fine.

23            MR. MILLER:  We took your admonition on the 20th to

24   get this case into the normal Chapter 11 framework and that's

25   what we're working on.

60

 1              THE COURT:  Okay.  I appreciate your report.  I have

 2       a question or two for you and I may have a very general

 3       question for Mr. Marsal.

 4              MR. MILLER:  Sure.

 5              THE COURT:  The question for you, principally,

 6       involves can you provide at this juncture any predictions of

 7       coming attractions as to what you anticipate requiring of the

 8       Court over the next sixty to ninety days or is this still a

 9       case that is in a reactive mode?

10              MR. MILLER:  Your Honor, we are moving, I believe,

11       and Mr. Marsal can confirm this, I hope, we are moving out of

12       the reactive process and that phase.  And I believe we're

13       moving into a phase in which we are beginning to think

14       affirmatively in what will be the ultimate objective in these

15       Chapter 11 cases.  Is it just going to be a wind down or is

16       there something -- some entity or groups of entities that may

17       be reorganized so that this process can be brought to an

18       earlier termination.

19              It is going to be a long process, Your Honor.  What

20       is coming up in the immediate future, and I think is probably

21       the most critical thing we are facing right now, is the ability

22       to recruit qualified people who can assist in unwinding the

23       most difficult transactions that we have.  And again, Your

24       Honor, I refer to the derivatives.  I believe that the team and

25       the Lehman legacy people, they have the real estate situation

1    under control.  They are beginning to get control of all of the

2    data.  Yes, there are some assets that you might say are in the

3    danger situation.  But every one of those assets has a team

4    that's focusing on it.

5         So coming up before Your Honor, I think very shortly,

6    will be a request for authority to put into place a recruitment

7    program to get qualified people.  And the difficulty with that,

8    Your Honor, and we've discussed this at length with the

9    creditors' committee is to get the kind of people that are

10   needed with the expertise that is required in the Wall Street

11   community which I don't want to characterize it -- I'll

12   characterize it the way other people do as very high

13   compensation levels.  A compensation that may have to be

14   offered is not the compensation you would normally find in a

15   Chapter 11 case.  And that is the problem that we are trying to

16   deal with.

17        THE COURT:  It sounds like a problem that may be as

18   much optical as it is anything else.

19        MR. MILLER:  That's right.  I can visualize, Your

20   Honor, the stories if we were to hire somebody at x amount of

21   dollars.  But it may be expensive in the first instance but the

22   fruits of that employment will be many, many fold more than the

23   cost of employment.  And what we're trying to do is work it out

24   with the creditors' committee.  I think that's the first thing

25   that's going to come up before Your Honor.

1            THE COURT:  All right.

2            MR. MILLER:  Okay?

3            THE COURT:  Anything else?

4            MR. MILLER:  Not at this moment, Your Honor.

5            THE COURT:  Okay.

6            MR. MILLER:  Thank you.

7            THE COURT:  The other question, which is really a

8    question for you and I'm going to ask this of Mr. Marsal, too,

9    there is an overriding theme in at least certain of the

10   objections that have been filed by the informal noteholders

11   group, certain of the 2004 requests and the term that seems to

12   appear repeatedly is "transparency".  It's a term that I myself

13   used at the last omnibus hearing.  I think I have heard you

14   say, although in not precisely a declarative sentence, that the

15   efforts currently underway by Mr. Marsal and his team from

16   Alvarez and Marsal are ultimately dedicated to the proposition

17   that this will be a transparent case in the sense that

18   individual creditors who have information requests will be able

19   to have those requests satisfied within a reasonable period of

20   time after making those requests.  Am I right in drawing that

21   conclusion?

22           MR. MILLER:  I will make it a simple declarative

23   sentence, Your Honor.  Yes.

24           THE COURT:  Okay.  My question for Mr. Marsal will

25   then be how is he going to do that.  When does he believe it's