# BCI Exhibit 504

James B. Kobak, Jr.
Christopher K. Kiplok
Anson B. Frelinghuysen
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) SIPA |
| Debtor. | |

**MOTION UNDER SIPA SECTION 78fff-2(f), 11 U.S.C. SECTIONS 105(a) AND 363(b) AND FED. R. BANKR. P. 9019(a) FOR APPROVAL OF THE TRUSTEE'S IMPLEMENTATION OF THE LBI LIQUIDATION ORDER TO COMPLETE THE ACCOUNT TRANSFERS FOR THE BENEFIT OF CUSTOMERS, INCLUDING THE RELATED LIMITED SETTLEMENT AGREEMENT COMPLETING THE PIM CONVERSION FOR THE BENEFIT OF PRIVATE INVESTMENT MANAGEMENT CUSTOMERS, AND TERMINATING THE ACCOUNT TRANSFER PROCESS**

James W. Giddens (the "**Trustee**"), as Trustee for the liquidation of the business

of Lehman Brothers Inc. ("**Debtor**" or "**LBI**"), by and through his undersigned counsel, presents

this motion (the "**Motion**") pursuant to section 78fff-2(f) of the Securities Investor Protection

Act ("**SIPA**")[1], sections 105(a) and 363(b) of the U.S. Bankruptcy Code (the "**Bankruptcy**

**Code**") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy**

---

1.    SIPA appears at 15 U.S.C. §78aaa.  For convenience, subsequent references to SIPA will omit "15 U.S.C."

**Rules**") for entry of an order approving the Account Transfers[2] (as defined below) pursuant to

SIPA section 78fff-2(f) and as the final step in that process, a limited settlement and compromise

among the Trustee and Barclays Capital Inc. ("**Barclays**") as set forth in the settlement

agreement attached hereto as Exhibit A (the "**Settlement Agreement**")[3] finalizing the transfers

for the benefit of Private Investment Management ("**PIM**") account transfers.  In support of the

Motion, the Trustee respectfully represents as follows:

## PRELIMINARY STATEMENT

By this Motion, the Trustee respectfully seeks the Court's approval of steps taken

and proposed to be taken to complete the Account Transfers and terminate this phase of the

liquidation.  This process has involved the transfer of approximately $92 billion[4] in  assets for

the benefit of over 110,000 former LBI customers.  In conjunction with this request, the Trustee

seeks confirmation that the delivery of cash and available securities from LBI's various custodial

banks, the purchase of missing securities, or the provision of cash in their place, in connection

with the Account Transfers, were and are authorized by the LBI Liquidation Order (as defined

below) commencing this liquidation, the transfer account section (§78fff-2(f)) of SIPA, and, with

respect to Barclays, the Sale Orders (as defined below) approving the account transfers as part of

the sale, and the Purchase Agreement (as defined below).  As set forth below and in the

Settlement Agreement, the Trustee and Barclays have agreed to complete the transfer of the final

PIM related assets to Barclays, thereby consummating the Account Transfers, in accordance with

---

2.  Capitalized terms in this Motion not herein defined shall have the meaning ascribed to them in the Settlement Agreement.

3.  The Settlement Agreement attached hereto does not include a copy of Schedule C or Schedule F, as to which Barclays and the Trustee will jointly seek authority to file under seal.  The Settlement Agreement is subject to non-material modifications.

4.  For the purposes of this Motion, all securities have been valued as of the Filing Date, except where noted otherwise.

the relevant provisions of SIPA, the LBI Liquidation Order, the Sale Orders, and the Purchase Agreement.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157.  Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

## BACKGROUND

2.      Beginning on September 15, 2008 and periodically thereafter, Lehman Brothers Holdings Inc. ("**LBHI**") and certain of its subsidiaries (collectively, the "**Chapter 11 Debtors**") commenced voluntary cases (the "**Chapter 11 Cases**") under Chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases have been consolidated for procedural purposes and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Procedure Rules.

3.      On September 19, 2008 (the "**Filing Date**"), the Honorable Gerard E. Lynch of the United States District Court for the Southern District of New York (the "**District Court**"), entered the Order Commencing Liquidation (the "**LBI Liquidation Order**") in the case captioned *Securities Investor Protection Corporation v. Lehman Brothers Inc.*, Case No. 08-CIV-8119 (GEL) (S.D.N.Y. Sept. 19, 2008) (the "**SIPA Proceeding**").

4.      The LBI Liquidation Order: (i) determined that LBI's customers were in need of the protections afforded by SIPA; (ii) appointed the Trustee as the trustee for the liquidation of LBI with special authority and power to transfer customer accounts; (iii) removed the proceeding to this Court; and (iv) authorized the Trustee to take immediate possession of the property of LBI, wherever located.  (LBI Liquidation Order ¶¶ I, II, X, XIII, XIV.)  The LBI Liquidation Order specifically included a provision authorizing the Trustee to "take other action

as necessary and appropriate for the orderly transfer of customer accounts and related property"
(*Id.* ¶ X(c), which provision the Securities Investor Protection Corporation ("**SIPC**") specifically
included in its application for LBI's liquidation for this purpose.

## FACTS

### I.    The Account Transfer Process

5.    To effectuate the SIPA goals of providing protection to customers,
avoiding harm to customers, preserving account values, and stabilizing markets, the Trustee
initiated and is now completing the transfer of: (i) PIM customer accounts to Barclays;
(ii) Private Asset Management ("**PAM**") customer accounts to Ridge Clearing and Outsourcing,
Inc. ("**Ridge**") for the benefit of customers of Neuberger Berman, LLC ("**Neuberger**"); and
(iii) prime brokerage customer accounts ("**PBA**") to brokers designated by the benefited PBA
holders (collectively, the "**Account Transfers**"). The Account Transfers allowed former LBI
customers access to assets held in over 110,000 LBI accounts promptly following the largest
broker-dealer liquidation in history. Each component of the Account Transfers was undertaken
to preserve investor confidence in turbulent markets and protect customer assets.

6.    As noted above, language was included in the LBI Liquidation Order for
the specific purpose of authorizing substantial and immediate account transfers, one of the
principal goals of the LBI Liquidation Order and the proceedings on the Filing Date. In seeking
protective measures for LBI customers through entry of the LBI Liquidation Order, SIPC, by its
counsel Kenneth J. Caputo, explained the anticipated efforts that would be made:

> There is a hearing in the bankruptcy court before Bankruptcy
> Judge Peck which attempts to consummate a deal by which various
> aspects of Lehman Holdings will be sold and the customer
> accounts will be moved to acquiring broker-dealer entities, which
> of course is intended to afford customers immediate access to their
> account and to provide again for the fair, and orderly markets we
> seek.

Dist. Ct. Hr. Tr. on Sept. 19, 2008, at 4-5.

A.      Conversion of Private Investment Management Accounts to Barclays Capital Inc. for the
         Benefit of PIM Account Holders

   7.      On September 20, 2008, following entry of the LBI Liquidation Order

with the language quoted above, this Court entered (i) an order approving, *inter alia*, the sale of

the PIM business to Barclays, pursuant to the Asset Purchase Agreement entered into on

September 16, 2009 between certain of the debtors in the Chapter 11 Case, LBI, and Barclays (as

it may be amended, clarified, or supplemented from time to time, the "**Purchase Agreement**")

(Chapter 11 Cases Docket No. 258) (such order, the "**LBHI Sale Order**"), and (ii) a concurrent

Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, an Order

Authorizing the Sale of Purchased Assets and other Relief in the Lehman Brothers Holdings Inc.

Chapter 11 Proceedings (the "**LBI Sale Order**," Docket No. 3, together with the LBHI Sale

Order, the "**Sale Orders**"), thereby authorizing the Trustee to consummate the sale of the PIM

business and transfer of PIM accounts.[5]

   8.      In accordance with the LBI Liquidation Order, the account transfer

provisions of SIPA, and the Sale Orders, on or about September 26, 2008, the PIM accounts

were converted from accounts on LBI's books and records to accounts on Barclays' books and

records, creating mirror accounts for the holder(s) of each such PIM account on Barclays'

systems (the "**PIM Conversion**"; each former PIM customer whose account was transferred to

---

5.   At the sale hearing, SIPC, explaining what would become a component of the Account Transfers, stated "we
      support [the PIM account transfer]. It allows these customers, these high net worth customers, essentially, to be
      moved.... And we stand back from the proceeding at first but we have committed all of the energy and all of
      the resources of SIPC to enable the SIPC trustee to get his work done, to enable Barclays to step in, take over
      the accounts that they are willing to take over and then to deal with the other transactions in the ordinary course
      of business as necessary." (Bankruptcy Ct. Hr. Tr. On Sept. 19 2008 at 72).  LBHI supported the transfer of
      accounts to Barclays: "if the sale with Barclays is consummated, customer accounts [will] continue on a
      seamless, uninterrupted basis and trading [will] continue on a normal basis, thereby maintaining the billions of
      dollars in value" (*Id.* at 101).

Barclays as part of the PIM Conversion became a Barclays account holder, a "**PIM Account Holder**"). The PIM Conversion also includes the subsequent transfer of assets associated with the applicable PIM accounts from LBI to Barclays. The Trustee has, with the advice and consent of SIPC, from time to time, from and beginning on or about September 26, 2008, and continuing until the date hereof, and in numerous separate transfers, delivered cash and PIM Securities to Barclays whenever practicable and from all available sources, with the purpose of completing the PIM Conversion in connection with the Sale Orders pursuant to the Trustee's authority under SIPA and the expectation of all interested parties.

9.        On February 11, 2009, the Court entered an Order approving the Compromise and Settlement Related to Certain Automated Customer Account Transfers Through Depository Trust & Clearing Corporation ("**DTCC**") and its affiliated entities (the "**ACATS Settlement**," Docket No. 690). Pursuant to the ACATS Settlement, (i) the Trustee transferred cash in the aggregate amount of $166,824,237 in U.S. Dollars to Barclays, and (ii) the Trustee was relieved of any obligation to transfer the securities specified in the ACATS Settlement, which are also referenced in the Settlement Agreement. The ACATS Settlement adjusted for failed automated customer account transfers on September 22, 2008 through a DTCC subsidiary and settled certain transfers. The parties to the ACATS Settlement have carried out and executed the contemplated property transfers and releases, and the ACATS Settlement has been consummated.

10.        With respect to the PIM Conversion, the Trustee has transferred customer cash and securities valued at nearly $42.3 billion to Barclays for the benefit of over 88,000 individual PIM Account Holders. In most cases, the securities were segregated for customers and readily deliverable. In other instances, the securities had not been properly segregated and

were in LBI's "main" account at the depository banks.  The Trustee's professionals have

transferred securities to Barclays when and to the extent they were available.  To the extent LBI

was indebted to a depository bank, such banks refused to release assets for the benefit of LBI's

former customers including PIM Account Holders.  Other PIM Securities were not available for

delivery due to seizure by domestic banks or because they were included in repurchase

transactions and liquidated by the counterparty.

11.    As provided in the Settlement Agreement, the Trustee and Barclays have

agreed on the steps necessary to complete the PIM Conversion.  These steps include that the

Trustee (i) transfer the remaining cash balances associated with the PIM Conversion,

(ii) purchase and transfer certain securities to replace missing securities, (iii) transfer cash where

cash substitutions for PIM Securities have already occurred, (iv) fund Barclays' purchase of

replacement securities, and (v) provide for the anticipated transfer and substitution of cash where

securities are missing and cannot be replaced.  Further description of the Settlement Agreement

appears in Section II, *infra*.

B.    <u>Conversion of the Private Asset Management Accounts to Ridge Clearing & Outsourcing
Solutions, Inc. for the Benefit of Neuberger Berman, LLC Customers</u>

12.    Prior to the Filing Date, LBI served as Neuberger's clearing broker for the

PAM accounts.  Following the commencement of the Chapter 11 Cases, Neuberger negotiated to

transfer clearing services for LBI's PAM accounts to Ridge.  Though not yet formally appointed,

the Trustee collaborated with Neuberger and Ridge, with input from various federal regulators,

to ensure that the conversion of clearing services would be seamless and have a minimal effect,

if any, on Neuberger's customers.

13.    Consistent with the account transfer provisions of SIPA and the

Liquidation Order, and to transfer all securities and cash related to the PAM accounts to Ridge

for Neuberger's customers' benefit, on or about the Filing Date, over 38,000 PAM accounts were converted from accounts on LBI's books and records to accounts on Ridge's books and records (as the replacement carrying broker-dealer for Neuberger), creating mirror accounts for the holder(s) of each such PAM account on Ridge's systems (the "**PAM Conversion**"; each former PAM account holder that became a Neuberger customer via Ridge in the PAM Conversion, a "**PAM Account Holder**").  To facilitate the PAM Conversion and the transfer of assets associated with the applicable PAM accounts from LBI to Ridge, Ridge and former LBI operations personnel confirmed that all net cash balances and all net securities positions associated with such PAM accounts were captured in the PAM Conversion.  Immediately following the Trustee's appointment, the Trustee, with the advice and consent of SIPC, transferred a majority of the assets associated with PAM accounts to Ridge for the benefit of Neuberger and the PAM Account Holders.  The PAM Conversion has resulted in the complete transfer of assets by the Trustee to Ridge for the benefit of Neuberger and the PAM Account Holders, except as stated below.

14.    In limited instances, securities were not available to the Trustee for delivery to Ridge for the benefit of Neuberger's customers.  On January 7, 2009, the Trustee agreed to transfer cash from LBI's customer reserve account to Neuberger for the purpose of allowing Neuberger to purchase and replace unavailable securities for its customers.  These replacement purchases have been completed to the extent possible, and where a replacement purchase could not be completed, the Trustee has provided cash to Neuberger for the affected PAM Account Holders.

15.    The Trustee's obligations to deliver cash and securities to Ridge in connection with the PAM Conversion have been performed, and, to the extent not performed,

have been relieved as provided in a second agreement among the Trustee, Ridge, and Neuberger dated as of October 30, 2009. The January and October agreements also provide for the return of cash and securities transferred to Ridge in excess PAM Account Holder positions. Neuberger and Ridge have each returned to the Trustee these excess deliveries.

16.     With respect to the PAM Conversion, the Trustee has transferred customer cash and securities valued at over $45.5 billion to Ridge and Neuberger for the benefit of over 38,000 individual PAM Account Holders.

C.     The Prime Brokerage Account Transfer Process

17.     Prior to the Filing Date, LBI's prime brokerage unit serviced hundreds of accounts representing billions of dollars in value. These PBA holders, primarily hedge funds, pension funds, insurance companies, trading companies, university endowments, and asset managers, controlled large pools of investment capital held on behalf of many retirees, employees, depositors, and investors. Transferring the PBAs as authorized by the Liquidation Order and the account transfer provisions of SIPA mitigated a liquidity crisis and prevented, to the extent possible, a deepening cascade of negative fallout from LBI's liquidation. With the freezing of several billions of dollars of these account holders' assets a possibility, the Trustee, in consultation with SIPC, initiated a program the transfer of the PBAs out of LBI to brokers of the benefited PBA's designation.

18.     On October 14, 2008, the Trustee promulgated the Protocol Regarding Prime Brokerage Arrangements (the "**Protocol**") (attached hereto as Exhibit B), creating a consensual, voluntary process for the orderly transfer of PBAs to operating broker-dealers. The Protocol detailed the rules and procedures for reconciling accounts, closing out certain financial instruments, and transferring account assets. Because of the complexity and interplay of the many financial instruments carried in PBAs, each PBA required manual review prior to transfer.

The Trustee's professionals determined each PBA's holdings, identified available segregated assets in LBI depositories, reconciled accounts with the PBA holders, and, following review and confirmation from SIPC, transferred available assets to the PBA holders' new broker to the extent possible.[6] The Trustee successfully transferred the majority of PBA assets under this process. However, a number of the account transfers were only partial because of the complex financial and contractual arrangements associated with the PBAs or because assets were not available. In all cases, prior to the transfer of assets, PBA holders maintaining margin debits repaid the estate by wire or other mutually agreeable debit cures, including partial distributions or partial asset liquidations.

19.    On January 23, 2009, the Trustee released a Statement Regarding the October 14, 2009 Prime Brokerage Protocol (attached hereto as Exhibit C) announcing that transfer requests from PBA holders to avail themselves to the Protocol needed to be received by January 30, 2009. PBAs including both those that had partially benefited from the Protocol and those that had not became subject to the SIPA claims process, except to the extent that a transfer pursuant to the Account Transfers was already in process.

---

6.    LBI maintained cash of not less than $250 million at JP Morgan Chase Bank, N.A. ("JPMC") related to certain PBAs, but this cash was not available for transfer because JPMC claimed it was collateral available to it to apply against a substantial LBI overdraft under the terms of the clearance agreement, as amended, by which JPMC served as LBI's clearing bank. While the Trustee and JPMC have been seeking to resolve their dispute with respect to this issue, to complete the PBA transfers, the Trustee distributed over $155 million in cash from available reserves with respect to seized cash balances and seized redemption proceeds.

LBI maintained other securities related to the PBAs at JPMC valued at not less than $590 million (book entry) and not less than $47 million (physical), which are also subject to the claims of the bank under the clearance agreement, which the Trustee disputes. On December 5, 2008, the Trustee entered into a replacement agreement with JPMC to gain access to the securities for the purpose of protecting customers. Both parties reserved their rights with respect to the appropriateness of the asserted liens, and the Trustee was able to transfer the securities to PBA holders after depositing $582,215,585 with JPMC. Cooperation with JPMC in this cash substitution allowed the Trustee to deliver otherwise unavailable assets to PBAs and advance the Account Transfers,

20.     In total, the Trustee effectuated transfers from approximately 300 PBAs of over $3.4 billion in customer cash and securities. This component of the Account Transfers is complete, leaving a discrete number of claims filed by PBA holders that were unable to benefit from the Account Transfers or that were not satisfied by treatment of their account under the Account Transfer process. The Trustee's professionals are handling these claims in the course of regular claims processing.

D.     Completion of the Account Transfers

21.     In an efficient and streamlined manner, the Account Transfers provided more than 110,000 LBI account holders with the treatment that SIPC, regulatory authorities, and others had sought and that the District Court had ordered. In both the PIM and PAM Conversions, the Trustee worked primarily with three parties, Barclays, Ridge, and Neuberger, with minimal dealings with the thousands of affected customers. Of the 77,000 individual PIM Account Holders, 2,389 filed claims. Most were prophylactic claims and the remainder were claims for assets not converted due to activity in the week before the Filing Date or for accounts associated with PIM accounts not transferred to Barclays. Only 133 PAM Account Holders filed claims in the SIPA proceeding, and in most instances they were prophylactic claims for issues that had or have been resolved as part of the PAM Conversion. Finally, as noted above, the transfer of PBAs resulted in the filing of claims for less than a quarter of LBI's total prime brokerage related assets as of the Filing Date.

22.     The PIM Conversion is the only remaining aspect of the Account Transfers not yet complete. As a result of certain customer property being unavailable, the Trustee has been unable to deliver all PIM assets to Barclays from available sources. Notwithstanding cooperation between the Trustee's professionals and Barclays' employees, the transfer of assets to Barclays to complete the PIM Conversion was not as immediate as the PAM

Conversion transfers, and the number and value of missing securities is significantly greater. To maintain customer relations and provide stability to the market, Barclays agreed to sell or transfer securities appearing as long positions on PIM Account Holders that had not been transferred by the Trustee because they were unavailable. Where Barclays was able to purchase the security directly from, or come to a mutually agreed upon close-out price with, the PIM Account Holder, a known cash replacement value was readily available. When a customer request required that Barclays deliver a non-existent security to a third party, that transfer created a Barclays delivery obligation (a "**fail**"). In instances where Barclays was subsequently bought-in by the third party or where Barclays came to a mutually agreed close-out price with the third-party, a clear cash replacement for such securities became known. For these sets of securities, cash has already been used to replace a missing security in a suitable amount, and the Trustee and Barclays have agreed to convert the Trustee's security obligation to a cash obligation. The Trustee and Barclays have also reached agreement regarding the treatment of certain securities that were unavailable to the Trustee for transfer to Barclays and that the Trustee was not able to purchase in the market. The Trustee and Barclays have been working closely together to reduce the impact these securities will have on customers and believe the terms of the Settlement Agreement appropriately minimize any possible negative impacts.

23.    The Trustee's performance under the Settlement Agreement, if approved by the Court, will result in the transfer of customer assets to Barclays and complete the PIM Conversion. It will also be the final step of, and conclude, the Account Transfers. The

mechanics and terms of the Settlement Agreement as agreed upon by the Trustee and Barclays are set forth below.[7]

## II.     The Settlement Agreement

24.     The Settlement Agreement substantially completes the PIM Conversion and therefore the Account Transfers.  The securities listed on Schedules A, B, C, D-1, D-2, E, and F, and the ACATS Securities  (as each term is defined in the Settlement Agreement) represent all of the securities included in the PIM Conversion and attributable to PIM Account Holders (the "**PIM Securities**")[8].  The Opening Cash, the PIM Distributions, the Dropped RISC Cash, and the ACATS Settlement Cash (all defined herein) are each components of, and together represent, all cash balances related to the PIM Conversion as set forth on the respective subparts of Schedule G of the Settlement Agreement (the "**PIM Cash**") with a total value of $1,125,477,931.  Settlement Agreement § 10.  Specific details of the transfer of the PIM Securities and the PIM Cash are set forth below.

25.     The Settlement Agreement memorializes the customer assets received by Barclays from the Trustee in connection with the PIM Conversion (i.e., the Schedule D-1 Securities, the ACATS Settlement Cash, the Dropped RISC Cash, and portions of the PIM Distributions).  It also provides for the disposition of the Schedule A Securities, the Schedule B Securities, the Schedule C Securities, the Schedule D-2 Securities, the Schedule E Securities, and

---

7.     To the extent any of the descriptions of the Settlement Agreement provided herein are inconsistent with the terms of the Settlement Agreement, the terms of the Settlement Agreement shall control.

8.     The Settlement Agreement filed with the Court concurrently with this Motion contains schedules updated as of October 18, 2009.  In some instances, where pricing cannot be immediately obtained without affecting the price of such security, the security's value has been left blank or a mere estimate has been provided.  The Cut-Off Date (as defined in the Settlement Agreement) shall be set as proximately as possible to the last day of business before the Objection Deadline for this Motion (i.e., December 10, 2009).  The Trustee will file with the Court updated Schedules to the Settlement Agreement, as of the Cut-Off Date, or such other applicable date, which schedules will serve as the operative deliverables under the Settlement Agreement.

the Schedule F Securities (as defined herein).  As set forth in the Settlement Agreement, the

Trustee and Barclays have provided or planned for disposition of all assets associated with the

PIM Conversion and confirmed that the schedules to the Settlement Agreement are an accurate

and complete representation of the securities and cash owed to Barclays in connection with the

PIM Conversion for the benefit of the PIM Account Holders.

26.    Schedule A of the Settlement Agreement lists certain securities that were

purchased by Barclays from, or as to which Barclays came to a mutually agreed close-out with, a

PIM Account Holder whose account statement from Barclays showed such PIM Account Holder

to have a long position in such security.  (the "**Schedule A Securities**").  With respect to the

Schedule A Securities, the parties agree that the Trustee will transfer $38,171,334.82 in place of

the securities, in cash to Barclays, which represents an agreed upon and fair valuation of the

replaced securities.  Settlement Agreement § 1.

27.    Schedule B of the Settlement Agreement lists certain securities with

respect to which a PIM Account Holder initiated a delivery to a third party (by sale, transfer,

etc.), and Barclays either covered that delivery by borrowing the security or failed to deliver the

security (including, without limitation, fails to deliver to a broker-dealer or other custodian or

clearing agency through which such securities were to be transferred) to such third party or any

other third party in connection therewith, and Barclays was subsequently bought-in by or has

come to a mutually agreed upon close-out price with such party (the "**Schedule B Securities**").

With respect to the Schedule B Securities, the parties agree that the Trustee will transfer

$23,635,165.64 in place of the securities which represents an agreed upon and fair valuation of

the replaced securities.  Settlement Agreement § 2.

28.     Schedule C of the Settlement Agreement lists certain securities that were not available to the Trustee for delivery to Barclays on behalf of PIM Account Holders and for which replacement securities could not be readily purchased by the Trustee (the "**Schedule C Securities**"). The Schedule C Securities are owed by Barclays to third parties as the result of transfers initiated by PIM Account Holders. The Trustee and Barclays have agreed on a pricing structure they believe provides a reasonable market value of any Schedule C Security. Using this pricing mechanism, the Trustee and Barclays will determine, on the Effective Date, the current market value of the Schedule C Securities, which cash will be transferred from the Trustee to Barclays[9]. In turn, Barclays may close or otherwise satisfy any open obligations it may have with respect to the Schedule C Securities using the funds provided by the Trustee. To the extent open obligations are not closed out, Barclays will calculate a hedge for its remaining delivery obligations. To the extent the initial cash transferred in connection with the Schedule C Securities is greater than the actual costs incurred replacing securities plus the hedge costs, the Trustee will supplement its payment to Barclays, or Barclays will refund the Trustee for any excess it may have received. The Trustee will also transfer to Barclays cash or other proceeds resulting from dividends, accrued interest and other distributions, principal payments and redemption amounts and other proceeds (collectively, the "**Distributions**") on the Schedule C Securities as applicable by the terms of the Settlement Agreement.

29.     Schedules D-1, D-2, and D-3 hereto list certain securities that (i) in the case of Schedule D-1, have been delivered, in the amounts shown on Schedule D-1, by the Trustee to Barclays for in connection with the PIM Conversion pursuant to the Purchase Agreement (the "**Schedule D-1 Securities**"), (ii) in the case of Schedule D-2, are owed to

_____

9.    A good faith estimate of the value is $80,188,086.82.

Barclays in connection with the PIM Conversion pursuant to the Purchase Agreement and will be delivered, in the amounts shown on Schedule D-2, by the Trustee (the "**Schedule D-2 Securities**"), and (iii) in the case of Schedule D-3, have been delivered by the Trustee to Barclays but are due back to the Trustee (the "**Schedule D-3 Securities**"; and collectively with the Schedule D-1 Securities and the Schedule D-2 Securities, the "**Schedule D Securities**"). The parties agree that each of the Schedule D-1 Securities has been delivered, that each of the Schedule D-2 Securities will be transferred to Barclays following the Effective Date, and that each of the Schedule D-3 Securities will returned to the Trustee. Settlement Agreement § 4.

30.    The Trustee has determined that certain securities due to PIM Account Holders in connection with the PIM Conversion are in his possession but as to which legal title cannot be readily transferred due to transfer restrictions that have been imposed by the applicable issuer, transfer agent, or other third party, or that otherwise arise under applicable law (the "**Schedule E Securities**"). With respect to the Schedule E Securities, the parties agree that the Trustee shall be deemed to hold such securities as custodian for Barclays for the benefit of the relevant PIM Account Holders. In connection with his role as custodian, the Trustee will maintain control of the Schedule E Securities to the extent that the Trustee's control is not limited by operation of law, keep the Schedule E Securities free from any charge, lien, or claim of any kind in favor of LBI or any persons making any claim through LBI or the Trustee for a Schedule E Security, and physically segregate the Schedule E Securities from other assets held by the Trustee. Furthermore, pursuant to the Settlement Agreement, the Trustee will transfer to Barclays any Distributions with respect to the Schedule E Securities, but only to the extent such proceed is actually paid by the issuer. Though not an operating broker-dealer, upon notice from Barclays, the Trustee will use reasonable efforts to exercise any voting rights or other rights with

respect to the Schedule E Securities.  The Parties will each use their commercially reasonable efforts to cause any transfer restrictions with respect to the Schedule E Securities to be lifted, at which time the Trustee will transfer the applicable Schedule E Security to Barclays.  Settlement Agreement § 5.

31.    Schedule F of the Settlement Agreement list certain securities that were not available to the Trustee for delivery to Barclays on behalf of PIM Account Holders, and for which replacement securities could not be readily purchased by the Trustee and which are owed to PIM Account Holders (the "**Schedule F Securities**").  Under the terms of the Settlement Agreement, the Trustee will transfer to Barclays for the benefit of the PIM Account Holders, approximately $218 million, which represents the Filing Date or Cut-Off Date value of the Schedule F Securities, in each case whichever is higher (Filing Date $195,277,345 plus estimated Cut-Off Date value $23 million).[10]  Settlement Agreement § 6.  Barclays will return to the Trustee any part of the cash related to the Schedule F Securities that is not actually used to satisfy customers or hedge such securities, and the Trustee will transfer Distributions on the Schedule F Securities as applicable by the terms of the Settlement Agreement.  Settlement Agreement § 6.

32.    Cash in the aggregate amount of $166,824,237 in U.S. Dollars (the "**ACATS Settlement Cash**") represents the Settlement Amount reached in connection with the ACATS Settlement Agreement related to the failure of certain Automated Customer Account Transfers through DTCC and its affiliated entities with respect to the securities specifically referenced therein (the "**ACATS Securities**").  The Parties acknowledge that, pursuant to the

---

10    For the purpose of this Motion, the Cut-Off value has been estimated as of November 18, 2009.  The value as it appears on the final Schedules will be the deliverable amount.

ACATS Settlement Agreement, the ACATS Securities and the ACATS Settlement Cash have previously been delivered by DTCC or the Trustee to Barclays. Settlement Agreement § 8.

33.    The Parties believe that there may have been certain PIM Securities shown long in a PIM Account Holder's account at the time of the PIM Conversion that LBI or the Trustee also delivered to a third party (a "**Third Party Recipient**") shortly before or after the Filing Date for the intended benefit of such PIM Account Holder (such securities, "**Misdelivered Securities**"). Through June 1, 2010 or such other date as the Parties may agree, the Parties will cooperate to identify the Misdelivered Securities and to determine whether the relevant PIM Account Holder received the security at the Third Party Recipient and, if so, whether such PIM Account Holder also still holds such security in an account at BCI. Following such identification and categorization, the Parties will resolve and remedy, as set forth in the Settlement Agreement, the Misdelivered Securities.

34.    As of July 31, 2009, the PIM Cash, both transferred and not transferred, totaled to the U.S. Dollar equivalent of $1,125,477,931, of which the amount $618,916,811 has been transferred from the Trustee to Barclays, as set forth in the Settlement Agreement, and $506,561,120 remains to be transferred, as set forth in the Settlement Agreement.

35.    Cash in the aggregate U.S. Dollar equivalent amount of $454,886,958 in the amounts and currencies as set forth on Schedule G-1 of the Settlement Agreement (the "**Opening Cash**") represents the September 25, 2008 net cash positions of all PIM Accounts included in the PIM Conversion and will be transferred by the Trustee to Barclays as set forth in the Settlement Agreement. Settlement Agreement § 10(a).

36.    Cash in the aggregate U.S. Dollar equivalent amount of $596,660,183 in the amounts and currencies  represents Distributions relating to any of the PIM Securities that

have a record date prior to the applicable close-out, buy-in or delivery date and that were actually made by the relevant issuers from the Filing Date through the July 31, 2009 and certain other miscellaneous cash (the "**PIM Distributions**"). The PIM Distributions comprises cash in the aggregate amount of $544,986,021 in U.S. Dollars that has previously been transferred by the Trustee to Barclays for the benefit of the PIM Account Holders and cash in the aggregate U.S. Dollar equivalent amount of $51,674,162, which shall be transferred in the currencies and amounts set forth on Schedule G-2 as set forth in the Settlement Agreement. Settlement Agreement § 10(b). PIM Distributions also include credits for checks drawn on PIM accounts that had stop payments placed on them and were subsequently re-credited to PIM accounts, incoming ACH activity that was credited to PIM accounts, outgoing ACH activity that was not processed by LBI's banks and was subsequently re-credited to PIM accounts, incoming Fed Fund wire activity that was credited to PIM accounts, outgoing Fed Fund wire activity that was not processed by LBI's banks and was subsequently re-credited to PIM accounts, and miscellaneous customer activity that was transferred from LBI to Barclays as agreed to by the Trustee and Barclays.

      37.     Cash in the aggregate U.S. Dollar equivalent amount of $73,930,789.59 as set forth in the amounts and in the currencies on Schedule G-3 of the Settlement Agreement (the "**Dropped RISC Cash**") represents certain PIM Account Holders' cash balances initially excluded from the PIM Conversion but which the Parties agree should not have been excluded, and was transferred in September 2009 in the currencies and amounts set forth in Schedule G-3 by the Trustee to Barclays and credited to the PIM Account Holders accordingly. Settlement Agreement § 10(c).

38.    The transfers listed in the Settlement Agreement's sections 10(a) to 10(c) comprise the transfer in full of the PIM Cash from the Trustee to Barclays such that the Trustee will have no further obligations to transfer any PIM Cash to Barclays at any time.  Settlement Agreement § 10(d).

39.    With respect to cash or other Distributions that have record date prior to the applicable close-out date, buy-in date, hedge date or delivery date that have actually been made, or will be made, by the relevant issuers after the Cash Calculation Date (the "**Late Accrued PIM Distributions**"), the parties agree that within 30 days of the Effective Date the parties will reconcile the Late Accrued PIM Distributions and the Trustee will transfer such cash amount to Barclays.  The Trustee will transfer to Barclays on a monthly basis any Late Accrued PIM Distributions that are actually made by the relevant issue following the Cash Calculation Date.  Settlement Agreement § 11.

40.    As a result of facilitating customer sales or other deliveries of PIM Securities and PIM Cash positions that have not been received from the Trustee, Barclays has incurred and continues to incur carrying and funding costs (the "**Carrying Costs**").  A reasonable approximation of these costs as of October 30, 2009 is set forth on Schedule H in the amount of $29,248,963.  The Trustee will transfer this amount to Barclays and will not be liable for any further carrying, funding, or similar costs of Barclays in connection with the PIM Conversion.

41.    Out of an abundance of caution and subject to reservation rights, Barclays has filed various customer claims in the SIPA Proceeding, two of which are addressed in connection with the Settlement Agreement.  The "**BCI Omnibus Claim**" is claim 900005753 asserted by Barclays for itself and on behalf of its "Customers" for "Undelivered Customer

Property" (as such terms are defined in the Letter Agreement, dated as of January 27, 2009,

between Barclays and the Trustee (the "**Omnibus Claim Letter**"))  The "**BCI Administrative**

**Claim**" is claim number 900005752 asserted by Barclays dated as of January 28, 2009, and filed

on January 30, 2009.  A portion of the BCI Administrative Claim is for "Undelivered Customer

Property" (as such term is defined in the Omnibus Claim Letter) (the "**BCI Administrative PIM**

**Claim**").  In connection with the Settlement Agreement, and under the Trustee's power to

determine claims under SIPA section 78fff-2, the BCI Omnibus Claim and the BCI

Administrative PIM Claim shall be deemed satisfied in full when and as provided for in the

Settlement Agreement.  It is the Parties' express intention that nothing in the Settlement

Agreement shall in any way impair or modify the Trustee's or Barclays' (or any respective

affiliate's) rights and remedies with respect to any other claims that have been asserted, or may

be asserted between them and not related to the PIM Conversion or the Settlement Agreement,

Settlement Agreement § 15(a).  Pursuant to the Settlement Agreement, the Parties anticipate

exchanging releases with respect to various obligations between them related to the PIM

Conversion, which releases are intended to be and are strictly limited to the PIM Conversion.

## <u>RELIEF REQUESTED</u>

42.    By this Motion, the Trustee respectfully seeks an Order of this Court, in

the form attached hereto, approving the Settlement Agreement and authorizing the Account

Transfers, including approval of the post and future uses of estate assets to fund the Account

Transfers, which have enabled the orderly liquidation of LBI and eased market tension for

thousands of former LBI account holders.

**The Account Transfers Are Authorized Pursuant to SIPA, the Bankruptcy Code and the Bankruptcy Rules.**

43.    SIPA authorizes the Trustee to transfer customer accounts to satisfy customers of a failed broker-dealer and ensure its orderly liquidation separate from the net equity customer claims process.  SIPA provides, in pertinent part:

> In order to facilitate the prompt satisfaction of customer claims and the orderly liquidation of the debtor, the trustee may, pursuant to terms satisfactory to him and subject to the prior approval of SIPC, sell or otherwise transfer to another member of SIPC, without consent of any customer, all or any part of the account of a customer of the debtor.

15 U.S.C. § 78fff-2(f).

44.    The Trustee has wide discretion in determining whether and when to transfer all or any part of a customer's account under SIPA section 78fff-2(f).  *Adler, Coleman Clearing Corp. v. Mishkin (In re Adler, Coleman Clearing Corp.)*, No. 95-08203 (JLG) 1998 WL 551972, at * 11 (Bankr. S.D.N.Y. Aug. 24, 1998).  SIPA provides that, with SIPC's approval, a trustee may transfer some or all customer accounts to another SIPC member broker dealer under SIPA section 78fff-2(f).  *See Securities Investor Protection Act Amendments of 1975:  Hearing on H.R. 8064 Before the Subcomm. On Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce,* 94th Cong. 67 (1975) (Major policy recommendations of the task force appointed to review the 1970 version of SIPA.).  SIPA's legislative history instructs that three conditions must be met for a Trustee to initiate account Transfers: (i) the failed firm must have kept complete and accurate books and records of customer accounts, (ii) the Trustee must find another firm or firms willing to carry the accounts and provide brokerage services, and (iii) the cost of transferring the accounts must be less than the cost of carrying out the liquidation in traditional form, that is, account by account.  *See Id.* at

56 (SIPC Chairman Hughes remarked to Congress, "One of the principal goals of the proposed [amendment to SIPA] is to make it possible for the trustee to render accounts to customers as they stood when the firm failed. One way to accomplish this in very rapid order is to empower the trustee to transfer accounts in bulk to another broker/dealer.").[11] Customer consent to have an account transferred is not needed: "[t]ransferring accounts without consent is an obvious prerequisite if the transfer is to occur within a reasonable time frame." *Id.* at 67. The two foremost factors that impact the feasibility of a bulk transfer are (i) the condition of the debtor's books and records (i.e., the character of the accounts themselves), and (ii) the availability of a SIPC member with sufficient capital and financial stability that is interested in, and capable of, assuming and servicing the debtor's customer accounts. *Id.*

45.    The Trustee initiated the Account Transfers to protect customers and maintain financial market stability, to the extent possible. The Account Transfers were specifically authorized by the LBI Liquidation Order that commenced the liquidation and are, in fact, the very purpose of the LBI liquidation. The Account Transfers match SIPA's provisions: to shorten the length of time necessary to satisfy claims, SIPA provides that the Trustee may, under certain circumstances, sell or transfer customer accounts of the debtor to another SIPC member, where it is economically expedient to do so, and where the debtor's books and records make this possible. Stephen P. Harbeck, *Stockbroker Bankruptcy: The Role of the District Court and the Bankruptcy Court Under the Securities Investor Protection Act*, 56 Am. Bank. L.J.

---

11.  The Special Task Force appointed by Chairman Owens to report to the SIPC board of directors regarding the proposed amendment and directed to consider better, quicker, and more efficient methods of liquidating firms, recommended that section 78fff-2(f) be adopted: "The Task Force believes that customers' accounts should be reconstituted as they existed on the filing date with due regard for the limitations of protection provided in [SIPA]. It also believes that this policy best meets the legitimate expectations of customers. Moreover, the knowledge that his account will be returned in the form in which it existed on the filing date, allows the customer to continue to exercise investment prerogatives with respect to his portfolio with minimal disruption. If the account is promptly transferred to another broker-dealer, the customers may continued [sic] trading." *Id.* at 61, 64-65.

277, 284-285 (Summer 1982) (Mr. Harbeck is the President and CEO of SIPC and served as its

general counsel from 1995 to 2003, when he became CEO). Further, when amending the Statute

in 1978, Congress included provisions allowing for the transfer of accounts without customer

consent. Michael E. Don & Josephine Wang, *Stockbroker Liquidations Under the Securities

Investor Protection Act and Their Impact on Securities Transfers*, 12 Cardozo L. Rev. 509, 546

(October 1990) (Ms. Wang has been SIPC's general counsel since 2004). Congressional waiver

of customer consent expedites the satisfaction of customers and alleviates potential hardships

related to liquidation. As such, the Trustee, in consultation with SIPC, entered into agreements

with Barclays, Neuberger, Ridge, and other SIPC members to facilitate the transfer of LBI

customer accounts to these firms. Each of these firms was ready to accept the transferred

accounts and has been able to maintain them since the respective conversions. And, as detailed

above, the Account Transfers effectuated the transfer of over 110,000 accounts, substantially and

significantly reducing and resolving potential customer claims to those accounts. Completing

the transfer of the PIM assets to Barclays will also resolve the BCI Omnibus Claim which is one

of the most significant claims against the estate in dollar value and number of affected

customers, and will also resolve one of the issues that would otherwise have to be litigated in

connection with the Motions of the Trustee, LBHI, and the Official Committee of Unsecured

Creditors of LBHI for relief pursuant to Fed. R. Civ. P. 60 with respect to the Sale Orders (such

motions, collectively, the "**Rule 60 Motions**"[12]) and in connection with one or more of the

related adversary proceedings commenced against Barclays by the Trustee, LBHI and the LBHI

---

12. The Rule 60 Motions are comprised of docket entries 5148, 5149, 5150, 5151, 5154, 5156, 5169, 5170, 5171,
    5172, and 5173 in Case No. 08-13555 and docket entries 1682, 1683, 1684, 1685, 1686, 1687, 1688, 1689, and
    1702 in Case No. 08-01420.

Creditors Committee on or about November 16, 2009 (such adversary proceedings, the "**Adversary Proceedings**").[13]

46.    The Settlement Agreement, which contemplates the completion of the SIPA Account Transfers by finalizing the PIM Conversion, meets the requirements of sections 105(a) and 363(b) of the Bankruptcy Code and Rule 9019(a) of the Bankruptcy Rules, applicable to this proceeding pursuant to SIPA section 78fff(b).

47.    Under section 363(b) of the Bankruptcy Code, a debtor in possession or trustee may "use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363(b) states the general principle that the trustee may use or sell property of the estate outside of the ordinary course of business, it does not set forth a standard for determining when it is appropriate for a court, in an exercise of its sound discretion, to authorize such sale or other disposition of a debtor's assets. Courts in the Second Circuit (and elsewhere) have required that such disposition outside the ordinary course of business be based on the sound business judgment of the trustee or debtor-in-possession. *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (section 363(b) relief "is permissible if the 'judge determining the . . .application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application'" (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983))); *Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.)*, 980 F.2d 165, 169 (2d Cir. 1992) (same); *see also In re Lionel Corp.*, 722 F.2d at 1069, 1071 (holding that, in considering a section 363(b) motion, "a bankruptcy judge must not be

---

13. The Adversary Proceedings are: Adv. Pro. 09-01732 (JMP), Adv. Pro. 09-01731 (JMP) and Adv. Pro. 09-01733 (JMP).

shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative

power granted him under the Code," but must simply find a "good business reason" supporting

the proposed transaction).

48.     The Trustee has acted and anticipates acting pursuant to his powers and

obligations under SIPA, which have enabled him to complete the Account Transfers and this

customer-centered aspect of the Purchase Agreement which is unaffected by the pending claims

raised in the Rule 60 Motions and in the Adversary Proceedings.  To the extent property

associated with transferred accounts was not available to the Trustee, purchase of the missing

securities or providing cash is authorized not only by SIPA section 78fff-2(f)(2) but also

constitutes a transaction authorized under section 363(b) of the Bankruptcy Code.  In this

context, entry by the Trustee into the Settlement Agreement regarding the PIM Conversion meets

the ultimate goal of SIPA, customer protection, the LBI Liquidation Order, the requirements of

the Sale Orders, and the Bankruptcy Code.

49.     In addition to SIPA section78fff-2(f), section 105(a) of the Bankruptcy

Code, empowers the Court to "issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  In practice, section

105(a) of the Bankruptcy Code grants bankruptcy courts broad statutory authority to enforce the

Bankruptcy Code's provisions either under the specific statutory language of the Bankruptcy

Code or under equitable common law doctrines.  *See Momentum Mfg. Corp. v. Employee*

*Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994).  Section

105(a) provides the Court with authority to carry out the provisions of section 363(b).  *Official*

*Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22,

27 (S.D.N.Y. 2005).  As described above, the requested order approving the Settlement

Agreement and the transfers described above allows completion of the Account Transfers

authorized by SIPA, and the Liquidation Order, as well as the Sale Orders, and also clearly

represents a sound, and indeed necessary, exercise of the Trustee's business judgment.

50.    Although the preceding statutory sections provide ample authority in

themselves, the Settlement Agreement, which contemplates the completion of the Account

Transfers by finalizing the PIM Conversion, also meets the requirements of Rule 9019(a) of the

Bankruptcy Rules.  That Rule provides, in relevant part, that "[o]n motion by the trustee and

after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr.

P. 9019(a).  Bankruptcy Rule 9019(a) "empowers the Bankruptcy Court to approve compromises

and settlements if they are in the best interests of the estate." *Vaughn v. Drexel Burnham*

*Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr.

S.D.N.Y. 1991).  In determining whether to approve a proposed settlement pursuant to

Bankruptcy Rule 9019(a), a court must find that the proposed settlement is fair and equitable,

reasonable, and in the best interests of the debtor's estate. *Protective Comm. for Indep.*

*Stockholders of TMT Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *accord In re*

*Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007); *J.P. Morgan Chase Bank, N.A. v.*

*Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, No. 09-01132 (JMP), slip op. at

48 (Bankr. S.D.N.Y. Nov. 17, 2009).

51.    In determining whether a settlement falls within the range of

reasonableness, a bankruptcy court must consider:  (i) the balance between the litigation's

possibility of success and the settlement's future benefits; (ii) the likelihood of complex and

protracted litigation, with its attendant expense, inconvenience, and delay, including the

difficulty in collecting after obtaining a judgment in the litigation; (iii) the paramount interests of

the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (iv) whether other parties in interest support the settlement; (v) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy judge reviewing, the settlement; (vi) the nature and breadth of releases to be obtained by officers and directors; and (vii) the extent to which the settlement is the product of arm's length bargaining. *In re Iridium Operating LLC*, 478 F.3d at 462. [14] In the instant case, all of the reasonableness factors weigh in favor of approval of the Settlement Agreement.

52.    The Settlement Agreement will resolve any outstanding claims between Barclays and the Trustee arising from the transfer of the PIM accounts to Barclays. It will result in the orderly transfer of customer securities to Barclays, and will fulfill the stated goal of the account transfer provision of SIPA by rendering accounts to customers as they stood when the firm failed. Litigation either between the Trustee and Barclays, or involving the thousands of affected customers, would be complex and result in expense, inconvenience and delay. The judicial resolution of this dispute would likely be prolonged and expensive, without any immediate benefit to the parties, customers, or the LBI estate. Instead, the Settlement Agreement provides for the reduction of costs, immediate transfer of assets and cash, and avoidance of the inherent uncertainty attendant to litigation. Specifically, the Settlement Agreement is designed to maintain the limited effects the PIM Conversion has had on customers by providing the

---

14. *See also In re Purofied Down Prods.*, 150 B.R. 519, 522 (Bankr. S.D.N.Y. 1993) (in making the determination of reasonableness, the court need not conduct a "mini-trial" on the merits). "All that [the proponent of the settlement] must do is establish [that] it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly [the settlement] might be considerably less (or more) than were the case fought to the bitter end." *Florida Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960) (internal citations omitted).

Trustee and Barclays an appropriate framework to handle replacement of the missing securities with cash.

53.     Finally, the Settlement Agreement is the product of arm's length negotiations between the Trustee and Barclays, and represents the parties' good faith compromise of potential disputes with the principal goal of protecting customers.  Accordingly, the Trustee submits that the settlement and compromise embodied in the Settlement Agreement is appropriate in light of the relevant factors, is fair and equitable, falls well within the range of reasonableness, and represents a beneficial outcome for the estate and LBI's former customers. For these reasons, the settlement should be approved.

**The Court Should  Waive the Periods Required By Rules 6004(h) of the Federal Rules of Bankruptcy Procedure**

54.     Pursuant to Interim Rule 6004(h) (formerly Rule 6004(g) of the Bankruptcy Rules), unless the court orders otherwise, all orders authorizing the use of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 10 days after entry of the order. Fed. R. Bankr. P. 6004(h).[15]  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. *See* Fed. R. Bankr. P. 6004(h) advisory committee's note.  In this context, the Settlement Agreement enables the Trustee and Barclays to continue to protect the PIM Account Holders.  To enable Barclays to provide its account holders with access to their assets in an expeditious manner, the Trustee hereby requests that the Court waive the 10-day stay period under Bankruptcy Rule 6004(h).

---

15. Bankruptcy Rule 6004(h) is an interim Bankruptcy Rule adopted pursuant to standing General Order M-308 of the United States Bankruptcy Court for the Southern District of New York, signed on October 11, 2005 by Chief Judge Stuart M. Bernstein.

## **CONCLUSION**

WHEREFORE, the Trustee respectfully requests that the Court approve the

Settlement Agreement and the related relief requested herein by entering an order, substantially

in the form annexed hereto as Exhibit D, and grant such additional and further relief as the Court

deems just and appropriate.


Dated:  New York, New York
       November 20, 2009


                            HUGHES HUBBARD & REED LLP

                            By:_____
                                James B. Kobak, Jr.
                                Christopher K. Kiplok
                                Anson B. Frelinghuysen
                                One Battery Park Plaza
                                New York, New York 10004
                                Telephone:  (212) 837-6000
                                Facsimile:  (212) 422-4726
                                Email:  kobak@hugheshubbard.com


                                Attorneys for James W. Giddens,
                                Trustee for the SIPA Liquidation of
                                Lehman Brothers Inc.