# BCI Exhibit 630

Page 1

1

2                UNITED STATES BANKRUPTCY COURT

3                SOUTHERN DISTRICT OF NEW YORK

4    ---------------------------X

5    IN RE:

6                               Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,

9

10                   Debtors.

11   ---------------------------X

12

13

14

15           HIGHLY CONFIDENTIAL DEPOSITION OF

16               ANSON FRELINGHUYSEN

17               New York, New York

18             Thursday, March 4, 2010

19

20

21

22

23

24   Reported by:
     JOMANNA DeROSA, CSR
25   JOB NO. 27494

## Page 2

```
 1
 2
 3
 4          March 4, 2010
 5          9:40 a.m.
 6
 7
 8          HIGHLY CONFIDENTIAL Deposition of
 9   ANSON FRELINGHUYSEN, held at the offices of
10   Boies Schiller & Flexner, LLP, 575 Lexington
11   Avenue, New York, New York, pursuant to
12   Notice, before Jomanna DeRosa, a Certified
13   Shorthand Reporter and Notary Public of the
14   States of New York, New Jersey, California
15   and Arizona.
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4
 5      JONES DAY, LLP
 6      Attorneys for Lehman Brothers, Inc.
 7         222 East 41st Street
 8         New York, New York 10017-6702
 9      BY:  JENNIFER L. DEL MEDICO, ESQ.
10
11
12      BOIES SCHILLER & FLEXNER, LLP
13      Attorneys for Barclays
14         5301 Wisconsin Avenue, N.W.
15         Washington, D.C. 20015
16      BY:  JONATHAN SHAW, ESQ.
17
18
19      HUGHES HUBBARD & REED, LLP
20      Attorneys for SIPA Trustee
21         One Battery Park Plaza
22         New York, New York 10004
23      BY:  SETH D. ROTHMAN, ESQ.
24
25
```

## Page 4

```
 1
 2   A P P E A R A N C E S (Continued):
 3
 4
 5      QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
 6      Attorneys for the Creditors Committee
 7         51 Madison Avenue, 22nd Floor
 8         New York, New York 10010
 9      BY:  ERIC M. KAY, ESQ.
10
11
12   ALSO PRESENT:
13      JOSH LIPSON, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1           FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
 2           THE VIDEOGRAPHER:  This is the
 3   start of tape No. 1 of the videotaped
 4   deposition of Anson Frelinghuysen in the
 5   matter In re Lehman.
 6           Today's date is March 4th, 2010, at
 7   approximately 9:40 a.m.
 8           Will the court reporter please
 9   swear in the witness.
10   A N S O N   F R E L I N G H U Y S E N, called as
11   a witness, having been duly affirmed by a
12   Notary Public, was examined and testified
13   as follows:
14   EXAMINATION BY
15   MR. SHAW:
16      Q.   Mr. Frelinghuysen, my name is
17   Jonathan Shaw.  We met off the record a moment
18   ago.  I'm with Boies, Schiller & Flexner, and I
19   represent Barclays Capital, Inc.
20           You're an associate of Hughes
21   Hubbard & Reed.  Is that correct?
22      A.   That's correct.
23      Q.   And you were an associate of Hughes
24   Hubbard & Reed in September of 2008.  Is that
25   right?
```

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        A.   I was.
3        Q.   How long at law school were you?
4        A.   I graduated from Brooklyn Law
5    School in June of 2007.
6        Q.   And you've been at Hughes Hubbard
7    your entire career?
8        A.   I have been.
9        Q.   Since September 2008 you've been
10   working on the SIPA liquidation of Lehman
11   Brothers, Inc.  Is that correct?
12       A.   Yes.
13       Q.   When were you first assigned to
14   that matter?
15       A.   I was first assigned to the Lehman
16   Brothers, Inc. matter on September 13th.
17       Q.   And how did you learn on
18   September 13th that you would be working on that
19   matter?
20       A.   I received a call from Mr. Margolin
21   that he would like for me to come into the office
22   the next morning.
23       Q.   "The next morning" being Saturday
24   the 14th?
25       A.   Sunday the 14th.

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        Q.   Sunday the 14th.  Okay.
3             And did you get any further
4    instruction in the course of that phone call?
5        A.   No.
6        Q.   Can you give me an overview of what
7    you did in connection with that matter between
8    starting work on September the 14th and the
9    closing of the transaction on the morning of
10   September 22nd.
11            MR. ROTHMAN:  You can give him a
12       general overview without revealing any
13       privileged information.
14       A.   As a first-year associate, I
15   prepared some of the documents associated with the
16   filing of the SIPA liquidation.  I attended the
17   district court hearing in which Lehman Brothers,
18   Inc. was placed in liquidation.  I also attended
19   the closing of the transaction between Lehman
20   Brothers, Inc. and Barclays.
21       Q.   I take it, then, that you did not
22   attend the September 19th sale hearing?
23       A.   I was -- I was at the
24   September 19th sale hearing before it began.
25       Q.   And you left to go where?

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        A.   There were other documents that
3    needed to be prepared in connection with the
4    Trustee's appointment.
5        Q.   And I take it you also did not
6    attend the September 17th hearing?
7        A.   I did not attend that hearing.
8        Q.   Over the weekend following the sale
9    hearing, did you participate in any discussions
10   concerning the documentation of the sale
11   transaction?
12       A.   I did, yes.
13       Q.   Setting aside any purely internal
14   discussions between you and the Trustee or the
15   Trustee's lawyers at Hughes Hubbard, tell me what
16   discussions concerning the documentation with the
17   transaction you were involved in.
18       A.   Primarily I was there to discuss
19   the signing of a multitude of signature pages for
20   the related documents for the closing of the
21   transaction.
22       Q.   So that would be early on the
23   morning of the 22nd?
24       A.   No.  Most of the signature pages
25   were signed on Saturday, September 20th.  Still

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    others were signed on Sunday, September 21st.
3        Q.   Were any signed on the morning of
4    the 22nd?
5        A.   If they were signed on the morning
6    of the 22nd it would have been, you know, between
7    midnight and 2:00 a.m.  And actually, there were
8    further documents signed later in the morning.
9        Q.   Later in the morning of the 22nd?
10       A.   Yes.
11       Q.   What documents were signed later in
12   the morning of the 22nd?
13       A.   The services and settlement
14   agreement was signed in the morning, as well as
15   the DTCC letter.
16       Q.   Were you physically present at the
17   offices of Weil Gotshal at any time during that
18   weekend?
19       A.   I was -- yes, I was.
20       Q.   How much of the weekend were you
21   present at Weil Gotshal?
22       A.   I was present for large portions of
23   both Saturday, Sunday, and I was there from
24   midnight Monday morning until about 8:00 a.m.
25       Q.   Tell me what you were doing there.

Page 10

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2  A.  I was monitoring the closing
3  proceedings for the Trustee and reporting back
4  information as necessary.
5  Q.  When you say you were "monitoring
6  the closing proceedings," what do you mean?
7  A.  There were a number of people there
8  discussing issues related to the closing, and I
9  would listen to them and let other attorneys at
10  HHR and the Trustee know what was going on.
11  Q.  And when you say "issues related to
12  the closing," do you mean substantive issues or
13  just logistical issues about how the documents
14  were going to be signed, or both?
15  A.  There would be both document
16  signing and logistical issues that really were not
17  relevant.  That was just, what does my signature
18  block look like, you know, that kind of thing,
19  which is not relevant.
20  Primarily, the discussion was
21  between Barclays and JPMorgan Chase over an issue
22  that they were having that was holding up the
23  closing.
24  Q.  And when were those discussions
25  taking place?

Page 11

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2  A.  Those discussions took place all
3  day Saturday, all day Sunday and into Monday
4  morning.
5  Q.  Were you involved -- were there any
6  other representatives of the Trustee at Weil
7  Gotshal?
8  A.  Yes.  Mr. Kiplok arrived around
9  4:00 or 5:00 on Sunday the 21st.
10  Q.  5:00 a.m. or p.m.?
11  A.  Oh, p.m.
12  Q.  And how long did he stay?
13  A.  Mr. Kiplok and I left together
14  around 8:00 a.m. on Monday morning.
15  Q.  Why did you sign the documents
16  rather than Mr. Kiplok or someone else more
17  senior?
18  A.  Most of the documents were signed
19  before Mr. Kiplok got there.
20  Q.  Apart from the -- strike that.
21  You talked about discussions
22  between Barclays and JPMorgan that stretched from
23  Saturday through some point on Monday.
24  Were you present for any portion of
25  those discussions?

Page 12

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2  A.  Those discussions were behind
3  closed doors when they were between the parties
4  themselves, and they then made various
5  presentations to the larger group, which I would
6  have been present for.
7  Q.  How many such presentations do you
8  recall?
9  A.  There were two or three or -- two
10  or three of them.
11  Q.  And who did the presenting?
12  A.  Mr. Cox did some of the presenting,
13  people who -- you know, I didn't know who they
14  were at the time.
15  Q.  Representatives of JPMorgan?
16  A.  Representatives of JPMorgan,
17  representatives of Barclays, both lawyers and
18  business individuals.
19  Q.  What was your understanding of the
20  substance of the issue that was being discussed
21  between JPMorgan and Barclays?
22  A.  I understood from their discussions
23  to have been a holdup in collateral transfers,
24  with assets stuck at JPMorgan that were
25  purportedly due to Barclays.

Page 13

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2  Q.  Would that be the $7 billion?
3  A.  Yes, that's -- I recall that being
4  one of the issues that was discussed.
5  Q.  What other issues do you recall
6  being discussed?
7  A.  That was the primary kind of
8  blockage that they were unable to resolve for
9  quite some time.
10  Q.  Can you tell me anything about what
11  was discussed during these presentations, as much
12  detail as you can recall?
13  A.  You know, at the presentations,
14  some of them were at the beginning where they
15  presented the issue, and then some of them were
16  later when they had reached a -- what they
17  believed to be a resolution to the issue.
18  Yes.  Since they didn't necessarily
19  affect what we were doing there, I don't remember
20  the details of them.
21  Q.  When Mr. Kiplok was present on
22  Sunday going through to Monday morning, what were
23  his responsibilities as compared with your
24  responsibilities?
25  A.  Mr. Kiplok had other -- I mean, I

4 (Pages 10 to 13)

Page 14

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2  wouldn't know what to say what his
3  responsibilities were.
4      Q.   Did you have any understanding of
5  what he was doing, as opposed to what you were
6  doing?
7      A.   We both were monitoring the
8  proceeding at that point.
9      Q.   Did you attend or participate in
10  any discussions of the terms of the clarification
11  letter?
12      A.   I did.
13      Q.   When did you -- how many such
14  discussions were you involved in?
15      A.   There were discussions on Sunday
16  late afternoon and evening, and then there was a
17  continuous and longer discussion on Monday
18  morning.
19      Q.   Were there any discussions you were
20  a party to concerning the terms of the
21  clarification letter on Saturday?
22      A.   There were no substantive
23  discussions.  It was discussed as an item that
24  existed, but we didn't have a copy of it.
25      Q.   Tell me about Saturday.

Page 15

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2      What time did you arrive at Weil
3  Gotshal?
4      A.   I believe I got to Weil Gotshal
5  around 10:00 a.m. on Saturday.
6      Q.   And what did you do once you
7  arrived?
8      A.   There were not a lot of people
9  there when I arrived, or at least not into the
10  room in which I had been directed.  I made contact
11  with Ms. Clausen, who was the associate at Weil
12  Gotshal coordinating the signing of the documents,
13  and primarily I met with her to go over signature
14  blocks and signing of the documents on behalf of
15  the Trustee.
16      Q.   Which documents did you sign on
17  Saturday?
18      A.   I signed every document that I
19  signed that's attached to the APA.
20      Q.   Okay.  What else did you do on
21  Saturday?
22      How long did the discussions of
23  signature blocks and the signing of those
24  documents take?
25      A.   It would have been hours back and

Page 16

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2  forth getting the signature block correct.  There
3  were some problems with the signature pages, you
4  know, I think, created with document numbers in
5  the wrong places.  It was kind of normal lawyer
6  stuff.
7      Q.   What else did you do on Saturday?
8      A.   I met with Mr. Messineo a few
9  times, with Ms. Fife a few times.  I also met with
10  Mr. Gruszecki from Cleary Gottlieb.  And there
11  were some other associates there from both firms.
12      Q.   What was the name of the person
13  from Cleary Gottlieb?
14      A.   I'm not sure I pronounced it --
15  it's Gruszecki.  Grabowski maybe.
16      Q.   How many times did you meet with
17  Mr. Messineo on Saturday?
18      A.   On Saturday I probably had four or
19  five separate discussions with Mr. Messineo.
20      Q.   And what was the subject of those
21  discussions?
22      A.   The first one was to go over my
23  signatory role on behalf of the trustee.  On
24  another occasion I asked for completed documents
25  of the APA.  Another occasion I asked for the PIK

Page 17

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2  notes.  On another occasion I asked for a
3  clarification letter.  And on another occasion we
4  discussed whether the Trustee would need to open a
5  new 15c3-3 account after the filing.
6      Q.   Let's start with the discussion
7  about the 15c3-3 account.
8      Please tell me what you recall
9  about that discussion.
10      A.   Mr. Messineo approached me with
11  Ms. Fife.  They asked me whether we had undertaken
12  any research as to whether the Trustee would need
13  to open a new 15c3-3 account to perform the
14  function that a 15c3-3 account performs.
15      Q.   And what did you tell them?
16      A.   I told them that I would check.
17      Q.   Did you check?
18      A.   I did.
19      Q.   Did you report back to them?
20      A.   No.
21      Q.   Why not?
22      A.   I didn't have an answer.
23      Q.   Tell me about the discussion where
24  you asked for a copy of the clarification letter.
25      A.   Towards the end of the evening --

5 (Pages 14 to 17)

Page 18

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1  or late afternoon/early evening when I was told
2  that they would not be closing that night because
3  they were working on a few other matters,
4  primarily what had been discussed was the
5  JPMorgan/Barclays issue, but also he said there
6  was this clarification letter.
7          And I said that we should probably
8  have a copy of that.
9      Q.   And what did he tell you?
10     A.   He didn't give me a copy.
11     Q.   Do you know if there was a copy to
12 give you at that point?
13     A.   I didn't know that.
14     Q.   Did you later learn that there was
15 a copy to give you?
16     A.   I've seen documents that have, you
17 know, earlier dates.
18     Q.   You ultimately did receive various
19 drafts of the clarification letter.  Is that
20 correct?
21     A.   I did receive various drafts of it,
22 yes.
23     Q.   Over the course of the weekend?
24     A.   Beginning on Sunday evening, yes.

Page 19

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1      Q.   You mentioned PIK notes.
2          What do you mean by the "PIK
3  notes"?
4      A.   PIK notes are the payment-in-kind
5  notes; that I understood the holding company moved
6  all the subsidiaries out from underneath LBI in
7  return for a PIK note to be valued at a later
8  date, and that PIK note was to be delivered to the
9  Trustee.
10     Q.   Aside from the discussion you've
11 already testified about that involved both
12 Mr. Messineo and Ms. Fife concerning the 15c3-3
13 account, what other discussions did you have on
14 Saturday with Ms. Fife?
15     A.   With Ms. Fife?
16     Q.   Yes.
17     A.   None.
18     Q.   What discussions did you have with
19 Mr. Gruszecki or Grabowski, the gentleman from
20 Cleary Gottlieb?
21     A.   That -- those conversations would
22 have been three-way with Ms. Clausen as we
23 discussed the signature pages.  Those two
24 associates were primarily working on getting the

Page 20

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1  signature pages to all the ancillary documents to
2  the APA in order and signed in triplicate or
3  quadruplicate as necessary.
4      Q.   Anything else of significance that
5  you did on Saturday?
6      A.   No.  When I left in the evening I
7  gave my contact details to Ms. Clausen and
8  Mr. Gruszecki in case they needed to contact me in
9  the event that the deal would actually be able to
10 close that night, and I could sign any of the
11 final documents.
12     Q.   What time did you leave?
13     A.   I think I left at 6:30 or 7:00.
14     Q.   Any additional activity that
15 evening or that night?
16     A.   Yes.
17     Q.   What happened that night?
18     A.   I communicated with attorneys from
19 Hughes Hubbard.
20     Q.   Did you return to Weil Gotshal on
21 Sunday?
22     A.   I did, yes.
23     Q.   At what time?
24     A.   I arrived later that day, probably

Page 21

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1  between 11:00 and 12:00.
2      Q.   Okay.  And what did you do on
3  Sunday?
4      A.   Sunday was similar to Saturday.  We
5  re-signed some of the documents with the proper
6  date because it was -- now another day had passed.
7  I monitored proceedings again on behalf of the
8  Trustee and reported back any developments.
9      Q.   And when you say you "monitored"
10 the proceedings, what proceedings are you talking
11 about?
12     A.   There were people in and out of
13 various rooms, and I was in the hallway.  I was
14 listening.
15     Q.   And what did you hear when you
16 listened?
17     A.   Primarily discussions regarding the
18 Barclays transaction with -- and the issue with
19 JPMorgan.
20     Q.   Anything about the terms of the
21 transaction?
22     A.   The terms of the Barclays
23 transaction?
24     MR. ROTHMAN:  Which transaction?

Page 22

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2  Q.   The sale transaction.
3  A.   No, that was -- that was not really
4  being discussed.
5  Q.   Anything concerning the terms of
6  the clarification letter that you were involved in
7  discussing on Sunday?
8  A.   Yes.  We would have discussed the
9  clarification letter beginning much later on
10  Sunday night.
11  Q.   And who would you have had those
12  discussions with?
13  A.   Mr. Kiplok and I went into a room
14  with Mr. Messineo, Mr. Murgio.  Both of those
15  individuals are from Weil.  Mr. McLaughlin, an
16  attorney from Cleary Gottlieb.  And there were a
17  few other associates in both of those firms
18  sitting in the perimeter of the office.  And, you
19  know, we reviewed the clarification letter.
20  Q.   About what time did that -- did
21  that occur?
22  A.   We were in that room probably
23  beginning around 1:00 a.m. on Monday morning
24  through until about 6:00 or 7:00 in the morning.
25  Q.   Tell me in as much detail as you

Page 23

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2  can what you remember about that session between
3  1:00 a.m. and 6:00.
4  A.   Primarily, Mr. Messineo or
5  Mr. Murgio, both of whom had laptops, would make
6  changes to the clarification letter as they were
7  discussed between Mr. Murgio and Mr. Messineo and
8  Mr. McLaughlin.  Mr. McLaughlin would suggest
9  various changes.  Mr. Murgio would discuss it with
10  him.  They would then make or not make the change.
11  Q.   Did you or Mr. Kiplok offer any
12  input into this process?
13  A.   No.  We were reading along while
14  they made suggestions to the document.  We were
15  not familiar with the document that they had been
16  drafting together, so we, you know, let them
17  finish it.
18  Q.   Do you recall any of the
19  substantive issues that were discussed during that
20  meeting?
21  A.   We discussed certain changes to the
22  customer account section, which is what we
23  primarily were focused on.  The transfer of
24  customer accounts.  There was a section about some
25  sort of insurance liability that remained after

Page 24

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2  the fact and where that cash would go.
3  You know, those were the two areas
4  I remember discussing.
5  Q.   Do you remember that there was
6  discussion about other issues; you just don't
7  remember what it was -- or what they were?
8  A.   They may have discussed other, you
9  know, parts.  Those were the ones I remember.  It
10  was five hours.
11  Q.   Did you or Mr. Kiplok ask any
12  questions during the course of that session?
13  A.   I don't recall any specific
14  questions.
15  Q.   Were you excluded from any portion
16  of the discussions?
17  A.   There were a lot of different rooms
18  in which people were having a lot of different
19  conversations.  We were not present at all
20  conversations regarding the clarification letter.
21  Q.   Did anyone ever tell you that you
22  were not welcome at any particular discussion?
23  A.   Certainly we were not welcome at
24  the discussions between JPMorgan and Barclays.
25  Q.   Any other discussions you were not

Page 25

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2  welcome at?
3  A.   Those people went into separate
4  rooms to have private conferences with their
5  attorneys with themselves, and we were not welcome
6  at those.
7  Q.   Any multilateral discussions in
8  which you were not welcome?
9  A.   Not that I know of.  But people
10  went into different rooms all the time.
11  Q.   Did you attend or participate in
12  any discussion of the terms of the DTCC letter?
13  A.   I did.
14  Q.   When did those discussions take
15  place?
16  A.   I believe those discussions were
17  parallel to the clarification letter discussions,
18  and then probably I started looking at it around
19  6:00 in the morning.
20  Q.   When you say those discussions
21  "were parallel to the clarification letter
22  discussions," what do you mean?
23  A.   The first letter that I received
24  was at 6:00 a.m., and it had already been written,
25  so it had to have been written while I was working

7 (Pages 22 to 25)

Page 26

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1 on the clarification letter.
2
3      Q.   So you were not present for any
4  discussion -- well, were you present for any
5  discussion with representatives of the DTCC over
6  that weekend?
7      A.   I don't think so.
8      Q.   And just so I'm clear, I don't
9  necessarily mean physically present.
10         Were you on the phone with the DTCC
11  at any point over that weekend?
12      A.   I don't believe I had phone -- oh,
13  over the weekend?
14      Q.   Yeah.
15      A.   After the sale hearing there was a
16  phone call with members of the DTCC. This would
17  have been Saturday morning in the early hours.
18      Q.   This would be before you got to
19  Weil Gotshal?
20      A.   That's correct.
21      Q.   Okay. And what was discussed in
22  that call?
23      A.   Whether we would meet with them or
24  have a telephonic conversation with them the next
25  day.

Page 27

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2      Q.   And that call was between
3  representatives of the Trustee and representatives
4  of the DTC. Is that correct?
5      A.   Correct.
6      Q.   Was anyone representing any other
7  entity on that call?
8      A.   I walked into the room after it had
9  begun, so --
10      Q.   When you say you walked in the
11  room, it was a room at Hughes Hubbard or --
12      A.   That's correct.
13      Q.   And who was on that call for Hughes
14  Hubbard?
15      A.   It would have been the normal group
16  of people: Mr. Kiplok, Mr. Kobak, the Trustee.
17      Q.   And was it purely a logistical call
18  or were any issues of substance discussed?
19      A.   As I recall, it was a logistical
20  call.
21      Q.   Were you aware, prior to receiving
22  a copy of the DTCC letter or a draft of the DTCC
23  letter at 6:00 a.m., that such a document was
24  being created?
25      A.   I wouldn't say so.

Page 28

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2      Q.   Who gave you a copy of the DTCC
3  letter at around 6:00 a.m. on Monday morning?
4      A.   It would have -- I received a
5  couple of hundred e-mails. It would have been one
6  of those e-mails. I'm not sure from whom it came.
7      Q.   Were you told anything about what
8  this document was?
9      A.   Yes.
10      Q.   What were you told?
11      A.   Mr. Kiplok was the primary person
12  who discussed it with me.
13      Q.   What was your understanding of what
14  the DTCC letter was?
15      MR. ROTHMAN: If you had any
16      understanding separate and apart from what you
17      learned from Mr. Kiplok.
18      A.   I mean, I read the letter, so I can
19  read. It looked like it maintained the accounts
20  of LBI at DTC for the Trustee's control and
21  allocated the $250 million consideration that had
22  been shifted over to DTC as collateral during the
23  liquidation to be paid back to the Trustee at the
24  end.
25      Q.   What did you do when you received

Page 29

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1  that copy of the DTCC letter at 6:00 a.m.?
2
3      A.   I was working primarily off my
4  Blackberry, so I would have had to forward it to
5  one of the secretaries at Weil and ask that she
6  print it, and then go and get it from her and read
7  it.
8      Q.   And for what purpose were you
9  reading it?
10      A.   I was reading it to check whether
11  it was correct. I couldn't read it on my
12  Blackberry.
13      Q.   Well, did you have any
14  understanding of what the deal was supposed to be?
15      A.   Mr. Kiplok had asked that I print
16  two copies, so I did.
17      Q.   Okay. And you said you read it to
18  check that it was correct.
19         What criteria were you using to
20  determine whether it was correct?
21      A.   I would probably be looking for
22  typos and other things that, you know, I would
23  know about in that letter.
24      Q.   Did you attend or participate in
25  any discussions concerning the economic terms of

8 (Pages 26 to 29)

Page 30

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1     the sale transaction over that weekend?
2
3        A.   I did.
4        Q.   Okay.  When was that?
5        A.   There was a presentation to the
6     larger group that had gathered at Weil Gotshal on
7     Sunday night with various individuals from the Fed
8     and the SEC on the phone.
9        Q.   What time Sunday night was that?
10       A.   That call remained open from about
11    4:00 p.m. until 1:00 a.m.
12       Q.   And were you on that call
13    constantly from 4:00 p.m. until 1:00 a.m.?
14       A.   When I was in the room in which the
15    line was open.  There was a lot of down time on
16    that call.
17       Q.   Okay.  Do you know who else was on
18    that call for the Trustee?
19       A.   Mr. Kobak, Mr. Kiplok, the Trustee.
20       Q.   Kobak, Kiplok and the Trustee?
21       A.   You know, it's impossible to say
22    when people were on and off the call.  It lasted
23    for a long time.
24            MR. ROTHMAN:  He was just asking
25        you to clarify your prior answer.

Page 31

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1            MR. SHAW:  Yeah.  I just wasn't --
2            MR. ROTHMAN:  It wasn't clear when
3
4        you said Kobak, Kiplok, whether they were --
5            MR. SHAW:  For the Trustee or also
6        with the Trustee.
7            MR. ROTHMAN:  -- for the Trustee or
8        also with.
9        A.   Oh.  Also with.
10       Q.   Tell me in as much detail as you
11    can recall anything of substance discussed on that
12    call.
13       A.   Again, the focus of that call was
14    the Barclays/JPMorgan issue and resolution of
15    that.  The SEC and the Fed were adamant that the
16    deal be closed before business opened on Monday
17    and that those two parties reach a resolution so
18    the deal as discussed on Friday night, the sale
19    hearing, would close.
20            And primarily they went through
21    their resolution of the issue.  And one part of
22    that resolution that I recall was that the
23    $250 million of collateral that originally was
24    going to be paid to LBI was going to be paid to --
25    not collateral; sorry -- consideration was going

Page 32

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1     to be paid to DTCC.
2        Q.   What did paying the collateral to
3     DTCC have to do with the JPMorgan/Barclays issue?
4        A.   It was consideration, not
5     collateral.
6        Q.   Okay.  What did payment of the
7     $250 million of consideration to DTCC have to do
8     with the JPMorgan/Barclays issue?
9        A.   I don't know.
10       Q.   But your understanding was it was
11    somehow related to that?
12       A.   I understand if the
13    JPMorgan/Barclays issue was holding up the
14    transaction, that there would be some relation.
15       Q.   You said a moment ago that the SEC
16    and the Fed were adamant that the deal be closed
17    before business opened on Monday.
18            What's your basis for saying that?
19       A.   I recall voices on the telephone
20    saying, Please resolve this issue before the
21    markets open on Monday.
22       Q.   Anything else?
23       A.   Not that I recall specifically.
24       Q.   Do you recall anything else about

Page 33

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1     what was discussed on that call that was open from
2     about 4:00 p.m. until about 1:00 a.m.?
3        A.   No, not in detail.
4        Q.   Approximately how much of that call
5     were you present for between 4:00 p.m. and
6     1:00 a.m.?
7        A.   Between 4:00 p.m. and 1:00 a.m. the
8     call was probably active for two and a half to
9     three hours, and I was probably present for all of
10    the active moments of it.
11       Q.   And what were you doing when it was
12    inactive?
13       A.   We had various side conversations
14    with Hughes Hubbard attorneys, and we had -- that
15    was pretty much it.
16       Q.   Did you or any other representative
17    of the Trustee request any changes to any of the
18    deal documents over the course of that weekend?
19       A.   Yeah.  We had a lot of changes to
20    the signature blocks of the documents.  The DTCC
21    letter we did have some substantive changes to.
22       Q.   You did or you did not have?
23       A.   Did, positive.
24       Q.   Okay.  What substantive changes did

9 (Pages 30 to 33)

Page 34

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1    the Trustee request in the DTCC letter?
2        A.   I don't recall what they were.  I
3    just remember that there were other discussions
4    going on.
5        Q.   And you requested changes.
6            Were those changes made?
7        A.   I don't know.
8        Q.   Who requested the changes on behalf
9    of the Trustee?
10        A.   Mr. Kobak and Mr. Kiplok.
11        Q.   And you don't recall what any of
12    those requested changes were?
13        A.   Not at this time.
14        Q.   And you don't know whether the
15    changes that were requested, whatever they were,
16    were actually incorporated in the final letter; do
17    you?
18        A.   If we signed the letter, they must
19    have been acceptable to us.
20        MR. ROTHMAN:  Well, don't guess.
21        A.   No, I don't know what the changes
22    were and whether they were incorporated.
23        Q.   Do you know whether any requests
24    for changes were made orally or in writing?

Page 35

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1        A.   Do you mean via e-mail?
2        Q.   E-mail, somebody marking up an
3    agreement; anything like that?
4        A.   You know, we were not physically
5    present with DTC attorneys or themselves, so I
6    would -- my recollection is that they would be
7    oral requests.
8        Q.   And you were not personally
9    involved in any discussions concerning the
10    contents of the DTCC letter.  Is that right?
11        A.   Not with DTCC, no.
12        Q.   With anyone other than internally
13    at Hughes, Hubbard & Reed?
14        A.   My discussions about the DTCC
15    letter were with Mr. Kiplok.
16        Q.   Did the Trustee -- aside from
17    changes you've mentioned to the signature block,
18    perhaps, did the Trustee or any of its
19    representatives request changes to the
20    clarification letter at any time?
21        A.   I don't know what they did.
22        Q.   You're not aware of it if they did?
23        A.   I'm not aware of anything else than
24    what I was there for on Monday morning.

Page 36

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1        Q.   While you were there over the
2    weekend, did anyone ever state or suggest the deal
3    as documented in the final version of the
4    clarification letter had not been approved by the
5    Court?
6        A.   My understanding of the deal
7    documents was that they reflected what had been
8    presented to the Court on Friday night, and that
9    the reason that I was signing was because no
10    substantive changes were being made.
11        MR. SHAW:  I'll show you what's
12    been previously marked as Exhibit 25 in this
13    case.
14        Q.   I'm just going to ask if you
15    recognize that as the clarification letter that
16    you signed on the Trustee's behalf?
17        MR. ROTHMAN:  Objection to the
18    form.
19        Q.   Do you recognize that document?
20        A.   I do recognize this document.
21        Q.   Did you -- and what is the document
22    you recognize?
23        A.   The document appears to be the
24    clarification letter.

Page 37

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1        Q.   And did you sign the clarification
2    letter?
3        A.   I signed the signature page that's
4    attached to this letter, yes.
5        Q.   Okay.  And you did so on behalf of
6    the -- of James Giddens, Trustee for the SIPA
7    liquidation of Lehman Brothers, Inc.?
8        A.   That's correct.
9        Q.   When did you sign that signature
10    page?
11        A.   I signed the signature page on the
12    late evening of Sunday, September 21st or in the
13    early morning of September 22nd, probably before
14    1:00 or 2:00 a.m.
15        Q.   And where were you physically when
16    you signed that page?
17        A.   I believe at this point for the
18    signing of this one, I went to some internal
19    office at Weil Gotshal where Mr. Gruszecki and
20    Ms. Clausen had been set up once the larger office
21    they had been using had been taken for other
22    purposes.  That was the room where all the
23    signature pages were being kept in those accordion
24    files.

Page 38

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2     Q.   And when they gave it to you to
3  sign, was there just a signature page or was there
4  an agreement attached to the signature page when
5  you were signing it?
6     A.   It was just the signature page; no
7  agreement.
8     Q.   Was there at some point any further
9  authorization you were required to give before
10 they could use the signature page that you signed?
11    A.   The deal was closed around
12 8:00 a.m. on Monday morning when the signature
13 pages were released by the various parties.
14    Q.   And how was -- how was the -- how
15 were the signature pages that you signed released
16 by the Trustee?
17    A.   We were in another conference room
18 at Weil Gotshal, and all the documents had been
19 signed and reached and the funds transferred.
20    Q.   Let me unpack that for a moment.
21         You were in a conference room at
22 Weil Gotshal at around 8:00 a.m. Monday morning.
23 Is that correct?
24    A.   That's correct.
25    Q.   And who else was in this conference

Page 39

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1  room?
2     A.   More people than I could remember
3  or describe.  It was not the larger conference
4  room.  It was kind of small, and it was full.
5     Q.   Representatives of Barclays?
6     A.   There were representatives of
7  Barclays, of JPMorgan, of -- you know, there were
8  Cleary lawyers, Weil lawyers, Shearman lawyers; a
9  lot of people.
10    Q.   Anyone for the creditors committee?
11    A.   I recall that there were members of
12 the creditors committee there during the course
13 of -- earlier in the evening.  I assumed they
14 didn't go home.
15    Q.   And so you're in this room with
16 representatives of various parties.
17         And did they have final versions of
18 all the contract documents?
19    A.   No, not at all.
20    Q.   So how was it that the documents
21 were -- or that the signature pages were released?
22         I mean, did a representative, for
23 example, of the Trustee say, "Okay, our signature
24 pages are now released," or what happened?
25

Page 40

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2     A.   I don't actually recall that
3  moment, but --
4     Q.   But in some way, was it you or some
5  other representative of the Trustee indicated that
6  it was okay to release the signature pages?
7     A.   I didn't.
8     Q.   Do you know who did?
9     A.   No, I can't recall.
10    Q.   Had you read a final version of the
11 clarification letter at that point?
12    A.   I had seen drafts of the
13 clarification letter and had read what I thought
14 was the final version, yes.
15    Q.   And when you say "what I thought
16 was the final version," do you still believe that
17 was the final version that you read?
18    A.   I assumed there were no changes
19 made after we wrapped up.
20    Q.   If you'd take a look at the first
21 page of Exhibit 25, and particularly the paragraph
22 that is at the bottom of that page, No. 1(a)(ii).
23         Do you see that?
24    A.   Yes, I see that paragraph, yes.
25    Q.   And you'll see that that paragraph

Page 41

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2  references a Schedule A and a Schedule B.
3         Do you see that?
4     A.   I do see the references to
5  Schedule A and Schedule B.
6     Q.   Had you seen those references prior
7  to signing this?
8     A.   Had I seen those references?
9     Q.   Yes.
10    A.   Yes, I had.
11    Q.   Did you make any effort to examine
12 Schedule A or Schedule B?
13    A.   These schedules were never
14 delivered to us for review.
15    Q.   When you say they were not
16 "delivered to us for review," do you mean they
17 were never delivered to the Trustee for review?
18    A.   That's -- I never received a copy
19 of them.
20    Q.   And when you say "never," I take it
21 you mean that weekend?
22    A.   That's correct.
23    Q.   Do you know whether anyone else, a
24 representative of the Trustee, ever received a
25 copy of those this weekend -- that weekend?

11  (Pages 38 to 41)

Page 42

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2        A.  I don't know what other people
 3   received.
 4        Q.  Do you know if anyone representing
 5   the Trustee ever asked for copies of either
 6   Schedule A or Schedule B?
 7        A.  I did not.
 8        Q.  And you don't know whether anyone
 9   else did?
10        A.  I don't know.
11        Q.  Are you aware that final versions
12   of Schedule A and Schedule B were filed with the
13   Court on September 30th, 2008?
14        A.  I'm -- am I aware of that?
15        Q.  Yes.
16        A.  No.
17        Q.  Did you ever have occasion to
18   review the final filed versions of Schedule A or
19   Schedule B?
20        A.  I have seen them.
21        Q.  In what context?
22        A.  As .pdf documents.
23        Q.  When approximately did you see
24   them?
25        A.  At some point in the months
```

Page 43

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2   following.
 3        Q.  And for what purpose were you
 4   looking at them?
 5        A.  To transmit them.  They -- I was
 6   just passing them.  They weren't really
 7   something that I could read.
 8        Q.  To whom did you transmit them?
 9        A.  To Deloitte.
10        Q.  And when you transmitted them to
11   Deloitte, did you transmit them with any
12   instruction?
13        MR. ROTHMAN:  That's a yes-or-no
14   question.
15        A.  No.
16        Q.  Were you involved in the process of
17   preparing those final versions of Schedule A and
18   Schedule B?
19        A.  No.
20        Q.  Do you know if any representative
21   of the Trustee was involved in preparing the final
22   versions of Schedule A or Schedule B?
23        A.  I do not know.
24        Q.  Do you know if anyone representing
25   the Trustee ever requested to be involved in the
```

Page 44

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2   preparation of those final versions of Schedule A
 3   and Schedule B?
 4        A.  I do not know.
 5        Q.  Other than the Trustee and his
 6   counsel, have you ever discussed the preparation
 7   or contents of Schedule A or Schedule B with
 8   anyone?
 9        A.  No.
10        Q.  Are the terms "636 box" and
11   "074 box" familiar to you?
12        A.  I don't normally refer to them that
13   way.
14        Q.  Okay.
15        MR. ROTHMAN:  That wasn't what he
16   asked you, but go ahead.
17        Q.  If I were to say the 636 box, what
18   would your understanding of that be?
19        A.  The DTCC participant account of
20   LBI's.
21        Q.  Okay.  And the 074 box, what would
22   your understanding of that be?
23        A.  It's another participant account
24   member of LBI's.
25        Q.  At the DTCC?
```

Page 45

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2        A.  At DTCC.
 3        Q.  When did you learn that?
 4        A.  I learned that on Monday,
 5   September 22nd or Tuesday, September 23rd.
 6        Q.  And how did you come to learn that?
 7        A.  I began the process of the customer
 8   account transfers which involved the transfer of
 9   assets to the benefit of those customers, and the
10   assets had to transfer through DTC.
11        Q.  And did someone explain to you what
12   the 636 and 074 boxes were?
13        A.  Yes.
14        Q.  Who would that be?
15        A.  Mr. Ullman at Lehman Brothers,
16   Inc., who became a Barclays Capital employee.
17        Q.  Do you know when Mr. Ullman became
18   a Barclays Capital employee?
19        A.  I assume he became a Barclays
20   Capital employee the moment that the transaction
21   changed.
22        MR. SHAW:  Can we take a short
23   break.  This is a logical stopping point.
24        THE VIDEOGRAPHER:  The time is
25   10:29.  We are going off the record.
```

12 (Pages 42 to 45)

Page 46

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        (Recess taken.)
3        THE VIDEOGRAPHER:  The time is
4    10:40.  We are back on the record.
5        Q.    Mr. Frelinghuysen, could you please
6    give me an overview of what you did in connection
7    with this matter between the closing and the end
8    of September 2008.
9        A.    Between the closing on
10   September 22nd through the end of September 2008,
11   I was -- I worked primarily on the transfer of
12   customer assets to Neuberger Berman, Barclays and
13   Prime Brokerage.
14       Q.    Anything else?
15       A.    I worked on various other kind of
16   administrative matters within, you know, the
17   liquidation.
18       Q.    And what was entailed by the
19   transfer of customer assets to Neuberger Berman,
20   Barclays and the Prime Brokerage?
21       A.    Primarily it involved authorization
22   to DTC to transfer customer assets from LBI's
23   accounts at DTC to accounts -- other participant
24   accounts at DTC, Barclays, Ridge, or whomever the
25   Prime Brokerage people designated.

Page 47

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        Q.    And you had other responsibilities
3    as well over the course of that week or so.  Is
4    that correct?
5        A.    I worked on some other matters,
6    yes.
7        Q.    Were you involved with approving
8    payments from the LBI estate?
9        A.    "Approving payments"?  I'm not
10   sure --
11       MR. ROTHMAN:  Objection to the
12   form.
13       A.    I don't know what that means.
14       Q.    Were the request -- strike that.
15       What did you understand the limits
16   on your authority to act for the Trustee were?
17       A.    I was --
18       MR. ROTHMAN:  Objection to the
19   form.
20       Q.    You can answer.
21       A.    I was there to transfer customer
22   assets and to facilitate those movements through
23   the holders of those securities.
24       Q.    In your understanding, did the
25   scope of your authority differ depending on which

Page 48

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    entity you were interacting with?
3        MR. ROTHMAN:  Objection to the
4    form.
5        A.    The purpose remained to have
6    custodial banks, such as DTC or any of the others
7    around the world, transfer customer assets as
8    needed.
9        Q.    And in order to accomplish these
10   asset transfers, did you understand that you had
11   been invested with some measure of authority to
12   act on the Trustee's behalf in his dealings -- or
13   in your dealings with these custodial entities?
14       A.    Yes.
15       Q.    And what did you understand the
16   scope of the authority you had been given to be?
17       A.    That I should encourage or instruct
18   the banks to transfer LBI's assets that were
19   related to customers as necessary.
20       Q.    Do you understand yourself to have
21   more or less -- strike that.
22       Did you understand yourself to have
23   more, less or the same authority in dealing with,
24   say, JPMorgan as you did in dealing with the DTC
25   or the OCC?

Page 49

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        MR. ROTHMAN:  Objection to the
3    form.
4        A.    My authority with the DTC and JPMC
5    with respect to LBI's accounts at those banks
6    where customer assets were stored was identical.
7        Q.    You were on site in Jersey -- at
8    Lehman Brothers' Jersey City facility for much of
9    that period.  Is that right?
10       A.    It's been -- yes.  I was at
11   70 Hudson Street.
12       Q.    Okay.  Was Mr. Kiplok there as
13   well?
14       A.    No, he was not.
15       Q.    Were there any other
16   representatives of the Trustee on site in
17   Jersey City?
18       A.    In what time period?
19       Q.    Between closing and the end of
20   September.
21       A.    No.
22       Q.    Were there any other
23   representatives of the Trustee who were involved
24   in authorizing the transfers of assets from the
25   DTC and OCC and JPMorgan custodial accounts during

13 (Pages 46 to 49)

Page 50

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   that time period?
3        A.   There were.
4        Q.   Who were they?
5        A.   Mr. Kiplok.
6        Q.   How were responsibilities allocated
7   between you and Mr. Kiplok during that period?
8        A.   I worked most entirely with DTCC
9   and with JPMC after Mr. Kiplok had established
10  those channels of dealings.
11       Q.   And he had responsibility for what,
12  as you understood it?
13       A.   He did the JPMC transfers
14  initially, and I took over for those since I was
15  located at the operations center.  And that's it.
16       Q.   How much supervision did you
17  receive from more senior lawyers or other
18  representatives of the Trustee during that week?
19       MR. ROTHMAN:  Objection to the
20       form.
21       Q.   You can answer.
22       A.   I received general instruction to
23  transfer customer assets as they were presented to
24  me.
25       Q.   One of the responsibilities you had

Page 51

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   that week was to determine if proposed transfers
3   of assets should be authorized by the Trustee or
4   denied.  Correct?
5        A.   My role was to assure that the
6   assets that Barclays' personnel were asking be
7   transferred got transferred to the extent they
8   were customer assets.
9        Q.   When you say to the extent that
10  they were customer assets, who -- strike that.
11       Who gave you your instructions
12  about what your role was?
13       A.   About what my role was?
14       Q.   Yes.
15       A.   Hughes Hubbard attorneys.
16       Q.   Which Hughes Hubbard attorneys
17  particularly?
18       A.   Mr. Kobak, Mr. Kiplok and the
19  Trustee.
20       Q.   As exactly as possible, what were
21  you told was your role?
22       MR. ROTHMAN:  I instruct you not to
23       answer that question.
24       Q.   In deciding which transfers to
25  approve and which to deny approval to, how did

Page 52

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   you -- how did you do that?
3        MR. ROTHMAN:  Again, you can give a
4        general idea, but please don't reveal any
5        privileged communications you may have had
6        with other lawyers at Hughes Hubbard or with
7        the Trustee.
8        A.   Okay.  I instructed Mr. Ullman that
9   when he had a request for me to transfer assets,
10  that he had to state where they were going and for
11  what purpose, and that that purpose needed to be a
12  customer transfer.
13       Q.   When did you have this discussion
14  with Mr. Ullman?
15       A.   That discussion would have taken
16  place on September 23rd, which is a Tuesday.
17       Q.   What time on September 23rd?
18       A.   I believe I arrived at his offices
19  at the 70 Hudson location around 11:00 a.m.  We
20  had numerous conferences throughout the day going
21  over, you know, what needed to be done, how it
22  would be done.  And in the course of those
23  conversations, that discussion happened.
24       Q.   When in the course of those
25  discussions did that conversation happen?

Page 53

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        A.   It would have happened multiple
3   times in the course of that conversation.
4        Q.   And tell me as exactly as you can
5   precisely what you instructed Mr. Ullman with
6   respect to -- with respect to requesting transfers
7   of assets.
8        A.   That I needed appropriate
9   instructions as to where the assets would be going
10  and where they would be coming from.  I needed
11  appropriate contact information.  I needed
12  confirmation from him that those assets were
13  related to customers.
14       Q.   What were your exact words to
15  Mr. Ullman?
16       A.   I don't recall.
17       Q.   Did you put any of these
18  instructions in writing?
19       A.   Not to Mr. Ullman.
20       Q.   To anyone?
21       A.   On certain occasions where I
22  received instructions that did not match what I
23  needed to have them, I would refuse the
24  instructions and address the short-falling.
25       Q.   Do you recall any specific examples

14 (Pages 50 to 53)

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  of situations like that?
3      A.   I do not.  I just recall that it
4  happened more than once.
5      Q.   With Mr. Ullman or with others?
6      A.   With Mr. Ullman or any of his
7  personnel working for him.
8      Q.   And who were the personnel working
9  for him that you're thinking of?
10     A.   My primary people with whom I
11 worked on those customer account transfers and the
12 transfer of customer assets would have been
13 Mr. Fondacaro, Mr. Gallagher and Mr. Borzi.
14 Mr. Crispino was -- worked for them and was also
15 involved.
16     Q.   What about Laura Vecchio; did you
17 have any contact with her during that period of
18 time?
19     A.   I did.
20     Q.   And what was your contact with her?
21     A.   Ms. Vecchio was assisting to
22 coordinate some of the operations.
23     Q.   And did you understand her to be a
24 Barclays employee?
25     A.   Yes.

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2      Q.   A former Lehman person who became a
3  Barclays employee effective with the closing.
4      Is that your understanding?
5      A.   That was -- my understanding is
6  that she was -- that that was her position, yes.
7      (Exhibit 669-B marked for
8  identification.)
9      MR. SHAW:  I'm showing you what's
10 been marked as Exhibit 669-B.
11     Q.   Take a moment to look at it and
12 then tell me if you recognize this as a
13 September 26th, 2008, e-mail chain, parts of which
14 you wrote and parts of which were addressed to
15 you.
16     A.   What was your question?
17     Q.   Sure.  Do you recognize this as a
18 September 26th, 2008, e-mail -- or e-mail chain,
19 rather, parts of which you wrote and parts of
20 which -- of which were addressed to you?
21     A.   Yes, I do recognize it as that.
22     Q.   Okay.  If you take a look at the
23 earliest e-mail in the chain, that is, the first
24 chronologically, do you recognize that as an
25 e-mail to you from Mr. Borzi, requesting that the

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  Trustee authorize the transfer of PIM Plant
3  Securities from LBI's 074 box to Barclays 229 box?
4      A.   I do not see the word "box," but I
5  understand it to be a request to move PIM customer
6  assets from LBI's participant account 074 to
7  Barclays' participant account.
8      Q.   Take a look at the next e-mail in
9  the chain.
10     Does that indicate to you that at
11 about 13 minutes after receiving that request that
12 you forwarded that e-mail, along with the
13 Trustee's authorization, to the DTCC?
14     A.   Yes.  This shows that I forwarded
15 it to various attorneys and operations personnel
16 at DTCC with the Trustee's authorization.
17     Q.   How did you decide it was
18 appropriate to authorize that transfer?
19     A.   This transfer in particular had
20 been discussed offline and in very close detail
21 with Mr. Borzi and Mr. Ullman, so I was expecting
22 it.
23     And also, it had the appropriate
24 language from Mr. Borzi to me, stating that it was
25 customer assets going to Barclays, and that the

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  PIM business was the business of -- that I had
3  known Barclays to have acquired.
4      Q.   When we talk about customer assets,
5  there were PIM customer assets, there were PAM
6  customer assets, P-A-M, and there were Prime
7  Brokerage assets.  Is that correct?
8      A.   Those are some of the classes of
9  assets.
10     Q.   Okay.  What other customer assets
11 were you involved -- what other classes of
12 customer assets were you involved in transferring
13 during that period of time?
14     A.   We only would have done PIM and
15 PAM, and PB didn't actually start until October.
16     Q.   Okay.  So when you talk about
17 customer assets, at least in that time period,
18 you're talking about the PIM and the PAM assets?
19     A.   That's correct.
20     Q.   Take a look at the most recent
21 e-mail in the string on Exhibit 669-B.  You
22 thanked Mr. Borzi for the clarity and precision of
23 his instructing e-mail.
24     What specifically were you
25 commenting on?

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1        A.   Mr. Borzi had included references
2  that I had specifically asked him to include, such
3  as which participant account number it was going
4  to, that it was related to PIM clients and
5  customers.  That's it.
6        Q.   And so it was important to you that
7  Mr. Borzi specify that the assets to be
8  transferred were PIM customer assets.  Is that
9  right?
10       A.   Yes, and that they were being
11  transferred in connection with Barclays' purchase
12  of the PIM customers under --
13       Q.   Okay.  And if I understand you
14  correctly, when transfers of customer assets were
15  requested, you required that the assets be
16  identified as customer assets.  Is that right?
17       A.   Well, my understanding was that
18  only customer assets were being transferred.
19       Q.   Where did you get that
20  understanding from, sir?
21       A.   That's what I understood the
22  transaction to include.  And certainly that's all
23  I understood to be going on in those first couple
24  of weeks.

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1        Q.   Did you consult on the transfers of
2  any assets with more senior attorneys at Hughes
3  Hubbard & Reed or other representatives of the
4  Trustee?
5       A.   Yes.
6       Q.   With whom did you consult during
7  that period of time?
8       A.   Mr. Kobak, Mr. Kiplok.
9       Q.   Anyone else?
10       A.   At Hughes Hubbard?
11       Q.   At Hughes Hubbard or anyone else
12  representing the Trustee?
13       A.   No.
14       Q.   To the best of your recollection,
15  did requests that you authorize the transfer of
16  customer assets always specify that the assets in
17  question were customer assets?
18       A.   Requests to me?
19       Q.   Yes.
20       A.   No, they very often did not, and I
21  wouldn't approve them.
22       Q.   Okay.  How did -- when you received
23  such a request, how did you verify that the assets
24  requested were actually customer assets?

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1        A.   Based on the information and the
2  representation from the Lehman/Barclays employee.
3       Q.   In connection with any request for
4  the transfer of assets, was anyone from Barclays
5  ever dishonest with you?
6       MR. ROTHMAN:  Objection to the
7  form.
8       A.   Was anyone ever dishonest with me?
9       Q.   Do you believe that anyone from
10  Barclays ever lied to you or attempted to mislead
11  you about the transfer of any assets?
12       MR. ROTHMAN:  Same objection.
13       A.   I would have always understood them
14  to be asking that I transfer customer assets.
15       Q.   That's not responsive to my
16  question, sir.
17       My question was:  In connection
18  with any requests for transfers of assets, do you
19  believe that anyone from Barclays was ever
20  dishonest with you?
21       MR. ROTHMAN:  Same objection.
22       A.   No.
23       Q.   Did you communicate with Alastair
24  Blackwell concerning any asset transfers during

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1  September 2008?
2       A.   I did.
3       Q.   Who was Mr. Blackwell, sir?
4       Or who -- rather, who did you
5  understand Mr. Blackwell to be?
6       A.   I understood Mr. Blackwell to be
7  the head of global operations of Barclays.
8       Q.   A former Lehmanite?
9       A.   I actually wasn't clear on that.
10       Q.   How many times did you discuss the
11  transfer of assets with Mr. Blackwell in September
12  2008?
13       A.   It's hard to say when in
14  September -- you know, a number of times.
15       Q.   Tell me about any specific
16  discussions you recall having with Mr. Blackwell
17  about the transfer of assets.
18       A.   I recall a specific discussion the
19  first week after the closing with Mr. Blackwell.
20       Q.   One discussion or more than one
21  discussion?
22       A.   One discussion with him in his
23  office, or an office he was using, followed up by
24  some phone calls.

Page 62

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2   Q.   So was this in Jersey City?
3   A.   This was in Jersey City.
4   Q.   Do you recall when during the week
5   your discussion with Mr. Blackwell took place?
6   A.   I think that it must have been a
7   Thursday.
8   Q.   Thursday the --
9   A.   It should have been the 25th.
10   Q.   The 25th.
11       Tell me everything you remember
12   about that discussion.
13   A.   Mr. Blackwell and I discussed the
14   customer transfers that were ongoing and that we
15   were in the process of completing for PIM and PAM.
16   We discussed some other customer transactions and
17   that there was an additional transfer of assets
18   that needed to occur that valued around
19   $1 billion.
20   Q.   And what did you understand that
21   $1 billion in assets to be?
22   A.   I don't recall what he said it was.
23   Q.   Well, do you recall what you
24   thought it was?
25   A.   No.

Page 63

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2   Q.   How long did that discussion in an
3   office in Jersey City last?
4   A.   Around half an hour probably.
5   Q.   Can you recall anything else about
6   the discussion?
7   A.   No.
8   Q.   Can you recall anything else about
9   the approximately $1 billion in other assets that
10   you discussed with Mr. Blackwell?
11   A.   He never asked me to transfer it.
12   Q.   What did he ask you?
13   A.   He asked me what steps would be
14   necessary to transfer it.
15       And I said I would get back to him.
16   Q.   And did you get back to him?
17   A.   I did.
18   Q.   And what did you tell him?
19   A.   I drafted him a representation from
20   him that the assets were appropriate to transfer,
21   and he never responded.
22   Q.   Did you record your time on this
23   case?
24   A.   As a matter of course, I record my
25   time.

Page 64

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2   Q.   Do you do it daily?
3   A.   I keep daily track of my time.  I
4   sometimes catch up at the end of the week.
5   Q.   Was that true in September of 2008
6   that you were keeping daily track of your time?
7   A.   Yes.
8   Q.   Is it fair to say that you
9   attempted to record your time accurately?
10   A.   Yes.
11   Q.   And that's at least in part because
12   you understood that your time entries would
13   ultimately be submitted to the Court in connection
14   with Hughes Hubbard's fee submission.  Is that
15   correct?
16   A.   That is correct.
17       (Exhibit 670-B marked for
18   identification.)
19       MR. SHAW:  I'm showing you what has
20   been marked as Exhibit 670-B.  I will
21   represent to you that this is an excerpt from
22   a much larger document submitted by Hughes
23   Hubbard & Reed in connection with its request
24   for fees for the period from September 13,
25   2008, through January 31st, 2009.

Page 65

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1
2   Q.   Are you aware that such a
3   submission was made?
4   A.   I am aware of that submission, yes.
5       MR. ROTHMAN:  Just for the record,
6   it's a three-page document.  The first page
7   appears to be a cover page, and then it has
8   pages 46 and 47.
9   Q.   If you'll take a look at the entry
10   that appears at the bottom of page 46 and carries
11   onto the top of page 47 of this document.
12       Do you recognize that as a
13   description of your time for September 24th, 2008?
14   A.   Yes, I do recognize it as that.
15   Q.   And do you believe that that time
16   is -- that is recorded there -- or that the entry
17   that's recorded there is as you wrote it?
18   A.   I have no reason to believe it's
19   not.
20   Q.   Do you have any reason to believe
21   that that entry is inaccurate?
22   A.   No, I do not.
23   Q.   The first part of that entry
24   discusses the PAM customer accounts.  Is that
25   correct?

17 (Pages 62 to 65)

1       FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2              And when I say "part," I'm
3   referring to the segments that end with a number
4   in parentheses and a semicolon.
5       A.   Yeah.  The first part of the entry
6   that ends with a number on page 47 is with respect
7   to PAM transfers.
8       Q.   And what were the PAM customer
9   accounts?
10      A.   The PAM customer accounts were the
11  private asset management customer accounts that
12  were transferred to Ridge as the new broker-dealer
13  for Neuberger Berman.
14      Q.   And if you look at the second and
15  third portions of the entry for that date, you'll
16  see that they talk about PIM transfers.  Is that
17  correct?
18      A.   That is correct.  They do talk
19  about PIM transfers.
20      Q.   Okay.  And what did you mean by
21  "PIM transfers"?
22      A.   PIM transfers was the private
23  investment management business of Lehman Brothers,
24  Inc. that was purchased by Barclays.
25      Q.   And then the fourth section talks

1       FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   about what appears to be a three-hour discussion
3   with David Aronow concerning PB accounts.
4              What did you mean by "PB accounts"?
5       A.   Those were the prime brokerage
6   accounts.
7       Q.   And what did you talk about with
8   Mr. Aronow about the transfer of prime brokerage
9   accounts?
10      A.   We had been discussing in the -- in
11  the course of the day how to gather assets related
12  to customers to effectuate their transfer to a new
13  broker-dealer.
14             Most of the PIM customers were
15  relatively simple accounts.  PB accounts hold a
16  lot of other financial products and have more
17  complicated trading arrangements.  We were trying
18  to figure out a way operationally to move those
19  accounts and their assets.
20      Q.   And then the final section of your
21  time entry talks about a discussion with
22  A. Blackwell Re: Transfer of other LBI assets in
23  relation to asset purchase agreement.  Is that
24  correct?
25      A.   That is correct.

1       FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2       Q.   And when you wrote about other
3   assets, you're referring to the $1 billion of
4   other assets that Mr. Blackwell had discussed with
5   you?
6       A.   Yes.  It appears that conversation
7   was on the 24th.
8       Q.   And when you write "other" assets,
9   that's to distinguish it from the PAM, PIM and
10  prime brokerage assets that are discussed in
11  earlier sections of your time entry.  Is that
12  correct?
13      A.   Yes.
14      Q.   Does this refresh your recollection
15  that what you discussed with Mr. Blackwell is the
16  transfer of the remaining clearance box assets
17  pursuant to the clarification letter?
18             MR. ROTHMAN:  Objection to the
19  form.
20      A.   This is -- reflects my recollection
21  that Mr. Blackwell was requesting assets --
22  requesting transfer of non-customer assets.
23      Q.   And the assets he was requesting
24  were assets in the 636 and 074 box.  Is that
25  correct?

1       FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2       A.   He did not disclose to me which
3   assets they were; only their value.
4       Q.   Now having read your time entry for
5   the 24th, do you have any further recollection of
6   your conversation with Mr. Blackwell on this
7   topic?
8       A.   Nothing further to what was just
9   discussed.
10      Q.   And after your discussion with
11  Mr. Blackwell, what did you do with respect to his
12  request concerning the transfer of those assets?
13             MR. ROTHMAN:  Object -- go ahead.
14      Objection.  Asked and answered.
15             You can answer again.
16      A.   I contacted other -- I contacted
17  other attorneys at Hughes Hubbard.
18      Q.   And who specifically did you
19  contact?
20      A.   Mr. Kobak, Mr. Kiplok.
21             (Exhibit 671-B marked for
22      identification.)
23      Q.   If you would look at what has been
24  marked as Exhibit 671-B.
25             Have you had a chance to look at

Page 70

1     FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   it?
3        A.   I have reviewed this document, yes.
4        Q.   Do you recognize that as an e-mail
5   that you wrote to Mr. Blackwell on the 25th of
6   September, 2008?
7        A.   Yes, I do.
8        Q.   And you copied Mr. Giddens,
9   Mr. Kobak and Mr. Kiplok on that e-mail.  Is that
10  correct?
11       A.   That's correct.
12       Q.   And why did you copy them
13  particularly?
14       A.   I copied my supervisors on a
15  regular basis.
16       Q.   Okay.  And you had discussed this
17  issue between your conversation with
18  Mr. Blackwell -- strike that.
19            Between your conversation with
20  Mr. Blackwell on the 24th and the time you sent
21  this e-mail on the 25th, you had discussed this
22  with at least Mr. Kobak and Mr. Kiplok.  Is that
23  right?
24       A.   That's correct.
25       Q.   Had you run a draft of this past

Page 71

1     FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   them?
3            MR. ROTHMAN:  I'm going to instruct
4        him not to answer that question.  I think
5        you're getting into the privilege.
6        Q.   Attached to this e-mail is a letter
7   that you sent to Mr. Blackwell which he would need
8   to submit before the Trustee would:
9            "... authorize the movement of the
10  positions discussed earlier that are due as part
11  of the LBI/Barclays transaction."
12            Is that right?
13       A.   It says:
14            "... which were sold to Barclays
15  Capital pursuant to the asset purchase."
16       Q.   I was actually quoting from your
17  e-mail.  Sorry.  I asked a confusing question.
18  Let me start again.
19            You sent Mr. Blackwell a letter
20  that he needed to submit before the Trustee would:
21            "... authorize the movement of the
22  positions discussed earlier that are due as part
23  of the LBI/Barclays transaction."
24            Is that correct?
25       A.   That's correct.

Page 72

1     FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        Q.   And when you say "discussed
3   earlier," you're referring to the discussions
4   shown on your time records for the 24th.  Right?
5        A.   Yes, that's correct.
6        Q.   And why did you need that letter?
7        A.   Because he had stated that they
8   were due as part of the asset purchase agreement,
9   and we were going to be basing that movement on
10  his representation.
11       Q.   And you didn't request a similar
12  letter when Mr. Borzi asked you to authorize
13  transfer of pending client securities; did you?
14       A.   No.
15       Q.   Why did you request a letter from
16  Mr. Blackwell in connection with the transfer you
17  discussed with him, but didn't request a similar
18  letter from Mr. Borzi in connection with the
19  earlier transfer we looked at?
20            MR. ROTHMAN:  Objection to the
21        form.
22       A.   The nature of the transfer was
23  different.
24       Q.   In what -- I'm sorry.  Go ahead.
25       A.   The customer transfers had been

Page 73

1     FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   discussed between me and Mr. Borzi, Mr. Ullman and
3   Mr. Gallagher.  The file had been discussed.
4            Mr. Blackwell had brought me into a
5   separate room to discuss this, closed the door,
6   and represented these were certain accounts that
7   they needed to have transferred -- certain assets.
8   Pardon me.
9        Q.   You say he took you into a separate
10  room and closed the door?
11            You mean the two of you went and
12  sat at a desk in an office?
13       A.   Yeah.  We went into his office.
14       Q.   Okay.  And did you attach any
15  significance to his closing the door?
16       A.   Most of the discussions I had had
17  regarding transfer of customer assets had been on
18  the operations floor with, you know, ten or 15
19  people who were on the team working on it.
20       Q.   Take a look at the draft letter
21  attached to 671-B, the attachment.
22            In that letter you ask
23  Mr. Blackwell to confirm that the requested assets
24  were:
25            "... assets of Lehman Brothers,

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  Inc. which were sold to Barclays Capital, Inc.
3  pursuant to the asset purchase agreement dated as
4  of September 16, 2008, as amended."
5        Right?
6        A.    That's a correct reading of the
7  letter -- draft of the letter.
8        Q.    And beyond just a correct reading
9  of the letter, that was, in fact, what you were
10  asking him to do.  Right?
11        A.    I was, in fact, asking him to
12  represent that these were assets under the APA.
13        Q.    And you understood that they were
14  proprietary assets of LBI, not customer assets.
15  Right?
16        MR. ROTHMAN:  Objection to the
17    form.
18        A.    I understood them to not be
19  customer assets.
20        (Exhibit 672-B marked for
21    identification.)
22        Q.    Have you had a chance to read
23  through Exhibit 672-B?
24        A.    I have.  Thank you.
25        Q.    And do you recognize that as an

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  e-mail string that was sent to you by Neal Ullman
3  at 4:19 p.m. on Friday, September 26, 2008?
4        A.    I do recognize it to be that, yes.
5        Q.    And that string was about the
6  transfer of approximately $269 million in
7  collateral from the 636 box at DTC to Barclays.
8  Is that correct?
9        A.    Yes, it appears to discuss that
10  transfer.
11        Q.    And in the most recent e-mail in
12  that string, Mr. Ullman says to you:
13        "Be over in a minute."
14        Right?
15        A.    That's correct.
16        Q.    Okay.  Did he, in fact, come over
17  to your office to discuss that transfer?
18        A.    I can't recall.
19        Q.    Were you physically located near
20  Mr. Ullman during this period of time?
21        A.    We were on the same floor of the
22  building.  He was 100 yards away and around the
23  corner.
24        Q.    Do you remember ever discussing
25  this request with Mr. Ullman?

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        A.    No, I do not.
3        Q.    Do you remember ever discussing
4  this request with Ms. Vecchio?
5        A.    No, I do not.
6        Q.    Do you remember ever discussing
7  this request with anyone?
8        A.    Then, no -- well, this wouldn't
9  have been sufficient for me.
10        MR. ROTHMAN:  That wasn't the
11    question he asked you.
12        Q.    Why would this not have been
13  sufficient for you?
14        A.    It didn't contain an instruction.
15        Q.    What do you mean by "didn't contain
16  an instruction"?
17        A.    It says:
18        "Be over in a minute."
19        There's no instruction of what to
20  do with it.
21        Q.    Are you aware that you had six
22  minutes earlier actually already sent the
23  instruction and authorization to the DTC on this
24  transaction -- for this transfer, rather?
25        A.    No.

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        Q.    Would it surprise you to learn
3  that?
4        MR. ROTHMAN:  Objection to the
5    form.
6        A.    Would it surprise me now?
7        Q.    Yes.
8        A.    Yes.
9        Q.    Did you understand the
10  approximately $269 million in securities
11  referenced in this e-mail string to be a portion
12  of the assets that Mr. Blackwell had discussed
13  with you a couple of days earlier?
14        MR. ROTHMAN:  Objection to the
15    form.
16        A.    No, I did not know what these
17  assets were, and I did not know them to be related
18  to the conversation I'd had with Mr. Blackwell.
19        Q.    Do you see anywhere on here any
20  indication that these are customer assets?
21        MR. ROTHMAN:  Objection to the
22    form.
23        A.    No.
24        Q.    Take a look at the earliest e-mail
25  in this string.  That's an e-mail from Monty

Page 78

```
1           FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    Forrest to Mister -- to Mr. Blackwell.
3           Do you see that?
4      A.   I do see that, yes.
5      Q.   Okay.  And if you look at the last
6    sentence of the first paragraph of this e-mail,
7    you see that Mr. Forrest writes that:
8           "The list has changed a bit since
9    this morning as Paolo asked take out the very
10   small pieces (under $10)."
11          Do you see that?
12     A.   I do see that sentence, yes.
13     Q.   Would it have been acceptable to
14   leave behind even small pieces if these were, in
15   fact, customer assets?
16          MR. ROTHMAN:  Objection to the
17     form.
18     A.   In the course of transferring
19   customer assets we did many transfers, some of
20   which were to catch up on transfers that had been
21   left out in the initial files.
22     Q.   Can you think of any reason why, if
23   you were transferring customer assets, you would
24   exclude small portions of the customer assets --
25          MR. ROTHMAN:  Objection to --
```

Page 79

```
1           FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2      Q.   -- from a particular customer
3    account?
4           MR. ROTHMAN:  Objection to the
5      form.
6      A.   DTCC is a complicated place.  They
7    were doing the operations for us.  We were trying
8    to get a bulk of the assets across.  We wouldn't
9    have wanted to gum up their systems with small
10   transfers.
11     Q.   Is that just your speculation now,
12   or do you have any recollection of thinking that
13   at the time?
14     A.   That's my understanding of how the
15   transfers were effected.
16     Q.   Can you think of any other
17   transfers where small pieces of the -- of the
18   accounts to be transferred were excluded from the
19   transfer of DTC?
20          MR. ROTHMAN:  Objection to the
21     form.  It assumes facts not in evidence.
22     Q.   You can answer.
23     A.   As a matter of fact, I know that,
24   you know, over the course of doing these transfers
25   the smaller bits of securities had to be cut up
```

Page 80

```
1           FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    later, so they were not always included in the
3    initial files.
4      Q.   Not quite what I was asking, or at
5    least may not what I intended to ask.  Let me try
6    it again.
7           Can you think of any other
8    transaction where small amounts of securities were
9    deliberately excluded from a planned transfer of
10   customer assets?
11          MR. ROTHMAN:  Objection to the
12     form.
13     A.   No.
14          THE VIDEOGRAPHER:  The time is
15   11:27.  We are going off the record.
16          (Recess taken.)
17          THE VIDEOGRAPHER:  The time is
18   11:36.  We are back on the record.
19          (Exhibit 673-B marked for
20   identification.)
21     Q.   Have you had a chance to look at
22   Exhibit 673-B?
23     A.   I have, thank you.
24     Q.   And do you see this is an e-mail
25   from you to various people at the DTCC, copying
```

Page 81

```
1           FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    Mr. Ullman, Ms. Vecchio, Mr. Kobak, Mr. Kiplok,
3    among others?
4      A.   Yes, that's correct.
5      Q.   And this was an e-mail that you
6    sent at 4:13 p.m. on Friday the 26th of September,
7    2008?
8      A.   That's correct.
9      Q.   And you were authorizing on
10   behalf of the -- strike that.
11          And you were transmitting to the
12   DTCC the Trustee's authorization of the transfer
13   of approximately $269 million in securities.  Is
14   that correct?
15     A.   There's no dollar figure.
16     Q.   If you'd take a look at the bottom
17   of the first attachment.
18     A.   269 units, yes.
19     Q.   And you think it's units, not
20   dollars?
21     A.   It doesn't say dollars.  A lot of
22   times they transferred numbers of shares.
23     Q.   Do you know whether that's the
24   same -- strike that.
25          Do you know whether this is the
```

Page 82

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  authorization for the transfer that Mr. Ullman
3  e-mailed you about in Exhibit 672-B?
4        A.   I did not know that, no.
5        Q.   Okay.  Take a look at the last page
6  of this Exhibit 673-B.  I note that the
7  authorization form is signed by Mr. Kiplok and not
8  by you, although you're the one who sent it to the
9  DTCC.
10            Do you know why that is?
11       A.   Mr. Kiplok must have prepared the
12  authorization.
13       Q.   Which anticipates my next question:
14  Which of you prepared the authorization form?
15       A.   It appears that Mr. Kiplok prepared
16  the authorization form.
17       Q.   Okay.  You can put aside 673-B.
18            Do you recall whether the transfer
19  of the $269 million in securities authorized on
20  the 26th went through on the 26th?
21            MR. ROTHMAN:  Objection to the
22       form.  Which exhibit are you referring back
23       to?  Because I think he just said that 673 is
24       units, not dollars.
25            MR. SHAW:  Let me change my

Page 83

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  question slightly.
3        Q.   Do you recall whether the transfer
4  authorized on the 26th in Exhibit 673-B, in fact,
5  went through on the 26th?
6        A.   I do not know.
7        Q.   Do you recall learning that it had
8  gone through on the 29th?
9        A.   I have learned that it went
10  through, you know, a number of days after it was
11  authorized.
12       Q.   It was authorized on a Friday and
13  it went through on the following Monday.  Is that
14  correct?
15       A.   I don't know.
16       Q.   Do you know who Dan Fleming is?
17       A.   I do.
18       Q.   Who is Mr. Fleming?
19       A.   Mr. Fleming was an employee of
20  Lehman and then became an employee of Barclays.
21       Q.   Did you have any discussions with
22  Mr. Fleming in September of 2008?
23       A.   Yes.
24       Q.   Did you have any discussions with
25  Mr. Fleming about this particular transfer in

Page 84

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  September of 2008?
3        A.   Not that I recall.
4        Q.   What else did you discuss with
5  Mr. Fleming during the month of September 2008?
6        A.   Mr. Fleming and I discussed how to
7  transfer cash.
8        Q.   For what purpose?
9        A.   For customers.
10       Q.   Any other topics you and
11  Mr. Fleming discussed?
12       A.   That's all that I recall discussing
13  with him.
14            (Exhibit 674-B marked for
15       identification.)
16            MR. SHAW:  And don't worry.  You're
17       not missing your name on this.  This is not
18       something that was sent to you.
19       Q.   Have you had a chance to read
20  Exhibit 674-B, sir?
21       A.   I have, yes.
22       Q.   Okay.  And do you see it's
23  discussing -- its heading "636 Collateral."
24            Do you see that?
25       A.   I see that heading, yes.

Page 85

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        Q.   And if you take a look back at
3  Exhibit -- at Exhibit 672-B, you'll see that that
4  is also headed "636 Collateral."  Correct?
5        A.   Yes, they have -- I see that
6  heading, yes.
7        Q.   Okay.  And still looking at 270 --
8  at 672-B, it says:
9            "We need to deliver the 269 MM
10  DTC 636 collateral to Barclays corporate DTC
11  Box 7256."
12            That's in the e-mail from
13  Mr. Hraska to Ms. Vecchio that was ultimately
14  forwarded to you by Mr. Ullman.
15            Do you see that?
16            It's on the first page of
17  Exhibit 672-B.
18       A.   Yes, I do see that.
19       Q.   Okay.  And if you take a look now
20  at 674-B, the first attachment, you'll see that
21  under the heading "Lehman Market Value" -- we're
22  looking at 674-B, the first attachment to the
23  e-mail chain.
24       A.   Uh-huh.
25       Q.   You'll see that under the heading

22 (Pages 82 to 85)

Page 86

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1    "Lehman Market Value" it has a sum of
2    $269,921,368.
3          Do you see that?
4          A.   Yes, I see that.
5          Q.   Does this refresh your recollection
6    that the amount of the transfer you authorized --
7    or strike that.
8          Does this refresh your recollection
9    that the amount of the transfer authorized in
10   Exhibit 673-B was, in fact, $269 million?
11         MR. ROTHMAN:  Objection to the
12   form.
13         A.   The authorization from Mr. Kiplok
14   doesn't state a value.
15         Q.   Well, if you look at the chart that
16   immediately precedes the authorization by
17   Mr. Kiplok, you'll see it contains almost the same
18   number. It's off by, it looks like, about $20 as
19   the one attached to Exhibit 674-B that we looked
20   at a moment ago.
21         A.   Yes, I see that the numbers are
22   approximate and that the attachment on 674-B
23   contains two additional lines.
24         Q.   Those being the lines:

Page 87

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1          "Schultz Securities and securities
2    delivered.
3          Is that what you're referring to?
4          A.   Yes.
5          Q.   Looking at the -- at
6    Exhibit 674-B --
7          A.   Yes.
8          Q.   -- does that refresh your
9    recollection that you were informed by Mr. Fleming
10   on the 29th that a transfer of $269 million in
11   securities had taken place?
12         MR. ROTHMAN:  Objection to the
13   form.
14         MR. SHAW:  You can answer.
15         A.   By Mr. Fleming?
16         Q.   Yes.
17         A.   I don't recall that.
18         Q.   Well, you note that Mister -- it
19   says "Dan" -- this is an e-mail from Mr. Tonucci
20   to Mr. Fleming, copying Mr. Marsal.
21         Do you note where it says "Dan" --
22   this is an e-mail from Mr. Tonucci to Mr. Fleming.
23         "Dan, can you advise the SIPC team
24   with this transfer of assets that's been

Page 88

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1    completed."
2          A.   That is what's written.
3          Q.   Okay. And do you remember
4    Mr. Fleming ever advising any members of the SIPC
5    team that it had been completed?
6          A.   I have no recollection of that.
7          MR. SHAW:  You can put 674-B aside.
8          (Exhibit 675-B marked for
9    identification.)
10         MR. SHAW:  Take a moment to read
11   what's now been marked as Exhibit 675-B,
12   please.
13         Q.   Have you had a chance to read
14   through that?
15         A.   I have.
16         Q.   Do you recognize that as an e-mail
17   string between you and Mr. Ullman, dated
18   September 29th, 2008?
19         A.   I do, yes.
20         Q.   If you'd look at the most -- at
21   the -- sorry -- at the oldest e-mail in the string
22   at the bottom of the first page. It says:
23         "Anson, I am seeking authorization
24   to transfer the securities in the attached

Page 89

FRELINGHUYSEN - HIGHLY CONFIDENTIAL
1    spreadsheets as part of the transfer of assets to
2    Barclays Capital."
3          Do you see that?
4          A.   I do see that.
5          Q.   And then it attaches two worksheets
6    which are not attached to this exhibit.
7          Do you see that?
8          A.   I do see that.
9          Q.   Do you recall this transfer?
10         A.   No.
11         Q.   Do you know why this is headed
12   forward resending?
13         A.   No.
14         Q.   Take a look at the second e-mail in
15   the string. You see that your response to
16   Mr. Ullman was that you asked him to confirm that:
17         "... the attachments to the e-mail
18   below represent assets of Lehman Brothers, Inc.
19   that were sold to Barclays Capital, Inc. pursuant
20   to the Asset Purchase Agreement dated as of
21   September 16, 2008."
22         Do you see that?
23         A.   I see that, yes.
24         Q.   Okay. That is substantially the

23 (Pages 86 to 89)

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  same as the representation that you asked
3  Mr. Blackwell to make in the draft letter that you
4  e-mailed to him a few days earlier.  Is that
5  right?
6        MR. ROTHMAN:  Objection to the
7     form.
8     A.   I communicated with Mr. Ullman and
9  Mister -- and Mr. Blackwell on different subjects.
10    Q.   That's not my question, sir.
11        My question is:  The confirmation
12  you were seeking from Mr. Ullman with respect to
13  these transfers was substantially the same as the
14  confirmation you sought from Mr. Blackwell in the
15  letter that you -- in the draft letter that you
16  sent him on the 25th?
17        MR. ROTHMAN:  Same objection.
18    Q.   Is that correct?
19    A.   It does seem similar, yes.
20    Q.   Okay.  And now -- because you
21  understood that what Mr. Ullman was asking you to
22  transfer were non-customer assets, just as the
23  ones Mr. Blackwell had discussed with you earlier.
24  Right?
25    A.   No.  I only understood Mr. Ullman

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  to be requesting transfer of customer securities.
3    Q.   Then why are you asking for this
4  confirmation?
5    A.   I asked for confirmation that the
6  assets being transferred were appropriate for
7  transfer every time I made a transfer.
8    Q.   Okay.  You didn't ask him to
9  confirm that these were customer assets.  Right?
10    A.   My understanding with Mr. Ullman is
11  that we were transferring customer assets.
12    Q.   That's not my question, sir.
13        My question is:  You did not ask --
14  you did not ask him to confirm that these were
15  customer assets being transferred.  Right?
16        MR. ROTHMAN:  Objection.  Asked and
17     answered.
18    Q.   You can answer.
19    A.   I asked him to -- no.
20    Q.   And you previously stated that --
21  strike that.
22        And Mr. Ullman confirmed at about
23  3:50 p.m. on the 29th that what you had asked him
24  to confirm was correct.  Is that right?
25    A.   Yes.

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        MR. SHAW:  Showing you what's been
3     previously marked as Exhibit 449 in this case.
4    Q.   Do you recognize that as an e-mail
5  that you sent to various personnel at the DTCC and
6  copied to Mr. Kobak, Mr. Ullman, Ms. Vecchio and
7  Mr. Gallagher on the 29th of September, 2008, at
8  approximately 3:52 p.m.?
9    A.   Yes.
10    Q.   And do you understand that to be
11  you're transmitting the authorization that
12  Mr. Ullman was requesting you to transmit in
13  Exhibit 675-B?
14    A.   Yes, I do.
15    Q.   And you did that without any
16  confirmation that these were customer assets.  Is
17  that correct?
18    A.   I transferred them as -- in
19  connection with the Asset Purchase Agreement,
20  which I understood to effect the transfer of
21  customer assets.
22    Q.   You'd also had a discussion with
23  Mr. Blackwell a few days earlier where you had
24  discussed with him a billion dollars of other
25  assets that were -- that were to be transferred

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  pursuant to the Asset Purchase Agreement.  Isn't
3  that correct?
4    A.   I had asked Mr. Blackwell at that
5  time to transmit to me a file and a signed letter
6  from him that those assets were being transferred,
7  not Mr. Ullman.
8        MR. SHAW:  Move to strike as
9     nonresponsive.
10    Q.   My question, sir, was:  And you'd
11  had a conversation with Mr. Blackwell a few days
12  earlier about a billion dollars of other assets.
13  Correct?
14        MR. ROTHMAN:  Objection to the
15     form.
16        You can answer.
17    A.   I had had a conversation with
18  Mr. Blackwell about the transfer of other assets.
19    Q.   Yes.  And those other assets were
20  assets that you understood were conveyed under the
21  Asset Purchase Agreement.  Correct?
22    A.   I was asking him to represent that
23  they were conveyed under the Asset Purchase
24  Agreement.
25    Q.   Yes.  But you understood that the

Page 94

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   Asset Purchase Agreement dealt with things other
3   than customer assets. Correct?
4          MR. ROTHMAN: Objection to the
5      form.
6      A.   I was asking him to make that
7   representation.
8      Q.   And you were asking Mr. Ullman --
9   going back to Exhibit 675-B, you were asking
10  Mr. Ullman to make that same representation in
11  connection with these two transfers. Correct?
12         MR. ROTHMAN: Objection to the
13     form.
14     A.   I asked Mr. Ullman to confirm that
15  we were transferring customer assets in connection
16  with the APA.
17     Q.   Where does -- where do you see the
18  words "confirm that these were customer assets"?
19     A.   My normal course of dealing with
20  Mr. Ullman was with customer assets.
21     Q.   Okay. But you did not ask
22  Mr. Ullman to confirm that these were, in fact,
23  customer assets; did you?
24         MR. ROTHMAN: Objection to the
25     form. He just said that he did.

Page 95

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2      Q.   Can you show me where on this -- on
3   Exhibit 675-B you asked Mr. Ullman to confirm that
4   these were customer assets.
5      A.   I asked that they were being
6   transferred pursuant to the Asset Purchase
7   Agreement, which I understood to transfer customer
8   assets.
9      Q.   And which you also understood to
10  transfer non-customer assets. Right?
11     A.   I had asked other personnel to
12  inform me or to represent to me that it
13  transferred other assets.
14     Q.   So you were asking Mr. Blackwell to
15  give you legal advice on what the Asset Purchase
16  Agreement transferred?
17         MR. ROTHMAN: Objection to the
18     form.
19     A.   Representation is not legal advice.
20         MR. SHAW: Let's take a five-minute
21     break. I may be done. I just want to look at
22     a couple of things.
23         THE VIDEOGRAPHER: The time is
24     11:58. We are going off the record.
25         (Recess taken.)

Page 96

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2          THE VIDEOGRAPHER: The time is
3      12:03. We are back on the record.
4          MR. SHAW: Mr. Frelinghuysen, I
5      have no further questions for you at this
6      time. Thank you very much.
7          THE WITNESS: Thank you.
8   EXAMINATION BY
9   MR. ROTHMAN:
10     Q.   I'd like to just clarify one thing
11  with you, if I may, Mr. Frelinghuysen.
12         Do you recall telling Mr. Shaw that
13  you saw a draft of the clarification letter on
14  Monday morning, the 23rd or 22nd?
15     A.   22nd.
16     Q.   And you assumed that that was the
17  final version?
18     A.   Yes.
19     Q.   When did you see that draft?
20     A.   I saw that draft around 6:00 a.m.
21     Q.   And why did you assume it was the
22  final version?
23     A.   We stopped talking about the
24  clarification letter at that point.
25     Q.   Did you get any further drafts of

Page 97

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   the clarification after 6:00 that morning?
3      A.   I don't recall receiving or seeing
4   any further drafts of the clarification letter
5   that morning.
6      Q.   Do you know if the draft that you
7   got at 6:00 a.m. that morning is the same as the
8   exhibit that you've been shown here today?
9      A.   I do not know that.
10         MR. ROTHMAN: That's all I have.
11         MR. SHAW: Just one question
12     following up on that.
13  EXAMINATION BY
14  MR. SHAW:
15     Q.   Mr. Rothman asked you if you got
16  any further drafts of the clarification letter
17  after 6:00 that morning, and you said no.
18         Were you speaking only for
19  yourself, or were you purporting to speak for
20  the -- for any representative of the Trustee --
21  let me -- let me take that question out and shoot
22  it and start again.
23         When Mr. Rothman asked you if you
24  recalled receiving any further drafts of the
25  clarification letter after 6:00 that morning, and

## Page 98

```
1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    you said you did not, did you mean only that you
3    personally did not receive any further drafts, or
4    were you purporting to testify that the -- that no
5    representative of the Trustee received any further
6    drafts?
7        A.   I did not see any further drafts of
8    the document.
9        Q.   Personally?
10       A.   Personally.
11          MR. SHAW:  Thank you.
12          THE VIDEOGRAPHER:  The time is
13       12:05.  We are going off the record.
14            (Time Ended:  12:05 p.m.)
15
16       _____
17       ANSON FRELINGHUYSEN
18
19   Subscribed and sworn to
20   before me this      day
21   of March, 2010
22
23   _____
24
25
```

## Page 99

```
1               INDEX:
2    WITNESS     EXAM BY:          PAGE:
3    A. Frelinghuysen  Mr. Shaw         5
4               Mr. Rothman    96
5               Mr. Shaw       97
6
7
8               EXHIBITS
9    EXHIBIT NO.              PAGE:
10   Exhibit 669-B    Series of e-mails      55
                (HHR_00000694 - 696)
11
     Exhibit 670-B    Summary of expenses     64
12              for Hughes Hubbard
                (No Bates)
13
     Exhibit 671-B    E-mail and letter     69
14              (BCI-EX-(S)-
                00004199 - 4200)
15
     Exhibit 672-B    Series of e-mails     74
16              (HHR_00001084 - 1086)
17   Exhibit 673-B    E-mail and attachment     80
                (HHR_00019133 - 35)
18
     Exhibit 674-B    Series of e-mails     84
19              and attachment
                (BCI-EX-(S)-
20              00012499 - 502)
21   Exhibit 675-B    Series of e-mails     88
                (HHR_00001074 -75)
22
23
24
25
```

## Page 100

```
1        LITIGATION SUPPORT INDEX
2
3    DIRECTION TO WITNESS NOT TO ANSWER
4       Page   Line   Page   Line
5       51    20    70    25
6
7    REQUEST FOR PRODUCTION OF DOCUMENTS
8       Page   Line   Page   Line
9            (NONE)
10
11       INFORMATION TO BE FURNISHED
12      Page   Line   Page   Line
13           (NONE)
14
15       QUESTIONS MARKED FOR A RULING
16      Page   Line   Page   Line
17           (NONE)
18
19
20
21
22
23
24
25
```

## Page 101

```
1
2            CERTIFICATE
3    STATE OF NEW YORK )
4            )ss:
5    COUNTY OF NEW YORK)
6        I, JOMANNA DeROSA, a Certified
7    Shorthand Reporter and Notary Public within
8    and for the States of New York, New Jersey,
9    California and Arizona, do hereby certify:
10       That ANSON FRELINGHUYSEN, the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn by me and that such deposition
13   is a true record of the testimony given by
14   such witness.
15       I further certify that I am not
16   related to any of the parties to this action
17   by blood or marriage, and that I am in no
18   way interested in the outcome of this
19   matter.
20       In witness whereof, I have hereunto
21   set my hand this 4th day of March, 2010.
22
23       _____
24
         JOMANNA DeROSA
25
```

Page 102

```
 1          * * *ERRATA SHEET* * *
 2     NAME OF CASE:  In Re:  Lehman Brothers
 3     DATE OF DEPOSITION: 3/4/10
 4     NAME OF WITNESS:  A. Frelinghuysen
 5     Reason codes:
 6        1. To clarify the record.
           2. To conform to the facts.
 7        3. To correct transcription errors.
 8     Page _____ Line _____ Reason _____
       From _____ to _____
 9
10     Page _____ Line _____ Reason _____
       From _____ to _____
11
12     Page _____ Line _____ Reason _____
       From _____ to _____
13
14     Page _____ Line _____ Reason _____
       From _____ to _____
15
16     Page _____ Line _____ Reason _____
       From _____ to _____
17
18     Page _____ Line _____ Reason _____
       From _____ to _____
19
20     Page _____ Line _____ Reason _____
       From _____ to _____
21
22
23     _____
           ANSON FRELINGHUYSEN
24
25
```

TSG Reporting 877-702-9580