# BCI Exhibit 631

Page 1

1      IN THE UNITED STATES BANKRUPTCY COURT

2      FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

   In re:                    )
5                            ) Chapter 11

   LEHMAN BROTHERS           ) Case No. 08-13555(JMP)
6  HOLDINGS, INC., et al,    ) (Jointly Administered)
                             )
7            Debtors.        )
   -----------------------)

8

9

10

11

12          30(b)(6) DEPOSITION OF

13     CLEARY GOTTLIEB STEEN & HAMILTON LLP

14                  by

15          VICTOR I. LEWKOW

16          New York, New York

17      Wednesday, February 10, 2010

18

19

20

21

22

23  Reported by:

24  MAYLEEN CINTRON, RMR, CRR

25  JOB NO. 28226

Page 2

```
 1
 2
 3                    February 10, 2010
 4                    10:02 a.m.
 5
 6
 7
 8        30(b)(6) DEPOSITION OF CLEARY
 9   GOTTLIEB STEEN & HAMILTON LLP, by VICTOR I.
10   LEWKOW, held at the offices of Cleary
11   Gottlieb Steen & Hamilton LLP, 450 Park
12   Avenue, New York, New York, pursuant to
13   Notice, before MayLeen Cintron, a Registered
14   Merit Reporter, Certified Realtime Reporter,
15   and Notary Public of the State of New York.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   A P P E A R A N C E S:
 2
 3   JONES DAY LLP
 4   Attorneys for Debtors - Lehman Brothers, Inc.
 5      222 East 41st Street
 6      New York, New York 10017-6702
 7   BY: ROBERT W. GAFFEY, ESQ.
 8      BRIDGET CRAWFORD, ESQ.
 9
10   BOIES, SCHILLER & FLEXNER LLP
11   Attorneys for Barclays
12      5301 Wisconsin Ave., N.W.
13      Washington D.C. 20015
14   BY: HAMISH HUME, ESQ.
15
16
17   QUINN, EMANUEL, URQUHART,
18   OLIVER & HEDGES LLP
19   Attorneys for the Creditors Committee
20      51 Madison Avenue - 22nd Floor
21      New York, New York 10010
22   BY: JAMES TECCE, ESQ.
23
24
25
```

Page 4

```
 1   A P P E A R A N C E S: (Cont'd)
 2
 3   HUGHES, HUBBARD & REED LLP
 4   Attorneys for the SIPA Trustee
 5      One Battery Park Plaza
 6      New York, New York  10004-1482
 7   BY: WILLIAM R. MAGUIRE, ESQ.
 8      AMINA HASSAN, ESQ.
 9
10
11   CLEARY GOTTLIEB STEEN & HAMILTON LLP
12   Attorneys for the Witness: Victor Lewkow
13      One Liberty Plaza
14      New York, New York 10006
15   BY: BOAZ S. MORAG, ESQ.
16      ROBERT P. DAVIS, ESQ.
17
18
19
20              - - -
21
22
23
24
25
```

Page 5

```
 1              -Lewkow-
 2   V I C T O R   I.   L E W K O W,
 3      called as a witness, having been duly
 4      sworn by a Notary Public, was examined
 5      and testified as follows:
 6         THE REPORTER:  Please state your
 7   full name for the record.
 8         THE WITNESS:  Victor -- do you need
 9   a middle name?  Ira Lewkow, L-E-W-K-O-W.
10         MR. GAFFEY:  That's all we needed.
11   We just wanted to know your middle
12   name.
13   EXAMINATION BY
14   MR. GAFFEY:
15      Q.  Good morning, Mr. Lewkow.  My name
16   is Bob Gaffey, I'm from Jones Day and we are
17   special counsel to the Debtors in this
18   proceeding.
19         Have you had your deposition taken
20   before?
21      A.  Once.
22      Q.  In the interest of efficiency, I
23   will give you the short version of the usual
24   instructions.  If at any point you don't
25   understand a question, please say so and I
```

1          -Lewkow-
2  will try to rephrase it so we understand each
3  other.  If you need a break at any time, say
4  so and we can do that.
5          (Telephone interruption.)
6      Q.  If you need a break at any time,
7  just say so.  If there is a question pending,
8  I prefer we get an answer on the record before
9  we take a break?
10         MR. GAFFEY:  Let me ask the
11     reporter to mark, what's the next
12     exhibit, 613A, a copy of a declaration
13     submitted by Barclays in this matter.
14         (Deposition Exhibit 613A,
15     Declaration of Victor Lewkow, marked
16     for identification, as of this date.)
17     Q.  Is that your Declaration, sir?
18     A.  It is.
19     Q.  Let me ask you to turn your
20  attention, please, to Paragraph 4 of your
21  Declaration.
22         By way of background, my questions
23  today will be about the sale transaction
24  that's at issue in this matter, that is the
25  transaction between Lehman and Barclays, to

1          -Lewkow-
2  which I understand your Declaration is
3  addressed.
4          In Paragraph 4 of your Declaration,
5  you say, "The transaction was never discussed
6  or documented as what might be called a
7  'balance sheet' transaction, which would have
8  included pre-closing and/or post-closing
9  purchase price adjustment provisions relating
10  to a valuation of the transferred assets and
11  liabilities".
12         Is the term "balance sheet
13  transaction" a term of art of some kind?
14         MR. MORAG:  Object to the form.
15     You can answer.
16     A.  In many private acquisitions as
17  opposed to public company acquisitions, there
18  are price adjustments tied to an audited
19  balance sheet that is prepared as of the
20  closing date.
21         And I'm not sure if it is a broadly
22  used term, but it certainly is what I was
23  talking about.  So...
24     Q.  I'm sorry.  Are you done with your
25  answer?

1          -Lewkow-
2      A.  Yes.
3      Q.  So, there are not, I take it,
4  particular -- there is not a defined list of
5  things you expect to find, that you need to
6  see in a transaction in order to qualify as a
7  so-called "balance sheet transaction"; is that
8  right?
9          MR. MORAG:  Objection to form.
10     A.  I would say that in my experience,
11  in the context of buying a business where
12  there were a lot of financial assets valued
13  and liabilities, the value of which changed
14  over -- could change or would change or did
15  change over time between signing and closing
16  or between if there weren't represented -- a
17  representation by the seller as to the value
18  as of signing, starting date could be actually
19  earlier than the signing of the asset purchase
20  agreement.
21         If between whatever date a balance
22  sheet was represented as of and the closing
23  date, the value of the assets and liabilities
24  had changed and I would expect as part of a
25  balance sheet transaction, for there to be pre

1          -Lewkow-
2  or post-closing price -- pre or post- closing
3  price adjustments.
4      Q.  Now in the transaction that was
5  agreed between Lehman and Barclays initially
6  on September 16th, that is embodied in the
7  Asset Purchase Agreement, was there any such
8  purchase price adjustment provision?
9      A.  There was no balance sheet audited
10  financial statement valuation type balance
11  sheet adjustment, no.
12     Q.  Was there a purchase price
13  adjustment provision?
14         MR. MORAG:  Object to form.
15     A.  There was a -- I'm going to say --
16  my answer would be no in the usual sense.  I
17  would comment, and I think that is what you're
18  getting at, we can call it -- if you want to
19  call it "purchase price adjustment", you
20  could, it is simply a matter of semantics.
21         But there was a provision in the
22  original deal -- there were two provisions
23  that had aspects of -- no.  There was one
24  provision that had aspects of additional
25  consideration potentially flowing to the

Page 10

1          -Lewkow-
2    seller. There was a -- there was a provision
3    that said that on a certain pool of positions,
4    that we would be -- that Barclays would be
5    acquiring at the closing, that if, as I
6    recall -- and you know, without having the
7    Agreement in front of me to look at the words,
8    I always defer to what's in the contract.
9          But my recollection is that the --
10   there was a provision that if within some
11   period, I think it was a year, to the extent
12   that Barclays actually sold positions -- not
13   what their value was on a given date or the
14   like, not as audit, not if they held
15   positions, even if those positions increased
16   enormously in value or if they went down in
17   value.
18         But if with respect to some pool --
19   and I don't remember the details of how it
20   worked because that provision was later
21   dropped, as you know. There was a provision
22   that if -- with respect to some of those
23   assets, if we -- if Barclays sold them during,
24   I think, the first year, there would be some
25   sharing of the -- of the profit compared to
        TSG Reporting - Worldwide    877-702-9580

Page 11

1          -Lewkow-
2    what -- I forget what the base was exactly, as
3    to what date the assumed valuation was.
4          So there was a provision for
5    additional consideration potentially to flow
6    to the seller.
7    **Q.  I'll show you the Asset Purchase**
8    **Agreement in a minute and we'll spend some**
9    **time with it today.**
10   **But is the provision that you**
11   **described, is that fairly described as a**
12   **post-closing purchase price adjustment**
13   **provision?**
14         MR. MORAG:  Objection.  Asked and
15   answered.
16     A.  Yeah, I have nothing more to say
17   other than what I said on that subject.
18   **Q.  I'm not sure I have an answer to**
19   **the question as to whether it is -- the**
20   **provision you described is what you would**
21   **describe, and I'm referring to Paragraph 4 of**
22   **your affidavit, as a "post-closing purchase**
23   **price adjustment provision"?**
24     A.  Well, with due respect, if you read
25   my declaration, it says, "...a pre-closing
        TSG Reporting - Worldwide    877-702-9580

Page 12

1          -Lewkow-
2    and/or post-closing purchase price adjustment
3    provision relating to the valuation of the
4    transferred assets and liabilities".  This was
5    not such a provision.
6    **Q.  So to qualify as a balance sheet**
7    **transaction, in your view, the pre or post**
8    **closing purchase price adjustment provision**
9    **would have to relate to a valuation of the**
10   **assets and liabilities?  It's that last piece,**
11   **"valuation of the assets and liabilities" that**
12   **defines it as a purchase price adjustment**
13   **provision as you meant it in your Declaration?**
14         MR. MORAG:  Object to form.
15     A.  As I said earlier, to me a balance
16   sheet transaction is when you later prepare --
17   I'm not sure that the word -- I would say do a
18   valuation from an accounting standpoint.  As a
19   balance sheet, normally you would prepare a
20   balance sheet based on generally accepted
21   accounting principles, have it audited and
22   adjust the purchase price based on that.
23   **Q.  Is there a reason such a mechanism**
24   **was not included in the transaction at issue**
25   **here?**
        TSG Reporting - Worldwide    877-702-9580

Page 13

1          -Lewkow-
2    A.  You know, I would -- I don't recall
3    whether at any point in time, whether Lehman
4    or its advisors requested such a provision.  I
5    just don't recall.  Certainly if they did, it
6    came and went very quickly in the discussions
7    of the concept of the Asset Purchase
8    Agreement.  But I don't recall there ever
9    being such a provision.
10        I would note that we were -- as
11   everybody knew then and knows now, it was an
12   incredibly volatile couple of days.  The Asset
13   Purchase Agreement was being negotiated on
14   that Monday and Tuesday after Lehman had filed
15   for Chapter 11 late Sunday night, early Monday
16   morning.
17        And I think the idea that anyone
18   had a wonderfully exact knowledge as to what
19   the value of portfolio assets in particular
20   were at that point in time, it would be
21   amazing because there was a very uncertain
22   value at that point in time.
23   **Q.  Did Cleary Gottlieb play any role**
24   **in the negotiation of the transaction with**
25   **regard to arriving at a valuation of the**
        TSG Reporting - Worldwide    877-702-9580

Page 14

1          -Lewkow-
2    assets to be transferred?
3          MR. MORAG:  Object to the form.
4    Vague.
5          A.  No.
6          Q.  Were there negotiations between the
7    parties concerning the value of the assets to
8    be transferred?
9          A.  As described in my declaration,
10   there were discussions, I would not -- I don't
11   believe there was a negotiation, as I heard it
12   described.  And I want to stay away from
13   privileged communications, although I'm not
14   sure I have any in particular in mind now.
15   But obviously, I assume none of -- you're not
16   asking me at any point -- if you are, I assume
17   I'll be telling you not, that I won't, or one
18   of the lawyers here will tell me not to.
19          But it was my understanding that
20   Lehman -- that Barclays -- let me step back a
21   second.
22          Even before the bankruptcy, even
23   before that Friday morning when -- the Friday
24   before the 15th, the 12th I guess when
25   Barclays had first retained us certainly, they

TSG Reporting - Worldwide    877-702-9580

Page 15

1          -Lewkow-
2    may have gotten involved a little bit the day
3    before or something.  But even before Barclays
4    had started thinking about, as far as I know,
5    Lehman, there had been stories in the press
6    about suggesting that Lehman had been slow to
7    revalue assets, and that they had inflated
8    values in their portfolio.
9          But beyond that in the very limited
10   time, as I understood it, that Barclays had
11   been provided with some information about the
12   portfolio that we were -- that Barclays was
13   being asked to -- that it be acquiring as part
14   of its acquisition of basically the entire
15   business with certain exceptions and the
16   assumption of very substantial certain
17   specified liabilities, when their people,
18   financial people, trading people, whoever it
19   was -- and I'm not sure I knew all the people
20   involved.  It was a new client in the
21   United -- I don't know the name of all the
22   people who were going -- who were around and
23   in the different rooms that we were -- that
24   meetings were taking place on that Monday and
25   Tuesday up at Lehman Brothers on the -- on the

TSG Reporting - Worldwide    877-702-9580

Page 16

1          -Lewkow-
2    big conference and dining floor.
3          But it was my understanding that
4    Barclays people had reviewed certain
5    information about the assets and liabilities
6    and had thought that the -- there were
7    large -- certain category types of assets and
8    the like that had, as last marked by Lehman,
9    were substantially overstated.  Whether they
10   had been overstated as of the date they
11   originally been marked or were overstated
12   because of the passage of a couple of days, I
13   believe they would not have been marked for a
14   couple of days.  It's my recollection.  I
15   could be wrong on that.
16          But one way or another, or a
17   combination of the two, that the Barclays
18   people had concluded that the Lehman marks
19   were substantially overstated.
20          Q.  When was Cleary first retained in
21   connection with this transaction?
22          A.  We were retained on Friday.  Not on
23   this transaction, we were retained on the
24   Friday before the bankruptcy on the 12th,
25   early that morning, to assist Barclays in

TSG Reporting - Worldwide    877-702-9580

Page 17

1          -Lewkow-
2    looking at a potential much larger transaction
3    to buy not just a substantial part of the U.S.
4    and Canadian broker-dealer investment banking
5    business, but a much larger portion of Lehman
6    Brothers.
7          I don't know whether initially -- I
8    can't recall whether initially it might have
9    been all of Lehman.  I think very early it
10   became clear it was not quite everything but
11   it was a larger universe than what we ended up
12   trying to do in doing, starting with the
13   Monday filing the Chapter 11.
14          Q.  In the interest of everyone's time,
15   we've taken a lot of depositions in this case.
16   Some time over the weekend, the concept of
17   that larger transaction came to an end, those
18   negotiations?
19          A.  Correct.  Sunday around midday.
20          Q.  And around some point, negotiations
21   resumed with respect of the smaller
22   transaction that was ultimately concluded,
23   correct?
24          A.  I don't know if it matters.  But I
25   would use the word "resume."

TSG Reporting - Worldwide    877-702-9580

Page 18

```
 1        -Lewkow-
 2     Q.  Okay.
 3     A.  As far as I can tell, they stopped
 4  on Sunday, people went home and saw their
 5  families.  And I got a call Monday morning,
 6  "Well, can you come up to Lehman Brothers?
 7  We're going to see if we can do a deal.  If
 8  they did file as they said they would" -- we
 9  thought they would -- "they filed in
10  Chapter 11 and now want to see whether or not
11  there's something we can do to purchase" --
12  you know, I don't remember how it was
13  described to me in that initial call.
14        But, "Can you come up to Lehman
15  Brothers?"
16        MR. MORAG:  Mr. Lewkow, let me
17     caution you on privilege.  I think you
18     just said the gist to the conversation,
19     which is sufficient for these purposes.
20     Q.  You came back?
21     A.  I went up to Lehman Brothers.
22     Q.  Let's just talk about the period
23  when you came back.  In the negotiations that
24  began then, what steps, if any, were taken to
25  accommodate Barclays' view that the Lehman
```

TSG Reporting - Worldwide    877-702-9580

Page 19

```
 1        -Lewkow-
 2  marks were substantially overstated, to use
 3  your term?
 4        MR. MORAG:  Objection.  Vague.
 5     A.  Yeah.  I guess -- I don't know what
 6  you mean by "accommodate."  And the word --
 7  you also used the word "the view."  I think
 8  that view -- I did mention the newspaper.
 9        MR. MORAG:  I think we need a
10     break.
11        (Whereupon, a recess was taken
12     from 10:22 a.m. to 10:25 a.m.)
13  BY MR. GAFFEY:
14     Q.  In the negotiations that took place
15  in connection with the transaction that's
16  brought us here today, Mr. Lewkow, were there
17  discussions, to your knowledge, between the
18  folks at Barclays and the folks at Lehman
19  about Barclays' view that the assets of Lehman
20  were overstated on its books?
21        MR. MORAG:  Object to the form.
22     A.  Yes.  As to certain assets.
23     Q.  Can you tell me what you know with
24  regard to those discussions?
25     A.  As I stated in my declaration,
```

TSG Reporting - Worldwide    877-702-9580

Page 20

```
 1        -Lewkow-
 2  Barclays, was my understanding, that Barclays'
 3  trading and/or financial folks had been
 4  provided certain information about the trading
 5  positions; that it was contemplated that
 6  Barclays would assume as part of an
 7  acquisition of the business of substantially
 8  all of the business.
 9        And in the course of that, Barclays
10  had -- Barclays people had reached the view
11  that there were very significant -- that the
12  aggregate carrying value that they had been
13  furnished by Lehman was substantially higher
14  than Barclays believed was appropriate that
15  Monday or Tuesday.
16     Q.  And by "aggregate carrying value",
17  do you mean Lehman's book value?
18     A.  It's my -- I'm not an accountant,
19  as you know.  I'm a lawyer.  It is my
20  understanding that for an entity such as
21  Lehman, they are supposed to -- under
22  regulatory accounting principles, maybe
23  generally accepted accounting principles, I
24  don't know.  But as a general matter,
25  broker-dealers mark their portfolio to market
```

TSG Reporting - Worldwide    877-702-9580

Page 21

```
 1        -Lewkow-
 2  on a daily basis.  And I believe that means
 3  their book value is effectively adjusted each
 4  day.  To the extent that a balance sheet is
 5  prepared, the balance sheet is prepared based
 6  on those marks.
 7     Q.  So when you use the phrase
 8  "aggregate carrying value," were you referring
 9  to Lehman's books marked to market in that
10  manner?
11        MR. MORAG:  Object to the form.
12        MR. HUME:  Objection, asked and
13     answered.
14     A.  I think I've got nothing more to
15  say on that.
16     Q.  What did you mean to say when you
17  said "aggregate carrying value"?
18     A.  The value -- what I hear people
19  refer to as "the marks."  What they were being
20  marked at on the books of Lehman by Lehman.
21     Q.  And in the negotiations of the
22  transaction, were any steps taken to address
23  Barclays' concern that the aggregate carrying
24  value was substantially higher than it should
25  have been?
```

TSG Reporting - Worldwide    877-702-9580

Page 22

```
 1         -Lewkow-
 2      MR. HUME:  Objection.  Vague.
 3      MR. MORAG:  Objection.  Asked and
 4   answered.
 5      A.  I have -- I've told you -- I have
 6   nothing to add to my answer.
 7      Q.  Well, I'm afraid that's not going
 8   to work, so I do need an answer to the
 9   question.
10      A.  Your question asked in the
11   negotiations.  I don't -- I don't -- if you
12   mean in the negotiations of the transaction, I
13   think my answer would be no, as I have said in
14   my declaration and in my statement.
15      Barclays was furnished information
16   which led it to believe that Lehman's marks
17   were not correct and overstated the value of
18   assets, and was -- Barclays was not prepared
19   to do a deal with -- where they were
20   overstated marks on the Lehman books of large
21   amounts.
22      Q.  So if Barclays was not prepared to
23   do a deal where there were overstatements on
24   Lehman's books of large amounts, what did
25   Barclays do to address that concern in order
```

TSG Reporting - Worldwide    877-702-9580

Page 23

```
 1         -Lewkow-
 2   to conclude a transaction?
 3      A.  Barclays made -- made its
 4   position -- made its view of the marks, that
 5   they were overstated substantially, clear to
 6   Lehman people and urged -- my understanding,
 7   they urged Lehman to take a fresh look at the
 8   values that they were carrying them on on
 9   their books because it was at a crazy world,
10   and it was something that Lehman should take a
11   fresh look at to -- to both deal with the
12   passage of time and information.
13      I don't know what -- you know, in
14   my declaration, I mention an example that was
15   mentioned in a broad public -- "public" is the
16   wrong statement.  With both sides present,
17   including lawyers, including me -- of the
18   example of a particular position where
19   Barclays had a junior position of -- junior
20   tranche position from the same issuer, same
21   type of security, and was carrying it --
22      I'm sorry.  Barclays had a senior
23   position and was carrying it at a bigger
24   discount to par than Lehman was carrying the
25   junior position.  And those are -- you know,
```

TSG Reporting - Worldwide    877-702-9580

Page 24

```
 1         -Lewkow-
 2   I'm sure there were other examples.  That was
 3   the one that was easy to explain to us lawyers
 4   as evidencing why Barclays believed Lehman
 5   needed to take a fresh look at what it -- how
 6   it was carrying certain portions of the
 7   portfolio on its books and whether or not they
 8   needed to revise their marks.
 9      Q.  Did the level at which Lehman was
10   carrying its assets on the books affect the
11   price which Barclays was willing to pay on the
12   transaction?
13      MR. MORAG:  Object to form.
14      A.  I think it affected their
15   willingness to do the deal.  The price was
16   what was in the Agreement where we acquired
17   certain assets, acquired certain liabilities,
18   agreed to make certain payments, assumed a
19   certain level of obligations.
20      We were buying a business as a
21   whole; the purchase price was the whole
22   transaction.  We were not -- no one from
23   Barclays went into this to buy a portfolio; it
24   was to buy substantially all the assets of a
25   business.
```

TSG Reporting - Worldwide    877-702-9580

Page 25

```
 1         -Lewkow-
 2      Q.  Describe for me, if you would, the
 3   price that Barclays paid in that purchase.
 4      A.  At what time, sir?
 5      Q.  Good point.  Describe for me the
 6   price that Barclays agreed to pay for that
 7   business on September 16, 2008?
 8      MR. HUME:  I'm going to just object
 9   to the extent that it calls for
10   interpretation of the contract which he
11   hasn't been shown.
12      (Discussion off the record.)
13      Q.  I think the question on the table,
14   Mr. Lewkow, is:  Will you describe for me the
15   price that Barclays agreed to pay for that
16   business on September 16, 2008?
17      MR. MORAG:  Objection.  To the
18   extent it calls for a legal
19   interpretation of the contract.  If you
20   recall generally the terms.
21      A.  Look, I think the contract is the
22   contract.  Without having it in front of me, I
23   may omit certain things.  But in general
24   terms, my recollection is that under the Asset
25   Purchase Agreement as signed late on the 16th
```

TSG Reporting - Worldwide    877-702-9580

Page 26

1          -Lewkow-
2    or early on the 17th, I think it is dated the
3    16th, Barclays agreed to make payments. Some
4    were going to be based on appraised value of
5    certain specified real estate assets.
6          There was a -- they were also going
7    to pay another $250 million. They were going
8    to, under the Asset Purchase Agreement, they
9    would pay, as I testified earlier, under
10   certain circumstances if they sold certain
11   portfolio assets within one year and netted a
12   profit as described in the Asset Purchase
13   Agreement, they would share some of that
14   profit with Lehman Brothers.
15         They were also taking on various
16   liabilities, including liabilities related to
17   the portfolio, part of the portfolio positions
18   that they were taking. They were agreeing to
19   pay certain cure costs, the amount of which --
20   whatever they turned out to be. And they also
21   were agreeing to pay certain compensation
22   amounts under the Asset Purchase Agreement.
23         I may be forgetting some things.
24   If I had the the Agreement in front of me, I'd
25   be happy to go through it and take another
TSG Reporting - Worldwide    877-702-9580

Page 27

1          -Lewkow-
2    look.
3         Q.  I understand, sir, it is your
4    general recollection.
5         The deal, as it finally closed, did
6    it change the structure you just described?
7         MR. MORAG:  With respect to the
8    purchase price?
9         MR. GAFFEY:  Yes.
10        A.  Yes.
11        Q.  How did it change?
12        A.  It changed -- first of all, the
13   provision that required Barclays, under some
14   scenarios, to share some of the potential
15   profit on the -- if they sold within a year.
16   I think it was a year, it might have been six
17   months. If they sold within a fixed period
18   certain of the positions that they assumed
19   they made a profit, some portion of that would
20   go to Lehman Brothers.
21        That provision was dropped. So
22   that was a change in one of the price related
23   provisions. And -- I remember the other.
24        The other thing -- I don't know if
25   I would call it a price provision or not, but
TSG Reporting - Worldwide    877-702-9580

Page 28

1          -Lewkow-
2    it involved money; cash.
3         And the original agreement, the
4    Asset Purchase Agreement, had a concept of
5    retained cash, if I remember the defined term,
6    which provided that that amount of cash would
7    be among the assets that Barclays would be
8    receiving as part of the acquisition. And
9    that was -- that was dropped subsequently from
10   the -- from the transaction.
11        Q.  Anything else that you remember in
12   terms of changes between the transaction, the
13   pricing provisions of the transaction on
14   September 16th, and the provisions as the deal
15   ultimately closed?
16        MR. HUME:  Objection to the extent
17   it calls for an interpretation of the
18   contract.
19        MR. MORAG:  At this point, I'm
20   going to ask you to show it to him.
21        A.  It would be helpful to see the
22   Clarification Letter to know that. Let me
23   just for one second.
24        Let me just... none that occurs to
25   me without looking at the contract.
TSG Reporting - Worldwide    877-702-9580

Page 29

1          -Lewkow-
2         Q.  Let me show you what's previously
3    been marked as Deposition Exhibit 1, a copy of
4    the Asset Purchase Agreement.
5         Have you had a chance to review
6    this prior to your deposition today, reviewed
7    it recently?
8         A.  Yes.
9         Q.  Would you take a look at page 14 of
10   that exhibit, sir, Section 3.3 of the
11   Agreement.
12        A.  Yes.
13        Q.  That provision, "Adjustment to cash
14   amount," is that the provision you've been
15   talking about when you talked about potential
16   payments to Lehman depending on the values of
17   certain assets after a year?
18        A.  Let me just reread it.
19        Q.  Sure.
20        MR. MORAG:  Objection.
21        Q.  Don't take my explanation. But I
22   just want to know if that's the agreement,
23   that's the provision you've been talking
24   about?
25        MR. MORAG:  Object to the
TSG Reporting - Worldwide    877-702-9580

Page 30

1          -Lewkow-
2    characterization of it, but you can
3    answer if that's the provision you were
4    referring to earlier.
5          (Witness reviewing document.)
6    A.  Yes.
7    **Q.  Now, having taken a look at**
8    **Section 3.3 of the Asset Purchase Agreement,**
9    **and directing your attention again to**
10   **Paragraph 4 of your Declaration, could you**
11   **tell me, sir, whether Section 3.3 is a**
12   **post-closing purchase price adjustment**
13   **provision relating to valuation of transferred**
14   **assets and liabilities, as you described it in**
15   **Paragraph 4?**
16         MR. HUME:  Objection.  Asked and
17   answered.
18         MR. MORAG:  You can answer.
19   A.  No, I don't think so.
20   **Q.  Why not?**
21   A.  Because if you were going to do it
22   based on a valuation, you would have valued
23   all of the -- those -- at least all of the
24   portfolio assets, and it would turn not on whether or
25

TSG Reporting - Worldwide    877-702-9580

Page 31

1          -Lewkow-
2    not Barclays in its complete discretion had or
3    had not sold some, if not others, of those
4    assets.
5    **Q.  Do you know if a balance sheet of**
6    **any kind was prepared in connection with the**
7    **Asset Purchase Agreement?**
8          MR. MORAG:  Object to the form.
9    A.  I don't know whether I would
10   characterize it as a balance sheet.  There was
11   a one-page piece of paper that somebody from
12   Lehman Brothers went into the room late in the
13   game, late in the -- you know, late that
14   Tuesday.  I don't remember what time, that had
15   certain categories of assets other than
16   liabilities on the -- on the -- on it, that
17   was talked about previously and is referred to
18   in one place in the Asset Purchase Agreement.
19   **Q.  Mr. Lewkow, I'm showing you what's**
20   **previously been marked as Exhibit 19.**
21        **Is that the one-page piece of paper**
22   **you just referred to?**
23   A.  I recall that there was at least
24   two versions of this that came in.  And I
25   think both were initialled by Berkenfeld, that

TSG Reporting - Worldwide    877-702-9580

Page 32

1          -Lewkow-
2    came and went.  So I'm not sure if this was --
3    I don't remember the dating and the time of
4    it.
5          So whether this was the first or
6    the second or some other version, I can't
7    tell.  But it looked generally like this, yes.
8    **Q.  Whether this is the particular one**
9    **you are referring to, it is a version of**
10   **Exhibit 19 that you were referring to; is that**
11   **correct?**
12         MR. MORAG:  Object to the form.
13   A.  It is what I just said.  It looks,
14   in general terms, like what I am referring to.
15   **Q.  Have you seen this document before?**
16   A.  I believe so.  Again, I don't
17   remember all the numbers on the page, and so I
18   don't know whether -- which version this was.
19         But certainly I have -- I believe I
20   have seen this document at least recently.
21   Whether I saw this version that night, I have
22   less certainty.
23   **Q.  Do you know why Mr. Berkenfeld**
24   **signed the one-page piece of paper that you**
25   **mentioned?**

TSG Reporting - Worldwide    877-702-9580

Page 33

1          -Lewkow-
2          MR. MORAG:  Objection.  He's --
3          MR. HUME:  Objection.  Calls for
4    speculation.
5    A.  I can tell you what I recall him
6    saying.
7    **Q.  Okay.**
8    A.  I think he said something like --
9    the Asset Purchase Agreement had been
10   substantially finalized, and he had come into
11   the room with this piece of paper or a version
12   of this piece of paper, and there was some
13   talk about -- that I don't remember very well,
14   about the categories of assets and liabilities
15   on this piece of paper.
16         And he said, "Well, this is what
17   we're talking about here.  I'm going to
18   initial it," or something like that.
19   **Q.  Did you ask him why he did that?**
20   **Why he said "This is what we're talking about,**
21   **I'm going to initial it"?**
22   A.  No.
23   **Q.  Did the one-page piece of paper**
24   **that Mr. Berkenfeld initialled play any role**
25   **in the transaction?**

TSG Reporting - Worldwide    877-702-9580

Page 34

-Lewkow-

1
2      MR. MORAG:  Objection to form.
3      MR. HUME:  Objection.  Vague.
4      A.  As I mentioned, there is a
5  provision in the compensation section that
6  refers to this piece of paper or some version
7  of it, yes.
8      **Q.  Was it your understanding that the**
9  **one-page piece of paper Mr. Berkenfeld signed**
10 **also guided the transaction to the extent the**
11 **value of portfolio of assets was concerned?**
12     MR. MORAG:  Mr. Gaffey, I'm going
13 to object.  You keep using the word
14 "signed," he keeps using the word
15 "initialled."
16     MR. GAFFEY:  We are big boys.  We
17 both know it means he wrote on the
18 document.  Do you want me to say
19 "initialled"?
20     MR. MORAG:  If you could.
21     MR. GAFFEY:  Sure.  Can you read
22 the question back?
23     (Record read as follows:
24 "Question:  Was it your understanding
25 that the one-page piece of paper

TSG Reporting - Worldwide    877-702-9580

Page 35

-Lewkow-

1
2  Mr. Berkenfeld signed also guided the
3  transaction to the extent the value of
4  portfolio of assets was concerned?"
5      **Q.  Can you answer that question as if**
6  **I said "initialled"?**
7      A.  I need to hear it again.  I'm
8  sorry.
9      **Q.  Let me rephrase it.**
10     **The one-page piece of paper that**
11 **Mr. Berkenfeld initialled, what role, if any,**
12 **did that play in the transaction?  Withdrawn.**
13     **Did the one-page piece of paper**
14 **that Mr. Berkenfeld initialled guide the**
15 **transaction with regard to the value of the**
16 **portfolio of assets transferred?**
17     MR. MORAG:  Object to the form.
18     A.  I would not -- I don't know what
19 you mean by "guide."
20     **Q.  Was it meant to instruct the drafts**
21 **people of the Asset Purchase Agreement as to**
22 **the value of the long position that was**
23 **transferred?**
24     A.  The drafts people had already
25 drafted the Agreement.  I don't remember

TSG Reporting - Worldwide    877-702-9580

Page 36

-Lewkow-

1
2  exactly what the status was at the precise
3  time.  This was brought in.  I don't think it
4  influenced the drafting.  If by the draftsmen
5  you mean the lawyers from both sides who were
6  involved in preparation of the document, the
7  Asset Purchase Agreement, I don't believe this
8  guided the drafting of the Agreement, no.
9      **Q.  Did anyone from Cleary Gottlieb**
10 **play any role in the preparation of this**
11 **document?**
12     A.  No.  To the best of my knowledge,
13 no.
14     **Q.  Did anyone from Cleary Gottlieb**
15 **play any role in determining the values that**
16 **are shown on this document?**
17     A.  No.
18     **Q.  Did anyone from Barclays**
19 **participate in the preparation of this**
20 **document?**
21     A.  I don't believe, not to my
22 knowledge.
23     **Q.  Did anyone from Barclays play any**
24 **role in determining the values shown on this**
25 **document?**

TSG Reporting - Worldwide    877-702-9580

Page 37

-Lewkow-

1
2      A.  I don't -- I don't know what that
3  means.  Other than as I testified previously
4  and is set forth in my declaration, you can
5  characterize that in any way you want.  But
6  other than that, I don't know of anything
7  relative to the question.
8      **Q.  Would you take a look at**
9  **Paragraph 9 of your Declaration?**
10     A.  Sure.
11     **Q.  Take the time you need to review**
12 **the paragraph to refresh yourself of its**
13 **contents.**
14     **But my question is going to go to**
15 **the portion that begins -- seven lines down --**
16 **"While I was not present for the actual**
17 **discussions between Barclays and Lehman**
18 **Brothers traders..."**
19     A.  Let me just reread it.
20     **Q.  Sure.**
21     (Witness reviewing document.)
22     A.  Yes?
23     **Q.  Now, to your knowledge, was the**
24 **document I have before you marked as**
25 **Exhibit 19, a product of the discussions**

TSG Reporting - Worldwide    877-702-9580

-Lewkow-

1  between Barclays and Lehman traders that
2  you're referring to in Paragraph 9 of your
3  Declaration?
4  Declaration?
5      MR. MORAG:  Object to the form.
6      A.  No.  I -- I wouldn't -- I mean,
7  I -- this was a Lehman Brothers document.  I
8  assume that as --
9      To the extent that Lehman Brothers,
10 having listened to Barclays' views as to
11 valuation may have changed their marks, as I
12 believe they did, it may have reflected those
13 judgments by Lehman as to the proper marking
14 of assets or liabilities.  But that's all.
15     Q.  Did you come to an understanding
16 that Lehman changed its marks in response to
17 Barclays' expression of concern that they were
18 too high?
19     A.  It was my understanding that they
20 had determined that they would change their
21 marks.
22     MR. MORAG:  By that, who are you
23 referring to?
24     THE WITNESS:  Lehman.  The only one
25 that was making marks was Lehman.  It

TSG Reporting - Worldwide    877-702-9580

-Lewkow-

1
2  was their balance sheet.
3      Q.  From whom did you obtain that
4  understanding?  Can I just caution you, if it
5  is a Barclays person, just tell me their name?
6  I don't want to know the substance of the
7  conversation.
8      A.  No, I understand that.
9      Q.  Yes.
10     A.  I don't remember the name.  I have
11 a recollection of someone being involved in
12 those discussions coming into the room.  I
13 believe it was -- where lawyers and other
14 folks from the other side were in the room and
15 reported what I had characterized in my
16 testimony a minute or two ago.  But I don't
17 remember the name of the individual from
18 Barclays.
19     Q.  Do you know if Lehman did, in fact,
20 change its marks?
21     A.  I have no way of knowing that.
22     Q.  Did you or anyone else from Cleary
23 ever ask that question in the week
24 beginning -- well, from Tuesday, September
25 16th through the closing of the transaction on

TSG Reporting - Worldwide    877-702-9580

-Lewkow-

1
2  the 22nd?
3      A.  No.
4      Q.  Actually, will you turn to, in the
5  Asset Purchase Agreement, which is Exhibit 1.
6  If I can ask you, please, Mr. Lewkow, to turn
7  to page 6, which contains the definition of
8  "Purchased Assets."
9      And in particular, if you would
10 take a look at subsection (d) of that
11 definition.
12     A.  Yup.
13     Q.  Do you see there's a reference
14 there to various categories of securities.
15 Let met read it.  "Government securities,
16 commercial paper, corporate debt, corporate
17 equity, exchange-traded derivatives and
18 collateralized short-term agreements with a
19 book value as of the date hereof of
20 approximately $70 billion (collectively 'long
21 positions')."  Do you see that?
22     A.  I do.
23     Q.  Where did the $70 billion come from
24 that was put into subsection (d) of the
25 definition of "Purchased Assets"?

TSG Reporting - Worldwide    877-702-9580

-Lewkow-

1
2      A.  From Lehman.
3      Q.  Was it Barclays' understanding at
4  the time that that was an accurate estimation
5  of the book value of the described assets?
6      MR. MORAG:  Objection to form.
7      A.  To my knowledge, it was Barclays'
8  understanding that it represented what Lehman
9  Brothers -- having considered the discussions
10 I described earlier in terms of what they
11 concluded, after hearing Barclays, was the
12 proper mark to take on its balance sheet.
13 That it reflected Lehman's conclusions.
14     Q.  Was the term "book value" used for
15 a reason in subsection (d) in the definition
16 of "Purchased Assets"?
17     MR. HUME:  Objection.  Vague.
18     A.  Who's -- yeah, whose reason?
19     Q.  Well, was it supposed to say
20 "market value"?
21     A.  Not all assets on the balance sheet
22 have a market value.  There are -- it is my
23 understanding.  Again, I'm not an expert, a
24 broker-dealer expert or a market expert or a
25 valuation expert, but it is my understanding

TSG Reporting - Worldwide    877-702-9580

Page 42

1          -Lewkow-
2     that for some positions where there is no
3     active market, that other -- other things go
4     into how a broker-dealer is supposed to mark
5     their -- their valuation from an accounting
6     standpoint.
7          **Q.  Was it a considered choice of the**
8     **people who drafted the Asset Purchase**
9     **Agreement to use the phrase "book value"**
10    **instead of some other phrase such as "market**
11    **value"?**
12         MR. HUME:  Objection.  Vague and
13    lacks foundation.
14         A.  Can I have the question read back,
15    please?
16         (Record read.)
17         A.  I don't know how to answer that
18    question, final question.
19         Every -- we tried as a group, Weil
20    Gotshal, Simpson Thacher, Sullivan & Cromwell,
21    Cleary Gottlieb, tried to do the best we could
22    in drafting this Agreement under
23    extraordinarily unusual, difficult
24    circumstances.
25         I do recall that, that this was one

TSG Reporting - Worldwide    877-702-9580

Page 43

1          -Lewkow-
2     of those final changes that was added in
3     handwriting, if I had the other version of the
4     Agreement.  And somebody, I believe on
5     Lehman's side of the table said, suggested we
6     add in words such as -- to categorize that
7     what we were talking about were, you know, a
8     disfunction of assets.  And it was for that
9     purpose that it was referenced.
10         And I believe that it was first
11    suggested -- and again, I don't know from
12    whom, it might have been a Lehman person.  It
13    might have been one of their lawyers.  Said,
14    let's say, with a -- you know, with a
15    marking -- with marks of 70 billion, or some
16    words of that sort.
17         And some lawyer -- again, I don't
18    know on which side.  Because this was all
19    being done in group session issue -- said,
20    "Well, should we use the word" -- "from a
21    legal, instead of saying 'marks', should we
22    use the word 'book value'?"
23         And that's the word that went in.
24    But I don't think people were trying to draw a
25    distinction between book value and marks, at

TSG Reporting - Worldwide    877-702-9580

Page 44

1          -Lewkow-
2     least from what this lawyer believed, the
3     lawyer from Weil, understood "book value" to
4     mean in the context of financial assets held
5     by a broker-dealer.
6          **Q.  Did anyone from the Barclays side**
7     **of the table -- by that I'm including Barclays**
8     **personnel or Cleary, ask for or get any**
9     **information to indicate whether the value of**
10    **$70 billion described in subsection (d) was an**
11    **accurate description of Lehman's book value**
12    **for those classes of securities?**
13         MR. MORAG:  Object to the form.
14         A.  As I told you, as I believe I
15    testified, I believe we were in a group told
16    that Lehman was going to remark certain
17    portfolio assets to reduce them.  I assumed
18    that Lehman had done -- it never occurred to
19    me, when they talked about "marks", I assumed
20    that it reflected whatever Lehman had,
21    therefore, done.  And therefore, book value
22    likewise.
23         **Q.  So from what we talked about so**
24    **far, would it be fair to say that the**
25    **understanding was that Lehman negotiated to**

TSG Reporting - Worldwide    877-702-9580

Page 45

1          -Lewkow-
2     **reduce its marks?**
3          MR. MORAG:  Object to the form.
4          A.  I'm not going to characterize.  I
5     have -- you're trying to characterize what I
6     testified to.  I stand by the accuracy of my
7     testimony.  But I would not -- I would not --
8     I would not call that "negotiated."  It is
9     what it is.
10         **Q.  Mr. Lewkow, don't get me wrong.**
11    **I'm not suggesting any lack of credibility of**
12    **your testimony.  What I'm looking for is your**
13    **best memory of what people talked about at the**
14    **time?**
15         A.  I've given you my best.
16         **Q.  Do you remember anything else in**
17    **terms of discussions concerning the use of the**
18    **phrase "book value" in subsection (d)?**
19         A.  No.
20         **Q.  Let me show you what's previously**
21    **been marked as Exhibit 518.  Take a look at**
22    **the document.  My questions will go to the**
23    **notations on page 7.**
24         MR. HUME:  Page which?
25         MR. MORAG:  7.  Of the document

TSG Reporting - Worldwide    877-702-9580

Page 46

```
 1            -Lewkow-
 2      itself, not the Bates number.
 3         A.  Yup?
 4         Q.  And you referred a few moments ago,
 5   Mr. Lewkow, to the addition of the phrase
 6   "book value" in a handwritten note, in a
 7   handwritten annotation.  Is this the document
 8   that you were remembering?
 9         A.  It appears to be, yes.
10         Q.  At least I wasn't clear as to
11   whether you have a memory as to which side of
12   the negotiations added that phrase.  Do you
13   recall whether it was Lehman or Barclays, or
14   do you not recall either side?
15         A.  As I testified, it was a suggestion
16   of someone on the Lehman side that words of
17   that nature be added, yes.
18         Q.  Do you recall who on the Lehman
19   side?
20         A.  No.  I believe it was not one of
21   their outside lawyers.  I believe it was
22   somebody from Lehman itself, but I have no
23   recollection who.
24         Q.  If you can turn back.  Actually, I
25   created kind of a document mess in front of
```

TSG Reporting - Worldwide    877-702-9580

Page 47

```
 1            -Lewkow-
 2   you.
 3         A.  It is all right.
 4         Q.  Why don't you fold those up?  And
 5   let go back to your Declaration for a minute.
 6         A.  Sure.
 7           (Witness complying.)
 8         Q.  Actually, just before we go back to
 9   your Declaration?
10         MR. GAFFEY:  Bridgett, can I have
11      25, please?
12         Q.  Mr. Lewkow, I put before you a copy
13   of what previously has been marked as
14   Exhibit 25.
15           You referred a few moments ago to a
16   Clarification Letter.  Is that the
17   Clarification Letter to which you were
18   referring?
19         A.  Yes.  It appears to be.
20         Q.  What was the purpose of the
21   Clarification Letter?
22         A.  The Clarification Letter was, as
23   set forth in the opening paragraph, "To
24   clarify the intent of the parties with respect
25   to certain provisions of the Asset Purchase
```

TSG Reporting - Worldwide    877-702-9580

Page 48

```
 1            -Lewkow-
 2   Agreement, supplement in certain respects the
 3   agreements of the parties stated therein, and
 4   amend the Asset Purchase Agreement in certain
 5   respects."
 6         Q.  Now, are there particular portions
 7   of the Agreement that were amended or are
 8   there particular portions that were
 9   supplemented or are there particular portions
10   that were clarified?
11         MR. MORAG:  Objection to the form.
12         MR. HUME:  Objection to the form
13      and that it calls for an intersection
14      of the agreement.  And generally
15      Barclays will object to the extent you
16      ask the witness to give legal
17      interpretations of the contract as
18      revealing privilege.
19         A.  The answer is -- the document is
20   the document.  No one ever tried to say, all
21   right, this clause is a supplement; this
22   clause is an amendment; this clause is -- they
23   are what they are.  Certain -- certain things
24   did clarify; certain things amended.  No
25   one -- there was no reason -- there was no
```

TSG Reporting - Worldwide    877-702-9580

Page 49

```
 1            -Lewkow-
 2   effort to allocate into buckets in this
 3   document.
 4         Q.  Do you recall if the use of the
 5   word "amend" was a deliberate drafting choice?
 6         MR. MORAG:  Objection.
 7         MR. GAFFEY:  That's a bad question.
 8      Let me withdraw that question.
 9         Q.  Do you recall if the word "amend"
10   was added at some point during exchanging
11   drafts of the Clarification Letter?
12         A.  I would need to see all the drafts
13   to be sure.  But my recollection is yes.
14         Q.  Okay.  I'm going to show you the
15   draft, so I'm not going to ask you to
16   speculate and pinpoint.
17           Do you recall any discussions
18   between the party, that is between Lehman and
19   Barclays or their representatives, about
20   adding the word "amend" to the Clarification
21   Letter?
22         A.  I have a vague recollection that
23   with the very first draft of the Clarification
24   Letter, which was prepared very quickly by
25   someone -- and I don't know which side --
```

TSG Reporting - Worldwide    877-702-9580

Page 50

1        -Lewkow-
2   after the Asset Purchase Agreement had been
3   signed and filed with the Court on Wednesday
4   morning, that the original first draft was a
5   page or two and it clearly was truly nothing
6   other than clarification.  And so that the
7   first draft did not use the word "amendment."
8        At some later point, as things got
9   more complicated and things were happening, it
10  became -- there was discussion that we should
11  add the word "amend."  That is my
12  understanding.
13      Q.  Do you recall who was involved in
14  those discussions?
15      A.  People from Cleary Gottlieb and
16  people from Weil Gotshal, and probably Simpson
17  Thacher.
18      Q.  Do you have a more specific memory
19  of which people?  I know it was a pretty
20  tumultuous week.  But do you recall who in
21  particular was involved in those discussions?
22      A.  It was more in the direct
23  conversations between -- I think most of the
24  conversations on the Clarification Letter were
25  on Barclays side between some combination,

TSG Reporting - Worldwide    877-702-9580

Page 51

1        -Lewkow-
2   Duane McLaughlin, David Leinwand; Robert
3   Davis; some cases me, but not primarily me;
4   and various people from Weil Gotshal which I
5   believe included Robert Messineo, I may be
6   mispronouncing his name, David Murgio, maybe
7   Tom Roberts and I'm not sure who else.
8      Q.  Do you know if Harvey Miller was
9   involved in those discussions?
10     A.  Which discussions?  You started --
11  I probably went too far in answering your
12  question.
13     Q.  I don't know who led who astray
14  there.
15        The question, the issue is what you
16  talked about a minute ago --
17     A.  The word "amendment"?
18     Q.  Yes.  That it became more complex
19  and I decided to add the word "amendment,"
20  whether Mr. Harvey Miller was involved in
21  those discussions.
22     A.  I don't think -- I don't know what
23  Mr. Miller was doing talking internally with
24  his colleagues or with his clients.  Did he
25  participate in the exact wording of that?  I

TSG Reporting - Worldwide    877-702-9580

Page 52

1        -Lewkow-
2   don't know.  I do have a distinct recollection
3   of him describing to the Court at the sale
4   hearing that Friday evening that there were
5   major changes in the deal.
6        So I can't imagine -- I don't want
7   to speculate.  I do not recall specifically
8   whether he was involved in adding the word
9   "amend" in that clause.
10     Q.  Was the Clarification Letter meant
11  to memorialize those major changes in the
12  deal?
13        MR. MORAG:  Object to form.
14     A.  I'm picking up the Clarification
15  Letter.  It was made to both supplement,
16  clarify and amend the Asset Purchase
17  Agreement.  And it was intended to be
18  consistent with what the Court had been told
19  this Friday evening.
20     Q.  Were you yourself present in court
21  on the sale hearing on the 19th?
22     A.  I was.
23        MR. MORAG:  Yes.
24        MR. GAFFEY:  Yes.  Okay.
25     Q.  The Clarification Letter,

TSG Reporting - Worldwide    877-702-9580

Page 53

1        -Lewkow-
2   Exhibit 25, sets forth certain changes in the
3   definition of "Purchased Assets" from the
4   original Asset Purchase Agreement; is that
5   correct?
6        MR. HUME:  Object to the form.
7      A.  Can I look at --
8      Q.  Sure.
9      A.  -- both at the Clarification Letter
10  and the Asset Purchase Agreement?
11     Q.  Look at whatever you need to look
12  at.
13     A.  Thank you.
14        (Witness reviewing document.)
15     A.  Yes.
16     Q.  While you were present in court,
17  was Judge Peck told about the changes in the
18  definition of "Purchased Assets"?
19        MR. MORAG:  Object to the form.
20     A.  You can read the transcript as well
21  as I can, and I think it speaks for itself.
22        I think that what the judge was
23  told was about the substantive changes in the
24  deal, major changes in the deal that had been
25  orally agreed to, is my understanding, by

TSG Reporting - Worldwide    877-702-9580

Page 54

1            -Lewkow-
2    representatives of Lehman and Barclays in a
3    couple of hours preceding the beginning of the
4    court hearing.
5         So it does not mean that -- as the
6    Court was well aware and as the Court noted,
7    that he did not have the document.  The
8    document did not yet exist but, you know,
9    major changes were described by Mr. Miller and
10   Ms. Fife to the Court.
11        **Q.  And in Cleary Gottlieb's view at**
12   **the time, were the changes as described by**
13   **Mr. Miller and Ms. Fife to the Court at the**
14   **hearing, accurate and complete?**
15        MR. MORAG:  Object to the form.
16        A.  Yes.
17        **Q.  Were any changes to the transaction**
18   **discussed or agreed upon after the sale had**
19   **been concluded, that were incorporated in the**
20   **Clarification Letter?**
21        MR. MORAG:  Object to the form.
22        A.  Well, one -- one thing that was
23   changed that I recall related to the
24   residential mortgages, the so-called RESIs.
25        The original Asset Purchase

TSG Reporting - Worldwide    877-702-9580

Page 55

1            -Lewkow-
2    Agreement had -- contained a provision that
3    treated the residential mortgages differently
4    than any other category of assets and
5    provided -- can I look at the Agreement?
6        **Q.  Sure.  I think you might be looking**
7    **for 1(e) in the definition of "Purchased**
8    **Assets"?**
9        A.  He knows where all the clauses are
10   here.
11        **Q.  Page 6.**
12        **(Witness reviewing document.)**
13        A.  Right.  So the original Asset
14   Purchase Agreement provided that the Purchased
15   Assets that Barclays would be acquiring
16   included a 50 percent interest in the
17   positions in the residential mortgage
18   securities.
19        At some point on Thursday, late
20   Thursday or early Friday -- I have no
21   recollection of when it was precisely -- an
22   amendment No. 1 to the Asset Purchase
23   Agreement was executed by the parties that was
24   addressed -- was done to address a problem.
25        There was real uncertainty as to

TSG Reporting - Worldwide    877-702-9580

Page 56

1            -Lewkow-
2    whether the deal could be completed because of
3    issues that DTC wanted assurances that it was
4    being -- it would be protected in certain
5    respects, the details of which I have -- was
6    not involved in, and that I don't recall great
7    detail.
8        But the amendment instead provided
9    that the 50 percent interest that Lehman was
10   going to keep, as I recall, was instead going
11   to be delivered -- and I don't remember the --
12   I have to look at amendment No. 1, but it was
13   going to be delivered instead to DTC.  And if
14   at the end of some period and the like it
15   turned out that to secure up to, I believe,
16   250 million.  But again, I would need to look
17   at amendment No. 1.
18        But that to the extent that there
19   was some excess available, it would go back to
20   Lehman.  So that Lehman still might end up
21   having some interest in the RESIs to the
22   extent that DTC did not need them to protect
23   it in connection with the Lehman positions.
24        The Court was, as I recall in the
25   court hearing, Mr. Miller and Ms. Fife made

TSG Reporting - Worldwide    877-702-9580

Page 57

1            -Lewkow-
2    reference to this provision.
3        It turned out that the parties
4    learned at some point, Friday or Saturday, I
5    believe, that, in fact, the so-called
6    residential real estate mortgage securities or
7    RESIs, that Lehman didn't have such positions
8    available to transfer to Barclays in the first
9    place.  So there were no such -- and the
10   reasons were -- and I really don't recall.  I
11   don't know if I ever knew in detail.
12        Some of those positions had already
13   been traded; they no longer owned them; some,
14   they may have been pledged to third parties;
15   some would have involved, to the extent there
16   were separate double counting with other
17   securities that were getting outside this
18   provision.  And accordingly, there were no
19   RESIs of the sort that the Court had been told
20   about by Mr. Miller or Ms. Fife in the sale
21   hearing.  So that provision was eliminated in
22   the Clarification Letter which basically
23   amended the agreement to unwind amendment No.
24   1.
25        **Q.  Just so I'm clear we don't have a**

TSG Reporting - Worldwide    877-702-9580

Page 58

1          -Lewkow-
2     disconnect between my question and your
3     answer.  My question went to changes that were
4     made after the sale hearing ended.
5          Was that a change that was made
6     after the sale hearing ended?
7          A.  I believe so.  Because as I said,
8     as I testified, Ms. Fife or Mr. Miller had
9     said, had described the state of the Asset
10    Purchase Agreement as amended by amendment No.
11    1 in the sale hearing.  And this Clarification
12    Letter had the provisions that I just
13    described and for the reasons I described.
14          MR. MORAG:  I need a bathroom break
15     if that's --
16          MR. GAFFEY:  I can't hear you.
17          MR. MORAG:  Bathroom break.
18          MR. GAFFEY:  Perfect time.
19          (Whereupon, a short recess was
20     taken from 11:22 a.m. to 11:35 a.m.)
21    BY MR. GAFFEY:
22          Q.  Mr. Lewkow, I put in the top of the
23     other pile of documents you have in front of
24     you what we previously marked as Exhibit 24,
25     First Amendment to the Asset Purchase
       TSG Reporting - Worldwide    877-702-9580

Page 59

1          -Lewkow-
2     Agreement.
3          Is that the first amendment you
4     were referring to before the break?
5          A.  Yes, it is.
6          Q.  And that was superceded by the
7     Clarification Letter?
8          A.  Yes.
9          Q.  Were there any other changes to the
10    transaction made after the conclusion of the
11    sale hearing that are reflected in the
12    Clarification Letter?
13          MR. MORAG:  Object to the form.
14          A.  The Clarification Letter was not --
15    I can't deal with words like "after".
16          The Clarification Letter didn't
17    exist at the time of the court hearing.  The
18    Clarification Letter did what it did; trying
19    to implement what the Court had been told as
20    well as the clarifications that needed to be
21    made.
22          And the example I gave you before
23    was different from what the Court had been
24    told to the disadvantage, I might add, to
25    Barclays because we had at the time of the
       TSG Reporting - Worldwide    877-702-9580

Page 60

1          -Lewkow-
2     Asset Purchase Agreement and at the time of
3     amendment No. 1 and at the time Weil Gotshal
4     described the transaction, changes to the
5     transaction that had been made.  And when they
6     described that to the Court, they had believed
7     and Barclays had believed that there was a
8     separate pool available of residential
9     mortgages that over and above other assets
10    Barclays was getting would -- 50 percent of
11    the value of which would be something Barclays
12    was getting.
13          That was what the Court was told.
14    It turned out there weren't any separately
15    identifiable residential assets, residential
16    mortgage asset, RESIs.  And so that -- that
17    was a change to reflect the fact that Barclays
18    was not getting something that it had
19    bargained for.  But I don't know what you mean
20    by changes after the sale hearing.
21          Q.  Were there any other changes made
22     to reflect facets of the deal that were
23     different from what the Court had been told,
24     apart from this issue you told me about the
25     RESIs?
       TSG Reporting - Worldwide    877-702-9580

Page 61

1          -Lewkow-
2          MR. MORAG:  Objection to form.  The
3     feed is not coming through.
4          (Discussion off the record.)
5          (Record read as follows:
6     "Question:  Were there any other
7     changes made to reflect facets of the
8     deal that were different from what the
9     Court had been told, apart from this
10    issue you told me about the RESIs?")
11          MR. MORAG:  Object to the form.
12          A.  I'm struggling.  I'm not sure I can
13    answer it.  Can I hear it one more time?
14          (Record read as follows:
15    "Question:  Were there any other
16    changes made to reflect facets of the
17    deal that were different from what the
18    Court had been told, apart from this
19    issue you told me about the RESIs.")
20          A.  Do I recall any changes to the deal
21    as they -- other than as I testified, any
22    changes to the deal that were -- from what the
23    Court, the totality of what the Court had been
24    told about the deal as a result of both the
25    Asset Purchase Agreement, the presentations,
       TSG Reporting - Worldwide    877-702-9580

Page 62

1          -Lewkow-
2   the Wednesday hearing and the Friday hearing,
3   I don't recall any changes to the deal after
4   that, you know, at this -- at this -- at this
5   time.
6          Q.   Take a look, if you would,
7   Mr. Lewkow at Paragraph 1, and tell me if
8   there are changes to the definition of
9   "Purchased Assets" affected by the
10  Clarification Letter, changes to the
11  definition from the Asset Purchase Agreement?
12         MR. MORAG:  You're asking him --
13    A.   Yes.
14         MR. MORAG:  -- the Clarification
15  Letter?
16    A.   Yes.
17         MR. MORAG:  The last thing --
18    A.   The answer is yes.  There was a
19  change in the definition, that's correct.
20         Q.   Do you know if the change in the
21  definition of "Purchased Assets" was brought
22  to the Court's attention?
23    A.   There was --
24         MR. MORAG:  Object to the form.
25    A.   The Court was told about the
        TSG Reporting - Worldwide    877-702-9580

Page 63

1          -Lewkow-
2   substance of the deal.  The Court was not told
3   about clause, actual clause Y or clause Z and
4   the like.  So I can't answer that question
5   other than to say, you know, you can read the
6   transcript and I do not believe the words
7   anyone said, and so such and such a clause or
8   such and such a definition will be
9   appropriately changed.  That's not the way the
10  hearing went.
11         Q.   So, for example, no one, to your
12  knowledge, told the Court that the definition
13  of "Purchased Assets" would be changed to now
14  include securities owned by LBI and
15  transferred to Purchaser or its affiliates
16  under the Barclays Repurchase Agreement?  I'm
17  referring to Paragraph 1A, subsection (ii).
18         MR. MORAG:  Objection to form.
19    A.   To the extent that -- a couple of
20  things.  First of all, that was not -- I do
21  not believe that was a change in the deal.
22  Barclays had agreed, with certain specified
23  exception, to acquire all of the assets used
24  in the business.  Who financed those assets at
25  a given point in time I don't think is
        TSG Reporting - Worldwide    877-702-9580

Page 64

1          -Lewkow-
2   relevant to that question.
3          At the time the Asset Purchase
4   Agreement was signed, it's my understanding
5   that, you know, a lot of the assets were in
6   the form -- were being financed overnight by
7   the Federal Reserve pursuant to a repo.
8          At some point, Thursday or the
9   like, Barclays had taken the fed out of the
10  repo and provided the financing.  But it was
11  the same -- or it should have been, if the
12  assets had been there as had been thought.
13  But those assets, the fact that we added a
14  reference to "repo" doesn't change whether the
15  substance of the transaction changed.
16         Q.   Was there a reason that that
17  particular phrase was added to the
18  Clarification Letter then?
19         MR. MORAG:  Objection.  What
20  particular phrase?
21    A.   I think you're going to have to be
22  more specific.
23         Q.   Well, was there discussion back and
24  forth between the parties about putting that
25  language in the Clarification Letter,
        TSG Reporting - Worldwide    877-702-9580

Page 65

1          -Lewkow-
2   referring to the repo assets?
3    A.   Can you point me to the exact
4   language, please?
5          Q.   Paragraph 1(a)(ii)(A), "The
6   securities owned by LBI and transferred to
7   Purchaser or its affiliates under the Barclays
8   Repurchase Agreement, as defined below, as
9   specified on Schedule A previously delivered
10  by Seller and accepted by Purchaser."  That
11  language.
12    A.   There were, as you know, a number
13  of drafts that were circulated of the
14  Clarification Letter.  And my recollection is
15  that at some point, as lawyers working on the
16  Clarification Letter first learned and then
17  focused on the fact that a lot, most but not
18  all of the assets had been in the -- referred
19  to in the definition of, I believe, "Long
20  positions" in the Asset Purchase Agreement,
21  were now -- had been financed by Barclays at
22  the Feds' request and were in the repo, some
23  lawyer -- and I don't remember whether it was
24  initially from Weil Gotshal or Cleary
25  Gottlieb, but there was agreement that it made
        TSG Reporting - Worldwide    877-702-9580

Page 66

1        -Lewkow-
2  sense to refer to the repo in this context.
3        Q.  Do you recall when it was that the
4  lawyers first learned that assets that had
5  been originally described in the long
6  positions were, in fact, in the repo?  When
7  did that happen?
8        MR. MORAG:  Object to the form.
9        A.  Yeah, I think -- first of all, I
10  can't answer for all lawyers.  That would
11  include the Weil Gotshal lawyers and other
12  lawyers on behalf of...
13        As to Cleary Gottlieb, at some
14  point I believe, at least one of my colleagues
15  that Thursday had heard that there had been --
16  that Barclays had extend -- provided repo
17  financing to Barclays.  I'm not sure.  It is
18  my understanding none of the details, we had
19  not been involved in that at all.  But it was
20  mentioned, and we learned more about it on
21  Friday and over the weekend.
22        But even as -- even as of the Court
23  hearing we knew very little about it.
24        Q.  Did there come a time when you
25  learned that the Repurchase Agreement had been

TSG Reporting - Worldwide    877-702-9580

Page 67

1        -Lewkow-
2  terminated by Barclays?
3        MR. MORAG:  Object to the form.
4        A.  There came a time when I learned --
5  when I -- when I learned that -- I'm not sure
6  how I can answer, whether I can answer this
7  without talking about a privileged
8  conversation.  Can I have...
9        Q.  Absolutely.  Just before you talk
10  to your lawyers, I'm focusing on the timing
11  here.  When did you learn it?  We will tread
12  carefully so that --
13        A.  When did I learn it requires -- I
14  have to deal with your characterization.  Can
15  I hear the question again?
16        Q.  Let me put a question, and then if
17  you need to consult, you can do that.
18        A.  Sure.
19        Q.  The question is:  Did there come a
20  time when you learned that the Repurchase
21  Agreement had been terminated by Barclays?
22        A.  There came --
23        MR. MORAG:  Objection to form.
24        MR. HUME:  I will object and
25  instruct you not to answer to the

TSG Reporting - Worldwide    877-702-9580

Page 68

1        -Lewkow-
2  extent it would reveal a privilege from
3  Barclays.
4        MR. GAFFEY:  As to when?
5        MR. HUME:  Well, you assumed
6  when --
7        MR. GAFFEY:  It is attorney --
8        MR. HUME:  It was terminated.  What
9  does terminated mean?
10        MR. GAFFEY:  It means ended.
11        A.  It's a legal... If you want to ask
12  the question -- can I talk to counsel for
13  Barclays and my counsel?
14        Q.  Sure.  Absolutely.
15        (Whereupon, a recess was taken
16  from 11:49 a.m. to 11:52 a.m.)
17        A.  Before the break you asked me a
18  question about did there come a time of
19  learning about the termination of the repo.
20        Of course, the repo did terminate,
21  as I understand it, when we closed on Monday,
22  but I assume that's not what you're asking.
23        Q.  It is not.
24        A.  There did come a time over the
25  weekend, I don't recall whether it was

TSG Reporting - Worldwide    877-702-9580

Page 69

1        -Lewkow-
2  Saturday or Sunday, where we did learn -- I
3  think I was reminded in preparing for the
4  deposition, that it was -- we initially
5  learned it when we were copied, or not copied
6  and then forwarded on an e-mail from Sullivan
7  & Cromwell who was co-counsel with us for
8  Barclays, and/or to -- to Weil, that there had
9  been an inadvertent notice given to Barclays
10  by folks in the -- I don't know who, but
11  someone at Barclays had sent a notice of
12  termination of the repo at some point, I
13  believe late Friday, and that that was done in
14  error and should be undone.
15        So if that's what you're asking
16  about, you've heard what my recollection is.
17        Q.  It is.  Let me show you what's
18  previously been marked as Exhibit 27.
19        Have you seen that document before,
20  sir?
21        (Witness reviewing document.)
22        A.  No, I don't believe I have.
23        Q.  You learned about the inadvertent
24  termination of the repo over the weekend; is
25  that right?

TSG Reporting - Worldwide    877-702-9580

Page 70

```
 1            -Lewkow-
 2      A.  Yes.
 3      Q.  Was it the Saturday or the Sunday?
 4      A.  I don't know.
 5      Q.  Were you involved in any
 6  discussion, you or anyone else from Cleary or
 7  Barclays, involved in any discussions from the
 8  Lehman folks or Weil Gotshal about the
 9  inadvertent termination of the repo?
10      A.  It is my -- I don't think I
11  personally was, but here as a
12  30(b)(6) witness --
13      Q.  You are Cleary Gottlieb, sir.
14      A.  -- internally.  I was perfectly
15  happy not knowing in my life.
16          It is my understanding that
17  following up on the e-mail from Sullivan &
18  Cromwell and the like, that the -- that there
19  may have been some discussions about, you
20  know, implementing this and getting it right
21  to -- to -- because it was, as I -- as I was
22  told at the time and we were told at the time,
23  and as I testified to, it was sent in error.
24  But I don't recall any other discussion.
25          I'm not aware of any other
```

Page 71

```
 1            -Lewkow-
 2  discussion that Cleary Gottlieb was aware of
 3  with the other side on, on this subject.
 4      Q.  That's sort of where I'm leading.
 5  Let me rephrase the question so you'll know
 6  what it is I'm looking for here.
 7          What knowledge does Cleary Gottlieb
 8  have that Weil Gotshal or Lehman knew about
 9  the termination of the repo, that it had been
10  terminated?
11      A.  I believe, as I testified a minute
12  ago, that there was an e-mail that Sullivan &
13  Cromwell on behalf of Barclays sent to Weil
14  Gotshal.  And I believe there were some
15  follow-up conversations referencing the fact
16  that there had been an inadvertent notice that
17  had been sent on this subject.  Can I look at
18  the Clarification Letter?
19      Q.  Sure.  Paragraph 13 is probably
20  where you want to go.
21      A.  Fine.
22      Q.  The language in Paragraph 13 was
23  supplied by Sullivan & Cromwell, correct?
24      A.  I would have to look at this and
25  compare it to the words in the e-mail.  I
```

Page 72

```
 1            -Lewkow-
 2  don't know the answer to that.
 3      Q.  There is a reference in Paragraph
 4  13 to the Notice of Termination, do you see
 5  that?
 6      A.  Yes.
 7      Q.  Is the notice of termination that
 8  is referred to in Paragraph 13 of the
 9  Clarification Letter, the notice that we've
10  marked as Exhibit 27?
11      A.  Well, it says it is a notice of
12  termination in Paragraph 13 dated
13  September 19.  Exhibit 27 that you've shown
14  me, that as I testified I do not believe I've
15  ever seen, it is dated September 19th.  It is
16  from Barclays, it is to Lehman, and it says it
17  is a notice of termination.  So it appears to
18  be it is, but that's all I can tell you.
19      Q.  Was there any discussion between
20  the folks on the Barclays side of the table,
21  including Cleary, and the folks on the Lehman
22  side of the table including Weil Gotshal,
23  about whether there were implications under
24  the Bankruptcy Code to the fact that the repo
25  had been terminated?
```

Page 73

```
 1            -Lewkow-
 2      A.  It is my understanding that to the
 3  best of Cleary Gottlieb's knowledge, no.
 4      Q.  Did Cleary Gottlieb have
 5  communications with any other person or entity
 6  outside of your client, outside of Barclays
 7  and Cleary, about Section 559 of the
 8  Bankruptcy Code in connection with the
 9  termination of the repo?
10      MR. HUME:  Outside of any
11  privilege.
12      MR. GAFFEY:  Outside of any
13  privilege, yes.
14      A.  To the best of my knowledge, no,
15  subject to this caveat.  You will be taking my
16  partner's Ed Rosen's deposition.  He was
17  involved in the discussions with DTC and other
18  clearance -- clearing entities.  And since he
19  was going to be the 30(b)(6) witness on those
20  discussions, I have not consulted him.  So as
21  to whether or not there was anything on that
22  point, I do not know the answer on behalf of
23  Cleary Gottlieb.  Subject to that, the answer
24  is no.
25      Q.  Were there discussions about 559
```

Page 74

1         -Lewkow-
2   with any other self-regulating organizations
3   or governmental agency concerning Section 559
4   of the Bankruptcy Code.
5         A.  Not to my knowledge.
6         Q.  Mr. Lewkow, I'm going to show
7   you --
8         A.  This is starting to look like my
9   desk at the office.
10        Q.  I'm trying to make you feel at
11  home.  Let me add this to the pile there and
12  show you what previously was marked as Exhibit
13  579B, a Declaration of Alan Kaplan, deputy
14  general counsel of Barclays, that's been
15  submitted in Barclays's opposition papers on
16  Rule 60.  Have you seen this before?
17        A.  I can't remember if someone showed
18  me this in the last few days or not.
19        Q.  Take a minute if you would --
20        A.  I wouldn't swear that I haven't.
21  But if so, I didn't read it very careful.
22        Q.  There's a statement that Mr. Kaplan
23  makes that I want to see if you had any
24  knowledge about.  And it's in Paragraph 4 of
25  his declaration.  He is referring to the

TSG Reporting - Worldwide    877-702-9580

Page 75

1         -Lewkow-
2   notice going out erroneously, I'm
3   paraphrasing.  Then he says, "The parties
4   corrected that error in Paragraph 13 of the
5   Clarification Letter."  Do you see that?
6         A.  Yes, let me read all of
7   Paragraph 4, if I may?
8         Q.  Sure.
9            (Witness reviewing document.)
10        A.  Remind me of the question?
11        Q.  I think the question was:  Do you
12  see that?  But --
13        A.  I do.
14        Q.  Okay.  When Mr. Kaplan says "the
15  parties", plural, "The parties corrected the
16  problem with Paragraph 13", I show you that to
17  see if it refreshes your recollection in any
18  way whether there were any discussions between
19  the parties, that is between Barclays and its
20  representatives and Lehman and its
21  representative, about the problem created by
22  the termination of the repo?
23        MR. MORAG:  Objection to the form.
24        A.  I don't know what you mean by the
25  "problem created."  But I believe it was

TSG Reporting - Worldwide    877-702-9580

Page 76

1         -Lewkow-
2   discussed between the fact that this change
3   needed to be made, that it was sent in error.
4   It was discussed at least briefly between the
5   Barclays side, including Cleary and Sullivan &
6   Cromwell, and the Lehman side including Weil,
7   yes.
8         Q.  Again, does it refresh your
9   recollection, where you read Mr. Kaplan
10  talking about "correcting an error," does it
11  refresh your recollection about whether there
12  were any discussions between the Barclays side
13  of the table including Cleary, and the Lehman
14  side of the table including Weil, about
15  implications into the Bankruptcy Code from the
16  termination?
17        A.  I answered that question.  To the
18  best of my knowledge, there were no such
19  discussions.
20        Q.  If I could ask you to restrict your
21  answer, sir, to yes or no to the question I'm
22  about to ask you.
23            Were there any discussions between
24  Barclays and Cleary concerning implications
25  under the Bankruptcy Code of the termination

TSG Reporting - Worldwide    877-702-9580

Page 77

1         -Lewkow-
2   of the repo?  Yes or no?
3         MR. HUME:  Objection to the extent
4   it calls for privileged communications.
5         MR. GAFFEY:  I'm not sure yes or no
6   does.  And I think I'm entitled to that
7   information under local Rule 26.
8         MR. HUME:  Well, what's your basis
9   for saying --
10        MR. GAFFEY:  Local Rule 26 provides
11  that if privilege is asserted at a
12  deposition, I'm entitled to the same
13  information that would be included on a
14  privilege log, which would be the
15  author, recipient, subject matter of
16  the communication, of the otherwise
17  privileged communication.
18            That's why I'm restricting it to a
19  yes or no.
20        MR. MORAG:  The issue here though
21  is you did not just ask about the
22  subject matter of the termination
23  notice being the subject of the
24  conversation, you asked for yes or no
25  as to the specific advice, whether it

TSG Reporting - Worldwide    877-702-9580

Page 78

1          -Lewkow-
2    was discussed.
3          MR. GAFFEY:  Actually, no.  I --
4          MR. MORAG:  You asked for the
5    specific advice.
6          MR. GAFFEY:  It is phrased quite
7    carefully not to.  That's the point.
8    That's the topic that would be on the
9    privilege log.
10         MR. MORAG:  No, I believe it would
11   be the Notice of Termination.
12         MR. GAFFEY:  Let me get a yes or no
13   to that.  Because I want to see where
14   the instruction not to answer is
15   framed.
16   BY MR. GAFFEY:
17      **Q.  Were there discussions between**
18   **Cleary and Barclays concerning the termination**
19   **of the repo?  Yes or no.**
20      A.  Yes.
21      **Q.  When did those discussions take**
22   **place?**
23      A.  Some point over Saturday or Sunday.
24      **Q.  Were there discussions between**
25   **Barclays and Cleary Gottlieb about**
         TSG Reporting - Worldwide     877-702-9580

Page 79

1          -Lewkow-
2    **implications under the Bankruptcy Code in**
3    **connection with the termination of the repo?**
4    **Again, yes or no, please.**
5    DI     MR. HUME:  Again, objection.  I
6       instruct the witness not to answer.
7          I don't believe the privilege log
8       subject matter would have to reveal the
9       specific nature of the communication,
10      request for advice under Section Y, Y,
11      Z. I mean --
12         MR. GAFFEY:  I understand you are
13      going to assert it.  I don't want to
14      take time with the colloquy.
15         MR. MORAG:  Hold on one second.
16         THE WITNESS:  Can we talk outside?
17      Is that all right?
18         (Whereupon, a recess was taken
19      from 12:07 p.m. to 12:09 p.m.)
20         MR. MORAG:  Subject to your
21      agreement that whatever Mr. Lewkow
22      responds will not constitute any waiver
23      of the attorney/client privilege, which
24      you said it wouldn't, but if you
25      confirm that, Mr. Lewkow is prepared to
         TSG Reporting - Worldwide     877-702-9580

Page 80

1          -Lewkow-
2    answer the question.
3          MR. GAFFEY:  Okay.
4          THE WITNESS:  Can I hear the
5    question?
6          MR. MORAG:  The one that you were
7    prepared to answer.
8          MR. GAFFEY:  I rephrased it.  But
9    let's read it back.
10         THE WITNESS:  Let's hear the last
11   question.
12         (Record read as follows:
13   "Question: Were there discussions
14   between Barclays and Cleary Gottlieb
15   about implications under the Bankruptcy
16   Code in connection with the termination
17   of the repo?  Again, yes or no,
18   please.")
19      A.  To the best of my knowledge, no.
20      **Q.  What needed to be corrected, then,**
21   **in connection with the termination of the**
22   **repo?  Do you know?**
23      A.  That it was in error.  It wasn't
24   supposed to be terminated.  I think I was told
25   that it would create a monstrous obligation to
         TSG Reporting - Worldwide     877-702-9580

Page 81

1          -Lewkow-
2    give notices and so forth and so forth to
3    everyone who was on -- to various party,
4    etcetera.  That's all I remember.
5       **Q.  Did you or anyone else at Cleary**
6    **Gottlieb have an understanding that upon**
7    **termination of the repo in financing haircut**
8    **over and above the amount advanced would need**
9    **to be repaid into the estate of LBI?**
10         MR. MORAG:  Objection.  I think you
11      are asking for a legal opinion from
12      this witness.
13         MR. GAFFEY:  You are right.  Let me
14      withdraw that.
15      **Q.  Was there any discussion with**
16   **anyone outside of the circle of Cleary and**
17   **Barclays to the effect that the Bankruptcy**
18   **Code would require the financing haircut in**
19   **the repo to be paid back into the estate over**
20   **and above the amount that Barclays had**
21   **advanced in the Repurchase Agreement?**
22      A.  Not to my knowledge.
23         MR. MORAG:  Objection to
24      characterization.
25      **Q.  Do you know if anyone at Cleary had**
         TSG Reporting - Worldwide     877-702-9580

Page 82

-Lewkow-

1   communications with anyone outside of
2   privilege, that is anyone outside of
3   privilege, that is anyone outside of
4   communications with your client concerning
5   whether anyone would seek to stay the
6   application of 559 of the Bankruptcy Code in
7   connection with the termination of the repo?
8       A.   Not to my knowledge.
9       Q.   In your capacity as a 30(b)(6)
10  witness, have you inquired about that topic?
11      A.   Yes.
12      Q.   Is there a reason, Mr. Lewkow, that
13  Sullivan & Cromwell was given the
14  responsibility for drafting the language in
15  Paragraph 13 as opposed to Cleary?
16      MR. MORAG:  Objection.
17      MR. HUME:  Objection.  Calls for
18  privilege.
19      MR. MORAG:  Yes, I mean --
20      THE WITNESS:  I think I can give
21  some factual information, if you want
22  me to.
23      MR. GAFFEY:  I do.
24      THE WITNESS:  Let him ask the
25  question.

TSG Reporting - Worldwide    877-702-9580

Page 83

-Lewkow-

1
2       MR. MORAG:  I would ask you to
3   first pose the foundational question of
4   whether he knows there is a reason.
5       Q.   Do you know whether there's a
6   reason Sullivan & Cromwell drafted the
7   language in Paragraph 13?
8       MR. HUME:  I instructed the witness
9   not to answer that.  To the extent it
10  reveals privilege, I don't know how you
11  can answer it otherwise.
12      THE WITNESS:  I actually think I
13  can.
14      MR. HUME:  If you can, go ahead.
15      A.   We had, as I testified earlier,
16  basically nothing to do with the creation, the
17  documentation, the implementation of the repo.
18  I don't know whether Sullivan & Cromwell did
19  or not, but we had not.  And so I'm not
20  surprised that we had nothing to do with
21  follow-ups with regard to that.
22      Q.   Let's clean up the pile again and
23  go back to the Lewkow declaration, which is
24  the first thing I showed you.  I forget the
25  exhibit number.

TSG Reporting - Worldwide    877-702-9580

Page 84

-Lewkow-

1
2       In Paragraph 4, again, Mr. Lewkow,
3   you say, this is the last sentence, "Further,
4   I do not recall anyone involved in the
5   transaction ever suggesting that the deal was
6   supposed to be a 'wash' with the value of
7   assets acquired equal to the value of
8   liabilities assumed."
9       Did you or anyone else from Cleary
10  Gottlieb ever have conversations with Bart
11  McDade about his understanding of the
12  transaction?
13      A.   Bart McDade was -- about his
14  understanding of the transaction, he was in
15  the room at the time the Asset Purchase
16  Agreement -- at times when the Asset Purchase
17  Agreement was being negotiated.  So in that
18  context, I had -- we sort of had conversations
19  with him.  I don't recall any other
20  conversations with him.
21      Q.   Were any of the conversations with
22  him addressed to the topic of whether or not
23  it was a transaction in which the assets and
24  liabilities were supposed to roughly match?
25      MR. MORAG:  Object to the form.

TSG Reporting - Worldwide    877-702-9580

Page 85

-Lewkow-

1
2       A.   I have included in my declaration
3   that I do not recall anyone involved in a
4   transaction ever suggesting that.  And so that
5   is my recollection.  And Bart McDade comes
6   within the term of "anyone."
7       Q.   I'm asking for a slightly different
8   question.
9       Was the topic ever discussed with
10  Mr. McDade?
11      A.   Not to my knowledge.
12      Q.   Was the topic ever discussed with
13  anyone --
14      MR. HUME:  Objection.  Go ahead.
15      A.   I don't know what the topic is.
16      Q.   -- whether --
17      A.   The deal was the deal, okay.  The
18  agreement is reflected in the Asset Purchase
19  Agreement as originally entered into and then
20  as supplemented, clarified and amended by the
21  Clarification Letter.
22      Q.   I'm assuming, sir -- and correct me
23  if I'm wrong -- that there must have been some
24  discussions between the parties beyond the
25  level of well, the deal is the deal and it is

TSG Reporting - Worldwide    877-702-9580

Page 86

1          -Lewkow-
2   there in that piece of paper.
3          So in those discussions, were there
4   any discussions with Mr. McDade about whether
5   or not the deal was one where assets and
6   liabilities were supposed to roughly match?
7       A.  I do not recall any discussion of
8   that topic with Mr. McDade.
9       Q.  Were there any discussions with
10  anyone from Lehman as to whether or not the
11  deal was one where assets and liabilities were
12  supposed to roughly match?
13      A.  The reason I am struggling with
14  your question is every time you have a
15  discussion about what the deal is and someone
16  doesn't say it is or it isn't a "wash"
17  transaction, is it about whether it is a
18  "wash" transaction? And insofar as that is
19  your question, well, then every conversation
20  was about whether it was or wasn't because it
21  was a discussion of what it was.  But there
22  was no discussion of "wash" sales.
23      Q.  It is a fair point.  Let me just
24  clear the record up a little bit on it and
25  I'll move on to another topic.
         TSG Reporting - Worldwide    877-702-9580

Page 87

1          -Lewkow-
2       So I take it from your answer that
3   there was no discussion about that topic as
4   opposed to discussions that didn't mention it
5   and therefore, excluded it?
6       A.  I do not --
7       Q.  There were no discussions about
8   that topic?
9          MR. MORAG:  Let him finish the
10  question so the record is clear.
11      Q.  There were no discussions expressly
12  about that topic?
13      A.  To the best of my recollection,
14  there were none.
15      Q.  Now, in Paragraph 5 of your
16  Declaration, generally the top Paragraph 5 and
17  6, you talk about generally the topic of
18  employment offers made by Barclays to certain
19  Lehman executives, and I'd like to ask you
20  some questions about that.
21      Was Cleary Gottlieb involved in any
22  way in the negotiations between Barclays and
23  Lehman executives to whom job offers were
24  made?
25      A.  I cannot recall -- "involved" in
         TSG Reporting - Worldwide    877-702-9580

Page 88

1          -Lewkow-
2   negotiations, if you mean had meetings with
3   any of those executives or their
4   representative, I do not -- I believe the
5   answer is no.
6       Q.  You seemed concern.  We may have a
7   disconnect on the phrase "involved" here.
8       Was there any indirect role for
9   Cleary in connection with the offering of
10  employment to Lehman executives by Barclays?
11      A.  The only -- the reason I phrased it
12  the way I did is because what I do not recall
13  is whether anyone at Cleary Gottlieb drafted
14  or saw a form of -- form of potential
15  employment agreement at some point that may or
16  may not have ever been, you know, traded with
17  any of the potential senior people, the eight
18  senior officials that were originally covered
19  by the Asset Purchase Agreement.
20      Q.  Do you know if there were
21  employment negotiations between Barclays and
22  Lehman executives other than the eight to whom
23  you just referred?
24      A.  At what time period are we talking
25  about?
         TSG Reporting - Worldwide    877-702-9580

Page 89

1          -Lewkow-
2       Q.  Prior to the closing of September
3   22nd.
4       A.  I don't know about negotiations.
5   As I said in my declaration, it was clear that
6   it was very important to Barclays, everyone,
7   it was discussed that -- when you buy -- many
8   people have bought investment banking firms or
9   the businesses from such firms and spent a lot
10  of money, and then spent a lot more money
11  trying to keep people and then had those deals
12  blow up in their faces.
13      So everyone was aware that Barclays
14  wanted to retain not just eight people but a
15  lot of other key people, and that was
16  well-known.  I do not know -- we were not
17  involved in any specific conversations, but it
18  would not -- consistent with my declaration,
19  it wouldn't surprise me if some of those
20  people particularly said, "Gee, we really look
21  forward..." I just don't know.
22      Q.  Look for a minute at Paragraph 9 of
23  your Declaration where you referred, and I
24  asked you about this sentence a while ago.
25  You say, "While I was not present for the
         TSG Reporting - Worldwide    877-702-9580

-Lewkow-

1    -Lewkow-
2  actual discussions between Barclays and Lehman
3  traders..." are you with me?
4    A.  That's correct.
5    Q.  Do you know if any of the Lehman
6  traders described in Paragraph 9 were among
7  the Lehman employees to whom Barclays offered
8  employment prior to September 22nd?
9    MR. MORAG:  Object to the form.
10    A.  I have no idea.
11    Q.  Were there any discussions between
12  Cleary and Barclays on the one hand and Lehman
13  and Weil on the other hand about the degree to
14  which the extent and nature of employment
15  should be disclosed?
16    A.  No.
17    Q.  Do you know --
18    A.  Not to the best of my recollection.
19    Q.  Do you know if the nature and
20  extent of the negotiations was disclosed to
21  the Lehman Board?
22    A.  I have no idea what was disclosed
23  to the Lehman Board.
24    Q.  At any point in the negotiations of
25  the transaction or the discussions between the

TSG Reporting - Worldwide    877-702-9580

1    -Lewkow-
2  parties prior to the closing on
3  September 22nd, did Cleary ask to see the
4  minutes of any Lehman Board meeting concerning
5  the transaction?
6    A.  No.
7    Q.  Is that something that as an M&A
8  lawyer you normally would ask for in a deal
9  where you have a little more time than you had
10  here?
11    MR. MORAG:  Objection to form.
12    A.  Probably not.  In fact, I think it
13  would be highly unusual.
14    Q.  Do you know if Barclays made an
15  offer of employment to Mr. McDade prior to
16  September 22, 2008?
17    A.  I have a very vague recollection,
18  and I -- from the time.  But I've heard it
19  since, so I'm not 100 percent certain I heard
20  it at the time.
21    But I believe I heard at the time,
22  whether they had offered it or not, but it had
23  been determined that he had made a
24  determination early on that he would not --
25  would not go with the business.  And the

TSG Reporting - Worldwide    877-702-9580

1    -Lewkow-
2  assumption was that he would not be joining
3  the business.
4    Q.  I want to make sure your record and
5  my record are clear here.
6    Can you tell me if you learned that
7  before or after September 22nd?
8    A.  What I just testified is, I'm not
9  sure.  I believe I had learned it before, but
10  I'm not certain of that.
11    Q.  Mr. Lewkow, I'm putting before you
12  what was previously marked as Exhibit 581B,
13  minutes of the meeting of Barclays Board of
14  September 16, 2008.  Have you seen those
15  minutes before?
16    A.  No.
17    Q.  On page 3 of that exhibit, sir, is
18  Paragraph 5 entitled "Retention of Lehman
19  Staff, which says, "An in principle agreement
20  had been reached with Lehman's U.S. senior
21  leadership team on the bonus arrangements
22  subject to approval of the proposals by the
23  Board HR and Remuneration Committee."
24    I know you haven't seen the
25  document before.  Did Cleary know one way or

TSG Reporting - Worldwide    877-702-9580

1    -Lewkow-
2  the other that there were in principle
3  agreements between Barclays and Lehman's U.S.
4  senior leadership team on or about
5  September 16, 2008?
6    MR. HUME:  Objection.  Vague.
7    MR. MORAG:  Objection to the form.
8    MR. GAFFEY:  Let me make it clear.
9  You are right.
10    Q.  Did you know that on
11  September 16th?
12    MR. HUME:  Same objection.
13    A.  September 16th?  I don't know what
14  "U.S. senior leadership team" means.  I'm not
15  sure if they are talking about there is a
16  provision in the Asset Purchase Agreement
17  about certain bonuses.  But other than that, I
18  have no idea what this is talking about.
19    MR. GAFFEY:  That just saved me a
20  whole page of my notes.
21    Q.  Mr. Lewkow, I'm handing you a
22  series of documents which previously had been
23  marked Exhibit 28, 29, 30, 31, 32, 33, 34, 35,
24  36 and 37.  And you will see, sir, that they
25  consist of various iterations of the

TSG Reporting - Worldwide    877-702-9580

Page 94

1          -Lewkow-
2    Clarification Letter.  I want to go through
3    some of them.
4          And you will need handy, from
5    amidst the other documents, we will refer from
6    time to time to Exhibit 25, the final.
7       A.  Oh, the final?  The Asset Purchase
8    Agreement, too.
9       Q.  We may get to that, too.  But maybe
10   not.
11      A.  As long as there is no quiz on it.
12   I guess it is --
13      Q.  The quiz will come after I take the
14   exhibits away from you.  It is sort of an open
15   book test.
16          You testified a little while ago or
17   we talked a little while ago concerning a
18   point at which the language of the first
19   paragraph of the final Clarification Letter
20   came to include the phrase "supplement" and
21   the phrase "amend."  I just pinpoint that
22   generally for the topic.  All right?
23      A.  I testified a little bit about the
24   word "amends," yes.
25      Q.  Will you take a look in the stack I
         TSG Reporting - Worldwide     877-702-9580

Page 95

1          -Lewkow-
2    have in front of you at Exhibit 34.
3       Q.  MR. GAFFEY:  Let's go off the
4    record for a minute.
5          (Witness reviewing document.)
6       A.  I'm looking in Exhibit 34.
7       Q.  Within Exhibit 34, it is both a
8    clean and a blacklined draft.  The blackline
9    begins on page 10279851 in the lower
10   right-hand corner.  If you could go there,
11   that will be helpful.
12          MR. MORAG:  Is there a reason that
13   all the pages are numbered 10279851?
14          MR. GAFFEY:  Yes.  It has to do
15   with how they were numbered at the
16   outset.  They weren't Bates.
17      A.  Okay.  I'm looking.
18      Q.  Do you see there that in that
19   blackline which is in a draft bearing a date
20   of September 19th, "WGM comments,
21   September 19th noon," the blackline indicates
22   that the phrase "supplements in certain
23   respects the agreements of the parties stated
24   therein, and shall amend the Agreement to the
25   extent necessary so as to be consistent with
         TSG Reporting - Worldwide     877-702-9580

Page 96

1          -Lewkow-
2    this letter and" has been added in the
3    blackline?
4       A.  I see that.
5          Can I just state, on the page you
6    are pointing to, it does say, "September 19th
7    at noon."  But my recollection is consistent
8    with, if you go to the first page of this
9    exhibit, I never saw the version that's at the
10   top that shows an e-mail from Andy Keller to
11   Steve Berkenfeld, not surprisingly.
12          The next -- but that then forwards
13   a prior e-mail from Robert Messineo of Weil to
14   a number of people, including me.
15      Q.  Right.
16      A.  And you will see that is --
17      Q.  September 19th, nine minutes after
18   noon, right?
19      A.  Well...
20          (Witness reviewing document.)
21      Q.  So does that cover e-mail indicate
22   to you that you had at least transmitted to
23   you this draft at or about the time it was
24   prepared?
25      A.  Yeah, I don't remember when I saw
         TSG Reporting - Worldwide     877-702-9580

Page 97

1          -Lewkow-
2    it.  Uh-huh.
3       Q.  Okay.
4          I'm going to ask you two questions.
5    I will tell you why I'm asking the first one.
6    I'm going to ask you if it pinpoints your
7    memory of when the decision to include the
8    phrase "supplement and amends" was included
9    and whether it refreshes your recollection as
10   to whether there were any events as to why it
11   was determined to include it at that point?
12          MR. MORAG:  Objection.  Compound.
13      Q.  But you can answer.
14      A.  It clearly came first.  This was
15   presented to us by Weil Gotshal.  They added
16   those words.  I do not recall whether there
17   was any conversation before then as to the
18   fact that they were going to add those words
19   when they prepared this draft.  And since I
20   don't recall any discussion on the front, I
21   can only speculate, which I will not do, as to
22   why Weil added those words.
23      Q.  I most certainly don't want you to
24   speculate.  I just want to know -- I take it
25   the answer is no -- whether this refreshes
         TSG Reporting - Worldwide     877-702-9580

Page 98

1          -Lewkow-
2  your recollection as to whether any
3  development or event in the negotiations gave
4  rise to a decision to add the words
5  "supplement and amend"?
6          MR. MORAG:  That was communicated
7  to you.
8          MR. GAFFEY:  That Cleary knew
9  about.  This is a 30(b)(6) witness.
10         A.  I would need to -- let me just
11 think for a minute.
12         I don't recall.
13         Q.  Okay.  Within the pile that I gave
14 you a moment ago, will you turn to Exhibit 31,
15 that's a September 18th -- it is under an
16 e-mail.
17         A.  I'm sorry.  Which document?
18         Q.  31.  That's under an e-mail from
19 Dave Messineo to you dated September 18, 2008,
20 11:40 p.m. GMT.  Do you see that?
21         A.  Thursday night, yes.
22         MR. MORAG:  Can I just make a
23 statement for the record?  And I'm not
24 suggesting this is the case.  But with
25 respect to Exhibit 34, I just did

TSG Reporting - Worldwide    877-702-9580

Page 99

1          -Lewkow-
2  notice that as an e-mail emanating from
3  Weil Gotshal, it does not indicate at
4  the bottom that there, in fact, was an
5  attachment.  I've often meant to send
6  attachments that I didn't actually
7  attach.  And I'm not saying we didn't
8  get it.  But Exhibit 31, which also
9  emanates from Weil Gotshal, it does
10 indicate below the subject line an
11 attachment.
12         THE WITNESS:  We did get this.
13         MR. MORAG:  Okay.
14         THE WITNESS:  We did get this.
15         MR. GAFFEY:  So we don't have to be
16 troubled by that.  I get the concern.
17 Do you notice it says "attached
18 Clarification Letter"?
19         MR. MORAG:  It says it on the
20 forward.
21         THE WITNESS:  It doesn't say it on
22 the lower one, but that may be a
23 difference between the Simpson system
24 and how we attached it and the like.
25 We did receive it.

TSG Reporting - Worldwide    877-702-9580

Page 100

1          -Lewkow-
2          MR. MORAG:  There are a number of
3  drafts in this case that weren't sent
4  to us.
5          THE WITNESS:  But this one, we did
6  receive this one.
7          MR. GAFFEY:  My questions have
8  nothing to do with when you got it.  If
9  I'm going to get there, I'll try to be
10 very clear about it.  So if that's a
11 concern, you raise it.
12 BY MR. GAFFEY:
13         Q.  My question, Mr. Lewkow, goes to
14 Paragraph 10 of the draft that is within this
15 document.
16         A.  Of 31?  Of Exhibit 31?
17         Q.  Of Exhibit 31, yes.
18         A.  Which was late --
19         Q.  The draft is entitled "WGM
20 Comments, September 18, 7:30 p.m."
21         A.  Right.  Although it was sent to us
22 at 11:40 p.m. on Thursday, September 18th.
23         Q.  GMT, which would put you at 7:40
24 p.m.  We spent a lot of time on this
25 documents, sir.

TSG Reporting - Worldwide    877-702-9580

Page 101

1          -Lewkow-
2          A.  Oh, you did?  You're right, I
3  guess.
4          Q.  So if would you take a look at
5  Paragraph 10, which has no translation.  It is
6  Paragraph 10.
7          A.  Yes.
8          Q.  There is a reference to the
9  "9/16/08 balance sheet."  Do you see that?
10         A.  Yes.
11         Q.  Do you know if that balance sheet
12 that's referred to there is the one that was
13 marked as Exhibit 19 that I showed you before?
14         A.  Is and was at the time my
15 understanding that what they were referring to
16 here was either the exhibit you mentioned or,
17 as I testified earlier, some variant of that.
18 I do not know it was precisely the one, but
19 something like that exhibit that you just
20 mentioned.
21         Q.  To push that point a bit further,
22 if you can take a look at Exhibit 19 and look
23 at the lower right-hand corner and see that
24 it's got a time stamp on it of 11:18 a.m.
25         (Witness reviewing document.)

TSG Reporting - Worldwide    877-702-9580

Page 102

1              -Lewkow-
2      A.  So it does.
3      Q.  And the reference to Paragraph 10
4  is to a balance sheet printed at 11:18 a.m. on
5  9/16/08?
6      A.  Yes, it is.
7      Q.  Does that refresh your recollection
8  in any way?
9      A.  It seems to be.
10      Q.  Does any of this refresh your
11  recollection as to whether there were
12  discussions during the course of the week
13  after the APA had been signed about that
14  balance sheet marked as Exhibit 19?
15      A.  My recollection, and I don't recall
16  whether we knew this was going to be in the
17  draft or not, but my recollection is that this
18  showed up and we didn't think it was
19  appropriate to start dealing with that
20  document, which we had not intended to and had
21  not included as an exhibit to the Asset
22  Purchase Agreement.  And so this did not stay
23  in the Clarification Letter.
24      Q.  Were there any discussions between
25  Barclays and Cleary Gottlieb on the one hand

TSG Reporting - Worldwide    877-702-9580

Page 103

1              -Lewkow-
2  and Lehman and Weil Gotshal on the other about
3  whether or not to include that sheet as an
4  exhibit to the Asset Purchase Agreement?
5      A.  I believe that during the -- at
6  some point at the very end of the finalization
7  of the Asset Purchase Agreement, and it may
8  have been -- you know, it was a final meeting
9  at which people tried to finalize the Asset
10  Purchase Agreement, and that is the meeting at
11  which a Simpson Thacher associate sat between
12  me and John Findley of Simpson Thacher and
13  tried to act as scribner as the combined group
14  of people around a very large rectangular
15  table, square table reached agreement on final
16  changes.  And then she entered in handwritten
17  form, which we have looked at previously or I
18  testified about earlier today.
19          I believe, I'm not sure, but I
20  believe it was in that context that someone on
21  the Lehman side would have raised the idea,
22  would it make sense to attach this document,
23  Exhibit 19, or some variant thereof to the
24  Asset Purchase Agreement.  And a decision was
25  made collectively not to do so.

TSG Reporting - Worldwide    877-702-9580

Page 104

1              -Lewkow-
2      Q.  What was the basis for the decision
3  made collectively not to do so?
4      A.  The agreement --
5      Q.  I withdraw "basis."
6          What was the reason it was decided
7  not to do that?
8      A.  My recollection is that the piece
9  of paper had been prepared by Lehman and shown
10  to us and the like, and that there was one
11  reference to it that was going into the Asset
12  Purchase Agreement, but that it did not -- the
13  agreement in the deal was to be embodied in
14  the Asset Purchase Agreement, and we had not
15  spent any specific time looking at Exhibit 19
16  or any variant of it with a view towards
17  having legal significance and what it might
18  mean and how it might modify the Asset
19  Purchase Agreement.
20          The Asset Purchase Agreement was
21  intended to stand on its own two feet.
22      Q.  Let me ask you to put before you
23  Exhibit 35.  It is included in the packet of
24  documents that I gave you.
25      A.  Sure.  Yes.

TSG Reporting - Worldwide    877-702-9580

Page 105

1              -Lewkow-
2      Q.  And Exhibit 35, the first page, has
3  an e-mail from David Murgio at 9:15 p.m. GMT,
4  September 19, 2008 to among others me.  And
5  it attaches this, another draft of the
6  Clarification Letter?
7      A.  Correct.
8      Q.  If you would, again, sir, please
9  turn within the document to the blackline
10  section which begins at page 10279864.
11      A.  Yup.
12      Q.  And within the definition of
13  "Purchased Assets," "Excluded Assets" on the
14  first page of that blackline --
15      A.  On the first page?  First what?
16      Q.  On the first page of the blackline.
17  Okay?  Paragraph 1 of the blackline.
18      A.  Okay.  You referred -- I didn't
19  realize 64 was on all the pages.
20      Q.  It is.  It is the first page marked
21  64.
22      A.  Okay.
23      Q.  And it is Paragraph 1, "Purchased
24  Assets."
25          The underscored language in that

TSG Reporting - Worldwide    877-702-9580

Page 106

1          -Lewkow-
2  draft includes the following, "Plus with
3  respect to securities of LBI shall also
4  include municipal securities, residential
5  mortgage securities and other securities of
6  which a summary description by category is
7  reflected in Exhibit A hereto.  It being
8  understood that the long positions referred to
9  in clause (d) of Purchased Assets do not have
10 a book value of approximately 70 million."  We
11 will take the "million" as a typo.  I don't
12 think anybody used that number anywhere in
13 this deal.
14         My question to you, sir, is:  Do
15 you recall a point in the negotiations of the
16 terms of the Clarification Letter where
17 language like this was proposed for the
18 definition of "Purchased Assets"?
19     A.  Let me respond with a number of
20 comments.
21     One, when we look at the first
22 page of this exhibit, this was sent at 9:15
23 GMT, which you pointed out in the other one,
24 which makes it 5:15 New York time.  At 5:15
25 New York time, I was sitting in Judge Peck's
       TSG Reporting - Worldwide    877-702-9580

Page 107

1          -Lewkow-
2  room and the like.  So none of us in the
3  courtroom -- if I snuck a look at my
4  BlackBerry, I might have known that this
5  document had arrived, but I certainly had not
6  looked at it at that stage.
7         By the time -- I believe some of my
8  colleagues did look at it.  By time the Court
9  had approved the sale around midnight, I
10 believe -- and I then went back to the office.
11 I think either late that night, I think we
12 were told by Weil basically that this draft
13 did not reflect the discussions that had taken
14 place in the hour or two or three before the
15 Court hearing had begun, were written by
16 lawyers who had not been involved in those
17 discussions and that a new draft would be
18 prepared and we really should not spend a lot
19 of time worrying about this.
20        And in fact, a new draft was
21 furnished to us some time early afternoon, I
22 believe, on Saturday.
23     Q.  In what respect did Weil lawyers
24 tell you in that conversation the draft did
25 not reflect the discussions that had taken
       TSG Reporting - Worldwide    877-702-9580

Page 108

1          -Lewkow-
2  place in the hour or two or three before the
3  Court hearing?
4      A.  That it didn't.
5      Q.  Other than the statement that it
6  did not, did they provide any more detail as
7  to the manner --
8      A.  The lawyers --
9      Q.  -- in which it did not?
10     A.  I believe that the lawyers who said
11 that were the ones who had not been in on the
12 discussions and they knew the discussions had
13 taken place that had not been -- they had not
14 been aware of when they did this.  And I
15 believe that's all they've done, to the best
16 of my knowledge.
17     Q.  In your Declaration, you refer at
18 some point to the fact that a draft of the
19 Clarification Letter had been sent by
20 BlackBerry during the sale hearing.  I have to
21 confess I'm panting a little bit because I
22 can't find exactly where you say that.
23     A.  It's not in my declaration?
24     Q.  I don't think so.
25         MR. MORAG:  It's Paragraph 11.
       TSG Reporting - Worldwide    877-702-9580

Page 109

1          -Lewkow-
2      THE WITNESS:  Yes, it is.
3      (Witness reviewing document.)
4      Q.  Here we go.  Second sentence of
5  Paragraph 11, "Weil had circulated a revised
6  draft of the Clarification Letter by e-mail
7  during the sale hearing".  Do you recall that?
8      A.  Yes.  That's the one that I
9  mentioned.  It's this draft that arrived while
10 I was in court, correct.
11     Q.  That's this draft marked as
12 Exhibit 35?
13     A.  Correct.
14     Q.  Did anyone in the court have any
15 discussions about the draft that was
16 circulated by e-mail?
17     A.  No.
18     Q.  So other than this statement in
19 your Declaration that was circulated by
20 e-mail, do you have anything you can add as to
21 what anybody did about that fact?  Anybody
22 read it?  Talk about it?
23     A.  No one -- no one had more than a
24 BlackBerry, no copies were ever delivered, to
25 my knowledge, certainly not to Cleary Gottlieb
       TSG Reporting - Worldwide    877-702-9580

Page 110

1          -Lewkow-
2     or Barclays in the courtroom.  Whether
3     somebody from Weil had them handed a draft or
4     not?  I don't know.  But certainly no one on
5     our side saw them in the courtroom.
6          Q.  Now, there's a reference in the
7     blacklined portion of Paragraph 1 of
8     Exhibit 35 to a Schedule A, in that sentence I
9     read you about the long position?  Do you see
10    that?
11         A.  Yes.
12            MR. HUME:  "Exhibit A."
13            MR. GAFFEY:  No.  Schedule A.
14            THE WITNESS:  No.  It actually says
15    "Exhibit A."
16         Q.  You're actually right.
17         A.  I see that.
18         Q.  Was there any discussion that the
19    "Exhibit A" referred to there was the sheet
20    marked as Exhibit 19?
21         A.  Well, there was no discussion of
22    this letter that I was aware of.  I believe if
23    you look at subsequent drafts, the concept of
24    Exhibit A that dealt with -- it did survive,
25    but it was a very different -- it was not
         TSG Reporting - Worldwide    877-702-9580

Page 111

1          -Lewkow-
2     anything approaching Exhibit 19.
3          Q.  Now --
4          A.  But I don't know what -- I do not
5     know what Weil Gotshal had in mind, whether
6     they had in mind something like Exhibit 19,
7     but it certainly didn't stay in the
8     agreement -- in the draft of the Clarification
9     Letter.
10         Q.  Now, at this point in the
11    chronology, let me be clear about this point,
12    the hearing is over, you're back at your
13    office, you were told by these Weil lawyers,
14    look, this draft doesn't reflect what happened
15    in the two or three days before the hearing,
16    at that point in time --
17         A.  Can I interrupt you?
18         Q.  Absolutely.
19         A.  I don't think you got my testimony
20    correctly.  But it may be that I didn't state
21    it clearly.
22            I'm not sure that when I got back I
23    had a conversation with Weil.  I believe I got
24    back and I was told by one of my colleagues
25    that they had been told that by Weil.
         TSG Reporting - Worldwide    877-702-9580

Page 112

1          -Lewkow-
2          Q.  Okay.  You get back to your office,
3     you learned that Weil has said, this draft
4     won't work because it doesn't reflect the
5     changes made in the two or three hours?
6          A.  I might also have been told that, I
7     don't recall, but Tom Roberts or others who
8     were in the courtroom from Weil Gotshal, that
9     they might have said, ignore the stuff that my
10    colleague sent you.  I just don't recall.
11         Q.  Do you recall Ms. Fife saying to
12    the judge at the sale hearing, we are working
13    on a Clarification Letter and we hope to have
14    it down here?
15         A.  I believe she did say something
16    along that line, yes.
17         Q.  At that point, during the sale, by
18    the time you're certainly in the middle of the
19    sale hearing, before that, had there been any
20    discussions between Barclays and its
21    representatives on the one hand and Lehman and
22    its representatives on the other, about
23    whether the Clarification Letter would need to
24    be submitted to the Court for approval?
25            MR. MORAG:  Objection to the form.
         TSG Reporting - Worldwide    877-702-9580

Page 113

1          -Lewkow-
2          A.  My recollection is that on
3     Wednesday and Thursday the goal had been to
4     have a Clarification Letter that we could
5     submit to the Court.  The process was taking a
6     longer time than anyone would have hoped,
7     through no one's fault since everybody
8     operated in good faith to try to get it done.
9            But then on -- so it was already
10    moving slowly.  And by Friday, it was my
11    understanding that Lehman and Barclays
12    officials both learned that there were
13    substantial assets that Barclays -- that the
14    agreement contemplated -- the Asset Purchase
15    Agreement contemplated that Barclays was going
16    to receive as part of its acquisition of
17    basically -- issue with only specified
18    exceptions, basically all of the assets of the
19    business.  And there were a lot less -- in
20    terms of financial assets that it turned out
21    there were going to be a lot fewer than that
22    Lehman was going to be able to deliver.
23            And that had led to discussions
24    that took place during the day Friday -- I
25    don't know exactly when they started and when
         TSG Reporting - Worldwide    877-702-9580

Page 114

1          -Lewkow-
2    they ended.  I don't know if they were in
3    person or over the phone -- between not the
4    lawyers, between representatives of Barclays
5    and representatives of Lehman.  And that was
6    going on until very shortly before the Court
7    hearing began.
8          So while it had been contemplated
9    the day before that we would try to have a
10   proposed form of, or maybe an actual form, I
11   don't recall which, of Clarification Letter to
12   provide to the Court, that events made that
13   impossible.
14        **Q.  Now, I take it that between the**
15   **time of this draft marked as Exhibit 35 and**
16   **the finalizing of the Clarification Letter on**
17   **Monday, the signing of the Clarification**
18   **Letter on Monday, other changes are made.  We**
19   **will get to those, but I just want to**
20   **establish the fact that changes were made over**
21   **the weekend, correct?**
22        MR. HUME:  Objection, vague.
23   Changes to what?
24        MR. GAFFEY:  To the Clarification
25   Letter.

TSG Reporting - Worldwide     877-702-9580

Page 115

1          -Lewkow-
2        A.  Changes to the draft Clarification
3    Letter were made that are reflected in the
4    final Clarification Letter that was signed,
5    yes.
6        **Q.  And some of those changes were made**
7    **over the weekend, Saturday the 20th and Sunday**
8    **the 21st, correct?**
9        A.  New drafts were being prepared and
10   changes to the prior draft were therefore
11   made, correct.
12        **Q.  Now, the discussions that you**
13   **learned had taken place on Friday morning**
14   **between non-lawyers for Lehman and Barclays**
15   **that you referred to a moment ago --**
16       A.  Morning or early afternoon.  I'm
17   not sure which.
18       **Q.  Was it your understanding that**
19   **those discussions were to include assets in**
20   **the deal, to make up for assets that Lehman**
21   **had not been able to deliver?**
22       MR. MORAG:  Objection to form.
23       A.  Let me -- I think, I was told --
24   and now I want to carefully describe how I was
25   told it.  But I was told it twice about the

TSG Reporting - Worldwide     877-702-9580

Page 116

1          -Lewkow-
2    conversation.  I'm doing this and I'm looking
3    at my counsel and Barclays counsel, so they'll
4    caution me, I think.
5          But I was told substantially the
6    same.  And to the extent there's differences,
7    I don't remember which and what was
8    the difference.  I was told twice about the
9    results of the conversations that I just
10   alluded to that took place between Barclays
11   representatives and Lehman representatives
12   during the day Friday before the Court
13   hearing.
14         I arrived at the courthouse shortly
15   before the Court was supposed to convene for
16   this case.  And while I was still outside the
17   courtroom, having arrived -- while I was still
18   outside -- not outside the courtroom, outside
19   the courthouse.  While I was still outside the
20   Customs House, another car arrived, or taxi
21   and out came several Barclays representatives,
22   including Michael Klein.
23         Michael Klein, I may have said,
24   what's going on or what happened or something
25   like that --

TSG Reporting - Worldwide     877-702-9580

Page 117

1          -Lewkow-
2        MR. HUME:  Why don't I interject.
3        THE WITNESS:  Okay.  I don't have
4    to stay with that.
5        MR. HUME:  To the extent --
6        THE WITNESS:  Let me jump ahead.
7    Let me just jump ahead.  Go ahead.
8        MR. HUME:  Just so the record is
9    clear, to the extent Barclays
10   representatives communicated to you in
11   a privileged setting facts that they
12   later communicated in a way that is not
13   privileged, you should disclose --
14       THE WITNESS:  The latter.
15       MR. HUME:  Be careful, but disclose
16   only what was not privileged.
17   BY MR. GAFFEY:
18       **Q.  On that point, I want you to go**
19   **back to what was next in a minute.  But Klein**
20   **is there.  Who else was there?  Anybody non**
21   **Barclays was there?**
22       A.  Not downstairs, no.
23       **Q.  So it was Barclays people and you?**
24       A.  I had a conversation, and he
25   summarized the results of the conversation.

TSG Reporting - Worldwide     877-702-9580

Page 118

-Lewkow-

1    We then all went to the courtroom,
2 which was a zoo, if I can use that technical
3 term.  And I was near the front of the
4 courtroom near the well.
5    I was sitting on -- I managed to
6 get a seat which not many of us did -- on the
7 side.  I can't remember if there was a jury
8 box in that courtroom or not.  If so, I was
9 just in the chairs just inside what would have
10 been a jury box and next to the table at which
11 Weil Gotshal as debtor's counsel was sitting.
12    And there was a conversation that
13 took place that -- of, you know, somewhere
14 between four and eight people, I can't -- I
15 think it was at least five people, six people,
16 including Michael Klein, myself, Lori Fife,
17 and a few other people.  And it may -- among
18 those other people may have been -- I don't
19 think Harvey Miller was one of them.  I'm not
20 100 percent certain.  I believe that one of
21 them may have included, one or more of them
22 may have been Lehman Brothers business folks
23 or representatives, or Lazard representatives.
24 I'm not sure.  I don't remember.

TSG Reporting - Worldwide    877-702-9580

Page 119

-Lewkow-

1    The only three people I am sure of
2 were present were Michael Klein, Lori Fife and
3 me.  There may have been somebody else from
4 Barclays there as well, like Archie Cox.  I
5 just don't remember.
6    And Michael repeated it enough --
7 as I said in the beginning, I don't recall
8 which conversation is which.  And they were in
9 all, to the extent I can recall, they covered
10 the same topic and were consistent with each
11 other and I'm sure he used different words and
12 the like.  But he repeated what he had told me
13 outside 30 or 40 or 50 minutes earlier, or 15
14 or 10 or whatever.
15  Q.  What did he say?
16  A.  I thought you'd ask that.
17    He reported -- and I had -- he
18 reported that it turned out that Lehman and
19 Barclays had both -- officials had both
20 learned in the prior 24 hours that a number of
21 categories of assets that Lehman had told
22 Barclays and agreed before the Asset Purchase
23 Agreement had been signed and were covered by
24 the Asset Purchase Agreement, as to categories

TSG Reporting - Worldwide    877-702-9580

Page 120

-Lewkow-

1 -- specifically specified categories.
2    And of course, as you know,
3 Barclays was to get under the Asset Purchase
4 Agreement, except for specified excluded
5 assets, we were supposed to get all assets
6 used in the business.  But there were certain
7 assets, including financial assets that were
8 included within that universe but were also --
9 and so that Barclays had been led to believe
10 were going to be delivered.  That would be
11 true whether or not they were also articulated
12 as within the including language that follows
13 in the definition of "Purchased Assets."
14    But -- so it's the same universe
15 either way.  But certain of those assets,
16 which we have been told were among the assets
17 that Barclays would be getting would not --
18 were not available to be transferred to us.
19 That they either did not own or they had
20 double counted or they were subject to liens
21 in favor of third parties and they could not
22 be delivered.  And so he reported that.
23    And he said that this was -- and
24 again, I believe there may have been a Lehman

TSG Reporting - Worldwide    877-702-9580

Page 121

-Lewkow-

1 person standing there, but I can't tell you
2 who, or a Lazard person, and that he had
3 created real issues as to whether the deal
4 could be due -- doable.
5    He went on to describe a number of
6 things that had come out as further
7 investigation as to facts as well as further
8 discussions and negotiations as to what to do,
9 as to whether this deal could be saved and
10 whether there would be no deal and there would
11 be no one to purchase the assets and to
12 purchase the business and leave the creditors
13 to a liquidation scenario.
14    But he reported on a number of
15 things.  First of all, that two category of
16 assets should have been identified that could
17 have been included in assets that Lehman used
18 in the business and, therefore, should be
19 coming to Barclays pursuant to the Asset
20 Purchase Agreement, which had not been
21 specifically ever mentioned or focused on by
22 Barclays.  And that those helped to some
23 extent mitigate the shortfall that I just
24 described based on what we had known.

TSG Reporting - Worldwide    877-702-9580

31 (Pages 118 to 121)

## Page 122

-Lewkow-

So, we had learned things that
reduced the pool of assets that were worth --
substantially all the assets that we were
getting. But that there were two categories
of assets that were within what we were
getting that we had not focused on and that
Lehman had not told us about were within the
pool of assets that Lehman had available for
transfer, that they could transfer and would
transfer pursuant to the deal.

And those, these two categories
were the 15c3-3 reserve account or something
like that. I'm not sure "reserve" is the
right account. And where I was told -- I
remember often this one being told the precise
number, but I don't remember what number it
is. But it was slightly over a billion-seven
in -- and I believe he said in security, but
he may -- he may not have been that specific.

And the second was assets in what I
was told was something called the clearance
box about -- again, I may have been given a
more specific number but this one is less
vivid in my mind, of approximately two billion

TSG Reporting - Worldwide    877-702-9580

## Page 123

-Lewkow-

of assets, and that these assets were
available and would be transferred by Lehman
as part of the transfer of essentially all the
assets that they were going to be giving us.

I was also told of some discussions
of changes that needed to be made to the deal
because that didn't -- the identification of
those assets, of additional -- those assets
that would be transferred as part of the deal
didn't solve by any means the entirety of the
problem that had been learned by both sides as
to other assets that could not be transferred.

And that certain changes to the
deal were going to be made.

One was -- and that first, another
negative change in the deal from Barclays's
perspective in that there was a -- there was
in the Asset Purchase Agreement a concept
of -- I forget what the word was. "Retained
cash." It was a very strangely drafted
clause. Because retained cash was Lehman's
cash that Barclays would get and in a sense it
was retained because it would be retained for
use in the business that we were effectively

TSG Reporting - Worldwide    877-702-9580

## Page 124

-Lewkow-

purchasing all the assets of, and certain --
and assuming certain specified liabilities.

And so I was told that the fact
that Lehman would receive the -- Lehman would
transfer the so-called retained cash was
dropping away and that Barclays would not get
that cash. I believe -- I believe I was told
that they just didn't have free cash sitting
around, but I don't remember precisely what
words were used. I don't remember precisely
what the words were on any, any of these.
This is my recollection and paraphrase of what
he told the group in the well in the courtroom
before the hearing started with a half a dozen
or so people.

He also talked about a favorite
topic, the RESIs, and that it turned out --
wait a second. Hold on a second. -- no. I
don't think -- I withdraw that. I don't think
there is anything about the RESIs.

He reported that another change
that needed to be made that the parties had
agreed to orally was to eliminate the
provision that I testified about earlier in

TSG Reporting - Worldwide    877-702-9580

## Page 125

-Lewkow-

response to some -- some of your questions
that provided that if Barclays sold certain of
the financial positions within one year and
made a profit, that certain amounts of
additional consideration or compensation would
be paid to -- to Lehman, that that provision
had also -- would be deleted.

That -- let me just think if there
was anything else that I can recall. That's
my recollection.

MR. GAFFEY: Do you want to take a
lunch break?

MR. MORAG: Yes. I believe it's
available.

(Luncheon recess taken at 1:10 p.m.)

- - -

TSG Reporting - Worldwide    877-702-9580

Page 126

1    -Lewkow-
2    A F T E R N O O N   S E S S I O N
3    (Time noted: 1:53 p.m.)
4    V I C T O R   I.   L E W K E W, resumed as a
5    witness and testified as follows:
6    CONTINUED EXAMINATION BY
7    MR. GAFFEY:
8    Q.  Mr. Lewkow, before the break you
9    were telling us about a conversation between
10   Michael Klein, Lori Fife, yourself and some
11   others, about discussions that had taken place
12   in the morning before the sale hearing.
13       Was there any discussion between
14   Barclays and its representatives on the one
15   hand, and Lehman and its representatives on
16   the other about what, if anything, of those
17   facts should be told to the judge in the sale
18   hearing?
19       A.  First of all, when you say -- you
20   said "morning," I was very careful.  I believe
21   it continued until shortly before the hearing
22   started at one o'clock, so I was not limited
23   to the morning.  The answer to your question
24   is, no.
25       Q.  As you sat through the sale hearing
    TSG Reporting - Worldwide    877-702-9580

Page 127

1    -Lewkow-
2    and heard the presentations to the Court from
3    the various lawyers who spoke to the judge,
4    was Cleary and Barclays's comfortable that the
5    aspect of the deal that had been discussed in
6    that session prior to the sale hearing were
7    accurately disclosed to the judge?
8        MR. MORAG:  Object to the form.
9    Certainly you speak to Cleary.  As to
10   Barclays, I'm not sure if that calls
11   for a privilege conversation.
12       MR. GAFFEY:  Let me just ask as to
13   Cleary.  That's a good point.
14       A.  As was my understanding was,
15   typical the debtor's counsel on a sale would
16   normally be the ones who take the -- make the
17   presentation to the Court.
18       THE REPORTER:  Can I ask you to
19   please speak up?  Thank you.
20       THE WITNESS:  I'll try.
21       A.  As typical, Weil as counsel for the
22   debtor was making the presentation.  Maybe in
23   other context people would have seen a draft
24   of what Lori Fife was going to say or the
25   like.  But certainly, since it was such a
    TSG Reporting - Worldwide    877-702-9580

Page 128

1    -Lewkow-
2    moving target we had, as I told you in your
3    last question, really hadn't had any
4    consultation as to what exactly she and
5    Mr. Miller were going to tell the Court.
6        That having been said, as I sat
7    there, I am, as a member of the Bar, I am -- I
8    do have obligations and certainly if I had
9    thought that I heard something that was
10   inconsistent with my understanding of the deal
11   or omitted information that was obvious that
12   should have been -- would make the description
13   of what the judge heard -- and by "description
14   of what the judge heard," I include everything
15   that he heard Wednesday and everything that
16   was in the Asset Purchase Agreement that he
17   had heard before.
18       If I thought he was being misled, I
19   obviously would have, as was Mr. Granfield who
20   was my partner who I was sitting next to, we
21   would have either, you know, addressed the
22   Court directly or would have talked to Weil
23   Gotshal and asked them to make appropriate
24   other statements to the Court.
25       Q.  As I understand the events and
    TSG Reporting - Worldwide    877-702-9580

Page 129

1    -Lewkow-
2    discussions that Mr. Klein described to you,
3    essentially because Lehman was unable to
4    deliver certain assets within the
5    contemplation of the Asset Purchase Agreement,
6    other assets were substituted for them?
7        MR. MORAG:  Objection to form.
8        A.  No.  I totally -- that is not a
9    correct characterization.
10       Q.  What is the correct
11   characterization?
12       A.  What I testified.
13       Q.  Is it your testimony that the two
14   categories of assets you discussed, 15c3 and
15   the contents of the box, were covered by the
16   original language of the Asset Purchase
17   Agreement?
18       A.  I don't want to give you legal
19   advice.  But I will point you to the words of
20   the Asset Purchase Agreement that basically
21   says all assets used in the business, other
22   than Excluded Assets, which is a defined term.
23       Q.  At the time that you had the
24   conversation with Mr. Klein and Ms. Fife, was
25   it at that point still within the
    TSG Reporting - Worldwide    877-702-9580

## Page 130

-Lewkow-

1  contemplation of the parties that the
2  **contemplation of the parties that the**
3  **Clarification Letter would be submitted to the**
4  **Court?**
5     A.  Well, we -- I don't -- the -- it
6  had been the contemplation on Wednesday and
7  Thursday, and the goal had been to, as I
8  testified earlier, to give the Court, to
9  give -- to have that ready to give the judge.
10 It was also the intention at that stage to try
11 to close Friday evening.
12    And on that sort of scenario, if,
13 in fact, you were there, it would have been
14 probably possible, one would have hoped to
15 have had a Clarification Letter that one could
16 have given to the Court.
17    It was clear to me, but I don't
18 recall that given what had changed and given
19 that there was a draft that had been served up
20 while we were in court, that -- given that it
21 showed up when it did, I was dubious even
22 before I saw it and before I talked to my
23 colleagues as to whether it did or didn't
24 reflect those discussions given the timing of
25 it.

TSG Reporting - Worldwide    877-702-9580

## Page 131

-Lewkow-

1  
2     So to me, it was, it would have
3  been shocking if before the Court could have
4  approved it, whether we would have had a final
5  Clarification Letter that we could have
6  provided the Court.
7     **Q.  By the end of the sale hearing, no**
8  **Clarification Letter had been finalized and**
9  **everybody let to continue their work over the**
10 **weekend.  Was there a point during the weekend**
11 **when there were conversations between Barclays**
12 **on the one hand and Lehman on the other**
13 **including their representatives, about**
14 **bringing the Clarification Letter to the**
15 **judge?**
16    MR. MORAG:  Objection to the form.
17    You can answer.
18    A.  What I recall, and to me the
19 Clarification Letter was -- it was getting
20 close to being signed.  I have a vague
21 recollection, I do have a recollection of
22 sitting in the room -- I did a lot of sitting
23 in the rooms -- with a number of Weil Gotshal
24 lawyers, including Harvey Miller, including
25 one or more of his corporate colleagues in

TSG Reporting - Worldwide    877-702-9580

## Page 132

-Lewkow-

1  
2  which -- and this would have been late Sunday
3  night, early hours of Monday morning.  I don't
4  know.  But it was very late, very late in the
5  game.  It might have even been Monday.
6     In fact, it might have been Monday
7  morning, you know, 5:00, 6:00, 7:00, just
8  shortly before we closed as I think about it.
9  I don't know when it was.  But it was late.
10 It wasn't Saturday.  It wasn't Sunday morning.
11 It wasn't even Sunday afternoon.  And we were
12 very close to, you know, finish.  The big
13 issues that people were dealing with were DTC
14 and J.P. Morgan and those sorts of issues were
15 really the big issues that people were facing.
16    But very late in the process,
17 Harvey Miller saying to a group of -- you
18 know, again, I don't know how many other -- it
19 was a very fluid group of people who would be
20 sitting in what room at what time that
21 weekend.  But there were a number of other
22 Weil people and Harvey Miller and me.  I don't
23 remember whether any of my colleagues were in
24 the room with me.
25    And Harvey looked at the assembled

TSG Reporting - Worldwide    877-702-9580

## Page 133

-Lewkow-

1  
2  group and said something like, Does anyone
3  think that we have done anything inconsistent
4  with what we've told the Court and have to
5  bring this -- go back to court?  Or something
6  like that.  I don't remember the words.  I'm
7  totally paraphrasing.
8     My recollection is, I've read
9  Mr. Miller's deposition transcript, and he
10 does not mention who -- he mentions a
11 conversation which is, I think, more or less
12 consistent with my recollection, but he
13 doesn't mention that anyone from Cleary
14 Gottlieb, like me, was there.
15    But -- and he may have had more
16 than one, so I have no way of knowing if it's
17 the same conversation.
18    But I do recall that.  And he
19 looked around the room and nobody said
20 anything.  It was mostly people on his side.
21 So that's the one that -- you know, in
22 connection with the finalization of the
23 Clarification Letter, that conversation took
24 place.
25    **Q.  Were any of your bankruptcy**

TSG Reporting - Worldwide    877-702-9580

Page 134

-Lewkow-
1
2 partners present during this conversation?
3     A.  I do not believe so.
4     Q.  Have you read any other
5 depositions?
6     A.  Yes.  I've read parts or all of
7 Mr. Miller's deposition, Mr. Hughes deposition
8 and Mr. Ridings' deposition.  I believe that's
9 all.
10     Q.  Did you read both days of
11 Mr. Hughes deposition?
12     A.  Yes.  Skimming, yes.
13     Q.  Did you review any briefs or
14 pleadings to prepare for your deposition?
15     A.  No.
16     Q.  Have you read the Rule 60 filed by
17 the debtor or the Trustee or the Creditors
18 Committee?
19     A.  No.
20     Q.  Have you had them summarized for
21 you?
22         MR. HUME:  Objection.  I think that
23     calls for privileged conversations.
24 DI      MR. MORAG:  Same objection.  I
25     instruct you not to answer.

Page 135

-Lewkow-
1
2     Q.  Was there a time, was there not,
3 where it was contemplated that the
4 Clarification Letter would be styled as an
5 amendment to the APA, as a contractual
6 amendment to the APA.  Do you recall that?
7         MR. MORAG:  Objection to form.
8     A.  Contemplated by whom?
9         MR. GAFFEY:  Can I have this marked
10 as 614A?
11         (Deposition Exhibit 614A, Letter
12 from S&C, CGSH 00020701-20714, marked
13 for identification, as of this date.)
14     Q.  You have before you, Mr. Lewkow,
15 what we marked as Exhibit 614A, a document
16 bearing Bates numbers CGSH 00020701 through
17 20714.  Have you seen that document before?
18     A.  Yes.
19     Q.  I'm sorry.  I didn't hear you.
20     A.  Yes.
21     Q.  Did you see it at or around the
22 time that it's dated, September 19, 2009?
23     A.  I think that around that time, I
24 either saw the cover letter, cover e-mail, or
25 saw a cover e-mail from one of my colleagues

Page 136

-Lewkow-
1
2 basically dismissing it.
3     Q.  Why was it dismissed?
4     A.  Because it was not consistent, best
5 I can recall.  This was sent by someone at
6 Sullivan & Cromwell who had not been involved
7 directly in any of the discussions with --
8 regarding the Clarification Letter.  We didn't
9 know where this had come from.  Hold on a
10 second.  Wait a second.
11         (Witness reviewing document.)
12     A.  I think.  I think a couple of
13 things.  Shortly after this -- this came on,
14 what date is this?
15         (Witness reviewing document.)
16     A.  Friday?  May I look at amendment
17 No. 1?
18     Q.  Sure.  Absolutely.
19     A.  That you had given me earlier.
20     Q.  That's Exhibit 27, right, for the
21 record?
22     A.  24.
23     Q.  I beg your pardon.  24.  You're
24 right.
25         MR. HUME:  Can I just interject?

Page 137

-Lewkow-
1
2 To the extent that the question that's
3 pending, I think --
4         THE WITNESS:  I'm not sure.
5         MR. HUME:  -- is why was it
6     dismissed, to the extent to answer that
7     question requires you to divulge any
8     privileged conversations within Cleary
9     or Cleary and Barclays, I instruct you
10     not to answer.  Otherwise you can
11     answer.
12     A.  The answer is I'm not sure -- I've
13 seen the e-mail from one of my colleagues, I
14 think it was Dave Wyman.  But it was also, and
15 I don't know the precise timing.  One of the
16 elements that I see is, and maybe the key
17 element, was this rider that Ms. Summers had
18 sent with this e-mail to deal with what was
19 called -- a new section called a holdback to
20 deal with the DTC problem.
21         In fact, later that day, Sullivan &
22 Cromwell did, in fact, prepare a First
23 Amendment to the Asset Purchase Agreement to
24 try to address based on what -- what people
25 understood at the time were the -- were the

Page 138

1          -Lewkow-
2  facts relating to the residential real estate
3  mortgage securities which were later learned
4  were not the facts.
5          And in fact, amendment No. 1 was
6  signed.
7      **Q.  The Asset Purchase Agreement --**
8      A.  More accurately, first amendment
9  was signed.
10     **Q.  And the Asset Purchase Agreement**
11 **and the first amendment of the Asset Purchase**
12 **Agreement, both were submitted to Judge Peck**
13 **at the sale hearing.  Do you recall that?**
14     A.  They were both described.  I
15 assume -- I know the Asset Purchase Agreement
16 had been submitted in a technical sense,
17 whether the first amendment was or not, I
18 assume it was, but I don't know for a fact.
19     **Q.  I'll go back to a question I asked**
20 **you a few moments ago.**
21         **Given that the Clarification Letter**
22 **recites that it amends the Asset Purchase**
23 **Agreement, was one of the three verbs that we**
24 **talked about, that it "amends" the Asset**
25 **Purchase Agreement.**

TSG Reporting - Worldwide    877-702-9580

Page 139

1          -Lewkow-
2      **When Mr. Miller asked whoever was**
3  **assembled in that room as to whether anyone**
4  **thought it was different than what had been**
5  **described to the Court, was there any part of**
6  **that discussion that noted that this was an**
7  **amendment to the agreement that had been**
8  **submitted to the judge?**
9          MR. MORAG:  Objection to the form
10 and to the characterization of his
11 testimony regarding Mr. Miller's
12 statement.
13     A.  I don't recall.  I would note that
14 Mr. Miller couldn't have been more clear on
15 Friday to the Court that there were major
16 changes in the deal.  And so the fact that in
17 part this was to some extent an amendment of
18 certain aspects of the Asset Purchase
19 Agreement, I think it was entirely consistent
20 with what Weil Gotshal told the Court on
21 Friday.
22         And the Court carefully considered
23 as I recall the comments made by I think a few
24 of the creditors and/or the Committee or
25 somebody, I don't remember who, arguing that

TSG Reporting - Worldwide    877-702-9580

Page 140

1          -Lewkow-
2  he should wait until he had the final document
3  before he approved the same.  And he discussed
4  that subject in his statements from the bench
5  and concluded that he did not need to wait for
6  a written document.
7      **Q.  Was it Cleary's understanding**
8  **coming out of the sale hearing that there were**
9  **any limitations on what could be included in**
10 **the clarification agreement and still be**
11 **within the terms of the Sale Order?**
12         MR. MORAG:  Objection.  I think
13 that's work product and privilege.
14 Cleary's understanding?  He can't
15 answer it.
16         MR. GAFFEY:  What's the privilege?
17         MR. MORAG:  The mental impressions
18 of a lawyer of what they couldn't --
19         MR. GAFFEY:  I just want you to
20 identify the privilege.
21         MR. MORAG:  I said work product and
22 attorney/client privilege.
23         MR. GAFFEY:  Okay.
24         MR. MORAG:  To the extent they were
25 discussed with attorneys.

TSG Reporting - Worldwide    877-702-9580

Page 141

1          -Lewkow-
2      **Q.  Do you recall any colloquy with the**
3  **Court that you witnessed on Friday concerning**
4  **any limitations placed on the Clarification**
5  **Letter?**
6      A.  No.  None other than what I
7  testified to earlier.
8      **Q.  Do you recall any restrictions in**
9  **the Sale Order itself placing restrictions on**
10 **the Clarification Letter?**
11         MR. HUME:  Same objection, I
12 believe.
13         MR. MORAG:  I think --
14         MR. HUME:  It calls for a legal
15 interpretation of the Sale Order.  That
16 is a matter in the litigation and
17 you're asking a lawyer how to interpret
18 it for you.  So I think it's asking for
19 work product.
20     **Q.  Were there any discussions between**
21 **Barclays on the one hand including its**
22 **representatives, and Lehman on the other**
23 **including its representatives, as to whether**
24 **there were any limitations in the sail order**
25 **as to what could be included in the**

TSG Reporting - Worldwide    877-702-9580

Page 142

1           -Lewkow-
2    Clarification Letter?
3        A.  Yes.  Two conversations.  One I
4    testified to already, the late Sunday night or
5    late Monday morning conversation with
6    Mr. Miller.  Earlier, I believe it was Sunday,
7    it was a crazy weekend, I believe it was
8    Sunday, there was a conversation in the
9    hallway where the subject of whether certain
10   circumstances, if we did certain things, would
11   lead to a change of -- that would require
12   going back to the Court.
13       Q.  Can you --
14       A.  I may have mischaracterized that.
15   Go ahead.  Ask your next question.
16       Q.  Okay.  My obvious question is:  How
17   did you mischaracterize it?
18       But tell me what you remember about
19   that conversation.  Who said what to who?
20       A.  So, as I testified earlier on
21   Friday, one of the things that Lehman Brothers
22   and Barclays had discovered that among the
23   Purchased Assets that Barclays was going to
24   receive in the -- pursuant to its purchase of
25   substantially all of the assets used in the

TSG Reporting - Worldwide    877-702-9580

Page 143

1           -Lewkow-
2    business, other than Excluded Assets, that
3    although there had been very substantial
4    reductions in what Lehman could deliver, they
5    also had realized and ascertained that there
6    were assets that were part of their assets
7    used in the business that had not previously
8    been sort of focused on specifically by the
9    parties, although they were assets of Lehman
10   used in the business.
11       And I mentioned two -- two
12   categories of such assets.  One was the
13   so-called 15c3-3 account.  And I think I
14   testified -- I'm not sure, it's been a long
15   day so far.  Maybe not.  I may not have
16   mentioned this.  But one of things that
17   Michael Klein had reported in describing that
18   was that he had been told by someone on behalf
19   of Lehman that there was some e-mail around in
20   which the -- pursuant to which referencing
21   that someone in the division of market
22   regulation at the SEC had confirmed that the
23   15c3-3, the assets in the 15c3-3 could, in
24   fact, be transferred by Lehman and at some
25   point, I believe Saturday morning or at some

TSG Reporting - Worldwide    877-702-9580

Page 144

1           -Lewkow-
2    point Saturday, we asked Weil to see that
3    agreement.
4        At some later point, I believe on
5    Sunday, but I couldn't swear to it at this
6    stage -- at some point, as I was walking in
7    the hallway of Weil Gotshal, we were in
8    meetings spread out over a large portion of
9    Weil Gotshal that was full of purely -- I
10   believe purely a conference space.  There were
11   lots of meetings going on by different people.
12   There were people working on the Transition
13   Services Agreement, there were people dealing
14   with DTC, there were people just getting ready
15   to do a closing.  Because all of the work had
16   to be done to be prepared to close, even while
17   other work was going on.  Discussions with
18   JPMorgan Chase.
19       Anyway, we were with Weil Gotshal
20   on that floor.  And as I was walking down the
21   floor, there were a number of the Weil
22   partners standing at this big desk which I
23   assume was the reception desk, although it
24   wasn't near the elevators where there was a
25   big reception desk.  But I don't know.  It

TSG Reporting - Worldwide    877-702-9580

Page 145

1           -Lewkow-
2    wasn't clear.  Maybe it was for if you needed
3    secretaries during the conference room.  I
4    don't remember what it was since I had never
5    been there during a working day, only on
6    weekend.
7        But standing around this desk were
8    a number of Weil lawyers.  There may have well
9    been somebody from Lehman or Lazard there as
10   well, I don't recall.  I believe Harvey Miller
11   was one of the people among the group that was
12   there for Weil, and they said we have -- you
13   asked for and we now have, it gave me the
14   impression they had just received it in the,
15   you know, minutes or the last hour or two, and
16   certainly not before then was the impression.
17   I'm not sure whether they said that or not.
18   That we now have the e-mail relating to the
19   15c3-3 account.  And they showed it to me.
20   And I looked at it.
21       And they said that -- first
22   thing -- well, I noticed and commented on, I
23   believe I commented on, that it was not as I
24   had thought from the SEC but merely an
25   internal Lehman e-mail referencing a

TSG Reporting - Worldwide    877-702-9580

Page 146

1          -Lewkow-
2   conversation with the SEC, with someone on
3   staff of the SEC.
4          And somebody from Lehman, somebody,
5   I'm sorry, from Weil said -- and it may have
6   been Mr. Miller but I don't know.  But
7   somebody from Weil said something like, We
8   didn't realize that some -- that the account
9   was not entirely securities but included a
10  bank account that -- with cash.  It was a
11  major bank.  It was one of the things on that
12  e-mail.  So it was -- and as I recall, it was
13  a million dollars in the bank account that
14  Lehman maintained with a third party bank.
15  And 700-plus, 760 odd million of securities
16  were in that account.
17         And in the course of that, one of
18  the Lehman people, again, I believe it was
19  Mr. Miller, but I'm not sure, said, the
20  question is, does anyone remember exactly what
21  Ms. Fife -- I don't think Ms. Fife was there
22  at the time -- told the Court, when she was
23  discussing the fact that you retain the cash
24  provision in the Asset Purchase Agreement was
25  being eliminated, did she say anything that

Page 147

1          -Lewkow-
2   would be inconsistent with us transferring as
3   part of all the assets of the business, the
4   15c3-3 account which we now know includes a
5   bank account.
6          There then followed some further
7   discussions on a number of -- let me just go
8   through them.
9          MR. MORAG:  If you like.
10         A.  Go ahead, ask another question.
11         Q.  Tell me about the further
12  discussions.
13         A.  So -- and I don't remember in
14  quite -- again, this was a weekend that was
15  very -- at the end of the week that had been a
16  very complex and difficult and weak -- not
17  just from the financial markets but from
18  everyone on both sides of this deal who were
19  trying to see if this deal could get done.  So
20  I don't remember how quickly it got done,
21  whether it was dragged out over two hours or
22  only over half an hour.
23         But there were some follow-up
24  conversations and one of the things -- it may
25  have even dragged on longer than two hours.

Page 148

1          -Lewkow-
2   Because one of things we asked, or someone
3   asked is -- I don't know who asked it.  Is it
4   possible, can we get a transcript, can we find
5   out exactly what Ms. Fife said to the Court to
6   see whether or not she said something that
7   would be or might appear to be inconsistent
8   now that we knew that the 15c3-3 account
9   included a bank account.
10         All of this is paraphrase.  I do
11  not remember precisely.  All of my testimony
12  where I say what people say is paraphrase.  I
13  don't recall specific words.
14         So some time clearly passed while
15  that -- but I don't remember how long, while
16  people investigated that issue.  And we were
17  told at some point -- again, I don't know by
18  whom -- that it would not be possible to get a
19  transcript, that no transcript had been
20  prepared, and that in effect the -- there had
21  not been a court reporter, shockingly, but it
22  had been -- there was a tape of the Court
23  hearing, and that tape, we learned, was locked
24  up in the courtroom.  This was Sunday.  I'm
25  sure it was Sunday.  That tape was locked up

Page 149

1          -Lewkow-
2   in the courtroom, in the courthouse, there was
3   no way to get access to it, and so there would
4   be no way to obtain a transcript.
5          There was some further discussion;
6   at different points different people joined
7   the discussion.  Still in the hallway.  All of
8   this took place in the hallway.  It may have
9   been a return to the hallway, but it again
10  happened in the hallway.
11         And among those who joined the
12  discussion, and there was more -- in fact, the
13  original discussion there may have been four
14  or five or six people, by then there were 10
15  or 12 people.  And included in the further
16  discussions were from the Barclays side, both
17  Michael Klein, I believe Archie Cox, I'm not
18  hundred percent sure and my partner Ed Rosen.
19         By then -- by some -- you know, was
20  it a second conversation or a third
21  conversation?  I cannot recall.  But at some
22  point we had -- "we" being the Barclays side
23  talked about --
24         Q.  You shouldn't tell me about that
25  conversation.

Page 150

-Lewkow-
1
2     A.  I'm trying to figure out --
3         MR. MORAG:  There was a
4     communication.
5     A.  There was a communication about
6     what we had heard from Harvey Miller and/or
7     others from Weil Gotshal that I described in
8     my testimony, and that was discussed.
9         And putting aside the conversation
10    that I had with the Barclays representatives,
11    when we got back and the discussion that I'm
12    testifying to resumed with the other side, we
13    said, look, if there's no transcript, nobody
14    remembers precisely what he said.
15        And so until we can get a
16    transcript -- because she clearly had talked
17    about cash and there was, you know --  the
18    retained amount was not, was sort of cash that
19    was free and available and not tied up in
20    positions.  It was just cash that we had been
21    led to believe at the time of the Asset
22    Purchase Agreement was totally free cash that
23    they had somewhere, and that they were going
24    to transfer as part of the Purchased Assets.
25        And nobody knew precisely how
      TSG Reporting - Worldwide    877-702-9580

Page 151

-Lewkow-
1
2     Ms. Fife had, in describing the changes from
3     the deal as reflected in the Asset Purchase
4     Agreement, how precisely she had put it in
5     describing those changes.  And she had clearly
6     indicated that that cash wasn't in -- wasn't
7     going to be in the deal but again, nobody knew
8     precisely what it was.
9         And so the alternative, since
10    nobody wanted to -- neither Weil Gotshal nor
11    Lehman nor Barclays nor the lawyers wanted to
12    do anything inconsistent with what the Court
13    had been told, there were two choices
14    available, which was to wait until Monday, get
15    a transcript and see what, in fact, she had
16    been told.  And then, if necessary, go back to
17    the Court.
18        There were three choices.  Just go
19    back to the Court Monday morning or find
20    another solution.  And the other solution was
21    the one that Barclays put on the table of
22    saying, okay, we will take just the securities
23    portion, 760-some-odd million in securities.
24    And in the course of that discussion, Michael
25    Klein said that if -- if for some reason you
      TSG Reporting - Worldwide    877-702-9580

Page 152

-Lewkow-
1
2     can't --
3         And there was some conversation by
4     someone at Weil about do we -- do we need SEC
5     approval.  And Ed Rosen said no.  And they
6     said well -- they wanted to add language that
7     we had no problem with, something saying
8     "subject to applicable law," or something to
9     that nature that ended up in the Clarification
10    Letter.
11        And then Klein said, Look, if we --
12    you know, we're giving up this billion dollars
13    that we thought we were getting as of Friday
14    afternoon and we want to make sure we're
15    getting this 769 million in securities, and so
16    we want to add language that says -- again,
17    I'm paraphrasing, that if we can't get that,
18    you'll get us 769 million of securities of
19    some other securities.  That is my
20    recollection.
21    Q.  By the time of the conversation
22    with Mr. Miller on either Sunday night or
23    Monday morning concerning whether anyone
24    thought there were any aspects of the
25    Clarification Letter that required going back
      TSG Reporting - Worldwide    877-702-9580

Page 153

-Lewkow-
1
2     to the Court, had anybody seen a transcript by
3     then?
4     A.  No.
5     Q.  Had anybody heard the tape by then?
6     A.  No.
7     Q.  Was there any discussion on Monday
8     before the closing concluded of getting the
9     transcript or the tape to make sure the
10    Clarification Letter was consistent with the
11    Court's limitations or instructions?
12        MR. MORAG:  Object to the form.
13    A.  There was no -- to my recollection,
14    there was no discussion of that.  There was a
15    belief by all of the people that's discussed
16    that it was really important to get this deal
17    closed and announced before the market opened
18    Monday morning.  There was -- the market --
19    there had been press announcements that came
20    out after midnight Friday night that had been,
21    I believe, in the Saturday papers or Sunday
22    papers or both, that the Court had approved
23    the sale.
24        And both Lehman and Barclays
25    believed it was really important both from the
      TSG Reporting - Worldwide    877-702-9580

Page 154

1          -Lewkow-
2  financial markets perspective and from the
3  perspective of Barclays of keeping the Lehman
4  employees -- and I want to come back to the
5  Lehman employees in a second -- comfortable,
6  that they should hang around and that there
7  really was a deal.  That there had been a real
8  hope -- you know, there had been -- I think
9  some of the press reports might have picked up
10  the concept from this.
11          I'm not sure of this, but I believe
12  at least some of the press reports from people
13  who had been in the courtroom had indicated
14  that the deal might close over the weekend or
15  would -- was expected to close over the
16  weekend.
17          And so there was great concern that
18  if, in fact, the markets opened Monday morning
19  and we had not announced a sale, that people
20  would have thought the deal was falling apart
21  or had fallen apart, was never going to
22  happen, or what the heck is the problem out
23  there.  And in the markets that we lived in,
24  this was in the course of the days when the
25  papers were full of information talking about

Page 155

1          -Lewkow-
2  whether Morgan Stanley will go under?  Will
3  Goldman Sachs go under?  Will we be in a Great
4  Depression?  That was the context in which
5  this conversation took place.
6          And there was a belief, as I said,
7  that the employees -- that this would be a
8  major problem if we didn't announce the deal
9  that we had closed by Monday morning before
10  the market opened.
11          I mentioned the employees.  The
12  employees were very important to this deal.
13  Barclays was not -- you know, all of this
14  discussion we've had and this testimony has
15  been -- and I understand that, has been about
16  the financial assets.  Barclays was not doing
17  this deal to buy a portfolio of financial
18  assets.  Barclays was doing this deal because
19  it wanted to buy a broker-dealer investment
20  banking business in the United States and was
21  prepared to take very substantial risks in
22  their view in doing that.
23          And I say "very substantial risks"
24  not focusing particularly on the financial
25  assets but because of the fact that when

Page 156

1          -Lewkow-
2  people have bought investment banking firms in
3  the United States, they have often worked out
4  very badly.
5          Because it is not only what you pay
6  day one but it's can you make it work?  Can
7  you get the employees to stay?  Can you get
8  them integrated?  Can you keep them happy so
9  as to create value for your shareholders?  And
10  that's true in the best of days.
11          And I think of General Electric,
12  pretty savvy acquirers as people would think.
13  They had bought Kidder Peabody, spent a great
14  deal of money and then spent a lot more money
15  over the next X years trying to make it work
16  and had lost a zillion bucks.  A zillion is --
17  I don't know.  But they lost a lot of money.
18  And not just the money they invested but the
19  money they later put in to try to make it
20  work.
21          And that's what Barclays was
22  committing itself to do.  So the reaction of
23  the employees and keeping the employees, in
24  particular the key employees comfortable that
25  they assumed -- and I think rightfully so, and

Page 157

1          -Lewkow-
2  they may have known it as a fact, I don't
3  know, but they assumed that really the
4  Barclays -- the best Barclays [sic] people,
5  the ones you most wanted to keep were getting
6  other inquiries from competitors during the
7  the days, during Monday, during the prior week
8  over that weekend, etcetera, and it was
9  important that we keep -- that Barclays be
10  able to keep the people together.
11          All of that went to the point that
12  the parties believed, both parties, that it
13  was really important to try to get this deal
14  announced before the beginning of the market
15  opening on Monday morning.
16      **Q.  Was the concern about announcing**
17  **the closing of the deal before the opening of**
18  **the market on Monday morning, a factor in the**
19  **decision of the group as to whether or not to**
20  **bring the Clarification Letter back to the**
21  **judge?**
22      A.  No.
23          MR. MORAG:  Object to the form.
24      A.  The question was, the Court had
25  approved the the Sale Order without the

Page 158

1          -Lewkow-
2    Clarification Letter.  He knew he didn't have
3    the Clarification Letter.
4          So the only question that I
5    believed that Mr. -- the reason Mr. Miller
6    asked the question, I believe as I described,
7    was, Okay, what we're doing -- what we are
8    doing here in the Clarification Letter, is
9    it -- are we being consistent with what the
10   Court had approved?  Which turned on what the
11   Court had heard, and heard again on Wednesday,
12   on Friday in -- in the Asset Purchase
13   Agreement and the other information that the
14   Court had, and were we doing anything that was
15   inconsistent with that.
16         And this was why the question --
17   so, the question was, the Court clearly knew
18   that he didn't have to see the Clarification
19   Letter.  The question is had something
20   happened that was inconsistent with what he
21   had been told that would change that plan.  He
22   expected us to close over the weekend.  That
23   was what was talked about on Friday.
24         So the only reason we would have to
25   go back is if something had changed that made
        TSG Reporting - Worldwide    877-702-9580

Page 159

1          -Lewkow-
2    it not be -- made a change that was
3    inconsistent with what he had been told.  It
4    was for that reason in the prior conversation
5    that there was uncertainty because we weren't
6    sure what he had said about that to the extent
7    it might or might not affect the ability to
8    deliver the cash in that bank account that I
9    mentioned that was part of the assets of the
10   15c3-3 account, that since we weren't sure on
11   that issue, that would have raised the problem
12   that I testified about.
13         But that was the only time that
14   there was any discussion of going back.  And
15   even there, the concept was, how do we --
16   Barclays gave up in its mind a billion dollars
17   because it was important to get the deal
18   closed on Monday morning.
19         MR. GAFFEY:  I don't have anything
20   further.
21         Thanks.  Thanks for your time,
22   Mr. Lewkow.
23         THE WITNESS:  Can we take a break?
24         (Whereupon, a recess was taken
25   from 2:41 p.m. to 2:52 p.m. )
        TSG Reporting - Worldwide    877-702-9580

Page 160

1          -Lewkow-
2    EXAMINATION BY
3    MR. MAGUIRE:
4      Q.  Mr. Lewkow, as you know, my name is
5    Bill Maguire, I represent the SIPA Trustee.
6    Before we start with questions, your counsel
7    is going to put on the record the topics you
8    have been designated as representative today.
9          MR. MORAG:  As I think we confirmed
10   to you separately, Mr. Lewkow and
11   Mr. Rosen together are responding to
12   the 30(b)(6) deposition notice served
13   on Cleary Gottlieb and they have
14   separately been subpoenaed for their
15   own personal deposition, which you now
16   have agreed to complete Mr. Lewkow's
17   personal deposition along with his
18   share of the 30(b)(6).
19         With respect to 30(b)(6), the
20   easiest way for me to explain it is
21   that Mr. Rosen is addressing issues
22   relating to the DTC, OCC, and the terms
23   of the Clarification Letter relating to
24   exchange-traded derivatives.
25         To the extent there may be overlap
        TSG Reporting - Worldwide    877-702-9580

Page 161

1          -Lewkow-
2    with respect to the 15c3-3 issue, then
3    they're both designated.
4          I think you know from the
5    declaration, Mr. Rosen is a market
6    regulation person and Vic is the
7    mergers and acquisition.
8          That may not be the precise answer,
9    but if you have any question, you
10   should certainly ask them of
11   Mr. Lewkow.  If it's Ed, he will tell
12   you.
13         MR. MAGUIRE:  Thank you.
14   BY MR. MAGUIRE:
15     Q.  Sir, you have seen in the course of
16   today a number of drafts of the deal document,
17   many of them with the black lining or red
18   lining convention.
19         What was the practice in terms of
20   the Cleary team dealing with the Weil team and
21   the other parties in the course of negotiating
22   first the APA and then exchanging drafts in
23   connection with the Clarification Letter?
24         MR. MORAG:  Objection to form.
25   Vague as to "practice".
        TSG Reporting - Worldwide    877-702-9580

Page 162

-Lewkow-

1
2      A.  This was in a very unusual deal
3  because in the time period in which it was
4  done, and I'm going to answer the question
5  first with regard to the Asset Purchase
6  Agreement and then with regard to the
7  clarification.
8          The Asset Purchase Agreement was --
9  the first draft of the Asset Purchase
10  Agreement was served up when everyone was
11  involved.  I mean, it doesn't mean there
12  weren't phone calls back to clients and
13  others.  But all of the lawyers certainly and
14  parts of the welded teams were sitting in one
15  or the other of the conference rooms at Lehman
16  Brothers and the first draft was served up by
17  Lehman's counsel -- Weil and Simpson Thacher,
18  I forget who -- that Monday night and it was
19  signed about 25 hours later.
20          Between the first draft on Monday
21  night, and Tuesday night when it was signed,
22  there were -- people were working in the same
23  room on the document.  It doesn't mean someone
24  didn't take his or her laptop out of the room
25  for a few minutes and worked on it, but

TSG Reporting - Worldwide    877-702-9580

Page 163

-Lewkow-

1
2  basically people were working on it together.
3  And I am not sure that every interim draft was
4  ever sent by e-mail from anyone to anyone else
5  because people were together.
6          There may have been copies -- this
7  applies to the Clarification Letter as well --
8  that were printed out and looked at by people
9  onsite that were never sent outside of Lehman
10  or Weil, depending on what we're talking about
11  the Asset Purchase Agreement or the
12  Clarification Letter.  So it was all done very
13  quickly.  People were there together.
14          As to the Clarification Letter, it
15  was largely not negotiations.  It was trying
16  to -- and this is true to a large extent in
17  the Asset Purchase Agreement as well.  It was
18  trying to, you know, get it right.  People in
19  good faith were trying to make sure they
20  weren't -- given the incredible timeframe that
21  was going on here, instead of weeks, it was
22  being done within hours.  People were
23  trying -- on the Clarification Letter, I'm
24  talking about Saturday and Sunday.
25          There were drafts that were traded

TSG Reporting - Worldwide    877-702-9580

Page 164

-Lewkow-

1
2  back and forth electronically starting some
3  point Wednesday through the Friday afternoon/
4  evening one that I testified about earlier.
5  But starting on Friday when we went to Weil
6  Gotshal it was an effort to get the
7  Clarification Letter finalized, consistent
8  with the intent of the parties, consistent
9  with, you know, the broad -- the Court's
10  approval of the deal, including -- you know,
11  knowing that there was going to be a
12  Clarification Letter that would lay out the
13  details, but certainly to avoid anything.  To
14  get it right and to make sure we had a deal
15  that was -- that reflected the intent and
16  didn't screw it up.
17          So there were drafts.  There may
18  have been drafts on Saturday and Sunday at
19  Weil that were not sent electronically.  I
20  have no way of knowing for sure.
21      **Q.  Specifically with respect to that
22  Saturday and Sunday, are you aware of any
23  instances where there wasn't an opportunity
24  for people to blackline changes for other
25  people to see?**

TSG Reporting - Worldwide    877-702-9580

Page 165

-Lewkow-

1
2      A.  I don't -- I don't know.  The
3  work -- the other thing about it was that, you
4  know, to some extent, particularly Sunday,
5  people from various parties who were around
6  were sitting in the same room working together
7  on the documents.  So it is -- it is certainly
8  possible that there was one or more drafts
9  that were not blacklined.  I do not know.
10      **Q.  Did you have an expectation over
11  the weekend that if any of the folks changed a
12  term, that would either be discussed with the
13  other side or would be blacklined, there would
14  be something to point out that the change had
15  been made?**
16      A.  Well, when you say "the other
17  side," certainly Sunday, is my recollection,
18  Weil Gotshal is certainly keeping the master.
19  So we certainly didn't make any changes that
20  weren't discussed because we didn't have the
21  ability to do that.
22      **Q.  How did you make sure you were
23  aware of all the changes that, that somebody
24  was keeping up with all of them?**
25      A.  As I said, there were, and it was

TSG Reporting - Worldwide    877-702-9580

Page 166

-Lewkow-

1  mostly not me, but several of my partners were
2  sitting in a room with Weil Gotshal lawyers
3  and, you know, intermittently working on --
4  along with everything else that was going on,
5  intermittently working towards revising the
6  document. And it doesn't necessarily mean
7  that -- so, if something shows up, for
8  example, in a draft at 8:00 p.m. and I have
9  no recollection, I can go through it. We have
10 documented evidence there were particular
11 drafts that were sent by e-mail.
12        But at 8 p.m. it shows up in the
13 draft, the prior draft at 2:00 p.m., it
14 doesn't mean that the change was agreed to by
15 the party at 8:00 p.m. It might have gone
16 into somebody's computer at 3:15 p.m. but no
17 one produced an interim draft.
18    Q. How many Cleary professionals
19 worked at Weil that weekend?
20    A. You know, there were Cleary
21 professionals, lawyers, dealing with a lot of
22 different topics. We had a team working on
23 the Transition Services Agreement, which was
24 important to both Lehman, the estate as well

TSG Reporting - Worldwide    877-702-9580

Page 167

-Lewkow-

1  as to Barclays. We had people dealing with
2  J.P. Morgan and DTC and OCC. We had people on
3  some administerial stuff, but important
4  administerial stuff talking -- dealing with
5  the SEC staff.
6        So we had a lot of people. All
7  told -- oh, and we had people working on the
8  closing, trying to prepare for the closing --
9  I don't know, somewhere between 10 and 15.
10    Q. You mentioned that you became aware
11 at some stage that DTC, of which I understand
12 you to mean the Depository Trust Corporation,
13 wanted to be protected. How did you become
14 aware of that?
15    A. My recollection is that at the
16 Wednesday hearing on the the Sale Order, that
17 somebody from Wachtell on behalf of DTCC had
18 said some things that they had contacted our
19 client and maybe us, and there started to be a
20 whole issue of whether to use a phrase I had
21 not heard before "the pipes would be open."
22        Whether or not -- if we closed
23 Friday night or over the weekend, whether or
24 not customers and others who were doing

TSG Reporting - Worldwide    877-702-9580

Page 168

-Lewkow-

1  business would be able to get access to their
2  accounts. And DTC was an important part of
3  that. And without that, the whole -- you
4  know, there would have been an enormous mess
5  on the hands of the financial system. I don't
6  remember precisely when I was told precisely
7  what.
8    Q. Do you have your Declaration? I
9  believe the copy was marked Exhibit 613A.
10   A. Hold on. Let me find it.
11       (Witness reviewing documents.)
12   A. Yes. I have it.
13   Q. In Paragraph 3 you describe the
14 basis for your Declaration?
15   A. Yes.
16   Q. You mention your personal
17 knowledge. You mention your review of
18 transaction documents. Is that review the
19 review that you did at the time or did you do
20 a review of transaction documents for the
21 purpose of preparing this declaration?
22       (Witness reviewing document.)
23   A. Where are you looking at, counsel?
24   Q. First line of Paragraph 3 of your

TSG Reporting - Worldwide    877-702-9580

Page 169

-Lewkow-

1  Declaration.
2    A. Right.
3    Q. "I base this declaration on my
4  personal knowledge, review of transaction
5  documents..."
6    A. I did, in connection with the
7  preparation of the declaration, review
8  certain -- certain -- yeah, the purchase, the
9  Asset Purchase Agreement and the
10 clarification.
11   Q. Anything else?
12   A. I talked to some of my partners, as
13 indicated.
14   Q. Just talking about transaction --
15   A. But you're talking about documents.
16 I think to some extent I had looked at some of
17 the drafts. I mean, I was doing this at the
18 same time as I was starting to get ready for
19 this day that I was so much looking forward to
20 for the deposition.
21       So, you know, I had started looking
22 at some materials and so -- so I had looked at
23 some of the drafts, I think, before I signed
24 the declaration.

TSG Reporting - Worldwide    877-702-9580

Page 170

1                -Lewkow-
2        Q.  You mention here the recollection
3  of your partners.  How did you go about
4  collecting the recollection of your partners?
5        MR. MORAG:  Object to the form.
6        A.  Can I answer that?
7        MR. GAFFEY:  Yes.
8        A.  Some of it was over the period of
9  months, most of it was in the context of --
10  you know, in the couple of weeks before I
11  signed this.  There were -- we had a few
12  meetings.  Some of it was, you know,
13  one-on-one with me and a particular partner.
14  Others were sitting in a room with several of
15  my partners who had worked on the deal
16  together with -- in some cases, Mr. Morag, I
17  think once, I think by phone, at least once
18  with Mr. Hume.  So some -- but some of it was
19  just in one-on-one conversations with some of
20  my colleagues.
21        Q.  Can you tell me who of your
22  partners you met with to discuss this
23  one-on-one?
24        A.  In what timeframe, sir?
25        Q.  In the last few weeks.  The period
TSG Reporting - Worldwide     877-702-9580

Page 171

1                -Lewkow-
2  you referred to in your last answer.
3        A.  In the last few weeks, putting
4  aside Mr. Hume and Mr. Morag, had
5  conversations with Duane McLaughlin, David
6  Leinwand, Lindsee Granfield, to some extent Ed
7  Rosen.  I think that's it.
8        Q.  And these are all --
9        A.  Oh, Bob Davis.  Robert P. Davis.
10        Q.  And these are all people you met
11  one-on-one?
12        A.  No.  No.  I'm not saying that at
13  all.  Some of those folks I only talked about
14  this in larger groups.  Some I had one-on-one,
15  some I did maybe some of each.
16        Q.  What about Mr. Rosen?
17        A.  Any conversation I had with him was
18  in the context of there was some -- the
19  context of us working together to prepare his
20  declaration and my declaration.  So I had no
21  one-on-one conversations with Ed.
22        Q.  Have you seen Mr. Rosen's
23  declaration?
24        A.  I did read it, yes.
25        Q.  Did you see any drafts of his
TSG Reporting - Worldwide     877-702-9580

Page 172

1                -Lewkow-
2  declaration?
3        A.  Yes.
4        Q.  In any of the meetings that you
5  described with your partner, did Mr. Jonathan
6  Hughes participate?
7        A.  No, I don't believe he did.
8        Q.  Did you have any meeting with
9  Mr. Hughes concerning any of the topics for
10  this deposition?
11        A.  In what timeframe?
12        Q.  In the last few weeks.
13        A.  No.  Last few weeks, I don't know
14  how many weeks is "a few weeks."
15        MR. MORAG:  The question relates to
16  the Deposition Notice to Cleary
17  Gottlieb Steen & Hamilton.
18        A.  No.
19        Q.  Did you have any meetings with
20  Mr. Hughes?
21        A.  Oh, did anyone talk to Mr. Hughes?
22  Is this addressed to me or --
23        Q.  Yes, you.
24        A.  My personal, did I have any
25  conversations in connection with the
TSG Reporting - Worldwide     877-702-9580

Page 173

1                -Lewkow-
2  declaration?
3        Q.  In connection with any of the
4  topics that are in the Notice for this
5  deposition.
6        A.  Can I speak with counsel?
7        Q.  Why don't we leave this for a
8  break?
9        A.  Sure.
10        Q.  You can ask and then you can answer
11  after that.
12        A.  Sure.
13        Q.  I gather from your earlier
14  testimony that you had almost a front row seat
15  at the sale hearing on the 19th of September?
16        A.  Yes.
17        Q.  And you understood the purpose of
18  that hearing was for the Court to decide
19  whether to approve the sale of the business to
20  Barclays?
21        A.  Yes.
22        Q.  Did you understand that the Court
23  needed to understand the economics of the
24  transaction in order to make that
25  determination?
TSG Reporting - Worldwide     877-702-9580

Page 174

1            -Lewkow-
2        MR. HUME:  Objection.  Vague.
3    Calls for speculation.
4        MR. MORAG:  Objection to form.
5        A.  I don't know what you mean by "the
6    economics."
7        Q.  Did you have an understanding that
8    the Court needed to know the overall values of
9    what were being provided to Barclays and what
10   Barclays -- the consideration that Barclays
11   was paying?
12       A.  It was my understanding that the
13   Court needed to know the terms of the deal.
14   The terms were, as set forth in the Asset
15   Purchase Agreement, and as -- with such
16   changes as were described to the Court.  That
17   is what I believe was required and took place.
18       Q.  And you had no understanding beyond
19   that as to whether the Court needed to know
20   what the economic value of those terms were?
21       A.  You know, "economic value" is --
22   there's all sorts of -- there are lots of
23   numbers around and the like.  There was no --
24       We were buying basically a
25   business.  Obviously, everyone knew that
            TSG Reporting - Worldwide    877-702-9580

Page 175

1            -Lewkow-
2    Barclays thought that it was buying a business
3    because they thought in the long run they
4    would make money; that it would be a good
5    investment for them and a good acquisition --
6    taking enormous risks in the course of doing
7    that.
8        So, you know, I don't know what --
9    I don't know what you're getting at,
10   Counselor.  But as I said, the Court needed to
11   know, and did know, the terms of the Asset
12   Purchase Agreement and they were told about
13   the material changes that, you know, were
14   going to be made to deal with -- as described
15   to the Court by Weil Gotshal.
16       Q.  Did you have any understanding as
17   to whether the Court, in making its
18   determination, needed to know what the value
19   was of the terms that you described?
20       MR. MORAG:  Mr. Lewkow --
21       THE WITNESS:  I think he's asking
22   for my legal --
23       MR. MORAG:  To the extent your
24   understanding is based on legal advice
25   that you developed yourself or someone
            TSG Reporting - Worldwide    877-702-9580

Page 176

1            -Lewkow-
2    has provided to you within Cleary
3    Gottlieb, I instruct you not to answer.
4        A.  I have no -- I'm not going to
5    respond.
6        Q.  Sir, on page 7, Paragraph 11 of
7    your Declaration, you refer to the Lehman
8    Trustees' representatives were present at
9    Weil.  Did you meet with any of those
10   representatives?
11       A.  Not one-on-one.
12       Q.  Did you have any discussions with
13   them?
14       A.  They were in the room at various
15   times when discussions took place, and I
16   believe that they had other conversations with
17   the Debtors' representatives.
18       Q.  Do you recall any discussions you
19   had with any particular representative of the
20   Trustee?
21       A.  No.
22       Q.  Sir, if you turn to page 9 of your
23   Declaration.  If you take a look at
24   Paragraph 17.  If you read that first
25   sentence.
            TSG Reporting - Worldwide    877-702-9580

Page 177

1            -Lewkow-
2        (Witness reviewing document.)
3        A.  Read the first sentence?
4        Q.  Yes.  The first sentence of
5    Paragraph 17.
6        A.  Uh-huh.  Yes.
7        Q.  You refer there to your
8    conversations with your partners?
9        A.  Yes.
10       Q.  What are you referring to?
11       A.  Well, all I'm getting at is that I
12   was signing this declaration and it was my
13   knowledge.  But in this sentence, it was
14   not -- as said in one of the introductory
15   paragraphs that you asked me about earlier, I
16   did consult with my -- some of my partners in
17   preparation -- in preparing this declaration.
18   And in particular, I bring attention to the
19   fact that this -- this does -- was not merely
20   in my presence, but I did confirm with my
21   partners that this was -- applied to them as
22   well.
23       Q.  And how did you do that?
24       A.  The conversations I've described to
25   you.
            TSG Reporting - Worldwide    877-702-9580

Page 178

```
1         -Lewkow-
2    Q.  With the partners you've named
3  earlier; is that correct?
4    A.  Yes.  Yes.
5    Q.  And what did you ask those
6  partners?
7       MR. HUME:  I'm going to object to
8    that to the extent it calls for any
9    question not necessary to confirm the
10   facts set forth in the first sentence
11   of Paragraph 17 which are facts
12   relating to non-privileged
13   communications and the like thereof
14   between Cleary and Lehman's lawyers, or
15   Lehman.
16   A.  All I --
17      MR. HUME:  You are not entitled to
18   ask him every aspect of the
19   conversations he had with his partners
20   just because they confirmed facts.
21   A.  The answer is I asked --
22      MR. MAGUIRE:  Excuse me.  Let me
23   just make the record clear.
24   Q.  I'm only asking you now about the
25  conversations you had with your partners for
```

Page 179

```
1         -Lewkow-
2  the purpose of being prepared to prepare your
3  Declaration and for your testimony today.
4      And specifically what I'm asking
5  you is: How did you elicit from your partner
6  that no such suggestion had been made?  The
7  suggestion being what you referred to in
8  Paragraph 17.
9    A.  I asked the more likely suspects.
10   Q.  And what did you ask them?
11   A.  Whether or not they had ever heard
12  of -- during those -- those day or two, a
13  suggestion by the other side that the property
14  that was securing the exchange- traded
15  derivatives portion of the business that we
16  were buying was not to be transferred as part
17  of the Purchased Assets.
18   Q.  Who was the person on the Cleary
19  team who had principal responsibility for that
20  part of the deal?
21   A.  Well, "that part of the deal"?  So
22  there were conversations including with the
23  OCC that are referenced here, where -- but
24  those weren't conversations with the other
25  side.  Those were conversations with the OCC.
```

Page 180

```
1         -Lewkow-
2  On that subject, I defer to Ed Rosen.  He was
3  certainly involved in the OCC conversations
4  and there may have been others who were
5  involved in those conversations.  I was not
6  involved in the OCC conversation.
7       I was involved, as were the people
8  I mentioned earlier, in the Clarification
9  Letter.  And those reflected conversations
10  that took place in connection -- by those
11  people who were present in connection at one
12  point or another with the Clarification
13  Letter.  And they confirmed, as stated in my
14  declaration, that to their knowledge, none of
15  the -- none of those people, in conversations
16  they were party to, had ever suggested what I
17  say here, what I have in this Paragraph 17.
18   Q.  Did anyone tell you about any
19  suggestion or any indication from anyone, that
20  any portion of the property held to secure
21  Lehman's exchange-traded derivatives was not
22  to be transferred to Barclays?
23   A.  No.
24   Q.  Did anyone tell you that any
25  language --
```

Page 181

```
1         -Lewkow-
2       MR. HUME:  Excuse me.
3       (Discussion off the record.)
4  BY MR. MAGUIRE:
5    Q.  Did anyone tell you that any
6  language concerning the transfer of margin to
7  Barclays had been deleted from a draft of the
8  Clarification Letter?
9       MR. MORAG:  Object to the form.
10   A.  I have trouble with the way you
11  asked that question.  There were a lot of
12  changes that got changed over the weekend to
13  the Clarification Letter to implement the
14  transaction, to clarify the transaction,
15  etcetera.
16      So changes were made in the
17  Clarification Letter, but they were
18  consistent.  Insofar as they relate to the
19  margin on the exchange-traded derivatives, it
20  was consistent with our understanding with
21  what the Asset Purchase Agreement had always
22  contemplated.
23      And change X by itself might have
24  one impact that you had to fix by, therefore,
25  also changes -- making change Y, but the net
```

Page 182

1          -Lewkow-
2  result was to maintain exactly the same
3  situation as it had always been, that the
4  entire positions, including the margin
5  associated with those positions was part of
6  the deal.
7       Q.  I don't want to speak in
8  generalities here.  I want to ask you very
9  specific questions.  Were you personally made
10 aware that language providing for margin,
11 transfer of margin to Barclays, was deleted in
12 a draft of the Clarification Letter?
13      MR. MORAG:  Objection.
14 Mischaracterizes the evidence.
15      A.  You're going to have to point me to
16 something if you have something in mind.  I
17 can't -- I'm not sure I know what you're
18 referring to, so I can't answer that question.
19      Q.  Do you have any recollection from
20 the work that you did that any reference to
21 "margin," to transferring margin to Barclays
22 was deleted from a draft of the Clarification
23 Letter?
24      MR. MORAG:  Object to the form.
25 Mischaracterizes the evidence.

TSG Reporting - Worldwide    877-702-9580

Page 183

1          -Lewkow-
2       A.  I don't know what you're referring
3  to, if anything.
4       Q.  Do you have any such recollection,
5  sir?
6       A.  Deleting a reference to margin?  As
7  I said, there were changes that were made, and
8  one change might have an unintended -- might
9  either -- remember, these were drafts.  They
10 weren't signed except for the version that was
11 signed.
12      There may have been changes where
13 something got deleted and then the side effect
14 of it was -- by somebody, rightly or wrongly,
15 and then someone said, Wait a second, the
16 effect of that is to have an impact that
17 wasn't intended.  So if that clause gets out,
18 we have to add another clause somewhere else.
19      That happened in a few context in
20 the Clarification Letter.  I'm not sure if it
21 happened here.  And if so, it may have been
22 fixed.  But if so, it was to maintain the
23 deal.
24      Q.  I'm not asking you now what might
25 have happened.  I'm asking you what you do

TSG Reporting - Worldwide    877-702-9580

Page 184

1          -Lewkow-
2  remember; whether you have a recollection or
3  whether you do not have a recollection.
4       A.  The reason -- look, the reason...
5       Q.  Why don't I rephrase the question
6  and you can give me your best recollection?
7       Sir, do you have a recollection
8  whether in a draft of the Clarification
9  Letter, language concerning a proposed
10 transfer of margin to Barclays was deleted?
11      MR. HUME:  I object to the
12 question.  To the extent you're asking
13 about a specific provision that was
14 changed, I think you need to show it to
15 the witness in order for the record to
16 be accurate.  Otherwise, I think the
17 record is inaccurate.
18      A.  We went through a lot of drafts
19 very quickly, and I'll be happy to go through
20 them and answer your question.
21      Q.  Without going through the draft,
22 sir, do you have an independent recollection?
23      A.  No.
24      Q.  Did any of the partners to whom you
25 spoke, advise you that there had been language

TSG Reporting - Worldwide    877-702-9580

Page 185

1          -Lewkow-
2  transferring margin to Barclays that had been
3  deleted from a draft of the Clarification
4  Letter?
5       In any of the conversations that
6  you testified that you had with your partners
7  over the last few weeks?
8       MR. MORAG:  Objection.  That calls
9  for attorney/client communications and
10 work product.  You know that Mr. Rosen
11 is responding to an assertion made in
12 this case and they obviously -- he's
13 already testified they discussed it.
14      MR. MAGUIRE:  If you're directing
15 the witness not to answer, that's one
16 thing.  Otherwise, I'll ask the witness
17 to answer.
18 DI      MR. MORAG:  I'm directing him not
19 to answer.
20 BY MR. MAGUIRE:
21      Q.  Sir, the next sentence of Paragraph
22 17 starts, "to the contrary."  Do you see
23 that?
24      A.  Yes.
25      Q.  I'd like to ask you to focus on

TSG Reporting - Worldwide    877-702-9580

Page 186

1          -Lewkow-
2    your reference to the parties' communications.
3    Do you see that?
4          (Witness reviewing document.)
5          Q.  Is there anything --
6          A.  Yes.
7          Q.  -- that you're referring to there
8    other than the e-mails to and from the OCC and
9    its counsel?
10         A.  I don't recall.  Not to my personal
11   recollection.
12         Q.  You go on to mention the deal
13   documents?
14         A.  I do.
15         Q.  And you say that they "make clear,
16   do you see those words?
17         A.  Yes.
18         Q.  And you have a quote there, "Any
19   property that may be held to secure
20   obligations under such derivatives."
21         A.  Yes.
22         Q.  I take it that's a quote from the
23   deal documents?
24         A.  I believe so, unless we put in a
25   typo or something.  But yes, that's my

Page 187

1          -Lewkow-
2    understanding.
3          Q.  In making this clear, is it your
4    understanding that those words are to be read
5    in their plain English meaning and not as any
6    term of art?
7          MR. HUME:  Objection.  Vague.
8          MR. MORAG:  Objection to form.
9       You're asking for a legal opinion.  But
10      I think you can answer that question
11      without explaining why your answer is
12      what it is.
13         A.  I don't understand the question.
14         Q.  When you say that this language
15   makes clear that Barclays was to receive, that
16   language, are you telling us it makes it clear
17   in its plain English sense?  Or are you
18   suggesting there is some term of art here that
19   we should know about?
20         MR. HUME:  I object to the question
21      as it calls for a legal interpretation,
22      and I think the terms you are using are
23      vague.
24         A.  I'm -- I find it vague.
25         Q.  If you're unable to answer the

Page 188

1          -Lewkow-
2    question, sir, you can just say so.
3          A.  I think the deal documents made it
4    clear that they -- that we were to receive --
5    that Barclays was to receive the exchange-
6    traded derivatives, including any property
7    that may be held to secure obligations under
8    such derivatives.
9          Q.  And those words are plain on their
10   face; is that your understanding?
11         A.  I don't think there's a trick in
12   those words.
13         Q.  Are you aware of any discussions
14   that anyone in the Barclays side had
15   concerning -- with anyone, from Lehman or the
16   Trustee or anyone else involved in the
17   transaction, concerning the subject of margin?
18         A.  Yes.
19         MR. MORAG:  With regard to
20      exchange-traded derivatives or
21      otherwise?
22         MR. MAGUIRE:  Yes.  Any margin.
23         A.  I believe that there was -- there
24   is a -- that there is a -- there was
25   discussion when language -- in the context of

Page 189

1          -Lewkow-
2    finalizing and prior to that the Clarification
3    Letter, that necessarily because some language
4    was added to eliminate any conceivable issue
5    and to reflect the original understanding in
6    the Asset Purchase Agreement, that on the
7    exchange-traded derivatives, that the margin
8    was part of the positions.  So, yes.
9          Q.  Tell me what you know of those
10   discussions?
11         A.  Well, it would be helpful if I can
12   look at the Clarification Letter and the
13   various drafts.
14         Q.  We will certainly do that.  But
15   first, I would like your independent
16   recollection of the discussions you recall
17   concerning the --
18         A.  My understanding -- and some of
19   this is personal recollection and some of it
20   is my capacity as a representative of the firm
21   under the 30(b)(6) -- is that in the course of --
22   a couple of things happened.  One was the
23   discussions with the OCC that I was not
24   directly a party to it, that people had
25   focused on the margin, and that meanwhile

Page 190

1  -Lewkow-
2  people were playing with the -- people had
3  made a variety of changes to do other things
4  in the Clarification Letter.
5  And at some point, language was
6  added to confirm that it had -- and it was my
7  understanding this was not at all
8  controversial, to confirm the intention of the
9  parties that in the Asset Purchase Agreement,
10  signed in the Asset Purchase Agreement, that
11  the intention was that the entire -- that the
12  positions relating to exchange-traded
13  derivatives that were being acquired by
14  Barclays included the margin and in some words
15  clarifying and making that specifically that
16  those were within the all assets that were
17  being purchased, other than Excluded Assets,
18  that that was included.
19  Q.  And who was involved in those
20  discussions that you just referred to?
21  A.  I believe one or more -- I may have
22  been a participant to a very minor extent.  I
23  believe it was one or more of Duane
24  McLaughlin, Bob Davis and Dave Leinwand and Ed
25  Rosen.  Ed Rosen I think may have been
TSG Reporting - Worldwide    877-702-9580

Page 191

1  -Lewkow-
2  involved as well.
3  Q.  You said you were involved to a
4  very minor extent.  Can you tell me what you
5  remember?
6  A.  What I told you.  What I just
7  testified to.
8  Q.  With whom did you have discussions
9  about including margin, you personally?  Not
10  in your representative capacity.
11  A.  To anyone other than my colleagues
12  or my client?
13  Q.  Yes.
14  A.  Not sure I did.
15  Q.  Can you tell me, please, with whom
16  Duane McLaughlin had discussions about margin?
17  MR. HUME:  Excuse me.  Is
18  Mr. Lewkow designated as 30(b)(6) on
19  this topic?
20  MR. MORAG:  No, he is not actually.
21  A.  Then you'll have to ask Mr. Rosen.
22  Q.  The names you mentioned, Duane
23  McLaughlin, Bob Davis, Dave Weinman --
24  A.  It's David Leinwand,
25  L-e-i-n-w-a-n-d.
TSG Reporting - Worldwide    877-702-9580

Page 192

1  -Lewkow-
2  Q.  What is your basis for
3  understanding that they had discussions about
4  margin?
5  A.  Because they were involved in the
6  clarification over that weekend.  They were
7  sitting with Weil Gotshal.  Weil Gotshal was
8  keeping, at least on Sunday, was running the
9  documents and they were sitting there on and
10  off talking to Weil Gotshal.
11  And where everyone else was around
12  in a room that was open to all the folks who
13  were there that weekend and people came in and
14  out.  And that change was made.  So that's my
15  understanding they were involved.
16  Q.  Did any of the gentlemen you
17  mentioned, the four people you mentioned, tell
18  you they had had discussions about margin?
19  A.  They told me that they were -- one
20  or more of them, and I don't remember which
21  ones.  But I think a couple of them did
22  indicate that they were -- that this provision
23  which was added by Weil Gotshal in turning the
24  documents, reflected conversation they had
25  with Weil Gotshal.
TSG Reporting - Worldwide    877-702-9580

Page 193

1  -Lewkow-
2  Q.  Did they tell you anything more
3  about that?
4  MR. HUME:  This is all --
5  THE WITNESS:  This is all 30(b)(6).
6  MR. HUME:  It is either privileged
7  or 30(b)(6), and you're not on the
8  30(b)(6) topic.  The only reason we're
9  allowing it to go is based on your
10  initial reference there to Paragraph 17
11  of the declaration, which I assume is
12  what you're asking.
13  MR. MAGUIRE:  Well, I would like to
14  hear what the witness was told about
15  the conversations with Weil.
16  Q.  First of all, can you tell me who
17  of the four told you that they had a
18  conversation with Weil?
19  MR. MORAG:  Objection.  Asked and
20  answered.  He just told you.
21  A.  I said, I don't recall.
22  Q.  Can you tell me, what did they tell
23  you about the conversation other than they had
24  a conversation with Weil about margin?
25  A.  My recollection is that there --
TSG Reporting - Worldwide    877-702-9580

Page 194

1          -Lewkow-
2   their -- either as a result of other changes
3   that had been made -- other things in the
4   Clarification Letter or as a result of the OCC
5   process, that somebody had raised the issue of
6   whether it was still clear, as it had been in
7   the Asset Purchase Agreement that there was
8   any doubt on the subject and that Weil agreed
9   that was the intention and they put it in.
10  But I don't remember specifically.  This was
11  not negotiated is my understanding.  It was
12  agreed it went in because it was reflecting
13  the transaction as it had always been --
14  "always" meaning from the signing of the Asset
15  Purchase Agreement onward, had always been
16  understood.
17      Q.  Do you know any of the details of
18  what the Cleary representatives told Weil in
19  this discussion --
20      MR. MORAG:  Objection.  Asked and
21  answered.
22      Q.  -- about the margin?
23      A.  I told you everything I recollect,
24  sir.
25      Q.  You described earlier a hallway
    TSG Reporting - Worldwide    877-702-9580

Page 195

1          -Lewkow-
2   conversation that you had which started with
3   your reviewing an internal Lehman e-mail.  Do
4   you recall that testimony, sir?
5       A.  An internal Lehman Brothers'
6   e-mail?
7       Q.  Yes.
8       A.  Yes.
9       MR. GAFFEY:  I'll show you a
10  document which we will mark as
11  Exhibit 615A which is an e-mail from
12  Joel Potenciano to a list of people, a
13  long list of people, starting with
14  Joseph Abate dated Thursday,
15  September 18, 2008.
16      (Deposition Exhibit, 615A, 2PP
17  9/18/08 e-mail from J. Potenciano to
18  distribution re: Preliminary 15c3-3
19  reserve lock-up as of 9/17/08, marked
20  for identification, as of this date.)
21      Q.  If you can take whatever time you
22  need, sir, to examine that document and tell
23  me whether you've ever seen it before.
24      (Witness reviewing document.)
25      A.  Well, it may be the printing.  But
    TSG Reporting - Worldwide    877-702-9580

Page 196

1          -Lewkow-
2   I recall seeing a document that -- that didn't
3   have an attachment, the second page -- well,
4   wait a second.  I never saw this document.
5   I've never seen this document.  This is
6   different than what I've seen.
7       Q.  You described in some detail the
8   hallway conversation.  Is there anything that
9   you recall of that conversation that you did
10  not describe in your prior testimony?
11      A.  Give me a minute, please.
12      I gave a long answer.  I don't
13  remember precisely what I said.  Nothing
14  occurs to me at the moment that I did not
15  include in that subject.
16      Q.  Prior to that hallway conversation,
17  did you have an understanding of what a 15c3-3
18  account was?
19      A.  As I testified this morning, until
20  that Friday afternoon -- this hallway
21  conversation was on Sunday.  Until Friday
22  afternoon, I had -- I may have heard of it.
23  But if so, it never registered in my
24  consciousness.  Prior to that, I really did
25  not know anything about 15c3-3 accounts prior
    TSG Reporting - Worldwide    877-702-9580

Page 197

1          -Lewkow-
2   to Friday.
3       Q.  In the course of the hallway
4   conversation, did anyone describe what a 15c3
5   account was?
6       A.  At some point between Friday
7   afternoon and Sunday, I heard a little bit --
8   I don't remember from whom -- about 15c3-3
9   accounts, and that it would -- that they were,
10  you know, accounts maintained by a
11  broker-dealer of their own assets, with their
12  assets, but that for regulatory reasons were
13  segregated in connection with the company's --
14  the broker-dealers to protect the interest of
15  clients of the broker-dealer.
16      Q.  You understood that the assets were
17  restricted to ensure that customer property
18  could be returned to the customers?
19      MR. MORAG:  Object to the form.
20      A.  Yeah, I used the word "segregated."
21  There were applicable -- I knew there were
22  applicable SEC rules.  Because if you could
23  merely -- if tomorrow Goldman Sachs could take
24  its 15c3-3 account and just spend it all on
25  bonuses, if you will, that would eliminate the
    TSG Reporting - Worldwide    877-702-9580

Page 198

1          -Lewkow-
2    protection that the rule is aimed at doing.
3          I don't know if I would use the
4    word you used, but I recognized that there
5    were regulatory implications about the ability
6    to take the money out that were tied to the
7    accounts of the customers who were being
8    directly or indirectly -- I'm not sure the
9    details of how it works -- to provide some
10   level of effort to the customers and clients.
11        Q.   Was there a discussion of the
12   regulatory constraints on Lehman in releasing
13   funds from its c3 account?
14        A.   As I testified this morning, I
15   believe that when the discussion took place,
16   somebody from Weil -- none of the Weil people
17   were experts at all on 15c3-3 accounts as they
18   all said at the time.  One of them made that
19   point.  And on our side, we did have someone
20   who did have real expertise, Ed Rosen, who was
21   participating at least by the latter stages in
22   discussions.  So somebody from Weil had raised
23   the question of, "Gee, as far as we at Weil
24   know, maybe we need approval from the SEC to
25   do this.  And Rosen said, "You don't need
        TSG Reporting - Worldwide    877-702-9580

Page 199

1          -Lewkow-
2    approval to do it, there is no approval
3    requirement."
4          And they said, "Well, this is an
5    account that we gather -- you know, we know is
6    required as a regulatory matter.  Let's at
7    least say --" they may have proposed saying,
8    you know, "subject to SEC approval," I don't
9    remember if they used those words.
10        And Ed said, "No, that's wrong
11   because there is no need for SEC approval."
12   And they said, "Can we say something like
13   'subject to applicable law'?"  Or something
14   like that.  And since we tried to comply with
15   the SEC laws and rules, Ed did not object to
16   that, and language to that effect went into
17   the document.
18        Q.   Did anyone explain that only an
19   amount in excess of a c3 calculation is
20   permitted to be removed from such a restricted
21   account?
22        MR. MORAG:  Objection to form.
23        Answer with respect to anything you
24   were told from the Lehman side.
25        A.   I believe that 15 -- as I
        TSG Reporting - Worldwide    877-702-9580

Page 200

1          -Lewkow-
2    understood 15c3-3 with total non-expertise, it
3    is a requirement that you maintain certain
4    reserves in a segregated account to protect
5    the interest of customers.  And I don't
6    recall -- I was aware certainly that basically
7    Barclays was assuming the accounts.  So I'm
8    not sure whether there was a difference
9    between an excess and a non-excess given that
10   I don't think Lehman, as a broker-dealer, was
11   going to continue to have customer accounts.
12   But that's all I can say on that subject.
13        Q.   In that hallway conversation,
14   Mr. Rosen did not say that only the excess
15   could be transferred?
16        MR. MORAG:  Is that a question?
17        MR. MAGUIRE:  Yes.
18        A.   I don't remember the word "excess."
19   You'll have to ask Mr. Rosen.
20        Q.   Did Mr. Rosen say anything about a
21   deficiency in the c3 account?
22        A.   There was no discussion of
23   deficiency of the c3 account.  Lehman Brothers
24   on Friday -- I was told that Lehman Brothers
25   on Friday had identified this account as
        TSG Reporting - Worldwide    877-702-9580

Page 201

1          -Lewkow-
2    assets that consistent with the Asset Purchase
3    Agreement that required the delivery of all
4    assets used in the business other than
5    specifically excluded assets.  But they
6    identified this account for the first time on
7    Friday as assets that were Lehman, that Lehman
8    could deliver to Barclays as the purchaser.
9    And therefore, certainly no one had a
10   discussion of the deficiency.
11        Q.   Did anyone have any discussion
12   about a shortfall in customer property?
13        A.   I don't know what you mean by
14   "shortfall" as opposed to "deficiency."  To me
15   it sounds the same.  I don't -- no.
16        Q.   Did anyone discuss where Lehman
17   would get the property to pay Barclays if it
18   was unable, could not get approval, to remove
19   the funds from the c3 account?
20        A.   I think --
21        MR. MORAG:  Object to the form of
22   the question, to the word "funds."  I
23   think there has been testimony what was
24   agreed to be transferred was
25   securities.
        TSG Reporting - Worldwide    877-702-9580

## Page 202

1        -Lewkow-
2     A.  As I testified earlier, in the
3 course of this discussion, Mr. Klein said in
4 words or in substance that, okay, we will take
5 the billion dollars that are sitting in a bank
6 in cash, deposited with the bank but we want
7 to get the 760-odd million.  And if you can't
8 get it there, we want to get it some other
9 way.  And that's my recollection of the
10 discussion.
11     **Q.  In the middle of Paragraph 20 of**
12 **your Declaration, page 10, after you referred**
13 **to Mr. Klein, you say, "This was agreed to by**
14 **representatives of Lehman."  Do you see that?**
15     A.  Yes.
16     **Q.  What do you mean by "this"?**
17     A.  That if the lead -- if there were
18 legal constraints preventing transfer of the
19 rule 15c3-3 account assets, Barclays would
20 receive substitute assets.
21     **Q.  And who were the Lehman**
22 **representatives who agreed to that?**
23     A.  At a minimum, it included the Weil
24 group that was standing there.  I don't know
25 what authority they had.  As I said, this took
    TSG Reporting - Worldwide    877-702-9580

## Page 203

1        -Lewkow-
2 place over a couple of conversations, I think.
3 At a minimum, it included them.
4     I actually believed that somebody
5 from Lehman may have been with them during
6 this discussion, but I don't have a distinct
7 recollection of that.  As I said, the group
8 had gotten larger during the course of these
9 two or three hallway conversations.  But I --
10 you know, certainly I leave it to Weil
11 Gotshal.
12     You know, I have enormous respect
13 for Mr. Miller and Mr. Roberts and Ms. Fife
14 and the other lawyers, and Mr. Masaneo, and
15 the other lawyers who were there doing their
16 best to represent their clients.  They know
17 what things they need to go back to and not go
18 back to.
19     So if there was no one from Lehman
20 Brothers there -- I just don't recall if
21 someone from Lehman was there at that moment
22 or not.  But Lehman -- Lehman's counsel -- and
23 there may have been somebody from Simpson
24 Thacher there as well.  May well have been.
25     Lehman's counsel agreed to it.  And
    TSG Reporting - Worldwide    877-702-9580

## Page 204

1        -Lewkow-
2 then it went -- later in the day it got into a
3 draft.  So certainly -- I don't know what
4 kind -- if Lehman people were not present at
5 that moment, I assume Weil either had
6 authority or obtained authority to include
7 that in.  But you'll have to ask them.
8     **Q.  How did Mr. Miller signify his**
9 **agreement to this?**
10     A.  He said -- somebody from Weil said,
11 okay, or yes, or that's not a problem.  I
12 don't know what words he used.
13     **Q.  Who was the person from Weil who**
14 **said one of those variety of comments?**
15     A.  I don't -- I don't remember.
16     **Q.  And did you understand that person**
17 **from Weil to be agreeing that Barclays would**
18 **get $769 million unconditionally as part of**
19 **the sale as opposed to simply agreeing to the**
20 **inclusion of the language proposed "to the**
21 **extent permitted by applicable law"?**
22     A.  No, I think the phrase -- my
23 understanding at the time and I think what we
24 were all talking about was my understanding
25 was the reason "to the extent permitted by
    TSG Reporting - Worldwide    877-702-9580

## Page 205

1        -Lewkow-
2 applicable law" or words of that nature were
3 going to get added to the language was because
4 of the technical rules governing 15c3-3 that
5 the Weil lawyers had conceded they were not
6 experts on.
7     I had absolutely no expectation,
8 and it was never suggested, to my
9 recollection, that the limitation "to the
10 extent permitted by applicable law" was a
11 limitation on the broader statement: if we
12 can't transfer that, we will transfer
13 something else.  That was not my
14 understanding.
15     **Q.  Did you do anything to confirm your**
16 **understanding that when Weil, somebody at Weil**
17 **said "okay" or "yes," they were agreeing to**
18 **make this obligation unconditional as opposed**
19 **to simply agreeing to the inclusion of the**
20 **language proposed "to the extent permitted by**
21 **applicable law"?**
22     A.  The language was drafted to reflect
23 the conversation that took place in the
24 hallway and was included in the Clarification
25 Letter.  I believe there is nothing else to
    TSG Reporting - Worldwide    877-702-9580

Page 206

-Lewkow-

1  say.  People agreed to a principle, it got
2  reflected in the Clarification Letter.
3      Q.  A couple of lines down in your
4  Declaration, you refer to some other language,
5  it's the phrase you referred to "are
6  securities of substantially the same nature
7  and value."  Do you see that?
8      A.  Yes.
9      Q.  Who proposed that language?
10     A.  I described the agreement, the oral
11 agreement that was reached in the hallway.  It
12 was then left to the folks focusing on pushing
13 the paper forward on the Clarification Letter,
14 which included both Cleary folks and Weil
15 folks and there were others involved, or at
16 least in the room at some time during that
17 conversation.
18     And I believe that somebody did a
19 first version of it that referred to -- of the
20 same nature and didn't include "and value."
21 And then someone on the Barclays' team said,
22 "Well, that doesn't work because that
23 wouldn't -- what does that mean?"  So the
24 words "and value" got put in.

TSG Reporting - Worldwide    877-702-9580

Page 207

-Lewkow-

1      Q.  Did anyone at Barclays go back and
2  ask anyone at Weil what that meant?
3      A.  What what meant, sorry?
4      Q.  The words "are securities of
5  substantially the same nature"; what was meant
6  by that language?
7      A.  With all due respect, when people
8  are trying to write a document and trying to
9  get a deal done under incredibly difficult
10 circumstances and somebody writes a language
11 that on its face does not work to solve the
12 problem that had been discussed and agreed to
13 on all matters by people to solve a problem,
14 and it was obvious that to say "the same
15 nature" could mean one dollar worth of
16 securities, that would have been an idiotic
17 remark.
18     We had no reason to believe that
19 Weil was trying to sabotage the deal that
20 their colleagues had agreed to.  And so my
21 understanding, someone said, "You got to add
22 the word 'and value'," and they said "Of
23 course," and it happened.
24     Q.  From whom did you get that

TSG Reporting - Worldwide    877-702-9580

Page 208

-Lewkow-

1  understanding?
2      A.  From my colleagues, Mr. Davis,
3  Mr. McLaughlin and Mr. Leinwand and one or
4  more of that group.
5      MR. HUME:  Can we take a short
6  break?
7      THE WITNESS:  Yes, I can use a
8  bathroom break.  Thank you.
9      (Whereupon, a recess was taken
10 from 3:58 p.m. to 4:24 p.m.)
11 BY MR. MAGUIRE:
12     Q.  Sir, over the course of the weekend
13 prior to closing, did you participate in any
14 meetings with the Creditors Committee?
15     A.  No.  Let me add to that.  That
16 isn't to say that one or more members of the
17 Creditors Committee may have been present when
18 meetings took place.  But I certainly did not
19 have any -- to my knowledge, any particular
20 meetings with the Creditors Committee.
21     Q.  Let me show you a document that's
22 previously been marked as Exhibit 451.
23     A.  I got it.
24     Q.  Do you recognize that document,

TSG Reporting - Worldwide    877-702-9580

Page 209

-Lewkow-

1  sir?
2      A.  Yes.
3      Q.  What is it?
4      A.  This looks like, and this is the
5  document, I'm quite sure, that I was shown and
6  you asked me about before.  This is the
7  letter -- the internal Lehman Brothers' e-mail
8  that I was shown that Sunday by Weil Gotshal
9  with respect to the 15c3-3 reserve account.
10     Q.  And you mentioned that a bank had a
11 billion dollars of cash.  Are you referring to
12 the cash with Wells Fargo?
13     A.  Yes.  On deposit with Wells Fargo.
14     Q.  So you understand this was, taking
15 the billion dollars in cash out of the
16 transaction left $769 million in qualified
17 securities?
18     A.  Yes.
19     Q.  And that was in the subject of the
20 provision that was put in the Clarification
21 Letter?
22     A.  Yes.
23     Q.  You'll see the reference here to
24 Mike Macchiaroli?

TSG Reporting - Worldwide    877-702-9580

Page 210

1          -Lewkow-
2      A.   Yes.
3      Q.   Did anyone from Barclays have any
4  discussions with Mr. Macchiaroli prior to the
5  closing concerning this issue?
6          MR. MORAG:  To your knowledge.
7      A.   Not to my knowledge.
8      Q.   Did anyone from Barclays have any
9  discussion with anyone at the SEC concerning
10  the c3 account?
11      A.   Not to my knowledge.
12      Q.   I'll show you a document we
13  previously marked as Exhibit 49.
14      A.   Yes.
15      Q.   Do you know whether you've seen
16  this before?
17      A.   Yes, I have.
18      Q.   When did you first see it?
19      A.   At or about the time it was sent.
20      Q.   When did you last see it?
21      A.   I think in preparation for this
22  deposition, it's -- I didn't study it closely.
23  But I did quickly look at the various drafts
24  that my counsel had provided me.
25      Q.   And you understand this is a
       TSG Reporting - Worldwide    877-702-9580

Page 211

1          -Lewkow-
2  revised Clarification Letter that Mr. Leinwand
3  sent around on Saturday, September 20th?
4      A.   Revised draft Clarification Letter
5  that Mr. Leinwand sent around at --
6  late Saturday night.  It went out at
7  11:13 p.m. Yes.
8      Q.   And he circulated, the attachment
9  is both a clean version and a blackline?
10      A.   That is correct.
11      Q.   The blackline is about halfway
12  through the document and it has at the top
13  "Cleary Gottlieb Comments."  Do you see that?
14      A.   Yes.
15      Q.   If you turn to the second page of
16  that, sir.
17      A.   Of the blacklined version?
18      Q.   Yes.
19      A.   Yes.
20      Q.   You will see there is a blackline
21  in section (d), the second half of the page.
22      A.   Yes.
23      Q.   And if you scroll down about
24  two-thirds of the way down, you'll see a
25  reference to a Section A.  Do you see that?
       TSG Reporting - Worldwide    877-702-9580

Page 212

1          -Lewkow-
2      A.   I see it.
3      Q.   And the language reads, "By or on
4  behalf of LBI pursuant to Rule 15c3-3 of the
5  Securities Exchange Act of 1934, or
6  otherwise..."  Do you see that?
7      A.   I do.
8      Q.   And then it goes on to say, "Are by
9  or on behalf of any clearing agency or any
10  clearing organization to collateralize,
11  guarantee, secure, whether as margin,
12  guarantee funds, deposits or in any other
13  form."  Do you see that that language, sir?
14      A.   I do.
15      Q.   Now, were you aware that that
16  language was deleted from the next draft, at
17  least a subsequent draft of the Clarification
18  Letter?
19          MR. MORAG:  Objection to the form
20      of the question; the characterization
21      "delete."
22      A.   I believe so, yes.
23      Q.   I'll show you a document that we'll
24  mark as 616A, which is Bates stamped
25  WGM-LEHMAN-E 00006236 through 6264?
       TSG Reporting - Worldwide    877-702-9580

Page 213

1          -Lewkow-
2      (Deposition Exhibit 616A, 9/22/08
3      e-mail from R. Messineo re:
4      Lehman-Barclays, WGM-LEHMAN-E
5      00006236-6264, marked for
6      identification, as of this date.)
7      (Witness reviewing document.)
8      Q.   Take whatever time you need to
9  review the document, sir.  What I want to know
10  is whether you have ever seen it before, this
11  or any part of the document?
12      A.   Well, I certainly never saw the
13  cover e-mail from Mr. Messineo to your
14  colleagues at Hughes Hubbard.  I'm just trying
15  to figure out the timing.
16      (Witness reviewing document.)
17      A.   May I look at the other -- the
18  draft I was furnished this morning in
19  connection with this deposition to see if this
20  looks the same as the one that I've seen with
21  a different transmittal e-mail?
22      Q.   Feel free to look at any of the --
23      A.   Thank you.
24      Q.   -- exhibits there.
25          MR. MORAG:  The 28 and the 37 --
       TSG Reporting - Worldwide    877-702-9580

## Page 214

1      -Lewkow-
2   don't go through Sunday.
3        THE WITNESS:  Yeah, I'm looking at
4   28.  Well, I don't have it here then.
5   Okay.  Let me look at it and see if it
6   helps me...
7      A.  I don't -- I would need to look at
8   ones that I know I've seen.  This does not --
9   I don't know that I've seen this.
10     Q.  If you look in particular --
11     A.  But, you know, and I realize
12  litigators do things the way they do things
13  for the reasons they do, but I'm sure you have
14  all the ones that have been produced that we
15  know I've received.  So if you show me one
16  that's got -- that I know I received it, then
17  I can tell you if this is the same one or not.
18  But on the face, and looking quickly, I don't
19  recall this one.
20     Q.  If you turn to the second page of
21  the document.
22     A.  Yup.
23     Q.  Do you see that same section I
24  believe we were looking at.  In the prior
25  draft, it was (d); here it is (c).  You will

## Page 215

1      -Lewkow-
2   see the language that I asked you to read
3   before --
4      A.  Yup.
5      Q.  -- concerning margin --
6      A.  Yup.
7      Q.  -- is crossed out or deleted?
8      A.  Yup.
9      Q.  Does that refresh your recollection
10  that you were aware that that language had
11  been deleted from a draft of the --
12       MR. MORAG:  Objection to form.
13     A.  By counsel for Lehman Brothers?
14     Q.  By anyone.
15     A.  It appears -- I don't know if this
16  was -- again, it may have been delivered -- I
17  can't tell without seeing this.  It may well
18  have been deleted from language that was --
19  that we -- the version we saw.  I do think
20  that language never ended in, so I know it was
21  deleted at some stage.
22       Whether this draft is the one I saw
23  or not?  I think that language went in there,
24  is my understanding.  It went in there and I
25  think it was wrong.  It was taking away what

## Page 216

1      -Lewkow-
2   had been -- it's interesting.  The language
3   which you've shown me that went in, and it
4   went in a draft that my partner Mr. Leinwand
5   sent out.
6        But it went in there and it
7   suggests that we were taking out of the deal
8   somehow what had been agreed to, which is that
9   margins is part of the position.  And I think
10  that may be to deal -- in an effort, a
11  mistaken effort to deal with OCC issues.  But
12  it was not the deal, and it should have never
13  gone in, and it was taken out.
14     Q.  Just so I can catch up with you.
15       You were referring to the version
16  that Mr. Leinwand sent out.  That was
17  Exhibit 49?
18     A.  Yes.  You showed me language that
19  you read from that Exhibit 49.
20     Q.  You're referring to the margin
21  language on page 2 in section (d)?
22     A.  Yes.  That language was added,
23  correct.  And it's in the -- it was added as
24  part of -- hold on a second.
25       It was part of a sentence that said

## Page 217

1      -Lewkow-
2   "Excluded Assets" -- I'm now confusing myself.
3   Hold on a second.
4        (Witness reviewing document.)
5      A.  Hold on a second.  I withdraw what
6   I just said.  I shouldn't jump to conclusions.
7   I think this is -- excuse me.
8        (Witness reviewing document.)
9      Q.  I think you withdrew what you said,
10  so maybe I should ask another question.
11     A.  Start over.  Yes.
12     Q.  Please take whatever time you need
13  to answer.
14     A.  I rushed.  I should take my time
15  then and answer it carefully.
16     Q.  Understand that I don't want you to
17  reach conclusions.  I'm really looking for
18  your recollections of what you previously
19  concluded or previously understood.
20     A.  Uh-huh.
21     Q.  Does looking at the exhibits we put
22  in front of you refresh your recollection that
23  there was, in a draft of the clarification
24  language of the Clarification Letter, language
25  concerning margin?

Page 218

1          -Lewkow-
2          A.  I see there is such language.  I
3   very vaguely recall such language now that I
4   see it, but it's very vague.
5          **Q.  Do you have a recollection as to**
6   **whether that language was proposed by Cleary**
7   **Gottlieb?**
8          A.  I don't know who proposed it.  It
9   was sent out in a draft that Dave Leinwand
10  sent out.
11         (Witness reviewing document.)
12         **Q.  Do you have an understanding,**
13  **sir --**
14         A.  I was --
15         **Q.  Sorry.**
16         A.  I was taking another look at it.  I
17  have not finished the answer.
18         **Q.  Sure.  Please take as much time as**
19  **you need.**
20         (Witness reviewing document.)
21         A.  I believe.
22         (Witness reviewing document.)
23         A.  I'm not certain.
24         **Q.  Do you know, sir, whether this**
25  **language was put in to reflect the business**

TSG Reporting - Worldwide    877-702-9580

Page 219

1          -Lewkow-
2   **agreement between the parties, that Barclays**
3   **should get Lehman's margin?**
4          MR. MORAG:  Objection to form.
5          A.  It was my understanding that the
6   Asset Purchase Agreement contemplated as part
7   of Barclays' purchase of all of the assets
8   used in the business subject -- other than
9   Excluded Assets.  That among the assets that
10  Barclays was entitled to under the original
11  Asset Purchase Agreement, including margin
12  relating to the account that they were buying
13  as part of the purchase of business.
14         So to suggest that it was put in by
15  someone in a draft was not to say that it
16  wasn't -- again, these are people who were
17  dealing with a lot of different things.  It
18  was not to make a -- to the extent that's what
19  this document does or would have done if it
20  were in the final agreement, it was not, in my
21  view, making a change in what the deal was.
22         **Q.  So you understood that this**
23  **language was effectuating the APA by conveying**
24  **the margin from Lehman to Barclays?**
25         MR. MORAG:  Objection to the form

TSG Reporting - Worldwide    877-702-9580

Page 220

1          -Lewkow-
2   of the question.
3          A.  "Effectuating" is a funny word.
4   But I think it was consistent with the APA in
5   view of the -- again, things were being done
6   to the Clarification Letter on other things
7   that had been done.  And there had been
8   changes made to cause romanette ii on page 1
9   over to the definition of what were Purchased
10  Assets.
11         We had, by this stage, I believe,
12  deleted the reference that had originally been
13  in the Asset Purchase Agreement.  The
14  reference to "long positions" had been
15  deleted, and there were changes that reflected
16  the Repurchase Agreement that we were -- we
17  had already paid for.  Barclays had
18  effectively already paid for the securities.
19  And those were changes.  And I think people
20  were trying to make changes that preserved the
21  -- the provision of what was in the Asset
22  Purchase Agreement.
23         **Q.  Did you have an understanding that**
24  **there was anything wrong in this language,**
25  **that there was anything -- any respect to**

TSG Reporting - Worldwide    877-702-9580

Page 221

1          -Lewkow-
2   **which this reference to "margin" here, this**
3   **language, failed to effectuate the parties'**
4   **business agreement?**
5          MR. HUME:  I'm going to object to
6      the form of the question and the lack
7      of foundation.  Just to make clear --
8      correct me if I'm wrong -- Mr. Lewkow
9      is not the 30(b)(6) witness --
10         THE WITNESS:  No, I'm not.
11         MR. HUME:  -- on this provision?
12         MR. MORAG:  He is not.
13         MR. HUME:  And he's testified he
14  doesn't recall the provision.
15         THE WITNESS:  I don't recall.
16         MR. HUME:  So I think I'm going to
17  object on lack of foundation as well.
18         **Q.  You don't --**
19         A.  I don't personally recall.
20         **Q.  You don't recall.  Okay.**
21         **You referred to "Excluded Assets."**
22  **Can I ask you to take out the Asset Purchase**
23  **Agreement, Exhibit 1, somewhere in that file**
24  **before you?**
25         A.  Yup.  I have it.

TSG Reporting - Worldwide    877-702-9580

Page 222

-Lewkow-
1
2      **Q.  When you described in your**
3  **Declaration that none of your partners had**
4  **indicated any suggestion that any property**
5  **that was collateralizing exchange-traded**
6  **derivatives was going to Barclays?**
7          MR. MORAG:  That was not --
8          THE WITNESS:  I think you got it
9  backwards.
10         MR. MAGUIRE:  I'm sorry.  Did I put
11  a double negative there?
12         MR. MORAG:  You said none was going
13  to Barclays?
14     A.  Why don't you start over?
15     **Q.  Yes.**
16     A.  Do you want to look at my
17  declaration?
18     **Q.  Still looking at your Declaration.**
19  **Yes.  It think it was Paragraph 17 we were**
20  **looking at.**
21     A.  Yes.
22     **Q.  And that was the suggestion there?**
23     A.  That "no one had suggested in my
24  presence or based on my conversations" --
25     **Q.  Yes.**

TSG Reporting - Worldwide    877-702-9580

Page 223

-Lewkow-
1
2      A.  "--in my partners' presence that
3  any portion of the property held to secure
4  Lehman's exchange-traded derivatives was not
5  to be transferred to Barclays as part of the
6  transaction."
7      **Q.  Did any of your partners bring to**
8  **your attention any of the particular**
9  **provisions of the Asset Purchase Agreement in**
10 **connection with the conversations you**
11 **described in Paragraph 17?**
12         MR. HUME:  I think that calls for
13  privileged work product.  You're asking
14  did anyone --
15     **Q.  Yes.  Did anyone say to you in**
16  **words or substance: Mr. Lewkow, you've asked**
17  **me whether anything here is suggestive that**
18  **this property was not going to Barclays, well,**
19  **you better take a look at this particular**
20  **section of the Asset Purchase Agreement?**
21         MR. HUME:  I think it still does
22  call for a privileged communication or
23  interpretation of the contract.  The
24  declaration says no one --
25         MR. MORAG:  Why don't you ask him

TSG Reporting - Worldwide    877-702-9580

Page 224

-Lewkow-
1
2  if his statement of declaration is
3  consistent with his understanding of
4  the Asset Purchase Agreement?
5      **Q.  I'm asking about the conversations**
6  **that you had with your partners that you**
7  **referred to.**
8          **In any of those conversations, did**
9  **any of those partners say, You better look at**
10 **this?**
11     A.  I'm not an expert on 30(b)(6).  I
12  would refer to M&A litigation counsel who are
13  sitting in the next two seats to my right.
14         But it seems to me if any of them
15  did do it and they were here in their personal
16  capacity being deposed about how they
17  interpreted the contract, they wouldn't be
18  required to tell you the interpretation.
19         Therefore, the fact is that as
20  30(b)(6), I can't imagine, changes the rules
21  on that.  But I would defer to my counsel and
22  counsel for Barclays on that.  I told you, I
23  used to be a lawyer.
24         MR. HUME:  I think you should
25         answer the question and we should take

TSG Reporting - Worldwide    877-702-9580

Page 225

-Lewkow-
1
2  a short break.
3          THE WITNESS:  I should answer the
4  question?
5          MR. HUME:  Answer the question if
6  it doesn't reveal a privilege.
7      A.  Can I hear the question again?
8      **Q.  Did any of the partners to whom you**
9  **refer in Paragraph 17 say to you, in**
10 **connection with whether there was any**
11 **suggestion that any of this property was not**
12 **to be transferred to Barclays, did any of them**
13 **say, You better look at this provision of the**
14 **Asset Purchase Agreement?**
15     A.  No.
16     **Q.  Either in those words or in**
17 **substance.**
18     A.  I am familiar with the Asset
19  Purchase Agreement.  I think the Asset
20  Purchase Agreement always reflected the
21  understanding of the parties that this was
22  coming along that I could point to, they can
23  point to provisions that show that.
24         Did any of them suggest there was
25  language inconsistent with this?  I don't

TSG Reporting - Worldwide    877-702-9580

## Page 226

1    -Lewkow-
2  recall anyone suggesting that.
3        MR. HUME:  Do you want to take a
4  short break?
5        MR. MAGUIRE:  Sure.
6        (Whereupon, a recess was taken
7  from 4:50 p.m. to 5:01 p.m.)
8        MR. MAGUIRE:  Sir, I have no
9  further questions, thank you.
10 EXAMINATION BY
11 MR. HUME:
12     Q.  Mr. Lewkow, I'm Hamish Hume and I'm
13 here representing Barclays, as you know.  I
14 just wanted to make sure one thing on the
15 record is clear.
16     On page 197 of the rough transcript
17 we are looking at, you were asked a question
18 by counsel for the Trustee.  This was
19 referring to the conversation you testified to
20 with Weil Gotshal about the $769 million in
21 securities.
22     The question was: "And did you
23 understand that person from Weil to be
24 agreeing that Barclays would get $769 million
25 unconditionally as part of the sale as opposed

TSG Reporting - Worldwide    877-702-9580

## Page 227

1    -Lewkow-
2  to simply agreeing to the inclusion of the
3  language proposed 'to the extent permitted by
4  applicable law'?"
5        Your answer was "No," and then you
6  went on with an explanation.
7        Let me just make sure the record is
8  clear in terms of the "yes" and the "no" of
9  that question.
10       Was it your understanding from your
11 conversation with Weil Gotshal that you
12 referenced relating to the $769 million in
13 securities, that Barclays did have an
14 unconditional right to receive those assets?
15     A.  Yes.  The question, with all due
16 respect, was ambiguous, because I was offered
17 a choice, was I agreeing -- was the Lehman
18 person agreeing unconditionally to pay or
19 agreeing -- "simply agreeing," was your term,
20 to the inclusion of language "to the extent
21 permitted by applicable law."  That was a
22 choice.  And I started with "no."  My "no" was
23 addressed to the end of your question, that it
24 was not merely "to the extent permitted by
25 applicable law."

TSG Reporting - Worldwide    877-702-9580

## Page 228

1    -Lewkow-
2        It was, as I explained in the rest
3  of my answer, the discussion of "the
4  applicable law," as I understood what the
5  individual was saying on behalf of Lehman, was
6  merely to 15c3-3 and not to the concept that
7  if that were not payable, there would be an
8  unconditional obligation to deliver the
9  securities some other way.
10       MR. HUME:  I have no other
11 questions.
12       MR. MAGUIRE:  Nothing further.
13       (Time noted:  5:05 p.m.)
14
15
16    _____
17       VICTOR I. LEWKOW
18
19
20
21 Subscribed and sworn to before me,
22 this _____ day _____ of 2010.
23
24 _____
25    Notary Public

TSG Reporting - Worldwide    877-702-9580

## Page 229

1  ------------------I N D E X------------------
2  WITNESS        EXAMINATION BY        PAGE
3  V. LEWKOW      MR. GAFFEY          5
4        MR. MAGUIRE      160
5        MR. HUME        226
6
7  DIRECTIONS: PAGE  79, 134, 185
8  MOTIONS:   [None]
9  REQUEST:   [None]
10
11 ----------------EXHIBITS-------------------
12 EXHIBIT                  FOR I.D.
13 Exhibit 613A              6
14 Declaration of Victor Lewkow
15
16 Exhibit 614A              135
17 Letter from S&C, CGSH
18 00020701-20714
19
20 Exhibit, 615A            195
21 2PP 9/18/08 e-mail from J.
22 Potenciano to distribution re:
23 Preliminary 15c3-3 reserve lock-up
24 as of 9/17/08
25

TSG Reporting - Worldwide    877-702-9580

Page 230

```
 1   ----------------EXHIBITS------------------
 2        [previously marked]
 3   EXHIBIT                  FOR I.D.
 4   Exhibit 1                29
 5   Exhibit 19               31
 6   Exhibit 518              45
 7   Exhibit 25               47
 8   Exhibit 24               58
 9   Exhibit 27               69
10   Exhibit 579B             74
11   exhibit 581B             92
12   Exhibit 28               93
13   Exhibit 29               93
14   Exhibit 30               93
15   Exhibit 31               93
16   Exhibit 32               93
17   Exhibit 33               93
18   Exhibit 34               93
19   Exhibit 35               93
20   Exhibit 36               93
21   Exhibit 37               93
22   Exhibit 34               95
23   Exhibit 451              208
24   Exhibit 49               210
25            - - -
```

TSG Reporting - Worldwide    877-702-9580

Page 231

```
 1        C E R T I F I C A T E
 2
 3   STATE OF NEW YORK     )
 4                         ) ss.:
 5   COUNTY OF KINGS       )
 6        I, MAYLEEN CINTRON, a Registered
 7   Merit Reporter, Certified Realtime
 8   Reporter and Notary Public within and
 9   for the State of New York, do hereby
10   certify:
11        That VICTOR I. LEWKOW, the witness
12   whose deposition is hereinbefore set
13   forth, was duly sworn by me and that
14   such deposition is a true record of the
15   testimony given by such witness.
16        I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I
19   am in no way interested in the outcome
20   of this matter.
21        IN WITNESS WHEREOF, I have hereunto set
22   my hand this 10th day of February, 2010.
23
24        --------------------------
25        MAYLEEN CINTRON, RMR, CRR
```

TSG Reporting - Worldwide    877-702-9580

Page 232

```
 1        ERRATA SHEET FOR THE TRANSCRIPT OF:
 2   Case Name: Re: Lehman Brothers Holdings
     Dep. Date: February 10, 2010
 3   Deponent:  Cleary Gottlieb | Victor I. Lewkow
 4   Pg. Ln.  Now Reads     Should Read   Reason

 5   ___ ___ _____ _____ ____
 6   ___ ___ _____ _____ ____
 7   ___ ___ _____ _____ ____
 8   ___ ___ _____ _____ ____
 9   ___ ___ _____ _____ ____
10   ___ ___ _____ _____ ____
11   ___ ___ _____ _____ ____
12   ___ ___ _____ _____ ____
13   ___ ___ _____ _____ ____
14   ___ ___ _____ _____ ____
15   ___ ___ _____ _____ ____
16   ___ ___ _____ _____ ____
17   ___ ___ _____ _____ ____
18   ___ ___ _____ _____ ____
19
20        _____
21        VICTOR I. LEWKOW
22
     SUBSCRIBED AND SWORN BEFORE ME,
23   This___ day of_____, 2010.
24   _____
          Notary Public
25   My Commission Expires:_____
```

TSG Reporting - Worldwide    877-702-9580