# BCI Exhibit 633

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ---------------------------X

5    IN RE:

6                        Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,

9

10              Debtors.

11   ---------------------------X

12

13

14

15     HIGHLY CONFIDENTIAL DEPOSITION OF ISAAC MONTAL

16              New York, New York

17           Tuesday, February 9, 2010

18

19

20

21

22

23

24   Reported by:

     JOMANNA DeROSA, CSR

25   JOB NO. 27501

Page 2

```
 1
 2
 3              February 9, 2010
 4              9:30 a.m.
 5
 6
 7         Deposition of ISAAC MONTAL, held
 8   at the offices of Hughes Hubbard & Reed,
 9   LLP, One Battery Park Plaza, New York,
10   New York, pursuant to Notice, before
11   Jomanna DeRosa, a Certified Shorthand
12   Reporter and Notary Public of the States
13   of New York, New Jersey, California and
14   Arizona.
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide     877-702-9580

Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4
 5       JONES DAY, LLP
 6       Attorneys for Lehman Brothers, Inc.
 7          222 East 41st Street
 8          New York, New York 10017-6702
 9       BY:  BRIDGET A. CRAWFORD, ESQ.
10
11
12       BOIES, SCHILLER & FLEXNER, LLP
13       Attorneys for Barclays
14          575 Lexington Avenue - 7th Floor
15          New York, New York  10022
16       BY:  JACK G. STERN, ESQ.
17
18
19       HUGHES HUBBARD & REED, LLP
20       Attorneys for SIPA Trustee
21          One Battery Park Plaza
22          New York, New York 10004
23       BY:  WILLIAM R. MAGUIRE, ESQ.
24          AMINA HASSAN, ESQ.
25
```

TSG Reporting - Worldwide     877-702-9580

Page 4

```
 1
 2   A P P E A R A N C E S (Continued):
 3
 4
 5       QUINN EMANUEL
 6       Attorneys for the Creditors Committee
 7          51 Madison Avenue, 22nd Floor
 8          New York, New York 10010
 9       BY:  ROBERT DAKIS, ESQ.
10
11
12       PROSKAUER ROSE, LLP
13       Attorneys for DTCC and the Witness,
14       Isaac Montal
15          1585 Broadway
16          New York, New York 10036-8299
17       BY:  GREGG M. MASHBERG, ESQ.
18          SHELDON I. HIRSHON, ESQ.
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide     877-702-9580

Page 5

```
 1        MONTAL - HIGHLY CONFIDENTIAL
 2   I S A A C   M O N T A L, called as a witness,
 3      having been duly affirmed by a Notary
 4      Public, was examined and testified as
 5      follows:
 6   EXAMINATION BY
 7   MR. MAGUIRE:
 8        Q.   And Mr. Montal, as you know, my
 9   name is Bill Maguire, and I'm from Hughes, Hubbard
10   & Reed, and I represent the SIBA Trustee, James
11   Giddens.
12        If any question I ask you today is
13   unclear, can you please call me on it, and I'll
14   try to make it clear?
15        A.   Yes.
16        Q.   If you want to take a break at any
17   time, you can just indicate it, and we'll find a
18   convenient spot to stop.
19        Can you tell me, sir, what is your
20   position at DTCC?
21        A.   Managing director and deputy
22   general counsel.
23        Q.   And can you tell me, just very
24   briefly, what is DTCC?
25        A.   It is a holding company for a
```

TSG Reporting - Worldwide     877-702-9580

## Page 6

MONTAL - HIGHLY CONFIDENTIAL

1  number of regulated subsidiaries that include the
2  Depository Trust Company, DTC; National Securities
3  Clearing Corporation, NSCC; Fixed Income Clearing
4  Corp., FICC; and a number of other subsidiaries.
5  And the basic function of those companies is to
6  provide clearance and settlement services for
7  securities in the United States.
8          MR. MASHBERG:  Mr. Maguire, if I
9  could just say one thing.  As Mr. Montal just
10 testified, he is the deputy general counsel of
11 DTCC and the operating subsidiaries.  He is
12 here today as the 30(b)(6) witness.
13         I just want to make clear for the
14 record at the outset, and if we need to do so
15 during the course of the deposition, that he's
16 not waiving and DTCC is not waiving the
17 attorney/client privilege, but we are
18 confident that he'll be able to answer your
19 questions today without implicating the
20 privilege.  If that does come up, then we'll
21 deal with it at the time, but I don't think
22 it's going to be a problem.
23         MR. MAGUIRE:  Absolutely.
24     A.  I wanted to add that we also have a

TSG Reporting - Worldwide    877-702-9500

## Page 7

MONTAL - HIGHLY CONFIDENTIAL

1  European subsidiary, EuroCCP, which provides
2  clearance and settlement services for securities
3  in Europe.
4          MR. MAGUIRE:  I understand our next
5  exhibit number is 601, so I'm going to mark
6  the document entitled Annual Report as
7  Exhibit 601.
8          (Exhibit 601 marked for
9  identification.)
10     Q.  Sir, do you recognize the document
11 that's been marked as Exhibit 601?
12     A.  I do.
13     Q.  And how do you recognize that
14 document, sir?
15     A.  Are you asking me what this
16 document is?
17     Q.  Yes.  What is this?
18     A.  It is the 2008 annual report of
19 DTCC.
20     Q.  And does DTCC produce a report on
21 an annual basis?
22     A.  Yes.
23     Q.  And this is the report for 2008?
24     A.  I believe so.  And this looks like

TSG Reporting - Worldwide    877-702-9500

## Page 8

MONTAL - HIGHLY CONFIDENTIAL

1  a copy of it, and I'm assuming it's an accurate
2  copy, yes.
3      Q.  In the course of the deposition, if
4  I refer to "DTCC," you'll understand that I'm
5  referring to Depository Trust and Clearing
6  Corporation?
7      A.  Yes.
8      Q.  And if I sometimes abbreviate that
9  to DTC, I'll be referring to the same entity.  Is
10 that okay?
11     A.  That's fine, as long as -- there
12 may be times we need to refer to DTC in particular
13 as compared to NSCC or EuroCCP or FICC.  So I'm
14 not going to know the difference if you do that.
15     Q.  Okay.  If some occasion arises
16 where it makes -- it's important to your answer to
17 be specific as to a particular subsidiary of DTCC,
18 can I ask you to try to be specific in those
19 instances?
20         As a general matter, I'm going to
21 be referring, I think, to the general corporate
22 entity of DTCC.
23     A.  I will try to do that, but I may
24 slip.

TSG Reporting - Worldwide    877-702-9500

## Page 9

MONTAL - HIGHLY CONFIDENTIAL

1      Q.  Okay.  I'd like to direct your
2  attention to the time period of September of 2008.
3  Is that okay?
4      A.  Yes.
5      Q.  At that time, can you explain what
6  was the -- at the beginning of September, what was
7  the relationship of DTCC to Lehman?
8      A.  Lehman was a participant of DTC,
9  NSCC, and FICC and EuroCCP.
10     Q.  Okay.
11     A.  And when we say "Lehman," there may
12 have been different Lehman entities that may have
13 been members of those DTCC subsidiaries.
14     Q.  As a general matter, what did DTCC
15 do for Lehman?
16     A.  Provided clearance and settlement
17 services.
18     Q.  And how was -- I'll represent that
19 September 15, I believe, was the date of which the
20 holding company, the Lehman Brothers Holdings,
21 Inc., filed bankruptcy.
22         Did DTC have concerns about its
23 exposure to Lehman?
24     A.  Yes.

TSG Reporting - Worldwide    877-702-9500

Page 10

1    MONTAL - HIGHLY CONFIDENTIAL
2    Q.   And how was DTCC exposed to Lehman?
3    A.   In the provenance of clearance and
4  settlement services in particular at NSCC, NSCC
5  stands as a central counterparty to trades that
6  are done by its participants and guarantees the
7  completion of those trades in the event of a
8  default of its participant.
9    Q.   And where there's a default of a
10 participant, then DTCC is exposed to the
11 guaranteed trades?
12   A.   Potentially, yes.
13   Q.   How did DTCC manage its risk with
14 respect to Lehman?
15   A.   It carefully monitored all of the
16 trading that was happening at Lehman.  It
17 evaluated on a more frequent basis the
18 participant's fund that Lehman had on deposit at
19 DTCC subsidiaries, DTC and NSCC, and it placed
20 Lehman on the highest level of surveillance with
21 respect to its trading activities and at some
22 point, I believe, also lowered Lehman's debit cap
23 so that the amount of risk that was being extended
24 or incurred by Lehman would be limited.
25   Q.   When you say "debit cap," is this a
          TSG Reporting - Worldwide   877-702-9580

Page 11

1    MONTAL - HIGHLY CONFIDENTIAL
2  restriction on the amount of Lehman trading that
3  would go on?
4    A.   It's a restriction on the amount of
5  Lehman trading that would come through -- would
6  come through NSCC.
7    Q.   And did DTCC advise Lehman that it
8  should restrict the amount of trading that would
9  go through DTCC?
10   A.   Yes.
11   Q.   You mentioned the highest level of
12 surveillance.
13        Is that, in effect, a credit watch?
14   A.   Yes.
15   Q.   And you mentioned a fund.
16        What was the fund that provided
17 protection to DTC against its exposure to Lehman?
18        And sir, if it makes a difference,
19 you know, let me know.  But generally, I'm going
20 to use the terms -- I'll try to say "DTCC" all the
21 time.  If I lapse into DTC, my intention is to
22 speak to the Depository Trust Clearing
23 Corporation.
24   A.   In response to your last comment,
25 I understand that DTCC provides no clearance or
          TSG Reporting - Worldwide   877-702-9580

Page 12

1    MONTAL - HIGHLY CONFIDENTIAL
2  settlement services or depository services to
3  anybody.  It is simply a holding company.
4        So when we talk about participants'
5  funds, credit watch, debit cap, all of those
6  things, none of that is at DTCC.  All of that is
7  happening at the subsidiary levels.
8    Q.   Okay.  So when I refer to DTCC,
9  then, I'm really including not just the holding
10 company but its subsidiaries?
11   A.   We can work that way if that's how
12 you want to go, but understand that nothing is
13 happening at the DTCC level with respect to any of
14 the activities I've described.  It's all happening
15 at the subsidiaries.
16   Q.   Okay.  So I should probably refer
17 to DTC for the most part.
18   A.   Or NSCC or EuroCCP or FICC.  But if
19 you want to kind of bulk it together and get a
20 general high-level overview, we can do the DTCC
21 thing, as you wish.
22   Q.   You referred to a fund at DTC.
23        How did that -- what was that fund
24 and how did that provide protection to DTC?
25   A.   I referred to the participant's
          TSG Reporting - Worldwide   877-702-9580

Page 13

1    MONTAL - HIGHLY CONFIDENTIAL
2  fund, in which each participant is obligated to
3  deposit and maintain on deposit various sums of
4  cash or equity or other collateral to secure its
5  obligation and potential obligations to DTC and
6  NSCC, et cetera, depending upon the entity.  And
7  there are different funds for the different
8  regulated subsidiaries.
9    Q.   Did Lehman maintain assets at DTC?
10   A.   Yes.
11   Q.   Were some of those assets in
12 segregated accounts?
13   A.   Yes.
14   Q.   Were they referred to sometimes as
15 seg'd assets?
16   A.   Yes.
17   Q.   And what is a seg'd property?
18   A.   It's not -- typically it is -- they
19 are assets that are not part of the participant's
20 "free account" and are not -- are generally seg'd
21 for customer position or other regulatory
22 requirements that the participant may have to
23 maintain segregated funds.
24        The free account is -- essentially
25 represents assets that are not segregated and are
          TSG Reporting - Worldwide   877-702-9580

Page 14

MONTAL - HIGHLY CONFIDENTIAL

1  MONTAL - HIGHLY CONFIDENTIAL
2  the general assets, from our perspective, of that
3  participant.
4      Q.   Is that generally where the
5  proprietary assets are maintained?
6      A.   They could be proprietary assets or
7  they could be customer assets that are, for
8  example, in a margin account in which there is no
9  requirement for those assets to be segregated.
10     Q.   And did DTC have any rights over
11 the assets in the free account?
12     A.   Yes.
13     Q.   What were those rights?
14     A.   We have a lien on all of the assets
15 in the accounts.  In the event of a default, we
16 have the ability to liquidate those assets to
17 satisfy any open obligations.
18     Q.   Following the filing of bankruptcy
19 by the Lehman holding company, did DTC consider
20 issuing a Cease to Act Notice with respects to the
21 broker-dealer participant of Lehman Brothers,
22 Inc.?
23     A.   Yes.
24     Q.   And can you tell me, what is a
25 Cease to Act Notice?

TSG Reporting - Worldwide    877-702-9580

Page 15

1  MONTAL - HIGHLY CONFIDENTIAL
2      A.   It is a notice that is issued by
3  the clearing corporations and the depository in
4  the event that those entities make a determination
5  that they are no longer going to act on behalf of
6  that particular participant.
7          And it's a decision to essentially
8  stop doing any new business with respect to that
9  participant and will result in the closing out of
10 all open positions, satisfying any open
11 obligations, liquidating whatever assets need to
12 be liquidated in order to accomplish that, and
13 wind up the business of that participant at those
14 clearing and depository entities.
15     Q.   And can you describe, in as simple
16 terms as you can, what the impact is on the going
17 concern on a broker-dealer's ongoing businesses
18 where its clearing organization ceases to act for
19 it.
20     A.   Unless there is another entity that
21 immediately steps into the shoes of the
22 participant that for whom we have ceased to act
23 and assumes all of the obligations and liabilities
24 of the ceased-to-act participant and tries to
25 continue as a going concern immediately,

TSG Reporting - Worldwide    877-702-9580

Page 16

1  MONTAL - HIGHLY CONFIDENTIAL
2  essentially they're out of business.
3      Q.   We've been talking about the week
4  following the Lehman Brothers holding company's
5  filing for bankruptcy on September 15th.
6          By the time we get -- I'm going to
7  ask you now towards the end of that week.  I'll
8  represent that the Friday of that week was the day
9  of the bankruptcy court sale hearing.  That was
10 Friday, September 19th.
11         By the time you got to Friday, were
12 there a number of open Lehman trades in the
13 trading system that DTC had guaranteed?
14     A.   Yes.
15     Q.   Was DTC concerned about its
16 exposure to Lehman in processing those open
17 trades?
18     A.   Yes.
19     Q.   Can you generally summarize for me,
20 what was DTC's concern with respect to that
21 exposure?
22     A.   There was concern about the ability
23 of Lehman to continue as a going concern, the
24 ability of Lehman to continue to do business, for
25 other entities to continue to be willing to do

TSG Reporting - Worldwide    877-702-9580

Page 17

1  MONTAL - HIGHLY CONFIDENTIAL
2  business with Lehman and extend credit and engage
3  in trading with Lehman.
4          There was concern about whether
5  Lehman's clearing bank would continue to act in
6  that capacity and, therefore, be able to settle
7  Lehman's obligations on a daily basis.
8          And general concern about whether
9  the assets that we were holding in the Lehman
10 accounts, what their continued value would be,
11 given the extreme volatility in the marketplace in
12 the time period that you are referring to.
13     Q.   Did DTC know -- was it able to
14 quantify what the liabilities would be in closing
15 out all the guaranteed trades?
16     A.   DTC might be able to -- do you mean
17 DTC or do you mean NSCC or do you mean -- what do
18 you mean?
19     Q.   What I'm interested in is as of
20 Friday the 19th, if I understand it, there were
21 many billions of dollars of uncleared Lehman
22 trades.  Is that true?
23     A.   Correct.
24     Q.   Did the DTCC organization,
25 including its subsidiaries, know what the

TSG Reporting - Worldwide    877-702-9580

Page 18

MONTAL - HIGHLY CONFIDENTIAL

1 **potential liability was to DTCC in clearing out**
2 **those trades in the event of a Lehman default?**
4    A.  DTCC and its subsidiaries could not
5 predict, if there was a liquidation, exactly how
6 that would play out.
7        Again, even in situations where
8 there is no market volatility to the extreme that
9 we saw during that time period, it's difficult to
10 say how things will play out when you're
11 liquidating an entity certainly the size of
12 Lehman.  In particular in the Lehman situation,
13 there was extreme market volatility.
14        While one may be able to take a
15 snapshot of a given point in time and say we have
16 X value as of this moment and we have Y value of
17 potential liabilities as of this moment, it's
18 impossible to predict how those will play out when
19 there is a liquidation.
20    Q.  You mentioned another broker-dealer
21 **stepping into the shoes of Lehman.**
22        **Was it DTC's wish that Barclays**
23 **would step into the shoes of Lehman in connection**
24 **with assuming all of Lehman's obligations to DTCC**
25 **and its affiliates?**

TSG Reporting - Worldwide    877-702-9580

Page 19

MONTAL - HIGHLY CONFIDENTIAL

1    A.  I don't think I can say that DTC
2 had a wish one way or another that it be Barclays
3 in particular or anybody in general with respect
4 to the Lehman account.
5        Its first and foremost obligation
6 was to protect its assets and the value that its
7 participants had put into DTCC and make sure that
8 it was protected.  Beyond that, of course, it had
9 a general concern for the marketplace.
10        And to the extent that Lehman --
11 the Lehman situation could be resolved in a way
12 that caused the least market disruption possible
13 and have another firm step in and assume all of
14 the obligations and assets of Lehman and continue
15 as a going concern, I would say that, generally
16 speaking, it was understood that that would be
17 much better for the marketplace as a whole, and
18 probably for DTCC as well.
19    Q.  So in terms of DTCC being protected
20 **and its affiliates being protected, a strong**
21 **creditworthy broker-dealer coming in and taking**
22 **over, stepping into the shoes of Lehman, would**
23 **take care of any exposure that DTCC had to Lehman?**
24    A.  It certainly would be the simplest

TSG Reporting - Worldwide    877-702-9580

Page 20

MONTAL - HIGHLY CONFIDENTIAL

1 way to resolve the Lehman situation at that point.
2 It would be the least disruptive.  It would not
3 result in a liquidation and a closeout.  You
4 wouldn't have to liquidate and sell out all the
5 positions and satisfy all the open obligations.
6        The situation that you're
7 describing in general, I'm assuming, would be one
8 that would be accomplished relatively seamlessly,
9 in which there would be a swing of all of the
10 Lehman obligations and assets to the new firm and
11 an assignment and assumption and move forward from
12 there.
13    Q.  And did there come a time prior to
14 **the Friday the 19th, the end of that week, when**
15 **DTCC understood that Barclays was negotiating a**
16 **transaction with Lehman?**
17    A.  Yes.
18    Q.  And did DTC have discussions with
19 **Barclays in which Barclays made plain its concern**
20 **that DTCC not issue a Cease to Act Notice with**
21 **respect to Lehman?**
22    A.  I don't have a specific
23 recollection necessarily of a particular
24 conversation that you've described in your

TSG Reporting - Worldwide    877-702-9580

Page 21

MONTAL - HIGHLY CONFIDENTIAL

1 question.  There were many, many meetings, many,
2 many conference calls during that week surrounding
3 the Lehman situation.
4        There were many folks that
5 expressed the desire to have Lehman continue as a
6 going concern for as long as possible and for it
7 to be taken over as a going concern rather than
8 having us cease to act.
9    Q.  Did there come a time in which it
10 **was proposed that there would be provided to**
11 **DTC -- that Barclays would provide to DTC some**
12 **form of guarantee up to the amount of the purchase**
13 **price of the transaction, $250 million, and also**
14 **an interest in certain residential mortgage**
15 **securities?**
16    A.  If you can just repeat the question
17 or please have the court reporter read it back,
18 I'd appreciate that.
19    Q.  Yes.  Did there come a time in
20 **which it was proposed to DTC that there would be**
21 **certain collateral provided to cover, at least to**
22 **the extent the collateral DTCC's exposure to**
23 **Lehman, and that collateral would consist of**
24 **$250 million, being the purchase price of the sale**

TSG Reporting - Worldwide    877-702-9580

Page 22

1    MONTAL - HIGHLY CONFIDENTIAL
2    transaction, and also an amount of residential
3    mortgage securities that at one time had been
4    marked at $3 billion?
5        A.   Yes.
6        Q.   And this was collateral that would
7    be available to DTC, assuming that the sale
8    actually had consummated with Barclays?  Let me
9    strike that.
10          Let me ask you:  On the Friday, at
11   the end of the week, had DTCC advised Lehman that
12   it should not put through any additional trades
13   through DTC?
14       A.   By Friday, the answer to that
15   question is yes.
16          MR. MASHBERG:  DTC or DTCC subs?
17          MR. MAGUIRE:  DTCC or any of its
18   subsidiaries.
19       A.   Certainly the U.S. subsidiaries,
20   yes.
21       Q.   Now, step back a bit.  You
22   understood at some point that there was a proposal
23   in which DTC was going to be provided with certain
24   collateral, meaning to protect it against losses
25   on clearing Lehman trades?

TSG Reporting - Worldwide    877-702-9580

Page 23

1    MONTAL - HIGHLY CONFIDENTIAL
2        A.   DTCC?
3        Q.   Yes.
4        A.   And its subsidiaries?
5        Q.   Exactly.
6        A.   Yes.
7        Q.   And that collateral included
8    $250 million cash.  Is that right?
9        A.   Yes.
10       Q.   And it also included these --
11   whatever the value of these residential mortgage
12   securities were?
13       A.   Correct.
14       Q.   Did DTCC come to learn following
15   the sale hearing -- the sale hearing -- come to
16   learn -- let me strike that.
17          The sale hearing, I represent, was
18   on the Friday the 19th and continued into the
19   early hours of Saturday morning.
20          Were you present at that sale
21   hearing?
22       A.   I was present for probably the
23   first half an hour.
24       Q.   DTC learned that the court had
25   approved the sale at that hearing.  Is that

TSG Reporting - Worldwide    877-702-9580

Page 24

1    MONTAL - HIGHLY CONFIDENTIAL
2    correct?
3        A.   Yes.
4        Q.   And following the hearing, did you
5    come to learn that what had been proposed or
6    promised by way of those residential mortgage
7    securities, that additional collateral was not, in
8    fact, available and would not, in fact, be
9    provided to DTCC?
10       A.   At some point we did learn that,
11   yes.
12       Q.   And was that at some point over the
13   weekend following the sale hearing?
14       A.   Yes.
15       Q.   Did that cause DTC any concerns?
16       A.   Yes.
17       Q.   Can you explain why.
18       A.   Because there was collateral that
19   was supposed to have been available to us to
20   secure the open Lehman obligations, and that
21   collateral was no longer going to be available.
22       Q.   Did DTC inquire whether Barclays
23   was prepared to step into the shoes of Lehman?
24          MR. MASHBERG:  Time frame?
25          MR. MAGUIRE:  Over the weekend

TSG Reporting - Worldwide    877-702-9580

Page 25

1    MONTAL - HIGHLY CONFIDENTIAL
2    of -- following the sale hearing and prior to
3    the closing.
4        Q.   Let me put it a little differently:
5    Did DTC seek an unlimited guarantee from Barclays
6    of DTC's exposure?
7        A.   My hesitation in answering the
8    question is -- really relates to the time frame.
9    The answer to the question is yes.  I just don't
10   recall if it was before the sale hearing and/or
11   after.
12       Q.   In any event, DTC had made plain to
13   Barclays that it wanted an unlimited guarantee or
14   effectively wanted Barclays to step into the shoes
15   of Lehman with respect to its obligations to DTC?
16       A.   At some point, yes.
17       Q.   And at some point Barclays had
18   indicated that it was not willing to do that?
19       A.   Correct.
20       Q.   Let me ask you:  Did anyone from
21   Barclays visit DTC's offices?
22       A.   When?
23       Q.   At any time -- let me narrow it
24   down to the weekend prior to the closing.
25          On the Saturday or the Sunday

TSG Reporting - Worldwide    877-702-9580

## Page 26

MONTAL - HIGHLY CONFIDENTIAL

1 following the sale hearing, did Barclays send a
2 due diligence team to DTC's offices?
3     A.   Yes.
4     Q.   And can you tell me approximately
5 how many people from Barclays had visited your
6 offices?
7     A.   I'd be guessing, but I know it was
8 a large team.
9     Q.   When you say "a large team," can
10 you just give me a general range?
11     A.   I can't.
12     Q.   And can you tell me, what did you
13 understand the Barclays team to be doing at your
14 premises?
15     A.   Reviewing Lehman's accounts and
16 records in a due diligence effort.
17     Q.   Now, what did the Barclays
18 representatives indicate?
19     What did this work stream indicate
20 to DTC in terms of whether Barclays was looking to
21 take or not to take any of the assets that Lehman
22 had in its free account at DTC?
23     A.   Can you repeat the question,
24 please.

TSG Reporting - Worldwide    877-702-9580

## Page 27

MONTAL - HIGHLY CONFIDENTIAL

1     A.   Yes.  With respect to the due
2 diligence team from Barclays that visited your
3 offices, what did they tell or what did your
4 people hear from them about whether Barclays
5 wanted to take assets or not take assets from the
6 free accounts?
7     A.   I'm not aware that the due
8 diligence team was the one that communicated with
9 us at all with respect to that subject matter.
10     Q.   Did you hear from any Barclays
11 representatives on that subject matter?
12     A.   Yes.
13     Q.   And what did you hear?
14     MR. MASHBERG:  "You" meaning DTCC?
15     MR. MAGUIRE:  Exactly.
16     A.   We heard different things at
17 various points in time.
18     Q.   And can you tell me generally what
19 you heard at the different points in time.
20     A.   At times we heard Barclays say they
21 were going to take everything.  At times we heard
22 Barclays say they were going to take nothing.  And
23 at times we heard that they wanted to take very
24 specific assets and not others.

TSG Reporting - Worldwide    877-702-9580

## Page 28

MONTAL - HIGHLY CONFIDENTIAL

1     Q.   And was there a chronological
2 sequence to this, or was it different people from
3 Barclays telling you different things at different
4 times?
5     A.   All of the above.
6     Q.   From DTC's perspective did there
7 appear to be some confusion on the part of
8 Barclays's representative as to what they wanted
9 to take or not take?
10     A.   I wouldn't characterize it as
11 confusion, but I think there were various opinions
12 at various points in time about what they wanted
13 to do and didn't want to do.
14     Q.   And the different opinions that you
15 heard, were these from the same people, or were
16 there different work streams that were relaying
17 different or conflicting points of view?
18     A.   Again, all of the above.  There
19 were a lot of different work streams that were
20 going on.  There were a lot of conference calls,
21 meetings, conversations that were taking place.
22     And I'm assuming, but I can't be
23 certain about this, that as the due diligence
24 teams reported back to their managers as to what

TSG Reporting - Worldwide    877-702-9580

## Page 29

MONTAL - HIGHLY CONFIDENTIAL

1 they were finding or to the extent that there were
2 internal meetings that were going on at Barclays
3 and decisions being considered, we would hear
4 different things as those events were taking
5 place.
6     Q.   Did you get any understanding from
7 Barclays as to why its representatives thought at
8 one time that the -- that Barclays would not want
9 to take assets from the free account?
10     MR. STERN:  Objection to the form.
11     A.   DTCC and its clearing subsidiaries
12 and its depository were not prepared to allow the
13 DTCC assets -- the Lehman assets at the DTCC
14 entities to be taken without an adequate guarantee
15 with respect to the open obligations that Lehman
16 had.
17     And so there was a lot of back and
18 forth about what could be taken, what kind of
19 guarantee was needed.  And that, I believe,
20 influenced a lot of the decision-making process as
21 well.
22     Q.   So DTC had a lien on the assets in
23 the free account and was not prepared to release
24 that lien unless there was adequate substitute

TSG Reporting - Worldwide    877-702-9580

Page 30

1          **MONTAL - HIGHLY CONFIDENTIAL**
2  **collateral that was provided to DTCC?**
3          A.   Correct.
4          **Q.   Did anyone from Barclays indicate**
5  **that it had any concern about the values of any of**
6  **the assets in the -- in the free account?**
7          A.   I don't have a specific memory of a
8  specific discussion in a manner that you've
9  described.
10          But given the market volatility
11 during the time period leading up to the days we
12 are speak about, the weekend of September 19th,
13 20th, 21st, I think there was a great deal of
14 concern that everybody shared about valuations.
15         **Q.   Did anyone from any of the Barclays**
16 **representatives indicate that they had a concern**
17 **that some of the assets in the free account might**
18 **have liabilities associated with them?**
19          A.   I don't remember a specific
20 discussion around that point with Barclays.
21          But in general, there were open
22 obligations that Lehman had with respect to
23 delivering assets.  It had open obligations with
24 respect to receiving assets and paying for them.
25          And so when you say, was there
        TSG Reporting - Worldwide    877-702-9580

Page 31

1          MONTAL - HIGHLY CONFIDENTIAL
2  concern about assets that had obligations that
3  went along with them, there certainly were assets
4  like that.
5          **Q.   When the -- when it became clear**
6  **that the additional collateral and the residential**
7  **mortgage securities were not available, that**
8  **additional collateral was not available to DTCC,**
9  **the proposal at that point was that DTCC should**
10 **release its lien and look to the remaining**
11 **collateral, which is just the $250 million of the**
12 **purchase price.  Is that right?**
13          A.   I don't think that's right.  I
14 don't think there was any discussion about DTCC
15 releasing its lien.  In particular, I think there
16 was a discussion about whether the $250 million
17 would be sufficient.
18         **Q.   And did DTCC agree that the**
19 **$250 million would be sufficient?**
20          A.   DTCC agreed to allow -- to accept
21 the $250 million as additional collateral and
22 guarantee while allowing Lehman to go into a
23 wind-down mode.  I don't think that DTCC agreed
24 that 250 is sufficient.
25         **Q.   So at that point, by allowing**
        TSG Reporting - Worldwide    877-702-9580

Page 32

1          MONTAL - HIGHLY CONFIDENTIAL
2  **DTC -- allowing Lehman to go into a wind-down**
3  **mode, that meant that DTCC would have the limited**
4  **guarantee of the $250 million in collateral and**
5  **would also be able to look to the assets in the**
6  **free account to protect itself against its**
7  **exposure to Lehman in winding down the open**
8  **trades?**
9          A.   Yes.
10         **Q.   Did DTCC ever -- and I'm including**
11 **all of its affiliates -- tell Barclays that its**
12 **concerns about its exposure to Lehman had been**
13 **satisfied or no longer existed at any time over**
14 **the weekend?**
15          A.   Repeat that again, please.
16         **Q.   Did DTCC tell Barclays at any time**
17 **over the weekend that it felt its exposure from**
18 **processing the open Lehman trades was**
19 **substantially less than it had originally feared?**
20          A.   Not that I'm aware of.
21         **Q.   At any point over the weekend, did**
22 **DTCC conclude or think that its exposure to open**
23 **Lehman trades was substantially less than it had**
24 **originally feared?**
25          A.   Not that I'm aware of.
        TSG Reporting - Worldwide    877-702-9580

Page 33

1          MONTAL - HIGHLY CONFIDENTIAL
2          **Q.   Did DTCC ever indicate to Barclays**
3  **that it would release its lien over the free**
4  **assets in Lehman's -- the assets in Lehman's free**
5  **account?**
6          A.   Not that I'm aware of.
7          **Q.   Did DTCC ever release its lien over**
8  **the assets in the free account?**
9          A.   I don't think so.
10         **Q.   Did there come a time in which DTC**
11 **was informed that Barclays was not going to take**
12 **the assets in the free account?**
13          A.   Yes.
14         **Q.   And can you tell me how that**
15 **happened.**
16          A.   It happened in a phone call in the
17 late hours of Sunday night the 21st or early hours
18 of the 22nd of September, 2008, in which members
19 of Barclays was on the phone with DTCC.  And the
20 ultimate decision, we were told, was that they
21 weren't going to take anything.
22         **Q.   And what was the significance of**
23 **that decision to DTCC?**
24          A.   It had a continuing lien on those
25 assets.
        TSG Reporting - Worldwide    877-702-9580

1     MONTAL - HIGHLY CONFIDENTIAL
2         Q.   Did DTCC want to document that
3     agreement?
4         A.   Yes.
5         Q.   And did it, in fact, document that
6     agreement?
7         A.   Yes.
8         Q.   Can you tell me how it went about
9     doing that.
10        A.   There was a letter agreement that
11    was drafted in the late hours of Sunday,
12    September 21st and the early hours of Monday,
13    September 22nd, a series of revisions that had
14    been made and ultimately signed in the early hours
15    of Monday, September 22nd.
16            That was an agreement between DTCC
17    on behalf of itself and its subsidiaries on the
18    one hand, Barclays on the other, and the Trustee
19    on behalf of Lehman as well.
20        Q.   Sir, I'll show you a document
21    that's previously been marked as Exhibit 52.  If
22    you can take whatever time you need, sir, to
23    review the document.
24            And then I'll ask you if this is
25    the agreement you're referring to?
     TSG Reporting - Worldwide    877-702-9580

1     MONTAL - HIGHLY CONFIDENTIAL
2         A.   Yes.
3         Q.   Now, if you'd turn, sir, to
4     section 1 of the agreement on page 2.
5            You see that refers to winding down
6     of accounts?
7         A.   I do.
8         Q.   And this provides -- this records
9     Barclays' agreement that the accounts would remain
10    excluded assets.
11            And why was that of significance to
12    DTC?
13        A.   I think the paragraph describes
14    exactly why that is.  It allows DTC to use those
15    assets for purposes of winding down the accounts,
16    liquidating the transactions and using the --
17    those assets to satisfy open obligations.
18        Q.   So DTC retained its lien over the
19    assets in the accounts and could look to the
20    Trustee for authority in winding down the
21    accounts?
22        A.   The Trustee, I believe -- the
23    answer is yes.  But I believe that the Trustee
24    gave its authority in this document.
25        Q.   Right.
     TSG Reporting - Worldwide    877-702-9580

1     MONTAL - HIGHLY CONFIDENTIAL
2         MR. MAGUIRE:  We'll mark as
3     Exhibit 602 a document Bates stamped DTCC00493
4     through 497.
5            (Exhibit 602 marked for
6     identification.)
7         Q.   Sir, this is an e-mail chain, and
8     you're welcome to look at as much of the document
9     as you want.  Just for your information, I'm going
10    to ask you first about the section of the e-mail
11    that's at the bottom of the first page and carries
12    over to the top of the second page, and
13    specifically about the sentence at the bottom of
14    the first page that says:
15            "DTCC was informed by a senior
16    person at Barclays Capital that Barclays would not
17    be accepting any open positions as part of the
18    transfer of the LEHM assets.  DTCC is interpreting
19    that to mean any trades that are still in the
20    settlement cycle will not be guaranteed.  This
21    could mean trades from today will fail.  DTCC is
22    contemplating a 'Cease to Act' notice for LEHM
23    tonight."
24            Do you see that, sir?
25        A.   I do.
     TSG Reporting - Worldwide    877-702-9580

1     MONTAL - HIGHLY CONFIDENTIAL
2         Q.   And is it correct, sir, that over
3     the course of the week of -- starting
4     September 15, DTC did at various times consider
5     issuing a Cease to Act Notice for Lehman?
6         A.   Yes.  I believe that's what I
7     testified to earlier.
8         MR. MAGUIRE:  We'll mark as
9     Exhibit 603 a document Bates stamped DTCC00316
10    through 317.
11            (Exhibit 603 marked for
12    identification.)
13        Q.   Sir, is this an e-mail chain that
14    you received on the Friday morning?
15        A.   I am listed in the "To" section of
16    the top e-mail.  I'm sure it was received in my
17    inbox.  I can't tell you exactly when I saw it.
18        Q.   If you look at the bottom of the
19    first page, there's the proposal from Barclays.
20            Do you see that?
21        A.   I see the proposal from Barclays
22    counsel, Hydee Feldstein, to Shelly -- by Hydee on
23    behalf of Barclays to Shelly Hirshon.
24        Q.   And that proposal was for a limited
25    guarantee not to exceed $250 million?
     TSG Reporting - Worldwide    877-702-9580

MONTAL - HIGHLY CONFIDENTIAL

1  
2  A.  Correct.
3  Q.  And it notes at the end of the
4  second paragraph that Barclays is not taking all
5  of the assets or the liabilities in the account at
6  DTC.  This is account No. 0074.
7  Do you see that?
8  MR. STERN:  What are you reading
9  from.
10  Q.  Towards the bottom of the second
11  paragraph, you will see there is a sentence that
12  begins:
13  "As you know, the assets and
14  liabilities in that account are not limited to
15  those we are purchasing or assuming and so we
16  would expect to have the open trades settled and
17  the assets and liabilities in the accounts
18  segregated and transferred either to the SIPC
19  trustee's account or to a new account for
20  Barclay's as quickly as practicable."
21  A.  I see that sentence.
22  Q.  So you understood that Barclays was
23  suggesting that it would not be taking all of the
24  assets from the free account and would require DTC
25  to segregate or divide up the assets that Barclays

MONTAL - HIGHLY CONFIDENTIAL

1  was taking and separate them from the assets that
2  it was not taking?
3  
4  MR. STERN:  Objection to the form.
5  A.  I don't know that I read this
6  sentence you're referring to.  I don't know that I
7  interpreted that sentence that you're referring to
8  in the way that you've described.
9  The main focus and the main message
10  in this e-mail to DTCC's counsel as it affected us
11  was that there was a $250 million limit on the
12  guarantee, and there were potential liabilities
13  beyond that.
14  And from DTCC's perspective at
15  least at this point in time, it wanted and
16  expected an unlimited guarantee in connection with
17  the assignment and assumption of the assets and
18  liabilities in the Lehman account.
19  Q.  And hence, DTC responded that this
20  proposal would have to go before DTC's board, but
21  would go without any recommendation -- or with a
22  recommendation from management that the proposal
23  be rejected?
24  A.  That's what the e-mail says.
25  Q.  And subsequent to this, did you

MONTAL - HIGHLY CONFIDENTIAL

1  
2  understand an offer was made of additional
3  collateral being provided to DTC, namely the
4  residential mortgage securities?
5  A.  Yes.
6  Q.  And then at some point in time you
7  further learned that, in fact, those -- that
8  additional collateral, the residential mortgage
9  securities, would not, in fact, be available?
10  A.  Correct.
11  Q.  I'll represent to you that at the
12  sale hearing, at page 49 of the transcript the
13  Court asked:  "What was the aggregate value of the
14  posted collateral?"
15  And the lawyer for Lehman,
16  Ms. Laurie Fife, responded:  "Your Honor, I'm
17  not -- excuse me.  There are 300,000 trades, but
18  we're not sure the value of the collateral."
19  Did DTCC itself or any of its
20  affiliates conduct any valuation of the
21  residential mortgage securities?
22  A.  The answer to the question is no.
23  But I'm not sure how that ties to
24  the passage you read.
25  Q.  Did --

MONTAL - HIGHLY CONFIDENTIAL

1  
2  A.  DTCC did not ever value the
3  residential mortgages that we were referring to
4  with respect to the additional collateral.
5  Q.  Did you retain anyone to do any
6  such valuation?
7  A.  No.  I don't think we ever learned
8  of the specifics -- I know we never learned of the
9  specifics of what that collateral consisted of.
10  Q.  Were you ever provided with any
11  CUSIPs identifying what the securities were?
12  A.  No, we were not.
13  Q.  Did you have any further
14  information about what these residential mortgage
15  securities -- what the specifics of them were?
16  A.  No.  We were told they were -- its
17  stated value was $3 billion.  We recognized that
18  that -- those values may not be accurate.
19  And by the time it would have been
20  relevant for us to get the specifics on -- of the
21  collateral that was being suggested, the
22  collateral was no longer available.  And,
23  therefore, we never got that far.
24  MR. MAGUIRE:  We'll mark as
25  Exhibit 604 a document Bates stamped

Page 42

1          MONTAL - HIGHLY CONFIDENTIAL
2     DTCC00120.
3          (Exhibit 604 marked for
4     identification.)
5          Q.   Sir, you're not copied on this
6     e-mail, but I just want to direct your attention
7     to the first paragraph, which says:
8          "I am wondering if I could send you
9     a few comments on the DTC docs understanding that
10    the DTC team is tied up on bigger business issues
11    at the moment and the guarantee in particular will
12    likely need to be changed once we know the
13    outcome."
14          Can you tell me, sir, what was the
15    main business issue that preoccupied the DTC team
16    on the Sunday night?
17          MR. MASHBERG:  Just so the record
18    is clear, the e-mail is sent to Shelly
19    Hirshon.
20          MR. MAGUIRE:  Yeah.
21          A.   The focus of the discussions on
22    Sunday night revolved around what assets, if any,
23    Barclays was going to take, what collateral was
24    going to be posted, whether the clearing banks
25    would continue to operate and settle on behalf of
          TSG Reporting - Worldwide    877-702-9580

Page 43

1          MONTAL - HIGHLY CONFIDENTIAL
2     Lehman.
3          And this e-mail has a time stamp of
4     11:39 p.m., but I can't tell you whether the
5     topics I've just outlined were happening before,
6     during or after 11:39.
7          But in general terms, those were
8     the issues that were being discussed and
9     considered on Sunday night.
10          MR. MAGUIRE:  Okay.  We'll mark as
11    Exhibit 605 a document Bates stamped DTCC00375
12    through 376.
13          (Exhibit 605 marked for
14    identification.)
15          Q.   Sir, it's correct, is it not, that
16    you received -- or at least this indicates you
17    received the -- not the top e-mail, but the -- you
18    were copied on the previous one dated Monday,
19    September 22, a little bit after midnight?
20          A.   You're talking the one -- about the
21    one from Michael Mazzuchi to Shelly Hirshon, with
22    a cc to Ed Rosen, Larry Thompson, Isaac Montal,
23    Merrie Witkin and Nikki Poulos?
24          Q.   Yeah.
25          A.   My name is on there as a recipient,
          TSG Reporting - Worldwide    877-702-9580

Page 44

1          MONTAL - HIGHLY CONFIDENTIAL
2     as a copy.
3          Q.   If you start at the beginning of
4     the chain at the bottom of the first page, going
5     over to the second page, you'll see that
6     Mr. Mazzuchi at Cleary Gottlieb writes to your
7     counsel, Mr. Hirshon, and says:
8          "I now understand the entire
9     approach is overtaken by events and the accounts
10    aren't being transferred, and the guaranty will be
11    changed -- are you going to run these changes?
12    Please let me know so we can coordinate; thanks."
13          Do you see that, sir?
14          A.   I do.
15          Q.   And then you see that Mr. Hirshon
16    responded saying:
17          "We are revising the guar
18    letter" -- which I read as guarantee letter -- "in
19    case there is a revised deal."
20          Do you see that, sir?
21          A.   Yes.
22          Q.   And in fact, at some point did
23    Barclays confirm that there was a -- that it was
24    agreeing to a revised deal?
25          A.   At some point there was an
          TSG Reporting - Worldwide    877-702-9580

Page 45

1          MONTAL - HIGHLY CONFIDENTIAL
2     agreement that was reflected from DTCC's
3     perspective in the agreement that was signed in
4     the early morning hours of September 22nd,
5     reflected in the exhibit that you marked -- that
6     you showed me earlier, which I believe is marked
7     as Exhibit 52.
8          MR. MAGUIRE:  We'll mark as
9     Exhibit 606 a document Bates stamped DTCC00003
10    through 00007.
11          (Exhibit 606 marked for
12    identification.)
13          Q.   Sir, please take whatever time you
14    need to review Exhibit 606, and then if you can
15    explain to us what the document is.
16          A.   This appears to be an e-mail from
17    me to Ed Rosen, Michael Mazzuchi, I believe it's
18    Jim Kobak and Mr. Giddens at Hughes Hubbard, with
19    a copy to Larry Thompson, Steve Harbeck, Kris
20    Caputo, Merrie Witkin, John Petrofsky, Shelly
21    Hirshon and Mr. Kiplok at Hughes Hubbard,
22    enclosing a version of what is ultimately
23    Exhibit 52.
24          I'd have to do a word-to-word
25    comparison to tell you if this is the final or
          TSG Reporting - Worldwide    877-702-9580

1          MONTAL - HIGHLY CONFIDENTIAL
2    not.
3          MR. MAGUIRE:  We'll mark as
4    Exhibit 607 a document Bates stamped DTCC00610
5    through 615.
6          (Exhibit 607 marked for
7    identification.)
8          Q.   Can you tell me, sir, what is
9    Exhibit 607?
10         A.   It's an e-mail from Michael
11   Mazzuchi to myself, with a copy to a bunch of
12   other folks, I think the ones that I mentioned
13   with respect to the last exhibit, 4:58 a.m. on
14   September 22nd, attaching a revised draft of what
15   is -- ultimately turned out to be Exhibit 52.
16         Again, I'd have to do a
17   word-to-word comparison between Exhibit 52 and
18   this document to tell you if they are exactly the
19   same or not.  I can't tell you that right now.
20         MR. MAGUIRE:  We'll mark as
21   Exhibit 608 a document Bates stamped
22   DTCC00565.
23         (Exhibit 608 marked for
24   identification.)
25         (Discussion off the record.)

1          MONTAL - HIGHLY CONFIDENTIAL
2          Q.   Sir, I'm not asking you to do a
3    word-for-word comparison with Exhibit 52.  But if
4    you can tell me in general terms what you
5    understand Exhibit 608 to be.
6          A.   It's an e-mail from Merrie Witkin
7    to a bunch of folks, enclosing a version of what
8    is -- ultimately turned out to be Exhibit 52.
9          And although the cover e-mail
10   states that -- states, among other things, that
11   it's the finalized agreement incorporating certain
12   comments, it was still subject to review by -- I
13   believe it was Barclays' counsel.
14         And again, I can't tell you if this
15   was the version that was ultimately signed without
16   doing a word-for-word comparison.
17         MR. MAGUIRE:  We'll mark as
18   Exhibit 609 a document Bates stamped DTCC00401
19   through 404.
20         (Exhibit 609 marked for
21   identification.)
22         A.   Okay.
23         Q.   Now, sir, this e-mail chain is
24   generally about DTC documents.
25         And do you understand that to be a

1          MONTAL - HIGHLY CONFIDENTIAL
2    reference to the DTC letter and the DTC guarantee
3    that ultimately was embodied in the agreement
4    we've marked as Exhibit 52?
5          A.   Yes.
6          Q.   There's also a reference -- you'll
7    see it on the top of the second page of this
8    exhibit -- to a clarification agreement.
9          Did you understand that there were
10   some negotiations going on concerning something
11   that was referred to as a clarification agreement?
12         A.   I was generally aware that there
13   was a clarification agreement that was being
14   discussed or drafted by parties other than DTCC.
15         Q.   Was -- did DTCC ever consider being
16   a party to the clarification agreement?
17         A.   No.
18         Q.   Once Barclays and DTCC agreed --
19   reached an agreement concerning the -- what
20   ultimately became the contract we've marked as
21   Exhibit 52, did DTCC pay any attention to what was
22   happening in connection with the clarification
23   letter?
24         MR. STERN:  Objection to the form.
25         A.   The clarification letter was not an

1          MONTAL - HIGHLY CONFIDENTIAL
2    agreement that DTCC was a party to or considered
3    being a party to, and so whatever issues there
4    might have been around the clarification letter
5    was not on our radar screen.  There were lots and
6    lots of other things that were our issues that we
7    were focusing on.
8          MR. MAGUIRE:  We'll mark as
9    Exhibit 610 a document Bates stamped DTCC00627
10   through 633.
11         (Exhibit 610 marked for
12   identification.)
13         Q.   Sir, can you tell me, what is
14   Exhibit 610?
15         A.   It's an e-mail from Michael
16   Mazzuchi to Merrie Witkin, with a copy to a bunch
17   of other folks, with the subject line "Re: DTC
18   Account Swing Documentation and Limited Guaranty
19   Letter Agreement."  The entire text of the e-mail
20   says "executed guaranty."
21         And there's an attachment which
22   appears to be similar to what we've referred to as
23   Exhibit 52.  Again, I have not done a
24   line-to-line, word-for-word comparison.
25         MR. MAGUIRE:  We'll mark as

Page 50

1          MONTAL - HIGHLY CONFIDENTIAL
2    Exhibit 611 a document Bates stamped
3    DTCC00318.
4              (Exhibit 611 marked for
5    identification.)
6              MR. MASHBERG:  Off the record.
7              (Recess taken.)
8              MR. MAGUIRE:  We have marked as
9    Exhibit 611 a document Bates stamped DTCC00318
10   through 21.
11        **Q.   Sir, I'm not sure you're on any of**
12   **this e-mail chain.  I just want to confirm that**
13   **this is from DTC's business records.**
14             MR. STERN:  Objection to the form.
15        A.   There is no DTCC person listed on
16   any of the e-mails that you -- that are included
17   in this document.  They appear to be e-mail
18   exchanges between Erika Weinberg at Weil Gotshal
19   and Shelly Hirshon, who is their outside counsel.
20   And so I don't know that I agree with your
21   characterization.
22        **Q.   Okay.  There is a comment I'd just**
23   **like you to read.  It's on the first page.  It's**
24   **from Mr. Hirshon's e-mail to Erika Weinberg, and**
25   **it says:**
         TSG Reporting - Worldwide    877-702-9580

Page 51

1          **MONTAL - HIGHLY CONFIDENTIAL**
2          **"Its a curious document, in**
3    **substance and designation.  What is its reason?**
4    **Is it an amendment to the Apa (I can't imagine it**
5    **is because otherwise the court didn't approve the**
6    **final version) or is it like legislative history**
7    **with no contractual import."**
8          **Do you see that, sir?**
9         A.   I do.
10        **Q.   Did DTCC ever conclude on what the**
11   **import of the clarification letter was?**
12             MR. STERN:  Objection to the form.
13        A.   I want to break that answer up into
14   two parts.
15             One is in connection with the --
16   what you read from the e-mail, I wasn't a party to
17   that.  I don't know what the authors or recipients
18   intended, and I don't know anything about it.  So
19   that's with respect to the e-mail.
20             With respect to whether or not DTCC
21   ever -- what was your question, whether it ever
22   considered the import of the clarification letter?
23        **Q.   Yes.  Did DTCC ever get an**
24   **understanding as to exactly what the purpose of**
25   **the clarification letter was?**
         TSG Reporting - Worldwide    877-702-9580

Page 52

1          **MONTAL - HIGHLY CONFIDENTIAL**
2         A.   DTCC was not a party to the
3    clarification letter.  The clarification letter, I
4    believe, is a clarification to the APA agreement,
5    which DTCC was not a party to, either.  And that
6    was not, as I mentioned earlier, an issue that
7    DTCC was affected by or focused on.
8          **Q.   Why did DTCC seek to protect its**
9    **interests in its own agreement as opposed to**
10   **simply signing on, shall we say, to the**
11   **clarification letter?**
12        A.   I don't know what's in the
13   clarification letter, number one, to be able to
14   tell you whether or not it's something we would --
15   that would be appropriate for us to sign on to.
16   But there were certainly other aspects, we
17   understood, that were being dealt with in the
18   clarification letter beyond DTCC's issues.
19             And we -- there was no reason for
20   us to be a part of those provisions.  And it's
21   just cleaner to have the provisions that apply to
22   DTCC in a separate standalone document.
23             I would add that the -- I believe
24   the clarification letter was -- well, certainly
25   the APA went before the court for its approval.
         TSG Reporting - Worldwide    877-702-9580

Page 53

1          MONTAL - HIGHLY CONFIDENTIAL
2    DTCC at this point, or I don't think at any point,
3    had agreed to submit itself to the jurisdiction of
4    the bankruptcy court and did not want to enter
5    into an agreement that would possibly result in
6    that having happened.
7          **Q.   Now I'd like to ask you some**
8    **questions about the time period over the weekend**
9    **following the sale hearing.  Okay?**
10        A.   Can you give me some dates?
11        **Q.   Yes.  It would be -- the sale**
12   **hearing was on Friday the 19th and went past**
13   **midnight into the Saturday and the Sunday.  So**
14   **it's Saturday the 20th and Sunday the 21st.**
15        A.   That's what you're focusing on?
16        **Q.   Yes.**
17        A.   Okay.
18        **Q.   And actually, I'd like to narrow**
19   **that down even more and focus on the period of the**
20   **weekend after Barclays had agreed that the assets**
21   **in the free account -- at Lehman's free account at**
22   **DTC would be excluded from the sale.**
23        A.   Okay.
24             MR. STERN:  Objection to the form.
25   Can you restate the question again, please.
         TSG Reporting - Worldwide    877-702-9580

Page 54

1    MONTAL - HIGHLY CONFIDENTIAL
2         MR. MAGUIRE: I haven't phrased the
3    question. I'm simply directing the witness to
4    the --
5         MR. STERN: No, you're prefacing.
6         **Q.   The preface is any time after the**
7    **agreement was reached between Barclays and the**
8    **DTC, that the assets in Lehman's free account at**
9    **DTC would be excluded from the sale.**
10        MR. STERN: Objection to the form.
11        **Q.   Any time after that agreement, did**
12   **anyone at Barclays indicate to DTC that Barclays**
13   **intended, in fact, to acquire and take some or all**
14   **of the Lehman assets in the free account at DTC?**
15        A.   When you're -- can you read the
16   question back, please.
17        (The requested portion of the
18   record was read.)
19        A.   When you -- I don't understand the
20   question. When you say "agreement," do you mean
21   the signed agreement that is Exhibit 52?
22        **Q.   Yes, the signed agreement that's**
23   **Exhibit 52, or whatever earlier time that that**
24   **business agreement, that Exhibit 52, that**
25   **document. Any time after the parties agreed that**
     TSG Reporting - Worldwide    877-702-9580

Page 55

1    **MONTAL - HIGHLY CONFIDENTIAL**
2    **the free account was going to be an excluded**
3    **asset.**
4         MR. STERN: Objection to the form.
5         A.   Well, Exhibit 52 doesn't speak
6    about the free account in particular. It says
7    Barclays has indicated and hereby agrees that all
8    of the accounts of LBI maintained at the clearing
9    agency's subsidiaries, defined as the accounts,
10   constitute excluded assets within the meaning of
11   the APA.
12        So you're referencing free account.
13   You're talking about an agreement. I don't know
14   if you mean the signed written agreement, which I
15   believe, based upon the e-mail exchanges you have
16   shown me, the final signed copy was probably
17   circulated around 8:00 a.m. on Monday the 22nd.
18        Are you referring to a time period
19   after that?
20        **Q.   Let's take -- let's start with**
21   **8:00 a.m. or the time when the signed copy was**
22   **circulated.**
23        **Are we together on the time frame?**
24        A.   So your time frame is 8:00 a.m.
25   Monday, September 22nd and thereafter?
     TSG Reporting - Worldwide    877-702-9580

Page 56

1    MONTAL - HIGHLY CONFIDENTIAL
2         **Q.   Yes.**
3         MR. MASHBERG: Just so we're clear,
4    we're talking about Exhibit 610, which is
5    timed 8:02 a.m. on Monday? This is the
6    executed guaranty.
7         MR. MAGUIRE: Yes. We have -- as
8    Exhibit 610, right, and that's 8:02 a.m.?
9         MR. MASHBERG: Right. That's
10   Monday.
11        MR. MAGUIRE: Okay.
12        A.   So --
13        **Q.   Let's take that time frame.**
14        **At any time after Mr. Mazzuchi sent**
15   **this to DTC, did anyone representing Barclays**
16   **indicate that Barclays intended to take some or**
17   **all of the assets in the accounts that were the**
18   **subject of this agreement?**
19        MR. STERN: Objection to the form.
20        A.   From 8:00 a.m. Monday,
21   September 22nd until today?
22        **Q.   No. I'm talking from 8:00 a.m.**
23   **forward any time that Monday.**
24        A.   I don't believe so.
25        **Q.   Now, if you'd turn, sir, to**
     TSG Reporting - Worldwide    877-702-9580

Page 57

1    **MONTAL - HIGHLY CONFIDENTIAL**
2    **Exhibit 606.**
3         A.   Okay.
4         **Q.   This was your e-mail in which you**
5    **said:**
6         **"Attached is the Guaranty revised**
7    **to reflect the agreement reached earlier this**
8    **evening."**
9         **Do you see that?**
10        A.   I do.
11        **Q.   And with respect to "earlier this**
12   **evening," that time frame, what's your best**
13   **recollection as to what that time frame is?**
14        A.   At or around midnight, give or take
15   an hour in either direction.
16        **Q.   Taking that time -- that point in**
17   **time when the parties reached that agreement, at**
18   **any point after that agreement, did anyone**
19   **representing Barclays indicate to DTC that**
20   **Barclays intended to take some or all of the**
21   **assets that were in the accounts that were the**
22   **subject of that agreement?**
23        MR. STERN: Objection to the form.
24        A.   Again, from approximately midnight
25   of September 21, September 22, between Sunday and
     TSG Reporting - Worldwide    877-702-9580

Page 58

1  MONTAL - HIGHLY CONFIDENTIAL
2  Monday, until the present?
3      Q.   Let me just take it with any time
4  on the Monday, first of all.
5          Did anyone from Barclays indicate
6  to you any time after this agreement was reached
7  that Barclays intended to acquire some or all of
8  the assets in the accounts that were the subject
9  of this agreement?
10     A.   No.
11     Q.   When did you first hear -- when did
12 DTC first hear that Barclays was taking the
13 position that it was entitled to some or all of
14 the assets in the Lehman accounts that were the
15 subject of this agreement?
16     A.   I believe when there were some
17 court filings and some of those positions became
18 public. I do not believe that we were aware of it
19 before then.
20     Q.   And is that some several months
21 after September of 2008?
22     A.   Probably.
23     Q.   Prior to that time when you saw
24 those court filings, did anyone from Barclays
25 indicate to you that Barclays intended to draw a
   TSG Reporting - Worldwide    877-702-9580

Page 59

1  MONTAL - HIGHLY CONFIDENTIAL
2  distinction between the accounts that Lehman had
3  at DTC and the contents of those accounts?
4          MR. STERN:  Objection to the form.
5      A.   Well, your question started with
6  the preface that I saw the filings.
7      Q.   Let me eliminate the preface
8  because I don't want to hold you to having seen
9  any filings.
10         I'm simply looking for a point in
11 time.  And I'm not even going to ask you what year
12 it was, whether it was 2008 or 2009.  It's
13 perfectly sufficient for my purpose if it was some
14 number of months after September of 2008.  So my
15 only question about those filings was simply to
16 nail a point in time.
17     A.   So I think it would be helpful to
18 me if you could just rephrase the question.
19     Q.   Okay.  First of all, let's see if
20 we can reach some agreement on the point in time
21 so we can give ourselves a little time frame.
22         Are you comfortable saying that you
23 were not aware of any -- let me withdraw that.
24         You don't recall the precise time
25 when you heard that Barclays was claiming the
   TSG Reporting - Worldwide    877-702-9580

Page 60

1  MONTAL - HIGHLY CONFIDENTIAL
2  assets in the Lehman accounts?
3      A.   No.
4      Q.   Do you know whether that was in
5  2008 or 2009?
6      A.   I do not.
7      Q.   But you are comfortable saying it
8  was several months, at least, after the closing of
9  the transaction?
10         MR. STERN:  Objection to the form
11 of the question.
12     Q.   If you recall.
13     A.   Probably, but I can't be certain.
14     Q.   Okay.  Whenever that was, was there
15 any time prior to that that anyone from Barclays
16 indicated to DTC that it understood the DTC -- its
17 agreement with the DTC to apply only to Lehman's
18 accounts at DTC, and not in any way to affect
19 Barclays' rights to acquire the contents of those
20 accounts?
21     A.   No.
22     Q.   Was the first time that you became
23 aware of that distinction between the -- that
24 Barclays was drawing between the accounts at DTC
25 and the contents of those accounts in connection
   TSG Reporting - Worldwide    877-702-9580

Page 61

1  MONTAL - HIGHLY CONFIDENTIAL
2  with the current dispute that has resulted in your
3  appearing here as a witness?
4          MR. STERN:  Objection to the form.
5      A.   I don't understand the question.
6      Q.   Do you recall when you -- let me
7  withdraw the question.
8          Has anyone from Barclays informed
9  DTC that it believes the agreement reached between
10 the parties and recorded in Exhibit 52 means that
11 the Lehman accounts should stay with DTC, but that
12 Barclays is nonetheless entitled to all of the
13 contents of those accounts?
14         MR. STERN:  Objection to the form.
15     A.   I don't believe so.
16     Q.   Did DTC ever agree that Barclays
17 could take all of the contents of the accounts at
18 DTC without providing DTC with any collateral --
19     A.   No.
20     Q.   -- other than the $250 million?
21         MR. STERN:  Objection to the form.
22     A.   No.
23     Q.   Did DTC ever intend that Barclays
24 could take all of the contents of Lehman's
25 accounts at DTC without providing DTC with
   TSG Reporting - Worldwide    877-702-9580

Page 62

MONTAL - HIGHLY CONFIDENTIAL

1
2  collateral -- substitute collateral in addition to
3  the 250 million?
4          MR. STERN:  Objection to the form.
5      A.   No.
6      Q.   I believe you previously testified
7  that the limited guarantee that Barclays had
8  proposed, the $250 million, was not considered to
9  be acceptable by DTC.
10         Can you tell me why that was
11  considered to be unacceptable by DTC?
12     A.   I'm not certain if we used the word
13  "acceptable" or "sufficient" the first time we
14  spoke about it.  And I think I answered it
15  previously.
16     Q.   Did DTC ever change its position
17  that $250 million alone was not sufficient
18  collateral to permit it to give up its rights to
19  any assets that Lehman had at DTCC or any of its
20  affiliates?
21     A.   Can you just read it back?  Because
22  I think there were some double negatives in there,
23  so I'm struggling with the question.
24     Q.   Yes.  Let me -- let me rephrase it.
25         After DTCC first informed Barclays

Page 63

MONTAL - HIGHLY CONFIDENTIAL

1
2  that the $250 million collateral alone would be
3  insufficient, did DTCC ever change its position or
4  agree to proceed on the basis of getting only
5  $250 million in collateral?
6      A.   We proceeded in accordance with
7  what is the outline in Exhibit 52.
8      Q.   And that outline in Exhibit 52
9  retained for DTCC $250 million purchase price as
10  collateral.  Correct?
11     A.   It retained for DTC and its
12  clearing agency subsidiaries $250 million that was
13  wired to it by Barclays, separate -- with no
14  connection to the purchase price.
15     Q.   And it also retained whatever
16  rights -- all of the rights that DTC had over the
17  assets in the Lehman box -- in the Lehman accounts
18  at DTC?
19     A.   Right.
20     Q.   Did DTCC ever agree to give up its
21  rights to recourse over the assets in the Lehman
22  box -- in the Lehman accounts at DTC?
23     A.   No.
24         MR. MAGUIRE:  Sir, I have no
25  further questions at this time.  Thank you.

Page 64

MONTAL - HIGHLY CONFIDENTIAL

1
2          MR. STERN:  I have some questions.
3  We'll start with Exhibit 52.
4  EXAMINATION BY
5  MR. STERN:
6      Q.   Mr. Montal, you have Exhibit 52
7  before you?
8      A.   I do.
9      Q.   Exhibit 52 refers to a guaranty
10  amount of $250 million.  Is that correct?
11     A.   Yes.
12     Q.   Okay.  To what extent has DTCC and
13  its clearing agency subsidiaries drawn on that
14  guaranty?
15     A.   I don't know the answer to that
16  question in particular, in the sense that the
17  guaranty covers losses, claims, damages, expenses,
18  including legal fees and liabilities, which the
19  clearing agency subsidiaries may incur as a result
20  of winding down and closing out the accounts.
21         And we've certainly incurred
22  losses, claims, damages, expenses, legal fees and
23  liabilities with respect to the winding down and
24  closing out of the accounts, and have charged some
25  of those or all of those -- well, I would say some

Page 65

MONTAL - HIGHLY CONFIDENTIAL

1
2  of those against the funds that we are holding on
3  behalf of Lehman.
4          Considering that money is fungible,
5  I can't tell you that it's specifically the
6  $250 million guaranty versus the participant's
7  fund, but it's one or the other.
8      Q.   As of today, what is the amount of
9  those losses?
10     A.   I don't have an exact number.
11     Q.   Can you give me an estimate?
12     A.   Well, I would say that the winding
13  down and closeout also is not complete.  And so
14  until that is done, I couldn't tell you what the
15  ultimate number will be.
16     Q.   Would you have any estimate of what
17  it is as of today?
18     A.   I feel comfortable saying that it's
19  under $100 million.
20     Q.   At the bottom of the second page of
21  Exhibit 52 there's a sentence that states:
22         "Should any portion of the cash
23  deposit remain following the closeout of the
24  accounts in satisfaction of all obligations, in
25  accordance with the rules and procedures of the

1     **MONTAL - HIGHLY CONFIDENTIAL**
2     **clearing agency subsidiaries, such amount shall be**
3     **remitted to the Trustee."**
4             **Do you see that?**
5         A.   I do.
6         **Q.   Has DTCC had any discussions with**
7     **the Trustee concerning amounts that may be**
8     **remitted to the Trustee under the sentence I just**
9     **read?**
10        A.   We've had discussions with the
11    Trustees and his representatives with respect
12    to funds ever transferred to the Trustee, but I
13    wouldn't say that it was pursuant to this
14    sentence.
15        **Q.   Has -- well, have there been any**
16    **discussions between DTCC and the Trustee**
17    **concerning amounts to be remitted to the Trustee**
18    **in the event that losses, as that term is used in**
19    **this agreement, do not exceed the cash deposit?**
20        A.   Again, there have been discussions
21    between DTCC and the Trustee with respect to
22    transferring funds from DTCC's control to the
23    Trustee, but those discussions are not focused on
24    the provisions of this agreement.
25             And part of the reason, I believe,

TSG Reporting - Worldwide     877-702-9580

1       MONTAL - HIGHLY CONFIDENTIAL
2     is because there hasn't been a complete closeout
3     of the accounts and satisfaction of all
4     obligations in accordance with the rules and
5     procedures of the clearing agency's subsidiaries.
6     And so there is discussions of in-term type
7     transfers.
8         **Q.   Has the Trustee ever asked DTCC for**
9     **an estimate of the losses that would be charged**
10    **against the cash deposit?**
11        A.   I don't think that there were --
12    that the Trustee ever asked for an estimate, but
13    there was certainly losses that we articulated to
14    the Trustee and for which the Trustee authorized
15    DTCC to reimburse itself for those losses.
16        **Q.   And did DTCC reimburse itself for**
17    **those losses in accordance with this agreement,**
18    **the agreement we've marked as Exhibit 52?**
19        A.   I believe that it did, subject to
20    my previous answer, with respect to the
21    fungibility of funds and the distinction between
22    funds in the participant's fund versus the
23    $250 million.
24        **Q.   Can you explain what that means?**
25        A.   There's a pot of money that DTCC is

TSG Reporting - Worldwide     877-702-9580

1       MONTAL - HIGHLY CONFIDENTIAL
2     holding that includes the $250 million, and that
3     includes the participant's fund on behalf of
4     Lehman --
5             MR. MASHBERG:  You mean the
6     participant fund?  You said participant's
7     fund.
8             THE WITNESS:  The participant fund
9     attributable to Lehman.
10        A.   And there were losses and expenses
11    incurred by DTCC, as described in Exhibit 52, for
12    which DTCC was reimbursed pursuant to discussions
13    with the Trustee.
14        **Q.   Okay.  Now, does the DTCC have any**
15    **projection of losses, as defined in this**
16    **agreement, going forward?**
17        A.   No.
18        **Q.   Does DTCC anticipate incurring**
19    **losses, as that term is defined in this agreement,**
20    **in excess of the $250 million cash deposit?**
21        A.   Until the closeout is complete, the
22    closing of all of the accounts, and the
23    satisfaction of all of the obligations of Lehman
24    in accordance with the rules and procedures of the
25    clearing agency's subsidiaries, it is impossible

TSG Reporting - Worldwide     877-702-9580

1       MONTAL - HIGHLY CONFIDENTIAL
2     to predict with certainty what those losses may
3     come to.
4         **Q.   Realistically, however, does the**
5     **DTCC have any estimate or projection at this point**
6     **indicating that the DTCC anticipates those losses**
7     **to exceed the $250 million cash deposit?**
8         A.   I'll stick with my previous answer.
9         **Q.   Let me ask my question again.  Does**
10    **the DTC have any estimate or projection or any**
11    **analysis indicating to DTCC that the losses, as**
12    **defined in this agreement, will exceed the**
13    **$250 million cash deposit?**
14        A.   I believe I answered previously
15    that it doesn't have projections, period, with
16    respect to this issue.
17        **Q.   And as of today, the losses, I**
18    **believe you testified, are more in the range of**
19    **$100 million than $250 million.**
20             **Is that a correct description of**
21    **your testimony?**
22        A.   No.
23        **Q.   Tell me, then, what is the**
24    **estimate?**
25        A.   I said that I'd be -- I feel very

TSG Reporting - Worldwide     877-702-9580

Page 70

MONTAL - HIGHLY CONFIDENTIAL
1
2  comfortable telling you today that they are below
3  $100 million.  Whether they have reached 50 or a
4  little above 50 or a little below 50 or -- I
5  couldn't tell you where that number lies and --
6  but I said to you that I feel very comfortable
7  that they are below $100 million.
8         MR. MASHBERG:  Could we take a
9  short break?
10        (Recess taken.)
11        (Exhibit 612 marked for
12  identification.)
13     Q.   Mr. Montal, we were referring
14  previously to the term "losses" as that term is
15  defined in the agreement marked as Exhibit 52.
16         In Paragraph 2 on page 2 of the
17  exhibit, it defines that term "losses" as
18  including any and all losses, claims, damages,
19  expenses, including legal fees or liabilities.
20         And then it goes on to refer to
21  that any of them -- that's the clearing
22  agencies -- may incur as a result of winding down
23  and closing out the accounts.
24         Can you break down for me in rough
25  estimates the categories of losses that DTCC and
   TSG Reporting - Worldwide    877-702-9580

Page 71

MONTAL - HIGHLY CONFIDENTIAL
1
2  its clearing agency subsidiaries have incurred in
3  connection with winding down and closing out the
4  Lehman accounts?
5     A.   It would be difficult for me to
6  ascribe numbers to them, but the categories in
7  general terms are -- there were certain claims, I
8  believe, by members of FICC, with respect to
9  certain events that occurred during the closeout,
10  that they looked for compensation on and that was,
11  I believe, paid.
12     Q.   What was the nature and rough
13  amount of those claims?
14     A.   I don't remember the details,
15  sitting here today.  There were claims, I believe,
16  relating to ACAT's movements that were ultimately
17  paid.  And there were expenses, including legal
18  fees, relating to the winding down of the
19  accounts.
20     Q.   Were there --
21     A.   There were no trading losses from
22  that perspective.
23     Q.   So there were no trading losses.
24  Is that correct?
25     A.   In the aggregate, I believe that's
   TSG Reporting - Worldwide    877-702-9580

Page 72

MONTAL - HIGHLY CONFIDENTIAL
1
2  true.  I can't tell you that there was a
3  particular -- that there was no security that was
4  sold at a loss, but I believe in the aggregate
5  that's true.
6     Q.   And you referred to a category that
7  you described as related to ACAT's movements.
8         Can you describe the nature of that
9  and the estimated amount?
10     A.   I can't tell you the estimated
11  amount.  I simply don't remember.
12         But the ACAT refers to a service
13  that is designed to move accounts from one
14  brokerage firm to another when a customer wants to
15  move its account.
16         And the way the service works, it
17  results in -- it creates debits and credits from
18  the various firms involved in the transfer of the
19  accounts.  And I believe there were some losses
20  that were incurred by certain members relating to
21  the ACAT's movements.
22     Q.   And you don't recall the estimated
23  amount of that category?
24     A.   I don't remember offhand.
25     Q.   Okay.  And the expenses that you
   TSG Reporting - Worldwide    877-702-9580

Page 73

MONTAL - HIGHLY CONFIDENTIAL
1
2  referred to, the legal fees, do you know what the
3  estimated amount of those were?
4     A.   I do not offhand, no.
5         MR. STERN:  Counsel, I think if the
6  DTC has this in writing, we would appreciate
7  getting some information on those amounts.
8         MR. MASHBERG:  Okay.  We'll take
9  that under advisement.
10     Q.   Has the DTCC had any discussions
11  with the Trustee concerning when DTCC expects to
12  complete the wind-down and closeout of these
13  accounts?
14     A.   We've had discussions with the
15  Trustee about the fact that the Lehman accounts
16  are still open at DTCC and its clearing agency
17  subsidiaries, and that the assets have not yet
18  been moved out from -- all of the assets have not
19  yet been moved out from DTCC and its clearing
20  agency subsidiaries to either another member firm
21  or just outside of DTCC.
22         And so there was a continuing issue
23  with respect to whether or not the closeout --
24  well, not whether or not, but the fact that the
25  closeout of the accounts have not yet been
   TSG Reporting - Worldwide    877-702-9580

Page 74

MONTAL - HIGHLY CONFIDENTIAL

1  completed.
2      Q.   Does the DTCC have any projected
3  timetable for completing that process?
4      A.   That is within the control of the
5      A.   That is within the control of the
6  Trustee.
7      Q.   And has the Trustee indicated when
8  the Trustee plans to have that process completed?
9      A.   No.
10     Q.   Have you had discussions about the
11 timing of that?
12     A.   In general terms, but without any
13 specific answers or agreements.
14     Q.   What is the nature of the work that
15 would have to be done to complete that process?
16     A.   Instructions from the Trustee to
17 move all of its assets to another DTCC, using that
18 term loosely, participant, and closing of the
19 Lehman accounts.
20     Q.   Once the DTCC receives such
21 instructions from the Trustee, approximately how
22 long would that process take?
23     A.   Assuming it was a bulk movement of
24 everything that existed at DTC, I would say, you
25 know, it would be fairly short.

TSG Reporting - Worldwide    877-702-9580

Page 75

MONTAL - HIGHLY CONFIDENTIAL

1
2      Q.   "Fairly short" meaning a matter of
3  hours or days?
4      A.   Days or a week or, you know,
5  something like that.
6      Q.   And once that process is completed,
7  am I correct that at that point, any portion of
8  the cash deposit that remains under the agreement
9  marked as Exhibit 52 would then be remitted to the
10 Trustee?
11     A.   There would presumably be a
12 reconciliation between DTCC and the Trustee with
13 respect -- a reconciliation of all the numbers of
14 what was in the account, what expenses there were,
15 et cetera. There would be an accounting.
16     Q.   And is it fair to say that at this
17 point, the only thing holding up that process is
18 that the DTCC is awaiting instructions from the
19 Trustee?
20     MR. DAKIS:  Objection to form.
21     A.   It's instructions from the Trustee.
22 I guess it's an agreement with another party who
23 is willing to take on those assets or obligations
24 or whatever it is that may be involved in getting
25 these accounts closed.

TSG Reporting - Worldwide    877-702-9580

Page 76

MONTAL - HIGHLY CONFIDENTIAL

1
2      Q.   But assuming that you have another
3  party in a position to take on the accounts, the
4  key to completing this process is instructions
5  from the Trustee?
6      MR. DAKIS:  Objection to form.
7      A.   I can't list for you today every
8  requirement that would have to be satisfied in
9  order for the accounts to be closed, but I think
10 I've listed for you some of the primary ones.
11     Q.   One of the primary ones would be
12 instructions from the Trustee.  Correct?
13     A.   Correct.
14     Q.   And those have not been forthcoming
15 to date.  Correct?
16     A.   Correct.
17     Q.   Now, I believe you indicated in one
18 of your earlier answers that some assets have been
19 moved out of these accounts.  Is that correct?
20     A.   Yes.
21     Q.   Okay.  When assets are moved out of
22 the accounts, is that something that DTCC and its
23 clearing agency subsidiaries are knowledgeable
24 about?
25     A.   What do you mean by

TSG Reporting - Worldwide    877-702-9580

Page 77

MONTAL - HIGHLY CONFIDENTIAL

1
2  "knowledgeable"; that are we aware of it?
3      Q.   Exactly.
4      A.   Yes. The Trustee sends
5  instructions to DTCC to complete the transfers.
6      Q.   So any transfer of assets out of
7  accounts maintained by DTCC clearing agency
8  subsidiaries would require notice to those
9  subsidiaries.  Is that correct?
10     MR. MASHBERG:  Object to the form.
11     A.   With respect to the Lehman
12 accounts, yes.
13     Q.   So to the extent that there had
14 been transfers of any assets from those Lehman
15 accounts, that is something that the DTCC clearing
16 agency subsidiaries would know?
17     A.   Correct.
18     Q.   Let me show you a document that we
19 have previously marked as Exhibit 50.
20     Looking at Exhibit 50, can you tell
21 me what it is?
22     A.   It appears to be an e-mail from
23 Michael Mazzuchi to myself, sent on Monday,
24 September 22nd, 2008, at 6:03 a.m., with a cc to a
25 bunch of folks listed on the first page of

TSG Reporting - Worldwide    877-702-9580

MONTAL - HIGHLY CONFIDENTIAL

1    Exhibit 50.  The subject is "Re: Barclays
2    Guaranty."  And the text of the e-mail says:
3             "The current form of the
4    clarification letter is attached."
5             And there appears to be an
6    attachment.
7        **Q.    And do you recognize the attachment
8    as the clarification letter that is referenced in
9    the line that's labeled "attached" and that is
10   referenced in the cover note from Mr. Mazzuchi?**
11       A.   I don't have any reason to doubt
12   what Mr. Mazzuchi is saying, but I certainly do
13   not recognize it because we were not a party to it
14   and it was not something that we focused on.  I am
15   fairly certain that I probably never read this.
16       **Q.    Do you know whether your counsel
17   read it, Mr. Hirshon?**
18       A.   I do not.  And I'd be surprised if
19   he read it on the morning of September 22nd.
20       **Q.    Well, do you know if he read it at
21   any time; do you know one way or the other?**
22       A.   I do not.
23       **Q.    Do you know whether Mr. Hirshon or
24   other counsel from DTCC received any prior drafts**

TSG Reporting - Worldwide    877-702-9580

**MONTAL - HIGHLY CONFIDENTIAL**

1    **of this agreement, the clarification letter; do
2    you know one way or the other?**
3        A.   I have a vague recollection of the
4    exhibits that I saw this morning, including
5    something relating to the clarification letter
6    going to Mr. Hirshon, but I don't know if it was
7    before or after.  I don't have that in front of
8    me.
9        **Q.    Okay.  So you personally don't know
10   one way or the other whether Mr. Hirshon reviewed
11   prior drafts of this agreement?**
12       A.   The clarification letter was not
13   something that DTCC was a party to or was
14   intending to be a party to and, therefore, it was
15   not something that DTCC or its counsel was focused
16   on.
17           I would be surprised to learn that
18   anybody at DTCC or its counsel had reviewed the
19   clarification letter prior to its execution.
20       **Q.    Let's look back at Exhibit 609, if
21   we could.
22           Do you have Exhibit 609?**
23       A.   I do.
24       **Q.    And if you'd just look at the**

TSG Reporting - Worldwide    877-702-9580

**MONTAL - HIGHLY CONFIDENTIAL**

1    **second page.  At the top there's a message from
2    Mr. Hirshon that states:
3             "By the way, when will we see the
4    clarification agreement so we know what the deal
5    is?"
6             Do you see that?**
7        A.   I do see that.
8        **Q.    Do you -- does DTCC know why
9    Mr. Hirshon was requesting the clarification
10   agreement at that time?**
11       A.   I do not.
12       **Q.    Looking at Exhibit 611.
13           Do you have Exhibit 611 in front of
14   you?**
15       A.   I do.
16       **Q.    And looking at the first page, this
17   is from Mr. Hirshon, 9/20/2008, 5:51 p.m.  Do you
18   see that he states:
19             "Its a curious document, in
20   substance and designation.  What is its reason?"
21           And then he asks questions
22   concerning the clarification letter.
23           Do you see that?**
24       A.   I do.

TSG Reporting - Worldwide    877-702-9580

MONTAL - HIGHLY CONFIDENTIAL

1        **Q.    Do you know what version of the
2    clarification letter Mr. Hirshon was reviewing at
3    that time?**
4            MR. MAGUIRE:  Objection to form.
5    Misstates the record.
6            MR. STERN:  How does it misstate
7    the record?
8            MR. MAGUIRE:  There's nothing in
9    the record Mr. Hirshon was reviewing anything
10   at that time.
11       **Q.    Do you know whether Mr. Hirshon, as
12   of the time he sent this e-mail, had reviewed a
13   draft of the clarification letter; does DTCC know
14   that?**
15       A.   If you look at the entire e-mail
16   chain in 611, the e-mail immediately preceding the
17   one that you were referring to from Mr. Hirshon at
18   5:51 p.m. is an e-mail from Erika Weinberg to
19   Mr. Hirshon saying:
20           "Clarification letter isn't done."
21           And that followed an e-mail
22   apparently from Mr. Hirshon to Erika Weinberg,
23   asking for a final version of the clarification
24   letter.

TSG Reporting - Worldwide    877-702-9580

1    MONTAL - HIGHLY CONFIDENTIAL
2         And so it appears to me that
3  Mr. Hirshon's comments in his e-mail of 5:51 p.m.
4  on September 20th, 2008, to Erika Weinberg
5  probably occurred without him seeing -- the
6  conclusion I would draw is that his comments were
7  made without him seeing the clarification letter.
8    Q.   Is that something that DTCC knows
9  or is that your speculation?
10    A.   I'm not aware of Mr. Hirshon having
11  reviewed the clarification letter at this point.
12  You've asked me to look at Exhibit 611, and those
13  are the conclusions I'm drawing from this
14  document.
15    Q.   I am asking you, as the 30(b)(6)
16  representative for DTCC, whether DTCC knows
17  whether its counsel reviewed a draft of the
18  clarification letter before it was filed?
19         MR. DAKIS:  Objection.  Asked and
20    answered.
21    Q.   Do you know one way or the other?
22         MR. DAKIS:  Objection.  Asked and
23    answered.
24         MR. MAGUIRE:  Same objection.
25    A.   I am not aware.  And DTCC -- I'm

1    MONTAL - HIGHLY CONFIDENTIAL
2  answering this as a 30(b)(6) witness for DTCC.  I
3  am not aware of Mr. Hirshon having reviewed the
4  clarification letter prior to its execution.
5    Q.   You're not aware of it.
6         Does that mean that you know that
7  DTCC knows for a certainty that Mr. Hirshon did
8  not receive a draft of the clarification letter
9  before it was finalized?
10         MR. MASHBERG:  That's a different
11    question.
12         MR. DAKIS:  Objection to the form.
13    A.   You asked me whether or not
14  Mr. Hirshon reviewed it, not whether he received
15  the draft.  And my answer is the same.  DTCC is
16  not aware of Mr. Hirshon having reviewed the
17  clarification letter prior to its execution.
18    Q.   Okay.  Looking at Exhibit 50 --
19  before we get to Exhibit 50, does DTCC know why
20  Mr. Hirshon was requesting a copy of the
21  clarification letter?
22         MR. MASHBERG:  I'm sorry.  50?
23    Q.   Before we get to Exhibit 50, does
24  DTCC know why Mr. Hirshon was requesting a copy of
25  the clarification letter?

1    MONTAL - HIGHLY CONFIDENTIAL
2         MR. MAGUIRE:  Asked and answered.
3    A.   I do not.
4    Q.   Does DTCC have any reason to
5  believe that Mr. Hirshon did not intend to read a
6  copy of the document he was requesting?
7    A.   I have no knowledge as to what
8  Mr. Hirshon's intent was.
9    Q.   Looking at Exhibit 50, I'd like to
10  direct your attention to the third page of the
11  document.
12         MR. MASHBERG:  Is that page 3?
13         MR. MAGUIRE:  It is -- it has a
14    Bates number ending with the numbers 139 in
15    the bottom right.
16         MR. MASHBERG:  Okay.  Right.
17    Q.   Do you see there's a paragraph
18  that's labeled Paragraph 1:
19         "Purchased Assets/Excluded Assets."
20    A.   I do.
21    Q.   And do you see that under
22  section 1(A)(ii) in subsection B there is a
23  reference to:
24         "Such securities and other assets
25  held in LBI's clearance boxes as of the time of

1    MONTAL - HIGHLY CONFIDENTIAL
2  the closing."
3         Do you see that?
4         MR. MASHBERG:  I'm sorry.  Did you
5    say 1?
6         MR. MAGUIRE:  1(A)(ii)(b).
7    A.   Okay.
8    Q.   Do you see that that refers to:
9         "Such securities and other assets
10  held in LBI's clearance boxes as of the time of
11  the closing."
12         Do you see that?
13    A.   I see that those words are in this
14  document.
15    Q.   At any time after the DTCC received
16  this document, did DTCC ever object to the
17  provision that I just read?
18    A.   DTCC is not a party to this
19  agreement and, therefore, it has no basis one way
20  or another to object to it, and it did not object
21  to it.
22    Q.   So at no time after receiving this
23  agreement did DTCC object to either Lehman or
24  Barclays that this agreement had a provision for
25  the transfer of "such securities and other assets

Page 86

1    MONTAL - HIGHLY CONFIDENTIAL
2  held in LBI's clearance boxes as of the time of
3  the closing." Is that correct?
4       A.   DTCC was not a party to this
5  agreement. DTCC did not review this agreement
6  prior to its execution and had no comments one way
7  or another or interest in what is in this
8  document.
9       Q.   So DTCC never objected to this
10  provision. Is that correct?
11       MR. DAKIS: Objection to the form.
12       A.   I'll stand by my previous answer.
13       Q.   Well, did DTCC ever communicate
14  orally or in writing after receiving the document
15  that's marked as Exhibit 50 that this agreement
16  provided for the transfer of such securities and
17  other assets held in LBI's clearance boxes as of
18  the time of the closing?
19       A.   I'll stand by my previous answer.
20       Q.   My question is: Did DTCC ever
21  communicate orally or in writing to either
22  Lehman or Barclays any objection to the transfer
23  of such securities and other assets held in LBI's
24  clearance boxes?
25       A.   I believe you've asked me that
    TSG Reporting - Worldwide    877-702-9580

Page 87

1    MONTAL - HIGHLY CONFIDENTIAL
2  question and I've answered it. And I'll stick
3  with my previous answer.
4       Q.   Is the answer no, DTCC never did
5  object orally or in writing?
6       A.   I'm going to stick with my previous
7  answer.
8       Q.   I'm going to have to insist on an
9  answer to my question.
10       A.   I did answer your question.
11       Q.   Did DTCC ever object orally or in
12  writing to the provision of this agreement calling
13  for the transfer of such securities and other
14  assets held in LBI's clearance boxes?
15       A.   DTCC, as I stated to you
16  previously, is not a party to this agreement. It
17  did not review this agreement prior to the time of
18  its execution and, therefore, had no basis to
19  object or not object or provide any comment with
20  respect to the provisions in this agreement.
21       Q.   Did DTCC ever -- or anybody acting
22  on behalf of DTCC ever review this agreement at
23  any time after the closing, to the best of your
24  knowledge?
25       MR. DAKIS: Objection. Asked and
    TSG Reporting - Worldwide    877-702-9580

Page 88

1    MONTAL - HIGHLY CONFIDENTIAL
2  answered.
3       A.   From that time until today?
4       Q.   Yes.
5       A.   The answer to that is probably yes.
6       Q.   Okay. At any time has DTCC or
7  anybody acting on behalf of DTCC objected, either
8  orally or in writing, to Barclays or Lehman to the
9  transfer provided here of such securities and
10  other assets held in LBI's clearance boxes?
11       I understand that DTCC is not a
12  party to this agreement.
13       My question is simply whether DTCC
14  ever objected orally or in writing to this
15  provision? Yes or no.
16       A.   DTCC is not a party to this
17  agreement and did not review its provisions prior
18  to the agreement being executed and, therefore,
19  had no basis to comment or object one way or
20  another with respect to the provisions of this
21  agreement. It was not DTCC's issue.
22       Q.   I think you told me that at some
23  time in the period from the closing until today
24  that the answer is probably yes, that somebody
25  acting on behalf of DTCC reviewed this agreement.
    TSG Reporting - Worldwide    877-702-9580

Page 89

1    MONTAL - HIGHLY CONFIDENTIAL
2       Is that your testimony?
3       MR. MASHBERG: Maybe I can cut
4  through this by just reading the transcript
5  here. But I think this has been asked and
6  answered explicitly.
7       With your permission, can I read
8  it? And it may -- it may solve your problem.
9       MR. STERN: Go ahead.
10       (The requested portion of the
11  record was read.)
12       MR. STERN: I'm entitled to ask a
13  narrower question. And the statement about
14  not being a party I'm trying to separate from
15  this.
16       Q.   I understand your testimony that
17  DTCC is not a party to this agreement. But I'm
18  asking a very narrow question, and I'd like you to
19  please answer that question.
20       At any time after receiving the
21  agreement that is marked as Exhibit 50, did DTCC
22  ever object to Lehman or Barclays concerning the
23  provision of the agreement that calls for the
24  transfer of such securities or other assets held
25  in LBI's clearance boxes?
    TSG Reporting - Worldwide    877-702-9580

1  **MONTAL - HIGHLY CONFIDENTIAL**
2  MR. DAKIS: Objection to form.
3  Asked --
4  **Q. Did DTCC ever object to that**
5  **provision?**
6  MR. DAKIS: Objection to form.
7  Asked and answered.
8  **Q. Yes or no?**
9  MR. DAKIS: Objection to form.
10  Asked and answered.
11  MR. MAGUIRE: Same objection.
12  **Q. Yes or no?**
13  A. DTCC is not a party to this
14  agreement. It has no basis to object one way or
15  another with respect to the provisions in the
16  agreement.
17  Both Barclays and Lehman were
18  represented by counsel in connection with this
19  transaction. And it is not DTCC's place one way
20  or another to comment or object to the provisions
21  in this agreement, and it did not do so.
22  **Q. And it did not do so. Correct?**
23  MR. MAGUIRE: Objection to form.
24  Asked and answered.
25  MR. DAKIS: Same objection.
TSG Reporting - Worldwide    877-702-9580

1  MONTAL - HIGHLY CONFIDENTIAL
2  A. That's exactly what I said.
3  MR. STERN: Let's mark as
4  Exhibit 612 an e-mail from Sheldon Hirshon to
5  Eric Kay dated March 31, 2009.
6  **Q. Before we get to this document,**
7  **Exhibit 612, let me ask you this: Do you know**
8  **whether, in connection with the Lehman sales to**
9  **Barclays, any clearance box assets or assets from**
10  **the free account that Mr. Maguire referred to were**
11  **actually transferred to Barclays?**
12  THE WITNESS: Can you read it back,
13  please.
14  (The requested portion of the
15  record was read.)
16  A. I can't answer whether they were in
17  connection with the sale of assets, which is what
18  I think you prefaced your question with. But
19  there were certainly assets that went from
20  Lehman's account to Barclays.
21  **Q. Does DTCC know whether any**
22  **clearance box assets or assets from the Lehman**
23  **free account were transferred to Barclays at any**
24  **time?**
25  A. Yes.
TSG Reporting - Worldwide    877-702-9580

1  MONTAL - HIGHLY CONFIDENTIAL
2  **Q. And what is DTCC's understanding**
3  **concerning those transfers?**
4  A. We would have received instructions
5  from the Trustee or individuals acting on the
6  Trustee's behalf to effectuate those transfers.
7  **Q. Okay. And with respect to those**
8  **transfers of clearance box assets, did DTCC or**
9  **anybody acting on behalf of DTCC object to those**
10  **transfers or refuse to execute those transfers?**
11  A. First of all, I'm not sure what you
12  mean by clearance box assets versus free account.
13  So I answered the previous question in which you
14  used both terms --
15  **Q. Well, let me rephrase --**
16  A. -- and which to me encompassed the
17  entire account.
18  **Q. Let me -- let me rephrase it.**
19  **With respect to those transfers --**
20  **with respect to those transfers of clearance box**
21  **assets or assets from Lehman's free accounts, did**
22  **DTCC ever object or refuse to execute those**
23  **transfers?**
24  THE WITNESS: Can you just read
25  that back, please.
TSG Reporting - Worldwide    877-702-9580

1  MONTAL - HIGHLY CONFIDENTIAL
2  (The requested portion of the
3  record was read.)
4  A. If we received instructions from
5  the Trustee or an authorized person acting on the
6  trustee's behalf to transfer assets out of the
7  Lehman accounts to Barclays, we effectuated those
8  transfers and did not object to them.
9  **Q. And at the time of those transfers,**
10  **am I correct that the winding down and closing out**
11  **of the Lehman accounts had not been completed?**
12  MR. DAKIS: Objection to form.
13  **Q. Is that correct?**
14  A. If what you mean by "the winding
15  down and closing out" of the accounts is that all
16  of the assets has been -- had been transferred out
17  and the accounts closed, then yes, that's correct.
18  **Q. Let's look at Exhibit 612.**
19  **Do you have 612 in front of you?**
20  A. I do.
21  **Q. This is a series of e-mail exchange**
22  **between Mr. Hirshon and counsel for creditors**
23  **committee. I'm really just going to focus on the**
24  **e-mail from Mr. Hirshon to Eric Kay on the first**
25  **page, and what I'd like to do is just read that**
TSG Reporting - Worldwide    877-702-9580

MONTAL - HIGHLY CONFIDENTIAL

1  e-mail into the record.
2
3          And I want to ask you if you have
4  any reason to disagree with certain of the
5  statements that Mr. Hirshon makes in this e-mail.
6  Okay?
7          Mr. Hirshon writes -- this is
8  March 31, 2009, 10:03 p.m.:
9          "Eric, working from memory, the
10  gist of your request is for documents that record
11  the deal between Lehman and Barclays.  Neither
12  DTCC nor any of its clearing agency subsidiaries
13  (collectively DTCC) was a party to that deal,
14  participated in the negotiations or had any
15  documents prepared by either side that demonstrate
16  values, assets to be purchased, et cetera."
17          Do you have any reason to disagree
18  with that statement by Mr. Hirshon that I just
19  read?
20      A.   No.
21      Q.   Going on, Mr. Hirshon says:
22          "As for the resi securities, the
23  original deal was for Barclays to secure DTCC's
24  position with a $250 million guarantee and the
25  pledge of one-half of the $6 billion of the resi's

MONTAL - HIGHLY CONFIDENTIAL

1  it was to receive in the deal or $3 billion, as
2  was mentioned at the Friday night hearing.  (At no
3  time was the deal that DTCC would receive the
4  entire $6 bill of resi's.)  However, about
5  midnight on Sunday the regulators arranged for the
6  DTCC resi's to be given to Chase to break a
7  deadlock with it, and these securities were never
8  pledged to DTCC.  DTCC never received, saw or
9  evaluated these securities.  It cannot provide any
10  information regarding them."
11          Do you have any reason to disagree
12  with any of those statements?
13      A.   Yes.
14      Q.   And what is the basis for your
15  disagreement?
16      A.   Are you asking me which provisions
17  I disagree with?
18      Q.   Yes.
19      A.   I am not aware that the resi's that
20  were supposed to have been given to DTCC were
21  given to Chase to break a deadlock with that.
22          Other than that, I agree with the
23  paragraph you read.
24      Q.   DTCC -- your testimony is that DTCC

MONTAL - HIGHLY CONFIDENTIAL

1  doesn't know whether the regulators arranged for
2  the DTCC resi's to be given to Chase to break a
3  deadlock with it?
4      A.   We have no idea what happened to
5  as the resi's.  The resi's were available at some
6  point earlier in the weekend to secure and be
7  provided as collateral to DTCC.  Later on in the
8  weekend those resi's were no longer available.  We
9  have no idea what happened to them.
10      Q.   Does DTCC know what the basis for
11  Mr. Hirshon's statement here was?
12      A.   I suspect it was his memory, but I
13  have no memory of those facts.
14      Q.   Let's -- I'll skip the next
15  paragraph and read the fourth paragraph.  It
16  states:
17          "DTCC monitors its risk daily.  In
18  a BD, broker-dealer, failure, the DTCC's standard
19  procedure is for DTCC to cease to act.  It turns
20  off the failed BD, broker-dealer's, access to the
21  market so that DTCC's risk is limited to the
22  trades already in the pipeline.  In the Lehman
23  deal, the regulators prevailed on DTCC to hold off
24  on its usual procedures in order to facilitate the

MONTAL - HIGHLY CONFIDENTIAL

1  transfer of LBI's BD, broker-dealer, business to
2  Barclays by keeping LBI alive instead of shutting
3  it down.  The idea as expressed at the hearing was
4  to deliver the BD, broker-dealer, business intact
5  and as a going business.  The $250 million
6  Barclays guarantee and the resi's were to be
7  provided to protect DTCC from any losses it would
8  incur as a result of not ceasing to act for LBI.
9  As I said, the resi's were pulled from the deal,
10  leaving only the Barclays guarantee.  And after an
11  internal review of the situation, DTCC accepted
12  the revised deal."
13          Do you see that?
14      A.   I do.
15      Q.   Is there any part of what
16  Mr. Hirshon says that you disagree with?
17      A.   I'm not sure if I would have
18  characterized it as only the regulators prevailed
19  on DTCC to hold off on its usual procedures,
20  et cetera.  But I believe it was the regulators as
21  well as all the parties involved were interested
22  and had a strong desire to transfer LBI's BD,
23  broker-dealer, business to Barclays as a going
24  business.

Page 98

MONTAL - HIGHLY CONFIDENTIAL
1
2         Other than that, I have no
3  disagreement with anything in that paragraph you
4  read.
5         Q.   Let's look back at Exhibit 52, if
6  we could.  On the second page of this agreement,
7  there's a paragraph labeled "1. Winding down of
8  accounts."
9         Do you see that?
10        A.   I do.
11        Q.   I believe you testified to a
12  conversation that occurred either late the evening
13  of Sunday, September 21 or early morning Monday,
14  September 22.
15        Do you recall that testimony?
16        A.   I do.
17        Q.   Do you recall what time that
18  conversation took place?
19        A.   I believe I said it was within an
20  hour before or after midnight, but somewhere close
21  to that.
22        Q.   It was before this agreement was
23  finalized?
24        MR. MASHBERG:  "This" being
25        Exhibit 52?

TSG Reporting - Worldwide    877-702-9580

Page 99

MONTAL - HIGHLY CONFIDENTIAL
1
2         MR. STERN:  Yes.
3         A.   Exhibit 52 was designed to document
4  what was agreed in that conversation.
5         Q.   Okay.  And did you personally
6  participate in that conversation?
7         A.   I did.
8         Q.   Where were you at the time?
9         A.   At 55 Water Street, 22nd floor.
10        Q.   Who was on that call on behalf of
11  Barclays?
12        A.   There were many people on the call
13  on behalf of Barclays, and I can't list everybody
14  who participated.  There were people from
15  operations.  There were executives.  I don't
16  remember everybody.
17        Q.   Do you recall who spoke on behalf
18  of Barclays during that call?
19        A.   I recall that there were numerous
20  people speaking on behalf of Barclays during that
21  call.
22        Q.   Do you recall who they were?
23        A.   I know there were some folks from
24  the operations area and some executives.
25        Q.   Do you recall the names of any of

TSG Reporting - Worldwide    877-702-9580

Page 100

MONTAL - HIGHLY CONFIDENTIAL
1
2  those people?
3         A.   I recall that Gerard LaRocca was on
4  the phone.  I'm not sure if Alan Kaplan was on the
5  line.  I don't recall any other names.
6         Q.   Do you recall specifically what the
7  Barclays people said during that call?
8         A.   I believe they said that they
9  weren't taking anything.
10        Q.   What precise words did they use?
11        A.   I think they were the ones I just
12  stated.  "We're not going to take anything."
13        Q.   Was that a discussion concerning
14  the Lehman accounts?
15        A.   Yes.
16        Q.   Was there any discussion in that
17  call concerning the assets in those accounts?
18        A.   There were calls that took place
19  throughout the evening leading up to what I would
20  say is the final call that resulted in Exhibit 52
21  in which there were discussions about whether
22  Barclays can take certain assets out of the
23  accounts but not others.
24        MR. STERN:  Okay.  I have no
25        further questions.

TSG Reporting - Worldwide    877-702-9580

Page 101

MONTAL - HIGHLY CONFIDENTIAL
1
2         MR. DAKIS:  I just have a couple.
3  EXAMINATION BY
4  MR. DAKIS:
5         Q.   I'm Robert Dakis from Quinn Emanuel
6  Urquhart Oliver & Hedges for the official
7  committee of unsecured creditors.  I won't take up
8  much of your time.
9         I'm going to hand you a document
10  that was marked at another deposition as
11  Exhibit 423-B.
12        MR. DAKIS:  And I don't think we
13        have enough copies for everyone.  I apologize.
14        I'll give out what I have.
15        Q.   This is a transcript from the sale
16  hearing on September 19, 2008.  Take your time.
17  Review as much or as little of it as you'd like.
18  My questions are going to focus on some statements
19  on pages 51 to 52.  So if you could at the very
20  least read from pages 51 to 52, that would be
21  incredibly helpful.
22        A.   I've read 51 and 52.
23        Q.   Okay.  The sections of the
24  transcript that I've directed your attention to,
25  pages 51 to 52, consist primarily of statements

TSG Reporting - Worldwide    877-702-9580

Page 102

1      MONTAL - HIGHLY CONFIDENTIAL
2   from your counsel, Mr. Hirshon, to the Court
3   during the sale hearing. Correct?
4       A.   That's true on page 51, beginning
5   at line 16 and continuing through page 52.
6       Q.   Okay. And Mr. Hirshon is
7   discussing with the Court the residential mortgage
8   securities we've discussed during the deposition
9   today. Correct?
10      A.   Amongst other things, yes.
11      Q.   Okay. And I'd just like to draw
12  your attention to lines 6 through 8. On line 6
13  Mr. Hirshon states:
14          "The residential mortgages that
15  you've heard about that were going to be split
16  50/50 are in the DTC registry. We hold them now.
17  They are there."
18          Do you see that?
19      A.   I do.
20      Q.   Do you under -- do you have any
21  reason to disagree with Mr. Hirshon's statement
22  there?
23      A.   Yes.
24      Q.   What would that basis be?
25      A.   We never knew what the residential,

TSG Reporting - Worldwide    877-702-9580

Page 103

1       MONTAL - HIGHLY CONFIDENTIAL
2   or the resi's, as they were referred to, consisted
3   of or where they are. There may have been
4   statements that were made to us by either Lehman
5   or others in general terms as to where those
6   resi's may reside, but we were never given CUSIPs.
7   We were never given specifics at all about what
8   the resi's consisted of other than this stated
9   value was $3 billion.
10      Q.   And so just to make sure I
11  understand, the basis for Mr. Hirshon's statement
12  would likely be statements from Lehman or Barclays
13  or some other third party prior to the hearing?
14      A.   I can't tell you what the basis was
15  for Mr. Hirshon's statement other than what I've
16  already told you.
17          MR. DAKIS: Nothing further.
18  EXAMINATION BY
19  MR. MAGUIRE:
20      Q.   Sir, I just want to follow up on
21  some questions that Mr. Stern asked you in
22  connection with the call with the Barclays
23  representatives who said they weren't taking
24  anything.
25          I understand that prior to that

TSG Reporting - Worldwide    877-702-9580

Page 104

1      MONTAL - HIGHLY CONFIDENTIAL
2   call there were a number of discussions with
3   Barclays representatives concerning what assets
4   Barclays was taking or what assets Barclays was
5   not taking. Is that correct?
6       A.   Correct.
7       Q.   And where were you for those
8   conversations?
9       A.   For at least some of them, I was at
10  55 Water Street.
11      Q.   And were these conversations over
12  the telephone?
13      A.   Yes.
14      Q.   Now, ultimately there was the call
15  in which the Barclays representatives agreed that
16  they were not taking anything.
17          Following that call, did anyone
18  from Barclays revisit or raise again any question
19  about Barclays taking any of the assets from the
20  Lehman accounts at DTC?
21      A.   Time frame?
22      Q.   Any time after that call in which
23  Barclays said, We're not taking anything.
24      A.   Until -- from that time until when?
25      Q.   If any Barclays representative has

TSG Reporting - Worldwide    877-702-9580

Page 105

1       MONTAL - HIGHLY CONFIDENTIAL
2   said that to you until today, you can just tell me
3   when the first time that happened. I'm just
4   looking for -- I guess first of all, let's break
5   it up.
6           Following the call that you had in
7   which they said, We're not taking anything, any
8   other time that weekend did anyone from Barclays
9   revisit with DTC the issue of Barclays taking some
10  or all of the assets at the Lehman accounts at
11  DTC?
12      A.   No.
13      Q.   Did anyone at Barclays tell you
14  that they were -- that they had changed their
15  position from "we're not taking anything" to "we
16  are, in fact, taking something"?
17      A.   We had a call at or around
18  midnight, give or take an hour in either
19  direction, which I described earlier. And it was
20  pursuant to that call that we prepared Exhibit 52
21  which was ultimately executed.
22      Q.   And at no --
23      A.   I'm not aware of any communications
24  between those two points in time that was
25  different from what ultimately appeared in

TSG Reporting - Worldwide    877-702-9580

Page 106

1    MONTAL - HIGHLY CONFIDENTIAL
2  Exhibit 52.
3      Q.  So from the moment that Barclays
4  said "we're not taking anything" through to its
5  execution of the DTC letter marked as Exhibit 52,
6  no one from Barclays indicated to you that they
7  had changed their position or that their position
8  was anything other than what they had told you on
9  that call, which was they were not taking any of
10  the assets of DTC?
11      MR. STERN:  Objection to the form.
12      A.  I'm not aware of any communication
13  from Barclays from the time of the call that we're
14  describing and which, you know, it was probably
15  the last of numerous calls that had taken place
16  over the weekend, up until the execution of
17  Exhibit 52.  There was -- I'm not aware of any
18  communication that was different than what is in
19  Exhibit 52.
20      Q.  So from the time of that call
21  through the execution of Exhibit 52, it was your
22  understanding that Barclays was sticking by its
23  agreement that the assets of DTC were excluded
24  from the deal?
25      MR. STERN:  Objection to the form.
   TSG Reporting - Worldwide    877-702-9500

Page 107

1    MONTAL - HIGHLY CONFIDENTIAL
2      A.  The deal was as documented in
3  Exhibit 52.  And I'm not aware of any
4  communications between at or around midnight on
5  the phone call that I've described up until the
6  execution of Exhibit 52 of any communications from
7  Barclays that was different than what's in
8  Exhibit 52.
9      Q.  Okay.  If you could look, sir, at
10  Exhibit 612.  That's the e-mail from Mr. Hirshon
11  to Mr. Kay.  The last --
12      A.  I'm looking -- I'm looking at the
13  first page of 612.
14      Q.  Yeah.  I'm only going to ask you
15  about the fourth paragraph, the last line.
16      Was it your understanding, sir,
17  that DTC accepted the revised deal with the
18  understanding that Barclays had agreed to exclude
19  from the transaction the assets of DTC?
20      MR. STERN:  Objection to the form.
21      A.  First of all, you're referring to
22  the sentence that reads:
23      "As I said, the resi's were pulled
24  from the deal, leaving only the Barclays
25  guarantee.  And after an internal review of the
   TSG Reporting - Worldwide    877-702-9500

Page 108

1    MONTAL - HIGHLY CONFIDENTIAL
2  situation, DTCC accepted the revised deal."
3      Is that what you're referring to?
4      Q.  That's the sentence exactly.
5      A.  And what's your question?
6      Q.  And the question is:  The revised
7  deal that DTC accepted, that was the deal that you
8  spoke about on the call in which Barclays said it
9  was not taking any of the assets from DTC.
10  Correct?
11      A.  The deal --
12      MR. STERN:  Objection to the form.
13      A.  The deal that DTCC entered into is
14  reflected in Exhibit 52.
15      Q.  And that's what you understand this
16  reference to be here as the revised deal?
17      MR. STERN:  Objection to the form.
18      MR. MASHBERG:  Is "the revised
19  deal" Exhibit 52?  Is that what you're asking?
20      MR. MAGUIRE:  Yeah.
21      Q.  You were asked -- let me try to
22  make it clearer.  You were asked by Mr. Stern
23  whether you agreed with the language on this
24  exhibit, and the language includes the words "the
25  revised deal."
   TSG Reporting - Worldwide    877-702-9500

Page 109

1    MONTAL - HIGHLY CONFIDENTIAL
2      So I just want to make the record
3  clear that when you said you agreed with that, you
4  were referring to Exhibit 52 as the revised deal.
5      A.  I'm referring to -- I was referring
6  to Exhibit 52 as the revised deal.
7      But the focus, to me, of this
8  e-mail is about the resi's and whether the resi's
9  were transferred or made available to DTCC as
10  collateral, and they were not.  And that's
11  what's -- and originally they were, and that's
12  what's reflected in Exhibit 52.
13      MR. MAGUIRE:  Sir, I've got nothing
14  further.
15      MR. STERN:  I have just a few.
16  EXAMINATION BY
17  MR. STERN:
18      Q.  Mr. Montal, Exhibit 52, second
19  page, paragraph labeled "1.  Winding down of
20  accounts" refers to all of the accounts of LBI
21  maintained at the clearing agency subsidiaries.
22      Do you see that?
23      A.  Yes.
24      Q.  So you see that refers to accounts.
25      Is there any provision of this
   TSG Reporting - Worldwide    877-702-9500

Page 110

1    **MONTAL - HIGHLY CONFIDENTIAL**
2    agreement that addresses -- withdrawn.
3        **Is there any provision of this**
4    **agreement that provides that assets in those**
5    **accounts are to be treated as excluded assets?**
6        MR. DAKIS:  Objection to form.
7        MR. MASHBERG:  You mean are
8    those -- are those words in the agreement?
9        MR. STERN:  Yes, those words.
10       MR. MASHBERG:  Well, do you want to
11   make a representation to him as to whether
12   they are or not?  Otherwise, he's going to
13   have to read the whole thing and --
14       A.    The agreement says what it says.  I
15   mean --
16       **Q.    The agreement says what it says.**
17   **So if the agreement does not refer**
18   **to assets in the accounts, then the agreement**
19   **doesn't deal with assets in the accounts?**
20       MR. MAGUIRE:  Objection to form.
21       MR. DAKIS:  Objection to form.
22       MR. MAGUIRE:  Misstates the
23   agreement.
24       **Q.    Is that correct?**
25       MR. DAKIS:  Same objection.
     TSG Reporting - Worldwide    877-702-9580

Page 111

1    MONTAL - HIGHLY CONFIDENTIAL
2        **Q.    The agreement is a fully integrated**
3    **agreement.  Right?**
4        MR. MASHBERG:  Mr. Montal is not
5    here as a lawyer.  He's here as a fact
6    witness.
7        **Q.    Does the agreement address whether**
8    **assets in the accounts are to be treated as**
9    **purchased assets or excluded assets, or is that**
10   **something that is treated in the purchase**
11   **agreement between Barclays and Lehman?**
12       MR. DAKIS:  Objection to form.
13       **Q.    Do you know?**
14       A.    I can read to you the words in this
15   document, but I don't think that's what you want
16   me to do for you.
17       **Q.    Let me ask you a different**
18   **question.**
19       **Did DTCC ever negotiate with**
20   **Barclays concerning the scope of purchased assets**
21   **in the purchase agreement between Barclays and**
22   **Lehman?**
23       MR. MAGUIRE:  Objection to form.
24       MR. DAKIS:  Same objection.
25       MS. CRAWFORD:  Join in the
     TSG Reporting - Worldwide    877-702-9580

Page 112

1        MONTAL - HIGHLY CONFIDENTIAL
2    objection.
3        A.    DTCC did not negotiate with
4    Barclays as to what it was purchasing -- what it,
5    Barclays, was purchasing from Lehman.
6        But it did negotiate with Barclays
7    regarding whether or not Barclays could take
8    assets from the Lehman accounts without providing
9    DTCC with an unlimited guarantee or a more limited
10   guarantee that DTCC would find sufficient.
11       **Q.    And the entirety of that agreement,**
12   **sir, is reflected in the agreement that's marked**
13   **as Exhibit 52.  Correct?**
14       A.    The end result of those discussions
15   were documented in Exhibit 52.
16       **Q.    When DTCC received instructions**
17   **from the Trustee to transfer clearance box assets**
18   **or assets from the free account, did DTCC consider**
19   **that transfer to be inconsistent with or a breach**
20   **of the agreement that we've marked as Exhibit 52?**
21       MR. MAGUIRE:  Objection to form.
22       MR. DAKIS:  Same objection.
23       A.    DTCC has no knowledge as to why the
24   Trustee is issuing an instruction for the transfer
25   of assets, whether it's pursuant to Exhibit 52,
     TSG Reporting - Worldwide    877-702-9580

Page 113

1        MONTAL - HIGHLY CONFIDENTIAL
2    whether it's pursuant to another agreement or
3    whether it's simply the transfer of customer
4    accounts that were moving from Lehman's account to
5    Barclays.
6        **Q.    When DTCC received the instruction**
7    **to transfer assets from the free accounts, did**
8    **DTCC ever consider whether that might be a breach**
9    **of the agreement we marked as Exhibit 52?**
10       MR. DAKIS:  Objection to form.
11       A.    Exhibit 52 is an agreement to which
12   Barclays and the Trustee signed on to and
13   specifically provides that the Trustee,
14   pursuant -- I'll read it:
15       "Pursuant to the authority granted
16   to the Trustee in the orders, the Trustee hereby
17   instructs the clearing agency subsidiaries" --
18       MR. MASHBERG:  Start again, and
19   tell us where you're reading from.
20       THE WITNESS:  Okay.
21       A.    The Exhibit 52 to which both
22   Barclays and Lehman are parties specifically
23   provides that the Trustee has the authority
24   pursuant to orders entered into -- issued by the
25   bankruptcy court, has the authority to issue
     TSG Reporting - Worldwide    877-702-9580

Page 114

1        MONTAL - HIGHLY CONFIDENTIAL
2   instructions with respect to the Lehman accounts
3   at the clearing agency subsidiaries.
4        Q.   Okay.  So to the extent that the
5   Trustee agreed to the transfer of assets from the
6   free accounts, that was permissible under the
7   agreement we've marked as Exhibit 52?
8        MR. MASHBERG:  You mean agreed or
9   instructed?
10        MR. STERN:  Either/or.
11        MR. DAKIS:  Objection to the form.
12        MR. STERN:  Agreed or instructed.
13        A.   The Trustee has authority to issue
14   instructions with respect to the Lehman accounts.
15   Why and for what purpose the Trustee is issuing
16   those instructions, DTCC and its clearing agency
17   subsidiaries do not know, just as with respect to
18   instructions that any participant issues with
19   respect to the assets in its account.  If they're
20   an authorized instruction, DTC follows them.
21        Q.   And to the extent that the Trustee
22   executed a clarification letter agreement agreeing
23   to the transfer of assets from the free accounts,
24   that is something that the DTCC would not consider
25   inconsistent with its agreement.  Is that correct?

TSG Reporting - Worldwide    877-702-9580

Page 115

1        MONTAL - HIGHLY CONFIDENTIAL
2        MR. MAGUIRE:  Objection to form.
3        MR. DAKIS:  Same objection.
4        A.   DTCC has no knowledge as to what's
5   in the clarification letter and has not considered
6   it in connection with instructions received by the
7   Trustee with respect to the transfer of assets
8   from the Lehman accounts.
9        Q.   But DTCC would adhere to the
10   instructions that it receives from the Trustee.
11   Correct?
12        A.   Yes.
13        Q.   Okay.  And if those instructions
14   are based on an agreement that the Trustee has
15   reached with Barclays, DTCC would follow those
16   instructions?
17        MR. MAGUIRE:  Objection to the
18   hypothetical question.
19        MR. DAKIS:  Same objection.
20        A.   DTCC would have no knowledge one
21   way or another whether the instructions being
22   issued by the Trustee are in furtherance or in
23   accordance with an agreement or not.
24        Q.   Okay.  And there is nothing --
25        A.   If they are an authorized

TSG Reporting - Worldwide    877-702-9580

Page 116

1        MONTAL - HIGHLY CONFIDENTIAL
2   instruction from the Trustee, we would follow it.
3        Q.   So from the DTCC's perspective,
4   there is nothing inconsistent with such -- between
5   such instructions from the Trustee and the
6   agreement we've been looking at marked as
7   Exhibit 52?
8        MR. DAKIS:  Objection.
9   Mischaracterizes testimony.
10        MR. MAGUIRE:  Same objection.
11        MS. CRAWFORD:  Join in the
12   objection.
13        THE WITNESS:  Can you read the
14   question back, please.
15        Q.   Let me rephrase it.
16        From the DTCC's perspective, would
17   it matter if the Trustee had reached an agreement
18   with Barclays separate and apart from Exhibit 52
19   to transfer assets from the free accounts?
20        MR. MAGUIRE:  Objection to form.
21        THE WITNESS:  Can you read it back.
22        Q.   Well, you've testified that the
23   DTCC was not a party to the purchase agreement.
24   Correct?
25        A.   I was happy to answer your first

TSG Reporting - Worldwide    877-702-9580

Page 117

1        MONTAL - HIGHLY CONFIDENTIAL
2   question.  I just needed it read back.
3        Q.   Let me -- let me start over again.
4        You testified that DTCC was not a
5   party to the purchase agreement between Barclays
6   and Lehman.  Correct?
7        A.   Correct.
8        Q.   Okay.  Did DTCC have any concern
9   about the Trustee agreeing with Barclays in the
10   clarification letter to transfer assets from the
11   free account?
12        A.   DTCC had no knowledge or interest
13   in the clarification letter.
14        Q.   And so to the extent that the
15   Trustee reached that agreement with Barclays, that
16   was not a concern of DTCC.  Correct?
17        MR. MAGUIRE:  Objection to form.
18   Misstates the testimony.
19        MR. DAKIS:  Same objection.
20        MS. CRAWFORD:  Join in the
21   objection.
22        A.   DTCC was not aware and had no
23   interest in what was in the clarification letter.
24   Its agreement was reflected in Exhibit 52.
25        Q.   So to the extent that the Trustee

TSG Reporting - Worldwide    877-702-9580

Page 118

1    MONTAL - HIGHLY CONFIDENTIAL
2    agreed with Barclays to the transfer of assets for
3    the free account, would that be of any concern to
4    DTCC?
5              MR. MAGUIRE:  Objection to the
6    hypothetical question.
7              MR. DAKIS:  Objection to form.
8         A.   DTC would have no way of knowing
9    why a particular instruction was being issued.
10   DTCC's agreement is reflected in Exhibit 52 for
11   the wind-down of the DTCC -- of the Lehman
12   accounts at the DTCC clearing subsidiaries, and
13   that's what it implemented.
14             And to the extent that the Trustee
15   issues an instruction for the transfer of assets
16   from the Lehman accounts that are not -- and those
17   instructions are not inconsistent with the
18   wind-down, the Trustee, as far as we know, based
19   upon the orders entered by the bankruptcy court,
20   has the authority to issue those instructions.
21        Q.   Okay.  Did DTCC receive any
22   instructions from the Trustee --
23             MR. DAKIS:  Objection.  Asked and
24   answered.
25        Q.   -- with respect to assets in the
     TSG Reporting - Worldwide     877-702-9580

Page 119

1         MONTAL - HIGHLY CONFIDENTIAL
2    free account that were inconsistent with
3    Exhibit 52?
4              MR. MAGUIRE:  Objection to form.
5              MR. DAKIS:  Same objection.
6         A.   DTCC is not aware of why a
7    particular instruction is being issued and,
8    therefore, has no knowledge that it would be
9    inconsistent with what's in Exhibit 52.
10        Q.   Did DTCC ever raise any questions
11   or any concerns about whether instructions it
12   received from the Trustee with respect to assets
13   in the free account were inconsistent with
14   Exhibit 52?
15        A.   No.
16        Q.   Referring back to the Sunday
17   night/Monday morning conversation, who from
18   Barclays made a statement during that conversation
19   concerning Barclays "not taking anything"?
20             Mr. Maguire asked you a number of
21   questions about somebody saying that Barclays is
22   "not taking anything."
23             And what I'd like to know is:  Who
24   specifically used those words and what did they
25   say?
     TSG Reporting - Worldwide     877-702-9580

Page 120

1         MONTAL - HIGHLY CONFIDENTIAL
2         A.   I can't remember with certainty who
3    said that.
4              MR. STERN:  No further questions.
5    EXAMINATION BY
6    MR. MAGUIRE:
7         Q.   Sir, just to finish up, when
8    Barclays said "we're not taking anything," did you
9    understand that to mean that they weren't taking
10   any assets?
11             MR. STERN:  Objection to the form.
12        A.   The agreement reached on the phone
13   call is reflected in Exhibit 52.
14        Q.   I understand that.  I'm just asking
15   about your understanding at the time of the call.
16   And there had been, I understand, a number of
17   discussions prior to that where Barclays said it
18   was taking certain assets or it was not taking
19   certain assets.
20             So the question is:  With respect
21   to the moment when you were told that Barclays had
22   agreed it was not taking anything, did you
23   understand that to mean that Barclays was not
24   taking any assets?
25             MR. STERN:  Objection to the form.
     TSG Reporting - Worldwide     877-702-9580

Page 121

1         MONTAL - HIGHLY CONFIDENTIAL
2         A.   Well, what do you mean by "assets"?
3    Because Barclays had entered into an APA agreement
4    and was buying something.  Whether it was
5    buildings or computer systems or human resources
6    or furniture or anything else, clearly Barclays
7    was taking or purchasing assets.
8              But if you're asking whether --
9    what my understanding was of what was -- whether
10   Barclays was purchasing anything that were in the
11   DTCC accounts, my understanding was that they were
12   not.
13        Q.   And that was of importance to you
14   because DTCC or its affiliates had a lien over
15   those assets.  Isn't that correct?
16        A.   Correct.
17        Q.   And so this call was an important
18   call to resolve this question as to whether
19   Barclays was taking these assets or not taking
20   these assets.  Correct?
21        A.   Yes.
22             MR. MAGUIRE:  No further questions.
23             MR. STERN:  One more question.
24   EXAMINATION BY
25   MR. STERN:
     TSG Reporting - Worldwide     877-702-9580

Page 122

```
 1        MONTAL - HIGHLY CONFIDENTIAL
 2        Q.   Did you -- did DTCC or its counsel
 3   do anything to review the purchase agreement to
 4   determine whether, in fact, Barclays was acquiring
 5   and that the Trustee had agreed that Barclays
 6   would acquire assets from the free accounts?
 7        MR. MAGUIRE:  Objection to form.
 8        MR. DAKIS:  Same objection.
 9        MS. CRAWFORD:  Join in the
10   objection.
11        MR. STERN:  Let me rephrase it.
12        Q.   Did DTCC or its counsel do anything
13   to review the final purchase agreement in order to
14   determine whether, in fact, the Trustee had agreed
15   that Barclays would acquire assets from the free
16   accounts?
17        MR. MAGUIRE:  Objection to the
18   form.
19        MR. DAKIS:  Same objection.
20        A.   Our agreement was spelled out in
21   Exhibit 52, and that's what we understood the
22   agreement to be.
23        Q.   I understand that.  My question is
24   different.
25        My question is:  Did DTCC or its
         TSG Reporting - Worldwide    877-702-9580
```

Page 123

```
 1        MONTAL - HIGHLY CONFIDENTIAL
 2   counsel do anything to review the final purchase
 3   agreement in order to determine whether, in fact,
 4   the Trustee had agreed that Barclays would acquire
 5   assets from the free accounts?
 6        MR. MAGUIRE:  Asked and answered.
 7        MR. DAKIS:  Same objection.
 8        MS. CRAWFORD:  Join the objection.
 9        A.   I believe I stated previously that
10   the clarification letter, which is, I assume, what
11   you're referring to when you say "the final
12   purchase agreement," was not something that DTCC
13   was a party to.  It was not our issue.
14        We had an agreement as reflected in
15   Exhibit 52, signed by the Trustee and Barclays,
16   and that is what DTCC understood and relied on to
17   govern the relationship between these three
18   parties with respect to the Lehman accounts.
19        Q.   So if the Trustee in the
20   clarification letter agreed to the transfer of
21   certain assets to Barclays, that was not DTCC's
22   issue.  Is that correct?
23        MR. MAGUIRE:  Objection to the
24   form.
25        MR. DAKIS:  Same objection.
         TSG Reporting - Worldwide    877-702-9580
```

Page 124

```
 1        MONTAL - HIGHLY CONFIDENTIAL
 2        Q.   Is that correct?
 3        MR. MAGUIRE:  Same objection.
 4        MR. DAKIS:  Same objection.
 5        A.   That's correct.  We were relying on
 6   Exhibit 52.
 7        MR. STERN:  No further questions.
 8        MR. MAGUIRE:  Thank you, sir.
 9        MR. MASHBERG:  No questions.
10        (Time Ended: 1:09 p.m.)
11
12
13        ISAAC MONTAL
14
15   Subscribed and sworn to
16   before me this    day
17   of February, 2010
18
19
20
21
22
23
24
25
         TSG Reporting - Worldwide    877-702-9580
```

Page 125

```
 1             INDEX:
 2   WITNESS       EXAM BY:          PAGE:
 3   I. Montal    Mr. Maguire          5
 4             Mr. Stern        64
 5             Mr. Dakis        101
 6             Mr. Maguire        103
 7             Mr. Stern        109
 8             Mr. Maguire        120
 9             Mr. Stern        121
10
11
12             EXHIBITS
13   EXHIBIT NO.                PAGE:
14   Exhibit 601   DTCC 2008 Annual Report      7
               (No Bates)
15
     Exhibit 602   Series of e-mails        36
16        (DTCC00493 - 497)
17   Exhibit 603   Series of e-mails        37
          (DTCC00316 - 317)
18
     Exhibit 604   E-mail dated 9/21/08      42
19        with attachment
            (DTCC00120 - 125)
20
     Exhibit 605   Series of e-mails        43
21        (DTCC00375 - 376)
22   Exhibit 606   E-mail dated 9/22/08      45
          and Guaranty
23          (DTCC00003 - 00007)
24   Exhibit 607   E-mail dated 9/22/08      46
          and attachment
25          (DTCC00610 - 615)
         TSG Reporting - Worldwide    877-702-9580
```

## Page 126

EXHIBITS (continued)

| EXHIBIT NO. | PAGE: |
|---|---|
| Exhibit 608   E-mail dated 9/22/08 and attachment (DTCC00565 - 569) | 46 |
| Exhibit 609   Series of e-mails (DTCC00401 - 404) | 47 |
| Exhibit 610   E-mail dated 9/22/08 and executed Guaranty (DTCC00627 - 633) | 49 |
| Exhibit 611   Series of e-mails (DTCC00318 - 321) | 50 |
| Exhibit 612   Series of e-mails (Various Bates) | 70 |

TSG Reporting - Worldwide    877-702-9580

## Page 127

LITIGATION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER

Page    Line    Page    Line
(NONE)

REQUEST FOR PRODUCTION OF DOCUMENTS

Page    Line    Page    Line
(NONE)

INFORMATION TO BE FURNISHED

Page    Line    Page    Line
73        5

QUESTIONS MARKED FOR A RULING

Page    Line    Page    Line
(NONE)

TSG Reporting - Worldwide    877-702-9580

## Page 128

CERTIFICATE

STATE OF NEW YORK )
                        )ss:
COUNTY OF NEW YORK)

I, JOMANNA DeROSA, a Certified Shorthand Reporter and Notary Public within and for the States of New York, New Jersey, California and Arizona, do hereby certify:

That ISAAC MONTAL, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 9th day of February, 2010.

_____
JOMANNA DeROSA

TSG Reporting - Worldwide    877-702-9580

## Page 129

* * *ERRATA SHEET* * *
NAME OF CASE:  In Re: Lehman
DATE OF DEPOSITION:  2/9/10
NAME OF WITNESS:  I. Montal
Reason codes:
     1. To clarify the record.
     2. To conform to the facts.
     3. To correct transcription errors.
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

_____
ISAAC MONTAL

TSG Reporting - Worldwide    877-702-9580