# BCI Exhibit 634

Page 1

1

2              UNITED STATES BANKRUPTCY COURT

3                SOUTHERN DISTRICT OF NEW YORK

4       --------------------------------X

5       IN RE:

6                          Chapter 11

7       LEHMAN BROTHERS           Case No. 08-13555(JMP)

8       HOLDINGS, INC. et al.,

9               Debtors.

10      --------------------------------X

11

12                   HIGHLY CONFIDENTIAL

13           DEPOSITION OF KENNETH RAISLER

14                 New York, New York

15                    March 1, 2010

16

17

18      Reported by:

        Bonnie Pruszynski, RMR

19      JOB NO. 28462

20

21

22

23

24

25

## Page 2

1
2          March 1, 2010
3          8:30 a.m.
4
5
6          Deposition of KENNETH RAISLER, Hughes
7     Hubbard & Reed, LLP, One Battery Park Plaza,
8     New York, New York, before Bonnie
9     Pruszynski, Registered Professional
10    Reporter, Registered Merit Reporter,
11    Certified LiveNote Reporter, and a Notary
12    Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2     A P P E A R A N C E S:
3     JONES DAY, LLP
4     Attorneys for Lehman Brothers, Inc.
5          222 East 41st Street
6          New York, New York 10017
7     BY:     BRIDGET A. CRAWFORD, ESQ.
8     BOIES, SCHILLER & FLEXNER, LLP
9     Attorneys for Barclays
10         10 North Pearl Street, 4th Floor
11         Albany, New York 12207
12    BY:     TRICIA J. BLOOMER, ESQ.
13    HUGHES HUBBARD & REED, LLP
14    Attorneys for SIPA Trustee
15         One Battery Park Plaza
16         New York, New York 10004
17    BY:     NEIL J. OXFORD, ESQ.
18    QUINN EMMANUEL
19    Attorneys for the Creditors Committee
20         51 Madison Avenue
21         New York, New York 10010
22    BY:     ERIC M. KAY, ESQ.
23
24
25

## Page 4

1
2     A P P E A R A N C E S (continued):
3     SULLIVAN & CROMWELL, LLP
4     Attorneys for the Witness
5          125 Broad Street
6          New York, New York  10004
7     BY:  ROBINSON B. LACY, ESQ.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1          Confidential - K. Raisler
2     KENNETH RAISLER,
3          called as a witness, having been first
4          duly sworn, was examined and testified
5          as follows:
6     EXAMINATION
7     BY MR. OXFORD:
8          Q     Good morning, Mr. Raisler.
9          A     Good morning.
10         Q     As you know, my name is Neil Oxford.
11    I'm with the law firm of Hughes Hubbard & Reed.
12    We represent the SIPA trustee in this matter.
13             I'm here to take your deposition
14    today particularly in connection with a
15    declaration you submitted in support of Barclays'
16    opposition papers.
17             (Exhibit 658A marked for
18         identification as of this date.)
19         Q     You have in front of you what I have
20    marked as Exhibit 658-A, sir.
21             Do you recognize that document, sir?
22         A     Yes, I do.
23         Q     Is that in fact your declaration that
24    you submitted in support of Barclays' opposition
25    papers in this matter?

Page 6

1           Confidential - K. Raisler
2       A     Yes, it is.
3       Q     In paragraph three of your
4   declaration, Mr. Raisler, you describe very
5   generally that you were involved in meetings and
6   discussions between LBI and Barclays personnel
7   concerning a potential acquisition by Barclays of
8   LBI's proprietary futures business as well as its
9   business as a futures commission merchant; is that
10  correct?
11      A     Correct.
12      Q     What I would like to do is drill down
13  a little further into those generalities, sir.
14          Sullivan & Cromwell was first engaged
15  by Barclays in connection with this matter on
16  September 15th; is that correct?
17      A     No, actually on the 14th.
18      Q     How was it that Sullivan & Cromwell
19  first became engaged, sir?
20      A     I don't remember precisely, but I do
21  recall we had -- I had some phone calls with, with
22  representative of Barclays --
23          MS. BLOOMER:  I'm just going to
24      object and instruct the witness not to
25      reveal the substance of the communications.

Page 7

1           Confidential - K. Raisler
2       A     -- in the afternoon and evening of
3   Sunday, September 14th.  I believe that was the
4   first time that we were involved.  It certainly
5   was the first time I was involved.
6       Q     Other than representatives of
7   Barclay, Mr. Raisler, was anybody else on those
8   telephone calls on Sunday, the 14th of September?
9       A     Other than representatives of
10  Sullivan & Cromwell and Barclays, no.
11      Q     When was the first time, Mr. Raisler,
12  that you were involved in a meeting between Lehman
13  and Barclays personnel concerning the potential
14  acquisition by Barclays of any part of Lehman's
15  futures business?  And I should broaden my
16  question.  Not just meetings.  I'm inquiring about
17  any conference calls as well.
18      A     The morning of September 15th.
19      Q     Can you tell me about that meeting,
20  please, sir?  Well, withdrawn.
21          Was that a meeting or a conference
22  call?
23      A     It was a meeting, and it was a
24  meeting that lasted most of the day, to my best
25  recollection.

Page 8

1           Confidential - K. Raisler
2       Q     Where did it take place?
3       A     Again, this is only a recollection,
4   but I think it was at Lehman's offices on 7th
5   Avenue.
6       Q     Do you remember approximately when it
7   started, sir?
8       A     I really don't recall.  I have some
9   vague recollection that we had a pre-meeting at
10  Barclays before we went over to Lehman, but I am
11  not sure that is right.
12      Q     To your recollection, sir, did the
13  meeting with the Lehman folks start in the morning
14  or the afternoon?
15      A     Definitely in the morning.
16      Q     And the meeting lasted, you said,
17  most of the day.  Approximately when do you think
18  it finished?
19      A     The problem I have, and I should
20  probably get this on the record early, the week is
21  sort of a blur because there were meetings going
22  on steadily the whole week, so, when meetings
23  ended and when meetings started becomes sort of a
24  disconnect for me.
25          My best guess was late in the

Page 9

1           Confidential - K. Raisler
2   afternoon into the early evening.
3       Q     To the best of your recollection,
4   sir, who was in attendance at that meeting?
5       A     Here again, there is a certain amount
6   of vagueness in my recollection.  Obviously
7   representatives of Sullivan & Cromwell.
8       Q     Maybe it's easier to break it down,
9   sir.
10      A     Right.
11      Q     Who else was there from Sullivan &
12  Cromwell apart from you, sir?
13      A     I think on that day it may have only
14  been me.
15          Representatives from Barclays.
16      Q     Who were the representatives from
17  Barclays, sir?
18      A     Again, it's a little bit of a blur,
19  but my best guess would be Tim Stack, Liz James,
20  Alex Guest.  Those are the only ones I am sure of.
21  I know there were more than that in the room, but
22  I just don't remember who they were.
23      Q     Do you remember the names,
24  Mr. Raisler, of the Lehman representatives who
25  were present at that meeting on the 15th?

Page 10

Confidential - K. Raisler

1
2      A     The only person I precisely remember
3   was Jeff Jennings.  Again, there were more people
4   from Lehman than that in the room.
5      Q     Do you remember what Mr. Jennings'
6   role or title was at Lehman?
7      A     He ran the futures division for
8   Lehman.
9          If I can just amend my prior answer.
10   I also recall, I believe, that a gentleman by the
11   name of Ron Filler was in the room as well.
12      Q     Who was Mr. Filler representing?
13      A     Ron was a consultant for Lehman.  He
14   had run their futures division up until May of
15   2008, when he retired, and was brought back to
16   help on this transaction.
17      Q     To your understanding, sir, what was
18   the purpose of this meeting on the 15th?
19      A     It was to explore what was involved
20   in taking over the futures and futures-related
21   businesses of Lehman by Barclays.
22      Q     As of September 15th, Mr. Raisler,
23   did you have an understanding as to the
24   interactions, if any, or the relationship, if any,
25   between Barclays' consideration to purchase the

Page 11

Confidential - K. Raisler

1
2   futures business of Lehman, and the potential
3   purchase by Barclays of other assets of the Lehman
4   broker dealer?
5          MS. BLOOMER:  I am going to object
6      and just instruct the witness to be sure --
7      I will do this throughout the day when
8      questions seem to call for it.  As a general
9      matter, please do not convey the substance
10      of the discussions you had with counsel or
11      with Barclays.
12          I apologize.  Go ahead.
13      A     At a high level, yes.  I generally
14   knew there were other lawyers at Sullivan &
15   Cromwell working on a bigger transaction, and I
16   also knew that Cleary Gottlieb was involved in a
17   broader transaction, but I really was far from the
18   details of that.
19      Q     Were you involved, Mr. Raisler, at
20   any time prior to the closing of the transaction
21   before the markets opened on the 22nd of
22   September, in any aspect of the, what I will call
23   the broader purchase of assets from Lehman, other
24   than the futures business?
25          MS. BLOOMER:  Objection to form.

Page 12

Confidential - K. Raisler

1
2      A     The only other aspect related to the
3   business, the options business, of Lehman and, in
4   particular, dealings with the OCC.
5      Q     Do you have any notes of your meeting
6   from the 15th, sir?
7      A     I do not.
8      Q     Is it your routine practice to take
9   notes at such meetings?
10      A     Actually, it's my routine practice
11   not to take notes.  I very rarely take notes of
12   anything.
13      Q     You said, Mr. Raisler, that the
14   purpose of the meeting was to explore what would
15   be involved in Barclays taking over the futures
16   and futures-related business of Lehman.  Can you
17   be a little more specific about the discussions in
18   that regard, sir?
19      A     To not distinguish the events of the
20   15th specifically from the events of the days that
21   followed, we were looking at and engaging in due
22   diligence to explore a transfer of all of the
23   futures accounts and related assets of Lehman to
24   Barclays.
25      Q     Was it your understanding, sir, that

Page 13

Confidential - K. Raisler

1
2   a business agreement had been reached between
3   Lehman and Barclays to transfer the assets that
4   you referenced in your prior answer?
5          MS. BLOOMER:  Objection to the form,
6      vague as to time frame.
7      A     As of what time would that -- as of
8   the 15th, no.
9      Q     Did you at any time, Mr. Raisler,
10   come to learn that a business deal had been
11   reached between Lehman and Barclays to purchase
12   any assets related to Lehman's futures business?
13      A     I was vaguely familiar with the
14   negotiation of the asset purchase agreement.  I
15   don't know that it influenced what I was doing in
16   any meaningful way during the course of that week.
17      Q     How was it, sir, that you were
18   familiar with the negotiations of the asset
19   purchase agreement?
20          MS. BLOOMER:  Objection.  Just
21      instructing the witness not to disclose the
22      substance of communications with Barclays.
23      A     Can I have your question read back,
24   please?
25      Q     Sure.

Page 14

```
 1          Confidential - K. Raisler
 2          (Record read.)
 3      A    To be clear, I wasn't -- I wasn't
 4  familiar with the negotiations of it per se.  I
 5  was familiar that there had been some kind of an
 6  agreement entered into.  And I would have learned
 7  that from counsel.
 8      Q    From counsel for whom, sir?
 9      A    Most likely, other colleagues at
10  Sullivan & Cromwell.
11      Q    Do you know when you learned that
12  information, sir?
13      A    Again, somewhat of a blur, but likely
14  on the 16th or 17th.
15      Q    Do you say that because you
16  understand that the asset purchase agreement was
17  finalized and signed around that time period?
18          MS. BLOOMER:  Objection, form,
19  mischaracterizes his testimony.
20      A    No.  I think I learned of it then.
21      Q    Is it fair to characterize the
22  meetings that you were in, sir, as due diligence
23  meetings rather than meetings in which the
24  negotiations of the underlying business deal
25  between Barclays and Lehman in connection with the
```

Page 15

```
 1          Confidential - K. Raisler
 2  futures business took place?
 3          MS. BLOOMER:  Objection to form.
 4      A    I would certainly agree it was not
 5  the latter.
 6      Q    So you weren't involved, sir, in any
 7  negotiations of the business deal as -- as it
 8  related to Barclays' purchase of Lehman's futures
 9  business?
10      A    To my best recollection, I was not
11  involved at all in that.  I believe in answering
12  your earlier question, I would have characterized
13  it as due diligence in a very broad sense as what
14  these meetings were about.
15      Q    What, what is the reason for your
16  qualification, sir?
17      A    I think people have different
18  definitions of due diligence, and I am sure we are
19  going to get to an opportunity to discuss in more
20  detail what I did.  I don't know.  Some people
21  might have described what I was doing as due
22  diligence.  Some people might have described it as
23  sort of something else.  So I just want to leave
24  some latitude for that explanation.
25      Q    Do you have any recollection, sir, of
```

Page 16

```
 1          Confidential - K. Raisler
 2  the information that Barclays requested during
 3  that meeting on the 15th?
 4      A    Again, the meetings for me blur
 5  during the course of the 15th versus 16th versus
 6  17th.
 7          I believe that among the information
 8  that was being requested was the exchanges on
 9  which Lehman had positions, either proprietary or
10  customer; the regulators that they were dealing
11  with around the world, and, broadly stated, the
12  information around the positions and assets that
13  were held in those markets.
14      Q    During that meeting on the 15th, sir,
15  were the representatives of Lehman able to provide
16  some or all of the information that you have just
17  described as requested by Barclays?
18      A    Only at the very highest level.  I
19  believe we started to collect information about
20  the markets that they were in, whether they were
21  clearing members in those markets or cleared
22  through third parties, and regulators that they
23  had dealt with.
24          To be clear, the information was
25  dramatically incomplete.
```

Page 17

```
 1          Confidential - K. Raisler
 2      Q    Lehman was unable to provide a list
 3  of the markets in which it was a clearing member?
 4      A    There was vagueness and uncertainty
 5  about that in certain markets around the world.
 6      Q    Was Lehman able to provide any
 7  information about the markets in which it was a
 8  clearing member?
 9      A    Yes, certainly it did provide
10  information, although it, too, was incomplete,
11  about markets in the U.S.
12      Q    In what regard was the information
13  incomplete, sir?
14      A    Well, it was able to provide us with
15  information as to where it was a clearing member.
16  It was not able to tell us whether it had any
17  positions in those markets where it was a clearing
18  member, or the size and contours of those
19  positions.
20      Q    Do you have an understanding of why
21  Lehman was unable to provide the information about
22  the positions or the size or contours of those
23  positions?
24      A    Only at the most general level.  The
25  impression I had was that the days leading up to
```

Page 18

Confidential - K. Raisler

1 the 15th of September had been extremely chaotic
2 for the staff, and they just didn't have a handle
3 on it.
4    Q    As the meetings progressed through
5 the week of the 15th, sir, was Lehman able to
6 provide further information about the positions in
7 the markets in which it was a clearing member?
8    A    We did obtain more information as the
9 week went on, yes.
10    Q    Can you tell me about that
11 information, please.
12    A    I was delegated the responsibility to
13 reach out to each of the exchanges and, where
14 different, clearing houses, to establish contact
15 and obtain information. And when I say obtain
16 information, I am referring to basically
17 information about what would be involved in our
18 moving the positions from Barclays to Lehman.
19       MR. LACY: I think you misspoke.
20    A    I'm sorry, Lehman to Barclays. Thank
21 you. It's probably the only time I will do that
22 today; right?
23    Q    If you only do it once, sir, you will
24 be in a minority of one, and I will congratulate

Page 19

Confidential - K. Raisler

1 you.
2    A    And in the course of that, there were
3 questions that I raised with Lehman officers, and
4 that was part of the way in which we got more
5 information.
6    Q    Which Lehman officers did you raise
7 questions with, sir?
8    A    Well, I think mostly my recollection
9 was with Jeff Jennings and Ron Filler.
10    Q    Who delegated the responsibility to
11 you, Mr. Raisler, to reach out to the exchanges
12 and clearing houses?
13    A    Probably representatives of Barclays.
14    Q    And did you reach out to all clearing
15 organizations and exchanges of which Barclays was
16 a member in the U.S. and outside of the U.S.?
17       MS. BLOOMER: Did you mean Barclays
18 there or Lehman?
19       MR. OXFORD: Sorry, sorry. There we
20 go. Thank you, Trish. Didn't take long.
21 It's infectious.
22       THE WITNESS: Right.
23    Q    Let me try that again.
24       Did you reach out, Mr. Raisler, to

Page 20

Confidential - K. Raisler

1 all clearing organizations and exchanges of which
2 Lehman was a member both in the U.S. and outside
3 of the U.S.?
4    A    Outside the U.S., definitely no.
5 Inside the U.S., I believe I reached out to all of
6 them. There may have been one missing.
7    Q    Are you able, sitting here today, to
8 give me a list of the organizations that you
9 reached out to in this matter?
10    A    I can give you my best recollection.
11 It would have been the Chicago Mercantile
12 Exchange, which would have embraced the positions
13 of its divisions, including the Chicago Board of
14 Trade and NYMEX, ICE futures U.S., formerly known
15 as the New York Board of Trade, the Chicago
16 Climate Futures Exchange.
17       I don't recall initially reaching out
18 to the CBOE Futures Exchange because I don't
19 believe we knew that they had any positions there
20 for several days.
21       I think I reached out to the Kansas
22 City Board of Trade, even though Lehman was not a
23 clearing member of the Kansas City Board of Trade.
24 But we did know they had positions there.

Page 21

Confidential - K. Raisler

1       I don't recall, although I believe
2 just an absence of memory, which non-U.S.
3 exchanges I reached out to. As a general matter,
4 Lehman, LBI, the entity that we were dealing with,
5 was not a clearing member on those foreign
6 exchanges, and that might be why I don't have a
7 distinct memory of speaking to people about them.
8    Q    If Lehman was not a clearing member
9 of foreign exchanges, sir, did it use a foreign
10 FCM?
11    A    It did use a -- well, outside the
12 U.S. they would not have been called necessarily
13 FCMs.
14    Q    I understand.
15    A    But it would have used a clearing
16 broker in those jurisdictions. That clearing
17 broker could have been an affiliate, and in many
18 cases was.
19    Q    Did you reach out to any of Lehman's
20 clearing brokers that they used to clear futures
21 outside of the U.S., sir?
22    A    I think that was part of the problem.
23 Many of those, many of those clearing
24 relationships were with affiliates. There wasn't

Confidential - K. Raisler

1 anybody easily you could get ahold of to talk to
2 about it.
3     Q    I am limiting my question to the
4 clearing brokers outside of the U.S. who are not
5 affiliates, sir.
6     A    Okay.
7     Q    Did you reach out to any such
8 organizations in connection with the authority
9 that was delegated to you by Barclays?
10        MS. BLOOMER:  Objection, vague as to
11 time frame.
12     A    The only one I remember, and this
13 memory is not that distinct, was Macquarie in
14 Australia.
15     Q    What do you recall about reaching out
16 to Macquarie in Australia, sir?
17     A    Just an attempt to try to find
18 information about what they knew about the
19 positions in the markets in Australia.
20     Q    Do you remember if that attempt was
21 successful, sir?
22     A    I remember it as not being
23 successful.  We didn't get a very good report from
24 them as to what was going on.

Confidential - K. Raisler

1     Just to elaborate a bit, I also
2 believe that Ron Filler was reaching out to some
3 of the foreign clearing relationships during the
4 same time period and reporting back as well.
5     Q    Reporting back to whom, sir?
6     A    This group meeting that started on
7 Monday and sort of went through the week of
8 Barclays and Lehman representatives.
9     Q    Did you reach out, Mr. Raisler, to
10 any Lehman affiliates who acted as clearing
11 brokers outside of the U.S.?
12     A    To my best recollection, I did not.
13     Q    Do you know if anybody else did reach
14 out to Lehman clearing affiliates?
15     A    If anybody had, it probably would
16 have been Filler.  But I don't remember -- I guess
17 I don't remember much by way of results there, so
18 I don't know whether attempts were made or not.
19     Q    How was it that you reached out to
20 the clearing organizations and exchanges in the
21 U.S., sir?  Did you have a telephone call with
22 them?  Did you e-mail them?
23     A    In each case, it would have been by
24 phone.  I would have spoken to any number of

Confidential - K. Raisler

1 people within those organizations, usually in the
2 first instance through the general counsel's
3 office.
4     Q    Turning first to the CME, sir, were
5 you able to obtain any information by reaching out
6 to the CME about what would be involved in moving
7 the Lehman positions to Barclays?
8     A    Yes.  I would say the CME was
9 probably the most transparent and cooperative, the
10 one most anxious to make sure it went smoothly.
11     Q    Did you have a primary contact at the
12 CME, sir?
13     A    Probably two people.  It would have
14 been Jerry Salzman, who is the outside counsel to
15 the CME.
16     Q    Is he at Skadden?
17     A    He is currently, yes.
18     Q    Was he with Skadden at the time?
19     A    I am not sure.  He had his own firm
20 and moved over to Skadden around that time.  I
21 don't remember precisely.  It could have been a
22 little before, a little after.
23        And Kim Taylor, who runs the CME
24 clearing house.

Confidential - K. Raisler

1     Q    Do you remember when you first
2 reached out to the CME, Mr. Raisler?
3     A    Not precisely, but it wouldn't
4 surprise me if it had been that Monday, the 15th.
5     Q    Did you continue your discussions
6 with the CME and its representatives throughout
7 the week of the 15th, sir?
8     A    Certainly through Thursday.  I don't
9 remember any discussions with them on Friday.
10     Q    At the CME, Mr. Raisler, did you ask
11 for information about Lehman's proprietary or
12 customer positions?
13     A    In each case when I made inquiry of
14 any exchange or clearing house, I was seeking
15 information at the highest level.  I wasn't
16 looking at what the nature or type of their
17 positions was.  I was more interested in
18 understanding from them whether they saw any
19 impediments to moving those positions to Lehman,
20 from Lehman to Barclays.
21        So I think my answer to your question
22 is yes, sort of.
23     Q    Is it accurate, Mr. Raisler, to say
24 that you did not ask for any information at the

Page 26

Confidential - K. Raisler

1  CME about the substance and nature of Lehman's
2  customer or proprietary positions at the CME?  Is
3  that accurate?
4       MS. BLOOMER:  Objection to form.
5       A    I would say that is not accurate.  I
6  would say I asked both custom and nature, but not
7  the particulars of the positions.  So I was
8  interested in knowing which markets, on which
9  markets they had positions, and whether there were
10  any complications associated with those positions
11  that would hinder their movement to Barclays.
12      Q    But you didn't ask what the size of
13  those positions were, for example?
14      A    I did not.  I am not sure absent a
15  more complex process they would have been able to
16  give me that information, because it was not in
17  the first instance Barclays information.
18      Q    And at this stage that information is
19  proprietary to Lehman?
20      A    Correct.
21      Q    Did you consider the proprietary
22  nature of this information to be a barrier to you
23  asking for information about the size of these
24  positions and any collateral held to secure them?
25

Page 27

Confidential - K. Raisler

1       A    I was not delegated that
2  responsibility, so I never really thought in those
3  terms.
4       Q    Was there someone else, to your
5  knowledge, Mr. Raisler, who was delegated the task
6  to attempt to ascertain whether -- at the CME or
7  elsewhere -- what the size and nature was of
8  Lehman's customer and proprietary futures
9  positions?
10      A    Generally speaking, again, based on
11  these meetings that we had, the operations people
12  within Barclays would have been attempting to get
13  information of that sort from their counterpart at
14  Lehman.
15      Q    Do you know who the operations people
16  within Barclays were who were responsible for this
17  attempt to get information?
18      A    That team would have been led by Liz
19  James.
20      Q    Do you know who else was on that team
21  reporting up to Liz James?
22      A    I am not that good at names and I
23  don't recall.
24      Q    As a general matter, sir, would you
25

Page 28

Confidential - K. Raisler

1  expect the CME to be able to provide to Lehman a
2  list of the Lehman customer and proprietary
3  positions and any collateral the CME held in
4  respect of those positions?
5       MR. LACY:  Object to the form of the
6  question.
7       A    It's a somewhat more complicated
8  question than I think you intend.  To a certain
9  extent, the answer to your question should be yes.
10  I think some of the information, though, that
11  would be transmitted would have to be digested by
12  Lehman, because they would be the only ones who
13  would know certain pieces of information that the
14  CME would not know.
15      Q    What information would Lehman only
16  know but the CME wouldn't know in connection with
17  your last answer, sir?
18      A    The CME carries all of the customer
19  positions of Lehman in a single account, and so to
20  the extent that Lehman was able to get that -- to
21  the extent that the CME was able to get that
22  information to Lehman, it would be in an aggregate
23  form.  It wouldn't be delineated by customer.
24      Q    I understand.
25

Page 29

Confidential - K. Raisler

1       Is there any other information that
2  you were referring to other than the breakdown by
3  customer in your answer two answers ago?
4       A    That would likely be the largest
5  impediment to getting a clean piece of
6  information.
7       Q    Would your answer also apply not just
8  to the CME, but to any clearing organization, sir?
9       MS. BLOOMER:  Objection to form.
10      A    I think that generally the answer
11  should be yes.  I believe the sophistication of
12  some of the other clearing organizations and their
13  ability to get that information may be slower, but
14  the answer should be yes, at some point in time.
15      Q    You said you also spoke to ICE
16  Futures U.S., Mr. Raisler.
17      A    Correct.
18      Q    Can you tell me about your
19  conversations with them, please?
20      A    I don't, I don't want to imply in
21  answering this question that I have given you the
22  answer to the question with respect to the CME.  I
23  don't think you asked this question with respect
24  to the CME.
25

Confidential - K. Raisler

1
2    Q    I understand that.
3    A    Okay.
4    Q    Focusing specifically on the --
5    A    ICE Futures.
6    Q    -- ICE Futures U.S., can you tell me
7    about your conversation.
8    A    Again, it was a discussion about
9    moving the positions that they were carrying to
10   Barclays, but the discussion focused mostly on
11   their insecurity about Lehman's continuing ability
12   to perform and their worry if there was inadequate
13   margin at ICE Futures what would happen.
14   Q    Were those insecurities or worries
15   assuaged in any way, to your knowledge, sir?
16   A    We were not able to assuage those
17   insecurities, no.
18   Q    Did anything happen as a result of
19   this inability to assuage their concerns?
20   A    We are speaking now with respect to
21   ICE Futures?
22   Q    Yes.
23   A    They, as with any U.S. clearing
24   house, have the right, if they have this
25   insecurity, to take over the positions and to

Confidential - K. Raisler

1
2    liquidate them or to auction them off.
3    Ultimately, that is what ICE Futures did with
4    respect to the proprietary positions of Lehman
5    that were on their exchange.
6    Q    Do you have any information, sir,
7    about the nature of the propriety positions that
8    Lehman had prior to this auctioning off?
9    A    My recollection is imprecise, but I
10   believe that Lehman had some stock index products
11   that were trading on ICE Futures, among other
12   things.
13   Q    Do you know when the auction
14   happened, sir?
15   A    I don't precisely recall whether it
16   was an auction or whether it was just a
17   liquidation.  I think it was an auction.  I only
18   recall it occurred after the CME's auction.  I
19   don't recall exactly when.  Maybe a day later.
20   Q    To the best of your recollection,
21   sir, when was the CME's auction?
22   A    The CME's auction started the morning
23   of the 18th of September.
24   Q    So you think ICE Futures had an
25   auction after the 18th or at least after the

Confidential - K. Raisler

1
2    morning of the 18th, but it was also prior to the
3    closing of the transaction on the 22nd, sir?
4    A    My best recollection is yes.  But I
5    am not -- I am much more certain about what the
6    CME did.  The ICE position was not that large
7    compared to the CME's.
8    Q    Do you have a sense, sir, of how
9    large the ICE position was?
10   A    My recollection, in the scheme of
11   things at the time, it was a relatively small
12   position.
13   Q    Do you have any information,
14   Mr. Raisler, as to the nature and amount of any
15   collateral that Lehman held in respect of the ICE
16   Futures?
17   A    I don't.  And I wouldn't have known
18   that then.
19   Q    Do you have any information about any
20   collateral that ICE rather than Lehman would have
21   held in respect to those positions that were
22   liquidated?
23        MR. LACY:  Object to the form of the
24   question.
25   A    I am not sure I understand that

Confidential - K. Raisler

1
2    question.
3    Q    I was simply making sure that I had
4    asked about your knowledge with respect to any
5    collateral held by Lehman and any collateral
6    posted at the exchange, sir.  Do you understand
7    the distinction I am making?
8    A    Yes.  And I wasn't intending to
9    distinguish between the two.
10   Q    Do you know, Mr. Raisler, whether or
11   not Barclays purchased any of the positions that
12   were either liquidated or auctioned by ICE?
13   A    I never heard that one way or the
14   other, no.
15   Q    Did the CME, to your knowledge, sir,
16   have similar concerns to ICE about the ability of
17   Lehman to continue to perform its obligations as a
18   clearing member?
19   A    Yes.
20   Q    How is it that you came to learn
21   that?
22   A    This was something that was mentioned
23   as early as my first conversation with them.  As I
24   testified, I think it was on the 15th.  It
25   culminated in a conversation I had with them

Page 34

Confidential - K. Raisler

1  Confidential - K. Raisler
2  between 11 p.m. and midnight on the 17th of
3  September, in which they asked -- let me begin
4  that sentence over again, if I can.
5  I received a call, I received several
6  calls that evening from representatives of the
7  CME, which I was at a dinner and was not able to
8  catch up with.  When I did get the messages, I
9  called them back sometime between 11 p.m. and
10 midnight.  I got a number of people at the CME at
11 that time on the phone.
12 They asked me, consistent with the
13 discussions we had had leading up to this point,
14 whether Barclays was prepared to guarantee
15 Lehman's proprietary positions at the exchange.
16 I told them I would get back to them
17 the following morning, as it was almost midnight.
18 They told me that was not satisfactory, that they
19 needed an answer within an hour, and that absent a
20 guarantee, they would commence an auction first
21 thing in the morning.
22 Q    Were you able to get them an answer
23 to their question within an hour, sir?
24 A    I was able to get them an answer
25 within an hour, and I was -- I told them that

Page 35

1  Confidential - K. Raisler
2  Barclays was not in a position to guarantee the
3  proprietary positions of Lehman, and that they had
4  to do what they had to do.
5  Q    And did the CME then proceed to
6  auction Lehmans' proprietary positions at the CME?
7  A    That is my understanding, yes.
8  Q    What is the basis of that
9  understanding, sir?
10 A    They told me that.
11 Q    Who told you in particular?
12 A    Kim Taylor.  Jerry Salzman.
13 Phupinder Gill, a name I am not going to be able
14 to spell or pronounce, who is the president of the
15 exchange, was also on those calls.
16 Q    Apart from those three individuals,
17 sir, do you remember anybody else being on those
18 calls?
19 A    I think there were others.  I don't
20 remember who they were.
21 Q    Did you have an understanding, based
22 on those calls or otherwise, of the size of
23 Lehman's proprietary positions at the CME?
24 A    I understood them to be huge.
25 Q    Can you be any more specific, give me

Page 36

1  Confidential - K. Raisler
2  an order of magnitude other than huge?
3  A    Well, the exchange had explained to
4  us that they thought that the exposure of those
5  positions was enormous.  Again, I am unable to put
6  easy dollars around them.  I do indicate in my
7  declaration that the auction resulted in a
8  movement of approximately $1.6 billion in margin
9  that had been posted at the exchange to the
10 auction winners.  I think that gives an idea of
11 the scale of the positions.
12 Q    What is the basis for your statement
13 in your declaration, which I believe is paragraph
14 four, that you understand the auctioning off of
15 LBI's proprietary futures positions at the CME led
16 to a loss of approximately $1.6 billion in
17 collateral that LBI had posted at the CME?
18 A    Someone at Barclays had told me that.
19 I don't recall precisely who that was or how I got
20 that information.
21 MS. BLOOMER:  And I am going to
22 object.  You shouldn't really go into that
23 discussion in any detail.  Sorry about the
24 late objection, but --
25 A    I don't remember the who, what or

Page 37

1  Confidential - K. Raisler
2  where of when I got that information.
3  Q    And you don't remember, sitting here
4  today, whether it was a legal representative of
5  Barclays, whether external or internal, or whether
6  it was a business person; is that correct?
7  A    I don't.
8  Q    And other than this conversation with
9  an unnamed and unremembered person at Barclays,
10 sir, do you have any basis for the statement that
11 you make in the last sentence of your declaration?
12 A    I have some vague recollection.  I
13 also read it in a news article at one point, but I
14 can't pin that down.
15 Q    It's not based on a review of
16 documents related to the auction, sir?
17 A    It is not.
18 Q    It not based on conversations with
19 anybody at the CME?
20 A    It is not.
21 Q    Did you have any discussions,
22 Mr. Raisler, with anybody at the CME about the
23 customer positions that Lehman held at the CME?
24 A    Yes.  The dialogue starting on Monday
25 with each of the exchanges, clearing houses, would

Page 38

1           Confidential - K. Raisler
2    have related to both the customer positions and
3    the proprietary positions.
4         Q    Did the CME have similar concerns in
5    respect of the customer positions that Lehman held
6    as it did to the proprietary futures that you just
7    testified about?
8              MS. BLOOMER: Object to the form.
9         A    They had concerns. They were not of
10   the same dimension.
11        Q    What were their concerns, sir?
12        A    Their concerns there again was that
13   Lehman customers -- let me amend that.
14             Their concerns were at two levels.
15   One is, was Lehman able to administer, continue to
16   administer the customer positions in an effective
17   way. That is, did it have a handle on what was
18   going on. Was it able to manage daily margin pays
19   and collects.
20             And then secondly, given the
21   volatility and uncertainties in the market, were
22   Lehman's customers going to be able to perform
23   their obligations, because under the law, if they
24   were not, Lehman would be backstopping those
25   customers, and as we just discussed, the exchange

Page 39

1           Confidential - K. Raisler
2    was not confident of Lehman's ability to do that
3    in the context of its proprietary book already, so
4    it certainly would be concerned about their
5    ability to do that with respect to the customer
6    positions.
7         Q    Turning to the CME's first concern,
8    about Lehman's ability to continue to administer
9    or manage Lehman's customer positions, was that
10   concern at the CME resolved, to your knowledge,
11   sir?
12        A    The answer is no. Each day they had
13   that concern, but each day they were apparently
14   getting satisfactory results.
15             I should point out that this was sort
16   of a code red event not just for the CME but also
17   for the Commodities Future Trading Commission. We
18   haven't discussed them, but they were heavily
19   involved as well in these discussions during the
20   course of the week.
21        Q    Was the second concern of the CME the
22   ability of Lehman's customers to perform, and if
23   they were unable to perform, the ability of Lehman
24   to be a backstop as they are required? Did that
25   performance obligation -- was that concern

Page 40

1           Confidential - K. Raisler
2    resolved, to your knowledge, sir?
3         A    Not until the positions moved from
4    Lehman to Barclays the following week.
5         Q    Do you have an understanding --
6    withdrawn.
7              The CME didn't do anything to close
8    out those futures positions held on behalf of
9    customers by Lehman?
10        A    They did not. They were just
11   actively and aggressively monitoring daily and
12   intraday what was going on.
13        Q    Do you have an understanding, sir, of
14   how it is that the CME got comfortable such that
15   they were willing to continue to clear Lehman's
16   customer business?
17             MR. LACY: Object to the form of that
18   question.
19        A    I think the word "comfortable" would
20   be a significant overstatement, given the amount
21   of time and attention they were spending on this.
22   Moving customer positions is not an easy process,
23   compared to auctioning off proprietary positions.
24   They needed to just monitor the positions very
25   aggressively and make sure that there were no

Page 41

1           Confidential - K. Raisler
2    defaults. If there had been defaults, they would
3    then have gone through a much more complicated
4    process as to what to do next.
5              So the answer is, in the few days
6    they obviously were able to get through.
7         Q    To your knowledge, sir, did the CME
8    hold collateral in respect of Lehman's customer
9    futures positions?
10        A    Absolutely.
11        Q    Can you tell me what it is you know
12   about the nature and extent of the collateral that
13   the CME held in respect of those positions?
14        A    Well, to simplify, the positions that
15   Lehman's customers had would have had initial
16   margin associated with them, and that initial
17   margin would have been posted with the CME
18   clearing house. Typically, the clearing broker,
19   in this case Lehman, would have additional funds
20   posted with the clearing house as a buffer.
21             And each day there would be mark to
22   market variation margin that would be paid and
23   collected on behalf of those customers as a group
24   through the clearing house.
25        Q    Do you know whether in fact Lehman

Page 42

Confidential - K. Raisler

1  had posted additional funds as a buffer at the CME
2  for its futures business for its customers?
3      A    I certainly came to know that.  At
4  what point in time I did know that -- I think I
5  knew that early in the week.
6      Q    When you came to learn about the
7  buffer, sir, did you come to learn about the size
8  of the buffer?
9      A    I don't think I ever really knew sort
10 of the scale of the positions, customer,
11 proprietary, and the scale of the monies involved.
12     Q    Can you tell me, please, about your
13 conversations with the Chicago Climate Futures
14 Exchange.
15     A    My best recollection is that the only
16 positions that were on that exchange were
17 proprietary.  There were no customer positions.
18 But here again, I think the positions were very
19 small.
20         I believe the conversations were
21 similar in that there were questions about
22 insecurity and Lehman not being able to perform.
23     Q    Did the Chicago Climate Futures
24 Exchange close out Lehman positions prior to the

Page 43

Confidential - K. Raisler

1  closing of the transaction, to your knowledge,
2  Mr. Raisler?
3      A    I am not sure in terms of my memory.
4  but it would be unlikely that they would have
5  closed it out.  It would have been more likely
6  that they would have auctioned it.  It would have
7  been difficult to close it out.
8      Q    Do you know whether or not the
9  Chicago Climate Futures Exchange auctioned any
10 Lehman positions?
11     A    I don't have a real good
12 recollection of that.  Again, this was a
13 relatively small matter, so it got blurred with
14 the other activities.
15     Q    Do you remember who you spoke to at
16 the Chicago Climate Futures Exchange?
17     A    Probably would have been their inside
18 counsel, a woman by the name of Ann Cresce.
19 C-R-E-S-C-E.
20     Q    I think you said you also spoke to
21 someone at the Kansas City Board of Trade; is that
22 correct?
23     A    Right.  I don't remember the name of
24 the person there.

Page 44

Confidential - K. Raisler

1      Q    What do you recall about the
2  substance of your conversations with that person,
3  whoever that may be, who was the representative of
4  the Kansas City Board of Trade?
5      A    In Kansas City, unlike the other U.S.
6  exchanges we have discussed, Lehman was not a
7  clearing member.  It cleared through a broker.
8  Who it was itself a member.  So I would believe
9  that the conversation was a somewhat higher level
10 one, just to make sure that they knew what we were
11 doing, and what was involved in the next steps.
12     Q    Do you recall whether the Kansas City
13 Board of Trade had similar concerns to those of
14 the CME?
15     A    Their concern -- first of all, their
16 position was significantly smaller, probably the
17 smallest of the lot.  Also, they had the comfort
18 that their clearing member provided them with,
19 with backstop, if Lehman's customers did not
20 perform, or if Lehman's proprietary positions
21 didn't perform.
22     Q    You also had conversations, albeit
23 perhaps not initially, with the CBOE?
24     A    Correct.  And just to be clear on

Page 45

Confidential - K. Raisler

1  that, also the OCC, the Options Clearing Corp.,
2  which clears for the CBOE.
3      Q    Okay.  Focusing first on your
4  conversations with the CBOE, Mr. Raisler, can you
5  tell me what you recall about your conversations
6  with the CBOE in the week of the 15th of
7  September?
8      A    I don't think I had any conversations
9  with them that week.
10     Q    Do you know whether anybody else at
11 Sullivan & Cromwell had conversations with the
12 CBOE that week?
13     A    It is possible that my partner, David
14 Gilberg, could have had conversations with them
15 that week, because he and I were splitting up some
16 of these responsibilities to reach out to
17 exchanges.
18     Q    Can you describe for me your role
19 with respect to the futures due diligence, as you
20 have described it, and Mr. Gilberg's role?
21     A    There was really not any separation
22 between us.  We worked together, and we just might
23 have split up some of the responsibilities to
24 reach out.  But it was a team.

Page 46

Confidential - K. Raisler

1
2    Q    Generally were you working separately
3 in the sense that you would call and try and get
4 information from a set list of exchanges or
5 clearing organizations, and Mr. Gilberg would be
6 tasked with getting that information from a
7 different set of organizations?
8    A    Possible.  I think it was more that
9 we might -- one of us might do follow-up on the
10 other -- it wasn't as discrete as you have
11 described it.
12    Q    In the conversation, for example,
13 with the CME that you have testified to today, was
14 Mr. Gilberg also on those conference calls?
15    A    I don't recall he was on any of those
16 calls.  He could have been.
17    Q    And you don't believe Mr. Gilberg was
18 in the initial meeting on the 15th, sir; is that
19 correct?
20    A    My best recollection is no, although
21 I am sure he was in some of the subsequent
22 meetings.
23    Q    Why was it you came to have a
24 conversation with the OCC in the week of the 15th,
25 Mr. Raisler?

Page 47

Confidential - K. Raisler

1
2    A    I am not sure -- first of all, I am
3 not sure I have testified to that.
4    Q    Let me lay a foundation.  Perhaps I
5 misunderstood your earlier testimony.  I didn't
6 mean to mischaracterize it.
7         Do you believe you had a conversation
8 with any representative of the OCC in the week
9 between the 15th of September and the closing of
10 the transaction on the 22nd?
11         MS. BLOOMER:  Neil, whenever you are
12 ready for a break, we probably should take
13 one soon.
14    A    I am not sure.  I know I had
15 conversations with them the week of the 22nd.  I
16 don't recall conversations with them that week,
17 although I could have had some.
18         Just to elaborate on one point is
19 that OCC also clears some futures contracts in
20 addition to clearing options.  And so they would
21 have been a part of my remit to the extent that
22 there were futures positions of Lehman proprietary
23 or Lehman customers that cleared OCC, separate and
24 apart from OCC's clearing of the equity options.
25    Q    Which types of futures contracts does

Page 48

Confidential - K. Raisler

1
2 the OCC clear?
3    A    They clear for the CBOE Futures
4 Exchange, CFE.  And in particular, the largest
5 contract there is called the VIX contract, V-I-X,
6 which is a volatility-based contract.
7         MR. OXFORD:  Okay.  Does everybody
8 want to take a five-minute break?
9         MS. BLOOMER:  This might be a good
10 time.
11         THE WITNESS:  Sure.
12         (Recess taken.)
13 BY MR. OXFORD:
14    Q    Mr. Raisler, did you have any
15 understanding one way or the other whether
16 Barclays was one of the bidders for the Lehman
17 proprietary positions at the CME that were
18 auctioned off, I think you said the 18th of
19 September, 2008?
20    A    I did not know that at the time.  I
21 heard that afterwards.
22         MS. BLOOMER:  I would just remind the
23 witness not to disclose the substance of
24 communications --
25         THE WITNESS:  Right.

Page 49

Confidential - K. Raisler

1
2    A    I was not involved in any of that
3 process.  To the extent that Barclays was
4 involved, I just heard about it afterwards.
5    Q    Do you know whether anyone from
6 Sullivan & Cromwell was involved in that process?
7    A    I am virtually certain we were not.
8    Q    Other than the discussions you have
9 already testified to this morning, Mr. Raisler, do
10 you recall having any other discussion with the
11 Chicago Mercantile Exchange during the week of the
12 15th of September?
13    A    You know, I testified earlier that I
14 didn't recall conversations with them on that
15 Friday.  But as I -- as I reflect on it, I think I
16 did have a conversation with them on Friday.  In
17 particular, they had asked whether Barclays was
18 prepared to guarantee the customer positions of
19 Lehman over the weekend, 20th and 21st.  I don't
20 recall whether -- what exactly they said, if we
21 weren't prepared to guarantee them, what they
22 would do, but the clear implication was that they
23 needed that guarantee; otherwise, they could
24 potentially take action.
25         And we did -- I did consult with

Page 50

1              Confidential - K. Raisler
2    Barclays and we did -- I did communicate to the
3    CME sometime on Friday afternoon, the 19th, that
4    Barclays was prepared to guarantee the customer
5    positions of Lehman over the weekend.
6         Q     What do you mean by over the weekend,
7    Mr. Raisler? Were these positions being traded
8    over the weekend?
9         A     The positions do trade 24 hours a
10   day. And obviously given the volatility in the
11   markets, there could be substantial movements over
12   a weekend, where there is generally less liquidity
13   but still active mark to market trading.
14        Q     Did the CME also request of Barclays
15   that Barclays guarantee the trading on the 22nd of
16   September?
17        A     I think at the time that the
18   conversation on Friday was for the weekend, which
19   I would have assumed for the opening on Monday,
20   but the transaction was expected to be
21   accomplished so that by the opening on Monday the
22   positions would be the responsibility of Barclays.
23        Q     Were you involved, Mr. Raisler, in
24   creating any documents that relate to Barclays'
25   agreement to guarantee Lehman's customer positions

Page 51

1              Confidential - K. Raisler
2    over the weekend of the 21st and I guess the 20th
3    of September?
4         A     Curious, I don't recall preparing any
5    documents. I -- it could have been, I just don't
6    recall.
7         Q     To your knowledge, sir, was Barclay's
8    asked to guarantee any other of Lehman's customer
9    positions at any time between the 15th of
10   September and the closing of the transaction on
11   the 22nd?
12        THE WITNESS: I'm sorry, could I have
13        that read back, please.
14        (Record read.)
15        A     OCC made a similar demand -- I think
16   before the break I was not certain about
17   conversations with OCC that week, but I did have
18   conversations with OCC that Thursday and Friday,
19   in which they were insecure. Friday is actually
20   an expiration date for options, and they wanted to
21   make sure that the positions would be secured by
22   Barclays, again over the weekend, during the
23   settlement period. And here specifically customer
24   positions.
25        Q     With whom at the OCC or on whose

Page 52

1              Confidential - K. Raisler
2    behalf -- withdrawn.
3         Did you talk to someone within the
4    OCC, or was it their outside counsel?
5         A     Both. I would have spoken to Bill
6    Navin, who is the inside general counsel, and Jim
7    McDaniel at Sidley, who is their outside counsel.
8         Q     And as best you recall, sir, these
9    conversations took place on Thursday, the 18th of
10   September, and Friday, the 19th of September?
11        A     Correct.
12        Q     Was the demand made by the OCC for a
13   guarantee of customer positions at the OCC or firm
14   positions at the OCC or both?
15        A     My recollection, it was both.
16        Q     And did the demand, sir, to your
17   knowledge, relate only to the futures that were
18   cleared through the OCC or was it all positions
19   including equity options that were cleared through
20   the OCC?
21        A     It's interesting, because as of
22   Thursday and Friday, we were not aware that there
23   were any futures positions, so it would have been
24   at least in our thinking exclusively with respect
25   to the options positions.

Page 53

1              Confidential - K. Raisler
2         Q     When you say "we," sir, were not
3    aware of the futures positions, are you talking
4    about Sullivan & Cromwell or Barclays or anybody
5    representing Barclays?
6         A     Sullivan & Cromwell and Barclays were
7    not aware of any futures positions until I believe
8    Saturday, the 20th.
9         Q     How is it, sir, that you came to
10   learn about the futures positions at the OCC on
11   Saturday, the 20th of September?
12        A     I am waiting for her privilege
13   admonition.
14        MS. BLOOMER: Whether I object or
15   not, a standing objection for sure.
16        Q     And presumably a standing admonition
17   as well.
18        A     Conversations with Barclays.
19        Q     Since you were dealing with the
20   futures side of the transaction, sir, and you just
21   told me that Barclays and certainly you didn't
22   know about the futures positions at the OCC until
23   the weekend, can you tell me how it is you came to
24   have a conversation with Mr. Navin and
25   Mr. McDaniel a day or two prior to that about

1        Confidential - K. Raisler
2    their request that Barclays guarantee positions of
3    Lehman at the OCC?
4        A    It's a good question, actually.  It's
5    not really clear to me.  I think everybody was
6    sort of scrambling around.  I knew the people at
7    the OCC very well.  And I am -- I am assuming at
8    some point somebody asked me to reach out to them,
9    and that's why I did.  I don't recall specifically
10   sort of how that came to pass.
11       Q    Can you tell me, Mr. Raisler, as best
12   you can recall, everything about the conversations
13   you had with Mr. Navin and Mr. McDaniel about the
14   OCC's demand for this guarantee of Lehman's
15   positions, both customer and proprietary, at the
16   OCC?
17       MS. BLOOMER:  Objection to form.
18       A    My best recollection was that Friday
19   was an expiration date for options, that there was
20   very substantial volatility in the market,
21   particularly around equity and equity options
22   trading.  And it could even have been that OCC
23   reached out to me.  But that they were very
24   concerned that they were not getting good
25   information about the status of Lehman, and they

1        Confidential - K. Raisler
2    wanted comfort that they would not have to take
3    action themselves to either auction or liquidate
4    positions.
5        And so particularly rolling into
6    Friday, they wanted to make sure that there would
7    be performance on the options that expired, and
8    that there wouldn't be any shortfall come Monday.
9        Q    As I understood your earlier
10   testimony, Mr. Raisler, OCC asked Barclays whether
11   or not they would guarantee Lehman's trading.  Did
12   I understand your testimony correctly?
13       A    Right.  I think the word "trading" is
14   a little inaccurate at the end there.  It would be
15   basically whether Barclays would be prepared to
16   guarantee Lehman's obligations to the exchange and
17   its clearing house in the event there were any
18   shortfalls, and it would involve both customer and
19   proprietary.
20       Q    When was the OCC seeking to have that
21   guarantee in place with effect from?
22       A    I believe sometime on Friday.  I
23   believe the discussions preceded that, but I
24   believe sometime on Friday was what they were
25   looking for.

1        Confidential - K. Raisler
2        Q    Did you take that request back to
3    Barclays, sir?
4        A    I am sure I did.
5        Q    Do you remember whether or not you
6    communicated a response from Barclays back to the
7    OCC?
8        A    My best recollection is that I did,
9    and that I assured them that that would be
10   something that would be undertaken.
11       Q    Being as precise as possible, right,
12   in asking you, given all this happened about 18
13   months ago, can you tell me what it is that you
14   assured the OCC Barclays would do in respect of
15   their request to guarantee Lehman's obligations to
16   the OCC and the clearing house?
17       A    Again, my best recollection is this
18   time it was effectively memorialized in an
19   agreement.  I, myself, did not have direct
20   responsibility for the drafting of that agreement,
21   but the agreement reflected the terms of the
22   guarantee too.
23       Q    And that was a guarantee with effect
24   from the close of the transaction, sir, not prior
25   to the transaction?

1        Confidential - K. Raisler
2        A    I believe the request that was made
3    at the end of the week of the 15th was for the
4    opening of the 22nd, something quite similar to
5    what we talked about with the CME.
6        Q    Right.  As I understood your earlier
7    testimony, Mr. Raisler, you said that the CME
8    asked for a guarantee of trading over the
9    weekend --
10       A    Right.
11       Q    -- of the 20th and 21st; right?
12       MS. BLOOMER:  Objection,
13   mischaracterizes his testimony.
14       A    The -- what the CME was asking for
15   was, when they issued margin calls for the opening
16   on Monday, that if there were any shortfall, that
17   Barclays would be responsible for it.
18       I guess theoretically there could be
19   a margin call over the weekend, but since you
20   can't wire any money over the weekend, that would
21   be quite unusual.  So I think it was much more for
22   the opening on Monday.
23       And I heard the OCC to be sort of
24   asking for the same thing.
25       Q    Is the agreement that you referenced

Page 58

Confidential - K. Raisler

1  Confidential - K. Raisler
2  that memorialized the understanding between the
3  OCC and Barclays something that is known as a
4  transfer and assumption agreement?
5      A    That is correct.
6      Q    You are familiar with that term?
7      A    I am, yes.
8      Q    Have you seen the document that
9  memorializes the agreement between Barclays and
10  the OCC?
11     A    I have.
12     Q    Were you involved in negotiating
13  that, sir?
14     A    I was not. I was not specifically
15  involved in the drafting of it. I did communicate
16  to the various people the issues we discussed.
17     Q    Do you know who was negotiating the
18  TA? My question is not specifically Barclays.
19     A    Right.
20     Q    But if you know who was negotiating
21  on behalf of the OCC, Barclays or Lehman.
22     A    Well, certainly the same people on
23  behalf of the OCC. I believe that Navin actually
24  signed it.
25         On behalf of Barclays, I believe it

Page 59

1  Confidential - K. Raisler
2  was handled more by Cleary, but I don't have a
3  specific recollection of the details of that.
4         And for Lehman, I am not really sure.
5      Q    You testified before the break,
6  Mr. Raisler, that you understand that a business
7  decision by Barclays to purchase the futures
8  business was made around the 16th or 17th of
9  September, 2008; is that correct?
10     A    Yes, that is my understanding.
11     Q    Do you know, sir, what information
12  Barclays had about the nature and extent of
13  customer positions and any associated collateral
14  at the time it made that business decision?
15         MS. BLOOMER: I am going to object
16     and make sure the witness is clear he's not
17     to disclose the substance of communications
18     with Barclays.
19     A    I do know that the information was
20  very imprecise. I also know that the positions
21  were very large.
22     Q    Beyond that answer, are you able to
23  provide any additional information in response to
24  my question?
25         MS. BLOOMER: Objection to form.

Page 60

1  Confidential - K. Raisler
2      A    Well, I mean I have already testified
3  that we knew to a large extent some of the
4  exchanges on which the trading occurred, and on
5  those exchanges proprietary versus customer, so,
6  you know, we had more information, I could
7  elaborate by the testimony I have given to this
8  point.
9      Q    Other than the positions --
10  withdrawn.
11         Other than the exchanges on which
12  these positions were held, do you have any
13  information that -- about the information Barclays
14  had at the time the business decision was made to
15  purchase the futures business from Lehman as to
16  the nature and extent of the customer positions
17  and any associated collateral?
18         MS. BLOOMER: Objection to form.
19     And, Neil, I assume you are not expecting
20     him to repeat everything he's already told
21     you this morning.
22         MR. OXFORD: No.
23         MS. BLOOMER: Okay.
24     A    The question is a little hard to
25  follow, so, I am going to ask you, if you could,

Page 61

1  Confidential - K. Raisler
2  to maybe break it down for me a little bit.
3      Q    Yes.
4      A    Okay.
5      Q    Leaving aside the identity of the
6  exchanges on which positions were held, at the
7  time Barclays made the business decision to
8  acquire the futures business of Lehman, do you
9  know what information Barclays had about the size
10  of the customer positions and the size of the
11  collateral that is associated with those
12  positions?
13     A    I think at the highest level that
14  information was known. Also, to the extent that
15  at that time we were not aware from Lehman of any
16  defaults on any of the exchanges on which they
17  were trading, one could conclude that whatever the
18  margin and collateral was, was adequate at that
19  moment in time to meet the exchanges' demands.
20     Q    When you say, Mr. Raisler, at the
21  highest level that information was known, are you
22  able to be more precise about the -- the nature
23  and extent of the customer positions, the size of
24  those positions and the collateral associated with
25  those positions?

Page 62

Confidential - K. Raisler

1
2      MS. BLOOMER:  Objection to form.
3      A     I think there were some general
4  discussions about the types of customers that
5  Lehman had.  I think there was some general
6  discussions about the size of the positions,
7  although I never saw any breakdowns of that.
8          I think there were some general
9  discussions about the amount, global amount of
10  collateral, but I couldn't tell you how much of
11  that was where at various points in time.
12     Q     Same question with respect to the
13  proprietary positions.  At the time Barclays made
14  the business decision to acquire Lehman's futures
15  business, do you know what information Barclays
16  had about the size of those proprietary positions
17  and the associated collateral?
18     A     My sense is that information was less
19  precise than the customer positions, but also
20  similarly high level.
21     Q     Do you believe, Mr. Raisler, that
22  Barclays was able to make a similar conclusion as
23  to the one that you believe was possible in
24  relation to the customer business, that there was
25  sufficient collateral to secure those positions?

Page 63

Confidential - K. Raisler

1
2      MS. BLOOMER:  Objection to form.
3      A     Yes, to be clear, I don't think I
4  said that there was sufficient collateral to
5  secure the positions.  All I said was that at a
6  point in time, which would be each day when the
7  exchange marks the positions, that there had not
8  been any defaults.  The adequacy of the collateral
9  to deal with what transpires or is going to
10  transpire the next day would be unknown.
11          So all I would comment on is that in
12  a retrospective way, open of business on the 16th,
13  open of business on the 17th, there was from the
14  exchange's position sufficient collateral to avoid
15  a default, and I believe that would be true for
16  the proprietary positions as well, to the extent
17  we had a handle on it.
18     Q     You described I think very well how
19  one meeting that week rolled into another meeting
20  which rolled into another meeting, sir.  Do you
21  have any specific recollections of meetings that
22  you had participated in on the 16th of September,
23  or conference calls that you had on that date?
24     A     I think that after the meeting on the
25  16th, I think most of my work that week is

Page 64

Confidential - K. Raisler

1
2  blurred, as I was seeking information and
3  reporting back information about contacts with
4  exchanges and contacts with the regulators.
5      Q     Do you recall sitting in any other
6  meetings in conference rooms with Lehman
7  individuals?
8      A     My recollection is that those kinds
9  of meetings were sort of going on throughout the
10  week, and that I would be in those meeting and out
11  of those meetings during the course of the week.
12     Q     Other than the individuals you
13  identified towards the beginning of the deposition
14  who were in the meeting on the 15th, sir, do you
15  remember being in meetings about this, this topic,
16  Barclays' acquisition of the Lehman's futures
17  business, with any other individuals either on the
18  Lehman's side or the Barclays side?
19     A     That remained the least cast.  I know
20  that there were a lot of other people in the room
21  during the course of the week, but it's blurred
22  and I don't remember distinctly other particular
23  people.
24     Q     You understand, Mr. Raisler, that the
25  sale hearing in this matter took place in the

Page 65

Confidential - K. Raisler

1
2  bankruptcy court in the bankruptcy court in
3  Bowling Green on the 19th of September?
4      A     I do understand that.
5      Q     Were you present at that, sir?
6      A     I was not.
7      Q     Where were you on the 19th?
8      A     Most likely in my office, doing most
9  of this work by phone.
10          It's possible there was another
11  meeting up at Lehman or Barclays that day as well.
12     Q     Is it fair to say, Mr. Raisler, that
13  from the time you were first involved on the
14  evening of the 14th of September until the
15  transaction closed on the 22nd, that you were
16  working exclusively or almost exclusively on this
17  matter?
18     A     I would doubt that.  I mean, that is,
19  not generally, but I would say this would
20  certainly have been my most significant engagement
21  that week.  I am sure not everything else I was
22  doing stopped.  So it would be substantial but not
23  by any means all.
24     Q     Did you continue to work on this
25  matter through the weekend of the 20th and 21st of

Confidential - K. Raisler

1              Confidential - K. Raisler
2   September?
3      A   I did.
4      Q   Were you in your office or at
5   Lehman's office?
6      A   I know there were a lot of phone
7   calls over the weekend.  I don't recall any
8   specific meetings.
9      Q   Did you have any conversations,
10  Mr. Raisler, with any regulators of Lehman's
11  futures business?  And to give you the time frame
12  initially, my question is directed towards when
13  you were first engaged on the 14th through the
14  closing of the transaction on the 22nd.
15     A   Yes.  I mean I would have had
16  extensive discussions with the Commodity Futures
17  Trading Commission, which we call the CFTC,
18  throughout the week.
19      I also likely had conversations with
20  other regulators, but it would have been more
21  sporadic.
22     Q   Which other regulators, sir?
23     A   Probably the FSA in the U.K.
24  Potentially the Canadian regulators in Toronto.
25      I believe there were some

1              Confidential - K. Raisler
2  communications as well with the Japanese
3  regulators, although that would have been by
4  e-mail rather than by phone.
5     Q   For what purpose, Mr. Raisler, were
6  you engaged in discussions with the CFTC?
7     A   In two broad areas.  One was to keep
8  them up-to-date on what was transpiring with
9  respect to the transaction, as they had their own
10  insecurities and their own responsibilities.
11      And two was to negotiate a bulk
12  transfer order that would allow the positions to
13  be moved from Lehman to Barclays in the event of a
14  Lehman bankruptcy.  And in this regard, I am
15  referencing LBI.
16     Q   Whom at the CFTC did you deal with
17  that week, sir?
18     A   There would have been a number of
19  people, but the primary contact would have been an
20  individual named Bob Wasserman.
21     Q   Do you remember the names of the
22  other individuals who you would have dealt with
23  that week?
24     A   I would have spoken as well to -- and
25  I will let somebody else deal with the spelling of

1              Confidential - K. Raisler
2  this one -- Ananda Radhakrishnan, is the person to
3  whom I addressed a letter.
4     Q   R-A-D-H-A-K-R-I-S-H-N-A-N.
5     A   That sounds perfect.  It certainly
6  would have been the way I would have spelled it if
7  I was called upon to do so.
8      John Lawton also in that division.
9      Likely some folks from the general
10  counsel's office.  Perhaps also somebody from the
11  chairman's office.
12     Q   Can you tell me, Mr. Raisler, what
13  the respective roles were of Mr. Wasserman,
14  Mr. Radhakrishnan, and Mr. Lawton?
15     A   They all work in the same division.
16  Radhakrishnan is the head of the division of
17  clearing and intermediary oversight.  Wasserman
18  and Lawton work for Radhakrishnan.  Wasserman's
19  specialty is bankruptcy.
20     Q   What were the insecurities that the
21  CFTC had?
22     A   They wanted to be sure that there was
23  not going to be a default in the performance of
24  Lehman, either in its proprietary or in its
25  customer accounts, and they also, simply put, had

1              Confidential - K. Raisler
2  the same insecurities that the clearing houses
3  did.
4     Q   You also mentioned that the CFTC had
5  its own responsibilities, sir.  What did you mean
6  by that?
7     A   As an agency responsible for
8  supervising the futures markets, they want to make
9  sure that the markets continue to operate
10  efficiently, and their concerns on -- with respect
11  to performance, are from their point of view
12  concerns that relate directly to them in addition
13  to relating to the exchanges and the clearing
14  houses.
15     Q   Did you have any conversations, sir,
16  about what, if anything, the CFTC was doing to
17  satisfy itself that there would not be a default
18  relating to Lehman's proprietary customer
19  accounts?
20     A   Basically the CFTC would get its
21  information from the exchanges, so, they would be
22  in constant contact with the exchanges to get
23  whatever information they could.  The exchanges
24  have separate responsibilities, but the CFTC could
25  encourage them to take action if they thought it

Page 70

Confidential - K. Raisler

1  was appropriate to do so.
2       Q     Do you know whether or not,
3  Mr. Raisler, the CFTC had anybody on-site at
4  Lehman's offices in the week or weeks running up
5  to the closing of the transaction?
6       A     I believe they had some people come
7  in at some point that week, but I don't have a
8  good recollection of it.
9       Q     By that week, do you mean the week
10 beginning the 15th of September?
11      A     Correct.
12      Q     Do you have any understanding of the
13 purpose for which the CFTC's employees were
14 present on-site at Lehman that week?
15      A     They would as a routine matter want
16 to look at books and records and make sure that
17 things were in order and that they could get a
18 handle on what was going on. I don't recall them
19 doing that, but it certainly would not have been
20 illogical for them to have been on-site.
21      Q     When did you first speak to anyone at
22 the CFTC in connection with this matter?
23      A     Probably Monday the 15th, the latest
24 Tuesday the 16th.
25

Page 71

Confidential - K. Raisler

1       Q     Do you remember whether you reached
2  out to them or they reached out to you?
3       A     I probably most likely would have
4  reached out to them, because they wouldn't have
5  most likely known to have reached out to me.
6       Q     Do you remember who was reached out
7  to? Was it Mr. Wasserman?
8       A     It probably would have been Ananda,
9  because I wouldn't have assumed who he would have
10 assigned responsibilities to.
11      Q     Can you tell me as best you can what
12 you remember about that conversation with Ananda.
13      A     My best recollection, and it's not
14 very precise, would be that I would have called
15 him, told him that we had been engaged by Barclays
16 to assist in this possible transaction, and that
17 my responsibility was to keep them informed to the
18 extent I had information, and that if they needed
19 anything from Barclays, to contact me, and that
20 one of the things we would be looking at if the
21 deal went forward was some kind of a blessing from
22 the Commission endorsing the transfer, so I would
23 be back to him to discuss that.
24      Q     And do you recall, sir, what the
25

Page 72

Confidential - K. Raisler

1  response was from the CFTC in -- in response to
2  that overture?
3       A     I am sure it was the usual formal
4  appreciation of the contact, and the, the
5  indication that we would be sure to have further
6  conversations.
7       Q     What is the next contact you recall
8  with the CFTC?
9       A     Again, there is a blurring here, but
10 I probably would have had a dozen or more contacts
11 with them during the course of the week.
12      Q     Were those contacts primarily with
13 Mr. Wasserman?
14      A     Yes, although oftentimes there were
15 others on the phone with him.
16      Q     And what was the purpose,
17 Mr. Raisler, of your continuing contact with the
18 CFTC that week? Was that to update them on the
19 transaction as it progressed, to your
20 understanding?
21      A     Twofold, as I indicated earlier. One
22 is to update on the transaction, and to basically
23 touch base about that, and the second was to
24 discuss with them the bulk transfer order.
25

Page 73

Confidential - K. Raisler

1       Q     You said you also had conversations
2  you believe with the FSA in the U.K.?
3       A     Correct.
4       Q     Can you tell me why that was?
5       A     I think basically the same thing. To
6  the extent that Lehman had positions in the U.K.
7  that potentially were going to be taken over by
8  Barclays, I just wanted to make sure that they
9  knew that I was the point person for
10 communications.
11      I must say, as I am sitting here
12 today, I don't remember having detailed or
13 extensive conversations with them. It might have
14 been just one or two quick calls.
15      Q     Do you remember who at the FSA you
16 spoke to?
17      A     It might have been Gavin Hill. I am
18 not sure.
19      Q     To your knowledge, sir, did Barclays
20 negotiate a bulk transfer order or agreement with
21 the FSA as it did with the CFTC?
22      A     No, we did not. There was no
23 requirement for that in the U.K.
24      Q     Mr. Raisler, do you know what

Page 74

Confidential - K. Raisler

1  happened to Lehman's positions in the U.K.?  Were
2  they actually transferred to Barclays?
3      A    I am not sure.
4          MR. LACY:  Let me object to the form
5  of the question.
6      A    I am not sure.  I don't -- as I sit
7  here today, I don't know.
8      Q    The positions that Lehman had in the
9  U.K., do you know whether they were cleared
10  through a Lehman affiliate?
11      A    My recollection is they would have
12  been cleared through a Lehman affiliate, yes.
13      Q    Was that affiliate LBIE?
14      A    That is my best recollection.
15      Q    Do you have any recollection of any
16  contact with a Canadian regulator?  I think you
17  said you --
18      A    Right.
19      Q    -- potentially had contact.
20      A    Here again, it's somewhat vague.  I
21  believe I might have.  I don't remember who I
22  would have reached out to there.  That is quite
23  vague.
24      Q    What is the name of the Japanese

Page 75

Confidential - K. Raisler

1  regulator that you reached out to by e-mail?
2      A    It would have been the MOF, Ministry
3  of Finance.
4      Q    And for what purpose were you
5  reaching out to the Ministry of Finance?
6      A    Same purpose.  It is possible that
7  rather than reaching out to them directly, we
8  contacted the CFTC and asked the CFTC to reach out
9  to them, because I don't recall any specific
10  e-mails.  But I certainly, I certainly did not
11  speak to them.  That I would have remembered.
12      Q    Turning to your declaration for a
13  moment, Mr. Raisler, that is Exhibit 658-A, if you
14  turn to the second page, there is a sentence that
15  begins, "I recall," in the first line.
16          Do you see that?
17      A    Right.
18      Q    You write, "I recall that during
19  those meetings and telephone conferences, Barclays
20  was unable to get detailed information concerning
21  LBI's futures business for a number of reasons,
22  both technical and practical."
23          Do you see that?
24      A    Yes.

Page 76

Confidential - K. Raisler

1      Q    I think we may have covered some of
2  this already.  I am not trying to retread ground
3  we have already gone through, but I want to make
4  sure that I have the -- your complete
5  recollection.
6          What did you mean by the technical
7  reasons that you referenced in your declaration?
8      A    I think that the systems information
9  was not readily available, particularly where it
10  was trading through affiliates.  That we were
11  not -- there weren't any -- there were requests
12  for it, but there weren't any reports about
13  positions that were made available.
14          So, I think that was sort of a
15  systems breakdown problem.
16      Q    Do you know, Mr. Raisler, who at
17  Barclays asked for this information and who at
18  Lehman they asked?
19      A    I believe these were general
20  questions raised at these meeting we were having
21  with the group around the table to get position
22  reports and the like.
23      Q    You also reference practical reasons
24  that Barclays was unable to get detailed

Page 77

Confidential - K. Raisler

1  information about the futures business.  What did
2  you mean by that?
3      A    I guess broadly stated, the market
4  was in substantial turmoil during that time
5  period.  Positions were changing relatively
6  rapidly.  Particularly in the foreign markets,
7  there were rumors that positions were being taken
8  over, liquidated.
9          So, in a practical sense, there was
10  just chaos and resource constraints that were
11  driving the lack of information flow.
12      Q    You go on in the next sentence to
13  describe the obstacle to information sharing that
14  stands out most in your mind as the problems with
15  the LBI books and records.
16          Do you see that?
17      A    Yes.
18      Q    You then go on to say in the next
19  sentence, "My recollection is that due to these
20  and other issues, the discussions during these
21  meetings and calls were had at a very high level,
22  all relating generally to LBI's proprietary
23  positions and collateral, the customer segregated
24  and secured accounts through which LBI conducted

Confidential - K. Raisler

1                  
2  that business, and the customer accounts that
3  related to that business."
4         Do you see that?
5     A   Yes, I do.
6     Q   At the start of that sentence, you
7  refer to other issues.  What did you mean by that,
8  sir?
9     A   Well, depending on what we mean by
10 technical and practical, there were some
11 situations where information was just not
12 delivered, and an example of that is with this VIX
13 position on the CFE that we didn't learn about
14 until Saturday, the 20th, even though it had been
15 on the books the entire week.
16       I mean, I don't believe -- just to be
17 clear, I don't believe anybody was withholding
18 information from us per se, but information was
19 not getting to us, and this was a proprietary
20 position and a relatively significant one that was
21 just not disclosed.
22    Q   Were you referring to anything else,
23 sir, when you referenced the other issues in your
24 declaration?
25       MS. BLOOMER:  Objection to form.

Confidential - K. Raisler

1
2     A   I think there were other issues with
3  foreign markets of just not -- information just
4  not flowing in terms of where they had positions
5  and accounts, which may go beyond technical and
6  practical.
7     Q   You reference in that same sentence,
8  sir, the customer segregated and secured accounts.
9  Can you tell me, please, what those are?
10    A   Customers that trade in the U.S.
11 futures markets have collateral that they post.
12 That collateral is held pursuant to CFTC
13 regulation in a segregated account, segregated
14 from the proprietary assets of the futures
15 program.
16       If a customer wishes to trade in a
17 non-U.S. futures market through a U.S. broker,
18 generally, the funds will be held in a secured
19 account, which is a separate account from the
20 segregated account, but an account that also has
21 significant protection from the liabilities of the
22 futures broker or its affiliates.
23    Q   Do I understand from your answer,
24 Mr. Raisler, that there is a difference in the
25 degree of protection from liabilities of the

Confidential - K. Raisler

1
2  broker for the customer collateral in the
3  segregated and the secured accounts?
4     A   This has never really been tested in
5  a court situation, but I think most people would
6  agree that both of them are entitled to
7  substantial protection, but that segregated
8  positions are probably a bit more protected than
9  secured positions.
10    Q   And can you explain a little more
11 with respect, firstly, to the segregated and then
12 the secured accounts, how that, how that actually
13 works?  If a customer of Lehman provides
14 collateral to Lehman, where is that held?
15    A   There are really two --
16       MS. BLOOMER:  Objection, lacks
17    foundation.
18    A   There are two locations for the
19 holding of customer funds.  One would be at a bank
20 account of the futures broker, labeled customer
21 segregated account.  It would be an aggregate
22 account holding the segregated funds of all of the
23 customers of that broker.  And the bank holding
24 those segregated funds would pledge to the broker
25 that it was holding the accounts in segregation

Confidential - K. Raisler

1
2  pursuant to CFTC rules and could not use any of
3  that money to meet any of the obligations of the
4  futures broker or its affiliates.
5        The second location would be in a
6  customer segregated account in the name of Lehman,
7  in this case, held at the clearing house.
8     Q   And would the customer segregated
9  account, Mr. Raisler, have the same protection by
10 way of a pledge as the bank account would?
11    A   Yes.  And in fact, it wouldn't be
12 surprising that the clearing house has a clearing
13 bank where it keeps the money, and so the same
14 basic representations apply.
15    Q   I see references to 30.7 accounts.
16    A   30.7 refers to the secured, not the
17 segregated account regime.
18    Q   And that is for non-U.S. futures
19 markets; correct?
20    A   Correct.
21    Q   Is there a similar designation or
22 number that refers to the segregated accounts?
23    A   Generally it's referred to as either
24 4d, four small d, which is the statutory
25 provision, or 1.20, one point two zero, who is the

Page 82

1      Confidential - K. Raisler
2  regulatory provision.
3      Q    Taking Lehmans as our example, would
4  Lehman own the assets in the -- either the bank
5  account or the customer segregated account held at
6  the clearing house?
7          MS. BLOOMER:  Objection, vague as to
8      time frame, and lacks foundation.
9      A    I think actually absolutely the
10 opposite.  These would be recognized as assets to
11 secure the obligations of the customers, and they
12 would not be the assets of Lehman Brothers in your
13 example.
14         I guess it's necessary to put a small
15 caveat on that, which is, as we discussed
16 earlier -- I don't want to rehash what we
17 discussed earlier, but Lehman and/or a futures
18 broker typically would have some of its own assets
19 in the segregated account as a buffer to avoid
20 concerns at the clearing house that intraday or
21 daily margins can't be met.
22     Q    And are you making a distinction as
23 to who owns the buffer assets, as you have
24 described them, and the assets that are held to
25 secure the obligations of customers?

Page 83

1      Confidential - K. Raisler
2          MS. BLOOMER:  Objection to the form
3      of that question.
4      A    Correct.  If there were to be a
5  default, all of those assets would be deemed to be
6  part of the customer estate and would be used by
7  the customers before the excess, if there were
8  any, were to be returned to the broker.
9          However, if there were not to be a
10 default, and the business were to be wound down,
11 hypothetically, that buffer money could be
12 returned to the broker.
13     Q    I think I got your last answer, and I
14 appreciate that.  I just want to make sure that we
15 are not talking past each other.
16         The assets of the broker dealer, that
17 the broker dealer puts into such a segregated
18 account as a buffer for intraday trading, as you
19 describe, would you consider those to be the
20 assets of the broker dealer rather than of
21 customers?
22         MS. BLOOMER:  Objection to the form
23     of the question.
24     A    Two comments there.  One is, it's not
25 just for intraday.  It would just generally be to

Page 84

1      Confidential - K. Raisler
2  complete margin calls as they occur.
3          As I indicated, it's a bit of a
4  hybrid.  If there were to be a default, that money
5  would be used by the exchange or the CFTC
6  administering that default as an asset for the
7  benefit exclusively of the customers, and only if
8  there were, if there was some money left over,
9  could it be potentially returned, but if there
10 were not a default, and if it were just to be sort
11 of shut down the business, buffer money might be
12 identified as separate monies that would go back
13 to -- assuming everything else gets paid out, that
14 would go back to the FCM.
15     Q    I think I understand that.  Thank
16 you.
17         Is it correct then to say that to
18 your understanding, sir, the -- someone other than
19 the broker dealer, in this case Lehman, has an
20 interest in the assets in the segregated account?
21         MS. BLOOMER:  Objection to form.  Did
22     you say other than the broker dealer, in
23     this case Lehman?
24         MR. OXFORD:  Yes.
25         MS. BLOOMER:  Objection to the form

Page 85

1      Confidential - K. Raisler
2  of the question.
3      A    Just for clarity, since this probably
4  comes up a number of times, your reference to the
5  broker dealer I don't object to except for the
6  fact that it's both a joint broker dealer and a
7  futures commission merchant, and it's only in its
8  capacity as a broker dealer that this issue comes
9  up.
10         But I think the answer to your
11 question is yes.
12     Q    And is it a particular exchange or
13 clearing organization that has an interest in the
14 segregated account?
15     A    It's the customers as a whole, as a
16 group in aggregate form that have an interest in
17 that account.
18     Q    Would, for example, the CME be able
19 to draw down from a customer seg account?
20         MR. LACY:  Perhaps -- I suppose it's
21     an objection.  But the two of you are -- I
22     am not sure you are both using the same
23     understanding of the word "interest."
24     Perhaps if the question could be more
25     detailed about what an interest means.

Page 86

Confidential - K. Raisler

1
2     Q     By interest, I mean any rights to.
3     A     The clearing house and the exchange
4   have no rights to any assets except -- well, to
5   any assets period.
6         In administering a default, they
7   would take over positions and use assets in a
8   segregated account to meet market-related demands,
9   but it shouldn't be implied that the clearing
10  house can put money in its pocket.
11    Q     Right.  I think I understand, then.
12  Thank you.
13        So, other than in the event of a
14  default by the FCM, the clearing house has no
15  ability to draw down money for variation margin or
16  initial margin, for example, from a customer seg
17  account; is that correct?
18        MS. BLOOMER:  Objection to form.
19    A     No, that is not correct.  I mean I
20  think, we have to go back a little bit to first
21  principles.  Basically the segregated account is
22  there to meet the daily requirements of the
23  customers as a whole to the clearing house, and so
24  the clearing house routinely will be drawing down
25  to meet the market-based obligations of the

Page 87

Confidential - K. Raisler

1
2   customers as a whole, and that will happen daily.
3     Q     And does the clearing house have a
4   right to draw down an unlimited amount from the
5   segregated account?
6     A     To the extent that it's needed to
7   meet obligations of the clearing house, yes.
8     Q     You said obligations of the clearing
9   house.  Did you mean obligations of customers?
10    A     Obligations of the FCM's customers to
11  the clearing house.
12        And I think it's also important to
13  recognize that there is a default scenario which
14  we have been speaking to, but there is also the
15  ability of the exchange, if it has insecurity, to
16  take action as well.
17    Q     And what would that action be, sir?
18    A     That action would be similar to the
19  action that they took with respect to the
20  proprietary positions at the CME.  They could
21  direct some positions to be moved to another
22  futures broker.  They would need the CFTC to
23  assist them to make that happen.
24        Or they could direct that the trading
25  be for liquidation only, or they could literally

Page 88

Confidential - K. Raisler

1
2   take over the accounts and liquidate them
3   themselves.
4     Q     Is there any requirement that an FCM
5   maintain a buffer or an excess in a segregated
6   account, or is it simply common practice?
7     A     It -- it's common practice.  The
8   legal requirement for the FCM is it has to
9   maintain net capital.  That net capital is part of
10  its capital structure, not necessarily money that
11  it puts into a segregated account.  The net
12  capital requirements are a percentage of the funds
13  in segregation.
14    Q     So would it be accurate to say that
15  an FCM could withdraw any excess in the segregated
16  account at any time?
17    A     I think it could withdraw money that
18  it had put up as its buffer, provided the exchange
19  did not have any insecurity, in which case the
20  exchange would not let them do that.
21        And I'm sorry, when I refer to
22  exchange there, I may be referring to the clearing
23  house.  The two are interchangeable when you are
24  dealing with something like the CME.
25    Q     Would the exchange or clearing house,

Page 89

Confidential - K. Raisler

1
2   Mr. Raisler, have a right to draw down money on a
3   daily or perhaps intraday basis not only from the
4   segregated account that is held at the clearing
5   house, but if there are separate bank accounts
6   that are held by the FCM, which is I think the
7   first example you gave, would the clearing house
8   also have a right to draw down monies from that
9   account?
10    A     Yes.
11    Q     Turning to the world then of secured
12  accounts, which I think you described as non-U.S.
13  futures markets cleared through a U.S. broker.
14    A     Correct.
15    Q     Can you tell me, sir, whether or not
16  the rights of the clearing brokers or exchanges
17  ex-U.S. are any different than the rights of the
18  exchanges or clearing houses in the U.S. under the
19  segregated accounts?
20        MR. LACY:  Can I just stop for a
21  moment and say that you are using someone
22  who is supposed to be a fact witness
23  basically to give you a lecture on
24  commodities regulations.
25        All of this stuff is available in the

## Page 90

Confidential - K. Raisler

1  rules for you to look up yourselves, so I
2  hope this will not go on all day, and I
3  don't think it's fair to the witness
4  basically to make him take the day off of
5  work for his other clients to explain this
6  all to you.
7        Obviously we are happy to go on for a
8  while, but this should not be the day's
9  work.
10     A    The -- in structure and concept, the
11  answer should be yes.  However, each foreign
12  clearing house has its own rules, and therefore,
13  each one of these secured amount and secured
14  account situations would have to be evaluated
15  based on the rules of each of the markets.
16     Q    To your knowledge, Mr. Raisler, did
17  Lehman as an FCM calculate the amount of money in
18  its customer segregated and secured accounts on a
19  daily basis?
20        MS. BLOOMER:  Objection, lack of
21  foundation.
22        MR. LACY:  Object to the form as
23  well.
24     Q    And my question is specifically

## Page 91

Confidential - K. Raisler

1  directed towards the time period when you were
2  involved, sir, from the 15th onwards.
3     A    It would be effectively required to
4  do so by regulation.
5     Q    And would the calculation that Lehman
6  performed that week show whether or not there was
7  any excess in the segregated and secured accounts
8  for customers over and above that which was
9  required under regulation to be held?
10        MS. BLOOMER:  Objection to the form.
11  It lacks foundation.
12     A    I think it's important to just stop a
13  moment here and talk about the word "excess," and
14  particularly talk about it in the context of what
15  was going on in the week of September 15th.  Given
16  the amount of volatility in the market, not just
17  for Lehman, but for any futures broker that week,
18  you wouldn't -- you would know at a snapshot in
19  time, that is when the end of day, which as we
20  indicated these markets trade 24 hours, but there
21  is an arbitrary end of day calculation done where
22  the position is marked to market, I believe
23  typically at 3:30 or 4 p.m.
24        By the time you have run that

## Page 92

Confidential - K. Raisler

1  calculation, which would be sometime thereafter,
2  usually several hours, you wouldn't know at that
3  point whether you were actually in line and know
4  where you stood with respect to excess versus
5  required capital to meet obligations.
6        So, theoretically I would answer your
7  question yes, but practically, particularly in a
8  volatile market, the answer is no.
9     Q    Is it your understanding,
10  Mr. Raisler, that Lehman was required to perform
11  segregated and secured calculations on a daily
12  basis?
13        MS. BLOOMER:  Objection to the form,
14  foundation.
15     A    That is correct, yes.
16     Q    And they were required to perform
17  those calculations by a particular time each day;
18  is that correct?
19     A    Not really.
20        MS. BLOOMER:  I am just going to --
21  before you answer, I'm going to object, and
22  I am just going to -- are you asking for his
23  legal opinion on what Lehman was required to
24  do?

## Page 93

Confidential - K. Raisler

1        MR. OXFORD:  I'm asking if he knows.
2        MS. BLOOMER:  You are asking him what
3  is required.  Do you mean legally required
4  under a regulation?  Is that what you are
5  asking him?
6        MR. OXFORD:  I'm asking him if he
7  knows the answer to the question.
8     A    To my knowledge, there was no
9  specific time of day required.
10     Q    Do you know whether or not the
11  segregated and secured calculations were
12  scrutinized during the week of the 15th, sir, by
13  the CFTC?
14     A    I do not know.
15     Q    Did you ever see any customer
16  segregated and secured account calculations as
17  part of the investigation or the due diligence,
18  however you describe it, as part of your work
19  prior to the closing of the transaction on the
20  22nd?
21     A    I did not.
22     Q    Did you ask to see any segregated,
23  customer segregated and secured calculations?
24     A    I don't recall doing so.

Page 94

1       Confidential - K. Raisler
2       Q      Do you know whether or not anybody at
3  Barclays asked for that information?
4            MS. BLOOMER:  Objection to form and
5        foundation.
6       A      I believe that was one of the topics
7  that was discussed in the meetings early in the
8  week.
9       Q      Do you know whether or not that the
10 results of the seg and secured calculations were
11 provided to Barclays at any time during the week
12 of the 15th?
13      A      I believe some information was
14 provided.  My recollection is it was at a high
15 level.
16      Q      Can you be more specific about what
17 you mean by a high level?
18      A      I believe that aggregate numbers were
19 provided.
20      Q      And what information would be
21 included in those aggregate numbers, again
22 specifically with respect to the customer
23 segregated and secured accounts of Lehman in the
24 week of the 15th?
25      A      My recollection is some numbers were

Page 95

1       Confidential - K. Raisler
2  thrown out as to what the amount of seg and the
3  amount of secured were at various times, but they
4  were always going to be out of date by the time we
5  received them.
6       Q      Why would they be out of date, sir?
7       A      Because whenever they reported them,
8  they would be several hours at a minimum after the
9  actual mark to market times, and the markets were
10 moving rapidly, so they were retrospectively
11 reliable, but current time not.
12      Q      To your understanding, sir, did
13 Barclays have information about the seg and
14 secured calculations at more than one point over
15 the week of the 15th?
16            MS. BLOOMER:  I am going to object to
17        the question as to vagueness of the term
18        calculation.  Just so you are not talking
19        past each other, are you asking him about
20        the calculation meaning the requirement or
21        the actual balance in the accounts at any
22        given point?  I think there may be some
23        confusion.
24            MR. OXFORD:  That is a fair
25        objection.

Page 96

1       Confidential - K. Raisler
2       Q      My questions, Mr. Raisler, are
3  directed to trying to find out what information,
4  if any, Barclays had about, on the one hand, the
5  required amount that Barclays -- sorry, Lehman was
6  obligated to have in the customer segregated and
7  secured accounts, and how much Lehman actually had
8  locked up compared with that obligation.
9       A      My recollection, and it is not very
10 precise, is that the numbers that were thrown
11 around were the total balances, not any breakdown
12 about the required versus other amounts.
13      Q      Do you know whether or not Barclays
14 knew at any time prior to the closing of the
15 transaction, sir, whether or not Lehman had locked
16 up in its customer segregated and secured accounts
17 sufficient assets to meet its obligations to those
18 customers?
19            MR. LACY:  I am going to object to
20        the form of that question.
21      A      I think I testified about this
22 earlier.  All I could say is that up until the
23 time of the closing, there had not been a default,
24 but that doesn't tell you whether -- you know,
25 what would be adequate under the circumstances,

Page 97

1       Confidential - K. Raisler
2  because of the market's rapid changing of
3  positions.
4       Q      My question is not directed towards
5  any defaults post closing, Mr. Raisler.  My
6  question is whether or not Barclays knew whether
7  or not Lehman was in compliance with its
8  obligations under the CFTC regulations with
9  respect to the amount of collateral it had locked
10 up in its customer segregated and secured
11 accounts.
12            MS. BLOOMER:  Objection.
13            MR. LACY:  Object to the form of the
14        question.
15      A      It was my understanding during the
16 course of the week of the 15th that there were, in
17 total, in the segregated and secured accounts
18 monies sufficient to meet the margin calls that
19 the exchanges had imposed on those accounts.
20            That does not specifically answer
21 your question as to whether there was adequate
22 collateral in those accounts.
23      Q      Did you ask anyone at Lehman whether
24 or not there was adequate collateral in those
25 customer segregated and secured accounts to meet,

Page 98

Confidential - K. Raisler

1  first of all, the requirement under the CFTC
2  regulations?
3     A    See, no one could know that.  That is
4  the sort of -- I mean absent -- given the
5  volatility of the market and the uncertainty of
6  the market, that is always going to be an unknown,
7  more dramatically unknown when the markets are
8  moving rapidly.  In this context it was made
9  emphatically unknown because we weren't getting
10 complete information about positions.
11    MR. OXFORD:  Do we want to take a
12 five-minute break?
13    THE WITNESS:  Sure.
14    (Recess taken.)
15    (Exhibit 659-A marked for
16 identification as of this date.)
17    MR. OXFORD:  Back on.
18    Q    Mr. Raisler, I have handed you what I
19 have marked as Exhibit 659-A.  If you could take a
20 moment to review that and let me know when you are
21 done, please.
22    In the meantime, I will just identify
23 that for the record as an e-mail with the Bates
24 number BCISC 00009676, and the document goes

Page 99

Confidential - K. Raisler

1  through 9688.
2     MR. LACY:  Can you make out the
3  highlighting?
4     THE WITNESS:  Yes.
5     MS. BLOOMER:  This highlighting?
6     MR. LACY:  Just so we are all on the
7  same page, the first attachment to this is a
8  comparison with highlighted material, and
9  it's extraordinarily difficult to see what
10 is highlighted on the copy.
11    THE WITNESS:  I am not even sure that
12 is the case, but --
13    MR. LACY:  Well, the description on
14 the attachments.
15    THE WITNESS:  The third one.
16    MR. LACY:  Oh, the third?
17    THE WITNESS:  Yes.
18    MR. LACY:  I'm sorry.  Why do we have
19 three attachments?
20    THE WITNESS:  One is a Word version,
21 so I am mystified by that, too.
22    MR. LACY:  Got it.
23    MS. BLOOMER:  Is that supposed to be
24 highlighted or not?

Page 100

Confidential - K. Raisler

1     MR. LACY:  Apparently it's not.  That
2  is apparently some sort of copying defect.
3     THE WITNESS:  Can we go off the
4  record for a moment?
5     MR. OXFORD:  Sure.
6     (Discussion held off the record.)
7     MR. LACY:  Exhibit 659-A was a copy
8  apparently of the document that was
9  produced.  The witness pointed out that the
10 third attachment is supposed to be a
11 blackline.  It's not a blackline of the same
12 document of which the first two attachments
13 are copies and which would suggest that
14 there appears to be a mistake in the
15 production, which I will clear up.
16    MR. OXFORD:  Thank you.
17    Q    Mr. Raisler, with that on the record,
18 my questions are going to focus primarily on the
19 first attachment to Exhibit 659-A.
20    Do you recognize that document, sir?
21    A    Yes, I do.
22    Q    Can you tell me what it is, please?
23    A    This is the request letter to the
24 CFTC that I previously described as the request

Page 101

Confidential - K. Raisler

1  for a bulk transfer order.
2     Q    You will see, turning to the e-mail
3  that sends this to the CFTC, it appears to be sent
4  by your partner, David Gilberg, and on Friday,
5  September 19th, just after 10 a.m.
6     Do you see that?
7     A    Yes.
8     Q    And sent to Paul Wasserman, John
9  Lawton, and there is another name that I don't
10 think you mentioned before.  Is that Natalie
11 Markman?
12    A    Yes, it is.
13    Q    Did you have any conversations with
14 Ms. Markman about the transfer of futures business
15 to Barclays from Lehman?
16    A    Yes, we did.
17    Q    Can you tell me what those
18 conversations were, please?
19    A    They would be similar to the
20 conversations we had with the other people we have
21 identified.  The only specifics is that I believe
22 working on this letter we had conversations back
23 and forth with Natalie on suggested changes or
24 clarifications.

Page 102

Confidential - K. Raisler

1
2      Q      Did you or anyone else at Sullivan &
3  Cromwell send drafts of this letter to the CFTC?
4      A      Yes.
5      Q      Sitting here today, do you have any
6  recollection of how many drafts were sent?
7      A      I'm sure more than one, but probably
8  only a couple.
9      Q      As best you can recall, sir, when was
10  the first draft sent?
11      A      I believe probably the prior day.  I
12  believe all of this was negotiated in about a
13  24-hour or so time period.
14      Q      The negotiation of this letter with
15  the CFTC, did it take place with the three
16  individuals who are the recipients of the e-mail
17  that is Exhibit 659-A?
18      A      Yes.
19      Q      Were there others at the CFTC who
20  were also involved?
21      A      Ananda Radhakrishnan was also
22  involved.
23      Q      If you could turn to your letter,
24  sir, that is the first attachment to the e-mail,
25  and you will see if you look on the third page, it

Page 103

Confidential - K. Raisler

1
2  appears to be an executed copy.
3      A      I believe that is a fourth page, but
4  it is signed, yes.
5      Q      I am sorry, I thought I said fourth
6  page.  My mistake.
7          Is that your signature, sir, or did
8  someone sign on your behalf?
9      A      That is not my signature.  That looks
10  like David Gilberg's signature.
11      Q      Signing on your behalf?
12      A      That's correct.
13      Q      Did you authorize Mr. Gilberg to sign
14  on your behalf?
15      A      I did.
16      Q      If you could turn to the second page
17  of your letter, please, sir.  You will see the
18  first full paragraph begins, "Pursuant to the
19  agreement."
20      A      Correct.
21      Q      Do you have that?
22      A      Yes.
23      Q      It reads, "Pursuant to the agreement
24  LBI will transfer all customer accounts, including
25  100 percent of each customer's net equity, as

Page 104

Confidential - K. Raisler

1
2  reflected on the books of LBI, to the LLC. "
3          Do you see that?
4      A      Yes.
5      Q      That letter contemplates a transfer
6  of the futures business into a newly formed
7  Delaware limited liability company; is that
8  correct?
9      A      Among other things, yes.
10      Q      Did the transfer to the LLC ever
11  happen?
12      A      To my knowledge, no.
13      Q      Were you aware, sir, whether or not
14  Barclays -- withdrawn.
15          Were you aware, Mr. Raisler, whether
16  or not Lehman cleared futures positions for its
17  affiliates either in the U.S. or ex-U.S.?
18      A      Yes, I am aware.
19      Q      Can you tell me, sitting here today,
20  do you know which affiliates that it cleared
21  positions for?
22      A      In the U.S. markets, I believe it
23  cleared for all of its affiliates.
24      Q      Do you know whether or not Lehman
25  cleared for its affiliates outside of the U.S.?

Page 105

Confidential - K. Raisler

1
2      A      Yes.  It was my understanding that in
3  the U.S. markets, LBI, so we can be more precise,
4  cleared for all of the non-U.S. affiliates of
5  Lehman trading in U.S. markets.
6      Q      Do you know whether or not LBI
7  cleared for non-U.S. affiliates in markets outside
8  of the U.S.?
9      A      I don't believe LBI had clearing
10  rights with respect to any markets outside the
11  U.S., or at least I am not aware of any.
12      Q      Was it your understanding of the
13  business agreement between Lehman and Barclays,
14  sir, that the accounts that non-U.S. affiliates
15  had with LBI for clearing futures in the U.S.,
16  that those accounts would be transferred to
17  Barclays?
18          MS. BLOOMER:  Objection to form.
19      A      My understanding was that all of the
20  accounts were to be transferred to Barclays.
21      Q      Did you ever have any discussions
22  with anyone, Mr. Raisler, as to the treatment of
23  the Lehman affiliate accounts elsewhere in the
24  transaction between Lehman and Barclays, by which
25  I mean other than as it relates to the futures

Page 106

Confidential - K. Raisler

1 business?
2
3        MS. BLOOMER:  Objection to form.
4     A    I am sorry, I am going to need you to
5 restate that, because I wasn't sure I followed
6 you.
7     Q    Let me try it this way.  I think you
8 just testified that if a Lehman affiliate outside
9 of the U.S., such as LBIE, for example, had an
10 account with LBI through which LBI would clear
11 LBI's business in the U.S., for example at the
12 CME, that was an account that would be transferred
13 to Barclays.
14        MS. BLOOMER:  Again I'm going to
15     object to form and vagueness of the term
16     "account."
17        MR. LACY:  You mean futures account.
18        MR. OXFORD:  Right.
19        MS. BLOOMER:  I still object.
20 BY MR. OXFORD:
21     Q    Does that accurately reflect your
22 understanding that the futures account of the
23 non-U.S. Lehman affiliate would be transferred to
24 Barclays?
25     A    Yes.  That was my understanding.

Page 107

Confidential - K. Raisler

1
2     Q    And did you have an understanding,
3 sir, that other than in respect of futures
4 accounts, that affiliate accounts of LBI were not
5 being transferred to Barclays?
6        MS. BLOOMER:  Objection, lacks
7     foundation.
8        THE WITNESS:  I am sorry, could you
9     read that back again.
10     (Record read.)
11     A    I was not involved in issues
12 associated with non-U.S. affiliates of Lehman's
13 accounts other than in the context of futures, so
14 I would not be in a good position to answer that
15 question.
16     Q    The answer is you don't know?
17        MS. BLOOMER:  Objection, and instruct
18     the witness not to answer to the extent it
19     calls for the disclosure of privileged
20     communications with Barclays.
21     A    I don't recall.
22     Q    That's fine, thank you.
23        Sticking with paragraph -- the
24 second -- sorry, the first full paragraph on page
25 two of your letter, Mr. Raisler, you go on to say,

Page 108

Confidential - K. Raisler

1
2 "Some of these accounts are accounts that contain
3 no open commodity positions and accounts that are
4 in deficit within the meaning of certain CFTC
5 regulations."
6        Do you see that?
7     A    Yes.
8     Q    Others may be, quote, house accounts
9 as defined in Regulation 190.01W.
10     A    Correct.
11     Q    Do you see that?
12     A    Yes.
13     Q    I don't mean to mischaracterize that.
14 I know there is another cite to the CFR after
15 that.
16        Was it your understanding that you
17 were seeking in this letter, Mr. Raisler, the
18 CFTC's consent for a bulk transfer of LBI
19 proprietary futures trading accounts from Lehman
20 to Barclays?
21     A    Basically this letter asks for CFTC
22 permission for the transfer of three frequent
23 types of accounts.  If I can read from the bottom
24 of page two, it would be the house accounts, as
25 you just read in the sentence that you just

Page 109

Confidential - K. Raisler

1
2 highlighted; accounts that are in deficit, which
3 would normally not be transferable except for
4 permission; and accounts that have no open
5 commodity contracts.
6        All three of those accounts without
7 permission would not be transferable.
8     Q    And house accounts are --
9     A    The house accounts -- I'm sorry.
10     Q    House accounts are the accounts
11 through which Lehman or LBI would conduct
12 proprietary trading; correct?
13     A    If I can restate your comment a
14 little differently.  The house accounts defined in
15 190.01W would be all of the proprietary accounts
16 of Lehman, which would include the accounts of
17 affiliates which otherwise would be customer
18 accounts on the books of Barclays.
19     Q    What do you mean when you say they
20 would otherwise be customer accounts?
21     A    When they are transferred from
22 Lehman, the affiliate accounts are not anymore
23 affiliates, they are customers.
24     Q    The second type of account permission
25 for the transfer of which you are seeking in this

Page 110

Confidential - K. Raisler

1    letter is accounts that are in deficit.  What do
2    you mean when you write accounts that are in
3    deficit?
4    
5        A    Basically that means an individual
6    customer account on the books of Lehman -- I guess
7    technically it could include an affiliate as well,
8    but a customer account on the books of Lehman is
9    in fact in deficit, so it is -- there is a
10   shortfall in that account, and the -- that
11   individual customer owes and has an outstanding
12   margin call.
13       Q    The third category is accounts that
14   have no open commodity contracts.  Can you explain
15   what you mean by that, please?
16       A    A commodity contract for this purpose
17   would be a futures position, and some of those
18   accounts may have open, open trade equity, that is
19   cash or securities, in their segregated account,
20   but no actual active futures position.
21       Q    Would the accounts that you describe
22   in point three at the bottom of page two of your
23   letter include proprietary accounts, house
24   accounts, or would that be limited to customer
25   accounts?

Page 111

Confidential - K. Raisler

1
2        A    I believe that the house accounts are
3    covered by one, and so three would not refer to
4    house accounts.
5        Q    Okay.  Moving back up to the first
6    full paragraph on page two, the last sentence in
7    your letter says, "We understand that LBI has
8    sufficient segregated and secured amount funds, as
9    well as sufficient regulatory capital pursuant to
10   the provisions of the Commodity Exchange Act and
11   the Commission's regulations thereunder."
12       Do you see that?
13       A    Yes.
14       Q    Can you tell me what you meant by
15   this sentence?
16       A    I think this is some of what we
17   discussed before the break, that up until the time
18   of this letter, there had been no defaults by
19   Lehman in terms of meeting its obligations to the
20   various clearing houses of which it was a member.
21       As I indicated before the break as
22   well, that doesn't indicate how much capital and
23   collateral there was for the future obligations,
24   which obviously is the point of concern by the
25   OCC, by the CME and by the CFTC as well, and why

Page 112

Confidential - K. Raisler

1    there is a need to get this relief.
2        Q    Can you tell me, Mr. Raisler, how it
3    is you get from the position where there is a lack
4    of default by Lehman, in its futures trading, to a
5    conclusion that there is sufficient segregated and
6    secured amount funds?
7        A    Well, as indicated here, some of the
8    customers are in deficit potentially, so with
9    respect to those customers, there would be
10   inadequate clearing, segregated or secured funds,
11   so it must mean that other customers or the
12   buffer, if you will, made it, at that snapshot in
13   time, sufficient in terms of secured and
14   segregated funds, as well as the regulatory
15   capital is not -- is separate.
16       But the secured and segregated funds
17   would be an aggregate, as I indicated earlier.
18   The account would be a customer seg account which
19   would aggregate all of the customer seg positions.
20   Effectively, to oversimplify, some customers'
21   money is being used to protect those customers
22   that are in deficit, so that the total amount of
23   money is sufficient.
24       Q    And it's also true in addition to

Page 113

Confidential - K. Raisler

1    customer A potentially covering the obligations of
2    customer B, Lehman's buffer money --
3        A    Correct.
4        Q    -- would also be covering the
5    obligations of a customer who may be in default;
6    is that correct?
7        A    Be clear.  In deficit.
8        Q    Sorry.
9        A    We didn't say default.
10       Yes, that is correct.  The
11   combination of excess, some customers having more
12   in segregation than would be required, combined
13   with the buffer, allowed this representation to be
14   made at this point in time.
15       Q    Okay.  To be clear, is this
16   representation that you made to the CFTC based on
17   something other than the fact that Lehman hadn't
18   defaulted at any exchange or clearing
19   organization, up until the date on which you
20   e-mailed the letter?
21       A    That would be true with respect to
22   the seg and secured amounts.  The sufficient
23   regulatory capital would be a separate calculation
24   that would have been represented to us by Lehman.

Confidential - K. Raisler

1  
2    Q    Okay.  We will get to regulated
3  capital in a second, and I appreciate the, the
4  care with which you answered that.
5            Focusing on your statement in your
6  letter to the CFTC, "We understand that LBI has
7  sufficient segregated and secured amount funds,"
8  can you tell me what, what that statement is based
9  on.
10    A    It's based on, one, the absence of
11  default, and two, I assume some representations
12  that confirm that, that we got from Lehman.
13    Q    Focusing on the second part of your
14  answer, the representations that you assume you
15  got from Lehman, can you be more specific about
16  any representations you received that LBI has
17  sufficient segregated and secured amount funds
18  before you wrote this letter to the CFTC?
19    A    Well, I think that they were able to
20  confirm what we generally knew, which is that
21  there had not been any defaults.  We would take
22  significant comfort in that alone, and we were in
23  separate touch with the exchanges and clearing
24  houses, although that wouldn't guarantee we would
25  have been so informed.

Confidential - K. Raisler

1  
2    Q    So are the representations that,
3  underpin -- withdrawn.
4            The representations to you,
5  Mr. Raisler, that underpin your statement to the
6  CFTC, are simply representations from Lehman that
7  there have been no defaults at the exchanges or
8  clearing organizations in the customers
9  business -- sorry, futures business, or did they
10  make additional representations?
11    A    I would -- I believe that they made a
12  representation to us consistent with the words in
13  that sentence.
14    Q    So are you essentially repeating to
15  the CFTC what LBI has represented to you?
16    A    It's actually backwards, but yes.
17  And by backwards, I mean that the CFTC demanded we
18  make this representation as a condition to their
19  taking the action, and so we would have been
20  inclined to make the representation if we could
21  make it and confirmed it by the two methods I have
22  described, no default and the corresponding
23  representation from LBI.
24    Q    Why would the CFTC -- withdrawn.
25            Do you know why the CFTC demanded

Confidential - K. Raisler

1  
2  that this representation be contained in your
3  letter?
4    A    I don't believe we ever specifically
5  discussed it.  But if this were not the case, then
6  they would be looking to take more dramatic action
7  and may not be prepared to allow a movement of the
8  type described in this letter.
9    Q    Do you know -- withdrawn.
10            Mr. Raisler, do you know who at LBI
11  provided the representation to you about the
12  sufficiency of LBI's segregated and secured amount
13  funds that you then used as a basis for your
14  letter to the CFTC?
15    A    I don't precisely recall it, but
16  again it would be probably the same group led by
17  Jeff Jennings.
18    Q    I think I have this from your earlier
19  testimony, but I just want to be sure.  Is this
20  statement about your understanding of the
21  sufficiency of LBI's segregated and secured amount
22  funds, is that based on any calculations that you
23  or anyone working at your direction or Barclays'
24  saw in connection with those accounts?
25    MS. BLOOMER:  Objection.

Confidential - K. Raisler

1  
2    A    I can answer the first part, which is
3  not me nor anybody under my direction.  I don't
4  believe anybody else at Barclays, but I couldn't
5  be sure.  And just to be clear on that point, I
6  think the use of the words "we understand" are
7  important in that regard.
8    Q    Who is the "we" there, sir?
9    A    I think "we" in this context is
10  probably Sullivan & Cromwell, as best reading of
11  the letter.  We said, "on behalf of our client,"
12  Barclays Capital, Inc., this is a request, so I
13  think it would be -- and we use the term "we"
14  throughout.  I assume we are talking the firm in
15  submitting this letter requested.
16    Q    So it is Sullivan & Cromwell's
17  understanding that LBI has sufficient segregated
18  and secured amount funds for what purpose, sir?
19    MS. BLOOMER:  Objection to form.
20    A    I think the language of the sentence
21  picks it up, pursuant to the provisions of the
22  Commodity Exchange Act and Commission regulations.
23    Q    And in layman's terms, sir, is that
24  your understanding -- in the last sentence of this
25  paragraph we are looking at that begins "we

Page 118

1       Confidential - K. Raisler
2 understand," does that equate to your
3 understanding that there is not a shortfall in the
4 segregated and secured amount funds that LBI was
5 required under the Commodities Exchange Act and
6 the Commission's regulations to maintain?
7       MS. BLOOMER: Objection to form.
8    A    That one got a little complicated.
9    Q    Yeah, sorry. Let me try this again
10 with a little better syntax.
11    A    Okay. Particularly if we can avoid
12 using "layman" when referring to Lehman. That is
13 particularly confusing.
14    Q    In writing that last sentence, sir,
15 that begins, "We understand," did, did you believe
16 that LBI did not have a shortfall in the
17 segregated and secured amount funds that it was
18 required to maintain pursuant to the Commodity
19 Exchange Act and the Commission's regulations
20 thereunder?
21    A    That would have been our
22 understanding at this moment in time, yes.
23    Q    Thank you.
24       Moving down the page to the next
25 paragraph, the last sentence of that reads,

Page 119

1       Confidential - K. Raisler
2 "Moreover, regulation 190.06E2. Do you have that,
3 sir?
4    A    Yes.
5    Q    It goes on to say, "prohibits the
6 transfer in respect of any eligible account of
7 property whose value," quotes, "would exceed the
8 funded balance of such account, based on available
9 information as at the close of business on the
10 business day immediately preceding the transfer,"
11 close quotes, "less the value of prior transfers."
12       Do you see that sentence?
13    A    Yes, yes.
14    Q    What was the purpose of including
15 that sentence in your letter, sir?
16    A    Because we were seeking an exemption
17 from that prohibition, so it clarified, as the
18 other parts of the letter did, what we were
19 seeking and the contours in which we were seeking
20 it.
21    Q    Can you explain to me what
22 prohibition you were seeking exemption for?
23    A    In this regard, there are certain
24 permitted movements of accounts between FCMs, in
25 the context of a bankruptcy or in other contexts.

Page 120

1       Confidential - K. Raisler
2 There are other things that are prohibited absent
3 CFTC express approval.
4       We were seeking express approval for
5 a number of things, one of which was if an account
6 had -- if an individual customer's account had
7 collateral in excess of that customer's
8 requirements, that that money would move with the
9 customer's account.
10    Q    In any part of your letter that I
11 marked as 659-A, the final signed one, are you
12 seeking permission from the CFTC to move to
13 Barclays from LBI any LBI funds that you have
14 described previously as a buffer, the additional
15 monies that LBI kept in the customer segregated
16 and secured accounts?
17    A    We would not need permission from the
18 CFTC to do that.
19    Q    Thank you. That's all I have for
20 that exhibit. Let me mark another one.
21       (Exhibit 660-A marked for
22       identification as of this date.)
23
24    Q    Mr. Raisler, I have handed you what I
25 have marked as Exhibit 660-A, which is an e-mail

Page 121

1       Confidential - K. Raisler
2 with the Bates number BCISC 00009653, and the
3 attachments run through 9665.
4       If you could take a moment to review
5 that and let me know if you have seen it before
6 and let me know when you are done, please. Also,
7 to the extent you identify any of the possible
8 production errors we referenced earlier with this
9 document, if you can let me know that, too.
10       MS. BLOOMER: Does anyone know why
11    the bottom Bates number is the same on all
12    of these pages, or on at least a few anyway,
13    9662?
14       THE WITNESS: It has multiple
15    numbers.
16       MS. BLOOMER: Right, but the bottom
17    number is the same Bates label on multiple
18    pages.
19       THE WITNESS: It isn't so on the --
20       MR. OXFORD: I don't know.
21       MR. LACY: And I don't know.
22       MR. OXFORD: As long as we can
23 refer --
24       MR. LACY: What are you looking at?
25       MS. BLOOMER: Do you see this says

Page 122

Confidential - K. Raisler

1  9654?  The bottom of the two Bates numbers
2  doesn't seem to be correct, but the top one
3  does.
4
5      MR. LACY:  The bottom should just be
6  ignored.  The bottom number should just be
7  ignored.
8      A    Okay.
9      Q    Do you recognize this document, sir?
10     A    Yes, I do.
11     Q    Can you tell me what it is, please?
12     A    We are referring specifically to the
13  first one of the three?
14     Q    Yes.  The e-mail.
15     A    The e-mail.  Oh, the e-mail.  Okay.
16         The e-mail is an update about two
17  hours later to the CFTC with a new letter that
18  changes via deletion the structure of the
19  transaction to eliminate the intermediate LLC
20  arrangement that was discussed and described in
21  the prior letter.
22     Q    And is the first attachment to that
23  letter, sir, is that the final executed letter?
24     A    Yes, it's an executed letter that is
25  intended to supersede the letter that we just

Page 123

Confidential - K. Raisler

1  finished discussing, the 659-A.
2
3      Q    Again, sir, on the last page, that is
4  not your signature on 660-A, is it?
5      A    No.  Again, it is Mr. Gilberg's.
6      Q    Did you authorize Mr. Gilberg to sign
7  for you?
8      A    I did.
9      Q    Is it correct, Mr. Raisler, that the
10  updated letter doesn't change in any way the
11  representation as to Sullivan & Cromwell's
12  understanding as to the sufficiency of the
13  segregated and secured amount funds that we
14  discussed earlier?
15     A    Correct.  This letter only changes,
16  as I recall it and understand it, the LLC
17  references that were in the letter that we
18  previously discussed.
19     Q    Now, this letter also makes a
20  representation, sir, as to Sullivan & Cromwell's
21  understanding of the sufficiency as to LBI's
22  regulatory capital; is that correct?
23     A    In that respect, it's not different
24  from the last letter.
25     Q    I am only asking with respect to this

Page 124

Confidential - K. Raisler

1  letter because I realize I forgot to ask you with
2  respect to the first letter.  I don't mean to
3  confuse.
4      A    Right.
5      Q    What did -- what did you mean when
6  you wrote to the CFTC that you understood that LBI
7  has sufficient regulatory capital?
8      A    As we discussed earlier, regulatory
9  capital is required under CFTC legislation and
10  rules consistent with a formula that relates to
11  the surmise of the customer seg and secured assets
12  that it's holding on behalf of customers, and so
13  here we would have received a representation, I am
14  sure, from Lehman, that they had sufficient
15  regulatory capital.
16         I did not myself check that.  I don't
17  know whether anybody at Barclays did either.
18     Q    Do you know whether or not anyone at
19  Sullivan & Cromwell checked that for you?
20     A    I am certain that nobody else at
21  Sullivan & Cromwell checked that for me.
22     Q    Are you able to testify as to the
23  source of the representation made to you about the
24  sufficiency of LBI's regulatory capital other than

Page 125

Confidential - K. Raisler

1  to say generally that someone at Lehman must have
2  done it?
3      MS. BLOOMER:  I'm going to object to
4  the extent you keep saying sufficiency of
5  the regulatory capital and leaving off the
6  regulations pursuant to which it speaks to
7  sufficiency.
8      Q    Trish's objection is a fair one.  I
9  don't mean to mischaracterize your letter.  I am
10  simply seeking that you tell me, as best you are
11  able to today, who at Lehman gave either you or
12  anyone else at Sullivan & Cromwell the
13  representation that LBI had sufficient regulatory
14  capital pursuant to the particular provisions of
15  the Commodity Exchange Act and the Commission's
16  regulations that you reference in your letter to
17  the CFTC.
18     A    In answer to your previous question,
19  you are correct.
20     Q    I am correct that you not able to
21  tell me beyond a statement generally that someone
22  at Lehman must have done so, but sitting here
23  today, sir, you are not able to tell me who that
24  person was?

Page 126

Confidential - K. Raisler

1
2    A    That is correct.
3        (Exhibit 661-A marked for
4    identification as of this date.)
5
6    Q    Mr. Raisler, I have handed you what I
7    have marked as Exhibit 661-A, which is an e-mail
8    BCISC 00009298, with an attachment that goes
9    through 9301.
10    A    Correct.
11    Q    Can you tell me, please, focusing on
12    the attachment to the e-mail, what that document
13    is, please?
14    A    I am sorry, you want me to focus on
15    the e-mail or the attachment?
16    Q    The attachment to the e-mail.
17    A    The attachment is a letter from the
18    CFTC to me, that approves the request set forth in
19    the letter we just finished discussing for
20    authorization to transfer the accounts, and the
21    terms and the conditions described in the prior
22    request.
23    Q    That it is all I have for that one,
24    sir.
25        Were you involved, Mr. Raisler, in

Page 127

Confidential - K. Raisler

1
2    Barclays' assumption of Lehman's -- I should say
3    LBI's rights and obligations in its futures
4    business, by which I mean specifically
5    implementation of how Barclays assumes
6    responsibilities for those accounts?
7        MS. BLOOMER:  Objection to form.
8    A    Generally, yes.
9    Q    Can you tell me, please, what your
10    role was in that regard.
11    A    In the week starting September 22nd,
12    after the approvals, a process began to move
13    positions and funds from Lehman to Barclays.  I
14    was involved in a series of meetings and
15    discussions about effectuating that.  In
16    particular, moving the funds was quite complex and
17    was the subject of a lot of back and forth
18    involved, not just Barclays and Lehman, but the
19    CFTC, the trustee, and JPMorgan.
20    Q    Which funds are you referring to in
21    that last answer, sir?
22    A    Broadly stated, the collateral that
23    was securing the customer positions at the U.S.
24    futures exchanges, as well as the collateral that
25    was supporting positions on non-U.S. exchanges.

Page 128

Confidential - K. Raisler

1
2    Q    Are these the same funds that were
3    held in the customer segregated and secured
4    accounts that you have testified to earlier?
5    A    Yes, that is correct.
6    Q    Why was the movement of those funds
7    complex, sir?
8    A    We hadn't anticipated it would be
9    that complex in the U.S., where the rules are
10    quite clear.  However, there was a number of
11    players who wanted to get comfort that they would
12    be protected if they moved the funds.  And so a
13    process had to be developed in order to effectuate
14    those movements.
15    Q    Who are those players, sir?
16    A    Well, I guess in particular, JPMorgan
17    as the bank that was holding the seg and secured
18    funds, they wanted to make sure that transferring
19    those funds to Barclays would be consistent with
20    authorizations that had been obtained through the
21    bankruptcy.
22    Q    To your knowledge, sir, did JPMorgan
23    get the comfort they were seeking in this regard?
24    A    They did from the trustee.
25    Q    Tell me what you know about that,

Page 129

Confidential - K. Raisler

1
2    please.
3        MS. BLOOMER:  Objection, form.
4    A    I think the, the view that Barclays
5    had, and that we had as their counsel, was that
6    the bankruptcy court's approval was sufficient and
7    should have been sufficient for JPMorgan to
8    authorize the movement of the funds.
9        JPMorgan saw it differently, and
10    sought to get express approval from the trustee.
11    The form and content of that approval was
12    negotiated and it took a number of days.
13    Q    When did those negotiations take
14    place, sir?
15    A    I think the positions, the futures
16    positions moved on the 22nd.  So I would assume
17    that discussions about the collateral moving would
18    have begun at that time.  And I believe the funds
19    started to move and finally were relocated at
20    Barclays around the 20 -- I am sorry, around the
21    first week in October.
22    Q    The customer and -- customer
23    segregated and secured funds that were moved in
24    early October, sir, to your knowledge, did they
25    include any assets that were Lehman assets,

Page 130

1          Confidential - K. Raisler
2    specifically the buffer that you have described
3    earlier, between, I suppose the minimum that was
4    required to be in these accounts and what was
5    desirable from a business perspective to have in
6    these accounts?
7          MS. BLOOMER: Objection to form.
8          MR. LACY: Object to the form of the
9    question.
10         MR. OXFORD: Withdrawn.
11    Q     Did, did the accounts and the funds,
12   the segregated and secured funds that were being
13   moved in October, did they include LBI assets as
14   well as assets that were the property of
15   customers?
16    A     I think I can answer that question
17   this way: It was my understanding that all of the
18   property that was in the seg and secured accounts
19   moved to Barclays.
20    Q     And at the time it was moved, sir,
21   did you have an understanding one way or the other
22   as to whether the property included property of
23   LBI as well as property of customers?
24    A     I don't believe I had an
25   understanding one way or the other, other than my

Page 131

1          Confidential - K. Raisler
2    best recollection was that all of the collateral
3    in those accounts moved to Barclays.
4     Q     Okay. Just based on your general
5    experience and familiarity with the industry, sir,
6    would you have expected the property in those seg
7    and secured accounts that moved to Barclays to
8    include LBI property as well as customer property?
9          MR. LACY: Object to form of the
10   question.
11    A     Yes.
12    Q     Do you know one way or the other,
13   sir, whether that expectation was also Barclays'
14   expectation at the time the funds were moved in
15   early October?
16         MS. BLOOMER: Object. And I am going
17         to instruct the witness not to disclose the
18         substance of communications with Barclays.
19    A     Yes.
20    Q     Do you know, sir, that Barclays did
21   in fact expect that the customer seg and secured
22   amounts that were moved in early October did
23   include LBI assets in addition to customer assets?
24         MS. BLOOMER: Object to the form, and
25         the same privilege objection.

Page 132

1          Confidential - K. Raisler
2          THE WITNESS: I'm sorry. Can I get
3          that read back. I just want to understand
4          the word "knew" in that context.
5          (Record read.)
6     A     I think so, although I don't
7    specifically recall that discussion at that time.
8     Q     Do you know, Mr. Raisler, that --
9    withdrawn.
10         Do you know whether or not Barclays
11   knew at the time of the closing of the transaction
12   on the 22nd of September, whether or not the
13   customer seg and secured funds held by Lehman
14   included not just customer property, but LBI
15   assets as well?
16         MS. BLOOMER: I am going to object,
17         and I am going to object generally to you
18         asking this witness from Sullivan & Cromwell
19         questions about what he knew about what
20         Barclays believed at the time.
21         Obviously, that would have been
22         conveyed through discussions with counsel,
23         so I am going to instruct the witness not to
24         disclose the substance or things he learned
25         through communications with Barclays.

Page 133

1          Confidential - K. Raisler
2          To the extent there were discussions
3          that you had in the presence of third
4          parties in which you learned information
5          that would be responsive to the question,
6          you can answer.
7     A     I don't have anything to add to my
8    prior answers on this.
9     Q     Other than the transfer of segregated
10   and secured funds, Mr. Raisler, were you involved
11   in any other of the mechanics of the
12   implementation of Barclays' purchase of the Lehman
13   futures business?
14    A     In the U.S. largely, no. But outside
15   the U.S., we were looking at not just moving of
16   funds, but also moving of positions, and that was
17   a more complicated undertaking.
18         I guess also, I don't want to leave a
19   gap. In the U.S., I was also involved in not just
20   the seg and secured funds but also the movement of
21   positions and assets of a proprietary sort, either
22   positions of LBI or of its affiliates or of
23   customers of its affiliates.
24    Q     Turning first to your involvement
25   with the transfer of the U.S. business, sir. We

Page 134

Confidential - K. Raisler

1  discussed earlier the transfer and assumption
2  agreement that was executed between Barclays, the
3  OCC and SIPA trustee.  Do you recall that
4  testimony?
5  
6      A   Yes.
7      Q   Were there any other agreements put
8  in place in connection with U.S.-based futures
9  business with any other exchange or clearing,
10 organization to your knowledge?
11     A   No, there were not, to my knowledge.
12 I also don't specifically recall, but I don't know
13 that the transfer and assumption agreement dealt
14 with futures either.
15     Q   Can you tell me, please, what your
16 involvement was, sir, in moving proprietary assets
17 or positions of LBI or LBI's affiliates from
18 Lehman to Barclays?
19     A   I can recall generally discussions
20 with Barclays, with Lehman and with the exchanges
21 on those movements of funds and positions.  The
22 specifics are a little less clear.
23     Q   Who at Lehman were you discussing the
24 movement of positions and collateral with?
25     A   This, probably during this time

Page 135

Confidential - K. Raisler

1  period would be more intensely with Ron Filler
2  than anybody else.
3      Q   What were your discussions with
4  Mr. Filler?
5      A   I think we, we shared information
6  about what we respectively learned, primarily in
7  the foreign markets, about what they were doing
8  with positions and what they were doing with
9  collateral.  And we discussed less actively what
10 was going on in the U.S., which was a little bit
11 clearer.
12     Q   Did Barclays enter into an agreement
13 with the Chicago Mercantile Exchange in connection
14 with its assumption of the rights and obligations
15 from Lehman of Lehman's futures business?
16     A   No.  One wouldn't expect that there
17 would be such an agreement, because the -- between
18 the order of the CFTC, which they would have
19 gotten a copy of, and the bankruptcy approval
20 order itself, the instructions were clear as to
21 what they would have to do.  They are actually
22 copied on the CFTC letter.
23     Q   Dealing with the ex-U.S. futures
24 positions, Mr. Raisler, did Barclays enter into

Page 136

Confidential - K. Raisler

1  any agreements with any exchange, clearing
2  organization or other broker dealer in connection
3  with its assumption of LBI's rights and
4  obligations to the positions and collateral?
5      A   Not to my knowledge, and I think I
6  would know.
7      Q   Why would you think you would know?
8      A   Because in part that was one of the
9  things I was working on during the time period.
10 So had there been anything negotiated, I think I
11 would have heard about it.
12     Again, the exchanges and clearing
13 houses were taking action pursuant to whatever
14 their legal regime was, and there was a very
15 substantial amount of ambiguity about the legal
16 regimes around the world and actions that would be
17 taken, in particular confusion around releasing
18 funds there were held by affiliates of LBI who
19 might have been the introducing or clearing
20 members of those foreign exchanges.
21     Q   How is it Barclays went about getting
22 access to the positions and funds that were in
23 Lehman's futures accounts outside of the U.S.?
24     MS. BLOOMER:  Objection to form,

Page 137

Confidential - K. Raisler

1  assumes facts not in evidence.
2      A   Well, first of all, that project is
3  still ongoing.  Those monies that -- in some cases
4  in some jurisdictions the positions moved without
5  the collateral, and in some situations the
6  positions didn't move and the collateral didn't
7  move.
8      As a general matter, the collateral
9  has been slow to move in every location around the
10 world, in part because or in large part because
11 the position collateral was being held by an
12 affiliate of Lehman who itself had
13 bankruptcy-related issues and concerns.
14     So, this was a very difficult
15 project, one in its scale that was without
16 precedent.  And so the ability to recover these
17 monies has been an ongoing process.
18     I think there has been some limited
19 amount of success with respect to a few foreign
20 accounts that were being held by third-party
21 brokers, but even there, those brokers have not
22 been willing to give the money to Barclays but
23 instead have returned the money to, broadly
24 stated, the Lehman estate, which means in those

Page 138

Confidential - K. Raisler

1  situations where Lehman has taken over the
2  positions -- I mean Barclays has taken over the
3  positions of Lehman in those foreign
4  jurisdictions, it's had to fund the obligations,
5  the collateral obligations, from its own account,
6  which just highlight the complexity of the
7  transaction, broadly stated.
8      Q    Are you able to tell me on an
9  exchange by exchange or broker dealer by broker
10  dealer basis where Barclays has moved positions
11  and/or collateral?  Again, outside the U.S.
12          MS. BLOOMER:  Objection to form.
13          MR. LACY:  I'm sorry.  Go ahead.
14      A    Okay.  I can answer that question
15  with respect to some of the jurisdictions but not
16  all.
17      Q    Okay.  With respect to the
18  jurisdictions where you can answer, can you tell
19  me where Barclays has moved positions and or
20  collateral?
21          MS. BLOOMER:  Objection to form.
22      A    I can give you my best understanding
23  of that.
24      Q    That is all I am asking for.

Page 139

Confidential - K. Raisler

1      A    Right.
2          In the U.K. my understanding is that
3  positions have moved to Barclays, but with very
4  limited exceptions collateral has not moved.
5          With respect to Germany and Eurex,
6  here again, positions moved and collateral has not
7  moved.  I think in this context without exception
8  collateral has not moved.
9          In Japan, there is supposed to be a
10  bankruptcy hearing coming up, at which to decide
11  whether to release the collateral funds, but
12  again, the positions have moved without the
13  collateral.
14          Singapore, the same.
15          In some jurisdictions that I haven't
16  named, exchanges liquidated the positions of the
17  customers leaving in question where the and how
18  the excess collateral, if there was any excess,
19  could be released and to whom, but that being
20  subject to the local jurisdiction's bankruptcy
21  regime.
22          In Australia, as I indicated earlier,
23  the positions moved, the collateral has not moved
24  to Barclays to this date, to my knowledge.  It has

Page 140

Confidential - K. Raisler

1  been released back to LBI, but not to Barclays.
2          To be complete, in each of these
3  contexts that I have just addressed to you, I may
4  not be completely current on events, because
5  things continue to move, and we have not been as
6  intensely involved as we were in the weeks
7  immediately following the transaction.
8      Q    In the instances where positions have
9  moved, Mr. Raisler, did Barclays enter into any
10  agreements with the broker dealers or any other
11  third party with whom or through whom these
12  positions were placed?
13      A    As I indicated, for the most part,
14  most of the jurisdictions in the world were, the
15  futures broker that LBI was trading through was an
16  affiliate of Lehman, and in almost all of those
17  cases that affiliate is in some sort of insolvency
18  regime.
19          There have been no agreements that I
20  am aware of with respect to any of them, and that
21  has locked up money in those situations.  The
22  positions are moved at the direction of the
23  exchange and clearing house rather than the
24  direction of the broker, and so positions can move

Page 141

Confidential - K. Raisler

1  even and collateral is stuck in an insolvent or
2  bankrupt entity.
3      Q    Has Barclays then been in touch with
4  foreign exchanges and clearing houses in an effort
5  to get those organizations to move the positions?
6      A    And the collateral, yes, and I would
7  also add to that equation, foreign regulators.
8      Q    Has Barclays entered into any
9  agreements with foreign exchanges or clearing
10  houses in connection with its efforts to have the
11  positions and collateral moved to Barclays?
12      A    Again, not to my knowledge, and I
13  think I would know.  Again, I think each of these
14  decisions are effectively self-effectuating
15  pursuant to local law, so, one wouldn't expect
16  that there would be agreements in those
17  situations.
18      Q    Has Barclays, to your knowledge,
19  Mr. Raisler, assumed all of LBI's obligations with
20  respect to futures trading at foreign exchanges
21  and clearing houses?
22          MR. LACY:  Objection.  Could you make
23  clear whether you are talking about the
24  obligations on the clearing house side as

Page 142

Confidential - K. Raisler

1    Confidential - K. Raisler
2    opposed to the customer side?
3        MR. OXFORD:  Yes, sorry, I meant on
4    the clearing house side.
5        A    I'm sorry, lost the train of the
6    question there.
7        Q    Let me try it this way:  Has
8    Barclays, to your knowledge, Mr. Raisler, assumed
9    LBI's clearing obligations with respect to the
10   former Lehman futures positions at foreign
11   exchanges and clearing houses?
12       MR. LACY:  Objection.  That made it
13   worse.
14       A    To the extent I understand your
15   question, I think the answer is yes.  When the
16   positions moved, to the extent that they moved to
17   Barclays, Barclays would assume the obligations to
18   the clearing house that previously had been
19   assumed by the affiliate or other entity that was
20   previously clearing those positions for LBI.
21       MR. OXFORD:  Can we go off for a
22   second.
23       (Recess taken.)
24   BY MR. OXFORD:
25       Q    Mr. Raisler, I am handing you what

Page 143

1    Confidential - K. Raisler
2    has been marked previously in these depositions as
3    Exhibit 556.  If you could take a moment to review
4    that and let me know whether you have seen this
5    document before, please.
6        A    Yes.
7        Q    In what context have you seen that
8    document, sir?
9        A    I think I have seen it near
10   contemporaneous with the date on it at one of the
11   early meetings.
12       Q    Do you know who Alasdair Hodge is?
13       A    Yes, I do know who Alasdair Hodge is.
14       Q    Who is he?
15       A    Alasdair Hodge is, I guess,
16   technically I think Tim Stack's boss.  He runs
17   futures or at the time I think he ran futures
18   globally, whereas Tim Stack ran futures in the
19   U.S.
20       Q    Generally speaking, Mr. Raisler, does
21   this memorandum reflect the meeting that you
22   attended on the 15th of September, 2008, that you
23   testified to this morning?
24       MR. LACY:  Object to the form of the
25   question.

Page 144

1    Confidential - K. Raisler
2        A    Broadly stated.  The goal of the
3    meeting on Monday was to talk about a potential
4    acquisition of the Lehman Brothers futures
5    business, and this memo speaks to that, so, to
6    that extent, yes.
7        I think the memo -- I think as we
8    discussed earlier, other events sort of overtook
9    this memo in terms of a broader acquisition
10   effort.  This is actually a siloed -- this memo
11   reflects a more siloed discussion of just looking
12   at this business and not all the other capital
13   markets activity that was going on within the
14   Lehman-Barclays world.
15       Q    If you turn to the third paragraph
16   that begins, "Lehman Brothers' future business
17   overview."  Do you see that?
18       A    Um-hum.
19       Q    It says, "Lehman's futures business
20   consists of approximately 100 institutional
21   clients and total global futures revenues of
22   approximately $250 million."
23       Do you see that?
24       A    Yes.
25       Q    Does that reflect the discussion that

Page 145

1    Confidential - K. Raisler
2    took place on September 15th at the meeting that
3    you had with Barclays and Lehman that day?
4        MR. LACY:  I object to the form of
5    the question.  I don't know what you mean by
6    "reflect."
7        Q    Do you understand the question, sir?
8        A    Let me try to answer it in my words.
9        I think during the course of the
10   meeting, these were the broad high-level data
11   points that were shared by Lehman with the
12   Barclays team.
13       Q    And those high-level data points
14   include the sentence I just read or at least the
15   substantive information contained in the sentence
16   I just read about what Lehman's futures business
17   consists of in terms of clients and revenue?
18       A    Correct.  And while not trying to get
19   ahead of you, the rest of the paragraph as well.
20       Q    Okay, thank you.  I appreciate that.
21       Towards the bottom of that paragraph,
22   sir, in the memorandum, it notes that Lehman
23   futures operates under two legal entities, LBI
24   being the U.S.-based FCM and LBIE being the
25   European-based FCM.  Do you see that?

Page 146

```
 1              Confidential - K. Raisler
 2      A    Yes.
 3      Q    Was it your understanding as of the
 4  date of this memo, the 15th of September, that
 5  Barclays was intending to buy both the U.S.-based
 6  FCM and the European-based business?
 7          MS. BLOOMER:  Object to the form of
 8      the question.
 9      A    That needs a little clarification.  I
10  think that, again in my words, I think that the
11  transaction was to take over all of the
12  futures-based businesses of LBI and its
13  affiliates.  So, it would embrace the futures
14  customers that were -- I am pausing here because I
15  think that the transaction that was being
16  discussed was -- on the 15th was really about
17  LBI's business.
18          It interacted with its affiliates in
19  a variety of ways, and some of those affiliate
20  customers ultimately could have come over to LBI,
21  but -- to Barclays.  But I think that the deal
22  that I -- as I am now thinking about it, was to
23  taking over the LBI futures business, and to the
24  extent that there were other businesses, that was
25  really not part of the transaction.
```

Page 147

```
 1              Confidential - K. Raisler
 2      Q    Okay, thank you.
 3          Do you recall any discussion between
 4  Barclays and Lehman at the meeting on the 15th or
 5  at any time that week about the creditworthiness
 6  of Lehman's clients?
 7      A    Yes.  I think that there were some
 8  again high-level discussions about high-quality
 9  clients.
10      Q    Can you be a little more specific
11  about what those discussion were?
12      A    I think there were some clients who
13  were identified who would have been known to us,
14  both Barclays and myself, as important or premier
15  institutional users in the market.
16      Q    Do you recall any discussions that
17  week, Mr. Raisler, about any clients that would
18  not be considered premier or might be considered a
19  credit risk for Barclays to take on as customers?
20          MS. BLOOMER:  Objection to form.
21      A    I think during the course of the week
22  of September 15th, a lot of blue chip
23  institutional customers became credit risks, so,
24  it was a chaotic time period, and Lehman itself
25  might have been considered blue chip even a week
```

Page 148

```
 1              Confidential - K. Raisler
 2  before, so I don't know that there was any real
 3  security or feeling that any individual client was
 4  in fact secure during this time period.  And by
 5  secure, I mean creditworthy.
 6      Q    Under the heading transaction
 7  benefits and risks, do you see there is a -- three
 8  paragraphs down, the words "key risk" appear.  Do
 9  you see that, Mr. Raisler?
10      A    Yes.
11      Q    It says, "Loss of key clients due to
12  inability to execute expedient transactions."  Do
13  you see that?
14      A    Yes.
15      Q    At any of the meetings that you were
16  present in, between Lehman and Barclays, were any
17  other risks to Barclays identified?
18      A    Yes.  The financial risk of
19  non-performance was what we were spending almost
20  all of our time on.  That could be a whole range
21  of non-performances, but as we tried to get a
22  handle on the accounts and the customers and the
23  proprietary positions, the risks that they
24  presented in a volatile chaotic market were the
25  center risks that I would have described
```

Page 149

```
 1              Confidential - K. Raisler
 2  discussing during that week.
 3      Q    In your last answer you mean
 4  non-performance by whom?
 5      A    Non-performance by the Lehman
 6  proprietary account positions, that is not having
 7  sufficient capital to meet those losing positions,
 8  and non-performance by individual customers on
 9  their obligations as futures customers.
10      Q    Turning the page, sir, there is --
11  the second paragraph, number two, is headed
12  "Additional Capital Requirements."  Do you see
13  that?
14      A    Yes.
15      Q    Did you have any understanding, sir,
16  at any time whether or not Barclays required its
17  acquisition of the futures business of Lehman to
18  be capital accretive?
19      A    I am sorry.  I'm going to have to ask
20  you to define what you mean by "capital
21  accretive."
22      Q    Do you have any understanding of what
23  that term means, sir?
24          MS. BLOOMER:  Objection to form.
25      A    I would be guessing.
```

Page 150

Confidential - K. Raisler

1
2      Q    You would be guessing as to what it
3  means to you?
4      A    Right.  I didn't -- my accounting
5  classes are far behind me, and I wouldn't want to
6  be wrong in making a wrong assumption about what
7  you mean there, so.
8      Q    Do you see under the second heading
9  the last sentence says, "We require senior
10  management approval related to such a capital
11  increase"?
12     A    Correct.
13     Q    Did you have any discussions with
14  anybody in the week of the 15th through the
15  closing of the transaction, sir, that Barclays be
16  required to increase their capital to take on the
17  futures business?
18          MS. BLOOMER:  I object to the
19          question and instruct the witness not to
20          disclose the substance of communications
21          that were not held in the presence of Lehman
22          or any other third party.
23     A    I think from the earliest meetings
24  with Lehman and Barclays, it was understood that
25  additional capital would be required.

Page 151

Confidential - K. Raisler

1
2      Q    What is the basis for that answer,
3  sir?
4      A    The goal of the transaction was
5  substantially to increase the futures business of
6  Barclays.  That was the opportunity that the
7  business people saw.  And if are you going to
8  substantially increase your business, then that
9  means that you have more customer segregated funds
10  and therefore you need more capital.
11     Q    Were you ever involved, Mr. Raisler,
12  in any discussions about whether or not Lehman's
13  own proprietary assets in the futures business,
14  including but not limited to the buffer funds that
15  you described before in the customer seg and
16  secured accounts, would impact the need for
17  additional capital?
18          MS. BLOOMER:  Objection to form.
19     A    None that I recall.
20     Q    Okay.  That is all I have for that
21  exhibit.  Thanks.
22          The letters, Mr. Raisler, that you
23  wrote to the CFTC that we looked at this morning,
24  do you remember those letters?
25     A    Yes.

Page 152

Confidential - K. Raisler

1
2      Q    I think I had marked them as 660-A
3  and 661-A.
4      A    I think 661 is the letter back.  We
5  had 659-A and 660-A were the letters to, and 661-A
6  was the letter back.
7      Q    Thank you, appreciate that.
8          Did you get approval from Barclays
9  before you sent those letters to the CFTC?
10          MS. BLOOMER:  Objection to form.
11          You can answer to the extent you
12          don't disclose the substance of your
13          discussions.
14     A    Yes.
15     Q    Was Barclays aware of the
16  representations from Lehman upon which you relied
17  in writing those letters, sir?  And particularly,
18  I am directing this question to the
19  representations as to the sufficient segregated
20  and secured amount funds that we discussed
21  earlier.
22          MS. BLOOMER:  Objection, lacks
23          foundation and same privilege objection and
24          instruction.
25     A    Again, with the caveats that we put

Page 153

Confidential - K. Raisler

1
2  on those representations from our discussion this
3  morning, the answer is yes.
4      Q    I am handing you, Mr. Raisler, a copy
5  of the asset purchase agreement in this matter
6  that has been marked previously as Exhibit 1.
7          Have you seen this document before,
8  sir?
9      A    Yes.
10     Q    When was the first time you saw this
11  document?
12     A    I don't recall, but it was
13  substantially after it was signed.
14     Q    Was it after the transaction closed
15  on September 22nd, 2008?
16     A    Yes.  I may have had it sent to me by
17  somebody during the course of the dealings, but I
18  don't recall ever having sat down and read it for
19  months after.
20     Q    And you were not involved in the
21  negotiation of this document?
22     A    That is correct.
23     Q    And have you spoken with anybody who
24  was involved in the negotiation of this document,
25  specifically about the effect of this document, if

Page 154

Confidential - K. Raisler

1          Confidential - K. Raisler
2   any, on Barclays' acquisition of Lehman's futures
3   business?
4         MS. BLOOMER:  Objection, and I
5     instruct the witness not to disclose the
6     substance of discussions with Barclays or
7     its other representatives.
8    A   The answer is no.
9    Q   Is it safe to say, sir, then that you
10  don't have a view whether or not this document
11  conveys to Barclays any particular asset
12  associated with Lehman's futures business?
13        MS. BLOOMER:  Objection to form of
14    the question.
15    A   Actually, I don't have a view on this
16  document at all.
17    Q   That gets us done very quickly.
18    A   Right.
19    Q   Mr. Raisler, I am handing you what's
20  been marked as Exhibit 25 previously in this
21  matter, which is the clarification letter.  And
22  you will not be surprised to learn that I have a
23  similar set of questions with respect to this
24  document as I did --
25    A   You are not going to be surprised to

Page 155

1          Confidential - K. Raisler
2   hear the same answers then; right?
3    Q   I will not.
4        When was the first time you saw this
5  document, sir?
6    A   I might have seen it the same time I
7  saw the asset purchase agreement, which would have
8  been sometime substantially after the transaction
9  closed.
10    Q   Did anyone consult with you,
11  Mr. Raisler, to your knowledge, during the
12  drafting of this agreement?
13        MS. BLOOMER:  Objection.
14        MR. LACY:  About the agreement?
15        MR. OXFORD:  Yes.
16    A   No.
17    Q   And just so we are clear, this
18  clarification letter is dated the 20th of
19  September, but it was executed on or about the
20  22nd of September, 2008.  That doesn't change your
21  last answer, does it?
22    A   No, it does not.
23        MS. BLOOMER:  Objection to the form
24    of that question.
25    Q   And conversely, you don't have an

Page 156

1          Confidential - K. Raisler
2   opinion as to whether or not this document
3  transfers to Barclays any particular asset that
4  relates in any way to Lehman's futures business?
5        MS. BLOOMER:  Object to the form.
6    A   As with my comment on the asset
7  purchase agreement, I don't have a view on the
8  document at all.
9    Q   Okay, thank you.
10        Mr. Raisler, I'm handing you the
11  transfer and assumption agreement in this case
12  previously marked as Exhibit 51.  If you could
13  just take a moment to review that document and let
14  me know when you are done, sir.
15        MS. BLOOMER:  Do you know whose
16  handwriting is on that first page?
17        MR. OXFORD:  The underlining?
18        MS. BLOOMER:  Yes.
19        MR. OXFORD:  I do not.  To the best
20    of my knowledge, this is the execution copy.
21    A   Okay.
22    Q   You have seen this document before,
23  sir?
24    A   Yes, I have.
25    Q   When was the first time you saw this

Page 157

1          Confidential - K. Raisler
2   document?
3    A   This document I might have seen as
4  early as Friday the 19th in some kind of draft
5  form.
6    Q   How is it you came to see a draft of
7  it?
8    A   I think as I --
9    Q   Of this document, sir.
10    A   I'm sorry.
11        I think as I testified earlier, I had
12  been in contact with OCC, and they had expressed
13  concerns about their security around the Lehman
14  accounts over the Friday settlement and the
15  weekend.  And as a result, there were discussions
16  about creating some degree of certainty for OCC,
17  and while I didn't draft, and to my best
18  recollection didn't comment, on this agreement, I
19  was made aware of it, and it was the plan to
20  address OCC's concerns.
21    Q   To your understanding, Mr. Raisler,
22  does this document govern the futures that are
23  cleared through the OCC?
24    A   Yeah, I testified this morning that I
25  didn't think so.  Looking at it now, and I don't

Page 158

1       Confidential - K. Raisler
2   remember -- the definition here is the account,
3   and it references number 74, 84 and 273.  I think
4   that -- and my recollection is a little rusty on
5   this -- I think that 84 might have been the
6   futures account, in which case I would amend my
7   testimony from this morning to say that this
8   agreement does cover the futures account.
9       The reason I didn't or I wasn't clear
10  about that this morning is that we did not and
11  were not aware as of the 19th that there were
12  futures, at least to the best of my recollection.
13  Q     Are the futures, Mr. Raisler, that
14  are cleared through the OCC, are those cleared
15  differently to futures cleared through an
16  organization like the CME?
17  A     No.  They are cleared -- there is a
18  division of the OCC that is recognized as a
19  derivatives clearing organization that is
20  permitted by the CFTC to execute clearing
21  activities and clearing functions, and its
22  responsibilities are identical to any other
23  futures clearing house.
24      It is important, though, not to
25  confuse that activity with the clearing that OCC

Page 159

1       Confidential - K. Raisler
2   does for equity options, which is done through a
3   different part of OCC.  I mean it's certainly --
4   on reflecting on my earlier comment, I apologize,
5   it would certainly make sense that the transfer
6   and assumption agreement would cover futures,
7   because presumably it would cover everything, all
8   of the obligations that may be at risk at the OCC.
9       The reason I think -- I didn't think
10  it -- the reason I testified that it may not have
11  is just because I didn't know that there were any
12  futures at the time this agreement was entered
13  into.
14  Q     That is all I have for that document,
15  sir.
16      Mr. Raisler, do you recall any
17  discussions with the CFTC as to the existence or
18  otherwise of excess seg and secured funds in
19  Lehman's accounts over and above the required
20  minimums in those accounts?
21      MS. BLOOMER:  Object to -- actually,
22  I object to the form of the question.
23      MR. OXFORD:  I won't object to the
24  form of that objection.
25  A     There was never any discussion with

Page 160

1       Confidential - K. Raisler
2   the CFTC about that, that I recall.
3   Q     Were you the only person from
4   Sullivan & Cromwell who was liaison with the CFTC
5   or was Mr. Gilberg also involved?
6   A     Mr. Gilberg was also involved, and
7   there could have been others as well, but I would
8   have been aware of what the communications were,
9   and I would be confident in saying it was never
10  discussed.
11      I should just caveat that answer by
12  saying that the way in which you characterize what
13  the account is and excess and words like that need
14  to be qualified by the answers I have given in
15  testimony I gave this morning about what that
16  means.
17  Q     I understand.
18      In your declaration, sir, you
19  describe in paragraph three in the last sentence,
20  that what you believe was the general
21  understanding of all participants was in relation
22  to what part of the LBI futures business was going
23  to be transferred to Barclays.
24  A     Correct.
25      MS. BLOOMER:  I object to the form of

Page 161

1       Confidential - K. Raisler
2   that last question to the extent it was a
3   question.
4       MR. OXFORD:  It was a question.  I
5   think I got a yes.
6       MS. BLOOMER:  I object to the form of
7   the question, vague use of the term "what
8   part of the business."
9   BY MR. OXFORD:
10  Q     The people who were in your meetings,
11  Mr. Raisler, the ones that you describe in your
12  declaration, were not the people who were
13  responsible for negotiating the business terms of
14  this transaction between Lehman and Barclays
15  insofar as it pertains to the futures business;
16  correct?
17      MS. BLOOMER:  Object to the form.
18  A     That was my understanding, correct.
19  Q     Are you aware who, if anyone, on
20  behalf of Lehman actually agreed to transfer the
21  business, the futures business, as you describe in
22  paragraph three of your declaration?
23  A     Not in name, no.
24  Q     In any other manner are you able to
25  identify such a person for me?

Page 162

Confidential - K. Raisler

1    Confidential - K. Raisler
2         MS. BLOOMER: Objection to form.
3    A    I can't identify an individual. In
4    that sense I don't know that I can help you out.
5    Q    Is there some other unit that is
6    larger than an individual that you can identify
7    for me who you believe agreed to the transaction
8    that you described in the last sentence of
9    paragraph three of your declaration?
10    A    Well, I mean to the extent that the
11    team that I was working with was implementing a
12    strategy to effectuate this proposal, it certainly
13    was the assumption that Lehman, LBI, Inc., the
14    trustee, people responsible were the ones who were
15    going to allow us to do that. Otherwise, we were
16    wasting a lot of time. That is how I came to that
17    conclusion.
18    Q    But that conclusion is not based on a
19    conversation with anybody who represents or had
20    authority to negotiate on behalf of LBI, is it?
21         MS. BLOOMER: Objection to form and
22    foundation.
23    A    I don't think it -- it did not
24    result -- it did not come from a conversation with
25    anybody who had authority to negotiate for LBI.

Page 163

1    Confidential - K. Raisler
2    Q    And has anyone identified to you,
3    Mr. Raisler, just to close this line of
4    questioning, whether the deal that you described,
5    as your understanding based on what you say in
6    paragraph three of your declaration, was actually
7    agreed to by anybody on behalf of LP?
8         MS. BLOOMER: Object to form of the
9    question and instruct the witness --
10         MR. OXFORD: Let's try that one a
11    again.
12    Q    You told me that you don't have an
13    understanding based on any conversation with
14    anybody as to what the precise business terms of
15    the deal were as agreed to by LBI; correct?
16         MS. BLOOMER: Objection to the
17    characterization of the testimony.
18    A    I am not sure that's what I would
19    say. I think the best answer I can give you, at
20    the risk of some repetition, is that there was a
21    team of people at Barclays who spent the week
22    meeting with people at LBI to implement a transfer
23    of assets and interests consistent with paragraph
24    three.
25         Each of us were under the clear

Page 164

1    Confidential - K. Raisler
2    understanding, impression, whatever other word you
3    want to use, that this was the deal that LBI was
4    proposing to enter into with Barclays. It was not
5    as a result of a conversation with anybody
6    negotiating that deal, but the word from on high
7    came down, and this is what the people in the
8    trenches were doing. And I was there in the
9    trenches.
10    Q    I understand, thank you. I think I
11    have your testimony on that.
12    A    Right.
13    Q    Did you have any discussions with
14    anyone, Mr. Raisler, at any time about the need
15    for an accounting as to -- withdrawn.
16         Did you have any discussion with
17    anyone at any time, Mr. Raisler, about whether
18    Barclays needed to keep track of any customer seg
19    and secured funds for monies in those accounts
20    that belonged to LBI?
21         MS. BLOOMER: Object to the form of
22    the question, and an instruction not to
23    answer to the extent it requires you to
24    disclose the communications you have had
25    with Barclays.

Page 165

1    Confidential - K. Raisler
2    A    I confess I lost that question
3    somewhere in the middle.
4    Q    I think the question might have too.
5    Let me try it this way: You had
6    discussions, Mr. Raisler, that you testified to
7    earlier on about the difficulties in transferring
8    the customer segregated and secured funds to
9    Barclays; correct?
10    A    That is correct, yes.
11    Q    I believe you also testified that you
12    believed there were monies in those segregated and
13    secured accounts that exceeded the obligations to
14    customers that Barclays would be taking
15    responsibility for?
16         MS. BLOOMER: Objection,
17    mischaracterizes the testimony.
18    A    I'm struggling a little bit with
19    words likely "responsibility for." If I can
20    potentially clarify.
21    Q    Please.
22    A    It was my understanding that all of
23    those funds were both domestically and to the
24    extent there were funds outside of the U.S., were
25    to come over to Barclays. That was my

Page 166

```
 1          Confidential - K. Raisler
 2  understanding of the transaction.
 3      Q    And was it also your understanding of
 4  the transaction that all of those funds would come
 5  over to Barclays even if there was -- there were
 6  more customer seg and secured funds than were --
 7  there were obligations to customers that Barclays
 8  was taking responsibility for?
 9      A    Yes.
10      Q    That is the buffer that we talked
11  about earlier; correct?
12          MS. BLOOMER:  Objection to form.
13      A    It could be a variety of things, one
14  of which I guess could be something like a buffer,
15  but the point I would make is that as we looked at
16  the transaction, in the week of September 15th,
17  all of those assets that were in segregated and
18  secured accounts were to be transferred to
19  Barclays along with all of the positions that were
20  represented in those various accounts; in
21  addition, the proprietary positions and the assets
22  that were supporting those proprietary positions.
23  That was my understanding.
24      Q    Did you ever have any discussions
25  with anyone, including the trustee's office, about
```

Page 167

```
 1          Confidential - K. Raisler
 2  whether any part of the customer seg and secured
 3  funds might be returned to the LBI estate?
 4      A    Absolutely not.
 5      Q    Did you ever consider whether or not,
 6  independent of any conversations you had with the
 7  trustee or anyone representing the trustee, that
 8  there might be a need for any part of the customer
 9  segregated and secured amount funds to be returned
10  to the LBI estate?
11          MS. BLOOMER:  Objection to form.
12      A    I sorry.  I am not sure that is a
13  different question from the last one.
14          MR. LACY:  He's asking about your
15  understanding instead of your conversations.
16
17      Q    Rob is right.
18      A    Okay.  No, I did not.
19          (Exhibit 662-A marked for
20  identification as of this date.)
21
22      Q    I am handing you, Mr. Raisler, a
23  document that has been marked as Exhibit 662.
24          MR. LACY:  662-A, I hope.
25          MR. OXFORD:  You are keeping me
```

Page 168

```
 1          Confidential - K. Raisler
 2  honest today.
 3          MS. BLOOMER:  I'm going to object.
 4  We might have to call this document back,
 5  Neil.  It appears that it contains contents
 6  of communications between Barclays and its
 7  lawyers.  So, I would like a little bit of a
 8  break to consider this before we go into
 9  questions about it.
10          MR. OXFORD:  Okay.  Do you want to
11  take five minutes?
12          MS. BLOOMER:  Yes, please.
13          (Recess taken.)
14          MR. OXFORD:  Ready to go back on?
15          MS. BLOOMER:  For the record,
16  Barclays inadvertently produced a privileged
17  document, Bates number BCIEXS 00116806
18  through 07.  And we are going to be formally
19  exercising our clawback rights under the
20  established process after the deposition,
21  but effective immediately, would ask that no
22  further reference be made to the document by
23  the other side or any other adverse party.
24          MR. OXFORD:  That is fine, Trish.  We
25  will review your request when we receive it,
```

Page 169

```
 1          Confidential - K. Raisler
 2  and I won't make any further reference to
 3  that document in this deposition.
 4      Q    Mr. Raisler, independent of the
 5  document that I had marked as 662-A, I just want
 6  to make sure that I have your testimony that you
 7  never considered -- withdrawn.
 8          I just want to make sure that
 9  independent of 662-A, I have your testimony as to
10  whether or not you ever considered that there be a
11  need for an accounting or the possible return of
12  some portion of the customer segregated and
13  secured funds that were transferred to Barclays as
14  part of Lehman's futures business.
15          MR. LACY:  I'm sorry, hold on a
16  second.
17          I take it you mean a return to the
18  estate, not to a customer.
19          MR. OXFORD:  Yes.
20          MR. LACY:  Okay.
21      A    As I previously testified, I was not
22  aware of any consideration being given to
23  returning any of those funds, which were part of
24  the transaction and part of the transfer, as I
25  understood it.
```

Page 170

1          Confidential - K. Raisler
2          MR. OXFORD:  Can we go off for a
3     second.
4          (Discussion held off the record.)
5          MR. LACY:  Back on the record.
6          Mr. Oxford has shown me a document
7     that was produced by Sullivan & Cromwell in
8     response to a subpoena in this case, number
9     SC 3897 through 3905.
10         The top half of the first page of
11    this is privileged.  It was produced
12    inadvertently, pursuant to, I think it's the
13    protective order and provision concerning
14    the inadvertent disclosure, we request the
15    return of the top half of the first page of
16    this document.
17         No privilege is claimed with respect
18    to the bottom two e-mails or to the
19    attachment, so if you want to go ahead and
20    ask about the attachment, feel free to go
21    ahead and ask about the attachment.
22         MR. OXFORD:  You are claiming
23    privilege on the most interesting part of
24    the e-mail, so I will hold my questions for
25    now.  Thank you.

Page 171

1          Confidential - K. Raisler
2     BY MR. OXFORD:
3          Q    Just going back to the last question
4     and answer before we broke, Mr. Raisler, I
5     realized in reviewing the record I asked a
6     compound question, so I want to break it up.
7          Did you ever consider the need for an
8     accounting with respect to Barclays' acquisition
9     of Lehman's customer segregated and secured
10    accounts?
11         MS. BLOOMER:  I object to the form of
12    the question, the undefined vague use of the
13    term "accounting."
14    A     I am not sure what is meant by the
15    term "accounting," although I am inclined to think
16    that I didn't.
17    Q     In my question I mean that the
18    contents of the customer segregated and secured
19    accounts had to be tracked in case there was a
20    need to return any of those customer segregated
21    and secured funds to the Lehman estate.
22    A     No.
23         MS. BLOOMER:  Objection to form, I
24    think.
25         (Exhibit 663-A marked for

Page 172

1          Confidential - K. Raisler
2     identification as of this date.)
3     Q     Mr. Raisler, I am handing you what I
4     have marked as Exhibit 663-A, which I will
5     identify for the record as an e-mail with the
6     Bates number SC 00003451 and an attachment that
7     goes through 3453.
8          If you could take a moment to review
9     that and tell me if you have seen it before.
10    A     Yes, I am familiar with this.
11    Q     How is it you are familiar with it,
12    sir?
13    A     This was part of a discussion that I
14    was involved in with the OCC that actually dates
15    all the way pack to the transfer and assumption
16    agreement as OC -- as Barclay's was trying to
17    recover assets owed to it pursuant to the terms of
18    that agreement.
19    Q     Did Barclays, to your knowledge, ask
20    the OCC to write this letter?
21    A     My best recollection is they, they
22    proposed to write it.  We were in discussions with
23    them as they were trying to figure out what to do
24    with these assets, and they were sort of advancing
25    this in the interest of sorting that out.

Page 173

1          Confidential - K. Raisler
2     Q     Did you discuss this request with JPM
3     Chase at any time, sir?
4     A     I believe there were some discussions
5     with JPMC during the course of this.
6     Q     Were there discussions with JPM Chase
7     themselves or counsel for Chase?
8     A     I'm sure it would have been counsel.
9     I don't know whether it would have been inside
10    counsel or outside counsel.
11    Q     And did you comment on this letter
12    before it was sent, sir?
13         MS. BLOOMER:  Objection.  Before it
14    was sent to whom?
15         MR. OXFORD:  That's a good objection,
16    Trish.  Thank you.
17    Q     Did you -- let me try it this way:
18    Did you see a draft of this letter prior to the
19    November 4th draft that appears to be sent to you
20    by Jim McDaniel on the 6th of November?
21    A     I believe so.  I don't recall
22    precisely, but I believe so.
23    Q     Do you believe that draft was sent to
24    you by Mr. McDaniel?
25    A     Yes.  I'm sorry to be -- the word

Confidential - K. Raisler
1
2  "that" in that question referring to the earlier
3  draft?
4      Q     The earlier draft, yes.
5      A     Yes.
6      Q     Did you provide comments on the
7  earlier draft provided by Mr. McDaniel?
8      A     I don't have a precise recollection,
9  but I might have been the one who referred him to
10  JPMC to make sure that their thoughts and
11  considerations were taken into account.
12     Q     Did you provide Mr. McDaniel comments
13  on the draft that is attached to the e-mail that
14  we are looking at, 663-A?
15     A     I don't believe so.  I think that
16  this -- to my best recollection, this form looks
17  pretty final to me.
18     Q     That is all I have for that.
19          I make no promises, but this may be
20  my last document.  I think it is.
21     A     Okay.
22          (Exhibit 664-A marked for
23          identification as of this date.)
24     Q     Mr. Raisler, I have handed you a
25  document that I have marked as 664-A, which is a

Confidential - K. Raisler
1
2  Friday the 19th, 3 p.m. e-mail, with the subject
3  "Domestic and Foreign Calculations," and two
4  attachments.
5          If you could take just a moment and
6  review it and let me know whether you have seen
7  the e-mail or the attachments before.
8      A     I don't believe that I have seen this
9  before.  Or at least I don't recall seeing it
10  before.
11     Q     Are you able to tell, just from your
12  review of the documents -- I understand that you
13  don't, sitting here today, think you have seen
14  this before.  You don't recall seeing it before.
15          Are you able to tell me what the two
16  attachments are?
17     MR. LACY:  Object for lack of
18  foundation.
19     A     I am not familiar with this form of
20  document.  Obviously I could read the subject line
21  and tell you what the subject line says, but as
22  far as how the math works or anything like that, I
23  can't, I can't be helpful.
24          In fact, I can't -- on the second
25  document, I can't make the math work, so I am not

Confidential - K. Raisler
1
2  really sure I follow it.
3      Q     You testified before lunch, sir,
4  about the interests that certain exchanges and
5  clearing organizations have in segregated and
6  secured accounts.  Do you remember that testimony?
7      A     Yes, I think it was sort of muddled,
8  but yes.
9      Q     If it were muddled, I am not sure it
10  was the fault of the witness, rather it's the
11  questioner.
12          Is it your understanding, sir, that
13  an organization such as the CME would have a lien
14  over all assets in Lehman's, that is LBI's
15  segregated customer bank account?
16     MR. LACY:  Object to the form of the
17  question.
18     A     There would be a form of a lien that
19  the CME clearing house would have.  It doesn't
20  really accord very well with the traditional UCC
21  security interest type concept.  So I think it can
22  be confusing.
23          But the CME would say that to the
24  extent that the customer or house accounts
25  respectively of any clearing member of the

Confidential - K. Raisler
1
2  exchange are needed to meet the obligations of
3  those respective accounts, they would have a call
4  on those assets for that purpose, and they would
5  have the ability, as we discussed this morning, to
6  reach into a segregated account even at a non-CME
7  clearing house bank location to use those funds to
8  meet margin calls.
9          So in that sense, I think it probably
10  would be equivalent to, although they don't
11  usually use the term "lien."
12     MS. BLOOMER:  Neil, I don't mean to
13  interrupt your questioning, but do you know
14  whose document this is?  I mean I don't know
15  who the sender is, and I don't see any Bates
16  number on it.  I am just wondering who --
17  whose document this is.  Is it an LBI
18  document?  Is it a trustee document?
19     MR. OXFORD:  I think it was created
20  on Friday afternoon, September 19th, prior
21  to the appointment of the SIPA trustee.
22     MS. BLOOMER:  Okay.  So it's not a
23  trustee document.
24     MR. OXFORD:  It's not created by the
25  trustee.

Confidential - K. Raisler

1    Confidential - K. Raisler
2        MS. BLOOMER:  Do you know who Bianca
3    Castedo is?
4        MR. OXFORD:  Yes, I believe she was
5    formerly employed by Lehman, and I believe
6    she is currently employed by your client.
7        MS. BLOOMER:  Okay.  Thank you.
8        This document hasn't been produced by
9    anyone at all in the litigation, I take it.
10       MR. OXFORD:  Not to my knowledge.
11       Mr. Raisler, I don't think I have any
12   further questions for you at this time.  I
13   don't know if counsel for any other party
14   does.
15       MS. CRAWFORD:  The debtor doesn't.
16       MR. KAY:  No questions from the
17   committee.
18   EXAMINATION
19   BY MR. LACY:
20       Q    Mr. Raisler, you testified early this
21   morning about some uncertainty created by the fact
22   that the customer positions at a clearing house
23   are aggregated.
24       Do you remember that.
25       A    Yes, I do.

1    Confidential - K. Raisler
2        Q    Was there a -- as part of this due
3    diligence that went on during the week of the
4    15th, was there a similar issue relating to the
5    house accounts?
6        A    Yes.  As I indicated this morning, at
7    the exchange level, they would have positions, and
8    they would have positions aggregated for all
9    customers in a single customer account.  In
10   addition, the proprietary positions would be
11   aggregated so that you won't know which positions
12   are LBI's, which positions are LBI's affiliates',
13   and which positions are the positions of customers
14   at LBI's affiliates, all of which would be
15   indicated on the proprietary -- in the proprietary
16   account at the clearing house.
17       So, while you could get certain
18   information from the clearing house, because of
19   its aggregate nature, you wouldn't be able to
20   distill out exactly where the exposures were and
21   whose responsibilities they were.
22       Q    And you also mentioned that Barclays
23   first learned of the VIX position on the morning
24   of the 21st, Saturday the 21st.
25       A    I think Saturday was the 20th.

1    Confidential - K. Raisler
2        Q    Saturday the 20th?
3        A    Yes.
4        Q    Do you remember that?
5        A    Yes.
6        Q    What was the significance of that?
7        A    I think the significance of that is a
8    couple-fold.  It sort of highlights the
9    uncertainty around the disclosures, and it
10   emphasizes some of the points I make in my
11   declaration about not knowing exactly what was
12   going on except at the highest levels.
13       The VIX position, which was a
14   significant position, was not discovered, as I
15   recall, until Saturday, and the problem with the
16   VIX position is that it's a problem with
17   volatility, and at the time volatility was at
18   record levels, and it was a substantial position.
19   My recollection is it was a substantial portion of
20   the open interest on the exchange, in the
21   neighborhood of 30 percent, so that liquidating
22   the position would not have been easy, nor would
23   it have been easy to hedge the position.
24       I recall some discussions about that,
25   that it would have -- it would take up to two or

1    Confidential - K. Raisler
2    even three weeks to actually unload that position
3    or to risk manage it, and so it was an example
4    where the amount of margin that had been called
5    for by the OCC for that position is -- was pretty
6    obviously in Barclays' eyes insufficient to marry
7    up with the exposure that that position had, if it
8    was going to take two to three weeks to liquidate.
9        I think it just emphasizes the levels
10   of uncertainty about positions and exposures that
11   were on the books as Barclays was trying to make
12   these decisions.
13       MR. LACY:  I have no further
14   questions.
15       MS. BLOOMER:  I don't have any
16   questions.
17       MR. OXFORD:  I have got some
18   follow-up on those questions and answers.
19   FURTHER EXAMINATION
20   BY MR. OXFORD:
21       Q    Starting at the end, Mr. Raisler, you
22   just testified that in Barclays' view the margin
23   at the OCC was not adequate -- I'm sorry, was not
24   insufficient to cover the exposure that the
25   position had if it was going to take two to weeks

Page 182

1          Confidential - K. Raisler
2    to liquidate?
3          A     Correct.
4               MR. LACY:  I think you misspoke.
5          A     Sufficient, not insufficient; right?
6          Q     Let's go back for one second.
7               Is it your testimony, sir, that the
8    margin that Lehman had posted at the OCC in
9    respect of the VIX positions was insufficient in
10   Barclays' eyes?
11         A     That is correct.
12         Q     And that is based upon a conversation
13   with Barclays; is that correct?
14         A     That's correct.
15              MS. BLOOMER:  I'm going to object and
16         instruct the witness not to disclose the
17         substance of communications with Barclay
18         that were not had in the presence of third
19         parties such as Lehman.
20         A     I think some of these conversations,
21   and I will try to remember as best I can, some of
22   them were within the presence of Lehman and some
23   were not.
24              MS. BLOOMER:  Okay.  So please stick
25         to the ones that were in the presence of

Page 183

1          Confidential - K. Raisler
2    Lehman.
3          Q     Was the basis of the testimony that
4    you gave in response to your partner's questions,
5    was that a conversation that you had in the
6    presence of Lehman or was it not?
7               MS. BLOOMER:  I'm going to object to
8         the extent that requires you to disclose the
9         ones that you had in the presence of only
10        Barclays.
11         A     My recollection is that it was a
12   conversation that was had in the presence of
13   Lehman as we were trying to figure out what the
14   exposure was of this position.
15         Q     Okay.  Who at Lehman's, sir?
16         A     Again, the same vagueness that I had
17   from this morning, but I would have assumed it
18   would be Jeff Jennings and Ron Filler, but I would
19   not be certain about that, and obviously others.
20         Q     Do you remember anyone advising you
21   that there was excess margin of approximately
22   $28 million in connection with the VIX positions?
23              MS. BLOOMER:  Objection, vague as to
24         time frame.
25         Q     Prior to the closing of the

Page 184

1          Confidential - K. Raisler
2    transaction, sir, on the 22nd.
3          A     I recall that there was some
4    discussion about the size of the margin and the --
5    a clear conclusion after discussion with Lehman
6    that the margin was significantly inadequate.
7          Q     Significantly inadequate for what
8    purpose, sir?
9          A     The risk of the position in the view
10   of Barclays, as we discussed it with Lehman, was
11   that this was an illiquid position in an extremely
12   volatile market, and it was a volatility index
13   that therefore had potential enormous swings to
14   it, and as a result, the margin that was being
15   required made assumptions about liquidity and
16   market moves that we thought were too
17   conservative, and therefore, the margin that was
18   already up at the clearing house was not by orders
19   of magnitude sufficient.
20         Q     And who calculated the required
21   margin at the clearing house, sir?  Was that the
22   OCC?
23         A     The OCC would have been the
24   calculator of that, yes.
25         Q     And it's your testimony that the

Page 185

1          Confidential - K. Raisler
2    OCC's requirement for the margins on the VIX
3    positions was unduly conservative -- withdrawn.
4               It's your testimony, sir, that the
5    margin that the OCC required Lehman at the time,
6    prior to the close of the transaction, to post in
7    respect of those VIX positions at the OCC was
8    inadequate to cover Lehman's and in turn Barclays'
9    long-term exposure to those positions?
10         A     I think the way I would characterize
11   it is that there was a significant risk that the
12   margin that had been posted would be insufficient,
13   and in that sense it was too conservative from a
14   risk-taking standpoint for the futures team to
15   take over that position with that small amount of
16   collateral.
17         Q     Was the risk that Barclays was
18   concerned about, sir, was that a risk of market
19   movement post closing?
20         A     Well, it would be a risk of -- since
21   we had guaranteed the OCC's position as of Friday
22   for Monday's close, as of Friday the 19th, it
23   would be a risk that would be in front of us at
24   the time that we discovered it on the 20th,
25   because it was already in effect as of the prior

Page 186

Confidential - K. Raisler

1  day, the 19th.
2  
3      Q      Okay.  Let's go back to the guarantee
4  on the 19th.  Please tell me everything you
5  remember about Barclays' guaranteeing Lehman's
6  obligations to the OCC with effect from the 19th
7  of September, 2008.
8          MS. BLOOMER:  Objection, asked and
9      answered.
10     A      I think simplistically the agreement
11 provides that we were pledging to OCC that any of
12 the obligations that occurred from the time of the
13 agreement forward would be obligations to be met
14 by Barclays.
15     Q      And when you say the agreement, sir,
16 what agreement are you referring to?
17     A      The transfer and assumption
18 agreement.
19     Q      When did Barclays sign the transfer
20 and assumption agreement, sir?
21     A      I understood it was sometime on the
22 19th.
23     Q      If I were to represent to you that
24 Barclays did not in fact sign that until a matter
25 of hours before the closing at around 8 a.m. on

Page 187

Confidential - K. Raisler

1  
2  September 22nd, 2008, would that change your
3  testimony?
4      A      No, because it was effective as of
5  the 19th, as I understood it, regardless of when
6  it was signed.
7      Q      Because Barclays had agreed to this
8  in principle?
9      A      And ultimately when it was -- I guess
10 you could raise an interesting intellectual
11 question if Barclays had decided to walk away from
12 the agreement at that point, what would have
13 happened.  I believe that the agreement when they
14 entered into it was intended to be effective as of
15 the 19th, and that was a pledge and representation
16 that had been made in order to satisfy the OCC,
17 not to take any actions with respect to these
18 positions.
19     Q      Who made that representation that the
20 transfer and assumption agreement -- withdrawn.
21         What is the basis of your testimony,
22 sir, that Barclays had agreed in principle to the
23 transfer and assumption agreement with effect from
24 some point on Friday, the 19th of September, 2008?
25         MS. BLOOMER:  Objection, I think it

Page 188

Confidential - K. Raisler

1  
2  may mischaracterize the witness' testimony.
3      He can clarify it.
4      A      The agreement itself says it's
5  effective as of September 19th close of business.
6  In the discussions that we had on the 18th and the
7  19th, that I had with OCC, it was clear to me that
8  Barclays was stepping up, as it did with the CME,
9  to take responsibility for what occurred over the
10 weekend.
11         I also understood from direct
12 conversations with the OCC, that their insecurity
13 required this type of action as of the 19th, so
14 all of those combined to lead me to that
15 conclusion.
16     Q      Did anybody at Barclays or acting on
17 behalf of Barclays tell you that with effect from
18 Friday the 19th, they had agreed to the TAA?
19         MS. BLOOMER:  Object to the form of
20     the question, and I instruct the witness not
21     to disclose the contents of privileged
22     communications with Barclays.
23     A      I think that to the extent there were
24 such conversation, they would be governed by the
25 privilege that my counsel has highlighted.

Page 189

Confidential - K. Raisler

1  
2      Q      Other than a privileged conversation,
3  sir, you are unable to tell me what the basis is
4  of your testimony that you believe Barclays agreed
5  to the TAA Friday, the 19th?
6          MS. BLOOMER:  Objection.  You are
7      characterizing what he said.  He didn't say
8      that Barclays agreed to the TAA.  He had a
9      discussion about something that was not
10     necessarily the exact same thing as the TAA,
11     Neil.  You have to separate the two, I
12     think, to get a clear record.
13     A      Let me try to clarify, I think.
14     Q      Sure.
15     A      Which is sort of my answer earlier,
16 which is as a result of my conversations with the
17 OCC, as a result of my understanding of their
18 insecurities, and as a result of a demand which
19 they had made, which I had communicated back to
20 Barclays, all of those led me to understand that
21 Barclays had represented to the OCC that effective
22 the close on the 19th, that it was going to stand
23 by all of the obligations of LBI to OCC effective
24 the close of business the 19th?
25     Q      Okay.  I think that is helpful, thank

Page 190

Confidential - K. Raisler

1  you. Let me just zoom in on the last part of your
2  answer there, sir.
3      And you said you understood that
4  Barclays had represented to OCC that effective the
5  close of the 19th, it was going to stand by all of
6  the obligations of LBI to OCC effective the close
7  of the 19th. When did Barclays make that
8  representation to the OCC, to your knowledge?
9      A    Okay. What I was trying to describe
10  was the data points that I had that led me to that
11  conclusion. I don't know when that was done. I
12  don't actually know if it was done, I don't know
13  who did it.
14      But all of the circumstances around
15  my activities and the comfort level that I got
16  from OCC at the end of the day on Friday, the
17  19th, led me to conclude that such a
18  representation almost certainly had to have been
19  made.
20      Q    But you don't know whether or not
21  such a representation was in fact made because you
22  don't have any direct knowledge, it's an
23  inference, sir?
24      A    No, no. I think we tried to separate
25

Page 191

Confidential - K. Raisler

1  this part of the discussion from what I may have
2  obtained through the attorney-client privilege.
3      Q    All right. So, I see what you are
4  saying. So, other than what you may have obtained
5  through the attorney-client privilege, you are
6  unable to identify what representation, if any,
7  was made by Barclays to the OCC as of the 19th of
8  September?
9      MR. LACY: I am going -- on the --
10      Q    As of and on the 19th of September,
11  2008.
12      MR. LACY: The agreement itself is as
13  of the 19th.
14      A    I think I have to rely on what I said
15  in answering the prior questions, yes.
16      Q    When you said, Mr. Raisler, that
17  Barclays had told you it considered the margin
18  that was posted at the OCC in respect of the VIX
19  positions we discussed was inadequate, who told
20  you it was inadequate?
21      MS. BLOOMER: I'm going to object.
22  And please, to the extent -- please.
23      Only disclose the communications that
24  you had in the presence of LBI or a third
25

Page 192

Confidential - K. Raisler

1  party.
2      I'm sorry, is there a concern with
3  that objection, Neil?
4      MR. OXFORD: No.
5      MS. BLOOMER: Okay. Thank you.
6      A    I am reasonably certain it would have
7  been Tim Stack.
8      Q    Was anyone else present for that
9  discussion with Mr. Stack?
10      A    We had a series of discussions, some
11  of which would be privileged, but some of which
12  would have also included, I believe, Jeff Jennings
13  and/or Ron Filler at Lehman as we were trying to
14  get to the bottom of the VIX exposure.
15      Q    And Mr. Stack told you what exactly
16  with respect to the inadequacy of the margin to
17  cover the risk to Barclays?
18      MS. BLOOMER: Same objection.
19      A    Beyond the high-level articulation I
20  have given you, I am not confident that the more
21  detailed conversations occurred in the presence of
22  Lehman rather than just with Mr. Stack alone or
23  with the team at Barclays alone.
24      Q    Did you have any discussions with

Page 193

Confidential - K. Raisler

1  anybody about the need for Barclays to have margin
2  over and above the OCC's minimum requirements in
3  order to protect Barclays against the future
4  market risk of movements of Lehman positions at
5  the OCC for which they were assuming
6  responsibility?
7      MS. BLOOMER: Same objection.
8      A    I think the discussions that we had,
9  that I had with the OCC on the 18th and the 19th,
10  highlighted that point from the OCC's perspective.
11  I know that concern was shared by Barclays as a
12  result of the meeting we had during the week
13  of the 15th.
14      Q    Do you have any other information
15  that answers my last question?
16      I am happy to have it read back.
17  Would you like it read back?
18      A    That's okay.
19      MS. BLOOMER: Again, the same
20  objection.
21      A    No more detail that doesn't implicate
22  the attorney-client privilege.
23      Q    Mr. Lacy asked you some questions
24  about the aggregation of proprietary positions.

Page 194

Confidential - K. Raisler

1  Confidential - K. Raisler
2  Do you remember that testimony?
3      A    Yes, I do.
4      Q    At which exchange or clearing
5  organization were proprietary positions
6  aggregated, sir?
7      A    Basically all of them in the U.S.,
8  and actually, I didn't discuss this in my
9  testimony earlier, but in exchanges around the
10 world, there is a commingling of customer and
11 proprietary in a single account in most
12 jurisdictions, certainly in the -- in Eurex and
13 Germany and a number of Asian exchanges.
14          Specifically in the U.S., there would
15 be a single proprietary account, as there would be
16 a single customer account, and the proprietary
17 account would include the positions of, in this
18 situation, LBI, but also LBI's affiliates and the
19 customers of LBI's affiliates.  All of them would
20 be aggregated in a proprietary account.
21     Q    Why would the customers of LBI
22 affiliates be aggregated in the proprietary
23 account?
24     A    Because under the foreign
25 jurisdictions from which those accounts would

Page 195

1  Confidential - K. Raisler
2  come, because we are talking about non-U.S.
3  affiliates of LBI, the -- those jurisdictions that
4  I just indicated don't distinguish between
5  customer and proprietary, so at the futures broker
6  level, let us say an LBIE level, they would have a
7  single account, and it would commingle proprietary
8  and customer.
9          So when it delivers the position to
10 LBI, LBI would know an account of LBIE or LBSF or
11 some other LBI entity.  It wouldn't know how much
12 of that account was proprietary to that affiliate
13 and how much of it represented customer positions
14 of that foreign affiliate.
15     Q    We covered this next series of
16 questions a little earlier, but I want to make
17 sure I understand what you know about this issue,
18 Mr. Raisler.
19          To your understanding of the business
20 deal, sir, how were the accounts of LBI affiliates
21 being treated in the transfer of the futures
22 business from Lehman to Barclays?
23          MS. BLOOMER:  Objection to form.
24     A    They would be treated -- let me be
25 sure I have this right.  I am not sure I knew then

Page 196

1  Confidential - K. Raisler
2  and I am not sure I recall now.
3      Q    Your letter to the CFTC that we
4  looked at earlier says, "Pursuant to the
5  agreement, LBI will transfer all customer accounts
6  including 100 percent of each customer's net
7  equity as reflected on the books of LBI to the
8  LLC."
9          Do you remember that passage, sir?
10     A    Yes.
11     Q    Is it your testimony that you simply
12 don't remember one way or the other whether
13 affiliates are included within what you meant when
14 you wrote to the CBTC about customer accounts
15 being transferred?
16          MR. LACY:  He has testified about
17 that at some point.
18     A    The affiliates would be included in
19 the house account provision of, of that letter,
20 not the customer provision of that letter.
21     Q    Okay.  Great.
22     A    Since the affiliate would be a house
23 account.
24          And the permission obtained from the
25 CFTC to transfer the house account to -- from LBI

Page 197

1  Confidential - K. Raisler
2  to Barclays is clear from the CFTC's letter.
3          What I don't know, did not know then
4  and don't recall now, was exactly what the terms
5  of the agreement between LBI and Barclays are in
6  terms of the -- sort of the -- not who is, if you
7  will, responsible for those positions, who gets to
8  own them.
9      Q    Do you know, sir, one way or the
10 other whether or not Barclays has charged back the
11 LBI estate for any costs incurred in connection
12 with LBI affiliate accounts?
13          MS. BLOOMER:  Objection to form and
14 to the use of the term "charged back."
15     A    I think I need some clarification.
16     Q    Do you know whether or not Barclays
17 has in any way looked to the LBI estate for the
18 costs it incurred in connection with any LBI
19 affiliate account that was transferred pursuant to
20 the provision in the CFTC letter of the 19th?
21          MS. BLOOMER:  Objection to form.
22     A    I don't know.
23     Q    I think we have covered it before.  I
24 just want to make sure I am not missing anything.
25          Do you know what steps, if any,

Page 198

1       Confidential - K. Raisler
2   Barclays has taken to close out positions on the
3   Tokyo Commodity Exchange?
4       A    I -- we talked earlier a little bit
5   about the Ministry of Finance in Japan.  My best
6   recollection is that the positions were moved,
7   that the customer positions were moved from the
8   LBI affiliate in Japan to the Barclays entity that
9   carries those positions, but that the collateral
10  supporting the positions is tied up in the LBI
11  affiliate bankruptcy in Japan.
12        And there has been communications
13  with, including the Japanese regulators, about
14  releasing those assets.  I believe that
15  proprietary positions of LBI in Japan have been
16  liquidated, but I don't know a lot of detail about
17  that.
18      Q    Do you know who they were liquidated
19  by, sir?
20      A    If they were to have been liquidated,
21  they would have been liquidated by the exchange.
22  Let me put a caveat on that.  It also could have
23  been liquidated by Lehman in the week prior.  I
24  don't know, because the discussions that we have
25  had pretty much across-the-board with the foreign

Page 199

1       Confidential - K. Raisler
2   exchanges had been around customer positions, not
3   house positions, as most of the house positions
4   had been either voluntarily or involuntarily
5   liquidated.
6         The one complication is with those
7   markets that don't distinguish between customer
8   and house, you don't really know what you got.
9       Q    With respect to the Tokyo Grain
10  Exchange, sir, do you know what steps have been
11  taken, if any, to close out any Lehman positions
12  there or to transfer them to Barclays?
13      A    I think the same across all of the
14  Japanese markets.  I don't recall a distinction
15  among them.  I think they are all sort of tied up
16  in the same bankruptcy situation.
17      Q    What about the Hong Kong Futures
18  Exchange, sir?  Do you know what steps have been
19  taken by Barclays to assume LBI's positions at the
20  Hong Kong Futures Exchange?
21        MS. BLOOMER:  Objection to form.
22      A    I think Hong Kong, the positions
23  moved, but the assets haven't, as I described in
24  some other jurisdictions.
25      Q    When the positions move in a

Page 200

1       Confidential - K. Raisler
2   jurisdiction such as Hong Kong and others, I think
3   the U.K. and Germany you described earlier, sir,
4   did Barclays have to make any payment to the
5   exchange in respect of any liability in respect to
6   those positions?
7       A    That -- insofar as the positions
8   moved to Barclays without collateral moving, there
9   would be only two choices.  One is the customer
10  would be responsible for coming up with that, with
11  a -- well, I'm sorry.
12        To be clear, there are two parts to
13  your question.  One is if there is a shortfall in
14  the account, a deficit in the account, there are
15  two sources to fund that, the customer whose
16  liability it is and have the customer put up the
17  money, or you could put up the money, Barclays
18  could have put up the money itself.
19        The other is you would have to
20  re-post initial margin, because the initial margin
21  has been swallowed up in the collateral freeze of
22  the bankrupt broker.  In that case the same, you
23  can go back to your original customer and say, I'm
24  sorry, your money has been frozen.  So if you want
25  to continue to trade, you are going to have to put

Page 201

1       Confidential - K. Raisler
2   up new initial margin.  Or Barclays could have
3   funded it for them on the assumption that Barclays
4   would get back that money at some point in the
5   future.
6         It's my understanding that generally
7   Barclays put up the money in both situations I
8   described, although I think for the most part the
9   initial margin situation was clearer.  The deficit
10  probably would be more of a case by case.
11      Q    Were there futures that Lehman had on
12  the Korea Exchange, sir, do you know?
13      A    There were positions in the Korea
14  Exchange, which were discussed, and we were also
15  trying to get monies released from there as well
16  after the positions I think moved.
17      Q    So Barclays has transferred the
18  positions from Lehman to Barclays at the Korea
19  Exchange; is that right?
20        MS. BLOOMER:  Objection to form.
21      A    I think you misspoke there, but I
22  think that the -- that Barclays as part of the
23  purchase has been able to move the positions that
24  were previously with Lehman to the Barclays
25  account in Korea.

Page 202

Confidential - K. Raisler

1
2    Q    When Barclays, you say pursuant to
3  the agreement, has been able to move these
4  positions, are you talking about the APA, sir?
5    A    It's a fair comment.  I would say in
6  aggregate all of the agreements, without trying to
7  distinguish one versus the other.
8    Q    And I am not trying to be tricky.
9    A    Pursuant to the -- perhaps the
10 oversimplification, would be pursuant to the
11 bankruptcy court order approving the agreements.
12   Q    But in no case are you aware, sir, of
13 a separate agreement other than the bankruptcy
14 court order and any related sale documents?
15   A    There would be no -- as we discussed
16 earlier, no separate or distinct agreement with a
17 foreign exchange or a foreign market that I am
18 aware of, and I would not think there would be.
19   Q    Were there also futures positions on
20 the Malaysia Bursa?
21   A    My recollection is yes, there were.
22 I believe that one or several of the Asian,
23 non-Japanese Asia market exchanges did release
24 some of the capital, some of the collateral back
25 to Barclays.  I just don't recall which markets it

Page 203

Confidential - K. Raisler

1
2  was.
3    Q    Who is responsible for dealing with
4  the Japanese and Asian market exchanges that may
5  have released back some of this collateral back to
6  Barclays?
7    A    It would be the same operations
8  people within Barclays that we discussed at the
9  inception of this deposition.
10   Q    Was that something for which you also
11 had responsibility as an outside counsel to
12 Barclays, sir?
13   A    In the broadest sense.  I was to try
14 to get a handle on that information, and also to
15 the extent clarification was available, clarity
16 around a process to move those positions and the
17 collateral.
18   Q    Did Lehman also have positions at the
19 ICE Futures in Canada?
20   A    Yes, it did.
21     MS. BLOOMER:  Objection, asked and
22 answered.
23   A    Again, we are talking the same --
24 presumably we are talking the same time frame.
25   Q    Yes.

Page 204

Confidential - K. Raisler

1
2    A    The week of September 15th.
3    Q    And have those positions been moved
4  to Barclays?
5    A    My understanding is that those
6  positions have been moved, and my best
7  understanding is the collateral has moved as well.
8      MS. BLOOMER:  Just to clarify, we are
9  talking about customer positions now as
10 opposed to proprietary?
11     MR. OXFORD:  Well, I thought
12 Mr. Raisler testified that with respect to
13 all of the foreign exchanges, he was talking
14 about customer positions.
15   A    I have been focused on customer
16 positions across-the-board, that's correct.
17   Q    So the answers that you have had in
18 response to the series of questions that I have
19 given you were intended to refer to customer
20 positions; is that correct?
21   A    Except where I have indicated that
22 the customer and proprietary may be commingled, in
23 which case it is not clear which is which, in
24 which case positions may have moved that included
25 proprietary positions.

Page 205

Confidential - K. Raisler

1
2    Q    Okay, thank you.
3    A    That would not be true of Canada,
4  where there is a distinction between customer and
5  proprietary accounts.
6    Q    Were there also -- sorry, we have
7  covered Singapore.  Forgive me.  It's getting late
8  and warm here.
9      Kansas City Board of Trade, I forgot
10 whether I asked you if the positions have been
11 moved.
12   A    We discussed the Kansas City Board of
13 Trade.  The -- as we discussed, LBI is not a
14 clearing member of the Kansas City Board of Trade,
15 so it cleared through another broker.  That other
16 broker, I can't remember, I think that Kansas City
17 did not have any customer positions.  It only had
18 affiliate positions.  I think those positions
19 were, were liquidated, but the positions and the
20 collateral did move, to my best recollection.
21   Q    Did Barclays take any steps to move
22 Lehman proprietary futures positions to its
23 account at any exchange or clearing organization
24 or broker outside of the U.S.?
25     MS. BLOOMER:  Objection, lacks

Page 206

Confidential - K. Raisler

1
2      foundation.
3          A      I think almost all of the proprietary
4      positions had been liquidated prior to the
5      effective date of the transaction, the 22nd.  The
6      only ambiguity I have around that is that some of
7      the exchanges, as I indicated, commingled customer
8      and futures, and therefore it would be difficult
9      for them to know which ones were proprietary and
10     which ones were not, and so in those markets the
11     positions might well have moved and then be up to
12     Barclays to sort out which ones were customer and
13     which ones were proprietary and either take over
14     or liquidate the proprietary positions.
15             (Continued on next page with witness
16         jurat.)
17
18
19
20
21
22
23
24
25

Page 207

Confidential - K. Raisler

1
2              MR. OXFORD:  Thank you, Mr. Raisler.
3      I don't have any questions, any further
4      questions for you at this time.
5              MR. LACY:  This deposition is closed.
6          (Time noted:  3:31 p.m.)
7                  oOo
8          I, KENNETH RAISLER, the witness herein,
9      do hereby certify that the foregoing testimony of
10     the pages of this deposition to be a true and
11     correct transcript, subject to the corrections, if
12     any, shown on the attached page.
13
14             _____
15                 KENNETH RAISLER
16     Subscribed and sworn before me this
17     _____day of _____,_____.
18     _____
19         NOTARY PUBLIC
20
21
22
23
24
25

Page 208

1
2      STATE OF NEW YORK  )      Pg.  of Pgs.
3      COUNTY OF NEW YORK  )
4          I wish to make the following changes
5      for the following reasons:
6      PAGE  LINE
7      ____  ____   CHANGE:_____
8             REASON:_____
9      ____  ____   CHANGE:_____
10            REASON:_____
11     ____  ____   CHANGE:_____
12            REASON:_____
13     ____  ____   CHANGE:_____
14            REASON:_____
15     ____  ____   CHANGE:_____
16            REASON:_____
17     ____  ____   CHANGE:_____
18            REASON:_____
19     ____  ____   CHANGE:_____
20            REASON:_____
21     ____  ____   CHANGE:_____
22            REASON:_____
23     ____  ____   CHANGE:_____
24            REASON:_____
25     _____

Page 209

1
2              C E R T I F I C A T E
3      STATE OF NEW YORK    )
4                    : SS.
5      COUNTY OF NEW YORK    )
6
7              I, BONNIE PRUSZYNSKI, a Notary
8      Public with and for the State of New York,
9      do hereby certify:
10         That KENNETH RAISLER, the witness
11     whose deposition is hereinbefore set forth,
12     was duly sworn by me and that such deposition
13     is a true record of the testimony given by
14     the witness.
15         I further certify that I am not related
16     to any of the parties to this action by
17     blood or marriage, and that I am in no way
18     interested in the outcome of this matter.
19         IN WITNESS WHEREOF, I have hereunto
20     set my hand this 1st of March, 2010.
21
22
23             _____
24         Bonnie Pruszynski
25

1
2
3                    I N D E X
4    WITNESS                    PAGE
5    KENNETH RAISLER
6    BY MR. OXFORD              5, 181
7    BY MR. LACY                178
8
9                  E X H I B I T S
10   Exhibit 658A Declaration of Kenneth     5
11        Raisler
12   Exhibit 659-A BCISC 00009676-88      98
13   Exhibit 660-A BCISC 00009653-65      120
14   Exhibit 661-A BCISC 00009298-301     126
15   Exhibit 662-A BCIEXS 00116806-07     167
16   Exhibit 663-A SC 00003451-53         171
17   Exhibit 664-A September 19, 2008      174
18        e-mail plus attachment
19
20
21
22
23
24
25