# BCI Exhibit 635

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4    ------------------------x

5    In Re:

6                          Chapter 11

7    LEHMAN BROTHERS         Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al,    (Jointly Administered)

9            Debtors.

10   ------------------------x

11

12          DEPOSITION OF EDWARD J. ROSEN

13             New York, New York

14             February 19, 2010

15

16   Reported by:

17   MARY F. BOWMAN, RPR, CRR

18   JOB NO. 28461

19

20

21

22

23

24

25

Page 2

```
 1
 2
 3
 4                February 19, 2010
 5                    9:35 a.m.
 6
 7
 8        Deposition of EDWARD J. ROSEN, held at
 9    the offices of Cleary, Gottlieb, Steen &
10    Hamilton, LLP, One Liberty Plaza, New York, New
11    York, before Mary F. Bowman, a Registered
12    Professional Reporter, Certified Realtime
13    Reporter, and Notary Public of the State of New
14    York and New Jersey.
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
 1
 2                   APPEARANCES:
 3
 4    JONES DAY, LLP
 5    Attorneys for Lehman Brothers, Inc.
 6       222 East 41st Street
 7       New York, New York   10017-6702
 8    BY:  ROBERT W. GAFFEY, ESQ.
 9
10
11    BOIES, SCHILLER & FLEXNER, LLP
12    Attorneys for Barclays and The Witness
13       5301 Wisconsin Avenue, NW - Suite 800
14       Washington DC   20015
15    BY:  HAMISH HUME, ESQ.
16
17
18    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
19    Attorneys for the Creditors Committee
20       51 Madison Avenue - 22nd Floor
21       New York, New York   10010
22    BY:  ROBERT DAKIS, ESQ.
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
 1
 2                 APPEARANCES:
 3
 4    HUGHES, HUBBARD & REED, LLP
 5    Attorneys for the SIPA Trustee
 6       One Battery Park Plaza
 7       New York, New York   10004-1482
 8    BY:  WILLIAM R. MAGUIRE, ESQ.
 9       AMINA HASSAN, ESQ.
10
11    CLEARY, GOTTLIEB, STERN & HAMILTON, LLP
12    Attorneys for the witness
13       One Liberty Plaza
14       New York, New York   10006
15    BY:  BOAZ S. MORAG, ESQ.
16       ROBERT P. DAVIS, ESQ.
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
 1
 2
 3
 4
 5        IT IS HEREBY STIPULATED AND AGREED, by
 6    and between the attorneys for the respective
 7    parties herein, that filing and sealing be
 8    and the same are hereby waived.
 9        IT IS FURTHER STIPULATED AND AGREED
10    that all objections, except as to the form
11    of the question, shall be reserved to the
12    time of the trial.
13
14
15        IT IS FURTHER STIPULATED AND AGREED
16    that the within deposition may be sworn to
17    and signed before any officer authorized to
18    administer an oath, with the same force and
19    effect as if signed and sworn to before the
20    Court.
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 6

ROSEN

1
2    (Exhibit 622, declaration of Edward J.
3    Rosen marked for identification, as of this
4    date.)
5    EDWARD J. ROSEN,
6        called as a witness by the parties,
7        having been duly sworn, testified as follows:
8    EXAMINATION BY
9    MR. MAGUIRE:
10       Q.    As you know, my name is Bill Maguire
11   with Hughes, Hubbard & Reed.  I am here with my
12   colleague Amina Hassan.  We represent James
13   Giddens, the SIPA trustee.
14           We are going to ask you some
15   questions.  If any questions are unclear, let me
16   know.  If you need to take a break at any time,
17   just let me know.
18           I will show you a document we have
19   marked as Exhibit 622.  If you can tell me what
20   that document is, sir.
21       A.    It looks like my declaration, pursuant
22   to Rule 30(b)(6).
23       Q.    You have mentioned in the second
24   paragraph that you specialize in derivatives.
25   Do you see that?

TSG Reporting - Worldwide     877-702-9580

Page 7

ROSEN

1
2        A.    Yes.
3        Q.    Can you tell me what -- the
4    derivatives that Barclays acquired in the
5    transaction that's the subject of this, did that
6    include any futures contracts?
7            MR. MORAG:  Object to the form.
8        A.    It did, it did include the acquisition
9    of the futures business.
10       Q.    And did that futures business include
11   any positions?
12       A.    I don't know.  I don't know what
13   positions were actually on.  We didn't handle
14   the futures side of the arrangements.  Those
15   were handled by S&C, by and large.
16       Q.    Did you have an understanding whether
17   any futures contracts were included in the
18   acquisition by Barclays?
19           MR. MORAG:  Object to the form.
20       A.    Yes.  I believe, my understanding was
21   that there were futures positions and listed
22   options positions.
23       Q.    And what kinds of futures and options
24   contracts did you understand Barclays to be
25   acquiring in this transaction?

TSG Reporting - Worldwide     877-702-9580

Page 8

ROSEN

1
2        A.    I'm not sure I understand the
3    question, what type of futures options.
4        Q.    Were they exchange-traded or over the
5    counter?
6        A.    Yes, yes, listed.  Not over the
7    counter.  My understanding was the
8    over-the-counter business was excluded.
9        Q.    Did you have an understanding how
10   Lehman organized its derivatives business?
11       A.    No.
12       Q.    When did you become involved in the
13   transaction?
14       A.    My recollection was sometime around
15   the 15th of September, maybe the 14th of
16   September.
17       Q.    And what was your role?
18           MR. MORAG:  Time frame?  At the start?
19       Q.    Starting on the 15th.
20       A.    On the 15th, going forward, I was both
21   dealing with certain of the deal issues relating
22   to the regulated character of the transaction,
23   and also dealing with certain regulators on
24   issues that needed to be addressed if the deal
25   was going to be closed.

TSG Reporting - Worldwide     877-702-9580

Page 9

ROSEN

1
2        That's primarily what I was doing, but
3    also the clearinghouse issues that arose and the
4    JP Morgan issues that arose, I had some
5    involvement in, as events unfolded between then
6    and the 22nd.
7        Q.    When you say the clearinghouse, are
8    you referring to DTCC?
9        A.    And OCC.
10       Q.    What regulators did you deal with?
11       A.    I spoke with the SEC.  I did have one
12   or two conversations with staff at FINRA, and I
13   had a couple of conversations with folks at the
14   Federal Reserve.
15       Q.    With whom did you deal at the SEC?
16       A.    I had conversations with Mike
17   Macchiaroli, Randall Roy, and Dan Gallagher.
18       Q.    What were the subject of your
19   conversations with Mike Macchiaroli?
20       A.    There were a couple of issues.  The
21   principal issue related to the fact that Lehman
22   operated under a different -- was registered
23   under a different broker dealer regulatory
24   regime with different capital requirements than
25   Barclays, and there were questions about how

TSG Reporting - Worldwide     877-702-9580

ROSEN

1 capital would be computed in the face of the
2 combination of those two entities.
3    Q.   What was the outcome of those
4 discussions?
5    A.   The outcome of those discussions was
6 that the SEC confirmed that following the
7 combination -- it is a little bit complicated,
8 but in essence, that the surviving entity could
9 take advantage of the regulatory status that the
10 LBI broker dealer enjoyed with potential
11 accommodations being made for systems
12 integration, things like that.  Because you have
13 systems to compute capital and they were
14 disparate systems.
15    Q.   Notwithstanding Barclays' acquisition
16 of the North American business, the acquired
17 business would remain subject to the previous
18 regulatory capital regime?
19    A.   It would actually be sort of a
20 combination of the two, but would ultimately, to
21 the extent that the systems were able to
22 consolidate, it could be operated under the same
23 regime, yes.
24    Q.   Did you have any discussions with

TSG Reporting - Worldwide    877-702-9580

ROSEN

1 Mr. Macchiaroli specifically about the amount of
2 capital that would be required to operate the
3 acquired business?
4    A.   The amount of capital?  There was a
5 conversation about whether or not there would be
6 combined tentative net capital, I believe, of
7 5 billion dollars, and I believe the view was
8 that there would be adequate tentative net
9 capital.
10    Q.   What was your understanding as to what
11 tentative net capital meant?
12    A.   It's a calculation before certain
13 deductions for various positions and associated
14 risks of a market credit nature.  I should add I
15 am not an expert on capital computations.
16    Q.   Is what you are describing an
17 understanding that was reached between Barclays
18 and the SEC, that there would be a tentative net
19 capital of 5 billion dollars following the
20 acquisition to support the acquired business?
21    A.   I don't recall it being an express
22 condition or agreement.  And I think, I think
23 people possibly operated under the assumption
24 that there would be adequate tentative net

TSG Reporting - Worldwide    877-702-9580

ROSEN

1 capital as a result of the combination.
2    Q.   Do you know whether any such
3 understanding was documented?
4    A.   There was language -- there was an
5 undertaking, which I don't recall the terms of,
6 there was an undertaking that was provided by
7 Barclays to the SEC, because there hadn't
8 been -- usually you go through a formal process
9 in order to become part of this regime, and
10 there was a document.  I don't recall its
11 contents sitting here now.
12    Q.   Who prepared that undertaking?
13    A.   That was I believe prepared at
14 Barclays.
15    Q.   Who is the person on the Barclays side
16 who was responsible for the net capital
17 discussions with the SEC?
18    A.   That, I mean, I don't know.  I, I
19 believe, corresponded with Jonathan Hughes and
20 Alan Kaplan on those issues.  I don't know who
21 they may have coordinated with internally.
22    Q.   Was there any discussion with Mike
23 Macchiaroli about where Barclays would get the
24 5 billion tentative net capital?

TSG Reporting - Worldwide    877-702-9580

ROSEN

1    MR. MORAG:  Object to the form.
2    A.   No.  Not that I recall, I should say.
3    Q.   Was there any discussion with Mike
4 Macchiaroli as to whether the acquired business
5 itself would be a source of the capital needed
6 to support its future operations?
7    A.   Could you ask the question again.
8    Q.   Yes.  Was there any discussion with
9 Mike Macchiaroli about whether Barclays would
10 obtain the capital to support the business from
11 the business itself?
12    A.   I don't recall discussing with him
13 what the source of the tentative net capital
14 would be.
15    Q.   Was there any discussion with Mike
16 Macchiaroli about day one gain, profit that
17 Barclays expected to make on the acquisition?
18    MR. MORAG:  Objection, foundation,
19 lack of foundation.
20    A.   I don't recall having a conversation
21 with Mike Macchiaroli about that.
22    Q.   Do you recall any such conversation
23 with anyone at the SEC, including Randall Roy or
24 Dan Gallagher?

TSG Reporting - Worldwide    877-702-9580

**ROSEN**

1
2      A.   Remind me again, any conversation
3  regarding --
4      **Q.   About Barclays anticipating making a**
5  **day one gain or profit on the acquisition of the**
6  **business.**
7      A.   I don't recall participating in or
8  being aware.  It doesn't mean that there weren't
9  conversations.  I was not a party to them.
10     **Q.   Were you aware at any point that**
11 **Barclays did anticipate a day one gain or profit**
12 **on the acquisition of the Lehman business?**
13     MR. MORAG:  Objection to form and
14     foundation.
15     A.   I don't recall having conversations
16 about the accounting treatment for the
17 transaction.  So I couldn't say.
18     **Q.   And leaving aside accounting**
19 **treatment, in terms of economic gain, were you**
20 **ever aware that Barclays was anticipating an**
21 **economic gain from the transaction?**
22     MR. MORAG:  Objection to the form.
23     Time frame.
24     A.   I'm not sure what you mean by an
25 economic gain.  I do know that they wouldn't

**ROSEN**

1
2  have done this transaction if they didn't think
3  that it would have been profitable for them to
4  do over the long term.  I think they were making
5  a major bet on their North American investment
6  banking activities and taking a significant risk
7  at the same time.
8      **Q.   But you have no further knowledge**
9  **beyond that general understanding?  And to help**
10 **you, I am specifically talking not about a**
11 **long-term gain or the expected performance of**
12 **the business after the closing, I'm talking**
13 **about whether Barclays anticipated that the**
14 **total economic value of what it was getting in**
15 **the deal would exceed what it was paying, such**
16 **that it would record an immediate economic value**
17 **in favor of Barclays at the closing?**
18     A.   No, but I don't think my involvement
19 in the transaction would have necessarily
20 positioned me to be part to those discussions.
21 If they were to be had, they probably would have
22 been with other people.
23     **Q.   Certainly that was not a subject that**
24 **was discussed in any of your discussions with**
25 **the regulators?**

**ROSEN**

1
2      A.   I don't recall having a conversation
3  with the regulators regarding the details of
4  the -- you know, how the transaction would be
5  reflected on Barclays' books and records.  It
6  was not part of my role in the transaction, I
7  guess.
8      **Q.   Can you tell me any other subjects**
9  **that you discussed with Mike Macchiaroli?**
10     MR. MORAG:  Please try to keep your
11     voice up for the court reporter.
12     A.   Conversations with Mike Macchiaroli.
13 I'm sorry.  I'm trying to remember certain
14 subjects and who I would have spoken with about
15 them.
16     I did have conversations with Mike
17 Macchiaroli about sort of generally how things
18 were going, because he was, from what I
19 understood, the -- at Lehman presiding over sort
20 of developments there.  And we might have had --
21 we had conversations from time to time, and we
22 may have spoken about how things looked from his
23 perspective, and while I don't remember the
24 specifics of the exchange that we had, I do
25 remember coming away from the conversation with

**ROSEN**

1
2  Mike, was, you know, not committal, and I think
3  he was struggling to stay on top of all the
4  information that he needed to figure out sort of
5  where the books and records were, but I do
6  remember coming away with the impression that he
7  was optimistic that the assets there were going
8  to be adequate for covering the customer claims,
9  which was good, because everybody was hoping
10 that there weren't going to be any obstacles.
11     I may have had other conversations,
12 but I can't recall other conversations that I
13 necessarily had with Mike.
14     **Q.   Any other conversations you recall**
15 **with anyone else at the SEC?**
16     A.   Yes.  I did have a conversation with
17 Dan Gallagher at one point which related to an
18 issue that I was not directly negotiating about
19 the PIM accounts and what was coming across and
20 what was not, and I had a conversation with
21 Randall Roy about some additional relief that
22 Barclays -- that Barclays identified relating to
23 the Fed's request that Barclays step into its
24 shoes in the repos that were outstanding with
25 the Fed, and I can't remember, I can't remember

ROSEN

1
2  for sure all the people at the SEC who I might
3  have spoke with, but we did request that the SEC
4  agree to waive certain rights that they might
5  otherwise have been entitled to exercise that
6  might have prevented Barclays from exercising
7  its rights under the repo should the deal not go
8  through. But I honestly can't remember the
9  details of that. We did ultimately get that
10 assurance.
11        And I had a conversation with Bob
12 Colby, who contacted me because there was a
13 miscommunication among the representatives of
14 the clearing organization, OCC, and the SEC, and
15 there was some suggestion that the SEC was
16 imposing a requirement on Lehman that would have
17 prevented Lehman from taking the accounts at
18 OCC -- I am sorry, I mean Barclays, take the
19 accounts under the TAA, and I spoke to him
20 regarding that, and it took a little bit of
21 time, but it was identified as a
22 misunderstanding on the part of outside counsel
23 to OCC. So that issue disappeared.
24    **Q.   Besides that misunderstanding and**
25 **besides the PIM accounts and the repo and**

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  **capital requirements, any other subjects you**
3  **recall discussing with the SEC?**
4     A.   I may have had a number of others. I
5  honestly just don't remember them, sitting here
6  now.
7        You know, I can't remember how far my
8  conversations went with this, but one of the
9  questions presented by the transaction was how
10 the Lehman business would be acquired and what
11 entity, and there are different regulatory
12 consequences if it is acquired by a going broker
13 dealer that is already registered than if it was
14 acquired by a new entity that doesn't enjoy a
15 registration.
16        And there was thinking going on as to
17 the various pros and cons to how the transaction
18 was to be booked -- what entity might take it,
19 and I recall spending some time trying to get
20 the approval to be able to close the deal if we
21 needed to with the Lehman business being
22 acquired by an affiliate or subsidiary of the
23 registered broker dealer, rather than the
24 registered brother teller itself.
25        That ultimately was not necessary, but

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  I believe I spent some time dealing with that
3  issue.
4     **Q.   Do you know which entity acquired the**
5  **PIM business?**
6     A.   Do I know which entity acquired the
7  PIM business. I had thought -- I thought or
8  assumed that it was Barclays Capital, Inc.
9     **Q.   Can you tell me what is or was the PIM**
10 **business?**
11       MR. HUME:  Object to the form.
12    A.   I believe it is a business in which
13 investment management services are provided by
14 Lehman brokers to customers. I don't know more
15 than that. I don't know the business plan, I
16 don't know the scope of it.
17    **Q.   Did you understand that it was part of**
18 **the investment management business, the**
19 **investment management division?**
20    A.   I don't know structurally how it fit
21 into Lehman's organization.
22    **Q.   Do you know whether the customers of**
23 **the PIM business did any trading in derivatives?**
24    A.   I don't -- I didn't have specific
25 knowledge as to whether they did or didn't. I

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  assume it would be possible that they did.
3     **Q.   In paragraph 3 of your declaration,**
4  **you note the basis for your declaration in the**
5  **first sentence.**
6     A.   Yes.
7     **Q.   And you refer to the recollection of**
8  **your partners. Can you tell me to whom you are**
9  **referring there?**
10    A.   It would have included Mr. Davis, and
11 Lindsee Granfield, Duane McLaughlin, David
12 Leinwand, L-E-I-N-W-A-N-D.
13       Dana Fleischman, Vic Lewkow, Boaz
14 Morag. I feel like I am forgetting somebody.
15       MR. MORAG:  Washington?
16    A.   I am sorry, and Mike Mazzuchi, a
17 partner in the Washington office. Thank you.
18 He participated by phone, so I didn't remember
19 him.
20    **Q.   Everyone else participated in person?**
21    A.   Not necessarily. In some cases -- for
22 example, I think Duane McLaughlin was out of
23 town and may have called in.
24    **Q.   How did you go about collecting the**
25 **recollection of these partners?**

TSG Reporting - Worldwide    877-702-9580

| | |
|---|---|
| Page 22 | Page 23 |

**Page 22**

ROSEN

1
2    A.   Talking about the 30(b)(6) issues and
3    discussing our recollection of them.
4       **Q.   Can you tell me when that happened?**
5       MR. HUME:  I am just going to object,
6    because I think the record is unclear
7    whether your question is about recollections
8    reflected in the affidavit versus 30(b)(6)
9    prep.
10      **Q.   Did you distinguish between preparing,**
11   **getting your recollections for your declaration**
12   **and your recollections for your deposition, or**
13   **was that all part of the same process where you**
14   **were preparing to testify either by way of**
15   **declaration or by way of deposition?**
16      A.   Well, obviously the discussions were
17   held earlier with respect to the declaration,
18   sometime during the week leading up to the
19   completion of the declaration.  I don't recall
20   whether Duane McLaughlin or Dana Fleischman
21   participated in those earlier discussions.
22      **Q.   They did, however, participate in**
23   **another round of similar discussions --**
24      A.   After the declaration.
25      **Q.   -- after the declaration.**

TSG Reporting - Worldwide    877-702-9580

**Page 23**

ROSEN

1
2       **And when was that?  Was that just in**
3    **the last week?**
4       A.   The week before, primarily.  And
5    yesterday, but only a small subset.
6       **Q.   And how did you actually get the**
7    **recollection from the partners?  How did you**
8    **find out what they remembered?**
9       A.   I'm not quite sure I understand the
10   question.  We talked amongst ourselves about the
11   events and our recollections of them covered by
12   the 30(b)(6).
13      **Q.   Did any of your partners remember**
14   **things that you did not remember?**
15      A.   I would say yes, we all had different
16   recollections.
17      **Q.   Now, you note in your declaration,**
18   **paragraph 3, you say, "Where indicated, the**
19   **recollection of my partners."  Do you see that?**
20   **It's on the second line of paragraph 3.**
21      A.   Um-hm.  I do see that.
22      **Q.   Is there any recollection that any of**
23   **your partners gave you that you did not set**
24   **forth in this declaration?**
25      MR. MORAG:  Objection to form and

TSG Reporting - Worldwide    877-702-9580

**Page 24**

ROSEN

1
2    objection on the attorney/client privilege
3    and work product.
4       MR. MAGUIRE:  Are you objecting or
5    directing the witness not to answer?
6       MR. MORAG:  If I understand your
7    question correctly, I'm directing him not to
8    answer.
9       **Q.   In paragraph 4, sir, you refer to the**
10   **removal of certain language.  Do you see that?**
11      A.   Yes.
12      **Q.   And you note specifically the draft**
13   **that it was removed from.**
14      A.   I am sorry.
15      **Q.   You refer to language -- you refer to**
16   **a draft that contained that language?**
17      A.   Yes.
18      **Q.   And the draft language that you are**
19   **referring to, you set that forth in paragraph 5;**
20   **is that correct?**
21      A.   I am sorry, in paragraph 4, I don't
22   see a reference to paragraph 5.
23      **Q.   That's correct.  In paragraph 4, you**
24   **refer to the removal of certain language.**
25      A.   Yes.  I am sorry.  You are referring

TSG Reporting - Worldwide    877-702-9580

**Page 25**

ROSEN

1
2    to paragraph 5 of the declaration, not
3    paragraph -- OK, could you repeat the question.
4       **Q.   I just want to make sure we are on the**
5    **same page here.  You're -- when you talk about**
6    **the certain language in paragraph 4, you are**
7    **referring to the language that you set forth in**
8    **quotes in paragraph 5 of your declaration?**
9       A.   Yes.  This is a reference to the
10   language in 1D.
11      MR. MORAG:  Let me note for the record
12   that the quoted language in paragraph 5 does
13   have ellipses and was not intended to be a
14   full quote.
15      **Q.   As a matter of reference, we are**
16   **talking about the same language?**
17      A.   Yes.
18      **Q.   At the end of paragraph 4, you say**
19   **that the trustee's position is incorrect, and**
20   **you say, "There was to my or my partners'**
21   **knowledge never any such agreement or**
22   **discussion."  Do you see that?**
23      A.   Yes.
24      **Q.   Sir, was there any discussion, to your**
25   **knowledge, or to the knowledge of your partners,**

TSG Reporting - Worldwide    877-702-9580

Page 26

**ROSEN**

1
2 **with anyone, about the removal of the language**
3 **that you discuss in paragraphs 4 and 5 of your**
4 **declaration?**
5     MR. MORAG: Object to the form, and to
6     the extent -- you can answer to the extent
7     you're going to talk about discussion with
8     anyone on the Lehman side.
9     THE WITNESS: Yeah, I know, it's fine.
10     A. The only -- I -- the answer is, I
11 don't recall the specific content of the
12 discussion. But in response to that language,
13 there was -- there was additional language that
14 we drafted that was provided and identified to
15 Lehman's attorneys explaining that this language
16 was needed in light of the changes that had been
17 made to 1D.
18     Q. And is that, sir, your recollection or
19 **the recollection of one of your partners?**
20     A. Well, we gave -- it is our collective
21 recollection that we drafted the additional
22 language, and it was our recollection that we
23 provided that in the form of a handwritten
24 markup, and I don't recall, and I'm not sure any
25 of my partners specifically recall, who actually

TSG Reporting - Worldwide    877-702-9580

---

Page 27

ROSEN

1
2 handed the markup over to the Lehman side, but
3 it was provided to the Lehman side in the form
4 of handwritten comments.
5     Q. **And the handwritten comments, are**
6 **those the ones that included the parenthetical**
7 **"property held to secure"?**
8     A. Yes, yes.
9     Q. **Have you seen those handwritten**
10 **comments?**
11     MR. MORAG: Time frame?
12     Q. **At any time?**
13     A. You mean including at the time that
14 they were drafted?
15     Q. **Yes.**
16     A. The recollection of the group was that
17 I drafted them.
18     Q. **Do you recall actually what you did**
19 **with those handwritten notes?**
20     A. I would have given them to one of my
21 partners.
22     Q. **Have you seen them since the weekend**
23 **when those notes were prepared?**
24     A. No, no, I have not.
25     Q. **Do you know whether they exist today?**

TSG Reporting - Worldwide    877-702-9580

---

Page 28

**ROSEN**

1
2     A. I don't know.
3     Q. **Do you know whether, in fact, you did**
4 **give them to somebody or what you did with those**
5 **handwritten notes?**
6     A. My recollection is that I handed them
7 to one of my partners.
8     Q. **Do you know which partner you handed**
9 **them to?**
10     A. I don't recall specifically.
11     Q. **Do you have a general recollection?**
12     A. I have a general recollection, it
13 would have been Bob Davis or Duane McLaughlin or
14 David Leinwand. It would have been one of those
15 three.
16     Q. **Have you asked your partners for that**
17 **draft?**
18     A. No, I haven't.
19     Q. **Do you know whether anyone has**
20 **attempted to locate that draft?**
21     A. I don't know.
22     Q. **Did you talk to anyone on the Lehman**
23 **side concerning the insertion of the**
24 **parenthetical that you were proposing in that**
25 **draft?**

TSG Reporting - Worldwide    877-702-9580

---

Page 29

ROSEN

1
2     A. Did I personally speak to anyone on
3 the Lehman side? Well, it depends upon -- I am
4 sorry, I personally did not speak to anyone on
5 the Lehman side.
6     Q. **Do you know whether any of your**
7 **partners spoke to anyone on the Lehman side**
8 **about including that parenthetical in the**
9 **clarification letter?**
10     A. Our understanding, our recollection,
11 Cleary's recollection, is that it would have
12 been -- it would have been identified as a
13 change to be made to the agreement, to the --
14 whoever the lawyer was on the -- representing
15 Lehman that was handling the document.
16     Q. **And do you know who the lawyer on the**
17 **Lehman side was to whom it was handed?**
18     A. I don't know. I don't know.
19     Q. **And the draft that was handed to that**
20 **Lehman lawyer, did it have any other handwritten**
21 **changes?**
22     A. I'm trying to remember. There were
23 two other changes that I recall, and you will
24 have to forgive me for being a little bit
25 unclear about the timing or the sequencing, but

TSG Reporting - Worldwide    877-702-9580

Page 30

ROSEN

1  I believe there were two other changes.
2      One, there was language -- let me back
3  up and ask you this question and get
4  clarification. Are you asking me just about the
5  language that's described in 1D, or are you
6  asking about other changes to the clarification
7  letter?
8      Q.   Let's get our time frame and context
9  **together first. I'm talking to you specifically**
10 **about the draft that I understand from your**
11 **testimony in which you, in handwriting, inserted**
12 **the parenthetical that includes the words "and**
13 **property held to secure."**
14     A.   Yes.
15     Q.   And the question is whether that draft
16 **included any other proposed changes.**
17     A.   I'd have to go back and look at the
18 sequence of the drafts. There were two other
19 changes that may or may not have been
20 simultaneous. I don't know. They may have been
21 given sequentially but have been processed by
22 the other side as part of one turn. I don't, I
23 don't recall.
24     But there was a change in the

TSG Reporting - Worldwide    877-702-9580

Page 31

ROSEN

1  clarification of language concerning 15c3-3,
2  provision to add the word "or value" at the end
3  of a sentence, and there was a sentence to
4  clarify what had been agreed as part of the
5  resolution of issues with DTC, that the
6  liabilities to DTC associated with Lehman were
7  excluded liabilities under the APA.
8      Q.   I am going to ask you again
9  **specifically about the draft in which you**
10 **inserted that parenthetical "property held to**
11 **secure."**
12     With respect to that draft, can you
13 **tell me what, if anything, was said about anyone**
14 **on the Barclays side or the Cleary side to the**
15 **person on the Lehman side who received that**
16 **draft?**
17     A.   No, I can't give you verbatim what
18 would have been said, but what would ordinarily
19 happen in that circumstance is that the changes
20 would be identified to the other side so they
21 could understand what was being provided to
22 them.
23     Q.   And when you say the changes would be
24 **identified, the other side would be shown what**

TSG Reporting - Worldwide    877-702-9580

Page 32

ROSEN

1  **the proposed language was?**
2      A.   Yes. We did not control the
3  documents, so Cleary did not input those
4  changes. Those changes were put into whatever
5  revised draft emerged in whatever time it
6  emerged by the Lehman's counsel.
7      Q.   Other than pointing out the changed
8  **language, do you know what, if anything, was**
9  **said to Lehman about the addition of that**
10 **parenthetical?**
11     A.   No. Not at that time.
12     Q.   When you say not at that time, is
13 **there some other time that there was a**
14 **discussion --**
15     A.   Not about that specific parenthetical
16 but about the subject, there were a lot of --
17 there were exchanges of a number of
18 communications and documents that I think were
19 addressed to the same issue that were exchanged.
20     Q.   I would like to go through some of
21 **them, and the first one I'd like to take is the**
22 **one that you refer to in paragraph 4. And**
23 **that's the draft language that you have put**
24 **forth in quotes in paragraph 5.**

TSG Reporting - Worldwide    877-702-9580

Page 33

ROSEN

1  **And if we get our sequence right,**
2  **there was a draft that included this language**
3  **which has an express reference to margin, and**
4  **that's the language you have set forth in**
5  **paragraph 5, right?**
6      A.   I am sorry, could you repeat the
7  question about this language.
8      Q.   Yes. Let's get our context right
9  **first.**
10     I invite you to look at paragraph 5
11 **and look at the draft language that you have,**
12 **starting with the quotes, "any and all**
13 **property."**
14     A.   I am sorry, where are you in
15 paragraph 5?
16     Q.   About midway down, the second full
17 **sentence: "The draft language accomplished this**
18 **by making clear that the definition of**
19 **excluded assets did not include 'any and all property,'"**
20 **and it continues.**
21     A.   Correct.
22     Q.   So for my next couple of questions, I
23 **am going to be asking you specifically about**
24 **that language and the draft in which that**

TSG Reporting - Worldwide    877-702-9580

Page 34

```
 1              ROSEN
 2   language was deleted or crossed out.  Are you
 3   with me?
 4       A.   Yes.
 5       Q.   Did you see the draft in which that
 6   language was crossed out?
 7           MR. MORAG:  Object to the form.  I
 8       also object to the representation that all
 9       of the language was crossed out.  If you
10       want to show him the actual draft, it may be
11       more appropriate.
12       A.   I saw a draft which included a number
13   of changes in which language was moved to other
14   sections and modifications were made, and those
15   modifications included modifications to this
16   language.  Yes, I did.
17       Q.   And you refer to this as the removal
18   of certain language in paragraph 4?
19       A.   Well, I would -- without mincing
20   words, I would say that there was a draft
21   prepared that dealt with some of these issues in
22   other ways, in other provisions of the
23   agreement.
24       Q.   Did you see the draft in which the
25   language you quote in paragraph 5 was removed?
```

TSG Reporting - Worldwide    877-702-9580

Page 35

```
 1              ROSEN
 2       A.   Yes.  Well, subject to the caveat as
 3   to what you mean by remove.
 4       Q.   What I mean by removed is the language
 5   that you quote was deleted, it was marked as
 6   deleted?
 7           MR. MORAG:  Object to the form.
 8       Q.   Did you see such a draft?
 9       A.   I saw a draft in which this language
10   did not appear in this form.
11       Q.   Did this language appear in any other
12   form in that draft?
13       A.   Some of it did and obviously some of
14   it didn't.
15       Q.   And what part of it did not?
16       A.   I'd have to -- I would have to look at
17   the particular draft of the agreement to answer
18   that question.  I can't recall with accuracy --
19   with accuracy what the other changes were that
20   were made at the same time as this change was
21   made.
22       Q.   Once you saw that draft, did you
23   personally have any discussions with anyone on
24   the Lehman side concerning the removal of any of
25   this language?
```

TSG Reporting - Worldwide    877-702-9580

Page 36

```
 1              ROSEN
 2       A.   As I said earlier, we prepared
 3   language, I prepared language, and that language
 4   was provided to Lehman, and they would have
 5   identified to Lehman that this language was now
 6   necessary.
 7       Q.   Yes.  And I understand that testimony.
 8   I was just asking whether there was any other
 9   conversation that you recalled.
10       A.   No, not that I was -- not that I am
11   aware of.
12       Q.   Are you aware of any discussion
13   involving any of your partners and anyone on the
14   Lehman side --
15       A.   Actually, hang on just a second.  Hang
16   on just a second.
17           I need to see the clarification
18   agreement in which this language appears,
19   because this language deals with a number of
20   issues that were in flux at the time, some of
21   which were the subject of discussions.
22           There was language that addresses
23   15c3-3, as I said earlier, that also addressed
24   the DTC situation which had changed.  And so --
25   and there were conversations obviously among the
```

TSG Reporting - Worldwide    877-702-9580

Page 37

```
 1              ROSEN
 2   parties about a number of issues that are
 3   addressed in this language.
 4           But as I said, with respect
 5   specifically to the language that was added in
 6   response in section 1(a)(ii)(C), the
 7   conversation would have been in connection with
 8   the transmittal of that language to the Lehman
 9   side.
10       Q.   And you don't recall any other
11   communication with the Lehman side concerning
12   the removal of this language beyond what you
13   have told us?
14           MR. HUME:  Object to the form.
15           MR. MORAG:  Same objection.
16       A.   I think the -- other than the language
17   itself, other than the changes that were
18   proffered by Cleary having received a revised
19   draft and discussions that I suspect we are
20   going to cover relating to 15c3-3, and the
21   discussions relating to DTCC, there were no
22   specific conversations that we had and none that
23   we thought were necessary, because this was part
24   of the deal.
25       Q.   Did you have any discussions with
```

TSG Reporting - Worldwide    877-702-9580

ROSEN

1    **ROSEN**
2    **anyone on the Lehman side concerning margin?**
3        MR. MORAG:  Time frame?
4        **Q.    Over the weekend prior to the closing?**
5        MR. MORAG:  Objection to the form.
6        Objection to the term "margin."
7        A.    Well, there were conversations --
8    there were e-mail communications in which I was
9    copied and Lehman's people were copied about
10   what was going to happen to the margin at OCC.
11   Not just the margin but the property associated
12   with those accounts, yes, in which OCC said,
13   consistent with the order in their -- what was
14   then the draft TAA that they had prepared, was
15   going to be transferred to Barclays.
16       **Q.    Any discussions about margin with**
17   **anyone on the Lehman side other than in**
18   **connection with the OCC?**
19       MR. MORAG:  Objection to the form.
20       A.    There was an e-mail to me copying
21   Lehman, I believe, about the transfer of a
22   certain amount of margin -- I can't remember
23   exactly what it was -- in which Lehman was
24   copied.  I think that e-mail was from Jim
25   McDaniel.  I think the trustee's representatives

ROSEN

1    ROSEN
2    were also copied on that.
3        **Q.    And that's in connection --**
4    **Mr. McDaniel represented the OCC?**
5        A.    The OCC.
6        **Q.    Yes.**
7            **Other than with respect to the OCC,**
8    **any discussions that you had concerning margin?**
9        A.    Well, verbal discussions?
10       **Q.    Yes.**
11       A.    I believe that there were conference
12   calls about the clearinghouses.  I think they
13   may have been scheduled for Saturday or Sunday,
14   and the arrangements that were going to be made
15   and the transfers, and I believe that
16   representatives from Lehman were on those calls.
17   I cannot recall specifically, either the
18   specific discussions or exactly when they
19   occurred.
20           And it would have -- I think it
21   probably included discussions about how things
22   were going to be done in the transfer of margin
23   and the like.
24       **Q.    What clearinghouses are you referring**
25   **to?**

ROSEN

1    **ROSEN**
2        A.    DTC and OCC.
3        **Q.    Do you recall any discussion**
4    **concerning margin at DTCC?**
5        A.    Discussing margin at DTCC?  Well,
6    there were discussions about the DTC accounts
7    and how they were going to be handled, and those
8    accounts would have included both proprietary
9    positions, customers' positions, positions that
10   may have been margined, and so indirectly, all
11   of those discussions with DTC potentially
12   included discussions about margin, to the extent
13   that that was relevant.
14       **Q.    Any express reference to margin?**
15   **Margin coming up in any express way in any**
16   **conversation with DTC that you remember?**
17       A.    Well, in the sense that to the extent
18   that anything constituted margin that was in
19   there and the discussions covered those
20   accounts, yes.  But I don't remember us
21   specifically singling out margin as a topic.
22       **Q.    Do you recall any discussions about**
23   **margin at any foreign exchanges or**
24   **clearinghouses?**
25       A.    Again, I don't recall conversations

ROSEN

1    ROSEN
2    with foreign clearinghouses, but to the extent
3    that we discussed the accounts that were going
4    over and the credit support for them, to the
5    extent that as part of the business that was
6    being transferred, there were positions in those
7    accounts, they would have been covered by the
8    conversations.
9        **Q.    And do you recall any specific such**
10   **conversations?**
11       A.    Well, there were negotiations between
12   the parties about the business, so if you're
13   saying that I'm taking the FCM business and if
14   that business includes positions that are traded
15   on foreign markets, then by definition you're
16   talking about them as part of the same thing.
17   If you are taking that business and customer and
18   other deposits associated with them and assets
19   associated with that business, then yes, you are
20   talking about the margin indirectly, although
21   you may not be specifically singling it out.
22       **Q.    That's what I want to do.  I want to**
23   **single it out.**
24           **Do you recall a specific singling out,**
25   **a specific mention of either margin or guarantee**

Page 42

**ROSEN**

1
2 **fund deposit in any conversations other than in**
3 **connection with the OCC?**
4     MR. HUME: Objection, asked and
5 answered.
6     A.   I think I would say that the
7 discussions about the assets that were being
8 transferred in connection with the business and
9 any deposits is a discussion about guarantee
10 fund deposits and margin at those clearing
11 organizations.
12     **Q.   I understand that testimony.  The**
13 **question is, do you have a recollection or have**
14 **you heard from any of your partners their**
15 **hearing that somebody specifically referred,**
16 **specifically to margin or guarantee fund deposit**
17 **in any of those discussions?**
18     A.   I think that the answer to your
19 question is that in the documents, that is
20 covered.  And I'm confident that there may have
21 been -- I shouldn't say that.
22     I don't recall the specific
23 conversations that we had with the clearing
24 organizations and other lawyers who may have
25 been involved.  We may have or may not have

TSG Reporting - Worldwide    877-702-9580

Page 43

ROSEN

1
2 specifically referred to the word "margin" on
3 those calls.
4     But we did repeatedly exchange
5 communications regarding the various forms of
6 assets that would be coming over, for example,
7 under the TAA.
8     **Q.   We have been talking now about the**
9 **time period over the weekend prior to the**
10 **closing.  I would like to just ask you if I have**
11 **missed anything, if we go back to the work that**
12 **you were doing from the 15th on, anytime up to**
13 **that weekend.  During that period, do you recall**
14 **any discussions specifically in which margin or**
15 **guarantee fund deposit were mentioned?**
16     A.   Again, I would say in the deal
17 documentation relating to the transfer of assets
18 associated with those businesses that were being
19 transferred and the agreements as to the
20 inclusion of deposits, including customer
21 deposits, yes, they were the subject of
22 communications in that form.
23     **Q.   And what discussion do you remember in**
24 **which anyone specifically referred to margin?**
25     A.   As I say, I don't recall specifically

TSG Reporting - Worldwide    877-702-9580

Page 44

ROSEN

1
2 the content of specific conversations that I may
3 have had at that time.
4     **Q.   Is there any conversation that you're**
5 **aware of where anyone on the Barclays or Cleary**
6 **side had specifically discussed guarantee funds**
7 **deposit?**
8     MR. MORAG:  You can answer to the
9 extent it involves someone on the Lehman or
10 OCC or DTC side as well.
11     A.   It was never raised as an issue for
12 discussion, because it was assumed by all
13 parties, I think, that it was part of the
14 business.  And certainly nobody on the Lehman
15 side ever suggested or raised the question as to
16 its needing to be singled out from the language
17 that otherwise covered it.
18     **Q.   Now, when you saw that the draft**
19 **language referring to margin and guarantee fund**
20 **deposit had been removed from the draft, did**
21 **that suggest to you that there needed to be a**
22 **discussion about this or that someone on the**
23 **Lehman side was suggesting that they had**
24 **different assumptions or different**
25 **understandings from what you had?**

TSG Reporting - Worldwide    877-702-9580

Page 45

**ROSEN**

1
2     MR. MORAG:  Objection to form.
3 Compound.
4     A.   As I mentioned, the language that came
5 out was actually not specific to OTC -- to
6 listed derivatives or listed derivatives
7 customers.  It was language that sort of
8 addressed a variety of issues.
9     And so I would not have drawn any
10 necessary inference as to what specifically the
11 concerns were that, from the Lehman side, were
12 being addressed.  There were changes to the deal
13 that needed to be addressed in that language.
14 There were changes in the agreements that
15 related to the handling of -- I'm sorry.  There
16 were changes in the language that was
17 documenting, for lack of a better reference, the
18 15c3-3 treatment, and indeed the fact that the
19 DTC arrangement had essentially changed.
20     So it was clear that the language that
21 was modified needed to be modified.  As to
22 whether or not that modification signaled a
23 specific view about the treatment of credit
24 support for exchange-traded derivatives, you
25 would never know until you clarified it with

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2    your own language, and to my knowledge, nobody
3    on the Lehman side, when presented with that
4    language, expressed any surprise or objection.
5        So I think the clear inference is that
6    it was not a surprise to them, and therefore, we
7    inferred that there was no intent to communicate
8    to us that they didn't think it was part of the
9    deal, or anybody else who had the opportunity to
10   see those changes, which would have been all the
11   signatories.
12       Q.   So you didn't feel there was any need
13   to go up and have a specific discussion with the
14   folks on the Lehman side about the removal of
15   the language?
16       A.   I didn't think that there was anything
17   more that needed to be done than to provide to
18   them the language that we thought was
19   appropriate in order to clarify what the deal's
20   agreement was with respect to the treatment of
21   that credit support, that property.  That is the
22   way we ordinarily communicate in a transaction
23   of this type.
24       Q.   In the beginning of the, of your
25   paragraph 5, you note that the draft language at

ROSEN

1
2    issue was an attempt to accurately document the
3    business deal.  Do you see that?
4        A.   Yes.
5        Q.   What is the business deal that you are
6    referring to there?
7        A.   Here, that Barclays was acquiring the
8    exchange-traded businesses, exchange-traded
9    derivatives businesses of Lehman and the assets
10   and customer deposits and other deposits that
11   were part of that business.
12       Q.   Are you aware of whether there was any
13   business discussion between the Barclays and
14   Lehman folks concerning specifically the
15   acquisition of either margin or clearing fund,
16   guarantee fund deposit?
17       MR. HUME:  Objection, asked and
18   answered.
19       MR. MORAG:  Objection, form.
20       A.   I don't know whether there were or
21   weren't.  I assume as part of the negotiation of
22   the deal leading up to the description, the
23   documentation of it, that it was implicit in
24   those discussions.
25       Q.   You go on to say that the draft

ROSEN

1
2    language accomplished this, the beginning of the
3    next sentence.  Do you see that, sir?
4        A.   Um-hm.
5        Q.   Can you tell me, what did the draft
6    language accomplish?
7        A.   What did the -- in relation to the
8    exchange-traded derivatives, that it -- what
9    it -- what this -- I am sorry, let me see.
10       It included language that, as I said,
11   covered a wide variety of things, but also would
12   have provided -- I am sorry, included language
13   that clarified that the property of any kind
14   that was basically held by any of these or in
15   any of these forms, was not an excluded asset
16   under the terms of the deal documentation.
17       Q.   And in the quotes, you have "any and
18   all property," and then you have square
19   parenthesis, "including cash."  Do you see that?
20       A.   Um-hm.
21       Q.   Why did you include those square
22   brackets around the words "including cash"?
23       A.   Just as a clarification.  It's not
24   necessary, but just for the sake of -- for the
25   avoidance of any lack of clarity.

ROSEN

1
2        Q.   Why did you not include those words in
3    the handwritten parenthetical that you provided?
4        A.   The answer to that question -- I'm
5    going to try to answer this without going into
6    attorney/client privileges, but the answer to
7    that question is because we also came to believe
8    that this was not the best location for
9    clarifying this, because this got caught up in
10   provisions dealing with, you know, what the
11   parties understood to be an exception to the
12   excluded assets, and excluded assets included
13   cash.  So we wanted to make sure in this
14   provision that it was relevant.
15       But on the other hand, we realized
16   that providing this clarification in an
17   exclusion to the -- to an exclusion was not the
18   clearest way to do it and, therefore, we decided
19   in response, rather than go back into this
20   provision and start wordsmithing, which we
21   didn't have the time to do, we would just make
22   it abundantly clear, in as concise words as we
23   could, what the purchased assets included in
24   relation to that business.
25       Q.   And you made it abundantly clear by

ROSEN

2 putting the parenthetical that made clear it
3 included property held to secure?
4     A.  Yes.
5     Q.   And my question is, why did you not
6 include, beside "property," the words "including
7 cash"?
8     A.   Didn't think it was necessary.  At
9 this point in time, it was 5 or 6 o'clock in the
10 morning.  We were extremely concerned about
11 whether we were going to run out of time in
12 terms of the objective of having this deal
13 signed in time to be announced early in the
14 morning, so as to avoid any negative sort of
15 market reaction to the deal not being announced.
16     And we were trying in as concise a
17 form as possible and as clear a form as possible
18 to get it down and not to get embroiled in
19 parsing words.
20     So, I, I mean did I have -- would I
21 have preferred to have had hours to have sat
22 down and drafted it and perfected it?  I
23 certainly would.  But I thought it was
24 absolutely clear that if we said "any property,"
25 that it would include cash, noncash, securities,

ROSEN

2 nonsecurities, whether or not it was held by
3 Lehman, by a clearing organization, wherever it
4 was, and whoever was holding it and whatever its
5 character might be.
6     I think for the purpose of clarifying
7 what might have been a subject of dispute in
8 light of the deletion of that language, we
9 didn't think it was actually necessary to
10 include the language, but we were concerned
11 about the sort of negative inferences that could
12 arise, and so we thought because it was an
13 important point for the deal that we would make
14 it as clear as we could, as concisely as we
15 could.
16     Q.   You had had a discussion, and we will
17 get to this a little bit later, on the subject
18 of whether cash in the 15c3 account could be
19 transferred to Barclays.  You recall that?
20     A.  Yes.
21     Q.   And in connection with that, some of
22 the Lehman people at least took the position
23 that cash could not be properly transferred?
24     A.   I wouldn't describe what they said as
25 that.  I would say, this was part of the purpose

ROSEN

2 of the clarification letter.  There were
3 provisions about deposits, customer deposits.
4 There were provisions in the excluded assets
5 provisions of the APA regarding bank accounts.
6 And I think it was clear to us that the 15c3-3
7 assets were assets of the business that we were
8 buying.
9     I would describe what I heard at least
10 as being an expression of concern as to whether
11 in light of what had been said to the court
12 about bank deposits, whether or not if we were
13 going to include cash in bank deposits -- that
14 would be in bank deposits, whether some
15 additional steps might need to be taken, which
16 would have been inconsistent with completing the
17 deal and being able to announce it.
18     But I don't recall anybody saying that
19 it couldn't be done or that it wasn't part of
20 the deal or that it wouldn't be permitted or
21 that it wasn't part of the sale order.  There
22 was, I would have said, a decision taken to
23 avoid the issue by limiting the account assets.
24     MR. HUME:  We have been going for
25     about an hour.  Can we have a break?

ROSEN

2     MR. MAGUIRE:  Sure.  If we can just
3     wrap up this.  It might take a couple of
4     minutes.
5     Q.   Were you at the sale hearing?
6     A.   Only during the, for lack of a better
7 word, the intermission.  It went into recess and
8 I was there.  I was not actually there at the
9 time that it was --
10     Q.   Do you know whether the court was told
11 anything about bank deposits as opposed to cash?
12     A.   No, I don't know.  I just know that
13 the issue about it was raised, and under the
14 circumstances, people were willing to eliminate
15 the issue, rather than -- because I think the
16 feeling was that if we didn't close before the
17 Monday open, there may have been greater
18 jeopardy to the deal.
19     Q.   In order to avoid the issue, Barclays
20 agreed that it would not take any of the cash in
21 the Wells Fargo account that was part of the
22 15c3 account?
23     MR. MORAG:  Objection to the form.
24     A.   I would say Barclays agreed to include
25 language in the clarification letter that only

ROSEN

1
2     called out the transfer of a certain amount of
3     securities associated with the 15c3 account, or
4     if those weren't available, other securities of
5     similar value.
6         Q.    And did not call out the 1 billion
7     dollars in cash that was at Wells Fargo?
8         A.    Not in the clarification provision,
9     correct.
10        Q.    Now, given those discussions, and the
11    decision by everyone to avoid the cash issue,
12    did it occur to you that the words "including
13    cash" should be included in the parenthetical
14    when you described property held to secure?
15        A.    No. No, because I thought there was a
16    clear distinction between deposits and customer
17    deposits and LBI cash in its bank accounts.
18        MR. MAGUIRE:  This is a good time for
19    a break.
20        (Recess)
21        MR. MORAG:  I should just put on the
22    record, to the extent, Mr. Maguire, you're
23    curious, Cleary did search for all
24    documents, including any handwritten notes,
25    and our production does not include them

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2     because we were not able to find the markup
3     that you asked about in your examination.
4         MR. MAGUIRE:  I appreciate that.
5         MR. HUME:  I should also state we have
6     looked for it in the Weil production, have
7     not found it.  I'm double checking.
8         THE WITNESS:  Which would have been
9     consistent with our handing it to Weil to
10    deal with the document.
11    BY MR. MAGUIRE:
12        Q.    Sir, before the break, we were in
13    paragraph 5 of your declaration and we were
14    talking about the -- what you referred to as the
15    business deal in the first and second lines of
16    that declaration.
17        Was it your understanding that the
18    business deal was documented in the asset
19    purchase agreement?
20        A.    It was my understanding that the deal
21    was documented in the asset purchase agreement,
22    the first amendment in the clarification letter.
23        Q.    The language that we have been talking
24    about in the quotes at the bottom of page 2 of
25    your declaration, starting with "any and all

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2     property," did you draft that language?
3         A.    I'm sorry, could you --
4         MR. MORAG:  Starting here.
5         Q.    Paragraph 5 on page 2 and starting
6     with the language we have been talking about
7     that starts with the quotation "any and all
8     property."
9         A.    I was involved in its drafting, but I
10    think it was, like many things, a bit of a group
11    process.
12        Q.    So who were the members of this group?
13        A.    The members of the group on the Cleary
14    side would have been me, Dana Fleischman, Bob
15    Davis, Duane McLaughlin, possibly David
16    Leinwand.  Whether -- the extent to which any of
17    one of them was specifically involved in
18    particular language, I don't recall.
19        Q.    So this was a collective, this
20    language was a collective drafting effort of a
21    number of Cleary lawyers?
22        A.    Yes, although I would say probably
23    principally me.
24        Q.    When it was proposed to the Lehman
25    side, your understanding was that this language

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2     accurately reflected the business deal?
3         A.    Yes.
4         Q.    Did you ever ask anyone to identify
5     who had negotiated this specific part of the
6     business deal?
7         MR. MORAG:  Object to the form.
8         I will let you answer if it is -- as
9     to the yes or no, but if it involves a
10    privileged communication, do not go into the
11    substance of the communication.
12        A.    I assume it was negotiated by the
13    principals who negotiated the deal that was
14    ultimately documented in the APA and these
15    documents.  I was not privy to those specific
16    negotiations.
17        Q.    Do you know the names of the
18    individuals who negotiated the deal specifically
19    on this point?
20        A.    I don't know who participated in each
21    discussion.  I know that Archibald Cox and
22    Michael Klein and Jonathan Hughes and Rich Ricci
23    were involved in the negotiations, but I did
24    not -- I don't have personal knowledge of those
25    exchanges.

TSG Reporting - Worldwide    877-702-9580

Page 58

ROSEN

1
2    Q.  Do you know who was involved on the
3  Lehman side specifically with respect to the
4  business deal that's -- that you describe in --
5    A.  Whoever was in those conversations,
6  and I wasn't present, so I couldn't identify
7  them.
8    Q.  Did the business deal ever change?
9  I'm talking now specifically about that part of
10  the business deal that's the subject of the
11  language you and your group drafted and that you
12  put forth in paragraph 5 of your declaration.
13  Did that part of the business deal change
14  anytime after the discussion of the asset
15  purchase agreement?
16    MR. MORAG:  Object to the form.
17    You can answer.
18    A.  I would say that the only respect in
19  which it changed was reflected in the 3-3
20  provisions in which Barclays agreed in essence
21  to relinquish the claims specifically in the
22  clarification letter to the -- the non-769
23  million or whatever it was of securities in the
24  15c3-3 account.
25    There were aspects in which the deal

TSG Reporting - Worldwide     877-702-9580

Page 59

ROSEN

1
2  was evolving as it contemplated it would at the
3  sale hearing in relation to the DTC
4  arrangements.  That is all that comes to mind.
5    Q.  And specifically with respect to
6  assets that were related to derivatives, margin
7  or clearing funds deposit, did the deal change
8  anytime after -- the business deal change at any
9  time after the execution of the asset purchase
10  agreement?
11    A.  I'm not aware that it ever changed.
12  only that it was clarified.
13    Q.  You refer, at the bottom of page 2 and
14  top of page 3 of your declaration, to the
15  obligations of LBI or any other person.  To whom
16  are you referring with the words "any other
17  person"?
18    A.  It could be -- well, without
19  limitation on what it might include, the two
20  obvious inclusions would have been the
21  obligations of LBI or any affiliate or any
22  customer who was involved as part of these
23  transactions or part of the business that was
24  being transferred.
25    Q.  Then you say, "in an account

TSG Reporting - Worldwide     877-702-9580

Page 60

ROSEN

1
2  maintained by or on behalf of."  Can you tell me
3  what is the distinction here between an account
4  maintained by as opposed to an account
5  maintained on behalf of LBI?
6    A.  Well, Lehman, when Lehman conducts --
7  when a broker dealer conducts business with a
8  customer or on behalf of an affiliate or for its
9  own proprietary account, it will reflect, it
10  will be required to reflect on its own books and
11  records accounts which are its accounts.  Those
12  assets may be held by custodian banks, other
13  banks, clearing agencies, clearing
14  organizations.
15    So this is meant to not be limited to
16  those specific alternatives to the account as it
17  is described on the books of the carrying
18  broker, to carry anything, wherever it may be,
19  if it was to secure obligations in essence for
20  which BCI was going to become responsible.
21    Q.  And you go on to say, "for which
22  Barclays shall become responsible as of the
23  closing."  What were you referring to there?
24    A.  At this point, I believe it was
25  unclear how the DTCC accounts were going to be

TSG Reporting - Worldwide     877-702-9580

Page 61

ROSEN

1
2  handled, but it was clear that, for example, to
3  the extent that Barclays was a clearing, either
4  a clearing member of a clearing organization
5  which carried accounts, or was a clearing broker
6  carrying positions with other clearing brokers
7  who were clearing members of other exchanges on
8  which positions may have been carried in or out
9  of the United States, whatever the form, that
10  would have been covered.
11    The point was that if there was credit
12  support available and Barclays was on the hook
13  and potentially subject to liabilities
14  associated with that, that all of those assets
15  would be available.
16    Q.  And were Barclays -- in the case of a
17  foreign account, where Barclays was not
18  taking -- stepping into the shoes of Lehman and
19  taking over from Lehman, the obligations to a
20  foreign exchange or clearing corporation, it
21  would get the exchange-traded derivatives but
22  not the associated assets?
23    MR. MORAG:  Object to form.
24    A.  Not at all.  Not at all.  That's not
25  what I am saying at all.

TSG Reporting - Worldwide     877-702-9580

Page 62

ROSEN

1          ROSEN
2          In fact, if BCI was going to be in the
3   chain of financial responsibility for those
4   positions, whether it was because they were
5   taking the account or they were carrying the
6   account or they were carrying the account with a
7   foreign clearinghouse or another broker who was
8   in the clearinghouse, that that would be
9   included.
10      Q.   And that's what I am trying to
11  understand.  Where the flip side of that
12  happens, where Barclays was not taking the
13  account, did you consider what happens when
14  Barclays does not take the account at a foreign
15  exchange?
16      A.   I think that language is dealt with
17  elsewhere.  And I need the clarification letter
18  to --
19      Q.   So you believe there is a separate
20  provision that deals with when Barclays takes
21  exchange-traded derivatives --
22      A.   I don't recall the specific language.
23  I would prefer to --
24      MR. MORAG:  You have to --
25      A.   I am sorry, I prefer to look at the
    TSG Reporting - Worldwide    877-702-9580

Page 63

1          ROSEN
2   clarification letter.
3      Q.   Well, we will certainly get to the
4   clarification letter, but your understanding is
5   that that's not covered by this language; is
6   that correct?
7      A.   Well, there are ellipses in here.
8   This is a very long provision, and I'm not
9   prepared to summarize all the things that it
10  does or does not cover in this abbreviated form.
11  So if you want me to tell you what it covers,
12  you are going to have to give me the provisions
13  so that I can look at them.
14      Q.   Sounds fair.  I think it is Exhibit
15  25.
16      MR. MORAG:  Mr. Maguire, if I recall
17  correctly, Exhibit 25 is the executed
18  clarification letter.  You have been asking
19  him questions about language which was not
20  included in the executed clarification
21  letter.  So I'm not sure that's going to be
22  responsive to his request.
23      Q.   That may be fair.  Maybe we should go
24  through the drafts.
25      A.   I think we should look at the draft
    TSG Reporting - Worldwide    877-702-9580

Page 64

1          ROSEN
2   that has this --
3      MR. MORAG:  Only if you have questions
4   about the draft.  If you have questions
5   about the final, show him the final.
6      Q.   Why don't we do that.  We will go
7   through the drafts and then we will take a look
8   at the final.
9          Before we do that, let me ask you to
10  scroll down to the end of that paragraph, the
11  bottom of paragraph 5.  You refer there to,
12  "which is consistent with the discussions of the
13  lawyers from both sides."
14          Do you see that reference to those
15  discussions?
16      A.   Um-hm.
17      Q.   Can you tell me what discussions you
18  are referring to there?
19      A.   The discussions negotiating the terms
20  of the deal, which were that Lehman sold the
21  exchange-traded derivatives business and all
22  assets associated with it and all deposits and
23  customer deposits.  But basically it is
24  consistent with the treatment in the
25  documentation and therefore the negotiation of
    TSG Reporting - Worldwide    877-702-9580

Page 65

1          ROSEN
2   the documentation relating to what it was that
3   Barclays was getting.
4      Q.   Is there any specific conversation
5   among any two or more lawyers that you were
6   intending to refer to in that last sentence of
7   paragraph 5?
8      A.   I was not present in the negotiations
9   of the original provisions in the APA that this
10  clarifies.
11      Q.   And you're not aware of any
12  conversations that your partners have told you
13  they remember from the negotiation of the
14  original deal?
15          What I am trying to clarify is just,
16  did you have in mind when you wrote this
17  reference to discussions something either that
18  you remembered or something that one of your
19  partners told you about?
20      A.   No.  I'm referring to what would have
21  had to have been discussed if the parties were
22  to come to the terms on which they signed the
23  APA.
24      Q.   I am going to show you a document that
25  has previously been marked as Exhibit 30.  Do
    TSG Reporting - Worldwide    877-702-9580

Page 66

ROSEN

1 you recognize this document?
2      A.   Looking at the first page, no.  I
3 don't believe I was copied -- yes, I am.  OK.
4      I don't recall looking at this
5 document, but it is possible that I saw it at
6 some point.
7      Q.   If you look, sir, at paragraph 11, you
8 will see that the language there includes a
9 paragraph on derivatives.  Do you see that?
10      A.   Yes.
11      Q.   And there is a reference to Exhibit A.
12 Did you ever see an Exhibit A?
13      A.   I don't recall whether I saw
14 Exhibit A.
15      MR. MAGUIRE:  I would ask your counsel
16 to maybe let us know if you were able to
17 find an Exhibit A in the Cleary production.
18      MR. MORAG:  If we did, we would have
19 produced it.  I certainly have never seen
20 it.  It would not be the first time in this
21 deal that someone anticipated an Exhibit A
22 that was never completed.
23      Q.   Mr. Rosen, I will show you a document
24 previously marked as Exhibit 36.  Have you ever

Page 67

ROSEN

1 seen this draft, sir?
2      A.   I can't be sure.  I would have to look
3 at it against other drafts to know.
4      Q.   If you look at the markup version.
5      A.   Is that in here?
6      MR. MORAG:  At the end.
7      Q.   About halfway through.
8      A.   OK.
9      Q.   On the first page of the markup, if
10 you look down at the bottom, you will see there
11 is a provision that refers to a clearance box.
12 Do you see that?
13      A.   Let me just look at it.
14      Q.   Sure.
15      A.   Yes, I see the provision, clause B.
16      Q.   Did you understand that Barclays was
17 acquiring assets at the DTC clearance box?
18      MR. MORAG:  Object to the form.
19      A.   I understood that they were acquiring
20 all the assets of the business, including
21 clearance box assets, some of which were at DTC
22 and some of which were not at DTC.  That was my
23 understanding at the time.  All of the assets of
24 the business that was being acquired other than

Page 68

ROSEN

1 the defined excluded assets.
2      Q.   If you turn to page 4, you will see a
3 section 8.  It refers to DTC arrangements.
4      MR. MORAG:  There is two section 8s.
5 I guess you mean the second one.
6      Q.   The second one.  Yes.
7      A.   Um-hm, I do see it.
8      Q.   Did you have an understanding at any
9 time that Barclays was contemplating assuming
10 all of Lehman's obligations to the Depository
11 Trust and Clearing Corporation?
12      A.   I'm not exactly sure what you mean by
13 contemplating, but the question as to how the
14 DTCC situation would be handled and documented
15 was the subject of negotiations.  There were a
16 range of potential outcomes, one of which could
17 have included assuming those rights and
18 obligations, but there were concerns associated
19 with the liabilities to which they had not
20 contemplated they would be subject based on the
21 liabilities that were intended to be excluded
22 but which they would become responsible for if
23 they just simply assumed the liabilities in the
24 accounts.

Page 69

ROSEN

1      So at this point in time, I don't
2 think there was -- it was -- I don't think
3 people were proceeding on the Barclays side
4 necessarily on the assumption they were going to
5 be doing this, but this was an open issue.
6      Q.   I am going to show you a document that
7 has previously been marked as Exhibit 49.
8      A.   Is this blacklined --
9      Q.   Why don't we follow the blacklined.
10      Do you recall seeing this document
11 before?
12      A.   It looks like a draft I may have seen.
13 Again, without, you know, comparing them, I
14 can't be sure.
15      Q.   Was that a protocol that Cleary
16 followed at the top of the blackline, where it
17 says "CGSH comments" and the date and time?
18      MR. HUME:  Object to the form.
19      MR. MORAG:  Same objection.
20      A.   I don't know that it is a practice
21 that's uniformly followed, but when there is
22 enough time and the comments are transmitted in
23 this way, you might do it just because there
24 could otherwise be confusion about the timing of

ROSEN

1 drafts and what followed what.
2        But it would not have been the
3 protocol, for example, in circumstances where,
4 as happened frequently in this deal, comments
5 were just scribbled on a piece of paper and sort
6 of shared and then ultimately inputted.
7    **Q.   Do you see at the bottom of the first**
8 **page, there is a reference to certain assets and**
9 **the clearance box language has been removed?  Do**
10 **you see that?**
11        MR. HUME:  Object to the
12 characterization of the document.
13        MR. MORAG:  There is no question
14 pending other than to refer your attention
15 to the first page.
16    A.   I'm just trying to understand the
17 entire document.  OK.  Yes.
18    **Q.   At the bottom where the clearance box**
19 **language was on the bottom of page 1, do you see**
20 **that?**
21    A.   Yes, I do.
22    **Q.   You will see that Cleary has added the**
23 **language, "or any portion of such securities."**
24 **See that, the last two lines on the page?**

ROSEN

1    A.   Um-hm, yes, I do.
2    **Q.   Just from your previous testimony, I**
3 **understood your understanding was that Barclays**
4 **was acquiring all of the assets at DTC.  So can**
5 **you explain to me why Barclays wanted to**
6 **negotiate the right to acquire only a portion**
7 **instead of all of the assets?**
8        MR. MORAG:  Object to the form, and
9 objection, mischaracterizes his testimony.
10    A.   I didn't say that they were buying all
11 the assets at DTCC.  I said they were acquiring
12 the assets of the business.
13        And in terms of this, it looks to me
14 as though the portion of this, the change that
15 was made here, was that to the extent there was
16 any discretion not to take them, that discretion
17 enabled them to decide when they were going to
18 take all or just a portion of them.  It wasn't
19 an all or nothing decision.
20        I think there was not -- it was not
21 entirely clear -- I'll just leave it at that.
22    **Q.   And can you tell me why it was**
23 **important to have the ability to take a portion**
24 **of the assets, instead of all of the assets?**

ROSEN

1        MR. HUME:  I am going to object to the
2 lack of foundation and to the extent it
3 calls for speculation.
4        MR. MORAG:  Same objection.
5    A.   I wasn't directly involved in this,
6 but my recollection is that this provision
7 relating to the ability not to take some
8 clearance box assets, I'm not sure that we were
9 the source of that, but I think this provision
10 merely provided more flexibility that to the
11 extent that there was discretion to take or not,
12 that was a discretion to take or not in whole or
13 in part.
14    **Q.   And were you privy to any of the**
15 **discussions about why it was important to have**
16 **that flexibility?**
17    A.   I was not privy to those discussions,
18 and I don't know whether there were discussions
19 or whether it was a provision that was suggested
20 by the other side, or whether we really cared
21 about it, given that it provided a flexibility
22 that we didn't have any obligation to, that
23 Barclays didn't have any obligation to exercise
24 or not.

ROSEN

1    **Q.   If you turn to the top of the next**
2 **page, you will see item C on the second line**
3 **refers to exchange-traded futures.  Do you know**
4 **why the reference here is to exchange-traded**
5 **futures?**
6    A.   This was, I think -- this was a
7 placeholder.  I think the purpose of putting
8 this in brackets was that people wanted to put a
9 marker down that they needed to consider whether
10 anything needed to be addressed to those issues,
11 and if so, what, and people didn't know exactly
12 what it would have been appropriate to have
13 included here or whether it was necessary to
14 include anything, but so as not to drop the
15 issue, I think the bracketed language was
16 included, and I don't think there was any
17 particular attention paid to exactly how those
18 issues were put on the table.
19    **Q.   And then if you look down at item D,**
20 **you will see the exception, exclusion from the**
21 **exclusion.**
22    A.   Right.  I see that.
23    **Q.   And this includes the language that**
24 **you referred to in your declaration?**

**ROSEN**

1  A.   It seems to.  Again, I can't be sure
2  that all of these words are exactly the same
3  without verifying, but it looks like the
4  provision that was just described.
5  **Q.   If you turn to the next page, page 4,**
6  **and the section 8, do you see the same language**
7  **appearing in that section?**
8     MR. MORAG:  As what?
9     MR. MAGUIRE:  As well.
10     MR. MORAG:  No.  As what?  Same as
11  what?
12  **Q.   Same as the language that you quote in**
13  **paragraph 5 of your declaration.**
14  A.   I see some similar wording.  I don't
15  think it is exactly the same.
16  **Q.   If we turn back to page 2, to that**
17  **section D, as in David.**
18     MR. HUME:  Section 2?  Page 2.
19  **Q.   At the beginning of D, it specifically**
20  **says that "excluded assets shall not include any**
21  **and all property of any customer."  Do you see**
22  **that?**
23  A.   I see that it says "except as
24  otherwise specified in the definition of

TSG Reporting - Worldwide    877-702-9580

**ROSEN**

1  purchased assets, excluded assets shall not..."
2  **Q.   And what was the point of this**
3  **reference to customer property?**
4  A.   The purpose of this language was to
5  insure that to the extent that -- what do you
6  call it -- to insure that to the extent that, in
7  connection with any account that was
8  transferred, there were liabilities associated
9  with them at the property that secured those
10  obligations and protected those liabilities,
11  were included in the deal, not excluded by any
12  other provision.
13  **Q.   And you're talking about all the**
14  **customer accounts that were transferred from**
15  **Lehman to Barclays?**
16  A.   Yes, this refers to customers whose
17  accounts were being transferred.
18  **Q.   You see a little further down, there**
19  **is a reference to 15c3-3?**
20  A.   By the way, it says "or."
21  **Q.   Right.**
22  A.   "Maintained by or on behalf of," "for
23  which they become responsible," parsing down.
24     So whether or not the account was

TSG Reporting - Worldwide    877-702-9580

**ROSEN**

1  being transferred, if somehow Lehman -- Barclays
2  was to assume responsibility for that, that
3  would also be included.  It didn't have to
4  necessarily be a transferred account.
5  **Q.   So you're saying it either had to be a**
6  **transferred account or an account for which**
7  **Barclays became responsible?**
8  A.   You know, I hate to say this, but this
9  sentence is incomplete.  I see that it says
10  maintained, A, and then I don't see a clause B.
11  So it is not impossible that there was other
12  language that should have been included here
13  that wasn't.
14     But in terms of the language that's in
15  here, I think the concept was, if we were taking
16  accounts or would otherwise become responsible
17  for them, that they would be ours, and if they
18  were otherwise purchased assets, they would be
19  ours.  Any of those three categories would have
20  been encompassed.
21  **Q.   And the 15c3 account is mentioned here**
22  **too, right?**
23  A.   Yes.
24  **Q.   And you understood that the entire**

TSG Reporting - Worldwide    877-702-9580

**ROSEN**

1  15c3 account was being transferred to Barclays;
2  is that correct?
3     MR. MORAG:  Objection, time frame.
4  **Q.   The time frame was as of this draft.**
5  A.   That is what this draft seems to
6  provide.
7  **Q.   Now, we discussed earlier about how**
8  **Barclays was getting the assets associated with**
9  **the accounts when it was becoming responsible**
10  **for the accounts, and I had asked you about**
11  **foreign exchanges where Barclays was not taking**
12  **over the accounts, it was not stepping into the**
13  **shoes of Lehman, and the question I asked you**
14  **then, and I would like to re-pose to you now --**
15  A.   I would like to just stop you and say,
16  I'm not aware of Lehman not -- of there being a
17  distinction in the context of the
18  exchange-traded derivatives between, you know,
19  U.S. listed derivatives and non-U.S. listed
20  derivatives.  So you can postulate that, but I'm
21  not necessarily agreeing that that's the right
22  characterization.
23  **Q.   I'm not characterizing derivatives**
24  **differently.  I'm talking about where -- I'm**

TSG Reporting - Worldwide    877-702-9580

Page 78

```
 1              ROSEN
 2  asking you to focus on the distinction between
 3  the accounts that Barclays was assuming and
 4  becoming responsible for and the accounts that
 5  Barclays was not assuming and not becoming
 6  responsible for. And you told me about the
 7  first. Now I want to ask you about the second.
 8         With respect to those accounts, and
 9  the example I will give you is the foreign
10  accounts, when Barclays was acquiring
11  exchange-traded derivatives in foreign
12  organizations around the world and was not
13  stepping into the shoes of the foreign -- of
14  Lehman in those foreign clearing organizations,
15  what was your understanding as to how margin
16  clearing fund deposit was being treated under
17  the business deal?
18         MR. HUME: I object to the question as
19  lacking foundation, particularly in light of
20  the witness' testimony that he is not aware
21  of any such accounts. Therefore, I object
22  that it calls for speculation and a
23  hypothetical, and he is not here as an
24  expert.
25     A.  Well, if there was a guarantee fund
```

TSG Reporting - Worldwide    877-702-9580

Page 79

```
 1              ROSEN
 2  deposit, and it was a Lehman guarantee fund
 3  deposit, you would have to parse that under the
 4  agreement. But there are -- the fact that
 5  Lehman may not have been a clearing member of
 6  the foreign clearinghouse directly and had
 7  contributed to the guarantee fund deposit does
 8  not mean that was not an account for which
 9  Barclays would have become responsible, as I
10  said, if Barclays was in any part of the chain
11  between customer and the clearinghouse.
12         So, it may not have been Barclays -- a
13  transfer of an account, but if Lehman maintained
14  the account and carried the account with
15  Barclays who carried it with somebody else, that
16  would have been a different matter. And if it
17  was part of the assets that were purchased, if
18  it were part of the assets that were purchased,
19  then whether or not the account was transferred
20  or whether or not it was an account for which
21  Barclays became responsible, if it was something
22  that they acquired as part of Lehman's business,
23  exchange listed derivatives business, then it
24  would be included.
25         I guess I am not here to advise you as
```

TSG Reporting - Worldwide    877-702-9580

Page 80

```
 1              ROSEN
 2  to whether the language provided for that or
 3  not.
 4     Q.  I don't want any advice, sir. What I
 5  am looking for is to follow up on your earlier
 6  testimony where you said you needed to see the
 7  draft, and specifically what I had asked you
 8  to see where Barclays was not taking the
 9  account, Barclays did not take the account at a
10  foreign exchange. And I believe you answered
11  that that language is dealt with elsewhere and
12  you needed the clarification letter to point
13  that out.
14         Can you point out in this draft of the
15  clarification letter anything that you
16  understood at the time covered the situation
17  where Barclays was not acquiring the account?
18         MR. HUME: Objection, lacks
19  foundation. I don't think you have
20  established when Barclays didn't acquire the
21  account or what that means.
22         MR. MAGUIRE: I'm just asking the
23  witness to identify what he was referring to
24  in his prior testimony.
25     A.  You are asking -- I am sorry, can you
```

TSG Reporting - Worldwide    877-702-9580

Page 81

```
 1              ROSEN
 2  ask specifically the question --
 3     Q.  Sure.
 4     A.  -- that you are asking me to respond
 5  to.
 6     Q.  What I am focusing on is the limiting
 7  words -- I won't give it a characterization,
 8  I'll say the words, that are in the language
 9  drafted here by you and your Cleary colleagues,
10  where you -- where the language we have been
11  discussing is specific to accounts for which
12  purchaser shall become responsible as of the
13  closing.
14         I'm asking you what -- where in this
15  document did it deal with those accounts for
16  which Barclays did not become responsible at the
17  closing?
18         MR. MORAG: Object to the form, and I
19  think you have mischaracterized his
20  testimony. I'm not sure he said it was
21  reflected in this draft.
22     A.  Well, as I said, this exception is
23  itself limited to the extent that it was a
24  purchased asset of a business. This language
25  does not call out and specifically address --
```

TSG Reporting - Worldwide    877-702-9580

Page 82

ROSEN

1  this particular provision doesn't specifically
2  address it, and how it would be treated would be
3  a function of how you evaluate the scope of the
4  purchased assets which were all the assets
5  associated with the business.
6      So you would still have to evaluate
7  it, not under this language but under the
8  purchased asset provisions. Obviously I can't
9  go further into how you would evaluate those
10 provisions.
11     Q.  I'm not asking you to form an opinion
12 here, just so we are clear. I am only asking
13 you for your understanding at the time. And --
14     A.  As I said, I'm not -- there seems to
15 be a clause B that's not here, and so I'm not
16 entirely comfortable sitting here reflecting on
17 all of the things that I was thinking about at
18 the time that I drafted.
19     But I will -- but I agree that the
20 language here as it relates to customer
21 accounts, are accounts that are transferred or
22 accounts for which BCI is becoming responsible
23 in some way.
24     Q.  And you had referred earlier in your
25

TSG Reporting - Worldwide    877-702-9580

Page 83

ROSEN

1  testimony to where that situation was covered by
2  language elsewhere. Was there some other
3  language --
4      A.  I am sorry, I am sorry. Or if it was
5  a cash item maintained by LBI pursuant to
6  15c3-3.
7      So if there was -- so it wouldn't have
8  been customer property, it would have been
9  property, technically property of Lehman
10 Brothers, Inc. But to the extent that it
11 relates, the reserve relates to a customer
12 account, that does not seem to be so limited
13 here.
14     But I don't think you need me to parse
15 the language in this provision.
16     Q.  No. What I am looking for, sir, is,
17 when you referred to language elsewhere covering
18 this specific point where Barclays was not
19 acquiring the accounts, what language did you
20 have in mind?
21     A.  Purchased assets.
22     Q.  Section 1 --
23     A.  Purchased assets provisions.
24     Q.  Section 1 of the clarification letter?
25

TSG Reporting - Worldwide    877-702-9580

Page 84

ROSEN

1      A.  The answer to your question is, all of
2  the other provisions of the documentation that
3  establish the rights and obligations of the
4  parties.
5      Q.  Is there anything specific you can
6  point me to?
7      A.  The provisions that relate to
8  purchased assets.
9      Q.  Is that generally section 1 of the
10 clarification letter, or is there anything --
11     A.  It is in the APA, and it's in the
12 clarification letter.
13     Q.  Is there any more specificity you can
14 provide me?
15     A.  I think I am going to leave that
16 parsing to you.
17     Q.  If you turn to page 4, section 8, the
18 new section 8 that starts with DTC arrangements
19 and some language, that language and other
20 language removed. Do you see that?
21     A.  Yes.
22     Q.  Can you tell me what prompted the
23 removal of the language concerning the DTC
24 arrangements?
25

TSG Reporting - Worldwide    877-702-9580

Page 85

ROSEN

1      A.  I don't think it was removal of that
2  language so much as a belief by the drafters
3  that these provisions needed to cover a broader
4  set of -- category of arrangements than just
5  DTCC. Because, for example, there was the OCC
6  arrangement and possibly other clearinghouses of
7  which Lehman might have been a member that might
8  have been coming over.
9      Q.  This section continues in the next
10 sentence, "Assumption of accounts: Purchaser
11 shall assume all customer accounts of the
12 business." Do you see that?
13     A.  I do.
14     Q.  And do you understand that the text
15 that follows all describes transfers of property
16 to Barclays in connection with the transfer of
17 customer accounts?
18     MR. HUME:  Objection to the form.
19     A.  First let me just clarify that it says
20 all accounts of the business, not necessarily
21 all accounts.
22     MR. MORAG:  I am going to object --
23     A.  I think to answer your question, I am
24 going to have to evaluate how you interpret the
25

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  interplay of various provisions here. I'm not
3  sure I can answer that without effectively
4  analyzing the contract and interpreting it.
5      Q.   Did you understand that Barclays was
6  **assuming all of the customer accounts of the**
7  **business?**
8          MR. HUME:  Objection to the form.
9          MR. MORAG:  Again, the time frame?
10     Q.   At the time of this draft.
11     A.   I -- it was very fluid.  I can't
12  recall when I understood what precisely was in
13  and what was out.  I knew that there were some
14  things that were in and some things that were
15  out, but I'm not sure at this time what my state
16  of knowledge was.
17         I was also not the draftsperson of
18  this or the draftsperson to use language that
19  was common to the provision.
20     Q.   Did you come to understand at some
21  **point that certain of the customer accounts of**
22  **the business were not being assumed by Barclays?**
23     A.   Yes.  Yes, I understood that there was
24  the sale of something called PAM that was being
25  sold to Neuberger Berman.  I can't remember when

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  I became aware of.
3         And I believe that there was -- there
4  were certain exceptions to the PIM accounts, or
5  maybe it was some other business, but I
6  didn't -- as I say, I am not -- I was not and am
7  not familiar with how the business was
8  organized, but there were some that were in and
9  there were some that were not.
10     Q.   I will show you a document previously
11  **marked as Exhibit 616A.  Obviously I'm not going**
12  **to ask you about the first page, which is an**
13  **e-mail that you weren't copied on, but I will**
14  **ask you, sir, if the rest of the document is a**
15  **draft that you were aware of at the time.**
16     A.   I'm not sure that I can -- I can't
17  read this.  I can't read out the provisions, and
18  I don't know what time this document was
19  generated or when it was shared with anyone on
20  our side sitting here.  I don't know.  This may
21  have been an internal draft.  I'm not sure I
22  recall seeing it contemporaneously.
23     Q.   The only reason I wanted to show it to
24  **you is really on page 2 at the bottom, if you**
25  **can make out through the highlighting, you will**

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  **see language concerning margin and guarantee**
3  **funds deposit, the language that you address in**
4  **your declaration.**
5      A.   I cannot actually see it on this copy
6  unfortunately.
7      Q.   OK.  I'll represent to you that this
8  **draft removes that language.  I think in your**
9  **declaration, you refer to a draft --**
10         MR. HUME:  Are you representing it is
11     removed or removed and replaced with
12     something else?
13         MR. MAGUIRE:  I can read it on my
14     copy.
15         MR. HUME:  I understand.  But you are
16     representing that it is removed.  Are you
17     representing that anything was added?
18         MR. MAGUIRE:  I am certainly not
19     representing that.
20         MR. HUME:  There is language added
21     right after the removal.
22         MR. MORAG:  If I may state for the
23     record, in terms of the declaration, the
24     fact of the non-inclusion of the language of
25     paragraph 5 was established by a draft, a

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  subsequent draft, but not necessarily this
3  one.
4         MR. MAGUIRE:  You're right, actually,
5  and we will show that to the witness next.
6  It is Exhibit 50.
7      Q.   In broad terms, you were aware that
8  **the language we have been discussing from**
9  **your -- that you quote in your declaration was**
10  **removed, but do you have a recollection of**
11  **actually seeing the draft that had that removal**
12  **in it, that showed the actual deletion of that**
13  **language?**
14     A.   I would have seen a draft which
15  modified the language that we had included, as I
16  described earlier.  Whether I saw it in a
17  blackline or a clean copy, I can't remember.
18     Q.   Did you ask any of your partners about
19  **that question, whether they saw it with the**
20  **language actually deleted --**
21     A.   I didn't ask my partners or I don't
22  recall asking my partners that question.
23     Q.   Let me show you a document previously
24  **marked as Exhibit 50.  Take whatever time you**
25  **need to review the draft, sir, and just let me**

TSG Reporting - Worldwide    877-702-9580

Page 90

ROSEN

1 know when you're ready.
2         And my first question is going to be,
3 have you seen this draft before?
4     A.   I've seen before an e-mail transmittal
5 from Michael Mazzuchi passing on a draft of the
6 clarification letter to DTCC and its counsel at
7 their request, there being a draft of the
8 clarification letter attached to it that was
9 provided to us by Weil.
10         But as to whether this is exactly the
11 same draft, I can't say.  I would have to
12 verify.
13     Q.   You will see at the bottom of page 1
14 of the draft is a reference to LBI's clearance
15 boxes.
16     A.   I see that.
17     Q.   Do you know why the word DTC was not
18 included there?
19     A.   My understanding is that it was not
20 included because there were clearance box assets
21 held at locations other than DTCC.  So DTCC was
22 not the exclusive depository of clearance boxes,
23 is my recollection.
24     Q.   And what were the other depositories?

TSG Reporting - Worldwide    877-702-9580

Page 91

ROSEN

1     A.   I don't remember knowing the details.
2     Q.   Did anyone consider saying DTC and
3 other clearance boxes?
4         MR. MORAG:  Object to the form.
5     A.   I wouldn't speculate as to whether
6 somebody did or didn't.  They may have.
7     Q.   In a prior draft, there had been a
8 reference to the box 074, which I understand was
9 the DTC box.  Do you have any knowledge as to
10 why that reference was dropped?
11     A.   I am not certain, but I have a
12 recollection that it was because 074 may not
13 have included all of the clearance box assets,
14 that they may not have been confined to the
15 account 074.  But I'm not 100 percent certain.
16 I have a recollection of something along those
17 lines.
18     Q.   If you look at the bottom of page 1,
19 you will see there is a parenthetical that says,
20 "provided, however, that purchaser in its
21 discretion may elect within 60 days after the
22 closing to return any such securities to LBI."
23         Do you see that?
24     A.   Yeah.

TSG Reporting - Worldwide    877-702-9580

Page 92

ROSEN

1     Q.   And can you tell me what was the
2 purpose of that?
3     A.   I'm not sure that we were the source
4 of that language.  I think that on its face, it
5 seemed to have contemplated that there may be
6 things that, in the clearance box, that Barclays
7 might not have wanted.
8     Q.   And do you have any understanding as
9 to what kinds of assets Barclays would not want
10 from the clearance box?
11         MR. HUME:  Objection, calls for
12 speculation.
13     A.   As I say, I'm not sure that this was
14 motivated by Barclays, and I'm not sure that
15 this wasn't an option that was being provided to
16 Barclays that Barclays didn't see any reason to
17 negotiate, since it gave them the ability to do
18 something but not an obligation to do it.
19     Q.   But you don't have knowledge as to
20 what prompted this?
21     A.   No, I don't.  Or I should say I don't
22 recall.
23     Q.   If you turn to page 4, and see the
24 paragraph 8, transfer of customer accounts.  And

TSG Reporting - Worldwide    877-702-9580

Page 93

ROSEN

1 towards the end of that, you will see a
2 reference to 15c3.
3     A.   Yes.
4     Q.   And at the end of that sentence, it
5 refers to the phrase, "or securities of
6 substantially the same nature and value."
7     A.   Yes.
8     Q.   Can you tell me how did those words
9 get to be inserted in the clarification letter?
10         MR. MORAG:  Which words?  All of them?
11     Q.   The words "or securities of
12 substantially the same nature and value."
13     A.   My recollection of the events for
14 that, following on the discussion which led to
15 the limiting of this provision to 769 million of
16 securities, that Harvey Miller raised the
17 question whether or not it was clear that we
18 could agree to this.
19         And I told him that I was not aware of
20 a limitation, particularly to the extent as had
21 been represented, that the 769 million dollars
22 was excess to the level that Lehman was required
23 to reserve under 3-3 as of that date, and in
24 response to the question can we do it, I

TSG Reporting - Worldwide    877-702-9580

Page 94

1              ROSEN
2    suggested that if there was a concern along
3    those lines, which we didn't share -- and I'll
4    say only, my recollection is there was a
5    question raised about it -- that we say to the
6    extent permitted by applicable law and as soon
7    as practicable after the closing.
8              And because the provision by its terms
9    then raised a question about whether or not this
10   value was going to be conveyed, because the
11   reason this was in here and was the subject of
12   discussion was that there was a significant
13   erosion or concern about the erosion of value
14   and assets that were contemplated to be
15   delivered initially but were not available to be
16   delivered, and that Lehman identified this as a
17   source of value, and so we wanted to make sure
18   that that value was conveyed.
19             And so as a result of this language,
20   it made us think, well, fine, if you can't give
21   us these 769 million of securities, give us
22   those other securities of a similar nature and
23   value.
24             That's my recollection of the origins
25   of this provision.
     TSG Reporting - Worldwide    877-702-9580

Page 95

1              ROSEN
2    Q.   I'll show you a document we have
3    previously marked as Exhibit 451.  Have you seen
4    that before, sir?
5    A.   I don't recall that I necessarily saw
6    precisely this.  I do recall that there was a
7    representation made that the SEC had approved as
8    excess a certain level of value and that there
9    was an e-mail.  We thought that we were going to
10   see an e-mail saying that.  Instead, there was
11   an e-mail, I recall, but which didn't involve --
12   didn't come from the SEC, but reported that it
13   was approved.
14             I don't think I have seen this
15   particular document, and I can't say that I
16   recall with precision the numbers for the
17   allocations between cash and securities.
18   Q.   Did you ever discuss Lehman's 15c3
19   account with Mike Macchiaroli?
20   A.   I don't recall being able -- at the
21   time that I sort of first saw this, which I
22   believe was on a -- or not this -- I was made
23   aware of the e-mail and shown something, I do
24   not believe that I spoke to Mike Macchiaroli,
25   but as I mentioned at the outset of this, I had
     TSG Reporting - Worldwide    877-702-9580

Page 96

1              ROSEN
2    earlier had a conversations with Mike which,
3    while we didn't discuss specifically the 3-3
4    reserve account or the amount that was excess, I
5    came away with the impression that he was
6    optimistic that there was going to be sufficient
7    assets.
8              So I did not have a -- I did not have
9    a -- I did not have a confirmation from him.  I
10   didn't have a concern that there would be a
11   deficiency, but I did not have an opportunity to
12   actually go over this with him.
13   Q.   So in your earlier conversation with
14   Mr. Macchiaroli, he was optimistic that there
15   would be sufficient assets available to pay all
16   customer claims; is that correct?
17   A.   Yeah.  That -- well, I don't think he
18   would have -- I don't think he would have -- I
19   don't mean to put words in his mouth but he
20   would have made a representation to those
21   effects, but I came away with an impression that
22   he was optimistic that there wouldn't be a
23   shortfall.
24   Q.   And you took from that conversation
25   that there wouldn't be a shortfall in customer
     TSG Reporting - Worldwide    877-702-9580

Page 97

1              ROSEN
2    property?
3    A.   Yes.
4    Q.   And you, therefore, expected --
5    A.   Well, I took away that at that point,
6    knowing what he knew, that it looked as though
7    there wouldn't be.  I wouldn't say -- I wouldn't
8    characterize it beyond that.
9    Q.   And he didn't tell you to what extent
10   there would be any excess?
11   A.   We didn't discuss any quantification.
12   Q.   Did you have any discussions with
13   anyone at the SEC concerning the reserve account
14   or any excess in the reserve account?
15             MR. MORAG:  Objection, asked and
16   answered.
17   A.   I don't recall.
18   Q.   Now, you were responding to a Weil
19   question.  Was it Harvey Miller who said can we
20   do it?
21   A.   I believe it was Harvey Miller, yes.
22   Q.   What we was referring to is the
23   transfer from the 3-3 account?
24   A.   Yes.  He was, he was raising the
25   question as to whether there might be a
     TSG Reporting - Worldwide    877-702-9580

Page 98

1    ROSEN
2  limitation on this transfer.
3    Q.   And did you understand that there was
4  1.7 billion in the reserve account?
5    A.   I don't think I recall at that time
6  specifically what the number was.  I knew that
7  there was a reserve account, and I knew it was
8  funded.  I can't recall at what level it was
9  funded.
10    Q.   And there was -- one issue was this
11  cash issue that you testified about earlier,
12  right?  And that was to people avoiding
13  the issue and simply not transferring the cash
14  to Barclays, correct?
15    A.   Correct.
16    Q.   And that left the 700 or 769 million
17  which was government securities?
18    A.   They were securities, yes.
19    Q.   And with respect to that, Mr. Miller
20  raised the question can we do it, meaning can we
21  transfer this 769 million from the reserve
22  account to Barclays?
23    A.   Correct.
24    Q.   And you said that there was no limit
25  to the extent to which that could be transferred
     TSG Reporting - Worldwide    877-702-9580

Page 99

1    ROSEN
2  where there was an excess in the account?
3    MR. MORAG:  Objection to
4  mischaracterizing.  I think he said
5  limitation.
6    A.   What I said was I wasn't aware of a
7  limitation that would prevent them as part of
8  this transaction from effecting that transfer,
9  and I said particularly if it is an excess.  I
10  didn't limit it to it being an excess.
11    Q.   Where there was no excess, where there
12  was in fact a deficiency or shortfall in
13  customer property, were you aware of any
14  limitation on the ability of Lehman to transfer
15  from the reserve account to Barclays?
16    A.   There is not a limitation identified
17  to me that couldn't necessarily be addressed as
18  part of the transaction.  They could -- there is
19  no -- the sale of a business where the customer
20  accounts or some portion of them are going over,
21  I'm not aware of a reason why the SEC and the
22  court couldn't assent to the transfer of those
23  assets if it wanted to.
24    And one would have inferred from the
25  documents that as part of the assets of the
     TSG Reporting - Worldwide    877-702-9580

Page 100

1    ROSEN
2  business that was being sold, that that had in
3  fact been approved in a transaction approved by
4  the court and to which the SEC gave no
5  objection.
6    Q.   And that would have involved then
7  transferring -- where there was a shortfall or
8  deficiency, the transfer of 769 million would
9  have to come from customer property; isn't that
10  correct?
11    MR. MORAG:  Object to the form.
12    A.   Not necessarily.
13    Q.   Well, the transfer of that amount to
14  Barclays would mean that 769 million would not
15  be available to satisfy customer claims?
16    A.   That's not -- whether or not Lehman
17  would have been under-reserved going forward,
18  when it was in liquidation mode, is an entirely
19  different question that would not necessarily --
20  if these assets were in the account but this
21  account was required to have more, those assets
22  would still be assets of Lehman, that as part of
23  this transaction could have been approved to be
24  transferred to Barclays as part of the business
25  that it was acquiring.
     TSG Reporting - Worldwide    877-702-9580

Page 101

1    ROSEN
2    Q.   And it was your view that could have
3  been done regardless of whether that left
4  customers, remaining customers short by the
5  amount of 769 million?
6    A.   That's not what I said.  I said that
7  could be done even if as a result Lehman had a
8  deficit in its reserve account.
9    Q.   I know that's what you said.  But my
10  question is, where there is such a deficit and
11  the transfer of these assets means that the
12  customers do not have access to that
13  769 million, and that means that --
14    A.   You know, those assets may have had --
15  as the deal was approved, it was represented
16  that there were other assets that Lehman had.
17  The assets that can be made -- as I'm sure you
18  are aware, the assets that can be made available
19  to customers in satisfaction of their claims are
20  not limited to what is in the 15c3-3 account.
21  That is a regulatory construct that does not
22  limit the recourse of customers.
23    So I reject the premise that the
24  transfer of that would necessarily have resulted
25  in a shortfall.
     TSG Reporting - Worldwide    877-702-9580

Page 102

```
1              ROSEN
2      Q.   And leaving aside the whole construct
3   and whole premise, my only question is, you were
4   not aware of any limitation, even in the
5   event --
6      A.   I wasn't, I wasn't thinking about all
7   of the -- parsing all of the scenarios.  There
8   was nothing on the face of this agreement that
9   to my mind couldn't be accomplished, and from my
10  perspective, caveating it with the language "the
11  extent permitted by applicable law," even though
12  you could argue that that's implicit, was a
13  concession that we could readily make in order
14  to complete the deal.
15     Q.   So given that concession, you didn't
16  think through what would happen if the transfer
17  left unavailable property for customers?
18         MR. MORAG:  Object to the form.
19     A.   No, I reject that characterization.
20  It was not necessarily the case that there would
21  have been any deficit for customers as a result.
22  And as a result, because I didn't have the
23  information available to evaluate it, I did not
24  engage in a hypothetical conjecture as to
25  whether -- under what circumstances or set of
        TSG Reporting - Worldwide    877-702-9580
```

Page 103

```
1              ROSEN
2   facts there would be a problem.
3          But from my perspective, but for the
4   concern, which was really a procedural concern
5   as a matter of caution, as I understood it from
6   Harvey Miller, I believed that these assets
7   arguably were intended to be transferred, were
8   intended to be transferred as part of the assets
9   of the business.
10     Q.   In any event, you and the Barclays
11  side of the house agreed to set aside the cash
12  issue by taking the billion dollars in cash out
13  of the deal, correct?
14     A.   By taking the billion dollars out of
15  the deal?
16     Q.   Yeah.  The 1 billion dollars in the
17  bank account was not being transferred as part
18  of the reserve account?
19     A.   Let me say this.  This provision, this
20  provision doesn't call for the transfer of that.
21  I will leave it to the lawyers to argue what the
22  implications of that might be.
23     Q.   And as to the remaining issue as
24  raised by Mr. Miller about can we do it with
25  respect to the government securities, somebody
        TSG Reporting - Worldwide    877-702-9580
```

Page 104

```
1              ROSEN
2   proposed that that issue would be resolved by
3   inserting the words "to the extent permissible
4   by law"?
5      A.   My recollection is that that was me.
6      Q.   Now, did all this happen in a hallway
7   conversation?
8      A.   Yes.
9      Q.   Who was present?
10     A.   I don't have a clear recollection
11  other than Harvey Miller was there, Vic Lewkow
12  was there.  I think Dana Fleischman may have
13  been there at least for some portion of it.  And
14  there were others huddling around, but I don't
15  have a clear recollection, and to be perfectly
16  candid, because I wasn't involved in the
17  negotiation of this transaction from the very
18  beginning, I was not as -- and I was mostly
19  troubleshooting specific issues, particularly
20  those relating to the clearing arrangements, I
21  was not as familiar with the lawyers from the
22  other side, so I could not have readily, as
23  readily identified them.
24     Q.   How long did the, did this hallway
25  huddling session last?
        TSG Reporting - Worldwide    877-702-9580
```

Page 105

```
1              ROSEN
2      A.   I honestly don't know.  More than a
3   couple of minutes, less than a couple of hours.
4      Q.   And can you tell me what you recall
5   being said in the course of this hallway
6   conversation?
7      A.   Pretty much what I have just described
8   to you, that there was a group already there
9   when I arrived.  I guess some predecessor
10  language to this was being reviewed, and Harvey
11  Miller, as I said, raised the question whether
12  there might be limits under applicable law, and
13  I said that I wasn't aware of any, but to the
14  extent that they exist, and it would address
15  your concern, we can provide that the transfer
16  be to the extent permitted by applicable law.
17  But if there was such a constraint, that that
18  basically 769 million dollars in securities
19  would come from somewhere else.
20         And can I remember exactly what was
21  said, whether it was a grunt or a nod or a
22  smile, I don't remember, but I remember coming
23  away from the conversation feeling that we had
24  sort of resolved the point.
25     Q.   Who was the person who gave the --
        TSG Reporting - Worldwide    877-702-9580
```

27 (Pages 102 to 105)

Page 106

ROSEN

1    **ROSEN**
2    manifested assent with the grunt or nod or
3    smile?
4        A.   I could be wrong, my recollection was
5    that it was Harvey Miller, but I could be wrong.
6        Q.   Did Mr. Miller agree to your proposal
7    that "to the extent permitted by applicable law"
8    would be inserted into the --
9        A.   That was my understanding, yes.
10       Q.   Did he also agree to avoid the cash
11   issue by having this provision not call for the
12   transfer of a billion dollars in cash?
13       A.   I believe he did.
14       Q.   And did that also happen in this
15   hallway conversation?
16       A.   It may have been two different
17   conversations or it may have been a continuing
18   conversation.  Again, I was called out to deal
19   with other issues constantly, issues that were
20   being dealt with in different rooms and on
21   different floors, so I don't have a clear
22   recollection of precisely what the progress, the
23   progression of discussions were.
24       The cash conversation clearly preceded
25   this.  And there may have been a break before

TSG Reporting - Worldwide    877-702-9580

Page 107

ROSEN

1    ROSEN
2    this issue, it may have been that drafts were
3    prepared and exchanged to reflect the first
4    issue, and then the second issue was raised.  I
5    just don't have a clear recollection of it.
6        Q.   We seem to have the cash issue, you
7    say maybe came up first, and then we have a
8    second issue, is can we do it, as in
9    transferring the 769, and that gets resolved
10   with your proposed language "to the extent
11   permissible by applicable law," right?
12       MR. HUME:  Objection, mischaracterizes
13   his testimony.
14       A.   Do you want to repeat the question?
15       Q.   If the first issue is the cash issue,
16   the second issue is the can we do it question
17   that Mr. Miller raised?
18       A.   Transfer, there was a discussion about
19   the transfer of securities.
20       Q.   Which gets resolved with your proposed
21   language?
22       A.   Yes.  And the documentation of it gets
23   resolved.
24       Q.   Do I understand you to be saying there
25   was also a third issue in that somebody said if

TSG Reporting - Worldwide    877-702-9580

Page 108

ROSEN

1    **ROSEN**
2    for any reason it is not permissible to transfer
3    the government securities from the reserve
4    account, Lehman has to make that up to Barclays
5    with securities of some other value?
6        A.   I'm not sure I would describe it as a
7    third issue, but as an adjunct to the second
8    issue, that if the securities, these 769 million
9    were not available, some other 769 million
10   dollars of securities would be made available.
11       Q.   How did that, whatever you want to
12   call it, an adjunct to the second issue or a
13   third issue, how did that issue get raised?
14       A.   How did it get raised?
15       MR. HUME:  Objection, asked and
16   answered.
17       A.   Someone on our side, maybe me, maybe
18   somebody else who was there, I don't have a
19   clear recollection on the second point, but
20   said, well, if there is any contingency to the
21   769 from the 3-3, we get them from somewhere.
22       The whole purpose of this, again, was
23   to say -- we were identifying a source of value
24   that was in the deal in the light of other
25   evaporating value, and so it was important to

TSG Reporting - Worldwide    877-702-9580

Page 109

ROSEN

1    ROSEN
2    the Lehman side -- I am sorry, it was important
3    to the Barclays side that if this wasn't
4    available, some other asset would be available.
5        Q.   Was there any discussion about the
6    implications for customer property claims --
7        A.   No, there was no discussion about
8    customer property claims.
9        Q.   And there was no discussion of the
10   implications on customers of transferring 769
11   million --
12       A.   None of us, none of us on the Barclays
13   side had anything like the information that
14   would have been necessary to evaluate that, to
15   even raise questions about it.  That information
16   was not available, and there was no way for it
17   to become available and to be discussed and
18   analyzed in a time frame that would have enabled
19   the deal to close.
20       MR. MORAG:  Let him finish the
21   questions.
22       Q.   Can you tell me -- you came away from
23   this meeting with an understanding that Harvey
24   Miller or someone on the Weil side had
25   manifested assent to the proposition that if the

TSG Reporting - Worldwide    877-702-9580

Page 110

```
              ROSEN
 1
 2    government securities in the reserve account
 3    weren't available, some alternative similar
 4    securities would be provided.
 5         Can you tell me, how are you -- how do
 6    you know that Mr. Miller or his colleague was
 7    agreeing to that unconditional transfer as
 8    opposed to his nod, his grunt, his smile,
 9    whatever you recall, meaning nothing more than
10    this conversation is at an end or that we agree
11    to your proposed language "to the extent
12    permitted by applicable law"?
13         MR. MORAG:  Object to the form.
14      A.  I don't think I have more to add, more
15    than what I have already said, except to say
16    that a draft was provided to us by Weil that
17    reflected that agreement.
18      Q.  You got a draft from Weil which
19    provided that Barclays -- that Lehman would
20    transfer to Barclays 769 million from the
21    reserve account or securities of a substantially
22    similar nature.  Are you aware of that?
23      A.  I recall that.
24      Q.  What was the reaction on the Barclays'
25    side when you got that draft?
```

TSG Reporting - Worldwide    877-702-9580

Page 111

```
              ROSEN
 1
 2      A.  We didn't know what "or nature" meant
 3    and whether it was clear that it meant that they
 4    would be of equivalent value.  So we added the
 5    words "or value."  I believe I may have made
 6    that change.
 7      Q.  Did you have any discussion with
 8    anyone at Weil to find out what they meant by
 9    adding the words "substantially similar,"
10    without the words "in value"?
11         MR. MORAG:  Objection, foundation.
12      You have not established that Weil added
13      these words as opposed to mistyped or didn't
14      type the Cleary proposal.
15      Q.  Well, let me back up.  I thought you
16    said you were provided with a draft from Weil
17    that included the words "substantially similar
18    nature"?
19      A.  I believe I was shown a draft that
20    included that language, an interim draft that
21    included that language.
22      Q.  Do you know who provided you that
23    draft?
24      A.  I don't have a clear recollection, but
25    my assumption is it was Weil.  That's my
```

TSG Reporting - Worldwide    877-702-9580

Page 112

```
              ROSEN
 1
 2    assumption.
 3      Q.  Did you have any discussion with Weil
 4    about that draft and specifically about those
 5    words in that draft?
 6      A.  Yes, in the sense that we provided a
 7    markup of it with the words "or value," and that
 8    seems to have been accepted as an appropriate
 9    clarification of the agreement that we had
10    reached earlier and reflected in the next
11    turnover of documents.
12      Q.  Any communication between the Cleary
13    and the Weil folk, other than --
14      A.  Yes.  The language "or value," which I
15    think speaks for itself.
16      Q.  I'm just saying, anything beyond that?
17      A.  I don't think there needed to be
18    anything beyond that.
19      Q.  And have you heard from your partners
20    whether they are aware of anything beyond that?
21      A.  I don't have a recollection of
22    discussing it.
23         MR. HUME:  Are you going to finish
24      before lunch or should we take a break for
25      lunch or take another break?  Either way I
```

TSG Reporting - Worldwide    877-702-9580

Page 113

```
              ROSEN
 1
 2    think we can use another break.  We have
 3    been going for an hour and a half.
 4         MR. MAGUIRE:  Why don't we take a
 5      break, and if lunch is ready, this is a fine
 6      time for lunch.  I certainly will continue
 7      after lunch.
 8         MR. HUME:  You will.
 9         MR. MAGUIRE:  Yes.  I still have quite
10      a bit to go.
11         (Recess)
12    BY MR. MAGUIRE:
13      Q.  Sir, before the break, you were
14    describing the hallway conversation at Weil
15    Gotshal's offices concerning the 3-3 account,
16    and I note that is a subject of paragraph 7 of
17    your declaration; is that correct?
18      A.  Yes.
19      Q.  In paragraph 7, and you don't refer to
20    the contingency that you described in your
21    testimony earlier today concerning what would
22    happen if Barclays did not get or Lehman could
23    not transfer government securities from the 3-3
24    account.  Do you see that?
25      A.  Um-hm.
```

TSG Reporting - Worldwide    877-702-9580

Page 114

ROSEN

1
2    Q.   Can you tell me why you did not refer
3 to that contingency in your declaration?
4    A.   No.
5    Q.   Earlier in your declaration, in
6 paragraph 5, you refer both to the removed
7 language that we have discussed earlier, the
8 language that starts, "any and all property" --
9 you remember that? -- and also to the
10 parenthetical that ultimately ends up being
11 inserted in the clarification letter, that's a
12 parenthetical that reads, "and any property that
13 may be held to secure obligations under such
14 derivatives."
15    A.   Correct.
16    Q.   Can you tell me why when you posed the
17 parenthetical, you didn't simply put the earlier
18 language in the parenthetical?
19    A.   The only reason is that it was -- the
20 original language had been obviously subject to
21 modification, and I didn't want to get
22 embroiled -- we didn't have time to get
23 embroiled in sending back language and having
24 extensive negotiations.
25    So the purpose of doing it this way

TSG Reporting - Worldwide    877-702-9580

Page 115

ROSEN

1
2 was to do it as simply and clearly as possible
3 and not resurrect language that might have
4 been -- for other reasons raised issues in
5 people's minds for reasons unrelated to the
6 point that was intended to be conveyed here,
7 clarified here.
8    Q.   By inserting the parenthetical, did
9 you mean anything different from what you say in
10 your declaration, paragraph 5 was documenting
11 the business deal?
12    MR. MORAG:  Object to the form.
13    Q.   In other words, did you mean anything
14 different in the language in the parenthetical
15 from the earlier language that had been removed?
16    MR. HUME:  Objection, I think you are
17 really calling for him to interpret the
18 contract now.
19    MR. MAGUIRE:  No, no, I am asking what
20 he meant at the time.
21    A.   What I will say is that I meant to
22 express the thought reflected in the markup, but
23 I didn't parse, because I didn't have time to
24 parse the differences in the wording.  And this
25 was intended to pick up everything in a shorter

TSG Reporting - Worldwide    877-702-9580

Page 116

ROSEN

1
2 and more concise formulation.
3    Q.   Do you know how much in value terms
4 this parenthetical picked up?
5    MR. MORAG:  Objection to the form.
6    Q.   In other words, do you know how much
7 property there actually was that was held to
8 secure obligations under such derivatives?
9    MR. HUME:  The question is whether he
10 knows today?
11    Q.   Did you know at the time what the
12 dollar amount of that was?
13    MR. MORAG:  And I object, lack of
14 foundation.
15    Go ahead.
16    A.   I did not know the precise number, no.
17    Q.   Did you have a general understanding?
18    A.   I would have assumed it was a
19 significant amount of, significant amount of
20 money.  Lehman was a very significant, one of
21 the largest investment banks.  They had a very
22 significant business, and I would have assumed
23 that with a significant business would come
24 significant customer property to margin the
25 proprietary and customer activities that were

TSG Reporting - Worldwide    877-702-9580

Page 117

ROSEN

1
2 going on.
3    So the bigger it was, the more
4 concerned I was about it.
5    Q.   Did you understand that the customer
6 margin was in the billions of dollars?
7    A.   I didn't have specific knowledge of
8 it, but it wouldn't surprise me to hear that.  I
9 expected it to be a large number.
10    Q.   Did you understand what the
11 proprietary margin was that was in the billions
12 of dollars?
13    A.   I would have expected it to be of that
14 kind of magnitude, but I didn't know exactly
15 what it was.
16    Q.   Do you know whether the folks at Weil
17 had an understanding as to how much property was
18 picked up by the parenthetical?
19    MR. MORAG:  Object to the form and
20 foundation.
21    A.   All I'll say about that is that they
22 had more ready access to that information
23 through their client than we had.
24    Q.   What about the trustee, do you know
25 whether the trustee had any knowledge about the

TSG Reporting - Worldwide    877-702-9580

Page 118

ROSEN

1
2    amount of the property that was the subject of
3    that parenthetical?
4        A.   I can't speak to the state of mind of
5    the trustee, but I assume that as part of this,
6    the trustee was looking at what was there.
7        Q.   Is your answer the same with respect
8    to the creditors committee?
9        A.   I've had no direct interaction with
10   them, the creditors committee, such that I can
11   recall.
12           MR. MAGUIRE:  We will mark as
13       Exhibit 623 a document dated September 19,
14       2008, Bates stamped GCGSH0002699 through
15       700.
16           (Exhibit 623, document Bates stamped
17       CGSH0002699 through 700 marked for
18       identification, as of this date.)
19       A.   Can I back up a second to your
20   previous question?  In terms of what the trustee
21   and Weil knew about the amount of the margin,
22   they would have known -- they were copied on
23   e-mails which -- from OCC just in the context of
24   OCC that suggested that just the pays and
25   collects from -- for the Monday would have been
TSG Reporting - Worldwide    877-702-9580

Page 119

ROSEN

1
2    on the order of several hundreds of millions of
3    dollars, which would have suggested an
4    extraordinarily large amount of positions and
5    therefore margin associated with them.
6        So they could have inferred that it
7    would be an extremely significant amount of
8    margin.
9        Q.   When you refer to the pays and
10   collects, what are you referring to?
11       A.   The accounts are marked on a periodic
12   basis by the clearinghouse, and it was sort of
13   what additional flows are coming in or going out
14   between the clearinghouse and the clearing
15   member as a result of the changes in the marks
16   or the exercises of contracts or whatever other
17   activity is being conducted in the account.
18       Q.   And what's a pay?
19       A.   Well, it depends on what your
20   perspective is, but some amounts are paid by the
21   clearinghouse to the clearing member, and there
22   are amounts that are paid, so if you are
23   receiving the funds, you are the collect, and if
24   you are paying the funds, you're the pay.
25       Q.   Do you know whether the trustee or
TSG Reporting - Worldwide    877-702-9580

Page 120

ROSEN

1
2    Weil actually received any information
3    concerning pays or collects at the OCC prior to
4    the closing?
5        A.   I believe they were copied on e-mail
6    correspondence from the OCC, but that may be a
7    misrecollection, but I believe there was a lot
8    of correspondence including another e-mail that
9    referred to a billion dollars and that confirmed
10   that OCC was going to transfer all of that to
11   Barclays, as we would have all expected.
12       Q.   And did you receive any response to
13   Exhibit 623?
14       A.   I don't have a clear recollection of a
15   specific response to this except that the SEC,
16   after this interim exchange of communications
17   regarding DTCC, stepped up to support the
18   transaction, so presumably if they had had a
19   problem, they would have raised it in connection
20   with their support of the transaction.
21       Q.   We will mark as Exhibit 624 a document
22   Bates stamped DTCC 00126 through 00198.
23           (Exhibit 624, document Bates stamped
24       DTCC 00126 through 00198 marked for
25       identification, as of this date.)
TSG Reporting - Worldwide    877-702-9580

Page 121

ROSEN

1
2        Q.   Is this an e-mail you received from
3    DTCC on or about September 20, 2008?
4        A.   Appears so.
5        Q.   It is a lengthy document.  I am really
6    going to ask you only about one of the
7    attachments, the contents.
8           MR. MORAG:  Just for the record, there
9       do appear to be other e-mails starting at
10      page 180 that may or may not be part of
11      this.  Since they are dated later, I don't
12      know that they could have been part of the
13      original e-mail.
14       Q.   I'm not going to ask you about
15   anything after 178.  But if you could take a
16   look at the pages that begin 175.
17       A.   Um-hm.
18       Q.   You will see on page 176, the first
19   paragraph concerns assumption of accounts.
20       A.   Right.
21       Q.   Was there at one point in time a
22   discussion whereby Barclays was assuming the
23   DTC -- the Lehman accounts at DTCC?
24           MR. MORAG:  Object to the form.
25           MR. HUME:  Object to the form.
TSG Reporting - Worldwide    877-702-9580

Page 122

ROSEN

1            ROSEN
2        A.   I am sorry, can you repeat the
3    question.
4        Q.   Yes.  With respect to paragraph 1 at
5    the top of page 176, you see that's entitled
6    "Assumption of Accounts."  Do you recall that
7    drafts were exchanged which provided that
8    Barclays would assume the Lehman accounts at
9    DTC?
10       A.   I believe in this form, I don't
11   believe that Barclays had at this point agreed
12   to do that.  I know I got these documents.  I
13   know Michael Mazzuchi was looking at them.  I
14   don't recall focusing on them, because at the
15   time that we got these, our client had not
16   decided that it was going to assume the
17   accounts.  I said it was a potential outcome,
18   but it was not one that had been agreed.
19       Q.   You will see paragraph 2 is entitled
20   "Excluded Assets and Liabilities."  Did you have
21   any discussions with DTCC concerning excluding
22   certain assets?
23           MR. MORAG:  Object to the form.
24       A.   There were discussions with DTCC about
25   what was in the accounts.  There were

TSG Reporting - Worldwide   877-702-9580

Page 123

1            ROSEN
2    discussions about whether or not or the extent
3    to which Barclays was going to assume
4    responsibilities for liabilities in the
5    accounts, and there were discussions about, in
6    recognition that there were assets that Barclays
7    was getting as part of the transaction and
8    assets that Barclays was not getting as part of
9    the transaction, and all of those factors played
10   into sort of the crucible of considerations as
11   to how this would be -- how this situation with
12   DTCC was going to be resolved.
13           But I think it was not until Sunday
14   night that there was a meeting of the minds as
15   to how this was going to be handled.  There was
16   a first amendment which reflected an arrangement
17   which ultimately was -- couldn't be performed
18   because of the unavailability of certain
19   securities to be used as part of the -- what do
20   you call it? -- as part of the credit support
21   for DTCC.
22       Q.   You referred to discussions with DTCC
23   concerning assets that Barclays was getting and
24   assets that Barclays was not taking.  Can you
25   tell me what you know of those discussions?

TSG Reporting - Worldwide   877-702-9580

Page 124

1            ROSEN
2        A.   What I said was there were assets that
3    Barclays was taking and there were assets --
4    there were assets that Barclays was not taking,
5    and there were discussions with DTCC about
6    should -- what the position at the DTCC
7    subsidiary clearing organizations were, but I
8    think in the end, they didn't proceed to a point
9    where Barclays was comfortable assuming
10   greater -- assuming responsibility for the
11   financial obligations that were associated with
12   the accounts.
13       Q.   I'm not going to ask you now about the
14   assumption of liabilities or anything about
15   assuming liabilities.  I just want to ask you
16   what you recall of your involvement in any
17   discussions with DTCC concerning what assets
18   Barclays was taking and what assets Barclays was
19   not taking from the Lehman accounts at DTCC.
20       A.   Those discussions were held by an
21   operations team, and I don't believe that there
22   was a focus with DTCC on that.  The focus on
23   what assets were being sold and what were not
24   and what liabilities was the deal documentation.
25   DTCC was not a part of the negotiations about

TSG Reporting - Worldwide   877-702-9580

Page 125

1            ROSEN
2    what Barclays was and wasn't taking, but there
3    were extensive meetings about what the
4    liabilities might be and what kind of recourse
5    was going to be -- you know, what additional
6    credit support DTCC might look for.
7        Q.   Were you aware that a Barclays due
8    diligence team visited DTCC's offices?
9        A.   Yes.
10       Q.   To review the assets that were there?
11           MR. MORAG:  Object to the form.
12       A.   I would say that there was a due
13   diligence team that was trying to learn as much
14   as it could about the accounts.  But I'm not
15   sure that there weren't potentially multiple
16   objectives from their perspective.
17       Q.   Who, to your knowledge, was part of
18   that operations team?
19       A.   Gerard Larocca is the individual that
20   I corresponded with, but I believe he had an
21   extensive team.
22       Q.   Anyone else you can remember?
23       A.   I don't remember the names in here,
24   no.  Maybe John Rodefeld.
25       Q.   Did any of the Barclays operations

TSG Reporting - Worldwide   877-702-9580

Page 126

**ROSEN**

1 team members report to you?
2 A. Well, we communicated. I wouldn't
3 have described what they did as reporting to me.
4 Q. Did any of them fill you in on any of
5 their specific findings from their due
6 diligence?
7 A. I think they reported to --
8 MR. MORAG: It is a yes or no question
9 on that. The substance may be privileged,
10 so I think the answer is -- calls for a yes
11 or a no.
12 A. That team did not report findings to
13 me.
14 Q. When you say "that team," you're
15 referring to the due diligence team?
16 A. The team, the operations team that was
17 at DTCC.
18 Q. Did you hear through any other source
19 the findings of the Barclays due diligence team?
20 MR. MORAG: Yes or no.
21 A. No.
22 Q. Did you participate in any of the
23 phone calls between any Barclays operations
24 people on that due diligence team and

TSG Reporting - Worldwide    877-702-9580

Page 127

**ROSEN**

1 representatives of DTCC on Sunday, the Sunday
2 night?
3 A. I may have participated in one call or
4 sort of been in and out of the call while
5 dealing with other issues, but I'm -- I don't
6 have a clear recollection.
7 Q. Do you recall anything of that call?
8 A. I don't recall the specifics of the
9 call.
10 Q. Do you recall when it happened?
11 A. At what time on Sunday, no.
12 Q. Do you recall who participated?
13 A. I don't have a specific recollection.
14 I could speculate based on who was involved in
15 the conversations, but I don't have a specific
16 recollection beyond, you know, it would have
17 included Archie Cox and Jonathan Hughes, Gerard
18 Larocca. As to the other participants, I just
19 don't recall.
20 Q. Do you recall anything that was said
21 in that call?
22 A. No. I recall the results of the call,
23 but I don't recall the specific discussion.
24 Q. Do you know who led the call on the

TSG Reporting - Worldwide    877-702-9580

Page 128

**ROSEN**

1 Barclays side?
2 A. I'm not sure that there was a leader.
3 There was a group convened to share information
4 and reach conclusions.
5 Q. Do you recall any Barclays persons
6 speaking on that call?
7 A. Since it was an internal Barclays
8 call, yes, I mean there was an exchange of --
9 MR. MORAG: Wait.
10 MR. HUME: This is --
11 Q. We may have misunderstood each other.
12 I'm not asking about an internal Barclays call.
13 I'm asking about your -- whether you have any
14 knowledge of a call between Barclays operations
15 people and folks at DTCC on the Sunday night.
16 A. I am sorry, no.
17 Q. Did you participate in any telephone
18 call with anyone from DTCC on the Sunday?
19 A. Yes.
20 Q. How many calls?
21 A. I honestly don't remember, but there
22 could have been two or three or maybe three or
23 four, or a long call that I walked in and out
24 of. But there were continued discussions until

TSG Reporting - Worldwide    877-702-9580

Page 129

ROSEN

1 quite late at night with DTCC.
2 Q. Can you tell me on the Barclays side,
3 who were the Barclays participants?
4 A. Archie Cox, Jonathan Hughes, myself,
5 Michael Klein. I -- Gerard Larocca, although
6 I'm not sure that he was on all of the calls or
7 on the calls all of the time.
8 Q. And taking the wider Barclays group,
9 you would include yourself as participating in
10 those calls?
11 A. I was in a room for a lot of those
12 calls, not all of them.
13 Q. Did you say anything on any of those
14 calls?
15 A. Did I say anything on those calls? I
16 may very well have, but I don't have specific
17 recollection of what I may have said.
18 Q. Any general recollection?
19 A. I really can't recall.
20 Q. Anyone else from Cleary who
21 participated in any of these calls?
22 A. On Sunday night, I don't think so.
23 Q. Do you recall anything that Archie Cox
24 said on any of these calls?

TSG Reporting - Worldwide    877-702-9580

Page 130

ROSEN

A.   He conveyed Barclays' reluctance to
assume the obligation to provide any form of
guarantee beyond the 250 million dollars
representing the holdback of that payment that
would otherwise have been made to Lehman under
the APA, and there would have been -- there was
a call -- there was a point at which he said, he
conveyed to DTCC that because Barclays was not
willing to accept more liability than that, they
would not be accepting the transfer of those
accounts.

Q.   Anything else you remember Mr. Cox
saying in any of the Sunday night calls?

A.   I really don't recall specifics.
There was undoubtedly a lot more discussed and a
lot more give and take, but candidly, I cannot
remember the specifics of the dialogues. There
would have been conversations about, gee, does
DTCC really need all the credit support that it
is asking for, can't it get comfortable, it has
better access to the information than Barclays
does. It would have been of that nature, but I
just, sitting here now, can't recall the
conversations.

TSG Reporting - Worldwide    877-702-9580

Page 131

ROSEN

Q.   Anything you recall Jonathan Hughes
saying?

A.   Not really. I don't have a specific
recollection. I think -- I'm sure that he
reiterated or articulated many of the same
themes as Archie Cox, because the Barclays view
was, at that point, pretty well settled that
they were not prepared to assume additional
potentially substantial liabilities.

Q.   Anything you recall Mr. Hughes saying
beyond what you said?

A.   Not specific words, no.

Q.   Anything you recall Michael Klein
saying?

A.   No.

Q.   Anything you recall Mr. Larocca
saying?

A.   Well, there were a lot of
conversations also about sort of the pipes and
the plumbing and sort of the operational aspects
of what was going to be the mechanism for DTC to
effect the transfers of securities that needed
to be effected as part of the transactions, what
accountant are they going to go to or through,

TSG Reporting - Worldwide    877-702-9580

Page 132

ROSEN

or how that was going to be hooked up or
handled, but I was not focused on those because
I regarded them as essentially operational
matters.

Q.   Was that an issue that was in
Mr. Larocca's purview?

A.   Yes, I think so -- yes.

Q.   Did he speak to that?

A.   He did, and he may have delegated some
of the details of it to people who reported to
him.

Q.   Do you recall Mr. Larocca saying in
any call on Sunday night or early Monday morning
we are not taking anything?

A.   I do not recall Gerard Larocca saying
that or anyone else saying that, because it
was -- the whole purpose of the DTC endeavor was
to resolve their concerns in a manner that would
enable them to effect the transfers of assets
that were necessary to consummate the deal. So
it would have been a ludicrous thing for anyone
to have said, because otherwise, why did we need
to be dealing with DTCC?

Q.   Was anyone from DTCC present for any

TSG Reporting - Worldwide    877-702-9580

Page 133

ROSEN

of these discussions?

A.   These -- they were on the phone.
There was nobody from DTCC in the room at Weil's
offices.

Q.   Who did you understand was
participating from DTCC?

A.   My understanding was that it was Larry
Thompson, the general counsel; his deputy, Isaac
Montal, Shelly Hirshon, their outside counsel,
and Don Donahue, the chairman of DTCC, at least
at some -- at least in some portions of the
conversation.

Q.   And who was the person who did most of
the talking for DTCC?

A.   My recollection was that it was Larry
Thompson.

Q.   Did you understand at some point, DTCC
was considering issuing a cease to act with
respect to Lehman?

MR. MORAG: Object to the form.

A.   After Barclays had conveyed to DTCC
that Barclays was not going to accept a transfer
of the accounts, I believe Larry Thompson
indicated -- and I don't recall exactly when

TSG Reporting - Worldwide    877-702-9580

Page 134

ROSEN

1
2 this was -- that they would issue a cease to
3 act, which meant that once the pipeline and
4 these transactions were transferred, DTCC would
5 be liquidating positions and closing out the
6 account and not accepting any other
7 transactions.
8        And I received a call from Don Donahue
9 to say, you know, if we could avoid doing that,
10 they would prefer to do that, because they
11 hadn't done it before, and which I told him I
12 would convey to the client.
13    **Q.   Do you have an understanding of what**
14 **the consequences would be for the transaction if**
15 **the DTC were to issue a cease to act notice?**
16       MR. MORAG:  Objection to form.
17    A.   My understanding is that it wouldn't
18 have affected the transaction.
19    **Q.   Did you have any discussion with**
20 **anyone as to whether Barclays could or would**
21 **close the transaction if DTCC issued a cease to**
22 **act notice?**
23       MR. MORAG:  Again, Mr. Rosen, if your
24    discussions are with anybody outside of
25    Barclays, you can answer.  Not -- if not,

TSG Reporting - Worldwide    877-702-9580

Page 135

ROSEN

1
2 say you are not able to answer.
3    A.   Would you mind repeating the question.
4    **Q.   Yes.  The question is whether you had**
5 **any discussion, any conversation with anyone**
6 **about whether Barclays could or would close the**
7 **transaction if DTCC were to issue a cease to**
8 **act.**
9       MR. MORAG:  Do you have a time frame
10 on when the issuance was supposed to be?
11    A.   It really --
12    **Q.   Yes, the Sunday.**
13    A.   Can I just -- let me just say this.
14 It really depends.  Your question presupposes
15 with respect to what point in time the cease to
16 act would take effect.
17       If -- I did have a conversation with
18 Shari Leventhal at the Fed, which the substance
19 of which was that I expressed my concern that we
20 were not making rapid progress in the
21 negotiations with DTCC toward a resolution in
22 which they would accept a much more limited
23 amount of credit support, and I was worried that
24 we were running out of time, and we thought that
25 it might be helpful to let the Fed know, that we

TSG Reporting - Worldwide    877-702-9580

Page 136

ROSEN

1
2 didn't want the Fed to find out at the last
3 minute that this thing was falling apart for
4 reasons unrelated to, you know, the actual
5 negotiation of the deal, that because of a
6 problem with DTCC.
7        So I spoke to Shari Leventhal and
8 said, if we can't reach a resolution with DTCC
9 and DTCC does not agree to process the
10 transactions, absent other arrangements, we are
11 not going to be able to close this, at least in
12 the manner in which we had contemplated.
13       And I did have that conversation with
14 her.
15    **Q.   Can you help me out and explain,**
16 **because I thought you had told us that a cease**
17 **to act from DTCC would not have affected the**
18 **transaction, but I thought you also told us --**
19    A.   I also told you it depends at what
20 point they are ceasing to act.  And if they
21 cease to act following the processing of the
22 transaction and the transactions that are in
23 their pipeline, we would have been able to close
24 the transaction.  If they said as of Saturday,
25 we are ceasing to act and we are not going to

TSG Reporting - Worldwide    877-702-9580

Page 137

ROSEN

1
2 accept any other instructions on Monday to
3 transfer customer or proprietary agents, that
4 would have been a very different result than the
5 one which ultimately obtained.
6    **Q.   And when you told us earlier that**
7 **after Barclays had made clear it was not**
8 **accepting the transfer of accounts and Larry**
9 **Thompson responded that DTCC would issue a cease**
10 **to act, what did you understand the timing of**
11 **that notice that he was talking about to be?**
12    A.   My understanding was that DTCC was
13 going to issue a cease to act after processing
14 trades in the pipeline, including the transfers
15 that were necessary to implement the deal, and
16 that there had been operational calls, my
17 understanding was to sort of discuss the
18 plumbing and how you accomplish that.
19    **Q.   So Mr. Thompson was simply telling you**
20 **that they would issue a cease to act after**
21 **clearing all the pipelines, all the uncleared**
22 **trades after the closing?**
23    A.   Yeah, I didn't think -- I did not
24 understand him to be saying -- well, I'm going
25 to add some clarification to this.  There was a

TSG Reporting - Worldwide    877-702-9580

Page 138

ROSEN

1  point at which we were not, we did not have a
2  meeting of the minds with DTC about what, in
3  addition to 250, Barclays might make available,
4  and DTC, DTC was not, had not yet agreed to
5  accept only the 250 million, so you had two
6  parties who were -- who lacked a meeting of the
7  minds.
8        In that context, Larry Thompson may
9  well have said basically, you know, if we don't
10 get what we want, we are just going to cease to
11 act and you are going to have to figure things
12 out for yourself.  That was some of the need to
13 deal with that issue, so we could close
14 expeditiously and not have to create some kind
15 of a work-around, was precisely why we continued
16 the negotiations until DTCC would be willing to
17 process the transactions that were in the
18 pipeline and transactions that are associated
19 with this deal.
20     **Q.   Was that comment by Mr. Thompson about**
21 **what they would do if they didn't get what they**
22 **wanted, was that in response to hearing from**
23 **Barclays that Barclays was not accepting**
24 **transfer of the accounts?**

TSG Reporting - Worldwide    877-702-9580

Page 139

ROSEN

1     A.   Again, you have got to focus on the
2  time.  I think at some point it was made clear
3  that not having the credit support meant that
4  after the cease to act, when a meeting of the --
5  when DTCC agreed that on the understanding that
6  it was going to get the 250 million in credit
7  support but no more, the fact that they would
8  have to cease to act was never presented by him
9  as, you know, something that would have
10 precluded the very reason that we were having
11 the negotiations, in order to enable the
12 transaction to close by processing and making
13 the transfers.
14     **Q.   Let me try --**
15    A.   You couldn't accept a transfer of
16 customer accounts and get that business if the
17 accounts couldn't be -- the assets in them
18 couldn't be transferred by DTCC.  Everybody
19 realized that they had to agree to do that and
20 not shut the pipes down.
21     **Q.   Yeah, I'm not interested in what would**
22 **or could have happened.  I want to get the**
23 **sequence of your recollection down right.**
24        **I understand that on Sunday night at**

TSG Reporting - Worldwide    877-702-9580

Page 140

ROSEN

1  **some point, Archie Cox described to DTCC**
2  **Barclays' reluctance to assume the accounts and**
3  **made plain that Barclays was not accepting the**
4  **transfer of the accounts of DTCC?**
5     A.   Yes.
6     **Q.   That's correct?**
7        **Now, what was -- in response to that,**
8  **did Mr. Thompson say in words or substance if**
9  **DTCC can't get happy, it will issue a cease to**
10 **act?**
11    A.   I don't recall it being specifically
12 in response to the -- you know, the articulation
13 of the final position or whether it occurred in
14 the course of earlier assertions of the
15 position.  But it was clear in their minds that
16 if they didn't have a -- if they did not have
17 adequate credit support or a viable creditworthy
18 clearing member, that they were not going to
19 take the risk of just carrying the accounts open
20 and continuing to accept positions.  They would
21 have to go through the process that they
22 described as ceasing to act.
23     **Q.   And they made that clear to Barclays?**
24    A.   Yes.

TSG Reporting - Worldwide    877-702-9580

Page 141

ROSEN

1     **Q.   Can you tell me, what happened or what**
2  **was the event that triggered the decision by**
3  **Barclays that it would not accept a transfer of**
4  **accounts at DTCC?**
5        MR. MORAG:  I caution you from
6  disclosing any privileged communications.
7     A.   Can I consult on the privilege
8  question?
9     **Q.   Sure.**
10       (Recess)
11    **Q.   Would you like the question, sir?  Can**
12 **you tell me what happened or what was the event**
13 **that triggered the decision by Barclays that it**
14 **would not accept a transfer of accounts at DTCC?**
15    A.   After the report from the operations
16 team, of the operations team to their principal,
17 their principals, Archie Cox, the decision was
18 made that they would not -- they would not
19 accept the possibility of liabilities in excess
20 of 250 million dollars, and they confirmed to
21 DTCC that they were firm on their position they
22 weren't going to accept the accounts.
23    **Q.   When was the report of the operations**
24 **team received?**

TSG Reporting - Worldwide    877-702-9580

Page 142

1              ROSEN
2        A.   Other than that it was earlier in the
3    evening on Sunday, but possibly late, I don't
4    have a specific recollection.
5        Q.   Do you have any sense of the timing as
6    to when a decision was made by Barclays that it
7    would not accept any liabilities beyond the 250
8    million?
9        A.   Well, I think internally they had
10   reached that position -- we were trying in good
11   faith to see whether they could get enough
12   information to make them comfortable, but it was
13   finally communicated that they were firm on the
14   250 and not accepting the accounts, maybe like
15   11 o'clock, something like -- it was quite late
16   on Sunday night.
17       Q.   And was that Mr. Cox who conveyed that
18   to DTCC?
19       A.   I believe so, I believe so.
20       Q.   Was Larry Thompson on the call in
21   which --
22       A.   I believe so.
23       Q.   He was?
24       A.   I believe so.
25       Q.   Did Mr. Thompson make a reference to
     TSG Reporting - Worldwide    877-702-9580

Page 143

1              ROSEN
2    issuing a cease to act on that call?
3        A.   I don't recall him specifically making
4    a reference at that time in response to it.  But
5    to be clear, the understanding was that the
6    cease to act was not in respect of the
7    processing of any of the transactions that --
8    any of the -- processing any of the transfers
9    that were part of the transaction.
10       Q.   Now, when did you have the call with
11   Shari Leventhal?
12       A.   Earlier in the evening.  Whether it
13   was at 5 o'clock or 8 o'clock or 9 o'clock, I
14   don't honestly recall.
15       Q.   Did you have any follow-up call with
16   her?
17       A.   I don't recall that I had a follow-on,
18   one-on-one call with Shari.  It's possible that
19   I did, but they were on the open line which was
20   established for the purpose of reporting to all
21   people who needed to know simultaneously,
22   because we were under a very tight time frame,
23   sort of what was open and what was being agreed.
24       There was an open line with the Fed
25   and the SEC and other interested parties, and I
     TSG Reporting - Worldwide    877-702-9580

Page 144

1              ROSEN
2    believe that at least at some point, she was on
3    to hear the results of the negotiations.  She
4    may have gotten information from DTCC, I just
5    don't recall specifically.
6        Q.   Can you tell me what else you recall
7    Larry Thompson saying in the various
8    conversations on Sunday night?
9        A.   For the most part, I recall him
10   justifying their need for collateral in excess
11   of the 250 million dollars.  That was the point
12   at which they were willing to go forward on that
13   basis.
14       Q.   How did he justify that?
15       A.   That they were -- his team, you know,
16   were concerned about the risks.
17       Q.   Do you recall anything specifically
18   said about the risks?
19       A.   Mostly my recollection is, you know,
20   there is uncertainty, there is a lot in there to
21   do, it would take time, we can't know exactly
22   what the results of the liquidations will be.  I
23   mean they are a clearinghouse, they are a
24   conservative organization, and they viewed the
25   risk conservatively.
     TSG Reporting - Worldwide    877-702-9580

Page 145

1              ROSEN
2        Q.   Do you recall him saying anything
3    further about a cease to act other than what you
4    have told us?
5        A.   Nothing beyond what I told you.
6        Q.   Do you recall saying, addressing
7    specifically the subject of whether the -- of
8    when the cease to act would take effect and the
9    impact that it would have on the transaction or
10   on the unsettled trades that were at DTCC?
11       MR. MORAG:  Objection, asked and
12   answered.
13       A.   He never suggested that there would be
14   any impact as the transaction was resolved.  The
15   purpose of the resolution was that there would
16   be no impact.
17       Q.   Did he ever address whether the cease
18   to act would have an impact on outstanding
19   unsettled trades?
20       A.   Mostly what I recall him focusing on
21   was they don't like to cease to act because it
22   means that other participants in the marketplace
23   aren't going to receive the benefit of the
24   processing that they would otherwise do when
25   those transactions came in, and hadn't had to do
     TSG Reporting - Worldwide    877-702-9580

Page 146

ROSEN

1 it in the past.
2      My impression was that they were more
3 concerned about the public relations
4 implications of a clearing corporation doing
5 that than they were focused on any impact on us,
6 because it was a mutual premise that the purpose
7 of this was to enable us to close and process
8 the transactions.
9      **Q.   Did he ever say anything to indicate**
10 **that his references to cease to act related**
11 **exclusively to a notice that would come into**
12 **effect after the closing and after all of the**
13 **unprocessed, unsettled trades of Lehman had been**
14 **cleared by DTCC?**
15      MR. MORAG:  Object to the form.
16      A.   I think in going over the terms of the
17 arrangements it was clear that the transactions
18 that were the subject of the acquisition, those
19 transfers were going to be made, and I don't
20 think there was any implication of any kind, it
21 would have been absurd for there to have been an
22 implication that we reached an agreement with
23 DTC and by the way, they were going to not
24 process the transactions.

TSG Reporting - Worldwide    877-702-9580

Page 147

ROSEN

1      **Q.   Let me ask you about the time period**
2 **prior to reaching a meeting of the minds with**
3 **DTCC.  At any time before that, did he give any**
4 **representation or assurance to Barclays that**
5 **while DTCC might issue a cease to act, it would**
6 **not affect the transaction, and that they would**
7 **honor and process all unsettled trades?  Did he**
8 **say that in words or substance?**
9      A.   I am sorry, can you repeat that.
10      **Q.   Yes.  At any time prior to the meeting**
11 **of the minds between Barclays and DTCC, did**
12 **Larry Thompson in words or substance say, we may**
13 **have to issue a cease to act, but it will not**
14 **affect the transaction, and notwithstanding our**
15 **cease to act, we will make sure that it takes**
16 **effect only after all unsettled trades have been**
17 **cleared?**
18      A.   No.  I think that if the -- if we
19 hadn't reached an agreement with DTCC, then we
20 had, we had the prospect of having to figure out
21 another way of consummating the transaction if
22 they were not going to process trades, and
23 basically what DTCC was saying was that if they
24 were going to continue to process trades and act

TSG Reporting - Worldwide    877-702-9580

Page 148

ROSEN

1 for these accounts, then they wanted more credit
2 support than they would have if they were left
3 to look only to the assets of LBI.
4      **Q.   Is there anything further you recall**
5 **Larry Thompson saying on the Sunday night other**
6 **than what you have told us?**
7      A.   I'm sure there is a lot more that
8 could be said.  I just don't have a specific
9 recollection of that.
10      **Q.   And all my questions are just to your**
11 **recollection.**
12      **What about Mr. Montal?  Do you recall**
13 **anything that Mr. Montal said in any of the**
14 **conversations on Sunday night or early Monday**
15 **morning?**
16      A.   He was not a prominent speaker, at
17 least while I was in the room.
18      **Q.   Anything that you recall?**
19      A.   I don't have a specific recollection
20 of what he might have said.
21      **Q.   What about Shelly Hirshon?**
22      A.   I don't remember Shelly Hirshon
23 speaking of it.
24      **Q.   You did tell us about Don Donahue**

TSG Reporting - Worldwide    877-702-9580

Page 149

**ROSEN**

1 **making a call to you.  Anything else that you**
2 **recall hearing from Dan Donahue on the Sunday**
3 **night?**
4      A.   No.  No more than that conversation.
5      **Q.   I have been asking you now about the**
6 **conversations with DTC for some time limited to**
7 **the Sunday night, and I know that there were**
8 **conversations that may have spilled over into**
9 **the wee hours of early morning.  So if we**
10 **include Monday morning, are there any**
11 **conversations by any of the participants that**
12 **you recall that you haven't told us about?**
13      A.   I have a vague recollection that there
14 may have been continuing discussions on the
15 operations side in anticipation of the closing
16 of the transaction, and the balance of the
17 exchanges were between the lawyers trying to
18 reflect what had been agreed in I think what's
19 become or been referred to as the DTCC letter.
20      **Q.   And anything else, if you recall?**
21      A.   Not that I specifically recall,
22 sitting here.
23      **Q.   We will mark as Exhibit 625 a document**
24 **Bates stamped DTCC 00359 through 361.**

TSG Reporting - Worldwide    877-702-9580

Page 150

```
 1              ROSEN
 2        (Exhibit 625, document Bates stamped
 3    DTCC 00359 through 361 marked for
 4    identification, as of this date.)
 5     A.   I recall this.
 6     Q.   If you look at the e-mail at the top,
 7    the first page, sir.  Can you tell me what you
 8    meant when you said, "The obligations and
 9    entitlements in relation to the funds run
10    between DTC and the LBI estate, not between
11    Barclays and DTC"?
12     A.   Because the credit support was going
13    to be limited to the 250 million dollar cash
14    payment, we thought that since we could direct
15    that payment, I thought that since it was
16    possible to direct that payment on Lehman's
17    behalf, so that the DTC got hold of it, it
18    was -- as far as the transaction was concerned,
19    that was an asset of -- that would otherwise
20    have been an asset of the estate that was being
21    made available to provide credit support, and
22    since it would otherwise have been an asset,
23    that the arrangements relating to that were
24    between Lehman and DTC and didn't need to be
25    between Barclays.
```
TSG Reporting - Worldwide    877-702-9580

Page 151

```
 1              ROSEN
 2        So my feeling was that to keep things
 3    simple, we didn't really need to have a separate
 4    agreement.
 5     Q.   Let me show you a document that's
 6    previously been marked as Exhibit 606.
 7        While we are waiting for that, sir,
 8    how did the impasse between Barclays and DTC get
 9    resolved?  How did the parties reach a meeting
10    of the minds?
11     A.   There were conversations staking out
12    positions.  The parties would go off.  There was
13    due diligence being done on both sides, because
14    both sides wanted to know what the risks were,
15    and they would get back on the telephone, and at
16    some point, DTC decided that the position that
17    had been articulated by Barclays was acceptable
18    to it.
19     Q.   So DTC had previously refused to
20    accept Barclays' position of limiting the
21    recourse to 250 million, but it changed its mind
22    at some point on the Sunday or early Monday?
23     A.   Until late on Sunday night, DTC had
24    not signaled its agreement to go forward based
25    on the 250 million dollars.
```
TSG Reporting - Worldwide    877-702-9580

Page 152

```
 1              ROSEN
 2     Q.   How did DTCC signal its agreement?
 3     A.   On a conference call, it -- Larry
 4    Thompson said, we are willing to go forward on
 5    this basis.
 6     Q.   And what was the specific thing he
 7    said with respect to the basis?
 8     A.   That Barclays would not be assuming
 9    the accounts and that the credit support that
10    would be made available would be limited to the
11    250 million dollar holdback on the purchase, on
12    the 250 million dollars.
13     Q.   Is that something that you recall
14    Larry Thompson specifically saying?
15     A.   I could be wrong, but that's my
16    recollection.  My recollection is that Larry was
17    largely the spokesperson for DTC.
18     Q.   And did Larry explain what prompted
19    DTCC to change its position?
20     A.   No.  I don't recall -- I don't recall
21    having an explanation from him.
22     Q.   Did you have any understanding as to
23    what prompted DTCC to change its position?
24     A.   I assume that -- all I can say is that
25    I assumed with more time, they got a better
```
TSG Reporting - Worldwide    877-702-9580

Page 153

```
 1              ROSEN
 2    understanding of what the assets and the risks
 3    were, and assumed that they decided that would
 4    be acceptable for them, to take the liquidation
 5    risk with the assets that they had in the
 6    250 million.
 7        But he didn't give us a
 8    quantitative -- he didn't share his quantitative
 9    analysis of their evaluation of that risk, nor
10    did we expect them to.
11     Q.   When did this meeting of the minds
12    conversation happen?
13     A.   It was very late on Sunday night.
14    Sometime before midnight, I think.
15     Q.   Do you know whether it was before
16    midnight or after midnight?
17     A.   I would have to refresh my
18    recollection.
19     Q.   How would you do that?
20     A.   I would look at the e-mail traffic.
21     Q.   Anything else?
22     A.   I think that is all that I would have
23    available to me today to help.
24     Q.   I show you a document previously
25    marked as Exhibit 606.  Sir, you received this
```
TSG Reporting - Worldwide    877-702-9580

Page 154

ROSEN

1   e-mail?
2   A.   Yes.
3   Q.   Does it -- do you see the reference to
4   "earlier this evening," the first line?  Does
5   that refresh your recollection as to -- the
6   first line of the e-mail, cover e-mail, does
7   that refresh your recollection as to when the
8   agreement was reached?
9   A.   Well, I know it was before 3:43 a.m.
10  How much before -- I remember we felt that we
11  tended to wait a long time to get drafts back
12  from the other side, but I don't recall.
13  Q.   Who prepared this draft?
14  A.   This was -- it appears to have been
15  prepared by DTC or its counsel, but I don't know
16  specifically.
17  Q.   Did you have any discussions with DTCC
18  or its counsel anytime after receiving this
19  e-mail?
20  A.   Most of the direct negotiations
21  regarding this were conducted by my partner Mike
22  Mazzuchi.  I did exchange e-mails including, I
23  guess it was slightly earlier in the evening,
24  with Sheldon Hirshon.  There may have been later

TSG Reporting - Worldwide    877-702-9580

Page 155

ROSEN

1   e-mails exchanges, I don't recall.
2   Q.   Leaving aside e-mails, do you know
3   whether Mike Mazzuchi had discussions with
4   anyone at DTCC after circulating or the
5   circulation of this draft that has been marked
6   as Exhibit 606?
7   A.   Well, with their counsel, certainly.
8   I don't recall whether or not he was, he had
9   conversations that included individuals from
10  DTCC.
11  Q.   Do you know what conversations he had
12  with their counsel?
13  A.   Other than to discuss changes to this
14  document prior to its finalization, I don't.
15  Q.   And do you know whether there were in
16  fact discussions as opposed to e-mail exchanges?
17  A.   I don't -- I think it was principally
18  exchanges of drafts.  It was very late and
19  people were very tired.
20  Q.   If you turn to paragraph 1, sir, the
21  winding down of accounts.  Did you review this
22  at the time?
23  A.   I don't recall specifically whether I
24  looked at this draft or a subsequent draft.

TSG Reporting - Worldwide    877-702-9580

Page 156

ROSEN

1   Q.   Did you understand that, at the time
2   this draft was received, that there was an
3   agreement, a meeting of the minds between
4   Barclays and DTC whereby all of the assets in
5   the Lehman accounts at DTC were going to go to
6   Barclays and the accounts themselves were going
7   to stay at DTCC?
8   MR. MORAG:  Object to the form.
9   A.   Could you repeat the question.
10  Q.   Did you have an understanding at the
11  time you received this e-mail that there had --
12  there was an agreement, a meeting of the minds
13  between Barclays and DTCC?
14  MR. MORAG:  That's the only question?
15  MR. MAGUIRE:  Yes.
16  A.   Yes.
17  Q.   And did you understand that that
18  agreement involved the accounts, the Lehman
19  accounts staying at Lehman and at DTC?
20  A.   Yes.
21  Q.   Did you understand what was happening
22  to the assets in those accounts?
23  A.   Insofar as Barclays was concerned, our
24  understanding was that the assets, whether they

TSG Reporting - Worldwide    877-702-9580

Page 157

ROSEN

1   were proprietary assets or customer assets that
2   under the deal terms were to be transferred,
3   would be processed.
4   Q.   And once those transactions were all
5   processed, who owned the assets in the Lehman
6   accounts at DTCC?
7   A.   The residual assets that were not to
8   be -- whatever we didn't -- whatever Barclays
9   didn't buy or acquire was part of the Lehman
10  estate.
11  Q.   Did you have an understanding as to
12  whether Barclays was acquiring any of the assets
13  at the -- in the DTCC clearance boxes?
14  A.   Yes.  Yes, my understanding is that
15  they were acquiring those assets.
16  Q.   And so that at the closing, those
17  assets would then belong to Barclays?
18  A.   Contractually, yes, at the closing
19  there would have been an agreement to transfer
20  them to Barclays, an understanding that those
21  transactions would be processed by DTCC and not
22  be subject to a cease to act.
23  Q.   And was that explained to the DTCC,
24  that the assets in the Lehman accounts would

TSG Reporting - Worldwide    877-702-9580

Page 158

ROSEN

1  contractually belong to Barclays at closing?
2      A.   The DTCC was provided at their request
3  a draft of the agreement that reflected the --
4  what do you call it? -- that reflected the
5  agreements to transfer the clearance box assets
6  as part of the deal.
7      Q.   A draft of the clarification letter?
8      A.   A draft of the letter, right.
9      Q.   Other than providing the DTCC with a
10 draft of the clarification letter, did anyone on
11 the Barclays side explain to DTCC that the
12 assets --
13     A.   I believe that that was the subject of
14 discussions on an operational level, because
15 they wanted to impose a cease to act at some
16 point, and they had to figure out a way to
17 effect the transfers and do whatever else that
18 they wanted to do under their rules.
19     Q.   Did you participate in any of the
20 operations conversations in which anyone from
21 the Barclays side explained to anyone on the
22 DTCC side that all of the assets at, in the
23 Lehman accounts at DTCC were being acquired by
24 Barclays?

TSG Reporting - Worldwide    877-702-9580

Page 159

ROSEN

1      A.   No, I don't think that I said that all
2  of the assets in those accounts were being
3  acquired.  There are some assets that were being
4  acquired, some assets that were not being
5  acquired.  There were customer accounts that
6  were being transferred and presumably other
7  customer accounts that were not part of the
8  deal.  I mean customer securities.
9          That was dealt with in the
10 clarification letter.  What Lehman was and was
11 not selling to Barclays was not the subject of
12 the DTCC letter.  The DTCC letter from the
13 beginning was about financial responsibilities
14 to DTCC for the liabilities associated with
15 those accounts.
16     Q.   And did anyone explain to DTCC that
17 Barclays understood there to be a distinction
18 between the accounts and the assets in the
19 accounts?
20     A.   It would have been an absurd
21 conversation to have with a clearing
22 corporation, because a clearing corporation is
23 basically structured fundamentally on the
24 premise that there is a difference between legal

TSG Reporting - Worldwide    877-702-9580

Page 160

ROSEN

1  ownership and responsibility for accounts and
2  beneficial ownership and entitlement to the
3  assets in the accounts.
4          Without that distinction, every person
5  who owns a security in the United States in
6  order to own it would have to be a clearing
7  member of a clearing corporation, which is not
8  how we would realize our financial markets.
9      Q.   You are not aware of any conversation
10 between anyone at Barclays, working for
11 Barclays, and anyone at DTCC concerning any
12 distinction between the Lehman accounts and the
13 assets in the Lehman accounts at DTCC?
14     MR. HUME:  Objection, asked and
15 answered.
16     A.   I don't have anything to add.
17     Q.   Did it come to your attention that
18 DTCC was of the understanding that the assets in
19 the Lehman account were remaining with the
20 estate?
21     A.   It is impossible for me to understand
22 how they could have formed that view or that
23 they -- and I am unaware that they did form that
24 view.

TSG Reporting - Worldwide    877-702-9580

Page 161

ROSEN

1      Q.   If you look, sir, at paragraph 1 of
2  the draft before you marked as Exhibit 606, you
3  will see the second part of that section 1, same
4  paragraph really of that section 1, says, "As
5  part of this closeout process, the trustee
6  hereby authorizes DTC to accept and act upon
7  instructions from NSCC to deliver securities
8  from the DTC LBI account to NSCC's account," and
9  it goes on.  Do you see that sentence?
10     A.   I do.
11     Q.   Can you explain why the parties were
12 providing for the trustee to exercise authority
13 over assets in the Lehman account if those
14 assets contractually were understood all along
15 to belong to Barclays?
16     MR. MORAG:  Objection,
17 mischaracterizes his testimony.  For the
18 third time.
19     A.   And I think you're asking me to
20 interpret what the import of this is, because I
21 don't accept your characterization of what this
22 does or -- what this provision does or says.
23     Q.   So you would --
24     A.   I think I would decline to answer on

TSG Reporting - Worldwide    877-702-9580

Page 162

ROSEN

1
2   the grounds that I think my interpretation of
3   this provision would be privileged.
4       Q.   At the time that this draft was
5   received, did you understand that Barclays was
6   taking -- was cherry picking or at least taking
7   certain assets from the clearance box and not
8   other assets, or at least that it had that
9   option?
10      MR. MORAG:  Objection, compound.
11      A.   Why don't you ask the first question.
12      Q.   Sure.  What I am trying to understand
13  is, at the time that this draft is circulated,
14  what is your understanding of the business deal
15  between Barclays and the estate?
16      A.   I was not -- I was not aware -- I
17  don't know it to be the case, sitting here
18  today, that there were clearance box assets that
19  Barclays had decided they didn't want.
20      Q.   Did you understand that Barclays had
21  the ability to either return or not take certain
22  clearance box assets?
23      A.   I'm not sure at that time that I had
24  focused on the language that you showed me
25  earlier today.

TSG Reporting - Worldwide    877-702-9580

Page 163

ROSEN

1
2       Q.   Did you raise any question with DTCC
3   or anyone else as to why there was not any
4   mechanism here for separating out the assets
5   that were being taken by Barclays and the assets
6   that Barclays did not choose to take from the
7   DTC clearance boxes?
8       A.   No, because at that point, I was under
9   the impression that Barclays was taking all of
10  the clearance box assets, which it was their
11  ability to do or not do, as they decided at any
12  time.  I think there was a lack of -- I don't
13  know how clearly it was understood what all of
14  those assets were.
15      Q.   I'll show you next a document that has
16  been marked as Exhibit 607.
17      MR. HUME:  How much more do you have?
18  And would it make sense to take a break at
19  some point afternoon then finish?
20      MR. MAGUIRE:  I can finish this in
21  five minutes and that might be a better time
22  to take a break.
23      Q.   This is an e-mail that your colleague,
24  Mr. Mazzuchi circulated?
25      A.   Um-hm.

TSG Reporting - Worldwide    877-702-9580

Page 164

ROSEN

1
2       Q.   I note in this draft and the prior
3   draft, there is a signature line for James B.
4   Giddens as trustee for the liquidation of Lehman
5   Brothers.  And the signature line is for James
6   B. Kobak, Jr.  Do you see that?
7       A.   Um-hm.
8       Q.   Did you have any discussions with
9   Mr. Kobak concerning this agreement?
10      A.   I did not have a verbal conversation
11  with James Kobak about this agreement, but he
12  was provided the various drafts that were
13  exchanged.
14      Q.   And made comments?
15      A.   As far as I'm aware, yes.
16      Q.   You see Mr. Mazzuchi's cover e-mail
17  says, "Further to Ed Rosen's discussion with
18  Sheldon, attached is a revised draft of the
19  recourse arrangement for the 250 million dollar
20  purchase price.  This also reflects comments
21  from Lehman."
22      Did you understand that to be a
23  reference to comments from the trustee's
24  representatives?
25      A.   I don't know.

TSG Reporting - Worldwide    877-702-9580

Page 165

ROSEN

1
2       Q.   Do you know whether this agreement was
3   discussed with anyone from Weil Gotshal?
4       WITNESS' ATTORNEY:  Are you referring
5   to the DTC letter in general or this draft
6   in particular?
7       Q.   The DTC letter in general.
8       A.   I do not recall.
9       Q.   Do you know whether Weil was provided
10  with any draft of the DTC letter agreement?
11      A.   Yes, it would have been on the closing
12  table and it may have been provided separately
13  by Shelly Hirshorn.
14      Q.   Other than it being on the closing
15  table and whether Mr. Hirshorn did or did not
16  provide it, do you though whether anyone
17  otherwise provided either the final agreement or
18  a draft of the DTC later agreement to anyone at
19  Weil?
20      A.   I don't have a recollection.  They may
21  well have been in the room.  The rooms weren't
22  closed off.  They may have participated in
23  reviewing the exchanges of draft.  I just don't
24  have a specific recollection.  Again, at this
25  time, I was in and out of the documentation,

TSG Reporting - Worldwide    877-702-9580

Page 166

1           ROSEN
2 also working on other problems.
3      Q.   In which room was the DTC letter
4 agreement put together -- speaking now to Cleary
5 and the Barclays representatives -- which room
6 at Weil were you working in?
7           WITNESS' ATTORNEY:  Objection,
8 compound.  It is two different questions.
9      A.   Yeah, I don't know how to describe,
10 there was a room on a floor and I was not
11 located in a particular room.  I jockeyed
12 between several rooms.
13      Q.   Where was the, speaking specifically
14 now to the DTCC negotiations, telephone calls
15 and the drafting, in which room did that happen?
16      A.   That happened in a room on a different
17 floor.
18      Q.   Do you know what floor?
19      A.   I believe it was the floor below the
20 floor where the other meetings were taking
21 place.
22      Q.   Were there any other Lehman-related
23 conference rooms in use on that lower floor?
24      A.   I don't, I don't recall.
25      Q.   Did anyone from Cleary instruct anyone
TSG Reporting - Worldwide     877-702-9580

Page 167

1           ROSEN
2 from Weil that they were not permitted into that
3 room?
4      A.   No, not that I am aware.
5      Q.   Have you -- at the beginning of
6 Mr. Mazzuchi's e-mail, he says, "Further to Ed
7 Rosen's discussion with Sheldon," do you know
8 what that discussion refers to?
9      A.   I think it refers to the same issue
10 that's reflected in the earlier exchange of
11 e-mail in which we were taking the view that
12 this was a limited recourse form of credit
13 support and not a guarantee of Barclays.  This
14 was an asset that would otherwise have been paid
15 to the estate as part of the transaction that
16 was being made available to secure additional
17 credit support to DTCC and its related
18 affiliates, and I thought that describing it as
19 a guarantee by Barclays was not entirely
20 accurate.
21      Q.   OK.
22           MR. MAGUIRE:  This is probably a good
23      time to take a break.
24           (Recess)
25      Q.   I will show you a document we have
TSG Reporting - Worldwide     877-702-9580

Page 168

1           ROSEN
2 previously marked as Exhibit 563C.  Have you
3 ever seen that letter before?
4      A.   Again, yes, without verifying how
5 closely it tracks the actual agreement.
6      Q.   If you turn, sir, to page 4, there is
7 a sentence beginning at the first full paragraph
8 that starts, "By Sunday night, September 21."
9 Do you see that sentence?
10      A.   Um-hm, yes.
11      Q.   I give that to you as background.  My
12 question is whether on any of the Sunday night
13 or Monday morning conversations anyone from DTCC
14 said in words, substance that they believed that
15 DTCC's exposure to Lehman from processing the
16 remaining transactions was substantially less
17 than it originally feared?
18      A.   I think implicitly by them saying they
19 had become comfortable with the internal review
20 that they were doing, they would be willing to
21 close the transaction with 250 million.
22      Q.   So the fact that there was a meeting
23 of the minds suggests that DTCC had become more
24 comfortable with its exposure?
25      A.   They may have said that we have
TSG Reporting - Worldwide     877-702-9580

Page 169

1           ROSEN
2 continued to review this and we have gotten to
3 that point based on the review.  I don't recall
4 specifically.
5      Q.   Do you have any recollection of that?
6           MR. HUME:  Objection, asked and
7      answered.
8      Q.   The reason I ask is because you say
9 specifically?
10      A.   I have an impression that that was
11 what was conveyed, that they had gotten
12 comfortable with the risk.  But I don't have a
13 specific recollection of a specific articulation
14 from the calls.
15      Q.   I'll show you a document that has
16 previously been marked as Exhibit 156B.  It is
17 actually not entirely clear, but it is a letter
18 from Cleary Gottlieb dated March 6, 2009.  Do
19 you know whether you have ever seen that letter
20 before, sir?
21      A.   I may have seen a draft of this
22 letter.  I don't have a specific recollection.
23      Q.   My only questions, sir, are with
24 respect to page 3 of this letter, the second
25 full sentence on page 3, starts, "Nothing in
TSG Reporting - Worldwide     877-702-9580

Page 170

ROSEN

1      **ROSEN**
2   this letter or in Exhibit B should be construed
3   to suggest."
4         **Do you see that?**
5      A.   Yes.
6      Q.   **Do you have an understanding, sir, as**
7   **to what that sentence means, of Mr. Kobak's**
8   **letter?**
9      A.   To be honest with you, I would have to
10  look at -- I would have to read the entire
11  letter in order to put that sentence in context.
12        WITNESS' ATTORNEY:  Maybe we could
13     discuss this off the record and I could
14     explain it to you.
15     Q.   **Sure, that would be helpful.  Let me**
16  **just ask you then if you have an understanding**
17  **that the securities in the Lehman -- that**
18  **Barclays acquired the securities in the Lehman**
19  **clearance boxes at the time of closing**
20  **regardless of whether any customers had long**
21  **positions in those securities?**
22        MR. HUME:  I think you're asking the
23     witness to interpret the contract when you
24     ask that question.  If you want to ask him a
25     factual question about a discussion, that's
       TSG Reporting - Worldwide     877-702-9580

Page 171

ROSEN

1      ROSEN
2   fine, but to interpret precisely which
3   securities are covered by the clearance box
4   provision of the clarification letter just
5   seems like you're asking him a legal
6   interpretation question.
7      Q.   **You can answer.**
8         MR. HUME:  Well, you can't answer to
9     the extent it would reveal attorney work
10    product analysis that we have done and I
11    think beyond that --
12     A.   I think answering the question would
13  call for me to interpret the contractual
14  documents.
15     Q.   **Let me leave aside the contractual**
16  **documents.  Just as a matter of the business**
17  **deal that was negotiated, did you understand the**
18  **business agreement between the parties was that**
19  **Barclays was getting the assets in the clearance**
20  **boxes that were not owned by customers or did**
21  **you understand that Barclays was getting the**
22  **assets in the clearance boxes notwithstanding**
23  **whether any customer had had a long position?**
24     A.   My understanding was that they were
25  getting what was in the clearance boxes.
       TSG Reporting - Worldwide     877-702-9580

Page 172

ROSEN

1      ROSEN
2      Q.   **And that's regardless of what**
3   **customers had long positions in those**
4   **securities?**
5      A.   It is based on there being lien-free
6   securities.
7      Q.   **So the fact that customers had long**
8   **positions did not affect Barclays' rights?**
9      A.   I think you're asking me to interpret
10  the implications of those provisions in the
11  clearance box, relating to the clearance box.
12     Q.   **I'm just asking you to tell me what**
13  **you just told me?**
14     A.   You're asking me to interpret whether
15  the reference to the clearance box, the extent
16  to which it covered certain kinds of assets and
17  that's asking me to interpret a term of the
18  agreement.
19     Q.   **Leaving aside the agreement, just the**
20  **business deal, just the business deal between**
21  **the parties, did you understand --**
22     A.   The business deal, as far as I was
23  aware, did not include a limitation on the
24  clearance box assets that Barclays was getting
25  as far as I recall.
       TSG Reporting - Worldwide     877-702-9580

Page 173

ROSEN

1      ROSEN
2         MR. MAGUIRE:  We will mark as Exhibit
3     626 a document Bates stamped BCI-CG 0024097
4     through 99.
5         (Exhibit 626, document Bates stamped
6     BCI-CG 00024097 through 99 marked for
7     identification, as of this date.)
8      Q.   **Had you received this e-mail chain**
9   **from Mr. McDaniel, sir?**
10     A.   I did.
11     Q.   **And you had learned at some point that**
12  **there was 1 billion dollars in cash margin at**
13  **the OCC?**
14     A.   Could you repeat your question.
15     Q.   **Yes, you learned at some point there**
16  **was 1 billion dollars in cash that the OCC was**
17  **holding for the accounts of LBI?**
18     A.   That is in here, yes.
19     Q.   **And that was in addition to government**
20  **securities that were being held at JP Morgan**
21  **Chase?**
22     A.   It presumably is additional to any
23  other collateral that would have been noncash.
24     Q.   **And you asked Jim for more information**
25  **about the 1 billion dollars?**
       TSG Reporting - Worldwide     877-702-9580

Page 174

ROSEN

1
2    WITNESS' ATTORNEY:  Object to the
3    characterization.
4        Q.    Specifically, you asked him whether it
5    was excess margin?
6        A.    Yeah.
7        Q.    Tell me why you asked that question.
8        A.    Yes.  Barclays was -- by agreeing to
9    step into Lehman's shoes under the TAA, it was
10   stepping into the responsibility to perform all
11   of the obligations for all positions that were
12   in the account up until the day at some point in
13   the future when the positions in the account
14   were ultimately liquidated and there was no
15   further exposure.
16       One of the things that I was trying to
17   ascertain was whether or not, if Barclays
18   stepped into the -- into Lehman's shoes, whether
19   in addition to the ongoing liabilities that it
20   was going to assume while the positions in those
21   accounts were outstanding, it was stepping into
22   a day one liability, and in addition, the extent
23   to which there was what would have been from
24   OCC's perspective an excess requirement which is
25   not necessarily obviously the same as whether

TSG Reporting - Worldwide    877-702-9580

Page 175

ROSEN

1
2    there is an excess from the clearing brokers'
3    requirement.
4        There are very few, if any, clearing
5    brokers who limit the amount of margin that they
6    collect across their customer base to the amount
7    that's required at the clearing house,
8    particularly in the case of less creditworthy
9    customers.  So this was part of an endeavor to
10   get our arms around how much potential liability
11   Barclays might be stepping into in taking on
12   these accounts.
13       Q.    And what did you learn?
14       A.    Not a lot.  Not as much as we would
15   have liked to have learned.  What we learned was
16   that over the weekend, I received an e-mail that
17   suggested that there was -- it was an e-mail
18   forwarded to me by Bill Navin, I'm sure it is in
19   the record, that it looked like there were net
20   in-flows to the clearing accounts expected on
21   Monday at the open of business.
22       So that suggested to me that if we
23   closed on Monday morning, at least on Monday
24   morning -- obviously you can't speak to Monday
25   night or Tuesday morning -- as far as Monday

TSG Reporting - Worldwide    877-702-9580

Page 176

ROSEN

1
2    morning when they closed, Barclays would not
3    have to have coughed up a significant amount of
4    additional margin to be held at OCC.
5        I also learned though one of the
6    things that we wanted to find out about, as I
7    say, there are two dimensions to the risk that
8    you assume when you do this.  One dimension to
9    the risk is the liability you assume as of the
10   pre-existing mark to market by the clearing
11   corporation and the other is the risk that you
12   assume with respect to positions that are in
13   there, particularly if they are positions of
14   someone who is not creditworthy and may not be
15   good for the payment.
16       And so I asked the question whether or
17   not there looked to be positions that could
18   entail that kind of risk and was told yes and
19   one position in particular that was identified
20   was a position of an affiliate, I don't remember
21   which affiliate of Lehman that was, a very
22   substantial position in what was called a VIX
23   future contract that the OCC cleared that was
24   regarded as being so large that it would have
25   taken a very significant amount of time to

TSG Reporting - Worldwide    877-702-9580

Page 177

ROSEN

1
2    liquidate it and because it was on market
3    volatility at that point in time, it was a -- it
4    was basically opposite the most volatile market
5    reference and there was significant concern, for
6    example, that it may take many million, tens of
7    millions of dollars before that position could
8    be liquidated.
9        There was separately some effort that
10   I saw in an e-mail to provide better information
11   about sort of what the collateral was, what the
12   positions were.  But those positions were not
13   made available in a way that would have enabled
14   Barclays to fully sort of model and understand
15   the respective risks.
16       So they were not ultimately aware how
17   much risk they were assuming by assuming
18   financial responsibility for those.  But it did
19   appear that at least at the moment that the
20   transaction was concluded, there wouldn't have
21   been a shortfall that they would necessarily
22   have to make up.
23       But it was equally true that the
24   hundreds of millions or billions that were going
25   in on Monday morning could have gone out on

TSG Reporting - Worldwide    877-702-9580

Page 178

ROSEN

1  Tuesday morning because that was the volatility
2  from just one mark to another. So there was
3  obviously a substantial amount of risk in a
4  market with very substantial volatility.
5        So we tried to find out what we could,
6  but it was a very mixed picture with a potential
7  significant downside.
8     **Q.  And the risk, as you understood it,**
9  **was concentrated in what would happen after**
10 **closing as opposed to inherent in any of the**
11 **positions as of closing?**
12    A.  It was that -- yes, let me put it
13 differently, I would say that the amount of
14 immediate payment obligations seemed to be
15 known, unless the market or the facts changed in
16 a way between the time we got that e-mail and
17 what happened when it opened. It could
18 conceivably have been some event in an early
19 open in Asia that caused the markets to tank so
20 significantly that OCC would have said, sorry,
21 we need another mark. But it didn't -- there
22 wasn't -- there wasn't a clear obligation to pay
23 out money on Monday morning to the OCC.
24    **Q.  Did Barclays do anything to protect**

TSG Reporting - Worldwide    877-702-9580

Page 179

ROSEN

1  **itself against the uncreditworthy affiliate and**
2  **its VIX futures position?**
3     A.  I think it just decided to take the
4  risk of that with the balance of the
5  arrangements. There was nothing it could have
6  done in terms of Monday. The markets weren't
7  open to close out the positions and the reason
8  there was a significant risk was because the
9  position couldn't have been closed out that
10 quickly because it was apparently so large in
11 relation to the liquidity of the market for
12 contract.
13        MR. MAGUIRE:  We will mark as Exhibit
14    627 a document Bates stamped CGSH 00034491
15    through 92.
16        (Exhibit 627, document Bates stamped
17    CGSH 0034491 through 92 marked for
18    identification, as of this date.)
19    **Q.  Is this an e-mail you received from**
20 **Bill Navin on the Sunday?**
21    A.  Yes, yes, it is. It was on Sunday
22 morning.
23    **Q.  And he provides in this the**
24 **information concerning the collects, that is the**

TSG Reporting - Worldwide    877-702-9580

Page 180

ROSEN

1  **amount that the OCC would pay to the clearing**
2  **member, in this case to Lehman or its successor,**
3  **Barclays, on Monday morning, right?**
4     A.  The witness is nodding, the deponent
5  is nodding.  Yes.
6     **Q.  And you understand in each case, the**
7  **collect was a positive, meaning that payment**
8  **from the OCC to Lehman or, following closing, to**
9  **Barclays?**
10    A.  Well, let me just say that I forwarded
11 this on to Barclays to interpret, but my lay
12 reading of this would be that these were net
13 collects to the clearing member.
14    **Q.  So you understood this at the time you**
15 **received it?**
16    A.  I understood it the way I described to
17 you, yes.
18    **Q.  And you understood the payments to**
19 **Barclays would be in the hundreds of millions of**
20 **dollars?**
21    A.  Yes.
22        MR. MAGUIRE:  We will mark as Exhibit
23    628 a document Bates stamped OCC 0036408
24    through 409.

TSG Reporting - Worldwide    877-702-9580

Page 181

ROSEN

1        (Exhibit 628, document Bates stamped
2    OCC36408 through 409 marked for
3    identification, as of this date.)
4     **Q.  Is this an e-mail you received from**
5  **Jim McDaniel on the previous day, Saturday,**
6  **September 20?**
7     A.  Yes.
8     **Q.  You will see the first question that**
9  **Jim McDaniel raises is how much of the billion**
10 **dollars in cash will be transferred to Barclays**
11 **at the closing. Do you know what happened to**
12 **that?**
13    A.  I believe it was transferred.
14    **Q.  The entire 1 billion?**
15    A.  Yeah, it would have been the deal that
16 all of that margin was transferred.
17    **Q.  The second question he asks is how**
18 **would Barclays replace the 252 million in**
19 **letters of credit. Do you know what happened**
20 **about that?**
21    A.  I'm not sure, but I think they may
22 have called down those letters of credit because
23 they were going to lapse and they wanted to make
24 sure they had enough -- I'm not certain -- I

TSG Reporting - Worldwide    877-702-9580

Page 182

ROSEN

1    know that they did call down some. I'm not sure
2    whether it is these particular letters of
3    credit.
4         Q.   Do you know what happened with respect
5    to the 927 million in government securities at
6    JPM?
7         A.   I don't, I'm not certain, but they may
8    have been part of a body of securities that are
9    in dispute as to how they are going to be
10   allocated that we -- I think the documents make
11   pretty clear were supposed to be transferred to
12   Barclays.
13        Q.   Mr. McDaniel ends the e-mail talking
14   about excess margin and he talks about how
15   preliminary numbers actually showed a 5.1
16   million margin deficit, do you see that?  Did
17   you get any update on the margin situation?
18        A.   I didn't, but I was under the
19   impression at this time that -- and I can't
20   remember the timing, that Barclays was going to
21   do what it could to focus on this. I wanted to
22   get the process started, but I was certainly not
23   doing the credit analysis and deciding what was
24   and wasn't acceptable to Barclays.

Page 183

ROSEN

1         Q.   So you understood somebody at Barclays
2    was following up and doing the credit analysis?
3         A.   Doing what they could. I believe they
4    were limited in their ability to do a fully
5    satisfactory credit analysis because they didn't
6    have in a form that was electronic that they
7    could have manipulated the transaction data that
8    would have enabled them to evaluate the risk.
9         So I think to a certain extent, they
10   were assuming a significant risk in going
11   forward because they really didn't know
12   themselves what the likely statistical outcomes
13   were for the portfolio.
14        Q.   Did Barclays obtain a statement from
15   the OCC on Lehman's accounts?
16        A.   I believe that I saw an e-mail that
17   indicated that OCC had provided some data on
18   collateral and positions to Barclays personnel.
19   I did not see the data and I don't know
20   firsthand that it was received or what it was,
21   but I believe so.
22        Q.   Did anyone tell you what the statement
23   showed in terms of the excess margin, the amount
24   of excess margin at the OCC?

Page 184

ROSEN

1         WITNESS' ATTORNEY:  Objection to the
2    form. Time frame.
3         Q.   Any time before the closing?
4         WITNESS' ATTORNEY:  What's the date of
5    the statement?
6         Q.   The statement meaning statement of
7    Lehman's positions as of the close of business
8    on Friday?
9         A.   I don't know what those positions were
10   and I never saw that statement.
11        Q.   Nobody told you what the amount of the
12   excess margin was?
13        A.   No, not -- I did not have information
14   other than -- I don't recall having information
15   other than the information transmitted by e-mail
16   that I was copied on. If it came through my
17   e-mail box, I may have just not have focused on
18   it.
19        MR. MAGUIRE:  We will mark as Exhibit
20   629 a document Bates stamped OCC 0036472
21   through 36473.
22        (Exhibit 629, document Bates stamped
23   OCC 0036472 through 36473 marked for
24   identification, as of this date.)

Page 185

ROSEN

1         Q.   You sent this e-mail to Mr. McDaniel
2    on Sunday, September 21?
3         A.   Yes.
4         Q.   He had raised a question with you in
5    his prior e-mail to which you were responding.
6    Do you see that?
7         A.   Um-hm, yes, I do.
8         Q.   And he is referring to the letter
9    draft raising a specific issue about assumed
10   liabilities. Do you see that?
11        A.   Yes.
12        Q.   And he notes that the current draft
13   would appear to say that Barclays is not
14   assuming liabilities represented by the short
15   option positions in the accounts of Lehman at
16   OCC. Did you have any discussion with him about
17   that?
18        A.   He responds at the top of the page.
19        Q.   Did you have any verbal discussion
20   with him about that?
21        A.   No, just what I communicated to him
22   and I assume that he accepted my explanation.
23   Which is -- sorry.
24        Q.   Did you at the time agree with his

Page 186

1                    **ROSEN**
2    **observation that the draft --**
3         A.   I didn't analyze it because I didn't
4    think that it was relevant.  If Barclays signed
5    on to the asset transfer agreement and had
6    separately reached some other agreement about
7    was going to happen with respect to assets in
8    the account that would not have limited
9    Barclays' obligations having stepped into the
10   transferred assumption agreement.
11        So I didn't regard the clarification
12   letter as a limiting Barclays' obligation to
13   OCC, whatever the net result of the entitlements
14   and obligations between Lehman and Barclays.
15        **Q.   You are getting a little ahead of me.**
16   **Let me ask you first, he is asking you about the**
17   **intention.  Do you see that, the intention of**
18   **the clarification letter?**
19        A.   Yes.
20        **Q.   So my first question is, was it the**
21   **intention in t,he clarification letter to say**
22   **that Barclays was not assuming liabilities**
23   **represented by short option positions?**
24        A.   I didn't evaluate that because I did
25   not think it was relevant to DTCC and so my
     TSG Reporting - Worldwide    877-702-9580

Page 187

1                    ROSEN
2    responsibility -- I am sorry, to OCC, and my
3    response was basically to say that the TAA
4    speaks for itself on what our liabilities are to
5    the OCC.
6         **Q.   I think I understand your answer and I**
7    **don't want to follow up on any evaluation that**
8    **you did or did not do.  I am really asking about**
9    **the intention, not the evaluation of any**
10   **contractual language.**
11        **Was the intention of the parties as**
12   **you understood it that Barclays was not assuming**
13   **liabilities represented by short option**
14   **positions in the accounts of Lehman at the OCC?**
15        A.   As between Barclays and Lehman, I
16   would have to refresh my recollection of the
17   definition of excluded liabilities to answer
18   that question and it probably would have to call
19   for me to interpret it.
20        **Q.   Why don't we give you the final**
21   **clarification letter and see, it is Exhibit 25,**
22   **which should be in front of you.**
23        WITNESS' ATTORNEY:  I don't think you
24   ever showed him 25.
25        Q.   Here you are, sir.
     TSG Reporting - Worldwide    877-702-9580

Page 188

1                    **ROSEN**
2         A.   I think I need the APA as well.
3         **Q.   That's Exhibit 1.**
4         **WITNESS' ATTORNEY:  Do you know which**
5    **draft of the clarification letter is being**
6    **referred to in Daniel's e-mail of**
7    **September 20, 2008, a.m.**
8         MR. MAGUIRE:  I don't.
9         A.   I would have to -- it would take me
10   some time to focus on this, but I don't think
11   this provision is focused on options positions.
12   But I'm not that familiar with this portion of
13   the agreement.  It will take me some time and
14   I'm concerned that evaluating whether his
15   concern is justified would require me to
16   interpret these provisions.
17        **Q.   Yes, my question is directed not so**
18   **much to interpretation of provisions, more to**
19   **your understanding of what the intention of the**
20   **parties was.  Did you have an understanding of**
21   **what the intent of the parties was?**
22        MR. HUME:  I am going to object.  That
23   is a very subtle distinction.  Why don't you
24   ask whether there was a discussion about
25   those provisions with the other side.
     TSG Reporting - Worldwide    877-702-9580

Page 189

1                    ROSEN
2    That's a factual question.
3         MR. MAGUIRE:  The factual question I
4    have asked is with respect to Jim McDaniel's
5    e-mail where he refers to the intention.
6         **Q.   And the question is at the time, did**
7    **you agree with him?**
8         MR. HUME:  He has already answered
9    that.
10        A.   I did not agree with him because I did
11   not think it mattered what was in the agreement
12   vis-a-vis any concerns he might have -- I should
13   say in the APA vis-a-vis any concerns that he
14   might have regarding the scope of the
15   responsibility that Barclays was undertaking to
16   OCC.
17        **Q.   That's where I said you were moving**
18   **ahead of me.  I wanted to understand the**
19   **precursor to that.  He says --**
20        A.   I know, but I have never -- I didn't
21   analyze it at the time or form a view.  I formed
22   a view that the subject matter was something
23   that we didn't have to go into.
24        So whether or not he was right, I
25   could probably form a view, but it would take me
     TSG Reporting - Worldwide    877-702-9580

Page 190

ROSEN

1    ROSEN
2    time that I haven't spent evaluating the concern
3    that he is raising here and the various
4    interconnected provisions of the agreement.
5        Q.    You did not --
6        A.    I did not address this.  I basically
7    said it doesn't seem to be relevant, what the
8    agreement provides in terms of our obligations
9    to OCC.
10       Q.    Now, he offered a proposed
11   clarification.  Do you see he offers some
12   language here?
13       A.    He did.
14       Q.    What did you do with that?
15       A.    I don't recall having done anything
16   with it.
17       Q.    Why not?
18       A.    Because I didn't believe that the
19   provisions in the asset purchase agreement
20   affected the undertakings that we were making to
21   OCC.
22       Q.    You said in your note to him, "What we
23   agree with Lehman regarding assumed liabilities
24   and what we agree with OCC are two different
25   things with potentially different economic
TSG Reporting - Worldwide    877-702-9580

Page 191

1    ROSEN
2    consequences."
3        A.    Right.
4        Q.    Can you explain what you meant by
5    that?
6        A.    I can.  If the position of a customer
7    was in an account that Barclays had assumed and
8    executed the TAA and was carrying at the
9    clearing house, they had economic liability to
10   the clearing house.
11       If it were the case that as part of
12   the deal, the liability that Barclays was
13   assuming to the clearing corporation was a
14   liability that, in fact, Lehman remained
15   responsible for, then it was between Barclays
16   and Lehman for Barclays to be made whole for
17   whatever its obligation under the TAA was.
18       So for that reason, I didn't think it
19   was relevant.  So it performed an obligation of
20   a liability that it wasn't assuming, it could
21   have had a claim over and against Lehman.  But
22   it couldn't have used that claim against Lehman
23   that it wasn't assuming that liability for
24   refusing to pay OCC what it owed OCC.
25       Q.    So are you saying that the transfer
TSG Reporting - Worldwide    877-702-9580

Page 192

1    ROSEN
2    and assumption agreement set forth Barclays'
3    obligations to the OCC, but did not in any way
4    affect Barclays' rights under the clarification
5    letter?
6        WITNESS' ATTORNEY:  Object to the
7    form.
8        A.    I wouldn't say that they were utterly
9    unrelated, but I would have said that the
10   liabilities that it did or didn't assume under
11   the clarification -- under the deal documents as
12   reflected in the various agreements overrode the
13   contractual obligation that it was separately
14   making to OCC.
15       OCC wanted to know that Barclays was
16   going to be responsible for every liability that
17   arose in those accounts and that was the risk
18   and liability that Barclays was assuming, even
19   if that meant they were not liabilities that
20   Barclays was contemplating acquiring from or
21   assuming from Lehman as part of the deal.
22       Q.    Did you have any discussions with
23   Mr. McDaniel about that?
24       A.    Just -- my recollection is that -- I
25   don't recall him coming back to me.  There may
TSG Reporting - Worldwide    877-702-9580

Page 193

1    ROSEN
2    be e-mail traffic that you could refresh my
3    recollection, but I think this was the last of
4    the discussion of this issue, but I could be
5    forgetting something.
6        MR. MAGUIRE:  We will mark as Exhibit
7    630 a document Bates stamped OCC 0036482
8    through 483.
9        (Exhibit 630, document Bates stamped
10   OCC 0036482 through 483 marked for
11   identification, as of this date.)
12       Q.    You sent this e-mail to Mr. McDaniel
13   on Sunday morning?
14       WITNESS' ATTORNEY:  No.
15       A.    It looks will like I sent it to him
16   sometime in the afternoon on Sunday.
17       Q.    3:31 p.m.?
18       A.    Yes.
19       Q.    And you were responding to his e-mail
20   of just about half an hour earlier?  And he is
21   communicating, the purpose of his e-mail is to
22   communicate OCC's position to you?
23       A.    Yes.
24       Q.    And he explains that they need the
25   transaction, the transfer and assumption
TSG Reporting - Worldwide    877-702-9580

Page 194

ROSEN

1      agreement signed, right, and he says over
2      towards the end of his e-mail on the next page
3      in the paragraph numbered 3, "If the transaction
4      does not close tonight, OCC would need to
5      immediately liquidate and close out the Lehman
6      accounts and is preparing to do so."
7          Do you see that?
8      A.   I do see that.
9      Q.   You got back to him in your response
10     and you say, "Very sorry to keep you hanging."
11         Can you tell me why did Barclays keep
12     the OCC hanging on the Sunday afternoon?
13     A.   Because we didn't think that this was
14     the most difficult issue to solve and we had
15     much bigger fish to fry and so I was not able to
16     turn my attention to this, although what I did
17     do is forward it on, my recollection, is to a
18     number of people, including the president of
19     SIPC because I thought other people would have
20     more leverage with OCC to get them to calm down
21     and wait because it was looking less like we
22     were going to be able to sign up the entire deal
23     by that night.
24         So I thought it would probably be more
25     TSG Reporting - Worldwide     877-702-9580

Page 195

ROSEN

1      effective for me to spend my time dealing with
2      the fires we were feeling with and let somebody
3      else calm them down.
4      Q.   When did the Barclays'
5      representatives, the businessmen make the
6      decision to authorize the TAA, transfer and
7      assumption agreement, to the execution of that
8      agreement?
9      A.   I would have to look and see -- I
10     would have to refresh my recollection of the
11     e-mails transmitting the drafts to remember
12     exactly when that was.  But I mean, I think it
13     might have been quite late when I asked Jonathan
14     Hughes, once we had reached agreement on the
15     language, whether or not they had sign off from
16     the business people.
17     Q.   And when you say quite late, do you
18     mean on the near side of midnight or far side of
19     midnight on Sunday?
20     A.   I'm not sure, but it could have been
21     on the far side of midnight.  I may be
22     misremembering, but my recollection is that the
23     handling of the documentation of the sort of the
24     clearing house agreements followed the sort of
25     TSG Reporting - Worldwide     877-702-9580

Page 196

ROSEN

1      the dealing with the various issues that needed
2      to be solved, particularly with the DTCC.
3          I was not that concerned because I
4      think subject to sort of the due diligence and
5      whatever, we did not have the same problems in
6      the OCC arrangement that we had with the DTC
7      arrangement.  So I was relatively saying that we
8      would get there.
9      Q.   Who was the decision maker at Barclays
10     who gave the sign-off authority if you know?
11     A.   I don't know who Jonathan Hughes
12     corresponded with.
13         MR. MAGUIRE:  Why don't we take a
14     break and I may actually be done.
15         (Recess)
16     Q.   Sir, you have talked some today about
17     the margin Lehman maintained at the OCC.  Did
18     you consider that to be an asset that was
19     related to Lehman's exchange-traded derivatives?
20     A.   Yes.
21     Q.   What about the margin at other
22     derivatives exchanges?  Did you consider the
23     margin that Lehman maintained at other
24     derivatives exchanges to be an asset that was
25     TSG Reporting - Worldwide     877-702-9580

Page 197

ROSEN

1      related to its exchange-traded derivatives?
2      A.   If it was part of the FCM business
3      that they were acquiring or the equity brokering
4      dealing, trading business, yes.
5      Q.   When you say FCM business, you are
6      referring to futures commission merchant?
7      A.   Yes, or the options being an outgrowth
8      of the equity trading and brokerage business.
9      Q.   Now, you mentioned a number of
10     meetings that you had with various of your
11     partners to obtain recollection and to prepare
12     yourself for a number of things; one was your
13     declaration and another was for this deposition.
14     Did you also have meetings with your partners in
15     connection with Jonathan Hughes' preparation for
16     his deposition?
17     A.   I'm trying to remember.  I'm not sure
18     I was involved in Jonathan Hughes' preparation.
19     Q.   Did you not meet with Jonathan Hughes
20     in connection with his deposition?
21         MR. HUME:  I am going to object to the
22     question to the extent there may be
23     privileged meetings that Mr. Hughes and
24     Mr. Rosen had that may also have somehow
25     TSG Reporting - Worldwide     877-702-9580

Page 198

1              ROSEN
2    informed the deposition, it may be hard to
3    parse that.
4        Q.   I am asking you about whether you met
5    with him where the purpose of the meeting was to
6    help him prepare and get recollections from
7    Cleary partners so he could testify as a
8    representative of Barclays.
9        A.   I don't recall participating in the
10   meeting.
11       Q.   In any of the meetings that you had
12   with your partners in connection with preparing
13   your declaration, or in connection with
14   preparing for this deposition, in searching
15   people's recollections, did any of your partners
16   suggest that anyone on the Lehman side had ever
17   indicated that margin was not included in the
18   deal?
19       A.   No, I don't recall any such statement.
20       Q.   You have, I think, the asset purchase
21   agreement in front of you as Exhibit 1.  If you
22   could turn to section 1.1, to the definition of
23   excluded assets on page 2 and the one I would
24   like to ask you about is subparagraph N.  It is
25   at the top of page 4.

TSG Reporting - Worldwide    877-702-9580

Page 199

1              ROSEN
2        Did any of your partners invite you to
3   address that section of the APA?
4        WITNESS' ATTORNEY:  That is a yes or
5   no question.
6        A.   No.
7        Q.   Did you have any discussion with any
8   of your partners concerning whether margin was
9   an excluded asset under the APA?
10       WITNESS' ATTORNEY:  I am going to
11   object on privilege grounds.  If you want to
12   ask him for his understanding or discussions
13   with Lehman, that's fine, but his
14   declaration says what it says and --
15       MR. MAGUIRE:  Are you directing him
16   not to answer?
17       WITNESS' ATTORNEY:  Phrased that way,
18   yes.
19       Q.   Let me ask you, sir, did any of your
20   partners describe to you any discussions that
21   they had had with anyone at Lehman concerning
22   the excluded asset in the APA?
23       A.   I don't think in our conversations we
24   discussed the definition of excluded assets.
25       Q.   Did you have any -- did anyone discuss

TSG Reporting - Worldwide    877-702-9580

Page 200

1              ROSEN
2   any conversation that they had had with anyone
3   at Lehman on that subject?
4        A.   That was not the subject of the
5   discussions between us.
6        Q.   Let me --
7        A.   But it doesn't surprise me that we
8   didn't discuss that because derivatives
9   contracts in that context would have been
10  regarded as relating to the OTC derivatives
11  contracts.
12       Q.   Can you explain what you mean by that
13  answer?
14       A.   I believe that this reference is
15  intended to be a reference to OTC derivatives
16  contracts.
17       Q.   What's the basis for that belief?
18       A.   Because it would have been
19  fundamentally inconsistent with the agreement
20  for it to have any other meaning because the
21  derivatives business that was OTC was not part
22  of the deal and the derivatives business that
23  was the listed derivatives and the assets
24  associated with it were.
25            So I think that the natural reading

TSG Reporting - Worldwide    877-702-9580

Page 201

1              ROSEN
2   that provision is that it was intended to refer
3   to the derivatives business that was not coming
4   over, the derivatives contracts rather than not
5   coming over.
6        Q.   When were OTC derivatives excluded?
7        A.   I believe they were excluded as part
8   of the original deal as reflected in the APA.
9        Q.   Are you referring again to this
10  provision N?
11       WITNESS' ATTORNEY:  I am going to
12  instruct him not to answer.
13       MR. HUME:  You are asking him to
14  interpret the contract.
15       WITNESS' ATTORNEY:  You asked him
16  about business understanding or business
17  deal, he has answered that, and now you are
18  asking him to prove it by asking him where
19  in the contract.
20       Q.   When did you learn that the OTC
21  derivatives were not part of the deal?
22       A.   I don't remember when I first learned
23  that.
24       Q.   How did you learn that?
25       A.   I don't remember precisely how I first

TSG Reporting - Worldwide    877-702-9580

Page 202

ROSEN

1 learned it.
2     Q.   Do you know from whom you learned
3 that?
4     A.   No.  It might have been from reading
5 the document.  It may have been from Jonathan
6 Hughes.  It may have been from one of my
7 partners.
8     MR. MAGUIRE:  Sir, I have no further
9 questions for you at this time.
10     MR. GAFFEY:  I have just a couple.  If
11 it is OK, rather than have a break, we
12 should be pretty quick.  I am Bob Gaffey,
13 Jones Day, special counsel to the debtor.
14 EXAMINATION BY
15 MR. GAFFEY:
16     Q.   Earlier today, in response to one of
17 Mr. Maguire's questions, you spoke a bit about
18 conversations you had with Dan Gallagher at the
19 SEC regarding Barclays stepping into the shoes
20 of the Fed in respect to a certain repo.  Do you
21 recall that topic generally?
22     A.   No, I don't recall having a
23 conversation with Dan.  He may have been one of
24 the people at the SEC -- I couldn't remember

Page 203

ROSEN

1 specifically who I had followed up with at the
2 SEC.
3     Q.   Let me give you a more general
4 question.  Whether you remember the particular
5 person you spoke to or people you spoke to at
6 the moment, did you have conversations with
7 people at the SEC about the topic of the repo?
8     A.   I had discussions with the SEC about
9 the need for a waiver by the SEC of certain
10 rights that it might be construed to have.  That
11 would have affected the ability of Barclays, if
12 the transaction hadn't closed, to exercise
13 contractual rights embodied in the documentation
14 of the repo that they were contemplating
15 entering into with Lehman, and in the
16 eventuality that the deal didn't close, I didn't
17 want Barclays to be in the position where it
18 wasn't going to be able to exercise all of its
19 rights under the repo agreement.
20     Q.   The repo that you are talking about,
21 was that what has been referred to, you might
22 have heard the term "replacement transaction,"
23 where Barclays stepped into the shoes of the
24 Fed?

Page 204

ROSEN

1     A.   This is the transaction where the Fed
2 unwound its repo, repurchase transaction with
3 Lehman, and Barclays entered into the repo with
4 Lehman on purportedly the same assets.
5     Q.   What assurances were needed from the
6 SEC with regard to Barclays' rights under that
7 repo?
8     A.   It was, because of the possibility
9 that LBI would have become -- I'm not a SIPC
10 expert, but I can tell you that my understanding
11 was that in the event of a SIPC liquidation of
12 the broker/dealer, that if the broker/dealer had
13 entered into a repurchase transaction, that
14 there was some risk -- not saying that it was my
15 understanding that this outcome was clear, but
16 there was some potential risk that the ability
17 to exercise rights of termination, liquidation,
18 set-off, whatever it is, might have been
19 something that the SEC would have had an ability
20 under applicable provisions to have sought a
21 stay on and we wanted the SEC to agree that in
22 consideration for Barclays doing this, which it
23 would probably not otherwise have undertaken to
24 do in the face of an insolvent counterparty, in

Page 205

ROSEN

1 the event that the deal was not going to be
2 consummated.
3     Q.   And when you say applicable
4 provisions, applicable provisions of what, of
5 the Bankruptcy Code?
6     A.   I think there are maybe 34 SIPC
7 provisions.  As I said, I'm not an expert.
8     Q.   Do you recall, as we talk about this,
9 do you recall who at the SEC you communicated
10 with about this topic?
11     A.   That's what I -- I don't remember
12 who -- I'm sure it is in the -- I'm sure it is
13 in the e-mails.  Well, I suppose -- no, it would
14 have to be in the e-mails because something came
15 back from them saying that they would agree to
16 waive.
17     Q.   And the nature of the rights that you
18 were talking about, again as a general matter --
19 I take your point you're not an expert in the
20 area -- but what type of rights were you asking
21 for assurances about in terms of Barclays'
22 exercising its rights under the repo?
23     A.   I think they are rights to terminate
24 the transactions; for example, in the event of a

Page 206

ROSEN

1  default or insolvency set-off claims against
2  collateral.  It would be whatever rights are in
3  the relevant master repurchase documentation.
4      Q.   Did you review the relevant master
5  repurchase documentation when you had these
6  discussions?
7      A.   I did not.
8      Q.   Who did?
9      A.   I did not.
10          Let me just say something, I received
11  copies of them.  I didn't actually open the
12  e-mails with those until recently.  But in terms
13  of the risk to Barclays, when the Fed asked them
14  to do this, one of my colleagues, Sandra Rocks
15  provided advice to Barclays.
16      Q.   And I am sorry, Sandra --
17      A.   Sandra Rocks.
18      Q.   What is Sandra Rocks' area of
19  specialty?
20      A.   Creditors' rights.
21      Q.   And did Sandra Rocks propose some
22  language, either directly or through you,
23  propose particular language --
24      A.   Yeah, I drafted the language and I

TSG Reporting - Worldwide    877-702-9580

Page 207

ROSEN

1  provided it to the SEC and also I believe to
2  SIPC.
3      Q.   And the rights that were at the center
4  of this discussion had to do with, Barclays, as a
5  general matter, Barclays' rights to recover the
6  amounts that it advanced under the repo?
7      A.   I think it would have been whatever
8  the contractual rights under the terms of the
9  agreement were.
10      Q.   Did you or anyone on the Barclays'
11  side of the table have any discussions with
12  anyone on the Lehman side of the table or the
13  business people or lawyers about this issue?
14      A.   About the reservation of rights?
15      Q.   Yeah, about, this for lack -- it is my
16  term, not yours -- but about this contingency
17  plan about what would happen if the
18  broker/dealer were liquidated?
19      A.   I don't recall who all the
20  participants were on the phone.  It may very
21  well have been Lehman and Fed representatives
22  and Barclays' representatives, but I can't -- I
23  don't recall for sure.
24      Q.   When you say you don't recall, is it

TSG Reporting - Worldwide    877-702-9580

Page 208

ROSEN

1  because you have a vague recollection someone
2  were there and you're not sure, or because there
3  were a lot of phone calls and you can't tell one
4  way or the other?
5      A.   Both.
6      Q.   Were you part of any discussions with
7  Lehman or its representatives at Weil Gotshal
8  about what Barclays' rights would be in the
9  event of the termination of the repo?
10      A.   No.  We would have assumed that
11  they -- that the documents spoke for itself.
12  They would know from the standard form
13  documentation.
14      Q.   Are you aware of any discussions
15  where, with Lehman or its representatives at
16  Weil Gotshal, about what, if anything, the
17  documents said that addressed that possibility
18  of a termination of the repo?
19      A.   No, the agreement I think spoke for
20  itself and they executed it and I don't know who
21  was involved in the process of approving and
22  executing the repo?
23      Q.   So we have a clear record, the
24  document you are talking about is the master

TSG Reporting - Worldwide    877-702-9580

Page 209

ROSEN

1  repurchase agreement or the transaction
2  documents relating to the sale transaction or
3  both?
4      A.   Well, I believe your question was
5  directed to the master repurchase agreement.
6      Q.   Did, at any point, were you involved
7  in any discussions or to your knowledge was
8  anybody at Cleary -- withdrawn.
9          To your knowledge, was anybody on the
10  Barclays' side of the table, Barclays or its
11  representatives involved in discussion with
12  Lehman or its representatives about provisions
13  in the clarification letter that need -- that
14  addressed the issue of the termination of the
15  repo?
16      A.   I'm not sure, am I the designated
17  spokesperson -- what I spoke to you about, what
18  I responded to on the repo was something I
19  responded to because I was actually directly
20  involved.
21      Q.   I should have said this up front, I am
22  sorry --
23      A.   I'm not aware --
24      Q.   We have collapsed your deposition into

TSG Reporting - Worldwide    877-702-9580

Page 210

1                    **ROSEN**
2    **both 30(b)(6) and your individual deposition.**
3    **My questions go to your personal knowledge. I**
4    **have sort of reversed the rules a little bit.**
5        A.   I am sorry, could you repeat the
6    question.
7        **Q.   Do you have any knowledge of whether**
8    **anyone on the Barclays' side of the table,**
9    **Barclays or its representatives, spoke to anyone**
10   **on the Lehman side of the table, Lehman or its**
11   **representatives, about provisions that needed to**
12   **be included in the clarification letter**
13   **regarding the termination of the repo?**
14              MR. HUME:  Object to the form.
15       A.   I am sorry?
16              MR. HUME:  I object to the form.
17       **Q.   I think you can answer.**
18       A.   I believe that there may have been
19   conversations between the lawyers, maybe Alan
20   Kaplan at Barclays, but I don't have personal
21   knowledge because I was not involved in the
22   events leading up to the notice and the
23   clarification that was made in the clarification
24   letter.
25              But I assume that -- it is obvious
     TSG Reporting - Worldwide    877-702-9580

Page 211

1                    ROSEN
2    that since the provisions were ultimately
3    included in the clarification letter, that it
4    was conveyed in the form of the amendments to
5    the clarification letter that reflected those
6    provisions.
7        **Q.   OK. I would like to show you -- let's**
8    **mark this as our next exhibit.**
9              **(Exhibit 631, document Bates stamped**
10   **BCI-EX(S) 201894 through 95 marked for**
11   **identification, as of this date.)**
12       **Q.   The document I have put before you**
13   **Mr. Rosen marked as Exhibit 631 bears Bates**
14   **number BCI-EX(S) 00201894 through 895.**
15             **Have you seen the document before?**
16       A.   Again, not parsing every word, but it
17   looks like an e-mail that I sent.
18       **Q.   And you'll see it is an e-mail from**
19   **you to Josephine Wang?**
20       A.   Yes.
21       **Q.   I can't --**
22       A.   This is what I was referring to --
23       **Q.   It is?**
24       A.   -- earlier in terms of the sort of the
25   clarification of the language included in the
     TSG Reporting - Worldwide    877-702-9580

Page 212

1                    ROSEN
2    order, and then we asked SIPC and, I guess it
3    was Mike Macchiaroli now that I see this, to
4    confirm that they wouldn't seek such a stay.
5        **Q.   I can't tell from the e-mail address**
6    **with whom or what is Josephine Wang affiliated.**
7        A.   You can't tell that. I think she is
8    in the legal department at SIPC.
9        **Q.   And you say in this e-mail to**
10   **Josephine Wang and Steven Sharbeck, Mike**
11   **Macchiaroli, "Below is the language we believe**
12   **to be necessary to ensure that the order is**
13   **sufficiently broad to cover the relevant**
14   **Barclays Capital transactions."**
15             **Do you see that?**
16       A.   Yes.
17       **Q.   And below that is some proposed**
18   **language and below that is a note that says,**
19   **"Mike, I am trying to place us in the document,**
20   **are you with me?"**
21             **Where did the particular language set**
22   **off in italics come from, beginning, "Exercise**
23   **of any rights," and ending "September 24, 2008"?**
24       A.   Probably from my colleague, Sandra
25   Rocks.
     TSG Reporting - Worldwide    877-702-9580

Page 213

1                    ROSEN
2        **Q.   And was this particular language shown**
3    **to or discussed with, to your knowledge, anybody**
4    **on the Lehman side of the table, including its**
5    **business people or representatives?**
6        A.   I think that certainly they would have
7    seen the order in the proposed sale -- the sale
8    order.
9        **Q.   Well, you are a bit ahead of me. I**
10   **guess I should have asked that. The order that**
11   **you refer to, is that the sale order?**
12       A.   Yes.
13       **Q.   Do you know if this language wound up**
14   **in the sale order?**
15       A.   I would have to check. I believe so,
16   but I would have to check to confirm.
17       **Q.   And in the language that you proposed**
18   **in this e-mail, there is a reference to section**
19   **559 of the Bankruptcy Code. Do you see that?**
20       A.   Yes.
21       **Q.   Were you familiar with the terms of**
22   **Section 559 of the Bankruptcy Code when you**
23   **proposed this language to the Section and SIPC?**
24       A.   No, I was the transmitter.
25       **Q.   Do you know if anyone at -- on the**
     TSG Reporting - Worldwide    877-702-9580

Page 214

1          **ROSEN**
2    **Barclays side of the table, including its**
3    **representatives, spoke to anyone on the Lehman**
4    **side of the table, including its representatives**
5    **about Section 559 of the Bankruptcy Code?**
6        A.   I don't have a specific recollection
7    of that.
8        WITNESS' ATTORNEY:  Mr. Gaffey, let me
9    state for the record, for what it's worth,
10   the language, the italicized language says,
11   "The order that the stays set forth above
12   shall not apply to," and I just am not sure
13   whether or not that really is referring to
14   the sale order as opposed to some other
15   order.
16       MR. GAFFEY:  Neither am I.  That's why
17   I asked the question.
18   **Q.   Does what your counsel has to say**
19   **refresh your recollection?**
20       MR. HUME:  I think it is the SIPC
21   order.
22       A.   Hang on a second.  You know what, I
23   think you're right.  This predated the sale
24   order.  This is Wednesday -- this is the 17th of
25   September, so there was a stay put into place
TSG Reporting - Worldwide    877-702-9580

Page 215

1          ROSEN
2    and I guess this was to seek clarification of
3    that.
4        **Q.   This refers to the SIPC order, the**
5    **SIPA order?**
6        THE WITNESS:  Is that the only order?
7        MR. GAFFEY:  Let's go off the record
8    for a minute.
9        (Recess)
10       MR. GAFFEY:  Back on the record.
11   **Q.   Mr. Rosen, do you know one way or the**
12   **other what order is being referred to?  I mean**
13   **from memory, do you know one way or the other**
14   **what order is being referred to in the document**
15   **we have marked as 631, your e-mail?**
16       A.   I believe it was in anticipation of
17   the sale order, but I'm not 100 percent
18   confident.
19   **Q.   And how much time -- I know it was a**
20   **busy week -- but how much time did you devote to**
21   **conversations with the SEC about this assurance**
22   **language that's set out in Exhibit 631, this**
23   **issue?**
24       A.   I really don't have a clear
25   recollection.  We sent it down to them and I had
TSG Reporting - Worldwide    877-702-9580

Page 216

1          ROSEN
2    a conversation and asked them to focus on it and
3    then come back.  I think there was -- they
4    understood what the import of it was.  And then
5    they came back and confirmed that they
6    wouldn't -- you know, that they agreed they
7    wouldn't exercise that right to seek a stay.
8    But it didn't take a lot of to'ing and fro'ing
9    on the telephone to get there.  Their people are
10   I think quite familiar with their rights.
11   **Q.   Did there come a point that it came to**
12   **your attention that the repurchase agreement**
13   **was, in fact, terminated?**
14       A.   Well, it came to my attention that the
15   clarification letter provided for a collapse
16   instead of unwinding the repurchase agreement
17   and then separately transferring to basically
18   collapse that into one step.  And it was part
19   of -- the collateral that had been under that
20   agreement was part of the securities that were
21   being sold.
22   **Q.   My question is a little different.  It**
23   **goes to the timing point more than anything**
24   **else, but did there come a time when you learned**
25   **that the prepurchase agreement had been**
TSG Reporting - Worldwide    877-702-9580

Page 217

1          **ROSEN**
2    **terminated?  And if so, when did you find that**
3    **out?**
4        A.   Well, with a consummation of the
5    transaction, it was terminated.
6        **Q.   Do you know when the repurchase**
7    **agreement was terminated?**
8        MR. HUME:  Objection, asked and
9    answered.
10       A.   My recollection is that the agreement
11   was terminated as part of the consummation of
12   the sale transaction.
13   **Q.   That would be at the closing on the**
14   **22nd?**
15       A.   Which would be at the closing.
16   **Q.   Did it come to your attention at any**
17   **point prior to the closing that Barclays issued**
18   **a notice of termination to Lehman?**
19       A.   At some point, I did see e-mail
20   traffic indicating that a notice had been sent
21   in error and then my recollection is that there
22   was an effort to document that in the
23   clarification letter.
24   **Q.   When did the fact of the notice come**
25   **to your attention?**
TSG Reporting - Worldwide    877-702-9580

Page 218

**ROSEN**

1  A.  I honestly don't recall.
2  **Q.  Was it after the sale hearing?**
3  A.  I honestly don't recall when I became
4  aware of it to be honest with you.  There is
5  probably an e-mail somewhere about it.  I don't
6  have a date on it.
7  MR. GAFFEY:  OK.  Let's mark this
8  document as Exhibit 632.
9  (Exhibit 632, document Bates stamped
10  CGSH 163813 through 815 marked for
11  identification, as of this date.)
12  **Q.  I have put before you, Mr. Rosen, what**
13  **has been marked as Exhibit 632 document bearing**
14  **Bates number CGSH 00163813 through 815.  Take a**
15  **look at the document, please, sufficient to tell**
16  **me whether you have seen it before.**
17  A.  Yes, it looks like the e-mail
18  correspondence to which I was a party.
19  **Q.  Does this e-mail constitute the**
20  **assurance that had been requested from the SEC?**
21  A.  Yeah, I believe this is.
22  **Q.  And had you spoken with Alastaire**
23  **Bambach about the topic?**
24  A.  I don't recall.  It is possible that

TSG Reporting - Worldwide    877-702-9580

Page 219

ROSEN

1  he -- that I did or that he was on the phone
2  when I spoke to someone regarding it.  I
3  honestly don't have a clear recollection.  There
4  was so many conversations with the SEC.
5  **Q.  And you asked Alastaire in the e-mail**
6  **at the top of the chain, an e-mail dated**
7  **September 18, 2008 at the time of 4:01 p.m. -- I**
8  **beg your pardon, the time of 3:59 p.m.**
9  **Alastaire, "Is this comfort something that we**
10  **may share with others who may have an interest."**
11  **Do you see that?**
12  A.  Yes.
13  **Q.  Who were the others you are referring**
14  **to?**
15  A.  I'm looking at that and I don't recall
16  specifically whether this was sort of just a
17  general, abstract question or whether I had
18  somebody in mind.  I honestly don't recall
19  sitting here today.
20  **Q.  And did you share this comfort with**
21  **others?**
22  A.  I think I probably shared it with the
23  client certainly.
24  **Q.  Did you share it with anybody at Weil**

TSG Reporting - Worldwide    877-702-9580

Page 220

**ROSEN**

1  **Gotshal?**
2  A.  I don't recall providing it directly
3  to Weil Gotshal.
4  **Q.  Do you know if it was provided**
5  **indirectly to Weil Gotshal?**
6  A.  I don't have a recollection about
7  that.  It may have been.  I do not.  It may have
8  been that I did this because the client at
9  Barclays wanted to forward it on and they asked
10  me whether they could.  But I just -- but
11  honestly, this is not a keen recollection.
12  **Q.  Do you have any knowledge, direct or**
13  **indirect, as to whether this comfort language**
14  **was shared with Lehman or Weil Gotshal?**
15  A.  I really don't recall.
16  **Q.  You referred a few times today in**
17  **various contexts to -- you can put the document**
18  **aside.  To various circumstances where -- and**
19  **this is, again, not a quote, but you talked**
20  **about jeopardy to the deal closing by Monday the**
21  **22nd, that's a prospect that you have talked**
22  **about a few times today.  Was there a drop-dead**
23  **date for closing?**
24  A.  No, there was just a perception that

TSG Reporting - Worldwide    877-702-9580

Page 221

ROSEN

1  if it didn't close by Monday, there could be
2  developments in the marketplace which might have
3  complicated or prevented the deal from getting
4  done.  I don't think it was an ultimatum.
5  I think people wanted to get the deal
6  done, but I think there was a concern about
7  letting another business cycle go by was just --
8  because we didn't know what was going to happen.
9  I think this was the weekend where we had
10  learned very late Sunday night that, you know,
11  Morgan Stanley and Goldman Sachs had quite
12  expeditiously become banks and people were
13  worried and the hurry to do that was no doubt in
14  part due to concerns.
15  So I wouldn't say that it was a drop
16  dead or an ultimatum or anything like that.  It
17  was that people realized it became more
18  complicated and there was more noise that could
19  interfere with the transaction the more time
20  that elapsed.  So we all, I think internally at
21  Cleary regarded it as, put it this way, if the
22  deal wasn't ready to close on Monday, we didn't
23  want to be the ones responsible for it not being
24  ready to close on Monday morning, so we took it

TSG Reporting - Worldwide    877-702-9580

Page 222

ROSEN

1
2  seriously.
3  **Q.   That issue aside, the deal could have**
4  **closed on Tuesday?**
5     A.   Theoretically, it could have closed on
6  Tuesday if things hadn't intervened.  It was
7  more the risks that were associated with not
8  closing expeditiously that were the concerns.
9  You had to remember, the markets were very
10  volatile and there were assets whose valuation
11  was the source of considerable uncertainty and
12  concern.
13     MR. GAFFEY:  I don't have anything
14  further.  Thank you for your time.
15     MR. DAKIS:  The committee has no
16  questions.
17     THE WITNESS:  Thank you.
18     (Time Noted:  4:35 p.m.)
19
20     _____
     EDWARD J. ROSEN
21
22  Subscribed and sworn to
   before me this EDWARD J. ROSEN  day
23  of February, 2010.
24
25     _____

TSG Reporting - Worldwide    877-702-9580

---

Page 223

ROSEN

1
2  INDEX:
3  WITNESS      EXAM BY:        PAGE:
4  E. Rosen       Mr. Maguire        6
5             Mr. Gaffey     202
6     EXHIBITS
7  Exhibit No.                Marked
8  Exhibit 622 declaration of Edward J. Rosen     8
9  Exhibit 623 document Bates stamped     120
10     CGSH0002699 through 700
11  Exhibit 624 document Bates stamped DTCC     122
12     00126 through 00198
13  Exhibit 625 document Bates stamped DTCC     152
14     00359 through 361
15  Exhibit 626 document Bates stamped BCI-CG     175
16     00024097 through 99
17  Exhibit 627 document Bates stamped CGSH     181
18     0034491 through 92
19  Exhibit 628 document Bates stamped     183
20     OCC36408 through 409
21  Exhibit 629 document Bates stamped OCC     186
22     0036472 through 36473
23  Exhibit 630 document Bates stamped OCC     195
24     0036482 through 483
25

TSG Reporting - Worldwide    877-702-9580

---

Page 224

ROSEN

1
2  EXHIBITS
3  Exhibit No.                Marked
4  Exhibit 631 document Bates stamped     213
5     BCI-EX(S) 201894 through 95
6  Exhibit 632 document Bates stamped CGSH     220
7     163813 through 815
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

---

Page 225

ROSEN

1
2  CERTIFICATE
3  STATE OF NEW YORK )
4        )ss:
5  COUNTY OF NEW YORK)
6     I, MARY F. BOWMAN, a Registered
7  Professional Reporter, Certified Realtime
8  Reporter, and Notary Public within and for
9  the State of New York, do hereby certify:
10     That EDWARD J. ROSEN, the witness
11  whose deposition is hereinbefore set forth,
12  was duly sworn by me and that such
13  deposition is a true record of the testimony
14  given by such witness.
15     I further certify that I am not
16  related to any of the parties to this action
17  by blood or marriage and that I am in no way
18  interested in the outcome of this matter.
19     In witness whereof, I have hereunto
20  set my hand this 19th day of February, 2010.
21
22     _____
     MARY F. BOWMAN, RPR, CRR
23
24
25

TSG Reporting - Worldwide    877-702-9580

```
 1            ROSEN
 2        * * *ERRATA SHEET* * *
 3   NAME OF CASE:  In Re:  Lehman Brothers
 4   DATE OF DEPOSITION:  February 19, 2010
 5   NAME OF WITNESS:  EDWARD J. ROSEN
 6   Reason codes:
 7      1. To clarify the record.
        2. To conform to the facts.
 8      3. To correct transcription errors.
 9   Page _____ Line _____ Reason_____
     From _____ to_____
10
11   Page _____ Line _____ Reason_____
     From _____ to_____
12
13   Page _____ Line _____ Reason_____
     From _____ to_____
14
15   Page _____ Line _____ Reason_____
     From _____ to_____
16
17   Page _____ Line _____ Reason_____
     From _____ to_____
18
19   Page _____ Line _____ Reason_____
     From _____ to_____
20
21   Page _____ Line _____ Reason_____
     From _____ to_____
22
23
24      _____
        EDWARD J. ROSEN
25
```

TSG Reporting - Worldwide     877-702-9580