# BCI Exhibit 638

Contains Highly Confidential Information

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :
In re:                                                         :   Chapter 11
                                                               :
LEHMAN BROTHERS HOLDINGS INC., *et al*.,                       :   Case No. 08-13555 (JMP)
                                                               :
            Debtor**.**                                        :   (Jointly Administered)
                                                               :
                                                               :
                                                               :
                                                               :
                                                               :
---------------------------------------------------------------x
                                                               :
*In re*:                                                       :   SIPA Proceeding
                                                               :
LEHMAN BROTHERS INC.,                                          :   Case No. 08-01420 (JMP)
                                                               :
            Debtor.                                            :
                                                               :
---------------------------------------------------------------x

## THE MOVANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to the Court's Scheduling Order Concerning Certain Motions Filed By LBHI, SIPA Trustee And Creditors Committee, dated October 27, 2009, and with reference to Rule 7056-1 of the Local Bankruptcy Rules, James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI"), Lehman Brothers Holdings Inc. ("LBHI"), and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. and its affiliated debtors and debtors-in-possession (the "Committee," collectively, the "Movants") hereby submit their statement of material facts relevant to (i) The Trustee's Motion For Relief Pursuant To The Sale Orders Or, Alternatively, For Certain Limited Relief Under Rule 60(b), filed on September 15, 2009 ("The Trustee's Rule 60(b) Motion"); (ii) the Debtor's Motion For An Order, Pursuant To Fed. R. Civ. P. 60 And Fed. R. Bankr. P. 9024, Modifying The

NYI-4238859v1

**Contains Highly Confidential Information**

September 20, 2008 Sale Order And Granting Other Relief, dated September 15, 2009 ("Debtor's Rule 60 Motion"); (iii) Motion Of Lehman Brothers Holdings Inc., Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying The SIPA Sale Order And Joinder In Official Committee Of Unsecured Creditors' Motion For Relief From SIPA Sale Order, dated September 16, 2009 ("Debtor's Joinder"); (iv) the Motion Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al., Pursuant To 11 U.S.C. §§ 105(a), 363, and 365 And Federal Rules Of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (a) Sale Of Purchased Assets Free And Clear Of Liens And Other Interests and (b) Assumption And Assignment Of Executory Contracts And Unexpired Leases, dated September 20, 2008 (And Related SIPA Sale Order) And Joinder In Debtors' and SIPA Trustee's Motions For An Order Under Rule 60(b) To Modify Sale Order, dated September 15, 2009 (the "Committee's Rule 60 Motion," and collectively, with the Trustee's Rule 60 Motion, Debtor's Rule 60 Motion and Debtor's Joinder, the "Rule 60 Motions"), as to which there is no genuine issue that requires an evidentiary hearing.

For the purposes of this statement of undisputed facts, "Lehman" refers to LBHI and its affiliates and subsidiaries. "Barclays" refers to Barclays Capital Inc.[1]

1. At the time of the sale transaction, Robert Azerad ("Azerad") worked at Lehman and was responsible for liquidity management at Lehman. (A. 1 [Azerad] 14:16-15:7.)[2]

---

[1] Unless specified herein, abbreviations used in this document are the same as those set forth in the Rule 60 Motions.

[2] Exhibits to Debtor's Rule 60 Motion are cited herein as "A. __" and deposition transcripts filed as exhibits to such motion are cited as "A. __ [deponent] __." The "Sale Transaction" referred to herein is, as defined in the Rule 60 Motions, the sale, which closed on September 22, 2008, of certain of the assets of LBHI, LB 745 LLC, and LBI to Barclays in accordance with the terms set forth in the Asset Purchase Agreement, dated September 16, 2008 ("Asset Purchase Agreement") and related agreements and modifications thereto.

NYI-4238859v1

**Contains Highly Confidential Information**

469. On September 19, 2008, Hraska transferred or pledged $1.035 billion in securities for the benefit of Barclays. (A. 12 [Hraska] 49:19-51:18, 102:7-103:24, 242:7-11, 252:7-260:15.)

470. Hraska expected that by pledging or transferring the $1.035 billion in securities on September 19, 2008 he would be able to secure the return of $1.035 billion in cash from Barclays to pay off part of the $7 billion loan. (A. 12 [Hraska] 49:19-51:18, 102:7-103:24, 252:7-260:15.)

471. LBI did not receive $1.035 billion in cash from Barclays as a result of Hraska pledging or transferring the $1.035 billion in securities on September 19, 2008. (A. 12 [Hraska] 50:23-53:16, 102:7-103:24.)

472. LBI was unable to repay any part of the $7 billion loan from Chase using cash received from Barclays for the $1.035 billion in securities. (A. 12 [Hraska] 50:23-53:16, 102:7-103:24.)

473. The $1.035 billion in securities pledged or transferred for the benefit of Barclays on September 19, 2008 were listed on Schedule B of the executed Clarification Letter. (A. 12 [Hraska] 47:12-17, 139:23-148:4, 161:13-24; 222:13-20, 241:11-242:11, 306:22-308:2; A. 32; A. 127.)

474. The $1.035 billion in securities were not in LBI's clearance box at the close of business on September 19, 2009 or at the closing of the transaction. (A. 7 [Denig] 197:24-198:10.)

475. Ricci testified that as of the morning of September 19, 2008 he believed Barclays did not have a sufficient "cushion" in the Sale Transaction. (A. 23 [Ricci] 156:9-157:22.)

476.  In connection with the Sale Transaction, Klein testified that he was instructed by Barclays to ask Lehman for more assets, "to go in and express that we needed more assets." (A. 17 [Klein] 94:3-18.)

477.  Barclays informed Lehman on September 19, 2008 that there was a "shortfall" in the amount of assets it would receive through the Repurchase Agreement, but Barclays did not say how much difference had to be made up, only that, without more, the Sale Transaction would not close. (A. 16 [Kirk] 100:10-102:24; A. 23 [Ricci] 121:8-123:5; *see* A. 17 [Klein] 95:2-97:20.)

478.  Asked about Barclays's September 19, 2008 request for more assets at his deposition, Diamond testified that Lehman was "scrambling" to add more value for Barclays. (A. 8 [Diamond] 129:11-136:15.)

479.  In connection with the Sale Transaction, on the morning of September 19, 2008, McDade instructed Lowitt to identify "additional sources of value" to "include in a new transaction" with Barclays. (A. 19 [Lowitt] 62:8-15.)

480.  In connection with the Sale Transaction, McDade testified that Barclays demanded additional assets on September 19, 2008 because it was "uncomfortable with the new aspect of what they now had . . . agreed upon." (A. 20 [McDade] 164:23-165:13.)

481.  In connection with the Sale Transaction, on the morning of September 19, 2008, Ricci instructed Lowitt "to identify where there were different sources of value" to transfer to Barclays. (A. 19 [Lowitt] 60:10-24.)

482.  In connection with the Sale Transaction, Lowitt testified these "additional sources of value" that potentially could be transferred to Barclays would be "elements" of a

different deal than the one that had been reached on "Monday and Tuesday." (A. 19 [Lowitt] 59:7-16.)

483. In connection with the Sale Transaction, the assets that Lowitt was instructed to identify beginning on September 19, 2008 were assets in addition to those included in the Repurchase Agreement. (A. 20 [McDade] 138:18-140:27; A. 26 [Tonucci] 118:4-22; A. 23 [Ricci] 172:16-173:25.)

484. In connection with the Sale Transaction, Lowitt knew that finding additional assets was "important." (A. 19 [Lowitt] 63:24-64:8, 64:17-65:2, 148:8-16 ("The whole exercise of identifying additional collateral, which as we talked about was a result of a conversation with Bart as well as with Rich Ricci, was a very important exercise for us on the Friday, which is why I think I would have talked about it in this way.").)

485. In connection with the Sale Transaction, Lowitt worked on finding additional assets that potentially could be transferred to Barclays on the Friday, September 19, 2008, and through the weekend of September 20-21, 2008. (A. 19 [Lowitt] 63:24-64:8, 148:8-16.)

486. In connection with the Sale Transaction, on or around September 19, 2008, McDade asked Kirk to help locate additional assets that potentially could be transferred to Barclays. (A. 16 [Kirk] 102:4-20.)

487. In connection with the Sale Transaction, Kirk worked with Lowitt, Tonucci and Kelly to satisfy Barclays' request for additional assets. (A. 20 [McDade] 164:23-165:21; *see also* A. 19 [Lowitt] 60:10-63:14; A. 26 [Tonucci] 54:24-56:20; A. 14 [Kelly] 129:6-130:2.)

Contains Highly Confidential Information

488.  In connection with the Sale Transaction, Kirk's understanding of the "project" to find additional assets that potentially could be transferred to Barclays was to continue to locate additional assets until Barclays said "that's enough." (A. 16 [Kirk] 112:10-24.)

489.  In connection with the Sale Transaction, McDade testified that "[i]t was very clear that Barclays still wanted more value in terms of assets." (A. 20 [McDade] 172:2-22.)

490.  In connection with the Sale Transaction, Lowitt was given a "target" by McDade of $3 to $4 billion of additional assets to identify. (A. 19 [Lowitt] 62:16-20; s*ee also* A. 78 ("The 15c3 lockup looks ok at 1.3 bn . . . so we are short 1.7 bn"); A. 19 [Lowitt] 151:2-9 ("[m]y recollection is between 3 and 4, and the math here in [A. 78] suggests that what we were targeting was $4 billion."); A. 26 [Tonucci] 203:23-204:10 (expectation after Friday's court hearing was $3 billion in unencumbered and 15c3-3 assets).)

491.  In connection with the Sale Transaction, Kirk wrote an email, dated September 19, 2008, to McDade stating that Ricci "just told me he won't blow up the deal by being a pig." (A. 81; *see* A. 16 [Kirk] 185:24-189:14.)

492.  In connection with the Sale Transaction, when Kirk informed Ricci there were no more available assets to give, Ricci told Kirk "we're not going to be pigs and go after every last nickel." (A. 23 [Ricci] 158:4-159:8.)

493.  In connection with the Sale Transaction, Lowitt and others at Lehman "look[ed]in a number of places to determine – to find extra value." (A. 19 [Lowitt] 151:2-5; A. 26 [Tonucci] 54:24-56:20; A. 14 [Kelly] 128:16-130:15.)

494.  In connection with the Sale Transaction, Lowitt and others searched for additional assets located in a so-called "15c3 lock up." (A. 19 [Lowitt] 59:17-60:2.)

495. The term "15-c3 lock up" involved a regulatory requirement that, *inter alia,* brokerages kept on hand assets sufficient to cover a specified percentage of their customer portfolio. (A. 3 [Blackwell] 139:14-140:11.)

496. In connection with the Sale Transaction, Lehman personnel under the direction of Lowitt, Tonucci and Kelly searched the so-called "clearance boxes" maintained for its benefit by JP Morgan Chase and other entities, such as the Depository Trust & Clearing Corporation ("DTCC"), and performed detailed "depot analysis" and database reviews to try to locate assets that potentially could be sent to Barclays. (A. 98 (Lehman's 9/21/08 "depot analysis"); A. 99; A. 12 [Hraska] 48:9-12, 107:18-108:5, 212:5-215:23; A. 7 [Denig] 64:17-65:18, 105:10-108:14.)

497. In connection with the Sale Transaction, Lowitt and others searched on Friday, September 19, 2008, and over the weekend after the Sale Hearing, for additional "unencumbered assets," to potentially convey to Barclays. (A. 19 [Lowitt] 59:17-60:2; s*ee also* A. 115; A. 116; A. 100; A. 117; A. 87; A. 12 [Hraska] 50:23-51:18, 296:11-21.)

498. In connection with the Sale Transaction, the term "unencumbered assets" refers to assets that had not been pledged for other purposes and therefore potentially could be given to Barclays. (*See* A. 12 [Hraska] 34:14-19; A. 116; A. 117; *see also* A. 12 [Hraska] 50:23-51:18.)

499. According to Lowitt, the value of additional assets identified over the weekend of September 20-21, 2008 that potentially could be transferred to Barclays under the Sale Transaction totaled at least $2.7 billion. (A. 19 [Lowitt] 60:3-19; *see* A. 97; A. 100.)

500. On September 20, 2008, Klein wrote in an email to Diamond that stayed, in part:

> Great day.
>
> We clawed back 3B more of value in the transaction and cut the building prices by 160 mm.

(A. 82.)

501. Lowitt testified as follows:

> Q: And what, as best you recall, is the value of those additional elements, dollar value?
>
> A: The dollar value of the unencumbered collateral was in and around $2 billion, and, you know, the 15c3 excess, my understanding of the deal that was reached vis-a-vis the 15c3 excess was round $750 million to 800 million dollars.

(A. 19 [Lowitt] 60:3-9; *see* A. 97 (September 20 update on search of assets); A. 100 (identifying $2.3 billion in potentially transferable assets).)

502. The so-called "unencumbered assets" potentially available for transfer to Barclays under the Clarification Letter totaled at least $1.9 billion. (A. 12 [Hraska] 223:4-14, 267:19-270:18, 293:9-300:2, 304:17-308:2; A. 23 [Ricci] 164:16-165:25 (on Friday, Ricci and McDade agreed that Barclays would accept $1.9 billion in "additional assets"); A. 91 ("Goal Is $1.9 billion in unencumbered"); A. 92 (same); A. 127; A. 118.)

503. Some evidence puts the total so-called "unencumbered assets" to which Barclays claims entitlement under the Clarification Letter as high as $2.3 billion. (A. 12 [Hraska] 267:19-270:18, 293:9-300:2, 304:17-308:2; A. 95; A. 132; A. 67; A. 100.)

504. Between October 2008 and July 2009 Barclays attempted to identify additional so-called "unencumbered assets" that could be transferred from Lehman to Barclays as substitutes for assets Barclays claims it should have received under the Sale Transaction and Clarification Letter. (A. 12 [Hraska] 145:13-21, 245:5-246:20, 296:11-19.)

505. As recently as July 2009, Barclays directed certain of its employees to try to locate more securities to substitute for assets Barclays claims it should have received under the Sale Transaction and Clarification Letter. (A. 12 [Hraska] 296:11-19.)

506. McDade has agreed that Lehman never intended for the Clarification Letter to provide Barclays with billions of dollars in margin at the OCC. (A. 20 [McDade] 277:14-18; A. 82.)

507. Kirk testified at his deposition with respect to the Sale Transaction, "[t]his transaction was very different than what had been previewed [to the Court] two days before, and it would have to be explained why it came up." (A. 16 [Kirk] 82:18-25; *see also* A. 19 [Lowitt] 59:7-60:16.)

508. At the Sale Hearing on September 19, 2008, the search for additional assets to transfer to Barclays in connection with the proposed Sale Transaction was not disclosed to the Court.

509. Over the weekend following the Sale Hearing, the parties negotiated a "letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008" referenced in the LBHI Sale Order (the "Clarification Letter"). (Maguire Decl. Ex. 1 [LBHI Sale Order] at 1.)

510. The Clarification Letter, dated as of September 20, 2008, was finalized and executed on September 22, 2008. (*See* A.2 [Berkenfeld] 260:22-261:17; 298:4-299:9; A. 18 [LaRocca] 126:25-128:3.)

511. The Trustee was not an active participant in the drafting process or in the negotiations concerning the Clarification Letter. (Kobak Decl. ¶ 9.)

**Contains Highly Confidential Information**

Dated: December 15, 2009

| | |
|---|---|
| s/ William R. Maguire | s/ William J. Hine |
| **HUGHES HUBBARD & REED LLP** | **JONES DAY** |
| William R. Maguire | Robert W. Gaffey |
| Seth D. Rothman | Jayant W. Tambe |
| Neil J. Oxford | William J. Hine |
| One Battery Park Plaza | 222 East 41st Street |
| New York, New York 10004 | New York, New York 10017 |
| (212) 837-6000 (telephone) | (212) 326-3939 (telephone) |
| (212) 422-4726 (facsimile) | (212) 755-7306 (facsimile) |
| maguire@hugheshubbard.com | rwgaffey@jonesday.com |
| Attorneys for James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc. | Attorneys for Debtors and Debtors in Possession |

s/ James C. Tecce
**QUINN EMANUEL URQUHART OLIVER & HEDGES**
Susheel Kirpalani
James C. Tecce
51 Madison Ave
22nd Floor
New York, NY 10010
212 849-7000 (telephone)
212 849-7100 (facsimile)
jamestecce@quinnemanuel.com

Erica P. Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

Attorneys for Official Committee of Unsecured Creditors