# BCI Exhibit 644

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                 Debtors.

10

      ----------------------x

11

12

13

14         DEPOSITION OF ANTHONY J. LEITNER

15             New York, New York

16             February 25, 2010

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 28367

Page 2

```
 1
 2              February 25, 2010
 3
 4      Deposition of ANTHONY J. LEITNER,
 5  held at the law offices of Hughes,
 6  Hubbard & Reed, LLP, One Battery Park
 7  Plaza, New York, New York, before Kathy
 8  S. Klepfer, a Registered Professional
 9  Reporter, Registered Merit Reporter,
10  Certified Realtime Reporter, Certified
11  Livenote Reporter, and Notary Public of
12  the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2              A P P E A R A N C E S :
 3
 4  JONES DAY, LLP
 5  Attorneys for Lehman Brothers, Inc.
 6      222 East 41st Street
 7      New York, New York  10017-6702
 8  BY:  KELLY A. CARRERO, ESQ.
 9
10  BOIES, SCHILLER & FLEXNER, LLP
11  Attorneys for Barclays Capital
12      10 North Pearl Street
13      4th Floor
14      Albany, New York  12207
15  BY:  TRISH BLOOMER, ESQ.
16
17  QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
18  Attorneys for the Creditors Committee
19      51 Madison Avenue, 22nd Floor
20      New York, New York  10010
21  BY:  ROBERT K. DAKIS, ESQ.
22
23
24
25
```

Page 4

```
 1
 2
 3          A P P E A R A N C E S :  (Cont'd.)
 4
 5  HUGHES, HUBBARD & REED, LLP
 6  Attorneys for the SIPA Trustee
 7      One Battery Park Plaza
 8      New York, New York  10004-1482
 9  BY:  NEIL J. OXFORD, ESQ.
10      WILLIAM MAGUIRE, ESQ.
11      STEPHEN LUGER, ESQ.
12      AMINA HASSAN, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              A. Leitner
 2  ANTHONY J. LEITNER, called as a
 3      witness, having been duly sworn by a Notary
 4      Public, was examined and testified as
 5      follows:
 6  EXAMINATION BY
 7  MR. OXFORD:
 8      Q.   Good morning, Mr. Leitner.  We met off
 9  the record.  As you know my name is Neil Oxford.
10  I'm with the law firm of Hughes, Hubbard & Reed
11  and we represent the SIPA Trustee in this
12  matter.
13          Have you been deposed before, sir?
14      A.   Yes.
15      Q.   In which matters have you been
16  deposed?
17      A.   It was a litigation involving a bunch
18  of broker-dealers suing other broker-dealers
19  several years ago on issues relating to the
20  Federal Margin Rules.
21      Q.   Who were the plaintiffs in this case,
22  sir?
23      A.   There were six or seven and I do not
24  remember who they all were.
25      Q.   Were you engaged by the plaintiffs or
```

Page 6

1              A. Leitner
2    the --
3       A.   Yes.
4       Q.   -- defendants?
5           Who engaged you, sir?
6       A.   I was originally approached by a
7    lawyer in California and then I was dealing with
8    a lead lawyer named -- I forget his name,
9    Richard something, down in Washington.  This was
10   so many years ago I've forgotten.
11      Q.   Can you give me an approximate
12   timeframe for the year or so?
13      A.   1994, '95.
14      Q.   You were still employed by Goldman at
15   that time, sir?
16      A.   No, I was -- I was a consultant to
17   Goldman Sachs and I am a consultant.
18      Q.   Did you testify at trial in that case,
19   sir?
20      A.   No.
21      Q.   Have you testified on any other
22   occasions?
23      A.   No.
24      Q.   Welcome to your second deposition.
25          This is not intended to be a marathon,

Page 7

1              A. Leitner
2    so if you need a break at any time, please just
3    let me know.
4       A.   Thank you.
5       Q.   If you don't understand any of my
6    questions, I'll be happy to rephrase them, so
7    please ask me to do that.
8       A.   You'll have to speak up because I have
9    hearing loss in one year.
10      Q.   Okay.  Did you hear my last question,
11   sir?  What I said was I'll be happy -- in
12   addition to speaking up, I'll be happy to
13   rephrase questions if you don't hear them for
14   that -- if you don't understand them for that
15   reason.
16      A.   Thank you.
17      Q.   Have you seen the expert stipulation
18   in this case, sir, that was negotiated between
19   Barclays and the movants?
20      A.   I believe I did.
21      Q.   And you understand that Barclays is
22   required to produce a complete statement of all
23   your opinions and the bases for them?
24      A.   Yes.
25          (Exhibit 652, Report of Anthony J.

Page 8

1              A. Leitner
2    Leitner, marked for identification, as of
3    this date.)
4       Q.   I have marked as Exhibit 652, sir,
5    your report, which I believe is dated January 8,
6    2010,
7       A.   Yes.
8       Q.   Does that, sir, include all of your
9    opinions in this case?
10      A.   All the opinions I was asked to give,
11   yes.
12      Q.   Do you have opinions in this case that
13   you were not asked to give?
14      A.   On what topic?
15      Q.   Any topic, sir.
16          MS. BLOOMER:  Objection to the form of
17   the question.
18      A.   I was only asked to focus on the
19   issues that I was asked to opine on, and I
20   frankly have not formed a specific opinion on
21   any other matter.
22      Q.   Did you form a general opinion on any
23   other matter relating to this case, sir, that is
24   not contained in your report?
25          MS. BLOOMER:  Objection to the form of

Page 9

1              A. Leitner
2    the question.
3       A.   I'm not sure I would know how to
4    respond to that because I have a general
5    understanding of what happened here, but I have
6    not formed any particular opinions other than on
7    the issue of the collateral, which I think we
8    defined as posted collateral, that is the prime
9    topic of my report.
10      Q.   You understand that discovery in this
11   case, sir, has continued past January 8, 2010,
12   correct?
13      A.   Yes.
14      Q.   Have you read any of the depositions
15   that have been taken subsequent to the signing
16   of your report?
17      A.   Yes.
18      Q.   Which ones have you signed, please,
19   sir?
20          MS. BLOOMER:  Object to the form of
21   the question.
22      Q.   Which ones have you read, sir?
23      A.   The deposition of Mr. Rosen, of Mr.
24   Dzeimian I believe are the ones I focused on.
25      Q.   I'll represent to you --

| Page 10 | Page 11 |
|---|---|

Page 10

1             A. Leitner
2      A.   And Elizabeth James.
3      Q.   I'll represent to you, sir, that Mr.
4   Dzeimian has not yet been deposed.
5      A.   Then I would change my answer to refer
6   to his declaration and not his deposition.
7      Q.   Thank you.  Did you read Jonathan
8   Hughes' deposition, sir?
9      A.   I did.  Thank you for reminding me.  I
10  read portions of his deposition.
11     Q.   Do you understand that he was deposed
12  over the course of two days, sir?
13     A.   Yes.
14     Q.   Did you read portions of both of those
15  days or just one of those days?
16     A.   Just the first day.
17     Q.   Did you read Mr. Clark's deposition?
18     A.   No.
19     Q.   Did you know, sir, that Mr. Clark was
20  deposed?
21     A.   I believe I was informed that he was.
22     Q.   And did you read Sharon Blake's
23  deposition?
24     A.   No.
25     Q.   Did you know that Ms. Blake was

Page 11

1             A. Leitner
2   deposed?
3      A.   Yes.
4      Q.   Should, during the course of your
5   questioning, you recall an additional deposition
6   that you read, if you would please just -- you
7   can interrupt my questions to answer and
8   supplement.
9          MS. BLOOMER:  I'm going to object to
10      the form of the question.  Just to clarify,
11      you mean since he filed his report, that's
12      the scope of your question?
13         MR. OXFORD:  Yes.  Yes.
14     A.   Okay, since I filed my report, I also
15  read portions of Mr. Kobak's deposition and
16  reread portions of Mr. King's deposition.
17  That's all I can recall.
18     Q.   Did you read exhibits that were
19  referenced in those depositions, sir?
20     A.   I did refer to some of the exhibits
21  referenced there.  Many of them had been -- many
22  of them I had reviewed, you know, prior to the
23  deposition, so I was already familiar with that.
24     Q.   Did you review any additional
25  materials other than those you have just

| Page 12 | Page 13 |
|---|---|

Page 12

1             A. Leitner
2   testified to since you signed your report on
3   January 8?
4      A.   Not beyond the materials that I
5   believe I identified in the exhibit to my
6   report.
7      Q.   And you're referring, sir, to Schedule
8   2 -- sorry, Schedule 1 to your report, sir?
9      A.   Yes.
10     Q.   Did any of the materials that you
11  reviewed subsequent to the filing of your
12  report, sir, did they change your opinion in any
13  way?
14     A.   On the contrary.  They reinforced my
15  opinion.
16     Q.   Could you describe for me generally
17  how they reinforced your opinion?
18     A.   Yes, I can describe generally how they
19  reinforced my opinion.
20     Q.   Please do so.
21     A.   My report, and I'll speak just
22  generally about the conclusions in my report,
23  are based in large measure on the lack of
24  information and general volatility and
25  uncertainty relating to the time period during

Page 13

1             A. Leitner
2   which Lehman was undergoing its financial
3   difficulties leading up to the conclusion and
4   closing of this transaction.
5          The one additional element that was --
6   that came out of reviewing those materials was
7   the degree of operational risk associated with
8   the transaction, which was, in my view, simply a
9   subset of the other risks referred to in my
10  opinion that would have been obvious to Barclays
11  before they signed the APA and continued through
12  the life of the transaction.
13     Q.   Can you describe for me what you mean
14  by "the degree of operational risk associated
15  with the transaction"?
16     A.   Yes, I can.
17     Q.   Would you please do so?
18     A.   Lehman Brothers had derivative
19  positions at various brokers and at the Options
20  Clearing Corp., a clearing corporation that they
21  were members of, and at through affiliate
22  companies at foreign exchanges.  A transfer of
23  positions is not something that can be
24  accomplished even in the best of circumstances
25  overnight, and not without a lot of preparation,

Page 14

```
 1              A. Leitner
 2    and the weekend over which this transaction was
 3    concluded added to the complication because it's
 4    what's called an expiration weekend at the
 5    Options Clearing Corp.  So all of the options
 6    that were expiring at that time had to be
 7    settled.
 8         Those settlement obligations all
 9    became obligations of Barclays on November 1.
10    Barclays also had to deal with the fact that
11    some of Lehman's customers were not coming over
12    to Barclays.  The customer transfers, by the
13    way, had their own issues, but just focusing on
14    the clearing side of the Lehman business that
15    Barclays was acquiring, and so although Barclays
16    had as of Monday morning, as I understand it,
17    all of Lehman's obligations to the Option
18    Clearing Corp., it took them several days to set
19    up the process for being able to manage the
20    clearance and settlement of these transactions
21    and figure out how to do that.
22         And so that's what I meant by
23    "operational risk."
24    Q.   Which Lehman customers were not coming
25    over to Barclays, sir?
```

Page 15

```
 1              A. Leitner
 2    A.   I don't know that I've ever known
 3    that.  You asked me which customers, and you
 4    meant by name, I assume.
 5    Q.   Well, can you categorize them in any
 6    way, sir?
 7    A.   Other than -- not other than as
 8    customers that for some reason, which I don't
 9    completely understand, remained at Lehman
10    Brothers.
11    Q.   Do you know which customers did go to
12    Barclays?
13    A.   Yes.
14    Q.   Which customers went to Barclays, sir?
15    A.   A group of customers that were
16    generally categorized as PIM customers is what I
17    recall.
18    Q.   What's a PIM customer, sir?
19    A.   My understanding is that "PIM" stands
20    for private investment management.
21    Q.   And what does that mean to you, sir?
22         MS. BLOOMER:  Objection.
23    A.   I can only describe it in terms of
24    what it means to me in general terms and based
25    on my experience in the business, although it
```

Page 16

```
 1              A. Leitner
 2    might not be exactly what -- how they
 3    interpreted it here.
 4    Q.   Did you ask anybody, sir, what type of
 5    customers were going to Barclays and which type
 6    of customers weren't?
 7    A.   No.
 8    Q.   What is the basis for your testimony
 9    that PIM customers were going to Barclays?
10    A.   The basis is that it's referred to in
11    the testimony of some of the witnesses.
12    Q.   Did you understand, sir, that the
13    reason certain types of customers were not going
14    to Barclays was because Barclays didn't want
15    them?
16    A.   I'm not aware of that, no.  Just to be
17    clear, whether Barclays wanted them or not,
18    effective on Monday morning, they had the
19    clearance risk for all of them.
20    Q.   Where did they have the clearance risk
21    for all of Barclays' customers?
22    A.   Because, to the extent that
23    Barclays -- those customers that did not come
24    over had any derivative positions that had been
25    at Lehman Brothers, those responsibilities were
```

Page 17

```
 1              A. Leitner
 2    acquired by Barclays effective on Monday.
 3    Q.   Is that opinion you have just
 4    provided, sir, limited to the OCC, or is it to
 5    any position at any derivative clearing
 6    organization or exchange?
 7         MS. BLOOMER:  Objection to the form of
 8    the question.  Vague and ambiguous.
 9         You can answer the question, if you
10    understand.
11    A.   I think I understand it.
12         To the extent that the customer's
13    position was being cleared by Lehman and was on
14    Lehman's books and records and was assumed by
15    Barclays as a result of the transaction, then
16    Barclays had the risk to the broker or clearing
17    association for those positions.  I believe that
18    was the understanding.
19    Q.   And it's your opinion --
20    A.   With respect to OCC, that would be
21    literally true.
22    Q.   Leaving OCC out of my question, sir,
23    is it your understanding that customer positions
24    outside of the OCC were being assumed by
25    Barclays?
```

Page 18

1          A. Leitner
2    A.   Can we --
3          MS. BLOOMER:  Objection to the form of
4    the question.  You mean exchange-traded
5    derivatives positions, right?
6          MR. OXFORD:  Yes.
7          THE WITNESS:  I was going to say I
8    don't understand --
9    Q.   Perhaps I can give you a running
10   direction, sir.  Your report concerns
11   exchange-traded derivatives.  You told me, "I
12   don't have any opinions on matters in this case
13   other than exchange-traded derivatives," so to
14   the extent my questions are unclear but are
15   clarified by this, you can assume that they all
16   relate to exchange-traded derivatives.
17   A.   The -- what I think is important to
18   clarify is the difference between customer
19   accounts and customer positions that were
20   cleared by Lehman Brothers.
21   Q.   Okay.  Please clarify.
22   A.   To the extent that Lehman had
23   responsibility for clearing these customer
24   accounts and that was part of the
25   exchange-traded derivatives business, then

Page 19

1          A. Leitner
2    Barclays acquired the exchange-traded derivative
3    business and, therefore, all of the obligations
4    that related to clearing the positions that
5    Lehman had.
6          And my understanding of the facts is
7    that they included positions that were
8    proprietary positions and customer positions.
9    Q.   Could you turn to paragraph 19 of your
10   report, sir.  It's on page 7.
11         MS. BLOOMER:  What exhibit number did
12   you mark the report?
13         MR. OXFORD:  I'm sorry.  Thank you,
14   Trish.  I believe I marked it as 652.
15         MS. BLOOMER:  Thank you.  And what
16   paragraph?
17         MR. OXFORD:  19.
18   Q.   Do you have that in front of you, sir?
19   A.   Yes, I do.
20   Q.   In the first sentence of paragraph 19,
21   sir, you set out Barclays' contention as to its
22   position with respect to the acquisition of
23   exchange-traded derivatives from Lehman, do you
24   see that?
25         MS. BLOOMER:  I object to the

Page 20

1          A. Leitner
2    characterization of the opinion to the
3    extent that was a characterization.
4    A.   Sorry.  You want to read me something
5    from --
6    Q.   Let me ask it this way.  Can you read
7    the first sentence of paragraph 19 and tell me
8    what the basis is for that statement?
9    A.   "Barclays contends in this litigation
10   that, in the midst of the extreme and uncertain
11   circumstances surrounding its acquisition of the
12   capital markets, brokerage, futures commission
13   merchants and other ETD businesses of LBI,
14   Barclays entered into to an agreement with LBI
15   whereby (i) Barclays would assume all of LBI's
16   rights and obligations in and to all
17   exchange-traded derivatives, including options
18   and futures (hereinafter collectively called
19   'ETDs'), held for LBI's account as well as for
20   the accounts of LBI affiliates and LBI customers
21   at clearing houses or clearing brokers in
22   connection with those businesses; and (ii)
23   Barclays would receive all LBI's rights with
24   respect to the margin and related property
25   (including clearing fund deposits) held by the

Page 21

1          A. Leitner
2    clearing houses or clearing brokers in relation
3    to the ETDs (whether such property related to
4    proprietary positions or customer positions)
5    (hereinafter the 'posted collateral')."
6    Q.   What's the basis for that statement,
7    sir?
8    A.   I would refer you to the pages and
9    paragraphs in my report that set forth the basis
10   of that opinion.  Those paragraphs begin, I
11   believe, on page 38, where I recite the opinions
12   again, and then on page 40, where I recite the
13   analysis.  Those paragraphs set forth the basis
14   for my opinions.
15   Q.   Do you agree with me, sir, that margin
16   or collateral is something different from an
17   exchange-traded derivative?
18         MS. BLOOMER:  I object to the form of
19   the question.
20   A.   I don't understand the question.
21   Different in what respect?
22   Q.   They're different assets, sir.
23         MS. BLOOMER:  Object to the form of
24   the question.
25   A.   I don't necessarily agree with that.

Page 22

A. Leitner

1
2    Q.   Will you turn to page 94 of your
3    report, please, sir?
4        A.   Paragraph 94?
5        Q.   Sorry, paragraph 94.  Do you have
6    that, sir?
7        A.   I do.
8        Q.   Do you see that in the first sentence
9    you say, "With respect to posted collateral, in
10   normal circumstances, a buyer and seller would
11   have reached an agreement about whether the
12   transfer of ETDs would come with or without the
13   related collateral."  Do you see that, sir?
14       A.   Yes, I do.
15       Q.   Isn't it correct, sir, that in that
16   sentence you treat as different assets the
17   exchange-traded derivatives and the collateral
18   that may be related to that?
19       MS. BLOOMER:  Objection to the form of
20   the question and the characterization of the
21   testimony, that sentence.
22       A.   I'm sorry, the paragraph -- the
23   sentence speaks for itself, so what's the
24   question?
25       Q.   The question, sir, is whether or not

Page 23

A. Leitner

1
2    you believe there is a distinction between an
3    exchange-traded derivative and collateral
4    related to that derivative?
5        MS. BLOOMER:  Objection to form.
6        Q.   Are they the same assets or different
7    assets?
8        MS. BLOOMER:  I object to the form.
9    That's a different question.
10       A.   Here's why I don't understand the
11   question.  Are you asking me the question from
12   an accounting perspective or from a business
13   perspective?  How are you asking the question?
14       Q.   From a business perspective, sir.
15       A.   From a business perspective, certainly
16   in the circumstances of this transaction it was
17   all part of the business.  So you cannot
18   separate the derivative from the assets
19   supporting that business, and in my view,
20   collateral constitutes assets supporting the
21   business.
22       I think that's the way it is generally
23   understood in the industry.  Can you separate
24   them into two pieces?  You cannot have the
25   derivative if you -- if collateral is required

Page 24

A. Leitner

1
2    without posting collateral.
3        Q.   From a legal perspective, sir, is
4    collateral different from an exchange-traded
5    derivative?
6        MS. BLOOMER:  Objection to the form of
7    the question.  It requires a legal
8    conclusion.
9        A.   An exchange-traded derivative is a
10   contract.  Collateral is collateral.
11       Q.   Is that a "yes"?
12       MS. BLOOMER:  Object to the form of
13   the question.
14       A.   That's the best answer I can give.
15       Q.   From an accounting perspective, sir,
16   is an exchange-traded derivative the same as
17   collateral related to an exchange-traded
18   derivative?
19       MS. BLOOMER:  Objection.  Beyond the
20   scope of the expert's expert testimony and
21   knowledge.
22       A.   I have -- I don't pretend to be an
23   expert on the accounting treatment of
24   exchange-traded derivatives.
25       Q.   Do you have any knowledge, sir, as an

Page 25

A. Leitner

1
2    expert who has worked in this area for some 20
3    or 30 years, as to what the accounting treatment
4    is of exchange-traded derivative contracts and
5    the collateral related thereto?
6        MS. BLOOMER:  Objection.  Beyond the
7    scope of the expert's testimony and
8    knowledge.
9        A.   I do not have knowledge of the
10   accounting treatment of exchange-traded
11   derivatives and related collateral for GAAP
12   accounting purposes.
13       Q.   Do you have such knowledge for any
14   accounting purposes, sir?
15       MS. BLOOMER:  Objection to the form of
16   the question and the scope.
17       A.   I'm sorry, can you repeat the
18   question?
19       (Record read.)
20       A.   No.
21       Q.   Mr. Leitner, I'm handing you a copy of
22   the Asset Purchase Agreement in this matter
23   that's previously been marked Exhibit 1.  Have
24   you seen that document before, sir?
25       A.   Yes.

Page 26

A. Leitner

1
2  Q.  In fact, you reviewed it as part of
3  your preparation for your report; is that
4  correct?
5  A.  I have.
6  Q.  And your opinion in this matter is
7  based in part upon your review of the Asset
8  Purchase Agreement, correct?
9  A.  Yes.
10  MS. BLOOMER:  Objection to the form of
11  the question.
12  Q.  This is one of the governing
13  agreements, sir, that you believe is consistent
14  with Barclays' legal position in this matter,
15  correct?
16  A.  Yes.
17  Q.  Do you agree with me, sir, that there
18  is no reference in the Asset Purchase Agreement
19  to either margin or any other collateral that
20  relates to exchange-traded derivatives?
21  MS. BLOOMER:  Objection to the form of
22  the question.
23  A.  I do not agree with your statement.
24  Q.  Why not?
25  A.  I would refer to my opinion for a more

Page 27

A. Leitner

1
2  complete definition, but using my own words, my
3  understanding was that the transactions involved
4  in the sale of businesses and assets associated
5  with those businesses, exchange-traded
6  derivatives were specifically referred to in the
7  document.  Deposits are referred to in the
8  agreement.
9  There is a reference I think to short
10  positions as included assets that would take the
11  other side of derivatives as long positions, and
12  I don't see anything inconsistent -- I did not
13  see anything inconsistent with the agreement --
14  in the agreement with the proposition that any
15  collateral that was securing the exchange-traded
16  derivative positions was part of the business.
17  Q.  That's not quite my question, sir.  My
18  question is, is there in the Asset Purchase
19  Agreement any specific reference to margin or
20  collateral that relates to exchange-traded
21  derivatives?
22  MS. BLOOMER:  Objection to the form of
23  the question.
24  A.  I don't believe those words -- that I
25  found those words used in the APA.

Page 28

A. Leitner

1
2  Q.  And it's your opinion, sir, that the
3  reference to exchange-traded derivatives,
4  deposits, and short positions are not
5  inconsistent with Barclays' position that it
6  gets the margin under the APA, sir, is that
7  correct?
8  MS. BLOOMER:  Objection.
9  Mischaracterizes the witness's testimony.
10  A.  My opinion speaks for itself.
11  Q.  Well, sir, with respect, your opinion
12  doesn't speak for itself, which is why you're
13  sitting for a deposition today.  You have to
14  answer my questions.
15  MR. OXFORD:  Can you read that back,
16  please?
17  MS. BLOOMER:  And the question
18  mischaracterized his testimony.
19  MR. OXFORD:  Your objection is on the
20  record.  Thanks, Trish.
21  MS. BLOOMER:  You asked him a
22  different question.
23  (Record read.)
24  A.  If you'll allow me to answer without
25  using a double negative, my answer would be that

Page 29

A. Leitner

1
2  it is consistent with their position.
3  Q.  Is the Asset Purchase Agreement, sir,
4  in your opinion also consistent with the
5  position that Barclays does not acquire the
6  margin or collateral related to exchange-traded
7  derivatives under the APA?
8  MS. BLOOMER:  Objection.  Calls for
9  interpretation of the agreement.
10  MR. OXFORD:  Trish, he's offered an
11  opinion on the interpretation of the
12  agreement.  You do know that.
13  MS. BLOOMER:  He's saying what it's
14  consistent with.  I'm just making an
15  objection.  You can ask the question.  I
16  haven't instructed him not to answer.
17  Q.  Do you have the question in mind, sir?
18  A.  I'm sorry, I didn't hear you.
19  Q.  Do you have the question in mind, sir?
20  A.  Yes.
21  MS. BLOOMER:  Would you like the
22  question repeated so it can refresh your
23  memory?
24  THE WITNESS:  Are you instructing me
25  not to answer?

Page 30

1              A. Leitner
2       MS. BLOOMER:  No.  No.
3       THE WITNESS:  She's speaking into my
4   bad ear.
5       MR. OXFORD:  We can swap if it's
6   easier.
7    A.   Let me be very clear, if I can.
8    Q.   Please.
9    A.   The agreement is helpful in forming my
10  conclusion as stated in my report.  It is
11  certainly not the only factor I used in reaching
12  the conclusion that I did, but my report
13  concludes that Barclays believed at the time
14  this agreement was signed and throughout the
15  transaction, and acted on that assumption, that
16  it would be receiving all of the assets
17  necessary to run the business, which in my
18  opinion would include all the collateral
19  supporting those exchange-traded derivative
20  positions.
21      MR. OXFORD:  Can you read my question
22  back that starts with "the Asset Purchase
23  Agreement."
24      (Record read.)
25   A.   My answer would be no.

Page 31

1              A. Leitner
2    Q.   Did you talk to anybody at Barclays,
3   sir, about any of the provisions in the APA that
4   you have referred to in your testimony today?
5       MS. BLOOMER:  I object to the form of
6       the question to the extent it requires you
7       to disclose discussions that you've had with
8       attorneys.  I instruct you not to answer to
9       that extent, but otherwise, you can answer.
10   A.   I'm trying to think.  In the -- with
11  respect to the actual employees of Barclays with
12  whom I have personally met, did I ever speak
13  about provisions of the agreement, the answer is
14  I don't recall any such discussions.
15   Q.   Did you talk, sir, to the people who
16  from Barclays negotiated the Asset Purchase
17  Agreement?
18   A.   I did not.
19   Q.   You didn't talk to anybody at Barclays
20  about what they meant when they signed an
21  agreement that says "purchased assets include
22  exchange-traded derivatives"; is that correct?
23   A.   To the best of my recollection, I did
24  not have any such discussions.
25      You're asking me if I had such

Page 32

1              A. Leitner
2   discussions; is that right?
3       You want to read the question back,
4   please?
5       (Record read.)
6    A.   Correct.
7    Q.   Did you --
8    A.   I don't recall any such discussions.
9    Q.   Did you talk to anybody at Barclays
10  about what they meant when they signed an
11  agreement that included deposits in purchased
12  assets, sir?
13      MS. BLOOMER:  Object to the question.
14      Only answer to the extent that you can.  You
15      can do so without disclosing discussions
16      that you've had with lawyers.
17   A.   I believe the question was did I have
18  any discussion with people at Barclays?
19      MS. BLOOMER:  Yes.
20      THE WITNESS:  And the answer would be
21  I did not.
22   Q.   Do you agree, sir, that margin is an
23  asset that is related to a derivative contract?
24      MS. BLOOMER:  Objection to the form of
25      the question.

Page 33

1              A. Leitner
2    A.   I'm sorry, I don't mean to quibble,
3   but how do you mean "related"?
4    Q.   I'm not sure I can be more specific.
5   Do you know what the word "related" means?
6       MS. BLOOMER:  Object to the form of
7       the question.
8    A.   The problem -- here's the problem I
9   have with the question, and this transaction
10  highlights it.  "Margin" is a term generally
11  used to define, either by rule or regulation, or
12  by the rules, in this case, of a clearing house,
13  the property or cover -- I'm going to get back
14  to the word "cover" -- that it is prepared to
15  accept for the privilege of being able to have
16  an exposure to the market.
17      So, for example, the Options Clearing
18  Corp. will accept letters of credit as
19  collateral for the position.  I would not
20  characterize -- I would characterize that letter
21  of credit as meeting the margin requirement, but
22  not as an asset.
23      It may also be that, in the case of,
24  as I say in my opinion, the methodology by which
25  the margin requirement is calculated may be

Page 34

1          A. Leitner
2   based on offsets of long positions.
3          So this is an area where I would
4   hesitate to give you an answer to your question
5   that does not take into account the -- what is
6   meant by the word "margin."
7      Q.    In your example, sir, would the letter
8   of credit be related to the derivative contract,
9   the risk of which it was posted to cover?
10         MS. BLOOMER: Objection to the form of
11  the question.
12     A.    The letter of credit is accepted by
13  the clearing house as cover for or margin for
14  the exposures in the aggregate sense of all of
15  the derivatives that are in that clearing
16  member's account. That's the best way I can
17  answer it.
18     Q.    Sir, is it related or not related to
19  the derivatives in that account?
20         MS. BLOOMER: Objection. Asked and
21  answered.
22     A.    To the extent that the clearing house
23  recognizes any type of collateral, including
24  letters of credit, as constituting sufficient
25  cover for the assets in the account, I would

Page 35

1          A. Leitner
2   agree that it is related.
3      Q.    Could you turn, sir, to page 2 of the
4   Asset Purchase Agreement. Do you see towards
5   the bottom, sir, there's the definition of
6   "excluded assets"?
7      A.    Yes.
8      Q.    And do you see that the list of
9   excluded assets starts on page 2, continues
10  through page 3 and over onto page 4; do you see
11  that, sir?
12     A.    Yes.
13     Q.    Did you review that list when forming
14  your opinions, sir?
15     A.    Yes.
16     Q.    Turning your attention specifically to
17  clause (n) at if top of page 4.
18     A.    Yes.
19     Q.    And it reads, "All assets primarily
20  related to the IMD business and derivatives
21  contracts." Do you see that, sir?
22     A.    Yes.
23     Q.    Did you consider that clause in
24  forming your opinion?
25         MS. BLOOMER: Object to the form of

Page 36

1          A. Leitner
2   the question.
3      A.    My answer would be that generally,
4   yes, but specifically, no.
5      Q.    Do you agree, sir, that this clause
6   excludes from the definition of "purchased
7   assets" assets primarily related to derivatives
8   contracts?
9          MS. BLOOMER: Objection.
10     A.    You're asking me to interrupt the
11  contract. I --
12     Q.    Yes, I am, sir.
13     A.    Well, I -- I was not asked in my
14  opinion to interpret the contract and I can't
15  interpret the contract. I don't have enough
16  information to draw any conclusion about either
17  what the IMD business was or what derivative
18  contracts were meant with regard to the IMD
19  business.
20     Q.    Sir, you do know --
21         Sorry. I didn't mean to cut you off.
22     A.    Because the agreement elsewhere refers
23  to exchange-traded derivatives, because these
24  could well have been swaps or OTC derivatives.
25  I have no idea.

Page 37

1          A. Leitner
2      Q.    You've offered an opinion, sir, that
3   the governing agreements, including the APA, are
4   consistent with Barclays' position in this
5   litigation, haven't you, sir?
6      A.    I did.
7      Q.    And this is one of the governing
8   agreements you have offered an opinion on, sir?
9          MS. BLOOMER: Objection to the form of
10  the question.
11     A.    I offered an opinion about the
12  agreement in the context, as my report states,
13  of all the other relevant facts that were stated
14  in my opinion, yes.
15     Q.    And your opinion, sir, is that the
16  definition of "exchange-traded derivatives" in
17  paragraph D of the purchased assets includes
18  collateral or margins; is that correct?
19         MS. BLOOMER: Objection to the form of
20  the question. Mischaracterizes his
21  testimony. Paragraph D of what agreement
22  are you talking about?
23         MR. OXFORD: The definition of
24  "purchased assets" in the APA.
25         MS. BLOOMER: In the APA?

Page 38

A. Leitner

1
2     Could you refer him to a page number?
3     MR. OXFORD:  Sure.
4  Q.  Page 6, sir.
5  A.  Page 6 of what?
6  Q.  The Asset Purchase Agreement.
7     MS. BLOOMER:  Do you have the question
8  in mind?
9  A.  So what am I --
10 Q.  Your opinion is that paragraph D of
11 the definition of "purchased assets,"
12 particularly the inclusion of the phrase
13 "exchange-traded derivatives," is consistent
14 with Barclays' position in this litigation that
15 the Asset Purchase Agreement conveys to Barclays
16 the margin associated with exchange-traded
17 derivatives; isn't that correct, sir?
18    MS. BLOOMER:  Objection to the form of
19    the question.  You are selectively moving
20    from his testimony.  That mischaracterizes
21    his testimony.
22 A.  It is consistent with my opinion taken
23 together with all the other facts and
24 circumstances referred to in my opinion.
25 Q.  Is it possible, sir, that assets

Page 39

A. Leitner

1
2  primarily related to derivatives contracts in
3  the sense that it is used in paragraph (n) on
4  page 4 is intended to exclude from the purchased
5  assets going to Barclays the margin or other
6  collateral associated with derivatives
7  contracts?
8     MS. BLOOMER:  Objection to the use of
9     the undefined term "derivatives contract"
10    and to the deletion of the language in the
11    middle of assets and derivatives contracts
12    in paragraph (n).
13    THE WITNESS:  I'm sorry, can you
14    repeat the question?
15    (Record read.)
16    MS. BLOOMER:  Objection to the form of
17    the question.
18 A.  It seems to me completely inconsistent
19 with the basic agreement, as I understood it,
20 that various businesses were being transferred
21 from Lehman to Barclays and that the core of
22 those businesses were defined in the included
23 assets.  In the context of this agreement, the
24 IMD business appears to be a business they were
25 not acquiring, and therefore -- and I have no

Page 40

A. Leitner

1
2  idea why they used the word "derivatives," and
3  so I think it is completely irrelevant to any
4  aspect of my report.  But I have formed that
5  opinion because you asked me just now, but
6  that's ...
7  Q.  You didn't --
8  A.  And --
9     Sorry.  Go ahead.
10 Q.  Have you finished your answer, sir?
11 A.  I have.
12 Q.  Safe to say you didn't talk to anybody
13 at Barclays about who negotiated the Asset
14 Purchase Agreement about what they meant by
15 paragraph (n) of the excluded assets when they
16 signed this document, sir?
17    MS. BLOOMER:  Objection to the form of
18    the question and I instruct the witness not
19    to answer to the extent it would require the
20    disclosure of discussions with his attorney.
21    MR. DAKIS:  I'm sorry.  I hate to
22    interject.  He's testifying as an expert
23    today, correct?
24    MS. BLOOMER:  Yes, he is.
25    MR. DAKIS:  Well, to the extent that

Page 41

A. Leitner

1
2  he relied on a conversation with an attorney
3  in forming an opinion in his report, he
4  can't take the privilege.
5     MS. BLOOMER:  I don't think that he --
6     the question is asking whether he relied on
7     what the attorney told him in forming his
8     opinion.  He's asking about whether he
9     talked to an attorney, and there is a
10    stipulation -- let me finish, please.  There
11    is a stipulation in this case that precludes
12    Mr. Oxford from asking questions about
13    discussions that he had with counsel that
14    were separate from any underlying fact, and
15    so the question of whether he spoke with an
16    attorney is potentially calling for
17    information that is beyond what is required
18    to be disclosed and permitted to be asked
19    about in the deposition.
20    MR. DAKIS:  With all due respect, the
21    stipulation only goes to the extent he
22    didn't rely on a discussion with the
23    attorney.
24    MS. BLOOMER:  That's right, and that's
25    why I gave the exception "to the extent."

Page 42

1            A. Leitner
2        MR. DAKIS: We respectfully disagree
3    with your reading of the stipulation and
4    with the instruction. We'll take it up with
5    the judge at another time.
6        MS. BLOOMER: Fine.
7        THE WITNESS: So could you read back
8    the question?
9        (Record read.)
10    A.   I do not recall any such discussion.
11    Q.   It's your opinion, Mr. Leitner, isn't
12    it, that margin is such an important part of
13    this transaction that no rational purchaser of
14    Lehman's exchange-traded derivatives business
15    would agree, in the circumstances in which
16    Barclays purchased that business in September
17    2008, to buy the business without the margin,
18    correct?
19        MS. BLOOMER: Objection to the form of
20    the question.
21    A.   I would refer to my report for the
22    accurate statement, but in general terms, I
23    believe that's my conclusion.
24    Q.   If it's so important to Barclays to
25    get the margin, why wouldn't they make a

Page 43

1            A. Leitner
2    specific reference to the margin in the APA?
3        MS. BLOOMER: Objection to the form of
4    the question. Calls for speculation.
5    A.   It does call for speculation and I
6    can't speculate. I wasn't there, I don't know
7    what was in the minds of the parties, but I have
8    generally taken the view simply as a lawyer that
9    the more expansive and general terms you use the
10    more you intend it to be expansive and general.
11    Q.   You're aware, sir, that Barclays was
12    represented by sophisticated counsel in this
13    matter, correct?
14        MS. BLOOMER: Objection to the form of
15    the question.
16    A.   I believe both sides of this
17    transaction were represented by competent and
18    experienced counsel.
19    Q.   And the counsel that represented
20    Barclays knew how to draft a clause that would
21    expressly convey margin and collateral --
22        MS. BLOOMER: Objection.
23    Q.   -- in a sale document?
24        MR. OXFORD: Please let me finish the
25    question.

Page 44

1            A. Leitner
2    Q.   Correct?
3    A.   I don't mean to be facetious, but I
4    think that under the time pressure that these
5    attorneys were working, they did the best job
6    they could possibly do. So I cannot speculate
7    about whether and why people did not explore
8    every potential avenue that might have been
9    explored or clarified in the APA if you had, for
10    example, a month to do the transaction or even a
11    week.
12        I think, just as a personal comment, I
13    believe both sides did a very good job under
14    very trying circumstances.
15    Q.   In Schedule 1 to your opinion, sir,
16    you set out the documents that you reviewed in
17    forming your opinion, correct?
18    A.   I'm sorry, just --
19        (Record read.)
20    A.   Yes.
21    Q.   And there are over a hundred documents
22    in there, correct, sir?
23    A.   Yes.
24    Q.   In any of those documents that you
25    reviewed did you see a reference to margin or

Page 45

1            A. Leitner
2    collateral associated with exchange-traded
3    derivatives in a document that's dated prior to
4    the Sale Hearing?
5        MS. BLOOMER: Objection.
6    A.   Prior to the Sale Hearing?
7    Q.   Correct.
8        MS. BLOOMER: Do you know specifically
9    when the Sale Hearing was just so that you
10    can answer the question appropriately? I
11    just want to be sure it's a fair question.
12        MR. OXFORD: Sure.
13    Q.   If it helps you answer my question,
14    Mr. Leitner, I will represent to you that the
15    Sale Hearing in this case took place on
16    September 19, 2008.
17        MS. BLOOMER: And the timeframe?
18    A.   Friday?
19    Q.   Friday at around approximately 4 or 5
20    P.M.
21    A.   And so the question was, did I?
22    Q.   Have you seen any documents that are
23    dated prior to the Sale Hearing that so much as
24    reference margin or collateral?
25    A.   Yes.

Page 46

1              A. Leitner
2      Q.   Which documents, sir?
3          And just so we have a clean record,
4   you jumped in a little bit, I understand we're
5   trying to move forward, but my question is have
6   you seen any documents that were dated prior to
7   the Sale Hearing, as I have just explained it to
8   you, that were created by Barclays that
9   specifically reference margin or collateral
10  associated with exchange-traded derivatives?
11     A.   The answer is I believe I -- I believe
12  that I did see such a document.  I do not recall
13  if it referred to any specifics, specific
14  numbers relating to margin, but it may have
15  referred to margin generally and ...
16     Q.   Are you able to identify that document
17  for me, sir?
18     A.   Not by reference number.  Only in
19  general terms.
20     Q.   Give me the best you can in general
21  terms of your description of that document.
22     A.   My recollection was that it was a
23  document either produced by or given to Liz
24  James in connection with their examination of
25  the FCM business of Barclays, which, as I recall

Page 47

1              A. Leitner
2   either from her testimony or in preparation for
3   her declaration, occurred prior to the Sale
4   Hearing.
5      Q.   Perhaps we could leave a space in the
6   transcript and we could identify that document
7   by Bates number.
8          MS. BLOOMER:  I can try to get you --
9   I will get you the Bates number before the
10  end of the day, hopefully after the next
11  break, which by way, we might want to take
12  soon.  It's been over an hour.
13         MR. OXFORD:  Sure.  A couple more
14  minutes to finish this line and then we can
15  take a break.
16         MS. BLOOMER:  Absolutely.
17     Q.   Have you -- withdrawn.  Other than
18  that one document that relates to the futures
19  business, sir, have you seen any documents
20  created by Barclays that reference margin as it
21  relates to exchange-traded derivatives prior to
22  the date of the Sale Hearing?
23         MS. BLOOMER:  Objection.  You said
24  "other than," but you've changed the scope
25  of the question.  Now you're saying

Page 48

1              A. Leitner
2   documents created by Barclays as opposed to
3   just documents created prior to the Sale
4   Hearing?  Did you mean to change the scope?
5   I just want to make sure.
6          MR. OXFORD:  I don't think I did
7   change the scope, but my question is fine.
8          MS. BLOOMER:  Objection to the form of
9   the question.
10     A.   I don't remember.
11         MR. OXFORD:  Now is probably a good
12  time to take a couple of minutes.
13         (Recess; Time Noted:  9:39 A.M.)
14         (Time Noted:  9:52 A.M.)
15  BY MR. OXFORD:
16     Q.   Mr. Leitner, you reviewed Bart
17  McDade's testimony before you wrote your
18  opinion, correct?
19     A.   Yes.
20     Q.   Did you review Bart McDade's testimony
21  about the inclusion of margin in the transaction
22  between Lehman and Barclays?
23         MS. BLOOMER:  Objection to the form.
24     A.   As best I can recall, yes.
25     Q.   How did that affect your opinion, sir?

Page 49

1              A. Leitner
2          MS. BLOOMER:  Objection.  Lack of
3   foundation.
4      A.   As best I can recall, nothing in what
5   I read was inconsistent with the opinions that I
6   was forming.
7      Q.   Did you understand, sir, that Bart
8   McDade was Lehman's chief negotiator of the
9   transaction?
10     A.   Yes.
11     Q.   And you understand that he testified
12  at the Sale Hearing we have discussed earlier?
13     A.   That -- I'm sorry, I didn't hear you.
14  The Sale Hearing what?
15     Q.   That we discussed earlier, you
16  understand Mr. McDade testified at that hearing?
17     A.   Yes.
18     Q.   Do you understand that Mr. McDade
19  participated in all of the negotiations
20  involving the Asset Purchase Agreement?
21         MS. BLOOMER:  Objection to the form of
22  the question.
23     A.   I don't know one way or the other
24  whether he participated in all of the
25  negotiations.

A. Leitner

1
2  Q.    Okay.  Well, I will represent to you
3  that Mr. McDade testified that he did
4  participate in all negotiations concerning the
5  Asset Purchase Agreement.
6       I will also represent to you that he
7  never discussed with anyone the transfer of
8  margin to Barclays under the Asset Purchase
9  Agreement, sir.
10      With those two representations in
11 mind --
12      MS. BLOOMER:  And I'm going to object
13      to the form of the question.
14 Q.    With those two representations in
15 mind, sir, how does that affect your opinion, if
16 at all?
17      MS. BLOOMER:  Object to the form of
18      the question.  I'm going to --
19 A.    Just read the question back again,
20 what was represented.
21      (Record read.)
22 A.    It doesn't affect my opinion.
23 Q.    Why not, sir?
24 A.    As my report states, I reached the
25 opinions expressed there in part because of my

A. Leitner

1
2  understanding that there was a transfer of
3  business involved that included exchange-traded
4  derivatives, and that it would not, at the time
5  of the inception of the transaction, been
6  necessary to more precisely define what was
7  involved in the business unless you really
8  wanted to be specific about something.
9       So, for example, there is no reference
10 in the excluded asset category to margin at all,
11 so presumably one could say that the fact that
12 there wasn't any reference to the transfer of
13 margin, the Lehman side just as easily as the
14 Barclays side could have dealt with that
15 explicitly if they wished to.  I don't believe
16 it was necessary for them to explicitly deal
17 with it, and so the answer is I don't see that
18 his failure to specifically bring it up has any
19 impact on my opinion.
20 Q.    Not Mr. McDade's failure to bring it
21 up.  He never discussed with anybody for
22 Barclays the inclusion of margin in the deal as
23 reflected in the APA, sir.  Does that, with that
24 representation in mind, does that affect your
25 opinion?

A. Leitner

1
2  A.    No.
3       MS. BLOOMER:  Objection.  Asked and
4       answered.
5  A.    Could we just pause for a second
6  because I'd like to correct a statement that it
7  occurred to me that when you were asking in a
8  line of questioning at the beginning of this
9  deposition about transfer of customers?
10 Q.    Sure.
11 A.    Just to make clear that I was
12 certainly aware that in connection with the
13 transfer of the FCM business, that is, the
14 futures business, that that was a customer
15 business, and to the extent that they took on
16 that business, obviously all of the FCM
17 customers were included, other than those that
18 might have decided on their own to go somewhere
19 else.  I think we only focused on the securities
20 options side.
21 Q.    Are you able to identify for me, sir,
22 a single businessperson who on behalf of Lehman
23 agreed to provide Barclays with the margin or
24 collateral associated with exchange-traded
25 derivatives?

A. Leitner

1
2  A.    My report states, and my opinion is,
3  that the agreement to transfer the entire
4  businesses that are referred to in the agreement
5  that included the exchange-traded derivatives
6  aspect of those businesses and the business
7  itself necessarily comprised the assets
8  necessary to conduct those businesses, which
9  would have included the assets deployed to
10 secure the positions, and that it was, as I
11 state in my opinion, in Lehman's interest to do
12 that because the failure to do it would have
13 exposed Lehman to huge risks and to the SIPA
14 Trustee for that matter.
15      So whether it was -- so, anyway,
16 that's my opinion.
17 Q.    Is it correct, sir, that you're not
18 able to identify for me a single businessperson
19 who on behalf of Lehman specifically agreed that
20 Barclays should, in addition to the
21 exchange-traded derivatives, get the margin or
22 collateral that was related to those
23 derivatives, yes or no?
24      MS. BLOOMER:  Objection to the form of
25      the question.

Page 54

A. Leitner

1
2      A.   I'm not aware of anyone on the Lehman
3   side who, based on any testimony I've seen, that
4   drilled down to that level of detail in
5   connection with the APA.
6      Q.   Does that conclude your answer, sir?
7      A.   Yes.
8      Q.   Can you answer this question yes or
9   no:  Are you able to identify for me, sir, any
10  businessperson who on behalf of Lehman
11  specifically agreed that Barclays, in addition
12  to the exchange-traded derivatives, would get
13  the collateral or margin associated with those
14  exchange-traded derivatives?
15     A.   When?
16        MS. BLOOMER:  Objection to the form of
17  the question.
18     Q.   At any time.
19        MS. BLOOMER:  Objection to the form of
20  the question.
21     A.   I cannot identify any specific Lehman
22  person.
23     Q.   Can you have the Asset Purchase
24  Agreement in front of you, sir?
25     A.   Can I just complete my answer?

Page 55

A. Leitner

1
2        I just want to -- I'm not sure that
3   your timeframe -- I want to make sure I
4   understood the timeframe because my answer
5   related to the Asset Purchase Agreement.  There
6   were subsequent developments that clearly
7   confirm what I view was the intent of the
8   parties to transfer all of the collateral, and
9   that includes the signing of the asset -- of the
10  assignment and transfer agreement, or whatever
11  it was called, with OCC and, you know, other
12  developments.
13        So I'm only talking in terms of not
14  knowing whether anybody at Barclays specifically
15  agreed to it to the negotiations relating to the
16  APA.
17        MR. OXFORD:  Can you read back, Kathy,
18     my question that begins "can you answer this
19     question yes or no," please?
20     (Record read.)
21        MS. BLOOMER:  Objection to form and
22  asked and answered.
23     A.   I cannot identify the Barclays
24  businessperson.
25        MS. BLOOMER:  I think you mean Lehman.

Page 56

A. Leitner

1
2      A.   I'm sorry, I do that from time to
3   time.  I mean the -- thank you for correcting
4   me -- anyone, any businessperson on the Lehman
5   side.  I don't mean to imply that there wasn't,
6   but I can't identify.
7      Q.   Can you identify a businessperson on
8   the Barclays side who, on behalf of Barclays,
9   specifically agreed with Lehman that Barclays,
10  in addition to the exchange-traded derivatives,
11  would also get the collateral and margin
12  associated with those exchange-traded
13  derivatives?
14        MS. BLOOMER:  Objection to form.
15     Objection to the form of the question.
16     A.   I can't identify who on the Barclays
17  side were the primary negotiators of the
18  documents, so the answer is no, I can't identify
19  any such person.
20     Q.   With the APA in front of you, sir,
21  could you turn to page 6?  Do you have that in
22  front of you, sir?
23     A.   Yes.
24     Q.   Do you see that paragraph D of the
25  purchased assets includes government securities,

Page 57

A. Leitner

1
2   commercial paper or corporate debt, corporate
3   equity, exchange-traded derivatives, and
4   collateral short-term agreements with a book
5   value as of the date hereof of approximately $70
6   billion, do you see that?
7      A.   I do.
8      Q.   Those are defined collectively as the
9   long positions, do you see that, sir?
10     A.   Yes.
11     Q.   And if you turn to page 12 --
12  actually, initially, to page 11, you see there's
13  a definition of "assumed liabilities" in
14  paragraph 2.3?
15     A.   Yes.
16     Q.   Do you see that over the page on page
17  12, subclause "i" of 2.3, includes as assumed
18  liabilities or short positions and repos
19  relating to any securities or interests of the
20  types included in the definition of "long
21  positions" with a book value as of the date
22  hereof of approximately $69 billion, do you see
23  that?
24     A.   Yes.
25     Q.   "Collectively, short positions, and

Page 58

A. Leitner

1     A. Leitner
2   together with long positions, the positions."
3   Do you see that, sir?
4       A.   Yes.
5       Q.   With that in mind, can you turn to
6   paragraph 24 of your report, please?
7           (Exhibit 653, a document bearing Bates
8       Nos. BCI-EX-(S)-00074256 through 57, marked
9       for identification, as of this date.)
10      A.   Okay.
11      Q.   I've handed you, sir, what I have
12  marked as Exhibit 653, sir.  Do you see that
13  that is the document you reference in paragraph
14  24 of your report?
15          MS. BLOOMER:  Paragraph 24?
16          MR. OXFORD:  Paragraph 24.
17      A.   Okay.
18      Q.   Is that correct?
19      A.   Yes.
20      Q.   And in paragraph 24, you make a
21  reference to the long positions and short
22  positions in Lehman's corporate equity
23  inventory --
24      A.   Yes.
25      Q.   -- as of September 15, do you see

Page 59

1     A. Leitner
2   that?
3       A.   Yes.
4       Q.   If you look at the attachment to
5   Exhibit 653, that's the source for your numbers
6   in paragraph 24, correct?
7       A.   Yes.
8       Q.   And based on the e-mail that is at
9   Bates 74256, would you agree that this was the
10  balance sheet that Barclays was attempting to
11  tie out to?
12          MS. BLOOMER:  Objection to the form of
13      the question.
14      A.   Could you explain what you mean by
15  "tie out to"?
16      Q.   Yes, there's a reference on the first
17  page of the e-mail in the e-mail from Jasen Yang
18  to James Walker.  The subject is "LBI Balance
19  Sheet Tie-Out."  Do you see that?
20          MS. BLOOMER:  The question is do you
21      see that?
22          MR. OXFORD:  Yes.
23      A.   Okay, what's the question?
24      Q.   Do you see the subject line, "LBI
25  Balance Sheet Tie-Out"?

Page 60

1     A. Leitner
2       A.   Yes.
3       Q.   And do you see Mr. Yang writes, "This
4   is the balance sheet summary I'm trying to tie
5   out to"?
6       A.   Yes, I see that reference.
7       Q.   Does that suggest to you, sir, that
8   Barclays is trying to tie back the assets they
9   are purchasing to the balance sheet that's
10  attached to this e-mail?
11          MS. BLOOMER:  Object to the form of
12      the question and foundation.
13      A.   I don't know what they were doing.
14      Q.   Okay.  Let's try it this way, sir.
15  Your opinion is, at paragraph 24, that as of
16  September 15, 2008 LBI's corporate equity
17  inventory appears to have included long
18  positions worth approximately $8.4 billion and
19  short positions worth approximately $6.3
20  billion, correct?
21      A.   Yes.
22      Q.   And the basis for your opinion, sir,
23  is the spreadsheet that I marked as Exhibit 653,
24  correct?
25      A.   Yes.

Page 61

1     A. Leitner
2       Q.   Is it reasonable, then, to conclude
3   that LBI's derivatives inventory as of the same
4   date is approximately 4.8 billion long positions
5   and 4.5 billion short positions?
6           MS. BLOOMER:  Objection to the form of
7       the question and foundation.
8       A.   No, I don't think it's possible to
9   conclude that.  I look at the document as being
10  a part of the confusion surrounding exactly what
11  was going to be coming over to Barclays.  The
12  purpose of paragraph 24, in my opinion, is to
13  provide some idea of the size in dollar terms of
14  the equity book that they thought they were
15  getting.  That's the purpose of paragraph 24.
16      Q.   Okay.  And the basis for that, again,
17  is Exhibit 653, correct?
18      A.   Yes.
19      Q.   So wouldn't Exhibit 653 also give some
20  idea of the derivatives book that was also going
21  to Barclays?
22          MS. BLOOMER:  Objection to the form of
23      the question and mischaracterizes the
24      document and the vague use of the term
25      "derivatives."

Page 62

A. Leitner

1    A.   I can't answer that.  I don't know
2  what the word "derivatives" meant in the context
3  of this particular report.  I don't know whether
4  it included only the exchange-traded derivatives
5  or OTC derivatives as well.
6        I think there was some confusion at
7  various points in time as to whether or not
8  information provided by Lehman to Barclays
9  included or didn't include OTC options.  By
10 "OTC" I mean over-the-counter or privately
11 negotiated options as opposed to the
12 exchange-traded derivatives.
13       So I cannot answer whether there is
14 any -- whether this document is a fair
15 representation of what the exchange-traded
16 derivatives book looked like, and as I said, I
17 wasn't using those numbers for any purpose in
18 this report other than to try to give the sense
19 of the size, overall size, of the book and the
20 exposures because I felt that was relevant.
21    Q.   Do you know, sir, one way or the other
22 whether the figures for derivatives in Exhibit
23 653 include margin and other collateral related
24 to derivatives?

Page 63

A. Leitner

1    A.   No, I do not know.
2    Q.   If those figures did not include
3  margin on collateral related to derivatives,
4  would that support the conclusion that margin
5  was not conveyed to Barclays under the Asset
6  Purchase Agreement?
7    A.   This document doesn't support any such
8  conclusion one way or the other.  This document
9  is only relevant to a point in time where the
10 Barclays people were trying to understand what
11 it all meant, as far as I can tell from the
12 correspondence.
13   Q.   Mr. Leitner, I'm handing you what has
14 previously been marked as Exhibit 19 in these
15 depositions.  You've seen that document before,
16 haven't you, sir?
17   A.   Looks familiar.
18   Q.   In fact, you include it in the list of
19 documents that you reviewed to prepare for your
20 report, correct?
21   A.   Yes.
22   Q.   Can you tell me what you understand
23 that to be?
24   A.   It's one of the balance sheet

Page 64

A. Leitner

1  snapshots that the parties were dealing with.  I
2  believe it was prepared by Lehman for Barclays.
3    Q.   You read Mr. Berkenfeld's testimony as
4  part of your presentation for your report,
5  correct?
6        MS. BLOOMER:  Objection to the form of
7  the question.
8    A.   I looked at it, yes.
9    Q.   Did you look at Mr. Berkenfeld's
10 testimony on Exhibit 19?
11   A.   I have no specific recollection of
12 doing that.
13   Q.   Do you understand that Mr. Berkenfeld
14 testified that Exhibit 19 was intended to
15 explain the assets that were conveyed under the
16 APA?
17       MS. BLOOMER:  Objection to the form of
18 the question.
19   A.   I don't -- I don't recall enough of
20 his testimony to be able to say one way or the
21 other whether that's what he said or did.  I
22 just don't, don't -- I've read so many things in
23 connection with this transaction, so ...
24   Q.   There have been a lot of depositions,

Page 65

A. Leitner

1  that's for sure.  Yours is now being added to
2  that pile.
3        I will represent to you for the next
4  series of questions, sir, that Mr. Berkenfeld
5  did so testify, that Exhibit 19 was intended to
6  explain the assets conveyed to Barclays under a
7  the APA.  Do you understand that representation?
8        MS. BLOOMER:  I'm going to object to
9  the representation, Neil.  There are a lot
10 of things that Steve Berkenfeld may have
11 said about this document.  Your
12 representation as to one of them, without
13 having had the opportunity for Mr. Leitner
14 to review all of the testimony about this,
15 does not necessarily make for a fair
16 representation of the questioning.
17       MR. OXFORD:  I don't think we need to
18 derail the deposition for this, but I will
19 represent that Mr. Leitner included Schedule
20 1 as part of his reliance materials of Mr.
21 Berkenfeld's deposition.
22       MS. BLOOMER:  That's right, but he has
23 not represented that he read cover to cover
24 of the deposition, and you can ask him if he

Page 66

```
 1              A. Leitner
 2    did, as I think you already have, and he
 3    said he didn't.
 4    Q.   Do you understand that represent --
 5         MR. DAKIS:  That mischaracterizes Mr.
 6    Leitner's testimony.
 7         THE WITNESS:  Well, let me state for
 8    the record that I did not read Mr.
 9    Berkenfeld's deposition cover to cover.
10         MR. OXFORD:  Can you just read back my
11    representation so we can make some progress
12    here, Kathy?
13         (Record read.)
14    A.   I understand the representation.
15    Q.   On Exhibit 19, sir, you see there's a
16    line item for "Derivatives" under "Assets"?
17    A.   Yes.
18    Q.   And you see that there's a line item
19    for "Derivatives" also under "Liabilities"?
20    A.   Yes.
21    Q.   And that the entries under both assets
22    and liabilities for derivatives is 4.5?
23    A.   Yes.
24    Q.   And you understand that, sir, to be a
25    reference to $4.5 billion, correct?
```

Page 67

```
 1              A. Leitner
 2         MS. BLOOMER:  Objection to the form of
 3    the question.
 4    A.   I have always assumed that.  If you
 5    represent to me that that's what it was, then it
 6    confirms my assumption.
 7    Q.   I will so represent.
 8         Do you have any basis, sir, to believe
 9    that margin is included within the 4.5 billion
10    on either side of the balance sheet for the
11    "Derivatives" line item on Exhibit 19?
12         MS. BLOOMER:  Objection to the form of
13    the question and beyond the scope of the
14    expert's report.
15    A.   This document doesn't tell me anything
16    one way or the other about the category in which
17    collateral may have been accounted for in the
18    balance sheet.
19    Q.   Are there other categories in Exhibit
20    19, sir, that you believe might encompass margin
21    or collateral related to derivatives?
22         MS. BLOOMER:  Objection to the form of
23    the question.  Calls for speculation.
24    A.   I have no idea.
25    Q.   Did you do anything, sir, to determine
```

Page 68

```
 1              A. Leitner
 2    whether or not margin was included in the 4.5
 3    billion of assets and liabilities associated
 4    with derivatives on Exhibit 19?
 5    A.   No.
 6    Q.   Did you ask Barclays for the data
 7    underlying this balance sheet, sir?
 8         MS. BLOOMER:  Objection.  Assumes
 9    facts not in evidence.
10    A.   I did not ask any person at Barclays
11    to explain what they thought this meant.
12    Q.   That's not quite my question, sir.  I
13    asked whether you asked Barclays for the data
14    that's underlying the spreadsheet, particularly
15    the data that underlies the entries for
16    derivatives under the "Assets" and the
17    "Liabilities" columns?
18         MS. BLOOMER:  Object to the form of
19    the question and, again, to the fact that it
20    assumes facts not in evidence.
21    A.   Sorry, just read back the question.
22    I'm going to be --
23         (Record read.)
24    A.   No, I did not ask Barclays for that
25    data.
```

Page 69

```
 1              A. Leitner
 2    Q.   Do you agree, sir, with the
 3    representation as to Mr. Berkenfeld's testimony
 4    in mind, do you agree, sir, that if these
 5    numbers 4.5 for liabilities and assets in the
 6    "Derivatives" line item of Exhibit 19 did not
 7    include margin, that would support the
 8    conclusion that margin was not included in the
 9    Asset Purchase Agreement?
10         MS. BLOOMER:  Objection to the form of
11    the question and to the representation.  It
12    does not cover all of Mr. Berkenfeld's
13    testimony about this schedule.
14    A.   No.
15    Q.   Why not, sir?
16    A.   Because it doesn't say anything about
17    the ever-changing disposition of assets by
18    Lehman Brothers to cover the margin requirements
19    at the clearing house for both customers and the
20    firm proprietary positions.  So any portion of
21    these assets may have been deployed in
22    supporting those obligations together with, you
23    know, indirect support, such as letters of
24    credit.
25    Q.   You'll notice, sir, that the entries
```

Page 70

A. Leitner

1  under "Assets" and "Liabilities" for derivatives
2  balance, do you see that?
3
4      A.   I see it.
5      Q.   Assuming those figures are to be
6  correct, sir, as of the date of this schedule,
7  and assuming that they represent long and short
8  derivatives positions but not margin, in your
9  opinion, sir, would it be irrational for a
10 purchaser such as Barclays to buy the long and
11 short derivatives positions without the margin?
12     MS. BLOOMER:  Objection to the form of
13 the question and assumes facts not in
14 evidence.
15     A.   This transaction was so unique in
16 circumstances that were themselves unique that I
17 simply refuse to speculate about a different set
18 of scenarios that weren't present here.
19     My understanding from the Barclays
20 side is that they had serious doubts as to
21 whether any of these numbers were accurate.
22 So -- nor is it clear to me that a transaction
23 that involved essentially taking over businesses
24 and a bunch of assets and liabilities,
25 particularly in the derivatives side associated

Page 71

A. Leitner

1  with those businesses, could possibly be done
2  based on a snapshot at any given point in time
3  given the volatility in the marketplace that
4  changed the value of any of these component
5  pieces by significant size from hour to hour and
6  given the activity in the marketplace that was
7  happening with regard to those assets, as I
8  state in my report, in terms of how they were
9  being depleted.
10     So I simply cannot make any conclusion
11 about the relevance of this document to the
12 transaction much less in a hypothetical that,
13 you know, does not reflect all of the facts and
14 circumstances of this crazy situation.
15     Q.   I understand, sir, that you may not
16 agree with my hypothetical, but you still have
17 to answer the question.
18     A.   Well, I would --
19     MS. BLOOMER:  He's answered the
20 question, Neil, as best he can.  Do you have
21 a different question?
22     MR. OXFORD:  I have the same question.
23 I would like him to --
24     A.   You referred earlier to paragraph 94
25

Page 72

A. Leitner

1  of my report.  The paragraphs both before and
2  after deal with potential scenarios not present
3  here in which the parties could have done
4  something different than what I believe happened
5  here, and that's the best I can do in responding
6  to this type of line of questions.
7      So what I would say is that, given
8  perfect facts, plenty of time, and an ability
9  for a snapshot to be meaningful, the parties
10 could have explicitly determined to do something
11 with the collateral securing these positions
12 other than what they actually agreed to do and,
13 indeed, in the case of the OCC margin, did,
14 which was to move it all to Barclays.
15     Q.   So your opinion, sir, is it would not
16 be irrational if long derivatives positions were
17 equal in value to the long derivatives -- the
18 short derivative liabilities for Barclays to
19 purchase those derivative assets and liabilities
20 without the margin associated with those
21 derivatives?
22     MS. BLOOMER:  I object to the form of
23 the question and it completely
24 mischaracterizes his testimony.
25

Page 73

A. Leitner

1      A.   The problem with this balance sheet
2  and the problem with the derivatives business
3  that they were taking over is that the exposures
4  on the clearing business that Barclays took over
5  from Lehman was not solely related to the
6  proprietary positions that would be reflected on
7  this balance sheet.
8      This is an asymmetric risk that they
9  were assuming.  Let's be very clear about that.
10 And I tried to make it clear in the report that
11 what Barclays was doing for Lehman and for the
12 SIPA Trustee was to take on a package of unknown
13 and unquantifiable exposures on the day of the
14 closing that related to more than the
15 proprietary positions.
16     This balance sheet statement, as far
17 as I can see, relates only to the proprietary
18 positions of Lehman.  But Lehman took on --
19 Barclays took on every single risk associated
20 with the clearing business that they took on.
21 And so when we talk about the collateral
22 securing those exposures, we are talking about
23 collateral securing more than the exposures on
24 the proprietary business.  Clear?
25

Page 74

```
                A. Leitner
 1
 2    Q.   Very clear.
 3         Leaving aside the exposures on the
 4   customer side, do you agree that if the data in
 5   Exhibit 19 relating to derivatives is accurate,
 6   by which I mean there's 4.5 billion of long
 7   derivatives positions and 4.5 billion of short
 8   derivatives positions, would it be irrational
 9   for Barclays to have agreed to purchase those
10   assets and liabilities without the margin
11   associated with those derivatives contracts?
12         MS. BLOOMER: Objection.  Assumes
13   facts not in evidence.
14    A.   Let me tell you again -- I cannot give
15   you a yes or no answer to that question because
16   I cannot see any abstract situation where
17   parties would be acquiring only a bunch of
18   derivative positions without the related assets
19   and liabilities and books of business that came
20   along with them.
21         So your hypothetical is simply not a
22   real-world hypothetical that I can answer other
23   than based on my experience in the business.  It
24   would never happen, and therefore, I simply
25   refuse to give a hypothetical answer to a
```

Page 75

```
                A. Leitner
 1
 2   situation that I don't think would ever be true
 3   in the real world.
 4    Q.   In your opinion, sir, was Barclays
 5   acquiring the book of business that went along
 6   with the exchange-traded derivatives portfolio
 7   that Lehman had for its proprietary business?
 8    A.   As I understood the APA, they were
 9   acquiring a capital markets business, a
10   brokerage business, and the exchange-traded
11   derivatives, which, upon analysis, is
12   essentially a clearing operation, as well as --
13   I mean, it's a general term to define a whole
14   bunch of things that were going on.
15         So the exchange-traded derivatives are
16   both an independent business and an ancillary
17   support operation to the other businesses that
18   they were acquiring and that presumably Barclays
19   wished to continue.
20    Q.   Can you turn to paragraph 63 of your
21   report, please, sir.  Do you have it there, sir?
22    A.   Yes, I do.
23    Q.   Is it your opinion that many of the
24   securities that -- withdrawn.  Is it your
25   opinion, sir, that many of the equity securities
```

Page 76

```
                A. Leitner
 1
 2   that Barclays was purchasing under the Asset
 3   Purchase Agreement were hedged by or hedged
 4   derivatives positions that Barclays was also
 5   buying under the APA?
 6         MS. BLOOMER: Objection to the vague
 7   use of the term "derivatives."
 8    A.   My understanding relating only to that
 9   portion of the exchange-traded derivatives that
10   related to the proprietary trading operations of
11   Lehman was that the positions were put on for a
12   variety of reasons and strategies, some of which
13   involved hedging of equity-related positions of
14   one sort or another that to some extent
15   included, or could have included,
16   over-the-counter transactions, as well as long or
17   short equity positions.
18         I have to emphasize that we're talking
19   about long and short options that relate to both
20   long and short equity positions.
21    Q.   You say in paragraph 63, sir, that,
22   "Subsequent to the signing of the APA, the
23   exchange-traded derivatives assets and
24   liabilities were constantly changing, as was the
25   portfolio of equity securities that Barclays had
```

Page 77

```
                A. Leitner
 1
 2   originally intended to acquire."  Do you see
 3   that, sir?
 4    A.   Yes.
 5    Q.   And you say that many of those equity
 6   securities hedged or were hedged by the
 7   exchange-traded derivatives, is that correct,
 8   sir?
 9    A.   Yes.
10    Q.   Do you have any idea, sir, of the
11   extent to which the exchange-traded derivatives
12   portfolio hedged Lehman's equities positions?
13   And my question specifically relates to the
14   exchange-traded derivatives positions and equity
15   security positions that Barclays intended to buy
16   under the APA.
17    A.   When?
18    Q.   As of the date of the APA, which is
19   September 16, 2008.
20    A.   I have no idea.  I don't think Lehman
21   had any idea and I certainly know that Barclays
22   didn't have any idea.
23    Q.   But you know some of those equity
24   positions that Barclays was intending to buy
25   under the APA were hedged by derivative
```

Page 78

A. Leitner

1
2    positions, exchange-traded derivative positions,
3    that Barclays also intended to buy under the
4    APA, correct?
5        A.    My understanding is that, as paragraph
6    63 says, they were constantly changing.  Why
7    were they constantly changing?  They were
8    constantly changing because to some extent the,
9    as I state elsewhere in the report, some of the
10   long positions were being financed and they
11   disappeared because the other side would close
12   the transactions out or the shorts were closed
13   out.  Shorts would be difficult to transfer
14   under any circumstances, even though that was
15   the intent of the parties.  But so that the
16   degree to which the positions were hedged at any
17   given point in time were difficult, if not
18   impossible, to determine.  That's my
19   understanding of the facts.
20       Q.    Leaving aside the question of degree,
21   sir, you do know that there was some hedging of
22   positions, specifically, the long equity
23   positions and the exchange-traded derivatives
24   positions in the book of business that Barclays
25   was intending to buy under the APA?

Page 79

A. Leitner

1
2        A.    Yes.
3        Q.    Where an exchange-traded derivative
4    position is hedged by an equity position, sir,
5    does that increase or decree the risk to the
6    holder of those positions?
7        A.    In a hypothetical sense, it decreases
8    the risk.
9        Q.    So if Barclays were to purchase both
10   sides of that hedge, the derivatives position
11   and the equities position that hedges that
12   derivatives position, the risk to Barclays is
13   limited in those circumstances, correct?
14           MS. BLOOMER:  Objection to the form of
15       the question.
16       A.    Well, sounds like we're going back to
17   paragraph 94 of my opinion, which describes a
18   situation where, with respect to the proprietary
19   books of business, assuming that everything was
20   coming over and you could anticipate and expect
21   that, that you could at least determine for that
22   aspect of the exposures you were taking on what
23   the potential risk would be.
24           But let me emphasize again that the
25   risks were asymmetric because Barclays was

Page 80

A. Leitner

1
2    taking on risks both for customer positions and,
3    as it turned out, for affiliate positions in the
4    clearing sense for which it had no hedges.
5        Q.    I understand that, sir.  My questions
6    are just related to the propriety positions that
7    Barclays was purchasing.
8        A.    Right, but just -- I'm -- I want to be
9    as clear as I possibly can in the context of my
10   report that I did not in my report attempt to
11   distinguish in terms of the clearing risks that
12   Barclays was assuming between -- and, therefore,
13   the reason for why I conclude that it was
14   rational for them only to take on those risks
15   together with the collateral solely based on
16   their desire to acquire the proprietary
17   positions.
18       Q.    If Barclays purchases from Lehman both
19   the exchange-traded derivatives position and the
20   equity position that hedges that derivatives
21   position, does it also need the margin
22   associated with that derivatives position to
23   cover its risk?
24           MS. BLOOMER:  Objection to the form of
25       the question.

Page 81

A. Leitner

1
2        A.    I believe paragraph 94 answers that
3    question in substance.  If not paragraph 94
4    alone, then certainly paragraphs both prior to
5    and preceding that.
6           In a perfect world, with knowledge of
7    the full facts, which frankly neither party to
8    this transaction appears to have had, of the
9    accurate facts, by the way, the parties could
10   have negotiated a different deal than the one I
11   believe they negotiated.
12           MR. OXFORD:  Can you read back my
13       question, please?
14           (Record read.)
15           MS. BLOOMER:  And again, I object and
16       it's asked and answered.
17       A.    If the acquisition of this business
18   were the subject of specific detailed
19   negotiation, the parties would have dealt with
20   the business, this subset of the business
21   holistically.  That's not our case.  So you're
22   asking me a hypothetical question, which is not
23   these facts, and so the answer is, if that were
24   possible, could it have been done?  The answer
25   is, well, sure.  But there is no question that

Page 82

1              A. Leitner
2  those facts did not exist in this case in any
3  way, shape or form at any time.
4      Q.   Can you turn to paragraph 99 of your
5  report, please, sir?
6      A.   9, sorry?
7      Q.   99.
8      A.   Okay.
9      Q.   Do you have it there, sir?
10     A.   I do.
11     Q.   You're referring in paragraph 99 to
12 the timeframe of September 19, correct?
13     A.   Yes.
14     Q.   And you say on page 48 that, "The one
15 thing that was virtually certain by this time
16 was that the vast majority -- and perhaps the
17 entirety -- of the exchange-traded derivatives
18 were essentially naked exposures.  That is,
19 Barclays had no assurance it was acquiring (and
20 in most instances, knew that it was not
21 acquiring) the other side of these positions."
22     Do you see that, sir?
23     A.   Yes.
24     Q.   And you go on in paragraph 100 to say
25 that, "In short, the circumstances as they

Page 83

1              A. Leitner
2  existed to the ends of the week of September 15,
3  made it not just reasonable, but imperative that
4  Barclays acquire all of the collateral held in
5  respect of LBI's various ETD accounts."
6      A.   Right.  I see that.
7      Q.   Is it your opinion, sir, that it was
8  imperative that Barclays acquire all of the
9  collateral held in respect of LBI's various ETD
10 accounts at the beginning of the week of
11 September 15?
12     MS. BLOOMER:  I'm going to, before he
13 answers, object to the fact that you read
14 certain pieces of the paragraph while
15 clearly skipping a couple of sentences, and
16 I would encourage the witness to read the
17 entire paragraph before he answers your
18 question.
19     Q.   Mr. Leitner, you should at all times
20 feel free to read any part of any document that
21 I put in front of you, including your own report
22 that you wrote.
23     A.   My opinion has always been based upon
24 the conclusion that, from Barclays' side, they
25 were supposed to get all of the collateral

Page 84

1              A. Leitner
2  securing the derivatives exposures from the
3  beginning of the transaction.
4      Let me be clear that the reason I
5  reached that conclusion is because anyone
6  rationally looking at the -- what they knew
7  about the derivatives business and what they
8  would be taking on was a set of clearing
9  exposures that, without regard to the nature of
10 the proprietary positions, would have only
11 protected them from unquantifiable loss if they
12 took on at least whatever margin was there
13 because they wouldn't know at that time even
14 whether they would have to put up more.  So, at
15 the very least, they would want to get whatever
16 was there and that that had to be true from the
17 beginning.
18     So my point in paragraph 99 and 100 is
19 that, by the end of the week, all the risks that
20 could be anticipated in fact happened.
21     MR. OXFORD:  Can you read back my
22 question?
23     (Record read.)
24     A.   I guess I could have just said yes.
25     MS. BLOOMER:  When you're ready for a

Page 85

1              A. Leitner
2  break, we've been going about an hour.
3      MR. OXFORD:  We can take five minutes.
4      (Recess; Time Noted:  10:52 A.M.)
5      (Time Noted:  11:02 A.M.)
6  BY MR. OXFORD:
7      Q.   You can have the Asset Purchase
8  Agreement in front of you, and then also let --
9      A.   Yes, sir.
10     Q.   I'm going to hand you one other
11 document that you have seen before that is the
12 Clarification Letter in this case that has
13 previously been marked as Exhibit 25.
14     You've seen the Clarification Letter
15 before, sir?
16     A.   Yes.
17     Q.   Do you see that in paragraph 1(A)(ii),
18 the Clarification Letter changes the definition
19 of "purchased assets"?
20     A.   Okay.
21     Q.   And specifically, it changes the
22 definition of "purchased assets" as defined in
23 the Asset Purchase Agreement that we were
24 looking at earlier, do you see that?
25     A.   I've read it.  I see what it says.  I

Page 86

1        A. Leitner
2   wouldn't characterize it, but, you know, it says
3   what it says.
4       Q.   Would you disagree with my
5   characterization?
6       A.   That it -- that --
7       Q.   That paragraph 1(A)(ii) changes the
8   definition of "purchased assets" as that
9   definition was reflected in the Asset Purchase
10  Agreement?
11          MS. BLOOMER:  Objection to form.
12      A.   I mean, look, not to be a pain here,
13  but it says what it says, and with regard to
14  specific clauses in the original agreement, it
15  says, you know, it -- the point is I don't know
16  the extent to which it actually changes those
17  clauses or changes the whole thing, but I'll
18  accept for purposes of moving forward here that,
19  yes, it does change the definition of "purchased
20  assets."  So ...
21      Q.   Thank you.  And it includes in that
22  definition of "purchased assets" on page 2 after
23  capital C, "exchange-traded derivatives," and in
24  parens, "and any property that may be held to
25  secure obligations under such derivatives,"

Page 87

1        A. Leitner
2   close parens, "and collateralized short-term
3   agreements," yes?
4       A.   I see what it says.
5       Q.   Do you understand the Clarification
6   Letter, in particular that clause that I just
7   read, to reflect the agreement of Lehman and
8   Barclays with respect to the transfer of
9   exchange-traded derivatives?
10          MS. BLOOMER:  Objection to form.
11      A.   I'd like to read the whole paragraph
12  to myself again just to refresh my recollection,
13  and I'd like to -- sorry, I mean read the whole
14  section, so ...
15      Q.   Yes, please do.
16          (Document review.)
17          MS. BLOOMER:  Object to the form of
18  the question.
19          (Discussion off the record.)
20      A.   Okay.  I've read the whole thing now.
21  Thank you.
22          MS. BLOOMER:  The whole agreement
23  again?
24          THE WITNESS:  No, no, I read the whole
25  Section 1 --

Page 88

1        A. Leitner
2          MS. BLOOMER:  Because the question
3   asks you about the agreement.  And maybe
4   that's why I'm objecting, just for the
5   record.
6       A.   Okay, sorry.  The point I was making
7   is that I asked for a pause so I could read
8   Section 1 of the Clarification Letter, which I
9   have now read.
10      Q.   Okay.  Great.
11          MR. OXFORD:  Can you read back,
12  please, Kathy, my question that begins "do
13  you understand"?
14          (Record read.)
15      A.   I read it in the context of the entire
16  paragraph that begins by saying, "The purchased
17  assets means all of the assets of seller used
18  primarily in the business or necessary for the
19  operation of the business," and then clause 2,
20  so that's the -- that's the basis on which I
21  understand that.
22          So I take it in context, and in that
23  regard, yes, I think it refers to the
24  exchange-traded derivatives and reflects what
25  the parties' continuing understanding to be with

Page 89

1        A. Leitner
2   regard to them.
3       Q.   Okay.  Thank you.  Could you also
4   direct your attention, sir, to paragraph 3 of
5   the Clarification Letter, sir.  It's on page 3,
6   and it's titled "Assumed and Excluded
7   Liabilities."
8       A.   Okay.
9       Q.   Do you see four lines up from the
10  bottom of the paragraph it reads, "Consistent
11  with the other provisions of this letter, no
12  liabilities described in Clause (i) of the
13  definition of assumed liabilities shall be
14  'assumed liabilities.'"  Do you see that, sir?
15      A.   Yes.
16      Q.   And if you could turn to the APA and
17  page 12, could you review Clause 2.3(i) and tell
18  me whether you agree that the Clarification
19  Letter does not require Barclays to assume any
20  liabilities for Lehman's exchange-traded
21  derivatives?
22          MS. BLOOMER:  I object to the extent
23  that the witness is not here to interpret
24  the agreement for you, but if you can
25  answer.

Page 90

A. Leitner

1
2    A.   So what's the question?
3       (Record read.)
4    A.   Well, you know, I'm -- I don't want to
5  try to interpret this contract, but, you know,
6  my understanding has always been that the
7  parties agreed that the exchange-traded
8  derivatives clearing operation would be assumed
9  by Barclays, and in fact, it was assumed by
10  Barclays, and so if there is an inconsistency in
11  the language, in fact, Barclays took on all
12  those responsibilities and liabilities, which
13  seems consistent with the paragraph that we read
14  first in the -- and certainly consistent with
15  what I understood the agreement to be.
16       If I were interpreting this, you know,
17  I guess I would say that, you know, in fact the
18  short positions are difficult to transfer and
19  so -- the short positions of securities, where
20  you have to borrow in order to make a delivery.
21  So I'm not -- I wasn't the lawyers, I wasn't
22  involved in this, but if I were to guess, that's
23  what I would assume they meant.
24    Q.   Is it your testimony, sir, that as you
25  interpret the Clarification Letter to the best

Page 91

A. Leitner

1
2  of your ability, you believe that liability for
3  the short positions in Lehman's exchange-traded
4  derivative portfolio is excluded from the deal?
5       MS. BLOOMER: Objection.
6    Mischaracterizes his testimony.
7    A.   I don't know what it means.  I was
8  focusing only on the exchange-traded derivatives
9  portion of the paragraph 1, and I think your --
10  I thought your question was does the reference
11  in the later paragraph mean that somehow
12  Barclays wasn't taking on the obligations for
13  the exchange-traded derivatives.  Wasn't that
14  your question?
15    Q.   My question is does the Clarification
16  Letter, irrespective of any other aspect of the
17  deal that you may believe are relevant, does the
18  Clarification Letter relieve Barclays of its
19  obligations to assume liabilities under the
20  exchange-traded derivatives in Lehman's
21  portfolio?
22       MS. BLOOMER: Objection to form.
23    A.   Relieve?  Relieve Barclays of the
24  obligations?
25    Q.   Yes.

Page 92

A. Leitner

1
2    A.   On the exchange-traded derivatives,
3  no, it does not, and did not.
4    Q.   Even though there are no derivative
5  contracts under the definition of "assumed
6  liabilities" pursuant to paragraph 3 of the
7  Clarification Letter?
8       MS. BLOOMER: Objection to the
9    characterization of the agreement and to the
10    expert's scope.
11    A.   I'm sorry, Mr. Oxford, you've got me
12  confused.  Okay?  If that was your objective,
13  you have succeeded, but I'm sure it wasn't.
14    Q.   It was not, but it sometimes happens
15  along the way.
16    A.   Okay.
17    Q.   You would not be the first and you may
18  not be the last.
19       MS. BLOOMER: Is that a request that
20    he clarify his question?
21    A.   I mean, if I understand your question,
22  if you follow the logic, if I understood it
23  correctly, the Lehman estate and the SIPA
24  Trustees would have woken up on Monday morning
25  with obligations for all the short derivatives

Page 93

A. Leitner

1
2  and Lehman would just have been, you know,
3  holding the longs.  I don't think that was the
4  deal.
5    Q.   That is my logic, sir.  I'm not asking
6  you whether or not that's the deal.  I'm asking
7  you whether or not you believe that's what the
8  Clarification Letter reflects.
9       MS. BLOOMER: And I object to the
10    request that this expert interpret the
11    contract.
12    A.   Yes, I -- the answer is I have no idea
13  what was intended to be accomplished by that
14  paragraph, by that reference that you mention in
15  paragraph 3 of the Clarification Letter.
16    Q.   You said that you didn't think it was
17  the deal that the SIPA Trustee would retain the
18  obligations under the derivatives and Barclays
19  would take the assets, the long positions --
20    A.   Correct.
21    Q.   -- in the portfolio, correct?
22       And in fact, that deal wouldn't make
23  any sense, would it, Mr. Leitner, because --
24    A.   For either party.
25       MS. BLOOMER: Just let him finish his

Page 94

A. Leitner

1  question so you can be sure you're answering
2  what's being asked.
3     Q.   And tell me why it wouldn't make sense
4  for either party?
5     A.   It wouldn't have made any sense for
6  the Lehman trustee because it would have had
7  exposures that were -- that I believe it was not
8  in a position to manage based on, you know, my
9  understanding of what was going on.  It may be
10 an incomplete understanding, but that that was,
11 you know, one of the real benefits to the estate
12 was to in fact relieve itself of the need to
13 continue to manage the derivatives book -- I'm
14 sorry, the clearing operation of the derivatives
15 book.
16    Q.   Tell me why the deal that we've agreed
17 doesn't make any sense wouldn't make any sense
18 for Barclays?
19    A.   In my report I refer to a number of
20 risks associated with clearing exchange-traded
21 derivatives, so I would let my report speak for
22 itself with regard to the characterization of
23 those risks.  All of those risks would have had
24 to have been assumed by the estate and the
25

Page 95

A. Leitner

1  trustee, the volatility risk of continuing
2  market exposure, the clearance and settlement
3  risks for -- related to exercise of options;
4  with regard to futures, the need to potentially
5  unwind at a loss futures positions; and I don't
6  know what you'd do with the exposures that
7  you're responsible for on the short side related
8  to, you know, the clearing of the affiliate
9  businesses, so -- for which you -- I have no
10 idea what margin or assets they continue to hold
11 for that.
12    So of all the risks that I describe in
13 my report, they would have been solely assumed
14 by the trustee.  I think it was to the trustee's
15 advantage and the estate's advantage to get rid
16 of those unquantifiable risks.
17    Q.   Looking at paragraph 1(C) of the
18 Clarification Letter, sir, I'd like you to have
19 in mind the following assumption:  If paragraph
20 1(C) -- sorry, 1(A)(ii) of the Clarification
21 Letter were to mean that Barclays gets all of
22 the exchange-traded derivatives, that is, the
23 long positions subject to the short positions;
24 and that if the long positions exceed the shorts
25

Page 96

A. Leitner

1  at a particular exchange at the close, then
2  those derivatives are an asset that go to
3  Barclays, but if the short positions exclude the
4  long -- sorry, the short positions exceed the
5  long position, then those derivatives are no
6  longer an asset and don't have to be assumed by
7  Barclays.
8     On that interpretation of the
9  Clarification Letter, would that be a bad deal
10 for Barclays?
11    MS. BLOOMER:  Objection to the form of
12 the question.
13    Q.   And if you would like Kathy to read it
14 back.
15    A.   No, I understand can question.  I
16 mean, your question is related to a subset of a
17 subset of the total exposures that Barclays took
18 on.  There were several accounts that Lehman had
19 that on its books that were reflected at the
20 Options Clearing Corp.  They were proprietary
21 accounts, market-making accounts, customer
22 accounts and so forth.
23    So what you're asking about is a
24 subset of the proprietary positions, I believe,
25

Page 97

A. Leitner

1  that related to positions Lehman Brothers put on
2  for itself even though the proprietary account
3  also included affiliate positions.  What are we
4  doing with those?
5     I mean, so your -- it's virtually
6  impossible to, you know, answer your question
7  unless you're going to tell me, you know,
8  what -- whether Lehman is going to actually
9  retain clearing responsibility for everything
10 else, yes or no.  I mean, because we have to
11 understand what really happened here, right?
12    Barclays stepped into Lehman's shoes
13 with respect to clearing every exchange-traded
14 derivative that Lehman had on its books
15 regardless of whether customers came over,
16 regardless of whether the affiliates margined
17 those positions, or anything else.  So it is
18 extremely difficult to take a subset of a subset
19 and make any sense out of it.  That's the best I
20 can do.
21    Q.   Assuming we're talking here, sir, only
22 about Lehman's proprietary positions, not
23 positions they were clearing for affiliates or
24 other customers, can you answer my question as
25

Page 98

```
 1              A. Leitner
 2    to whether or not that would be a bad deal for
 3    Barclays?
 4          MS. BLOOMER:  Objection to form of the
 5      question.
 6      A.   Are you -- what happens to the -- by
 7    the way, when?  What point in time?
 8      Q.   At the closing of the transactions.
 9      A.   On Monday?  Very interesting, because
10    who's got the settlement risk for all the
11    exercised options over the weekend?  Does the
12    trustee retain those risks under your
13    hypothetical for all the shorts?  They would be
14    responsible for, normally, for settlements.  So,
15    they do?  They don't?
16      Q.   Let's take the first option.  They do,
17    the trustee does.
18      A.   Actually, it doesn't matter,
19    because -- sorry, your hypothetical was would it
20    have been a good deal?
21      Q.   Would it have been a rational deal for
22    Barclays to agree to if they get the longs
23    subject to the shorts?
24      A.   For Barclays to have agreed to that?
25      Q.   Yes.
```

Page 99

```
 1              A. Leitner
 2          MS. BLOOMER:  Objection to the form of
 3      the question and beyond the scope of his
 4      opinion.
 5      A.   I just can't answer the question.  I
 6    mean, I just -- there is -- there is no way to
 7    approach it to give you an answer that's a yes
 8    or no answer.
 9      Q.   I'm handing you, Mr. Leitner, what has
10    previously been marked as Exhibit 622.
11      A.   Yes, sir.
12      Q.   You see that that's the declaration of
13    Mr. Ed Rosen?
14      A.   Yes, sir.
15      Q.   You read Mr. Rosen's testimony?
16      A.   Yes.
17      Q.   In preparation for your testimony
18    today?
19      A.   Yes, I did.
20      Q.   Did you also speak to Mr. Rosen?
21      A.   No.
22      Q.   Have you read Mr. Rosen's declaration?
23      A.   Yes.
24      Q.   If you could turn your attention to
25    paragraphs 4 and 5 of Mr. Rosen's declaration.
```

Page 100

```
 1              A. Leitner
 2    If you could just review that to yourself and
 3    let me know when you've done so, please.
 4          (Document review.)
 5      A.   Okay.
 6      Q.   Do you see that Mr. Rosen states in
 7    his declaration that, "The language contained in
 8    a draft of the Clarification Letter circulated
 9    on September 20 reflected the business deal that
10    Barclays would receive the margin as well as the
11    derivatives in any account for which Barclays
12    becomes responsible at closing.
13      A.   You're referring to paragraph 4?
14      Q.   And to paragraph 5, sir.
15      A.   Paragraph 4 and 5 refer to, as far as
16    I can understand it, to various drafts being
17    passed back and forth between the lawyers on --
18    of the drafts of the Clarification Letter being
19    passed back and forth on September 20, and your
20    question was what?  You wanted me to refer to
21    specifically to what aspect of those drafts?
22      Q.   I asked you whether you agreed with me
23    that Mr. Rosen states in his declaration that
24    the language contained in the draft
25    Clarification Letter circulated on September 20,
```

Page 101

```
 1              A. Leitner
 2    which he refers to in paragraph 4 of his
 3    declaration --
 4      A.   Okay, so it is paragraph 4.
 5      Q.   -- reflected the business deal that
 6    Barclays would receive the margin as well as the
 7    derivatives in any account for which Barclays
 8    became responsible at the closing?
 9          MS. BLOOMER:  And I object to the
10      characterization of the document.  It speaks
11      for itself and reads differently.
12      A.   Well, Mr. Rosen says in paragraph 4,
13    "I understand that the trustee's position that
14    the removal of language contained in 1(d) of the
15    draft of the Clarification Letter reflects an
16    agreement that Barclays was not acquiring cash
17    margin."  He goes on to say that position is
18    incorrect.  There was, to my or my partner's
19    knowledge, never any such agreement or
20    discussion.
21          So your question is what exactly?
22          (Record read.)
23      Q.   And sir, just before you answer, to
24    answer that question, I have directed you a
25    couple of times to paragraph 4 and to paragraph
```

Page 102

A. Leitner

1  5. I believe in order to answer my question you
2  will have to read paragraph 5, particularly the
3  first two sentences.
4      MS. BLOOMER:  Objection to the form.
5  You're just asking him to tell you whether
6  he says among the things he says in 4 and 5
7  what you just said exactly?  Is that the
8  question?
9      MR. OXFORD:  We have the question four
10  times now.  We can have it read back a fifth
11  time.
12      MS. BLOOMER:  I object to the form of
13  the question.
14  A.  Okay.  Paragraphs 4 and 5 express Mr.
15  Rosen's belief that the transaction being
16  clarified in the Clarification Letter was that
17  Barclays would acquire all margin, including
18  cash, associated with exchange-traded
19  derivatives positions.
20  Q.  Thank you.  Do you agree with Mr.
21  Rosen's understanding of the transaction between
22  Barclays and Lehman?
23      MS. BLOOMER:  Objection.  Form and
24  foundation.
25

Page 103

A. Leitner

1  A.  My opinion, my opinion, relates to
2  what a rational party would do under the
3  circumstances.  I have said in my opinion that I
4  see nothing -- I think I'm just characterizing
5  it generally -- that I see nothing in any of the
6  agreements or conduct of the parties as
7  inconsistent with them acting rationally with
8  regard to this transaction, that is, as
9  naturally by both the Barclays' site and by the
10  trustee's side.
11      So to the extent that Mr. Rosen is
12  simply saying that, indeed, he believes the
13  parties did always have this understanding is
14  simply, you know, consistent with one of the
15  predicates of my opinion.
16  Q.  Is it your understanding of the
17  business deal between Barclays and Lehman that
18  Barclays would get the margin as well as the
19  derivatives in any account for which they
20  assumed responsibility at closing?
21      MS. BLOOMER:  Objection to form.
22  A.  It is my understanding that that's
23  what the parties agreed to.  I'm -- without
24  interpreting the contract, I was -- I believe

Page 104

A. Leitner

1  that was the rational thing to do.  It appears
2  that's what the parties did.
3  Q.  Could you turn to your report, sir, in
4  particular to footnote 1 in paragraph 10.
5  A.  I'm sorry, paragraph?
6  Q.  Footnote 1 on page 10.
7  A.  Yes, sir.
8  Q.  Do you have that in front of you, sir?
9  A.  Yes.
10  Q.  Do you see that you list in footnote 1
11  exchanges on which LBI traded exchange-traded
12  derivatives, correct?
13      MS. BLOOMER:  I would --
14  A.  Which paragraph are we looking at?
15      MS. BLOOMER:  I would ask the witness
16  to refer to the text as well as the
17  footnotes so he's reading it in context and
18  can answer the question.
19  A.  I don't have the page.
20  Q.  Page 10, footnote 1.
21  A.  Again, I -- you have to bear with my
22  hearing issues.
23      Sorry, what's your question now?  I
24  see there's a list of exchanges.

Page 105

A. Leitner

1  Q.  On which Lehman traded exchange-traded
2  derivatives, correct?
3      MS. BLOOMER:  And again, I'm going to
4  object and suggest that you read the text
5  and the footnotes so you understand the
6  question and the context in which the
7  footnote is provided.
8  A.  The reference on page 10 is to
9  clearing organizations that I understood Lehman
10  was a clearing member of.  Some of them are
11  derivatives clearing organizations and some of
12  them clear securities.  And your question is?
13  Q.  Is it your understanding of the
14  transaction between Lehman and Barclays, sir,
15  that if Barclays did not assume responsibility
16  for the accounts at any of these exchanges, they
17  would not be entitled to the margin in
18  connection with the derivatives at any of those
19  exchanges?
20  A.  My understanding is that, in
21  connection with some of the exchanges on which
22  exchange-traded derivatives were traded,
23  particularly the foreign exchanges, LBI was not
24  a clearing member but was dealing through some

Page 106

1           A. Leitner
2    clearing broker other than themselves.
3           With respect to the Option Clearing
4    Corp. and the CME, my understanding was that LBI
5    was a direct clearing member and directly
6    responsible to the clearing house. With respect
7    to the other exchanges, my understanding is that
8    they traded through third parties.
9           And your question is?
10   Q.   Is it your understanding of the
11   transaction between Lehman and Barclays, sir,
12   that if Barclays didn't assume responsibility
13   for Lehman's accounts at or in connection with
14   the trading at these exchanges listed in
15   footnote 1, then Barclays would not be entitled
16   to the margin associated with the derivatives in
17   Lehman's portfolio at those exchanges?
18          MS. BLOOMER: Object to form.
19   A.   Yes.
20   Q.   Do you have an opinion, sir, on
21   whether or not the agreement between Barclays
22   and Lehman transferred to Lehman -- sorry,
23   transferred to Barclays -- there I go --
24   surprised it took so long -- the exchange
25   memberships that Lehman held at any clearing

Page 107

1           A. Leitner
2    organization or derivatives exchange?
3           MS. BLOOMER: Objection. Assumes
4    facts not in evidence.
5    A.   I am not aware of any transfer of
6    exchange memberships at all. With regard to
7    clearing organizations, my understanding is that
8    Barclays was a clearing member of OCC and that
9    LBI was a member of OCC, but that it was not
10   necessary to assume the positions of Lehman that
11   Barclays acquire any additional memberships to
12   accomplish that.
13   Q.   At the OCC, other than the clearing
14   fund, would Lehman have a membership of the OCC
15   that was valuable as an asset?
16   A.   Was the membership an asset?
17   Q.   Yes.
18   A.   Is that your question?
19          I have no idea. I mean, you mean
20   asset on the books of the entity?
21   Q.   An asset in any sense, sir.
22          MS. BLOOMER: Objection to form.
23   A.   As a business matter, it is an asset
24   to be a clearing member of an exchange. You
25   don't have something that's transferable.

Page 108

1           A. Leitner
2    Therefore, you don't have an asset in a normally
3    understood sense of being able to sell something
4    to someone else. So that would be my answer to
5    whether or not it was an asset.
6           As a requirement of membership, you
7    have to maintain a clearing fund deposit which
8    in size, as I mention in my report, is based
9    upon the amount of business you do.
10   Q.   Turning to the --
11          Sorry. I didn't mean to interrupt.
12   Are you finished?
13   A.   Go ahead.
14   Q.   Turning to exchange membership, sir,
15   you said you're not aware of any transfers of
16   exchange memberships between Lehman and
17   Barclays, correct?
18   A.   Right.
19   Q.   And you're not aware of any business
20   deal between Lehman and Barclays that would
21   transfer the exchange memberships to --
22          MS. BLOOMER: I'm going to --
23          MR. OXFORD: Please let me finish,
24   Trish.
25   Q.   -- from Lehman to Barclays?

Page 109

1           A. Leitner
2           MS. BLOOMER: I'm going to object to
3    the form of the question and the undefined
4    definition of the term "memberships"?
5    A.   No, I'm not aware of any.
6    Q.   Taking the example of Lehman's
7    exchange membership at CME, sir, do you believe
8    Barclays -- withdrawn. Was Barclays also a
9    member of the CME?
10   A.   I believe that there was a Barclays
11   entity that was a member of the CME. I cannot
12   be assured that it was Barclays Capital, Inc.
13   That I'm not sure of.
14   Q.   Can you think of any reason why
15   Barclays Capital Inc. would need to acquire
16   Lehman's membership at the Chicago Merc, or the
17   CME?
18          MS. BLOOMER: Objection to the
19   question. Beyond the scope of the witness's
20   report and opinion.
21   A.   I don't -- I don't have any -- I've
22   not researched the question and I'm not -- have
23   not been asked to give an opinion on it, and I
24   don't know any facts relating to the CME
25   membership.

Page 110

1        A. Leitner
2      Q.   Turning to paragraph 19 of your
3  report, sir.  After setting out what you believe
4  to be Barclays' position in this dispute, seven
5  lines down you write, "Not only are the
6  governing agreements entirely consistent with
7  this position, but so too are the record facts,
8  all of which lead me to conclude, based on my
9  experience and expertise in the derivatives
10 industry, that no rational purchaser would have
11 agreed to acquire the ETDs, or to assume the
12 financial responsibility of a clearing broker
13 with respect to such ETDs, without also
14 receiving LBI's rights with respect to the
15 entirety of the posted collateral."
16     That's your opinion, sir?
17     A.   Yes.
18     Q.   And then you go on to list the three
19 separate types of risks that Barclays faced
20 which are the bases of your opinion that I just
21 read, correct?
22     A.   Yes.  And by the way, as I think I
23 testified before, I would add to those three
24 risks the what I described as operational risk,
25 which I believe was always there but became

Page 111

1        A. Leitner
2  clearer to me in reviewing declarations and
3  testimony after I completed this report.
4      Q.   It's your opinion, sir, that Barclays
5  did not have enough information to value the
6  exchange-traded derivatives that Lehman held as
7  of the 16th of September, correct?
8      A.   I don't believe I testified that they
9  didn't have the ability to value.  I may have
10 said they didn't have the ability to value, but
11 more importantly, they didn't have the ability
12 to quantify the exposures because the value of
13 the positions that they were acquiring in the
14 proprietary sense, as I indicated before, had
15 little relation to the actual exposures they
16 would be acquiring in taking on the clearing
17 business.
18     Q.   Leaving aside the exposures on the
19 clearing business for the purposes of my
20 question, sir, is it your testimony and your
21 opinion that Barclays had enough information to
22 be able to quantify the exposure to Lehman's
23 proprietary exchange-traded derivatives?
24         MS. BLOOMER:  Objection to the form of
25     the question.

Page 112

1        A. Leitner
2      Q.   On September 16?
3      A.   It is, based upon my review of the
4  facts, it's my understanding and I guess my
5  opinion that at no time, whether it was the
6  16th, 17th, 18th, 19th, that they had the
7  ability to quantify with any degree of certainty
8  either what the value of those positions was or
9  the exposures to the clearing book.
10     Q.   I believe you testified earlier about
11 this topic and described those risks as unknown
12 and unquantifiable risks?
13         MS. BLOOMER:  Objection to form.
14     A.   I mean, you certainly knew generally
15 the categories of risks, but you did not know --
16 you could not quantify them, and certainly
17 unknown in the sense that you didn't know how
18 much of the proprietary positions were carried
19 for the affiliates.  So, in that sense, it was
20 not known because that was an additional credit
21 risk.
22     Q.   When did Barclays first learn of the
23 margin at the OCC that was related to LBI's
24 derivatives book at the OCC?
25         MS. BLOOMER:  Objection.

Page 113

1        A. Leitner
2      A.   I don't actually remember the precise
3  point in time when they had that information.  I
4  believe that, generally speaking, that it wasn't
5  until the weekend, but they may have gotten a
6  report sooner than that.
7      Q.   Can you turn to paragraph 106 of your
8  report, please, sir.
9          Do you have it there, sir?
10     A.   Yes, sir.
11     Q.   Do you see, Mr. Leitner, "Because
12 Barclays had to decide whether to close the
13 transaction without sufficient knowledge of the
14 value and exposure of the ETD positions, it was
15 taking a blind risk with respect to those
16 positions."  Do you see that?
17     A.   Yes, I do.
18     Q.   You go on to say that that is
19 "something that no rational purchaser of ETDs
20 would be willing to do without the belief that
21 it was receiving a cushion in the form of excess
22 margin posted in the accounts and clearing fund
23 deposits."  Do you see that?
24     A.   Yes, I do.
25     Q.   That's your opinion, sir?

Page 114

A. Leitner

1
2     A.    Yes, it is.
3     Q.    Do you agree that even if Barclays
4  were to obtain the margin and clearing fund
5  deposits that does not -- Barclays quantified
6  the risk that it is taking with respect to the
7  ETD positions?
8          MS. BLOOMER:  Objection to the form of
9  the question.
10    A.    Sorry, just read that.  That does not
11 what?  Just read that back.
12    Q.    It does not quantify the risk that
13 Barclays is taking with respect to those
14 positions?
15         MS. BLOOMER:  Objection to the form of
16 the question.
17    A.    Let me make sure I understand the
18 question.  You're asking me that if, even if all
19 the margin came over, that does not necessarily
20 quantify the risks that they took?
21    Q.    Yes.
22    A.    That's correct.
23    Q.    So the risk that Barclays is taking
24 under the transaction as you believe it to have
25 happened, is still a blind risk for Barclays,

Page 115

A. Leitner

1
2  correct?
3          MS. BLOOMER:  Objection to form.
4     A.    On the closing date, yes, it was still
5  a blind risk.
6     Q.    Why would a rational purchaser take
7  such a blind risk, sir, in your opinion?
8     A.    Because they got the margin along with
9  the positions.
10    Q.    But if they get the margin along with
11 the position, the risk is still blind and their
12 potential exposure is less than if they don't
13 have the margin, but their potential exposure is
14 still unlimited and unquantifiable, correct?
15    A.    That's correct, but it's better than
16 the alternative.
17    Q.    Right.  On the theory that more money
18 is better than less money?
19         MS. BLOOMER:  Objection.
20    Q.    It's better than the alternative,
21 correct?
22         MS. BLOOMER:  Objection to form.
23    A.    Correct.
24    Q.    Do you believe it was rational for
25 Barclays to conclude the deal you say they did,

Page 116

A. Leitner

1
2  which was to take an unquantifiable risk on
3  Barclays exchange-traded derivatives positions,
4  albeit mitigated by the margin associated with
5  those positions?
6     A.    I'm sorry, was that a question?
7     Q.    Yes.
8     A.    I thought it was a statement.
9     Q.    Is says "do you believe" --
10         MS. BLOOMER:  Do you believe it
11 rational for Barclays to do what it did?
12    A.    Yes.
13    Q.    Why?
14    A.    They were taking a business risk and
15 they had the capital, I believe, to -- and the
16 personnel to be able to manage those risks at
17 some point in time.  So they could move to,
18 quickly to a point where they could quantify the
19 risks so they were not taking an entirely
20 open-ended exposure, but -- that is, it couldn't
21 go to infinity, but once they had all the data,
22 they can begin to figure out what to do with it.
23    Q.    Is it your opinion, sir, that after
24 the closing, Barclays was able to manage the
25 risk associated with the exchange-traded

Page 117

A. Leitner

1
2  derivatives portfolio that they assumed that you
3  said prior to closing was unquantifiable?
4          MS. BLOOMER:  Objection to form.
5     A.    I'm aware from testimony I've read
6  that they began to take action to mitigate
7  its -- their market exposure.  I don't know what
8  other steps they took to manage the other
9  exposures that they had both in terms of credit
10 and capital exposures, but just, again, and they
11 also worked hard to get a handle on the
12 operational issues involved in taking over the
13 positions, but it took them a while to do that
14 and there may well have been, you know, market
15 exposure insofar as it took them time to get
16 everything under control.
17    Q.    Your opinion as reflected in paragraph
18 106, sir, is that no rational purchaser of
19 exchange-traded derivatives would be willing to
20 take those positions without the belief that it
21 was receiving a cushion in the form of the
22 excess margin posted in the accounts and
23 clearing fund deposits, correct?
24    A.    Is that the same question you asked me
25 before?

Page 118

1           A. Leitner
2       Q.   I'm just reorienting you to a
3   particular portion of your opinion on paragraph
4   106.
5       A.   Okay.
6           MS. BLOOMER:  Is that a question?
7           MR. OXFORD:  I'm asking him if he sees
8   that portion of his opinion.
9       A.   The first sentence?
10      Q.   Yes.
11      A.   Yes, okay.
12      Q.   Did Barclays believe there was excess
13  margin in the accounts in clearing fund deposits
14  when it closed this transaction?
15      A.   Well, the testimony is that there was
16  a lot of uncertainty as to exactly what it was
17  getting, and given that there had been
18  fluctuations in these positions of several
19  hundred million dollars per day, I think it was
20  extremely difficult to take a snapshot.
21          If you're asking, you know, as of the
22  morning of the 21st, the Monday morning --
23      Q.   22nd?
24      A.   Or the 22nd, what did OCC tell them
25  was the margin requirement and what were the

Page 119

1           A. Leitner
2   speculation over the weekend, there was some,
3   clearly some speculation over the weekend that
4   some portion of the margin they were getting
5   would be excess, excess in terms of the OCC
6   opening on Monday and giving them a report based
7   on the valuation and calculations that they used
8   to determine what the margin would be to a
9   normal solvent entity.
10          So there was some correspondence over
11  the weekend about what that margin would be,
12  which in my view sounded like, you know,
13  questions about whether there would be enough,
14  because, if not, Barclays was going to have to
15  come up with more.  And there was a lot of
16  things changing, not only the market changing,
17  but also, you know, whether these LOCs, these --
18  if the LOCs were not there and the margin
19  requirement increased, Barclays was clearly
20  going to have to come up with, you know, more
21  capital to fund the margin requirement.
22          And I think that was, you know, in a
23  complete state of uncertainty from Friday to
24  Monday, from all I can gather.
25      Q.   In your opinion, sir, how much of a

Page 120

1           A. Leitner
2   cushion in the form of excess margin would a
3   rational purchaser need to conclude the deal
4   that Barclays concluded?
5           MS. BLOOMER:  Objection to the form.
6       A.   I can't answer that, because even if I
7   try to put myself in the position of what I
8   would have done, assuming that I had the luxury
9   of, you know, the ability to negotiate based on
10  all the facts, given the volatility of the
11  market, you know, I don't know what kind of
12  cushion I would have, you know, rationally
13  placed on this.
14          I mean, the fact is that there was
15  just too much market volatility in the equity
16  portfolio over time, and by -- so -- and I'm
17  certain, you know, the same would apply, you
18  know, at the time the APA was negotiated.  I
19  mean, the -- at that point, you know, everyone
20  thought that, you know, these businesses were
21  going to move and they understood what the
22  businesses were, and between then and Friday,
23  you know, you had all these facts changing, as
24  my opinion indicates.
25      Q.   Your opinion, sir, is that no rational

Page 121

1           A. Leitner
2   purchaser would be willing to do this deal
3   without the belief that it was receiving a
4   cushion in the form of excess margin in accounts
5   and clearing fund deposits?
6       A.   Yes.
7       Q.   Would it be rational for the purchaser
8   of Lehman's ETDs to do this deal with a $1
9   cushion?
10          MS. BLOOMER:  Objection to the form.
11      A.   I think a rational purchaser would
12  have wanted as much cushion as they could
13  possibly negotiate, particularly with respect to
14  the clearing fund deposit, because if you had a
15  business like Barclays had, which was fairly
16  small, and you were acquiring Lehman's business,
17  you would know that your clearing fund deposit
18  was going to go up exponentially, so that was
19  definitely a plus to help you be able to support
20  the business.  So that's my answer.
21      Q.   I should have done this in the correct
22  order.  What do you mean by "excess margin" in
23  paragraph 106?
24      A.   Well, first of all, let me be clear
25  that that paragraph does not relate solely to

Page 122

A. Leitner

1
2  the OCC and to the options book.  The futures
3  positions also had collateral securing the
4  futures position, and there was a little bit
5  more information, as I understood it, about what
6  the collateral picture of the future positions
7  looked like.
8        And there, I think the quantification
9  of what would be excess in relation to the
10  business was potentially more negotiable, but
11  there was definitely, in a lot of those
12  accounts, collateral over and above what was
13  necessary to meet the initial margin
14  requirement.
15    Q.   Let's stick with the OCC at the
16  moment.  In your opinion, sir, would a rational
17  purchaser of Lehman's exchange-traded
18  derivatives at the OCC be willing to do so if it
19  received the minimum margin required by the OCC
20  for those positions?
21        MS. BLOOMER:  Objection.  Calls for
22    speculation.
23    A.    It's difficult to take any of these
24  questions completely out of the context of what
25  was happening here.  You know, you would have

Page 123

A. Leitner

1
2  to -- you know, I'd have to assume a zillion
3  other facts.  I'm not taking any futures
4  position.  I'm not taking any other risks.  I
5  have full knowledge of the book I'm taking, and
6  I don't have, you know, 5 percent, you know,
7  market fluctuations every day.
8        MS. BLOOMER:  Let him answer your
9    question.  I'm sorry.  I didn't mean to
10    interrupt you.  I wanted you to feel
11    comfortable answering the question.
12    Q.   I think you misunderstood my question,
13  sir.
14        MS. BLOOMER:  Can he finish the answer
15    he was giving first?
16    A.   No.  No.  I was done.
17    Q.   I didn't mean to interrupt you.
18    A.   No, that's okay.  I thought you were
19  asking me about the OCC.
20    Q.   I am asking you about the OCC, and
21  your answer said you would require to know the
22  value of any exposure for those positions at the
23  OCC.  My question is a little different.
24        My question would be, with respect to
25  the OCC only for the moment, in your opinion,

Page 124

A. Leitner

1
2  would a rational purchaser of those derivatives
3  positions held by Lehman at the OCC take those
4  positions if there was no excess margin, but
5  only to the penny the required margin per the
6  OCC's requirements?
7        MS. BLOOMER:  I'm going to object, and
8    I'm going to ask you to let him finish his
9    answer whether you like it or not this time.
10        MR. OXFORD:  I think the witness has
11    stated that I did not interrupt him.
12    A.    Based on my experience and knowledge
13  in the industry, my advice to someone in the
14  position of acquiring a book in which all of the
15  knowledge of the exposures was known at the OCC
16  and the proprietary book only, and I had no
17  hedges against those positions, I was completely
18  relying solely on the amount of margin that was
19  there to help cover my losses, but I would
20  otherwise take all the time risk and execution
21  risk thereafter, I would want to negotiate for
22  an excess over and above the required collateral
23  that was commensurate with the volatility, the
24  displayed volatility in the market at the time.
25  So I would be making some calculation that took

Page 125

A. Leitner

1
2  into account the various factors that would lead
3  to carrying me over the duration risk that I had
4  before I got these positions under control.
5        I don't know what that percentage
6  would be without knowing all these factors, but
7  I would go down to a minimum only in the most
8  calm market conditions, where I could assume
9  complete management of those positions on day
10  one.  That's the only time I would ever be
11  comfortable with taking only the snapshot
12  required margin, and by "snapshot required
13  margin," I mean margin determined at the close
14  of business on the closing day so that when we
15  open for business the next day, I am ready to
16  go.
17        MS. BLOOMER:  Just when you're ready,
18    I think it's getting close to time for
19    another break.
20    Q.   And based on your --
21    A.   And by the way, that's assuming we're
22  only talking about my proprietary stuff.  I have
23  no other, you know, uncertainties involved in
24  the positions.
25    Q.   And you would require this negotiated

Page 126

1        A. Leitner
2   cushion, sir, to protect against future market
3   risk and the movement of those positions after
4   the closing of the transaction, correct?
5       A.   My answer was all of the factors that
6   I would take into account, of which that was
7   one.
8       Q.   Remind me what those other factors
9   were, please.
10       MS. BLOOMER:  Objection to the form of
11   the question.  Asked and answered.  You can
12   read the question and answer again if you
13   need reminding.
14       A.   I thought my answer was pretty good.
15   Maybe she should read it back again.
16       Q.   Your statement in paragraph 106, sir,
17   about no rational purchaser would be willing to
18   do the transaction you've described in your
19   report without the belief that there was a
20   cushion, you said that that -- that opinion
21   applies to not just the closing of the
22   transaction, but you don't believe that it would
23   have been rational to make that agreement on the
24   16th of September when the parties signed the
25   APA?

Page 127

1        A. Leitner
2       MS. BLOOMER:  Objection to the form of
3   the question and to the characterization of
4   the report.
5       Q.   Let me put it another way, sir.
6       A.   Well, let me -- let me be clear.  106
7   begins with a timing, the importance of the
8   timing, that is, decide whether to close.  So
9   the entire predicate of the question and the
10   import of that sentence is based on what happens
11   Monday, and the fact that I can certainly agree
12   with you that on Monday, based on the
13   calculations of OCC, and the acquiring knowledge
14   about margin of the futures positions, that
15   there was a cushion there and that they would
16   then at that point have been willing to close.
17       That is different than my opinion that
18   no rational purchaser would have entered the
19   transaction, the APA, other than with the
20   knowledge that you were going to get all the
21   collateral and other assets supporting the
22   business and risk you were taking on.
23       So do we have that timing clear?
24       Q.   Yes, we do.
25       A.   Okay, great.

Page 128

1        A. Leitner
2       Q.   Would, in your opinion, would a
3   rational purchaser have agreed to take Lehman's
4   ETD positions without knowing the value and
5   exposure of those positions on the 16th and
6   without knowing whether or not there was excess
7   margin, the cushion that you refer to in
8   accounts and clearing fund deposits?
9       A.   Yes, it would have been rational.
10       Q.   Why?
11       A.   One of two things would happen.
12   Either the positions would be blown out, like
13   the CME did, and you wouldn't take them on and
14   Lehman would have a loss, or they wouldn't be
15   blown out or liquidated because Lehman was
16   managing to keep adequate collateral there and
17   keep the clearing houses comfortable.
18       So, by the time of the closing, I am
19   either getting exposures where I have a
20   reasonable expectation that there is enough
21   margin or not.  I have some risk that between,
22   you know, in this case, between Friday and
23   Monday, that there will be a move against me if
24   there -- if Lehman is margining every day to the
25   dollar, I may have some risk that I'll wake up

Page 129

1        A. Leitner
2   and have to put another $100 million into the
3   margin account or that, you know, half of the
4   margin is going to be in the form of letters of
5   credit and I'm going to have to either replace
6   the letters of credit or put up whatever margin
7   is reflected by the letters of credit.
8       So that's why it would be rational to
9   say at the beginning of the deal, you know, I'll
10   run that risk.
11       MS. BLOOMER:  And again, Neil,
12   whenever --
13       MR. OXFORD:  Now is probably a good
14   time for a break.
15       (Luncheon Recess; Time Noted:  12:14
16   P.M.)
17
18
19
20
21
22
23
24
25

Page 130

A. Leitner

1    A. Leitner
2        AFTERNOON SESSION
3        (Time Noted:  1:03 P.M.)
4    ANTHONY J. LEITNER, resumed and
5        testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. OXFORD:
8        Q.    Mr. Leitner, I'd like to turn to the
9    section in your report where you describe the
10   market risk associated with the unvetted
11   positions in the exchange-traded portfolio?
12       A.    Paragraph?
13       Q.    Paragraph 19, sir.
14       A.    Okay.
15       Q.    Do you have that there, sir?  You
16   state in the middle of the page, "This
17   conclusion is based on the following risks that
18   Barclays faced, each of which was particularly
19   acute under the circumstances surrounding this
20   acquisition," and the first risk you identify is
21   "the market risk associated with the tens of
22   thousands of unvetted positions in LBI's
23   portfolio of ETDs, particularly given the
24   extremely volatile market conditions that
25   existed at the time of this transaction."

Page 131

A. Leitner

1    A. Leitner
2        Do you see that, sir?
3        A.    Yes.
4        Q.    And that reflects your opinion?
5        A.    Yes.
6        Q.    When you talk about market risk in
7    your report, sir, are you talking about market
8    risk as it applies to proprietary positions only
9    or to other types of positions as well?
10       A.    I'm talking about holistically
11   associated with the risks that they were taking
12   in the derivative book, which would have
13   included all of the exposures for which they
14   were responsible and, you know, that would
15   include, you know, any associated securities
16   positions that they happened to wind up with.  I
17   did not intend to limit this only to the
18   proprietary side.
19       Q.    So it's your opinion, sir, that
20   Barclays faced a market risk in connection not
21   just with Lehman's proprietary positions, but
22   also Lehman affiliate positions and Lehman
23   customer positions?
24       A.    Yes.
25       Q.    Is that correct?

Page 132

A. Leitner

1    A. Leitner
2        A.    Yes.
3        Q.    Is your opinion limited to equity
4    options or is it your opinion also that Lehman
5    faced a market risk in connection with the
6    futures business?
7        A.    It was across the board in all
8    derivatives.
9        Q.    Starting with options, sir, you
10   testified earlier that you understood that
11   Barclays took over the PIM customer accounts
12   from Lehman; is that correct?
13       MS. BLOOMER:  Objection to form and
14   characterization of his earlier testimony.
15       A.    It is my present understanding that
16   they took over -- or, they agreed to take over
17   the private investment management business and
18   the customer accounts associated with them.
19       Q.    Is it also your present understanding,
20   Mr. Leitner, that in connection with the
21   assumption of those same accounts, that Barclays
22   received the entirety of the assets that Lehman
23   held for those same PIM customers?
24       A.    I understand that was the intention.
25   I haven't done any analysis of the facts to

Page 133

A. Leitner

1    A. Leitner
2    determine whether that all happened, but that
3    was -- that would be generally, in my
4    experience, what happens when you talk about a
5    transfer of accounts; that is, the account
6    positions, which would include debits as well as
7    credits, if you were extending credit to a
8    customer, would essentially pass over.
9        Q.    Mr. Leitner, I'll ask you to assume
10   for the purposes of this line of questioning
11   that Barclays has in fact received the entirety
12   of the assets that Barclays held for those same
13   PIM customers.
14       Do you know whether or not Lehman used
15   its own proprietary assets for the purpose of
16   posting margin for PIM customer options at the
17   OCC?
18       A.    My understanding is that, for the most
19   part, they did use their own assets.  For the
20   most part.
21       Q.    Why do you qualify that answer, sir,
22   to "the most part"?
23       A.    Because in connection with preparing
24   for this deposition, one of the contacts I had
25   was with a gentleman who was responsible for the

Page 134

A. Leitner

1    actual, you know, margining of the customer
2    positions, and he made clear that some of the
3    customers took advantage of the ability to use
4    what are generally in the industry called escrow
5    receipts or margin deposit letters to cover
6    their portion of the margin requirements.
7         So that would have relieved Lehman of
8    having to post, you know, its own assets to
9    secure those positions.
10    Q.    Did those customers include PIM
11    customers, sir?
12    A.    I'm not sure I understood ever
13    explicitly who they were for.  They are
14    generally institutional customers who have a
15    limitation on their ability to put their assets
16    with a broker-dealer and keep their assets in a
17    bank.  So I am not certain whether they fell
18    into the PIM category, but were institutional
19    customers that did -- that were Lehman
20    customers.
21         To the extent they came to Barclays
22    and continued to use those escrow receipts, then
23    that was the reason for my qualifying my answer.
24    I have no specific knowledge as to whether those
25

Page 135

A. Leitner

1    institutional customers came over, but if they
2    did, then they would have continued to use that
3    method of -- of margining their position,
4    keeping in mind that their margin requirement is
5    actually a margin requirement to the broker that
6    is carrying their positions and that the market
7    has evolved this particular type of instrument
8    to satisfy both the customer's requirement to
9    the broker as well as the requirement to the
10    clearing Corp.  Pretty neat.
11    Q.    Who's the gentleman, Mr. Leitner, who
12    provided this information to you about escrow
13    receipts?
14    A.    I don't remember whether it was Dan
15    Dzeiman or -- is it Craig Jones?  There are two
16    operations guys who now work for Barclays that
17    were knowledgeable about this subject.
18    Q.    Do you agree, Mr. Leitner, that the
19    PIM customers that Barclays took over from
20    Lehman bear the risk of gain or loss on their
21    options positions rather than the broker-dealer
22    through which they placed those options?
23         MS. BLOOMER:  Objection to the form of
24    the question.
25

Page 136

A. Leitner

1    A.    They bear the gain or loss profit and
2    loss risk in the options that they own, and I
3    just want to make clear we distinguish that from
4    the clearing risk.  They don't bear the clearing
5    risk.  The clearing member bears the clearing
6    risk from a P&L point of view, yes.
7    Q.    To cover the clearing risk that you
8    have just described, the broker-dealer such as
9    Lehman would obtain from the customers
10    collateral or margin in order to cover that
11    risk, correct?
12    A.    Yes.
13    Q.    And that collateral or margin you
14    believe was intended to be transferred to
15    Barclays, correct?
16    A.    Yes.
17    Q.    And I've asked you to assume that that
18    collateral was in fact transferred to Barclays.
19         Assuming that to be true, do you agree
20    that in the event of the clearing risk being
21    realized, Barclays has recourse to that
22    collateral the customers originally provided to
23    Lehman and was transferred to Barclays?
24    A.    Yes.
25

Page 137

A. Leitner

1    Q.    So in what sense does Barclays face a
2    market risk for the options that it cleared for
3    PIM customers?
4    A.    The market risk is always the credit
5    risk.  So here the two can't be really separated
6    because the credit risk is that the customer
7    will not in fact meet its margin requirement and
8    that the clearing member still has the exposure
9    to the exchange.
10         So you hope, but you don't know for
11    certain that all the customers are creditworthy.
12    You are willing to take them on.  You assume,
13    therefore, the margin done day one and that you
14    can handle them and handle their accounts on day
15    one.  But the margin used by the acquiring,
16    because it's typical in the industry to
17    essentially use your own assets rather than the
18    customer assets to margin the positions at the
19    clearing house, that's part of the assets used
20    in the business.
21         So if you're a broker clearing for
22    people who in fact engage in exchange-traded
23    derivatives, the custom and practice in the
24    industry is to use mostly your own assets to

Page 138

```
1              A. Leitner
2    margin their positions.
3       Q.   Would you agree that Barclays did not
4    need, in the case of PIM customers who they took
5    on, in order to cover the market risk associated
6    with the PIM customers' positions, as you've
7    described as associated with the credit risk,
8    Barclays didn't need the margin that was posted
9    by LBI at the OCC in order to cover that risk
10   because that risk was already covered by the
11   collateral that the PIM customers provided to
12   Barclays -- to Lehman, which was then
13   transferred to Barclays?
14          MS. BLOOMER: Objection to the form of
15      the question.
16      A.   The market risk would apply to the
17   amount of collateral that would -- and would
18   affect the amount of collateral required to
19   cover the customer short positions at the
20   exchange or at the clearing house. So since
21   there was market risk in the sense that if the
22   margin requirement went up, Barclays would have
23   to put more assets to work to be able to cover
24   the customer positions, so there was certainly
25   market risk to whoever was going to be clearing
```

Page 139

```
1              A. Leitner
2    the positions, if you state it in that way, how
3    much margin, how much of your own assets are you
4    going to have to use to support the business
5    that you took on.
6       Q.   In what sense, sir, is that a market
7    risk?
8       A.   Well, I guess you could also
9    characterize it as a liquidity risk, how much
10   liquidity do you have to apply to carry the
11   business. So the market risk equals what the
12   liquidity factor is to be able to support the
13   business.
14      Q.   Because you have another opinion here
15   that one of the risks Barclays faced was the
16   open-ended risk of funding the margin
17   requirement and potentially increase clearing
18   fund deposits. Do you see that? And again, I'm
19   just --
20      A.   I just flipped the page. Let me go
21   back to that.
22          Yes, I see that.
23      Q.   And my questions are not about the
24   funding risk. We will get to that in due
25   course. My questions are about the market risk
```

Page 140

```
1              A. Leitner
2    as you describe in point 1 of paragraph 19, the
3    market risk associated with the unvetted
4    positions.
5          So can you tell me, sir, distinct and
6    apart from the risk of funding margin
7    requirements, what market risk Barclays faced in
8    clearing PIM customer option positions?
9          MS. BLOOMER: Objection to the form of
10      the question. Asked and answered.
11      A.   I would say that there is a less
12   visible market risk associated with the customer
13   positions than for the proprietary and affiliate
14   positions.
15      Q.   Okay. I appreciate that answer. It's
16   less visible. What is it?
17      A.   You're assuming that these risks, even
18   though I have mentioned them as separate risks,
19   are in fact separate. And the point I was
20   trying to make before is that they're not really
21   separate, that market, funding, liquidity and
22   credit risks are all part of a bundle,
23   especially when you're talking about customer
24   accounts.
25          So I wouldn't say that there is no
```

Page 141

```
1              A. Leitner
2    market risk associated with taking on the
3    futures positions of the customer accounts. I
4    would hesitate to say that there's none.
5       Q.   Other than the funding risk for the
6    margin requirements and the credit risk, can you
7    identify for me --
8       A.   Those are the two --
9          MS. BLOOMER: Objection.
10      A.   -- larger risks.
11          MS. BLOOMER: Can you let him finish
12      the question and give me a moment to state
13      an objection?
14          THE WITNESS: Yes.
15          MS. BLOOMER: Object to the form of
16      the question.
17      Q.   Is it your opinion, Mr. Leitner, that
18   in addition to the collateral that Barclays got
19   from Lehman for the PIM customers, Barclays
20   should also get the collateral that Lehman
21   posted at the OCC to secure the performance of
22   the options positions placed for those PIM
23   customers?
24      A.   Yes.
25      Q.   Why is that, sir?
```

Page 142

A. Leitner

1
2    A.    Well, because the collateral posted at
3    OCC secured everything at OCC.  So even though
4    there were separate accounts in which OCC would
5    compute a requirement for those accounts so
6    that, as I mentioned in my opinion, the customer
7    account positions were subject to a different
8    methodology for computing the margin
9    requirements in the proprietary accounts.
10        But Lehman, as would be typical in the
11   industry, even though they would get separate
12   account-by-account, that is,
13   clearing-account-by-account margin requirements,
14   tended to look at what was the total margin
15   requirement that they would have to put up
16   associated with the business.
17        And so, based on my expertise in the
18   industry, while you could look at these accounts
19   as being separate, that's not the way the firm
20   would look at the assets required to maintain
21   the -- maintain the margin.  And indeed, they
22   can move around the allocation of acceptable
23   collateral account by account.  So you can have
24   more LOCs that are associated with this account,
25   but you're looking at the gross requirement that

Page 143

A. Leitner

1
2    you have.
3        Q.    What's the basis for your testimony,
4    sir, that Lehman, even though they would get
5    separate account-by-account statements, tended
6    to look at what was the total margin requirement
7    associated with the business?
8        A.    My conversations with the --
9             MS. BLOOMER:  Objection to the form of
10   the question.
11        A.    I use that as the basis of my
12   conversations and interviews with the witnesses,
13   Dzeimian and I believe it's Jones.  Is it Jones?
14             I don't -- I'm trying to
15   remember the -- I'm -- I just confess that my
16   memory for names is not that great.  There were
17   two OCC option operations people that I talked
18   to to understand exactly how they managed the
19   business.
20        Q.    I understand.  I'm only seeking your
21   recollection.  If I would like Trish's
22   recollection, I will ask her questions, probably
23   not under oath.
24             MS. BLOOMER:  I would hesitate to give
25   my recollections under oath.

Page 144

A. Leitner

1
2    Q.    What would happen, sir, in the event
3    that all the PIM customers who moved to Barclays
4    close out their options positions and the cost
5    of closing out those options positions was not
6    greater than the collateral they provided to
7    Lehman which was transferred to Barclays to
8    cover the cost of closing out the positions?
9             MS. BLOOMER:  Objection to the form of
10   the question.
11        Q.    Would the collateral that Lehman had
12   posted at the OCC then become excess collateral
13   that could be returned to the broker-dealer?
14        A.    In the case of Lehman or any other
15   clearing firm that had, like Lehman, a bunch of
16   different accounts at which it was -- in which
17   it had margin requirements, the first thing you
18   would look at is whether you still needed that
19   collateral to margin your gross position.
20             If the answer was that -- the answer
21   to that question was no, you don't need that
22   anymore, then the clearing firm would be able to
23   withdraw it.
24        Q.    And in this case, Barclays would be
25   that clearing firm, correct?

Page 145

A. Leitner

1
2    A.    Correct.
3        Q.    Can you tell me, sir, if -- withdrawn.
4             Can you tell me, sir, why a rational
5    purchaser -- withdrawn.  I'll try a different
6    attempt.
7             Can you tell me, sir, why a rational
8    seller, when transferring its customers and the
9    collateral that the customers had provided to it
10   to another broker-dealer, would also give away
11   the collateral posted at the OCC in connection
12   with those same customers and the options that
13   it had placed at the OCC for those customers?
14             MS. BLOOMER:  Objection to the form of
15   the question.
16        A.    I can only explain that it would have
17   been -- it was indeed rational for that to
18   happen in connection with this transaction under
19   these circumstances.
20             To the extent your question is posed
21   in the abstract in relation to another set of
22   facts and circumstances, I would have to know
23   what they were to be able to answer your
24   question.  But in the context of this
25   transaction, I believe it was in fact rational

Page 146

1            A. Leitner
2    for the parties to agree that that was intended
3    in the context of transferring the assets
4    necessary to support the broker's business,
5    because essentially this is the part of the
6    business we're talking about.  It's the
7    brokerage business to which the exchange-traded
8    derivatives are associated.  So the two are
9    connected.
10        Q.   Why do you consider it rational, sir,
11   in the context of this transaction?
12        A.   Because it was in the interests of
13   Lehman and the trustees to see these customer
14   positions effectively transferred out, and it
15   was rational for Barclays to be willing to take
16   them along with the assets that supported that
17   business.
18        Q.   Would it have been rational, sir, for
19   Barclays to take these customer positions and
20   the margin and collateral given by the customers
21   to Lehman without also taking the additional
22   proprietary LBI assets that were posted at the
23   OCC to secure the customer positions?
24        A.   You lost me.
25           (Record read.)

Page 147

1            A. Leitner
2         MS. BLOOMER:  Objection to the form of
3    the question.  Are you limiting this to the
4    customers, the PIM customers, Neil, or to
5    the options customers?
6         A.   Or any FCM business?
7         Q.   The PIM options customers.
8         A.   Yes, it would have been rational for
9    them to have been willing to take the PIM
10   customer accounts without also taking the
11   proprietary accounts, if that was your question.
12        Q.   No, it wasn't.
13           Can you read back my question, please,
14   Kathy?
15          (Record read.)
16        MS. BLOOMER:  Are you --
17        A.   Excuse me.  I'm going to take a minute
18   to diagram what I think is happening for myself.
19   So can we go off the record for a second?  I
20   just want to make sure that I understand.
21        MR. OXFORD:  Sure.
22        MS. BLOOMER:  Before you -- I'm not
23   sure that this is an appropriate.  The
24   deposition is oral testimony.
25        THE WITNESS:  Oh, I know.

Page 148

1            A. Leitner
2         MS. BLOOMER:  So you're going to have
3    to try the give the answers in an oral way.
4    This is not, I don't think, an appropriate
5    way to answer the question, unfortunately.
6         A.   Okay.  You know, my problem is with
7    the question is that I'm trying to understand,
8    and I think it was your use of the word
9    "without" in the relation in which you used it.
10   Maybe you can rephrase the question in a way I
11   can understand it.
12           So the rational is that the customer
13   accounts are coming over?
14        Q.   Yes.
15        A.   Yes.  And would it be rational to take
16   the customer accounts without also taking the
17   proprietary accounts?
18        Q.   No.  My question is this, Mr. Leitner:
19   Would it have been rational for Barclays to take
20   the PIM customer accounts plus the collateral
21   that the PIM customers had provided to Lehman,
22   but not the margin that Lehman had posted at the
23   OCC to secure the customer options placed at the
24   OCC?
25        A.   So let me get this straight.  The --

Page 149

1            A. Leitner
2    everything is coming over to Lehman -- to
3    Barclays, proprietary positions, everything else
4    is coming over, but the margin associated with
5    the customer positions is not coming over?
6         Q.   Would that be rational, sir?
7         A.   In the -- I thought I already answered
8    that, but let me say again, in the context of
9    this transaction, I don't think it would have
10   been rational because Barclays did not know all
11   of the risks it was going to take in taking the
12   full brunt of the -- I'm sorry, the full set of
13   obligations as a clearing firm for all of these
14   positions, including the customer positions.
15           Thank you for patiently going through
16   your scenario.
17        Q.   You're aware, sir, that Barclays, for
18   non-PIM customer options positions, has charged
19   back the Lehman estate for the cost of closing
20   out those positions?
21        MS. BLOOMER:  Objection to the form of
22   the question.
23        A.   Who's charged back closing out which
24   positions?
25        Q.   You understand that Lehman cleared

Page 150

1           A. Leitner
2   positions at the OCC for customers other than
3   PIM customers, correct?
4       A.   Yes.
5       Q.   And you understand that when Barclays,
6   after the closing of the transaction on the
7   22nd, cleared those non-PIM customer positions,
8   Barclays charged back the Lehman estate for the
9   costs incurred in closing out those positions?
10          MS. BLOOMER:  Object to the form of
11      the question.
12      A.   I may describe what I think happened
13  differently than the way you did, because my
14  understanding is that the customers that
15  remained with Lehman -- and those are the
16  customer we're talking about, right?
17      Q.   The customer accounts.
18      A.   The customer accounts that stayed at
19  Lehman?
20      Q.   Yes.
21      A.   -- who had option positions, either
22  long or short, the clearing responsibility was
23  accepted by Barclays for those accounts and an
24  operational mechanism was set up so that
25  Barclays could work with the trustee and the

Page 151

1           A. Leitner
2   customers to accommodate those customers'
3   activities.
4           My understanding was the customers
5   were still in charge of what happened in their
6   accounts and were ultimately responsible for
7   making or taking delivery, paying for securities
8   and so forth, and had to work through the
9   trustee.  That is my general understanding of
10  what happened.
11          So Barclays was fully at risk if an
12  option was exercised for one of those customers
13  and was not settled by the customer.
14      Q.   It sounds to me like you're testifying
15  about a credit risk or a risk of default by the
16  customer, sir.
17          MS. BLOOMER:  Objection to the form of
18      the question.
19      A.   I'm just expressing my understanding
20  of what happened.
21          Sorry, go ahead.
22      Q.   Is there a market risk that Barclays
23  faced in clearing for the LBI customers whose
24  accounts it did not assume?
25          MS. BLOOMER:  Objection to the form of

Page 152

1           A. Leitner
2   the question.  Asked and answered.
3       A.   Only associated with the potentiality
4   for increasing the credit risk.
5       Q.   Are you aware, Mr. Leitner, one way or
6   the other, whether or not, where there was a
7   customer default for a customer whose account
8   Barclays did not assume, Barclays charged back
9   the LBI estate for the cost associated with that
10  close-out?
11      A.   By the way, I -- I -- you're using the
12  word "charge back."  I have not object to that
13  word, but I would not use that word in
14  connection with what Barclays was doing.
15  Barclays was settling transactions, and the
16  requirement was to make or take delivery in
17  connection with option exercises and the like
18  and, therefore, to look for either the party to
19  make delivery or to compensate Barclays for the
20  cost of doing so.
21          So I'm -- I think I understand what
22  you're meaning, but I just want to make sure
23  that there is a settlement operation that in a
24  sense had its own performance risks.
25      Q.   I understand that, sir.

Page 153

1           A. Leitner
2           Is it your understanding that if the
3   customers did not fulfill their obligations to
4   Barclays, and again, these are customers whose
5   accounts Barclays did not take, then Barclays
6   has looked to the Lehman estate to make good on
7   the losses incurred by Barclays in connection
8   with the close-out of the customer whose account
9   they did not take?
10      A.   Yes, that's my understanding.
11          MS. BLOOMER:  Objection.  I object to
12      the form of the question.
13      Q.   Turning to the proprietary positions
14  taken at the OCC, sir, by Barclays, you have
15  described in your earlier testimony some of the
16  risks that are associated with taking those
17  positions, right?
18      A.   Yes.
19      Q.   Would you agree, sir, that there's
20  also a potential upside to taking those
21  positions?
22      A.   Yes.
23      Q.   Is the reason that Barclays took the
24  proprietary derivatives at the OCC because of
25  that potential upside?

Page 154

1           A. Leitner
2      A.   I have no factual basis to know how
3  Barclays valued this particular aspect of the
4  transaction.  I assume, again, as an expert in
5  the industry, that Barclays discerned some value
6  for being in the, holistically, in this
7  transaction and doing it at all, but I don't
8  know where they saw the value or in fact how
9  they valued it.
10      Q.   Were you aware, sir, that in addition
11  to Barclays' knowledge about the existence of
12  hundreds of millions of dollars of excess margin
13  at the OCC prior to the closing, Barclays
14  understood that it could expect payments of
15  almost 370 million from the firm accounts at the
16  OCC on the morning of September 22?
17         MS. BLOOMER:  I object to the form of
18      the question and the fact that it assumes
19      facts not in evidence.
20      A.   I don't have any recollection of
21  exactly, you know, which accounts were -- at the
22  OCC were which.  I think that there was in fact
23  a -- that on the 22nd, I believe there was a
24  so-called excess over the requirement there.
25      Q.   I'm handing you, Mr. Leitner, what has

Page 155

1           A. Leitner
2  been marked previously at another deposition as
3  Exhibit 627.  If you could take a moment, sir,
4  and let me know whether you've seen this
5  document before, please.
6      A.   Okay.  I've seen this.
7      Q.   In what context have you seen it, sir?
8      A.   In preparing for this deposition and
9  in reviewing materials, but I don't know when I
10  first saw it.
11      Q.   Do you agree with me, sir, that this
12  document reflects the knowledge of Barclays'
13  counsel the day before the closing of this
14  transaction that Barclays could expect to
15  receive projected settlements of almost $370
16  million from the former LBI firm accounts at the
17  Options Clearing Corporation?
18         MS. BLOOMER:  Objection to the form of
19      the question and mischaracterizes the
20      document.
21      A.   This seems to be a, as far as I can
22  determine from this document, it appears to be a
23  notification which is conditional on amounts
24  deemed at that time to be owed to Barclays, but
25  it is also my understanding that there were

Page 156

1           A. Leitner
2  clearance and settlement issues arising out of
3  the expiration of options, and I am not sure,
4  although I believe it to be the case, that they
5  had -- they would have an impact on what the net
6  was, but I don't know what that was.
7         MR. OXFORD:  Okay.  Can you read back
8      my last question?
9         (Record read.)
10         MS. BLOOMER:  If you're repeating the
11      question, I object in that it's been asked
12      and answered.
13      Q.   Can you answer my question, sir?
14      A.   I thought I did.
15      Q.   I think you tried to.  I don't think
16  you did, with respect, sir.  I'd like you to try
17  again.
18         MS. BLOOMER:  Objection.  Asked and
19      answered.  If you don't like his answer,
20      that doesn't mean he has to try and give you
21      a different answer.
22         MR. OXFORD:  I'm entitled to an
23      answer.  So, please, can you try again to
24      answer the question?
25         MS. BLOOMER:  Objection.  Asked and

Page 157

1           A. Leitner
2  answered.
3         MR. OXFORD:  That's fine.  That's on
4      the record.
5      A.   My answer was that there is a number
6  here that is due of $358 million that is a
7  collect that is subject to all margins staying
8  where it is, and my recollection is that because
9  there was also a settlement of options over the
10  weekend, I have a recollection that that will
11  impact a potential pay.  So I don't know whether
12  the net is -- that this reflects the net.  So --
13      Q.   Sir, with respect, I'm not asking you
14  about the net.
15      A.   But it may be that my recollection is
16  incorrect and that this is the number that came
17  over.  I don't know that it did.  All I know is
18  that it reflects -- it says what it says, which
19  is that it -- that there is a collect, i.e., an
20  amount due the firm based on the calculation at
21  that time.
22      Q.   And independent of your recollection,
23  sir, which you have testified may or may not be
24  correct, is it your understanding that this
25  document reflects a communication from the OCC

Page 158

A. Leitner

1        A. Leitner
2  to Barclays' counsel the day before the closing
3  that Barclays could expect to receive a
4  projected settlement from the LBI accounts at
5  OCC, the firm accounts, of approximately $370
6  million?  And my question is limited to this
7  document, sir.
8    A.  Yes.
9      MS. BLOOMER:  I object to the
10   question.  You've asked and answered the
11   question.
12    Q.  Could you turn to paragraph 62 of your
13  report, please, sir?
14    A.  Page?
15    Q.  26.
16    A.  Oh.
17    Q.  Paragraph 62.
18    A.  Okay.
19    Q.  Do you have that there, sir?
20    A.  I do.
21    Q.  The first sentence of your opinion in
22  paragraph 62 says, "At the time of signing of
23  APA, Barclays had received only limited, and in
24  some respects inaccurate, information from LBI
25  concerning the long and short positions Barclays

Page 159

A. Leitner

1        A. Leitner
2  had originally contracted to acquire (and even
3  less information, if any, about the
4  exchange-traded derivatives components of those
5  positions)."
6      Do you have any idea, sir, one way or
7  the other, whether or not Barclays had any
8  information about the exchange-traded derivative
9  portfolio of LBI when it signed the APA?
10      MS. BLOOMER:  Objection to the form of
11   the question.
12      THE WITNESS:  Sorry, what did you say?
13      MS. BLOOMER:  I just objected to the
14   form of the question. I'm sorry.  I forgot
15   about the hearing issue.  I apologize.
16    A.  Would you read back the question?
17    (Record read.)
18    A.  No.
19    Q.  Do you know whether or not, sir,
20  Barclays asked anybody at Lehman, prior to
21  Barclays signing the APA, for information about
22  the derivatives portfolio that it would acquire
23  under the APA?
24    A.  Excuse me.  The timing of the document
25  was the 16th?

Page 160

A. Leitner

1        A. Leitner
2    Q.  Correct.
3    A.  Which was Wednesday?
4    Q.  Tuesday, sir.
5    A.  Tuesday.
6    Q.  Tuesday, the 16th of September.
7      MS. BLOOMER:  I'm going to object.  I
8   think the agreement may have been signed on
9   the 17th, Neil.  I'm not 100 percent sure
10   about that, but I think there's some
11   confusion about that.
12      MR. DAKIS:  It's agreed to on the 16th
13   and then presented to the court at the
14   Procedures Motion Hearing on the 17th.
15      MS. BLOOMER:  Okay.
16      MR. DAKIS:  It was agreed to and I
17   think dated as of the 16th.
18      MS. BLOOMER:  It's dated as of the
19   16th?
20      MR. DAKIS:  I believe so.  I believe
21   it's agreed to on the 16th.
22      MS. BLOOMER:  Agreed to on the 16h.
23   Okay, I'll take your representation.  You
24   can take the representation as true.  I
25   wasn't sure.  Thank you.

Page 161

A. Leitner

1        A. Leitner
2    A.  Not that it matters one way or the
3  other, but my recollection of the documents I
4  reviewed, the testimony I reviewed was that, as
5  stated here, they were trying to find out what
6  those positions were, but I don't know how much
7  information they had actually received prior to
8  the signing of the agreement.
9    Q.  And you actually don't know whether or
10  not Barclays even asked for that information
11  prior to signing the APA, do you, sir?
12    A.  I do not know when or who initially
13  communicated requests for that information, but
14  I am aware that they were -- that there were --
15  particularly Mr. King was looking for
16  information because he was the risk manager of
17  the transaction.
18    Q.  You spoke to Mr. King in preparation
19  for your deposition?
20    A.  No, I did not.  I only read his
21  testimony.
22    Q.  Did you speak to Mr. King in
23  connection with your report?
24    A.  No, I only read his deposition.
25    Q.  If you could turn to Schedule 2,

## Page 162

A. Leitner

1  sir -- sorry, Schedule 1 to your report, in
2  particular to page 4 of Schedule 1. Do you have
3  that page, sir?
4     A.  Yes.
5     Q.  Do you see there's a list -- there's a
6  heading "Witness Interviews," do you see that,
7  sir?
8     A.  Yes.
9     Q.  And then there's a list of people
10 underneath that?
11    A.  Yes.
12    Q.  Did you compile that list, sir?
13    A.  I assisted in its compilation. I
14 reviewed it.
15    Q.  Okay. What's that list intended to
16 represent, sir?
17    A.  Any contacts, which would include
18 meetings that I attended where people may have
19 been on the phone, conference calls. I don't
20 recall being in a meeting with Mr. King, but he
21 may have been on a call with any one of those
22 parties when we were discussing aspects of the
23 transaction.
24    Q.  But you did in some sense meet or

## Page 163

A. Leitner

1  interview with him prior to and pursuant to your
2  efforts to compile this January 8 report, sir?
3     MS. BLOOMER: Object. If you can
4  remember, you can answer the question.
5     A.  I'm sorry, your question was?
6     MS. BLOOMER: Did you meet with or
7  speak to Stephen King before the report.
8     A.  I don't recall him being in the same
9  room with me.
10    Q.  Did you speak with Mr. King on the
11 telephone, sir, in connection with preparing
12 your report?
13    A.  I believe he was on at least one
14 meeting where there were other people present
15 and I believe the subject matter had to do with
16 post-transaction issues.
17    Q.  Did you ask Mr. King if he asked
18 Lehman for information about the exchange-traded
19 derivative portfolio that Barclays intended to
20 acquire?
21    A.  No.
22    Q.  You presumably then didn't ask him
23 when he asked that question of Lehman?
24    A.  Correct.

## Page 164

A. Leitner

1     Q.  The next sentence at paragraph 62 of
2  your opinion, sir, reads, "Indeed, Barclays'
3  only way to gauge the nature of the ETD
4  positions prior to the closing was to observe
5  directional movements in the OCC's margin
6  requirements." Do you see that?
7     A.  Yes.
8     Q.  Is that your opinion, sir?
9     A.  It's not an opinion. It is what I
10 understood to be a fact based on Mr. King's
11 deposition.
12    Q.  But you know, sir, that Barclays did
13 in fact have lists of Lehman's exchange-traded
14 derivatives positions prior to the closing,
15 correct?
16    MS. BLOOMER: Objection to the form of
17 the question. Assumes facts not in
18 evidence.
19    MR. OXFORD: It assumes facts in Mr.
20 Leitner's report.
21    MS. BLOOMER: Do you want to specify
22 which positions they had lists of and which
23 they didn't, Neil? Because if not, it
24 assumes facts not in evidence.

## Page 165

A. Leitner

1     MR. OXFORD: I'll get there.
2     Q.  Do you have my question in mind, Mr.
3  Leitner?
4     (Record read.)
5     A.  I believe they had -- step back. At
6  some point prior to closing, I believe they had
7  a list of the OCC option positions. I'm not
8  certain that they had a list of all of the
9  futures positions traded on foreign exchanges.
10 I just don't remember -- know that they did.
11    Q.  So if your testimony that you have
12 just given is accurate, that Barclays had a list
13 of OCC options positions prior to closing, then
14 it can't be true that Barclays' only way to
15 gauge the nature of those positions prior to the
16 closing was to observe directional movements in
17 the OCC's margin requirements, can it?
18    MS. BLOOMER: Objection to the form of
19 the question.
20    A.  If, as I recollect, they only were
21 able to receive and digest the positions over
22 the weekend, it would have been too late to do
23 anything about it. So -- and indeed, even with
24 those positions, the -- on the morning of the

Page 166

1          A. Leitner
2    closing, that would -- it would also be true
3    that they would only be able to observe the
4    directional movement, so on a gross basis.
5       Q.   Have you finished your answer, sir?
6       A.   Yes.
7       Q.   Why do you say that if Barclays did
8    not receive information on Lehman's
9    exchange-traded derivatives until the Friday
10   before the closing of the transaction it was too
11   late to do anything about it?
12      A.   I think, in order to understand that,
13   it's important to read the balance of paragraph
14   62 in which I say, "This lack of information was
15   partly the result of the setup of LBI's computer
16   system, which lumped together both
17   exchange-traded derivatives and over-the-counter
18   derivatives."
19          That was -- that statement was based
20   on Mr. King's testimony and, therefore, my
21   belief that based on that testimony, that the
22   prior statement was an accurate statement, that
23   is, that the only way to gauge the nature of the
24   positions prior to closing was to observe the
25   directional movement.

Page 167

1          A. Leitner
2          So the fact that they got a printout
3    at some point that had a list of the positions
4    did not necessarily indicate that they would be
5    in a position to take risks mitigation action
6    other than on a sort of gross basis.
7          MS. BLOOMER:  Would this be a good
8       time for a break, Neil?
9          MR. OXFORD:  Can I have -- I want to
10      do a couple of documents and then we can
11      take a break.
12      Q.   Mr. Leitner, I'm handing you, sir, a
13   document that's been previously marked in these
14   depositions as Exhibit 554.
15      A.   I have the document.
16      Q.   Okay.  Could you turn to paragraph 91
17   of your report, sir, and tell me whether or not
18   this is the first e-mail that you reference in
19   paragraph 91?
20          MS. BLOOMER:  I'm going to object to
21      the question and just ask, are you certain
22      that this is a full reproduction of the
23      exhibit to the e-mail, Neil?
24          MS. HASSAN:  Exhibit 564 is an excerpt
25      of, I think.

Page 168

1          A. Leitner
2          MS. BLOOMER:  Of a how many page
3       document?
4          MS. HASSAN:  It's a long one.
5          MS. BLOOMER:  Do you know how long?
6          MS. HASSAN:  I think it's a few
7       hundred pages.
8          MR. OXFORD:  Is this an accurate -- is
9       Exhibit 55 -- is this, is what I have
10      marked --
11         MS. HASSAN:  Right.
12         MR. OXFORD:  -- everything that's in
13      Exhibit 554?
14         MS. HASSAN:  Right, and it corresponds
15      to the Bates number in paragraph 91.
16         MS. BLOOMER:  I don't care what the
17      exhibit is.  I care about the fact that if
18      the e-mail is saying they're sending
19      something that's six pages long or that's
20      506 pages long.  What was the actual
21      attachment to the e-mail that Barclays
22      received as reflected on this cover e-mail?
23         MR. OXFORD:  It sounds like it may be
24      longer, so we can get that if you would like
25      that, Trish.

Page 169

1          A. Leitner
2          MS. BLOOMER:  I think it's important
3       context to help him answer the questions
4       you're asking him.
5       A.   Is there a question?
6       Q.   Yes.  Can you tell me whether Exhibit
7    554 is the first e-mail and attachment that you
8    reference in paragraph 91, subject to Trish's
9    question as to whether or not there may be
10   additional pages to the attachment?
11      A.   It certainly appears to be.  It's --
12   the time sequence on it of 4:45 P.M. is close to
13   what's on the e-mail, which says 4:45:22 P.M.
14         MS. BLOOMER:  Were you going to get
15      the whole document before you ask any
16      questions about it?  I mean, you can't give
17      him this and ask him to answer questions on
18      it if it's not the right document.
19         MR. OXFORD:  I can ask him whatever
20      questions I like, Trish.  You can have
21      whatever objections you like.  We'll get the
22      document.
23         MS. BLOOMER:  I'm going to object to
24      any question you ask about this document
25      before you give him the full attachment to

Page 170

1    A. Leitner
2    the e-mail.
3        MR. OXFORD:  That's fine.  I can't
4    pull a rabbit out of a hat quite that
5    quickly.
6        MS. BLOOMER:  I understand.  Maybe you
7    can come back to it or at least represent to
8    him how many pages this document is.  Maybe
9    you can determine that out of a hat.
10       MR. OXFORD:  I cannot.
11   Q.   Do you know, sir, looking at 554 which
12   computer system this report is drawn from?
13       MS. BLOOMER:  Objection to the
14   question to the extent the witness said he
15   doesn't have a full and complete picture of
16   the exhibit.
17       MR. OXFORD:  Your objection is noted.
18   Q.   Can you tell, sir?
19   A.   No, I can't tell.
20   Q.   Did you ask anybody?
21   A.   No.
22       MS. BLOOMER:  Objection to the
23   question.
24   Q.   You didn't ask Mr. King?
25   A.   Excuse me?

Page 171

1    A. Leitner
2    Q.   You didn't ask Mr. King what Lehman
3    system this document came from?
4        MS. BLOOMER:  Objection to the
5    question.
6    A.   No.
7    Q.   You said to prepare your report with
8    two of the former Lehman operations people with
9    responsibility for options; is that correct,
10   sir?
11   A.   Yes.
12   Q.   And those names are Dan Dzeimian and
13   Craig Jones?
14   A.   Yes.
15   Q.   Did you ask either Mr. Dzeimian or Mr.
16   Jones about what information was available in
17   Lehman's computer systems about Lehman's ETD
18   portfolio in the week of September 15?
19   A.   No.
20   Q.   Did you ask anybody in preparation for
21   your report, sir, about what information was
22   available in Lehman's computer systems about
23   Lehman's exchange-traded derivatives portfolio
24   in the week of September 15?
25   A.   No.

Page 172

1    A. Leitner
2    Q.   Do you have any information, sir,
3    about what information was available in Lehman's
4    computer systems about Lehman's ETD portfolio on
5    the week of 15th of September?
6        MS. BLOOMER:  Objection to the form of
7    the question.
8    A.   No, no direct information.  Only
9    indirect information based on documents that I
10   have received, such as the document you're
11   showing me, which was produced as a document
12   received by Barclays.  So I was focusing
13   obviously in my opinion on what Barclays had and
14   what they knew and when they knew it, and as you
15   point out, if this is the position run for --
16   even if it's only the list of derivatives
17   position, it's a document they got at 4:45 on
18   Friday.
19   Q.   Do you have any reason to believe,
20   sir, that if Barclays had asked for a position
21   run from Lehman's computer systems at any time
22   during the week of September 15th, 2008, that
23   Barclays would not have received that position
24   run on the exchange-traded derivatives portfolio
25   that they intended to acquire from Barclays?

Page 173

1    A. Leitner
2        MS. BLOOMER:  I object to the form of
3    the question.  It assumes facts not in
4    evidence.
5    A.   I would like an opportunity to refer
6    to my report and refresh my recollection,
7    because I want to see whether other paragraphs
8    cover that so I can answer you.
9    Q.   Okay.  Please take a moment.
10       (Discussion off the record.)
11   A.   Okay.  I've reviewed the report and it
12   hasn't really helped me refresh my recollection,
13   but I do believe that there is -- there are
14   e-mail exchanges between Barclays executives
15   relating to the lack of information prior to the
16   Friday in an attempt to receive the information,
17   including OTC derivatives, but I would have to
18   look elsewhere in the record to find out if my
19   recollection is accurate.
20       But I believe that on the Thursday and
21   the Friday morning, there were attempts to get
22   this information, which is why they got it on
23   Friday because clearly somebody had asked for it
24   before then.
25       MS. BLOOMER:  And just to -- you were

Page 174

1              A. Leitner
2    reviewing your report while Neil and I were
3    having a discussion, but this document, the
4    attachment to this e-mail, was 760 pages
5    long.  They were able to determine it.
6          THE WITNESS:  Yes, I know.  I have
7    seen it, I have seen the entire document,
8    which helps me to appreciate even more so
9    why there was such a post-closing
10   operational issue to try to get this data
11   migrated onto Barclays' systems.  Because
12   there were just thousands of positions.
13         MR. OXFORD:  And Trish, just so the
14   record is clear, when you were talking about
15   this document, the record should reflect you
16   were pointing to Exhibit 554.
17         MS. BLOOMER:  Thank you.
18         MR. OXFORD:  Can you read back,
19   please, Kathy, my last question?
20         (Record read.)
21         MS. BLOOMER:  And again, I object.
22   Assumes facts not in evidence.
23      A.  I have no information on the topic, so
24   I don't know.
25         MR. OXFORD:  Now might be a good time

Page 175

1              A. Leitner
2    to take a five-minute break.
3          (Recess; Time Noted:  2:13 P.M.)
4          (Time Noted:  2:29 P.M.)
5    BY MR. OXFORD:
6       Q.  Turning back to paragraph 62 of your
7    report for a moment, sir, you stated that the
8    lack of information that Barclays had about
9    Lehman's ETD positions prior to closing was
10   partly the result of the setup of LBI's computer
11   systems which lumped together both
12   exchange-traded derivatives and over-the-counter
13   derivatives.  Do you see that part of your
14   opinion, sir?
15      A.  Yes.
16      Q.  Is that opinion based on anything
17   other than a reading of Mr. King's testimony?
18      A.  No.
19      Q.  Was Mr. King, to your knowledge, ever
20   employed by Lehman, sir?
21      A.  I don't know.
22      Q.  As you understand it, he was employed
23   by Barclays, correct?
24      A.  Yes.
25         MS. BLOOMER:  Objection.

Page 176

1              A. Leitner
2       Q.  Did you do anything to test whether or
3    not Mr. King's statement about the lack of
4    information that Barclays had about the
5    exchange-traded derivatives prior to closing
6    being partly the result of the set-up of LBI's
7    computer systems?
8          MS. BLOOMER:  Objection to the form of
9    the question.
10      Q.  Sorry.  Did you do anything to test
11   whether or not that statement by Mr. King was
12   true?
13      A.  No.
14      Q.  Does it seem credible to you that a
15   sophisticated broker-dealer such as LBI would
16   have a computer system that would not be able to
17   separate exchange-traded and over-the-counter
18   derivatives?
19         MS. BLOOMER:  Objection to the form
20   and scope of his opinion.
21      A.  I would not be surprised, based on my
22   experience in the industry, that a sophisticated
23   firm for purposes of its management of its
24   equity derivatives books, trading books, would
25   combine all of its exposures in one place and

Page 177

1              A. Leitner
2    that it would take a degree of expertise based
3    on someone knowledgeable about the systems to
4    know how to extract the particular risk profiles
5    you wanted to see within that book, very much
6    dependent upon the organization structure and
7    technological capabilities of each firm, but it
8    would not surprise me if in fact the proprietary
9    equity derivatives positions were combined.
10      Q.  Would it surprise you if it were
11   impossible to extract from Lehman's computer
12   systems a report that separated the
13   exchange-traded and over-the-counter
14   derivatives?
15      A.  Would you read back the question,
16   please?
17         (Record read.)
18      A.  It would surprise me if any firm
19   couldn't eventually get a report of all its
20   exchange-traded derivatives positions.  I have
21   no knowledge of how, assuming that the document
22   with -- many-thousand-page document or whatever
23   it is, many thousand positions that were
24   delivered to Barclays on the Friday night, which
25   computer system they were extracted from.  All I

Page 178

A. Leitner

1  know is that the testimony that I was -- that I
2  based my statements on page 62 was that, prior
3  to the Friday, Mr. King's understanding,
4  presumably from something he heard from the
5  Lehman side, I don't know what, was that they
6  were having problems extracting the listed
7  positions from the OTC positions which were not
8  coming over.
9      Q.   When you met with the Lehman's
10 operations people, did, including Mr. Dzeimian
11 and Mr. Jones, did you ask them whether anybody
12 asked them in the week of September 15 to
13 extract any information from Lehman's computer
14 systems about Lehman's exchange-traded
15 derivatives portfolio?
16     A.   I did not ask them.
17     Q.   You didn't ask them whether or not Mr.
18 King's statement that you rely upon in paragraph
19 62 of your report was in any way accurate?
20     MS. BLOOMER:  That's another question?
21     MR. OXFORD:  Yes, it's another
22 question.
23     A.   My conversations with those gentlemen
24 had to do with the management of the collateral,
25

Page 179

A. Leitner

1  not with the risk or of composition of the
2  options book.  It would not have occurred to me
3  to ask them, given my knowledge of what their
4  job was, to test that question.  I would have
5  been shocked if they knew the answer.
6      Q.   Did you talk to anybody who would know
7  whether or not what Mr. King said was correct?
8      A.   No.
9      Q.   You're aware, sir, that Lehman had a
10 long-standing relationship with the OCC,
11 correct?
12     A.   Based on my industry experience, yes,
13 I'm aware.
14     Q.   And as a result -- withdrawn.  Based
15 on your expertise in the industry, sir, you are
16 aware, are you not, that a broker-dealer such as
17 Lehman has access to reports from the OCC's
18 computer systems?
19     A.   Yes.
20     Q.   The OCC is able to generate a report
21 from its computer systems that shows the
22 positions held by each of the broker-dealers who
23 are members of that corporation, correct?
24     A.   Yes.
25

Page 180

A. Leitner

1      Q.   What's the name of that report, sir?
2      A.   I don't remember.
3      Q.   Would you characterize it as a
4  positions report?
5      A.   Yes.
6      Q.   And the OCC are able to generate a
7  report for each account held by each
8  broker-dealer, correct?
9      A.   Yes.
10     Q.   They're able to do that fairly easily,
11 aren't they, sir?
12     A.   Should be able to, yes.
13     Q.   And in fact, these reports are
14 provided to broker-dealers who are OCC members
15 on a routine basis, are they not?
16     MS. BLOOMER:  Objection to the
17 question.
18     A.   My -- I'm not certain whether today
19 that's a query that the firm can make and,
20 therefore, pull it whenever they want or whether
21 they have to request a download from OCC.
22     Q.   Okay.  So whether the broker-dealer
23 has to request the data from the OCC or whether
24 the broker-dealer has direct access to the OCC's
25

Page 181

A. Leitner

1  computer systems, you agree that a broker-dealer
2  can quickly and easily obtain a report from the
3  OCC as to the positions that that broker-dealer
4  holds at the OCC, correct?
5      MS. BLOOMER:  Objection to the form of
6  the question.
7      A.   Yes.
8      Q.   And that holds true as of September
9  2008, correct, not just today?
10     A.   Yes.
11     Q.   Barclays is a member of the OCC as
12 well, correct?
13     A.   Yes.
14     Q.   How long has Barclays been a member of
15 the OCC for?
16     A.   I have no idea.
17     Q.   Do you know if Barclays was a member
18 of the OCC in 2008?
19     A.   Without certainty as to the structure
20 of Barclays, a Barclays entity, and it could
21 have been BCI, was a member of OCC, that's my
22 understanding.
23     Q.   And do you have any understanding,
24 sir, of how long prior to September 2008 the
25

Page 182

A. Leitner

1    Barclays entity, whether it's BCI or some other
2    Barclays entity, had been a member of --
3        A.   No.
4        Q.   -- the OCC?
5        A.   I don't have any knowledge about that.
6        Q.   Is it reasonable in your expert
7    opinion, sir, to assume that Barclays, as a
8    member of the OCC, would have had an
9    understanding of the types of reports and data
10   available to a broker-dealer such as LBI from
11   the OCC's computer systems?
12       A.   I would assume they did know that,
13   yes.  Somewhere in the organization.
14       Q.   Do you have any reason to believe,
15   sir, that the information on the OCC's computer
16   systems as of the week of September 15, 2008
17   regarding the LBI positions at the OCC was
18   inaccurate?
19           MS. BLOOMER:  Objection to the form of
20       the question.
21       A.   I have no reason to believe it was
22   inaccurate.
23       Q.   Do you have any reason to believe that
24   information on the OCC's computer systems was

Page 183

A. Leitner

1    incomplete in the week of September 15 --
2        A.   No.
3           MS. BLOOMER:  Objection to the form of
4       the question.
5        Q.   -- 2008?
6        A.   No.
7        Q.   You're aware, sir, are you not, that
8    Barclays was in direct contact with the OCC
9    prior to the closing of this transaction?
10          MS. BLOOMER:  Objection to the form of
11      the question.  Assumes facts not in
12      evidence.
13       A.   Can you put a context and a timeframe?
14   I mean, they were, as members of OCC,
15   Barclays -- some people at Barclays would be in
16   touch with OCC daily.  So --
17       Q.   In connection with this transaction,
18   sir, we looked at an e-mail from the OCC to Mr.
19   Ed Rosen of Cleary, who is Barclays outside
20   counsel, do you remember that?
21       A.   Correct.
22       Q.   So we know based, if nothing else, on
23   that e-mail, we know that there was direct
24   contact between the OCC and Barclays' counsel,

Page 184

A. Leitner

1    correct?
2           MS. BLOOMER:  Barclays' counsel did
3       you say?
4           MR. OXFORD:  Yes.
5        A.   Right.  Yes.
6        Q.   Do you have any reason to believe that
7    the OCC reports of LBI's positions during the
8    week of September 15 could not have been made
9    available to Barclays?
10          MS. BLOOMER:  Objection to the form of
11      the question.
12       A.   I don't know why they couldn't have
13   been.  I also don't know why they weren't.
14       Q.   Do you think a rational purchaser
15   would have requested a report from the OCC of
16   Lehman's derivatives positions prior to signing
17   the Asset Purchase Agreement in this case?
18          MS. BLOOMER:  Objection to the form of
19      the question.
20       A.   Under the chaotic circumstances of
21   this case, with the, what appeared to me,
22   relatively small number of people working on the
23   deal documents and transactions on both sides,
24   that is what appears to me to be the case, that

Page 185

A. Leitner

1    the Barclays people relied on a small number of
2    people on the Lehman side to give them the
3    information that they needed.
4           Whether it would have been a good idea
5    for them to try and get OCC to give them this
6    information at some point in time, would it have
7    been a good idea?  Well, sure.  I'm not certain,
8    by the way, that OCC would have accommodated
9    them since they have no obligation to provide
10   the information from, you know, one member to
11   another.
12          But I think it's also important to
13   keep in mind that Barclays at some point was
14   also becoming aware that, both with respect to
15   the customer positions and with respect to the
16   proprietary positions, they were -- there was
17   some quantity of option positions in there that
18   were not really proprietary positions because
19   they were positions of affiliates, and that with
20   respect to the customer positions, there were
21   similarly positions that really were being
22   carried for Lehman affiliates.
23          And so the risk management challenge
24   to Barclays was only in part based upon their

Page 186

```
1            A. Leitner
2  ability to, you know, assess the overall risk of
3  the thousands of positions for which they were
4  responsible.
5      Q.   You've testified, sir, that Barclays,
6  in assuming responsibility for Lehman's
7  exchange-traded derivative portfolio, faced
8  unquantifiable risks as of closing, correct?
9      A.   Yes.
10     Q.   And you agree with me --
11         MS. BLOOMER:  I object to the
12     characterization of the testimony.  Just
13     give me a moment.  I'm sorry.  I didn't get
14     my objection in quick enough.
15         THE WITNESS:  Sorry.
16     Q.   Do you believe, sir, that it would
17 have been prudent for Barclays, prior to
18 agreeing to assume that unquantifiable risk, to
19 have requested, whether directly from the OCC or
20 from the OCC via Lehman, a report of the
21 derivatives portfolio for which it was assuming
22 or proposing to assume responsibility?
23     A.   My understanding is that there was a
24 wide range of businesses, assets, people and so
25 forth involved in this transaction being managed
```

Page 187

```
1            A. Leitner
2  by a relatively small team on both sides.  As
3  important as the derivatives clearing business
4  was, this was a subset of all the issues that
5  people were worried about, including Mr. King,
6  and so it is not surprising to me that, in
7  trying to assess and manage all the risks of the
8  businesses that they were taking on, the fixed
9  income portfolios, which assets they were going
10 to take and not take, other aspects of the
11 transaction that were not related to the
12 equities book, that some of the things that
13 would have been good to do or even important to
14 do were not done.
15     I think that, given the short
16 timeframe and the many issues that they were
17 running with, they did as good a job they could
18 have done, but that's only my, you know,
19 assessment of, you know, the facts.  And I
20 believe they were getting -- it appears to me
21 that they were getting as much cooperation as
22 they could from the Lehman side as quickly as it
23 could be provided.
24     But the Lehman team was, you know,
25 this was just one of the many issues they were
```

Page 188

```
1            A. Leitner
2  trying to deal with.  That is the impression I
3  take away from, you know, the broader record
4  that I have seen and why, you know, in many
5  cases in the depositions that I looked at the
6  exchange-traded derivatives portion of those
7  depositions is only a small portion of the
8  deposition.
9      Q.   Do you believe --
10     A.   I think, in other words, I believe
11 that the context described in my report about
12 the chaotic nature of this transaction has to be
13 taken into account whenever we are dealing with
14 the "would have been's," "could have been's,"
15 "should have been's."
16     Q.   Do you believe, Mr. Leitner, that it
17 would have been prudent for Barclays, prior to
18 agreeing to assume the unquantifiable risk in
19 Lehman's exchange-traded derivatives portfolio,
20 to have requested, whether directly from the OCC
21 or from the OCC via Lehman, a report of the
22 derivatives portfolio for which it was proposing
23 to assume responsibility?
24         MS. BLOOMER:  Objection to the
25     question.  Asked and answered.
```

Page 189

```
1            A. Leitner
2      Q.   Would it have been prudent, sir?
3          MS. BLOOMER:  Objection to the
4      question.  Asked and answered.
5      A.   Unnecessary.  Good backup.  I wouldn't
6  call it it's of such a prudential nature that,
7  because it -- just keep in mind it wouldn't have
8  told them anything else about the, what -- about
9  the package of unquantifiable risks, when I use
10 that word, that I intended to describe, and that
11 included the credit risks related to the
12 positions that they discovered they were
13 carrying for affiliates and the like.  So it
14 wouldn't have told them anything about that.
15 And so it could have been helpful but not
16 necessary.  It didn't matter really where they
17 got the information.
18     Q.   Is that a question, it wouldn't have
19 been prudent?
20         MS. BLOOMER:  Objection.  Asked and
21     answered twice now.
22     A.   Prudent, but unnecessary.
23     Q.   Why unnecessary, sir?  Unnecessary
24 because they had the information from someone
25 else or because they didn't need the
```

Page 190

A. Leitner

1 information?
2    A.    Because they wanted to do the deal.
3 And I'm talking about the entire transaction.
4 It appears that everyone was motivated to get
5 the transaction done.  And this was -- this was
6 a portion, although an important portion of the
7 transaction, and so you are -- I don't
8 understand the point of your question.
9    If you're isolating a single event as
10 being, you know, prudent or required, the reason
11 I said not required was because they were --
12 because of the context of the transaction as a
13 whole and the fact that they would be getting
14 the assets supporting the businesses, I guess
15 they were willing to work it out.
16    Q.    I thought you said, sir, that they
17 were only getting the assets or they needed the
18 assets according to the businesses because they
19 didn't know this unquantifiable risk, right,
20 that's your testimony?
21    MS. BLOOMER:  Objection to the
22 characterization of his testimony.
23    A.    I don't think I said anything
24 inconsistent with my prior testimony, so ...
25

Page 191

A. Leitner

1    Q.    I'm trying to understand, sir, why
2 when you've testified that Lehman faced --
3 sorry, that Barclays faced an unquantifiable
4 risk in assuming responsibility for Lehman's
5 derivatives portfolio, and that, as a
6 consequence of that unquantifiable risk,
7 Barclays would only have taken that risk if it
8 had the assets, the margin securing those risks,
9 why it wouldn't have been necessary for Barclays
10 to get information such as the information from
11 the OCC about the risks inherent in the
12 derivatives portfolio that it was proposing to
13 acquire from Barclays?
14    MS. BLOOMER:  If that's what you're
15 trying to understand, then I suggest you ask
16 the question that poses that, because that's
17 a different question.  The risks inherent in
18 the derivatives.  The risks, you said this
19 time, information from the OCC asking him
20 for information from the OCC about the risks
21 inherent in the derivatives portfolio.  That
22 is a different question, Neil.  Please don't
23 confuse the witness.
24    Q.    Would a report such as the ones you
25

Page 192

A. Leitner

1 have testified that were available from the OCC,
2 sir, would those reports help Barclays quantify
3 the risks inherent in assuming Barclays'
4 derivatives portfolio?
5    A.    Those reports and any other
6 information that they could get about the
7 portfolios would have helped them assess the
8 risk.
9    Q.    I'm going to hand to you what I've
10 marked as Exhibit 564 -- actually, what I'm
11 about to mark as Exhibit 654.
12    (Exhibit 654, an e-mail from Sheila
13    Zach to Richard Konefal at Barclays Capital
14    copied to Dan Dzeimian and others Monday,
15    September 22 at 4:41 P.M., marked for
16    identification, as of this date.)
17    Q.    Exhibit 654, sir.  I'll identify this
18 for the record, sir, as an e-mail from Sheila
19 Zach to Richard Konefal at Barclays Capital,
20 copied to Dan Dzeimian and others Monday,
21 September 22, at 4:41 P.M.
22    MS. BLOOMER:  Can you wait until I
23 have the document so that I can see that
24 you're identifying it accurately?
25

Page 193

A. Leitner

1    MR. OXFORD:  And the exhibit I have
2 marked is the full document.  In the
3 interest of not killing trees, everybody
4 else has excerpted ones.  We can deal with
5 that if that becomes a problem.
6    Q.    Can you take a moment to review that
7 document, sir and tell me whether you've ever
8 seen it before?
9    A.    It looks familiar.
10    Q.    It looks familiar from where, sir?
11    A.    Because I believe I've seen it before.
12    Q.    In what circumstances have you seen
13 it?
14    A.    I believe this was an exhibit to
15 somebody's testimony.  I don't remember whose.
16    Q.    Did you review it in preparation for
17 your deposition today, sir?
18    A.    I reviewed it in connection with the
19 preparation of my report.
20    Q.    You see on the second page of that
21 e-mail at 3:47 P.M. on Monday, the 22nd of
22 September, Mr. Konefal at Barclays sends an
23 e-mail to Michael Evans of New York, at New
24 York, entitled "Options Positions."
25

| Page 194 | Page 195 |
|---|---|

Page 194

A. Leitner

1
2    A.    I'm looking -- I'm sorry, which?
3    Q.    The bottom of the second page, sir,
4  which has the Bates number 36754.
5    A.    At 3:47, is that the one?
6    Q.    Yes, 3:47 P.M.  Do you see that, sir?
7    A.    I'm reading it now.
8       Okay.
9    Q.    Do you see that Mr. Konefal of
10  Barclays asks Mr. Evans of Lehman Brothers for
11  an OCC file of open positions in 074 for the
12  firm in market-making ranges, do you see that?
13    A.    Yes.
14    Q.    Do you see that Mr. Evans then
15  forwards this request to the OCC?
16    A.    Okay.
17    Q.    And do you see that by 4:41 P.M.,
18  Sheila Zach has provided the requested report to
19  Mr. Konefal?
20    A.    Okay.
21    Q.    Do you see that, sir?
22    A.    Yes.
23    Q.    Do you agree that in less than one
24  hour of Barclays' request for an OCC positions
25  report, the OCC has provided that to Barclays?

Page 195

A. Leitner

1
2    A.    Yes.
3    Q.    Could you take a moment to look at the
4  attachments, the reports that are attached to
5  Mr. -- I'm sorry, Ms. Zach's e-mail?
6    A.    I see it.
7    Q.    Are you familiar with these types of
8  reports, sir?
9    A.    You know, I've seen them once or twice
10  in the course of my career, or reports similar
11  to this.
12    Q.    In your opinion as an expert in this
13  industry, sir, does the report that's attached
14  to the e-mail that I have marked as Exhibit 654
15  provide information that would have been useful
16  to Barclays in quantifying the risks of owning
17  Lehman's exchange-traded derivatives portfolio?
18    A.    Yes.
19    Q.    Is there any other information that
20  Barclays would have needed to know in order to
21  manage the risk inherent in Lehman's
22  exchange-traded derivatives portfolio?
23    A.    Yes.
24    Q.    What's that information, sir?
25    A.    What positions do I have behind it

Page 196

A. Leitner

1
2  that are hedging this book, are there -- are
3  these all the prop account positions or does
4  anybody else have an interest in the positions,
5  would be the among questions you would need to
6  know.
7    Q.    What else, sir?
8    A.    This, this report and data, by the
9  way, to the extent that it went to the
10  operations people, would have been necessary for
11  them to know in order to know -- be able to sort
12  the options not only by Cusip or party, but also
13  by expiration, because they would be concerned
14  about preparing for exercises on the long or
15  short side.
16    Q.    That's all I have for that exhibit,
17  sir.
18       Is it your opinion, Mr. Leitner, that
19  there was market risk to Barclays in unvetted
20  futures positions?
21    A.    Yes.
22    Q.    Can you explain for me what that
23  market risk was?
24    A.    Depends on the futures, but you either
25  have a long or a short position, and as the

Page 197

A. Leitner

1
2  market moves, you are required to either make or
3  take daily variation payment.  So for any
4  position that is on you have a potential
5  immediate funding requirement for that position,
6  usually in cash.
7       So, whereas on the option marketplace
8  you can use various types of collateral to cover
9  your existing margin requirement, the futures
10  market has a daily cash settlement requirement.
11  So there is a liquidity component that's a
12  little bit different than option margin.
13    Q.    Futures are marked to market every
14  day; isn't that correct, sir?
15    A.    Yes.
16    Q.    Was there risk to Barclays in taking
17  Lehman's option -- sorry, futures positions that
18  there would be an immediate liability when the
19  markets opened on the 22nd, or was the risk that
20  the markets would move against these positions
21  and Barclays would have to pay variation margin?
22       MS. BLOOMER:  Object to the form of
23  the question.
24    A.    If I understood your question, I don't
25  know that they're mutually exclusive.  I mean,

Page 198

1           A. Leitner
2   you have a risk, as soon as you take them over,
3   to meet your clearing obligations, and to the --
4   and the clearing obligations of all the options
5   you have taken over as a clearing member,
6   customer or firm, and to see that there is
7   adequate margin there at all times. I think
8   I've described the risks in my report.
9       Q.   Do you believe that the risks to
10  Barclays in taking over the futures positions
11  from Lehman were the same with respect to
12  customer and firm futures?
13      A.   Well, the types of risks that I
14  described in my report apply to a clearing
15  member's responsibilities to the exchange for
16  either the proprietary or customer position. I
17  have this mix of market, liquidity, sort of
18  funding and credit risks, and all of those are
19  present regardless of the type of
20  exchange-traded derivative you're talking about.
21       So my quibble about, you know, which
22  risks are more acute in which market, they're
23  all -- they all exist. And then there's the
24  operational component, particularly with respect
25  to the foreign futures, of having the

Page 199

1           A. Leitner
2   responsibility but having to work out
3   arrangements to take over those positions.
4       Q.   Was there also a potential upside to
5   Barclays in taking over the Lehman firm futures
6   positions?
7       A.   Yes.
8       Q.   Did Barclays do anything to quantify
9   the risk and potential benefit of taking on
10  Lehman's foreign futures positions?
11          MS. BLOOMER:  Objection in that it
12      calls for testimony beyond the scope of his
13      expertise and report.
14      A.   I believe you asked me this question
15  before. I would give the same answer, which is
16  I don't know that there was any specific
17  discussion. I'm not aware of any. In terms of
18  how they value or whether they valued this
19  aspect of the transaction in some specific way
20  as opposed to this was simply a part of this
21  larger transaction that they were doing or
22  acquiring the businesses.
23      Q.   Are you aware, sir, whether or not
24  Barclays did any due diligence on Lehman's
25  futures business?

Page 200

1           A. Leitner
2       A.   They tried.
3       Q.   Tell me what they tried to do.
4       A.   My understanding is that, as I think I
5   testified before, that -- and I believe is
6   reflected in the testimony of Elizabeth James --
7   that Barclays was contacted at some point prior
8   to the signing of the Asset Purchase Agreement
9   about whether they were interested in acquiring
10  the FCM business as a separate business from
11  Barclays, and so there was at least one
12  operational meeting to -- in which Barclays was
13  trying to learn about what that business looked
14  like and in which markets they were operating.
15      Q.   Does that answer, sir, exhaust your
16  knowledge of the due diligence that Barclays
17  did, or tried to do, on the Lehman futures
18  business?
19          MS. BLOOMER:  Objection. At what
20      timeframe are we talking about?
21          MR. OXFORD:  Prior to closing.
22          MS. BLOOMER:  I don't know that we've
23      defined "closing." You mean September 22,
24      2008?
25          MR. OXFORD:  Is there another closing

Page 201

1           A. Leitner
2   date you're aware of?
3          MS. BLOOMER:  I don't think you've
4      ever established with Tony Leitner what you
5      mean by "the closing," so I would like you
6      to establish the date so that he's clear on
7      the question.
8       Q.   Prior to the closing of the
9   transaction, sir, on September 22, 2008, which
10  is a Monday, other than the answer you gave me a
11  moment ago, do you have any information about
12  the due diligence that Barclays did, or
13  attempted to do, before acquiring Barclays'
14  futures business?
15      A.   Only insofar as it is described in the
16  testimony and declaration of Elizabeth King -- I
17  mean Elizabeth --
18      Q.   James?
19      A.   Liz James.
20          Elizabeth King works for the S.E.C.,
21  so ...
22      Q.   I'm sure Ms. James would take the
23  promotion.
24      A.   No, she wouldn't.
25      Q.   If not the pay cut.

Page 202

1            A. Leitner
2      A.   No, she wouldn't.  She wouldn't want
3   Elizabeth's job.
4      Q.   In Ms. James' testimony at her
5   deposition she said that Barclays did not
6   believe there was a proprietary futures business
7   left at Lehman, so she did not believe that
8   there were any house futures positions to take
9   over.  Do you remember seeing that testimony?
10     A.   No.
11           MS. BLOOMER:  Objection to the
12   characterization.
13     A.   No, I don't remember seeing that
14   testimony.
15     Q.   Assuming that is Ms. James' testimony,
16   do you agree that Barclays did not take on any
17   risks, or did not knowingly take on any risks in
18   Barclays -- withdrawn.  Let me try that again
19   properly.
20           If you assume that my representation
21   that Ms. James testified that Barclays did not
22   believe it was assuming any proprietary futures
23   business from Lehman, would you agree with me,
24   sir, that Barclays did not knowingly take on any
25   risks associated with Lehman's proprietary

Page 203

1            A. Leitner
2   futures business?
3           MS. BLOOMER:  Objection to the form of
4      the question and to the characterization of
5      Ms. James' testimony.
6      A.   I believe my report states, and
7   certainly my own knowledge of the transaction
8   is, that Barclays' knowledge of the full range
9   of derivative positions which it was agreeing to
10   take on was imperfect and that it was prepared
11   to take on the clearing responsibilities in
12   spite of its imperfect knowledge in the context
13   of this transaction, and as I indicated, that a
14   basis for them to be willing to do so was that
15   whatever collateral was there to secure those
16   positions would be part of the business and,
17   therefore, so if they wound up in fact having
18   proprietary positions that they didn't expect,
19   they would also have whatever collateral was
20   there to support that.
21     Q.   Would you agree with me, sir, that
22   because futures positions are marked to market
23   every day, they are flat at the end of the
24   trading day?
25           MS. BLOOMER:  Objection to the form.

Page 204

1            A. Leitner
2      A.   Traders would not use the term "flat"
3   to describe the exposure in a futures book.
4      Q.   Do you understand what I'm talking
5   about when I use the term "flat"?
6           MS. BLOOMER:  Objection.
7      A.   I'm not sure I do.
8      Q.   Can you tell me how a trader, then,
9   would --
10     A.   "Flat" normally would --
11           Yes, I can --
12           MS. BLOOMER:  Let him finish his
13   question.
14     A.   -- describe how a trader would
15   describe "flat."  Would you like me to do so?
16     Q.   Please.
17     A.   The way a trader would describe "flat"
18   is he takes the position at the beginning of the
19   day.  For example, he would go long a S&P
20   futures contract, and at the end of the day he
21   would have sold that contract and, therefore, he
22   has no exposure.  He would be flat.  He has
23   generated a loss or a profit as a result of
24   being in and out of the transaction during that
25   day.

Page 205

1            A. Leitner
2           But to a trader, "flat" means no risk,
3   and in this case, if the positions are still on,
4   there is risk.  All you have done in making any
5   variation margin payment is simply complying
6   with an exchange or broker's requirement to
7   reflect the change in value from the beginning
8   of the day or the previous evening until the
9   next day.
10           And you might receive a payment or you
11   would make a payment based on that change in
12   value, but as I think I made clear in my report,
13   it is also possible that you will be asked to
14   make a payment in the middle of the day.  That
15   is not uncommon.  And so part of the particular
16   risks of the futures business is the need for
17   liquidity to be able to make those payments,
18   particularly with respect to foreign markets,
19   where the practice is often to require that the
20   assets and the cash be there before you can even
21   trade.
22           MS. BLOOMER:  Neil, whenever you're
23   ready for another break, I think I am.
24           MR. OXFORD:  I'll take a two-minute
25   break if you guys need it.

Page 206

1           A. Leitner
2        (Recess; Time Noted:  3:18 P.M.)
3        (Time Noted:  3:26 P.M.)
4   BY MR. OXFORD:
5        Q.   Mr. Leitner, I want to go back to one
6   question and answer we had a few moments ago.
7        In the futures business, and I'm
8   talking about the proprietary futures business,
9   when Barclays acquired the business with effect
10  from the morning before the markets opened on
11  the 22nd of September, were the positions, the
12  futures positions, an asset or a liability?  Or
13  were they neither?  Were they a potential asset
14  or liability depending on whether the market
15  moved against or towards the position?
16       MS. BLOOMER:  Objection to the form of
17  the question.
18       A.   I'm not in a position to give an
19  accounting answer.  A future is a contract for
20  future performance subject to the rules of the
21  market on which it's traded, and I've described
22  in my report both the mechanisms for securing a
23  party's performance and the potential risks.
24       Q.   I'm not asking for an accounting
25  answer, sir.  I'm asking for your answer as an

Page 207

1           A. Leitner
2   expert in this industry in 30 or 40 years to
3   tell me whether or not, before the markets
4   opened or immediately on the market's opening on
5   September 22, 2008, there is an immediate loss
6   or gain to Barclays because they now own these
7   futures contracts?
8        MS. BLOOMER:  Objection to the form of
9   the question.
10       Q.   Do you understand my question, sir?
11       A.   Yes, I think I do.  The way I would
12  describe it is that there is an immediate
13  exposure to gain or loss as a result of market
14  movements in the underlying -- in the underlier
15  of the futures contract, whatever it happens to
16  be.
17       Q.   In your opinion, sir, would a rational
18  purchaser of futures positions in any
19  circumstances take those positions without the
20  margin that's posted to cover those positions at
21  the exchanges?
22       A.   Let me start by saying it would be
23  impossible to take on futures positions, for a
24  new party to take on futures positions without
25  them being margined, and the -- assuming the

Page 208

1           A. Leitner
2   rules for contract market would allow a change
3   of beneficial ownership of the underlying
4   contract, they would, in my opinion, tend to do
5   so only with the movement of the underlying
6   collateral.
7        Q.   And in your experience, sir --
8        A.   Excuse me.  Let me answer your
9   question.
10       Q.   Sorry.  I thought you were finished.
11       A.   Therefore, it would be -- I think your
12  question was would it be rational for someone
13  acquiring futures contracts to do so without the
14  margin?  It would be both, in my view,
15  irrational and virtually impossible to do so
16  without the movement of the underlying
17  collateral.
18       Q.   And in your experience, sir, if the
19  underlying collateral was purchased along with
20  the futures position, the contract, would the
21  purchase price reflect the acquisition of the
22  asset that is the collateral posted at the
23  exchange to secure the performance of the
24  futures contract?
25       MS. BLOOMER:  Objection to the form of

Page 209

1           A. Leitner
2   the question.
3        A.   You're asking a hypothetical that is
4   not this case, because this case is this strange
5   acquisition of a business through an ostensible
6   sale of purchase of assets and assumption of
7   liabilities.  Included in that is the
8   replacement of one clearing member of an
9   exchange by another clearing member of an
10  exchange and taking on of all the contract
11  exposures.
12       So this is not simply the acquisition
13  deliberately and independently of a book of
14  derivatives, but also of the clearing business.
15  For that reason, the consequence reached here is
16  the only basis, in my view, and as I state in my
17  opinion, on which you can accomplish that
18  transaction in a rational way.  That is, you
19  take on the positions along with the collateral,
20  and you don't establish a -- I'm not aware of
21  the establishment of any independent separate
22  value for that, and I think I've testified to
23  that before.
24       Q.   So, in your opinion, if there's a
25  billion dollars of collateral to secure Lehman's

## Page 210

1          A. Leitner
2    futures positions, that's just something that
3    goes to Barclays?
4       A.   Hypothetically, yes.  Hypothetically,
5    if that's what exists on the closing date,
6    but...
7       Q.   And tell me, sir, if there is excess
8    margin on Lehman's proprietary futures accounts,
9    does a rational purchaser need the excess margin
10   to take on Lehman's proprietary futures book?
11       MS. BLOOMER:  Objection to the form of
12   the question.
13       A.   I believe that's particularly true in
14   a case of futures, where the custom is in fact
15   to, especially with regard to foreign futures,
16   maintain balances that exceed the initial margin
17   requirement in order to support the trading
18   business or, in the case of customers, the FCM
19   customer margin requirements that are required
20   to be collected by the exchange.
21       So it is, you know -- sorry.
22       Q.   And why does Barclays or a rational
23   purchaser of Lehman's futures, proprietary
24   futures book, why does Barclays need that excess
25   capital above and beyond the initial margin

## Page 211

1          A. Leitner
2    that's posted to secure those proprietary
3    futures?
4       MS. BLOOMER:  Objection to the form of
5    the question.  You're turning it from
6    something that goes to Barclays that
7    something that Barclays needs.
8       MR. OXFORD:  Well, they're two
9    different questions.  I can't ask the same
10   question all day.  It may seem like it.
11       MS. BLOOMER:  I object to the form of
12   your question.  You changed the premise.
13       A.   So what was the question?
14       Q.   Why does Barclays for a rational
15   purchaser of Barclays' futures, proprietary
16   futures book, need the excess margin above and
17   beyond the initial margin that's posted to
18   secure the proprietary futures positions?
19       A.   The answer is found in my report,
20   which is that in the circumstances of this
21   transaction, taken as a whole, and given the
22   risks of assuming the clearance responsibilities
23   for both the clearance and the customer
24   accounts, that a rational purchaser under these
25   circumstances would do so only on the

## Page 212

1          A. Leitner
2    understanding that whatever collateral was there
3    and with regard to futures, one would assume
4    that there would be more collateral than
5    theoretically necessary as a result of initial
6    margin requirements, would come to the
7    purchaser, namely, Barclays.
8       Q.   How would you quantify, sir, the
9    market risk for Barclays in acquiring Lehman's
10   proprietary futures positions.
11       (Record read as follows:  "How would
12   you quantify --")
13       A.   "Quantify."  Thank you.
14       I have made no judgment to quantify
15   it.  Generally speaking, you quantify risk based
16   on the nature and volatility of the underlier in
17   the particular marketplace.
18       Q.   What would Barclays do, sir, to close
19   out any proprietary futures that it acquired
20   from Lehman?  What steps would it take?
21       MS. BLOOMER:  Objection to the form.
22       A.   It would first have to establish that
23   it was in a position to give an instruction to
24   take action to close out the position, and then
25   it would give an instruction to buy or sell the

## Page 213

1          A. Leitner
2    opposite side of the transaction.
3       Q.   Moving to the customer futures, sir --
4       A.   Excuse me?
5       Q.   Moving to the customer futures that
6    Barclays acquired, the customer futures?
7       A.   Yes, what about them?
8       Q.   Moving on to them.
9       A.   Okay.
10       Q.   Can you tell me, please, what the risk
11   is to Barclays in acquiring that clearing
12   business?
13       A.   The same measure of risks that I have
14   used generally to define what's involved in
15   clearing derivatives, so that would be market,
16   credit, liquidity, and operational risk.
17       Q.   Do you know, sir, whether or not
18   Barclays conducted any due diligence on the
19   customers' seg and secured calculations prior to
20   the closing of this transaction?
21       MS. BLOOMER:  Objection to the form of
22   the question.
23       A.   I don't recall specifically what steps
24   Barclays folks were able to actually accomplish.
25   I am aware that they were looking for as much

Page 214

A. Leitner
1
2 information about these positions as they could
3 get, both where they were and the nature of the
4 positions and the amount of margin that secured
5 them.  I'm less certain about when and how they
6 got the information.
7     Q.    Or what information they got?
8     A.    Correct.
9         (Exhibit 655, handwritten notes,
10    marked for identification, as of this date.)
11     Q.    Mr. Leitner, I'm handing you what I
12 have marked as Exhibit 655.  I'll identify for
13 the record as a set of handwritten notes that
14 were produced to me by counsel to Barclays.
15        Do you recognize those notes, sir?
16     A.    Yes.
17     Q.    Are they your notes, sir?
18     A.    Yes.
19     Q.    Could you turn to page 3, please?
20        MS. BLOOMER:  Back to back or which?
21        MR. OXFORD:  No, counting from the
22 middle.
23        MS. BLOOMER:  No, one, two, the third
24 page, or the third --
25        MR. OXFORD:  The third page.

Page 215

A. Leitner
1
2        MS. BLOOMER:  -- side of the page?
3     A.    They're not numbered, so ...
4     Q.    The third page.  Do you want to
5 identify it by what's on the top, please?
6     A.    That's the fifth page.
7     Q.    I think I have something -- I now have
8 a Bates-stamped copy.
9        MS. BLOOMER:  That would be helpful.
10     A.    297510.
11     Q.    Okay.
12        MS. BLOOMER:  For the record, that's
13 the second page of the copy I have.
14     Q.    Do you have that page, sir?
15     A.    Yes.
16     Q.    Can you tell me what it says, those
17 first three lines say?
18     A.    "Customer gain.  LBI buffer.  5
19 percent excess - secured account."
20     Q.    Are these notes of a conversation with
21 someone you had to prepare your report, sir?
22     A.    This was I think a conversation with
23 Liz James.
24     Q.    What's the reference to customer gain
25 to?

Page 216

A. Leitner
1
2     A.    I don't remember.
3     Q.    What does "LBI buffer" mean?
4     A.    I was interested to know what the LBI
5 practice, if Liz knew, of about what -- how much
6 excess collateral they put up in connection with
7 customer -- the customer FCM positions.
8     Q.    And the next line you said reads "5
9 percent excess"?
10     A.    5 percent excess, dash, secured
11 account.
12     Q.    What's the reference to a secured
13 account, sir?
14     A.    That's the account maintained for
15 customer foreign futures positions.  I don't
16 recall whether that reference was a reference to
17 what LBI did or what Barclays' practice was
18 because we were going back and forth with, okay,
19 what did you guys do, what do we do, and so
20 forth.  So I do not know whether that note
21 specifically in fact references LBI practices or
22 Barclays' practices.
23     Q.    Do you remember what, if anything, Liz
24 James told you about what she knew about
25 Lehman's practice with respect to an excess in

Page 217

A. Leitner
1
2 the secured account?
3     A.    I don't remember.
4     Q.    A few lines down toward the right-hand
5 side, there's a reference that looks like "700
6 MM excess."  Do you see that, sir?
7     A.    Yes.
8        MS. BLOOMER:  Wait.  I don't.  Can you
9 show me?
10     (Witness indicates.)
11        MS. BLOOMER:  Thank you.
12     Q.    Did I read that correctly?  Is that
13 what it says, "700 MM excess"?
14     A.    Yes.
15     Q.    What does that mean?
16     A.    I have no recollection of what that
17 was from.
18     Q.    Does it perhaps reflect that there was
19 a $700 million excess in Lehman's customers' seg
20 or secured account prior to closing?
21     A.    I don't remember.  I don't know
22 whether that was, you know, a reference to what
23 was in the OCC account or the -- or the futures
24 account.  I just don't have any recollection.
25     Q.    The next line down, it appears -- you

Page 218

A. Leitner

1  appear to write, "Generally left greater than 5
2  percent?"
3
4      A.   Yes.
5      Q.   Do you know what that's a reference
6  to?
7      A.   Again, I don't remember -- I believe
8  that was again with respect to the futures
9  discussion, and I don't remember whether that
10 was a note that reflected Liz James talking
11 about the Barclays practice or the Lehman
12 practice, but I think it -- my best recollection
13 is that it -- my best recollection is that it
14 was Liz's description of what she had found that
15 Barclays was doing, which was generally to put
16 more than 5 percent in.
17         And just to step back, my experience
18 in the industry is that how much of a cushion
19 you have for customer FCM positions depends very
20 much on the customer activity and the nature of
21 the futures that they are trading.  The larger
22 the customer base the more they trade.  The
23 larger the margin requirement the more excess
24 you tend to put in.
25         And understanding that this is largely

Page 219

A. Leitner

1  an institutional business, it would not have
2  surprised me if -- if LBI in fact maintained
3  balances well in excess of 5 percent.
4      Q.   Would it have surprised you, sir, to
5  learn that Lehman had in excess in their
6  customer seg and secured account that ran into
7  hundreds of millions of dollars?
8          MS. BLOOMER:  Objection to the form.
9      A.   No.
10     Q.   Would it surprise you, sir, to learn
11 that Lehman had in excess in its customer seg
12 and secured accounts in excess of $1 million?
13     A.   No.
14     Q.   Why not, sir?
15     A.   I was generally aware that Lehman was
16 one of the largest FCMs in the world, maybe
17 second or third behind my former employer, and
18 that these numbers would not be out of question
19 for the business that they did.
20     Q.   Is it your opinion, sir, that Barclays
21 is entitled to any excess in the customer seg
22 and secured accounts for the Lehman futures
23 business it acquired?
24         MS. BLOOMER:  Objection to the form of
25

Page 220

A. Leitner

1  the question; the scope that you're seeking.
2          You can answer.
3      A.   Again, my -- I would put this in the
4  context of my report and of all the bases for my
5  report and simply say that these were assets
6  supporting the business, that the parties
7  intended to move to support the business,
8  particularly the FCM business.
9      Q.   You testified earlier, sir, that
10 Barclays had more information about the
11 collateral that was posted in the futures
12 business than it did for the collateral posted
13 in the options business.  Do you remember saying
14 that, sir?
15         MS. BLOOMER:  Objection to the form.
16     A.   I remember saying that.
17     Q.   What information do you believe that
18 Barclays had about the collateral supporting the
19 futures business before it closed the deal with
20 Lehman?
21     A.   I am not sure they had more detailed
22 information.  My reference was to the fact that
23 there had been conversations about the FCM
24 business by Liz James prior to the signing of

Page 221

A. Leitner

1  the APA and an attempt on her part to understand
2  that business, and so I think that she had
3  acquired -- I'm not sure this is her exact
4  testimony -- some degree of knowledge about how
5  that business was run, so -- and she was, of
6  course, a professional at Barclays which had a
7  similar business, maybe not as -- I don't know
8  whether it was as large or not.
9          So that was the basis for my
10 statement.  I don't know that she had any
11 detailed customer- or collateral-related
12 information.  I haven't looked at her deposition
13 for that purpose, so ...
14     Q.   Is it your opinion, sir, that a
15 rational purchaser of Lehman's FCM business
16 would have required 100 percent of the excess in
17 the seg and secured amounts in order to accept
18 the risk associated with managing that customer
19 business?
20     A.   I'm sorry, I thought I answered that
21 already.  The answer is that, as my opinion
22 states, in the context of this transaction, it
23 was the rational thing to do, and given the --
24 all of the factors that I cite in my report,
25

Page 222

A. Leitner

1      A. Leitner
2 including the lack of knowledge, the
3 uncertainties in volatility of the markets, and
4 the -- all the other risk I described.
5      Q.   Lack of knowledge about who, sir?
6      A.   They didn't know the customers
7 were or how they -- I think that, you know, they
8 knew little more than the general structure of
9 the business.  I don't know how much information
10 they had.  They knew which markets they traded
11 in.
12      Q.   So if you assume for purposes of my
13 question, sir, that there was an excess in the
14 customer seg and secured accounts of
15 approximately a billion dollars, it's your
16 testimony that, in order to take on the risk of
17 managing Lehman's FCM business, Barclays needed
18 to have that billion dollars, otherwise it
19 wouldn't close?
20      MS. BLOOMER:  I object to the question
21 and to the vague timeframe that you're
22 asking about.
23      A.   Look, I -- it's impossible for me to
24 answer this question in the abstract because
25 what's -- just as we found in the options

Page 223

A. Leitner

1      A. Leitner
2 clearance business, where there was a 500 -- up
3 to a $500 million move in the margin requirement
4 any given day, the appropriate question to ask,
5 if you had perfect knowledge, was what was the
6 volatility of this FCM business and how much
7 excess could disappear in a particular day of
8 volatility.  I don't know that they knew that.
9 I don't know that -- certainly Barclays didn't
10 know that.
11      And so that's one of the reasons why I
12 said, when you asked me is a billion dollars a
13 lot, I said not necessarily, or words to that
14 effect.  Would I have been surprised if it was a
15 billion dollars, and the answer was no, because
16 it depended on the, you know, customer base and
17 the potential that, you know, because there
18 could have been many hundreds of billions of
19 dollars of underlier for which a move could
20 generate a margin requirement or a mark to
21 market requirement that was substantial.  And if
22 a customer did not post that margin immediately,
23 then there had to be, you know, money in the seg
24 account to be able to cover it.
25      Q.   I'm handing you, sir, what has

Page 224

A. Leitner

1      A. Leitner
2 previously been marked as Exhibit 556.  Have you
3 seen this document before, sir?
4      A.   Yes.
5      Q.   When have you seen it, sir?
6      A.   I don't know.  Sometime in the last
7 month.
8      Q.   Do you see, sir, that this is an
9 internal Barclays briefing memo about the
10 potential acquisition of Lehman's futures
11 business?
12      A.   Yes.
13      Q.   It's dated Monday, September 15,
14 correct?
15      A.   Yes.
16      Q.   Can you tell me whether or not
17 Barclays, in this memorandum or elsewhere,
18 identified any of the risks that you have
19 testified are inherent in acquiring Lehman's
20 futures business?
21      MS. BLOOMER:  I would ask that you let
22 him read the document if you're asking if
23 there's something anywhere in the document.
24      MR. OXFORD:  Sure.  We can go off the
25 record for a second if you want to read the

Page 225

A. Leitner

1      A. Leitner
2 whole document.
3      (Pause in the proceedings.)
4      A.   Okay.  I've read this.
5      Sorry, what was the question?
6      Q.   Can you tell me whether or not
7 Barclays, in the memorandum that you have in
8 front of you, identified any of the risks that
9 you have testified are inherent in Barclays'
10 acquisition of Lehman's futures business?
11      A.   I don't see any such discussion in
12 this memorandum.
13      Q.   Okay.  Actually, just while you have
14 that in front of you, sir, do you agree that
15 Barclays identifies as a benefit to Barclays in
16 taking over Lehman's FCM business that it will
17 allow BarCap to double its business in size by
18 adding annual revenues of approximately $250
19 million?
20      A.   I see the statement.
21      Q.   Do you disagree with that statement?
22      MS. BLOOMER:  Objection.
23      A.   I don't disagree with the fact that
24 it's in the memorandum.
25      Q.   Do you disagree with it?

## Page 226

A. Leitner

1
2    A.   I have no opinion one way or the other
3  as to whether it's true.
4    Q.   You have no reason to disbelieve that
5  it's true?
6         MS. BLOOMER:  Objection to the form of
7    the question.
8    Q.   No reason to doubt that statement,
9  sir?
10        MS. BLOOMER:  Object to the form of
11   the question.
12   A.   I have no reason to believe it.  I
13  have no reason to doubt it.  I have no opinion
14  whatsoever.
15        (Exhibit 656, and article from Futures
16   Magazine, marked for identification, as of
17   this date.)
18   Q.   I'm handing you, sir, what I have
19  marked as Exhibit 656.
20        Do you recognize that document, sir?
21   A.   Yes, I do.
22   Q.   Can you tell me what it is, please?
23   A.   It's an article that I wrote for
24  Futures Magazine.
25   Q.   Could you turn to the third page, sir?

## Page 227

A. Leitner

1
2    A.   Okay.
3    Q.   Do you agree in the shaded box you
4  identify some of the risks inherent in the
5  business of a futures commission merchant?
6         MS. BLOOMER:  Which page and which
7    shaded box?  Can you give me a page number?
8         MR. OXFORD:  The third page, Trish.
9    It's page 58.
10        MS. BLOOMER:  Okay.  Again, we have
11   double-sided copies, so it's just confusing
12   to say "the third page."
13        Page 58.  And where is the shaded
14   portion?
15   Q.   Do you see, sir, there's a box
16  entitled "Understanding the Differences in
17  Securities and Futures" --
18        MS. BLOOMER:  I don't see a box and I
19   don't see a shaded portion.  I see the
20   title.  I just want you to know there's no
21   shaded on our versions.  He needs to know
22   what you're directing him to.
23   Q.   Do you see the words, sir,
24  "Understanding the Differences in Securities and
25  Future Margin Rules"?

## Page 228

A. Leitner

1
2    A.   Yes.  What's your question?
3         MS. BLOOMER:  Do you need a moment to
4    familiarize yourself with the article?
5         THE WITNESS:  Yes, I saw it a little
6    while ago.  So what's the question?
7    Q.   Could you turn your attention, sir, to
8  the penultimate paragraph on that page that
9  begins "in futures land"?
10   A.   Yes.
11   Q.   Do you see that, sir?
12   A.   Yes.
13   Q.   It says, "In futures land, margin is
14  passed through the futures commission merchant
15  to the clearing house.  The FCM is not, in the
16  usual case, extending its own credit to the
17  customer.  That is not to imply that there is no
18  intermediary credit risk in futures.  FCMs, like
19  broker-dealers, face customer default risk."
20        Do you see that, sir?
21   A.   Yes, I do.
22   Q.   You go on to write that, "To mitigate
23  their risk to their clearing members, derivative
24  clearing houses -- both the futures clearing
25  houses and the OCC for U.S. listed options --

## Page 229

A. Leitner

1
2  have developed models to determine the market
3  risks inherent in the portfolio positions
4  carried by their members and to collect margin
5  commensurate with that risk."
6         Do you believe that's an accurate
7  statement, sir?
8    A.   I would call it accurate, but
9  incomplete in one respect.
10   Q.   In what respect is it incomplete, sir?
11   A.   It is not the practice, necessarily,
12  in respect to foreign futures that the customer
13  margin is passed through to the clearing house,
14  and in fact, in the institutional marketplace,
15  customers will negotiate with a FCM essentially
16  to earn interest from their futures margin
17  deposits that necessitate the FCM using its own
18  funds to post at the clearing house and/or in
19  the futures account.
20        So sometimes the margin is not, quote,
21  passed through, unquote, to the clearing house.
22  The point I was making in the mitigation section
23  is that, at the intermediary level, in some
24  cases they may collect more margin from the
25  customer than is required for initial margin.

Page 230

1              A. Leitner
2    Although, again, the practice in the
3    institutional marketplace is that institutions
4    usually have the market power to put up only
5    what they're required to put up.
6        Q.    Do you know whether or not Lehman
7    collected more margin from its customers than
8    was required by the initial margin?
9        A.    I don't know.
10            MR. OXFORD:  Can we go off the record
11    for one second?
12            Can we take a short break?
13            (Recess; Time Noted:  4:07 P.M.)
14            (Time Noted:  4:13 P.M.)
15    BY MR. OXFORD:
16        Q.    New topic.  Sir, could you turn to
17    paragraph 20 of your report, please.  Is it your
18    opinion, sir, that there was a substantial risk
19    that if Lehman did not transfer its
20    exchange-traded derivatives to Barclays and its
21    responsibilities as a clearing broker to
22    Barclays, that the accounts would have been
23    liquidated and some or all of the collateral
24    supporting those positions would have been wiped
25    out?

Page 231

1              A. Leitner
2        A.    Yes.
3        Q.    You say in your report, sir, at
4    paragraph 46 and 47 that margin is calculated to
5    ensure that the net liquidating value of
6    positions is not less than zero, correct?
7        A.    Yes.
8        Q.    And what that means, sir, is the OCC
9    requires a broker-dealer to post sufficient
10    collateral such that if it had to liquidate
11    those positions, the OCC is comfortable it
12    wouldn't make a loss; is that correct?
13            MS. BLOOMER:  Objection to form.
14        A.    Yes, that's the purpose of the
15    calculation.
16        Q.    And would you agree with me that the
17    OCC builds in a cushion to protect itself when
18    it's calculating those margin requirements?
19        A.    Yes.
20        Q.    Have you, in your experience, sir,
21    ever come across a situation where the OCC has
22    liquidated a broker-dealer's positions and all
23    of the margin posted in the OCC has been
24    exhausted in liquidating those positions?
25        A.    I cannot remember the outcome of the

Page 232

1              A. Leitner
2    liquidation of a firm in Chicago that -- and
3    exactly, you know, what the outcome was, but
4    there's been at least one liquidation of a
5    firm's positions, but I don't know.
6            I mean, let's keep in mind that the
7    OCC also has the right, and does in fact
8    exercise that right, to conclude that the model
9    run overnight for the beginning of the day is
10    not enough and to make an intraday call, and has
11    done so in periods of market volatility for all
12    members.
13        Q.    So, back to my question, sir.  You're
14    not aware, in your experience in the industry,
15    of a situation where it has ever happened that
16    the OCC liquidating a broker-dealer's position
17    has run through the entirety of the margin
18    posted by that member at the OCC?
19        A.    Unlike the CME, I'm not aware of an
20    option of a clearing member.  I am -- exhausting
21    the margin.  But similar models are used by
22    intermediaries for market professionals, and I
23    am aware that those models are not perfect and
24    there have been defaults by clearing firms of
25    market members using exactly the same portfolio

Page 233

1              A. Leitner
2    margin modeling strategy that have exhausted the
3    collateral put up at the -- at the clearing
4    member.
5            So that would be, by the way,
6    essentially what Barclays was doing in OCC for
7    the affiliates.  They were clearing those folks
8    as though they were members.
9        Q.    In the circumstances that you just
10    testified to, where intermediaries from market
11    professionals use a similar margining system as
12    the OCC?
13        A.    Right.
14        Q.    Was there excess margin above and
15    beyond the exchange minimum requirements that
16    was also exhausted?
17        A.    Absolutely.
18        Q.    What were those situations, sir?
19        A.    They were situations that were -- I
20    don't remember the specific circumstances, but
21    prior to the acquisition of First Options
22    Corporation by Goldman Sachs, and in connection
23    with the market break of 1987 when First Options
24    was operating on its own and almost went under,
25    it was brought under by the fact that it was

Page 234

A. Leitner

1 performing that business for a number of, you
2 know, market professionals and they blew them
3 out.
4        Again, that was 1987. It was a period
5 of extreme volatility, just like we had at the
6 time that Lehman went under and for the month
7 thereafter. So those are -- those periods are,
8 fortunately, infrequent, but they were true here
9 in this case.
10   Q.   Is it your testimony, sir, that the
11 rules used to margin by First Options
12 Corporation back in 1987 were identical to the
13 OCC's margin rules in 2008?
14   A.   My recollection is that models were
15 being use at that time.
16   Q.   I understand models were being used at
17 that time, sir, but is it the same model? Is it
18 exactly the same?
19   A.   I don't remember. Don't remember.
20   Q.   You can't testify one way or the other
21 whether the same model was used in the example
22 you gave as was used by the OCC to margin in
23 2008, correct?
24   A.   No.

Page 235

A. Leitner

1   Q.   Is it consistent with your experience
2 when the OCC liquidated a broker-dealer's
3 positions and all of the margin was not
4 exhausted --
5   A.   I don't have any specific case in mind
6 to answer that question.
7   Q.   Okay. Well, let me ask this question,
8 Mr. Leitner. If the scenario that you described
9 at paragraph 20 of your report happened, by
10 which I mean to say that the OCC had stepped in
11 and liquidated Lehman's positions, if the
12 margining requirements worked as they were
13 intended to and protected the OCC, there would
14 be margin left over to return to the
15 broker-dealer, or at least the broker-dealer
16 should be flat?
17   A.   Absolutely not.
18   Q.   Why not?
19   A.   All you need is two market moves like
20 you had between the, I think it was the 15th and
21 16th, or one of those days, when the market
22 moved adversely to the proprietary positions by
23 a significant amount. If you had that movement
24 two days and you started the liquidation on day

Page 236

A. Leitner

1 one, you would have -- and they hadn't put the
2 collateral up, you would have blown through
3 everything.
4        So the risk is that the model works
5 assuming you can have an orderly liquidation and
6 a fairly static market, but if the volatility is
7 over and above the volatility used in the model,
8 then it suddenly doesn't work. And I think
9 there was every reason to believe by the folks
10 at Barclays on Monday and Tuesday when they were
11 deciding to do this deal that that was a
12 substantial risk.
13   Q.   Sir --
14   A.   And nor would they know at that time
15 whether they would have enough collateral, too
16 much, too little by the time they closed the
17 deal on Monday when they had to make the
18 decision about whether to do it and to sign the
19 APA. That would be true of futures, it would be
20 true of options, and all of the OTC derivatives
21 that they had.
22   Q.   In the event that the OCC did go ahead
23 and close out Lehman's positions and all of the
24 margin was not used up, do you agree that in

Page 237

A. Leitner

1 that situation the remaining margin would be
2 returned to the LBI estate?
3   A.   I'm sorry, would you help me make sure
4 I understand your hypothetical?
5   Q.   Of course.
6   A.   Just say it again. Let's go through
7 it in steps.
8   Q.   In the event that the OCC had
9 liquidated LBI's positions at the OCC and the
10 margin that LBI had posted to the OCC was not
11 exhausted by that liquidation process, the
12 remaining margin would be returned to the LBI
13 estate, correct?
14   A.   I believe I refer to the OCC rules in
15 my report. I believe that would be the outcome,
16 that any assets left over would be returned to
17 the defaulting member.
18   Q.   But it's your opinion, sir, that a
19 liquidation by the OCC could have wiped out all
20 of the margin held by the OCC, correct?
21   A.   Absolutely.
22   Q.   But you can't testify as to what would
23 have happened?
24        MS. BLOOMER: You have to answer

Page 238

1          A. Leitner
2     verbally.
3        A.   I can only testify that the rules
4     allow for a liquidation, and you would need to
5     know what the market conditions were under which
6     the liquidation occurred in order to make any
7     determination as to what the outcome would be.
8        Q.   Did you do any analysis, sir, of what
9     the outcome would have been if Barclays had not
10    bought LBI's derivatives business?
11       A.   No.
12       Q.   You haven't done any analysis to allow
13    you to testify that all of the margin that LBI
14    posted at the OCC would have been exhausted by a
15    close-out, a liquidation by the OCC?
16       A.   Could have been, not would have been I
17    believe was what I said in my opinion, and I
18    gave you a scenario just a short time ago in
19    which that could have happened, and it was a
20    scenario that in fact it occurred during that
21    week at least on one day.
22       Q.   And it also could have happened, sir,
23    that there would have been substantial margin
24    left over after the OCC liquidation, correct?
25       A.   Take a snapshot anytime you want and

Page 239

1          A. Leitner
2     you will get a different outcome.
3        Q.   You just don't know one way or the
4     other whether or not there would have been any
5     margin left over by the liquidation by the OCC
6     of Lehman's positions, correct?
7        A.   The point is that on Monday and
8     Tuesday of that week, nobody knew.  What they
9     did know is that the risks existed.
10       Q.   Can you tell me, sir, going back to
11    your rational purchaser example -- actually, to
12    take a rational seller example, why would a
13    rational seller of Lehman's positions and margin
14    at the OCC prefer to give that margin to
15    Barclays, including up to $700 million of excess
16    margin, rather than take the chance that, after
17    an OCC liquidation, there would be excess margin
18    to return to the estate?
19       A.   You're assuming that on Monday and
20    Tuesday of that week that Lehman would have
21    known those numbers and known those factors.
22    They didn't know them.  The question was
23    whether, given the knowledge that Lehman had and
24    that Barclays had prior to the execution of the
25    Asset Purchase Agreement, what motivated them to

Page 240

1          A. Leitner
2     do the transaction.
3          My conclusion was that a person in
4     Lehman's position, thinking of the derivatives
5     book and knowing the issues -- and I'm, by the
6     way, assuming that Lehman had certainly
7     knowledge of -- more knowledge than Barclays had
8     about the risks inherent in having to carry the
9     positions of the affiliates and so forth and the
10    ability to get rid of those risks and move them
11    over to Barclays, that they would have been well
12    motivated for all the reasons I stated to get
13    rid of it and to do so with the margin moving
14    over.
15       Q.   Do you agree, sir, that if Lehman had
16    not agreed to transfer the exchange-traded
17    derivatives business to Barclays, in the event
18    of the OCC's liquidation of its positions, it
19    would have been rational for Lehman to prefer to
20    have the OCC close out its positions in the
21    expectation that some of that margin posted at
22    the OCC would have been returned to Lehman?
23       MS. BLOOMER:  Object to the form of
24    the question.
25          To prefer it to what, Neil?

Page 241

1          A. Leitner
2       MR. OXFORD:  To prefer it to a
3     transfer to Barclays.
4        A.   Again, on Monday and Tuesday of that
5     week, the entire discussion, as I understand it
6     and have stated in my report, is based on a sale
7     of businesses that included this exchange-traded
8     derivatives clearing operation, and I believe
9     that LBI was appropriately highly motivated to
10    move all of the risks of that business.
11          And you are now doing what we did
12    earlier in this deposition in which you're
13    asking for a hypothetical on a subset of the
14    risks that would evolve in the business deal.
15    And frankly, I refuse to go there because I
16    don't believe that that's relevant to my report.
17    And so dealing with hypotheticals that have to
18    do with something that was never on the table
19    and the parties never considered doesn't seem to
20    me to advance the ball.
21          You know, would have, could have,
22    should have could be asked throughout this
23    transaction when, you know, under the unique set
24    of pressures that everybody was under, this was
25    the way to get the deal done.

Page 242

1              A. Leitner
2      Q.   Are you familiar at all, sir, with the
3  S.E.C.'s Customer Protection Rules?
4      A.   In a general way, I am.
5      Q.   Do you understand that margin that's
6  posted at the OCC for customer positions is a
7  debit in the customer protection formula, the
8  S.E.C. Rule 15c3 formula?
9          MS. BLOOMER:  Objection.  Beyond the
10     scope of his opinion and expertise.
11     A.   I'm aware that it is, yes.
12     Q.   I'd like you to assume that Lehman had
13  a $507 million debit in its 15c3 calculation as
14  of September 19 and that debit relates to the
15  margin that it had posted at the OCC for its
16  customer business.  You with me so far?
17     A.   Okay.  What day?
18     Q.   September 19.
19     A.   Okay.
20     Q.   And I'd also like you to assume for me
21  that if it did not have that debit, there would
22  be a shortfall in the customer reserve fund.
23         With me so far?
24     A.   Sort of.
25     Q.   Do you agree that if that margin, sir,

Page 243

1              A. Leitner
2  that $507 million for which Lehman placed a
3  debit in the customer reserve formula, if that
4  $507 million was sold to Barclays for its own
5  account, there would be a deficit in Lehman's
6  15c3 reserve fund?
7          MS. BLOOMER:  I object to the form of
8     the question, to the factual basis for the
9     assumptions, and to the vagueness of the
10    timeframe that you're asking about.
11     A.   The answer is I can't answer that
12  because you haven't given me enough facts
13  because the customer reserve formula is based
14  upon all the position you have for customers,
15  and my question is where did the customers go.
16  So I have to find out where the credits are.
17         If you transfer the customer accounts,
18  then you've transferred the credits.  So the
19  actual reserve formula is subject to a
20  recalculation at some point.  What I do is call
21  Mike Macchiaroli and say what should I do.
22         MR. OXFORD:  Can we go off for a
23     second?
24         (Pause in the proceedings.)
25     A.   Just, if I could for the record, I've

Page 244

1              A. Leitner
2  known Mike Macchiaroli for a long time and so
3  I've discussed a lot of issues with him, so my
4  remark was a facetious remark.
5          I mean, I know this was a complicated
6  matter in which the S.E.C. was all over it, but,
7  you know, I don't pretend to be an expert in the
8  formula.  I know a little bit more about custody
9  and control than I do about the formula.  I know
10  enough to know I've got to ask my former
11  colleague at Goldman, who's the real expert.
12     Q.   Could you turn to paragraph 94 of your
13  report, sir.
14         Do you have it there, sir?
15     A.   Yes, sir.
16     Q.   You see, "With respect to posted
17  collateral, under normal circumstances, a buyer
18  and seller would have reached an agreement about
19  whether the transfer of ETDs would come with or
20  without the related collateral."  Do you see
21  that, sir?
22     A.   Yes, sir.
23     Q.   Can you give me some examples of
24  business deals you are familiar with in which
25  the transfer of exchange-traded derivatives came

Page 245

1              A. Leitner
2  without the related collateral?
3      A.   First of all, this situation is so
4  unique.  The answer would be that all the
5  situations that I'm aware of were done in the
6  normal course of acquiring the company and,
7  therefore, all of its assets including all of
8  the collateral securing its position.
9          So, you know, normally when you buy a
10  business, you buy all of the assets supporting
11  that business through an acquisition of stock.
12  This transaction was extraordinarily complicated
13  because it was -- of its being structured as an
14  asset purchase and liability assumption.
15         I mean, that was the whole purpose of
16  my report, was to say how complicated it is, and
17  although we are focusing on paragraph 94, I
18  would just want to, you know, note for the
19  record that my discussion of the unusual
20  circumstances of this case and sort of normal
21  ways you would do this begins on paragraph 91.
22     Q.   Okay.  With that narrative, sir, can
23  you answer my question?
24     A.   You have to read the question again.
25         (Record read.)

Page 246

1           A. Leitner
2      A.   No, I do not know of any business
3  deals where they did not come without the
4  related collateral.
5      Q.   And in the business deals where the
6  exchange-traded derivatives came with the
7  related collateral, sir, how was that collateral
8  valued?
9          MS. BLOOMER:  Objection to the form.
10     A.    In the cases I'm familiar with, the
11 collateral was not separately valued.  The
12 business as a whole was valued and there was a
13 consideration given for the acquisition of the
14 business.  Easy to do in an ongoing concern
15 case.
16     Q.   I understand your point, sir.
17         In the transaction that you are
18 familiar with where the collateral was valued as
19 part of the business as a whole, is that
20 collateral valued typically dollar for dollar?
21         MS. BLOOMER:  Objection to the form of
22     the question and to the characterization of
23     his testimony.
24     A.   I don't know the answer to that
25 question.  I'm not trying to be vague here, but

Page 247

1           A. Leitner
2  as I've stated in the report, for a firm that's
3  anywhere like Lehman, you are starting with a
4  whole book of business, long and short -- again,
5  just talking about the equity business -- long
6  and short equity business, all of the trading
7  that they do, market-making and so forth, you've
8  got all these businesses and you've got
9  exchange-traded derivatives, and you've got the
10 collateral supporting those businesses, and that
11 total book, including the capital and the
12 liquidity and related costs of maintaining that
13 collateral position, has a cost and a value.
14         And so the assessment about, quote,
15 what it's worth is based on, you know, numerous
16 factors because it may be the case that
17 collateral is provided by letters of credit or
18 by assets you might have hanging around or
19 assets that you've brought in through borrowing.
20         So it is not just simple to say
21 whether the collateral is just assets free and
22 clear.  The fact is that collateral are not free
23 and clear assets once they're posted as
24 collateral.
25     Q.   Do you know, sir, why Barclays wanted

Page 248

1           A. Leitner
2  to buy Lehman's derivatives positions?
3          MS. BLOOMER:  Objection.  Assumes
4      facts not in evidence.
5      A.   No, I don't know specifically why,
6  other than, again, as I state in my report, if
7  they were buying the businesses, the capability
8  and the exchange-traded derivatives were an
9  integral part of all of the businesses that they
10 were buying, the FCM business and the capital
11 markets business.
12         For them to be intermediaries in the
13 capital market business, they would have needed
14 to have and maintain exchange-traded
15 derivatives, so they were integrally related to
16 these other businesses.
17         MR. OXFORD:  Can we go off the record
18     and take another short break?  I think we
19     may be close to finishing up.
20         MS. BLOOMER:  Sure.
21         (Recess; Time Noted:  4:45 P.M.)
22         (Time Noted:  4:51 P.M.)
23 BY MR. OXFORD:
24     Q.   Mr. Leitner, I'm handing you what is a
25 complete copy of the document that was

Page 249

1           A. Leitner
2  previously marked at a deposition as Exhibit
3  554.
4          I handed you an excerpt before and
5  said I would get you the full copy, so now I've
6  handed you the full copy.
7      A.   Great.  As long as I don't have to
8  take it with me.
9      Q.   I'll leave that between you and your
10 counsel.
11         MS. BLOOMER:  I hope I don't have to
12     take it with me either.
13     Q.   Are you able to tell me, sir, now that
14 you have the full document, whether that is the
15 document you reference in page 91 of your
16 report -- sorry, paragraph 91 of your report?
17         MS. BLOOMER:  Is this the first or the
18     second of the two e-mails that had a list of
19     options positions?  Because I just don't
20     want him to be confused.  There were two
21     different sets of lists that went on the
22     same day at about the same time.
23         MR. OXFORD:  This I believe is the
24     first, based on the time stamp.
25     A.   Okay.  Yes, it is.

Page 250

A. Leitner

1
2    Q.   Do you agree, sir, that this
3    information would have been important for
4    Barclays to have to enable it to assess the
5    risks it was facing in acquiring Lehman's
6    derivatives portfolio?
7         MS. BLOOMER: Objection. Asked and
8         answered, I believe.
9    A.   It would have been nice for them to
10   have it before they signed the APA.
11   Q.   My question is a little different,
12   though, with respect, sir. My question is would
13   it have been important for Barclays to have this
14   document to enable it to assess the risks it was
15   facing in acquiring Lehman's derivatives
16   portfolio?
17   A.   Yes, it would have been important to
18   help them assess the risks.
19   Q.   And you don't know, sir, whether or
20   not Barclays asked for this document or
21   information to be produced to them prior to the
22   afternoon of Friday, September 19?
23   A.   No, I do not.
24   Q.   Are you able to tell me, sir, by
25   reviewing this document, whether it contains

Page 251

A. Leitner

1
2    information on exchange-traded derivatives only
3    or also over-the-counter derivatives?
4    A.   I have not examined the document for
5    that purpose, so I couldn't tell you.
6    Q.   Can you take a moment to tell me
7    whether you're able to answer that question?
8    Obviously I'm not expecting you to read every
9    single line of 760 pages, but --
10        MS. BLOOMER: I'm going to object to
11        the form of the question.
12   A.   Since this document is not identified
13   as an OCC report that is one generated from the
14   Options Clearing Corp. related solely to its
15   positions, and because there are not identifiers
16   for the options with which I would be familiar
17   with, which is either the option identifier,
18   Cusip number, or the like, I actually can't -- I
19   can't make that distinction.
20   Q.   Okay. Do you, on the last page, have
21   a subtotal and a total?
22   A.   Yes, okay, subtotal and total.
23   Q.   And between the lines of "Subtotal"
24   and "Total," do you have a line that reads "OCC
25   Options Netting"?

Page 252

A. Leitner

1
2    A.   Yes.
3    Q.   Does that suggest to you, sir, that
4    this report includes only exchange-traded
5    derivatives at the Options Clearing Corporation?
6    A.   Without more information, it doesn't
7    suggest anything to me. I've made no judgment
8    about what this would mean, and in any case,
9    these guys got it apparently on Friday after the
10   deal had already been struck on
11   Tuesday/Wednesday.
12   Q.   Do you know which computer system this
13   is generated from?
14   A.   No, I don't.
15   Q.   And do you have any information, sir,
16   about source data or data feed for the system
17   that generated this report, sir?
18   A.   I -- I'm not sure I've ever known
19   where this came from. If I knew, I've
20   forgotten.
21       (Exhibit 657, a document bearing Bates
22   Nos. BCI-EX-(S)-00075257 with attachment,
23   marked for identification, as of this date.)
24   Q.   Handing you, Mr. Leitner, another
25   weighty document that I've marked as Exhibit

Page 253

A. Leitner

1
2    657, sir. You see that the e-mail has the Bates
3    number BCI-EX-(S)-00075257, you see that, sir?
4    A.   Yes.
5    Q.   Does that help you answer my question
6    as to whether or not this is the document, the
7    second document referenced in paragraph 91 of
8    your report?
9    A.   I'm sorry, the second document?
10   Q.   Yes. You referenced two documents in
11   paragraph 91, sir. I'm asking you if that's the
12   second document.
13   A.   Yes.
14   Q.   It appears, sir, to be in similar form
15   to the last exhibit we looked at, is that
16   correct?
17   A.   I'm sorry?
18   Q.   It appears to be a document in similar
19   form to the document we just looked at, the
20   exhibit we just looked at?
21       MS. BLOOMER: Objection to the form of
22       the question.
23   A.   Well, it is formatted differently and
24   it has different data. I also note that the --
25   both documents contain a reference to what looks

Page 254

1            A. Leitner
2  to be like an internal Lehman Brothers business
3  unit or division responsible for the maintenance
4  of the positions, for example, Equity
5  Strategies, Liquid Market Americas, and the
6  like.
7            So I guess I would amend my prior
8  statement to say that this was not a -- these
9  documents are not OCC-generated, but are,
10 rather, internally generated documents by Lehman
11 Brothers, because there is no way that OCC would
12 know which internal profit center was
13 responsible for these positions.
14    Q.   On the first page of the attachment,
15 sir, do you see that there is a heading that
16 reads "Long Options"?
17    A.   Which attachment?
18    Q.   The --
19    A.   The second one?
20    Q.   Yes, Exhibit --
21    A.   The one 657?
22    Q.   657, the one I just handed you.
23         MS. BLOOMER:  Can you repeat the
24    question?
25         MR. OXFORD:  Sure.

Page 255

1            A. Leitner
2    Q.   Do you see there's a heading entitled
3  "Long Options"?
4    A.   Yes.
5    Q.   And at the bottom of that page headed
6  "Long Options," there's a total, sir?
7    A.   Yes.
8    Q.   And the total of long options on this
9  report is approximately $2.9 billion, do you see
10 that, sir?
11         MS. BLOOMER:  Objection to the form of
12    the question.  Mischaracterizes the
13    document.  I don't think I see a dollar sign
14    anywhere.
15    A.   Well, there's a number 2.9 million and
16 it says "total," but I don't know what's the
17 total of what.  If it's subtotal minus OCC
18 option netting and then total, but I have no
19 idea what the OCC option netting means, nor is
20 it clear whether this report speaks of -- what
21 date it speaks of, whether it was a report
22 produced as all the options at the close of
23 business on the 19th --
24    Q.   Well, sir, I don't mean to interrupt
25 you, but perhaps --

Page 256

1            A. Leitner
2         MS. BLOOMER:  You shouldn't interrupt
3    him.  Let him finish his answer.
4    Q.   If you look at the e-mail, sir, it'll
5  answer that question.
6    A.   Oh, "9/18 close."  Okay, so --
7    Q.   Okay.  So if you turn your attention
8  to the e-mail, then I think we can get out of
9  here.
10   A.   Okay.
11   Q.   You see that the bottom e-mail
12 Christopher Mincak sends to you, Stephen King
13 and others at Barclays on September 19 at 4:45
14 P.M.?
15   A.   Yes, sir.
16   Q.   You see that?  "Net long options.
17 Attached are the options.  Awaiting the risk
18 report from Risk.  Chris."  Do you see that,
19 sir?
20   A.   Yes.
21   Q.   Does that appear to be Exhibit 556
22 which we marked earlier in the deposition and I
23 have now given you the full 760-page --
24        MS. BLOOMER:  I think we need to ask
25    the question again.  That was very -- I

Page 257

1            A. Leitner
2  don't even understand what you're asking.
3         MR. OXFORD:  You know what, it doesn't
4    matter.
5    Q.   Do you see the top of the e-mail, sir?
6  And again, I'm looking at 657, sir.
7    A.   Yes, sir.
8    Q.   Mr. Mincak writes to Mr. Yang, Mr.
9  King and others at Barclays, "As included short
10 options, long/shorts as of yesterday's close,
11 9/18"?
12   A.   Yes.
13   Q.   Do you see that, sir?
14   A.   Yes.
15   Q.   Again, would this information
16 contained in this report have been useful to
17 Barclays in assessing the risk attendant in
18 assuming responsibility for Lehman's
19 exchange-traded derivatives positions?
20        MS. BLOOMER:  Objection.  Vague and
21    ambiguous.
22   A.   The answer is I don't know how useful
23 it would have been.  Better than nothing, but I
24 don't -- I can't say anything beyond that
25 because it's already a day old.  You don't know

Page 258

1          A. Leitner
2  how many of the positions may have changed over
3  the day, and they may have been significant
4  positions that changed over the day.  And most
5  importantly, you don't know at this point
6  exactly which options that are still on the
7  books are going to now be in the money and
8  exercised the next day.
9          So, in order to do a kind of full
10  analysis of where you're going to be at the
11  opening of business Monday is going to take the
12  whole weekend is going to figure this out.  None of this
13  information was known on Tuesday when these guys
14  agreed to do this deal.
15          So the fact that they got it by the
16  weekend is good, but there's very little, I
17  believe, that Barclays could have done with this
18  other than to say, oh, we've got some gross
19  numbers here, we seem to be this amount short,
20  this amount long, maybe we should sell some S&P
21  puts or something or buy something.
22          And I don't know, you know, what they
23  would have done with this other than also with
24  the operations people for them to start figuring
25  out how are we going to get these on our books.

Page 259

1          A. Leitner
2          So from the operations point of view,
3  you know, it would be very useful because they
4  now have an idea of the size of the positions
5  that they have to convert to their own books and
6  records and to try to figure out how to do that.
7          For the risk managers I think it would
8  be been useful, but less useful.
9      Q.   And for the risk managers, Mr.
10  Leitner, would it be more useful if Barclays had
11  had this information earlier in the week,
12  correct?
13      A.   Absolutely.
14          MS. BLOOMER:  Object to the form of
15    the question.
16      A.   Yes, it would have been useful for
17  them to have it earlier in the week, and it
18  would have been -- but the deal was already
19  done.  I mean, I don't know when you mean
20  "earlier in the week," but the deal was struck
21  on Tuesday and signed Wednesday.  That was the
22  sequence of events, and so your, as far as I'm
23  aware, there was very little information known
24  other than that they were acquiring the books
25  and in some kind of general size at the time

Page 260

1          A. Leitner
2  they actually signed the deal.
3          MR. OXFORD:  Mr. Leitner, I don't
4    think I have any further questions for you
5    at this time.
6          THE WITNESS:  Thank you for your
7    courtesies and thanks very much for lunch.
8          (Continued on the next page to include
9    the jurat.)

Page 261

1          A. Leitner
2          MR. DAKIS:  In the interest of time,
3  the Committee has no questions.  However, to
4  the extent the deposition is reopened or
5  continued for any reason, we reserve our
6  right to ask questions at that time.
7          MS. CARRERO:  The estate has no
8  questions either.
9          MS. BLOOMER:  Thank you.
10          MR. OXFORD:  Thank you for your
11  courtesy, sir.
12          (Time noted:  5:08 P.M.)
13                oOo
14
15
16
17
18
                    _____
19
                    ANTHONY J. LEITNER
20
      Subscribed and sworn to
      before me this    day
21    of       2010.
22
                    _____
23
24
25

Page 262

```
1              A. Leitner
2            CERTIFICATE
3   STATE OF NEW YORK )
              : ss
4   COUNTY OF NEW YORK )
5        I, Kathy S. Klepfer, a Registered
6   Merit Reporter and Notary Public within and
7   for the State of New York, do hereby
8   certify:
9        That ANTHONY J. LEITNER, the witness
10  whose deposition is herein before set forth,
11  was duly sworn by me and that such
12  deposition is a true record of the testimony
13  given by such witness.
14       I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18       I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23       In witness whereof, I have hereunto
24  set my hand this 25th day of February, 2010.
25  -------------------------------
```

Page 263

```
1              A. Leitner
2               INDEX
3   TESTIMONY OF A. LEITNER:              PAGE
4   Examination by Mr. Oxford ...............   5
5
6   EXHIBITS:                     PAGE
7   Exhibit 652, Report of Anthony J. Leitner      8
8   Exhibit 653, a document bearing Bates Nos.    58
9   BCI-EX-(S)-00074256 through 57
10  Exhibit 654, an e-mail from Sheila Zach to    192
11  Richard Konefal at Barclays Capital copied to
12  Dan Dzeimian and others Monday, September 22
13  at 4:41 P.M.
14  Exhibit 655, handwritten notes            214
15  Exhibit 656, and article from Futures Magazine 226
16  Exhibit 657, a document bearing Bates Nos.    252
17  BCI-EX-(S)-00075257 with attachment
18
19
20
21
22
23
24
25
```

Page 264

```
1              A. Leitner
2   NAME OF CASE:  In re:  Lehman Brothers
3   DATE OF DEPOSITION:  February 25, 2010
4   NAME OF WITNESS:  Anthony J. Leitner
5   Reason Codes:
6      1. To clarify the record.
       2. To conform to the facts.
7      3. To correct transcription errors.
8   Page _____ Line _____ Reason _____
    From _____ to _____
9
    Page _____ Line _____ Reason _____
10  From _____ to _____
11  Page _____ Line _____ Reason _____
    From _____ to _____
12
    Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
    From _____ to _____
15
16  Page _____ Line _____ Reason _____
17  From _____ to _____
    Page _____ Line _____ Reason _____
18  From _____ to _____
19  Page _____ Line _____ Reason _____
    From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
    Page _____ Line _____ Reason _____
22  From _____ to _____
23  Page _____ Line _____ Reason _____
    From _____ to _____
24
25  _____
```

**A**

**ability (11)**
72:9 91:2 111:9,10,11
112:7 120:9 134:4
134:16 186:2
240:10

**able (31)**
14:19 33:15 46:16
52:21 53:18 54:9
64:21 108:3 111:22
116:16,24 121:19
138:23 139:12
144:22 145:23
165:22 166:3 174:5
176:16 179:21
180:7,11,13 196:11
205:17 213:24
223:24 249:13
250:24 251:7

**Absolutely (5)**
47:16 233:17 235:18
237:22 259:13

**abstract (3)**
74:16 145:21 222:24

**accept (4)**
33:15,18 86:18
221:18

**acceptable (1)**
142:22

**accepted (2)**
34:12 150:23

**access (2)**
179:18 180:25

**accommodate (1)**
151:2

**accommodated (1)**
185:9

**accomplish (3)**
107:12 209:17 213:24

**accomplished (2)**
13:24 93:13

**account (34)**
20:19 34:5,16,19,25
97:3 100:11 101:7
103:20 125:2 126:6
129:3 133:5 142:7
142:23,23,24 152:7
153:8 180:8 188:13
196:3 215:19
216:11,13,14 217:2
217:20,23,24 219:7
223:24 229:19
243:5

**accounted (1)**
67:17

**accounting (9)**
23:12 24:15,23 25:3
25:10,12,14 206:19
206:24

**accounts (53)**
18:19,24 20:20 83:5
83:10 96:19,22,22
96:23 105:17
106:13 113:22
117:22 118:13
121:4 122:12 128:8
132:11,18,21 133:5
137:15 140:24
141:3 142:4,5,9,18
144:16 147:10,11
148:13,16,17,20
150:17,18,23 151:6
151:24 153:5
154:15,21 155:16
158:4,5 210:8
211:24 219:13,23
222:14 230:22
243:17

**account-by-account...**
142:12 143:5

**accurate (11)**
42:22 70:21 74:5 81:9
165:13 166:22
168:8 173:19
178:20 229:6,8

**accurately (1)**
192:25

**acquire (14)**
29:5 77:2 80:16 83:4
83:8 102:18 107:11
109:15 110:11
159:2,22 163:21
172:25 191:14

**acquired (7)**
17:2 19:2 206:9
212:19 213:6
219:24 221:4

**acquiring (26)**
14:15 39:25 74:17
75:5,9,18 82:19,21
101:16 111:13,16
121:16 124:14
127:13 137:16
199:22 200:9
201:13 208:13
212:9 213:11
224:19 245:6 250:5
250:15 259:24

**acquisition (12)**
19:22 20:11 81:17
130:20 208:21
209:5,12 224:10

23:12 24:15,23 25:3

**225:10 233:21**
245:11 246:13

**acted (1)**
30:15

**acting (1)**
103:8

**action (4)**
117:6 167:5 212:24
262:15

**activities (1)**
151:3

**activity (2)**
71:7 218:20

**actual (5)**
31:11 111:15 134:2
168:20 243:19

**acute (2)**
130:19 198:22

**add (1)**
110:23

**added (2)**
14:3 65:2

**adding (1)**
225:18

**addition (6)**
7:12 53:20 54:11
56:10 141:18
154:10

**additional (7)**
11:5,24 13:5 107:11
112:20 146:21
169:10

**adequate (2)**
128:16 198:7

**Administered (1)**
1:8

**advance (1)**
241:20

**advantage (3)**
95:16,16 134:4

**adversely (1)**
235:23

**advice (1)**
124:13

**affect (5)**
48:25 50:15,22 51:24
138:18

**affiliate (6)**
13:21 80:3 95:9 97:4
131:22 140:13

**affiliates (9)**
20:20 97:17,24
112:19 185:20,23
189:13 233:7 240:9

**afternoon (2)**
130:2 250:22

**aggregate (1)**
34:14

**ago (6)**
5:19 6:10 201:11
206:6 228:6 238:18

**agree (37)**
21:15,25 26:17,23
32:22 35:2 36:5
42:15 59:9 69:2,4
71:17 74:4 89:18
98:22 102:21 114:3
127:11 135:19
136:20 138:3 146:2
153:19 155:11
181:2 186:10
194:23 202:16,23
203:21 225:14
227:3 231:16
236:25 240:15
242:25 250:2

**agreed (21)**
52:23 53:19 54:11
55:15 56:9 72:13
74:9 90:7 94:17
98:24 100:22
103:24 110:11
128:3 132:16
160:12,16,21,22
240:16 258:14

**agreeing (3)**
186:18 188:18 203:9

**agreement (59)**
20:14 22:11 25:22
26:8,18 27:8,13,14
27:19 29:3,9,12
30:9,14,23 31:13,17
31:21 32:11 35:4
36:22 37:12,21 38:6
38:15 39:19,23
40:14 49:20 50:5,9
53:3,4 54:24 55:5
55:10 63:7 69:9
76:3 85:8,23 86:10
86:14 87:7,22 88:3
89:24 90:15 92:9
101:16,19 106:21
126:23 160:8 161:8
184:18 200:8
239:25 244:18

**agreements (7)**
26:13 37:3,8 57:4
87:3 103:7 110:6

**ahead (4)**
40:9 108:13 151:21
236:23

**al (1)**

1:8

**Albany (1)**
3:14

**albeit (1)**
116:4

**allocation (1)**
142:22

**allow (5)**
28:24 208:2 225:17
238:4,12

**alternative (2)**
115:16,20

**ambiguous (2)**
17:8 257:21

**amend (1)**
254:7

**Americas (1)**
254:5

**AMINA (1)**
4:12

**amount (9)**
108:9 124:18 138:17
138:18 157:20
214:4 235:24
258:19,20

**amounts (2)**
155:23 221:18

**analysis (6)**
21:13 75:11 132:25
238:8,12 258:10

**ancillary (1)**
75:16

**and/or (1)**
229:18

**annual (1)**
225:18

**answer (103)**
10:5 11:7 17:9 24:14
28:14,24,25 29:16
29:25 30:25 31:8,9
31:13 32:14,20 34:4
34:17 36:3 40:10,19
45:10,13 46:11
51:17 54:6,8,25
55:4,18 56:18 62:2
62:14 71:18 74:15
74:22,25 81:23,24
89:25 93:12 97:7,25
99:5,7,8 101:23,24
102:2 104:19 108:4
120:6 121:20 123:8
123:14,21 124:9
126:5,12,14 133:21
134:24 140:15
144:20,20 145:23
148:5 156:13,19,21

156:23,24 157:5
163:5 166:5 169:3
169:17 173:8 179:6
199:15 200:15
201:10 206:6,19,25
206:25 208:8
211:19 220:3
221:22 222:24
223:15 235:7
237:25 243:11,11
245:4,23 246:24
251:7 253:5 256:3,5
257:22
**answered (18)**
34:21 52:4 55:22
71:20 81:16 126:11
140:10 149:7 152:2
156:12,19 157:2
158:10 188:25
189:4,21 221:21
250:8
**answering (2)**
94:2 123:11
**answers (4)**
81:2 83:13,17 148:3
**Anthony (9)**
1:14 2:4 5:2 7:25
130:4 261:18 262:9
263:7 264:4
**anticipate (1)**
79:20
**anticipated (1)**
84:20
**anybody (13)**
16:4 31:2,19 32:9
40:12 51:21 55:14
159:20 170:20
171:20 178:12
179:7 196:4
**anymore (1)**
144:22
**anytime (1)**
238:25
**anyway (1)**
53:15
**APA (36)**
13:11 27:25 28:6 29:7
31:3 37:3,24,25
43:2 44:9 51:23
54:5 55:16 56:20
64:17 65:8 75:8
76:5,22 77:16,18,25
78:4,25 89:16
120:18 126:25
127:19 158:23
159:9,21,23 161:11

221:2 236:20
250:10
**apart (1)**
140:6
**apologize (1)**
159:15
**apparently (1)**
252:9
**appear (2)**
218:2 256:21
**appeared (1)**
184:22
**appears (12)**
39:24 60:17 81:8
104:2 155:22
169:11 184:25
187:20 190:5
217:25 253:14,18
**applies (2)**
126:21 131:8
**apply (4)**
120:17 138:16 139:10
198:14
**appreciate (2)**
140:15 174:8
**approach (1)**
99:7
**approached (1)**
6:6
**appropriate (3)**
147:23 148:4 223:4
**appropriately (2)**
45:10 241:9
**approximate (1)**
6:11
**approximately (10)**
45:19 57:5,22 60:18
60:19 61:4 158:5
222:15 225:18
255:9
**area (2)**
25:2 34:3
**arising (1)**
156:2
**arrangements (1)**
199:3
**article (4)**
226:15,23 228:4
263:15
**aside (3)**
74:3 78:20 111:18
**asked (44)**
8:10,13,18,19 15:3
28:21 34:20 36:13
40:5 41:18 52:3
55:22 68:13,13

81:16 88:7 94:3
100:22 109:23
117:24 126:11
136:18 140:10
152:2 156:11,18,25
158:10 159:20
161:10 163:18,24
172:20 173:23
178:13 188:25
189:4,20 199:14
205:13 223:12
241:22 250:7,20
**asking (30)**
23:11,13 31:25 36:10
41:6,8,12 52:7
81:22 93:5,6 96:24
102:6 114:18 118:7
118:21 123:19,20
157:13 169:4
191:20 206:24,25
209:3 222:22
224:22 241:13
243:10 253:11
257:2
**asks (2)**
88:3 194:10
**aspect (7)**
40:4 53:6 79:22 91:16
100:21 154:3
199:19
**aspects (2)**
162:23 187:10
**assess (6)**
186:2 187:7 192:8
250:4,14,18
**assessing (1)**
257:17
**assessment (2)**
187:19 247:14
**asset (42)**
25:22 26:7,18 27:18
29:3 30:22 31:16
32:23 33:22 35:4
38:6,15 40:13 49:20
50:5,8 51:10 54:23
55:5,9 63:6 69:9
76:2 85:7,23 86:9
96:3,7 107:15,16,20
107:21,23 108:2,5
184:18 200:8
206:12,13 208:22
239:25 245:14
**assets (88)**
21:22 22:16 23:6,7,18
23:20 27:4,10 30:16
31:21 32:12 34:25

35:6,9,19 36:7,7
37:17,24 38:11,25
39:5,11,23 40:15
53:7,9 56:25 60:8
64:16 65:7 66:16,21
68:3,16 69:5,17,21
70:2,24 71:8 72:20
74:10,18 76:23
85:19,22 86:8,20,22
88:17,17 93:19
95:11 127:21
132:22 133:12,15
133:19 134:9,16,17
137:18,19,20,25
138:23 139:3
142:20 146:3,16,22
186:24 187:9
190:15,18,19 191:9
205:20 209:6 220:6
237:17 245:7,10
247:18,19,21,23
**assignment (1)**
55:10
**assisted (1)**
162:14
**associated (41)**
13:7,14 27:4 38:16
39:6 45:2 46:10
52:24 54:13 56:12
68:3 70:25 72:21
73:20 74:11 80:22
94:21 102:19
106:16 116:4,25
130:10,21 131:11
131:15 132:18
138:5,7 140:3,12
141:2 142:16,24
143:7 146:8 149:4
152:3,9 153:16
202:25 221:19
**association (1)**
17:17
**assume (29)**
15:4 18:15 20:15
89:19 90:23 91:19
105:16 106:12
107:10 110:11
123:2 125:8 133:9
136:18 137:13
151:24 152:8 154:4
182:8,13 186:18,22
188:18,23 202:20
212:3 222:12
242:12,20
**assumed (16)**
17:14,24 57:13,17

67:4 89:6,13,14
90:8,9 92:5 94:25
95:14 96:7 103:21
117:2
**assumes (13)**
68:8,20 70:13 74:12
107:3 154:18
164:18,20,25 173:3
174:22 183:12
248:3
**assuming (23)**
70:5,7 73:10 79:19
80:12 97:22 120:8
125:21 136:20
140:17 177:21
186:6,21 191:5
192:4 202:15,22
207:25 211:22
236:6 239:19 240:6
257:18
**assumption (6)**
30:15 67:6 95:20
132:21 209:6
245:14
**assumptions (1)**
243:9
**assurance (1)**
82:19
**assured (1)**
109:12
**asymmetric (2)**
73:9 79:25
**attached (4)**
60:10 195:4,13
256:17
**attachment (10)**
59:4 168:21 169:7,10
169:25 174:4
252:22 254:14,17
263:17
**attachments (1)**
195:4
**attempt (4)**
80:10 145:6 173:16
221:2
**attempted (1)**
201:13
**attempting (1)**
59:10
**attempts (1)**
173:21
**attendant (1)**
257:17
**attended (1)**
162:19
**attention (5)**

35:16 89:4 99:24
228:7 256:7
**attorney (6)**
40:20 41:2,7,9,16,23
**attorneys (6)**
3:5,11,18 4:6 31:8
44:5
**available (6)**
171:16,22 172:3
182:11 184:10
192:2
**avenue (2)**
3:19 44:8
**Awaiting (1)**
256:17
**aware (30)**
16:16 43:11 52:12
54:2 107:5 108:15
108:19 109:5 117:5
149:17 152:5
154:10 161:14
179:10,14,17 183:8
185:15 199:17,23
201:2 209:20
213:25 219:16
232:14,19,23
242:11 245:5
259:23
**A.M (4)**
48:13,14 85:4,5

**B**

**back (42)**
28:15 30:22 32:3
33:13 42:7 50:19
55:17 60:8 66:10
68:21 79:16 81:12
84:21 88:11 96:15
100:17,19 102:11
114:11 126:15
139:21 147:13
149:19,23 150:8
152:8,12 156:7
159:16 165:6 170:7
174:18 175:6
177:15 206:5
214:20,20 216:18
218:17 232:13
234:13 239:10
**backup (1)**
189:5
**bad (3)**
30:4 96:10 98:2
**balance (14)**
59:10,18,25 60:4,9
63:25 67:10,18 68:7

70:3 73:2,8,17
166:13
**balances (2)**
210:16 219:4
**ball (1)**
241:20
**bank (1)**
134:18
**BANKRUPTCY (1)**
1:2
**BarCap (1)**
225:17
**Barclays (364)**
3:11 7:19,21 13:10
14:9,10,12,15,15,25
15:12,14 16:5,9,14
16:14,17,21,23 17:2
17:15,16,25 19:2,21
20:9,14,15,23 26:14
28:5 29:5 30:13
31:2,11,16,19 32:9
32:18 37:4 38:14,15
39:5,21 40:13 42:16
42:24 43:11,20 46:8
46:25 47:20 48:2,22
50:8 51:14,22 52:23
53:20 54:11 55:14
55:23 56:8,8,9,16
59:10 60:8 61:11,21
62:9 63:6,11 64:3
65:7 68:6,10,13,24
70:10,19 72:15,19
73:5,12,20 74:9
75:4,18 76:2,4,25
77:15,21,24 78:3,24
79:9,12,25 80:7,12
80:18 82:19 83:4,8
83:24 87:8 89:19
90:9,10,11 91:12,18
91:23 93:18 94:19
95:22 96:4,8,11,18
97:13 98:3,22,24
100:10,11 101:6,7
101:16 102:18,23
103:10,18,19
105:15,16 106:11
106:12,15,21,23
107:8,11 108:17,20
108:25 109:8,8,10
109:12,15 110:4,19
111:4,21 112:22
113:12 114:3,5,13
114:23,25 115:25
116:3,11,24 118:12
119:14,19 120:4
121:15 130:18

131:20 132:11,21
133:11,12 134:22
135:17,20 136:16
136:19,22,24 137:2
138:3,8,12,13,22
139:15 140:7
141:18,19 144:3,7
144:24 146:15,19
148:19 149:3,10,17
150:5,8,23,25
151:11,22 152:8,8
152:14,15,19 153:4
153:5,5,7,14,23
154:3,5,11,13
155:12,14,24 158:2
158:3,23,25 159:7
159:20,21 161:10
163:20 164:3,13
165:13,15 166:7
168:21 172:12,13
172:20,23,25
173:14 174:11
175:8,23 176:4
177:24 181:12,15
181:18,21,21 182:2
182:3,8 183:9,16,16
183:20,25 184:3,10
185:2,14,25 186:5
186:17 188:17
191:4,8,10,14 192:3
192:4,14,20 193:23
194:10,24,25
195:16,20 196:19
197:16,21 198:10
199:5,8,24 200:7,11
200:12,16 201:12
201:13 202:5,16,18
202:21,24 203:8
206:9 207:6 210:3
210:22,24 211:6,7
211:14,15 212:7,9
212:18 213:6,11,18
213:24 214:14
216:17,22 218:11
218:15 219:21
220:11,19 221:7
222:17 223:9 224:9
224:17 225:7,9,15
225:15 230:20,22
233:6 236:11 238:9
239:15,24 240:7,11
240:17 241:3 243:4
247:25 250:4,13,20
256:15 257:9,17
258:17 259:10
263:11

**Bart (3)**
48:16,20 49:7
**base (2)**
218:22 223:16
**based (41)**
12:23 15:24 26:7 34:2
54:3 59:8 71:3
74:23 80:15 83:23
94:9 108:8 110:8
112:3 119:6 120:9
124:12 125:20
127:10,12 130:17
142:17 157:20
164:11 166:19,21
172:9 175:16
176:21 177:2 178:3
179:13,15 183:23
185:25 205:11
212:15 241:6
243:13 247:15
249:24
**bases (3)**
7:23 110:20 220:5
**basic (1)**
39:19
**basis (20)**
16:8,10 20:8 21:6,9
21:13 60:22 61:16
67:8 88:20 143:3,11
154:2 166:4 167:6
180:16 203:14
209:16 221:10
243:8
**Bates (10)**
47:7,9 58:7 59:9
168:15 194:4
252:21 253:2 263:8
263:16
**Bates-stamped (1)**
215:8
**Battery (2)**
2:6 4:7
**BCI (2)**
181:22 182:2
**BCI-EX (5)**
58:8 252:22 253:3
263:9,17
**bear (4)**
104:22 135:21 136:2
136:5
**bearing (4)**
58:7 252:21 263:8,16
**bears (1)**
136:6
**becoming (1)**
185:15

**been's (3)**
188:14,14,15
**began (1)**
117:6
**beginning (8)**
52:8 83:10 84:3,17
129:9 204:18 205:7
232:9
**begins (6)**
55:18 88:12,16 127:7
228:9 245:21
**behalf (4)**
52:22 53:19 54:10
56:8
**belief (6)**
102:16 113:20 117:20
121:3 126:19
166:21
**believe (91)**
7:20 8:5 9:24 10:21
12:5 17:17 19:14
21:11 23:2 26:13
27:24 32:17 42:23
43:16 44:13 46:11
46:11 51:15 64:3
67:8,20 72:5 81:2
81:11 91:2,17 93:7
94:8 96:25 102:2
103:25 109:7,10
110:3,25 111:8
112:10 113:4
114:24 115:24
116:9,10,15 118:12
126:22 136:15
143:13 145:25
154:23 156:4
160:20,20 163:14
163:16 165:6,7
172:19 173:13,20
182:15,22,24 184:7
186:16 187:20
188:9,10,16 193:12
193:15 198:9
199:14 200:5 202:6
202:7,22 203:6
210:13 218:7
220:18 226:12
229:6 236:10
237:15,16 238:17
241:8,16 249:23
250:8 258:17
**believed (1)**
30:13
**believes (1)**
103:13
**beneficial (1)**

**beneficial (1)**
208:3
**benefit (2)**
199:9 225:15
**benefits (1)**
94:12
**Berkenfeld (3)**
64:14 65:5,11
**Berkenfeld's (6)**
64:4,10 65:22 66:9
69:3,12
**best (14)**
13:24 24:14 31:23
34:16 44:5 46:20
48:24 49:4 71:21
72:6 90:25 97:20
218:12,13
**better (4)**
115:15,18,20 257:23
**beyond (13)**
12:4 24:19 25:6 41:17
67:13 99:3 109:19
199:12 210:25
211:17 233:15
242:9 257:24
**billion (17)**
57:6,22 60:18,20 61:4
61:5 66:25 67:9
68:3 74:6,7 209:25
222:15,18 223:12
223:15 255:9
**billions (1)**
223:18
**bit (4)**
46:4 122:4 197:12
244:8
**Blake (1)**
10:25
**Blake's (1)**
10:22
**blew (1)**
234:3
**blind (5)**
113:15 114:25 115:5
115:7,11
**blood (1)**
262:16
**BLOOMER (283)**
3:15 8:16,25 9:20
11:9 15:22 17:7
18:3 19:11,15,25
21:18,23 22:19 23:5
23:8 24:6,12,19
25:6,15 26:10,21
27:22 28:8,17,21
29:8,13,21 30:2

31:5 32:13,19,24
33:6 34:10,20 35:25
36:9 37:9,19,25
38:7,18 39:8,16
40:17,24 41:5,24
42:6,19 43:3,14,22
45:5,8,17 47:8,16
47:23 48:8,23 49:2
49:21 50:12,17 52:3
53:24 54:16,19
55:21,25 56:14
58:15 59:12,20
60:11 61:6,22 64:7
64:18 65:9,23 67:2
67:12,22 68:8,18
69:10 70:12 71:20
72:23 74:12 76:6
79:14 80:24 81:15
83:12 84:25 86:11
87:10,17,22 88:2
89:22 91:5,22 92:8
92:19 93:9,25 96:12
98:4 99:2 101:9
102:5,13,24 103:22
104:14,16 105:4
106:18 107:3,22
108:22 109:2,18
111:24 112:13,25
114:8,15 115:3,19
115:22 116:10
117:4 118:6 120:5
121:10 122:21
123:8,14 124:7
125:17 126:10
127:2 129:11
132:13 135:24
138:14 140:9 141:9
141:11,15 143:9,24
144:9 145:14 147:2
147:16,22 148:2
149:21 150:10
151:17,25 153:11
154:17 155:18
156:10,18,25 158:9
159:10,13 160:7,15
160:18,22 163:4,7
164:17,22 165:19
167:7,20 168:2,5,16
169:2,14,23 170:6
170:13,22 171:4
172:6 173:2,25
174:17,21 175:25
176:8,19 178:21
180:17 181:6
182:20 183:4,11
184:3,11,19 186:11

188:24 189:3,20
190:22 191:15
192:23 197:22
199:11 200:19,22
201:3 202:11 203:3
203:25 204:6,12
205:22 206:16
207:8 208:25
210:11 211:4,11
212:21 213:21
214:20,23 215:2,9
215:12 217:8,11
219:9,25 220:16
222:20 224:21
225:22 226:6,10
227:6,10,18 228:3
231:13 237:25
240:23 242:9 243:7
246:9,21 248:3,20
249:11,17 250:7
251:10 253:21
254:23 255:11
256:2,24 257:20
259:14 261:9
**blown (3)**
128:12,15 236:3
**board (1)**
132:7
**BOIES (1)**
3:10
**book (29)**
57:4,21 61:14,20
62:17,20 75:5 78:24
94:14,16 112:9,24
122:2 123:5 124:14
124:16 131:12
177:5 179:3 187:12
196:2 204:3 209:13
210:10,24 211:16
240:5 247:4,11
**books (12)**
17:14 74:19 79:19
96:20 97:15 107:20
176:24,24 258:7,25
259:5,24
**borrow (1)**
90:20
**borrowing (1)**
247:19
**bottom (5)**
35:5 89:10 194:3
255:5 256:11
**bought (1)**
238:10
**box (4)**
227:3,7,15,18

**break (14)**
7:2 47:11,15 85:2
125:19 129:14
167:8,11 175:2
205:23,25 230:12
233:23 248:18
**briefing (1)**
224:9
**bring (2)**
51:18,20
**broader (1)**
188:3
**broker (7)**
17:16 106:2 110:12
135:6,10 137:22
230:21
**brokerage (3)**
20:12 75:10 146:7
**brokers (3)**
13:19 20:21 21:2
**broker's (2)**
146:4 205:6
**broker-dealer (16)**
134:17 135:22 136:9
144:13 145:10
176:15 179:17
180:9,23,25 181:2,4
182:11 231:9
235:16,16
**broker-dealers (5)**
5:18,18 179:23
180:15 228:19
**broker-dealer's (3)**
231:22 232:16 235:3
**Brothers (12)**
1:7 3:5 13:18 15:10
16:25 18:20 69:18
97:2 194:10 254:2
254:11 264:2
**brought (2)**
233:25 247:19
**brunt (1)**
149:12
**buffer (2)**
215:18 216:3
**builds (1)**
231:17
**bunch (5)**
5:17 70:24 74:17
75:14 144:15
**bundle (1)**
140:22
**business (145)**
14:14 15:25 18:25
19:3 23:12,14,15,17
23:19,21 27:16

30:17 35:20 36:17
36:19 39:24,24
42:14,16,17 46:25
47:19 51:3,7 52:13
52:14,15,16 53:6
73:3,5,21,25 74:19
74:23 75:5,7,9,10
75:16 78:24 79:19
81:17,20,20 84:7
88:18,19 100:9
101:5 103:18
107:23 108:9,19
111:17,19 116:14
121:15,16,20
122:10 125:14,15
127:22 132:6,17
137:21 139:4,11,13
142:16 143:7,19
146:4,6,7,17 147:6
187:3 199:25
200:10,10,13,18
201:14 202:6,23
203:2,16 205:16
206:7,8,9 209:5,14
210:18 213:12
219:2,20,22 220:7,8
220:9,13,14,20,25
221:3,6,8,16,20
222:9,17 223:2,6
224:11,20 225:10
225:16,17 227:5
234:2 238:10
240:17 241:10,14
242:16 244:24
245:10,11 246:2,5
246:12,14,19 247:4
247:5,6 248:10,11
248:13 254:2
255:23 258:11
**businesses (26)**
20:13,22 27:4,5 39:20
39:22 53:4,6,8
70:23 71:2 75:17
95:10 120:20,22
186:24 187:8
190:15,19 199:22
241:7 247:8,10
248:7,9,16
**businessperson (6)**
52:22 53:18 54:10
55:24 56:4,7
**buy (11)**
42:17 70:10 77:15,24
78:3,25 212:25
245:9,10 248:2
258:21

buyer (2)
22:10 244:17
buying (3)
76:5 248:7,10

_____ C _____

C (3)
3:2 4:3 86:23
calculated (2)
33:25 231:4
calculating (1)
231:18
calculation (4)
124:25 157:20 231:15
242:13
calculations (3)
119:7 127:13 213:19
California (1)
6:7
call (6)
43:5 162:22 189:6
229:8 232:10
243:20
called (5)
5:2 14:4 20:18 55:11
134:5
calling (1)
41:16
calls (6)
29:8 43:4 67:23
122:21 162:20
199:12
calm (1)
125:8
capabilities (1)
177:7
capability (1)
248:7
capital (16)
3:11 20:12 75:9 86:23
109:12,15 116:15
117:10 119:21
192:14,20 210:25
247:11 248:10,13
263:11
care (2)
168:16,17
career (1)
195:10
CARRERO (2)
3:8 261:7
carried (3)
112:18 185:23 229:4
carry (2)
139:10 240:8
carrying (3)

case (38)
1:7 5:21 6:18 7:18 8:9
8:12,23 9:11 18:12
33:12,23 41:11
45:15 72:14 81:21
82:2 85:12 128:22
138:4 144:14,24
156:4 184:18,22,25
205:3 209:4,4
210:14,18 228:16
234:10 235:6
245:20 246:15
247:16 252:8 264:2
cases (3)
188:5 229:24 246:10
cash (5)
101:16 102:19 197:6
197:10 205:20
categories (2)
67:19 112:15
categorize (1)
15:5
categorized (1)
15:16
category (3)
51:10 67:16 134:19
center (1)
254:12
certain (11)
16:13 82:15 83:14
120:17 134:18
137:12 165:9
167:21 180:19
185:8 214:5
certainly (14)
23:15 30:11 52:12
77:21 81:4 90:14
112:14,16 127:11
138:24 169:11
203:7 223:9 240:6
certainty (2)
112:7 181:20
CERTIFICATE (1)
262:2
Certified (2)
2:10,10
certify (3)
262:8,14,18
challenge (1)
185:24
chance (1)
239:16
change (8)
10:5 12:12 48:4,7
86:19 205:7,11

208:2
changed (5)
47:24 71:5 211:12
258:2,4
changes (5)
85:18,21 86:7,16,17
changing (7)
76:24 78:6,7,8 119:16
119:16 120:23
chaotic (2)
184:21 188:12
Chapter (1)
1:6
characterization (14)
20:2,3 22:20 86:5
92:9 94:23 101:10
127:3 132:14
186:12 190:23
202:12 203:4
246:22
characterize (5)
33:20,20 86:2 139:9
180:4
characterizing (1)
103:5
charge (2)
151:5 152:12
charged (4)
149:18,23 150:8
152:8
Chicago (2)
109:16 232:2
chief (1)
49:8
choosing (1)
38:19
Chris (1)
256:18
Christopher (1)
256:12
circulated (2)
100:8,25
circumstances (25)
13:24 20:11 22:10
23:16 38:24 42:15
44:14 70:16 71:15
78:14 79:13 82:25
103:4 130:19
145:19,22 184:21
193:13 207:19
211:20,25 233:9,20
244:17 245:20
cite (1)
221:25
Civil (1)
262:21

Clarification (21)
85:12,14,18 87:5 88:8
89:5,18 90:25 91:15
91:18 92:7 93:8,15
95:19,21 96:10
100:8,18,25 101:15
102:17
clarified (3)
18:15 44:9 102:17
clarify (5)
11:10 18:18,21 92:20
264:6
Clark (1)
10:19
Clark's (1)
10:17
clause (8)
35:17,23 36:5 43:20
87:6 88:19 89:12,17
clauses (2)
86:14,17
clean (1)
46:3
clear (22)
16:17 30:7 52:11
70:22 73:10,11,25
74:2 80:9 84:4
105:13 121:24
127:6,23 134:3
136:4 174:14 201:6
205:12 247:22,23
255:20
clearance (8)
14:20 16:19,20 95:3
156:2 211:22,23
223:2
cleared (5)
17:13 18:20 137:3
149:25 150:7
clearer (1)
111:2
clearing (108)
13:20,20 14:5,14,18
17:5,16 18:23 19:4
20:21,21,25 21:2,2
33:12,17 34:13,15
34:22 69:19 73:5,21
75:12 80:4,11 84:8
90:8 94:15,21 95:9
96:21 97:10,14,24
105:10,11,12,25
106:2,3,5,6,25
107:7,8,13,24 108:7
110:12 111:16,19
112:9 113:22 114:4
117:23 118:13

121:5,14,17 128:8
128:17 135:11
136:5,5,6,6,8,21
137:9,20,22 138:20
138:25 139:17
140:8 144:15,22,25
149:13 150:22
151:23 155:17
187:3 198:3,4,5,14
203:11 209:8,9,14
213:11,15 228:15
228:23,24,24
229:13,18,21
230:21 232:20,24
233:3,7 241:8
251:14 252:5
clearing-account-b...
142:13
clearly (5)
55:6 83:15 119:3,19
173:23
Cleary (1)
183:20
close (19)
78:11 87:2 96:2
113:12 125:13,18
127:8,16 144:4
169:12 212:18,24
222:19 236:24
240:20 248:19
255:22 256:6
257:10
closed (4)
78:12 118:14 220:20
236:17
close-out (3)
152:10 153:8 238:15
closing (42)
13:4 73:15 98:8
100:12 101:8
103:21 115:4
116:24 117:3
125:14 126:4,21
128:18 144:5,8
149:19,23 150:6,9
154:13 155:13
158:2 164:5,15
165:7,14,17 166:2
166:10,24 175:9
176:5 183:10 186:8
200:21,23,25 201:5
201:8 210:5 213:20
217:20
CLR (1)
1:24
CME (8)

106:4 109:7,9,11,17
109:24 128:13
232:19
**Codes (1)**
264:5
**collateral (110)**
9:7,8 21:5,16 22:9,13
22:17 23:3,20,25
24:2,4,10,10,17
25:5,11 26:19 27:15
27:20 29:6 30:18
33:19 34:23 37:18
39:6 43:21 45:2,24
46:9 52:24 53:22
54:13 55:8 56:11
57:4 62:24 63:4
67:17,21 72:12
73:22,24 80:15 83:4
83:9,25 110:15
122:3,6,12 124:22
127:21 128:16
136:11,14,19,23
138:11,17,18
141:18,20 142:2,23
144:6,11,12,19
145:9,11 146:20
148:20 178:25
197:8 203:15,19
208:6,17,19,22
209:19,25 212:2,4
216:6 220:12,13,19
230:23 231:10
233:3 236:3,16
244:17,20 245:2,8
246:4,7,7,11,18,20
247:10,13,17,21,22
247:24
**collateralized (1)**
87:2
**collateral-related (1)**
221:12
**colleague (1)**
244:11
**collect (4)**
157:7,19 229:4,24
**collected (2)**
210:20 230:7
**collectively (3)**
20:18 57:8,25
**columns (1)**
68:17
**combine (1)**
176:25
**combined (1)**
177:9
**come (9)**

16:23 22:12 119:15
119:20 170:7 212:6
231:21 244:19
246:3
**comfortable (4)**
123:11 125:11 128:17
231:11
**coming (9)**
14:11,24 61:11 79:20
148:13 149:2,4,5
178:9
**commensurate (2)**
124:23 229:5
**comment (1)**
44:12
**commercial (1)**
57:2
**commission (3)**
20:12 227:5 228:14
**Committee (2)**
3:18 261:3
**communicated (1)**
161:13
**communication (1)**
157:25
**companies (1)**
13:22
**company (1)**
245:6
**compensate (1)**
152:19
**competent (1)**
43:17
**compilation (1)**
162:14
**compile (2)**
162:13 163:3
**complete (7)**
7:22 27:2 54:25
119:23 125:9
170:15 248:25
**completed (2)**
111:3 262:22
**completely (6)**
15:9 39:18 40:3 72:24
122:24 124:17
**complicated (3)**
244:5 245:12,16
**complication (1)**
14:3
**complying (1)**
205:5
**component (3)**
71:5 197:11 198:24
**components (1)**
159:4

**composition (1)**
179:2
**comprised (1)**
53:7
**compute (1)**
142:5
**computer (19)**
166:15 170:12 171:17
171:22 172:4,21
175:10 176:7,16
177:11,25 178:14
179:19,22 181:2
182:12,16,25
252:12
**computing (1)**
142:8
**concern (1)**
246:14
**concerned (1)**
196:13
**concerning (2)**
50:4 158:25
**concerns (1)**
18:10
**conclude (8)**
54:6 61:2,9 80:13
110:8 115:25 120:3
232:8
**concluded (2)**
14:3 120:4
**concludes (1)**
30:13
**conclusion (14)**
13:3 24:8 30:10,12
36:16 42:23 63:5,9
69:8 71:11 83:24
84:5 130:17 240:3
**conclusions (1)**
12:22
**conditional (1)**
155:23
**conditions (3)**
125:8 130:24 238:5
**conduct (2)**
53:8 103:7
**conducted (1)**
213:18
**conference (1)**
162:20
**confess (1)**
143:15
**confirm (1)**
55:7
**confirms (1)**
67:6
**conform (1)**

264:6
**confuse (1)**
191:24
**confused (2)**
92:12 249:20
**confusing (1)**
227:11
**confusion (3)**
61:10 62:7 160:11
**connected (1)**
146:9
**connection (23)**
20:22 46:24 52:12
54:5 64:24 105:19
105:22 106:13
131:20 132:5,20
133:23 145:11,18
152:14,17 153:7
161:23 163:12
183:18 193:19
216:6 233:22
**consequence (2)**
191:7 209:15
**consider (2)**
35:23 146:10
**consideration (1)**
246:13
**considered (1)**
241:19
**consistent (13)**
26:13 29:2,4,14 37:4
38:13,22 89:10
90:13,14 103:15
110:6 235:2
**constantly (4)**
76:24 78:6,7,8
**constitutes (1)**
23:20
**constituting (1)**
34:24
**consultant (2)**
6:16,17
**contact (2)**
183:9,25
**contacted (1)**
200:7
**contacts (2)**
133:24 162:18
**contain (1)**
253:25
**contained (5)**
8:24 100:7,24 101:14
257:16
**contains (1)**
250:25
**contends (1)**

20:9
**contention (1)**
19:21
**context (22)**
37:12 39:23 62:3 80:9
88:15,22 104:18
105:7 122:24
145:24 146:3,11
148:9 149:8 155:7
169:3 183:14
188:11 190:13
203:12 220:5
221:23
**continue (3)**
75:19 94:14 95:11
**continued (6)**
9:11 13:11 134:23
135:3 260:8 261:5
**continues (1)**
35:9
**continuing (2)**
88:25 95:2
**contract (19)**
24:10 32:23 34:8
36:11,14,15 39:9
90:5 93:11 103:25
204:20,21 206:19
207:15 208:2,4,20
208:24 209:10
**contracted (1)**
159:2
**contracts (11)**
25:4 35:21 36:8,18
39:2,7,11 74:11
92:5 207:7 208:13
**contrary (1)**
12:14
**control (3)**
117:16 125:4 244:9
**Cont'd (2)**
4:3 130:6
**conversation (3)**
41:2 215:20,22
**conversations (4)**
143:8,12 178:24
220:24
**convert (1)**
259:5
**convey (1)**
43:21
**conveyed (3)**
63:6 64:16 65:7
**conveys (1)**
38:15
**cooperation (1)**
187:21

**copied (3)**
192:15,21 263:11
**copies (1)**
227:11
**copy (6)**
25:21 215:8,13
248:25 249:5,6
**core (1)**
39:21
**Corp (8)**
13:20 14:5,18 33:18
96:21 106:4 135:11
251:14
**corporate (4)**
57:2,2 58:22 60:16
**corporation (6)**
13:20 155:17 179:24
233:22 234:13
252:5
**correct (85)**
9:12 22:15 26:4,8,15
28:7 31:22 32:6
37:18 38:17 40:23
42:18 43:13 44:2,17
44:22 45:7 48:18
52:6 53:17 58:18
59:6 60:20,24 61:17
63:21 64:6 66:25
70:6 77:7 78:4
79:13 82:12 93:20
93:21 104:13 105:3
108:17 110:21
111:7 114:22 115:2
115:14,15,21,23
117:23 121:21
126:4 131:25
132:12 136:12,16
144:25 145:2 150:3
157:24 160:2
163:25 164:16
171:9 175:23 179:8
179:12,24 180:9
181:5,10,13 183:22
184:2 186:8 197:14
214:8 224:14 231:6
231:12 234:24
237:14,21 238:24
239:6 253:16
259:12 264:7
**correcting (1)**
56:3
**correctly (2)**
92:23 217:12
**correspondence (2)**
63:13 119:10
**corresponds (1)**

168:14
**cost (6)**
144:4,8 149:19 152:9
152:20 247:13
**costs (2)**
150:9 247:12
**counsel (11)**
41:13 43:12,18,19
155:13 158:2
183:21,25 184:3
214:14 249:10
**counting (1)**
214:21
**COUNTY (1)**
262:4
**couple (5)**
47:13 48:12 83:15
101:25 167:10
**course (7)**
10:12 11:4 139:25
195:10 221:7 237:6
245:6
**court (2)**
1:2 160:13
**courtesies (1)**
260:7
**courtesy (1)**
261:11
**cover (26)**
33:13,14 34:9,13,25
65:24,24 66:9,9
69:12,18 80:23
124:19 134:6 136:8
136:11 138:5,9,19
138:23 144:8
168:22 173:8 197:8
207:20 223:24
**covered (1)**
138:10
**Craig (2)**
135:16 171:13
**crazy (1)**
71:15
**created (4)**
46:8 47:20 48:2,3
**credible (1)**
176:14
**credit (25)**
33:18,21 34:8,12,24
69:24 112:20 117:9
129:5,6,7 133:7
137:5,7 138:7
140:22 141:6
151:15 152:4
189:11 198:18
213:16 228:16,18

247:17
**Creditors (1)**
3:18
**credits (3)**
133:7 243:16,18
**creditworthy (1)**
137:12
**CRR (1)**
1:24
**cushion (13)**
113:21 117:21 120:2
120:12 121:4,9,12
126:2,20 127:15
128:7 218:18
231:17
**Cusip (2)**
196:12 251:18
**custody (1)**
244:8
**custom (2)**
137:24 210:14
**customer (85)**
14:12 15:18 17:23
18:18,19,23 19:8
21:4 52:14 74:4
80:2 96:22 131:23
132:11,18 133:8,16
134:2 137:7,19
138:19,24 140:8,12
140:23 141:3 142:6
146:13,19,23
147:10 148:12,16
148:20,23 149:5,14
149:18 150:7,16,17
150:18 151:13,16
152:7,7 153:8
185:16,21 198:6,12
198:16 210:19
211:23 213:3,5,6
215:18,24 216:7,7
216:15 218:19,20
218:22 219:7,12,22
221:12,19 222:14
223:16,22 228:17
228:19 229:12,25
242:3,6,7,16,22
243:3,13,17
**customers (68)**
14:11,24 15:3,8,11,14
15:15,16 16:5,6,9
16:13,21,23 20:20
52:9,17 69:19 97:16
97:25 132:23
133:13 134:4,11,12
134:15,20,21 135:2
135:20 136:10,23

137:4,12 138:4,6,11
141:19,23 144:3
145:8,9,12,13
146:20 147:4,4,5,7
148:21 150:2,3,14
151:2,2,4,12,23
153:3,4 210:18
213:19 217:19
222:6 229:15 230:7
243:14,15
**customer's (2)**
17:12 135:9
**cut (2)**
36:21 201:25

--------
**D**
--------

**D (4)**
37:17,21 38:10 56:24
**daily (3)**
183:17 197:3,10
**DAKIS (10)**
3:21 40:21,25 41:20
42:2 66:5 160:12,16
160:20 261:2
**Dan (5)**
135:15 171:12 192:15
192:21 263:12
**dash (1)**
216:10
**data (13)**
68:6,13,15,25 74:4
116:21 174:10
180:24 182:10
196:8 252:16,16
253:24
**date (18)**
8:3 47:22 57:5,21
58:9 61:4 70:6
77:18 115:4 192:17
201:2,6 210:5
214:10 226:17
252:23 255:21
264:3
**dated (7)**
8:5 45:3,23 46:6
160:17,18 224:13
**day (37)**
3:4 10:16 47:10 73:14
118:19 123:7 125:9
125:14,15 128:24
137:14,15 155:13
158:2 197:14
203:23,24 204:19
204:20,25 205:8,9
205:14 211:10
223:4,7 232:9

235:25 238:21
242:17 249:22
257:25 258:3,4,8
261:20 262:24
**days (6)**
10:12,15,15 14:18
235:22,25
**deal (39)**
14:10 51:16,22 72:3
81:10 91:4,17 93:4
93:6,17,22 94:17
96:10 98:2,20,21
100:9 101:5 103:18
108:20 115:25
120:3 121:2,8 129:9
184:24 188:2 190:3
193:5 220:20
236:12,18 241:14
241:25 252:10
258:14 259:18,20
260:2
**dealing (5)**
6:7 64:2 105:25
188:13 241:17
**deals (3)**
244:24 246:3,5
**dealt (2)**
51:14 81:19
**debit (5)**
242:7,13,14,21 243:3
**debits (1)**
133:6
**debt (1)**
57:2
**Debtors (1)**
1:9
**decide (2)**
113:12 127:8
**decided (1)**
52:18
**deciding (1)**
236:12
**decision (1)**
236:19
**declaration (9)**
10:6 47:3 99:12,22,25
100:7,23 101:3
201:16
**declarations (1)**
111:2
**decreases (1)**
79:7
**decree (1)**
79:5
**deemed (1)**
155:24

**default (3)**
151:15 152:7 228:19
**defaulting (1)**
237:18
**defaults (1)**
232:24
**defendants (1)**
6:4
**deficit (1)**
243:5
**define (4)**
33:11 51:6 75:13
213:14
**defined (5)**
9:8 39:22 57:8 85:22
200:23
**definitely (2)**
121:19 122:11
**definition (17)**
27:2 35:5 36:6 37:16
37:23 38:11 57:13
57:20 85:18,22 86:8
86:9,19,22 89:13
92:5 109:4
**degree (7)**
13:7,14 78:16,20
112:7 177:2 221:5
**deletion (1)**
39:10
**deliberately (1)**
209:13
**delivered (1)**
177:24
**delivery (4)**
90:20 151:7 152:16
152:19
**depended (1)**
223:16
**dependent (1)**
177:6
**depending (1)**
206:14
**depends (2)**
196:24 218:19
**depleted (1)**
71:10
**deployed (2)**
53:9 69:21
**deponent (1)**
262:19
**deposed (6)**
5:13,16 10:4,11,20
11:2
**deposit (4)**
108:7 121:14,17
134:6

**deposition (39)**
1:14 2:4 6:24 9:23
10:6,8,10,17,23
11:5,15,16,23 28:13
41:19 52:9 65:19,22
65:25 66:9 133:24
147:24 155:2,8
161:19,24 164:12
188:8 193:18 202:5
221:13 241:12
249:2 256:22 261:4
262:10,12,21 264:3
**depositions (7)**
9:14 11:19 63:16
64:25 167:14 188:5
188:7
**deposits (12)**
20:25 27:7 28:4 32:11
113:23 114:5
117:23 118:13
121:5 128:8 139:18
229:17
**derail (1)**
65:19
**derivative (35)**
13:18 16:24 17:5 19:2
21:17 23:3,4,18,25
24:5,9,16,18 25:4
27:16 30:19 32:23
34:8 36:17 72:19,20
74:18 77:25 78:2
79:3 91:4 92:4
97:15 131:12 159:8
163:20 186:7
198:20 203:9
228:23
**derivatives (189)**
18:5,11,13,16,25
19:23 20:17 22:17
24:24 25:11 26:20
27:6,11,21 28:3
29:7 31:22 34:15,19
35:20 36:7,23,24
37:16 38:13,17 39:2
39:6,9,11 40:2
42:14 45:3 46:10
47:21 51:4 52:25
53:5,21,23 54:12,14
56:10,13 57:3 61:3
61:20,25 62:3,5,6
62:13,17,23,25 63:4
66:16,19,22 67:11
67:21 68:4,16 69:6
70:2,8,11,25 72:17
72:18,22 73:3 74:5
74:7,8,11 75:6,11

75:15 76:4,7,9,23
77:7,11,14 78:23
79:10,12 80:19,20
80:22 82:17 84:2,7
86:23,25 87:9 88:24
89:21 90:8 91:8,13
91:20 92:2,25 93:18
94:14,15,22 95:23
96:3,6 100:11 101:7
102:20 103:20
104:13 105:3,12,19
105:23 106:16
107:2 110:9 111:6
111:23 112:24
116:3 117:2,19
122:18 124:2 132:8
137:24 146:8
153:24 159:4,22
164:15 166:9,17,18
171:23 172:16,24
173:17 175:12,13
176:5,18,24 177:9
177:14,20 178:16
184:17 186:21
187:3 188:6,19,22
191:6,13,19,22
192:5 195:17,22
209:14 213:15
230:20 236:21
238:10 240:4,17
241:8 244:25 246:6
247:9 248:2,8,15
250:6,15 251:2,3
252:5 257:19
**describe (14)**
12:16,18 13:13 15:23
95:13 130:9 140:2
150:12 189:10
204:3,14,15,17
207:12
**described (14)**
89:12 110:24 112:11
126:18 136:9 138:7
153:15 188:11
198:8,14 201:15
206:21 222:4 235:9
**describes (1)**
79:17
**description (2)**
46:21 218:14
**desire (1)**
80:16
**detail (1)**
54:4
**detailed (3)**
81:18 220:22 221:12

**determination (1)**
238:7
**determine (9)**
67:25 78:18 79:21
119:8 133:2 155:22
170:9 174:5 229:2
**determined (2)**
72:11 125:13
**developed (1)**
229:2
**developments (2)**
55:6,12
**diagram (1)**
147:18
**difference (1)**
18:18
**Differences (2)**
227:16,24
**different (26)**
21:16,21,22 22:16
23:6,9 24:4 28:22
70:17 71:22 72:5
81:10 123:23
127:17 142:7
144:16 145:5
156:21 191:18,23
197:12 211:9 239:2
249:21 250:11
253:24
**differently (3)**
101:11 150:13 253:23
**difficult (6)**
78:13,17 90:18 97:19
118:20 122:23
**difficulties (1)**
13:3
**digest (1)**
165:22
**diligence (4)**
199:24 200:16 201:12
213:18
**direct (6)**
89:4 106:5 172:8
180:25 183:9,24
**directed (1)**
101:24
**directing (1)**
227:22
**direction (1)**
18:10
**directional (4)**
164:6 165:17 166:4
166:25
**directly (3)**
106:5 186:19 188:20
**disagree (5)**

42:2 86:4 225:21,23
225:25
**disappear (1)**
223:7
**disappeared (1)**
78:11
**disbelieve (1)**
226:4
**discerned (1)**
154:5
**disclose (1)**
31:7
**disclosed (1)**
41:18
**disclosing (1)**
32:15
**disclosure (1)**
40:20
**discovered (1)**
189:12
**discovery (1)**
9:10
**discussed (5)**
49:12,15 50:7 51:21
244:3
**discussing (1)**
162:23
**discussion (12)**
32:18 41:22 42:10
87:19 101:20
173:10 174:3
199:17 218:9
225:11 241:5
245:19
**discussions (8)**
31:7,14,24 32:2,8,15
40:20 41:13
**displayed (1)**
124:24
**disposition (1)**
69:17
**dispute (1)**
110:4
**distinct (1)**
140:5
**distinction (2)**
23:2 251:19
**distinguish (2)**
80:11 136:4
**DISTRICT (1)**
1:3
**division (1)**
254:3
**document (78)**
25:24 27:7 40:16
43:23 45:3 46:12,16

46:21,23 47:6,18
58:7,13 61:9,24
62:15 63:8,9,16
65:12 67:15 71:12
83:20 85:11 87:16
100:4 101:10 155:5
155:12,20,22
157:25 158:7
159:24 167:13,15
168:3 169:15,18,22
169:24 170:8 171:3
172:10,11,17 174:3
174:7,15 177:21,22
192:24 193:3,8
224:3,22,23 225:2
226:20 248:25
249:14,15 250:14
250:20,25 251:4,12
252:21,25 253:6,7,9
253:12,18,19
255:13 263:8,16
**documents (19)**
44:16,21,24 45:22
46:2,6 47:19 48:2,3
56:18 63:20 161:3
167:10 172:9
184:24 253:10,25
254:9,10
**doing (11)**
60:13 64:13 73:12
97:5 152:14,20
154:7 199:21
218:15 233:6
241:11
**dollar (5)**
61:13 128:25 246:20
246:20 255:13
**dollars (9)**
118:19 154:12 209:25
219:8 222:15,18
223:12,15,19
**double (2)**
28:25 225:17
**double-sided (1)**
227:11
**doubt (2)**
226:8,13
**doubts (1)**
70:20
**download (1)**
180:22
**draft (4)**
43:20 100:8,24
101:15
**drafts (3)**
100:16,18,21

**draw (1)**
36:16
**drawn (1)**
170:12
**drilled (1)**
54:4
**due (8)**
41:20 139:24 157:6
157:20 199:24
200:16 201:12
213:18
**duly (2)**
5:3 262:11
**duration (1)**
125:3
**Dzeimian (10)**
9:24 10:4 135:16
143:13 171:12,15
178:11 192:15,21
263:12

---

**E**

**E (4)**
3:2,2 4:3,3
**ear (1)**
30:4
**earlier (14)**
49:12,15 71:25 85:24
112:10 132:10,14
153:15 220:10
241:12 256:22
259:11,17,20
**earn (1)**
229:16
**easier (1)**
30:6
**easily (3)**
51:13 180:11 181:3
**East (1)**
3:6
**Easy (1)**
246:14
**Ed (2)**
99:13 183:20
**effect (2)**
206:9 223:14
**effective (2)**
16:18 17:2
**effectively (1)**
146:14
**efforts (1)**
163:3
**either (21)**
26:19 33:11 36:16
46:23 47:2 67:10
93:24 94:5 112:8

128:12,19 129:5
150:21 152:18
171:15 196:24
197:2 198:16
249:12 251:17
261:8
**element (1)**
13:5
**Elizabeth (5)**
10:2 200:6 201:16,17
201:20
**Elizabeth's (1)**
202:3
**EMANUEL (1)**
3:17
**emphasize (2)**
76:18 79:24
**employed (3)**
6:14 175:20,22
**employees (1)**
31:11
**employer (1)**
219:18
**enable (2)**
250:4,14
**encompass (1)**
67:20
**encourage (1)**
83:16
**ends (1)**
83:2
**engage (1)**
137:23
**engaged (2)**
5:25 6:5
**ensure (1)**
231:5
**entered (2)**
20:14 127:18
**entire (7)**
53:3 83:17 88:15
127:9 174:7 190:4
241:5
**entirely (2)**
110:6 116:19
**entirety (5)**
82:17 110:15 132:22
133:11 232:17
**entitled (7)**
105:18 106:15 156:22
193:25 219:22
227:16 255:2
**entity (6)**
107:20 109:11 119:9
181:21 182:2,3
**entries (3)**

66:21 68:15 69:25
**equal (1)**
72:18
**equals (1)**
139:11
**equities (3)**
77:12 79:11 187:12
**equity (21)**
57:3 58:22 60:16
61:14 75:25 76:17
76:20,25 77:5,14,23
78:22 79:4 80:20
120:15 132:3
176:24 177:9 247:5
247:6 254:4
**equity-related (1)**
76:13
**errors (1)**
264:7
**escrow (3)**
134:5,23 135:13
**especially (2)**
140:23 210:15
**ESQ (7)**
3:8,15,21 4:9,10,11
4:12
**essentially (8)**
70:23 75:12 82:18
133:8 137:18 146:5
229:15 233:6
**establish (3)**
201:6 209:20 212:22
**established (1)**
201:4
**establishment (1)**
209:21
**estate (11)**
92:23 94:12,25
149:19 150:8 152:9
153:6 237:3,14
239:18 261:7
**estate's (1)**
95:16
**et (1)**
1:8
**ETD (10)**
20:13 83:5,9 113:14
114:7 128:4 164:4
171:17 172:4 175:9
**ETDs (9)**
20:19 21:3 22:12
110:11,13 113:19
121:8 130:23
244:19
**Evans (3)**
193:24 194:10,14

**evening (1)**
205:8
**event (6)**
136:21 144:2 190:10
236:23 237:9
240:17
**events (1)**
259:22
**eventually (1)**
177:19
**everybody (2)**
193:4 241:24
**ever-changing (1)**
69:17
**evidence (12)**
68:9,20 70:14 74:13
107:4 154:19
164:19,25 173:4
174:22 183:13
248:4
**evolve (1)**
241:14
**evolved (1)**
135:8
**exact (1)**
221:4
**exactly (11)**
16:2 61:10 101:21
102:8 118:16
143:18 154:21
232:3,25 234:19
258:6
**examination (4)**
5:6 46:24 130:6 263:4
**examined (2)**
5:4 251:4
**example (10)**
33:17 34:7 44:10 51:9
109:6 204:19
234:22 239:11,12
254:4
**examples (1)**
244:23
**exceed (3)**
95:25 96:5 210:16
**exception (1)**
41:25
**excerpt (2)**
167:24 249:4
**excerpted (1)**
193:5
**excess (39)**
113:21 117:22 118:12
119:5,5 120:2 121:4
121:22 122:9 124:4
124:22 128:6

144:12 154:12,24
210:7,9,24 211:16
215:19 216:6,9,10
216:25 217:6,13,19
218:23 219:4,6,12
219:13,22 221:17
222:13 223:7
233:14 239:15,17
**exchange (19)**
17:6 96:2 106:24
107:2,6,24 108:14
108:16,21 109:7
137:10 138:20
198:15 205:6
208:23 209:9,10
210:20 233:15
**exchanges (13)**
13:22 104:12,25
105:17,20,22,24
106:7,14,17 165:10
173:14 207:21
**exchange-traded (1...**
18:4,11,13,16,25 19:2
19:23 20:17 21:17
22:17 23:3 24:4,9
24:16,17,24 25:4,10
26:20 27:5,15,20
28:3 29:6 30:19
31:22 36:23 37:16
38:13,16 42:14 45:2
46:10 47:21 51:3
52:24 53:5,21 54:12
54:14 56:10,12 57:3
62:5,13,16 75:6,10
75:15 76:9,23 77:7
77:11,14 78:2,23
79:3 80:19 82:17
86:23 87:9 88:24
89:20 90:7 91:3,8
91:13,20 92:2 94:21
95:23 97:14 102:19
104:12 105:2,23
111:6,23 116:3,25
117:19 122:17
130:11 137:23
146:7 159:4,8
163:19 164:14
166:9,17 171:23
172:24 175:12
176:5,17 177:13,20
178:15 186:7 188:6
188:19 195:17,22
198:20 230:20
240:16 241:7
244:25 246:6 247:9
248:8,14 251:2

252:4 257:19
**exclude (2)**
39:4 96:4
**excluded (6)**
35:6,9 40:15 51:10
89:6 91:4
**excludes (1)**
36:6
**exclusive (1)**
197:25
**Excuse (5)**
147:17 159:24 170:25
208:8 213:4
**execution (2)**
124:20 239:24
**executives (1)**
173:14
**exercise (2)**
95:4 232:8
**exercised (3)**
98:11 151:12 258:8
**exercises (2)**
152:17 196:14
**exhaust (1)**
200:15
**exhausted (6)**
231:24 233:2,16
235:5 237:12
238:14
**exhausting (1)**
232:20
**exhibit (60)**
7:25 8:4 12:5 19:11
25:23 58:7,12 59:5
60:23 61:17,19
62:23 63:15 64:11
64:15 65:6 66:15
67:11,19 68:4 69:6
74:5 85:13 99:10
155:3 167:14,23,24
168:9,13,17 169:6
170:16 174:16
192:11,12,13,18
193:2,15 195:14
196:16 214:9,12
224:2 226:15,19
249:2 252:21,25
253:15,20 254:20
256:21 263:7,8,10
263:14,15,16
**exhibits (3)**
11:18,20 263:6
**exist (2)**
82:2 198:23
**existed (3)**
83:2 130:25 239:9

**existence (1)**
154:11
**existing (1)**
197:9
**exists (1)**
210:5
**expansive (2)**
43:9,10
**expect (5)**
79:20 154:14 155:14
158:3 203:18
**expectation (2)**
128:20 240:21
**expecting (1)**
251:8
**experience (13)**
15:25 74:23 110:9
124:12 133:4
176:22 179:13
208:7,18 218:17
231:20 232:14
235:2
**experienced (1)**
43:18
**expert (12)**
7:17 24:20,23 25:2
40:22 93:10 154:4
182:7 195:12 207:2
244:7,11
**expertise (6)**
110:9 142:17 177:2
179:16 199:13
242:10
**expert's (4)**
24:20 25:7 67:14
92:10
**expiration (3)**
14:4 156:3 196:13
**expiring (1)**
14:6
**explain (6)**
59:14 64:16 65:7
68:11 145:16
196:22
**explained (1)**
46:7
**explicitly (4)**
51:15,16 72:11
134:14
**explore (1)**
44:7
**explored (1)**
44:9
**exponentially (1)**
121:18
**exposed (1)**

53:13
**exposure (15)**
33:16 95:3 111:22
113:14 115:12,13
116:20 117:7,15
123:22 128:5 137:9
204:3,22 207:13
**exposures (25)**
34:14 62:21 73:4,14
73:23,24 74:3 79:22
82:18 84:2,9 94:8
95:7 96:18 111:12
111:15,18 112:9
117:9,10 124:15
128:19 131:13
176:25 209:11
**express (1)**
102:15
**expressed (1)**
50:25
**expressing (1)**
151:19
**expressly (1)**
43:21
**extending (2)**
133:7 228:16
**extent (25)**
16:22 17:12 18:14,22
20:3 31:6,9 32:14
34:22 40:19,25
41:21,25 52:15
76:14 77:11 78:8
86:16 89:22 103:12
134:22 145:20
170:14 196:9 261:4
**extract (3)**
177:4,11 178:14
**extracted (1)**
177:25
**extracting (1)**
178:7
**extraordinarily (1)**
245:12
**extreme (2)**
20:10 234:6
**extremely (3)**
97:19 118:20 130:24
**e-mail (28)**
59:8,17,17 60:10
167:18,23 168:18
168:21,22 169:7,13
170:2 173:14 174:4
183:19,24 192:13
192:19 193:22,24
195:5,14 253:2
256:4,8,11 257:5

263:10
**e-mails (1)**
249:18

---

**F**

**face (2)**
137:2 228:19
**faced (10)**
110:19 130:18 131:20
132:5 139:15 140:7
151:23 186:7 191:3
191:4
**facetious (2)**
44:3 244:4
**facing (2)**
250:5,15
**fact (43)**
14:10 26:2 41:14
51:11 63:19 68:19
83:13 84:20 90:9,11
90:17 93:22 94:13
120:14 127:11
133:11 136:19
137:8,23 140:19
145:25 154:8,18,22
164:11,14 167:2
168:17 177:8
180:14 190:14
203:17 210:14
216:21 219:3
220:23 225:23
229:14 232:7
233:25 238:20
247:22 258:15
**factor (2)**
30:11 139:12
**factors (7)**
125:2,6 126:5,8
221:25 239:21
247:16
**facts (34)**
19:6 37:13 38:23 68:9
68:20 70:13 71:14
72:9 74:13 78:19
81:7,9,23 82:2
107:4 109:24 110:7
112:4 120:10,23
123:3 132:25
145:22 154:19
164:18,20,25 173:3
174:22 183:12
187:19 243:12
248:4 264:6
**factual (2)**
154:2 243:8
**failure (3)**

51:18,20 53:12
**fair (3)**
45:11 62:15 65:16
**fairly (3)**
121:15 180:11 236:7
**familiar (10)**
11:23 63:18 193:10
    193:11 195:7 242:2
    244:24 246:10,18
    251:16
**familiarize (1)**
228:4
**far (7)**
63:12 73:17 100:15
    155:21 242:16,23
    259:22
**FCM (18)**
46:25 52:13,16 147:6
    200:10 210:18
    216:7 218:19 220:9
    220:24 221:16
    222:17 223:6
    225:16 228:15
    229:15,17 248:10
**FCMs (2)**
219:17 228:18
**February (4)**
1:16 2:2 262:24 264:3
**Federal (2)**
5:20 262:20
**feed (1)**
252:16
**feel (2)**
83:20 123:10
**fell (1)**
134:18
**felt (1)**
62:21
**fifth (2)**
102:11 215:6
**figure (4)**
14:21 116:22 258:12
    259:6
**figures (3)**
62:23 63:3 70:5
**figuring (1)**
258:24
**file (1)**
194:11
**filed (2)**
11:11,14
**filing (1)**
12:11
**financed (1)**
78:10
**financial (2)**

13:2 110:12
**find (3)**
161:5 173:18 243:16
**fine (4)**
42:6 48:7 157:3 170:3
**finish (10)**
41:10 43:24 47:14
    93:25 108:23
    123:14 124:8
    141:11 204:12
    256:3
**finished (4)**
40:10 108:12 166:5
    208:10
**finishing (1)**
248:19
**firm (21)**
5:10 69:20 142:19
    144:15,22,25
    149:13 154:15
    155:16 157:20
    158:5 176:23 177:7
    177:18 180:20
    194:12 198:6,12
    199:5 232:2 247:2
**firms (1)**
232:24
**firm's (1)**
232:5
**first (28)**
10:16 19:20 20:7 22:8
    59:16 90:14 92:17
    98:16 102:4 112:22
    118:9 121:24
    123:15 130:20
    144:17 155:10
    158:21 167:18
    169:7 212:22
    215:17 233:21,23
    234:12 245:3
    249:17,24 254:14
**five (1)**
85:3
**five-minute (1)**
175:2
**fixed (1)**
187:8
**flat (9)**
203:23 204:2,5,10,15
    204:17,22 205:2
    235:17
**FLEXNER (1)**
3:10
**flipped (1)**
139:20
**Floor (2)**

3:13,19
**fluctuations (2)**
118:18 123:7
**focus (1)**
8:18
**focused (2)**
9:24 52:19
**focusing (4)**
14:13 91:8 172:12
    245:17
**folks (3)**
213:24 233:7 236:10
**follow (1)**
92:22
**following (2)**
95:20 130:17
**follows (3)**
5:5 130:5 212:11
**footnote (6)**
104:5,7,11,21 105:8
    106:15
**footnotes (2)**
104:18 105:6
**foreign (9)**
13:22 105:24 165:10
    198:25 199:10
    205:18 210:15
    216:15 229:12
**forget (1)**
6:8
**forgot (1)**
159:14
**forgotten (2)**
6:10 252:20
**form (145)**
8:16,22,25 9:20 11:10
    17:7 18:3 21:18,23
    22:19 23:5,8 24:6
    24:12 25:15 26:10
    26:21 27:22 31:5
    32:24 33:6 34:10
    35:25 37:9,19 38:18
    39:16 40:17 42:19
    43:3,14 48:8,23
    49:21 50:13,17
    53:24 54:16,19
    55:21 56:14,15
    59:12 60:11 61:6,22
    64:7,18 67:2,12,22
    68:18 69:10 70:12
    72:23 79:14 80:24
    82:3 86:11 87:10,17
    91:22 96:12 98:4
    99:2 102:5,13,24
    103:22 106:18
    107:22 109:3

111:24 112:13
    113:21 114:8,15
    115:3,22 117:4,21
    120:2,5 121:4,10
    126:10 127:2 129:4
    132:13 135:24
    138:14 140:9
    141:15 143:9 144:9
    145:14 147:2
    149:21 150:10
    151:17,25 153:12
    154:17 155:18
    159:10,14 164:17
    165:19 172:6 173:2
    176:8,19 181:6
    182:20 183:4,11
    184:11,19 197:22
    203:3,25 206:16
    207:8 208:25
    210:11 211:4,11
    212:21 213:21
    219:9,25 220:16
    226:6,10 231:13
    240:23 243:7 246:9
    246:21 251:11
    253:14,19,21
    255:11 259:14
**formatted (1)**
253:23
**formed (3)**
8:20 9:6 40:4
**former (4)**
155:16 171:8 219:18
    244:10
**forming (7)**
30:9 35:13,24 41:3,7
    44:17 49:6
**formula (7)**
242:7,8 243:3,13,19
    244:8,9
**forth (12)**
21:9,13 96:23 100:17
    100:19 151:8
    186:25 216:18,20
    240:9 247:7 262:10
**fortunately (1)**
234:9
**forward (2)**
46:5 86:18
**forwards (1)**
194:15
**found (4)**
27:25 211:19 218:14
    222:25
**foundation (4)**
49:3 60:12 61:7

102:25
**four (2)**
89:9 102:10
**frankly (3)**
8:20 81:7 241:15
**free (3)**
83:20 247:21,22
**Friday (14)**
45:18,19 119:23
    120:22 128:22
    166:9 172:18
    173:16,21,23
    177:24 178:4
    250:22 252:9
**front (9)**
19:18 54:24 56:20,22
    83:21 85:8 104:9
    225:8,14
**fulfill (1)**
153:3
**full (14)**
81:7 123:5 149:12,12
    167:22 169:25
    170:15 193:3 203:8
    249:5,6,14 256:23
    258:9
**fully (1)**
151:11
**fund (15)**
20:25 107:14 108:7
    113:22 114:4
    117:23 118:13
    119:21 121:5,14,17
    128:8 139:18
    242:22 243:6
**funding (7)**
139:16,24 140:6,21
    141:5 197:5 198:18
**funds (1)**
229:18
**further (4)**
130:5 260:4 262:14
    262:18
**future (5)**
122:6 126:2 206:19
    206:20 227:25
**futures (86)**
20:12,18 47:18 52:14
    95:5,6 122:2,4
    123:3 127:14 132:6
    141:3 165:10
    196:20,24 197:9,13
    197:17 198:10,12
    198:25 199:5,10,25
    200:17 201:14
    202:6,8,22 203:2,22

204:3,20 205:16
206:7,8,12 207:7,15
207:18,23,24
208:13,20,24 210:2
210:8,10,14,15,23
210:24 211:3,15,16
211:18 212:3,10,19
213:3,5,6 216:15
217:23 218:8,21
219:23 220:12,20
224:10,20 225:10
226:15,24 227:5,17
228:9,13,14,18,24
229:12,16,19
236:20 263:15

**G**

**GAAP (1)**
25:11
**gain (6)**
135:21 136:2 207:6
207:13 215:18,24
**gather (1)**
119:24
**gauge (3)**
164:4 165:16 166:23
**general (14)**
8:22 9:4 12:24 15:24
42:22 43:9,10 46:19
46:20 75:13 151:9
222:8 242:4 259:25
**generally (20)**
12:16,18,22 15:16
23:22 33:10 36:3
43:8 46:15 103:6
112:14 113:4 133:3
134:5,15 212:15
213:14 218:2,15
219:16
**generate (3)**
179:21 180:7 223:20
**generated (5)**
204:23 251:13 252:13
252:17 254:10
**gentleman (2)**
133:25 135:12
**gentlemen (1)**
178:24
**getting (9)**
61:15 118:17 119:4
125:18 128:19
187:20,21 190:14
190:18
**give (30)**
6:11 8:10,13 18:9
24:14 34:4 46:20

61:19 62:19 74:14
74:25 99:7 109:23
141:12 143:24
145:10 148:3
156:20 169:16,25
185:3,6 186:13
199:15 206:18
212:23,25 227:7
239:14 244:23
**given (21)**
46:23 71:3,4,7 72:8
78:17 118:17
120:10 130:23
146:20 165:13
179:4 187:15
211:21 221:24
223:4 239:23
243:12 246:13
256:23 262:13
**giving (2)**
119:6 123:15
**go (27)**
15:11 40:9 52:18
82:24 96:3 106:23
108:13 110:18
113:18 116:21
121:18 125:7,16
139:20 147:19
151:21 204:19
206:5 224:24
228:22 230:10
236:23 237:7
241:15 243:15,22
248:17
**goes (4)**
41:21 101:17 210:3
211:6
**going (52)**
11:9 16:5,9,13 18:7
33:13 39:5 50:12,18
61:11,20 65:9 68:22
75:14 79:16 83:12
85:2,10 94:10 97:8
97:9 105:4 108:22
109:2 119:14,20
120:21 121:18
124:7,8 127:20
129:4,5 138:25
139:4 147:17 148:2
149:11,15 160:7
167:20 169:14,23
187:9 192:10
216:18 239:10
251:10 258:7,10,11
258:25
**Goldman (4)**

6:14,17 233:22
244:11
**good (15)**
5:8 44:13 48:11 98:20
126:14 129:13
153:6 167:7 174:25
185:5,8 187:13,17
189:5 258:16
**gotten (1)**
113:5
**governing (4)**
26:12 37:3,7 110:6
**government (1)**
56:25
**great (4)**
88:10 127:25 143:16
249:7
**greater (2)**
144:6 218:2
**gross (5)**
142:25 144:19 166:4
167:6 258:18
**group (1)**
15:15
**guess (7)**
84:24 90:17,22 112:4
139:8 190:15 254:7
**guys (5)**
135:17 205:25 216:19
252:9 258:13

**H**

**half (1)**
129:3
**hand (3)**
85:10 192:10 262:24
**handed (4)**
58:11 249:4,6 254:22
**handing (10)**
25:21 63:14 99:9
154:25 167:12
214:11 223:25
226:18 248:24
252:24
**handle (3)**
117:11 137:15,15
**handwritten (3)**
214:9,13 263:14
**hanging (1)**
247:18
**happen (4)**
74:24 128:11 144:2
145:18
**happened (16)**
9:5 72:5 84:20 97:12
114:25 131:16

133:2 150:12 151:5
151:10,20 232:15
235:10 237:24
238:19,22
**happening (3)**
71:8 122:25 147:18
**happens (5)**
92:14 98:6 127:10
133:4 207:15
**happy (3)**
7:6,11,12
**hard (1)**
117:11
**HASSAN (6)**
4:12 167:24 168:4,6
168:11,14
**hat (2)**
170:4,9
**hate (1)**
40:21
**headed (1)**
255:5
**heading (3)**
162:7 254:15 255:2
**hear (4)**
7:10,13 29:18 49:13
**heard (1)**
178:5
**hearing (16)**
7:9 45:4,6,9,15,23
46:7 47:4,22 48:4
49:12,14,16 104:23
159:15 160:14
**hedge (1)**
79:10
**hedged (8)**
76:3,3 77:6,6,12,25
78:16 79:4
**hedges (5)**
3:17 79:11 80:4,20
124:17
**hedging (3)**
76:13 78:21 196:2
**held (14)**
2:5 20:19,25 83:4,9
86:24 106:25 111:6
124:3 132:23
133:12 179:23
180:8 237:21
**help (7)**
121:19 124:19 169:3
192:3 237:4 250:18
253:5
**helped (2)**
173:12 192:8
**helpful (3)**

30:9 189:15 215:9
**helps (2)**
45:13 174:8
**hereinafter (2)**
20:18 21:5
**hereof (2)**
57:5,22
**hereunto (1)**
262:23
**hesitate (3)**
34:4 141:4 143:24
**highlights (1)**
33:10
**highly (1)**
241:9
**hold (1)**
95:11
**holder (1)**
79:6
**holding (1)**
93:3
**HOLDINGS (1)**
1:8
**holds (2)**
181:5,9
**holistically (3)**
81:21 131:10 154:6
**hope (2)**
137:11 249:11
**hopefully (1)**
47:10
**hour (5)**
47:12 71:6,6 85:2
194:24
**house (12)**
33:12 34:13,22 69:19
106:6 137:20
138:20 202:8
228:15 229:13,18
229:21
**houses (5)**
20:21 21:2 128:17
228:24,25
**Hubbard (3)**
2:6 4:5 5:10
**huge (1)**
53:13
**Hughes (4)**
2:5 4:5 5:10 10:8
**hundred (3)**
44:21 118:19 168:7
**hundreds (3)**
154:12 219:8 223:18
**hypothetical (12)**
71:13,17 74:21,22,25
79:7 81:22 98:13,19

209:3 237:5 241:13
**Hypothetically (2)**
210:4,4
**hypotheticals (1)**
241:17

**I**

**idea (18)**
36:25 40:2 61:13,20
67:24 77:10,20,21
77:22 93:12 95:11
107:19 159:6
181:17 185:5,8
255:19 259:4
**identical (1)**
234:13
**identification (6)**
8:2 58:9 192:17
214:10 226:16
252:23
**identified (4)**
12:5 224:18 225:8
251:12
**identifier (1)**
251:17
**identifiers (1)**
251:15
**identifies (1)**
225:15
**identify (17)**
46:16 47:6 52:21
53:18 54:9,21 55:23
56:6,7,16,18 130:20
141:7 192:18
214:12 215:5 227:4
**identifying (1)**
192:25
**ii (1)**
20:22
**IMD (4)**
35:20 36:17,18 39:24
**immediate (4)**
197:5,18 207:5,12
**immediately (2)**
207:4 223:22
**impact (3)**
51:19 156:5 157:11
**imperative (2)**
83:3,8
**imperfect (2)**
203:10,12
**imply (2)**
56:5 228:17
**import (1)**
127:10
**importance (1)**

127:7
**important (12)**
18:17 42:12,24
166:13 169:2
185:13 187:3,13
190:7 250:3,13,17
**importantly (2)**
111:11 258:5
**impossible (6)**
78:18 97:7 177:11
207:23 208:15
222:23
**impression (1)**
188:2
**inaccurate (3)**
158:24 182:19,23
**inception (1)**
51:5
**include (13)**
8:8 30:18 31:21 62:10
62:24 63:3,19 69:7
131:15 133:6
134:11 162:18
260:8
**included (24)**
19:7 27:10 32:11
39:22 51:3 52:17
53:5,9 57:20 60:17
62:5,10 65:20 67:9
68:2 69:8 76:15,15
97:4 131:13 189:11
209:7 241:7 257:9
**includes (6)**
37:17 55:9 56:25
57:17 86:21 252:4
**including (14)**
20:17,25 34:23 37:3
83:21 102:18
149:14 173:17
178:11 187:5 222:2
239:15 245:7
247:11
**inclusion (3)**
38:12 48:21 51:22
**income (1)**
187:9
**incomplete (4)**
94:11 183:2 229:9,10
**inconsistency (1)**
90:10
**inconsistent (7)**
27:12,13 28:5 39:18
49:5 103:8 190:25
**incorrect (2)**
101:18 157:16
**increase (2)**

79:5 139:17
**increased (1)**
119:19
**increasing (1)**
152:4
**incurred (2)**
150:9 153:7
**independent (3)**
75:16 157:22 209:21
**independently (1)**
209:13
**INDEX (1)**
263:2
**indicate (1)**
167:4
**indicated (2)**
111:14 203:13
**indicates (2)**
120:24 217:10
**indirect (2)**
69:23 172:9
**industry (16)**
23:23 110:10 124:13
134:5 137:17,25
142:11,18 154:5
176:22 179:13,16
195:13 207:2
218:18 232:14
**infinity (1)**
116:21
**information (67)**
12:24 36:16 41:17
62:9 111:5,21 113:3
122:5 135:13
158:24 159:3,8,21
161:7,10,13,16
163:19 166:8,14
171:16,21 172:2,3,8
172:9 173:15,16,22
174:23 175:8 176:4
178:14 182:16,25
185:4,7,11 189:17
189:24 190:2
191:11,11,20,21
192:7 195:15,19,24
201:11 214:2,6,7
220:11,18,23
221:13 222:9 250:3
250:21 251:2 252:6
252:15 257:15
258:13 259:11,23
**informed (1)**
10:21
**infrequent (1)**
234:9
**inherent (10)**

191:12,18,22 192:4
195:21 224:19
225:9 227:4 229:3
240:8
**initial (7)**
122:13 210:16,25
211:17 212:5
229:25 230:8
**initially (2)**
57:12 161:12
**insofar (2)**
117:15 201:15
**instances (1)**
82:20
**institutional (6)**
134:15,19 135:2
219:2 229:14 230:3
**institutions (1)**
230:3
**instruct (2)**
31:8 40:18
**instructed (1)**
29:16
**instructing (1)**
29:24
**instruction (3)**
42:4 212:23,25
**instrument (1)**
135:8
**integral (1)**
248:9
**integrally (1)**
248:15
**intend (2)**
43:10 131:17
**intended (16)**
6:25 39:4 64:15 65:6
77:2,15 78:3 93:13
136:15 146:2
162:16 163:20
172:25 189:10
220:8 235:14
**intending (2)**
77:24 78:25
**intent (2)**
55:7 78:15
**intention (1)**
132:24
**interest (5)**
53:11 193:4 196:4
229:16 261:2
**interested (1)**
200:9 216:4 262:17
**interesting (1)**
98:9
**interests (2)**

57:19 146:12
**interject (1)**
40:22
**intermediaries (3)**
232:22 233:10 248:12
**intermediary (2)**
228:18 229:23
**internal (1)**
224:9 254:2,12
**internally (1)**
254:10
**interpret (6)**
36:14,15 89:23 90:5
90:25 93:10
**interpretation (3)**
29:9,11 96:9
**interpreted (1)**
16:3
**interpreting (2)**
90:16 103:25
**interrupt (8)**
11:7 36:10 108:11
123:10,17 124:11
255:24 256:2
**interview (1)**
163:2
**interviews (2)**
143:12 162:7
**intraday (1)**
232:10
**inventory (3)**
58:23 60:17 61:3
**investment (2)**
15:20 132:17
**involved (10)**
27:3 51:3,7 70:23
76:13 90:22 117:12
125:23 186:25
213:14
**involving (2)**
5:17 49:20
**irrational (4)**
70:9 72:17 74:8
208:15
**irrelevant (4)**
40:3
**irrespective (1)**
91:16
**isolating (1)**
190:10
**issue (3)**
9:7 159:15 174:10
**issues (12)**
5:19 8:19 14:13
104:23 117:12
156:2 163:17 187:4

187:16,25 240:5
244:3
**item (4)**
66:16,18 67:11 69:6
**it'll (1)**
256:4
**i.e (1)**
157:19

---
**J**

**J (10)**
1:14 2:4 4:9 5:2 7:25
130:4 261:18 262:9
263:7 264:4
**James (15)**
10:2 46:24 59:18
200:6 201:18,19,22
202:4,15,21 203:5
215:23 216:24
218:10 220:25
**January (4)**
8:5 9:11 12:3 163:3
**Jasen (1)**
59:17
**job (6)**
1:25 44:5,13 179:5
187:17 202:3
**Jointly (1)**
1:8
**Jonathan (1)**
10:7
**Jones (7)**
3:4 135:16 143:13,13
171:13,16 178:12
**judge (1)**
42:5
**judgment (2)**
212:14 252:7
**jumped (1)**
46:4
**jurat (1)**
260:9

---
**K**

**K (1)**
3:21
**Kathy (9)**
1:24 2:7 55:17 66:12
88:12 96:14 147:14
174:19 262:5
**keep (6)**
128:16,17 134:17
185:14 189:7 232:6
**keeping (1)**
135:5
**KELLY (1)**

3:8
**killing (1)**
193:4
**kind (3)**
120:11 258:9 259:25
**King (17)**
161:15,18,22 162:21
163:8,11,18 170:24
171:2 175:19
176:11 179:8 187:5
201:16,20 256:12
257:9
**King's (7)**
11:16 164:11 166:20
175:17 176:3 178:4
178:19
**Klepfer (3)**
1:24 2:8 262:5
**knew (14)**
43:20 82:20 84:6
112:14 172:14,14
179:6 216:5,24
222:8,10 223:8
239:8 252:19
**know (188)**
5:9 7:3 9:3 10:19,25
11:22 15:2,11 29:12
33:5 36:20 43:6
45:8 49:23 55:11
60:13 62:2,4,22
63:2 69:23 71:14
77:21,23 78:21
84:13 86:2,15,15
90:4,5,16,17 91:7
93:2 94:9,12 95:7,9
97:7,8 100:3 103:15
109:24 112:15,17
117:7,14 118:21
119:12,17,20,22
120:9,11,11,12,17
120:18,19,20,23
121:17 122:25
123:2,6,6,21 125:5
125:23 128:22
129:3,9 131:14,15
133:14 134:2,9
137:11 145:22
147:25 148:6
149:10 154:2,8,21
155:4,9 156:6
157:11,17,17
159:19 161:6,9,12
164:13 165:11
168:5 170:11 174:6
174:24 175:21
177:4 178:2,6 179:7

181:18 182:13
183:23,24 184:13
184:14 185:11
186:2 187:18,19,24
188:3,4 190:11,20
195:9,20 196:6,11
196:11 197:25
198:21 199:16
200:22 210:21
213:17 216:4,20
217:21,22 218:5
221:8,11 222:6,7,9
223:8,9,10,16,17,23
224:6 227:20,21
230:6,9 232:3,5
234:3 236:15 238:5
239:3,9,22 241:21
241:23 244:5,7,8,9
244:10 245:9,18
246:2,24 247:15,25
248:5 250:19
252:12 254:12
255:16 257:3,22,25
258:5,22,22 259:3
259:19
**knowing (5)**
55:14 125:6 128:4,6
240:5
**knowingly (2)**
202:17,24
**knowledge (31)**
24:21,25 25:8,9,13
81:6 101:19 113:13
123:5 124:12,15
127:13,20 134:25
154:11 155:12
175:19 177:21
179:4 182:6 200:16
203:7,8,12 221:5
222:2,5 223:5
239:23 240:7,7
**knowledgeable (2)**
135:18 177:3
**known (9)**
15:2 112:20 124:15
239:21,21 244:2
252:18 258:13
259:23
**Kobak's (1)**
11:15
**Konefal (6)**
192:14,20 193:23
194:9,19 263:11

---
**L**

**lack (8)**

12:23 49:2 166:14
173:15 175:8 176:3
222:2,5
**land (2)**
228:9,13
**language (5)**
39:10 90:11 100:7,24
101:14
**large (2)**
12:23 221:9
**largely (1)**
218:25
**larger (4)**
141:10 199:21 218:21
218:23
**largest (1)**
219:17
**late (2)**
165:23 166:11
**law (2)**
2:5 5:10
**lawyer (3)**
6:7,8 43:8
**lawyers (3)**
32:16 90:21 100:17
**LBI (32)**
20:13,14,20,20 59:18
59:24 104:12
105:24 106:4 107:9
138:9 146:22
151:23 152:9
155:16 158:4,24
159:9 176:15
182:11,18 215:18
216:3,4,17,21 219:3
237:3,11,13 238:13
241:9
**LBI's (16)**
20:15,19,23 60:16
61:3 83:5,9 110:14
112:23 130:22
166:15 175:10
176:6 184:8 237:10
238:10
**lead (3)**
6:8 110:8 125:2
**leading (1)**
13:3
**learn (4)**
112:22 200:13 219:6
219:11
**leave (2)**
47:5 249:9
**Leaving (4)**
17:22 74:3 78:20
111:18

**left (6)**
202:7 218:2 235:15
237:17 238:24
239:5
**legal (3)**
24:3,7 26:14
**Lehman (138)**
1:7 3:5 13:2,18 14:14
14:24 15:9 16:25
17:13 18:20,22 19:5
19:23 39:21 48:22
51:13 52:22 53:13
53:19 54:2,10,21
55:25 56:4,9 62:9
64:3 69:18 73:6,12
73:19,19 75:7 76:11
77:20 80:18 87:7
92:23 93:2 94:7
96:19 97:2,9,15
102:23 103:18
105:2,10,15 106:11
106:22,22,25
107:10,14 108:16
108:20,25 111:6
124:3 128:14,15,24
131:22,22 132:4,12
132:22 133:14
134:8,20 135:21
136:10,24 138:12
141:19,20 142:10
143:4 144:7,11,14
144:15 146:13,21
148:21,22 149:2,19
149:25 150:8,15,19
153:6 159:20
163:19,24 171:2,8
175:20 178:6
179:10,18 185:3,23
186:20 187:22,24
188:21 191:3
194:10 198:11
199:5 200:17 202:7
202:23 212:20
218:11 219:6,12,16
219:23 220:21
230:6,19 234:7
239:20,23 240:6,15
240:19,22 242:12
243:2 247:3 254:2
254:10 264:2
**Lehman's (70)**
14:11,17 17:14 42:14
49:8 53:11 58:22
77:12 89:20 91:3,20
97:13,23 106:13,17
109:6,16 111:22

121:8,16 122:17
123:3 131:21
164:14 166:8
171:17,17,22,23
172:3,4,21 175:9
177:11 178:10,14
178:15 184:17
186:6 188:19 191:5
195:17,21 197:17
199:10,24 202:25
209:25 210:8,10,23
212:9 216:25
217:19 221:16
222:17 224:10,19
225:10,16 235:12
236:24 239:6,13
240:4 243:5 248:2
250:5,15 257:18
**Leitner (303)**
1:14 2:4 5:1,2,8 6:1
7:1 8:1,2 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1,21
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1,11 43:1 44:1
45:1,14 46:1 47:1
48:1,16 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1,14 64:1 65:1
65:14,20 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
83:19 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
93:23 94:1 95:1
96:1 97:1 98:1 99:1
99:9 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
113:11 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1

128:1 129:1 130:1,4
130:8 131:1 132:1
132:20 133:1,9
134:1 135:1,12,19
136:1 137:1 138:1
139:1 140:1 141:1
141:17 142:1 143:1
144:1 145:1 146:1
147:1 148:1,18
149:1 150:1 151:1
152:1,5 153:1 154:1
154:25 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1,4
166:1 167:1,12
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
188:16 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
196:18 197:1 198:1
199:1 200:1 201:1,4
202:1 203:1 204:1
205:1 206:1,5 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1,11 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1,9 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
248:24 249:1 250:1
251:1 252:1,24
253:1 254:1 255:1
256:1 257:1 258:1
259:1,10 260:1,3
261:1,18 262:1,9
263:1,3,7 264:1,4
**Leitner's (2)**
66:6 164:21
**letter (25)**
33:20 34:7,12 85:12
85:14,18 87:6 88:8

89:5,11,19 90:25
91:16,18 92:7 93:8
93:15 95:19,22
96:10 100:8,18,25
101:15 102:17
**letters (8)**
33:18 34:24 69:23
129:4,6,7 134:6
247:17
**let's (6)**
60:14 73:10 98:16
122:15 232:6 237:7
**level (2)**
54:4 229:23
**liabilities (23)**
57:13,18 66:19,22
68:3,17 69:5 70:2
70:24 72:19,20
74:10,19 76:24 89:7
89:12,13,14,20
90:12 91:19 92:6
209:7
**liability (5)**
91:2 197:18 206:12
206:14 245:14
**life (1)**
13:12
**limit (1)**
131:17
**limitation (1)**
134:16
**limited (5)**
17:4 79:13 132:3
158:6,23
**limiting (1)**
147:3
**line (24)**
47:14 52:8 59:24
66:16,18 67:11 69:6
72:7 133:10 216:8
217:25 251:9,24
264:8,9,11,12,14,15
264:17,18,20,21,23
**lines (5)**
89:9 110:5 215:17
217:4 251:23
**Liquid (1)**
254:5
**liquidate (1)**
231:10
**liquidated (6)**
128:15 230:23 231:22
235:3,12 237:10
**liquidating (3)**
231:5,24 232:16
**liquidation (13)**

232:2,4 235:25 236:6
237:12,20 238:4,6
238:15,24 239:5,17
240:18
**liquidity (9)**
139:9,10,12 140:21
197:11 198:17
205:17 213:16
247:12
**list (16)**
35:8,13 63:19 104:11
104:25 110:18
162:6,10,13,16
165:8,9,13 167:3
172:16 249:18
**listed (3)**
106:14 178:7 228:25
**lists (3)**
164:14,23 249:21
**literally (1)**
17:21
**litigation (4)**
5:17 20:9 37:5 38:14
**little (12)**
46:4 111:15 122:4
123:23 197:12
222:8 228:5 236:17
244:8 250:11
258:16 259:23
**Livenote (1)**
2:11
**Liz (7)**
46:23 201:19 215:23
216:5,23 218:10
220:25
**Liz's (1)**
218:14
**LLP (5)**
2:6 3:4,10,17 4:5
**LOCs (3)**
119:17,18 142:24
**logic (2)**
92:22 93:5
**long (46)**
27:11 34:2 57:9,20
58:2,21 60:17 61:4
70:7,10 72:17,18
74:6 76:16,19,20
78:10,22 93:19
95:24,25 96:5,6
106:24 150:22
158:25 168:4,5,19
168:20 174:5
181:15,25 196:14
196:25 204:19
244:2 247:4,5 249:7

254:16 255:3,6,8
256:16 258:20
**longer (2)**
96:7 168:24
**longs (2)**
93:3 98:22
**long-standing (1)**
179:11
**long/shorts (1)**
257:10
**look (14)**
59:4 61:9 64:10 86:12
142:14,18,20 143:6
144:18 152:18
173:18 195:3
222:23 256:4
**looked (11)**
62:17 64:9 122:7
153:6 183:19 188:5
200:13 221:13
253:15,19,20
**looking (10)**
84:6 85:24 95:18
104:15 142:25
161:15 170:11
194:2 213:25 257:6
**looks (5)**
63:18 193:10,11
217:5 253:25
**loss (11)**
7:9 84:11 95:6 128:14
135:21 136:2,3
204:23 207:5,13
231:12
**losses (2)**
124:19 153:7
**lost (1)**
146:24
**lot (8)**
13:25 64:25 65:10
118:16 119:15
122:11 223:13
244:3
**LUGER (1)**
4:11
**lumped (2)**
166:16 175:11
**lunch (1)**
260:7
**Luncheon (1)**
129:15
**luxury (1)**
120:8

---

**M**

**Macchiaroli (2)**

243:21 244:2
**Madison (1)**
3:19
**Magazine (3)**
226:16,24 263:15
**MAGUIRE (1)**
4:10
**maintain (5)**
108:7 142:20,21
210:16 248:14
**maintained (2)**
216:14 219:3
**maintaining (1)**
247:12
**maintenance (1)**
254:3
**majority (1)**
82:16
**making (6)**
29:14 88:6 124:25
151:7 205:4 229:22
**manage (8)**
14:19 94:9,14 116:16
116:24 117:8 187:7
195:21
**managed (2)**
143:18 186:25
**management (6)**
15:20 125:9 132:17
176:23 178:25
185:24
**manager (1)**
161:16
**managers (2)**
259:7,9
**managing (3)**
128:16 221:19 222:17
**many-thousand-pa...**
177:22
**marathon (1)**
6:25
**margin (183)**
5:20 20:24 21:15
26:19 27:19 28:6
29:6 32:22 33:10,21
33:25 34:6,13 38:16
39:5 42:12,17,25
43:2,21 44:25 45:24
46:9,14,15 47:20
48:21 50:8 51:10,13
51:22 52:23 53:21
54:13 56:11 62:24
63:4,5 67:9,20 68:2
69:7,8,18 70:8,11
72:14,21 74:10
80:21 84:12 95:11

100:10 101:6,17
102:18 103:19
105:18 106:16
112:23 113:22
114:4,19 115:8,10
115:13 116:4
117:22 118:13,25
119:4,8,11,18,21
120:2 121:4,22
122:13,19 124:4,5
124:18 125:12,13
125:13 127:14
128:7,21 129:3,4,6
133:16 134:6,7
135:5,6 136:11,14
137:8,14,16,19
138:2,8,22 139:3,16
140:6 141:6 142:8
142:13,14,21 143:6
144:17,19 146:20
148:22 149:4
154:12 164:6
165:18 191:9 197:9
197:12,21 198:7
205:5 207:20
208:14 210:8,9,16
210:19,25 211:16
211:17 212:6 214:4
218:23 223:3,20,22
227:25 228:13
229:4,13,16,20,24
229:25 230:7,8
231:4,18,23 232:17
232:21 233:2,14
234:12,14,23 235:4
235:15 236:25
237:2,11,13,21
238:13,23 239:5,13
239:14,16,17
240:13,21 242:5,15
242:25
**margined (2)**
97:17 207:25
**margining (5)**
128:24 134:2 135:4
233:11 235:13
**margins (2)**
37:18 157:7
**mark (3)**
19:12 192:12 223:20
**marked (28)**
8:2,4 19:14 25:23
58:8,12 60:23 63:15
85:13 99:10 155:2
167:13 168:10
192:11,16 193:3

195:14 197:13
203:22 214:10,12
224:2 226:16,19
249:2 252:23,25
256:22
**market (63)**
33:16 95:3 117:7,14
119:16 120:11,15
123:7 124:24 125:8
126:2 130:10,21,24
131:6,7,20 132:5
135:7 137:3,5 138:5
138:16,21,25 139:6
139:11,25 140:3,7
140:12,21 141:2
151:22 196:19,23
197:2,10,13 198:17
198:22 203:22
206:14,21 207:13
208:2 212:9 213:15
223:21 229:2 230:4
232:11,22,25
233:10,23 234:3
235:20,22 236:7
238:5 248:13 254:5
**marketplace (6)**
71:4,7 197:7 212:17
229:14 230:3
**markets (11)**
20:12 75:9 197:19,20
200:14 205:18
206:10 207:3 222:3
222:10 248:11
**market's (1)**
207:4
**market-making (3)**
96:22 194:12 247:7
**marriage (1)**
262:16
**materials (6)**
11:25 12:4,10 13:6
65:21 155:9
**matter (15)**
5:12 8:21,23 25:22
26:6,14 43:13 53:14
98:18 107:23
163:16 189:16
244:6 257:4 262:17
**matters (3)**
5:15 18:12 161:2
**McDade (4)**
49:8,16,18 50:3
**McDade's (3)**
48:17,20 51:20
**mean (52)**
11:11 13:13 15:21

18:4 33:2,3 36:21
44:3 48:4 55:25
56:3,5 59:14 62:11
74:6 75:13 86:12
87:13 91:11 92:21
95:22 96:17 97:6,11
99:6 107:19,19
108:11 112:14
120:14,19 121:22
123:9,17 125:13
156:20 169:16
183:15 197:25
200:23 201:5,17
216:3 217:15 232:6
235:11 244:5
245:15 252:8
255:24 259:19,19
**meaning (1)**
152:22
**meaningful (1)**
72:10
**means (7)**
15:24 33:5 88:17 91:7
205:2 231:8 255:19
**meant (11)**
14:22 15:4 31:20
32:10 34:6 36:18
40:14 62:3 63:12
68:11 90:23
**measure (2)**
12:23 213:13
**mechanism (1)**
150:24
**mechanisms (1)**
206:22
**meet (5)**
122:13 137:8 162:25
163:7 198:3
**meeting (4)**
33:21 162:21 163:15
200:12
**meetings (1)**
162:19
**member (24)**
105:11,25 106:5
107:8,9,24 109:9,11
136:6 137:9 181:12
181:15,18,22 182:3
182:9 185:11 198:5
209:8,9 232:18,20
233:4 237:18
**members (9)**
13:21 179:24 180:15
183:15 228:23
229:4 232:12,25
233:8

**membership (7)**
107:14,16 108:6,14
109:7,16,25
**memberships (6)**
106:25 107:6,11
108:16,21 109:4
**member's (2)**
34:16 198:15
**memo (1)**
224:9
**memorandum (4)**
224:17 225:7,12,24
**memory (2)**
29:23 143:16
**mention (2)**
93:14 108:8
**mentioned (2)**
140:18 142:6
**Merc (1)**
109:16
**merchant (2)**
227:5 228:14
**merchants (1)**
20:13
**Merit (2)**
2:9 262:6
**met (3)**
5:8 31:12 178:10
**method (1)**
135:4
**methodology (2)**
33:24 142:8
**Michael (1)**
193:24
**middle (4)**
39:11 130:16 205:14
214:22
**midst (1)**
20:10
**migrated (1)**
174:11
**Mike (2)**
243:21 244:2
**million (15)**
118:19 129:2 154:15
155:16 157:6 158:6
217:19 219:13
223:3 225:19
239:15 242:13
243:2,4 255:15
**millions (2)**
154:12 219:8
**Mincak (2)**
256:12 257:8
**mind (15)**
29:17,19 38:8 50:11

50:15 51:24 58:5
69:4 95:20 135:5
165:3 185:14 189:7
232:6 235:6
**minds (1)**
43:7
**minimum (1)**
122:19 125:7 233:15
**minus (1)**
255:17
**minute (1)**
147:17
**minutes (3)**
47:14 48:12 85:3
**mischaracterized (1)**
28:18
**mischaracterizes (9)**
28:9 37:20 38:20
61:23 66:5 72:25
91:6 155:19 255:12
**misunderstood (1)**
123:12
**mitigate (2)**
117:6 228:22
**mitigated (1)**
116:4
**mitigation (2)**
167:5 229:22
**mix (1)**
198:17
**MM (2)**
217:6,13
**model (5)**
232:8 234:18,22
236:5,8
**modeling (1)**
233:2
**models (5)**
229:2 232:21,23
234:15,17
**moment (12)**
122:16 123:25 141:12
155:3 173:9 175:7
186:13 193:7 195:3
201:11 228:3 251:6
**moments (1)**
206:6
**Monday (23)**
14:16 16:18 17:2
92:24 98:9 118:22
119:6,24 127:11,12
128:23 192:15,21
193:22 201:10
224:13 236:11,18
239:7,19 241:4
258:11 263:12

**money (4)**
115:17,18 223:23
258:7
**month (3)**
44:10 224:7 234:7
**morning (10)**
5:8 14:16 16:18 92:24
118:22,22 154:16
165:25 173:21
206:10
**Motion (1)**
160:14
**motivated (4)**
190:5 239:25 240:12
241:9
**movants (1)**
7:19
**move (12)**
46:5 72:15 116:17
120:21 128:23
142:22 197:20
220:8 223:3,19
240:10 241:10
**moved (3)**
144:3 206:15 235:23
**movement (6)**
126:3 166:4,25 208:5
208:16 235:24
**movements (3)**
164:6 165:17 207:14
**moves (2)**
197:2 235:20
**moving (5)**
86:18 213:3,5,8
240:13
**mutually (1)**
197:25

_____
**N**

**n (6)**
3:2 4:3 35:17 39:3,12
40:15
**naked (1)**
82:18
**name (6)**
5:9 6:8 15:4 180:2
264:2,4
**named (1)**
6:8
**names (2)**
143:16 171:12
**narrative (1)**
245:22
**naturally (1)**
103:10
**nature (9)**

84:9 164:4 165:16
166:23 188:12
189:6 212:16 214:3
218:20
**neat (1)**
135:11
**necessarily (7)**
21:25 53:7 65:16
114:19 167:4
223:13 229:11
**necessary (12)**
30:17 51:6,16 53:8
88:18 107:10
122:13 146:4
189:16 191:10
196:10 212:5
**necessitate (1)**
229:17
**need (22)**
7:2 65:18 80:21 94:13
95:5 109:15 120:3
126:13 138:4,8
144:21 189:25
196:5 205:16,25
210:9,24 211:16
228:3 235:20 238:4
256:24
**needed (6)**
144:18 185:4 190:18
195:20 222:17
248:13
**needs (2)**
211:7 227:21
**negative (1)**
28:25
**negotiable (1)**
122:10
**negotiate (4)**
120:9 121:13 124:21
229:15
**negotiated (8)**
7:18 31:16 40:13
62:12 81:10,11
120:18 125:25
**negotiation (1)**
81:19
**negotiations (4)**
49:19,25 50:4 55:15
**negotiator (1)**
49:8
**negotiators (1)**
56:17
**Neil (14)**
4:9 5:9 65:10 71:21
129:11 147:4 160:9
164:24 167:8,23

174:2 191:23
205:22 240:25
**neither (3)**
81:7 206:13 262:18
**net (5)**
156:5 157:12,12,14
231:5 256:16
**netting (3)**
251:25 255:18,19
**never (6)**
50:7 51:21 74:24
101:19 241:18,19
**new (20)**
1:3,15,15 2:7,7,12 3:7
3:7,14,20,20 4:8,8
193:24,24 207:24
230:16 262:3,4,7
**nice (1)**
250:9
**night (1)**
177:24
**non-PIM (2)**
149:18 150:7
**normal (5)**
22:10 119:9 244:17
245:6,20
**normally (4)**
98:14 108:2 204:10
245:9
**North (1)**
3:12
**Nos (4)**
58:8 252:22 263:8,16
**Notary (3)**
2:11 5:3 262:6
**note (4)**
216:20 218:10 245:18
253:24
**noted (16)**
48:13,14 85:4,5
129:15 130:3
170:17 175:3,4
206:2,3 230:13,14
248:21,22 261:12
**notes (6)**
214:9,13,15,17
215:20 263:14
**notice (1)**
69:25
**notification (1)**
155:23
**November (1)**
14:9
**number (17)**
19:11 38:2 46:18 47:7
47:9 94:20 157:5,16

168:15 184:23
185:2 194:4 227:7
234:2 251:18 253:3
255:15
**numbered (1)**
215:3
**numbers (8)**
46:14 59:5 62:18 69:5
70:21 219:19
239:21 258:19
**numerous (1)**
247:15

_____
**O**

**oath (2)**
143:23,25
**object (50)**
9:20 11:9 19:25 21:18
21:23 23:8 24:12
31:5 32:13 33:6
35:25 50:12,17
60:11 65:9 68:18
72:23 81:15 83:13
87:17 89:22 93:9
101:9 102:13 105:5
106:18 109:2 124:7
141:15 150:10
152:12 153:11
154:17 156:11
158:9 160:7 163:4
167:20 169:23
173:2 174:21
186:11 197:22
211:11 222:20
226:10 240:23
243:7 251:10
259:14
**objected (1)**
159:13
**objecting (1)**
88:4
**objection (155)**
8:16,25 15:22 17:7
18:3 22:19 23:5
24:6,19 25:6,15
26:10,21 27:22 28:8
28:19 29:8,15 32:24
34:10,20 36:9 37:9
37:19 38:18 39:8,16
40:17 42:19 43:3,14
43:22 45:5 47:23
48:8,23 49:2,21
52:3 53:24 54:16,19
55:21 56:14,15
59:12 61:6,22 64:7
64:18 67:2,12,22

68:8 69:10 70:12
74:12 76:6 79:14
80:24 86:11 87:10
91:5,22 92:8 96:12
98:4 99:2 102:5,24
103:22 107:3,22
109:18 111:24
112:13,25 114:8,15
115:3,19,22 117:4
120:5 121:10
122:21 126:10
127:2 132:13
135:24 138:14
140:9 141:9,13
143:9 144:9 145:14
147:2 149:21
151:17,25 153:11
155:18 156:18,25
159:10 164:17
165:19 170:13,17
170:22 171:4 172:6
175:25 176:8,19
180:17 181:6
182:20 183:4,11
184:11,19 186:14
188:24 189:3,20
190:22 199:11
200:19 202:11
203:3,25 204:6
206:16 207:8
208:25 210:11
211:4 212:21
213:21 219:9,25
220:16 225:22
226:6 231:13 242:9
246:9,21 248:3
250:7 253:21
255:11 257:20
**objections (1)**
169:21
**objective (1)**
92:12
**obligation (1)**
185:10
**obligations (16)**
14:8,9,17 19:3 20:16
69:22 86:25 91:12
91:19,24 92:25
93:18 149:13 153:3
198:3,4
**observe (4)**
164:5 165:17 166:3
166:24
**obtain (3)**
114:4 136:10 181:3
**obvious (1)**

13:10
**obviously (3)**
52:16 172:13 251:8
**OCC (122)**
17:4,20,22,24 55:11
72:14 107:8,9,13,14
112:23,24 118:24
119:5 122:2,15,18
122:19 123:19,20
123:23,25 124:3,15
127:13 133:17
138:9 141:21 142:3
142:3,4 143:17
144:12 145:11,13
146:23 148:23,24
150:2 153:14,24
154:13,16,22
157:25 158:5 165:8
165:14 179:11,21
180:7,15,22,24
181:4,5,12,16,19,22
182:5,9,18 183:9,15
183:17,19,25 184:8
184:16 185:6,9
186:19,20 188:20
188:21 191:12,20
191:21 192:2
194:11,15,24,25
217:23 228:25
231:8,11,17,21,23
232:7,16,18 233:6
233:12 234:23
235:3,11,14 236:23
237:9,10,11,15,20
237:21 238:14,15
238:24 239:5,14,17
240:20,22 242:6,15
251:13,24 254:11
255:17,19
**occasions (1)**
6:22
**occurred (5)**
47:3 52:7 179:3 238:6
238:20
**OCC's (10)**
124:6 164:6 165:18
179:18 180:25
182:12,16,25
234:14 240:18
**OCC-generated (1)**
254:9
**offered (4)**
29:10 37:2,8,11
**offices (1)**
2:5
**offsets (1)**

34:2
**oh (4)**
147:25 158:16 256:6
258:18
**okay (58)**
7:10 11:14 18:21 50:2
58:10,17 59:23
60:14 61:16 82:8
85:20 87:20 88:6,10
89:3,8 92:12,16
100:5 101:4 102:15
118:5,11 123:18
127:25 130:14
140:15 148:6 155:6
156:7 158:18
160:15,23 162:16
167:16 173:9,11
180:23 194:8,16,20
213:9 215:11
216:18 225:4,13
227:2,10 235:8
242:17,19 245:22
249:25 251:20,22
256:6,7,10
**old (1)**
257:25
**OLIVER (1)**
3:17
**once (3)**
116:21 195:9 247:23
**ones (5)**
9:18,22,24 191:25
193:5
**ongoing (1)**
246:14
**oOo (1)**
261:13
**open (2)**
125:15 194:11
**opened (3)**
197:19 206:10 207:4
**opening (3)**
119:6 207:4 258:11
**open-ended (2)**
116:20 139:16
**operating (2)**
200:14 233:24
**operation (7)**
75:12,17 88:19 90:8
94:15 152:23 241:8
**operational (10)**
13:7,14 14:23 110:24
117:12 150:24
174:10 198:24
200:12 213:16
**operations (8)**

76:10 135:17 143:17
171:8 178:11
196:10 258:24
259:2
**opine (1)**
8:19
**opinion (114)**
8:20,22 12:12,15,17
12:19 13:10 17:3,19
20:2 21:10 26:6,25
28:2,10,11 29:4,11
30:18 33:24 35:24
36:14 37:2,8,11,14
37:15 38:10,22,24
40:5 41:3,8 42:11
44:15,17 48:18,25
50:15,22 51:19,25
53:2,11,16 60:15,22
61:12 70:9 72:16
75:4,23,25 79:17
83:7,23 99:4 103:2
103:2,4,16 106:20
109:20,23 110:16
110:20 111:4,21
112:5 113:25 115:7
116:23 117:17
118:3,8 119:25
120:24,25 122:16
123:25 126:20
127:17 128:2 131:4
131:19 132:3,4
139:14 141:17
142:6 158:21 164:3
164:9,10 172:13
175:14,16 176:20
182:8 195:12
196:18 207:17
208:4 209:17,24
219:21 221:15,22
226:2,13 230:18
237:19 238:17
242:10
**opinions (11)**
7:23 8:9,10,12 9:6
18:12 21:11,14
35:14 49:5 50:25
**opportunity (2)**
65:14 173:5
**opposed (3)**
48:2 62:12 199:20
**opposite (1)**
213:2
**option (17)**
14:17 98:16 106:3
140:8 143:17
150:21 151:12

152:17 165:8
185:18 197:7,12,17
232:20 251:17
255:18,19
**options (58)**
13:19 14:5,5 20:17
33:17 52:20 62:10
62:12 76:19 95:4
96:21 98:11 122:2
132:4,9 133:16
135:22,23 136:3
137:3 141:22 144:4
144:5 145:12 147:5
147:7 148:23
149:18 155:17
156:3 157:9 165:14
171:9 179:3 193:25
196:12 198:4
220:14 222:25
228:25 233:21,23
234:12 236:21
249:19 251:14,16
251:25 252:5
254:16 255:3,6,8,22
256:16,17 257:10
258:6
**oral (2)**
147:24 148:3
**order (14)**
90:20 102:2 121:22
136:11 138:5,9
166:12 195:20
196:11 210:17
221:18 222:16
238:6 258:9
**orderly (1)**
236:6
**organization (4)**
17:6 107:2 177:6
182:14
**organizations (3)**
105:10,12 107:7
**original (1)**
86:14
**originally (4)**
6:6 77:2 136:23 159:2
**ostensible (1)**
209:5
**OTC (7)**
36:24 62:6,10,11
173:17 178:8
236:21
**outcome (7)**
231:25 232:3 237:16
238:7,9 239:2
262:17

**outside (2)**
17:24 183:20
**overall (2)**
62:20 186:2
**overnight (2)**
13:25 232:9
**over-the-counter (7)**
62:11 76:16 166:17
175:12 176:17
177:13 251:3
**owed (1)**
155:24
**ownership (1)**
208:3
**owning (1)**
195:16
**Oxford (81)**
4:9 5:7,9 11:13 18:6
19:13,17 28:15,19
29:10 30:5,21 37:23
38:3 41:12 43:24
45:12 47:13 48:6,11
48:15 55:17 58:16
59:22 65:18 66:10
71:23 81:12 84:21
85:3,6 88:11 92:11
102:10 108:23
118:7 124:10
129:13 130:7
147:21 156:7,22
157:3 164:20 165:2
167:9 168:8,12,23
169:19 170:3,10,17
174:13,18,25 175:5
178:22 184:5 193:2
200:21,25 205:24
206:4 211:8 214:21
214:25 224:24
227:8 230:10,15
241:2 243:22
248:17,23 249:23
254:25 257:3 260:3
261:10 263:4

---
**P**

**P (4)**
3:2,2 4:3,3
**package (2)**
73:13 189:9
**page (70)**
19:10 21:11,12 22:2
35:3,9,10,10,17
38:2,4,5 39:4 56:21
57:11,12,16,16
59:17 82:14 86:22
89:5,17 104:7,20,21

105:9 130:16
139:20 158:14
162:3,4 168:2 178:3
193:21 194:3
214:19,24,25 215:2
215:4,6,13,14
226:25 227:6,7,8,9
227:12,13 228:8
249:15 251:20
254:14 255:5 260:8
263:3,6 264:8,9,11
264:12,14,15,17,18
264:20,21,23
**pages (8)**
21:8 168:7,19,20
169:10 170:8 174:4
251:9
**pain (1)**
86:12
**paper (1)**
57:2
**paragraph (94)**
19:9,16,20 20:7 22:4
22:5,22 37:17,21
38:10 39:3,12 40:15
56:24 57:14 58:6,13
58:15,16,20 59:6
60:15 61:12,15
71:25 75:20 76:21
78:5 79:17 81:2,3
82:4,11,24 83:14,17
84:18 85:17 86:7
87:11 88:16 89:4,10
90:13 91:9,11 92:6
93:14,15 95:18,20
100:13,14,15 101:2
101:4,12,25,25
102:3 104:5,6,15
110:2 113:7 117:17
118:3 121:23,25
126:16 130:12,13
140:2 158:12,17,22
164:2 166:13
167:16,19 168:15
169:8 175:6 178:19
228:8 230:17 231:4
235:10 244:12
245:17,21 249:16
253:7,11
**paragraphs (8)**
21:9,10,13 72:2 81:4
99:25 102:15 173:7
**parens (2)**
86:24 87:2
**Park (2)**
2:6 4:7

**part (25)**
18:24 23:17 26:2,7
27:16 42:12 50:25
61:10 64:5 65:21
83:20 133:19,20,22
137:20 140:22
146:5 175:13
185:25 199:20
203:16 205:15
221:2 246:19 248:9
**participate (1)**
50:4
**participated (2)**
49:19,24
**particular (13)**
9:6 62:4 87:6 96:2
104:5 118:3 135:8
154:3 162:3 177:4
205:15 212:17
223:7
**particularly (13)**
38:12 68:14 70:25
102:3 105:24
121:13 130:18,23
161:15 198:24
205:18 210:13
220:9
**parties (22)**
43:7 55:8 64:2 72:4
72:10 74:17 78:15
81:9,19 88:25 90:7
103:7,14,24 104:3
106:8 126:24 146:2
162:23 220:7
241:19 262:15
**partly (3)**
166:15 175:10 176:6
**partner's (1)**
101:18
**party (8)**
81:7 93:24 94:5 103:3
152:18 196:12
207:24 262:19
**party's (1)**
206:23
**pass (1)**
133:8
**passed (5)**
100:17,19 228:14
229:13,21
**patiently (1)**
149:15
**pause (4)**
52:5 88:7 225:3
243:24
**pay (3)**

157:11 197:21 201:25
**paying (1)**
151:7
**payment (5)**
197:3 205:5,10,11,14
**payments (2)**
154:14 205:17
**Pearl (1)**
3:12
**penny (1)**
124:5
**penultimate (1)**
228:8
**people (19)**
31:15 32:18 44:7
63:11 137:23
143:17 162:10,19
163:15 171:8
178:11 183:16
184:23 185:2,3
186:24 187:5
196:10 258:24
**percent (9)**
123:6 160:9 215:19
216:9,10 218:3,16
219:4 221:17
**percentage (1)**
125:5
**perfect (4)**
72:9 81:6 223:5
232:23
**performance (5)**
141:21 152:24 206:20
206:23 208:23
**performing (1)**
234:2
**period (2)**
12:25 234:5
**periods (2)**
232:11 234:8
**permitted (1)**
41:18
**person (4)**
54:22 56:19 68:10
240:3
**personal (1)**
44:12
**personally (1)**
31:12
**personnel (1)**
116:16
**perspective (6)**
23:12,13,14,15 24:3
24:15
**phone (1)**
162:20

**phrase (1)**
38:12
**picture (2)**
122:6 170:15
**pieces (3)**
23:24 71:6 83:14
**pile (1)**
65:3
**PIM (25)**
15:16,18,19 16:9
132:11,23 133:13
133:16 134:11,19
135:20 137:4 138:4
138:6,11 140:8
141:19,22 144:3
147:4,7,9 148:20,21
150:3
**place (2)**
45:15 176:25
**placed (6)**
120:13 135:23 141:22
145:13 148:23
243:2
**plaintiffs (2)**
5:21,25
**Plaza (2)**
2:7 4:7
**please (38)**
7:2,7 9:18 11:6 12:20
13:17 18:21 22:3
28:16 30:8 32:4
41:10 43:24 55:19
58:6 75:21 81:13
82:5 87:15 88:12
100:3 108:23 113:8
126:9 147:13 155:5
156:23 158:13
173:9 174:19
177:16 191:23
204:16 213:10
214:19 215:5
226:22 230:17
**plenty (1)**
72:9
**plus (2)**
121:19 148:20
**point (28)**
63:10 71:3 78:17
84:18 86:15 88:6
98:7 113:3 116:17
116:18 120:19
127:16 136:7 140:2
140:19 165:7 167:3
172:15 185:7,14
190:9 200:7 229:22
239:7 243:20

246:16 258:5 259:2
**pointing (1)**
174:16
**points (1)**
62:8
**portfolio (33)**
75:6 76:25 77:12 91:4
91:21 93:21 106:17
117:2 120:16
130:11,23 159:9,22
163:20 171:18,23
172:4,24 178:16
186:7,21 188:19,22
191:6,13,22 192:5
195:17,22 229:3
232:25 250:6,16
**portfolios (2)**
187:9 192:8
**portion (13)**
69:20 76:9 91:9 118:3
118:8 119:4 134:7
188:6,7 190:7,7
227:14,19
**portions (4)**
10:10,14 11:15,16
**posed (1)**
145:20
**poses (1)**
191:17
**position (52)**
17:5,13 19:22 26:14
28:5 29:2,5 33:19
37:4 38:14 79:4,4
79:10,11,12 80:19
80:20,21,22 94:9
96:6 101:13,17
110:4,7 115:11
120:7 122:4 123:4
124:14 135:4
144:19 167:5
172:15,17,20,23
196:25 197:4,5
198:16 204:18
206:15,18 208:20
212:23,24 232:16
240:4 243:14 245:8
247:13
**positions (256)**
13:19,23 16:24 17:17
17:23 18:5,19 19:4
19:7,8,8 21:4,4
27:10,11,16 28:4
30:20 34:2 53:10
57:9,18,21,25 58:2
58:2,21,22 60:18,19
61:4,5 69:20 70:8

70:11 72:12,17 73:7
73:16,19 74:7,8,18
76:4,11,13,17,20
77:12,14,15,24 78:2
78:2,10,16,22,23,24
79:6 80:2,3,6,17
82:21 84:10 90:18
90:19 91:3 93:19
95:6,24,24,25 96:4
96:5,25 97:2,4,18
97:23,24 102:20
107:10 111:13
112:8,18 113:14,16
114:7,14 115:9
116:3,5 117:13,20
118:18 122:3,6,20
123:22 124:3,4,17
125:4,9,24 126:3
127:14 128:4,5,12
130:11,22 131:8,9
131:16,21,22,23
133:6 134:3,10
135:7,22 137:19
138:2,6,19,24 139:2
140:4,8,13,14 141:3
141:22 142:7 144:4
144:5,8 146:14,19
146:23 149:3,5,14
149:14,18,20,24
150:2,7,9,21 153:13
153:17,21 158:25
159:5 161:6 164:5
164:15,23 165:8,10
165:14,16,22,25
166:24 167:3
174:12 175:9 177:9
177:20,23 178:8,8
179:23 180:5 181:4
182:18 184:8,17
185:16,17,18,19,20
185:21,22 186:3
189:12 193:25
194:11,24 195:25
196:3,4,20 197:17
197:20 198:10
199:3,6,10 202:8
203:9,16,18,22
205:3 206:11,12
207:18,19,20,23,24
209:19 210:2
211:18 212:10
214:2,4 216:7,15
218:19 229:3
230:24 231:6,11,22
231:24 232:5 235:4
235:12,23 236:24

237:10 239:6,13
240:9,18,20 242:6
248:2 249:19
251:15 254:4,13
257:19 258:2,4
259:4
**possible (4)**
38:25 61:8 81:24
205:13
**possibly (4)**
44:6 71:2 80:9 121:13
**post (4)**
134:9 223:22 229:18
231:9
**posted (29)**
9:8 21:5 22:9 34:9
110:15 113:22
117:22 138:8
141:21 142:2
144:12 145:11
146:22 148:22
207:20 208:22
211:2,17 220:12,13
231:23 232:18
237:11 238:14
240:21 242:6,15
244:16 247:23
**posting (2)**
24:2 133:16
**post-closing (1)**
174:9
**post-transaction (1)**
163:17
**potential (15)**
44:8 72:3 79:23
115:12,13 153:20
153:25 157:11
197:4 199:4,9
206:13,23 223:17
224:10
**potentiality (1)**
152:3
**potentially (4)**
41:16 95:5 122:10
139:17
**power (1)**
230:4
**practice (9)**
137:24 205:19 216:5
216:17,25 218:11
218:12 229:11
230:2
**practices (2)**
216:21,22
**preceding (1)**
81:5

**precise (1)**
113:2
**precisely (1)**
51:6
**precludes (1)**
41:11
**predicate (1)**
127:9
**predicates (1)**
103:16
**prefer (4)**
239:14 240:19,25
241:2
**premise (1)**
211:12
**preparation (8)**
13:25 26:3 47:2 99:17
161:18 171:20
193:17,20
**prepare (3)**
63:20 171:7 215:21
**prepared (3)**
33:14 64:3 203:10
**preparing (4)**
133:23 155:8 163:12
196:14
**present (6)**
70:18 72:3 132:15,19
163:15 198:19
**presentation (1)**
64:5
**presented (1)**
160:13
**pressure (1)**
44:4
**pressures (1)**
241:24
**presumably (4)**
51:11 75:18 163:23
178:5
**pretend (2)**
24:22 244:7
**pretty (2)**
126:14 135:11
**previous (1)**
205:8
**previously (8)**
25:23 63:15 85:13
99:10 155:2 167:13
224:2 249:2
**price (1)**
208:21
**primarily (4)**
35:19 36:7 39:2 88:18
**primary (1)**
56:17

**prime (1)**
9:8
**printout (1)**
167:2
**prior (42)**
11:22 45:3,6,23 46:6
47:3,21 48:3 81:4
117:3 154:13
159:20 161:7,11
163:2 164:5,15
165:7,14,16 166:22
166:24 173:15
175:9 176:5 178:3
181:25 183:10
184:17 186:17
188:17 190:25
200:7,21 201:8
213:19 217:20
220:25 233:21
239:24 250:21
254:7
**private (2)**
15:20 132:17
**privately (1)**
62:11
**privilege (2)**
33:15 41:4
**probably (3)**
48:11 129:13 143:22
**problem (6)**
33:8,8 73:2,3 148:6
193:6
**problems (1)**
178:7
**Procedure (1)**
262:21
**Procedures (1)**
160:14
**proceedings (2)**
225:3 243:24
**process (2)**
14:19 237:12
**produce (1)**
7:22
**produced (5)**
46:23 172:11 214:14
250:21 255:22
**professional (2)**
2:8 221:7
**professionals (3)**
232:22 233:11 234:3
**profiles (1)**
177:4
**profit (3)**
136:2 204:23 254:12
**progress (1)**

66:11
**projected (2)**
155:15 158:4
**promotion (1)**
201:23
**prop (1)**
196:3
**properly (1)**
202:19
**property (4)**
20:24 21:3 33:13
86:24
**proposing (3)**
186:22 188:22 191:13
**proposition (1)**
27:14
**proprietary (51)**
19:8 21:4 69:20 73:7
73:16,18,25 75:7
76:10 79:18 80:16
84:10 96:21,25 97:3
97:23 111:14,23
112:18 124:16
125:22 131:8,18,21
133:15 140:13
142:9 146:22
147:11 148:17
149:3 153:13,24
177:8 185:17,19
198:16 202:6,22,25
203:18 206:8 210:8
210:10,23 211:2,15
211:18 212:10,19
235:23
**propriety (1)**
80:6
**protect (2)**
126:2 231:17
**protected (2)**
84:11 235:14
**protection (2)**
242:3,7
**provide (4)**
52:23 61:13 185:10
195:15
**provided (14)**
17:4 62:9 105:8
135:13 136:23
138:11 144:6 145:9
148:21 180:15
187:23 194:18,25
247:17
**provisions (3)**
31:3,13 89:11
**prudent (6)**
186:17 188:17 189:2

189:19,22 190:11
**prudential (1)**
189:6
**Public (3)**
2:11 5:4 262:6
**pull (2)**
170:4 180:21
**purchase (31)**
25:22 26:8,18 27:18
29:3 30:22 31:16
35:4 38:6,15 40:14
49:20 50:5,8 54:23
55:5 63:7 69:9
72:20 74:9 76:3
79:9 85:7,23 86:9
184:18 200:8
208:21 209:6
239:25 245:14
**purchased (16)**
31:21 32:11 36:6
37:17,24 38:11 39:4
42:16 56:25 85:19
85:22 86:8,19,22
88:16 208:19
**purchaser (25)**
42:13 70:10 110:10
113:19 115:6
117:18 120:3 121:2
121:7,11 122:17
124:2 126:17
127:18 128:3 145:5
184:15 207:18
210:9,23 211:15,24
212:7 221:16
239:11
**purchases (1)**
80:18
**purchasing (3)**
60:9 76:2 80:7
**purpose (8)**
61:12,15 62:18
133:15 221:14
231:14 245:15
251:5
**purposes (7)**
25:12,14 86:18
111:19 133:10
176:23 222:12
**pursuant (3)**
92:6 163:2 262:20
**put (20)**
76:11 83:21 84:14
97:2 120:7 127:5
129:2,6 134:16
138:23 142:15
183:14 216:6

218:15,24 220:4
230:4,5 233:3 236:2
**puts (1)**
258:21
**P&L (1)**
136:7
**P.M (21)**
45:20 129:16 130:3
169:12,13 175:3,4
192:16,22 193:22
194:6,17 206:2,3
230:13,14 248:21
248:22 256:14
261:12 263:13

_____

**Q**

**qualify (1)**
133:21
**qualifying (1)**
134:24
**quantification (1)**
122:8
**quantified (1)**
114:5
**quantify (14)**
111:12,22 112:7,16
114:12,20 116:18
192:3 199:8 212:8
212:12,13,14,15
**quantifying (1)**
195:16
**quantity (1)**
185:18
**query (1)**
180:20
**question (284)**
7:10 8:17 9:2,21
11:10,12 17:8,9,22
18:4 21:19,20,24
22:20,24,25 23:9,11
23:11,13 24:7,13
25:16,18 26:11,22
27:17,18,23 28:17
28:22 29:15,17,19
29:22 30:21 31:6
32:3,13,17,25 33:7
33:9 34:4,11 36:2
37:10,20 38:7,19
39:14,17 40:18 41:6
41:15 42:8,20 43:4
43:15,25 45:10,11
45:13,21 46:5 47:25
48:7,9 49:22 50:13
50:18,19 53:25 54:8
54:17,20 55:18,19
56:15 59:13,20,23

60:12 61:7,23 64:8
64:19 67:3,13,23
68:12,19,21 69:11
70:13 71:18,21,22
71:23 72:24 74:15
77:13 78:20 79:15
80:25 81:3,13,22,25
83:18 84:22 87:18
88:2,12 90:2 91:10
91:14,15 92:20,21
94:2 96:13,16,17
97:7,25 98:5 99:3,5
100:20 101:21,24
102:2,9,10,14
104:19,24 105:7,13
106:9 107:18 109:3
109:19,22 111:20
111:25 114:9,16,18
116:6 117:24 118:6
123:9,11,12,23,24
126:11,12 127:3,9
135:25 138:15
140:10 141:12,16
143:10 144:10,21
145:15,20,24 147:3
147:11,13 148:5,7
148:10,18 149:22
150:11 151:18
152:2 153:12
154:18 155:19
156:8,11,13,24
158:6,10,11 159:11
159:14,16 163:5,6
163:24 164:18
165:3,20 167:21
169:5,9,24 170:14
170:23 171:5 172:7
173:3 174:19 176:9
177:15 178:21,23
179:5 180:18 181:7
182:21 183:5,12
184:12,20 188:25
189:4,18 190:9
191:17,18,23
197:23,24 199:14
201:7 203:4 204:13
206:6,17 207:9,10
208:9,12 209:2
210:12 211:5,10,12
211:13 213:22
219:19 220:2
222:13,20,24 223:4
225:5 226:7,11
228:2,6 232:13
235:7,8 239:22
240:24 243:8,15

245:23,24 246:22
246:25 250:11,12
251:7,11 253:5,22
254:24 255:12
256:5,25 259:15
**questioning (4)**
11:5 52:8 65:17
133:10
**questions (24)**
7:6,13 11:7 18:14
28:14 41:12 65:5
72:7 80:5 119:13
122:24 139:23,25
143:22 169:3,16,17
169:20 196:5 211:9
260:4 261:3,6,8
**quibble (2)**
33:2 198:21
**quick (1)**
186:14
**quickly (4)**
116:18 170:5 181:3
187:22
**QUINN (1)**
3:17
**quite (3)**
27:17 68:12 170:4
**quote (2)**
229:20 247:14

_____

**R**

**R (2)**
3:2 4:3
**rabbit (1)**
170:4
**ran (1)**
219:7
**range (2)**
186:24 203:8
**ranges (1)**
194:12
**rational (50)**
42:13 80:14 98:21
103:3 104:2 110:10
113:19 115:6,24
116:11 117:18
120:3,25 121:7,11
122:16 124:2
126:17,23 127:18
128:3,9 129:8 145:4
145:7,17,25 146:10
146:15,18 147:8
148:12,15,19 149:6
149:10 184:15
207:17 208:12
209:18 210:9,22

211:14,24 221:16
221:24 239:11,12
239:13 240:19
**rationally (3)**
84:6 103:8 120:12
**reached (5)**
22:11 50:24 84:5
209:15 244:18
**reaching (1)**
30:11
**read (92)**
9:14,22 10:7,10,14,17
10:22 11:6,15,18
20:4,6 25:19 28:15
28:23 30:21,24 32:3
32:5 39:15 42:7,9
44:19 49:5 50:19,21
55:17,20 64:4,23
65:24 66:8,10,13
68:21,23 81:12,14
83:13,16,20 84:21
84:23 85:25 87:7,11
87:13,20,24 88:7,9
88:11,14,15 90:3,13
96:14 99:15,22
101:22 102:3,11
105:5 110:21
114:10,11 117:5
126:12,15 146:25
147:13,15 156:7,9
159:16,17 161:20
161:24 165:5
166:13 174:18,20
177:15,17 212:11
217:12 224:22,25
225:4 245:24,25
251:8
**reading (4)**
42:3 104:18 175:17
194:7
**reads (7)**
35:19 89:10 101:11
164:3 216:8 251:24
254:16
**ready (4)**
84:25 125:15,17
205:23
**real (3)**
75:3 94:12 244:11
**realized (1)**
136:22
**really (8)**
51:7 97:12 137:6
140:20 173:12
185:19,22 189:16
**Realtime (1)**

2:10
**real-world (1)**
74:22
**reason (33)**
7:15 15:8 16:13 80:13
84:4 109:14 134:24
153:23 172:19
182:15,22,24 184:7
190:11 209:15
226:4,8,12,13
236:10 261:5 264:5
264:8,9,11,12,14,15
264:17,18,20,21,23
**reasonable (4)**
61:2 83:3 128:20
182:7
**reasons (3)**
76:12 223:11 240:12
**recalculation (1)**
243:20
**recall (15)**
11:5,17 15:17 31:14
32:8 42:10 46:12,25
48:24 49:4 64:20
162:21 163:9
213:23 216:16
**receipts (3)**
134:6,23 135:14
**receive (9)**
20:23 100:10 101:6
155:15 158:3
165:22 166:8
173:16 205:10
**received (9)**
122:19 132:22 133:11
158:23 161:7
168:22 172:10,12
172:23
**receiving (5)**
30:16 110:14 113:21
117:21 121:3
**Recess (7)**
48:13 85:4 129:15
175:3 206:2 230:13
248:21
**recite (2)**
21:11,12
**recognize (2)**
214:15 226:20
**recognizes (1)**
34:23
**recollect (1)**
165:21
**recollection (20)**
31:23 46:22 64:12
87:12 143:21,22

154:20 157:8,10,15
157:22 161:3 173:6
173:12,19 217:16
217:24 218:12,13
234:15
**recollections (1)**
143:25
**record (49)**
5:9 25:19 28:20,23
30:24 32:5 39:15
42:9 44:19 46:3
50:21 55:20 66:8,13
68:23 81:14 84:23
87:19 88:5,14 90:3
101:22 110:7
146:25 147:15,19
156:9 157:4 159:17
165:5 173:10,18
174:14,15,20
177:17 188:3
192:19 212:11
214:13 215:12
224:25 230:10
243:25 245:19,25
248:17 262:12
264:6
**records (2)**
17:14 259:6
**recourse (1)**
136:22
**Reed (3)**
2:6 4:5 5:10
**refer (13)**
10:5 11:20 21:8 26:25
38:2 42:21 94:20
100:15,20 104:17
128:7 173:5 237:15
**reference (32)**
26:18 27:9,19 28:3
43:2 44:25 45:24
46:9,18 47:20 51:9
51:12 58:13,21
59:16 60:6 66:25
91:10 93:14 105:9
167:18 169:8
215:24 216:12,16
216:16 217:5,22
218:5 220:23
249:15 253:25
**referenced (4)**
11:19,21 253:7,10
**references (1)**
216:21
**referred (10)**
13:9 16:10 27:6,7
31:4 38:24 46:13,15

53:4 71:25
**referring (3)**
12:7 82:11 100:13
**refers (3)**
36:22 88:23 101:2
**reflect (6)**
71:14 87:7 174:15
205:7 208:21
217:18
**reflected (11)**
51:23 73:7 86:9 96:20
100:9 101:5 117:17
129:7 168:22 200:6
218:10
**reflects (8)**
88:24 93:8 101:15
131:4 155:12
157:12,18,25
**refresh (4)**
29:22 87:12 173:6,12
**refuse (3)**
70:17 74:25 241:15
**regard (12)**
36:18 71:8 84:9 86:13
88:23 89:2 94:23
95:5 103:9 107:6
210:15 212:3
**regarding (1)**
182:18
**regardless (3)**
97:16,17 198:19
**Registered (3)**
2:8,9 262:5
**regulation (1)**
33:11
**reinforced (3)**
12:14,17,19
**relate (3)**
18:16 76:19 121:25
**related (45)**
19:4 20:24 21:3 22:13
22:18 23:4 24:17
25:5,11 29:6 32:23
33:3,5 34:8,18,18
35:2,20 36:7 39:2
53:22 55:5 62:24
63:4 67:21 73:6,15
74:18 76:10 80:6
95:4,8 96:17 97:2
112:23 187:11
189:11 244:20
245:2 246:4,7
247:12 248:15
251:14 262:15
**relates (8)**
26:20 27:20 47:18,21

73:18 77:13 103:2
242:14
**relating (10)**
5:19 8:23 12:25 46:14
55:15 57:19 74:5
76:8 109:24 173:15
**relation (4)**
21:2 111:15 122:9
145:21
**relationship (1)**
179:11
**relatively (2)**
184:23 187:2
**relevance (1)**
71:12
**relevant (5)**
37:13 62:21 63:10
91:17 241:16
**reliance (1)**
65:21
**relied (3)**
41:2,6 185:2
**relieve (4)**
91:18,23,23 94:13
**relieved (1)**
134:8
**rely (2)**
41:22 178:19
**relying (1)**
124:18
**remained (2)**
15:9 150:15
**remaining (2)**
237:2,13
**remark (2)**
244:4,4
**remember (24)**
5:24 48:10 113:2
135:15 143:15
163:5 165:11 180:3
183:21 193:16
202:9,13 216:2,23
217:3,21 218:7,9
220:14,17 231:25
233:20 234:20,20
**Remind (1)**
126:8
**reminding (2)**
10:9 126:13
**removal (1)**
101:14
**reopened (1)**
261:4
**reorienting (1)**
118:2
**repeat (3)**

25:17 39:14 254:23
**repeated (1)**
29:22
**repeating (1)**
156:10
**rephrase (3)**
7:6,13 148:10
**replace (1)**
129:5
**replacement (1)**
209:8
**report (124)**
7:25 8:5,24 9:9,16
  11:11,14 12:2,6,8
  12:12,21,22 18:10
  19:10,12 21:9 22:3
  26:3 30:10,12 37:12
  40:4 41:3 42:21
  50:24 53:2 58:6,14
  62:4,19 63:21 64:5
  67:14 71:9 72:2
  73:11 75:21 78:9
  80:10,10 82:5 83:21
  94:20,22 95:14
  104:4 108:8 109:20
  110:3 111:3 113:6,8
  119:6 126:19 127:4
  130:9 131:7 158:13
  161:23 162:2 163:3
  163:8,13 164:21
  167:17 170:12
  171:7,21 173:6,11
  174:2 175:7 177:12
  177:19 178:20
  179:21 180:2,5,8
  181:3 184:16
  186:20 188:11,21
  191:25 193:20
  194:18,25 195:13
  196:8 198:8,14
  199:13 203:6
  205:12 206:22
  211:19 215:21
  220:5,6 221:25
  230:17 231:3
  235:10 237:16
  241:6,16 244:13
  245:16 247:2 248:6
  249:16,16 251:13
  252:4,17 253:8
  255:9,20,21 256:18
  257:16 263:7
**Reported (1)**
1:23
**Reporter (5)**
2:9,10,11 262:6

**reports (9)**
179:18 180:14 182:10
  184:8 192:3,6 195:4
  195:8,10
**repos (1)**
57:18
**represent (14)**
5:11 9:25 10:3 45:14
  50:2,6 65:4,20 66:4
  67:5,7 70:7 162:17
  170:7
**representation (13)**
51:24 62:16 65:8,10
  65:13,17 66:11,14
  69:3,11 160:23,24
  202:20
**representations (2)**
50:10,14
**represented (5)**
43:12,17,19 50:20
  65:24
**reproduction (1)**
167:22
**request (6)**
92:19 93:10 180:22
  180:24 194:15,24
**requested (5)**
184:16 186:19 188:20
  194:18 262:19
**requests (1)**
161:13
**require (5)**
40:19 89:19 123:21
  125:25 205:19
**required (18)**
7:22 23:25 41:17
  122:19 124:5,22
  125:12,12 138:18
  142:20 190:11,12
  197:2 210:19
  221:17 229:25
  230:5,8
**requirement (29)**
33:21,25 108:6
  118:25 119:19,21
  122:14 135:5,6,9,10
  137:8 138:22
  139:17 142:5,15,25
  143:6 152:16
  154:24 197:5,9,10
  205:6 210:17
  218:23 223:3,20,21
**requirements (15)**
69:18 124:6 134:7
  140:7 141:6 142:9
  142:13 144:17

164:7 165:18
  210:19 212:6
  231:18 233:15
  235:13
**requires (3)**
24:7 31:6 231:9
**reread (1)**
11:16
**researched (1)**
109:22
**reserve (6)**
242:22 243:3,6,13,19
  261:5
**respect (37)**
17:20 19:22 20:24
  21:21 22:9 28:11
  31:11 41:20 79:18
  83:5,9 87:8 97:14
  106:3,6 110:13,14
  113:15 114:6,13
  121:13 123:24
  156:16 157:13
  185:15,16,21
  198:11,24 205:18
  216:25 218:8 229:9
  229:10,12 244:16
  250:12
**respectfully (1)**
42:2
**respects (1)**
158:24
**respond (1)**
9:4
**responding (1)**
72:6
**responsibilities (6)**
16:25 90:12 198:15
  203:11 211:22
  230:21
**responsibility (14)**
18:23 97:10 103:21
  105:16 106:12
  110:12 150:22
  171:9 186:6,22
  188:23 191:5 199:2
  257:18
**responsible (11)**
95:8 98:14 100:12
  101:8 106:6 131:14
  133:25 151:6 186:4
  254:3,13
**result (8)**
17:15 166:15 175:10
  176:6 179:15
  204:23 207:13
  212:5

**resumed (1)**
130:4
**retain (3)**
93:17 97:10 98:12
**return (2)**
235:15 239:18
**returned (5)**
144:13 237:3,13,17
  240:22
**revenues (1)**
225:18
**review (13)**
11:24 26:7 35:13
  48:20 65:15 87:16
  89:17 100:2,4 112:3
  193:7,17 262:19
**reviewed (12)**
11:22 12:11 26:2
  44:16,25 48:16
  63:20 161:4,4
  162:15 173:11
  193:19
**reviewing (5)**
13:6 111:2 155:9
  174:2 250:25
**Richard (4)**
6:9 192:14,20 263:11
**rid (3)**
95:16 240:10,13
**right (20)**
18:5 32:2 41:24 65:23
  80:8 83:6 97:12
  108:18 115:17
  150:16 153:17
  168:11,14 169:18
  184:6 190:20 232:7
  232:8 233:13 261:6
**rights (3)**
20:16,23 110:14
**right-hand (1)**
217:4
**risk (121)**
13:7,14 14:23 16:19
  16:20 17:16 34:9
  73:9,20 79:5,8,12
  79:23 80:23 95:2
  98:10 110:24
  112:21 113:15
  114:6,12,23,25
  115:5,7,11 116:2,14
  116:25 124:20,21
  125:3 126:3 127:22
  128:21,25 129:10
  130:10,20,21 131:6
  131:8,20 132:5
  135:21 136:3,5,6,7

136:8,12,21 137:3,5
  137:6,7 138:5,7,9
  138:10,16,21,25
  139:7,9,11,16,24,25
  140:3,6,7,12 141:2
  141:5,6 151:11,15
  151:15,22 152:4
  161:16 177:4 179:2
  185:24 186:2,18
  188:18 190:20
  191:5,7,8 192:9
  195:21 196:19,23
  197:16,19 198:2
  199:9 205:2,4 212:9
  212:15 213:10,16
  221:19 222:4,16
  228:18,19,23 229:5
  230:18 236:5,13
  256:17,18 257:17
  259:7,9
**risks (69)**
13:9 53:13 79:25 80:2
  80:11,14 84:19
  94:21,24,24 95:4,13
  95:17 98:12 110:19
  110:24 112:11,12
  112:15 114:20
  116:16,19 123:4
  130:17 131:11
  139:15 140:17,18
  140:22 141:10
  149:11 152:24
  153:16 167:5 186:8
  187:7 189:9,11
  191:9,12,18,19,21
  192:4 195:16 198:8
  198:9,13,18,22
  202:17,17,25
  205:16 206:23
  211:22 213:13
  224:18 225:8 227:4
  229:3 239:9 240:8
  240:10 241:10,14
  250:5,14,18
**RMR (1)**
1:24
**ROBERT (1)**
3:21
**room (1)**
163:10
**Rosen (8)**
9:23 99:13,20 100:6
  100:23 101:12
  103:12 183:20
**Rosen's (5)**
99:15,22,25 102:16

102:22
**routine (1)**
180:16
**RPR (1)**
1:24
**rule (3)**
33:11 242:8 262:20
**rules (10)**
5:20 33:12 206:20
208:2 227:25
234:12,14 237:15
238:3 242:3
**run (8)**
30:17 129:10 172:15
172:21,24 221:6
232:9,17
**running (2)**
18:9 187:17

**S**

**s (11)**
1:24 2:8 3:2 4:3 58:8
242:3 252:22 253:3
262:5 263:9,17
**Sachs (2)**
6:17 233:22
**Safe (1)**
40:12
**sale (15)**
27:4 43:23 45:4,6,9
45:15,23 46:7 47:3
47:22 48:3 49:12,14
209:6 241:6
**satisfy (1)**
135:9
**saw (3)**
154:8 155:10 228:5
**saying (8)**
29:13 47:25 88:16
103:13 168:18
207:22 220:14,17
**says (21)**
31:21 78:6 85:25 86:2
86:3,13,13,15 87:4
101:12 102:7,7
116:9 157:18,18
158:22 169:13
215:16 217:13
228:13 255:16
**scenario (4)**
149:16 235:9 238:18
238:20
**scenarios (2)**
70:18 72:3
**schedule (9)**
12:7,8 44:15 65:20

69:13 70:6 161:25
162:2,3
**SCHILLER (1)**
3:10
**scope (15)**
11:12 24:20 25:7,16
47:24 48:4,7 67:13
92:10 99:3 109:19
176:20 199:12
220:2 242:10
**second (15)**
6:24 52:5 147:19
193:21 194:3
215:13 219:18
224:25 230:11
243:23 249:18
253:7,9,12 254:19
**section (5)**
87:14,25 88:8 130:9
229:22
**secure (11)**
53:10 86:25 134:10
141:21 146:23
148:23 203:15
208:23 209:25
211:2,18
**secured (13)**
142:3 213:19 214:4
215:19 216:10,12
217:2,20 219:7,13
219:23 221:18
222:14
**securing (9)**
27:15 72:12 73:23,24
84:2 122:3 191:9
206:22 245:8
**securities (13)**
52:19 56:25 57:19
75:24,25 76:25 77:6
90:19 105:13
131:15 151:7
227:17,24
**security (1)**
77:15
**see (94)**
19:24 22:8,13 27:12
27:13 35:4,8,10,21
44:25 46:12 51:17
56:24 57:6,9,12,16
57:22 58:3,12,25
59:19,21,24 60:3,6
66:15,18 70:3,4
73:18 74:16 77:2
82:22 83:6 85:17,24
85:25 87:4 89:9,14
99:12 100:6 103:5,6

104:11,25 113:11
113:16,23 131:2
139:18,22 146:13
162:6,7 164:7 173:7
175:13 177:5
192:24 193:21
194:6,9,12,14,17,21
195:6 198:6 217:6
224:8 225:11,20
227:15,18,19,19,23
228:11,20 244:16
244:20 253:2,3
254:15 255:2,9,13
256:11,16,18 257:5
257:13
**seeing (2)**
202:9,13
**seeking (2)**
143:20 220:2
**seen (21)**
7:17 25:24 45:22 46:6
47:19 54:3 63:16
85:11,14 155:4,6,7
174:7,7 188:4 193:9
193:12,13 195:9
224:3,5
**sees (1)**
118:7
**seg (8)**
213:19 217:19 219:7
219:12,22 221:18
222:14 223:23
**selectively (1)**
38:19
**sell (3)**
108:3 212:25 258:20
**seller (6)**
22:10 88:17 145:8
239:12,13 244:18
**sending (1)**
168:18
**sends (2)**
193:23 256:12
**sense (7)**
34:14 39:3 62:19 79:7
80:4 93:23 94:4,6
94:18,18 97:20
107:21 108:3
111:14 112:17,19
137:2 138:21 139:6
152:24 162:25
**sentence (10)**
19:20 20:7 22:8,16,21
22:23 118:9 127:10
158:21 164:2
**sentences (2)**

83:15 102:4
**separate (14)**
23:18,23 41:14
110:19 140:18,19
140:21 142:4,11,19
143:5 176:17
200:10 209:21
**separated (2)**
137:6 177:12
**separately (1)**
246:11
**September (39)**
42:16 45:16 58:25
60:16 77:19 82:12
83:2,11 100:9,19,25
111:7 112:2 126:24
154:16 160:6
171:18,24 172:5,22
178:13 181:9,25
182:17 183:2 184:9
192:16,22 193:23
200:23 201:9
206:11 207:5
224:13 242:14,18
250:22 256:13
263:12
**sequence (2)**
169:12 259:22
**series (1)**
65:5
**serious (1)**
70:20
**SESSION (1)**
130:2
**set (14)**
14:18 19:21 21:9,13
44:16 70:17 84:8
145:21 149:12
150:24 214:13
241:23 262:10,24
**sets (1)**
249:21
**setting (1)**
110:3
**settled (2)**
14:7 151:13
**settlement (9)**
14:8,20 95:3 98:10
152:23 156:2 157:9
158:4 197:10
**settlements (2)**
98:14 155:15
**settling (1)**
152:15
**setup (2)**
166:15 175:10

**set-up (1)**
176:6
**seven (2)**
5:23 110:4
**shaded (5)**
227:3,7,13,19,21
**shape (1)**
82:3
**Sharon (1)**
10:22
**sheet (12)**
59:10,19,25 60:4,9
63:25 67:10,18 68:7
73:2,8,17
**Sheila (4)**
192:13,19 194:18
263:10
**shocked (1)**
179:6
**shoes (1)**
97:13
**short (36)**
27:9 28:4 57:18,25
58:21 60:19 61:5
70:7,11 72:19 74:7
76:17,19,20 82:25
90:18,19 91:3 92:25
95:8,24 96:4,5
138:19 150:22
158:25 187:15
196:15,25 230:12
238:18 247:4,6
248:18 257:9
258:19
**shortfall (1)**
242:22
**shorts (5)**
78:12,13 95:25 98:13
98:23
**short-term (2)**
57:4 87:2
**show (1)**
217:9
**showing (1)**
172:11
**shows (1)**
179:22
**side (26)**
14:14 27:11 51:13,14
52:20 54:3 56:5,8
56:17 67:10 70:20
70:25 74:4 78:11
82:21 83:24 95:8
103:11 131:18
178:6 185:3 187:22
196:15 213:2 215:2

217:5
**sides (5)**
43:16 44:13 79:10
184:24 187:2
**sign (2)**
236:19 255:13
**signed (13)**
9:18 12:2 13:11 30:14
31:20 32:10 40:16
126:24 159:9 160:8
250:10 259:21
260:2
**significant (3)**
71:6 235:24 258:3
**signing (10)**
9:15 55:9 76:22
158:22 159:21
161:8,11 184:17
200:8 220:25
**similar (6)**
195:10 221:8 232:21
233:11 253:14,18
**similarly (1)**
185:22
**simple (1)**
247:20
**simply (12)**
13:8 43:8 70:17 71:11
74:21,24 103:13,15
199:20 205:5
209:12 220:6
**single (5)**
52:22 53:18 73:20
190:10 251:9
**SIPA (6)**
4:6 5:11 53:13 73:13
92:23 93:17
**sir (367)**
5:13,22 6:5,15,19
7:11,18 8:4,8,15,23
9:11,19,22 10:3,8
10:12,19 11:19 12:7
12:8,12 14:25 15:6
15:14,18,21 16:4,12
17:4,22 18:10 19:10
19:18,21 21:7,15,22
22:3,6,13,15,25
23:14 24:3,15,25
25:14,24 26:13,17
27:17 28:2,6,11
29:3,17,19 31:3,15
32:12,22 34:7,18
35:3,5,11,14,21
36:5,12,20 37:2,5,8
37:15 38:4,17,25
40:10,16 43:11

44:15,22 46:2,17
47:19 48:25 49:7
50:9,15,23 51:23
52:21 53:17 54:6,9
54:24 56:20,22 57:9
58:3,11,12 60:7,14
60:22 62:22 63:17
65:5 66:15,24 67:8
67:20,25 68:7,12
69:2,4,15,25 70:6,9
71:16 72:16 75:4,21
75:21,25 76:21 77:3
77:8,10 78:21 79:4
80:5 82:5,9,22 83:7
85:9,15 89:4,5,14
90:24 93:5 95:19
97:22 99:11,14
100:14 101:23
104:4,8,9 105:15
106:11,20 107:21
108:14 109:7 110:3
110:16 111:4,20
113:8,9,10,25 115:7
116:23 117:18
119:25 120:25
122:16 123:13
126:2,16 127:5
130:13,15 131:2,7
131:19 132:9
133:21 134:12
139:6 140:5 141:25
143:4 144:2 145:3,4
145:7 146:10,18
149:6,17 151:16
152:25 153:14,19
154:10 155:3,7,11
156:13,16 157:13
157:23 158:7,13,19
159:6,19 160:4
161:11 162:2,4,8,13
162:17 163:3,12
164:3,9,13 166:5
167:12,17 170:11
170:18 171:10,21
172:2,20 175:7,14
175:20 179:10,16
180:2,12 181:25
182:8,16 183:8,19
186:5,16 189:2,23
190:17 191:2 192:3
192:18,19 193:8,11
193:18 194:3,6,21
195:8,13,24 196:7
196:17 197:14
199:23 200:15
201:9 202:24

203:21 206:25
207:10,17 208:7,18
210:7 212:8,18
213:3,17 214:15,17
215:14,21 216:13
217:6 219:5,11,15
219:21 220:10,15
221:15 222:5,13
223:25 224:3,5,8
225:14 226:9,18,20
226:25 227:15,23
228:7,11,20 229:7
229:10 230:16,18
231:3,8,20 232:13
233:18 234:11,18
236:14 237:19
238:8,22 239:10
240:15 242:2,25
244:13,14,15,21,22
245:22 246:7,16
247:25 249:13
250:2,12,19,24
252:3,15,17 253:2,3
253:11,14 254:15
255:6,10,24 256:4
256:15,19 257:5,6,7
257:13 261:11
**site (1)**
103:10
**sitting (1)**
28:13
**situation (8)**
71:15 74:16 75:2
79:18 231:21
232:15 237:2 245:3
**situations (3)**
233:18,19 245:5
**six (2)**
5:23 168:19
**size (8)**
61:13 62:20,20 71:6
108:8 225:17 259:4
259:25
**skipping (1)**
83:15
**small (5)**
121:16 184:23 185:2
187:2 188:7
**snapshot (6)**
71:3 72:10 118:20
125:11,12 238:25
**snapshots (1)**
64:2
**sold (2)**
204:21 243:4
**solely (6)**

73:6 80:15 95:14
121:25 124:18
251:14
**solvent (1)**
119:9
**somebody (1)**
173:23
**somebody's (1)**
193:16
**soon (2)**
47:12 198:2
**sooner (1)**
113:6
**sophisticated (3)**
43:12 176:15,22
**sorry (52)**
12:8 19:13 20:4 22:5
22:22 25:17 29:18
33:2 36:21 39:13
40:9,21 44:18 49:13
56:2 68:21 82:6
87:13 88:6 92:11
94:15 95:21 96:5
98:19 104:6,24
106:22 108:11
114:10 116:6 123:9
149:12 151:21
159:12,14 162:2
163:6 176:10
186:13,15 191:4
194:2 195:5 197:17
208:10 210:21
221:21 225:5 237:4
249:16 253:9,17
**sort (6)**
76:14 167:6 196:11
198:17 242:24
245:20
**sounded (1)**
119:12
**sounds (3)**
79:16 151:14 168:23
**source (2)**
59:5 252:16
**SOUTHERN (1)**
1:3
**so-called (1)**
154:24
**space (1)**
47:5
**speak (9)**
7:8 12:21 28:12 31:12
94:22 99:20 161:22
163:8,11
**speaking (4)**
7:12 30:3 113:4

212:15
**speaks (5)**
22:23 28:10 101:10
255:20,21
**specific (15)**
8:20 27:19 33:4 43:2
46:13 51:8 54:21
64:12 81:18 86:14
134:25 199:16,19
233:20 235:6
**specifically (17)**
27:6 35:16 36:4 45:8
46:9 51:18 53:19
54:11 55:14 56:9
77:13 78:22 85:21
100:21 213:23
216:21 248:5
**specifics (1)**
46:13
**specify (1)**
164:22
**speculate (3)**
43:6 44:6 70:17
**speculation (6)**
43:4,5 67:23 119:2,3
122:22
**spite (1)**
203:12
**spoke (2)**
41:15 161:18
**spreadsheet (2)**
60:23 68:14
**ss (1)**
262:3
**stamp (1)**
249:24
**stands (1)**
15:19
**start (2)**
207:22 258:24
**started (1)**
235:25
**starting (2)**
132:9 247:3
**starts (2)**
30:22 35:9
**state (13)**
2:12 53:11 66:7 71:9
78:9 119:23 130:16
139:2 141:12
209:16 248:6 262:3
262:7
**stated (8)**
30:10 37:13 124:11
161:5 175:7 240:12
241:6 247:2

**statement (21)**
7:22 20:8 21:6 26:23
42:22 52:6 73:17
116:8 126:16
166:19,22,22 176:3
176:11 178:19
221:11 225:20,21
226:8 229:7 254:8
**statements (2)**
143:5 178:3
**states (8)**
1:2 37:12 50:24 53:2
100:6,23 203:6
221:23
**static (1)**
236:7
**stayed (1)**
150:18
**staying (1)**
157:7
**step (2)**
165:6 218:17
**Stephen (3)**
4:11 163:8 256:12
**stepped (2)**
97:13 235:11
**steps (4)**
117:8 212:20 213:23
237:8
**Steve (1)**
65:11
**stick (1)**
122:15
**stipulation (5)**
7:17 41:10,11,21 42:3
**stock (1)**
245:11
**straight (1)**
148:25
**strange (1)**
209:4
**strategies (2)**
76:12 254:5
**strategy (1)**
233:2
**Street (2)**
3:6,12
**struck (2)**
252:10 259:20
**structure (3)**
177:6 181:20 222:8
**structured (1)**
245:13
**stuff (1)**
125:22
**subclause (1)**

57:17
**subject (12)**
59:18,24 81:18 95:24
98:23 135:18 142:7
157:7 163:16 169:8
206:20 243:19
**Subscribed (1)**
261:20
**subsequent (4)**
9:15 12:11 55:6 76:22
**subset (9)**
13:9 81:20 96:17,18
96:25 97:19,19
187:4 241:13
**substance (1)**
81:3
**substantial (4)**
223:21 230:18 236:13
238:23
**subtotal (4)**
251:21,22,23 255:17
**succeeded (1)**
92:13
**suddenly (1)**
236:9
**sufficient (3)**
34:24 113:13 231:9
**suggest (5)**
60:7 105:5 191:16
252:3,7
**suing (1)**
5:18
**summary (1)**
60:4
**supplement (1)**
11:8
**support (12)**
63:5,8 69:7,23 75:17
121:19 139:4,12
146:4 203:20
210:17 220:8
**supported (1)**
146:16
**supporting (11)**
23:19,20 30:19 69:22
127:21 190:15
220:7,19 230:24
245:10 247:10
**supposed (1)**
83:25
**sure (34)**
9:3 33:4 38:3 45:11
45:12 47:13 48:5
52:10 55:2,3 65:2
81:25 92:13 94:2
109:13 114:17

134:13 147:20,21
147:23 152:22
156:3 160:9,25
185:8 201:22 204:7
220:22 221:4
224:24 237:4
248:20 252:18
254:25
**surprise (4)**
177:8,10,18 219:11
**surprised (5)**
106:24 176:21 219:3
219:5 223:14
**surprising (1)**
187:6
**surrounding (3)**
20:11 61:10 130:19
**swap (1)**
30:5
**swaps (1)**
36:24
**sworn (3)**
5:3 261:20 262:11
**system (8)**
166:16 170:12 171:3
176:16 177:25
233:11 252:12,16
**systems (16)**
171:17,22 172:4,21
174:11 175:11
176:7 177:3,12
178:15 179:19,22
181:2 182:12,17,25
**S&P (2)**
204:19 258:20
**S.E.C (2)**
201:20 242:3,8 244:6

━━━━━━━━━━━━
**T**
━━━━━━━━━━━━
**table (1)**
241:18
**take (78)**
27:10 34:5 41:4 42:4
47:11,15 48:12
73:13 80:14 85:3
88:22 93:19 97:19
98:16 115:6 116:2
117:6,20 118:20
122:23 124:3,20
126:6 128:3,13
132:16 137:13
146:15,19 147:9,17
148:15,19 149:11
152:16 153:5,9
155:3 160:23,24
167:5,11 173:9

175:2 177:2 187:10
187:10 188:3 193:7
195:3 197:3 198:2
199:3 201:22 202:8
202:16,17,24
203:10,11 205:24
207:19,23,24
209:19 210:10
212:20,24 222:16
230:12 238:25
239:12,16 248:18
249:8,12 251:6
258:11
**taken (8)**
9:15 38:22 43:8
153:14 188:13
191:8 198:5 211:21
**takes (1)**
204:18
**talk (9)**
31:2,15,19 32:9 40:12
73:22 131:6 133:4
179:7
**talked (2)**
41:9 143:17
**talking (19)**
37:22 55:13 73:23
76:18 97:22 125:22
131:7,10 140:23
146:6 150:16
174:14 190:4
198:20 200:20
204:4 206:8 218:10
247:5
**team (2)**
187:2,24
**technological (1)**
177:7
**telephone (1)**
163:12
**tell (34)**
20:7 63:12,23 67:15
74:14 89:17 94:4,17
97:8 102:6 118:24
140:5 145:3,4,7
167:17 169:6
170:18,19 193:8
200:3 204:8 207:3
210:7 213:10
215:16 224:16
225:6 226:22
239:10 249:13
250:24 251:5,6
**tend (2)**
208:4 218:24
**tended (2)**

142:14 143:5
**tens (1)**
130:21
**term (8)**
33:10 39:9 61:24
75:13 76:7 109:4
204:2,5
**terms (13)**
15:23,24 42:22 43:9
46:19,21 51:3
61:13 71:9 80:11
117:9 119:5 199:17
**test (3)**
176:2,10 179:5
**testified (23)**
5:4 6:21 12:2 49:11
49:16 50:3 64:15
110:23 111:8
112:10 130:5
132:10 157:23
186:5 191:3 192:2
200:5 202:21
209:22 220:10
224:19 225:9
233:10
**testify (6)**
6:18 65:6 234:21
237:23 238:3,13
**testifying (2)**
40:22 151:14
**testimony (61)**
16:8,11 22:21 24:20
25:7 28:9,18 31:4
37:21 38:20,21 47:2
48:17,20 54:3 64:4
64:11,21 65:15 66:6
69:3,13 72:25 90:24
91:6 99:15,17 111:3
111:20 117:5
118:15 132:14
143:3 147:24
153:15 161:4,21
165:12 166:20,21
175:17 178:2
186:12 190:21,23
190:25 193:16
199:12 200:6
201:16 202:4,9,14
202:15 203:5 221:5
222:16 234:11
246:23 262:12
263:3
**text (2)**
104:17 105:5
**thank (19)**
7:4,16 10:7,9 19:13

19:15 56:3 86:21
87:21 89:3 102:21
149:15 160:25
174:17 212:13
217:11 260:6 261:9
261:10
**thanks (2)**
28:20 260:7
**theoretically (1)**
212:5
**theory (1)**
115:17
**thereto (1)**
25:5
**thing (6)**
82:15 86:17 87:20
104:2 144:17
221:24
**things (7)**
64:23 65:11 75:14
102:7 119:16
128:11 187:12
**think (76)**
9:7 17:11 18:17 23:22
27:9 31:10 40:3
41:5 44:4,12 48:6
52:19 55:25 61:8
62:7 65:18 66:2
75:2 77:20 88:23
91:9 93:3,16 95:15
103:5 109:14
110:22 118:19
119:22 121:11
122:8 123:12
124:10 125:18
147:18 148:4,8
149:9 150:12
152:21 154:22
156:15,15 160:8,10
160:17 166:12
167:25 168:6 169:2
184:15 185:13
187:15 188:10
190:24 198:7 200:4
201:3 205:12,23
207:11 208:11
209:22 215:7,22
218:12 221:3 222:7
235:21 236:9
248:18 255:13
256:8,24 259:7
260:4
**thinking (1)**
240:4
**third (9)**
106:8 214:23,24,25

215:4 219:18
226:25 227:8,12
**thought (12)**
61:14 68:11 91:10
116:8 120:20
123:18 126:14
149:7 156:14
190:17 208:10
221:21
**thousand (1)**
177:23
**thousands (3)**
130:22 174:12 186:3
**three (3)**
110:18,23 215:17
**Thursday (1)**
173:20
**tie (4)**
59:11,15 60:4,8
**Tie-Out (2)**
59:19,25
**time (73)**
6:15 7:2 12:25 14:6
30:13 42:5 44:4
48:12,13,14 51:4
54:18 56:2,3 62:8
63:10 71:3 72:9
78:17 82:3,15 84:13
85:4,5 98:7 102:12
112:5 113:3 116:17
117:15 120:16,18
124:9,20,24 125:10
125:18 128:18
129:14,15 130:3,25
155:24 157:21
158:22 167:8
169:12 172:21
174:25 175:3,4
185:7 191:20 206:2
206:3 230:13,14
234:7,16,18 236:15
236:17 238:18
244:2 248:21,22
249:22,24 259:25
260:5 261:2,6,12
**timeframe (10)**
6:12 45:17 55:3,4
82:12 183:14
187:16 200:20
222:21 243:10
**times (4)**
83:19 101:25 102:11
198:7
**timing (4)**
127:7,8,23 159:24
**title (1)**

227:20
**titled (1)**
89:6
**today (7)**
28:13 31:4 40:23
99:18 180:19
181:10 193:18
**told (5)**
18:11 41:7 189:8,14
216:24
**Tony (1)**
201:4
**top (3)**
35:17 215:5 257:5
**topic (6)**
8:14,15 9:9 112:11
174:23 230:16
**total (12)**
96:18 142:14 143:6
247:1 251:21,22
251:24 255:6,8,16
255:17,18
**touch (1)**
183:17
**trade (2)**
205:21 218:22
**traded (7)**
104:12 105:2,23
106:8 165:10
206:21 222:10
**trader (4)**
204:8,14,17 205:2
**Traders (1)**
204:2
**trading (7)**
76:10 106:14 176:24
203:24 210:17
218:21 247:6
**transaction (69)**
13:4,8,12,15 14:2
17:15 23:16 30:15
33:9 42:13 43:17
44:10 48:21 49:9
51:5 64:24 70:15,22
71:13 81:8 84:3
102:16,22 103:9
105:15 106:11
113:13 114:24
118:14 126:4,18,22
127:19 130:25
145:18,25 146:11
149:9 150:6 154:4,7
155:14 161:17
162:24 166:10
183:10,18 186:25
187:11 188:12

190:4,6,8,13 199:19
199:21 201:9 203:7
203:13 204:24
209:18 211:21
213:2,20 221:23
240:2 241:23
245:12 246:17
**transactions (7)**
14:20 27:3 76:16
78:12 98:8 152:15
184:24
**transcript (2)**
47:6 262:20
**transcription (1)**
264:7
**transfer (22)**
13:22 22:12 50:7 51:2
51:12 52:9,13 53:3
55:8,10 78:13 87:8
90:18 107:5 108:21
133:5 230:19
240:16 241:3
243:17 244:19,25
**transferable (1)**
107:25
**transferred (10)**
39:20 106:22,23
136:15,19,24
138:13 144:7
146:14 243:18
**transferring (2)**
145:8 146:3
**transfers (2)**
14:12 108:15
**treat (1)**
22:16
**treatment (3)**
24:23 25:3,10
**trees (1)**
193:4
**trial (1)**
6:18
**tried (5)**
73:11 156:15 200:2,3
200:17
**Trish (9)**
3:15 19:14 28:20
29:10 108:24
168:25 169:20
174:13 227:8
**Trish's (2)**
143:21 169:8
**true (16)**
17:21 75:2 84:16
136:20 160:24
165:15 166:2

176:12 181:9
210:13 226:3,5
234:9 236:20,21
262:12
**trustee (12)**
4:6 5:11 53:14 73:13
93:17 94:7 95:2,15
98:12,17 150:25
151:9
**trustees (2)**
92:24 146:13
**trustee's (3)**
95:15 101:13 103:11
**try (14)**
47:8 60:14 62:19 90:5
120:7 145:5 148:3
156:16,20,23
174:10 185:6
202:18 259:6
**trying (16)**
31:10 44:14 46:5 60:4
60:8 63:11 140:20
143:14 148:7 161:5
187:7 188:2 191:2
191:16 200:13
246:25
**Tuesday (9)**
160:4,5,6 236:11
239:8,20 241:4
258:13 259:21
**Tuesday/Wednesda...**
252:11
**turn (22)**
19:9 22:2 35:3 56:21
57:11 58:5 75:20
82:4 89:16 99:24
104:4 113:7 130:8
158:12 161:25
167:16 214:19
226:25 228:7
230:16 244:12
256:7
**turned (1)**
80:3
**turning (7)**
35:16 108:10,14
110:2 153:13 175:6
211:5
**twice (2)**
189:21 195:9
**two (19)**
10:12 23:24 50:10,14
102:4 128:11
135:16 137:6 141:8
143:17 146:8 171:8
211:8 214:23

235:20,25 249:18
249:20 253:10
**two-minute (1)**
205:24
**type (6)**
16:4,5 34:23 72:7
135:8 198:19
**types (8)**
16:13 57:20 110:19
131:9 182:10 195:7
197:8 198:13
**typical (2)**
137:17 142:10
**typically (1)**
246:20

_____

**U**

**ultimately (1)**
151:6
**uncertain (1)**
20:10
**uncertainties (2)**
125:23 222:3
**uncertainty (3)**
12:25 118:16 119:23
**unclear (1)**
18:14
**uncommon (1)**
205:15
**undefined (2)**
39:9 109:3
**undergoing (1)**
13:2
**underlier (3)**
207:14 212:16 223:19
**underlies (1)**
68:15
**underlying (8)**
41:14 68:7,14 207:14
208:3,5,16,19
**underneath (1)**
162:11
**understand (62)**
7:5,14,21 9:10 10:11
14:16 15:9 16:12
17:10,11 18:8 21:20
23:10 46:4 49:7,11
49:16,18 63:11,23
64:14 65:8 66:4,14
66:24 71:16 80:5
87:5 88:13,21 92:21
96:16 97:12 100:16
101:13 105:6
114:17 132:24
143:18,20 147:20
148:7,11 149:25

150:5 152:21,25
166:12 170:6
175:22 190:9 191:2
191:16 204:4
207:10 221:2
234:17 237:5 241:5
242:5 246:16 257:2
**understanding (47)**
9:5 15:19 17:18,23
19:6 27:3 51:2
70:19 76:8 78:5,19
88:25 90:6 94:10,11
102:22 103:14,17
103:23 105:14,21
106:4,7,10 107:7
112:4 132:15,19
133:18 150:14
151:4,9,19 153:2,10
155:25 157:24
178:4 181:23,24
182:10 186:23
200:4 212:2 218:25
227:16,24
**understood (15)**
23:23 39:19 55:4 75:8
90:15 92:22 105:10
108:3 120:21 122:5
132:10 134:13
154:14 164:11
197:24
**unfortunately (1)**
148:5
**unique (4)**
70:15,16 241:23
245:4
**unit (1)**
254:3
**UNITED (1)**
1:2
**unknown (3)**
73:13 112:11,17
**unlimited (1)**
115:14
**unnecessary (4)**
189:5,22,23,23
**unquantifiable (14)**
73:14 84:11 95:17
112:12 115:14
116:2 117:3 186:8
186:18 188:18
189:9 190:20 191:4
191:7
**unquote (1)**
229:21
**unusual (1)**
245:19

**unvetted (4)**
130:10,22 140:3
196:19
**unwind (1)**
95:6
**upside (3)**
153:20,25 199:4
**URQUHART (1)**
3:17
**use (20)**
39:8 43:9 61:24 76:7
133:19 134:4,23
135:3 137:18,25
139:4 143:11 148:8
152:13 189:9 197:8
204:2,5 233:11
234:16
**useful (8)**
195:15 257:16,22
259:3,8,8,10,16
**usual (1)**
228:16
**usually (2)**
197:6 230:4
**U.S (1)**
228:25

_____

**V**

**vague (6)**
17:8 61:24 76:6
222:21 246:25
257:20
**vagueness (1)**
243:9
**valuable (1)**
107:15
**valuation (1)**
119:7
**value (20)**
57:5,21 71:5 72:18
111:5,9,10,12 112:8
113:14 123:22
128:4 154:5,8
199:18 205:7,12
209:22 231:5
247:13
**valued (8)**
154:3,9 199:18 246:8
246:11,12,18,20
**variation (2)**
197:3,21 205:5
**variety (1)**
76:12
**various (8)**
13:19 39:20 62:8 83:5
83:9 100:16 125:2

197:8
**vast (1)**
82:16
**verbally (1)**
238:2
**versions (1)**
227:21
**view (9)**
13:8 23:19 43:8 55:7
119:12 136:7
208:14 209:16
259:2
**virtually (3)**
82:15 97:6 208:15
**visible (2)**
140:12,16
**volatile (1)**
130:24
**volatility (15)**
12:24 71:4 95:2
120:10,15 124:23
124:24 212:16
222:3 223:6,8
232:11 234:6 236:7
236:8

_____

**W**

**wait (2)**
192:23 217:8
**wake (1)**
128:25
**Walker (1)**
59:18
**want (27)**
16:14 20:4 32:3 45:11
47:11 48:5 55:2,3
80:8 84:15 90:4
124:21 136:4
147:20 152:22
164:22 167:9 173:7
180:21 202:2 206:5
215:4 224:25
227:20 238:25
245:18 249:20
**wanted (8)**
16:17 51:8 100:20
121:12 123:10
177:5 190:3 247:25
**Washington (1)**
6:9
**wasn't (12)**
43:6 51:12 56:5 62:18
90:21,21 91:12,13
92:13 113:4 147:12
160:25
**way (50)**

12:13 14:13 15:6 20:6
23:22 34:16 47:11
49:23 60:14 62:22
63:9 64:21 67:16
81:9 82:3 92:15
98:7 99:6 110:22
125:21 127:5 139:2
142:19 148:3,5,10
150:13 152:5,11
159:6 161:2 164:4
165:15 166:23
178:20 185:9 196:9
199:19 204:17
207:11 209:18
226:2 233:5 234:21
239:3 240:6 241:25
242:4 254:11
262:16
**ways (1)**
245:21
**Wednesday (2)**
160:3 259:21
**week (19)**
44:11 83:2,10 84:19
171:18,24 172:5,22
178:13 182:17
183:2 184:9 238:21
239:8,20 241:5
259:11,17,20
**weekend (11)**
14:2,4 98:11 113:5
119:2,3,11 157:10
165:23 258:12,16
**weighty (1)**
252:25
**Welcome (1)**
6:24
**went (7)**
15:14 75:5 138:22
196:9 233:24 234:7
249:21
**weren't (3)**
16:6 70:18 184:14
**We'll (2)**
42:4 169:21
**we're (7)**
46:4 76:18 79:16
97:22 125:21 146:6
150:16
**we've (4)**
85:2 94:17 200:22
258:18
**whatsoever (1)**
226:14
**whereof (1)**
262:23

**wide (1)**
186:24
**WILLIAM (1)**
4:10
**willing (11)**
113:20 117:19 121:2
  122:18 126:17
  127:16 137:13
  146:15 147:9
  190:16 203:14
**wind (1)**
131:16
**wiped (2)**
230:24 237:20
**wished (2)**
51:15 75:19
**withdraw (1)**
144:23
**withdrawn (7)**
47:17 75:24 109:8
  145:3,5 179:15
  202:18
**witness (29)**
5:3 18:7 29:24 30:3
  32:20 39:13 40:18
  42:7 66:7 83:16
  87:24 89:23 104:16
  124:10 141:14
  147:25 159:12
  162:7 170:14 174:6
  186:15 191:24
  217:10 228:5 260:6
  262:9,13,23 264:4
**witnesses (2)**
16:11 143:12
**witness's (2)**
28:9 109:19
**woken (1)**
92:24
**word (10)**
33:5,14 34:6 40:2
  62:3 148:8 152:12
  152:13,13 189:10
**words (6)**
27:2,24,25 188:10
  223:13 227:23
**work (7)**
135:17 138:23 150:25
  151:8 190:16 199:2
  236:9
**worked (3)**
25:2 117:11 235:13
**working (2)**
44:5 184:23
**works (2)**
201:20 236:5

**world (3)**
75:3 81:6 219:17
**worried (1)**
187:5
**worth (3)**
60:18,19 247:15
**wouldn't (21)**
42:25 61:19 84:13
  86:2 93:22 94:4,6
  94:18 128:13,14
  140:25 189:5,7,14
  189:18 191:10
  201:24 202:2,2
  222:19 231:12
**wound (1)**
203:17
**write (3)**
110:5 218:2 228:22
**writes (2)**
60:3 257:8
**wrote (3)**
48:17 83:22 226:23

### X
**x (2)**
1:4,10

### Y
**Yang (3)**
59:17 60:3 257:8
**year (2)**
6:12 7:9
**years (4)**
5:19 6:10 25:3 207:2
**yesterday's (1)**
257:10
**York (18)**
1:3,15,15 2:7,7,12 3:7
  3:7,14,20,20 4:8,8
  193:24,25 262:3,4,7

### Z
**Zach (4)**
192:14,20 194:18
  263:10
**Zach's (1)**
195:5
**zero (1)**
231:6
**zillion (1)**
123:2

### $
**$1 (2)**
121:8 219:13
**$100 (1)**

129:2
**$2.9 (1)**
255:9
**$250 (1)**
225:18
**$358 (1)**
157:6
**$370 (2)**
155:15 158:5
**$4.5 (1)**
66:25
**$500 (1)**
223:3
**$507 (3)**
242:13 243:2,4
**$6.3 (1)**
60:19
**$69 (1)**
57:22
**$70 (1)**
57:5
**$700 (2)**
217:19 239:15
**$8.4 (1)**
60:18

### 0
**00074256 (2)**
58:8 263:9
**00075257 (3)**
252:22 253:3 263:17
**074 (1)**
194:11
**08-13555(JMP) (1)**
1:7

### 1
**1 (17)**
12:8 14:9 25:23 44:15
  65:21 87:25 88:8
  91:9 104:5,7,11,21
  106:15 140:2 162:2
  162:3 264:6
**1(A)(ii) (3)**
85:17 86:7 95:21
**1(C) (2)**
95:18,21
**1(d) (1)**
101:14
**1:03 (1)**
130:3
**10 (5)**
3:12 104:5,7,21 105:9
**10:52 (1)**
85:4
**100 (4)**

82:24 84:18 160:9
  221:17
**10004-1482 (1)**
4:8
**10010 (1)**
3:20
**10017-6702 (1)**
3:7
**106 (6)**
113:7 117:18 118:4
  121:23 126:16
  127:6
**11 (2)**
1:6 57:12
**11:02 (1)**
85:5
**12 (3)**
57:11,17 89:17
**12:14 (1)**
129:15
**12207 (1)**
3:14
**15 (11)**
58:25 60:16 83:2,11
  171:18,24 178:13
  182:17 183:2 184:9
  224:13
**15c3 (3)**
242:8,13 243:6
**15th (3)**
172:5,22 235:21
**16 (2)**
77:19 112:2
**16h (1)**
160:22
**16th (11)**
111:7 112:6 126:24
  128:5 159:25 160:6
  160:12,17,19,21
  235:22
**17th (3)**
112:6 160:9,14
**18th (1)**
112:6
**19 (23)**
19:9,17,20 20:7 45:16
  63:15 64:11,15 65:6
  66:15 67:11,20 68:4
  69:6 74:5 82:12
  110:2 130:13 140:2
  242:14,18 250:22
  256:13
**19th (2)**
112:6 255:23
**192 (1)**
263:10

**1987 (3)**
233:23 234:5,13
**1994 (1)**
6:13

### 2
**2 (7)**
12:8 35:3,9 86:22
  88:19 161:25 264:6
**2.3 (2)**
57:14,17
**2.3(i) (1)**
89:17
**2.9 (1)**
255:15
**2:13 (1)**
175:3
**2:29 (1)**
175:4
**20 (6)**
25:2 100:9,19,25
  230:17 235:10
**2008 (15)**
42:17 45:16 60:16
  77:19 172:22
  181:10,19,25
  182:17 183:6
  200:24 201:9 207:5
  234:14,24
**2010 (7)**
1:16 2:2 8:6 9:11
  261:21 262:24
  264:3
**21st (1)**
118:22
**214 (1)**
263:14
**22 (7)**
154:16 192:16,22
  200:23 201:9 207:5
  263:12
**22nd (8)**
3:19 118:23,24 150:7
  154:23 193:22
  197:19 206:11
**222 (1)**
3:6
**226 (1)**
263:15
**24 (9)**
58:6,14,15,16,20 59:6
  60:15 61:12,15
**25 (4)**
1:16 2:2 85:13 264:3
**25th (1)**
262:24

**252 (1)**
263:16
**26 (1)**
158:15
**28367 (1)**
1:25
**297510 (1)**
215:10

_____ **3** _____

**3 (7)**
35:10 89:4,5 92:6
93:15 214:19 264:7
**3:18 (1)**
206:2
**3:26 (1)**
206:3
**3:47 (3)**
193:22 194:5,6
**30 (2)**
25:3 207:2
**30(e) (1)**
262:21
**36754 (1)**
194:4
**370 (1)**
154:15
**38 (1)**
21:11

_____ **4** _____

**4 (14)**
35:10,17 39:4 45:19
99:25 100:13,15
101:2,4,12,25 102:7
102:15 162:3
**4th (1)**
3:13
**4.5 (7)**
61:5 66:22 67:9 68:2
69:5 74:6,7
**4.8 (1)**
61:4
**4:07 (1)**
230:13
**4:13 (1)**
230:14
**4:41 (4)**
192:16,22 194:17
263:13
**4:45 (4)**
169:12 172:17 248:21
256:13
**4:45:22 (1)**
169:13
**4:51 (1)**

248:22
**40 (2)**
21:12 207:2
**41st (1)**
3:6
**46 (1)**
231:4
**47 (1)**
231:4
**48 (1)**
82:14

_____ **5** _____

**5 (16)**
45:19 99:25 100:14
100:15 102:2,3,7,15
123:6 215:18 216:8
216:10 218:2,16
219:4 263:4
**5:08 (1)**
261:12
**500 (1)**
223:2
**506 (1)**
168:20
**51 (1)**
3:19
**55 (1)**
168:9
**554 (6)**
167:14 168:13 169:7
170:11 174:16
249:3
**556 (2)**
224:2 256:21
**564 (2)**
167:24 192:11
**57 (2)**
58:8 263:9
**58 (3)**
227:9,13 263:8

_____ **6** _____

**6 (3)**
38:4,5 56:21
**62 (8)**
158:12,17,22 164:2
166:14 175:6 178:3
178:20
**622 (1)**
99:10
**627 (1)**
155:3
**63 (3)**
75:20 76:21 78:6
**652 (4)**

7:25 8:4 19:14 263:7
**653 (8)**
58:7,12 59:5 60:23
61:17,19 62:24
263:8
**654 (5)**
192:12,13,18 195:14
263:10
**655 (3)**
214:9,12 263:14
**656 (3)**
226:15,19 263:15
**657 (6)**
252:21 253:2 254:21
254:22 257:6
263:16

_____ **7** _____

**7 (1)**
19:10
**700 (2)**
217:5,13
**74256 (1)**
59:9
**760 (2)**
174:4 251:9
**760-page (1)**
256:23

_____ **8** _____

**8 (5)**
8:5 9:11 12:3 163:3
263:7

_____ **9** _____

**9 (1)**
82:6
**9/18 (2)**
256:6 257:11
**9:39 (1)**
48:13
**9:52 (1)**
48:14
**91 (9)**
167:16,19 168:15
169:8 245:21
249:15,16 253:7,11
**94 (9)**
22:2,4,5 71:25 79:17
81:2,3 244:12
245:17
**95 (1)**
6:13
**99 (4)**
82:4,7,11 84:18