Kenneth J. Kelly, Esq, Bar No. KK 4195
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500
kkelly@ebglaw.com

Counsel to InfoSpace, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) ) ) | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., et al., | ) ) ) | 08-13555 (JMP) |
| Debtors. | ) ) ) ) | (Jointly Administered) |

**LIMITED OBJECTION TO DEBTORS' MOTION, PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 901, AND GENERAL ORDER M-390 AUTHORIZING THE DEBTORS TO IMPLEMENT CLAIMS HEARING PROCEDURES AND ALTERNATIVE DISPUTE RESOLUTION PROCEDURES FOR CLAIMS AGAINST DEBTORS**

InfoSpace, Inc., a Delaware corporation ("InfoSpace" or, variously, "Objector"), by and through its counsel Epstein, Becker & Green, P.C., files this limited objection (the "Objection") to the Debtors' Motion Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 901, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims against Debtors [Docket No. 7581] (the "Motion"). In support of its Objection, InfoSpace respectfully states as follows:

DC:2457098v1

**Background**

1. On September 15, 2008, Lehman Brothers Holdings, Inc. ("LBH") and certain of its subsidiaries (collectively, the "Debtors") commenced voluntary cases under chapter 11 of the Bankruptcy Code. LBH was formerly the fourth largest investment bank in the United States and a leader in global financial markets. Moreover, LBH is the parent in control of Lehman Brothers, Inc., ("LBI") which formerly operated as LBH's investment management division, providing investment management services to institutional, corporate, government, and high net-worth individual clients, including InfoSpace. LBI is currently in liquidation under the Securities Investor Protection Act ("SIPA"), which proceeding was commenced separately from the Debtors' Chapter 11 cases on September 19, 2008.

2. Prior to the commencement of these cases, LBI acted as a broker-dealer to InfoSpace for the management of an investment account (the "Account") pursuant to a Cash Management Agreement dated December 9, 2003 (the "Cash Management Agreement"). At all relevant times, the Account was supervised by Tim Ford and Kevin Laurie, who are FINRA registered brokers, and served as members of senior management at LBI. As was communicated by InfoSpace during preliminary negotiations with LBI, and throughout the course of the brokerage relationship, InfoSpace desired to invest only in short-term, low risk securities, the positions of which could be easily liquidated at any given time. LBI marketed auction rate securities ("ARS") to InfoSpace as an investment that offered better yields as compared with money market funds, but which were comparable in liquidity to money market funds.

3. Concurrent with the execution of the Cash Management Agreement on December 9, 2003, the parties executed an Investment Advisory Agreement (the "Investment Advisory Agreement"). The Investment Advisory Agreement gave LBI the authority to invest the

Account funds in its discretion, subject to the limitation that all investments fell within the parameters of a written and board approved Investment Policy provided by InfoSpace (the "Investment Policy). The Investment Policy defined InfoSpace's conservative investment objectives for the Account in the following order of priority: (1) safety and preservation of capital; (2) liquidity sufficient to meet cash flow requirements; (3) maximization of yield, while remaining in secure investments; and (4) a portfolio structure which provides flexibility, liquidity and ease of management.

4.      Throughout its course of dealing with InfoSpace, LBI invested millions of dollars of InfoSpace Account funds in ARS. In making these investments, LBI represented ARS as low risk liquid securities that were a suitable alternative to money market funds and complied with the Investment Policy. Based on these representations, and in reliance on LBI's professional experience and advice, InfoSpace invested, and maintained its investment, in ARS.

5.      Contrary to the representations made by LBI, and unbeknownst to InfoSpace, the ARS invested for the Account were in fact, unreasonably risky, complex, highly structured investments, which ran contrary to InfoSpace's core objectives and were unsuitable and inappropriate under the Investment Policy. Further investigation reveals that LBI failed to disclose to InfoSpace material facts about the ARS market and the particular ARS purchased for the Account, of which InfoSpace was unaware, and which LBI knew or should have known existed at the time of making these investment decisions. Specifically, LBI failed to inform InfoSpace that: (1) ARS were not cash equivalents or suitable alternatives to money market funds; (2) the continuing liquidity of ARS was uncertain because it was completely dependant on LBI supporting the ARS market; (3) no real secondary market for ARS existed and most of the auctions for the ARS would be certain to fail but for LBI acting as a backup buyer for the ARS;

(4) ARS would become illiquid if LBI ceased to support the ARS market; and (5) in the event of a failed auction, the rate reset of the ARS might not adequately compensate InfoSpace for the loss of liquidity of the ARS.

6.      On August 28th, 2007, LBI stopped supporting the auctions for the ARS it sold to InfoSpace and many other investors. In a matter of days, $40,430,000 of InfoSpace funds, which were in the form of ARS, became illiquid due to auction failures.

7.      The recent report of the Examiner, as well as a number of recent articles and books, including "*A Colossal Failure of Common Sense: The Inside Story of the Collapse of Lehman Brothers*," by Lawrence McDonald (Crown Business, 2009), a former vice president of Lehman Brothers, indicate that as early as 2005 and 2006, and certainly early in 2007, senior Lehman Brothers officers were aware that the United States was facing a massive real estate bubble and that Lehman faced significant exposure, on sub-prime and Alt-A residential mortgages originated by Lehman's mortgage origination affiliates BNC Mortgage, Inc. and Aurora Loan Services, LLC.

8.      Lehman, via its primary mortage subsidiaries, originated both sub-prime mortgages, via BNC Mortgage, Inc. and "Alt-A" mortgages[1], via Aurora Loan Services, LLC. Lehman Brothers then shifted the risks of these mortgages by selling them off to investors. However, Lehman has risk that it could not securitize the mortgages or sell the RMBS to third parties, in which case they stayed on Lehman's own balance sheet, as "retained interests." The Examiner's report shows that in late 2006, Lehman's non-investment grade retained interests grew sharply as investors great cautious about purchasing RMBS bonds backed by sub-prime mortgages. At this point, Lehman's trading desk was struggling to sell the residuals and the non-

---

[1] A loosely defined category of mortages between prime and subprime designated for borrowers with good credit records who did not meet standard guidelines for documentation requirements.

investment grade bonds. Moreover, the report says that Lehman's mortgage business began to experience increases in repurchase requests, rises in delinquency rates and a spike in first-payment defaults.

9. In late January, 2007, Lehman's residential mortgage analyst said that "Looking at the trends on originations and linking them to first payment defaults, the story is ugly. During the last four months Aurora has originated the riskiest loans ever, with every month being riskier than before – the industry meanwhile has pulled back during that time."

10. The Examiner's report says that his financial advisors estimated the losses from Lehman's residential mortgage positions from the first quarter of 2007 through the third quarter of 2008 at a staggering $7.4 billion.

11. McDonald was Vice President, Distressed Debt and Convertible Securities Trading. He wrote that Michael Gelband, managing director and global head of fixed income at Lehman Brothers, had shared Gelband's view, with McDonald and others at Lehman, in June, 2005, that the U.S. real estate market would plunge down the road. McDonald writes that in June, 2007, Lehman had to take a 5% discount on the sale of a $2 billion CDO to sell the CDO; in other words, take a $100 million haircut, to sell off a "hung" CDO.[2] And, that Lehman also knew then that there were derivative problems over at Citigroup and Bank of America. He writes that Lehman also knew Merrill Lynch had 19 hung CDOs which Merrill was having trouble selling off at the right price. And, at the end of June 2007, the 3-month LIBOR went from 5.36% to 5.95%, the biggest move in three month LIBOR since Long Term Capital Management went under in 1998, causing Lehman to trim many of its own long positions. Shortly thereafter, in July, 2007, two of Bear Stearns' hedge funds went bust.

---

[2] The CDO may actually have been residential mortage backed securities (RMBS) originated by Lehman subsidiaries.

12. These materials indicate that LBI knew, or should have known, prior to August, 2007, that LBI and its affiliates could no longer support the auction-rate-securities auctions, yet this crucial information was withheld from InfoSpace and other clients.

13. The recent report of the Examiner, as well as a number of recent articles and books, including "*A Colossal Failure of Common Sense: The Inside Story of the Collapse of Lehman Brothers*," by Lawrence McDonald (Crown Business, 2009), a former vice president of Lehman Brothers, indicate that as early as 2005 and 2006 several senior Lehman Brothers officers were aware that the United States was facing a massive real estate bubble and that Lehman faced significant exposure on its derivative positions. These materials indicate that LBI knew, or should have known, prior to August, 2007, that LBI and its affiliates could no longer support the auction-rate-securities auctions, yet this crucial information was withheld from Infospace and other clients.

14. The commencement of LBI's SIPA proceeding on September 15, 2008 and LBH's bankruptcy proceeding on September 19, 2008 invoked the protection of the "automatic stay" as to both LBI and LBH. Thus, the "automatic stay" of Section 362 of the Bankruptcy Code is now in place as to LBI and LBH.

15. On May 29, 2009, InfoSpace timely filed a Proof of Claim against LBI in Case No. 08-01420 (JMP) SIPA seeking damages in an amount of $39,730,020, incurred as a result of LBI's purchase of ARS for Infospace's account (the "LBI Proof of Claim"). In support of its Proof of Claim, Lehman attached a Statement of Claim asserting the liability of Lehman, and Lehman representatives Tim Ford and Kevin Laurie for: (i) breach of contract; (ii) breach of fiduciary duties of care and loyalty; (iii) unsuitability of investments under the Investment Policy; (iv) unauthorized trading on behalf of InfoSpace; (v) negligent misrepresentation and

omission; (vi) failing to supervise the employees who handled the InfoSpace matters; and (vii) conversion of InfoSpace's possessory interest in the funds (the "Statement of Claim").

16. On September 21, 2009, InfoSpace filed a protective Proof of Claim with this Court, for the actions and inactions of LBH, in directing or controlling its subsidiary, LBI and the employees thereof, to engage in the conduct and practices which injured InfoSpace. InfoSpace's claims against LBH include those actions and inactions of LBH, including, without limitation, failure to supervise, which led to InfoSpace's independent claims against LBI.

### The Debtors' Motion

17. The Debtors request approval of claims and alternative dispute resolution ("ADR") procedures, which would require claimants in certain instances, and at the Debtors' discretion, to mediate their claims.

18. The Motion describes the claims reconciliation process as triggered by the Debtors' objection to a claim (each, a "Contested Claim"). If Debtors object on the basis that a Contested Claim fails to properly state a claim, the court will schedule a sufficiency hearing (the "Sufficiency Hearing"). However, Debtors' may elect to forego the Sufficiency Hearing and send claimant directly to ADR or a Merits Hearing. If the Debtors' objection is based on the merits of a Contested Claim, then at the Debtors' discretion, a claimant must participate in compulsory, non-binding mediation governed by the ADR Procedures.

19. Debtors must provide notice to claimants and mediation must follow within 60 days of service of the notice. If the Debtors and the claimant are unable to settle a claim through mediation, or if the Debtors, in their sole discretion, elect to bypass mediation, the parties will advance to an evidentiary hearing before the Court on the merits of a claim (the "Merits

Hearing"). The ADR Procedures do not set a mediation deadline, prescribing that mediation will conclude at the mediator's discretion.

20.     Debtors also propose a temporary litigation injunction that will take effect immediately upon the service of an objection to a claim. The injunction is extremely broad in scope, enjoining a claimant from "commencing or continuing any action or proceeding, or engaging in any discovery, in any manner in any place . . . seeking to establish, liquidate, collect on, or otherwise enforce any and all Contested Claims." The injunction only expires upon either settlement of a claim or, if the ADR Procedures do not yield a settlement, upon entry of a scheduling order for a Merits Hearing.

## Argument

21.     While mediation is not objectionable in general, the ADR Procedures promulgated by Debtors must be modified to protect the rights of InfoSpace and avoid an improper imbalance favoring the Debtors.

### A. The Mediation Cannot Continue Indefinitely.

22.     Given that the ADR Procedures impose a temporary litigation injunction while the parties are mediating, it becomes essential to ensure that there is an appropriate end date to the mediation process so that the mediation process itself never becomes a litigation tactic. Although mediation must begin within 60 days of notice, there is no guidance for the mediator regarding when mediation must terminate. Objector proposes that mediation and the temporary litigation stay should conclude automatically after the first mediation session, unless both parties agree that it would be beneficial to conduct additional mediation sessions.

### B. The Court May Intervene If the Debtors Cause Undue Delay.

23. The proposed ADR Procedures give Debtors unlimited discretion to select the determination procedure, be it mediation, Sufficiency Hearing or a Claims Objection Hearing, with which the claimant must proceed. The Debtors' total control of scheduling matters also gives the Debtors the potential opportunity to delay the reconciliation and resolution of a claim without regard for the expenditure of resources on the part of a claimant. The Procedures should be amended to allow claimants the option to seek relief from the ADR Procedures from the Court if they believe in good faith that there is undue delay or abuse of the ADR Procedures.

### C. The Mediation and Injunction Must Be Claim Specific.

24. As proposed the temporary litigation injunction applies to all of the claimant's claims. The ADR Procedures should be amended to limit the temporary litigation injunction to the claims that are the subject of mediation.

### D. More Detail Is Needed Regarding the Evidentiary Hearing.

25. If mediation is unsuccessful, the Parties are directed to resolve a Contested Claim through an evidentiary hearing before the Court. *See* ADR Procedures at ¶1. However, the various hearings proposed in Debtors' Motion are not adequately articulated and as such are not distinguishable from one another. The ADR Procedure must be amended to distinguish between a Merits Hearing and a Claims Objection Hearing. The ADR Procedures should be modified further to set requirements and procedures for such hearings.

26. There should be a Scheduling Order in the contested matter which allows at least 180 days for discovery, insofar as $40 million plus is at issue. That order should also set dates for the exchange of witness and exhibit lists, the date for a pre-trial conference, and the date for a subsequent evidentiary hearing, etc.

WHEREFORE, the Objector pray that the Motion be DENIED, absent modifications of the nature set forth herein, and for such other and further relief as is just and proper.

Dated: April 6, 2010                                        Respectfully Submitted,

*/s/ Kenneth J. Kelly*

_____
Kenneth J. Kelly, KK 4195
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500

Counsel to the Objector

OF COUNSEL:

David B. Tatge, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25TH Street, N.W., Suite 700
Washington, D.C.  20037
(202) 861-0900