WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------------x
                                              :
In re                                         :    Chapter 11 Case No.
                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,        :    08-13555 (JMP)
                                              :
                Debtors.                      :    (Jointly Administered)
                                              :
                                              :
-------------------------------------------------------------------x
```

### DEBTORS' REPLY IN FURTHER SUPPORT OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 362 OF THE BANKRUPTCY CODE FOR AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST AND COMPELLING PAYMENT OF POST-PETITION FUNDS BY SWEDBANK AB

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Reply to the Objection of Swedbank AB (the "Objection") [Docket No. 6976] and in further support of the Debtors' Motion Pursuant to Sections 105(a) and 362 of the Bankruptcy Code for an Order Enforcing the Automatic Stay and Compelling Payment of Post-Petition Funds by Swedbank AB [Docket No. 6734] (the "Motion"), and respectfully state:

**Preliminary Statement**

1.  By its Objection, Swedbank attempts to transmute the Debtors' straightforward application for the return of post-petition deposits in a commercial bank account into a sideshow predicated on its misguided reliance on the Bankruptcy Code's safe harbor provisions. The Court should not be side-tracked by Swedbank's meritless arguments.

2.  As demonstrated in the Motion and the Objection, Swedbank intends to set off alleged *pre-petition* obligations of LBHI arising under certain swap agreements against unrelated funds deposited *post-petition* in LBHI's Swedbank Account.[1] Swedbank's proposed setoff – and Swedbank's administrative freeze of the Swedbank Account pending such setoff – violate the automatic stay. Despite Swedbank's attempt to cloak its illicit setoff with safe-harbored immunity, the setoff is neither protected by the safe harbor provisions contained in sections 560 or 561 of the Bankruptcy Code nor exempt from the requirements of section 553.

3.  The so-called safe harbor provisions in sections 560 and 561 of the Bankruptcy Code provide an exception to the automatic stay *only* for the netting of amounts owed under *specified* derivative contracts and *only* under specific limited circumstances. Specifically, section 560 protects the setoff or netting of "termination values or payment amounts" *only* where *both* the debt and the claim that the counterparty seeks to set off arise *"under or in connection with* the liquidation, termination or acceleration of one or more swap agreements." 11 U.S.C. § 560 (emphasis added). Similarly, section 561 protects the setoff of "termination values, payment amounts or transfer obligations" that *both* arise *"under or in connection with one or more"* specifically-identified derivative contracts. 11 U.S.C. § 561(a) (emphasis added). There is no dispute that Swedbank's obligation to pay LBHI the over SEK 82

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

million (over $11.7 million)[2] contained in the Swedbank Account does not arise "under or in connection with" a swap agreement or any other derivative contract and that Swedbank's proposed setoff has nothing to do with "the liquidation, termination or acceleration" of any such agreement. A fortiori, the safe harbor provisions do not protect setoff against that account.

        4.        Swedbank's proposed setoff is also prohibited by section 553, which expressly limits all setoffs against a debtor to those of pre-petition *mutual* claims. Swedbank does not dispute that, as demonstrated in the Motion, no mutuality exists between LBHI's alleged pre-petition obligations to Swedbank and the funds deposited and/or wired into LBHI's Swedbank Account after the Commencement Date. As further demonstrated below, Swedbank has not, and cannot, cite any authority that supports its erroneous contention that sections 560 and 561 of the Bankruptcy Code, even were they to apply, exempt Swedbank's proposed setoff from the mutuality requirement.

        5.        Accordingly, despite Swedbank's contention that its setoff is permitted by the safe harbor provisions, it is clear that (i) the safe harbor provisions do not protect Swedbank's freeze of the Swedbank Account or its offsetting against any funds contained in that account; (ii) Swedbank's proposed setoff is precluded by section 553 of the Bankruptcy Code; and (iii) Swedbank's actions to date constitute violations of the automatic stay.

---

[2] The Debtors contend that SEK 82,765,466.45 were deposited and/or credited to the Swedbank Account after the Commencement Date, while Swedbank contends that SEK 82,266,239.79 were deposited post-petition. That amounts to a difference of SEK 499,226.66 (approximately $71,000 based on a Reuters conversion rate of 1 SEK to 0.142240 USD on 1/11/10 at 3:22 p.m. EST). The Debtors reserve their right to contest Swedbank's calculation of post-petition deposits and have requested that Swedbank provide them with account statements from September 12, 2008 through the present in order to better assess the amount of deposits and/or credits made after the Commencement Date. Without conceding that Swedbank's calculation of post-petition deposits is correct and with a full reservation of all their rights and claims regarding the safe harbor defense, the Debtors are prepared to limit the relief they are seeking under the Motion to SEK 82,266,239.79 and any other amounts that Swedbank agrees was deposited and/or credited to the Swedbank Account after the Commencement Date.

3

6. Notably, the Objection speaks volumes about the facts and legal allegations that Swedbank silently concedes. Swedbank does not and cannot dispute that: (i) it unilaterally placed an administrative freeze on LBHI's Swedbank Account at least sixteen months ago without seeking relief from the automatic stay; (ii) section 553 of the Bankruptcy Code precludes the setoff of non-mutual obligations, i.e., the setoff of pre-petition obligations against post-petition funds; (iii) LBHI's alleged pre-petition obligations to Swedbank and Swedbank's obligation to pay LBHI the amounts deposited in the Swedbank Account after the Commencement Date are not mutual debts as required by section 553; and (iv) over SEK 82 million were deposited and/or credited to the Swedbank Account after the Commencement Date. In addition, Swedbank does not dispute that the Swedbank Account is a general deposit account and does not contend that the account arises under or is related to the termination, liquidation or acceleration of a swap agreement or any other derivative contract. Despite these undisputed facts, Swedbank intends to set off LBHI's alleged pre-petition obligations against the post-petition deposits contained in the Swedbank Account, and in fact, *already* exercised a setoff of SEK 370,012 (approximately $52,000) against the funds in that account. *See* Teng Decl., Exh. B (indicating debit of SEK 371,012 to Swedbank on 12/1/08) and Exh. D at Appendix (11/27/08 Letter from Swedbank to LBHI); *see also infra* ¶ 18-19. Swedbank's actions are in clear violation of the automatic stay and it cannot seek refuge in the narrowly-construed safe harbor provisions.

7. The Court should not condone Swedbank's violations; rather, the Court should compel Swedbank to immediately release the administrative freeze from all funds deposited and/or wired into the Swedbank Account after the Commencement Date and immediately pay all such funds to LBHI.

4

**Swedbank's Administrative Freeze of and Proposed Setoff
Against the Funds Contained in the Swedbank Account
<u>Violate the Automatic Stay And Are Not Insulated by the Safe Harbor Provisions</u>**

8.  Swedbank argues that sections 553 and 362 do not apply to its setoff against the Swedbank Account because it is owed certain amounts by LBHI under various "swap agreements" and "master netting agreements," and thus, sections 560 and 561 protect its asserted rights of setoff.[3] Objection ¶¶ 2, 21. Swedbank's argument is not supported by the language or purpose of the safe harbor provisions.

9.  The specific language of section 560 protects only limited setoff rights by a swap participant. Specifically, the relevant portion of section 560 provides that:

> The exercise of any contractual right of any swap participant . . . to offset or net out any *termination values or payment amounts arising under or in connection with the termination, liquidation or acceleration of one or swap agreements* shall not stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title.

11 U.S.C. § 560 (emphasis added). The United States Supreme Court held in *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 243 (1989) that, "[t]he plain meaning of legislation should be conclusive, except in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." Any plain reading of the language of section 560 shows that it protects setoff only where *both* the debt and claim "aris[e] *under or in connection with the termination, liquidation or acceleration* of one or more swap agreements." *See* 11 U.S.C. § 560 (emphasis added). The Swedbank Account, against which Swedbank intends to offset claims arising under certain swap agreements, is a general deposit

---

[3] While the Debtors do not in this Reply contest the amounts that Swedbank claims are due under the various ISDA Master Agreements, including an ISDA Master Agreement with Lehman Brothers International (Europe), a non-debtor in these proceedings, the Debtors reserve their right to contest, object to, or otherwise challenge the amounts sought by Swedbank under such agreements.

5

account with no relationship whatsoever to a swap agreement, or specifically, to the "termination, liquidation or acceleration of" a swap agreement. *See* Teng Decl. ¶ 3. It is not sufficient, as Swedbank insists, that LBHI's alleged debts arise under swap agreements, *see* Objection ¶ 24; Swedbank's obligation to LBHI that it seeks to setoff must as well. Here, it does not.

        10.     In addition to relying on section 560, Swedbank contends that section 561 permits setoff against the Swedbank Account. Objection ¶¶ 21-24. The relevant language of section 561, however, is nearly identical to the language in section 560 and does not by any stretch permit setoffs against sums, and in particular *post-petition* sums, in an unrelated commercial bank account. Section 561 simply extends the setoff rights available for swap participants in section 560 to permit the exercise of setoffs arising under and across various derivative products. Specifically, section 561 protects "any contractual right . . . to offset or net *termination values, payment amounts, or other transfer obligations arising under or in connection with one or more (or the termination, liquidation, or acceleration of one or more)*" securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements, or master netting agreements. 11 U.S.C. § 561(a) (emphasis added). As made clear by its text, section 561 protects the setoff or netting of obligations *only* under one or more specifically-identified derivative contracts. In other words, a counterparty that has one or more forward contract, swap agreement, repurchase agreement, commodity contract, or securities contract may exercise the rights specified in section 561 (including netting and offset) with respect to all its obligations under those agreements.[4] Given the statutory limitation of its reach

---

[4] Indeed, section 561(b) states that unless a right was exercisable under section 555 (securities contracts), 556 (forward contracts and commodity contracts), 569 (repurchase agreements) or 560 (swap agreements) it would not be exercisable under 561. As such, Congress never intended that section 561 do anything more than extend rights *already available* under section 555, 556, 559 and 560. As Congressman James A. Leach noted, "[w]ith regard to the cross product netting provisions, nothing in this title expands netting

6

*to only those agreements,* section 561, like section 560, does not protect setoff against unrelated funds deposited in an ordinary bank account, such as the Swedbank Account.

11. This reading of sections 560 and 561 is supported by the overall purpose behind the enactment of section 560 (in 1990) and section 561 (in 2005). Swedbank correctly observes that the safe harbor provisions were intended to "provide certainty for swap transactions and thereby stabilize the domestic markets by allowing the terms of the swap agreement to apply notwithstanding the bankruptcy filing." *See* Objection ¶ 26 (quoting 136 Cong. Rec. S7535 (remarks of Sen. DeConcini)). Swedbank fails to recognize that a setoff against a general deposit account is not the type of setoff that Congress protected. As explained in a House Report, the "setoff process" that Congress exempted from the automatic stay was the reconciling process between two counterparties following the termination, liquidation, or acceleration of their swap transactions:

> At the end of the swap agreement term, or upon default, the total of the periodic fluctuations, measured at specified periods during the term, are calculated, the amounts the first party owes to the second are set off against the amounts the second party owes the first, and the net sum owing from one party to the other is "netted out."

Act of June 25, 1990, H.R. Rep. 101-484, 3, *as reprinted in* 1990 U.S.C.C.A.N. at 225 (also available at 1990 WL 92539 (1990)). By enacting the safe harbor provisions, Congress addressed concerns that the "termination and setoff of a swap agreement would be automatically stayed when one of the parties files a bankruptcy petition," and that a trustee, "after indefinitely postponing termination of the swap agreement, could refuse setoff and unfairly 'cherry pick' only the portions of the agreement advantageous to the debtor, while rejecting the portions

---

to any new contracts." *Bankruptcy Reform Act of 1999 Hearing* (Part III), Hearing before Subcommittee on Commercial and Administrative Law of the Committee on the Judiciary House of Representatives, 106th Cong., 1st Sess. on H.R. 833, March 18, 1999 at 6 (statement of Hon. James Leach).

unfavorable to the debtor." *Id.* These concerns bear no relationship to Swedbank's ordinary commercial debts to LBHI with regard to the Swedbank Account.

12. Despite the limiting language and purpose of sections 560 and 561, Swedbank argues that these provisions protect the exercise of "'any' contractual right, whenever arising," and thus, "there is *no limit on the type of obligation* against which a master netting agreement counterparty can set off against . . . ." *See* Objection ¶ 23-24 (emphasis added). Swedbank could not be more wrong. First, Swedbank ignores that this Court has held that section 560 (and by extension 561) does not protect "*any* contractual right." *In re Enron Corp.*, 306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004) (holding section 560 does not provide swap participants with "unqualified right[s]"); *see also Calpine Energy Servs. v. Reliant Energy Elec. Solutions*, No. 05-60200(BRL), Adv. Proc. No. 08-1251(BRL), 2009 WL 1578282, *6 (Bankr. S.D.N.Y. May 7, 2009) (holding that analogous section 556 does not protect all contractual rights, but only those specified in the statute). Second, the statutory language of sections 560 and 561 demonstrates that the exercise of "any contractual right" to setoff obligations is expressly limited as described in those provisions. In fact, the author of the very article cited by Swedbank recognized that the safe harbor provisions *do not* permit a creditor to offset the debtor's obligation under a swap agreement against *any* obligation owed by the creditor to the debtor. *See* Edward R. Morrison & Joerg Riegel, *Financial Contracts and the New Bankruptcy Code: Insulating Markets from the Bankrupt Debtors and Bankruptcy Judges,* 13 Am. Bankr. Inst. L. Rev. 641, 657-658 (2005) (*"Morrison"*) (explaining the safe harbor protections "should not shelter ordinary commercial transactions"). Rather, they protect setoff only to allow the

8

liquidation, termination, and acceleration of obligations owed under the specifically-designated agreements.[5]

13. Under Swedbank's interpretation, a creditor that is in-the-money on a swap could at any time, and without relief from the stay, reduce its in-the money position by virtue of a setoff against *any* obligation the debtor owes the creditor, including, for example, an obligation on an ordinary sales contract. That is exactly what Swedbank seeks to do – recover dollar-for-dollar payment from LBHI by *unilaterally deducting post-petition sums* from LBHI's Swedbank Account. Such a result does not further the purpose of the safe harbor provisions and defeats the purpose of the automatic stay – to prevent creditors from arrogating property of the estate to themselves to the detriment of other creditors. *See In re Drexel Burnham Lambert Group, Inc.,* No. 90B-10421, 1990 WL 302177, *5 (Bankr. S.D.N.Y. Dec. 14, 1990) ("The automatic stay 'also protects creditors'' interests by preserving their relative positions and preserving the remains of the debtor's estate against unsupervised dissipation through a 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts'"); *see also In re Masterwear Corp.*, 229 B.R. 301, 311 (Bankr. S.D.N.Y. 1999) ("[Setoff] operates to prefer one creditor over every other."); *In re Garden Ridge Corp.*, 338 B.R. 627, 633 (Bankr. D. Del. 2006) (setoff "elevate[s] an unsecured claim to secured status"), *aff'd,* 399 B.R. 135 (D. Del. 2008).

---

[5] Grasping for straws, Swedbank relies on an article in the American Bankruptcy Institute Law Review to argue that there are no limits on its asserted post-petition right of setoff. *See* Objection ¶ 23 (quoting *Morrison*). The complete sentence, which was omitted by Swedbank, reads, "Nothing in the Code places an explicit limit on a counterparty's *post-petition* rights (termination, liquidation, and setoff) under a fraudulent transaction." *Morrison* at 658 (emphasis in original). Here, Morrison explains that safe harbor provisions in section 546 do not apply in cases of actual fraud under section 548(a)(1)(A) and that nothing specifically curtails *post-petition* rights under a fraudulent transaction. *Id.* The statement quoted by Swedbank, therefore, is limited to post-petition rights under *fraudulent transactions,* which are not at issue here.

14. Finally, it is well-established that exceptions to the automatic stay, including the safe harbor provisions, are to be narrowly construed, with the creditor shouldering the burden of proof. *In re Enron Corp.,* 314 B.R. 524, 534 (Bankr. S.D.N.Y. 2004) (exceptions to the automatic stay are narrowly construed); *Pearce v. E.L.W. Corp.,* 400 B.R. 126, 131 (Bankr. N.D. Iowa 2009) ("Defendants have the burden of proof regarding the applicability of any § 362(b) exceptions to the automatic stay."); *In re Amcor Funding Corp.,* 117 B.R. 549, 552-53 (D. Ariz. 1990) (exceptions to the stay apply "in circumscribed situations in which Congress has determined that automatic imposition of a stay would pose unacceptable hardships or risks"). Swedbank cannot meet this burden. It is undisputed that the Swedbank Account is a general deposit account with no relation whatsoever to a derivative contract and that the setoff Swedbank seeks to exercise has nothing to do with the netting of obligations upon the "termination, liquidation or acceleration" of any such contract, the only setoff or netting process protected by sections 560 and 561. Accordingly, the safe harbor provisions do not insulate Swedbank's administrative freeze or setoff against the funds deposited in the Swedbank Account.

### Section 553 Does Not Exempt Swedbank's Setoff from the Mutuality Requirement

15. Without citing any authority, Swedbank argues that sections 560 and 561 render the requirements of section 553 "wholly inapplicable." *See* Objection ¶ 31. Section 553(a) expressly preserves a creditor's right to:

> offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case. . . .

11 U.S.C. § 553(a). It is undisputed that section 553 protects the right of setoff, but *only* of mutual pre-petition claims. *See, e.g., In re Bennett Funding Group, Inc.*, 146 F.3d 136, 139 (2d Cir. 1998); *Lehman Bros. Holdings Inc. (DnB Nor Bank),* 404 B.R. 752, 757-58 (Bankr. S.D.N.Y. 2009). Nothing in the plain language of section 553 (or anywhere in the Bankruptcy

10

Code) permits any reading into it of an exception to the mutuality requirement for contractual setoff rights. *See In re SemCrude, L.P.,* 399 B.R. 388, 399 (Bankr. D. Del. 2009) (holding there is "nothing in the language of the Code upon which to" conclude "that there is a contractual exception to the 'mutual debt' requirement" and that "[a]bsent a clear indication from the text of the Code that such an exception exists, the Court deems it improper to recognize one."). Likewise, neither section 560 nor section 561 provides an exemption to the mutuality requirement of section 553. The exceptions for setoffs in sections 560 and 561 are merely temporal (not substantive) exceptions – they allow parties to exercise setoff despite the automatic stay and without seeking court relief from the stay – they do not provide counterparties with otherwise invalid non-mutual setoff rights. As recognized by Mark Brickell, Chairman of the International Swaps and Derivatives Association, the exceptions to the automatic stay for netting "[do]not interfere with the basic operation of the Bankruptcy Code" which "already preserves the right of setoff although requiring a court hearing." Hearing before Subcomm. on Courts and Admin. Practice of the Comm. of the Judiciary of the U.S. Senate, at 29 (testimony on April 11, 1989 in support of enacting the safe harbor provisions). Congress enacted sections 560 and 561 after it enacted section 553 and with full recognition of the mutuality requirement in section 553. Had Congress wanted to declare an exception to the rule that setoffs must be of mutual pre-petition claims, it would have done so. *See FDIC v. Hirsch,* 980 F.2d 125, 132-33 (2d Cir. 1992) (stating that Congress will "expressly designate the provisions whose application it wishes to suspend, rather than leave that consequence to the uncertainties of implication compounded by the vagaries of judicial construction").

16.     In support of its argument, Swedbank appears to rely on sections 553(a)(2)(B)(ii), 553(a)(3)(C), and 553(b)(1), which in some cases remove traditional limitations on setoff rights. *See* Objection ¶ 23. A simple review of these sections reveals that they are

11

inapplicable here. Section 553(a)(2)(B)(ii) and 553(a)(3)(C) disallow setoffs created by the assignment or transfer of claims and incurrence of debts in the 90 days prior to the petition date and section 553(b)(1) provides a means to recover setoffs that occurred pre-petition. None of these provisions addresses or attempts to address an administrative freeze or setoff imposed on *post-petition* funds owed to a debtor in possession *after* the petition date. Indeed, Swedbank cites no support for the contention that the safe harbor provisions provide a creditor the right to satisfy its pre-petition claims against a debtor from post-petition assets from a debtor in possession. Swedbank must, therefore, satisfy the requirements of section 553(a) to establish its right to setoff against post-petition funds contained in the Swedbank Account.

17. As demonstrated in the Debtors' Motion, the over SEK 82 million deposited and/or credited to the Swedbank Account after the Commencement Date lack the requisite mutuality with LBHI's alleged pre-petition obligations to Swedbank. *See* Motion ¶¶ 21-22. Accordingly, the post-petition funds in the Swedbank Account are ineligible for setoff and Swedbank should be compelled to pay such funds to LBHI.

### The Material Facts and Legal Conclusions Establishing Swedbank's Violations and Entitling the Debtors to Relief Are Not in Dispute

18. Swedbank does not contest the very facts and legal conclusions that demonstrate that Swedbank has and continues to violate the automatic stay. Swedbank does not dispute that it unilaterally placed an administrative freeze on the Swedbank Account shortly after the Commencement Date (over sixteen months ago) and has not sought relief from the automatic stay. Swedbank concedes that section 553 of the Bankruptcy Code precludes the offset of pre-petition obligations against post-petition funds, *see* Objection ¶ 23, and does not dispute that LBHI's alleged pre-petition obligations to Swedbank lack the requisite mutuality with the funds deposited and/or credited to the Swedbank Account after the Commencement Date. Finally, the Debtors and Swedbank agree that at least SEK 82 million were deposited into the Swedbank

Account after the Commencement Date, and thus, constitute post-petition funds belonging to the debtor in possession. *See* Objection ¶ 16. In an attempt to avoid the legal consequences to it arising from these undisputed matters, Swedbank seeks to divert the Court's attention from its contumacious conduct to the safe harbor provisions in order to justify its continued administrative freeze and intention to set off LBHI's alleged obligations against the funds deposited in the Swedbank Account post-petition, in violation of sections 362 and 553 of the Bankruptcy Code. Swedbank, however, does not and cannot dispute the very fact that renders the safe harbor provisions inapplicable – that the Swedbank Account is a general deposit account with no relation whatsoever to a derivative contract, and thus, the setoff process protected by sections 560 and 561. Finally, Swedbank also admits that it has already begun exercising setoffs without seeking relief from this Court. *See* Objection ¶ 17 (admitting some setoff was "already taken"), ¶ 35 (seeking determination that setoff already performed did not violate the automatic stay). Such blatant disregard for the automatic stay should not be condoned.

### Swedbank's Violation of the Automatic Stay Constitutes Grounds for Denying Any Alleged Right to Setoff

19. Swedbank has flaunted its violation of the automatic stay for at least sixteen months by placing on administrative freeze on the Swedbank Account without moving for relief from the stay. And, Swedbank *has already* offset LBHI's alleged obligations to Swedbank against the funds contained in the Swedbank Account. *See* Objection ¶¶ 17, 34. Even if Swedbank were able to establish that it had a valid setoff right – which it does not – Swedbank's utter disregard for the automatic stay, alone, constitutes sufficient grounds for denying any request for setoff. Indeed, Swedbank should be compelled to return any funds that it has already setoff in violation of the automatic stay.

20. Courts routinely have disallowed setoff and directed creditors to turnover the disputed funds to the debtor in cases, such as here, where the creditor has violated the

13

automatic stay. *See Shugrue v. Fischer,* 164 B.R. 839, 844 (Bankr. S.D.N.Y. 1994) (denying setoff and directing creditor to turnover funds where creditor's proof of claim "clearly evidences a decision to exercise the right of setoff without obtaining relief from the automatic stay"); *Official Comm. of Unsecured Creditors of Operation Open City, Inc. v. N.Y. Dep't of State*, 148 B.R. 184, 194 (Bankr. S.D.N.Y. 1992) ("In view of [the Creditor's] violation of the automatic stay, the [Creditor] must now turnover the Disputed Funds to the Debtor pursuant to § 542(a) of the Code.  To do otherwise would have the practical effect of holding that there is an automatic right to setoff."), *aff'd,* 170 B.R. 818 (S.D.N.Y. 1994).  *See Blava In-Line v. Midlantic Nat'l Bank/North*, 133 B.R. 33, 36 (Bankr. S.D.N.Y. 1991) ("The bankruptcy court should deny a setoff to those creditors who violate the automatic stay.") (citing *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 618 (2d Cir. 1989)).  Accordingly, the Court should grant the Debtors the relief sought in the Motion as well as compel Swedbank to return any funds that it has already set off in complete disregard for, and violation of, the automatic stay.

14

21.  WHEREFORE, for the foregoing reasons, the Debtors request that the Court enter an Order (i) enforcing the automatic stay and directing Swedbank to release the administrative freeze placed on all funds deposited and/or wired into the Swedbank Account after the Commencement Date;  (ii) compelling Swedbank to pay to LBHI, all amounts deposited and/or wired into the Swedbank Account after the Commencement Date;  (iii) compelling Swedbank to pay to LBHI, all amounts against which it has setoff LBHI's alleged obligations in violation of the automatic stay;  (iv) denying all relief sought by Swedbank in the Objection;  and (iv) such other and further relief that the Court deems just and proper.

Dated: April 9, 2010
      New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession