Hearing Date and Time: April 14, 2010 at 10:00 a.m.

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Jayant W. Tambe
Stephen Pearson
James K. Goldfarb
Benjamin Rosenblum

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re:                                                      :   Chapter 11
                                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                    :   Case No. 08-13555 (JMP)
                                                            :
                    Debtors.                                :   (Jointly Administered)
                                                            :
------------------------------------------------------------x

## DEBTORS' RESPONSE TO THE SUR-REPLY OF NORTON GOLD FIELDS LIMITED

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Commercial Corporation ("LBCC"), as debtor and debtor in possession (together with Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, the "Debtors"), files this response to the Sur-Reply of Norton Gold Fields Limited to Debtors' Reply in Support of Motion to Compel Performance by Norton Gold Fields Limited of its Obligations under an Executory Contract and to Enforce the Automatic Stay (the "Sur-Reply"), and respectfully states as follows:[1]

---

[1] Unless stated otherwise, capitalized terms used here have the definitions set forth in the Motion of the Debtors and Debtors in Possession pursuant to Section 105(a), 362, and 365 of the Bankruptcy Code to Compel Performance by Norton Gold Fields Limited of its Obligations under an Executory Contract and to Enforce the Automatic Stay (the "Motion").

## PRELIMINARY STATEMENT

1. Norton and LBCC are parties to a valid, binding contract – a gold price swap agreement, memorialized in an ISDA Master Agreement, along with the Schedule thereto, and various confirmations entered into thereunder (the "Agreement"). Norton does not deny that fact. Indeed, Norton continues to honor parts of the contract. Yet Norton believes that Section 2(a)(iii) of the Master Agreement permits it to suspend payment permanently in the event of an Event of Default, such as LBCC's or LBHI's bankruptcy filing or LBCC's supposed repudiation of the Agreement, or under the English law doctrine of promissory estoppel. Based on this reasoning, Norton refuses to pay $29,591,189.43 to LBCC.[2]

2. In the Motion and Reply, LBCC dispatched each of Norton's flawed explanations for why it may shirk its obligation to pay LBCC, while at the same time refuse to terminate the Agreement and continue to enjoy the Agreement's benefits. In the Sur-Reply, Norton attempts to rehabilitate just two of those arguments – repudiation and promissory estoppel. But Norton's attempts falter because they ignore fundamental bankruptcy principles, and rely on a warped interpretation of the Master Agreement and English law. For these reasons, those set forth in the Motion and Reply, and those set forth below, the Court should reject Norton's arguments, grant the Motion, and order Norton to honor its contract.

---

[2] In the Reply, LBCC cited a figure of $24,211,689.46. (See Reply ¶ 1 & n.2). Given the passage of time and the close of another quarterly settlement period under the Agreement, the amount of unpaid matured payments has risen to greater than $29 million. LBCC sent a detailed invoice to Norton on March 31, 2010, a copy of which is attached hereto as Exhibit A.

## ARGUMENT

**I.   NORTON'S INTERPRETATION OF REPUDIATION IS WRONG**

3.   LBCC demonstrated in the Reply that a non-repudiating party has only two options in the face of repudiation. It either may (i) accept the repudiation, terminate the contract, and pursue its remedies, or (ii) affirm the contract and perform it completely. Where, as here, the non-repudiating party fails to accept the repudiation, and continues to perform parts of the contract, the contract is affirmed, the repudiatory act is a nullity, and the non-repudiating party must perform completely. (*See* Reply ¶ 34).

4.   Norton does not deny that this is the effect of English law, which the parties agreed controlled the construction of the contract. (*See* Sch. Part 4(h)). Instead, Norton argues that the Master Agreement does not incorporate the English common law element of affirmation or acceptance – once LBCC (supposedly) said it would not perform, the repudiation provision of the Master Agreement was triggered, and Norton was entitled to suspend some, but not all, of its performance. (Sur-Reply at 1, ¶¶ 3-4, 8).

5.   As a threshold matter, the Court need not even reach Norton's interpretive argument because LBCC did not repudiate the Agreement. The communications (or absence of communications) on which Norton relied in its Objection to argue otherwise do not reflect – let alone clearly or unequivocally express – an intent on LBCC's part to not perform the contract. (*See* Reply ¶¶ 29-33). LBCC made the point in the Reply, but Norton ignores it in the Sur-Reply. For this reason alone, Norton's repudiation arguments fails.

6.   Even if the Court were to consider Norton's novel interpretation of the Master Agreement, Norton loses for several reasons. First, under controlling English law, the meaning of a term in a contract is not what one or other of the particular parties meant or understood by the words used, but "the meaning which the document would convey to a reasonable person

having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract." *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 at 912. In other words, English courts apply an objective, market-based test.

7. Under the objective test, the reasonable person would give "repudiation", as used in the Agreement, its common law meaning. Indeed, the plain language of the Master Agreement neither states nor suggests that, in the face of a repudiatory act, Norton may jettison the common law element of affirmation or acceptance and honor certain aspects of the Agreement, but ignore others at its choosing. Fundamentally, that is not what is permitted by English law. *See Suisse Atlantique Société d'Armement Maritime S.A. v NV Rotterdamsche Kolen Centrale* [1967] 1 AC 361, 398 (Lord Reid) ("Where the contract has been affirmed by the innocent party, at first sight the position is simple. You must either affirm the whole contract or rescind the whole contract: you cannot approbate and reprobate by affirming part of it and disaffirming the rest – that would be making a new contract."). If the framers of the Master Agreement wished to jettison the element of affirmation or acceptance, they would have expressed that intention clearly.[3]

8. Further, Norton cites no case law or learned commentary for the proposition that repudiation under the Master Agreement has a different meaning from repudiation under the common law. Nor does Norton advance any reason why that interpretation makes sense as a

---

[3] Norton argues that, under *Suisse Atlantique*, "the terms of the operative contract can provide for a different remedy than those available under common law and that those contractual rights may be relied upon by the innocent party." (Sur-Reply ¶ 6). But *Suisse Atlantique* does not stand for that broad proposition at all. It is specifically concerned with whether the *repudiating* party may rely on a provision limiting its liability when the non-repudiating party affirms the contract, either as a result of (i) construction of the clause limiting its liability (that is, evaluating whether that clause applies to the specific type of breach), or (ii) a rule of substantive law. It does not provide for the wider principle that Norton urges.

matter of policy. Absent some indication that the Master Agreement was intended to strike out on a different path, the better practice is to give "repudiation" its common law meaning.[4]

9. Next, Norton argues that the Master Agreement gives it the option of not terminating the contract, but suspending payment indefinitely. (*See* Sur-Reply ¶ 5). This misses the point. The option arises only upon a repudiation – meaning a repudiatory act that is accepted. Norton never accepted LBCC's alleged repudiatory acts (*see* Reply ¶ 36 n.12) – a fact Norton does not deny in the Sur-Reply. Instead, Norton affirmed the contract (*see id.* ¶ 35), which rendered "the alleged act of repudiation . . . wholly nugatory and ineffective in law." *Howard v Pickford Tool Co. Ld.* [1951] 1 K.B. 417, 421.[5] As a result, the alleged option to not terminate the contract, but to suspend payment indefinitely, never arose.[6]

10. Tacitly conceding that it never accepted LBCC's supposed repudiation, but has affirmed parts of the contract (*see* Reply ¶ 36 n.12), Norton tries to accept LBCC's alleged repudiatory act now by arguing that LBCC is engaged in a continuing repudiation – failing to enter the intra-quarterly weekly trades. (*See* Sur-Reply ¶ 9). But LBCC had no obligation to engage in such trades – a point raised in the Reply (*see* Reply ¶¶ 48-52), and ignored by Norton in the Sur-Reply. In any event, the filing of the bankruptcy petition cut off LBCC's obligation to

---

[4] Norton's suggestion that "affirmation" and "acceptance" are common law "remedies" that have been supplanted by the remedies set forth in the Master Agreement (*see* Sur-Reply ¶ 5) misapprehends the English law concept of "affirmation" or "acceptance" in the context of repudiation. It is an element of, not a remedy for, repudiation. Thus, a repudiatory act that is accepted gives rise to the remedy of terminating and suing for damages at common law.

[5] Norton contends that *Howard* and *Suisse Atlantique* are "inapplicable to this case" because they "address[] the common law right of repudiation . . . ." (Sur-Reply ¶ 3 n.1). As noted above, the Master Agreement incorporates the common law right of repudiation. Norton cites no authority and points to no policy reason that supports the opposite conclusion.

[6] Norton also argues that its performance of certain parts of the contract did not amount to an affirmation because, under the Master Agreement, Norton may suspend some, but not all, performance. (*See* Sur-Reply ¶ 8). This argument relies on the very point Norton is attempting to prove – that "repudiation" under the Master Agreement is different from "repudiation" under the common law. It is not (*see* ¶¶ 6-8, above), and the argument fails.

take any action under the Agreement and likewise cut off Norton's ability to suspend performance, post-petition, based on an alleged post-petition breach. *See generally* 11 U.S.C. §§ 362(a), 365.

11.     Finally, it would be inconsistent with the protections of the Code to allow a counterparty to charge a debtor with a continuing repudiation during the gap period. According to Norton's own case law, a continuing repudiation means "persisting in an earlier" "refusal to perform a contract". *Safehaven Investments Inc. v. Springbok Ltd* [1996] P. & C.R. 59, 69 (cited in Sur-Reply ¶ 9)). It can hardly be said that a debtor is persisting in refusing to perform the contract when it is, in the gap period, deciding whether to assume or reject the contract, as LBCC is doing here. If Norton found these circumstances not to its liking, it had the right to terminate timely under the Code's swap safe harbor provisions. Norton chose not to terminate so that it could avoid having to pay a substantial termination payment (*see* Mot. ¶ 3; Reply ¶ 35), and now it is too late to terminate. (*See* Mot. Ex. B [Metavante Tr., Sept. 15, 2009] at 111:23 to 112:2). Norton chose this course.

## II.     NORTON'S PROMISSORY ESTOPPEL ARGUMENT FAILS

12.     Norton relies on the English law doctrine of promissory estoppel to argue that LBCC may not demand payment now because it promised Norton in September 2008 that it would not enforce its right to payment, and Norton relied on that promise to its detriment. In the Reply, LBCC demonstrated that it made no such promise – let alone clearly or unequivocally, as is required to invoke the doctrine – and that Norton failed to show that it relied on any such promise to its detriment. (*See* Reply ¶¶ 41-44). Norton has no effective response.

13.     Norton argues that whether a promise was made is judged from the promisee's perspective. Norton then insists it "reasonably interpreted LBCC's actions and words as a promise to not exercise its right to payment." (Sur-Reply ¶ 10). But this self-serving

interpretation withers when exposed to the very words that Norton claims Lehman used. According to Norton, Lehman advised it that "the administrator *may come back and ask for all the cash* from the gold hedge contracts that have closed." (Brodie Decl. Ex. B (emphasis added); *see also* Obj. ¶ 119).[7] Thus, LBCC preserved the right to seek payment, and did not clearly promise not to seek payment. (*See* Reply ¶ 42). Norton offers nothing in response but its *ipse dixit* insistence.

14.    Turning to detrimental reliance, Norton argues that LBCC "failed to enter into further Weekly Variation Pairs" and Norton "lost the contract counterparty for which it bargained." (Sur-Reply ¶ 13). Putting aside that Norton is raising these allegations for the first time in its Sur-Reply,[8] neither allegation is availing. First, the Agreement does not require the parties to enter into Weekly Variation Pairs. (*See* Reply ¶¶ 48-52). Failing to do something that one was not obligated to do cannot be a detriment – at least not one chargeable to LBCC. Moreover, even if the parties had committed to engage in weekly trades, Norton fails to explain – let alone quantify – how it has been harmed by not entering into Weekly Variation Pairs.

15.    Likewise there is no merit to the argument that Norton lost the counterparty for which it bargained. As an initial matter, Norton provides no explanation as to what it means to "lose a counterparty" here, or how "losing a counterparty" here has worked a detriment to Norton.

---

[7] The Declaration of Simon Brodie was filed simultaneously with Norton's Objection.

[8] In the Objection, Norton claimed that it detrimentally relied when it passed on "opportunities for mergers and acquisitions" and "funding and growth opportunities", and because it "has been forced to accrue and incur costs associated with the management of the trusts and Notes underlying the Financing Transaction". (Obj. ¶ 122). In the Reply, LBCC demonstrated that neither form of detrimental reliance was sufficient to invoke the promissory estoppel doctrine. (*See* Reply ¶¶ 43-44). Norton makes no attempt to rehabilitate these reasons in its Sur-Reply. It simply abandons them and, for the first time, introduces two new allegations of detrimental reliance.

16. In any event, LBCC has not rejected the Agreement, and it has the financial wherewithal to satisfy its contractual obligations to Norton. As the Court held in connection with the *Metavante* matter:

> Lehman Brothers is sitting on a huge pile of cash. I don't know what today's numbers would reveal but it's something in the neighborhood of more than fifteen billion dollars. That is enviable liquidity. It is difficult for a counterparty dealing with a party such as Lehman Brothers and its affiliates to complain about meaningful economic risk associated with making a payment into that high a mountain of cash.

(*In re Lehman Bros. Holdings, Inc.*, Case No. 08-13555 (JMP), at 38:1-8 (Bankr. S.D.N.Y. Oct. 23, 2009) (Transcript) (denying motion of Metavante Corp. seeking adequate assurances from its counterparties)). Accordingly, Norton can hardly complain that LBCC will not have the financial ability to make payments to Norton if required.

17. In any event, Norton never responds to the threshold point that, even assuming LBCC made a promise, English law expressly recognizes that a debtor may retract its promise because the interest in marshaling the debtor's assets trumps the counterparty's interest in not being penalized for detrimentally relying. (*See* Reply ¶ 40). Thus, the Court need not even address Norton's vague and anemic detrimental reliance allegations.

## CONCLUSION

18. For the foregoing reasons, Norton can avail itself of neither the repudiation Event of Default nor the English law doctrine of promissory estoppel. Accordingly, the Court should grant the Motion, order Norton to pay the matured amounts (totaling greater than $29 million), and order Norton to continue performing completely under the Agreement.

Dated: New York, New York
April 9, 2010

Respectfully submitted,

/s/ James K. Goldfarb
Jayant W. Tambe
Stephen Pearson
James K. Goldfarb
Benjamin Rosenblum
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

# EXHIBIT A

# LEHMAN BROTHERS

Lehman Brothers Commercial Corp.
1271 Avenue of the Americas, 40th Floor
New York, NY 10020

## Invoice Summary

**Customer Information:**
Norton Gold Fields Limited

Attn: Andre Labuschagne
Phone: 61 (0) 7 3846 9200
Fax: 61 (0) 7 3846 9232
Email: alabuschagne@nortongoldfields.com.au

**Remit by wire to:**
Lehman Brothers Commercial Corp.
Bank: Citibank NA, New York
Acct: 3078-4782
ABA: 021000089
SWIFT: CITIUS33XXX
Ref: Norton Gold Fields

**Invoice Information:**
Invoice Number: 00001D
Invoice Date: March 31, 2010

Contact: Randley Gonzalez
Phone: (646) 285-9904
Email: randley.gonzalez@lehmanholdings.com

## Invoice Detail

| LBCC Ref # | Trade Date | Value Date | Cur | Amount | Cur | Amount | Trade Price | Strike Price | Trade Type | Buy/Sell | Call/Put | USD Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12875595 | 9/12/2008 | 9/16/2008 | XAU | 1,346 | AUD | 1,173,631 | 871.94 | 0 | FXD | B | | 111,380.00 |
| 12875596 | 9/12/2008 | 9/16/2008 | XAU | 1,346 | AUD | 1,247,486 | 926.81 | 0 | FXD | S | | -51,597.96 |
| 9777268 | 8/22/2007 | 9/26/2008 | XAU | 15,000 | AUD | 11,400,000 | 23.2175 | 760 | SMP | | P | $ - |
| 9817831 | 8/3/2007 | 9/30/2008 | XAU | 3,875 | AUD | 3,379,000 | 872 | 0 | FXD | B | | 678,853.50 |
| 9817811 | 7/25/2007 | 9/30/2008 | XAU | 3,875 | AUD | 3,332,500 | 860 | 0 | FXD | B | | 717,611.25 |
| 9817856 | 8/22/2007 | 9/30/2008 | XAU | 10,060 | AUD | 8,893,040 | 884 | 0 | FXD | B | | 1,661,771.16 |
| 11189137 | 2/21/2008 | 9/30/2008 | XAU | 17,500 | AUD | 15,312,500 | 875 | 0 | FXD | B | | 3,022,031.25 |
| 12275700 | 7/7/2008 | 9/30/2008 | XAU | 1,346 | AUD | 1,177,750 | 875 | 0 | FXD | S | | -232,437.38 |
| 12322500 | 7/11/2008 | 9/30/2008 | XAU | 1,346 | AUD | 1,177,750 | 875 | 0 | FXD | S | | -232,437.38 |
| 12384415 | 7/18/2008 | 9/30/2008 | XAU | 1,346 | AUD | 1,177,750 | 875 | 0 | FXD | S | | -232,437.38 |
| 12457345 | 7/25/2008 | 9/30/2008 | XAU | 1,346 | AUD | 1,177,750 | 875 | 0 | FXD | S | | -232,437.38 |
| 12517435 | 8/1/2008 | 9/30/2008 | XAU | 1,346 | AUD | 1,177,750 | 875 | 0 | FXD | S | | -232,437.38 |
| 12576177 | 8/8/2008 | 9/30/2008 | XAU | 1,346 | AUD | 1,177,750 | 875 | 0 | FXD | S | | -232,437.38 |

You are kindly requested to pay the amount shown to LBCC on Payment Date in immediately available funds, as per the instructions if Total Amount is due LBCC.
Please send invoice with payment instructions so payment may be processed timely if Total Amount is due Norton Gold Fields Ltd.

# LEHMAN BROTHERS

Lehman Brothers Commercial Corp.
1271 Avenue of the Americas, 40th Floor
New York, NY 10020

| ID | Date 1 | Date 2 | Ccy1 | Amt1 | Ccy2 | Amt2 | Rate | Type | Col1 | B/S | Col2 | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12648338 | 8/15/2008 | 9/30/2008 | XAU | 1,346 | AUD | 1,177,750 | 875 | 0 | FXD | S | | -232,437.38 |
| 12695197 | 8/22/2008 | 9/30/2008 | XAU | 1,346 | AUD | 1,177,750 | 875 | 0 | FXD | S | | -232,437.38 |
| 12756088 | 8/29/2008 | 9/30/2008 | XAU | 1,346 | AUD | 1,177,750 | 875 | 0 | FXD | S | | -232,437.38 |
| 12810454 | 9/5/2008 | 9/30/2008 | XAU | 1,346 | AUD | 1,177,750 | 875 | 0 | FXD | S | | -232,437.38 |
| 12872097 | 9/12/2008 | 9/30/2008 | XAU | 1,346 | AUD | 1,177,750 | 875 | 0 | FXD | S | | -232,437.38 |
| 11189152 | 2/21/2008 | 9/30/2008 | XAU | 17,810 | AUD | 15,604,540 | 876.1673 | 0 | FXD | S | | -3,058,235.94 |
| 9777269 | 8/22/2007 | 12/29/2008 | XAU | 15,000 | AUD | 11,400,000 | 25.195 | 760 | SMP | | P | $ - |
| 9817834 | 8/3/2007 | 12/31/2008 | XAU | 3,875 | AUD | 3,379,000 | 872 | 0 | FXD | B | | 958,678.10 |
| 9817809 | 7/25/2007 | 12/31/2008 | XAU | 3,875 | AUD | 3,332,500 | 860 | 0 | FXD | B | | 990,465.50 |
| 9817858 | 8/22/2007 | 12/31/2008 | XAU | 10,060 | AUD | 8,893,040 | 884 | 0 | FXD | B | | 2,406,327.86 |
| 11189132 | 2/21/2008 | 12/31/2008 | XAU | 17,500 | AUD | 15,312,500 | 875 | 0 | FXD | B | | 4,293,625.00 |
| 11189153 | 2/21/2008 | 12/31/2008 | XAU | 17,810 | AUD | 15,604,540 | 876.1673 | 0 | FXD | S | | -4,355,471.48 |
| 9777271 | 8/22/2007 | 3/27/2009 | XAU | 15,000 | AUD | 11,400,000 | 26.4375 | 760 | SMP | | P | $ - |
| 9817832 | 8/3/2007 | 3/31/2009 | XAU | 3,875 | AUD | 3,379,000 | 872 | 0 | FXD | B | | 1,245,611.00 |
| 9817812 | 7/25/2007 | 3/31/2009 | XAU | 3,875 | AUD | 3,332,500 | 860 | 0 | FXD | B | | 1,277,742.50 |
| 9817859 | 8/22/2007 | 3/31/2009 | XAU | 10,060 | AUD | 8,893,040 | 884 | 0 | FXD | B | | 3,150,349.36 |
| 11189138 | 2/21/2008 | 3/31/2009 | XAU | 17,500 | AUD | 15,312,500 | 875 | 0 | FXD | B | | 5,589,062.50 |
| 11189154 | 2/21/2008 | 3/31/2009 | XAU | 17,810 | AUD | 15,604,540 | 876.1673 | 0 | FXD | S | | -5,673,702.88 |
| 9777272 | 8/22/2007 | 6/23/2009 | XAU | 15,000 | AUD | 11,400,000 | 27.41 | 760 | SMP | | P | $ - |
| 9817835 | 8/3/2007 | 6/30/2009 | XAU | 3,875 | AUD | 3,379,000 | 872 | 0 | FXD | B | | 930,155.00 |
| 9817813 | 7/25/2007 | 6/30/2009 | XAU | 3,875 | AUD | 3,332,500 | 860 | 0 | FXD | B | | 967,587.50 |
| 9817861 | 8/22/2007 | 6/30/2009 | XAU | 10,060 | AUD | 8,893,040 | 884 | 0 | FXD | B | | 2,317,622.80 |
| 11189140 | 2/21/2008 | 6/30/2009 | XAU | 17,500 | AUD | 15,312,500 | 875 | 0 | FXD | B | | 4,158,437.50 |
| 11189157 | 2/21/2008 | 6/30/2009 | XAU | 17,810 | AUD | 15,604,540 | 876 | 0 | FXD | S | | -4,215,365.32 |

You are kindly requested to pay the amount shown to LBCC on Payment Date in immediately available funds, as per the instructions if Total Amount is due LBCC. Please send invoice with payment instructions so payment may be processed timely if Total Amount is due Norton Gold Fields Ltd.

# LEHMAN BROTHERS

Lehman Brothers Commercial Corp.
1271 Avenue of the Americas, 40th Floor
New York, NY 10020

| | | | | | | | | | | | | $ | - |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9777274 | 8/22/2007 | 9/28/2009 | XAU | 15,000 | AUD | 11,400,000 | 28.2625 | | SMP | | | | |
| 9817833 | 8/3/2007 | 9/30/2009 | XAU | 3,875 | AUD | 3,379,000 | 872 | | FXD | B | | | 917,155.15 |
| 9817816 | 7/25/2007 | 9/30/2009 | XAU | 3,875 | AUD | 3,332,500 | 860 | | FXD | B | | | 957,419.50 |
| 9817863 | 8/22/2007 | 9/30/2009 | XAU | 10,060 | AUD | 8,893,040 | 884 | | FXD | B | | | 2,276,521.66 |
| 11189139 | 2/21/2008 | 9/30/2009 | XAU | 17,500 | AUD | 15,312,500 | 875 | | FXD | B | | | 4,096,531.25 |
| 11189155 | 2/21/2008 | 9/30/2009 | XAU | 17,810 | AUD | 15,604,540 | 876.1673 | | FXD | S | | | -4,151,096.34 |
| 9777275 | 8/22/2007 | 12/28/2009 | XAU | 15,000 | AUD | 11,400,000 | 28.9025 | 760 | SMP | | P | $ | - |
| 9817838 | 8/3/2007 | 12/31/2009 | XAU | 3,875 | AUD | 3,379,000 | 872 | | FXD | B | | | 1,238,919.65 |
| 9817814 | 7/25/2007 | 12/31/2009 | XAU | 3,875 | AUD | 3,332,500 | 860 | | FXD | B | | | 1,279,742.00 |
| 9817865 | 8/22/2007 | 12/31/2009 | XAU | 10,060 | AUD | 8,893,040 | 884 | | FXD | B | | | 3,110,415.18 |
| 11189158 | 2/21/2008 | 12/31/2009 | XAU | 17,810 | AUD | 15,604,540 | 876.1673 | | FXD | S | | | -5,629,076.86 |
| 11189141 | 2/21/2008 | 12/31/2009 | XAU | 17,500 | AUD | 15,312,500 | 875 | | FXD | B | | | 5,549,031.25 |
| 11217659 | 8/22/2007 | 3/29/2010 | XAU | 15,000 | AUD | 11,400,000 | 28.9025 | 760 | SMP | | P | $ | - |
| 11200906 | 8/3/2007 | 3/31/2010 | XAU | 3,875 | AUD | 3,379,000 | 872 | | FXD | B | | | 1,201,804.90 |
| 9817817 | 7/25/2007 | 3/31/2010 | XAU | 3,875 | AUD | 3,332,500 | 860 | | FXD | B | | | 1,244,324.50 |
| 9817869 | 8/22/2007 | 3/31/2010 | XAU | 10,060 | AUD | 8,893,040 | 884 | | FXD | B | | | 3,009,654.22 |
| 11189156 | 2/21/2008 | 3/31/2010 | XAU | 17,810 | AUD | 15,604,540 | 876.1673 | | FXD | S | | | -5,455,783.65 |
| 11189143 | 2/21/2008 | 3/31/2010 | XAU | 17,500 | AUD | 15,312,500 | 875 | | FXD | B | | | 5,379,500.00 |

| **Total Amount Due LBCC:** | **USD 29,591,189.43** |
|---|---|

You are kindly requested to pay the amount shown to LBCC on Payment Date in immediately available funds, as per the instructions if Total Amount is due LBCC. Please send invoice with payment instructions so payment may be processed timely if Total Amount is due Norton Gold Fields Ltd.