# EXHIBIT "1"

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555 (JMP)


- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.

- - - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                January 30, 2009

                4:38 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2       EMERGENCY TELEPHONIC HEARING re Debtors' Emergency Motion for

3       an Order Pursuant to Section 362(a) of the Bankruptcy Code

4       Enforcing the Automatic Stay

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      Transcribed by:  Lisa Bar-Leib

3

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  SHAI WAISMAN, ESQ.

9

10   WEIL, GOTSHAL & MANGES LLP

11        Attorneys for Debtors

12        1395 Brickell Avenue

13        Suite 1200

14        Miami, FL 33131

15

16   BY:  NELLIE P. CAMERIK, ESQ.

17        ELISA LEMMER, ESQ.

18

19   MILBANK, TWEED, HADLEY & MCCLOY LLP

20        Attorneys for the Official Committee of Unsecured

21         Creditors

22        One Chase Manhattan Plaza

23        New York, NY 10005

24

25   BY:  DENNIS C. O'DONNELL, JR.

4

1

2    WINTHROP COUCHOT PROFESSIONAL CORPORATION

3        Attorneys for SCC Entities

4        660 Newport Center Drive

5        Fourth Floor

6        Newport Beach, CA 92660

7

8    BY:   PAUL J. COUCHOT, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    P R O C E E D I N G S

2            THE COURT:  This is by counsel for the debtors in

3    connection with an emergency motion and a proposed order to

4    show cause fixing a hearing to consider that motion.  Who's on

5    the line?

6            .   MR. WAISMAN:  Good afternoon, Your Honor.  For the

7    debtors, Lehman Brothers Holding Inc. and Lehman Commercial

8    Papers, Shai Waisman from Weil Gotshal & Manges.

9            MR. COUCHOT:  Good afternoon, Your Honor.  This is

10   Paul Couchot of Winthrop Couchot in Newport Beach, California

11   on behalf of the what is referred to in the motion as the SCC

12   entities.

13           THE COURT:  Is there anyone else on the line?  Is

14   there anyone else who needs to be on the line?

15           MR. WAISMAN:  Your Honor, Shai Waisman.  The

16   creditors' committee, I believe, is joining.  They might be

17   delayed just -- by last minute nature of our request.  I

18   believe they're intending to join.

19           THE COURT:  I don't want to start this until

20   everybody who should be on the line has already joined.  So

21   maybe we should take a five minute break until they join.  It

22   might be worth having somebody who has e-mail access or an

23   ability to call offline to check and find out the status of

24   their attempt to join the line.  And also, if you could tell me

25   who you think from the committee's team will be participating.

6

1          MR. WAISMAN:  Your Honor, we have somebody calling as

2     we speak.  My understanding is that it will be Dennis O'Donnell

3     of the Milbank firm for the committee.

4          THE COURT:  Okay.  Let's just wait for a minute or

5     two.

6          MR. WAISMAN:  Okay.

7       (Off the record)

8          THE COURT:  So I'll turn it over to Mr. Waisman to

9     explain what it is that he's seeking this afternoon.

10          MR. WAISMAN:  Thank you, Your Honor.  And thank you

11    to the Court and all the parties who are (indiscernible) on

12    such short notice.  Your Honor, what we are requesting is an

13    emergency motion enforcing the automatic stay in these Chapter

14    11 cases.  The Court has had involvement with this matter

15    before -- well, I'll briefly (indiscernible) through the facts

16    without belaboring the record.

17          THE COURT:  I'm actually familiar with the facts.

18    You can put this on the record if you wish but I have received

19    copies of the debtors' moving papers, the emergency motion and

20    the affidavit which you prepared as well as the proposed order

21    to show cause.  I note that there is an attachment of the

22    transcript from a hearing that I remember very well that took

23    place in November where Mr. Kessler was involved when he was

24    one of your partners on behalf of the debtors in opposing

25    relief from the stay being sought by the SSC (sic) parties.

7

1    And so, you can go through the facts if you wish but I'm

2    telling you now that I'm familiar with the facts.

3            MR. WAISMAN:  Okay, Your Honor.  Thank you.  And I'll

4    therefore make it very short.  As Your Honor pointed out, the

5    SCC entities brought on an expedited hearing before the Court

6    requesting a modification of the stay to proceed with

7    unfettered discretion in their cases because if they did not

8    have that relief they could (indiscernible) which immediately

9    befall the properties including various threats to health and

10   welfare.  As a result, this Court referred the matter for

11   expedited consideration on November 20th.

12           The movants made clear in that hearing that one of

13   the reasons they needed to seek relief from the stay or be

14   granted relief from the stay was because they intended to make

15   a motion in their case to use LCPI's cash collateral.  There

16   was lengthy discussion of that on the record.  At the

17   conclusion of the hearing, Your Honor -- and I was not

18   involved.  My partner, Mr. Kessler, who has since retired from

19   the firm, took the lead for LCPI in the matter but at the

20   conclusion, the Court was very clear with the SCC entities.

21   There were two ways to proceed.  Either they come back before

22   the Court with specific requests for relief that were clearly

23   tied to the Sonnax factors at which point the Court would

24   consider their requests and debtors' opposition, if any.  Or

25   the parties could work out their issues and settle the matter.

8

1    An order was entered subsequently, I believe, on the very next

2    day.  There was no appeal, no request for a rehearing.  And, in

3    fact, there was never a motion brought before Your Honor.

4            Quite astonishingly, instead of coming back to Your

5    Honor, the SCC entities decided about two months later to

6    disregard the automatic stay in these cases, disregard their

7    appearance before Your Honor, disregard Your Honor's

8    instruction, clear instructions as to how this matter was to

9    proceed, and filed a motion in their case, which is also

10   annexed to our emergency motion, and in the very first

11   paragraph, on page 2, paragraph 8, the first line, seeking

12   authorization for Palmdale Hills Property to use the surcharge

13   pursuant to 506(c) that purported cash collateral of Lehman

14   Commercial Paper Inc.  Lehman Commercial Paper Inc. remains a

15   debtor before this Court and the automatic stay remains in

16   place.  And we would ask that the automatic stay be enforced

17   and Your Honor's original order stand and that the SCC entities

18   not circumvent this Court and the automatic stay.  And if they

19   so choose to continue to prosecute a request for relief in cash

20   collateral do so in accordance with the Bankruptcy Code and the

21   directives of this Court.  And the SCC entities are, 'cause

22   they already have, likely a response that the stay has been

23   completely waived by actions in their cases and that we should

24   all forget what happened before Your Honor because the

25   California court has authority to modify the stay in these

9

1    cases.  This is exactly the position they've taken in their

2    case on this very issue.

3            THE COURT:  This is the first I'm hearing that.

4            MR. WAISMAN:  There have been -- in addition to this

5    motion, out of abundance of caution, LCPI responded in

6    California.  And its reply started off with there's an

7    automatic stay in place.  There was a hearing before Judge

8    Peck.  Judge Peck ruled and this is nothing more than an

9    attempt to circumvent the automatic stay and the Court's

10   ruling.

11           THE COURT:  Now just so I'm clear, Mr. Waisman, is

12   today's telephonic proceeding one in which you are seeking the

13   scheduling of a hearing or are you treating this as if it is

14   the hearing itself because I'm hearing what amounts to

15   substantive argument.  I'm just trying to understand what we're

16   doing.

17           MR. WAISMAN:  I'm treating this, Your Honor, as the

18   hearing itself.

19           THE COURT:  And is that something that --

20           MR. WAISMAN:  The SCC entities have requested to

21   proceed with their motion to use LCPI's cash collateral on

22   Tuesday of next week.

23           THE COURT:  Well, here's my confusion.  I just want

24   to make sure that I know what's going on.  And I was in another

25   meeting when I first heard about this.  Read the papers prior

10

1   to the start of this proceeding but when I read them, it was my

2   belief that you were seeking an order to show cause to schedule

3   this for a hearing sometime next week perhaps on Monday because

4   the order to show cause includes a blank date and indicates

5   that the motion is to be served on or before January 30 on all

6   parties entitled to receive notice of the motion.

7          So my first question is what are we doing right now.

8   And is this a consensual hearing on the merits of your motion

9   or is this is a consensual hearing with respect to the order to

10  show cause or is there no consent?  I just want to know what's

11  going on.

12         MR. COUCHOT:  May I speak, Your Honor?

13         THE COURT:  And is that Mr. Couchot?  Couchet?

14         MR. COUCHOT:  Yes, Your Honor.  Couchot.

15         THE COURT:  Couchot?

16         MR. COUCHOT:  Yes.  Your Honor --

17         THE COURT:  I remember that you --

18         MR. COUCHOT:  Your Honor, I'm appearing today and I

19  rearranged plans that I had because I was told that you wanted

20  me to make myself available.  So that's why I'm here.  I'm not

21  consenting to anything.  We filed a reply today that was

22  (indiscernible) at noon today and our position on today's issue

23  is set forth in that reply.  And I disagree with the

24  characterizations made about what the motion was.  And I

25  understand Your Honor was there and you said you remember it

11

1    very well. But the thrust of the motion was --

2              THE COURT: You were there, too. My recollection is

3    you were sitting in the courtroom as Morgan Lewis & Bockius was

4    arguing the motion. And you were physically present and I was

5    looking right at you.

6              MR. COUCHOT: Absolutely.

7              THE COURT: Okay. So we know who we are and we know

8    that we were both present at a time when I made an absolutely

9    clear ruling that you heard. And are you telling me that you

10   decided I'll just try my luck in California before Judge Smith?

11             MR. COUCHOT: No. That's not what happened, Your

12   Honor.

13             THE COURT: Well, you better tell me what happened.

14   You better tell me clearly and treat yourself as if you're

15   making a representation to the Court that's subject to

16   sanctions if it's not accurate.

17             MR. COUCHOT: Yes, Your Honor.

18             THE COURT: Go ahead.

19             MR. COUCHOT: We believed that our motion was

20   primarily one of two things. I was -- two different things.

21   One we were asking for the Court to give us relief from stay to

22   file a priming motion in California. And on top of that, we

23   asked for a general relief as best we could to administer the

24   cases. The emergency nature -- and in the general relief, we

25   listed several different things that, you know, might possibly

12

1   need to do and cash collateral was absolutely one of those

2   things.

3          The focus at the hearing, and I've reread the

4   transcript, was that the (indiscernible) term sheet on a DIP

5   financing that clearly the judge -- Your Honor, in my view,

6   after reviewing the (indiscernible) right now made a

7   determination that the priming lien loan would violate the

8   stay.

9          THE COURT:  No.  You're absolutely -- you are totally

10  and completely wrong.  And if you're trying to recharacterize

11  what I said, you better be careful.  I remember it and I've

12  also recently reviewed the transcript.  And I remember very

13  clearly the procedural history.  It was a general motion

14  seeking relief from the automatic stay without specificity.

15  Your counsel when you were present in court made an argument

16  that was wonting in all respects because of a failure to deal

17  with Second Circuit applicable precedent, the Sonnax standards.

18  And, in fact, when asked to identify how the Sonnax standards

19  applied failed completely and ducked the question.  I remember

20  the hearing extremely well.

21          MR. COUCHOT:  I agree that that occurred during the

22  hearing, Your Honor.  I'm not trying to --

23          THE COURT:  Now, if you are attempting through this

24  conversation to characterize my ruling or my order, you are out

25  of order.  If this is some kind of explanation as to how you

13

1    think this is permissible behavior, you are wrong.  It is

2    completely impermissible and sanctionable behavior and, in my

3    view, constitutes a willful violation of the automatic stay.

4    You could not have been on more direct and obvious notice than

5    you were.  I was looking right at you.

6            Now what are you going to do?

7            MR. COUCHOT:  Your Honor, if you're telling me that

8    your order -- I'm going to obey your order.

9            THE COURT:  Excuse me?

10           MR. COUCHOT:  I said I'm going to obey what you're

11   saying.  I'm going to comply with what you're saying today.

12           THE COURT:  Only because I've just said it?

13           MR. COUCHOT:  Your Honor --

14           THE COURT:  There was no motion for reconsideration.

15   There was no appeal.  And, in fact, if you remember clearly

16   what I suggested in the strongest possible terms, I suggested

17   that counsel meet and confer in an effort to develop a means by

18   which your client could deal with Lehman.  Did that happen?

19           MR. COUCHOT:  Yes, Your Honor.  It did.  We flew back

20   the next week and that was done personally.  Yes, we made -- I

21   called, I believe, Mr. Kessler the next day and requested a

22   face-to-face meeting.  And we flew back to New York and met

23   with Lehman, Mr. Kessler and with two representatives of

24   Alvarez & Marsal.

25           THE COURT:  And what was the result of that?

14

1          MR. COUCHOT:  Well --

2          THE COURT:  Now these are settlement discussions so

3    it may be you don't want to talk to me about it.

4          MR. COUCHOT:  Yes, that's my hesitancy, Your Honor.

5    I mean, I would love to tell you what happened but I -- suffice

6    it to say we were very far apart.

7          THE COURT:  And you apparently made the decision not

8    to file, which was your privilege if you chose to exercise it,

9    a follow-up motion for stay relief.  But instead, to act as if

10   what happened here didn't count, didn't matter?

11         MR. COUCHOT:  May I speak, Your Honor?

12         THE COURT:  Of course.

13         MR. COUCHOT:  There's a related case involving SunCal

14   entities and Lehman Commercial Paper before Judge Smith.  In

15   that case, Judge -- he's actually represented by Mr. Al Siegel,

16   who's the Chapter 11 trustee in that case -- moved for use of

17   cash collateral in Judge Smith's courtroom.  Lehman Commercial

18   adamantly opposed the motion.  Lehman Commercial did not raise

19   the stay as being invoked.  And in a fully briefed -- I think

20   there were two different hearings on the issue.  It never once

21   raised -- and in our view -- again, I know you disagree with me

22   but, in our view, cash collateral was not the focus and there

23   was no determination in your courtroom that cash collateral

24   violated -- the use of cash collateral would violate the stay.

25   What we heard -- what I heard was talk to Lehman, try to work

15

1      something out.  I'm not giving you general relief.  If you

2      think that you need relief from stay, come back and be

3      specific.  From our standpoint, at this point in time, Lehman

4      Commercial was not taking the position that the use of cash

5      collateral violated the stay.  And we did our own research and

6      we felt that that was the case.  And we figured, from our

7      thinking, we had a hearing -- we got a conference in front of

8      Judge Smith and I announced that we were going to use -- make a

9      motion for the use of cash collateral.  We even had a turnover

10     motion on this account and we worked conceptually with Lehman

11     at the divided briefing schedule.  We even had further talks to

12     try to work things out as recently as, I believe, yesterday or

13     the day before.  And it was only until we received their

14     opposition that we understand that they were taking a position

15     that the use of cash collateral violated the stay and that your

16     order did so, too, that your order had made that determination.

17     And I've looked at the transcript and I think you did make that

18     determination after a priming lien because that's what --

19     you're right. The in the (indiscernible) general order and

20     everything else you said about that hearing is correct.  But

21     the cash collateral issue was one of the several -- list of

22     things that really wasn't the focus.  The focus was, in my

23     opinion, was what you've mentioned, was that we need to go

24     through those factors and that the priming lien motion you said

25     would be burdensome to the estate and would harm the estate and

16

1    therefore, clearly, in my mind you said there was a violation

2    of the automatic stay.  But we proceeded with this motion in

3    good faith that Lehman Commercial was not taking the position

4    that cash collateral violated the stay.  In that related case

5    that's in front of Judge Smith.

6         THE COURT:  Okay.  Well, I know nothing about that

7    related case.  And this is not a hearing on possible sanctions

8    for willful violation of the automatic stay although that may

9    happen at some time in the future at which point the comments

10   you're making might be helpful.  They're not helpful to me now.

11        MR. COUCHOT:  I have the reply papers, Your Honor,

12   that has all that information in there that I could e-mail to

13   you as well.

14        THE COURT:  I don't need to see them tonight.

15        MR. COUCHOT:  Okay.

16        THE COURT:  The only thing that is before me now, and

17   I think I've already made clear what my position is, is that

18   you have no stay relief.  You know you have no stay relief.

19   And that denial of the motion brought by you and your local

20   counsel, Morgan Lewis & Bockius, in November speaks for itself

21   and there is a final order which denies that motion.  The legal

22   consequences of that denial are what they are.  I have no

23   knowledge, and I don't expect to get that knowledge now, as to

24   what happened in California.  To the extent relevant, I'll

25   learn it in due course.

17

1        The only thing which is before me is an emergency

2   motion to enforce the automatic stay.  It is enforced to the

3   extent applicable.  I'm not expanding it nor am I taking away

4   from counsel the ability to reach agreements to modify it.  But

5   if you don't come here and seek consensual relief from stay or

6   relief from stay with appropriate motion practice, you are at

7   full risk as is your client.  Act accordingly.

8        MR. COUCHOT:  Well, thank you for making that --

9   allowing me to make a record, Your Honor.

10        THE COURT:  Excuse me?

11        MR. COUCHOT:  I appreciate the fact that you allowed

12   me to make the record on that.  Thank you.

13        THE COURT:  I didn't think that's what just happened

14   but okay.  I just heard you make some statements about what you

15   believe may have given you cause to believe that what you were

16   doing was permissible.  I have not for a moment suggested that

17   I agree with you.  Nor is there a record here on the basis of

18   which I could make such a finding.  We're just having a

19   conversation.

20        MR. COUCHOT:  I understand, Your Honor.

21        THE COURT:  Now what happens next, Mr. Waisman?

22        MR. WAISMAN:  Your Honor, I believe Your Honor's

23   ruling is clear.  I believe the stay is in force and --

24        THE COURT:  There could never be a doubt on that

25   question.

18

1          MR. WAISMAN:  I believe the SCC entities need to act

2     in accordance with the stay and whatever the stay applies to.

3     And I think that point has been made clear.  But I would expect

4     that there would be either a consensual resolution among the

5     parties or a motion on proper notice and properly briefed

6     before this Court for modification of the stay that Your Honor

7     will rule on one way or the other in due course and that there

8     would be any proceedings before that.

9          As for the other allegations of waiver and the like,

10    there's no need to belabor the record.  When and if those

11    issues are relevant, they'll be addressed.

12          MR. COUCHOT:  May I speak, Your Honor?

13          THE COURT:  Of course.

14          MR. COUCHOT:  This waiver is definitely not -- that

15    was made.  The issue is whether or not the use of cash

16    collateral violates the automatic stay and that the -- Palmers

17    indicates that it does not.  In addition to the fact that

18    Lehman Commercial did not waive its interrelated case, that it

19    vigorously contested the use of cash collateral.  And then,

20    thirdly, for the record, my review of it, the Court did not

21    make a finding that the use of cash collateral violated the

22    automatic stay.  And I --

23          THE COURT:  Mr. Couchot, the only record that exists

24    in this record, which is written down, we don't have to

25    characterize it --

19

1          MR. COUCHOT:  Right.

2          THE COURT:  -- relates to a general motion made by

3    your client for relief from the automatic stay.  That motion

4    was denied by final order without prejudice --

5          MR. COUCHOT:  Yes.

6          THE COURT:  -- with statements made on the record

7    that we don't need to recharacterize.  You and other counsel

8    involved no doubt have considered the legal consequences of the

9    actions that you have undertaken with eyes wide open.  I don't

10   want to hear now argument as to why you believe that the action

11   you have taken is not covered by the order that I entered after

12   denying your motion for relief from stay.  It was not a

13   specified targeted motion for relief from stay.  Quite the

14   contrary.  It was a completely general give us full and

15   complete relief from stay.  Motion denied.  That means that the

16   stay applies to the extent it applies.  As you well know as an

17   experienced bankruptcy lawyer, careful lawyers almost always,

18   when there's a close question, seek relief from stay to avoid

19   the very severe sanctions that flow from -- especially flow

20   from willful violations of the stay.  You're in the zone of a

21   willful violation.  And this is not the time for you to defend

22   yourself.  That time may come.

23         MR. COUCHOT:  Yes, Your Honor.

24         MR. WAISMAN:  Your Honor, Shai Waisman.  I actually

25   thought that the issue was resolved.  But based on the

20

1    statements that (indiscernible) made, I have concern as to what

2    resources this estate has to expend in defending what is

3    clearly within the stay and clearly within what was raised,

4    argued and ruled on before this Court.  I thought we were

5    concluded.

6            THE COURT:  I thought we were, too.  But then again,

7    every time I think we're done, I hear another argument from

8    California as to why there's some belief the use of cash

9    collateral is not covered by the automatic stay.  I'm not

10   deciding that now.  It's not before me.  But lawyers can figure

11   this out.  The use of cash --

12           MR. COUCHOT:  I am sorry, Your Honor --

13           THE COURT:  The use of cash collateral happens at the

14   beginning of most Chapter 11 cases and involves either consent

15   or adequate protection.  That's Bankruptcy 101.

16           Now, can we conclude this evening's hearing?  And if

17   so, how?

18           MR. WAISMAN:  I believe for the debtors we can

19   conclude the hearing.  I would (indiscernible) of this Court

20   and this debtor.  If Mr. Couchot could advise based on the

21   Court's comments tonight whether we're proceeding with an

22   attempt to use the debtor's cash collateral or the SCC entities

23   are going to regroup and advise how they will proceed next

24   including to fully vindicate their rights before this Court.

25   That would go a long way and be very helpful.  If we need to

21

1   defend against the use of cash collateral in California, we

2   will do so.  And at the same time, we will bring additional

3   motion practice before Your Honor.

4          MR. COUCHOT:  My recommendations to my client will be

5   to come back to New York and file a motion for use of cash

6   collateral -- I mean, for relief from stay for the use of cash

7   collateral.

8          THE COURT:  I'll tell you what.  If the lawyers

9   involved are going to have a conversation about how to resolve

10  the matter which is not before me but is before Judge Smith in

11  the Central District of California, that doesn't have to be on

12  this record.

13         MR. WAISMAN:  In that case, Your Honor, perhaps we

14  can take leave of the Court and Mr. Couchot and I can

15  conference afterwards and assuming these debtors are properly

16  convinced that there is no more of a -- no risk with violations

17  of the stay, the matter would be concluded.  And if not, it

18  would be our burden to come back to Your Honor.

19         THE COURT:  Fine.  If you need further access at any

20  time before the hearing is presently scheduled, you can have

21  such access on Monday.

22         MR. WAISMAN:  Thank you, Your Honor.  That's greatly

23  appreciated as is the access today and apologize to everybody

24  for the short notice.

25         THE COURT:  No.  This is an important matter and no

22

1    apologies are needed.

2          MR. COUCHOT:  Thank you, Your Honor.

3          MR. WAISMAN:  Thank you, Your Honor.

4          THE COURT:  Have a good weekend, all.  Bye.

5          MR. WAISMAN:  Bye.

6       (Whereupon these proceedings were concluded at 5:18 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

23

1

2                           I N D E X

3

4                         R U L I N G S

5   DESCRIPTION                                    PAGE      LINE

6   Previous ruling of 11/20/08 denying SCC entities'   16      24

7   relief from the automatic stay enforced

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

24

1

2                      C E R T I F I C A T I O N

3

4     I, Lisa Bar-Leib, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6     **Lisa Bar-Leib**

                    Digitally signed by Lisa Bar-Leib
                    DN: cn=Lisa Bar-Leib, c=US
                    Reason: I am the author of this
                    document
7                         Date: 2009.02.02 16:49:18 -05'00'

8     LISA BAR-LEIB

9

10    Veritext LLC

11    200 Old Country Road

12    Suite 580

13    Mineola, NY 11501

14

15    Date:  February 2, 2009

16

17

18

19

20

21

22

23

24

25

# EXHIBIT "2"



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
11th FLOOR
LOS ANGELES
CALIFORNIA 90067-4100

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

NEW YORK
780 THIRD AVENUE
36th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

Dean A. Ziehl                    January 11, 2010                    dziehl@pszjlaw.com
                                                                     310.772.2362

**VIA E-MAIL**

Louis R. Miller
**Miller Barondess LLP**
1999 Avenue of the Stars
Suite 1000
Los Angeles, CA 90067

Paul J. Couchot
**Winthrop Couchot, P.C.**
660 Newport Center
4th Floor
Newport Beach, CA 92660

William N. Lobel, Esq
**The Lobel Firm**
840 Newport Center Drive
Suite 750
Newport Beach, CA 92660

        Re:    **In re Palmdale Hills**

Gentlemen:

        As discussed during a meet and confer with the Miller
Barondess firm on Friday, please advise us immediately concerning
SunCal's intentions with respect to the equitable subordination action
and the discovery propounded by SunCal, in light of the decision
issued by the Bankruptcy Appellate Panel on December 15, 2009.
Under that decision, further prosecution of the equitable subordination
action violates the automatic stay in the bankruptcy cases of Lehman
Brothers Holding, Inc. ("LHBI") and Lehman Commercial Paper Inc.
("LCPI").

        Specifically, the Panel found that "the adjudication of Debtors'
equitable subordination claim violates Lehman Commercial's
automatic stay" and that "the New York bankruptcy court must have

52063-001\DOCS_LA:213959.1

PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

Louis R. Miller
Paul J. Couchot
William N. Lobel
January 11, 2010
Page 2

the final say as to whether the automatic stay applies to the bankruptcy
case before it." Op. at 19. It further noted that "Debtors may either
seek relief from stay or initiate the equitable subordination action
against Lehman Commercial in the New York bankruptcy case." Op.
at 19-20.

SunCal's argument that Judge Smith's classification of the
Fenway repurchase agreement as a true sale renders the automatic stay
issue moot is incorrect. As you know, even if the repurchase
agreement is considered a true sale, LCPI still holds interests in all or
part of two loans and the liens securing them, and Judge Smith has not
yet ruled on the motion for clarification of her order regarding the
status of these liens. The Panel rejected SunCal's argument that the
automatic stay appeal was moot on this basis, ruling that "[e]ven if
Lehman Commercial has no interest in the Fenway Capital Loans, it
has an interest in at least one of the loans to Debtors" and "Lehman
Commercial also has an interest if and when the October Order
becomes final and is successfully appealed." Op. at 8-9.

Furthermore, as SunCal is fully aware, LBHI is the real party
in interest with respect to the loans, and Fenway has no economic
interest in the loans. As Irena Goldstein stated in her declaration:

> While it is correct that Fenway
> purchased interests in the loans pursuant
> to a repurchase agreement, it is not true
> that "the Lehman Entities relinquished
> all right, title and interest" in the loans. .
> . . [T]he loans serve as the ultimate
> collateral for the CP Notes issued by
> Fenway Funding to LBHI. LBHI
> pledged the CP Notes to JPM. . . . JPM
> did not foreclose on the commercial
> paper notes, and they are accordingly,
> the property of LBHI, subject to JPM's
> lien. While Fenway Capital may have
> legal title to interests in the loans in
> question, LBHI has the beneficial
> interest. . . . I]f loan proceeds are paid to
> Fenway Capital, those same proceeds



**PACHULSKI**

**STANG**

**ZIEHL**

**JONES**

LAW OFFICES

Louis R. Miller
Paul J. Couchot
William N. Lobel
January 11, 2010
Page 3

> will be transferred ultimately to LBHI.
> Conversely, neither Fenway Capital nor
> Fenway Funding is liable for amounts
> under the CP Notes under the governing
> agreements in the event there are
> insufficient proceeds from the loans to
> repay in full the CP Notes. The holder
> of the CP Notes ultimate recourse is only
> to the underlying collateral. Simply put,
> Fenway has no "skin" in the game.

6/18/09 Dec. of Irena Goldstein, ¶¶ 5-6. As the Panel noted in ruling
that the appeal was not moot, "Lehman Commercial . . . may possibly
have an interest in the Fenway Capital Loans under a contractual
repurchase obligation. . . . Therefore, Lehman Commercial has
standing to appeal the Denial Orders despite the October Order." Op.
at 8-9. Accordingly, the action cannot be maintained even against
Fenway alone without obtaining relief from stay in the Lehman cases.

I look forward to discussing the foregoing with you.

Sincerely,

Dean A. Ziehl

DAZ

cc:    Via E-Mail
       Lei Lei Wang Ekvall, Esq.
       Alan J Friedman, Esq.

# EXHIBIT "3"



**PACHULSKI**
**STANG**
**ZIEHL**
**JONES**

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
11th FLOOR
LOS ANGELES
CALIFORNIA 90067-4100

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

NEW YORK
780 THIRD AVENUE
36th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

WEB: WWW.PSZJLAW.COM

Dean A. Ziehl

January 27, 2010

dziehl@pszjlaw.com
310.772.2362

**VIA E-MAIL**

Paul J. Couchot
**Winthrop Couchot, P.C.**
660 Newport Center
4th Floor
Newport Beach, CA 92660

Louis R. Miller
**Miller Barondess LLP**
1999 Avenue of the Stars
Suite 1000
Los Angeles, CA 90067

William N. Lobel, Esq
**The Lobel Firm**
840 Newport Center Drive
Suite 750
Newport Beach, CA 92660

　　　Re:　　**In re Palmdale Hills**

Gentlemen:

　　　We feel compelled to respond to Paul Couchot's letter dated January 15, 2010 which proffers a fundamentally flawed legal and factual defense for the SunCal Debtors' continuing violations of the Lehman Debtors' bankruptcy stay. Since Special Litigation Counsel and the Chapter 11 Trustee Counsel do not appear to have been copied with Mr. Couchot's letter, we attach a copy for your reference.

　　　As you are well aware, the December 15, 2009 opinion issued by the Bankruptcy Appellate Panel of the Ninth Circuit (the "Panel") made clear that "the adjudication of Debtors' equitable subordination

52063-001\DOCS_LA:214558.4



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Louis R. Miller
William N. Lobel
January 27, 2010
Page 2

claim violates Lehman Commercial's automatic stay."[1]  The opinion
also left no doubt that "the New York bankruptcy court must have the
final say as to whether the automatic stay applies to the bankruptcy
case before it."[2]  Despite this, your letter dated January 15, 2010
argues that it would be ill-advised and procedurally improper for
Lehman Commercial Paper, Inc. ("LCPI") to go before the Bankruptcy
Court for the Southern District of New York (the "New York
Bankruptcy Court") and seek to enforce the automatic stay against the
equitable subordination litigation – the very procedure that the Panel's
opinion clearly authorized and contemplated.  In support of your
conclusion, you rehash arguments that have already been rejected by
the Panel, you once again parade recycled mischaracterizations of the
record that have already been the subject of numerous hearings, and
you ignore governing law.

To begin with, your contention that certain rulings issued by
Judge Smith on October 2, 2009 clearly and conclusively determined
that LCPI lacks ownership interests in the commercial loans made to
the SunCal Debtors has no support in the record.[3]  As you are well
aware, the SunCal Debtors made this argument to the Panel, and it was
rejected.[4]  The Panel held that "it is not clear that all the loans Lehman
Commercial made to the Debtors were the subject of the October
Order."[5]  In fact, the October Order clearly *did not* address ownership

---

[1] *Lehman Commercial Paper, Inc. v. Palmdale Hills Property, LLC (In re Palmdale
Hills Property, LLC)*, BAP Nos. CC-09-1100-HPaMk, BAP Nos. CC-09-1101-
HPaMk, BAP Nos. CC-09-1102-HPaMk, BAP Nos. CC-09-1103-HPaMk, BAP Nos.
CC-09-1104-HPaMk, BAP Nos. CC-09-1105-HPaMk, BAP Nos. CC-09-1106-
HPaMk, BAP Nos. CC-09-1107-HPaMk, at 19 (B.A.P. 9th Cir. Dec. 15, 2009) (slip
op.).

[2] *Id.* at 19.

[3] Those rulings are the Order On Objections To And Motion For Order Striking
Claims Filed By The Lehman Entities and the Findings Of Fact And Conclusions Of
Law In Support Of Order On Objections To Claims (together, the "October Order").

[4] *See* Motion to Dismiss Appeal for Lack of Jurisdiction; Declarations of Sean A.
O'Keefe and Paul J. Couchot in Support Thereof at 5-6; Appellee's Reply to LCPI's
Response to the Motion to Dismiss Appeal for Lack of Jurisdiction; Declarations of
Sean A. O'Keefe in Support Therefor at 12-13 ("As [Judge Smith] found, the MRA
is crystal clear on the issue of who owns what.  Per the contract, LCPI sold *ALL* of
its right, title and interest in the Sold Loans to Fenway Capital, LLC.").

[5] *In re Palmdale Hills*, CC-09-1100-HPaMk, at 8.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Louis R. Miller
William N. Lobel
January 27, 2010
Page 3

of the revolver component of the loans.  The October Order only encompassed those loans that were sold (in Bankruptcy Court's view) or transferred for security (in LCPI's view) "to Fenway Capital pursuant to the MRA."[6]  The Master Repurchase Agreement, or MRA, required written confirmations to identify which loans were subject to the MRA.[7]  There is no dispute that those required confirmations only describe the term components of the loans and identify face values that correspond only to the outstanding principal under the term components.[8]  The October Order therefore only held that the term components of the loans were sold to Fenway, and the Lehman entities remain owners of the revolvers.  More specifically, LCPI is the owner of the Ritter Ranch Revolver Loan, and therefore has a sufficient property interest to invoke its automatic stay.[9]

Likewise, your contention that LCPI "never raised the revolver argument" before entry of the October Order is equally ill-founded and contradicts representations that the SunCal Debtors made to the Panel. In briefing submitted to the Panel, the SunCal Debtors admitted that LCPI raised the "revolver argument" in a July 24, 2009 brief to the Bankruptcy Court and did so again in an August 17, 2009 memorandum to that court.[10]  Moreover, the SunCal Debtors acknowledged that LCPI raised this argument at a July 28, 2009 status

---

[6] *See* Findings Of Fact And Conclusions Of Law In Support Of Order On Objections To Claims ¶ 1.9.

[7] MRA § 3(b).

[8] *See* Lehman Commercial Paper Inc., Lehman ALI, Inc., Northlake Holdings LLC, and OVC Holdings LLC's Memorandum Responding to the Court's Inquiry at July 28, 2009 Status Conference Regarding Lehman Lenders' Retention of Certain Revolver Loan at 5-6.

[9] To be clear, my letter dated January 11, 2010 does not refer to the Ritter Ranch Mezz Loan.  In stating that "even if the repurchase agreement is considered a true sale, LCPI still holds interest in all or part of two loans and liens securing them, and Judge Smith has not yet ruled on the motion for clarification of her order regarding the status of these liens," I was referring to (i) LCPI's right to repurchase the term component of the loans and (ii) LCPI's continued ownership of the revolver component of the loans.

[10] Appellee's Reply to LCPI's Response to the Motion to Dismiss Appeal for Lack of Jurisdiction at 7; Declaration of Sean A. O'Keefe in Support Therefor ¶ 8.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Louis R. Miller
William N. Lobel
January 27, 2010
Page 4

conference.[11] In fact, the SunCal Debtors represented to the Panel that the October Order was "entered after the lower court had already considered LCPI's revolver argument."[12] The SunCal Debtors' current argument that LCPI "never raised the revolver argument" before entry of the October Order is simply incorrect, at best.

Only by ignoring the Panel's opinion and misconstruing the record can the SunCal Debtors conjure up a phantom "collateral attack" on the October Order. The Panel made it crystal clear that the equitable subordination action violated LCPI's automatic stay. An action to enforce LCPI's automatic stay in the New York Bankruptcy Court cannot possibly constitute a "collateral attack" because that is the very procedure that the Panel authorized in its opinion.[13] In fact, any effort by the SunCal Debtors to hinder LCPI's right to enforce its automatic stay in the New York Bankruptcy Court would constitute an impermissible "collateral attack" on the Panel's opinion. In addition, it is equally clear that the October Order did not address the Lehman entities' interests in the revolver loans. Your misreading of the October Order does not mean that "it is an adjudicated fact that LCPI does not own *any interest* in the Sold Loans."[14]

Furthermore, even if the revolver components of some loans were sold to Fenway, which is clearly not the case, LCPI would still have sufficient property interests to enforce its automatic stay. As you are well aware, the MRA gives LCPI the right to repurchase the loans that were transferred to Fenway. Your letter contends that, the

---

[11] Appellee's Reply to LCPI's Response to the Motion to Dismiss Appeal for Lack of Jurisdiction at 7.

[12] *Id.* at 14.

[13] *See In re Palmdale Hills*, CC-09-1100-HPaMk, at 19.

[14] To score points, the SunCal Debtors again note that the October Order stated (once) that it was a "misrepresentation" to describe the Lehman Lenders as creditors on the loans transferred to Fenway. Despite your implication to the contrary, we have no doubt that Judge Smith *does not* believe that either Mr. Pachulski or Mr. Soto "misrepresented" anything to the Court in their filings and arguments regarding the loans transferred to Fenway. Moreover, it is clear from the record and the context that Judge Smith used "misrepresentation" in its literal, not pejorative, sense – i.e., she believed that any statements in the prior filed proofs of claim inconsistent with her later findings were not accurate representations.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Louis R. Miller
William N. Lobel
January 27, 2010
Page 5

automatic stay notwithstanding, the Bankruptcy Code allows a non-debtor counterparty to terminate a repurchase agreement upon an event of default such as an insolvency. Putting aside whether your contention accurately states the governing law, it is beside the point.[15] That is because Fenway has never terminated either the MRA or LCPI's right to repurchase. Nor would LCPI's right to repurchase or otherwise reacquire the loans transferred to Fenway be automatically extinguished by the filing of a bankruptcy or by not immediately repurchasing the loans upon the filing of a bankruptcy.[16]

Moreover, your contention that LCPI's right to repurchase does not constitute property of its estate completely ignores the governing law. As the Panel made clear, "the New York bankruptcy court must have the final say as to whether the automatic stay applies to the bankruptcy case before it."[17] Thus, Second Circuit law, not law from the Ninth Circuit or Delaware or Illinois, controls what constitutes property of LCPI's estate. The Second Circuit has adopted a very broad definition of what constitutes property of the debtor's estate: "Our analysis begins with 11 U.S.C. § 541(a)(1), which defined the bankruptcy estate as including 'all legal or equitable interest of the debtor in property as of the commencement of the case.' It would be hard to imagine language that would be more encompassing than this broad definition."[18] Not surprisingly, then, property of the estate

---

[15] In any event, the provisions of the Bankruptcy Code concerning *ipso facto* clauses cited in your letter do not confer any rights or benefits on the SunCal Debtors. Those provisions are instead for the benefit of the non-debtor counterparty to a repurchase agreement, in other words, Fenway.

[16] *See* MRA §§ 11(a), (b).

[17] *See In re Palmdale Hills*, CC-09-1100-HPaMk, at 19. Judge Peck has also made it abundantly clear that he has the final authority to enforce LCPI's automatic stay. At a January 30, 2009 hearing, Judge Peck warned the SunCal Debtors that "if you don't come *here* and seek consensual relief from stay or relief from stay with appropriate motion practice, you are at full risk as is your client." January 30, 2009 Hearing Transcript (emphasis added).

[18] *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008). *See also Mercury v. Woodlawn Auto Workers, F.C.U.*, 757 F.2d 512, 515 (2d Cir. 1985) (referring to 11 U.S.C. § 541(a), the court held, "The section's scope is very broad."); *Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.)*, 371 B.R. 680, 691 (Bankr. S.D.N.Y. 2007) ("The term 'legal or equitable interests . . . in property' has been broadly interpreted to include *any* legally



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Louis R. Miller
William N. Lobel
January 27, 2010
Page 6

includes "[e]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative."[19] This broad definition undoubtedly includes LCPI's contractual right to repurchase the loans transferred to Fenway. Indeed, the Second Circuit has expressly held that "[c]ontractual rights clearly fall within the reach" of § 541, which defines property of the estate.[20]

As property of the estate, contract rights are subject to the automatic stay and the cases cited in your letter do not hold otherwise.[21] *In re Riso* and *In re Vitogiannis*, which you cite in your letter, simply do not address whether actions that would impair contract rights that are also property of the debtor's estate constitute violations of the automatic stay.[22] Instead, they concern whether certain contract rights are the type of property that are excepted from discharge under 11 U.S.C. § 523.[23] In *Competrol Acquisition Partnership v. Flag Wharf, Inc.*, also cited in your letter, the debtor argued that "the licenses [i.e., the underlying assets themselves] did constitute property of estate" and, as a result, the defendant's actions

---

enforceable right.") (emphasis added); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 101 (Bankr. S.D.N.Y. 1991) ("In accordance with *United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983), the concept of property of the estate is to be given a broad application.").

[19] *Chartschlaa*, 538 F.3d at 122. *See also In re Sterling Optical*, 371 B.R. at 691 ("Further, this definition is broad and includes even strictly contingent interests.").

[20] *Chartschlaa*, 538 F.3d at 122. *See also Wallach v. Nowak (In re Sherlock Homes of W.N.Y., Inc.)*, 246 B.R. 19, 23 (Bankr. W.D.N.Y. 2000) ("To the extent that a listing contract was in existence at the filing of the bankruptcy petition, the underlying contract rights were property of the estate.").

[21] *See, e.g., The Motorcycle Excellency Group, Inc. v. BMW of N. Am. (In re The Motorcycle Excellency Group, Inc.)*, 365 B.R. 370, 377-78 (Bankr. E.D.N.Y. 2006) (holding that contract rights in a franchise agreement, were property of the estate and subject to the automatic stay); *In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) ("Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay.").

[22] *In re Riso*, 978 F.2d 1151 (9th Cir. 1992); *In re Vitgiannis*, 2009 WL 1372065 (Banrk. N.D. Ill. 2009).

[23] *In re Riso*, 978 F.2d at 1153-54; *In re Vitgiannis*, 2009 WL 1372065 at *13-14.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Louis R. Miller
William N. Lobel
January 27, 2010
Page 7

violated the automatic stay.[24]  Unlike LCPI, the debtor in *Competrol Acquisition* did not argue that impairment of its contract rights, as opposed to the underlying asset, constituted an independent violation of the automatic stay.  Thus, not only are the cases cited in your letter not binding, they are not persuasive.

Furthermore, your letter, without citation to any authority, attempts to graft an "economic interest" or "economic reality" test onto the definition of property of the estate that has no basis in the governing law.  As the *In re Sherlock Homes* court held, "Contract rights are assets of the estate, even when these contract rights would have had limited or even no value to the debtor itself."[25]  In any event, LCPI has not made an "economic interest" argument concerning its right to repurchase.  Your letter appears to confuse the economic interest that Lehman Brothers Holding Inc. ("LBHI") has in certain commercial paper with LCPI's separate right to repurchase.

In addition to LCPI's right to repurchase, the economic interest in certain commercial paper issued by Fenway Funding to LBHI constitutes property of LBHI's estate.  As your letter acknowledges, Fenway Funding issued commercial paper to LBHI that is backed, in part, by the loans transferred to Fenway Capital.  In other words, proceeds from the loans transferred to Fenway Capital will be credited to the benefit of LBHI.  Under Second Circuit law, this contractual right to receive payment from the proceeds of the loans transferred to Fenway Capital constitutes property of LBHI's estate.  As the court held in *Banner v. Bagen (In re Bagen)*, "[b]y defining the term 'property of the estate' broadly, Congress intended to encompass contingent future payments that were subject to a condition precedent on the date of the bankruptcy."[26]  Your letter suggests, without citation

---

[24] *Competrol Acquisition Partnership v. Flag Wharf, Inc.*, 203 B.R. 914, 916 (D. Del. 2006).

[25] *In re Sherlock Homes*, 246 B.R. at 24-25.

[26] *Banner v. Bagen (In re Bagen)*, 186 B.R. 824, 829 (Bankr. S.D.N.Y. 1995).  *See also Sletteland v. Orndorff*, 2 Fed. Appx. 225, 227 (2d Cir. 2001) ("This would be true even if, as the Orndorff Group claims, the debtor's right to receive the net distributions should be characterized solely as a contractual right provided by the Guaranty, since it is well-settled that contractual interests of that type fall within the scope of 11 U.S.C. § 541(a)(1)."); *id.* at 228 ("The Orndorff Group have not provided any authority for their novel suggestion that one could not contractually



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Louis R. Miller
William N. Lobel
January 27, 2010
Page 8

to any authority, that LBHI's interest in the commercial paper does not constitute property of its estate because another party, JP Morgan, has asserted a right to foreclose on the commercial paper. But your suggestion amounts to little more than the proposition that property subject to a lien cannot constitute property of the debtor's estate -- a proposition that conflicts with the Second Circuit's interpretation of § 541.[27]

Your contention that the Bankruptcy Court has already rejected the argument that "LBHI is the real party in interest with respect to the loans" also mischaracterizes the record. LBHI's rights under the Fenway commercial paper was never an issue adjudicated before Judge Smith. In other words, contrary to your assertion, Judge Smith has never ruled that LBHI did not have a contractual interest or property right in the Fenway commercial paper. In any event, consistent with the Panel's opinion, the New York Bankruptcy Court is the proper place to seek to enforce that right.

In short, we do not intend to violate the October Order or any other orders, and nothing in our prior letter dated January 11, 2010 or your conversation with Mr. Pachulski suggested otherwise. As the Panel has recognized, the continued prosecution of the SunCal Debtors' equitable subordination claim and scorched earth discovery tactics are a continuing and willful violation of the Lehman Debtors' bankruptcy stay. We once again ask you to please advise what steps

---

separate the right to payment of the dividends on a stock from the ownership of the stock itself for the purposes of classification under the Bankruptcy Code.").

[27] *See, e.g., In re Sterling Optical,* 371 B.R. at 691 ("The term 'legal or equitable interests . . . in property' has been broadly interest to include *any* legally enforceable right.").



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Louis R. Miller
William N. Lobel
January 27, 2010
Page 9

the SunCal Debtors intend to take to stop violating LCPI's automatic
stay and to comply with the Panel's opinion.

Sincerely,

Dean A. Ziehl

DAZ
Enclosure

cc:    <u>Via E-Mail</u>
Lei Lei Wang Ekvall, Esq.
Alan J Friedman, Esq.

# EXHIBIT "4"



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
11th FLOOR
LOS ANGELES
CALIFORNIA 90067-4100

TELEPHONE: 310/277 6910
FACSIMILE: 310/201 0760

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000
FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100
FACSIMILE: 302/652 4400

NEW YORK
780 THIRD AVENUE
36th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700
FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

Dean A. Ziehl                 February 24, 2010              dziehl@pszjlaw.com
                                                            310.772.2362

**VIA E-MAIL**

Paul J. Couchot
**Winthrop Couchot, P.C.**
660 Newport Center
4th Floor
Newport Beach, CA 92660

Louis R. Miller
**Miller Barondess LLP**
1999 Avenue of the Stars
Suite 1000
Los Angeles, CA 90067

William N. Lobel, Esq
**The Lobel Firm**
840 Newport Center Drive
Suite 750
Newport Beach, CA 92660

     Re:    **In re Palmdale Hills**

Gentlemen:

     I write in response to your February 5, 2010 letter. The United States Bankruptcy Appellate Panel of the Ninth Circuit's (the "BAP") holding is crystal clear: "Debtors may not initiate an action or proceeding against Lehman Commercial that seeks affirmative relief, such as a counterclaim without violating the automatic stay."[1] You simply cannot reconcile the SunCal Debtors' position that they may pursue claims against LCPI, with the BAP's holding. For example, the SunCal Debtors' Fifth Claim for Relief against LCPI — to avoid and recover alleged fraudulent transfers under 11 U.S.C. §§ 544(b), 548

---

[1] *Lehman Commercial Paper, Inc. v. Palmdale Hills Prop., LLC (In re Palmdale Hills Prop., LLC)*, No. CC-09-1100, 2009 WL 5812119, at *8 (B.A.P. 9th Cir. Dec. 15, 2009).

52063-001\DOCS_LA:216200.2

PACHULSKI

STANG

ZIEHL

JONES

L A W   O F F I C E S

Paul J. Couchot
Louis R. Miller
William N. Lobel
February 24, 2010
Page 2

and Cal. Civil Code §§ 3439.04 and 3439.05 — clearly violates
LCPI's automatic stay.

The BAP also ruled the SunCal Debtors may not "prosecute an
adversary proceeding, or propose a reorganization plan, seeking to
equitably subordinate Lehman Commercial's claim and transfer its
liens to the estate in the California bankruptcy case without first
obtaining relief from the automatic stay in the New York bankruptcy
case."[2]  Nonetheless, the SunCal Debtors' continue to propose a plan
of reorganization that seeks to equitably subordinate LCPI's claims
and transfer its liens to the SunCal Debtors.  You cannot justify this
violation of LCPI's automatic stay.

The SunCal Debtors also continue to improperly prosecute an
equitable subordination claim against LCPI.  They seek to equitably
subordinate LCPI's claims and transfer any liens LCPI has securing
those claims to the SunCal Debtors.  You purport to have come to the
conclusion that the equitable subordination claim against LCPI does
not violate LCPI's automatic stay.  But the BAP made it clear that the
decision is not yours to make.  Instead, "the New York bankruptcy
court must have the final say as to whether the automatic stay applies
to the bankruptcy case before it."[3]

Your argument regarding the ownership of the applicable
revolver loans, including the Ritter Ranch Revolver Loan, remains
unsupportable.  The SunCal Debtors raised that argument before the
BAP in support of their motion to dismiss the appeal for lack of
jurisdiction, and the BAP rejected it and denied their motion.  When
Mr. Couchot raised this during the February 11, 2010 hearing in
addressing the effect of the BAP's decision as regards to the stay issue,
arguing that all of the LCPI loans had been sold, Judge Smith made it
clear that the Bankruptcy Court always understood there were sold *and*
*unsold* loans.  At this point, the undisputed documents, the BAP, and
Judge Smith have all recognized that for the claims at issue in the
equitable subordination proceedings, some loans remain unsold.  As

---

[2] *Id*. at *9.

[3] *Id*. at *8.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Louis R. Miller
William N. Lobel
February 24, 2010
Page 3

the applicable agreements and confirmations make clear, the Ritter Ranch Revolver Loan is one of them.[4]

The Ritter Ranch Revolver Loan is therefore property of LCPI's bankruptcy estate.[5]  It represents a significant asset of LCPI's bankruptcy estate because LCPI has an approximately $42.9 million dollar interest in that loan.[6]  Under these facts, as the BAP recognized, the automatic stay clearly applies: "[b]ecause, in this case, equitable subordination would modify [LCPI's] property interest, we find it violates [LCPI's] automatic stay."[7]

Additionally, the February 5 letter once again misconstrues inapposite cases while ignoring the governing law.  The letter references *In re Miller*[8] and *In re Mahurkar*[9] to argue the SunCal Debtors need not formally dismiss LCPI from the adversary proceeding and may instead treat it as an "interested non-litigant."  But the issue in *In re Miller* was whether a debtor-defendant should comply with "discovery requests [that] are framed as discovery pertaining only to the claims" of non-debtor defendants.[10]  Because *In re Miller* concerned only discovery relating to claims against non-debtors, it does not support your broader contention that "the SunCal Debtors would not be required to formally dismiss LCPI" from the adversary proceeding.

---

[4] To be clear, the Lehman Lenders continue to maintain that none of the loans at issue were sold to Fenway but instead were transferred for security.

[5] You state that LCPI's position "is directly contradicted by the filed proofs of claims."  Whatever that sentence is intended to mean, the applicable proofs of claim clearly distinguish between the amount owed on the term loans and the revolver loans.

[6] This amount includes interest.

[7] *In re Palmdale Hills Prop., LLC*, 2009 WL 5812119, at *1.

[8] 262 B.R. 499 (B.A.P. 9th Cir. 2001).

[9] *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969 (N.D. Ill. 1992).

[10] 262 B.R. at 504.  The court in *In re Mahurkar* similarly recognized that "discovery relating to claims against [the debtor] was stayed."  *Id.* (citing *In re Mahurkar*, 140 B.R. at 504-05).



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Louis R. Miller
William N. Lobel
February 24, 2010
Page 4

       The relevant cases that squarely address whether plaintiffs may pursue their claims against non-debtors make it clear that, at a minimum, plaintiffs must first sever the debtor from the multidefendant proceeding. For example, in *Broadcast Music, Inc. v. Northern Lights, Inc.*,[11] the court held the plaintiff had to sever Northern Lights, Inc., a debtor, from the action before it could proceed against Kip Fink, a non-debtor:

> Due to Northern Lights, Inc.'s petition in bankruptcy, all judicial proceedings against it have been stayed pursuant to 11 U.S.C. § 362(a). As such, failing to sever the claim against Northern Lights, Inc. would result in plaintiffs' inability to recover from either defendant and a statistical closure of the entire case.

*N. Lights*, 555 F. Supp. 2d 328. Indeed, courts in the Second Circuit consistently require plaintiffs to formally sever debtor-defendants from multidefendant proceedings. *See, e.g., Cashman v. Montefiore Med. Ctr.*, 191 B.R. 558, 563 (S.D.N.Y. 1996) (severance of the debtor "is the only alternative to granting the stay for all parties in this action . . . the alternative to severance . . . is denying the plaintiffs any trial until [the debtor's] bankruptcy proceedings are resolved"); *Plessey Precision Metals, Inc. v. The Metal Ctr., Inc. (In re The Meter Ctr., Inc.)*, 31 B.R. 458, 461 (Bankr. D. Conn. 1983) ("The options presented by the parties are sever and remand [plaintiff's] claim against [non-debtor], so that [plaintiff] may continue its state court action against [non-debtor] or retain the entire proceeding in this court, so that the rights and obligations of all parties can be litigated together.").[12]

---

[11] 555 F. Supp. 2d 328 (N.D.N.Y. 2008).

[12] *See also Symantec Corp. v. Logical Plus, Inc.*, No. C 06-7963, 2009 WL 2905930, at *1 (N.D. Cal. Sept. 8, 2009) ("The Court ordered the Clerk to administratively close this case until the bankruptcy stay was lifted. The Court's order also stated that if any party contended that the case could proceed against the non-bankrupt defendants, that party could file a motion to sever and partially lift the stay.").



PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

Paul J. Couchot
Louis R. Miller
William N. Lobel
February 24, 2010
Page 5

Finally, like your previous letter, the February 5 letter misconstrues the law concerning whether the Lehman Debtors' contract rights constitute property of their estates that are protected by the automatic stay. As we have informed you on a number of occasions, under governing Second Circuit law, the Lehman Debtors' contract rights are property of their estates– a point that you now acknowledge – and are subject to the automatic stay. The cases cited in the February 5 letter do not compel a contrary conclusion, for they are inapposite, wholly unpersuasive, and do not represent Second Circuit law.

The Second Circuit has made it clear that "where a non-debtor's action with respect to an interest that is intertwined with that of a bankrupt debtor would have the legal effect of diminishing or eliminating property of the bankrupt estate, such action is barred by the automatic stay." *Official Comm. of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines, Inc.)*, 928 F.2d 565, 574 (2d Cir. 1991) (automatic stay prevented non-debtor from taking worthless stock deduction on its 1998 tax return because it "would have an adverse impact" on debtor's ability to carryforward its net operating loss, which was property of the debtor's estate); *see also 48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427 (2d Cir. 1987) (automatic stay prevented landlord from terminating prime lease with non-debtor because that action "would inevitably have an adverse impact" on the debtor's sublease, which was property of the debtor's estate).[13] Here, the automatic stay

---

[13] The Second Circuit cases cited in the February 5 letter simply do not support your position. *Turner v. Lee (In re Minton)*, 46 B.R. 222, 224-25 (S.D.N.Y. 1985), held that a partner's statutory interest in partnership property as a "tenant in partnership" did not constitute property of the partner's estate because the rights of a tenant in partnership are "quite limited"; a tenant in partnership cannot, for example, "possess partnership property for any purpose other than those of the partnership" or "be assigned by the partner individually." These factors simply are not present here. In fact, you have admitted that (i) if LCPI had a right to repurchase the transferred loans and (ii) such right had not been terminated – both of which are true – *that such contract right would constitute property of LCPI's estate. See* February 5 Letter at 5. Similarly, *Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 698 F.2d 571 (2d Cir. 1983), is inapposite because, in that case, the bank's failure to name the debtor, a necessary party



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Louis R. Miller
William N. Lobel
February 24, 2010
Page 6

applies because, *inter alia*, the equitable subordination action and the other affirmative relief sought by the SunCal Debtors would adversely impact the Lehman Debtors' contract rights.

To avoid any misunderstanding, while it is not useful to engage in a point-by-point discussion of all the arguments raised in the February 5 letter, you should not interpret that to mean we agree with any of your arguments. Our position is clear. The BAP has held the SunCal Debtors' equitable subordination action violates LCPI's automatic stay, and nothing in your letters justifies the SunCal Debtors' continued violation of the Lehman Debtors' automatic stay. The SunCal Debtors must stop this continuing violation and comply with the BAP's opinion.

Sincerely,

Dean A. Ziehl

DAZ

cc:     Via E-Mail
        Lei Lei Wang Ekvall, Esq.
        Alan J Friedman, Esq.

---

to the underlying foreclosure action, meant that, as a matter of law, the "foreclosure action simply leaves such party's *rights to the premises unaffected*." 698 F.2d at 574 (emphasis added). In contrast, the equitable subordination action would adversely impact the Lehman Debtors' contract rights.

# EXHIBIT "5"

**$65,000,000.00 TERM LOAN**

**AND**

**$25,000,000.00**
**REVOLVING LINE OF CREDIT**

by

**LEHMAN ALI INC.**
individually and as Agent

and

**LEHMAN ALI INC.**
as Lender and such other Lenders which may become
Lenders from time to time pursuant to this Agreement
(collectively, the "Lenders")

to

**SUNCAL PSV, LLC, a Delaware limited liability company**
("Borrower")

February 12, 2007

(b)    Documents Taken as a Whole.  The words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document.

(c)    Headings.  The section and other headings contained in this Agreement or the other Loan Documents and the Table of Contents (if any) preceding this Agreement or the other Loan Documents are for reference purposes only and shall not control or affect the construction of this Agreement or the other Loan Documents or the interpretation thereof in any respect.

(d)    Implied References to This Agreement.  Section, subsection, clause, schedule and exhibit references are to this Agreement unless otherwise specified.

(e)    Persons.  Reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement or the other Loan Documents, as the case may be.

(f)    Modifications to Documents.  Reference to any agreement (including this Agreement and any other Loan Document together with the schedules and exhibits hereto or thereto), document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated.

(g)    Accounting Terms.  For purposes of this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.

2.    LOAN FACILITY.

2.1    Loan Facility.

2.1.1    Term Loan.  In reliance upon the representations and warranties of the Loan Parties, and subject to the terms and conditions of this Agreement and the Loan Documents, each Lender severally (and not jointly) hereby agrees to lend to or for the benefit of Borrower such Lender's Pro Rata Share of the Term Loan Commitment Amount, and Borrower agrees to pay all outstanding Obligations relating to the Term Loan evidenced and secured by the Loan Documents, in the manner and upon the terms and conditions expressed in the Loan Documents.  The Advance of the Term Loan made hereunder shall consist of loans made from the several Lenders ratably in proportion to their respective Pro Rata Shares.  The Term Loan may from time to time be a LIBOR Loan or a Base Rate Loan, as determined by Borrower and notified to Agent in accordance with Section 2.1.6(h).

2.1.2    Revolving Loan.  In reliance upon the representations and warranties of the Loan Parties, and subject to the terms and conditions of this Agreement and the Loan Documents, each Lender severally (and not jointly) hereby agrees to lend to or for the benefit of Borrower such Lender's Pro Rata Share of the Revolving Loan Commitment Amount, and Borrower agrees to pay all outstanding Obligations relating to the Revolving Loan evidenced and secured by the Loan Documents, in the manner and upon the terms and conditions expressed in

19

the Loan Documents. Each Advance of the Revolving Loan made hereunder shall consist of loans made from the several Lenders ratably in proportion to their respective Pro Rata Shares. The Revolving Loan may from time to time be LIBOR Loans or Base Rate Loans, as determined by Borrower and notified to Agent in accordance with Sections 2.1.6(h) or 2.3.3, provided that no Revolving Loan shall be made as a LIBOR Loan after the day that is one month prior to the Maturity Date.

(a)    Revolving Loan Commitment Amount; Limitations and Reduction.

(i)    Notwithstanding anything to the contrary set forth elsewhere herein or in any other Loan Document, the Revolving Loan Commitment Amount may be reduced from time to time pursuant to the terms of Section 2.2.

(ii)    Notwithstanding anything to the contrary set forth elsewhere herein or in any other Loan Document, upon the occurrence of an Event of Default or an Unmatured Event of Default, no further Advances will be available under the Revolving Loan.

Each of the foregoing reductions in the Commitment Amount shall occur automatically and without further notice or action by Agent or any Lender on the dates set forth above.

2.1.3    Nature of the Loan.

(a)    Subject to and upon the terms and conditions set forth herein, the Lenders hereby agree to make and Borrower hereby agrees to accept the Advance of the Term Loan on the Closing Date and each Advance of the Revolving Loan made on the Closing Date or thereafter.

(b)    Borrower may request and receive only one Advance under the Term Loan and any amount borrowed and repaid hereunder in respect of the Term Loan may not be reborrowed.

(c)    Subject to the limitations described in this Agreement, the Revolving Loan shall constitute a revolving line of credit and advances repaid may be reborrowed on a revolving basis. Although the outstanding principal of the Loan may be zero from time to time, the Loan Documents will remain in full force and effect until all obligations of Agent and the Lenders pursuant to this Agreement and the Loan Documents expire and all Obligations are paid and performed in full and the Commitment Amount has been reduced to zero. Upon the occurrence of an Event of Default or an Unmatured Event of Default, Agent (with the consent of the Required Lenders) may cause or declare any commitment of the Lenders to make Advances to be suspended or terminated, whereupon any obligation to make further Advances will immediately be suspended or terminated and the Commitment Amount shall be reduced to zero.

20

# EXHIBIT "6"

SECOND AMENDED AND RESTATED
TERM LOAN AND REVOLVING LINE OF CREDIT
LOAN AGREEMENT

$296,061,300.00 TERM LOAN

AND
$20,000,000.00
REVOLVING LINE OF CREDIT LOAN

BY

LEHMAN ALI INC.
individually and as Agent

and

LEHMAN ALI INC.
as Lender and such other Lenders which may become
Lenders from time to time pursuant to this Agreement

(collectively, the "Lenders")

to

SUNCAL MARBLEHEAD HEARTLAND MASTER LLC,
a Delaware limited liability company

AND

SUNCAL MARBLEHEAD LLC,
a Delaware limited liability company

AND

SUNCAL HEARTLAND LLC,
a Delaware limited liability company

(collectively and individually
jointly and severally "Borrower")

October 3, 2007

(e)    <u>Persons</u>.    Reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement or the other Loan Documents, as the case may be.

(f)    <u>Modifications to Documents</u>.    Reference to any agreement (including this Agreement and any other Loan Document together with the schedules and exhibits hereto or thereto), document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated.

(g)    <u>Accounting Terms</u>.    For purposes of this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.

## 2.    <u>LOAN FACILITY</u>.

### 2.1    <u>Loan Facility</u>.

2.1.1    <u>Term Loan</u>.    In reliance upon the representations and warranties of the Loan Parties, and subject to the terms and conditions of this Agreement and the Loan Documents, each Lender severally (and not jointly) hereby agrees to lend to or for the benefit of Borrower such Lender's Pro Rata Share of the Term Loan Commitment Amount, and Borrower agrees to pay all outstanding Obligations relating to the Term Loan evidenced and secured by the Loan Documents, in the manner and upon the terms and conditions expressed in the Loan Documents.    The Advances of the Term Loan made hereunder shall consist of loans made from the several Lenders ratably in proportion to their respective Pro Rata Shares.    The Term Loan may from time to time be a LIBOR Loan or a Base Rate Loan, as determined by Borrower and notified to Agent in accordance with <u>Section 2.1.6(h)</u>.

2.1.2    <u>Revolving Loan</u>.

(a)    <u>Revolving Loan</u>.    In reliance upon the representations and warranties of the Loan Parties and subject to the terms and conditions of this Agreement and the Loan Documents, each Lender severally (and not jointly) hereby agrees to lend to or for the benefit of Borrower such Lender's Pro Rata Share of the Revolving Loan Commitment Amount, and Borrower agrees to pay all outstanding Obligations relating to the Revolving Loan evidenced and secured by the Loan Documents, in the manner and upon the terms and conditions expressed in the Loan Documents.    Each Advance of the Revolving Loan made hereunder shall consist of loans made from the several Lenders ratably in proportion to their respective Pro Rata Shares.    The Revolving Loan may from time to time be LIBOR Loans or Base Rate Loans, as determined by Borrower and notified to Agent in accordance with Sections 2.1.6(h) or 2.3.3, provided that no Revolving Loan shall be made as a LIBOR Loan after the date that is one month prior to the Maturity Date.

(b)    <u>Revolving Loan Commitment Amount; Limitations and Reductions</u>.

(i)    Notwithstanding anything to the contrary set forth elsewhere herein or in any other Loan Document, the Revolving Loan Commitment Amount may be reduced from time to time pursuant to the terms of Section 2.2.

(ii)    Notwithstanding anything to the contrary set forth elsewhere herein or in any other Loan Document, upon the occurrence of an Event of Default or an Unmatured Event of Default, no further Advances will be available under the Revolving Loan Facility.

Each of the foregoing reductions in the Revolving Loan Commitment Amount shall occur automatically and without further notice or action by Agent or any Lender on the dates set forth above.

2.1.3    <u>Nature of the Loan</u>.

(a)    Subject to and upon the terms and conditions set forth herein, the Lenders have made and Borrower has accepted each Advance of the Term Loan on or prior to the Closing Date and each Advance of the Revolving Loan made on the Closing Date or thereafter.

(b)    As of the Closing Date, the Term Loan has been fully advanced to Borrower. Notwithstanding any provision to the contrary in this Agreement or any other Loan Document, any amount borrowed and repaid hereunder in respect of the Term Loan may not be reborrowed.

(c)    Subject to the limitations described in this Agreement, the Revolving Loan shall constitute a revolving line of credit and advances repaid may be reborrowed on a revolving basis. Although the outstanding principal of the Loan may be zero from time to time, the Loan Documents will remain in full force and effect until all obligations of Agent and the Lenders pursuant to this Agreement and the Loan Documents expire and all Obligations are paid and performed in full and the Commitment Amount has been reduced to zero. Upon the occurrence of an Event of Default or an Unmatured Event of Default, Agent (with the consent of the Required Lenders) may cause or declare any commitment of the Lenders to make Advances to be suspended or terminated, whereupon any obligation to make further Advances will immediately be suspended or terminated and the Commitment Amount shall be reduced to zero.

2.1.4    <u>Evidence of Loan; Outstanding Loan Borrowings; Other Amounts</u>. The Loan is and shall be evidenced by the Note and shall bear interest calculated and payable as provided in this <u>Section 2</u>.

(a)    Agent and each Lender will maintain an account of the Loan as follows:

(i)    Each Lender will maintain in accordance with its usual practice an account or accounts evidencing the Obligations due such Lender

22

# EXHIBIT "7"

$90,000,000.00 TERM LOAN

AND

$30,000,000.00
REVOLVING LINE OF CREDIT

BY

LEHMAN ALI INC.
individually and as Agent

and

LEHMAN ALI INC.
as Lender and such other Lenders which may become
Lenders from time to time pursuant to this Agreement

(collectively, the "Lenders")

to

LB/L – SUNCAL OAK VALLEY LLC, a Delaware limited liability company

("Borrower")

May 23, 2006

(b)    Documents Taken as a Whole.    The words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document.

(c)    Headings.    The section and other headings contained in this Agreement or the other Loan Documents and the Table of Contents (if any) preceding this Agreement or the other Loan Documents are for reference purposes only and shall not control or affect the construction of this Agreement or the other Loan Documents or the interpretation thereof in any respect.

(d)    Implied References to This Agreement.    Article, section, subsection, clause, schedule and exhibit references are to this Agreement unless otherwise specified.

(e)    Persons.    Reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement or the other Loan Documents, as the case may be.

(f)    Modifications to Documents.    Reference to any agreement (including this Agreement and any other Loan Document together with the schedules and exhibits hereto or thereto), document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated.

(g)    Accounting Terms.    For purposes of this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.

## 2.    LOAN FACILITY.

### 2.1    Loan Facility.

2.1.1    Term Loan.    In reliance upon the representations and warranties of the Loan Parties, and subject to the terms and conditions of this Agreement and the Loan Documents, each Lender severally (and not jointly) hereby agrees to lend to or for the benefit of Borrower such Lender's Pro Rata Share of the Term Loan Commitment Amount, and Borrower agrees to pay all outstanding Obligations relating to the Term Loan evidenced and secured by the Loan Documents, in the manner and upon the terms and conditions expressed in the Loan Documents.    The Advance of the Term Loan made hereunder shall consist of loans made from the several Lenders ratably in proportion to their respective Pro Rata Shares.    The Term Loan may from time to time be a LIBOR Loan or a Base Rate Loan, as determined by Borrower and notified to Agent in accordance with Section 2.1.6(h).

2.1.2    Revolving Loan.    In reliance upon the representations and warranties of the Loan Parties, and subject to the terms and conditions of this Agreement and the Loan Documents, each Lender severally (and not jointly) hereby agrees to lend to or for the benefit of Borrower such Lender's Pro Rata Share of the Revolving Loan Commitment Amount, and Borrower agrees to pay all outstanding Obligations relating to the Revolving Loan evidenced and

secured by the Loan Documents, in the manner and upon the terms and conditions expressed in the Loan Documents. Each Advance of the Revolving Loan made hereunder shall consist of loans made from the several Lenders ratably in proportion to their respective Pro Rata Shares. The Revolving Loan may from time to time be LIBOR Loans or Base Rate Loans, as determined by Borrower and notified to Agent in accordance with Sections 2.1.6(h) or 2.3.3, provided that no Revolving Loan shall be made as a LIBOR Loan after the day that is one month prior to the Maturity Date.

(a)    Revolving Loan Commitment Amount; Limitations and Reduction.

(i)    Notwithstanding anything to the contrary set forth elsewhere herein or in any other Loan Document, the Revolving Loan Commitment Amount may be reduced from time to time pursuant to the terms of Section 2.2.

(ii)    Notwithstanding anything to the contrary set forth elsewhere herein or in any other Loan Document, upon the occurrence of an Event of Default or an Unmatured Event of Default, no further Advances will be available under the Revolving Loan.

Each of the foregoing reductions in the Commitment Amount shall occur automatically and without further notice or action by Agent or any Lender on the dates set forth above.

2.1.3   Nature of the Loan.

(a)    Subject to and upon the terms and conditions set forth herein, the Lenders hereby agree to make and Borrower hereby agrees to accept the Advance of the Term Loan on the Closing Date and each Advance of the Revolving Loan made on the Closing Date or thereafter.

(b)    Borrower may request and receive only one Advance under the Term Loan and any amount borrowed and repaid hereunder in respect of the Term Loan may not be reborrowed.

(c)    Subject to the limitations described in this Agreement, the Revolving Loan shall constitute a revolving line of credit and advances repaid may be reborrowed on a revolving basis. Although the outstanding principal of the Loan may be zero from time to time, the Loan Documents will remain in full force and effect until all obligations of Agent and the Lenders pursuant to this Agreement and the Loan Documents expire and all Obligations are paid and performed in full and the Commitment Amount has been reduced to zero. Upon the occurrence of an Event of Default or an Unmatured Event of Default, Agent (with the consent of the Required Lenders) may cause or declare any commitment of the Lenders to make Advances to be suspended or terminated, whereupon any obligation to make further Advances will immediately be suspended or terminated and the Commitment Amount shall be reduced to zero.

2.1.4   Evidence of Loan; Outstanding Loan Borrowings; Other Amounts. The Loan is and shall be evidenced by the Note and shall bear interest calculated and payable as

19

# EXHIBIT "8"

EXECUTION VERSION

$68,500,000 TERM LOAN

and

$31,500,000 REVOLVING LINE OF CREDIT

by

LEHMAN ALI INC.,
individually and as Agent,

and

LEHMAN ALI INC.,
as Lender and such other Lenders which may become
Lenders from time to time pursuant to this Agreement
(collectively, the "Lenders"),

to

LB/L – SUNCAL NORTHLAKE LLC,
a Delaware limited liability company
("Borrower")

September 9, 2005

1.2    <u>Other Terms</u>.  Other terms defined herein shall have the meaning ascribed to them herein.

1.2.1    <u>Interpretation</u>.  Unless the context of this Agreement otherwise clearly requires, the following rules of construction shall apply to this Agreement and each of the other Loan Documents:

(a)    <u>Number; Inclusion</u>.  References to the plural include the singular, the plural, the part and the whole; "or" has the inclusive meaning represented by the phrase "and/or"; and "including" has the meaning represented by the phrase "including without limitation."

(b)    <u>Documents Taken as a Whole</u>.  The words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document.

(c)    <u>Headings</u>.  The section and other headings contained in this Agreement or the other Loan Documents and the Table of Contents (if any) preceding this Agreement or the other Loan Documents are for reference purposes only and shall not control or affect the construction of this Agreement or the other Loan Documents or the interpretation thereof in any respect.

(d)    <u>Implied References to This Agreement</u>.  Article, section, subsection, clause, schedule and exhibit references are to this Agreement unless otherwise specified.

(e)    <u>Persons</u>.  Reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement or the other Loan Documents, as the case may be.

(f)    <u>Modifications to Documents</u>.  Reference to any agreement (including this Agreement and any other Loan Document together with the schedules and exhibits hereto or thereto), document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated.

(g)    <u>Accounting Terms</u>.  For purposes of this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.

2.    <u>LOAN FACILITY</u>.

2.1    <u>Loan Facility</u>.

2.1.1    <u>Term Loan</u>.  In reliance upon the representations and warranties of the Loan Parties, and subject to the terms and conditions of this Agreement and the Loan Documents, each Lender severally (and not jointly) hereby agrees to lend to or for the benefit of Borrower such Lender's Pro Rata Share of the Term Loan Commitment Amount, and Borrower

agrees to pay all outstanding Obligations relating to the Term Loan evidenced and secured by the Loan Documents, in the manner and upon the terms and conditions expressed in the Loan Documents. The Advance of the Term Loan made hereunder shall consist of loans made from the several Lenders ratably in proportion to their respective Pro Rata Shares.

    2.1.2  <u>Revolving Loan</u>. In reliance upon the representations and warranties of the Loan Parties, and subject to the terms and conditions of this Agreement and the Loan Documents, each Lender severally (and not jointly) hereby agrees to lend to or for the benefit of Borrower such Lender's Pro Rata Share of the Revolving Loan Commitment Amount, and Borrower agrees to pay all outstanding Obligations relating to the Revolving Loan evidenced and secured by the Loan Documents, in the manner and upon the terms and conditions expressed in the Loan Documents. Each Advance of the Revolving Loan made hereunder shall consist of loans made from the several Lenders ratably in proportion to their respective Pro Rata Shares.

    2.1.3  <u>Nature of the Loan</u>.

    (a)    Subject to and upon the terms and conditions set forth herein, the Lenders hereby agree to make and Borrower hereby agrees to accept the Advances of the Loan on the Closing Date and each Advance of the Loan made thereafter.

    (b)    Borrower may request and receive only one Advance under the Term Loan and any amount borrowed and repaid hereunder in respect of the Term Loan may not be reborrowed.

    (c)    Subject to the limitations described in this Agreement, the Revolving Loan shall constitute a revolving line of credit and advances repaid may be reborrowed on a revolving basis. Although the outstanding principal of the Loan may be zero from time to time, the Loan Documents will remain in full force and effect until all obligations of the Agent and the Lenders pursuant to this Agreement and the Loan Documents expire and all Obligations are paid and performed in full and the Commitment Amount has been reduced to zero. Upon the occurrence of an Event of Default or an Unmatured Event of Default, Agent (with the consent of the Required Lenders) may cause or declare any commitment of the Lenders to make Advances to be suspended or terminated, whereupon any obligation to make further Advances will immediately be suspended or terminated and the Commitment Amount shall be reduced to zero.

    2.1.4  <u>Lenders Authorized to Advance for Interest, Fees and Expenses</u>. Borrower hereby authorizes the Lenders to make Advances (without requisition by Borrower) to pay interest fees and expenses due and payable under the Loan Documents as and when the same are due and payable. Notwithstanding anything to the contrary contained in this Agreement, the Agent and the Lenders shall have no obligation to make any such Advances (i) when and to the extent that Agent, in its sole judgment, determines that the Property is generating, on a cash basis, positive cash flow in excess of Borrower's other usual, reasonable and customary expenses (including interest expense) relating to the Property or (ii) if a Default or Event of Default shall exist.

# EXHIBIT "9"

CREDIT AGREEMENT

among

PALMDALE HILLS PROPERTY, LLC,
as Borrower,

The Several Lenders
from Time to Time Parties Hereto,

LEHMAN BROTHERS INC.,
as Arranger

LEHMAN COMMERCIAL PAPER INC.,
as Syndication Agent

and

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent

Dated as of February 8, 2007

(e)    All calculations of financial ratios set forth in Section 7.1 shall be calculated to the same number of decimal places as the relevant ratios are expressed in and shall be rounded upward if the number in the decimal place immediately following the last calculated decimal place is five or greater. For example, if the relevant ratio is to be calculated to the hundredth decimal place and the calculation of the ratio is 5.126, the ratio will be rounded up to 5.13.

## SECTION 2.  AMOUNT AND TERMS OF COMMITMENTS

2.1    Term Loan Commitments.  Subject to the terms and conditions hereof, the Lenders severally agree to make term loans (each, a "Term Loan") to the Borrower on the Closing Date in an amount for each Lender not to exceed the amount of the Term Loan Commitment of such Lender.  The Term Loans may from time to time be Eurodollar Loans or Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.11.

2.2    Procedure for Term Loan Borrowing.  (a)  The Borrower shall deliver to the Administrative Agent a Borrowing Notice (which Borrowing Notice must be received by the Administrative Agent prior to 10:00 A.M. (New York City time) one Business Day prior to the anticipated Closing Date) requesting that the Term Loan Lenders make the Term Loans on the Closing Date.  Upon receipt of such Borrowing Notice the Administrative Agent shall promptly notify each Term Loan Lender thereof.  Not later than 12:00 Noon (New York City time) on the Closing Date each Term Loan Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Term Loan or Term Loans to be made by such Lender.  The Administrative Agent shall make available to the Borrower the aggregate of the amounts made available to the Administrative Agent by the Term Loan Lenders, in like funds as received by the Administrative Agent in accordance with Section 2.2(b).

(b)    The Term Loans made available to the Borrower on the Closing Date shall be distributed as follows:  (i) $166,743,545.13 shall be used to refinance the Existing Credit Facility, (ii) $20,000,000 shall be deposited into the Development Account, (iii) to pay fees and expenses in connection with the transactions contemplated hereunder and (iv) to reimburse and pay development costs and expenses paid or incurred prior to the Closing Date, such costs and expenses to be pre-approved by the Administrative Agent in its sole discretion.

2.3    Repayment of Term Loans.  The Term Loan of each Lender shall mature in fifteen consecutive quarterly installments, commencing on June 30, 2007, each of which shall be in an amount equal to such Lender's Term Loan Percentage multiplied by the percentage set forth below opposite such installment of the aggregate principal amount of Term Loans made on the Closing Date:

| Installment | Percentage |
| --- | --- |
| June 30, 2007 ................. | 0.25% |
| September 30, 2007 .......... | 0.25% |
| December 31, 2007 ........ | 0.25% |
| March 31, 2008 .............. | 0.25% |

| Installment | Percentage |
|---|---|
| June 30, 2008 ................ | 0.25% |
| September 30, 2008 ........ | 0.25% |
| December 31, 2008 ........ | 0.25% |
| March 31, 2009 .............. | 0.25% |
| June 30, 2009 ................ | 0.25% |
| September 30, 2009 ........ | 0.25% |
| December 31, 2009 ........ | 0.25% |
| March 31, 2010 .............. | 0.25% |
| June 30, 2010 ................ | 0.25% |
| September 30, 2010 ........ | 0.25% |
| Term Loan Maturity Date ............................ | All amounts outstanding in respect of Term Loans |

2.4    Revolving Credit Commitments.    (a) Subject to the terms and conditions hereof, the Revolving Credit Lenders severally agree to make revolving credit loans ("Revolving Credit Loans") to the Borrower from time to time during the Revolving Credit Commitment Period (but not more frequently than once per month) in an aggregate principal amount at any one time outstanding for each Revolving Credit Lender which, when added to such Lender's Revolving Credit Loans then outstanding, does not exceed the amount of such Lender's Revolving Credit Commitment; provided, that the Borrower may not borrow any Revolving Credit Loans if, after giving effect to any disbursements from the Development Account requested to be made on such date by the Borrower in accordance with Section 5.3, the amount on deposit in the Development Account exceeds $20,000,000. During the Revolving Credit Commitment Period the Borrower may use the Revolving Credit Commitments by borrowing, prepaying the Revolving Credit Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof. The Revolving Credit Loans may from time to time be Eurodollar Loans or Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.5 and 2.11, provided that no Revolving Credit Loan shall be made as a Eurodollar Loan after the day that is one month prior to the Revolving Credit Termination Date.

(b)    The Borrower shall repay all outstanding Revolving Credit Loans on the Revolving Credit Termination Date.

2.5    Procedure for Revolving Credit Borrowing.    The Borrower may borrow under the Revolving Credit Commitments on any Business Day during the Revolving Credit Commitment Period, provided that the Borrower shall deliver to the Administrative Agent a Borrowing Notice (which Borrowing Notice must be received by the Administrative Agent prior to 12:00 Noon (New York City time) (a) three Business Days prior to the requested Borrowing Date, in the case of Eurodollar Loans, or (b) one Business Day prior to the requested Borrowing Date, in the case of Base Rate Loans). Each borrowing of Revolving Credit Loans under the Revolving Credit Commitments shall be in an amount equal to (x) in the case of Base Rate Loans, $1,000,000 or a whole multiple thereof (or, if the then aggregate Available Revolving Credit Commitments are less than $1,000,000, such lesser amount) and (y) in the case of Eurodollar Loans, $3,000,000 or a whole multiple of $1,000,000 in excess thereof. Upon receipt

of any such Borrowing Notice from the Borrower, the Administrative Agent shall promptly notify each Revolving Credit Lender thereof. Each Revolving Credit Lender will make its Revolving Credit Percentage of the amount of each borrowing of Revolving Credit Loans available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 12:00 Noon (New York City time) on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent in like funds as received by the Administrative Agent, by depositing the same to the Operating Account.

2.6    Repayment of Loans; Evidence of Debt. (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Revolving Credit Lender or Term Loan Lender, as the case may be, (i) the then unpaid principal amount of each Revolving Credit Loan of such Revolving Credit Lender on the Revolving Credit Termination Date (or on such earlier date on which the Loans become due and payable pursuant to Section 8) and (ii) the principal amount of each Term Loan of such Term Loan Lender in installments according to the amortization schedule set forth in Section 2.3 (or on such earlier date on which the Loans become due and payable pursuant to Section 8). The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.13.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 10.6(d), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, the Type of such Loan and each Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)    The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.6(b) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

(e)    The Borrower agrees that, upon the request to the Administrative Agent by any Lender, the Borrower will promptly execute and deliver to such Lender a promissory note of the Borrower evidencing any Term Loans or Revolving Credit Loans, as the case may be, of such Lender, substantially in the forms of Exhibit G-1 or G-2, respectively (a "Term Note" or "Revolving Credit Note", respectively), with appropriate insertions as to date and principal

# EXHIBIT "10"

1  PAUL J. COUCHOT - State Bar No. 131934
   SEAN A. OKEEFE – State Bar No. 122417
2  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
3  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
4  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
5  General Insolvency Counsel for
   Within Specified Administratively Consolidated
6  Debtors-in-Possession and
   Counsel for SCC Acquisitions, Inc.
7
   LOUIS R. MILLER, State Bar No. 54141
8  MARTIN PRITIKIN, State Bar. No. 210845
   **MILLER BARONDESS, LLP**
9  1999 Avenue of the Stars, Suite 1000
   Los Angeles, California 90067
10 Telephone: (310) 552-4400
   Facsimile: (310) 552-8400
11 Special Litigation Counsel to Administratively
   Consolidated Debtors-in-Possession and to
12 Chapter 11 Trustee for Within Specified Debtors

13          **UNITED STATES BANKRUPTCY COURT**
            **CENTRAL DISTRICT OF CALIFORNIA**
14              **SANTA ANA DIVISION**

15  In re                                    Case No. 8:08-bk-17206-ES

16  PALMDALE HILLS PROPERTY, AND ITS         Jointly Administered With Case Nos.
    RELATED DEBTORS,                         8:08-bk-17209-ES; 8:08-bk-17240-ES;
17                                           8:08-bk-17224-ES; 8:08-bk-17242-ES;
         Jointly Administered Debtors        8:08-bk-17225-ES; 8:08-bk-17245-ES;
18       and Debtors-in-Possession           8:08-bk-17227-ES; 8:08-bk-17246-ES;
                                             8:08-bk-17230-ES; 8:08-bk-17231-ES;
19  Affects:                                 8:08-bk-17236-ES; 8:08-bk-17248-ES;
                                             8:08-bk-17249-ES; 8:08-bk-17573-ES;
20  ☒ All Debtors                            8:08-bk-17574-ES; 8:08-bk-17575-ES;
                                             8:08-bk-17404-ES; 8:08-bk-17407-ES;
21  ☐ Palmdale Hills Property,               8:08-bk-17408-ES; 8:08-bk-17409-ES;
    ☐ SunCal Beaumont Heights, LLC           8:08-bk-17458-ES; 8:08-bk-17465-ES;
22  ☐ SCC Palmdale,                          8:08-bk-17470-ES; 8:08-bk-17472-ES;
    ☐ SunCal Johannson Ranch, LLC            and 8:08-bk-17588-ES
23  ☐ SunCal Summit Valley, LLC
    ☐ SunCal Emerald Meadows LLC             Chapter 11 Proceedings
24          *Caption Continued on Next Page*
                                             **DECLARATION OF SEAN A. OKEEFE**
25                                           **IN SUPPORT OF DEBTORS'**
                                             **OBJECTIONS TO AND MOTION FOR**
26                                           **ORDER STRIKING CLAIMS FILED BY**
                                             **THE LEHMAN ENTITIES**
27
                                             DATE: June 30, 2009
28                                           TIME: 2:00 p.m.
                                             PLACE: Courtroom 5A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Continued from Previous Page*

☐ SunCal Bickford Ranch, LLC
☐ Acton Estates, LLC
☐ Seven Brothers LLC
☐ SJD Partners, Ltd.
☐ SJD Development Corp.
☐ Kirby Estates, LLC
☐ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
☐ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☐ Tesoro SF LLC
☐ LBL-SunCal Oak Valley, LLC
☐ SunCal Heartland, LLC
☐ LBL-SunCal Northlake, LLC
☐ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☐ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

# DECLARATION OF SEAN A. O'KEEFE

I, Sean A. O'Keefe, hereby declare and state as follows:

1.  I am a member of the bar of California and I am associated with the law firm of Winthrop Couchot, P.C. (the "Firm").

2.  The Firm is general insolvency counsel to following Chapter 11 debtors Palmdale Hills, LLC ("Palmdale Hills"), SunCal Communities I, LLC ("SunCal I"), SunCal Communities III, LLC ("SunCal III"), SCC/Palmdale, LLC ("SCC/Palmdale"), Acton Estates, LLC ("Acton"), SunCal Beaumont, LLC ("Beaumont"), SunCal Emerald Meadows, LLC ("Emerald Meadows"), SunCal Johansson Ranch, LLC ("Johansson Ranch"), SunCal Bickford Ranch, LLC ("Bickford Ranch"), SunCal Summit Valley, LLC("Summit Valley"), Seven Brothers, LLC ("Seven Brothers"), Kirby Estates, LLC ("Kirby Estates"), SJD Partners, Ltd., a California limited partnership ("SJD Partners"), and SJD Development Corp., a California corporation ("SJD Corp") (collectively the "Voluntary Debtors").

3.  The Voluntary Debtors cases are being jointly administered with the pending Chapter 11 cases of the following debtors: Delta Coves Ventures, LLC ("Delta Coves"), SunCal Heartland, LLC ("SunCal Heartland"), SunCal Marblehead, LLC ("SunCal Marblehead"), LB-L-SunCal Northlake, LLC (SunCal Northlake"), LB-L-SunCal Oak Valley, LLC ("SunCal Oak Valley"), SunCal Century City, LLC ("SunCal Century City"), SunCal PSV, LLC ("SunCal PSV"), SunCal Torrance Properties, LLC ("SunCal Torrance"), and SunCal Oak Knoll, LLC ("SunCal Oak Knoll") (collectively, the "Trustee Debtors", and together with the Voluntary Debtors, the "Debtors").

4.  I have been a member of the team of lawyers working with Paul J. Couchot on the Chapter 11 cases filed by the Voluntary Debtors. In this capacity, and through the work that I have performed on the Voluntary Debtors' cases, I have become familiar with the facts stated herein and if called upon to testify to the same, I could and would testify accurately thereto.

5.  Attached hereto as Exhibit A is summary of the claims filed by Lehman Commercial Paper, Inc. ("LCPI"), Lehman ALI, Inc. ("Lehman ALI"), OVC Holdings, LLC, and Northlake Holdings, LLC (collectively the "Lehman Entities") in the Debtors' Chapter 11

1  proceedings. This summary was prepared based upon a review of the claims listed on the dockets

2  of the individual Debtors.

3       6.    True and correct copies of the below described documents were produced by

4  JPMorgan Chase, Inc. in response to discovery propounded by the SunCal debtors in that certain

5  adversary proceeding entitled 8:09-ap-01005-ES (the "Adversary"):

6      Exhibit B.   *Master Repurchase Agreement* (the "MRA") dated August 22, 2008 by

7            and between Fenway Capital, LLC ("Fenway Capital") and Lehman

8            Commercial Paper, Inc. ("LCPI");

9      Exhibit C.   *Annex I* to MRA dated August 22, 2008;

10      Exhibit D.   *Annex III* to MRA dated August 22, 2008;

11      Exhibit E.   Confirmation dated September 12, 2008 referring to repurchase

12            agreements relating to Marblehead Heartland Term Loan and the SunCal

13            Communities I Loan;

14      Exhibit F.   Confirmation dated September 12, 2009, referring to the Ritter Ranch

15            Term Loan and Delta Cove Senior Loan;

16      Exhibit G.   Confirmation dated September 12, 2009, referring to the Northlake Term

17            Loan and the Palm Spring Village Terrace;

18      Exhibit H.   Confirmation dated September 12, 2009, referring to the Oak Valley Term

19            Loan;

20      Exhibit I.   Letter from Lehman ALI, Inc. to Fenway Funding, LLC and JPMorgan

21            Chase dated November 18, 2008;

22      Exhibit J.   Letter from John E. Costango, Executive Director of JPMorgan Chase

23            Bank, N.A. to Deutsche Bank Trust Company Americas dated February

24            18, 2009;

25      Exhibit K.   Letter from Amy Wolf, counsel for JP Morgan Chase Bank, N.A. to Irena

26            Goldstein, counsel to Fenway Capital, LLC, dated February 18, 2009;

27      Exhibit L.   Letter from Deutsche Bank Trust Company Americas, as CP

28            Administrator and CP Collateral Agent to John E. Costango, Executive

          Director of J.P. Morgan Securities, Inc. February 19, 2009;

1    Exhibit M.    Commercial Paper Note Administration Agreement between Deutsche

2    Bank Trust Company America and Fenway Funding, LLC;

3    Exhibit N.    Guarantee of Lehman Brothers Holdings, Inc. and Fenway Capital, LLC,

4    dated August 20, 2008; and

5    Exhibit O.    List of Largest Secured Creditors filed by Lehman Brothers Holdings, Inc.,

6    with the United States Bankruptcy Court Southern District of New York.

7    7.    The documents above indicate that the following prepetition loans entered into by

8    and between the Debtors and one or more of the Lehman Entities have been sold to Fenway Capital

9    pursuant to a repurchase agreement (the "Sold Loans"):

| Loan | Claimant | Alleged Balance |
|------|----------|-----------------|
| SunCal Communities I Loan | LCPI | $343,221,391 |
| Ritter Ranch Loan | LCPI | $287,252,096 |
| SunCal PSV Loan | Lehman ALI | $88,257,340 |
| SunCal Delta Coves Loan | Lehman ALI | $206,023,142 |
| SunCal Marblehead/ Heartland Loan | Lehman ALI | $354,325,126 |
| Sun Cal Oak Valley Loan | OVC Holdings, LLC | $141,630,092 |
| SunCal Northlake Loan | Northlake Holdings, LLC | $123,654,777 |

14    8.    Attached hereto are true and correct copies of the following claims that were filed

15    against the Debtors by the Lehman Entities with respect to the Sold Loans:

| Exhibit | Debtor | Case No | Claimant | Claims |
|---------|--------|---------|----------|--------|
| P | SunCal I | 08-bk-17248 | LCPI | Claim No. 1 |
| Q | SunCal III | 08-bk-17249 | LCPI | Claim No. 2 |
| R | Acton | 08-bk-17236 | LCPI | Claim No. 6 |
| S | Emerald Meadows | 08-bk-17230 | LCPI | Claim No. 7 |
| T | Bickford | 08-bk-17231 | LCPI | Claim No.16 |
| U | Summit Valley | 08-bk-17227 | LCPI | Claim No. 12 |
| V | Palmdale Hills | 08-bk-17206 | LCPI | Claim No. 65 |
| W | SunCal PSV | 08-bk-17465 | Lehman ALI | Claim No. 12 |
| X | Delta Coves | 08-bk-17470 | Lehman ALI | Claim No. 21 |
| Y | SunCal Marblehead | 08-bk-17409 | Lehman ALI | Claim No. 9 |
| Z | SunCal Heartland | 08-bk-17407 | Lehman ALI | Claim No. 21 |
| AA | Sun Cal Oak Valley | 08-bk-17404 | OVC Holdings | Claim No. 16 |
| BB | SunCal Northlake | 08-bk-17408 | Northlake Holdings | Claim No. 6 |

24    9.    After receiving and reviewing the documents produced by JPMorgan Chase,

25    including the documents listed above, I spoke to counsel for Fenway Capital, LLC, Irena

26    Goldstein, counsel for JPMorgan Chase, Amy Wolf, and counsel for Deutsche Bank Trust

27    Company America. During these conversations, I explained that the above documents indicated

28    that certain loans made to the Debtors (See, Exhibit I) appeared to be subject to an outstanding

repurchase agreement pursuant to which title was vested in Fenway Capital, LLC, and that said

-4-

1  documents further indicated that JPMorgan held a lien on these loans. None of these lawyers

2  disagreed with this characterization of the facts. Irena Goldstein stated that Fenway Capital, LLC

3  had attempted to unwind/terminate this repurchase transaction on September 14, 2008. However,

4  this termination was predicated upon return of the CP Notes. Ms. Goldstein indicated that it was

5  her understanding that the attempt to terminate the transaction on this basis failed because these

6  notes were already pledged to JPMorgan Chase.

7      10.    Attached hereto as Exhibit "CC" is a true and correct copy of the "Guidance Notes"

8  published by the Bond Market Association, which accompany and explain the Master Repurchase

9  Agreement attached hereto as Exhibit "B."

10      11.    Attached hereto as Exhibit "DD" is a true and correct copy of a letter that was

11  transmitted to counsel for the LCPI, Lehman ALI, Inc., Northlake Holdings, LLC and OVC

12  Holdings, LLC (collectively the "Lehman Entities") on March 26, 2009.

13      12.    Attached hereto as Exhibit "EE" is a true and correct copy of a letter received from

14  counsel for the Lehman Entities in response to the letter attached hereto as Exhibit "DD."

15      13.    Attached as Exhibit "FF" is a true and correct copy of an email sent by Irena

16  Goldstein dated May 12, 2009.

17      I declare that the foregoing it true and correct under the penalty of perjury under

18  the laws of the United States.

19      Executed in Orange County, California, on May 29, 2009.

20

21                          /s/ Sean A. OKeefe

22                          _____

                            Sean A. OKeefe

23

24

25

26

27

28

**EXHIBIT C**

WC000043

JPM-PALMDALE0000006

LEHMAN COMMERCIAL PAPER INC.

PERRAY FUNDING LLC
825 SEVENTH AVENUE
NEW YORK NY 10019

07/11/2008

PAGE 1 OF 2

AS PRINCIPAL, WE CONFIRM THE FOLLOWING TRANSACTION:

CONTRACT NUMBER: 9A10016
TRADE DATE: 07/10/2008
PURCHASE DATE: 07/10/2008
REPURCHASE DATE: 09/27/2008
PRINCIPAL: 1,000,000,000.00
REPURCHASE RATE: 1.35521

THE SECURITIES DESCRIBED IN THE SCHEDULE SET FORTH BELOW SHALL BE HELD BY US FOR YOUR ACCOUNT. THE STANDARD TERMS AND CONDITIONS SET FORTH ON THE REVERSE SIDE OF THE STANDARD FORM OF CONFIRMATION MAILED TO YOU UPON EXECUTION OF THIS TRANSACTION, ARE HEREBY INCORPORATED IN THIS SCHEDULE BY REFERENCE.

SCHEDULE OF SECURITIES SUBJECT TO
REPURCHASE CONTRACT - BASIND

| SECURITY DESC/ MATURITY DATE | COUPON RATE | POOL/ CUSIP | ORIGINAL FACE/ % OF SHARE | CURRENT FACE ON TAR | MARKET VALUE |
|---|---|---|---|---|---|
| MARELLHAD HEARTLAND TFAN 04/01/2038 SINGAL COMMODITIES 3 07/01/2038 | 9.00001 0.00001 | M92441 M99121 | 296,441,300.60 276,336,276.86 | 316,799,666.51 315,819,118.36 |

REDACTED

**EXHIBIT D**

WC000045

JPM-PALMDALE000000/

LEHMAN COMMERCIAL PAPER INC.

FENWAY FUNDING LLC
810 SEVENTH AVENUE
NEW YORK NY 10019

SCHEDULE OF SECURITIES SUBJECT TO
REPURCHASE CONTRACT - RAYMOND

PAGE 2 OF 2

09/12/2008

**REDACTED**

| SECURITY DESC/ MATURITY DATE | COUPON RATE | POOL/ CUSIP | ORIGINAL FACE/ # OF SHARES | CURRENT FACE OR PAR | MARKET VALUE |
|---|---|---|---|---|---|
| RITTER RANCH TERM LOAN | | | | | |
| 07/01/2028 | 0.0002% | WH3522 | 286,477,500.00 | 183,448,780.26 | 183,628,716.65 |
| 09/01/2015 | 0.0002% | WH5739 | | | 130,397,493.36 |

TOTAL SHARES: _____   TOTAL M.V. _____ 1,026,000,000.00

**EXHIBIT E**

WC000047

JPM-PALMDALE0000000009

LEHMAN COMMERCIAL PAPER INC.

FENWAY FUNDING LLC
410 SEVENTH AVENUE
NEW YORK NY 10013

PAGE 2 OF 2

SCHEDULE OF SECURITIES SUBJECT TO
REPURCHASE CONTRACT - 3846006

09/12/2008



| SECURITY DESC/ MATURITY DATE | COUPON RATE | POOL/ CUSIP | ORIGINAL FACE/ # OF SHARES | CURRENT FACE OR PAR | MARKET VALUE |
|---|---|---|---|---|---|
| NORTHLAKE TERM - SINCAL 07/01/2038 SINCAL PALM SPRING VILLAGE TER 11/01/2034 | 0.00001 0.00001 | VXKS MM4707 | $6,100,000.00 $1,603,000.00 | $7,415,997.56 $2,778,904.16 | |
| TOTAL SHARES. | | | | | |
| TOTAL M.V. | | 1,603,000.00 | | 1,603,000,000.00 | |

**EXHIBIT F**

WC000049

JPM-PALMDALE000000010

LEHMAN COMMERCIAL PAPER INC.

FENWAY FUNDING LLC
810 SEVENTH AVENUE
NEW YORK NY 10019

PAGE   1 OF   3
09/12/2008

AS PRINCIPAL, WE CONFIRM THE FOLLOWING TRANSACTION:

CONTRACT NUMBER: 3A1Q040
TRADE DATE: 07/10/2008
PURCHASE DATE: 07/10/2008
REPURCHASE DATE: 09/25/2008
PRINCIPAL: 1,000,000,000.00
REPURCHASE RATE: 3.35391

THE SECURITIES DESCRIBED IN THE SCHEDULE SET FORTH BELOW SHALL BE HELD IN US FOR YOUR ACCOUNT. THE
STANDARD TERMS AND CONDITIONS SET FORTH ON THE REVERSE SIDE OF THE STANDARD FORM OF CONFIRMATION
MAILED TO YOU UPON EXECUTION OF THIS TRANSACTION ARE HEREBY INCORPORATED IN THIS SCHEDULE BY REFERENCE.

SCHEDULE OF SECURITIES SUBJECT TO
REPURCHASE CONTRACT - 3A1Q040

REDACTED

| SECURITY DESC/ MATURITY DATE | COUPON RATE | POOL/ CUSIP | ORIGINAL FACE/ # OF SHARES | CURRENT FACE OR PAR | MARKET VALUE |
|---|---|---|---|---|---|
| OAK VALLEY TERM LOAN 01/01/2014 | 0.00001 | M2100 | | 30,000,000.00 | 44,335,338.41 |

WC000050