# EXHIBIT "11"

1           UNITED STATES BANKRUPTCY COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                    --oOo--

4  In Re:                      )   Case No. SA08-17206-ES
                               )
5  PALMDALE HILLS PROPERTY, LLC, )   Santa Ana, California
                               )   Thursday, February 11, 2010
6          Debtor.             )   10:30 a.m.
                               )
7  _____)

8                              ADV. 09-01005
                               SCC ACQUISITION INC ET AL
9                              V. LEHMAN ALI INC ET AL

10                             HEARING RE: JOINT STIPULATION
                               REGARDING PLAINTIFFS' MOTION
11                             TO COMPEL DISCOVERY FROM
                               DEFENDANTS LEHMAN ALI, INC.,
12                             LEHMAN COMMERCIAL PAPER,
                               INC., NORTHLAKE HOLDINGS,
13                             LLC, OVC HOLDINGS, LLC, AND
                               LV PACIFIC POINT, LLC
14
                               CONT'D HEARING RE: DEFENDANTS
15                             LEHMAN ALI, INC., LEHMAN
                               COMMERCIAL PAPER, INC.,
16                             NORTHLAKE HOLDINGS, LLC, OVC
                               HOLDINGS, LLC, AND LV PACIFIC
17                             POINT, LLC'S MOTION TO COMPEL

18                             HEARING RE: DEFENDANT FENWAY
                               CAPITAL, LLC'S MOTION TO
19                             DISMISS THIRD AMENDED
                               COMPLAINT

20

21

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

```
 1                              CONT'D HEARING RE: DEFENDANTS
                                LEHMAN ALI INC.'S, NORTHLAKE
 2                              HOLDINGS LLC'S, OVC HOLDINGS
                                LLC'S, AND CREDITOR LEHMAN
 3                              COMMERCIAL PAPER INC.'S
                                MOTION TO DISMISS THIRD
 4                              AMENDED COMPLAINT

 5                   TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE ERITHE A. SMITH
 6                UNITED STATES BANKRUPTCY JUDGE

 7  APPEARANCES:

 8  For the Trustee and        SKIP MILLER, ESQ.
       Voluntary Debtors:      BRIAN A. PROCEL, ESQ.
 9                             MARTY PRITIKIN, ESQ.
                               Miller, Barondess, LLP
10                             1999 Avenue of the Stars
                               Suite 1000
11                             Los Angeles, California 90067
                               (310) 552-4400
12

13  For the Voluntary Debtors: PAUL J. COUCHOT, ESQ.
                               SEAN O'KEEFE, ESQ.
14                             PETER LIANIDES, ESQ.
                               Winthrop, Couchot
15                             660 Newport Center Drive
                               4th Floor
16                             Newport Beach, California
                                  92660
17                             (949) 720-4100

18  For the Lehman Entities:   DEAN A. ZIEHL, ESQ.
                               Pachulski, Stang, Ziehl &
19                                 Jones
                               10100 Santa Monica Boulevard
20                             11th Floor
                               Los Angeles, California 90067
21                             (310) 277-6910

22

23

24

25
```

*Briggs Reporting Company, Inc.*

1  APPEARANCES:   (cont'd.)

2  For the Lehman Entities:        CLAY ROESCH, ESQ.
                                   EDWARD SOTO, ESQ.
3                                  ALLEN YANCY, ESQ.
                                   Weil, Gotshal & Manges, LLP
4                                  139 Brickell Avenue
                                   Suite 1200
5                                  Miami, Florida 33131
                                   (305) 577-3100

6

7  For Fenway Capital:             RICHARD REINTHALER, ESQ.
                                   IRENA GOLDSTEIN, ESQ.
8                                  CORINNE LEVY, ESQ.
                                   Dewey & LeBoeuf
9                                  1301 Avenue of the Americas
                                   New York, New York 10119
10                                 (212) 259-8000

11 For Joint Provisional           JONATHAN M. HOFF, ESQ.
      Liquidators of Lehman RE     Cadwalader, Wickersham & Taft
12    Limited:                     One World Financial Center
                                   New York, New York 10281
13                                 (212) 504-6000

14 For the Committee in            ALAN J. FRIEDMAN, ESQ.
      Voluntary Cases:             Irell & Manella, LLC
15                                 840 Newport Center Drive
                                   Suite 400
16                                 Newport Beach, California
                                      92660
17                                 (949) 760-0991

18 For the Committee in            HUTCHINSON MELTZER, ESQ.
      Trustee Cases:               Weiland, Golden, Smiley,
19                                    Wang, Ekvall & Strok, LLP
                                   650 Town Center Drive
20                                 Suite 950
                                   Costa Mesa, California 92626
21                                 (714) 966-1000

22 For Creditor, TC               ROBERT MARTINEZ, ESQ.
      Construction Co., Inc.:      McDougal, Love, Eckis,
23                                    Boehmer
                                   460 North Magnolia
24                                 El Cajon, California 92022
                                   (619) 440-4444

25

iv

```
1  Court Recorder:              Rick Reid
                                United States Bankruptcy Court
2                               411 West Fourth Street
                                Suite 2030
3                               Santa Ana, California 92701

4  Transcriber:                 Briggs Reporting Company, Inc.
                                6336 Greenwich Drive, Suite B
5                               San Diego, California 92122
                                (310) 410-4151
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Briggs Reporting Company, Inc.*

1

1   SANTA ANA, CALIFORNIA  THURSDAY, FEBRUARY 11, 2010 10:30 AM

2                          --oOo--

3        (Call to order of the Court.)

4            THE COURT:  Going back to 34 and 35, SCC

5   Acquisition, Inc. v. Lehman Ali, Inc., et al.

6            I'm going to start with the telephonic -- excuse

7   me.  I'm going to start with the courtroom appearances, and I

8   will do a roll-call for the telephonic appearances at the

9   conclusion.

10           MR. MILLER:  Good morning, your Honor.  Skip

11  Miller and Brian Procel, litigation counsel for the trustee

12  and voluntary debtors.

13           MR. O'KEEFE:  Good morning, your Honor.  Sean

14  O'Keefe appearing on behalf of Winthrop Couchot, counsel for

15  the voluntary debtors.

16           MR. ZIEHL:  Good morning, your Honor.  Dean Ziehl,

17  Pachulski, Stang, Ziehl and Jones, appearing on behalf of the

18  Lehman entities.

19           Your Honor, also in court is Clay Roesch from the

20  Weil, Gotschal firm.  He would like to appear on the two

21  matters on this morning's calendar.  We filed a pro hac

22  application.  We have not seen the order yet.  With the

23  Court's permission, if Mr. Roesch could handle the argument

24  on the two scheduled matters, 34 and 35.

25           THE COURT:  All right.

2

1          MR. ROESCH:  Good morning, your Honor.  Clay
2 Roesch of Weil, Gotschal and Manges, on behalf of the Lehman
3 entities.

4          MR. REINTHALER:  Good morning, your Honor.
5 Richard Reinthaler from Dewey and LeBoeuf on behalf of Fenway
6 Capital.

7          MR. HOFF:  Good morning, your Honor.  Jonathan
8 Hoff for the joint provisional liquidators of Lehman RE
9 Limited.

10     (Pause.)

11          THE COURT:  On the telephonic appearances, is Mr.
12 Friedman there?

13          MR. FRIEDMAN:  (Telephonic) Alan Friedman of Irell
14 & Manella on behalf of the committee in the voluntary cases.

15          THE COURT:  All right.

16          Ms. Goldstein?

17          MS. GOLDSTEIN:  (Telephonic) Yes, I'm here, your
18 Honor.

19          THE COURT:  Please state your appearance.

20          MS. GOLDSTEIN:  Irena Goldstein, Dewey and
21 LeBoeuf, on behalf of Fenway Capital.

22          THE COURT:  Mr. Meltzer?

23          MR. MELTZER:  (Telephonic) Hutch Meltzer of
24 Weiland Golden appearing on behalf of the committee in the
25 trustee cases.

3

1        THE COURT:  Just a moment.  I will apologize ahead

2 of time if I need to take a break.  I'm dealing with a cold

3 at this point.  I've been talking a lot this morning so --

4 and just in case I need to take a break, I'll let you know

5 ahead of time but we'll see how far we can get along with

6 this.

7        As you may have noticed the tentative ruling was

8 pretty short.  It doesn't reflect the amount of time that I

9 spent reviewing this, because I did review all of the

10 stipulation, all of the arguments, and the pleadings on this.

11        I will just, before Mr. Roesch takes the podium,

12 tell you my general philosophy on discovery, and that is,

13 especially when it comes to issues of relevance, if there's a

14 close call between whether a particular item is relevant or

15 not, it's my view that I should err on the side of allowing

16 the discovery to take place.

17        And if something turns up not to be relevant, it's

18 not, but I think sometimes it's difficult to make that call,

19 particularly if it's a close call, as part of the discovery

20 motion.

21        So I will just tell you that unless it is

22 absolutely apparent unequivocally that there's no possible

23 relevance to the matters at hand, I'm inclined to allow the

24 discovery to go forward.

25        I was generally unimpressed with the arguments

*Briggs Reporting Company, Inc.*

4

1 regarding documents over which Lehman entities may not have

2 actual possession but in my view have control.

3        And so it seemed to me that based on the arguments

4 made in favor of requiring documents to be presented, whether

5 it related to documents or information or electronic access

6 to records in possession of either Barclays or A and M, that

7 the Lehman entities seem to have a sufficient basis for

8 having the ability to control the production of such

9 documents.

10       There was some -- and I may not hit on all of

11 these, but again, I just wanted to offer just a little more

12 than I had in the tentative ruling because it simply says --

13 it simply says "Grant."

14       With respect to what has been referred to as the

15 Tranche 1 documents, it wasn't clear to me that those

16 documents are entirely unrelated to the case on hand.  And

17 what I found also significant is that it appeared that the

18 defendants were also requesting documents that could be

19 categorized as Tranche 1 documents from the plaintiff.

20       So, again, not particularly impressed with that

21 argument.  But I'm absolutely open to hearing oral argument

22 on this.

23       Again, I apologize for the delay in getting to

24 you.  Hopefully, we will resolve this hearing before the next

25 hearing, although it's probably many of the same parties so

5

1 maybe it will all merge together.  I don't know.  Anyway --

2 but we'll go forward.

3          And, Mr. Roesch, I'll let you go for it.

4          MR. ROESCH:  Thank you, your Honor.

5          And, if I may, I'm going to start with the

6 Barclays and A and M documents, documents that are outside

7 the Lehman entities' possession, custody and control.  As

8 we --

9          THE COURT:  Let me say about that -- it seemed to

10 me that there was language in the agreement that seemed to

11 anticipate that there could be circumstances under which

12 documents related to litigation might be necessary or

13 might -- one party might need to have access to, and so I

14 have to tell you that that's what I found persuasive.  That

15 it seems to me that it wouldn't be that difficult and it

16 wouldn't be a burden, and it would seem to me to be within

17 the relationship between Barclay and the Lehman entities to

18 obtain that information.

19          MR. ROESCH:  With respect to Barclays and Lehman,

20 we agree, your Honor.  If you actually look at section 8.7, I

21 think, of the asset purchase agreement, it provides that the

22 seller and purchaser shall make records and personnel

23 available to the other as may be reasonably required.  And

24 that would be in connection with legal proceedings.

25          Consistent with that provision, Lehman's requested

*Briggs Reporting Company, Inc.*

6

1 that Barclays provide it with access to the documents for the

2 custodians with which we agreed to search with the debtors.

3        Now, Barclays has initially agreed to provide us

4 with access to the hard copy documents and we have produced

5 those in our initial productions.

6        The electronic documents raised a separate set of

7 issues that we've been engaged in negotiations with Barclays

8 and specifically Barclays has not agreed to provide us with

9 access to documents for those custodians while they were

10 Barclays employees.

11        Now, when Barclays purchased Lehman's assets,

12 certain of its employees also transitioned over to Barclays

13 as employees pursuant to a transition services agreement.

14 Most of those individuals were eventually terminated by

15 Barclays and some of them came back to work for Lehman.

16        Now, Barclays has agreed to give us access to

17 those individuals' documents before they went to work for

18 Barclays and after they came back to work for Lehman.  But

19 what they haven't agreed to do yet is to give Lehman access

20 to the documents during the gap period where they were

21 employed by Barclays.

22        Along the same lines, Barclays has informed us

23 that there are three individuals who are still Barclays --

24        THE COURT:  Would you explain what you mean by

25 that from a -- just logistically what does that mean?  Are

7

1 you referring to former Lehman employees who became Barclays

2 employees and the computers they used?  I mean, what exactly

3 do you mean when you say they were limiting this to former

4 Lehman employees and not to current Barclays employees?  What

5 exactly are you referring to?

6          MR. ROESCH:  Well, Barclays has all the computers,

7 the servers, the hard drives.

8          THE COURT:  Right.

9          MR. ROESCH:  On September 22nd, certain Lehman

10 employees actually went over to work for Barclays and became

11 Barclays employees.  And certain of those employees, I think

12 the majority of them who came back to work for Lehman came

13 back around mid-October.

14          So there's a period between September 22nd and

15 mid-October for most of those employees -- the dates could

16 vary -- for which Barclays has not agreed to provide us

17 access to the documents.

18          THE COURT:  And the documents that they are

19 agreeable to?

20          MR. ROESCH:  They are agreeable to the documents

21 before that time period and after that time period because

22 after that time period, assuming those people went back to

23 work for Lehman, they would have been creating Lehman

24 documents.

25          What Barclays issued is the turnover of Barclays

8

1 documents, what they see as documents created by Barclays

2 employees.

3        And just to clarify, your Honor, there are three

4 individuals who Barclays has informed us have been

5 continuously employed since September 22nd, and they have not

6 agreed to provide us with documents after that date for those

7 three individuals.

8        THE COURT:  So as to the period before September

9 22nd, they've allowed access to electronic files for that

10 period?

11        MR. ROESCH:  That's correct, your Honor.  So --

12        THE COURT:  And what is the status of that?

13        MR. ROESCH:  We've been told that it's going to

14 take an additional three weeks or so to obtain the remainder

15 of the Barclays documents.  And those are the documents that

16 Barclays has already agreed to provide us.

17        Once we get those documents, we're going to have

18 to load them into our review tool -- go through them, review

19 them for responsiveness and privilege.  And once we have that

20 review, then we'll produce them as soon as we can.

21        Also, we're still in negotiations with Barclays to

22 try and get access to the documents for that gap period, so

23 between September 22nd and the mid-October, give or take,

24 termination date for certain employees.  And in the event

25 those negotiations are successful, we'll be producing those

9

1  documents as well.

2          THE COURT:  All right.

3          MR. ROESCH:  Now, with respect to the A and M

4  documents, as we explained in our portion of the joint

5  stipulation, we haven't refused to produce A and M documents.

6  In fact, we've agreed to produce any A and M documents that

7  we have stored on our computer systems or that were sent

8  through our email systems.

9          But to the extent the debtors are seeking to

10  compel us to go to A and M's system, search for documents and

11  review and produce them, those documents simply aren't in our

12  possession, custody and control.  A and M was hired to assist

13  Lehman in its restructuring and there's nothing in Lehman's

14  contract with A and M that permits Lehman to demand access to

15  A and M's documents.

16          Now, in their portion of the joint stipulation,

17  the debtors identify two provisions in Lehman's contract with

18  A and M that they believe support their argument.  But,

19  again, neither provision provides that Lehman may demand

20  access to A and M's documents.

21          Now, the first provision they point to is

22  paragraph 1(d) and the specific sentence that they cite reads

23  that:  The CRO, which is the chief restructuring officer, and

24  the additional officer shall operate under the direction of

25  the board.

10

1        But paragraph 1(d) deals with the scope of A and

2 M's employment and specifically it deals with the issues of

3 whether A and M can undertake other matters while at the same

4 time continuing to assist Lehman in its restructuring.

5        If you look at the first sentence of that

6 paragraph 1(d), it states that the CRO and any additional

7 personnel will continue to work with other personnel of

8 A and M in connection with other unrelated matters which do

9 not unduly interfere with the services pursuant to this

10 engagement.

11        And the remainder of that provision provides that:

12 The CRO shall not undertake another client engagement for six

13 months from the date hereof to the extent required to provide

14 services hereunder, the additional officers will devote all

15 of their business time to the business affairs of the company

16 but it will not be a breach of the foregoing for them to

17 attend to administrative matters of A and M.

18        So the ability for Lehman to demand access to

19 A and M's documents is not mentioned anywhere in that

20 paragraph 1(d).  The words are absent.  The concept is

21 absent.  It's not there.

22        Now, the other contractual provision that the

23 debtors have cited to is the indemnification agreement

24 between Lehman and A and M.  But we don't believe that

25 agreement permits Lehman to demand access to A and M's

11

1 documents either.

2        Now, the indemnification agreement provides that
3 Lehman shall reimburse A and M for any costs associated with
4 searching for, complying or producing documents pursuant to a
5 subpoena or other legal or administrative process.

6        Now, the argument that this provision gives Lehman
7 the right to access A and M's documents can't be reconciled
8 with the plain language of that provision.   The
9 indemnification agreement provides that Lehman shall
10 reimburse A and M for costs associated with producing
11 documents.

12        If Lehman had the right to access those documents,
13 there would be no need to reimburse A and M since it would be
14 Lehman who is incurring the cost to collect, review and
15 produce those documents.

16        Your Honor, with respect to the cases cited for
17 the defendants for the proposition that the practicability to
18 obtain documents equals control for purposes of Rule 34 --

19        THE COURT:   Can you describe the relationship
20 between Lehman and A and M?

21        MR. ROESCH:   Yes, your Honor.   A and M was hired
22 to assist Lehman in its restructuring process.

23        THE COURT:   What does that mean?   Does that mean
24 acting as its agent, acting as a -- you know, basically an
25 officer capacity?

12

1          MR. ROESCH:  Certainly, it does.  The chief

2 restructuring officers come in and oversee Lehman's affairs.

3 And that's why we've agreed to produce any A and M documents,

4 any documents those people created that are on our system and

5 that have been sent through our email system.  Those

6 documents we agree are in our control.  In fact, they're in

7 our actual possession.

8          THE COURT:  So to the extent that A and M

9 performed services for Lehman and there were documents

10 relating to those services on their own computers, you're

11 saying that Lehman does not have control over that?

12          MR. ROESCH:  That's correct, your Honor.  The

13 contract between A and M and Lehman does not give Lehman the

14 right to request access to those documents.

15          THE COURT:  All right.

16          MR. ROESCH:  As I was saying, your Honor, the

17 cases cited by the debtors are inapposite.  The first case is

18 In re Synopsis, Inc. -- I'm sorry, In Synopsis v. Rio

19 (phonetic), and in that case the court based its finding of

20 control principally on the fact that the defendant was able

21 to secure a search of the third party's documents and

22 actually provided a declaration in connection with that

23 search.  So that defendant had shown that he could actually

24 go and search the third party's documents and that was the

25 primary basis for the court's finding on control.

13

1        That's not the case here.  We don't have the same

2 control or ability to search A and M's documents.

3        Now, with respect to the Ice Corp. (phonetic)

4 case, in that case there was a contract between the defendant

5 and a third party exclusively providing that the defendant

6 owned the legal right, title and interest to all of the

7 documents that were held by the third party.

8        And that's not the case here.  There's no similar

9 provision in Lehman's contract with A and M.

10        THE COURT:  Has Lehman had discussions with

11 A and M about providing documents pursuant to the request?

12        MR. ROESCH:  I don't believe so, your Honor.  I'm

13 not sure.  Mr. Soto can address that, your Honor, if you'd

14 like to hear from him.

15        MR. SOTO:  (Telephonic) Your Honor, we had

16 discussions with the A and M people who were involved in the

17 SunCal matter about producing all of the documents on our

18 systems, which are the systems that have been used in the

19 SunCal -- or our systems being the systems that currently

20 exist, but also the Barclays systems which are not our

21 systems but also exist, and informed them that we were

22 producing all of the A and M documents of any relevance to

23 SunCal.

24        They understood that, and we have already produced

25 those documents with the exception of the Barclays documents

*Briggs Reporting Company, Inc.*

14

1  that we'll get, if any are on that system.

2         So we've been including documents by, for example,

3  Mr. Fitts, Mr. Pietroforte, the names that we were given by

4  SunCal.  Those have been produced.

5         I think the distinction, certainly in our minds

6  and we think in the law, is A and M comes in to oversee the

7  operations of Lehman as the CRO, as mentioned by Mr. Roesch.

8  They're at our place, the office, you know, at the Lehman

9  offices.  They use the Lehman computers that exist and they

10 use the Barclays computers as they previously existed.

11 Anything on all of that we've searched and we're producing.

12        The difference is, A and M is a consultant on many

13 other matters having nothing to do with Lehman and, you know,

14 what we see this request as saying is we've got to go search

15 their computers, they're a consultant.

16        This is not to suggest that if they are, that they

17 couldn't be subpoenaed and somebody couldn't go get the

18 records from them.  That's right.  Someone could do that.

19 And that's contemplated under our contract.  That's why we

20 have to reimburse them if indeed someone wants records other

21 than our records.  When it's their records, they subpoena

22 them, and if it has anything to do with us, we're going to

23 have to reimburse them.

24        And so the conversations we've had have been about

25 producing our records.  If the Court were to require us to go

15

1 further than that, we'd have to have additional conversations

2 which we have not had yet, contemplating that the proper

3 procedure is for the debtor to subpoena A and M and get

4 whatever documents it's going to get from A and M.

5       We've already searched -- well, with the exception

6 of Barclays I keep saying because we haven't searched it yet,

7 but theoretically they'll be searching it and hopefully we'll

8 get it in three weeks. But we've searched what we have. And

9 I think that's the -- that's the answer.

10       THE COURT: All right.

11       MR. ROESCH: Okay, your Honor. I'd like to move

12 on, if I could, to the Tranche 1 documents.

13       As you know from the joint stipulation, these

14 documents are relating to the SunCal projects that are not

15 involved in this case. The debtors have argued that they're

16 relevant to prove Lehman's insider status, but under section

17 101 of the Bankruptcy Code, to prove that the Lehman entities

18 were insiders, the debtors would have to show that the Lehman

19 entities were affiliates or an inside of an affiliate if such

20 affiliate were the debtor.

21       And it's that reference to the debtor that is key.

22       Proof that Lehman may have had a joint venture or

23 a similar course of dealing with another SunCal entity that's

24 not a debtor on projects that aren't involved in this case is

25 not going to help the debtors prove that any Lehman entities

16

1  were an insider of any debtor who's involved in these

2  proceedings.

3          Now, your Honor had mentioned that when we served

4  our request, we did include references to certain Tranche 1

5  projects, and specifically they were Heritage Fields, College

6  Park, and Summerlin (phonetic).

7          At the time, we didn't realize that those were

8  Tranche 1 projects.  Our requests for production were

9  designed to get information about the allegations in the

10  third amended complaint.  And if you look at paragraphs 53

11  and 54 of that complaint, they contain allegations relating

12  to those three projects and those three projects only.

13          You won't see any reference in our requests for

14  production to the other Tranche 1 projects.  You won't see a

15  reference to Borchard (phonetic) or Patterson or any of the

16  others.  And when we received the debtor's RFPs, we focused

17  our investigation on those particular projects and we found

18  that they have nothing to do with this case, that they're

19  projects that don't involve the debtors here.

20          And so our requests related to those projects I

21  don't think is an admission that they're relevant.  It simply

22  reflects an attempt to gather information about the

23  allegations in the third amended complaint.

24          THE COURT:  All right.

25          MR. ROESCH:  The next set of documents that the

17

1 debtor has placed at issue were documents related to Lehman's

2 effort to syndicate the SunCal loans, so-called Churchill and

3 Roosevelt documents.

4        The debtors again have argued that these documents

5 are relevant to establish Lehman's motivations for wanting to

6 proceed with the development of the projects, but again,

7 they're mistaken.  Those documents aren't relevant.

8        Motivation or intent is not an element of

9 equitable subordination.  Equitable subordination requires

10 proof that Lehman engaged in some sort of inequitable

11 conduct, that that misconduct injured creditors or that it

12 conferred an unfair advantage on Lehman, and its

13 subordination would not be inconsistent with the Bankruptcy

14 Code.

15        What you didn't hear in any of those elements was

16 any mention of intent or motivation.  So the argument that

17 those documents are necessary to prove that intent is a non-

18 starter.

19        The next set of documents I think falls into the

20 same category, that's documents involving plaintiffs' request

21 that Lehman produce documents regarding the knowledge of

22 Lehman's financial condition or its impending bankruptcy.

23        Again, to the extent the debtors believe those

24 documents are going to demonstrate the Lehman entities'

25 reason for encouraging development of the debtor's projects,

18

1 that's irrelevant.  It doesn't show that Lehman engaged in

2 any inequitable conduct.  It doesn't show that the alleged

3 misconduct injured creditors or conferred an unfair

4 advantage.

5        And, your Honor, these documents are also

6 irrelevant to the motion for substantive consolidation.

7 Substantive consolidation requires an examination of the

8 debtor's finances, not Lehman's.  So to the extent that the

9 debtors are seeking these documents with respect to the

10 motion for substantive consolidation, those are irrelevant.

11        Now, the next category of documents -- again,

12 forgive me, I know there are a bunch of different

13 categories -- involve the transfer of interest in the SunCal

14 loans, and here SunCal is seeking the production of two

15 different subsets of documents.

16        The first is transfers between the Lehman entities

17 and third parties:  Fenway, Lehman RE, and Danske.  But

18 whether Lehman transferred an interest in any of those loans,

19 again, it doesn't go to any of the elements of equitable

20 subordination.

21        There's nothing inherently inequitable about the

22 transfer of an interest in a loan to a third party.  It

23 didn't affect SunCal one bit.  In fact, SunCal had already

24 defaulted under the loans that were transferred to Fenway.

25        Now, the debtors have also argued that Lehman may

19

1 have concealed the transfer of any remaining -- the remaining

2 five loans, in other words, loans that were involved in the

3 Fenway, Danske or Lehman RE transfers.  And they base that on

4 their idea that Lehman concealed the transfers to Fenway.

5       But nothing could be further from the case, your

6 Honor.  I think we've heard in previous hearings that on

7 April 15th, Mr. Soto sent a letter to the debtors in response

8 to their inquiry disclosing Fenway, Danske and Lehman RE

9 transfers.

10       But more to the point, there's not a single

11 allegation in the complaint that Lehman transferred an

12 interest in any of the other loans to any other third

13 parties.  So this request is just a fishing expedition

14 looking for something that's not there.

15       Now, the second subset of documents are what the

16 debtors call the inter-Lehman transfers or transfers between

17 the various Lehman entities.  The debtors only spent one

18 paragraph in their joint stipulation on these alleged

19 transfers.  I think it can be disposed of just as quickly.

20       The debtors argue that the Lehman entities blurred

21 their roles, and whether that's true or not -- and we don't

22 believe it is -- blurring of the roles, again, it doesn't go

23 to any of those three elements of equitable subordination

24 that I mentioned earlier.

25       And, you know, like the third party transfer

20

1 documents, the evidence that the Lehman entities transferred

2 interest in the SunCal loans between themselves, if they did,

3 it also doesn't go to any of those three elements.

4         Now, the debtors have also argued that those

5 inter-Lehman transfers are relevant to the substantive

6 consolidation motion.  And, again, that's just not the case.

7         Substantive consolidation requires proof of a

8 substantial identity between the entities to be consolidated.

9 That's the debtors, that's not Lehman.  So proof of what

10 Lehman did on its side has nothing to do with what the

11 debtors were doing during the relevant time period.

12         The eight categories of documents that SunCal is

13 seeking to compel the production of are documents relating to

14 their allegation that Lehman wrongfully withdrew money from

15 certain accounts -- certain SunCal accounts, I should say.

16         Of all the allegations in the third amended

17 complaint, there's only one that relates to an alleged

18 withdrawal of money from an account, and that paragraph

19 specifically identifies the accounts of Marblehead and

20 Heartland.  There's not a mention of any other account.

21         Now, even though the allegations in the complaint

22 are so limited, the debtors now claim that the Lehman

23 entities may -- and I stress may -- have also attempted to

24 withdraw cash from certain other accounts.

25         But there is not a single allegation or even a

21

1 statement on information and belief that Lehman withdrew

2 money from any accounts other than the two identified in the

3 third amended complaint.

4   And more to the point, your Honor, there's no

5 doubt that the debtors are in possession of documents

6 relating to their own bank accounts.  They would know whether

7 or not the Lehman entities withdrew money, attempted to

8 withdraw money, and whether in fact any money was withdrawn.

9   But since there are no allegations in the third

10 amended complaint related to the withdrawal of money from

11 other accounts -- those being not Marblehead and not

12 Heartland -- I believe the motion to compel production of

13 those documents should be denied.

14   Your Honor, the second to last category of

15 documents implicated by debtor's motion is the documents that

16 relate to post-petition conduct.

17   As you know, the debtors are seeking to compel the

18 production of documents created after the petition date in

19 this case.  According to SunCal, these documents consist of

20 communications relating to the filings of the proofs of claim

21 and the implementation of LCPI's automatic stay.

22   The BAP has already resolved the issue of the

23 automatic stay.  And no matter how hard SunCal tries to

24 ignore that issue and argue that LCPI didn't retain an

25 interest in any of those loans, that's simply not the case.

22

1          Not only did LCPI retain the Ritter Ranch revolver

2 loan, but the contractual rights to repurchase the loans

3 transferred to Fenway is also property of LCPI's estate.   And

4 that includes the right to repurchase the SunCal Community I

5 loan that the debtors cite in their portion of the joint

6 stipulation.

7          Now, your Honor, with respect to the proofs of

8 claim, this Court has already ruled that Lehman was Fenway's

9 agent and that the claims would not be struck.

10          So based on the law of this case, your Honor,

11 which is your agency ruling and the BAP's ruling, none of the

12 post-petition allegations which they cite in their portion of

13 the joint stipulation could even withstand a motion to

14 dismiss.   But even if they could, the cases that the debtors

15 rely on for the proposition that you can subordinate pre-

16 petition claims based on post-petition conduct are simply

17 inapplicable.

18          In those cases, post-petition conduct was used to

19 subordinate post-petition claims or that post-petition

20 conduct harmed the pre-petition creditors.

21          Here, we're not talking about post-petition

22 claims.   And based on your Honor's ruling and the BAP's

23 opinion, Lehman's post-petition conduct was proper and thus

24 could not harm the pre-petition creditors.

25          As a result, your Honor, these requests are

23

1 nothing more than an attempt to force Lehman to engage in

2 more pointless discovery.

3          Now, your Honor, the last set of documents sought

4 by debtors pertains to the documents post-December 2nd, 2008.

5 To the extent the Court agrees with us that post-petition

6 inequitable conduct is irrelevant to the claims in this case,

7 there's no need to separately address this category.

8          These documents are not relevant to substantive

9 consolidation or equitable subordination.  Nevertheless, in

10 their request for production, SunCal has sought the

11 production of documents up to and including June 30th, 2009.

12          Now, again, we don't believe that the post-

13 petition documents are relevant.  But in an attempt to

14 compromise with the SunCal debtors, we offered to produce

15 documents up until December 2nd, 2008.

16          We chose that date for a couple of reasons.  After

17 the debtors filed their petition for bankruptcy, Lehman and

18 SunCal engaged in a series of negotiations, trying to reach

19 an agreement on a deal that would avoid this litigation.  And

20 those negotiations came to an impasse on December 2nd, 2008.

21 From that date forward, both SunCal and Lehman agreed there

22 was not going to be a deal and that they should be prepared

23 to litigate.

24          Now, the debtors have not offered a reason why

25 documents from December 2nd, 2008 through June 30th, 2009

24

1  would be relevant to their attempt to subordinate Lehman's

2  pre-petition claims.  In fact, in their portion of the joint

3  stipulation, they simply hypothesize that these documents may

4  relate to pre-petition conduct, but that's not sufficient

5  under Rule 26, and as a result the debtor's motion to compel

6  the production of these documents should be denied.

7       Your Honor, unless you have any questions, I'm

8  going to move on to Lehman's motion to compel.

9       THE COURT:  All right.

10      MR. ROESCH:  And I'm going to begin, if I may,

11 with a little bit of background on this motion.

12      In connection with the discovery that we sought in

13 this case, we initially sought documents from 54 custodians.

14 And that might sound like a high number, and certainly SunCal

15 is trying to create that perception in their papers.  But

16 when you look at the number of projects, the number of

17 individual debtors, it comes out to slightly more than two

18 custodians per debtor.  That's not a high number, given the

19 26 different entities involved in this case.

20      Now, after engaging in a series of meet and

21 confers with the debtors, the Lehman entities agreed to

22 withdraw what ultimately became five of those custodians.  So

23 currently we have 49 custodians we're seeking documents from.

24 And of those 49, SunCal has refused to search or produce

25 documents from 21 of them.

25

1          Your Honor, I think your tentative recognizes that

2 the documents that these custodians hold are both relevant

3 and potentially responsive to the Lehman entities' request.

4 And, in fact, I believe SunCal would agree with that in their

5 portion of the joint stipulation when they say that the only

6 issue is one of burden.

7          So, in truth, your Honor, what SunCal has raised

8 as its burden argument is actually an argument that it is

9 inconvenient for them to search documents from these

10 additional custodians.

11          We understand the burden.  But SunCal has

12 nevertheless decided to unilaterally limit the documents that

13 it will review.  And according to SunCal, they're going to

14 incur somewhere in the neighborhood of one million dollars to

15 search the additional custodians.

16          In your Honor's tentative, you split the cost

17 between SunCal and Lehman, and I'd like to address why we

18 don't think that is appropriate in this circumstance.

19          THE COURT:  I'll explain the reason for that, and

20 that is -- and you can address this issue -- that I found

21 persuasive their argument regarding the financial burden of

22 having to do this at all.  And so as between not allowing it

23 all on the basis that it was a significant financial burden

24 and allowing it but trying to meet some medium in terms of

25 reducing that burden to allow it to continue, that's how I

26

1 got to the split cost, just so you know.

2          MR. ROESCH:  I understand, your Honor.  Putting

3 aside the accuracy of the calculations that SunCal put forth

4 in its portion of the joint stipulation, they're seeking to

5 subordinate over a billion dollars of the Lehman entities'

6 claims.

7          Their claim that they're going to spend a million

8 dollars in additional costs is one-tenth of 1 percent of the

9 total amount of claims they're seeking to subordinate in this

10 case.

11          And when they cited the case of <u>Nugget</u>

12 <u>Hydroelectric v. PG&E</u> in support of their argument that costs

13 for searching the additional custodians' documents would

14 create an undue burden, I think they miss the point in that

15 case.

16          In <u>Nugget</u>, the court found that most of those

17 documents fell outside the scope of discovery articulated in

18 Rule 26; in other words, the documents that -- I think it was

19 the plaintiff in that case was seeking the production of,

20 were not reasonably calculated to lead to the discovery of

21 admissible evidence.

22          That's not the case here.  These custodians have

23 relevant responsive documents in their possession -- ·

24          THE COURT:  What standard should I apply then in

25 determining whether or not to limit discovery on the basis of

27

1 undue burden?

2        MR. ROESCH:  Well, your Honor, we don't believe

3 there is any undue burden here.  We believe that because

4 these custodians have relevant and responsive documents, they

5 should have been included in the initial search and

6 production of documents.  That because they weren't, SunCal

7 is now --

8        THE COURT:  Well, my question was:  What is the

9 standard for determining undue burden, as you understand it,

10 based on your review of case law interpreting that rule?

11       MR. ROESCH:  Well, your Honor, you need to look at

12 the relevancy of the documents required, you need to take a

13 look at the costs that the producing party is going to incur,

14 and you need to look at that in the context of the overall

15 amount of the -- the overall disputed amount at issue.

16       THE COURT:  So where can I find that standard,

17 that you determine, let's just say financial burden based

18 upon the overall amount of what's being sought versus the

19 financial ability of the producing entity?

20       MR. ROESCH:  Well, I don't know that it's the

21 financial ability of the producing entities as part of that

22 test.  You weigh the factors --

23       THE COURT:  Well, I just asked you where you were

24 getting the test from.  Is it strictly your interpretation of

25 the rule or are you basing it on some case law?

28

1          MR. ROESCH:  Your Honor, I don't have the case

2 cite in front of me.  I'm sorry.

3          MR. SOTO:  Your Honor, we can get you the cost

4 shifting cases from the Ninth Circuit and certainly --

5          THE COURT:  I'm sorry.  I can't --

6          MR. SOTO:  The cost shifting cases from the Ninth

7 Circuit, because this is essentially cost shifting --

8          THE COURT:  Right.

9          MR. SOTO:  -- and the cost shifting cases from the

10 Ninth Circuit do have a standard and we'll get those for you

11 and can be prepared to address them.

12          MR. ROESCH:  So, your Honor, in light of the total

13 amount of the claims that the debtors are seeking to

14 subordinate, as well as the highly relevant nature of the

15 documents these custodians will have, the Lehman entities

16 should not be required to bear half the cost of the burden of

17 producing those documents.

18          THE COURT:  Okay.

19          MR. ROESCH:  Thank you, your Honor.

20          THE COURT:  Who is arguing for the plaintiffs?

21          MR. MILLER:  Mr. Procel will be arguing for

22 debtors --

23          THE COURT:  All right.

24          MR. PROCEL:  Good afternoon, your Honor.  Brian

25 Procel on behalf of the debtors and trustee.

29

1        If I may, I'd like to take the last issue first.
2  I think we can dispose of that fairly quickly.
3        I believe the Court's question was, what is the
4  standard for undue burden, and we cite to it in our papers at
5  page 14.
6            "In weighing the benefits and
7            burdens of discovery, the court must
8            take into account, among other things,
9            the needs of the case, the amount in
10            controversy, the importance of the
11            issues at stake, and the importance of
12            the discovery in resolving the issues."
13  And that's FRCP, 26(b)(2)(c)(3).
14        Here, although Lehman claims that the discovery is
15  relevant, we have submitted admissible evidence from Frank
16  Faye, the declaration of Frank Faye, who is the current chief
17  operating officer who is very familiar with all of the
18  projects at issue, and the project managers whose computer
19  files have been requested.
20        Mr. Faye has indicated that there would be a large
21  amount of documents dealing with the day-to-day operations of
22  the projects, which would be highly irrelevant to the facts
23  of this case.  They would be dealing with routine matters
24  such as scheduling, the construction, entitlements, things of
25  that nature.  And for that reason, we think that the majority

30

1 of the information would be irrelevant.

2        Notwithstanding that fact, we did not object on

3 relevance grounds.  We have never sought to withhold the

4 information from Lehman.  We have merely requested that

5 Lehman bear some or all of the cost of production, which is I

6 think what the Court struck a balance with in the tentative

7 ruling.

8        In light of the standard and the tenuous

9 relationship to the facts of the case, we would agree that

10 Lehman should bear half the cost and we're happy to produce

11 those documents.

12        Unless the Court has any questions, I'm happy to

13 move on to the --

14        THE COURT:  Well, one of the factors is -- you

15 might have mentioned -- is the party's resources.

16        MR. PROCEL:  Correct, your Honor.  And -- sorry.

17        THE COURT:  So my tentative ruling, I suppose,

18 reflects an understanding that the resources of the

19 plaintiffs were limited, and I'm wondering am I correct about

20 that and where can I find evidence that that is the case.

21        In other words, it's one thing to argue that it

22 will cost $1.2 million to do it, but if there are, you know,

23 significant assets in the estate, then maybe the $1.2 million

24 is not so burdensome.

25        MR. PROCEL:  Correct, your Honor.  The documents

31

1 on file in our case indicate that the debtors, I believe

2 currently have approximately 8 to $10 million total for the

3 entirety of the litigation, whereas Lehman has substantially

4 more than that.

5       I don't know that we submitted a declaration to

6 that effect, but I don't think there's any dispute in this

7 case that Lehman has spent hundreds of millions of dollars on

8 the litigation and related consultants and that they have

9 substantially more than that in their coffers.

10       Nor do I think that Lehman has made any issue of

11 that in the papers.

12       THE COURT:  All right.

13       MR. PROCEL:  Thank you, your Honor.  I guess I'd

14 like to move on.  I'll try to take the issues in the same

15 order as Mr. Roesch.

16       So I'll begin with control of the documents and in

17 the possession of Barclays.  I think what we have here is

18 just a fundamental disagreement on what the term "control"

19 means in the -- with respect to the FRCP.

20       It sounds as though the Lehman entities would have

21 the Court believe that possession equals control, which is

22 not the standard.

23       What the standard is, is "documents are considered

24 to be under a party's control when that party has the right,

25 authority or practical ability to obtain the documents from a

32

1 non-party to the action."  And that's from the Bank of New

2 York v. Meridian case, 171 FRD 135.

3         Practical ability is clearly not the same as

4 possession.

5         In this case, we were able to locate and provide

6 the Court the operative agreement that was entered into

7 between Lehman and Barclays.  And Mr. Roesch did discuss the

8 relevant section of that paragraph 8.7 which states that:

9              "Barclays shall make such records

10             and personnel available to Lehman as may

11             be reasonably required by such party in

12             connection with, among other things, any

13             legal proceedings against seller or

14             purchaser or any of their affiliates."

15        We believe that all the -- the conditions have

16 been satisfied here.

17        We have a legal proceeding.  We have requested

18 documents.  And the only issue really is whether the records

19 are reasonably required.

20        In this case, with the Court order, we believe

21 that that would be the requirement that the provision is

22 looking for.

23        But in addition to that, the documents that we're

24 seeking are reasonable under the circumstances.  We've asked

25 for documents between September 2008 and June of '09 relating

33

1  to a limited number of custodians.

2          We haven't heard or received any evidence from

3  Lehman that Barclays has objected to the scope of the

4  discovery or the discovery itself.

5          It seems as though Barclays is acting in its own

6  self-interest in attempting to gerrymander what they want to

7  produce.  They apparently want to produce only certain dates

8  and certain people.  Barclays wants to withhold documents

9  relating to current employees.

10          There's nothing in this agreement that anyone can

11  point to that allows Barclays the right to do that.  In fact,

12  Barclays is not the arbiter of what is in Lehman's control,

13  despite what Lehman states.

14          In their brief, Lehman states at page 12, line 26:

15              "To the extent that Barclays denies

16          the Lehman entities access to the

17          documents, the Lehman entities clearly

18          lack possession, custody or control of

19          those documents."

20          That's just not the law.  Barclays is not the

21  judge and jury with respect to discovery in this case.

22  That's an issue for the Court to decide.  Control is an issue

23  of law.

24          THE COURT:  So if Barclays declines to allow

25  access, then what?

34

1          MR. PROCEL:  Well, then I think that we --

2          THE COURT:  Does that mean that Lehman, then, is

3 in contempt of the Court's order?

4          MR. PROCEL:  If --

5          THE COURT:  Does that make sense to you?

6          MR. PROCEL:  On some level, it does, your Honor,

7 to the extent that we don't know at this point what efforts

8 Lehman has undertaken to request those documents.

9          There's no evidence before the Court that Lehman

10 has made a request for the documents.  There's no evidence

11 before the Court concerning which requests were made.  And

12 there's no evidence before that Barclays has -- no admissible

13 evidence that Barclays has denied any of that.

14          And just as Mr. Soto admitted, that Lehman hasn't

15 requested any documents from A and M, I don't know what we

16 can do at this point with respect to Barclays' decision not

17 to release the documents.  I think that's premature.

18          But if that were to arise, I think that

19 Barclays -- we would probably end up subpoenaing Barclays,

20 and they would probably be sanctioned at that point for --

21          THE COURT:  Well, I guess that begs the question

22 why not just subpoena Barclays in the first instance?

23          MR. PROCEL:  Yeah, that was a debate that we had

24 internally.  It's a fairly lengthy strategic decision that we

25 arrived at, but the reason was because we initially

35

1 subpoenaed Fenway early on in the case.  We sent several

2 subpoenas to them.  We received no documents, and we ended up

3 going around in circles with a lot of different parties for

4 quite some time in an effort to get the documents.

5          With respect to these issues, we made a decision

6 that it would be better to hold the parties who are currently

7 involved in the case to their obligation to provide the

8 documents that are under their control.

9          With respect to the law on that point, your

10 Honor -- that's the practical side of it.  With respect to

11 the law on that point, the Ice Corp. case that we cited in

12 our brief dealt with that very issue, and the court said:

13               "The Court does not agree with

14          defendants' argument that plaintiff

15          cannot file a motion to compel

16          defendants to produce documents

17          pertaining to a non-party pursuant to

18          FRCP 34 until plaintiff has attempted to

19          obtain those documents by means of a

20          subpoena to the non-party.

21               Where plaintiff has some evidence

22          that would indicate that a party has

23          control over the documents of a non-

24          party, even though the non-party has

25          actual possession of the documents,

36

1 plaintiff can proceed under Rule 34 if

2 it can meet the burden of proving that

3 the defendants have the requisite

4 control."

5  And in this case, we think based on the language

6 of the Barclays/Lehman agreement, they clearly have control

7 here.

8  And the fact of the matter is, we just don't know

9 what the discussion is between these parties.  Barclays seems

10 to be agreeing to produce hard documents but not electronic

11 documents and they'll produce documents before a certain date

12 but not after a certain date.  None of that can be based on

13 this agreement.  It seems to be based on their own self-

14 interest.

15  And we think a Court order would probably prompt

16 Barclays to act appropriately.

17  THE COURT:  I guess you recognize at this point

18 that any order issued by this Court would be directed to

19 Lehman since there's no basis for the Court to assert

20 jurisdiction over Barclays at this point.

21  MR. PROCEL:  We agree with that, your Honor.  But

22 we nevertheless made a decision early on that we think that

23 that order would be enough to compel Barclays to comply with

24 the contract and to produce the documents that we've

25 requested.

37

1          THE COURT:  In your view, what would the language
2 of the order sound like --

3          MR. PROCEL:  The language would be --

4          THE COURT:  -- that would be persuasive to
5 Barclays?

6          MR. PROCEL:  The language of the order would state
7 that:  The Court finds that pursuant to paragraph 8.7 of the
8 Barclays/Lehman agreement, Lehman has control over the
9 requested documents and Lehman must produce those.

10          And to the extent that Barclays then refuses to
11 produce those documents, Lehman would have a cause of action
12 against Barclays for breach of contract.  And we don't
13 anticipate that Barclays would, at that point, continue to
14 withhold the documents.

15          THE COURT:  Okay.  It seems that it may be subject
16 to some interpretation in terms of what documents are
17 included.  Clearly, something is included if they've drawn
18 apparently, based on what I've heard anyway, a line in the
19 sand in terms of what they believe they're required to
20 produce under the agreement and what they're not required to
21 produce.  So having taken that position and having
22 interpreted the section 8.7 as they have, I guess I'm just
23 wondering why an order would make any difference.

24          MR. PROCEL:  Well, I think because Barclays is
25 acting in the absence of an order.  I think right now they

**Briggs Reporting Company, Inc.**

38

1 don't feel like they are compelled to do anything at this

2 point.  They don't feel like they're exposed to any liability

3 for breach of contract.  They don't know what the Court's

4 opinion is on whether or not Lehman has control over these

5 documents pursuant to the agreement.

6        And in fact, your Honor, this is an issue that has

7 come up frequently and it has come up in the cases that we've

8 cited.  It's an issue where -- anytime a party requests

9 documents from an opposing party where those documents are in

10 control of a third party, this is going to come up.

11        But the law is very clear that Lehman or a party

12 to a case has an obligation to produce all documents that are

13 reasonably obtainable, meaning that it does have to go out

14 and get documents from third parties.  And the reason that

15 the law is there is because the Court does have some

16 jurisdiction and does have some force in that context by

17 requiring the party to the case to go out and seek the

18 documents from the non-party.

19        More importantly, though, I think we would like to

20 see some evidence from Lehman, if it proves to be true that

21 Barclays is going to withhold those documents, that this is

22 in fact what's going on.  Let them submit a declaration to

23 the Court indicating that they have requested all of the

24 documents in here and they've informed Barclays of the

25 Court's order and Barclays is continuing to refuse to do

39

1 that.

2           THE COURT:  All right.

3           MR. PROCEL:  With respect to A and M, there's

4 obviously an overlap of issues.  However, we believe that the

5 relationship between the parties is more significant than the

6 contract itself.

7           With respect to A and M, A and M is the

8 restructuring firm that has been involved in the case since

9 September of 2008, since Lehman's bankruptcy.  Lehman has

10 paid A and M more than $200 million over the course of that

11 time period.

12          A and M's principal, Brian Marsal, has acted as

13 the head of Lehman during that entire period.  And more

14 importantly, A and M's employees have acted not necessarily

15 on behalf of Lehman but as if they were Lehman.  And they've

16 done so in this very courtroom.

17          Jeff Fitts and Gerald Pietroforte have executed

18 documents that were on behalf of a Lehman entity, not on

19 behalf of A and M but on behalf of Lehman as if they were

20 employed by Lehman.

21          A and M signed the proofs of claim that were filed

22 in this Court on behalf of Lehman.

23          A and M signed the amended 2919 statement that was

24 filed in this Court on behalf of Lehman, not A and M, with no

25 reference to A and M whatsoever.

40

1         And so we would argue that Lehman and A and M

2 cannot now invoke their ostensibly distinct identities when

3 in fact they have acted interchangeably not only in the

4 business world and not only with respect to SunCal, but also

5 in this very courtroom.

6         I think it's also telling, if not disturbing, that

7 Lehman has not requested any of the documents from A and M up

8 until this point.  As discussed previously, Lehman had an

9 obligation to obtain all of the documents within its control.

10 And control is defined as the practical ability to obtain.

11         So if Lehman never asked A and M whether they

12 would be willing to produce the documents, how do we even

13 gauge that at this point?  This is something that should have

14 occurred months ago.

15         You know, I suspect the fact that the question was

16 never asked is because the answer probably would have been

17 yes.  And we probably would have had those documents by now.

18         The -- and this argument goes to both Barclays and

19 A and M issues.  The idea that there is no express provision

20 in a contract that requires A and M or Barclays to produce

21 the requested documents, that very argument has been

22 considered and rejected.

23         In the Ice Corp. case that we cite to in our

24 brief, the court states:

25                 "While defendants base their

41

1        argument on the fact that the contract

2        between themselves and Artus" --

3 A-R-T-U-S --

4        "does not expressly allow for the

5        copying of these documents, defendants

6        have failed to persuade the Court that

7        they could not simply ask or employ

8        their right or ability to influence

9        Artus for copies of the designs.

10        Here, the Court has every reason to

11        believe that these designs can be

12        'obtained easily' from Artus and the

13        defendants possess the practical ability

14        to obtain the documents irrespective of

15        legal entitlements to the documents."

16 So that's really the same situation we have here.

17        In this case, it's likely that based on the

18 relationship of the parties, and the agreements, A and M

19 would turn over those documents if they were asked.  And we

20 think a Court order would -- again, would facilitate that

21 process.

22        Moving on, your Honor, there were a number of

23 categories -- I believe roughly seven categories on which

24 Lehman objected on the basis of relevance.

25        With respect to these categories Lehman objected

42

1 solely on the basis of relevance.  There was no claim of

2 confidentiality.  There was no claim of undue burden.  There

3 were no declarations submitted about the cost or the time

4 that would be required.  So this is strictly a relevance

5 issue.

6        And, you know, as -- we agree with the standard

7 set forth by the Court.  We think it's improper at this point

8 in time to deny entire categories of documents and big chunks

9 of the case based on a relevance objection.

10        With respect to the standard of relevance, we

11 would just ask that the Court employ the same standard that

12 Lehman has asked for in their motion to our motion.

13        In their motion to compel, Lehman states that

14 SunCal has failed to show that the requested individuals'

15 files would not potentially yield relevant information.  And

16 with that standard, Lehman then asks for the production of 21

17 custodians' files.

18        These are custodians' files that we have

19 submitted -- on which we have submitted admissible evidence

20 that these people likely don't have any relevant information,

21 that they only dealt with the day-to-day operations of the

22 projects.  Notwithstanding that, they have still sought that

23 information because it might yield something.

24        And based on that standard, we think that we

25 easily qualify for the production of documents with respect

43

1 to these seven categories.

2          I don't want to take up the Court's time because I

3 think that the issues were fully briefed.

4          But just very quickly, with respect to the Tranche

5 1 documents, these relate to other projects on which both

6 Lehman and SunCal worked during the relevant time period.  We

7 think that these documents may show a course of dealing

8 between the parties that will be relevant to show a joint

9 venture existed.

10          While Lehman has argued that the evidence of those

11 projects are not relevant to the debtors in this case,

12 they've cited no case law to that effect.  We believe that

13 that would be circumstantial evidence of a joint venture

14 between the parties, potentially.  But we need to see the

15 documents first.

16          You know, the fact that counsel has now come up

17 and explained that they didn't intend to request the Tranche

18 1 documents based on a misreading of the complaint is fine.

19 However, we did produce those documents to them.  And we did

20 so without objection.

21          With respect to the Churchill and Roosevelt

22 documents, those deal with loans that are directly at issue

23 in this case.

24          Churchill and Roosevelt are the names of the

25 programs to syndicate the loans that we are discussing here,

44

1  and we need to know what those plans were to syndicate the

2  loans.   If they were bundling all of these loans together

3  with the understanding that they should all be treated the

4  same, that might be relevant to sub-con.

5          If they bundled all of these loans together and

6  concealed certain aspects or concealed the plan altogether,

7  that would be relative to eq-sub.   But we should be entitled

8  to the documents.

9          With respect to the transfer of the loans, the

10 mere fact that the Court has ruled that Lehman is the agent

11 of Fenway does not at all eliminate the argument that there

12 was improper conduct with respect to the handling of the loan

13 and the filing of the proofs of claim.

14         The transfer to Fenway was a multibillion dollar

15 transaction and -- one second.   I lost my place, your Honor

16 -- a multibillion dollar transaction that was effectively

17 kept secret from us.

18         We were in negotiations with Lehman at the time to

19 restructure these very loans between May and August of 2008.

20 We are interested in finding out if Lehman had transferred

21 these loans to a third party at the same time that it was

22 promising it would restructure the loans with us.   And that

23 clearly goes to Lehman's ability to perform on the contract

24 that it was entering into with us.   And that's relevant to

25 inequitable conduct.

45

1          The withdrawals of the cash that we're seeking,

2 that's directly relevant to the projects at issue in this

3 case.  If Lehman improperly removed money from the projects

4 just before bankruptcy which could have potentially caused

5 the bankruptcies, we need to know that too.

6          I'm happy to go into those in more detail, but I

7 think the Court probably has information at this point,

8 unless you have specific questions.

9          THE COURT:  I think I understand the argument.

10         Mr. Roesch.

11         MR. ROESCH:  Thank you, your Honor.

12         With respect to the custodians who Lehman is

13 seeking to compel production of documents, to the extent that

14 their computers or their files do contain irrelevant

15 documents, those documents should be excluded based on the

16 search terms that we've agreed to run with the SunCal

17 debtors.  You run a program through the documents.  Only the

18 documents that have the agreed-upon search terms will come up

19 for their review.

20         So to the extent, if there are irrelevant

21 documents, those will be excluded and they won't be reviewed

22 and SunCal won't have to incur the burden of looking at those

23 documents.

24         With respect to the Barclays documents, I don't

25 know if we can really be any clearer.  I mean, our argument

46

1 is not that possession equals control.  It's --

2          THE COURT:  Do you have something, a declaration

3 that describes the process that Lehman has gone through to

4 try to obtain the documents from Barclays and Barclays'

5 response to it?

6          MR. ROESCH:  We've not submitted one but we'd be

7 happy to, your Honor.

8          Anyway, our position is that --

9          THE COURT:  And what about A and M?

10          MR. ROESCH:  Well, A and M I think is a different

11 situation since you don't have the same contractual provision

12 permitting Lehman to --

13          THE COURT:  Yeah, but I mean in some ways the

14 A and M situation is more compelling because A and M is

15 basically acting under the direction of the board of Lehman

16 and is acting as Lehman's representative and has appeared in

17 this Court and has, you know, signed documents on behalf of

18 Lehman.

19          I mean, A and M is intricately involved in the

20 operations of Lehman.

21          MR. ROESCH:  And --

22          THE COURT:  So irrespective of whether there's a

23 contract that one can look to, are you basically saying --

24 I'll just ask the question that was asked by the plaintiffs

25 here:  If you were to say to A and M, we need to have these

47

1  documents, could you please produce them -- I don't know,

2  maybe they'd say no, but --

3          MR. SOTO:  Again, since he -- since Mr. Roesch was

4  not involved in any conversations then, the conversation that

5  Mr. Procel addressed -- and maybe it's unclear to me -- is

6  the conversation we had to produce all of the A and M

7  documents which have been produced.

8          So Mr. Pietroforte's, Mr. Fitts' documents, the

9  documents that he's talking about that they signed, all of

10 those things have been produced.  We produced them freely.

11 They're on our systems --

12         THE COURT:  Well, Mr. Roesch just said that, you

13 know, in order to eliminate irrelevant information on

14 searches that are being done for the individual custodians,

15 you don't, I suppose, pose the same question to A and M

16 without having to search all of their records.  And in fact

17 their records include other clients, then that would be

18 eliminated by simply eliminating the search, correct?

19         MR. SOTO:  I think -- and let's just go to that

20 issue, because I think you're pointing out the distinction

21 between the situation with Barclays and the situation with

22 A and M.

23         With Barclays, you know, we know what two computer

24 systems, the H drive, the G drive, those drives that they've

25 told us about that exist on the servers that they now have

48

1 that we once had and that we once used in common to go in to

2 load them, to search them, you know, we've made our demands.

3 And, frankly, I think the Court will be impressed with the

4 demands that we've made.  But -- so that's one situation.

5          With A and M, to suggest that, well, you know, on

6 all of those computers, you search for A and M documents or

7 you search for all relevant documents, yes, we have,

8 including any that have anything to do with A and M or

9 A and M people.  Those same ones.  We've done all that.

10          Now, what is being asked is to go to a third

11 party.  If you had -- instead of A and M, if you put Price

12 Waterhouse in here or FTI or any of the other entities that

13 do these kinds of things.

14          It would be one thing for all the work that we're

15 doing at this entity and to search for all of that and to

16 give it.  That's fine.

17          It would be another thing to go through all of

18 their computers and say, okay, can you find anything that

19 relates to SunCal.

20          Now, as I've said, we haven't asked them to do

21 that because we have no possession of those documents -- we

22 have no control over them.  They are -- certainly, we have a

23 relationship with them and we have, in that relationship,

24 produced everything we know exists on our computers.

25          If someone wants to subpoena A and M to get those

49

1  records --

2          THE COURT:  Let me back up a minute.

3          As a practical matter, if A and M has information
4  on its own computers regarding Lehman, you're basically
5  saying to me that Lehman, because the contract doesn't
6  provide for it, would have no right to information from
7  A and M relating to Lehman's business operations because
8  they're on A and M's computers and not Lehman's?

9          MR. SOTO:  No, that's -- no, that's not what I'm
10  suggesting.  What I'm suggesting is that most of the -- so,
11  for example, if it's something that -- it's hard for me to
12  understand because Pietroforte is working in our offices on
13  our computers, so was Fitts while he was working with us.

14          But what if, say, for example, Fitts and
15  Pietroforte had other jobs that had nothing to do with this
16  and they were back in their offices working on that, I'm
17  assuming that those are unrelated to this.  You're saying
18  could we ask them -- you know, we could ask them and see what
19  the burden is, and certainly if this Court tells us to, we
20  will.  And I said that earlier.  And we will do that.

21          We haven't done it yet because it is not within
22  the ambit of Rule 26(b) when you use the word "control."  And
23  this is -- what came to my mind is you can't have your cake
24  and eat it.

25          We know what control isn't.  Control isn't when

50

1 you have a relationship with somebody that's contractual and

2 they've limited it and they've told you what you can do, and

3 they've told you you can't have that.

4         But still, with Barclays, even though that's the

5 case, they're saying we control Barclays.  We don't control

6 Barclays.  The contract is limited and it says what it says.

7         At the end of the day, we've done everything we

8 can to get those documents -- that I think, short of, you

9 know, I guess like someone said, filing a lawsuit if they

10 choose not to.  That's one example.

11         We don't even have that with A and M.

12         THE COURT:  Well, it just seems to me that if your

13 restructuring officer is conducting work that's related to

14 the business of Lehman on non-Lehman computers, it just

15 strikes me as curious that Lehman would not have a -- would

16 not have the right to access that information

17         MR. SOTO:  Right.  And we don't know that they

18 are.  So, for example, we'll first ask and find out if they

19 are.

20         THE COURT:  Yeah.  I mean, you could ask the

21 question.  The question would be all of the work that we've

22 conducted ever -- ever, from the beginning of time has all

23 been in Lehman's offices or on Lehman's computers and the

24 answer is zero.  I mean, that could be it.

25         MR. SOTO:  That's right.  And in -- sorry.

51

1          THE COURT:  But to the extent that there may be

2 information -- and I'm certainly absolutely not suggesting

3 that anything clandestine went on.  I mean, there's nothing

4 before me that says that.  But you have -- you know, the

5 restructuring officer of Lehman has conducted business.  It

6 seems to me that Lehman would have a right to have access to

7 information regarding its own business, whether it's on

8 Lehman's computers or if it's on A and M computers.

9          MR. SOTO:  Well, and that's the point I was going

10 to say this is separate from whether or not -- you know,

11 certainly, we can ask the questions that you have suggested

12 and if you ask us to, we will.  There's no doubt.

13          But separate from that, what happens in discovery

14 is that the legal standards just get all fudged.  So if the

15 legal standard is possession, custody and control, he's not

16 arguing that we have possession.  He's not arguing that we

17 have custody.  What he's arguing is that we have control.

18          Well, generally speaking, control is through some

19 form of a legal relationship or through some form of a legal

20 agreement.  We don't have that with Barclays.  We've gone

21 through that already.

22          With A and M, the Court is suggesting that that

23 kind of a relationship might exist.  We will certainly make

24 the inquiries regarding how the computers -- you know, how

25 A and M is doing its business that in any way relates to

52

1 SunCal and if it's on our computers only, then they've got

2 everything short of what we're going to get from Barclays.

3       If it's on their computers as well, we'll ask the

4 next question, which is:  Well, how burdensome is this to

5 search?  Can we do, as you suggested, the same kind of

6 overlay that we have done with our own computers.

7       And we'll undertake to do those two things, your

8 Honor.

9       MR. ROESCH:  Your Honor, one final point with

10 respect to the cost shifting.  You had asked about the

11 standard earlier.  We just pulled it up, and I would cite to

12 IO Group, Inc. v. Veoh Networks, Inc.  It's 2007 Westlaw

13 1113800 at 7.  It's a Northern District of California 2007

14 case.  And it holds that cost shifting is only required where

15 the data sought is inaccessible.

16       Here, we don't believe that's the case.  The data

17 is not on a backup tape.  It's not stored in a warehouse.

18 It's these 21 individuals' computers.

19       THE COURT:  Okay.

20       MR. PROCEL:  Your Honor, I don't have anything

21 further on the points that were already addressed.

22       But there was one additional issue raised in the

23 papers that I don't think we have addressed at this point.

24 And those were the depositions of Jeff Fitts and Gerald

25 Pietroforte.  I think that may have been the first issue in

53

1  our papers.

2         It seems to me that -- if I'm not mistaken, it

3  seems to me that Lehman's position was that the issue is not

4  ripe based on the timing of the scheduling order.  I assume

5  that that is no longer their argument and that we can move

6  forward with those depositions now.

7         I think that initially the deposition inception

8  date was January 19th and that's long since passed.  So --

9  thanks.

10        MR. ZIEHL:  Yes.  With the Court's indulgence, I

11 did want to bring up, while we have everyone here, the issue

12 of the schedule, particularly with regard to the substantive

13 consolidation matter that's pending, if it's okay for me to

14 address that, because I think that ties in with the

15 deposition schedule.

16        THE COURT:  Only if it ties in because I'm running

17 out of time at this point.

18        MR. ZIEHL:  It directly impacts the schedule for

19 production and also discovery.  I can take it up later this

20 afternoon if the Court prefers.

21        THE COURT:  Yeah.  I guess I didn't really focus

22 on that because it seemed that the argument was that it

23 wasn't ripe because it was before January 19 or whatever the

24 date was.  Well, clearly we're beyond that, so I didn't think

25 there was going to be an issue --

54

1          MR. ZIEHL:  Yeah, the --

2          THE COURT:  -- as far as the depositions are

3 concerned.

4          MR. ZIEHL:  The problem, your Honor -- I'll just

5 be very brief, just to raise the issue.  We can talk about it

6 later on.

7          But basically we entered into a discovery

8 schedule.  One of the key drivers of that was production of

9 documents.  And depositions of parties were scheduled for a

10 certain period of time after documents review.

11          I think everyone in good faith tried to produce

12 documents.  We were several days late on our production, did

13 a rolling production.

14          SunCal didn't finish their production until this

15 month.  The documents were supposed to be produced on January

16 12th.

17          We still have the Barclays documents.

18          The Court now has issued an order requiring both

19 sides to produce additional documents.

20          SunCal says it will take at least 30 days to

21 produce the additional documents that they need to produce.

22          And so we need to push and extend the schedule

23 right now that we have scheduled for the substantive

24 consolidation matter.  It won't, at this point, affect the

25 discovery on the adversary because our discovery cutoff in

55

1 that matter is far enough out.

2          But at least with regard to the substantive

3 consolidation matter, there is no way that the parties can

4 comply with the current discovery schedule because of the

5 length of time.

6          And I'm -- this afternoon, if you want, I can talk

7 more about what both sets of parties have had to go through,

8 just in terms of the number of documents to review to produce

9 and that.  But it's been a monumental task.

10          THE COURT:  So the answer regarding the

11 depositions would be?

12          MR. ZIEHL:  There are to be -- those depositions

13 are not to be taken until after the document discovery is

14 completed.

15          THE COURT:  Okay.

16          MR. PROCEL:  I can address that just very briefly,

17 your Honor, if you'd like.  Otherwise, I can hold off until

18 after the motion --

19          THE COURT:  Go ahead.

20          MR. PROCEL:  With respect to the depositions and

21 in relationship to the document production, it was never

22 contemplated that the parties would produce and review all

23 documents before any depositions would be taken.  That's just

24 a mischaracterization of the scheduling order.

25          We've now -- both sides have produced millions of

56

1 pages of documents.  All sides have produced -- all parties

2 have produced documents at this point.

3        There's simply no reason to continue to delay

4 depositions.

5        The original scheduling order required the parties

6 to produce documents on January 12th.  Party depositions were

7 to begin one week later, on January 19th.  There was no way

8 that anybody contemplated that the parties would review

9 millions of pages of documents within that week.

10       Everyone knew that depositions would go forward

11 before all the documents were produced and before they were

12 reviewed.

13       In particular, with respect to non-party

14 depositions which could begin on January 5th and the document

15 production was to begin on the 12th, we knew that we wouldn't

16 even have the documents for those people.

17       So I think the idea at this point and this far

18 into the case, with as far as we are into discovery, to

19 continue to delay all depositions would really drag matters

20 out.  We think that we can begin taking a substantial number

21 of depositions at this point.

22       And maybe we can agree informally with Lehman to

23 hold off on certain depositions if we think that we should

24 wait for the production of the documents.

25       MR. ZIEHL:  The Court's order:  No party

57

1  depositions shall take place in connection with substantive

2  consolidation motion or the adversary proceeding until the

3  parties exchange documents.

4          We had a schedule for exchange of documents.

5  Through no bad faith on anybody's part, nobody met the

6  deadline.

7          We got a million five documents from SunCal last

8  week that we're starting to review.

9          We have Barclays documents.  I don't know how many

10 but it will be millions of documents to review.

11         We have the documents that the Court has ordered

12 today in its tentative both SunCal and Lehman to produce.

13         This is no longer -- under modern discovery

14 practice, we do not do trial by ambush.  We also wanted to

15 avoid having duplicate depositions of parties because

16 documents were produced afterwards.  It was the whole point

17 of this schedule.

18         There is simply no way that we can hold to this

19 schedule.  I thought, on a call we had, that everyone agreed

20 that there was a need to extend the process.

21         What you have is one party trying to get a jump

22 and play trial by ambush and get depositions of certain

23 witnesses that they want before documents have been

24 exchanged.

25         THE COURT:  Mr. Hoff?

58

1          MR. HOFF:  It's Jonathan Hoff for the joint

2 provisional liquidators.

3          Obviously, I have nothing to say about the

4 respective motions to compel.  I wanted to address this

5 schedule issue.  If the Court wants to wait until this

6 afternoon to address that, I'm happy to wait.

7          But I think the reality is that the current

8 schedule on sub-con provides for fact discovery to be

9 complete within the next, I think, 10 days.  There's no way

10 that we're going to be able to complete discovery to do the

11 depositions we need.

12          It's a bigger picture issue than the sequencing of

13 documents and depositions.  And on that issue, I agree with

14 what Mr. Ziehl said, and I think it's exactly what the Court

15 had ordered when we did the schedule.  But as a practical

16 matter, you know, we haven't even talked about -- we had a

17 meet and confer to talk about it, about witnesses.

18          I suggested we start with 30(b)(6) notices so we

19 can figure out who the witnesses will be for the various

20 topics and then fill in from there, but we haven't done that.

21 We don't even know who the witnesses are going to be, what

22 their schedules are like.  And it's just not realistic within

23 the next 10 days to complete that.

24          And then the schedule goes from there in terms of

25 then we've got to identify experts, we've got expert reports

59

1 and motions and then the hearing date.

2          THE COURT:  All right.

3          MR. PROCEL:  If I may, your Honor, just one final

4 point.

5          I don't think there's any dispute that the

6 scheduling order needs to be modified.  There's no dispute

7 that we're not going to meet the ultimate deadline and the

8 trial date that was set forth by the Court.

9          The issue is whether all the document production

10 needs to be completed before any depositions can begin.  And

11 that was never contemplated by the parties.

12          As Mr. Ziehl said, "no party depositions until the

13 parties exchange documents."  The parties have exchanged

14 documents.  The parties have exchanged millions of pages of

15 documents.

16          And the production date here was January 12th.

17 The deposition date was January 19th.  And then we have a

18 motion to compel procedure.  It was always contemplated that

19 more documents would be produced into February and March and

20 maybe even April and that -- but depositions would be going

21 on concurrently.

22          So the idea that everything needs to be -- all the

23 documents need to be produced before any deposition occurs

24 was never contemplated.  It's not in the rules.  It's clearly

25 not in the rules.  But it doesn't make sense in this context

60

1 to continue to delay everything until this is finished.    It

2 may never occur.

3        Thank you.

4        THE COURT:  You may never finish exchanging

5 documents.  I would like to hope that at some point after the

6 trial of this matter, the document exchange would cease.

7        Okay.  Basically, I've allowed this to go on

8 perhaps longer than it should have, but I really wanted to

9 make sure that both sides got to adequately present arguments

10 and to fully explain to me your respective positions on this.

11        I will tell you that my overall view of this

12 really hasn't changed dramatically, if at all, with respect

13 to the motions to compel.

14        As I said before, I think that in this case,

15 which -- I think everyone can agree, just based upon the last

16 numbers that I heard here regarding the exchange of millions

17 of documents, that this is a fairly complex case.

18        And that being the case, and there being a number

19 of different entities and transactions that have taken place

20 over a period of time, it's difficult -- given also the

21 length of the complaint, it's difficult, for me anyway, to

22 say, well, I'm going to foreclose discovery on this

23 particular area or with respect to these documents,

24 particularly on relevance grounds, because as I think it was

25 astutely pointed out, even the defendants would like to have

61

1 discovery and would like to have -- gather information from

2 individuals who might potentially lead to some information

3 that could be of assistance in the defense of the case.   I

4 think that goes both ways.

5        And I think that parties ought to have the

6 flexibility to put forth their positions.   Certainly, when it

7 comes to discovery, you're guided by the complaint and the

8 allegations of the complaint.   But the reality is that during

9 the course of discovery, things turn up that may embellish,

10 may enhance, may undermine the allegations of that complaint.

11        So I'm not inclined to want to restrict the

12 parties in terms of discovery, again unless I'm convinced

13 that what's being sought is not only completely irrelevant

14 but can't possibly lead to any relevant evidence that could

15 be supportive of either a claim or a defense to a claim.

16        And I'm going to go backwards a little bit.   On

17 the defendants' motion to compel, when I first read the

18 papers on that, I thought about potentially limiting the

19 additional parties to the -- I think there were maybe four or

20 five that had been identified in the moving papers as

21 absolutely necessary.

22        But still, defendants believe that even the

23 remaining disputed parties were parties that were involved in

24 the debtor's operations and that might have some information

25 that would be relevant to the defense.

62

1          And so when I looked at it on the second sort of
2 review of this, I thought why should I limit them to "X"
3 amount of custodians.

4          If these are people that were involved, maybe
5 ultimately what they have is not particularly relevant, but
6 at this point, this stage in the process, if there's
7 potential information here that could be relevant to the
8 defense, I should allow the defendants to pursue that.

9          And so ultimately I decided that -- you know, my
10 tentative, obviously, was to allow the defendants to
11 basically pursue information from all 49 or however -- what
12 the number is.

13          I did also focus on the potential burden to the
14 debtors because in looking at the various individuals and
15 their roles, at least as described in the papers, it also
16 seemed to me that there probably was some duplication that
17 went on there and there's also the potential that the debtor
18 could spend a million dollars producing and running the
19 searches that are being requested for what may be an exercise
20 in futility.

21          It seemed like a big number.  And so I tried to
22 figure out a balance in terms of whether or not to allow
23 discovery of individuals that may or may not have
24 information, whose information may or may not be duplicative
25 of other individuals' that are not disputed versus having the

63

1 debtor bear the burden of that, and whether some amount of

2 fee shifting would be appropriate.

3        And it seemed to me in this case, given that the,

4 at this point, unrefuted costs of conducting that discovery

5 is somewhere over a million dollars, which is a significant

6 portion of the debtor's current resources.

7        What I tried to do was apply similar standards to

8 both motions to compel, understanding they were entirely

9 different issues and I totally appreciate that.

10        I'm going to move over to the plaintiffs' motion

11 at this point.

12        As far as the A and M production and the Barclays

13 production, I am going to require that the defendants make

14 their best efforts to obtain -- to produce the documents,

15 including those documents that are in the possession of

16 either A and M or Barclays, that in connection with any

17 production that the defendants will provide to the plaintiffs

18 a declaration identifying all the efforts that have been made

19 to comply with the discovery request as to A and M and

20 Barclays, the response of A and M and Barclays.

21        I'm not going to require that -- and I don't

22 really believe I have jurisdiction to require that the

23 defendants take any particular action with respect to either

24 A and M or Barclays.  But I do think that there needs to be a

25 demonstration of best efforts used to obtain the documents.

64

1          I do believe that as to both A and M -- I
2 apologize.  I've been talking since 9:30 this morning so I
3 apologize if I'm not very articulate.  I'm not sure I'm
4 usually articulate but the cold gives me an excuse anyway.

5          I do think that there is sufficient evidence that
6 both A and M and Barclays are within the control of the
7 defendants.  Now, the question is the extent, the scope of
8 that control.  I mean, that I really don't know at this
9 point.

10          But I do think that the control is substantial
11 enough that the effort should be required.

12          With respect to what has been referred to as the
13 Tranche 1 documents, and also with respect to what has been
14 referred to as the Churchill and Roosevelt documents, again,
15 I'm going to stick with my tentative ruling, basically for
16 the reasons set forth in the motion and the reply, to require
17 that these documents be produced.

18          Similarly, with respect to the request for
19 production regarding Lehman's financial status as well as the
20 transfer of the loans, and -- I want to explain a little of
21 my reasoning on this.

22          And that is, I think that the plaintiffs are
23 entitled to attempt to obtain information that may be
24 relevant to background transactions or course of dealing or
25 interactions that they have some bearing, either directly or

65

1 indirectly on the claims that they are asserting, that is,

2 inequitable conduct or subordination or even substantive

3 consolidation.

4      It may very well be that some of the information

5 produced may not be evidence that the plaintiffs will use to

6 definitively establish inequitable conduct or grounds for

7 consolidation, but it may create an overall picture that may

8 be relevant in terms of allowing the Court to put certain

9 matters into context.  And so that's the reason I'm not going

10 to limit the scope of discovery.

11      I also want to just insert a caveat here, and that

12 is that there may be categories that I'm not covering

13 specifically even though I'm granting the motion overall.

14 I'm just sort of trying to highlight certain ones that seemed

15 to cause the most controversy and required the most amount of

16 argument at the hearing today.

17      With respect to the documents regarding post-

18 petition inequitable conduct, I spent a lot of time reviewing

19 this particular area because, I'll be honest, I'm not sure

20 that the post-petition conduct will ultimately be relevant.

21 I do point out -- and I also appreciate that the cases that

22 were cited may be distinguished on certain grounds.

23      I do note that one of the cases cited was In re

24 Nutrisystem.  And in that case, the court stated that -- and

25 this is a quote from the case, which is 169 Bankruptcy

66

1  Reporter 854 at 866.

2           "We do not agree with the

3           defendants when they suggest that

4           equitable subordination is applicable to

5           pre-petition conduct only.  There's

6           nothing in the language of section

7           510(c) which would so limit our inquiry,

8           nor will it engraft limitations into the

9           statute which Congress opted not to

10          include."

11          So for the moment, I'm going to let that be an

12 open issue as to whether or not any post-petition conduct is

13 or is not actionable.  And so I will allow the plaintiffs to

14 pursue discovery on those matters.

15          Does anyone recall the date that the third amended

16 complaint was filed?  Was that early 2009?  I should have

17 that here.

18          MR. PROCEL:  Your Honor, I think it's July 10th.

19          THE COURT:  Okay.  All right.

20          With respect to the cutoff date regarding post-

21 petition conduct, the debtor requests a cutoff date of June

22 30, I believe, which was the date of the hearing on the

23 motion to strike the claims.  It seems to me that the cutoff

24 date should be the date the debtor discovered the facts

25 leading to the filing of the motion to strike the claims.

67

1  I'm not sure what that date is.

2          MR. MILLER:  It was April -- it was around April

3  when we served the subpoena on J.P. Morgan.  And we got the

4  documents regarding the repo transaction.  I think it was --

5  if I remember correctly, it was like the third week in April.

6          MR. ZIEHL:  Your Honor, my letter was dated April

7  15th of 2009 and they had documents from J.P. Morgan before

8  then because they -- at least they said so.

9          MR. MILLER:  No.  We did not have the documents.

10  The letter was more confusing than anything.  We got the

11  documents after we got the letter on April 15th, and that's

12  when we figured out, at least started to figure out --

13          THE COURT:  All right.  We'll pick a cutoff date

14  of May 1.

15          One thing, I want to make sure I understand the

16  argument regarding the timing of the depositions, in

17  particular the two gentlemen.  One was Mr. Fitts and I forget

18  the other one, it begins with a "P."

19          MR. PROCEL:  Pietroforte.

20          THE COURT:  Yes.

21          What was the opposition to having those

22  depositions go forward?

23          MR. ZIEHL:  They're being deposed as restructuring

24  officers of Lehman and the stipulation and order that the

25  Court signed provides for party depositions to be taken after

68

1 documents have been produced.  We still don't have all the

2 documents.  Frankly, we don't have all of our documents

3 because Barclays has them and we need to see those documents

4 as well and review those so we can prepare our witnesses

5 before they're deposed.

6          MR. PROCEL:  May I, your Honor?

7          THE COURT:  Yes.  Because what I'm trying to avoid

8 is having, you know, depositions needing to be repeated.

9 There certainly seems to be a pretty extensive witness list

10 here, and to have the parties have to go back and re-depose

11 because, you know, documents have been produced that weren't

12 previously produced -- and I guess my question for the

13 plaintiffs is why would you not want to have those documents

14 available to you before taking the depositions also?

15          MR. PROCEL:  I think that we are aware at this

16 point what has been produced and what is left to be produced.

17 And I think that we made a determination that we would rather

18 the depositions go forward now.  We don't think that the

19 additional production will yield much in the way that is

20 relevant to these particular witnesses.

21          That being said, we are willing to concede that we

22 only get to take them once, and so if additional documents

23 become available -- which occurs in any case.  This is not

24 unusual to this case.  The depositions go forward, document

25 production goes on after.  You know, that's something that

69

1 strategically we will need to resolve for ourselves I think

2 internally.

3         But at this point, we're ready to go forward with

4 these witnesses.

5         I would also like to point out that Mr. Ziehl is

6 now taking the position that these people are parties to the

7 case, even though they're A and M employees, when for the

8 last couple hours we've heard that A and M is not a party to

9 the case and they don't have access to the documents.

10         You know, based on the current scheduling order,

11 we were entitled to take these witnesses' depositions before

12 any documents were even produced.   Non-party depositions were

13 to go forward January 5.  document production was to go

14 forward on the 12th.   These are not party witnesses.

15         MR. ZIEHL:  These witnesses are being deposed in

16 their capacity as restructuring officers for Lehman, as

17 Lehman's agents.   That doesn't mean they're employees of

18 Lehman and that they're not employees of A and M.   But the

19 reason they're being deposed is for their work and conduct on

20 behalf of Lehman.

21         We're entitled to have all the documents produced

22 and prepare witnesses before they're deposed.   And there's

23 absolutely no prejudice to treating these witnesses like

24 other party witnesses and having them deposed after all the

25 documents are produced.

70

1          That is what was contemplated in the stipulation

2 and order and there's absolutely no prejudice.  There is no

3 reason to give expedited treatment to any particular party

4 witness just because the plaintiffs think they have enough

5 and they want to be able to sneak up or surprise a witness.

6          THE COURT:  Well, it seems to be that they are

7 party witnesses.  I don't know how you can say they're not

8 party witnesses.  And I think, you know, the order is not

9 explicit in terms -- it says the parties will exchange

10 documents, and it doesn't say the discovery will be

11 completed.

12          But I think the idea was that the timing would be

13 such that the exchange of documents would be completed as to

14 the party witnesses and that the depositions would take place

15 thereafter.

16          So on this, I happen to agree with Mr. Ziehl that

17 as to party witnesses, those depositions should be deferred

18 until the production is complete.

19          MR. PROCEL:  With that, your Honor, can we then

20 request a date by which the Court is ordering document

21 production to be complete, so we don't drag this out too far

22 into the future?

23          MR. ZIEHL:  Your Honor, I had suggested to counsel

24 that we just slide the entire schedule by 60 days, at the

25 time thinking we had three more weeks to get the Barclays

71

1  documents, we would need to review them and then produce

2  them.

3       We now know that SunCal needs at least a month and

4  that's under their declaration if they work seven days a

5  week, 10 hours a day with their team to produce the documents

6  they have remaining to produce.  So I'm hesitant to go with

7  just 60 days.  I may suggest 90 days.

8       And then what I had suggested that we set the --

9  this is just on substantive consolidation, your Honor -- that

10 we set that trial for the next soonest available day and time

11 that the Court has that many days out, whether it's 60 or 90

12 days.

13       Perhaps if the Court can tell us what your

14 calendar is like, then we can work backwards and resubmit an

15 order.

16       THE COURT:  Okay.  Well, right now, my first

17 completely unencumbered trial week is August 23rd.

18       There's a possibility of four days in the week of

19 July 19, but I would only set that date -- it's only a

20 difference of one month, but I would only set that if you

21 knew for sure that date was going to go forward because doing

22 that, basically cuts one week of law and motion for me for

23 the month of July.

24       MR. ZIEHL:  I think we should go with August 23rd.

25       THE COURT:  But honestly, I mean after what I've

72

1 heard today, it seems to me that the August date is a

2 reasonable date and a much more realistic date, given the

3 number of depositions and the amount of discovery that needs

4 to be done.  If you're talking about designating expert

5 witnesses, probably August is the correct date.

6           And I'll just let you know, if you want to discuss

7 it -- because I'm going to start the 2:00 calendar at 2:30,

8 by the way.  I've got to give my clerk a moment to catch his

9 breath.

10          But just so you know, and maybe you want to

11 discuss it, as of right now, the August trial week is

12 available and so is the September trial week which is

13 September 20 through the 24th.

14          MR. ZIEHL:  I think we should take that week, your

15 Honor.  We don't want this case to drag on forever.

16          THE COURT:  Which one?

17          MR. ZIEHL:  The entire proceeding, SunCal

18 bankruptcy matters.

19          MR. PROCEL:  Which date?

20          MR. ZIEHL:  Oh, the August 23rd.  Yeah, the August

21 23rd I think is -- and then the parties will submit a revised

22 scheduling order based on the rulings today.  Hopefully, we

23 can agree on the balance of the schedule, expert exchanges,

24 et cetera, if that's okay.

25          THE COURT:  All right.

73

1        MR. MILLER:  Your Honor, do you have anything else
2 on calendar at 2:00 or 2:30 so maybe we could come back maybe
3 even at 3:00, grab a bite to eat?

4        THE COURT:  I have --

5        MR. MILLER:  That's just us?

6        THE COURT:  So you could --

7        MR. MILLER:  All right.  We'll be back at 2:30.

8        THE COURT:  If you want to come back at 3:00, I
9 don't have a problem with that either.

10       MR. SOTO:  The only issue for me, your Honor, is I
11 might have a significant argument, one that I think is
12 consistent with what I've done in the past, but I think
13 there's only one -- wait.  Never mind.  I got myself -- never
14 mind.  I'm on the red eye, I'm sorry.

15       MR. MILLER:  3:00?

16       THE COURT:  Okay.  Is that going to be a --

17       MR. SOTO:  No, it's not.

18       THE COURT:  Okay for you flight-wise?  All right.

19       MR. SOTO:  If it is, you're all in trouble.

20       MR. MILLER:  So we're okay at 3:00.

21       THE COURT:  Yes, we'll come back at 3:00.

22       MR. MILLER:  Thank you, your Honor.

23    (Proceedings recessed to reconvene.)

24

25

74

--o0o--

1    THE COURT:  Once again, in the matter of SCC

2  Acquisition, Inc. v. Lehman Ali, et al.

3    Appearances.

4    MR. MILLER:  Good afternoon, your Honor.  Skip

5  Miller and Marty Pritikin.  And Mr. Pritikin is going to make

6  the argument for our side today.

7    THE COURT:  All right.

8    MR. LIANIDES:  Good afternoon, your Honor.  Peter

9  Lianides of Winthrop Couchot on behalf of Palmdale Hills and

10  the voluntary debtors.

11    MR. ZIEHL:  Good afternoon, your Honor.  Dean

12  Ziehl, Pachulski, Stang, Ziehl and Jones, on behalf of the

13  Lehman entities.

14    MR. SOTO:  Your Honor, Ed Soto.  I'm here with my

15  colleagues, Clay Roesch whom you met already and Adam Yancy

16  of Weil, Gotschal and Manges, on behalf of the Lehman

17  entities.

18    THE COURT:  All right.

19    MR. REINTHALER:  Good afternoon, your Honor.

20  Richard Reinthaler with Dewey and LeBoeuf on behalf of Fenway

21  Capital.  And I have Corinne Levy from our office with me.

22    THE COURT:  Okay.

23    I indicated in the tentative ruling -- I just sort

*Briggs Reporting Company, Inc.*

75

1  of gave you short answers but now which side needed to focus

2  more -- the long answer, I'm just going to dismiss with that

3  and just allow you to argue.

4          I will just say that my tentative ruling was based

5  on my impressions of the matter after having read the motion,

6  the opposition and the reply.  All right.

7          Mr. Soto, you're starting, right?

8          MR. SOTO:  May I approach the bench?

9          THE COURT:  By the way, is there a telephonic

10 appearance?

11         MR. FRIEDMAN:  (Telephonic) Yes, there are, your

12 Honor.

13         THE COURT:  Okay.  Go ahead.  Make your

14 appearance.

15         MR. FRIEDMAN:  This is Alan Friedman of Irell and

16 Manella, on behalf of the committee in the voluntary cases,

17 your Honor.

18         THE COURT:  All right.

19         MR. MARTINEZ:  (Telephonic) Good afternoon, your

20 Honor.  Robert Martinez for creditor TC Construction Company,

21 Inc.

22         THE COURT:  Anyone else?

23         MR. MELTZER:  (Telephonic) Hutch Meltzer, Weiland

24 Goldman, on behalf of the committee in the trustee cases.

25         THE COURT:  All right.  Anyone else?

76

1          Is Mr. Leo there?

2          THE COURT CALL OPERATOR:  Your Honor, this is the

3 Court Call operator.  Mr. Leo did call in earlier and I let

4 him know about the delay, and he hasn't called back yet.

5          THE COURT:  All right.  Very well.  Thank you.

6          THE COURT CALL OPERATOR:  And, ma'am -- excuse

7 me -- your Honor, we also have Soham Naik and Irena Goldstein

8 on the line.

9          THE COURT:  All right.

10          Mr. Naik?  I think that's a listen only.

11          Ms. Goldstein?

12          THE COURT CALL OPERATOR:  Listen only.

13          THE COURT:  All right.  Thank you.

14          MR. SOTO:  Your Honor, the way we've divided the

15 argument, I'm going to discuss why the plaintiffs' causes of

16 action for equitable subordination, fraudulent inducement and

17 preferential transfer do not meet the requirements of Rule

18 12(b)(6) and Rule 9(b).  Those are counts 1, 2, 3 and 4 of

19 the third amended complaint.

20          And Mr. Ziehl will be addressing the infirmities

21 of the remaining counts.

22          As this Court knows from the last time we were

23 here to argue the motion to dismiss on the second amended

24 complaint, Rule 12 applies in an adversary proceeding like

25 this.  And the Supreme Court has addressed very recently on

77

1 two separate occasions the standard for notice pleading that

2 applies under Rule 12.  I'll be quoting from Twombley right

3 now.  They require that a plaintiff provide the grounds of

4 its entitlement to relief, which requires more than labels

5 and conclusions and a formulaic recitation of the elements of

6 the cause of action will not do.

7          That's from Twombley at 1964 to 1965.

8               "In other words, a plaintiff has to

9          provide the court with factual details

10          which if true would allow him to

11          prevail."

12          This standard was made even clearer in Ashcroft v.

13 Iqbal, which is at 129 Supreme Court 1937.  Quoting from

14 Iqbal:

15               "To survive a motion to dismiss, a

16          complaint must contain sufficient

17          factual matter accepted as true to state

18          a claim to relief that is plausible on

19          its face.  A claim has facial

20          plausibility when the plaintiff pleads

21          factual content that allows the court to

22          draw the reasonable inference that the

23          defendant is liable for the misconduct

24          alleged."

25 That's at Ashcroft, at 1949.  The Ashcroft v. Iqbal court

78

1 concluded that "a complaint must provide sufficient factual

2 detail to cross" and this is the quote from the case that's

3 sort of become famous:  "to cross the line from the

4 conceivable to the plausible."  And that's at 1951.

5         When we were last here, your Honor identified six

6 reasons why the second amended complaint did not state a

7 cause of action or a claim for equitable subordination, which

8 at the time was the only claim in the second amended

9 complaint.

10        First, your Honor recognized that the plaintiffs

11 could not lump all defendants together as one entity and

12 simply refer to them as Lehman.

13        Second, your Honor also dismissed the second

14 amended complaint because it failed to -- and I'm quoting

15 from the transcript and from the tentative which you were

16 reading:  "tie specific defendants to particular inequitable

17 conduct or (b) state sufficiently the basis for inputting the

18 conduct of the non-party Lehman to the defendants."

19        Third -- your Honor referred to this as reason

20 2(a) -- the second amended complaint did not, as you put it,

21 quote, "adequately allege gross and egregious conduct under

22 the circumstances," and we'll go to those circumstances in

23 this argument.

24        Fourth, your Honor held that -- again, quoting --

25 "As the cases have not been substantively consolidated, the

79

1 second amended complaint fails to identify particular

2 inequitable conduct by a defendant against particular debtor

3 plaintiffs on both sides."

4       Fifth, your Honor determined, again, that as the

5 cases have not been substantively consolidated, the second

6 amended complaint fails to sufficiently identify the alleged

7 injured creditors at least by category or by class.

8       And then finally, and this was number 6, your

9 Honor stated, quote, "to the extent subordination is premised

10 on fraudulent conduct, such conduct must be stated with

11 particularity."

12       And of course, that holding is consistent with

13 Rule 9(b).

14       In essence, you asked the plaintiffs to connect

15 the dots.  Tell me who did what to who and how it hurt them.

16 But instead of connecting the dots from the second amended

17 complaint, the third amended complaint just adds more

18 unconnected dots.

19       The plaintiffs added more paragraphs to the third

20 amended complaint but it's more of the same unconnected

21 allegations.  Instead of addressing the concerns that you

22 raised -- and we're going to go through those and apply them

23 to the third amended complaint -- regarding the pre-petition

24 conduct that had been alleged in the second amended

25 complaint, the plaintiffs added a number of

80

1 paragraphs alleging post-petition inequitable conduct, that

2 you heard about a little bit earlier today.

3          But under the law of the case -- and when I say

4 "the law of the case," your Honor, I mean this case today --

5 such post-petition conduct cannot as a matter of law support

6 a claim for equitable subordination.

7          As an example, I'll go right to that, the post-

8 petition inequitable conduct at the point -- point to LCPI is

9 alleged, they argue in paragraphs 179 and 180 that LCPI

10 improperly invoked the automatic stay in the New York

11 bankruptcy court.

12          But on December 15th of 2009 the Ninth Circuit BAP

13 held -- and I'm quoting from page 19 of that decision -- "The

14 adjudication of debtor's equitable subordination claim

15 violates Lehman Commercial's automatic stay."

16          So LCPI's legally proper invocation of an

17 automatic stay cannot possibly constitute inequitable

18 conduct.  And that's not just a logical conclusion.  That's a

19 legal conclusion.  In re 848 Brickell Ltd., 243 Bankruptcy

20 Reporter 142, and I'm quoting from 149.  "The pursuit of

21 one's legal rights may not be the grounds for equitable

22 subordination."

23          And, your Honor, that's as a matter of law.  In

24 seeking to enforce the automatic stay which the Ninth Circuit

25 BAP has said that LCPI had a right to do, and in filing

1  proofs of claims as the agent for lenders, which this Court

2  subsequently ruled LCPI had a right to do, the defendants

3  were taking actions that fell squarely within the ambit of,

4  quote, "pursuing one's legal rights," end quote.  And,

5  therefore, they cannot, as a matter of law, today be the

6  basis of equitable subordination.

7          Before I turn to why the plaintiffs have once

8  again failed to adequately allege equitable subordination on

9  the pre-petition allegations, it's also important at the

10 outset to address the impact of the Ninth Circuit BAP opinion

11 on the third amended complaint and on this pending motion to

12 dismiss, because that opinion made it clear that the

13 equitable subordination claim that is at issue here

14 implicates LCPI's stay, reading from page 1 of that opinion,

15 "because in this case equitable subordination would modify

16 the creditors' property interest, we find it violates the

17 creditors' automatic stay."

18         Reading further from page 19, the BAP went on to

19 state that:

20         "While the California bankruptcy

21         court may have concurrent jurisdiction

22         to determine the scope or applicability

23         of the automatic stay, the New York

24         bankruptcy court must have the final say

25         as to whether the automatic stay applies

82

1          to the bankruptcy case before it."

2          And so the BAP has spoken, and the plaintiffs must

3 seek relief from stay in the New York bankruptcy court in

4 order to prosecute their claims against LCPI.  Now, this --

5 certainly, the BAP only addressed equitable subordination

6 because that was the only claim that was before it.  But the

7 reasoning of the BAP goes to all the other claims that are

8 being raised against LCPI as well.

9          On footnote 8 of page 16, the BAP said:

10              "Lehman Commercial has a right to

11          protect its estate from diminishment of

12          its assets by others, which here

13          includes debtor's proposed modification

14          of its rights including its lien

15          rights."

16          Based on this reasoning, your Honor, it's clear

17 that to the extent that these claims are alleged against

18 LCPI, the automatic stay also applies to the plaintiffs' new

19 claims for fraudulent transfer and to avoid and recover

20 fraudulent transfer or to avoid liens and to disallow liens

21 because these claims clearly have the potential of

22 diminishing the assets of LCPI's estate and, therefore, are

23 subject to the same stay.

24          We did not rely on the BAP opinion in our motion

25 to dismiss, your Honor, because of course the opinion was

83

1 issued after we submitted our motion.  We certainly believe

2 that the plaintiffs' equitable subordination claims also fail

3 for other grounds, and we're going to address those grounds.

4         But there's also no doubt that the third amended

5 complaint which includes counts against LCPI must be amended

6 either to sever those counts or drop those counts or somehow

7 stay the prosecution of that action while the parties at

8 issue -- and I would assume it's the debtors and now also

9 Arch -- seek leave to file those actions.

10        As to Arch, your Honor, there's another point that

11 has to be raised, again preliminary but dealing with the

12 third amended complaint.

13        This Court allowed Arch to intervene in the

14 equitable subordination action because it had unique

15 independent facts regarding its separate interests that were

16 implicated by the equitable subordination action, and that

17 the debtors were not in a position to represent, and that

18 they were different from the other creditors.

19        Even though Arch argued that it was entitled to

20 equitable subordination when others were not, because of

21 different facts and separate facts, Arch's complaint in this

22 action is a mirror image of the debtor's complaint.  There is

23 not a word different.

24        The arguments that I will make today regarding

25 those claims, your Honor, apply equally to Arch.

84

1          Going to the substantive grounds, in order to

2 state a claim for equitable subordination the plaintiffs must

3 plead consistent with Iqbal and Twombley, one, that the

4 complaint engaged -- the claimant, Lehman, engaged in some

5 type of inequitable conduct, two, that the conduct injured

6 creditors or conferred unfair advantage on the claimant, and

7 three, that the subordination would not be consistent with

8 the Bankruptcy Code.

9          As we begin to go through these three elements,

10 it's important to note at the outset that the plaintiffs'

11 equitable subordination claims are clearly grounded in fraud.

12 And back in June of 2009, this Court made it clear, again, to

13 quote from the transcript:  "To the extent that subordination

14 is premised on fraudulent conduct, such conduct must be

15 stated with particularity."

16          Now, there is no question that the plaintiffs'

17 equitable subordination claim here is grounded in fraud.  At

18 bottom, their claim is based on facts that allege:

19          One, that letter made promises to SunCal;

20          Two, which induced SunCal to act;

21          Three, that SunCal relied on those promises; and

22          Four, that Lehman knew those promises were false

23 when they made them.

24          These allegations appear in the third amended

25 complaint at paragraph 5, paragraph 79 and paragraphs 110

85

1 through 117.

2         Recognizing that they could not plead this alleged

3 fraud with particularity, the particularity that this Court

4 already required and that Rule 9 required, the plaintiffs

5 apparently decided to scrub the word "fraud" from the third

6 amended complaint.  And now, instead of using the word

7 "fraud," they contend that they're simply alleging broken

8 promises.

9         But the plaintiffs cannot so easily sidestep the

10 requirements that this Court set out and that Rule 9(b) set

11 out.  As the Ninth Circuit has held, directly on point on

12 this issue, in <u>Vess v. Ciba-Geigy</u> -- and it's slide 1, your

13 Honor, in the attachments that I gave you -- although

14 plaintiffs nowhere use the word "fraud" in these allegations,

15 the pleading requirements of Rule 9(b) cannot be evaded by

16 simply avoiding the use of that magic word.  Whereas here,

17 the averments in the complaint necessarily describe

18 fraudulent conduct, Rule 9(b) applies to those averments.

19         As a sister court in this district has held since

20 then -- and it's on slide 2 -- in <u>In re Lantronix, Inc.</u>,

21 reading again from the case:

22              "Despite protestations to the

23              contrary, a review of the complaint

24              makes it perfectly clear that defendants

25              are alleged to have knowingly made

86

1          misstatements.  The basis for all of the

2          claims alleged in the complaint is that

3          the defendants made material

4          misstatements and thus Rule 9(b)

5          applies."

6          As I pointed out a moment ago, your Honor, the

7 third amended complaint necessarily describes fraudulent

8 conduct.  And the plaintiffs have not pled this alleged fraud

9 with particularity.

10         While they argue -- and, in fact, I would argue

11 that they admit, they don't just argue it.  They admit in

12 their opposition to the motion to dismiss -- which I will

13 refer to as the "opposition" -- quote:

14          "Where it was not necessary to

15          plead with particularity, because they

16          were alleging mere broken promises, not

17          fraudulent conduct, they did not."

18 So that's what they say at page 24 of their opposition.

19         But it's clear from the allegations that I just

20 read from the third amended complaint, these so-called broken

21 promises are just fraud under a different name.  And

22 plaintiffs have essentially admitted that they have not pled

23 fraud with particularity in those instances.

24         This is particularly critical here because this

25 case involves five defendants over 20 debtor plaintiffs and

87

1  potentially hundreds of allegedly harmed creditors.

2          In addition to plaintiffs' failure to satisfy the

3  Court's and Rule 9 mandate for fraud with particularity,

4  their equitable subordination claim also fails for a number

5  of other reasons.

6          And, first, let me address an important one, the

7  insider issue, which we addressed the last time we were here.

8          As you know, a heightened pleading standard

9  applies if the defendants are insiders.  This is one of the

10 two heightened pleading standards that the Ninth Circuit has

11 held to apply in instances like this.  The first one is the

12 Rule 9(b) standard and then this insider standard.

13         A plaintiff seeking equitable subordination must

14 both allege and prove that the creditor engaged in gross and

15 egregious conduct if he's not an insider -- he or she, it, is

16 not an insider.

17         As we pointed out in our motion to dismiss, the

18 Ninth Circuit has held that equitable subordination is an

19 unusual remedy which should be applied only in limited

20 circumstances.  And there, your Honor, I'm quoting from In re

21 Lazar.  It's a Ninth Circuit case, 1996.  And I'm quoting

22 from page 309.

23             "When dealing with equitable

24             subordination claims against a non-

25             insider, i.e., an ordinary lender, the

88

1          use of equitable subordination is even

2          rarer."

3 And the circumstances are, quoting from First Alliance, "few

4 and far between."

5          As you know, there are two types of insiders.  One

6 is a statutory insider and the other is a non-statutory

7 insider.  As a matter of law, the defendants in this matter

8 are not statutory insiders.

9          At the outset, let me point out how limited the

10 plaintiffs' statutory insider allegations are in the first

11 place.

12          To begin with, they have not alleged that LCPI,

13 for example, is a statutory insider.  Plaintiffs have only

14 alleged -- we believe improperly -- that Lehman Ali, OVC and

15 Northlake are statutory insiders to nine trustee debtors.

16 They have not alleged that any of the defendants are

17 statutory insiders of the 13 voluntary debtors.

18          So what you have here is a claim of statutory

19 allegations that only apply to nine of the 22 debtor

20 plaintiffs to begin with in this matter.  Specifically, the

21 plaintiffs contend that the defendants are insiders under a

22 very specific statute, 11 U.S.C. section 101(31)(e) which

23 defines a statutory insider as, and I'm quoting -- you heard

24 this earlier from Mr. Roesch:  "an affiliate, or insider of

25 an affiliate if such affiliate were the debtor."

89

1          So you've got to be an affiliate, or insider of an
2 affiliate as if the affiliate were the debtor.  That's how
3 you have to act.  The plaintiffs cannot allege that the
4 Lehman lenders are affiliates within the meaning of 101(31)
5 or that they're insiders of the trustee debtors.
6          So, instead, what the third amended complaint
7 attempts to do is to daisy-chain the Lehman lenders to the
8 trustee debtors through other third parties, sort of loop to
9 loop to connect the link.
10          But there are absolutely no cases, not a single
11 one, applying section 101(31) through that loop daisy-chain
12 process.
13          Specifically, the plaintiffs allege that Lehman
14 Ali, OVC and Northlake are insiders of the trustee because of
15 this:
16          First, they're affiliates with a company called
17 LBHI;
18          Second, LBHI is an insider of an entity, the
19 Lehman Equity Members, which is an LLC; and
20          Third, that that LLC, Lehman Equity Members, is an
21 insider to the trustee debtors which is also an LLC.
22          So you can see how they're trying to get through
23 the process.
24          In other words, they're not arguing that Lehman
25 Ali, or that OVC and or that Northlake are insiders because

90

1  they are direct affiliates of the debtors as required by

2  101(31)(e).   Instead, they're arguing that Lehman Ali, OVC

3  and Northlake are affiliates of an insider, comma, of an

4  insider, comma, of the trustee debtors, period I assume.

5          These allegations fail, your Honor, because they

6  stretch the definition of "insider" beyond what 101(31)(e)

7  allows.   And it's not just logic, again, that comes to that

8  conclusion.   Again, it's the law.

9          <u>Miller Avenue Professional Promotional Services v.</u>

10 <u>Brady</u>, which was not a case we cited last time but we did

11 cite it in the briefs this time, 319 Bankruptcy Reporter 626

12 at 632, says the following -- this is the Ninth Circuit BAP:

13              "There is no justification for

14          expanding the definition of per se

15          insider beyond what is plainly contained

16          in the statute."

17          Now, your Honor, the plaintiffs rely on two cases

18 that they say support their daisy-chain approach:   <u>In re</u>

19 <u>Reichman</u> and <u>In re Interlink</u>.   They argue that something

20 referred to as sibling affiliates may be insiders.

21          But if you look at these cases, your Honor, they

22 only construe the definition of "affiliate" under section

23 101(2).   They do not address what affiliates constitute an

24 insider under 101(31)(e).

25          And just so that it's clear, that's what section

*Briggs Reporting Company, Inc.*

91

1 101(2) does.  It defines the types of affiliates under the

2 Bankruptcy Code.  But it's 101(31) that defines which

3 affiliates can be insiders.  Those are two different

4 inquiries.

5         In addition, plaintiffs' statutory insider

6 allegations fail because they merely allege that Lehman Ali,

7 OVC and Northlake are statutory insiders based on their

8 relationship through Lehman Equity Members.  And as I pointed

9 out, Lehman Equity Members is an LLC and it's that

10 relationship of that LLC to the trustee debtors, another LLC.

11        And here again, there's law directly on point.

12 Section 101(31) of the Bankruptcy Code does not include LLCs

13 in the list of entities that may be viewed as statutory

14 insiders.

15        And as we just discussed, in interpreting that

16 section, the Ninth Circuit BAP held there is no justification

17 for expanding the definition.

18        And the Miller court, which I'm quoting from,

19 explains why:  Because that specific definition set up by the

20 Legislature set up a, quote, "conclusive presumption of

21 preferential treatment."

22        In other words, a different pleading standard for

23 statutory insiders and non-statutory insiders based on that

24 statutory language.  And it shouldn't be expanded to expand

25 that presumption.  That's the point the Miller court is

92

1 making.

2          Following the Ninth Circuit BAP's instruction in

3 Miller, bankruptcy courts in this circuit have held that LLCs

4 are not sufficiently analogous to corporations to permit a

5 court to apply corporate provisions of section 101(31) to an

6 LLC.

7          The cases are cited in our brief.  It's

8 Kotoshirodo v. Dorland and also Elsaesser v. Cougar.

9          Now, the first case which is In re Lull, the

10 plaintiffs argue, well, that's not what In re Lull says.

11 Your Honor, I went back to check again.  In re Lull

12 specifically held that LLCs were not analogous to

13 corporations under 101(31)(e), the same provision that

14 they're relying on here.

15          So because the definition of statutory insider

16 does not include an LLC that allegedly has a membership with

17 an LLC, the defendants cannot be statutory insiders as a

18 matter of law under that basis either.

19          Your Honor, it's our contention that the out of

20 circuit cases that the plaintiffs rely on simply do not

21 reflect the Ninth Circuit law that applies to this Court.

22          It is well settled, your Honor -- now, going to

23 the non-statutory insider status, because I've already done

24 the statutory one.  Turning to slide 3, it is well settled

25 that a creditor that has an arm's length business

93

1  relationship with the debtor is not an insider of that

2  debtor.   And, of course, we're first citing First Alliance,

3  which is the Ninth Circuit law on this issue.

4        Here, the loan documents and the restructuring

5  agreement between the parties state that they have an arm's

6  length relationship.   And this Court can certainly consider

7  those documents on this motion to dismiss because the Ninth

8  Circuit follows the incorporation by reference doctrine, your

9  Honor, which permits the Court to consider at this motion

10  stage "documents" -- and I'm quoting from Knievel v. ESPN,

11  which is Ninth Circuit 2005 case -- quote, "whose contents

12  are alleged in a complaint and whose authenticity no party

13  questions but which are not physically attached to the

14  plaintiff's pleading."

15        That's exactly the situation with the

16  restructuring agreement and the settlement agreement.

17        Looking at slide 4, that was the quote from

18  Knievel.

19        Now, moving on, your Honor, to slide 5.   Just as

20  importantly, the Ninth Circuit has held that courts are not

21  required to accept as true conclusory allegations that are

22  contradicted by the documents referred to in the complaint.

23        So here, we have the restructuring agreement, and

24  I'm reading from section 7 of it, and it's in your slide 6,

25  your Honor.

94

1       It provides that "The parties have an arm's length

2 business relationship that does not directly or indirectly

3 give rise to, nor does any party rely on, any fiduciary duty

4 on the part of the other party," along with -- as well as the

5 rest that I put on the slide for you.

6       The other loan agreements which are listed on page

7 7 are equally clear on this issue.  The agreements also state

8 that they're governed by New York law, which routinely

9 enforces contractual provisions stating that parties have

10 arm's length agreements like this.

11      And that is cited on slide 8 and also on slide 9,

12 your Honor.

13      Now, the plaintiffs contend that these provisions

14 do not apply because, they argue -- in their opposition only,

15 I might add -- that they have alleged an oral joint venture

16 that is beyond the scope of the parties' agreements.  And

17 that's in the opposition at page 12 through 13.

18      And if you've read the opposition, you might have

19 thought that that was also in the third amended complaint.

20 But the third amended complaint nowhere alleges an oral joint

21 venture.  And it is black-letter law that the plaintiffs

22 cannot amend the third amended complaint in their opposition.

23      And, by the way, there -- I always say there's law

24 on everything.  There's law on that too, your Honor.

25 Schneider v. California Department of Corrections, 151 F.3d

95

1  1194.   And that's a Ninth Circuit case, 1998.

2          Additionally, your Honor, the plaintiffs cannot

3  rely on any oral agreements not reflected in the parties'

4  contracts because the restructuring agreement, which is again

5  incorporated by reference, expressly states -- and I'm

6  reading the restructuring agreement, section 6, quote:

7              "It contains the entire agreement

8              among the parties with respect to the

9              subject matter hereof and any other

10             agreements shall be deemed to have

11             merged herewith."

12         So the plaintiffs argue that California law

13 governs the parties' relationship because California law will

14 sometimes look beyond these kinds of clauses.   But you have

15 to really see what this argument is based on.   And, frankly,

16 it's very circular in its reasoning.

17         Even though there is a written agreement

18 incorporated by reference into the third amended complaint,

19 the plaintiffs argue that, no, they're basing their position

20 on an oral agreement not in the third amended complaint, that

21 this oral agreement not in the third amended complaint that

22 flies in the face of the incorporated written agreement that

23 applies New York law, should apply California law, because

24 again, it's I guess because it was in California.   And if you

25 apply California law, well, then you can disregard the New

96

1 York agreement, so you've come full circle.

2         But the agreements between the parties expressly

3 state:

4         One, that the parties did not form a joint

5 venture;

6         Two, that the parties may not rely on any oral

7 representations not reflected in the agreement.

8         Plaintiffs' cases suggesting California may apply

9 to extra-contractual claims are simply not relevant here

10 based on what is actually alleged in the third amended

11 complaint, which must be taken as true for the purposes of

12 this hearing.

13         Now, plaintiffs also argue that Lehman Ali and

14 LCPI are non-statutory insiders, you know, in addition to

15 these other points I made, because 70 percent of SunCal's

16 debt financing came from the loans.

17         So now I'm going to go through the arguments, each

18 of them that they make about non-statutory.  We've gone

19 through the first one.

20         On this second one, the Ninth Circuit has held

21 that similar allegations are simply insufficient.  And I'm

22 going to address In re First Alliance here.  And I'm well

23 aware from our last hearing, your Honor, that, you know, you

24 had suggested, okay, In re First Alliance is distinguishable

25 on its facts.  I'm not going to rely on any factual

97

1  relationship.   I'm simply going to take the legal holdings of

2  the Ninth Circuit in that case, which by the way, were

3  premised on prior Ninth Circuit law and, frankly, very

4  consistent with other circuits that I'll refer to right here.

5          But In re First Alliance, the Ninth Circuit

6  affirmed the ruling that -- in that case, it was LCPI and

7  Lehman Brothers, they were not insiders despite the fact that

8  they were -- not the 70 percent source of the loan like we

9  are here, or at least alleged to have been -- but they were

10 the sole source of the warehouse funding and underwriting.

11         Plaintiffs' allegation that defendants were the

12 primary source of credit and therefore able to exercise

13 control is the same as the legal argument faced in In re

14 First Alliance.   And it was insufficient then, it's

15 insufficient now.

16         And the Ninth Circuit holding in First Alliance is

17 consistent with other circuits that have held that a lender

18 is not an insider of debtor simply because it's the debtor's

19 primary lender and is able to put financial pressure on the

20 debtor.

21         And that's quoting from Lynn v. Continental Bank.

22 It's In re Murchison.   It's a Northern District of Texas case

23 in 1993.

24         The plaintiffs also argue, a separate argument,

25 that the defendants are non-statutory insiders because in or

98

1 about 2007 Lehman Ali and LCPI became more, and I'm quoting,

2 "hands-on in scrutinizing and approving budgets and expenses.

3 Lehman Ali and LCPI had not only input on but importantly

4 veto vote over any expenditure undertaken under the

5 projects."  And that's in the third amended complaint on 83

6 and 84 to support this argument.

7          But, again, as a matter of law, your Honor, this

8 allegation does not adequately allege that the defendants are

9 non-statutory insiders because, as a matter of law, it is

10 well established -- and this is slide 10 -- "that the

11 exercise of financial control by a creditor over a debtor

12 which is incident to the creditor/debtor relationship does

13 not make a creditor an insider."

14          That's quoting Johnson v. NBD Park.

15          So the Ninth Circuit holding in First Alliance is

16 consistent with the majority rule followed with other

17 circuits.  And even if you wanted to throw out First

18 Alliance, that rule should still apply and at least be very

19 persuasive from those other circuits.

20          In fact -- and this is the other case that I

21 handed up to you, your Honor.  It's a case we found recently.

22 In In re Meridith Millard Partners, which we found after the

23 briefing, it held that the very same type of allegations that

24 plaintiffs allege here did not establish that a lender was an

25 insider.

99

1          In <u>Miller Partners</u> -- and I'm quoting -- quote:

2                "The respective property managers

3          would regularly submit disbursement

4          requests to the lender which the lender

5          would review, comment on, reject or

6          approve.  The debtors and the property

7          manager retained primary control over

8          day-to-day management and personnel

9          decisions while the lender primarily

10         exercised fiscal monitoring and

11         supervising."

12   That's at 145 Bankruptcy Reporter at 684 through -85.  It's

13   also on slide 11.

14          Looking at slide 12, the court goes on to hold

15   that:

16                "The lender had good cause to

17         monitor the debtor's expenses and

18         operations, especially since the loans

19         were in default.  Beyond that, the

20         debtors retained ultimate control of

21         their destiny.  They made the day-to-day

22         operation and personnel decisions and

23         exercised general control over the

24         business operations."

25   That's the same case at 688, your Honor.  Again, in <u>In re</u>

100

1 <u>Meridith Millard</u>, which is consistent with the majority of

2 courts that held that a lender is not an insider of a debt

3 unless the lender exercises operating control.

4        It's not enough to exercise financial control,

5 which frankly, I don't even think the third amended complaint

6 alleges enough financial control.  But that's not enough as a

7 matter of law.  Taking everything they say is true, they

8 don't allege day-to-day operational control because they know

9 it's not true.

10        So the <u>In re Winstar</u> case that is relied on

11 extensively in the opposition papers, your Honor, is simply

12 inapposite.  And the reason it's inapposite is because look

13 what happened there.  This was not just an entity that was

14 overseeing the borrowing and the lending and reviewing

15 budgets, but it was also deciding who to hire, who to fire,

16 what to buy, what to sell.  It had operating control.

17        THE COURT:  Mr. Soto --

18        MR. SOTO:  Yes.

19        THE COURT:  -- you're doing a wonderful job, and I

20 really hate to interrupt you.

21        MR. SOTO:  Sure.

22        THE COURT:  I'm going to need to take a brief

23 break.

24        MR. SOTO:  No problem, your Honor.

25        THE COURT:  I can feel my throat getting a little

101

1 dry --

2 　　　　MR. SOTO:  Me too.

3 　　　　THE COURT:  -- and it's better that I take a break

4 than devolve into a hacking situation here in the courtroom,

5 so I'll be right back.  Maybe two or three minutes.

6 　　　(Proceedings recessed briefly.)

7 　　　　THE COURT:  I do apologize.  The water didn't

8 work.  We'll try tea and honey and see if that makes it

9 better.

10 　　　　Go ahead.

11 　　　　MR. SOTO:  Your Honor, closing out on that point,

12 ultimately on that issue of non-statutory insider, the cases

13 cited by both defendants and plaintiffs show that a lender is

14 not an insider of a defendant simply because it exercises

15 strict financial control such as monitoring of a debtor's

16 operations or threatening to withhold a loan; that, instead,

17 it requires oversight of day-to-day operations, control of

18 it.

19 　　　　Because the third amended complaint simply alleges

20 that Lehman Ali and LCPI exercise financial control incident

21 to a creditor/debtor relationship, it does not adequately

22 allege that the defendants are non-statutory insiders.  And,

23 consequently, your Honor, the plaintiffs must plead gross and

24 egregious conduct to state a claim for equitable

25 subordination.

102

1          THE COURT:  Mr. Soto, just so I understand your

2 argument, one of the allegations, as I understand it, is that

3 at one point Lehman was dictating which creditors would be

4 paid and I assume it's your position that that would be a

5 financial control, and not operational?

6          MR. SOTO:  Right.  And that -- what the allegation

7 says is that we controlled what money we would give to them

8 to pay what.  Okay.  We controlled the revenue, the money,

9 and that's financial control.  We didn't control what they

10 chose to do, what they didn't choose to do.  If they didn't

11 want to do that -- if they didn't want to, they didn't have

12 to.  If they wanted to get money from another source, they

13 could -- whatever it was, we didn't control their daily

14 operations.

15          And it goes to a point on discovery, which I

16 agreed with you this morning actually, and that is, look,

17 it's not irrelevant what these people say when they come in

18 to tell us about their day-to-day operations.  Though it

19 might not be tremendously relevant to equitable

20 subordination, it might be to sub-con and to equitable

21 subordination if what they come in and say is:  We took our

22 cues from SunCal.

23          So when you ruled that this morning, I thought

24 about it because you were saying how you were thinking about

25 just either shutting it down or limiting it and you opted us

103

1  for making us pay for part of it.  I think in the end, that

2  information is exactly as you discussed:  potentially

3  relevant.  That's the issue that this goes to, whether or not

4  you were controlling the operations.  Not whether or not you

5  were doling out money for Project A, Project B, okay, we'll

6  pay that, we won't pay that.  You know, because those

7  decisions could be:  My gosh, the bridge is going to down,

8  well, better pay for that.  But look, I don't want to pay for

9  curbs.  Why do we need curbs?  There's nobody building

10 houses.  That kind of thing.  That's the difference.

11        So, your Honor, as I pointed out earlier, this

12 Court dismissed the second amended complaint because it did

13 not adequately allege gross and egregious conduct.

14        And so now I'm going to go through the third

15 amended complaint, each example that they give of gross and

16 egregious conduct, to show that, again, as a matter of law,

17 it doesn't meet the standards set by the Ninth Circuit and by

18 this Court.

19        So, first, they argue on -- opposition at page 20,

20 that the defendants engaged in gross conduct by threatening

21 to restrict future funding.  As a matter of law, your Honor,

22 these allegations are insufficient.  And I'll cite In re

23 Pinetree -- and it's in slide 13, your Honor.  In re Pinetree

24 Partners, Ltd.

25        It held that a lender's refusal to extend

104

1  additional financing to a debtor at the time the debtor was

2  in substantial default of the original loan -- and that was

3  absolutely the case here -- can only be construed to be

4  cautious, not egregious conduct.

5        This position represents the majority rule on

6  this, your Honor.  And slide 14 points out in In re After

7  Six, the bankruptcy court in the Eastern District of

8  Pennsylvania:

9              "In a vast majority of the refusal

10             to lend cases which we have found, the

11             courts have held that the lender's

12             refusal to lend or continue lending,

13             although devastating for the debtor, is

14             not inequitable."

15       Being a cautious lender is normal, your Honor, not

16 egregious.  And that's where the Ninth Circuit is, and there

17 are no cases in the Ninth Circuit to the contrary.

18       The second argument the plaintiffs raise to

19 support their claim that the defendants engaged in gross and

20 egregious conduct is by threatening or coercing them into

21 signing the restructuring agreement, which was heavily tipped

22 in the defendants' favor.  That's in their opposition at page

23 20.  It's in the third amended complaint at pages 89 to 99,

24 and again -- rather paragraphs, I'm sorry.  Although probably

25 pages too, but anyway paragraphs 89 to 99 and paragraphs 110

*Briggs Reporting Company, Inc.*

105

1 to 117.

2        But gross and egregious conduct must be conduct
3 that is tantamount to fraud, overreaching or spoliation to
4 the detriment of others.  That's the Ninth Circuit standard
5 enunciated in First Alliance.

6        Alternatively, to allege gross and egregious
7 conduct, the plaintiffs must allege actions that shock the
8 conscience.  Specifically on this issue, the plaintiffs
9 allege -- and let's read and then we'll see:  "Houston" --
10 this is a quote by the way, from the third amended complaint
11 at paragraph 93.  This is their zinger.

12            "Houston, in his capacity as an
13            agent of, among others, Lehman Ali and
14            LCPI, directly threatened Bruce Elieff
15            that if SunCal did not agree to what the
16            Lehman parties wanted, they would leave
17            Elieff hung out on the bonds."

18        That's what they cite in paragraph 93.  But
19 assuming Houston's statement is true, as we must for purposes
20 of this motion, it is not tantamount to a false fraud.
21 Consequently, it does not rise to the level of gross or
22 egregious conduct required by the Ninth Circuit.

23        Additionally, your Honor, this allegation only
24 underscores the fact that the plaintiffs have not corrected
25 the defects that you told them to correct last time.

106

1          This Court said that the plaintiffs on this issue

2   must, quote, "identify particular inequitable conduct by a

3   particular defendant against a particular debtor plaintiff."

4   So particular conduct, particular defendant, particular

5   debtor plaintiff.

6          But this allegation alleges a threat directed to

7   Elieff who is not a debtor plaintiff and possibly to SunCal,

8   again not a plaintiff.   Clearly, the plaintiffs have not

9   heeded the Court's direction.

10          Third -- here's the third argument they make.

11   They argue that the defendants engaged in gross and egregious

12   conduct because they, quote, "saddled," end quote, the

13   debtors with, quote, "needless debt through," quote, "onerous

14   cross-collateralizations," end quote.

15          But the plaintiffs have never explained why this

16   conduct was inequitable let alone gross and egregious.   In

17   fact, far from constituting conduct warranting equitable

18   subordination -- and I'm quoting from Paul Haymon, which we

19   had in our brief, quote, "cross-collateralization has become

20   a very common structuring technique in securitized loan

21   transactions."

22          Now, your Honor, this cross-collateralization may

23   be the basis of a preference claim, which I'll address later.

24   But it's clearly not the basis of equitable subordination

25   based on gross and egregious conduct standard.

107

1          The plaintiffs have not explained why agreements

2    that reflect common business practices that were negotiated

3    and agreed to by sophisticated parties are tantamount to

4    fraud, overreaching, spoliation, to the detriment of others,

5    which is the standard required in the Ninth Circuit.

6          Finally, your Honor -- this is their last point on

7    this one -- the plaintiffs contend that the defendants'

8    alleged post-petition conduct constitutes gross and egregious

9    conduct, and that's in the opposition at 2.

10         And as we've discussed, your Honor, the

11   plaintiffs' post-petition conduct cannot -- their arguments

12   about that cannot hold up against the law of the case that

13   has been decided by the Ninth Circuit BAP already and by this

14   Court.

15         The Ninth Circuit BAP has already ruled that the

16   equitable subordination claim violates the automatic stay;

17   that, therefore, LCPI had a right to invoke its automatic

18   stay on that basis.

19         Again, your Honor, In re 848 Brickell Ltd., which

20   is 243 Bankruptcy Reporter 142, a case that's relied on by

21   the plaintiffs, not just us, makes it clear that "the pursuit

22   of one's legal rights may not be the grounds for equitable

23   subordination."

24         So in dismissing -- that takes care of that issue

25   on gross and egregious.  But in dismissing the second amended

108

1 complaint, the court also held that as the cases have not

2 been substantively consolidated, the second amended complaint

3 fails to sufficiently identify the alleged injured creditors,

4 and what the plaintiffs have done in the third amended

5 complaint is to fail to remedy that flaw.

6       Instead, what they did is essentially repeat the

7 same allegations of the second amended complaint that the

8 defendants harmed virtually all of their creditors without

9 providing any specific examples as to why and then they

10 attached a list of the creditors.

11       I'll just give you one of the examples.  We have

12 several specific examples in the briefing.  But the second

13 amended complaint alleged in paragraph 13 and in the prayer

14 for relief that the plaintiffs are alleging that essentially

15 all of their unsecured debt is the result of the defendants'

16 inequitable conduct.

17       Here's what the third amended complaint alleges:

18 substantially all of the unsecured creditors' claims and

19 mechanic's liens that have been filed against each of the

20 plaintiffs debtors' estates, are obligations of Lehman Ali or

21 LCPI authorized -- and the -- who authorized the plaintiffs

22 to incur and promised to provide funding for that debt.

23       They added more words; they say the same thing.

24       The plaintiffs contend that they sufficiently

25 identified the creditors in their opposition because they

109

1 attached the list of the creditors who filed proofs of claim

2 against each of them.

3        This example sort of struck me so I always like to

4 go to it.  But I was looking at that list and I saw this one

5 claim for $489 under the SunCal Communities III property.

6 It's in there.  It's $459.40.  And they want us to be

7 equitably subordinated to that.

8        So I went and tried to find, well, what is that?

9 It turns out it's Verizon Telephone of California.  It's

10 listed, you know, on page 51, paragraph 226, as one of the

11 claims that has to be equitably subordinated.

12        Well, what in the world did Lehman do to be

13 equitably subordinated to Verizon?  Does that mean Verizon

14 only gave them the phone because we said something?

15        That's the very kind of fact that equitable

16 subordination requires.

17        Let me be clear.  We're not arguing, as the

18 plaintiffs suggest, by the way, in their opposition, that the

19 third amended complaint has to identify each creditor and

20 each debtor and each claim that the creditor was

21 disadvantaged.

22        Instead, what we're saying is what this Court said

23 the last time, and what the Ninth Circuit court requires:

24 that the plaintiffs must allege enough facts to show how the

25 creditors for each debtor were disadvantaged.  How did we

110

1 disadvantage that creditor?

2        Equitable subordination applies only to claims of

3 creditors whom the inequitable conduct has disadvantaged.

4 That's the Ninth Circuit <u>Stuvos</u> case that you relied on in

5 the tentative last time.  It's equally applicable to this

6 third amended complaint.

7        And for these reasons, the third amended complaint

8 should be dismissed, your Honor.

9        But even if you think that the third amended

10 complaint gets beyond 12(b)(6), there's a second independent

11 reason why it should be dismissed -- very quickly, because

12 we've gone through it already -- and that is they have not

13 satisfied Rule 9(b).

14        The last time I was here, I pointed out that the

15 courts frequently -- they use a phrase in trying to describe

16 what are the requirements of pleading under Rule 9(b).  They

17 call it the four Ws and an H.  Who, what, when, where and

18 how.  That's what the complaint has to tell you when it

19 sounds in fraud like this one.

20        And the Bankruptcy Rule 7009, which provides that

21 Rule 9(b) applies, we think that same four Ws and an H apply

22 as well.

23        The Ninth Circuit has also held that Rule 9(b)

24 applies when a plaintiff alleges that defendants engaged in

25 some form of fraudulent conduct, and that's the <u>Vess</u> case

111

1 that I cited earlier. So because the inequitable

2 subordination sounds in fraud and 9(b) requires that the

3 plaintiffs must state with particularity the circumstances

4 constituting that fraud or mistake, then that standard --

5 who, what, when, where and how -- applies in this context.

6          Normally, I would go through each of them, your

7 Honor, but it's been a while so I'll just state that Rule

8 9(b) requires that the plaintiff explain with particularity

9 the time, place and manner of each act of fraud. That's the

10 role that each -- and the role that each defendant played in

11 the alleged scheme. That's what the Ninth Circuit has held

12 as to Rule 9(b).

13          And here, the plaintiffs have conceded already

14 that they did not allege that kind of information as to

15 claims that they want to recast as broken promises which are

16 in fact merely fraud allegations.

17          Even where the plaintiffs have admitted -- because

18 there are a few places in the complaint where they admit --

19 allege in their opposition as well -- alleging fraudulent

20 conduct, namely, their allegations against LV Pac Point and

21 Lehman Ali, the allegations that concern the Pac Point

22 project.

23          They still fail for particularity under this

24 standard. Specifically, they allege that -- and I'm quoting

25 from paragraph 238 of the third amended complaint:

*Briggs Reporting Company, Inc.*

112

1          "Lehman Ali along with LV Pac Point

2          fraudulently induced SJD Partners and

3          SJD Development to consent to LV Pac

4          Point's foreclosure of the Pac Point

5          project by promising to cover bond and

6          vendor obligations and pay for lender

7          authorization work when it knew that an

8          LBHI bankruptcy was looming and that the

9          payment would not be forthcoming."

10         Once again, the plaintiffs have not alleged who

11 said it, what, when, where and how the misconduct is charged.

12 It's simply impossible for the defendants to know the date,

13 the times and the specific content and the parties that are

14 alleged to have taken part in this fraudulent conversation

15 because it's not in that paragraph.

16         The plaintiffs do not differentiate between Lehman

17 Ali and LV Pac Point.  Instead, they impermissibly lump them

18 all together.  But under clear Ninth Circuit law, they're not

19 allowed to do that under 9(b).  Under Schwartz v. KPMG which

20 is 476 F.3d at 756, and I'm quoting from 764:  "Rule 9(b),"

21 quote, "requires plaintiffs to differentiate their

22 allegations when suing more than one defendant."

23         In the context of a fraud suit involving multiple

24 defendants a plaintiff must, at a minimum, identify the role

25 of each defendant in the alleged scheme.

*Briggs Reporting Company, Inc.*

113

1        Finally, your Honor -- closing here -- the

2 plaintiffs would have this Court believe that they have pled

3 fraud with particularity with respect to Pac Point because --

4 and this is from their opposition at page 26 -- the timing

5 was suspicious and the senior personnel within LBHI were in

6 control of the defendants.

7        In other words, and they don't plead this in the

8 complaint, okay -- in other words, the plaintiffs would have

9 this Court speculate:

10        First, that in August of 2008, LBHI knew it would

11 file for bankruptcy one month later;

12        Second, that Mr. Gilhool was privy to this

13 knowledge as an employee of LBHI;

14        Third, that Mr. Gilhool was in control of Lehman

15 Ali;

16        Fourth, that Mr. Gilhool was in control of LV Pac

17 Point;

18        Fifth, that Mr. Gilhool knew in August of 2008

19 that LBHI's bankruptcy filing one month later would affect

20 the non-bankrupt LV Pac Point and Lehman Ali's ability to

21 fund that project; and

22        Sixth, that Mr. Gilhool, with that knowledge,

23 allegedly promised on behalf of LV Pac Point and Lehman Ali

24 to fund Pac Point.

25        Your Honor, the plaintiffs are simply stacking

114

1 speculations.  It's nothing more than a deck of cards, your

2 Honor, and if you take one card out, the deck tumbles.

3         In this case, the inequitable subordination claim

4 sounds in fraud, and contrary to this Court's order

5 dismissing the second amended complaint, they've pled nothing

6 with particularity in the third amended complaint that meets

7 that standard or the Rule 9(b) standard.  And because they

8 fail that, it must be dismissed for that independent basis as

9 well.

10         Your Honor, I'm also to address counts two, three

11 and four.  They're much shorter.

12         As to the second claim which was for fraudulent

13 inducement, the plaintiffs allege that LV Pac Point

14 fraudulently induced SJD Partners to assume certain accounts

15 payable to third party vendors and certain bond obligations

16 under the restructuring agreement which is attached as

17 Exhibit A to the motion to dismiss.  It's also incorporated

18 by reference into the complaint.

19         However, the plaintiffs' claims amount to nothing

20 more than a conclusory allegation that Lehman Ali and LV Pac

21 Point entered into an agreement without any intention to

22 honor it.  And I don't have to guess about that.  I can read

23 it in paragraph 252 and paragraph 258 of the third amended

24 complaint.  That's what they say.  They had no intention to

25 honor it.

115

1          These conclusory allegations are insufficient to
2  state a claim under New York law.  And the restructuring
3  agreement specifically contains a choice of law clause
4  stating that New York law applies.

5          Under New York law, the plaintiffs' allegation
6  that defendants simply did not intend to honor their promise
7  is not sufficient.  Because New York courts routinely hold
8  that allegations that a defendant entered into a contract
9  while lacking the intent to perform that contract are
10 insufficient to state a claim for fraudulent inducement.

11         In Holloway v. King, which is at 361 F.Supp.2d at
12 351, and I'll be quoting from 360, the court held that
13 allegations that, quote:  "Defendant entered into a contract
14 while lacking the intent to perform it are insufficient to
15 support a fraud in the inducement claim," exactly what
16 they're trying to do here.

17         Other courts have found that -- and here, I'm
18 quoting from Gordon v. Dino de Laurentiis which is a New York
19 appellate division case in 1988 in our briefs.  "A fraud
20 claim is not sufficiently stated where it alleges that a
21 defendant did not intend to perform a contract."

22         Further, quoting from the Southern District of New
23 York, a 2001 case, Four Finger Art Factory v. DiNicola.  "A
24 fraud claim may not simply allege that a contracting party
25 did not intend to meet its obligations."

116

1          Finally, in Caniglia v Chicago Tribune, another

2 New York case, this time the appellate division, 1994, 612

3 New York Supp. 2d 146.  Quote:

4               "It is well settled that a cause of

5               action for fraud does not arise where,

6               as here, the only fraud alleged merely

7               relates to a contracting party's alleged

8               intent to breach a contractual

9               obligation."

10          Now, the logic supporting this basic rule is --

11 again, it's obvious and compelling.  If a party does not live

12 up to the terms of its commitment in a contract, the opposing

13 party's straightforward remedy is to sue for breach of the

14 contract, not to manufacture a fraud claim.

15          The plaintiffs' argument that their allegations

16 are sufficient, at least in their opposition, are based on

17 the misreading of two cases.

18          First, they rely on Deerfield v. Chesebrough-

19 Ponds, which is in their opposition.  The court actually held

20 in that case that plaintiffs stated a claim for fraudulent

21 misrepresentation but only because the alleged

22 misrepresentation was totally collateral to the contract.

23          And the subsequent cases have confirmed this

24 point.  Bridgestone Firestone v. Recovery read Deerfield as

25 standing for the limited proposition that only

117

1 misrepresentations that are collateral or extraneous to a

2 contract state a claim for fraud.

3        And here's the example that is frequently given.

4 Assume, your Honor, that I was negotiating with you to build

5 a restaurant on vacant land but you were reluctant, so I

6 wanted to sweeten the deal.  So I said, not only will I

7 contract with you to build a restaurant on vacant land for

8 you, but I will also agree to make you the manager of the

9 restaurant.

10        So then, later, if I hire someone to build the

11 restaurant, okay, that is not, you know, the person who I had

12 contracted with initially.  Under that contract, you could

13 sue me.

14        But what if I hired someone else to manage?  Well,

15 that would be collateral to the first contract, not part of

16 the first contract.  Separate contracts.

17        And they say if you have a collateral duty that

18 induced you to enter into the first duty, that the only

19 reason why you let me build the restaurant is because I

20 promised to make you the manager, well, then, that is

21 inducement.  So that's the kind of collateral promise you

22 have to have.

23        It can't be a promise that's at the heart of the

24 original agreement, and yet here, the fraudulent inducement

25 that's alleged here is directly related, not extraneous to

118

1 the contract.

2          The plaintiffs allege only that Lehman Ali and LV

3 Pac Point did not intend to perform under the restructuring

4 agreement, the actual agreement that is, you know, at the

5 heart of it.  The alleged misrepresentation is no different

6 than the failure to perform the promise.  So it's not

7 collateral.

8          The plaintiffs similarly ignore holdings in MaNas

9 v. VMS Associates, which again, applying New York law, where

10 the court dismissed the plaintiffs' claim because the

11 allegations were merely general allegations that the

12 defendant entered into the contract while lacking the intent

13 to perform it, and therefore, they were just duplicative of a

14 breach of contract.

15          Turning to the settlement agreement, separate and

16 apart from the restructuring agreement, the plaintiffs'

17 fraudulent inducement claim as to that fails for the same

18 reasons as the restructuring agreement.

19          We believe the settlement agreement is just a

20 draft, that it was never finalized, but we're not arguing

21 those facts here.  We're assuming the facts as alleged by the

22 plaintiffs here.

23          Just like the restructuring agreement, they only

24 allege that Lehman entered into the settlement agreement

25 without any intent to perform its obligations.  And that's at

119

1 paragraph 252.  As I just discussed, that type of allegation

2 cannot state a fraudulent inducement claim.

3            Now, the plaintiffs want this Court to assume that

4 the settlement agreement was final and executed.  Fine.  But

5 if they do, then they also have to live with the settlement

6 agreement, and the settlement agreement also contains a

7 choice of law clause specifically stating that New York law

8 apply.

9            So all of the law that I just cited with respect

10 to the restructuring agreement applies equally as well to the

11 fraudulent inducement claim as to the settlement agreement.

12            And plaintiffs' allegations also fail, your Honor,

13 independent of what I've just stated, because they fail to

14 comply with the standards of Rule 9(b) as to these claims as

15 well.  And as discussed, again, your Honor, 9(b) requires

16 them to plead with particularity.  I won't go over that

17 again.

18            But, your Honor, if you remember that 9(b)

19 requires facts with particularity, if you look at Newborn

20 Milken (phonetic) on this type of claim which is a Ninth

21 Circuit case, 1993, the complaint must specify such facts as

22 time, dates, places, benefits.

23            They don't do that with respect to either the

24 restructuring agreement or the settlement agreement.  They

25 only say what I read.

120

1          Your Honor, even if you -- well, another argument

2 that they make -- and then this is the final point on this --

3 they argue that, you know what, even though these contracts

4 say New York law should apply, California law should apply

5 anyway because fraudulent inducement claim is a tort and, you

6 know, you don't have to apply torts under choice of law

7 provisions.

8          But, in fact, California courts routinely apply

9 contractual choice of law provisions to tort claims.

10          In <u>Nedlloyd Lines v. Superior Court</u> which is at

11 834 Pacific 2d 1148, the California Supreme Court established

12 a clear standard for the enforcement of such clauses,

13 including as to tort claims.  And I'm quoting:

14              "When two sophisticated commercial

15              entities agree to a choice of law

16              clause, the most reasonable

17              interpretation of their actions is that

18              they intended for the clause to apply to

19              all causes of action arising from or

20              related to their contract."

21          California courts have consistently applied

22 contractual choice of law provisions designating New York law

23 to tort claims that are related to contracts at issue.

24          So, for example, Ninth Circuit, 1995, <u>General</u>

25 <u>Signal Corp. v. MCI</u>, the Ninth Circuit enforced the parties'

*Briggs Reporting Company, Inc.*

121

1 choice of law provision, applied New York law to the

2 plaintiffs' fraud claims because the claims could only exist

3 because of the contract at issue.

4        Similarly, the Northern District of California, in

5 RSI Corp. v. International Business, which is IBM, which is a

6 Northern District of California case of last year -- and it

7 also applied a choice of law provision that designated New

8 York law to a tort claim of fraud.

9        Nevertheless, your Honor, even if you were going

10 to apply California law, and this is my last point on this,

11 the plaintiffs' claims would still fail under California law,

12 the law cited in our papers, Conrad v. Bank of America, and I

13 won't repeat that.  But it also applies the same standard as

14 New York would apply to these kinds of provisions.

15        So that's the fraud in the inducement claim.

16        And, finally, your Honor, there are two claims

17 that are very connected.  It's the third and fourth claim.

18 That's the claim to avoid and then to recover preferential

19 transfers.

20        In the third claim, SJD Partners' claim for relief

21 alleges that LV Pac Point's acquisition of the Pac Point

22 project at a non-judicial foreclosure sale constituted a

23 preferential transfer under 11 U.S.C. 547(b).

24        Your Honor, this claim should be dismissed for

25 three reasons.

122

1          First, to adequately plead a preferential

2 transfer, SJD Partners must allege sufficient facts

3 demonstrating that the transfer enabled the creditor to

4 receive more than it would have received in a Chapter 7

5 liquidation.  So that's the standard.

6          Under Ninth Circuit law -- and I'm going to quote

7 from In re Ehring, which is at 900 F.2d 184.  I'm quoting

8 from 189.  It's a Ninth Circuit case, 1990:

9               "A creditor who purchases at a

10              regularly conducted foreclosure sale has

11              not received more than it would have

12              under a Chapter 7 liquidation sale."

13 The plaintiffs pick up in their opposition on the language in

14 Ehring that the foreclosure has to be, quote, "regularly

15 conducted," and they argue that that wasn't the case here

16 because the foreclosure was allegedly fraudulently induced,

17 and we've already gone through that.

18          But the term, quote, "regularly conducted," end

19 quote, means that the foreclosure itself was conducted

20 pursuant to the normal procedural rules for such

21 foreclosures.

22          There's not a single allegation in the third

23 amended complaint that this foreclosure did not follow normal

24 procedures.

25          And I've already pointed out that the plaintiffs'

123

1  fraudulent inducement allegations do not satisfy Rule 9(b) or

2  Twombley.  But because their allegations that LV Pac Point

3  Chapter 7 liquidation sale acquired the project through a

4  foreclosure sale, they have not as a matter of law, received

5  more than it would have under a Chapter 7 liquidation sale.

6          The plaintiffs argue that claim three should not

7  be dismissed because defendants' liens are potentially

8  avoidable, and this position is simply unsupportable.

9          The two cases cited by the plaintiffs simply hold

10 that a creditor receives more than it would have at a

11 Chapter 7 litigation if the liens were never valid, and

12 that's key.  That's In re Jones that they rely on and In re

13 PC Systems.  Okay.

14         These cases simply do not hold that a creditor

15 receives more in a Chapter 7 liquidation if its claims are,

16 quote, "potentially avoidable," which is what is alleged in

17 the third amended complaint.

18         They hold that if the lien was never valid, that's

19 when that works.

20         Just to be clear, nobody is arguing that the

21 plaintiffs -- and the plaintiffs haven't even alleged it --

22 that Lehman never had a valid claim.

23         Under the controlling Ninth Circuit law in In re

24 Ehring, LV Pac Point has not received more than it would have

25 in a Chapter 7 litigation.  And claim three should be

124

1 dismissed.

2          Additionally, claim three should also be dismissed

3 because it just recites the statutory language of section

4 547(b) and that's all they do in paragraph 270, that's it.

5 Now, the Supreme Court has already held in _Iqbal_ and _Twombley_

6 that that's just not enough to satisfy Rule 8.

7          Finally, your Honor, claim three seeks to avoid

8 the alleged preferential transfer, quote, "including the

9 liens," end quote.  That's from paragraph 271 of the third

10 amended complaint.  That's it.  It does not allege any facts

11 concerning the liens.

12          What I've said is all it says and that certainly

13 doesn't meet the standards of _Iqbal_ and _Twombley_.

14          The fourth claim, your Honor, which is a claim to

15 recover is very quick and very simple.  Section 550(a) is

16 applicable only to the extent that the transfer is avoided

17 under section 547.  Because the SJD Partners section 547

18 claim fails, the 550 claim should also fail as a matter of

19 law.

20          And, again, even as to this claim, all they do is

21 cite and restate 550(a), which is, again, a violation of the

22 prescriptions of _Iqbal_ and _Twombley_ as to what is required by

23 Rule 8(a).

24          Thank you, your Honor.

25          MR. ZIEHL:  I know we're getting late, your Honor,

125

1  and I will cut down my remarks and not repeat what's in our

2  brief on the remaining causes of action.

3        But the fifth claim for constructive fraudulent

4  conveyance suffers from the same pleading failures that Mr.

5  Soto was just talking about and the requirements of Twombley

6  and Iqbal.

7        Essentially, the fifth claim for relief seeks to

8  avoid 47 transfers and obligations involving five co-

9  borrowing financing loans.  If you look at the allegations,

10  it is simply a formulaic recitation of the elements of

11  section 548.

12        Then, from that, they jump to the only factual

13  allegation which -- they take the gross amount of each loan

14  and they subtract mathematically the portion that each

15  borrower received.

16        And from that, they conclude that because each of

17  the borrowers only received a portion of the loan, that the

18  difference between the total amount of the loan and what each

19  of them received is a fraudulent transfer.

20        That is not sufficient as a matter of law, let

21  alone sufficient to state a plausible claim on its face.

22        First, the allegations of lack of reasonable

23  equivalent value are completely inadequate.  All they allege

24  is that each co-borrower received a portion of a loan.  If

25  that were true, you could never have a co-borrowing loan that

*Briggs Reporting Company, Inc.*

126

1  wasn't a fraudulent conveyance where the co-borrowers

2  received less than the total amount of the loan.

3        But the standard is fair value, and the Court is

4  to look -- and the allegations have to include what the fair

5  value is, not book value of the loan.

6        And they must also take into account -- and this

7  is critical, your Honor, the probability of the contingent

8  obligation will mature that is that any of the debtors will

9  be called upon to pay more than their share.

10       And the value of the contribution requires that

11 you look at the assets of all of the co-borrowers in order to

12 show the lack of reasonable equivalent value because if the

13 other co-borrowers have the wherewithal financially to pay

14 their proportionate share, then there is no fraudulent

15 transfer as a matter of law.

16       None of this is alleged in the complaint.

17       All of these facts are essential to determine -- I

18 cite the Court to the Mellon Bank case and a string of cases

19 that we cited but particularly the Mellon Bank case where

20 it's essential that the transfer -- that they allege facts

21 that show the lack of reasonable equivalent value that is

22 plausible on its face.

23       The same analysis applies to the second

24 significant element and that is the allegations of

25 insolvency.  The same analysis applies.  The assets must be

127

1 fairly valued and the liabilities must be assessed, and that

2 means that you have to allege the assets of all the co-

3 borrowers and take into account whether the co-borrowers had

4 the wherewithal to pay and whether the contingent liability

5 even exists.  And the Mellon case stands for that.

6           Finally, the third amended complaint does not

7 allege facts to show that there is a creditor under section

8 502.  Many of the transfers -- and you just can look at

9 paragraph 63 of the third amended complaint -- many of the

10 transfers occurred more than two years before the petition

11 date.

12           So section 548 doesn't provide any protection.

13 They have to go under 544.  And 544(b)(1) has an additional

14 pleading requirement, and that is that you have to show under

15 state law that there is an avoidable transfer and that

16 there's a creditor that holds that claim.  We're entitled to

17 know who has such a claim so that we can see whether that

18 predicate -- that is a minimal pleading requirement if

19 Twombley and Iqbal mean anything.

20           Your Honor, I'll go to the sixth claim, which is a

21 preference claim.  The third amended complaint does not

22 allege that the liens were granted during the preference

23 period.  The claim lacks that important specificity.

24           Section 547 only allows avoidance of transfers of

25 interest in property.  An obligation is only a transfer under

128

1 the Bankruptcy Code if it's been paid.

2          What they've done in this third amended complaint

3 is they conflate transfers and obligations, whether they've

4 been paid or not.  So as a minimum, the pleading and the

5 sixth cause of action require that they allege what were the

6 liens that were granted during the preference period that 544

7 applies to.

8          Secondly, the MH preference alleges payments made

9 by a non-debtor, Marblehead, Heartland Master, LLC.  That

10 cannot be the basis of a preference, and there are absolutely

11 no allegations to support their conclusion in their

12 opposition that subsidiaries of the debtor had vested

13 property interest in the parent's bank account.

14          So, again, it's a pleading failure.  They should

15 be given leave to amend, if they can.

16          The seventh claim, your Honor, the lien stripping

17 claim under 506(d), the law is clear.  All the cases are

18 clear.  Lien stripping of this nature can only be done

19 through a plan.  It is not -- 506(d) is not a stand-alone

20 basis for disallowance of a claim.  And I cite the Court to

21 1441 Veterans Street, the Ninth Circuit case.

22          It is only a means for bifurcating a claim for

23 purposes of plan treatment.

24          And, your Honor, finally, on the eighth claim for

25 relief, they ask for disallowance under 502(d).  I'm not

*Briggs Reporting Company, Inc.*

129

1 going to recite all the reasons why this is not a valid cause

2 of action but most simply 502(d) requires that a defendant

3 refuse to turn over a voided transfer.  They haven't pled

4 that there was a refusal to turn over a voided transfer

5 because there hasn't been a voided transfer and there's been

6 no refusal.

7       Even if you said that there was a separate cause

8 of action for that, they haven't even pled the statutory

9 requirements.

10       Thank you, your Honor.

11       MR. REINTHALER:  Good afternoon, your Honor.

12 Richard Reinthaler from Dewey and LeBoeuf on behalf of Fenway

13 Capital.

14       My client, Fenway Capital, finds itself stuck in

15 the middle of a quagmire it didn't create and had no idea it

16 was getting into when it entered into what it believed was a

17 standard arm's length repurchase transaction with Lehman in

18 August of 2008.

19       Although it is technically the owner of certain

20 loans that were sold to it by Lehman in that transaction, it

21 has, as everyone, including plaintiffs, readily concede no

22 stake in the outcome of this case.  No economic interest in

23 the loans it technically owns and no real interest in being

24 stuck in the middle of this dispute between Lehman and the

25 SunCal debtors.

130

1          Just because it is, according to plaintiffs , the

2 largest single creditor of SunCal -- and we hear that over

3 and over like a broken record -- but that's a misleading way

4 of describing Fenway's real lack of an economic stake in the

5 outcome.

6          It does not mean, just because they are the

7 technical owner of the loans that it's fair game to sue them.

8 Indeed, Fenway's lack of any economic interest in the loans

9 may very well support the argument that as a conduit company,

10 it isn't even a transferee, as that term is used in the

11 Bankruptcy Code.   But that's an issue for another day.

12          Fenway has been trying for some time to extricate

13 itself from this mess and is in the process of negotiating a

14 way out of it pursuant to a transaction by which Lehman will

15 repurchase Fenway's interests in all of the loans, including

16 the SunCal term loans that were the subject of the repo

17 agreement.

18          If that agreement can be reached, Fenway will no

19 longer own the loans or have any interest in them whatsoever

20 and will thus no longer be a necessary party to this

21 litigation, for it will no longer possess any claim that

22 could be subordinated.

23          Any such repurchase of the loans, if it occurs,

24 will require the approval of the bankruptcy court overseeing

25 Lehman's Chapter 11 case.   If that occurs, I submit it will

*Briggs Reporting Company, Inc.*

131

1 moot the claims.

2          But for now at least, we remain in the case.   And

3 I will argue why, if we do remain in the case, the three

4 claims against Fenway for equitable subordination, for

5 fraudulent transfer, and for avoidable preference should be

6 dismissed.

7          First, equitable subordination.   Mr. Soto has

8 already given you a plethora of reasons for dismissing

9 SunCal's equitable subordination claim.

10          I will not repeat those arguments other than to

11 note that if the complaint fails to state a claim against

12 Lehman for equitable subordination, a fortiori, it fails to

13 state a claim against Fenway, which is not alleged to have

14 engaged itself in any inequitable conduct, let alone the kind

15 of gross and egregious conduct tantamount to fraud,

16 misrepresentation, overreaching, spoliation or conduct

17 involving moral turpitude that the Ninth Circuit, in the

18 First Alliance and Pacific Express cases that are cited in

19 our briefs, has held is required to state a claim for

20 equitable subordination.

21          As your Honor is well aware, equitable

22 subordination is a drastic remedy that is rarely granted.   As

23 the Ninth Circuit held in First Alliance, given the high

24 pleading bar that exists, the standard of non-fiduciary, non-

25 insider conduct -- and that's what we're talking about with

*Briggs Reporting Company, Inc.*

132

1 regard to Fenway -- sufficient to warrant equitable

2 subordination is rarely if ever met.

3        But even assuming that plaintiffs could overcome

4 the high pleading bar vis-a-vis Lehman, it does not mean that

5 they have also stated a viable claim against Fenway.

6        This is so for several independent reasons.

7        First, plaintiffs have essentially conceded in

8 their opposition papers that Fenway itself did not engage in

9 any inequitable conduct.

10        All Fenway is alleged to have done is to have

11 entered into a standard arm's length repo agreement with

12 Lehman as part of a commercial paper program that allowed

13 Lehman to convert illiquid loans into liquid commercial

14 paper, a security that could be used by Lehman to obtain

15 financing or as additional collateral for its existing

16 obligations.

17        There is nothing inherently sinister, unusual or

18 clandestine about a repo transaction.  Entities buy and sell

19 loans and enter into repo and commercial paper transactions

20 all the time.

21        More importantly perhaps is the fact that the

22 complaint does not allege or explain how the repo transaction

23 harmed any creditor.  All Fenway did was to purchase the

24 loans and pledge them as security for a note to Fenway

25 funding which in turn issued commercial paper to Lehman that

*Briggs Reporting Company, Inc.*

133

1 was collateralized by the Fenway funding note and thus the

2 loans.

3          The repo and commercial paper transactions had no

4 impact at all on any of the SunCal borrowers or their

5 creditors.  In short, the complaint fails to state a claim

6 that Fenway itself did anything that would warrant the

7 drastic remedy of equitable subordination.

8          So plaintiffs' entire case against Fenway is based

9 on its status as a purchaser or subsequent transferee of the

10 term loans that it purchased under the repo transaction.

11 It's being tarred and feathered with Lehman's conduct.

12          And plaintiffs posit two alternative theories in

13 their opposing brief as to why Fenway should be tarred and

14 feathered by Lehman's alleged inequitable conduct.

15          First, they claim that as a successor to Lehman,

16 its status as a good faith transferee is not a defense.  But

17 they cite no case other than the bankruptcy court's opinion

18 in Enron I which was expressly reversed and discredited by

19 Judge Scheindlin in her opinion in Enron II, that it's ever

20 held that a good faith transferee take subject to any

21 equitable subordination defense the obligor may have had

22 against the transferor.

23          In Enron II, Judge Scheindlin examined the

24 statutory construction of section 510(c)(1) of the Bankruptcy

25 Code, the congressional intent underlying that section, and

*Briggs Reporting Company, Inc.*

134

1 the existing case law both before and after its enactment,

2 all of which supported the conclusion that equitable

3 subordination is a, quote, "harsh remedy that is not to be

4 lightly invoked," end quote.

5      She then contrasted the law on assignments versus

6 the law on sales, noting the very different consequences the

7 form of the transfer may entail for the assignee versus the

8 purchaser.

9      She held that assignment law principles do not

10 apply to sales of debt and that a purchaser as opposed to an

11 assignee does not stand in the shoes of the seller and as a

12 result can obtain greater rights than the transferor.

13      Judge Scheindlin then exhaustively examined the

14 case law under section 510(c), finding there to be no case,

15 pre- or post-enactment, that applied equitable subordination

16 to a transferee based solely on the conduct of the

17 transferor.

18      She then found, based on that case law and the

19 language of the statute which focused on the claimant, not

20 the claim, that Congress did not intend section 510(c) to be

21 applied to a transferee of a debt who itself has not acted

22 inequitably, merely because the debt was transferred directly

23 or indirectly by a bad actor.

24      In reaching this decision, Judge Scheindlin noted

25 that with respect to the debt markets in particular, it is

135

1 almost impossible for purchasers of debt to conduct due

2 diligence or have any realistic way of ascertaining whether

3 the seller engaged in any inequitable conduct.

4       Now, SunCal's response to Enron II is to cite to

5 the overruled bankruptcy court decision and a number of New

6 York state court cases dealing with assignees of mortgages,

7 having nothing to do with equitable subordination or section

8 510(c) and then to argue that if being a good faith

9 transferee is a defense, it is an affirmative defense that

10 cannot be raised on a motion to dismiss.

11       Once again, they're wrong.

12       Judge Scheindlin granted the transferee's motion

13 to dismiss in Enron II, finding that because equitable

14 subordination is a drastic and unusual remedy, it is

15 important to apply section 510 narrowly.

16       She then held that purchasers of claims with

17 actual notice of the inequitable conduct of the seller may be

18 subject to equitable subordination based on their own

19 misconduct, but in doing so, she made clear that only, quote,

20 "bad faith purchasers," end quote, who had, quote, "actual

21 knowledge," end quote, of the inequitable conduct of the

22 seller may be equitable subordination.

23       The court went on to say that the burden and risk

24 in the case of a sale is better carried by creditors as a

25 whole rather than the subsequent transferee.   In other words,

136

1 she held that it is plaintiff's burden to both plead and

2 prove bad faith and actual knowledge on the part of the

3 transferee.

4        The complaint here does not even attempt to plead

5 any inequitable conduct, let alone bad faith conduct on the

6 part of Fenway.   SunCal concedes this in its opening brief.

7 Nor does it allege anywhere that Fenway had actual knowledge

8 of any alleged inequitable conduct by Lehman.

9        And, again, she held that it's actual knowledge,

10 not constructive knowledge, that is the test.   And it hasn't

11 been met.

12        So in the end, it doesn't matter whether it is

13 SunCal's burden to plead bad faith and actual knowledge or as

14 plaintiffs allege, Fenway's status as a BFP is merely an

15 affirmative defense.   Either way, we win because both the

16 complaint and plaintiffs' own admissions leave no doubt as to

17 Fenway's status as a BFP.

18        So recognizing this, and recognizing that the

19 Enron II opinion and the lack of any contrary authority may

20 spell the death knell to any equitable subordination claim

21 against Fenway as a subsequent transferee, in their opposing

22 brief, plaintiffs posit an alternative theory not found

23 anywhere in their complaint, namely, that Fenway may be held

24 vicariously liable for Lehman's alleged post-repo and/or

25 post-petition inequitable conduct by virtue of the agency

*Briggs Reporting Company, Inc.*

137

1  relationship between Lehman and Fenway created under the repo

2  agreement.

3        This argument is riddled with gaping holes.

4        First, this is an argument that is not raised in

5  the pleadings, and accordingly, as Mr. Soto mentioned, it

6  cannot be raised by plaintiffs in their opposition to this

7  motion, which is directed to the face of the complaint.

8        Nowhere in that 77-page 391-paragraph document is

9  it alleged that any of the alleged inequitable conduct on the

10 part of Lehman was undertaken in Lehman's capacity as an

11 agent of Fenway.

12       On the contrary, plaintiffs' position to this day,

13 as I understand it, is that notwithstanding your Honor's

14 ruling to the contrary, Lehman has not been acting as

15 Fenway's agent but rather on its own in dealing with

16 plaintiffs and this Court.

17       Plaintiffs cannot, in any event, amend their

18 complaint through their briefs.

19       Second, there is nothing in the complaint, in the

20 repo agreement, or in the related transaction documents that

21 would suggest or permit the plausible inference that the

22 Lehman entities were acting as Fenway's agents in connection

23 with Lehman's alleged failure to close the so-called

24 settlement agreement, Lehman's alleged failure to fund the

25 projects, Lehman's alleged withdrawal of funds from the

138

1 projects, Lehman's alleged efforts to block the debtors'

2 bankruptcies, its invocation of the automatic stay in its own

3 bankruptcy case, et cetera, et cetera. All of the alleged

4 acts in the complaint relate solely to Lehman's entirely

5 separate relationship with SunCal.

6      There is no allegation in the complaint that

7 Fenway had knowledge of or acquiesced in any of that conduct.

8      And even with respect to the proofs of claim, as

9 your Honor is aware, the record in this proceeding is clear,

10 that no one at Fenway ever received or approved the proof of

11 claim forms before they were filed.

12      Fenway, through its counsel, merely sought and

13 received assurances from Lehman that it was taking

14 appropriate action to protect Fenway's interest in the loans.

15      Finally, it bears repeating that the complaint

16 does not allege that the repo transaction adversely impacted

17 or inflicted any harm on SunCal's creditors.

18      As Judge Scheindlin recognized in <u>Enron II</u>, and I

19 quote:  "Equitable subordination is not available to

20 creditors who suffered no injury," end quote, as a result of

21 a defendant's conduct.  That description fits this case to a

22 tee.

23      I'd now like to address briefly plaintiffs'

24 fraudulent transfer claim against Fenway.  Just to be clear,

25 the complaint does not allege that Fenway was the recipient

139

1 of any alleged fraudulent transfers from the debtors.  It is

2 thus being sued solely in its capacity as a subsequent,

3 immediate or mediate transferee of the SunCal Communities I

4 loan and the Marblehead, Heartland loans, together with the

5 liens associated therewith.

6         Plaintiffs' fraudulent transfer claim against

7 Fenway suffers from several fatal defects, each of which

8 independently requires dismissal.

9         First, if the initial transfers to the various

10 Lehman entities were not fraudulent transfers, a fortiori

11 again, the subsequent transfers of the same loans and liens

12 to Fenway could not have been fraudulent.

13         I will not repeat Mr. Ziehl's arguments on this

14 point other than to note our complete agreement with him.  If

15 he's right, the claim against Fenway inexorably falls by the

16 wayside as well.

17         Second, even if plaintiffs have adequately stated

18 a claim against the Lehman entities, plaintiffs cannot

19 proceed with their claim against Fenway without pleading any

20 facts at all because demonstrating any facts demonstrating

21 that when it entered into their repo transaction, Fenway did

22 not provide value, was acting in bad faith, and/or had

23 knowledge of voidability of the initial transfers to Lehman.

24         Section 550(b) of the Bankruptcy Code could not be

25 any clearer on this and provides a complete defense to

140

1 Fenway.   Under the statute, if Fenway took, quote, "for

2 value, in good faith, and without knowledge of the

3 voidability of the transfer avoided," end quote, it is home

4 free.

5         Now, I recognize that some courts have held that

6 section 550(b) provides a subsequent transferee with an

7 affirmative defense on which it has the burden of proof.

8 There are other cases, your Honor, that we have cited,

9 including the Northern District of California decision in In

10 re Daisy Systems Corp. that hold that the burden of pleading

11 and proof shifts to plaintiffs when seeking to avoid alleged

12 fraudulent transfer against subsequent transferees.

13        Even within the Ninth Circuit, different panels

14 have reached diametrically opposite conclusions.

15        We cited in our brief In re Avi (phonetic), in

16 which the court said that the burden of proof falls on the

17 party asserting the good faith defense.   And we did not cite

18 in our brief but I'd like to bring to the Court's attention

19 In re Video Depot Ltd., which is 127 F.3d 1195 at pages 1197

20 and -98.

21        THE COURT:   I'm sorry.   Could you give me the cite

22 again.

23        MR. REINTHALER:   Yes.   It's 127 F.3d 1195 at pages

24 1197 and 1198, which is a 1997 Ninth Circuit decision.   And

25 in that case, your Honor, the Ninth Circuit held that once a

141

1 transfer has -- and I'm reading from pages 1197 and '98.

2          "Once a transfer is determined to

3          be voidable as a fraudulent conveyance

4          under section 548, the trustee or the

5          debtor may recover it from either ..."

6          And then it quotes subsections (1) and (2).  It

7 then goes on to say:

8          "The distinction between the two,

9          however, is a critical one.  The

10          trustee's right to recover from an

11          initial transferee is absolute."

12 And it cites Danning v. Miller.

13          "On the other hand, the trustee may

14          not recover from a subsequent transferee

15          if the subsequent transferee accepted

16          the transfer for value in good faith and

17          without knowledge of the transfer's

18          voidability.  Subsequent transferees

19          therefore have a defense unavailable to

20          initial transferees.

21          The purpose of this scheme is to

22          protect creditors from last-minute

23          diminutions of the pool of assets in

24          which they have interests, while at the

25          same time to guard against the waste

142

1        .        that would be created if people either

2                 had to inquire how their transferors

3                 obtained their property or to accept a

4                 risk that a commercial deal would be

5                 reversed for no reason they could

6                 perceive at the time.

7                 Section 550 balances these two

8                 goals by imposing on the initial

9                 transferee the burden of inquiry and the

10               risk if the conveyance is fraudulent.

11               While the initial transferee is in the

12               best position" --

13               THE COURT:  Mr. Reinthaler.

14               MR. REINTHALER:  Excuse me?

15               THE COURT:  I don't mean to interrupt you.  I know

16 you're reading from the case.  You've already given me the

17 cite.  We're running out of time and I haven't even heard

18 from the other side.

19               So if I could just have you summarize your

20 position regarding this case.

21               MR. REINTHALER:  Well, I was at the end of --

22               THE COURT:  I've got the citation.  I can look it

23 up.

24               MR. REINTHALER:  Okay.

25               THE COURT:  Okay.

143

1          MR. REINTHALER:  This case is a perfect example of

2 why the dichotomy in pleading burdens under section 550 makes

3 sense.

4          Fenway's counsel, Irena Goldstein, in both her

5 declarations and testimony in connection with the agency

6 issue, which plaintiffs have referred to and as to which this

7 Court may take judicial notice, made clear that before

8 entering into the repo transaction, Fenway performed no due

9 diligence with respect to the loans it was purchasing and

10 relied entirely on its longstanding relationship with and the

11 creditworthiness of Lehman at the time.

12          But even if section 550(b) provides an affirmative

13 defense, that does not give plaintiffs a free pass at Fenway

14 or preclude a motion a dismiss, whereas here, the complaint

15 on its face merely parrots the statutory language, alleges no

16 facts suggesting, let alone permitting a plausible inference

17 that in entering into the repo transaction, Fenway did not

18 provide value, in good faith and without knowledge of the

19 voidability of the transfers to Lehman.

20          Your Honor, if all one needs to do to avoid the

21 dismissal of a fraudulent transfer claim against a subsequent

22 transferee is to make the bold allegation that, quote, "to

23 the extent Fenway was a transferee, it was not a good faith

24 transferee," end quote -- and that's it, that's all they

25 say -- no fraudulent transfer claim could be dismissed at the

144

1 pleading stage involving subsequent transferees.

2          To survive a motion to dismiss against a

3 subsequent transferee, one should have to do more than merely

4 parrot the statutory language.  That's all plaintiffs have

5 done and that's patently insufficient in the post-_Twombley_,

6 post-_Iqbal_ world in which we live.

7          Finally, your Honor, on voidable preference.  This

8 claim involving Fenway involves alleged payments amounting to

9 approximately $10 million at indeterminate times before and

10 after the 90-day preference period.

11          Plaintiffs allege that Fenway, as the transferee

12 of SunCal Communities' one loan and the Marblehead, Heartland

13 loans is liable for these preferential payments.  There are

14 any number of fatal flaws in this claim in addition to the

15 flaws that Mr. Soto and Mr. Ziehl have already described.

16          First, there's no allegation -- and this is

17 critical.  There is not a single allegation in the complaint

18 that any of these alleged preferential payments were made to

19 or received by Fenway.  That is fatal flaw number one.

20          On the contrary, the complaint expressly alleges

21 that the amounts in question were paid to Lehman Ali.

22 Although plaintiffs allege that certain loans were

23 transferred to Fenway on August 22, 2008, they do not allege

24 anywhere that any of the payments of interest or principal on

25 the loans or any withdrawal of cash from the projects either

*Briggs Reporting Company, Inc.*

145

1 before or after August 22 were made either by the debtors or

2 by Lehman Ali to Fenway.

3        I'm sorry, but a claim that if Fenway received

4 something from someone, it may be avoidable, just doesn't cut

5 it as a matter of pleading.  That's not hypothetical

6 pleading.  It's not pleading in the alternative.  It is sheer

7 rank speculation.

8        Even though the repo transaction occurred 89 days

9 before the SunCal filing, and thus any payment made to it

10 would have occurred during the 90-day non-insider preference

11 period, plaintiffs persist in arguing that Fenway may

12 nevertheless be held liable as a subsequent immediate or

13 mediate transferee for any preferential payments that were

14 made to Lehman Ali during the one-year insider preference

15 period that were in turn subsequently transferred to Fenway.

16        This purely speculative argument is, again,

17 premised on the assumption that Fenway in fact received

18 something from Lehman Ali, which of course is neither alleged

19 nor true.

20        The argument is also just plain wrong.  Why?

21 Because section 550(c) of the Bankruptcy Code on its face

22 makes clear that if a transfer made outside of the 90-day

23 preference period is made to an insider -- in this case

24 Lehman Ali, whose status as an insider is hotly disputed --

25 the trustee may not recover from a transferee that is not an

146

1 insider.

2        On its face, the clear and unambiguous language I

3 just read from section 550(c) precludes plaintiffs from suing

4 Fenway, a non-insider, for recovery of any alleged

5 preferential payments made to Lehman Ali more than 90 days

6 before the SunCal filing.

7        SunCal disputes this in its opposing brief, and

8 he -- they claim that this is not a clear and unambiguous

9 reading of the statute --

10        THE COURT:  I'm going to interrupt you again.  How

11 much longer are you going to go?

12        MR. REINTHALER:  About --

13        THE COURT:  Because I'm going to have to cut you

14 off.  I want you to give me highlights.  I feel like you're

15 reading from something.  I want you to give me the highlights

16 of your argument because I still haven't heard from the

17 plaintiffs, and it's already ten after 5:00.

18        MR. REINTHALER:  I understand that, your Honor.

19        THE COURT:  I want you to give a summary.  I mean,

20 there have been a lot of pleadings, and I've really, you

21 know, let the moving party -- because you are the moving

22 party and I realize that you're arguing against the

23 tentative --

24        MR. REINTHALER:  Okay.

25        THE COURT:  -- but I'm going to have to cut it off

147

1  at some point because I need to get to the other side.

2          MR. REINTHALER:  I'll be done at --

3          THE COURT:  You've got like two minutes to sum it

4  up.

5          MR. REINTHALER:  I'll be done in two minutes.

6          THE COURT:  All right.

7          MR. REINTHALER:  I've read to you the clear and

8  unambiguous reading of 550(c).  I refer you to our briefs

9  with regard to -- our reply brief with regard to the argument

10 that the plaintiffs made with regard to the legislative

11 history behind the enactments of section 550(c) and 550(I)

12 and what it addressed, to the actual legislative history of

13 those which, again, we cite in there.

14          And to sum up by saying, there's not a single

15 allegation of fact in the complaint to support a claim

16 defendant Fenway was anything other than a good faith

17 transferee for value and without knowledge of any preference

18 payments previously made to Lehman Ali.

19          But your Honor need not tackle all that issue,

20 given the total absence of any allegation that Fenway in fact

21 received any payments at all.  The failure to make such an

22 allegation should be the beginning, the middle, and the end

23 of your analysis.

24          Thank you.

25          THE COURT:  All right.

148

1          Mr. Pritikin?

2          MR. PRITIKIN:  Your Honor, I will try and be as
3 efficient as I can.

4          So you've heard a lot of arguments, and they're
5 basically interesting arguments for summary judgment.  Both
6 parties have essentially brought summary judgment motions.

7          Lehman has cited to deposition testimony in its
8 briefing.  They've cited to underlying documents that were
9 nowhere cited or even referenced in the complaint.  They have
10 cited to declarations in their reply.  They cited to a
11 declaration that was filed after the third amended complaint
12 was filed in the underlying bankruptcy.

13          Here today, at oral argument, they're referring to
14 still other documents.  And now, Fenway at oral argument is
15 referring to deposition testimony and documents that both
16 occurred after the third amended complaint was filed.

17          So every party is basically -- the defendants have
18 conceded that they cannot win a motion to dismiss.

19          Our lead argument in our opposition was that by
20 citing this evidence, this extrinsic evidence that's not
21 referenced in the complaint, that the complaint does not
22 depend on, they've conceded they've turned this into a
23 summary judgment motion.  And not only do they not refute
24 that lead argument, they didn't even address it anywhere in
25 their reply briefs or here today at oral argument.

*Briggs Reporting Company, Inc.*

149

1          They concede this is a summary judgment motion.

2          Now, assuming we are talking about a motion to

3 dismiss, it's true, there's Iqbal and there is Twombley.   And

4 they try and make hay about that, but really Iqbal and

5 Twombley just say -- Twombley says, and I quote:   "A

6 complaint attacked by a Rule 12(b)(6) motion to dismiss does

7 not need detailed factual allegations."

8          We have detailed factual allegations but we don't

9 need it.

10          And Iqbal talking about the plausibility standard,

11 says it's not akin to a probability requirement but asks for

12 more than a sheer possibility.   We fly by this requirement.

13 It's way more than plausible.

14          Now, Mr. Soto started out by quoting your order.

15 And your order, your Honor, almost exclusively dealt with

16 specificity, not with the adequacy of the substantive

17 allegations.   And the third amended complaint is far more

18 specific, in addition to being substantively adequate.

19          Now, Mr. Soto led off, and he said Rule 9(b)

20 applies because whether they say or not, they're alleging

21 fraud.

22          Your Honor, let me just take a bird's eye view for

23 a minute of what it is we are alleging.

24          In the second amended complaint that was

25 dismissed, we alleged that when the principals of Lehman who

150

1 are also in control of the defendant entities, Mark Walsh,

2 Paul Houston, Frank Gilhool -- when these people promised

3 back in 2007 that they were going to fund these projects and

4 induced SunCal to go forward and these debtors to go forward

5 and have this third party work be done, we originally alleged

6 that at the time they made those promises, they had no intent

7 to fulfill them.  They knew they weren't -- they knew they

8 were not going to perform.

9         And when Mr. Soto went through the elements of

10 fraud, he mentioned a promise that induces reliance, right,

11 and he said that they knew the promises were false when made.

12         Well, we changed our theory.  We are now no longer

13 alleging that back in 2007 those promises were made, that

14 they never intended to fulfill them.  That's not what we are

15 taking upon ourselves that we have to prove.

16         And we don't need to allege or prove that because

17 even in the absence of intent not to perform at the time

18 made, it's still equitable subordination, classic equitable

19 subordination under Stumbas (phonetic), under Winstar,

20 under numerous other cases cited in our pleadings -- say that

21 if you induce a debtor to take on more debt and then --

22 through promises that you're going to pay for it, and then

23 fail to do so, stiffing the debtor and the other creditors,

24 leaving them cold, that is inequitable.

25         And that's what we are alleging here.  And we are

151

1  alleging it for an ongoing business relationship.  We do not

2  need to allege fraud.  We are not trying to allege fraud,

3  except in money regards, which I will get to.  And they

4  cannot cram fraud down our throats.

5          They can't say, well, you know, you need to

6  specify Rule 9(b).  Only if we're trying to allege fraud.

7  Only if the complaint necessarily alleges fraud.

8          Mr. Soto quoted paragraphs in the third amended

9  complaint:  5, 79, 110 through 117.  If you look through

10 those paragraphs, nowhere do we say these people knew at the

11 time they were making these promises a year or two years

12 before the bankruptcy that they weren't going to perform.  We

13 don't need to allege it.  It's an inequitable even without

14 that fraud.

15         Mr. Soto also raised the BAP's ruling regarding

16 LCPI.  And here, although I don't want to take up the Court's

17 time by quoting, I feel I have to at least correct the

18 record.  Mr. Soto essentially argued that the BAP ruled that

19 as a matter law, no post-petition conduct could be

20 inequitable because Lehman Commercial Paper was doing what it

21 was lawfully authorized to do.

22         Well, the BAP ruling never said that they have an

23 interest in these loans if their stay does apply.  What the

24 BAP said, in the context of addressing standing and mootness,

25 they said -- and this is at page -- excuse me.  This is page

152

1 8, lines 11 through 16, and also 26 over to page 9.

2           It says:

3               "It's not clear that all of the

4               loans Lehman Commercial made to the

5               debtor were subject to the October

6               order."

7 That's your Honor's October order saying that the loans were

8 sold to Fenway.  They say:

9               "Moreover, Lehman Commercial has

10              filed a motion for clarification.  Thus,

11              no final order regarding the ownership

12              of the loans has yet been entered."

13          And then they go on to say that:

14              "Even if Lehman Commercial has no

15              interest, they may possibly have an

16              interest in the Fenway Capital loans

17              under another theory."

18 And they say Lehman Commercial has an interest if and when

19 the October order becomes final and is successfully appealed.

20          So essentially all the BAP has said is, it's

21 possible Lehman Commercial might have an interest, depending

22 on what's happened, but they don't assert that they do.  And,

23 therefore, the BAP does not assert that Lehman Commercial

24 invoking a stay is necessarily lawful.

25          Obviously, Lehman Commercial -- you know, it made

153

1 numerous other arguments.  They're essentially conflating --
2 you know, suing Lehman Commercial whether we need relief from
3 stay in New York versus alleging that Lehman Commercial
4 falsely invoking a stay is inequitable.

5        Those are two analytically distinct concepts and
6 they're basically conflating them because they know that the
7 loans were sold to Fenway and regardless whether they're an
8 agent, they are not the owners of the loans that were sold to
9 Fenway and therefore to the extent they invoked their stay
10 with regard to loans they do not own, that is inequitable.

11       Now, moving on to the insider allegations, so Mr.
12 Soto said that we're trying to gerrymander some daisy
13 chain --

14       THE COURT:  Are you going to address the argument
15 Mr. Soto that as to the other claims there is currently a
16 stay in effect as to Lehman and the debtor?

17       MR. PRITIKIN:  Well, I believe the Court's ruling
18 that the loans were sold would essentially take care of that
19 as well.  But in any event, again, they're not addressing the
20 issue of whether claims can be brought against Lehman
21 Commercial; it's the issue whether that's inequitable
22 conduct.

23       As to whether claims can be brought against Lehman
24 Commercial, we have already communicated with the other side
25 about this.  We've cited to them cases that say that we don't

154

1 need to formally dismiss, we don't need to amend our

2 complaint.  Essentially, they can be treated as interested

3 non-parties.

4          And I refer the Court -- there's two cases.

5 There's a Ninth Circuit BAP opinion.  It's _In re Miller_.

6 It's 262 B.R. 499.  That's from 2001.  Which essentially said

7 that discovery is not stayed as to debtor defendant, where

8 discovery is relevant to claims against a non-debtor like

9 Fenway.

10          Essentially, even if we can't pursue an equitable

11 subordination against Lehman Commercial without going to New

12 York, we can still proceed with the litigation in order to

13 pursue Fenway.

14          Also, in a case of _In re Mahurkar_, it's M-A-H-U-R-

15 K-A-R, and I'll leave it at that.  It's a long title.  It's

16 140 B.R. 969 at 977.  That's from the Northern District of

17 Illinois, 1992.  It basically said -- hold on a second.  I'm

18 sorry.

19          Well, _Miller_ actually cited the _Mahurkar_ case, and

20 it said it didn't dismiss the action against the debtor;

21 rather, it merely treated it as if it were no longer part of

22 the litigation, as if it were an interested non-litigant.

23          So regardless of whether we go to New York or not,

24 we can still proceed and essentially until there's a ruling

25 that Lehman Commercial owns anything, the BAP's ruling

155

1 essentially has no effect on this equitable subordination

2 litigation or any of the other claims in this adversary

3 proceeding.

4         Now, as to the insider allegations, Mr. Soto said

5 that we try and gerrymander the statute and he says we're

6 citing to cases that discuss affiliates, not insiders.  The

7 problem is, the statute 101(31) defines "insider" to include

8 affiliates and an insider of an affiliate as if such

9 affiliate were the debtor.

10         So it doesn't have its own definition of

11 "affiliate."  It incorporates by reference the other

12 definition.

13         We've cited cases that say that an indirect parent

14 can be an insider, an affiliate.  We've cited cases that say

15 that sibling entities can be affiliates and insiders.

16         And so they say, well, no case has ever found

17 insider status on the exact factual scenario that you guys

18 are alleging here.  Maybe.  But all the pieces of the puzzle

19 apply.  All the building blocks are there.  So they can't

20 disagree with any of the premises.  They disagree with the

21 conclusion without saying why the premises don't fit.

22         They also say that, well, you can't be an insider

23 of an LLC, at least per se, because that's not expressly in

24 the statute.  And they cite to the -- it's a different Miller

25 case, Enterprise Acquisition Partners, which says that you

156

1 shouldn't broaden the statute beyond the plain language.

2          Well, that's the point.  We're not broadening it

3 beyond the plain language.  We're fitting exactly within the

4 plain language because "insider" references affiliates.

5 "Affiliate" references corporation.  And "corporation" has

6 been defined by the Ninth Circuit BAP as including LLCs.  It

7 says it fits comfortably within the statutory definition of a

8 corporation.

9          So they really don't have an argument there

10 either.

11          As to non-statutory insiders, the Court's order

12 dismissing the second amended complaint said that the

13 allegations re control -- this is paragraph 1 -- i.e.,

14 insider status, are sufficient to state a claim for 12(b)(6)

15 purposes as to Lehman's conduct but that as currently pled,

16 all references to define the term are insufficient to include

17 defendants.

18          So essentially it was an issue about specificity,

19 not substantive allegations.  Lehman has essentially spent

20 the bulk of their argument trying to relitigate the issue of

21 the adequacy of the insider allegations on the merits.  That

22 essentially was already decided.  The only issue was

23 specificity.  There's far more specificity.

24          And although Lehman again, even after we called

25 them out on it, essentially, in our opposition, as only

157

1  cherry-picking and ignoring the factual allegations and

2  looking to the conclusory allegations at the end that recap

3  the detailed factual allegations, they again continued to

4  ignore it.

5          They do mention paragraph 74, but they gloss over

6  the meaty part -- excuse me -- paragraph 83.  Here's the part

7  that they skipped.

8              "When appearing at conference

9              calls, SunCal would explain what project

10             payables had to be paid and what work

11             had to be performed on the projects, and

12             Lehman Ali or LCPI would have to get

13             pre-authorization before any work could

14             occur or expenses being incurred.

15             Lehman Ali and LCPI would unilaterally

16             dictate what future work would proceed

17             and also decide what payables were

18             urgent and what other payables could be

19             deferred.  Lehman Ali and LCPI thereby

20             effectively took over not only financial

21             control of the respective debtors'

22             projects but ultimate management control

23             as well."

24             So the allegations in the complaint cross the line

25  from what they say is needed.  And every case that they cite,

158

1 the Pinetree Partners case, the other cases, they basically

2 acknowledge that if you go beyond financial control, which we

3 have alleged, that is enough.

4         They also cite this recent Meridith decision, this

5 1992 case which they recently discovered, but Meridith was a

6 case about appealing from a judgment after trial.  So, again,

7 it doesn't hold water on a 12(b)(6) motion.

8         They're trying to litigate the ultimate merits of

9 the case.  This is a pleading motion.  It's the lowest

10 standard of any dispositive motion, notwithstanding Iqbal,

11 notwithstanding Twombley.

12        And, again, we alleged more than enough if you

13 actually look at the factual allegations.

14        Also, at paragraph 236, we mention that in certain

15 instances, the defendants actually contacted and worked with

16 creditors directly, bypassing SunCal's management.  So we

17 have alleged that plus factor that they say is necessary to

18 cross the line from financial control to management control

19 because they actually are involved in the management of the

20 projects, in deciding what work is going to get done.  They

21 are involved in that.  It's more than adequate.

22        Now, Mr. Soto spent a long time talking about our

23 alleged failure to adequate plead gross and egregious

24 conduct.  There's an important thing I have to clarify.

25        At the last motion to dismiss, I clarified it

159

1 because the Court's order did say that we had failed in the

2 second amended complaint to allege gross and egregious

3 conduct.   And I asked -- I said, "Your Honor, to clarify,

4 that only applies if they're not insiders.   If they are

5 insiders, we don't need to plead or prove gross and egregious

6 conduct."

7          And your Honor said, "That's right."

8          And Mr. Soto's entire argument, both in the

9 briefing and at oral argument, is premised on the notion that

10 they're not insiders.   But of course, if the insider

11 allegations are sufficient, which they are, as we've

12 demonstrated in the pleading and here today, then we don't

13 need to allege gross and egregious conduct.

14          And nowhere in their briefing and nowhere at oral

15 argument do they argue that if they are insiders, that the

16 allegations of inequitable conduct are insufficient because

17 clearly they are because the burden is low, the burden is on

18 them at that point to prove that they acted in good faith and

19 properly.   And of course the complaint is far more than

20 adequate in that regard.

21          But even if somehow your -- there was a conclusion

22 that they weren't insiders, there is gross and egregious

23 conduct alleged here.   And Mr. Soto spent a lot of time

24 trying to distinguish the cases.   He cited In re After Six

25 and Pinetree Partners.

160

1          These are refusal to lend cases.  These were
2 already distinguished at the last hearing because this is not
3 a mere refusal to lend case.  It's they promised they would
4 fund, and then failed to do so.  That sets it apart.

5          In addition, there is coercion regarding the
6 restructuring agreement.  They love to jump on paragraph 93
7 and say that somehow this threat wasn't inequitable because
8 it was made to Bruce Elieff as opposed to individual debtors.

9          Well, in paragraph 73, we allege that Bruce Elieff
10 was an authorized agent of all of the debtors.  And so
11 somehow it's less inequitable because it's made to one
12 individual on behalf of all entities.  It doesn't make any
13 sense.

14          They say that cross-collateralization as a matter
15 of law can't be inequitable.  There are numerous debtors here
16 who got zero benefit for incurring, in some cases, hundreds
17 of millions of dollars of indebtedness.

18          To say there's no -- that there was no detriment,
19 right, that's for trial.  That's for summary judgment.  We
20 don't think it's going to win there either.  But it's
21 certainly not for a motion to dismiss.

22          In terms of ID'ing the creditors, as Lehman
23 acknowledges the Court's prior order didn't say we have to
24 identify every single creditor.  They said we have to
25 identify creditors at least by category or class.  We did so.

161

1 Not only did we include a list of all the creditors, but we

2 broke them down as to which debtors they were creditors of.

3         Now, Lehman says we're not asking did they connect

4 the dots, show me every single representation where we

5 promised we would pay Verizon and we promised we would pay

6 whoever.  But that essentially is what they are alleging.

7 That is what they are asking us to do.

8         We are alleging that there was a relationship here

9 where SunCal wouldn't go forward and incur debt unless Lehman

10 gave the green light, unless these defendants gave the green

11 light.  And there were representations made and promises made

12 that affected broad classes of creditors.

13         Now, maybe they think we're not going to be able

14 to prove it up.  And that's something for discovery, which

15 we're already engaged in.  We already have emails, we already

16 work authorizations, we have the stuff already and we're

17 looking through it as we go.  But that's not for a 12(b)(6)

18 motion.

19         And it is true, we do say in our complaint that

20 substantially all of the creditors were harmed by Lehman's

21 conduct.  Of course, as any cautious lawyer knows, as you go

22 through the evidence, you're going to find there are certain

23 exceptions.  Maybe it will turn out that Verizon or some

24 other creditor doesn't fit within the evidence.

25         So we were trying to be cautious and not make

162

1 absolute statements, and then they try and use that caution

2 against us and say, well, you're not saying who's who.

3         We also cited the schedules in the restructuring

4 agreement which listed literally hundreds of creditors, where

5 they were promised they would be paid tens of millions of

6 dollars.

7         And it's interesting because in the reply brief,

8 Lehman, the defendants, they didn't deny that these schedules

9 exist because they can't.  They didn't dispute that it was

10 appropriate for us to attach this evidence in response, since

11 they attached the restructuring agreement to which these were

12 appended to.  Their only argument in the reply was, well,

13 that's just a draft agreement.

14         Now, of course, that is a disputed issue for trial

15 and in any event, what was interesting was, here, today at

16 oral argument, Mr. Soto said, "Well, we're not going to get

17 into that.  I'm not going to argue the merits of whether it

18 was a draft and whether it was binding."

19         But yet in their briefing, submitted just a week

20 ago, that's exactly what they argue.  And in fact that's the

21 only thing they argue.

22         And so they've essentially conceded that, yes, the

23 evidence is there.  It is incorporated by reference into the

24 complaint.  And there was more than sufficient allegations

25 that there's identification of creditors who are harmed by

163

1 their conduct.

2         They try and dispute the merits all day long.
3 That's for trial, it's for summary judgment, it's for
4 discovery.  It's not for 12(b)(6).

5         Mr. Soto looped back to the argument that Rule
6 9(b) had to be satisfied, the allegations were not
7 sufficiently specific.

8         In our briefing, in our opposition, we do walk
9 through the who, the what, the when, the where, the how.  We
10 cite the paragraphs in the complaint where you can find this
11 information and, again -- you know, here they go again, in
12 their argument that we only cite conclusions, we don't spell
13 out the who, what, when, where and how, they cite to
14 paragraph 238.

15         Paragraph 238 is under the first cause of action
16 for equitable subordination.  It's a recap allegation.  They
17 continue to ignore the underlying detailed factual
18 allegations which can be found at paragraphs 208 to 213 and
19 they do contain the who:  Frank Gilhool, the Win (phonetic),
20 the settlement agreement, the estoppel certificate a day
21 later, to whom, to SunCal and to individuals who were at that
22 meeting, the substance of the allegations.  It's all there.

23         They also say that we fail to distinguish between
24 Lehman Ali and LV Pac Point.  But we allege that the same
25 representations were made on behalf of both entities and we

1 cite case law in our opposition that says that when there's a
2 group representation being made, you don't necessarily have
3 to parcel it out.

4        As to count two, the fraudulent inducement claim,
5 we cited law in our brief that both California and New York
6 courts will hold that the choice of law provision is not
7 going to apply to a non-contract tort claim.

8        And actually, on that note, I did skip something
9 that Mr. Soto spent a lot of time on.  It was the issue about
10 whether the insider allegations were barred by the contract
11 language.

12        I don't know if your Honor would like me to
13 address that or if your Honor's sufficiently persuaded that
14 it's not going to carry the day -- anyway, I'm happy to move
15 on.

16        THE COURT:  You can address it briefly just so
17 I've --

18        MR. PRITIKIN:  I'll address it briefly, okay.

19        THE COURT:  -- got an equal argument.

20        MR. PRITIKIN:  Sorry?

21        THE COURT:  Just go ahead.

22        MR. PRITIKIN:  So as to the contract language, Mr.
23 Soto made a lot about the fact that now, apparently in our
24 opposition, we're alleging an oral joint venture and we can't
25 amend our complaint through our briefing.

165

1          Well, we cite case law.  We cite, among other

2 things -- this is page 12, lines 15 to 17 of our opposition.

3 We cited the <u>April Enterprise</u> case which said, quote, "The

4 conduct of the parties may create a joint venture despite a

5 express declaration to the contrary."

6          So we're not just relying on a joint venture.

7          But in any event, this isn't a joint venture

8 claim.  This isn't a breach of joint venture agreement claim

9 we're bringing.  This is an equitable subordination claim,

10 and there are insider allegations.  And we have joint venture

11 type allegations.

12          Lehman wants to say we're precluded by contract.

13 And they say that New York law doesn't allow you to allege

14 joint venture in the face of contrary representations in the

15 agreement, but on this point at least, California clearly

16 applies.  This is because we were clearly alleging a

17 relationship outside of, extrinsic to the contract, and

18 California law clearly says that whether it's oral or through

19 the conduct, you can have a joint venture notwithstanding

20 language of the contract.

21          And in any event, as we pointed out, the contract

22 says -- it goes on to say, the same paragraph they said at

23 paragraph -- it's actually paragraph 11.

24          They say it's not intended to negate or alter any

25 fiduciary, advisory or other agency relationship which may

166

1 exist between or among various of the parties pursuant to the

2 agreements other than this agreement.

3        So the restructuring agreement isn't saying:  This

4 is defining the whole universe of the parties' relationships.

5 They're saying:  This contractual relationship isn't

6 necessarily a joint venture relationship.

7        California law says that doesn't bar us.  And in

8 any event, even on the terms of the contract itself, it

9 doesn't purport to be exclusive.

10        Now, as to count two, the fraudulent inducement

11 claim against LV Pac Point, they say New York law controls

12 here as well.  But again, there's the choice of law case we

13 already cited to.  California law, they say, requires

14 something other than an intent -- making a promise with

15 intent not to perform.

16        That's clearly not the case.  If you look at the

17 In re Lazar case that we cite in our brief, the California

18 Supreme Court clearly said that making a promise without

19 intent to perform is sufficient for promissory fraud.

20        Even under New York, they try and say there has to

21 be some promise extrinsic to or collateral to the agreement,

22 but we think that's a narrow reading of the New York cases.

23 If you look at the MaNas case, if you look at the Deerfield

24 case, we quoted it.  We weren't paraphrasing it.  We were

25 quoting it and it said, making a promise without intent to

167

1 perform, that is fraudulent inducement.

2          And, in any event, we do allege not only in detail

3 how the settlement agreements induced us, but there was also

4 the estoppel certificate that Lehman Ali asked that the City

5 of San Juan issue.  It was issued August 26th.  We allege the

6 date.

7          And that also gave us reassurance that we should

8 go forward and consent to this foreclosure of the Pac Point

9 project, because not only are they telling us they're going

10 to perform, but they want us to know that they're telling

11 third parties like the city that they're going to perform.

12          And so clearly there's enough to allege collateral

13 or extrinsic representations even if that were necessary,

14 which we don't think it is under California or New York law.

15          As to count three, the fraudulent transfer claim

16 regarding LV Pac Point, they say that there's no authority

17 for alleging that someone -- that there's a fraudulent

18 transfer if someone received more than would have in a

19 hypothetical Chapter 7 situation because they say both the

20 Jones and the PC System cases, which we cite, both relied on

21 the fact that the lien was never valid from the get-go.

22          Well, neither case states that is the reason for

23 their holdings.  And moreover, in neither case was there a

24 prior judicial determination that there was an invalid lien.

25 In both cases, the courts determined in the context of the

168

1 Chapter 7 analysis, they did a hypothetical analysis and said

2 well, let's deal with Chapter 7.  If it turns out that it was

3 an invalid unperfected lien, then they would have done better

4 than they would have in Chapter 7.

5          That fits squarely with what we're doing here.

6          They again say we're rehashing the bear elements

7 of the claim but again ignore that we incorporate by

8 reference all the detailed factual allegations throughout the

9 complaint.

10          Count four obviously is derivative of count five,

11 so there's nothing we really need to say there -- I mean,

12 excuse me -- derivative of count three.

13          Count five, the fraudulent transfer claims against

14 the other entities, again, essentially they're not saying

15 anything they're not already saying in their briefing.  One

16 thing I do find interesting is that they say that in

17 determining whether there was lack of reasonable equivalent

18 value, they say you have to consider the contingency of

19 contributions by co-borrowers.

20          Well, again, for a number of these debtors, they

21 received zero value.  And so clearly, there's no benefit to

22 them whatsoever regardless if there is a co-borrower.  And in

23 any event, these again are arguments for trial, not for a

24 motion to dismiss.  It will be up -- you know, once the

25 evidence shakes out, we'll see if it was in fact there a

169

1 reasonable equivalent value or not.  This is not grounds for

2 a motion to dismiss.

3          And I find curious, by the way, that they're

4 essentially saying that you have to consider the effect on

5 debtors of the group, not individually, when at the same time

6 they criticized us for assuming that substantive

7 consolidation was already in place.  They seem to back off on

8 it on oral argument, but they're essentially doing the same

9 thing.

10          In terms of alleging the identity of the creditor,

11 clearly the case law that we cited is sufficient there, that

12 we don't need to go into detail.  And they also fail to

13 address our argument -- if you look at page 39 of our

14 opposition -- that you can allege an after-acquired creditor

15 and that's sufficient.  And obviously we've alleged hundreds

16 of them by name.

17          As to count six, obligations versus transfers,

18 again, for convenience, we refer to them both as transfers

19 but the obligations here were the loans.  The transfers were

20 the deeds of trust that secured the loans.  So obviously you

21 can't analyze one without the other.

22          We did it for convenience's sake.  Now, they're

23 trying to make it a 12(b)(6) issue.  It's really specious.

24          As to the contention that there are not sufficient

25 allegations that the Marblehead and Heartland entities had a

170

1 beneficial interest in the account held by the parent entity,

2 well, we alleged that it was held for the benefit of those

3 entities and to be used for those projects.  That's more than

4 sufficient at pleading stage.  They can hash that out at

5 trial.

6         As to count seven, it's not really plausible.  I

7 mean, it's pretty much standard knowledge that lien stripping

8 is allowed in Chapter 11.  You don't need to do it through a

9 plan.

10        Count eight, again, nothing really new there.

11        Let me turn to Fenway.  I want to try and wrap up

12 quickly.

13        Fenway doesn't cite our complaint at all.  They

14 just say in the abstract that it's insufficient, and they're

15 basically trying to paint themselves as an innocent victim.

16 Again, that's for trial.

17        We've alleged that they were a willing conduit in

18 a highly suspicious transaction where essentially they helped

19 funnel billions of dollars to Lehman weeks before its

20 bankruptcy, and then on the eve of Lehman's bankruptcy,

21 scrambled to try and undo it at the last minute and

22 essentially got the ear of the global treasurer for all of

23 Lehman to sign this unwind agreement.  Apparently, it didn't

24 work.

25        Mr. Fenway got up here and said:  Well, we hope to

1 get out of it, we plan to get out it.  Well, it's been a year

2 and a half and they haven't got out of it.  And they're not

3 out of it.  And so they are the owner.  Whether they like it

4 or not, they are part of this case.

5          And they can't get around the fact that the

6 transaction they engaged in, even if repos in generally

7 aren't inherently suspicious, the transaction they engaged in

8 was, because on August 22nd, 2005, $1.5 billion in loans, the

9 bulk of the loans at issue in this case were sold to Fenway

10 and just three days later these Lehman defendants are signing

11 agreements with the debtor saying, yeah, we're going to

12 restructure these loans, loans that we don't own.

13          Fenway didn't take the obligations along with the

14 ownership, they just took the ownership.  So now there's a

15 severance of ownership and obligations.  The debtors aren't

16 told about it.  Yeah, that does affect the debtors.

17          In any event, we don't have to allege that.

18          Fenway tries to argue that Enron II is controlling

19 and under Enron II as long as they are a purchaser and not an

20 assignee, then basically they can't be held liable for

21 Lehman's wrongdoing.

22          Well, there are a number of problems with this.

23          Number one, they say that Enron II overruled Enron

24 I.  It's not actually true.  It disagreed with it on a

25 related ruling but it didn't overrule it.  In any event,

172

1 neither case is binding on this Court.

2          So the pure issue is what is persuasive.  _Enron I_

3 is a far better-reasoned case because _Enron II_ makes a false

4 and unworkable distinction between sales and assignments.  We

5 quoted numerous commentators in our brief that basically

6 say -- talk about not having -- not working in practice.  No

7 one knows how to make this distinction between sales and

8 assignments.  That's going to wreak havoc on the industry.

9          And one of these commentators, by the way, was Mr.

10 Soto's colleagues, partners at Weil, Gotschal who basically

11 go point by point -- I have a copy of the article if your

12 Honor would like -- going point by point through the _Enron II_

13 decision and talk about why it's badly reasoned, why it's

14 based on a misunderstanding of substantive law,

15 misunderstanding of statutes, misunderstanding of case law,

16 misunderstanding of the UCC.

17          On the plain language of the statute, _Enron I_ has

18 the better argument.  They say the statute says it applies to

19 claims, not claimants.  But _Enron II_ says it follows the

20 claimant, not the claim.

21          _Enron I_ noted that transferees take subject to

22 defenses in other contexts in bankruptcy and there was no

23 legislative history indicating that there was a contrary

24 intent here.

25          _Enron I_ acknowledged that if a transferee could

173

1 take free of the defenses, it would encourage a washing of

2 claims.

3          Also, essentially if _Enron II_ is adopted, what do

4 the debtors have to do?  They can't pursue equitable

5 subordination against the transferee.  What do they have to

6 do?  The transferee participates in distribution just like

7 other creditors, and then the debtor has to go after the

8 initial transferor for damages, which raises all sorts of

9 administrative problems, delay problems, increased costs and

10 also issues of inequitable distribution.

11          And to give just a flavor of how misguided the

12 _Enron II_ decision was on the policy grounds, in acknowledging

13 the fact that by doing -- by having this ruling this way it's

14 creating a risk that there's claim washing, _Enron II_ says --

15 and this is at page 448.

16          It's addressing the problem that what if the

17 transferor is insolvent, right, how is the debtor going to go

18 after the transferor for damages.  And it says:

19               "Insolvency of the transferor is

20               not of grave concern in the big picture.

21               The possibility that a transferor who is

22               able to sell its claim, as opposed to

23               assign it, will be insolvent is not very

24               great."

25          Well, obviously Lehman Commercial has been jumping

174

1 up and down about the fact that it's in bankruptcy, it's

2 insolvent, you can't do anything against it.  And so

3 essentially if you adopt Enron II, you're playing right into

4 their hands.  And the policy nightmare that was dismissed by

5 Enron II has come to light right here in this case.

6        Now, Fenway says that under Enron II the standard

7 is actual knowledge, not mere constructive knowledge.  Well,

8 in fact Enron II itself is internally inconsistent on this

9 point.  At one point, it says actual knowledge and bad faith

10 is the standard, but then later on page 448 again, it says:

11 The risk of this scenario, i.e., claim washing, is outweighed

12 by the countervailing policy at issue, namely the loss

13 consistent protection of bona fide purchases for value.

14        It doesn't say "actual bad faith," just the

15 standard BPV standard.

16        Enron I, by the way, doesn't even allow for a good

17 faith defense.  That wouldn't even be relevant if Enron I was

18 adopted.

19        It's interesting Fenway has the gall to suggest

20 that there are no facts alleged from which one could infer

21 actual or even constructive knowledge.  That's laughable.

22        Again, they entered into a $1.5 billion

23 transaction a few weeks before Lehman's bankruptcy.  And this

24 wasn't an isolated transaction.  Talk about daisy chains.

25 This was one of a series of several transactions, where as

175

1 Lehman's -- excuse me -- Fenway's own PMK, Irena Goldstein,

2 said -- she said:  This was basically a transaction where one

3 Lehman entity was loaning to another Lehman entity.  It was

4 Lehman loaning money to Lehman.  We were just a conduit.

5 And, by the way, it helped Lehman get badly needed liquidity

6 from J.P. Morgan mere weeks before its collapse.

7         There's something fishy there.  The fact that they

8 scramble to the line at the last second, there's something

9 fishy there too.  The fact that it was three days before

10 Lehman signed this settlement agreement with the debtors

11 saying they were going to restructure the loans they owned,

12 there's something fishy about that.

13         Now, we can hash it out at trial.  We can hash it

14 out at summary judgment.  But this is not something they can

15 win a motion to dismiss on.

16         They also say that actual knowledge is not an

17 affirmative defense but it's something that we bear the

18 burden of alleging and proving.  In fact, they're relying

19 solely on Enron II and they're taking Enron II out of

20 context.

21         If you look at Enron II at page 448, when they

22 talk about the burden and risk being better carried by

23 creditors, what they're talking about is their reasoning for

24 making a distinction between assignments and sales, not about

25 who had the burden of proof on the good faith purchaser

*Briggs Reporting Company, Inc.*

176

1 issue. And that's the only case they rely on. There's no

2 other authority that they rely on saying that the burden of

3 proof is on the plaintiff when it comes to their bona fide

4 purchaser status.

5          And in fact there's numerous -- extensive case law

6 that says that as a general rule, bona fide purchaser is

7 always an affirmative defense.

8          This is perhaps my favorite, and I'll end with

9 this because we're running short. Fenway says we didn't

10 allege in our complaint that Fenway is liable as a principal

11 for the acts of their agent and they say -- let me make sure

12 I get this right. They say that argument is not raised by

13 the pleadings, it's not raised in the pleadings.

14          Well, that's interesting because Lehman accuses us

15 of only raising legal arguments, not factual allegations.

16 And now Fenway is saying, well, we're just alleging facts,

17 we're not alleging the argument that flows therefrom.

18          Well, Mr. Reinthaler also said that there's

19 nothing in the documents, nowhere is there any suggestion

20 that Lehman was acting as Fenway's agent when they were

21 engaging in these various acts of inequitable conduct that

22 are alleged.

23          Well, since they cited from Ms. Goldstein's

24 declaration and her deposition, I'm going to as well, as well

25 as the fact I'm going to quote from Mr. Soto and his

177

1 colleague, Mr. Pachulski.

2          THE COURT:  Well, first of all, I want to clear

3 something up.  I consider this a 12(b)(6) motion.  And so I

4 know that there have been a lot of documents I've been

5 invited to review and consider that's beyond the four corners

6 of the complaint.

7          And while I understand the Court has the

8 discretion to treat a 12(b)(6) motion as a motion for summary

9 judgment when that happens, the Court also has the discretion

10 not to do that.

11          I think that it would only further complicate

12 things if I were to treat this as a motion for summary

13 judgment because then there would have to be a continuance

14 because we'd have to enhance the record with other documents

15 that are necessary for a motion for summary judgment.

16          So before you quote that declaration, just let me

17 say that I consider this a 12(b)(6) motion irrespective of

18 what's in the record.

19          Let me also say -- because we are running late,

20 I'll let you wrap up -- to the moving parties, I am not going

21 to allow a response.  I think I have heard the arguments.

22          I'm also not going to render a decision today

23 because I want to gather up all my thoughts, and I think that

24 whether it's the moving party or the responding party, that

25 you deserve more than just a grant or deny.

*Briggs Reporting Company, Inc.*

178

1        So, obviously, a lot of work has gone into this, a

2 lot of arguments that have been made.  And in the event that

3 any party wishes to appeal this, I think I need to make

4 findings one way or another so that there isn't any issues of

5 that respect either.

6        So once you have concluded, I will give you a date

7 by which I'll render my ruling, and then we'll recess,

8 hopefully before 6:00 o'clock.

9        MR. PRITIKIN:  Yes, your Honor.

10        MR. SOTO:  Your Honor, in addressing that issue,

11 if I could suggest -- and it's just something that I've seen

12 work in other courts.  This is a 300-and-something-

13 paragraph complaint.  It's a 77-page complaint.  We had,

14 essentially 14 days ago, the right to respond.

15        We have heard numerous 50,000-foot arguments,

16 which is exactly what a plaintiff ought to do.  A plaintiff

17 ought to make me and you -- well, me anyway -- take my

18 glasses off so it looks kind of fuzzy.  All right.

19        I would only ask for the opportunity to submit --

20 and both parties or any party -- no more than a seven-page

21 brief, because it won't take me more than seven pages to

22 respond to what I've just heard.

23        THE COURT:  Well, actually I'm going to say no,

24 and the reason is that over in District Court when these

25 kinds of motions are filed, you may or may not get a hearing.

179

1  And I think -- I mean I've not only -- I think you all have

2  made wonderful arguments.  I'm not sure how you would improve

3  on it at this point.

4          MR. SOTO:  I --

5          THE COURT:  And let me just state too that

6  you've -- I assume I can keep this handy little -- what was,

7  I guess, going to be part of a PowerPoint presentation.

8          MR. SOTO:  My only point in doing so -- and I

9  agree, your Honor.  I'll just shut up except for this point.

10 There have been at least three arguments made on this reply

11 that go absolutely contrary to the facts of this complaint.

12         THE COURT:  Well, and -- and so --

13         MR. SOTO:  And I don't have a chance to reply to

14 it.  He didn't put it in his papers.  He invited me to --

15         THE COURT:  Well, but the point is that, as I've

16 indicated before, I'm treating this as a 12(b)(6) motion

17 which is what it is.

18         And so when I complete my ultimate review of this,

19 obviously it's going to start with the complaint, and I'm

20 going to have to make a determination ultimately that the

21 complaint states a claim as to each and every count.

22         And in order to complete that analysis, I'm

23 necessarily going to have to review the pleadings that have

24 been filed.  To the extent that there is something in the

25 reply that is not actually in the complaint, you know,

1 I'll -- I'm going to look at all of this.  I looked at it

2 once.  I'll look at it all again.

3          I have taken pretty good notes.  To the extent

4 that my notes are not complete, it is extremely now

5 technologically speaking for me to -- I'm not saying -- I'm

6 not necessarily looking forward to doing so, but if I have

7 to, I can easily pull up the recording of this hearing and

8 listen to the arguments again.

9          But I think that -- I'm not saying we're beating a

10 dead horse.  All I'm saying is I think the arguments that

11 have been made, I think they've been made very well.  And I

12 think that you're entitled to a full review.

13          And one of the reasons I didn't interrupt you, Mr.

14 Soto, I went on -- I sort of interrupted Mr. Reinthaler, but

15 when I'm listening to the arguments and I hear there's a

16 little bit of repetition going on where I've heard the

17 argument before, I want to get it focused and I wanted to

18 make sure that the plaintiffs got an opportunity to be heard

19 as well.  And they probably got a little less time than the

20 moving party.

21          So I am going to end it.

22          And you can just wrap up your arguments, two

23 minutes, if it can be done.

24          MR. PRITIKIN:  Yes, your Honor.

25          The only -- I was going to cite -- I'm going to

181

1 cite one paragraph Irena Goldstein's complaint. Two reasons:

2 one, not as substantive evidence but to show that they're

3 judicially estopped from making an argument.

4        Second of all, they've cited to this declaration,

5 Mr. Reinthaler did, in his argument. So under a rule of

6 completeness, I would just like to quote from the very thing

7 he quoted from and end it at that. This is paragraph 9 of

8 her July 28th declaration:

9          "At all times relevant to these

10         proceedings, Lehman was expressly

11         authorized to act and was acting as

12         agent on behalf of Fenway's interests

13         under the SunCal loan agreements."

14        So for them to now say that Fenway was not a

15 principal and Lehman was not acting as an agent on their

16 behalf, they're simply precluded from doing so. They're

17 contradicting themselves.

18        So, your Honor, in conclusion, they're basically

19 making a motion for summary judgment. These arguments will

20 be interesting to hear how they play out, but it is not for a

21 12(b)(6) motion.

22        We have pleaded more than enough. We've been

23 through enough. It's time for this case to move on and move

24 forward. And your Honor should stand on your tentative.

25        And if your Honor would like a bankruptcy article.

182

1          THE COURT:  Is there any objection?

2          MR. PRITIKIN:  It's cited in our brief.

3          MR. SOTO:  It's been marked.  It's highlighted on

4 the other side.

5          MR. PRITIKIN:  Oh, thank you.  Let me give you a

6 clean copy.  I apologize.  Yes.  Thank you.

7          THE COURT:  I'm not sure if this is ultimately

8 going to be germane to my review, but Mr. Reinthaler, I do

9 want to follow up on this one point because I was a little

10 surprised by it.  You need to come to the podium here.

11          I believe you made the argument at one point that

12 Lehman was not authorized or that Fenway did not in any way

13 authorize or acquiesce in the proof of claim that was filed.

14          MR. REINTHALER:  No, no.  That's not what I said.

15 I said that Fenway -- and the testimony is that under the

16 terms of the loan agreement, after the repo transaction,

17 Lehman became Fenway's agent under the terms of that

18 agreement and it prepared and submitted the proofs of claim

19 in that capacity.

20          What I said is that we did not receive or review a

21 copy of the proof of claim and all of that was before the

22 Court when the agency issue was decided.

23          And the statement that, you know, at all times

24 from the date of the repo until the filing of the proofs of

25 claim Lehman was acting as Fenway's authorized agent is a

183

1 true statement but it's a true statement only insofar as

2 Lehman was acting in that capacity.

3         Lehman itself continued to own loans.  It

4 continued to have economic interests in the repo'd loans with

5 us.  And it was acting in its own stead and right in

6 connection with all the other conduct that is alleged in the

7 complaint.  And I don't think there's any fair inference to

8 the contrary that one could draw.

9         THE COURT:  No, no, no.  I don't want you to go

10 beyond this.  I'm only --

11        MR. REINTHALER:  That's -- uh-huh.

12        THE COURT:  I want that one statement because I

13 was very surprised by that.  It seemed to me a little

14 different from the position that I've heard before and that's

15 why I did want to follow up just on that one --

16        MR. REINTHALER:  No, I don't think it's any

17 different from the position we took before.

18        Your Honor, I think you may be confusing two

19 statements I made perhaps in consecutive sentences, as I'm

20 thinking about it.  I said that Lehman -- that Fenway didn't

21 acquiesce in or authorize any of these other acts that are

22 alleged to provide the basis for a claim of equitable

23 subordination.

24        THE COURT:  No, that wasn't the statement that I

25 was referring to.

184

1    MR. REINTHALER:  Okay.

2    THE COURT:  I know what I heard.  It had to do

3 with the filing of the proof of claim because I had certainly

4 intended to go back and follow up with that because it

5 surprised me a little bit that you said it.  And let's see if

6 I can tell you what the context was here.

7    Well, I'm not going to hold you guys.  I will --

8 I'm just going to make a note to listen to that part of the

9 hearing so that I understand.

10    MR. REINTHALER:  Whatever I may have said, if I

11 misspoke -- and I don't think I did -- Fenway's position is

12 that at all relevant times, Lehman was authorized to and

13 acting as Fenway's agent in connection with the preparation

14 and filing of proofs of claim.  That was, is and always has

15 been our position.

16   (Pause.)

17    THE COURT:  Okay.

18    MR. REINTHALER:  Thank you.

19    MR. COUCHOT:  Your Honor, this is not related to

20 that issue and just -- this is Paul Couchot, appearing on

21 behalf of the SunCal debtors.

22    I just want to make sure, you had asked a question

23 about the stay and the BAP decision.  I want to make sure

24 that question was answered to your satisfaction because what

25 I want to make sure that you understand is that the BAP --

185

1 the argument, along with the mootness argument in front of

2 the BAP was that there is no stay because the loans were sold

3 based on your ruling, the ruling that the repo was a true

4 sale, and that because of that, the appeal itself was moot.

5          And what the BAP said was, well, until that

6 issue -- because that issue is subject to appeal and to a

7 motion for clarification, potentially -- you know, it's not

8 moot because potentially it could be changed.  But the

9 current ruling that stands is that there is no economic

10 interest that LCPI owns that would precipitate a stay.

11          I just -- I wanted to just put that on the record

12 because I'm not quite sure if that came across.

13          MR. SOTO:  Your Honor, this is a huge point of

14 contention.  This is not a small point of contention.

15          This argument that the appeal should be dismissed

16 was raised before the BAP, fully briefed before the BAP.

17 What they argued before the BAP, supplying in fact a

18 declaration by Mr. O'Keefe, what they argued before the

19 BAP --

20          THE COURT:  Can I not just review the decision of

21 the BAP?  Is there something that I need to know other than

22 what the BAP decision actually says?

23          MR. SOTO:  Well -- but I think -- I think the

24 decision of the BAP is pretty clear, but it's also very clear

25 that what was just said flies squarely in the face of the

186

1  arguments made to the BAP that the BAP rejected.

2           The argument made to the BAP was that --

3           THE COURT:  Okay.  I don't want to reargue the BAP

4  again.  It seems to me, I should --

5           MR. SOTO:  I don't either.  I don't either.  I'm

6  simply --

7           THE COURT:  I should be able to simply read the

8  decision.  The decision should be -- I hope it would be clear

9  as to what the BAP was ruling.

10          MR. SOTO:  Okay, your Honor.  I guess the point

11  I'm making is -- all right.  I won't mention that.  But

12  here's what I will say.  What the BAP says is that in fact if

13  there are interests that are implicated that are LCPI's

14  property interests, 541 property interests --

15          THE COURT:  Okay.  Mr. Soto, you've made that

16  argument.  I heard it.  I heard it.

17          MR. SOTO:  All right.  Okay.  So but what is now

18  being said is that we don't --

19          THE COURT:  I don't know if this is like a

20  passive-aggressive thing going on here with Mr. Couchot or

21  with you.  But --

22          MR. SOTO:  I guess --

23          THE COURT:  The point is that what you're about to

24  say, you've already said that.

25          MR. SOTO:  No, I haven't.  I haven't.

*Briggs Reporting Company, Inc.*

187

1        What I'm about to say is that in fact, the point

2 that somehow there are no property interests of Lehman that

3 are now being implicated because this Court ruled on October

4 2nd that among the quote-unquote "sold loans" were also the

5 unsold loans.

6        That point has never been raised to this Court,

7 and I haven't raised it.  But it was raised to the BAP.  And

8 the only way -- I guess the only way that it can be

9 clarified --

10        THE COURT:  Well, I -- I'm confused.  This is why

11 I wanted to stop this anyway, because now it's just getting

12 out of hand.

13        MR. SOTO:  Okay.

14        THE COURT:  Because the point is I've always

15 understood that there were sold and there were unsold loans.

16        MR. SOTO:  Then there's no issue, your Honor.

17 Then if that's true, there's no issue, because the BAP

18 understands it as well.  And the motion for clarification --

19        THE COURT:  All right.  We've been through that at

20 numerous hearings, so this is, in my view, not really new.

21 Okay.

22        MR. SOTO:  Thank you, your Honor.

23        THE COURT:  So now we need to -- I guess it needs

24 to be soon, right, because we've got discovery things going

25 on also.

188

1          All right.  I guess I'll set the oral ruling for

2 February 16.

3          The thing is that I've got hearings all day that

4 day, including the 2:00 o'clock so I'm trying to figure out

5 the best time to do it.  I'm not quite sure how long the 2:00

6 o'clock matter is going to last.

7          Okay.  I'm going to -- I guess I'll deep-set this.

8 February 16 at 3:00 o'clock.  I'm hoping my 2:00 o'clock is

9 going to be done in an hour, hopefully.  That would be the

10 hearing on the oral ruling.  You can appeal telephonically

11 obviously.

12          February 16, Tuesday, at 3:00 o'clock.  I don't

13 want to put it out too far because there are a lot of things

14 going on in this case.  Besides that, my calendar is not

15 going to get any better, so this is probably the best time to

16 do it.

17          Okay.  So February 16 at 3:00 p.m.

18      (Proceedings concluded.)

19

20          I certify that the foregoing is a correct

21 transcript from the electronic sound recording of the

22 proceedings in the above-entitled matter.

23 /s/ Holly Martens_____      2-26-10_____
Transcriber                       Date

24

25

*Briggs Reporting Company, Inc.*