United States Bankruptcy Court/Southern District of New York
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al.<br>Debtors. | Case No. 08-13555 (JMP)<br>(Jointly Administered) |

**UNIQUE IDENTIFICATION NUMBER:** 1000193766

Name of Debtor Against Which Claim is Held
*LEHMAN BROTHERS HOLDINGS INC.*

Case No. of Debtor
*08-13555*

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000012549

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

LBH (CREDITOR.DBF,CREDNUM)CREDNUM # 1000193766*****
ARLINGTON PARTNERS LP
ATTN: ~~RODNEY A. TEMPLETON~~ *MARK B. WILLSON*
C/O THE PARK COMPANIES
124 ONE MADISON PLAZA, SUITE 1500
MADISON, MI 39110

*mwillson@<br>thepark<br>companies.com*

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim
Number: _____
   (If known)

Filed on: _____

Telephone number: *(601) 321-7655* Email Address:

Name and address where payment should be sent (if different from above)

*SAME AS ABOVE*

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number: _____     Email Address: _____

**1.   Amount of Claim as of Date Case Filed:  $ *778,386.59***

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete Item 5.

If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☒  Check this box if all or part of your claim is based on a Derivative Contract.*

☒  Check this box if all or part of your claim is based on a Guarantee.*

***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☐  Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.   Basis for Claim:** *TERMINATED INTEREST RATE SWAP*
(See instruction #2 on reverse side.)

**3.   Last four digits of any number by which creditor identifies debtor:** _____

   **3a. Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

**4.   Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other

Describe: _____

Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____

Amount of Secured Claim: $_____ Amount Unsecured: $_____

**5.   Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$ *0*

**6.   Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $ *0***
(See instruction #6 on reverse side.)

**7.   Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**8.   Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.

**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**

If the documents are not available, please explain:

**FOR COURT USE ONLY**

FILED / RECEIVED
SEP 1 4 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date:<br>*9/8/09* | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br>*Mark B. Willson* |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# LEHMAN BROTHERS SPECIAL FINANCING INC.

# SWAP CONFIRMATION DOCUMENT

# ARLINGTON PARTNERS, L.P.

# LEHMAN BROTHERS

**Transaction**

Date:        20 August, 2008

To:          Arlington Partners, L.P.,

From:        Lehman Brothers Special Financing Inc.
             Confirmations Group
             Facsimile      (1) 646-885-9551 (United States of America)
             Telephone      646 333 9539 (Leila Arjune)

Ref. Numbers:  Global Deal ID: 4012356

---

Dear Sir or Madam:

The purpose of this communication is to set forth the terms and conditions of the swap transaction entered into on the Trade Date referred to below (the "Transaction") between Lehman Brothers Special Financing Inc. ("Party A") and Arlington Partners, L.P., ("Party B"). This communication constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 01 August, 2008, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in or incorporated by reference to, such Agreement shall govern this Confirmation except as expressly modified below.

Party A and Party B each represents that entering into this Transaction is authorized and does not violate any laws of its jurisdiction of organization or residence, or the terms of any agreement to which it is a party. Party A and Party B each represents that (i) it is not relying on the other party in connection with its decision to enter into this Transaction and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (ii) it understands the risks of this Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (iii) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into this Transaction is appropriate for such party in light of its financial capabilities and objectives.

This Confirmation incorporates the definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions"). In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern

LEHMAN BROTHERS SPECIAL FINANCING INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

Deal ID: 4012356    / Effort ID: 2254275

The terms of the particular Transaction to which this communication relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 18 August, 2008 |
| Effective Date: | 22 August, 2008 |
| Termination Date: | 31 August, 2018, subject to adjustment in accordance with the Modified Following Business Day Convention |
| Notional Amount: | USD 14,000,000.00, which shall reduce on the dates and in the amounts (the "Reduction Amount") as set forth in Annex I hereto. |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Period End Dates: | The 1st calendar day of each month, from and including 01 September, 2008 to and including the Termination Date, subject to no adjustment. |
| Fixed Rate Payer Payment Dates: | The 1st calendar day of each month, from and including 01 September, 2008 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 3.355 % per annum |
| Fixed Rate Day Count Fraction: | 30/360 |

**Floating Amounts:**

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Floating Rate Period End Dates: | The 1st calendar day of each month, from and including 01 September, 2008 to and including the Termination Date, subject to no adjustment. |
| Floating Rate Payer Payment Dates: | The 1st calendar day of each month, from and including 01 September, 2008 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-SIFMA Municipal Swap Index |
| Designated Maturity: | Inapplicable |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/Actual |

Deal ID: 4012356    / Effort ID: 2254275

Deal ID: 4012356    / Effort ID: 2254275

| | |
|---|---|
| Reset Dates: | The Effective Date and each Thursday thereafter, up to and including the Thursday immediately preceding the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Method of Averaging: | Weighted Average |
| **Business Days:** | New York |

*1    Optional Partial Termination.*    Party B shall have the right to partially terminate this Transaction on September 1, 2010 without cost or any Settlement Amount due from either party upon 15 days written notice to Party A.  If such optional partial termination is effected by Party B, the Notional Amount applicable to this Transaction shall be the amount shown on Annex II and which shall reduce on the dates and in the amounts set forth in Annex II hereto, such optional partial termination may be directed by Freddie Mac as Credit Support Provider of Party B.

**Miscellaneous:**

| | |
|---|---|
| **Calculation Agent:** | Party A, or as specified in the Swap Agreement |
| **Business Days:** | New York |
| **Credit Support Document:** | With respect to Party A, the Guarantee of Lehman Brothers Holdings Inc. provided by Party A. |
| | With respect to Party B, the Swap Credit Enhancement Agreement of Federal Home Loan Mortgage Corporation. |
| | With respect to Party A and Party B, the Credit Support Annex entered into between Party A and Party B as of even date hereof.. |

**Account details:**

| | |
|---|---|
| Account for payment to Party A in: | JPMorgan Chase Bank ABA # 021000021, A/C of Lehman Brothers Special Financing Inc, A/C # 066-143543 |
| Account for Payment to Party B in: | Bank:    Wells Fargo Bank, N.A.<br>ABA No.:    121000248<br>Beneficiary:   Wells Fargo Bank, N.A. Collection Clearing Account<br>Acct No.:    4121384010<br>Ref:    Addison Park Apartments, FM Loan No.: 504169785 |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                  Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**        **Arlington Partners, L.P.,**

                                                  By: JAN-TX IV, LLC, a Mississippi limited
                                                  liability company, its General Partner

Anatoly Kozlov

Lehman Brothers Special Financing Inc.

                                                  By: _____
                                                  Name: J.B. Thames, Jr.
                                                  Title: Manager

Deal ID: 4012356    / Effort ID: 2254275

**ANNEX I**
to Confirmation, dated August 19, 2008,
between Lehman Brothers Special Financing Inc.
and
Arlington Partners, L.P.,

| Reduction Date | Revised Notional Amount | Notional Amount Reduction |
|---|---|---|
| 10/1/2008 | $13,987,358.86 | $12,641.14 |
| 11/1/2008 | $13,974,666.26 | $12,692.60 |
| 12/1/2008 | $13,961,921.99 | $12,744.27 |
| 1/1/2009 | $13,949,125.84 | $12,796.15 |
| 2/1/2009 | $13,936,277.60 | $12,848.24 |
| 3/1/2009 | $13,923,377.06 | $12,900.54 |
| 4/1/2009 | $13,910,424.00 | $12,953.06 |
| 5/1/2009 | $13,897,418.21 | $13,005.79 |
| 6/1/2009 | $13,884,359.48 | $13,058.73 |
| 7/1/2009 | $13,871,247.59 | $13,111.89 |
| 8/1/2009 | $13,858,082.32 | $13,165.27 |
| 9/1/2009 | $13,844,863.46 | $13,218.86 |
| 10/1/2009 | $13,831,590.79 | $13,272.67 |
| 11/1/2009 | $13,818,264.09 | $13,326.70 |
| 12/1/2009 | $13,804,883.14 | $13,380.95 |
| 1/1/2010 | $13,791,447.71 | $13,435.43 |
| 2/1/2010 | $13,777,957.59 | $13,490.12 |
| 3/1/2010 | $13,764,412.55 | $13,545.04 |
| 4/1/2010 | $13,750,812.37 | $13,600.18 |
| 5/1/2010 | $13,737,156.83 | $13,655.54 |
| 6/1/2010 | $13,723,445.70 | $13,711.13 |
| 7/1/2010 | $13,709,678.76 | $13,766.94 |
| 8/1/2010 | $13,695,855.77 | $13,822.99 |
| 9/1/2010 | $13,681,976.51 | $13,879.26 |
| 10/1/2010 | $13,668,040.75 | $13,935.76 |
| 11/1/2010 | $13,654,048.26 | $13,992.49 |
| 12/1/2010 | $13,639,998.81 | $14,049.45 |
| 1/1/2011 | $13,625,892.17 | $14,106.64 |
| 2/1/2011 | $13,611,728.10 | $14,164.07 |
| 3/1/2011 | $13,597,506.37 | $14,221.73 |
| 4/1/2011 | $13,583,226.75 | $14,279.62 |
| 5/1/2011 | $13,568,889.00 | $14,337.75 |
| 6/1/2011 | $13,554,492.88 | $14,396.12 |

Deal ID: 4012356      / Effort ID: 2254275

Deal ID: 4012356      / Effort ID: 2254275

| Reduction Date | Revised Notional Amount | Notional Amount Reduction |
|---|---|---|
| 7/1/2011 | $13,540,038.16 | $14,454.72 |
| 8/1/2011 | $13,525,524.59 | $14,513.57 |
| 9/1/2011 | $13,510,951.94 | $14,572.65 |
| 10/1/2011 | $13,496,319.97 | $14,631.97 |
| 11/1/2011 | $13,481,628.43 | $14,691.54 |
| 12/1/2011 | $13,466,877.09 | $14,751.34 |
| 1/1/2012 | $13,452,065.70 | $14,811.39 |
| 2/1/2012 | $13,437,194.01 | $14,871.69 |
| 3/1/2012 | $13,422,261.78 | $14,932.23 |
| 4/1/2012 | $13,407,268.77 | $14,993.01 |
| 5/1/2012 | $13,392,214.72 | $15,054.05 |
| 6/1/2012 | $13,377,099.39 | $15,115.33 |
| 7/1/2012 | $13,361,922.53 | $15,176.86 |
| 8/1/2012 | $13,346,683.88 | $15,238.65 |
| 9/1/2012 | $13,331,383.20 | $15,300.68 |
| 10/1/2012 | $13,316,020.23 | $15,362.97 |
| 11/1/2012 | $13,300,594.72 | $15,425.51 |
| 12/1/2012 | $13,285,106.42 | $15,488.30 |
| 1/1/2013 | $13,269,555.07 | $15,551.35 |
| 2/1/2013 | $13,253,940.41 | $15,614.66 |
| 3/1/2013 | $13,238,262.19 | $15,678.22 |
| 4/1/2013 | $13,222,520.14 | $15,742.05 |
| 5/1/2013 | $13,206,714.01 | $15,806.13 |
| 6/1/2013 | $13,190,843.54 | $15,870.47 |
| 7/1/2013 | $13,174,908.46 | $15,935.08 |
| 8/1/2013 | $13,158,908.51 | $15,999.95 |
| 9/1/2013 | $13,142,843.43 | $16,065.08 |
| 10/1/2013 | $13,126,712.95 | $16,130.48 |
| 11/1/2013 | $13,110,516.81 | $16,196.14 |
| 12/1/2013 | $13,094,254.73 | $16,262.08 |
| 1/1/2014 | $13,077,926.45 | $16,328.28 |
| 2/1/2014 | $13,061,531.70 | $16,394.75 |
| 3/1/2014 | $13,045,070.21 | $16,461.49 |
| 4/1/2014 | $13,028,541.71 | $16,528.50 |

Deal ID: 4012356    / Effort ID: 2254275

Deal ID: 4012356    / Effort ID: 2254275

| Reduction Date | Revised Notional Amount | Notional Amount Reduction |
|---|---|---|
| 5/1/2014 | $13,011,945.93 | $16,595.78 |
| 6/1/2014 | $12,995,282.59 | $16,663.34 |
| 7/1/2014 | $12,978,551.41 | $16,731.18 |
| 8/1/2014 | $12,961,752.13 | $16,799.28 |
| 9/1/2014 | $12,944,884.46 | $16,867.67 |
| 10/1/2014 | $12,927,948.12 | $16,936.34 |
| 11/1/2014 | $12,910,942.84 | $17,005.28 |
| 12/1/2014 | $12,893,868.33 | $17,074.51 |
| 1/1/2015 | $12,876,724.31 | $17,144.02 |
| 2/1/2015 | $12,859,510.50 | $17,213.81 |
| 3/1/2015 | $12,842,226.62 | $17,283.88 |
| 4/1/2015 | $12,824,872.38 | $17,354.24 |
| 5/1/2015 | $12,807,447.49 | $17,424.89 |
| 6/1/2015 | $12,789,951.67 | $17,495.82 |
| 7/1/2015 | $12,772,384.63 | $17,567.04 |
| 8/1/2015 | $12,754,746.07 | $17,638.56 |
| 9/1/2015 | $12,737,035.71 | $17,710.36 |
| 10/1/2015 | $12,719,253.25 | $17,782.46 |
| 11/1/2015 | $12,701,398.41 | $17,854.84 |
| 12/1/2015 | $12,683,470.88 | $17,927.53 |
| 1/1/2016 | $12,665,470.37 | $18,000.51 |
| 2/1/2016 | $12,647,396.58 | $18,073.79 |
| 3/1/2016 | $12,629,249.22 | $18,147.36 |
| 4/1/2016 | $12,611,027.98 | $18,221.24 |
| 5/1/2016 | $12,592,732.57 | $18,295.41 |
| 6/1/2016 | $12,574,362.68 | $18,369.89 |
| 7/1/2016 | $12,555,918.01 | $18,444.67 |
| 8/1/2016 | $12,537,398.26 | $18,519.75 |
| 9/1/2016 | $12,518,803.11 | $18,595.15 |
| 10/1/2016 | $12,500,132.27 | $18,670.84 |
| 11/1/2016 | $12,481,385.42 | $18,746.85 |
| 12/1/2016 | $12,462,562.26 | $18,823.16 |
| 1/1/2017 | $12,443,662.47 | $18,899.79 |
| 2/1/2017 | $12,424,685.74 | $18,976.73 |

Deal ID: 4012356        / Effort ID: 2254275

Deal ID: 4012356        / Effort ID: 2254275

| Reduction Date | Revised Notional Amount | Notional Amount Reduction |
|---|---|---|
| 3/1/2017 | $12,405,631.76 | $19,053.98 |
| 4/1/2017 | $12,386,500.21 | $19,131.55 |
| 5/1/2017 | $12,367,290.78 | $19,209.43 |
| 6/1/2017 | $12,348,003.16 | $19,287.62 |
| 7/1/2017 | $12,328,637.02 | $19,366.14 |
| 8/1/2017 | $12,309,192.04 | $19,444.98 |
| 9/1/2017 | $12,289,667.90 | $19,524.14 |
| 10/1/2017 | $12,270,064.29 | $19,603.61 |
| 11/1/2017 | $12,250,380.87 | $19,683.42 |
| 12/1/2017 | $12,230,617.32 | $19,763.55 |
| 1/1/2018 | $12,210,773.32 | $19,844.00 |
| 2/1/2018 | $12,190,848.54 | $19,924.78 |
| 3/1/2018 | $12,170,842.65 | $20,005.89 |
| 4/1/2018 | $12,150,755.32 | $20,087.33 |
| 5/1/2018 | $12,130,586.22 | $20,169.10 |
| 6/1/2018 | $12,110,335.01 | $20,251.21 |
| 7/1/2018 | $12,090,001.36 | $20,333.65 |
| 8/1/2018 | $12,069,584.94 | $20,416.42 |

Deal ID: 4012356    / Effort ID: 2254275

ANNEX II
to Confirmation, dated August 19, 2008,
between Lehman Brothers Special Financing Inc.
and
Arlington Partners, L.P.,

| *Reduction Date* | *Notional Amount Reduction* | *Revised Notional Amount* |
|---|---|---|
| 9/1/2010 | $400,000.40 | $13,281,976.12 |
| 10/1/2010 | $13,528.51 | $13,268,447.61 |
| 11/1/2010 | $13,583.19 | $13,254,864.42 |
| 12/1/2010 | $13,638.92 | $13,241,225.50 |
| 1/1/2011 | $13,694.07 | $13,227,531.43 |
| 2/1/2011 | $13,749.86 | $13,213,781.57 |
| 3/1/2011 | $13,805.88 | $13,199,975.69 |
| 4/1/2011 | $13,862.14 | $13,186,113.55 |
| 5/1/2011 | $13,918.63 | $13,172,194.92 |
| 6/1/2011 | $13,975.36 | $13,158,219.56 |
| 7/1/2011 | $14,032.32 | $13,144,187.24 |
| 8/1/2011 | $14,089.13 | $13,130,098.11 |
| 9/1/2011 | $14,146.57 | $13,115,951.54 |
| 10/1/2011 | $14,204.26 | $13,101,747.28 |
| 11/1/2011 | $14,288.77 | $13,087,458.51 |
| 12/1/2011 | $14,293.35 | $13,073,165.16 |
| 1/1/2012 | $14,378.35 | $13,058,786.81 |
| 2/1/2012 | $14,437.02 | $13,044,349.79 |
| 3/1/2012 | $14,495.51 | $13,029,854.28 |
| 4/1/2012 | $14,554.65 | $13,015,299.63 |
| 5/1/2012 | $14,614.06 | $13,000,685.57 |
| 6/1/2012 | $14,673.28 | $12,986,012.29 |
| 7/1/2012 | $14,733.19 | $12,971,279.10 |
| 8/1/2012 | $14,793.33 | $12,956,485.77 |
| 9/1/2012 | $14,853.32 | $12,941,632.45 |
| 10/1/2012 | $14,913.56 | $12,926,718.89 |
| 11/1/2012 | $14,974.46 | $12,911,744.43 |
| 12/1/2012 | $15,035.62 | $12,896,708.81 |
| 1/1/2013 | $15,096.62 | $12,881,612.19 |
| 2/1/2013 | $15,158.29 | $12,866,453.90 |
| 3/1/2013 | $15,219.81 | $12,851,234.09 |
| 4/1/2013 | $15,281.99 | $12,835,952.10 |
| 5/1/2013 | $15,344.04 | $12,820,608.06 |

Deal ID: 4012356    / Effort ID: 2254275

Deal ID: 4012356    / Effort ID: 2254275

| Reduction Date | Notional Amount Reduction | Revised Notional Amount |
|---|---|---|
| 6/1/2013 | $15,406.32 | $12,805,201.74 |
| 7/1/2013 | $15,469.30 | $12,789,732.44 |
| 8/1/2013 | $15,532.12 | $12,774,200.32 |
| 9/1/2013 | $15,595.62 | $12,758,604.70 |
| 10/1/2013 | $15,658.56 | $12,742,946.14 |
| 11/1/2013 | $15,722.58 | $12,727,223.56 |
| 12/1/2013 | $15,786.89 | $12,711,436.67 |
| 1/1/2014 | $15,851.04 | $12,695,585.63 |
| 2/1/2014 | $15,915.46 | $12,679,670.17 |
| 3/1/2014 | $15,980.15 | $12,663,690.02 |
| 4/1/2014 | $16,045.12 | $12,647,644.90 |
| 5/1/2014 | $16,110.76 | $12,631,534.14 |
| 6/1/2014 | $16,175.87 | $12,615,358.27 |
| 7/1/2014 | $16,242.07 | $12,599,116.20 |
| 8/1/2014 | $16,308.12 | $12,582,808.08 |
| 9/1/2014 | $16,374.88 | $12,566,433.20 |
| 10/1/2014 | $16,441.09 | $12,549,992.11 |
| 11/1/2014 | $16,507.98 | $12,533,484.13 |
| 12/1/2014 | $16,575.58 | $12,516,908.56 |
| 1/1/2015 | $16,642.63 | $12,500,265.93 |
| 2/1/2015 | $16,710.37 | $12,483,555.55 |
| 3/1/2015 | $16,778.81 | $12,466,776.75 |
| 4/1/2015 | $16,846.71 | $12,449,930.04 |
| 5/1/2015 | $16,915.72 | $12,433,014.31 |
| 6/1/2015 | $16,984.20 | $12,416,030.11 |
| 7/1/2015 | $17,053.37 | $12,398,976.74 |
| 8/1/2015 | $17,122.84 | 12,381,853.90 |
| 9/1/2015 | $17,192.60 | $12,364,661.30 |
| 10/1/2015 | $17,262.65 | $12,347,398.65 |
| 11/1/2015 | $17,332.99 | $12,330,065.66 |

Deal ID: 4012356      / Effort ID: 2254275

| Reduction Date | Notional Amount Reduction | Revised Notional Amount |
|---|---|---|
| 12/1/2015 | $17,403.22 | $12,312,662.45 |
| 1/1/2016 | $17,474.15 | $12,295,188.29 |
| 2/1/2016 | $17,545.39 | $12,277,642.91 |
| 3/1/2016 | $17,616.91 | $12,260,026.00 |
| 4/1/2016 | $17,688.74 | $12,242,337.25 |
| 5/1/2016 | $17,760.46 | $12,224,576.80 |
| 6/1/2016 | $17,832.89 | $12,206,743.90 |
| 7/1/2016 | $17,905.22 | $12,188,838.69 |
| 8/1/2016 | $17,978.25 | $12,170,860.44 |
| 9/1/2016 | $18,051.60 | $12,152,808.84 |
| 10/1/2016 | $18,125.25 | $12,134,683.59 |
| 11/1/2016 | $18,198.80 | $12,116,484.79 |
| 12/1/2016 | $18,272.65 | $12,098,212.14 |
| 1/1/2017 | $18,347.24 | $12,079,864.90 |
| 2/1/2017 | $18,422.13 | $12,061,442.77 |
| 3/1/2017 | $18,496.93 | $12,042,945.84 |
| 4/1/2017 | $18,572.04 | $12,024,373.80 |
| 5/1/2017 | $18,647.87 | $12,005,725.93 |
| 6/1/2017 | $18,723.61 | $11,987,002.32 |
| 7/1/2017 | $18,800.08 | $11,968,202.24 |
| 8/1/2017 | $18,876.47 | $11,949,325.78 |
| 9/1/2017 | $18,953.17 | $11,930,372.61 |
| 10/1/2017 | $19,030.59 | $11,911,342.02 |
| 11/1/2017 | $19,107.95 | $11,892,234.07 |
| 12/1/2017 | $19,186.03 | $11,873,048.04 |
| 1/1/2018 | $19,263.62 | $11,853,784.42 |
| 2/1/2018 | $19,342.35 | $11,834,442.07 |
| 3/1/2018 | $19,421.00 | $11,815,021.07 |
| 4/1/2018 | $19,499.99 | $11,795,521.08 |
| 5/1/2018 | $19,579.30 | $11,775,941.78 |
| 6/1/2018 | $19,659.37 | $11,756,282.42 |
| 7/1/2018 | $19,739.35 | $11,736,543.07 |
| 8/1/2018 | $19,819.25 | $11,716,723.81 |

# LEHMAN BROTHERS SPECIAL FINANCING INC.

## ISDA MASTER AGREEMENT

## ARLINGTON PARTNERS, L.P.

(Multicurrency-Cross Border)

# ISDA®

International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

dated as of August 1, 2008

**LEHMAN BROTHERS**              and              **ARLINGTON PARTNERS, L.P.**
**SPECIAL FINANCING INC.**

have entered and/or anticipate entering into one or more transactions (each a Transaction) that are or will be governed by this Master Agreement, which includes the schedule (the Schedule), and the documents and other confirming evidence (each a Confirmation) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.    **Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this Agreement), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2

ISDA® 1992

(ii) *Liability*. If: —

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e) **Default Interest; Other Amounts**. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.    Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a) *Basic Representations*.

(i) *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii) *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

ISDA® 1992

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.     Events of Default and Termination Events**

(a)     *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

    (i)     *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

    (ii)     *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

    (iii)     *Credit Support Default.*

        (1)     Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

        (2)     the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

        (3)     the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

    (iv)     *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

    (v)     *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

    (vi)     *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: ---

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: ---

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                                        ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)   *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1)   to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)   to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)   *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)   *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)   *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)   *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)   *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event*.

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate*. If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1)    *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9

ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A)  if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

10                                                ISDA® 1992

7.      **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)      a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)      a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.      **Contractual Currency**

(a)      *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)      *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)      *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)      *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

11                                                      **ISDA® 1992**

9.    **Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

**ISDA® 1992**

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12. Notices**

(a) *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i) if in writing and delivered in person or by courier, on the date it is delivered;

(ii) if sent by telex, on the date the recipient's answerback is received;

(iii) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv) if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v) if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b) *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13. Governing Law and Jurisdiction**

(a) *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b) *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c) *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

**ISDA® 1992**

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14                                    ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15                                                    **ISDA® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

16                                                                                ISDA® 1992

**"Specified Indebtedness"** means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

**"Specified Transaction"** means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

**"Stamp Tax"** means any stamp, registration, documentation or similar tax.

**"Tax"** means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

**"Tax Event"** has the meaning specified in Section 5(b).

**"Tax Event Upon Merger"** has the meaning specified in Section 5(b).

**"Terminated Transactions"** means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

**"Termination Currency"** has the meaning specified in the Schedule.

**"Termination Currency Equivalent"** means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

**"Termination Event"** means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

**"Termination Rate"** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

**"Unpaid Amounts"** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

**ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

<table>
<tr><td>

**LEHMAN BROTHERS
SPECIAL FINANCING INC.**
*(Name of Party)*

</td><td>

**ARLINGTON PARTNERS, L.P.**
*(Name of Party)*

</td></tr>
<tr><td></td><td>

By:  JAN-TX IV, LLC, a Mississippi limited liability company, its General Partner

</td></tr>
<tr><td>

By: _____

Name:

Title:   Robert E. Guglielmo

Date:   Senior Vice President

</td><td>

By: _____

Name:   Rodney F. Triplett, Jr.

Title:   Manager

Date:

</td></tr>
</table>

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

<table>
<tr><td><b>LEHMAN BROTHERS<br>SPECIAL FINANCING INC.</b><br><i>(Name of Party)</i></td><td><b>ARLINGTON PARTNERS, L.P.</b><br><i>(Name of Party)</i></td></tr>
</table>

By: JAN-TX IV, LLC, a Mississippi limited
liability company, its General Partner

By: _____    By: _____

Name:                          Name:    Rodney F. Triplett, Jr.

Title:                         Title:   Manager

Date:                          Date:

18

# LEHMAN BROTHERS

### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A") and **ARLINGTON PARTNERS, L.P.** ("Party B") have entered into a Master Agreement dated as of August 1, 2008, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)     Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of any obligation of Party A under the Agreement, the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment with respect to any Event of Default or Potential Event of Default, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)     This Guarantee shall remain in full force and effect until receipt by Party B of a written notice of termination from Guarantor. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)     Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)     Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

1

(g)     Guarantor shall have no right of subrogation with respect to any payments made under this Guarantee until all obligations of the Guaranteed Party under the Agreement are paid in full.

(h)     Guarantor represents and warrants (which representations and warranties shall be deemed to have been made by Guarantor on the date of each Transaction) that:

      i.     Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware;

      ii.     Guarantor has the legal capacity and the legal right to execute and deliver this Guarantee and to perform Guarantor's obligations hereunder;

      iii.     no consent or authorization of, filing with, or other act by or in respect of, any governmental authority and no consent of any other person (including, without limitation, any creditor of Guarantor) is required in connection with the execution, delivery, performance, validity or enforceability of this Guarantee;

      iv.     this Guarantee has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws; and

      v.     the execution, delivery and performance of this Guarantee will not violate any provision of the certificate of incorporation, by laws or other organizational documents of Guarantor, or any law, treaty, rule or regulation or determination of an arbitrator, a court or other governmental authority, applicable to or binding upon Guarantor or any of its property or to which Guarantor or any of its property is subject.

(i)     Any provision of this Guarantee which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(j)     No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege, and no waiver by Party B of any right or remedy hereunder on any one occasion shall be construed as a bar to any right or remedy which Party B would otherwise have on any future occasion. No failure to exercise, nor any delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(k)     If any term, provision, covenant, or condition of this Guarantee, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Guarantee had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Guarantee as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Guarantee and the deletion of such portion of this Guarantee will not substantially impair the respective benefits or expectations of the parties to this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By:
Name:    James J. Killerlane III
Title:    Vice President
Date:    August 21, 2008

# ISDA

International Swap Dealers Association, Inc.

## SCHEDULE TO THE
## MASTER AGREEMENT DATED AS OF
## BETWEEN

| | | |
|---|---|---|
| **LEHMAN BROTHERS**<br>**SPECIAL FINANCING INC.** | **AND** | **ARLINGTON PARTNERS, L.P.** |
| **("PARTY A")** | | **("PARTY B")** |

**Part 1.** Termination Provisions.

(a)　*"Specified Entity"* means, in relation to Party A for the purpose of:

　　Section 5(a)(v) (Default Under Specified Transaction): Any Credit Support Provider
　　Section 5(a)(vi) (Cross Default): Any Credit Support Provider
　　Section 5(a)(vii) (Bankruptcy): Any Credit Support Provider
　　Section 5(b)(iv) (Credit Event Upon Merger): Any Credit Support Provider

　　and in relation to Party B and its Credit Support Provider for the purpose of:

　　Section 5(a)(v) (Default Under Specified Transaction): Not Applicable
　　Section 5(a)(vi) (Cross Default): Not Applicable
　　Section 5(a)(vii) (Bankruptcy): Not Applicable
　　Section 5(b)(iv) (Credit Event Upon Merger): Not Applicable

(b)　*"Specified Transaction"* will have the meaning specified in Section 14 of this Agreement.

(c)　The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A, the Credit Support Provider of Party A, any Specified Entity of Party A and to the Credit Support Provider of Party B.

　　If such provisions apply:-

　　*"Specified Indebtedness"* will have the meaning specified in Section 14 of this Agreement.

　　*"Threshold Amount"* means, with respect to Party A, the lesser of 3% of the Shareholder's equity of Party A's Credit Support Provider or $100,000,000 and with respect to Party B's Credit Support Provider, $100,000,000.

(including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(d)    Subsection (iv) of Section 5(b) is hereby deleted in its entirety and replaced by the following:

*Credit Event Upon Merger*, which will apply to Party A and shall apply to Party B only in the event the Credit Support Provider of Party B is no longer a "government sponsored enterprise" subject to Chapter 46 of Title 12 of the United States Code and with respect to Party B and its Credit Support Provider will mean that such party ("X") consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganizes, incorporates, or reconstitutes into or as, another entity, or X otherwise reorganizes or effects a recapitalization, and such action does not constitute an event described in Section 5(a) (viii) but the creditworthiness of the resulting, surviving, transferee, reorganized or recapitalized entity is materially weaker than that of X immediately prior to such action ("materially weaker" for the purposes of this subsection (iv) meaning that the rating issued by either Standard and Poor's Corporation ("S&P") or Moody's Investors Services, Inc. ("Moody's") with respect to the resulting, surviving, transferee, reorganized or recapitalized entity's long-term, senior unsecured debt securities is (i) lower than the respective rating for such long-term debt securities of the predecessor entity and (ii) less than "AA-" (S&P) or "Aa3" (Moody's) - and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(e)    The "*Merger Without Assumption*" provisions of Section 5(a)(viii) will apply to Party A, the Credit Support Provider of Party A, any Specified Entity of Party A and the Credit Support Provider of Party B, but will not apply to Party B.

(f)    The "*Bankruptcy*" provisions of Section 5(a)(vii) will apply to Party A, the Credit Support Provider of Party A and any Specified Entity of Party A, but will not apply to Party B except with respect to the occurrence of any event described in Section 5(a)(vii) relating to the Credit Support Provider of Party B.

(g)    The "*Automatic Early Termination*" provisions of Section 6(a) will not apply to Party A or Party B.

(h)    For the purpose of Section 6(e) of this Agreement:

(i)    *Market Quotation* will apply
(ii)   *Second Method* will apply

(i)    "*Termination Currency*" means United States Dollars.

(j)    "*Additional Termination Event*".  The following Additional Termination Events shall apply:

2

(i)    If, prior to the occurrence of an Event of Default with respect to Party B, the long-term, unsecured and unsubordinated indebtedness of Federal Home Loan Mortgage Corporation ("Freddie Mac"), as the Credit Support Provider of Party B, ceases to be rated at least A3 (Moody's), A- (S&P) and A- (Fitch) or ceases to be rated by Moody's, S&P, or Fitch (a "Rating Downgrade"), then at the option of Party A such event shall constitute an Additional Termination Event with Party B as the Affected Party. Provided, however, a Rating Downgrade relating to Freddie Mac shall not be an Additional Termination Event if, within thirty (30) days of such Rating Downgrade, Party B shall exercise one of the following four options: (a) post Collateral pursuant to the Credit Support Annex between Party A and Party B under this Agreement, (b) cause Freddie Mac to (1) enter into a Credit Support Annex with Party A in substantially the same form as the Credit Support Annex between Party A and Party B under this Agreement, with such changes as are mutually acceptable to Party A and Freddie Mac, (2) simultaneously deliver an opinion of counsel reasonably acceptable to Party A that the Credit Support Annex has been duly authorized and executed by Freddie Mac and is a valid, binding and enforceable obligation of Freddie Mac in accordance with its terms, and (3) post Collateral in accordance with the terms of the Credit Support Annex (c); assign this Agreement, at the sole expense of Party B, to a Counterparty expressly approved by Party A in its sole discretion, or (d) provide Party A with a Credit Support Document from a Credit Support Provider expressly approved by Party A, in its sole discretion. In the event Party B takes any of the actions described in clauses (a), (b), (c) or (d) of this Subsection (j)(i) within such thirty (30) day period, then the applicable Rating Downgrade shall not be deemed effective for the purposes of Section 6(b)(iv).

(ii)   If, prior to the occurrence of an Event of Default with respect to Party A, the long-term senior unsecured debt of Party A's Credit Support Provider ceases to be rated at least A3 (Moody's), A- (S&P) and A- (Fitch), or ceases to be rated by Moody's, S&P, or Fitch, then, at the option of Party B, such event shall constitute an Additional Termination Event with Party A as the Affected Party. Provided, however, a Rating Downgrade relating to Party A shall not be an Additional Termination Event if, within thirty (30) days of such Rating Downgrade, Party A shall exercise one of the following three options: (a) to pledge Collateral pursuant to the terms of the Credit Support Annex between Party A and Party B dated as of the date hereof to secure the obligations of Party A under this Agreement, (b) to assign its interest and obligations under this Agreement, at the sole expense of Party A, to a Counterparty approved by Party B and Freddie Mac each in its sole discretion, or (c) to provide Party B with a Credit Support Document from a Credit Support Provider expressly approved by Party B and Freddie Mac, each in its sole discretion. In the event Party A takes any of the actions described in clauses (a), (b), or (c) of this Subsection (j)(ii) within such thirty (30) day period, then the applicable Rating Downgrade shall not be deemed effective for the purposes of Section 6(b)(iv).

(iii)  Party B may, with the consent of the Credit Support Provider of Party B, terminate

3

any Transaction at any time in whole or in part by providing Party A notice of the early termination day selected by Party B, which day shall be not less than three (3) local Business Days from the effective date of the notice, and the amount of the Transaction being terminated. The date selected by Party B shall be an Early Termination Date with Party B as the Affected Party. If Party B elects to terminate only a portion of any Transaction, then the parties shall concurrently with such termination execute an amendment to the Confirmation relating to such Transaction to amend the notional amount to reflect the partial termination.

(iv)    if for any reason the Swap Credit Enhancement Agreement fails to be delivered, fails to take effect, terminates or ceases to be in full force or an Event of Default (as defined in the Swap Credit Enhancement Agreement) has occurred. Party B shall be the Affected Party with respect to this Additional Termination Event.

(k)    *Additional Provisions.* The following additional provisions are hereby inserted:

    (i)    Notwithstanding any other provision of this Agreement, the occurrence of any of the events described in Sections 5(a)(ii), (iv), (v), (vi) or (vii) shall not constitute an Event of Default with respect to Party B unless such event occurs with respect to the Credit Support Provider of Party B.

    (ii)    Notwithstanding any other provision of this Agreement, the occurrence of any of the events described in Sections 5(a)(i) shall not constitute an Event of Default with respect to Party B, so long as Freddie Mac has not defaulted on its obligations under the Swap Credit Enhancement Agreement.

    (iii)    Party B may, with the consent of the Credit Support Provider of Party B, assign this Agreement, at the sole expense of Party B to a third party with the approval of Party A, such approval not to be unreasonably withheld or delayed provided that; (i) such assignee may lawfully assume the rights and obligations under this Agreement, (ii) no Event of Default or Credit Enhancement Event of Default, as applicable, has occurred under any Credit Support Document, and (iii) Freddie Mac is the Credit Support Provider of such assignee under this Agreement.

4

**Part 2  Tax Representations**

(a)    *Payer Tax Representation.*  For the purposes of Section 3(e), Party A and Party B will make the following representation:

> It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on:

> (i)    the accuracy of any representations made to it by the other party under Section 3(f) of this Agreement,

> (ii)    the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement, and

> (iii)    the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement;

> provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    *Payee Tax Representation.*

> (i)    *Party A Payee Tax Representation.*  For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the United States.

> (ii)    *Party B Payee Tax Representations.*  For the purpose of Section 3(f) of this Agreement, Party B represents that it is a limited partnership organized under the laws of the State of Mississippi and is a "U.S. person" for the purposes of Section 7701 of the United Stated Internal Revenue Code.

**Part 3  Agreement to Deliver Documents.**

For the purpose of Section 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents as applicable:--

(a)    Tax forms, documents or certificates to be delivered are:

| Party Required to Deliver Document | Form/Document/ Certificate | Date by Which to be Delivered |
|---|---|---|
|  |  |  |
| Party B | Form W-8 | Upon execution of the Master Agreement and thereafter, upon request. |

(b)    Other documents to be delivered are:--

| Party Required to Deliver Document | Form/Document/ Certificate | Date by Which to be Delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A | Certificate evidencing the incumbency, authority, and specimen signature of the officer of Party A executing the Master Agreement on behalf of Party A. | Execution of the Master Agreement | Yes |
| Party A | Opinion of Counsel to Party A in form annexed hereto as Exhibit B to this Schedule. | Execution of Master Agreement | No |
|  |  |  |  |
| Party B and its Credit Support Provider | Certified resolutions evidencing the authority of Party B to execute, deliver and perform its obligations under the Master Agreement and any Confirmations delivered thereunder and the Credit Enhancement Agreement. | Execution of Master Agreement | Yes |
| Party B and Party B's Credit Support Provider | Annual financial statements for Party B and all Credit Support Providers | As soon as available, but in any event not later than 180 days after the end of each of Party B's fiscal years | Yes |
| Party B and Party B's Credit Support Provider | Opinion of Counsel to Party B and Party B's Credit Support Provider in form and substance satisfactory to Party A. | Execution of Master Agreement | No |

**Part 4. Miscellaneous.**

(a)    _**Address for Notices.**_    For purposes of Section 12(a) of this Agreement:

Address for notices of communications to Party A:

| | |
|---|---|
| Address: | Lehman Brothers Special Financing Inc.<br>c/o Lehman Brothers Inc.<br>Legal Compliance and Audit Group<br>Capital Markets Contracts - Legal<br>1271 Avenue of the Americas, 43rd Floor<br>New York, NY 10020 |
| Attention: | Documentation Manager |
| Telephone No.: | (212) 526-7187 |
| Facsimile No.: | (212) 526-7672 |

Address for notices of communications to Party B:

Arlington Partners, L.P.
c/o The Park Companies
124 One Madison Plaza
Suite 1500
Madison, Mississippi 39110
Telephone: (601) 321-7600
Facsimile: (601) 321-7694
Attn: Rodney F. Triplett, Jr.

With copy to:  c/o Capmark Affordable Equity Holdings, Inc.
1801 California Street, Suite 3900
Denver, CO 80202

With a copy to: AMTAX Holdings 495, LLC
c/o Capmark Affordable Equity Holdings, Inc.
1801 California Street, Suite 3900
Denver, CO 80202
Attn: Michelle Austin, Esq.
Telephone: 303-294-3177
Facsimile: 303-291-5887

A copy of each and every notice given by or on behalf of either party to this Agreement, including any and all notices of default, shall also be sent to the Credit Support Provider of Party B, and the Servicer to the Transaction to which such

7

notice relates (as Servicer is defined in the Credit Support Documents of Party B for the Transaction to which such notice relates) at the following addresses:

To Freddie Mac:            Federal Home Loan Mortgage Corporation
                           8100 Jones Branch Drive
                           Mail Stop B4Q
                           McLean, Virginia 22102
                           Attention:  Director of Multifamily Management
                                          Information and Control
                           Telephone:  (703) 903-2000
                           Facsimile:  (703) 714-3273

With a copy to:            Federal Home Loan Mortgage Corporation
                           8200 Jones Branch Drive
                           McLean, Virginia 22102
                           Attention:  Associate General Counsel–Multifamily
                                          (Legal Division)
                           Telephone:  (703) 903-2000
                           Facsimile:  (703) 903-2885

With a copy to:            Federal Home Loan Mortgage Corporation
                           8100 Jones Branch Drive
                           Mail Stop B4F
                           McLean, Virginia 22102
                           Attention:  Director of Multifamily Loan Servicing
                           Telephone:  (703) 903-2000
                           Facsimile:  (703) 714-3003

To the Servicer:           Wells Fargo Bank, N.A.
                           2010 Corporate Ridge, Ste1000
                           McLean, VA 22102
                           Attention:  Mabel Harris/Servicing Manager
                           Telephone:  (703) 760-4700
                           Facsimile:  (866) 557-8784

(b)    *Process Agent.*  For the purpose of Section 13(c) of this Agreement:

       Party A appoints no agent as its Process Agent.
       Party B appoints no agent as its Process Agent.

(c)    *Offices.*  The provisions of Section 10(a) will apply to this Agreement.

(d)    *Multibranch Party.*  For the purpose of Section 10 of this Agreement:

       Party A s not a Multibranch Party.
       Party B is not a Multibranch Party.

8

(e)  *Calculation Agent.*   The Calculation Agent is Party A, unless an Event of Default has occurred and is continuing with respect to Party A and Party B has not designated an Early Termination Date, whereupon the parties will mutually appoint a financial institution which would qualify as a Reference Market Maker to act as Calculation Agent until the earlier of (i) a designation under Section 6(c)(ii), or (ii) the discontinuance of such Event of Default with respect to Party A.

(f)  *Credit Support Document.* Details of any Credit Support Document:

Party A:     The Credit Support Annex dated as of August 1, 2008 between Party A and Party B. Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

Party B:     Swap Credit Enhancement Agreement dated August 1, 2008 between Party A and Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Credit Support Annex described above; and, if executed pursuant to Part 1(j)(i) hereof, the Credit Support Annex under the Swap Credit Enhancement Agreement.

(g)  *Credit Support Provider.*

Party A:     Lehman Brothers Holdings Inc.
Party B:     Freddie Mac.

(h)  *Governing Law.*  This Agreement will be governed by and construed in accordance with the laws of the State of New York without regard to conflict of law principles.

(i)  *Netting of Payments.*  Subparagraph (ii) of Section 2(c) of this Agreement will apply on a Transaction by Transaction basis but will not apply in the aggregate to all Transactions.

(j)  *Affiliates.*  "Affiliates" will have the meaning specified in Section 14 of this Agreement with respect to Party A, provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(k)  *Recourse.*  Party A agrees that upon and after the delivery of the Swap Credit Enhancement Agreement by the Credit Support Provider of Party B, its sole remedy against Party B for any Event of Default or Termination Event with respect to Party B hereunder shall be to exercise its rights under the Swap Credit Enhancement Agreement and Credit Support Annex pursuant to their terms.

(l)  *Amendment of Section 3(d).*  Section(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period, the words "or, in the case of audited or unaudited financial statements, a fair presentation of the financial condition of the relevant person as of the time the statements state that they apply".

(m)  *Notice of Illegality.*  If any person gives a notice of Illegality, the due date for any payment scheduled to be made by either party pursuant to Section 2 in connection with any Affected Transaction at any time after that notice is effective shall be deferred to the earliest to occur of (i) the date for settlement payments pursuant to Section 6(e) in

connection with an Early Termination Date, (ii) the final Scheduled Payment Date for the Affected Transaction, and (iii) the date arrangements made pursuant to Section 6(b)(ii) to avoid the Illegality are effected. Any payments deferred pursuant to this provision shall be made on the deferred payment date together with interest on each deferred payment from and including its originally scheduled due date to but excluding the deferred due date (or, if an Early Termination Date is designated, to but excluding the day it is designated).

(n)     _**No Modification of Payment Instructions**_.  Party A and Party B agree that the Party B payment instructions set forth in any Confirmation for payments to Party B shall not be changed or modified without prior notice to, and the written consent of, the Credit Support Provider of Party B.

(o)     _**No Default Under Certain Circumstances**_.  Notwithstanding any other provision of this Agreement, and with respect to all Transactions, the failure of Party A to receive any payment due under this Agreement shall not constitute an Event of Default under Section 5(a)(i) of this Agreement prior to the fourth Business Day (as defined in the Swap Credit Enhancement Agreement) following the timely delivery to the Credit Support Provider of Party B a Deficiency Notice as defined in the Swap Credit Enhancement Agreement) with respect to the payment due to Party A.

(p)     _**Additional Notices.**_  In addition to providing the other notices required herein, the Calculation Agent shall notify the Servicer and the Trustee on each Period End Date, of the payments due by Party A and/or Party B to the other party hereto on the next succeeding Payment Date. No action or failure to act by Party A as Calculation Agent shall give rise to an Event of Default or Termination Event against Party A.

(q)     _**No Termination Without Consent of Credit Support Provider for Party B**_.  Notwithstanding any other provision herein, no transaction shall be amended or terminated in whole or in part by Party B and Party B shall not be permitted to declare an Early Termination Date or enter into additional Transactions hereunder without notice to, and the prior written consent of, the Credit Support Provider of Party B.

(r)     _**Setoff:**_  Any amount (the "Early Termination Amount") payable to one party of this Agreement (the Payee) by the other party (the Payer) under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(iv) has occurred, will, at the option of party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by its set-off against any amount(s) (the "Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer of instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off).  X will give notice to the other party of any set-off effected under this Section.

Nothing in this Section shall be effective to create a charge or other security interest. This Section shall be without prejudice and in addition to any right of set-off, combination of

10

accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise.)

## Part 5 Other Provisions.

(a) ***ISDA Definitions.***    Reference is hereby made to the 1992 ISDA U.S. Municipal Counterparty Definitions (the "1992 Definitions"), as published by the International Swap Dealers Association, Inc., which are hereby incorporated by reference herein, as completed or supplemented in this Schedule or in any Confirmation, as the case may be, but without regard to any revision or subsequent edition thereof. Any terms used and not otherwise defined herein which are contained in the 1992 Definitions shall have the meaning set forth therein. In the event of any inconsistency between the provisions of this Agreement and the 1992 Definitions, this Agreement will prevail.

(b) ***No Proceedings.***    Party A hereby agrees that upon and after the delivery of the Swap Credit Enhancement Agreement it will not institute against, or join any other person or entity in instituting against, Party B any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding, or other proceeding under any Federal or State bankruptcy or similar law of any applicable jurisdiction, for one year and one day after the termination of this Agreement. Party A's obligations under this paragraph will survive for one year and one day after the termination of this Agreement.

(c) ***Waiver of Jury Trial.***    Each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support Document.

(d) ***Eligible Swap Participant.***    Each party represents to the other that it is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(e) ***Additional Representation.***    Each party additionally represents and warrants to the other that (i) it is entering into the Agreement and will enter into all Transactions hereunder as principal and in connection with its business or the management of its business, (ii) it is aware of all the material risks associated with the Transactions, (iii) it is making its own business judgment in entering into the Transactions, and (iv) the other party is not its agent or fiduciary with respect to the Transactions.

(f) ***Assignment.***    Party A acknowledges and consents to the assignment by Party B of this Agreement, all Confirmations executed hereunder and the rights and benefits of all Transactions, including any collateral posted by Party A, to Freddie Mac pursuant to the terms of that certain Reimbursement and Security Agreement dated as of June 1, 2006 by and between Party B and Freddie Mac.

(g) ***Relationship Between Parties***.    Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

11

(i)      ***Non-Reliance.***  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)     ***Assessment and Understanding.***  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii)     ***Status of Parties.***  The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(h)    ***Counterpart and Facsimile Execution.***  This Agreement may be executed in one or more counterparts, either in original or facsimile form, each of which shall constitute an original and all of which together shall constitute one and the same agreement. When executed by the parties through facsimile transmission, this Agreement shall constitute the original agreement between the parties and the parties hereby adopt the signatures printed by the receiving facsimile machine as the original signature of the parties.

(i)    ***Cross Default.***  Section 5(a)(vi) of this Agreement is hereby amended by adding the following after the semicolon at the end thereof:

"provided, however, that notwithstanding the foregoing (but subject to any provision to the contrary contained in any such agreement or instrument), an Event of Default shall not occur under either (1) or (2) above if the default, event of default or other similar condition or event referred to in (1) or the failure to pay referred to in (2) is caused not (even in part) by the unavailability of funds but is caused solely due to a technical or administrative error which has been remedied within three Local Business Days after notice of such failure is given to the party."

(j)    **Transfer.** Notwithstanding anything to the contrary in <u>Section 7</u> of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor.

(k)    **Notices.** For the purposes of <u>subsections (iii)</u> and <u>(v)</u> of <u>Section 12(a)</u>, the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a

12

Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(l)    **Service of Process.** The penultimate sentence of <u>Section 13(c)</u> shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Schedule by their duly authorized officers as the date hereof.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

**ARLINGTON PARTNERS, L.P.**

By: JAN-TX IV, LLC, a Mississippi limited liability company, its General Partner

By: _____
Name:
Title:

By: _____
Name: Rodney F. Triplett, Jr.
Title: Manager

IN WITNESS WHEREOF, the parties have executed this Schedule by their duly authorized officers as the date hereof.

**LEHMAN    BROTHERS    SPECIAL
FINANCING INC.**

**ARLINGTON PARTNERS, L.P.**

By:  JAN-TX IV, LLC, a Mississippi limited liability company, its General Partner

By: _____

Name:

Title:

By: _____

Name: J. H. Thames, Jr.

Title:  Manager

# LEHMAN BROTHERS

### EXHIBIT A to Schedule

### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and ARLINGTON PARTNERS, L.P. ("Party B") have entered into a Master Agreement dated as of [date], as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of any obligation of Party A under the Agreement , the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment with respect to any Event of Default or Potential Event of Default, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until receipt by Party B of a written notice of termination from Guarantor. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

(g)    Guarantor shall have no right of subrogation with respect to any payments made under this Guarantee until all obligations of the Guaranteed Party under the Agreement are paid in full.

1

# LEHMAN BROTHERS

(h)    Guarantor represents and warrants (which representations and warranties shall be deemed to have been made by Guarantor on the date of each Transaction) that:

i.    Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware;

ii.    Guarantor has the legal capacity and the legal right to execute and deliver this Guarantee and to perform Guarantor's obligations hereunder:

iii.    no consent or authorization of, filing with, or other act by or in respect of, any governmental authority and no consent of any other person (including, without limitation, any creditor of Guarantor) is required in connection with the execution, delivery, performance, validity or enforceability of this Guarantee;

iv.    this Guarantee has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws; and

v.    the execution, delivery and performance of this Guarantee will not violate any provision of the certificate of incorporation, by laws or other organizational documents of Guarantor, or any law, treaty, rule or regulation or determination of an arbitrator, a court or other governmental authority, applicable to or binding upon Guarantor or any of its property or to which Guarantor or any of its property is subject.

(i)    Any provision of this Guarantee which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(j)    No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege, and no waiver by Party B of any right or remedy hereunder on any one occasion shall be construed as a bar to any right or remedy which Party B would otherwise have on any future occasion. No failure to exercise, nor any delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(k)    If any term, provision, covenant, or condition of this Guarantee, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Guarantee had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Guarantee as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Guarantee and the deletion of such portion of this Guarantee will not substantially impair the respective benefits or expectations of the parties to this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

2

# LEHMAN BROTHERS

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:

3

# LEHMAN BROTHERS

EXHIBIT B to Schedule

[Form of Opinion of Counsel for
Lehman Brothers Special Financing Inc. and
Lehman Brothers Holdings Inc.]

[date]

[COUNTERPARTY NAME]
[COUNTERPARTY ADDRESS]

Federal Home Loan Mortgage Corporation
McLean, VA 22102

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Party A"), and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of [date] between Party A and [counterparty] and the guarantee of Guarantor (the "Guarantee") delivered in connection with the Master Agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of the Master Agreement and the Guarantee, certificates and statements of public officials and officers of Party A and Guarantor and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Except as expressly set forth herein, no independent investigation (including, without limitation, conducting any review, search or investigation of any public files, records or dockets) has been undertaken to determine the existence or absence of the facts that are material to my opinions, and no inference as to my knowledge concerning such facts should be made.

When used herein the phrase "to my knowledge" means to my actual knowledge without independent investigation.

References in this letter to "Applicable Laws" are to those laws, rules and regulations of the State of New York and the United States of America which, in my experience, are normally applicable to transactions of the type contemplated by the Master Agreement and the Guarantee. References in this letter to "Governmental Authorities" are to executive, legislative, judicial, administrative or regulatory bodies of the State of New York and the United States of America. References in this letter to "Governmental Approval" are to any consent, approval, license, authorization or validation of, or filing, recording or registration with, any Governmental Authority pursuant to Applicable Laws.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1. Each of Party A and Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

2. The execution, delivery and performance of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, are within its corporate power, have been duly authorized by all necessary corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

# LEHMAN BROTHERS

3.    The Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, have been duly executed and delivered.

4.    To my knowledge, no Governmental Approval is required in connection with the execution, delivery and performance of the Master Agreement, in the case of Party A, or the Guarantee, in the case of Guarantor, except those that have been obtained and, to my knowledge, are in effect.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.    I am a member of the Bar of the [State of New York] [Commonwealth of Massachusetts] and render no opinion on any laws other than the laws of the State of New York, the federal laws of the United States of America and the General Corporation Law of the State of Delaware. I do not express any opinion with respect to any other laws.

B.    My opinions are limited to the present laws and to the facts as they presently exist, and no opinion is to be inferred or implied beyond the matters expressly so stated. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph A above be changed by legislative action, judicial decision or otherwise.

C.    This letter is rendered solely to you solely for your benefit in connection with the Master Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any other person, entity or agency or by you in any other context or for any other purpose. This letter may not be circulated, used or quoted in whole or in part, nor may copies hereof be furnished or delivered to any other person, without the prior written consent of Lehman Brothers Holdings Inc., except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you, (iii) pursuant to the order of any court of competent jurisdiction or any governmental agency and (iv) in connection with any legal action arising out of the Master Agreement or the Guarantee.

D.    I have assumed with your permission (i) the genuineness of all signatures by each party other than Party A or Guarantor, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, (iii) the accuracy of the matters set forth in the documents, agreements and instruments I reviewed, (iv) that each party other than Party A and Guarantor is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (v) the due execution and delivery, pursuant to due authorization, of the Master Agreement by each party other than Party A and (vi) that the Master Agreement is the legal, valid, binding and enforceable obligation of each party other than Party A, enforceable against each such party in accordance with its terms.

# LEHMAN BROTHERS

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal or other liability in connection with said opinions. By accepting and relying upon this opinion, each addressee hereof (i) acknowledges and agrees that the undersigned shall have no personal or other liability in connection herewith and (ii) agrees to not assert or raise any such claim against the undersigned in any proceeding or in any manner otherwise.

Very truly yours.

CREDIT SUPPORT ANNEX

to the Schedule to the
Master Agreement
(Multicurrency – Cross Border)

dated August 1, 2008

between

LEHMAN BROTHERS            and            ARLINGTON PARTNERS, L.P.
SPECIAL FINANCING INC.                    ("Party B")
("Party A")

## Paragraph 13. Elections and Variables

(a)   Security Interest for "Obligations".  The term "Obligations" as used in this Annex includes no additional obligations with respect to Party A and Party B.

(b)   Credit Support Obligations.

   (i)   Delivery Amount, Return Amount and Credit Support Amount.

      (A)   "Delivery Amount" will have the meaning specified in Paragraph 3(a).

      (B)   "Return Amount" will have the meaning specified in Paragraph 3(b).

      (C)   "Credit Support Amount" will have the meaning specified in Paragraph 3(b).

   (ii)   Eligible Collateral.  The following items will qualify as "Eligible Collateral":

|  | | *Remaining Maturity* | | |
| *ICAD Code* | *One (1) year or under* | *More than one (1) year up to and including five (5) years* | *More than five (5) years up to and including ten (10) years* | *More than ten (10) years* |
| --- | --- | --- | --- | --- |
| *US-CASH* | *100%* | *N/A* | *N/A* | *N/A* |
| *US-TBILL* | *99%* | *N/A* | *N/A* | *N/A* |
| *US-TNOTE* | *99%* | *98%* | *95%* | *N/A* |
| *US-TBOND* | *99%* | *98%* | *95%* | *95%* |
| *US-GNMA* | *98%* | *95%* | *93%* | *93%* |
| *US-FNMA* | *98%* | *95%* | *93%* | *93%* |
| *US-FHLMC* | *98%* | *95%* | *93%* | *93%* |

(iii)   Other Eligible Support. There shall be no "Other Eligible Support" for either party for purposes of this Annex.

(iv)    Thresholds.

(A)     "Independent Amount" shall not apply for purposes of this Annex.

(B)     "Threshold" means the amounts determined on the basis of the lower of the Long Term Debt Ratings set forth in the following table if such ratings are split, provided, however, that if (i) a party has no Long Term Debt Rating, or (ii) an Event of Default has occurred and is continuing with respect to such party, the Threshold shall be U.S. $0. The Threshold Amount with respect to Party A shall be determined by reference to the Long Term Debt Rating of Lehman Brothers Holdings Inc. The Threshold Amount with respect to Party B will be determined by reference to the Long Term Debt Rating of Federal Home Loan Mortgage Corporation ("Freddie Mac"), as the Credit Support Provider of Party B:

| LONG TERM DEBT RATING (S&P / Moody's/Fitch) | THRESHOLD Party B | THRESHOLD Party A |
|---|---|---|
| At or above A-/A3/A- | Infinity | Infinity |
| BBB+/Baa1/BBB+ | $1,000,000 | $1,000,000 |
| At or below BBB/Baa2/BBB | $0 | $0 |

As used herein:

"Long Term Debt Rating" means, with respect to a party, the public or private rating assigned by S&P, Moody's or Fitch to the extent the party is rated by such organization, to the long term, unsecured and unsubordinated indebtedness of such party, or, if applicable, the Credit Support Provider of such party. If a party has been assigned a private rating by S&P, Moody's or Fitch, such party is responsible to advise such private rating and any changes to such private rating to the other party and to provide any relevant credit reports to the other party.

"S&P" means Standard & Poor's Ratings Group.

"Moody's" means Moody's Investors Service, Inc.

"Fitch" means Fitch, Inc.

2

  (C) "Minimum Transfer Amount" means U.S.$75,000, provided, however, that if an Event of Default has occurred and is continuing with respect to a party, the Minimum Transfer Amount for such party shall be U.S.$0.

  (D) Rounding. The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of U.S.$10,000.

(c) Valuation and Timing.

  (i) "Valuation Agent" means, for the purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3 (or its Custodian), and, for the purposes of Paragraph 6(d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount (or its Custodian), as applicable, unless otherwise specified here: Valuation Agent shall be Party A.

  (ii) "Valuation Date" means any Local Business Day.

  (iii) "Valuation Time" means the close of business in the city of the Valuation Agent on the Valuation Date or date of calculation, as applicable;

  provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

  (iv) "Notification Time" means by 3:00 p.m., New York time, on a Local Business Day.

(d) Conditions Precedent and Secured Party's Rights and Remedies. The following Termination Event(s) will be a "Specified Condition" for each party (that party being the Affected Party if the Termination Event occurs with respect to that party) for the purposes of the Paragraphs specified below:

| | Paragraph 4(a) | Paragraph 6(c), 8(a) and (b) |
|---|---|---|
| Illegality | ☐ | ☐☐ |
| Tax Event | ☐ | ☐ |
| Tax Event Upon Merger | ☐ | ☐ |
| Credit Event Upon Merger | ☒ | ☒ |
| Additional Termination Event | ☒ | ☒ |

(e) Substitution.

  (i) "Substitution Date" has the meaning specified in Paragraph 4(d)(ii).

  (ii) Consent. Inapplicable.

(f)    Dispute Resolution.

(i) "Resolution Time" means 1:00 p.m., New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute under Paragraph 5.

(ii) Value. For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated as follows:

(A) with respect to any Collateral other than Cash (referred to herein as "Government Obligations"), the sum of (I) (x) the bid price quoted on such date by a mutually acceptable principal market maker for such Government Obligations, or (y) if no quotations are available from a principal market maker for such date, such bid price as of the day, next preceding such date, on which such quotations were available, in either case multiplied by the applicable Valuation Percentage, plus (II) the accrued interest on such Government Obligations (except to the extent Transferred pursuant to any applicable provision of this Agreement or included in the applicable price referred to in (I) of this clause (A)) as of such date multiplied by the Valuation Percentage set forth in Section (b)(ii) of this Paragraph 13 with respect to such Security.

(iii) Alternative. The provisions of Paragraph 5 will apply.

(g)    Holding and Using Posted Collateral.

(i) Eligibility to Hold Posted Collateral; Custodians. Party A will be entitled to hold Posted Collateral itself or through a Custodian pursuant to Paragraph 6(b), provided that the following conditions applicable to it are satisfied:

(1)    Party A is not a Defaulting Party

(2)    The Custodian if any, is a wholly owned, direct or indirect, subsidiary of Lehman Brothers Holdings Inc. or a bank or trust company located in the State of New York having total assets of at least USD 1 billion.

(ii) Eligibility to Hold Posted Collateral: Custodians. Party B may only hold Posted Collateral through a Custodian. In addition:

(1) The Custodian must be approved by the Credit Support Provider of Party B

(2) The Custodian shall initially be Wells Fargo Bank, N.A.

(iii) Use of Posted Collateral. The provisions of Paragraph 6(c) will apply.

(h)    Distributions and Interest Amount.

4

(i) <u>Interest Rate</u>. The Interest Rate will be the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

(ii) <u>Transfer of Interest Amount</u>. A notice confirming the Interest Amount due will be sent by the Secured Party to the Pledgor on the first Local Business Day of each calendar month. A Transfer of the Interest Amount will be made as soon as reasonably practicable after receipt by the Secured Party from the Pledgor of confirmation of the Interest Amount to be Transferred (and in any event no later than the following Local Business Day after receipt of confirmation).

(i)    <u>Additional Representations</u>.

None.

(j)    <u>Other Eligible Support and Other Posted Support</u>. Not Applicable.

(k)    <u>Demands and Notices</u>.

All demands, specifications and notices made by a party to this Annex will be made pursuant to the Notices Section of this Agreement unless otherwise notified from time to time.

(l)    <u>Addresses for Transfers</u>.

Party A:    (i)    In the case of cash, by wire transfer of immediately available funds for credit to a bank account of Party A to be designated in Party A's demand for the Delivery Amount or Return Amount, as applicable.

(ii)    In the case of securities or obligations that can be paid or delivered by book-entry on the records of U.S. Federal Reserve Banks, delivery to Chase, for credit to the account of Lehman Brothers Inc., as agent for Party A (in telegraphic abbreviation, CHASE NYC/LEHMAN, ABA #021000021).

Party B:    <u>Cash</u>: To be designated by Party B prior to the first Transfer of Eligible Collateral in accordance with the terms hereof.

<u>Eligible Collateral</u> (other than cash): To be designated by Party B prior to the first Transfer of Eligible Collateral in accordance with the terms hereof.

(m)    <u>Other Provisions</u>.

(i)    [RESERVED].

(ii)    [RESERVED]

5

(iii)  No Offset.  On any Valuation Date, if (i) each party is required to make a Transfer under Paragraph 3(a) and (ii) each party is required to make a Transfer under Paragraph 3(b), then the amounts of those obligations will not offset each other.

(iv)  This Credit Support Annex is a Security Agreement under the New York UCC.

(v)  Paragraph 12 is hereby amended by replacing the definition of "Interest Period" with the following:

"Interest Period" means the period from (and including) the first day of each calendar month to (and including) the last day of each calendar month."

Please confirm your agreement to the terms of the foregoing Credit Support Annex by signing below.

LEHMAN BROTHERS SPECIAL
FINANCING INC.

By:_____
Name:
Title: Robert E. Guglielmo
        Senior Vice President


ARLINGTON PARTNERS, L.P.

By:  JAN-TX IV, LLC, a Mississippi limited liability company, its General Partner


By:  _____
Name:  Rodney F. Triplett, Jr.
   Title:   Manager

6

(iii) No Offset. On any Valuation Date, if (i) each party is required to make a Transfer under Paragraph 3(a) and (ii) each party is required to make a Transfer under Paragraph 3(b), then the amounts of those obligations will not offset each other.

(iv) This Credit Support Annex is a Security Agreement under the New York UCC.

(v) Paragraph 12 is hereby amended by replacing the definition of "Interest Period" with the following:

"Interest Period" means the period from (and including) the first day of each calendar month to (and including) the last day of each calendar month."

Please confirm your agreement to the terms of the foregoing Credit Support Annex by signing below.

| LEHMAN BROTHERS SPECIAL FINANCING INC. | ARLINGTON PARTNERS, L.P. |
|---|---|
| | By:  JAN-TX IV, LLC, a Mississippi limited liability company, its General Partner |
| By:_____ | |
| Name: | By: _____ |
| Title:   Robert E. Guglielmo | Name: Rodney F. Triplett, Jr. |
| Senior Vice President | Title:   Manager |

6

(iii)  No Offset.  On any Valuation Date, if (i) each party is required to make a Transfer under Paragraph 3(a) and (ii) each party is required to make a Transfer under Paragraph 3(b), then the amounts of those obligations will not offset each other.

(iv)  This Credit Support Annex is a Security Agreement under the New York UCC.

(v)  Paragraph 12 is hereby amended by replacing the definition of "Interest Period" with the following:

"Interest Period" means the period from (and including) the first day of each calendar month to (and including) the last day of each calendar month."

Please confirm your agreement to the terms of the foregoing Credit Support Annex by signing below.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

**ARLINGTON PARTNERS, L.P.**

By:  JAN-TX IV, LLC, a Mississippi limited liability company, its General Partner

By:_____
Name:
Title:

By:  _____
Name:  J.H. Thames, Jr.
    Title:    Manager

# LEHMAN BROTHERS

**Transaction**

Date:          21 August, 2008

To:            Arlington Partners LP

From:          Lehman Brothers Special Financing Inc
               Transaction Management Group
               Facsimile     (1) 646-885-9551 (United States of America)
               Telephone     646 333 9539{Leila Arjune}

Global Id:     4012356

**SUBJECT: SWAP TRANSACTION**

---

Dear Sir or Madam:

The purpose of this communication is to set forth the terms and conditions of the swap transaction entered into on the Trade Date referred to below (the "Transaction") between Lehman Brothers Special Financing Inc. ("Party A") and Arlington Partners, L.P., ("Party B"). This communication constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 01 August, 2008, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in or incorporated by reference to, such Agreement shall govern this Confirmation except as expressly modified below.

Party A and Party B each represents that entering into this Transaction is authorized and does not violate any laws of its jurisdiction of organization or residence, or the terms of any agreement to which it is a party. Party A and Party B each represents that (i) it is not relying on the other party in connection with its decision to enter into this Transaction and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (ii) it understands the risks of this Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (iii) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into this Transaction is appropriate for such party in light of its financial capabilities and objectives.

This Confirmation incorporates the definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions"). In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern

The terms of the particular Transaction to which this communication relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 18 August, 2008 |
| Effective Date: | 22 August, 2008 |
| Termination Date: | 31 August, 2018, subject to adjustment in accordance with the Modified Following Business Day Convention |
| Notional Amount: | USD 14,000,000.00, which shall reduce on the dates and in the amounts (the "Reduction Amount") as set forth in Annex I hereto. |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Period End Dates: | The 1st calendar day of each month, from and including 01 September, 2008 to and including the Termination Date, subject to no adjustment. |
| Fixed Rate Payer Payment Dates: | The 1st calendar day of each month, from and including 01 September, 2008 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 3.355 % per annum |
| Fixed Rate Day Count Fraction: | 30/360 |

**Floating Amounts:**

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Floating Rate Period End Dates: | The 1st calendar day of each month, from and including 01 September, 2008 to and including the Termination Date, subject to no adjustment. |
| Floating Rate Payer Payment Dates: | The 1st calendar day of each month, from and including 01 September, 2008 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-SIFMA Municipal Swap Index |
| Designated Maturity: | Inapplicable |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/Actual |

| | |
|---|---|
| Reset Dates: | The Effective Date and each Thursday thereafter, up to and including the Thursday immediately preceding the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Method of Averaging: | Weighted Average |
| **Business Days:** | New York |

*1  Optional Partial Termination.*    Party B shall have the right to partially terminate this Transaction on September 1, 2010 in an amount not to exceed $400,000.00 without cost or any Settlement Amount due from either party upon 15 days written notice to Party A. If such optional partial termination is effected by Party B, the Notional Amount applicable to this Transaction as set forth in Annex I hereto shall be amended to reflect the amortization of the Revised Notional Amount. Such optional partial termination may be directed by Freddie Mac as Credit Support Provider of Party B.

**Miscellaneous:**

| | |
|---|---|
| **Calculation Agent:** | Party A, or as specified in the Swap Agreement |
| **Business Days:** | New York |
| **Credit Support Document:** | With respect to Party A, the Guarantee of Lehman Brothers Holdings Inc. provided by Party A. |
| | With respect to Party B, the Swap Credit Enhancement Agreement of Federal Home Loan Mortgage Corporation. |
| | With respect to Party A and Party B, the Credit Support Annex entered into between Party A and Party B as of even date hereof.. |

**Account details:**

| | |
|---|---|
| Account for payment to Party A in: | JPMorgan Chase Bank ABA # 021000021, A/C of Lehman Brothers Special Financing Inc, A/C # 066-143543 |
| Account for Payment to Party B in: | Bank:      Wells Fargo Bank, N.A.<br>ABA No.:     121000248<br>Beneficiary:  Wells Fargo Bank, N.A. Collection Clearing Account<br>Acct No.:    4121384010<br>Ref:      Addison Park Apartments, FM Loan No.: 504169785 |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                          Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**   **Arlington Partners, L.P.,**

By: _Anatoly Kozlov_                      By: _____
Name: Anatoly Kozlov                      Name:
Title:  Authorized Signatory               Title:

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                              Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**    **Arlington Partners, L.P.,**

                                              By: JAN-TX IV, LLC, a Mississippi limited
                                              liability company, its General Partner


                                              By:  _____
                                              Name: J.H. Thames, Jr.
                                              Title: Manager

Global Deal ID: 4012356

Page 4 of 11

ANNEX I
to Confirmation, dated August 19, 2008,
between Lehman Brothers Special Financing Inc.
and
Arlington Partners, L.P.,

| Reduction Date | Revised Notional Amount | Notional Amount Reduction |
| --- | --- | --- |
| 10/1/2008 | $13,987,358.86 | $12,641.14 |
| 11/1/2008 | $13,974,666.26 | $12,692.60 |
| 12/1/2008 | $13,961,921.99 | $12,744.27 |
| 1/1/2009 | $13,949,125.84 | $12,796.15 |
| 2/1/2009 | $13,936,277.60 | $12,848.24 |
| 3/1/2009 | $13,923,377.06 | $12,900.54 |
| 4/1/2009 | $13,910,424.00 | $12,953.06 |
| 5/1/2009 | $13,897,418.21 | $13,005.79 |
| 6/1/2009 | $13,884,359.48 | $13,058.73 |
| 7/1/2009 | $13,871,247.59 | $13,111.89 |
| 8/1/2009 | $13,858,082.32 | $13,165.27 |
| 9/1/2009 | $13,844,863.46 | $13,218.86 |
| 10/1/2009 | $13,831,590.79 | $13,272.67 |
| 11/1/2009 | $13,818,264.09 | $13,326.70 |
| 12/1/2009 | $13,804,883.14 | $13,380.95 |
| 1/1/2010 | $13,791,447.71 | $13,435.43 |
| 2/1/2010 | $13,777,957.59 | $13,490.12 |
| 3/1/2010 | $13,764,412.55 | $13,545.04 |
| 4/1/2010 | $13,750,812.37 | $13,600.18 |
| 5/1/2010 | $13,737,156.83 | $13,655.54 |
| 6/1/2010 | $13,723,445.70 | $13,711.13 |
| 7/1/2010 | $13,709,678.76 | $13,766.94 |
| 8/1/2010 | $13,695,855.77 | $13,822.99 |
| 9/1/2010 | $13,681,976.51 | $13,879.26 |
| 10/1/2010 | $13,668,040.75 | $13,935.76 |
| 11/1/2010 | $13,654,048.26 | $13,992.49 |
| 12/1/2010 | $13,639,998.81 | $14,049.45 |
| 1/1/2011 | $13,625,892.17 | $14,106.64 |
| 2/1/2011 | $13,611,728.10 | $14,164.07 |
| 3/1/2011 | $13,597,506.37 | $14,221.73 |
| 4/1/2011 | $13,583,226.75 | $14,279.62 |
| 5/1/2011 | $13,568,889.00 | $14,337.75 |
| 6/1/2011 | $13,554,492.88 | $14,396.12 |

| Reduction Date | Revised Notional Amount | Notional Amount Reduction |
|---|---|---|
| 7/1/2011 | $13,540,038.16 | $14,454.72 |
| 8/1/2011 | $13,525,524.59 | $14,513.57 |
| 9/1/2011 | $13,510,951.94 | $14,572.65 |
| 10/1/2011 | $13,496,319.97 | $14,631.97 |
| 11/1/2011 | $13,481,628.43 | $14,691.54 |
| 12/1/2011 | $13,466,877.09 | $14,751.34 |
| 1/1/2012 | $13,452,065.70 | $14,811.39 |
| 2/1/2012 | $13,437,194.01 | $14,871.69 |
| 3/1/2012 | $13,422,261.78 | $14,932.23 |
| 4/1/2012 | $13,407,268.77 | $14,993.01 |
| 5/1/2012 | $13,392,214.72 | $15,054.05 |
| 6/1/2012 | $13,377,099.39 | $15,115.33 |
| 7/1/2012 | $13,361,922.53 | $15,176.86 |
| 8/1/2012 | $13,346,683.88 | $15,238.65 |
| 9/1/2012 | $13,331,383.20 | $15,300.68 |
| 10/1/2012 | $13,316,020.23 | $15,362.97 |
| 11/1/2012 | $13,300,594.72 | $15,425.51 |
| 12/1/2012 | $13,285,106.42 | $15,488.30 |
| 1/1/2013 | $13,269,555.07 | $15,551.35 |
| 2/1/2013 | $13,253,940.41 | $15,614.66 |
| 3/1/2013 | $13,238,262.19 | $15,678.22 |
| 4/1/2013 | $13,222,520.14 | $15,742.05 |
| 5/1/2013 | $13,206,714.01 | $15,806.13 |
| 6/1/2013 | $13,190,843.54 | $15,870.47 |
| 7/1/2013 | $13,174,908.46 | $15,935.08 |
| 8/1/2013 | $13,158,908.51 | $15,999.95 |
| 9/1/2013 | $13,142,843.43 | $16,065.08 |
| 10/1/2013 | $13,126,712.95 | $16,130.48 |
| 11/1/2013 | $13,110,516.81 | $16,196.14 |
| 12/1/2013 | $13,094,254.73 | $16,262.08 |
| 1/1/2014 | $13,077,926.45 | $16,328.28 |
| 2/1/2014 | $13,061,531.70 | $16,394.75 |
| 3/1/2014 | $13,045,070.21 | $16,461.49 |
| 4/1/2014 | $13,028,541.71 | $16,528.50 |

| Reduction Date | Revised Notional Amount | Notional Amount Reduction |
|---|---|---|
| 5/1/2014 | $13,011,945.93 | $16,595.78 |
| 6/1/2014 | $12,995,282.59 | $16,663.34 |
| 7/1/2014 | $12,978,551.41 | $16,731.18 |
| 8/1/2014 | $12,961,752.13 | $16,799.28 |
| 9/1/2014 | $12,944,884.46 | $16,867.67 |
| 10/1/2014 | $12,927,948.12 | $16,936.34 |
| 11/1/2014 | $12,910,942.84 | $17,005.28 |
| 12/1/2014 | $12,893,868.33 | $17,074.51 |
| 1/1/2015 | $12,876,724.31 | $17,144.02 |
| 2/1/2015 | $12,859,510.50 | $17,213.81 |
| 3/1/2015 | $12,842,226.62 | $17,283.88 |
| 4/1/2015 | $12,824,872.38 | $17,354.24 |
| 5/1/2015 | $12,807,447.49 | $17,424.89 |
| 6/1/2015 | $12,789,951.67 | $17,495.82 |
| 7/1/2015 | $12,772,384.63 | $17,567.04 |
| 8/1/2015 | $12,754,746.07 | $17,638.56 |
| 9/1/2015 | $12,737,035.71 | $17,710.36 |
| 10/1/2015 | $12,719,253.25 | $17,782.46 |
| 11/1/2015 | $12,701,398.41 | $17,854.84 |
| 12/1/2015 | $12,683,470.88 | $17,927.53 |
| 1/1/2016 | $12,665,470.37 | $18,000.51 |
| 2/1/2016 | $12,647,396.58 | $18,073.79 |
| 3/1/2016 | $12,629,249.22 | $18,147.36 |
| 4/1/2016 | $12,611,027.98 | $18,221.24 |
| 5/1/2016 | $12,592,732.57 | $18,295.41 |
| 6/1/2016 | $12,574,362.68 | $18,369.89 |
| 7/1/2016 | $12,555,918.01 | $18,444.67 |
| 8/1/2016 | $12,537,398.26 | $18,519.75 |
| 9/1/2016 | $12,518,803.11 | $18,595.15 |
| 10/1/2016 | $12,500,132.27 | $18,670.84 |
| 11/1/2016 | $12,481,385.42 | $18,746.85 |
| 12/1/2016 | $12,462,562.26 | $18,823.16 |
| 1/1/2017 | $12,443,662.47 | $18,899.79 |
| 2/1/2017 | $12,424,685.74 | $18,976.73 |

| Reduction Date | Revised Notional Amount | Notional Amount Reduction |
|---|---|---|
| 3/1/2017 | $12,405,631.76 | $19,053.98 |
| 4/1/2017 | $12,386,500.21 | $19,131.55 |
| 5/1/2017 | $12,367,290.78 | $19,209.43 |
| 6/1/2017 | $12,348,003.16 | $19,287.62 |
| 7/1/2017 | $12,328,637.02 | $19,366.14 |
| 8/1/2017 | $12,309,192.04 | $19,444.98 |
| 9/1/2017 | $12,289,667.90 | $19,524.14 |
| 10/1/2017 | $12,270,064.29 | $19,603.61 |
| 11/1/2017 | $12,250,380.87 | $19,683.42 |
| 12/1/2017 | $12,230,617.32 | $19,763.55 |
| 1/1/2018 | $12,210,773.32 | $19,844.00 |
| 2/1/2018 | $12,190,848.54 | $19,924.78 |
| 3/1/2018 | $12,170,842.65 | $20,005.89 |
| 4/1/2018 | $12,150,755.32 | $20,087.33 |
| 5/1/2018 | $12,130,586.22 | $20,169.10 |
| 6/1/2018 | $12,110,335.01 | $20,251.21 |
| 7/1/2018 | $12,090,001.36 | $20,333.65 |
| 8/1/2018 | $12,069,584.94 | $20,416.42 |

EXECUTION COPY

Freddie Mac Loan No.: 504172522

## SWAP
## CREDIT ENHANCEMENT AGREEMENT

between

## FEDERAL HOME LOAN MORTGAGE CORPORATION

and

## LEHMAN BROTHERS SPECIAL FINANCING INC.

Relating to an

**ISDA Master Agreement dated as of August 1, 2008
between Arlington Partners, L.P.
and Lehman Brothers Special Financing Inc.**

**Dated as of August 1, 2008**

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

Section 1.1    Definitions................................................................................................ 2

Section 1.2    Interpretation........................................................................................... 5

## ARTICLE II
## REPRESENTATIONS

Section 2.1    Representations by Freddie Mac............................................................ 5

## ARTICLE III
## CREDIT ENHANCEMENT

Section 3.1    Credit Enhancement Payments ............................................................. 6

Section 3.2    Nature of the Swap Provider's Rights ................................................... 7

Section 3.3    Freddie Mac Not Liable to Owner ........................................................ 8

Section 3.4    Early Termination of Swap Agreement ................................................. 8

## ARTICLE IV
## COVENANTS

Section 4.1    Annual Reports ..................................................................................... 8

Section 4.2    Amendment of Documents .................................................................... 8

Section 4.3    Replacement of Servicer ....................................................................... 8

Section 4.4    Acknowledgement of the Owner's Assignment of Interest Under the
Swap Agreement .................................................................................... 8

## ARTICLE V
## DEFAULT AND REMEDIES

Section 5.1    Credit Enhancement Events of Default.................................................. 9

Section 5.2    Remedies of the Swap Provider............................................................. 9

Section 5.3    Remedies Not Exclusive ..................................................................... 10

Section 5.4    Restoration of Rights and Remedies..................................................... 10

## ARTICLE VI
## MISCELLANEOUS PROVISIONS

Section 6.1    Amendment.......................................................................................... 10

Section 6.2    No Individual Liability ....................................................................... 10

Section 6.3    Notices ................................................................................................ 10

Section 6.4    Governing Law .................................................................................... 12

Section 6.5    Severability ......................................................................................... 12

Section 6.6    Multiple Counterparts ......................................................................... 12

Section 6.7    Assignment ......................................................................................... 12

Section 6.8        Subrogation ................................................................................................. 12
Exhibit A-1       Form of Swap Default Notice
Exhibit A-2       Form of Deficiency Notice

## SWAP CREDIT ENHANCEMENT AGREEMENT

**THIS SWAP CREDIT ENHANCEMENT AGREEMENT** ("Agreement"), is made and entered into as of August 1, 2008 by and between the **FEDERAL HOME LOAN MORTGAGE CORPORATION** ("Freddie Mac"), a shareholder-owned government-sponsored enterprise organized and existing under the laws of the United States of America and **LEHMAN BROTHERS SPECIAL FINANCING, INC.** (the "Swap Provider"), a Delaware corporation. (Capitalized terms used herein shall have the meanings assigned in Article I unless otherwise indicated.)

### WITNESSETH:

**WHEREAS,** The Texas Department of Housing and Community Affairs (the "Issuer") has previously authorized the issuance of its Variable Rate Demand Multifamily Housing Revenue Refunding Bonds (Addison Park Apartments) Series 2008 (the "Bonds") to finance a multifamily rental housing project located in Arlington, Texas and known as Addison Park Apartments (the "Project"); and

**WHEREAS,** the principal of and interest on the Bonds will be payable from the payments received by the Trustee related to the mortgage loan that provided financing for the Project (the "Bond Mortgage Loan") and from moneys, securities and certain investment earnings thereon held in certain funds and accounts under the indenture that secures the Bonds (the "Indenture"); and

**WHEREAS,** so long as a Variable Rate (as defined in the Indenture) is in effect with respect to the Bonds, the rate of interest borne by the Bonds will be subject to change and the Bond Mortgage Loan that was funded with the proceeds of the Bonds includes an interest component that, at all times, will equal and change with, the interest rate on the Bonds; and

**WHEREAS,** in order to make its underwriting of the Bond Mortgage Loan feasible and provide protection for changes in interest rate under the Bond Mortgage Loan, Freddie Mac permitted the Owner to enter into a floating to fixed interest rate swap transaction pursuant to the Swap Agreement with the Swap Provider in order to provide interest rate protection for amounts due under the Bond Mortgage Loan on and after the Swap Effective Date; and

**WHEREAS,** the Swap Provider conditioned its execution and delivery of the Swap Agreement on the Owner's provision of credit enhancement for the obligations of the Owner thereunder; and

**WHEREAS,** Freddie Mac is willing to provide its credit enhancement for the Swap Agreement in order to facilitate the financing of the Bond Mortgage Loan provided that the Reimbursement Agreement requires the reimbursement of payments made by Freddie Mac hereunder and that the Owner's obligations under the Reimbursement Agreement be secured by a mortgage on the Project for the benefit of Freddie Mac;

**NOW, THEREFORE,** in consideration of the mutual agreements set forth herein, the fees to be paid to Freddie Mac, and other good and valuable consideration, the receipt and

sufficiency of which is hereby acknowledged, Freddie Mac and the Swap Provider do hereby agree as follows:

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

**Section 1.1    Definitions.**  Unless otherwise expressly provided in this Agreement or unless the context clearly requires otherwise, the following terms shall have the respective meanings set forth below for all purposes of this Agreement.

"*Act of Bankruptcy*" means any proceeding instituted under the Bankruptcy Code by or against the Owner, or any general partner thereof.

"*Agreement*" means this Swap Credit Enhancement Agreement, as amended or supplemented from time to time.

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy" as now and hereafter in effect, or any successor statute.

"*Bond Mortgage Loan*" means the loan made to the Owner to finance the Project.

"*Business Day*" means any day other than (i) a Saturday, (ii) a Sunday, (iii) a day on which the Federal Reserve Bank of New York (or other agent acting as Freddie Mac's fiscal agent) is authorized or obligated by law or executive order to remain closed, (iv) a day on which the permanent home office of Freddie Mac is closed or (v) a day on which (a) banking institutions in the City of New York, the city in which the Principal Office of the Trustee or the city in which the permanent home office of Freddie Mac is located are closed or are authorized to be closed or (b) the New York Stock Exchange is closed.

"*Calculation Agent*"  means the Swap Provider, provided that upon any "Event of Default" by the Swap Provider under the Swap Agreement, the Calculation Agent shall be such other party as is appointed by the Owner with the prior written consent of Freddie Mac.

"*Calculation Period*" means, with respect to any Payment Date, the "Calculation Period," as provided in the Confirmation, relating to such Payment Date.

"*Confirmation*" means the confirmation of the Swap, as such confirmation may be amended, modified or supplemented from time to time.

"*Credit Enhancement Event of Default*" means the occurrence of an event of default as described in Section 5.1.

"*Deficiency Notice*" means any notice in the form of Exhibit A-2 hereto delivered by the Swap Provider to Freddie Mac pursuant to Section 3.1(a)(ii).

"*Freddie Mac*" means the Federal Home Loan Mortgage Corporation, a shareholder-owned government-sponsored enterprise organized and existing under the laws of the United States of America, and its successors and assigns.

"*Guide*" means the Freddie Mac Multifamily Seller/Servicer Guide, as the same may be amended, modified or supplemented from time to time.

"*Indenture*" means that certain Trust Indenture dated as of August 1, 2008 between the Issuer and the Trustee pursuant to which the Bonds are issued and secured.

"*Notional Amount*" means the notional amount set forth in the Confirmation, as such amount may decrease over time, for purposes of calculating the amount of the Owner's Fixed Rate Swap Payment Obligation and the Swap Provider's Floating Rate Swap Payment Obligation for each Calculation Period.

"*Owner*" means Arlington Partners, L.P., and any permitted successor to or transferee or assignee of the rights and obligations of any of the foregoing under the Reimbursement Agreement.

"*Owner's Fixed Rate Swap Payment Obligation*" means, with respect to any Calculation Period, the gross amount required to be paid by the Owner under the Swap Agreement on the applicable Payment Date, as the fixed amount provided for in, and determined in accordance with, the Swap Agreement.

"*Owner's Net Amount Due*" means, with respect to any Payment Date, the net amount due from the Owner to the Swap Provider for the applicable Calculation Period if the amount of the Owner's Fixed Rate Swap Payment Obligation for the applicable Calculation Period exceeds the Swap Provider's Floating Rate Swap Payment Obligation for the same Calculation Period.

"*Payment Date*" means, with respect to the Swap, following the Swap Effective Date a) each date on which (1) a Required Swap Payment is due from the Owner to the Swap Provider in accordance with the Swap Agreement if the Owner's Fixed Rate Swap Payment Obligation for the applicable Calculation Period exceeds the Swap Provider's Floating Rate Swap Payment Obligation for the same Calculation Period or (2) a payment is due from the Swap Provider to the Servicer for remittance to the Owner in accordance with the Swap Agreement if the Swap Provider's Floating Rate Swap Payment Obligation for the applicable Calculation Period exceeds the Owner's Fixed Rate Swap Payment Obligation for the same Calculation Period and (b) the date on which a Swap Termination Payment is due from the Owner to the Swap Provider, or from the Swap Provider to the Servicer for remittance to the Owner, in accordance with the Swap Agreement.

"*Reimbursement Agreement*" means the Reimbursement and Security Agreement, dated as of August 1, 2008, between Freddie Mac and the Owner, as amended or supplemented from time to time.

"*Required Freddie Mac Payment*" means a payment required to be made by Freddie Mac to the Swap Provider under Section 3.1(a)(i) of this Agreement upon Freddie Mac's receipt of a

Swap Payment Default Notice or under Section 3.1(a)(ii) of this Agreement upon Freddie Mac's receipt of a Deficiency Notice.

"*Required Swap Payment*" means, with respect to a Payment Date, (a) the monthly payment of the Owner's Net Amount Due required to be made by the Owner to the Servicer, for remittance to the Swap Provider, which payment under the Swap Agreement is due and payable to the Swap Provider, (b) the Swap Termination Payment required to be made by the Owner to the Servicer, for remittance to the Swap Provider, under the Swap Agreement upon the occurrence of a Swap Termination Event, which payment under the Swap Agreement is due and payable to the Swap Provider and (c) the accrued interest, if any, due with respect to any payment described in clause (a) or clause (b) above from the Payment Date to the date of payment.

"*Servicer*" means Wells Fargo Multifamily Capital.

"*Swap*" means the Owner's fixed rate to floating rate interest rate swap with the Swap Provider, based on the Notional Amount, evidenced and documented by the Swap Agreement, including the Confirmation.

"*Swap Agreement*" means the ISDA Master Agreement, dated as of August 1, 2008 between the Owner and the Swap Provider relating to the Swap, including any applicable schedules, confirmations and credit support annex, as the same may be amended, modified or supplemented at any time and from time to time.

"*Swap Effective Date*" means the date on which the payment obligations (including swap termination payment obligations) under the Swap Agreement will become effective.

"*Swap Expiration Date*" means the last "Scheduled Payment Date," as provided in the Swap Agreement.

"*Swap Payment Default Notice*" means, with respect to any Required Swap Payment due to the Swap Provider, on a Payment Date, notice (by facsimile transmission and confirmed overnight delivery service) by the Swap Provider to Freddie Mac substantially in the form attached hereto as Exhibit A-1.

"*Swap Provider*" means Lehman Brothers Special Financing Inc., a corporation organized and existing under the laws of the State of Delaware, the counterparty to the Owner under the Swap Agreement.

"*Swap Provider's Floating Rate Swap Payment Obligation*" means, with respect to any Calculation Period, the gross amount required to be paid by the Swap Provider under the Swap Agreement on the applicable Payment Date as the floating amount provided for in, and determined in accordance with, the Swap Agreement.

"*Swap Termination Date*" means the date under the Swap Agreement on which the Swap will terminate as a result of the occurrence of a Swap Termination Event.

"*Swap Termination Event*" means any "Event of Default" or "Termination Event" set forth in the Swap Agreement.

"*Swap Termination Payment*" means any payment required to be made by the Owner under the Swap Agreement upon the occurrence of a Swap Termination Event.

"*Termination Date*" means, subject to Section 3.1(c) of this Agreement, the first to occur of the (a) Swap Expiration Date or (b) Swap Termination Date.

"*Trustee*" means Wells Fargo Bank, National Association and its successors and any other corporation or association resulting from or surviving any consolidation or merger to which it or its successors may be a party and any successor trustee at any time serving as successor trustee under the Indenture.

**Section 1.2    Interpretation**. In this Agreement, unless the context otherwise requires, words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include partnerships, corporations and associations, including public bodies, as well as natural persons. The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in this Agreement, refer to this Agreement. Any reference in this Agreement to an "Exhibit", a "Section", a "Subsection", a "Paragraph" or a "subparagraph" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Agreement, a section of this Agreement, a subsection of the section of this Agreement in which the reference appears, a paragraph of the subsection within this Agreement in which the reference appears, or a subparagraph of the paragraph within which the reference appears. All Exhibits attached to or referred to in this Agreement are incorporated by reference into this Agreement.

## ARTICLE II

## REPRESENTATIONS

**Section 2.1    Representations by Freddie Mac**. Freddie Mac represents and warrants that:

(a)    It is a shareholder-owned government-sponsored enterprise organized and existing under the laws of the United States, and has full power and authority to execute, deliver and perform its obligations under this Agreement.

(b)    The making and performance of this Agreement by Freddie Mac have been duly authorized by all necessary corporate and other action. This Agreement is a valid and binding obligation of Freddie Mac, enforceable against it in accordance with its terms except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other similar laws affecting the enforcement of creditors' rights generally or by general equitable principles. Neither the consummation of the transactions contemplated hereby nor the fulfillment of or compliance with the terms and conditions of this Agreement by Freddie Mac conflicts with, results in a breach of, or is a

default under, in any material respect, any of the terms, conditions or provisions of any legal restriction or any or instrument to which Freddie Mac is now a party or by which Freddie Mac is bound, or constitutes a violation of any law regulating the affairs of Freddie Mac or internal governing documents of Freddie Mac, and will not result in the creation of any prohibited encumbrance upon any of its assets.

## ARTICLE III

## CREDIT ENHANCEMENT

**Section 3.1    Credit Enhancement Payments.**

(a)(i)    If a Required Swap Payment is not received by the Swap Provider by 3:00 p.m., Washington, D.C. time, on the Business Day immediately following the applicable Payment Date, the Swap Provider may give a Swap Payment Default Notice in the form of *Exhibit A-1* to Freddie Mac.  The Swap Payment Default Notice may be given no later than 4:00 p.m., Washington, D.C. time, on any Business Day following the Payment Date.  If a Swap Payment Default Notice is given at any time on a day that is not a Business Day or is given later than 4:00 p.m., Washington D.C. time on any Business Day, the Swap Payment Default Notice shall be deemed effective on the next succeeding Business Day.  Upon receipt of a Swap Payment Default Notice, Freddie Mac shall, not later than the third (3rd) Business Day following the date on which Freddie Mac receives the Swap Payment Default Notice, pay or cause to be paid to the Swap Provider, as a Required Freddie Mac Payment, an amount equal to the insufficiency referenced in the Swap Payment Default Notice, such amount being equal to the sum of (a) the difference between (1) the amount of the Required Swap Payment that was to have been received by the Swap Provider on the Payment Date and which has not been received and (2) the amount actually received by the Swap Provider from the Owner, if any, for application to satisfy such Required Swap Payment and (b) the difference between (1) the interest, if any, required to be paid by the Owner to the Swap Provider under the Swap Agreement from the Payment Date to the date of payment and (2) the amount received by the Swap Provider from the Owner, if any, for application to satisfy its obligation to pay such interest.  No amount shall be deemed payable under clause (b) above until the Swap Provider notifies Freddie Mac of such amount; provided that Freddie Mac shall have the right in good faith to verify the amount due to the Swap Provider.  Freddie Mac shall, upon each receipt of a Swap Payment Default Notice relating to a Required Swap Payment arising on or before the Termination Date, as and to the extent provided in this Section 3.1(a)(i), make the Required Freddie Mac Payment to the Swap Provider, provided that if the Termination Date occurs after a Required Swap Payment is owed but prior to the delivery of a Swap Payment Default Notice, then either (x) the applicable Swap Payment Default Notice or (y) a written notice from the Swap Provider that it is using all reasonable efforts to deliver such Swap Payment Default Notice, must be received by Freddie Mac within forty-five (45) days of the first Payment Date that would have occurred following the Termination Date.

(ii)    If all or any portion of a Required Swap Payment is recovered from the Swap Provider, in whole or in part, pursuant to Sections 544, 547, 549 or 550 of the United States Bankruptcy Code or under the banking laws of the United States in any proceeding instituted thereunder by or against the Owner making such payment, the Swap Provider may deliver by

facsimile transmission, confirmed by overnight delivery service, a Deficiency Notice, in the form set forth in *Exhibit A-2* hereto, with respect to such recovery to Freddie Mac. Freddie Mac shall pay to the Swap Provider, within three (3) Business Days after receiving such Deficiency Notice, a Required Freddie Mac Payment in an amount equal to the amount of such recovery. If the Servicer is prevented from remitting to the Swap Provider all or any portion of a Required Swap Payment, as a result of an automatic stay imposed by the Bankruptcy Court under Section 362 of the United States Bankruptcy Code in a proceeding by or against the Owner making such payment, the Swap Provider may deliver by facsimile transmission, confirmed by overnight delivery service, a Deficiency Notice, in the form set forth in *Exhibit A-2* hereto, with respect to such stayed payment to Freddie Mac. Freddie Mac shall pay to the Swap Provider, within three (3) Business Days after receiving such Deficiency Notice, a Required Freddie Mac Payment in an amount equal to such stayed payment. Nothing contained in this Section 3.1(a)(ii) shall (i) preclude Freddie Mac from contesting, directly or indirectly, in any such proceeding, any such attempted recovery or stay or from seeking to lift or modify the automatic stay or (ii) relieve Freddie Mac of its obligations to pay under this Agreement.

(b)    Payments required to be made pursuant to this Agreement shall be made from any source legally available to Freddie Mac. The obligations of Freddie Mac to make payment pursuant to this Agreement to the Swap Provider upon the proper presentation of documents that conform strictly to the terms and conditions of this Agreement are irrevocable. If Freddie Mac does not make a payment pursuant to this Agreement due to the presentation of nonconforming documentation, Freddie Mac shall provide the Swap Provider prompt written notice of the delivery of any nonconforming documentation.

(c)    This Agreement shall become effective upon its execution and delivery by Freddie Mac and the Swap Provider and shall cease to be in effect on the Termination Date.. Notwithstanding the foregoing, this Agreement shall continue beyond the Termination Date solely with respect to (i) Freddie Mac's obligations under Section 3.1(a)(i) with respect to any payment to be made by the Owner on or prior to the Termination Date and any Swap Termination Payment, and (ii) Freddie Mac's obligations under Section 3.1(a)(ii) with respect to any payment made by the Owner on or prior to the Termination Date and within ninety-one (91) days prior to an Act of Bankruptcy until the earlier of the date on which Freddie Mac shall have paid to the Swap Provider the amount recovered or the date on which all applicable statutes of limitations shall have expired without a claim having been filed (or if any claim shall have been filed prior to such expiration, the later of the date on which such claim has been denied with prejudice by a final order which is no longer subject to appeal or the date on which such claim has been paid by Freddie Mac). Notwithstanding any of the above, all obligations of Freddie Mac hereunder shall terminate 100 days following the Termination Date, provided that the Swap Provider has not received notice that an Act of Bankruptcy has occurred.

**Section 3.2    Nature of the Swap Provider's Rights**. The right of the Swap Provider to receive payments from Freddie Mac pursuant to Section 3.1 shall not be diminished by any rights of set-off, recoupment or counterclaim Freddie Mac might otherwise have against the Swap Provider, the Owner or any other person.

**Section 3.3    Freddie Mac Not Liable to Owner.** Freddie Mac shall have no liability to the Owner by reason of any actions taken by Freddie Mac under or pursuant to this Agreement.

**Section 3.4    Early Termination of Swap Agreement.** The Swap Provider agrees that so long as no Credit Enhancement Event of Default hereunder shall have occurred and be continuing, the Swap Provider shall not accept a direction by the Owner, or otherwise voluntarily agree with the Owner, to terminate the Swap Agreement in whole or in part without the prior written consent of Freddie Mac, in its sole discretion; provided that the foregoing shall not in any way qualify or limit the Swap Provider's rights set forth in the Swap Agreement to terminate the Swap Agreement strictly in accordance with its terms where the Owner is the Affected Party or the Defaulted Party.

## ARTICLE IV

## COVENANTS

**Section 4.1    Annual Reports.** Freddie Mac registered its common stock with the U.S. Securities and Exchange Commission (the "SEC") under the Securities Exchange Act of 1934 (the "Exchange Act"), effective July 18, 2008. As a result, Freddie Mac files annual, quarterly and current reports, proxy statements and other information with the SEC. Any document that Freddie Mac files with the SEC may be read and copied at the SEC's public reference room at 100 F Street, N.E., Washington, D.C. 20549. These SEC filings are also available to the public from the SEC's web site at *http://www.sec.gov*.

**Section 4.2    Amendment of Documents.** So long as no Credit Enhancement Event of Default hereunder shall have occurred and be continuing, the Swap Provider shall not amend or modify, or consent to any amendment or modification of, the Swap Agreement without the prior written consent of Freddie Mac.

**Section 4.3    Replacement of Servicer.** Freddie Mac has appointed the Servicer pursuant to the Guide and the terms and conditions of that certain commitment letter dated August 22, 2008, as amended, between Freddie Mac and the Servicer (the "Commitment"). The Swap Provider acknowledges that, if the Servicer shall fail to service the Bond Mortgage Loan and this Agreement in accordance with the Guide and the Commitment, Freddie Mac shall have the right to terminate the Servicer's servicing of the Mortgage Loan and this Agreement and to transfer the servicing of the Bond Mortgage Loan and this Agreement to a successor servicer in accordance with the Guide. Freddie Mac shall promptly notify the Swap Provider of any such transfer of servicing and the identity of any such successor servicer.

**Section 4.4    Acknowledgement of the Owner's Assignment of Interest Under the Swap Agreement.** The Swap Provider hereby acknowledges that the Owner, pursuant to the Reimbursement Agreement, will collaterally assign all of its right, title and interest in and to the Swap Agreement to Freddie Mac, as security for the satisfaction of obligations of Owner under the Reimbursement Agreement. The Swap Provider hereby agrees that if the amount of the Swap Provider's Floating Rate Swap Payment Obligation for the applicable Calculation Period exceeds the Owner's Fixed Rate Swap Payment Obligation for the applicable Calculation Period,

the Swap Provider will pay said amount to the Servicer, or as otherwise may be directed by Freddie Mac. The Swap Provider waives any rights of set-off, recoupment or counterclaim with respect to the payment of such amount that the Swap Provider might otherwise have against Freddie Mac, the Owner or any other person.

## ARTICLE V

## DEFAULT AND REMEDIES

**Section 5.1    Credit Enhancement Events of Default.**    Any one or more of the following acts or occurrences shall constitute a Credit Enhancement Event of Default hereunder:

(a)    Failure by Freddie Mac to pay any amounts due under Section 3.1 when due;

(b)    Failure by Freddie Mac to perform or observe any of its covenants, agreements or obligations hereunder, except a failure described in (a) above, if the same shall remain uncured for a period of forty-five (45) days after written notice of such failure shall have been given by the Swap Provider to Freddie Mac; provided, however, that if such default is curable but requires acts to be done or conditions to be remedied which, by their nature, cannot be done or remedied within such 45-day period, no Credit Enhancement Event of Default shall be deemed to have occurred if Freddie Mac shall commence such acts or remedies within such 45-day period and thereafter, in the opinion of the Swap Provider, diligently pursue the same to completion; or

(c)    any governmental authority shall take over the operations of Freddie Mac, or require Freddie Mac to suspend its operations for more than three (3) Business Days (unless such requirement is applicable to financial institutions generally in the Commonwealth of Virginia or in the United States), or require the sale or transfer of all or substantially all of the assets of Freddie Mac.

**Section 5.2    Remedies of the Swap Provider.**    Upon the occurrence and continuance of any Credit Enhancement Event of Default by Freddie Mac hereunder, unless such Credit Enhancement Event of Default has been cured, the Swap Provider may take any one or more of the following steps, at its option:

(1)    by action at law or in equity, require Freddie Mac to perform its covenants and obligations hereunder, or enjoin any acts which may be unlawful or in violation of the rights of the Swap Provider; and

(2)    take whatever other action at law or in equity may appear necessary or desirable to enforce any monetary obligation of Freddie Mac hereunder, or to enforce any other obligations, covenant or agreement of Freddie Mac hereunder.

The above provisions are subject to the condition that if, upon or after the occurrence of any Credit Enhancement Event of Default hereunder, all amounts which would then be payable

hereunder by Freddie Mac if such Credit Enhancement Event of Default had not occurred and were not continuing, shall have been paid by or on behalf of Freddie Mac, and Freddie Mac shall have also performed all other obligations hereunder to the satisfaction of the Swap Provider, then such Credit Enhancement Event of Default may be waived by the Swap Provider, but no such waiver or annulment shall extend to or affect any subsequent Credit Enhancement Event of Default or impair any consequent right or remedy.

**Section 5.3    Remedies Not Exclusive.**  No remedy conferred in this Agreement or reserved to the Swap Provider is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

**Section 5.4    Restoration of Rights and Remedies.**  If the Swap Provider shall have instituted any proceeding to enforce any right or remedy under this Agreement and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the party instituting such proceeding, then and in every such case Freddie Mac and the Swap Provider shall, subject to any determination in such proceeding, be restored to their former positions hereunder and thereafter all rights and remedies of the Swap Provider shall continue as though no such proceeding had been instituted.

**Section 5.5    Ratings Downgrade and Collateralization.**   Pursuant to the Swap Agreement, the Borrower may post collateral as provided in the credit support annex which is made a part thereof ("Credit Support Annex") if a Rating Downgrade (as defined in the Swap Agreement) occurs with respect to Freddie Mac.  Freddie Mac may in the event of a Rating Downgrade with respect to Freddie Mac, post collateral on behalf of the Owner.  Freddie Mac and the Swap Provider agree that if Freddie Mac elects to post collateral, Freddie Mac and the Swap Provider shall be deemed to have expressly entered into an agreement governing such collateral having the same terms as the Credit Support Annex.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

**Section 6.1    Amendment.**  This Agreement shall be amended only by an instrument in writing by the parties hereto executed by their duly authorized representatives.

**Section 6.2    No Individual Liability.**  No covenant or agreement contained in this Agreement shall be deemed to be the covenant or agreement of any member of the Board of Directors of Freddie Mac or any officer, agent, employee or representative of Freddie Mac, the Swap Provider, in his or her individual capacity and none of such persons shall be subject to any personal liability or accountability by reason of the execution of this Agreement, whether by virtue of any constitution, statute or rule of law or by the enforcement of any assessment or penalty, or otherwise.

**Section 6.3    Notices.**  All notices, certificates and other written communications shall be sufficiently given and shall be deemed to be received (unless another form of notice shall be specifically set forth in this Agreement) on the Business Day following the date on which the

same shall have been delivered to a national overnight delivery service (receipt of which to be evidenced by a signed receipt for overnight delivery service) with arrangements made for payment of all charges for next business day delivery, addressed as follows:

|  |  |
|---|---|
| To Freddie Mac: | Federal Home Loan Mortgage Corporation<br>8100 Jones Branch Drive<br>Mail Stop B4Q<br>McLean, VA 22102<br>Attention:    Director of Multifamily Management<br>            and Information Control<br>Facsimile: (703) 714-3273<br>Telephone: (703) 903-2000 |
| with a copy to: | Federal Home Loan Mortgage Corporation<br>8200 Jones Branch Drive<br>McLean, VA 22102<br>Attention:    Associate General Counsel –<br>            Multifamily Legal Department<br>Facsimile: (703) 903-2885<br>Telephone: (703) 903-2000 |
| with a copy to: | Federal Home Loan Mortgage Corporation<br>8100 Jones Branch Drive<br>Mail Stop B4F<br>McLean, VA 22102<br>Attention:    Director of Multifamily<br>            Loan Servicing<br>Facsimile: (703) 714-3003<br>Telephone: (703) 903-2000 |
| To the Servicer: | Wells Fargo Multifamily Capital<br>c/o Wells Fargo Bank, N.A.:<br>2010 Corporate Ridge, Ste 1000,<br>Mclean, VA 22102<br>Telephone: (703) 760-4700<br>Facsimile: (866) 557-8784<br>Attn: Mabel Harris, |
| To the Swap Provider: | Lehman Brothers Special Financing Inc.<br>Sixteenth Floor<br>745 Seventh Avenue<br>New York, NY 10019<br>Attention: Municipal Financial Products Middle<br>Office<br>Facsimile: (646) 758-2298<br>Telephone: (212) 526-2240 |

Any of such addresses may be changed at any time upon written notice of such change sent, as provided above in this Section, to the other party.

**Section 6.4    Governing Law.** This Agreement shall be construed, and the rights and obligations of Freddie Mac and the Swap Provider hereunder determined, in accordance with the laws of the United States of America. Insofar as there may be no applicable precedent, the laws of the State of Virginia shall be deemed reflective of the laws of the United States of America.

**Section 6.5    Severability.** The invalidity or unenforceability of any provision of this Agreement shall not affect the validity of any other provision, and all other provisions shall remain in full force and effect.

**Section 6.6    Multiple Counterparts.** This Agreement may be simultaneously executed in multiple counterparts, all of which shall constitute one and the same instrument and each of which shall be, and shall be deemed to be, an original.

**Section 6.7    Assignment.** This Agreement and the rights of either party hereto created hereby may not be assigned or transferred by that party without the prior written consent of the other party.

**Section 6.8    Subrogation.** Swap Provider agrees that Freddie Mac shall be subrogated to all rights of Swap Provider against Owner in respect of any amounts paid by Freddie Mac pursuant to this Agreement, provided that Freddie Mac shall be entitled to enforce or receive any payment arising out of or based upon such right of subrogation only to the extent it has paid all amounts due and payable by it hereunder.

[Signature page follows]

**IN WITNESS WHEREOF,** the parties hereto have caused this Swap Credit Enhancement Agreement to be duly executed by their duly authorized officers or representatives.

FEDERAL HOME LOAN MORTGAGE
CORPORATION

By :_____

Name: _Lynn Extein_____

Title: _Director_____

[FM Signature Page to Addison Park Swap Credit Enhancement Agreement]

**IN WITNESS WHEREOF,** the parties hereto have caused this Swap Credit Enhancement Agreement to be duly executed by their duly authorized officers or representatives.

LEHMAN BROTHERS SPECIAL
FINANCING, INC.

By _____

Name: Robert E. Guglielmo
Title: Senior Vice President

[SIGNATURE PAGE TO *Addison Park* SWAP CREDIT ENHANCEMENT AGREEMENT]

**IN WITNESS WHEREOF,** the parties hereto have caused this Swap Credit Enhancement Agreement to be duly executed by their duly authorized officers or representatives.

LEHMAN BROTHERS SPECIAL
FINANCING, INC.

By _____
Name:
Title:
    Robert E. Guglielmo
    Senior Vice President

[SIGNATURE PAGE TO *Addison Park* SWAP CREDIT ENHANCEMENT AGREEMENT]

**EXHIBIT A-1**

## FORM OF SWAP PAYMENT DEFAULT NOTICE UNDER SECTION 3.1(a)(i)

**Form CEA-DN1**

Project Name: Addison Park

Freddie Mac Loan No.: 504172522

Date of Notice: _____

**SWAP PAYMENT DEFAULT NOTICE**
**under Section 3.1(a)(i) of Swap Credit Enhancement Agreement**
**dated as of August 1, 2008 between Freddie Mac and Lehman Brothers Special Financing,**
**Inc.**

Payment Date: _____ ___, ____

Required Swap Payment:    $_____

Required Swap Payment Received:    $(_____)

Interest due and payable to Swap Provider:    $_____

**TOTAL AMOUNT DUE AND PAYABLE**
**(THE "SWAP PAYMENT DEFICIENCY"):  $_____**

**CREDIT ENHANCEMENT PAYMENT DATE:**    _____ [3 Business Days following
receipt of Notice provided prior to 4:00 p.m., Washington, D.C. time]

    **NOTICE** is hereby given that there exists a Swap Payment Deficiency in the amount set
forth above in connection with the Payment Date set forth above.  As a result of said Swap
Payment Deficiency, a Required Freddie Mac Payment in an amount equal to the Swap Payment
Deficiency is due on the Credit Enhancement Payment Date set forth above.  The amount of the
Swap Payment Deficiency and the Credit Enhancement Payment Date have been determined
pursuant to the above-referenced Swap Credit Enhancement Agreement.

    **DEMAND** is hereby made for payment by Freddie Mac of such Required Freddie Mac
Payment on or prior to the close of business on the Credit Enhancement Payment Date.

LEHMAN BROTHERS SPECIAL FINANCING, INC.

Authorized Signature: _____
Name: _____
Title: _____

## EXHIBIT A-2

## FORM OF DEFICIENCY NOTICE UNDER SECTION 3.1(a)(ii)

Project Name: Addison Park Apartments

**Form CEA-DN2**

Freddie Mac Loan No.: 504172522

Date of Notice: _____

## DEFICIENCY NOTICE
### Under Section 3.1(a)(ii) of Swap Credit Enhancement Agreement dated as of August 1, 2008 between Freddie Mac and Lehman Brothers Special Financing, Inc.

**RECOVERY/STAY DATE:** _____

**CREDIT ENHANCEMENT PAYMENT DATE:** _____ [3 Business Days following receipt of Notice provided prior to 4:00 p.m., Washington, D.C. time]

**AMOUNT OF REQUIRED SWAP PAYMENT RECOVERED/STAYED/NOT RECEIVED BY SWAP PROVIDER: $_____**

**NOTICE** is hereby given that [all] [a portion] of a Required Swap Payment, in the Amount of Required Swap Payment Recovered/Stayed/Not Received by Swap Provider set forth above, [has been recovered under Section 544, 547, 549 or 550 of the United States Bankruptcy Code or under the banking laws of the United States of America] [is unavailable to pay amounts due to the Swap Provider named in the above Swap Credit Enhancement Agreement as a result of an automatic stay imposed by the Bankruptcy Court under Section 362 of the United States Bankruptcy Code]. As a result of said [recovery] [stay] [unavailability], a Required Freddie Mac Payment in an amount equal to the Amount of Required Swap Payment Recovered/Stayed set forth above is due on the Credit Enhancement Payment Date set forth above. The Amount of Required Swap Payment Recovered/Stayed and the Credit Enhancement Payment Date have been determined pursuant to the above-referenced Swap Credit Enhancement Agreement.

**DEMAND** is hereby made for payment by Freddie Mac of such Required Freddie Mac Payment on or prior to the close of business on the Credit Enhancement Payment Date.

LEHMAN BROTHERS SPECIAL FINANCING, INC.

Authorized Signature: _____
Name: _____
Title: _____

4829-5849-9074.2

# LEHMAN BROTHERS SPECIAL FINANCING INC.

# EVENT OF DEFAULT NOTICE LETTER

# ARLINGTON PARTNERS, L.P.

## EXHIBIT 1

October 9, 2008

**VIA FEDERAL EXPRESS
AND FACSIMILE (212) 526-7672**

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Legal Compliance and Audit Group
Capital Markets Contracts – Legal
1271 Avenue of the Americas, 43rd Floor
New York, NY 10020
Attn: Documentation Manager

Re:   Confirmation Letter between Lehman Brothers Special Financing Inc. ("Party A") and Arlington Partners, L.P. ("Party B") with a Trade Date of August 18, 2008, in the original notional amount of $14,000,000 (the "Subject Confirm"), Reference Nos: Risk ID:2045233L / Effort ID: 2256083 / Global Deal ID: 4012356

To whom it may concern:

An Event of Default with respect to Party A has occurred under the Master Agreement, dated August 1, 2008, under which the Subject Confirmation was issued (the "Master Agreement") pursuant to Section 5(a)(vii) thereof.   As a result, the undersigned hereby designates October 15, 2008 as the Early Termination Date with respect to the Subject Confirmation pursuant to Section 6(a) of the Master Agreement.   We will forward our calculation of the termination payment in accordance with the terms of the Master Agreement.

A Swap Credit Enhancement Agreement dated as of August 1, 2008 was delivered to you in connection with the execution of the Master Agreement.   Attached is a Release and Acknowledgement of Termination of Swap Credit Enhancement Agreement ("Release").   Please execute the Release on the earlier of; the Termination Date (if no termination payment is owed by the Borrower), and the date the termination payment is paid, and deliver the executed Release to Freddie Mac at the address contained in the Release.

Please contact me with any questions you may have.

Sincerely,

**Arlington Partners, L.P.**

By: _Rodney 7 Triple H_
Name: _Rodney F. Triple H. Jr._
Title: _MANAGER / MEMBER_

FEDERAL HOME LOAN MORTGAGE CORPORATION, as collateral assignee of the Master Agreement, consents to the termination of the Master Agreement as set forth above.

**FEDERAL HOME LOAN MORTGAGE
CORPORATION**

By: _Ilona J. Conolly_
Name: _Ilona T. Conolly_
Title: _Business Initiatives Director_

4832-3343-4627 1

**EXHIBIT A**

## RELEASE AND ACKNOWLEDGEMENT OF TERMINATION OF SWAP CREDIT ENHANCEMENT AGREEMENT

ISDA MASTER AGREEMENT BETWEEN LEHMAN BROTHERS SPECIAL FINANCING INC., AND **Arlington Partners, L.P.** DATED **August 1, 2008** AND RELATED CONFIRMATION
GLOBAL ID: 4012356

This Release and Acknowledgement of Termination of Credit Enhancement Agreement (this "Release") relates to that certain Swap Credit Enhancement Agreement, dated as of August 1, 2008, (the "Swap Credit Enhancement Agreement") by and between Federal Home Loan Mortgage Corporation ("Freddie Mac") and Lehman Brothers Special Financing Inc. ("LBSF") in its capacity as counterparty to the above-referenced Borrower with respect to the above-referenced transaction (the "Swap").

The Swap terminated on October 15, 2008 pursuant to a termination notice delivered by the Borrower on October 10, 2008. Any and all payments due by the Borrower under the Swap have been paid in full (including any termination payment owed by the Borrower). LBSF hereby releases and acknowledges the termination of the Swap Credit Enhancement Agreement, and Freddie Mac's obligations thereunder. In addition, the LBSF agrees to return immediately by overnight mail its original of the Swap Credit Enhancement Agreement to Freddie Mac to Ms. Leslie Gallahan, Federal Home Loan Mortgage Corporation, 8100 Jones Branch Drive, MS B4F, McLean, Virginia 22102.

IN WITNESS WHEREOF, this Release has been executed by a duly authorized officer of the undersigned effective on October 15, 2008.

LEHMAN BROTHERS SPECIAL
FINANCING INC.


By _____
Name _____
Title _____

4832-3343-4627.1

From:    Origin ID: JANA  (601)321-7650
Paula Werne
Park Companies
124 One Madison Plaza
Suite 1500
Madison, MS 39110



Ship Date: 09OCT08
ActWgt: 1 LB
CAD: 1067006/INET8091
Account#: S *********

SHIP TO: 646-333-9960          BILL SENDER
**Capital Markets Contracts-Legal**
**Lehman Brothers Special Financing**
**1271 AVENUE OF THE AMERICAS FL 43**

# NEW YORK, NY 100201401

Delivery Address Bar Code

Ref #   Arlington Partners
Invoice #
PO #
Dept #

TRK#   7980 3457 8832
0201

FRI - 10OCT        **A1**

**PRIORITY OVERNIGHT**
**ASR RES**

# XA NYCA

10020
NY-US
EWR

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

https://www.fedex.com/shipping/html/en//PrintIFrame.html                    10/9/2008



Español | Customer Support | FedEx Locations    Search    Go

Package/Envelope      Freight      Expedited      Office/Print Services

Ship ›              Track ›           Manage ›        Business Solutions ›

## Track Shipments/FedEx Kinko's Orders
## Detailed Results

⊟ Printable Version  ⑦ Quick Help

| | | | | |
|---|---|---|---|---|
| Tracking number | 798034578832 | Reference | Arlington Partners | **Wrong Address?** |
| Signed for by | M.UBIERN LEHMAN | Destination | NEW YORK, NY | Reduce future mista |
| Ship date | Oct 9, 2008 | Delivered to | Mailroom | FedEx Address Cha |
| Delivery date | Oct 10, 2008 9:48 AM | Service type | Priority Envelope - Adult | |
| | | | Signature Required | Tracking a FedEx S |
| | | Weight | 0.5 lbs. | Shipment? |
| | | | | Go to shipper login |

**Status**                 Delivered

**Signature image**        Yes
**available**

FedEx Desktop
Tracking at
your fingertips

Learn more ›

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| Oct 10, 2008 | 9:48 AM | Delivered | NEW YORK, NY | |
| | 8:37 AM | On FedEx vehicle for delivery | NEW YORK, NY | |
| | 7:50 AM | At local FedEx facility | NEW YORK, NY | |
| | 6:02 AM | Arrived at FedEx location | NEWARK, NJ | |
| | 3:43 AM | Departed FedEx location | MEMPHIS, TN | |
| | 1:03 AM | Arrived at FedEx location | MEMPHIS, TN | |
| Oct 9, 2008 | 9:30 PM | Left FedEx origin facility | RICHLAND, MS | |
| | 7:04 PM | Picked up | RICHLAND, MS | |
| | 5:19 PM | Package data transmitted to FedEx | | |

[ Signature proof ]    [ E-mail results ]    [ Track more shipments/orders ]

Subscribe to tracking updates (optional)

Your name: [                    ]        Your e-mail address: [                    ]

| E-mail address | Language | | Exception updates | Delivery updates |
|---|---|---|---|---|
| [              ] | English | | | ☐ |
| [              ] | English | | | ☐ |
| [              ] | English | | | ☐ |
| [              ] | English | | | ☐ |

Select format: ⦿ HTML  ◯ Text  ◯ Wireless

Add personal message:

Not available for Wireless or
non-English characters.

— By selecting this check box and the Submit button, I agree to these <u>Terms and</u>
— Conditions

Submit

Global Home | FedEx Mobile | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms of Use | Privacy Policy | Site Map
This site is protected by copyright and trademark laws under US and International law. All rights reserved. © 1995-2008 FedEx

# LEHMAN BROTHERS SPECIAL FINANCING INC.

## SWAP TERMINATION SETTLEMENT

## NOTICE AND CALCULATION

## ARLINGTON PARTNERS, L.P.

## THE PARK COMPANIES

(PARK)

R E A L   E S T A T E   D E V E L O P M E N T

124 One Madison Plaza, Suite 1500 · Madison, Mississippi 39110
601-321-7600 · Fax 601-321-7694

November 10, 2008

**VIA FEDERAL EXPRESS, EMAIL (Michael.zitoune@lehman.com),
AND FACSIMILE (212) 526-7672**

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Legal Compliance and Audit Group
Capital Markets Contracts – Legal
1271 Avenue of the Americas, 43rd Floor
New York, NY 10020
Attn: Documentation Manager

Re:     Settlement Amount due $798,386.59 to Arlington Partners, L.P. Interest Rate Swap,
        Reference Nos: Risk ID:2045233L / Effort ID: 2256083 / Global Deal ID: 4012356

To whom it may concern:

Per the notice sent to your firm on October 9, 2008, via fedex and fax, Arlington Partners, L.P.
has terminated the above referenced transaction effective October 15th, 2008.  Per Section 6(a) of
the ISDA and the election of Market Quotation and Second Method for purposes of Section 6(e)
in the Schedule dated August 1, 2008, we are submitting this letter as our Statement showing the
details of the calculations used to determine the Settlement Amount.

Generally, we solicited quotations from Reference Market-makers for the Market Quotation of
the above referenced transaction at approximately 1:00 p.m. eastern time on October 15th, 2008.
Requests for Market Quotations, a copy of which is attached, were emailed and we received 5
quotations, as attached and summarized below.  The arithmetic mean of the quotations, without
regard to the quotations having the highest and lowest values is USD $763,813.30, also shown
below.

| | |
|---|---|
| Bank of Montreal | 824,231.62 |
| Merrill Lynch | 809,200.29 |
| Suntrust | 769,254.61 |
| Royal Bank of Canada | 713,000.00 |
| Bank of New York | 700,000.00 |
| | |
| Average of three (remove high and low) | 763,818.30 |

In addition, we have calculated that the unpaid amount, representing the payments due on September 1, 2008 and October 1, 2008, which were neither invoiced nor paid.  The attached email between Kathleen Hinman of Wells Fargo Multifamily Capital and Leila Arjune of Lehman Brothers Capital Markets Contract's group describes our efforts to receive the statements.  The unpaid amount of $931.71 was subtracted from the Market Quotation to produce a Settlement Amount of $762,886.59, which is owed by Lehman Brothers Special Financing Inc. to Arlington Partners L.P.  We are also including invoices received from Kutak Rock of $4,000 for special counsel fees to Freddie Mac in connection with the swap termination, and from CAPM Funding of $31,500 for swap administrative services provided in connection with the Lehman swap termination.

Please direct all correspondence and settlement information to:

Arlington Partners
Rodney F. Triplett, Jr.
124 One Madison Plaza
Suite 1500
Madison, Mississippi 39110
Phone:  (601) 321-7655
Fax:  (601) 321-7694

Wiring Instructions:
Trustmark National Bank
P.O. Box 291
Jackson, Mississippi  39205-0291
ABA:  065300279
Account No.:  1000810267
Ref: Addison Park Swap


Please contact me with any questions you may have.

Sincerely,

**Arlington Partners, L.P.**


By: _Rody F. Triplett_
Name: _Rodney F. Triplett, Jr._
Title: _Manager_

<HELP> for explanation.

N118c Corp  **SWPM**

| Options | New Deal | Save Deal | Delete Deal | Copy Deal | SWAP | View | Series | | | SWAP MANAGER | DETAIL |

**Deal**  Counterparty  CAPM ARLINGTON    Ticker   / SWAP    Deal #   SLB00977

REC FIXED Coupon   3.35500              Frequency   M   Curr  USD  Notional  14000000
PAY FLOAT Latest Index  4.82000 +0.00 bp  Reset/Pmnt Freq  W/M  Curr  USD  Notional  14000000

Cashflow   Currency  USD

HISTORICAL  Cashflow                                                    EXPORT TO EXCEL

| Payment Dates | Payments(Rcv) | Payments(Pay) | Net Payments | Reinvested Value | Reset Rate |
|---|---|---|---|---|---|
| 09/02/2008 | 11742.50 | -7328.96 | 4413.54 | 4447.22 | 3.842414 |
| 10/01/2008 | 39141.67 | -42623.50 | -3481.83 | -3497.75 | 7.960000 |
| | | | | | |
| **Total** | | | | 949.47 | |

Australia 61 2 9777 8600  Brazil 5511 3048 4500  Europe 44 20 7330 7500  Germany 49 69 9204 1210  Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
H198-798-0 15-Oct-2008 17:14:31

10/15/2008 11:13 FAX  312 845 4075        BMO CAPITAL MARKETS                    @001/001



## MARKET QUOTATION FORM

### Quotation Date: October 15, 2008    Quotation Time: 1:00pm eastern
### Please fax this Form to Cap M Funding at 702-363-2816

**$13,987,358.86**
**Arlington Partners, L.P.**
**(Addison Park Apartments Project)**

We hereby submit our market quotation for the interest rate swap, subject to all the terms and conditions in accordance with the attached request for Market Quotation. We have read and understand all of the terms and conditions stated in the foregoing Request for Market Quotation.

Provider: **BANK OF MON. REAL**

Authorized Representative: **LYLE McCOY**

Date: **10/15/08**

Signature: _____

Value at swap rate of 3.355%: $ **(805,982)**   , Bmo would need to Rec this amount to enter Trade

Accrued Interest as of 10/15/2008: $ **(18,249.62)**

Total Market Quotation: $ **(824,231.62)**

In signing this Market Quotation, this Provider represents that:
(a)     We did not consult with any other potential provider about our market quotation;
(b)     Our quotation was determined without regard to any other formal or informal agreement with the issuer or any other person (whether or not in connection with the bond issue);
(c)     We are a reasonably competitive provider of interest rate swaps of the type described in the Request for Market Quotation.

CAP M FUNDING        PHONE: 917-913-9297        FAX: 702-363-2816



## MARKET QUOTATION FORM

**Quotation Date: October 15, 2008     Quotation Time: 1:00pm eastern**
**Please fax this Form to Cap M Funding at 702-363-2816**

$13,987,358.86
Arlington Partners, L.P.
(Addison Park Apartments Project)

We hereby submit our market quotation for the interest rate swap, subject to all the terms and conditions in accordance
with the attached request for Market Quotation. We have read and understand all of the terms and conditions stated in
the foregoing Request for Market Quotation.

Provider: _Merrill Lynch Capital Services_

Authorized Representative: _James Nacos_

Date: _October 15, 2008_

Signature: _____

Value at swap rate of 3.355%: $ _798,000  to MLCS_

Accrued Interest as of 10/15/2008: $ _11,200.29 to MLCS_

Total Market Quotation: $ _809,200.29 to MLCS_

In signing this Market Quotation, this Provider represents that:
(a)      We did not consult with any other potential provider about our market quotation;
(b)      Our quotation was determined without regard to any other formal or informal agreement with the issuer or any
other person (whether or not in connection with the bond issue);
(c)      We are a reasonably competitive provider of interest rate swaps of the type described in the Request for
Market Quotation.

CAP M FUNDING        PHONE: 917-913-9297        FAX: 702-363-2816



## MARKET QUOTATION FORM

**Quotation Date: October 15, 2008    Quotation Time:  1:00pm eastern**
**Please fax this Form to Cap M Funding at 702-363-2816**

$13,987,358.86
Arlington Partners, L.P.
(Addison Park Apartments Project)

We hereby submit our market quotation for the interest rate swap, subject to all the terms and conditions in accordance with the attached request for Market Quotation. We have read and understand all of the terms and conditions stated in the foregoing Request for Market Quotation.

Provider: _____SunTrust Bank_____

Authorized Representative: _____Yuriy Myachin_____

Date: _____October 15, 2008_____

Signature: _____

Value of swap rate of 3.355%: $ _____760,241_____

Accrued Interest as of 10/15/2008: $_____8,973.61_____

Total Market Quotation. $_____769,254.61_____

In signing this Market Quotation, this Provider represents that:
(a)      We did not consult with any other potential provider about our market quotation;
(b)      Our quotation was determined without regard to any other formal or informal agreement with the issuer or any other person (whether or not in connection with the bond issue);
(c)      We are a reasonably competitive provider of interest rate swaps of the type described in the Request for Market Quotation.

*Does not include the value of the option*

CAP M FUNDING        PHONE: 917-913-9297        FAX: 702-363-2816



## MARKET QUOTATION FORM

**Quotation Date: October 15, 2008     Quotation Time: 1:00 m eastern**
**Please fax this Form to Cap M Funding at 702-363-2 16**

$13,987,358.86
Arlington Partners, L.P.
(Addison Park Apartments Project)

We hereby submit our market quotation for the interest rate swap, subject to all the terms and c ditions in accordance with the attached request for Market Quotation. We have read and understand all of the term nd conditions stated in the foregoing Request for Market Quotation.

Provider: _Royal Bank of Canada_

Authorized Representative: _Jason Gross_

Date: _10/15/08_

Signature: _____

Value at swap rate of 3.355%: $ _____

Accrued Interest as of 10/15/2008: $ _6,861.95_

Total Market Quotation: $ _413,000.00_  value to | _Arlington Partners, inclusive of Accrueds_

In signing this Market Quotation, this Provider represents that:
(a)     We did not consult with any other potential provider about our market quotation;
(b)     Our quotation was determined without regard to any other formal or informal agreem t with the issuer or any other person (whether or not in connection with the bond issue);
(c)     We are a reasonably competitive provider of interest rate swaps of the type desc ed in the Request for Market Quotation.

CAP M FUNDING        PHONE: 917-913-9297        FAX: 70 -363-2816



## MARKET QUOTATION FORM

**Quotation Date: October 15, 2008    Quotation Time: 1:00pm eastern**
**Please fax this Form to Cap M Funding at 702-363-2816**

$13,987,358.86
Arlington Partners, L.P.
(Addison Park Apartments Project)

We hereby submit our market quotation for the interest rate swap, subject to all the terms and conditions in accordance with the attached request for Market Quotation. We have read and understand all of the terms and conditions stated in the foregoing Request for Market Quotation.

Provider: _____ The Bank of NY _____

Authorized Representative: _____ Casey Kastner _____

Date: _____ Cy M _____

Signature: _____ 10/15/08 _____

Value at swap rate of 3.355%: $ _____

Accrued Interest as of 10/15/2008: $_____

Total Market Quotation: $_____ BNY Would need to receive
$ 700,000

In signing this Market Quotation, this Provider represents that:
(a)     We did not consult with any other potential provider about our market quotation;
(b)     Our quotation was determined without regard to any other formal or informal agreement with the issuer or any other person (whether or not in connection with the bond issue);
(c)     We are a reasonably competitive provider of interest rate swaps of the type described in the Request for Market Quotation.

CAP M FUNDING    PHONE: 917-913-9297    FAX: 702-363-2816

**Tammy Ofek**

| | |
|---|---|
| **From:** | Kathleen.Hinman@wellsfargo.com |
| **Sent:** | Wednesday, October 15, 2008 2:08 PM |
| **To:** | tammyo@capmfunding.com |
| **Cc:** | jim@jjhargrove.com |
| **Subject:** | FW: Arlington Partners Global ID 4012356 |

Hi Tammy,

I was just speaking with Jim Hargrove regarding the September 1, 2008, payment under the swap for Addison Park.

We have never made or received any payments under this agreement. Below is a history of my (brief) written correspondence with Lehman Brothers on this issue.

Do not hesitate to contact me with questions.

Sincerely,

Kathleen Hinman
703-462-2240
MAC T2673-100

---

**From:** Hinman, Kathleen
**Sent:** Friday, September 12, 2008 3:23 PM
**To:** Iqbal, Nauman
**Cc:** Opaliski, Stephanie; Hilliard, Khadija; Harris, Mabel A.
**Subject:** RE: Arlington Partners Global ID 4012356

Hi Nauman,

This is just a quick follow up to our conversation earlier today to let you know that I will be out of the office on Monday and Tuesday of next week. As a consequence, should you discover anything further prior to Wednesday, please "reply all" to this message to ensure that your information receives attention.

Thanks for your help!

Sincerely,

Kathleen Hinman
703-462-2240
MAC T2673-100

---

**From:** Arjune, Leila [mailto:rookmin.arjune@lehman.com]
**Sent:** Thursday, September 11, 2008 5:25 PM

**To:** Hinman, Kathleen; Iqbal, Nauman
**Subject:** FW: Arlington Partners Global ID 4012356

Kathleen,
        The contact person in settlements is Nauman Iqbal (tel:1 201 499 6409).

Regards,
*Leila Arjune*
*Capital Markets Contracts - Legal*
*Tel: 1646 333 9539*
*Fax: 1646 885 9551*

---

**From:** Arjune, Leila
**Sent:** Thursday, September 11, 2008 3:52 PM
**To:** Alfred, Nigel
**Cc:** Muni Deriv Middle Office
**Subject:** FW: Arlington Partners Global ID 4012356

---

**From:** Kathleen.Hinman@wellsfargo.com [mailto:Kathleen.Hinman@wellsfargo.com]
**Sent:** Thursday, September 11, 2008 3:51 PM
**To:** Arjune, Leila
**Cc:** Stephanie.Opaliski@wellsfargo.com
**Subject:** Arlington Partners Global ID 4012356

Hi Leila,

This is just a quick follow-up to our conversation. Wells Fargo Multifamily Capital is the servicer for the referenced deal. Statements regarding amounts due under the swap should be sent via facsimile to 866-557-8784 or via email to WFMCGSEBondRates@wellsfargo.com. As discussed, our records do not show receipt of a statement for the payment due 9/1/2008.

Thanks for your help!

Kathleen M. Hinman
Wells Fargo Multifamily Capital
MAC T2673-100
2010 Corporate Ridge, Suite 1000
Mclean, Virginia 22102
Direct Voice: 703-462-2240
Toll Free: 877-734-5591
Fax: 866-359-3881
E: Kathleen.Hinman@wellsfargo.com

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying

10/16/2008

of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice. -------- IRS Circular 230 Disclosure: Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

No virus found in this incoming message.
Checked by AVG - http://www.avg.com
Version: 8.0.173 / Virus Database: 270.8.0/1724 - Release Date: 10/15/2008 7:29 AM

10/16/2008



DATE:      October 13, 2008

_**Via email- Draft#1**_

TO:        Referenced Market Makers of Swap Agreements (the "Provider")

FROM:      Cap M Funding

RE:        Request for Market Quotation of existing Swap Agreement (the "Agreement")

---

Pursuant to the recent Bankruptcy of Lehman Brothers, we are seeking market quotations on an existing transaction subject to the terms and conditions below. For your convenience, please find the original transaction Confirmation and Swap Amortization in an excel format as email attachments. In the case of any discrepancies between this RFQ and the Confirmation, the Confirmation shall govern.

| | | |
|---|---|---|
| I. | Issuer Name: | Texas Department of Housing and Community Affairs (the "Issuer") |
| II. | Program Name: | $14,000,000 Multifamily Housing Revenue Refunding Bonds (Addison Park Apartments Project) Series 2008 (the "Bonds") |
| III. | Borrower: | Arlington Partners, L.P., a Mississippi limited partnership (the "Owner" or "Borrower") |
| IV. | Notional: | $13,987,358.86 (subject to amortization per Exhibit A and subject to adjustment in the event of Optional Termination as further described below). |
| V. | Effective Date: | October 17, 2008 (to be confirmed) |
| VI. | Maturity Date: | August 31, 2018 (not subject to adjustment) |
| VII. | Optional Termination: | The Borrower and Freddie Mac (as swap credit enhancer) retain the right to terminate a portion of the swap, up to $400,000 (with a compounding adjustment to the amortization schedule) on September 1, 2010 upon 15 days notice to the Swap Provider at no additional cost. In the event this option is exercised, the amortization may be adjusted accordingly. |

CAP M FUNDING        PHONE: 917-913-9297        FAX: 702-363-2816



| VIII. | Swap Credit Enhancer: | Federal Home Loan Mortgage Corporation ("Freddie Mac") as further described below under "Credit Support". |
|---|---|---|

| IX. | Credit Support: | Freddie Mac will issue its Swap Credit Enhancement Agreement in connection with the swap on the Effective Date.    Freddie Mac will provide credit enhancement for the Owner's payments under the Swap Agreement pursuant to the Swap Credit Enhancement Agreement. Freddie Mac will agree in accordance with the Swap Credit Enhancement Agreement to make up any deficiency in the Owner's payment obligations, including both the ongoing monthly fixed rate payments and payments required upon designated early termination events for the swaps. |

**Attached is the form of the Freddie Mac Swap Credit Enhancement Agreement**

| X. | Floating Rate: | The SIFMA Municipal Swap Index (formerly BMA) (the "SIFMA Index"). |
|---|---|---|

| XI. | Floating Rate Reset Dates: | Each Wednesday, effective the following Thursday. |
|---|---|---|

| XII. | Your Desk Pays: | The Floating Rate monthly on the first calendar day of each month, commencing on the first calendar day following the Effective Date, subject to adjustment in connection with the modified following business day convention, and calculated on an actual/actual day basis. |
|---|---|---|

| XIII. | Your Desk Receives: | Fixed interest rate of 3.355% monthly on the first calendar day of each month commencing on the first calendar day following the Effective Date, subject to adjustment in connection with the modified following business day convention, and calculated on a 30/360 day basis. |
|---|---|---|

| XIV. | Calculation Period End Dates: | First day of each month, not subject to adjustment. |
|---|---|---|

CAP M FUNDING          PHONE: 917-913-9297          FAX: 702-363-2816



| | | |
|---|---|---|
| XV. | Method of Averaging: | Daily Weighted Average of all rates within the interest period. |
| XVI. | Compounding: | Inapplicable |
| XVII. | Provider Requirements: | Counterparties must be pre-approved by Freddie Mac. |
| XIX. | Quotation Submittal: | The Attached Quotation Form is to be emailed or faxed to Cap M Funding on October 15, 2008 by 1:00pm EST. |
| XXI. | Documentation: | For purposes of this market quotation, please note that your pre-negotiated documentation with Freddie Mac would prevail. This includes the Freddie Mac approved form of ISDA master agreement, with schedule, and Credit Support Annex. |
| XXII. | Additional Provision: | Freddie Mac, and any other member of the working group shall not be liable for any losses incurred or damages sustained by any party as a result of a failure to close on the Swap Agreement solicited herein. All losses and expenses incurred as a result of a failure to execute any proposed agreement or to submit or deliver documents under any circumstances will be solely the responsibility of the Borrower. |



**EXHIBIT A**
**SWAP AMORTIZATION SCHEDULE**

| Date | Amortization | Principal Balance |
|---|---|---|
| 8/22/2008 | $ - | $ 14,000,000.00 |
| 9/1/2008 | $ - | $ 14,000,000.00 |
| 10/1/2008 | $ 12,641.14 | $ 13,987,358.86 |
| 11/1/2008 | $ 12,692.60 | $ 13,974,666.26 |
| 12/1/2008 | $ 12,744.27 | $ 13,961,921.99 |
| 1/1/2009 | $ 12,796.15 | $ 13,949,125.84 |
| 2/1/2009 | $ 12,848.24 | $ 13,936,277.60 |
| 3/1/2009 | $ 12,900.54 | $ 13,923,377.06 |
| 4/1/2009 | $ 12,953.06 | $ 13,910,424.00 |
| 5/1/2009 | $ 13,005.79 | $ 13,897,418.21 |
| 6/1/2009 | $ 13,058.73 | $ 13,884,359.48 |
| 7/1/2009 | $ 13,111.89 | $ 13,871,247.59 |
| 8/1/2009 | $ 13,165.27 | $ 13,858,082.32 |
| 9/1/2009 | $ 13,218.86 | $ 13,844,863.46 |
| 10/1/2009 | $ 13,272.67 | $ 13,831,590.79 |
| 11/1/2009 | $ 13,326.70 | $ 13,818,264.09 |
| 12/1/2009 | $ 13,380.95 | $ 13,804,883.14 |
| 1/1/2010 | $ 13,435.43 | $ 13,791,447.71 |
| 2/1/2010 | $ 13,490.12 | $ 13,777,957.59 |
| 3/1/2010 | $ 13,545.04 | $ 13,764,412.55 |
| 4/1/2010 | $ 13,600.18 | $ 13,750,812.37 |
| 5/1/2010 | $ 13,655.54 | $ 13,737,156.83 |
| 6/1/2010 | $ 13,711.13 | $ 13,723,445.70 |
| 7/1/2010 | $ 13,766.94 | $ 13,709,678.76 |
| 8/1/2010 | $ 13,822.99 | $ 13,695,855.77 |
| 9/1/2010 | $ 13,879.26 | $ 13,681,976.51 |
| 10/1/2010 | $ 13,935.76 | $ 13,668,040.75 |
| 11/1/2010 | $ 13,992.49 | $ 13,654,048.26 |
| 12/1/2010 | $ 14,049.45 | $ 13,639,998.81 |
| 1/1/2011 | $ 14,106.64 | $ 13,625,892.17 |
| 2/1/2011 | $ 14,164.07 | $ 13,611,728.10 |
| 3/1/2011 | $ 14,221.73 | $ 13,597,506.37 |
| 4/1/2011 | $ 14,279.62 | $ 13,583,226.75 |
| 5/1/2011 | $ 14,337.75 | $ 13,568,889.00 |
| 6/1/2011 | $ 14,396.12 | $ 13,554,492.88 |
| 7/1/2011 | $ 14,454.72 | $ 13,540,038.16 |
| 8/1/2011 | $ 14,513.57 | $ 13,525,524.59 |
| 9/1/2011 | $ 14,572.65 | $ 13,510,951.94 |
| 10/1/2011 | $ 14,631.97 | $ 13,496,319.97 |
| 11/1/2011 | $ 14,691.54 | $ 13,481,628.43 |

CAP M FUNDING          PHONE: 917-913-9297          FAX: 702-363-2816



| | | |
|---|---|---|
| 12/1/2011 | $ 14,751.34 | $ 13,466,877.09 |
| 1/1/2012 | $ 14,811.39 | $ 13,452,065.70 |
| 2/1/2012 | $ 14,871.69 | $ 13,437,194.01 |
| 3/1/2012 | $ 14,932.23 | $ 13,422,261.78 |
| 4/1/2012 | $ 14,993.01 | $ 13,407,268.77 |
| 5/1/2012 | $ 15,054.05 | $ 13,392,214.72 |
| 6/1/2012 | $ 15,115.33 | $ 13,377,099.39 |
| 7/1/2012 | $ 15,176.86 | $ 13,361,922.53 |
| 8/1/2012 | $ 15,238.65 | $ 13,346,683.88 |
| 9/1/2012 | $ 15,300.68 | $ 13,331,383.20 |
| 10/1/2012 | $ 15,362.97 | $ 13,316,020.23 |
| 11/1/2012 | $ 15,425.51 | $ 13,300,594.72 |
| 12/1/2012 | $ 15,488.30 | $ 13,285,106.42 |
| 1/1/2013 | $ 15,551.35 | $ 13,269,555.07 |
| 2/1/2013 | $ 15,614.66 | $ 13,253,940.41 |
| 3/1/2013 | $ 15,678.22 | $ 13,238,262.19 |
| 4/1/2013 | $ 15,742.05 | $ 13,222,520.14 |
| 5/1/2013 | $ 15,806.13 | $ 13,206,714.01 |
| 6/1/2013 | $ 15,870.47 | $ 13,190,843.54 |
| 7/1/2013 | $ 15,935.08 | $ 13,174,908.46 |
| 8/1/2013 | $ 15,999.95 | $ 13,158,908.51 |
| 9/1/2013 | $ 16,065.08 | $ 13,142,843.43 |
| 10/1/2013 | $ 16,130.48 | $ 13,126,712.95 |
| 11/1/2013 | $ 16,196.14 | $ 13,110,516.81 |
| 12/1/2013 | $ 16,262.08 | $ 13,094,254.73 |
| 1/1/2014 | $ 16,328.28 | $ 13,077,926.45 |
| 2/1/2014 | $ 16,394.75 | $ 13,061,531.70 |
| 3/1/2014 | $ 16,461.49 | $ 13,045,070.21 |
| 4/1/2014 | $ 16,528.50 | $ 13,028,541.71 |
| 5/1/2014 | $ 16,595.78 | $ 13,011,945.93 |
| 6/1/2014 | $ 16,663.34 | $ 12,995,282.59 |
| 7/1/2014 | $ 16,731.18 | $ 12,978,551.41 |
| 8/1/2014 | $ 16,799.28 | $ 12,961,752.13 |
| 9/1/2014 | $ 16,867.67 | $ 12,944,884.46 |
| 10/1/2014 | $ 16,936.34 | $ 12,927,948.12 |
| 11/1/2014 | $ 17,005.28 | $ 12,910,942.84 |
| 12/1/2014 | $ 17,074.51 | $ 12,893,868.33 |
| 1/1/2015 | $ 17,144.02 | $ 12,876,724.31 |
| 2/1/2015 | $ 17,213.81 | $ 12,859,510.50 |
| 3/1/2015 | $ 17,283.88 | $ 12,842,226.62 |
| 4/1/2015 | $ 17,354.24 | $ 12,824,872.38 |
| 5/1/2015 | $ 17,424.89 | $ 12,807,447.49 |
| 6/1/2015 | $ 17,495.82 | $ 12,789,951.67 |
| 7/1/2015 | $ 17,567.04 | $ 12,772,384.63 |
| 8/1/2015 | $ 17,638.56 | $ 12,754,746.07 |
| 9/1/2015 | $ 17,710.36 | $ 12,737,035.71 |

CAP M FUNDING        PHONE: 917-913-9297        FAX: 702-363-2816



| | | |
|---|---|---|
| 10/1/2015 | $ 17,782.46 | $ 12,719,253.25 |
| 11/1/2015 | $ 17,854.84 | $ 12,701,398.41 |
| 12/1/2015 | $ 17,927.53 | $ 12,683,470.88 |
| 1/1/2016 | $ 18,000.51 | $ 12,665,470.37 |
| 2/1/2016 | $ 18,073.79 | $ 12,647,396.58 |
| 3/1/2016 | $ 18,147.36 | $ 12,629,249.22 |
| 4/1/2016 | $ 18,221.24 | $ 12,611,027.98 |
| 5/1/2016 | $ 18,295.41 | $ 12,592,732.57 |
| 6/1/2016 | $ 18,369.89 | $ 12,574,362.68 |
| 7/1/2016 | $ 18,444.67 | $ 12,555,918.01 |
| 8/1/2016 | $ 18,519.75 | $ 12,537,398.26 |
| 9/1/2016 | $ 18,595.15 | $ 12,518,803.11 |
| 10/1/2016 | $ 18,670.84 | $ 12,500,132.27 |
| 11/1/2016 | $ 18,746.85 | $ 12,481,385.42 |
| 12/1/2016 | $ 18,823.16 | $ 12,462,562.26 |
| 1/1/2017 | $ 18,899.79 | $ 12,443,662.47 |
| 2/1/2017 | $ 18,976.73 | $ 12,424,685.74 |
| 3/1/2017 | $ 19,053.98 | $ 12,405,631.76 |
| 4/1/2017 | $ 19,131.55 | $ 12,386,500.21 |
| 5/1/2017 | $ 19,209.43 | $ 12,367,290.78 |
| 6/1/2017 | $ 19,287.62 | $ 12,348,003.16 |
| 7/1/2017 | $ 19,366.14 | $ 12,328,637.02 |
| 8/1/2017 | $ 19,444.98 | $ 12,309,192.04 |
| 9/1/2017 | $ 19,524.14 | $ 12,289,667.90 |
| 10/1/2017 | $ 19,603.61 | $ 12,270,064.29 |
| 11/1/2017 | $ 19,683.42 | $ 12,250,380.87 |
| 12/1/2017 | $ 19,763.55 | $ 12,230,617.32 |
| 1/1/2018 | $ 19,844.00 | $ 12,210,773.32 |
| 2/1/2018 | $ 19,924.78 | $ 12,190,848.54 |
| 3/1/2018 | $ 20,005.89 | $ 12,170,842.65 |
| 4/1/2018 | $ 20,087.33 | $ 12,150,755.32 |
| 5/1/2018 | $ 20,169.10 | $ 12,130,586.22 |
| 6/1/2018 | $ 20,251.21 | $ 12,110,335.01 |
| 7/1/2018 | $ 20,333.65 | $ 12,090,001.36 |
| 8/1/2018 | $ 20,416.42 | $ 12,069,584.94 |



---

## MARKET QUOTATION FORM

### Quotation Date: October 15, 2008    Quotation Time: 1:00pm eastern
### Please fax this Form to Cap M Funding at 702-363-2816

---

**$13,987,358.86**
**Arlington Partners, L.P.**
**(Addison Park Apartments Project)**

We hereby submit our market quotation for the interest rate swap, subject to all the terms and conditions in accordance with the attached request for Market Quotation. We have read and understand all of the terms and conditions stated in the foregoing Request for Market Quotation.

Provider: _____

Authorized Representative: _____

Date: _____

Signature: _____


Value at swap rate of 3.355%: $ _____

Accrued Interest as of 10/15/2008: $_____

Total Market Quotation: $_____

In signing this Market Quotation, this Provider represents that:
(a)      We did not consult with any other potential provider about our market quotation;
(b)      Our quotation was determined without regard to any other formal or informal agreement with the issuer or any other person (whether or not in connection with the bond issue);
(c)      We are a reasonably competitive provider of interest rate swaps of the type described in the Request for Market Quotation.


CAP M FUNDING        PHONE: 917-913-9297        FAX: 702-363-2816

# LEHMAN BROTHERS SPECIAL FINANCING INC.

# TERMINATION FEE INVOICES

# ARLINGTON PARTNERS, L.P.

# K U T A K   R O C K   L L P

**OMAHA, NEBRASKA**
Telephone 402-346-6000
Facsimile 402-346-1148

Federal ID 47-0597598

October 21, 2008

**Check Remit To:**
Kutak Rock LLP
PO Box 30057
Omaha, NE 68103-1157

**Wire Transfer Remit To:**
ABA # 104000016
First National Bank of Omaha
Kutak Rock LLP
A/C # 24-690470
Client Matter No. 1178001-505
Reference Invoice No. 1311051

Arlington Partners, L.P.
c/o the Park Companies
124 Madison Plaza
Madison, MS  39110

Texas Department of Housing and Community Affairs
Variable Rate Demand Multifamily Housing Revenue Refunding Bonds
(Addison Park Apartments)
Series 2008

FOR PROFESSIONAL SERVICES RENDERED as special counsel to Freddie Mac in connection with the termination and replacement of an interest rate swap, including certain expenses incurred in connection therewith.                    $4,000

PRIVILEGED AND CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION AND/OR WORK PRODUCT

4812-9291-9555.1



# INVOICE
Via email

4575 Dean Martin Drive, Suite 2108
Las Vegas, NV 89103
Phone: 917-913-9297

INVOICE #1148
DATE: OCTOBER 21, 2008

**TO:**
Arlington Partners
c/o Park Development

**COUNTERPARTY:**
RBC

**CAP M WIRING INSTRUCTIONS:**
Bank: Citibank
CAPM Funding Acct #500-257-100
ABA #322-271-724
Reference#: Addison Park

| DESCRIPTION | | | FEE AMOUNT |
|---|---|---|---|
| Swap administrative services for Addison Park | | | $31,500.00 |
| | | TOTAL | $31,500.00 |

Thank you for your business!

From:    Origin ID: JANA  (601) 321-7650
Paula Werne
Park Companies
124 One Madison Plaza
Suite 1500
Madison, MS 39110


FedEx
Express

E

J09200908152023

Ship Date: 11SEP09
ActWgt: 1.0 LB
CAD: 1067006/INET9060
Account#: S *********

SHIP TO:    (866) 879-0688          BILL SENDER
**Lehman Brothers Holdings Claims**
**Epiq Bankruptcy Solutions, LLC**
**757 3RD AVE FRNT 3**

**NEW YORK, NY 10017**

Delivery Address Bar Code



Ref #    Arlington Partners, LP
Invoice #
PO #
Dept #

RECEIVED

SEP 1 4 2009



TRK#
0201    7969 3630 7714

TUE - 15SEP          A1
** 2DAY **

**SB OGSA**

10017
NY-US

EWR



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic valueof the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.