Hearing Date and Time: April 20, 2010 at 10:00 a.m.
Objection Date and Time: April 13, 2010 at 4:00 p.m.

CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000
James E. Spiotto (admitted *pro hac vice*)
Ann E. Acker (admitted *pro hac vice*)
Franklin H. Top, III (admitted *pro hac vice*)
James Heiser (JH-3660)

-and-

CHAPMAN AND CUTLER LLP
330 Madison Avenue, 34th Floor
New York, New York 10017-5010
Telephone: (212) 655-6000
Craig M. Price

Attorneys for U.S. Bank National Association, as Trustee

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | CHAPTER 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | CASE NO. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE TO DEBTOR'S MOTION PURSUANT TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO PURCHASE AND SELL NOTES ISSUED BY CERTAIN SPECIAL PURPOSE VEHICLES THAT ARE PARTY TO TRANSACTIONS WITH CERTAIN DEBTORS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        NOW COMES U.S. Bank National Association, not individually but as Indenture Trustee

and/or Owner Trustee in connection with certain transactions with special purpose vehicles that

08-13555-mg    Doc 8282    Filed 04/13/10    Entered 04/13/10 15:55:43    Main Document
Pg 2 of 15


entered into transactions with one or more of the Debtors (*"U.S. Bank"* or the *"Trustee"*) by and through its counsel, Chapman and Cutler LLP, to object to the Debtors' Motion Pursuant to Sections 105(A) and 363 of the Bankruptcy Code for Authorization to Purchase and Sell Notes Issued By Certain Special Purpose Vehicles that are Party to Transactions with certain Debtors (the *"Motion"*, and U.S. Bank's objection thereto, the *"Objection"*).  In support of its Objection, U.S. Bank states as follows:[1]

### SUMMARY

U.S. Bank objects to the Motion on grounds (a) that the use of Estate funds to make the investments contemplated by the Debtors is inappropriate in that the investments are speculative in nature and are not prudent and safe as contemplated by the Bankruptcy Code; (b) that exercise of rights by the Debtors as a holder of any purchased note, certificate or other investment under the terms of an Indenture or Trust Agreement is a conflict of interest in that the exercise of such rights would be to maximize a payment on a swap with respect to which a Debtor is a counterparty, and not on the investment and, as a result, the exercise of such rights may be prohibited under applicable law; and (c) that any Order approving any such purchase or sale should not alter any right, provision or protection set forth in the relevant Indenture.  Finally, the Motion fails to identify the Debtor that would be purchasing these investments, the identity of which might create conflicts among the Debtors and their creditor constituencies.

### BACKGROUND FACTS

Because the relief sought in the Motion is very general, and the Motion does not specifically designate the types of transactions or investments it is targeting, it is hard to

---

[1]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

definitively describe the types of transactions at issue. The Trustee believes, however, that the following description is typical of those transactions targeted by the Debtors in the Motion.

A special purpose vehicle (often a Cayman Islands entity) was established in a transaction sponsored or facilitated by a Lehman Entity. This special purpose vehicle raised funds by issuing notes or certificates to investors under the terms of an indenture or trust agreement. These notes or certificates were issued in various tranches. The proceeds of the notes or certificates were used to purchase an underlying asset which generates some income for the special purpose vehicle. The centerpiece of the transaction, however, is a credit default swap (a *"CDS"*) with one of the Debtors serving as a swap counterparty. The special purpose entity is the "risk party" under the CDS, with the Lehman entity "purchasing protection" through a periodic payment under the CDS. Often these CDS relate to not one, but a portfolio of reference entity securities. In the event of a defined Credit Event with respect to any one of the Reference Entities, the Trust (depending in part upon any loss threshold amounts that might be applicable) may be required to make a settlement payment to the Lehman counterparty. The obligation of the special purpose entity to make any settlement payment determined to be due under the CDS to the Lehman entity is secured by the underlying asset. Any payment of a settlement payment by the special purpose entity would (a) reduce the principal balance of one or more tranches of notes, certificates or other investments and (b) reduce the periodic payment due from the Lehman counterparty under the CDS.

The CDS transactions involved in these types of transactions generally have certain standard Events of Default including, but not limited to, (a) the failure of a counterparty to pay amounts as they come due under the terms of the CDS Agreements (defined below), (b) the filing of a voluntary insolvency proceeding by a Credit Support Party, and (c) the filing of a voluntary insolvency proceeding by a counterparty. These Events of Default may give rise to

- 3 -

certain termination rights as outlined in ISDA Master Agreement, the Schedule to the ISDA Master Agreement and the Confirmation for the relevant CDS (collectively, the *"CDS Agreements"*).  In the event that the CDS Transaction is terminated early by the special purpose entity or a trustee and an Early Termination Date is designated, the special purpose entity would make a termination payment to the counterparty in accordance with the terms of the CDS Agreements and the relevant trust agreement or indenture.  The source of these payments are proceeds from the liquidation of the underlying asset.  Generally both the CDS Agreements and the trust agreement or indenture provide that, in the event the Lehman counterparty is the defaulting party under the terms of the CDS Agreement, any termination payment due the Lehman entity would be paid after the notes, certificates or other investments, as appropriate, issued under the respective indenture or trust agreement were paid in full.

Depending upon the quality of the Reference Entity(ies) and the existence and amount of any loss threshold, the termination payment due the Lehman Entities under the CDS may be significant.  If the priority of payment provisions contained in the CDS Agreements and the relevant indenture or trust agreement are enforced, as the Trustee believes they should[2], it is unlikely the Lehman counterparty will receive a meaningful distribution on account of the termination payment.

Lehman believes that it may be able to purchase some notes, certificates or other investments in special purpose vehicles at a discount.  This "discount" was undoubtedly created by uncertainty in the state of the law created by the challenge of the Debtors to explicit Priority of Payment provisions often contained in both the CDS Agreements and the relevant indenture or

---

[2]    The Trustee is mindful of the decision rendered in connection with the Dante program but believes these are significant differences between the facts in that matter and the facts relevant to these types of transactions, and further, the decision rendered with respect to the Dante matter is currently the subject of appeal (and similar future rulings may be subject to future appeals).

trust agreement.  To the extent the purchase of these securities is truly an "investment", there is significant risk in that these securities could (a) lose significant value should the Debtors prevail in their interpretation of various Priority of Payment provisions or (b) increase in value at the expense of an investor who sold as a result of uncertainty created by the Debtors. The "hedging" aspect of this proposal, therefore, clearly comes as a result of uncertainty caused by the Debtors at the expense of other noteholders.

**A.      The Investment by the Lehman Debtors in Notes, Certificates or Other Investments Issued by Special Purpose Vehicles is Overly Speculative and Violates Fundamental Policies of the Bankruptcy Code.**

A debtor is required to invest estate funds in a responsible and prudent manner. Section 345(a) of the Bankruptcy Code provides:

> (a) A trustee in a case under the title may make such deposit or investment of the money of the estate for which such trustee serves as will yield the maximum reasonable net return on such money, *taking into account the safety of such deposit or investment*.

11 U.S.C. § 345(a)(emphasis added).  To that end, Congress has limited the investment of estate funds to insured, bonded or secured investments, "unless the court for cause orders otherwise."

11 U.S.C. §345(b)(2). The Legislative History for Section 345 of the Bankruptcy Code provides in pertinent part:

> Section 345 of the Code governs investments of the funds of bankrupt estates.  The purpose is to make sure that the funds of a bankrupt that are obligated to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankrupt estate.

140 Cong. Rec. H 10,767 (October 4, 1994).    While additional leeway for larger more sophisticated Debtors may be given, for just cause, the Trustee submits that the proposed highly speculative investments into obligations issued by SPVs goes beyond the spirit of Section 345.[3]

The waiver sought in this case is unusual.  Most often the waiver seeks to maintain a cash management system in place, and/or investments in high quality institutions such as commercial paper meeting a certain prescribed rating or a term deposit in an institution of a particular size and credit rating.  *See e.g. In re Versatel Telecom Int'l N.V*. Case No. 02-13003 (RDO); *In re WorldCom, Inc., et al.,* Case No. 02-13533 (AJG).  To the extent the Debtors proposed actions can truly be viewed as "investments," the proposed investments go well beyond the typical waiver as these investments are speculative.  These investments include substantial litigation risk; if the Debtors are correct in their view of the law with respect to Priority of Payment provisions, these investments could lose money.  This does not seem to be the prudence and safety contemplated by the Bankruptcy Code.

**B.    The Purchase of Securities by the Debtors and the Use of the Voting and Other Rights Relating Thereto to Improve the Position of the Debtors as a Swap Counterparty is a Conflict of Interest and Potentially Abusive of the Rights and Interests of Minority Holders.**

The primary purpose for purchasing the investments issued by the SPV appears to be an attempt to gain control over decisions made by the investors under the trust agreement or indenture by means of exercising voting or other privileges which are available to some or all investors under the terms of such agreements.  Through the exercise of these rights, the Debtors could attempt to force a resolution of the issues relating to the CDS and the CDS Agreements against the wishes and/or to the detriment of the holders of other notes, certificates or

---

[3]    The Trustee respectfully disagrees with the Debtors that these purchases are ordinary course transactions particularly for a liquidating Debtor.  Section 345 and the "with cause" requirement were promulgated by Congress for a reason: to insure that Debtors invest funds prudently.

investments issued by the special purpose vehicle.  These attempts by the Debtors would be with the purpose of maximizing a return with respect to their termination payment under the CDS at the expense of their position as a holder of an investment, and may exercise rights in a manner that another investor without these other interests would consider irrational.

Similar issues arise in bankruptcy in the context of the exercise of the right to vote under a plan of reorganization.  Where the exercise of this right is abusive and irrational from an investor's viewpoint, courts have refused "creditors" the right to exercise their voting rights.  For example, in the case of *In re Dune Deck Owners Corp*., 175 B.R. 839 (Bankr. S.D.N.Y. 1995), the bankruptcy court considered a case where a secured creditor purchased unsecured claims of a bankrupt debtor in order to block the debtor's proposed plan of reorganization.  The court noted that "while one who purchased claims to block a plan need not always explain the motive for its vote," certain facts suggesting a lack of good faith might warrant a factual inquiry by the court. *Id*. at 841.  The absence of good faith, or bad faith, are found where:  "(1) the claim holder attempts to extract or extort a personal advantage not available to other creditors in its class, and (2) the creditor has an 'ulterior motive', such as to procure some collateral or competitive advantage that does not relate to its claim." *Id*. at 844.

In *Dune Deck Owners Corp*., the court delineated several "badges of bad faith" that caselaw has developed in the bankruptcy context, including creditor votes designed to (1) assume control of the debtor; (2) put the debtor out of business or otherwise gain a competitive advantage; (3) destroy the debtor out of pure malice; or (4) obtain benefits under a private agreement with a third party that depends on the debtor's failure to reorganize. *Id*. at 844-45.  Additionally, the court stated that it could have the power to "designate" as in bad faith the vote of a creditor which has a conflict of interest with the class in which it votes.  In connection with this latter point, the court referred to the legislative history behind the 1978 Bankruptcy Code,

averring that Congress intended to give bankruptcy courts such power to designate exclusion of a creditor's claim.    Furthermore, the court indicated that Congress intended to overrule a non-bankruptcy holding (*Aladdin Hotel Corp. v. Bloom,* 200 F.2d 627 (8th Cir. 1953)) in which the shareholders of a company were permitted to vote their bond holdings of the same company in order to extend the maturity date of the bond obligation and thereby squeeze out the minority bondholders.    *Id.* at 845, n.13.    Thus, in the substantially analogous situation dealing with plans of reorganization, New York bankruptcy caselaw indicates a willingness to recognize that squeezing out minority bondholders to pursue the majority bondholders' private interest may be against Congressional policy.

In addition to the effect on other creditors, a proposed note purchase that evinces a desire to control the underlying entity may, in the eyes of a court, indicate bad faith and thus potentially impugn the proposed transaction.    For example, in *In re Allegheny International, Inc.*, 118 B.R. 282 (Bankr. W.D.Pa. 1990), an investment firm acquired large amounts of claims in two classes, despite not being a pre-petition creditor of the bankrupt debtor.    The two classes were opposed to each other in existing litigation.    The bankruptcy court disqualified the creditor's votes with regard to the debtor's plan of reorganization, holding that the creditor had the purpose of gaining control of the debtor, which the court found to be bad faith.    Additionally, the court pointed to the timing of the creditor's purchases, suggesting that it wanted to accumulate only a blocking position and no more.[4]

---

[4]    Another analogous situation is to so-called "exit consents," where a bondholder tenders its bonds on favorable terms in exchange for its vote in favor of amendments to an indenture, usually reducing the protections offered to the remaining bondholders.    In these situations, absent a pre-existing contractual provision holding otherwise, a vote made by a bondholder while exiting a transaction should not be used to constitute a majority vote for the purposes of amending the underlying indenture.    *See, e.g.,* Coffee & Klein, *Bondholder Coercion: The Problem of Constrained Choices in Debt Tender Offers and Recapitalizations*, 68 Uni. Chi. L. Rev. 1207 (1991).    These bondholders are, at best, indifferent to the fate of the remaining bondholders and their votes, although meeting the "letter" of the indenture, should not be counted.

The Second Circuit has in some situations limited the ability to amend an indenture by "majority vote." *See, Hackettstown Nat'l Bank v. D.G. Yuengling Brewing Co*, 74 F. 110 (2d Cir. 1896). In this classic case, the Second Circuit declined to give legal effect to "a consent to postpone the payment of the demands of the minority bondholders, made collusively by majority bondholders for the purpose of defeating the remedy of the minority, and not in the exercise of an honest discretion in the general interest." *Id*. at 112. The court noted, "[c]ommunity of interest, whether in the case of partners or security holders, creates mutual obligation, and imposes upon all persons occupying that position the duty of acting in the utmost good faith towards the interests of their associates." *Id*.

In the instant case, the Debtors do not appear to be interested in making an investment in the notes, certificates and/or investments in the special purpose vehicles because they are interested in them for investment purposes, but rather they appear to be interested in attempting to wield certain rights that may go along with such investments to take control of a transaction to benefit themselves as a swap counterparty at the expense of holders of notes. The Trustee fears the Debtors might use these rights in a manner in which no other noteholder would rationally use them at the expense of other holders of investments in the transaction. As a result, the Trustee believes the Motion should be denied, but to the extent the Court permits the investment, the investment should be without prejudice to a challenge of the exercise of any rights acquired by the Debtors by the Trustee and other affected third parties.

**C.      The Proposed Investment May be a Breach of the Implied Covenant of Good Faith and Fair Dealing Under New York Law**

The proposed investments, if used to resolve outstanding issues may also violate the implied covenant of good faith and fair dealing. This covenant is implied under every contract governed by New York law. *Metropolitan Life Ins. Co. v. RJR Nabisco*, 716 F.Supp. 1504, 1519 (S.D.N.Y.1989). The implied covenant of good faith and fair dealing is designed to address

exactly this situation – where a party does something to prevent its counterparty from enjoying the fruits of the contract. *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 388 (N.Y. 1995) ("Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance. . . . This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."); *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283, 298 (S.D.N.Y. 2005).

In this case, the Debtors are potentially attempting to use these investments to surreptitiously alter the terms of the CDS Agreements. One of the Debtors is a counterparty with a trust under the CDS Agreements. The CDS Agreements provide for certain specific agreements between the Debtor and the special purpose vehicle (for the benefit of investors). Of particular importance in this case are the provisions relating to Early Termination and the priority of the termination payment. The CDS Agreements and the trust agreements or indentures both generally provide that if the Lehman counterparty is in default of the CDS Agreements, that any termination payment due it is paid after any payment is made on the notes or certificates. Lehman's purchase of these notes or certificates in an effort to try to force a settlement on noteholders or certificateholders may deny these investors of their contractual right to be paid in full first. The Debtors are buying not to earn a return on these investments, but primarily (if not solely) to force a settlement on other noteholders. Therefore, the Debtors' intentional purchase of these securities may have "the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton*, 87 N.Y.2d  389. The Trustee believes that the debtors are breaching the implied covenant of good faith and fair dealing by trying to deny the noteholders of their bargained for rights.

**D.    The Documents for the Transactions Contain Limitations on the Use of Noteholder Rights Which Significantly Limit the Utility of the Rights to the Debtors; These Rights Must be Respected.**

The trust agreements and indentures contain a number of restrictions which attempt to minimize the risk that certain rights might be altered by a majority of holders to the detriment of a minority of holders.  The Trustee believes that any Order approving these investments must explicitly reserve rights with respect to these provisions, and further that these provisions may limit the usefulness of the Debtors purchasing these investments.

For example, Section 5.13 of the Exum Ridge 2004-6 Indenture provides for certain control rights of Holders of Notes.  That Section provides:

> The Holders of a Supermajority of (x) each of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes, Voting as separate Classes or (y) in the case of an Event of Default described in subclause 5.1(a) or (b) above, the Controlling Class will have the right to direct the Trustee in the conduct of any proceedings for any remedy available to the Trustee; *provided*, that:
>
> (a) such direction shall not be in conflict with any rule of law or with this Indenture;
>
> (b) the Trustee may take any other action deemed proper by it that is not inconsistent with such direction; *provided, however*, that, subject to *Section 6.1*, it need not take any action that it determines might involve it in liability;
>
> (c) the Trustee shall have been provided with indemnity satisfactory to it; and
>
> (d) any direction to the Trustee to undertake a sale of the Collateral shall be by the Holders of Notes secured thereby representing the percentage of the Aggregate Outstanding Amount of such Notes specified in Section 5.4 or 5.5 as applicable.

Exum Ridge 2006-4 Indenture, Section 5.13, p. 98.  As such, each proposed purchase must be examined on its own to ensure that the terms of the relevant trust agreements and

- 11 -

indentures are complied with and that the rights of the remaining noteholders in the transaction are protected.

Further, there may be bona fide issues as to whether an investment purchased by one of the Debtors would constitute an "Outstanding" security for purposes of a trust agreement or an Indenture.  For example, the Indenture dated as of September 15, 2006 by and between Exum Ridge CBO 2006-4, Ltd., as Issuer, Exum Ridge CBO 2006-4 Corp., as Co-Issuer and U.S. Bank National Association as Trustee (the *"Exum Ridge 2006-4 Indenture"*) defines Outstanding in pertinent part:

> With respect to a Class of Notes, all of the Notes or the Preference Shares, as of any date of determination, all of such Class of Notes, all of the Notes or Preference Shares, as the case may be, theretofore authenticated under the Shares Paying Agency Agreement and then issued and registered in the Share Register of the Issuer as Outstanding, as the case may be, except:
>
> * * * *
>
> *provided*, that in determining whether the Holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Notes, and Preference Shares owned by the Issuer or the Co-Issuer shall be disregarded and deemed not to be Outstanding; *provided, further*, that for the avoidance of doubt, the Class A Notes shall be deemed to be Outstanding unless an until the Class A Commitments have been reduced to zero (and there is no outstanding principal balance on the Class A Notes) . . .

Exum Ridge 2006-4 Indenture, Definitions Section, p. 34-35.  In the ordinary course of business, the Class A Notes have certain rights to direct and instruct the Trustee.  Should one or more of the Debtors own or purchase the Class A Notes, however, particularly where no amounts have been funded under the Class A Commitments (and therefore no principal amount is due thereunder), the Trustee questions whether the Notes are truly Outstanding and should be entitled to exercise any direction rights because the Debtors have no obligation to honor the Class A

- 12 -

Commitments.   Further other trust agreements or indentures exclude from the definition of Outstanding certain types of holders, particularly issuers, affiliates and sometimes other parties with another connection to the transaction.

There are also limitations on certain actions or amendments the Trustee might take even with the approval of the holders of a majority of Notes.  For example Section 8.2 of the Exum Ridge 2006-4 Indenture provides in pertinent part:

> …Notwithstanding the foregoing, the Trustee may not enter into any supplemental indenture without the written consent of the Credit Swap Counterparty and the Holders of each Outstanding Note of each Class materially and adversely affected thereby and the Issuer may not enter into any such supplemental indenture without the consent of the Holders of each Outstanding Preference Share materially and adversely affected thereby if such supplemental indenture:
>
> (a) changes the Stated Maturity of or the due date of any installment of interest on any Note the due date on which any dividend or any final distribution on the Preference Shares is payable, reduces the principal amount of any Note or the rate of interests thereon…changes the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on the Note…
>
> (c) impairs or adversely affects the Collateral except as otherwise permitted in this Indenture;…
>
> (g) modifies the Priority of Payments;…

Exum Ridge 2006-4 Indenture, Section 8.2 p. 130-133.  As indicated in Section 8.2, certain rights of holders are sacrosanct and can not be altered at the sole whim of a majority, but may require something more – a settlement approved by the known holders, and approved pursuant to Bankruptcy Rule 9019 with notice and an opportunity to be heard given to all holders of Notes and Preference Shares.  All of these provisions, and any other provision protecting the rights of minority investors ought to be explicitly reserved if this Court elects to grant the proposed relief.

Finally, it should be noted that these cases have not been substantively consolidated, and that the purchase by one Debtor entity of an investment issued by a Special Purpose Vehicle may conflict with an interest of another Debtor Entity and their respective creditor constituencies.

CONCLUSION

For all of the foregoing reasons:  (a) the inappropriateness of these investments under the spirit of the Bankruptcy Code, (b) the inappropriate conflict of interest in exercising rights as a noteholder primarily to advance its position as a swap counterparty, and (c) the restrictions on the exercise of such rights to the detriment of minority noteholders; the Motion should be denied or, alternatively, any Order should reserve all rights of the Trustee and third parties with respect to any notes, certificates or investments purchased by the Debtors as described herein.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, U.S. Bank National Association as Owner Trustee or Indenture Trustee respectfully requests that this Court deny the Motion in its entirety, or alternatively enter an order which (a) preserves all rights of the Trustee and Noteholders under the terms of the relevant documents, and (b) preserves all rights under applicable law with respect to the exercise of voting and other rights when significant conflicts of interests exist.

Respectfully submitted,

U.S. BANK NATIONAL ASSOCIATION, not
      individually but as Trustee


By: _____/s/ Ann Acker_____
                One of Its Attorneys


James E. Spiotto (admitted *pro hac vice*)
Ann E. Acker (admitted *pro hac vice*)
Franklin H. Top, III (admitted *pro hac vice*)
James Heiser (JH-3660)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois  60603
(312) 845-3000

Craig M. Price
CHAPMAN AND CUTLER LLP
330 Madison Avenue, 34th Floor
New York, New York  10017-5010
(212) 655-6000