**GIBSON, DUNN & CRUTCHER LLP**
Jeremy L. Graves (TX - 24059849)
2100 McKinney Avenue
Dallas, Texas
Telephone: (214) 698-3100
Facsimile: (214) 698-2900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------x
                        :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC., et al.** | : | **08-13555 (JMP)** |
| | : | |
| **Debtors** | : | **(Jointly Administered)** |
| | : | |
| | : | |

----------------------------------------------------------------------x

**THIS SUMMARY SHEET APPLIES TO:**

**X**   All Debtors

### SUMMARY SHEET PURSUANT TO THE UNITED STATES TRUSTEE GUIDELINES FOR REVIEWING APPLICATIONS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES FILED UNDER 11 U.S.C. § 330

Name of Applicant:                              GIBSON, DUNN & CRUTCHER, LLP

Date of Retention:                              TBD[1]

---

[1] The Debtors have filed their *Application of the Debtors Pursuant to Sections 327(e) and 328(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure for Authorization to Employ and Retain Gibson, Dunn & Crutcher LLP, as Special Counsel to the Debtors,* Nunc Pro Tunc *to September 1, 2009* [Docket No. 7005]. The Court has not yet entered an order approving Gibson Dunn's retention; however, in order to comply with the procedures set forth in the Court's *Third Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals* [Docket No. 4165], Gibson Dunn is filing this Application.  If the order approving Gibson Dunn's retention is not entered as of the date of the hearing on this Application, Gibson Dunn will seek to have the hearing adjourned until such time as Gibson Dunn's retention is approved.  Gibson, Dunn & Crutcher, LLP was retained in these cases *nunc pro tunc* to September 15, 2008 as an ordinary course professional pursuant to this

[Footnote continued on next page]

| | |
|---|---|
| Date of Entry of Order Authorizing Employment: | TBD |
| Period for Which Compensation and Reimbursement is Sought: | September 1, 2009 through January 31, 2010 |
| Amount of Compensation Sought As Actual, Necessary and Reasonable: | $380,329.25; £381,060.50 |
| Amount of Expense Reimbursement Sought as Actual, Necessary, and Reasonable | $5,695.16; £3,890.00 |
| This is: | The First Interim Application as a 327(e) Professional |
| Blended Rate of Professionals (Including Paraprofessionals): | $509.87; £453.21 |
| Blended Rate of Professionals (Excluding Paraprofessionals): | $525.43; £ 453.21 |

---

[Footnote continued from previous page]

Court's *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtors to Employ Professionals Utilized in the Ordinary Course of Business*, dated November 5, 2008 [Docket No. 1394] (the "OCP Order").

## PROFESSIONALS AND PARAPROFESSIONALS RENDERING SERVICES IN USD

### From September 1, 2009 through January 31, 2010

| NAME | POSITION | YEAR ADMITTED TO BAR | DATE OF EMPLOYMENT | HOURS | RATE* | AMOUNT |
|---|---|---|---|---|---|---|
| Amy R. Forbes | Partner—Real Estate | 1984 CA | 6/1/1984 | 16.25 | $840 | $13,650.00 |
| Jesse Sharf | Partner—Real Estate | 1986 CA | 6/1/1986 | 11.8 5.0 | $890 $925 | $15,127.00 |
| Wayne P. McArdle | Partner—Corporate | 1995 UK | 6/16/2001 | 6.8 1.0 | $1,065.00 $1,110.00 | $8,352.00 |
| Jesse I. Shapiro | Associate—Real Estate | 2000 NJ 2001 NY 2006 CA | 9/12/2005 | 27.3 1.9 | $610 $650 | $17,888.00 |
| Samuel A. Newman | Partner—Corporate | 2001 CA | 9/4/2001 | 1.5 | $610 | $915.00 |
| Austin V. Schwing | Associate—Litigation | 2000 CA | 11/6/2000 | 23.1 | $635 | $14,668.50 |
| Janna M. Boelke | Associate—Real Estate | 2003 CA | 10/7/2003 | 2.0 | $570 | $1,140.00 |
| David S. Egdal | Associate—Real Estate | 2003 CA | 11/3/2003 | 91.0 33.2 | $570 $615 | $72,288.00 |
| Farshad E. More | Associate—Real Estate | 2003 CA | 9/2/2003 | 126.4 9.9 | $570 $615 | $78,136.50 |
| Douglas M. Champion | Associate—Real Estate | 2006 CA | 9/5/2006 | 1.7 | $470 | $799.00 |
| Erika R. Randall | Associate—Real Estate | 2006 CA | 9/5/2006 | 7.3 3.4 | $470 $515 | $5,182.00 |
| Erica H. Weber | Associate—Real Estate | 2006 CA | 11/6/2006 | 0.1 | $470 | $47.00 |
| Serineh Baghdasarian | Associate—Real Estate | 2006 CA | 9/5/2006 | 6.0 | $470 | $2,820.00 |
| Jeffrey D. Tyrrell | Associate—Real Estate | 2006 CA | 10/17/2005 | 40.0 0.3 | $495 $515 | $19,954.50 |
| Charles Patrick Floyd | Associate—Litigation | 2006 TX | 9/5/2006 | 23.8 | $470 | $11,186.00 |
| Julie A. Smith | Associate—Corporate | 2006 TX | 9/5/2006 | 11.2 | $470 | $5,264.00 |

---

\* This column indicates rate increases as of January 1, 2010. These rate increases are based upon numerous factors, including increases in years of legal experience.

| NAME | POSITION | YEAR ADMITTED TO BAR | DATE OF EMPLOYMENT | HOURS | RATE* | AMOUNT |
|---|---|---|---|---|---|---|
| Milena Radoycheva | Associate—Corporate | 2006 UK | 10/9/2006 | 5.0 | $600 | $3,000.00 |
| Kelsey M. Lestor | Associate—Real Estate | 2007 CA | 10/1/2007 | 16.4<br>0.2 | $400<br>$490 | $6,658.00 |
| Jeremy L. Graves | Associate—Litigation | 2007 TX | 10/6/2008 | 68.0<br>2.6 | $400<br>$490 | $28,474.00 |
| Julie Arnaoutova | Associate—Real Estate | 2007 CA | 8/6/2007 | 56.5<br>4.2 | $470<br>$515 | $28,718.00 |
| Michael A. Zellen | Associate—Real Estate | 2008 CA | 10/1/2007 | 10.0<br>0.7 | $400<br>$490 | $4,343.00 |
| Sonam Makker | Associate—Real Estate | 2008 CA | 9/2/2008 | 0.5 | $345 | $172.50 |
| Carol A. Fabrizio | Associate—Real Estate | 2008 CA | 11/3/2008 | 34.5<br>2.1 | $345<br>$415 | $12,774.00 |
| Kelly Anne Bohne | Associate—Litigation | 2008 TX | 9/2/2008 | 33.4 | $345 | $11,523.00 |
| Travis S. Souza | Associate—Corporate | 2008 TX | 9/2/2008 | 1.8 | $345 | $621.00 |
| Daniel J. Aleshire | Associate—Real Estate | 2009 CA | 11/30/2009 | 2.6 | $360 | $936.00 |
| Sarah R. Garber | Associate—Real Estate | 2009 CA | 11/16/2009 | 12.8 | $360 | $4,608.00 |
| Michael Szczurek | Associate—Real Estate | 2009 CA | 11/30/2009 | 1.3<br>1.1 | $360<br>$360 | $864.00 |
| Irene Hymanson | Senior Paralegal—Real Estate | N/A | 11/02/1987 | 0.25 | $330 | $82.50 |
| Deborah D. Hoxie | Paralegal—Real Estate | N/A | 2/15/1996 | 37.25<br>2.25 | $315<br>$330 | $12,476.25 |
| Jennifer M. Contreras | Paralegal—Bankr. | N/A | 2/23/2004 | 13.7 | $290 | $3,973.00 |
| Robert King | Corporate Research Manager—Library | N/A | 11/06/2000 | 0.5 | $185 | $92.50 |
| Bette J. Page | Research Analyst—Library | N/A | 3/03/1986 | 0.2 | $180 | $36.00 |
| **TOTAL:** | | | | **757.7** | | **$386,329.25** |

**Total Professional Hours:......................703.55**
**Total Paraprofessional Hours:...............54.15**
**Total Hours: ...........................................757.7**
**Total Fee Amount:......................$386,329.25**

**Blended Rate: .....................................$509.87**
**Excluding Paraprofessional Hours:  $525.43**
**Total Amount Requested……..$380,329.25**[1]

---

[1]  This reflects a reduction of $6,000 as a result of a payment of Gibson Dunn's fees from a third party.

## PROFESSIONALS AND PARAPROFESSIONALS RENDERING SERVICES IN GBP

### From September 1, 2009 through January 31, 2010

| NAME | POSITION | YEAR ADMITTED TO BAR | DATE OF EMPLOYMENT | HOURS | RATE* | AMOUNT |
|---|---|---|---|---|---|---|
| Philip Rocher | Partner—Litigation | 1981 UK | 8/1/2005 | 3.2 | £625 | £2,000.00 |
| Nicholas P.B. Aleksander | Partner—Tax | 1986 UK | 2/5/2001 | 2.0 | £625 | £1,250.00 |
| Andrew S.V. Thomas | Partner—Corporate | 1990 UK | 5/1/2000 | 16.4 0.55 | £625 £625 | £10,593.75 |
| Wayne P. Mcardle | Partner—Corporate | 1995 UK | 6/16/2001 | 188.65 40.4 | £625 £625 | £143,156.25 |
| James Barabas | Partner—Corporate | 1998 UK | 1/2/2007 | 0.6 | £555 | £333.00 |
| Gregory A. Campbell | Partner—Corporate | 1999 UK 2004 NY | 6/2/2008 | 22.15 1.25 | £505 £505 | £11,817.00 |
| Niloufar Goharian | Associate—Corporate | 2000 FR 2007 UK | 10/3/2005 | 34.5 | £400 | £13,800.00 |
| Allan R. W. Neil | Associate—Litigation | 2001 UK | 10/6/2005 | 9.7 0.9 | £430 £430 | £4,558.00 |
| Michael Weir | Associate—Corporate | 2002 UK | 6/13/2005 | 156.2 | £430 | £67,166.00 |
| Milena Radoycheva | Associate—Corporate | 2006 UK | 10/9/2006 | 225.7 36.1 | £355 £355 | £92,939.00 |
| David Yoon | Associate—Corporate | 2006 UK | 9/4/2006 | 6.0 | £355 | £2,130.00 |
| Victor Campbell | Associate—Corporate | 2007 UK | 10/8/2007 | 30.75 | £335 | £10,301.25 |
| Linn Nathalie Mayhew | Associate—Corporate | 2007 UK | 1/1/2008 | 36.75 3.75 | £335 £335 | £13,567.50 |
| Stephen Thompson | Associate—Corporate | 2009 UK | 4/20/2009 | 25.25 | £295 | £7,448.75 |
| **TOTAL:** | | | | **840.8** | | **£381,060.50** |

**Total Professional Hours:......................840.8**

---

\* This column indicates rate increases as of January 1, 2010.  These rate increases are based upon numerous factors, including increases in years of legal experience.

**Total Paraprofessional Hours:**..................0.0
**Total Hours:** ...........................................840.8
**Total Fee Amount:**...................... £381,060.50
**Blended Rate:** ....................................£453.21
**Excluding Paraprofessional Hours:** £453.21

**GIBSON, DUNN & CRUTCHER LLP**
Jeremy L. Graves (24059849)
2100 McKinney Avenue
Dallas, Texas
Telephone: (214) 698-3100
Facsimile: (214) 698-2900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                          :

**In re**                                 :         **Chapter 11 Case No.**
                                          :
**LEHMAN BROTHERS HOLDINGS INC., et al.**    :         **08-13555 (JMP)**
                                          :
                    **Debtors**        :         **(Jointly Administered)**
                                          :
                                          :
-------------------------------------------------------------------x

**THIS APPLICATION APPLIES TO:**

 **X**   All Debtors

**APPLICATION OF GIBSON, DUNN & CRUTCHER LLP, AS A 327(e)
PROFESSIONAL, FOR ALLOWANCE OF INTERIM COMPENSATION
FOR SERVICES RENDERED AND FOR  REIMBURSEMENT OF ACTUAL
AND NECESSARY EXPENSES INCURRED FROM SEPTEMBER 1, 2009
THROUGH JANUARY 31, 2010**

      Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), a professional providing services to

Lehman Brothers Holdings, Inc. ("LBHI") and its affiliated debtors in the above-referenced

chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), files pursuant

to sections 330(a) and 331 of title 11 of the United States Code (the "Bankruptcy Code") and

Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), this

application (the "Application") for interim allowance of compensation for professional services

performed by Gibson Dunn for the period from September 1, 2009 through January 31, 2010 (the

6

"Compensation Period"), and for reimbursement of its actual and necessary expenses incurred during the Compensation Period.  Gibson Dunn respectfully represents:

### JURISDICTION

1.        This Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this Application is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, respectively.  The statutory predicates for the relief requested herein are sections 330 and 331 of the Bankruptcy Code.

### GENERAL BACKGROUND

2.        Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.        On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

4.        On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

5.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

6.      Gibson Dunn began performing legal services on behalf of the Debtors as an Ordinary Course Professional pursuant to this Court's *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtors to Employ Professionals Utilized in the Ordinary Course of Business*, dated November 5, 2008 [Docket No. 1394] (the "OCP Order").  In accordance with the procedures set forth in the OCP Order, such retention became effective *nunc pro tunc* to September 15, 2008 upon the filing of the affidavit of Jesse Sharf [Docket No. 2444] and the expiration of the relevant objection period.  The Debtors have subsequently filed their *Application of the Debtors Pursuant to Sections 327(e) and 328(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure for Authorization to Employ and Retain Gibson, Dunn & Crutcher LLP, as Special Counsel to the Debtors,* Nunc Pro Tunc *to September 1, 2009* [Docket No. 7005].  The Court has not yet entered an order approving Gibson Dunn's retention; however, in order to comply with the procedures set forth in the Court's *Third Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals* [Docket No. 4165] (the "Interim Compensation Order"), Gibson Dunn is filing this Application.  If the order approving Gibson Dunn's retention is not entered as of the date of the hearing on this Application, Gibson Dunn will seek to have the hearing adjourned until such time as Gibson Dunn's retention is approved.

## SUMMARY OF PROFESSIONAL COMPENSATION
## AND REIMBURSEMENT OF EXPENSES REQUESTED

7.      This Application is Gibson Dunn's first application for interim compensation and reimbursement of expenses as a 327(e) professional in these chapter 11 cases.

8.      Gibson Dunn prepared this Application in accordance with the *Amended Guidelines for Fees and Disbursements of Professionals in Southern District of New York Bankruptcy Cases*, adopted by the Court on April 19, 1995 (the "Local Guidelines"), the *United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330*, adopted on January 30, 1996 (the "UST Guidelines"), the Interim Compensation Order, and this Court's *Order Appointing Fee Committee and Approving Fee Protocol* [Docket No. 3651] (the "Fee Protocol Order," and together with the Local Guidelines, the UST Guidelines, and the Interim Compensation Order, the "Guidelines"). Pursuant to the Local Guidelines, a certification regarding compliance with the Guidelines is annexed hereto as Exhibit A.

9.      Gibson Dunn seeks allowance of interim compensation for professional services rendered to the Debtors during the Compensation Period in the amount of $380,329.25 and £381,060.50, and for reimbursement of expenses incurred in connection with such services in the amount of $5,695.16 and £3,890.00. During the Compensation Period, Gibson Dunn attorneys and paraprofessionals expended a total of 1,598.5 hours for which compensation is requested.

10.     There is no agreement or understanding between Gibson Dunn and any other person for the sharing of compensation to be received for services rendered in these cases.

11.     Gibson Dunn's fees in these cases are billed in accordance with its existing billing rates and procedures. The rates Gibson Dunn charges for the services rendered by its

professionals and paraprofessionals in these chapter 11 cases are the same rates Gibson Dunn

charges for professional and paraprofessional services rendered in comparable non-bankruptcy

matters.  Such fees are reasonable based on the customary compensation charged by comparably

skilled practitioners in comparable non-bankruptcy cases in a competitive international legal

market.

12.    Pursuant to the UST Guidelines, annexed hereto as Exhibit B is a schedule setting

forth:  (a) all Gibson Dunn professionals and paraprofessionals who have performed services in

these chapter 11 cases during the Compensation Period; (b) the capacities in which each such

individual is employed by Gibson Dunn; (c) the department in which each such individual

practices; (d) the hourly rate charged by Gibson Dunn for services performed by each such

individual; (e) the aggregate number of hours expended by each such individual on behalf of the

Debtors during the Compensation Period and (f) the year in which each professional was first

licensed to practice law.

13.    Annexed hereto as Exhibit C is a schedule specifying the categories of expenses

for which Gibson Dunn is seeking reimbursement and the total amount of reimbursement

requested for each such expense category.

14.    Pursuant to the UST Guidelines, annexed hereto as Exhibit D is a summary by

project category of the services performed by Gibson Dunn during the Compensation Period.

15.    Gibson Dunn has attempted to include in this Application all time and expenses

relating to the Compensation Period.  However, delays in processing such time and receiving

invoices for certain expenses may occur.  Accordingly, Gibson Dunn reserves the right to

supplement this Application prior to the date set by this Court for hearing this Application to

request additional compensation for professional services rendered and reimbursement of expenses incurred during the Compensation Period.

16.     Gibson Dunn maintains computerized records of the time spent by all Gibson Dunn attorneys and paraprofessionals in connection with its representation of the Debtors. Subject to redaction for attorney-client privilege where necessary to protect the Debtors and their estates, copies of such computerized records for the Compensation Period are attached hereto as Exhibit E and copies of Gibson Dunn's disbursement records for the Compensation Period are annexed hereto as Exhibit F.[1]

## SERVICES RENDERED BY GIBSON DUNN

17.     The description of services below summarizes the primary services rendered by Gibson Dunn during the Compensation Period, and highlights the benefits conferred upon the Debtors and their estates and creditors as a result of Gibson Dunn's services.  The following description is a summary of the primary services rendered by Gibson Dunn during the Compensation Period.

**A.     PHX TECH (MATTER # 00196)**

(Total Hours:  90.0  Total Fees:  $47,713.00; $41,713.00 requested after reduction for payments received from third parties)

---

[1]  Due to the voluminous nature of these records, Gibson Dunn will not serve them with this application.  Instead, these records may be viewed on the official website for the Bankruptcy Court at www.nysb.uscourts.gov, by using an account obtained from Pacer Service Center by dialing 1-800-676-6856 (from the United States) or 1-210-301-6440 (from outside the United States), or copies may be obtained upon written request to Jennifer Contreras, Gibson, Dunn & Crutcher, 200 Park Avenue, New York, NY 10166, Telephone 1-212-351-3826 or email at jcontreras@gibsondunn.com.

18.    The Debtors made a mezzanine loan in the amount of $6,500,000.00 in July 2006. During 2009, the borrower under the mezzanine loan threatened litigation against the Debtors for their alleged failure to fund protective advances that the borrower asserted the Debtors were required to fund and asserted that such failure resulted in the Debtors not being able to enforce the debt (the "Protective Advance Allegations").  Subsequently, the mezzanine loan matured in the fall of 2009 and it became apparent that the borrower's wholly owned subsidiary was going to default on its mortgage loan.  The Debtors and  the lender under the mortgage loan were parties to an intercreditor agreement which provides that the mezzanine loan is subordinate to the mortgage loan and following a mortgage loan default, mezzanine lender is not entitled to be paid on its mezzanine loan unless the mortgage loan is repaid in full.

19.    With the impending default on the mortgage loan, the Debtors elected to enter into a settlement agreement (the "Settlement") with the mortgage borrower pursuant to which the borrower would release all claims against the Debtors, the Debtors would receive a payment of approximately $550,000.00, the borrower would pay all of lender's attorney fees (up to $110,000.00), and the Debtors would agree to transfer the loan to an affiliate of the borrower if the borrower caused the mortgage lender to terminate the intercreditor agreement.

20.    Gibson Dunn has represented the Debtors to (i) defend against the Protective Advance Allegations, (ii) negotiate and document the Settlement, and (iii) negotiate and document the Assignment and the termination of the intercreditor agreement.

21.    Gibson Dunn received a direct payment of $6,000 from the borrower on account of these services, and accordingly has reduced the amount it is seeking in this Application by $6,000.

12

**B.      CENTRA LAS VEGAS (MATTER # 00249)**

(Total Hours:  0.5  Total Fees:  $157.50)

22.      Time billed to this matter by Gibson Dunn represents work performed in connection with the assisting the Debtors in their efforts to (1) address certain events of default under a Building Loan Agreement dated 17 May 2007 (the "Pilot Loan Agreement") and (2) ensure that its indirect subsidiary, LB NV-740 Pilot LLC ("LB Pilot"), has complied with its obligations, and protected its rights pursuant to a joint venture agreement dated 17 May 2007 (the "Pilot JV Agreement") between LB Pilot and Centra NV-740 Pilot LLC.

23.      During the Compensation Period, Gibson Dunn provided advice to the Debtors on the Loan Agreement and the Pilot JV Agreement, including addressing various events of default and other matters under the Loan Agreement and the Pilot JV Agreement, and exiting the joint venture.

**C.      CENTRA CLARK COUNTY (MATTER # 00263)**

(Total Hours:  0.7  Total Fees:  $623.00)

24.      Time billed to this matter is related to Gibson Dunn's representation of the Debtors in connection with debt and equity investments in Clark County, Nevada.

**D.      OCP (MATTER # 00271)**

(Total Hours:  0.7  Total Fees:  $329.00)

25.      Time billed to this matter is related to Gibson Dunn's representation of the Debtors in connection with the acquisition of the Warner Center property at 6101 Variel in Los Angeles, together with a joint venture with DS Ventures.  Gibson Dunn initially negotiated a purchase contract for the property.  Gibson Dunn also drafted and negotiated various agreements

that governed the Debtors' portion of the deposit made by the buyer under the purchase contract,

so that the Debtors could force DS Ventures to either terminate the contract and get the deposit

back or proceed without the Debtors after reimbursing the Debtors for their portion of the

deposit.  Gibson Dunn also drafted and negotiated a LLC agreement between the Debtors and DS

Ventures.  When the Debtors eventually decided to not make an equity investment in the

property but to instead they made a mezzanine loan to DS Ventures, Gibson Dunn drafted and

negotiated the mezzanine loan documents with DS Ventures.

E.    **SUNCAL GENERAL (MATTER # 00280)**

(Total Hours:  37.75  Total Fees:  $22,770.50)

26.    Time spent on this matter involved serving as local land use and development

counsel with respect to 13 different Suncal development projects, each in a different stage of

development. Work included updating the entitlement memos on all of the Suncal Property,

detailing the complete entitlement and permitting history, and outlining the necessary steps to

complete development of each project.  Gibson Dunn also focused on individual issues related to

specific developments.  For example, Gibson Dunn was asked to figure out the status of various

easements to be granted to merchant builders at PacPoint.  Gibson Dunn also reviewed a

proposed modification to the Heartland streambed alteration agreement, as well as agreements

related to the dedication of certain property required as mitigation of project impacts.  Gibson

Dunn also spent a significant amount of work reviewing the issue relative to the various

subdivision agreements and improvement bonds for each project.  Gibson Dunn researched

whether the liabilities under the agreements transferred to subsequent owners, as well as the rules

for accessing the subdivision bonds to complete the delinquent improvements.  Gibson Dunn

also gathered updated entitlement information for each of the 13 projects, and determined the

Debtors' potential rights and obligation under the development agreements applicable to the

projects.

**F.   VILLA MASTER (MATTER # 00323)**

(Total Hours:  13.6  Total Fees:  $6,688.00)

27.   Time billed on this matter relates to Gibson Dunn's representation of one of the

Debtors' affiliates in workout discussions with its partner.

**G.   VCC WORKOUT (Matter # 00324)**

(Total Hours:  248.2  Total Fees:  $129,157.75)

28.   Time billed on this matter was in connection with Gibson Dunn's representation

of the Debtors and various subsidiaries of PAMI LLC (the "LB Members"), in the restructuring

and work-out of various mortgage loans and/or joint ventures with subsidiaries of Venture

Corporation (the "VCC Members") whereby 19 LB Members received an assignment of

membership interests in the joint ventures from the VCC Members, and 2 LB Members assigned

their membership interests in the joint ventures to a subsidiary of the VCC Members.

**H.   CAPSTONE (MATTER # 00325)**

(Total Hours:  8.7  Total Fees:  $4,330.00)

29.   Time billed to this matter relates to Gibson Dunn's representation of the Debtors

in completing "buy-sell" transactions pursuant to partnership and joint venture agreements with

various Capstone subsidiaries.  The Debtors either acquired or assigned their interests in the

various joint ventures/partnerships from or to the Capstone subsidiaries.

## I.    EXCALIBUR (MATTER # 00326)

(Total Hours  543.65  Total Fees:  £239,539.25)

30.    Time billed to this matter by Gibson Dunn represents work performed in connection with the assisting the Debtors in their efforts to obtain control (the "LB RE Transaction") over the primary asset of LB RE Financing No. 3 Limited (in administration), a private limited company incorporated and registered in England and Wales ("LB RE").  LBHI is the primary creditor of LB RE, which is in administration (insolvency proceedings) in the United Kingdom.[1]  LB RE is the holder of a €722,181,000 Class B Note due 2054 (the "B Note") issued by Excalibur Funding No. 1 PLC ("Excalibur"), an orphan special purpose vehicle that Lehman Brothers created in May 2008 to issue real estate backed commercial debt obligations.  Pursuant to the LB RE Transaction, LBHI will (i) gain control over most of the commercial decisions relating to the B Note, (ii) secure the right to recover from LB RE amounts advanced to it in respect of the B Note, in priority to any other claims of creditors, and (iii) obtain the right, in certain circumstances, to acquire the B Note (or shares of LB RE).  The Debtors will benefit from the LB RE Transaction in a number of ways which are articulated in the *Debtors' Motion Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 6004 for Authorization to Enter Into Agreements to Provide Funding to LB RE Financing No. 3 Limited (in administration) in Connection with Certain Real Estate Investments* [Docket No. 5651] (the "LB RE Transaction Approval Motion").  These include direct benefits such as ensuring that the

---

[1]  LBHI will be directly and indirectly entitled to approximately 98.1% of LB RE's estate

B Note is effectively managed and indirect benefits such as creating synergies with other parties that have an interest in the underlying loan portfolio.

31.      During the Compensation Period, Gibson Dunn advised LBHI on the legal issues arising from the proposal to take control over commercial issues relating to the B Note and assisted with the drafting and negotiation of the underlying documents for the LB RE Transaction including (among others) a detailed term sheet for the transaction, a facility agreement, an option agreement, an advisory agreement, a power of attorney, a letter of indemnity, an account charge security document, a B Note charge security document, and a declaration of trust.

32.      Gibson Dunn also advised on issues in connection with some of the collateral debt obligations owned by Excalibur including (i) Cerep III, where a substantial cash amount belonging to the borrower was trapped in an account of Lehman Brothers International (Europe) Limited (in its role as custodian) instead of being released to Excalibur as debt service, (ii) Queensbridge House, where LBHI sought legal advice on acquiring the senior loan from Excalibur through a joint venture with the current equity owners of Queensbridge House, and (iii) an alleged event of default under the Drapers Gardens loan, and implications for the calculations of the coverage tests under the Excalibur securitization documents.  Gibson Dunn also advised in connection with the allegations by the Issuer that LB RE had failed to fund monies committed under the B Note Committed Subscription Agreement and potential implications of such alleged failure to fund.

**J.      1000 ISLANDS MALL RESTRUCTURING (MATTER # 00327)**

(Total Hours:  43.95  Total Fees:  £19,783.75)

33.     Time billed to this matter by Gibson Dunn represents work performed in connection with assisting the Debtors in their efforts to recover amounts due to Lehman Commercial Paper Inc. ("LCPI") from 1000 Islands Mall Finance Company Inc.

34.     Pursuant to a senior credit agreement dated 25 July 2007  (the "Senior Credit Agreement") between, amongst others, Lehman Brothers Canada Holdings Inc. and Boultbee Canada Holdings Inc, as borrowers (the "Senior Borrowers"), DekaBank Deutsche Girozentrale, as lender (the "Senior Lender") and certain guarantors, the Senior Lender made available to the Senior Borrowers a secured term loan facility in an amount of CAN$37,725,000 (the "Senior Loan").

35.     Pursuant to a mezzanine credit agreement dated 25 July 2007  (the "Mezzanine Credit Agreement") between, amongst others, 1000 Islands Mall Finance Company Inc., as borrower (the "Mezzanine Borrower"), LCPI, as lender (the "Mezzanine Lender"), Lehman Brothers International (Europe), as administrative agent and 1000 Islands Mall LP, as guarantor, the Mezzanine Lender made available to the Mezzanine Borrower a secured term loan facility in an amount of CAN$8,627,925 (the "Mezzanine Loan").

36.     In accordance with the terms of an intercreditor agreement dated 25 July 2007 (the "Intercreditor Agreement"), between, amongst others, the Senior Borrowers, the Senior Lender, the Mezzanine Borrower and the Mezzanine Lender, the amounts owed to the Mezzanine Lender under the Mezzanine Credit Agreement are subordinated to the amounts owed to the Senior Lender under the Senior Credit Agreement.

37.     The Senior Borrowers have defaulted under the Senior Credit Agreement by failing to meet their payment obligations and by failing to comply with certain other covenants. In accordance with the Senior Credit Agreement, the Senior Lender has notified the Senior

18

Borrowers of the occurrence of Events of Default and has requested that such Events of Default are promptly remedied.  The Senior Lender has informed the Senior Borrowers that it has reserved its right to accelerate the Senior Loan.

38.    An Event of Default under the Senior Loan gives rise to a default under the Mezzanine Loan. In addition, the Mezzanine Borrower has failed to meet its payment obligations under the Mezzanine Loan.  In accordance with the Mezzanine Loan Agreement, the Mezzanine Lender has notified the Mezzanine Borrower of the events of default and has requested that such events of default are promptly remedied.  The Mezzanine Lender has informed the Mezzanine Borrowers that it has reserved its right to accelerate the Mezzanine Loan.

39.    During the Compensation Period, work undertaken by Gibson Dunn lawyers included reviewing the Mezzanine Credit Agreement, the Senior Credit Agreement and the Intercreditor Agreement and advising on enforcement issues, assisting in the preparation of reservation of rights letters and advising on strategies for acquiring the senior loan on the property.

**K.      CRV II - FORECLOSURE (MATTER # 00328)**

(Total Hours:  5.05  Total Fees:  $2,815.75)

40.    Time billed to this matter represents work performed in representing the Debtors in the foreclosure of a Deed of Trust secured by real property located in Riverside County, California.

**L.      THUNDERBIRD (MATTER # 00329)**

(Total Hours:  21.55  Total Fees:  £9,742.75)

41.    Time billed to this matter by Gibson Dunn represents work performed in connection with (i) a loan agreement dated 7 October 2005 (subsequently amended and restated on 10 April 2007) in respect of a €22,900,000 investment facility and a €5,769,826 capex facility relating to a portfolio of properties in Berlin, Germany entered into by (among others) LCPI (as original lender) and Phoenix II Mixed H Sarl and affiliates thereof (as borrowers and guarantors) (the "Firebird Loan") and (ii) a loan agreement dated 29 June 2006 (last amended and restated on 19 October 2006) in respect of a €129,267,180 acquisition facility and a €14,804,849 capex facility relating to a portfolio of fifty-five properties in Germany entered into by (among others) LCPI (as original lender) and Thunderbird B Sarl and affiliates thereof (as borrowers) (the "Thunderbird Loan"). Pursuant to a master sale loan agreement dated 12 April 2007 (the "Master Sale Loan Agreement"), the Firebird Loan and the Thunderbird Loan (among others) were sold by LCPI to Windermere X CMBS Limited ("Windermere") with the exception of undrawn (at that time) parts of the capex facilities of each of the loans, which were approximately €4,897,317 for the Firebird Loan (the "Firebird Capex Loan") and €13,383,014 for the Thunderbird Loan (the "Thunderbird Capex Loan"). The Firebird Capex Loan has since been drawn down in full by the borrowers and an aggregate of €3,626,734 of the Thunderbird Capex Loan have been drawn down by the borrowers.  The Master Sale Loan Agreement envisaged that upon the advance of further amounts pursuant to the Firebird Capex Loan and the Thunderbird Capex Loan by LCPI to the relevant borrowers and provided that certain tests were satisfied at the relevant time, Windermere will pay an amount equal to such advances to Lehman Brothers Financing Limited ("LBF") who will use such amounts to purchase such advances from LCPI, and LBF will thereafter transfer such advances to Windermere. The amounts advanced by LCPI to the relevant borrowers under the Firebird Capex Loan and the Thunderbird Capex Loan are still on LCPI's

20

balance sheet due to the relevant tests for the acquisition of the loans by Windermere not being satisfied.

42.     During the Compensation Period, Gibson Dunn advised in connection with borrower change of control aspects, debt ranking issues, allocation of payments of principal and interest before and after an event of default and negotiation strategy vis-à-vis a potential acquiror of the equity of the borrower in circumstances where the potential acquirer was seeking an extension to the terms of the Firebird and Thunderbird Capex Loans.

## M.     EL CENTRO - FORECLOSURE (MATTER # 00330)

(Total Hours:  3.05  Total Fees:  $1,686.75)

43.     Time billed to this matter represents work performed in connection with representing the Debtors in the foreclosure of a Deed of Trust secured by real property located in El Centro, California.

## N.     SILVERLEAF (MATTER # 00331)

(Total Hours:  21.7  Total Fees:  £9,502.50)

44.     Time billed to this matter by Gibson Dunn represents work performed in connection with the assisting the Debtors in their efforts to ensure that their subsidiary, LB Greenleaf Opportunity LLC ("LB Greenleaf"), has complied with its obligations, and remedied any continuing events of default pursuant to a joint venture agreement dated 20 July 2007 (the "Greenleaf JV Agreement") between LB Greanleaf, Silverleaf Business Solutions, LLC. and Greenleaf Holding Ltd.

45.     During the Compensation Period, Gibson Dunn provided advice to LBHI on the Grenleaf JV Agreement and related documents and advised in connection with the consequences

21

under the Greenleaf JV Agreement of the Chapter 11 proceedings, including potential events of default and strategies for dealing with events of default and exiting the joint venture, including the interpretation of the valuation provisions of the Greenleaf JV Agreement.

## O.    CENTRA (MATTER # 00332)

(Total Hours:  165.75  Total Fees:  $87,314.50)

46.    Time billed to this matter by Gibson Dunn represents work performed in connection with the assisting the Debtors in their efforts to (1) address certain events of default under a Building Loan Agreement dated 1 December 2006 (the "Building Loan Agreement") and (2) ensure that its indirect subsidiary, LB Tirador LLC ("LB Tirador"), has complied with its obligations, and protected its rights pursuant to a joint venture agreement dated 1 December 2006 (the "Tirador JV Agreement") between LB Tirador and Centra Tirador LLC.

47.    During the Compensation Period, Gibson Dunn provided advice to the Debtors on the Building Loan Agreement and the Tirador JV Agreement, including addressing various events of default and other matters under the Building Loan Agreement and the Tirador JV Agreement, and exiting the joint venture.

## P.    RE HOLDINGS STRATEGY ADVICE (MATTER # 00334)

(Total Hours:  151.45  Total Fees:  £74,301.25)

48.    Time billed to this matter by Gibson Dunn represents work performed assisting the Debtors in their consideration of various strategies for seeking to gain greater control over LB UK RE Holdings Limited and Lehman Brothers (PTG) Limited (the "UK Entities").  The UK Entities are currently in UK administration.  The Debtors are, directly and indirectly, the most significant creditors of the UK Entities.  The UK Entities hold, directly or indirectly, interests in various real estate and real estate assets based in the UK and the rest of Europe.  The Debtors

wish to assume greater control over the assets held by the UK Entities.  Gibson Dunn's work in

connection with this matter extended to engaging and instructing Robin Dicker QC to advise on

various legal issues relating to the administration of the UK Entities, and preparing detailed

briefing materials for counsel, attending various meetings with counsel, and preparing detailed

notes of the meetings with counsel.  Gibson Dunn's work also involved considering various legal

issues arising out of administration of the UK Entities, and attending various meetings with

representatives of the Debtors to discuss the matter.  Gibson Dunn also prepared a detailed draft

proposal to be sent to the UK administrators of the UK Entities, as well as time lines and

decision charts for proceedings to seek greater control of the UK Entities and other related

materials.

**Q.    RETENTION AND FEE APPLICATIONS (MATTER #00335)**

(Total Hours:  167.3  Total Fees:  $72,393.00)

49.    Time billed to this matter by Gibson Dunn represents work performed in

connection with preparing Gibson Dunn's retention and fee applications to be filed with the

Court and in performing other tasks related to Gibson Dunn's obligations as a retained

professional.  During the Compensation Period time was spent preparing the *Application of the*

*Debtors Pursuant to Sections 327(e) and 328 (a) of the Bankruptcy Code and Rule 2014 of the*

*Federal Rules of Bankruptcy Procedure For Authorization to Employ and Retain Gibson, Dunn*

*& Crutcher LLP, As Special Counsel To The Debtors,* Nunc Pro Tunc *to September 1, 2009*, as

well as performing the necessary conflicts checks and drafting the necessary declaration

discussing Gibson Dunn's connections to parties in interest in these cases.  Time was also spent

preparing Gibson Dunn's *Application of Gibson, Dunn & Crutcher LLP, As an Ordinary Course*

*Professional, For Allowance of Interim Compensation For Services Rendered and For*

23

*Reimbursement of Actual and Necessary Expenses Incurred From May 1, 2009 Through May 31,*

*2009*, Gibson Dunn's *Application of Gibson, Dunn & Crutcher LLP, As an Ordinary Course*

*Professional, For Allowance of Interim Compensation For Services Rendered and For*

*Reimbursement of Actual and Necessary Expenses Incurred From June 1, 2009 Through June*

*30, 2009,* Gibson Dunn's *Application of Gibson, Dunn & Crutcher LLP, As an Ordinary Course*

*Professional, For Allowance of Interim Compensation For Services Rendered and For*

*Reimbursement of Actual and Necessary Expenses Incurred From August 1, 2009 Through*

*August 31, 2009.*

**R.    CEREP III CUSTODY ISSUES (MATTER # 00336)**

(Total Hours:  58.5  Total Fees: £28,191.00)

50.    Time billed to this matter by Gibson Dunn represents work performed assisting

the Debtors to ensure that payments of principal and interest could be made by CEREP III

Investments D S.à R.L. ("CEREP III") to Excalibur.  CEREP III is a borrower of a loan which

comprises one of the collateral loan obligations owned by Excalibur.  As noted previously, the

Debtors have sought to gain control over most of the commercial decisions relating to the B Note

issued by Excalibur, with a view to securing recoveries received by LB RE in respect of the B

Note.  The distribution to be made by CEREP III to Excalibur is important to ensure the

continued right of LB RE to receive amounts in respect of the B Note.  Gibson Dunn's work in

connection with this matter involved advising on the underlying loan documentation pursuant to

which distributions would be made by CEREP III to Excalibur, and advising on various

strategies to ensure that the distribution could be made on a timely basis.

S.      **CENTRA PILOT RESTRUCTURING (MATTER # 00337)**

(Total Hours:  16.4  Total Fees:  $10,303.50)

51.      Time billed to this matter by Gibson Dunn represents work performed in

connection with the assisting the Debtors in their efforts to (1) address certain events of default

under the Pilot Loan Agreement and (2) ensure that its indirect subsidiary, LB Pilot, has

complied with its obligations, and protected its rights pursuant to the Pilot JV Agreement.

52.      During the Compensation Period, Gibson Dunn provided advice to LBHI on the

Pilot Loan Agreement and the Pilot JV Agreement, including addressing various events of

default and other matters under the Pilot Loan Agreement and the Pilot JV Agreement, and

exiting the joint venture.

## ALLOWANCE OF COMPENSATION

53.      Section 331 of the Bankruptcy Code allows a bankruptcy court to authorize

interim compensation for "[a] trustee, an examiner, a debtor's attorney, or any professional

person employed under section 327 or 1103 of this title . . . not more than once every 120 days

after an order for relief in a case under this title…."

54.      Section 330 of the Bankruptcy Code authorizes the bankruptcy court to award a

trustee, examiner, ombudsman or professional employed pursuant to 11 U.S.C. § 327 reasonable

compensation for services and reimbursement of expenses.  Specifically, section 330 of the

Bankruptcy Code provides as follows:

(a)(1) After notice to the parties in interest and to the United States Trustee and a
hearing, and subject to sections 326, 328, and 329, the court may award to a
trustee . . . or a professional person employed under section 327 or 1103 —

(A)      reasonable compensation for actual, necessary services rendered by
the trustee, examiner, ombudsman, professional person, or attorney and by
any paraprofessional person employed by any such person; and

(B)    reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

55.    Section 330(a)(3) of the Bankruptcy Code provides that in determining the

amount of reasonable compensation to be awarded, the Court should consider the nature, extent,

and value of the services rendered to the estate, taking into account all relevant factors,

including:

(A)    the time spent on such services;

(B)    the rates charged for such services;

(C)    whether the services were necessary to the administration of, or
beneficial at the time at which the service was rendered toward the
completion of, a case under this title;

(D)    whether the services were performed within a reasonable amount
of time commensurate with the complexity, importance, and nature of the
problem, issue, or task addressed;

(E)    with respect to a professional person, whether the person is board
certified or otherwise has demonstrated skill and experience in the
bankruptcy field; and

(F)    whether the compensation is reasonable, based on the customary
compensation charged by comparably skilled practitioners in cases other
than cases under this title.

11 U.S.C. § 330(a)(3)(A)-(F).

56.    As analyzed below, Gibson Dunn submits that the elements governing awards of

compensation justify the allowance requested.

**(1)    The Time and Labor Required**

57.    During the Compensation Period, 1,598.5 recorded hours have been expended by

Gibson Dunn's partners, counsel, associates and paraprofessionals in providing the requested

professional services.  Exhibits B, D, and E attached hereto detail the time and labor expended

by Gibson Dunn on behalf of the Debtors.  Gibson Dunn has made every effort to coordinate its

efforts with those of the Debtors' bankruptcy counsel so as to avoid any duplication of efforts.

The number of hours spent by Gibson Dunn is commensurate with the defined tasks Gibson

Dunn has performed and continues to perform in these chapter 11 cases.

### (2)    The Rates Charged for Such Services

58.    During the Compensation Period, Gibson Dunn's hourly billing rates ranged from

$610 to $1,110 and £505 to £625 per hour for partners, $345 to $650 and £295 to £430 for staff

attorneys, of counsels and associates, and $180 to $330 for paraprofessionals.  Based on the

recorded hours expended by Gibson Dunn's attorneys and paraprofessionals, the average hourly

billing rate for Gibson Dunn's services was $509.87 and £453.21.

59.    The amounts charged to the Debtors for the particular services rendered

approximate the rates charged other clients of Gibson Dunn for such services.  Indeed, if the

firm's retention in these matters were not pursuant to the Bankruptcy Code, Gibson Dunn would

charge the Debtors and expect to receive, on a current basis, an amount at least equal to the

amounts requested herein for the professional services rendered.

60.    In connection with the provision of its legal services, Gibson Dunn has sought,

within the parameters required for effective legal representation, to minimize legal expenses.

Moreover, consistent with its belief that strict fee management inures to the benefit of the

Debtors, their creditors, the Court, and ultimately the public, Gibson Dunn diligently monitored

the integrity of its bills.  Gibson Dunn carefully reviewed the entries of all professionals and

paraprofessionals who worked on these cases to determine the reasonableness of the monthly

totals for services rendered.

### (3)    The Necessity of the Services and the Benefit to the Estate

61.    As detailed above, the services Gibson Dunn provided to the Debtors have conferred substantial benefit on the Debtors' estates.  Gibson Dunn's services to the Debtors have also served the desired goal of allowing for continuity of service in these non-bankruptcy matters.  This has allowed Debtors' bankruptcy counsel to focus on issues more closely related to the reorganization of Debtors' operations.

### (4)    Customary Compensation

62.    Gibson Dunn relies on the Court's experience and knowledge with respect to the compensation awards in similar cases.  Given that frame of reference, Gibson Dunn submits that, in light of the circumstances of the case and the substantial benefits derived from Gibson Dunn's assistance, compensation in the amount requested is fair and reasonable.

### (5)    Whether Services Were Performed In a Reasonable Amount of Time

63.    Gibson Dunn represents and can demonstrate to this Court that the services were performed in a reasonable amount of time, given the complexity of the issues involved and the many and varied legal issues facing the Debtors.  Gibson Dunn's detailed and thorough contemporaneous time records demonstrate that the time expended on various tasks was necessary and appropriate to the vigorous representation of the Debtors.  From the earliest stages of Gibson Dunn's involvement in the case, every attempt was made to limit the hours worked to the lowest amount feasible, and to avoid duplication of effort and other unnecessary costs.  On occasion, Gibson Dunn attorneys rendered services on behalf of the Debtors under time constraints.  Moreover, during the Compensation Period, Gibson Dunn attorneys were required to perform services on behalf of the Debtors to the preclusion of other firm matters and clients.

### (6)    Board Certification

64.    Because the services provided by Gibson Dunn were, by design, primarily non-bankruptcy in nature, Gibson Dunn submits that board certification in bankruptcy law is not a particularly relevant factor.  In preparing this fee application and when otherwise appropriate, however, the Gibson Dunn attorneys performing services for the Debtors did employ the assistance of experienced attorneys in Gibson Dunn's bankruptcy department.

### (7)    Whether Compensation is Reasonable

65.    Gibson Dunn's services have been rendered in a highly efficient manner by attorneys who have achieved a high degree of expertise in their respective fields.  The skill and competency of the Gibson Dunn attorneys who have represented the Debtors are amply demonstrated by the results achieved in these cases.  Gibson Dunn's highly professional and expert group of attorneys has ensured that the representation of the Debtors has progressed in an efficient and expeditious manner.

66.    Gibson Dunn thus represents and can demonstrate that the compensation sought for the services rendered and expenses incurred in connection with these chapter 11 cases is reasonable and commensurate with those rates charged by comparably skilled practitioners.

67.    Gibson Dunn's fee request is based upon the normal hourly rates that Gibson Dunn charges its non-bankruptcy clients.  Taking into consideration the time and labor spent, the nature and extent of the representation, and the nature of these proceedings, Gibson Dunn believes the allowance asked is reasonable.

68.    Based upon Gibson Dunn's blended hourly rate of $509.87 and £453.21 for professionals (including paraprofessionals) and $525.43 and £453.21 (excluding

paraprofessionals), Gibson Dunn submits that its rates are comparable to those prevailing in the relevant international market.  Therefore, Gibson Dunn's fees are fair and reasonable.

69.    Based on the factors to be considered under sections 330 and 331 of the Bankruptcy Code, the results Gibson Dunn has achieved to date more than justify allowance in full of Gibson Dunn's compensation and reimbursement request.

## DISBURSEMENTS

70.    For this Compensation Period, Gibson Dunn requests reimbursement of $5,695.16 and £3,890.00 for reasonable and necessary out-of-pocket expenses incurred on behalf of the Debtors.  Exhibit C attached hereto is a summary of such expenses, and Exhibit F attached hereto details each of the actual expenses incurred by Gibson Dunn on behalf of the Debtors during the Compensation Period.  Each of the charges reflected on Exhibits C and F is based on the actual and necessary expenses incurred by Gibson Dunn, in the exercise of reasonable discretion, on behalf of the Debtors.

71.    Gibson Dunn's normal billing rates do not take these expenses into consideration. Rather, Gibson Dunn bills each expense to the applicable client.  A prime example of the rationale for such an approach is photocopying expense.  Because of the great disparity between the photocopying requirements of different clients, it is virtually impossible to absorb photocopying costs fairly and equitably into Gibson Dunn's normal billing rates.  Accordingly, Gibson Dunn charges each client for photocopying expenses separately.  Similarly, Gibson Dunn charges each client separately for telephone, postage, overnight courier, travel expenses, computerized legal research, and messenger services, in each case at Gibson Dunn's cost. Gibson Dunn does not charge for incoming or outgoing facsimile transmissions.

72.     Gibson Dunn does not include the amortization of the cost of any investment, equipment, or capital outlay in its charges for these services.

73.     Any services billed by a third party vendor, with the exception of certain computerized research charges, are charged to the Debtors in the precise amount billed to and paid by Gibson Dunn.  Like many large law firms, Gibson Dunn has negotiated a special arrangement with computerized research companies under which Gibson Dunn pays a flat rate monthly fee for computerized research services.  Consistent with its general policy of billing out-of-pocket expenses only to clients for whom the use of such services is required, Gibson Dunn separately charges each client for computerized research.  To account for such charges and pass through Gibson Dunn's cost savings resulting from its special arrangements, Gibson Dunn charges those clients for whom such services are required up to eighty percent of the rates charged by the computerized research company to the general public for such services.  These charges are intended to cover Gibson Dunn's direct costs for computerized research.  A determination of Gibson Dunn's actual direct cost for computerized research, however, is dependent on both the volume of the research performed and the total expenses attributable to such research on an annual basis.  As a result, it is possible that Gibson Dunn will ultimately realize a discount greater than the twenty percent or more passed on to the client.

74.     Gibson Dunn has made reasonable efforts to minimize its disbursements in these cases.  Each of the expenses incurred by Gibson Dunn in providing professional services to the Debtors was necessary, reasonable, and justified under the circumstances to serve the needs of the Debtors, their estates, and creditors.

WHEREFORE, Gibson Dunn requests that allowance be made to it in the sum of $380,329.25 and £381,060.50 as compensation for necessary professional services rendered to the Debtors for the Compensation Period, and the sum of $5,695.16 and £3,890.00 for reimbursement of actual necessary costs and expenses incurred during that Period, and further requests such other and further relief as this Court may deem just and proper.

Dated:    April 15, 2010             **GIBSON, DUNN & CRUTCHER LLP**
          Dallas, Texas

                                     /s/ Jeremy L. Graves
                                     By:  Jeremy L. Graves (TX – 24059849)
                                     2100 McKinney Avenue
                                     Dallas, Texas
                                     Telephone: (214) 698-3100
                                     Facsimile: (214) 698-2900

                                     Proposed Special Counsel to the Debtors
                                     and Debtors in Possession