**Hearing Date: To Be Determined**
**Objection Deadline: To Be Determined**

DUFF & PHELPS LLC
55 East 52nd Street
New York, New York 10055

300 Headquarters Plaza
East Tower, 12th Floor
Morristown, NJ 07960
Allen M. Pfeiffer

Financial Advisors to the Examiner

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | Case No. 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------------x

**THIRD INTERIM FEE APPLICATION OF DUFF & PHELPS LLC, AS FINANCIAL
ADVISORS TO THE EXAMINER, ANTON R. VALUKAS, FOR INTERIM
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
REIMBURSEMENT OF EXPENSES INCURRED FROM
OCTOBER 1, 2009 THROUGH JANUARY 31, 2010**

**FOR FOURTH INTERIM APPLICATION PERIOD.**

**SUMMARY SHEET PURSUANT TO UNITED STATES TRUSTEE GUIDELINES
FOR REVIEWING APPLICATIONS FOR COMPENSATION AND
REIMBURSEMENT OF EXPENSES FILED UNDER 11 U.S.C. § 330**

| | |
|---|---|
| Name of Applicant: | Duff & Phelps LLC |
| Period for which Compensation and Reimbursement is Sought: | October 1, 2009 through January 31, 2010 |
| Authorized to Provide Professional Services to: | Anton R. Valukas (the "Examiner") |
| Date of Notice of Appointment (Examiner): | January 19, 2009 |
| Date of Retention (Duff & Phelps): | February 25, 2009, *nunc pro tunc* February 6, 2009 |

| | | |
|---|---|---|
| Amount of Compensation and Expense Reimbursement Sought As Actual, Reasonable and Necessary: | Fees Requested:[1] | $17,090,309.03 |
| | Expenses Requested:[2] | $346,491.55 |
| Prior Amounts Requested: | Fees Previously Requested: | $24,997,320.68 |
| | Fees Previously Awarded: | $24,425,663.21 |
| | Expenses Previously Requested: | $453,625.50 |
| | Expenses Previously Awarded: | $449,359.50 |

---

[1] This reflects an agreed 10% reduction in standard hourly rates because of the significant public interest associated with the Examiner's duties and responsibilities. This total also reflects the Duff & Phelps' voluntary reduction of half of non-working travel time, as well as other time that Duff & Phelps has voluntarily written-off and not billed. The total voluntary reductions for this interim period exceed $2 million.

[2] This amount represents a reduction in excess of $200,000 of expenses voluntarily written off by Duff & Phelps.

Summary of Time Recorded From October 1, 2009 - January 31, 2010
For Services Provided to the Lehman Examiner

| Professional | Rate[1] | Hours | Fee | Discounted Fees |
|---|---|---|---|---|
| **Managing Director** | | | | |
| Jerry Arcy | $835.00 | 13.5 | $11,272.50 | $10,145.25 |
| Margaret Daley | $835.00 | 204.1 | $170,423.50 | $153,381.15 |
| Ken Halperin | $835.00 | 685.2 | $572,142.00 | $514,927.80 |
| Jonathan Jacobs | $835.00 | 90.6 | $75,651.00 | $68,085.90 |
| Thomas Kabler | $835.00 | 101.0 | $84,335.00 | $75,901.50 |
| David Larsen | $835.00 | 3.0 | $2,505.00 | $2,254.50 |
| Erik Laykin | $835.00 | 41.0 | $34,235.00 | $30,811.50 |
| John Levitske | $835.00 | 640.7 | $534,984.50 | $481,486.05 |
| Paul Marcus | $835.00 | 646.4 | $539,744.00 | $485,769.60 |
| Michael O'Dowd | $835.00 | 23.7 | $19,789.50 | $17,810.55 |
| Allen Pfeiffer | $835.00 | 672.1 | $561,203.50 | $505,083.15 |
| Joseph Pimbley | $955.00 | 734.4 | $701,352.00 | $631,216.80 |
| Michael Vitti | $835.00 | 952.2 | $795,087.00 | $715,578.30 |
| Adam Warren | $835.00 | 126.4 | $105,544.00 | $94,989.60 |
| **Managing Director Total** | | **4,934.3** | **$4,208,268.50** | **$3,787,441.65** |
| **Senior Advisor** | | | | |
| Karen Balmer | $835.00 | 845.1 | $705,658.50 | $635,092.65 |
| Gary Holstrum | $700.00 | 149.2 | $104,440.00 | $93,996.00 |
| Timothy Lucas | $700.00 | 7.7 | $5,390.00 | $4,851.00 |
| Walter Schuetze | $750.00 | 26.6 | $19,950.00 | $17,955.00 |
| **Senior Advisor Total** | | **1,028.6** | **$835,438.50** | **$751,894.65** |
| **Director** | | | | |
| Jeffrey Andrews | $750.00 | 376.3 | $282,225.00 | $254,002.50 |
| Kelly Caputo | $750.00 | 0.5 | $375.00 | $337.50 |
| Jaime D'Almeida | $750.00 | 630.9 | $473,175.00 | $425,857.50 |
| TC Fleming | $750.00 | 1,140.7 | $855,525.00 | $769,972.50 |
| Mike Kresslein | $750.00 | 944.9 | $708,675.00 | $637,807.50 |
| Celia Lawson | $750.00 | 673.9 | $505,425.00 | $454,882.50 |
| Robert Maxim | $800.00 | 64.3 | $51,440.00 | $46,296.00 |
| Matthew Petrich | $750.00 | 38.2 | $28,650.00 | $25,785.00 |
| Andrew Taddei | $800.00 | 770.6 | $616,480.00 | $554,832.00 |
| Ekaterina Timaeva | $750.00 | 249.0 | $186,750.00 | $168,075.00 |
| **Director Total** | | **4,889.3** | **$3,708,720.00** | **$3,337,848.00** |
| **Vice President** | | | | |
| Aijun Besio | $595.00 | 868.1 | $516,519.50 | $464,867.55 |
| Robert Erlich | $595.00 | 341.4 | $203,133.00 | $182,819.70 |
| Erin Fairweather | $595.00 | 754.1 | $448,689.50 | $403,820.55 |

| Professional | Rate[1] | Hours | Fee | Discounted Fees |
|---|---|---|---|---|
| Seth Fliegler | $595.00 | 667.9 | $397,400.50 | $357,660.45 |
| Gary Hewitt | $595.00 | 477.3 | $283,993.50 | $255,594.15 |
| William Hrycay | $595.00 | 580.5 | $345,397.50 | $310,857.75 |
| Christopher Johnson | $595.00 | 360.9 | $214,735.50 | $193,261.95 |
| Chetan Joshi | $595.00 | 441.8 | $262,871.00 | $236,583.90 |
| Manasi Kapadia | $595.00 | 68.0 | $40,460.00 | $36,414.00 |
| Joe Leiwant | $595.00 | 769.9 | $458,090.50 | $412,281.45 |
| Cole Morgan | $595.00 | 673.1 | $400,494.50 | $360,445.05 |
| Santiago Rivera | $595.00 | 48.1 | $28,619.50 | $25,757.55 |
| Robert Sha | $595.00 | 116.3 | $69,198.50 | $62,278.65 |
| Anshul Shekhon | $595.00 | 100.5 | $59,797.50 | $53,817.75 |
| Paul Sipala | $595.00 | 104.5 | $62,177.50 | $55,959.75 |
| Joseph Thompson | $595.00 | 867.0 | $515,865.00 | $464,278.50 |
| Wai Yip | $595.00 | 3.5 | $2,082.50 | $1,874.25 |
| **Vice President Total** | | **7,242.9** | **$4,309,525.50** | **$3,878,572.95** |
| **Senior Associate** | | | | |
| Orie Attas | $450.00 | 343.9 | $154,755.00 | $139,279.50 |
| Aya Bellicha | $450.00 | 26.6 | $11,970.00 | $10,773.00 |
| Akshay Bhargava | $450.00 | 485.7 | $218,565.00 | $196,708.50 |
| Timothy Byhre | $450.00 | 754.9 | $339,705.00 | $305,734.50 |
| Daniel Carlson | $450.00 | 48.0 | $21,600.00 | $19,440.00 |
| Ambuj Chaudhary | $450.00 | 27.8 | $12,510.00 | $11,259.00 |
| Robert Daly | $450.00 | 80.3 | $36,135.00 | $32,521.50 |
| Aditya Darbari | $450.00 | 653.1 | $293,895.00 | $264,505.50 |
| John Duvoisin | $450.00 | 776.1 | $349,245.00 | $314,320.50 |
| Daniel Eliades | $450.00 | 508.0 | $228,600.00 | $205,740.00 |
| TC Fleming | $450.00 | 802.6 | $361,170.00 | $325,053.00 |
| Gregory Irwin | $450.00 | 330.9 | $148,905.00 | $134,014.50 |
| Rick Lee | $450.00 | 374.0 | $168,300.00 | $151,470.00 |
| Christopher McShea | $450.00 | 684.4 | $307,980.00 | $277,182.00 |
| Mukund Narayanan | $450.00 | 220.5 | $99,225.00 | $89,302.50 |
| Barry Oglesby | $450.00 | 278.0 | $125,100.00 | $112,590.00 |
| Nicole Patterson | $450.00 | 418.7 | $188,415.00 | $169,573.50 |
| Prithvi Ramesh | $450.00 | 320.4 | $144,180.00 | $129,762.00 |
| John Rotundo | $450.00 | 12.0 | $5,400.00 | $4,860.00 |
| Zain Saeed | $450.00 | 829.5 | $373,275.00 | $335,947.50 |
| Vivek Thaker | $450.00 | 678.6 | $305,370.00 | $274,833.00 |
| David Welch | $450.00 | 302.1 | $135,945.00 | $122,350.50 |
| **Senior Associate Total** | | **8,956.1** | **$4,030,245.00** | **$3,627,220.50** |

| Professional | Rate[1] | Hours | Fee | Discounted Fees |
|---|---|---|---|---|
| **Analyst** | | | | |
| Ted Berklayd | $315.00 | 471.7 | $148,585.50 | $133,726.95 |
| Allison Busse | $315.00 | 604.7 | $190,480.50 | $171,432.45 |
| Dennis Casey | $315.00 | 513.2 | $161,658.00 | $145,492.20 |
| Alex Chalunkal | $315.00 | 31.6 | $9,954.00 | $8,958.60 |
| Benjamin Filton | $315.00 | 12.8 | $4,032.00 | $3,628.80 |
| Megan Goering | $315.00 | 719.6 | $226,674.00 | $204,006.60 |
| Maryann Gunaratnam | $315.00 | 906.7 | $285,610.50 | $257,049.45 |
| Lakshmi Kannan | $315.00 | 63.5 | $20,002.50 | $18,002.25 |
| Justin Kao | $315.00 | 386.4 | $121,716.00 | $109,544.40 |
| Carly Kurkiewicz | $315.00 | 116.5 | $36,697.50 | $33,027.75 |
| Ian Lunderskov | $315.00 | 544.4 | $171,486.00 | $154,337.40 |
| Samantha Maresca | $315.00 | 496.7 | $156,460.50 | $140,814.45 |
| Brian Mcgrath | $315.00 | 485.7 | $152,995.50 | $137,695.95 |
| Donnacha O'Sullivan | $315.00 | 909.3 | $286,429.50 | $257,786.55 |
| Ajay Patel | $315.00 | 192.8 | $60,732.00 | $54,658.80 |
| Rita Patierno | $315.00 | 332.3 | $104,674.50 | $94,207.05 |
| **Analyst Total** | | **6,787.9** | **$2,138,188.50** | **$1,924,369.65** |
| **Grand Total** | | **33,839.1** | **$19,230,386.00** | **$17,307,347.40** |

Notes:

1. The rates displayed in this Exhibit do not reflect Duff & Phelps' 10% voluntary reduction.

**Hearing Date: To Be Determined**
**Objection Deadline: To Be Determined**

DUFF & PHELPS LLC
55 East 52nd Street
New York, New York 10055

300 Headquarters Plaza
East Tower, 12th Floor
Morristown, NJ 07960
Allen M. Pfeiffer

Financial Advisors to the Examiner

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
                                         :
In re                                    :        Chapter 11
                                         :
LEHMAN BROTHERS HOLDINGS INC., et al.,   :        Case No. 08-13555 (JMP)
                                         :
                          Debtors.       :        (Jointly Administered)
------------------------------------------------------------------x
```

**THIRD[3] INTERIM FEE APPLICATION OF DUFF & PHELPS, LLC, AS FINANCIAL
ADVISORS TO THE EXAMINER, ANTON R. VALUKAS, FOR INTERIM
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
REIMBURSEMENT OF EXPENSES INCURRED FROM
OCTOBER 1, 2009 THROUGH JANUARY 31, 2010**


**FOR FOURTH INTERIM APPLICATION PERIOD.**


TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

---

[3] Although this is the Fourth Interim period for this case, this is the Third Interim Fee Application that Duff &
Phelps is filing.

Duff & Phelps, LLC[4] ("Duff & Phelps" or the "Applicant"), financial advisors *nunc pro tunc* to the Examiner in the above-captioned matter, Anton R. Valukas (the "Examiner"), in support of its Third Interim Application (the "Third Interim Application") for allowance of compensation for professional services rendered and reimbursement of expenses incurred from October 1, 2009 through January 31, 2010 (the "Fourth Application Period"), respectfully represents:

## PRELIMINARY STATEMENT

1.      By this Third Interim Application, and pursuant to sections 330 and 331 of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Duff & Phelps requests that this Court authorize: (a) interim allowance and payment of reasonable compensation for actual and necessary professional services performed by Duff & Phelps in the aggregate amount of $17,090,309.03 for the period of October 1, 2009 through and including January 31, 2010 (the "Compensation Period")[5]; and (b) reimbursement of actual, reasonable and necessary expenses in the aggregate amount of $346,491.55 incurred during the Compensation Period.

2.      This Court has jurisdiction over this Third Interim Application pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

---

[4] On February 25, 2009, Order Authorizing the Examiner to Retain and Employ Duff & Phelps LLC as his Financial Advisors *Nunc Pro Tunc* as of February 6, 2009 ("February 25th Order") was entered by this Court in accordance with the Bankruptcy Rule 2016 and based on the Declaration of Allen M. Pfeiffer dated February 11, 2009. See Docket No 2924 (Order) and Docket No 2825 Exhibit B (AP Decl). In accordance with the February 25th Order, the Examiner retained Duff & Phelps LLC as financial advisor to assist the Examiner by Duff & Phelps' Letter of Engagement dated February 6, 2009 ("D&P Letter of Engagement"). See Docket No 2825 Exhibit C.

[5] The Third Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals entered on June 25, 2009 requires this Application, covering the four month period of October 1, 2009 through and including January 31, 2010, be submitted within 75 days of January 31, 2010 or on or before April 16, 2010.

3.     To aid this Court in its review and analysis, the Third Interim Application is set forth in four parts. Part I provides a brief background of the matter and Duff & Phelps' retention. Part II provides an overview of the Third Interim Application. Part III provides a description of the work performed by Duff & Phelps during the Compensation Period, by category, as well as how Duff & Phelps calculated the request for compensation for professional services rendered and reimbursement of expenses. Finally, Part IV explains why this compensation request should be allowed.

## I.     **BACKGROUND**

4.     On September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), Lehman Brothers Holdings Inc. ("LBHI") and certain of its direct and indirect subsidiaries (collectively, the "Debtors") commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

5.     On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

6.     On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA (the "SIPA Trustee") is administering LBI's estate.

7.     On January 16, 2009, the Court entered an order (the "Examiner Order") directing the appointment of an examiner, pursuant to 11 U.S.C. § 1104(c)(2), to investigate,

*inter alia*, various transfers and transactions by the Debtors and their affiliates, claims that

certain Debtors may have against LBHI, and the events that immediately preceded the

commencement of the LBHI chapter 11 case (collectively, the "Investigation"). Examiner Order

at ¶ 2 [Docket No. 2569]. The Examiner Order also directed the examiner to "perform the duties

specified in sections 1106(a)(3) and (4) of the Bankruptcy Code, except to the extent the Court

orders otherwise." Id. at ¶ 3.

8.       On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

Examiner in the chapter 11 cases, subject to Court approval, and filed notice of such

appointment. [Docket No. 2570]. On January 20, 2009, the U.S. Trustee filed an application for

an Order of this Court approving the appointment of Anton R. Valukas as examiner in the

chapter 11 cases. [Docket No. 2571]. On January 20, 2009, this Court entered an order

approving the appointment by the U.S. Trustee of Anton R. Valukas as Examiner in the

chapter 11 cases. [Docket No. 2583].

9.       On February 13, 2009, the Examiner filed an Application to authorize the

Retention and Employment of Duff & Phelps LLC Financial Advisors to the Examiner. [Docket

No. 2825]. On February 25, 2009, this Court entered the Order Authorizing the Examiner to

Retain and Employ Duff & Phelps LLC as his Financial Advisors *nunc pro tunc* as of

February 6, 2009 (the "February 25th Order"). [Docket No. 2924]. By Duff & Phelps' Letter of

Engagement dated February 6, 2009, the Examiner retained Duff & Phelps, LLC as financial

advisor to assist the Examiner in accordance with the February 25th Order. See Docket No.

2825 Exhibit C.

10.      On June 25, 2009, the Court entered the Third Amended Order Pursuant to

Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing

Procedures for Interim Monthly Compensation and Reimbursement of Expenses of

Professionals.  [Docket No. 4165].

11.    On February 8, 2010, the Examiner filed with the Court under seal the

Report of Examiner Anton R. Valukas (the "Report"), pursuant to the Court's Order Authorizing

the Examiner to File the Examiner's Report Under Seal [Docket No. 7024].  On March 11, 2010,

the Examiner publicly filed a partially redacted version of the Report, [Docket No. 7531], and

substituted an unredacted version of the Report with the Court under seal pursuant to the

Bankruptcy Court's Order dated March 11, 2010.  [Docket No. 7530].  On April 14, 2010, the

Examiner filed an unredacted version of Volume 5 of the Report.  [Docket No. 8307].

12.    On March 15, 2010, the Debtors filed the Joint Chapter 11 Plan of

Lehman Brothers Holdings Inc. and Its Affiliated Debtors.  [Docket No. 7572].  On April 14,

2010, the Debtors filed a revised Joint Chapter 11 Plan [Docket No. 8330] and a Disclosure

Statement for Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors

Pursuant to Section 1125 of the Bankruptcy Code.  [Docket No. 8332]. The period during which

the Debtors may solicit acceptances of the plan has been extended through May 17, 2010.

[Docket No. 4449].


## II.    THIRD INTERIM APPLICATION FOR THE FOURTH INTERIM APPLICATION PERIOD

13.    Duff & Phelps has prepared this Third Interim Application for the Fourth

Interim Application Period in accordance with the Administrative Order Re: Guidelines for Fees

and Disbursements for Professionals in Southern District of New York Bankruptcy Cases dated

June 20, 1991 (the "Original SDNY Guidelines"), the Administrative Order Re: Amended

Guidelines for Fees and Disbursements for Professionals in Southern District of New York

Bankruptcy Cases dated April 19, 1995 (the "Amended SDNY Guidelines," and together with

the Original SDNY Guidelines, the "Local Guidelines"), and the United States Trustee

Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330 promulgated by the United States Department of Justice dated January

30, 1996 (the "UST Guidelines" and collectively with the Local Guidelines, the "Guidelines").

Pursuant to the Amended SDNY Guidelines, a certification regarding compliance with such

guidelines is attached hereto as Exhibit A.

14.     Duff & Phelps has prepared its time and expense entries to comply with

suggested guidelines proposed by the Fee Committee.[6]

15.     Based on the Fee Committee's recommendation to add detail to time entry

descriptions, Duff & Phelps augmented certain of its time entry descriptions to comply with the

Fee Committee Report[7]. Duff & Phelps is prepared to provide additional information to the Fee

Committee with respect to any additional comments or questions the Fee Committee may have

with respect to disbursements or time entry descriptions for the period covered by this Third

Interim Fee Application.

16.     Duff & Phelps seeks interim allowance herein of reasonable compensation

for actual and necessary financial advisory services rendered to the Examiner during the

Compensation Period, in the aggregate amount of $17,090,309.03 and for reimbursement of

---

[6] On May 26, 2009, the Court entered an Order Appointing a Fee Committee and Approving a Fee Application
Protocol (the "Fee Committee Order") [Docket No. 3651].  On August 3, 2009, September 10, 2009, December 14,
2009, and March 10, 2010, the Fee Committee filed reports pertaining to the first, second, and third interim fee
applications.  [Docket Nos. 4655, 5104, 6165, 7498].

[7] See Exhibit K of this application for the additional information pertaining to time entry descriptions.
Augmentation of expense descriptions can be found included in items marked with an asterisk in Exhibit F.

actual, reasonable and necessary expenses incurred during the Compensation Period in

connection with the rendition of such services in the aggregate amount of $346,491.55.

17.    The fees sought by this Third Interim Application reflect an aggregate of

33,839.1 hours of professional time spent and recorded in performing services by and for the

Examiner during the Compensation Period. This aggregate amount does not include time that

might be construed as duplicative or otherwise not beneficial to the Examiner's Investigation.  In

addition, for the duration of the Application period, we eliminated all time spent by our

administrative and research analyst staff, transitory professionals, and executive management of

Duff & Phelps.

18.    Of the aggregate time expended during the Compensation Period, 5,962.9

recorded hours were expended by managing directors and senior advisors, 4,889.3 recorded

hours were expended by directors, 7,242.9 recorded hours were expended by vice presidents,

8,956.1 recorded hours were expended by senior associates, and 6,787.9 recorded hours were

expended by analysts.

19.    The fees charged by Duff & Phelps in this matter reflect a voluntary,

agreed upon 10% reduction from standard hourly rates because of the significant public interest

associated with the Examiner's duties and responsibilities.  The fees are otherwise billed in

accordance with Duff & Phelps' procedures in effect during the Compensation Period.

20.    During the Compensation Period, Duff & Phelps' hourly billing rates for

professionals working on these matters ranged from $120.00 to $955.00 per hour[8] before

applying the agreed upon 10% rate reduction, or $108.00 to $859.50 per hour after applying the

---

[8] Duff & Phelps' standard hourly rates set forth in the letter of engagement range from $120 to $920 per hour.
Consistent with the engagement letter and the retention application, as of April 1, 2009, Duff & Phelps' standard
hourly rates were adjusted, resulting in a range of $125 to $955 per hour.

reduction.  Allowance of compensation in the amount requested would result in a blended hourly

billing rate of approximately $505.05.

21.     Such rates are reasonable based on the customary compensation charged

by comparably skilled professionals in comparable non-bankruptcy cases in a competitive

national financial advisory services market.

22.     Pursuant to the Guidelines, annexed hereto as Exhibit C is a schedule

setting forth all Duff & Phelps professionals who have performed services for the Examiner

during the Compensation Period for which Duff & Phelps is seeking reimbursement, the position

in which each such professional is employed or retained by Duff & Phelps, the hourly billing rate

charged for services performed by such professional and the aggregate number of hours

expended in this matter and fees billed therefore.

23.     Pursuant to the UST Guidelines, annexed hereto as Exhibit B is a

summary by project matter of the fees generated by the services performed during the

Compensation Period, and, annexed hereto as Exhibit D for each separate project matter, a list of

each professional providing services on the project matter, a statement of the number of hours

spent and the amount of compensation requested for each professional on the project matter.

24.     Annexed hereto as Exhibit E is a schedule specifying the categories of

expenses for which Duff & Phelps is seeking reimbursement and the total amount for each such

expense category.

25.     Annexed hereto as Exhibit F is detailed list of all expenses for which

Duff & Phelps seeks reimbursement.  This schedule has been adjusted for and does not reflect

certain expenses incurred by Duff & Phelps for which it will not be seeking reimbursement.

During the Compensation Period, Duff & Phelps has voluntarily capped expenses in certain

categories and did not seek reimbursement for expenses in other categories.  For example, Duff & Phelps has voluntarily capped hotel expenses at $500 per night.  Further, Duff & Phelps is not seeking reimbursement for other expenses that it might be entitled to, including printing and copying fees, certain meal expenses incurred while working on the engagement, certain in-city transportation, for example taxi and subway expenses, as well as fees incurred in the ordinary course of business when booking travel.  These expenses voluntarily eliminated by Duff & Phelps total more than $200,000.

26.    Duff & Phelps maintains detailed records of the time spent by all professionals, and the expenses incurred by them, in connection with their responsibilities to the Examiner.  Copies of the redacted detailed time records are annexed hereto as Exhibit G, Exhibit H, Exhibit I and Exhibit J.  Exhibit G is a reproduction of Exhibit B from Duff & Phelps' October 2009 redacted fee statement, Exhibit H is a reproduction of Exhibit B from Duff & Phelps' November 2009 redacted fee statement, Exhibit I is a reproduction of Exhibit B from Duff & Phelps' December 2009 redacted fee statement and Exhibit J is a reproduction of Exhibit B from Duff & Phelps' January 2010 redacted fee statement.  Copies of unredacted versions of these detailed time records have been submitted previously to the Chair of the Fee Committee, under a confidentiality letter agreement, and the Office of the United States Trustee.

27.    During the course of the investigation, Duff & Phelps has prepared and submitted redacted versions of the detailed time entries in order to comply with the confidentiality requirement of Paragraph 5 of the Examiner Order.  Although the Examiner has now filed his Report and the Report has become public in its totality, the Examiner has cooperated and continues to cooperate with law enforcement authorities in their investigations.  Therefore, the scope of the Investigation continues to be confidential (except to the extent

disclosures are made in the Report itself), which is why the Duff & Phelps is submitting with this application the redacted versions of the detailed time records.

28.     Annexed hereto as Exhibit K is information intended to augment the time descriptions which are found in Exhibits G, H, I and J.

29.     All of the services for which interim compensation is sought were rendered to the Examiner solely in furtherance of his duties and functions as Examiner and not on behalf of any individual creditor or other person.

30.     Except for subcontractors hired by Duff & Phelps upon and with approval by the Examiner, Duff & Phelps has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases.

31.     Duff & Phelps has not shared, nor agreed to share (a) any compensation it has received or may receive with another party or person, other than subcontractors hired by Duff & Phelps upon and with approval by the Examiner, or (b) any compensation another person or party has received or may receive.  No promises have been received by Duff & Phelps as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

32.     To the extent that time or disbursement charges for services rendered or disbursements incurred relate to the Compensation Period, but were not processed prior to the preparation of this Third Interim Application, Duff & Phelps reserves the right to request additional compensation for such services and reimbursement of such expenses in a future application.

### III.    <u>SUMMARY OF SERVICES RENDERED</u>

33.    Duff & Phelps' Letter of Engagement, in conjunction with the

February 25th Order and the Application,  sets forth the terms and conditions of Duff & Phelps'

retention to advise and assist the Examiner as requested in his investigation directed by this

Court and specified in the Examiner Order.  Examiner Order at ¶ 2 [Docket No. 2569].

33.    The Examiner Order requires the Examiner to investigate, *inter alia*:

- Whether LBCC or any other entity that currently is an LBHI chapter 11

debtor subsidiary or affiliate ("LBHI Affiliate(s)") has any administrative claims

against LBHI resulting from LBHI's cash sweeps of cash balances, if any, from

September 15, 2008, the commencement date of LBHI's chapter 11 case, through

the date that such *applicab*le LBHI affiliate commenced its chapter 11 case

(herein referred to as "Task 1");

- All voluntary and involuntary transfers to, and transactions with, affiliates,

insiders and creditors of LBCC or its affiliates, in respect of foreign exchange

transactions and other assets that were in the possession or control of LBHI

Affiliates at any time commencing on September 15, 2008 through the day that

each LBHI Affiliate commenced its chapter 11 case (herein referred to as

"Task 2");

- Whether any LBHI Affiliate has colorable claims against LBHI for

potentially insider preferences arising under the Bankruptcy Code or state law

(herein referred to as "Task 3");

- Whether any LBHI Affiliate has colorable claims against LBHI or any other entities for potentially voidable transfers or incurrences of debt, under the Bankruptcy Code or otherwise applicable law (herein referred to as "Task 4");

- Whether there are more colorable claims for breach of fiduciary duties and/or aiding or abetting any such breaches against the officers and directors of LBCC and/or other Debtors arising in connection with the financial condition of the Lehman enterprise prior to the commencement of the LBHI chapter 11 case on September 15, 2008 (herein referred to as "Task 5");

- Whether assets of any LBHI Affiliates (other than Lehman Brothers, Inc.) were transferred to Barclays Capital Inc. as a result of the sale to Barclays Capital Inc. that was approved by order of the Bankruptcy Court entered September 20, 2008, and whether consequences to any LBHI Affiliate as a result of the consummation of the transaction created colorable causes of action that inure to the benefit of the creditors of such LBHI subsidiary or affiliate (herein referred to as "Task 6");

- The inter-company accounts and transfers among LBHI and its direct and indirect subsidiaries, including but not limited to: LBI, LBIE, Lehman Brothers Special Finance ("LBSF") and LBCC, during the 30-day period preceding the commencement of the chapter 11 cases by each debtor on September 15, 2008 or thereafter or such longer period as the Examiner deems relevant to the Investigation (herein referred to as "Task 7");

- The transactions and transfers, including but not limited to the pledging or granting of collateral security interest among the debtors and the pre-chapter 11

lenders and/or financial participants including but not limited to, JPMorgan

Chase, Citigroup, Inc., Bank of America, the Federal Reserve Bank of New York

and others (herein referred to as "Task 8");

- The transfer of the capital stock of certain subsidiaries of LBI on or about

September 19, 2008 to Lehman ALI Inc.  (herein referred to as "Task 9"); and

- The events that occurred from September 4, 2008 through September 15,

2008 or prior thereto that may have resulted in commencement of the LBHI

chapter 11 case (herein referred to as "Task 10").

Examiner Order, ¶ 2.

34.    During the Compensation Period, Duff & Phelps performed a wide variety

of tasks in connection with the Investigation.  As reported in the First and Second Interim Fee

Applications, to efficiently and effectively address and evaluate the issues before the Examiner,

Duff & Phelps professionals formed five functional teams: (1) Financial Engineering; (2)

Retrospective Valuation and Solvency; (3) Forensic Accounting and Investigation; (4) Data and

Document Management; and (5) Project Management.  During the Compensation Period, Duff

& Phelps professionals continued to work within these functional teams.  During the

compensation period, Duff & Phelps professionals worked with the Examiner and Jenner &

Block ("Counsel to the Examiner") to complete analyses which had begun in earlier time

periods and also to identify and complete additional analyses necessary for the Report.  In

January, Duff & Phelps worked with the Examiner and Jenner & Block to finalize the substance

of the Report and began a final review and editing process which included cite-checking

documents cited in the Report, proofreading the Report's text, and reviewing draft sections to

insure consistency throughout the Report[10].  Further, actions taken by each team are categorized into matter descriptions.

35.     As noted, Exhibit B is a summary by project matters of the fees generated during the Compensation Period.  The following are descriptions of the project matters and their necessity and benefit to the estate.  The descriptions include a statement of the aggregate number of hours spent and fees charged for each matter after applying the 10% reduction.  The persons providing services on each project matter are listed on Exhibit D.

36.     Duff & Phelps professionals worked together with Jenner & Block teams and consistent with the matters as described in Jenner & Block's Interim Fee Application.  In the detailed time entries, attached hereto as Exhibits G, H, I and J, use of the term "Team" refers to the Jenner teams working along with Duff & Phelps professionals on those matters.  Duff & Phelps professionals assigned to project matter "Intercompany Transfers" principally work with Jenner & Block "Team 2" elements of the investigation. Duff & Phelps professionals assigned to project matters "Governance and Fiduciary Duty", "Analysis of Risk Management" and "Commercial and Residential Real Estate Analysis" principally work with Jenner & Block "Team 3" elements of the investigation. Duff & Phelps professionals assigned to project matter "Bank and Other Third Party Transactions" principally work with Jenner & Block "Team 4" elements of the investigation. Duff & Phelps professionals assigned to project matter "Barclays Transactions" principally work with Jenner & Block "Team 5" elements of the investigation. Duff & Phelps professionals assigned to "Systems Analysis", "Solvency and Capital Adequacy", "Liquidity, Credit, and Other Financial Analysis", "Asset Valuation", "Compensation", and

---

[10] The Examiner filed the Report under seal with the Court on February 8, 2010.  On March 11, 2010, the Examiner publicly filed a partially redacted version of the Report [Docket No. 7531], and on April 14, 2010, the Examiner filed an unredacted version of Volume 5 of the Report [Docket No. 8307].

"Witness Interviews" worked across Jenner teams in various elements of the investigation.

Duff & Phelps professionals assigned to "Case Administration & Billing" and "Project

Infrastructure" principally work with Jenner & Block "Team 1."  Duff & Phelps professionals

assigned to "Cross Team Communications, Planning, and Coordination" and "Data and

Document Management Analysis" also worked across and in support of all Duff & Phelps and

Jenner & Block teams.


A.  **Intercompany Transfers**

37.    Duff & Phelps professionals assigned to this matter were primarily

charged with the investigation relating to Tasks 1, 2, 3, 4, 7 and 9 of the Examiner Order.

38.    During the Compensation Period, professionals who have been assigned to

these elements of the Investigation have (a) investigated and developed a thorough understanding

of the Debtors' cash management, accounting, trading, treasury and other systems; (b) reviewed

and analyzed extensive documents regarding intercompany cash transactions, foreign exchange

transactions, and collateral and other asset transactions; (c) extracted, reviewed and analyzed

extensive systems data regarding intercompany cash transactions, foreign exchange transactions,

and collateral and other asset transactions; (d) assisted Counsel to the Examiner in the

identification of  potential witnesses with information regarding these elements of the

Investigation; (e)  assisted Counsel to the Examiner in the preparation for, and execution of,

witness interviews; (f) assisted Counsel to the Examiner in the documentation of these elements

of the Investigation; (g) coordinated with our system teams to identify the systems of interest and

to determine the best way to retrieve needed data and information; (h) met with current and

former Lehman employees to evaluate how the cash management system functioned at Lehman

in a normal state and to evaluate how the same functioned at the time of, and immediately

following, bankruptcy filing; (i) worked to identify and investigate various transactions at or

leading up to the bankruptcy that may be deemed to have occurred in, and outside of, the

ordinary course of business--this required gathering and examining data relating to historical

periods in order to provide a comparative baseline for activity leading up to the bankruptcy; (j)

investigated the manner in which the Lehman entities were funded by either the parent company

or other affiliates; (k) constructed financial models and performed other analyses related to

intercompany cash transactions, third-party cash transactions, foreign exchange transactions, and

collateral and other asset transactions; (l) drafted reports and appendices, and prepared exhibits,

related to the various intercompany, third-party and foreign exchange transaction analyses

undertaken; (m) performed analyses of cash transactions involving the Debtors in order to

identify transactions which may give rise to administrative claims; (n) performed analyses of

foreign exchange transactions involving the Debtors including a detailed analysis of transactions

with certain third parties; and (o) performed analyses to catalogue certain cash transactions

involving the Debtors.

   39. During the Compensation Period, Duff & Phelps expended 8,403.6 hours,

at an aggregate charge of $4,688,923.95, on matters relating to the investigation of intercompany

transfers.

### B.  **Governance and Fiduciary Duty**

   40. Duff & Phelps professionals assigned to this matter were primarily

charged with the investigation relating to Tasks 5 and 10 of the Examiner Order.

41.     During the Compensation Period, professionals who have been tasked with assisting in these elements of the Investigation have (a) reviewed and analyzed extensive materials related to major securitizations executed by Debtors, including, but not limited to, a review of type of exposure, fees, limits and size; (b) reviewed and analyzed extensive background documents and materials regarding elements of major Leveraged Loan deals, including structure, commitment size, limits and fees; (c) reviewed and analyzed materials related to transactions in which Debtors acted as principle investor; (d) reviewed and analyzed Debtor speculative trading activity; (e) reviewed and analyzed presentations to the Board of Directors; (f) evaluated Debtor entity business line exposures over time; (g) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; (h) assisted Counsel to the Examiner in the preparation for and conduct of witness interviews; and (i) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

42.     Professionals tasked with this matter also performed extensive research and analysis relating to certain claims which included (a) review of accounting for securitizations, hedging and other strategic transactions for potential breach of fiduciary duty; (b) comparison of valuations for major securitizations, leveraged loans and commercial real estate transactions with internal valuation policies; (c) review of internal and external reporting and disclosures of financial condition, earnings, risk posture and risk management procedures for GAAP, regulatory and internal management purposes; (d) analysis of compliance with CSE requirements with respect to capital adequacy, reporting of financial condition, earnings and risk management processes; and (e) analysis of management's compliance with stated policies and procedures.

43.    During the Compensation Period, Duff & Phelps expended 1,097.1 hours, at an aggregate charge of $529,735.50, on matters relating to governance and fiduciary duty.

### C.  Analysis of Risk Management

44.    Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 5 and 10 of the Examiner Order.

45.    During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) gained a thorough understanding of risk management practices and procedures over time at Lehman Brothers; (b) reviewed and analyzed extensive documents and data related to risk management practices, procedures and systems; (c) extensively documented and sourced relevant information arising out of the review of risk management practices and procedures at Lehman Brothers; (d) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; (e) assisted Counsel to the Examiner in the preparation for and conduct of relevant witness interviews; and (f) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

46.    Professionals assigned to this matter performed analyses that included (a) identification and assessment of risk metric usage and limit calculations, including analysis of model changes and rationale for changes to evaluate the issue of potential manipulation; (b) analysis of  independence of risk management function and adherence to its objectives; (c) identification and review of major risk systems, including gaining access to systems to evaluate and determine whether risk management procedures were followed; (d) analysis of documentation within risk systems describing methodology changes; (e) analysis of the impact

23

of various factors on risk; (f) analysis of Lehman's stress testing processes and management's reaction to breaches; (g) analysis of  liquidity management; (h) assessment of the management of the loan commitment process and tracking of funding requirements; (i) analysis of  critical market events and periods of persistent market conditions or inflections in market conditions during the examination period; and (j) analysis of various internal capital adequacy metrics and concepts.

47.    During the Compensation Period, Duff & Phelps expended 390.3 hours, at an aggregate charge of $244,806.75, on matters relating to analysis of risk management.

### D.  **Commercial and Residential Real Estate Analysis**

48.    Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 3, 4, 5 and 10 of the Examiner Order.

49.    During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) executed on the Examiner's work plan in connection with the investigation of Lehman's commercial and residential real estate exposure and activities; (b) analyzed, extensively documented and sourced relevant information regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; and (d) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

50.    Professionals assigned to this matter performed analyses that included (a) the identification, review and summary of major commercial real estate transactions for Lehman's three main portfolios (i.e., commercial, principle transaction and bridge equity), including valuations ascribed to those transactions over time; (b) analysis of the timing and

impact of real estate deal inclusion in firm risk analysis; (c) analysis of the process and

effectiveness of Lehman's product control; (d) analysis of synthetic CDOs and their use as

collateral; (e) analysis of Lehman's accounting for securitizations and failed securitizations; (f)

analysis of CMBS, RMBS, residential whole loans, CLO and CDO activity, including

securitizations and related characteristics; and (g) drafting reports and appendices, and preparing

exhibits related to the various analyses regarding residential and commercial real estate.

51.    During the Compensation Period, Duff & Phelps expended 1,583.5 hours,

at an aggregate charge of $707,620.50, on matters relating to commercial and residential real

estate analysis.


### E.  **Bank and other Third-Party Transactions**

52.    Duff & Phelps professionals assigned to this matter were primarily

charged with the investigation relating to Tasks 4 and 8 of the Examiner Order.

53.    During the Compensation Period, professionals who have been assigned to

this element of the Investigation have (a) assisted Counsel to the Examiner in researching and

understanding collateral issues and the impact of liquidity on those issues; (b) analyzed,

extensively documented and sourced relevant systems regarding these issues; (c) assisted

Counsel to the Examiner in the identification of potential witnesses with information regarding

these elements of the Investigation; (d) assisted Counsel to the Examiner in the preparation for

and conduct of witness interviews; (e) analyzed LBHI guarantees of clearing agreements; (f)

documented all collateral transfers to pre-bankruptcy lenders; and (g) assisted Counsel to the

Examiner in the documentation of these elements of the Investigation.

54.     Professionals assigned to this matter analyzed topics with respect to Lehman's dealings with JP Morgan Chase, Citigroup, The Federal Reserve Bank of New York, HSBC, and other third parties. Professionals analyzed (a) extensive third-party and intercompany transaction data regarding the investigation of potentially voidable asset transfers; (b) collateral-related activity leading up to the bankruptcy filing; and (c) the impact of Lehman's liquidity on collateral either demanded by third parties and/or posted by Lehman at the time preceding the bankruptcy.

55.     During the Compensation Period, Duff & Phelps expended 4,702.3 hours, at an aggregate charge of $2,274,625.35, on matters relating to bank and other third-party transactions.

### F.  Barclays Transactions

56.     Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Task 6 and 9 of the Examiner Order.

57.     During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) leveraged the work already performed by Alvarez & Marsal; (b) created a master list of securities included in the Barclays transaction; (c) analyzed the trading history for certain Debtors prior to the Barclays transaction; (d) analyzed the ownership history of certain securities listed in the master list of securities included in the Barclays transaction; (e) reviewed and analyzed settlement papers related to the Barclays transaction; (f) analyzed the contractual arrangements governing intercompany trading activity involving securities listed in the master list of securities included in the Barclays transaction; (g) assisted Counsel to the Examiner in the identification and evaluation of tangible and intangible

assets; (h) assisted Counsel to the Examiner in developing an understanding of the business

operations of certain Debtors; (i) analyzed, extensively documented and sourced relevant

materials regarding these issues; (j) assisted Counsel to the Examiner in the identification of

potential witnesses with information regarding these elements of the Investigation; (k) assisted

Counsel to the Examiner in the preparation for and conduct of witness interviews; and (l)

assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

58.     Professionals assigned to this matter analyzed securities and other tangible

and intangible assets transferred to Barclays to aid in evaluating the propriety of the transfers,

and they also analyzed the accounting for back office costs and the allocation of those costs to

the legal entities.

59.     During the Compensation Period, Duff & Phelps expended 1,375.6 hours,

at an aggregate charge of $746,726.85, on matters relating to the Barclays transactions.


### G.  Systems Analysis

60.     Duff & Phelps professionals assigned to this matter were primarily

charged with the investigation relating to all ten of the Tasks of the Examiner Order.

61.     Professionals tasked with systems analysis facilitated the retrieval of data

from the thousands of systems at Lehman Brothers and Barclays.  The initial step to execute on

this matter was to conduct interviews of appropriate technical and business staff at

Lehman/Alvarez and Barclays to identify systems that were either operational or non-operational

and of potential interest to the Examiner.  Additional Lehman systems became relevant to the

Examiner throughout the period; as that occurred, D&P professionals performed the following

tasks: (a) identified the availability of systems; (b) identified the location of the available

systems; (c) determined the type of information available on each system; (d) identified systems

that contained data needed by professionals in the execution of their work; (e) researched on and

testing of the systems to identify the most efficient and proper method in which to search and

retrieve data and information;  (f) assessed how to efficiently access the requisite data; and (g)

performed data storage and retrieval for use by the Examiner and all of the appropriate Duff &

Phelps and Jenner & Block professionals.

       62.     Professionals tasked with systems analysis identified relevant systems

from thousands of systems and subsystems available, or previously available, to Lehman

Brothers and Barclays.  The process of identifying relevant systems and gaining access to those

systems has been a significantly more time consuming process than had originally anticipated.

The specific factors that resulted in additional time were: (a) multitude of systems with

connected data flows; (b) lack of access to business analysts (users of data within systems); and

(c) access to systems analysts with knowledge only of the technical rules within the systems.

       63.     In many cases, a relevant system was available.  Other systems were

decommissioned and gaining access involved a time consuming process that involved meetings

and approvals from the system owners and Counsel for Lehman and/or Barclays.  Gaining access

to decommissioned systems was often difficult because the systems needed restoration, which

required additional technology resources over and above those that were generally available.

After access was granted, Duff & Phelps professionals worked to understand the systems'

capabilities, including the relationships between various layers of secondary systems that

provided data to the subject system and the information contained thereon, and developed

querying or other capabilities needed to access and obtain the data in a veracious and efficient

manner.  The sophistication of the system, as well as the degree of accessibility granted to the

system, dictated the research and work needed to appropriately utilize the systems for the Investigation.

64.    To effectively and efficiently execute on this matter, certain Duff & Phelps professionals have been working at on-site locations at Lehman and Barclays in New York.

65.    Professionals tasked with systems analysis also developed protocols and facilitated access to various systems identified.  Such protocols included negotiating the level and type of access to relevant systems, training for D&P professionals utilizing the systems to understand the information available and how to appropriately query, review, retrieve and save data and information, as well as securing any and all information obtained from these systems.

66.    During the Compensation Period, Duff & Phelps expended 1,290.1 hours, at an aggregate charge of $517,053.60, on systems analysis.


### H.  Solvency and Capital Adequacy

67.    Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 3 and 4 of the Examiner Order.

68.    During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) developed a work plan for assessment of the solvency and capital adequacy of the debtor entities at different dates; (b) analyzed, extensively documented and sourced relevant materials regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; (d) assisted Counsel to the Examiner in the preparation for and conduct of

witness interviews; and (e)  assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

69.    Professionals assigned to this matter analyzed and performed a solvency analysis on Lehman Brother Holdings Inc. ("LBHI") as well as the numerous individual Lehman debtor entities at various dates.  Such analyses included (a) a review of LBHI financial statements; (b) a review of Lehman debtor financial statements for each of three tests of solvency (balance sheet test, the ability to pay debts, and capital adequacy); (c) the analysis of debtor capital levels and capital infusions; (d) a review of the composition of each debtor's financial inventory; (e) the identification and implications of debtor intangible assets on solvency; (f) the analysis of Lehman's funding and capital adequacy frameworks; (g) a review and assessment of Lehman's stress tests; (h) the analysis of public market equity and debt prices and their indication of LBHI solvency; (i) a review of optionality embedded in LBHI equity prices; (j) a review of relevant corporate and external events which impacted LBHI solvency; (k) analysis of the impact of various survival options on the solvency of LBHI; (l) analysis of the impact of various findings related to valuation on the solvency of LBHI as well as the debtor entities; and (m) drafting reports and appendices, and preparing exhibits, related to the various analyses regarding LBHI solvency and debtor solvency and capital adequacy.

70.    During the Compensation Period, Duff & Phelps expended 2,208.6 hours, at an aggregate charge of $1,085,192.55, on matters relating to solvency and capital adequacy.

### I.    Liquidity, Credit and Other Financial Analysis

71.    Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 3, 4, 5, 6, 8 and 10 of the Examiner Order.

72.    During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) developed a work plan for investigation into the use of an accounting device known within Lehman as Repo 105 as well as the liquidity and capital adequacy of the debtor entities at different dates; (b) analyzed, extensively documented and sourced relevant materials regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; (d) assisted Counsel to the Examiner in the preparation for and conduct of witness interviews; and (e) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

73.    Liquidity and other financial analysis included (a) a review of Lehman's funding framework; (b) analysis of various measures of liquidity over time, including Lehman's liquidity pool, Cash Capital and Equity Adequacy Framework, their contents and changes over time; (c) an assessment of Lehman's liquidity stress scenarios; (d) analysis of Lehman's disclosure of its liquidity levels to various constituents, including investors, regulatory bodies and credit rating agencies; (e) assessments of Lehman's creditworthiness through analysts and credit rating agencies; (f) assessments of Lehman's capital structure, debt maturities, and the stability of its funding sources; and (g) an extensive investigation into the use and impact of Repo 105.

74.    During the Compensation Period, Duff & Phelps expended 1,400.5 hours, at an aggregate charge of $788,888.70, on matters relating to liquidity, credit and other financial analysis.

J. **Asset Valuation**

75.     Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 3, 4, 5, 6, 8 and 10 of the Examiner Order.

76.     Execution of this matter required valuation analyses on a wide range of financial instruments at various dates, and the results of such analyses were likely relevant to more than one task of the Investigation.  As such, Duff & Phelps implemented a valuation coordination team ("VCT") comprised of professionals representing each functional team.  The purpose of the VCT is to avoid duplication of effort with regard to valuations and ensure the valuations are performed by the appropriate professionals.  VCT oversees all valuation related activities and is responsible for procuring the necessary data and communicating the results of such valuations to the appropriate teams.

77.     During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) developed a work plan relating to the analysis of Lehman's valuation procedures, including reviewing and testing internal and external valuations of Lehman Debtor assets at different dates; (b) analyzed, extensively documented and sourced relevant information regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; (d) assisted Counsel to the Examiner in the preparation for and conduct of witness interviews; and (e) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

78.     Professionals assigned to this matter reviewed (a) policies, procedures and monthly reports related to the valuation of assets and the verification of asset marks; (b) third party marks, where available, for reasonableness prior to performing any independent valuations;

(c) the classification of assets for FAS 157 purposes; and (d) submission to Lehman's independent auditors related to the valuation of marks. In addition, and as directed by Counsel for the Examiner, Duff & Phelps professionals performed independent valuation of various types of assets, including, but not limited to fixed assets, corporate debt, corporate equity, collateralized debt obligations, collateralized loan obligations, commercial and residential mortgage backed securities, derivatives, fixed income assets, equity, real estate, high yield instruments and leveraged loans; and (e) drafted reports and appendices, and prepared exhibits, related to the various analyses regarding asset valuations.

79.    During the Compensation Period, Duff & Phelps expended 5,115.9 hours, at an aggregate charge of $2,728,166.15, on matters relating to asset valuation.

### K. **Compensation**

80.    Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 2, 5, 7 and 10 of the Examiner Order.

81.    During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) executed upon a work plan relating to analysis of potential compensation issues of various Lehman employees; (b) analyzed background documents and materials regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; (d) assisted Counsel to the Examiner in the preparation for and conduct of witness interviews; and (e) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

82.    Professionals assigned to this matter researched the compensation structure at Lehman, including analysis of the impact on compensation resulting from decisions which may have caused various changes to Lehman's capital structure and/or profitability, as well as various payments of compensation to officers and/or directors at Lehman in the time period leading up to the bankruptcy.

83.    During the Compensation Period, Duff & Phelps expended 938.8 hours, at an aggregate charge of $426,055.95, on matters relating to compensation.

## L.  **Witness Interviews**

84.    Time entries in this matter relate to preparing for and conducting witness interviews.

85.    Duff & Phelps professionals assisted Counsel to the Examiner in the preparation of witness interviews which included (a) review of a comprehensive amount of documents related to the appropriate subject matter; (b) aid in the formulation of interview questions; and (c) analysis of documents and draft of exhibits used.

86.    Duff & Phelps professionals assisted Counsel to the Examiner in the conduct of witness interviews which included attendance and documentation of certain witness interviews as requested by the Examiner, as well as investigation and research of items raised in interviews including documentation of follow-up responses and questions later used by Counsel for the Examiner.  During the compensation period, Duff & Phelps professionals assisted in the preparation for and/or attended a total of 72 witness interviews.

87.    During the Compensation Period, Duff & Phelps expended 1,519.7 hours, at an aggregate charge of $897,998.40, on matters relating to witness interviews.

### M. **Non-Working Travel**

88.    This matter includes time entries related to non-working travel time spent by Duff & Phelps professionals to participate in internal and external meet and confer sessions with various third-parties and parties in interest as directed by the Examiner and includes travel for necessary on-site work at Lehman offices in New York.  When feasible, our professionals minimized the amount of non-working travel by working while travelling.

89.    During the Compensation Period, Duff & Phelps expended 903.8 hours, at an aggregate charge of $434,076.75, on non-working travel time.  Duff & Phelps is seeking compensation only for one-half of non-working travel time in the amount of $217,038.38.  Duff & Phelps is voluntarily reducing its bill for the balance.

### N. **Case Administration and Billing**

90.    This matter relates to internal case administration and the preparation of monthly fee statements and fee applications, and it included (a) general, internal administrative tasks; (b) timekeeping; and (c) review and preparation of monthly fee statements and interim fee applications.

91.    During the Compensation Period, Duff & Phelps expended 1,003.0 hours, at an aggregate charge of $402,409.80, on case administration and billing matters.

### O. **Project Infrastructure**

92.    This matter relates to the preparation of and execution on non-recurring infrastructure establishment tasks, and it includes (a) review and acknowledgement of

confidentiality agreements and stipulations by all Duff & Phelps professionals; and (b)

establishment of data, communication, document management and related protocols.

93.    During the Compensation Period, Duff & Phelps did not bill for any time

spent by professionals working on items related to Project Infrastructure.


P.    **Cross-Team Communications, Planning, and Coordination**

94.    In appointing the Examiner, the Court expressed a strong interest in

ensuring that the Investigation avoids replication of efforts and duplication of services.  Due to

the breadth of the Investigation, the number of parties and entities involved, the volume of

documents and data to be reviewed and analyzed, and the short time frame in which the

Examiner has committed to completing the Investigation so as to avoid unnecessary delays in the

administration of the chapter 11 cases, Duff & Phelps professionals routinely communicate and

coordinate internally regarding the scope of the Investigation, documents and data to request,

witnesses to interview, and research to be conducted which is relevant to multiple investigatory

subject matters.

95.    This matter includes time entries for such planning and coordination to

avoid the duplication of work and to conduct an expedient, yet thorough investigation, and

contains activities such as (a) analysis of issues that pertain to multiple teams; (b) ensuring team

collaboration on analyses that impact multiple teams or matters; (c) ensuring consistency and

efficiency in procurement of documents, information and interviews; (d) establishment of

communications protocols to avoid duplicative efforts, such as "one-team" communication with

Jenner & Block; (e) centralized oversight and management of a consolidated work plan for the

investigation, including related staffing and budgeting issues; and (f) time spent insuring that

each task performed is related to one of the tasks of the Examiner.

96.    During the Compensation Period, Duff & Phelps expended 389.4 hours, at

an aggregate charge of $229,779.90, on matters relating to cross-team communications,

planning, and coordination.

## Q. **Data and Document Management and Analysis**

97.    A critical piece of the Examiner's Investigation relates to the collection

and processing of a vast volume of documents and information that is in the possession of

various parties in interest.  This matter relates to the acquisition, management and review of

electronic and tangible documents and information, including (a) understanding, assessing and

accessing the available data systems at Alvarez and Lehman (among others); (b) reviewing and

executing stipulations and implementing related protocols as required regarding the handling and

use of data and documents; (c) technically processing documents for review by Duff & Phelps

professionals, including centralized data request function, categorization of data to aid in the

dissemination of information to the various teams to avoid duplication of efforts; (d) receiving,

processing and responding to data requests from Counsel to the Examiner; (e) management of

documents tagged by Counsel for the Examiner as for Duff & Phelps' review; (f) conferring on a

regular basis with professionals at Alvarez & Marsal and Barclays regarding the availability of

data necessary to complete the analyses assigned to us by the Examiner; and (g) analyzing and

implementing efficient protocols to focus the Examiner's Investigation on relevant data and

documents.  In addition to maintaining an internal database of documents created, utilized and

reviewed, Duff & Phelps professionals also relied upon two document management systems,

CaseLogistix and Stratify, which were utilized by Jenner & Block and populated with millions of pages of documents which were useful to the performing our duty as advisors to the Examiner. To effectively and efficiently execute on this matter, Duff & Phelps certain professionals have been working at on-site locations at Lehman in New York.

98.    To date, Duff & Phelps professionals have created and managed 120 unique information requests to Lehman Brothers and 348 remedy requests to Barclays, which relate to either systems or data needs.  Professionals have received and cataloged approximately 21,000 documents which were discovered by Duff & Phelps professionals in the course of their various areas of investigation of Lehman Brothers.  Additionally, over 7 terabytes of data, representing millions of individual documents and data files, were collected from Barclays and cataloged for analysis.

99.    During the Compensation Period, Duff & Phelps expended 1,516.9 hours, at an aggregate charge of $607,286.70, on matters relating to data and document management and analysis.

## IV.    DUFF & PHELPS' REQUESTED COMPENSATION SHOULD BE ALLOWED

100.    The foregoing professional services performed by Duff & Phelps were necessary and appropriate to the Examiner's administration of his duties in the above-referenced chapter 11 cases and were in the best interests of the Examiner, the Debtors' estates, and other parties in interest. Compensation for the foregoing services as requested is commensurate with the complexity, importance, and nature of the problems, issues, or tasks involved.

101.    Duff & Phelps has taken significant efforts to ensure that the professional services were performed with diligence, in an efficient manner, and without duplication of effort. Accordingly, when possible, Duff & Phelps delegated tasks to lower cost professionals or, for discrete matters, to professionals with specialized expertise in the particular task at issue. While that approach may have required intra-office conferences or involved individual professionals who spent only a few hours on the matter at hand, the net result was enhanced cost efficiency.

102.    In preparing this Third Interim Application, Duff & Phelps calculated the amount of time spent by each professional in performing actual and necessary advisory services to the Examiner and Counsel to the Examiner in the conduct of the Investigation. That data came directly from computerized records that are kept specifically for this engagement. Individual time entries are maintained on written daily logs and are input directly into the billing system.  All time entries and expenses are uploaded into the billing system, which then produces draft spreadsheets of time and expenses.  Duff & Phelps professionals have reviewed and edited the draft spreadsheets for errors prior to their submission.

103.    The rates used in this Third Interim Application are the customary and usual rates which Duff & Phelps charges clients on matters of this type, subject to the 10% reduction in standard hourly rates to which Duff & Phelps has agreed because of the significant public interest associated with the Examiner's duties and responsibilities.  In addition, the disbursements for which Duff & Phelps seeks reimbursement are the customary and usual expenses for which the Duff & Phelps seeks reimbursement from their clients.  Duff & Phelps does not charge its clients for facsimiles, postage, duplicating and computerized research, domestic and long distance telephone (other than while traveling), and certain overtime expenses,

and takes those expenses into account in its overhead. The hourly rates applied in this Third

Interim Application do not compensate the firm for such expenses.

104.    Section 331 of the Bankruptcy Code provides for interim compensation

of professionals and incorporates the substantive standards of section 330 to govern the Court's

award of such compensation. 11 U.S.C. § 331. Section 330 provides that a court may award a

professional employed under section 327 of the Bankruptcy Code "reasonable compensation

for actual necessary services rendered . . . and reimbursement for actual, necessary expenses."

11 U.S.C. § 330(a)(1). Section 330 also sets forth the criteria for the award of such

compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded to an Examiner, trustee under Chapter 11, or professional person, the court should consider the nature, the extent, and the value of such services, taking into account all relevant factors, including
>
> (A)    the time spent on such services;
>
> (B)    the rates charged for such services;
>
> (C)    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E)    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

105.    Duff & Phelps respectfully submits that the services for which it seeks compensation in this Third Interim Application were, at the time rendered, believed to be necessary and beneficial to the Examiner and the Investigation.  Duff & Phelps further submits that the compensation requested herein is reasonable in light of the nature, extent, and value of such services provided to the Examiner and Counsel to the Examiner.  The Examiner has been given the opportunity to review this application and has approved the requested amount.

106.    The services rendered by Duff & Phelps were consistently performed in a timely manner commensurate with the complexity, importance and nature of the issues involved. Duff & Phelps took numerous steps to ensure the services were rendered in the most efficient, cost-effective manner.  Such steps include (a) establishing several cross-functional teams, such as the project management, the data and document management and the valuation coordination ("VCT") teams to minimize overlap of activity among the functional teams; (b) focusing on the tasks deemed most beneficial to the investigation by taking top-down view of each of the major issues to readily identify areas that warranted greater scrutiny, and thereafter conferring with the Examiner and Counsel to the Examiner to again focus on only those tasks/deliverables they directed Duff & Phelps to continue to  focus upon; (c) establishing weekly team leader calls both internally and externally between Duff & Phelps' team leaders and the respective team leader(s) at Counsel for the Examiner; (d) leveraging off of work already performed by others, including Counsel to the Examiner, Alvarez, Barclays, Deloitte, Ernst & Young, Houlihan, Lokey, Howard & Zukin and Gifford Fong Associates; (e) primarily analyzing data and issues that have not yet been the focus of other investigations, the results of which we expect has and will continue to benefit other parties; (f) refraining in all but a select few instances from performing first level review of any document productions by coordinating efforts with Counsel for the Examiner who have, along with contract

attorneys, performed most first level reviews, and instead, efforts have been focused on reviewing

only those documents which have been flagged either as "Hot" or "for Duff review"; and (g) to the

extent we perform first level review of a document production, junior analyst reviewers

knowledgeable about the needs of each area of the investigation are assigned that can readily

identify relevant documents and communicate such findings with the appropriate teams.

107.    Based upon the foregoing, it is respectfully submitted that approval of the

interim compensation sought herein for the Compensation Period is warranted.

108.    To the extent applicable, Duff & Phelps further requests that the Court

waive for cause shown any Guideline requirement not met by this Third Interim Application.

109.    No previous application for the relief sought herein has been made to this

or any other court.

## CONCLUSION

WHEREFORE Duff & Phelps respectfully requests: (i) allowance and payment of compensation for professional services rendered during the Compensation Period in the amount of $17,090,309.03; and (ii) reimbursement for actual and necessary expenses Duff & Phelps incurred during the Compensation Period in the amount of $346,491.55; and (iii) that the Court grant Duff & Phelps such other and further relief as is just.

Dated: April 16, 2010

Respectfully submitted,

DUFF & PHELPS, LLC
By: Allen M. Pfeiffer
  Managing Director
  DUFF & PHELPS, LLC
  300 Headquarters Plaza
  12th Floor
  Morristown, NJ  07960
  (973) 775-8260