# BUILDING LOAN AGREEMENT

---

## NORTH FORK BANK

- with -

## NEW CENTRAL AVENUE, LLC

---

Premises: **260 Central Avenue, Lawrence, New York**

The within premises lie in
Section 40, Block B, Lot 21-23
in Nassau County

STARK, AMRON & LINER, LLP
Seven Penn Plaza, Suite 600
New York, New York  10001

Attention: Robert F. Liner, Esq.

## BUILDING LOAN AGREEMENT

THIS AGREEMENT made the 12th day of July, 2007 between **NEW CENTRAL AVENUE, LLC**, a New York limited liability company, with offices c/o The Orlo Fund, 614 Hempstead Gardens Drive, West Hempstead, New York 11552 (the "Borrower") and

**NORTH FORK BANK**, a New York banking corporation having offices at 275 Broadhollow Road, Melville, New York 11747 (the "Lender"),

WHEREAS, the Borrower has applied to the Lender for a loan in the sum of **Forty Three Million One Hundred Thousand and 00/100 ($43,100,000.00) Dollars** (the "Loan"), to be advanced as hereinafter provided and to be evidenced by the Building Loan Note (the "Note") of the Borrower for the payment of said sum as set forth in the Note in accordance with the terms thereof, or so much thereof as shall at any time be advanced thereon, with interest thereon as set forth in the Note in accordance with the terms thereof.

Said Note is secured by a Building Loan Mortgage (hereinafter sometimes referred to as the "Mortgage") on property situate at **260 Central Avenue, Lawrence, New York** (the "Property"), more fully described by metes and bounds on Schedule A annexed hereto;

TOGETHER with all right, title and interest of the Borrower in and to the land lying in the streets and roads in front of and adjoining said Property;

TOGETHER with all fixtures, chattels and articles of personal property now or hereafter attached to or used in connection with said Property, including, but not limited to, furnaces, boilers, oil burners, radiators and piping, coal stokers, plumbing and bathroom fixtures, refrigeration, air conditioning and sprinkler systems, washtubs, sinks, gas and electrical fixtures, stoves, ranges, awnings, screens, window shades, elevators, motors, dynamos, refrigerators, kitchen cabinets, incinerators, plants and shrubbery and all other equipment and machinery, appliances, fittings and fixtures of every kind used in the operation of the building(s) standing on said Property, together with any and all replacements thereof and additions thereto;

WHEREAS, the Lender agrees to make the Loan upon the terms, covenants and conditions hereinafter set forth and the Borrower agrees to take such Loan and expressly covenants to comply with and perform all of the terms, covenants and conditions of this agreement;

NOW, THEREFORE, it is agreed between the parties as follows:

1.    The Borrower expressly covenants to construct a four (4) story luxury condominium, which shall contain 138 apartments, containing approximately 202,944

square feet of sellable residential space, 213 off-street parking spaces and 159 storage units (collectively, the "Improvements") in accordance with the plans and specifications therefor which have been previously submitted to the Lender and approved by the Lender (as same may be amended from time to time in accordance with the provisions of this Agreement, the "Plans"). The Borrower agrees to file with all governmental authorities having jurisdiction and to obtain all necessary approvals of the plans and specifications and all necessary building permits from these authorities and to keep such permits and approvals in full force and effect until the earlier of (i) satisfactory completion of the Improvements or (ii) the Loan is paid in full. No changes or amendments to the Plans shall be made without first obtaining the written approval of the Lender, which approval shall not be unreasonably withheld or delayed.

The Improvements are to be completed in accordance with the construction schedule (as approved, the "Construction Schedule") and the project cost statement annexed hereto as Exhibit A (the "Project Cost Statement"), all as submitted to and accepted by Lender and an architect, engineer or other construction professional hired by Lender at Borrower's sole cost and expense (the "Construction Consultant").

2.    With the approval of the Lender, the Loan may be evidenced by more than one bond or note aggregating the amount of the Loan and to be secured by more than one mortgage, each covering a portion of the Premises. In that case, reference herein made to the bond, note or mortgage shall be deemed to include all of the bonds, notes or mortgages.

3.    The Note and Mortgage shall be upon Lender's standard forms of or, at the option of the Lender, upon such other forms and containing such clauses as the Lender shall determine are needed for the Lender's protection. The Mortgage shall be executed and acknowledged by all parties necessary to make it, as determined by the Lender's attorney. The Mortgage shall be a valid lien on a good and marketable title in fee to the Property and on the fixtures and personal property to be covered thereby for all sums that may be advanced, free and clear of all liens, encumbrances and defects, except those, if any, to which the Lender has expressly agreed herein to take subject to or which the Lender may hereafter waive. The Note and Mortgage are to be delivered contemporaneously with the execution of this Agreement.

4.    The Borrower, at the time of the execution of this Agreement or, at the option of the Lender, at the time fixed for the delivery of the Mortgage, shall pay all fees and charges agreed to be paid including the fees, if any, for the procuring and making of said loan and the charges for the examination of the title to said Property, surveys, appraisals, inspections and drawing of papers, and shall also pay the recording fees and Mortgage recording tax and cost of revenue stamps, if any, and architects', engineers' lender's construction consultant and building loan service fees.

5.    The Loan is to be advanced at such times and in such amounts as the Lender shall determine in its reasonable discretion, solely in connection with the costs of

construction of the Improvements. Without limiting the generality of foregoing, Lender shall have the right to withhold any advance requested by Borrower hereunder in the event that any approval required to be received from any federal state or local governmental or administration authority having jurisdiction over the Property or the Improvements has not been obtained.

6.    No advance shall be due unless, in the judgment of the Lender and the Construction Consultant, all work usually done at the stage of construction when the advance is made payable is in fact done in a good and workmanlike manner, and all materials and fixtures usually furnished and installed at that time are furnished and installed, and unless all construction is approved by the Construction Consultant.

7.    The Lender may advance parts or the whole of any installments before they become due, if the Lender believes it advisable so to do, and all such advances or payments shall be deemed to have been made in pursuance of this Agreement and not to be modifications thereof. The making of any advance or any part of an advance shall not be deemed an approval or acceptance by the Lender of the work therefore done. In no event shall any advance be made for the cost of material stored off the Property. Any advance or installment or any part or parts thereof may be postponed or deferred by mutual consent of the Borrower and the Lender, and any such postponement or postponements shall be deemed to be in the pursuance of this Agreement, and not in modification thereof. A receipt for any advance shall be binding on the Borrower although signed by any one of the individual parties constituting the Borrower, or any one partner, if the Borrower is a partnership, or by any one officer, if the Borrower is a corporation, or by any one managing member, if the Borrower is a limited liability company.

8.    All advances of the Loan are to be made at the office of the Lender or at such other place as the Lender shall designate, within five (5) days of the Lender's receipt of all documents and other items required by this paragraph 8, including, without limitation, the Construction Consultant's inspection report as required by subparagraph (f), below, and shall, subject to all of the terms and conditions hereof, be advanced as follows and upon the terms and the conditions precedent set forth herein:

(a)    Advances shall not be made unless (i) the Note, the Mortgage, this Agreement and all other documents executed in connection with the Loan are in full force and effect and (ii) no uncured Event of Default exists under the terms of the Note, the Mortgage, this Agreement, or any of the other documents executed in connection with the Loan.

(b)    With each and every advance request, Borrower shall deliver to Lender a written request for funds, together with a copy of all change orders pertaining to that advance (if any), in form and substance acceptable to Lender, stating the amount of the disbursement requested. The form to be used shall be the Lender's standard form. Borrower shall deliver not more than one (1) request for funds each month. A request for

funds shall be signed by the Borrower, Borrower's general contractor, if any, and the
architect or engineer, with the architect having signed and sealed the project plans and shall
be delivered to the Lender at least five business (5) days before the requested date of
disbursement.

(c)     With each and every request for an advance, Borrower must deliver
to Lender the following documents, together with such other documents as Lender may
reasonably request: (i) proof, reasonably satisfactory to Lender, including, but not limited
to, a certification by the Borrower, that all work for which funds are requested has been
completed in accordance with Plans, the Project Cost Statement and/or the Budget and with
applicable laws; (ii) lien waivers from payees under previous requests for funds; (iii) title
information in the form of an endorsement to the Loan Policy of Title Insurance held by the
Lender, which increases the amount of coverage and which confirms the first lien priority of
the Mortgage without additional matters affecting title to the Property, together with a
Pending Disbursements Clause in the form of Exhibit "B" annexed hereto and a
continuation of or endorsement to such policy, in a form approved by Lender's Counsel,
and setting forth no additional exceptions except those approved by Lender's Counsel;
(iv) Borrower's affidavit in the form of Exhibit "C" hereto annexed, and (v) certification
by the Borrower that there are sufficient funds remaining in the Borrower's construction
budget to complete the construction of the Improvements. All of the above information
shall be obtained and submitted to the Lender at the Borrower's expense.

(d)     The amount of each advance shall be determined as follows, at the
Lender's election:

(i) the amount of the Loan multiplied by the percentage of completion of
the Improvements attained, or

(ii) the estimated total cost of the construction of the Improvements as
determined from time to time by the Lender's Construction Consultant
multiplied by the percentage of completion of construction then
attained, less the amount by which said estimated total cost of
construction exceeds the amount of the Loan

less, in each case, (A) amounts theretofore advanced out of the Loan; and (B) the
Retainage (as hereinafter defined). In no event shall the amount advanced for any item
exceed the amount set forth in the Project Cost Statement and/or the Budget with respect
to such item. Notwithstanding anything contained herein to the contrary, the amount to
be advanced hereunder, when combined with the loan secured by the First Mortgage (as
defined in the Mortgage) and the sums advanced pursuant to the documents executed in
connection with the loan secured by the Project Loan Mortgage shall not at any time
exceed eighty (80%) percent of the total actual cost of the acquisition of the Property and
the construction of the Improvements.

(e)     The Lender shall retain from each advance a sum equal to the
greater of (i) any amount to be held back by the Borrower pursuant to the terms of any

construction contract and/or (ii) 10% of the amount of such advance; said sum(s) are hereinafter referred to as "Retainage".

(f)    The Construction Consultant, shall submit to the Bank a report based upon an on-site inspection, which report shall (i) certify that the portion of the Improvements completed as of the date of such inspection has been completed as of the date of such inspection and has been completed in accordance with the Plans, and (ii) state its estimate of (a) the percentage of the construction of the Improvements completed, (b) construction costs with respect to the Improvements, (c) the actual sum necessary to complete construction of the Improvements, (d) the amount of time required to complete construction of the Improvements in accordance with the Plans, and (e) the amount of time from the date of such inspection which will be required to complete construction of the Improvements in accordance with the Plans.

(g)    Prior to each advance, upon the request of Lender, Borrower shall furnish evidence satisfactory to Lender of the payment of all bills and charges to date.

(h)    If required by Lender, Borrower shall deliver written, notarized statements from each subcontractor and materialman that it has received payment in full, (subject to any required Retainage) of all monies owed to it by the general contractor to date.

(i)    Construction of the Improvements shall comply with applicable laws, rules, restrictions, orders and regulations of the governmental authorities, and Borrower shall have delivered to Lender all necessary certificates, authorizations, permits and letters required by the governmental authorities to permit the construction and completion of the Improvement.

(j)    The Construction Consultant shall be of the opinion that the Improvements can be completed by the Completion Date.

(k)    Lender shall have received in form and substance satisfactory to it and its counsel, all documents required by the commitment letter and those reasonably required by Lender's counsel.

(l)    Lender shall have received evidence (in the form of "will-serve" letters or other evidence reasonably satisfactory to the Lender) that arrangements have been made for all necessary utilities to be supplied to the Property, and that appropriate hook-ups therefore are available to the Property.

(m)    Notwithstanding anything contained herein to the contrary, no advances shall be made hereunder until such time as:

(i)    The principals of the Borrower have invested an additional Eight Million One Hundred Sixty Four Thousand and 00/100

($8,164,000.00) Dollars. Such additional equity may include the proceeds of the Mezzanine Loan (as defined in the Mortgage).

(ii)    The Plans and Specifications for the construction of the improvements and the Budget, all of which shall have been previously submitted to the Lender, shall have been reviewed and approved by the Lender's Construction Consultant and a plan and cost review prepared by the Construction Consultant at the Borrower's sole cost and expense shall have been submitted to and shall be in all respects satisfactory to the Lender.

(iii)    The Lender shall have received copies of all permits and approvals (including zoning approval) required in connection with the construction of the Improvements.

(iv)    The Lender shall have received copies of all contracts and subcontracts related to the construction of the Improvements, including the agreement with the architect and general contractor/construction manager. The general contractor and architect shall be satisfactory to the Lender in all respects in its sole discretion. The contract with the General Contractor shall be a "maximum price" contract satisfactory to the Lender in all respects in its sole discretion, and no changes shall be made to the contract with the General Contractor or with any major subcontractor without the Lender's express written consent.

(v)    The Lender shall have received satisfactory completion bonds from the general contractor and all major subcontractors.

For purposes of this subparagraph 8(m), a "major subcontract" shall be a subcontract the total cost of which shall be Three Million and 00/100 ($3,000,000.00) Dollars or more, and a "major subcontractor" shall be any subcontractor entering into a major subcontract.

9.    The Lender shall have no obligation to make disbursements for the cost of materials not in place, whether stored on or off site. Advances for all costs included in the cost of the Improvements which the Lender has agreed to fund shall be made at such times, in such amounts and for such items as the Lender shall reasonably determine.

10.    The Lender may at any time extend the payment of the principal secured by said Note and Mortgage, and any extensions so granted shall be deemed made in pursuance of this Agreement and not to be modifications thereof.

11.    The Borrower shall furnish to the Lender, on or before the making of the final advance hereunder (the "Final Advance"), the final certificates of approval, including certificate(s) of occupancy for the Improvements, of the various governmental authorities having jurisdiction and the certificate of the Board of Fire Underwriters acting in and for the locality in which the said Property are situated. In addition, if a mechanic's or materialman's lien arising out of such construction is filed against the Premises or the Improvements, the Lender shall not be obligated to make such Final Advance or any portion thereof until such lien shall have been removed by bonding or otherwise.

12.    The Borrower shall furnish to the Lender, or the Lender may procure at the expense of the Borrower, surveys made by a surveyor satisfactory to the Lender whenever required by the Lender.

13.    The Borrower shall furnish to the Lender insurance policies with premiums prepaid from companies and in form, substance and amounts satisfactory to the Lender insuring the Property against loss or damage by fire, with the usual extended coverage endorsement and other hazards as may reasonably be required by the Lender, including, without limitation "Builder's Risk" insurance in such amounts and issued by such company as shall be satisfactory to Lender in its reasonable discretion.  If Borrower fails to furnish same, Lender may procure same at Borrower's sole cost and expense.

14.    In the event of default, the Lender may, at the expense of the Borrower, employ a watchman to protect the Property from depredation or injury.

15.    If the construction of the Improvements is at any time discontinued or not carried on with reasonable dispatch in the judgment of the Lender, then Lender may purchase materials and employ workmen to protect the Property so that the same will not suffer from depredation or the weather, or to complete the Improvements, so that they may be used for the purposes for which it is designed under the Plans or for another purpose as reasonably determined by the Lender, at Borrower's sole cost and expense.

In addition, without limiting other rights and remedies provided in this or in any other related agreements or documents in the event of a default, in the event construction is not completed by the Completion Date or in the event of a default hereunder, Lender may hire, at Borrower's expense, a construction manager chosen by Lender to oversee construction until its completion.

16.    All sums paid or extended in accordance with any of the provisions of this Agreement shall be deemed advances to the Borrower and evidence by the  Note and secured by the Mortgage and may be applied at the option of the Lender to any advances thereafter becoming due.

17.    The Lender may deduct from any payment to be made under this agreement any amount necessary for the payment of any fees and expenses relating to the examination of the title to the Property, including costs of surveys, charges for appraisals, inspections, drawing of papers, mortgage recording tax, revenue stamps, if any, and architects' and engineers' fees, and any expenses incurred in the procuring or the making of the Loan and in the payment of any insurance premiums, mortgage tax, assessment, water rate, sewer rents and other charges, liens and encumbrances upon the Property, whether before or after the making of the Loan, and any other amounts necessary for the payment of the cost of Improvements as defined by the Lien Law and may apply such amounts in making the payments, and all sums so applied shall be deemed Advances under this agreement and evidenced by the Note and secured by the Mortgage.

18.     The Lender may assign this agreement and the Note and Mortgage and cause the assignee or any subsequent assignee to make any Advances not made at the time of the assignment and all of the provisions of this agreement shall continue to apply to the Loan, Note and Mortgage. In case the Loan is assigned in accordance with this Paragraph 18, it shall be deemed a compliance by the Lender with this agreement and to have been made pursuant thereto and not to be a modification thereof and the Advances so made shall be deemed evidenced by the Note and secured by the Mortgage.

19.     The Borrower will not assign this Agreement or the moneys due hereunder or convey or encumber the Property without the written consent of the Lender, but in such event the Lender may nevertheless, at the Lender's option, continue to make advances under this Agreement to the Borrower or to those who succeed to the Borrower's title; and all sums so advanced by the Lender shall be deemed advances under this Agreement, and not to be modifications thereof, and shall be deemed evidenced by the Note and secured by the Mortgage.

20.     The Borrower covenants and agrees not to do any act or thing prohibited by the terms of this Agreement, and it is expressly agreed that in any of the following events all obligations on the part of the Lender to make said loan or to make any further advance shall, if the Lender so elects, cease, and terminate, and all sums due to the Lender pursuant to the Note and Mortgage shall, at the option of the Lender, become immediately due and payable. Notwithstanding the foregoing, the Lender may make any advances or parts of advances after the happening of any of the following events without thereby waiving the right to demand payment of the Mortgage debt and without becoming liable to make any other or further advances. The following shall be considered events of default (each an "Event of Default"):

(a)     If the Mortgage offered by the Borrower does not give the Lender a good and sufficient lien for the indebtedness to be secured thereby on said Property satisfactory to the Lender's attorney.

(b)     If at the time any payment is due to the Borrower, the title is not satisfactory to the Lender's attorney, regardless of whether the lien, encumbrance or other question existed at the time of any prior advance.

(c)     If the Borrower assigns this Agreement or any of said advances or any interest therein, or if said Property are conveyed or encumbered in any way without the written consent of the Lender, except as provided in the Mortgage.

(d)     If a survey shows that any improvement on the Premises encroaches upon the street or upon adjoining

property or any adjoining structure encroaches upon the Premises to an extent deemed material by the Lender's attorney.

(e)    If the Improvements are not fully completed by **July 12, 2010** (the "Completion Date")

(f)    If the Borrower does not take the loan or the advances within sixty (60) days after they are made payable, or in any event if the Improvements are not fully completed and ready for occupancy by the Completion Date.

(g)    If the Property is, in the judgment of the Lender, materially injured or destroyed by fire or otherwise (subject to the terms of the Mortgage).

(h)    If a petition in bankruptcy is filed by or against the Borrower or any Guarantor (as defined in the Mortgage) or a receiver or trustee of the property of the Borrower or any Guarantor of the Loan is appointed, or if the Borrower or any Guarantor of the Loan files a petition for reorganization under any of the provisions of the United States Bankruptcy Code or of any other law, state or federal, or makes an assignment for the benefit of creditors or is adjudged insolvent by any state or federal court of competent jurisdiction. Notwithstanding the foregoing, in the event that any of the foregoing occurs without the consent or acquiesance of the Borrower, the Borrower shall have sixty (60) days from the date of such occurrence to have same dismissed prior to the Lender declaring a default hereunder.

(i)    If the Borrower, after fifteen (15) days notice and opportunity to cure, does not construct the Improvements in accordance with the Plans, the Construction Schedule, the Project Cost Statement and the Budget and any amendments thereof and additions thereto made with the written approval of the Lender during the construction of the Improvements and in accordance with all laws, rules, regulations and requirements of such governmental authorities existing at the commencement of the construction of the Improvements or fails to file amended or supplemental plans and specifications, if required, because of amendments and additions approved by the Lender and such governmental authorities, or fails to

furnish the Lender with a written certificate issued by the
department of the governmental authority in the locality in
which the Property is situated having jurisdiction thereover
approving the Plans and any amended and supplemental
plans and specifications where such department has
jurisdiction.

(j)    If, the Borrower does not permit Lender, or
representative of the Lender, to enter upon the Property and
inspect the improvement thereon at all reasonable times and
upon reasonable notice, accompanied by a representative of
the Borrower, and examine all detailed plans, shop
drawings and specifications which are kept at the work, or
fails to furnish to them, when requested, copies of such
plans, drawings and specifications.

(k)    If for any cause whatever the construction of said
the Improvements is at any time discontinued for longer
than thirty (30) consecutive days or not carried on with
reasonable dispatch in the judgment of the Lender, unless
such discontinuance is the result of a force majeure, in
which case the Borrower shall have up to an additional
sixty (60) days to recommence construction of the
Improvements.

(l)    If by reason of acts of God, floods, storms,
explosion, fires, labor troubles, strikes, insurrection, riots,
acts of the public enemy, or federal, state or local law,
order, rule, or regulation, either party is prevented from
complying with any condition of this agreement or from
complying with any express or implied covenant in the
agreement, then while so prevented the party shall be
relieved of the obligation of complying with such covenant
and shall not be liable for damages for failure to comply
with it. Any obligation of either party shall be extended for
as long as it is so prevented from complying with any
condition or covenant in the agreement. Notwithstanding
the above, nothing contained herein shall be construed to
relieve the Mortgagor from timely making any and all
payments required under the Note executed in connection
with this Agreement.

(m)    If the Borrower executes any chattel mortgage on
any materials, fixtures or articles used in the construction
or operation of the Improvements or appurtenant thereto, or

articles of personal property placed in said Property, or if any such materials, fixtures or articles are not satisfactory to the Lender or are purchased on conditional bill of sale or otherwise so that the ownership thereof will not vest unconditionally in the Borrower, free from encumbrance, on delivery at the Property; and if the Borrower does not furnish to the Lender, if requested, the contracts, bills of sale, statements, receipted vouchers and agreements, or any of them, under which the Borrower claims title to such materials, fixtures and articles.

(n)    If the Borrower fails to comply with any requirement of any governmental authority having jurisdiction within thirty (30) days after written notice of such requirement shall have been given to said Borrower; or if Borrower fails to furnish to the Lender, when requested, official searches, made by the governmental authorities having jurisdiction.

(o)    If the Borrower fails to keep, observe or perform any of the conditions, stipulations, agreements, or covenants contained in this Agreement or in the said Note and Mortgage executed in connection herewith.

(p)    If the Borrower fails to pay when due all obligations incurred by the Borrower for the cost of constructing the Improvement or for any restoration.

(q)    If the Borrower does not disclose to the Lender, upon demand, the names of all persons with whom the Borrower contracted for the construction of the Improvements or the furnishing of labor or materials therefor.

Notwithstanding anything contained herein to the contrary, the Lender shall give Borrower thirty (30) days written notice prior to declaring a default hereunder.

21.    In the event that an Event of Default shall have occurred and be continuing, then, at the option of the Lender, the principal indebtedness evidenced by the Note and secured by the Mortgage shall immediately become due and payable and the Mortgage may be foreclosed in either one or more actions, and any judgment of foreclosure and sale obtained therein may direct that the Property covered by the Mortgage sought to be foreclosed in such action be sold in one or more parcels.

22.    The Borrower, in compliance with Section 13 of the New York State Lien Law, covenants that the Borrower will receive the advances to be made hereunder and to be secured by the Mortgage executed pursuant hereto and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the Improvements before using any part of the total of the same for any purpose.

23.    It is mutually understood and agreed by and between the parties hereto on behalf of themselves and their respective personal representatives or successors in interest that the Note and Mortgage contemplated to be executed, acknowledged and delivered pursuant to this Agreement shall be made subject to all the conditions, stipulations, agreements and covenants contained in this Agreement, to the same extent and effect as they would be if fully set forth in and made part of said Note and Mortgage,; and it is further expressly understood and agreed that this Agreement is made subject to all the conditions, stipulations, agreements, and covenants contained in said Note and Mortgage, to the same extent and effect as they would be if fully set forth herein and made part hereof.

24.    The construction shall be completed by the Completion Date as set forth above.    Notwithstanding anything to the contrary contained in this Agreement, the construction shall not be deemed to have been completed until (i) the Improvements shall contain all equipment, furnishings and fixtures required for the use and operation of the Improvements and/or which may be required by governmental authorities and/or by any law, regulation or rule of any governmental authority, and (ii) a temporary certificate(s) of occupancy and all other necessary certificates, licenses, consents and other approvals of governmental authorities acting in and for the locality in which the Property are situated have been issued or made with respect to the Improvements.

25.    The Borrower represents and warrants to Lender that:

(a)    The Plans have been submitted to and approved by the general contractor, if any, and have, to the extent required by law, been submitted to all governmental authorities and all necessary building permits and approvals for the construction (including, but not limited to, all environmental approvals) have been obtained from the appropriate governmental authorities as required (or such permits or approvals will be obtained prior to commencing the work to which such permits or approvals relate).

(b)    The Improvements and their contemplated use will, upon completion in accordance with the Plans, comply with all applicable zoning resolutions, building codes, environmental and other applicable laws, rules and regulations.

(c)    The Property is not now damaged or injured as a result of any fire, explosion, accident, flood or other casualty.

(d)    No condemnation or eminent domain proceeding has been commenced or to the knowledge of the Borrower is about to be commenced against the Property.

(e)    The Borrower has no knowledge of any notices of violation of federal law or municipal ordinances or orders or requirements of the state in which the Property are located or any municipal department or other governmental authority, other than as set forth in that certain title report number SL29432 issued by Sutton Land Title Agency, as agent for Fidelity National Title Insurance Company.

26.    Upon the occurrence and during the continuance of an Event of Default, whether or not the indebtedness evidenced and evidenced by the Note and secured by the Mortgage shall be due and payable or the Lender shall have instituted any foreclosure or other action for the enforcement of the Mortgage or Note, the Lender may, in addition to any other remedies which the Lender may have hereunder and in the Lender's sole and absolute discretion after ten (10) days additional prior written notice and upon Borrower's failure to cure:

(a)    enter upon the Property and complete the construction of the Improvements in accordance with the Plans, with such changes therein as the Lender may deem appropriate and employ watchmen to protect the Property, all at the risk, cost and expense of the Borrower.

(b)    at any time discontinue the work commenced in respect of the Improvements or change any course of action undertaken by it and not be bound by any limitations or requirements of time whether set forth herein or otherwise.

(c)    assume any construction contracts made by the Borrower in any way relating to the Improvements and take over and use all or any part of the labor, materials, supplies and equipment contracted for by the Borrower, whether or not previously incorporated into the Improvements, and,

(d)    in connection with any construction of the Improvements undertaken by the Lender pursuant to the provisions of this Section:

(i)    Engage builders, contractors, architects, engineers and others (including, without limitation, a construction manager)

for the purpose of furnishing labor, materials and equipment in connection with any construction of the Improvements;

      (ii)    Pay, settle or compromise all bills or claims which may become liens against the Property and/or the Improvements, or which have been or may be incurred in any manner in connection with completing the Improvements or for the discharge of liens, encumbrances or defects in the title of the Property and/or the Improvements;

      (iii)    Take or refrain from taking such action hereunder as the Lender may from time to time determine; and

      (iv)    The Borrower hereby irrevocably constitutes and appoints the Lender, its successors and/or assigns, its true and lawful attorney-in-fact to execute, acknowledge and deliver any instruments and to do and perform any acts in the name and on behalf of the Borrower.

     27.    A true statement under oath, verified by the Borrower as required by Section 22 of the New York Lien Law, is attached hereto as Exhibit "D" and made part of this Agreement.

     28.    The Improvements will be examined by the Construction Consultant as reasonably determined by Lender, at Borrower's expense, who shall, prior to making advances or at any other time during the construction process as reasonably determined by Lender, inspect the Property and such other matters as Lender may determine in its sole discretion and shall certify to Lender that the work for which an advance is requested has been satisfactorily completed in accordance with the Plans and applicable laws. Borrower shall pay to the Construction Consultant its reasonable fee for each inspection of the Property performed by Construction Consultant, whether performed in connection with an advance or a periodic site inspection at Lender's direction. The Construction Consultant shall furnish periodic reports to the Lender on the progress of the work on at least a monthly basis, at Borrower's sole cost and expense. Regardless of inspections by Lender or its representatives, Lender shall have no responsibility or obligation to Borrower or any other individual or entity based, arising from or relating to any such inspections, and Borrower shall at all times have exclusive control over the work on the Improvement and sole responsibility for compliance with all governmental, quasi-governmental and private laws, ordinances, rules, regulations, codes, covenants, restrictions, easements and other matters which control, burden, apply to or otherwise affect the Property and/or the Improvement. Borrower's architect, engineer or other design professional shall be engaged by Borrower to render construction supervision/compliance and oversight services regarding the Improvement. Such design professional shall prepare monthly compliance reports regarding the status of completion of the Improvement and such reports shall be provided to Lender monthly.

29.    In the event the Lender reasonably determines, at any time, that the total "cost of completion" (hereinafter defined) of the Improvements, free of liens and encumbrances other than those in favor of Lender contemplated hereby, will exceed the available undisbursed portion of the amount available for advances, Lender may require Borrower to make additional cash deposits with Lender in an amount sufficient to cover such estimated excess costs of completing the Improvement. Said deposits shall be deposited into the "Reserve Account" established simultaneously herewith. As used in the loan documents and herein, the term "cost of completion" shall be deemed to include, without limitation, all costs necessary to design, construct and complete the Improvement, including costs of labor, materials and services, and equipment, site Improvements, amounts to be paid to contractors, professional fees, premiums for bonds, insurance and title insurance, title examination, costs and fees, appraisal fees, recording costs, inspection fees, and all amounts payable or reimbursable to Lender for expenses incurred hereunder including interest to accrue on the Loan.

30.    Lender shall not be required to make any further advances of the Loan if, in the opinion of the Lender and/or the Construction Consultant, the Borrower has experienced a material adverse change in its financial condition, the undisputed balance of the Loan after the making of an advance is less (the amount by which it is less being hereinafter called the "Deficiency") than the actual sum necessary to complete construction of the Improvements in accordance with the Plans and to pay all Construction Costs and all other costs and expenses of whatsoever nature incurred in connection therewith. The Borrower shall at its option either (i) deposit with the Lender an amount equal to the Deficiency within ten (10) days after the Lender shall notify the Borrower of the Deficiency, specifying in such notice the amount thereof, or (ii) provide the Lender with evidence satisfactory to Lender in the Lender's sole discretion that the Borrower has put an amount equal to the Deficiency into the project. Any amounts deposited by the Borrower with the Lender to pay the Deficiency which shall be deposited into the Reserve Account and released by Lender in accordance with this Agreement. If an Event of Default shall occur and be continuing, the Lender, in addition to all other rights which it may have, shall have the unconditional right, at its option, to apply, in whole or in part, any amounts deposited by the Borrower with the Lender with respect to the Deficiency, to the payment of indebtedness evidenced by the Note and secured by the Mortgage in such order and priority as the Lender shall deem proper.

31.    An advance hereunder shall not be deemed to be an approval by Lender of any work or labor performed thereon, or approval or acceptance by Lender as to the fitness of such work or materials.

32.    Lender may make advances of the Loan for construction costs in amounts greater or less than the respective amount set forth in the Construction Schedule, and any amounts so advanced shall be deemed advanced pursuant to and not in modification hereof, provided that the Borrower supplies the Lender with an accurate and appropriate Section 22 Affidavit and this Agreement is amended accordingly. Any provision or

condition of this Agreement that requires Lender to make advances on the basis of the
Construction Schedule is a condition imposed solely and exclusively for the benefit of
Lender, and no other person or entity shall be entitled to rely on any such condition or
provision as imposing an obligation on Lender to make any advances of the Loan in
accordance with the Construction Schedule.

     33.    This Agreement may not be changed or terminated orally.  Wherever the
word "Lender" is used herein it shall be deemed to include also the personal
representatives, successors and assigns of the Lender.

     34.    The terms, provisions, covenants and conditions of the Note and the
Mortgage herein are hereby incorporated herein by reference as if same were fully set
forth herein.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this agreement
the day and year first above written.

                 **NORTH FORK BANK**

                 **By:** _____
                     John Zieran, Vice President

                 **NEW CENTRAL AVENUE, LLC**

                 By: _____
                     Name: Aaron Orlofsky
                     Title:  Authorized Signatory

STATE OF NEW YORK        )
                                                )ss.:
COUNTY OF SUFFOLK        )


On the 12th day of July, 2007, before me, the undersigned, personally appeared John Zieran, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

Notary Public

BARRY MENDLOWITZ
Notary Public, State of New York
No. 24-...
Qualified in Kings County
Commission Expires Sept. 2, 20__


STATE OF NEW YORK        )
                                                )ss.:
COUNTY OF SUFFOLK        )


On the 12th day of July, 2007, before me, the undersigned, personally appeared Aaron Orlofsky, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

Notary Public

BARRY MENDLOWITZ
Notary Public, State of New York
No. ...
Qualified in Kings County
Commission Expires Sept. 2, 20__

## SCHEDULE A

Lot 21:

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being in the Village of Lawrence, Town of Hempstead, County of Nassau and State of New York, lying on the northerly side of Central Avenue and bounded and described as follows:

COMMENCING at the southwesterly corner thereof, which point is one hundred feet easterly along the northerly line of Central Avenue from the southeasterly corner of property belonging to Union Free School District Number fifteen, Town of Hempstead, New York;

THENCE easterly along said Central Avenue one hundred (100) feet to land formerly of James H. Jennings, and now or formerly of one Dowd;

THENCE extending northerly along land formerly of James H. Jennings and now or formerly of one Dowd and parallel with the easterly line of land of said Union Free School District Number fifteen about two hundred and ninety-nine (299) feet to land belonging to the Methodist Episcopal Church;

THENCE extending westerly along land of said Methodist Episcopal Church to land formerly of Samuel L. Pearsall and now or formerly of Harry Cohn, one hundred feet and nine tenths of a foot;

THENCE extending southerly along land formerly of said Samuel L. Pearsall and now of Harry Cohn about three hundred and nine (309) feet to Central Avenue, the point or place of BEGINNING.


Lot 22:

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being in the Village of Lawrence in the Town of Hempstead, County of Nassau and State of New York, being more particularly bounded and described as follows:-

BEGINNING at a point on the northerly side of Central Avenue distant 512.80 feet westerly from the corner formed by the intersection of the northerly side of Central Avenue with the westerly side of Rockaway Turnpike;

THENCE running northerly along the land now or formerly of Jennings, 310.73 feet to land of Methodist Episcopal Church;

THENCE running westerly along land of Methodist Episcopal Church, 100.30 feet to land of Union Free School District #15;

THENCE running southerly along the land of Union Free School District #15 320.90 feet to the northerly side of Central Avenue;

THENCE running easterly along the northerly side of Central Avenue, 100 feet to the point or place of BEGINNING.


Lot 23:

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being at Lawrence in the Town of Hempstead, County of Nassau, formerly Queens, and State of New York, bounded as follows:

COMMENCING at a point on the northerly side of Central Avenue distant six hundred and twelve and eight tenths (612.8) feet southwesterly from the northwest corner of Central Avenue and Rockaway Turnpike, and from said point running south sixty-one (61) degrees, west three hundred (300) feet along Central Avenue;

THENCE running north twenty nine (29) degrees, west three hundred and forty nine and eight tenths (349.8) feet, along land sold to John Wood;

THENCE running north sixty six (66) degrees, thirty-one (31) minutes east three hundred one and forty-one one-hundredths (301.41) feet along what is known as the cemetery to land of Prince, formerly of James H. Jennings; and

THENCE along said last mentioned land, south twenty nine (29) degrees, east three hundred twenty and nine tenths (320.9) feet to Central Avenue, at the point or place of BEGINNING.


Combined Description: (Lots 21, 22 & 23)

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being in the Village of Lawrence, Town of Hempstead, County of Nassau and State of New York, lying on the northerly side of Central Avenue and bounded and described as follows:

BEGINNING at a point on the northerly side of Central Avenue distant 412.80 feet westerly from the corner formed by the intersection of the westerly side of Rockaway/Jamaica Turnpike with the northerly side of Central Avenue;

RUNNING THENCE North 28 degrees 55 minutes 00 seconds West 301.92 feet to a point;

THENCE South 66 degrees 30 minutes 11 seconds West 502.24 feet to a point;

THENCE South 28 degrees 54 minutes 58 seconds East 350.09 feet to a point on the northerly side of Central Avenue;

THENCE North 61 degrees 00 minutes 00 seconds East and along the northerly side of Central Avenue, 500 feet to the point or place of BEGINNING.

Subject to the reservation of a right of way and easement contained in the deed delivered to New Central Avenue, LLC, described as follows:

BEGINNING at a point on the northerly line of Central Avenue at the division line between  Tax Lots 20 and 21 as they appear in Block B, Section 40 of the Nassau County Land and Tax Map, said point being distant westerly 390.11 feet from the westerly end of an arc connecting said northerly line of Central Avenue with the westerly widened line of Rockaway-Jamaica Turnpike, and from said point of beginning proceeding along the following four (4) courses:

9.  RUNNING THENCE South 61 degrees 00 minutes 00 seconds West along said northerly line of Central Avenue a distance of 2.00 feet;

10. THENCE North 29 degrees 00 minutes 00 seconds West through Tax Lot 21 a distance of 302.47 feet to the land now or formerly of Methodist Episcopal Church;

11. THENCE North 66 degrees 06 minutes 18 seconds East along said land now or formerly of Methodist Episcopal Church a distance of 12.05 feet to the division line between Tax Lots 20 and 21;

12. THENCE South 29 degrees 00 minutes 00 seconds East along said division line between Tax Lots 20 and 21 a distance of 301.40 feet to the Point of Beginning.

# EXHIBIT A
# PROJECT COST STATEMENT

| Property Address: | 260 Central Avenue, Lawrence, NY |
|---|---|
| Borrower Name: | 260 Central Avenue, LLC |

| Items of Cost/Use | Total Cost | Loan Amount | Equity Due at Closing | Equity due after $25 mil is funded | Funding in first $25 mil tranche |
|---|---|---|---|---|---|
| Hard costs | $ 47,084,280 | $ 43,100,000 | | $ 3,984,280 | |
| Contingency | | | | | |
| | | | | | |
| Subtotal - Hard Costs: | $ 47,084,280 | $ 43,100,000 | $ - | $ 3,984,280 | |
| | | | | | |
| SOFT COSTS | | | | | |
| Real Estate Taxes | $ 200,000 | | | $ 200,000 | |
| Interest | $ 9,200,000 | $ 9,200,000 | $ - | | $ 900,000 |
| Construction Loan Commitment | $ 764,000 | | $ 764,000 | $ - | |
| Appraisal Fee | $ 11,500 | | $ 11,500 | $ - | |
| Phase I Fee | $ 87,513 | | $ 87,513 | $ - | |
| Lenders Plan and Cost Review | $ 15,000 | | | $ 15,000 | |
| Lenders Consultant Monthly Inspections | $ 19,200 | | | $ 19,200 | |
| Lenders Counsel | $ 45,500 | | $ 45,500 | $ - | |
| Mortgage Recording Taxes: | $ 802,200 | | $ 802,200 | $ - | |
| Title Policies / Closing Costs: | $ 1,000,000 | | $ 1,000,000 | $ - | |
| Architect | $ 420,550 | | $ 420,550 | $ - | |
| Engineering | $ 83,000 | | $ 83,000 | | |
| Insurance: | $ 443,500 | | | $ 443,500 | |
| Permits Tests and Fees | $ 100,000 | | | $ 100,000 | |
| Soft Cost Contingencies: | $ 200,000 | | $ - | $ 200,000 | |
| Subtotal - Soft Costs: | $ 13,391,963 | $ 9,200,000 | $ 3,214,263 | $ 977,700 | |
| Total Hard & Soft Costs: | $ 60,476,243 | $ 52,300,000 | $ 3,214,263 | $ 4,961,980 | |
| | | | | | |
| Subordinate Soft Costs: | | | | | |
| Land Acquisition | $ 30,120,000 | $ 24,100,000 | $ 6,020,000 | $ - | $ 24,100,000 |
| Marketing & Advertising | $ 50,000 | $ - | $ - | $ 50,000 | |
| Legal and Admin | $ 204,250 | | $ 104,250 | $ 100,000 | |
| Mezzanine Loan Interest | $ 4,100,000 | | | $ 4,100,000 | |
| Management and Overhead | $ 500,000 | | | $ 500,000 | |
| Eastern Union Fee | $ 764,000 | | $ 764,000 | | |
| Interest on Sub-S/C Loan | $ - | $ - | | | |
| Subtotal - Subordinate Soft Costs: | $ 35,738,250 | $ 24,100,000 | $ 6,888,250 | $ 4,750,000 | |
| | | | | | |
| Total Costs: | $ 96,214,493 | $ 76,400,000 | $ 10,102,513 | $ 9,711,980 | $ 25,000,000 |
| Loan to Costs: | 100% | 79% | 10% | 10% | |

## EXHIBIT B

(Pending Disbursements Clause)

Pending disbursement of the full proceeds of the loan secured by the insured mortgage or deed of trust described herein, this policy insures only to the extent of the amount actually disbursed plus interest accrued thereon but increases up to the face amount of the policy as disbursements are made in good faith and without knowledge of any defects in, or encumbrances prior to, the lien of the insured mortgage or deed of trust other than exceptions on Schedule B of this policy not insured against hereunder.

Title shall be continued down to the date of each disbursement and the Company shall furnish to the Insured a continuation report which shall note (1) the new effective date and amount of the policy, (2) all assessments, taxes, liens, encumbrances, leases, mortgages, easements and other items including survey variations, encroachments and setback violations then affecting the insured Property which have been filed of record or discovered by the Company since the original date of the policy regardless of whether they affect the lien of the insured mortgage or deed of trust, (3) which of the aforesaid items have been filed or recorded since the date of the last preceding continuation report, and (4) which said items are intended to be added as exceptions to the coverage of the policy as to (a) all amounts secured by the insured mortgage or deed of trust and (b) only amounts secured by the insured mortgage or deed of trust advanced on or after the new effective date of the policy.

In addition, each continuation search will notify Lender of any liens which have been discharged by bonding, court deposit or any other means other than full payment.

In the event that the lien of the insured mortgage or deed of trust described herein is insured by more than one insurer, this Company agrees that it shall be bound by the continuation reports of a single company specified as "lead" insurer herein.

## EXHIBIT C
## BORROWER'S AFFIDAVIT

(to be furnished with each Advance)

STATE OF NEW YORK    )
                            : ss.:
COUNTY OF             )

    **Aaron Orlofsky**, being duly sworn, deposes and says:

    The undersigned is the authorized signatory for **NEW CENTRAL AVENUE, LLC**, (the "**Borrower**"), and has made due investigation as to matters hereinafter set forth and does hereby certify the following to induce NORTH FORK BANK (the "**Lender**") to make and advance the sum of _____ ($_____) Dollars to the Borrower pursuant to the terms of a  Building Loan Agreement, dated 12th day of July, 2007, between the Lender and the Borrower, and Request for Advance number ___, dated _____, 2007, the day on which this Affidavit is sworn to by affiant, being submitted to the Lender herewith:

    All representations and warranties contained in the  Building Loan Agreement are true and accurate in all material respects as of the date hereof.

    No Event of Default exists under the Building Loan Agreement, the Note, the Building Loan Mortgage, the Guaranty or under any other security document, and no event or condition has occurred and is continuing or existing or would result from the advance about to be made which, with the lapse of time or the giving of notice, or both, would constitute such an Event of Default.  No default has occurred and is continuing under any other debt of the Borrower or debt secured by any interest in the Borrower.

    Construction of the Improvements has been carried on with reason able dispatch and has not been discontinued at any time for a period of unavoidable delay for reasons within the control of the Borrower, the Improvements have not been damaged by fire or other casualty, and no part of the Property has been taken by eminent domain and no proceedings or negotiations therefor are pending or threatened.

    Construction of the Improvements is progressing in such manner so as to insure completion thereof in substantial accordance with the Plans on or before the Completion Date of **August 1, 2010**.

    All funds received from the Lender previously as advances under the Building Loan Agreement have been expended or are being held in trust for the sole purpose of paying costs of construction ("Costs") previously certified to the Lender in Requests for Advances;

and no part of said funds has been used, and the funds to be received pursuant to the Request for Advance submitted herewith shall not be used, for any other purpose. No item of Costs previously certified to the Lender in a Request for Advance remains unpaid as of the date of this Affidavit.

All of the statements and information set forth in the Request for Advance being submitted to the Lender herewith are true and correct in every material respect at the date hereof, and all Costs certified to the Lender in said Request for Advance accurately reflect the precise amounts due, or where such Costs have not yet been billed to the Borrower, the same accurately reflect the Borrower's best estimates of the amounts that will become due and owing during the period covered by said Request for Advance. All the funds to be received pursuant to said Request for Advance shall be used solely for the purposes of paying the items of cost specified therein or for reimbursing the Borrower for such items previously paid by the Borrower.

Nothing has occurred subsequent to the date of the Building Loan Agreement which has or may result in the creation of any lien, charge or encumbrance upon the Property or the Improvements or any part thereof, or anything affixed to or used in connection therewith or which has or may substantially and adversely impair the ability of the Borrower to make all payments of principal and interest on the Note, the ability of the Borrower to meet its obligations under the Building Loan Agreement or to the best of its knowledge, the ability of the Guarantor to meet its obligations under the Guaranty.

None of the labor, materials, overhead or other items of expense specified in the Request for Advance submitted herewith have previously been made the basis of any Request for Advance by the Borrower or of any payment by the Lender.

The status of construction of the Improvements is as follows:

The estimated aggregate cost of completing the Improvements including but not limited to labor, materials, architectural and engineering fees, management, financial and other overhead costs and expenses, does not exceed $_____.

All conditions to the advance referred to above and to be made in accordance with the Request for Advance submitted herewith in addition to those to which reference is made in this Affidavit have been met in accordance with the terms of the Building Loan Agreement.

The capitalized terms used herein have the meaning given thereto in the  Building Loan Agreement.

_____

Aaron Orlofsky

Sworn to before me this
day of _____, 2007.


_____

Notary Public

## EXHIBIT D
## LIEN LAW AFFIDAVIT

STATE OF NEW YORK     )
                        : ss.:

COUNTY OF SUFFOLK     )

     **Aaron Orlofsky**, being duly sworn, deposes and says:


     I reside at _____.  I am the authorized signatory for **NEW CENTRAL AVENUE, LLC**, the Borrower mentioned in the within  Building Loan Agreement.

2.     The amount of the Loan is                      $43,100,000.00

3.     The consideration for the Loan to
be paid and the other expenses heretofore
incurred or to be incurred in connection
with and paid out of the Loan are (or
are estimated to be) as follows:

| | |
|---|---|
| Commitment Fee | $0.00 |
| Interest on the Mortgage | $0.00 |
| Examination and insurance of title and recording fees | $0.00 |
| Mortgage tax | $0.00 |
| Appraisal Fees | $0.00 |
| Architect's, engineers, interior design | $0.00 |
| Lender's Construction Consultant | $0.00 |
| Lender's Attorneys Fees | $0.00 |
| TOTAL | \\      $0.00 |

4.     The amount, if any, to be advanced from the Loan
to repay amounts previously advanced to Borrower
pursuant to Requests for Advances for costs of the
Improvements completed prior to the date hereof is:        $0.00

5.    The amount, if any, to be advanced from the Loan to
the Borrower for costs of the Improvements expended by the
Borrower or to be expended after the commencement of the
Improvements on account of demolition and shoring but prior
to the date hereof are itemized as follows:                              $0.00

6.    A.    The estimated amount to be advanced from
the Loan for indirect costs of the Improvements which
may become due and payable after the date hereof
and during the construction of the Improvements (such
as bond and insurance premiums, fees of architects,
engineers and surveyors, ground rents, taxes, assessments
and water and sewer rent) is:                                            $0.00

       B.    Subordinate soft costs consisting of
Developer's fees and profits.                                            $0.00

7.    The net sum which the Borrower estimates
will be available to it from the Loan to pay contractors,
subcontractors, laborers and materialmen for
the Improvements is:                                           **$43,100,000.00**

This statement is made pursuant to Section 22 of the Lien Law of the State of New York.

The facts herein stated are true to the knowledge of the deponent.

_____
Aaron Orlofsky

Sworn to before me this
12th day of July, 2007