# PROJECT LOAN AGREEMENT

**NORTH FORK BANK**

- with -

**NEW CENTRAL AVENUE, LLC**

Premises: **260 Central Avenue, Lawrence, New York**

The within premises lie in
Section 40, Block B, Lot 21-23
in Nassau County

STARK, AMRON & LINER, LLP
Seven Penn Plaza, Suite 600
New York, New York 10001

Attention: Robert F. Liner, Esq.

# PROJECT LOAN AGREEMENT

THIS PROJECT LOAN AGREEMENT (this "Agreement") made the 12th day of July, 2007 between **NEW CENTRAL AVENUE, LLC**, a New York limited liability company, with offices c/o The Orlo Fund, 614 Hempstead Gardens Drive, West Hempstead, New York 11552 (the "Borrower") and

**NORTH FORK BANK**, a New York banking corporation having offices at 275 Broadhollow Road, Melville, New York 11747 (the "Lender"),

WHEREAS, the Borrower has applied to the Lender for a loan in the sum of **Nine Million Two Hundred Thousand and 00/100 ($9,200,000.00) Dollars** (the "Loan"), to be advanced as hereinafter provided and to be evidenced by the Project Loan Note (the "Note") of the Borrower for the payment of said sum as set forth in the Note in accordance with the terms thereof, or so much thereof as shall at any time be advanced thereon, with interest thereon as set forth in the Note in accordance with the terms thereof.

Said Note is secured by a Project Loan Mortgage (hereinafter sometimes referred to as the "Mortgage") on at **260 Central Avenue, Lawrence, New York** (the "Property"), more fully described by metes and bounds on Schedule A annexed hereto;

**TOGETHER** with all right, title and interest of the Borrower in and to the land lying in the streets and roads in front of and adjoining said Property;

**TOGETHER** with all fixtures, chattels and articles of personal property now or hereafter attached to or used in connection with said Property, including, but not limited to, furnaces, boilers, oil burners, radiators and piping, coal stokers, plumbing and bathroom fixtures, refrigeration, air conditioning and sprinkler systems, washtubs, sinks, gas and electrical fixtures, stoves, ranges, awnings, screens, window shades, elevators, motors, dynamos, refrigerators, kitchen cabinets, incinerators, plants and shrubbery and all other equipment and machinery, appliances, fittings and fixtures of every kind used in the operation of the building(s) standing on said Property, together with any and all replacements thereof and additions thereto;

WHEREAS, the Lender agrees to make the Loan upon the terms, covenants and conditions hereinafter set forth and the Borrower agrees to take such Loan and expressly covenants to comply with and perform all of the terms, covenants and conditions of this agreement;

NOW, THEREFORE, it is agreed between the parties as follows:

1. The Borrower expressly covenants to construct the Improvements as defined in, and in accordance with that certain Building Loan Agreement of even date herewith between the Borrower and the Lender (the "BLA"). Terms not otherwise defined herein shall have meaning ascribed thereto in the BLA.

2. With the approval of the Lender, the Loan may be evidenced by more than one bond or note aggregating the amount of the Loan and to be secured by more than one mortgage, each covering a portion of the Premises. In that case, reference herein made to the bond, note or mortgage shall be deemed to include all of the bonds, notes or mortgages.

3. The Note and Mortgage shall be upon Lender's standard forms of or, at the option of the Lender, upon such other forms and containing such clauses as the Lender shall determine are needed for the Lender's protection. The Mortgage shall be executed and acknowledged by all parties necessary to make it, as determined by the Lender's attorney. The Mortgage shall be a valid lien on a good and marketable title in fee to the Property and on the fixtures and personal property to be covered thereby for all sums that may be advanced, free and clear of all liens, encumbrances and defects, except those, if any, to which the Lender has expressly agreed herein to take subject to or which the Lender may hereafter waive. The Note and Mortgage are to be delivered contemporaneously with the execution of this Agreement.

4. The Borrower, at the time of the execution of this Agreement or, at the option of the Lender, at the time fixed for the delivery of the Mortgage, shall pay all fees and charges agreed to be paid including the fees, if any, for the procuring and making of said loan and the charges for the examination of the title to said Property, surveys, appraisals, inspections and drawing of papers, and shall also pay the recording fees and Mortgage recording tax and cost of revenue stamps, if any, and architects', engineers' lender's construction consultant and loan service fees.

5. The Loan is to be advanced at such times and in such amounts as the Lender shall determine in its reasonable discretion, solely to pay the interest to become due and payable throughout the term of the Loan on the Loan, the loan secured by that certain First Mortgage of even date herewith made by Borrower in favor of Lender and encumbering the Property (the "First Mortgage Loan") and the loan to be advanced pursuant to the BLA (the "Building Loan"). Notwithstanding anything contained herein to the contrary, the amount to be advanced hereunder, when combined with First Mortgage Loan and the sums advanced pursuant to the documents executed in connection with the Building Loan shall not at any time exceed eighty (80%) percent of the total actual cost of the acquisition of the Property and the construction of the Improvements.

6. No advance shall be due unless, in the judgment of the Lender and the Construction Consultant, all work usually done at the stage of construction when the advance is made payable is in fact done in a good and workmanlike manner, and all materials and fixtures usually furnished and installed at that time are furnished and installed, and unless all construction is approved by the Construction Consultant.

7. The Lender may advance parts or the whole of any installments before they become due, if the Lender believes it advisable so to do, and all such advances or payments shall be deemed to have been made in pursuance of this Agreement and not to

be modifications thereof. Any advance or installment or any part or parts thereof may be postponed or deferred by mutual consent of the Borrower and the Lender, and any such postponement or postponements shall be deemed to be in the pursuance of this Agreement, and not in modification thereof. A receipt for any advance shall be binding on the Borrower although signed by any one of the individual parties constituting the Borrower, or any one partner, if the Borrower is a partnership, or by any one officer, if the Borrower is a corporation, or by any one managing member, if the Borrower is a limited liability company.

8. All advances of the Loan are to be made at the office of the Lender or at such other place as the Lender shall designate, within five (5) days of the Lender's receipt of all documents and other items required by this paragraph 8 and shall, subject to all of the terms and conditions hereof, be advanced as follows and upon the terms and the conditions precedent set forth herein:

(a) Advances shall not be made unless (i) the Note, the Mortgage, this Agreement and all other documents executed in connection with the Loan are in full force and effect and (ii) no uncured Event of Default exists under the terms of the Note, the Mortgage, this Agreement, the BLA or any of the other documents executed in connection with the Loan.

(b) With each and every advance request, Borrower shall deliver to Lender a written request for funds stating the amount of the disbursement requested. The form to be used shall be the Lender's standard form. Borrower shall deliver not more than one (1) request for funds each month. A request for funds shall be signed by the Borrower and shall be delivered to the Lender at least five business (5) days before the requested date of disbursement.

(c) With each and every request for an advance, Borrower must deliver to such documents as Lender may reasonably request, including, without limitation, (i) a continuation of or endorsement to the title policy issued with respect to the Loan, in a form approved by Lender's Counsel, setting forth no additional exceptions except those approved by Lender's Counsel; (ii) Borrower's affidavit in the form of Exhibit "A" hereto annexed, and (iii) certification by the Borrower that there are sufficient funds remaining in the Borrower's construction budget to complete the construction of the Improvements. All of the above information shall be obtained and submitted to the Lender at the Borrower's expense.

(d) Notwithstanding anything contained herein to the contrary, no more than the sum of Nine Hundred Thousand and 00/100 ($900,000.00) Dollars shall be advanced hereunder until such time as:

(i) The principals of the Borrower have invested an additional Eight Million One Hundred Sixty Four Thousand and 00/100 ($8,164,000.00) Dollars. Such additional equity may include the proceeds of the Mezzanine Loan (as defined in the Mortgage).

(ii) The Plans and Specifications for the construction of the improvements and the Budget, all of which shall have been previously submitted to the Lender, shall have been reviewed and approved by the Lender's Construction Consultant and a plan and cost review prepared by the Construction Consultant at the Borrower's sole cost and expense shall have been submitted to and shall be in all respects satisfactory to the Lender.

(iii) The Lender shall have received copies of all permits and approvals (including zoning approval) required in connection with the construction of the Improvements.

(iv) The Lender shall have received copies of all contracts and subcontracts related to the construction of the Improvements, including the agreement with the architect and general contractor/construction manager. The general contractor and architect shall be satisfactory to the Lender in all respects in its sole discretion. The contract with the General Contractor shall be a "maximum price" contract satisfactory to the Lender in all respects in its sole discretion, and no changes shall be made to the contract with the General Contractor or with any major subcontractor without the Lender's express written consent.

(v) The Lender shall have received satisfactory completion bonds from the general contractor and all major subcontractors.

For purposes of this subparagraph 8(m), a "major subcontract" shall be a subcontract the total cost of which shall be Three Million and 00/100 ($3,000,000.00) Dollars or more, and a "major subcontractor" shall be any subcontractor entering into a major subcontract.

9. The Lender may at any time extend the payment of the principal secured by said Note and Mortgage, and any extensions so granted shall be deemed made in pursuance of this Agreement and not to be modifications thereof.

10. The Borrower shall furnish to the Lender insurance policies with premiums prepaid from companies and in form, substance and amounts satisfactory to the Lender insuring the Property against loss or damage by fire, with the usual extended coverage endorsement and other hazards as may reasonably be required by the Lender, including, without limitation "Builder's Risk" insurance in such amounts and issued by such company as shall be satisfactory to Lender in its reasonable discretion. If Borrower fails to furnish same, Lender may procure same at Borrower's sole cost and expense.

11. In the event of default, the Lender may, at the expense of the Borrower, employ a watchman to protect the Property from depredation or injury.

12. All sums paid or extended in accordance with any of the provisions of this Agreement shall be deemed advances to the Borrower and evidence by the Note and secured by the Mortgage and may be applied at the option of the Lender to any advances thereafter becoming due.

13. The Lender may deduct from any payment to be made under this agreement any amount necessary for the payment of any fees and expenses relating to the examination of the title to the Property, including costs of surveys, charges for appraisals, inspections, drawing of papers, mortgage recording tax, revenue stamps, if any, and architects' and engineers' fees, and any expenses incurred in the procuring or the making of the Loan and in the payment of any insurance premiums, mortgage tax, assessment, water rate, sewer rents and other charges, liens and encumbrances upon the Property, whether before or after the making of the Loan, and any other amounts necessary for the payment of the cost of Improvements as defined by the Lien Law and may apply such amounts in making the payments, and all sums so applied shall be deemed Advances under this agreement and evidenced by the Note and secured by the Mortgage.

14. The Lender may assign this agreement and the Note and Mortgage and cause the assignee or any subsequent assignee to make any Advances not made at the time of the assignment and all of the provisions of this agreement shall continue to apply to the Loan, Note and Mortgage. In case the Loan is assigned in accordance with this Paragraph 14, it shall be deemed a compliance by the Lender with this agreement and to have been made pursuant thereto and not to be a modification thereof and the Advances so made shall be deemed evidenced by the Note and secured by the Mortgage.

15. The Borrower will not assign this Agreement or the moneys due hereunder or convey or encumber the Property without the written consent of the Lender, but in such event the Lender may nevertheless, at the Lender's option, continue to make advances under this Agreement to the Borrower or to those who succeed to the Borrower's title; and all sums so advanced by the Lender shall be deemed advances under this Agreement, and not to be modifications thereof, and shall be deemed evidenced by the Note and secured by the Mortgage.

16. The Borrower covenants and agrees not to do any act or thing prohibited by the terms of this Agreement, and it is expressly agreed that in any of the following events all obligations on the part of the Lender to make said loan or to make any further advance shall, if the Lender so elects, cease, and terminate, and all sums due to the Lender pursuant to the Note and Mortgage shall, at the option of the Lender, become immediately due and payable. Notwithstanding the foregoing, the Lender may make any advances or parts of advances after the happening of any of the following events without thereby waiving the right to demand payment of the Mortgage debt and without becoming liable to make any other or further advances. The following shall be considered events of default (each an "Event of Default"):

> (a)  If the Mortgage offered by the Borrower does not give the Lender a good and sufficient lien for the indebtedness to be secured thereby on said Property satisfactory to the Lender's attorney.
>
> (b)  If at the time any payment is due to the Borrower, the title is not satisfactory to the Lender's attorney,

regardless of whether the lien, encumbrance or other question existed at the time of any prior advance.

(c) If the Borrower assigns this Agreement or any of said advances or any interest therein, or if said Property are conveyed or encumbered in any way without the written consent of the Lender, except as provided in the Mortgage.

(d) If a survey shows that any improvement on the Premises encroaches upon the street or upon adjoining property or any adjoining structure encroaches upon the Premises to an extent deemed material by the Lender's attorney.

(e) If the Improvements are not fully completed by **July 12, 2010** (the "Completion Date")

(f) If the Borrower does not take the loan or the advances within sixty (60) days after they are made payable, or in any event if the Improvements are not fully completed and ready for occupancy by the Completion Date.

(g) If the Property is, in the judgment of the Lender, materially injured or destroyed by fire or otherwise (subject to the terms of the Mortgage).

(h) If a petition in bankruptcy is filed by or against the Borrower or any Guarantor (as defined in the Mortgage) or a receiver or trustee of the property of the Borrower or any Guarantor of the Loan is appointed, or if the Borrower or any Guarantor of the Loan files a petition for reorganization under any of the provisions of the United States Bankruptcy Code or of any other law, state or federal, or makes an assignment for the benefit of creditors or is adjudged insolvent by any state or federal court of competent jurisdiction. Notwithstanding the foregoing, in the event that any of the foregoing occurs without the consent or acquiesance of the Borrower, the Borrower shall have sixty (60) days from the date of such occurrence to have same dismissed prior to the Lender declaring a default hereunder.

(i) If the Borrower, after fifteen (15) days notice and opportunity to cure, does not commence or recommence construction of the Improvements in accordance with the

condition or covenant in the agreement. Notwithstanding the above, nothing contained herein shall be construed to relieve the Mortgagor from timely making any and all payments required under the Note executed in connection with this Agreement.

(m)  If the Borrower executes any chattel mortgage on any materials, fixtures or articles used in the construction or operation of the Improvements or appurtenant thereto, or articles of personal property placed in said Property, or if any such materials, fixtures or articles are not satisfactory to the Lender or are purchased on conditional bill of sale or otherwise so that the ownership thereof will not vest unconditionally in the Borrower, free from encumbrance, on delivery at the Property; and if the Borrower does not furnish to the Lender, if requested, the contracts, bills of sale, statements, receipted vouchers and agreements, or any of them, under which the Borrower claims title to such materials, fixtures and articles.

(n)  If the Borrower fails to comply with any requirement of any governmental authority having jurisdiction within thirty (30) days after written notice of such requirement shall have been given to said Borrower; or if Borrower fails to furnish to the Lender, when requested, official searches, made by the governmental authorities having jurisdiction.

(o)  If the Borrower fails to keep, observe or perform any of the conditions, stipulations, agreements, or covenants contained in this Agreement or in the said Note and Mortgage executed in connection herewith beyond applicable notice, grace and/or cure periods, if any (or if none specified, except for monetary defaults, within fifteen (15) days after written notice thereof).

(p)  If the Borrower fails to pay when due all obligations incurred by the Borrower for the cost of constructing the Improvement or for any restoration.

(q)  If the Borrower does not disclose to the Lender, upon demand, the names of all persons with whom the Borrower contracted for the construction of the Improvements or the furnishing of labor or materials therefor.

Notwithstanding anything contained herein to the contrary, the Lender shall give Borrower thirty (30) days written notice prior to declaring a default hereunder.

18. In the event that an Event of Default shall have occurred and be continuing, then, at the option of the Lender, the principal indebtedness evidenced by the Note and secured by the Mortgage shall immediately become due and payable and the Mortgage may be foreclosed in either one or more actions, and any judgment of foreclosure and sale obtained therein may direct that the Property covered by the Mortgage sought to be foreclosed in such action be sold in one or more parcels.

19. The Borrower, in compliance with Section 13 of the New York State Lien Law, covenants that the Borrower will receive the advances to be made hereunder and to be secured by the Mortgage executed pursuant hereto and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the Improvements before using any part of the total of the same for any purpose.

20. It is mutually understood and agreed by and between the parties hereto on behalf of themselves and their respective personal representatives or successors in interest that the Note and Mortgage contemplated to be executed, acknowledged and delivered pursuant to this Agreement shall be made subject to all the conditions, stipulations, agreements and covenants contained in this Agreement, to the same extent and effect as they would be if fully set forth in and made part of said Note and Mortgage,; and it is further expressly understood and agreed that this Agreement is made subject to all the conditions, stipulations, agreements, and covenants contained in said Note and Mortgage, to the same extent and effect as they would be if fully set forth herein and made part hereof.

21. The Borrower represents and warrants to Lender that:

> (a) The Plans shall be submitted to and approved by the general contractor, if any, and, to the extent required by law, shall be submitted to all governmental authorities and all necessary building permits and approvals for the construction (including, but not limited to, all environmental approvals) have been obtained from the appropriate governmental authorities as required (or such permits or approvals will be obtained prior to commencing the work to which such permits or approvals relate).

> (b) The Improvements and their contemplated use will, upon completion in accordance with the Plans, comply with all applicable zoning resolutions, building codes, environmental and other applicable laws, rules and regulations.

(c) The Property is not now damaged or injured as a result of any fire, explosion, accident, flood or other casualty.

(d) No condemnation or eminent domain proceeding has been commenced or to the knowledge of the Borrower is about to be commenced against the Property.

(e) The Borrower has no knowledge of any notices of violation of federal law or municipal ordinances or orders or requirements of the state in which the Property are located or any municipal department or other governmental authority, other than as set forth in that certain title report number SL29432 issued by Sutton Land Title Agency, as agent for Fidelity National Title Insurance Company.

22. Upon the occurrence and during the continuance of an Event of Default, whether or not the indebtedness evidenced and evidenced by the Note and secured by the Mortgage shall be due and payable or the Lender shall have instituted any foreclosure or other action for the enforcement of the Mortgage or Note, the Lender may, in addition to any other remedies which the Lender may have hereunder and in the Lender's sole and absolute discretion after ten (10) days additional prior written notice and upon Borrower's failure to cure:

(a) enter upon the Property and complete the construction of the Improvements in accordance with the Plans, with such changes therein as the Lender may deem appropriate and employ watchmen to protect the Property, all at the risk, cost and expense of the Borrower.

(b) at any time discontinue the work commenced in respect of the Improvements or change any course of action undertaken by it and not be bound by any limitations or requirements of time whether set forth herein or otherwise.

(c) assume any construction contracts made by the Borrower in any way relating to the Improvements and take over and use all or any part of the labor, materials, supplies and equipment contracted for by the Borrower, whether or not previously incorporated into the Improvements, and,

(d) in connection with any construction of the Improvements undertaken by the Lender pursuant to the provisions of this Section:

(i) Engage builders, contractors, architects, engineers and others (including, without limitation, a construction manager) for the purpose of furnishing labor, materials and equipment in connection with any construction of the Improvements;

(ii) Pay, settle or compromise all bills or claims which may become liens against the Property and/or the Improvements, or which have been or may be incurred in any manner in connection with completing the Improvements or for the discharge of liens, encumbrances or defects in the title of the Property and/or the Improvements;

(iii) Take or refrain from taking such action hereunder as the Lender may from time to time determine; and

(iv) The Borrower hereby irrevocably constitutes and appoints the Lender, its successors and/or assigns, its true and lawful attorney-in-fact to execute, acknowledge and deliver any instruments and to do and perform any acts in the name and on behalf of the Borrower.

23. An advance hereunder shall not be deemed to be an approval by Lender of any work or labor performed thereon, or approval or acceptance by Lender as to the fitness of such work or materials.

24. This Agreement may not be changed or terminated orally. Wherever the word "Lender" is used herein it shall be deemed to include also the personal representatives, successors and assigns of the Lender.

25. The terms, provisions, covenants and conditions of the Note and the Mortgage herein are hereby incorporated herein by reference as if same were fully set forth herein.

STATE OF NEW YORK )
                                        )ss.:
COUNTY OF SUFFOLK )


On the 12th day of July, 2007, before me, the undersigned, personally appeared John Zieran, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public


STATE OF NEW YORK )
                                        )ss.:
COUNTY OF SUFFOLK )


On the 12th day of July, 2007, before me, the undersigned, personally appeared Aaron Orlofsky, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

## SCHEDULE A

Lot 21:

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being in the Village of Lawrence, Town of Hempstead, County of Nassau and State of New York, lying on the northerly side of Central Avenue and bounded and described as follows:

COMMENCING at the southwesterly corner thereof, which point is one hundred feet easterly along the northerly line of Central Avenue from the southeasterly corner of property belonging to Union Free School District Number fifteen, Town of Hempstead, New York;

THENCE easterly along said Central Avenue one hundred (100) feet to land formerly of James H. Jennings, and now or formerly of one Dowd;

THENCE extending northerly along land formerly of James H. Jennings and now or formerly of one Dowd and parallel with the easterly line of land of said Union Free School District Number fifteen about two hundred and ninety-nine (299) feet to land belonging to the Methodist Episcopal Church;

THENCE extending westerly along land of said Methodist Episcopal Church to land formerly of Samuel L. Pearsall and now or formerly of Harry Cohn, one hundred feet and nine tenths of a foot;

THENCE extending southerly along land formerly of said Samuel L. Pearsall and now of Harry Cohn about three hundred and nine (309) feet to Central Avenue, the point or place of BEGINNING.

Lot 22:

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being in the Village of Lawrence in the Town of Hempstead, County of Nassau and State of New York, being more particularly bounded and described as follows:-

BEGINNING at a point on the northerly side of Central Avenue distant 512.80 feet westerly from the corner formed by the intersection of the northerly side of Central Avenue with the westerly side of Rockaway Turnpike;

THENCE running northerly along the land now or formerly of Jennings, 310.73 feet to land of Methodist Episcopal Church;

THENCE running westerly along land of Methodist Episcopal Church, 100.30 feet to land of Union Free School District #15;

THENCE running southerly along the land of Union Free School District #15 320.90 feet to the northerly side of Central Avenue;

THENCE running easterly along the northerly side of Central Avenue, 100 feet to the point or place of BEGINNING.

Lot 23:

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being at Lawrence in the Town of Hempstead, County of Nassau, formerly Queens, and State of New York, bounded as follows:

COMMENCING at a point on the northerly side of Central Avenue distant six hundred and twelve and eight tenths (612.8) feet southwesterly from the northwest corner of Central Avenue and Rockaway Turnpike, and from said point running south sixty-one (61) degrees, west three hundred (300) feet along Central Avenue;

THENCE running north twenty nine (29) degrees, west three hundred and forty nine and eight tenths (349.8) feet, along land sold to John Wood;

THENCE running north sixty six (66) degrees, thirty-one (31) minutes east three hundred one and forty-one one-hundredths (301.41) feet along what is known as the cemetery to land of Prince, formerly of James H. Jennings; and

THENCE along said last mentioned land, south twenty nine (29) degrees, east three hundred twenty and nine tenths (320.9) feet to Central Avenue, at the point or place of BEGINNING.

Combined Description: (Lots 21, 22 & 23)

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being in the Village of Lawrence, Town of Hempstead, County of Nassau and State of New York, lying on the northerly side of Central Avenue and bounded and described as follows:

BEGINNING at a point on the northerly side of Central Avenue distant 412.80 feet westerly from the corner formed by the intersection of the westerly side of Rockaway/Jamaica Turnpike with the northerly side of Central Avenue;

RUNNING THENCE North 28 degrees 55 minutes 00 seconds West 301.92 feet to a point;

THENCE South 66 degrees 30 minutes 11 seconds West 502.24 feet to a point;

THENCE South 28 degrees 54 minutes 58 seconds East 350.09 feet to a point on the northerly side of Central Avenue;

THENCE North 61 degrees 00 minutes 00 seconds East and along the northerly side of Central Avenue, 500 feet to the point or place of BEGINNING.

Subject to the reservation of a right of way and easement contained in the deed delivered to New Central Avenue, LLC, described as follows:

BEGINNING at a point on the northerly line of Central Avenue at the division line between Tax Lots 20 and 21 as they appear in Block B, Section 40 of the Nassau County Land and Tax Map, said point being distant westerly 390.11 feet from the westerly end of an arc connecting said northerly line of Central Avenue with the westerly widened line of Rockaway-Jamaica Turnpike, and from said point of beginning proceeding along the following four (4) courses:

5. RUNNING THENCE South 61 degrees 00 minutes 00 seconds West along said northerly line of Central Avenue a distance of 2.00 feet;

6. THENCE North 29 degrees 00 minutes 00 seconds West through Tax Lot 21 a distance of 302.47 feet to the land now or formerly of Methodist Episcopal Church;

7. THENCE North 66 degrees 06 minutes 18 seconds East along said land now or formerly of Methodist Episcopal Church a distance of 12.05 feet to the division line between Tax Lots 20 and 21;

8. THENCE South 29 degrees 00 minutes 00 seconds East along said division line between Tax Lots 20 and 21 a distance of 301.40 feet to the Point of Beginning.