## Building Loan Mortgage

---

## NEW CENTRAL AVENUE, LLC

- to -

## NORTH FORK BANK

---

Premises: **260 Central Avenue, Lawrence, New York**

The within premises lie in
Section 40, Block B, Lot 21-23
in Nassau County

**Record and Return To:**
STARK, AMRON & LINER, LLP
SEVEN PENN PLAZA, SUITE 600
NEW YORK, NEW YORK  10001
ATTENTION:  ROBERT F. LINER, ESQ.

## BUILDING LOAN MORTGAGE

THIS BUILDING LOAN MORTGAGE, made as of the 12th day of July, 2007, between **NEW CENTRAL AVENUE, LLC**, a New York limited liability company, with offices c/o The Orlo Fund, 614 Hempstead Gardens Drive, West Hempstead, New York 11552, (the "Mortgagor") and **NORTH FORK BANK**, a corporation organized under the Banking Law of the State of New York having its principal offices at 275 Broadhollow Road, Melville, New York 11747 (the "Mortgagee").

WITNESSETH, that to secure the payment of an indebtedness in the sum of **Forty Three Million One Hundred Thousand and 00/100 ($43,100,000.00) Dollars**, lawful money of the United States, to be paid according to a certain note bearing even date herewith (the "Building Loan Mortgage Note"), together with any additional sums due under the terms of the Building Loan Mortgage Note and this Building Loan Mortgage (the "Debt"), the Mortgagor hereby mortgages to the Mortgagee the parcel described by metes and bounds on the annexed Schedule A (hereinafter the "Premises") and the buildings and improvements now or hereafter located thereon (hereinafter the "Improvements") together with:

(A)  all right, title and interest of the Mortgagor in and to the land lying in the streets and roads in front of and adjoining the Premises;

(B)  (a)  all appurtenances to the Mortgaged Property, as hereinafter defined;

   (b)  all machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature whatsoever owned by the Mortgagor, or in which the Mortgagor has or shall have an interest, now or hereafter located upon the Mortgaged Property, or appurtenances thereto and usable in connection with the Mortgaged Property (the "Equipment"), and the right, title and interest of the Mortgagor in and to any of the Equipment which may be subject to any security agreements (as defined in subdivision (A)(73) of Section 9-102 of the Uniform Commercial Code of New York), superior in lien to the lien of this Building Loan Mortgage;

   (c)  all awards or payments, including interest thereon, which may be made with respect to the Mortgaged Property, whether from the exercise of the right of eminent domain (including any transfer

made in lieu of the exercise of said right) or for any other injury to
or decrease in the value of the Mortgaged Property;

(d)     all leases and other agreements affecting the use or occupancy of
the Mortgaged Property now or hereafter entered into (the
"Leases") and the right to receive and apply the rents, issues and
profits of the Mortgaged Property (the "Rents") to the payment of
the Debt;

(e)     all proceeds of and any unearned premiums on any insurance
policies covering the Mortgaged Property, including, without
limitation, the right to receive and apply the proceeds of any
insurance, judgments or settlements made in lieu thereof in
reduction of the Debt, for damage to the Mortgaged Property; and

(f)     the right, in the name and on behalf of the Mortgagor, to appear in
and defend any action or proceeding brought with respect to the
Mortgaged Property and to commence any action or proceeding to
protect the interest of the Mortgagee in the Mortgaged Property.

The Premises, the Improvements and the Equipment together with the property,
rights and interests stated in Paragraphs (A) and (B) above are herein collectively called
the "Mortgaged Property".

This is a subordinate mortgage subject to a first mortgage held by the Mortgagee
in the original principal amount of **Twenty Four Million One Hundred Thousand and
00/100 ($24,100,000.00) Dollars** of even date herewith and to be recorded in the Office
of the Clerk of Nassau County (the "First Mortgage").

And the Mortgagor covenants and warrants with the Mortgagee that:

1.      The Mortgagor will pay the Debt as hereinabove provided.

2.      The Mortgagor warrants the title to the Mortgaged Property.

3.      The Mortgagor will keep the Mortgaged Property insured against loss or
damage by fire with extended coverage, flood insurance and such other hazards as the
Mortgagee shall from time to time require (including, but not limited to, builder's risk
insurance) in amounts approved by the Mortgagee and shall pay the premiums for such
insurance as same become due and payable.  All policies of insurance (the "Policies")
shall be issued by an insurer acceptable to the Mortgagee and shall contain the standard
New York mortgagee clause endorsement naming the Mortgagee as loss payee and
additional insured.  The Mortgagor will assign and deliver the Policies to the Mortgagee.

Not later than thirty (30) days prior to the expiration date of each of the Policies the Mortgagor will deliver to the Mortgagee satisfactory evidence of the renewal of each of the Policies. Sums paid to the Mortgagee by any insurer may be retained and applied by the Mortgagee toward payment of the Debt in such priority and proportions as the Mortgagee in its discretion shall deem proper or, at the discretion of the Mortgagee, the same may be paid, either in whole or in part, to the Mortgagor for such purposes as the Mortgagee shall designate. If the Mortgagee shall receive and retain such insurance money, the lien of this Building Loan Mortgage shall be reduced only by the amount thereof received after expenses of collection and retained by the Mortgagee and actually applied by the Mortgagee in reduction of the Debt. The provisions of Subsection 4 of Section 254 of the Real Property Law of New York covering the insurance of buildings against loss by fire shall not apply to this Building Loan Mortgage. The Mortgagee shall be entitled, in the event of other insurance and contribution between the insurers, to receive from the insurance moneys to be paid such an amount as would have been payable under the policy or policies held for the benefit of the Mortgagee in case there had been no contribution.

Notwithstanding anything contained in this paragraph 3 to the contrary, in the event that that certain Building Loan Agreement of even date herewith between Mortgagor and Mortgagee (the "Building Loan Agreement") continues to be in full force and effect, the proceeds of any of the Policies shall be received by the Mortgagee and disbursed to the Mortgagor for the restoration of the Mortgaged Property in the same manner as the funds contemplated to be disbursed under the Building Loan Agreement.

4.    The Mortgagor will pay all taxes, assessments, water rates, sewer rents and other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Premises, now or hereafter levied or assessed against the Mortgaged Property (the "Taxes") as same become due and payable. The Mortgagor will deliver to the Mortgagee, upon request, evidence satisfactory to the Mortgagee that the Taxes are not delinquent.

5.    At the option of the Mortgagee, the Mortgagor, in addition to the payments of interest and principal or both payable pursuant to the Building Loan Mortgage Note and this Building Loan Mortgage, will pay to the Mortgagee on each payment date an amount (the "Escrow Fund") which would be sufficient to pay the real estate taxes payable, or estimated by the Mortgagee to be payable, during the ensuing twelve (12) months from the date of calculation, divided by the number of Installments due during the period ending one (1) month prior to the date any such real estate tax is payable. The Escrow Fund and the payments of interest or principal or both payable pursuant to the Building Loan Mortgage Note and this Building Loan Mortgage shall be added together and shall be paid as an aggregate sum by the Mortgagor to the Mortgagee (the "Installments"). The Mortgagee will apply the Escrow Fund to payments required to be made by the Mortgagor pursuant to Paragraph 4 hereof. If the amount of the Escrow

Fund shall exceed the amounts due pursuant to Paragraph 4 hereof, the Mortgagee shall in its discretion: (a) return any excess to the Mortgagor; (b) credit such excess against the Debt in such priority and proportions as the Mortgagee in its discretion shall deem proper; or (c) credit such excess against future payments to be made to the Escrow Fund. In allocating such excess the Mortgagee may deal with the person shown on the records of the Mortgagee to be the owner of the Mortgaged Property. If the Escrow Fund is not sufficient to pay the real estate taxes, the Mortgagor shall· pay to the Mortgagee, upon request, an amount which the Mortgagee shall estimate as sufficient to make up the deficiency, in default whereof the Mortgagee may apply any sums in its hands to the payment of the following items in any order in its uncontrolled discretion:

      (i)     Taxes;
      (ii)    Interest on the principal;
      (iii)   Amortization of the principal;
      (iv)   Late charges payable pursuant to the provisions hereof.

       Until expended or applied as above provided, any amounts in the Escrow Fund shall constitute additional collateral security for the Debt and shall not bear interest.

      6.     Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise, the Debt shall not be reduced until any award or payment therefor shall have been actually received after expenses of collection and applied by the Mortgagee to the discharge of the Debt and the Mortgagee shall not be limited to the interest paid on the award by the condemning authority, but shall be entitled to receive out of the award interest on the principal at the rate herein provided. The Mortgagee may apply any such award or payment to the discharge of the Debt whether or not then due and payable. If the Mortgaged Property is sold, through foreclosure or otherwise, prior to the receipt by the Mortgagee of such award or payment, the Mortgagee shall have the right, whether or not a deficiency judgment on the Building Loan Mortgage Note shall have been sought, recovered or denied, to receive said award or payment or a portion thereof sufficient to pay the Debt, whichever is less.

      7.     The Mortgagee has the right to enter the Mortgaged Property for the purpose of enforcing its interests as set forth herein. Nevertheless, subject to the terms of this Paragraph 7, the Mortgagee waives the right to enter the Mortgaged Property for the purpose of collecting the Rents and grants the Mortgagor the right to collect the Rents. The Mortgagor shall hold the Rents, or an amount sufficient to discharge all current sums due on the Debt, in trust for use in the payment of the Debt. The right of the Mortgagor to collect the Rents may be revoked by the Mortgagee upon any default by the Mortgagor under the terms of the Building Loan Mortgage Note or this Building Loan Mortgage by giving notice of such revocation to the Mortgagor. Following such notice the Mortgagee may enter upon the Mortgaged Property, collect, retain and apply the Rents toward

payment of the Debt in such priority and proportions as the Mortgagee in its discretion shall deem proper.

The Mortgagor shall not, without the consent of the Mortgagee, make or suffer to be made any Leases or cancel or modify any Leases or accept prepayments of installments of Rents for a period of more than one (1) month in advance or further assign the whole or any part of the Rents. No Lease covering all or any part of the Mortgaged Property shall be valid or effective without the prior written approval of the Mortgagee. The Mortgagee shall have all of the rights against lessees of the Mortgaged Property as set forth in Section 291-f of the Real Property Law of New York. With respect to any Lease, the Mortgagor will: (a) fulfill or perform each and every provision thereof on its part to be fulfilled or performed; (b) promptly send to the Mortgagee copies of all notices of default which it shall send or receive thereunder; and (c) enforce all of the terms, covenants and conditions contained in the Leases upon the lessee's part to be performed, short of termination thereof. In addition to the rights which the Mortgagee may have hereunder, in the event of any default under this Building Loan Mortgage, the Mortgagee, at its option, may require the Mortgagor to pay monthly in advance to the Mortgagee, or to any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Mortgaged Property as may be in the possession of the Mortgagor. Upon default in any such payment the Mortgagor will vacate and surrender possession of the Mortgaged Property to the Mortgagee or to such receiver and in default thereof the Mortgagor may be evicted by summary proceedings or otherwise.

The Mortgagor agrees to deposit all security deposits heretofore or hereafter made by tenants under the Leases affecting the Mortgaged Property in a lease security account with the Mortgagee and to keep such security deposits in said account until the same are disbursed pursuant to the terms of the Leases.

8.     The Mortgagor will cause the Mortgaged Property to be maintained in good condition and repair. Except as provided in the Building Loan Agreement, the Improvements and the Equipment shall not be removed, demolished or altered (except for normal replacement of the Equipment) without the consent of the Mortgagee. The Mortgagor shall promptly comply with all laws, orders and ordinances affecting the Mortgaged Property or the use thereof and shall promptly repair, replace or rebuild (the "Work") any part of the Mortgaged Property which may be destroyed by any casualty or become damaged, worn or dilapidated or which may be affected by any proceeding of the character referred to in Paragraph 6 hereof and shall complete and pay for any structure at any time in the process of construction or repair on the Premises. If such casualty shall be covered by the Policies, the Mortgagor's obligation to do the Work shall be contingent upon the Mortgagee's paying to the Mortgagor the proceeds of the Policies, or such portion thereof as shall be necessary, upon completion of the Work to the Mortgagee's satisfaction.

9.   The Debt will, at the option of the Mortgagee, become immediately due and payable in the event that the Mortgagor shall, without the prior written consent of the Mortgagee, (a) permit the Mortgaged Property or any part thereof or any interest therein to be sold, transferred, conveyed or further encumbered to any other person or entity, or (b) sell, transfer, convey or encumber the Mortgaged Property or any part thereof or any interest therein, which shall include but not be limited to (i) where the Mortgagor is a corporation, the sale, transfer, pledge or encumbrance of any of the outstanding shares of the corporation or the dilution of the present stockholding or corporate control by issuance of new or treasury stock or by conversion of any non-voting stock or other securities to voting stock, or (ii) where the Mortgagor is a partnership, the sale, transfer, pledge or encumbrance of any of the interests in the Mortgagor, or the withdrawal, resignation or retirement of the general partner, or (iii) where the Mortgagor is a limited liability company, the sale, transfer, pledge or encumbrance of any of the interests in the Mortgagor. Notwithstanding anything contained herein to the contrary, sales of individual condominium units in accordance with the provisions of paragraph 45 of this Mortgage shall be permitted in accordance with such paragraph 45. In addition, notwithstanding anything contained herein to the contrary, the Mortgagee will not unreasonably withhold or delay its consent to mezzanine financing (the "Mezzanine Loan") of the Property, secured by a pledge of membership interests in the Mortgagor, provided that (i) the amount of such Mezzanine Loan shall not exceed Ten Million and 00/100 ($10,000,000.00) Dollars; (ii) the Mezzanine Loan is on terms and conditions satisfactory to the Mortgagee in its reasonable discretion and (iii) the holder of the Mezzanine Loan, the Mortgagee and the Mortgagor enter into an intercreditor agreement satisfactory to the Mortgagee and its counsel in their reasonable discretion.

10.   After request by the Mortgagee, the Mortgagor, within ten (10) days and at its expense, will furnish to the Mortgagee a statement, duly acknowledged and certified, setting forth the amount of the Debt, the rate of interest thereon, the date Installments were last paid, the offsets or defenses thereto, if any, and that the Building Loan Mortgage Note and this Building Loan Mortgage have not been modified or, if modified, giving particulars of such modification.

11.   Any notice, demand, statement, request or consent made hereunder shall be in writing and will be deemed given when postmarked, addressed and mailed to the address, as set forth above, of the party to whom such notice is to be given, or to such other address as the Mortgagor or the Mortgagee, as the case may be, shall designate in writing in the manner hereinabove set forth.

12.   If this Building Loan Mortgage is foreclosed, the Mortgaged Property or any interest therein may, at the discretion of the Mortgagee, be sold in one or more parcels and in any order or manner.

13.    If any law or ordinance is enacted or adopted which imposes a tax, either directly or indirectly, on the Building Loan Mortgage Note, this Building Loan Mortgage or the Debt, the Mortgagor will pay such tax with interest and penalties thereon, if any. In the event that the Mortgagee shall be advised by counsel chosen by it that the payment of such tax or interest and penalties by the Mortgagor would be unlawful, taxable to the Mortgagee or unenforceable or would provide the basis for a defense of usury, then and in that event the Mortgagee shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

14.    If at any time the United States of America, any state thereof or any subdivision of any such state shall require revenue or other stamps to be affixed to the Building Loan Mortgage Note or this Building Loan Mortgage, or shall impose any other tax or charge on the same, the Mortgagor will pay for the same with interest and penalties thereon, if any.

15.    The Mortgagee and its agents will have the right to enter and inspect the Mortgaged Property at all reasonable times.

16.    A.    The Mortgagor will keep adequate books and records of account in accordance with generally accepted accounting practices consistently applied and will furnish the Mortgagee with (i) annual accounting statements (including an annual certified "rent roll", if applicable) within ninety (90) days after the end of each calendar year, in form satisfactory to the Mortgagee, which shall disclose in reasonable detail all earnings and expenses with respect to the operation of the Mortgaged Property, certified by independent certified public accountants of recognized standing satisfactory to the Mortgagee and (ii) a signed copy of its annual federal income tax return, within thirty (30) days of the date of filing of same , but not later than November 1 of each calendar year. In addition, the Mortgagor will submit to the Mortgagee copies of any operating statements or the like when the Mortgagor is required to submit such information to any administrative or regulatory authority or agency having jurisdiction.

B.    In addition to the foregoing, David Neuberg, Malkie Neuberg, Mark Feuer and Aaron Orlofsky (the "Guarantors") shall each supply the Mortgagee on an annual basis with (i) his personal financial statement, on the Mortgagee's standard form, within thirty (30) days of the end of each calendar year, (ii) a signed copy of his federal income tax returns, within thirty (30) days of the date of filing of same , but not later than November 1 of each calendar year and (iii) such other financial documentation or information as the Mortgagee may reasonably request.

C.    In addition to but not in lieu of any other remedies available to the Mortgagee, upon the Mortgagor's or Guarantor's failure to supply to the Mortgagee the records and/or other information required by this Paragraph 16 after thirty (30) days written notice and opportunity to cure, and until such records and/or information are

furnished, interest payable under the Building Loan Mortgage Note and/or this Building Loan Mortgage shall be at the rate of twenty-four (24%) percent per annum or the maximum rate allowed to be charged by law, whichever is lower.

17.     The Mortgagor will observe and perform each and every term to be observed or performed by the Mortgagor pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Mortgaged Property.

18.     The Debt will become due at the option of the Mortgagee upon any one or more of the following events (each an "Event of Default"):

(a)     if any Installment is not paid when due;

(b)     if any of the Taxes are not paid when the same are due and payable;

(c)     if the Policies are not kept in full force and effect or if the Policies are not assigned and delivered to the Mortgagee upon request;

(d)     if the Mortgagor does not furnish a statement, in the manner provided herein, of the amount of the Debt and the offsets or defenses thereto, if any;

(e)     except as provided in the Building Loan Agreement, if without the consent of the Mortgagee any Improvement or the Equipment (except for normal replacement of the Equipment) is removed, demolished or altered or if the Mortgaged Property is not kept in good condition and repair;

(f)     if any Leases are made, cancelled or modified or if any of the Rents are prepaid for a period of more than one (1) month in advance or if any of the Rents are assigned without the consent of the Mortgagee, except as otherwise provided in Paragraph 7 hereof;

(g)     if any representation or warranty of the Mortgagor or of any Guarantor, made herein or in any such guaranty or in any certificate, report, financial statement or other instrument furnished in connection with the making of the Building Loan Mortgage Note, this Building Loan Mortgage or any such guaranty, shall prove false or misleading in any material respect;

(h)     if the Mortgagor or any Guarantor shall make an assignment for the benefit of creditors;

(i)     if a receiver, liquidator or trustee of the Mortgagor or of any Guarantor shall be appointed or if the Mortgagor or any Guarantor shall be adjudicated a

bankrupt or insolvent or if any petition for bankruptcy, reorganization or arrangement pursuant to the Federal Bankruptcy Code or any similar federal or state statute shall be filed by or against the Mortgagor or any Guarantor or if any proceeding for the dissolution or liquidation of the Mortgagor or of any Guarantor shall be instituted and, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by the Mortgagor or such Guarantor, upon the same not being discharged, stayed or dismissed within ninety (90) days;

(j)      if the Mortgagor does not reimburse the Mortgagee upon demand for all expenses incurred in remedying any default of the Mortgagor hereunder or in appearing in, defending or bringing any action or proceeding to protect the Mortgagee's interest in the Mortgaged Property, including reasonable attorneys' fees, with interest as provided herein;

(k)      if for fifteen (15) days after notice from the Mortgagee the Mortgagor shall continue to be in default under any other covenant of the Mortgagor hereunder;

(l)      if, after a default thereunder, the Mortgagee elects to enforce its rights under the Building Loan Mortgage Note or any instrument which may be held by the Mortgagee as additional security for the Debt;

(m)      if the Mortgagor shall be in default under any other mortgage covering any part of the Mortgaged Property whether it is superior or inferior in lien to this Building Loan Mortgage, including, without limitation, the First Mortgage and/or the Project Loan Mortgage (as hereinafter defined)(or any of the documents executed in connection with any of the foregoing);

(n)      if the Mortgaged Property becomes subject to (i) any tax lien which is superior to the lien of this Building Loan Mortgage, other than a lien for local real estate taxes and assessments not due and payable, or (ii) any mechanic's, materialman's or other lien and such lien shall remain undischarged for sixty (60) days;

(o)      if the Mortgagor fails to promptly cure any violations of laws or ordinances affecting or which may be interpreted to affect the Mortgaged Property;

(p)      if the Mortgagor shall convey or lease any air development rights with respect to the Mortgaged Property, inasmuch as the Mortgagor agrees that such sale or lease would conclusively impair the Mortgagee's security;

(q)      if the Mortgaged Property is encumbered by any mortgage lien other than (A) the lien of this Building Loan Mortgage, (B) the lien of the First Mortgage, and (C) the lien of that certain Project Loan Mortgage of even date herewith made by

Mortgagor in favor of Mortgagee and encumbering the Mortgaged Property (the "Project Loan Mortgage");

(r)    if a default shall occur (after applicable notice  grace and/or cure periods, if any) under the Building Loan Agreement or that certain Project Loan Agreement of even date herewith between Mortgagor and Mortgagee; or.

(s)    if a default, beyond applicable notice, grace and/or cure periods, if any, shall occur under the documents executed in connection with any Mezzanine Loan permitted hereunder.

Notwithstanding anything contained herein to the contrary, except for items 18(a) and 18(b), the Mortgagee shall give Mortgagor thirty (30) days written notice of non-monetary defaults prior to accelerating the Mortgage.

Upon the occurrence of any one of the foregoing events set forth in this Paragraph 18 and upon the Mortgagee exercising its option to declare the Debt immediately due and payable by reason thereof, the Mortgagor will pay, from the date of that event, interest at the rate of twenty-four (24%) percent per annum (the "Default Rate").

19.    If the Mortgagor fails to make any payment or to do any act as herein provided, the Mortgagee may, but without any obligation to do so and without notice to or demand on the Mortgagor and without releasing the Mortgagor from any obligation hereunder, make or do the same in such manner and to such extent as the Mortgagee may deem necessary to protect the security hereof, the Mortgagee being authorized to enter upon the Mortgaged Property for such purposes, or appear in, defend or bring any action or proceeding to protect its interests in the Mortgaged Property or to foreclose this Building Loan Mortgage or collect the Debt.  The cost and expense thereof (including reasonable attorneys' fees), with interest as provided in this paragraph, shall be due from Mortgagor upon demand made by the Mortgagee.  All such costs and expenses incurred by the Mortgagee in remedying such default or in appearing in, defending or bringing any such action or proceeding shall be paid with interest at the Default Rate for the period after notice from the Mortgagee that such cost or expense was incurred to the date of payment to the Mortgagee.  All such costs and expenses incurred by the Mortgagee pursuant to the terms hereof, with interest, shall be deemed to be secured by this Building Loan Mortgage.

20.    Mortgagor will pay a charge of four (4%) percent of any amount which cannot be debited from its account due to insufficient balances on the Debit Date (as defined in the Building Loan Mortgage Note), as liquidated damages for failure to make timely payment and such late charge shall be secured by this Building Loan Mortgage.

21.    In any action to foreclose this Building Loan Mortgage the Mortgagee shall be entitled to the appointment of a receiver without notice, and without regard to the adequacy of the security.

22.    The failure of the Mortgagee to insist upon strict performance of any term of the Building Loan Mortgage Note or this Building Loan Mortgage shall not be deemed to be a waiver of any term of the Building Loan Mortgage Note or this Building Loan Mortgage. The Mortgagor shall not be relieved of the Mortgagor's obligations hereunder by reason of (a) the failure of the Mortgagee to comply with any request of the Mortgagor or any Guarantor to take any action to foreclose this Building Loan Mortgage or otherwise enforce any of the provisions hereof or of the Building Loan Mortgage Note, (b) the release, regardless of consideration, of the whole or any part of the Mortgaged Property, or (c) any agreement or stipulation by the Mortgagee extending the time of payment or otherwise modifying or supplementing the terms of the Building Loan Mortgage Note or this Building Loan Mortgage. The Mortgagee may resort for the payment of the Debt to any other security held by the Mortgagee in such order and manner as the Mortgagee, in its discretion, may elect. The Mortgagee may take action to recover the Debt or any portion thereof or to enforce any covenant hereof without prejudice to the right of the Mortgagee thereafter to foreclose this Building Loan Mortgage. The rights of the Mortgagee under this Building Loan Mortgage shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of the Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

23.    If the Mortgagor consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.

24.    The terms of the Building Loan Mortgage Note and this Building Loan Mortgage shall be construed by the laws of the State of New York, except as herein expressly provided to the contrary.

25.    This Building Loan Mortgage is both a real property mortgage and a security agreement. The Mortgaged Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of the Mortgagor in the Mortgaged Property.

The Mortgagor will, at the request of the Mortgagee, deliver to the Mortgagee any and all further instruments which the Mortgagee shall require in order to further secure and perfect the lien of this Building Loan Mortgage. The Mortgagee is authorized and empowered to file financing statements, as required by the Uniform Commercial Code, to perfect its lien against the foregoing types of personal property without first obtaining the signature of the Mortgagor on the financing statements.

26.    The Mortgagor (and the undersigned representative of the Mortgagor, if any) has full power, authority and legal right to execute this Building Loan Mortgage and to keep and observe all of the terms of the Building Loan Mortgage Note and this Building Loan Mortgage on the Mortgagor's part to be performed.

27.    The Mortgagee has the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of the Mortgagor, which Mortgagee, in its discretion, feels should be brought to protect its interests in the Mortgaged Property.

28.    If any term, covenant or condition of the Building Loan Mortgage Note or this Building Loan Mortgage is held to be invalid, illegal or unenforceable in any respect, the Building Loan Mortgage Note and this Building Loan Mortgage shall be construed without such provision.

29.    This Building Loan Mortgage may be executed in any number of duplicate originals and each such duplicate original shall be deemed to constitute but one and the same instrument.

30.    If the Mortgagor is a corporation, the execution and delivery of this Building Loan Mortgage has been duly authorized by the board of directors of the Mortgagor and there is no requirement under its certificate of incorporation or its by-laws for consent of shareholders to this transaction; or if the Mortgagor is a partnership, the execution and delivery of this Building Loan Mortgage has been duly authorized by the partners of the Mortgagor pursuant to its partnership agreement; or if the Mortgagor is a limited liability company, the execution and delivery of this Building Loan Mortgage has been duly authorized in accordance with its operating agreement.

31.    Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Building Loan Mortgage shall be used interchangeably in singular or plural form. The word "Mortgagor" shall mean "each Mortgagor and/or any subsequent owner or owners of the Mortgaged Property or any part thereof or interest therein". The word "Mortgagee" shall mean "the Mortgagee or any subsequent holder of the Building Loan Mortgage Note". The word "Note" shall mean "the Building Loan Mortgage Note or any other evidence of indebtedness secured by this Building Loan Mortgage". The word "person" shall include an individual, corporation, partnership, limited liability company, trust, unincorporated association, government, governmental authority or other entity. The words "Mortgaged Property" shall include any portion of the Mortgaged Property or interest therein. The word "Debt" shall mean the principal with interest thereon and all other sums due pursuant to the Building Loan Mortgage Note and secured by this Building Loan Mortgage. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or

neuter forms and the singular form of nouns and pronouns shall include the plural and vice versa.

32.    This Building Loan Mortgage cannot be changed orally but only in writing by the person to be charged.

33.    Intentionally omitted prior to execution.

34.    (A)    Privileges, if any, to pay all or any part of the Debt, except as may be contained herein, are hereby terminated with the same force and effect as if they had never been granted.

(B)    Provided that the Mortgagor is not in default of any of the terms and conditions of the Building Loan Mortgage Note or this Building Loan Mortgage, upon giving thirty (30) days prior written notice to the Mortgagee of its intention to do so the Mortgagor shall have the privilege of prepaying the Debt in full or in multiples of Fifty Thousand and 00/100 ($50,000.00) Dollars, with interest computed to the day of prepayment, without penalty except for the LIBOR contract breakage costs incurred due to early prepayment during a LIBOR Rate Period (as defined in the Building Loan Mortgage Note).

35.    If, following the occurrence of any default under the Building Loan Mortgage Note or this Building Loan Mortgage and an exercise by the Mortgagee of its option to declare the Debt immediately due and payable, the Mortgagor shall tender payment of an amount sufficient to satisfy the entire Debt at any time prior to a foreclosure sale of the Mortgaged Property and if at the time of such tender prepayment of the principal is not permitted by this Building Loan Mortgage, the Mortgagor shall, in addition to the entire Debt, also pay to the Mortgagee a sum equal to interest which would have accrued on the Debt at the Default Rate from the date the Mortgagee exercises such option to the date the Mortgagor tenders payment of the Debt and thereafter at the Default Rate to the maturity date and a prepayment charge equal to the prepayment charge which would have been payable as of the first day of the period during which prepayment would have been permitted. If at the time of such tender prepayment of principal is permitted by this Building Loan Mortgage, such tender by the Mortgagor shall be deemed to be a voluntary prepayment of principal and the Mortgagor shall, in addition to the entire Debt, also pay to the Mortgagee the applicable prepayment charge, if any, as set forth in Paragraph 34 of this Building Loan Mortgage.

36.    The Mortgagor hereby agrees that upon its failure to pay the Debt on the maturity date the Mortgagor will pay to the Mortgagee interest on the then unpaid principal at the Default Rate from the maturity date and until the actual receipt and collection of the Debt by the Mortgagee. This charge shall be added to the principal and shall be deemed to be part of the Debt. This paragraph, however, shall not be construed

as an agreement or privilege to extend this Building Loan Mortgage, nor as a waiver of any other right or remedy accruing to the Mortgagee by reason of any such default.

37.     The Mortgagor hereby waives the right to assert a counterclaim other than a compulsory counterclaim in any action or proceeding brought against it by the Mortgagee and waives trial by jury in any action or proceeding brought by either party hereto against the other or in any counterclaim asserted by the Mortgagee against the Mortgagor on any matters whatsoever arising out of or in any way connected with the Building Loan Mortgage Note, this Building Loan Mortgage or the Debt.

38.     This Building Loan Mortgage is subject to the express condition that at no time shall the Mortgagor be obligated or required to pay interest on the principal balance due hereunder at a rate which could subject the Mortgagee to either civil or criminal liability as a result of being in excess of the maximum interest rate which the Mortgagor is permitted by law to contract or agree to pay. If by the terms of this Building Loan Mortgage the Mortgagor is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of such maximum rate, the rate of interest under this Building Loan Mortgage and/or the Building Loan Mortgage Note shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments toward the reduction of principal and not to the interest due hereunder.

39.     The Mortgagor covenants that the Mortgagor will, in compliance with Section 13 of the Lien Law, receive the advances secured hereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

40.     The Mortgagor hereby represents and warrants to the Mortgagee that the Mortgaged Property and the use thereof are and have been in full compliance with all federal, state and local laws, ordinances, rules and regulations regarding hazardous and toxic materials, and the Mortgagor hereby indemnifies and holds the Mortgagee free of and harmless from and against any and all claims, demands, damages or liabilities the Mortgagee may incur with regard thereto.

41.     Mortgagee may, either with or without entry or taking possession of the mortgaged property as provided in this Building Loan Mortgage or otherwise, personally or by its agents or attorneys, and without prejudice to the right to bring an action for foreclosure of this Building Loan Mortgage, sell the Mortgaged Property or any part thereof pursuant to any procedures provided by applicable law, including, without limitation, the procedures set forth in Article 14 of the New York Real Property Actions and Proceedings Law (and any amendments or substitute statutes in regard thereto), and all estate, right, title, interest, claim and demand therein, and right of redemption thereof,

at one or more sales as an entity or in parcels, and at such time and place upon such terms and after such notice thereof as may be required or permitted by applicable law.

42.     The Mortgagee shall have the right (but not the obligation) to apply partial payments on account of principal, interest, tax escrow installments or tax arrears as it shall determine in its sole discretion.

43.     Notwithstanding anything contained herein to the contrary, Mortgagor may file a Declaration of Condominium and By-Laws of Condominium Association with the Clerk of the County of Nassau, provided that (a) the Declaration of Condominium Ownership and By-Laws of Condominium Association are approved by the Mortgagee and by the office of the Attorney General of the State of New York, (b) the lien of this First Mortgage is spread to cover all of the condominium units, (c) the parties hereto enter into an Assumption and Subordination Agreement prepared by Mortgagee's counsel, at Mortgagor's sole cost and expense, whereby this First Mortgage will be subordinated to the Declaration of Condominium and By-Laws of Condominium Association and (d) the Offering Plan with respect to the proposed condominium provides that all contract deposits in connection with sales of condominium units shall be deposited into an attorney's escrow account to be maintained with the Mortgagee. The Mortgagor shall be responsible for the payment of any recording charges and expenses, including, without limitation, the Mortgagee's reasonable attorney's fees incurred in effectuating the foregoing.

44.     The Mortgagor will cause all contract deposits (individually, a "Deposit" and, collectively, the "Deposits") with respect to the sale of any Unit to be deposited into an attorney's escrow or IOLA account maintained with the Mortgagee; such contract deposits to remain in such account until the closing of title to such Unit (the "Conveyance") pursuant to the contract of sale (the "Contract") executed in connection with the Conveyance of said Unit. In the event the Conveyance does not occur, and the Mortgagor is entitled to retain the Deposit for such Unit in accordance with such Unit's Contract, the Deposit shall be retained by the Mortgagee and applied in reduction of the Debt secured hereby, the loan secured by the First Mortgage and/or the loan secured by the Project Loan Mortgage, in such order and priority as the Mortgagee may determine in its sole discretion.

45.     In the event that a Declaration of Condominium and By-Laws of Condominium Association is filed with the Clerk of the County of Nassau in accordance with paragraph 43, above, and provided the Mortgagor is not in default hereunder, upon receipt by Mortgagee of the Unit Release Price as hereinafter defined, Mortgagee shall release a condominium unit (each a "Unit") from the lien of this Building Loan Mortgage, the lien of the First Mortgage and the lien of the Project Loan Mortgage.

A.    For purposes of releasing a condominium unit from the lien of this Building Loan Mortgage, the lien of the First Mortgage and the lien of the Project Loan Mortgage, the "Unit Release Price" shall be the greater of (A) Six Hundred ($600.00) Dollars per square foot of the unit to be so released or (B) eighty-five (85%) percent of the Net Sales Proceeds (as hereinafter defined) of the unit to be so released, plus in each instance accrued interest and applicable legal fees, (ii) a parking unit from the lien of this Building Loan Mortgage, the lien of the First Mortgage and the lien of the Project Loan Mortgage upon a sale of such unit to a bona fide third party purchaser, provided that the Borrower shall pay a release price equal to one hundred (100%) percent of the Net Sales Proceeds for such parking space and (iii) a storage Unit from the lien of this Building Loan Mortgage, the lien of the First Mortgage and the lien of the Project Loan Mortgage, upon a sale of such unit to a bona fide third party purchaser, provided that the Mortgagor shall pay a release price equal to one hundred (100%) percent of the Net Sales Proceeds for such storage Unit. The term "Net Sales Proceeds" shall mean the gross sales price for the Unit to be so released, less transfer taxes, reasonable brokerage commissions, reasonable legal fees and other ordinary, necessary and reasonable closing costs. Upon receipt of said payment, Mortgagee shall apply the Unit Release Price in reduction of the Debt secured hereby, the loan secured by the First Mortgage and/or the loan secured by the Project Loan Mortgage, in such order and priority as the Mortgagee may determine in its sole discretion.

B.    Mortgagor shall also pay, as a condition of the release, any late charges, reasonable attorneys' fees for preparation of the unit release, and any and all other costs due pursuant to the terms of this Building Loan Mortgage, the First Mortgage and/or the Project Loan Mortgage.

**IN WITNESS WHEREOF**, this Mortgage has been duly executed by the Mortgagor as of the date first above written.

**NEW CENTRAL AVENUE, LLC**

By: _____

    Name: Aaron Orlofsky
    Title: Authorized Signatory

STATE OF NEW YORK     )
                               )ss.:
COUNTY OF SUFFOLK     )


       On the 12th day of July, 2007, before me, the undersigned, personally appeared Aaron Orlofsky, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

Notary Public

BARRY MENDLOWITZ
Notary Public, State of New York
No. 24-4804978
Qualified in Kings County
Commission Expires Sept. 2, 20 10

## SCHEDULE A

Lot 21:

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being in the Village of Lawrence, Town of Hempstead, County of Nassau and State of New York, lying on the northerly side of Central Avenue and bounded and described as follows:

COMMENCING at the southwesterly corner thereof, which point is one hundred feet easterly along the northerly line of Central Avenue from the southeasterly corner of property belonging to Union Free School District Number fifteen, Town of Hempstead, New York;

THENCE easterly along said Central Avenue one hundred (100) feet to land formerly of James H. Jennings, and now or formerly of one Dowd;

THENCE extending northerly along land formerly of James H. Jennings and now or formerly of one Dowd and parallel with the easterly line of land of said Union Free School District Number fifteen about two hundred and ninety-nine (299) feet to land belonging to the Methodist Episcopal Church;

THENCE extending westerly along land of said Methodist Episcopal Church to land formerly of Samuel L. Pearsall and now or formerly of Harry Cohn, one hundred feet and nine tenths of a foot;

THENCE extending southerly along land formerly of said Samuel L. Pearsall and now of Harry Cohn about three hundred and nine (309) feet to Central Avenue, the point or place of BEGINNING.


Lot 22:

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being in the Village of Lawrence in the Town of Hempstead, County of Nassau and State of New York, being more particularly bounded and described as follows:-

BEGINNING at a point on the northerly side of Central Avenue distant 512.80 feet westerly from the corner formed by the intersection of the northerly side of Central Avenue with the westerly side of Rockaway Turnpike;

THENCE running northerly along the land now or formerly of Jennings, 310.73 feet to land of Methodist Episcopal Church;

THENCE running westerly along land of Methodist Episcopal Church, 100.30 feet to land of Union Free School District #15;

THENCE running southerly along the land of Union Free School District #15 320.90 feet to the northerly side of Central Avenue;

THENCE running easterly along the northerly side of Central Avenue, 100 feet to the point or place of BEGINNING.


Lot 23:

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being at Lawrence in the Town of Hempstead, County of Nassau, formerly Queens, and State of New York, bounded as follows:

COMMENCING at a point on the northerly side of Central Avenue distant six hundred and twelve and eight tenths (612.8) feet southwesterly from the northwest corner of Central Avenue and Rockaway Turnpike, and from said point running south sixty-one (61) degrees, west three hundred (300) feet along Central Avenue;

THENCE running north twenty nine (29) degrees, west three hundred and forty nine and eight tenths (349.8) feet, along land sold to John Wood;

THENCE running north sixty six (66) degrees, thirty-one (31) minutes east three hundred one and forty-one one-hundredths (301.41) feet along what is known as the cemetery to land of Prince, formerly of James H. Jennings; and

THENCE along said last mentioned land, south twenty nine (29) degrees, east three hundred twenty and nine tenths (320.9) feet to Central Avenue, at the point or place of BEGINNING.


Combined Description: (Lots 21, 22 & 23)

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being in the Village of Lawrence, Town of Hempstead, County of Nassau and State of New York, lying on the northerly side of Central Avenue and bounded and described as follows:

BEGINNING at a point on the northerly side of Central Avenue distant 412.80 feet westerly from the corner formed by the intersection of the westerly side of Rockaway/Jamaica Turnpike with the northerly side of Central Avenue;

RUNNING THENCE North 28 degrees 55 minutes 00 seconds West 301.92 feet to a point;

THENCE South 66 degrees 30 minutes 11 seconds West 502.24 feet to a point;

THENCE South 28 degrees 54 minutes 58 seconds East 350.09 feet to a point on the northerly side of Central Avenue;

THENCE North 61 degrees 00 minutes 00 seconds East and along the northerly side of Central Avenue, 500 feet to the point or place of BEGINNING.

Subject to the reservation of a right of way and easement contained in the deed delivered to New Central Avenue, LLC, described as follows:

BEGINNING at a point on the northerly line of Central Avenue at the division line between   Tax Lots 20 and 21 as they appear in Block B, Section 40 of the Nassau County Land and Tax Map, said point being distant westerly 390.11 feet from the westerly end of an arc connecting said northerly line of Central Avenue with the westerly widened line of Rockaway-Jamaica Turnpike, and from said point of beginning proceeding along the following four (4) courses:

1. RUNNING THENCE South 61 degrees 00 minutes 00 seconds West along said northerly line of Central Avenue a distance of 2.00 feet;

2. THENCE North 29 degrees 00 minutes 00 seconds West through Tax Lot 21 a distance of 302.47 feet to the land now or formerly of Methodist Episcopal Church;

3. THENCE North 66 degrees 06 minutes 18 seconds East along said land now or formerly of Methodist Episcopal Church a distance of 12.05 feet to the division line between Tax Lots 20 and 21;

4. THENCE South 29 degrees 00 minutes 00 seconds East along said division line between Tax Lots 20 and 21 a distance of 301.40 feet to the Point of Beginning.

**Mortgagor:** NEW CENTRAL AVENUE, LLC

**Mortgagee:** NORTH FORK BANK

**Section:** 40
**Block:** B
**Lot:** 21-23

**Street Address:**    260 Central Avenue
Lawrence, New York

### Check One Box Only

1.    [   ]       The attached mortgage covers real property principally improved or to be improved by one or more structures containing in the aggregate not more than six residential dwelling units, each having their own separate cooking facilities.

2.    [ x ]       The attached mortgage does not cover real property improved as described above.

**NEW CENTRAL AVENUE, LLC**

By: _____
      Name: Aaron Orlofsky
      Title: Authorized Signatory