period and if curative action was promptly commenced and is being continuously and diligently pursued by Mezzanine Lender, Mezzanine Lender shall be given an additional period of time as is reasonably necessary for Mezzanine Lender in the exercise of due diligence to cure such non-monetary default (a "**Non-monetary Cure Period**") so long as (i) Mezzanine Lender makes or causes to be made timely payment of Borrower's regularly scheduled monthly principal and/or interest payments under the Senior Loan and any other amounts due under the Senior Loan Documents, (ii) such additional period of time does not exceed sixty (60) days following the expiration of the period of time available to the Borrower under the Loan Documents to cure such non-monetary default, unless such non-monetary default is of a nature that cannot be cured within such sixty (60) days, in which case, Mezzanine Lender shall have such additional time as is reasonably necessary to cure such non-monetary default not to exceed one hundred twenty (120) days in the aggregate, and (iii) during such Non-monetary Cure Period, there is no material impairment to the value, use or operation of the Premises.

(b)    To the extent that any Qualified Transferee acquires the Mezzanine Collateral in accordance with the provisions and conditions of this Agreement, such Qualified Transferee shall acquire the same subject to the Senior Loan and the terms, conditions and provisions of the Senior Loan Documents and this Agreement for the balance of the term of the Senior Loan, which shall not be accelerated by Senior Lender solely due to such acquisition and shall remain in full force and effect; provided, however, that (i) such Qualified Transferee shall have caused Borrower to reaffirm in writing, subject to such exculpatory provisions as shall be set forth in the Senior Loan Documents, if any, all of the terms, conditions and provisions of the Senior Loan Documents on Borrower's part to be performed and (ii) all defaults under the Senior Loan of which Mezzanine Lender has notice and which remain uncured as of the date of such acquisition have been cured by such Qualified Transferee or waived by Senior Lender. Senior Lender shall waive all defaults that are not susceptible of being cured by such Qualified Transferee unless such defaults that are not susceptible of being cured materially impair the value, use or operation of the Premises as determined by Senior Lender in its reasonable judgment. Notwithstanding any contrary or inconsistent provision of this Agreement, the Senior Loan Documents or the Mezzanine Loan Documents, no acquisition or other fee or similar charge shall be due in connection with such Qualified Transferee's acquisition of any interest in Borrower or the Mezzanine Collateral as the result of a Mezzanine Collateral Enforcement Action or assignment in lieu of foreclosure or other negotiated settlement in lieu of any of the foregoing (except that Senior Lender may charge for reimbursement of its third party review and/or underwriting costs and expenses and reasonable attorney's fees incurred in connection therewith).

(c)    So long as no Event of Default shall have occurred and be continuing under the Senior Loan Documents, all funds held and applied pursuant to the Senior Loan Documents, shall continue to be applied pursuant thereto and shall not be applied by Senior Lender to prepay the outstanding principal balance of the Senior Loan unless so provided in the Senior Loan Documents.

Section 12.    <u>No Actions; Restrictive Provisions</u>.    Senior Lender consents to Mezzanine Lender's right, pursuant to the Mezzanine Loan Documents, under certain circumstances, to cause the termination of the Property Manager.  In the event both Mezzanine Lender and Senior Lender shall have such rights at any time, and Senior Lender shall fail to exercise such rights, Mezzanine Lender may exercise such rights, provided such exercise may be superseded by any subsequent exercise of such rights by Senior Lender pursuant to the Senior Loan Documents.  Upon the occurrence of any event which would entitle Mezzanine Lender to cause the termination of the Property Manager pursuant to the Mezzanine Loan Documents, Mezzanine Lender shall have the right to select, or cause the selection, of one or more replacement property managers (including any asset manager) or leasing or sales agent for the Premises, which replacement managers, asset manager and/or leasing or sales agent shall either (a) be subject to Senior Lender's reasonable prior approval or (b) be a Qualified Manager. Notwithstanding anything in this <u>Section 12</u> to the contrary, if an Event of Default under the Senior Loan then exists or any other event shall have occurred pursuant to which Senior Lender has the right to select any replacement manager, asset manager and/or leasing or sales agent pursuant to the Senior Loan Documents, Senior Lender shall have the sole right to select any replacement manager, asset manager and/or leasing or sales agent, whether or not a new manager or agent was retained by Mezzanine Lender.

Section 13.    <u>Right to Purchase Senior Loan</u>.

(a)    If the Senior Loan has been accelerated, or an Event of Default has occurred and is continuing or any Enforcement Action has been commenced and is continuing under the Senior Loan Documents (each of the foregoing, a "**Purchase Option Event**"), Senior Lender shall give Mezzanine Lender written notice thereof and upon ten (10) Business Days prior written notice to Senior Lender (the "**Purchase Option Notice**"), Mezzanine Lender shall have the right to purchase, in whole but not in part, the Senior Loan for a price equal to the sum of (x) the outstanding principal balance thereof, (y) all accrued interest and other amounts due thereon (but excluding any prepayment fees or premiums, exit fees, additional fees, yield maintenance fees or similar fees and/or charges other than LIBOR breakage costs (if any)), any Protective Advances made by Senior Lender and any interest charged by Senior Lender on any advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances and (z) any and all reasonable fees and costs incurred by the Senior Lender in enforcing the terms of the Loan Documents (the "**Loan Purchase Price**"). Concurrently with payment to the Senior Lender of the Loan Purchase Price, Senior Lender shall deliver or cause to be delivered to Mezzanine Lender the balances in all accounts held by or for the benefit of the Senior Lender as well as all Senior Loan Documents held by or on behalf of Senior Lender and will execute in favor of Mezzanine Lender or its designee assignment documentation, in form and substance reasonably acceptable to Mezzanine Lender and Senior Lender, to assign the Senior Loan and its rights under the Senior Loan Documents (without recourse, representations or warranties, except for representations as to the outstanding balance of the Senior Loan, the Loan Purchase Price and as to Senior Lender's not having assigned or encumbered its rights in the Senior Loan).  The right of Mezzanine Lender to purchase the Senior Loan shall automatically terminate upon (i) (a) a transfer by foreclosure sale or trustee's sale of the

Premises occurs or (b) five (5) Business Days after Mezzanine Lender receives written notice of the delivery of a deed in lieu of foreclosure covering the Premises (whichever occurs first) or (ii) if a Purchase Option Event ceases to exist, it being agreed that Senior Lender shall provide Mezzanine Lender not less than five (5) Business Days prior written notice of Senior Lender's intent to accept a deed in lieu of foreclosure following the expiration of Mezzanine Lender's cure periods provided herein.

Section 14.    Additional Understandings.  For as long as the Mezzanine Loan remains outstanding:

(a)    Notices of Transfer; Consent.  Senior Lender promptly shall notify Mezzanine Lender if Borrower seeks or requests a release of the lien of the Senior Loan Documents (other than in connection with the sale of condominium units at the Premises) or seeks or requests Senior Lender's consent to, or take any action in connection with or in furtherance of, a sale or transfer of all or any material portion of the Premises or any direct or indirect interest in Borrower, the granting of a further mortgage, deed of trust or similar encumbrance against the Premises or a prepayment or refinancing of the Senior Loan.

(b)    Budget Approvals.  Mezzanine Lender shall have the right to approve the Project Budget and the annual operating budget(s) of Borrower in accordance with the terms of the Mezzanine Loan Documents. Notwithstanding anything contained herein, in the Senior Loan Documents or in the Mezzanine Loan Documents, the Mezzanine Lender may require Borrower to submit the proposed annual operating budget(s) to Mezzanine Lender for approval prior to any submission to the Senior Lender. Mezzanine Lender shall submit the approved annual operating budget(s) to the Senior Lender for its approval within thirty (30) days after Mezzanine Lender's receipt thereof from Borrower. In the event that the approval of the Mezzanine Lender is not obtained within thirty (30) days after Mezzanine Lender's receipt of the proposed annual operating budget(s) from Borrower, and provided that Senior Lender has not approved the annual budget(s), the then current existing operating budget(s) shall remain in effect with an increase in any non-discretionary expense item to either (i) the prior budgeted expense amount with 5% increase or (ii) the actual expense incurred as evidenced by the applicable bill or invoice.

(c)    Project Approvals.  Senior Lender and Mezzanine Lender hereby approve (i) the pre-development budget for the Project attached hereto as Exhibit F and (ii) the construction contracts listed on Exhibit G attached hereto.

(d)    Payments to Mezzanine Lockbox Account.  Notwithstanding anything to the contrary contained in the Senior Loan Documents, Senior Lender covenants and agrees to cause any net cash flow derived from the Premises, including, but not limited to the net proceeds derived from the sales of Units in the Project, (collectively, **"Property Revenue"**) which is remaining after application by Senior Lender to the Senior Loan or other amounts due under the Senior Loan Documents in accordance therewith or otherwise held by Senior Lender pursuant to the Senior Loan Documents, to be deposited directly into the Mezzanine Collection Account (which shall

be an account established and maintained at North Fork Bank or such other bank reasonably acceptable to Senior Lender) for application by Mezzanine Lender in accordance with the terms of the Mezzanine Loan Cash Management Agreement. For so long as the Mezzanine Loan remains outstanding, Senior Lender shall not cause or permit any Property Revenue to be disbursed to Borrower (other than developer overhead fees in accordance with the Project Budget) without Mezzanine Lender's prior written consent.

(e)    Change Orders; Reallocations; Etc.    Senior Lender agrees not to unreasonably withhold its consent to Borrower's request for approval of change orders and/or requests for approval of reallocation of savings from one line-item in the Project Budget to a separate line-item in the Project Budget.

(f)    Funding Priority.    With the exception of $13,410.00 of Senior Loan proceeds which will be applied to interest due on the Senior Loan on the next Senior Loan monthly payment date following the date of this Agreement, Senior Lender shall have no obligation to fund any additional Senior Loan proceeds until such time as the Mezzanine Loan (including the Tranche B portion thereof to the extent Mezzanine Lender elects to fund Tranche B in accordance with the terms and provisions of the Mezzanine Loan Documents) has been fully funded in accordance with the terms of the Mezzanine Loan Documents.

Section 15.    Financing of Mezzanine Loan.    Notwithstanding any other provision hereof, Senior Lender consents to Mezzanine Lender's pledge (a "**Pledge**") of the Mezzanine Loan and of the Separate Collateral to any entity which has extended a credit facility to Mezzanine Lender that is a Qualified Transferee or a financial institution whose long-term unsecured debt is rated at least "**A**" (or the equivalent) or better by each Rating Agency (a "**Loan Pledgee**"), on the terms and conditions set forth in this Section 15; provided that a Loan Pledgee which is not a Qualified Transferee may not take title to the Mezzanine Collateral without the prior written consent of Senior Lender (not to be unreasonably withheld or delayed). Upon written notice by Mezzanine Lender to Senior Lender that the Pledge has been effected, Senior Lender agrees to acknowledge receipt of such notice and thereafter agrees: (a) to give Loan Pledgee written notice of any default by Mezzanine Lender under this Agreement of which default Senior Lender has actual knowledge; (b) to allow Loan Pledgee a period of ten (10) days (in respect of a monetary default) and a period of thirty (30) days (in respect of a non-monetary default) to cure a default by Mezzanine Lender in respect of its obligations to Senior Lender hereunder, but Loan Pledgee shall not be obligated to cure any such default; (c) that no amendment, modification, waiver or termination of this Agreement shall be effective against Loan Pledgee without the written consent of Loan Pledgee, which consent shall not be unreasonably withheld; (d) that Senior Lender shall give to Loan Pledgee copies of any Senior Loan Default Notice simultaneously with the giving of same to the Mezzanine Lender and accept any cure thereof by Loan Pledgee made in accordance with the provisions of Section 11 of this Agreement as if such cure were made by the Mezzanine Lender; and (e) that, upon written notice (a "**Redirection Notice**") to Senior Lender by Loan Pledgee that Mezzanine Lender is in default, beyond applicable cure periods, under Mezzanine Lender's obligations to Loan Pledgee pursuant to the applicable credit agreement between Mezzanine Lender and Loan Pledgee (which notice need not be

joined in or confirmed by Mezzanine Lender), and until such Redirection Notice is withdrawn or rescinded by Loan Pledgee, Senior Lender shall remit to Loan Pledgee and not to Mezzanine Lender, any payments that Senior Lender would otherwise be obligated to pay to Mezzanine Lender from time to time pursuant to this Agreement, any Mezzanine Loan Document or any other agreement between Senior Lender and Mezzanine Lender that relates to the Senior Loan. Mezzanine Lender hereby unconditionally and absolutely releases Senior Lender from any liability to Mezzanine Lender on account of Senior Lender's compliance with any Redirection Notice believed by Senior Lender to have been delivered by Loan Pledgee. After Senior Lender's receipt of a Redirection Notice (so long as the same has not been withdrawn or rescinded by Loan Pledgee), Loan Pledgee shall be permitted to fully exercise its rights and remedies against Mezzanine Lender, and realize on any and all collateral granted by Mezzanine Lender to Loan Pledgee (and accept an assignment in lieu of foreclosure as to such collateral), in accordance with applicable law. In such event, the Senior Lender shall recognize Loan Pledgee (and any transferee which is also a Qualified Transferee at any foreclosure or similar sale held by Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns, as the successor to Mezzanine Lender's rights, remedies and obligations under this Agreement and the Mezzanine Loan Documents and any such Loan Pledgee or Qualified Transferee shall assume in writing the obligations of the Mezzanine Lender hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof. The rights of Loan Pledgee under this <u>Section 15</u> shall remain effective unless and until Loan Pledgee shall have notified the Senior Lender in writing that its interest in the Mezzanine Loan has terminated.

Section 16.    <u>Repayment of Mezzanine Loan</u>. Notwithstanding any other provision hereof, in the event that Mezzanine Lender elects not to fund to Mezzanine Borrower the Tranche B portion of the Mezzanine Loan pursuant to and in accordance with the terms and conditions of the Mezzanine Loan Agreement, Senior Lender agrees and hereby consents to Mezzanine Borrower's repayment of the Mezzanine Loan (whether by refinancing or from additional equity) on or before the Scheduled Maturity Date.

Section 17.    <u>Obligations Hereunder Not Affected</u>.

(a)    All rights, interests, agreements and obligations of Senior Lender and Mezzanine Lender under this Agreement shall remain in full force and effect irrespective of:

(i)    any lack of validity or enforceability of the Senior Loan Documents or the Mezzanine Loan Documents or any other agreement or instrument relating thereto;

(ii)    any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to or departure from any guaranty, for all or any portion of the Senior Loan or the Mezzanine Loan;

     (iii) any manner of application of collateral, or proceeds thereof, to all or any portion of the Senior Loan or the Mezzanine Loan, or any manner of sale or other disposition of any collateral for all or any portion of the Senior Loan or the Mezzanine Loan or any other assets of the Borrower or Mezzanine Borrower or any other Affiliates of the Borrower;

     (iv) any change, restructuring or termination of the corporate structure or existence of the Borrower or Mezzanine Borrower or any other Affiliates of the Borrower; or

     (v) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Borrower, Mezzanine Borrower or a subordinated creditor or a Senior Lender subject to the terms hereof.

    (b) This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of all or any portion of the Senior Loan is rescinded or must otherwise be returned by Senior Lender or Mezzanine Lender upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, all as though such payment had not been made.

    Section 18. Notices. All notices, demands, requests, consents, approvals or other communications required, permitted, or desired to be given hereunder shall be in writing sent by facsimile (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Section 18. Any such notice, demand, request, consent, approval or other communication shall be deemed to have been received: (a) three (3) Business Days after the date mailed, (b) on the date of sending by facsimile if sent and acknowledged during business hours on a Business Day (otherwise on the next Business Day), (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day) and (d) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

    To Senior Lender:

    North Fork Bank, a division of Capital One, N.A.
    275 Broadhollow Road
    Melville, New York 11747
    Attention:
    Telecopy:

    With a copy to:

    Stark Amron & Liner LLP
    Seven Penn Plaza
    Suite 600

New York, New York 10001
Attention: Robert F. Liner, Esq.
Telecopy: _____

To Mezzanine Lender:

Lehman Brothers Holdings Inc.,
individually and as agent for one or more Co-Lenders
399 Park Avenue
New York, New York 10022
Attention: Carmine Visone
Telecopy: (646) 758-3140

With a copy to:

Paul, Hastings, Janofsky & Walker LLP
75 E. 55th Street
New York, NY  10002
Attention: Kenneth J. Friedman
Facsimile No. (212) 230-7615

Section 19.    Estoppel.

     (a)    Mezzanine Lender shall, within ten (10) days following a request from Senior Lender, provide Senior Lender with a written statement setting forth the then current outstanding principal balance of the Mezzanine Loan, the aggregate accrued and unpaid interest under the Mezzanine Loan, and stating whether to Mezzanine Lender's knowledge any default or Event of Default exists under the Mezzanine Loan.

     (b)    Senior Lender shall, within ten (10) days following a request from Mezzanine Lender, provide Mezzanine Lender with a written statement setting forth the then current outstanding principal balance of the Senior Loan, the aggregate accrued and unpaid interest under the Senior Loan, and stating whether to Senior Lender's knowledge any default or Event of Default exists under the Senior Loan.

Section 20.    Further Assurances.  So long as all or any portion of the Senior Loan and the Mezzanine Loan remains unpaid and the Senior Mortgage encumbers the Premises, Mezzanine Lender and Senior Lender will each execute, acknowledge and deliver in recordable form and upon demand of the other, any other instruments or agreements reasonably required in order to carry out the provisions of this Agreement or to effectuate the intent and purposes hereof.

Section 21.    No Third Party Beneficiaries; No Modification.  The parties hereto do not intend the benefits of this Agreement to inure to the Borrower, Mezzanine Borrower or any other Person.  This Agreement may not be changed or terminated orally,

but only by an agreement in writing signed by the party against whom enforcement of any change is sought.

Section 22.    Successors and Assigns. This Agreement shall bind all successors and permitted assigns of Mezzanine Lender and Senior Lender and shall inure to the benefit of all successors and permitted assigns of Senior Lender and Mezzanine Lender.

Section 23.    Counterpart Originals. This Agreement may be executed in counterpart originals, each of which shall constitute an original, and all of which together shall constitute one and the same agreement.

Section 24.    Legal Construction. In all respects, including, without limitation, matters of construction and performance of this Agreement and the obligations arising hereunder, this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York applicable to agreements intended to be wholly performed within the State of New York.

Section 25.    No Waiver; Remedies. No failure on the part of the Senior Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 26.    No Joint Venture. Nothing provided herein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between or among any of the parties hereto.

Section 27.    Captions. The captions in this Agreement are inserted only as a matter of convenience and for reference, and are not and shall not be deemed to be a part hereof.

Section 28.    Conflicts. In the event of any conflict, ambiguity or inconsistency between the terms and conditions of this Agreement and the terms and conditions of any of the Senior Loan Documents or the Mezzanine Loan Documents, the terms and conditions of this Agreement shall control.

Section 29.    No Release. Nothing herein contained shall operate (i) to release Borrower from (a) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Senior Loan Documents or (b) any liability of Borrower under the Senior Loan Documents, or (ii) to release Mezzanine Borrower or Borrower from (a) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Mezzanine Loan Documents or (b) any liability of Mezzanine Borrower under the Mezzanine Loan Documents.

Section 30.    Continuing Agreement. This Agreement is a continuing agreement and shall remain in full force and effect until the earliest of (a) indefeasible payment in full of the Senior Loan Liabilities, (b) transfer of the Premises by foreclosure of the

Senior Mortgage or the exercise of the power of sale contained therein, (c) transfer of title to the Mezzanine Lender of all of the Separate Collateral or (d) payment in full of the Mezzanine Loan; provided, however, that any rights, remedies, duties or obligations of either party hereto arising out of any breach of any provision hereof occurring prior to such date of termination shall survive such termination.

Section 31.    Severability.  In the event that any provision of this Agreement or the application hereof to any party hereto shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable provisions to parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Agreement.

Section 32.    Expenses.

(a)    Mezzanine Lender agrees to pay to Senior Lender within fifteen (15) days of demand the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Senior Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Senior Lender against Mezzanine Lender hereunder to the extent that Senior Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Mezzanine Lender to perform or observe any of the provisions hereof; provided, however, that Mezzanine Lender shall not be required to pay any such fees or expenses to the extent any such fees or expenses have previously been paid by Borrower or have been recovered by Senior Lender out of or from any Senior Loan Collateral realized by Senior Lender (provided further that Senior Lender shall not be required to seek payment or recovery of such fees and expenses from Borrower or the Senior Loan Collateral before demanding payment from the Mezzanine Lender).

(b)    Senior Lender agrees to pay to Mezzanine Lender within fifteen (15) days of demand the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Mezzanine Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Mezzanine Lender against Senior Lender hereunder to the extent that Mezzanine Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Senior Lender to perform or observe any of the provisions hereof; provided, however, that Senior Lender shall not be required to pay any such fees or expenses to the extent any such fees or expenses have previously been paid by Mezzanine Borrower or have been recovered by Mezzanine Lender out of or from any Separate Collateral realized by Mezzanine Lender (provided further that Mezzanine Lender shall not be required to seek payment or recovery of such fees and expenses from Mezzanine Borrower or the Separate Collateral before demanding payment from the Senior Lender).

Section 33.    Injunction.    Senior Lender and Mezzanine Lender each acknowledge (and waive any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either Senior Lender or Mezzanine Lender hereunder would cause irreparable harm to the other. Accordingly, Senior Lender and Mezzanine Lender agree that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

Section 34.    Mutual Disclaimer.

(a)    Each of Senior Lender and Mezzanine Lender are sophisticated lenders and/or investors in real estate and their respective decision to enter into the Senior Loan and the Mezzanine Loan is based upon their own independent expert evaluation of the terms, covenants, conditions and provisions of, respectively, the Senior Loan Documents and the Mezzanine Loan Documents and such other matters, materials and market conditions and criteria which each of Senior Lender and Mezzanine Lender deem relevant. Each of Senior Lender and Mezzanine Lender has not relied in entering into this Agreement, and respectively, the Senior Loan, the Senior Loan Documents, the Mezzanine Loan or the Mezzanine Loan Documents, upon any oral or written information, representation, warranty or covenant from the other, or any of the other's representatives, employees, Affiliates or agents other than the representations and warranties of the other contained herein. Each of Senior Lender and Mezzanine Lender further acknowledges that no employee, agent or representative of the other has been authorized to make, and that each of Senior Lender and Mezzanine Lender have not relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement. Without limiting the foregoing, each of Senior Lender and Mezzanine Lender acknowledges that the other has made no representations or warranties as to the Senior Loan or the Mezzanine Loan or the Premises (including, without limitation, the cash flow of the Premises, the value, marketability, condition or future performance thereof, the existence, status, adequacy or sufficiency of the leases, the tenancies or occupancies of the Premises, or the sufficiency of the cash flow of the Premises, to pay all amounts which may become due from time to time pursuant to the Senior Loan or the Mezzanine Loan).

(b)    Each of Senior Lender and Mezzanine Lender acknowledges that the Senior Loan and the Mezzanine Loan are distinct, separate transactions and loans, separate and apart from each other.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, Senior Lender and Mezzanine Lender have executed this Agreement as of the date and year first set forth above.

**SENIOR LENDER:**

**NORTH FORK BANK**, a Division of Capital One, N.A.

By:_____
Name:  Louis J. Rosado
Title:   Senior Vice President

**MEZZANINE LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, individually and as agent for one or more Co-Lenders

By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, Senior Lender and Mezzanine Lender have executed this Agreement as of the date and year first set forth above.

**SENIOR LENDER:**

**NORTH FORK BANK** a corporation organized under the Banking Law of the State of New York

By:_____

Name:_____

Title:_____

**MEZZANINE LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, individually and as agent for one or more Co-Lenders

By:_____

Name:  Christopher McKenna

Title:   Authorized Signatory

EXHIBIT A

Description of Premises

**Lot 21:**

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being in the Village of Lawrence, Town of Hempstead, County of Nassau and State of New York, lying on the northerly side of Central Avenue and bounded and described as follows:

COMMENCING at the southwesterly corner thereof, which point is one hundred feet easterly along the northerly line of Central Avenue from the southeasterly corner of property belonging to Union Free School District Number fifteen, Town of Hempstead, New York;

THENCE easterly along said Central Avenue one hundred (100) feet to land formerly of James H. Jennings, and now or formerly of one Dowd;

THENCE extending northerly along land formerly of James H. Jennings and now or formerly of one Dowd and parallel with the easterly line of land of said Union Free School District Number fifteen about two hundred and ninety-nine (299) feet to land belonging to the Methodist Episcopal Church;

THENCE extending westerly along land of said Methodist Episcopal Church to land formerly of Samuel L. Pearsall and now or formerly of Harry Cohn, one hundred feet and nine tenths of a foot;

THENCE extending southerly along land formerly of said Samuel L. Pearsall and now of Harry Cohn about three hundred and nine (309) feet to Central Avenue, the point or place of BEGINNING.

**Lot 22:**

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being in the Village of Lawrence in the Town of Hempstead, County of Nassau and State of New York, being more particularly bounded and described as follows:-

BEGINNING at a point on the northerly side of Central Avenue distant 512.80 feet westerly from the corner formed by the intersection of the northerly side of Central Avenue with the westerly side of Rockaway Turnpike;

THENCE running northerly along the land now or formerly of Jennings, 310.73 feet to land of Methodist Episcopal Church;

THENCE running westerly along land of Methodist Episcopal Church, 100.30 feet to land of Union Free School District #15;

THENCE running southerly along the land of Union Free School District #15 320.90 feet to the northerly side of Central Avenue;

THENCE running easterly along the northerly side of Central Avenue, 100 feet to the point or place of BEGINNING.

**Lot 23:**

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being at Lawrence in the Town of Hempstead, County of Nassau, formerly Queens, and State of New York, bounded as follows:

COMMENCING at a point on the northerly side of Central Avenue distant six hundred and twelve and eight tenths (612.8) feet southwesterly from the northwest corner of Central Avenue and Rockaway Turnpike, and from said point running south sixty one (61) degrees, west three hundred (300) feet along Central Avenue;

THENCE running north twenty nine (29) degrees, west three hundred and forty nine and eight tenths (349.8) feet, along land sold to John Wood;

THENCE running north sixty six (66) degrees, thirty one (31) minutes east three hundred one and forty one one-hundredths (301.41) feet along what is known as the cemetery to land of Prince, formerly of James H. Jennings; and

THENCE along said last mentioned land, south twenty nine (29) degrees, east three hundred twenty and nine tenths (320.9) feet to Central Avenue, at the point or place of BEGINNING.

**Combined Description for Lots 21, 22 and 23:**

ALL THAT CERTAIN PLOT, piece or parcel of land, situate, lying and being in the Village of Lawrence, Town of Hempstead, County of Nassau and State of New York, lying on the northerly side of Central Avenue and bounded and described as follows:

BEGINNING at a point on the northerly side of Central Avenue distant 412.80 feet westerly from the corner formed by the intersection of the westerly side of Rockaway/Jamaica Turnpike with the northerly side of Central Avenue;

RUNNING THENCE North 28 degrees 55 minutes 00 seconds West 301.92 feet to a point;

THENCE South 66 degrees 30 minutes 11 seconds West 502.24 feet to a point;

THENCE South 28 degrees 54 minutes 58 seconds East 350.09 feet to a point on the northerly side of Central Avenue;

THENCE North 61 degrees 00 minutes 00 seconds East and along the northerly side of Central Avenue, 500 feet to the point or place of BEGINNING.

EXHIBIT B

<u>Senior Loan Documents</u>

<u>Senior Loan Documents dated as of July 12, 2007:</u>

1.   First Mortgage Note ($24,100,000)
2.   First Mortgage
3.   Building Loan Agreement
4.   Building Loan Mortgage Note ($43,100,000.00)
5.   Building Loan Mortgage
6.   Project Loan Agreement
7.   Project Loan Note ($9,200,000.00)
8.   Project Loan Mortgage
9.   Guaranty of Completion
10.  Guaranty of Payment
11.  Guaranty of Debt Service Guaranty
12.  Guaranty of Non-Recourse Carveouts
13.  Undertaking
14.  Assignment of Rents
15.  Assignment of Licenses, Permits Contracts and Plans

<u>Senior Loan (Modification) Documents dated as of January 24, 2008:</u>

1.   Modification Agreement (First Mortgage)
2.   Modification Agreement (Building Loan Agreement)
3.   Modification Agreement (Building Loan Mortgage)
4.   Modification Agreement (Project Loan Agreement)
5.   Modification Agreement (Project Loan Mortgage)
6.   Springing Guaranty of Payment
7.   Affirmation of Completion Guaranty
8.   Affirmation of Payment Guaranty
9.   Affirmation of Debt Service Guaranty
10.  Affirmation of Non-Recourse Carveouts Guaranty

## EXHIBIT C

### Mezzanine Loan Documents

1.  Mezzanine Construction Loan Agreement.

2.  Secured Promissory Note in the principal sum of $7,137,257.00.

3.  Pledge and Security Agreement (Interests in Project Owner).

4.  UCC-1 Financing Statements with respect to Borrower (Delaware).

5.  Pledge and Security Agreement (Interests in Borrower).

6.  UCC-1 Financing Statements with respect to Upper Tier Pledgor (Delaware).

7.  Subordinate Mortgage and Security Agreement.

8.  UCC-1 Financing Statement (Subordinate Mortgage) (Nassau County, New York).

9.  UCC-1 Financing Statement (Subordinate Mortgage) (Delaware).

10.  Mezzanine Lockbox, Pledge and Security Agreement.

11.  Environmental and Hazardous Substance Indemnification Agreement.

12.  Guaranty of Recourse Obligations.

13.  Carry Payment Guaranty.

14.  Completion Guaranty.

15.  Certificate of Sources and Uses.

16.  Borrower's Certification (Acquisition Docs., Construction Agreements, Management Agreement, etc.).

17.  Borrower's Certification (Reps. and Warranties).

18.  Borrower's Certification (Financial Statements & Equity Contributions).

19.  Payment Direction Letter.

20.  Recognition Agreement re: Architect (John Capobianco).

21.  Recognition Agreement re: Structural Engineer (Leonid Krupnik).

EXHIBIT D

Permitted Fund Managers

Apollo Real Estate Advisors
Archon Capital, L.P.
BlackRock, Inc.
Clarion Partners
Colony Capital, Inc.
DLJ Real Estate Capital Partners
Fortress Investment Group, LLC
H/2 Credit Partners Master Fund Ltd.
iStar Financial Inc.
J.E. Roberts Companies
Lend-Lease Real Estate Investments
Lonestar Opportunity Fund
Praedium Group
Starwood Financial Trust
The Blackstone Group International Ltd.
Walton Street Capital, LLC
Westbrook Partners
Whitehall Street Real Estate Fund, L.P.

EXHIBIT E
Qualified Transferee

AEW Capital Management
Angelo Gordon & Company
Arbor Financial
Apollo Real Estate Advisors
ARCap
Arden Realty
Barrow Street Capital
Blackacre Capital Group, L.P.
Blackstone Real Estate Partners
Boston Properties
Capital Trust
Carlyle Group
CarrAmerica Realty Corporation
Colony Investors (Colony Capital)
Crescent Real Estate
CW Capital
Emmes & Company
Fleet National Bank and its Tri-Sail Funds
Grammercy Capital
H/2 Credit Partners Master Fund Ltd.
Hartford Life Insurance Company (and
    affiliated insurance companies)
Heitman Financial
IStar Financial
JE Roberts Cos.
Legg Mason Real Estate
Lend Lease & Company
Lone Star Funds
Lupert Adler Partners
Mack Cali Realty
MassMutual (DL Babson and affiliated
    funds)
Meadowbrook Real Estate Fund
Metropolitan Life
Mony Realty Capital
New York Life (and affiliated funds)
Northstar Capital Investment Corp.
Oaktree Capital Management
Olympus Real Estate Fund (Hicks Muse)

Pacific Life
Praedium Group
Prentiss Properties
Reckson Associates/Reckson Operating
    Partnership
RREEF
Rockport Group
Starwood Opportunity Fund (Starwood
    Capital)
Sterling Equities
TrizecHahn Corp
Vornado Realty
Wells Fargo
Westbrook Real Estate Fund

EXHIBIT F

Pre-Development Budget

[See attached.]

# LAWRENCE PREDEVELOPMENT AND DEVELOPMENT BUDGET

| | Total Dev Budget | Total PreDev Budget | Funded by Equity Prior to Close | Predev Mezz Through Close | Predev Mezz Remaining | Predev Senior | Development Mezz |
|---|---|---|---|---|---|---|---|
| LAND ACQUISITION COSTS | $ 30,120,000.00 | $ 30,120,000.00 | $ 6,020,000.00 | $ - | $ - | $ 24,100,000.00 | $ - |
| **HARD COSTS** | | | | | | | |
| Demolition | $ 475,542.00 | $ 475,542.00 | $ 475,542.00 | - | - | - | - |
| Site Development | 1,139,065.00 | 40,082.00 | 40,082.00 | - | - | - | - |
| Excavation | 1,102,505.00 | 1,102,505.00 | - | - | 1,102,505.00 | - | - |
| Foundations | 1,778,804.00 | 88,940.00 | 88,940.00 | - | - | - | - |
| Structural Frame | 7,392,260.00 | 369,618.00 | 369,618.00 | - | - | - | 837,885.13 |
| Other Direct Work | 24,307,448.00 | 175,000.00 | 175,000.00 | - | - | - | - |
| General Conditions | 2,948,793.00 | 330,000.00 | - | - | 330,000.00 | - | - |
| Construction Contingency | 2,076,167.00 | 117,708.84 | 117,708.84 | - | 117,708.84 | - | - |
| G.L. Insurance | 549,660.00 | 549,660.00 | - | - | 549,660.00 | - | - |
| GC Fee | 1,624,196.00 | 202,508.00 | - | 49,001.54 | 38,703.98 | - | - |
| Environmental Clean-up | 224,655.09 | 224,655.09 | 224,655.09 | - | - | - | - |
| Pool Enclosure | 278,712.00 | 278,712.00 | - | - | - | - | - |
| **SOFT COSTS** | | | | | | | |
| Developer's Contingency | 1,900,000.00 | 230,357.14 | - | - | 230,357.14 | - | - |
| Real Estate Taxes | 1,544,815.87 | 5,141.41 | 5,141.41 | - | - | - | - |
| NFB Construction Commitment | 773,179.00 | 773,179.00 | 773,179.00 | - | - | - | - |
| Appraisal Fee | 11,029.00 | 11,029.00 | 11,029.00 | - | - | - | - |
| Phase I & II Fees | 23,612.50 | 23,612.50 | 23,612.50 | - | - | - | - |
| NFB Plan and Cost Review | 15,000.00 | 15,000.00 | - | - | 15,000.00 | - | - |
| NFB Consultant Monthly Inspections | 19,200.00 | 1,422.22 | 1,422.22 | - | 1,422.22 | - | - |
| Lender's Legal Costs to Close Senior Loan | 45,500.00 | 45,500.00 | 45,500.00 | - | - | - | - |
| Title Policies / Senior Loan Closing Costs | 1,164,169.00 | 1,164,169.00 | - | 1,164,169.00 | - | - | - |
| Title Costs (Mezz Closing) | 129,604.05 | 129,604.05 | - | 129,604.05 | - | - | - |
| Architect & Interior Design | 660,000.00 | 416,590.00 | 284,050.00 | 103,420.00 | 29,030.00 | - | - |
| Engineering | 578,520.00 | 282,607.57 | 131,307.66 | - | 151,299.91 | - | - |
| Insurance | 581,000.00 | 581,000.00 | 98,548.90 | 482,451.10 | - | - | - |
| Permits Tests and Fees | 250,000.00 | 106,323.00 | 2,923.00 | 60,000.00 | 43,400.00 | - | - |
| Security | 379,322.96 | 86,297.96 | 42,891.16 | - | 43,406.80 | - | - |
| Soft Cost Contingency | 279,803.69 | 134,319.05 | - | - | 134,319.05 | - | - |
| Marketing & Advertising | 202,940.42 | 127,940.42 | 2,940.42 | - | 125,000.00 | - | - |
| Borrowers Legal Costs to Close Senior Loan | 21,100.00 | 21,100.00 | 21,100.00 | - | - | - | - |
| LB Construction Monthly Inspections | 98,000.00 | 10,500.00 | - | - | 10,500.00 | - | - |
| Legal and Admin | 300,669.65 | 260,669.65 | 122,623.19 | 105,269.00 | 32,777.46 | - | - |
| Utilities Usage | 30,000.00 | 5,806.45 | 2,711.40 | - | 3,095.05 | - | - |
| Office Supplies and Related Expenses | 72,956.43 | 18,393.15 | 5,917.22 | - | 12,375.93 | - | - |
| LB Closing Costs | 297,285.00 | 297,285.00 | - | 297,160.00 | 125.00 | - | - |
| LB Loan Servicing Fee | 46,109.13 | 5,000.00 | - | - | 5,000.00 | - | - |
| Eastern Union (Mortgage Broker) | 764,000.00 | 764,000.00 | 764,000.00 | - | - | - | - |
| Management & Overhead | 458,740.11 | 458,740.11 | 266,740.11 | - | 192,000.00 | - | - |
| Senior Loan Interest | 9,189,979.10 | 1,844,937.44 | - | 134,905.00 | 810,032.44 | 900,000.00 | - |
| **GRAND TOTAL** | $ 93,883,411.00 | $ 41,616,555.06 | $ 9,479,298.54 | $ 2,525,979.69 | $ 4,611,276.83 | $ 25,000,000.00 | $ 837,885.13 |

\* LB MM includes $900,000 Project Loan interest reserve

| TOTAL SOURCES | | LLC | | | LLC | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Construction Loan | $ 76,000,000.00 | 81.4% | $ 25,000,000.00 | 60.1% | | | | - | 25,000,000.00 | - |
| LB Mezzanine Loan | 7,975,142.46 | 8.5% | 7,137,256.52 | 17.2% | | | 2,525,979.69 | 4,611,276.83 | | 837,885.13 |
| Sponsor Equity | 9,479,298.54 | 10.1% | 9,479,298.54 | 22.6% | 9,479,298.54 | | | | | |
| **TOTAL SOURCES** | $ 93,454,441.00 | | $ 41,616,555.06 | | $ 9,479,298.54 | | $ 2,525,979.69 | $ 4,611,276.83 | $ 25,000,000.00 | $ 837,885.13 |

EXHIBIT G

Fully Executed Construction Agreements

1.  Architect's Agreement between New Central Avenue, LLC and John F.
    Capobianco, dated April 24, 2007.

2.  Engineer's Agreement (Structural Engineer) between New Central Avenue, LLC
    and Leonid Krupnik, P.E., dated April 16, 2007.

3.  Engineer's Agreement (Civil Engineer) between New Central Avenue, LLC and
    RMS Engineering, dated May 1, 2007.

4.  Agreement between New Central Avenue, LLC and Security USA, Inc., dated
    July 12, 2007.

5.  Agreement between New Central Avenue, LLC and Great American Restoration
    Services, Inc., dated August 14, 2007.

6.  Agreement between New Central Avenue, LLC and Consulting Associates of NY,
    Inc., dated August 16, 2007.

7.  Interior Design Contract between New Central Avenue, LLC and Lilly Levy
    Interior Design, dated September 24, 2007.