INTERCREDITOR AGREEMENT

by and between

NORTH FORK BANK,
as Senior Lender

and

LEHMAN BROTHERS HOLDINGS INC, individually and as
agent for one or more Co-Lenders,
as Mezzanine Lender

Dated as of January 24, 2008

Premises:    260 Central Avenue
             Lawrence, New York

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "**Agreement**"), dated as of January 24, 2008, by and between NORTH FORK BANK, a Division of Capital One, N.A., having an office at 275 Broadhollow Road, Melville, New York 11747 ("**Senior Lender**"), and LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, individually and as agent for one or more Co-Lenders, having an office at 399 Park Avenue, New York, New York 10022 ("**Mezzanine Lender**").

## RECITALS

**WHEREAS**, pursuant to the terms, provisions and conditions set forth in (i) that certain Building Loan Agreement, and (ii) that certain Project Loan Agreement, each dated as of July 12, 2007 (collectively, the "**Senior Loan Agreement**"), among New Central Avenue, LLC, a New York limited liability company ("**Borrower**") and Senior Lender, Borrower has executed (i) that certain First Mortgage Note, (ii) that certain Building Loan Mortgage Note, and (iii) that certain Project Loan Mortgage Note, each dated as of July 12, 2007 (collectively, the "**Senior Note**") in the aggregate principal amount of up to $76,400,000.00, or so much thereof as may be advanced thereunder, in favor of Senior Lender, payable with interest and upon the terms and conditions described therein, evidencing an acquisition loan, a building loan and a project loan (all such amount, together with all other amounts due and payable, including without limitation any late charges, default interest, prepayment fees or premiums, advances and post-petition interest under the Senior Note and the other Senior Loan Documents (as hereinafter defined), the "**Senior Loan**"), which is secured by, among other things, (i) that certain First Mortgage, made by Borrower in favor of Senior Lender, (ii) that certain Building Loan Mortgage, made by Borrower in favor of Senior Lender, and (iii) that certain Project Loan Mortgage, made by Borrower in favor of Senior Lender, each dated as of July 12, 2007 (as each may hereafter be amended, extended, restated, supplemented, increased, severed, split, consolidated, renewed or otherwise modified or replaced from time to time, collectively, the "**Senior Mortgage**") and each encumbering certain real property located in the Village of Lawrence, New York and more particularly described on Exhibit A-1 attached hereto and made a part hereof and all improvements thereon and appurtenances thereto, and all other personal and other property, as more particularly described in the Senior Mortgage (collectively, the "**Premises**");

**WHEREAS**, pursuant to the terms, provisions and conditions set forth in that certain Mezzanine Construction Loan Agreement, dated as of the date hereof, by and among New Central Avenue II, LLC, a Delaware limited liability company (the "**Mezzanine Borrower**") and Mezzanine Lender (the "**Mezzanine Loan Agreement**"), Mezzanine Lender is the owner and holder of a loan to Mezzanine Borrower in the original principal amount of up to $7,137,257.00, or so much thereof as may be advanced thereunder (as such amount may be increased in accordance with the terms of the Mezzanine Loan Documents, the "**Mezzanine Loan**"), which Mezzanine Loan is evidenced by that certain Secured Promissory Note, dated as of the date hereof, made by Mezzanine Borrower in favor of Mezzanine Lender in the amount of up to $7,137,257.00 (as the same may be amended, restated or replaced in connection with Mezzanine

Lender's election to fund the Tranche B portion of the Mezzanine Loan in accordance
with the terms of the Mezzanine Loan Documents, the "**Mezzanine Note**"), and secured
by, among other things, (i) the Pledge Agreements (as defined in the Mezzanine Loan
Agreement) from Pledgors (as defined in the Mezzanine Loan Agreement), pursuant to
which Mezzanine Lender is granted a first priority security interest in all of the Collateral
(as defined in the Mezzanine Loan Agreement) (collectively, the "**Pledge Agreement**")
and (ii) that certain Subordinate Mortgage, Security Agreement, Assignment of Rents and
Leases and Fixture Filing, dated as of the date hereof, from Borrower, for the benefit of
Mezzanine Lender, which mortgage is subordinate to the Senior Mortgage and evidences
a second-priority lien on the Premises (the "**Subordinate Mortgage**"); and

      **WHEREAS**, Senior Lender and Mezzanine Lender desire to enter into
this Agreement to provide for the relative priority of the Senior Loan Documents (as such
term is hereinafter defined) and the Mezzanine Loan Documents (as such term is
hereinafter defined) on the terms and conditions hereinbelow set forth, and to evidence
certain agreements with respect to the relationship between the Mezzanine Loan and the
Mezzanine Loan Documents, on the one hand, and the Senior Loan and the Senior Loan
Documents, on the other hand.

      **NOW, THEREFORE**, in consideration of the foregoing recitals and for
other good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, Senior Lender and Mezzanine Lender hereby agree as follows:

      Section 1.     Certain Definitions; Rules of Construction.

      (a)     As used in this Agreement, the following capitalized terms shall
have the following meanings:

      "**Affiliate**" means, as to any particular Person, any Person directly or
indirectly, through one or more intermediaries, controlling, Controlled by or under
common control with the Person or Persons in question.

      "**Agreement**" means this Agreement, as the same may be amended,
modified and in effect from time to time, pursuant to the terms hereof.

      "**Award**" has the meaning provided in Section 9(d) hereof.

      "**Borrower**" has the meaning provided in the Recitals hereto.

      "**Borrower Group**" has the meaning provided in Section 10(c) hereof.

      "**Business Day**" means any day other than a Saturday, Sunday or any
other day on which national banks in New York, New York are not open for business.

      "**CDO**" has the meaning provided in the definition of the term "**Qualified
Transferee.**"

"**Continuing Senior Loan Event of Default**" means an Event of Default under the Senior Loan for which (i) Senior Lender has provided notice of such Event of Default to Mezzanine Lender in accordance with Section 11(a) of this Agreement and (ii) the cure period provided to Mezzanine Lender in Section 11(a) of this Agreement has expired.

"**Control**" means the ownership, directly or indirectly, in the aggregate of more than fifty percent (50%) of the beneficial ownership interests of an entity and the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise. "**Controlled by,**" "**controlling**" and "**under common control with**" shall have the respective correlative meaning thereto.

"**Directing Mezzanine Lender**" has the meaning provided in Section 4(c) hereof.

"**Eligibility Requirements**" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of $400,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $200,000,000 and (ii) is regularly engaged in the business of making or owning commercial real estate loans (or interests in commercial real estate loans) or operating commercial mortgage properties.

"**Enforcement Action**" means any (i) judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of any other enforcement action against the Premises or the Borrower, including, without limitation, the taking of possession or control of the Premises, (ii) acceleration of, or demand or action taken in order to collect, all or any indebtedness secured by the Premises (other than giving of notices of default and statements of overdue amounts) or (iii) exercise of any right or remedy available to Senior Lender under the Senior Loan Documents, at law, in equity or otherwise with respect to the Borrower and/or the Premises.

"**Equity Collateral**" means the equity interests pledged pursuant to the Pledge Agreements.

"**Event of Default**" as used herein means (i) with respect to the Senior Loan and the Senior Loan Documents, any Event of Default thereunder which has occurred and is continuing (i.e., has not been cured by Borrower or by the Mezzanine Lender in accordance with the terms of this Agreement) and (ii) with respect to the Mezzanine Loan and the Mezzanine Loan Documents, any Event of Default thereunder which has occurred and is continuing (i.e., has not been cured by Mezzanine Borrower).

"**Loan Pledgee**" has the meaning provided in Section 15 hereof.

"**Loan Purchase Price**" has the meaning provided in Section. 13(a) hereof.

"**Mezzanine Borrower**" has the meaning provided in the <u>Recitals</u> hereto.

"**Mezzanine Collateral**" means, collectively, the Equity Collateral and the Subordinate Mortgage Collateral.

"**Mezzanine Collateral Enforcement Action**" means any action or proceeding or other exercise of Mezzanine Lender's rights and remedies commenced by Mezzanine Lender, in law or in equity, or otherwise, in order to realize upon the Mezzanine Collateral.

"**Mezzanine Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Mezzanine Loan**" has the meaning provided in the <u>Recitals</u> hereto.

"**Mezzanine Loan Agreement**" has the meaning provided in the <u>Recitals</u> hereto.

"**Mezzanine Loan Cash Management Agreement**" means any cash management agreement or lockbox agreement executed in connection with, or the cash management provisions of, the Mezzanine Loan Documents.

"**Mezzanine Loan Documents**" means the Mezzanine Loan Agreement, the Mezzanine Note, the Pledge Agreements and the Subordinate Mortgage, together with all documents and instruments set forth on <u>Exhibit C</u> hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Mezzanine Loan Modification**" has the meaning provided in <u>Section 7(b)</u> hereof.

"**Mezzanine Note**" has the meaning provided in the <u>Recitals</u> hereto.

"**Monetary Cure Period**" has the meaning provided in <u>Section 11(a)</u> hereof.

"**Patriot Act**" means the United States of America Patriot Act, Pub.L. No. 107-56.

"**Permitted Fund Manager**" means any Person that on the date of determination is (i) one of the entities listed on <u>Exhibit D</u> or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, (ii) investing through a fund with committed capital of at least $250,000,000 and (iii) not subject to a Proceeding.

"**Person**" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, any

federal, state, county or municipal government (or any agency or political subdivision thereof) endowment fund or any other form of entity.

"**Pledge**" has the meaning provided in <u>Section 15</u> hereof.

"**Pledge Agreements**" has the meaning provided in the <u>Recitals</u> hereto.

"**Premises**" has the meaning provided in the <u>Recitals</u> hereto.

"**Proceeding**" has the meaning provided in <u>Section 10(c)</u> hereof.

"**Prohibited Person**" shall mean any Person:

(i)    listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**");

(ii)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions, of the Executive Order;

(iii)    with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Law, including the Executive Order;

(iv)    who commits, threatens or conspires to commit or supports "**terrorism**" as defined in the Executive Order;

(v)    that is named as a "**specially designated national and blocked person**" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

(vi)    who is an Affiliate of a Person listed in clauses (i) – (v) above.

"**Project**" means that certain luxury residential condominium project containing approximately 138 residential condominium units and approximately 213 off-street parking spaces and 159 storage units, to be constructed on the Premises by Borrower in accordance with the Senior Loan Documents and the Mezzanine Loan Documents.

"**Property Manager**" means a property manager (or construction manager, if applicable) selected or approved by Senior Lender and Mezzanine Lender in accordance with the Senior Loan Documents and the Mezzanine Loan Documents, or any successor thereto as property manager (or construction manager, if applicable) of the Premises.

"**Protective Advances**" means all sums advanced for the purpose of payment of real estate taxes (including special payments in lieu of real estate taxes), maintenance costs, insurance premiums or other items (including capital items) reasonably necessary to protect the Premises or the Separate Collateral, respectively, from forfeiture, casualty, loss or waste, to protect the lien of the Senior Loan Documents, and with respect to the Mezzanine Loan, amounts advanced by Mezzanine Lender pursuant to Section 11 hereof.

"**Purchase Option Notice**" has the meaning provided in Section 13(a) hereof.

"**Qualified Manager**" shall mean a property manager or construction manager, as applicable, of the Premises which (i) is a reputable management company or construction management company whose principals have at least five (5) years' experience in the management or construction management of residential condominium properties with similar uses as the Premises, (ii) has, for at least five (5) years prior to its engagement as property manager or construction manager, managed or managed construction of at least five (5) properties of the same property type and quality as the Premises, (iii) at the time of its engagement as property manager or construction manager has managed or managed construction of 1,000 residential condominium units in the same property type and quality as the Project, and (iv) is not the subject of a bankruptcy or similar insolvency proceeding.

"**Qualified Transferee**" means a Person that is not a "Prohibited Person" for purposes of the Patriot Act and that is (i) Mezzanine Lender or any Affiliate Controlled by the Mezzanine Lender, or (ii) one or more of the following:

(A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

(B)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

(C)    an institution substantially similar to any of the foregoing entities described in clauses (ii)(A) or (ii)(B) that satisfies the Eligibility Requirements;

(D)    any entity Controlled by any of the entities described in clause (i) or clauses (ii)(A) or (ii)(C);

(E)    a Qualified Trustee in connection with a securitization of, the creation of collateralized debt obligations (including, without limitation, collateralized loan obligations) ("CDO") secured by or financing through an "owner

trust" of, the Mezzanine Loan (collectively, "Securitization Vehicles"), so long as (A) the
special servicer or manager of such Securitization Vehicle has the Required Special
Servicer Rating and (B) the entire "controlling class" of such Securitization Vehicle,
other than with respect to a CDO Securitization Vehicle, is held by one or more entities
that are otherwise Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this
definition; provided that the operative documents of the related Securitization Vehicle
require that (1) in the case of a CDO Securitization Vehicle, the "equity interest" in such
Securitization Vehicle is owned by one or more entities that are Qualified Transferees
under clauses (ii)(A), (B), (C) or (D) of this definition and (2) if any of the relevant
trustee, special servicer, manager fails to meet the requirements of this clause (E), such
Person must be replaced by a Person meeting the requirements of this clause (E) within
thirty (30) days;

(F)     an investment fund, limited liability company, limited
partnership or general partnership where a Permitted Fund Manager or an entity that is
otherwise a Qualified Transferee under clauses (ii)(A), (B), (C) or (D) of this definition
acts as the general partner, managing member or fund manager and at least 50% of the
equity interests in such investment vehicle are owned, directly or indirectly, by one or
more entities that are otherwise Qualified Transferees under clauses (ii)(A), (B), (C) or
(D) of this definition;

(G)     any entity listed on Exhibit D attached hereto;

(H)     any entity listed on Exhibit E attached hereto; or

(I)     any Affiliate of a Person described in subparagraphs (A) –
(H).

"**Qualified Trustee**" means (i) a corporation, national bank, national
banking association or a trust company, organized and doing business under the laws of
any state or the United States of America, authorized under such laws to exercise
corporate trust powers and to accept the trust conferred, having a combined capital and
surplus of at least $100,000,000 and subject to supervision or examination by federal or
state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or
(iii) an institution whose long-term senior unsecured debt is rated either of the then in
effect top two rating categories of each of the Rating Agencies.

"**Rating Agencies**" shall mean each of S&P, Moody's Investors Service,
Inc., and Fitch, Inc., or any other nationally-recognized statistical rating agency which
has been designated by Senior Lender.

"**Redirection Notice**" has the meaning provided in Section 15 hereof.

"**Required Special Servicer Rating**" means (i) a rating of "**CSS1**" in the
case of Fitch, (ii) on the S&P list of approved special servicers in the case of S&P and
(iii) in the case of Moody's, such special servicer is acting as special servicer in a
commercial mortgage loan securitization that was rated by Moody's within the twelve
(12) month period prior to the date of determination, and Moody's has not downgraded or

withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities.

"**S&P**" means Standard & Poors Ratings Services, a division of The McGraw-Hill Companies, Inc.

"**Senior Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Senior Loan**" has the meaning provided in the <u>Recitals</u> hereto.

"**Senior Loan Agreement**" has the meaning provided in the <u>Recitals</u> hereto.

"**Senior Loan Cash Management Agreement**" means any cash management agreement or agreements executed in connection with, or cash management provisions of, the Senior Loan Documents.

"**Senior Loan Collateral**" means (i) the Premises and (ii) all other collateral given as security for the Senior Loan pursuant to the Senior Loan Documents.

"**Senior Loan Default Notice**" has the meaning provided in <u>Section 11(a)</u> hereof.

"**Senior Loan Documents**" means the Senior Loan Agreement, the Senior Note and the Senior Mortgage, together with the instruments and documents set forth on <u>Exhibit B</u> hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Senior Loan Liabilities**" shall mean, collectively, all of the indebtedness, liabilities and obligations of Borrower evidenced by the Senior Loan Documents and all amounts due or to become due pursuant to the Senior Loan Documents, including interest thereon and any other amounts payable in respect thereof or in connection therewith, including, without limitation, any late charges, default interest, prepayment fees or premiums, exit fees, advances and post-petition interest.

"**Senior Loan Modification**" has the meaning provided in <u>Section 7(a)</u> hereof.

"**Senior Mortgage**" has the meaning provided in the <u>Recitals</u> hereto.

"**Senior Note**" has the meaning provided in the <u>Recitals</u> hereto.

"**Separate Collateral**" means (i) the Mezzanine Collateral and (ii) any other collateral given as security for the Mezzanine Loan pursuant to the Mezzanine Loan

Documents and in accordance with the terms of this Agreement, in each case not directly constituting security for the Senior Loan.

"**SPE Constituent Entity**" means Borrower, Mezzanine Borrower and each of the respective pledgors (other than any individual pledgors) under the Pledge Agreements.

"**Subordinate Mortgage**" has the meaning provided in the <u>Recitals</u> hereto.

"**Subordinate Mortgage Collateral**" means all interests granted by Borrower to Mezzanine Lender pursuant to the terms of the Subordinate Mortgage.

"**Third Party Agreement**" has the meaning set forth in <u>Section 5(a)</u> hereof.

"**Third Party Obligor**" has the meaning set forth in <u>Section 5(a)</u> hereof.

"**Transfer**" means any assignment, pledge, conveyance, sale, transfer, mortgage, encumbrance, grant of a security interest, issuance of a participation interest, or other disposition, either directly or indirectly, by operation of law or otherwise.

(b)    For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)    all capitalized terms defined in the recitals to this Agreement shall have the meanings ascribed thereto whenever used in this Agreement and the terms defined in this Agreement have the meanings assigned to them in this Agreement, and the use of any gender herein shall be deemed to include the other genders;

(ii)    all capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Mezzanine Loan Agreement;

(iii)    all references in this Agreement to designated Sections, Subsections, Paragraphs, Articles, Exhibits, Schedules and other subdivisions or addenda without reference to a document are to the designated sections, subsections, paragraphs and articles and all other subdivisions of and exhibits, schedules and all other addenda to this Agreement, unless otherwise specified;

(iv)    a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall apply to Paragraphs and other subdivisions;

(v)    the terms "**includes**" or "**including**" shall mean without limitation by reason of enumeration;

(vi)    the words "**herein**", "**hereof**", "**hereunder**" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(vii)    the words "**to Mezzanine Lender's knowledge**" or "**to the knowledge of Mezzanine Lender**" (or words of similar meaning) shall mean to the actual knowledge of officers of Mezzanine Lender with direct oversight responsibility for the Mezzanine Loan without independent investigation or inquiry and without any imputation whatsoever; and

(viii)    the words "**to Senior Lender's knowledge**" or "**to the knowledge of Senior Lender**" (or words of similar meaning) shall mean to the actual knowledge of officers of Senior Lender with direct oversight responsibility for the Senior Loan without independent investigation or inquiry and without any imputation whatsoever.

Section 2.    <u>Approval of Loans and Loan Documents.</u>

(a)    Mezzanine Lender hereby acknowledges that (i) it has received and reviewed and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Senior Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Senior Loan Documents, (ii) the execution, delivery and performance of the Senior Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Mezzanine Loan Documents, (iii) Senior Lender is under no obligation or duty to, nor has Senior Lender represented that it will, see to the application of the proceeds of the Senior Loan by Borrower or any other Person to whom Senior Lender disburses such proceeds and (iv) any application or use of the proceeds of the Senior Loan for purposes other than those provided in the Senior Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Senior Loan Documents.

(b)    Senior Lender hereby acknowledges that (i) it has received and reviewed, and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Mezzanine Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Mezzanine Loan Documents, (ii) the execution, delivery and performance of the Mezzanine Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Senior Loan Documents, (iii) Mezzanine Lender is under no obligation or duty to, nor has Mezzanine Lender represented that it will, see to the application of the proceeds of the Mezzanine Loan by Mezzanine Borrower or any other Person to whom Mezzanine Lender disburses such proceeds and (iv) any application or use of the proceeds of the Mezzanine Loan for purposes other than those provided in the Mezzanine Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Mezzanine Loan Documents.    Senior Lender hereby acknowledges and agrees that any conditions precedent to Senior Lender's consent to mezzanine financing as set forth in the Senior

Loan Documents or any other agreements with the Borrower, as they apply to the Mezzanine Loan Documents or the making of the Mezzanine Loan, have been either satisfied or waived.

Section 3.    Representations and Warranties.

(a)    Mezzanine Lender hereby represents and warrants as follows:

(i)    Exhibit C attached hereto and made a part hereof is a true, correct and complete listing of all of the Mezzanine Loan Documents as of the date hereof. To Mezzanine Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Mezzanine Loan Documents.

(ii)    Mezzanine Lender is the legal and beneficial owner of the entire Mezzanine Loan free and clear of any lien, security interest, option or other charge or encumbrance, other than any lien or security interest granted to any Loan Pledgee as contemplated by the provisions of Section 15 hereof.

(iii)    There are no conditions precedent to the effectiveness of this Agreement or the enforceability of this Agreement against Mezzanine Lender that have not been satisfied or waived.

(iv)    Mezzanine Lender has, independently and without reliance upon Senior Lender and based on such documents and information as Mezzanine Lender deems appropriate, made its own credit analysis and decision to enter into the Mezzanine Loan and this Agreement.

(v)    Mezzanine Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Mezzanine Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Mezzanine Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Mezzanine Lender enforceable against Mezzanine Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)    To Mezzanine Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority,

bureau or agency is required in connection with the execution, delivery or performance by Mezzanine Lender of this Agreement or consummation by Mezzanine Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement by Mezzanine Lender will (v) violate or conflict with any provision of the organizational or governing documents of Mezzanine Lender, (w) to Mezzanine Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Mezzanine Lender is a party or to which any of its properties are subject, (x) to Mezzanine Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Mezzanine Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise, or other instrument (provided, however, that Mezzanine Lender shall have the right to grant a lien, charge, encumbrance, claim or security interest in the Mezzanine Loan or any portion thereof to a Loan Pledgee as contemplated by the provisions of Section 15 hereof), (y) violate any judgment, order, injunction, decree, or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Mezzanine Lender has knowledge against, or binding upon Mezzanine Lender or upon any of the securities, properties, assets, or business of Mezzanine Lender or (z) to Mezzanine Lender's knowledge, constitute a violation by Mezzanine Lender of any statute, law or regulation that is applicable to Mezzanine Lender.

(x)    The Mezzanine Loan is not cross-defaulted with any loan other than the Senior Loan. None of the Senior Loan Collateral secures any loan from Mezzanine Lender to Mezzanine Borrower or any other Affiliate of the Borrower.

(b)    Senior Lender hereby represents and warrants as follows:

(i)    Exhibit B attached hereto and made a part hereof is a true, correct and complete listing of the Senior Loan Documents as of the date hereof. To Senior Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Senior Loan Documents.

(ii)    Senior Lender is the legal and beneficial owner of the Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance.

(iii)    There are no conditions precedent to the effectiveness of this Agreement or the enforceability of this Agreement against Senior Lender that have not been satisfied or waived.

(iv)    Senior Lender has, independently and without reliance upon Mezzanine Lender and based on such documents and information as Senior Lender deems appropriate, made its own credit analysis and decision to enter into the Senior Loan and this Agreement.

(v)    Senior Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Senior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Senior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Senior Lender enforceable against Senior Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)    To Senior Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Senior Lender of this Agreement or consummation by Senior Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Senior Lender, (w) to Senior Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Senior Lender is a party or to which any of its properties are subject, (x) to Senior Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Senior Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise or other instrument, (y) violate any judgment, order, injunction, decree or award of any court, arbitrator, administrative agency or governmental or regulatory body of

which Senior Lender has knowledge against, or binding upon, Senior Lender or upon any of the securities, properties, assets, or business of Senior Lender or (z) to Senior Lender's knowledge, constitute a violation by Senior Lender of any statute, law or regulation that is applicable to Senior Lender.

   (x) The Senior Loan is not cross-defaulted with the Mezzanine Loan or any other Loan. The Premises do not secure any other loan from Senior Lender to Borrower, Mezzanine Borrower or any other Affiliate of Borrower.

Section 4. <u>Transfer of Mezzanine Loan or Senior Loan</u>.

   (a) Mezzanine Lender shall not Transfer more than 49% of its beneficial interest in the Mezzanine Loan unless either (i) Senior Lender has consented to such Transfer (such consent not to be unreasonably withheld or delayed) or (ii) such Transfer is to a Qualified Transferee. Any such transferee must assume in writing the obligations of Mezzanine Lender hereunder and agree to be bound by the terms and provisions hereof. Such proposed transferee shall also remake each of the representations and warranties contained herein for the benefit of the Senior Lender.

   (b) At least ten (10) days prior to a transfer to a Qualified Transferee, the Mezzanine Lender shall provide to Senior Lender a certification that such transfer will be made in accordance with this <u>Section 4</u>, such certification to include the name and contact information of the Qualified Transferee.

   (c) If more than one Person shall hold a direct interest in the Mezzanine Loan, the holder(s) of more than 50% of the principal amount of the Mezzanine Loan shall designate by written notice to Senior Lender one of such Persons (the "**Directing Mezzanine Lender**") to act on behalf of all such Persons holding an interest in the Mezzanine Loan. The Directing Mezzanine Lender shall have the sole right to receive any notices which are required to be given or which may be given to Mezzanine Lender pursuant to this Agreement and to exercise the rights and power given to Mezzanine Lender hereunder, including any approval rights of Mezzanine Lender; provided, that until the Directing Mezzanine Lender has been so designated, the last Person known to the Senior Lender to hold more than a 50% direct interest in the Mezzanine Loan shall be deemed to be the Directing Mezzanine Lender. Once the Directing Mezzanine Lender has been designated hereunder, Senior Lender shall be entitled to rely on such designation and upon any notices, approvals and consents provided by the Directing Mezzanine Lender until Senior Lender has received written notice from the holder(s) of more than 50% of the principal amount of the Mezzanine Loan of the designation of a different Person to act as the Directing Mezzanine Lender.

   (d) Senior Lender may, from time to time, in its sole discretion and without the necessity of any prior notice to Mezzanine Lender Transfer all or any of the Senior Loan or any interest therein, and notwithstanding any such Transfer or subsequent Transfer, the Senior Loan and the Senior Loan Documents shall be and remain a senior obligation in the respects set forth in this Agreement to the Mezzanine Loan and the Mezzanine Loan Documents in accordance with the terms and provisions of this

Agreement. Any such transferee of the Senior Loan shall be bound by the terms and provisions binding Senior Lender hereunder.

Section 5.    Foreclosure of Mezzanine Collateral.

(a)    Mezzanine Lender shall not exercise any rights it may have under the Pledge Agreements, the Subordinate Mortgage and the other Mezzanine Loan Documents or applicable law with respect to a foreclosure or other realization upon the Mezzanine Collateral (including, without limitation, obtaining title to the Mezzanine Collateral or selling or otherwise transferring the Mezzanine Collateral) without obtaining the prior written consent of Senior Lender (not to be unreasonably withheld or delayed) unless (i) the transferee of title to the Mezzanine Collateral is a Qualified Transferee, and (ii) the Premises will be managed by a Qualified Manager immediately after the transfer of title to the Mezzanine Collateral. Mezzanine Lender shall provide notice of the transfer and an officer's certificate from an officer of Mezzanine Lender certifying that all conditions set forth in this Section 5(a) have been satisfied to Senior Lender. Senior Lender may request reasonable evidence that the foregoing requirements have been satisfied. In the event that such Transfer results in the release of any guarantor, indemnitor, pledgor, or other obligor under the Senior Loan Documents (each, a **"Third Party Obligor"**), such transferee or an Affiliate thereof must be satisfactory to the Senior Lender (in the exercise of its reasonable judgment) and shall execute and deliver to Senior Lender a guaranty, indemnity, pledge agreement or other agreement which provides for the obligations of such obligor (each, a **"Third Party Agreement"**), in each case, in a form substantially similar to the Third Party Agreement that it is replacing, pursuant to which the Third Party Obligor shall undertake the obligations set forth therein, Senior Lender agreeing that an Affiliate of Mezzanine Lender shall be an acceptable substitute provided that in the case of a guarantor or indemnitor such Mezzanine Lender Affiliate has a net worth of not less than the guarantor or indemnitor being replaced.

(b)    Nothing contained herein shall limit or restrict the right of Mezzanine Lender to (i) exercise its rights and remedies, in law or in equity, or otherwise, in order to realize on any Separate Collateral that is not Mezzanine Collateral, or (ii) exercise any other rights or remedies other than foreclosure of the Mezzanine Collateral.

(c)    In the event Mezzanine Lender or any purchaser at a UCC sale, foreclosure sale or otherwise obtains title to the Separate Collateral, Senior Lender hereby acknowledges and agrees that any transfer or assumption fee in the Senior Loan Agreement shall be waived as a condition to such transfer and any such transfer shall not constitute a breach or default under the Senior Loan Documents, provided the conditions in Section 5(a) are met. Senior Lender also acknowledges and agrees that it will not impose any fees or unreasonable delays in connection with such Transfer (the foregoing shall not prohibit Senior Lender from charging for reimbursement of its third party review and/or underwriting costs and expenses and reasonable attorney's fees incurred in connection with such Transfer).

Section 6.    [Intentionally Omitted]

Section 7.    <u>Modifications, Amendments, Etc.</u>

(a)    Senior Lender shall have the right without the consent of
Mezzanine Lender in each instance to enter into any amendment, deferral, extension,
modification, increase, renewal, replacement, consolidation, supplement or waiver
(collectively, a "**Senior Loan Modification**") of the Senior Loan or the Senior Loan
Documents provided that no such Senior Loan Modification shall (i) increase the interest
rate or principal amount of the Senior Loan, (ii) increase in any other material respect any
monetary obligations of Borrower under the Senior Loan Documents, (iii) shorten the
scheduled maturity date of the Senior Loan (except that Senior Lender may permit
Borrower to exercise any extension options in accordance with the terms and provisions
of the Senior Loan Documents in effect as of the date hereof), (iv) convert or exchange
the Senior Loan into or for any other indebtedness or subordinate any of the Senior Loan
to any indebtedness of Borrower, (v) amend or modify the provisions limiting transfers of
direct or indirect interests in Borrower or the Premises, (vi) modify or amend the terms
and provisions of the Senior Loan Documents in any material respect with respect to the
manner, timing and method of the application of payments thereunder, (vii) cross default
the Senior Loan with the Mezzanine Loan or any other indebtedness of the Borrower, the
Mezzanine Borrower or any other indebtedness, (viii) require Borrower to enter into any
interest rate cap agreement, swap or other interest rate hedging product, (ix) obtain any
contingent interest, additional interest or so-called "**kicker**" measured on the basis of the
cash flow or appreciation of the Premises, (or other similar equity participation), (x) to
the extent applicable, extend the period during which voluntary prepayments are
prohibited or during which prepayments require the payment of an additional fee, exit
fee, a prepayment fee or premium or yield maintenance charge or increase the amount of
any such additional fee, exit fee, prepayment fee, premium or yield maintenance charge,
(xi) [reserved], (xii) add any Events of Default under the Senior Loan Documents, (xiii)
shorten any notice or cure periods provided in the Senior Loan Documents, (xiv) release
collateral for the Senior Loan except in accordance with the terms of the Senior Loan
Documents, (xv) release any guarantor or indemnitor from any liability or obligations
pursuant to any of the Senior Loan Documents, or (xvi) amend or modify any of the
recourse provisions contained in any of the Senior Loan Documents <u>provided, however</u>,
in no event shall Senior Lender be obligated to obtain Mezzanine Lender's consent to a
Senior Loan Modification in the case of a work-out or other surrender, compromise,
release, renewal, or indulgence relating to the Senior Loan during the existence of a
Continuing Senior Loan Event of Default, except that under no conditions shall <u>clause (i)</u>
(with respect to increase in principal amount only), <u>clause (ii)</u>, <u>clause (iii)</u>, <u>clause (vi)</u>,
<u>clause (vii)</u>, <u>clause (ix)</u> or <u>clause (x)</u> be modified without the written consent of
Mezzanine Lender.  In addition and notwithstanding the foregoing provisions of this
<u>Section 7</u>, any amounts funded by the Senior Lender under the Senior Loan Documents
as a result of (A) the making of any Protective Advances or other advances by the Senior
Lender, or (B) interest accruals, capitalizations of accrued interest as principal or
accretions and any compounding thereof (including default interest), shall not be deemed
to contravene this <u>Section 7(a)</u>. In the event that Senior Lender makes any Protective
Advance, Mezzanine Lender shall have the right to repay the Senior Loan in an amount

equal to the amount of such Protective Advance without prepayment fee or penalty and such repayment by Mezzanine Lender shall be deemed for the purposes of this Agreement to be a Protective Advance made by Mezzanine Lender.

(b)    Mezzanine Lender shall have the right, without the consent of Senior Lender in each instance, to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "**Mezzanine Loan Modification**") of the Mezzanine Loan or the Mezzanine Loan Documents provided that no such Mezzanine Loan Modification shall (i) increase the interest rate or principal amount of the Mezzanine Loan, (ii) increase in any other material respect any monetary obligations of Mezzanine Borrower under the Mezzanine Loan Documents, (iii) extend or shorten the scheduled maturity date of the Mezzanine Loan (except that Mezzanine Lender may permit Mezzanine Borrower to exercise any extension options in accordance with the terms and provisions of the Mezzanine Loan Documents in effect as of the date hereof), (iv) convert or exchange the Mezzanine Loan into or for any other indebtedness or subordinate any of the Mezzanine Loan to any indebtedness of Mezzanine Borrower, (v) provide for any additional contingent interest, additional interest or so-called "**kicker**" measured on the basis of the cash flow or appreciation of the Premises, or (vi) cross default the Mezzanine Loan with any other indebtedness other than the Senior Loan. Notwithstanding anything to the contrary contained herein, if an Event of Default exists under the Mezzanine Loan Documents, Mezzanine Lender shall be permitted to modify or amend the Mezzanine Loan Documents in connection with a work-out or other surrender, compromise, release, renewal or modification of the Mezzanine Loan except that under no conditions shall a Mezzanine Loan Modification of the type described in clause (i) (with respect to increases in principal amounts only), clause (ii), clause (iii) (with respect to shortening the maturity only), clause (iv), or clause (v) be entered into without the written consent of the Senior Lender. In addition and notwithstanding the foregoing provisions of this Section 7(b), any amounts funded by the Mezzanine Lender under the Mezzanine Loan Documents as a result of (A) the making of any Protective Advances or other advances by the Mezzanine Lender, or (B) interest accruals or accretions and any compounding thereof (including default interest), shall not be deemed to contravene this Section 7(b).

(c)    Senior Lender shall deliver to Mezzanine Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Senior Loan Documents (including, without limitation, any material side letters, waivers or consents entered into, executed or delivered by Senior Lender) within a reasonable time after any of such applicable instruments have been executed by Senior Lender.

(d)    Mezzanine Lender shall deliver to Senior Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Mezzanine Loan Documents (including, without limitation, any material side letters, waivers or consents entered into, executed or delivered by Mezzanine Lender) within a reasonable time after any of such applicable instruments have been executed by Mezzanine Lender.

Section 8.    Subordination of Mezzanine Loan and Mezzanine Loan Documents.

(a)    Mezzanine Lender hereby subordinates and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan, (ii) the liens and security interests created by the Senior Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents, and no amendments or modifications to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this Section 8(a).

(b)    Every document and instrument included within the Mezzanine Loan Documents shall be subject and subordinate to each and every document and instrument included within the Senior Loan Documents and all extensions, modifications, consolidations, supplements, amendments, replacements and restatements of and/or to the Senior Loan Documents permitted pursuant to Section 7(a) hereof.

(c)    This Agreement shall not be construed as subordinating and shall not subordinate or impair Mezzanine Lender's first lien priority right, estate and interest in and to the Equity Collateral and Senior Lender hereby acknowledges and agrees that Senior Lender does not have and shall not hereafter acquire (without the prior written consent of Mezzanine Lender), any lien on, or any other interest whatsoever in, the Equity Collateral, or any part thereof, and that the exercise of remedies and realization upon the Separate Collateral by Mezzanine Lender or a Loan Pledgee in accordance with the terms and provisions of this Agreement shall not in and of itself constitute a default or an Event of Default under the Senior Loan Documents.

Section 9.    Payment Subordination.

(a)    Except (i) as otherwise expressly provided in this Agreement and (ii) in connection with the exercise by Mezzanine Lender of its rights and remedies with respect to the Separate Collateral in accordance with the terms of this Agreement, all of Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are hereby subordinated to all of Senior Lender's rights to payment by Borrower of the Senior Loan Liabilities and the obligations secured by the Senior Loan Documents, and Mezzanine Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower, any guarantor and/or from the Premises prior to the date that all Senior Loan Liabilities are indefeasibly paid in full, provided, however, that Mezzanine Lender may accept or receive payments for servicing fees to be paid and/or other out-of-pocket costs incurred by Mezzanine Lender in connection with its administration of the Mezzanine Loan. If a Proceeding shall have occurred or a Continuing Senior Loan Event of Default shall have occurred and be continuing, Senior Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender before Mezzanine Lender is entitled to receive any

payment on account of the Mezzanine Loan (including, without limitation, the right to any Prepayment Premium under the Mezzanine Loan Documents). All payments or distributions upon or with respect to the Mezzanine Loan which are received by Mezzanine Lender contrary to the provisions of this Agreement shall be received and held in trust by the Mezzanine Lender for the benefit of Senior Lender and shall be paid over to Senior Lender in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or performance of the Senior Loan in accordance with the terms of the Senior Loan Documents. Nothing contained herein shall prohibit the Mezzanine Lender from making Protective Advances (and adding the amount thereof to the principal balance of the Mezzanine Loan) notwithstanding the existence of a default or Event of Default under the Senior Loan at such time.

(b)    Notwithstanding anything to the contrary contained in this Agreement, including, without limitation, Section 9(a), provided that Mezzanine Lender has not received a Senior Loan Default Notice (or if such notification has occurred, Mezzanine Lender is curing or has cured such Continuing Senior Loan Event of Default) as of the date payment is tendered to Mezzanine Lender, if and only if any such payments are permitted to be made to the Mezzanine Lender pursuant to the terms of the Senior Loan Documents (Senior Lender agreeing that Net Sales Proceeds permitted to be received by Borrower under the Senior Loan Documents, if any, and not applied to the Senior Loan shall be permitted to be paid to the Mezzanine Lender), Mezzanine Lender may accept payments of any amounts due and payable from time to time which Mezzanine Borrower is obligated to pay Mezzanine Lender in accordance with the terms and conditions of the Mezzanine Loan Documents and Mezzanine Lender shall have no obligation to pay over to Senior Lender any such amounts. If such payments are not permitted pursuant to the terms of the Senior Loan Documents, such payment shall be received in trust for the benefit of, and shall be paid over or delivered and transferred to, the Senior Lender for application to the payment of the Senior Loan in accordance with the provisions of the Senior Loan Documents.

(c)    Mezzanine Lender may take any Mezzanine Collateral Enforcement Action which is permitted under Section 5 hereof; provided, however, that (i) Mezzanine Lender shall, prior to commencing any Mezzanine Collateral Enforcement Action, give the Senior Lender written notice of the default which would permit Mezzanine Lender to commence such Mezzanine Collateral Enforcement Action and (ii) Mezzanine Lender shall provide Senior Lender with copies of any and all material notices, pleadings, agreements, motions and briefs served upon, delivered to or with any party to any Mezzanine Collateral Enforcement Action and otherwise keep Senior Lender reasonably apprised as to the status of any Mezzanine Collateral Enforcement Action.

(d)    In the event of a casualty to the buildings or improvements constructed on any portion of the Premises or a condemnation or taking under a power of eminent domain of all or any portion of the Premises, Senior Lender shall have a first and prior interest in and to any payments, awards, proceeds, distributions, or consideration arising from any such event (the "**Award**") and the ability to settle said award in accordance with the terms of the Senior Loan Documents. If, however, the amount of the

Award is in excess of all amounts owed to Senior Lender under the Senior Loan
Documents, and either the Senior Loan has been indefeasibly paid in full or Borrower is
entitled to a remittance of same under the Senior Loan Documents other than to restore
the Premises, such excess Award or portion to be so remitted to Borrower shall, to the
extent permitted in the Senior Loan Documents, be paid to or at the direction of
Mezzanine Lender, unless other Persons have claimed the right to such awards or
proceeds, in which case Senior Lender shall only be required to provide notice to
Mezzanine Lender of such excess Award and of any other claims thereto. In the event of
any competing claims for any such excess Award, Senior Lender shall continue to hold
such excess Award (or, at Senior Lender's option, deposit such excess Award with a
court of competent jurisdiction) until Senior Lender receives an agreement signed by all
Persons making a claim to the excess Award or a final order of such court of competent
jurisdiction directing Senior Lender as to how and to which Person(s) the excess Award
is to be distributed.    Notwithstanding the foregoing, in the event of a casualty or
condemnation, Senior Lender shall release the Award from any such event to the
Borrower if and to the extent required by the terms and conditions of the Senior Loan
Documents in order to repair and restore the Premises in accordance with the terms and
provisions of the Senior Loan Documents. Any portion of the Award made available to
the Borrower for the repair or restoration of the Premises shall not be subject to
attachment by Mezzanine Lender.

    Section 10.   Rights of Subrogation; Bankruptcy.

    (a)   Each of Mezzanine Lender and Senior Lender hereby waives any
requirement for marshaling of assets thereby in connection with any foreclosure of any
security interest or any other realization upon collateral in respect of the Senior Loan
Documents or the Mezzanine Loan Documents, as applicable, or any exercise of any
rights of set-off or otherwise. Each of Mezzanine Lender and Senior Lender assumes all
responsibility for keeping itself informed as to the condition (financial or otherwise) of
Borrower, Mezzanine Borrower, the condition of the Premises and all other collateral and
other circumstances and, except for notices expressly required by this Agreement, neither
Senior Lender nor Mezzanine Lender shall have any duty whatsoever to obtain, advise or
deliver information or documents to the other relative to such condition, business, assets
and/or operations. Mezzanine Lender agrees that Senior Lender owes no fiduciary duty
to Mezzanine Lender in connection with the administration of the Senior Loan and the
Senior Loan Documents and Mezzanine Lender agrees not to assert any such claim.
Senior Lender agrees that Mezzanine Lender owes no fiduciary duty to Senior Lender in
connection with the administration of the Mezzanine Loan and the Mezzanine Loan
Documents and Senior Lender agrees not to assert any such claim.

    (b)   No payment or distribution to Senior Lender pursuant to the
provisions of this Agreement and no Protective Advance by Mezzanine Lender shall
entitle Mezzanine Lender to exercise any right of subrogation in respect thereof prior to
the indefeasible payment in full of the Senior Loan Liabilities, and Mezzanine Lender
agrees that, except with respect to the enforcement of its remedies under the Mezzanine
Loan Documents permitted hereunder, prior to the satisfaction of all Senior Loan
Liabilities it shall not acquire, by subrogation or otherwise, any lien, estate, right or other

interest in any portion of the Senior Loan Collateral or the proceeds therefrom that is, or may be prior to, or of equal priority to, any of the Senior Loan Documents or the liens, rights, estates and interest created thereby.

(c)    Subject to <u>Section 30</u> of this Agreement, the provisions of this Agreement shall be applicable both before and after the commencement, whether voluntary or involuntary, of any case, proceeding or other action against Borrower, or any SPE Constituent Entity under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors (a "**Proceeding**"). For as long as the Senior Loan shall remain outstanding, Mezzanine Lender shall not, and shall not solicit any person or entity to, and shall not direct or cause Mezzanine Borrower to direct or cause Borrower, any guarantor or any entity which controls Borrower (the "**Borrower Group**") to: (i) commence any Proceeding; (ii) institute proceedings to have Borrower or any SPE Constituent Entity adjudicated a bankrupt or insolvent; (iii) consent to, or acquiesce in, the institution of bankruptcy or insolvency proceedings against Borrower, any guarantor or any SPE Constituent Entity; (iv) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of Borrower, any guarantor or any SPE Constituent Entity; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for Borrower, any guarantor or any SPE Constituent Entity, the Premises (or any portion thereof) or any other collateral securing the Senior Loan (or any portion thereof); (vi) make an assignment for the benefit of any creditor of Borrower, any guarantor or any SPE Constituent Entity; (vii) seek to consolidate the Premises or any other assets of Borrower, any guarantor or any SPE Constituent Entity with the assets of the Mezzanine Borrower or any member of the Borrower Group in any proceeding relating to bankruptcy, insolvency, reorganization or relief of debtors; or (viii) take any action in furtherance of any of the foregoing.

(d)    If Mezzanine Lender is deemed to be a creditor of Borrower in any Proceeding (i) Mezzanine Lender hereby agrees that it shall not make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Proceeding by or against the Borrower without the prior written consent of Senior Lender, except to the extent necessary to preserve or realize upon Mezzanine Lender's interest in the Mezzanine Collateral; <u>provided, however</u>, that any such action or filing shall not be as a creditor of the Borrower, (ii) Senior Lender may vote in any such Proceeding any and all claims of Mezzanine Lender, and Mezzanine Lender hereby appoints the Senior Lender as its agent, and grants to the Senior Lender an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to the Mezzanine Lender in connection with any case by or against the Borrower in any Proceeding, including without limitation, the right to file and/or prosecute any claims, to vote to accept or reject a plan, to make any election under Section 1111(b) of the Bankruptcy Code; <u>provided, however</u>, that with respect to any proposed plan of reorganization in respect of which creditors are voting, Senior Lender may vote on behalf of Mezzanine Lender only if the proposed plan would result in Senior Lender being "**impaired**" (as such term is defined in the United States Bankruptcy Code) and

(iii) Mezzanine Lender shall not challenge the validity or amount of any claim submitted in such Proceeding by Senior Lender in good faith or any valuations of the Premises or other Senior Loan collateral submitted by Senior Lender in good faith, in such Proceeding or take any other action in such Proceeding, which is adverse to Senior Lender's enforcement of its claim or receipt of adequate protection (as that term is defined in the Bankruptcy Code).

      Section 11.   <u>Rights of Cure</u>.

      (a)   Prior to Senior Lender commencing any Enforcement Action under the Senior Loan Documents, Senior Lender (i) shall provide written notice of the default which would permit the Senior Lender to commence such Enforcement Action to Mezzanine Lender and any Loan Pledgee entitled to notice thereof pursuant to <u>Section 15</u> of this Agreement, whether or not Senior Lender is obligated to give notice thereof to Borrower (each, a "**Senior Loan Default Notice**") and (ii) shall permit Mezzanine Lender an opportunity to cure such default in accordance with the provisions of this <u>Section 11(a)</u>. If the default is a monetary default relating to a liquidated sum of money, Mezzanine Lender shall have until ten (10) Business Days after the later of (i) the giving by Senior Lender of the Senior Loan Default Notice and (ii) the expiration of Borrower's cure period, if any, (a "**Monetary Cure Period**") to cure such monetary default; provided, <u>however</u>, in the event it elects to cure any such monetary default, Mezzanine Lender shall (x) defend and hold harmless Senior Lender for all cost, expenses, losses, liabilities, obligations, damages, penalties, costs, and disbursements imposed on, incurred by or asserted against Senior Lender due to or arising from such Monetary Cure Period and (y) without duplication of the foregoing, reimburse the Senior Lender for any interest charged by Senior Lender on any required (pursuant to any applicable pooling and servicing agreement) advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances. Mezzanine Lender shall not be required, in order to effect a cure hereunder for a default that is of a non-monetary nature (e.g. a default that cannot be cured solely by the payment of a liquidated sum of money), to pay any interest calculated at the default rate under the Senior Loan Documents to the extent the same is in excess of the rate of interest which would have been payable by Borrower in the absence of such default (and irrespective of any cure of such default by Mezzanine Lender pursuant to the provisions of this Agreement), and, solely with respect to defaults of a non-monetary nature, no interest shall accrue at the default rate as against Mezzanine Lender for such period provided that Mezzanine Lender is proceeding to cure such non-monetary default, including foreclosing on the Mezzanine Collateral or exercising its right to purchase the Senior Loan pursuant to <u>Section 13</u> below. Mezzanine Lender shall not have the right to cure as hereinabove set forth with respect to monthly scheduled debt service payments on the Senior Loan for a period of more than four consecutive months unless Mezzanine Lender has commenced and is continuing to diligently pursue its rights against the Separate Collateral. If the default is of a non-monetary nature (i.e. a default that cannot be cured solely by the payment of a liquidated sum of money), Mezzanine Lender shall have the same period of time as the Borrower under the Loan Documents to cure such non-monetary default plus an additional ten (10) Business Days; provided, <u>however</u>, if such non-monetary default is susceptible of cure but cannot reasonably be cured within such