# METROPOLITAN VALUATION SERVICES

### REAL ESTATE CONSULTING AND APPRAISAL

SELF-CONTAINED APPRAISAL

OF

260 CENTRAL AVENUE
LAWRENCE, NEW YORK 11559

DATE OF VALUE
October 30, 2009

PREPARED FOR
Mr. Sandro Collura
Capital One Bank, N.A.
901 Park Avenue, Floor 4
New York, New York 10016

MVS FILE NO. 09-0632

**METROPOLITAN VALUATION SERVICES, INC.**
**444 Park Avenue South – Suite 402**
**New York, NY 10016**
**Phone (212) 213-8650  Fax (212) 213-8621**

# METROPOLITAN VALUATION SERVICES

### REAL ESTATE CONSULTING AND APPRAISAL

November 12, 2009

Mr. Sandro Collura
Capital One Bank, N.A.
901 Park Avenue, Floor 4
New York, New York 10016

re:   The Development Site located at
        260 Central Avenue, Lawrence, NY 11559

Dear Mr. Collura:

Pursuant to your request, Metropolitan Valuation Services, Inc. has completed the appraisal of the above referenced property ("subject property") for your use as the intended user for facilitating your mortgage credit underwriting decisions regarding a possible foreclosure on the subject property.

The subject property consists of a development site comprising 3 adjacent parcels of land totaling 3.74 acres, situated along the north side of Central Avenue, approximately 500 feet to the west of Rockaway Turnpike, in the Village of Lawrence, within the "Five Towns" area of the Town of Hempstead, Nassau County, New York.   The site was formerly improved with Lawrence Public Elementary School No. 1, which was demolished soon after acquisition of the site by the current owner.

Prior to the collapse of the financial markets and the current recession, the owner/developer had planned a 4-story plus basement, 144-unit luxury residential condominium building.   The proposed improvement was to consist of a mix of 1-, 2-, and 3-bedroom units.   The proposed improvements were scheduled to contain a gross building area of 247,812 and a net saleable residential area of 208,515 square feet.   On-site community amenities were to consist of a 24-hour valet basement-level parking garage containing 180 delineated spaces (plus 33 surface parking spaces); concierge services; a state-of-the-art fitness center; an enclosed 4-season outdoor swimming pool with retractable roof; community room and game room; and 150 storage rooms.   The proposed facility was to have been the first resort-style luxury building in the community, a highly-affluent predominately Jewish Orthodox enclave, proximate a dense shopping district, Kosher restaurants, cultural and recreational activities, and houses of worship.

However, given current macro- and micro-economic conditions, including the lack of available construction financing for this product-type and an overall softening of demand for luxury condominium product, the original development plans have been placed on hold.   As of the date of the inspection on October 30, 2009, the subject property consisted of a cleared development site, with a partial concrete foundation.   The site was originally inspected on November 11, 2008 for a prior appraisal of the subject property and the site remains in a similar state as of the prior inspection, with no new construction having taken place over the past 12 months.

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 2*

The purpose of this appraisal is to estimate the "As Is" Market Value of the Fee Simple Interest of the subject property as of October 30, 2009, the date the subject property site was most recently inspected by the staff of Metropolitan Valuation Services.  As noted, we are familiar with the subject property, having previously appraised it as of November 11, 2008.

We have determined that the Highest and Best Use of the subject property site is a short-term hold until market conditions improve and such time that development becomes financially feasible.  The Sales Comparison Approach has been employed in estimating the underlying value of the subject property site.  In addition, and given the lack of recent, truly comparable development sites within the competitive market, a Land Residual technique via the Income Capitalization Approach has been employed as a cross-reference to the value estimate via the Sales Comparison Approach.  This technique assumes that the subject property is constructed as a luxury rental investment property as of the date of the appraisal, as we have determined that such a use is the only financially feasible use as of the date of the current appraisal.  The concluded value represents cash or its equivalent value and assumes both exposure and marketing times of 12 to 18 months.

Attached are our value conclusions, together with Certification and Basic Assumptions and Limiting Conditions, upon which we have based our opinion of the Market Values of the subject property.

**"As Is" Value**
Based on the following analysis of all assembled data, we are of the opinion that the "As Is" Market Value of the Fee Simple Interest in the subject property, which includes developer expenditures for the site excavation and foundation (hard and soft costs), as of October 30, 2009, free and clear of financing, is:

**SEVENTEEN MILLION DOLLARS**
**($17,000,000)**

*The concluded Market Value estimate is appropriately 54.3% lower than the underlying land "As Is" value as estimated in our prior appraisal of the subject property on November 11, 2008.  This is due to a precipitous decline in overall market conditions, reflected in overall declining land values for prospective developments of this type.  In addition, the lack of available construction financing for projects without significant pre-sales has also had a compressing effect on land values.*

*Lastly, we are aware that there are presently 8 liens levied against the subject property site, primarily by the General Contractor, Triton Construction Corp., in the aggregate amount of $7,423,147.  We have not processed any market value adjustments for the presence of liens. This information is provided for client-reference only.*

*(Continued…)*



*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 3*

We appreciated this opportunity to assist you with this assignment.  Please do not hesitate to contact us if we can be of further assistance.

Sincerely,

**METROPOLITAN VALUATION SERVICES, INC.**

By:    Steven J. Schleider, MAI, FRICS          By:    David C. Lyon
         LEED Accredited Professional                            Vice President
         President                                               *For the Firm*
         *For the Firm*

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 4*

### TABLE OF CONTENTS

Title Page
Letter of Transmittal
Table of Contents
Basic Assumptions and Limiting Conditions
Certificate of Appraisal
Photograph of the Subject Property
Location Map

### INTRODUCTION AND PREMISES OF THE APPRAISAL

Summary of Salient Facts and Important Conclusions ................................................... 11
Identification of the Subject Property .......................................................................... 13
Purpose and Intended Use of the Appraisal ................................................................ 13
Scope of Work ............................................................................................................ 13
Definitions .................................................................................................................. 14
History of Ownership .................................................................................................. 17

### DESCRIPTION AND PRESENTATION OF DATA

Regional Overview ...................................................................................................... 18
Neighborhood Analysis ............................................................................................... 27
Site Analysis ............................................................................................................... 38
Zoning Analysis .......................................................................................................... 43
Description of the Improvements ................................................................................ 46
Real Estate Assessments and Taxes .......................................................................... 51

### ANALYSIS OF DATA AND CONCLUSIONS

Highest and Best Use ................................................................................................. 55
The Appraisal Process ................................................................................................ 58
The Sales Comparison Approach (Underlying Land) ................................................... 60
The Income Capitalization Approach (Land Residual) ................................................. 80
Reconciliation and Final Estimate of Value ................................................................. 95

### ADDENDA EXHIBITS

Submitted Documents
Additional Photographs of the Subject Property
Engagement Letter
Qualifications of the Appraisers

### METROPOLITAN VALUATION SERVICES
REAL ESTATE CONSULTING AND APPRAISAL

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 5*

## BASIC ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal and report have been prepared under the following general assumptions and limiting conditions:

1.  No opinion is intended to be expressed and no responsibility is assumed for the legal description or for any matters which are legal in nature or require legal expertise or specialized knowledge beyond that of a real estate appraiser.

2.  Title to the property is assumed to be good and marketable and the property is assumed to be free and clear of all liens unless otherwise stated. All mortgages, liens and encumbrances have been disregarded unless so specified within this report.

3.  The appraiser has made no legal survey nor have we commissioned one to be prepared. Therefore, reference to a sketch, plat, diagram or previous survey appearing in the report is only for the purpose of assisting the reader to visualize the property.

4.  The subject property is analyzed as though under responsible ownership and competent management with adequate financial resources to operate the property within market parameters.

5.  It is assumed in this analysis that there were no hidden or unapparent conditions of the property, subsoil, or structures, including hazardous waste conditions, which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.

6.  Information furnished by others is believed to be reliable.  However, no warranty is given for its accuracy. Some information contained within this report may have been provided by the owner of the property, or by persons in the employ of the owner.  Neither the appraiser nor Metropolitan Valuation Services, Inc. ("MVS") shall be responsible for the accuracy or completeness of such information.  Should there be any material error in the information provided to or obtained by the appraiser; the results of this report are subject to review and revision.

7.  The appraiser assumes that no hazardous wastes exist on or in the subject property unless otherwise stated in this report. The existence of hazardous material, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the subject property. The appraiser however, is not qualified to detect such substances or detrimental environmental conditions. The appraisers have inspected the subject property with the due diligence expected of a professional real estate appraiser.  The appraisers are not qualified to detect hazardous waste and/or toxic materials.  Any comment by the appraisers that might suggest the possibility of the presence of such substances should not be taken as confirmation of the presence of hazardous waste and/or toxic materials.  Such determination would require investigation by a qualified expert in the field of environmental assessment.  The value estimate rendered in this report is predicated upon the assumption that there is no such material on or affecting the property which would cause a diminution in value. No responsibility is assumed by the appraiser for any such conditions, or for any expertise or environmental engineering knowledge required to discover same. The client is urged to retain an expert in this field if so desired.

8.  The appraisers have inspected the subject property with the due diligence expected of a professional real estate appraiser.  The physical condition of the improvements is based upon a visual inspection of the premises; MVS assumes no responsibility for the soundness the property's structural or mechanical systems and components.  We accept no responsibility for considerations requiring expertise in other professional fields.  Such considerations include, but are not limited to, soils and seismic stability, civil, mechanical, electrical, structural and other engineering and environmental matters.

9.  It is assumed that there is full compliance with all applicable federal, state, and local land use laws and environmental regulations and unless non-compliance is noted, described, and considered herein.

10. The Americans with Disabilities Act (ADA) became effective January 26, 1992. The appraiser has not made a specific compliance survey and/or analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal that the property is not in compliance with one or more elements of the ADA. If so, this fact could have a negative effect upon the value of the property. Since the appraiser has no direct evidence relating to this issue, the appraiser did not

## METROPOLITAN VALUATION SERVICES
### REAL ESTATE CONSULTING AND APPRAISAL

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 6*

11.    consider possible noncompliance with the requirements of the ADA in estimating the value of the subject property.

11.    It is assumed that all required licenses, consents or other legislative or administrative authority from any local, state or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

12.    Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without prior written consent and approval of the appraisers.

13.    Unless prior arrangements have been made, the appraiser, by reason of this report, is not required to give further consultation or testimony, or to be in attendance in court with reference to the property that is the subject of this report.

14.    Unless otherwise noted, this appraisal has not given any specific consideration to the contributory or separate value of any mineral and/or timber rights associated with the subject real estate.

15.    Disclosure of the contents of this report is governed by the Bylaws and Regulations of the Appraisal Institute.

16.    This appraisal has been made subject to current market terms of financing.  The opinion of value is valid only as of the date of appraisal.  Any changes that take place either within the property or the market subsequent to that date of value can have a significant impact on value.

17.    Forecasted income and expenses that may be contained within this report may be based upon lease summaries and operating expense statements provided by the owner or third parties.  MVS assumes no responsibility for the authenticity or completeness of such data.

18.    This report is intended to be used in its entirety; if not presented in its entirety, the conclusions presented herein may be misleading.  No part of this report may be used in conjunction with any other appraisal.

19.    This appraisal report has been prepared for the exclusive benefit of the addressee (the client), its successors and/or assigns.  It may not be used or relied upon by any other party.  Any other parties who use or rely upon any information in this report without our written consent do so at their own risk.  Any person or entity not authorized by MVS in writing to use or rely this report, agrees to indemnify and hold MVS and its respective shareholders, directors, officers and employees, harmless from and against all damages, expenses, claims and costs, including attorneys fees, incurred in conjunction with defending any claim arising from or in any way connected to the use of, or reliance upon, the report by any such unauthorized person or entity.

### *Extraordinary Assumptions*

An extraordinary assumption is defined as an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions.  Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property or about conditions external to the property, such as market conditions or trends, or the integrity of data used in an analysis.

This appraisal employs no extraordinary assumptions.

### *Hypothetical Conditions*

A hypothetical condition is defined as that which is contrary to what exists, but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property or about conditions external to the property, such as market conditions or trends, or the integrity of data used in an analysis.

This appraisal employs the hypothetical condition that the subject property is constructed as a rental investment facility as of the current date of valuation for the land Residual technique of the *Income Capitalization Approach*.

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 7*

### CERTIFICATE OF APPRAISAL

We, Steven J. Schleider, MAI and David C. Lyon certify that to the best of our knowledge and belief that:

1.    The statements of fact contained in this report are true and correct.

2.    The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions and conclusions.

3.    We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

4.    We have no personal interest with respect to the parties involved with this assignment.

5.    Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.    Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.    Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice and the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

8.    David C. Lyon has made a personal inspection of the property that is the subject of this report. Steven J. Schleider, MAI and David C. Lyon have extensive experience in the appraisal of similar properties.

9.    No one provided significant professional assistance to the person signing this report.

10.    The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representative.

11.    The Appraisal Institute conducts a program of continuing professional education for its designated members. MAI and RM members who meet minimum standards of this program are awarded periodic education certification. Steven J. Schleider, MAI is currently certified under the Appraisal Institute's continuing education program.

12.    Steven J. Schleider has been duly certified to transact business as a Real Estate General Appraiser (New York State certification #46000016498). David C. Lyon has been duly certified to transact business as a Real Estate General Appraiser (New York State certification #46000043655).

**METROPOLITAN VALUATION SERVICES, INC.**

By:    Steven J. Schleider, MAI
        President

By:    David C. Lyon
        Vice President

# METROPOLITAN VALUATION SERVICES
### REAL ESTATE CONSULTING AND APPRAISAL

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 8*

### PHOTOGRAPHS OF THE SUBJECT PROPERTY



*View of foundation facing north*



*View of foundation facing northeast*

## METROPOLITAN VALUATION SERVICES
### REAL ESTATE CONSULTING AND APPRAISAL

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 9*

### *AERIAL VIEWS OF THE SUBJECT PROPERTY*





## **M E T R O P O L I T A N   V A L U A T I O N   S E R V I C E S**
### R E A L   E S T A T E   C O N S U L T I N G   A N D   A P P R A I S A L

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 10*

### *LOCATION MAPS*





**M E T R O P O L I T A N   V A L U A T I O N   S E R V I C E S**
R E A L   E S T A T E   C O N S U L T I N G   A N D   A P P R A I S A L

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 11*

### SUMMARY OF SALIENT FACTS AND IMPORTANT CONCLUSIONS

*Date of Value*            October 30, 2009

*Address*                 260 Central Avenue
                          Lawrence, NY 11559

*Location*                The subject property consists of a development site
                          comprising 3 adjacent parcels of land totaling 3.74 acres,
                          situated along the north side of Central Avenue,
                          approximately 500 feet to the west of Rockaway Turnpike,
                          in the Village of Lawrence, within the "Five Towns" area of
                          the Town of Hempstead, Nassau County, New York.
                          Primary frontage is 500 feet along the north side of Central
                          Avenue.    The subject property site is within walking
                          distance of the downtown central business district (CBD) of
                          the Village of Lawrence.

*Parcel Identification*   Section 40, Block B, Lots 21, 22, and 23

*Site Area*               3.74 acres (163,003 square feet)

*Proposed Improvements*   Prior to the collapse of the financial markets and the
                          current recession, the owner/developer had planned a 4-
                          story plus basement, 144-unit luxury residential
                          condominium building.  The proposed improvement was to
                          consist of a mix of 1-, 2-, and 3-bedroom units.   The
                          proposed improvements were scheduled to contain a gross
                          building area of 247,812 and a net saleable residential
                          area of 208,515 square feet.  On-site community amenities
                          were to consist of a 24-hour valet basement-level parking
                          garage containing 180 delineated spaces (plus 33 surface
                          parking spaces); concierge services; a state-of-the-art
                          fitness center; an enclosed 4-season outdoor swimming
                          pool with retractable roof; community room and game
                          room; and 150 storage rooms.  The proposed facility was
                          to have been the first resort-style luxury building in the
                          community, a highly-affluent predominately Jewish
                          Orthodox enclave, proximate a dense shopping district,
                          Kosher restaurants, cultural and recreational activities, and
                          houses of worship.

                          However, given current macro- and micro-economic
                          conditions, including the lack of available construction

## METROPOLITAN VALUATION SERVICES
### REAL ESTATE CONSULTING AND APPRAISAL

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 12*

financing for this product-type and an overall softening of demand for luxury condominium product, the original development plans have been placed on hold. As of the date of the inspection on October 30, 2009, the subject property consisted of a cleared development site, with a partial concrete foundation. The site was originally inspected on November 11, 2008 for a prior appraisal of the subject property and the site remains in a similar state as of the prior inspection, with no new construction having taken place over the past 12 months.

*Purpose of Appraisal*

The purpose of this appraisal is to estimate the "As Is" Market Value of the Fee Simple Interest of the subject property as of October 30, 2009, the date the subject property site was most recently inspected by the staff of Metropolitan Valuation Services. As noted, we are familiar with the subject property, having previously appraised it as of November 11, 2008.

*Zoning*

Residence-E (Village of Lawrence)

*Real Estate Tax Liability*

$29,774 (2009/10 tax year – As Is)

*Highest and Best Use*
  *As Vacant*

Short-term hold until market conditions improve and residential rental development becomes financially feasible.

  *As Improved*

Completion of a multi-family residential rental development upon an improvement in market conditions.

**VALUE CONCLUSIONS**

| | |
|---|---|
| *Sales Comparison Approach* | $17,500,000 |
| *Income Capitalization Approach* | $17,000,000 |
| *Cost Approach* | N/A |
| **CONCLUDED VALUE** | **$17,000,000** |

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 13*

### PREMISES OF THE APPRAISAL

**Identification**

The subject property site consists of a 3.74-acre parcel of land situated along the north side of Central Avenue, approximately 500 feet to the west of Rockaway Turnpike, in the Village of Lawrence, within the "Five Towns" area of the Town of Hempstead, Nassau County, New York. The site was formerly improved with Lawrence Public Elementary School No. 1, which has since been demolished.  As of the date of the appraisal, only a partially completed foundation exists on the site.  Development plans are presently on hold.

The subject property is identified on the Nassau County tax maps as Section 40, Block B, Lots 21, 22, and 23.

*Purpose and Intended Use of the Appraisal*

The purpose of this appraisal is to estimate the "As Is" Market Value of the Fee Simple Interest of the subject property as of October 30, 2009, the date the subject property site was most recently inspected by the staff of Metropolitan Valuation Services.

This is a self-contained appraisal report.  It is intended to comply with reporting requirements set forth under the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute, and the Uniform Standards of Professional Appraisal Practice (USPAP) as promulgated by the Appraisal Standards Board of the Appraisal Foundation and FIRREA.

The intended use of this report is to assist the client, Capital One Bank, N.A., and its affiliates, as the intended user, in establishing the market value of this asset for a possible foreclosure on the subject property site.

*Scope of Work*

The scope of work herein is considered to be appropriate to the intended use of this report.

As part of this appraisal, we have conducted research and analyses.  In our appraisal of the subject property, we have:

- Inspected the subject property and its environs;
- Reviewed demographic and economic trends pertaining to the regional market in which the subject property is located;



**METROPOLITAN VALUATION SERVICES**
REAL ESTATE CONSULTING AND APPRAISAL

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 14*

- Conducted research and analysis with respect to the applicable zoning code requirements and flood zone status;
- Examined the regional and local residential markets in which the subject property competes. Sales of residential land sites and and rental data has been researched and verified with reliable sources wherever possible;
- Analyzed the data collected and processed it utilizing appropriate appraisal methodology and technique;
- Reconciled the indicated applicable approaches to value to a value conclusion; and
- Estimated a reasonable exposure and marketing period appropriate to the concluded value estimate.

*Date of Valuation*

The subject property is appraised as of October 30, 2009, the date on which the subject property site was most recently inspected by a staff member of Metropolitan Valuation Services, Inc. As noted, we are familiar with the subject property, having previously appraised it as of November 11, 2008.

*Property Rights Appraised*

The subject property's Fee Simple Interest is being appraised. A Fee Simple Interest is defined by the Appraisal Institute, *The Dictionary of Real Estate Appraisal*, Fourth Edition, Appraisal Institute, Chicago, IL, 2002, as:

"Absolute ownership unencumbered by any other interest or estate; subject only to the limitations of eminent domain, escheat, police power, and taxation."

*Definition of Market Value*

The following definition of Market Value is used by agencies that regulate federally insured financial institutions in the United States:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider their best interests;



**METROPOLITAN VALUATION SERVICES**
REAL ESTATE CONSULTING AND APPRAISAL

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 15*

- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

(12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)

*Exposure Time*

Exposure time is the time a property remains on the market. It is defined by the Appraisal Institute, *The Dictionary of Real Estate Appraisal*, Fourth Edition, Appraisal Institute, Chicago, IL, 2002, as:

"The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market. Exposure time is always presumed to occur prior to the effective date of the appraisal. The overall concept of reasonable exposure encompasses not only adequate, sufficient and reasonable time but also adequate, sufficient and reasonable effort. Exposure time is different for various types of real estate and value ranges and under various market conditions.

Market Value estimates imply that an adequate marketing effort and reasonable time for exposure occurred prior to the effective date of the appraisal. In the case of disposition value, the time frame allowed for marketing the property rights is somewhat limited, but the marketing effort is orderly and adequate. With liquidation value, the time frame for marketing the property rights is so severely limited that an adequate marketing program cannot be implemented."

According to the previously noted definition of value, the property must be allowed a reasonable time to be exposed in the open market to achieve the appraised value. Historically, buyers and sellers of residential real estate have assumed a maximum 12-month period between offering the property for sale and closing.

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 16*

However, given current market conditions, these periods have been consequently longer, or assuming a sale between12 and 18 months.

Review of transfer records suggests that there is a minimal degree of activity to confirm the presence of an active investor market for most forms of income-producing real estate.   Market activity suggests that there is a demand for properties such as the subject property and that conventional financing is available for properties that are significantly pre-leased or pre-sold.  Our appraisal of the subject property reveals no factors, other than current market conditions, that would reasonably suggest that the subject property is not marketable.

Accordingly, we believe, that if exposed to the market for a reasonable period of time prior to the effective date of this appraisal, which we consider to be 12 to 18 months, the subject property would transfer at an appropriate price (that is to say, the appraised value).  We acknowledge that in appraising the property to sell within 12 to 18 months, we must place most emphasis on the buyer's expectations and yield requirements.

*Marketing Time*

Marketing time is defined by the Appraisal Institute, *The Dictionary of Real Estate Appraisal*, Fourth Edition, Appraisal Institute, Chicago, IL, 2002, as:

"The time it takes an interest in real property to sell on the market subsequent to the date of an appraisal.  Reasonable marketing time is an estimate of the amount of time it might take to sell an interest in real property at its estimated market value during the period immediately after the effective date of the appraisal; the anticipated time required to expose the property to a pool of prospective purchasers and to allow appropriate time for negotiation, the exercise of due diligence, and the consummation of a sale at a price supportable by concurrent market conditions.  Marketing time differs from exposure time, which is always presumed to precede the effective date of the appraisal."

Our appraisal of the subject property reveals no factors that would reasonably suggest that the subject property is not marketable.  Based upon the subject property's location and condition, the subject property would attract a moderate degree of investor interest if offered on the market.  Accordingly, we believe, that if exposed to the market for a reasonable period of time prior to the

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 17*

effective date of the appraisal, which we consider to be 12 to 18 months, the subject property would transfer at an appropriate price.

*Ownership History of the Subject Property*

According to submitted documentation and public records, the subject property site was acquired by the current owner, New Central Avenue, LLC, from The Board of Education of Lawrence Union Free School District on July 12, 2007 for a recorded purchased price of $30,120,000.  The source of this transaction is the deed recorded on Book 12291, Page 592 on the Nassau County records.  Approvals for the proposed development were reportedly in place at the time of acquisition by the current owner, although variances for density and height restrictions have been since revised.  It is noted that out current estimate of land value is appropriately significantly below the price paid by the current owner in July 2007.  Land values at the time of acquisition by the current owner were at their highest in recent years, and we are aware that a highly competitive bidding process involved the subject property.   Given current economic conditions and demonstrated significant compression in land values, our estimate of the land value well below the acquisition price is appropriate.

The ownership of the land does not appear to have been subsequently transferred within the last 3 years, nor are we aware of any bids to purchase, purchase options or agreements, or other offerings which may affect the property as of the date of this appraisal.   We are aware however, that the client may be foreclosing on the subject property due to difficulties with an existing construction loan.

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 18*

### *REGIONAL OVERVIEW*

***Introduction***

The subject property is located in Nassau County on Long Island, New York, an eastern suburb of New York City.  Long Island is approximately 120 miles long, 12 to 16 miles wide and contains 1,460 square miles.  It is fully surrounded by water, with the Atlantic Ocean on the south shore and Long Island Sound on the north shore.  The East River separates Long Island from the New York City Boroughs of Manhattan, Bronx and Staten Island, as well as the mainland of the United States.  Long Island is geographically comprised of four counties; Nassau, Suffolk, Queens and Kings.  Queens and Kings Counties, both part of New York City proper, are located on the western end of the island. Although comprised of four counties, Long Island is commonly thought of as only Nassau and Suffolk Counties. These two counties comprise the Nassau-Suffolk metropolitan statistical area ("MSA").  The MSA is also part of the New York City Metropolitan Statistical Area, which is defined by the United States Department of Commerce as 25 counties within the States of New York, New Jersey and Connecticut.

*Transportation*

The Borough of Manhattan, the heart of New York City, is situated 35 miles from the Suffolk County/Nassau County border. Approximately 23% of working Long Islanders commute to New York City, primarily by car and the Long Island Rail Road (LIRR). The primary controlled access highways that service Long Island are the Long Island Expressway (L.I.E./I-495), Southern State Parkway and Northern State Parkway.  The Long Island Expressway travels from the Midtown Tunnel in Queens to Riverhead in eastern Suffolk. It generally follows the center of Long Island.  This is one of the two east/west bound highways serving the North Shore communities.  The second major east-west highway serving the north shore area is the Northern State Parkway. The Northern State Parkway commences at the Nassau/Queens border and is an eastward extension of the Grand Central Parkway.  It extends along a northerly route and terminates at Route 454 in Hauppauge in western Suffolk County.

The metropolitan area is served by three major airports; JFK International and LaGuardia in the Borough of Queens and Newark-Liberty International in Newark, New Jersey.  All three airports are proximate to major highways or intestates.  Long Island is also served by MacArthur Airport, located on Veterans Highway in Ronkonkoma.  In 1999, MacArthur Airport finished a

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 19*

$13 million improvement project and in 2005, Southwest Airlines added a new 154,000 square foot concourse, which expanded Southwest's capacity from 6 to 10 gates.

Ferry service on the Bridgeport-Port Jefferson Steamboat Company is available between Port Jefferson and Bridgeport, Connecticut, providing daily service. Ferry service to Connecticut is also available between Orient Point, Long Island and New London, Connecticut.

*Town of Hempstead*

The Town of Hempstead is the largest of the three Nassau County towns in terms of area and encompasses most of the southern half of Nassau County. Hempstead's population density of 6,289 people per square mile is the second highest of the three towns and two cities in Nassau County and all ten towns of Suffolk County. The City of Long Beach, located at Nassau County's southern border with the Atlantic Ocean, has the highest density with 16,887 people per square mile.

*Population*

According to ESRI Business Information Solutions ("ESRI"), a national data collection and reporting agency, the 2009 population for Nassau County is estimated at 1,321,125 persons, and projected to decline to 1,300,002 persons by 2014, representing an average annual decline of 0.32% over the next 5 years. Within Suffolk County, the population is projected to increase to 1,481,435 persons by 2014, indicating an average annual increase of 0.04% over the next 5 years.

As illustrated in the table on the following page, the population in Long Island has been shifting eastward into Suffolk County, which is indicating substantially higher growth rates. As all of Nassau County and most of western Suffolk County are well developed suburbs, the migration has been primarily to central Suffolk County, with the majority of development occurring in the Town of Brookhaven, as its population increased by approximately 40,000 people.

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 20*

### POPULATION TRENDS - NASSAU-SUFFOLK COUNTIES

| | | | | Average Annual % Change | |
|---|---|---|---|---|---|
| Nassau County | 2000 | 2009 | 2014 | 2000 - 2009 | 2009 - 2014 |
| Town | | | | | |
| Hempstead | 755,924 | 747,886 | 735,579 | -0.12% | -0.33% |
| North Hempstead | 222,611 | 220,157 | 217,091 | -0.12% | -0.28% |
| Oyster Bay | 293,925 | 291,640 | 286,828 | -0.09% | -0.33% |
| City | | | | | |
| Glen Cove | 26,622 | 26,727 | 26,446 | 0.04% | -0.21% |
| Long Beach | 35,462 | 34,715 | 34,058 | -0.24% | -0.38% |
| Nassau County Total | 1,334,544 | 1,321,125 | 1,300,002 | -0.11% | -0.32% |
| Suffolk County Total | 1,419,369 | 1,478,510 | 1,481,435 | 0.45% | 0.04% |
| Nassau - Suffolk Totals | 2,753,913 | 2,799,635 | 2,781,437 | | |

*Source: ESRI*

| | |
|---|---|
| *Income* | According to the 2000 Census data, the average household income in the Nassau-Suffolk PMSA was $86,983, with 28.9% of the households earning more than $100,000 per year and 7.9% of the households earning less than $15,000 per year.  ESRI estimates the average household income has increased to $114,714 as of 2009 and is projected to increase to $120,895 by 2014.  Accordingly, the percentage of households earning in excess of $100,000 increased to 46.9% in 2009 and is further anticipated to increase to 50.1% by 2014. |

The table on the following page illustrates the Nassau-Suffolk PMSA's 2000 Census data, along with 2009 estimates and 2014 projections, as reported by ESRI.

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 21*

### NASSAU-SUFFOLK PMSA INCOME ESTIMATES AND PROJECTIONS

| Household Income | 2000 Number | 2000 Percent | 2009 (Estimate) Number | 2009 (Estimate) Percent | 2014 (Projection) Number | 2014 (Projection) Percent |
|---|---|---|---|---|---|---|
| $0 - $14,999 | 72,515 | 7.9% | 47,276 | 5.1% | 43,650 | 4.7% |
| $15,000 - $24,999 | 63,715 | 7.0% | 45,032 | 4.8% | 39,045 | 4.2% |
| $30,000 - $34,999 | 69,377 | 7.6% | 45,010 | 4.8% | 35,921 | 3.9% |
| $35,000 - $49,999 | 111,081 | 12.1% | 75,738 | 8.2% | 71,410 | 7.7% |
| $50,000 - $74,999 | 188,243 | 20.5% | 175,250 | 18.9% | 173,313 | 18.8% |
| $75,000 - $99,999 | 147,847 | 16.1% | 105,241 | 11.3% | 96,930 | 10.5% |
| $100,000 - $149,999 | 156,092 | 17.0% | 247,214 | 26.6% | 254,952 | 27.6% |
| $150,000 - $199,999 | 55,298 | 6.0% | 94,923 | 10.2% | 105,397 | 11.4% |
| $200,000 + | 53,170 | 5.8% | 93,425 | 10.1% | 102,682 | 11.1% |
| | | | | | | |
| Median Household Income | $67,928 | | $91,790 | | $100,185 | |
| Average Household Income | $86,983 | | $114,714 | | $120,895 | |
| Per Capita Income | $29,278 | | $38,371 | | $40,474 | |
| | | | | | | |
| *Affluent Households* | | | | | | |
| $100,000 - $149,999 | 156,092 | 17.0% | 247,214 | 26.6% | 254,952 | 27.6% |
| $150,000 - $199,999 | 55,298 | 6.0% | 94,923 | 10.2% | 105,397 | 11.4% |
| $200,000 + | 53,170 | 5.8% | 93,425 | 10.1% | 102,682 | 11.1% |
| Total | 264,560 | 28.9% | 435,562 | 46.9% | 463,031 | 50.1% |
| | | | | | | |
| % Increase from Prior Period | | | | 62.4% | | 7.0% |

*Source: ESRI*

| | |
|---|---|
| *Employment* | Over the past 20 years, the employment base of Nassau-Suffolk County has experienced a decrease in blue collar manufacturing type positions and an increase in white collar service and non-manufacturing employment. |
| | The table on the following page illustrates the diversification of the PMSA's work force.  As noted, a majority of the area's work force is employed in the services and trade sectors. |

**M E T R O P O L I T A N   V A L U A T I O N   S E R V I C E S**
R E A L   E S T A T E   C O N S U L T I N G   A N D   A P P R A I S A L

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 22*

### EMPLOYMENT TRENDS – NASSAU-SUFFOLK PMSA

| Average for Year | As of Sep-09 | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|---|
| Mining & Construction | 68,900 | 70,000 | 71,900 | 69,800 | 66,700 | 66,400 |
| Manufacturing | 76,500 | 80,600 | 84,000 | 85,900 | 86,900 | 88,200 |
| Trade, Transportation & Utilities | 258,300 | 276,500 | 273,700 | 270,700 | 270,900 | 271,300 |
| Information | 24,800 | 26,500 | 28,100 | 29,200 | 29,400 | 28,900 |
| Financial Activities | 73,600 | 74,100 | 79,600 | 80,400 | 81,600 | 83,400 |
| Professional & Business Services | 159,300 | 162,500 | 164,200 | 162,300 | 159,700 | 155,800 |
| Education & Health Services | 218,600 | 220,800 | 211,800 | 206,200 | 203,000 | 200,700 |
| Leisure & Hospitality | 104,300 | 96,300 | 99,400 | 97,500 | 95,800 | 95,700 |
| Other Services | 52,300 | 53,800 | 52,700 | 51,900 | 51,900 | 51,400 |
| Services | 534,500 | 533,400 | 528,100 | 517,900 | 510,400 | 503,600 |
| Government | 191,100 | 208,000 | 202,700 | 198,700 | 198,700 | 196,900 |
| Total Employment | 1,227,700 | 1,269,100 | 1,268,100 | 1,252,600 | 1,244,600 | 1,238,700 |
| Net Gain (Loss) Since 2004 | -11,000 | 30,400 | 29,400 | 13,900 | 5,900 | 0 |
| Net Gain (Loss) Since 2004 as a % | -0.9% | 2.5% | 2.4% | 1.1% | 0.5% | 0.0% |

*(1) Totals may differ from sum due to rounding of figures.*
*Source: U.S. Bureau of Labor Statistics*

### WORK FORCE BY INDUSTRY – NASSAU-SUFFOLK PMSA

| Industry | Percentage |
|---|---|
| Mining & Construction | 5.6% |
| Manufacturing | 6.2% |
| Trade, Transportation & Utilities | 21.0% |
| Information | 2.0% |
| Financial Activities | 6.0% |
| Services | 43.5% |
| Government | 15.6% |
| Total Employment | 100.0% |

*Source: U.S. Bureau of Labor Statistics*

The region experienced minimal levels of overall employment gains from 2004 to 2008, followed by a decline in 2009, with the services sector exhibiting the greatest percentage growth, at 4.7%. The greatest decline was in the information sector, which lost 15.6% of its workforce since 2004.

*Unemployment Rate*    The table on the following page outlines the average unemployment rate in the Town of Hempstead, Nassau County,

### METROPOLITAN VALUATION SERVICES
REAL ESTATE CONSULTING AND APPRAISAL

the Nassau-Suffolk PMSA, New York State, and the United States between 2000 and September 2009. As illustrated, regional unemployment has increased significantly over the past year, but is still below the state and national figures, consistent with historical trends.

### AVERAGE ANNUAL UNEMPLOYMENT RATES 2000 – SEPTEMBER 2009 (AS %)

|        | Town of Hempstead | Nassau County | Nassau-Suffolk PMSA | New York State | United States |
|--------|-------------------|---------------|---------------------|----------------|---------------|
| 2000   | 3.4%              | 3.3%          | 3.4%                | 4.5%           | 4.0%          |
| 2001   | 3.9%              | 3.7%          | 3.8%                | 4.9%           | 4.7%          |
| 2002   | 4.9%              | 4.7%          | 4.7%                | 6.2%           | 5.8%          |
| 2003   | 4.9%              | 4.7%          | 4.8%                | 6.4%           | 6.0%          |
| 2004   | 4.8%              | 4.5%          | 4.6%                | 5.8%           | 5.5%          |
| 2005   | 4.3%              | 4.1%          | 4.2%                | 5.0%           | 5.1%          |
| 2006   | 4.0%              | 3.8%          | 3.9%                | 4.6%           | 4.6%          |
| 2007   | 3.9%              | 3.7%          | 3.8%                | 4.5%           | 4.6%          |
| 2008   | 4.9%              | 4.7%          | 4.9%                | 5.4%           | 5.8%          |
| Sep-09 | 7.6%              | 7.2%          | 7.4%                | 8.9%           | 9.2%          |

*Sources: U.S. Department of Labor and New York State Dept. of Labor*

*Nassau County*
*Redevelopment Plans*    Within Nassau County, significant development plans currently in the early stages of development include the redevelopment of the Nassau Veterans Memorial Coliseum and the enhancement of an area known as the Nassau Hub, located in Hempstead Village.

Lighthouse Development Group, a joint venture of developer Charles Wang and RexCorp Realty LLC, have filed plans with the Town of Hempstead for the $2.0 billion, 5.5 million square foot Lighthouse at Long Island mixed-used development. The filing and rezoning of the site marks the start of the official public review and approval process of the project, which will revitalize the Nassau Veterans Memorial Coliseum and the surrounding area into a 24/7 suburban center through a 150-acre planned development district. Lighthouse will include various housing projects, office space, complementary retail, conference and exhibition space and Long Island's first 5-star hotel. The project is expected to generate almost $60 million of annual real estate tax revenue, 16,000 construction jobs, thousands of permanent jobs and many new businesses. Overall, and if approved, Lighthouse at Long Island will add more than $200 million of incremental revenue over the next 25 years to Nassau County and New York State. The project is still being negotiated between the developer

and the Town of Hempstead, with the Town calling for a smaller-scale development as of the date of this report.

RexCorp has also recently announced two other major mixed-use projects on Long Island: the $1 billion, 67-acre waterfront Glen Isles development in Glen Cove; and a $550 million, 224-unit Ritz-Carlton condominium residence project in North Hills with co-developer Midtown Properties.  The latter project is part of a $2.8 billion partnership between RexCorp and Midtown, which will also include another Ritz-Carlton residential project in Baltimore's Inner Harbor and a 6-million-squarefoot mixed-use waterfront project in Bridgeport, Connecticut.

The proposed Nassau County Hub enhancements will help transform the center of the county into a major regional business center. The Nassau Hub corridor is located in central Nassau County and is surrounded by the Long Island Rail Road's Port Jefferson line to the north and Hempstead Turnpike to the south. New funding could be used for possible improvements to the hub, including new roads, a light rail system, new parking facilities, pedestrian and bicycle ways and new infrastructure connecting the Hub's commercial, recreational and industrial areas, including Nassau Veterans Memorial Coliseum.  The Nassau Hub is the primary focal point of commercial activity and economic development in Nassau County. Recently there has been substantial growth in residential and recreational uses.  The result has been significant increases in traffic congestion, both during traditional peak periods as well as on weekends, without the supporting investment in infrastructure to handle the increased demand.

***Conclusions***

The long-term outlook for Long Island's economic health is cautiously optimistic.  Although its traditional industrial base, which was entrenched in the aerospace industry, has eroded, adaptive re-use of existing industrial buildings by former defense-oriented companies to high tech industries and others has been occurring, and very successfully.  The Island's employment base continues its transformation into a service-driven economy.    Near-term weakening is predicted in most sectors as the local economy continues to contract in the wake of the current housing slump and current market conditions.  Housing remains in demand, although sales levels have slowed considerably and housing values have dropped.  Long Island's economy is expected to continue in a pattern of minimal growth over the next several years with

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 25*

moderate levels of population and labor force growth expected, particularly in Suffolk County.  The regional unemployment figures have increased significantly since the start of 2009, but are still below state and national statistics.  The success and/or approval or disapproval of the Lighthouse project is widely considered to reflect the overall health of the local Long Island economy.  Overall, the local economy's future prospects remain cautiously optimistic.

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 26*

### *REGIONAL LOCATION MAPS*





**M E T R O P O L I T A N  V A L U A T I O N  S E R V I C E S**
R E A L  E S T A T E  C O N S U L T I N G  A N D  A P P R A I S A L

### *NEIGHBORHOOD ANALYSIS*

| | |
|---|---|
| ***Introduction*** | The subject property is located in the Incorporated Village of Lawrence, in the Town of Hempstead, Nassau County, New York. The Village of Lawrence is in the southwest corner of the Town of Hempstead, adjoining the border with the New York City borough of Queens to the west, and near the Atlantic Ocean to the south. Lawrence is one of the "Five Towns", which consists of the villages of Lawrence and Cedarhurst, the hamlets (unincorporated areas) of Woodmere and Inwood, and "The Hewletts", which is made up of the hamlet of Hewlett together with the villages of Hewlett Bay Park, Hewlett Harbor and Hewlett Neck, along with Woodsburgh.  The Five Towns as a whole is highly affluent and located adjacent to southeastern Queens, within commuting distance to Manhattan employment centers. |
| | The Village of Lawrence has a total area of 4.7 square miles, of which 3.8 square miles of it is land and 0.8 square miles of it is water.  It is bordered on the north by the Hamlet of Inwood, the Village of Cedarhurst, the Hamlet of Woodmere, and the Village of Woodsburgh; on the east by several small uninhabited islands off of Hewlett Harbor; on the west by the Nassau/Queens county lines and Far Rockaway; and on the south by the City of Long Beach, the Village of Atlantic Beach, and the Atlantic Ocean. |
| *Old Lawrence* | Old Lawrence or "Back Lawrence" is a part of the Village of Lawrence, comprising many enormous mansions, beachside luxury villas and former plantations with very large property (and corresponding prices), some dating back to the time of the American Revolution. Huge golf courses, vast wetlands and nature preserves with historic battlefields enrich this beautiful area making it one of the most exclusive areas in all of Long Island. |
| | Old Lawrence is commonly referred to by historians as the "First Hamptons." During the second half of the 19th century, it was a main vacation spot for the rich families of the highest social scale until the 1890s. A series of hurricanes and nor'easters altered the coastline considerably and destroyed a large beachfront hotel. Lawrence could no longer boast direct access to the sands along the Atlantic Ocean. At the same time, Lawrence began to become more like a modern suburb, a village with schools, public facilities, better roads and a large town area that expanded into what is now today. |

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 28*

According to historical data and published articles within the *New York Times*, Lawrence, or most notably Old Lawrence, was formerly home to a large dominant upper class of White Anglo-Saxon Protestant families that lived there since the time of the American Revolution. While many prominent families still reside there, it has since become home to a large community of upper class Modern Orthodox, Reform, and Conservative Jewish families who have established a number of growing synagogues, particularly since the 1980s.

The Orthodox Jewish communities are close to the more Haredi nearby center of Far Rockaway which has more yeshivas for the children and younger members as well as a variety of kosher restaurants and communal organizations. Central Avenue in Lawrence (and its continuation in Cedarhurst) has a significant and growing number of kosher restaurants and other business catering to the Orthodox community.

*Population*

As of 2009, ESRI projects that the Village of Lawrence (Zip Code 11559) has a population of 8,136 persons.  Over the next 5 years, ESRI projects that the population will decrease to 8,027 by 2014, reflecting an annual decrease of 0.91%.  This is largely reflective of the percentage of older persons currently living in the Village, a percentage of which would likely downsize or move out of the area due to the high costs of home ownership here.

*Wealth and Income*

The range of income levels within the Village of Lawrence is presented in the following table.   As the table on the following page illustrates, the level of affluence within the subject property's neighborhood has increased substantially in recent years, and is projected to increase further over the next 5 years.

### INCOME LEVELS FOR THE VILLAGE OF LAWRENCE

| Household Income | 2000 (Census) Number | Percent | 2009 (Estimate) Number | Percent | 2014 (Projection) Number | Percent |
|---|---|---|---|---|---|---|
| $0 - $14,999 | 334 | 12.5% | 202 | 8.1% | 187 | 7.3% |
| $15,000 - $24,999 | 250 | 9.4% | 200 | 8.0% | 167 | 6.6% |
| $30,000 - $34,999 | 147 | 5.5% | 169 | 6.8% | 132 | 5.2% |
| $35,000 - $49,999 | 270 | 10.1% | 185 | 7.4% | 176 | 6.9% |
| $50,000 - $74,999 | 293 | 11.0% | 377 | 15.1% | 364 | 14.3% |
| $75,000 - $99,999 | 205 | 7.7% | 128 | 5.1% | 104 | 4.1% |
| $100,000 - $149,999 | 360 | 13.5% | 363 | 14.6% | 373 | 14.7% |
| $150,000 - $199,999 | 319 | 12.0% | 229 | 9.2% | 250 | 9.8% |
| $200,000 + | 485 | 18.2% | 636 | 25.6% | 792 | 31.1% |
| Total | 2,663 | 100.0% | 2,489 | 100.0% | 2,545 | 100.0% |
| | | | | | | |
| Median Household Income | $78,787 | | $103,754 | | $119,652 | |
| Average Household Income | $134,698 | | $160,310 | | $173,785 | |
| Per Capita Income | $44,126 | | $51,061 | | $55,132 | |

*Source: ESRI*

Going forward, ESRI predicts that within the Village of Lawrence, the number of households earning $100,000 or more will reach 1,415 households by 2014, an increase of 13.2% from 2009. The Village is projected to show a substantial increase in the number of households at the highest end of the income range, $200,000+. In this income bracket, households are projected to increase from 636 to 791 households, representing an increase of 156 households, or a gain of 19.7% between 2009 and 2014.

*Housing*

The majority of the housing mix within the Village of Lawrence is comprised of single-family houses. As of 2000, approximately 73.0% of the homes in Lawrence houses were described as single-family, included attached homes. According to projections for 2008, the median house value in the Village of Lawrence was $1,000,001. Lawrence had a 2008 home-ownership rate of 74.3%. As of 2008, there were 1,734 owner-occupied units in Lawrence, of which 1,437, or 82.9%, were valued in excess of $500,000. Furthermore, 902 owner-occupied units, or 52.0%, were valued in excess of $1,000,000.

Based on 2009 projections made by ESRI BIS, the housing stock in the Village of Lawrence is predominantly dominated by single-family houses, which account for 73.0% of all units. Most of the housing, approximately 99.3%, was constructed prior to 1990. The following tables present a summary of Village of Lawrence housing characteristics:

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 30*

VILLAGE OF LAWRENCE
OWNER-OCCUPIED HOUSING VALUE DISTRIBUTIONS

| Home Values | Number | Percent |
|---|---|---|
| Less than $50,000 | 0 | 0.0% |
| $50,000 - $99,999 | 10 | 0.6% |
| $100,000 - $149,999 | 15 | 0.9% |
| $150,000 - $199,999 | 90 | 5.2% |
| $200,000 - $299,999 | 58 | 3.3% |
| $300,000 - $499,999 | 124 | 7.2% |
| $500,000 - $999,999 | 535 | 30.9% |
| $1,000,000+ | 902 | 52.0% |
| | 1,734 | 100.0% |
| | | |
| Median Home Value (2009) | | $911,149 |

*Source: ESRI BIS*
*Note:  Total may not equal 100% due to rounding*

VILLAGE OF LAWRENCE
HOUSING CHARACTERISTICS

| Housing Mix | Number | % of Total |
|---|---|---|
| 1-unit detached | 1,653 | 72.0% |
| 1-unit attached | 24 | 1.0% |
| 2 units | 84 | 3.7% |
| 3 to 4 units | 32 | 1.4% |
| 5 to 9 units | 98 | 4.3% |
| 10 to 19 units | 31 | 1.3% |
| 20+ units | 375 | 16.3% |
| Mobile Home | 0 | 0.0% |
| Other | 0 | 0.0% |
| | 2,297 | 100.0% |

| Year Built | Number | % of Total |
|---|---|---|
| 1999 to March 2000 | 0 | 0.00% |
| 1995 to 1998 | 15 | 0.70% |
| 1990 to 1994 | 32 | 1.40% |
| 1980 to 1989 | 98 | 4.30% |
| 1970 to 1979 | 188 | 8.10% |
| 1969 and earlier | 1,964 | 85.50% |
| | 2,297 | 100.00% |

| | |
|---|---|
| Home-ownership Rate | 74.3% |
| Overall Vacancy Rate | 7.6% |
| Median Year Structure Built | 1951 |

*Source: ESRI BIS*

**METROPOLITAN VALUATION SERVICES**
REAL ESTATE CONSULTING AND APPRAISAL

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 31*

VILLAGE OF LAWRENCE
MONTHLY RENT DISTRIBUTIONS

| Gross Monthly Rent | Number | Percent |
|---|---|---|
| Less than $200 | 15 | 4.0% |
| $200 to $299 | 0 | 0.0% |
| $300 to $499 | 0 | 0.0% |
| $500 to $749 | 52 | 13.9% |
| $750 to $999 | 114 | 30.5% |
| $1,000 to $1,499 | 51 | 13.6% |
| $1,500 or more | 142 | 38.0% |
| Paying Rent | 374 | 100.0% |
| | | |
| Median Monthly Rent | | $1,035 |

*Source: ESRI BIS*

*Linkages*

The subject property is well located with access to multiple means of transportation, including highways, the Long Island Railroad, and nearby John F. Kennedy International Airport. Rail service is accessed at the Long Island Rail Road's Lawrence station, located within walking distance of the subject property, approximately 0.3 miles to the west. The Cedarhurst station is also proximate the subject property, less than 1 mile to the northeast. Travel time to Penn Station is approximately 30 minutes. The N31 and N32 (Long Island bus) buses of MTA Long Island Bus (Metropolitan Suburban Bus Authority) run along Central Avenue extending southwest into Far Rockaway (with a connection to the A Line of the New York City Subway) and northeast to the Hempstead Bus Terminal in central Nassau County with connections to other parts of Long Island.

Local commercial corridors within the immediate area include Rockaway Turnpike and Broadway, which provide access to all points within the Five Towns area, as well as Peninsula Boulevard and Sunrise Highway (Rt. 27) located to the north. The Nassau Expressway (Rt.878) provided access to Atlantic Beach to the south via the Atlantic Beach Bridge and the Borough of Queens to the west. The Belt Parkway, which becomes the Southern State Parkway in Nassau County, is located approximately 3.0 miles to the north of the Village, which serves as Long Island's primary arterial highway along the south shore. JFK International Airport is located less than 2.0 miles to the west. Air traffic and associated noise was noted as minimal at the time of our site visit.

*Retail Services*

A majority of the area's retail services are located along both sides of Central Avenue to the northeast of Rockaway Turnpike. This

**METROPOLITAN VALUATION SERVICES**
REAL ESTATE CONSULTING AND APPRAISAL

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 32*

area is within walking distance of the subject property and contains a high degree of restaurants, neighborhood-service retail establishments, as well as national retailers including The Gap and Williams-Sonoma. A cursory survey of the immediate area along Central Avenue revealed a 95% retail occupancy. A significant number of bank branches are also located within walking distance of the subject property. Larger, community-service shopping centers are found along the expanse of Rockaway Turnpike and to a greater extent along the east/west of Sunrise Highway to the north.

The subject property neighborhood is a concentrated a retail hub that attracts shoppers from Southeast Queens, the Rockaways, and southwestern Nassau. The large number of stores creates a synergism that encourages shopping in the area. The Five Towns name lends the area prestige, although shopping traffic has little direct interaction with the nearby residential population. Traffic is very dense along Nassau Expressway and Rockaway Boulevard.

*Community Services*

The Nassau County Police Department provides police services in Lawrence (served by the 4th Precinct). The Village is also served by the Lawrence-Cedarhurst Fire Department (LCFD). The LCFD consists of 85 volunteer firefighters and emergency medical technicians and provides fire protection to the Villages of Lawrence and Cedarhurst, as well as the North Lawrence Fire District and East Lawrence Fire District.

*Recreation*

Given the subject property's proximity to the Atlantic Ocean, which is less than 2.0 miles to the south, marine and beach-related activities are in abundance for residents of the neighborhood. The Lawrence Marina and Yacht House presently contain 135 slips available for rental. The Village of Lawrence has an 18-hole golf course, which ranks as one of the finest village-owned courses in the state. The course is available to residents of the village who may obtain permits on an annual basis, or a recreation permit to play on a daily green fee basis. The Village also operates 9 outdoor championship tennis courts.

*Education*

The Lawrence Public Schools, School District 15, serve the communities of Atlantic Beach, Cedarhurst, Inwood, Lawrence, and sections of Woodmere and North Woodmere. The Hebrew Academy of the Five Towns and Rockaway, is a K-12 Modern Orthodox school where students study Jewish and secular subjects in a dual curriculum. The Pre-School, Kindergarten and

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 33*

Elementary schools are located on one campus on Frost Lane and Washington Avenue. The Brandeis School is a conservative Jewish Day School located in Lawrence. Lawrence is also home to the Shor Yoshuv Institute, a Rabbinical College with several hundred students.

The table on the following page illustrates a cross-section of educational facilities in the competitive area

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 34*

## EDUCATIONAL FACILITIES – FIVE TOWNS AREA

| NAME | Grades | No. of Students | Tuition Range |
|---|---|---|---|
| **Cedarhurst** | | | |
| 5 School | 1st-5th | | |
| Lawrence High School | 9th - 12th | | |
| Hebrew Academy Five Towns Rockaway High | 9th - 12th | 450 | $25,000 |
| Torah Academy Of Lawrence-Cedarhurst | | | |
| | | | |
| **Hewlett** | | | |
| Franklin Early Childhood Center School | Pre-K - 1st | | |
| George W. Hewlett High School | 9th - 12th | | |
| Hewlett Elementary School | 2nd - 5th | | |
| Woodmere Middle School | 6th - 8th | | |
| Mesivta Ateres Yaakov School | 9th - 12th | 140 | $15,000 |
| Yeshiva Of South Shore School | Pre-K - 8th | 700 | $7,000-$12,000 |
| | | | |
| **Inwood** | | | |
| 2 School | 1st - 5th | | |
| 4 School | Pre-K - Unknown | | |
| Yeshiva Katana of Long Island | Pre-K - 8th | | $9,000-$11,000 |
| | | | |
| **Lawrence** | | | |
| Lawrence Middle School | 6th - 8th | | |
| Brandeis School | Pre-K - 8th | 140 | $14,000 |
| Hebrew Academy Of Five Towns | 1st - 8th | 850 | $7,000-$15,000 |
| Rambam Mesivta School | 9th - 12th | 170 | $22,000 |
| Tiferet High School For Girls (gamala) | | | |
| | | | |
| **Woodmere** | | | |
| 6 School | 1st-5th | | |
| Drs Yeshiva High School For Boys | 9th - 12th | 300 | $20,000 |
| Hebrew Academy For Special Children | | | |
| Lawrence Woodmere Academy | Pre-K - 12th | | |
| Shulamith School | Pre-K - 7th | | $8,000-$10,000 |
| | | | |
| **Far Rockaway** | | | |
| Yeshiva Darchai Torah | Pre-K - 12th | 1200 | $8,000-$15,000 |
| Torah Acadamy for Girls | Pre-K - 12th | 1000 | $8,000-$15,000 |

*Source: Field Survey; Compiled by MVS*

*Houses of Worship*          As noted, the immediate area and the surrounding communities encompassing the Five Towns area consist of a demonstrated religious community.   Accordingly, houses of worship of most denominations are in abundance in the community.  The following table illustrates houses of worship in the neighborhood.



*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 35*

### HOUSES OF WORSHIP – FIVE TOWNS AREA

| Cedarhurst | Address |
|---|---|
| Agudath Israel of the Five Towns | 508 Peninsula Boulevard |
| Bais Medrash of Cedarhurst | 504 West Broadway |
| Chabad of the Five Towns | 74 Maple Avenue |
| Chofetz Chaim Torah Center - Cedarhurst | 7 Derby Avenue Cedarhurst |
| Kehillas Bais Yehudah Tzvi of Cedarhurst - Red Shul | 391 Oakland Avenue |
| Temple Beth El | Locust Ave. & Broadway |
| The Sephardic Temple | 775 Branch Boulevard |
| Tifereth Zvi Minyan | 26 Columbia Avenue |
| Young Israel of Lawrence-Cedarhurst | 8 Spruce Street |
| Incarnation Lutheran Church | 411 Bayview Ave |
| St. Joachim | 614 Central Ave |
| **Hewlett** | |
| Anshei Chesed of Hewlett | 1170 William Street Hewlett |
| Reconstructionist Congregation Beth Emeth | 36 Franklin Avenue |
| Toras Chaim Congregation | 1107 William Street |
| Young Israel of Hewlett - Congregation Ahavat Yisrael | 1 Piermont Avenue |
| St. Joseph | 1346 Broadway |
| Trinity-St. John's Church | 1142 Broadway |
| **Inwood** | |
| Our Lady of Good Counsel | 68 Wanser Avenue |
| St. Paul`s Inwood | 200 Redwood Ave |
| **Lawrence** | |
| Beth Sholom Congregation | 390 Broadway |
| Bostoner Bais Medrash of Lawrence | 1109 Doughty Boulevard |
| Shaaray Tefila Congregation | 25 Central Avenue |
| Sh'or Yoshuv Rabbinical College | 1 Cedar Lawn Ave |
| Temple Israel | 140 Central Avenue |
| Temple Sinai of Long Island | 131 Washington Avenue |
| **Woodmere** | |
| Aish Kodesh | 894 Woodmere Place |
| Bais Tefilah of Woodmere | 409 Edward Avenue |
| Congregation Bais Ephraim Yitzchok | 812 Peninsula Boulevard |
| Congregation Sons of Israel | 111 Irving Place |
| Young Israel of Woodmere | 859 Peninsula Boulevard |
| Woodmere-lawrence Church | 1023 Broadway St |

*Source: Field Survey; Compiled by MVS*

**Conclusions**

Overall, the subject property's neighborhood is comprised primarily of residential uses, with supporting retail uses found along Central Avenue and other major thoroughfares.  The area benefits from one of the highest median household incomes on Long Island and a significant majority of the population is highly affluent.  Lawrence is a highly regarded and desirable community,

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 36*

with significantly higher median and average household incomes
and home values compared with the larger area.  The proximity to
Manhattan employment centers, the nearby shopping and
restaurant corridor to the immediate northeast, and recreational
facilities to the south promote the eventual development of the
subject property site as a luxury residential facility.

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 37*

### NEIGHBORHOOD MAP



*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 38*

### *SITE ANALYSIS*

***Introduction***     The following description is based on information submitted by the
client including an architectural site survey (prepared by Fehringer
Surveying, P.C., as of February 24, 2007), public records, and the
most recent site inspection by the Metropolitan Valuation
Services, Inc. staff on October 30, 2009.

***Physical Description***
*Site Size*                  3.742 acres (163,003 square feet)
*Configuration*           Irregular
*Bldg. Coverage Ratio*
  *As Is*                     0% (Vacant Site)
  *Upon Completion*     30%
*Frontage*                 500-0" of frontage along the northerly side of Central Avenue
*Excess Land*            None
*Surplus Land*           None
*Zoning*                    Residence E (Village of Lawrence)
*Flood Map Panel No.*  FEMA No. 36059C-0301F (Dated 4/2/97)
*Flood Zone*              Flood Zone X
*Census Tract No.*       4116.00
*Parcel Identification*   Section 40, Block B, Lots 21, 22, and 23

*Topography*             The site is generally level and at grade, following the natural
terrain of the land along Central Avenue.  No unusual soil or
drainage conditions were observed during the inspection;
however, no engineering or soil reports were provided to the
appraiser supporting these observations.

*Utilities*                 All typical public utilities are available to the site including water
(Long Island American Water) and sewer (Village of Lawrence),
electricity (Long Island Power Authority); gas (KeySpan); and
telephone (Verizon).  Cable television is provided by Cablevision
or Verizon Fios.

*Site Improvements*     At the time of inspection, extensive site-work, including a
significant majority of the foundation-work was underway.  The
initial site-work, which included the demolition of the original
school building and significant excavation work commenced in
October 2007.  The proposed site improvements will be identified
and detailed within a following section.

*On-Site Parking*        The original development plans proposed on-site parking for a
total of 213 vehicles, including 180 basement-level garage

### **M E T R O P O L I T A N   V A L U A T I O N   S E R V I C E S**
R E A L   E S T A T E   C O N S U L T I N G   A N D   A P P R A I S A L

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 39*

                     spaces, and 33 surface parking spaces. The proposed on-site parking is considered to be more than adequate for the proposed use, especially in consideration of proximity to public transportation (LIRR) and the downtown Lawrence and Cedarhurst CBD, both of which are within walking distance of the subject property site.

*Vehicular Access*

Vehicular access to the site is convenient via a curb cut along the northerly side of Central Avenue, to be centrally located at the site. Central Avenue is a 2-way, 75-foot wide residential thoroughfare carrying traffic past the subject property site in a northeasterly/southwesterly direction. The subject property site is located approximately 500 feet southwest of Rockaway Turnpike, a prominent commercial thoroughfare providing access to other areas of the Five Towns, as well as access to the Borough of Queens and John F. Kennedy International Airport to the west.

*Surrounding Improvements*

The character of the area immediately surrounding the subject property in all directions is primarily residential. The subject property is situated mid-block along the northerly side of Central Avenue, between Rockaway Turnpike and Lawrence Avenue. Adjacent improvements include the Peninsular Public Library to the east; 2-story cooperative buildings to the west and south; and single-family residences and St. Mary's Cemetery to the north. Commercial utilizations become more prevalent to the northeast of the subject property, particularly east of Rockaway Turnpike.

*Easements and/or Encroachments*

We were not provided with a title report for review. The ownership of the site has granted a 12-foot wide access easement to the adjoining property to the east, currently utilized as the Peninsular Public Library. The easement is one of ingress only and terminates with any change in use other than a library. The fee ownership of the easement will remain with the property owner (Sponsor) prior to the first condominium closing, and as such, the easement will not be considered part of the proposed condominium's common elements. Based upon our visual inspection of the site and public records, the subject property site does not appear to be adversely affected by any easements or encroachments. It is recommended that if any additional easements and/or encroachments are suspected, that a current title report be obtained.

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 40*

| | |
|---|---|
| *Restrictive Covenants, Etc.* | We are not aware of any covenants, conditions or restrictions impacting the site that may affect the marketability or highest and best use of the subject property. |
| *Subsoil Conditions* | We were not provided with an engineer's report for review. However, no adverse subsoil or drainage conditions were evident at the time of our inspection. |
| *Flood Area Information* | According to the Federal Emergency Management Agency (FEMA) map, as of April 2, 1997, the subject property site is located in a non-shaded Zone "X," which is an area determined to be outside the 0.2% annual chance floodplain. The applicable Flood Insurance Rate Map is Panel No. 36059C-0301F. A copy of the flood map is illustrated on a following page. |
| *Hazardous Substances* | A current Phase I Environmental Acquisition Study Report was not provided. Nonetheless, Metropolitan Valuation Services, Inc. is not qualified to detect the existence of potentially hazardous material or underground storage tanks which may be present on or near the site. The existence of such may have an affect on the value of the property. For purposes of this appraisal, the subject property is assumed to be free of any hazardous substances. |
| ***Conclusions*** | The subject property site is functionally adequate and well suited for its proposed use as luxury residential facility. The site offers the requisite exposure, accessibility, and access to neighborhood services, public transportation, and Nassau County and nearby Queens County employment centers. Although the proposed improvements would be the immediate area's first luxury-style multi-family residence, it would appear to be in conformity with immediately surrounding structures (multi-family cooperative buildings). As such, a proposed luxury residential development is deemed to represent a supportable residential option. Photographs of the site and the immediate vicinity are contained within the Addenda. |

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 41*

### FLOOD ZONE MAP



*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 42*

### CENSUS TRACT MAP



### *ZONING ANALYSIS*

*Overview*

The subject property falls under the zoning jurisdiction of the Incorporated Village of Lawrence. According to the *Dictionary of Real Estate Appraisal*, The Appraisal Institute, Third Edition, 1993, Page 399, zoning is defined as:

"The public regulation of the character and extent of real estate use through police power; accomplished by establishing districts or areas with uniform restrictions relating to improvements; structural height, area, and bulk; density of population; and other aspects of the use and development of private property."

*Subject Property
Zoning District*

The subject property site is situated within the Residence-E zoning district by the Village of Lawrence.

*Permitted Uses*

The principal permitted uses within the Residence-E zoning district are single-family dwellings, multifamily dwellings, municipal parking areas, public and private schools, public museums and libraries, and houses of worship.

*Bulk Regulations*

Bulk and other regulations for the Residence-E zoning district are detailed in the following table.

### BULK REGULATIONS – RESIDENCE-E ZONING DISTRICT

| Regulation | Required | Proposed* | Variance |
|---|---|---|---|
| Minimum Gross Area (Sq.Ft.) | 9,000 | 163,003 | No |
| Maximum Building Height | 30 feet, or 3.0 stories | 62'-7" (4-stories) | Yes |
| Maximum Building Area (% of Gross) | 30% | 42.3% | Yes |
| Minimum Street Frontage | 150 feet | 500 feet | No |
| Minimum Yard Setbacks | | | |
|   Front Yard | 50 feet | 60 feet | No |
|   Side Yard | 20 feet each | 20 feet each | No |
|   Rear Yard | 25 feet | 25 feet | No |
| Parking Requirements | 1.25 spaces per unit (200 required) | 207 | No |

*Source: Village of Lawrence Municipal Zoning Code; Compiled by MVS*
*\*Original development plans*

*Zoning Compliance*

As detailed on the foregoing table, the original proposed residential development contains components which have required the developer to apply for a variance. Specifically, the developer has received several variances from the Village of

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 44*

Lawrence Building Department.  Based upon a letter dated October 30, 2007 (a copy of which is in the addenda), the developer received a unanimous decision by the Village for variances on height, lot coverage, and dwelling units per acre. The following additional conditions were imposed as part of the granting of variances for the proposed development:

- 12-foot easement along easterly portion of site perimeter, as discussed within the *Site Analysis*;
- the premises must be improved with extensive permanent landscaping, to be professionally installed, maintained, and irrigated;
- Security lighting and surveillance cameras must be installed at the rear of the site for purposes of securing the cemetery property situated to the north;
- There shall be no commercial or professional tenancies in the proposed condominium development;
- The premises will provide 213 off-street paring spaces, including 180 garage spaces and 33 above-grade surface spaces; and
- The proposed premises will include a 24-hour, 7-day per week valet parking.

**Conclusions**

The subject property's proposed residential development appears to be permitted as a legal, non-conforming use, with approvals and appropriate variances granted (including special conditions) as discussed.   A reproduction of the zoning map showing the subject property site and the immediate surrounding area is presented on the following page.

**Executive Comment**

***According to conversations with both the developer's representative, Mr. Eric Orlofsky, and with representatives of the Village Building Department, the existing zoning variances will remain with the land upon any transfer of ownership of the subject property.***

# METROPOLITAN VALUATION SERVICES
## REAL ESTATE CONSULTING AND APPRAISAL

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 45*

### ZONING MAP



*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 46*

### SUMMARY DESCRIPTION OF PROPOSED IMPROVEMENTS

***Introduction***    The subject property site was inspected by the Metropolitan Valuation Services, Inc. staff on October 30, 2009, as well as on November 11, 2008 for the prior appraisal. At the time of our most recent inspection, only an E-shaped foundation was in place. The description of the proposed improvements is based primarily on a review of the submitted offering plan (dated October 14, 2008), which was recently approved by the Office of the New York State Attorney General. In addition, preliminary floor plans prepared my John F. Capobianco, A.I.A, the project's architect, were reviewed and are included in the addenda.

***Executive Comment***    The following summary description of the proposed improvements description is included to aid the client in its understanding of the valuation of the site via the Land Residual technique within the *Income Capitalization Approach*. Central to this technique is a hypothetical pro-forma operation of the subject property as a rental property. Accordingly, a basic understanding of such an improvement is salient to this analysis. As will be described within the Highest and Best use Analysis section, we have determined that the Highest and Best use of the subject property site as of the current date if for a temporary hold followed by multi-family residential rental development. Accordingly, we have assumed that the structural description of the proposed improvements as well as the unit layout, would largely similar for a development as a rental property (instead of for-sale condominium units), especially since the foundation is already in place.

The notable differences in a multi-family rental project would be reflected in the level of luxury fixtures and finishes, as well as services provided to prospective tenants. It is reasonable to conclude that a future conversion to condominium ownership would allow for prospective unit owners to perform unit upgrades at their own cost.

***Proposed Improvements***
*Facility Name*            Regency Residence at Lawrence
*Property Type*           Luxury, multi-unit residential building
*Number of Buildings*    1
*Number of Stories*       4-stories; plus basement
*Height*                  Approximately 62'-7" (ground level to highest roof point)
*Year Built*              2008-2010



*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 47*

| | |
|---|---|
| *No of Residential Units* | 144 |
| *Employee Units* | None (Superintendent will reside off-site) |
| *On-Site Parking* | 180 garage parking spaces; 33 surface spaces |
| *Storage Units* | 150 basement storage spaces |

**Proposed Area Measures**

| | |
|---|---|
| *Gross Building Area* | 247,812 square feet (above-grade) |
| *Net Saleable Area* | 208,415 square feet |
| *Average Area per Unit* | 1,447 square feet |

**Physical Description**

*Foundation*    Foundations will be cast-in place concrete spread footings supported by 2-TSF capacity soil.

*Structural System*    The vertical framing structure will be steel. The floor structure will consist of a steel frame with 8-inch pre-cast concrete panels.

*Exterior Walls*    Exterior walls will be brick veneer with 6-inch light gauge metal stud backup.

*Roof*    The roof will be flat, modified bitumen asphalt sheet membrane, with a black granulated-surfaced cap sheet. Flashing materials include counter-flashing and reinforced fluid-applied base flashings with copper counter flashings. Parapet walls will be 5 feet in height comprised of brick with aluminum copings. There will be no rooftop facilities at the subject property.

*Elevator*    The building will contain (3) 3,500-lb. capacity, Automatic Selective Collective passenger elevators, each of which will service the basement through the 4th floor of the proposed improvements. There will be no separate service elevator.

*Stairwells*    The subject property will include a total of 6 stairwells of concrete construction; with 2 in each wing of the "W" shaped configuration.

*Heating, Ventilation*
*and Air Conditioning*    Each apartment will have a separate gas-fired through-the-wall, forced-hot air Magic-Pak HVAC units. Natural ventilation for the living areas will be by operable windows. The public corridors and common areas will utilize split-type HVAC systems with electric heat.

*Electric and Gas*    Wiring will consist of circuit breakers, switches, fixtures and outlets. Electricity is assumed to be direct-metered and charged directly to

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 48*

|  |  |
|---|---|
|  | the tenant.  Each unit will have 150-amp, 120/208V, 1-phase, 30-pole electrical panels.  Gas service will also be direct-metered. |
| *Fire Protection* | The subject property will be fully sprinklered.  In addition, each unit will have smoke detectors in all bedrooms, smoke/carbon detector outside of bedroom locations and horn/strobes in the center of each unit, as well as in the common hallway areas.  Manual, wall-mounted pull-stations will be located in the common hallways.  All fire alarm equipment will be tied into a Fire Alarm Control Panel with a central monitoring system. |

**Proposed Layout**

|  |  |
|---|---|
| *Basement* | The subject property's basement level will contain the building's mechanical systems.  The majority of the remaining portion of the cellar will be utilized as the 180-car parking garage, accessed via a concrete ramp entrance along the western portion of the grade-level. |
| *Lobby Level* | The lobby of the building will be accessed from a circular drive entrance along the central portion of the first floor.  The doorway will lead to a vestibule and grand lobby area..  Additional services and amenities on the first floor include the game room, mail room, fitness center, and community room. |

**Residential Units**

|  |  |
|---|---|
| *Unit Mix* | According to discussions with the developer, and as permitted by the current zoning density, the subject property will contain a total of 144 residential rental units.   The superintendent would be anticipated to live off-site in a nearby apartment building (provided as part of payroll expense).  The residential units is proposed to consist of (13) 1-bedroom units, (100) 2-bedroom units, and (31) 3-bedroom units. |
|  | The following table illustrates the subject property's proposed unit mix and proposed sizes. |

UNIT MIX – REGENCY RESIDENCE AT LAWRENCE

| Type | No. of Units | As % of Total | Minimum Area (Sq.Ft.) | Maximum Area (Sq.Ft.) | Total Area (Sq.Ft.) | Average Area (Sq.Ft.) |
|---|---|---|---|---|---|---|
| 1-Bedroom | 13 | 9.0% | 801 | 846 | 8,946 | 813 |
| 2-Bedroom | 100 | 69.4% | 1,303 | 1,847 | 142,493 | 1,454 |
| 3-Bedroom | 31 | 21.5% | 1,735 | 2,155 | 56,976 | 1,965 |
| Total | 144 | 100.0% |  |  | 208,415 | 1,447 |

*Source:  Developer-provided materials; Compiled by MVS*

**M E T R O P O L I T A N   V A L U A T I O N   S E R V I C E S**
R E A L   E S T A T E   C O N S U L T I N G   A N D   A P P R A I S A L

*260 Central Avenue*
*Lawrence, NY*
*November 12, 2009*
*Page 49*

| | |
|---|---|
| *Unit Layouts* | The 1-bedroom units will each contain 1 bedroom, 1.5 bathrooms, a living/dining room, and a kitchen and laundry closet.  The 2- and 3-bedroom units will have similar layouts, with either 1 or 2 additional bedrooms, and the 2- and 3-bedroom units will have 2.5 bathrooms. Nine of the larger 3-bedroom units (called Super 3-bedrooms) will have 3.5 bathrooms.  It is noted that the proposed units will include kosher-style kitchens. |
| *Laundry Facilities* | Each unit will be supplied with a washer and dryer located within a dedicated utility closet.  There are no common area laundry facilities. |
| *Balconies* | All of the 144 residential units will have outdoor balconies ranging between 70 and 315 square feet. |

**Project Amenities**

| | |
|---|---|
| *Storage Rooms* | As noted, the subject property will include 150 storage rooms to be located in the basement of the improvements.  The sizes of the storage units will range between 5' x 7' and 7' x 10'.  One storage room will be allocated to each unit (included at no additional charge), and the remaining units will be used by the building staff.  The storage rooms will reportedly be constructed of chain-linked fencing with privacy slats; and each unit will have a separate locked-door entrance. |
| *Swimming Pool* | The subject property will feature a 4-season, 20' x 40' Gunite outdoor swimming pool with retractable roof.  The pool is to be located in the east courtyard.  The roof enclosure will be aluminum composition with clear glass monolithic polycarbonate on all 4 sides.  The pool will have its own heating equipment (400,000 BTU gas heater), and lifeguard services will be provided as required by local and state laws. |
| *Fitness Center* | The fitness center will be located on the 1st floor, adjacent to the game room, and accessed off of the main lobby corridor.  The fitness center will comprise a total of 492 square feet. There will be a men's and ladies' restroom located off of the fitness center area, each of which will measure 69 square feet. |
| *Game Room* | The game room will be located on the 1st floor adjacent to the fitness center and will comprise 620 square feet. |
| *Community Room* | The community room will contain a total of 1,179 square feet and will be accessed off of the main corridor on the first floor.  The |