**Hearing Date: TBD**
**Objection Deadline: TBD**

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

and

Paul Aronzon
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                                              :
In re:                                                        :        Chapter 11 Case No.
                                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,      :        08-13555 (JMP)
                                                              :
                          Debtors.                            :        (Jointly Administered)
                                                              :
------------------------------------------------------------- x

**FOURTH APPLICATION OF MILBANK, TWEED, HADLEY & MᶜCLOY LLP,
COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR
INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES
RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
OCTOBER 1, 2009 THROUGH AND INCLUDING JANUARY 31, 2010**

| | |
|---|---|
| Name of Applicant: | Milbank, Tweed, Hadley & MᶜCloy LLP |
| Authorized to Provide Professional Services to: | Official Committee of Unsecured Creditors |
| Date of Retention: | November 18, 2008 (effective as of September 17, 2008) |

Period for which compensation
and reimbursement is sought:                 October 1, 2009 – January 31, 2010

Amount of Compensation
requested:                                   $13,595,778.50

Amount of Expense
Reimbursement requested:                     $451,410.54

This is an:    X    interim  _____  final application.

This is the fourth interim fee application filed by Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP in
these cases.

**FOURTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & MᶜCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(OCTOBER 1, 2009 – JANUARY 31, 2010)**

| Name | Position; Experience | Hourly Rate[1] | Total Hours | Total Compensation |
|---|---|---|---|---|
| Paul Aronzon | Financial Restructuring Partner for 20 years; admitted in 1979. | $1,050<br>$995 | 54.80<br>25.90 | $57,540.00<br>$25,770.50 |
| Dennis Dunne | Financial Restructuring Partner for 11 years; admitted in 1991. | $1,050<br>$995 | 127.30<br>293.30 | $133,665.00<br>$291,833.50 |
| Russell Jacobs | Tax Partner for 23 years; admitted in 1987. | $995 | 5.00 | $4,975.00 |
| Robert Jay Moore | Financial Restructuring Partner for 13 years; admitted in 1977. | $995 | 2.10 | $2,089.50 |
| Marcelo Mottesi | Global Securities Partner for 11 years; admitted in 1995. | $1,025<br>$995 | 19.00<br>83.20 | $19,475.00<br>$82,784.00 |
| Richard Sharp | Litigation Partner for 19 years; admitted in 1984. | 1,025 | 10.50 | $10,762.50 |
| Andrew Tomback | Litigation Partner for 13 years; admitted in 1987. | $1,025 | 82.80 | $84,870.00 |
| Anthony Root | Global Securities Partner for 14 years; admitted in 1983. | $995 | 3.50 | $3,482.50 |
| John Walker | Global Finance Partner for 9 years; admitted in 1987. | $995 | 34.50 | $34,327.50 |
| Richard Gray | Global Finance Partner for 19; admitted in 1982. | $975<br>$950 | 9.10<br>13.80 | $8,872.50<br>$13,110.00 |
| Elizabeth Besio Hardin | Global Finance Partner for 13 years; admitted in 1996. | $950 | 4.40 | $4,180.00 |
| Stuart Harray | Global Corporate Partner for 3 years; admitted in 1993. | $950 | 14.00 | $13,300.00 |
| Thomas Janson | Global Corporate Partner for 7 years; admitted in 1982. | $950 | 6.00 | $5,700.00 |

---

[1] Effective January 1, 2010, Milbank implemented an annual increase in billing rates for all Partners, Of Counsel, Associates and Paraprofessionals.  The hourly rate listed here reflects this increase.

| | | | | |
|---|---|---|---|---|
| Dale Ponikvar | Tax Partner for 20 years; admitted in 1981. | $950 | 279.00 | $265,050.00 |
| Nicholas James Angel | Financial Restructuring Partner for 2 years; admitted in 1986. | $950<br>$925 | 13.70<br>44.80 | $13,015.00<br>$41,440.00 |
| Peter Benudiz | Global Corporate Partner for 17 years; admitted in 1987. | $950<br>$925 | 65.90<br>53.80 | $62,605.00<br>$49,765.00 |
| Winthrop Brown | Global Finance Partner for 27 years; admitted in 1975. | $900 | 150.70 | $135,630.00 |
| David Cohen | Litigation Partner for 8 years; admitted in 1994. | $950<br>$900 | 159.20<br>342.00 | $151,240.00<br>$307,800.00 |
| Robert Finkel | Global Corporate Partner for 14 years; admitted in 1988. | $925<br>$900 | 33.90<br>35.80 | $31,357.50<br>$32,220.00 |
| David Lamb | Global Corporate Partner for 20 years; admitted in 1992. | $925<br>$900 | 16.20<br>78.70 | $14,985.00<br>$70,830.00 |
| Eric Moser | Global Finance Partner for 11 years; admitted in 1991. | $925<br>$900 | 41.10<br>99.10 | $38,017.50<br>$89,190.00 |
| Langdon Van Nordon | Global Finance Partner for 10 years; admitted in 1992. | $900 | 11.50 | $10,350.00 |
| Andrew Walker | Tax Partner for 7 years; admitted in 1995. | $925<br>$900 | 15.50<br>29.70 | $14,337.50<br>$26,730.00 |
| Paul Wessel | Tax Partner for 14 years; admitted in 1988. | $925<br>$900 | 22.70<br>12.60 | $20,997.50<br>$11,340.00 |
| Wilbur Foster | Financial Restructuring Partner for 19 years; admitted in 1982. | $925<br>$875 | 155.90<br>490.90 | $144,207.50<br>$429,537.50 |
| Wayne Aaron | Litigation Partner for 6 years; admitted in 1996. | $850 | 5.20 | $4,420.00 |
| David Wolfson | Global Corporate Partner for 6 years; admitted in 1994. | $875<br>$850 | 7.00<br>22.70 | $6,125.00<br>$19,295.00 |
| Brett Goldblatt | Global Corporate Partner for 5 years; admitted in 1998. | $875<br>$825 | 64.20<br>74.90 | $56,175.00<br>$61,792.50 |
| Darrel Holstein | Global corporate Partner for 5 years; admitted in 1989. | $825 | 3.00 | $2,475.00 |
| James Warbey | Global Finance Partner for 5 years; admitted in 1996. | $875<br>$825 | 51.50<br>379.00 | $45,062.50<br>$312,675.00 |
| Debra Alligood White | Global Corporate Partner for 4 years; admitted in 1993. | $825 | 15.30 | $12,622.50 |
| Andrew Leblanc | Litigation Partner for 3 years; admitted in 1998. | $800 | 18.30 | $14,640.00 |
| Suhrud Mehta | Global Leveraged Finance Partner for 4 years; admitted in 1995. | $800 | 2.00 | $1,600.00 |

| Russell Kestenbaum | Tax Partner for 3 years; admitted in 1999. | $825 | 32.20 | $26,565.00 |
| | | $775 | 9.10 | $7,052.50 |
| Paul Denaro | Global Securities Partner for 2 years; admitted in 2000. | $800 | 44.10 | $35,280.00 |
| | | $740 | 44.60 | $33,004.00 |
| Robert Liubicic | Litigation Partner for 4 months; admitted in 1999. | $750 | 30.90 | $23,175.00 |
| | | $685 | 282.50 | $193,512.50 |
| Evan Fleck | Financial Restructuring Partner for 4 months; admitted in 2002. | $750 | 157.30 | $117,975.00 |
| | | $675 | 703.40 | $474,795.00 |
| Risa Rosenberg | Financial Restructuring Of Counsel for 8 years; admitted in 1984. | $850 | 28.40 | $24,140.00 |
| | | $825 | 116.20 | $95,865.00 |
| Dennis O'Donnell | Financial Restructuring Of Counsel for 3 years; admitted in 1992. | $850 | 279.20 | $226,152.00 |
| | | $785 | 605.20 | $475,082.00 |
| Richard Rosberger | Litigation Of Counsel for 3 years; admitted in 1994. | $750 | 90.10 | $67,575.00 |
| Matthew Mortimer | Tax Associate for 12 years; admitted in 1999. | $745 | 4.60 | $3,427.00 |
| | | $735 | 32.30 | $23,740.50 |
| David Sieradzki | Litigation Associate for 15 years; admitted in 1996. | $720 | 19.70 | $14,184.00 |
| | | $710 | 72.90 | $51,759.00 |
| Andrew Beirne | Litigation Associate for 14 years; admitted in 1996. | $695 | 8.10 | $5,629.50 |
| | | $685 | 41.70 | $28,564.50 |
| Lisa Brabant | Real Estate Associate for 12 years; admitted in 1999. | $685 | 36.20 | $24,797.00 |
| Cecilio Castillero | Global Finance Associate for 10 years; admitted in 2001. | $685 | 26.90 | $18,426.50 |
| Stephen Tudway | Litigation Associate for 12 years; admitted in 1998. | $695 | 7.00 | $4,865.00 |
| | | $685 | 155.30 | $106,380.50 |
| Lena Mandel | Senior Attorney; admitted in 1991. | $685 | 44.90 | $30,756.50 |
| | | $680 | 171.90 | $116,892.00 |
| Drew Batkin | Tax Associate for 8 years; admitted in 2003. | $695 | 69.60 | $48,372.00 |
| | | $650 | 132.80 | $86,320.00 |
| Lisa Brabant | Real Estate Associate for 12 years; admitted in 1999. | $695 | 19.10 | $13,274.50 |
| Aaron Renenger | Litigation Associate for 8 years; admitted in 2002. | $695 | 24.40 | $16,958.00 |
| | | $650 | 11.10 | $7,215.00 |
| Steven Szanzer | Financial Restructuring Associate for 10 years; admitted in 2001. | $695 | 135.70 | $94,311.50 |
| | | $650 | 52.90 | $34,385.00 |

| | | | | |
|---|---|---|---|---|
| Adrian Azer | Litigation Associate for 7 years; admitted in 2003. | $675<br>$625 | 171.60<br>497.50 | $115,830.00<br>$310,937.50 |
| Irene Bogdashevsky | Financial Restructuring Associate for 7 years; admitted in 2004. | $675<br>$625 | 17.50<br>39.20 | $11,812.50<br>$24,500.00 |
| James Bulger | Financial Restructuring Associate for 7 years; admitted in 2004. | $675<br>$625 | 48.90<br>110.00 | $33,007.50<br>$68,750.00 |
| Alistair Hill | Global Leveraged Finance Associate for 7 years; admitted in 2003. | $675 | 10.20 | $6,885.00 |
| Erika Kuver-Del Duca | Real Estate Associate for 7 years; admitted in 2004. | $675 | 10.40 | $7,020.00 |
| Brian Stern | Global Corporate Associate for 7 years; admitted in 2003. | $675<br>$625 | 11.80<br>48.50 | $7,965.00<br>$30,312.50 |
| Kevin Brown | Tax Associate for 6 years; admitted in 2008. | $650<br>$600 | 2.80<br>13.50 | $1,820.00<br>$8,100.00 |
| Peter Devonshire | Global Finance Associate for 6 years; admitted in 2007. | $650<br>$600 | 17.80<br>147.10 | $11,570.00<br>$88,260.00 |
| Melissa Gambol | Global Securities Associate for 6 years; admitted in 2007. | $650<br>$600 | 35.50<br>136.90 | $23,075.00<br>$82,140.00 |
| Aisha Greene | Global Leveraged Finance Associate for 6 years; admitted in 2005. | $650<br>$600 | 110.70<br>123.10 | $71,955.00<br>$73,860.00 |
| Candice Murdock | Global Project Finance Associate for 6 years; admitted in 2007. | $600 | 2.80 | $1,680.00 |
| Peter Newman | Financial Restructuring Associate for 6 years; admitted in 2005. | $650<br>$600 | 6.80<br>35.40 | $4,420.00<br>$21,240.00 |
| Scott Rozic | Global Securities Associate for 6 years; admitted in 2004. | $650<br>$600 | 117.90<br>106.90 | $76,635.00<br>$64,140.00 |
| Maximilian Schneider | Global Leveraged Finance Associate for 6 years; admitted in 2005. | $650<br>$600 | 5.90<br>7.80 | $3,835.00<br>$4,680.00 |
| Naomi Slavinski | Tax Associate for 6 years; admitted in 2005. | $600 | 2.00 | $1,200.00 |
| Melanie Westover | Litigation Associate for 6 years; admitted in 2005. | $600 | .20 | $120.00 |
| Temitope Adesanya | Global Project Finance Associate for 5 years; admitted in 2006. | $625<br>$575 | 86.00<br>43.30 | $53,750.00<br>$24,897.50 |

| | | | | |
|---|---|---|---|---|
| Douglas Barnes | Global Corporate Associate for 5 years; admitted in 2006. | $625 $575 | 29.10 58.30 | $18,187.50 $33,522.50 |
| Ana Bast | Global Securities Associate for 5 years; admitted in 2006. | $625 $575 | 106.60 13.90 | $66,625.00 $7,992.50 |
| Karen Bhatia | Global Securities Associate for 5 years; admitted in 2007. | $625 $575 | 75.00 80.00 | $46,875.00 $46,000.00 |
| Nicholas Robinson | Global Alternative Investments Associate for 5 years; admitted in 2006. | $625 | 4.50 | $2,812.50 |
| Gabriel M. Weaver | Litigation Associate for 5 years; admitted in 2006. | $575 | 10.30 | $5,922.50 |
| John White | Litigation Associate for 5 years; admitted in 2006. | $625 $575 | 98.60 349.30 | $61,625.00 $200,847.50 |
| Simon Williams | Global Finance Associate for 5 years; admitted in 2008. | $625 $575 | 10.90 90.90 | $6,812.50 $52,267.50 |
| Nicholas Bassett | Litigation Associate for 4 years; admitted in 2007. | $600 $550 | 102.90 294.50 | $61,740.00 $161,975.00 |
| Victoria Boid | Global Finance Associate for 4 years; admitted in 2007. | $600 $550 | 55.70 209.50 | $33,420.00 $115,225.00 |
| Jonathan Brown | Global Finance Associate for 4 years; admitted in 2007. | $600 $550 | 43.00 42.20 | $25,800.00 $23,210.00 |
| Melissa Ann Clark | Global Corporate Associate for 4 years; admitted in 2006. | $600 $550 | 41.40 86.00 | $24,840.00 $47,300.00 |
| Rachel Fink | Global Corporate Associate for 4 years; admitted in 2007. | $600 $550 | 9.70 41.60 | $5,820.00 $22,880.00 |
| James Harris | Financial Restructuring Associate for 4 years; admitted in 2008. | $600 $550 | 63.90 43.20 | $38,340.00 $23,760.00 |
| Aluyah Imoisili | Litigation Associate for 4 years; admitted in 2006. | $550 | 16.40 | $9,020.00 |
| Gabriel Mpubani | Global Project Finance Associate for 4 years; admitted in 2006. | $550 | 10.10 | $5,555.00 |
| Elad Roisman | Global corporate Associate for 4 years; admitted in 2007. | $550 | 2.60 | $1,430.00 |
| Stephanie Sklar | Real Estate Associate for 4 years; admitted in 2007. | $600 | 22.20 | $13,320.00 |
| Jeremy Sussman | Financial Restructuring Associate for 4 years; admitted in 2007. | $600 $550 | 96.10 32.40 | $57,660.00 $17,820.00 |

| | | | | |
|---|---|---|---|---|
| Hyosung Tang | Global Alternative Investments Associate for 4 years; admitted in 2007. | $550 | 21.00 | $11,550.00 |
| Wendy Williams | Global Securities Associate for 4 years; admitted in 2007. | $600<br>$550 | 120.00<br>85.10 | $72,000.00<br>$46,805.00 |
| Yeping Zhou | Global Securities Associate for 4 years; admitted in 2007. | $600 | 10.40 | $6,240.00 |
| Husam Badawi | Global Securities Associate for 3 years; admitted in 2008. | $575<br>$515 | 98.80<br>20.80 | $56,810.00<br>$10,712.00 |
| Constance Beverley | Litigation Associate for 3 years; admitted in 2008. | $575<br>$515 | 155.90<br>383.70 | $89,642.50<br>$197,605.50 |
| David Eastlake | Financial Restructuring Associate for 3 years; admitted in 2008. | $575<br>$515 | 5.70<br>33.00 | $3,277.50<br>$16,995.00 |
| Emin Guseynov | Global Leveraged Finance Associate for 3 years; admitted in 2008. | $575<br>$515 | 9.30<br>69.90 | $5,347.50<br>$35,998.50 |
| Tarnetta Jones | Global Leveraged Finance Associate for 3 years; admitted in 2008. | $575<br>$515 | 29.20<br>59.20 | $16,790.00<br>$30,488.00 |
| Sofia Khan | Litigation Associate for 3 years; admitted in 2008. | $575<br>$515 | 2.00<br>47.40 | $1,150.00<br>$24,411.00 |
| Bria La Salle Mertens | Financial Restructuring Associate for 3 years; admitted in 2008. | $575<br>$515 | 2.60<br>26.60 | $1,495.00<br>$13,699.00 |
| Michael Lee | Global Securities Associate for 3 years; admitted in 2008. | $575<br>$515 | 15.90<br>14.90 | $9,142.50<br>$7,673.50 |
| Nicole Leyton | Tax Associate for 3 years; admitted in 2008. | $575<br>$515 | 20.70<br>69.60 | $11,902.50<br>$35,844.00 |
| Michael Lynch | Global Corporate Associate for 3 years; admitted in 2007. | $575<br>$515 | 79.40<br>433.90 | $45,655.00<br>$223,458.50 |
| Heather Moore | Global Finance Associate for 3 years; admitted in 2008. | $515 | 29.10 | $14,986.50 |
| Gregory Papeika | Financial Restructuring Associate for 3 years; admitted in 2008. | $575<br>$515 | 69.10<br>22.50 | $39,732.50<br>$11,587.50 |
| Andrew Pendleton | Global Project Finance Associate for 3 years; admitted in 2008. | $515 | 9.40 | $4,841.00 |

| Name | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| Lindsay Pinto | Litigation Associate for 3 years; admitted in 2008. | $575 $515 | 17.00 219.70 | $9,775.00 $113,145.50 |
| Charles Rubio | Financial Restructuring Associate for 3 years; admitted in 2008. | $575 $515 | 56.80 126.70 | $32,660.00 $65,250.50 |
| Andrew Sullivan | Global Securities Associate for 3 years; admitted in 2008. | $575 $515 | 52.90 120.50 | $30,417.50 $62,057.50 |
| Laurice Thrasher | Global Leveraged Finance Associate for 3 years; admitted in 2008. | $575 $515 | 21.30 53.10 | $12,247.50 $27,346.50 |
| Andrew Young | Financial Restructuring Associate for 3 years; admitted in 2006. | $575 $515 | 39.80 264.20 | $22,885.00 $136,063.00 |
| Jeeseon Ahn | Global Alternative Investments Associate for 2 years; admitted in 2009. | $525 $440 | 4.80 9.90 | $2,520.00 $4,356.00 |
| Sonja Andersen | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525 $440 | 118.00 188.80 | 61,950.00 $83,072.00 |
| Michael Applebaum | Tax Associate for 2 years; admitted in 2009. | $525 $440 | 3.70 29.60 | $1,942.50 $13,024.00 |
| Kurt Avarell | Tax Associate for 2 years; admitted in 2009. | $525 $440 | 4.40 3.60 | $2,310.00 $1,584.00 |
| Adam Bagley | Global Corporate Associate for 2 years; admitted in 2009. | $525 $440 | 47.20 41.70 | $24,780.00 $18,348.00 |
| Tatiana Bayeva | Global Leveraged Finance Associate for 2 years; admitted in 2009. | $440 | 20.30 | $8,932.00 |
| Jennifer Beaudry | Global Securities Associate for 2 years; admitted in 2009. | $525 $440 | 80.80 104.90 | $42,420.00 $46,156.00 |
| Adlin Castro | Global Securities Associate for 2 years; admitted in 2009. | $525 $440 | 79.60 238.10 | $41,790.00 $104,764.00 |
| Ateesh Chanda | Litigation Associate for 2 years; admitted in 2009. | $525 $440 | 109.90 120.10 | $57,697.50 $52,844.00 |
| Michael Clarke | Global Finance Associate for 2 years; admitted in 2009. | $440 | 55.80 | $24,552.00 |
| Andrea Conis | Financial Restructuring Associate for Associate for 2 years; admitted in 2009. | $525 $440 | 207.10 495.60 | $108,727.50 $218,064.00 |

| Name | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| Julie Constantinides | Global Corporate Associate for 2 years; admitted in 2009. | $525<br>$440 | 9.00<br>18.50 | $4,725.00<br>$8,140.00 |
| Frederick Cristman | Global Corporate Associate for 2 years; admitted in 2009. | $440 | 7.60 | $3,344.00 |
| Erin Culbertson | Litigation Associate for 2 years; admitted in 2009. | $525<br>$440 | 60.70<br>70.10 | $31,867.50<br>$30,844.00 |
| Robert Dickens | Global Finance Associate for 2 years; admitted in 2009. | $525<br>$440 | 18.10<br>64.20 | $9,502.50<br>$28,248.00 |
| Rachel Dobson | Litigation Associate for 2 years; admitted in 2009. | $525<br>$440 | 100.10<br>333.10 | $52,552.50<br>$146,564.00 |
| Andrew Everett | Global Corporate Associate for 2 years; admitted in 2009. | $440 | 7.10 | $3,124.00 |
| Melissa Galicia | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525<br>$440 | 119.50<br>208.50 | $62,737.50<br>$91,740.00 |
| Derek Gluckman | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525<br>$440 | 161.10<br>301.40 | $84,577.50<br>$132,616.00 |
| Joanna L. Grossman | Tax Associate for 2 years; admitted in 2009. | $440 | 46.10 | $20,284.00 |
| Jared Joyce-Schleimer | Financial Restructuring Associate for 2 years; admitted in 2009. | $525<br>$440 | 68.00<br>258.80 | $35,700.00<br>$113,872.00 |
| Peter Idziak | Financial Restructuring Associate for 2 years; admitted in 2009. | $440 | 101.30 | $44,572.00 |
| David Kaye | Global Alternative Investments Associate for 2 years; admitted in 2009. | $440 | 4.20 | $1,848.00 |
| Marianna Kosharovsky | Global Securities Associate for 2 years; admitted in 2009. | $525<br>$440 | 20.80<br>134.10 | $10,920.00<br>$59,004.00 |
| Karen Kringen | Global Securities Associate for 2 years; admitted in 2009. | $525<br>$440 | 4.40<br>49.50 | $2,310.00<br>$21,780.00 |
| Kristen Lam | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525<br>$440 | 69.40<br>62.80 | $36,435.00<br>$27,632.00 |
| Alan Lawn | Financial Restructuring Associate for 2 years; admitted in 2009. | $525<br>$440 | 33.40<br>151.80 | $17,535.00<br>$66,792.00 |
| Brian Lee | Global Finance Associate for 2 years; admitted in 2009. | $525<br>$440 | 11.10<br>149.80 | $5,827.50<br>$65,912.00 |

| Roger Lee | Financial Restructuring Associate for 2 years; admitted in 2009. | $525 $440 | 12.80 104.70 | $6,720.00 $46,068.00 |
| Ulric Lewen | Global Securities Associate for 2 years; admitted in 2009. | $525 $440 | 93.90 137.40 | $49,297.50 $60,456.00 |
| Abbey Mansfield | Global Leveraged Finance Associate for 2 years; admitted in 2009. | $525 $440 | 46.50 191.50 | $24,412.50 $84,260.00 |
| Jan Nishizawa | Global Corporate Associate for 2 years; admitted in 2009. | $525 $440 | 13.20 44.80 | $6,930.00 $19,712.00 |
| Tanja L. Olano | Global Corporate Associate for 2 years; admitted in 2009. | $525 $440 | 28.90 45.50 | $15,172.50 $20,020.00 |
| Brendan Riley | Litigation Associate for 2 years; admitted in 2009. | $525 $440 | 27.90 139.20 | $14,647.50 $61,248.00 |
| Joanne Robertson | Global Finance Associate for 2 years; admitted in 2009. | $525 $440 | 41.40 349.10 | $21,735.00 $153,604.00 |
| Stephen Rose | Global Securities Associate for 2 years; admitted in 2009. | $525 $440 | 126.10 13.30 | $66,202.50 $5,852.00 |
| Iane Saenam | Global Corporate Associate for 2 years; admitted in 2009. | $440 | 27.00 | $11,880.00 |
| Matthew Squires | Global Securities Associate for 2 years; admitted in 2009. | $525 $440 | 36.10 32.10 | $18,952.50 $14,124.00 |
| Jeremy Steckel | Global Securities Associate for 2 years; admitted in 2009. | $525 $440 | 12.00 105.70 | $6,300.00 $46,508.00 |
| Stephanie Swanson | Global Securities Associate for 2 years; admitted in 2009. | $525 $440 | 94.90 126.00 | $49,822.50 $55,440.00 |
| Diane Young | Financial Restructuring Associate for 2 years; admitted in 2009. | $440 | 16.80 | $7,392.00 |
| Samuel Giorgi | Financial Restructuring International Attorney. | $440 | 69.30 | $30,492.00 |
| Abayomi A. Ayandipo | Case Manager | $250 | 159.60 | $39,900.00 |
| Monica Alston | Case Manager | $250 $245 | 84.10 244.20 | $21,025.00 $59,829.00 |
| Oscar Castrillon | Case Manager | $250 $245 | 2.20 40.20 | $550.00 $9,849.00 |
| Roger Francis | Case Manager | $245 | 4.60 | $1,127.00 |

| Name | Title | Rate | Hours | Amount |
|---|---|---|---|---|
| Rena Ceron | Case Manager | $215 | 33.60 | $7,224.00 |
| | | $210 | 114.90 | $24,129.00 |
| Angel Anderson | Case Manager | $215 | 11.50 | $2,472.50 |
| | | $185 | 54.00 | $9,990.00 |
| Richard Cosentino | Legal Assistant | $275 | 61.50 | $16,912.50 |
| | | $270 | 233.80 | $63,126.00 |
| Randy Hooks | Legal Assistant | $275 | 35.30 | $9,707.50 |
| | | $270 | 239.40 | $64,638.00 |
| Kim Strosser | Legal Assistant | $275 | 31.80 | $8,745.00 |
| | | $270 | 149.80 | $40,446.00 |
| Charles Sheehah | Legal Assistant | $265 | 35.70 | $9,460.50 |
| | | $260 | 137.10 | $35,646.00 |
| Paul Butters | Legal Assistant | $185 | 86.90 | $16,076.50 |
| Grace Green | Legal Assistant | $185 | 14.50 | $2,682.50 |
| Ricky Windom | Legal Assistant | $185 | 2.20 | $407.00 |
| Chris Georgakis | Legal Assistant | $180 | 3.00 | $540.00 |
| Jonathan Comick | Legal Assistant | $170 | 12.70 | $2,159.00 |
| Bryn Fuller | Legal Assistant | $170 | 35.40 | $6,018.00 |
| Shota Milorava | Legal Assistant | $185 | 3.50 | $647.50 |
| | | $170 | 2.00 | $340.00 |
| Charmaine Thomas | Legal Assistant | $185 | 31.20 | $5,772.00 |
| | | $170 | 73.30 | $12,461.00 |
| Jason Hsu | Legal Assistant | $165 | 66.80 | $11,022.00 |
| | | $160 | 169.80 | $27,168.00 |
| Kyle Martin | Legal Assistant | $175 | 156.20 | $27,335.00 |
| | | $160 | 457.30 | $73,168.00 |
| Jacqueline Brewster | Managing Attorney Clerk | $175 | 14.20 | $2,485.00 |
| | | $165 | 6.30 | $1,039.50 |
| Matthew Ottenstein | Librarian | $205 | 5.40 | $1,107.00 |
| Robin Traylor | Librarian | $205 | 2.90 | $594.50 |
| | | $200 | 23.10 | $4,620.00 |
| Joyanne Watson | Litigation Support Specialist | $295 | 22.20 | $6,549.00 |
| Marcin Grabysz | Litigation Support Specialist | $270 | 104.80 | $28,296.00 |
| Rhodely Vallon | Litigation Support Specialist | $275 | 42.10 | $11,577.50 |
| | | $260 | 69.90 | $18,174.00 |

| | | | | |
|---|---|---|---|---|
| Mitchell B. Gaines | Litigation Support Specialist | $230 | 3.10 | $713.00 |
| | | $225 | 2.90 | $652.50 |
| Theartis Everett | Litigation Support Specialist | $255 | 25.30 | $6,451.50 |
| | | $240 | 26.50 | $6,360.00 |
| Gabrielle Zsebi | Librarian | $210 | 2.30 | $483.00 |
| | | $205 | 8.50 | $1,742.50 |
| Maria Smilen | File Clerk | $115 | 7.70 | $885.50 |
| | | | | |
| **Total** | | **$571.23 (blended rate)[2]** | **23,801.00 hours** | **$13,595,778.50**[3] |

---

[2]      The blended rate <u>excluding</u> paraprofessionals is $624.54 per hour.

[3]      As is customary in connection with the preparation of this application, Milbank has reviewed the fees set forth in its Fee Statements, based on this review, the amount requested in the application is $13,291.85 less than the fees set forth in the Fee Statements.

**FOURTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>c</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(OCTOBER 1, 2009 – JANUARY 31, 2010)**

| ACTIVITY | HOURS | FEES |
|---|---|---|
| Adequate Protection Issues | 7.60 | 3,020.00 |
| Asset Sales | 112.10 | 76,437.00 |
| Automatic Stay Enforcement | 103.40 | 58,815.00 |
| Business Plan Review and Analysis | 488.00 | 385,225.50 |
| Chapter 7 Issues | 1.50 | 825.00 |
| Claims Analysis and Estimation | 5,562.90 | 2,918,372.00 |
| Committee Administration | 585.60 | 375,615.50 |
| Committee Meetings | 596.70 | 423,155.00 |
| Communication with Creditors | 314.10 | 160,875.00 |
| Court Hearings | 241.90 | 136,095.50 |
| Debtor in Possession Meetings | 45.30 | 35,999.00 |
| Derivative Issues | 4,671.75 | 2,901,757.75 |
| DIP and Exit Financing | 11.30 | 2,908.50 |
| Disclosure Statement | 1.00 | 210.00 |
| Employee Issues | 42.70 | 21,618.50 |
| Equipment/Personal Property Leases | 1.70 | 1,062.50 |
| Executory Contracts | 4.50 | 1,980.00 |
| Fee Committee Matters | 284.10 | 123,096.00 |
| File, Docket and Calendar Maintenance | 526.10 | 137,944.50 |
| Insurance Matters | 11.30 | 4,979.00 |
| International Insolvency Matters | 346.20 | 200,279.50 |
| Litigation | 2,685.85 | 1,210,902.50 |
| Pension Issues | 4.20 | 3,042.00 |
| Committee Retention Applications | 128.80 | 75,154.00 |
| Real Estate Matters | 1,014.80 | 683,282.50 |
| Regulatory Issues | .90 | 810.00 |

| | | |
|---|---:|---:|
| Reorganization Plan | 191.70 | 153,031.00 |
| Reporting Requirements | 9.30 | 4,328.50 |
| Retention of Professionals | 30.30 | 14,646.50 |
| Rule 2004 Examinations | 21.60 | 10,188.00 |
| SEC Investigations | 3.70 | 2,318.00 |
| Substantive Consolidation | 869.30 | 568,428.00 |
| Tax Issues | 433.70 | 314,828.50 |
| Trading Book | 141.70 | 99,290.00 |
| Travel Time | 169.55 | 137,596.50 |
| Voidable Transfers and Other Potential Claims | 15.90 | 10,867.00 |
| German Bank Issues | 136.10 | 86,204.00 |
| China Issues | 3.50 | 3,482.50 |
| Intercompany Issue | 244.80 | 146,356.50 |
| SIPC Issues | 925.90 | 611,136.00 |
| Bank Issues | 251.10 | 207,906.00 |
| LBI Sale | 122.30 | 87,209.50 |
| Neuberger Sale | 3.20 | 2,596.50 |
| UK Issues | 1,041.05 | 640,257.25 |
| Examiner Issues | 59.90 | 41,441.50 |
| Bank Book | 32.80 | 21,975.00 |
| Private Equity Issues | 95.80 | 68,313.50 |
| Cash Management Issues | 12.80 | 9,117.00 |
| Milbank Fee Statements and Applications | 1,190.70 | 410,799.50 |
| | | |
| **Total** | **23,801.00** | **$13,595,778.50** |

### FOURTH INTERIM FEE APPLICATION OF MILBANK, TWEED, HADLEY & MᶜCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL. (OCTOBER 1, 2009 – JANUARY 31, 2010)

| DISBURSEMENTS | AMOUNT |
|---|---|
| Airfreight | 1,426.37 |
| Binding | 160.00 |
| Cab Fares/Local Travel | 29,402.65 |
| Computer Database Research | 212,420.86 |
| Court Search | 5,904.00 |
| Court/Clerical Services | 5,319.15 |
| Document Processing/Overtime | 12,340.00 |
| Document Retrieval | 451.70 |
| Fees | 14,412.76 |
| Global Filings | 3,540.00 |
| Mail | 63.01 |
| Meals | 20,594.94 |
| Messenger | 1,410.22 |
| Misc | 482.81 |
| Outside Reproduction | 3,505.23 |
| Photocopies | 89,588.95 |
| Telephone/Telecopy | 17,171.92 |
| Travel | 33,215.97 |
| **TOTAL DISBURSEMENTS** | **$451,410.54** |

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

and

Paul Aronzon
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- x
                                         :

| | | |
|---|---|---|
| In re: | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

--------------------------------------------------------------- x

**FOURTH APPLICATION OF MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP,
COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR
INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES
RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
OCTOBER 1, 2009 THROUGH AND INCLUDING JANUARY 31, 2010**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP ("Milbank"), counsel to the Official

Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc.

("LBHI") and its affiliated debtors and debtors in possession in the above-captioned cases

(collectively, the "Debtors"), hereby submits its application (the "Application"), pursuant to

sections 330 and 331 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

(as amended, the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 (together, the "Local Guidelines"), the United States Trustee Guidelines

for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, effective January 30, 1996 (the "U.S. Trustee Guidelines"), the Third

Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy

Rule 2016(a) Establishing Procedures for Interim Monthly Compensation And Reimbursement

of Expenses of Professionals, dated June 25, 2009 (the "Interim Compensation Order"), and the

guidelines contained in the Fee Committee's email memorandum, dated February 9, 2010 (the

"Fee Committee Guidelines"), for the allowance of interim compensation for professional

services rendered from October 1, 2009 through and including January 31, 2010 (the "Fourth

Interim Compensation Period"), and for reimbursement of expenses incurred in connection with

such services, and in support thereof respectfully represents as follows:

## I.
## INTRODUCTION

**A.    Background**

   1.  **Bankruptcy Filing**.  On September 15, 2008 (the "Petition Date"), and

periodically thereafter, the Debtors commenced the above-captioned chapter 11 cases (the

"Chapter 11 Cases").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to section 1107(a)

and 1108 of the Bankruptcy Code.

2.  Creditors' Committee.  On September 17, 2008, the United States Trustee

appointed the Committee in the Chapter 11 Cases.

3.  SIPA Trustee.  On September 19, 2008, a proceeding ("SIPA

Proceeding") was commenced under the Securities Investor Protection Act of 1970 ("SIPA")

with respect to Lehman Brothers Inc. ("LBI"), a wholly owned subsidiary of LBHI and a

registered broker dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the

"SIPA Trustee") and is administering LBI's estate.

4.  Examiner.  The United States Bankruptcy Court for the Southern District

of New York approved the appointment of Anton R. Valukas as examiner (the "Examiner") in

the Chapter 11 Cases in the Order Approving the Appointment of Examiner dated January 20,

2009.

5.  Fee Committee.  The United States Bankruptcy Court for the Southern

District of New York appointed a fee committee (the "Fee Committee") and approved a fee

protocol (the "Fee Protocol") in the Chapter 11 Cases on May 26, 2009.

6.  Jurisdiction.  This Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§

1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory

predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code.

Pursuant to the Local Guidelines, a certification regarding compliance with the Local

Guidelines is attached hereto as Exhibit "A."

B.      **Retention of Milbank and Billing History**

7.      <u>Authorization for Milbank's Retention</u>.  On November 5, 2008, pursuant to the Interim Order Under 11 U.S.C. § 1103 And Fed. R. Bankr. P. 2014 And 5002 Authorizing The Retention And Employment Of Milbank, Tweed, Hadley & M°Cloy LLP, As Counsel For The Official Committee Of Unsecured Creditors Effective As Of September 17, 2008 (the "<u>Retention Order</u>"), the Court authorized Milbank's retention as counsel for the Committee in these cases.  The Retention Order, which became a final order on November 21, 2008, authorized Milbank to receive compensation pursuant to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee Guidelines, and the local rules and orders of this Court.

8.      <u>First Interim Fee Application</u>.  On April 10, 2009, Milbank filed its First Application Of Milbank, Tweed, Hadley & M°Cloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses During Period From September 17, 2008 Through And Including January 31, 2009 (the "<u>First Interim Fee Application</u>").  In the First Interim Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from September 17, 2008 Through And Including January 31, 2009 (the "<u>First Interim Compensation Period</u>") in the total amount of $12,123,376.00,[1] and (ii) reimbursement of its actual and necessary expenses incurred during the First Interim Compensation Period in the amount of $668,388.72.  Pursuant to the Interim Compensation Order, Milbank received payment in the amount of $10,397,943.56 during the First Interim

---

[1]      Milbank voluntarily reduced its fees for the First Interim Compensation Period by $129,111.00.  However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

Compensation Period.  On August 5, 2009, the Court approved the First Interim Fee

Application, subject to a ten percent holdback pursuant to the recommendation of the Fee

Committee.  On September 10, 2009, the Court approved the release of the remaining holdback,

subject to a $69,990.04 deduction, at the recommendation of the Fee Committee.[2]

        9.      Second Interim Fee Application.  On August 14, 2009, Milbank filed its

Second Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From February 1, 2009 Through

And Including May 31, 2009 (the "Second Interim Fee Application").  In the Second Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from February 1, 2009 through and including May 31, 2009 (the

"Second Interim Compensation Period") in the total amount of $16,829,521.00,[3] and (ii)

reimbursement of its actual and necessary expenses incurred during the Second Interim

Compensation Period in the amount of $1,019,754.61.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $14,582,737.21 during the Second Interim

Compensation Period.  On September 25, 2009, the Court approved the Second Interim Fee

Application, subject to a ten percent holdback pursuant to the recommendation of the Fee

Committee.[4]

---

[2]     Milbank reserves the right to seek the allowance of all or a portion of such fees at a later date.

[3]     Milbank voluntarily reduced its fees for the Second Interim Compensation Period by $154,700.25, on
account of, among other things, with respect to certain matters identified by the Fee Committee.  However,
Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at
a later date.

[4]     During the Third Interim Compensation Period, Milbank worked with the Fee Committee to resolve the
outstanding issues identified in Milbank's individual report submitted in connection with the Fee

10.    <u>Third Interim Fee Application</u>.  On December 14, 2009, Milbank filed its
Third Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee
of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services
Rendered And For Reimbursement Of Expenses During Period From June 1, 2009 Through
And Including September 30, 2009 (the "<u>Third Interim Fee Application</u>").  In the Third Interim
Fee Application, Milbank requested (i) allowance of compensation for professional services
rendered during the period from June 1, 2009 through and including September 30, 2009 (the
"<u>Third Interim Compensation Period</u>") in the total amount of $10,881,540.00,[5] and (ii)
reimbursement of its actual and necessary expenses incurred during the Second Interim
Compensation Period in the amount of $583,803.10.  Pursuant to the Interim Compensation
Order, Milbank received payment in the amount of $7,480,652.96 during the Third Interim
Compensation Period.  On April 9, 2010 the Court approved the Third Interim Fee Application,
subject to certain recommended reductions of the Fee Committee.[6]

11.    <u>Application</u>.  Milbank makes this fourth interim application for approval
and allowance of compensation and reimbursement of expenses pursuant to sections 330 and
331 of the Bankruptcy Code.

---

Committee report pertaining to Milbank's Second Interim Fee Application.  In response to such efforts, on
December 23, 2009, the Court released the ten percent holdback, minus a $311,734.82 deduction, at the
recommendation of the Fee Committee.

[5]    Milbank voluntarily reduced its fees for the Third Interim Compensation Period by $419,548.50, on
account of, among other things, with respect to certain matters identified by the Fee Committee.  However,
Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at
a later date.

[6]    The Fee Committee issued its final recommendation on March 10, 2010 that the Court release the
holdback, minus $292,555.40.  Milbank reserved, and continues to reserve, the right to seek the allowance
of all or a portion of such fees at a later date.

12.     In accordance with the Interim Compensation Order, Milbank submitted

monthly fee statements to the Debtors and the other requisite notice parties seeking interim

compensation and reimbursement of expenses.  During the Fourth Interim Compensation

Period, Milbank submitted the following fee statements:

(a)     On December 11, 2009, pursuant to the Interim Compensation Order, Milbank
served its thirteenth fee statement for the period from October 1, 2009 through
and including October 31, 2009 (the "Thirteenth Fee Statement").  The Thirteenth
Fee Statement sought (i) an allowance of $3,015,878.00 as compensation for
services rendered and (ii) the reimbursement of $113,860.87 in expenses.  As of
the date hereof, Milbank has received a total of $2,526,563.27, which represents
payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred
pursuant to the Thirteenth Fee Statement.

(b)     On February 19, 2010, pursuant to the Interim Compensation Order, Milbank
served its fourteenth fee statement for the period from November 1, 2009 through
and including November 30, 2009 (the "Fourteenth Fee Statement").  The
Fourteenth Fee Statement sought (i) an allowance of $3,214,429.00 as
compensation for services rendered and (ii) the reimbursement of $148,876.11 in
expenses.  As of the date hereof, Milbank has received a total of $2,720,419.31,
which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the
expenses incurred pursuant to the Fourteenth Fee Statement.

(c)     On March 12, 2010, pursuant to the Interim Compensation Order, Milbank filed
and served its fifteenth fee statement for the period from December 1, 2009
through and including December 31, 2009 (the "Fifteenth Fee Statement").  The
Fifteenth Fee Statement sought (i) an allowance of $3,122,245.50 as
compensation for services rendered and (ii) the reimbursement of $90,004.57 in
expenses.  As of the date hereof, Milbank has received a total of $2,587,800.97,
which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the
expenses incurred pursuant to the Fifteenth Fee Statement.

(d)     On April 9, 2010, pursuant to the Interim Compensation Order, Milbank filed and
served its sixteenth fee statement for the period from January 1, 2010 through and
including January 31, 2010 (the "Sixteenth Fee Statement" and, together with the
Thirteenth Fee Statement, Fourteenth Fee Statement and Fifteenth Fee Statement,
the "Fee Statements").  The Sixteenth Fee Statement sought (i) an allowance of
$4,243,226.00 as compensation for services rendered and (ii) the reimbursement
of $111,960.84 in expenses.

13.     Milbank has not entered into any agreement, express or implied, with any

other party for the purpose of fixing or sharing fees or other compensation to be paid for

professional services rendered in these cases.  No promises have been received by Milbank or

any member thereof as to compensation in connection with these cases other than in accordance

with the provisions of the Bankruptcy Code.

## II.

## APPLICATION

14.      By this Application, Milbank is seeking allowance of (a) compensation

for professional services rendered by Milbank, as counsel for the Committee, during the Fourth

Interim Compensation Period and (b) reimbursement of expenses incurred by Milbank in

connection with such services during the Fourth Interim Compensation Period.

15.      In this Application, Milbank seeks approval of $13,595,778.50[7] for legal

services rendered on behalf of the Committee during the Fourth Interim Compensation Period

and $451,410.54[8] for reimbursement of expenses incurred in connection with the rendering of

such services, for a total award of $14,047,189.04.

16.      Pursuant to the Interim Compensation Order, Milbank has already

received payment of $7,835,398.00 during the Fourth Interim Compensation Period.  Therefore,

Milbank seeks authorization for the Debtors to make a total payment of $6,211,791.04 pursuant

to this Application, which amount represents the portion of Milbank's fees for legal services

---

[7]    The compensation sought by this Application reflects an aggregate voluntary reduction of $111,446.50, including, but not limited to, with respect to certain matters identified by the Fee Committee.  Milbank reserves the right to seek allowance of all or a portion of any such fees in connection with its request for final approval of its fees and expenses in these cases.

[8]    This amount reflects a reduction of certain expenses pursuant to the Fee Committee Guidelines adopted by the Fee Committee.  Milbank reserves the right to seek reimbursement for the total amount of expenses incurred in connection with its representation of the Committee in connection with its request for final approval of its fees and expenses in these cases.

rendered and expenses incurred during the Fourth Interim Compensation Period not previously paid to Milbank pursuant to the Interim Compensation Order.[9]

17.    The fees sought by this Application reflect an aggregate of 23,801.00 hours of attorney and paraprofessional time spent and recorded in performing services for the Committee during the Fourth Interim Compensation Period, at a blended average hourly rate of $571.23 for both professionals and paraprofessionals.  The blended hourly rate for professionals only is $624.54.

18.    Milbank rendered to the Committee all services for which compensation is sought solely in connection with these cases, in furtherance of the duties and functions of the Committee.

19.    Milbank maintains computerized records of the time expended in the rendering of the professional services required by the Committee.  These records are maintained in the ordinary course of Milbank's practice.  For the convenience of the Court and parties in interest, a billing summary for the Fourth Interim Compensation Period is attached as part of the cover sheet, setting forth the name of each attorney and paraprofessional for whose work on these cases compensation is sought, each attorney's year of bar admission, the aggregate of the time expended by each such attorney or paraprofessional, the hourly billing rate for each such attorney or paraprofessional at Milbank's current billing rates, and an indication of the individual amounts requested as part of the total amount of compensation requested.  In addition, set forth in the billing summary is additional information indicating whether each

---

[9]    As is customary, in connection with the preparation of this Application, Milbank has reviewed the fees and expenses set forth in its Fee Statements.  Based on this review and as a result of the matters raised by the Fee Committee, the amount requested herein on account of fees and expenses incurred by Milbank during the Fourth Interim Compensation Period is $13,291.85 less than the sum of fees and expenses set forth in

attorney is a partner, counsel or associate, the number of years each attorney has held such

position, and each attorney's area of concentration.  Except as reduced voluntarily by Milbank,

the compensation requested by Milbank is based on the customary compensation charged by

comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

20.      Attached hereto as Exhibit "B" are time entry records broken down in

tenths of an hour by project category, based on the U.S. Trustee Guidelines, setting forth a

detailed description of services performed by each attorney and paraprofessional on behalf of

the Committee.[10]

21.      Milbank also maintains computerized records of all expenses incurred in

connection with the performance of professional services.  A summary of the amounts and

categories of expenses for which reimbursement is sought, as well as a breakdown of expenses

by project category and detailed descriptions of these expenses, are attached hereto as

Exhibit "C."

### III.

### SUMMARY OF PROFESSIONAL SERVICES RENDERED

22.      To provide an orderly summary of the services rendered on behalf of the

Committee by Milbank, and in accordance with the U.S. Trustee Guidelines, Milbank has

established the following separate project billing categories[11] in connection with these cases:

---

the Fee Statements.  Accordingly, subject to approval of the relief requested herein, Milbank will reduce its
request for payment from the Debtors by such amount.

[10]     Due to the volume of the time and expense records, and consistent with the Interim Compensation Order,
these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court;
(ii) counsel for the Debtors; and (iii) the members of the Fee Committee.

[11]     These billing categories will change in subsequent fee applications to reflect the uniform billing codes
established as of March 1, 2010.

| | |
|---|---|
| 00100 | Adequate Protection Issues |
| 00200 | Asset Sales |
| 00300 | Automatic Stay Enforcement & Litigation |
| 00400 | Business Plan Review and Analysis |
| 00500 | Change of Control Transactions |
| 00600 | Chapter 7 Issues |
| 00700 | Claims Analysis and Estimation |
| 00800 | Committee Administration |
| 00900 | Committee Meetings |
| 01000 | Communication with Creditors |
| 01100 | Corporate Matters |
| 01200 | Court Hearings |
| 01300 | Customer Contracts & Programs |
| 01400 | Debtor-in-Possession Meetings and Communications |
| 01500 | Derivatives Issues |
| 01600 | DIP and Exit Financing |
| 01700 | Disclosure Statement |
| 01800 | Employee Issues |
| 01900 | Environmental Issues |
| 02000 | Equipment/Personal Property Leases |
| 02100 | Estimation Issues |
| 02200 | Exclusivity Issues |
| 02300 | Executory Contracts |
| 02400 | Fee Applications and Fee Committee Matters |
| 02500 | File, Docket & Calendar Maintenance |
| 02600 | Insurance Matters |
| 02700 | International Insolvency Matters |
| 02800 | Litigation |
| 02900 | Pension Issues |
| 03000 | Committee Retention Applications |
| 03100 | Real Estate Matters |
| 03200 | Regulated Business Asset Sales |
| 03300 | Regulatory Issues |
| 03400 | Reorganization Plan |
| 03500 | Reporting Requirements |
| 03600 | Retention of Professionals |
| 03700 | Rule 2004 Examinations |
| 03800 | SEC Investigations and Securities Litigation |
| 03900 | Secured Transactions |
| 04000 | Substantive Consolidation |
| 04100 | Tax Issues |
| 04200 | Trading Book |
| 04300 | Travel Time |
| 04400 | Trustee Issues |
| 04500 | Utilities Matters |
| 04600 | Vendor Issues |

| 04700 | Voidable Transfers and Other Potential Claims |
| 04800 | German Bank Issues |
| 04900 | Japan Issues |
| 05000 | China Issues |
| 05100 | Intercompany Issues |
| 05200 | SIPC Issues |
| 05300 | Bank Issues |
| 05400 | LBI Sale |
| 05500 | Neuberger Sale |
| 05600 | UK Issues |
| 05700 | Equity Committee |
| 05800 | Examiner Issues |
| 05900 | Bank Book |
| 06000 | Private Equity |
| 06100 | Cash Management |
| 06200 | Milbank Fee Statements and Applications |

23.     The following summary is intended only to highlight key services rendered by Milbank in certain project billing categories where Milbank has expended a considerable number of hours on behalf of the Committee, and is not meant to be a detailed description of all of the work performed.  Detailed descriptions of the day-to-day services provided by Milbank and the time expended performing such services in each project billing category are fully set forth in Exhibit "B" hereto.  Such detailed descriptions demonstrate that Milbank was heavily involved in the performance of services for the Committee on a daily basis, including night and weekend work, often under extreme time constraints, to meet the needs of the Committee in these cases.  The sheer magnitude of matters in these Chapter 11 Cases has required and continues to require substantial and continuing efforts on the part of the Committee and its professional advisors, including Milbank, to address the many complex issues and problems that are presented by these extraordinary and complex cases.

A.     **Adequate Protection Issues**

24.     The Committee and its professionals worked in tandem with the Debtors and the Debtors' professionals to address the myriad challenges arising during the Fourth

12

Interim Compensation Period.  Among these challenges were DnB Nor Bank ASA's ("DnB")

appeal of the denial of its request for allowance and payment of an administrative expense claim

amounting to the equivalent of approximately $16.5 million for a loss DnB claimed to have

incurred on account of the failure of adequate protection and for allowance of setoff of such

claim (the "DnB Appeal").  Milbank monitored the DnB Appeal and reviewed and analyzed the

terms of the settlement thereof.  On March 22, 2010, the Court entered an order approving the

settlement and dismissing the DnB Appeal.

**B.**     **Asset Sales**

                25.     During the Fourth Interim Compensation Period, the Committee and its

professionals continued their evaluation of multiple complex asset sale transactions.  On behalf

of the Committee, Milbank's Financial Restructuring, Global Corporate, Tax, Strategic

Sourcing and Technology and other practice groups continued to work closely with the

Committee's financial advisors, FTI Consulting Inc. ("FTI") and Houlihan Lokey Howard &

Zukin Financial Advisors, Inc. ("Houlihan"), to analyze proposed transactions and negotiate for

enhanced asset sale values and terms for the unsecured creditors of each of the Debtors' estates.

                26.     Milbank reviewed and analyzed numerous transactions during the Fourth

Interim Compensation Period, as described more fully below.  Milbank worked to maximize the

value of the assets sold by both zealously advocating for the interests of unsecured creditors of

each of the Debtors and working cooperatively with the Debtors to prevent deterioration in asset

value occasioned by delay.  Throughout the Fourth Interim Compensation Period, Milbank

drafted and disseminated memoranda to the Committee analyzing proposed transactions and

providing the Committee with recommended courses of action.

27.   **Ormat**.  By way of example and as discussed in the Third Interim Fee Application, Milbank continued to work closely with Debtors' counsel concerning the sale of the Debtors' interests in a renewable energy project, OPC LLC ("Ormat") to another member of Ormat, Ormat Nevada, Inc. ("Ormat Nevada"), which chose to exercise its right of first offer to purchase the interests in Ormat.  As a result of such efforts, the sale to Ormat Nevada closed on October 30, 2009, recovering additional value for the Debtors' estates and limiting further exposure on the Debtors' investment in Ormat.

28.   **Omnium**.  During the Fourth Interim Compensation Period, Milbank also continued to play an active role in the Debtors' efforts to retain a data processing and workflow automation consultant on a permanent basis, following the expiration of the Transition Services Agreement put in place following the sale of Lehman's broker-dealer business to Barclays Capital, Inc. ("Barclays").  During the Third Interim Compensation Period, the Court approved the retention of Omnium LLC (formerly Citadel Solutions LLC, "Omnium") on an interim basis, as negotiations for a final agreement continued.  Milbank spent considerable time reviewing and analyzing the terms of the final agreement with Omnium, working in close communication with Debtors' counsel.

29.   **Merit**.  Milbank also addressed issues relating to Merit LLC ("Merit"), a Lehman special-purpose vehicle formed to buy shares in Daewoo Engineering & Construction Co. Ltd. ("Daewoo"), which on December 14, 2009, filed a petition commencing a chapter 11 case.  In connection with Merit's chapter 11 filing, the Debtors explored the possible sale of the Daewoo shares, and, accordingly, Milbank conducted due diligence to investigate and understand the issues surrounding Merit's assets and the possibility of monetizing the value of the Daewoo shares.

30.   **Libro**.  Finally, Milbank reviewed and analyzed the potential sale of the Debtors' interests in non-debtor affiliate Lehman Libro Securitizadora de Creditos Financeiros ("Libro"), a Brazilian entity.  In connection with a possible sale, the Debtors filed a motion seeking to waive certain interest payments owed by Libro to Lehman Brothers Special Financing Inc. ("LBSF"), on account of Brazilian tax law implications and the potential enhanced marketability of Libro.  In considering the potential waiver, Milbank examined the underlying loan documents and Brazilian tax law issues, before briefing the Committee on the terms of the waiver.

**C.   Automatic Stay Enforcement**

31.   During the Fourth Interim Compensation Period, Milbank reviewed numerous motions filed by parties in interest seeking to lift the automatic stay to enforce various contractual agreements or otherwise exercise rights against the Debtors' estates.

32.   **Merrill Lynch**.  In this connection, Milbank drafted and filed, on behalf of the Committee, a joinder to the Debtors' objection to the motion of Merrill Lynch International ("Merrill"), which sought, among other things, relief from the automatic stay in order to deliver notices of acceleration for certain notes issued by Lehman Brothers Treasury Co. B.V. ("LBT") and purportedly guaranteed by LBHI [Docket No. 6138].  Subsequent to the filing of the Debtors' objection and the Committee's joinder, Milbank played a leading role in negotiating an agreed form of order granting Merrill certain limited relief from the automatic stay and preserving all other rights, claims and defenses held by the Debtors and the Committee with respect to further relief from the automatic stay.

33.   **Calpers**.  Milbank spent a considerable amount of time analyzing the issues presented in the motion of California Public Employees Retirement System ("CalPERS")

for relief from the automatic stay to effect a setoff.  CalPERS sought to setoff a debt that it owed to LBSF under a swap agreement against a prepetition claim that CalPERS asserted against LBHI on account of certain unsecured bonds issued by LBHI.  Milbank researched and drafted memoranda regarding the foregoing, particularly with respect to the permissibility of a nonmutual setoff.  In connection therewith, Milbank drafted and filed a joinder to the Debtors' objection to CalPERS' motion [Docket No. 5944].  After hearing oral arguments on the matter, the Court entered an order denying the relief requested by CalPERS.

**D.    Business Plan Review and Analysis**

34.    During the Fourth Interim Compensation Period, Milbank continued reviewing and analyzing the myriad issues in connection with a potential business plan for the Debtors, including the Debtors' proposal to form an asset management company to manage the estates' assets.  Milbank worked in tandem with the Committee's financial advisors to identify issues related to the formation, structure, and function of such an asset management company and craft solutions in response to such issues, which were subsequently discussed and negotiated with the Debtors and their professionals.  Such discussions culminated in the documentation and formation of LAMCO, which documentation was approved by the Bankruptcy Court on April 15, 2010.

**E.    Claims Analysis**

35.    **Claims Database**.  Milbank continued, during the Fourth Interim Compensation Period, to expand and refine the database of the Debtors' debt offering documents ("Database") that was created and developed during the First Interim Compensation Period.  Milbank continued to use the Database to develop and present summary forensic capital structure information to the Committee and its advisors, as well as to answer individual queries

16

from the Committee and the public about specific Lehman debt instruments.  The Database is used by Milbank and the Committee's financial advisors on a regular basis to determine and analyze the Debtors' and certain foreign subsidiaries' capital structures, review certain proofs of claim, establish a basis upon which to determine and validate claim amounts, and analyze substantive consolidation, intercompany, preference and other potential issues.  Milbank continued to review and analyze the debt securities and guarantees of LBHI and its affiliates in order to expand the Database with respect to LBT and to address issues related to Lehman securities raised by the Committee.  Having access to the Database has proved invaluable to the Committee and its advisors, including with respect to the matters related to the Bar Date.

36.    **Capital Structure Issues**.  Milbank also drafted a number of memoranda on certain current and anticipated disputes relating to the Debtors' capital structure, including (i) subordination of indebtedness, (ii) intercompany claims, and (iii) valuation of structured notes.

37.    **Bar Date Motion.**  Milbank continued its review and analysis of various issues raised with respect to the Order establishing the deadline (the "Bar Date") for filing proofs of claim in the Debtors' chapter 11 cases, approving the form and manner of notice thereof and approving the proof of claim form.  During the Fourth Interim Compensation Period, Milbank reviewed and analyzed numerous motions filed by claimants seeking permission to file proofs of claim after the Bar Date.  In connection therewith, Milbank did extensive research regarding excusable neglect, the standard for late-filed proofs of claim, and related legal and factual issues.  Milbank drafted and filed a joinder to the Debtors' objection to the motion of Banesco Banco Universal ("Banesco") to permit a late-filed proof of claim, where

17

the Committee believed that Banesco had not established excusable neglect [Docket No. 5805],

and took similar positions on the record at the hearings on other similar motions.

**F.    Committee Administration**

38.    Milbank continued to maintain during the Fourth Interim Compensation

Period an elaborate protocol developed earlier in these cases for the organization and delegation

of the massive number of tasks involved in ensuring the Committee is kept aware and apprised

of all aspects of the Chapter 11 Cases, including frequent meetings among internal team

members and the maintenance of comprehensive rolling task lists, distribution lists, calendar

notifications, project calendars and research status lists on a daily basis.  Such measures ensure

that all matters are being attended to, without duplication of effort.  Due to the highly

complicated nature of the Debtors' cases and the high volume of documents that are produced

thereby, such tasks require the knowledge and expertise of junior associates and legal assistants.

39.    Additionally, Milbank has established a system whereby substantive

court filings are reviewed to provide the Committee with a comprehensive summary and

analysis of each pleading filed in the Chapter 11 Cases.  Milbank's efforts in setting up efficient

and comprehensive methods of administering the Committee's needs ensure that the Committee

has the logistical tools necessary to effectively carry out its fiduciary responsibilities to the

unsecured creditors of each of the Debtors.

**G.    Committee Meetings**

40.    During the Fourth Interim Compensation Period, the Committee held

weekly telephonic meetings and monthly in-person meetings in advance of in-person meetings

with the Debtors.  Prior to each Committee meeting, and in accordance with the Bylaws Of

Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al., Milbank

prepared an agenda listing topics for discussion.  Milbank also prepared and distributed related materials on behalf of the Committee's professionals for the Committee members' review. During the Committee meetings, Milbank discussed with Committee members and their counsel all significant matters arising during the Fourth Interim Compensation Period, and assisted the Committee in formulating positions with respect to such issues.  The exigencies of certain circumstances necessitated the scheduling of certain unscheduled teleconferences with the Committee during the Fourth Interim Compensation Period, especially as the end of the Debtors' exclusive period to file a plan of reorganization neared.

41.    Through Committee meetings and conference calls, and numerous other communications with members of the Committee, Milbank has assisted the Committee in (i) fulfilling its obligations to unsecured creditors of each of the Debtors' estates, and (ii) making informed decisions regarding the numerous issues that have arisen in these cases.

## H.    Committee Retention

42.    During the Fourth Interim Compensation Period, Milbank continued to review and update its connections to parties in interest in the Chapter 11 Cases, identify any required disclosures, maintain and manage the internal information walls in place at the firm, and correspond with the Office of the United States Trustee regarding certain issues involving the foregoing.  In connection therewith, Milbank drafted and filed, on December 23, 2009, a fifth supplemental affidavit in further support of its retention as counsel for the Committee [Docket No. 6360].

## I.    Communication with Creditors

43.    In accordance with the Stipulation and Agreed Order Between the Debtors and the Official Committee of Unsecured Creditors Regarding Creditor Access to

19

Information Pursuant to 11 U.S.C §§ 105(a), 1102(b)(3) and 1103(c) [Docket No. 498], which the Court approved on October 1, 2008 (the "Creditor Information Protocol"), Milbank, on behalf of the Committee, continued to populate and maintain an internet-accessed website (the "Committee Website").  The Committee Website contains a significant amount of content produced by Milbank, which is updated frequently and designed to provide information to creditors, including, among other things, (i) general information concerning the Debtors' Chapter 11 Cases, including adversary proceedings, chapter 15 cases, and the SIPA Proceeding; (ii) highlights of significant events; (iii) a case calendar; and (iv) answers to frequently asked questions, available in several foreign languages.  The Committee Website also acts as a critical pathway for the dissemination of information between Milbank and the Debtors' creditors.  For example, the Committee Website permits creditors to register to receive monthly reports and to submit inquiries directly to Milbank, as to which Milbank has worked in collaboration with the Debtors' counsel (as required by the Creditor Information Protocol) to provide responses.

44.    During the Fourth Interim Compensation Period, Milbank continued to expend substantial time developing and maintaining the Committee Website.  In addition, hundreds of creditors contacted Milbank via the Committee Website and telephonically with questions concerning the Chapter 11 Cases, and, more specifically, inquiries concerning substantive consolidation and other plan structure issues as the end of the Debtors' exclusive period for the filing of a plan of reorganization neared.  In accordance with the Creditor Information Protocol, Milbank reviewed and responded to all such creditor inquiries, often on a "no name" and "no claim" basis.

45.    During the Fourth Interim Compensation Period, Milbank continued to spend considerable time working with several *ad hoc* groups that had formed during the Chapter

11 Cases to advance the objectives of various creditor constituencies, in order to assist such groups' understanding of the issues in the Chapter 11 Cases.  Milbank also continued, at the Court's direction, to act as an information "liaison" between the Debtors, these *ad hoc* groups, and other creditors on a frequent basis.

**J.    Court Hearings**

46.    During the Fourth Interim Compensation Period, Milbank prepared for and appeared at each of the hearings conducted before this Court, including, among others, (i) numerous regularly scheduled omnibus hearings; (ii) special hearings and case conferences; (iii) hearings in the SIPA Proceeding; (iv) hearings in chapter 15 cases; and (v) hearings in more than fifty adversary proceedings arising out of the Chapter 11 Cases and the SIPA Proceeding. In advance of each hearing, Milbank would confer internally to address the issues presented by each motion or other pleading and coordinate a response thereto.  To that end, among other things, Milbank reviewed and analyzed documents, including correspondence and pleadings, did factual and legal research, and met with numerous parties to work toward the consensual resolution of any objections raised by the Committee or other parties in interest.  Following each hearing, Milbank produced summaries and analyses of the proceedings in order to keep the Committee fully apprised of developments in the Chapter 11 Cases.

**K.    Debtor-in-Possession Meetings and Communications**

47.    During the Fourth Interim Compensation Period, Milbank continued its frequent communication and exchange of correspondence with Debtors' counsel regarding, among numerous other issues, case administration, responses to pleadings, the settlement agreement with Lehman Brothers Bankhaus Aktiengesellschaft ("Bankhaus"), LAMCO, plan and disclosure issues, and upcoming hearings.  Milbank also prepared for and attended various

21

in-person meetings with the Committee members, the Debtors, and their respective professionals to, among other things, discuss the ongoing administration of and long term strategy for the Chapter 11 Cases.

**L.    Derivatives Issues**

48.    As reflected in the First Interim Fee Application, the Committee established a derivatives subcommittee (the "Derivatives Subcommittee") to evaluate issues relating to the Debtors' extensive derivatives portfolio.  During the Fourth Interim Compensation Period, Milbank continued to hold regular (at least weekly) meetings with the Derivatives Subcommittee to address and, where appropriate, make recommendations to the full Committee in respect of specific issues concerning the Debtors' portfolio of derivatives positions.  Pursuant to the orders of the Court entered in December 2008 and January 2009 to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts, absent further Court approval, the Committee must analyze and consent to all derivative transactions before the Debtors can consummate any such transaction.  To that end, Milbank, together with the Committee's financial advisors, continued to review and advise the Committee on all aspects of each proposed transaction and presented to the Derivatives Subcommittee for consultation.

49.    **Derivatives Compensation Program**.  During the Fourth Interim Compensation Period, the Derivatives Subcommittee spent a significant amount of time evaluating the need for, modifying, and ultimately supporting the implementation of an incentive compensation program for the employees who administer the Debtors' portfolio of derivatives contracts.  To that end, the Committee, through the Derivatives Subcommittee, worked closely with the Debtors to develop a compensation program that allowed the Debtors

to retain and provide incentives to those employees who are essential to the Debtors' value maximization efforts. Milbank prepared and filed a statement in support of the Debtors' motion for authorization to implement the Derivatives compensation program [Docket No. 5982]. On December 17, 2009, the Court entered an order granting the Debtors' motion.

50.    **Derivatives ADR**. As reflected in the Third Interim Fee Application, on September 17, 2009, this Court entered an order approving the Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and General Order M-143 for Authorization to Implement Alternative Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivative Contracts (the "Derivatives ADR Order"). During the Fourth Interim Compensation Period, Milbank continued to work closely with the Debtors to review and respond to the counterparty notices filed under the Derivatives ADR Order, and to consider settlement proposals under the alternative dispute resolution process.

51.    **Derivatives Litigation**. Milbank also continued to address issues related to, and provided recommendations on, derivatives matters, including the highly complex derivatives-related adversary proceedings commenced by the Debtors to recover the Debtors' "in-the-money" positions in various derivatives transactions. To that end, Milbank devoted substantial time to analyzing derivatives contracts and other related transaction documents, monitoring and participating actively in the derivatives-related adversary proceedings, communicating with the Debtors' counsel and the Committee's financial advisors, and developing and evaluating strategies to monetize complicated derivatives transactions for the benefit of unsecured creditors of each of the Debtors' estates. In that connection, Milbank expended considerable time summarizing such analyses and recommendations in numerous memoranda to the Committee.

52.     As noted, considerable attention was paid to certain adversary proceedings, each of which raises novel issues of law.  In preparation for representation of the Committee in certain of the derivatives-related adversary proceedings in which the Committee has intervened, Milbank researched complex legal issues related to, among other things, the treatment of derivative contracts in bankruptcy.  Specifically, substantial time was devoted to researching legal issues of first impression in the Second Circuit, including, without limitation, issues relating to the enforceability of section 2(a)(iii) of the 1992 ISDA Master Agreement Form under the Bankruptcy Code, and the scope of section 560 of the Bankruptcy Code.  Such research and analysis has been essential to the development of strategies to recover amounts due to the Debtors in disputed derivatives transactions for the benefit of unsecured creditors of each of the Debtors' estates.  Additionally, a high volume of such transactions are governed by English law.  Accordingly, derivatives professionals from Milbank's London office continue to assume an active role in analyzing transactions and assisting with prosecuting such actions domestically and abroad.

53.     **Saphir**.  Specifically, such research was instrumental to the key ruling obtained by the Debtors and the Committee in the Debtors' adversary proceeding against Bank of New York Mellon Corporate Trustee Services Limited ("BNY").[12]  This adversary proceeding arose out of a dispute related to two credit default swap agreements (the "CDS Agreements") between LBSF and Saphir Finance Public Limited ("Saphir"), which were entered into as part of a multi-issuer secured obligation program known as the "Dante Program."  Under the Dante Program, Saphir issued certain notes that were credit-linked to the CDS Agreements.  BNY was the trustee under the trust documents ("Trust Documents") that

24

governed the Saphir transactions.  On May 13, 2009, Perpetual Trustee Company Limited

("Perpetual"), the current holder of the Saphir notes, commenced a suit against BNY in the

High Court of Justice in London seeking an order directing BNY to make payment to it, rather

than to LBSF, pursuant to certain provisions in the Trust Document that Perpetual contended

subordinated LBSF's right to payment as the result of the Debtors' bankruptcies.  On May 10,

2009, LBSF filed a complaint in this Court, asserting that the Trust Document provisions that

purported to effectively subordinate LBSF's right to payment solely as a result of the Debtors'

bankruptcy filings constituted unenforceable *ipso facto* clauses, which did not fall within the

limited "safe-harbor" of section 560 of the Bankruptcy Code.  On June 10, LBSF moved for

summary judgment.  BNY cross-moved for summary judgment on September 25.  Recognizing

the significance of this litigation to the recoveries of the Debtors' estates, Milbank intervened in

this adversary proceeding on behalf of the Committee [Docket No. 9].

        54.     On January 25, 2010, this Court issued its decision granting summary

judgment for LBSF.  Significantly, this Court agreed with the arguments proffered by the

Debtors and the Committee, finding that: (i) the disputed provisions in the Trust Documents

were unenforceable *ipso facto* clauses; (ii) the *ipso facto* protections of the Bankruptcy Code

applied irrespective of whether the "triggering" event was LBHI's or LBSF's bankruptcy; (iii)

any attempt to enforce the Trust Document provisions would violate the automatic stay; and (iv)

the safe harbor accorded by section 560 of the Bankruptcy Code does not apply to provisions

affecting payment priorities.  This has been a key victory for the derivatives team, which would

likely not have been achieved without Milbank's development of legal strategy and active

participation in the litigation.

---

[12]     Lehman Bros. Special Fin. Inc. v. BNY Corp. Trustee Servs. Ltd., Case No. 08-13555, Adversary

**M.**   **Employee Issues**

55.    During the Fourth Interim Compensation Period, Milbank devoted time to researching and analyzing issues with respect to (i) potential insider preference avoidance actions that could be brought in the Chapter 11 Cases, and (ii) the planned termination by the Debtors of their post-retirement health and welfare benefit programs.  With respect to potential insider preference avoidance actions, Milbank had discussions with FTI to coordinate Milbank's efforts to obtain the necessary information from the Debtors to complete its preference analysis. In addition, Milbank assisted in the compilation of a request list for the Debtors' management regarding their ongoing analysis of the Debtors' insider preference payments.

56.    With respect to the Debtors' proposed termination of their post-retirement health and welfare benefit programs, Milbank (i) researched and analyzed section 1114 of the Bankruptcy Code and cases interpreting such section to determine if the Debtors would be required to comply with the standards and procedures enumerated in such section before terminating their post-retirement health and welfare benefit programs; and (ii) prepared a memorandum for the Committee addressing whether the Debtors must comply with section 1114 of the Bankruptcy Code before terminating their post-retirement health and welfare benefit programs.

**N.**   **Examiner Issues**

57.    During the Fourth Interim Compensation Period, Milbank continued to communicate and coordinate with the Examiner in connection with the Examiner's investigation mandate, which was authorized in connection with its appointment by order dated January 16, 2009, and its preliminary work plan, which was approved by order dated February

---

Proceeding No. 09-01242 (Bankr. S.D.N.Y. 2009).

17, 2009.  Milbank met with counsel for the Examiner to discuss, among other things, the

Examiner's investigation of intercompany claims.  In addition, Milbank prepared for, and

attended, a chambers conference with the Examiner to discuss, among other things, the

Examiner's investigation and report.  In connection therewith, Milbank also did research and

drafted a memorandum regarding the evidentiary weight of the facts and conclusions contained

in an examiner's report.  Finally, Milbank continued to review and monitor the Examiner's

confidentiality stipulations with third parties and the information provided pursuant to such

stipulations.

**O.**     **Executory Contracts**

          58.      During the Fourth Interim Compensation Period, Milbank reviewed and

analyzed pleadings filed with respect to the Debtors' executory contracts, including motions by

certain of the Debtors' counterparties seeking to compel the respective Debtor to assume or

reject a particular executory contract.  Such review and analysis included legal research

regarding the relief sought by such pleadings, analysis of the Debtors' rights and obligations

under the applicable executory contracts, consultation with the Committee's financial advisors

regarding the financial implications of the proposed treatment of the subject contracts,

correspondence with the Debtors' legal and financial advisors regarding the financial context

and implications of the proposed courses of action, and assessment of the potential impact on

the Debtors' estates.  Based upon such review and analysis, Milbank prepared memoranda for

the Committee summarizing such pleadings, applicable legal issues, corresponding financial

consideration, and the potential impact on the Debtors' estates and unsecured creditor

recoveries.

**P.**     **Fee Applications and Fee Committee Matters**

59.     During the Fourth Interim Compensation Period, Milbank reviewed the

monthly fee statements received from other professionals pursuant to the Interim Compensation

Order.  Additionally, Milbank assisted in the filing and service of the third interim fee

applications of other Committee professionals.

60.     In connection with the appointment of the Fee Committee, during the

Fourth Interim Compensation Period, Milbank reviewed and analyzed matters related to the Fee

Protocol, and regularly corresponded with the members of the Fee Committee and the other

professionals retained in the Chapter 11 Cases regarding such matters.  Such regular

correspondence led to the formation of a fee subcommittee (the "Fee Subcommittee") during the

Third Interim Compensation Period, which is comprised of Committee members, to provide an

appropriate forum for the discussion and resolution of such matters.  In addition to continuing to

attend regular meetings of the Fee Subcommittee, Milbank prepared for and attended a

chambers conference with the Fee Committee and continued to work cooperatively with the Fee

Committee to settle certain outstanding issues identified in the Fee Committee reports

pertaining to the retained professionals' second and third interim fee applications.  Such

cooperative efforts led to, among other things, the adoption of a revised protocol for the review

of fee statements and fee applications by the Fee Committee.

**Q.**     **File, Docket & Calendar Maintenance**

61.     During the Fourth Interim Compensation Period, Milbank continued to

maintain internal filing, record-keeping, docket-monitoring, and calendaring systems to

organize and track (i) pleadings filed in the Chapter 11 Cases, SIPA Proceeding, various chapter

15 cases, and related adversary proceedings, (ii) ongoing projects, and (iii) upcoming deadlines.

On a real-time basis, Milbank downloaded, consolidated, and organized pleadings in order to ensure efficient access.  Milbank also monitored the dockets on a real-time basis and summarized and circulated substantive pleadings to the Milbank team.  These summaries enabled Milbank to stay abreast of ongoing developments in these cases, facilitated the assignment of projects, and helped ensure that deadlines were not missed.

62.    Additionally, Milbank maintained a comprehensive internal calendar of active matters in these cases.  This calendar ensured that Milbank could effectively monitor and update the status of all pending matters, a resource that proved invaluable in responding to inquiries and discussing these matters with the Committee and other parties in interest.  Milbank also maintained and circulated to the Committee, on a weekly basis, a calendar of upcoming motions, hearing dates, and other important deadlines.

**R.    Insurance Matters**

63.    During the Fourth Interim Compensation Period, Milbank expended considerable time investigating and evaluating the Debtors' proposed settlement of actions or claims against the Debtors and their directors and officers with insurance proceeds from the Debtors' director and officer insurance liability policies.  On December 1, 2009, the Debtors filed the Motion Pursuant to Section 362 of the Bankruptcy Code for an Order Modifying the Automatic Stay to Allow Settlement Payment Under Directors and Officers Insurance Policies. The Debtors sought permission to settle an action brought by Openwave Systems, Inc. against the Debtors for $1,675,000 in insurance proceeds.  To obtain all relevant information regarding the legal ramifications to the Debtors' estates and unsecured creditors of such settlement, Milbank undertook substantial legal research, participated in numerous conferences and meetings, and exchanged correspondence, internally, and with the Committee, to determine the

Committee's rights and legal strategy with respect to the motion and other proposed settlements. On December 17, 2009, the Court granted the Debtors' motion, while reserving the Committee's rights to challenge any similar use of insurance proceeds at a later date.

**S.    Intercompany Issues**

64.    During the Fourth Interim Compensation Period, Milbank expended considerable time investigating matters related to intercompany obligations.  Most significantly, Milbank devoted substantial resources to an analysis of purported guarantees and their potential impact on creditor recoveries.  In this connection, Milbank drafted a memorandum to the Committee analyzing the standards courts use to determine when a purported intercompany "loan" made by a Lehman entity to an affiliate should be recharacterized as an equity contribution.  In drafting such memorandum, Milbank did research on recharacterization and the applicability of setoff and recoupment.  Milbank also did research regarding, and drafted a comprehensive memorandum addressing, certain other claims based on LBHI's purported guarantee of certain affiliates' obligations, the enforceability of such purported guarantees, and potential defenses to claims predicated on such guarantees.

**T.    International Insolvency Matters**

65.    During the Fourth Interim Compensation Period, Milbank continued to monitor and analyze issues regarding the numerous proceedings (the "Foreign Proceedings") initiated by or against Lehman-related entities (the "Foreign Affiliate Debtors") in countries outside of the U.S., or jurisdictions where Lehman entities may have assets and/or liabilities, including, without limitation, (i) the United Kingdom ("UK"); (ii) Hong Kong; (iii) Japan; (iv) France; (v) the Netherlands; (vi) Switzerland; (vii) Germany; (viii) Australia; (ix) Singapore; (x) Korea; (xi) the Philippines; (xii) China; (xiii) Cayman Islands;

(xiv) Luxembourg; (xv) Taiwan; and (xvi) Bermuda.  The following summarizes specific

international matters on which Milbank focused during the Fourth Interim Compensation

Period.

      66.    **Analysis of Foreign Proceedings and Claims.**  During the Fourth

Interim Compensation Period, Milbank attorneys and paraprofessionals across various

jurisdictions communicated with each other, Debtors' counsel, and third-party administrators

regarding the status of the Foreign Proceedings.  Milbank analyzed and summarized reports

published by the administrators of the Foreign Proceedings and other publicly available

information.  Milbank also continued to monitor compliance with and developments regarding

that certain Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies

(the "Protocol"), approved by the Court on June 17, 2009.[13]  Further, Milbank reported to the

Committee on the presentations and discussions at certain Protocol meetings, which were held

in Amsterdam in October 2009 and in New York in January 2010.  Additionally, Milbank

regularly liaised with the Committee and provided updates regarding the Foreign Proceedings.

      67.    In addition, Milbank, among other things, (i) assessed certain procedural

aspects of the Foreign Proceedings, including identifying any claims bar dates established in

each proceeding, and (ii) reviewed proofs of claims filed by and against the U.S. Debtors and

Foreign Affiliate Debtors.  Milbank spent considerable time analyzing, comparing and

compiling information regarding the proofs of claim filed by the Foreign Affiliate Debtors

against the U.S. Debtors.  Milbank also undertook research, communicated with attorneys in

---

[13]    During the Fourth Interim Compensation Period, additional administrators agreed to the terms of the
Protocol and, on November 9, 2009, the Debtors submitted supplemental signature pages reflecting this
update.  Milbank also reviewed the Report of Activities Through January 15 of the Official Representatives
and Other Participating Affiliates Pursuant to the Cross-Border Insolvency Protocol, which was filed with
the Court on February 2, 2010.

European and Asian countries, and drafted memoranda regarding the relevant insolvency laws applicable in the Foreign Proceedings, including any special treatment of intercompany claims.

68.    **Japan Issues.**    During the Fourth Interim Compensation Period, Milbank continued to monitor a dispute involving Sunrise Finance Co., Ltd. ("Sunrise"), a foreign affiliate under administration in Japan.  In the Sunrise insolvency proceeding, Shinsei Bank, Ltd. ("Shinsei"), one of LBHI's unsecured creditors and a former member of the Committee, proposed an alternative plan of rehabilitation that subordinated recoveries of LBHI and its Hong Kong affiliate, Lehman Brothers Asia Holdings, Inc, and, in response, the Debtors filed a motion for an order enforcing the automatic stay against and holding in contempt Shinsei (the "Contempt Motion").  The Court eventually denied the Contempt Motion pursuant to an order entered on October 27, 2009.

69.    **Bermuda Issues**.    On August 6, 2009, LBHI's affiliate Lehman Re Ltd. ("Lehman Re"), under liquidation in Bermuda, filed a petition in the Southern District of New York seeking (i) recognition of the Bermuda proceeding under chapter 15 of the Bankruptcy Code and (ii) among other related relief, pursuant to sections 1520 and 1521 of the Bankruptcy Code, (a) the issuance of a permanent injunction staying all actions against Lehman Re or in respect of its property, and (b) authority for the Bermuda court-appointed liquidators to investigate, protect, control and administer Lehman Re's U.S.-based assets.  See In re Lehman Re Ltd., Case No. 09-14884 (JMP) (Bankr. S.D.N.Y. 2009).  During the Fourth Interim Compensation Period, Milbank, among other things, monitored developments in Lehman Re's chapter 15 case, including a motion filed by Laurel Cove Development, LLC ("LCD") seeking, among other relief, to stay certain foreclosure proceedings of property subject to a construction project involving LCD that was financed by LBHI.  In response thereto, Milbank filed a joinder

to the Debtors' objection to LCD's motion [Docket No. 67].  On January 21, 2010, the Court

entered an order denying LCD's motion.

70.    **France Issues**.  Heart of la Defense SAS ("<u>Hold</u>"), which is majority

owned by LBHI, was incorporated in 2007 in order to acquire the shares of Karanis, a French

*société civile immobilière* ("<u>SCI</u>"), which owned the Coeur Defense Building (the "<u>Building</u>")

in La Defense, an office complex in Paris, France.  Following a merger between the companies,

Hold became the direct owner of the Building.  The transaction was financed through the

issuance of loans by Bankhaus, which were secured by interests of Hold and its parent company

Dame Luxembourg S.a.r.l. ("<u>Dame Luxembourg</u>"), and also included certain hedging protection

by LBIE that was guaranteed by LBHI.  On November 3, 2008, following the commencement

of the insolvency proceeding of Lehman Brothers International (Europe) ("<u>LBIE</u>") and the

chapter 11 case of LBHI, safeguard proceedings were commenced for Hold and Dame

Luxembourg in the Paris Commercial Court.  Subsequently, on September 9, 2009, the Paris

Commercial Court issued a decision that, among other things, approved a proposed safeguard

plan submitted in the Coeur Defense matter, which sought to discharge debts and preserve

creditors' rights.  During the Fourth Interim Compensation Period, Milbank researched and

drafted memoranda regarding the effects of the safeguard proceedings under the recently

amended French bankruptcy law and the subsequent court-approved safeguard plan.

71.    **German Bank Issues**.  Bankhaus is a wholly-owned subsidiary of LBHI

that was put into an insolvency proceeding by the Frankfurt Local Court (*Amtsgericht*) on

November 13, 2008.  On April 29, 2009, Bankhaus filed with the Court a petition for

recognition of a foreign main proceeding under chapter 15 of the Bankruptcy Code.  During the

Fourth Interim Compensation Period, Milbank analyzed numerous issues relating to Bankhaus,

and in particular, Bankhaus's intercompany claims against the Debtors, and the parties' disputed

ownership of certain commercial real estate loans.  In connection therewith, Milbank worked

with the Debtors and Houlihan to negotiate and draft the terms of a settlement agreement, which

provided for, among other things, the purchase of the disputed loans from Bankhaus by certain

of the chapter 11 Debtors, at a discount, thereby resolving the ownership dispute and settling

certain of the intercompany claims.  Milbank drafted and filed a statement in support of the

Debtors' motion for approval of the settlement agreement with Bankhaus [Docket No. 6414].

On January 14, 2010, the Court entered an order approving the settlement agreement between

the Debtors and Bankhaus.

72.    **UK Issues**.  LBIE, the Debtors' principal trading company in the UK,

along with several other British subsidiaries and affiliates of the Debtors, were placed into

insolvency administration (the "Administration") in the UK, and the English High Court

appointed PricewaterhouseCoopers, as joint administrators.  During the Fourth Interim

Compensation Period, Milbank continued to monitor the LBIE Administration and provide

English law advice in relation to various swaps and derivatives transactions to which Lehman

entities are a party.  This involved numerous internal telephone conversations, email

communication and memoranda, as well as email communication and conversations with the

Committee's financial advisors and the Debtors' advisors.

73.    In particular, Milbank performed extensive legal research into the

provisions and practical mechanics of the administration process under English law.  Milbank

regularly communicated with UK-based members of FTI and had regular conversations with

members of the London office of Weil, Gotshal & Manges LLP regarding the status of the

Administration.  In addition, Milbank monitored and provided updates and analyses to the

Committee on various issues in connection with the Administration including the previously

proposed LBIE Trust Asset Scheme of Arrangement, the alternative Trust Asset Contractual

Resolution Agreement, the Post-Administration Client Money directions hearing, the Pre-

Administration Client Money directions hearing, the LBIE Global Status hearing, the Trust

Asset Bar Date and distribution process, the upcoming RASCALs hearing and the upcoming

Pre-Administration Client Money Appeal.

74.     In relation to Lehman Brothers RE Financing No. 3 Limited (a subsidiary

of LBIE and also in administration), Milbank provided advice on the proposed Excalibur

transaction.  On derivatives-related matters, Milbank advised on the various transactions and

litigations where assets and/or parties reside in the UK, including the Perpetual/Belmont

litigation, the Norton Gold Fields transaction, and the RACERS SPV.

**U.     Litigation**

75.     During the Fourth Interim Compensation Period, Milbank did research

and prepared memoranda regarding the claims and issues raised by a wide range of pending

lawsuits and potential settlements impacting the Debtors' estates.  Milbank also held

teleconferences and meetings, both internally and with the Debtors and their professionals, with

regard to the foregoing and provided regular updates to the Committee.

76.     More specifically, with the exception of cases in which the Committee's

interests are represented by the Committee's conflicts counsel, Milbank monitored

developments in (i) all pending adversary proceedings commenced in this Court; (ii) lawsuits

commenced prepetition against the Debtors and pre- and post-petition against non-Debtor

affiliates, officers, directors, and related parties; (iii) litigation-raising issues similar to those

raised or to be raised in the Chapter 11 Cases; and (iv) contested matters in the Chapter 11

Cases.  When appropriate and directed by the Committee, Milbank intervened in such matters

on the Committee's behalf.  In connection with the monitored proceedings, Milbank reviewed

and analyzed proposed settlement agreements and advised the Committee regarding the same.

77.    In addition, Milbank responded to document requests received from

Barclays, prepared a 30(b)(6) witness, and participated in a 30(b)(6) deposition in connection

with the Motion of Official Committee Of Unsecured Creditors of Lehman Brothers Holdings

Inc., et al., Pursuant to 11 U.S.C. Section 105(A), Fed. R. Civ. P. 60(B), and Fed. R. Bankr. P.

9024, for Relief From Order Under 11 U.S.C. Sections 105(A), 363, and 365 and Federal Rules

of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of

Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and

Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and

Related SIPA Sale Order) and Joinder In Debtors' And SIPA Trustees Motions For An Order

Under Rule 60(B) To Modify Sale Order.

## V.    Milbank Fee Statements and Applications

78.    During the Fourth Interim Compensation Period, Milbank reviewed

Milbank's monthly fee statements for, among other purposes, compliance with the Interim

Compensation Order, the Local Guidelines and the Fee Committee Guidelines.  Milbank also

prepared and served its Fee Statements and its Third Interim Fee Application on all parties

required by the Interim Compensation Order.

## W.    Private Equity

79.    As reflected in the First Interim Fee Application, the Committee

established a private equity subcommittee (the "Private Equity Subcommittee") to monitor and

evaluate developments with respect to the Debtors' private equity assets.  During the Fourth

Interim Compensation Period, the Private Equity Subcommittee continued to hold regular meetings to address and make recommendations to the full Committee with regard to specific issues surrounding the Debtors' portfolio of private equity assets and formulate protocols with the Debtors to maximize the value of such portfolios.  Milbank worked closely with the Debtors, the Debtors' professionals, and the Committee's financial advisors in connection with the sale of several lines of business that were part of Lehman's private equity businesses.

80.   **Ormat**.  By way of example and as discussed in the Third Interim Fee Application, Milbank continued to expend time in connection with the sale of membership interests in a renewable energy project, Ormat.  Milbank worked closely with Debtors' counsel in reviewing and commenting on several drafts of the purchase agreement with another member of Ormat, Ormat Nevada, that chose to exercise its right of first offer to purchase LBHI's interests in Ormat, pursuant to Ormat's operating agreement.  Milbank also conducted diligence analyzing the terms of the right of first offer provision in Ormat's operating agreement.

81.   **One William Street**.  With respect to the assignment of limited partnership interests in One William Street LB Capital Partners, L.P. ("OWS"), Milbank, worked in close communication with the Debtors' counsel to review and analyze the terms the assignment agreement.  During the First Interim Compensation Period, OWS was restructured whereby nearly $400 million of unfunded commitments were extinguished.  Since the restructuring, OWS has been performing well and during the Fourth Interim Compensation Period, the Debtors were presented with an opportunity to sell a portion of its position in OWS.  In that connection, Milbank, together with the Committee's financial advisors, worked to ensure that recovery was maximized for the benefit of the Debtors' estates with respect to this

assignment.  Such efforts culminated in the Debtors negotiating a ten percent increase in the purchase price, while also reducing Lehman's overall exposure to OWS.

82.    **Portfolio Review**.  The Committee and its advisors also worked closely with the Debtors to review and evaluate the entire private equity portfolio, as recently re-underwritten, to begin to map out a process for ascertaining which of the assets should be sold in the near term and which should be held.

## X.    Real Estate Matters

83.    As reflected in the First Interim Fee Application, due to the size, complexity and potential for exposure of the Debtors' real estate portfolio, the Committee established a real estate subcommittee (the "Real Estate Subcommittee") to evaluate issues relating to the Debtors' extensive real estate portfolio.  During the Fourth Interim Compensation Period, the Real Estate Subcommittee continued to hold regular meetings to address and make recommendations to the full Committee with regard to issues related to the Debtors' real estate holdings in order to assess discrete issues, e.g., the Mountain House, Excalibur, Intrawest, SunCal, Archstone, Starman, 500 Fifth Avenue, Canyon Ranch, and Heritage Fields situations, and formulate protocols with the Debtors to attempt to maximize the value of the Debtors' real estate assets.

84.    The Debtors' real estate portfolio includes commercial, residential and corporate interests in which the Debtors hold both debt and equity positions, often in the form of joint ventures to develop large commercial projects.  Milbank continued to work closely with the Committee's financial advisors to assess whether the Debtors should continue to meet various funding obligations, and also reviewed and commented on the terms of the Debtors' proposed restructurings of their debt facilities.  In connection therewith, Milbank continued to

review the Debtors' rights, obligations and exposures relative to joint venture partners,

borrowers, senior secured lenders, unsecured creditors and other third parties in order to further

analyze the potential consequences of the proposed restructurings or failures to fund capital

calls.  Milbank also continued to participate in the consensual resolution of several outstanding

real estate related motions.

85.    During the Fourth Interim Compensation Period, Milbank, together with

the Committee's financial advisors, worked with the Debtors to establish additional protocols in

connection with the management of the Debtors' real estate portfolio that will reduce expenses

incurred by the Debtors' estates while also providing oversight mechanisms when the assets

involved exceed a certain threshold amount.  Those efforts led to the Debtors' motion to

establish procedures for the restructuring of, making additional investments into, or entering

into settlements or compromises with respect to, the Debtors' existing real estate investments.

In connection therewith, Milbank filed a statement in support of such procedures that

acknowledged this cooperative effort [Docket No. 5823].  On November 23, 2009, the Court

entered an order granting this motion.

**Y.    Lehman Bank Platform Issues**

86.    During the Fourth Interim Compensation Period, Milbank continued to

expend considerable time in connection with (i) Aurora Bank FSB, a federally chartered thrift

headquartered in Delaware, formerly known as Lehman Brothers Bank, FSB ("Aurora"),

overseen by the Office of Thrift Supervision (the "OTS") and (ii) Woodlands Commercial Bank

("Woodlands Bank" and, together with Aurora, the "Banks"), overseen by the Federal Deposit

Insurance Company (the "FDIC," together with the OTS, the "Regulators").  As previously

discussed, the Debtors' and Committee's professionals have strived to improve the capital

39

levels at each of the Banks to satisfy regulatory requirements, avoid potential seizures and liquidations by the Regulators, and facilitate the resumption of depository functions at the Banks to preserve and maximize value.  Accordingly, Milbank continued to work closely with the Debtors and their professionals in attempting to structure solutions to the various issues confronting the Banks, including communicating with the Regulators to discuss the Banks' alternatives and to negotiate a mutually acceptable solution to the Banks' regulatory issues.

87.    Milbank worked closely with the Committee's financial advisors to analyze and present the legal and financial implications of transactions involving the Banks to a subcommittee (the "<u>Bank Regulatory Subcommittee</u>") established to review such matters. During the Fourth Interim Compensation Period, the Bank Regulatory Subcommittee continued to hold regular meetings to review restructuring measures and other matters related to the Banks, discuss responsive courses of action and formulate recommendations regarding Bank matters that were presented to the full Committee for further consideration.

88.    Milbank has taken and continues to take measures to ensure that the Banks are being properly managed to maximize their value for the Debtors' estates and creditors.  To that end, during the Fourth Interim Compensation Period, Milbank spent considerable time, among other things, (i) preparing for meetings with the OTS to discuss the alternatives for Aurora, (ii) helping to develop and formulate a business plan submitted to the OTS, incorporating constraints requested by the Regulators to facilitate the resumption of banking and lending operations for the Banks, (iii) analyzing and assisting in the development and researching the implications of the terms of a proposed settlement agreement with the Regulators to resolve a dispute arising out of a certain master forward agreement between LBHI

and Aurora, (iv) reviewing Aurora's plans to sell its student loan portfolio, and (v) analyzing the

Supplemental Contribution Motion (defined below).

89.    On November 25, 2009, the Debtors filed a motion (the "Supplemental

Contribution Motion") seeking authorization to invest an additional $100 million into Aurora to

account for a miscalculation in the valuation of a portfolio of mortgage servicing rights

("MSRs") previously contributed to Aurora by LBHI and the continued effect of fair value

accounting on the Bank's capital.  Milbank, along with the Committee's financial advisors,

analyzed the Supplemental Contribution Motion and numerous issues regarding the MSR

portfolio, including valuation concerns.  On December 17, 2009, the Court issued an order

granting the relief requested in the Supplemental Contribution Motion.

## Z.    Reorganization Plan

90.    As the end of the Debtors' exclusive period for filing a plan of

reorganization neared, Milbank, together with the Committee's financial advisors, intensified its

long-pending review of the myriad issues involved with such a plan of reorganization

formulation process.  Such analysis included the review of bankruptcy, corporate governance,

pension, tax and structural issues, and the preparation and review of recovery scenarios.  In

connection therewith, Milbank, along with the Committee's financial advisors, regularly met

with the Debtors and their advisors to discuss the proposed treatment of a variety of plan-related

issues, including the preservation of net operating losses, substantive consolidation,

intercompany claims and guarantee claims reconciliation, corporate governance, and plan

currency.

91.    During the Fourth Interim Compensation Period, Milbank also continued

assembling precedent for reorganization plans and developing and maintaining a plan precedent

database, with a particular focus on issues relevant to the Chapter 11 Cases, especially with

respect to the above-mentioned issues.  Further, Milbank researched issues such as voting and

impairment, and the applicability of section 1145 of the Bankruptcy Code, and drafted

memoranda for the Committee regarding each of the foregoing.

## AA.    Rule 2004 Investigations

92.    During the Fourth Interim Compensation Period, Milbank continued to

monitor and analyze various motions for examination pursuant to rule 2004 of the Federal Rules

of Bankruptcy Procedure ("Rule 2004") filed by the Debtors and interested parties.  In

particular, Milbank reviewed and analyzed a motion filed by the Debtors for authorization,

pursuant to Rule 2004, to issue subpoenas for the production of documents and to examine

individuals and entities.  In connection therewith, Milbank worked with the Debtors to ensure

the Committee's access to oral examinations and documents obtained by the Debtors in

connection with the relief sought.  On November 23, 2009, the Court entered an order granting

the Debtors' motion.

## BB.    SIPC Issues

93.    During the Fourth Interim Compensation Period, in addition to reviewing

and analyzing various motions filed in the SIPA Proceeding, Milbank spent considerable time

reviewing pleadings filed in connection with the SIPA Trustee's motion for an order approving

the allocation of property of the estate (the "SIPA Allocation Motion"), reviewing related

discovery, conferring with the Committee's financial advisors, and preparing a response to the

SIPA Allocation Motion.  The Committee ultimately reached a consensual resolution of certain

of the issues identified in the SIPA Allocation Motion, which the Court approved on March 2,

2010.

94.     Milbank also closely monitored and analyzed the claims filed by Fifth Third Structured Large Cap Plus Fund and Providence Equity Partners so as to advise the Committee on those issues.  Additionally, Milbank drafted memoranda, as appropriate, on matters such as the enforceability of certain subordination agreements entered into by LBI and the value of Lehman ALI Inc. payment-in-kind note.

**CC.     Substantive Consolidation**

95.     During the Fourth Interim Compensation Period, Milbank continued its work on a comprehensive analysis of substantive consolidation and the factors commonly utilized by courts when analyzing substantive consolidation.   In preparing such analyses, Milbank did in-depth research on all reported cases discussing the doctrine of substantive consolidation and also undertook extensive factual investigation on the issue, including document review and employee and creditor interviews.  In connection therewith, Milbank, together with the Committee's financial advisors, also continued its analysis of the potential applicability of the principles articulated in such cases to the facts and circumstances of the Chapter 11 Cases.  Additionally, Milbank, researched and drafted several comprehensive memoranda on substantive consolidation and its implications on the Debtors' estates, and made numerous presentations to the Committee with respect to the foregoing.

**DD.     Tax Issues**

96.     During the Fourth Interim Compensation Period, Milbank devoted substantial time to analyzing and evaluating federal, state, local, and international tax issues relating to the Debtors' estates.  During the Fourth Interim Compensation Period, a subcommittee (the "Tax Subcommittee") regularly convened to address the myriad tax issues arising in the Chapter 11 Cases.  In addition to attending regular meetings of the Tax

Subcommittee, Milbank participated in weekly telephone conferences separately with each of

the Committee and the Debtors' in-house tax department, and reviewed, researched, and

analyzed (i) tax issues related to the disposition of certain assets; (ii) tax issues surrounding the

Banks, including the tax consequences of Real Estate Mortgage Investment Conduits

("REMICs") held by LBI; (iii) the Debtors' tax exposure and potential refund claims; (iv)

transactions subject to ongoing Internal Revenue Service ("IRS") audit of the Debtors' estate,

including foreign tax credit claims (e.g., "Voucher" trade and "stock loan" transactions) and the

Debtors' corporate-owned life insurance deductions; (v) motions and orders to restrict trading of

equity and debt claims of the Debtors; (vi) tax allocation issues among Debtors and LBI; (vii)

the impact of the receipt of government program funds on the use of the Debtors' net operating

losses; (viii) the potential impact on the Debtors' estate of tax provisions in proposed

legislation; and (ix) potential structures for the Debtors' plan of reorganization.  In connection

with the above-mentioned IRS audit, Milbank met several times with the Debtors' in-house tax

department and Debtors' tax litigation counsel, McKee Nelson LLP, now known as Bingham

McCutchen LLP, prepared memoranda for the Committee explaining the transactions at issue

and the tax exposure associated with the IRS audit, and participated in Debtors' and Debtors'

tax litigation counsel's development of negotiating strategy for the special IRS settlement

process for the significant issues that have arisen on audit.  The parties have reached a

settlement on several of the above described issues.  Milbank reviewed the proposed settlement

among the IRS, U.S. Department of Justice, and the Debtors, which currently remains subject to

bankruptcy court approval.

        97.     Additionally, Milbank researched, prepared legal memoranda, and

corresponded with the Debtors regarding (i) the potential exposure for significant tax liabilities

related to the ownership of REMIC residual interests; (ii) the priority of various tax claims

against the Debtors; (iii) tax allocation rules related to Debtors' right to contribution by

subsidiaries; (iv) the Debtors' motion to restrict the trading of certain claims; (v) the status of a

controlled foreign corporation when placed in receivership; (vi) potential withholding tax

claims against the Debtors for pre- and post-petition dates; and (vii) the Debtors' right to

interest on tax refunds.

**EE.**    **Trading and Loan Book**

98.    As reflected in the First Interim Fee Application, the Committee

established a loan book subcommittee (the "Loan Book Subcommittee") to review and analyze

matters related to the Debtors' loan book.  During the Fourth Interim Compensation Period, the

Loan Book Subcommittee continued to analyze, among numerous other matters related to the

Debtors' loan book, the unresolved objections, proposed settlements, ancillary motions, and

other residual issues concerning the Debtors' motions, dated November 14, 2008 and December

15, 2009, to assume or reject trade confirmations to purchase or sell interests in loans (the

"Open Trades").

99.    **Fusion**.  Milbank continued to review numerous issues in connection

with the Open Trades and related transactions involving the Debtors and counterparties Fusion

Funding Limited and Fusion Funding Luxembourg, S.a.r.l. (together, "Fusion").  The related

transactions included an underlying loan purchase agreement among Bankhaus, Lehman

Commercial Paper Inc. ("LCPI"), GE Corporate Financial Services, Inc. ("GE"), and Fusion,

whereby LCPI and Bankhaus, among other things, agreed to sell and participate in certain loans

to Fusion.  During the Fourth Interim Compensation Period, Milbank and advisors to the

Debtors and other parties in interest negotiated the terms of a settlement resolving the disputed

45

issues concerning the GE/Fusion matter.  In connection with the settlement, Milbank helped

develop the terms of a Master Participation Agreement (the "<u>MPA</u>"), providing for the purchase

by LCPI of participations in certain loans owned by GE.  On December 14, 2009, the Debtors

filed a stipulation and proposed order, incorporating a settlement agreement resolving all issues

among GE, Fusion, the Debtors and other parties in interest (the "<u>Settlement</u>"), including the

cancelation of the related Open Trades, the withdrawal of claims by GE against the Debtors, the

integration of the MPA, and the withdrawal of certain motions by both GE and the Debtors as

they related to the subject Open Trades.  In connection therewith, Milbank filed a statement in

support of the stipulation and Settlement [Docket No. 6301], which were approved by the Court

on December 22, 2009.

100.    **Field Point**.  In addition to the GE/Fusion Open Trades matter, Milbank

monitored and reviewed the development of a settlement of a dispute between the Debtors and

Field Point I.V. S.a.r.l. ("<u>Field Point</u>") regarding the Debtors' proposed assumption of certain

Open Trades, which required LCPI to sell certain debt interests to Field Point.  Pursuant to the

proposed settlement, among other things, the parties agreed to the performance of the Open

Trades for a certain discounted price and the withdrawal of Field Point's prior objection to the

Debtors' Open Trades motion.  Milbank reviewed and analyzed the terms of the stipulation of

settlement between the parties, which was approved by the Court on October 16, 2009.

101.    **FairPoint**.  Additionally, during the Fourth Interim Compensation

Period, Milbank continued to monitor the restructuring of FairPoint Communications

("<u>FairPoint</u>"), a company in which the Debtors owned senior secured debt positions.  In

particular, Milbank reviewed and analyzed the Debtors' motion (the "<u>Fair Point Motion</u>"),

seeking authorization for LCPI to purchase a participation in a secured loan to FairPoint.

Milbank analyzed and discussed with the Loan Book Subcommittee the transactions

contemplated by the FairPoint Motion, which was subsequently granted by the Court on

October 16, 2009.

102.    Milbank worked with the Committee's financial advisors to analyze and

present the legal and financial implications of the Debtors' loan book transactions to the Loan

Book Subcommittee in order to facilitate its recommendations and responsive courses of action

to the full Committee.  Milbank reviewed certain credit agreements related to loan book

transactions and closely monitored and charted defaults thereunder.  To that end, the Loan Book

Subcommittee convened meetings to discuss and formulate recommendations regarding all

outstanding loan book matters.

FF.    **Voidable Transfers and Other Potential Claims**

103.    During the Fourth Interim Compensation Period, Milbank devoted

substantial time to researching and evaluating potential claims on behalf of the Debtors' estates,

including voidable transfer claims.  In connection with voidable transfer claims, Milbank

researched the law applicable to, and performed analyses of, potential preferential transfers to

insiders and certain counterparties.  Further, Milbank did research regarding the ownership of

such claims.

### IV.

### ALLOWANCE OF COMPENSATION

104.    The professional services rendered by Milbank have required a high

degree of professional competence and expertise to address, with skill and dispatch, the

numerous issues requiring evaluation and action by the Committee.  Milbank respectfully

submits that the services rendered to the Committee were performed efficiently, effectively and

economically, and that the results obtained to date have benefited not only the members of the Committee, but also the unsecured creditors of each of the Debtors' estates.

     105.    The allowance of interim compensation for services rendered and reimbursement of expenses in bankruptcy cases is expressly provided for in section 331 of the Bankruptcy Code:

> Any professional person . . . may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered . . . as is provided under section 330 of this title.

11 U.S.C. § 331.

     106.    With respect to the level of compensation, section 330(a)(1)(A) of the Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person "reasonable compensation for actual, necessary services rendered."  Section 330(a)(3), in turn, provides that:

> In determining the amount of reasonable compensation to be awarded to . . . [a] professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (A)    the time spent on such services;
>
> (B)    the rates charged for such services;
>
> (C)    whether the services were necessary to the administration of, or beneficial at the time which the service was rendered toward the completion of, a case under this title;
>
> (D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E)    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and expertise in the bankruptcy field; and

(F)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

107.    The congressional policy expressed above provides for adequate compensation in order to continue to attract qualified and competent professionals to bankruptcy cases.  In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994) ("Congress rather clearly intended to provide sufficient economic incentive to lure competent bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation marks omitted); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y. 1991) ("Congress' objective on requiring that the market, not the Court, establish attorneys' rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists.").

108.    In assessing the "reasonableness" of the fees requested, courts have looked to a number of factors, including those first enumerated by the Fifth Circuit in In re First Colonial Corp. of America, 544 F.2d 1291, 1298-99 (5th Cir. 1977), and thereafter adopted by most courts.[14]  See In re Nine Assocs., Inc., 76 B.R. 943, 945 (S.D.N.Y. 1987) (adopting First Colonial/Johnson analysis); In re Cuisine Magazine, Inc., 61 B.R. 210, 212-13 (Bankr. S.D.N.Y 1986) (same); see generally 3 Collier on Bankruptcy ¶ 330.04[3] (Lawrence P. King, et al. eds. 15th ed. rev. 2009) (enumerating First Colonial and Johnson as the "leading cases to be considered in determining a reasonable allowance of compensation").  Milbank respectfully

---

[14]    The factors embraced by the Fifth Circuit in First Colonial were first adopted by the Fifth Circuit's decision in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), except that First Colonial also included the "spirit of economy" as a factor expressly rejected by Congress in enacting section 330 of the Bankruptcy Code.  Strooock & Stroock & Lavan v. Hillsborough Holdings Corp. (In re Hillsborough Holdings Corp.), 127 F.3d 1398, 1403 (11th Cir. 1997).  A majority of the First Colonial factors are now codified in section 330(a)(3). 3 Collier on Bankruptcy ¶ 330.04[3].

submits that the consideration of these so-called <u>Johnson</u> factors should result in this Court's

allowance of the full compensation requested.

(A)    <u>The Time and Labor Required</u>.  The Debtors' cases are among the largest, most complex and active bankruptcy cases ever filed.  Accordingly, the professional services rendered by Milbank on behalf of the Committee have required the continuous expenditure of substantial time and effort, under time pressures which sometimes required the performance of services late into the evening and, on a number of occasions, over weekends and holidays.  The services rendered required a high degree of professional competence and expertise in order to be administered with skill and dispatch.

(B)    <u>The Novelty and Difficulty of Questions</u>.  Novel and complex issues have arisen in the course of these chapter 11 cases, and it can be anticipated that other such issues will be encountered.  In these cases, as in many others in which the firm is involved, Milbank's effective advocacy and creative approach to problem solving have helped clarify and resolve difficult issues and will continue to prove beneficial.

(C)    <u>The Skill Requisite to Perform the Legal Services Properly</u>.  Milbank believes that its recognized expertise in the area of financial restructuring, its ability to draw from highly experienced professionals in other areas of its practice such as securities, structured products, asset divestiture, litigation, and regulatory law and its practical approach to the resolution of issues help maximize the distributions to the unsecured creditors of each of the Debtors.

(D)    <u>The Preclusion of Other Employment by Applicant Due to Acceptance of the Case</u>.  Due to the size of Milbank's financial restructuring department and the firm as a whole, Milbank's representation of the Committee has not precluded the acceptance of new clients.  However, the number of matters needing attention on a continuous basis has required numerous Milbank attorneys, across multiple practice groups, to commit significant portions of their time to these cases.

(E)    <u>The Customary Fee</u>.  The compensation sought herein is based upon Milbank's normal hourly rates for services of this kind.  Milbank respectfully submits that the compensation sought herein is not unusual given the magnitude and complexity of these cases and the time dedicated to the representation of the Committee.  Such compensation is commensurate with fees Milbank has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience.

(F)    <u>Whether the Fee Is Fixed or Contingent</u>.  Milbank charges customary hourly rates for the time expended by its attorneys and paraprofessionals in representing the Committee, and Milbank's fee is not outcome dependent.

(G)    <u>Time Limitations Imposed by Client or Other Circumstances</u>.  As stated above, Milbank has been required to attend to various issues as they have arisen in these cases.  Often, Milbank has had to perform these services under significant time constraints requiring attorneys and paraprofessionals assigned to these cases to work evenings and on weekends.

(H)    <u>The Amount Involved and Results Obtained</u>.  The Committee represents the interests of unsecured creditors of each of the Debtors that, in the aggregate, hold unsecured claims estimated to be valued in the hundreds of billions of dollars, in what has been widely described as the largest chapter 11 cases ever filed.  The Committee's participation, with Milbank's counsel and guidance, has greatly contributed to the efficient administration and prospects for reorganization of these cases.

(I)    <u>The Experience, Reputation and Ability of the Attorneys</u>.  Milbank has a sophisticated and nationally recognized corporate reorganization and financial restructuring practice, and Milbank attorneys involved in this representation have played a major role in numerous complex restructurings including, for example, the chapter 11 cases of Lyondell Chemical Company, Nortel Networks Inc., Capmark Financial Group Inc., Hayes Lemmerz International, Inc., DBSD North America, Inc., Refco, Inc., Enron Corp., TOUSA, Inc., Vicorp, Interstate Bakeries Corp., Winn-Dixie Stores, Inc., Fruit of the Loom Inc., Adelphia Communications Corp., Maxxim Medical Group, Inc., RCN Corp., US Airways Group, Inc., Global Crossing Ltd., Fleming Companies, Inc., Dairy Mart Convenience Stores, Inc., Lernout & Hauspie Speech Products N.V., Teligent, Inc., World Access, Inc., ORBCOMM Global, L.P., ICO Global Communications Inc., Safety-Kleen Corp., HomePlace Stores, Inc., Hvide Marine, Inc., Sun TV and Appliances, Inc., Seven-Up/RC Bottling Company of Southern California, Inc. and Ames Department Stores, Inc.  Milbank's experience enables it to perform the services described herein competently and expeditiously.

(J)    <u>The "Undesirability" of the Case</u>.  These cases are not undesirable but, as already indicated, have required a significant commitment of time from many of Milbank's attorneys.

(K)    <u>Nature and Length of Professional Relationship</u>.  Milbank was selected as the Committee's counsel shortly after the Committee's formation, on September 17, 2008, and was retained <u>nunc</u> <u>pro</u> <u>tunc</u> to that date pursuant to an order of the Court dated November 21, 2008.  Milbank has been rendering services continuously to the Committee since the Committee was formed, and Milbank has rendered such services in a necessary and appropriate manner.

109.    The total time spent by Milbank attorneys and paraprofessionals during the Fourth Interim Compensation Period was 23,801.00 hours and has a fair market value of $13,595,778.50.  As shown by this Application and supporting exhibits, Milbank's services

51

were rendered economically and without unnecessary duplication of efforts.  In addition, the work involved, and thus the time expended, was carefully assigned in consideration of the experience and expertise required for each particular task.

## V.

## EXPENSES

110.    Milbank has incurred a total of $451,410.54 in expenses in connection with representing the Committee during the Fourth Interim Compensation Period.  Milbank records all expenses incurred in connection with the performance of professional services.  A schedule of expenses by project billing category, as well as a summary of these expenses and detailed descriptions of these expenses, is annexed hereto as Exhibit "C."

111.    In connection with the reimbursement of expenses, Milbank's policy is to charge its clients in all areas of practice for expenses, other than fixed and routine overhead expenses, incurred in connection with representing its clients.  The expenses charged to Milbank's clients include, among other things, telephone and telecopy toll and other charges, mail and express mail charges, special or hand delivery charges, photocopying charges, out-of-town travel expenses, local transportation expenses, expenses for working meals, computerized research and transcription costs.

112.    Milbank charges the Committee for these expenses at rates consistent with those charged to Milbank's other bankruptcy clients, which rates are equal to or less than the rates charged by Milbank to its non-bankruptcy clients.  Milbank seeks reimbursement from the Debtors at the following rates for the following expenses:  (i) ten cents ($0.10) per page for photocopying and printing; (ii) no charge for incoming facsimiles; (iii) two dollars ($2.00) per page for outgoing facsimiles; and (iv) an average of nineteen cents ($0.19) per minute for long

distance.  Specifically, with respect to phone charges over \$100.00, such charges were accrued in connection with conference calls in which the Committee, the Debtors and/or other parties in interest participated.

113.    In accordance with section 330 of the Bankruptcy Code, the Local Guidelines and the U.S. Trustee Guidelines, Milbank seeks reimbursement only for the actual cost of such expenses to Milbank.[15]  Additionally, Milbank has further limited and defined its expenses in accordance with the Fee Committee Guidelines.

114.    In providing or obtaining from third parties services which are reimbursable by clients, Milbank does not include in such reimbursable amount any costs of investment, equipment or capital outlay.

115.    Milbank regularly charges its non-bankruptcy clients for ordinary business hourly fees and expenses for secretarial, library, word processing and other staff services because such items are not included in the firm's overhead for the purpose of setting the billing rates.

116.    Attorneys at Milbank have not incurred expenses for luxury accommodations or deluxe meals.  The Application does not seek reimbursement of air travel expenses in excess of coach fares.  Throughout the Fourth Interim Compensation Period, Milbank has been keenly aware of cost considerations and has tried to minimize the expenses charged to the Debtors' estates.

---

[15]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

## VI.

## NOTICE

117.    Notice of this Application has been given to (a) the Court,  (b) counsel for the Debtors, and (c) the members of the Fee Committee.

## VII.

## CONCLUSION

WHEREFORE, Milbank respectfully requests the Court to enter an order conforming to the amounts set forth in Fee Schedule A(1) attached hereto as Exhibit "D" (i) allowing Milbank (a) interim compensation for professional services rendered as counsel for the Committee during the Fourth Interim Compensation Period in the amount of $13,595,778.50 and (b) reimbursement of expenses incurred in connection with rendering such services in the aggregate amount of $451,410.54, for a total award of $14,047,189.04; (ii) authorizing and directing the Debtors to pay to Milbank $6,211,791.04, which is an amount equal to the difference between (i) this $14,047,189.04 award and (ii) $7,835,398.00, the total of all amounts that the Debtors have previously paid to Milbank pursuant to the Interim Compensation Order for services rendered and expenses incurred during the Fourth Interim Compensation Period; and (iii) granting such further relief as is just.

Dated: New York, New York
        April 16, 2010

**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**

By:    /s/ Dennis F. Dunne
Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

and

Paul Aronzon
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:  (213) 892-4000


Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

# EXHIBIT A

**Certification**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------- x
                                          :
In re:                                    :            Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :            08-13555 (JMP)
                                          :
                    Debtors.              :            (Jointly Administered)
                                          :
----------------------------------------------------------- x
```

**CERTIFICATION UNDER GUIDELINES FOR FEES AND DISBURSEMENTS
FOR PROFESSIONALS IN RESPECT OF FOURTH APPLICATION OF MILBANK,
TWEED, HADLEY & M<sup>c</sup>CLOY LLP, COUNSEL TO
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
<u>OCTOBER 1, 2009 THROUGH AND INCLUDING JANUARY 31, 2010</u>**

Pursuant to the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 (together, the "<u>Local Guidelines</u>"), and the United States Trustee

Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, adopted on January 30, 1996 (the "<u>U.S. Trustee Guidelines</u>" and,

together with the Local Guidelines, the "<u>Guidelines</u>"), the undersigned, a member of the firm

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP ("<u>Milbank</u>"), counsel to the Official Committee of

Unsecured Creditors (the "<u>Committee</u>") of Lehman Brothers Holdings Inc. and its affiliated

debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>"), hereby certifies

with respect to Milbank's fourth application for allowance of compensation for services rendered

and for reimbursement of expenses, dated April 16, 2010 (the "<u>Application</u>"), for the period of

October 1, 2009 through and including January 31, 2010 (the "Fourth Interim Compensation Period") as follows:

1.   I am the professional designated by Milbank in respect of compliance with the Guidelines.

2.   I make this certification in support of the Application, for interim compensation and reimbursement of expenses for the Fourth Interim Compensation Period, in accordance with the Local Guidelines.

3.   In respect of section B.1 of the Local Guidelines, I certify that:

a.   I have read the Application.

b.   To the best of my knowledge, information and belief formed after reasonable inquiry, the fees and disbursements sought fall within the Guidelines.

c.   Except to the extent that fees or disbursements are prohibited by the Guidelines, the fees and disbursements sought are billed at rates in accordance with practices customarily employed by Milbank and generally accepted by Milbank's clients.

d.   In providing a reimbursable service, Milbank does not make a profit on that service, whether the service is performed by Milbank in-house or through a third party.[1]

4.   In respect of section B.2 of the Local Guidelines, I certify that Milbank has provided statements of Milbank's fees and disbursements previously accrued, by filing and serving monthly statements in accordance with the Interim Compensation Order (as defined in the Application), except that completing reasonable and necessary internal accounting and review procedures have at times precluded filing fee statements within the time periods established in the Interim Compensation Order.

---

[1]   The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

5.    In respect of section B.3 of the Local Guidelines, I certify that copies of the

Application are being provided to (a) the Court, (b) the Debtors, (c) counsel for the Debtors, (d)

the Office of the United States Trustee, and (e) the members of the Fee Committee.

6.    I certify that the Application for interim compensation and reimbursement of

expenses for the Third Interim Compensation Period has been prepared in accordance with the

Fee Committee Guidelines (as defined in the Application).

Dated:        New York, New York
              April 16, 2010


                              By:   /s/ Dennis F. Dunne
                                    Dennis F. Dunne

# **EXHIBIT B**

**Time Entry Records**[1]

---

[1] Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the members of the Fee Committee.

# **EXHIBIT C**

**Expenses**[1]

---

[1]    Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; (v) the members of the Fee Committee.

# EXHIBIT D

**Fee Schedule A(1)**

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 4/10/09 Docket No. 3337 | $12,132,376.00 | $12,062,428.50 | $1,213,237.60 | $1,143,247.54 | $668,388.72 | $668,346.18 |

| SECOND INTERIM FEE PERIOD FEBRUARY 1, 2009 – MAY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 8/14/09 Docket No. 4821 | $16,829,521.00 | $16,233,210.42 | $1,682,952.10 | $1,371,217.28 | $1,019,754.61 | $1,006,175.08 |

| THIRD INTERIM FEE PERIOD JUNE 1, 2009 – SEPTEMBER 30, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & | 12/14/09 | $10,881,540.00 | $10,689,053.40 | $1,088,154.00 | $795,598.60 | $583,803.10 | $483,734.30 |

**FEE SCHEDULE A(1)**

| McCloy LLP | Docket No. 6203 | | | | | | |
|---|---|---|---|---|---|---|---|

| FOURTH INTERIM FEE PERIOD OCTOBER 1, 2009 – JANUARY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 4/16/10 Docket No. [x] | $13,595,778.50 | [ ] | $1,359,577.85 | $6,211,791.04[1] | $451,410.54 | [ ] |

---

[1]    The amount requested on account of fees and expenses incurred by Milbank during the Fourth Interim Compensation Period was $13,291.85 less than the sum of fees and expenses set forth in the Fee Statements served during the Fourth Interim Compensation Period.

**FEE SCHEDULE A(1)**