**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re <br><br> LEHMAN BROTHERS HOLDINGS INC., *et al.*, <br><br> Debtors. | Chapter 11 Case No. <br> 08-13555 (JMP) <br> (Jointly Administered) |
| In re <br><br> LEHMAN BROTHERS INC., <br><br> Debtor. | Case No. 08-01420 (JMP) |

### MEMORANDUM OF BARCLAYS CAPITAL INC. IN OPPOSITION TO MOTION IN LIMINE FOR AN ORDER EXCLUDING THE EXPERT TESTIMONY OF PROFESSOR PAUL PFLEIDERER

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

April 19, 2010

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ..................................................................................................................... 1

I.  PROFESSOR PFLEIDERER IS QUALIFIED TO OPINE ON THE VALUATION OF SECURITIES. ................................................................................................................... 5

II.  PROFESSOR PFLEIDERER'S PROPOSED TESTIMONY DEMONSTRATING THAT THERE WAS NO $5 BILLION DISCOUNT WITH RESPECT TO THE REPO COLLATERAL MEETS THE "FIT" AND RELIABILITY REQUIREMENTS OF RULE 702 ................................................................................................................................. 9

    A.  Professor Pfleiderer's Independent Assessment of Barclays' Valuations Provides the Court with Reliable and Highly Relevant Information. .................................................. 10

        1.  Professor Pfleiderer's Method of Analysis Is Reliable Under Rule 702. .................... 10

        2.  Professor Pfleiderer's Opinion On The Alleged "Secret $5 Billion Discount" Is Relevant And Admissible. .......................................................................................... 15

    B.  The Use of Support Staff to Assist with the Compilation, Processing, and Evaluation of Data Does Not Disqualify Professor Pfleiderer's Testimony. ......................................... 17

    C.  Movants' Assertion that Professor Pfleiderer Did Not Consider Contradictory Evidence Is Baseless. ................................................................................................................... 19

III.  PROFESSOR PFLEIDERER'S OTHER OPINIONS ARE VALID AND ADMISSIBLE UNDER RULE 702. ........................................................................................................ 21

    A.  Professor Pfleiderer's Opinion That The APA's Definition Of The Long Positions Did Not Reflect A Secret $5 Billion Discount Is Based on Objective Data and Expressly Avoids Reliance on Witness Credibility Determinations. ................................................ 21

    B.  The Risks Associated with the Huge and Often Illiquid Positions in the Repo Collateral Are Highly Relevant. ................................................................................................... 22

    C.  Professor Pfleiderer's Opinion That There Is No Need for an Accounting Separate from Barclays' 2008 Results Announcement Is Relevant. ..................................................... 23

    D.  Professor Pfleiderer's Opinions Regarding the Benefits of the Sale Transaction Relative to Liquidation of the Assets Are Admissible. ............................................................... 24

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Arista Records LLC v. Usenet.com, Inc.*,
608 F. Supp. 2d 409 (S.D.N.Y. 2009)................................................................12

*Barban v. Rheem Textile System, Inc.*,
No. 01-CV-8475, 2003 WL. 387660 (E.D.N.Y. Feb. 11, 2005) .........................7

*Borawick v. Shay*,
68 F.3d 597 (2d Cir.1995)...................................................................................2

*Cary Oil Co. v. MG Refining & Marketing, Inc.*,
No. 99 Civ. 1725, 2003 WL. 1878246 (S.D.N.Y. Apr. 11, 2003).......................6

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)...............................................................................14, 15

*Dreyer v. Ryder Automobile Carrier Group, Inc.*,
367 F. Supp. 2d 413 (W.D.N.Y. 2005)..............................................................13

*E.E.O.C. v. Morgan Stanley & Co.*,
324 F. Supp. 2d 451 (S.D.N.Y. 2004)..................................................................2

*In re Fosamax Products Liability Litigation*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009).......................................................2, 4, 14

*In re Iridium Operating LLC*,
373 B.R. 283 (Bankr. S.D.N.Y. 2007)..................................................................5

*Jarvis v. Ford Motor Co.*,
283 F.3d 33 (2d Cir. 2002)................................................................................14

*Li v. Aponte*,
No. 05 Civ. 6237, 2009 WL. 1285928 (S.D.N.Y. May 5, 2009).......................17

*McCullock v. H.B. Fuller & Co.*,
61 F.3d 1038 (2d Cir. 1995)................................................................................6

*Monsanto Co. v. David*,
516 F.3d 1009 (8th Cir. 2008) ..........................................................................16

*Playtex Products, Inc. v. Procter & Gamble Co.*,
No. 02 Civ. 8046, 2003 WL. 21242769 (S.D.N.Y. May 28, 2003)...................12

*Smith v. Herman Miller, Inc.*,
    No. CV-03-5358, 2005 WL. 2076570 (E.D.N.Y. Aug. 26, 2005)......................................7

*TC System Inc. v. Town of Colonie, N.Y.*,
    213 F. Supp. 2d 171 (S.D.N.Y. 2002)........................................................................6, 7, 14

*UMG Recordings, Inc. v. Lindor*,
    531 F. Supp. 2d 453 (E.D.N.Y. 2007) ...............................................................................2

*United States v. Schiff*,
    538 F. Supp. 2d 818 (D.N.J. 2008) .................................................................................12

*Watanabe Realty Co. v. City of New York*,
    No. 01 Civ. 10137, 2004 WL. 27720 (S.D.N.Y. Jan. 5, 2004).........................................12

*Wechsler v. Hunt Health System. Ltd.*,
    381 F. Supp. 2d 135 (S.D.N.Y. 2003)...........................................................................6, 7

## FEDERAL RULES

Fed. R. Evid. 401 .............................................................................................................14

Fed. R. Evid. 702 ...............................................................................................................2

Barclays Capital, Inc. ("Barclays"), hereby objects to the Motion *in Limine* for an Order

Excluding the Expert Testimony of Professor Paul Pfleiderer (the "Motion") filed on April 2,

2010, by Debtor Lehman Brothers Holdings Inc. ("LBHI"), the Trustee for the SIPA Liquidation

of Lehman Brothers Inc. ("LBI"), and the Official Committee of Unsecured Creditors

("Creditors' Committee") (collectively, the "Movants").  Barclays respectfully requests that the

Court deny the Motion.

## <u>INTRODUCTION</u>

Movants ask the Court to exclude, in its entirety, the prospective testimony of Professor

Paul Pfleiderer, a financial economist who is the C.O.G. Miller Distinguished Professor of

Finance at Stanford University's Graduate School of Business.  Although Professor Pfleiderer

has studied, written about, and taught classes concerning the pricing and valuation of financial

assets for almost three decades—and although this Court has previously found Professor

Pfleiderer to be an "especially credible" expert on financial issues—Movants urge this Court to

determine summarily that he is not qualified to opine on the valuation, finance, and economic

issues discussed in his expert report.

In his report (the "Report," attached as Exhibit A to the Motion), Professor Pfleiderer

examined, among other things, Movants' claims that Barclays understated the value of the assets

it received in the Sale Transaction.  The Movants are suggesting to this Court that on the

Acquisition Balance Sheet that was included in its publicly disclosed financial statements, which

were audited by PricewaterhouseCoopers ("PWC") and filed with the SEC, Barclays *materially*

*understated* the value of the assets it received in the Sale.  Professor Pfleiderer carefully

reviewed the Barclays valuation methodologies, the numerous categories of illiquid and untraded

securities it acquired, as well as the work papers and related documents from the PWC audit, and

concluded that the Movants' outlandish suggestion has no merit whatsoever.  Indeed, while the

Movants have put forward a whole group of experts to support their suggestion that Barclays'

materially *understated* the value of the assets it received, even those hired experts are unwilling

to state directly what the Movants would have this Court conclude—i.e., that the publicly-filed

Barclays Acquisition Balance Sheet, which was disclosed to the world in an SEC filing,

materially understates the value of the assets Barclays acquired.[1]

In particular, Professor Pfleiderer's report addresses the specific claim by Movants that

the assets received by Barclays in connection with the Fed Replacement Repo transaction (the

"Repo Collateral") were actually worth $5 billion more than the $45 billion in cash that Barclays

advanced to Lehman at the insistence of the Federal Reserve Bank of New York.  As explained

in detail in his report, Professor Pfleiderer concluded that those assets were worth at most the

approximately $45.5 billion at which Barclays *booked them* on the Acquisition Balance Sheet

Barclays publicly filed with its SEC disclosures.  Professor Pfleiderer also concluded that the

assets would have been worth substantially less than that amount if the entire portfolio were to

have been liquidated in a highly unstable market—a result the Barclays sale avoided.

The Second Circuit has expressed a clear preference for admission of expert testimony,

even where the trier of fact is a jury.  *See Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)

(noting that the Supreme Court has "advanced a bias in favor of admitting evidence short of that

solidly and indisputably proven to be reliable"); *UMG Recordings, Inc. v. Lindor*, 531 F. Supp.

---

[1]  As explained in Barclays' forthcoming motion to exclude the Movants' valuation experts, those experts are taking illogical and self-contradictory positions regarding whether the Acquisition Balance Sheet understates the values of the assets acquired by Barclays.  For that and many other reasons, the Court should exclude the Movants' experts, and should reject outright the Movants' efforts to insinuate—without ever plainly stating—that the Barclays' publicly filed Acquisition Balance Sheet reflected a material understatement of the values of the assets acquired in the Sale Transaction.

2d 453, 456 (E.D.N.Y. 2007) ("As the Second Circuit has noted, district courts should presume expert evidence is reliable.").  "[T]he rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, Advisory Committee's Notes at 424; *accord E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004).  "[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion."  *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009).

Movants point to nothing that approaches a "serious flaw" in Professor Pfleiderer's proposed testimony.[2]  Instead, where they do not simply mischaracterize Professor Pfleiderer's opinions and the process by which he reached them, Movants' allegations at most go to the weight of those opinions, not their admissibility:

- First, Movants assert that Professor Pfleiderer is not qualified to opine on valuation because (a) his experience is mostly academic and (b) he does not specialize in the valuation of particular classes of assets.  Movants contrast Professor Pfleiderer with their team of witnesses, purportedly experts in valuing particular types of financial assets, who were retained to produce "independent" valuations solely for litigation purposes.  But Movants ignore that Professor Pfleiderer was reviewing and opining on the extensive valuation work performed by Barclays' valuation professionals—who are experts themselves in valuation work with years of experience valuing *precisely the sort of assets at issue here* (with real money on the line).  Professor Pfleiderer reviewed and examined the work these individuals did in the ordinary course of business, pursuant to

---

[2]  By contrast, as explained in Barclays' motion to exclude the Movants' valuation experts, their reports are riddled with serious flaws that justifies exclusion even under the generally permissive standards referenced above.

Barclays' standard valuation policies and practices.  By contrast, the Movants

lead expert relies upon a raft of alleged "experts" who did far less work than the

Barclays valuation professionals, and who did it solely in the context of litigation

for which they were being paid.

- Second, Movants argue that, because Professor Pfleiderer did not personally value

    each of nearly 12,000 CUSIPs from scratch, his opinion that Barclays did not

    receive a "discount" of $5 billion on those assets does not contain any

    "independent" analysis and should be excluded in its entirety.  In this regard,

    Movants are not just incorrect; their logic is self defeating.  As an initial matter,

    Professor Pfleiderer did independently apply his training and expertise in the

    course of assessing the validity of the actual valuations Barclays performed

    outside the litigation context.  Moreover, he extensively reviewed the actual

    securities that were being valued, and conducted valuation analyses of many of

    them as part of his overall assessment of the Barclays methodologies.  The fact

    that Professor Pfleiderer did not perform the particular analysis that Movants

    assert he should have performed does not make his expert opinion inadmissible.

    Barclays is aware of no case holding that, for example, an accounting expert who

    opines on the validity of an audit must first conduct an independent audit from

    scratch, or that a medical expert must re-perform an operation in order to opine on

    the reasonableness of the approach undertaken by the actual surgeon.  Tellingly,

    *Movants' own experts* did not perform the type of CUSIP-by-CUSIP analysis that

    they now assert Professor Pfleiderer should have performed, and so Movants have

effectively conceded that the approach to which they now object was in fact wholly proper.

- Finally, Movants challenge several of Professor Pfleiderer's other opinions: that LBI's own books and records are not consistent with Movants' theory of a secret $5 billion discount; that Barclays took substantial risks in acquiring the Repo Collateral (to the benefit of the LBI estate); that the Acquisition Balance Sheet generated by Barclays, and the extensive backup to that balance sheet produced by Barclays in this litigation, provides an ample "accounting" for the transaction; and that the Sale Transaction was substantially more beneficial to LBI stakeholders than a liquidation would have been. Movants oppose these opinions primarily on the basis of relevance. As discussed below, each of these opinions speaks to specific topics that were put at issue by the Movants themselves, and each opinion will provide the Court with additional evidence that will help it to analyze the Movants' core claims in this case.

Because Movants have not raised any objection warranting exclusion of Professor Pfleiderer's testimony, the Motion should be denied.

## I.    PROFESSOR PFLEIDERER IS QUALIFIED TO OPINE ON THE VALUATION OF SECURITIES.

Professor Pfleiderer earned his Ph.D. in Economics from Yale University with a focus in financial economics. Expert Report of Professor Paul Pfleiderer ("Report") at p. 80 (attached as Exhibit A to the Motion). He currently holds a chair as the C.O.G. Miller Distinguished Professor of Finance at Stanford University's Graduate School of Business, and has held similar positions at Stanford for nearly 30 years. *Id.* at 80-81. As this Court has previously noted, among his other duties at Stanford, he teaches courses on the valuation of securities and other

financial assets to both undergraduate business majors and M.B.A. students. *In re Iridium Operating LLC*, 373 B.R. 283, 337 (Bankr. S.D.N.Y. 2007) (Peck, J.); Declaration of Paul Pfleiderer at ¶ 1 ("Pfleiderer Decl.") (attached hereto as Exhibit A). Professor Pfleiderer has written extensively on issues related to the pricing of financial instruments. *Iridium*, 373 B.R. at 81-83. This Court has previously allowed Professor Pfleiderer to testify on complex financial issues, finding him to be "an especially credible witness." *Id.* at 337.[3] Movants nonetheless assert that Professor Pfleiderer is not qualified to opine on the valuation of the Repo Collateral. Movants offer two theories, neither of which warrants exclusion of Professor Pfleiderer's testimony.

First, Movants assert that the fact that Professor Pfleiderer is an academic who has never participated in a repurchase transaction somehow invalidates his opinions about the value of the assets Barclays received.[4] Motion at ¶¶ 34-36. Movants overlook the fact that Professor Pfleiderer has extensive training in valuation, and indeed teaches valuation techniques to the people who perform valuations in the finance industry—the very people Movants suggest are experts. Moreover, he was assessing the validity of valuations reached by Barclays valuation professionals, who themselves have years of experience valuing precisely these sorts of assets in the ordinary course of business. These professionals were attempting to determine the accurate value of the assets Barclays acquired as part of their *normal work responsibilities* – not for the purpose of litigation, but for the purpose of accurately stating the values of those assets to their

---

[3] Movants cite a single piece of testimony from the *Iridium* case in which Professor Pfleiderer stressed the need to look at all available data, claiming it somehow contradicts his opinions in this case. *In re Iridium Operating LLC*, No. 01-02952-JPM (Bankr. S.D.N.Y.) (2/27/07 Hearing Tr. 35:18-24) (Docket No. 192). As discussed below, however, Professor Pfleiderer did take the LBI, JPM, and BONY marks into account, and found that for certain types of assets they were not reliable indicators of value under the circumstances. *See infra*, Section II.C.

[4] This latter point is a complete *non sequitur.* Movants fail to explain why lack of experience in transacting repurchase transactions would detract from Professor Pfleiderer's ability to opine on the value of the financial assets used as collateral in such a transaction. Regardless of the mechanics of how they change hands, the financial assets in question remain the same as do the applicable valuation principles and techniques.

management, their Board, their shareholders, the general investing public, and the regulators at the FSA and SEC.

Movants also gloss over the plain text of Federal Rule of Evidence 702, which does not adopt the limit that Movants urge, but rather approves expert testimony by "a witness qualified as an expert by knowledge, skill, experience, training, *or* education." Fed. R. Evid. 702 (emphasis added). "The Second Circuit and courts within this circuit have liberally construed expert qualification requirements." *TC Sys. Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 174 (S.D.N.Y. 2002). Courts recognize that Rule 702 does not set any fixed experience requirement. "[L]ack of extensive practical experience directly on point does not necessarily preclude [an] expert from testifying. A formal education in a particular field is sufficient to qualify a witness as an expert." *Cary Oil Co. v. MG Refining & Marketing, Inc.*, No. 99 Civ. 1725, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) (internal citation omitted).

Second, Movants assert that Professor Pfleiderer lacks sufficient expertise to value all classes of assets among the Repo Collateral. Motion at ¶¶ 34, 37. That criticism ignores the scope of Professor Pfleiderer's expertise in the theory and techniques generally applicable to the valuation of *all* financial assets. It also ignores the fact that the Barclays' valuation professionals whose work Professor Pfleiderer has independently analyzed each have extensive practical experience in valuing precisely the sorts of assets at issue here. Professor Pfleiderer carefully reviewed their work and, where he had questions about particular decisions or assumptions, investigated and satisfied himself that those decisions and assumptions were reasoned and appropriate. Pfleiderer Decl. at ¶¶ 5-9.

In any event, courts in this Circuit have held that "Rule 702 does not require such specificity among the backgrounds of proposed expert witnesses." *Wechsler v. Hunt Health Sys..*

7

*Ltd.*, 381 F. Supp. 2d 135, 143 (S.D.N.Y. 2003); *see also McCullock v. H.B. Fuller & Co.*, 61

F.3d 1038, 1043 (2d Cir. 1995) ("[Defendant's] suggestion that [expert physician] had to be a

specialist in environmental medicine to provide expert testimony in this case is an unwarranted

expansion of the gatekeeper role announced in *Daubert*."); *Pension Committee of the Univ. of

Montreal Pension Plan v. Banc of Am. Secs., LLC*, --- F. Supp. 2d ----, 2010 WL 648369,

(S.D.N.Y. Feb. 22, 2010) (noting that "the lack of *specific* experience with hedge fund audits is

not necessarily determinative" and concluding that expert's "*general* auditing expertise" was

sufficient "to qualify him to testify about auditing standards as they apply to hedge funds" )

(emphasis added); *Cary Oil*, 2003 WL 1878246, at *2 (holding that expert's general experience

in the petroleum industry was sufficient under Rule 702 even though expert had never "run the

day-to-day operations of a small fuel distributor"); *TC Sys.*, 213 F. Supp. 2d at 174-75 (holding

that expert's general economics background and position teaching urban development were

sufficient even though expert had no practical experience with compensation for use of public

rights-of-way).

Movants rely on two cases from the Eastern District of New York to support this

argument.  Neither does.  In each case, the proffered expert had no expertise—whether general or

specific—about the field in which he proposed to testify.  *See Barban v. Rheem Textile Sys., Inc.*,

No. 01-CV-8475, 2003 WL 387660, at *3 (E.D.N.Y. Feb. 11, 2005) (noting that witness had

"never designed any machines in any field"); *Smith v. Herman Miller, Inc.*, No. CV-03-5358,

2005 WL 2076570, at *3 (E.D.N.Y. Aug. 26, 2005) (noting that witness had no experience or

academic knowledge regarding furniture design).  No such argument can credibly be made here.

At most, therefore, Professor Pfleiderer's status as an alleged "generalist"[5] goes only to weight and provides no grounds for precluding his testimony. *See, e.g.*, *Wechsler*, 381 F. Supp. 2d at 144 (holding that arguments about lack of specialization "relate to the weight, rather than the admissibility," of expert testimony) Wright & Miller, 29 Fed. Prac. & Proc. § 6265 (West 2010) ("[T]he witness's lack of specialization usually goes to the weight of the witness's testimony but does not disqualify the witness.").

## II.    PROFESSOR PFLEIDERER'S PROPOSED TESTIMONY DEMONSTRATING THAT THERE WAS NO $5 BILLION DISCOUNT WITH RESPECT TO THE REPO COLLATERAL MEETS THE "FIT" AND RELIABILITY REQUIREMENTS OF RULE 702.

Professor Pfleiderer opines that Barclays did not in fact receive Repo Collateral worth $5 billion more than the repo loan Barclays advanced. Instead, Barclays received assets that were properly valued at no more than approximately $45.5 billion in exchange for a $45 billion loan to LBI (this opinion also included the opinion that many of the illiquid securities received in the Repo Collateral were inaccurately "marked" by Lehman and the custodian banks at inaccurate and overstated amounts). *See* Report at Section II. In forming this opinion, Professor Pfleiderer carefully examined the actual marks established by Barclays' valuation professionals in the ordinary course of business (and long before there were any signs of impending litigation over these assets). Movants, by contrast, have hired several professional experts to produce "independent" valuations solely for the purposes of this litigation. Nonetheless, Movants assert that Professor Pfleiderer did no "independent" analysis to reach his conclusion, and his results

---

[5] Even if lack of "specialization" were a valid legal objection to the *admission* of expert testimony, Movants do not give a single example of how the differences between asset classes supposedly make it impossible for anyone but someone specialized in a particular asset class to value such assets. Indeed, the fact that Movants themselves rely on experts who admit that they have never valued the types of assets on which they are opining in this case demonstrates that this argument is a makeweight. For example, Movants' expert Joseph Schwaba identified 20 of the 26 securities that he valued as auction-rate securities, a class of securities that he could not recall ever having previously traded or valued and certainly was not valuing during September of 2008. Schwaba Dep. Tr. at 20:22-21:2; 33:20-34:23; 72:22-25 (attached hereto as Exhibit D).

are therefore not reliable enough to admit as evidence, because he did not personally value every one of the nearly 12,000 CUSIPs in the Repo Collateral. Accepting Movants' position would require the Court to simply ignore numerous careful analyses performed by Professor Pfleiderer on the most reliable valuations available—those that were not prepared simply for the purpose of litigation, but instead were prepared in an effort to accurately state the values of the assets on Barclays' publicly filed SEC reports and financial statements.

### A. Professor Pfleiderer's Independent Assessment of Barclays' Valuations Provides the Court with Reliable and Highly Relevant Information.

Movants' central complaint about Professor Pfleiderer's report is that he did not conduct an "independent" analysis and instead "rubber stamped" the valuations conducted by Barclays in the wake of the Sale Transaction. Motion at ¶¶ 16-21. Movants' position fundamentally mischaracterizes this section of Professor Pfleiderer's report.

#### 1. *Professor Pfleiderer's Method of Analysis Is Reliable Under Rule 702.*

Movants assert that Professor Pfleiderer "never did his own valuation of the approximately 12,000 CUSIPs at issue" in the Repo Collateral and did not validate Barclays' valuation of each individual CUSIP on a CUSIP-by-CUSIP basis. Motion at ¶ 18. But Movants nowhere show that the valuation methods and formulae Professor Pfleiderer relied on in forming his opinion that the Repo Collateral was worth at most $45.5 billion were questionable, much less invalid. Nor do Movants demonstrate that the underlying data in the Barclays spreadsheets—obtained from neutral sources such as pricing and bid reporting services, offering memoranda, etc.—are inaccurate or biased.[6] To the extent Movants do contest specific components of the Barclays valuations, they do so only with respect to the proper values and the

---

[6] Indeed, Movants do not point to a single instance where they believe that the underlying data Barclays used when valuing the Repo Collateral is inaccurate or unreliable. In fact, one of Movants' own experts, Professor Mark Zmijewski, verified that the price data used by Barclays did in fact match the original source data. *See* Zmijewski Dep. Tr. at 46:3-11, 83:14-24, 136:16-20 (attached as Exhibit B); Pfleiderer Decl. at ¶ 7 n.7.

appropriateness of making certain adjustments and assumptions, not with respect to the relevant

factors that must be considered in performing valuations.

Movants' assertion that Professor Pfleiderer did not do any "independent" analysis is

patently false, resulting from Movants' selective omission of any discussion of the majority of

Professor Pfleiderer's report.  In fact, Professor Pfleiderer conducted numerous independent

analyses while reaching his conclusions:

- An analysis of the extent to which actual transaction quotes were available on either
  Bloomberg or Standard & Poors Capital IQ for the CUSIPS in the Repo Collateral for
  September 18, 2008, or shortly thereafter, concluding that "Repo Collateral positions
  with a value of between $9 billion and $10 billion cannot be marked on the basis of
  observed prices" (Report at ¶¶ 29-33; Pfleiderer Dep. Tr. at 153:20-154:3 (attached as
  Exhibit B to the Motion));[7]

- An analysis of the last set of LBI marks created prior to the Closing of the Sale
  Transaction in which Professor Pfleiderer examined the data in LBI's computer system,
  concluding that LBI's marks were unreliable because they exhibited substantial
  "stickiness" by not changing after September 15 (or September 12, in the case of many of
  the CUSIPs) despite the chaos in the markets during the intervening week.  That
  stickiness was especially pronounced in the most difficult to value assets (Report at ¶¶
  38-40);

- An analysis of marks made by the two repo custodians, JPM and BONY, concluding that
  those marks "were in fact inaccurate, often significantly so" because of the extremely
  short time the custodians had to perform their analyses, the inclusion in the Repo
  Collateral of many types of assets not normally eligible for inclusion in a repo, and the
  difficulty of marking such assets (such as illiquid securities, private label mortgage-
  backed securities, and other structured financial products that became so central to the
  2008 financial crisis) (Report at ¶¶ 41-45);

- A close analysis of the valuation methods and formulas used by Barclays in creating its
  "exit marks," which were "developed and finalized by valuation professionals at Barclays
  over the course of several months."  Report at ¶¶ 47-52, 61-62; Pfleiderer Dep. Tr. at
  41:8-24; Pfleiderer Decl. at ¶¶ 5-9.  The "exit mark" process involved dozens of senior
  personnel from many areas of Barclays' business, and was completed in the ordinary
  course of business for the purpose of creating accurate initial values of the Repo

---

[7]  This statement uses the proper Barclays valuations in describing the total value of assets for which no observable
price data was available.  If instead, the overstated values of the custodian banks for these illiquid securities are
used, the total value of assets in the Repo Collateral for which no observable pricing data was available was
*approximately $12 billion*.

Collateral for accounting purposes. *See* Exhibit C, attached hereto (listing personnel and experience involved in compiling exit marks); Report at ¶ 51 (describing exit mark process in detail). Professor Pfleiderer has developed an extremely detailed understanding of the data and methods used in creating the exit marks, asking probing questions of the Barclays staff who prepared the exit marks and receiving answers he found satisfactory.[8] *See* Pfleiderer Dep. Tr. at 19:12-25:15, 86:17-87:7; Pfleiderer Decl. at ¶ 8. For a substantial sample of CUSIPs across different asset classes, Professor Pfleiderer replicated the individual valuation performed by Barclays to ensure he understood and concurred with what was done as well as with the result. Pfleiderer Decl. at ¶ 7. Professor Pfleiderer concluded that the fair value of all assets ultimately received as part of the Repo Collateral was, at most, $45.546 billion. Report at ¶ 62.

- An analysis of how the Barclays exit marks compared to the BONY custodial marks across asset classes, concluding that differences in valuation corresponded to differences in risk and liquidity of the assets rather than reflecting an unreasoned across the board adjustment (Report at ¶¶ 53-56, Ex. 6);

- An analysis of specific positions to determine whether specific characteristics of those positions supported Barclays' exit marks or the custodial marks (Report at ¶ 57);

- An analysis of the post-acquisition profitability of the Repo Collateral positions (i.e., profit or loss on those positions net of any profit or loss on associated hedging positions placed by Barclays), concluding that Barclays gained a mere $51 million on those positions relative to the exit marks, rather than receiving the $5 billion in profits that should have occurred if Movants' theory of a "secret discount" were correct (Report at ¶¶ 65-71).

The fact that Professor Pfleiderer's independent analyses differed from the specific analysis that Movants say he should have done does not make his testimony about the analyses he *did* do inadmissible.

Moreover, Movants fail to mention that Professor Pfleiderer did expressly consider "the feasibility of developing an entirely new set of marks, completely independent of any of the available sources" for the nearly 12,000 CUSIPs constituting the Repo Collateral. Report at ¶ 60. But he concluded that such an analysis was likely to result in less reliable marks for a number of reasons: the lack of feel for the market conditions at the time, the fact that such a *de*

---

[8] Movants cite to deposition testimony for the proposition that Professor Pfleiderer thinks it is "presumptuous" to question Barclays' valuation methodology. Motion at ¶ 18. Movants have taken this quote out of context. What Professor Pfleiderer in fact was testifying about was that it would be presumptuous for an analyst to reject actual transaction prices in favor of his own model unless there are good reasons to question its validity as an indication of value. Pfleiderer Decl. at ¶ 10.

*novo* valuation would be created solely for litigation purposes rather than in the normal course of business, and the immense practical difficulties associated with creating an entirely new set of marks for 12,000 different financial positions.  *Id.*  For such a granular analysis, "the gain in accuracy is probably illusory because you're basically going to get some that are more and some that are less, but the average is going to reflect the population."  Pfleiderer Dep. Tr. at 254:9-16.

Movants' insistence that Professor Pfleiderer's testimony is inadmissible due to his failure to perform such an analysis is belied by the positions of Movants' experts who did not themselves perform such a granular analysis across the entire portfolio.  Pfleiderer Decl. at ¶¶ 20, 27.  Movants' experts claim that the Barclays exit marks analyzed by Professor Pfleiderer undervalue the Repo Collateral by billions of dollars.  Much of that total, however, derives from their broad (and mostly unsupported and self-contradictory) analyses of entire asset classes, comprising hundreds or thousands of individual CUSIPs—exactly the type of analysis that Movants allege is not sufficient.[9]

Even if Movants were correct that Professor Pfleiderer had only analyzed and approved of Barclays' valuation methodology without doing anything else, Movants' legal argument is also incorrect.  *See* Motion at ¶ 17.  In this District, courts have held that expert testimony that examines the correctness of the methodology used to create a financial document is admissible. *See, e.g.*, *Watanabe Realty Co. v. City of New York*, No. 01 Civ. 10137, 2004 WL 27720, at *4 (S.D.N.Y. Jan. 5, 2004) (admitting expert testimony on repair costs even if all expert did was apply his expertise to review methodology of another and confirm the results); *United States v. Schiff*, 538 F. Supp. 2d 818, 845 (D.N.J. 2008) (holding that review and analysis of business records is legitimate subject of expert testimony).  Movants' cases, by contrast, involve situations

---

[9] Movants' experts often did not even know what types of asset structures were present in the portfolios they were analyzing, as was the case with Joseph Schwaba, who did not bother checking which assets in his portfolio were failed auction rate securities, many of which he improperly valued near or even above par.  Pfleiderer Decl. at ¶ 23.

where an expert merely regurgitated factual information from a party as his own conclusions, without applying any professional expertise. *See Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009) (expert merely accepted and "regurgitate[ed]" information provided to him in an interview as his own expert opinion without any "application of specialized knowledge"); *Playtex Prods., Inc. v. Procter & Gamble Co.*, No. 02 Civ. 8046, 2003 WL 21242769, at *10 (S.D.N.Y. May 28, 2003) (expert merely repeated conclusions of party's own testing program without even verifying the methodology of the testing).

Moreover, Movants offer no evidence suggesting that the data underlying the Barclays valuations—the price quotes and the like that were mechanically gathered from industry standard databases—are inaccurate. To the contrary, when one of the Movants' experts (Dr. Zmijewski) searched for material differences between Barclays' data and the third-party source data, he found none. *See*, *e.g.*, Zmijewski Dep. Tr. at 46:3-11, 83:14-24, 136:16-20 (attached hereto as Exhibit B) ("I looked at the Bloomberg prices and compared the Bloomberg last prices to Barclays and verified that they were reasonable representations of the Bloomberg last prices"). Moreover, the relevant data were gathered by Barclays in the ordinary course of business, were subject to audit by PricewaterhouseCoopers, and were gathered for the purpose of preparing Barclays' financial statements in accordance with applicable government regulations. Pfleiderer Decl. at ¶ 29. That fact further distinguishes this case from those Movants cite. *See Dreyer v. Ryder Auto Carrier Group, Inc.,* 367 F. Supp. 2d 413, 446-47 (W.D.N.Y. 2005) ("Notably, Defendants do not suggest that the underlying data was prepared by Defendants in the ordinary course of business or for the purpose of meeting reporting requirements in compliance with government regulations which could provide some indicia of reliability for the data.")

14

Because Professor Pfleiderer did engage in analysis involving the application of his expertise, his testimony is admissible.

> ### 2. *Professor Pfleiderer's Opinion On The Alleged "Secret $5 Billion Discount" Is Relevant And Admissible.*

Movants further assert that merely analyzing the valuations done by Barclays and concluding that those valuations were "reasonable" was insufficient.[10]  Motion at ¶¶ 19-20. Movants' assertion that this is the extent of Professor Pfleiderer's opinion on the alleged "secret discount" is incorrect and misleading.

The crux of the "secret $5 billion discount" issue is Movants' allegation that this discount was secretly delivered to Barclays through the Repo Collateral.  *See, e.g.*, LBHI Reply at ¶¶ 72-76; Committee Reply at ¶¶ 55-60.  This allegation should be rejected at the outset because there was nothing secret about the Repo transaction (it was known at the time of the Sale and described in detail to this Court by the Trustee and the New York Fed in the December 2008 settlement hearing).[11]

In addition, however, the value of the Repo Collateral was *not* $50 billion, as Movants contend (by relying upon the marks of repo custodians that the Movants had at the time of the Sale Transaction and knew to be stale and inaccurate, but now seek to embrace in the context of this litigation).  Professor Pfleiderer concluded that "contrary to Movants' assertions, the Repo

---

[10] Movants' complaint that Professor Pfleiderer does not assign specific values to specific CUSIPs is a red herring. With respect to the one example Movants cite—Lehman-issued debt—Professor Pfleiderer was clear that he agreed with Barclays' decision to mark such instruments down substantially, but just wasn't offering an opinion about whether they should be marked at zero cents on the dollar versus two cents on the dollar (as opposed to nearly at par, as was the case with LBI's own marks).  Pfleiderer Dep. Tr. at 320:3-321:3; *see also id.* at 107:22-108:22 (noting that BONY valued Lehman commercial paper at near par value, despite Lehman's bankruptcy).  Moreover, Movants' own expert. Professor Mark Zmijewski, does not dispute Barclays' markdown of these assets.  Pfleiderer Decl. at ¶ 11.

[11] Moreover, the Purchase Agreement this Court approved clearly entitled Barclays to acquire the entire Repo Collateral, without any requirement that its value be limited to a certain amount.  For that reason, the factual dispute over the value of the Repo Collateral should be held to be legally irrelevant.  If the Court is to entertain evidence relating to that dispute, however, then Professor Pfleiderer's testimony on that issue should be admitted and considered.

Collateral pledged to Barclays in the Fed Replacement Repo, including the securities and cash

ultimately received in Barclays' December settlement with JP Morgan Chase and LBI, was

worth at most approximately $45.5 billion"—i.e., the amount Barclays determined it was worth

on their publicly-filed financial statements.  Report at ¶ 8.[12]  Movants' position also ignores the

other opinions generated by the various analyses described above.

Under Rule 702, moreover, "[t]he requirement that expert testimony 'assist the trier of

fact' goes primarily to relevance."  *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d 164,

173 (S.D.N.Y. 2009) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)).

Evidence that "has any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the

evidence" is relevant.  Fed. R. Evid. 401.  Moreover, an expert's opinion need not be conclusive

to be admissible.  *See Jarvis v. Ford Motor Co.*, 283 F.3d 33, 48 (2d Cir. 2002) (holding that

expert testimony was admissible "even if it did not conclusively demonstrate—as it need not—

what specific defect caused" an unexpected acceleration).  And any "[d]oubts about the

usefulness of an expert's testimony should be resolved in favor of admissibility."  *TC Sys. Inc. v.*

*Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 174 (S.D.N.Y. 2002).

Even if Movants were correct that the entirety of Professor Pfleiderer's opinion with

respect to the alleged "secret discount" was that Barclays' valuation technique produced

"reasonable" results—and it is not limited just to that—that opinion would still be admissible

because it helps the Court analyze whether Barclays did in fact receive an alleged "secret

---

[12] Indeed, the central objective of this portion of Professor Pfleiderer's report was to set "an upper bound on the value that one would place on [the Repo Collateral] from an economic point of view."  Pfleiderer Dep. Tr. at 130:23-131:2.

discount" through the Repo Collateral, as Movants allege.[13]  The Barclays valuations that

Professor Pfleiderer analyzed and validated were conducted by experienced valuation

professionals in the ordinary course of business and long before any litigation.  Professor

Pfleiderer's careful assessment of the valuations performed by Barclays and his conclusion that

they are "reasonable" are directly relevant to the Court's assessment of what the actual value of

the Repo Collateral was at the time of the transaction.

> **B.      The Use of Support Staff to Assist with the Compilation, Processing, and Evaluation of Data Does Not Disqualify Professor Pfleiderer's Testimony.**

Movants next assert that Professor Pfleiderer's entire testimony should be excluded

because he relied on staff support at the Finance Scholars Group ("FSG") to perform certain data

collection and processing work, and did not have perfect recall at his deposition of everything

that was done.[14]  Motion at ¶¶ 22-24.  In support of this point, Movants cite a handful of

instances when Professor Pfleiderer could not remember details of what his support staff did.  In

listing these instances, Movants fail to describe what tasks were at issue, much less demonstrate

how those tasks were in any way necessary for Professor Pfleiderer's opinions to be reliable.  *Id.*

at ¶ 23.  These items are often trivial, usually pertain to "tests" and "checks" that only Movants

believe are necessary, and would go to the weight of Professor Pfleiderer's testimony rather than

---

[13] Movants also ignore the admonition in *Daubert* that "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  509 U.S. at 594.

[14] Movants incorrectly suggest that it was somehow improper that Barclays had retained the Finance Scholars Group prior to its retention of Professor Pfleiderer.  Motion at ¶ 16, n.4.  Finance Scholars Group was already providing support services for another expert in this matter, and Professor Pfleiderer elected to use them as a resource as well.  Professor Pfleiderer testified that he was fully satisfied with the quality of the support he received from the staffers working at his direction.  Pfleiderer Dep. Tr. at 308:21-309:19.

its admissibility.[15]  Movants also omit any discussion of the numerous detailed analyses that

Professor Pfleiderer did perform.  *See supra*, Section II.A.1.

Movants thus have no basis for their sweeping assertion that Professor Pfleiderer does not

understand the work done under his direction and merely endorsed "recommendations" of the

Finance Scholars Group.[16]  Motion at ¶ 24.  As Movants' sole case demonstrates, in order for

testimony to be excluded because it relies at least in part on work done by support staff, the

failings must be truly egregious.  *In re Worldcom, Inc.*, disallowed expert testimony regarding a

telephone survey, but only where that survey was entirely designed and executed by a research

assistant who had just graduated from college, had no experience in the field, and received no

oversight from the proffered expert.  371 B.R. 33, 42-43 (Bankr. S.D.N.Y. 2007).  The court

concluded that the research assistant's "methodology and execution were not in accordance with

*any* accepted procedural standards and the data that was gathered was not reported in *any*

accurate or helpful way."  *Id.* at 44 (emphasis added).

By contrast, Professor Pfleiderer was involved in every step of the process.  Professor

Pfleiderer regularly met with the support staff at FSG, discussing all aspects of their work, and

received constant updates on the progress of that work.  Pfleiderer Decl. at ¶ 9.  Professor

Pfleiderer led the investigation that generated his opinions, identifying key issues requiring

---

[15] *See* Pfleiderer Dep. Tr. at 38:23-39:11 (whether staff used the Intex service when checking Barclays' valuations as opposed to directly analyzing the calculations Barclays used), 118:14-120:17 (whether staff checked for market prices for thinly traded investments unlikely to have an observed market price), 156:25-157:11 (whether staff checked for Bloomberg prices from dates other than the Closing), 208:13-18 (whether staff examined the offering memorandum on one specific CUSIP), 223:14-22 (whether staff did an analysis from scratch on one particular CUSIP in addition to Professor Pfleiderer's in depth analysis of the steps Barclays took to value that CUSIP), 217:2-220:22 (whether staff did anything in addition to extensive electronic searches and Professor Pfleiderer's own review of the Barclays file and interviews of Barclays personnel with respect to a single specific CUSIP), 264:23-265:23 (Professor Pfleiderer testifying that he *does* remember staff interviewing Barclays personnel regarding specific valuation decision).

[16] Courts regularly allow expert testimony that relies on work done by someone other than the expert.  *See, e.g.*, *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (8th Cir. 2008) (stating that "numerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703").

18

further information and leading interviews of key Barclays and ex-Lehman personnel to ensure

he had the necessary information. *Id.* at ¶ 8. And, contrary to Movants' portrayal, Professor

Pfleiderer himself performed the critical parts of his analysis, often on a line-by-line basis; he did

not adopt any "recommendations" produced independently by FSG as his own conclusions. *Id.*

at ¶ 7. Movants have not demonstrated that Professor Pfleiderer's use of support staff to assist

with the collection and processing of large amounts of information—a common practice in the

preparation of expert testimony—is grounds for excluding his opinions.[17]

### C.    Movants' Assertion that Professor Pfleiderer Did Not Consider Contradictory Evidence Is Baseless.

Movants also claim that Professor Pfleiderer's testimony should be excluded in its

entirety because of a purported failure to "consider information that could contradict his

conclusions." Motion at ¶¶ 25-29. Movants point solely to the marks set by LBI, JPM, and

BONY.[18] But, as Movants tacitly admit, Professor Pfleiderer did not fail to consider those marks

at all.[19] In fact, Professor Pfleiderer expressly considered both the LBI marks carried on

Lehman's internal system and the marks created by the repo custodians. Report at ¶¶ 38-45.

---

[17] Compare this with Movants' own valuation experts, who relied on staffers at Chicago Partners to perform similar tasks. Indeed, some of Movants' experts were forced to admit that they left critical valuation tasks entirely to their staffers. *See, e.g.*, Schwaba Tr. 139:2-140:15 (asked to identify one of the models used in his own valuation, Schwaba admitted that he did not recognize it as something he used in preparing his own opinion, speculated that it might have been used by his staff to prepare his opinion, acknowledged that he did not know how it was used, where it was obtained, or how it worked, and ultimately admitted that he had neither personally examined the models that he used nor was personally familiar with how they worked).

[18] Movants also cite the PricewaterhouseCoopers ("PWC") audit of Barclays' valuation numbers. Motion at ¶ 27. Movants fail to explain how factoring in PWC's approval of Barclays' valuations as part of a formal audit but not interviewing PWC personnel who concluded that Barclays' valuation was properly and reliably conducted ignored evidence that would *contradict* Professor Pfleiderer's report. Movants also ignore the fact that Professor Pfleiderer and his staff did review the materials prepared during PWC's audit and concluded the audit had been conducted in a careful and thorough manner. Pfleiderer Decl. at ¶ 14.

[19] Movants' sole case on this issue is therefore inapposite. In that case, the court rejected an opinion on the cause of a medical injury proffered by a chiropractor who had not even reviewed the patient's medical records. *Li v. Aponte*, No. 05 Civ. 6237, 2009 WL 1285928, at *6 (S.D.N.Y. May 5, 2009). That stands in clear contrast to the case here, where Professor Pfleiderer considered other marks, but ultimately rejected them due to concerns about their accuracy.

Professor Pfleiderer concluded that LBI's marks had not all been updated since September 15 (and in many cases not since September 12), and that stickiness made LBI's marks unreliable in light of the extreme market volatility of the intervening week. *Id.* at ¶¶ 38-40. Similarly, after a careful analysis of the JPM and BONY marks, Professor Pfleiderer concluded that they "were in fact inaccurate, often significantly so." Report at ¶ 42. Movants' insistence on the purported need to review the LBI, JPM, and BONY pricing policies is misplaced. Motion at ¶ 26. To the extent that those marks are inaccurate on their face, or as a result of a close, independent analysis of the appropriate valuation, there is no need for the additional step demanded by Movants.

The sole example given by Movants of a CUSIP for which Professor Pfleiderer's analysis of the BONY mark was allegedly inadequate is the Pine CLO, which is a prime example of the ways in which the custodians' marks are facially inaccurate.[20] Motion at ¶ 28. Professor Pfleiderer and his staff did carefully review all publicly available material on the Pine CLO, as well as the information produced in discovery. Pfleiderer Decl. at ¶ 13. Professor Pfleiderer and his staff also analyzed the trading history of the position, investigated the creditworthiness of the loans underlying the position, and interviewed the personnel most knowledgeable about the valuation of the position. *Id.* at ¶ 13. Only after conducting this careful analysis did Professor Pfleiderer come to the conclusion that the Barclays mark on this position was reliable. This type of analysis involves precisely the sort of "reliable principles and methods" required by Rule 702.

---

[20] Movants fail to mention the Giants stadium auction rate security CUSIP discussed by one of their purported experts, John J. Olvany, and discussed by Professor Pfleiderer in his Report. Report at ¶ 57. In that instance, the Barclays valuation agrees with the BONY valuation. Pfleiderer Dep. Tr. at 316:5-17. Movants' expert disputes the accuracy of the BONY mark in that case, despite its defense of the BONY marking procedure in the case of the Pine CLO CUSIP here. *See also* Schwaba Dep. Tr. at 103:3-15 (disagreeing with BONY marks) (attached hereto as Exhibit D).

### III.    PROFESSOR PFLEIDERER'S OTHER OPINIONS ARE VALID AND ADMISSIBLE UNDER RULE 702.

Movants further dispute Professor Pfleiderer's opinions resulting from additional

analyses beyond those pertaining to the accuracy of the Barclays valuation process and the actual

value of the Repo Collateral transferred to Barclays.  Movants' arguments repeatedly

misrepresent the analyses actually performed by Professor Pfleiderer and should be rejected.

### A.    Professor Pfleiderer's Opinion That The APA's Definition Of The Long Positions Did Not Reflect A Secret $5 Billion Discount Is Based on Objective Data and Expressly Avoids Reliance on Witness Credibility Determinations.

In Section III of his report, Professor Pfleiderer analyzed the available data showing

Lehman's marks on LBI's books as of September 12, 2008.  He then compared those values to

the estimates of assets to be transferred on which Movants place such emphasis in their Rule

60(b) motions, in particular the September 16, 2008 financial schedule initialed by Lehman

executive Steve Berkenfeld.[21]  Professor Pfleiderer concluded that "[f]ar from being distorted

and understated by $5 billion, the aggregate asset value on the Estimated Transaction Balance

Sheet is almost identical to the aggregate asset value recorded on Lehman's books *at Lehman's

marks*."  Report at ¶ 81 & Table 4 (emphasis added).  Professor Pfleiderer also compared the

September 16 financial schedule with the updated transaction balance sheet from September 17,

noting that the available assets had declined even further and were now worth less than the

estimated assets to be transferred.  *See* Report at ¶ 87 & Ex. 7 thereto.  The clear conclusion,

based on LBI's own financial records, is that there was not an additional $5 billion of assets

available to transfer, whether secretly or otherwise.

Movants ask the Court to exclude this analysis, claiming that it somehow involves an

"exercise of crediting certain pieces of evidence and excluding others" and that "weighing

---

[21] This balance sheet is duplicated—and relied on—on page 30 of the Debtor's Rule 60(b) motion.

conflicting evidence and deciding what evidence to credit is decidedly the province of the

Court."[22]  Motion at ¶ 41.  Movants entirely mischaracterize the purpose of this analysis, which

is precisely the opposite—to provide an objective analysis, based on his expertise and on LBI's

own financial records, that will aid the trier of fact in determining the truth of the matter in what

would otherwise be a "he said, she said" type of situation.[23]  *See* Report at ¶ 78 ("Although I

have my doubts about whether, taken as a whole and sensibly interpreted, this testimony supports

the Movants' assertion, testing the validity of that assertion need not come down to how I or

anyone else reads the testimony of the witnesses.").  In his deposition, Professor Pfleiderer

confirmed that he designed his analysis to avoid having to make credibility determinations.

Pfleiderer Dep. Tr. at 97:3-24.  ("It is obviously a somewhat confused record because people are

saying different things and have different recollections, and that's why I felt for some of the

conclusions I read, it was useful to look at the actual information that was there that wasn't going

to be based on people's recollections. . . . But I did not in any way draw a conclusion that I can

rely on X and not rely on Y.").  Because Professor Pfleiderer's analysis does not rely on any

credibility determinations, there is no basis for excluding his testimony on this point.

### B.    The Risks Associated with the Huge and Often Illiquid Positions in the Repo Collateral Are Highly Relevant.

Movants also take issue with Professor Pfleiderer's discussion of the risks for Barclays

associated with taking on the Repo Collateral, arguing that it does not meet Daubert's "fit"

---

[22] Movants cite a single exchange in Professor Pfleiderer's deposition in which Professor Pfleiderer was asked whether "any part of any opinion [he was] offering in this matter [is] based on [his] views of the credibility of witnesses."  Pfleiderer Dep. Tr. at 94:14-16.  Movants quote his "yes" answer, but do not quote his explanation that he merely meant that, to the extent he is relying on deposition testimony, he is assuming that the deponents were telling the truth.  *Id.* at 94:17-95:14.

[23] Movants also object to Professor Pfleiderer's use of the September 12 marks rather than any available September 15 marks.  Motion at ¶ 42.  Movants do not offer any explanation of why this is material; indeed, no one believes that the value of LBI's assets was increasing over that weekend.  Moreover, using the September 12 marks—from a time before the APA negotiations had even begun—ensures those marks were not affected by any alleged "secret" deal to conceal a transfer of value.

requirement—in other words, it is not relevant.  Motion at ¶ 46.  In Section IV of his Report,

Professor Pfleiderer discusses three types of heightened risk faced by Barclays:  information risk

due to the fact that Barclays had substantially less information about the assets it was acquiring

than did LBI, market risk due to the relative illiquidity of many positions due to size or to lack of

demand combined with extremely volatile economic conditions, and business risk associated

with the viability of the LBI business and the risk of mass exodus of former LBI employees and

customers.  Report at ¶¶ 92-108.  Barclays does not agree with Movants' assertion that the law

permits a de novo analysis of whether LBI received fair value for the assets transferred to

Barclays under the APA, as discussed in its Opposition to the Rule 60(b) motions.  But, to the

extent Movants contend such a step is allowed by law, the risks for Barclays associated with the

Sale Transaction (and removed from the Lehman estates) are highly relevant to the question of

whether the Lehman estates received fair value (and in particular received more than they would

have in a liquidation).

> ### C.     Professor Pfleiderer's Opinion That There Is No Need for an Accounting Separate from Barclays' 2008 Results Announcement Is Relevant.

Section V of the Report outlines Professor Pfleiderer's testimony regarding Movants'

demand for an "accounting" with respect to the Sale Transaction.  Report at ¶¶ 109-121.

Professor Pfleiderer concluded that Barclays' 2008 Results Announcement—in which it

disclosed the $4.1 billion gain on acquisition on which Movants place so much emphasis in their

Rule 60(b) briefing—and the associated work papers and files "provide sufficient data and

analytical support to establish that the values Barclays assigned to the acquired assets and

assumed liabilities approximated 'fair values' at the time of the Acquisition with reasonable

precision."  *Id.* at ¶ 109.  Professor Pfleiderer also reviewed similar large acquisitions of broker

dealer assets, and found that "negative goodwill and an accounting gain on acquisition were

common features of transactions involving financial institutions in 2008 and early 2009," so the

fact that Barclays posted a similar accounting gain is not unexpected.  *Id.* at ¶ 120.  These

opinions are directly relevant to claims made by Movants in their Rule 60(b) briefing.  *See, e.g.*,

Creditor Committee Rule 60(b) Motion at 50 (requesting accounting).

### D.  Professor Pfleiderer's Opinions Regarding the Benefits of the Sale Transaction Relative to Liquidation of the Assets Are Admissible.

Finally, Movants complain about Section VI of Professor Pfleiderer's Report.  Motion at

¶¶ 48-49.  In that Section, Professor Pfleiderer applies his expertise to analyze the benefits that

accrued to LBHI, LBI, Lehman creditors, and Lehman customers as a result of the Sale

Transaction relative to the fire sale of assets that would have occurred otherwise.  Report at ¶¶

122-134.  Professor Pfleiderer concludes that "the fire-sale which would have ensued absent the

Transaction would have been worse for creditors and other interested parties."  *Id.* at ¶ 129.

Movants' objection is based solely on Professor Pfleiderer's use of two quotations from

the Court's hearing on September 19, 2008.  *Id.* at ¶ 133.  Movants argue that this supposed

attempt to "sit in judgment of . . . the reasonableness of this Court's findings" invalidates the

entire section.  Motion at ¶ 48.  That the Court addressed the benefits of the Sale Transaction in

approving that Transaction does not mean that further testimony on the subject—a complex issue

of fact relevant to the issues now before the Court—is in any way improper or inadmissible.  At

the evidentiary hearing, the Court will be free to assign whatever weight it chooses to such

testimony.

## CONCLUSION

For the foregoing reasons, Barclays respectfully requests that the Court deny Movants'

Motion *in Limine* for an Order Excluding the Expert Testimony of Professor Paul Pfleiderer.


Dated: New York, New York
      April 19, 2010

           Respectfully submitted,

           BOIES, SCHILLER & FLEXNER LLP


           By:    /s/ Jonathan D. Schiller
               Jonathan D. Schiller
               Jack G. Stern
               575 Lexington Avenue
               New York, New York 10022
               Tel: (212) 446-2300
               Fax: (212) 446-2350
               Email: JSchiller@bsfllp.com
                     JStern@bsfllp.com

               Hamish P. M. Hume
               5301 Wisconsin Avenue, N.W.
               Washington, D.C. 20015
               Tel: (202) 237-2727
               Fax: (202) 237-6131
               Email: HHume@bsfllp.com

               *Attorneys for Barclays Capital Inc.*