# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

                                                    :

In re:                                              :        Chapter 11
LEHMAN BROTHERS HOLDINGS INC, et al.,               :        Case No. 08-13555 (JMP)
                                                             (Jointly Administered)
              Debtor.                               :

                                                    :

-------------------------------------------------------------------- X

                                                    :

In re: LEHMAN BROTHERS INC.,                        :
                                                             Case No. 08-01420 (JMP)
              Debtor.                               :

                                                    :

-------------------------------------------------------------------- X

### DECLARATION OF PAUL PFLEIDERER

     I, PAUL PFLEIDERER, declare as follows:

     1.     I am the C.O.G. Miller Distinguished Professor of Finance at the Graduate School of Business of Stanford University, a Professor of Law (by courtesy) at Stanford Law School, Stanford Graduate School of Business Trust Faculty Fellow for 2009-2010, and Co-Director of the Wealth Management Executive Program at Stanford.  I have been retained by Barclays Capital Inc. ("Barclays") as an expert in these cases.  I base this Declaration on my personal knowledge and upon review of pertinent documents.

     2.     On January 8, 2010, I submitted my expert report in this matter, a document entitled the "Expert Report of Professor Paul Pfleiderer," which accurately sets forth my

opinions in this matter.   On February 23, I provided deposition testimony.   In response to

questions from Counsel during that examination, I further elaborated upon my opinions and the

extensive investigation and analysis that I performed, with assistance from staff at Finance

Scholars Group ("FSG"), in the course of developing my opinions and preparing my report.

3.      I understand that Debtor Lehman Brothers Holdings Inc., the Trustee for the SIPA

Liquidation of Lehman Brothers Inc., and the Official Committee of Unsecured Creditors

(collectively, the "Movants") have asked the Court to exclude my prospective testimony from the

upcoming evidentiary hearing in this matter.   Counsel for Barclays has asked me to review the

Movants' Motion *In Limine* for an Order Excluding the Expert Testimony of Professor Paul

Pfleiderer (the "Motion to Exclude" or "Motion") to ascertain whether the Motion properly

characterizes my opinions, the bases for my opinions, and the work that I and others working at

my direction performed as I developed my opinions and prepared my report.[1]   Counsel for

Barclays also asked me to examine whether Movants' experts based the opinions they expressed

in their reports and depositions[2] on reliable data, whether Movants' experts employed sound

principles and methods in their investigations, and whether Movants' experts applied such

principles and methods in appropriate ways likely to generate reliable findings and conclusions.

I was not asked to opine, and I do not opine, on any legal issues raised in the Motion to Exclude.

4.      Upon review of the Movants' Motion to Exclude, I have determined that the

Motion contains numerous erroneous and misleading assertions about my opinions, the bases for

my opinions, and the work that I did or directed in the course of developing my opinions and

preparing my report.   Furthermore, the Motion (a) omits any reference to many analyses

---

[1] Motion *In Limine* for an Order Excluding the Expert Testimony of Professor Paul Pfleiderer, *In re:  Lehman Brothers Holding Inc., et al*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Apr. 2, 2010) (hereinafter "Motion to Exclude").

[2] Movants' expert John Olvany has not been deposed as of the date of this declaration.

summarized in my report that flatly contradict the Movants' assertion that my opinions lack rigor
and reliability and (b) fails to cite testimony I gave at deposition that directly refutes many of the
erroneous and misleading assertions contained in the Motion.   As a result, the Motion
fundamentally mischaracterizes my opinions, the bases for my opinions, and the work that I did
or directed in the course of developing my opinions and preparing my report.

5.    Movants claim that, instead of "conducting [my] own valuation of the Repo
Collateral," I "merely accepted Barclays' valuation on faith."[3]  They also claim that I conducted
my work with "an utter lack of the independence essential to admissible expert testimony."[4]
These statements are false, and they fundamentally mischaracterize how I approached this
engagement and how I did my work.  I did not accept Barclays' valuations on faith, but instead
conducted a comprehensive, rigorous, detailed, and probing review, including investigation and
analysis, both to "test" Barclays' valuations and to identify the most reliable basis for valuing the
securities that transferred to Barclays in this transaction.

6.    That my review, investigation, and analysis were comprehensive cannot be
disputed.  I personally examined and evaluated the full portfolios of positions that transferred to
Barclays in both the initial inventory and in the JP Morgan Chase ("JPM") settlement inventory,
as also did staff working at my direction.  In many cases, we examined and evaluated individual
positions (i.e., holdings in individual CUSIPs); in other cases, we examined and evaluated
groups of positions in similar securities (e.g., Lehman equity-linked notes, municipal auction rate
securities).  While I did not conduct an *individualized* valuation of *every* CUSIP represented in
the Repo Collateral, large portfolios of securities are seldom, if ever, valued on the basis of

---

[3] Motion to Exclude at ¶ 13.

[4] Motion to Exclude at ¶ 18.

individualized valuations.  Movants' own experts implicitly confirm that such individualized valuations are not necessary to address the valuation issues in this matter.  As I discuss further below, with the exception of a relatively few "cherry-picked" CUSIPs, Movants' experts themselves do not perform individualized valuations, but instead purport to perform the same kind of "portfolio valuations" that I perform (though I believe they actually failed to do that properly, and instead simply second-guessed reasonable methodologies and judgments made at the time, in ways that inflate their valuations of the securities Barclays acquired).[5]

7.    My investigative and analytical work in this case also was extensive, rigorous, and detailed.  I personally spent many hours examining and analyzing many different aspects of Barclays' valuations, often on a line-by-line, CUSIP-by-CUSIP basis.  Among other things, I examined and analyzed, for every class of securities, the extent to which Barclays relied on well-known sources of third-party data on prices and quotations; how Barclays used these data to estimate mid-point prices as of the valuation date; what method Barclays used to adjust mid-point prices to exit prices (as they were required to under the relevant accounting rules); and what kinds of data and analyses Barclays used to estimate the size of an appropriate "mid to bid" adjustment.[6]  In many instances, I worked through and essentially replicated the methods

---

[5] Moreover, a close examination of the methods of the Movants' experts in the instances in which they do perform individualized valuations reveals numerous flaws and inconsistencies that in my opinion significantly bias their conclusions as to value.  Their individualized valuations demonstrate exactly the problems I had in mind when I wrote in my report (at page 36) that "it is highly unlikely that such a procedure [developing entirely new marks, in litigation, more than a year after the events at issue] would lead to better marks than the marks developed by Barclays.  Rather, such a procedure could in the end produce *less* reliable marks for several reasons."

[6] Movants' experts assert that Barclays' methods were flawed and inconsistent in numerous ways, that Barclays' independent auditor, PricewaterhouseCoopers, either did not find these flaws and inconsistencies or simply accepted them, and that I either did not find them or simply ignored them.  In fact, most of what Movants' experts call flaws and inconsistencies are nothing of the sort.  They typically are either (a) appropriate and justifiable differences in methods required by the varying quality and quantity of available information across different types of assets or (b) differences of opinion and judgment as to methods of the sort that typically arise between different analysts examining complex securities.  This is demonstrated by the fact that Movants' experts' own valuation analyses themselves exhibit numerous "flaws and inconsistencies," many of which are far more problematic than the flaws

Barclays used on a CUSIP-by-CUSIP basis—again, for a sample of CUSIPs and not for every individual CUSIP—to make sure I had a complete and intimate understanding of Barclays' methods.[7]

8.      My investigative and analytical work in this case was entirely independent and deeply probing.  As a starting point, I personally read the transcripts of a large number of depositions of percipient witnesses, and staff working at my direction further scrutinized the transcripts of the depositions I read and of others for relevant information.  While these depositions provided useful insight into many of the valuation issues at the center of this matter—especially the complexity of many of the securities that transferred over to Barclays, and the conditions in relevant financial markets at the time of the transfer—I and staff working at my direction requested the opportunity to interview, and in fact did interview, a long list of former Lehman and/or Barclays professionals with detailed knowledge of the securities at issue, the conditions in markets at the time of the transfer, valuation methods employed by both Lehman and Barclays in the normal course of business, the types and sources of data that Lehman and Barclays relied upon in valuing securities of the type at issue in this case, and similar topics.[8] Where I and my staff felt it would be helpful, we sometimes requested follow-up interviews,

---

and inconsistencies these experts purport to have identified in Barclays' valuations.  I provide examples of serious flaws and inconsistencies in the analyses conducted by Movants' experts below.

[7] As I stated in my deposition, I did not as a general matter "audit" the raw third-party data reported or referenced in Barclays's spreadsheets to ensure, for example, that data that Barclays identified as Markit data was in fact Markit data.  In part, this was because, in working with Barclays' third-party data, I saw no indication whatsoever that any of the third-party data used by Barclays had been manipulated or misstated in any way.  Furthermore, so far as I know, Movants have never asserted that the third-party data Barclays used was inaccurate in any way.  In fact, when one of the Movants' experts (Dr. Zmijewski) searched for material differences between Barclays' data and the third-party source data, he found none.  *See, e.g.*, Videotape Deposition of Mark Zmijewski, *In re:  Lehman Brothers Holding Inc., et al*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Apr. 14, 2010), at 46:3-11, 83:14-24, 136:16-20 (hereinafter "Zmijewski Deposition") ("I looked at the Bloomberg prices and compared the Bloomberg last prices to Barclays and verified that they were reasonable representations of the Bloomberg last prices").

[8] Movants mistakenly assert that I chose not to interview Martin Kelly.  In fact, staff working at my direction interviewed Mr. Kelly and reported back to me on the communication.

which were arranged as requested in every instance.  In the course of these interviews, I and my staff were given access to trading desk managers, product control professionals, accounting personnel, and other senior executives, and we spent many hours asking probing and detailed questions without limitation or restriction.  Examples of the kinds of topics we covered include the following:  whether any of the Barclays professionals involved in valuing the Repo Collateral had any personal or institutional incentive to understate or overstate the values of these securities (they did not); the extent to which the methods used to value the Repo Collateral were consistent with valuation methods used by Barclays in the normal course of business (they were consistent); and the extent to which Barclays' valuation methods were subject to regulatory review (such reviews were rigorous and intensive).  Of course, we also had access to and examined a very extensive set of documents, data, spreadsheets, and analyses related to (a) Barclays' valuation procedures and methods, and (b) the manner in which Barclays implemented such procedures and methods in valuing the inventory of trading securities it acquired from Lehman.

9.      Any reasonable review and characterization of the work I did would find nothing like Movants' claim that I was "casual at best, . . . often assuming something was correct instead of verifying it, or relying solely on staff without bothering to learn or check the details of their work."[9]  To the contrary, I personally spent many hours studying, examining, and testing different aspects of the matters about which I testified.  I also spent many hours meeting with the senior professionals at Finance Scholars Group who were providing investigative and analytical support to me in the course of my work on this matter.  We discussed all aspects of their support work in detail and at length, and I was regularly and fully apprised of the work they were doing at my direction.

---

[9] Motion to Exclude at ¶ 16.

10.    Movants purport to support their assertion that my work was not sufficiently "independent" with a single quotation from my deposition, when I said, "it would be rather presumptuous for me to say that Barclays[,] who is marking this at the actual sale that they realized[,] is wrong."[10]    This statement is taken out of context.    In fact, as originally presented during my deposition, it relates to an important point of difference between my own professional judgments views and those of at least some of the Movants' experts.    Most, if not all, of the valuation experts in this case (by which I mean Mssrs. Zmijewski, Schwaba, Olvany, Slattery, and myself) appear to agree that marks necessarily are estimates and that our objective as valuation analysts should be to identify, adopt, and implement procedures, methods, and data that are likely to produce unbiased estimates of value.    In this regard, it is widely accepted by accounting and valuation professionals and in the relevant literature that a price observed in an actual transaction, when available, is an important piece of information that should be given considerable weight in reaching a value determination.    At least two of Movants' experts reject this widely accepted general principle.    Specifically, Professor Zmijewski contends that a valuation analyst should consider only transactions that occur before the valuation date, hour, and minute, and should ignore an observed price that occurs even *five minutes* after this cut-off.[11] I believe that is an insupportable view, and is simply wrong.    Mr. Schwaba takes an even more extreme and unusual position, stating that he would reject an actual price from an actual transaction close in time to the valuation date simply for the sake of consistency.[12]    In sharp contrast to Professor Zmijewski and Mr. Schwaba, I believe (as I said in my deposition) that it is

---

[10] Motion to Exclude at ¶ 18 (citing the deposition of Paul Pfleiderer at 107:11 – 110:16).

[11] *See* Zmijewski Deposition at 56:3 – 57:16.

[12] *See* Deposition of Joseph Schwaba, *In re: Lehman Brothers Holding Inc., et al*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Apr. 12, 2010), at 50:17-23.

"presumptuous" of an analyst to reject a sale price from an actual transaction without good reason for doubting that that price was an accurate indicator of value at the time, and instead claim that his or her own models and assumptions provide a better indication of value than an actual transaction at the time.

11.    Movants claim to demonstrate my supposed lack of independence by citing my review of a small group of securities identified as Lehman-issued warrants and Lehman-issued equity-linked notes — securities that depended for their value on Lehman's ability to pay the underlying obligations, which after the bankruptcy was obviously substantially impaired. Specifically, Movants cite my statement that, based on my analysis of the risk characteristics and likelihood of payment of these particular securities, "I certainly agree [with Barclays] that they should be significantly marked down. Whether you mark them down to zero or two cents [on the dollar] or five cents [on the dollar] is not something that I would offer an opinion about without doing more due diligence."[13] I stand by that statement and note two relevant facts:  First, the total amount of value at issue here, for a price difference of two to five cents, for all of the Lehman equity-linked notes and all of the Lehman-issued warrants is at most approximately $10 million.[14] Second, Prof. Zmijewski, who purports to have performed a careful valuation of the equities in this case, does not contest Barclays' decision to write these securities down to zero. Thus, a valuation judgment on my part that Movants' Counsel claim illustrates my refusal "even to entertain that [any] Barclays' valuation was wrong" does not even merit a footnote in the

---

[13] Motion to Exclude at ¶ 20 (citing the deposition of Paul Pfleiderer at 320:16 – 320:3).

[14] According to information presented in Barclays acquisition detail, two percent of the total Sept. 18, 2008 Bank of New York ("BoNY") valuation of untested Lehman-issued equity-linked notes and Lehman-issued warrants is $4.06 million, while five percent is $10.15 million.

report of Prof. Zmijewski (who was Movants' expert assigned to value the "equities" portfolio).[15]

12.    Movants claim that I "did not, and could not, provide any analysis or opinion concerning Barclays' valuation of any specific CUSIP."[16] This is simply not true. In fact, I included an Appendix in my report in which I presented my analysis of and conclusions regarding the valuation of a broad variety of securities. As it happens, among the specific securities I analyzed were the Lehman-issued warrants and the Lehman equity-linked notes discussed above. Other specific securities I analyzed included certain high-risk varieties of collateralized mortgage obligations (namely, interest-only CMOs and inverse interest-only CMOs), Giants Stadium notes (which were auction rate securities), and certain insurance-related notes (also auction rate securities).

13.    Another security that I analyzed individually in the course of preparing my report, with the assistance of FSG staff, was Pine CCS, a collateralized loan obligation ("CLO"). With respect to Pine, Movants assert that all I did "was review what Barclays had written about Pine in its own files [and] perhaps review Pine data on a Lehman database . . .."[17] They assert that I "did not speak with anyone at Barclays to determine what might be causing" the "disparity" perceived between the price Barclays determined for Pine and the price determined by custodian firm Bank of New York ("BoNY"). Movants further assert that I "did not review the terms of the Pine security" and "did not consider the creditworthiness of the credits underlying the CLO."[18] Here, as elsewhere, Movants are simply wrong. I or staff working at my direction had several

---

[15] Motion to Exclude at ¶ 19.

[16] Motion to Exclude at ¶ 7.

[17] Motion to Exclude at ¶ 28.

[18] Motion to Exclude at ¶ 28.

conversations with the professionals at Barclays most knowledgeable about Pine, reviewed virtually all of the information that was publicly available about Pine or available in the extensive document production in this matter, evaluated the history and trading record for Pine CCS, and investigated the creditworthiness of the loans packaged in this CLO.

14.    Movants correctly note that I attach significant weight to the fact that PricewaterhouseCoopers ("PwC") conducted a comprehensive audit of Barclays' 2008 financial statements that included an extensive, detailed, and thorough audit of the valuations and accounting decisions that went into the preparation of the acquisition balance sheet.  They assert, however, that I "did not speak with anyone at PwC" when preparing my report.[19]  This is true, as far as it goes.  But what Movants do not acknowledge is that I and staff working at my direction confirmed the depth and thoroughness of PwC's audit with Barclays' accounting professionals and that we reviewed a large sample of documents developed in the course of this audit that support a conclusion that the PwC audit was careful and thorough.[20]  Movants also note that in my deposition I could not confirm "whether PwC checked Barclays' prices for each CUSIP" in the inventory of trading assets that Barclays acquired from Lehman.[21]  On this point, it is important to understand the specific data about which the deposing attorney was asking.  In asking about "Barclays' prices" here, he was asking not about Barclays' marks, but about market data provided by well-known and highly-reputable vendors (such as Bloomberg, Standard & Poor's Capital IQ, and similar data providers) of the type routinely used and relied upon by both investment analysts and academic researchers.  The deposing attorney's question was whether I

---

[19] Motion to Exclude at ¶ 27.

[20] Since the completion of my report, more PwC documents have become available to me, and those documents confirm the understanding that I had at the time I prepared my report.

[21] Motion to Exclude at ¶ 27.

had determined whether PwC had, in the course of its audit, checked each and every data point against the original source for that data.  Of course, auditors typically do not fully authenticate or replicate every single data point on which their clients rely, but instead use sampling methods and materiality considerations to focus their efforts.  Furthermore, in the course of my own work that involved the price data identified by Barclays as vendor data, I saw no evidence that these data were not what Barclays indicated they were, and have no reason to believe that PwC saw any such evidence either.[22]  Thus, while I could not rule out that PwC had in fact verified and authenticated every single data point Barclays had pulled from a vendor, I was (and remain) unwilling to confirm that PwC had in fact checked Barclays' prices for every CUSIP.

15.    At various points, Movants assert that I ignored relevant sources of information or otherwise exclude "pieces of evidence," that I discount deposition testimony, and that I chose not to talk to key people in the course of my investigation.  None of these statements is accurate.  In fact, I considered and analyzed all of the relevant information available to me.  As a financial economist and valuation analyst, however, I did attach significant weight to hard data and numerical facts, and to the results of my analysis of these data and facts, especially where these helped to resolve or reconcile the sometimes conflicting and confused testimony and email traffic related to the issues I examined.

16.    Finally, Movants claim that I "did not analyze the transaction that was disclosed to and approved by the Court."[23]  This is false.  I reviewed the documents that I understand constitute the agreement between the parties that was presented to the Court for approval, and I also read the transcript of the Sale Hearing on September 19, 2008.  Furthermore, I studied the transaction as implemented in great detail.  In my opinion, the "transaction that actually

---

[22] Nor have any of the Movants' experts cited any such evidence, to the best of my knowledge.
[23] Motion to Exclude at ¶ 8.

occurred" (to use the Movants' phrase) was, in all essential respects, the transaction that was described in the key documents presented to the Court and in the presentation made to the Court in the Sale Hearing.[24]

17.     Movants' experts assert that Barclays' methods were flawed and inconsistent in numerous ways.  In fact, the "flaws and inconsistencies" that Movants claim to have identified are nothing of the sort.  Rather, the "flaws and inconsistencies" claimed by the Movants relate to either (a) appropriate and justifiable differences in valuation methods for widely different kinds of securities, for which there was a varying quality and quantity of available information, or (b) differences of opinion and judgment as to the best methods for valuing illiquid securities – where Movants' experts are trying to second-guess the judgments Barclays made at the time in ways that inflate the valuations of the securities Barclays acquired (through methods that I believe are unreliable and unsupported).

18.     As I now demonstrate through a non-exhaustive set of examples, Movants' experts' valuation analyses suffer from serious data issues and a number of outright methodological errors that are far more problematic than any of the supposed flaws and inconsistencies Movants purport to have identified in Barclays' analyses.

19.     Professor Zmijewski is Movants' expert on the valuation of equities in the initial inventory and also on the valuation of all of the securities in the JPM inventory—which together constitute approximately 30% of the aggregate value of the Repo Collateral based on Barclays' marks.  (Prof. Zmijewski also accumulates the valuation conclusions of Movants' other experts and offers an opinion as to the alleged aggregate or total overvaluation of the Repo Collateral. As I show below, Prof. Zmijewski did not sufficiently assess the reliability of the findings and

---

[24] Motion to Exclude at ¶ 8.

opinions of these other experts to justify his reliance on them.).  It is important to note that, as is
not disputed by the Movants' experts, the "equities" portfolio included many assets that were not
publicly traded, liquid stocks; instead, it included many over-the-counter, thinly traded, or
illiquid securities, including convertible debt securities.  Thus, the valuation of this portfolio
could not be done simply by looking up observable pricing data.

20.     As an initial observation, it is significant and telling, in light of Movants'
criticism of me for not valuing positions individually, that Prof. Zmijewski valued both the
equities in the initial portfolio and the entire JPM inventory on a *portfolio basis*, not by
individual valuation of each CUSIP.  These were not insignificant components of the Repo
Collateral:  The equities valued by Prof. Zmijewski on a portfolio basis included 4,028 CUSIPs
and had an aggregate value, at Barclays' marks, of $9.343 billion.  The JPM inventory valued by
Prof. Zmijewski on a portfolio basis included 1,195 CUSIPs and had an aggregate value, at
Barclays' marks, of $3.740 billion.

21.     More important, Professor Zmijewski's valuations of both the equities in the
initial portfolio and the JPM portfolio are seriously flawed.  With respect to the JPM inventory,
Prof. Zmijewski relied on JPM marks for *September 17, 2008* (two days *before* his own preferred
valuation date.)   However, he did nothing to verify or check the reliability of the JPM marks as
of that date.[25]   Moreover, even if the JPM marks were reliable, which they are not, Prof.

---

[25] In this regard, Prof. Zmijewski relies on the opinion of Movants' expert, John Schneider, that JPM had the
capability to value the Repo Collateral.  However, Mr. Schneider did not study the composition of the Repo
Collateral and did not know what specific securities were included in the Repo Collateral, and so had no basis for his
opinion that JPM had the capability to value the Repo Collateral.  *See* Deposition of John J. Schneider, *In re:
Lehman Brothers Holding Inc., et al*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Apr. 12, 2010), at 33:12-25
("Quoting Mr. Schneider's deposition testimony: "I've seen a list of assets, but I did not analyze it in any way. . . .  I
did not do anything other than see a list of assets." [Schneider transcript, 46:6-10]  "Q: And you know nothing about
what sort of collateral was actually in the Fed replacement repo; is that correct?  A: Other than your question
previously where I did look at a list of collateral.)

Zmijewski did not have JPM marks for his valuation date, which is September 19, 2008.[26]  Prof.

Zmijewski recognized that he had to adjust the September 17th JPM marks to September 19th, but

the data he uses as the basis for this necessary adjustment is the Lehman GFS system for

September 17, 2008, through September 19, 2008 — a time period when Lehman's President,

Mr. McDade, and others have testified that the marks from the Lehman trading desks that fed

into that system were not being updated comprehensively due to the fact that Lehman's traders

and employees were not all actively working, due to the dislocation and uncertainty caused by

the September 15 bankruptcy filing.[27]  Indeed, the Lehman Examiner studied the GFS system

and concluded that it was acceptably reliable through September 12, 2008, but was not reliable

thereafter.[28]  Thus, because his adjustment of JPM marks from September 17 to September 19 is

flawed, the September 19 mid-point marks that are the starting point for Prof. Zmijewski's

valuation of $3.74 billion of securities in the Repo Collateral are unreliable.  Moreover, to the

extent that securities prices generally were falling during the week of September 15, 2008, the

GFS system failed to capture the full extent of the decline; this means that the error in Prof.

---

[26] To be clear, I disagree with Movants' experts' use of a September 19, 2008 valuation date — that is, a full three days before the Sale Transaction closed and title to the assets passed to Barclays — which substantially inflates their valuations.  In my view, Barclays' use of of September 22 and, to the extent relevant, dates during the following week (selected in consultation with its auditors at PwC) is more appropriate.  The use of a December 22 valuation date for cash and securities ultimately received from JPMorgan was also, in my opinion, a more reasonable estimate of the fair value of Barclays claim as at September 22 than using September 19 values of those assets.

[27] To support his claim that GFS data provide a suitable basis for adjusting the September 17 JPM marks to September 19, Prof. Zmijewski cites a table in his report showing the percentage of GFS prices that changed one or more days during the span from September 12 through September 19.  (A high percentage of the GFS prices change once or twice or even three times during this span.)  But the relevant question is whether GFS prices changed between September 17 and September 19 (which they often do not); Prof. Zmijewski does not report data for this particular time period.  In fact, it is likely, based on my analysis of daily GFS reports on the relevant days, that the changes Prof. Zmijewski cites for his five-trading-day span in fact occur mostly early in that span and not between September 17 and September 19.

[28] *See*, *e.g.*, Report of Anton R. Valukas, Examiner, *In re:  Lehman Brothers Holding Inc., et al*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Mar. 11, 2010), at 1595-1596, 1604, 2007-2010.

Zmijewski's mid-to-bid adjustment method and data clearly bias his valuations in favor of Movants, i.e., towards artificially higher valuations compared to Barclays' marks.

22.     Movants' expert Joseph Schwaba examined and claims to have independently valued a small subset of the more than 500 municipal securities that Barclays acquired from Lehman.  Mr. Schwaba states that 20 of the 26 municipal securities that he examined were auction-rate securities, a subclass of municipal securities that was particularly troubled in 2008— indeed, many analysts described the market for these securities as "frozen" during much of 2008, and the market remains dormant, at best, today.  Despite this, Mr. Schwaba valued the auction rate securities he examined either *very close to, at, or above par*.  This is inconsistent with his own observation in his report that "[f]ailed [auction-rate securities] would trade below par and may be subject to restricted liquidity."

23.     Mr. Schwaba's method for valuing the auction rate securities he examined was flawed, unreliable, and biased in favor of Movants, i.e., designed to generate high values for securities that were not trading or tradable in September 2008.  Specifically, his valuation method did not take into account the fact that he was valuing auction-rate securities that had failed at auction, often continuously for months.  At his deposition, Mr. Schwaba could not recall ever having previously traded or valued auction rate securities; indeed, his experience with municipal securities generally has been extremely limited.

24.     Mr. Schwaba's lack of experience with or understanding of auction rate securities led him to adopt a fundamentally unsound approach to valuing these securities.  Specifically, he based his valuations of the auction rate securities he examined on 152 transactions involving supposedly "comparable" securities, all of which traded at or very near par.  But Mr. Schwaba was unable to identify which of his comparable securities were auction-rate securities and had no

idea which, if any, were failed auction-rate securities.[29]  As a result, in selecting the comparables

that he used to value failed auction-rate securities, Mr. Schwaba failed to check whether his

comparables had the one characteristic essential to establishing comparability, namely, whether

they were auction-rate securities with a similar auction history.  This is the equivalent of valuing

houses adjacent to toxic waste sites with "comparables" that are adjacent to other municipal

properties—parks, golf courses, schools, and the like.  Needless to say, the resulting valuations

are unreliable and biased upwards.  Mr. Schwaba's failure to take into account such an important

factor in the valuation of auction-rate securities renders his testimony on this issue unreliable.

25.    Movants' expert Mark E. Slattery claims that he "calculated the fair value of a

total of 6,667 securities acquired by Barclays in the Acquisition."[30]  These securities fall into six

different asset classes:  U.S. Treasury and agency debt securities; agency residential mortgage-

backed securities ("RMBS"); non-agency RMBS; collateralized loan obligations ("CLOs"),

including the Pine CCS CLO, collateralized debt obligations ("CDOs"); and commercial

mortgage backed securities ("CMBS").

26.    One major difference between Mr. Slattery's valuations and Barclays' valuations

is the method used to adjust mid-prices to bid or exit prices for certain classes of assets.  Mr.

Slattery agreed that such an adjustment was appropriate, but contends that the adjustments used

by the Barclays valuation personnel were too large.  As an alternative to Barclays' mid-to-bid

adjustments, Mr. Slattery constructs his own mid-to-bid adjustments in an unorthodox way using

data that are outdated, do not reflect of the market conditions prevailing in September 2008, and

---

[29] Even if any of the transactions that Mr. Schwaba used as comparables actually involved a failed auction-rate
security, that would still not make it a valid indicator of the value of the failed auction-rate securities that he was
valuing because Mr. Schwaba also made no effort to screen out non-arm's length transactions in which financial
institutions repurchased failed auction-rate securities from their own retail customers for relationship reasons or in
response to regulatory or litigation pressure.  Such a non-arm's length transactions in one failed auction-rate security
provides little information about what a different failed auction-rate security would have traded for in an arm's-
length transaction.
[30] Expert report of Mark Slattery, paragraph 5.

whose reliability is not known and cannot be tested.   So far as I am aware, Mr. Slattery's technique has never been used in the relevant academic literature and has never been endorsed by any other valuation professional; moreover, Mr. Slattery was unable to cite any use of this technique in the academic literature or any support for his approach by any standard setting organization of valuation professionals.

27.    Mr. Slattery's approach was to attempt to derive a mid-to-bid adjustment that reflects the degree of illiquidity prevailing in September 2008 in the markets for the fixed-income securities he examined.   As a first step, he attempts to calculate a "multiplier" that captures the relationship between bid-ask spreads in a "typical" market to bid-ask spreads in a "distressed" market.   To estimate that multiplier, Mr. Slattery uses information from a chapter entitled "A User's Guide to Buy-Side Bond Trading," contained in 1997 book on bond portfolio management.   Exhibit 1 in that chapter reports what the author describes as "indicators of market liquidity for a cross-section of the fixed-income universe."   However, the information Mr. Slattery relies on is not verifiable data, but rather "Salomon Brothers, Lehman Brothers, and Sanford C. Bernstein estimates."   Beyond this reference, the article does not specify when the estimates were gathered (although it must have been at least 13 years ago) or what market conditions were deemed by the author or those providing the estimates to be "typical" and "distressed."   Whatever "distressed" market conditions were deemed to be in 1997, it is highly unlikely that the phrase brought to mind conditions in any way comparable to the tumultuous market conditions that prevailed in September 2008.   Nonetheless, Mr. Slattery computed his multiplier by dividing the "distressed" discount for a given class of securities by the "typical" discount for that same class.[31]   In sum, Mr. Slattery's distressed-to-typical multipliers are based on vaguely-sourced and out-of-date estimates of bid-ask spreads that prevailed during unknown

---

[31] For example, a "typical" spread of 0.5% and a "distressed" spread of 1.5% would produce a multiplier of 3.

time periods, under ill-defined conditions which are not comparable to the conditions that prevailed in September 2008 (or least whose comparability cannot be reliably determined).

28.    Mr. Slattery's second step is to use his multipliers to convert "typical" bid-ask spreads to "distressed" bid-ask spreads.  Here, too, Mr. Slattery's technique was flawed, because the sources of his "typical" bid-ask spreads were likewise out of date.  For Treasury and agency securities, Mr. Slattery relied on data about liquidity discounts during the period from 1992 through 2002.  For residential mortgage-backed securities, he used figures that one of his support staff had gathered in some unspecified fashion while employed at Bank of America in *2001*.  Mr. Slattery did not properly test, and has no way of knowing, whether this stale bid-ask data was an appropriate starting point for computing bid-ask spreads that prevailed in *mid-2008*.  Thus, both components of Mr. Slattery's novel "technique" are flawed.  As a result, his calculations are fundamentally unreliable and do not provide a sound basis for adjusting mid-point marks to bid prices.

29.    As I established in my report in this matter, Barclays' valuations were developed not for litigation purposes, but in the normal course of business over several months following the transaction, primarily for the purpose of preparing financial statements to meet stringent filing requirements in accordance with government regulations.  Barclays' personnel gathered the kinds of information that they typically relied on and applied valuation methods that they typically relied on in the normal course of business, and the data Barclays relied on, the valuation methods Barclays employed, and conclusions as to value Barclays reached all were tested and accepted by PricewaterhouseCoopers.

30.    As I said in my report, "I also considered the feasibility of developing an entirely new set of marks, completely independent of any of the available sources.  I determined that it is

highly unlikely that such a procedure would lead to better marks than the marks developed by Barclays.  Rather, such a procedure could in the end produce *less* reliable marks . . ."[32]  The many flaws in the work of Movants' experts and the defects in the marks they developed show that the concerns I expressed were well founded and justified.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Palo Alto, California on April 19, 2010.

_____
Paul Pfleiderer

# Exhibit B

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4     ---------------------------------X

5     IN RE:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC. et al.,

9          Debtors.

10    --------------------------------X

11

12            HIGHLY CONFIDENTIAL

13     VIDEOTAPE DEPOSITION OF MARK ZMIJEWSKI

14            New York, New York

15             April 14, 2010

16

17

18    Reported by:

      Bonnie Pruszynski, RMR

19    JOB NO. 29652

20

21

22

23

24

25

Page 2

```
1
2                    April 14, 2010
3                    9:34 a.m.
4
5
6           Videotape deposition of MARK
7    ZMIJEWSKI, taken at BOIES, SCHILLER &
8    FLEXNER, LLP, 575 Lexington Avenue, New
9    York, New York, before Bonnie Pruszynski,
10   Registered Professional Reporter, Registered
11   Merit Reporter, Certified LiveNote Reporter,
12   and a Notary Public of the State of New
13   York.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2    A P P E A R A N C E S:
3    JONES DAY, LLP
4    Attorneys for Lehman Brothers, Inc.
5         222 East 41st Street
6         New York, New York
7    BY:      JAYANT W. TAMBE, ESQ.
8             KELLY A. CARRERO, ESQ.
9    BOIES, SCHILLER & FLEXNER, LLP
10   Attorneys for Barclays
11        401 East Las Olas Blvd. - Suite 1200
12        Fort Lauderdale, FL 33301
13   BY:      W. TODD THOMAS, ESQ.
14
15   HUGHES HUBBARD & REED, LLP
16   Attorneys for SIPA Trustee
17        One Battery Park Plaza
18        New York, New York 10004
19   BY:      FARA TABATABAI, ESQ.
20
21   QUINN EMANUEL URQUHART & SULLIVAN, LLP
22   Attorneys for the Creditors Committee
23        51 Madison Avenue
24        New York, New York 10010
25   BY:      ROBERT K. DAKIS, ESQ.
```

Page 4

```
1
2    ALSO PRESENT:  STEVE SANPIETRO, Legal Video
3         Specialist
4         MARC VELLRATH, Ph.D., CFA
5         ELIZABETH DAVIS
6         Finance Scholars Group
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1           M. Zmijewski
2           THE VIDEOGRAPHER:  This is the start
3    of the tape labeled number one of the
4    videotape deposition of Mark Zmijewski in
5    the matter of In Re: Lehman.
6           This deposition is being held at
7    575 Lexington Avenue, New York, on
8    Wednesday, April the 14th, 2010, at
9    approximately 9:34 a.m.
10          My name is Steve Sanpietro from TSG
11   Reporting, Inc.  I am the legal video
12   specialist.
13          The court reporter today is Bonnie
14   Pruszynski in association with TSG
15   Reporting.
16          Can I please have counsel introduce
17   themselves for the record.
18          MR. THOMAS:  Todd Thomas from Boies
19   Schiller & Flexner on behalf of Barclays.
20          MR. TAMBE:  Jay Tambe from Jones Day
21   on behalf of Lehman Brothers Holdings, Inc.
22          MR. DAKIS:  Robert Dakis from Quinn,
23   Emanuel, Urquhart & Sullivan for the
24   official committee of unsecured creditors.
25          MS. CARRERO:  Kelly Carrero with
```

Page 6

M. Zmijewski

1 M. Zmijewski
2 Jones Day also for Lehman Brothers Holdings,
3 Inc.
4      THE VIDEOGRAPHER:  Will the court
5 reporter please swear in the witness.
6 MARK ZMIJEWSKI,
7      called as a witness, having been first
8      duly sworn, was examined and testified
9      as follows:
10 EXAMINATION
11 BY MR. THOMAS:
12      Q     Good morning.
13      A     Good morning.
14      Q     Have you been deposed before?
15      A     I have.
16      Q     Approximately how many times?
17      A     Fifty.
18      Q     So you are very familiar with how the
19 process works.
20      A     Yes.
21      Q     If you have any questions or
22 uncertainty about what I am asking you, please ask
23 me to rephrase the question.  I am happy to do so.
24      A     Thank you.
25      Q     What areas, subject areas do you

Page 7

1 M. Zmijewski
2 consider yourself an expert in?
3      A     Accounting, economics and finance, as
4 it relates to valuation issues, and security
5 analysis issues.
6      Q     Any others?
7      A     No.  Although I have a much more
8 detailed couple paragraphs on that background that
9 expands those words in my report, so.
10      Q     Have you ever spent any time on a
11 trading desk?
12      A     I have not.
13      Q     When did you first start doing any
14 work on this current project involving Lehman?
15      A     It was November or December of last
16 year.  Late November, December.  I'm not sure.
17      Q     And what was your initial assignment
18 or why were you asked to be involved?
19      A     I was asked to be involved initially
20 as a consultant to just become familiar with the
21 issues in the matter, and some data, and
22 everyone's position so that if, you know, there
23 was a need, I would be a witness.
24      Q     And what did you understand were the
25 issues at that time, when you came on board?

Page 8

1 M. Zmijewski
2      A     The issues that were in the, I think
3 it's 60(b) motions, if I recall that correct.
4      Q     So you would have reviewed the
5 movants' Rule 60(b) motion?
6      A     Correct.  That was the first thing I
7 did.
8      Q     And was there any particular area or
9 aspects of the motion that you were looking at
10 or -- when you came on in the November or December
11 time frame?
12      A     The issues that are in my report.  It
13 was -- the issues were related to what I call the
14 Barclays windfall.
15      Q     Anything other than the Barclays
16 windfall or those issues that are reflected in
17 your report that you analyzed or looked at or
18 considered?
19      A     I was asked to be prepared to rebut
20 witnesses who would be relevant to that particular
21 issue.
22      Q     The scope of your work was just
23 related to the issues that are reflected in your
24 final report?
25      A     Oh, yes.

Page 9

1 M. Zmijewski
2      Q     So there is no other issues that you
3 looked up that ended up not being in your report?
4      A     Correct.
5      Q     And can you tell me approximately how
6 many hours did you spend on this project overall.
7      A     Ballpark, middle April -- somewhere
8 between three and four hundred, I would say.
9      Q     And did you do the work yourself or
10 did you have assistance in performing whatever
11 work you did?
12      A     I had a number of people at Chicago
13 Partners help me do work under my direction and
14 supervision.
15      Q     Are you referring to the individuals
16 who also gave expert reports in this matter?
17      A     No.  There is a staff at Chicago
18 Partners who help read documents, analyze data,
19 create datasets for me.  As you know, the number
20 of documents that were coming to us was many and
21 fast.
22      Q     Have you done any work on this matter
23 since your report was completed?
24      MR. TAMBE:  Objection to the form of
25 the question.

Page 10

M. Zmijewski

1
2   A   Other than prepare for my deposition,
3   no.
4   Q   You expect to testify at the
5   evidentiary hearing?
6   A   If asked to do so -- I don't know if
7   I will be asked to do so -- yes.
8   Q   Do you have any -- do you plan to do
9   any work on this project between now and then,
10  other than preparing for the testimony?
11  A   I -- I -- probably, yes.  Yeah.
12  Q   Have you identified any other further
13  work in connection with your report that you plan
14  to do before the hearing?
15  A   Well, I am aware that since the date
16  of my report, we received some additional
17  documents and data, which I haven't had an
18  opportunity to analyze, so, we naturally would
19  look at that, and to the extent it was relevant,
20  we would, you know, revise my analysis and do
21  whatever is necessary, conditional on the data
22  that we receive.
23  Q   Can you describe what the --
24  generally what -- the documents and data that you
25  are referring to?

Page 11

M. Zmijewski

1
2   A   I believe we recently received some
3   equities pricing from GFS that we asked for before
4   and wasn't in the original production, but was
5   received -- I am just aware that it was received
6   recently.  I haven't looked at it at all.
7   Q   When you say "we asked for before,"
8   who is the "we," and who did you ask?
9   A   "We" being Chicago, people at Chicago
10  Partners, and we asked the lawyers who I
11  understand asked you, who I assume asked
12  Barclay's, but there is conjecture in there --
13  Q   Right.
14  A   -- as to who asked whom what.  But I
15  know that we asked our lawyers.
16  Q   Okay.  But you asked your lawyers for
17  that information?
18  A   Yes.
19  Q   And was that, that information
20  relevant to your analysis, that you asked for but
21  didn't receive?
22  A   Certainly had we had it at the time,
23  we would have used it, and compared it to the
24  other types of equity prices that were available,
25  so it's something we would have used, but is it

Page 12

M. Zmijewski

1
2   relevant or not, you don't know until you analyze
3   it to know if it's important.
4   Q   So it may or may not have changed --
5   may or may not affect your opinions in your
6   report?
7   A   Correct.
8   Q   Other than those GFS documents and
9   data, is there any other work that you anticipate
10  doing between now and your testimony?
11  A   I don't know who else will be deposed
12  in this matter, so naturally, I know some of the
13  valuation experts have to be deposed yet.
14  Mr. Schwaba was deposed this week.  I don't know
15  if there will be follow-up work there.
16      To the extent there is follow-up work
17  with them, I will be part of that work, and I will
18  change my report as necessary based on any changes
19  in their work.
20      And there might be other witnesses.
21  You know, I don't --
22  Q   So as you sit here today --
23  A   As I sit here today?  I am not aware
24  of anything.  I have no plans.  But I have done
25  this before, so I understand as more information

Page 13

M. Zmijewski

1
2   and more witnesses are deposed, there is usually
3   follow-up work, so, I expect to do something, but
4   what, I don't know.
5   Q   Let me ask you your understanding of
6   certain terms that appear in a lot of these -- in
7   your report, and some other documents, and just so
8   we are on the same page.
9       What is your definition of the term
10  "discount"?
11  A   In what context?
12  Q   In the context that it's used in your
13  report when you refer to "discount."
14      MR. TAMBE:  Objection to the form of
15      the question.
16  A   You know, if you give me a copy of my
17  report, I can look, so it would be helpful to have
18  a copy.
19      If you mean focused on liquidity
20  discount, if that is the context you are
21  talking -- I am not sure how --
22  Q   Let me just ask generally.  When you
23  hear the word "discount" in your area or
24  profession, what does that term mean to you?
25  A   It means to reduce a value by some

Highly Confidential

Page 14

M. Zmijewski

1
2 amount, for some purpose, depending on what the
3 qualifier is for a discount.  So, if it's a
4 discount factor, it could be for the time value of
5 money or for risk, or it could be a discount for
6 liquidity, which is something that is discussed in
7 my report.
8     Q    So it's a reduction.
9     A    It's a reduction in some value.
10     Q    And the reduction can be for a
11 variety of reasons?
12     A    You need a context to understand what
13 that reduction would be for, yes.  There has to be
14 a qualifier on "discount."  There is many ways one
15 uses the term "discount."
16     Q    For -- in the context of whether a
17 purchaser buying assets received a discount, in
18 that context, what would your understanding be of
19 what that would mean, to say that a purchaser
20 received a discount in buying assets?
21     MR. TAMBE:  Object to the form of the
22 question.
23     A    The purchaser received a discount?
24 Well, if -- you know, again, it would have to be a
25 discount from what?  So, the question is, well, a

Page 15

M. Zmijewski

1
2 discount from?
3     Q    That is my exact question to you.  If
4 you just said a discount, what would it be, what
5 would that -- would it have any particular meaning
6 to you in terms of what it was from, a discount
7 from what?
8     A    You need a specific context, so,
9 liquidity discount could be -- have a certain
10 context, that because -- based on a calculation
11 using a certain framework to value the security,
12 that doesn't include a liquidity discount, you
13 have a value based on that framework, and from
14 that you could reduce that value for a liquidity
15 discount.
16     An example would be, let's assume you
17 are buying a company, and you used the discounted
18 cash flow valuation model.  Now, the discount in
19 that is irrelevant to what I am talking about.
20 But you use a discounted cash flow valuation
21 model.  Those valuation models typically do not
22 include a liquidity discount, sometimes called a
23 marketability discount.  Well, you would calculate
24 the value based on the discounted cash flow
25 valuation model, and if the liquidity discount

Page 16

M. Zmijewski

1
2 were appropriate, you would reduce that value by a
3 marketability or liquidity discount.
4     You might also increase the value for
5 a premium because you are buying it and there are
6 synergies related to the -- you know, as a result
7 of the purchase, so you might actually increase
8 the value for synergies, so.
9     But there always has to be some type
10 of context, when you use the word "discount," you
11 know, in the way I use it in my report.
12     Q    So, in terms of a purchaser buying
13 assets, is it -- would the most likely context be,
14 in terms of whether it got a discount, would be
15 the -- compared to fair market value of the assets
16 being sold, or would it be how they valued them on
17 their balance sheet, or don't you know because you
18 really have to know the context and saying
19 "discount" doesn't mean any particular thing?
20     A    Well, the answer is, it depends on
21 how you calculated the value.  You said fair
22 value.  If that is a market value, where there is
23 a willing buyer and a willing seller for a -- in a
24 transaction, well, a discount should have already
25 been taken as in the calculation of that fair

Page 17

M. Zmijewski

1
2 value already, so you wouldn't discount a fair
3 value in that particular context because it should
4 have been included already in the way you
5 calculated the fair value.
6     So, again, it depends on what the
7 context is.
8     Q    So -- okay.  What is a liquidity
9 discount?
10     A    A liquidity discount is a discount,
11 you know, you would apply to a value to account
12 for the illiquid nature of a security.
13     Q    Can you just describe how you would
14 go about doing that?
15     MR. TAMBE:  Object to the form of the
16 question.
17     A    Well, it -- it -- if -- it depends on
18 what the security is.
19     MR. THOMAS:  I'm sorry, just a
20 minute.  Is there a way to make this work?
21     THE VIDEOGRAPHER:  The time is
22 9:48 a.m.  We are now off the record.
23     (Discussion off the record.)
24     THE VIDEOGRAPHER:  The time is
25 9:49 a.m.  We are now back on the record.

Page 18

M. Zmijewski
1    M. Zmijewski
2  BY MR. THOMAS:
3      Q    I believe you said something, that
4  liquidity discount is -- let me just ask you --
5  you may have answered this.  Let me ask you to
6  restate it again, what a liquidity discount is.
7      A    It's the discount you would apply to
8  a price, assuming the price didn't include a
9  discount already, or a price or a value, because
10 of the illiquid nature of an asset.  The asset
11 that you are valuing.
12     Q    I think that type of discounting, you
13 are not trying to reduce the price below fair
14 market value, but rather you are trying to adjust
15 the price to fair market value; is that correct?
16     MR. TAMBE:  Object to the form.
17     A    My definition of fair market value
18 would include the price at which parties are
19 willing to transact.  So therefore, to the extent
20 there is a liquidity discount, it should be
21 included in that fair market value.
22     Q    So the fact that there is a discount
23 included in a particular price, doesn't mean that
24 that price is below fair market value; correct?
25     A    It depends.  It doesn't have to mean

Page 19

M. Zmijewski
1    M. Zmijewski
2  that, but it can mean that.  The question is:  To
3  what was it applied?
4      So let's, let's start with there is a
5  fair market value.  When somebody gives me fair
6  market value, and someone takes a discount on the
7  appropriate market value, well, then, the
8  resulting discounted price would be below fair
9  market value because you already started with the
10 price that included fair market value.
11     I will give you an example relevant
12 to this case.  The -- you know, the accountants in
13 the U.S. discuss exit prices, so that the standard
14 is typically to take a market price, let's say
15 today I had -- right now, as soon as the market
16 closed, I observe a price, transactions happening
17 for a very liquid security, but there is still a
18 bid/ask range of that price, but I observe
19 something.  Well, the fair market value in my view
20 would be the price.
21     Accountants require through their
22 standards that you use exit prices, so you would
23 want to apply a discount to get a bid/ask spread
24 discount to get from what I would consider a fair
25 market value to an exit price.  So, that is

Page 20

M. Zmijewski
1    M. Zmijewski
2  applying a discount, a big discount, and it
3  reduces it to a bid price, but I don't think the
4  bid price is the market value.
5      Q    And the situation you are referring
6  to is when you have a liquid market with actual
7  sales being transacted; correct?
8      A    I gave you a hypothetical, so there
9  wasn't an issue of timing during the day, when you
10 observed the last price.  So, I just eliminated
11 that issue by assumption.
12     Q    Do you disagree with the U.S.
13 accounting guidance on fair market value?
14     A    It's fair -- if you read the
15 standard, the fair market value is fair market
16 value at exit prices, so, they qualified the
17 definition of fair market value.  It's not fair
18 market value with respect to the expected value
19 one would get.  It's fair market value on an exit,
20 an immediate exit.
21     It's a different concept of fair
22 market value.  It's different than the economist's
23 concept of at what price is a willing buyer and a
24 willing seller going to transact if each party has
25 relevant information and no one is pressured to

Page 21

M. Zmijewski
1    M. Zmijewski
2  sell.
3      Accountants aren't measuring that
4  value.  If you look at the accounting rules, they
5  are measuring something on conservative exit
6  value.  How you can exit immediately.  That is,
7  that is below market value.
8      Just look at prices, how prices
9  trade.  Prices don't trade at bid prices.  Prices
10 trade in between the bid/ask prices.  So we see
11 empirically over and over again that the
12 accountants are being conservative, and that is
13 not wrong.  That is how they are defining the
14 value for the financial statements.
15     Q    Is the accounting measure expected
16 receipt from sale?
17     A    I don't know if that is the
18 terminology they use, but it's the expected --
19 what can you exit at immediately.  What is a
20 reasonable amount to, to have as a value assuming
21 an immediate exit.
22     Q    In other words, is it what the seller
23 can actually get for the asset if they sell it?
24     MR. TAMBE:  Object to form.
25     A    If they sell it immediately.  I know

Page 22

M. Zmijewski

1 immediately if I see a bid, where I know there is
2 enough volume under, underpinning that bid, and I
3 want to sell less than that volume, then it's very
4 highly certain that I can actually sell at that
5 price.
6 That doesn't mean if I go into the
7 marketplace and put an auction out there with my
8 stock, that it's actually going to be trading at
9 that price. And the price at which it trades is
10 the market value, and market values are not exit
11 prices.
12 Q So, what the market value might be
13 is -- can be dependent upon the volume of assets
14 you are selling, as well?
15 A Of course, sure.
16 Q What do you understand the term "bulk
17 discount" to mean?
18 A Professor Pfleiderer has that in --
19 the Pfleiderer report contains that language. I
20 would characterize it as a block trade discount, a
21 large volume discount, if you want to dump a large
22 block of securities, sell them quickly.
23 Q And what is your definition of exit
24 price?

Page 23

M. Zmijewski

1 MR. TAMBE: Objection, asked and
2 answered.
3 A You know, the exit price is defined
4 by the accounting rules, so, if you give me
5 Mr. Garvey's report, he outlines that in detail.
6 That's the definition.
7 Q Do you have an understanding of what
8 exit price is, in kind of layman's terms?
9 A Well, I have read and taught, you
10 know, Statement 157, so, so I have it, but I don't
11 want to paraphrase it. When I teach, I have notes
12 in front of me. So, you are giving me a closed
13 book exam here. That is not the kind of exam I
14 prepared for.
15 And if you give me the documents, I
16 can go through and explain it to you in layman's
17 terms. But I prefer to have either FAS 157 or
18 Mr. Garvey's report, and the relevant parts are
19 contained in his report.
20 Q As you sit here, there is no
21 particular meaning of exit price that you have in
22 mind?
23 MR. TAMBE: Objection to form.
24 MR. DAKIS: Objection, asked and

Page 24

M. Zmijewski

1 answered.
2 A I don't believe I said that. If I
3 did, I misspoke.
4 What I said is, it's a precise term
5 defined by the accounting rules, and I am happy to
6 look at those accounting rules and explain those
7 accounting rules to you.
8 Q How about the term "last price," can
9 you give me your definition of that?
10 A The last price typically is the last
11 traded observed price in a marketplace.
12 Q And the end-of-day price?
13 A I -- I don't -- I don't know.
14 Different vendors might have different terminology
15 they use. I would have to look it up. I'd like
16 for me to go to a vendor and understand how a
17 vendor is using it.
18 Q How about mid price?
19 A Mid price is usually characterized as
20 a price between the bid and the ask price. It
21 could be the mid price. I'm sorry. It could be
22 the mid of the bid and the ask price, and that is
23 typically how it would be calculated.
24 Q And the term "windfall"?

Page 25

M. Zmijewski

1 A I defined that in my report.
2 Specifically for -- that has many meanings. I
3 don't think it's a term of art. It's something
4 that needs to be defined, and I defined it in my
5 report for the purposes of this litigation.
6 Q Is that a term you used in other
7 reports that you recall.
8 A I don't recall. I could have. In
9 this particular case, I didn't see -- I used that
10 phrase because there doesn't -- none of the
11 movants' 60(b) -- I always forgot -- 60(b) motions
12 I think they are, use the word "damage," so, I
13 would think of this as a damage calculation, but
14 since the motions never talked about damages, I
15 called it a windfall, so I defined it that way in
16 this particular case.
17 Q And you sometimes used the term
18 "economic analysis." What precisely qualifies as
19 economic analysis in your mind?
20 A Applying economic principles, data,
21 to a problem, and a question.
22 Q Let me go ahead and give you a copy
23 of your report and start marching through it.
24 Let me show you an exhibit we will

Page 26

1              M. Zmijewski
2    mark as 706B.
3       A    Thank you.
4            MR. THOMAS:  Counsel, you have a copy
5    of the report.  Do you want another one?
6            (Discussion held off the record.)
7            (Exhibit 706B marked for
8    identification as of this date.)
9
10      Q    Pardon me.  Do you prefer doctor or
11   professor?
12      A    Anything other than doctor.
13      Q    Okay.  Professor or Mr.?
14      A    That's great.
15      Q    Okay.  Are you connected now?
16      A    May I rip these apart?  Is that okay?
17      Q    Yes.  She might be angry.
18           MR. TAMBE:  We can put them back
19   together.
20      Q    We can put them back together.
21      A    You have a stapler.
22      Q    In the same order.
23           MR. TAMBE:  Go ahead.
24      Q    Do you recognize Exhibit 706B?
25      A    I do.

Page 27

1              M. Zmijewski
2       Q    Can you describe what it is, please?
3       A    It's my expert report dated March 15,
4    2010.
5       Q    And would you go ahead and turn,
6    please, to Exhibit B-1.
7       A    I'm sorry, B?
8       Q    Exhibit B-1.
9            And would you describe what this
10   chart reflects, please.
11      A    It reflects the calculation of what I
12   call the Barclays windfall from the transaction.
13      Q    And I would like to just move through
14   these figures to make sure I understand what they
15   are, how they are calculated.
16      A    Okay.
17      Q    The first figure is what, the
18   50,165,000,000 figure?
19      A    Those are the financial assets on
20   Barclays' opening balance sheet as a result of
21   this transaction.
22      Q    And you went and looked at what to
23   come up with that number?
24      A    That number is taken off of the
25   Barclays opening balance sheet.  If I recall the

Page 28

1              M. Zmijewski
2    schedule, I can look it up, but I think it's -- or
3    the exhibit -- I think it is 88-B, as in boy.
4       Q    And the next line, 775 million, would
5    you describe what that is for us.
6       A    Those are, according to Mr. Romain's
7    testimony, I think there are two exhibits to
8    his -- I don't remember which deposition -- where
9    he outlines certain assets that are -- that
10   Barclays views as undelivered but they haven't
11   been recorded on Barclays' balance sheet.  So they
12   are claimed assets that Barclays did not yet put
13   on its balance sheet, based on Mr. Romain's
14   testimony.
15      Q    So this is under the assumption that
16   Barclays prevails and recovers those assets;
17   correct?
18      A    Correct.
19      Q    What is the next line, the
20   103 million?
21      A    There is a couple of lines on the
22   balance sheet that -- for OCC assets, and if -- I
23   merely updated that calculation so that it's based
24   on September 19th rather than September 19th and
25   September 22nd, so I moved it so that there is a

Page 29

1              M. Zmijewski
2    consistent calculation as of September 19th.
3       Q    And then what is the $5,112,000,000
4    number?
5       A    That is the undervaluation that I
6    explained in my discussion of Exhibit A-1.
7       Q    And it cites A-1 there, but did you
8    mean to say A-2?
9       A    I will check.
10           Yes.
11      Q    Thank you.
12      A    Correct.  The cite should be to
13   Exhibit A-2.  Thank you.
14      Q    And let's turn briefly to A-2.  Would
15   you describe what Exhibit A-2 reflects.
16      A    Yes.  As you know, there are
17   different valuation experts that have been engaged
18   by the movants, and those are Mr. Olvany,
19   Mr. Slattery, Mr. Schwaba and myself, and each of
20   these experts valued certain securities in
21   different appropriate ways, and this table
22   documents the number of CUSIPs that they valued;
23   Barclays' opening balance sheet valuation of those
24   values, and that would be column A.  Column B is
25   the valuation expert's opinion with respect to the

Page 30

1          M. Zmijewski
2  appropriate valuation of those CUSIPs.
3          And the last column is merely the
4  difference between columns A and columns B --
5  column A and column B.
6      Q     And the persons who is doing these
7  other valuations, Mr. Olvany, Mr. Slattery, Mr.
8  Schwaba, do they all work with the same company
9  that you work at?
10     A     Yes.  We all work at Chicago
11  Partners.
12     Q     And do they work in the same office
13  that you work out of?
14     A     Well, I don't know that everybody
15  works -- I don't work out of any particular
16  office.  I'm at the university, so, I work in
17  New York out of the New York office as much as the
18  Chicago office, so.
19          Mr. Olvany, Mr. Slattery are in
20  Chicago.  I don't even know where Mr. Schwaba is
21  located.  I have never -- I don't know where he's
22  working.
23     Q     Have you ever met Mr. Schwaba?
24     A     No, I have not.  I have spoke to him
25  on the phone but have never met him in person.

Page 31

1          M. Zmijewski
2      Q     Mr. Olvany, Mr. Slattery -- do you
3  have an office at Chicago Partners?
4      A     I do have an office there.  I have
5  seen them.  They have been at Chicago Partners
6  longer than Mr. Schwaba.  All three of these
7  gentlemen are -- I call them affiliates.  They are
8  independent experts that work with Chicago
9  Partners.
10     Q     Are they paid by Chicago Partners?
11     A     Yes.
12     Q     So you are all part of Chicago
13  Partners?
14     A     Correct.
15     Q     Can you describe your level of
16  collaboration with these other individuals in
17  coming up with the values reflected in A-2?
18     A     We have had several conversations
19  starting from the first day they were each brought
20  into this matter to do valuation, and we discussed
21  the valuation approaches, the type of data that
22  was necessary, the type of valuation systems which
23  they discuss in the report, that was necessary,
24  for them to do valuations of this sort.
25          So, we discussed the inputs and how

Page 32

1          M. Zmijewski
2  they would measure the inputs, so, you know, we
3  essentially discussed how they were going to go
4  about valuing all the securities.
5      Q     And as I understand it from your
6  report, you are accepting their values on certain
7  assets and you have come up with values on, on
8  your own, for other assets; is that correct?
9      A     I am relying on their work, of
10  course.  I believe their work is reliable, based
11  on my interactions with them and the discussions
12  that I have had with them, so, I believe their
13  work is reliable.
14          However, I did not do any of those
15  calculations, nor did I review the calculations
16  themselves.  I just discussed the approach and
17  the -- and how they were going to measure things.
18  So it was a discussion on the approach
19  methodologies that they were going to use and how
20  they were going to execute those methodologies.
21          But I didn't check any of the work or
22  I wasn't part of the calc- -- you know, the
23  execution.  I didn't partake in that.  But I rely
24  on them, but I believe they are reliable.
25     Q     Can you describe Mr. Olvany's

Page 33

1          M. Zmijewski
2  approach and methodologies to the valuations he
3  calculated?
4      A     I could do it better if you gave me a
5  copy of his report.  I assume you don't want to do
6  that.
7          So he used mostly corporate bonds,
8  and, and Giants Stadium revenue bonds he focused
9  on as well, because Professor Pfleiderer did that.
10  So he looked at corporate bonds.  It's a
11  discounted cash flow methodology.  Term structure
12  of interest rates, yield curves.  We discussed how
13  he was going to use that.
14          He used a valuation software package
15  that we've had at Chicago Partners for some time
16  now called FINCAD that I have used in valuing
17  certain types of securities over the years.
18          I am not sure how much more.  I mean,
19  you have to go to his report.  I don't remember
20  all the details.  I haven't talked about that with
21  him for a while now.
22     Q     How about the approach and
23  methodology of Mr. Slattery?
24     A     Back to Mr. Olvany.  Of course, he
25  had price data he also -- one of the things you

Page 34

M. Zmijewski

1  do, which is -- I will just jump to Mr. Schwaba
2  and include him in this conversation -- if you can
3  find comparable types of securities, Mr. Olvany
4  used comparable pricing as part of his analysis as
5  well, which is primarily what Mr. Schwaba did.
6      So that I would characterize
7  Mr. Schwaba's methodology as using comparable
8  transactions, comparable pricing methodology,
9  comparable security methodology.
10     Mr. Slattery focused on mortgages
11 mostly, and Pine.  Again, focused on Pine because
12 Professor Pfleiderer did.  In his methodology, he
13 uses PolyPath to measure that methodology, and
14 it's a more sophisticated methodology than just
15 the discounted cash flow methodology, because it
16 will have dynamic programming of interest rate
17 series in it, and we discussed how he was going to
18 use those models, and in his report he identifies
19 the specific models within PolyPath that he uses.
20 We discussed those models, and we discussed how he
21 was going to measure the inputs for those models.
22     That is my recollection of the closed
23 book test.
24     Q     And how many conversations have you

Page 35

M. Zmijewski

1  had, did you have with Mr. Slattery prior to his
2  report?
3      A     You know, we had this series of
4  conversations.  I don't remember who was on the
5  phone.  Everyone was participating in the calls.
6  So we had -- I felt it was important, so, I was
7  first on the team, so, my goal, when we brought
8  other people into the -- other experts on board,
9  was to make sure we were all discussing what
10 methodologies are we using, what views do we have.
11 Let's make sure that we have the same view.  If we
12 don't have the same view, we better figure out
13 why.  Let's make sure we have the same inputs, so
14 that there is a consistency in the approach, and
15 the analysis.
16     Therefore, we had a series of calls,
17 Mr. Olvany and Mr. Slattery -- calls and
18 meetings -- and Mr. Schwaba, sometimes they were
19 on, sometimes they weren't on.  They had calls
20 with me and without me.
21     There was a long series of calls.
22     Q     What were the main issues that came
23 up in terms of approach that you recall?
24     A     The main issue was, what are good

Page 36

M. Zmijewski

1  software methodology, you know, methodologies that
2  are used, you know, in the marketplace.  So,
3  FINCAD was one of them, and everyone was
4  comfortable with FINCAD.  It's not good for the
5  mortgages, so, they talked about a lot -- I don't
6  have specific knowledge of what the different
7  trading desks were using at the time.  That's not
8  my area of expertise.  That was their area of
9  expertise, and they talked about it and concluded,
10 everyone concluded that PolyPath was a very good
11 program to use with dynamic interest rate
12 generation, and it would be valuable, so it's
13 something that we acquired for this particular
14 engagement.
15     Q     Were there any disagreements amongst
16 you in terms of approach and methodology?
17     A     None that I can recall.  It was -- if
18 you think about it, everybody has the basic
19 framework that there is expected cash flows from
20 these securities, and you have to get a present
21 value of those securities -- or cash flows.  So it
22 was a discussion of what is the best way to
23 measure this and make sure that we were consistent
24 with what the market was using as well.

Page 37

M. Zmijewski

1  Q     Did you review their draft reports?
2  A     I did not.
3  Q     So you didn't -- the first time you
4  saw the reports was their final reports?
5  A     I did not read the reports until
6  after they were issued.  I certainly had
7  conversations about what the reports would have in
8  them, so I was well aware, and I saw calculations,
9  but I never read the report until after it was
10 issued.
11 Q     Now, the valuations that A-2
12 describes you as being responsible for are
13 equities, the initial inventory, and the JPM
14 inventory; is that correct?
15 A     Yes.
16 Q     Now, the valuations that are shown to
17 be done by people other than yourself, again, just
18 to confirm, those are not valuations you did or
19 calculated or tested in any way, rather you are
20 accepting their valuations?
21     MR. TAMBE:  Objection to the form of
22 the question.
23 A     I am relying on their valuations.
24 However, I believe their valuations are reliable

Page 38

1     M. Zmijewski
2 based on fairly detailed discussions about how
3 they were going to conduct their valuations and
4 execute the methodologies.
5     Q    But again, you didn't actually do any
6 of the valuation work yourself on those assets;
7 correct?
8     A    I apologize if I --
9         MR. TAMBE:  Objection to form.
10     A    I apologize if I didn't answer the
11 previous question clearly.  I did not do any
12 calculations.  I was not a participant in the
13 execution of the methodologies.
14     Q    Now, if their valuations you rely on
15 were incorrect, that would make your conclusions
16 in your report incorrect; correct?
17     A    If there is something that I identify
18 as or become aware of that is not the correct
19 number, of my own work or of their work, we would
20 make adjustments, and address any issues that were
21 outstanding and adjust the information so that it
22 was appropriate to give to the Court.
23     Q    Is that a yes?
24     A    I think it was a yes.
25     Q    So, turning back to the B-1, and the

Page 39

1     M. Zmijewski
2 5.112 number --
3     A    Yes.
4     Q    -- that comes from a summation on
5 A-2; is that correct?
6     A    Yes.
7     Q    And can you describe the equities
8 initial inventory, can you describe the universe
9 of assets that you looked at?
10     A    I'm sorry, in B-1?
11     Q    In A, back on A-2.
12     A    Oh, sorry.
13         It was the universe of equities used
14 by Professor Pfleiderer in the opening initial
15 inventory.
16     Q    Okay.  And where is the universe of
17 assets looked at on the next line down, JPM
18 inventory?
19     A    The JPM inventory is annex A or
20 exhibit 87-B, I think the exhibit is.  I can check
21 that if that -- to make sure I am right.  I'm sure
22 somebody will tell me if I am not right.
23         And maybe it's better to say the
24 equities are all the equities in the initial
25 inventory, which is 86-A -- 86-B, rather.  So, we

Page 40

1     M. Zmijewski
2 have on Barclays' opening balance sheet, their
3 detailed records, we have initial inventory, which
4 I think I am -- 86-B.  If I am wrong, we can look
5 it up.
6         And then we have the JPM inventory
7 that comes from 87-B, and the universe of equities
8 would be from 86-B, and JPM inventory is 87-B.
9     Q    Can you describe, by reference to
10 documents that are contained in the -- generally
11 what you understand to be those assets?
12     A    Of?
13     Q    Of the JPM inventory.
14     A    Of the JPM inventory?
15     Q    Yes.
16     A    Okay.  That was inventory that was
17 not initially transferred at the closing of the
18 sale transaction.
19     Q    When was the closing of the sales
20 transaction?
21     A    It's my understanding the close, the
22 exact closing was 12:01 a.m., on Monday,
23 September 22nd, 2008.
24     Q    Let's go ahead and look at, spend
25 some time going through the details of how you

Page 41

1     M. Zmijewski
2 calculated your valuation difference with respect
3 to equities.  And if you would like to go earlier
4 on in your report where that discussion is in some
5 detail.
6         Actually, on our way there, let me
7 just ask a question on page six.  On page six of
8 your report.
9     A    Go ahead.
10     Q    Footnote ten, it says, "I am assuming
11 that all of these amounts reflect the same concept
12 of value."
13         Can you explain what you mean there?
14     A    Yes.  There is a concept of value.
15 I'm assuming that there was an apples-to-apples
16 comparison of what Mr. Golden calculated as the
17 net transaction value to Barclays of a negative
18 1.85 billion, as well as all the other valuations,
19 I am assuming they would be measured on an
20 apples-to-apples basis.
21     Q    And how does that -- the footnote ten
22 comes after Barclays' windfall.  How does -- can
23 you just give me a -- be more concrete, explaining
24 what do you mean by apples-to-apples comparison?
25     A    I mean that all the measures of

Page 42

M. Zmijewski

1  values above it, every value above it is measured
2  in a reasonably consistent fashion with respect to
3  what value it represents.
4      Q     Do you know what fashion in fact it
5  is represented, or measured?
6      A     Generally it would be fair value
7  defined by the accounting principles in FAS 157.
8      Q     And is that the appropriate standard
9  of value for purposes of your calculation of
10  windfall?
11      A     Based on my understanding of the
12  court-approved sales transaction, yes.
13      Q     Let's go ahead and move to the
14  valuation of the equities in the report.
15          And then your opinion, opinion one,
16  starts at the bottom of page one. The first
17  sentence in your opinion one says, "Movants
18  engaged valuation experts with expertise in
19  valuing certain types of securities."
20          Did you, did you yourself select the
21  other persons doing these other valuations?
22      A     I was part of the selection process.
23      Q     And are you familiar with -- did you
24  know these people before this project?

Page 43

M. Zmijewski

1      A     I knew Mr. Olvany. I did not know
2  Mr. Slattery or Mr. Schwaba.
3      Q     Can you describe generally how that
4  selection process was undertaken?
5      A     The partners at Chicago Partners
6  discussed potential experts for different --
7  for -- valuation experts for different types of
8  securities, and we identified some people, and we
9  reviewed their background. Others had discussions
10  with them before I did, and they were selected --
11  I assume they were selected by counsel, but I
12  don't know who made the final decision, but I
13  assume it's counsel's decision.
14      Q     The next sentence says, "The
15  securities are assets in the initial inventory and
16  the JPM inventory, but do not include other assets
17  at issue in this matter."
18          So for purposes of your analysis, the
19  value of those other assets at issue, do you
20  accept Barclays' valuation of those other assets?
21      A     For the purposes of my calculation, I
22  am using those as appropriate.
23      Q     And can you describe what those other
24  assets are?

Page 44

M. Zmijewski

1      A     It would be all the line items -- if
2  you go back to Exhibit B-1, it would be all the
3  line items but for the 5,112,000,000.
4      Q     And can you describe the
5  adjustment -- first describe the universe of
6  equities that you made an adjustment to for
7  purposes of your windfall calculation.
8      A     I will. It's probably useful to go
9  to, for this particular series of questions,
10  page 11. The page you were at is at the summary
11  section of the report, so, the detail.
12      Q     I am on 11.
13      A     You are on 11. Okay. You are
14  referring to pumpkins.
15          So in paragraph 16, these are the
16  equities that were in the initial inventory.
17      Q     Can you describe what those
18  particular equities are, or why you chose those?
19      A     I didn't choose them. They were
20  identified as equities in the database.
21      Q     When you say database, what database
22  is that?
23      A     The data that was in -- and I am sure
24  you read this, but in footnote five I explain all

Page 45

M. Zmijewski

1  the different documents, so if I incorrectly refer
2  to a document, footnote five has the correct
3  documents.
4          But this would be the native files
5  for Exhibit 86-B.
6      Q     So, for some set of equities, you
7  made an adjustment to the value calculated by
8  Barclays for those equities; is that correct?
9      A     Correct. And the sum set is the set
10  of equities identified by Barclays as equities and
11  used by Professor Pfleiderer as equities.
12      Q     Then can you describe what
13  adjustments you made for purposes of your
14  calculation to Barclays' valuation?
15      A     In addition to what's in my report
16  or -- I mean, I laid it out step by step. Do you
17  want me to just go through it?
18      Q     Can you just describe it.
19      A     Sure. So, the Barclays has a 9/22,
20  2008 price Barclays used for its opening balance
21  sheet. They also have September 19th prices.
22  These are Barclays' prices. I used the
23  September 19th prices instead of the
24  September 22nd prices, so I used Barclays' same

Page 46

1          M. Zmijewski
2    prices.
3          I went to Bloomberg and collected
4    Bloomberg data for those securities to the extent
5    they existed, and collected Bloomberg's last price
6    and the bid/ask, and checked to make sure that
7    those September 19th prices were indeed close to
8    what the Bloomberg prices would be, and they were.
9    I don't believe Barclays uses Bloomberg, but the
10   prices would naturally be close, and they were, so
11   I was comfortable with that.
12         And then based on the September 19th
13   prices, I applied a liquidity discount, that is
14   called. It's really not a liquidity discount.
15   I'm sorry, I misspoke. It's reducing the last
16   price to what the accounting rules call is an exit
17   price, but it's in Barclays documents sometimes
18   exit price, sometimes it's called a price mark or
19   sometimes it's just called a bid price.
20   Q     Is this all part of an effort by you
21   to value what Barclays received in terms of assets
22   from the sale transaction?
23         MR. TAMBE: Objection to the form of
24   the question.
25   A     Yes.

Page 47

1          M. Zmijewski
2    Q     And if you're valuing what Barclays
3    received as assets in the sale transaction, why
4    wouldn't you value those as of the closing date of
5    the sale transaction when Barclays took title to
6    those?
7    A     I believe I did. Barclays took title
8    to the assets, based on my understanding, as of
9    12:00 a.m. on Monday, the 22nd. Therefore, what
10   is the price at that point in time, on that -- at
11   that, you know, exact point in time, 12:01, Monday
12   morning, and the only price that -- the most
13   recent price that existed is the price -- closing
14   price on Friday.
15   Q     So just to make sure I understand
16   this.
17         You agree that the appropriate date
18   by which to value the assets that Barclays
19   received is September 22nd; correct?
20         MR. TAMBE: Objection to the form of
21   the question.
22         MR. DAKIS: Objection to the form.
23   Mischaracterizes testimony.
24   A     I don't think there is a date that
25   one could use, because there is a point in time,

Page 48

1          M. Zmijewski
2    so the closing is at a point in time, which is
3    12:01 a.m. on Monday, the 22nd.
4    Q     Whatever time it is on Monday, the
5    22nd, it's -- Monday, the 22nd, would be the
6    relevant date by which to value the assets that
7    Barclays received; correct?
8    A     It's my understanding that that is
9    the closing date and time, and so you would value
10   the asset as of that moment.
11   Q     Is that a yes?
12         MR. TAMBE: Objection to the form of
13   the question.
14   A     That is a yes.
15   Q     Why isn't the end of the day on the
16   22nd a better estimate of the 12:01 a.m. value?
17   A     It didn't exist. You have to value
18   the assets as of that point in time. That price
19   didn't exist. You could not observe it. So if
20   you were sitting there and you were having to --
21   let's assume that there is a transaction at
22   12:01 a.m. where there was a check written for
23   assets and somebody said, okay, well, what is the
24   value of the assets. I don't think anybody is
25   going to say, well, let's wait until this

Page 49

1          M. Zmijewski
2    afternoon and the closing price and we will figure
3    it out and we'll just call that now. I'd say I
4    want my check right now.
5          So at the point the sale was closing,
6    risk was transferring, as far as I know, and the
7    asset, assets were transferring. Therefore, you
8    needed to value the assets at that point in time,
9    without using information after that point in
10   time.
11   Q     So, the September 19th valuation that
12   you calculated is essentially a proxy for the
13   September 22nd value of those assets; is that
14   fair?
15         MR. TAMBE: Objection to form.
16         MS. TABATABAI: Objection to form.
17   A     I didn't quite -- again, you say
18   September 22nd, and that could be confusing. I
19   think it needs to be clarified than when we say
20   the closing, it's 12:01 midnight. It's different
21   to say 12:01 midnight from noon or to 5 p.m. or
22   7 p.m. Those are different points in time.
23   Different information is available. So it's 12:01
24   just after midnight on Monday. That's the time.
25   Q     So you are saying very early on the

Page 50

M. Zmijewski

1 M. Zmijewski
2 22nd, but as I understand it, you are saying --
3 you are not saying the 19th is the appropriate day
4 to value these assets. You're saying that the
5 appropriate day is very early on the 22nd, but
6 that in your view, the best proxy for the value of
7 the assets 12:01 a.m. on the 22nd is the value of
8 the assets on September 19th; is that correct?
9 MR. TAMBE: Objection to the form.
10 MR. DAKIS: Objection to the form.
11 MS. TABATABAI: Join in the
12 objection.
13 A To the best of my knowledge, it is
14 the last price that is available and known as of
15 12:01 on the 22nd. 12:01 a.m. on the 22nd.
16 Q And is that -- the reason you used
17 your calculations of the September 19th price is
18 because it was the last price available?
19 A Correct.
20 Q And do you think that is the best
21 measure of market value as of 12:01 a.m. on
22 Monday?
23 A Yes. Now, when I went through this
24 exercise, one of the things that I did was also
25 what other information do we have between the

Page 51

1 close of the market on Friday, and 12:01 a.m.
2 Other information, I travel to Europe and Asia
3 quite often, so I know the Europe and Asia
4 exchanges, so I did take a look at what happened
5 in the early hours U.S. time in the Europe and
6 Asia markets, and on average that was a positive
7 return.
8 So I had no reason to think that
9 something was happening in the global security
10 markets, financial markets, that would have caused
11 that price to differ from the Friday close.
12 Q What precisely do you look at on the
13 Asian markets?
14 A I don't remember all the -- I did
15 this a while ago, early on. Off the top of my
16 head, it would have been the markets in China,
17 Hong Kong, Singapore, Japan, Australia, U.K,
18 Germany. I don't know where else I would have
19 looked. But it would have been the primary -- the
20 major exchanges in the financial markets.
21 Q Okay. Now, Germany, I guess they are
22 six hours ahead, so they wouldn't have been open
23 at 12:01 a.m.
24 A That's correct.
25

Page 52

1 M. Zmijewski
2 Q You still considered it relevant to
3 look at those; correct?
4 A Correct.
5 Q And when you looked at those markets,
6 do you recall what exactly you did? Did you do
7 some kind of analysis or look at the particular
8 issues or types of securities?
9 A That's-- I looked at the index for
10 the exchange, at the New York Stock Exchange index
11 or the S&P 500 index. I looked at the index for
12 the exchange from the close of the market until
13 that point in time.
14 Q Is this something you made a
15 systematic effort to look at or glanced at, or how
16 would you describe it?
17 MR. TAMBE: Objection to form.
18 MR. DAKIS: Same objection.
19 A I looked at all of the exchanges and
20 saw that they were on average positive, and after
21 that, I didn't feel a need to do anything else
22 other than that.
23 Q So the total amount of time you would
24 have spent looking at this, just roughly ballpark?
25 A Well, my time was short, of course,

Page 53

1 M. Zmijewski
2 because I asked staff at Chicago Partners to go
3 identify the different indices that were open at
4 12:01 midnight and collect the data. I don't know
5 how many hours they spent, but that would take a
6 substantial amount of time.
7 My role was short, of course, because
8 I just looked at the end result.
9 Q And when did you do that exercise?
10 A A long time, you know, a long time
11 ago, before -- as I was starting to do this
12 calculation.
13 Q Have you done any analysis of how
14 sensitive your calculations are to differences
15 between market value of those assets on the 19th
16 versus market value of those assets on the 22nd?
17 MR. TAMBE: Objection to form of the
18 question.
19 A I used Barclays' data because they
20 happened to have data, prices on the 19th and the
21 22nd, and the number that I calculate in the
22 exhibit in my report is based on the difference
23 between those two numbers adjusted for the exit
24 price adjustment, so I did, and -- because I used
25 both the 22nd and the 19th in my calculations of

Page 54

1        M. Zmijewski
2    the difference.
3        Q    In the time period roughly
4    September 15th to the 29th, the rough two-week
5    period, do you have any sense of whether
6    September 19th was an up or down day in the
7    markets?
8        MR. TAMBE:  Object to the form of the
9    question.
10        MR. DAKIS:  Same objection.
11    A    No.  I think it was an up day, but
12    I -- it was a volatile time.  There were some big
13    ups.  I don't know if the 19th was a big up or
14    not.
15        Q    If the assets that you are valuing in
16    your report, the equities, were worth more on
17    Friday, the 19th of September, than they were on
18    Monday, September 22nd, Then that would cause your
19    calculation to be off; correct?
20        MR. TAMBE:  Objection to the form of
21    the question.
22        MR. DAKIS:  Same objection.
23    A    No, that is my calculation.  My
24    calculation compares the value of Barclays on
25    September 22nd to the value on September 19th.

Page 55

1        M. Zmijewski
2    That is my calculation.
3        Q    You are saying there is a difference
4    between those two; correct?
5        A    Correct.
6        Q    And your ultimate goal was to
7    calculate the value of the assets, as you say, as
8    of 12:01 on September 22; correct?
9        A    Correct.
10        Q    So, if the September -- if the
11    equities, if the valuation of the equities on
12    September 19th is higher than the proper valuation
13    of those equities at 12:01 a.m. on September 22nd,
14    then your calculation would be incorrect; right?
15        MR. TAMBE:  Objection to the form of
16    the question.
17        MR. DAKIS:  Same objection.
18    A    Of course it would.  However, I don't
19    believe that is the case, and I believe the last
20    price that I am using is the last available price
21    that exists.
22        Q    I am just trying to make sure we
23    understand.
24        MR. TAMBE:  Whenever is a good time
25    to take a break.

Page 56

1        M. Zmijewski
2        MR. THOMAS:  Okay.
3        Q    Is it your view that no information
4    that became available after 12:01 a.m. on
5    September 22nd can be used to inform the estimate
6    of value at 12:01 a.m.?
7        A    If it's the -- if that information
8    was not known or knowable as of 12:01 a.m.,
9    then -- and we are measuring fair market value --
10    the answer is no.
11        Q    What if for some relevant security
12    there had been a trade at 12:05 a.m.; would that
13    be useful information?
14        A    If I were the buyer and the seller, I
15    would find it interesting, but the check was cut
16    and the parties parted.  Too bad.
17        Q    What if the check wasn't cut at that
18    point?
19        MR. TAMBE:  Objection to the form of
20    the question.
21        MR. DAKIS:  Same objection.
22        MS. TABATABAI:  Same objection.
23    A    I am using that metaphorically.  The
24    close happened.  The assets transferred.  The risk
25    transferred at that point in time.  So when there

Page 57

1        M. Zmijewski
2    was a new market price, somebody won and somebody
3    lost, but the game was over.
4        Q    If there was a trade at 12:05 a.m.
5    for one of the equities you valued, it would not
6    be okay to use that information, the trade
7    information in the valuation?
8        MR. TAMBE:  Objection.
9        Q    Is that your opinion?
10        MR. TAMBE:  Objection to form.
11    A    I believe I answered that before.  If
12    you are calculating a fair market value as of
13    12:01 a.m., the answer is yes.
14        Q    So I mean yes, it would not be okay
15    then to use it?
16    A    Correct.
17        MR. THOMAS:  It's up to you whether
18    we finish up the --
19        MR. TAMBE:  If you want to finish up.
20        THE WITNESS:  Just keep going.  I am
21    happy to go as long as you do.
22        MR. THOMAS:  Okay.
23        Q    Okay.  You quote an e-mail on the top
24    of page 12 of your report.  Do you see that?
25    A    I do.

Page 58

M. Zmijewski

1
2     Q    And you describe this as Barclays
3  explaining its adjustment approach.
4     A    Correct.
5     Q    The second sentence reads: "For
6  simplicity, we have assumed that these are mids
7  and so we need to make an adjustment to move these
8  to the bid side of the market."
9         And then the next sentence says: "A
10  more conservative assumption would be that the
11  prices are offers, which is a rapidly falling
12  market is probably more realistic," which I assume
13  that means "in a rapidly falling market is
14  probably more realistic," "which would obviously
15  lead to a larger adjustment.
16         Do you agree that that would be a
17  more conservative assumption?
18         MR. TAMBE:  Objection to the form of
19  the question.
20     A    I am pausing here just to try to
21  think of the context of this e-mail.
22     Q    Sure.
23     A    Because "conservative" needs a
24  context.  So I am just trying to think of the
25  context of how I am using "conservative."

Page 59

M. Zmijewski

1
2  I think so, based on the
3  correspondence to the auditors and what they are
4  attempting to do.  I think it would be more
5  conservative.
6     Q    And by more, the more conservative
7  assumption would result in a lower valuation of
8  those equities; correct?
9     A    Yes.
10     Q    So, do you understand this to be
11  indicating that one option would be to assume that
12  those equity prices are mids and adjust from the
13  mids down to the bid side?  That is one option;
14  correct?
15         MR. TAMBE:  Objection to the form of
16  the question.
17     A    Yes.
18     Q    And the other one, the more
19  conservative assumption would be that the prices
20  are offers, which would result in a larger
21  adjustment down to bid; is that correct?
22         MR. TAMBE:  Objection to the form of
23  the question.
24         MR. DAKIS:  Same objection.
25         MS. TABATABAI:  Join.

Page 60

M. Zmijewski

1
2     A    Correct.
3     Q    And that what Barclays is doing here
4  is doing the approach that results in a higher
5  valuation of the equities; correct?
6         MR. TAMBE:  Objection to the form of
7  the question.
8         MR. DAKIS:  Same objection.
9         MS. TABATABAI:  Join in the
10  objection.
11     A    You can't discern that from this
12  e-mail.  You don't know, and based on an analysis
13  of securities, the bid offer spreads of
14  2.64 percent, I have tried to think about how they
15  calculated that, and I can't -- I don't know what
16  data they used, so I couldn't reproduce the
17  calculation to know whether it referred to the
18  first sentence or the second sentence.  I don't
19  know which they did.
20     Q    Which do you mean, what are you
21  referring to, when you say what refers to the
22  first sentence or the second sentence?
23     A    The 2.64 percent.  It says based on
24  an analysis of securities, the bid offer spread of
25  2.64 percent.  This again would be a conservative

Page 61

M. Zmijewski

1
2  estimate of securities quoted.
3         You know, I don't know if that is --
4  from what I can tell, it's -- you know, it's not
5  clear what they are doing from this.  It's not
6  clear which one they used.
7     Q    So you're not sure which of those two
8  possibilities they used?
9     A    Based on this e-mail; correct.
10     Q    And putting that aside for the
11  moment, do you agree that the first one, assuming
12  they are mids, results in a higher valuation than
13  assuming they are offers, higher valuation of
14  those equities?
15         MR. TAMBE:  Objection to the form of
16  the question.
17     A    Yes.
18     Q    And then continuing on, to the last
19  sentence, it says:  "This again would be a
20  conservative estimate, as the securities with a
21  quoted bid offer would most likely be the
22  liquid -- be the most liquid and hence trading at
23  the tightest spreads."
24         What do you understand that point to
25  be?

Page 62

1              M. Zmijewski
2         MR. TAMBE:  Object to the form of the
3    question.
4         A      The point they are making is they
5    have 2100 of 3700 securities, represents I think
6    86 percent or 80 plus percent of the market value,
7    but not 100 percent of the market value of course.
8    There is only 2100 of 3700 securities.  And the
9    average is 2.64 percent for that 2100.  The
10   question is -- which is 80 plus percent.
11        The question is, for the other ten to
12   20 percent of the securities, what is the bid/ask
13   spread for that group?  And it's not observed, so
14   the statement is the following, that given that we
15   can't observe for the other securities, roughly,
16   I'm going to call it 15 percent of the value,
17   use -- it's more likely that the unobserved
18   securities have a higher bid/ask spread than the
19   observed securities.  Therefore, it's conservative
20   to use the average bid/ask spread for the 2100
21   observed securities.
22        That is what I believe they are
23   saying.
24        Q      That is your understanding of that?
25        A      That is my understanding of it.

Page 63

1              M. Zmijewski
2         Q      Do you have an -- are they making the
3    point that they don't have a universe of all the
4    spreads and that the spreads that they don't have
5    are likely larger?
6              MR. TAMBE:  Objection to the form of
7    the question.
8         A      My question wasn't very good -- my
9    answer wasn't very good last time, because I
10   thought that is what I just said.  In my previous
11   question, that is what I thought I said.  Maybe I
12   misspoke.
13        Q      Do you understand this to be
14   indicating that if they had all of the CUSIPs, the
15   average bid offer of 2.64 would likely be higher?
16        A      Correct, that -- yes.
17        Q      So if they had all those, the
18   calculation, the value of those equities would
19   likely be lower?
20        A      No.  Because you -- if you had them
21   all, you would not use the simple average as it's
22   calculated there.  It would be completely
23   inappropriate to do that.
24        Q      And that's what your understanding of
25   this is, that they are using the simple average?

Page 64

1              M. Zmijewski
2         A      This combined with the spreadsheet
3    they cite, where they calculate for
4    September 22nd, their bid/ask spread adjustment,
5    yes, that is a simple average.  It's not a
6    weighted average.
7         Q      Now, when you -- going back to the
8    second and third sentences, you said you weren't
9    sure which approach that Barclays actually used?
10        A      Yes.
11        Q      Where it says, "For simplicity, we
12   have assumed these are mids, and so we need to
13   make an adjustment to move these to the bid side
14   of the market."  The next sentence says, "A more
15   conservative assumption would be."
16        Does that indicate to you that what
17   they did was they assumed they were mids?
18             MR. TAMBE:  Objection to the form of
19   the question.
20             MR. DAKIS:  Same objection.
21             MS. TABATABAI:  Same objection.
22        A      That is what is in this e-mail, but
23   if you look at the spreadsheet and look at the
24   calculation for September 22nd -- and this e-mail
25   is dated in December, sometime later.  It was a

Page 65

1              M. Zmijewski
2    correspondence to their auditors.  If you look at
3    the calculation that they made for September 22nd
4    bid adjustment, bid price adjustment, I don't
5    believe they followed this, exact followed this
6    approach for September 22nd.
7         So I agree with your interpretation
8    of the language, but if you combine it with
9    looking at the data, it is not clear how they
10   ended up.
11        Q      Does how they ended up impact your
12   analysis at all?
13        A      I don't think so, because what I do
14   is I follow -- I implement their opinion and -- or
15   their view here.  Plus in the spreadsheet, I
16   execute that.  So, my assumption is that they
17   would be in agreement with what I did.
18        Q      When you write at the beginning of
19   paragraph 18, I conservatively adopt the Barclays
20   approach as described in this e-mail, what
21   approach is that that you are referring to?
22        A      It's using the simple average of the
23   observed securities to apply to the entire
24   portfolio of securities.
25        Q      Average bid?  The average of what?

Page 66

M. Zmijewski

1
2    A    The bid/ask spread.
3    Q    Do you assume whether they are mids
4 or offers?
5    A    I am attempting to recall, and I
6 don't recall exactly. My recollection of what
7 they do is they take the entire bid/ask spread, as
8 a percent, and they apply it to the entire bid/ask
9 spread, not half of it. It's not as if it's a
10 mid. They take the entire bid/ask spread and
11 apply it to the price.
12          If my recollection is correct, then
13 it would be in that spreadsheet for
14 September 22nd. The second sentence, not the
15 first.
16    Q    You mean the third sentence, not the
17 second?
18    A    Let me count. No, I meant the third
19 sentence -- yes, correct. I meant the third
20 sentence.
21    Q    You meant the third sentence.
22    A    Let me repeat it. A more
23 conservative assumption would be that prices are
24 offers.
25    Q    Okay. Is that what you did in your

Page 67

M. Zmijewski

1
2 calculation, to assume that the prices were
3 offers?
4    A    I applied the entire bid/ask spread
5 percentage to the price, so I didn't take half of
6 it, which would be the mid. I took the entire
7 bid/ask, because that's what they did in their
8 spreadsheet on the 22nd.
9    Q    You did whatever Barclays did because
10 you just applied their spreadsheet?
11    A    Correct.
12          MR. THOMAS: Why don't we go ahead
13 and take a short break now?
14          THE VIDEOGRAPHER: This is the end of
15 tape number one. The time is now 10:55 a.m.
16 We are now off the record.
17          (Recess taken.)
18          THE VIDEOGRAPHER: This is the start
19 of tape number two. The time is now
20 11:05 a.m.
21          We are now back on the record.
22 BY MR. THOMAS:
23    Q    Do you agree in valuing these
24 equities, in principle, that it is appropriate to
25 adjust bid point prices or offer prices to bid

Page 68

M. Zmijewski

1
2 prices?
3    A    The accounting rules require it.
4    Q    So --
5    A    So, therefore, it is appropriate to
6 meet the accounting definition of fair value.
7    Q    Did you independently value any of
8 these securities?
9          MR. TAMBE: Objection to the form of
10 the question.
11    A    If by independently you mean identify
12 the security and use valuation methodologies,
13 collect data, and so forth, I did not. I, as I
14 said before, used Barclays' own September 19th
15 valuations of them, as well as checked those
16 valuations, compared those valuations to Bloomberg
17 prices.
18    Q    Why do you say conservatively used
19 Barclays' valuations? Do you believe there is any
20 basis for questioning those valuations?
21    A    I guess I was saying conservative
22 from the perspective of, I didn't think Barclays
23 would object to me using their data and their
24 approach, even though I don't necessarily agree
25 with the way they calculated the bid price

Page 69

M. Zmijewski

1
2 adjustment.
3    Q    And what way do you disagree with how
4 they calculated the bid price adjustment?
5    A    They used a simple average, and I
6 agree with the comment that for the ten or
7 12 percent -- for September 19th, my recollection
8 is, we were able to get Bloomberg prices for a
9 little over 2100 of the securities, which composed
10 88 percent of the market value.
11          So, the question is, for the ten,
12 12 percent for which we did not have market value,
13 we don't have an actual bid/ask spread. There is
14 an issue as to what the appropriate bid/ask spread
15 would be for that group.
16          Barclays uses a simple average, which
17 is way too high for 88 percent to compensate for
18 the unknown 12 percent. I use that approach.
19 However, if you use a median or a weighted average
20 bid price adjustment, you get a much lower
21 adjustment. So I am -- I believe I am
22 conservative by using their simple average rather
23 than a weighted average or a median adjustment or
24 for the 2100 securities a security-by-security
25 adjustment. All those, which is identical to the

Page 70

1                M. Zmijewski
2    weighted average -- it would be identical to the
3    weighted average.  Those would all give you
4    substantially lower bid price adjustments.
5        Q    Is there an industry standard in
6    terms of how to do this calculation?
7            MR. TAMBE:  Objection to the form of
8        the question.
9        A    I don't know.  Whether the auditors
10   might have some standard, I don't know.  I am not
11   aware.
12       Q    Do you have any knowledge of how
13   other companies other than Barclays might do this
14   same type of valuation?
15       A    I do not.  What I can tell you is,
16   let's assume you have all the securities,
17   100 percent, instead of 88 percent, and you apply
18   an average, you are going to get the wrong answer.
19       Q    Isn't that true in a lot of these
20   valuations, that you are making estimates and
21   can't always get the exact correct valuation?
22       A    You always have to make estimates.
23   You have to estimate inputs or measure inputs.
24   Therefore, the valuation is not exact unless you
25   see it transacted, and then you know the market

Page 71

1                M. Zmijewski
2    price because you observe it.
3            So there is always estimates that one
4    must make.  However, in our -- in your analysis,
5    your goal is to have unbiased estimates, not
6    biased estimates, and we know that the simple
7    average, if you used a -- if you had a 100 percent
8    sample observations, that using a simple average
9    is going to give you a biased number.
10       Q    In this valuation process, in trying
11   to come up with estimates, are there judgments
12   that need to be made?
13       A    Valuation work always requires the
14   measurement of unobserved variables, and you
15   typically would like some type of -- you typically
16   would like a model or other basis you would have
17   to inform you as to what the appropriate input
18   would be.
19       Q    In the valuation work that you did
20   and looked at, does it involve numerous judgments
21   as to how best to estimate value?
22            MR. TAMBE:  Object to the form.
23            MR. DAKIS:  Same objection.
24       A    It all requires inputs into some type
25   of valuation model and methodology.  Some of those

Page 72

1                M. Zmijewski
2    require estimates, some can be observed, some --
3    and -- but the estimates should be based on some
4    type of foundation, and it's -- it's not
5    uninformed judgment.
6        Q    But they're informed judgments?
7        A    Usually based on analysis, it's an
8    informed judgment, yes.
9        Q    And there is no blueprint or form
10   that says exactly how these valuations are done;
11   is that correct?  There has to be judgments as to
12   how to -- as to approach and methodology; is that
13   fair?
14           MR. TAMBE:  Objection to form.
15           MR. DAKIS:  Same objection.
16       A    The methodologies are fair -- many of
17   these methodologies are fairly rigorous, so there
18   isn't judgment there.  It's a methodology.
19           Measuring the inputs into -- for the
20   execution of that methodology requires an analysis
21   so that one can measure an input based on an
22   analysis, so from that perspective, there is
23   judgment as to what analysis to use and how to --
24   what input to actually get from the analysis.
25           That part has judgment, but the

Page 73

1                M. Zmijewski
2    methodologies -- for example, a discounted cash
3    flow methodology, it's a formula, no judgment.
4        Q    There's judgments in terms of which
5    methodology should be used; correct?
6        A    There can be judgments of when there
7    are alternative methodologies; correct.
8        Q    Can there be reasonable differences
9    in judgments as to which methodologies to use?
10       A    Sometimes.  Not always but sometimes
11   there could be.  Which is important.  That's why
12   it's important to have count and counterpoint.
13   There are two sides and people looking at each
14   other and reviewing each other's work so that all
15   views are expressed.
16       Q    You write, "I conservatively adopted
17   Barclays' approach as described in this e-mail."
18           You are saying you adopt the
19   approach, but not the actual Barclays numbers; is
20   that right?
21       A    Correct.
22       Q    And how you -- and by -- forgive me
23   if you answered this, but the approach, just so we
24   are clear, the approach that you adopt when you
25   say that is what precisely?

Page 74

1          M. Zmijewski
2      A      The approach is going to the
3  September 19th, and taking the bid/ask spreads on
4  September 19th, calculating the average and use --
5  applying that average to the entire portfolio of
6  equities.
7          This e-mail is in December of 2008,
8  not September.
9      Q      And assuming -- you assumed that
10  prices are mids?
11          MR. TAMBE:  Objection to the form of
12  the question.
13      A      That one I answered.
14          No, because that's what Barclays
15  says.  I take 100 percent of the bid/ask spread
16  and apply it to the price, not half.
17      Q      You write, "I used Barclays'
18  valuation of the equities as of September 19th,
19  which are the end-of-day prices and not adjusted
20  to bid prices (exit price marks)."
21          Are bid prices and exit prices the
22  same?
23      A      It -- in the documents that I have
24  seen for this litigation, sometimes people call
25  things bid prices, sometimes they call -- or bid

Page 75

1          M. Zmijewski
2  price adjustments, and sometimes they will call
3  them exit price -- I'm sorry, exit marks, exit
4  price marks.
5          I don't think all the documents
6  consistently use those terms.
7      Q      Sort of a -- be different meanings to
8  the terms depending on who is using the term?
9      A      That is my observation.
10      Q      Now, here you have "exit price
11  marks."  Is that different from exit prices?
12      A      Think of a price as being a
13  transaction, an observed transaction that
14  occurred.  These are not transactions.  So they
15  are price mark, mark signals, that they are not a
16  transaction.
17      Q      And what is a mark?
18          MR. TAMBE:  Objection to the form of
19  the question.
20          MR. DAKIS:  Same objection.
21      A      As I said earlier, I can look up the
22  footnote.  I don't want to define it differently
23  and use different words, but I adopt the same
24  definition of the mark Professor Pfleiderer uses.
25      Q      Can you tell me what a mark is, just

Page 76

1          M. Zmijewski
2  how you are using the term there?  Without looking
3  it up, can you tell me?
4      A      No.  I don't think that is useful to
5  do, you know.  You know, I am very specific.  I
6  say, I used the term marks, quotes and prices
7  according to footnote 22 of Professor Pfleiderer.
8  I use them exactly the same way.
9      Q      Do you have an understanding of how
10  he uses the term "marks"?
11      A      I don't have an exact recollection of
12  his language, but we can look at footnote 22 of
13  his report.
14      Q      You write, "I adjust the Barclays
15  September 19th valuation of the non-convertible
16  equities to bid prices by using a liquidity
17  adjustment in the following way."
18          What is the purpose of using a
19  liquidity adjustment?
20      A      Again, these terms aren't being used
21  consistently in this e-mail.  It's an exit price
22  adjustment or a bid price adjustment.  If you look
23  at the spreadsheets that they have, they sometimes
24  call the same adjustment a liquidity adjustment.
25  It's the same adjustment that I spoke of before.

Page 77

1          M. Zmijewski
2          It's the same calculation.  They use
3  those terms for equities interchangeably.
4          So this is not what we call the
5  liquidity discount in the context of our
6  conversation earlier.
7      Q      Are you trying to adjust something
8  you said earlier?
9          MR. TAMBE:  Objection to the form of
10  the question.
11      A      No, I am not.
12          MS. TABATABAI:  Objection.
13      A      Earlier I talked about a liquidity
14  adjustment in a specific context.  Here -- which
15  is why I say it has to have a specific context.
16  The liquidity adjustment is another term Barclays
17  uses in some of its spreadsheets, and in this
18  particular case, when it's applied to equities, it
19  means the adjustment to bid or the calculation
20  from my last price to an exit mark.  They are
21  using those all in the same way in these different
22  documents.
23      Q      Is this -- the way it's being used --
24  the way you use it here, liquidity adjustment,
25  what do you mean it to mean here, when you use it?

Page 78

1              M. Zmijewski
2      A    I mean it to mean what Barclays uses
3  it -- means it to mean in its spreadsheet, which
4  is described in the quotation above paragraph 17.
5      Q    Okay.  Is that the adjustment from
6  mid to bid prices?
7          MR. TAMBE:  Objection to the form of
8  the question, asked and answered.
9      A    Well, I will call it a bid price
10 adjustment.  Because the way Barclays calculates
11 that adjustment, it's not from the mid, it's using
12 100 percent of the bid/ask spread, multiplying it
13 by the last price.  So that is not a mid to bid
14 adjustment.  It's a last price to bid adjustment
15 using 100 percent of the bid/ask spread.
16         That is the calculation that they
17 use.  I use the same calculation.
18     Q    Is the --
19     A    And that's what I mean by the
20 liquidity adjustment in that context.
21     Q    Is that the same thing as a liquidity
22 discount?
23         MR. TAMBE:  Objection to the form of
24 the question.
25         MR. DAKIS:  Same objection.

Page 79

1              M. Zmijewski
2          MS. TABATABAI:  Same objection.
3      A    I don't recall if Barclays uses in
4  its spreadsheet liquidity discount.  I think they
5  might actually call it a liquidity discount for
6  the equities, and they might characterize it that
7  way in some of their product, their work product.
8      Q    In footnote 35, the second sentence,
9  you say:  "I restrict the sample for calculation
10 in the following steps.  First I eliminate all
11 convertible equities, which leaves 3731 CUSIPs out
12 of the 4,028 CUSIPs that Barclays valued."
13         Why do you eliminate those?
14     A    Because that's what Barclays does.
15 Barclays does not apply an adjustment to the
16 convertibles.  If you look at their spreadsheet
17 for September 22nd, they don't apply an adjustment
18 to the convertibles, and I follow that same
19 process.
20     Q    Then you write, "Then I select CUSIPs
21 with non-negative bid price, ask price and last
22 price from Bloomberg, leaving 2295 CUSIPs."
23         So what are you excluding there by
24 doing that?
25     A    There might be some, some negative

Page 80

1              M. Zmijewski
2  prices that are included in the database that I
3  exclude, because they are not last traded prices.
4  That is what they tell you.
5      Q    And have you calculated how many
6  there are?
7          MR. TAMBE:  How many of what?
8      A    Negative prices?
9      Q    Yes.
10     A    No.
11     Q    As a result of this restriction, you
12 exclude about between 1400 and 1500 CUSIPs?
13     A    No.  It's not just that restriction,
14 because I have to go to Bloomberg, and Bloomberg
15 first has to have data.  So the overwhelming
16 number of these aren't negative prices.  The
17 overwhelming number of these would be Bloomberg
18 doesn't have the CUSIP in it.
19     Q    What does that indicate to you when
20 Bloomberg doesn't have the CUSIP?
21     A    Bloomberg doesn't track that
22 particular security.
23     Q    Does that indicate anything to you
24 about that security?
25     A    It's not traded on a widely known

Page 81

1              M. Zmijewski
2  exchange.
3      Q    Do those tend to be illiquid, more
4  illiquid securities?
5          MR. TAMBE:  Objection to form.
6      A    I'm sorry.  I didn't hear if you said
7  liquid or illiquid.
8      Q    More illiquid.
9      A    They would be more illiquid
10 securities.
11     Q    And so you are saying when you go
12 down from 3700 to 2200, that 1400 or 1500
13 reduction in CUSIP samples, you are saying most of
14 them are because Bloomberg didn't have prices?
15     A    Correct.
16     Q    Do you have any sense, order of
17 magnitude of the numbers that were excluded for
18 reasons other than that?
19     A    I don't.  I'm sorry.  It will be
20 small relative to that total difference.
21     Q    Small in terms of number --
22     A    Number.
23     Q    -- in terms of CUSIPs and in
24 percentage of value?
25     A    Definitely quite small in percentage

---

Page 82

1          M. Zmijewski
2 of value.  And in percentage of CUSIPs.
3     Q     Have you done any analysis to see how
4 the exclusion of those CUSIPs impacts your
5 calculation?
6     A     You can't conduct my calculation with
7 a negative price, so.  Or negative bid price or
8 ask price.  It's nonsensible to include it.
9     Q     Does it concern that some of your
10 data seems to include nonsensible bid/ask?
11        MR. TAMBE:  Objection to the form of
12     the question.
13     A     I didn't say that.  I didn't say that
14 the data were nonsensible.  I said including them
15 in the analysis would be nonsensible.
16        Bloomberg identifies certain --
17 sometimes they have negative prices.  I forgot all
18 the reasons they will code something as a negative
19 price.  You can send them an e-mail, they'll tell
20 you.
21        So it's nonsensible to include them.
22     Q     Is there any significance to the fact
23 that some of the CUSIPs had negative prices, as
24 far as you know?
25        MR. TAMBE:  Object to the form of the

---

Page 83

1          M. Zmijewski
2 question.  That is not what he said.
3        MR. DAKIS:  Same objection.
4     A     If you look at this e-mail, and also
5 if you look at the spreadsheet, the e-mail
6 indicates that to calculate the bid/ask spread,
7 that Barclays was able to identify the bid/ask
8 spread for 2100 of 3700 securities.
9        So, notice, if you take a look, it's
10 not random chance that I was able to identify the
11 proper bid/ask spread for 2106 of 3731 securities.
12 These are the same securities at different points
13 in time.
14        My analysis is the same as their
15 analysis.  They have, from what I can tell,
16 alternative sources other than Bloomberg.  They
17 don't tell us what that is, but based on my
18 observation, I don't believe they are using
19 Bloomberg prices generally.  However, they do use
20 Bloomberg prices on September 22nd for some of
21 their securities, so they use the same source I do
22 for some of their securities, and they calculate
23 2100 of 3700 bid/ask spreads, and I calculate 2106
24 of 3731 bid/ask spreads.
25        So I'm following their process

---

Page 84

1          M. Zmijewski
2 detailed in their data.  They go through the same
3 process, and they have to have the same type of
4 exclusions.  It's not sensible to not have those
5 exclusions.
6     Q     Did you attempt to find out what
7 source Barclays used and why?
8     A     I did.  We read the record, and the
9 best I can tell, it's not in the record with
10 respect to their sources, other than one of their
11 spreadsheets is clearly labeled for
12 September 22nd, that they do use Bloomberg, but
13 it's not -- it's clear they don't use Bloomberg
14 prices all the time.
15     Q     So in the -- for the equities that
16 you are recalculating the value of, as you sit
17 here today, are you aware what source Barclays
18 used in its calculation of those values?
19     A     I am not.
20     Q     Are you aware of other viable sources
21 other than Bloomberg?
22     A     Of course.
23     Q     What are those?
24     A     Reuters has data.  That is probably
25 the widest.  Thompson.

---

Page 85

1          M. Zmijewski
2     Q     Why did you choose to use Bloomberg?
3     A     Bloomberg is a widely accessed source
4 of data.  It's the source that we use at Chicago
5 Partners.  It's well accepted.
6        But I have also used FactSet and used
7 Capital IQ.
8        Professor Pfleiderer also uses
9 Bloomberg prices, if I recall correctly.
10     Q     Did you see in the CUSIPs you looked
11 at, the data you looked at, were there any
12 negative bid/ask spreads?
13     A     I know there were some.
14     Q     And what is the significance to you
15 of a negative bid/ask spread?
16     A     It's -- the significance is that from
17 practicality, I don't include it, so I exclude it
18 from my analysis.
19     Q     Do those make sense, having negative
20 bid/ask spreads?
21     A     Not that I can think of, no.
22     Q     Do you have any idea why there were
23 negative bid/ask spreads in the data that you
24 looked at?
25     A     It would be conjecture to --

Page 86

| | M. Zmijewski |
|---|---|
| 1 | |
| 2 | Q    Please go ahead and conjecture. |
| 3 | A    No, thank you. |
| 4 | Q    Do you have any idea of why that -- |
| 5 | they might be there? |
| 6 | A    Of course there could be input data |
| 7 | problems; right? Every database has input |
| 8 | problems. A small error rate, but there is an |
| 9 | error rate. The number of bid/ask spreads is |
| 10 | small. So it could be that. |
| 11 | Q    Anything else you can think of? |
| 12 | A    Maybe they didn't measure the bid and |
| 13 | the ask at the same time, so there could be a |
| 14 | timing difference. That would be unusual for them |
| 15 | to do that, but that is possible. |
| 16 | Q    When you say it would be unusual for |
| 17 | them to do that, what is the basis of your |
| 18 | opinion? |
| 19 | A    It's unusual to see a negative |
| 20 | bid/ask spread. |
| 21 | Q    Did the presence of negative bid/ask |
| 22 | spreads in the data you looked at cause you any |
| 23 | concern about the data that you were looking at? |
| 24 | A    No. Barclays has their bid/ask |
| 25 | spreads for September 22nd, and -- or its |

Page 87

| | M. Zmijewski |
|---|---|
| 1 | |
| 2 | December -- I don't know if it's December 12, |
| 3 | December 18th. In the spreadsheet they have them. |
| 4 | They have negative bid/ask spreads. |
| 5 | Q    Continuing in footnote 35, you say, |
| 6 | "Further restricting to CUSIPs with non-negative |
| 7 | bid/ask spreads, there are 2253." |
| 8 | So, I guess does that indicate there |
| 9 | is 42 samples of negative bid/ask spreads -- |
| 10 | A    It does. |
| 11 | Q    -- being encountered? |
| 12 | Did you consider or analyze any |
| 13 | impact the exclusion of those negative bid/ask |
| 14 | spreads had on your calculation? |
| 15 | A    Well, excluding -- excluding them is |
| 16 | appropriate, but excluding them increases the |
| 17 | average bid/ask spread. You are excluding a |
| 18 | negative number, so therefore the average would be |
| 19 | higher. |
| 20 | Q    Then you say, "The final sample set |
| 21 | is the 2106 CUSIPs for which the ratio of the |
| 22 | bid/ask spread to the PCG 9/19 price is less than |
| 23 | or equal to 50 percent." |
| 24 | A    Correct. |
| 25 | Q    So you are also excluding 147 CUSIPs |

Page 88

| | M. Zmijewski |
|---|---|
| 1 | |
| 2 | with a bid/ask spread that is greater than |
| 3 | 50 percent; is that correct? |
| 4 | A    Yes. |
| 5 | Q    Why did you do that? |
| 6 | A    Because that's what Barclays does. |
| 7 | If you go back to their spreadsheet and look at |
| 8 | their calculations for December, and they have -- |
| 9 | it's -- I think I indicate what document this is |
| 10 | in footnote 34, so it's one of -- I am pretty sure |
| 11 | it's one of those two documents, but it's a |
| 12 | spreadsheet. |
| 13 | In the spreadsheet there is a summary |
| 14 | tab, and in the summary tab they describe their |
| 15 | steps in calculating the average bid/ask spread, |
| 16 | and they exclude bid/ask spreads greater than |
| 17 | 50 percent. |
| 18 | Q    Do you know why they do that? |
| 19 | A    Well, because -- I imagine why. They |
| 20 | don't say, but I think it's reasonable because |
| 21 | 50 percent would be assumed to be something like |
| 22 | an outlier. |
| 23 | Keep in mind bid/ask spread |
| 24 | percentages are a skewed distribution, so you |
| 25 | can -- when you use an average, you can really |

Page 89

| | M. Zmijewski |
|---|---|
| 1 | |
| 2 | have a biased central tendency calculation by |
| 3 | using an average when you include outliers, |
| 4 | because you only have outliers in one direction. |
| 5 | Q    And why -- can you think of any |
| 6 | reason why there would be securities with such |
| 7 | large bid/ask spreads? |
| 8 | A    Again, there could be data input |
| 9 | errors. It could be a timing problem, or it could |
| 10 | be that it's just how the market at a point in |
| 11 | time -- how the market maker was viewing the |
| 12 | security. |
| 13 | Q    Could it be indicative of securities |
| 14 | that are illiquid? |
| 15 | A    It's possible, if -- what I would do |
| 16 | to assess that is look at a time series of the |
| 17 | bid/ask spreads and see if it's always that large |
| 18 | or if it's a day that happies to be so large, |
| 19 | because if it's a day that's large, it's |
| 20 | indicating that it's probably a different issue |
| 21 | than some illiquid asset. However, if it's that |
| 22 | large day after day, and that's what was observed |
| 23 | with the security, it would be consistent with |
| 24 | having something -- having a security that is |
| 25 | quite illiquid. |

Page 90

M. Zmijewski

1                M. Zmijewski
2    Q    Have you gone and looked at or
3    analyzed the particular securities that have been
4    excluded from your sample set?
5    A    I have not.  I adopted Barclays'
6    methodology, which I assume they stand behind and
7    would be comfortable with.  I didn't think there
8    was a need to go beyond using the approach that
9    they used.
10    Q    So, from the 4,028 CUSIPs, you
11    excluded CUSIPs with negative bid prices, with
12    negative ask prices and negative last prices; is
13    that correct?
14    A    Or.  There is an "or" there.  It's
15    not "and," it's an "or."
16    Q    Or negative last prices.
17    A    Yes, correct.
18    Q    Now, that accounts -- going back to
19    your sentence, the third sentence, do those three
20    exclusions add up to excluding about 1400 to 1500
21    CUSIPs?
22    MR. TAMBE:  Objection to the form of
23    the question.
24    A    No.  I believe what I said before is
25    the overwhelming majority of those is a lack of

Page 91

M. Zmijewski

1                M. Zmijewski
2    data in Bloomberg.
3    Q    Okay.  So you don't -- okay.  You
4    don't say that in that sentence, but you are just
5    elaborating on that?
6    MR. TAMBE:  Objection to the form of
7    the question.
8    MR. DAKIS:  Same objection.
9    Q    Is there somewhere in here that you
10    say that a certain number didn't have data on
11    Bloomberg?
12    A    It should be in this footnote, if it
13    were there, so I believe not.
14    Q    And again, you have no, no idea how
15    many of these 1400 to 1500 CUSIPs that were
16    excluded actually lacked Bloomberg data as opposed
17    to having negative bid prices, negative ask prices
18    or negative last prices?
19    A    Correct.  I don't know the specific
20    number, but I do know it's the overwhelming
21    number.
22    Q    Is there like a percentage that you
23    know that is on --
24    A    I don't.
25    Q    On footnote 37, you say, "I

Page 92

M. Zmijewski

1                M. Zmijewski
2    conservatively adopt Barclays' approach to measure
3    the bid/ask spread percentage."
4    A    Yes.
5    Q    Which appears to be the difference
6    between the ask price and the bid price and
7    divided by the last price?
8    A    Correct.
9    Q    That is what we have been discussing
10    prior; right?
11    A    Yes.
12    Q    And you talk about the median ratio
13    and the average ratio.  And I just want to make
14    sure I understand which one you used.
15    A    Are you waiting for me to answer a
16    question?
17    Q    Yes.
18    A    I'm sorry, I didn't know that.  I
19    thought you stopped in the middle of a question.
20    Q    No, no.  You refer to --
21    A    I'm with you.  I have the question.
22    Q    Do you -- the one that you actually
23    used, is it the median ratio of .24 percent or the
24    average ratio of 1.48 percent?
25    A    If you look at Exhibit 81, the

Page 93

M. Zmijewski

1                M. Zmijewski
2    foot -- first note in that exhibit explains that I
3    used the simple average of 1.48 percent, just so
4    you know it's there.
5    Q    Okay.
6    A    I apologize.  I thought you were in
7    the middle of a question.
8    Q    No problem.
9    So, you end up calculating a
10    $541 million change to the valuation of these
11    equities that Barclays made; is that right?
12    A    Correct.
13    Q    How much of that $541 million results
14    from the change in date versus other factors?
15    A    That's not something I calculated.
16    Roughly, I think it's probably 400 million, using
17    the Barclays September 19th date, and probably the
18    rest of it is the difference in the liquidity
19    adjustment calculation.  Instead of using the
20    calculation that they use for a different date, I
21    used the calculation on the 19th.
22    Q    Are there any other factors that go
23    into that $541 million difference other than your
24    use of September 19th values and your different
25    liquidity calculation?

Page 94

M. Zmijewski

2  A    No.
3  Q    In your next opinion, opinion two,
4  you say that -- you say that Barclays received
5  more assets than were approved by the Court in the
6  transaction, and paid less for those assets than
7  was represented to the Court, and thus benefited
8  from the sale transaction beyond what was approved
9  by the Court.
10       Actually, you are saying that's what
11  the movants say; correct?
12  A    Correct. That is, just so we have it
13  here, my definition of the Barclays windfall.
14  Q    And just to put it in your own words,
15  what is the definition of the Barclays windfall?
16  Are you just going to read that back to me?
17  A    These are my own words, so. If it's
18  not clear, I am happy to -- and the execution --
19  maybe I should say the execution of those words is
20  on Exhibit B-1, where I actually showed the
21  calculation.
22  Q    We are going to come back to this
23  after I go through one more painful economic
24  calculation.
25  A    Only one. That would be great.

Page 95

M. Zmijewski

2  Q    Well, two.
3  A    See, always holding back.
4  Q    Turning to the calculation of the JPM
5  inventory, that is the other major adjustment you
6  made to the Barclays calculation; is that correct?
7  A    Correct.
8  Q    Can you just describe what you did to
9  make that calculation?
10  A    It would be helpful if we at least go
11  to the exhibit --
12  Q    Sure.
13  A    -- where it shows that calculation.
14  Q    Sure.
15  A    Which is -- which it's somewhere I
16  can't find it. Exhibit C-1.
17  Q    Okay.
18  A    The second column of numbers is the
19  number of CUSIPs. If you look at the total, it's
20  1195, and that's the total number of CUSIPs in the
21  JPM inventory according to Exhibit 87-B, as well
22  as 641-A.
23  Q    Before -- I'm sorry. I didn't mean
24  to cut you off. But just generally describe the
25  universe of documents what we are talking about

Page 96

M. Zmijewski

2  here in the context of the sale transaction.
3  A    I am sorry, I didn't understand.
4       MR. TAMBE: Objection to form.
5  Q    What universe of assets are we
6  describing here?
7  A    I will see if this is an answer that
8  is responsive. This is the universe of assets
9  that was not transferred as of the closing date,
10  but was physically transferred by JPM, but held
11  back by JPM and later negotiated between JPM and
12  Barclays in December of that year.
13       Is that what you were looking for?
14  Q    Yes.
15  A    Okay.
16  Q    And what adjustment did you make to
17  Barclays' calculation of value of those assets?
18  A    Barclays, if you recall, used a
19  December date to value the assets. My valuation
20  date is the last price before the closing date as
21  of 12:01 a.m. on the -- on September 22nd, which
22  effectively becomes the closing of September 19th,
23  so, my goal was to value JPM inventory as of the
24  19th of September, 2008.
25  Q    Why not value the assets that

Page 97

M. Zmijewski

2  Barclays received on the day they actually
3  received them?
4  A    By that you mean the 22nd?
5  Q    Yes. Or -- no, December.
6  A    December?
7  Q    December.
8  A    What is the date in December? Is it
9  December 22nd also?
10  Q    We will stick with December.
11  A    Just say December? I think it's
12  December 22nd, too. I apologize for just
13  saying -- but December.
14       In December, there wasn't any
15  transfer, as far as I know, of assets from Lehman
16  to Barclays. That occurred on 12:01 a.m,
17  September 22nd. That is my understanding of how
18  it worked.
19       And they had a claim on those assets
20  as of that point in time. The reason they didn't
21  get them, to be candid, I haven't thought about,
22  investigated and read all the reasons, but I know
23  there was some dispute with JPMorgan, and JPMorgan
24  didn't give all those assets to Barclays, for
25  reasons I don't know, but that was an issue

Page 98

1          M. Zmijewski
2  between -- as I understand, an issue between
3  JPMorgan and Barclays, and Lehman did what it was
4  supposed to do as of 12:01 a.m., September 22nd,
5  so that would be the date and point in time you
6  would value the assets.
7      Q     So your understanding is that Lehman
8  did everything it was supposed to in terms of
9  fulfilling its requirements of the Barclays
10 repurchase agreement?
11     A     I don't have any information contrary
12 to that.
13     Q     Is that understanding relevant to
14 your opinions?
15     A     Well, you know, I need to get these
16 understandings from the lawyers of course, or the
17 Court, because it's a legal issue as to what the
18 closing date was, and was the closing time the
19 point in time at 12:01 a.m. September 22nd. I
20 understand that was the closing date, and that the
21 transaction was finalized on that date, point in
22 time, which means you measure at that point in
23 time the value of the assets.
24     Q     You made a statement to the effect
25 that Lehman did everything that it was supposed to

Page 99

1          M. Zmijewski
2  do in terms of delivering the assets. Is that
3  understanding of yours that you stated relevant to
4  your opinions and conclusions?
5      A     I don't know if I stated it that way.
6  If I did, it was fairly loose language.
7          My understanding is the closing date
8  of the transaction, the closing point in time was
9  12:01 a.m., September 22nd, closed. The
10 transaction completed, and there were
11 disagreements subsequent to that.
12         It's my understanding -- I might be
13 wrong -- the disagreement was between JPM and
14 Barclays, but I could be incorrect. But it's a
15 legal issue, not an economic issue. Is 12:01 a.m.
16 the closing where the transaction was finalized?
17 If it is, you value it at that point in time.
18     Q     So from your perspective, the proper
19 valuation point in time is the closing?
20     A     Yes.
21     Q     Is that true even if the assets
22 aren't received on the closing?
23     A     Yes.
24         MR. TAMBE: Objection to the form of
25 the question.

Page 100

1          M. Zmijewski
2      A     Receipt of assets isn't relevant.
3  Ownership, transfer of -- I am not characterizing
4  this as legal talk. Transfer of the ownership of
5  the assets and the risk of ownership, risk and
6  rewards of ownership of those assets at that point
7  in time, that's when you would measure the value.
8      Q     So, if the JPM securities that
9  Barclays eventually received in December, 2008,
10 had gone up in value between September 22nd and
11 December by $100 billion, you would then say that
12 Barclays got a $113 billion windfall on the
13 transaction?
14         MR. TAMBE: Objection to the form of
15 the question.
16         MR. DAKIS: Same objection.
17         MS. TABATABAI: Objection.
18     A     If I could repeat that back.
19     Q     Sure.
20     A     Because I don't think I agree with
21 it, but I want to make sure, because it seems too
22 clear that I wouldn't agree with it. So let me
23 ask.
24         You said on September 22nd, it was
25 worth, I will say X, and on December 22nd, it was

Page 101

1          M. Zmijewski
2  worth 100 billion plus X? In December it was
3  worth 100 billion plus X? Is that what you said?
4      Q     Yes.
5      A     There is -- that has nothing to do
6  with my windfall, because the windfall is
7  calculated based on X as of September --
8  12:01 a.m. on September 22nd. So it's X that
9  matters. What it's worth in December is
10 irrelevant.
11     Q     Okay. Other than trying to calculate
12 it, calculate the value of those -- strike that.
13         You previously said in one of your
14 answers that they, presumably Barclays would have
15 a claim on those assets as of September 22nd; is
16 that correct?
17     A     As of the closing date, yes.
18     Q     Is it your understanding that they
19 would have a claim on those particular securities
20 or would have a claim on securities in a certain
21 amount or would have a claim for a certain amount
22 of money?
23     A     My assumption is that -- what I am
24 assuming here is it's a claim on a set of
25 securities in the JPM inventory. That is my

Page 102

1         M. Zmijewski
2    assumption in this calculation.  It's not an
3    amount.  It's a specific claim on those
4    securities.
5         Q    And is that assumption as part of
6    your calculation relevant to your calculation?
7         A    Yes.
8         Q    In what way?
9         A    Well, alternatively, there was a --
10   Professor Pfleiderer talked about a $7 billion
11   cash, supposed cash payment that might have
12   occurred and didn't occur, but securities were
13   given instead.
14         If someone said the claim was as you
15   just described, the potential claim for
16   $7 billion, and that was the expected value of the
17   claim, $7 billion, independent of securities, none
18   of this would be relevant.  I would have put
19   $7 billion down for the value of this claim.
20         Q    When you value a claim, a legal
21   claim, how do you value it?
22         MR. TAMBE:  Objection to the form of
23   the question.
24         MR. DAKIS:  Same objection.
25         A    You value it like any other asset.

Page 103

1         M. Zmijewski
2    You would make an assessment of what the cash
3    flows would be and what the risk of those cash
4    flows would be, when, the timing of the cash
5    flows, and discount it back to the point in time
6    you valuate it.
7         Q    When you said if Barclays had a claim
8    for $7 billion, you would have put down
9    $7 billion, would you have done any analysis
10   beyond just writing down the amount of the claimed
11   amount?
12         A    I don't think I said that.  I think I
13   said -- may I have my answer read back, just so I
14   understand what I said?
15         MR. TAMBE:  Your answer starts,
16   "well, alternatively."  "Well,
17   alternatively" is the answer.
18         (Record read.)
19         A    That's correct.
20         Q    So, by having a potential claim of
21   $7 billion, you would have valued that at
22   $7 billion for purposes of this valuation?
23         A    That's not what I said.  The
24   gentleman to your right is pointing at some
25   language.  Maybe that is the right language to

Page 104

1         M. Zmijewski
2    clarify the point.
3         Q    So, can you unpack expected value?
4         A    And that is -- you asked me how I
5    would value it, so the value would be what are the
6    expected cash flows from the transaction, and what
7    is the timing of those cash flows, what is the
8    risk of the cash flows, and that is the present
9    value.
10         Q    Okay.  What if the expected value was
11   $3 billion, what would you value it at?
12         A    If the expected value of that claim
13   was $3 billion?  Is that the question?
14         Q    Yes.
15         A    I would have used $3 billion.
16         Q    Do you know if Lehman delivered to
17   JPM these securities free and clear as of
18   September 22nd?
19         A    I don't know.
20         Q    So you weren't able to -- strike
21   that.
22         In addition to calculating the value
23   of these securities, or trying to identify the
24   value of these securities, as of September 22nd,
25   instead of the date they were actually received by

Page 105

1         M. Zmijewski
2    Barclays, did you do any other adjustments to
3    Barclays' calculation of value?
4         A    Just to be clear, September 19th is
5    the day.  You said September 22nd.  September 19th
6    is the date I am using, as the most recent
7    available price as of 12:01 a.m. on the 22nd.  So,
8    when I say September 19th, I mean the latest price
9    available, an appropriate price to use for
10   12:01 a.m. on September 22nd.
11         So if I could just from now on define
12   that as what I mean by September 19th, that I
13   valued it as of September 19th, these assets.
14         Q    Okay.  The ideal would be to value
15   it, in your view, as of 12:01 September 22nd, but
16   you used September 19th values because you didn't
17   have values for 12:01 September 22nd; right?
18         MR. DAKIS:  Objection to form.
19         A    Because those are the last available
20   prices.
21         Q    Okay.  And so how did you -- can you
22   describe how you calculated September -- 12:01
23   September 22nd values for these --
24         A    Of course.
25         Q    -- JPM inventory securities?

Page 106

1          M. Zmijewski
2     A     I used the JPM valuations as of
3  September 17th, because that is the day for which
4  we have a JPM valuation for those assets.  I then
5  went to the GFS database provided to us through
6  Processor Pfleiderer, and calculated the
7  percentage change in price on a CUSIP basis for
8  all the CUSIPs in the JPM inventory.
9          And I then applied that percentage
10  change in price in the GFS database to the JPM
11  valuation as of September 17th.  So I calculate
12  essentially the return between the 17th and the
13  19th using GFS, apply those returns to the JPM
14  custodial price point.
15     Q     Did you use the same -- in
16  calculating between the 17th and the 19th, did you
17  use the same CUSIPs that were trying to value, the
18  JPM CUSIPs, or did you use another set of CUSIPs
19  as a proxy and apply that to the JPM case?
20     A     Well, if you read -- maybe you are
21  not aware.  The GFS database is incomplete.  At
22  least the database that we were provided through
23  Professor Pfleiderer is incomplete.  It doesn't
24  cover all the universe of securities in the
25  initial inventory, in the JPM inventory, so

Page 107

1          M. Zmijewski
2  therefore we didn't have CUSIP-by-CUSIP matches.
3          For the securities for which we had a
4  CUSIP-by-CUSIP match, we applied the return on a
5  CUSIP-by-CUSIP basis.
6          For the securities for which we
7  didn't have a CUSIP-by-CUSIP match, we went to
8  Barclays' class -- asset classifications that
9  Barclays used, calculated the weighted average
10  percentage return in the GFS database for that
11  asset class, and applied it to the remaining
12  CUSIPs in the database.
13     Q     And roughly how much of it was CUSIP
14  by CUSIP?  I think this is described at page 30 of
15  your report.
16     A     Thank you.
17          I don't think so.  No.
18     Q     I'm sorry, I meant paragraph 30.
19     A     Oh, okay.  Thank you.
20     Q     Before I go on there, did you -- can
21  I just ask, in the last question you referred to
22  Barclays asset classes.
23     A     Yes.
24     Q     Did you mean Lehman asset classes?
25     A     No.  I meant Barclays asset classes.

Page 108

1          M. Zmijewski
2     Q     Okay.  Turning to, turning to page --
3  paragraph 30.
4     A     It will take me a minute or two to
5  read the footnotes.  It would be in the footnotes.
6     Q     Sure.
7     A     It doesn't state in the footnote what
8  percentage.  Based on Exhibit F-1, in Exhibit F-1
9  I show some of the holes in the GFS database.  I
10  illustrate that.  And on average it's 60 percent
11  of the value is in GFS and 40 percent is not.
12     Q     Do you know if those rough
13  percentages would apply to the question we were
14  discussing in terms of how much of this would have
15  been CUSIP by CUSIP as opposed to applying a
16  percentage change based upon observation of
17  changes in other securities?
18     A     I have no reason to believe that that
19  same average wouldn't be true.  I don't know that
20  factually, but 60 percent should be reasonable.
21     Q     Do you have -- and do you have any
22  reason to believe that the movement in the JPM
23  mark from the 17th to the 19th would mirror the
24  movement in price of the securities that you
25  looked at in GFS between the 17th and the 19th?

Page 109

1          M. Zmijewski
2     A     I just didn't catch the first phrase
3  of your question.  Do I have a reason to think
4  they are different or not different.  I just don't
5  know.
6     Q     To believe they are the same.
7     A     Are the same?  They are valuing the
8  same assets.  I have no reason to believe they are
9  different.
10     Q     The same asset category, not
11  literally the same securities?
12     A     Well, somewhere in the ballpark of
13  60 percent are identical securities.
14     Q     Okay.  And the other -- the other
15  40 percent, which you don't have identical
16  securities for, which you have -- you're taking
17  some type of -- some of the securities that you
18  are trying to value, JPM securities, you are
19  looking at the values for them as reported by JPM
20  on the 17th, and you are trying to estimate or
21  calculate what those values would be on the 19th;
22  right?
23     A     I am calculating the 19th values;
24  correct.
25     Q     Some of those you are saying you

1          M. Zmijewski
2    would actually look at movements in GFS from the
3    17th to the 19th?
4          Q    On a CUSIP-by-CUSIP basis; correct.
5          Q    For those CUSIPs, you would just take
6    the value of the CUSIP of the 19th?
7          A    No.  I would use the percentage
8    change in GFS and apply it to the 17th value in
9    JPM.
10         Q    For the same security?
11         A    For the same CUSIP, same security.
12         Q    Was there a difference in the GFS
13   value for that security on the 17th and the JPM
14   value?
15         A    Probably.  I didn't look.
16         Q    Do you know why there would be a
17   difference?
18         A    Well, first, just because it's a
19   CUSIP-by-CUSIP analysis doesn't mean that the
20   volume is the same.  So, we can look at the
21   percentage change in GFS and apply it to the value
22   in JPMorgan, but that doesn't mean that those
23   valuations will be the same, because the number of
24   securities could be different in the database.
25   The GFS database is just not complete.

1          M. Zmijewski
2          Q    How would the number of securities
3    being, the volume being different affect the price
4    that you observed in GFS versus JPM?
5          A    Just to be clear, it's not the
6    volume, like a trading volume.  It's the number of
7    securities.
8          So the number of bonds that could be
9    in GFS could only be part of what's in JPM, or in
10   GFS it could be more because it includes -- for
11   that CUSIP, because it includes inventory that was
12   in the initial inventory as well as in the JPM
13   inventory.
14         So it's not as if the amount, the
15   number of securities is going to be identical.
16         Q    When you say CUSIP by CUSIP, the
17   CUSIP -- it's not -- you are not necessarily
18   looking at the same securities?
19         MR. TAMBE:  Objection to the form of
20   the question.
21         MR. DAKIS:  Same objection.
22         A    It would be like shares of Barclays,
23   all right.  Well, in JPM, because it's JPM, a
24   subset, there are 100 shares of Barclays in the
25   JPM inventory, but you look at GFS.  GFS, because

1          M. Zmijewski
2    it's incomplete, could have ten shares of
3    Barclays, or it could have 5,000 shares of
4    Barclays, because it could include inventory from
5    somewhere else, but it's all Barclays shares.
6          So what I did, so I didn't have to --
7    so I made sure I wasn't miscounting the number of
8    shares in the example I am giving, I just looked
9    at the percentage change of value in GFS and
10   applied that to the value in JPMorgan.  Therefore,
11   I made sure that I wouldn't be adjusting volume --
12   not volume -- the quantity incorrectly.
13         There was no adjustment in quantity.
14   I was just moving it forward two days based on the
15   return on that security.  It's at the security
16   level.
17         Q    For the ones where you didn't have
18   the same CUSIPs, you had to measure the reported
19   change in GFS from the 17th to the 19th and apply
20   that percentage change to the JPM securities that
21   you were calculating; correct?
22         A    For the securities for which I did
23   not have an exact CUSIP match in both databases, I
24   first calculated in the GFS database, and I took
25   the Barclays asset classifications, put all the

1          M. Zmijewski
2    CUSIPs in the GFS database in those
3    calculations -- in those classifications.  For
4    each classification calculated a weighted average
5    return for that asset class, for that period, and
6    applied that weighted average return to each CUSIP
7    for which I did not have an exact CUSIP match.
8          Q    Okay.  Why wouldn't you simply use
9    the September 19th GFS price when available?
10         A    Because it was incomplete.  We didn't
11   have a complete database for GFS.
12         Q    You didn't have available -- as I
13   understand it, what you are saying is you didn't
14   use -- you couldn't tell whether -- in GFS what
15   volume you were looking at of a CUSIP?
16         MR. TAMBE:  Object to form.
17         A    Sometimes you can tell, sometimes you
18   can't tell.  It depends on the nature of the
19   security.  Sometimes if you have the notional
20   value, it's possible to take out the -- to
21   understand what the Q is.  The total value is
22   price times quantity.  So, sometimes you can
23   understand the Q, but not always.
24         However, we had the JPM database, and
25   it was the value on the 17th.  We had to roll that

Page 114

```
 1          M. Zmijewski
 2   valuation forward two days, and we had a partial
 3   database, sometimes too much of a security,
 4   sometimes too little, sometimes none at all.  So
 5   we -- you know, I followed an implementation of
 6   what I think is a completely reasonable approach,
 7   to roll forward the JPM valuations using the GFS
 8   returns.
 9        Q     Don't GFS reports give quantity and
10   pricing?
11        A     It gives notional value.  It
12   doesn't -- and from that, you can't always get the
13   exact quantity.
14        Q     You're attempting to get
15   September 19th prices for these JPM inventory
16   securities.  Did you at any point attempt to
17   calculate those prices based on the GFS system?
18        A     I did not.
19        Q     And why didn't you?
20          MR. TAMBE:  Objection as to form.
21        A     First, it was incomplete.  I don't
22   have -- I couldn't, because Barclays, as I
23   understand it, did not supply complete information
24   with respect to the GFS database.  It was a
25   partial snapshot, not a complete snapshot of all
```

Page 115

```
 1          M. Zmijewski
 2   the inventory.  That is my understanding and that
 3   is my observation, given what I examined in the
 4   GFS database.
 5          So, it's not possible to use the GFS
 6   database to value all the Annex A or JPM
 7   inventory.  It's not possible.  It doesn't exist.
 8        Q     You said first it was incomplete.
 9   Were there any other reasons other than your
10   belief the GFS data was incomplete?
11        A     That is the primary reason.
12        Q     Can you think off any other reasons?
13        A     Not as I sit here right now.
14        Q     Did you have concern about whether
15   the GFS data as of the 19th was being updated?
16        A     No, that was not a concern, although
17   I did not analyze -- had I planned to use the G --
18   I immediately -- not immediately.  Before I
19   started conducting calculations, I rejected using
20   GFS data because it was incomplete.  I originally
21   thought I would use GFS data, and you would have
22   had a column in these different exhibits with GFS
23   data.  And I found out that the -- Barclays did
24   not provide a complete dataset, so it's not
25   possible to do those calculations.
```

Page 116

```
 1          M. Zmijewski
 2          At that point, I just stopped using
 3   GFS data, unless I needed it for a specific
 4   purpose that I thought was reasonable and
 5   appropriate.
 6        Q     How did you know that the GFS data
 7   wasn't complete?
 8        A     GFS -- I think everybody knows that
 9   if you go through and you have the Barclays
10   inventory, 86-B and 87-B, by CUSIP detailed, so
11   it's Barclays inventory from this sale
12   transaction, and you go to the GFS database, and
13   you match up the CUSIPs and you then try to match
14   up the values, you see there is big holes in the
15   GFS database relative to what Barclays said they
16   had.
17          So one of two things happened.
18   Either the GFS database is incomplete or Barclays
19   is including assets in its inventory that aren't
20   relevant to the sale transaction.  I don't think
21   the latter was correct.  I think the former was
22   correct.
23        Q     And you did that analysis you just
24   mentioned comparing the two and seeing that it was
25   incomplete?
```

Page 117

```
 1          M. Zmijewski
 2        A     I did.
 3        Q     When did you do that?
 4        A     Soon after we received the data and I
 5   reviewed Professor Pfleiderer's report.
 6        Q     Can you just put a date roughly when
 7   that is?
 8        A     It had to be -- I don't know.  What
 9   is the date of Professor Pfleiderer's report?
10   Within 30 days.  If you give me the date that we
11   actually received the backup documentation, that
12   took a few weeks, so we didn't receive all of the
13   information immediately.
14          So, whenever -- you can look in your
15   records.  When you transferred the data, we
16   received it within a day.  We analyzed it right
17   away.  The first thing we did was of course
18   compare GFS to the Barclays database.
19        Q     Did you have any occasion to do any
20   calculations of the value of assets received prior
21   to Mr. Pfleiderer's report?
22          MR. TAMBE:  Objection to the form of
23   the question.
24        A     No, I don't -- I -- no, I don't
25   believe so.  I think the only -- what we were
```

---

**Page 118**

1            M. Zmijewski
2  trying to do then is just trying to understand the
3  flow of documents.  Until Professor Pfleiderer's
4  report came, I don't think we did any analysis
5  whatsoever.
6        Q     Did you have occasion to use --
7  request GFS data before receiving Professor
8  Pfleiderer's report?
9            MR. TAMBE:  Objection to the form of
10       the question.
11       A    I don't remember the -- yes.  I
12  believe so.  I believe Barclays supplied a
13  snapshot of the data back then.
14       Q    Did you look at the data back then?
15       A    In a preliminary way, yes, to try to
16  understand it, and make sure that as soon as we
17  received some reports, that we could start
18  analyzing, so we started created a database, and
19  some knowledge to understand what GFS contained in
20  it.
21       Q    And did you gain an understanding at
22  that time that the data you were looking at was
23  incomplete?
24       A    I don't remember doing that until
25  after Professor Pfleiderer gave us a report, but

---

**Page 119**

1            M. Zmijewski
2  you can check when counsel asked you for more
3  data, because that -- I assume that was queued up
4  by our indication that the data were incomplete.
5        Q     You are not --
6        A     And it's just now that we received,
7  just recently within the last week or two, that we
8  received the equities part of GFS.  Just received
9  it.
10       Q    You're not personally familiar with
11  what the actual requests were between lawyers in
12  terms of data; right?
13       A    I only know what I told the lawyers.
14       Q    You asked for the data, and what did
15  you -- what precisely did you ask for when you
16  asked for GFS data?
17       A    We want the complete GFS database
18  that is available, and I forgot what range of
19  dates I asked for, but it was the range of dates
20  from sometime after the close to before the close.
21       Q    And you didn't ask for that until
22  after the Pfleiderer report; correct?
23       A    I don't think that is true.  I think
24  that we asked for earlier.
25       Q    So you asked for --

---

**Page 120**

1            M. Zmijewski
2        A     Maybe -- I don't remember.
3        Q     You don't remember one way or the
4  other?
5        A     Look at -- counsel told us that they
6  are sending the request, so, I assume they did
7  that.  If they did that, you can look at the
8  request date, letter, e-mail, and you will know
9  when I asked.
10       Q    Do you understand to what extent
11  movants have access to the GFS system or have had
12  access since closing?
13            MR. TAMBE:  Since when?
14            MS. TABATABAI:  Objection.
15            MR. THOMAS:  Since closing.
16            MR. TAMBE:  Objection to the form of
17       the question.
18            MR. DAKIS:  Same objection.
19       A    I understand that maybe it's through
20  the auditor or through some third party that for
21  the ongoing work of the estate, it has access to
22  GFS data, but it's through a third party.  I think
23  a request -- this is my understanding.  It could
24  be wrong.  It's not a clear understanding.
25            So they need to make a request, and

---

**Page 121**

1            M. Zmijewski
2  the request goes and the data is given, but that
3  is for the ongoing activities of the estate and
4  not looking back previous to the closing.
5            That is my understanding.  It may be
6  wrong.  I don't have a clear understanding.
7        Q     When you say that GFS is incomplete,
8  are you saying that the GFS system is incomplete
9  or that the data received is incomplete?
10       A    I only know that the data that I
11  received is incomplete.  I don't know that it is
12  incomplete.  I have no knowledge from the record
13  indicating that GFS doesn't contain all the
14  securities that were in Barclays' inventory,
15  either the initial inventory or the JPM inventory.
16            Based on the record, it seems as
17  though GFS did include all that inventory, but
18  clearly Professor Pfleiderer didn't have all those
19  records.  That is clear because from his work you
20  can see that he didn't have it.
21       Q    So, for your calculation of the value
22  of the JPM inventory securities, in order for that
23  calculation that you made to incorporate into your
24  opinion and conclusions to be correct, it has to
25  be concluded that the appropriate valuation date

---

Page 122

M. Zmijewski

1       M. Zmijewski
2 is, or valuation time is not when Barclays
3 received the securities, and entered the
4 settlement, but rather when -- at 12:01 a.m. on
5 September 22nd; correct?
6      A    I apologize. I missed the first part
7 of your question.
8      Q    For your calculation of the JPM
9 inventory securities to be correct, one of the
10 assumptions you make and one of the things that
11 has to be correct is that the appropriate time of
12 valuation is not when Barclays actually received
13 those securities or actually entered into a
14 settlement agreement, but rather at 12:01 a.m. on
15 September 22nd?
16      A    Correct.
17      Q    Another assumption that your
18 calculation is predicated on is that the value of
19 those securities on the 19th is equal to the value
20 of those securities on -- at 12:01 a.m. on
21 September 22nd; correct?
22      A    It is reasonable to use for that
23 value.
24      Q    Well, if it's not the same, then your
25 calculation isn't correct; right?

---

Page 123

M. Zmijewski

1       M. Zmijewski
2      MR. TAMBE: Objection to form.
3      MS. TABATABAI: Objection.
4      MR. DAKIS: Same objection.
5      A    Incorrect.
6      Q    I mean the ultimate correct valuation
7 that you are looking for would be -- and when I
8 say valuation, do you understand me to talk about
9 fair market valuation?
10      A    Yes.
11      Q    And is that the appropriate valuation
12 that we should be looking at for these purposes?
13      A    Yes.
14      Q    In order for your calculation --
15 you're attempting to calculate the value of the
16 JPM inventory securities as of 12:01 a.m.
17 September 22nd, 2008; correct?
18      A    Yes.
19      Q    So if you are -- to do that, you are
20 trying to calculate the value of the JPM
21 securities as of September 19th; correct?
22      A    Correct.
23      Q    So if the value of the securities on
24 September 19th is not the same as the value of the
25 securities at 12:01 a.m. on September 22nd, then

---

Page 124

M. Zmijewski

1       M. Zmijewski
2 your calculation is incorrect; right?
3      A    No. I would disagree with that,
4 because there isn't an observed price on 12:01.
5 And I just disagree with -- you said same or you
6 said equal. We don't have an observed market
7 value as of 12:01 a.m. on the 22nd. It doesn't
8 exist. Therefore, you have to measure it using
9 something else.
10      And as long as that measurement is
11 reasonable and unbiased, then it's appropriate to
12 use for 12:01 a.m. We will never know what is
13 equal on that date. Equal doesn't exist because
14 the actual doesn't exist. So you don't know.
15 There is never a time to judge.
16      So it has to be a reasonable and
17 unbiased measure for that price.
18      Q    Okay.
19      A    Maybe that is subtle, but it seemed
20 important to me.
21      Q    So your goal is not to -- is your
22 goal then not to calculate the actual value of the
23 JPM securities as of 12:01 a.m. September 22nd,
24 but rather just a reasonable and unbiased value?
25      MR. TAMBE: Objection to form.

---

Page 125

M. Zmijewski

1       M. Zmijewski
2      MS. TABATABAI: Same objection.
3      MR. DAKIS: Same objection.
4      A    Of the actual -- of what the price
5 would be had we been able to observe an actual
6 price. You can't measure the actual price. That
7 is an impossible goal to attain. Actual prices do
8 not exist.
9      Q    Another assumption on which your
10 calculation is predicated is the accuracy of the
11 JPM marks on the JPM inventory equities as of
12 September 17th; correct?
13      A    Yes.
14      Q    If those marks are inaccurate or
15 wrong, your calculation will be inaccurate or
16 wrong?
17      A    I don't know why you are using
18 inaccurate and wrong. I am not sure -- you know,
19 if it's, if it's not accurate, I would have to
20 adjust to a reasonable unbiased measurement.
21      Q    And what efforts did you make, if
22 any, to establish whether the JPM marks as of the
23 17th were in fact accurate for those JPM inventory
24 equities?
25      A    Well, first I am relying on the

---

Page 126

1              M. Zmijewski
2    testimony of Mr. Schneider with respect to the
3    type of organization JPMorgan is, although I know
4    JPMorgan well, but also the role of a custodian in
5    this case in this situation. So I rely on his
6    testimony.
7              In addition, I looked at, when I
8    started this assignment, looked at, well, how does
9    JPMorgan compare on the 17th to BoNY on the
10   19th -- I think BoNY on the 19th -- and looked at
11   a comparison to see if they were similar, and
12   adjusting for the days, and it seemed like it was
13   similar for -- this is not of course for the JPM
14   Annex A inventory, but it's for the initial
15   inventory.
16   Q    Okay. So, for the -- did you do
17   anything other than rely on Mr. Schneider to
18   determine the accuracy of the JPM marks of the JPM
19   inventory securities as of September 17th?
20         MR. TAMBE: Object to the form of the
21   question.
22   A    I have done nothing more than I just
23   explained.
24   Q    And the part about observing the
25   relationship between JPM September 17th marks and

Page 127

1              M. Zmijewski
2    BoNY September 19th marks, did not relate to marks
3    for the JPM inventory; correct?
4    A    Correct. BoNY didn't value the JPM
5    inventory.
6    Q    That was regarding some other set of
7    securities?
8    A    Well, the initial inventory, which is
9    fairly representative of the JPM inventory.
10   Q    Did you do any -- in connection with
11   looking, noticing the JPM valuation on the 17th
12   and the BoNY valuations on the 19th, did you do
13   any analysis of overall market changes between
14   those two days, that might have impacted the
15   valuations?
16   A    Well, I looked at the GFS database.
17   Other than the GFS database, no.
18   Q    In other words, you could have -- on
19   the 17th, you could have a JPM market security at
20   a hundred, and on the 19th you could have a BoNY
21   mark of that security at a hundred, and it would
22   not indicate that BoNY and JPM are marking the
23   securities in the same way or to the same values;
24   correct?
25         MR. TAMBE: Objection to the form of

Page 128

1              M. Zmijewski
2    the question.
3    A    Incorrect. Well, your statement is
4    correct. But there is no relevance to what I was
5    doing, because you left out an examination of GFS.
6         So you compare the 17th to the 19th,
7    but also then making the adjustment for the GFS
8    percentage change over that two-day period, as I
9    did, as we explained in I think quite a bit of
10   detail earlier.
11   Q    Let's move on then to a fourth
12   assumption that your calculation is predicated on,
13   is that the percentage change that you had
14   calculated from non-JPM inventory securities using
15   GFS, would apply accurately to the percentage
16   change in JPM inventory for securities that you
17   couldn't line up CUSIP by CUSIP.
18   A    That's correct.
19   Q    And you said before your best
20   estimate is maybe there is 40 percent of the
21   CUSIPs you would have had to apply a percentage
22   change to based upon some other set of securities'
23   movement in GFS; is that correct?
24   A    As I sit here right now, based on, I
25   think it's Exhibit F-1, 60 percent of a match and

Page 129

1              M. Zmijewski
2    40 percent non-matches is the best I can do.
3    Q    Okay. And a fifth assumption upon
4    which your calculation would be predicated is that
5    the GFS system was being fully and accurately
6    updated between September 17th and September 19th;
7    correct?
8    A    Yes. For those securities, for that
9    subset of securities.
10   Q    Right.
11        Did you do any -- of course if it's
12   not being fully and accurately updated, would you
13   know if those securities were updated?
14   A    I'm sorry, I don't understand the
15   question.
16   Q    Strike that.
17        Did you do anything to confirm
18   whether the GFS system was being fully and I
19   accurately updated for those securities between
20   September 17th and September 19th?
21        MR. TAMBE: Object to the form.
22   A    I didn't isolate those securities,
23   but I did conduct analysis that I have in my
24   report concerning the updating process, or the
25   frequency of updating is a better way to say that,

Page 130

1        M. Zmijewski
2   so I have that information indicating that there
3   was updating.
4        Q    What specifically are you referring
5   to?
6        A    I never saw a sign like that before.
7        Exhibit E-3.
8        Q    And just so we are clear, did you --
9   nothing in E-3 indicates that the securities in
10  JPM inventory were being updated from September 17
11  through September 19th, does it?
12       A    That is incorrect.  It does indicate
13  that GFS was being updated.  It's not specific to
14  the JPM inventory, but it does indicate generally
15  that there was updating in GFS.
16       Q    Does it indicate there was updating
17  to the more illiquid securities as well as to the
18  securities which may be updated electronically?
19       A    It does indicate that there was
20  updating of all the securities.
21       Q    And in what way does it indicate
22  that?
23       A    If I recall, Professor Pfleiderer
24  characterized the principal mortgage trading
25  group, PMTG, as being less liquid, the less -- the

Page 131

1        M. Zmijewski
2   least liquid of that set of categories, and
3   between September 12 through September 19th,
4   69 percent of the securities in GFS traded on at
5   least one -- changed its price on one day, and
6   64 percent on two days, and 51 percent on three
7   days, and 25 percent on four days, and 20 percent
8   on all five days.
9        It's the last line of the top panel.
10       Q    This is E --
11       A    E3, Edward 3.
12       Q    Okay.  And you believe that that
13  indicates that all the securities in GFS were
14  being updated between September 17th and
15  September 19th?
16       MR. TAMBE:  Object to the form.
17       A    I don't believe I said that.  I -- I
18  believe this is evidence that this system was
19  being updated, and naturally this is one piece of
20  evidence.
21       Look at the record from the CFO of
22  Lehman, and I forgot the other gentleman within
23  Lehman, who indicated that the prices were being
24  updated.  There was some contradictory evidence to
25  that.  We need to take it all together.

Page 132

1        M. Zmijewski
2        There is evidence -- it's clearly --
3   contrary to Professor Pfleiderer, who looked at a
4   few securities, if you look at the whole database,
5   securities were being updated.
6        Q    Have you attempted to look at the
7   securities in question, the JPM inventory
8   securities, and whether they were updated?
9        A    I did not isolate just the JPM.  This
10  was the systematic analysis of all the securities.
11       Q    Have you reached the conclusion that
12  all the securities in the GFS database were being
13  updated between the 17th and the 19th?
14       MR. TAMBE:  Objection to the form of
15       the question, asked and answered.
16       MR. DAKIS:  Same objection.
17       A    I did not reach such a conclusion.
18       Q    What you are saying is that Exhibit E
19  shows that there was some updating of the GFS
20  system going on between the 17th and the 19th?
21       A    Correct.
22       THE VIDEOGRAPHER:  Counsel.
23       MR. THOMAS:  Go ahead.
24       THE VIDEOGRAPHER:  That is the end of
25       tape number two.  The time is now 12:33 p.m.

Page 133

1        M. Zmijewski
2        We are now off the record.
3        (Recess taken.)
4        THE VIDEOGRAPHER:  This is the start
5       of tape number three.  The time is now
6       1:25 p.m.
7        We are now back on the record.
8   BY MR. THOMAS:
9        Q    Mr. Zmijewski, in footnote 106 you
10  have a reference to Joseph Mason's report.
11       A    Yes.
12       Q    Do you know, was there a report by
13  Joseph Mason that you reviewed?
14       A    No.  Since I wrote my report before I
15  read anyone else's report, I was in the incorrect
16  assumption that Professor Mason was going to write
17  a report.
18       Q    What did you think he was writing the
19  report on?
20       A    The initial conversations that I had
21  about the custodian marks were with Mr. Schneider
22  and Mr. Mason, and I assumed incorrectly that
23  Mr. Mason was writing the report rather than
24  Mr. Schneider, who ultimately wrote the report.
25       Q    So we just substitute Mr. Schneider

Page 134

1          M. Zmijewski
2    in for Mr. Mason in that footnote?
3        A    Yes.  Thank you.
4        Q    Now, you said for purposes of
5    calculating certain values of Lehman securities on
6    September 19th, that the reason you didn't use the
7    GFS system, the values in the GFS system, is
8    because you believed they were not complete; is
9    that correct?
10       A    Yes.
11       Q    Was it or was it not also a reason
12   that you had concerns about whether the GFS data
13   had been updated the week of the bankruptcy?
14       A    That never entered any of my
15   decisions.
16       Q    You never discussed that with anyone?
17       A    No.
18       Q    You knew it was an issue in the case?
19       A    Once I read Professor Plfeiderer's
20   report, I knew it was an issue in the case.
21       Q    Prior to that, you didn't know?
22       A    I don't think so.
23       Q    Now, we talked about two sets of
24   securities for which you have provided a
25   calculation in your chart of the Barclays, what

Page 135

1          M. Zmijewski
2    you call windfall, the equities and the JPM
3    inventory securities; correct?
4        A    Yes.
5        Q    And as I understand it, in neither
6    case did you attempt to independently try to value
7    any of those securities yourself?
8        MR. TAMBE:  Objection to the form of
9        the question.
10       MR. DAKIS:  Same objection.
11       A    In neither case did I actually on a
12   security-by-security basis use a valuation model
13   with inputs to value the security.  I valued them
14   in other ways, as I explained and as we
15   discussed -- in my report, and as we discussed
16   earlier.
17       So I valued them, but I did not
18   conduct an independent valuation with a specific
19   model with inputs into the model.  I did not do
20   that.
21       Q    In each case you relied on somebody
22   else's having done a valuation of the security?
23       A    No.  You know, for the equities, I
24   looked at the equity prices that Barclays was
25   using and compared them to the last prices in

Page 136

1          M. Zmijewski
2    Bloomberg, so I understood that those were last
3    prices.  So I verified that they were prices, so
4    no one conducted a valuation.  They were prices,
5    observed prices.
6        Q    For the 19th on the inventory?
7        A    For the 19th equities.
8        Q    Okay.  Did -- on the JPM inventory,
9    you didn't -- those securities, you didn't
10   actually independently try to value those
11   securities; correct?
12       A    Correct.
13       Q    And on the inventory, initial
14   inventory equities, did you -- you accepted
15   Barclays' valuations; correct?
16       A    No.  I just explained that I looked
17   at the Bloomberg prices and compared the Bloomberg
18   last prices to Barclays and verified that they
19   were reasonable representations of the Bloomberg
20   last prices.
21       Q    Was there a set of documents in the
22   equities, set of equities -- strike that.
23       Was there a set of those equities for
24   which you couldn't do that?
25       A    Correct.

Page 137

1          M. Zmijewski
2        Q    And for those, how did you determine
3    value?
4        A    I used Barclays' own value on
5    September 19th.
6        Q    So, you either used somebody else's
7    valuation or -- or you looked up the price in
8    Bloomberg; is that fair?
9        A    Yes, that is fair.
10       Q    Okay.  Let me go ahead and direct
11   your attention back to paragraph 30, and the last
12   sentence of that paragraph.  Specifically where
13   you say, "I adjusted the calculated JPMorgan
14   September 19th value to incorporate Barclays'
15   liquidity adjustment."
16       Do you see that?
17       A    Yes.
18       Q    Let me show you a document we will
19   mark as 707B, a two-page document, not attached.
20       (Exhibit 707B marked for
21       identification as of this date.)
22       Q    If you would take a moment to review
23   that, and let me know if you recognize that.
24       A    This appears to be the liquidity tab
25   of either 87-B or 86-B.

Page 138

M. Zmijewski
1
2     MR. TAMBE: Could you tell us, could
3 you tell us where this is from? It's got no
4 footer, no anything. It would just be
5 helpful to know, if it comes from a
6 spreadsheet, which one it comes from. There
7 is just a lot of spreadsheets out here. If
8 you can tell us, it would be helpful.
9     THE WITNESS: Well, I think they are
10 from one of those exhibits. It's obvious
11 you have qualified what it appears to be.
12     Q    So, if I can continue my examination,
13 what I would like to know is what or how you used
14 the spreadsheet in any way.
15     MR. TAMBE: Objection to the use of
16 the spreadsheet unless we know where it's
17 from. It could be misleading as to which
18 particular spreadsheet produced by Barclays
19 this comes from, unless the witness can tell
20 by just looking at the face of these two
21 pages, can link it to a particular
22 spreadsheet.
23     MR. THOMAS: Well, I think the
24 witness said it appears to be the
25 spreadsheet.

Page 139

M. Zmijewski
1
2     MR. THOMAS: That is all he said. Now
3 you are asking a specific question whether
4 he used these numbers.
5     MR. THOMAS: I have your objection.
6     Q    Mr. Zmijewski, I am trying to just
7 make sure we understand what you did to
8 incorporate Barclays' liquidity adjustment. Can
9 you just explain that, referencing or not
10 referencing document 707B.
11     A    Of course. That is explained in
12 footnote 57. So, if you read footnote 57, which
13 is on page 18, I explain how I take the liquidity
14 adjust -- I explain the documents, and this might
15 be from the same document, I don't know, but it's
16 a document like this. It says "liquidity haircut"
17 on the column.
18     And I multiply -- for the particular
19 type of security, I multiplied the liquidity
20 haircut times the valuation, and that is the bid
21 exit price adjusted value, which is what I
22 explained in the first part of the footnote.
23     In the last sentence of the footnote,
24 I explain that for the equities, I use the
25 liquidity adjustment that was used by Barclays for

Page 140

M. Zmijewski
1
2 equities of 4.32 percent.
3     Q    Do you know why calculating the value
4 of the JPM inventory was assigned to you as
5 opposed to one of your colleagues at Chicago
6 Partners?
7     A    I don't recall why. To the best of
8 my recollection, I just said, well, I will -- here
9 is what I can do, and I did it, and it's -- and it
10 was being used.
11     I can tell you that it's just a
12 function of time that we had since Mr. Pfleiderer
13 or Professor Plfeiderer wrote his report, that the
14 valuation experts couldn't value all the
15 securities in both the initial inventory and the
16 JPMorgan inventory.
17     Q    Let me ask another question. I'm
18 sure you are going to tell me if I asked this
19 before, but I am not sure.
20     On the -- in paragraph 30, the third
21 sentence, where it says, "According to JPM price
22 marks on September 17th, the JPM inventory had a
23 value of 5994."
24     Do you see that?
25     A    I do.

Page 141

M. Zmijewski
1
2     Q    Are you assuming that the JPM price
3 marks were mid prices?
4     A    If you look at Exhibit C-1, it
5 explains it, that I have -- for September 17th, I
6 have JPM price marks. I assume that those require
7 an adjustment, a liquidity adjustment, liquidity
8 haircut, depending on whatever phrase you would
9 like to use for that.
10     So I start with those. I roll those
11 forward two days to the 19th, and then after I
12 roll those forward two days to the 19th, I apply
13 the Barclays liquidity adjustments to them.
14     Q    Is that a yes to my prior question of
15 whether you assumed that JPM price marks were mid
16 prices?
17     A    In this calculation, it's a yes.
18     Q    Did you ever review any, any
19 documents that reflect analyses of the value of
20 assets received by Barclays done by Houlihan Lokey
21 or FTI or Deloitte or Alvarez?
22     MR. TAMBE: Objection to the form of
23 the question.
24     A    I may have reviewed documents. I
25 don't -- I don't recall anything specific.

## Page 142

M. Zmijewski

1       M. Zmijewski
2 Certainly I know those companies were involved. I
3 don't -- and for the purpose of my Exhibit C-1, my
4 other calculations, I didn't, I don't -- I didn't
5 review it specifically and recall some number that
6 is comparable to any of these numbers.
7     Q    Okay. Did you -- or do you recall
8 using any such documents or information from any
9 of those financial advisors for any purpose for
10 your report?
11     A    I just missed the first phrase. I'm
12 sorry.
13     Q    Do you recall using any such
14 documents or information from any of those
15 financial advisors for any purpose of your report?
16       MR. DAKIS: You objection to form.
17     A    No.
18     Q    Were you aware that Deloitte was
19 doing work on an opening balance sheet post-sales
20 transaction?
21       MS. TABATABAI: Objection to form.
22       MR. DAKIS: Same objection.
23     A    I don't recall that.
24     Q    Let me go ahead and show you a
25 document previously marked as 570, Exhibit 570.

## Page 143

1       M. Zmijewski
2      Have you seen that document before?
3     A    Possibly. I don't recall it.
4     Q    Let me ask you to look at the first
5 paragraph of that. This is an October 31, 2008
6 e-mail from Attorney Wachtell, counsel for JPM, to
7 Hughes Hubbard and Deloitte and SIPC and a number
8 of other entities.
9      Do you see that?
10     A    I see it.
11     Q    It says, "I attached a spreadsheet
12 with 'collateral values' as of September 17th,
13 which was the last evening on which the fed
14 provided financing. I understand that these
15 collateral values were furnished principally by
16 third-party pricing sources, and we caution
17 against using those values as reliable indicators
18 of realizable value."
19      Do you see that?
20     A    Yes.
21     Q    Were you aware that JPMorgan was
22 cautioning against the use of their collateral
23 values as realizable indicators of realizable
24 value?
25       MR. TAMBE: Objection to the form.

## Page 144

1       M. Zmijewski
2       MS. TABATABAI: Object to the form.
3       MR. DAKIS: Same objection.
4       MR. TAMBE: Objection, asked and
5 answered.
6     A    I am just trying to find out, reading
7 the document, trying to identify how this was a
8 JPMorgan document. Maybe I didn't hear you
9 correctly. You said this was a JPMorgan document?
10     Q    You understand Wachtell is counsel
11 for J.P. Morgan?
12     A    I did not know that.
13     Q    My question to you is simply, were
14 you aware that JPMorgan was cautioning that its
15 collateral values could not be used as reliable
16 indicators of realizable value?
17       MR. TAMBE: Objection, lack of
18 foundation.
19       MS. TABATABAI: Objection to form.
20       MR. TAMBE: Objection to form.
21 Objection, asked and answered.
22       MR. DAKIS: Join in all those
23 objections.
24     A    I just want to take a minute just to
25 read the document.

## Page 145

1       M. Zmijewski
2     Q    Sure.
3     A    Just so I understand.
4     Q    Sure.
5     A    I don't recall seeing this document.
6 I might have. I don't recall seeing it.
7     Q    Apart from the --
8     A    The underpinning spreadsheet looks
9 familiar, but this e-mail does not.
10     Q    Do these in fact appear to be the
11 same JPM inventory securities that you included a
12 valuation of in your calculations in your report?
13     A    I can't tell from this. I'm sorry.
14     Q    Putting aside whether you have seen
15 the document before, did anyone tell you that
16 JPMorgan, or were you aware that JPMorgan was
17 cautioning against using the -- its September 17th
18 collateral values as reliable indicators of
19 realizable value?
20     A    I was not.
21       MR. DAKIS: Objection to form.
22     A    And that might mean because they
23 haven't applied any, what Barclays calls liquidity
24 haircut to it, to make them realizable values or
25 exit values. I am not sure what that means.

Highly Confidential

Page 146

1              M. Zmijewski
2      Q     We will take a look in a minute.
3           Would this have been important to
4  your consideration of whether to accept JPMorgan's
5  September 17th collateral values?
6      A     This document doesn't change my
7  opinion, at least what I have read of it now.
8      Q     So, even if the values, the JPMorgan
9  September 17 values of those JPM inventory
10 securities were considered to be not reliable
11 indicators of realizable value, that wouldn't
12 change your opinions and conclusions about how you
13 calculated the values of those securities?
14           MR. DAKIS:  Objection to form.
15           MS. TABATABAI:  Same objection.
16      A     Unless I understand what is meant by
17 realizable value, and if what is -- they said they
18 used third-party pricing.  That it's reasonable to
19 use third-party pricing.
20           "We caution against using those
21 values as reliable indicators of realizable
22 value."  If that means you need to apply a
23 liquidity haircut to it, that's what I did, and I
24 did it using Barclays' own approach to adjusting
25 for liquidity haircuts.

Page 147

1              M. Zmijewski
2      So if that's what it means -- I don't
3  know what it means.  If that's what it means, then
4  I am very comfortable.  If it means something
5  else, I would have to think how it might affect my
6  analysis.
7      Q     Do you know how JPMorgan calculated
8  values on securities that were not available in
9  Bloomberg or by other third-party pricing?
10      A     I do not.
11      Q     Would you at least like to have
12 considered information like this concerning
13 reliability of the September 17th JPMorgan marks
14 in forming your opinions and conclusions about the
15 value of those securities?
16      A     This document doesn't change my
17 opinion, so, at this point it's not relevant.
18      Q     So even if -- assuming that it's not
19 just -- the difference -- the distinction that JPM
20 is drawing between collateral value and realizable
21 value, do you understand realizable value to mean
22 essentially fair market value?
23           MR. TAMBE:  Objection to the form of
24      the question.
25           MR. DAKIS:  Same objection.

Page 148

1              M. Zmijewski
2      A     I don't know in what context it's
3  being used.  If it's being used in the context of
4  a book value, then according to FAS 157,
5  realizable value would be based on exit prices
6  rather than fair market value.  Different concept,
7  so, I don't know what the context is of its use.
8      Q     So, the distinction between the,
9  quote, collateral values of September 17th and
10 realizable value, are you saying that it's
11 possible that that is explained by the need to
12 make the liquidity adjustment?
13           MR. DAKIS:  Objection to form,
14      mischaracterizes testimony.
15      Q     That's a question.
16      A     I understood.
17           It is possible the difference between
18 collateral value and realizable value requires the
19 adjustment for a liquidity discount or a haircut.
20 It's not necessarily just liquidity that was in
21 those, in these adjustment factors.  It's, you
22 know, they -- Barclays uses liquidity adjustment
23 or liquidity factor or liquidity haircut in a very
24 broad sense.  It's an adjustment of a price to get
25 to what they think is an exit value.

Page 149

1              M. Zmijewski
2      Q     So you don't think this information
3  is going to change your opinion?
4           MR. TAMBE:  Objection, asked and
5      answered.
6           MR. DAKIS:  Same objection.
7           MS. TABATABAI:  Same objection.
8      A     I don't -- I don't think I said that.
9  What I said is this, on the face of it, as I sit
10 here and read it, doesn't change my opinion.
11      Q     Do you think it's also -- strike
12 that.
13           If the point being made here were
14 that the collateral value of marks as of
15 September 17th were either stale or unreliable
16 because they are too difficult to value, would
17 that cause you to change the way you calculated
18 the value of the JPM inventory as of
19 September 19th?
20           MR. TAMBE:  Objection to the form of
21      the question.
22           MR. DAKIS:  Same objection.
23      A     This is a hypothetical?
24      Q     That's correct.
25      A     Hypothetically, if the interpretation

## Page 150

M. Zmijewski

1  of this document is that the values in the JPM
2  inventory on September 17th are inappropriate,
3  unreasonable -- I forgot what terms you used --
4  then would that change my opinion, the answer is,
5  well, yes. I would have to understand why they
6  are inappropriate, and how I can adjust it to make
7  them appropriate, and I would naturally adjust my
8  numbers accordingly so that they are appropriate.
9  Q     Let me go ahead and show you another
10 document we will mark as Exhibit -- it's been
11 previously marked -- strike that.
12       Let me show you a document that's
13 been previously marked as Exhibit 571. This is
14 another e-mail from JPM's counsel concerning the
15 settlement that involved the JPM inventory that
16 you presented calculations of.
17       And you see in the first sentence, it
18 says: "In accordance with your request, attached
19 is the spreadsheet showing, A, the collateral
20 value as of September 17th of the settlement
21 consideration, Fed portfolio securities, which are
22 the securities to be delivered to BarCap under the
23 proposed settlement agreement, and B, JPMorgan's
24 estimate of market value as of November 3."

## Page 151

M. Zmijewski

1  Do you see that?
2  A     Yes.
3  Q     And do you understand this to be
4  referring to the same universe of securities that
5  you valued as part of your expert report?
6       MR. TAMBE: Objection to the form of
7  the question.
8       MR. DAKIS: Same objection.
9       MS. TABATABAI: Same objection.
10 A     It appears to be, yes.
11 Q     Do you see that JPMorgan is careful
12 to use the term "collateral value," which it puts
13 in quotes, as something different than market
14 value?
15      MR. TAMBE: Objection to the form of
16 the question.
17      MR. DAKIS: Objection.
18 A     I see that they are different.
19 Q     And is that a surprise to you, that
20 the collateral value mark is not considered by JPM
21 to be the market value necessarily?
22 A     I see they are not using it in the
23 same way. And -- you know, they used "collateral
24 value" in a different context. Again, they repeat

## Page 152

M. Zmijewski

1  in the second paragraph, collateral value may not
2  be a reliable indicator of realizable value.
3       So we would have to know more about
4  how they define the term "collateral value,"
5  "realizable value," to really understand this
6  document, and how it differs from market value.
7  Q     Do you think that reliability of the
8  collateral value could be impacted by the fact
9  that Lehman is being bankrupt that week and the
10 incredible tumultuousness in the market that week,
11 and the fact that you are dealing with illiquid
12 securities?
13      MR. TAMBE: Objection to the form of
14 the question.
15      MR. DAKIS: Same objection.
16      MS. TABATABAI: Object to the form.
17 A     Just the first phrase, if you could
18 repeat it back.
19 Q     Sure.
20      Do you think that the reliability of
21 the collateral value could be impacted by the fact
22 that Lehman had just gone into bankruptcy, and the
23 incredible tumultuous times of the markets, and
24 the fact that there were relatively illiquid

## Page 153

M. Zmijewski

1  securities in those -- in that collection?
2       MR. TAMBE: Same objection.
3       MR. DAKIS: Same objection.
4       MS. TABATABAI: Same objection.
5  A     We know -- let me define what I am
6  going to use as my view of what reliability is in
7  this context, and that is, you have an estimate or
8  an assessment of price, and the question is, well,
9  what is your distribution of prices?
10      I don't know if you understand what I
11 mean. It's not as if, when you calculate a price,
12 there is the price. There is a distribution with
13 a central tendency, and typically we think that is
14 the appropriate price.
15      We know that during this time, the
16 distribution widened greatly on all securities.
17 It was a much more volatile market, so we know
18 that any assessment of value had a wider
19 distribution. So you could say, well, if you
20 want to discuss in probability terms what the
21 likelihood is of a certain price, things change
22 during that period. Does that mean that the point
23 estimate is not a point estimate? Is it biased?
24 Is it inaccurate, and, you know, biased in some

Page 154

1              M. Zmijewski
2    way?
3              There is no evidence at that point in
4    time to think that any price estimate was a biased
5    estimate. It certainly would have a different
6    assessment of what the distribution is. That is
7    true of all of the prices during that period of
8    time.
9         Q    What do you mean by biased?
10        A    If there is a concept of -- if you
11   use a model that is either on average too high or
12   on average too low relative to what the actual
13   market value will be.
14        Q    Have you done anything to quantify
15   the degree of uncertainty surrounding any of the
16   marks you estimated in your work on this case?
17        A    No.
18        Q    Are you familiar with the concept of
19   confidence interval?
20        A    Of course.
21        Q    Can you quantify a 95 percent
22   confidence interval around your estimate?
23        A    I can -- I cannot, and that is --
24   this concept of a confidence interval, that is
25   essentially the same concept I was talking about

Page 155

1              M. Zmijewski
2    earlier, when I was talking about the distribution
3    of security prices widening, so we know the
4    confidence interval widens during this time. It
5    doesn't mean that it was biased. We just know
6    that it was widened at this time.
7         Q    Do you know how much it was widened
8    by?
9         A    I do not know.
10        Q    Looking back at 571, the last
11   sentence of the first paragraph says: "You will
12   note that there are a number of securities for
13   which JPMorgan did not provide such an estimate,
14   because there is insufficient information on which
15   it can base an estimate."
16             Was it difficult to value some of
17   these securities that were being conveyed to
18   Barclays?
19        A    These securities meaning these
20   particular securities in this inventory, or are
21   they just the sale transaction?
22        Q    I will say sale transaction
23   generally.
24        A    Of course.
25        Q    And in the -- these securities here

Page 156

1              M. Zmijewski
2    in particular, the JPM inventory securities for
3    which you provided a calculated value.
4         A    Well, as it states, there are a
5    number of securities. Is that the overwhelming
6    part of the market value? The answer is no. But
7    is there a part of the securities that were,
8    Professor Plfeiderer used the word "esoteric"?
9    The answer is yes.
10        Q    If you would turn to the first page
11   of the attachment, of Exhibit 571, and on the left
12   side, do you see as -- three columns under "Marked
13   by JPM"?
14        A    I see that.
15        Q    And do you see the middle column that
16   says "CV Remaining"?
17        A    Yes.
18        Q    And you understand that to be
19   referring to the collateral value remaining as
20   referred to in the attached e-mail?
21             MR. TAMBE: Object to the form of the
22   question.
23             MR. DAKIS: Same objection.
24             MS. TABATABAI: Same objection.
25        A    It says collateral value, yes.

Page 157

1              M. Zmijewski
2         Q    Fair enough.
3              Then you have eleven three JPM value.
4    Do you see that?
5         A    Yes.
6         Q    And you see the collateral value is
7    5.4 billion?
8         A    I see that.
9         Q    And you see the JPM value, which
10   is -- you understand the JPM value to be the
11   market value placed upon those by JPM?
12        A    Yes.
13             MR. TAMBE: Objection to form of the
14   question.
15             MR. DAKIS: Same objection.
16             MS. TABATABAI: Same objection.
17        Q    And do you see there that total value
18   being marked at 2.8 billion?
19        A    Yes.
20        Q    Now, the difference between 5.4 and
21   2.8 billion can't be explained by any liquidity
22   adjustment, can it?
23             MR. DAKIS: Objection to form.
24             MS. TABATABAI: Objection to form.
25        A    Of course not, but it can be

Page 158

1              M. Zmijewski
2   explained by September 17th versus November 3rd.
3   Different pricing dates.
4       Q     Have you done that analysis for these
5   securities?
6       A     I haven't.
7       Q     Do you have an opinion as to whether
8   or not the $5.4 billion, the $2.8 billion, is the
9   function of the time passage between
10  September 17th and November 3rd?
11      A     I don't have an opinion.  I didn't
12  state an opinion.  I just stated that they are at
13  different dates, and therefore there is not just
14  one factor that explains the difference in value.
15      Q     Could another factor be the
16  collateral value figures were completely
17  unreliable to begin with?
18          MR. DAKIS:  Objection to form.
19      A     That is a potential explanation.  Of
20  course that is a conjecture.  Of course it's a
21  possible conjecture.
22      Q     Just like the other examples you have
23  between change in value from September to
24  November, that is just possible conjecture also;
25  right?

Page 159

1              M. Zmijewski
2       A     No, I don't think so.  We know that
3   market prices were changing during this period,
4   so -- I don't recall the record, but if you look
5   in the record, I think the market prices were
6   going down during this period.
7       Q     Do you agree that this may be
8   evidence that the collateral values JPMorgan had
9   as of September 17th were not reliable as market
10  values?
11          MR. TAMBE:  Objection to the form of
12      the question.
13          MR. DAKIS:  Same objection.
14          MS. TABATABAI:  Same objection.
15      A     This is evidence that the
16  November 3rd market values differ from the
17  September 17th collateral values.  That is what it
18  is evidence of.
19      Q     One possible explanation is that the
20  collateral values as of September 17th were not
21  accurate or reliable as market values; right?
22          MR. DAKIS:  Objection to the form.
23          MR. TAMBE:  Objection to the form.
24      A     Assuming that prices -- that the
25  underlying value did not change between

Page 160

1              M. Zmijewski
2   September 17th and November 3rd, the answer is
3   yes.
4       Q     And assuming the underlying prices
5   didn't go down by 50 percent, the answer is yes;
6   right?
7          MR. TAMBE:  Object to the form of the
8      question.
9          MR. DAKIS:  Objection to the form.
10      A     No.  I think my previous qualifier is
11  the correct qualifier.  Assuming the price of
12  these securities didn't change between
13  September 17th and November 3rd, then the answer
14  to your question would be yes.
15      Q     What if the prices went down by
16  20 percent, would it also call in -- still call
17  into question the accuracy of the collateral value
18  marks as of September 17th?
19          MR. TAMBE:  Object to the form of the
20      question.
21          MR. DAKIS:  Same objection.
22          MS. TABATABAI:  Same objection.
23      A     If we assumed we knew truth and we
24  knew the market value decreased between that
25  period, then we could calculate what the market

Page 161

1              M. Zmijewski
2   value was on September 17th.
3          This is all hypothetical.  We don't
4   have those facts, and so it's conjecture and
5   hypothetical questions.
6       Q     You haven't explored the reason why
7   JPM's market value is half of what their
8   collateral value on the 17th was; correct?
9          MR. TAMBE:  Objection to the form of
10      the question.
11          MR. DAKIS:  Same objection.
12          MS. TABATABAI:  Objection.
13      A     Why JPMorgan -- just to be specific,
14  why JPMorgan's November 3rd value -- I have not
15  explored why their November 3rd value differs from
16  the JPM marks on the 17th of September.  I have
17  not explored that.
18      Q     Let's turn to your OCC adjustment at
19  paragraph 24, please.  And can you describe again
20  why you made this adjustment?
21      A     Yes.  Footnote 44 explains it, that
22  there was -- in the calculation, as you go --
23  refer to the document in footnote 44, the first
24  document you will see there is a September 22
25  value and a September 19th value for the two

Page 162

1          M. Zmijewski
2    different positions that compose -- the two
3    different components or positions that compose
4    this asset, and I was provided a database, which I
5    assume came from Barclays, that allowed me to
6    recalculate the difference between the 19th value,
7    September 19th value and the September 22nd value,
8    for that one component that was measured as of
9    September 22nd. I adjusted that value and the
10   difference is 103 million. So, in short --
11        Q    And did you use Barclays' marks for
12   purposes of this, that you just used their 9/19
13   marks instead of the 9/22 marks?
14        A    Correct. If you see in the fourth
15   line of that footnote, the database from which I
16   was able to calculate those numbers is indicated
17   in that citation. That is a Barclays database.
18        Q    Did you independently value any of
19   those assets?
20        A    I did not.
21        Q    And why did you use the value on the
22   19th instead of the 22nd?
23            MR. TAMBE: Objection, asked and
24   answered.
25            MS. TABATABAI: Same objection.

Page 163

1          M. Zmijewski
2            MR. DAKIS: Same objection.
3        A    For all the, for all the reasons that
4    I explained earlier, with respect to the date.
5    These were prices as of the closing date on the
6    19th, rather than the closing date on the 22nd.
7        Q    I'm sorry, when you say that the
8    closing -- the prices, which prices are you
9    referring to when you say --
10        A    The mid value in this calculation,
11   that is shown in the exhibit in the first lines
12   leading over to the second line, the value in that
13   exhibit is on September 22nd, is based on
14   September 22nd close of market prices.
15        And if you recalculate -- I did
16   recalculate that number for September 7 -- 19th,
17   excuse me, using the database that is on the
18   fourth line, Barclays' database, and the
19   difference between the value on September 22nd
20   versus the value on September 19th, again, all
21   using Barclays data, is 103 million.
22        Q    The reason -- the reason you wanted
23   to use the 19th instead of the 22nd, is that what
24   you have said before, you thought the 19th was a
25   better indicator?

Page 164

1          M. Zmijewski
2        A    Correct.
3        Q    And that is true of all assets in the
4    sale transaction?
5        A    All of my work. With respect to
6    anything that related to valuation on the 19th, as
7    I said before, means that it's the most
8    appropriate price that we have and reasonably
9    accurate for using a value -- for a value as of
10   September 22nd, 12:01 a.m.
11        Q    When you say, "I have adjusted the
12   mid value to September 19th using the associated
13   native file," how exactly did you do that?
14        A    It's a database that has both the
15   22nd -- it appears that Barclays was looking at
16   both the 19th and the 22nd, so many of its
17   databases have prices on the 19th or values on the
18   19th and values on the 22nd. So I merely
19   calculated the value on the 22nd, to calculate the
20   value on the 19th, from its own database, and took
21   the difference in the two numbers.
22        Q    And again, you think in this
23   situation also, as in other situations, you think
24   the best estimate of value, market value for those
25   assets as of 12:01 on September 22nd, is not

Page 165

1          M. Zmijewski
2    September 22nd, but on September 19th; correct?
3        A    Is not the closing price on
4    September 22nd, but the closing price on
5    September 19th; correct.
6        Q    At the end of that footnote 44, you
7    say, "I determined they reflect the balance on
8    9/19/08 by reviewing an e-mail dated
9    9/21 attaching a 9/18 OCC statement detailing cash
10   of 1 billion something, letters of credit of
11   250 million, and Treasuries with a market value of
12   almost a billion, for a total balance of just over
13   2.3 billion."
14        A    Yes.
15        Q    What is your point of that statement?
16        A    On the balance sheet they show an
17   asset and liability position, and they take the
18   net of that, and that is what they eventually
19   present in the balance sheet. I am merely stating
20   how I adjusted the liability position, how I
21   checked the asset position, and I made no change
22   to the asset position.
23        The last part of that, which is what
24   was just read, is the asset position, that I
25   looked at it, I verified it, it seems to be

Page 166

1          M. Zmijewski
2  correct based on the OCC statement.
3          And there is a typo here.  The typo,
4  there's in the third line from the bottom, to the
5  last date to the right, that should be "9/19/08
6  OCC statement."
7          That last sentence merely says that I
8  reviewed the asset valuation, and agree with it.
9      Q     Okay.  That is the only significance
10 to the last sentence for purposes of your opinion?
11     A     That is all it says.
12     Q     Maybe I got this wrong, but there
13 was -- were you suggesting that there was a
14 mismatch in the numbers that Barclays used between
15 the 22nd and the 19th?
16     A     Not related to these assets, only
17 related to the liabilities, which is the first
18 part of the calculation.
19     Q     Okay.  Let's turn to I guess your
20 opinion two, and your discussion of what was
21 represented to the Court.
22         Briefly, before we do that, let's go
23 back and just look at your, quote, windfall,
24 unquote, calculation chart, Exhibit B-1.  And
25 actually, before we get into what was described to

Page 167

1          M. Zmijewski
2  the Court, that 2.085 number, can you tell me what
3  that is?
4      A     Yes.  That is the non-financial
5  assets from the opening balance sheet, Barclays'
6  opening balance sheet.
7      Q     How did you calculate that number?
8      A     I took the number right off of
9  Barclays' opening balance sheet.
10     Q     When you say opening balance sheet,
11 are you talking about a particular document?
12     A     It's 88-B, and also -- is it 366-A?
13 Is that the number?  I don't know.  Let me go back
14 to footnote five.  88-B, 377-A.
15     Q     Let me show you a document previously
16 marked as 377-A.
17     A     Thank you.
18     Q     Is that the document that you got the
19 2.085 off of?
20     A     Yes.  You can calculate it from here.
21     Q     Can you show me how you calculate it?
22     A     I am trying to get this in focus.
23 Sorry.  It's small print.
24         It would be the subsidiaries
25 overseas.  I believe this is correct.  Let me

Page 168

1          M. Zmijewski
2  just -- intangibles.  Let's take the big piece.
3  The intangibles, which is line 26, or row 26,
4  1.45.  I am sorry, this is on the second page, 44.
5  The last two digits in the Bates number, 44, row
6  26, intangibles, 1.45.
7          Row 28, fixtures, .53.
8          Row 27, prepayments, deposits, .07.
9          And line 23, subsidiaries.
10         I believe that adds up to
11 two-point -- maybe not.  Does that add up?
12 What else is there?  And there aren't as
13 many significant digits here.  I believe if
14 you go to the other exhibit, 88-B, it has --
15 which is a spreadsheet, where you can
16 actually get all the detail
17     Q     And what types of -- can you describe
18 what types of things are intangible assets or
19 operating leases, row 26?
20     A     I would have to go back to Barclays'
21 documents to remember all the intangible assets.
22 There were customer lists.  I don't remember the
23 other intangible -- maybe there was some branding,
24 operating leases, leases of certain -- I don't
25 recall.  Maybe it's software.  I don't remember

Page 169

1          M. Zmijewski
2  the details.  I would have to go back to Barclays.
3      Q     Let me show you a document previously
4  marked as Exhibit 1.
5      A     I don't think I have seen this.
6  Where it all began.  Oh, did I see this?  This is
7  the asset purchase agreement.  Of course.
8      Q     So you have seen and reviewed this
9  document before?
10     A     Of course, yes.
11     Q     Will you describe what it is, please?
12     A     It's the asset purchase agreement,
13 dated September 16th, 2008, for the sales
14 transaction between Lehman and Barclays.
15     Q     And for good measure, let me just
16 also show you what has been previously marked as
17 Exhibit 24.  Do you recognize that document,
18 Exhibit 24?
19     A     Yes.
20     Q     Can you describe what it is, please?
21     A     It's the first amendment to the asset
22 purchase agreement, which is Exhibit 1.
23     Q     And let me show you a document
24 previously marked as Exhibit 25.  And do you
25 recognize Exhibit 25?

## Page 170

1          M. Zmijewski
2     A     Yes. This was a letter from Barclays
3 to Lehman, concerning the asset purchase agreement
4 in Exhibit 1, and the first amendment in Exhibit
5 2, or 24 rather.
6     Q     And do you understand this agreement
7 to modify or amend the asset purchase agreement?
8          MR. TAMBE:  Objection to the form of
9     the question.
10          MR. DAKIS:  Same objection.
11          MS. TABATABAI:  Same objection.
12     A     That is what it says it amends.  It
13 says that, okay.  I don't know if it -- if it
14 actually amended it or clarified.  I remember
15 clarified was used.  Both words are used in this
16 instance, clarifies and amends.
17     Q     You understand these three documents,
18 Exhibits 1, 24, and 25, the original APA, the
19 first amendment and the clarification letter, to
20 comprise the purchase agreement that the parties
21 entered?
22     A     In combination, it's the purchase
23 agreement that the parties signed.  I don't
24 believe it was the -- what the -- the sale
25 transaction that was approved by the Court, but it

## Page 171

1          M. Zmijewski
2 is what the parties signed.
3     Q     Is there some other agreement between
4 the parties relating to the sale that comprises
5 the parties' agreement governing the sales
6 transaction other these three documents?
7     A     Not to the best of my knowledge, but
8 it's my understanding that the Court did not
9 approve this, all these documents, as part of the
10 sale transaction.
11     Q     When you talk about the sale
12 transaction that was approved, what agreement
13 between the parties are you referring to?
14     A     Well, it would be the agreement that
15 was approved, the nature of the agreement that was
16 approved by the Court.  That is my understanding
17 of the issue in this matter.
18     Q     So, what would be the actual
19 agreement?
20     A     I am not a lawyer.  I don't know.  I
21 don't know if the parties agreed to something
22 different than what the Court approved.  I don't
23 know the answer to your question in that
24 situation.
25          I am sure the Court's -- that is

## Page 172

1          M. Zmijewski
2 something the Court has to figure out, I guess.  I
3 don't know.  You are pulling me into your area.  I
4 am getting uncomfortable.  I am not a lawyer.
5     Q     Well, there are statements about the
6 sales transaction, what was represented to the
7 court, and it's part of your baseline analysis,
8 right, what, what the agreement was between the
9 parties?
10          MR. TAMBE:  Objection.
11     Q     And on which you calculated windfall?
12          MR. TAMBE:  Objection to the form of
13     the question.
14          MR. DAKIS:  Objection.
15          MS. TABATABAI:  Same objection.
16     A     You said based on.  That is a
17 reasonable word.  I would call it a benchmark, and
18 that comes from Mr. Golden.
19     Q     Let's start with -- look at the
20 definition of -- well, let me ask you this:
21 Does -- do you have any idea what the terms of
22 this sale transaction that you deemed to be
23 approved by the Court are?
24     A     By terms, you mean terms in a
25 contract?

## Page 173

1          M. Zmijewski
2     Q     Sure.
3     A     The only documents I have read are
4 the documents that -- with respect to this
5 transaction, are the documents that you handed me
6 with respect to the asset purchase agreement.
7 These are the three transactions, or three
8 documents that I am aware of with respect to the
9 asset purchase agreement.
10          That is different from, based on my
11 understanding from counsel, my understanding from
12 Mr. Golden's report, also from my understanding
13 just reading the record, that the Court didn't
14 necessarily approve all of these, all of these
15 documents.
16     Q     Did he tell you whether the Court
17 approved some other agreement between the parties,
18 or is it just that the Court didn't approve any
19 agreement?
20          MR. TAMBE:  Objection to the form.
21          MR. DAKIS:  Same objection.
22          MS. TABATABAI:  Objection.
23     A     I don't know the answer to the
24 question.
25     Q     So, for example, in paragraph 47 of

Page 174

1           M. Zmijewski
2    your report, when you say in the context of
3    criticizing Mr. Plfeiderer, in terms of his
4    analysis of the sale transaction, you say: "The
5    sale transaction approved by the Court was based
6    on certain representations of value for the asset
7    being purchased and the liabilities being
8    assumed."
9           And I just want to confirm when you
10   reference the sale transaction approved by the
11   Court, you have no idea what agreement that might
12   be referring to?
13          MR. TAMBE:  Objection to the form of
14      the question.
15          MR. DAKIS:  Same objection.
16          MS. TABATABAI:  Same objection.
17    A     I don't know what the Court --
18   specifically what the Court approved, what
19   documents the Court had in mind when it approved.
20          What the movants are claiming is that
21   these documents are not the documents that the
22   Court approved or the Court wasn't aware of the
23   information in these documents and was
24   inadvertently or intentionally or for whatever
25   reason not provided all the information that was

Page 175

1           M. Zmijewski
2    appropriate to represent to the Court what was
3    actually going to happen based on these documents.
4    That is my understanding of their claim.
5     Q     Looking at the APA, Exhibit 1,
6    definition of purchased assets, please.
7           Have you found that section yet?
8     A     Page six.
9     Q     And do you see there is a list of
10   different assets there?
11    A     I do.
12    Q     And are some of the assets that you
13   included in your 2.085 figure and in your Barclays
14   windfall calculation, are they defined as
15   purchased assets here?
16          MR. DAKIS:  Objection to the form of
17      the question.
18    A     Yes, yes.
19    Q     Are they all -- are they all
20   purchased assets?
21    A     I believe so.  I have no reason to
22   doubt that.
23    Q     So from the beginning, what is in
24   your 2.085 were assets that Barclays was acquiring
25   as part of the sales transaction; correct?

Page 176

1           M. Zmijewski
2           MR. DAKIS:  Objection to the form of
3      the question.
4     A     Yes.
5     Q     Do you have any reason to believe
6    that that changed at some point during the week,
7    that they were excluded from being assets
8    conveyed?
9           MR. TAMBE:  Objection to the form of
10      the question.
11          MR. DAKIS:  Same objection.
12          MS. TABATABAI:  Same objection.
13    A     Not to the best of my knowledge.
14    Q     Then why do you add them to your
15   calculation of a Barclays windfall?
16    A     If I may take it just a step back to
17   give you the big picture of this calculation, the
18   calculation is, here is Barclays' purchased assets
19   with a certain value, and those assets, if you add
20   them all up, add to $58.2 billion.
21          That is what they received in value
22   of the assets.  So that this is the adjusted total
23   assets acquired.  Do you see that?
24    Q     Yes.
25    A     So that's what they received.

Page 177

1           M. Zmijewski
2           What consideration did they pay?
3    Well, that is the liabilities and opening balance
4    sheet, adjusted comp and so forth, so they
5    actually in essence, because of assumption of
6    liabilities and cash payments, paid 47.03 billion.
7    The difference between those two is the gain.
8    They bought assets valued at 58, roughly
9    58 billion, paid 47 billion for them.  Well, that
10   means you have a gain of $11 billion.  That is
11   what this calculation is.
12          So the assets at the top include all
13   the assets they received plus assets that they are
14   claiming to have a right to but have not yet
15   received.  That is the 775.  So that is the top
16   part of this.
17          So all the assets, it's not as if
18   these assets shouldn't have been received.  That's
19   a different issue.  This is what they received and
20   that is the calculation.  What did they receive,
21   what is the value of it.  What did they pay, what
22   is the amount.
23          The difference is either a gain or a
24   loss, and in this case it's an $11 billion gain.
25          What did the Court approve?  The

Page 178

```
1           M. Zmijewski
2  Court approved a net transfer to Lehman of 1.85.
3  Therefore, they benefited by, Barclays benefited
4  by 11.  Lehman should have benefited by 1.85.
5  Therefore, the delta between the benchmark,
6  Mr. Golden's number, and what they actually
7  received is $13 billion.  That is the big picture
8  of that calculation.
9      Q      The net transaction value, the 1.850.
10     A      Yes.
11     Q      Let me understand it.  Your
12  understanding was that it was judicially mandated
13  that Barclays have a loss of $1.8 billion in the
14  deal?
15         MR. DAKIS:  Objection to the form.
16         MR. TAMBE:  Objection to the form.
17         MR. THOMAS:  For the record, every
18  counsel laughed here at the table.
19         MR. DAKIS:  I don't think I was
20  laughing, but I did object to your question.
21     A      I thought it was funny.
22     Q      The witness laughed.
23     A      And I will tell you why I thought it
24  was funny, because as a professor, it's a
25  mischaracterization.  This isn't a gain or a loss,
```

Page 179

```
1           M. Zmijewski
2  when you buy an asset.  What this is is, when you
3  buy an asset and you pay just -- let's say you buy
4  a business, Professor Plfeiderer gives examples of
5  buying a business.  If you buy a business and you
6  look at the assets and you look at -- let's just
7  assume it's simple.
8           Here is a piece of a building, that
9  is an office building, and you have a company in
10  this office building, but the only asset you
11  really have is the office building.  The office
12  building has an appraised value of $100.  You pay
13  $150 for it.  Did you incur a loss?  No, that is
14  not a loss.  You paid $150.  Why?  Because the
15  value of these assets was $100, but you also
16  bought an ongoing business and you were willing to
17  pay more for it, because you had an ongoing
18  business, and that is called goodwill.
19           Accountants don't call that a loss.
20  If that was the case, I don't know what percent of
21  the mergers, but most of the mergers in the U.S.
22  would be loss situations.  That is goodwill
23  because you are willing to pay more than the
24  appraised value of the individual assets, because
25  there is an ongoing business.
```

Page 180

```
1           M. Zmijewski
2           That would have been called goodwill.
3  It would have been put on Barclays' balance sheet
4  as goodwill, an asset.  It wouldn't have been a
5  loss.
6      Q      So you think, excluding goodwill, it
7  was judicially mandated that assets -- liabilities
8  had to exceed assets by $1.8 billion?
9         MR. DAKIS:  Objection to form.
10        MS. TABATABAI:  Objection to form.
11        MR. TAMBE:  Same objection.
12     A      That is not my opinion.  I don't know
13  if Mr. Golden would agree with that
14  characterization of his opinion, but the
15  $1.85 billion would indicate that the value of the
16  assets minus the consideration, cash paid, plus
17  the value of the assumed liabilities, would have
18  been a negative $1.85 billion, and would have
19  resulted in that much benefit to Lehman's estate,
20  and that much goodwill put on the books of
21  Barclays.  That is what the 1.85 billion means.
22     Q      Now, if the goodwill amount was
23  identified to be 250 million, right, then most, at
24  least most of that 1.850 would be loss; right?
25        MR. TAMBE:  Objection to the form of
```

Page 181

```
1           M. Zmijewski
2  the question.
3         MR. DAKIS:  Same objection.
4      A      Well, if the Court declared that the
5  approved transaction should have a $250 million
6  positive goodwill, which means that the value of
7  the assets minus the value of the consideration is
8  250 million, then that that number I would have
9  used there would be minus .25.
10     Q      So, the difference between assets and
11  liabilities is measured by goodwill?
12     A      The net -- the fair value of the
13  assets minus the fair value of the consideration,
14  cash plus liabilities, is equal to goodwill.
15  Either positive or negative.  If it's positive,
16  it's put on the balance sheet as an asset.  If
17  it's negative, which it was for Barclays in this
18  case, it is viewed as a gain, an immediate gain,
19  and flows into the shareholder's equity on the
20  equity side of the balance sheet.
21     Q      Now, is the 1.850 calculated?
22     A      That comes from Mr. Golden's report,
23  and you would have to read his report.  It's
24  entirely his analysis.
25     Q      Have you read his report?
```

Page 182

M. Zmijewski

1             M. Zmijewski
2    A    Yes.
3    Q    And just on your knowledge, you talk
4 about amounts that he's represented to the Court
5 and so forth, can you tell me just roughly how you
6 get to assets being 1.85 billion less than
7 liabilities?
8    A    He has a schedule.  I don't remember
9 which table it is in his report, but he has a
10 schedule where he calculates based on his reading
11 of the record what all the assets are, and what
12 the consideration should be, and the delta, the
13 difference between those numbers is minus 1.85
14 negative.
15       It's a schedule right out of his
16 report.
17    Q    Being more specific, can you recall
18 what the liabilities were, for example?
19    A    I don't remember how he calculated
20 his number in that level of detail.  But it's well
21 specified in -- I don't know if it's the first
22 exhibit, but in his exhibit.
23    Q    I am just going to show you briefly
24 page seven of his report.
25    A    Sure.

Page 183

M. Zmijewski

1             M. Zmijewski
2    Q    Does that look like --
3    A    May I just take a quick look?
4    Q    Sure.
5    A    Yes.
6    Q    I will take it back.
7       Is that what you're referring to?
8    A    Yes.  You can see the 1.85 in the
9 bottom left-hand side.
10    Q    And conceptually, is it your
11 understanding -- how did he go about calculating
12 these?  Is this based upon particular values that
13 were mentioned in court?
14    A    Based on my reading of -- you should
15 ask him, of course.  Based on my reading of his
16 report, he looked at the court record and the
17 documents from the court record, and calculated
18 his understanding of what the court-approved
19 transaction was valued at.
20    Q    And is it your belief that on the
21 list of purchased assets there, any asset for
22 which a particular value was not mentioned has to
23 be excluded from the 1.85 calculation?
24    A    I'm sorry, I don't understand your
25 question.

Page 184

M. Zmijewski

1             M. Zmijewski
2    Q    Do you have any understanding of --
3 of what he included in -- he comes up with a
4 number, which supposedly is, is the amount of
5 assets Barclays was going to get pursuant to an
6 unidentifiable court-approved agreement, and a
7 number of liabilities that it was going to pay.
8 Is that right?
9       MR. TAMBE:  Objection to the form.
10    A    Correct.
11    Q    The asset side of the number, when he
12 comes up with the assets that Barclays was
13 supposed to get, is it your understanding that he
14 only added up -- strike that.
15       Is it your understanding that his
16 addition of all of the assets that
17 Barclays was to get pursuant to the APA, the
18 definition of purchased assets?
19    A    I am trying to -- I don't recall.
20 Sorry.  I would have to go back and read his
21 report again.
22    Q    I will make some copies of that and
23 we will work through it a little bit.
24    A    Okay.  It would be helpful to have
25 his whole report so I could read it, because

Page 185

M. Zmijewski

1             M. Zmijewski
2 that --
3    Q    Well, I think I am just going to ask
4 you based on this chart that he's copying.
5    A    The chart.
6    Q    You read his report; right?  You rely
7 on the report.  You are familiar with it.
8    A    I read his report several weeks ago.
9    Q    And you rely on the 1.8?
10    A    I do rely on the 1.85.  But that
11 doesn't mean that I could answer questions, closed
12 book questions.  I understand that you like those
13 tests, but --
14    Q    Actually, I have let you go through
15 your report on most of this.
16    A    That's true.
17    Q    It's just for shortening the process.
18    A    I appreciate that.
19    Q    If I lay out the questions to you and
20 you still want to see other parts of his report,
21 we will get you his report.
22    A    Okay.
23    Q    We will have to take a break and get
24 it.
25    A    I appreciate it.

Page 186

1           M. Zmijewski
2     Q     Let me ask you a question just
3  briefly.  Keep that there because we are going to
4  go back to it.
5           Turning back to the JPM settlement
6  and how to value what Barclays got from the sales
7  transaction with respect to those assets, if, as
8  part of the settlement agreement, in December of
9  2008, if instead of the JPM securities Barclays
10 had received some other unrelated securities, from
11 IBM, IBM securities, as a part of the settlement
12 agreement in court, okay, and those securities are
13 worth at the time of the settlement $3 billion.
14           At the time of the settlement, let's
15 say those securities were worth $20 billion.  At
16 the time -- excuse me.  At the time of closing,
17 let's say they were worth $20 billion, those same
18 IBM securities.
19           How would you then value what
20 Barclays got as far as the sales transaction?
21 Would you say they got $20 billion in assets
22 because those securities were worth $20 billion on
23 September 22nd, or would you value them at
24 $3 billion or what?
25     A     None of the above.

Page 187

1           M. Zmijewski
2     Q     What would you do?
3     A     It goes back to what I said before.
4  There is, as of the closing date -- it's a
5  hypothetical; right?  This is a hypothetical, of
6  course.  It's a good hypothetical.
7           But the issue isn't about what they
8  received in December and what the value of what
9  they received in December was, in some other date,
10 the 19th of September.  What is at issue here is
11 what the claim as of 12:01 a.m., on
12 September 22nd, what is the claim, what is the
13 value of that claim.  Because that is the value of
14 what they received at the closing date.  And that
15 is what I am attempting to value.
16           So if it was worth 20 billion, that's
17 irrelevant.  If it's worth 3 billion, it's
18 irrelevant.  Because it's not the same security,
19 it's not the same claim.  It was settled.  The
20 issue is what is the expected value of the claim
21 on -- as of 12:01 a.m. September 22nd.
22     Q     And your answer is the expected value
23 of the claim was 100 percent of the fair market
24 value of those JPM securities as of
25 September 19th; is that correct?

Page 188

1           M. Zmijewski
2     A     They -- no, it's not correct, because
3  there is also this 1.25 billion cash component.
4  So if you add the 1.25 billion, yes, that is
5  different.  So it's that cash component plus the
6  securities.
7     Q     Okay.  All right.  Let me show you
8  the chart that you have referred to.
9     A     Did you want to mark this?
10    Q     Yes.  That is a good catch.  You have
11 probably done more depositions than I have.  You
12 are really good at this.
13           708B.  Thank you.
14           (Exhibit 708B marked for
15           identification as of this date.)
16
17    A     You know, the first person I was ever
18 deposed -- not deposed by, cross-examined by, was
19 your partner, Mr. Boies.
20    Q     Really?
21    A     That was the start of my career,
22 1989.
23    Q     What was case was that?
24    A     United Airlines, that was being sued
25 by the other airlines for reservation systems.

Page 189

1           M. Zmijewski
2  That is for the reservation systems.  That's in
3  the late 1980s.
4           What is the reservation --
5     Q     Sabre.
6     A     That was American's.  United was --
7     Q     Not Worldspan.
8     A     No.  Acobia or something.  But
9  anyway, it was about the airlines --
10    Q     I did the Worldspan --
11    A     Oh, did you?
12    Q     -- three years, several years later.
13    A     I worked with him a couple years
14 later on the Continental Northwest.  So we were on
15 the same side on that one.
16    Q     Good.
17           No trick questions here.  I just
18 wanted to understand.  I mean, this is the chart
19 you referred to.
20           MR. TAMBE:  Note all the counsel is
21           chuckling now.
22    A     We take you at your word.
23    Q     You see the 1.85.
24    A     That is Mr. Golden's number.  That is
25 the number that I use in my analysis.

Page 190

1         M. Zmijewski
2     Q     And you see that he is adding up
3 certain assets, okay.
4     A     Yes.
5     Q     In the left column.  And do you
6 understand him to be saying that those are the
7 assets that Barclays was supposed to get as part
8 of what is called the court-approved sales
9 transaction?
10     A     Yes.
11     Q     Okay.  And let me go ahead and -- I
12 have seen some reference in your report to the
13 hearing transcripts, that you reviewed the hearing
14 transcripts.
15     A     I see that.
16     Q     You reviewed the hearing transcripts
17 of the sale transaction.
18         Let me show you what has been
19 previously marked as Exhibit 442.  And I am not
20 going to ask you to read that whole thing.
21     A     Thank you.
22     Q     But do you recognize it generally as
23 the --
24     A     Yes.
25     Q     -- September 19 sale hearing

Page 191

1         M. Zmijewski
2 transcript?
3     A     I do.
4     Q     Okay.  Have you read this whole
5 thing?
6     A     Yes.  The first thing that I have
7 done, or I did, was go through the motions, 60(b)
8 motions, and then we had these documents because
9 they were public, so very early when I read this.
10     Q     Okay.  And if you would turn to
11 page 47, please.
12     A     I am there.
13     Q     Do you see the reference to
14 $47.4 billion in line four?
15     A     I see that.
16     Q     The oddities of this case, and the
17 47.4 appears at line four of page 47.
18         Do you see the 47.4 in Exhibit 708B?
19     A     I do.
20     Q     And do you understand that 47.4 in
21 Mr. Golden's calculation of assets to be referring
22 to the 47.4 on page 47 of the hearing transcript?
23     A     I believe so, but you would have to
24 ask him.
25     Q     That is your understanding?

Page 192

1         M. Zmijewski
2     A     That is my general understanding,
3 yes.
4     Q     And it says, at the start of that
5 page 47, originally we were selling assets that
6 had a value of 70, approximately $70 million, and
7 today your -- those same assets have a value of
8 $47.4 billion.
9         The $70 billion, if you would turn
10 back to the APA, which is Exhibit 1, and if you
11 look at the definition of purchased assets again
12 in subpart D.
13     A     Government securities, commercial
14 paper, et cetera, $70 billion, collectively long
15 positions.
16     Q     Right.
17         And I know there is -- in your
18 report, you have a reference to the 47.4 number,
19 which is in paragraph 47, of course.  You refer to
20 that as, "The repo collateral was part of the
21 $47.4 billion of trading assets."
22     A     Yes.
23     Q     The trading assets description, is
24 that consistent with the description in subpart D
25 of the purchased assets?

Page 193

1         M. Zmijewski
2     A     Subpart --
3     Q     D.
4     A     Yes.
5     Q     And do you understand Ms. Fife of
6 Weil Gotshal to in fact be giving the Court some
7 updated estimate on the value of subpart D that
8 relates to what the 70 billion has become?
9         MR. TAMBE:  Objection to the form of
10     the question.
11     A     Yes, okay.  "Has become" is sort of
12 an interesting use of words.  You know, it's a
13 different set of assets at a different point in
14 time.
15     Q     Fair enough.  But it's the -- apples
16 to apples, it's the $70 billion trading assets in
17 the subpart D, and the -- and the -- and what the
18 value of trading assets, similar trading assets is
19 now.
20         MR. TAMBE:  Objection to the form.
21     Q     At the time of the hearing.
22         MR. DAKIS:  Same objection.
23     A     No.  I think it's minus the set of
24 assets that were taken out and maybe some assets
25 that were put -- there were some musical chairs

Page 194

1    M. Zmijewski
2  there on assets.
3    Q    I didn't mean to suggest that the
4  value has gone down to 47.
5    A    All right.
6    Q    So subpart D is one set, obviously a
7  big set, of the purchased assets being conveyed as
8  part of the original purchase agreement; right.
9    A    Correct.
10    Q    When she says 47.4 -- she references
11  the 70 billion.  Then she says the 47.4, and what
12  you described as trading assets.  You understand
13  that she is referring to one set of assets being
14  conveyed, not necessarily every asset being
15  conveyed, with the sale of the company?
16    MR. TAMBE:  Objection to form.
17    MS. TABATABAI:  Objection to form.
18    MR. DAKIS:  Same objection.
19    A    Yes.  Later on this same page, this
20  is the page of the hearing, on line 16, the
21  discussion goes to, "And here's your real estate
22  assets."
23    Q    Right.
24    So there are other assets besides the
25  47.4 in trading assets.  There are real estate

Page 195

1    M. Zmijewski
2  assets or the RESIs.
3    MR. TAMBE:  Object to the form of the
4  question.
5    Q    There's the real estate assets?
6    A    Correct.
7    Q    And what about the RESIs?
8    A    I don't know where those are here.  I
9  don't know where they are at this point.
10    Q    Do you see in subpart D in the
11  purchase assets of A, the RESIs?
12    MR. TAMBE:  Sorry.  Which one are you
13  on?  Which document are you on?
14    MR. THOMAS:  The original asset
15  purchase agreement.
16    Q    And you look below subpart D.  Do you
17  see that RESIs are not part of D but are a
18  separate line item?
19    A    I see that is true here.  I don't
20  know if the 47 -- it's not clear that the RESIs
21  are not in the 47.4 billion here.  I understand
22  how your logic is going, whether she says 70 and
23  then 47.4.  But it's not clear to me that the
24  residential wouldn't also be in the 47.4.
25    Q    Do you recall her going on -- well,

Page 196

1    M. Zmijewski
2  it's clear that they weren't originally in the 70;
3  right?
4    A    It is clear that they were not in the
5  70.
6    Q    Okay.  And do you recall her going on
7  in a few pages to speak about the RESIs
8  separately?
9    A    No.  I will have to read it.
10    THE VIDEOGRAPHER:  Counsel.
11    MR. THOMAS:  Okay.  Why don't you go
12  ahead and switch now.
13    THE VIDEOGRAPHER:  That is the end of
14  tape number three.  The time is 2:54 p.m.
15    We are now off the record.
16    (Discussion off the record.)
17    THE VIDEOGRAPHER:  This is the start
18  of tape number four.  The time is now
19  2:56 p.m.
20    We are now back on the record.
21  BY MR. THOMAS:
22    Q    If you look at page 49, line eight,
23  do you see there being a statement that "there was
24  a provision in the old agreement pursuant to which
25  the parties were sharing the residential real

Page 197

1    M. Zmijewski
2  estate mortgages.  There is no longer that
3  provision.  Barclays was required to post
4  collateral actually this morning in order to get
5  the DEC to open up trading, and that collateral
6  was posted.  Pursuant to this transaction,
7  Barclays is taking over and guaranteeing all of
8  those transactions, and they are assuming the risk
9  related to those transactions so that collateral
10  will remain with Barclays."
11    Do you see that?
12    A    Yes.
13    Q    Does that indicate to you that when
14  she separately addresses these RESIs, that they
15  are still not part of the trading assets of the
16  47.4, just like they weren't part of the
17  70 billion?
18    MR. TAMBE:  Objection to the form of
19  the question.
20    MR. DAKIS:  Same objection.
21    A    No.
22    Q    Putting aside whether you believe
23  that the RESIs were in the 47.4, clearly, clearly
24  items like the non-financial assets that you list
25  were not part of the 47.4; right?

---

Page 198

1          M. Zmijewski
2          MR. DAKIS:  Objection to form.
3      A    Correct.
4      Q    So -- and it's your understanding, I
5  think you already testified that it was your
6  understanding that those were in the deal from the
7  beginning and would always be in the deal; right?
8      A    To the best of my knowledge, yes.
9      Q    Okay.  So, if his calculation of
10  1.85, looking back at 708B, is -- is just taking
11  the 47.4 number; right?
12     A    Yes.
13     Q    And it's not including the 2.085
14  number in non-financial assets.  Are you with me?
15     A    I understand what you are saying,
16  yes.
17     Q    So that means if you -- since you are
18  adding them to your windfall calculation, you are
19  essential double counting them, because you are
20  not providing for them in your 1.85.  In other
21  words, if you add in on the asset side of this,
22  it's not 48.69, 708B; right?
23     A    I just missed -- just give me those
24  numbers again.
25     Q    48.69 --

---

Page 199

1          M. Zmijewski
2      A    Yes.
3      Q    -- is the asset calculation --
4      A    Correct.
5      Q    -- that feeds into the net loss of
6  1.85 billion.
7      A    Yes.
8      Q    Which you use as your base point for
9  calculating the Barclays windfall.
10     A    I used the 1.85; correct.
11     Q    Now, if you fail to include the 2.085
12  billion in its calculation of assets, if you
13  include that in, 2.085, which you agreed is part
14  of the deal from day one, you get a different
15  number; right?
16         MR. TAMBE:  Objection.
17     Q    It's not a loss of 1.85, it is a gain
18  of -- too many numbers today -- 130 million?
19         MR. TAMBE:  Objection to the form of
20     that question.
21         MR. DAKIS:  Same objection.
22         MS. TABATABAI:  Objection.
23     A    I believe your arithmetic is
24  incorrect.  Sorry.
25     Q    Sure.  It probably is.  It's a long

---

Page 200

1          M. Zmijewski
2  day with a lot of numbers.
3         So, if you add into the asset side --
4      A    I think you are taking 2.085 and
5  adding a negative 1.85.  I don't think -- maybe
6  it's right.
7      Q    I had 130.
8      A    130?  Is that correct?
9         MR. THOMAS:  Anybody else want to
10     challenge my math?
11         MR. TAMBE:  No.  Just challenge your
12     question.
13     Q    135.  And the difference would be, if
14  you add in -- so let's start that over.
15         If you add in the 2.085, of
16  non-financial assets, which were always in the
17  deal, and then that net gain or loss is not a loss
18  of 1.85, it's actually a gain of 135 million.
19         MR. TAMBE:  Objection to the form of
20     the question, if there was a question there.
21     A    I still don't trust your arithmetic,
22  but that is okay.  I understand what you are
23  trying to get at.  So let's get past the
24  arithmetic, if we could.
25         I think it might be 200, two, not

---

Page 201

1          M. Zmijewski
2  one.  Maybe I'm wrong.  I don't have a calculator,
3  and I don't trust my brain.
4      Q    You are right.  It is 235.
5      A    All right.  So there.
6      Q    I'm challenged in my math, which is
7  why I am a lawyer, not an expert.
8         Let's start over so we have a clear
9  record.  If you add in the 2.085, in non-material
10  assets, that was admittedly a part of the deal to
11  begin with, then instead of that loss of
12  1.85 billion, it would actually show a gain of
13  235 million; correct?
14         MR. TAMBE:  Objection to the form of
15     the question.
16         MS. TABATABAI:  Same objection.
17         MR. DAKIS:  Same objection.
18     A    Your arithmetic is now correct, I
19  agree.  I don't believe with your
20  characterization.  I believe it's wrong.
21     Q    What is wrong about my
22  characterization?
23     A    First, I don't double count.  That is
24  not what I do.  So therefore it's not -- that is
25  wrong, because I wouldn't do that.

---

Page 202

1          M. Zmijewski
2          Second, the issue isn't what were the
3    value, what's the value of the assets that Barclay
4    received when we are measuring values, the
5    $2.085 billion, that is not the question. The
6    question is: What was the Court told the value of
7    those assets was?
8          And so this column here represents
9    what the Court, what was represented to the Court
10   with respect to the value. And there is no
11   evidence in the record that says the intangible
12   assets were worth 1.3 or $1.4 billion. I don't
13   remember the numbers. That is not in there.
14         The Court wasn't told that based on
15   my recollection. So, if the Court was told
16   nothing about the value of intangible assets, then
17   a zero appears here, so this column here is the
18   value of the assets represented to the Court.
19         This calculation, the top part of it,
20   is the value of the assets that they actually
21   received. Different concepts.
22   Q     So in calculating your windfall for
23   your expert report, you understood and appreciated
24   that Mr. Golden's 1.85 calculation was based on an
25   asset calculation that allowed for zero non-,

Page 203

1          M. Zmijewski
2    non-financial assets?
3    A     Correct.
4    Q     And would you agree that if it was
5    understood that those non-financial assets were
6    part of the approved sales transaction, it would
7    be inappropriate to add them to your windfall
8    calculation?
9          MR. TAMBE: Objection to the form of
10   the question.
11         MS. TABATABAI: Join the objection.
12         MR. DAKIS: Same objection.
13   A     No, I disagree with that. It's not
14   this clear. Let me just give you a clear
15   hypothetical.
16         Your Honor, we have a brand or a
17   customer list, and the intangible assets, of which
18   a customer list is a part. We have that asset and
19   we are giving it to Barclays, and it has zero
20   value, and Barclays puts it on its books at a
21   billion dollars.
22         Mr. Golden would have appropriately
23   zero, and I would have appropriately a billion
24   dollars. Why? Because the Court was told
25   something was going to be sold that had a value of

Page 204

1          M. Zmijewski
2    zero, when in fact it had a value of a billion
3    dollars. That is the nature of the windfall.
4          So it would be appropriate to have
5    zero or exclude it if it's zero from Mr. Golden's
6    calculation, and necessary to put it in my
7    calculation of the Barclays windfall.
8          Does that help?
9    Q     If it's an approved part of -- if
10   it's an asset that is understood and approved,
11   part of the sales transaction, that $2 billion,
12   just because it's coming over to Barclays and it
13   may be valued by Lehman as zero on their books,
14   you think that that means that that is a
15   $2 billion windfall over the approved amount of
16   the asset transfer?
17   A     That is not what I am saying. What I
18   am saying is the following: If the Court's
19   perception was -- so this is based on the Court's
20   perception. What I have -- the only number I have
21   for that at the moment is 1.85 negative from
22   Mr. Golden, but the Court naturally has its
23   perception and will say whatever it is at the
24   right time.
25         But if the Court's perception is that

Page 205

1          M. Zmijewski
2    that sales transaction was approved with an
3    intangible asset that the Court believed to have
4    zero value, and then it turned out to have a
5    $1 billion value, so the Court wasn't told the
6    correct information, that would be part of the
7    Barclays windfall.
8    Q     Now, you have changed it. First you
9    said that if it's valued zero on Lehman's books
10   and now you said if the Court believes it has zero
11   value; correct?
12         MR. TAMBE: Objection to the form of
13   the question.
14         MS. TABATABAI: Same objection.
15         MR. DAKIS: Same objection.
16   A     Maybe I said Lehman's books before.
17   If I did, I misspoke, because my whole, the whole
18   basis of my calculation is what is the value of
19   the transaction that the Court approved versus
20   what is the value of the transaction that actually
21   occurred for Lehman's. It's that difference.
22   Q     So now in your view, it would be only
23   appropriate to include the $2 billion if the Court
24   believed that, and was intending to value those
25   non-financial assets at zero?

## Page 206

M. Zmijewski

1
2       MR. TAMBE:  Objection to the form of
3    the question.
4       MR. DAKIS:  Same objection.
5       MS. TABATABAI:  Join.
6    A    No.  The 2 billion should be
7    included.  The only way you wouldn't include the
8    2.085 billion for non-financial assets, is if it
9    was the situation like the real estate.  I did not
10   include the real estate here in my transaction.
11   Why?  In my calculation.  Why?  Because the real
12   estate, based on what the Court said, is was --
13   the real estate is going to be sold, it's going to
14   be sold at the appraised value.  You will --
15   therefore, the value is the appraised value.
16   Therefore, I could have put it up in the top, and
17   I could have put it in the second part of the
18   calculation, and it would have been a wash.  I
19   excluded it.
20       Mr. Golden has it here, actually,
21   both as an asset and as a consideration, so it's a
22   wash.
23       So in that case, then you could
24   exclude it, as I did, for the real estate, but
25   unless those two values are identical or the

## Page 207

M. Zmijewski

1
2    concepts of value are identical, such as we're
3    going to -- the value, the real estate's appraised
4    value, and we will pay them appraised value,
5    unless it's a situation like that, you should be
6    including it on Mr. Golden's calculation and
7    including it on my calculation.
8    Q    If the Court understood and intended
9    there would be non-financial assets, like customer
10   lists and so forth, being transferred and that
11   $2 billion was in the acceptable valuation range
12   of those assets, you definitely wouldn't include
13   the $2 billion in your windfall gain; right?
14       MR. TAMBE:  Objection, objection to
15   the form of the question.
16       MR. DAKIS:  Same objection.
17       MS. TABATABAI:  Same objection.
18   A    If the non-financial assets -- let's
19   just assume, your Honor, the non-financial assets
20   will be transferred over per the APA, and the
21   value of those assets is $2.08 billion -- eight
22   five billion dollars.  In that particular -- if
23   that is the case, if that were the case, it's a
24   hypothetical of course, if that were the case, I
25   would have treated it like the real estate.  I

## Page 208

M. Zmijewski

1
2    would not have included it.
3    Q    And so it's a necessary premise of
4    your including it that the judge did not believe
5    there was going to -- by your including all of
6    it -- strike that.
7       It's a necessary premise of your
8    including all of the $2 billion in your windfall
9    calculation that the judge did not approve any
10   non-financial assets going over?
11       MS. TABATABAI:  Objection.
12       MR. TAMBE:  Objection to the form.
13       MR. DAKIS:  Same objection.
14   A    I don't believe I said that.
15   Q    I am not saying you said that.  I'm
16   just asking the question.
17   A    So, the judge --
18       MR. TAMBE:  Same objection.
19   A    It's the valuation of those assets,
20   it's not whether the judge approved or not
21   approved the transfer of the asset.  It's the
22   value of the asset.
23       So if he approved it and it was
24   valued at zero, which is -- that is what the
25   assumption is here, in Mr. Golden's report, then

## Page 209

M. Zmijewski

1
2    the difference is, since it's 1.85, he included it
3    at zero and I included it at .085.  That is the
4    delta.
5       If the judge said and approved of the
6    sale for those assets of a billion dollars, well,
7    then Mr. Golden would have put a billion dollars
8    here.  I would have kept the 2 billion here.  But
9    the 1.85 would have been negative .85, and it
10   would have gone down.
11       So, I wouldn't change anything that I
12   would do.  The only thing that I would change is
13   the minus 1.85, as we went through the example
14   before, the 1.85 changes, because this is the
15   court-approved document, or Mr. Golden's attempt
16   at figuring out what the court approved as far as
17   the sale transaction.
18       So, let's assume the judge says,
19   well, no, I knew those assets were being
20   transferred, and $2 billion is fair, that is okay,
21   well, then we do the arithmetic that you did, and
22   this number at the bottom here, and my numbers
23   would have changed, but the minus 1.85 would
24   change to the positive -- whatever you calculated
25   before.  We don't have to go through that

Page 210

M. Zmijewski

1  arithmetic again.
2
3      Q    235.
4      A    That's how we do it.  So any
5  difference between Mr. Golden's opinion and what
6  the judge, the Court finally determines as what
7  was the approved transaction would flow into an
8  adjustment to my minus 1.85.  Everything else
9  remains the same.
10     Q    When do you believe would have been
11 the soonest that $2 billion figure could have been
12 calculated in this case in these circumstances?
13         MR. TAMBE:  Objection to the form of
14     the question.
15     A    I don't know the answer to that.  I
16 don't know.
17     Q    Would it -- in a rough guess, would
18 it have been months after the closing?  Would it
19 have been on the closing date, before the closing
20 date?
21     A    Well, I -- it's a billion dollars.
22 Now, maybe to the bankers that is not a lot of
23 money, but if I were on the valuation team, I
24 would be valuing that.  I would be valuing every
25 asset I could possibly value.  Customer list.

Page 211

M. Zmijewski

1
2  They've purchased banks before.  They understand
3  the nature of that type of asset, what it's worth.
4         They had -- I would be shocked if
5  they didn't have some type of an assessment of the
6  value of assets like that.
7      Q    In what time period?
8      A    Before the transaction as they were
9  going through this.  This is normal course of
10 business for these people; right?  This is what
11 they do.  They buy banks all the time.
12     Q    This was a normal course of business
13 transaction?
14     A    This was a huge transaction, of
15 course, buying the customer list, the
16 intangible assets of this in a deal.  They
17 understand how to value it.
18         The Royal Bank of Scotland, for
19 example, they just -- I don't remember how far,
20 how much earlier that was.  They were bidding for
21 the Royal Bank of Scotland and lost.  I am sure
22 they were thinking about all these issues, so they
23 had to be prepared to do these kinds of
24 valuations.
25     Q    Do you have an understanding one way

Page 212

M. Zmijewski

1
2  or another whether Barclays was able to do any
3  valuation of non-financial assets prior to closing
4  of the deal?
5      A    Well, they have a fiduciary
6  responsibility to their shareholders, so I assume
7  they would be doing valuations of this sort,
8  something that is worth a billion dollars.
9      Q    Why do you keep saying a billion
10 dollars?
11     A    Because I think that is what it is.
12 I think you said it's 1.45 billion, the
13 intangibles.
14     Q    Do you know one way or the other or
15 are you just speculating with?
16     A    I am speculating, but it's an
17 informed speculation based on my experience
18 working with companies on buying another company.
19     Q    What about in a situation where the
20 parties agree that they are selling basically the
21 whole, all the business assets of the company, and
22 there is no specific value placed on the
23 non-financial assets, and the Court approves the
24 sales transaction?  Do you understand that the
25 subsequent recognition of any non-material,

Page 213

M. Zmijewski

1
2  non-financial assets should result in a
3  declaration that this was an inappropriate
4  windfall?
5         MR. TAMBE:  Objection to the form of
6     the question.
7      A    Could you repeat the first part
8  again.  I have just want to make sure I understand
9  the context.
10     Q    Sure.
11         In a situation where the parties
12 agree to the sale of a business or almost all the
13 business assets, and clearly there is going to be
14 some non-financial assets involved, but there is
15 no calculation made or presented and nothing is
16 predicated on that in the deal and so forth, do
17 you -- and the Court approved that transaction --
18 do you think that just because later there is a
19 valuation made of the non-financial assets, that
20 that is somehow an improper windfall that wasn't a
21 part of the court-approved transaction?
22         MR. TAMBE:  Objection to the form.
23         MS. TABATABAI:  Objection to form.
24         MR. DAKIS:  Same objection.
25     A    Let's go back to -- I would just like

Page 214

1           M. Zmijewski
2   to break that up into two pieces and separate the
3   Court approval process from the transaction
4   itself.
5           Two companies agree, Company A will
6   buy Company B, and you are not buying the
7   non-financial assets.  You are buying the company
8   of course, and you would value that and tell your
9   company.  Unequivocally, you would value the whole
10  company, and you would figure out what is the
11  value I am willing to pay for this company as a
12  going concern.  That is the value that you would
13  put onto it.
14          You wouldn't pay that amount.  That's
15  what you would be willing -- you would negotiate
16  around the range, but you would pay somewhere in
17  the range, what you felt comfortable the true
18  value of that asset is to you when you are buying
19  it.  That's what you would do.  That's how the
20  calculation would be made ex ante.
21      Q    In that situation it wouldn't matter
22  if later on you put a value on customer lists of a
23  billion dollars or something?
24      A    No.  I wasn't finished.
25          How do we measure what the value is?

Page 215

1           M. Zmijewski
2   How do we measure what the value of that asset is
3   afterwards?  Well, the accounting rules require
4   companies to conduct that calculation and say,
5   well, here is the value that you are assigning to
6   the total company, and you, according to the
7   accounting rules, must allocate that total value
8   that you agreed to purchase the company for and
9   allocate it across the fair market value of the
10  assets.
11          Companies are required to do that.
12  They have to also value the liabilities that were
13  assumed in that calculation.
14          So what we are doing is using the
15  balance sheet for the -- the initial balance sheet
16  or opening balance sheet of Barclays to actually
17  measure that value that they actually approved in
18  the deal, that they agreed to in the negotiation.
19      Q    So you are trying to measure the
20  value that they agreed to in the negotiation?
21          MR. TAMBE:  Object to the form of the
22  question.
23          MR. DAKIS:  Same objection.
24          MS. TABATABAI:  Same objection.
25      A    Well, we're valuing based on your

Page 216

1           M. Zmijewski
2   opening balance sheet the value of the deal that
3   they actually received.
4       Q    Compared to the value of the deal
5   that they agreed to?
6       A    That is why I separated out the court
7   approval.  In this particular case, it had to be
8   the court-approved deal, so it's not the value
9   they agreed to, but it's the -- the benchmark is
10  the deal that the Court approved, the value of
11  that.
12      Q    Let me understand.  In a situation
13  where a company sells most of its business assets
14  and it's done very quickly, historically quickly,
15  and it's not predicated on certain assets having
16  certain values and so forth, and there is no --
17  and the parties understand that there is going to
18  be intangible assets that can go over as part of
19  the deal, it's no mystery, and the Court approves
20  this transaction, but then you think that if the
21  purchaser then when it does the balance sheet
22  assigns value to the intangible assets, that that
23  is somehow an improper windfall because that value
24  was not previously disclosed to the Court?
25          MR. TAMBE:  Objection to the form of

Page 217

1           M. Zmijewski
2   the question.
3           MS. TABATABAI:  Same objection.
4           MR. DAKIS:  Same objection can.
5       A    I agree with that, yes.
6       Q    So you think it is?
7       A    Yes.
8       Q    So, so let's say the only assets --
9   let's say we are just talking about the
10  $2 billion, again, in non-financial assets, and
11  the parties give the Court a contract and ask for
12  approval, with lots of different items in the
13  purchase, in the purchased assets described, but
14  only a couple of the big ones have values attached
15  to them, and the Court approves the deal, approves
16  the sale of the transaction.
17          Your view is that you would add up
18  the specific values mentioned to the Court and
19  that would act as a bar or a cap on how much the
20  purchaser should get in terms of assets, and
21  everything else would be a windfall?
22      A    No, I don't believe that is what I
23  calculated.  Hopefully I didn't characterize.
24  What I said was, in your hypothetical the Court
25  was told certain things, and at the end of the

Page 218

M. Zmijewski

1  day, the Court made a decision as to what the
2  value of this particular transaction was, your
3  hypothetical transaction.  So the Court had in its
4  mind and its view a certain value to the
5  transaction, and based on that assessment of
6  value, the Court approved the transaction.
7          Then the question is:  What was the
8  real value of that transaction?  And I would
9  compare it to the Court's perception of value.
10 That is what is measured, and what Mr. Golden is
11 doing is his assessment to the best that he can of
12 assessing what the Court's view of what the
13 approved value of the transaction was.
14     Q     And his assessment is the Court
15 viewed the value of non-financial assets to be
16 zero?
17     A     Yes, that is absolutely correct.
18     Q     And then that assumption is fed into
19 your calculation of the windfall by the use of
20 Mr. Golden's number; right?
21     A     Correct.
22     Q     And that is true of every other asset
23 that wasn't specifically identified to the Court.
24     A     Yes.  And keep in mind the goal here

Page 219

M. Zmijewski

1  isn't to look at all the assets.  The goal is an
2  attempt to assess the Court's view of what the
3  value of the transaction was, and the way
4  Mr. Golden is doing is by looking at
5  individual assets, looking at considerations that
6  were told to the Court.
7          But at the end of the day, if we
8  could, we would like to, you know, go to the
9  mountain and go up to the secret box and pull out,
10 here is the Court's assessment of value, and bring
11 it back down, and I would place that value here
12 where the value of minus 1.85 is.
13         So we are looking at individual
14 assets with the goal of assessing -- attempting to
15 assess what the Court's view of the value of the
16 transaction was.
17     Q     Have you ever estimated in any way
18 the value of the gain that Barclays would appear
19 to get in the face of the original asset purchase
20 agreement?
21     A     I'm sorry, I don't understand your
22 question.
23     Q     If you look at the original asset
24 purchase agreement, have you ever attempted to

Page 220

M. Zmijewski

1  calculate whether Barclays would receive a gain or
2  loss based on that transaction?
3     A     No.
4     Q     You have no idea which way it goes?
5     A     I haven't done that at all.
6     Q     But your view is that the asset
7  purchase agreement goes out the window and the
8  only thing that matters is Mr. Golden's divination
9  of what the Court thought the values were that
10 were being transferred?
11         MR. TAMBE:  Objection to form.
12     A     No.  What matters is the Court's view
13 on what the value of that transaction was, and I
14 am using Mr. Golden's assessment of the Court's
15 view of what the value of that transaction was.
16     Q     What type of expertise does
17 Mr. Golden have to say what the value, the Court's
18 perception of the value of the transaction was?
19         MR. DAKIS:  Objection to the form.
20         MS. TABATABAI:  Objection to the
21 form.
22     A     Well, you can read his background on
23 his CV.  You know, he ran a company, took it
24 through bankruptcy.  He's again been in front of

Page 221

M. Zmijewski

1  the courts, bankruptcy court several times.
2  I'm not here to judge his
3  qualification, but he seems qualified to me,
4  running a company.  He was the CEO of a company,
5  and he went through bankruptcy, and he's been a
6  bankruptcy consultant.
7     Q     Do you have any expertise in
8  identifying or analyzing the Court's perception of
9  the value of the transaction?
10     A     It would depend on what the nature of
11 the record was, what the Court was saying.
12     Q     Do you have an opinion as to whether,
13 whether the 47.4 number mentioned by Ms. Fife, on
14 page 47 of the transcript, was intended to be a
15 cap on the assets which were transferred to
16 Barclays in addition to the real estate?
17         MR. TAMBE:  Object to the form of the
18 question.
19         MR. DAKIS:  Same objection.
20     A     I -- I don't have an opinion one way
21 or the other.
22         MR. THOMAS:  This is probably a good
23 place for a short break.
24         THE WITNESS:  Okay.

Page 222

1             M. Zmijewski
2        THE VIDEOGRAPHER:  The time is
3    3:25 p.m.
4             We are now off the record.
5        (Recess taken.)
6        THE VIDEOGRAPHER:  The time is now
7    3:46 p.m.  We are now back on the record.
8    BY MR. THOMAS:
9        Q     With respect to Exhibit 708B, and
10   your calculation of a windfall, is it fair to say
11   that your baseline for your windfall calculation
12   is only correct if the court approval of the sale
13   transaction carried with it a cap on assets to be
14   transferred apart from the real estate?
15       A     No.
16            MR. TAMBE:  Objection to form.
17       Q     Of $47.4 billion?
18       A     No. Sorry.
19       Q     Can you -- do you agree that if the
20   sale -- the Court approved the sale transaction --
21   strike that.
22            Do you agree if the sale transaction
23   approved by the Court allowed for the transfer of
24   assets greater than $47.4 billion, plus the value
25   of the real estate, which we will keep out of

Page 223

1             M. Zmijewski
2    this, then your baseline would have to be adjusted
3    for your windfall calculation?
4        A     No.
5        Q     Can you explain why that didn't
6    follow?
7        A     Of course.  The concept isn't the
8    assets that I am using -- I am using the net gain
9    or loss or what Mr. Golden calls the net
10   transaction value to Barclays, so to the extent
11   that number, the minus 1.85 is not representative
12   of the Court's view of the net value of the
13   transaction, then I would change Exhibit B-1, the
14   net value of the transaction, I would change the
15   negative 1.85 to whatever the Court felt the, or
16   decided the appropriate value of the transaction
17   was at that time.
18            So it's the net transaction.  It's
19   not the assets or the liabilities.  It's the net
20   of all that.
21       Q     Holding liabilities constant, and
22   putting aside the real estate that was purchased,
23   if the sale transaction that was approved by the
24   Court did not have an asset limit or cap of
25   $47.4 billion, then you would have to adjust the

Page 224

1             M. Zmijewski
2    baseline of your windfall calculation; correct?
3        A     It's not a cap or not a cap.  At the
4    end of the day, the Court has a value of the net
5    transaction.  And if the Court doesn't have a
6    cap -- now, if you are telling me the Court
7    doesn't have a cap, and therefore, if the value is
8    50 billion, rather than 47.4, and therefore the
9    Court's view would be based on -- let me just say
10   it's 50.4 billion.  Well, then the bottom line
11   there, the negative 1.85, I would have to add a
12   positive 3 billion to it.  So I would take the
13   difference of those two, and that is the net
14   amount I would take, assuming nothing else
15   changed.
16            So it's the totality of the
17   calculation, but I need a number.  If it's
18   uncapped to infinity, well, then, then I don't
19   know.  If the Court said I don't really care what
20   the value of the assets is, it is what it is.
21   Then I would have to rethink how we are doing this
22   calculation.  I would have to think about that.
23       Q     It wouldn't make sense to try to
24   calculate a windfall for a deal that wasn't
25   predicated on a particular asset and liability

Page 225

1             M. Zmijewski
2    value mix; correct?
3            MR. TAMBE:  Objection to the form of
4    the question.
5        A     It's not the particular, it's the net
6    of whatever the value of the assets and
7    liabilities happens to be.
8            Did the judge assume -- I will try it
9    this way.  Let me just state it simple, because I
10   saw this language in some documents.  The word
11   "wash" has been used by Professor Pfleiderer.  It
12   has been used, I know, in the movants' motion, so
13   the word "wash," which I assume is assets equal
14   liabilities, it's a wash, they are essentially
15   zero.
16            If the Court assumes that the
17   transaction was a wash, Barclays should have
18   been -- the value of the assets transferred to
19   Barclays should have been roughly the same as the
20   consideration, it's a wash, then my negative 1.85
21   would be zero.
22       Q     So your report assumes that the judge
23   did not view the transaction as a wash; correct?
24            MR. TAMBE:  Object to the form of the
25   question.

Page 226

M. Zmijewski

1
2     MS. TABATABAI:  Same objection.
3     MR. DAKIS:  Same objection.
4     A     Correct.
5     Q     Have you seen -- have you reviewed
6 the sale motion, motion to approve the sale?
7     A     Initially, yes.
8     Q     And have you reviewed the order
9 approving the sale?
10    A     Yes.
11    Q     Is there -- and you reviewed the
12 three contract documents?
13    A     Correct.
14    Q     Is there anything in there that you
15 think indicates that this sale transaction was
16 somehow predicated on a certain amount of assets
17 and a certain amount of liabilities?
18    MR. TAMBE:  Object to the form.
19    A     Well, if you include in the set of
20 documents I read the movants' motions, it's
21 clearly -- all over those motions they talk about
22 either a net benefit to Lehman, from this
23 transaction, or that the transaction would be a
24 wash, so I mean it's all over those documents'
25    Q     I'm not asking about movants'

Page 227

M. Zmijewski

1
2 motions, in their papers and briefs what they say.
3 The documents I asked about, the three sales
4 transaction agreements, documents, the motion to
5 approve the sale, and the sale order.  In those
6 documents is there anything in there that
7 indicates the deal is somehow predicated on assets
8 having some relation to the liability?
9     MR. TAMBE:  Objection to form.
10    A     I don't recall one way or the other,
11 I don't recall that being the case, but I don't
12 recall those documents well enough.
13    Q     So, one scenario is in which this was
14 more like a sale of a business in which it was
15 known that assets and liabilities were changing
16 and uncertain, and that the sale was not
17 predicated on any particular relationship between
18 assets and liabilities.
19          Do you accept that as one possible
20 scenario for the sales transaction?
21    MR. TAMBE:  Object to form.
22    A     No, no.
23    Q     That is not possible?
24    A     Right.
25    Q     So all Lehman's financial advisors

Page 228

M. Zmijewski

1
2 and lawyers have -- their concept of the deal is
3 just flat wrong?
4     MR. TAMBE:  Object to the form.
5     MS. TABATABAI:  Objection to the
6 form.
7     MR. DAKIS:  Objection.
8     A     I don't think my response "no" to the
9 previous question leads to the conclusion that you
10 just stated in your question, your second
11 question.
12    Q     And have you read Harvey Miller's
13 deposition testimony and Barry Ridings' deposition
14 testimony?
15    A     Yes.
16    Q     And you have seen how they describe
17 the deal?
18    A     Yes.
19    Q     They certainly didn't describe it as
20 being predicated on some certain amount of assets
21 and liabilities, did they?
22    A     Again, it's not certain amount of A
23 or B.  It's what is the net effect.  I don't think
24 they said there was going to be a $13 billion
25 windfall to Barclays.

Page 229

M. Zmijewski

1
2     Q     They didn't believe it was predicated
3 on it being a wash or a gain to Lehman, did they?
4     MR. TAMBE:  Objection to the form of
5 the question.
6     MR. DAKIS:  Same objection.
7     A     I just don't recall their testimony
8 in that level of detail.
9     Q     Is that -- would it be relevant -- I
10 know you have criticized Mr. Pfleiderer for not
11 reviewing and considering certain deposition
12 testimony in this case.  Do you think it's
13 relevant to consider the lead bankruptcy's counsel
14 attorney for Lehman and their lead financial
15 advisors' view of what the sale transaction
16 actually was that was presented to the Court?
17    A     Well, you know, the benchmark
18 hurdle -- I forgot which word you used.  I will
19 call it a benchmark.  The benchmark isn't what
20 their opinion was of the deal.  The benchmark is
21 what the Court's approved deal was, what was the
22 value of that deal.  That is the benchmark.
23    Q     When you say the Court's approved
24 value of the deal, you are certainly not referring
25 to the Court's written sale order which doesn't

Page 230

```
 1          M. Zmijewski
 2  have anything of value in that, and you are
 3  certainly not referring to the motion to approve
 4  the sale, which doesn't have any values in there.
 5  You are certainly not referring to the sale
 6  agreements between the parties, which doesn't have
 7  anything like that there that says that there has
 8  to be a net relationship between the assets and
 9  liabilities being one thing or the other.
10          So, when you are referring to the
11  Court approval, you are referring to Mr. Golden's
12  interpretation of the hearing transcript of the
13  19th?
14          MR. TAMBE:  Objection to the form.
15          MS. TABATABAI:  Objection to the
16  form.
17          MR. DAKIS:  Same objection.
18      A    I am referring to the Court's view on
19  what the value of this deal was that the Court
20  approved, and what I am using for that in my
21  calculation is Mr. Golden's assessment that that,
22  the value of the approved deal, was minus 1.85.
23          So if the Court assumed it was a
24  wash, the number for Mr. Golden becomes zero.  If
25  the Court viewed it as no, they should have had a
```

Page 231

```
 1          M. Zmijewski
 2  gain, a negative goodwill or an immediate gain of
 3  X, well, then my number there would be X.
 4          So at the end of this process,
 5  although Mr. Golden provides a starting point, I
 6  am fairly convinced that the Court will actually
 7  say here is the number, put this number into your
 8  calculation.
 9      Q    So, it's inconceivable to you that
10  the relationship was -- between assets and
11  liabilities was simply not knowable at the time;
12  is that right?
13          MR. TAMBE:  Object to the form.
14          MR. DAKIS:  Same objection.
15          MS. TABATABAI:  Same objection.
16      A    That, you know, I'm not presuming to
17  know what the judge had in his mind or the Court
18  had in its view or not.  I don't have any
19  presumption of that.
20      Q    You rejected there was even a
21  possible hypothetical scenario that this was a
22  sale essentially of a business, most of the
23  business assets, that was not predicated on any
24  total value of assets or total value of
25  liabilities or net relationship between the two;
```

Page 232

```
 1          M. Zmijewski
 2  right?
 3      A    I believe what I said was the -- I
 4  rejected the view that the net value of this deal
 5  was totally irrelevant to the Court.  It could
 6  have been 1 billion, it could have been
 7  100 billion to Barclays' benefit or Lehman's
 8  benefit.
 9          I reject the notion that the Court
10  did not care whether or not there was a positive
11  or a negative number or what the negative -- what
12  the number happened to be.  I rejected the Court
13  didn't care about that.
14          Your question was, essentially it was
15  irrelevant, and I don't think that is irrelevant
16  to a court in bankruptcy.
17      Q    I understand you are offering an
18  opinion as to what the Court cared about and
19  thought.  Put that aside.
20          Let me ask you a hypothetical,
21  separate from this case.  Okay.  Will you accept
22  that it is possible for there to be a transaction
23  in which there is essentially the sale of a
24  business or most of the business assets of a
25  company, if it's done quickly, the assets and
```

Page 233

```
 1          M. Zmijewski
 2  liabilities are not precisely known, and are
 3  changing, and the sale is not predicated on any
 4  particular valuation of the assets, or valuation
 5  of the liabilities or net relationship between the
 6  two?  Are you with me?
 7      A    I understand what you are saying.
 8      Q    Do you accept that that is -- apart
 9  from this case, that is a possible hypothetical
10  sale transaction situation?
11      A    It wouldn't be if I were the
12  financial advisor of the seller or the buyer.
13      Q    Aside from that qualifier, can you
14  accept that as a scenario?
15      A    People are free to do whatever they
16  want to do, so of course it's possible, and there
17  are people who could do irrational things.  I
18  don't believe that would be rational.
19          In that particular situation, if you
20  had that much uncertainty, you would have some
21  kind of true-up ex post, after the fact true-up;
22  right?  So you would say -- so let's in your
23  hypothetical -- we don't know what the value of
24  these assets are, the liability.  We need to cut a
25  deal.  Okay.  Let's cut the deal, transfer the
```

Page 234

```
 1              M. Zmijewski
 2   ownership to you.  However, conditional on that
 3   over the next time period, whatever we specify it
 4   to be, based on these outcomes, you need to true
 5   up.
 6       Q    So if you wanted to have a sales
 7   transaction predicated on some net relationship
 8   between assets and liabilities, in a situation
 9   where you couldn't immediately place accurate
10   values on the assets and liabilities as of the
11   closing date, one way to do it would be through a
12   true-up provision in the contract; correct?
13           MR. TAMBE:  Objection to the form.
14       A    Again, speaking hypothetically?
15       Q    Sure.
16       A    Absolutely.
17       Q    Can you think of any other way to do
18   it in that scenario where you are unable to value
19   assets or liabilities that quickly?
20       A    I can't, as I sit here right now.  If
21   I think of something, I will say it later.
22           The true-up seems to make sense.  At
23   some point you will understand what the assets and
24   liabilities are worth.  The big issue there is can
25   you monitor ex post what those liabilities are
```

Page 235

```
 1              M. Zmijewski
 2   worth or not, what the assets are worth.
 3           In this case, where there is such a
 4   large amount of financial assets, many of which
 5   have readily available prices, an ex post true-up
 6   is more feasible than in a company that makes some
 7   product and it's hard to monitor performance.
 8       Q    In that scenario, where you have sale
 9   of a business, putting aside whether there is a
10   true-up or not, but a sale of a business that is
11   not predicated on assets being a certain amount or
12   liabilities being a certain amount, or a net
13   relationship, I mean, a particular kind, between
14   assets and liabilities, in that situation, would
15   your process of calculating a windfall the way you
16   do be applicable?
17           MR. TAMBE:  Objection to the form.
18       A    With my true-up, it wouldn't be
19   necessary, because we would have a true-up and
20   there would be an automatic trigger mechanism.  So
21   that in this particular case with these numbers,
22   $11 billion would be paid.
23       Q    That is if there was a true-up?
24       A    With a true-up.
25       Q    But even in that situation, your,
```

Page 236

```
 1              M. Zmijewski
 2   your -- whether there is a true-up or not a
 3   true-up, your -- it wouldn't make sense to try to
 4   do your windfall calculation in that situation.
 5   It wouldn't make sense to call it a windfall if
 6   the deal is not predicated on a certain
 7   relationship between assets and value -- and
 8   liabilities; correct?
 9       A    Well, first I -- you said with a
10   true-up or without a true-up.  I reject the
11   without a true-up.  The hypothetical is
12   economically irrational and shouldn't even be
13   considered.  So I wouldn't even consider that as a
14   hypothetical, because it shouldn't happen.
15           But in the case of where there is a
16   true-up, then this calculation is not necessary,
17   because there is an automatically triggered
18   calculation that does the same thing.
19           So you can think about -- it's an
20   interesting point.  This calculation is sort of
21   like a true-up; right?  It's very similar to a
22   true-up.  And it happens to be that there isn't a
23   true-up, or at least the true-up was taken out of
24   the contract.  So there isn't a true-up anymore.
25   And this calculation essentially does that
```

Page 237

```
 1              M. Zmijewski
 2   true-up.
 3       Q    It's your understanding that there
 4   was a true-up in the contract?
 5       A    Based on my reading, there seemed to
 6   be.
 7       Q    That would perform a similar function
 8   as to your windfall calculation?
 9           MR. TAMBE:  Objection to form.
10       A    Here's my understanding, that it
11   would be similar, and mostly for the financial
12   assets, though, so it wouldn't take into
13   consideration the non-financial assets.  For
14   non-financial assets there was the repo
15   collateral.
16           My understanding of the repo
17   collateral was there was a liability, so at the
18   end of the day that should have gone through a
19   process to be liquidated or somehow exchanged, and
20   the repo collateral should have been trued up, and
21   it's only through the clarification letter, if I
22   remember that correctly, that -- calling it a
23   true-up, that true-up was taken away.
24           And then my recollection is, in the
25   asset purchase agreement, for certain assets there
```

Page 238

M. Zmijewski

1  was a payment to Lehman of, from the realization
2  of -- I think it's over $500 million of profits,
3  that Lehman gets a certain part or maybe all of it
4  for a certain amount.
5        So there were some true-ups in these
6  contracts, as I recall.
7     Q     In your view, did the Court approve
8  the removal of what you are referring to as a
9  true-up provision?
10    A     I am not a lawyer.  I don't know what
11 the Court approved or didn't approve.  You are
12 pulling me out of my territory again.
13    Q     Do you know whether it was disclosed
14 to the Court or not, the removal of the true-up
15 provision?
16    A     Well, I believe the asset purchase
17 agreement was disclosed to the Court.  My
18 understanding based on the transcript from last --
19 last week -- was it last Friday?  Based on that
20 transcript, that the Court did not approve the
21 clarification letter.
22       I don't know if the Court saw the
23 clarification letter or not, but my understanding
24 is that the Court didn't approve the clarification

Page 239

M. Zmijewski

1  letter, and that's when I believe the change
2  happened for the repo assets.
3     Q     Do you know whether the removal of
4  what you are referring to as a true-up provision
5  was raised with the Court or not at the sale
6  hearing?
7     A     I don't recall.
8     Q     Is that of any significance to you,
9  either way?
10    A     Only in that I might answer your
11 question differently.  It has no effect on -- this
12 conversation, at least based on what I am hearing
13 of it so far, has no effect on my calculations.
14 It's sort of off on a tangent from what I can
15 tell.
16    Q     Let me go back to the hypothetical
17 that you haven't answered yet.  I will try it one
18 more time.
19    A     I am trying.
20    Q     If you have a sale transaction, in
21 which the sale transaction is not predicated on
22 assets being a certain value, liabilities being a
23 certain value or any particular net relationship
24 between the two, and you don't have a true-up

Page 240

M. Zmijewski

1  provision, in that situation your windfall
2  calculation or approach would not be appropriate;
3  correct?
4        MR. TAMBE:  Objection to the form of
5     the question.
6     A     There is no such calculation to make.
7  There can't be a claim, because at the end of the
8  day, we agreed to transact at whatever price we
9  transacted at, and it doesn't really matter what
10 happens.  That is what you are saying, that is
11 your hypothetical.
12       So that means no matter what happens,
13 good or bad, no matter what information was
14 withheld from either party, it doesn't matter what
15 happened, that transaction is over.  That is what
16 your -- that is your hypothetical.
17       If that is your hypothetical, then
18 there is no calculation like this or true-up or
19 any other calculation.
20    Q     Well, you added in something about
21 information withheld to the parties.  My -- you
22 understand my hypothetical is simply that the
23 parties agreed to a sales transaction which was
24 not predicated on assets, liabilities or a net

Page 241

M. Zmijewski

1  relationship between the two, and it did not have
2  a true-up provision.
3        In that situation, without adding
4  anything else into that hypothetical, would you
5  agree that your windfall approach would not be
6  applicable?
7     A     Same answer that I gave previous.
8     Q     So you agree with me?
9     A     Yes.
10    Q     What is your definition of the term
11 "book value"?
12    A     I thought Mr. Garvey did a great job
13 at outlining book value, and I would refer you to
14 his report.  There is nothing in his report on
15 book value or anything else that I disagree with.
16    Q     Can you tell me your general
17 understanding of the term "book value"?
18    A     I have it in my report of course, but
19 I refer to Mr. Garvey.
20       You want a closed book test again.
21    Q     On this one question, I would like
22 what you understand book value to be, if it has a
23 set meaning or different meanings to different
24 people or only one meaning.  What is that meaning?

---

Page 242

M. Zmijewski

1  What does book value mean?
2
3      A    I think we need to restrict it
4  somehow to at least be we are talking about
5  companies and financial terms rather than grocery
6  list or something, okay.
7      Q    Sure.
8      A    All right.  So, keeping it in that
9  business framework, book value is the value of an
10 asset on a balance sheet, or liability.  It's the
11 value of an item on a balance sheet, whatever that
12 item is.
13     Q    And when you say that it's value,
14 would that be a fair market value?
15     A    No.  It's the value that's on the
16 balance sheet.
17     Q    What is written down?
18     A    Whatever is on the balance sheet.
19 Based on the accounting rules, it could be fair
20 value, or based on -- for a different type of item
21 at a different point in time, it might not be fair
22 value.
23     Q    I think we covered this earlier in
24 the day, but if a purchaser buys an asset that is
25 on the seller's book at $100, but in reality the

---

Page 243

M. Zmijewski

1
2  fair market value of that asset everyone agrees is
3  $90, and the purchaser pays $90 for the item, has
4  the purchaser received a discount?
5          MR. TAMBE:  Objection to the form of
6      the question.
7      A    So, the market value everybody agrees
8  is $90?
9      Q    Yes.
10     A    So it happens to have a book value of
11 $100?
12     Q    Yes.
13     A    It doesn't represent market value.
14     Q    Right.
15     A    Then it's -- it's an irrelevant
16 calculation.  There is no gain or loss.  There is
17 no concept of gain or loss in that way.
18     Q    The question is, if the purchaser
19 pays 90 for it, have they received a discount?
20         MR. TAMBE:  Object to the form.
21     A    There is no -- well, there is a
22 discount off of book value.  Again, discount
23 has -- it's such a broad term.  So there is a
24 discount off of the book value, but that discount
25 doesn't have an economic meaning related to a gain

---

Page 244

M. Zmijewski

1
2  or a loss.
3      Q    So if you were just asked -- can you
4  answer yes or no whether a purchaser in that
5  scenario where the book value says 100, but the
6  fair market value is really 90, and the seller
7  pays -- and the purchaser pays 90 for it, has that
8  purchaser received a discount?
9          MR. TAMBE:  Object to the form.
10     A    I can't answer yes or no.  I cannot
11 answer yes or no.
12     Q    Is that because the question is
13 vague?
14     A    Because you need to specify what the
15 book value is to which you refer.  If the book
16 value is some value on the books of $100, for
17 example, a fixed asset that isn't marked to
18 market, so it's not related to market value, it's
19 independent of market value, then there isn't a
20 discount.
21         If it is a market value and it's an
22 appropriate market value, then there would be a
23 discount.  But then we have this conflict of how
24 can both of those numbers be market value.  So we
25 have a conflict.

---

Page 245

M. Zmijewski

1
2         It's -- naturally hypotheticals are
3  not so clean-cut.  There are always complexities
4  involved.
5      Q    Well, let's say in a hypothetical
6  where your book value is 100, fair market value is
7  90, and the reason for the difference is either
8  because the book value hasn't been updated
9  recently or because it was just wrongly marked,
10 overly aggressively marked.
11         In that scenario where the purchaser
12 pays 90 for the asset, which has a fair market
13 value of 90, has the purchaser received a
14 discount?
15         MR. TAMBE:  Object to the form.
16     A    Again, you have to define discount.
17 So a discount relative to fair value, the answer
18 is no.  Discount relative to the book value, the
19 answer is yes.
20         Discount doesn't have a specific
21 meaning.  It could be a discount to either of
22 those.  It just means a reduction from one value.
23     Q    At paragraph 26 of your report, you
24 say you adjusted compensation liability to
25 1.5 billion.  Do you see that?

Page 246

M. Zmijewski

1        M. Zmijewski
2     A    Yes.
3     Q    Now, you don't question that Barclays
4  incurred these other expenses that you identify in
5  your footnote in connection with the sale
6  transaction, do you?
7     A    I do not.
8     Q    Why do you discount them as
9  liabilities then if --
10     A    I don't discount them as liabilities.
11  My understanding from the movants' position -- of
12  the movants' position is that only the -- the only
13  liability that was represented to the Court was
14  liability related to bonuses and not these other
15  liabilities.  So, I do not include those other
16  parts of the liabilities because they don't relate
17  to the bonus.
18     Q    And so there are expenses incurred --
19  and remind me, where does this feed into your
20  report, this --
21     A    It would be under reported cash
22  consideration and liabilities, B-1, B as in boy
23  one, adjusted comp, severance subtracted.
24        So the difference is between the
25  $2 billion and the $1.55 billion.  That difference

Page 247

1  is not related to bonus.  It's severance
2  subtracted.  It's my understanding the position of
3  the movants is that that severance should not be
4  included.
5     Q    And where does that understanding
6  come from?
7     A    From counsel.
8     Q    So they just told you to assume that
9  and back those numbers out.  This isn't based on
10  some independent expertise or analysis on your
11  part.
12     A    What they said was the severance is
13  not part -- should not have been included, and
14  then once they told me that, I did the calculation
15  to exclude the severance.
16     Q    Okay.  And if you would turn to
17  paragraph -- excuse me, paragraph 40 of your
18  report.
19     A    Okay.
20     Q    You make some observations concerning
21  the RESIs, residential -- you understand what I
22  mean by RESIs?
23     A    I do.
24     Q    And what is that?  What do you mean

Page 248

M. Zmijewski

1        M. Zmijewski
2  by RESIs?
3     A    What I believe you mean by RESIs is
4  residential mortgages and mortgage-backed
5  securities?
6     Q    Right.
7        What is the point here that you are
8  making in paragraph 40?
9     A    Well, I think it's clear if you look
10  at the exhibit, which is -- I got all mixed up,
11  sorry.  D, as in David, 1.
12        I was asked the question:  What
13  percent of the mortgage and mortgage-backed
14  securities were transferred to Lehman's, and what
15  amount of value.  So, I -- the Exhibit D-1
16  calculated just that.
17     Q    I think you meant to say to Barclays.
18     A    Thank you.
19     Q    To what end?
20     A    I was asked this question by movants'
21  counsel, what mortgages, mortgage-backed
22  securities were transferred to Barclays from
23  Lehmans, and this calculation is the answer to
24  that question.
25     Q    You don't draw any significance or

Page 249

1  relevance of it, you are just responding to a
2  specific question from the lawyers?
3     A    Well, it answers a specific question,
4  so that's my opinion, that 67 percent of the
5  mortgage, of the value of the mortgage and
6  mortgage-backed securities in Lehman, from Lehman,
7  was transferred to Barclays.
8     Q    There is no relevance as far as you
9  are aware to your windfall calculation?
10     A    It is not an input into my windfall
11  calculation.
12     Q    That is, you were asked a question,
13  you answered a question, and that's the sum of the
14  reason you included it in your report; right?
15     A    Correct.
16     Q    Did you use a -- in your calculation
17  of the percentage, your numerator and denominator,
18  they involved different dates; right?
19     A    My calculation of 70.3 percent, do
20  you see that number?  It's the fourth line down,
21  on the right hand -- oh, I'm sorry.  It was on the
22  exhibit.  My apologies.  The forth line down to
23  the right, 70.3 percent?
24     Q    Um-hum.

## Page 250

M. Zmijewski

1
2     A     All of that analysis is based on
3   September 16th, 2008, the inventory that was
4   provided from Lehmans to Barclays with respect
5   to -- they were providing all the inventory, but
6   one of the spreadsheets was related to mortgage
7   and mortgage-backed securities, and I analyzed
8   that spreadsheet.
9          To make sure that I had just another
10  way to view it, the numerator of that calculation,
11  instead of using the Lehman prices, which had a
12  total value of 4.226, I used the custodial price
13  marks, and those price marks are available as of
14  9/19.  So for that second calculation, which is
15  more conservative than the first, I used the
16  custodial marks of 4,034,000,000, and it is a
17  different date, 9/19.
18    Q     Why did you use different dates?
19    A     Because the inventory that was being
20  sent over and the records that were being
21  transferred are on 9/16 and the custodial marks
22  are 9/19, and neither one exists on the other
23  date.
24    Q     If you could turn to page 34 of your
25  report.

## Page 251

M. Zmijewski

1
2          And just going back to your last
3   answer, what was your source for determining the
4   RESIs?
5     MR. TAMBE:  Object to the form of the
6   question.
7     Q     The values that you used.
8     A     There was a series of e-mails that --
9   which is footnote 72.  If you look on page 23,
10  there are three e-mails that included eight Excel
11  files.  These e-mails are from Lehman to Barclays
12  identifying here is our, here is our valuation of
13  all of our different financial assets, and it's in
14  eight different Excel files.
15          One of those files contained the
16  residential mortgages, mortgage and
17  mortgage-backed securities, not residential,
18  mortgage and mortgage-backed securities, of which
19  a subset was residential.  That is the source of
20  the first four lines.
21          And that then the next line,
22  custodial values, are from the BoNY custodial
23  values and the JPM Annex A asset values, and that
24  is in -- I don't know what footnote it is in the
25  text.  It is in footnote two to the table D-1.

## Page 252

M. Zmijewski

1
2          Then the specific cites are given, in
3   that note two to table D-1.  It would be in one of
4   the footnotes in the text as well, but I can't
5   grab it right away.  I can look for it if you
6   would like.
7     Q     That's okay.
8          Turning to the footnote 115 on
9   page 34, you reference a conference call with
10  analysts on September 17th, 2008, in which
11  Barclays announced the Lehman acquisition will
12  improve its capital ratios.
13    A     Yes.
14    Q     The transaction is capital ratio
15  accretive without additional equity issuance.
16    A     Yes.
17    Q     Did you review the transcript of that
18  call?
19    A     Yes.
20    Q     What was the purpose in your
21  reviewing it?
22    A     I just wanted to -- Professor
23  Pfleiderer talks about it, so I wanted to read
24  what he wrote.
25    Q     Does that -- sorry.

## Page 253

M. Zmijewski

1
2          In the conference call, does Barclays
3   indicate that they expect to have a gain on the
4   transaction, meaning that assets will be greater
5   than liabilities?
6     A     Yes.
7     Q     So it's clear from reading the
8   conference call that Barclays was at this time not
9   expecting the deal to be a wash or for them to
10  have to have a loss in terms of assets being more
11  than liability -- liabilities being more than
12  assets; correct?
13    MR. TAMBE:  Objection to the form of
14  the question.
15    A     Correct.
16    Q     And the gain that is being described
17  by Barclays, capital ratio accretive and so forth,
18  is not just a purchase accounting gain, but rather
19  a gain in terms of assets being greater than
20  liabilities; correct?
21    MR. TAMBE:  Objection to form.
22    A     They are one and the same thing,
23  so --
24    Q     Fair enough.
25          The gain was -- was it your

Page 254

M. Zmijewski

1         M. Zmijewski
2 understanding from reading the conference call
3 that the gain was -- did not just involve
4 non-financial assets, but the actual financial
5 assets would be greater than liability?
6         MR. TAMBE: Object to the form.
7    A   No. It was the total assets. It was
8 the deal. It was the effect of the deal. It
9 wasn't financial, just financial or just
10 non-financial. It was the deal itself, the entire
11 deal, contrasting -- similar to Mr. Golden's
12 1.85 billion negative number, they have after tax
13 the positive $2 billion.
14    Q   You use the term "fire sale." What
15 is a fire sale?
16    A   I used the term?
17    Q   Yes, you do.
18    A   Oh, in my report?
19    Q   Yes.
20    A   Oh, okay.
21         That is the term that Professor
22 Pfleiderer used, and I would interpret that term
23 to be different from a willing buyer, willing
24 seller, where both side have information and
25 neither side has some type of pressure or stress

Page 255

M. Zmijewski

1         M. Zmijewski
2 to sell.
3         I would view it not that, but indeed
4 that it's a price at which one of the parties had
5 some type of pressure to sell. So it would not be
6 a fair market value.
7    Q   So if a party was forced to sell
8 something quickly, that asset -- and they had an
9 auction and got the best available price for that
10 asset, and it sold at $100, the $100 would not be
11 the fair market value for that asset?
12    A   Because they were forced to sell it.
13 The whole notion of a fire sale is that they were
14 forced to sell it, and they could sell it for
15 something else if they were not forced to sell it.
16 The whole notion of a fire sale is that you are
17 selling something below what you could sell it if
18 you had sufficient time to go through the standard
19 normal process.
20    Q   It's a function of time, time
21 pressure or time horizon to sell?
22    A   Fire sales are usually a function of
23 time; correct.
24    Q   In a situation where someone has,
25 instead of, you know, six months to sell

Page 256

M. Zmijewski

1         M. Zmijewski
2 something, they have a week to sell something, and
3 they have an auction and a bid, and the price, the
4 asset goes for $100, you would say that is not
5 fair market value because that time pressure --
6 the time span for selling it was short?
7    A   It doesn't meet the -- the definition
8 of a market value is where -- part of the
9 definition is where neither party has some undue
10 reason to sell, so that they are not pressured to
11 sell. The IRS has a definition like that. The
12 courts have a definition like that.
13         So, the very nature of your
14 hypothetical is that it violates that definition
15 of fair market value or market value.
16    Q   So, was Barclays' sale -- excuse me.
17         So, was Lehman's sale of its assets a
18 fire sale?
19    A   I don't know the answer to that.
20    Q   What would it depend on?
21    A   Did Barclays pay market value or
22 didn't they pay market value? Based on the
23 calculations that I have here, it indicates that
24 they did not pay market value.
25    Q   When you say based on the

Page 257

M. Zmijewski

1         M. Zmijewski
2 calculations that you have here --
3    A   My calculations calculate the fair
4 value of the assets and the consideration and the
5 difference of $11 billion. They did not pay,
6 Barclays did not pay $11 billion.
7    Q   I want to unpack that, but you will
8 agree that a lot of those calculations are made by
9 others and you are relying on them; correct?
10    A   Correct.
11    Q   Now, if you think of the Barclays
12 sale in terms, and the Lehmans sale in terms of
13 the sale of a business that has been on the block
14 for months, and then finally gets sold for X,
15 isn't X arguably the market value?
16    A   Is this a hypothetical or --
17    Q   Yes.
18    A   -- trying to portray the facts?
19    Q   We will treat it as a hypothetical,
20 despite possible similarities with our case.
21    A   You said that under your breath. I
22 don't know if the microphone picked it up.
23    Q   She got it. It's up here.
24    A   Okay.
25         If in fact it was an orderly sale,

Page 258

M. Zmijewski

1  and at the time of the sale -- so a fire sale
2  typically happens because you don't have enough
3  time.  If at the time of the sale, if the party
4  had some type of pressure to sell, which is
5  usually a function of time, then, then independent
6  of time, it's not a fair market value.  It
7  violates the definition of fair market value.  If
8  they had pressure to sell.  If they were forced
9  for some reason to sell.
10    Q    How much time do they have to have in
11  order for it not to be a fire sale?
12    A    It is not just time.  It's at the
13  time of the sale.  Time is usually a part of this
14  calculation or part of this assumption, if you
15  have to sell immediately.  So the issue is at the
16  time of the sale, do they have un- -- some undue
17  pressure to sell because of some liquidity issues
18  or some other issue where they need to dispose of
19  the asset, where in an orderly disposition the
20  price would be different.
21    Q    So if I, I take it, I have to sell my
22  house within a year, and I have it on the market
23  for a year, and the year comes up, and in the year
24  I take the best offer available, is that fair

Page 259

M. Zmijewski

1  market value for the house?
2    A    No, it would not be.  It could -- it
3  might not be.  It depends.  If you are right at
4  the I have to sell tomorrow, and somebody makes
5  you an offer and they make you a lowball offer,
6  and you say I have to take it, I know it's not the
7  right price or it's not the price I could get if I
8  just kept waiting, then it's not fair market
9  value.
10    Q    If you would turn, please, to page 50
11  of your report.
12        Now, you say that movants -- strike
13  that.
14        You take exception to
15  Professor Pfleiderer's view that the presence of
16  some $5 billion discount with respect to the
17  $70 billion assets referred to in subpart D of the
18  purchase, the purchase agreement -- strike that.
19        Do you under- -- do you understand
20  this issue about a $5 billion discount, what it's
21  referring to?
22    A    Yes.
23    Q    What is it?  What is the issue?
24    A    It's referring to a discount on

Page 260

M. Zmijewski

1  the -- I will call it the repo collateral.  I
2  think that is what Mr. -- Professor Pfleiderer
3  calls it.
4    Q    Did you ever do anything to try to
5  value Lehman's assets as of any date prior to
6  September 17th?
7    A    I did not.
8    Q    The reference to $70 billion in
9  subpart D of the asset purchase agreement,
10  definition of purchased assets, do you have any
11  idea or any opinion as to whether that is an
12  accurate, reasonably accurate estimate of book
13  value -- excuse me, reasonably accurate estimate
14  of fair market value for those assets that are
15  referred to?
16    A    I do not.
17    Q    So, with respect to the -- you state
18  in paragraph 102 of your report, it is possible
19  that a $15 billion existed.
20        MR. TAMBE:  Five billion.
21    Q    $5 billion discount existed at the
22  inception of the transaction.  Do you see that?
23    A    I do.
24    Q    What do you mean by the inception of

Page 261

M. Zmijewski

1  the transaction?
2    A    Professor Pfleiderer -- if you go to
3  paragraph 98, this section of my report refutes
4  his opinion.  And my opinion eight is quoted from
5  Professor Pfleiderer:  "The movants' assertion of
6  a secret $5 billion discount from inception is
7  implausible."
8        So that is his opinion, and what I do
9  in the remainder of this section is refute that
10  opinion.  And so I just -- and his
11  characterization of inception, so I am using
12  inception as he used it, his characterization of
13  inception was that when the deal was starting to
14  be negotiated and discussed prior to the closing,
15  at that point in time.  That is how I interpreted
16  his report, and that's what I interpreted to be
17  inception.
18        And his opinion that -- is that it's
19  implausible, and I believe I documented clearly
20  that he doesn't have foundation and therefore it
21  is plausible.
22    Q    You say that it is possible.  Have
23  you reached -- possible that a $5 billion discount
24  existed at inception of the transaction.  Have you

Page 262

1           M. Zmijewski
2    reached any opinion as to whether it is likely or
3    unlikely?
4        A    Looking at the valuation experts'
5    analysis, the exhibit that we discussed earlier,
6    $5.1 billion is -- maps to this $5 billion, so
7    based on that evidence, the answer would be that
8    it is plausible and likely and -- that it existed.
9        Q    Is that based on anything other than
10   that?
11       A    No.
12       Q    Why do you say -- if you now believe
13   that it is likely, why is it you didn't say that
14   in your report?
15           MR. DAKIS:  Objection to form.
16       A    I do discuss in that previous
17   section, the undervaluation of the assets, which
18   is the 5 billion -- is equivalent to a $5 billion
19   discount.
20           Professor Pfleiderer was using
21   specific words in a specific context, and this
22   section of my report refutes his statement, and
23   his singular statement.  Well, and -- his
24   statement, which is a summary statement of a
25   number of other conclusions that he has in section

Page 263

1           M. Zmijewski
2    three of his report.
3        Q    You have seen your $5 billion
4    discount referenced in movants' papers; correct?
5    That you have read?
6        A    Correct.
7        Q    What do you understand that to be
8    referring to?
9        A    I believe it's the same as this
10   $5 billion discount, and it was a negotiated
11   discount off of the repo collateral.
12       Q    So that the repo collateral was
13   really worth the 49.7 that it was marked at?
14           MR. TAMBE:  Objection to the form of
15   the question.
16       Q    Is that part of this?
17           MR. DAKIS:  Same objection.
18       A    Yes.
19       Q    And the fact that the parties treated
20   it as being less than that for purposes of the
21   transaction, is that where the discount comes in?
22       A    Well, the movants had -- if I -- it's
23   been quite a while since I read those documents.
24   My recollection is that the movants have two
25   positions.

Page 264

1           M. Zmijewski
2        Position one was that the initial
3    decision was to mark down the value of the assets,
4    and by marking down the value of the assets, it
5    would be an embedded $5 billion discount.  If I
6    could finish.  I think that -- I believe that is
7    what is in their motion.  I might be wrong.  I
8    might not be remembering correctly.
9        The second position they have is that
10   the change because there was what I call the
11   true-up in the repo collateral was taken out in
12   the clarification letter, the alternative way that
13   Barclays was able to capture the discount was
14   through not having a true-up of the repo
15   collateral.
16       That is my recollection.  I haven't
17   read that in some time, but this again is just a
18   recollection of the movants' motions, and they are
19   what they are.
20       Q    On the first point, were you aware of
21   any evidence that Lehman's assets were marked down
22   by $5 billion?
23       A    If I didn't say it in my previous
24   response, their initial -- I believe the position
25   of the movants, and I mean, you can read their

Page 265

1           M. Zmijewski
2    documents, I am sure you have -- so, the initial
3    position was the discount was going to be
4    effectuated through a reduction in the book values
5    of Lehman's, but then was not, and was executing
6    through reversing or negating the true-up for the
7    repo collateral.  That is my recollection of their
8    position.
9        Q    Okay.  And on the first position, are
10   you referring to the assertion that the
11   $70 billion referred to in subpart D of the APA
12   was really worth more like $75 billion?
13       A    I would have to look at their
14   motions.  They pulled testimony from different
15   deponents.  I don't remember all that testimony.
16       Q    Do you recall whether there actually
17   was any markdown -- strike that.
18       Do you know whether the first
19   scenario you described had any residual impact on
20   the second scenario?
21       A    I don't.
22           MR. TAMBE:  Objection, objection to
23   the form of the question.
24           MR. DAKIS:  Same objection.
25       Q    Now, when you are giving your expert

## Page 266

M. Zmijewski

1  testimony opinion about the $5 billion discount,
2  let me just make sure I understand which -- what
3  discount you are talking about, and that, and that
4  is your assertion that the repo assets were really
5  worth $5 billions more than -- than what?
6      A    Than they were recorded in the
7  opening balance sheet of Barclays.
8      Q    And what were they recorded in the
9  opening balance sheet of Barclays at?
10     A    This is on Exhibit A-2. It's
11  44.43 billion. It's the second column of numbers.
12     Q    You say A-2?
13     A    A-2. Apple two. Second column of
14  numbers, very last number.
15     Q    And that's your understanding of
16  the -- that is your understanding of Barclays'
17  final valuation of the repo collateral?
18     A    Well, I am not sure what you mean by
19  final. It's the valuation that was put in their
20  opening balance sheet that was provided.
21     Q    Okay.
22     A    To the shareholders, and the SEC and
23  all the regulatory agencies.
24     Q    That is your understanding of what

## Page 267

M. Zmijewski

1  Barclays' valuation in their -- after their
2  audited financial process was of the repo?
3      A    Yes. This comes from Schedule 88-B.
4      Q    And you are saying that the Chicago
5  Partners valuation of that or calculation of
6  valuation perhaps based on other marks was
7  49 billion?
8      A    49.5; correct.
9          THE VIDEOGRAPHER:  Counsel, I have to
10  change the tape.
11          MR. THOMAS:  Go ahead.
12          THE VIDEOGRAPHER:  That is the end of
13  tape number four.  The time is now 4:46 p.m.
14          We are now off the record.
15          (Pause)
16          THE VIDEOGRAPHER:  This is the start
17  of tape number five.  The time is now
18  4:47 p.m.
19          We are now back on the record.
20  BY MR. THOMAS:
21     Q    And the $5 billion discount that you
22  referred to, you talked about in your report, is
23  the difference between the 49.5 and the 44.4?
24     A    Correct.

## Page 268

M. Zmijewski

1      Q    That is what you are talking about
2  when you talk about the $5 billion difference,
3  discount?
4      A    Well, I characterize it as an
5  undervaluation.
6      Q    Okay. And that is a big difference,
7  though, right, undervaluation and discount?
8          MR. TAMBE:  Object to the form.
9      Q    Or is it?
10     A    "Discount" is such a broad term. You
11  know, you go to the Walmart store and you get
12  discounts. I mean, it's such a broad term used in
13  so many different ways.
14          It's a discount off the market value.
15  An undervaluation. If somebody pays less than
16  fair market value, one can characterize that as a
17  discount. I call it an undervaluation. I think
18  that is a more precise term, indicating that the
19  value on their opening balance sheet is less than
20  the value calculated by these valuation experts.
21     Q    Now, the valuation experts calculated
22  this amount, and I think -- is it accurate that
23  most of them, like yourself, relied on other
24  valuations to do their calculations, by other

## Page 269

M. Zmijewski

1  persons, or did they go out there and try to
2  independently value these assets?
3          MR. TAMBE:  Object to the form of the
4  question.
5          MR. DAKIS:  Same objection.
6      A    It's a mix of the two.
7      Q    And what you are referring to as the
8  mix that is independently valuing, you mean going
9  and looking up things in Bloomberg to see prices
10  and so forth?
11          MR. TAMBE:  Object to the form.
12     A    I just didn't understand -- some of
13  what they did was comparable pricing.
14  Mr. Schwaba, I don't know if you deposed
15  Mr. Schwaba, but Mr. Schwaba discussed his
16  comparable pricing where he found similar
17  securities and used those securities to price the
18  securities at issues. That is a valuation method.
19          Some of it is looking up third-party
20  prices and using third-party pricing, which is
21  what I did and Barclays does for the equities.
22          And some of it then is having --
23  adopting a detailed valuation model and measuring
24  the inputs into that valuation model and pressing

| Page 270 | Page 271 |
|---|---|

**Page 270**

1  M. Zmijewski
2 the button to do the calculations.
3  So, that is another form of
4 valuation, and Mr. Olvany, Mr. Slattery, used all
5 three of those methods.
6  Q  And this $49 billion figure was
7 calculated in late 2009, or early 2010?
8  A  Early 2010.
9  Q  And the $44.4 billion figure, as you
10 cited, was calculated by Barclays approximately
11 when?
12  A  I don't remember when they had
13 their -- they have a -- they came with a
14 preliminary balance sheet that turned out to be
15 very close to their final coming balance sheet.
16 I don't remember the date of that. It's sometime
17 in the middle, roughly in the middle of 2008.
18  Q  Nine?
19  A  Nine.
20  Q  2009?
21  A  Roughly in the middle of 2009, thank
22 you.
23  Q  So both of these figures are ex post
24 at least months after the sale transaction, that
25 these amounts were calculated; right?

**Page 271**

1  M. Zmijewski
2  A  I wouldn't use ex post in the same
3 way. It's confusing. Because there is two ways
4 to use -- to say something is ex post. One is to
5 use ex post information, the other is to do it
6 after the date.
7  Barclays valued these assets after
8 the closing date and used after-the-fact
9 information.
10  Q  Okay.
11  A  Where the valuation experts only --
12 although they conducted the valuation in 2010, it
13 was using information as of the closing date.
14  Q  Both calculations were done months or
15 years after the sale transaction; correct?
16  A  Correct.
17  Q  Do you know what Barclays' valuation
18 or estimate or view of the value of the repo
19 collateral was at the time of the sale
20 transaction, if they had one?
21  MR. TAMBE: Object to the form.
22  A  I don't know that there was one view.
23 I don't know that they had a specific view at the
24 time of the sales transaction. Clearly there is
25 evidence in the record from individuals from

**Page 272**

1  M. Zmijewski
2 Barclays stating certain numbers related to the
3 value of these assets.
4  Q  Do you recall --
5  A  But I don't know if that is a
6 Barclays view or individuals at Barclays.
7  Q  Do you recall the rough range of
8 those numbers?
9  A  My Exhibit E, Edward, dash one, lists
10 different individuals, not all Barclays
11 individuals. Some of these individuals are from
12 Barclays.
13  Q  And you think -- you -- part of your
14 assumption in doing your work was that these
15 reflect, these values reflect Barclays' view of
16 the amount of the repo collateral?
17  A  That is not what I said. You asked
18 me the question did Barclays have a view, and my
19 answer was, well, some individuals gave testimony
20 about the number, and I don't know if that is
21 Barclays' view or the individuals' view, but there
22 is factual evidence on what some individuals at
23 Barclays said about the valuation.
24  Q  Are you aware of anyone at Barclays
25 at the time or representing Barclays at the time

**Page 273**

1  M. Zmijewski
2 expressing the view that the value of the repo
3 assets were substantially lower than 49.7, closer
4 to the $45 billion range?
5  MR. TAMBE: Objection to the form.
6  A  I don't remember.
7  Q  How did you pick out these particular
8 e-mails?
9  A  Searching the records, this is the
10 information I observed that was valuing these
11 assets somewhere between the 18th and the 20th of
12 September, 2008.
13  Q  So you went out and searched the
14 records yourself or had someone do it under your
15 direction?
16  A  The Chicago Partners staff did, yes.
17  Q  And the directive was to find
18 evidence of what Barclays viewed the value of the
19 repo collateral as?
20  A  No. These are not all Barclays
21 individuals. It was in the record what testimony
22 was offered related to the value of the repo
23 assets, so Ms. Leventhal, for example, was someone
24 who was at the New York Fed, so. And some of
25 these individuals -- there are two notes from the

Highly Confidential

| Page 274 | Page 275 |
|---|---|

**Page 274**

M. Zmijewski

1           M. Zmijewski
2 court transcript, and Mr. King of course is from
3 the Malloy or from Barclays. Mr. Tonucci is from
4 Lehman.
5       It was just a collection of, for
6 these dates, what were people saying related to
7 these dates the value of these assets were. It
8 was just part of the record, so I put it on an
9 exhibit.
10     Q    So you think Mr. King thought the
11 value of the repo collateral was over $52 billion?
12     A    I don't know what he thought. I only
13 know what he wrote.
14     Q    But is that an indication of what
15 he -- what you get, what you want to get is what
16 they thought; right? What they thought the value
17 was?
18          MR. TAMBE: Objection to the form of
19 the question.
20          MR. DAKIS: Same objection.
21     A    The -- the work of -- I don't know
22 what he thought. He was deposed, I am sure. I
23 don't know if he discussed this issue or not,
24 and --
25     Q    Did you read his deposition?

**Page 275**

M. Zmijewski

1           M. Zmijewski
2     A    Mr. King's, I did. I looked at all
3 these depositions. I just don't recall what he
4 said about this.
5     Q    Your take-away from Mr. King's
6 deposition was that he thought the repo collateral
7 was, fair market value, worth $52 billion?
8          MR. TAMBE: Objection to the form of
9 the question.
10     A    I don't believe I said that. I
11 believe I said that this is an e-mail that
12 Mr. King wrote, and in that e-mail he indicated
13 the value of the repo collateral was
14 $52.3 billion.
15     Q    Are you putting this in there to try
16 to suggest to the Court that Mr. King thinks the
17 value is $52 billion?
18          MR. DAKIS: Objection to form.
19     A    I created this exhibit in response to
20 Professor Pfleiderer's statement that because of
21 the stress and the timing and that individuals
22 weren't deposed for some time later, we should
23 ignore all the evidence in the record with respect
24 to timeliness, timely statements of what the value
25 of the assets was.

| Page 276 | Page 277 |
|---|---|

**Page 276**

M. Zmijewski

1           M. Zmijewski
2       So in response to that, I collected
3 the valuation information that was relevant to
4 these particular dates.
5     Q    Okay. So, is it your sum and total
6 take-away that Barclays has had a view that the
7 collateral was worth near $49 billion or less than
8 that, or do you have any view, or you just don't
9 know what Barclays' view was?
10     A    As I said before, I don't have an
11 opinion one way or the other what Barclays' view
12 was.
13     Q    How about Lehman's view of the value
14 of the repo collateral as the collateral was
15 actually delivered to -- strike that.
16       What do you understand of Lehman's
17 view of value of the collateral as of the 19th?
18     A    Again, some of these individuals --
19 Mr. Tonucci was the treasurer of Lehman. So some
20 of these individuals made statements about what
21 the value of that collateral was. Again, I don't
22 know that these individuals represent Lehman's
23 view. I'm not sure what the -- what you -- how
24 you would define a Lehman's view. Who has to do
25 that? There must be some legal way to figure out

**Page 277**

M. Zmijewski

1           M. Zmijewski
2 what a Lehman's view is.
3       These were individuals from Lehman,
4 and this is what they wrote in documents or
5 testified to in the court transcript or in some
6 other hearing.
7     Q    Now, when you say -- when you refer
8 to a discount, what -- between these numbers, a
9 $5 billion difference between these numbers, what
10 exactly are you saying when you say "discount"?
11          MR. TAMBE: Objection.
12     Q    Does that mean simply that Barclays
13 is -- there wasn't a separate payment made for the
14 repo collateral, was there?
15          MR. TAMBE: Objection to the form of
16 the question.
17          MR. DAKIS: Same objection.
18          MR. TAMBE: Objection. Asked and
19 answered.
20          MR. DAKIS: Same objections.
21     A    You're sort of asking a couple
22 questions there.
23     Q    Sure.
24       You said that the discount that you
25 are talking about in your report, and you give

Page 278

M. Zmijewski

1
2 opinions about and so forth, is reflected by the
3 difference between these two numbers, the
4 49.5 billion the 44.4 billion, and you have said
5 discount means a lot of different things, discount
6 to what.
7        So what are you saying when you say
8 "discount" there?  Are you making the assertion
9 that there is a difference between the amount
10 Barclay valued the price at versus what you
11 believe the fair value, fair market value is?
12        MR. DAKIS:  Objection to the form.
13        MR. TAMBE:  Objection.  Asked and
14    answered and form.
15    A    What you just said is what the
16 exhibit measures.
17    Q    Okay.  But when you say "discount,"
18 do you mean anything more than that?  Is there
19 just simply a difference between what you say the
20 value of the repo was and what Barclays says it
21 was?
22    A    In my exhibits related to the
23 Barclays windfall, I don't believe I used the term
24 "discount."  It's an undervaluation,
25 undervaluation meaning there is a valuation on

Page 279

M. Zmijewski

1
2 Barclays' books and that valuation is $5.1 billion
3 lower than the fair market value as assessed by
4 the experts from Chicago Partners.
5    Q    And is that the extent of your
6 knowledge and opinions about the $5 billion
7 discount?
8        MR. TAMBE:  Objection, to the extent
9    it mischaracterizes his testimony.
10        MR. DAKIS:  Same objection.
11    A    My report has all sorts of comments
12 and responses to Professor Pfleiderer's comments
13 about a discount, so it's -- that is all over the
14 report.
15    Q    Are you aware of any evidence that
16 there was some agreement between anyone at
17 Barclays and anyone at Lehman to mark down or
18 artificially treat the repo collateral as being
19 $5 billion less in order to convey to Barclays a
20 $5 billion windfall?
21        MR. DAKIS:  Objection to form.
22        MR. TAMBE:  Objection.
23    A    My reading of the movants' documents
24 and the evidence they put forth in those documents
25 is that there was some type of implicit agreement

Page 280

M. Zmijewski

1
2 of that sort.
3    Q    Between whom?
4    A    I don't recall who they -- who they
5 said the agreement was -- I forgot the individuals
6 who were doing -- who were leading the
7 negotiation, and who were making the agreements.
8 I don't remember who they were, but it's in the
9 movants' documents, 60(b) motion or briefs,
10 responses.
11    Q    Is that something you are going to be
12 giving an opinion about, as to why --
13    A    I am only making the statements in
14 response to your questions.  It's not in my
15 report.  None of that is in my report.
16    Q    Okay.
17    A    My -- I am only expecting to testify
18 on what's in my report, and if I do additional
19 work afterwards because I learned something new, I
20 would add it to my report.  But it -- my testimony
21 would be restricted to my report.
22    Q    Do you know what you are referring to
23 when you said stuff in the movants' papers about
24 any kind of implicit agreements?
25    A    Of course I know what I am talking

Page 281

M. Zmijewski

1
2 about.  There were allegations.  I don't remember
3 the individuals' names, but individuals from
4 Lehmans who were negotiating the contract were
5 simultaneously negotiating some type of severance
6 packages or employment packages with Barclays for
7 themselves, and movants claim that was a conflict.
8 That is my recollection.
9    Q    That's what you are referring to?
10    A    Correct.
11    Q    As I read your discussion of risk,
12 what you are saying is not that Barclays wasn't
13 undertaking a lot of risk, but that the risk would
14 have been factored into the agreement; is that
15 right?
16    A    I agree with that statement, but that
17 is not what I am saying.
18        It would have been taken into account
19 in the agreement.  But it would also be taken into
20 account into the value of the transaction approved
21 by the Court.
22        So, remember the benchmark is the
23 court-approved value, Mr. Golden's negative
24 1.85 billion.  So -- so my point is, whatever that
25 value is, I am using Mr. Golden's number, but the

Page 282

1           M. Zmijewski
2  Court's approved value, whatever that value
3  happens to be, took into account the risk of the
4  situation.  It also took into account the benefits
5  from this merger.
6           It took all of that into account,
7  it's pretty clear from the record, the riskiness
8  of the situation, and the potential benefits to
9  the world, essentially they are somewhere in
10  there, in the record, was known by all the
11  parties, including the Court, so it was taken into
12  consideration in the Court's assessment of what
13  the value of the transaction is.
14      Q     And just breaking this down, first
15  just the initial predicate, you agree that
16  Barclays was taking a huge risk in doing this
17  transaction?
18           MR. TAMBE:  Objection to the form of
19      the question.
20           MR. DAKIS:  Same objection.
21      A     I try not to use words like "huge"
22  because it's hard to really quantify something
23  like that, but, you know, it was a large
24  transaction for them.  It was a volatile time in
25  the market.  So there was uncertainty.

Page 283

1           M. Zmijewski
2           And it was therefore risky, higher
3  risk than you normally have in normal
4  circumstances.
5      Q     With higher risk, do you usually get
6  higher return, or a chance of higher return?
7           MR. DAKIS:  Objection to form.
8      A     Yes.  However, that is worked into
9  the price when everybody is settling, sitting down
10  at the table and determining the price.  It's
11  figured out then.
12           MR. THOMAS:  I may be close to done.
13      Why don't we go off the record a minute.
14           THE VIDEOGRAPHER:  The time is
15      5:07 p.m.
16           We are now off the record.
17           (Recess taken.)
18           THE VIDEOGRAPHER:  The time is now
19      5:19 p.m.
20           We are now back on the record.
21  BY MR. THOMAS:
22      Q     Let me show you a document we will
23  mark as 709B.
24      A     Thank you.
25           (Exhibit 709B marked for

Page 284

1           M. Zmijewski
2      identification as of this date.)
3
4      Q     Have you seen this document before?
5      A     Yes.
6      Q     Can you describe what it is, please?
7      A     So it's an annual report filed with
8  the United States Securities and Exchange
9  Commission.
10      Q     Does it include Barclays' opening
11  balance sheet from the Lehman sales transaction?
12      A     I believe so.
13      Q     What page is that?
14      A     Page 99 of 121.
15      Q     Ninety-nine?
16      A     Ninety-nine.  Upper right-hand
17  corner.
18      Q     Oh, upper right, sorry.
19      A     Page 83 on the source document.
20      Q     Is it your testimony that you believe
21  that Barclays materially understated the assets on
22  its opening balance sheet with respect to the
23  Lehman transaction?
24      A     I haven't thought about that issue.
25  I wasn't asked to think about it, so I haven't

Page 285

1           M. Zmijewski
2  even thought about it.
3      Q     What percentage of the value of the
4  repo collateral was Lehman-related assets?
5           MR. TAMBE:  Objection to the form.
6           MR. DAKIS:  Same objection.
7      A     I don't remember.
8      Q     Did you know at one point and you
9  don't recall, or are you not sure?
10      A     It was something that we discussed at
11  one point, but it wasn't anything that was
12  specifically relevant to me.
13      Q     It wasn't relevant to you how much of
14  that repo collateral was Lehman related?
15           MR. TAMBE:  Object to the form.
16      A     Correct.
17      Q     Do you have any idea roughly what
18  the -- 50 percent, 10 percent, 90 percent?
19      A     I don't remember.
20      Q     You referred to Chicago Partners'
21  efforts at valuing the repo collateral.  Did
22  Chicago Partners, in valuing those assets, only
23  use information available at the time of the
24  closing?
25      A     I believe so.

Page 286

M. Zmijewski

1
2    Q    Do you think it's -- why did they do
3    that?
4         MR. DAKIS:  Objection to form.
5    A    Because we were asked to measure fair
6    value as of the date of the closing, 12:01 a.m.,
7    September 22nd.
8    Q    And that necessarily means you can't
9    consider information that came into existence
10   after 12:01 September 22nd?
11        MR. TAMBE:  Objection to the form of
12   the question.
13        MR. DAKIS:  Same objection.
14   A    It's not information that was
15   available.  If it's information that wasn't
16   available as of the closing, then it can't be used
17   to measure the value as of the closing.
18   Q    And that is a function of what?
19   Accounting principles or what your attorneys asked
20   you to do or --
21   A    It's a function of economic
22   principles.  The first principle is, if you are
23   valuing an asset as of a certain date, you use
24   information -- or at a point in time, you use
25   information as of that point in time.

Page 287

M. Zmijewski

1
2    Q    Would you agree that an economic
3    analysis of Barclays' gain might also include an
4    assessment of whether the gain was reasonable
5    under the circumstances?
6         MR. DAKIS:  Objection to form.
7         MR. TAMBE:  Objection to form.
8         MS. TABATABAI:  Objection to form.
9    A    For the purposes of my calculation?
10   Q    No, just --
11   A    Just generally?
12   Q    Yes.
13   A    I am sure there is some situations
14   where maybe that is relevant.
15   Q    For the purpose of your calculation?
16   A    Not relevant.
17   Q    Why not?
18   A    Because my calculation is clear, it's
19   what did the Court approve for a value versus
20   what -- which -- I'm assuming that the Court had
21   an assessment of what the value was and what the
22   value of that transaction would be, and a
23   comparison of that to what Barclays actually
24   received in value as of the close of the
25   transaction is a Barclays windfall.

Page 288

M. Zmijewski

1
2    Q    You're assuming the Court's approval
3    of the deal was predicated on a particular
4    relationship between assets and liabilities;
5    right?
6    A    A particular net value.
7    Q    Yes.
8    A    Well, I am not sure what you meant by
9    relationship.  My answer is, if you mean by
10   relationship a particular net value, then yes.
11   Q    And that is a particular net value,
12   so let's try to make it clean.
13        Your assumption that underlies your
14   report is that the court approval of the
15   transaction was based on a particular relationship
16   or particular net value relationship between
17   assets and liabilities; correct?
18   A    Yes.
19   Q    In other words, that assets had to be
20   X and liabilities had to be Y.
21        MR. TAMBE:  Object to the form.
22        MR. DAKIS:  Same objection.
23        MS. TABATABAI:  Same objection.
24   A    No.  The net difference between
25   assets and liabilities, plus consideration, you

Page 289

M. Zmijewski

1
2    have 250 million in cash, that net is a certain
3    value.
4    Q    So --
5    A    So there are many ways to get that
6    value; right?  So --
7    Q    So assets minus liabilities equals X.
8    A    Assets minus liabilities minus cash
9    payment equals X.
10   Q    Now, you don't think that that was
11   the deal actually agreed to by the parties, do
12   you?
13        MR. TAMBE:  Objection to the form.
14        MS. TABATABAI:  Objection to form.
15        MR. DAKIS:  Objection to form of the
16   question.  Assets minus liabilities minus
17   cash equal X.
18   Q    That the deal was predicated on a
19   certain asset, liability and value relationship?
20        MR. TAMBE:  Object to the form.
21   A    I don't know what the parties had in
22   mind.  You know, the Court had to approve a
23   certain transaction, so, I am assuming the parties
24   understood that the Court had to approve the
25   transaction.

Page 290

1           M. Zmijewski
2     Q    Isn't the parties' intent usually
3  found in the parties' agreement that they enter
4  and sign?
5          MR. DAKIS:  Objection to the form.
6     A    I am being pulled into the legal area
7  again, so -- so since I am not trying to make a
8  legal opinion, but you can only -- my very small
9  understanding of the bankruptcy law is, it's
10  not -- the parties can't contract to have a
11  transaction that is different from the
12  court-approved transaction.  It wouldn't be a
13  valid contract, as far as I know.  But I'm not a
14  lawyer, so you would know that better than I.
15     Q    You've seen the parties' -- you've
16  viewed the parties' contracts.  There is nothing
17  in there that makes you think that the parties
18  intended the deal to be predicated on a certain
19  net value relationship between assets and
20  liabilities, is there?
21          MR. DAKIS:  Objection to the form.
22          MR. TAMBE:  Objection to form.
23          MS. TABATABAI:  Objection to form.
24     A    And that includes all three documents
25  we spoke of earlier?

Page 291

1           M. Zmijewski
2     Q    Yes.
3     A    In combination?
4     Q    In combination or separately or any
5  combination you want.
6     A    Separately there was a true-up just
7  by the nature of the repo collateral, and there
8  was a true-up in the original asset purchase
9  agreement for some ex post profits above -- I
10  think it's above 500 million.  So there were some
11  of these true-ups in the asset purchase agreement
12  by the nature of the repo contract.
13          So there were some true-ups there,
14  and those true-ups -- it wasn't until the
15  clarification letter that those true-ups were
16  taken out of the mix.  Because of those true-ups,
17  that had a result in some relationship between
18  assets and liabilities.
19     Q    What true-ups are you referring to?
20          MR. TAMBE:  Objection, asked and
21  answered.
22          MR. DAKIS:  Same objection.
23     Q    The contract provision that was taken
24  out, I understand that one, but if there is other
25  true-ups.

Page 292

1           M. Zmijewski
2          MR. TAMBE:  Same objection.
3          MR. DAKIS:  Same objection.
4     A    My understanding of the repo
5  liability is based on a repo contract, repurchase
6  contract, you give me collateral, I give you cash.
7  At the end of it we figure out, okay, we have to
8  either liquidate the collateral or I can give the
9  collateral back to and you give the cash back to
10  me.
11          And there is a net where you get the
12  value of your collateral or the cash equivalent of
13  the value of your collateral.  Somehow that deal
14  is trued up so that you get your collateral back
15  in true value.
16          And I believe that was -- I'm going
17  to call it undone or unwound by the clarification
18  letter.
19     Q    Do you believe Barclays when it
20  entered into the repo would have entered into the
21  repo but for the overall sales transaction?
22          MR. DAKIS:  Objection to the form.
23     A    I don't know what Barclays would do.
24     Q    You have no basis for an opinion on
25  whether that would have been commercially

Page 293

1           M. Zmijewski
2  reasonable for Barclays to enter into a repurchase
3  agreement?
4          MR. DAKIS:  Objection to form.
5     A    I recall Professor Pfleiderer's
6  discussion of that, and he said they wouldn't
7  enter into it, but I don't believe he had any
8  economic analysis on that point.
9          MR. THOMAS:  Thank you.  I have
10  nothing further.
11          THE WITNESS:  Thank you.
12          (Contined on next page with wintess
13  jurat.)
14
15
16
17
18
19
20
21
22
23
24
25

## Page 294

1          M. Zmijewski
2          MR. TAMBE:  Thank you.
3          THE VIDEOGRAPHER:  That concludes the
4     video record for today.  The time is
5     5:33 p.m.
6          We are now off the record.
7               oOo
8          I, MARK ZMIJEWSKI, the witness herein,
9     do hereby certify that the foregoing testimony of
10    the pages of this deposition to be a true and
11    correct transcript, subject to the corrections, if
12    any, shown on the attached page.
13          _____
14               MARK ZMIJEWSKI
15    Subscribed and sworn to before me this
16    _____day of _____,_____.
17    _____
18          NOTARY PUBLIC
19
20
21
22
23
24
25

## Page 295

1
2     STATE OF NEW YORK  )       Pg.   of Pgs.
3     COUNTY OF NEW YORK  )
4          I wish to make the following changes
5     for the following reasons:
6     PAGE  LINE
7     ____  ____   CHANGE:_____
8              REASON:_____
9     ____  ____   CHANGE:_____
10             REASON:_____
11    ____  ____   CHANGE:_____
12             REASON:_____
13    ____  ____   CHANGE:_____
14             REASON:_____
15    ____  ____   CHANGE:_____
16             REASON:_____
17    ____  ____   CHANGE:_____
18             REASON:_____
19    ____  ____   CHANGE:_____
20             REASON:_____
21    ____  ____   CHANGE:_____
22             REASON:_____
23    ____  ____   CHANGE:_____
24             REASON:_____
25             _____

## Page 296

1
2          C E R T I F I C A T E
3     STATE OF NEW YORK    )
4          : SS.
5     COUNTY OF NEW YORK    )
6
7          I, BONNIE PRUSZYNSKI, a Notary
8     Public with and for the State of New York,
9     do hereby certify:
10         That MARK ZMIJEWSKI, the witness
11    whose deposition is hereinbefore set forth,
12    was duly sworn by me and that such deposition
13    is a true record of the testimony given by
14    the witness.
15         I further certify that I am not related
16    to any of the parties to this action by
17    blood or marriage, and that I am in no way
18    interested in the outcome of this matter.
19         IN WITNESS WHEREOF, I have hereunto
20    set my hand this 14th of April, 2010.
21
22          _____
23          Bonnie Pruszynski
24
25

## Page 297

1
2          I N D E X
3     WITNESS                    PAGE
4     MARK ZMIJEWSKI
5     BY MR. THOMAS              6
6
7
8          E X H I B I T S
9     Exhibit 706B Mr. Zmijewski's Expert Report 26
10    Exhibit 707B Spreadsheet          137
11    Exhibit 708B Chart from Mr. Golden's    188
12         Report
13    Exhibit 709B Annual report          283
14
15
16
17
18
19
20
21
22
23
24
25

# Exhibit C

**GIV [Global Independent Valuations]**          **(Marcus Morton)**

**I. US Fixed Income Valuations**
    **(A.) FI ABS**                          **(Rich Landreman)**
    **(B.) FI Rates and Credit**            **(Sean Teague)**

**(A.) FI ABS**

**Rich Landreman – Director**
Mr. Landreman has over 20 years of experience in the mortgage capital markets, serving in a broad range of analytical and technology roles for Government Agencies, Wall Street Banks and Consulting/Advisory firms.  His primary role in PCG has been to develop, perform and implement the price testing controls related to the diverse portfolios of Agency and Non-Agency Structured Products held by Barclays Capital. He has a MBA in Finance from Loyola University of Chicago.

**Victor Tian – Vice President**
Mr. Tian has 9 years experience in the U.S. RMBS market.  He graduated from MIT-Sloan School of Management with a MBA degree in Financial Engineering.  His experience includes Agency RMBS market risk management at Banc of America Securities and CSFB, price-testing for RMBS and fixed-income derivatives at BearingPoint, Non-Agency RMBS structuring and securitization management at America Home Mortgage.  Mr. Tian joined Barclays Capital in Oct '07 to support the Structured Credit Product valuation and price-testing.  Mr. Tian has CFA and FRM designations.

**\*Usman Babar – Vice President**
Mr. Babar has 11 years of working experience on the mortgage capital markets. Legacy Lehman since 2006,  he worked with CSFB as a VP in the structured products valuation for primary and secondary CMBS securities.  He has three years with Moody's Investor Service supporting RMBS valuation models. Usman holds a bachelors degree from New York Institute of Technology in Finance.

**Richard Beame- Vice President**
Mr. Beame has worked supporting the Barclays New York CMBS Primary Desk for over 4 years doing their P&L and monthly valuation testing.  In the last two years he has also been doing the CMBS primary and secondary valuation.  Before working at Barclays (May 2005) Mr. Beame worked for Merrill Lynch for 7 years in a finance capacity doing municipal and credit derivatives.  Richard graduated from the University of Michigan.  He holds an MBA in finance from Baruch College.  Richard became a CFA Charterholder in 2007.

**Scott Ginsberg – Assistant Vice President**
Mr. Ginsberg has over 5 years of mortgage related experience at Barclays Capital. Mr. Ginsberg graduated from Muhlenberg College in 2004 with a degree in Business Administration and Economics. Mr Ginsberg has worked exclusively with the RMBS desk since he joined the firm in 2004. Mr. Ginsberg initially supported the desk in a PnL function responsible for daily FOBO reconciliations and monthly balance sheet and income statement reconciliations. Three years ago, Mr. Ginsberg joined the valuation group and is now responsible for price-testing and valuation analysis on ABS, RMBS, Conduits and Alt-A securities.

**Vincent Pini – Assistant Vice President**
Mr. Pini is a graduate of the Barclays Capital rotational analyst program.  During his three year rotation,  he performed in Regulatory Reporting, Credit Price Testing, and RMBS Price Testing.  He performs the monthly valuation of Subprime Whole Loans, Subprime MSRs and a various analytics supporting senior management.  He has worked on a broad array of products including CDO's, Private Placement Bonds, Leveraged Loans, and Distressed Debt.  He is a liaison with the trading desk, PCG management, risk management, and operations to review, identify and resolve price valuation issues.  His educational

**\*[Indicates individuals that joined Barclays through the Lehman acquisition]**

background includes a BS in Finance from Rutgers Business School and is a CFA Program candidate (Level 3).

**Ansari, Imran – Assistant Vice President**
Mr. Ansari has over 3 years of mortgage/securitization experience.  He received his BS in Finance from Boston College in 2005.   Previous to joining Barclays,  Imran was a Collateral Analyst at  Deloitte's Securitization Transaction Team.

**\*Jae Park – Assistant Vice President**
Mr. Park is Legacy Lehman since Aug 2007 working in the valuations group for RMBS and ABS.  Prior to his work at Lehman,  he worked as a Fixed Income associate at JP Morgan Chase pricing various structured products.  He graduated from the University of Wisconsin in 2003 with a Bachelors degree in Economics.

**Jessica Wang – Analyst**
Jessica Wang graduated with honors from Bentley College with a Bachelors of Science in Finance. She started her career at Morgan Stanley as an analyst in Financial Controllers Group and then obtained an associate position with Merrill Lynch in Financial Reporting Group. She joined Barclays in June 2007 to support the MBS PCG business and is now responsible for price testing analysis on Subprime Loss Modeling projections,  Alt-A securities and CDOs. She is a liaison with the trading desk, PCG management, risk management, and operations to review, identify and resolve price valuation issues.  She has recently assumed the primary contact point for OTTI analysis for conduits and works closely with the team to support the IPV process.

**Eli Bloshtein – Analyst**
Mr Bloschtein joined the valuations group last year from the Finance Graduate training program.  He currently performs the daily PnL for the CMBS Primary desk and supports secondary CMBS valuations.

## (B.) FI Rates and Credit

**Sean Teague - Director**
Manages FI Credit/Rates Price Testing.  14 years investment banking experience.  Joined Barclays over 3 years ago.  Previously Sean performed Due Diligence for AIS (Fund of Funds) after a 1 yr on correlation trading desk at Commerzbank.  Prior experience spans credit and interest rate PCG roles at Deutsche Bank and Bankers Trust.

**(i) FI Rates**

**Grant Rusk – Vice President**
Grant manages FI Rates Price Testing.  He has over 15 years experience in derivative control and price testing, with 5 years experience at Barclays and prior to that 10 years at Credit Suisse. He is experienced with modeling the risk and valuation of derivatives across a wide range of product types and asset classes, including Fixed Income, Equities and Credit. Grant also has 5 years experience in Audit and Financial Reporting and is a qualified accountant.

**Alessandra Riccardi – Vice President**
Alessandra is responsible for the Non-Linear Price Testing for Fixed Income Rates, and oversees design and methodology of the options US price testing. She has 8 years of product control experience across FX Options, EM Rates, Commodities (precious metals) and Fixed Income derivatives. In those areas Alessandra performed a variety of technical roles, and she was managing the FX Options PCG team in London before moving to NY. Alessandra also has audit experience at Mediobanca and E&Y in Milan.

**Elly Pu – Vice President**
Elly has 6 years experience in various financial products of structured finance and Rates area.  She graduated from University of Michigan, Ann Arbor with a master degree in Financial Engineering.  She joined Barclays in February 2006. Her experience includes RMBS portfolio trading support at US Bank, price-testing for RMBS, Treasuries, Agencies and Municipals at Barclays Capital.

**Kevin McAndrew – Assistant Vice President**
Kevin has 15 years experience in product control at Barclays, primarily in derivative products.  The first eleven were spent in daily p&l and risk production, as well as monthly price testing, while the focus for the past four years has been exclusively on price testing.  Prior to that he was an FX trader at BZW and Standard Chartered Bank.  He holds a Bachelor of Science in Mathematics from Villanova University.

**Pavan Makhija – Analyst**
Pavan had 2 years experience in the Lehman Fixed Income Valuation group prior to joining Barclays following the acquisition. His experience at Lehman covered various instrument types, testing both linear and non-linear products. Pavan has implemented a number of processes since joining Barclays which have streamlined the process and assisted with completeness controls. Pavan has a Masters of Science in Financial Engineering.

**\*Rob Timmons – Analyst**
Rob graduated with and MBA from University of Chicago prior to joining the Lehman graduate program in 2008 and has since gained experience in Fixed Income bond and yield curve testing. Rob has 8 years financial experience, including 6 years at Citadel covering PnL and reconciliation.

**\*Qiran Ren - Analyst**
Qiran completed his M.A. degree in Mathematics of Finance at Columbia University in early 2008. He started his career at Lehman Brother and joined Barclays Capital in October 2008 following the acquisition. Qiran is part of the FI Rates Valuation Control, where, together with other team members, implements new methodologies for swaption price testing as well as independent valuations of Muni Derivatives.

**(ii) FI Credit**

**Kevin Jhea – Vice President**
Kevin manages US Credit Valuations and oversees design and methodology of credit price testing globally. He has over 10yrs of product control experience across equity and credit derivatives. Kevin has good management experience with extensive knowledge of credit derivative products, including correlation.

**David Wei- Vice President**

---

**\*[Indicates individuals that joined Barclays through the Lehman acquisition]**

PhD in Finance and Management with over 13yrs finance experiences spanning Risk, Trading and Controlling.  Extensive knowledge and expertise in market and credit risk management.  David manages correlation price testing and oversees valuations of EM and Prop desks.

**Heidi Su - Assistant Vice President**
Previous to joining Barclays Heidi was working at Factset Research.  Her academic background includes MBA, CFA, CQF, CPA & FRM.

**\*Amine Haqqaou – Assistant Vice President**
Mr. Haqqaoui is legacy Lehman since October 2007 working in the valuation group covering credit products. Prior to Lehman Brothers, Amine worked for 3 years as a credit derivatives structurer within Portfolio Management at BNP Paribas.  Amine holds an MA in Mathematics of Finance from Columbia University.

**Ilya Riskin - Assistant Vice President**
After attending NYU, Ilya joined the 2005 Grad program.  Ilya was recently promoted to AVP due to combination of strong work ethics, tight controls and ability to value illiquid cash and derivatives instruments.

**Khan, Mohemmed (Riyaz) – Assistant Vice President**
Riyaz joined the IVG Independent Valuations Group out of the IT area.  He performs the CDS Indep Valuations.  Riyaz has over 8 years IT experience.

**Ethan Zheng – Analyst**
Ethan holds a master of science in mathematical finance having graduated with magna cum laude honors from Boston University in May 2007.  He received his bachelor's degree with a double major in Electrical Engineering and Business Administration from Shanghai Jiaotong University in June 2005.  Prior work experiences include financial auditing and risk management at KPMG.  Since starting his career at Barcap in the summer of 2008, Ethan's extensive technical training has prepared him well to be the lead price tester for cash bonds within the FI Credit space.

**Kartik Kothari – Analyst**
A member of the 2007 graduate Analyst program out of Rutgers University, Mr. Kothari has had broad exposure to Valuation concepts in his two years with the firm.  After spending a year in CMBS P&L/Price Testing, Mr. Kothari was rotated, and subsequently placed permanently, into the Credit Price Testing team where he now oversees a broad range of cash and CDS products. His CFA candidacy has progressed quite quickly as he successfully negotiated levels 1 & 2 within several months of one another.

\*[Indicates individuals that joined Barclays through the Lehman acquisition]

**\*Dara Mao – Analyst**

Dara works in the Credit Valuations at Barclays joining from Lehman in 2008. Prior to that, she spent more than 3 years at Morgan Stanley in various roles spanning from projects to product control covering Equity and Fixed Income products. Dara holds a BA in Actuarial Science from Baruch College.

## II. US Equities Valuations

**Jerry Shi - Director**

Mr Shi has over 15 years experience within risk control, audit and valuation control roles within the investment banking industry.  He gained a BA, MA & Phd in Mathematics, which he completed in 1991 and then completed a post doctorate, teaching Maths for three years in Ontario, before joining RBC in Toronto.  His experience includes roles in Risk Management & Control (specifically focused on credit risk modelling), internal audit (responsible for quantitative audit focused on modelling and risk), and five years in Valuation control for Equity structured products where his primary focus has been price testing, provisioning, model control and implementation of accounting policy EITF.

**Katharine Gee - Vice President**

Ms Gee has over 10 years experience within product/risk control, valuation control and Equities front office roles in both Hong Kong and New York, having worked at both Morgan Stanley and Goldman Sachs prior to joining Barclays Capital in 2006.  Since joining Barclays she has worked in valuation control across securitized products, ABS and Equities.  She has an MBA from Cornell University, NY.

**Yu Zhou - Executive**

Mr Zhou holds and MA in Statistics from Columbia University in addition to a Masters of mathematics and Bachelors of Engineering.  He has previously worked as a quantitative analyst at TD Securities before joining Lehman Brothers in 2007 to work in the Structured Equity Exotics Valuation control team.

**Kunal Kunde - Executive**

Mr Kunde holds an MSc in Financial Engineering from Columbia University, as well as an MSc from MIT and Bachelors degree from the Indian Institute of Technology.  Following 3 years working as an analyst for a transportation consultancy Mr Kunde joined Lehman Brothers in 2007 to work in the Equity Valuation control team.

**\*[Indicates individuals that joined Barclays through the Lehman acquisition]**

# Exhibit D

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

               Debtors.

10

      -----------------------x

11

12

13          DEPOSITION OF JOSEPH SCHWABA

14              New York, New York

15              April 12, 2010

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 29650A

Page 2

```
 1
 2              April 12, 2010
 3                9:28 A.M.
 4
 5         Deposition of JOSEPH SCHWABA,
 6    held at the law offices of Boies
 7    Schiller & Flexner, LLP, 575 Lexington
 8    Avenue, New York, New York, before Kathy S.
 9    Klepfer, a Registered Professional
10    Reporter, Registered Merit Reporter,
11    Certified Realtime Reporter, Certified
12    Livenote Reporter, and Notary Public
13    of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2
 3            A P P E A R A N C E S :
 4
 5    JONES DAY, LLP
 6    Attorneys for Lehman Brothers, Inc.
 7      222 East 41st Street
 8      New York, New York  10017-6702
 9    BY:  JAYANT W. TAMBE, ESQ.
10         GEORGE E. SPENCER, ESQ.
11
12    BOIES, SCHILLER & FLEXNER, LLP
13    Attorneys for Barclays
14      5301 Wisconsin Avenue, N.W.
15      Washington, D.C.  20015
16    BY:  JONATHAN M. SHAW, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2       A P P E A R A N C E S :  (Cont'd.)
 3
 4    QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
 5    Attorneys for the Creditors Committee
 6      51 Madison Avenue
 7      22nd Floor
 8      New York, New York  10010
 9    BY:  ROBERT K. DAKIS, ESQ.
10
11    HUGHES, HUBBARD & REED, LLP
12    Attorneys for the SIPA Trustee
13      One Battery Park Plaza
14      New York, New York  10004-1482
15    BY:  SAMUEL C. McCOUBREY, ESQ.
16
17
18    ALSO PRESENT:
19      MARC VELLRATH, FSG
20
21
22
23
24
25
```

Page 5

```
 1            J. Schwaba
 2    JOSEPH SCHWABA, called as a
 3      witness, having been duly sworn by a Notary
 4      Public, was examined and testified as
 5      follows:
 6    EXAMINATION BY
 7    MR. SHAW:
 8      Q.   Please state your name for the record,
 9    sir.
10      A.   Joseph Schwaba.
11      Q.   Mr. Schwaba, we introduced ourselves
12    off the record, but my name is Jonathan Shaw.
13    I'm representing Barclays Capital, Inc.
14          Have you ever been deposed before,
15    sir?
16      A.   I think I was deposed before once.
17      Q.   In what context?
18      A.   As a witness.
19      Q.   An expert witness?
20      A.   No.
21      Q.   Fact witness?
22      A.   Yes.
23      Q.   What kind of case was that?
24      A.   It was a long time ago.  Must have
25    been, oh, I'm guessing 20 years or so in regard
```

Page 6

1              J. Schwaba
2  to a employee, somebody who used to report to
3  me.
4      Q.   Okay. I'm going to ask you questions.
5  If any of my questions are unclear to you,
6  please let me know and I'll try and do a better
7  job of phrasing them. If at some point today
8  you want to take a break, just let me know, and
9  I may ask that we finish up a question or two,
10 but, you know, obviously I'm happy to let you do
11 that.
12     A.   Sure.
13     Q.   Have you ever testified as an expert
14 before in any context?
15     A.   I was in a couple of cases, must be
16 eight-plus, nine years ago, where I gave some
17 expert testimony, but it was an arbitration, as
18 I recollect.
19     Q.   What kind of arbitration was it?
20     A.   I don't even -- I think it had
21 something to do with a fixed income portfolio
22 valuation, but I don't even remember the
23 specifics and it didn't get very far.
24     Q.   Did you actually testify in either of
25 the actual arbitration or in deposition?

Page 7

1              J. Schwaba
2      A.   I was there and gave a minimal amount
3  of testimony, as I recollect, but nothing more
4  than that.
5      Q.   How many hours have you worked on this
6  matter so far?
7      A.   I don't have a specific number, but
8  I've put in easily a hundred-plus.
9      Q.   Over what period of time?
10     A.   Over the last couple of months. Let's
11 see, where are we now? April?
12     Q.   Yes.
13     A.   I would recollect probably two, two
14 and a half months.
15     Q.   When were you engaged to begin work on
16 this matter?
17         MR. TAMBE: Object to the form of the
18 question.
19         You can answer.
20         THE WITNESS: I'm sorry? Say again.
21         MR. TAMBE: I just object to the form
22 of the question, but you can answer if you
23 understand his question.
24     A.   Repeat the question, please.
25     Q.   Sure. Do you know when -- you work

Page 8

1              J. Schwaba
2  for Chicago Partners; is that correct? Navigant
3  Consulting?
4         Let me start again. For whom do you
5  work?
6      A.   I'm an independent contractor.
7      Q.   Okay. And were you retained in this
8  matter, in this litigation at some point?
9      A.   I was asked to provide -- to be an
10 expert with regard to this matter.
11     Q.   And who asked you to be an expert in
12 regard to this matter?
13     A.   Nick Weir.
14     Q.   And who is Mr. Weir?
15     A.   He is a principal of Chicago
16 Partners/Navigant.
17     Q.   And approximately when did Mr. Weir
18 ask you to serve as an expert consultant in this
19 matter?
20     A.   I don't recollect.
21     Q.   Was it in 2009 or 2010?
22     A.   The best I can recall is we started
23 having some discussions of a general nature in
24 2009, fall, and ...
25     Q.   Have you ever at any point in your

Page 9

1              J. Schwaba
2  career been a trader of municipal securities?
3         MR. TAMBE: Object to the form of the
4  question.
5      Q.   You can answer.
6      A.   I have been -- I have managed trading
7  operations of which municipal securities were a
8  part.
9      Q.   When did you manage trading
10 operations?
11     A.   One would be in when I worked for
12 Continental Bank.
13     Q.   And when was that?
14     A.   That was approximately 1986 through
15 1990.
16     Q.   Are there any other times that you
17 managed traders in municipal securities?
18     A.   I have managed portfolios at the
19 Federal Home Loan Bank of Pittsburgh, which
20 included some municipal securities as well.
21     Q.   And when was that?
22     A.   That was 19 -- or, excuse me, 2003
23 through 2009.
24     Q.   What portfolio --
25     A.   I should also, excuse me, during

Page 10

1            J. Schwaba
2  Prudential Bache, 1982 through 1986, there were
3  some municipal positions, or we dealt with
4  strategy development with regard to some
5  municipal positions.
6      Q.   **In your work at the Federal Home Loan**
7  **Bank of Pittsburgh what were your specific**
8  **responsibilities?**
9      A.   I was a Director of Corporate Risk
10 Management.
11     Q.   **What do you mean by that?**
12     A.   I was responsible for managing market
13 risk which had two or three different functions.
14     Q.   **And what were those functions?**
15     A.   One was the actual management of
16 market risk on the balance sheet and the
17 components of that; second was income simulation
18 and forecasting; and third was optimizing
19 capital management.
20     Q.   **What do you mean by "optimizing**
21 **capital management"?**
22     A.   Well, incorporating into our analysis
23 the amount of capital that would be allocated to
24 particular -- an amount of capital we were
25 using.  The preservation and expansion of that

Page 11

1            J. Schwaba
2  capital ideally as well.
3      Q.   **And what do you mean by "income**
4  **simulation and forecasting"?**
5      A.   Basically in income simulation
6  forecasting you're looking at a variety of
7  different scenarios, potentially.  Interest
8  rates go up.  Interest rates go down.  Yield
9  curve shifts.  Goes flat.  Yield curve goes
10 steep.  How will that impact your income both on
11 a current basis and projecting out in a
12 particular period of time.
13     Q.   **And what do you mean when you say**
14 **"management of market risk"?**
15     A.   The securities that you have in your
16 position will either go up in value or down in
17 value based on market dynamics.
18     Q.   **How many portfolios were you**
19 **responsible for managing while you were at the**
20 **Home Loan Bank in Pittsburgh?**
21         MR. TAMBE:  Objection to the form of
22 the question.
23     Q.   **You can answer the question.**
24     A.   I was one of -- there were -- I'm not
25 sure I can understand the question.  There was a

Page 12

1            J. Schwaba
2  balance sheet and there are components of the
3  balance sheet, and part of my responsibility and
4  my group's responsibility was to measure that
5  risk, and the measurement of that risk entailed
6  both analysis of individual securities as well
7  as analysis of portfolios or subsets of those
8  portfolios.
9      Q.   **What percentage of the portfolios that**
10 **you managed consisted of municipal securities?**
11         MR. DAKIS:  I'm going to object to the
12 form of the question.
13     Q.   **You can answer.**
14     A.   Municipals were not a large part of
15 our portfolio, as I recollect.
16     Q.   **What do you mean by "not a large**
17 **part"?**
18     A.   I don't have specific numbers on them,
19 but they were, you know, small percentage.
20     Q.   **Under 5 percent?**
21     A.   I would, as the best I can recollect,
22 I would say they were definitely under 5
23 percent.
24     Q.   **Under 1 percent?**
25     A.   I couldn't say.

Page 13

1            J. Schwaba
2      Q.   **Did you actually have any**
3  **responsibility for directing trading decisions**
4  **in the portfolio that you were responsible for**
5  **as a risk manager?**
6      A.   At where?
7      Q.   **At Pittsburgh.**
8      A.   No direct trading decisions, no.
9  However, I was on the Asset/Liability Committee,
10 I should amend that, and we made major strategic
11 decisions in the Asset/Liability Committee.
12     Q.   **What percentage of the portfolios you**
13 **were involved with at Pittsburgh consisted of**
14 **adjustable rate municipals?**
15     A.   I don't -- I couldn't recollect.
16     Q.   **Presumably it's a subset of the**
17 **municipals in their entirety, right?**
18     A.   If we had them in there, presumably.
19     Q.   **And you don't know if you had any in**
20 **there?**
21     A.   I don't know.
22     Q.   **What about auction rate securities?**
23     A.   I don't know for sure on that as well.
24     Q.   **Did you have any responsibility for**
25 **valuation of municipal securities at Pittsburgh?**

Page 14

1          J. Schwaba
2      A.   Part of our -- a big part of our
3  responsibility was to measure the risk in our
4  asset/liability book, and municipals were a part
5  of that, and so given the asset/liability system
6  that we were using and employing, there would be
7  a value that would be derived from that.  So we
8  had a hand in coming up with a valuation,
9  therefore, for those securities.
10     Q.   When you say you had a hand in coming
11 up with a valuation, what precisely do you mean?
12     A.   Calculating what the risk of that
13 particular element of the portfolio as well as
14 other elements of the portfolios were.
15     Q.   Did you have any responsibility for
16 providing marks for those securities?
17         MR. TAMBE:  Objection to the form of
18     the question.
19     A.   We did not have, the best I can
20 recollect, we did not have direct responsibility
21 for input of marks.  However, we would check
22 those marks with other business units that were
23 providing.  So we had input and oversight or
24 some -- some, not oversight, but some input
25 responsibility as a check.

Page 15

1          J. Schwaba
2      Q.   I'm not quite sure I understand what
3  you mean.  What do you mean you would check, who
4  would provide you the marks that you were
5  checking?
6      A.   Typically, we would get them from the
7  Capital Markets Department and from the -- they
8  would get them from the street.
9      Q.   Okay.  And so you would then do what
10 to check marks you received from the Capital
11 Markets Department?
12     A.   We would run -- we would, given what
13 they gave us, we would run our models, and
14 sometimes there are outliers.  There could be a
15 mistake, you know, the price, if a trade price
16 looked like something was askew or, you know, a
17 part of our responsibility was to make sure we
18 caught that and to make sure, you know, if
19 something was input wrong or there was an
20 individual security that was -- whose price
21 was -- looked different other than what, you
22 know, some type of reasonable range, given the
23 situation, it could be different, it was part of
24 our responsibility, I thought, to check that.
25     Q.   What's the source of the models that

Page 16

1          J. Schwaba
2  were used to check these marks?
3      A.   We had a -- we had a highly reputable
4  model that was used in the street, an
5  asset/liability model.
6      Q.   Was that a proprietary model for your
7  employer or was it something you had --
8      A.   No, it was a -- it was a model that we
9  contracted with an entity for.
10     Q.   And what entity was that?
11         MR. TAMBE:  Can I just consult with
12     the witness?
13         (The witness confers with Mr. Tambe.)
14         MR. TAMBE:  I think there's just a
15     concern about the confidentiality of who the
16     vendor might have been.  We'll --
17         MR. SHAW:  It's not something I feel
18     strongly about so let's skip that one.
19         MR. TAMBE:  Okay.  He just doesn't
20     know whether he's at liberty to divulge the
21     name of that.
22         MR. SHAW:  I understand.  I
23     understand.
24     Q.   And you described that model as an
25 asset/liability model; is that correct?

Page 17

1          J. Schwaba
2      A.   That is correct.
3      Q.   And is an asset/liability model a
4  valuation model?
5          MR. TAMBE:  Object to the form of the
6      question.
7          MR. DAKIS:  Join in that objection.
8      A.   I believe that an asset/liability
9  model has a component of valuation in it.
10     Q.   Is an asset/liability model, the type
11 that you use, the type of model one would use to
12 value a municipal security?
13         MR. TAMBE:  Object to the form of the
14     question.
15         MR. DAKIS:  Same objection.
16     A.   Could you repeat the question again,
17 please?
18     Q.   Sure.  Is an asset/liability model of
19 the type that you used the type of model one
20 would use to value a municipal security?
21         MR. TAMBE:  I repeat the objection.
22         MR. DAKIS:  Same objection.
23     A.   If I understand you correctly, our --
24 there were -- there were values obtained for the
25 municipal component of our asset and liabilities

1          J. Schwaba
2   through use of the model.
3      **Q.   When you found what you described as**
4   **an outlier, what would you do to investigate the**
5   **difference between the values that had been**
6   **provided to you by your Capital Management Group**
7   **and those that would be coming up on your model?**
8      A.   Typically, what we would do is go back
9   and check, first of all, with our Capital
10  Markets folks that gave us -- through whom we
11  got the quote or the number, and then we would
12  either talk with them directly or in some cases
13  we might go back to the ultimate source of that
14  where we got our -- our street counterpart.
15     **Q.   Would it be fair to say the reason you**
16  **would talk to the Capital Markets folks is that,**
17  **as people who were actively trading in that**
18  **market, they had a feel for the market and**
19  **perhaps information about why a particular trade**
20  **had occurred at a particular price?**
21         MR. TAMBE:  Object to the form of the
22  question.
23         MR. DAKIS:  Same objection.
24     A.   Well, if I understand you, I mean, it
25  could be.  I don't, you know, there could be a

1          J. Schwaba
2   number of reasons, but --
3      **Q.   What other reasons would you have for**
4   **talking to them about -- talking to them in the**
5   **process of investigating why you found an**
6   **outlier?**
7      A.   Well, as I said before, to see what,
8   you know, why that number is what it is.
9      **Q.   And the reason you would expect them**
10  **to know why that number is what it is is because**
11  **they were, at least in part, is because they**
12  **were actively participating in the market; is**
13  **that correct?**
14         MR. TAMBE:  Object to the form of the
15  question.
16     A.   I'm not going to presume to know what
17  their role is in great detail.  However, other
18  things being equal, they should know, you know,
19  why the value of their positions are where they
20  are.  I think, you know, my experience, that's
21  part of the job.
22     **Q.   In September of 2008, what involvement**
23  **did you have with the market for municipal**
24  **securities?**
25     A.   Well, as you know and as we just have

1          J. Schwaba
2   been discussing, that was part of my
3   responsibility -- I was at the Federal Home Loan
4   Bank and my responsibilities that I have just --
5   we've just talked about.
6      **Q.   What percentage of your time when you**
7   **were working for the Federal Home Loan Bank**
8   **would you say you spent working on issues**
9   **relating to municipal securities?**
10     A.   Very low percentage.
11     **Q.   Under 5 percent?**
12     A.   Probably under 5 percent.
13     **Q.   Do you know if you spent any of your**
14  **time working on issues relating to adjustable**
15  **municipal securities?**
16     A.   I do not recollect working on
17  adjustable rate securities.
18     **Q.   At any point in your career have you**
19  **done work on adjustable rate municipal**
20  **securities?**
21     A.   I don't recollect that.
22     **Q.   Just so it's clear, at any point in**
23  **your career have you done any work on auction**
24  **rate municipal securities?**
25     A.   I may have on some occasions, but I

1          J. Schwaba
2   don't recollect direct involvement in that.
3      **Q.   To the best of your knowledge, at any**
4   **point in your career have you had any**
5   **involvement with the valuation of adjustable**
6   **rate municipal securities?**
7      A.   To the extent that auction rate or
8   adjustable, as you described it, were involved
9   in some of the portfolios that I was responsible
10  for overseeing, there could have been some
11  involve -- indirect involvement.
12     **Q.   I think it's probably worth spending a**
13  **minute just defining some terms.  What is your**
14  **understanding of what an adjustable rate**
15  **municipal security is?**
16     A.   My understanding is the rate on the
17  security varies.  We -- it can be an adjustable
18  rate based on an auction rate, it can be an
19  adjustable rate based on how it's priced in the
20  marketplace, and that rate can vary through
21  certain defined conditions.
22     **Q.   So if I'm understanding you correctly,**
23  **in your view, an auction rate security or**
24  **auction rate securities -- strike that.**
25         **If I'm understanding you correctly, in**

Page 22

J. Schwaba

1
2  your view, auction rate municipal securities are
3  a subset of the larger group of adjustable rate
4  securities, is that fair?
5      A.  They could be construed that way.
6      Q.  Well, is that how you construed them
7  when you used the term in your report?
8      A.  I wouldn't characterize it that way.
9  I think we were defining what each specific
10  security was.
11      Q.  In the context of auction rate
12  securities, what is a failed auction?
13      A.  That is when there are not enough
14  bidders for the particular security that's being
15  auctioned off and so that they're, given that
16  there are not enough bidders for the auction,
17  the auction literally doesn't -- doesn't take
18  place because there's not enough interest.
19      Q.  So a failed auction indicates a lack
20  of market interest in a security?
21          MR. TAMBE:  Objection to the form of
22  the question.
23          MR. DAKIS:  Same objection.
24      A.  I would not -- I am not sure I would
25  characterize it that way.

Page 23

J. Schwaba

1
2      Q.  In what way is that characterization,
3  in your view, inaccurate?
4      A.  If you could repeat the question?
5      Q.  Sure.  Does a failed auction in an
6  auction rate municipal security indicate to you
7  a lack of market interest in that security?
8      A.  It could be that the rate is not high
9  enough.  I mean, given market conditions at that
10  time, perhaps one could construe that.
11      Q.  When you say the rate is not high
12  enough, you mean the rate is not high enough to
13  interest people in purchasing the security?
14      A.  That's right.
15      Q.  Would it be fair to say that auction
16  rate securities that have failed at auction
17  would trade below par?
18      A.  They could trade below par, but not
19  necessarily.
20      Q.  Would you expect such a security to
21  trade below par?
22      A.  That's an interesting question because
23  one of the things that was interesting to me was
24  that there were a large number, a relatively
25  large number of securities that did not trade

Page 24

J. Schwaba

1
2  below par even though there have been failed
3  auctions.
4      Q.  Failed auctions in those particular
5  securities?
6      A.  Yes, or like securities.
7      Q.  Or like securities?  Well, which is
8  it?  Have you identified particular transactions
9  where there were trades at or above par in a
10  security that had failed at auction?
11          MR. TAMBE:  Object to the form of the
12  question.
13          MR. DAKIS:  Objection.  Same
14  objection.
15          MR. McCOUBREY:  Same objection.
16      A.  I'm sorry, repeat the question again.
17      Q.  Sure.  Have you identified particular
18  transactions where there were trades at or above
19  par in an auction rate security that had failed
20  at auction?
21          MR. TAMBE:  Same objection.
22          MR. DAKIS:  Same objection.
23          MR. McCOUBREY:  Same.
24      A.  There was some definite analysis going
25  on, but I couldn't give you specifics of that as

Page 25

J. Schwaba

1
2  I recollect.
3      Q.  What do you mean there was some
4  definite analysis going on?  Does that mean you
5  were looking for such examples?
6      A.  In our -- in our review of the market
7  and the dynamics that were going on, I recollect
8  that obviously there were failed or some failed
9  auctions.  It was a phenomenon going on in that
10  time and place, and it was immediately -- it was
11  very interesting to look at the prices, the
12  market prices of those, and but I didn't -- I
13  can't recollect at this time specific
14  recommendations or specific points about those.
15      Q.  So as you sit here today you're unable
16  to identify for me any particular transaction of
17  which you're aware where an auction rate
18  security that had failed at auction sold at or
19  above par?
20          MR. TAMBE:  Objection to form.
21      Q.  Is that accurate?
22          MR. DAKIS:  Same objection.
23          MR. McCOUBREY:  Same objection.
24      A.  I can't answer that with regard to a
25  specific security, to the best of my

Page 26

1          J. Schwaba
2   recollection.
3       **Q.    Did you find examples of auction rate**
4   **securities that failed at auction that traded**
5   **below par?**
6       A.    To the best of my recollection, I can
7   recall auction rate securities that were trading
8   at par or below par in the best of my
9   recollection. I couldn't answer one
10  specifically right now.
11      **Q.    So we're clear, you said, "I can**
12  **recall auction rate securities were trading at**
13  **par or below par." Did you mean auction rate**
14  **securities that had failed at their auctions?**
15      A.    Both ones that had failed and ones
16  that had not failed.
17      **Q.    How far below par did the ones that**
18  **had failed -- strike that. When you observed**
19  **auction rate securities had failed at auction or**
20  **were trading below par, what was the range of**
21  **discount to par that you observed?**
22      A.    I don't -- I don't recall the
23  specifics of that.
24      **Q.    And just so I'm clear, you do not**
25  **recall finding any examples of an auction rate**

Page 27

1          **J. Schwaba**
2   **security that had failed at auction that traded**
3   **above par; is that correct?**
4       A.    No, I would not say that either.
5       **Q.    Well, do you recall such an example?**
6       A.    Of what?
7       **Q.    Of an auction rate security that had**
8   **failed at auction that traded above par?**
9       A.    I can't recall the specifics of that
10  at this particular point in time.
11      **Q.    Well, sitting here today, you have no**
12  **idea whether you can come up with an example of**
13  **an auction rate security that failed at auction**
14  **that traded above par, is that accurate?**
15          MR. TAMBE:  Objection to the form of
16      the question.
17          MR. DAKIS:  Same objection.
18          MR. McCOUBREY:  Same objection.
19      A.    I don't recall -- I can't recall for
20  you the specifics at this particular point in
21  time.
22      **Q.    Do you have work papers that you could**
23  **check to determine that?**
24      A.    There could be work papers that we
25  have available or that would -- could show that

Page 28

1          J. Schwaba
2   possibly.
3       **Q.    And what would those work papers be?**
4       A.    I'd have to go back and look at some
5   of the specifics, but did we look at the
6   municipal market? Absolutely, in terms of the
7   dynamics of the auction rate market and what the
8   market prices were.
9       **Q.    So I'm clear, your testimony is that**
10  **you looked specifically to determine what the**
11  **market prices for auction rate securities that**
12  **had failed their auctions were; is that correct?**
13          MR. TAMBE:  Objection to the form of
14      the question.
15          MR. DAKIS:  Same objection.
16      A.    That would be part of our analysis.
17      **Q.    In your opinion, what factors would**
18  **influence whether a particular auction rate**
19  **security that had failed at auction would trade**
20  **at, above, or below par?**
21      A.    Say the question again, please.
22      **Q.    In your opinion, what factors would**
23  **influence whether a particular auction rate**
24  **security that had failed at auction would trade**
25  **at, above, or below par?**

Page 29

1          **J. Schwaba**
2       A.    There were a number of factors we
3   looked at in terms of municipal auction rate
4   securities, but basically the demand, we were
5   very -- we were driven by market traded prices,
6   and that was our chief consideration.
7       **Q.    The market traded prices that you**
8   **used, are you referring to the 152 comparables**
9   **that you selected?**
10      A.    Primarily.
11      **Q.    What else are you referring to?**
12      A.    Well, those were primary
13  consideration, but there were also were the
14  actual securities, we had any indication on
15  those as well.
16      **Q.    Do you know whether any of the 152**
17  **comparable transactions that you selected**
18  **involved auction rate securities?**
19      A.    Yes, a substantial -- a substantial
20  portion of that 152, as I recollect, were
21  auction rate securities.
22      **Q.    Is there anywhere in your work papers**
23  **that identifies which are auction rate**
24  **securities as opposed to other types of**
25  **securities?**

Page 30

1             **J. Schwaba**
2     A.   As I recollect, they do.
3     **Q.   Where would I find that in your work**
4  **papers?**
5     A.   I couldn't tell you where you would
6  find it right as we speak, but I believe they --
7  I can't recall exactly, but I believe they were
8  as part of the information given out.
9     **Q.   Are you sure that these transactions**
10 **were auction rate securities as opposed to**
11 **adjustable rate securities?**
12          MR. TAMBE:  Objection to the form of
13 the question.
14          MR. DAKIS:  Same objection.
15          MR. McCOUBREY:  Same objection.
16    A.   I think we would have to define our
17 terms.
18    **Q.   Sure, let's define our terms.  Would**
19 **it be fair to define an adjustable rate security**
20 **as one where the interest rate is adjusted by**
21 **some mechanism over time?**
22    A.   I would agree with that.
23    **Q.   And one of the potential mechanisms**
24 **for adjusting interest rates is an auction**
25 **process; is that correct?**

Page 31

1             **J. Schwaba**
2     A.   I would agree with that.
3     **Q.   So can we agree on a definition of**
4  **"auction rate securities" as adjustable rate**
5  **securities whose adjustable rate is determined**
6  **through an auction process?**
7     A.   I would accept that.
8     **Q.   Okay.  So then using those**
9  **definitions, my question for you, sir, is of**
10 **your 152 examples, how many were auction rate**
11 **securities?**
12    A.   My understanding is that they were
13 virtually all, or close to being all, were
14 auction rate securities.
15    **Q.   And what's the basis for that**
16 **understanding?**
17    A.   The source of information that we got
18 on those securities.
19    **Q.   What was the source of information you**
20 **got on those securities?**
21    A.   The MSRB data.
22    **Q.   Is it your understanding the MSRB data**
23 **identifies whether a particular transaction**
24 **involved an auction rate security?**
25    A.   I can't recall exactly.  I believe it

Page 32

1             J. Schwaba
2  did, but ...
3     **Q.   If you're wrong about whether the**
4  **transactions that you used as comparables**
5  **included auction rate securities, what**
6  **implications would that have for your opinions**
7  **in this case?**
8          MR. DAKIS:  Objection to the form of
9  the question.
10          MR. TAMBE:  Same objection.
11          MR. McCOUBREY:  Same objection.
12    A.   I'm not sure I understand that
13 question and how to answer it.
14    **Q.   Well, would you have any concern if**
15 **the transactions you picked are not**
16 **comparable -- strike that.  Would you have any**
17 **concern that the transactions you were using as**
18 **comparables for valuing auction rate securities**
19 **in the group of securities that you looked at**
20 **were not appropriate comparables if the**
21 **comparables you used were not auction rate**
22 **securities?**
23    A.   Say that again, please.
24    **Q.   If the comparables that you used were**
25 **not auction rate securities, would it concern**

Page 33

1             **J. Schwaba**
2  **you that they might not be appropriate**
3  **comparables for the actual securities you were**
4  **valuing, some of which were auction rate**
5  **securities?**
6     A.   So are you saying that the securities
7  that we're valuing are auction rate or not
8  auction rate?  Are they adjustable or -- could
9  you please --
10    **Q.   Let me back up.  You valued a group of**
11 **26 CUSIPS; is that correct?**
12    A.   That's correct.
13    **Q.   In fact, it's really 24 distinct**
14 **CUSIPS because two of them are valued twice,**
15 **right?**
16    A.   Right.
17    **Q.   Do you know whether any of those were**
18 **auction rate securities?**
19    A.   Yes.
20    **Q.   How many of them were auction rate**
21 **securities?**
22    A.   My understanding is that there were 20
23 auction rate, or we refer to them as adjustable,
24 but 20 were of that type, except there was one
25 that was an OID adjustable or auction rate as

Page 34

1    J. Schwaba
2  well and the dynamics of pricing for that were
3  kind of a combination.  But that's -- but
4  basically what I'm saying is that my
5  understanding is that the 19 were what you would
6  term auction rate securities.
7    Q.  Well, just so I'm clear, your
8  testimony is that 19 of the securities you
9  looked --
10    A.  Twenty were labeled as adjustable rate
11  securities, okay?
12    Q.  Okay.
13    A.  And that would be how many.
14    Q.  And your testimony is that of those 20
15  that were labeled adjustable rate securities, 19
16  of them were auction rate securities or 20 were
17  auction rate securities?
18    A.  My understanding is actually that 20
19  were labeled as auction rate securities.  The
20  dynamics of how one, in my opinion, was priced
21  would -- would make it a little bit unique in
22  that respect, but definitely 19, and then 20
23  were labeled.
24    Q.  When you say "labeled," where would
25  they be labeled?

Page 35

1    J. Schwaba
2    A.  The source of our information.
3    Q.  So that would be in your work papers?
4    A.  I believe, I believe it would be
5  located there.
6    Q.  And if I understand you correctly, if
7  I look at your work papers and I see that
8  something is labeled is an adjustable rate
9  municipal security, I should understand that to
10  mean that it's an auction rate?
11    MR. TAMBE:  Objection to the form of
12  the question.
13    Q.  Is that correct?
14    MR. DAKIS:  Same objection.
15    A.  You can draw your own conclusions.
16  You know, I'm not sure --
17    Q.  I don't want to draw my own
18  conclusions.  I want to know what your
19  understanding is.  You're the one who prepared
20  the work papers or had them prepared for you,
21  right?
22    A.  That's correct.
23    Q.  So when in your work papers a security
24  is labeled adjustable rate, does that mean it's
25  an auction rate security or you're not sure

Page 36

1    J. Schwaba
2  whether it means it's an auction rate security?
3    MR. TAMBE:  Objection to the form.
4  Which pool are you talking about?  The
5  ones that he valued or the --
6    MR. SHAW:  The ones he valued.
7    A.  My understanding is it is most -- the
8  adjustable rate securities and auction rate
9  securities were used somewhat interchangeably
10  there.
11    Q.  Well, if I put the list of 24 CUSIPS
12  in front of you, sir, would you be able to tell
13  me which ones are auction rate and which ones
14  are adjustable rate?
15    A.  I would be able to tell you which ones
16  I believe to be auction rate, yes.
17    Q.  We'll have a chance to do that a
18  little later.
19    Would you expect a security with a
20  history of repeated failed auctions to be more
21  likely to trade below par than one that had only
22  one failed auction?
23    A.  If you're asking for my professional
24  opinion, I would say other things being equal, I
25  would agree with that.

Page 37

1    J. Schwaba
2    Q.  And why is that?
3    A.  It would strike me as there would be
4  less demand for the bond.
5    Q.  Would you expect there to be a
6  correlation between the length of time since the
7  security was subject to a successful auction and
8  the likelihood that such a security would trade
9  below par?
10    MR. TAMBE:  Object to the form of the
11  question.
12    MR. DAKIS:  Same objection.
13    MR. McCOUBREY:  Same objection.
14    A.  Say that again, please.
15    Q.  Would you expect there to be a
16  correlation between the length of time since a
17  security was subject to a successful auction and
18  the likelihood that such a security would trade
19  below par?
20    A.  Not necessarily.
21    Q.  Why not?
22    A.  Because of the, in our analysis and
23  what we saw, in terms of valuing these
24  securities, and especially through the use of
25  the comparables and proxies, as we termed them,

Page 38

1              J. Schwaba
2  there were a large, fairly large number of
3  securities that were trading at or around par.
4      Q.   How many of those comparables were
5  auction rate securities that had failed at their
6  auctions?
7      A.   I don't have that specific answer.
8      Q.   Is that something you looked at?
9      A.   We looked at what had failed and what
10  hadn't. We were aware of the failed auctions.
11      Q.   When you say you were aware of the
12  failed auctions, what do you mean?
13      A.   When we were doing our analysis of a
14  particular security, and I believe even in many
15  of the comparables we were aware of auctions
16  that were failed and those that didn't.
17      Q.   So if I understand you correctly, when
18  you were looking at possible comparables, you
19  tried to determine whether they had been the
20  subject of a failed auction?
21      A.   I can't give you specifics on that. I
22  do know we were primarily concerned with the
23  price, the traded price in the marketplace.
24      Q.   So as you sit here today, you cannot
25  tell me whether you made any effort to determine

Page 39

1              J. Schwaba
2  if any particular comparable had been subject to
3  a failed auction?
4          MR. TAMBE:  Objection to the form.
5          MR. DAKIS:  Objection to the form.
6      Q.   Is that correct?
7      A.   I can't say that, no.
8      Q.   So, just so I'm clear, you cannot say
9  that you made any efforts to determine if any
10  particular comparable had been subject to a
11  failed auction; is that correct?
12          MR. TAMBE:  Objection to the form of
13      the question.
14          MR. DAKIS:  Same objection.
15      A.   No, I can't say that.
16      Q.   Would you expect there to be any
17  correlation between the length of time since a
18  security was subject to a successful auction and
19  the amount below par at which that security
20  would trade?
21      A.   Say that again, please.
22      Q.   Would you expect there to be a
23  correlation between the length of time since a
24  security was subject to a successful auction and
25  the amount below par at which that security

Page 40

1              J. Schwaba
2  would trade?
3      A.   Not necessarily. I -- one of the
4  things that struck me, as I've said before, was
5  the price of the security, the failed ones even,
6  trading -- having traded prices at or around
7  par.
8      Q.   But you can't identify for me any
9  particular comparable transaction that was the
10  sale of a failed auction rate security; is that
11  right?
12          MR. TAMBE:  Objection. Asked and
13      answered any number of times now.
14          MR. DAKIS:  Same objection.
15      A.   I can't give you that, but I'm not
16  going to say that that didn't occur.
17      Q.   But you also can't say that it did
18  occur, can you?
19      A.   (Witness nods.)
20          MR. TAMBE:  Objection.
21          MR. McCOUBREY:  Objection.
22          MR. DAKIS:  Same objection.
23      Q.   You need to answer orally, please.
24      A.   Exactly, yes, I can't say it did or I
25  can't say it didn't.

Page 41

1              J. Schwaba
2      Q.   Would it be fair to say that auction
3  rate securities that failed at auction may be
4  subject to restricted liquidity?
5          MR. TAMBE:  Objection to form.
6      A.   Would it be fair -- is your question
7  would it be fair to say that they could be?
8      Q.   No. Would it be fair to say that
9  auction rate securities that failed at auction
10  may be subject to restricted liquidity?
11          MR. TAMBE:  Objection to form.
12          MR. DAKIS:  Same objection.
13      A.   That's a possibility, yes. It may --
14  that may happen. It could happen.
15      Q.   Would you expect it to happen?
16      A.   I would -- not necessarily based on
17  our analysis.
18      Q.   And what analysis precisely is that,
19  sir?
20      A.   The prices of market traded securities
21  as it relates to auction rate securities who
22  both -- both failed and didn't fail.
23      Q.   For any given failed auction security
24  what information would you look at to determine
25  whether it was subject to restricted liquidity?

Page 42

1                 **J. Schwaba**
2          MR. TAMBE:  Objection to the form of
3     the question.
4          MR. DAKIS:  Objection.
5          MR. McCOUBREY:  Objection.
6          A.   Say that again, please.
7     **Q.   Yes.  For any given example of a**
8     **failed auction rate security, what information**
9     **would you look at to determine whether it was**
10    **subject to restricted liquidity?**
11         A.   Well, in our analysis of securities,
12    we would look both at the information contained
13    in Bloomberg and we would look at information
14    contained in the official statements to
15    determine what some of those conditions were, if
16    they applied or not.
17    **Q.   What do you mean by "some of those**
18    **conditions were"?**
19         A.   I'm sorry, repeat that again in terms
20    of your original question because --
21    **Q.   You said, "Well, in our analysis of**
22    **securities, we would look both at the**
23    **information contained in Bloomberg and we would**
24    **look at the information contained in the**
25    **official statements to determine what some of**

Page 43

1                 **J. Schwaba**
2     **those conditions were, if they applied or not,"**
3     **and what I'm asking is what are the conditions**
4     **you're talking about?**
5          A.   As they relate to the manner in which
6     those securities would be auctioned and as it
7     relates -- as it potentially could relate to
8     some of the conditions affecting liquidity.
9     **Q.   And did you draw any conclusions based**
10    **on that analysis of the factors that would**
11    **influence the extent or likelihood which the**
12    **liquidity of such a security would be**
13    **restricted?**
14         A.   To the best of my recollection, it was
15    so individual.  I mean, I'd like to be able to
16    say that this, okay, they're all securities like
17    this, but that they were -- had different
18    characteristics, different -- different aspects
19    about it.
20    **Q.   Would a period of time following a**
21    **failed auction during which a security did not**
22    **trade at all be an indicator that it was -- that**
23    **that security was subject to restricted**
24    **liquidity?**
25         MR. DAKIS:  Objection to form.

Page 44

1                 J. Schwaba
2          MR. TAMBE:  Same objection.
3          A.   Say that again, please.
4     **Q.   Would a period of time following a**
5     **failed auction, during which the failed auction**
6     **rate security did not trade at all, be an**
7     **indicator to you that it was subject to**
8     **restricted liquidity?**
9          MR. DAKIS:  Objection to form.
10         A.   I would say, based on the way you
11    phrased that question, that could be that.
12    **Q.   How would you go about determining --**
13    **strike that.**
14         **Will you please tell me what the**
15    **market for auction rate securities was like in**
16    **September of 2008?**
17         MR. TAMBE:  Object to the form of the
18    question.
19         MR. DAKIS:  Same objection.
20         A.   Say that question again, please.
21    **Q.   Sure.  Would you please describe the**
22    **market for auction rate securities in September**
23    **of 2008?**
24         MR. TAMBE:  Same objection.
25         A.   Did you want my general commentary or

Page 45

1                 J. Schwaba
2     is it this is my opinion?
3     **Q.   You said you extensively researched**
4     **what the market conditions were like in**
5     **September of 2008 for auction rate securities,**
6     **so I would like to hear your general views on**
7     **that topic.**
8          A.   My general view was there was -- there
9     was -- we were operating in a general market
10    crisis at that time.  There were a lot -- there
11    was a lot of concern, a lot of nervousness in
12    the markets.  I think that what was interesting
13    about it was, though, that there were still
14    appeared to be -- there were certainly questions
15    about some liquidity and questions about
16    nervousness.
17         At the same time, there were -- not
18    all securities were reacting to it the same way.
19    There was even potentially some evidence among
20    some people that there was -- there was a flight
21    to quality of certain investors going into
22    Treasuries and even some investors for a period
23    of time going into some municipals.  I
24    remember -- I kind of recall that as being a
25    particular element as well.

1          J. Schwaba
2          So there was a lot of nervousness in
3   the market, I do recollect that very well, and
4   there was at the same time, as I recollect, a
5   fair amount of trading going on so that
6   liquidity was a concern, but there were in some
7   markets there was also a fair amount of activity
8   going on in terms of trading activity.
9          Q.   Just so I'm clear, when you say there
10  was a fair amount of trading activity going on,
11  are you talking specifically about auction rate
12  securities?
13         A.   I'm talking about what we're talking
14  about being an auction rate or adjustable rate
15  securities, that's right.
16         Q.   Well, I'm asking specifically about
17  auction rate securities now.  What was your
18  understanding of the conditions in the market
19  for auction rate securities in September of
20  2008?
21         A.   There was a fair amount of activity
22  going on in terms of trading, as I recollect.  I
23  can tell you, based on our information, that on
24  September 19, based on the information we have,
25  there were 12,416 municipal securities traded,

1          J. Schwaba
2   of which 1,664 were labeled as auction rate
3   securities.
4          Q.   1,66 --
5          A.   Based on the -- based on the
6   information that we had.
7          Q.   They were labeled as auction rate
8   securities or adjustable rate securities?
9          A.   I don't -- I thought they were, but I
10  could be -- I don't -- I believe they were -- we
11  would label them adjustable rate securities, of
12  which we believed they were mostly auction rate
13  securities.
14         Q.   And what's the basis for your belief
15  they were mostly auction rate securities?
16         A.   Based on the information that we
17  derived from our sources.
18         Q.   And what sources would those be?
19         A.   The MSRB database, Access, Bloomberg
20  rating systems.
21         Q.   And were any records created of your
22  determinations as to whether these were auction
23  rate or adjustable rate or some other type of
24  securities?
25         MR. TAMBE:  Objection to the form of

1          J. Schwaba
2   the question.
3          MR. DAKIS:  Same objection.
4          MR. McCOUBREY:  Same objection.
5          A.   We documented the evidence or the
6   information that we got from those sources.
7          Q.   And where would I find the
8   documentation of that information, sir?
9          A.   Well, what I'm saying is that we were
10  verifying -- well, we got the information from
11  those sources, as I said, and I don't recall
12  specific documentation with regard to that,
13  however, the analysis that we did accounted for
14  our large -- the 152 that we used as proxies.
15  So we were analyzing those 1,664, if you will,
16  or out of that universe, and comparing different
17  aspects of the bonds, of those municipal bonds
18  to our 20, 19 to 20 ARS, if you will, to
19  determine the commonalities between those and,
20  on a qualitative basis, the correlative factors.
21         Q.   Have you ever heard anyone describe
22  the auction rate securities market in September
23  of 2008 as essentially frozen?
24         A.   I have heard that.
25         Q.   Do you believe that's an accurate

1          J. Schwaba
2   statement concerning the auction rate securities
3   market at that time?
4          MR. TAMBE:  Objection to the form of
5   the question.
6          MR. DAKIS:  Same objection.
7          MR. McCOUBREY:  Same objection.
8          A.   I believe that it could have applied
9   towards -- I mean that term is used.  I believe
10  it could have been applied to certain
11  securities.
12         Q.   Which securities could it have been
13  applied to?
14         A.   I couldn't give you specifics.
15         Q.   Could it have applied to the 24
16  securities that you valued in your report?
17         MR. TAMBE:  Objection to the form of
18  the question.
19         A.   I couldn't give you a specific answer
20  on that.
21         Q.   Well, one thing we know is that you
22  did not find prices for any of those 24
23  securities; is that correct?
24         MR. TAMBE:  Objection to the form of
25  the question.

Page 50

1            J. Schwaba
2      A.   Actually, that's not quite correct.
3  There were two securities, one of which I
4  believe was an auction rate security, the other
5  was a zero coupon that did trade on September
6  19.
7      Q.   What auction rate security traded on
8  September 19, sir?
9      A.   I don't recall the specific one.
10     Q.   Okay.  I'll try and remember to ask
11 you about that one when we pull out the list.
12     A.   The source for that was
13 investinginbonds.com.
14     Q.   And when you valued that one, did you
15 use that market price or did you use a proxy?
16     A.   We used a proxy.
17     Q.   Why did you use a proxy rather than
18 the market price?
19     A.   Because we wanted to be consistent in
20 our application.  We didn't want it to be
21 construed as cherrypicking or we wanted a -- I
22 wanted to use a methodology that I felt was to
23 be consistently applied.
24     Q.   And was the actual price of the
25 transaction of that security on 9/19 higher or

Page 51

1            J. Schwaba
2  lower than the price that you arrived at through
3  your use of proxies?
4      A.   I don't recall.  I think -- I don't
5  recall exactly.  As I recollect, the actual
6  price was at par, if I remember correctly, and I
7  may not be remembering correctly, but if I did,
8  I believe it was at par, and I can't recall
9  specifically what the proxy price was.
10     Q.   You stated at one point a few minutes
11 ago that you noticed that there was a flight to
12 quality.  Do you remember that?
13     A.   General market conditions in September
14 of 2008, that would be correct.
15     Q.   Did that flight to quality involve
16 investors flying to auction rate securities?
17     A.   I could not draw that specific
18 conclusion, but my recollection is that some
19 security -- some investors were moving to
20 municipals, which theoretically could have
21 included some auction rate.
22         (Recess; Time Noted:  10:36 A.M.)
23         (Time Noted:  10:47 A.M.)
24 BY MR. SHAW:
25     Q.   Mr. Schwaba, I believe you said

Page 52

1            J. Schwaba
2  earlier that you had observed a, quote, fair
3  amount of trading in the adjustable rate
4  municipal securities market in September of
5  2008, is that --
6      A.   I think I --
7          MR. TAMBE:  Objection to the form of
8  the question.
9          You can answer.
10         MR. DAKIS:  Same objection.
11         MR. McCOUBREY:  Same objection.
12     A.   I think I, as I recollect, and I'm --
13 I think there was a fair amount of trading going
14 on in the municipal market.
15     Q.   So are you saying then you did not
16 observe a fair amount of trading in the
17 adjustable rate market?
18         MR. TAMBE:  Objection to form.
19         MR. DAKIS:  Objection to form.
20         MR. McCOUBREY:  Form objection.
21     A.   I can't say that definitively.  I
22 believe that there was -- my interpretation was
23 that there was a fair amount of trading going on
24 in the ARS market as well.
25     Q.   And when you use the term "ARS," do

Page 53

1            J. Schwaba
2  you mean adjustable rate or do you mean auction
3  rate?
4      A.   We use adjustable rate, incorporating
5  auction rate as well.
6      Q.   And the evidence --
7      A.   I do that.  Excuse me.
8      Q.   And the evidence that you have -- I'm
9  sorry.  Strike that.
10         And the basis for your statement that
11 there was a fair amount of trading in the ARS
12 market is that on the 19th you observed trading
13 in a little less than 1700 ARS securities; is
14 that right?
15     A.   We did observe trading in the ARS
16 market and we -- what I also heard anecdotally
17 was that there was a fair amount of trading
18 going on.  In other words, the volume on that
19 particular day was not necessarily all that
20 different from, in terms of total volume, in the
21 weeks and months previous and the weeks and
22 months after, but I don't have -- I couldn't
23 give you specifics on that at this particular
24 point in time.
25     Q.   So you wouldn't be able to tell me,

Page 54

J. Schwaba

1    J. Schwaba
2    for example, how the volume on September 19,
3    2008 compared to the average ARS trading volume
4    in, say, December of 2007?
5        A.   I could not give you that, no.
6        Q.   Or how it compares to trading today?
7        A.   I could not give you that at this
8    time.
9        Q.   In fact, you have no idea how --
10    whether looking at it in historical terms, the
11    volume of trading on September 19 was high or
12    low?
13        MR. TAMBE:  Objection to the form of
14    the question.
15        MR. McCOUBREY:  Objection to the form.
16        Q.   Is that right?
17        MR. DAKIS:  Same objection.
18        A.   I could not give you that information
19    at this time.  I have had discussions about
20    that, but I do not have -- I could not give you
21    that at this time.
22        Q.   With whom have you had discussions
23    about that?
24        A.   My counterparts.
25        Q.   Your counterparts, meaning who?

Page 55

1    J. Schwaba
2        A.   My -- the staff that I've been working
3    with.
4        Q.   And who are the staff you've been
5    working with?
6        A.   I've used some resources, as I've
7    indicated in my report, of Chicago Partners.
8        Q.   And that was in place before you were
9    retained to work on this matter; is that right?
10        MR. TAMBE:  Objection to the form of
11    the question.
12        MR. DAKIS:  Same objection.
13        Q.   They were already working on this
14    matter before you were retained; is that
15    correct?
16        A.   I couldn't give you that information.
17    I don't have that information.
18        Q.   Had you previously worked with Chicago
19    Partners?
20        A.   I've worked with Mr. Nick Weir on a
21    discussion basis prior to this.
22        Q.   Have you worked with any of the
23    individuals who have been providing you support
24    services at Chicago Partners before this
25    engagement?

Page 56

1    J. Schwaba
2        A.   No.
3        Q.   Were you given the option of retaining
4    other support personnel?
5        A.   Say that question again, please.
6        Q.   Yes.  When you were retained to work
7    on this, were you given an option to use people
8    other than persons at Chicago Partners if you so
9    preferred?
10        A.   That's a hypothetical question because
11    I understood the resources available and chose
12    to employ them as outlined, but my
13    interpretation would be if I want -- this is my
14    project, this is my opinion.  If I want to use
15    an outside source, I have that option.  That's
16    the way I interpret that.
17        Q.   And you think that's an appropriate
18    arrangement for an expert, is that correct?
19        MR. DAKIS:  Objection to form.
20        A.   I'm being -- my role here is to
21    provide an independent valuation, and I would --
22    I characterize that as doing whatever is in the
23    spirit of that to carry that out.
24        Q.   Are you aware -- well, actually,
25    strike that.  Did there come a point in time in

Page 57

1    J. Schwaba
2    2008 when auction rate security auctions started
3    to fail fairly regularly?
4        A.   Based on the information that I saw,
5    it appeared that failed auctions did start to
6    increase, you know, in the time period you were
7    talking about, in 2008, maybe even a little
8    before that, as I recollect.
9        Q.   So as far back as 2007 your
10    recollection is that auctions started to fail at
11    an increasing rate?
12        A.   As I recollect, it was -- it was
13    sometime in the period of time late 2007,
14    definitely in 2008.  I can't give a specific
15    timeframe, but I do recollect that.
16        Q.   By September of 2008, what percentage
17    of auctions were failing?
18        MR. TAMBE:  Objection to form of the
19    question.
20        MR. DAKIS:  Same objection.
21        MR. McCOUBREY:  Same objection.
22        A.   I don't have a specific number on
23    that.
24        Q.   More than 20 percent?
25        A.   I would not be surprised if it were

1    J. Schwaba
2    more than 20 percent.
3    **Q.    More than 40 percent?**
4    A.    It could be.
5    **Q.    More than 60 percent?**
6    A.    I don't know.
7    **Q.    As much as 80 percent?**
8    A.    I don't -- I don't have a specific
9    number on that.
10    **Q.    Are you aware that by September 2008**
11    **some investors in auction rate securities**
12    **contended that they had been misled by the**
13    **financial institutions from whom they had**
14    **purchased such securities?**
15    A.    I do not have that specific
16    information.
17    **Q.    Do you know whether any financial**
18    **institutions faced lawsuits relating to their**
19    **sales of auction rate securities to investors?**
20    A.    I don't have any specific information
21    about that.
22    **Q.    Do you know whether there were any**
23    **government or regulatory investigations ongoing**
24    **into the practices of financial institutions**
25    **that sold auction rate securities to investors?**

1    **J. Schwaba**
2    A.    I don't have specific information on
3    that.
4    **Q.    Do you know whether any financial**
5    **institutions responding to either relationship**
6    **pressures or legal or regulatory pressures were**
7    **buying back auction rate securities from**
8    **investors at or near par?**
9    A.    I have public information to that
10    effect. I had heard that.
11    **Q.    And that was true as of September**
12    **2008?**
13    A.    I don't recall the specific time, but
14    it could have been on or around then.
15    **Q.    Do you know if such transactions would**
16    **have been reported on MSRB?**
17    A.    I do not. I do not know that.
18    **Q.    Would you agree that a transaction**
19    **where a financial institution is repurchasing**
20    **auction rate securities from investors for a**
21    **relationship or in response to legal or**
22    **regulatory pressures are not arm's length**
23    **transactions?**
24    MR. TAMBE:  Objection to the form of
25    the question.

1    J. Schwaba
2    MR. DAKIS:  Objection to form.
3    MR. McCOUBREY:  Objection to form.
4    A.    I believe that's an interpretation
5    which I can't speak with authority about.
6    **Q.    Would you be at all concerned with**
7    **using such a transaction as a comparable for**
8    **purposes of valuing the securities that you in**
9    **fact valued in this case?**
10    MR. TAMBE:  Objection to the form of
11    the question.
12    MR. DAKIS:  Same objection.
13    MR. McCOUBREY:  Same objection.
14    A.    I potentially could be concerned, but
15    I'm not sure it would change the conclusions,
16    any conclusion that I necessarily would have.
17    **Q.    But you're also not sure that it**
18    **wouldn't; is that correct?**
19    A.    I'm not going to say that it would or
20    it wouldn't.
21    **Q.    I'd like you to set aside for the**
22    **moment securities that traded deep in active**
23    **markets with frequent purchases and sales, okay?**
24    A.    With what?  Excuse me.
25    **Q.    Securities that trade in deep and**

1    **J. Schwaba**
2    **active markets with frequent purchases and**
3    **sales. So --**
4    A.    You'd like me to set that aside?
5    **Q.    For purposes of the next couple of**
6    **questions. So we're not talking about**
7    **Treasuries and we're not talking about equities**
8    **issued by large Fortune 500 companies, okay?  I**
9    **want to focus on less liquid securities. Do you**
10    **understand that?**
11    A.    (Witness nods.)
12    **Q.    You need to answer orally.**
13    A.    Yes, I do understand.
14    **Q.    Would you agree that for such less**
15    **liquid securities a mark is an estimate of the**
16    **value as of some date and time?**
17    MR. TAMBE:  Object to the form of the
18    question.
19    A.    It could represent that.
20    **Q.    If you don't have an actual**
21    **transaction price for that security, would the**
22    **mark necessarily be an estimate of its value?**
23    A.    If you don't have a -- if you don't
24    have an actual trade for the security, a mark --
25    a mark could be construed as an estimate.

J. Schwaba

1
2   Q.   Under what circumstances would it not
3   be an estimate?
4           MR. TAMBE:  Objection to the form of
5   the question.
6           MR. DAKIS:  Same objection.
7       A.   It depends.  Theoretically, it could
8   depend on what the person or the entity or the
9   institution putting out the mark was going to
10   use it -- what it wanted to indicate.
11       Q.   What is a mark?
12       A.   Excuse me.
13       Q.   What is your understanding of the term
14   "mark"?
15       A.   I guess I'd have to ask you that.
16   What do you mean by "mark" in this instance?
17       Q.   Didn't you define a "mark" in your
18   report?
19       A.   We've -- we defined actual traded
20   prices.  A transaction -- there was originally a
21   bid and there was originally an offer and
22   there's a transaction.
23       Q.   And what is a mark in a circumstance
24   where you do not have an actual transaction in
25   that particular security?

J. Schwaba

1
2       A.   It could be construed as an estimate
3   of value of that security.
4       Q.   Isn't it necessarily an estimate of
5   the value of that security?
6       A.   Excuse me?
7       Q.   Isn't it necessarily an estimate of
8   the value of that security as of a given date
9   and time?
10       A.   It could be construed as that.
11       Q.   Was there any way to construe that
12   it's not that?
13       A.   It depends on what you want to use
14   that mark for.
15       Q.   How does it depend on what you want to
16   use that mark for?
17       A.   In my mind, a mark is an estimate of
18   the value.  It's an estimate.
19       Q.   Okay.  Have you ever taken a
20   statistics course or an econometrics course?
21       A.   Yes.
22       Q.   Would it be fair to say that, speaking
23   statistically, an estimate is virtually always
24   subject to some degree of uncertainty?
25       A.   I would agree with that.

J. Schwaba

1
2       Q.   And so there's necessarily some margin
3   for error; is that correct?
4       A.   From a statistical perspective, I
5   would agree with that.
6       Q.   Have you done anything to quantify the
7   degree of uncertainty surrounding any of the
8   marks that you estimated in your work on this
9   case?
10           MR. TAMBE:  Objection to the form of
11   the question.
12       A.   Say that again, please.
13       Q.   Have you done anything to quantify the
14   degree of uncertainty surrounding any of the
15   marks that you estimated in your work on this
16   case?
17           MR. TAMBE:  Same objection.
18       A.   No, we have not.
19       Q.   Are you familiar with the concept of
20   confidence interval?
21       A.   I am familiar with that.
22       Q.   Are you able to quantify for me a 95
23   percent confidence interval around your
24   estimates?
25       A.   I cannot do that or haven't done that.

J. Schwaba

1
2       Q.   Why not?
3       A.   My choice was to use traded prices.
4   It's not -- traded prices indicates to me an
5   actual trade took place, and that's where the
6   value of that particular security was.
7       Q.   But just so we're clear, with the
8   exception of perhaps 2 of the 24 securities you
9   looked at, you did not observe any traded price
10   for that security; is that correct?
11       A.   I observed traded prices for proxies.
12       Q.   And your selection of proxies required
13   you to use judgment, is that fair?
14       A.   That would be accurate.
15       Q.   And would you agree that a reasonable
16   valuation expert could disagree with some of
17   your choices of proxies?
18       A.   I would accept that that could happen.
19       Q.   We've talked previously about how at
20   least some people would describe in the auction
21   rate securities market as essentially frozen
22   around September of 2008; is that correct?
23       A.   Yes, we did.
24       Q.   It's not clear to me, do you agree
25   that the market was essentially frozen at that

Page 66

J. Schwaba

1    time?
2    A.    Given the use of the term "frozen" and
3    what it means in the auction rate securities, I
4    could accept that there was some degree of --
5    that that condition could be used to describe
6    the market.
7    Q.    Well, just so we're clear, then, what
8    **do you understand the term "frozen" to mean in**
9    **that context?**
10   A.    That basically there was little or no
11   movement in terms of the auction rate securities
12   markets in terms of basically a number or a
13   large number of failed auctions and relatively
14   little activity from an investment in the
15   auction rate market.
16   Q.    **And would it be fair to say that, as a**
17   **result of that, the quantity and quality of**
18   **available information about prices for auction**
19   **rate securities was thin?**
20       MR. TAMBE:  Object to the form of the
21   question.
22       MR. DAKIS:  Same objection.
23       MR. McCOUBREY:  Same objection.
24   A.    That could be an interpretation, but
25

Page 67

J. Schwaba

1    there -- it would depend also from a larger
2    perspective on the number of trades going on in
3    the marketplace as well.
4    Q.    **In other words, you would determine**
5    **whether the quantity and quality of information**
6    **available was thin by reference to the number of**
7    **trades going on in the marketplace?**
8    A.    Well, there are different aspects of
9    the marketplace and should be weighed and
10   evaluated.
11   Q.    **Are there any aspects in your**
12   **opinion -- strike that.  In your opinion, were**
13   **there any aspects of the auction rate securities**
14   **marketplace where the quality and quantity of**
15   **available information about price was not thin**
16   **in September of 2008?**
17       MR. TAMBE:  Objection to the form of
18   the question.
19       MR. DAKIS:  Same objection.
20       MR. McCOUBREY:  Same objection.
21   A.    I'm not sure I understand that
22   question.
23   Q.    **In your opinion, were there any**
24   **aspects of the auction rate securities**
25

Page 68

J. Schwaba

1    **marketplace where there was a deep and active**
2    **market during September of 2008?**
3    A.    Say that one more time, please.
4    Q.    **In your opinion, were there any**
5    **aspects of the auction rate securities**
6    **marketplace where there was a deep and active**
7    **market during September of 2008?**
8        MR. TAMBE:  Objection to the form of
9    the question.
10       MR. McCOUBREY:  Same objection.
11   A.    One could interpret the number of
12   trades going on during that period of time as
13   indicating more -- a fair amount of value and
14   depth of the market than one would have
15   originally suspected.
16   Q.    **And when you say that, you're**
17   **referring specifically to the 1,664 trades and**
18   **adjustable rate securities that you identified**
19   **in your report?**
20   A.    And the 12,460 municipal securities
21   traded on September 19.
22   Q.    **Do you have any idea of how the volume**
23   **of municipal securities traded on September 19**
24   **compared to those trades historically over, say,**
25

Page 69

J. Schwaba

1    **the preceding three years?**
2        MR. TAMBE:  Objection to the form of
3    the question.  Objection.  Asked and
4    answered.
5    Q.    **You can answer.**
6    A.    I could not -- I do not have that
7    information given the way you phrased that
8    question.
9    Q.    **Do you know how the volume traded on**
10   **September 19, 2008 compared to, say, the average**
11   **daily volume in 2007?**
12   A.    I do not.
13   Q.    **Would it surprise you if it was**
14   **reduced by between two-thirds and**
15   **three-quarters?**
16       MR. TAMBE:  Objection to the form of
17   the question.
18   A.    Of what?  The volume -- are you saying
19   the volume in 2007 would be less than 2008?
20   Q.    **No, I'm saying that the volume in**
21   **September of 2008 would be between one-quarter**
22   **and one-third of the volume in 2007.**
23       MR. TAMBE:  Objection.
24   A.    I don't know whether I'd be surprised
25

Page 70

1          J. Schwaba
2 or not.
3     Q.    Would that have any implications for
4 your analysis in this case?
5         MR. DAKIS:  Objection to the form.
6     A.    I couldn't necessarily say that. I
7 think we would have to look at, you know, what
8 the composition of that was as well, but...
9     Q.    What do you mean, you would have to
10 look at what the composition of that was?
11    A.    Well, I'd like -- I would personally
12 like to see more specifics with regard to that.
13 I don't have that information.
14    Q.    Would it be fair to say that valuation
15 of auction rate securities was relatively
16 difficult in September of 2008?
17        MR. TAMBE:  Objection to the form.
18        MR. DAKIS:  Same objection.
19    A.    I'm not sure that I would necessarily
20 come to that conclusion given the traded prices
21 that we saw.
22    Q.    So because you took a look at --
23 strike that.
24        When you say the traded prices that
25 you saw, you're referring to the 1,664

Page 71

1          J. Schwaba
2 adjustable rate securities that you observed
3 being traded on September 19; is that correct?
4     A.    That would be right.
5     Q.    Okay.  And you're not referring to
6 anything else when you say that, right?
7        MR. TAMBE:  Objection to the form of
8 the question.
9        MR. DAKIS:  Same objection.
10        MR. McCOUBREY:  Same objection.
11    A.    That is what I'm -- that was what my
12 primary focus was.
13    Q.    Is there a secondary focus?
14    A.    Market conditions.
15    Q.    And what were the market conditions?
16    A.    General overall market conditions.
17    Q.    So you would not agree that valuation
18 of financial assets was particularly difficult
19 in September of 2008?
20        MR. TAMBE:  Object to the form.
21    A.    I wouldn't say that at all.
22    Q.    You would not -- that was a badly
23 phrased question so let me make sure.
24        When you say you wouldn't say that at
25 all, you mean you would not say that valuation

Page 72

1          J. Schwaba
2 of many financial assets was particularly
3 difficult during September of 2008?
4        MR. DAKIS:  Objection to form.
5     Q.    Is that correct?
6     A.    Say that again, please.
7     Q.    Sure.  Is the following statement
8 correct:  Valuation of many financial assets was
9 particularly difficult in September of 2008?
10        MR. DAKIS:  Objection to form.
11    Q.    In your opinion?
12        MR. DAKIS:  Objection to form.
13    A.    I'm not going to -- I'm not going to
14 draw that necessarily conclusion.
15    Q.    I'm focusing specifically on auction
16 rate securities.  Was that a particularly
17 difficult time to value them?
18        MR. TAMBE:  Objection to form.
19        MR. DAKIS:  Same objection.
20    A.    There were challenges with regard to
21 going on in that market.  I do know that.
22    Q.    You yourself were not engaged in
23 valuing auction rate securities in September of
24 2008; is that correct?
25    A.    That's correct.

Page 73

1          J. Schwaba
2     Q.    And you yourself were not involved in
3 valuing adjustable rate securities in September
4 of 2008; is that correct?
5     A.    That would be correct, except to the
6 extent that we may have had them in our
7 portfolio at the Federal Home Loan Bank, as we
8 have discussed.
9     Q.    You valued the securities that you
10 valued as of September 19, 2008; is that
11 correct?
12    A.    Based on traded prices.
13    Q.    I'm just asking about the valuation
14 date.  So you valued as of September 19, 2008;
15 is that correct?
16    A.    I'm sorry, I don't understand.  Are
17 you saying what did I value back in September
18 19, 2008?
19    Q.    No, I'm not.  I'm sorry.  Let me try
20 and be clearer.
21        The valuations that you reached were
22 what you understood or what you have determined
23 the values to have been as of September 19,
24 2008; is that correct?
25    A.    Based on traded prices.

Page 74

J. Schwaba

1
2  Q.  **Based on whatever methodology, the**
3  **valuation date --**
4    A.  Was as of September 19.
5    Q.  **Okay.  Why did you not value them as**
6  **of September 22?**
7    A.  September 19, as I -- September 19, as
8  I understood it, as I do understand it, is when
9  the September 22 dated as of September -- or as
10 of market as of September 19 was when this
11 transaction occurred.
12   Q.  **When did the transaction close?**
13        **Before you answer that, when you say**
14 **"this transaction," you're talking about the**
15 **sale transaction between Barclays and the Lehman**
16 **estate?**
17   A.  That's correct.
18   Q.  **Do you have any understanding of when**
19 **that transaction closed?**
20   A.  My understanding is it closed on or
21 about midnight on the 22nd, but I could be wrong
22 on that.
23   Q.  **Do you know when title to the**
24 **financial assets passed to Barclays?**
25   A.  I do not know that exactly.

Page 75

J. Schwaba

1
2  Q.  **Do you know when it was on the 19th?**
3    A.  I do not know it specifically.
4    Q.  **Do you know whether it was on the**
5  **22nd?**
6    A.  I answered that before.  I think that
7  was my understanding, but again, I don't know.
8    Q.  **Are you offering an independent expert**
9  **view that the proper valuation date is September**
10 **19?**
11   A.  Yes.
12   Q.  **What is the basis for that view?**
13   A.  My understanding of the -- my
14 understanding of the transaction.
15   Q.  **What does that mean, your**
16 **understanding of the transaction?  What about**
17 **the transaction leads you to believe that the**
18 **19th was the proper valuation date?**
19        MR. DAKIS:  Objection to form.
20   A.  This is my understanding of when the
21 sale occurred, as I indicated before.  I think I
22 answered that before.
23   Q.  **So your expert opinion that the 19th**
24 **is the appropriate valuation date is based on**
25 **your understanding that the sale occurred on the**

Page 76

J. Schwaba

1
2  **19th?**
3        MR. TAMBE:  Objection to the form of
4  the question.
5    Q.  **Is that right?**
6        MR. DAKIS:  Objection to form.
7        MR. McCOUBREY:  Same objection.
8    A.  My valuation has to do with the
9  valuation of a select number of municipal
10 securities as of a given date, and that date is
11 September 19.
12   Q.  **And were you asked to assume September**
13 **19 was the appropriate valuation date or did you**
14 **select that yourself?**
15        MR. DAKIS:  Objection to form.
16   A.  Say that again, please.
17   Q.  **Yes.  Did you yourself independently**
18 **select September 19 as your appropriate**
19 **valuation date, or were you asked to assume that**
20 **was the appropriate valuation date?**
21   A.  My assumption was that that was the
22 appropriate valuation -- valuation date.
23   Q.  **Well, was that an assumption that you**
24 **independently arrived at or were you asked to**
25 **assume that?**

Page 77

J. Schwaba

1
2    A.  Part of my analysis I derived that
3  that was the -- that September 19 was the
4  appropriate date.
5    Q.  **And the basis for your decision that**
6  **that was the case was the fact that you believed**
7  **the transaction took place on the 19th?**
8        MR. TAMBE:  Objection to the form of
9  the question.
10        MR. DAKIS:  Same objection.
11   A.  The transaction -- if we were going to
12 provide a reasonable market value as it relates
13 to the transaction, where would you go to find a
14 reasonable market valuation, and the market --
15 the closest time of that market valuation would
16 have been as of the close of September 19.
17   Q.  **When you say "closest," you mean**
18 **closest time?**
19   A.  To a real market functioning.
20   Q.  **Wouldn't, by definition, close of**
21 **market on September 22 be closer to midnight**
22 **September 22 than the previous Friday?**
23   A.  Well, you could interpret it that way,
24 but no market -- nothing ever -- nothing ever
25 really happened.  In my opinion, anyway,

Page 78

1            J. Schwaba
2  professional opinion, it's better to take actual
3  market data because you know exactly what
4  happened.  You don't know what happened after
5  midnight on the 22nd.
6        If the deal closed -- if the deal did
7  close on midnight on the 22nd, to say you were
8  going to close as of the close of business on
9  the 22nd, in my opinion, wouldn't be as
10  appropriate as saying -- as taking the close on
11  the previous trading day, which would be the
12  close of the 19th.
13        I'll acknowledge that markets trade 24
14  hours, 24/7, but how much volume or liquidity
15  are you going to get over a weekend and how much
16  volume are you going to get in terms of overseas
17  markets as well.
18    Q.  Why does the amount of volume that you
19  get matter to your opinion on that?
20    A.    In my opinion, it's a better
21  indication of the depth and breadth of the
22  market, the volume traded, in my professional
23  opinion.
24    Q.  Did you make any effort to quantify
25  the difference that valuation as of the 19th as

Page 79

1            J. Schwaba
2  opposed to valuation as of the 22nd makes to the
3  valuation of the particular securities you
4  looked at?
5    A.    No, I did not do that specifically.
6    Q.  Did you examine the Lehman marks for
7  the particular securities that you looked at?
8    A.    The Lehman marks?  I don't believe we
9  did.
10    Q.  What's your understanding of the
11  meaning of the term "bid price"?
12    A.    My understanding of the bid price
13  would be the price at which buyers will be
14  willing to pay for a particular security.
15    Q.  Are the terms "bid price" and "exit
16  price" essentially synonymous, as you understand
17  them?
18    A.    Not necessarily the same to me.
19    Q.  In what way do they differ?
20    A.    Well, I think it's, in my mind, an
21  exit price is going to end up being part of a
22  net transaction, theoretically.  A bid price is
23  what are you willing to pay for something.  An
24  exit price is the price at which -- what you
25  would need to do to exit or to get out of the

Page 80

1            J. Schwaba
2  market, and I think that they're all -- they're
3  both -- I mean, I think there are some different
4  interpretations there for those, those two
5  terms.  The most ascertainable aspect of value
6  is where prices trade or traded prices are.
7    Q.  Would a bid price ever be higher than
8  exit price?
9        MR. TAMBE:  Objection to the form of
10    the question.
11        MR. DAKIS:  Same objection.
12    A.    I don't know.  That's -- I couldn't
13  answer that.
14    Q.  Do you agree that it's appropriate for
15  purposes of valuing these securities to focus on
16  valuations at bid prices?
17        MR. TAMBE:  Objection to the form of
18    the question.
19        MR. DAKIS:  Same objection.
20        MR. McCOUBREY:  Objection.
21    A.    Again, I say, you know, traded prices
22  are the best indication, in my opinion.  The bid
23  price can become the traded price.  You know,
24  when the security trades, it's when a bid and
25  offer come together.

Page 81

1            J. Schwaba
2    Q.  Would you agree that it's appropriate
3  for purposes of the analysis of the value of the
4  securities to focus on valuations at exit
5  prices?
6        MR. TAMBE:  Objection to the form of
7    the question.
8    A.    I don't -- I'm still -- I don't
9  understand exactly what -- I have a problem with
10  exit prices as a definition.  I mean, I don't --
11  I guess I don't understand exactly what that
12  means.
13    Q.  So you're not able to define for me
14  the term "exit price"?
15    A.    I can attempt to define it, but I'm
16  not sure -- it doesn't have the same certainty
17  associated with it as a traded price.
18    Q.  Okay.  What do you understand an exit
19  price to be?
20    A.    To me an exit price would be the price
21  at which I would get out of an existing
22  security, and that could be my interpretation of
23  what that price would be.  It wouldn't be a
24  traded price where an actual transaction took
25  place.

Page 82

1          J. Schwaba
2     Q.   Are the values that you provide mid
3  price values or bid or exit price values?
4     A.   They're actual traded prices and they
5  probably embody a combined bid and offer, bid
6  price and offer price.  That's where buyer and
7  seller come together and agree on what the value
8  of a particular security is through the
9  mechanism of a traded price.
10    Q.   Valuing a portfolio of securities for
11 purposes of marking one's books pursuant to
12 applicable accounting standards, is it necessary
13 to mark them to exit prices?
14        MR. TAMBE:  Objection to the form of
15    the question.
16    A.   I couldn't answer that question.
17    Q.   Is it appropriate to value using exit
18 prices?
19        MR. TAMBE:  Same objection.
20    A.   Again, I couldn't answer that
21 question.
22    Q.   In valuing assets, in valuing
23 financial assets, is it necessary to adjust from
24 mid to bid prices?
25        MR. TAMBE:  Objection to the form of

Page 83

1          J. Schwaba
2  the question.
3     A.   Again, I couldn't answer that.
4     Q.   Do you know how traders use the term
5  "mid price"?
6     A.   My understanding of "mid price" is
7  it's the midway point or halfway point, if you
8  will, between a bid and offer.
9     Q.   And what is your understanding of how
10 traders use the term "bid price"?
11    A.   It's the price at which they would be
12 willing to bid for a particular security or buy
13 a security, a price at which they were going to
14 pay or buy a security.
15    Q.   And what's your understanding of what
16 traders use as how traders use the term "ask
17 price"?
18    A.   Ask price or offer price is the price
19 at which they would be willing to sell that
20 which they already have in their position.
21    Q.   And do you know whether your
22 valuations are mid or bid?
23    A.   My valuations are based on traded
24 prices, and whether that was a mid price or a
25 bid price, it's kind of hard to say because at

Page 84

1          J. Schwaba
2  the point at which it's done, let's say the
3  bid/offer is 5 bid at 7 or 5 bid at 8, I'm
4  buying -- willing to bid at 5 and offer at 8,
5  okay?  Or let's say 5 -- 5 bid at 7.  There's a
6  market there, a bid/offer spread of 2 points.
7  The midway point would be halfway between that,
8  but I may as a trader decide you know what, I'm
9  going to hit the bid, I got to get out of my
10 position, so I might have talked about a mid
11 price being, you know, 6 between 5 and 7, but I
12 end up doing the trade at 5, okay?  So was it --
13 is 5 -- 5 was at a midpoint.
14    Q.   Is it possible that actual prices
15 could have been at ask?
16    A.   An actual price could, could end up
17 being what the original bid price was or the
18 offered price was.  Could be.
19    Q.   In valuing these securities, you did
20 not make any adjustment from mid to bid?
21        MR. TAMBE:  Objection to the form of
22    the question.
23    Q.   Is that right?
24    A.   We ended up using the -- we ended up
25 using the bid -- we called that the bid price,

Page 85

1          J. Schwaba
2  basically, but it was basically the traded
3  price.
4     Q.   So the answer to my question is no?
5        MR. TAMBE:  Objection to form.
6     Q.   You did not make any adjustment from
7  mid price to bid price?
8        MR. TAMBE:  Objection to form.
9        MR. DAKIS:  Objection to form.
10       MR. McCOUBREY:  Same objection.
11    Q.   Is that correct?
12       MR. TAMBE:  Same objection.
13    A.   I'm not sure I can answer that.
14    Q.   What's your understanding of the
15 implications of a failed auction for the
16 interest rate coupon rate that the borrower must
17 pay in the context of an auction rate security?
18    A.   My understanding is that it could,
19 depending on the individual security, the
20 security could be auctioned at the maximum rate
21 set.
22    Q.   Is it your view that a high penalty
23 rate on an auction rate security makes
24 refinancing of that security attractive to the
25 issuer?

Page 86

J. Schwaba

1
2    A.   I can't answer that, but based on what
3    you say, I would not -- theoretically, I would
4    say I agree with that.
5    Q.   Do you know what portion of auction
6    rate securities have experienced failed auctions
7    have been redeemed voluntarily?
8    A.   I don't have that information.
9    Q.   In order to redeem an auction rate
10   security, the issuer would need to have
11   alternative financing in place; is that correct?
12        MR. TAMBE:   Objection to the form of
13   the question.
14   A.   I could not necessarily make that
15   assumption.
16        (Exhibit 697, Expert Report of Joseph
17   Schwaba, marked for identification, as of
18   this date.)
19        (Exhibit 698, Expert Report of Joseph
20   Schwaba Errata, marked for identification,
21   as of this date.)
22        (Recess; Time Noted:  11:33 A.M.)
23        (Time Noted:  11:38 A.M.)
24   BY MR. SHAW:
25   Q.   Mr. Schwaba, showing you what has been

Page 87

J. Schwaba

1
2    marked as Exhibit 697, do you recognize that as
3    a copy of your expert report in this matter?
4    A.   I do.
5    Q.   Showing you what has been marked as
6    Exhibit 698, immediately behind it, do you
7    recognize that as a copy of the errata sheet
8    prepared by you?
9    A.   Yes.
10   Q.   Looking at paragraph 8 of your report,
11   page 2?
12   A.   Yes.
13   Q.   Do you see in the second bullet point
14   you use the phrase "adjustable rate securities
15   (hereafter 'ARS')"?
16   A.   Yes.
17   Q.   And I just want to confirm that you're
18   using "ARS" to encompass all adjustable rate
19   securities, including auction rate securities;
20   is that correct?
21   A.   (Witness nods.)
22   Q.   You need to answer orally.
23   A.   Yes.
24   Q.   Now, in that bullet point you state
25   that, "Barclays applied an arbitrary excessive

Page 88

J. Schwaba

1
2    20 percent liquidity discount in determining the
3    exit values of all but five municipal adjustable
4    rate securities (hereafter, 'ARS')."  Do you see
5    that?
6    A.   Yes.
7    Q.   What do you mean by "arbitrary"?
8    A.   Arbitrary would be a choice made in
9    not necessarily related to the facts of the
10   situation.
11   Q.   Do you know how Barclays selected the
12   liquidity discount that applied to municipal
13   securities in this instance?
14   A.   Do I know how Barclays did it?
15   Q.   Yes.
16   A.   I do not.
17   Q.   So how do you know it was arbitrary?
18   A.   It appeared -- it appeared to me to be
19   arbitrary.  Why, you know, why 20 percent?  I'm
20   not sure where that number came from.
21   Q.   Turn to the next page, if you would,
22   paragraph 9.  Now, you define something you
23   called the municipal portfolio as consisting of
24   26 securities with a principal value of 382
25   million and change; is that correct?

Page 89

J. Schwaba

1
2    A.   That's right.
3    Q.   When you did your work in this case,
4    did you look at only those 26 or did you attempt
5    to value any other securities?
6        MR. TAMBE:   Objection to the form of
7    the question.
8    Q.   Let me back up.  Is it your
9    understanding that those 26 securities are all
10   of the municipal securities that Barclays
11   acquired in this transaction?
12   A.   No.
13   Q.   So it's a subset?
14   A.   It's a subset.
15   Q.   And my question is the work you've
16   done was valuing that subset, not the entire
17   population of municipal securities Barclays
18   acquired; is that correct?
19   A.   There was an analysis done to
20   initially delineate the 19 securities where
21   there was a difference in custodial marks versus
22   Barclays' marks of greater than a million
23   dollars.  Subsequent to that, I noticed that
24   there were seven securities that were valued at
25   one-tenth of a cent and that ended up comprising

Page 90

1        J. Schwaba
2    the 26, if you will.
3        Q.    So aside from identifying the 26 you
4    were going to focus on, you did not analyze any
5    of the other municipal securities that Barclays
6    acquired; is that right?
7        A.    I have not, no.
8        Q.    Did anyone working for you do that?
9        A.    No.
10        Q.    Now, in the second sentence of
11    paragraph 9, you state that, "These municipal
12    securities consisted of 20 adjustable rate
13    bonds."  Do you see that?
14        A.    Yes.
15        Q.    And just so we're clear, you believe
16    that all of those bonds were auction rate
17    securities; is that correct?
18        A.    I believe that to be true.  The -- one
19    of those 20, the adjustable rate OID, I would
20    character -- almost characterize as kind of a
21    hybrid because of the way it was structured.
22        Q.    The adjustable rate OID security
23    aside, the other 19 you believe were all auction
24    rate securities?
25        A.    I believe that to be the case.

Page 91

1        J. Schwaba
2        Q.    If you would turn to the Exhibit 2 to
3    your report, please.  Is that a listing of the
4    26 securities that you valued?
5        A.    Yes.
6        Q.    And as we previously discussed, there
7    are in fact 24 distinct securities, but 2 were
8    repeated, right?
9        A.    That's right.
10        Q.    Of these 26 securities, which are the
11    4 that you believe are not auction rate
12    securities?
13        A.    Well, there are three zero coupons,
14    two fixed coupons, and there's a floating rate
15    note, so that's six, and then there's -- so
16    those would be the non-ARS.  You've got -- I've
17    got three in there and I can't match the CUSIP
18    number up there, but three zero coupon bonds,
19    two fixed coupon bonds, one floating rate bond.
20    Okay?
21        Q.    So that you've just identified six of
22    them, correct?  So what -- so when you say there
23    are 20, you're essentially double-counting the 2
24    that were duplicates; is that right?
25        A.    That's right, yes, that would be

Page 92

1        J. Schwaba
2    correct, yes.
3        Q.    So you think there are 18 distinct
4    auction rate securities?
5        A.    I think there's actually 17, I
6    believe.  Well, 18 including -- if you want to
7    include the OID ARS.
8        Q.    All right.  Can you tell me which of
9    those auction rate securities had failed
10    auctions?
11        A.    I cannot tell you that right now.
12        Q.    Is there anything in your work papers
13    that would enable you to do so?
14        A.    I don't believe so.  In our analysis
15    we did look through them, but I don't believe I
16    have that immediately available.
17        (Exhibit 699, a document bearing Bates
18    Nos. LEH-NAVIGANT 026173 Purdue through IL,
19    marked for identification, as of this date.)
20        Q.    Showing you what has been marked as
21    Exhibit 699, can you tell me what this document
22    is, sir?
23        A.    Yes, this is the document that shows
24    how the number of proxies that were used for
25    each particular adjustable rate security to

Page 93

1        J. Schwaba
2    derive a value for that.
3        Q.    Okay.  So there would be in a
4    listing -- there should only be then 18 pages to
5    this document?  In other words, it should
6    exclude the ones that are non-adjustable rate
7    securities; is that correct?
8        A.    I believe so, yes.
9        Q.    Let's look at the first page of this
10    document.  Looking at the first entry, is that
11    one of the securities that you were actually
12    valuing here?
13        A.    That would be correct.
14        Q.    And that's CUSIP 746189HG7; is that
15    correct?
16        A.    That's correct.
17        Q.    Do you know whether that was an
18    auction rate security?
19        A.    I do not.  I cannot tell exactly from
20    here, but it's an adjustable, split adjustable.
21        Q.    Okay.  And therefore, you don't know
22    whether that was a failed auction rate security?
23        A.    I couldn't tell you that.
24        Q.    Looking at your five comps here, are
25    those the five CUSIPS that appear in the next

Page 94

1          J. Schwaba
2  tier down on this sheet?
3     A.   Yes.
4     Q.   Can you tell me which of those were
5  auction rate securities?
6     A.   I cannot.
7     Q.   Can you tell me which of those were
8  failed auction rate securities?
9     A.   I cannot.
10    Q.   Can you tell me whether any of those
11 transactions -- let me back up for a second.
12        You remember that we discussed earlier
13 today that certain financial institutions were
14 buying back auction rate securities from their
15 customers for relationship or legal or
16 regulatory reasons?
17    A.   I recall you saying that.
18    Q.   Are you able to tell me with respect
19 to any of the five comparables that you selected
20 whether it was such a transaction?
21    A.   I cannot tell you that.
22    Q.   Turning to page 2.
23    A.   I would say it's interesting that they
24 each are trading on or around par.
25    Q.   You've got a column here, second

Page 95

1          J. Schwaba
2  column here ---
3     A.   I'm sorry, where you are you?
4     Q.   Still first page, second column, "PX
5  Last," do you see that?
6     A.   Last price.
7     Q.   Yes.  And would that be a 9/19 price?
8     A.   That is correct.
9     Q.   Do you know for certain that there was
10 in fact a transaction that took place on
11 September 19, 2008 with respect to each of these
12 securities?
13    A.   My understanding is that those --
14 those were five traded prices on September 19,
15 2008.
16    Q.   And that would have been drawn from
17 the MSRB data?
18    A.   That's right.
19    Q.   Looking at the next page, if you
20 would, and this shows CUSIP 7178182U1; is that
21 correct?
22    A.   That's right.
23    Q.   And that's one of the securities you
24 valued?
25    A.   Yes.

Page 96

1          J. Schwaba
2     Q.   And you were not able to find an
3  actual transaction price for that security, were
4  you?
5        MR. TAMBE:  Object to the form of the
6     question.
7     Q.   On the 19th?
8     A.   We, as I indicated before, I wanted to
9  stick to the methodology I created.  After -- I
10 don't recollect this is one of the bonds where
11 there was an actual trade traded on 9/19, but
12 apart from that, we wanted to stick to the
13 methodology; I wanted to stick to the
14 methodology that I created.
15    Q.   You thought -- if I remember
16 correctly, you think there was one of the
17 auction rates or one of the adjustable rate --
18    A.   I believe there was one, and if I see
19 it, it might jog my memory here.
20    Q.   If you see it --
21    A.   This is not, to the best of my
22 recollection, this was not one of them.
23    Q.   Can you say for sure that this CUSIP
24 was an auction rate security?
25    A.   I cannot say for sure.

Page 97

1          J. Schwaba
2     Q.   Do you know whether it was a failed
3  auction rate security?
4     A.   I can't say that as well.
5     Q.   And of the eight comparables you
6  selected, can you tell me whether any of those
7  were auction rate securities?
8     A.   No.
9     Q.   And you can't tell me whether any of
10 them were failed auction rate securities?
11    A.   That's correct.  I will, if I may --
12    Q.   Yes.
13    A.   -- add the additional factor that the
14 last price traded there was, again, on or above
15 par.
16    Q.   And you're referring to the entry
17 99.644 on the first line, or what?
18    A.   I'm referring to the eight CUSIPS
19 there.
20    Q.   On the eight CUSIPS on the second
21 tier, they're comparables, those are 9/19
22 prices, as far as you know?
23    A.   That's right.
24    Q.   In selecting your comparables, what
25 criteria did you apply to determine what was an

J. Schwaba

1
2 appropriate comparable for any given security
3 you were valuing?
4     A.   You can basically get an indication if
5 you look across there in terms of the type, the
6 rating, both by S&P and Moody's, whether the
7 callable and puttable features were -- existed,
8 the purpose for which the bond, and of course,
9 the basic type, whether it was revenue or GO,
10 and I think we added geography in there as well
11 as another factor.
12     Q.   Did you examine the ratings of the
13 comps?
14     A.   We looked at the ratings of the comps.
15 That was a factor.
16     Q.   But you don't report the rates of the
17 comps in your work papers, do you?
18     A.   I'm sorry?
19     Q.   You don't report any of those ratings
20 in this spreadsheet, do you?
21     A.   I don't believe we do, but we did look
22 at it, but I don't -- I don't -- it's not in
23 here.
24     Q.   And then with respect to these eight
25 comps, I take it you are also not able to tell

J. Schwaba

1
2 me how many of these were a result of non-arm's
3 length transactions?
4     A.   Were a result of what?
5     Q.   Non-arm's length transactions?  Where,
6 for example, a --
7     A.   I could not tell you that.
8     Q.   And I take it the same thing would be
9 true with respect to each of the other
10 securities for which you got a security and then
11 a list of comps on this document?
12     A.   Yes.
13     Q.   You can't tell me which ones are
14 auction rate securities?
15     A.   No.
16     Q.   Can't tell me which are failed auction
17 rate securities?
18     A.   No.
19     Q.   And you can't tell me which are
20 non-arm's length transactions?
21     A.   No.
22     Q.   Looking at the seventh page of this
23 document, sir, it's the one with really small
24 type --
25     A.   Oh.

J. Schwaba

1
2     Q.   -- which is CUSIP 196479ME6, I
3 believe.
4     A.   Yes, it's the Colorado Housing &
5 Finance Authority.
6     Q.   Yes.  And my question for you, if you
7 look under "Product Name," it says 2007 B2
8 weekly FLT RT VRDN.  What does the VRDN mean?
9     A.   I believe it's variable rate demand
10 note.
11     Q.   Again, you don't know whether that was
12 an auction rate security; is that correct?
13     A.   No, although I would surmise that it
14 probably is not based on the fact that it's a
15 variable rate demand note.  I could be wrong.
16     Q.   Let's put Exhibit 699 to one side for
17 the moment.  Now, one distinction between each
18 of your comps and, with possibly one or two
19 exceptions, the securities you were actually
20 valuing is that securities you were actually
21 valuing were not trading, is that correct,
22 whereas the comps, by definition, were --
23     A.   With the exceptions that you and I
24 were citing.
25     Q.   Are you able to tell me with respect

J. Schwaba

1
2 to any of the securities you valued what the
3 most recent trade date prior to September 19
4 was?
5     A.   I cannot.
6     Q.   Are you able to tell me with respect
7 to any of the comp -- any of the securities that
8 you valued what the next trade date after
9 September 19 was?
10     A.   I cannot.
11     Q.   For any of the auction rate securities
12 you examined did you analyze the fail rate
13 formula?
14     A.   I did not.
15     Q.   Did you analyze any relevant caps,
16 maximums or exclusions?
17     A.   We did analyze --
18         I'm sorry, could you repeat that
19 question previous again?  I want to make sure I
20 answered that correctly.
21     Q.   Sure.  For any of the auction rate
22 securities that you examined did you analyze the
23 fail rate formulas?
24     A.   Actually, we did look at some of the
25 fail rate formulas on an anecdotal when we saw

Page 102

1           J. Schwaba
2   them in the screen shot analysis that we were
3   using and/or the official statements that we
4   had, and but they are not -- again, this was
5   just general information we were taking in.
6       Q.   So they're nothing you relied on in
7   valuing these bonds -- or, these securities,
8   rather?
9       A.   Not based on the methodology you see
10  here, that's correct.
11      Q.   And did you analyze any relevant caps,
12  maximums or exclusions?
13      A.   We definitely analyzed or took note of
14  what they were and were definitely tried to be
15  as aware as possible of the caps and maximum
16  rates for each of the securities.
17      Q.   Did you analyze any of the look-back
18  provisions?
19      A.   As I recollect, no.
20      Q.   Now, if you would take a look at
21  Exhibit 697, which is your expert report, and
22  again look at the section or, rather, Appendix
23  II -- Exhibit 2, and there are seven securities
24  here for which the value was 1/10 of a cent; is
25  that correct?

Page 103

1           J. Schwaba
2       A.   That is correct.
3       Q.   And is it your understanding that the
4   way that Barclays arrived at those values was it
5   accepted the BoNY valuations of those
6   securities?
7       A.   My understanding is that that is what
8   I -- that is what was happening.
9       Q.   So not just Barclays, but also Bank of
10  New York valued each of those securities at that
11  price; is that correct?
12      A.   That's right.
13      Q.   And I take it you disagree with the
14  BoNY marks of those securities?
15      A.   Yes.
16      Q.   And you don't know whether Lehman
17  valued any of those securities; is that right?
18      A.   I do not know that.
19      Q.   Are any of those securities
20  Lehman-related, do you know?
21      A.   I wouldn't know.
22      Q.   So for 7 of the 24 bonds you examined
23  you determined that BoNY had the wrong marks; is
24  that correct?
25          MR. TAMBE:  Objection to the form of

Page 104

1           J. Schwaba
2   the question.
3           MR. DAKIS:  Same objection.
4           MR. McCOUBREY:  Same objection.
5       A.   My response is that I looked at those
6   and we came up -- we valued each of these
7   securities.  I valued each of these securities
8   the way I thought was the most appropriate
9   value, and that's what we did.
10      Q.   And it's fair to say that the value
11  you arrived at was substantially different from
12  the values that BoNY arrived at for each of
13  those seven securities, is that fair?
14      A.   That would be correct.
15      Q.   And does that give you any concern
16  about the reliability of BoNY's marks for the
17  securities that it valued?
18          MR. TAMBE:  Objection to the form of
19  the question.
20      A.   That's to me, you know, given my
21  expert opinion, that's -- what I'm concerned
22  about is what the value should be on those
23  particular securities.
24      Q.   Okay.  And by your estimation of the
25  24 securities that you valued, BoNY was wrong in

Page 105

1           J. Schwaba
2   about 30 percent of them; is that right?
3       A.   If you look at the seven securities, I
4   would conclude that -- I would conclude that my
5   marks -- excuse me, my value based on traded
6   prices is a better value, is a correct value.
7       Q.   And therefore, BoNY's valuation was
8   incorrect; that's your conclusion?
9       A.   I would conclude that my values are
10  correct.
11      Q.   So you wouldn't draw any conclusion
12  about the BoNY valuations for the same
13  securities that you valued at substantially
14  more?
15      A.   I'm not going to draw any conclusions
16  on that.
17      Q.   Why not?
18      A.   Because I'm being -- I'm focusing on
19  what I think the value of these securities are.
20      Q.   So, in your view, the BoNY valuations
21  could be completely correct; is that what you're
22  saying?
23      A.   No.
24      Q.   And therefore, in your view, those
25  values are incorrect, right?

Page 106

1    **J. Schwaba**
2    A.  I guess that would be correct then.
3    **Q.   Is there a range of appropriate**
4  **valuations for these securities?**
5    A.  We tried to apply the same methodology
6  with some appropriate modifications and then on
7  the non-ARS securities, but these were based
8  again on a number of factors we've talked about
9  and these are the values that we -- that I think
10  are correct.
11    **Q.   You're saying they're correct to the**
12  **penny?**
13    A.  I would stand by it.  I think
14  they're -- I believe that they're correct.
15    **Q.   So what you're saying is when you**
16  **valued the one with the CUSIP 841513LJ1 at**
17  **3,093,446 dollars and zero cents, that is**
18  **exactly correct?**
19    A.  That is what I believe to be the value
20  of that security.
21    **Q.   And if someone reached a different**
22  **valuation, in your view, that would be**
23  **necessarily wrong; is that what you're saying?**
24    A.  I believe that my values are correct.
25    **Q.   And you believe that your values are**

Page 107

1    **J. Schwaba**
2  **the only correct values?**
3      MR. TAMBE:  Objection to the form of
4  the question.
5    A.  I would not say that.
6    **Q.   And that's in part because your values**
7  **depend on your selection of certain proxies,**
8  **right?**
9      MR. DAKIS:  Objection to the form of
10  the question.
11      MR. McCOUBREY:  Same objection.
12    A.  I have a methodology that I employ
13  here.
14    **Q.   And your methodology relies upon the**
15  **selection of appropriate proxies for valuation?**
16    A.  Proxies and/or comparables.
17    **Q.   How are you distinguishing between a**
18  **proxy and a comparable?**
19    A.  A comparable in the calculation of the
20  fixed and zero coupon and the floating rate
21  note, we use conventional bond calculations, and
22  the comparables are also factored in as well in
23  terms of coming up with the valuations.  So
24  I'm -- you know, but those are the values.
25    **Q.   Let's just focus on the auction rates**

Page 108

1    **J. Schwaba**
2  **for a moment.  You didn't use any sort of model**
3  **to value those, right?**
4    A.  No.  We used the methodology as
5  defined.
6    **Q.   And the methodology as defined is you**
7  **selected what you believed to be comparable**
8  **securities?**
9    A.  Right.
10    **Q.   And you looked at what they had traded**
11  **at on the 19th?**
12    A.  Right.
13    **Q.   And you took an average of what those**
14  **had traded at; is that correct?**
15    A.  Exactly.
16    **Q.   You didn't weight the average at all?**
17    A.  No.
18    **Q.   Did you analyze it for statistical**
19  **significance?**
20    A.  No.
21    **Q.   Did you make any effort to determine**
22  **how sensitive your analysis was to particular**
23  **securities you selected?**
24    A.  I'm not sure I understand that
25  particular question.

Page 109

1    J. Schwaba
2    **Q.   If you changed any one comparable --**
3  **strike that.**
4      **And in selecting the comparable**
5  **securities that you used, you acknowledge that**
6  **you were using judgment; is that correct?**
7    A.  Yes.
8    **Q.   And would it be fair to say that a**
9  **reasonable valuation expert could reach a**
10  **different conclusion about the appropriateness**
11  **of any particular comparable that you selected?**
12    A.  It would be possible.
13      MR. TAMBE:  Objection to the form of
14  the question.
15      You can answer.
16      MR. DAKIS:  Objection to form.
17    **Q.   And if a -- and in selecting your**
18  **comparables, you did not focus on whether any**
19  **given comparable -- strike that.**
20      **In selecting your comparables, you did**
21  **not take into account whether a given comparable**
22  **was a failed auction rate security?**
23    A.  I did not.
24    **Q.   Don't you think it would be important**
25  **to do so if the security you're valuing is a**

Page 110

1              **J. Schwaba**
2    **failed auction rate security?**
3              MR. TAMBE:  Objection to the form of
4         the question.
5         A.   Well, we focused on traded prices,
6    okay?  So if you take a look at the traded
7    prices, you can see what the traded prices are,
8    and the marketplace was saying at that
9    particular point in time, on September 19, that
10   these traded prices, buyers and sellers were
11   willing to establish prices for those based on
12   actual transactions.
13        **Q.   Right, buyers and sellers were willing**
14   **to establish prices for the comparables, right?**
15        A.   For the comparables.
16        **Q.   Okay.  And in terms of looking at the**
17   **comparables to determine whether they are useful**
18   **indicators of what the security you're valuing**
19   **would trade at, you need to be sure those**
20   **comparables are in fact appropriate comparables,**
21   **right?**
22        A.   That would be correct.
23        **Q.   Okay.  And in determining whether**
24   **those were appropriate comparables, even though**
25   **you knew that some of the securities you were**

Page 111

1              **J. Schwaba**
2    **valuing were failed auction rate securities, you**
3    **did not make any effort to ensure that the**
4    **comparables you were looking at were failed**
5    **auction rate securities?**
6         A.   Actually, I don't -- the first part of
7    your question I can't -- I don't know whether
8    they were failed securities or not, so I'm not
9    drawing a conclusion about that.
10        **Q.   Okay.  Well, I'd like you to assume**
11   **that some of them were failed auction rate**
12   **securities, sir.  If you assume that some of the**
13   **securities you valued were failed auction rate**
14   **securities, don't you think it would have been**
15   **more appropriate to have ensured that the**
16   **comparables you used for that security were also**
17   **failed auction rate securities?**
18             MR. TAMBE:  Objection to the form of
19        the question.
20             MR. McCOUBREY:  Same objection.
21             MR. DAKIS:  Same objection.
22        A.   I think it's good information to know,
23   but would I have differed from my conclusion?  I
24   can't necessarily say that.
25        **Q.   And you can't necessarily say that you**

Page 112

1              **J. Schwaba**
2    **wouldn't have?**
3         A.   That's true.
4         **Q.   So to the extent that Barclays relied**
5    **on BoNY marks, is it your view that that was**
6    **improper valuation technique?**
7              MR. TAMBE:  Objection to the form of
8         the question.
9         A.   I don't want to make -- I'm not sure I
10   would be -- I'm hesitant about making a
11   conclusion about that, but those numbers are
12   very suspect in terms of one-tenth of a cent
13   value.
14        **Q.   What if the securities in question**
15   **were Lehman-related securities?**
16             MR. TAMBE:  Objection to form.
17        **Q.   Would that have any impact in your**
18   **assessment of whether the valuation assigned**
19   **were appropriate?**
20             MR. TAMBE:  Same objection.
21        A.   Well --
22             MR. DAKIS:  Objection to form.
23        A.   -- a one-tenth of a cent value is --
24   no, that would not.  I would still be --
25   regardless of where these numbers came from, if

Page 113

1              J. Schwaba
2    it were one-tenth of a cent, you know, that
3    is -- that would -- that would capture my
4    interest and attention.
5         **Q.   If you have a Lehman-related security**
6    **and Lehman's just gone bankrupt, would that be**
7    **something that you should take into account in**
8    **valuing that security?**
9              MR. TAMBE:  Objection to the form of
10        the question.
11             MR. DAKIS:  Same objection.
12             MR. McCOUBREY:  Same objection.
13        A.   My approach would be the same, I
14   believe.  I'd look at the security on its face
15   and employ whatever appropriate valuation
16   methodologies I felt were appropriate for that
17   security and come up with a value, which I
18   believe -- certainly I believe would be
19   different than the one-tenth of a cent value
20   placed on those securities.
21        **Q.   Might it also be different than the**
22   **essentially 100 cents on the dollar valuation**
23   **that you placed on many of those securities?**
24        A.   It could.
25        **Q.   But you didn't look to see whether any**

Page 114

J. Schwaba

1    J. Schwaba
2   of them were Lehman-related?
3      A.   I did not.
4      Q.   So you think that the appropriate
5   valuation methodology is that the person doing
6   the valuation should not just accept the BoNY
7   marks but should evaluate them independently; is
8   that your testimony?
9          MR. TAMBE:  Objection to the form of
10   the question.
11      A.   I believe there should be an
12   independent valuation.
13      Q.   And it would be improper technique or
14   improper methodology in your view simply to
15   accept the BoNY marks; is that what you're
16   saying?
17          MR. TAMBE:  Objection.  Objection to
18   the form of the question.
19          MR. McCOUBREY:  Same objection.
20          MR. DAKIS:  Same objection.
21      A.   I believe I was -- I am hired -- I am
22   here to give, provide an independent valuation,
23   and I would stick to that as close as possible.
24      Q.   In the course of performing an
25   independent valuation, your view is that it

Page 115

J. Schwaba

1    J. Schwaba
2   would be improper simply to accept the BoNY
3   marks; is that correct?
4          MR. TAMBE:  Objection to the form of
5   the question.
6          MR. McCOUBREY:  Same objection.
7          MR. DAKIS:  Same objection.
8      A.   I believe that I should stick to my
9   independent analysis, and if I see a mark or a
10   value there, a dollar value of one-tenth of one
11   percent, and I don't agree -- and obviously I
12   don't agree with it, I'm going to come up with
13   whatever my appropriate valuation is.
14          If somebody wants to interpret that
15   that I don't agree with that, then I suppose
16   that's their -- that's their right, I guess.
17      Q.   What is your understanding of the
18   process that Barclays used to value the
19   municipal securities that it acquired?
20      A.   Are you talking about these particular
21   26 securities?
22      Q.   No, I'm talking about the entire
23   portfolio of 562 of which these 26 are a part.
24      A.   I would defer to my other experts on
25   that.  I don't have specific knowledge of those

Page 116

J. Schwaba

1    J. Schwaba
2   particular securities.
3      Q.   I'm not asking about those securities.
4   I'm asking about the methodology that Barclays
5   used to value the municipal securities that it
6   acquired.
7          MR. TAMBE:  Objection to the form of
8   the question.
9      A.   I can't speak with -- with any
10   authority on those particular securities in
11   terms of methodology.
12      Q.   What about these 26, what methodology
13   did Barclays use to value these?
14      A.   I believe they were using the
15   liquidity haircuts.  I mean, they took a 20
16   percent haircut, uniform basis, applying it to
17   each of those adjustable rate securities.
18      Q.   Do you understand the concept of
19   adjusting midpoint prices to exit prices?
20          MR. TAMBE:  Objection.  Asked and
21   answered.  We spent some time on this.
22          MR. DAKIS:  Same objection.
23          MR. TAMBE:  You can answer.
24      A.   I guess I thought we discussed it
25   before, but I don't --

Page 117

J. Schwaba

1    J. Schwaba
2      Q.   I was really just bridging back into a
3   new topic.
4      A.   Okay.
5      Q.   So you recall we had a discussion
6   about that?
7      A.   Yes.
8      Q.   Now, when you criticized Barclays for
9   using a liquidity adjustment, do you reject the
10   basic concept of the adjustment from mid to bid,
11   or do you just reject the particular adjustment
12   that Barclays used?
13          MR. TAMBE:  Objection to the form of
14   the question.
15      Q.   Or both?
16          MR. McCOUBREY:  Same objection.
17          MR. DAKIS:  Same objection.
18      A.   You know, to me I think you have to
19   address each security in and of itself.  I mean,
20   you could -- even from a liquidity adjustment
21   factor alone, is 20 percent of liquidity factor
22   applicable or appropriate for all securities
23   there?
24      Q.   Well, do you understand that Barclays
25   mid to bid adjustment was applied across a broad

Page 118

J. Schwaba

1
2    portfolio of municipal securities, not just the
3    26 that you cherry-picked?
4        A.  Yeah, I --
5            MR. TAMBE:  Objection to the form of
6    the question.
7            MR. DAKIS:  Same objection.
8            MR. McCOUBREY:  Same objection.
9        A.  We didn't cherry -- we don't
10   cherrypick anything.
11       Q.  All right.  Let me change the phrasing
12   of that slightly.
13           Do you understand that Barclays' mid
14   to bid adjustment was applied across a broad
15   portfolio of municipal securities, not just the
16   26 that you valued?
17       A.  That is my understanding.
18       Q.  Do you have any understanding of
19   whether that adjustment was intended to reflect
20   an average across both higher quality and lower
21   quality munis?
22       A.  I did not.
23           MR. TAMBE:  Objection to form.
24           MR. DAKIS:  Same objection.
25       Q.  Do you have any understanding whether

Page 119

J. Schwaba

1
2    that was intended to be an average across more
3    liquid and less liquid munis?
4            MR. DAKIS:  Objection to form.
5        A.  I do not.
6        Q.  Did you consider the risk
7    characteristics of the entire portfolio of munis
8    that Barclays acquired in reaching your
9    conclusions?
10       A.  I did not.
11       Q.  Are you an expert in fair value
12   accounting?
13       A.  No.
14       Q.  Are you an expert in fair value
15   measurement?
16       A.  No.
17       Q.  Are you an expert -- strike that.
18           Take a look at paragraph 8 of your
19   report, if you would, please, sir.  In the fifth
20   bullet point you state that your values are
21   based on observed market prices.  Do you see
22   that?
23       A.  I'm sorry, where was that?  Is that on
24   page --
25       Q.  Page 3.

Page 120

J. Schwaba

1
2        A.  Page 3.
3        Q.  Second bullet point on that page.  Do
4    you see that?
5        A.  Yes.
6        Q.  And those are the prices that you
7    pulled off MSRB for the comparable securities
8    that you selected; is that right?
9        A.  That's right.
10       Q.  Are you aware that in 2008 there was a
11   small secondary market in which holders of
12   failed auction rate securities traded
13   over-the-counter?
14       A.  No, I'm not.
15       Q.  So you didn't investigate prices for
16   failed auction rate securities by looking at
17   trades in the secondary market?
18           MR. TAMBE:  Objection to the form.
19           MR. DAKIS:  Objection to form.
20           MR. McCOUBREY:  Same objection.
21       A.  I believe we discussed that.
22       Q.  I'm not sure we did, so could you
23   answer my question?
24       A.  I'm sorry, say the question again,
25   please.

Page 121

J. Schwaba

1
2        Q.  So you didn't investigate prices for
3    fail auction rate securities by looking at
4    trades in the secondary market?
5            MR. TAMBE:  Objection to form.
6            MR. DAKIS:  Same objection.
7        Q.  Correct?
8            MR. McCOUBREY:  Same objection.
9        A.  When we looked at analysis of the --
10   if we came across that, we did look at it, so I
11   can't say categorically that I didn't look at
12   it.
13       Q.  Well, when you say you -- if you came
14   across it, the only place you would have come
15   across it would have been in the MSRB; is that
16   correct?
17       A.  Yes, we did some analysis on some of
18   the Bloomberg in terms of information about
19   those.  So, I mean, I'm trying to -- I can't
20   recall specifically, but I'm saying we may have
21   come across that.
22       Q.  Do you know whether on the secondary
23   market failed auction rate securities were
24   trading at a discount to par?
25           MR. TAMBE:  Objection to the form of

Page 122

1           J. Schwaba
2    the question.
3           MR. DAKIS:  Same objection.
4           MR. McCOUBREY:  Same objection.
5       **Q.   In September of 2008.**
6           MR. TAMBE:  Objection.
7       A.   Again, say that again, please.
8       **Q.   Do you know whether in September of**
9    **2008 failed auction rate securities were trading**
10   **on the secondary markets at a discount to par?**
11          MR. TAMBE:  Objection to form.
12          MR. DAKIS:  Same objection.
13      A.   I did not know that.
14          MR. McCOUBREY:  Same objection.
15      **Q.   I take it you also do not know the**
16   **range of discounts to par that were prevailing**
17   **in those secondary markets?**
18      A.   That would be correct.
19          MR. TAMBE:  Same objection.
20          MR. DAKIS:  Same objection.
21          MR. McCOUBREY:  Same objection.
22      **Q.   If there were reported trades of**
23   **auction rate securities at substantial discount**
24   **to par on the secondary markets at this time, is**
25   **that something you would have wanted to analyze?**

Page 123

1            **J. Schwaba**
2           MR. TAMBE:  Objection to the form of
3    the question.
4           MR. DAKIS:  Same objection.
5           MR. McCOUBREY:  Same objection.
6       A.   I would want to do -- I would want to
7    have known the information.  Would it have
8    altered my analysis?  I don't believe so.
9       **Q.   How can you say that without knowing**
10   **what the information is?**
11      A.   I don't believe I would have.
12      **Q.   Why don't you believe you would have**
13   **altered your analysis without knowing what the**
14   **information is?**
15          MR. TAMBE:  Objection to the form of
16   the question.
17          MR. DAKIS:  Same objection.
18          MR. McCOUBREY:  Same objection.
19      A.   My methodology had a lot -- had almost
20   everything to do with market traded prices.  To
21   the extent it would have affected those market
22   traded prices, then it probably would have
23   affected it.  But it would have expressed itself
24   in market traded prices, I believe.
25      **Q.   Well, what if there were trades in one**

Page 124

1            **J. Schwaba**
2    **of your 24 CUSIPS on a secondary market at say a**
3    **70 -- at 70 percent of par, would that have**
4    **influenced your opinions in this case?**
5           MR. TAMBE:  Objection to the form of
6    the question.
7           MR. DAKIS:  Same objection.
8           MR. McCOUBREY:  Same objection.
9       A.   I can't say that definitively, but I
10   would have stuck to the methodology we embraced.
11      **Q.   So does that mean you would have**
12   **ignored an actual trade in the security you are**
13   **valuing and looked instead at securities that**
14   **might or might not have been failed auction rate**
15   **securities, trades in those?**
16          MR. DAKIS:  Objection to form.
17   Mischaracterizes testimony.
18          MR. TAMBE:  Same objection.
19          MR. McCOUBREY:  Same objection.
20      A.   Well, I think it sounds like a
21   hypothetical situation you're suggesting, and so
22   hypothetically I might have factored that in or
23   perhaps not, but it sounds like this is a
24   hypothetical that you're asking me about.
25      **Q.   Go to paragraph 9 of your report, if**

Page 125

1            **J. Schwaba**
2    **you would, please.  The last words there you say**
3    **that, "All these bonds had maturities in excess**
4    **of seven years and, based on the data I have**
5    **reviewed, were investment grade."  Do you see**
6    **that?**
7       A.   Yes.
8       **Q.   Do you agree there's a range of credit**
9    **ratings that fall under the category generally**
10   **referred to as investment grade?**
11      A.   Yes, I understand that to be true.
12      **Q.   Were the securities you examined at**
13   **the high end or the low end of that range?**
14          MR. TAMBE:  Objection to form.
15          MR. DAKIS:  Same objection.
16          MR. McCOUBREY:  Same objection.
17      A.   They had -- the municipal securities I
18   looked at were veering lower, but were still, as
19   I recollect them, to be still investment grade.
20      **Q.   So they were at the lower end of the**
21   **investment grade spectrum as you recall?**
22      A.   That's correct.  Well, I wouldn't
23   necessarily characterize that on a universal
24   basis.
25      **Q.   That's your general impression?**

Page 126

J. Schwaba

1
2  A.   That was my general impression.
3  Q.   Okay.  And did you take that
4  information into account in your valuations?
5  A.   I believe based on the methodology
6  that we chose and were using, yes.
7  Q.   And how did you take that into account
8  in your valuation?
9  A.   Well, we were looking at comparables
10 and we were looking at ratings.  The ratings
11 were one of the variables involved.
12 Q.   And what was your -- what selection
13 criterion did you apply in determining whether
14 the rating was too far off or too different for
15 it to be an appropriate comparable?
16 A.   It was a qualitative assessment per
17 individual security.  I mean, it depended.
18 Q.   So it was an exercise of your
19 judgment; is that correct?
20 A.   It was partly judgment, that's
21 correct.
22 Q.   And in exercising judgment on
23 questions like that, would you expect that
24 someone who was actively involved in either
25 trading or valuing assets in the market at the

Page 127

J. Schwaba

1
2  time would be in a better position to exercise
3  judgment than you are 18 months later?
4  MR. DAKIS:  Objection to form.
5  MR. TAMBE:  Objection.
6  A.   I don't know.
7  Q.   You concede that's a possibility?
8  A.   I would concede that's a possibility.
9  Q.   In paragraph 9 are you referring only
10 to the 24 CUSIPS that you actually examined and
11 not to the broader group of municipal securities
12 that Barclays acquired?
13 A.   Yes.
14 Q.   And so you don't know whether those
15 other municipal positions that Barclays acquired
16 were also investment grade?
17 A.   No.
18 Q.   In selecting comparable securities,
19 please tell me as precisely as you can the
20 procedures and rules you used to identify them.
21 A.   Say that again, please.
22 Q.   What I'm asking you is to describe in
23 as much detail as you can the process by which
24 you selected the comparable securities that you
25 used.

Page 128

J. Schwaba

1
2  A.   Well, I believe I indicated it in here
3  in the report, but and I think we talked when we
4  went over the variables that you saw on top in
5  terms of the Exhibit 699, these were a range of
6  variables that we -- that I viewed on a combined
7  basis and made a qualitative judgment about
8  whether these comparables applied and how they
9  matched up with the particular municipal
10 security selected.
11 I mean, whether they were the same
12 geography or same type of bond, same basic type
13 of bond, were their maturity structure, were
14 they callable and puttable, there were roughly
15 five to seven factors that went into the
16 decision.
17 Q.   Are there any other factors that went
18 into the decision besides the ones that you just
19 listed?
20 A.   Or the ones that I mentioned, no.
21 Q.   And when you say the ones you
22 mentioned, are you referring to paragraph 23 of
23 your report?
24 A.   Well, I didn't mention -- I think when
25 you see here it doesn't necessarily include

Page 129

J. Schwaba

1
2  geography, but that is -- that was a factor as
3  well.
4  Q.   Okay.  Well, if you look at paragraph
5  23 of your report, which is Exhibit 697, in the
6  second sentence you say, "I began by determining
7  the key characteristics of the bonds,
8  including," and you list maturity, credit
9  rating, geographic location, issue type and
10 revenue sources, do you see that?
11 A.   Yes.
12 Q.   Were there any other criteria that you
13 applied?
14 A.   No, I would say that this is pretty
15 much it.
16 Q.   Okay.  And did you have any fixed
17 rules about when, you know, a particular
18 security was too different in terms of
19 geography, or was it a qualitative judgmental
20 exercise?
21 A.   It was a qualitative assessment.
22 Q.   Why was it important to match the
23 issue type, general obligation versus revenue
24 bond?
25 A.   I just felt like that was a, you know,

Page 130

J. Schwaba

1 J. Schwaba
2 a good -- a prominent enough differentiation
3 between a general obligation bond and a revenue
4 bond.
5 Q. So you wouldn't want to use general
6 obligation bonds as comparables for a revenue
7 bond or vice-versa, is that fair?
8 A. Well, I don't recall, but there might
9 have been some exceptions to that when you look
10 through that. They could have been offset, but
11 I can't recall with specificity here, but it
12 could have been offset by other factors that
13 were -- that would argue on that. It was just
14 one of, as you can see, five or six or seven
15 factors.
16 Q. All of which you threw into a hopper,
17 exercised your judgment on, and made a call
18 about which comps to use?
19 A. That's right.
20 MR. TAMBE: Objection to form.
21 A. Well, that's right.
22 Q. Paragraph 17 of your report, sir, you
23 state that you're able to observe prices on
24 12,416 municipal securities that traded on
25 September 19, do you see that?

Page 131

1 J. Schwaba
2 A. Yes.
3 Q. Is that the total number of trades or
4 is that the total number of unique municipal
5 CUSIPS that traded on that day?
6 A. I believe that was -- I believe that
7 was a total number of trades.
8 Q. And then in the next sentence you say,
9 "Some 1,664 were adjustable rate municipal
10 bonds"?
11 A. Yes.
12 Q. Do you see that? And that would be
13 the total number of trades of adjustable rate
14 municipal bonds that day?
15 A. I believe so.
16 Q. Paragraph 24 of your report, sir, you
17 state in the second sentence, "Once I had
18 determined that the proxy price was reasonable,"
19 you see that?
20 A. Yes.
21 Q. What do you mean by that?
22 A. That, relating to what we had talked
23 about before, that the proxies were reasonable,
24 provided a reasonable comparison to the specific
25 security that we were valuing based on those

Page 132

1 J. Schwaba
2 factors that we talked about.
3 Q. Did you take into account credit
4 enhancement in determining your -- the
5 comparability of --
6 A. Actually, credit enhancement was a
7 factor that we valuated as well when and where
8 we saw that information.
9 Q. How typical is it that an auction rate
10 or adjustable municipal bond offers credit
11 enhancement protection?
12 MR. TAMBE: Objection to the form of
13 the question.
14 MR. DAKIS: Same objection.
15 MR. McCOUBREY: Same objection.
16 A. I can't recall.
17 Q. Did you ever know?
18 MR. TAMBE: Objection to form.
19 MR. DAKIS: Same objection.
20 MR. McCOUBREY: Same objection.
21 A. I can't recall that.
22 Q. Well, would it be fair to say that
23 such securities are typically insured upon
24 issuance or not?
25 MR. TAMBE: Objection to form.

Page 133

1 J. Schwaba
2 MR. DAKIS: Same objection.
3 MR. McCOUBREY: Same objection.
4 A. Yeah, I -- I don't know.
5 Q. Can you tell me who the -- who a
6 couple of the major insurers of auction rate
7 securities were in September of 2008?
8 A. I can't say I know. AMBAC and MBIA.
9 Q. Any others?
10 A. I'm not ...
11 Q. Do you have any understanding of what
12 the financial condition of AMBAC or MBIA were in
13 September of 2008?
14 A. In terms of our analysis, we did read
15 some -- came across some concern about that, but
16 not -- nothing more than that.
17 Q. And did you take that into account
18 when you were doing your valuations?
19 A. Yes.
20 Q. How did you take that into account
21 when doing your valuations?
22 A. Well, I registered it as something to
23 be mindful of when I'm looking through.
24 Q. So something that informed your
25 judgment --

Page 134

J. Schwaba

1
2    A.    Yes.
3    Q.    -- as to which comparables were
4    appropriate?
5    A.    That would be correct.
6         MR. SHAW:  Why don't we take a short
7    break.
8         (Luncheon Recess; Time Noted:  12:41
9    P.M.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 135

J. Schwaba

1
2         AFTERNOON SESSION
3         (Time Noted:  1:31 P.m.)
4    JOSEPH SCHWABA, resumed and
5         testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. SHAW:
8    Q.    Mr. Schwaba, if you would take a look
9    again at your report, which is Exhibit 697, and
10   specifically at Appendix II, Documents Relied
11   Upon.  If you look under the heading "Other
12   Documents" about the middle of the page?
13   A.    Uh-huh.
14   Q.    Do you see that?  You say you have
15   Barclays Capital valuation methodology and it's
16   got some Bates numbers associated with that, do
17   you see that?
18   A.    Yes.
19   Q.    Apart from that document, in the
20   course of doing your work on this matter did you
21   review any other documents prepared in
22   connection with Barclays' valuation of the
23   securities it received in this transaction?
24        MR. TAMBE:  Objection to the form of
25   the question.

Page 136

J. Schwaba

1
2         MR. DAKIS:  Objection.
3         MR. McCOUBREY:  Same objection.
4    A.    I don't recall.
5    Q.    The next item there is entitled
6    "Review of Barclays Capital Price Testing
7    Methodology and Framework" and it's got a Bates
8    number that begins with PWC, do you see that?
9    A.    Yes.
10   Q.    Did, in the course of your work in
11   this matter, did you review any documents
12   relating to PWC's review of Barclays' price
13   testing or its valuation of the securities it
14   received in this transaction?
15   A.    If it's the same document I think it
16   was, I did read through it.
17   Q.    Yes.  And aside from that document,
18   did you review any documents --
19   A.    No.
20   Q.    -- in reaching that decision?
21        The very last item on that page is
22   entitled Schwaba, Market Inputs.pdf, do you see
23   that?
24   A.    Yes.
25   Q.    Can you tell me what that document is?

Page 137

J. Schwaba

1
2    A.    My understanding is that's the
3    information, some of the information we've been
4    looking at today with regard to comparables, et
5    cetera, some of the exhibits.
6    Q.    Okay.  And what about
7    investinginbonds.com.xlsx, can you tell me what
8    that is?
9    A.    Yes, that's actually where we -- the
10   Website that keeps track of municipal trades
11   that were actually done in the marketplace,
12   among other things, and when you and I were
13   discussing -- we were talking about two trades
14   we saw, that's where we got that information.
15   Q.    Okay.  And I guess my question is, as
16   I understand it, the "xlsx" suffix indicates an
17   Excel spreadsheet.  Are you aware of an Excel
18   spreadsheet that was downloaded from or
19   populated with information from the
20   investinginbonds.com that you relied on?
21   A.    If I recollect clearly, I think that's
22   where we -- it was downloaded to an Excel
23   spreadsheet, I believe.
24   Q.    Do you know if that document has been
25   produced?

Page 138

J. Schwaba

1
2     MR. SHAW:  Do you know, Jay?
3     MR. TAMBE:  I don't know the answer.
4  We can check.
5     A.   I have it in my binder.
6     MR. SPENCER:  It has.
7     MR. TAMBE:  It has been produced.
8     MR. SHAW:  I would appreciate it if at
9  some point you can identify for me which
10  document that is and also which the Schwaba
11  market inputs document is.
12     MR. SPENCER:  Sure.
13     Q.   Put that so one side.  I show you --
14  if we could mark this as the next number.
15        Showing you a document -- showing you
16  what has been marked as Exhibit 670, sir.  Do
17  you recognize that document?
18     A.   I don't believe I do.
19        (Discussion off the record.)
20        (Exhibit 700, a document bearing Bates
21  Nos. LEH-NAVIGANT 026165 Sheet 1, marked for
22  identification, as of this date.)
23     Q.   Mr. Schwaba, while we were off the
24  record, we corrected the exhibit number so let
25  me ask my question again.

Page 139

J. Schwaba

1
2        Showing you what has been marked as
3  Exhibit 700, sir, do you recognize that
4  document?
5     A.   I do not believe I do.
6     Q.   Do you know if this is a document that
7  you used in the course of preparing your
8  opinions in this case?
9     A.   It is not.
10     Q.   Do you know if this is a document that
11  was used by someone working under your direction
12  in preparing your opinions in this case?
13     A.   It could have been.
14     Q.   Are you aware that if you used a model
15  in the course of preparing any of your opinions
16  in this case?
17     A.   Yes, we have used a couple of models
18  in terms of bonds.
19     Q.   And which of the securities did you
20  value the models?
21     A.   I believe we used, on the fixed and
22  zero coupon and OID, I think we used FINCAD and
23  I think we used -- I think we might have use
24  Polypath in terms of validating some of our
25  curve construction.

Page 140

J. Schwaba

1
2     Q.   I take it you do not know what Exhibit
3  700 was used for?
4     A.   That is correct.
5     Q.   And then you don't know where it was
6  obtained?
7     A.   That's right.
8     Q.   And you don't know how it works?
9     A.   That's right.
10     Q.   When you made use of models, did you
11  personally examine the models?
12     A.   No.
13     Q.   Were you personally familiar with how
14  the particular models you used worked?
15     A.   No.
16     Q.   Okay.
17        (Exhibit 701, a document bearing Bates
18  Nos. LEH-NAVIGANT 026176 Floater, marked for
19  identification, as of this date.)
20     Q.   Showing you what has been marked as
21  Exhibit 701, sir, tell me what this document is.
22     A.   This is actually a, as I recollect,
23  this is a valuation spreadsheet that we used,
24  and I believe that was the -- that was to value
25  the floating rate note, one of the CUSIPS we

Page 141

J. Schwaba

1
2  have been talking about.
3     Q.   And is this data that was input into a
4  model, sir?
5     A.   I think we -- I think there was
6  some -- we used a combination of a model, but
7  this was basically, I believe, our own work in
8  terms of coming up with a value on the, like I
9  said, one of the CUSIPS, which was the floating
10  rate bond, I believe.
11     Q.   How was the data that's listed on this
12  exhibit used?
13     A.   Well, it was used to construct the
14  price, ultimately the price of the bond based on
15  using the LIBOR forward curve.  As I recollect,
16  this particular security was -- I had a couple
17  different pricing components.  One was basically
18  taking 67 percent of, in effect, three-month
19  LIBOR plus adding in a spread of 57 basis points
20  to it.  So and that would be -- that would be
21  how the coupon was set on an amounts due a
22  periodic three-month basis.
23     Q.   What does the abbreviation "OAS" in
24  the second line stand for?
25     A.   Well, the convention is option adjust

Page 142

J. Schwaba

spread. We use it as kind of a term that
factors in not only potential optionality but
potentially credit, some type of credit spread
that the particular security would have, and
it's kind of an add-on feature that can account
for the additional marginal risk of a particular
security.

Q.    If you look at the columns on the
first page, you see "Date," "Years," "Spot"?

A.    Uh-huh.

Q.    And then something called "LIBOR PV,"
what does that stand for?

A.    I believe it's LIBOR present value, I
believe.

Q.    If you turn to the last page, sir, you
see up in the right-hand corner, upper
right-hand corner, there are entries saying
"Notes"?

A.    Yes.

Q.    It says, "These are continuously
compounded zero rates bootstrapped from LIBOR
and swap rates"?

A.    Right.

Q.    What does that mean?

Page 143

J. Schwaba

A.    This was a, is my understanding, this
is what we used to fit a particular date for the
security that you saw ahead of this, in terms of
its dates, customizing it to reflect a LIBOR
swap curve to fit that particular curve given
the dates.  It's basically an interpolation
mechanism.  It's a -- become a fairly
conventional bond valuation mechanism.

Q.    What is a LIBOR swap curve?

A.    That is the -- the LIBOR swap curve is
the term structure of interest rates not for
treasuries but for basically euro dollars or
London Interbank Offered -- LIBOR means London
Interbank Offered Rate, and the LIBOR swap curve
is basically a combination of the LIBOR curve
and the interest rate swap curve extended on out
from zero to basically 30 years.  It's become a
benchmark for valuing different types of bonds.

So what you might see when you talk --
when we talked about OAS, or option-adjusted
spreads, you might see -- the benchmark might be
the LIBOR curve, but a particular bond may be
valued to yield let's say 15, as an example, 15
over the LIBOR benchmark or -- so it could be

Page 144

J. Schwaba

said to have an option-adjusted spread of 15
basis points, as an example.  That's my
understanding of it.

Q.    In the course of calculating these
values, is there any application of judgment?

MR. TAMBE:  Objection to the form of
the question.

Q.    Is it purely a mechanical calculation
or is it something involves that --

A.    It's mostly a mechanical calculation,
except that one selection of an option-adjusted
spread, and that's where comparables can come
into play.  So if you're looking at a bond that
has, other things being equal, some comparables,
you could make a judgment as to how much let's
say OAS to add to that.  So that's where the
comparable effect.  So there would be some
degree of judgment there.

Q.    And did you use comparables in
arriving at the OAS, the 15 that was used here?

A.    We did as more of a reference point
and then factored in other -- and I believe in
this we had -- we looked at comparables, and as
I recollect, because we did a, I think some

Page 145

J. Schwaba

FINCAD analysis in relation to this, and I
believe it came out to be 12 or 13 basis points
and so we factored in 15 basis points as an OAS,
erring slightly on the side of conservatism.

Q.    And would conservatism tend to make
the value higher or lower?

A.    I'm sorry, say again?

Q.    You said you were conservative in your
choice of --

A.    That would make -- higher OAS would
make the price lower, yield higher.

Q.    I think earlier you referenced the
Polypass or Polypath model; is that correct?

A.    Yes.

Q.    Which is it, Polypass or Polypath?

A.    Polypath.

Q.    What is the Polypath model?

A.    It's a bond valuation model.  I don't
know the intricacies of it.  It's used to test
bond valuation in different interest rates.

Q.    Before your work on this particular
valuation project, had you ever used the
Polypath model?

A.    I had not.

Page 146

J. Schwaba

1
2    Q.    What did you do to verify the Polypath
3    model was an appropriate model to use for the
4    purposes you used it in this project?
5            MR. TAMBE:  Objection to the form of
6    the question.
7    A.    Polypath is one of the models that we
8    use to test some of the data that we have in
9    running through it, so I don't know if that
10   answers your question or not.
11   Q.    I think you also mentioned another
12   model.  It sounded like FINCAD to me.
13   A.    Yes.  FINCAD is a, again, another type
14   of bond valuation, but more of a kind of a
15   work -- interactive worksheet exercise that you
16   use.
17   Q.    Is that F-I-N-C-A-D?
18   A.    That's right.
19   Q.    And what's the source of the FINCAD
20   model?
21           MR. TAMBE:  Objection to the form of
22   the question.
23   A.    I'm not sure what the source of that
24   is.
25   Q.    Before this valuation exercise you've

Page 147

J. Schwaba

1
2    done in this case, had you ever worked with the
3    FINCAD model?
4    A.    No.
5    Q.    Did you do any of the work on the
6    FINCAD model yourself?
7    A.    No.
8    Q.    What about the Polypath model, did you
9    do any work yourself?
10   A.    No.
11   Q.    Did you review the work that was done
12   on the FINCAD model, or did you simply
13   incorporate it into your analysis?
14           MR. TAMBE:  Objection to the form of
15   the question.
16   A.    I reviewed the output from it, much as
17   like we're looking at here.
18   Q.    When you say you reviewed the output,
19   you mean you saw the value that it gave?
20   A.    Yes.
21   Q.    And did you in any way test whether
22   that was an appropriate value?
23   A.    We had done testing through the -- as
24   part of our analysis and viewed how it stood up
25   against, again, selected comparables.  There was

Page 148

J. Schwaba

1
2    a qualitative judgment there, though.
3            (Exhibit 702, a document bearing Bates
4    Nos. LEH-NAVIGANT 026175 Muni, marked for
5    identification, as of this date.)
6    Q.    Sir, showing you what has been marked
7    as Exhibit 702, can you tell me what this
8    document is?
9    A.    The cover page is -- the top four rows
10   there or let's say the top four sections running
11   horizontal are a set of comparables that we use
12   in terms of valuing our zero coupon and fixed
13   rate bonds.  Again, the CUSIP numbers you see
14   down below, the first three are zero coupons.
15           The next two -- well, the next one is
16   a fixed rate coupon.  The next one, the Park
17   Center one, is the ARS OID that I've been
18   talking about periodically, and Tennessee
19   Housing is the other fixed rate bond.
20           So when you look at -- the key column
21   to look at there is the CP Price.  That's the
22   Chicago Partners, that's our -- that's my price
23   in terms of valuation, and if you look at the
24   first one, for example, Dawson Ridge, Colorado
25   and you look up top, you can see three so-called

Page 149

J. Schwaba

1
2    comparables there.  Two had an OIS of 110.8 and
3    one of 6.2, respectively, and a third 54.9.
4    Q.    So, just so I understand what's going
5    on here, if we look at the bottom portion, in
6    other words, is says an analysis of fixed coupon
7    municipal bonds, do you see that?
8    A.    Right.
9    Q.    The first CUSIP there is number
10   239427AG2; is that correct?
11   A.    That is correct.
12   Q.    Dawson Ridge, Colorado.  And the
13   comparables you used for that are the three that
14   appear above the first horizontal line in the
15   upper section of this?
16   A.    That is correct.
17   Q.    So that would be E-470 Pub Highway
18   Auth Colorado and the next two?
19   A.    That's correct.
20   Q.    And if you look underneath that
21   horizontal line that we just looked at where you
22   have Savannah, Georgia and Washington, Georgia
23   bonds, do you see that?
24   A.    Yes.
25   Q.    Those would be comparable to the

Page 150

1          J. Schwaba
2   Richmond County, Georgia --
3      A.   That is correct.
4      Q.   -- on the two values; is that correct?
5          And then beneath those you have got
6   the two San Joaquin Hills bonds?
7      A.   That's correct.
8      Q.   And these would be your comparables
9   for the San Joaquin, California bond you've got
10  there?
11     A.   That's right.
12     Q.   And then below that you've got
13  Regional Transn Auth Ill and New York State Dorm
14  Auth Revs bonds, do you see those?
15     A.   That's right.
16     Q.   What were those the comparables for?
17     A.   Those would be comparable for the two
18  fixed rate bonds.
19     Q.   And that would be the Park Center and
20  Tennessee?
21     A.   No, that would be the Southeast Texas
22  Housing and Tennessee.
23     Q.   And what were your comparables for the
24  Park Center bonds?
25     A.   The Park Center bond, it may not be --

Page 151

1          J. Schwaba
2   there were four comparables as a reference point
3   that we used that were the same, as I recollect,
4   to the floating rate bond.  And let's see, I
5   think the second page you see is the same type
6   of bootstrapping page that we saw for the
7   previous bond over here, and then --
8      Q.   I take it you're looking at a series
9   of pages that have "Southeast Texas Called" in
10  the bottom right-hand corner?
11     A.   Well, there's a Southeast Texas Called
12  and that's -- we valued it on a callable basis
13  and these are the numbers in support of that,
14  and we came up with a value of 103.77, which is
15  slightly different from 103.92, but not by much.
16          We decided to be more conservative in
17  that way and we -- the analysis is done -- it's
18  not quite in the format it is here.  You see
19  "Southeast Texas Called," and after that you see
20  "Southeast Texas Non-call" after that.
21     Q.   Uh-huh.
22     A.   There's a pretty much appreciable
23  difference in price, and given, as I recollect,
24  the other aspects of the bond, we defaulted to
25  using the option adjusted spread on both the

Page 152

1          J. Schwaba
2   Southeast Texas bond and the Tennessee Housing
3   and two fixed, which was an average of those two
4   up here you see on the first page.  Okay, you
5   see the 35 -- if you look at the OAS, the
6   Regional Transportation Auth Illinois and the
7   Illinois State Dorm, those were our comparables
8   to those two fixed.  We decided to default to
9   using that average OAS for those two, so that
10  would apply to both Southeast Texas Housing and
11  Tennessee Housing, notwithstanding the analysis
12  we did for that.
13     Q.   Look at the last page of this
14  document.
15     A.   Okay, the last page of the document
16  refers to the Park Center, which was -- and I'm
17  glad the explanation got here -- Park
18  Development from a valuation perspective we
19  decided to treat as a bullet maturity.  Right
20  now it pays a coupon of 1.863, which is well
21  below the LIBOR curve, but on April 14, 2014,
22  that coupon is going to jump to 6 percent, well
23  above the LIBOR forward of 459.  On that basis,
24  we could justify it's probably a larger OAS to
25  that, and because it's callable at any time

Page 153

1          J. Schwaba
2   after 4/15/12, we decided to treat it
3   realistically as -- and plus, there's a sinking
4   fund that begins as well, but it's not
5   significant, but the -- we decided to treat it
6   as a bond maturing at 4/15/2014 with a current
7   coupon of 1863 and, therefore, I used a price of
8   86.98, which reflects that OAS 50 that you see
9   there.
10     Q.   What do you mean by a bulletin
11  maturity?
12     A.   Bullet maturity, a bullet maturity
13  means it's a three-year bullet maturity, meaning
14  it matures in three years.  Everything stops
15  then.  Principal is due.  No more coupon
16  payments.  And came up with, again, with a price
17  of 103 -- excuse me, 86.98 on that Park Center,
18  which was -- that was the OID ARS, okay.
19     Q.   Uh-huh.
20     A.   And what's interesting about that is
21  we actually had four, as I recollect, we had
22  three or four comparables, but they didn't seem
23  to have any overt bearing to how this -- how
24  this is priced, so we decided we wanted to take
25  the more conservative route and price it

Page 154

1          J. Schwaba
2  accordingly.
3      Q.   Other --
4      A.   What's interesting about it also is
5  that, well, if you -- you compare it to both
6  Barclays' and BoNY's as -- you can see that it's
7  not all that -- actually, it's not that really
8  different from what Barclays said here in terms
9  of their -- and BoNY, they're pricing it at 100,
10 so...
11     Q.   I just want to confirm, that bond,
12 when you treat it as paying below LIBOR, is that
13 correct, throughout its expected lifespan?
14     A.   Right.
15     Q.   And yet you price it above par; is
16 that right?
17     A.   No, Park Center wasn't -- no.  No,
18 that's -- Park Center was -- is below.
19     Q.   Below par?
20     A.   That's 86.98.
21     Q.   I guess that's why I asked the
22 question.
23     A.   The Southeast Texas Housing is at the
24 5.36 cent coupon and that's priced at 103.77.
25     Q.   And if you take a look at Exhibit 699,

Page 155

1          J. Schwaba
2  which is your errata sheet, the first CUSIP for
3  which you change the values was the 700404AA4
4  CUSIP; is that correct?
5      A.   I believe so, yes.
6      Q.   And that is the Park Center bond?
7      A.   That would be, right.
8      Q.   Okay.  And that reflects that you
9  reduced your valuation of that bond by, if I
10 remember correctly, around $2 million; is that
11 correct?
12     A.   There was a transposition error I
13 think between the Southeast Texas Housing -- I'm
14 trying to remember if that was the one -- and
15 this center --
16          MR. TAMBE:  Is there a question
17     pending?  I'm not sure.
18          MR. SHAW:  He seemed to be going
19     through --
20     A.   I'm sorry, so your question is again?
21     Q.   I think you've answered my question.
22     A.   Okay.
23     Q.   It's just I thought you seemed to be
24 looking at something else.
25          Who is your current employer, sir?

Page 156

1          J. Schwaba
2      A.   I'm self-employed.
3      Q.   Are you not working for Schwaba &
4  Associates anymore?
5      A.   Well, I'm not calling it Schwaba &
6  Associates.  Joseph Schwaba.
7      Q.   Functionally, it's Schwaba &
8  Associates without the associates?
9      A.   That's actually, yes, pretty true.
10         (Continued on the next page to include
11     the jurat.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 157

1          J. Schwaba
2      Q.   Why did you leave the Federal Home
3  Loan Bank of Pittsburgh?
4      A.   There was a reorganization at Federal
5  Home Loan Bank and, you know, I got basically
6  reorged out, if you will, and so that was what
7  happened.
8          MR. SHAW:  Thank you very much for
9     your time, sir.
10         THE WITNESS:  Thank you.
11         (Time Noted:  2:03 P.M.)
12              oOo
13
14
15
16
17
18         _____
            JOSEPH SCHWABA
19
20     Subscribed and sworn to
       before me this    day
21     of      2010.
22
       _____
23
24
25

Page 158

```
 1
 2              CERTIFICATE
 3    STATE OF NEW YORK )
               : ss
 4    COUNTY OF NEW YORK)
 5         I, Kathy S. Klepfer, a Registered
 6    Merit Reporter and Notary Public within and
 7    for the State of New York, do hereby
 8    certify:
 9         That JOSEPH SCHWABA, the witness whose
10    deposition is herein before set forth, was
11    duly sworn by me and that such deposition is
12    a true record of the testimony given by such
13    witness.
14         I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18         I further certify that neither the
19    deponent nor a party requested a review of
20    the transcript pursuant to Federal Rule of
21    Civil Procedure 30(e) before the deposition
22    was completed.
23         In witness whereof, I have hereunto
24    set my hand this 12th day of April, 2010.
25       -------------------------------
```

Page 159

```
 1
 2                 INDEX
 3    TESTIMONY OF J. SCHWABA:           PAGE
 4    Examination by Mr. Shaw        5
 5
 6    EXHIBITS:                 PAGE
 7    Exhibit 697, Expert Report of Joseph Schwaba    86
 8    Exhibit 698, Expert Report of Joseph Schwaba    86
 9    Errata
10    Exhibit 699, a document bearing Bates Nos.    92
11    LEH-NAVIGANT 026173 Purdue through IL
12    Exhibit 700, a document bearing Bates Nos.    138
13    LEH-NAVIGANT 026165 Sheet 1
14    Exhibit 701, a document bearing Bates Nos.    140
15    LEH-NAVIGANT 026176 Floater
16    Exhibit 702, a document bearing Bates Nos.    148
17    LEH-NAVIGANT 026175 Muni
18
19
20
21
22
23
24
25
```

Page 160

```
 1
 2    NAME OF CASE:  In re:  Lehman Brothers
 3    DATE OF DEPOSITION:  April 12, 2010
 4    NAME OF WITNESS:  Joseph Schwaba
 5    Reason Codes:
 6        1. To clarify the record.
          2. To conform to the facts.
 7        3. To correct transcription errors.
 8    Page _____ Line _____ Reason _____
      From _____ to _____
 9
      Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
      From _____ to _____
12
      Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
      From _____ to _____
15
      Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
      From _____ to _____
18
      Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
      From _____ to _____
21
      Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
      From _____ to _____
24
25       _____
```