Hearing Date:   May 3, 2010
Objections Date:   April 26, 2010

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
Jonathan D. Schiller
Hamish P. M. Hume
Jack G. Stern

Attorneys for Barclays Capital Inc.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) |

**MOTION *IN LIMINE* OF BARCLAYS CAPITAL INC. FOR AN ORDER EXCLUDING
THE EXPERT TESTIMONY OF DANIEL McISAAC RELATING TO EXCHANGE-
TRADED DERIVATIVES ("ETDs") AND ETD MARGIN**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Barclays Capital Inc. ("Barclays"), by and through its undersigned counsel, hereby moves the Court for the entry of an order, pursuant to Federal Rule of Evidence 702, excluding the expert testimony of Daniel McIsaac.

**INTRODUCTION**

1.  Barclays respectfully moves this Court to exclude the proposed expert testimony of Daniel McIsaac concerning the exchange-traded derivatives ("ETDs") and associated margin ("ETD Margin") included as Purchased Assets by LBI to Barclays as part of the Sale Transaction. Mr. McIsaac is proffered by James W. Giddens (the "Trustee"), trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI"). In his written expert report, Mr. McIsaac opines that Barclays could not have acquired the ETD Margin unless it paid the exact amount, "dollar for dollar," that had been deposited by LBI as ETD Margin at the time of the Sale and that a purchaser would have to a premium over that "dollar for dollar" amount. (Expert Report of Daniel McIsaac (Mar. 14, 2010) ("McIsaac Report"), attached as Exhibit 1, at ¶¶ 50, 55 ("dollar for dollar" compensation would be required) and ¶¶ 18, 59 (additional premium would be paid "based on the anticipated earnings of the clearing business")). Mr. McIsaac also opines that Barclays was undertaking little to no risk in acquiring the extensive exchange-traded derivatives business of LBI, whether with respect to proprietary positions, customer positions, or positions of LBI affiliates. (Ex. 1 (McIsaac Rpt.) at ¶¶ 10(i) and (iii), ¶¶ 40-68.)

2.  Mr. McIsaac's proposed testimony should be excluded because it is manifestly lacking in the reliability required of expert testimony. Mr. McIsaac admits that he did not even know about, let alone factor into his opinion, the most basic circumstances that existed at the time the Sale was negotiated. His testimony reveals that he based his opinion on several assumptions that are indisputably false. And in deposition, Mr. McIsaac abandoned the central

2

opinion in his written report—that it would not be rational for a seller to transfer any of the posted ETD Margin to Barclays without receiving "dollar for dollar" consideration plus a premium—by admitting that "*I would agree that the seller could make a rational decision to transfer the accounts with no compensation, if that's what they wanted, based on facts and circumstances at that point in time . . . .*" (McIsaac Deposition Transcript (Apr. 6, 2010), attached hereto as Exhibit 2, at 198:15-19.)

3. Moreover, Mr. McIsaac is not an expert on ETDs, and therefore lacks the credentials to provide testimony on the ETD topics about which he opines.

4. Accordingly, Barclays requests that the Court exclude Mr. McIsaac's testimony from the record and the upcoming hearing pursuant to Fed. R. Evid. 702.

## ARGUMENT

### A. Mr. McIsaac's Testimony Should Be Excluded Because He Failed To Consider The Facts And Circumstances Relevant To His Opinion.

5. An expert opinion must be excluded as unreliable when the expert forms it "without even endeavoring to obtain and consider all the available and relevant information." *See, e.g.*, *Li v. Aponte,* No. 05 Civ. 6237, 2009 WL 1285928, at *7 (S.D.N.Y. May 5, 2009). Mr. McIsaac's deposition testimony confirms that in putting together his expert report, he did not endeavor "to obtain and consider" *any* relevant information about the circumstances surrounding the Sale Transaction in general, or about the ETD Margin in particular.

6. Mr. McIsaac purports to give expert testimony relating to what a rational seller would do with respect to the ETD Margin at issue *in this transaction*. In order to provide such expert testimony, therefore, he must actually consider the facts and circumstances of *this transaction*. Such relevant information includes: the speed with which the transaction was negotiated and consummated; the imperfect and incomplete information available to Barclays;

3

the risk that Barclays faced in acquiring ETDs that could represent billions of dollars in liabilities (especially given the extreme volatility and credit risks that were created by the financial crisis); the fact that there were no other bidders for this business; and the fact that the LBI estate was very unlikely to realize any value at all from the ETD Margin if Barclays had declined to complete the deal (as it would have if the parties had not agreed to include margin) since clearing corporations and exchanges would likely have liquidated the ETDs at a loss. *See, e.g.*, BCI Ex. 49 [Sept. 19, 2008 H'g Tr.] at 61:16-19, 239:17-21 (LBI took a loss of $1.6 billion when the CME unilaterally closed out LBI positions on September 18, 2008); BCI Ex. 267 [Email from J. McDaniel to J. Giddens *et al.* (Sept. 21, 2008 4:37 p.m.)] (explaining that the OCC would liquidate all of LBI's OCC positions if the transaction did not close).

7.  Mr. McIsaac failed to consider critically relevant facts to this transaction and often relied on erroneous assumptions contrary to those facts. For example:

- Mr. McIsaac testified that he was "sure" that, as an alternative to the deal with Barclays, LBI could have decided to sell to a different entity. (Ex. 2 (McIsaac Dep. Tr.) at 99:2-4).
    - The reality, as the Court recognized at the time, is that there were no other prospective purchasers; the idea of delaying the sale in hopes of obtaining a better offer was a "preposterous notion" and an immediate sale to Barclays was the only viable alternative to a potentially "disastrous" liquidation. BCI Ex. 49 [Sept. 19, 2008 H'g. Tr.] at 248:25-249:3, 250:13-18. *See also id.* at 249:3-11 (the Court: "[F]or a transaction like this to happen, only Barclays can do it").

4

- Mr. McIsaac "assume[d]" that the Fed "could have continued to provide liquidity while [LBI looked] for another purchaser" (Ex. 2 (McIsaac Dep. Tr.) at 100:17 – 101:2).
    - The reality is that the Fed was unambiguous about its unwillingness to continue providing liquidity and it, the SEC, and the CFTC placed "constant pressure" on LBI to consummate a sale no later than September 19th. BCI Ex. 30 [Leventhal Decl.] at ¶ 7 (Fed unwilling to continue funding); BCI Ex. 49 [Sept. 19, 2008 H'g. Tr.] at 93:13-19 (federal regulators exerted "constant pressure" to get the deal closed by Sept. 19, 2008).
- Mr. McIsaac had "no idea" about the time frame in which the parties negotiated the APA. (Ex. 2 (McIsaac Dep. Tr.) at 62:3-17.) Mr. McIsaac simply "did not give much thought" to this, and even questioned "what that has to do with what we're talking about." *Id.* at 63:22-64:4; 63:8-15. Mr. McIsaac assumed that Barclays took "whatever time it needed to take" to assess "how much they were getting and what they were willing to pay for it." *Id.* at 62:3-17, 63:22-64:9, 215:11-216:13.
    - The reality is that the APA—with a value initially estimated at over $70 billion—was negotiated in *less than 48 hours*. BCI Ex. 97 [Shapiro Dep. Tr.] at 66:7-21. This was not by choice, but of necessity. BCI Ex. 49 [Sept. 19, 2008 H'g. Tr.] at 250:5-8 (the Court noting that although a "theoretical bankruptcy jurist" would have demanded more time, immediate action was "imperative") (*contra* Ex. 2 (McIsaac Dep. Tr.) at

5

> 72:24-73:14 ("nobody was holding a gun to their head saying if you don't do this, I'm going to shoot you")).

- Mr. McIsaac believed that the parties "could have postponed the closing" in order to allow for more time for due diligence if the parties believed that was necessary. (Ex. 2 (McIsaac Dep. Tr.) at 72:24-73:13.)
    - o The reality is that counsel and representatives for all parties implored this Court to approve this transaction given the importance of its completion prior to the open of business on Monday morning. *See, e.g.*, BCI Ex. 49 [Sept. 19, 2008 H'g Tr.] at 59:11-61:13, 73:14-21, 80:22-81:4, 92:25-93:19, 94:13-20, 102:3-18, 102:19-103:1. The OCC, for its part, had already informed all of the parties that it would liquidate LBI's OCC accounts on Monday morning if the sale to Barclays was not closed by then. BCI Ex. 262 [Email from J. McDaniel to E. Rosen, Sept. 21, 2008, 4:03 p.m.].
- In his Report, Mr. McIsaac opines as to what a rational seller would agree to without even mentioning the fact that the OCC had flatly stated it would liquidate LBI's accounts if the deal did not close, or that just days before, LBI had seen the CME close out LBI's accounts there at a substantial loss. (*E.g.*, Ex. 2 (McIsaac Rpt.) at ¶¶ 22, 40-68.
    - o The reality is that the OCC was threatening to liquidate the accounts, BCI Ex. 262 [Email from J. McDaniel to E. Rosen, Sept. 21, 2008, 4:03 p.m.], and when the CME had closed out LBI's proprietary accounts on September 18, it came at a cost to LBI of $1.6 billion in posted margin.

6

BCI Ex. 49 [Sept. 19, 2008 H'g Tr.] at 61:14-19, 239:17-21. As Mr. McIsaac acknowledged in deposition when confronted with these facts, he did not believe the OCC's calculation for determining its margin requirements "can ensure anything", including "that in the event of a liquidation there would not be a deficit in the margin account", irrespective of any excess going into such a liquidation.[1]

- Mr. McIsaac did not know (or believe) that the country was in a recession as of September 19, 2008 (Ex. 2 (McIsaac Dep. Tr.) at 136:12 – 137:2 ("[T]here was I don't believe a recession on September 19, but I don't know.")). He also claimed that he "would not care if there was a recession in analyzing individual customer's ability to meet their obligations." (*Id.* at 138:25-139:14.)

---

[1] The testimony proceeded as follows:

> Q: Are the – is the OCC's formula guaranteed to ensure that in the event of a liquidation there would not be a deficit in the margin account?
>
> A: I don't think any calculation can ensure anything. I think their calculation is there for whatever they feel they need to address as far as the volatility of the firm and/or the marketplace.
>
> Q: Is it possible that a firm, a broker-dealer could have an excess in an account and nevertheless, upon a liquidation the following day, incur a cost that exceeds the amount that they had posted?
>
> . . .
>
> A: I would assume anything is possible. . . .
>
> . . .
>
> Q: In a market in which there's more than average volatility, would you agree that its more likely that their margin requirement will be insufficient to cover the liquidating cost of an account?
>
> A: More likely than what?
>
> Q: Than in an average – than in a market with average volatility.
>
> A: Okay, so if you're saying in a market that has extreme volatility, could their calculations be more likely to – to not be correct than in a market that has average volatility? I guess the answer would be yes.

(McIsaac Dep. Tr.) at 31:5 – 32:5; 35:8-21.)

- As the Court is intimately aware, and as would be obvious from even a cursory reading of the September 19, 2008 hearing transcript, the reality recognized by all parties is that the Sale Transaction was negotiated in the middle of a worldwide financial crisis. *E.g.*, BCI Ex. 49 [Sept. 19, 2008 H'g Tr.] at 68:1-5 (creditors' committee), 71:20-72:5 (SIPC); 164:13-22 (bondholders); 248:13-249:3 (the Court). The deal closed only days after LBHI had filed for bankruptcy, triggering a massive sell-off in the financial markets, and causing widespread panic and uncertainty. As Debtor's financial advisor Barry Ridings testified, these were "unprecedented times" when the "securities markets were probably in "the worst condition that one could ever imagine." BCI Ex. 92 [Ridings Dep. Tr.] at 9:17–10:5. These circumstances were the driving force behind the deal, and the Sale Transaction can only be evaluated when considered in the "context of the marketplace, the illiquidity in the marketplace" and "the volatility" that pervaded the markets at this time. BCI Ex. 85 [McDade Dep. Tr.] at 147:21-25.

8. As the preceding examples demonstrate, Mr. McIsaac failed even to *inquire* into the circumstances surrounding the Sale Transaction and, as a result, he knew virtually nothing about even the most basic of those circumstances. Common sense alone dictates that, without this basic knowledge, Mr. McIsaac could not possibly offer a reliable opinion concerning what a rational seller (or, for that matter, a rational buyer) would have done under the circumstances. Under well-established law, an expert opinion must be excluded as unreliable when the expert forms it "*without even endeavoring to obtain and consider* all the available and relevant

8

information." *Li v. Aponte,* No. 05 Civ. 6237, 2009 WL 1285928, at *7 (S.D.N.Y. May 5, 2009) (emphasis added).

### B. Mr. McIsaac's Testimony Should Be Excluded Because It Contradicts the Record Evidence.

9. Expert testimony should be excluded if it contradicts the underlying facts relevant to that opinion. *See generally GE v. Joiner*, 522 U.S. 136, 146 (1997); *Davidov v. Louisville Ladder Group, LLC*, No. 02 Civ. 6652, 2005 WL 486734, at *2 (S.D.N.Y. Mar. 1, 2005) (excluding expert testimony that was inconsistent with the facts of the case), *aff'd* 169 Fed. Appx. 661 (2d Cir. Mar. 10, 2006); *see also Point Prods. A.G. v. Sony Music Entm't, Inc*., 2004 U.S. Dist. LEXIS 2676, at *24 (S.D.N.Y. Feb. 20, 2004) (excluding expert testimony that contained "gaping omissions of real world events that were highly material").

10. As explained above, Mr. McIsaac's proffered testimony contradicts facts that cannot be genuinely disputed: his testimony contradicts the indisputable facts that (a) there were no alternative buyers for the Business, (b) the Sale was negotiated in an emergency and truncated period of time, (c) the Sale had to close immediately, given the risk of a disintegrating Business and a panicking marketplace, (d) Barclays had no reliable information relating to the ETDs and ETD Margin, and (e) the LBI estate faced virtually certain losses on its ETD positions and margin if they were not immediately transferred to Barclays.

11. Finally, Mr. McIsaac's opinion contradicts the following basic fact: the APA provided for Barclays to acquire "all assets . . . used in connection with the Business," unless specifically excluded. BCI Ex. 1 [APA] at § 1.1 (definition of Purchased Assets). The consideration Barclays was obligated to deliver for that purchase was set forth in section 3.1 of the APA, which provided that Barclays would pay the "Cash Amount" (which totaled $250 million and the appraisal cost for real estate) and would assume certain "Assumed Liabilities."

9

*Id.* at § 3.1. No valuations were provided for the Assumed Liabilities, and estimated values were provided for only two of the nineteen Purchased Assets that were listed as examples in the APA. The emergency circumstances of this transaction, the baseline concept that a business and related assets were being exchanged for cash and the assumption of largely unknown liabilities, and the parties' inability to provide valuations for the consideration being exchanged all mean that Mr. McIsaac's opinion that a "rational" seller would have negotiated for a "dollar for dollar" price is in applicable to this transaction. No "dollar for dollar" price can be ascertained for assets that are neither itemized nor valued (but which are nonetheless plainly within the defined terms of the deal), and Mr. McIsaac's opinion should therefore be excluded as contrary to the facts and to the plain terms of the APA.

      **C.     Mr. McIsaac's Opinion Should Be Excluded Because He Effectively Abandoned It When Confronted With The Facts Of This Case.**

12.     That the facts identified above are critically relevant is confirmed by Mr. McIsaac's deposition testimony, in which he abandoned his core opinion when confronted by those facts. The opinions he offers are therefore necessarily unreliable. In his report, Mr. McIsaac opined that under *any* circumstances, a rational seller would agree to transfer the ETD margin only if it received additional compensation (and in most instances, "dollar for dollar" compensation) in return. (Ex. 1 (McIsaac Rpt.) at ¶¶ 50, 55.) In deposition, after being confronted with the actual facts and circumstances of this transaction, Mr. McIsaac admitted that this was not in fact his opinion at all:

> Q: So when you say in your report a rational seller would not include margin in the deal unless it was being compensated dollar for dollar, do you mean what you say in that sentence or are you modifying it here today?
>
> A: You are giving me facts that were not part of my opinion. What I said in my opinion was that a rational purchaser would want to quantify the risk to determine what additional assets it needed, and a rational seller would include margin on dollar-for-dollar basis.

10

> As you negotiate that, you may change your mind. You may decide I'll take 50 cents on the dollar, I may take 25 cents on the dollar, I may want a dollar and a half on a dollar because I think the assets are worth more. That's a negotiation that would occur at the time.

(Ex. 2 (McIsaac Dep. Tr.) at 197:9-198:4.) Indeed, when pressed further, Mr. McIsaac said he "would agree that the seller could make a rational decision to transfer the accounts with *no compensation*, if that's what they wanted, *based on facts and circumstances at that point in time* . . . ." (Ex. 2 (McIsaac Dep. Tr.) at 198:15-19 (emphasis added).):

13. This change of position further demonstrates that Mr. McIsaac's proffered testimony – which is still evolving with each circumstance surrounding the Sale Transaction he learns about – is entirely unreliable. *See Delehanty v. KLI, Inc.*, 663 F. Supp. 2d 127, 133 (E.D.N.Y. 2009) (finding proffered testimony unreliable where expert failed to research the basic facts of the case, then changed his testimony when confronted with facts that contradicted his opinion).

### D. Mr. McIsaac's Testimony Should Be Excluded Because He Is Not Credentialed As An ETD Expert.

14. Mr. McIsaac's proffered testimony on ETD Margin is also inadmissible for the independent reason that he is not a qualified expert on ETDs. Although Mr. McIsaac "did some reviews" of futures-related acquisitions in his past experience with other companies, the only expertise that that experience even arguably confers on him would relate to the impact that a transaction would have on a firm's reputation, capital position, or "financial statement disclosure" issues—and perhaps a "general understanding of the business." (Ex. 2 (McIsaac Dep. Tr.) at 24:13-25:2.)

15. Finally, although Mr. McIsaac may have expertise in the field of conducting customer segregation calculations applicable to broker-dealers and in managing regulatory and compliance issues, he provides no indication in his expert report or in his deposition testimony

that he is qualified to provide expert testimony concerning any of the risks associated with actually operating or acquiring an ETD trading and clearing business. (*See generally*, Ex. 2 (McIsaac Dep. Tr.) at 23:2-25:2 (affirmatively disclaiming expertise or proficiency in evaluating risk management or the risk associated with particular types of ETDs).) Mr. McIsaac is not an expert on ETDs, has never had occasion to analyze the types of risks about which he opines in this case, and has no relevant experience in operating an ETD trading and clearing business. He therefore lacks the expertise needed to qualify him as an expert on the ETD issues he has proposed to address in this case.

16.     Notably, Mr. McIsaac's initial involvement in this case was through his work on Rule 15c3-3 issues during the summer of 2009, and through his subsequent retention by the Trustee as an expert on that topic. Whatever qualifications he may have are in the areas of broker-dealer regulatory compliance, managing customer segregation calculations, and oversight of regulatory filings – *not* in managing, evaluating, or negotiating complex ETD positions. (Ex. 1 (McIsaac Rpt.) at Ex. A.) Tellingly, Mr. McIsaac was not retained to provide an expert opinion concerning ETD issues until "sometime in February" of 2010, after the Trustee was served with the ETD-related expert report of Anthony Leitner as proffered by Barclays. (Ex. 2 (McIsaac Dep. Tr.) at 8:14.) Mr. McIsaac then submitted his report on March 14, 2010. Thus, his entire review of ETD-related facts, analysis of ETD-related issues, and drafting and finalization of his report took place in a matter of *weeks*. This explains his failure to consider any of the facts and circumstances relevant to his proffered testimony.

## **CONCLUSION**

For the foregoing reasons, Barclays respectfully requests that the Court enter an Order excluding the proffered expert testimony of Mr. McIsaac.

Dated:   New York, New York
         April 19, 2010

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Jonathan D. Schiller

Jonathan D. Schiller
Hamish P.M. Hume
Jack G. Stern
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Attorneys for Barclays Capital Inc.