**Exhibit 1**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 |
| Debtors. | Case No. 08-13555 |
| | (Jointly Administered) |
| In re: | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) SIPA |
| Debtor. | |

### <u>Expert Report of Daniel McIsaac</u>

March 14, 2010

## I.    INTRODUCTION

1.    I have been retained by Hughes Hubbard & Reed LLP ("Hughes Hubbard"), attorneys for James W. Giddens as Trustee for the Liquidation of Lehman Brothers Inc. (the "Trustee" and "LBI," respectively), to provide, for the purposes of this report, expert analysis and opinions concerning the sale of exchange traded derivatives by LBI to Barclays Capital Inc. ("Barclays") as part of the sale transaction that closed on September 22, 2008 (the "Closing"). These exchange traded derivatives were held by LBI for its own account, or for the accounts of its affiliates or customers.

2.    My report also constitutes a response to the Report of Anthony J. Leitner, dated January 8, 2010 (the "Leitner Report"). Mr. Leitner was retained by counsel for Barclays and offered his expert opinion in his report "concerning Barclays' acquisition of exchange traded derivatives held by Lehman Brothers, Inc." (Leitner Report ¶ 1.)

3.    In preparing this report, I have relied on various documents related to the issues discussed herein, as cited in the text and footnotes in this report and/or in Exhibit A to this report.

## II.    BACKGROUND & QUALIFICATIONS

4.    For approximately 30 years, I have held executive positions in financial institutions and public accounting firms, specializing in the accounting and regulatory compliance issues facing broker-dealers. My *curriculum vitae* is attached as Exhibit B.

5.    Currently, I serve as Chairman of the Capital Committee of the Securities Industry and Financial Markets Association ("SIFMA"), a membership organization comprised of participants in the financial industry, including securities

firms, U.S.-registered broker-dealers and asset managers. The Capital Committee is focused on regulatory and legislative issues that impact the regulatory capital and customer protection activities of member firms. I am a former president and current advisory board member of the Financial Management Division of SIFMA, which focuses on matters relating to financial and regulatory issues in the securities industry. I have also served in various capacities on industry committees and task forces responsible for development, interpretation and compliance with regulations promulgated by the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA").

6.    I also have many years of private sector experience with regulated broker-dealers, including UBS Securities LLC ("UBS"), Dean Witter Reynolds and Drexel Burnham Lambert, dealing primarily with SEC reporting and compliance. Most recently, from 1994 until June 2009, I served as the regulatory controller for UBS, directing all regulatory calculations and filings, including daily as well as monthly Commodity Futures Trading Commission ("CFTC") segregation calculations applicable to broker-dealers, 1-FR Reports, and monthly Financial and Operational Combined Uniform Single ("FOCUS") Reports. I was the firm's designated representative and principal day-to-day contact with regulators on financial and operational issues. I also served as the firm's industry representative in regulatory matters.

7.    Based on my experience in the public and private sectors, I am fully familiar with margining rules governing SEC-registered broker-dealers, with margining and customer protection rules governing CFTC-registered Futures

2

Commission Merchants ("FCM"s), and with industry practices regarding margining and handling of customer funds in connection with derivatives transactions.

8.    I am being compensated for my time at an hourly rate of $650 plus direct out of pocket expenses. This compensation is not contingent upon the substance of this report or the outcome of this matter.

9.    I reserve the right to alter or amend this report and any of the opinions rendered herein to take into account any changes in the factual predicates to my opinions or any rulings or interpretations by competent authorities that render any opinion expressed in this report incorrect or that require any qualification thereof.

## III.    SUMMARY OF OPINIONS

10.    Based on my experience in the securities industry, and my review of documents in this matter, I conclude as follows:

i.    In acquiring LBI's exchange traded derivatives customer and affiliate clearing business, Barclays assumed no market risk. The market risk was borne by the customers and the affiliates. The only risk borne by Barclays was credit risk associated with LBI's customers and affiliates. The credit risk with respect to customers was minimal, and in the case of customers whose accounts were transferred to Barclays, *i.e.*, the PIM customers, largely theoretical. Mr. Leitner focuses on the credit risk Barclays faced with respect to affiliates, but Barclays has charged back the net cost of closing out the affiliate positions to the LBI estate. For any customer accounts being transferred to Barclays, I would expect that the customer assets held by or on behalf of LBI would be transferred to Barclays. Under the circumstances, I would not expect either (a) the margin that LBI posted with respect to such positions, or (b) any excess firm assets deposited by LBI in customer segregated and secured accounts to be transferred to the purchaser, without specific agreement and additional consideration being paid.

ii.    The proprietary exchange traded derivatives were one piece of the total portfolio of financial instruments acquired by Barclays. When a purchaser is acquiring a portfolio of assets, I would not anticipate the need to provide the purchaser with downside protection for any one subset of those assets, nor would I expect the seller to share in the upside. I would certainly not expect collateral associated with any of these assets to be transferred to a

3

purchaser without additional consideration. That is particularly so in the case of futures, where - because they are marked-to-market daily - Barclays was unlikely to face a significant net liability position immediately on Closing.

iii.    Any ongoing market risk associated with the proprietary exchange traded derivatives that Barclays acquired could be, and was, mitigated by Barclays by hedging these positions. These positions would also have had the potential for a gain if the market moved favorably. As discussed above, I would certainly not expect margin posted by LBI with respect to these positions to be transferred to Barclays without specific negotiation and agreement, and additional consideration.

## IV.    OPINIONS & ANALYSIS

### A.    The Sale Documents

11.    Exchange traded derivatives are contracts, the value of which is based on the performance of an underlying financial instrument, executed on an exchange. To ensure performance of the obligation under an exchange traded derivatives contract, exchanges, clearing organizations and broker-dealers may require the counterparty to post collateral, known as margin. Margin, therefore, is an asset that may be related to an exchange traded derivatives contract, but it is not the same as an exchange traded derivatives contract.

12.    Barclays concedes that exchange traded derivatives and margin are distinct assets. (Ricci Tr. 256:22-257:6 ("Derivatives is position and the property that may be held to secure obligations is margin").)[1] Mr. Leitner, when asked whether "collateral [is] different from an exchange-traded derivative," agreed that "[a]n exchange-traded derivative is a contract. Collateral is collateral." (Leitner Tr. 24:3-10.) Mr. Leitner also testified that margin may be "related to [a] derivative[s] contract." (*Id.* at 34:7-35:2.)

_____

1.    Citations to "X Tr.," refer to deposition transcripts of the named witnesses.

4

13.    I understand that the Trustee's position is that neither the Asset Purchase Agreement ("APA") nor the Clarification Letter (together, the "Sale Documents") transfers to Barclays any margin in connection with the exchange traded derivatives. (*See* Kobak Decl. ¶ 16.)[2]

14.    The APA includes long and short exchange traded derivative positions. It defines "Purchased Assets" to include "government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion (collectively, 'Long Positions')." (APA § 1.1, definition of "Purchased Assets," clause (d).) It also defines "Assumed Liabilities" to include "all short positions and 'repos' relating to any securities or interests of the types included in the definition of 'Long Positions' with a book value as of the date hereof of approximately $69 billion (collectively, 'Short Positions' and, together with the Long Positions, 'Positions')." (*Id.* at § 2.3(i).) The APA makes no mention of margin in the definition of "Purchased Assets."

15.    The Clarification Letter deletes the definition of Purchased Assets in the APA and replaces it with several assets, including "(C) exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)." (Clarification Letter ¶ 1(a)(ii)(C).)

16.    I understand that Barclays argues that it is entitled under the APA to margin because Barclays "acquired 'all of the assets' used in [the seller's] Business unless specifically excluded." (*See* Memorandum of Barclays Capital Inc. in Opposition

---

2.    "Kobak Decl." refers to the Declaration of James B. Kobak, Jr., dated September 15, 2009, filed in support of the Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b).

to the Rule 60 Motions and in Support of Motion of Barclays Capital Inc. to Enforce the

Sale Order and Secure Delivery of all Undelivered Assets, dated January 29, 2010 ("Opp.

Br.") ¶ 380.)

17.     Based on my experience in the securities industry, I would expect

that the sale of proprietary "exchange traded derivatives," the "Long Positions" and the

"Short Positions," defined in the APA (paragraph 14 above) would be for the long and

short positions, and would not include the sale of margin associated with those positions.

If margin were to be included in such a transaction, I would expect it to be separately

negotiated and accounted for as part of the net asset value of the business.

18.     Based on my experience in the securities industry, I would expect

that the sale of a derivatives clearing business would include the margin provided by the

customers to the broker-dealer for the benefit to those customers.  If firm assets, such as

posted margin, beyond that provided by customers, were to be included in the deal, again

I would expect these to be separately negotiated and paid for as part of the net asset value

of the business.  In addition to the net asset value, I would expect a purchaser to pay a

premium based on the anticipated earnings of the clearing business.

19.     In either case, given that Barclays is claiming entitlement to

margin worth billions of dollars, I would expect that any agreement to transfer that

margin would be expressly reflected in the Sale Documents.

20.     My opinions are consistent with the acknowledgment in Mr.

Leitner's report that buyers and sellers generally negotiate a separate agreement about

"whether the transfer of ETDs [exchange traded derivatives] would come with or without

the related collateral." (Leitner Report ¶ 94.)  The circumstances of the transaction

between Lehman and Barclays do not change my opinions in this matter.

      21.     The fact that the agreement between Lehman and Barclays does

not include margin posted by LBI makes economic sense.  It is my understanding that

Barclays claims that margin posted by LBI was always part of the deal.  (*See* Ricci Tr.

161:7-162:5.)  Based on my reading of the APA, it appears that under the APA, Barclays

was purchasing approximately (i) $70 billion of LBI's proprietary "Long Positions,"

including "corporate equity" and LBI's exchange traded derivatives portfolio, and (ii)

$69 billion of "Short Positions," including corporate equity and the exchange traded

derivatives portfolio.  (*See* paragraph 14 above.)  LBI's proprietary exchange traded

derivatives must be assessed within the context of the total "Purchased Assets" and

"Assumed Liabilities."  To treat the sale of LBI's proprietary exchange traded derivatives

in isolation appears to be inconsistent with the APA as well as with the way broker-

dealers, such as LBI, operate.  Where a purchaser is acquiring a portfolio of assets, I

would not anticipate the need to provide the purchaser with downside protection for any

one subset of those assets, nor would I expect the seller to share in the upside.  I would

certainly not expect collateral associated with any of these assets to be transferred to a

purchaser for no additional consideration.

      22.     Furthermore, I would assume that the purchaser would have

anticipated that the short exchange traded derivatives positions would be hedged by

certain long equity positions in LBI's total portfolio.  For example, if LBI held a short

call option, *i.e.*, it had an obligation to deliver the underlying security if the option was

exercised, that short call could be hedged by a long equity position, *i.e.*, LBI's ownership

of the underlying security. Indeed, Mr. Leitner appears to assume that Barclays was, at

least at the start of the week, purchasing a book of business that was at least partly

hedged. (*See* Leitner Report ¶ 63.) While a purchaser might like to receive a windfall by

acquiring posted margin at no additional cost, he would not need to do so in order to

conclude the purchase of a book of long and short positions. Indeed, a rational seller

would not provide a windfall by giving away the firm's assets without obtaining

additional value. If Barclays' claim for margin is successful, it means that in return for

the $250 million consideration, Barclays will obtain not only ongoing profitable

businesses, but also billions of dollars in additional firm-owned assets.

   23.  Barclays claims that it is entitled to the margin that LBI posted at

domestic and foreign brokers, clearing corporations and with other custodians, whether

for LBI's own benefit or for the benefit of LBI's customers, because of the inclusion in

the Clarification Letter of the parenthetical "(and any property that may be held to secure

obligations under such derivatives)." (*See* Opp. Br. ¶¶ 380-81.) I understand that the

Trustee's position is that this parenthetical refers to margin posted by LBI's customers

and affiliates and *held by* LBI to secure the derivatives trading of its customers and

affiliates. (*See* The Trustee's Motion for Relief Pursuant to the Sale Orders or,

Alternatively, for Certain Limited Relief Under Rule 60(b), dated September 15, 2009

("Trustee's Motion") ¶ 67.) I think that the Trustee's reading of the Clarification Letter is

the more reasonable business approach. In my view, the parenthetical, "(and any

property that may be held to secure obligations under such derivatives)," fails to include

margin *posted* by LBI and held by exchanges, clearing houses, foreign brokers or other

custodians. I believe that the correct phrase to include that margin would read, "and any

property posted by LBI, and on deposit with any exchange, clearing house, broker or

other custodian to secure the obligations of LBI for such derivatives." (*See* Leitner

Report ¶ 94, where Mr. Leitner refers specifically to "*posted* collateral," as opposed to

collateral *held by* LBI.)

24.    I also understand that Barclays claims entitlement, under the APA

and the Clarification Letter, to all of the assets in LBI's customer segregated and secured

accounts related to futures trading, including the LBI assets placed in those accounts in

excess of the requirements of the CFTC regulations. (Exhibit C - Barclays' supplemental

response to the Trustee's Second Rule 30(b)(6) notice, provided to the Trustee on March

1, 2010 ("Barclays' Supplemental Response").)[3] Even if Barclays was successful on its

claim that it is entitled to margin *held or posted* by LBI with various custodians, Barclays

would certainly not be entitled to these excess assets because these were not held or

posted to secure any obligations. Rather, as Mr. Raisler notes, FCMs tend to keep excess

assets in segregated and secured accounts to ensure that they do not fall afoul of the

CFTC regulations and for the administrative convenience of being able to meet variation

margin calls by futures exchanges efficiently. (Raisler Tr. 88:7-13; Leitner Report ¶ 43.)

In accordance with industry practice, it appears that LBI maintained excess segregated

and secured assets in its segregated and secured accounts for the same reason. LBI's

calculations show that on September 18, 2008 LBI held an excess of approximately $1.4

---

3.    Barclays' Supplemental Response attaches Exhibit 1, which describes the futures assets Barclays is
claiming and has booked on its final acquisition balance sheet. The first chart in Exhibit 1, entitled
"Summary," shows that Barclay is claiming all assets in LBI's segregated and secured accounts
irrespective of whether these assets were LBI's customers' assets or LBI's proprietary assets, and
irrespective of whether these were in excess of the CFTC's requirements. As an example, see
Barclays' entries for "Cash" and "Mutual Funds" on the "Summary" spreadsheet.

billion in segregated and secured funds. (*See* Ex. 664A.)[4] The excess firm assets

reflected in the segregated and secured calculations could have been withdrawn by LBI at

any time (*see* Raisler Tr. 88:14-20) and are, therefore, in excess of, and should not

properly be considered part of, the property that "secure[s]" obligations under any

exchange traded derivatives.

### B.    Due Diligence

25.    Mr. Leitner argues that Barclays entered the deal as a blind buyer,

with no knowledge of the assets it was buying. (*See* Leitner Report ¶ 106.) Mr. Leitner

concludes that because Barclays was taking a blind and unquantifiable risk in assuming

responsibility for LBI's exchange traded derivatives, Barclays is justified in obtaining

many billions of dollars in margin to offset those risks. (*Id.*; Leitner Tr. 84:4-17.) I do

not agree either that Barclays entered the deal as a blind buyer, or that the risks that

Barclays was taking justified its taking of any margin, never mind billions of dollars of

margin.

26.    Mr. Leitner argues that knowledge of the exchange traded

derivatives positions that Barclays was buying would have been "prudent, but

unnecessary" to quantify the risk it was undertaking with respect to the exchange traded

derivatives because Barclays was getting the margin. (*See* Leitner Tr. 189:2-190:16.)

This argument appears to be entirely circular, where Mr. Leitner's initial premise is that

Barclays is entitled to all the margin because that risk was unquantifiable.

27.    Included below are the due diligence processes that Barclays could

have, and in some cases did, conduct on LBI's exchange traded derivatives business.

---

4.    Citations to "Ex. X," refer to exhibits marked at depositions in this matter.

This analysis shows, in my opinion, that Barclays was in no way blind to the information needed to assess the risks involved in the exchange traded derivatives part of the deal. To the extent Barclays did not have access to the information it claimed it needed, such information was readily available to Barclays, including via third parties, and I cannot fathom why Barclays would not have requested it.

<u>Options</u>

28.     Mr. Leitner claims that the only way for Barclays to obtain information about LBI's options positions was to follow the margin requirements at OCC and discern trends from that. (Leitner Report ¶ 62.) I do not know why Barclays would monitor margin requirements instead of reviewing the actual positions. If, however, as Barclays claims, it did follow the margin requirements, then Barclays clearly had access to information about LBI's collateral at the OCC. I see no reason why Barclays was able to access information about margin but not positions at the OCC. I believe that the best way for Barclays to obtain information about LBI's options positions to quantify any risk it was undertaking, was to obtain position reports from LBI's systems. Mr. Leitner acknowledged that Barclays had obtained options position reports later on Friday afternoon, around the time the September 19, 2008 sale hearing commenced, and well before the transaction closed. (Leitner Report ¶ 91; *see* Ex. 554; Ex. 657.) Mr. Leitner was also unable to point to a single request for this information that Barclays made prior to Friday, September 19, 2008. (Leitner Tr. at 161:9-17; 249:13-250:23.)

29.     Barclays claims that one of the reasons data was not available to Barclays was that LBI's systems could not distinguish between exchange traded derivatives (which Barclays was buying) and over-the-counter derivatives (which it was not). (King Tr. 216:17-21; Leitner Report ¶ 62.) Daniel Dziemian, former Vice

11

President of Lehman's Purchasing & Sales & Options, Clearance Area (who joined

Barclays after the liquidation of LBI was commenced), testified that there would have

been no problem in generating a report from LBI's systems that included only the

exchange traded derivatives. (Dziemian Tr. 107:14-108:6.) There was no reason to

believe that these systems were inaccurate. With respect to options at the OCC, for

instance, Mr. Dziemian testified that he was not aware of any problems with the data-

feeds into these systems from the OCC during the week of September 15, 2008, and that

he and his team continued reconciling the data in LBI's systems with the OCC's data

throughout that week. *(See id.* at 23:21-24:19.) Mr. Dziemian also testified that positions

reports (including pricing information) could be generated from LBI's systems within

approximately four hours. (*See id.* at 45:22-46:15, 49:10-17.)

      30.    Even if Barclays was for some reason unable to obtain position

reports from LBI, it could easily have obtained the information from the OCC. Barclays

was itself a member of the OCC (*see* Leitner Tr. 107:6-8) and must have known that the

OCC could provide position reports within an hour or two of a request for such reports.

(*See* Dziemian Tr. 55:22-59:25; *see also* Ex. 654; Ex. 671A.) Barclays' counsel was in

direct contact with the OCC prior to Closing, asking for and receiving information about

LBI's margin and net pay/collects at the OCC. (*See, e.g.,* Ex.626; Ex. 627.) On the day

of the Closing, Barclays did in fact ask the OCC to provide position reports and received

these within an hour or two of its request. (*See* Ex. 654; Ex. 671A.) I have not seen any

evidence, however, that Barclays requested these reports from the OCC prior to Closing.[5]

---

5.  Barclays' statement that it could not have obtained information about LBI's derivatives business
because of confidentiality issues (James Tr. 36:16-37:5) makes no sense. Confidentiality agreements
are routinely executed in business negotiations to overcome precisely this issue. Barclays' claim also
seems strange to me in light of documents that clearly show that Barclays was in direct contact with

31.    On Sunday, September 21, 2008, Barclays learned that immediately on closing the transaction, it would receive over $360 million of payments in connection with LBI's firm accounts at the OCC. (*See* Ex. 627 showing collects for, among others, LBI's firm accounts 074F and 074M.)  These assets appear to be payments owed by the OCC to LBI at the close of business on September 19, 2008 resulting from cash settlements of index options.  (*See* Ex. 555 at BCI-EX-(S)-00188236 and 00188238, showing $362.1 million in net collects for LBI from the OCC with respect to LBI's firm accounts 074F ($358.9 million) and 074M ($3.2 million).)  If that is the case, as I understand it to be, this amount was a receivable to LBI prior to Closing, and neither an exchange traded derivative, nor collateral held to secure any obligations with respect to exchange traded derivatives.  The same conclusion holds true for other similar receivables from the OCC to LBI as of the close of business on September 19, 2008.[6]

32.    By the time Barclays closed the deal, it knew that (after adjusting for letters of credit) LBI had posted with the OCC, with respect to options transactions, approximately $1.9 billion of assets as margin and clearing fund.[7]  (*See* Ex. 555; Ex. 552 at 1.)[8]  Barclays also knew, as of Sunday, September 21, 2008, that of the total assets

---

the OCC and with other exchanges, seeking and obtaining information about the status of LBI's accounts.  (*See* paragraph 30 above, and paragraph 34 below.)

6.   Ex. 555 shows that as of the close of business on September 19, 2008, the OCC owed LBI the following additional payments resulting from cash settlements of index options with respect to other OCC accounts:  $9.6 million for account 074C; $16,180 for account 084C; and $9.1 million for account 084F.

7.   $1.9 billion is the sum of total collateral for accounts 074C, 074F, 074M, 273C, and 074Z  as reflected on Ex. 555 and 552, less collateral in the form of letters of credit.  Including the letters of credit ($252 million) and the assets LBI posted with the OCC with respect to futures trading (accounts 084C and 084F) ($119.6 million), the total assets posted by LBI at the OCC, prior to Closing, were $2.26 billion. (*See* Ex. 555, adding the "TOTAL COLLATERAL VALUE (IN USD)" for the relevant accounts; *see also*, Ex. 552 at 1.)

8.   This $1.9 billion of total assets included approximately $1.25 billion (not including the letters of credit) with respect to LBI's firm accounts, 074M and 074F; $512 million with respect to LBI's

posted by LBI with the OCC, $689 million was excess margin, above and beyond the

margin required under the OCC's requirements. (*See* Ex. 555; Ex. 552 at 2; James Tr.

193:14-16; 194:9-195:6.) Of this $689 million, over $430 million was excess margin

attributable to LBI's firm options accounts (074M and 074F); $191 million to LBI's

customer options accounts (074C and 273C); $61 million to LBI's firm and customer

futures accounts (084F and 084C) and the remaining to LBI's clearing fund account

(074Z). (*See* Ex. 555, adding the "EXCESS/DEFICIT" for the relevant accounts.)

      33.    Although monitoring margin requirements was by no means the

best way for Barclays to obtain information about LBI's options positions, the OCC's

margin requirement for LBI's firm accounts prior to Closing was a good proxy for the

risk that Barclays was allegedly undertaking in acquiring LBI's proprietary options

positions, because the OCC requires sufficient margin such that the cost of liquidating the

positions in the account will be no greater than the margin.[9] As discussed above,

Barclays could have requested LBI's OCC margin statements earlier in the week of

September 15, 2008, and did in fact receive the OCC statement for LBI's accounts

showing OCC's margin requirements as of the Closing. (*See* Ex. 555, showing a margin

requirement for the firm accounts 074F and 074M of approximately $1 billion.)[10] Thus,

---

customer accounts, 074C and 273C; and $171 million in LBI's clearing fund account, 074Z. (*See* Ex. 555; Ex. 552 at 1.)

9.  OCC Rule 601(c): "The margin requirement for an account other than a customers' account or firm non-lien account shall be the amount of margin assets, expressed in U.S. dollars, that must be held in the account such that the minimum expected liquidating value of the account after excluding positions covered by deposits in lieu of margin (the "minimum expected liquidating value"), measured at such confidence level as may be selected by the Corporation from time to time, will be not less than zero."

10.  Ex. 555: Total requirement for 074F of $641.9 million (BCI-EX-(S)-00188235), plus total requirement for 074M of $0 (BCI-EX-(S)-00188237), plus total requirement for 074MP of $379.1 million (BCI-EX-(S)-00188239) for a total of $1.021 billion.

Barclays would have known that its maximum day one exposure on LBI's proprietary options would be no more than, and likely would be less than, $1 billion.

Futures

34.    Prior to Closing, Barclays knew, at the very least, that LBI had sufficient assets segregated to cover its obligations to customers. (*See* Ex. 659A at BCI-SC00009678 (Barclays' counsel stating that "LBI has sufficient segregated and secured amount funds.").) Barclays could easily have discovered, if it did not in fact discover, that LBI had more than $1 billion excess in the customer segregated and secured accounts, to which Barclays now claims entitlement. As early as Tuesday, September 16, 2008 Barclays was in direct contact with exchanges and clearing organizations where LBI traded futures, and obtained information including reports on LBI positions there. (*See, e.g.,* BCI-EX-(S)-00231517-2046; BCI-EX-(S)-00188474-78; Raisler Tr. 18:5-19, 20:8-21:8, 24:4-26:12, 30:6-13, 42:13-23, 44:2-12.)

35.    CFTC regulations require that all customer property deposited with the FCM in connection with futures trading for customers be held in one or more "segregated" and "secured" accounts in an amount to cover the FCM's current obligations to those customers. CFTC Regulation 1.20 requires the FCM to hold all customer assets for transactions on U.S. derivatives exchanges, known in the industry as the "segregated amount" assets, to be held in "segregated" accounts for the benefit of customers. 17 C.F.R. § 1.20(a)-(b). Similarly, pursuant to CFTC Regulation 30.7, FCMs typically hold all assets from U.S. customers trading in foreign derivatives, referred to in the industry as the "secured amount" assets, in "secured" accounts for the benefit of customers. 17 C.F.R. § 30.7(a)-(b).

36.    The segregated and secured assets may be held in bank accounts or in accounts at the relevant exchanges, clearing organizations, FCMs, or members of foreign boards of trade. 17 C.F.R. §§ 1.20(a)-(b); 30.7(a)-(b). When customer assets are deposited with any of these entities, they must be deposited under an account name that clearly identifies them as such and shows that they are segregated as required by the relevant CFTC regulations. *Id.* In addition, the custodian must acknowledge that these assets are set aside for the benefit of customers with no right of offset or lien by the custodian under the applicable regulation. *Id.*

37.    FCMs are required to calculate their segregated and secured requirements by noon each day, as of the close of business the day before. The segregated and secured calculations show how much the FCM is required to lock up in the segregated and secured accounts, and the assets actually locked up in those accounts. The calculations show whether there is an excess or deficit in the segregated and secured accounts. If for any reason a deficit arises, the firm must immediately report to its Designated Self-Regulatory Organization that the firm is not in compliance with CFTC rules and regulations.

38.    On September 19, 2008, LBI performed the segregated and secured calculation for the close of business on September 18, 2008. This calculation showed that there was an excess of approximately $1.4 billion over the amounts owed the customers (comprised of an excess in the segregated calculation of $699 million, and an excess in the secured calculation of $714 million over the amounts owed the customers). (Ex. 664A.) The results of the September 18, 2008 calculation (performed on September 19, 2008) were consistent with those of the calculations performed during the week

16

leading up to September 19, 2008. The September 17 calculation (performed on

September 18, 2008) showed an excess of over $1.2 billion dollars, the September 16

calculation (performed on September 17, 2008) an excess of more than $1.4 billion

dollars, the September 15 calculation (performed on September 16, 2008) an excess of

more than $700 million and the September 12 calculation (performed on September 15,

2008) an excess of more than $1.2 billion.[11]

     39.     Barclays' corporate representative testified that one of the risks

Barclays assumed in taking the customers' futures business was a potential shortfall in

the customer segregated and secured funds. (James Tr. 237:4-11.) I consider it highly

unlikely that as part of Barclays' due diligence it would not have received copies of

LBI's daily segregated and secured calculations throughout the week of September 15,

2008. Regardless, it appears that Barclays did at least have sufficient comfort as to the

sufficiency of the segregated and secured calculations that its outside counsel was able to

represent to the CFTC in a letter written on September 19, 2008, shortly before the sale

hearing began, that "[w]e understand that LBI has sufficient segregated and secured

amount funds, as well as sufficient regulatory capital, pursuant to the provisions of the

Commodity Exchange Act and the Commission's Regulations thereunder." (Ex. 659A at

BCI-SC00009678.)

### C.     The Risks To Barclays Are Either Unfounded or Greatly Exaggerated

#### 1.     Risks Generally

     40.     Mr. Leitner addresses the risks that Barclays allegedly undertook

when it acquired certain of LBI's exchange traded derivatives. His report identifies three

---

11. *See* Exhibits D-G (Emails from Bianca Castedo (Lehman) to, among others, Lori Gialessas (Chicago
Mercantile Exchange), dated September 15, 16, 17 and 18, respectively, and attaching LBI's
segregated and secured calculations.

types of risk, and in his deposition he suggested two more: (i) market risk; (ii) the open

ended risk of funding margin requirements, (iii) credit risk (*i.e.*, the risk of default by

customers), (iv) operational risk, and (v) the risk of assuming a net liability position as at

the Closing. (*See* Leitner Report ¶¶ 19, 82; Leitner Tr. 13:5-12, 196:18-198:8.)

<blockquote>(i)     *Market Risk*</blockquote>

41.     In my opinion, Barclays assumed no market risk with respect to

any customer or affiliate option positions, since the customers or affiliates themselves

bear the risk of gain or loss on the positions. (*See, e.g.,* James Tr. 152:24-153:13, where

Ms. James confirms the foregoing with respect to customers.) The only market risk that

Barclays assumed was with respect to LBI's proprietary positions, which were only one

subset of the entire portfolio of financial assets acquired by Barclays. A rational buyer

may want security against the risk that the assets it is buying may decrease in value, but

that would be the subject of a separate negotiation. A rational seller cannot be expected

to insure a buyer against the risk of doing business, at least not without commensurate

consideration.

42.     This is particularly so because Barclays was able to hedge the

proprietary positions it acquired from LBI, and in fact did so, thereby managing its risk.

(Clark Tr. 20:4-16, discussing Ex. 647.) Barclays even had access to the Lehman traders

who had managed those same positions at Lehman and were employed by Barclays after

Closing. (Clark Tr. 36:16-18.)

<blockquote>(ii)     *The Open Ended Risk of Funding Margin Requirements*</blockquote>

43.     Mr. Leitner claims that Barclays ran the open ended risk of funding

margin requirements. (Leitner Report ¶ 19 and at page 39.) I am not sure why he

believes that this is a risk, as I would consider it a requirement that Barclays invest in the

business it acquired. A rational seller would not expect to fund the purchaser's

investment in the business it was acquiring, without receiving appropriate consideration.

(iii)    <em>Credit Risk</em>

44.    Mr. Leitner identifies Barclays' fear that LBI affiliates might not

be in a position to compensate it for any losses it incurred with respect to their positions.

(Leitner Report ¶ 19 and at page 39.) Barclays did not assume responsibility for affiliate

customers under the Sale Documents, and has charged back the LBI estate for its losses

in closing out at least the options positions attributable to the affiliates. (Declaration of

Daniel Dziemian, dated January 8, 2010, attached to the Leitner Report ("Dziemian

Decl.") ¶¶ 13-16.)

(iv)    <em>Operational Risk</em>

45.    Mr. Leitner claims that Barclays took on operational risk in

assuming LBI's exchange traded derivatives business. (Leitner Tr. 13:5-12; 13:18-

14:23.) Operational risk is inherent in any business deal and is assessed by the purchaser

in the negotiations of the transaction. In my opinion, any operational risk in this case

would have been mitigated by the fact that the Lehman systems and employees involved

in managing the business were transferred to Barclays at Closing. (Clark Tr. 36:16-18.)

(v)    <em>The Risk of a Net Liability at Closing</em>

46.    Mr. Leitner's definition of market risk appears to include the risk

that Barclays will have purchased positions that were a net liability at the opening of the

markets on September 22, 2008. (Leitner Tr. 196:18-198:8.) The proprietary exchange

traded derivatives were one piece of the total portfolio of financial instruments that

Barclays acquired. When a purchaser is acquiring a portfolio of assets, I would not

anticipate the need to provide the purchaser with downside protection for any one subset

19

of those assets, nor would I expect the seller to share in the upside. I would certainly not expect collateral associated with any of these assets to be transferred to a purchaser without additional consideration. That is particularly so in the case of futures, where - because they are marked-to-market daily - Barclays was unlikely to face a significant net liability position immediately upon Closing.

### 2. **Risks Relating to Options**

#### (i) *Risk Relating to PIM Customers*

47.     As noted above, the customers, not Barclays, faced the market risk on the customer positions. The only risk Barclays faced in clearing customer options was a credit risk. It is important to note that the credit risk to Barclays in assuming clearing responsibility for the PIM customer option positions was no different from the risk they took with any other customer margin account it acquired.

48.     Pursuant to FINRA Rule 431, LBI required its customers to provide it with collateral to meet its margin requirements, including the buying and selling of options. Barclays was purchasing the PIM business. With that business, Barclays acquired the PIM customers, the PIM customer accounts and the assets in those accounts that the PIM customers gave to LBI to secure their options as well as any other margin transactions. (Exhibit H, Barclays' Partial Response to the Trustee's Second Rule 30(b)(6) notice, provided to the Trustee on February 22, 2010 ("Barclays Partial Response") at 5, bullet point 3.) Thus, in the event that a margin call was made to a PIM customer, or there was a cost in clearing or settling a PIM customer position, and the customer refused to settle, Barclays would have had the protection of the collateral it already held from the customer, and would not need the margin posted at the OCC.

49.     If Barclays were to obtain both the collateral posted by the PIM customers *and* the margin that LBI posted at the OCC to cover the PIM customer options, Barclays would get a windfall.  This margin was not needed by Barclays to cover any risk as Barclays had already received the customer margin collateral with the transfer of the customer accounts.

50.     While a purchaser might like to obtain the margin that LBI posted at the OCC to cover the PIM customer options, given the largely theoretical nature of the risks involved, in my opinion a rational purchaser would not need to have that margin in order to take on those positions, and a rational seller would not include that margin in the deal, unless it was being compensated dollar for dollar.

> (ii)     *Risk Relating to Customers Whose Accounts Barclays Did Not Purchase (Including Affiliates)*

51.     As with PIM customers, the only possible risk that Barclays faced with customers whose accounts it did not purchase was a credit risk.  However, Barclays only "assumed clearing responsibility for these options," and has charged back the LBI estate for the cost of maintaining and closing out those positions.  (Dziemian Decl. ¶¶ 12, 14-16.)[12]

52.     To date, Barclays has charged the LBI bridge account $80,285,927.09 for the net cost of closing affiliate options positions.  (*Id.* ¶ 14.)  This receivable was also recorded in Barclays' final acquisition balance sheet.  (Ex. 534A at

---

12.  Account 074F, one of LBI's firm accounts at the OCC, contained firm options and options held on behalf of LBI's subordinated affiliate, Lehman Brothers Special Finance, S.A. ("LBSF").  (Declaration of Eric Clark, dated January 8, 2010 ¶ 5.)  Barclays appears to have treated the LBSF options as if they were owned by LBI.  (*Id.*)  I have not seen any documentary evidence showing that Barclays has charged back losses associated with clearing these LBSF options.  In contrast, Barclays has charged back costs associated with clearing all other affiliate options at the OCC (options in OCC account 074C).  (Dziemian Decl. ¶¶ 12, 14.)  I have seen no explanation from Barclays concerning this inconsistency in treatment of the affiliate options positions.

pages 1 and 2 of 10.)  To date, Barclays has also charged the LBI bridge account $8.3

million for the net cost of closing non-PIM customer positions.  (*See* Exhibit I, bridge

account spreadsheet: 057_Reconciliation_033109 at page 2 of 2; *see also* Dziemian Tr.

105:24-106:16.)

53.    Prior to Closing, LBI had posted $507 million in assets at the OCC

with respect to account 074C (which contained options attributable to PIM customers,

non-PIM customers and affiliates).  (Ex. 555 at BCI-EX-(S)-00188233.)  Of this $507

million, $187 million was in excess of the OCC's requirement.  (*Id.*)  However, because

Barclays assumed limited or no risks with respect to *any* of the customers for which the

margin was posted, I would consider the entire $507 million to be excess margin.

(iii)    *Risk Relating to Proprietary Positions*

54.    In my opinion, the proprietary exchange traded options (and

futures, for that matter) were one piece of the total portfolio of financial instruments

acquired by Barclays.  As I have noted earlier, when a purchaser is acquiring a portfolio

of assets, I would not anticipate the need to provide the purchaser with downside

protection for any one subset of those assets, nor would I expect the seller to share in the

upside.  I would certainly not expect collateral associated with any of these assets to be

transferred to a purchaser for no additional consideration.

55.    In addition, if Barclays wanted to quantify the risk in taking LBI's

exchange traded derivatives proprietary positions separately from the portfolio of assets

and liabilities it was acquiring, as Mr. Leitner suggests they had to (*see* Leitner Report ¶¶

84-86), Barclays could have quantified that risk.  (*See* paragraphs 30 and 33 above.)

Barclays' failure to quantify this risk does not justify their taking the posted margin to

offset an unquantified, though *quantifiable*, risk.  A rational purchaser would quantify

22

that risk and determine whether additional assets were needed to offset that risk.
Certainly, a rational seller would not include margin in the deal, unless it was being
compensated dollar for dollar.

### 3.    Risks Relating to Futures

#### (i)    *Risk of Clearing Futures for Non-Affiliate Customers*

56.    The risk to Barclays in clearing customer futures positions was
negligible, if it existed at all.  For Barclays to have suffered a loss on the clearing of
customer futures the market would have to have moved against the customers, and the
customers would have to have defaulted on Barclays' call for additional margin.

57.    As with options, exchanges and clearing houses require FCMs to
obtain from their futures customers the initial margin that the exchange or clearing house
requires the FCM to post with the exchange or clearing house.  My experience in the
industry is that FCMs typically obtain more margin from their customers than the initial
margin required by the exchange, to avoid the administrative inconvenience of making
repeated margin calls to their customers.  (Leitner Report ¶ 43.)  Thus, LBI likely had an
additional cushion against any customers defaulting on a margin call.

58.    Since Barclays was taking the futures customers, it is also entitled
to the margin provided by those customers to LBI, which was reflected in those
customers' accounts.  (Clarification Letter ¶ 8.)  As noted at paragraphs 34 and 39 above,
Barclays understood at a minimum that there was no shortfall in the assets LBI held to
cover the liabilities to customers it was assuming.  Barclays has estimated the liabilities
to customers to be approximately $2 billion.  (Ex. 546A, showing net payable to
customers of $2.02 billion; Declaration of Elizabeth James, dated January 8, 2010
("James Decl.") ¶ 15.)  As discussed in more detail below in section D, Barclays is

23

claiming more than \$3.2 billion of assets to cover this \$2 billion liability.[13]  Of the

claimed \$3.2 billion, Barclays has already received from the LBI estate in excess of \$2.5

billion,[14] and is claiming an additional \$700 million from the LBI estate.

59.    In my experience in the industry, most firms acquiring a futures

execution and clearing business would pay a premium for the business.  With respect to

this, Barclays itself reviewed the key benefits and risks involved in assuming

responsibility for LBI's futures clearing business.  A memorandum reflecting that

analysis shows that Barclays considered the benefit of the transaction to be the generation

of additional annual revenue of approximately \$250 million.  (Ex. 556.)  The only risk

identified by Barclays in that memorandum was the risk that customers would leave if the

transaction could not be completed quickly.  (*Id.*)  Indeed, far from reflecting a concern

about credit risk, Barclays perceived the LBI futures clearing business, which consisted

of clearing for approximately 100 institutional customers, not to be a significant credit

risk.  (*See id.*)

60.    Given the remoteness of a credit risk in taking on LBI's futures

clearing business, in my opinion a rational purchaser would not need to take on the

excess segregated and secured funds in order to do the transaction.  A rational seller

would not agree to give away over one billion dollars of excess firm assets for no

---

13.  The \$3.2 billion is comprised of the assets associated with the segregated and secured accounts as
booked on Barclays' acquisition balance sheet and reflected on Ex. 546A:  \$811,681,708 in cash,
\$1,385,212,984 in mutual funds, \$249,458,241 in T-bills, \$403,733,010 at domestic exchanges, plus
\$206,308,929 at foreign brokers for a subtotal of \$3,056,394,872.  (*See also* Exhibit C - Barclays'
Supplemental Response, Exhibit 2, which describes Ex. 546A.)  In addition to this \$3.056 billion,
Barclays is also claiming \$165 million in assets at foreign affiliates, though these assets have not been
recorded on Barclays' acquisition balance sheet.  (*See* paragraph 72 below.)

14.  Exhibit 2 to the Declaration of Elizabeth James shows that Barclays has received \$2.2 billion in
"Futures Customer Collateral." (James Decl., Ex. 2.)  Barclays has also represented that on September
24, 2008, it received approximately \$313 million in a cash distribution from the liquidation of a money
market fund.  (*See* Exhibit C - Barclays' Supplemental Response, Exhibit 2, chart entitled "Money
Market Funds," Note A.)

additional consideration. Rather, as Mr. Leitner acknowledges, the parties would negotiate a deal in which the excess would be treated separately from the positions. (Leitner Report ¶ 94.) A rational seller would only convey excess segregated and secured funds if it received additional value for those assets.

             (ii)   *Risk of Assuming LBI's Proprietary Futures Positions*

61.     Barclays has represented that prior to Closing, it understood that it was not assuming any proprietary futures positions. (James Tr. 78:8-15.) Therefore, any risk related to proprietary positions was irrelevant to Barclays' pre-Closing risk assessment.

62.     Even if Barclays did knowingly assume responsibility for LBI's proprietary futures positions, my conclusion remains unchanged. The risk Barclays undertook in acquiring LBI's proprietary futures accounts - limited to the variation margin attributable to market movements during September 19, 2008 - was minimal. A rational purchaser of proprietary futures accounts would expect to pay the net asset value of those accounts. Certainly, a rational seller would expect to receive the net asset value in return for its business. Since futures positions are marked-to-market every day, the rational buyer and seller would expect to negotiate a price based on the open trade value of those accounts. Open trade value is comprised of the initial margin in the account, any additional funds held in the account, and any net pay/collects from variation margin resulting from market movement to or against the positions.

63.     As I have noted earlier, a seller would not insure a purchaser against the going forward risk of doing business without additional consideration. Additionally, these positions would have the potential for a gain if the market moved favorably.

64.    Finally, to the extent that Barclays did not wish to assume the ongoing risk of LBI's proprietary futures positions, it could have closed them out. I have not seen any evidence from Barclays concerning what it cost Barclays to close these positions. However, Barclays has conceded that the closeout of LBI's proprietary futures positions was "settled against the then-existing balance in the respective" house accounts. (James Decl. ¶ 8.) Barclays has represented that after the close out of all positions in these house accounts, the remaining balance in the accounts was approximately $457 million. (James Decl. ¶ 8; Exhibit 1 attached to James Declaration). In my opinion, Barclays' claim for $457 million appears to be out of all proportion to the minimal risk, if any, it assumed with respect to these positions.

(iii)    *Risk of Clearing Futures for Affiliate Customers*

65.    Barclays argues that since many affiliates were in bankruptcy or liquidation proceedings, there was a risk that if the market moved away from the affiliates' positions and Barclays had to make a margin call on September 22, 2008, that call would not be honored, leaving Barclays exposed for the shortfall owed to the exchanges or clearing houses.

66.    In my opinion, Barclays did not assume any risk with respect to LBI affiliate customers' futures positions. I have not seen any evidence of a business agreement that the accounts of LBI affiliates were to be transferred to Barclays. Indeed, the Sale Documents expressly exclude affiliate accounts from the transfer to Barclays. (Clarification Letter ¶ 8.)[15]  Under Mr. Leitner's general theory, Barclays is entitled to

---

15. For reasons that are unclear to me, it appears that Barclays has taken over LBIE's omnibus customer account with LBI. With respect to all other affiliates, Barclays assumed only clearing responsibility. (Exhibit J - Barclays' second supplemental response to the Trustee's Second Rule 30(b)(6) notice, provided to the Trustee on March 11, 2010 ("Barclays' Second Supplemental Response") at 1.)

margin because it is needed to cover the risk associated with assuming the positions. I see no reason at all for Barclays to obtain the margin that relates to positions that were not to be transferred to them. In this instance, the affiliate accounts were not transferred, and therefore, the margin associated with these positions should also not be transferred.[16]

   67. Based on my conversations with the Trustee's professionals, I understand that they have estimated that approximately 87.5% of the open positions in LBI's futures house accounts as of September 19, 2008, as reflected on LBI's RISC system, were held by LBI for the account of its affiliates. It follows, therefore, that the vast majority of the collateral in LBI's futures house accounts, and of the balance remaining after closing all positions in these accounts ($457 million), would be attributable to the affiliate positions. I see no reason why Barclays should obtain hundreds of millions of dollars of collateral that relates to positions held for affiliates, when it did not assume responsibility for the affiliates' accounts. To the extent that Barclays elected to clear such positions, consistent with Barclays' charge back to the LBI estate for net cost of closing the affiliate option positions (paragraphs 51-53 above), Barclays should also charge back - or in this case, credit back - the LBI estate the remaining collateral associated with the affiliate futures positions.

   68. Notably, Barclays has represented that it closed out the affiliate futures positions at relatively little cost to Barclays: $36 million for affiliate positions at

---

16. Barclays position appears to be that it assumed clearing responsibility for the affiliate futures positions. (Exhibit J - Barclays' Second Supplemental Response at 1.) As with options positions, I would expect Barclays to have charged back the LBI estate for the net cost of closing out the affiliate futures. (*See* paragraphs 51-53 above.) I have not seen any documentary evidence that Barclays has done so.

the OCC, $517,000 for affiliate positions at non-OCC domestic exchanges, and $0[17] for affiliate positions at foreign exchanges. (*See* Ex. 534A at page 3 of 10; James Decl. ¶¶ 8, 12.) On the other hand, Barclays is claiming hundreds of millions of dollars for the alleged risk of clearing these positions.[18] Even assuming Barclays undertook a risk in clearing affiliates futures positions, I find Barclays' claim completely out of proportion to that alleged risk.

**D.    Selling the OCC Margin to Barclays Would Leave a Shortfall in the SEC Rule 15c3-3 Reserve**

        69.    As of the closing of the transaction, LBI had posted $507 million in margin at OCC to secure customer options trading. (*See* Motion for Order Approving Trustee's Allocation of Property of the Estate, dated October 5, 2009 ¶ 97.) LBI properly included a debit in the September 19, 2008, SEC Rule 15c3-3 customer reserve formula for this deposit. The inclusion of the OCC deposit in the 15c3-3 formula reduced the reserve requirement by $507 million (less 3%, per Rule 15c3-3's mandatory 3% haircut rule for debits). *See* FINRA, Interpretations of Financial and Operational Rules, Customer Protection - Reserves and Custody of Securities, SEA Rule 15c3-3 ("Rule 15c3-3 Interpretations"), at 2604 (2008). If the Trustee were to divert to Barclays assets that have been included in the reserve calculation as "customer property," without assurances that the estate would be able to replace those assets, the result would be a deficit of $507 million in the property available to satisfy customer claims. Because of

---

17.  Barclays has represented that all positions in LBI's house accounts at foreign brokers were settled against the collateral within these accounts. (James Decl. ¶ 8.) As discussed in paragraph 67 above, approximately 87.5% of the positions in these accounts were affiliate positions.

18.  Barclays is claiming at least the following collateral which relates to affiliate futures: (i) at least $46.4 million deposited by LBI at the OCC with respect to account 084F, which contained affiliate futures (Ex. 552 at 1; 534A at page 3 of 10); and (ii) the larger proportion of $457 million remaining at foreign exchanges. (*See* paragraph 67 above.)

this serious impact on the ability of the LBI estate to comply with the SEC's customer

protection rule, I would have expected any agreement about the transfer of the margin to

be explicit, and for that agreement to be expressly brought to the attention of parties, such

as the Trustee, as well as the SEC itself.

E.    **Barclays Recorded a Day One Gain of Almost Two and a Half Billion Dollars by Taking the Margin Associated with the Exchange Traded Derivatives It Acquired from LBI**

70.    Barclays' acquisition balance sheet recognizes a day one gain of

$1.19 billion relating to options.  (Ex. 377A at BCI-EX-00115844, row 14 plus row 18.)

This appears to be comprised of approximately $2.29 billion of margin at the OCC (*id.* at

BCI-EX-00115845, row 16 plus row 26) less $1.1 billion of liabilities at the OCC (*id.* at

BCI-EX-00115845, row 42).

71.    Barclays' acquisition balance sheet also recognizes a day one gain

of $1.18 billion relating to futures.  (*Id.* at BCI-EX-00115844, row 17; Ex. 546A

attaching spreadsheet showing $1.178 billion in "Adjusted Total".)  This appears to be

comprised of (i) approximately $1 billion of firm assets held in the segregated and

secured accounts over and above the liabilities to customers for which Barclays assumed

responsibility,[19] and (ii) approximately $200 million of margin relating to LBI proprietary

positions.[20]  I understand that Barclays has confirmed these gains in its supplemental

response to the Trustee's Second Rule 30(b)(6) notice, which provides a breakdown of

the assets and liabilities on Ex. 546A.  (Exhibit C - Barclays' Supplemental Response,

Exhibit 1.)

---

19.  Ex. 546A:  $811,681,708 in cash, $1,385,212,984 in mutual funds, $249,458,241 in T-bills, $403,733,010 at domestic exchanges, $206,308,929 at foreign brokers, plus a customer balance debit of $315,099,463 (for a subtotal of $3,371,494,335), minus $2,335,276,442 owed to customers.

20.  Ex. 546A:  $155,000,000 in T-bills plus $55,129,039 held at non-affiliate foreign brokers.

72.     In addition to the gain already recognized on the acquisition balance sheet, Barclays is also claiming an additional $470 million of assets on deposit at foreign affiliate brokers.  (Ex. 399A (showing $460 million of "Futures collateral @ affiliates"); Romain Tr. 73:2-13; 110:16-23 (explaining that accrued interest had increased the $460 million to $470 million).)   This appears to be comprised of at least the following: (i) approximately $237 million of collateral related to proprietary futures positions held at Lehman affiliate foreign brokers (Exhibit C - Barclays Supplemental Response, Exhibit 2)[21] and (ii) approximately $165 million of collateral related to customer futures.  (*Id.*)[22] [23]

---

21.  *See* Exhibit C - Barclays' Supplemental Response, Exhibit 2, spreadsheet entitled "Prop Futures," Note A, explaining that $237,882,995.96 of assets "included within exhibit 1 [to the Declaration of Elizabeth James], but not included in the acquisition balance sheet."

22.  *See* Exhibit C - Barclays' Supplemental Response, Exhibit 2, spreadsheet entitled "Lehman Affiliates," Note A, explaining that the "Lehman affiliate provision," is "included within the exhibits 2-3 [to the Declaration of Elizabeth James], but not included in the acquisition balance sheet."  This "Lehman affiliate provision" includes, $5,955,828.87 at Lehman Brothers Futures Asia; $1,289,014.08 at Lehman Brothers S.A.; and $157,705,652.19 at Lehman Brothers International for a sum of $165 million.

23.  It is my understanding that the rest of this $470 million is comprised of other "Differences" reflected on Exhibit 2 of Barclays' Supplemental Response (Exhibit C) between the futures assets noted on the acquisition balance sheet and the amount to which Barclays is claiming it is entitled.  All these differences have not yet been reconciled by Barclays.  (*See* Exhibit C.)  I have not seen any document from Barclays clearly articulating the composition of the $470 million.

73.    It appears therefore, that if Barclays is successful in its claim to all the collateral associated with the exchange traded derivatives, it will make a gain of at least $2.8 billion ($1.19 billion recorded gain on options, $1.18 billion recorded gain on futures and $470 million in off-balance sheets assets) on just this one part of the book of business it acquired from LBI.  In my opinion, this gain is disproportionate to any risks Barclays claims it undertook in acquiring LBI's proprietary exchange traded derivatives and exchange traded derivatives clearing business.

March 14, 2010
New York, New York

_____
Daniel McIsaac

# EXHIBIT A

*In re LEHMAN BROTHERS HOLDINGS INC., et al.,* **Case No. 08-13555**

### EXPERT REPORT OF DANIEL MCISAAC

### Exhibit A: Reliance Material

In addition to the report of Anthony J. Leitner, dated January 8, 2010, and the exhibits attached to Mr. McIsaac's report, the reliance material for this report is as listed below:

#### TRANSACTION DOCUMENTS
- Asset Purchase Agreement, dated as of September 16, 2008
- Clarification Letter, dated as of September 20, 2008
- Transfer and Assumption Agreement, dated as of September 20, 2008

#### PLEADINGS
- Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), dated September 15, 2009
- Motion for Order Approving Trustee's Allocation of Property of the Estate, dated October 5, 2009
- Memorandum of Barclays Capital Inc. in Opposition to the Rule 60 Motions and in Support of Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets, dated January 29, 2010

#### DEPOSITION TRANSCRIPTS
- Rich Ricci, 09/08/09
- Stephen King, 09/10/09
- Gary Romain, 01/13/10
- Elizabeth James, 01/14/10
- Eric Clark, 02/24/10
- Anthony J. Leitner, 02/25/10
- Kenneth Raisler, 03/01/10
- Daniel Dziemian, 03/04/10

#### DECLARATIONS
- Declaration of James B. Kobak, dated September 15, 2009
- Declaration of Daniel Dziemian, dated January 8, 2010, and exhibits thereto
- Declaration of Elizabeth James, dated January 8, 2010, and exhibits thereto
- Declaration of Eric Clark, dated January 8, 2010, and exhibits thereto
- Declaration of Sharon Blake, dated January 8, 2010, and exhibits thereto
- Declaration of Craig Jones, dated January 8, 2010, and exhibits thereto
- Declaration of Stephen King, dated January 27, 2010 (BCI Ex. 363)
- Declaration of Kenneth Raisler, dated January 27, 2010 (BCI Ex. 367)

**Deposition Exhibits & Other Documents**
- 377A
- 399A
- 534A
- 546A
- 552
- 554
- 555
- 556
- 626
- 627
- 647
- 652
- 654
- 657
- 659A
- 664A
- 671A
- Email starting with the bates number BCI-EX-(S)-00154669
- Email starting with the bates number BCI-EX-S-00231517
- Email starting with the bates number BCI-EX-(S)-00188474
- Documents starting with the bates number BCI-EX-00297437

**Rules & Regulations**
- CFTC Regulation 1.20
- CFTC Regulation 30.7
- FINRA Rule 431
- OCC Rules and Regulations

# E<small>XHIBIT</small> B

# DANIEL MCISAAC, CPA,

11 Harris Ct. Baldwin Place, New York 10505
DanielTMcisaac@aol.com • 914-628-8449 • cell 914-589-9271

---

## CFO • Controller

---

A goal-oriented Financial Manager with extensive experience in the financial services industry, specializing in investment banking and securities broker dealers. Series 27 FINOP. Demonstrated track record of managing the preparation and analysis of daily and monthly financial results. Filing of all financial regulatory reports with regulatory agencies. Proven expertise in analyzing and interpreting financial and regulatory rules and regulations, establishing processes to meet the reporting requirements, and responding to regulatory and other inquiries. Continually maintained efficiency and productivity through evaluation of financial management systems and implementation of process improvements. Talented leader specializing in cross business processes, including new business initiatives, review and approval of transactions requiring prior approval, and mergers and acquisitions. Chairman of the SIFMA Capital committee and past president of the SIFMA Financial Management Division. *Core competencies include:*

- Accounting Management
- Financial Analysis
- Capital Management
- Securities Operations
- New product analysis
- Regulatory Rule Interpretation
- Technology Integration
- Regulatory Compliance
- Futures Operations

---

## CAREER EXPERIENCE

**UBS Securities LLC, Stamford Ct, 1994 – June 2009**

**Regulatory Controller - FinOp**

Directed all financial regulatory filings and calculations, including monthly FOCUS Reports, weekly Reserve Formula calculations, daily and monthly CFTC segregation calculations. Responsible for the firm's capital management including daily analysis of profit and loss, daily capital analysis, and monthly and yearly projections. Manage all regulatory relationships and the firm's industry representative in regulatory matters. Chairman of the SIFMA Capital committee and past president of the SIFMA Financial Management Division. Member of numerous cross business initiatives, responsible for the financial and regulatory aspect of new business initiatives. Senior finance manager on numerous acquisitions, including the coordination and review of financial due diligence process. Work closely with regulators in the development of new regulatory rules and interpretations. Developed skilled team to achieve established objectives. Interact with the Board of Directors and President concerning financial forecasts and reports.

- ➢ Successful management of regulatory relationships.
- ➢ Maintained constant staff levels throughout significant growth of the firm and its products
- ➢ Successfully implemented numerous business acquisitions.
- ➢ Continuous development of alternative solutions to issues
- ➢ Member of industry committees and task forces.
- ➢ Senior financial manager responsible for the purchase and implementation of futures business across multiple entities and locations.

*Continued...*

## DANIEL MCISAAC • Page 2

### CAREER EXPERIENCE CONTINUED

Dean Witter Reynolds, New York, New York, 1989 –1994

**Manager of Regulatory Reporting**

Managed the regulatory reporting department. Responsible for the preparation, analysis and review of all regulatory reports. Worked closely with the business and operations to monitor regulatory compliance and implementation of new rules and regulations. Developed significant process improvements that led to significant overtime reductions. Managed regulatory exams to satisfactory conclusions. *Key Achievements:*

- ➢ Implemented more efficient month end financial closing process, replacing service bureau. Implementation provided significant time savings as well as cost savings.
- ➢ Established distribution broker dealer for the issuance of Investment Company initial shares
- ➢ Worked closely with corporate management on the implementation of a new general ledger system

Drexel Burnham, New York, New York, 1986 – 1989

**Director of Capital Markets Internal Audit**

Responsible for auditing all capital markets areas within the firm. Department was considered a business partner and worked closely with various areas of the firm to develop sound controls and resolve issues. Audit work performed at year end was relied upon by external auditors as part of their certification. Managed the external audit process including the discussion of fees and budgets. Also, coordinated all regulatory exams, including the development and implementation of regulatory recommendations. *Key Achievements:*

- ➢ Uncovered significant reconciliation issues during system conversions.
- ➢ Worked closely with financial accounting and external auditors to develop accounting policies more consistent with the industry.

Deloitte Haskins and Sells, New York, New York, 1978 – 1986

**Audit Manager**

Responsible for the management of certified audits for financial services entities. Managed multi-national audits. Responsible for the development of training programs for industry staff as well as the maintenance of the firm's industry audit guides and programs. Responsible for the supervision of other managers and staff in the audits of over 700 unit investment trust funds. Established the groundwork for the development of an automated approach to these audits *Key Achievement:*

- ➢ Designated firm securities industry expert.
- ➢ Designated firm Mutual Fund industry expert, including the participation in the development of the industry audit guide
- ➢ Participated in the development of the commodity audit guide

### EDUCATION

Bachelor of Science, Accounting (1978)
   LEHMAN COLLEGE (CUNY), New York, New York

# EXHIBIT C

Pursuant to the discussion between Tricia Bloomer and Neil Oxford on February 15, 2010, Barclays submitted its initial written responses to the Trustee's Second Rule 30(b)(6) Deposition Notice to Barclays (the "Second Notice") on February 22, 2010.   In that submission, we represented that we would provide certain materials in a second, supplemental submission, which follows.

## Topic 1

### *Trustee's Request:*

*LBI's options positions, as of the Closing, including the value of each of (i) the long options positions, and (ii) the short options positions at the Closing; the source and timing of Barclays' knowledge of the same; a breakdown of the positions at each exchange attributable to (i) LBI, (ii) Affiliate Customers, and (iii) Non-Affiliate Customers; whether, how, and the extent to which, those options positions have been included in Barclays' purchase accounting, including in the document marked as Exhibit 377A at the Rule 2004 depositions ("Exhibit 377A").*

### *Barclays' Supplemental Response:*

Barclays supplements its initial response to Topic 1 of the Second Notice by incorporating by reference a letter from Tricia J. Bloomer to William McGuire dated March 1, 2010, which supplements the letter from Tricia J. Bloomer to William McGuire dated February 22, 2010 that was referenced in Barclays' initial response to Topic 1 of the Second Notice.

## Topic 2

### *Trustee's Request:*

*Collateral, including Margin, posted by LBI, whether directly at an exchange or with another broker-dealer, as of the Closing, to secure options trading, including, with respect to each exchange: the value and form (e.g., cash, securities, money market account) of that collateral at the Closing; the source and timing of Barclays' knowledge of the same; a breakdown of that collateral attributable to (i) LBI positions or accounts; (ii) Affiliate Customer positions or accounts; and (iii) Non-Affiliate Customer positions or accounts; the extent to which that collateral was in excess of the minimum Margin requirement of the exchange as at the opening and closing of business on September 19, 2008 and as of the Closing; whether, when, and the extent to which, Barclays has taken possession of that collateral; and to the extent that LBI did not post collateral directly at an exchange or clearing house, with whom, and where, was that collateral posted.*

### *Barclays' Supplemental Response:*

Barclays supplements its initial response to Topic 2 of the Second Notice by incorporating by reference a letter from Tricia J. Bloomer to William McGuire dated March 1, 2010, which supplements the letter from Tricia J. Bloomer to William McGuire dated February 22, 2010 that was referenced in Barclays' initial response to Topic 2 of the Second Notice.

Barclays further supplements its initial response to Topic 2 by incorporating by reference the data contained in the document produced contemporaneously herewith in native format at Bates number BCI-EX-00302876 (spreadsheet entitled "OCC Day over Day Change Analysis"), which contains information concerning amounts booked by Barclays on its Acquisition Balance Sheet relating to the collateral that is the subject of Topic 2.

## Topics 4-7

### Trustee's Requests:

**4.  *LBI's futures positions as of the Closing, including, for each exchange: the value of the positions at the Closing; the source and timing of Barclays' knowledge of the same; a breakdown of the positions attributable to (i) LBI, (ii) Affiliate Customers, and (iii) Non-Affiliate Customers; the extent to which the positions attributable to each of LBI, Affiliate Customers and Non-Affiliate Customers are reflected in the document marked as Exhibit 546A at the Rule 60(b) depositions ("Exhibit 546A"); and whether, when, and the extent to which, those positions were closed, by whom, and at what cost.***

**5.  *Collateral, including Margin, posted by LBI, whether directly at an exchange or with another broker-dealer, as of the Closing, to secure futures trading, including, with respect to each exchange: the value and form (e.g., cash, securities, money market account) of that collateral at the Closing; the source and timing of Barclays' knowledge of the same; a breakdown of that collateral attributable to (i) LBI positions, (ii) Affiliate Customer positions, and (iii) Non-Affiliate Customer positions; how, and the extent to which, that collateral, attributable to each of (i) LBI positions; (ii) Affiliate Customer positions; and (iii) Non-Affiliate Customer positions, is reflected on Exhibit 546A; and to the extent that LBI did not post collateral directly at an exchange or clearing house, with whom, and where, was that collateral posted.***

**6.  *For Exhibits 1-3 to the Declaration of Elizabeth James, dated January 8, 2010 ("James Declaration"), a reconciliation of each of the exhibits with (i) Exhibit 546A; and (ii) with the list of other assets claimed by Barclays not included in Exhibit 377A, and reflected on the document marked as Exhibit 399A at the Rule 2004 depositions; a breakdown of the collateral, including Margin, reflected on Exhibits 1-3 attributable to (i) LBI positions, (ii) Affiliate Customer positions, and (iii) Non-Affiliate Customer positions; and for each exchange or clearing house reflected on Exhibits 1-3, whether LBI, an Affiliate, or a nonaffiliated broker held membership at that exchange or clearing house.***

**7.  *With respect to each exchange or clearing house at which LBI traded in options or futures as of the Closing, whether, when, and the extent to which Barclays has received any assets from the exchange, clearing house or exchange member, except for positions, as a result of the Sale Transaction, including a breakdown of the assets attributable to (i) Margin, (ii) Clearing Fund deposits, (iii) proceeds from the liquidation of LBI positions, Affiliate Customer positions or Non-Affiliate Customer positions, (iv) exchange membership, or (v) any other assets; and whether, and the extent to which, Barclays has booked that collateral in its purchase accounting, including on Exhibits 546A and 377A.***

2

***Barclays' Supplemental Response:***

Barclays supplements its initial response to Topics 4-7 of the Second Notice as follows:

First, Barclays incorporates by reference a letter from Tricia J. Bloomer to William McGuire dated March 1, 2010, which supplements the letter from Tricia J. Bloomer to William McGuire dated February 22, 2010 that was referenced in Barclays' initial response to Topics 4-7 of the Second Notice.

Second, as part of Topics 4-7 of the Second Notice, the Trustee has requested detailed information with regard to Exhibit 546A.  Pursuant to the discussion between Tricia Bloomer and Neil Oxford on February 15, 2010, attached hereto as Exhibit 1 is a spreadsheet entitled "Futures Breakdown" that includes a detailed description of each line item reflected on Exhibit 546A.

Third, as part of Topic 6 of the Second Notice, the Trustee requested "For Exhibits 1-3 to the Declaration of Elizabeth James, dated January 8, 2010 ("James Declaration"), a reconciliation of each of the exhibits with (i) Exhibit 546A…."  In response to this request, please see Exhibit 2 attached.

## Topic 9

***Trustee's Request:***

***Clearing Fund at each exchange or clearing house on which LBI traded in options or futures, including, for each exchange or clearing house: the value and form of the Clearing Fund as of the Closing; the source and timing of Barclays' knowledge of the same; whether, how, and the extent to which, Barclays has booked the Clearing Fund deposits in its purchase accounting, including in Exhibits 546A and 377A; whether, when, and the extent to which, Barclays has received or taken possession of the Clearing Fund at each exchange; and whether, and the extent to which, the Clearing Fund deposits are reflected in Exhibits 1-3 of James Declaration.***

***Barclays' Response:***

Approximately $171 million in clearing fund deposit was held at the OCC as of the time of Closing.  This amount was recorded on Barclays' Acquisition Balance Sheet (it is a component of the $2.29 billion that is the sum of the "OCC margin against exchange traded options" line item and the "OCC customer and clearing margin" line item on the third page of Exhibit 377A (produced at BCI-EX-00115845)).  This clearing fund deposit was comprised entirely of t-bills at the time of the Closing.  Barclays has only received approximately $19 million of this amount.  *See* BCI Ex. 335 (Nov. 9, 2008 12:04 pm e-mail from J. McDaniel to J. Giddens, *et. al* with attachment); *see also* BCI Ex. 334 (e-mail chain including Oct. 21, 2008 4:50 pm email from W. Navin to K. Raisler with attachments).

Although Barclays is entitled to all clearing fund deposits associated with LBI's futures business as of the Closing (at the OCC and elsewhere), Barclays has not received any such assets from any domestic clearing house other than the OCC.  To Barclays' knowledge, LBI was not a clearing member of any foreign clearing house and would not have held any clearing fund deposits with those entities.

Please see the letter from Tricia J. Bloomer to William McGuire dated February 22, 2010, as supplemented by the letter from Tricia J. Bloomer to William McGuire dated March 1, 2010, for a comprehensive account of the information to which Barclays had access prior to the Closing concerning the entirety of LBI's exchange-traded derivatives business, including clearing fund deposits.

## **Topic 10**

### *Trustee's Request:*

***Membership at each exchange or clearing house on which LBI traded in options or futures, including, for each exchange or clearing house: which entity (e.g., LBI, and Affiliate or a non-affiliated broker) held membership; the status of that membership since the Closing (e.g., closed, transferred to Barclays, or other); whether, when, and how that membership has been valued; whether, how, and at what value, that membership has been accounted for in Barclays' purchase accounting, including in Exhibit 377A and 546A; and whether Barclays held membership at that exchange or clearing house prior to the Closing.***

### *Barclays' Response:*

To Barclays' knowledge, the exchanges and clearing houses through which LBI traded in futures as of the Closing are set out in the spreadsheet entitled "Exchange Matrix" (BCI-EX-00302874) that is being produced contemporaneously herewith.  LBI was a clearing member of the organization that cleared trades for each of the Domestic and Canadian exchanges listed except the Kansas City Board of Trade, the Montreal Exchange, the Minneapolis Grain Exchange, the Winnipeg Grain Exchange, and the Toronto Stock Exchange, on which LBI traded through non-affiliate brokers MF Global and Bank of Montreal.

LBI had no memberships on any exchanges outside the United States or Canada.  LBI traded on foreign exchanges either through an affiliate or through a third-party, non-affiliated broker, as reflected in the International Exchange Matrix section of the attached Exchange Matrix (BCI-EX-00302874).

Prior to the Closing, Barclays maintained memberships at, among others, the Chicago Mercantile Exchange (CME), Chicago Board of Trade (CBT), New York Mercantile Exchange (NYMEX/COMEX), Ice Clear US (ICE/NY), EUREX US, and Chicago Climate Futures Exchange (CCFE).  Barclays was not a member of the Chicago Futures Exchange (CFE) which is listed on the Exchange Matrix as "CFF" and "CBOE Futures Exchange."

4

See the document produced at SC 00023274-75 (e-mail from A. Reinstein to D. Gilberg and K. Raisler, September 22, 2008 2:57 p.m.) regarding the transfer of exchange memberships to Barclays.

See the spreadsheet entitled "Exchange Seats 9.22.08 Valuation as of 1.12.09", produced in native format with the placeholder Bates number BCI-EX-00302875, for information regarding, among other things, certain of the seats and shares LBI held as of the Closing with various exchanges on which it traded in futures. Barclays' recognized the approximately $61 million related to LBI's commodities exchange seats reflected on that spreadsheet in the "Intangible Assets" category of its Acquisition Balance Sheet. Barclays valued those seats as of September 22, 2008, using publicly-available prices. Since the time Barclays prepared its Acquisition Balance Sheet, Barclays became aware that LBI also held exchange seats for NYBOT as of the Closing. Although not reflected on Barclays' Acquisition Balance Sheet, Barclays is entitled to the NYBOT membership seats (and to all exchange membership shares that LBI held as of the Closing) as well.

Barclays was, and remains, unable to obtain further information from the exchanges concerning exchange memberships.

## Topic 11

### *Trustee's Request:*

***Whether Barclays hedged the assets it acquired pursuant to the Sale Transaction, irrespective of whether Barclays has received the assets, and including (i) options and futures positions, and (ii) assets delivered to Barclays pursuant to the December Settlement; the net gain or loss on those assets after taking account of the results of hedging; whether, and the extent to which, any reported losses (e.g., the alleged loss of $730 million reflected on Exhibit 534A, topic 25) have been offset by hedging the assets; and whether, and the extent to which, Barclays has accounted for the results of hedging in it purchase accounting, including in Exhibits 377A.***

### *Barclays' Response:*

As contemplated by the February 22, 2010 letter from Tricia Bloomer to William Maguire, on February 24, 2010, Barclays produced Eric Clark as Barclays' 30(b)(6) representative to address that portion of Topic 11 that relates to exchange-traded options and futures (as opposed to assets delivered pursuant to the December settlement). Barclays will separately provide the information sought in Topic 11 as it relates to the assets delivered pursuant to the December settlement.

## EXHIBIT 1 TO BARCLAYS' SUPPLEMENTAL RESPONSE TO THE TRUSTEE'S SECOND 30(B)(6) NOTICE

<u>Summary</u>

| | What these assets are? | In Barclays possession? | Breakdown attached? | How acquisition balance sheet figures prepared? |
|---|---|---|---|---|
| **Cash** | These are the segregated bank accounts for the Futures business held by LBI as at close of business on 19th Sept 2008. | Yes - The Trustee transferred to Barclays the cash out of these bank accounts during the last week of September 2008. | See 'Cash' tab | The cash balances were initially obtained from the RISC and ADP systems.<br>These balances were then adjusted for all significant reconciling items that were outstanding on the bank reconciliations as at close of business 19th September 2008.<br>The booking of these adjustments brought the cash balances to within $1m of the statement balances across all the bank accounts. |
| **Mutual Funds** | These are the segregated Mutual Funds for the Futures business held by LBI as at close of business on 19th September 2008.  These were either held directly by LBI or pledged to domestic exchanges. | Barclays has received all the cash from redemptions of these mutual fund holdings, except for $5m in the Reserve Primary Fund. | See 'Mutual Funds' tab | The balances were initially obtained from the RISC system.<br>The balances were reconciled to Mutual Fund position confirmations/statements as at close of business19th September 2008.  Adjustments were posted for all significant differences noted between the system and the confirmations, plus any related items on the bank reconciliations |
| **T-bills** | $249m of this balance are the US government T-bills that had been placed with foreign brokers / lehman affiliates to cover customer positions.<br>The remaining $155m of US government T-bills were those placed with foreign brokers to cover house positions. | Barclays received either the T-bill or equivalent redemption funds from the foreign brokers which were covering customer positions.<br>Barclays has not received any of the T-bills held by lehman affiliates or those held at foreign brokers to cover house positions. | See 'T-bills' tab | The balances were initially obtained from the RISC system.<br>These balances were then adjusted for all significant reconciling items that were outstanding on the bank reconciliations or otherwise noted when preparing the balance sheet for close of business 19th September 2008.<br>The balances were then reconciled to the foreign broker and lehman affiliate statements as at close of business 19th September 2008. |
| **Domestic Exchanges** | This balance is made-up of the open trades and associated collateral that LBI had placed with domestic exchanges to cover customer positions as at close of business 19th September 2008. | Yes | See 'Domestic Exchanges' tab | The balances were initially obtained from the RISC system.<br>These balances were then adjusted for all significant reconciling items that were outstanding on the bank reconciliations as at close of business 19th September 2008.<br>Discussions were also held with operations staff to identify any significant differences to the exchange statements as at close of business 19th September 2008. |
| **Foreign Brokers** | This balance is made-up of the open trades and associated collateral that LBI had placed with foreign brokers to cover both customer and house positions as at close of business 19th September 2008. | Barclays has not received any funds with respect to the house positions.<br>Barclays has received funds from some of the foreign brokers in relation to customer positions, but has not received any from New Edge, Polaris or Samsung. | See ' Foreign Brokers' tab | The balances were initially obtained from the RISC system.<br>These balances were then adjusted for all significant reconciling items that were outstanding on the bank reconciliations or otherwise noted when preparing the balance sheet for close of business 19th September 2008.<br>The balances were then reconciled to the foreign broker statements as at close of business 19th September 2008. |
| **Lehman Affiliates** | This balance is made-up of the open trades and associated collateral that LBI had placed with lehman affiliates to cover customer positions as at close of business 19th September 2008. | Barclays has not received any amounts with respect to these affiliate balances. | See ' Lehman Affiliates' tab | The balances were initially obtained from the RISC system.<br>These balances were then adjusted for all significant reconciling items that were outstanding on the bank reconciliations or otherwise noted when preparing the balance sheet for close of business 19th September 2008.<br>These balances were also adjusted for significant entries posted in the RISC system after the acquisition that upon investigation was found to relate to the pre-acquisition period. |
| **Customer Balances** | This balance is made-up of open trades and associated collateral placed by clients with LBI as at close of business 19th September 2008. | Barclays has settled nearly all these amounts with the relevant customers. | No summary breakdown available as balance was comprised of thousands of different customer accounts. | The balances were initially obtained from the RISC system.<br>These balances were then adjusted for all significant reconciling items that were outstanding on the bank reconciliations or otherwise noted when preparing the balance sheet for close of business 19th September 2008 (e.g. trade pricing errors noted on foreign broker reconciliations).<br>These balances were also adjusted for entries posted after the acquisition in the ledger that actually related to transactions that occurred pre-acquisition. |
| **Accrued fees etc** | These balances are related to interest and fee rebates that were due to customer as at close of business 19th September 2008. | Barclays has repaid these amounts to customers. | No further breakdown available | The balances were initially obtained from the RISC system.<br>The amounts paid to customer post acquisition related to interest and fees was calculated and compare to the amounts accrued to ensure reasonable. |
| **Provisions for:**<br>**-OCC Loss**<br>**-WAMCO**<br>**-LCH Duplicate trades**<br>**- Customer non-recovery** | These provisions are for (i) customer receivable balances where the customer was questioning the amount payable which brought into question collectibility; and (ii) losses that were taken on closing out certain positions after the acquisition date. | (i) Barclays has now received some of the amounts that were originally provided for.<br>(ii) Barclays has paid out the amounts in relation to the trading losses. | This was already broken down in the acquisition balance sheet. | These provisions were identified through discussions with various staff in operations, finance and the business. |

## Cash

| RISC/ADP AC | Balance /$ |
|---|---|
| 73191124 / 066-010-322 | 403,027,876 |
| 73191195 / 066-027-209 | (141,527) |
| 73191159 / 930-1-031259 | 388,358,377 |
| 01100049 / 066-619-491 | 20,044,077 |
| Other | 392,904 |
| | **811,681,707** |

## **Mutual Funds**

| Description | Balance /$ |
| --- | --- |
| Lehman Prime Fund Reserve | 904,641,953 |
| BGI Prime MM | 165,700,251 |
| Lehman Cash Mgmt Prime | 113,500,000 |
| Reserve Primary Fund | 50,867,187 |
| JPM Chase Prime Fund 3605 | 50,000,000 |
| GS FSQ MMF | 35,994,724 |
| Blackrock Temp Fund | 19,300,679 |
| Lehman Money Market | 18,237,917 |
| Other | 26,970,275 |
| | **1,385,212,984** |

## T-bills

| Held at | House/Customer | Balance /$ |
|---|---|---|
| Bank of Montreal | House | 5,000,000 |
| Macquarie | House | 150,000,000 |
| Macquarie | Customer | 75,079,358 |
| MF Global | Customer | 24,908,958 |
| Bank of Montreal | Customer | 54,815,883 |
| LB PTE | Customer | 74,726,875 |
| LBJ | Customer | 19,927,167 |
| | | **404,458,241** |

## Domestic Exchanges

| Description | Balance /$ |
|---|---|
| CAD @ CME on behalf of Client | 19,382,429 |
| CME (Cash + 99204001 + 99204501) | 322,550,737 |
| OCC - 084 box margin | 47,682,824 |
| Other | 14,117,020 |
| | **403,733,010** |

## Foreign Brokers

| Description | House/Customer | Balance /$ |
|---|---|---|
| MF Global | House | 45,176 |
| Macquarie | House | 49,595,067 |
| Newedge | House | 28,505 |
| Kenanga | House | 5,460,292 |
| Samsung | Customer | 4,318,343 |
| Macquire Bank | Customer | 57,305,967 |
| Kenanga | Customer | 5,084,576 |
| MF Global | Customer | 7,544,832 |
| New Edge | Customer | 2,123,622 |
| Polaris | Customer | 93,345,603 |
| Bank of Montreal | Customer | 36,585,985 |
| | | **261,437,968** |

## Lehman Affiliates

| Description | Receivable / $ | (Payable) / $ | (Provision) / $ |
|---|---|---|---|
| LBI Client (022-96258) | 16 | | (16) |
| LBIE Co183 (Various) | 149,433,181 | | (149,433,181) |
| LBIE Omnbius (279-80766, 80866, 86266) | | (127,726,041) | |
| LB Securities HK (022-95547) | 1,286,741 | | (1,286,741) |
| LBIE Seoul Korea (Various) | 5,205,067 | | (5,205,067) |
| LB Futures Asia Clearing (022-95572) | 12,954,078 | | (12,954,078) |
| LB PTE Co34 (022-95612) | 60,536,677 | | |
| LBJ Co83 (Various) | 58,843,688 | | |
| **Total** | **288,259,447** | **(127,726,041)** | **(168,879,082)** |

# EXHIBIT 2 TO BARCLAYS' SUPPLEMENTAL RESPONSE TO THE TRUSTEE'S SECOND 30(B)(6) NOTICE

**Reconcilation of Exhibits 1-3 o the Acquisition balance sheet**
**Summary schedule**

| Proprietary Futures | Exhibits $ | Acq Balance Sheet $ | Difference $ | |
|---|---|---|---|---|
| Total per Exhibit 1 | 457,205,950.14 | | | |
| | | | | |
| *Acq Balance Sheet* | | | | |
| T-bills held to cover house positions | | 155,000,000.00 | | |
| Foreign brokers (House positions) | | 55,129,039.27 | | |
| **Difference** | **457,205,950.14** | **210,129,039.27** | **247,076,910.87** | *See Prop Futures tab for reconciliation* |

| Money Market Funds | Exhibits $ | Acq Balance Sheet $ | Difference $ | |
|---|---|---|---|---|
| Total per Exhibit 2 | 1,063,520,709.28 | | | |
| Total per Exhibit 3 | 5,108,924.50 | | | |
| | | | | |
| *Acq Balance Sheet* | | | | |
| Mutual Funds | | 1,385,212,984.34 | | |
| **Difference** | **1,068,629,633.78** | **1,385,212,984.34** | **(316,583,350.56)** | *See Money Market Funds tab for reconciliation* |

| Cash | Exhibits $ | Acq Balance Sheet $ | Difference $ | |
|---|---|---|---|---|
| Total per Exhibit 2 | 871,564,537.93 | | | |
| | | | | |
| *Acq Balance Sheet* | | | | |
| Cash | | 811,681,707.64 | | |
| **Difference** | **871,564,537.93** | **811,681,707.64** | **59,882,830.29** | *See Cash tab for reconciliation* |

| Foreign Brokers | Exhibits $ | Acq Balance Sheet $ | Difference $ | |
|---|---|---|---|---|
| Total per Exhibit 2 | 265,986,962.50 | | | |
| Total per Exhibit 3 | 99,300,047.51 | | | |
| | | | | |
| *Acq Balance Sheet* | | | | |
| T-bills held at foreign brokers | | 154,804,198.81 | | |
| Foreign brokers (Customer positions) | | 206,308,929.20 | | |
| **Difference** | **365,287,010.01** | **361,113,128.01** | **4,173,882.00** | *See Foreign Brokers tab for reconciliation* |

| Lehman Affiliates | Exhibits $ | Acq Balance Sheet $ | Difference $ | |
|---|---|---|---|---|
| Cash total per Exhibit 3 | 289,239,642.95 | | | |
| T-Bills total per Exhibit 3 | 95,000,000.00 | | | |
| | | | | |
| *Acq Balance Sheet* | | | | |
| T-bills held at Lehman affiliates | | 94,654,042.00 | | |
| Lehman affiliates receivables | | 288,259,446.58 | | |
| Lehman affiliates provision | | (168,879,081.91) | | |
| **Difference** | **384,239,642.95** | **214,034,406.67** | **170,205,236.28** | *See Lehman Affiliates tab for reconciliation* |

**Reconcilation of Exhibits 1-3 with the Acquisition Balance Sheet**
**Proprietary Futures**

| Proprietary Futures | Exhibits<br>$ | Acq Balance Sheet<br>$ | Difference<br>$ | |
|---|---|---|---|---|
| Total per Exhibit 1 | 457,205,950.14 | | | |
| *Acq Balance Sheet* | | | | |
| T-bills held to cover house positions | | 155,000,000.00 | | |
| Foreign brokers (House positions) | | 55,129,039.27 | | |
| **Difference** | **457,205,950.14** | **210,129,039.27** | **247,076,910.87** | *See below* |

| *Reconciliation of Difference* | $ | |
|---|---|---|
| House positions held at Lehman Affiliates (Japan, Korea & Singapore) | 237,882,995.96 | Note A |
| Macquarie LEHH collateral | 7,121,559.61 | Note B |
| Other differences | 2,072,355.30 | Note C |
| | **247,076,910.87** | |

**Note A**
These items were included within exhibit 1, but not included in the acquisition balance sheet.
The exhibits included amounts irrespective of any assessment of collectability.
No amounts were recognised in the acquisition balance sheet due to uncertainty around the ability of those entities to pay the due amounts.

**Note B**
There was $36m notional of USD T-bills placed with Macquire covering house positions as at the acquisition date.
In the acquisition balance sheet, this was recorded as $36,211,761 to represent the current market value and would include any accrued interest.
In exhibit 1 this was recorded at $43,333,320 due to the USD collateral being converted to AUD and then back to USD using different FX rates.
The exhibit figure was prepared based a AUD figure from the Macquarie statement as at 5th November, when the positions had been closed out.
The collateral value was shown in AUD on the statement at a figure of 52,144,738.04 which had been calculated by Macquarie by converting the USD figure using the FX rate at that time of 0.69.
However, when converted to USD in the exhibit an FX rate of 0.83102 was used to convert back into USD.

**Note C**
The figures in the exhibit were based on the statement figures once the accounts had been closed out.
The figures in the acquisition balance sheet were based on the statement figures as at close of business 19th September 2008.
We have not fully reconciled the remaining difference, but there are various reasons that would explain the movement due to the difference in timing that the two sets of information were prepared based on.
These differences would include movement in FX rates, MTM movements on any open trades and interest on collateral.

**Reconciliation of Exhibits 1-3 with the Acquisition Balance Sheet**
**Money Market Funds**

| | Exhibits | Acq Balance Sheet | Difference |
|---|---|---|---|
| **Money Market Funds** | **$** | **$** | **$** |
| Total per Exhibit 2 | 1,063,520,709.28 | | |
| Total per Exhibit 3 | 5,108,924.50 | | |
| *Acq Balance Sheet* | | | |
| Mutual Funds | | 1,385,212,984.34 | |
| **Difference** | **1,068,629,633.78** | **1,385,212,984.34** | **(316,583,350.56)** *See below* |

| *Reconciliation of Difference* | **$** | |
|---|---|---|
| Lehman Prime (IN KIND) redemption | (313,450,449.06) | Note A |
| Other differences | (3,132,901.50) | Note B |
| | **(316,583,350.56)** | |

**Note A**
The acquisition balance sheet figure is based on the position at the time of acquisition, i.e. 22nd September 2008.
The amount shown for money market funds in the exhibit is the amount that was transferred by the trustee to Barclays at the beginning of October 2008.
The Lehman Prime fund was in the process of being run down during this time period with cash distributions being made to holders as the underlying investments reached maturity.
The $313,450,449.06 is the amount of cash distributions that were received directly into a Barclays own bank account at BONY on 24th September 2008.
As the $313,450,449.06 was received directly into a Barclays bank account, it does not feature within the cash balance on exhibit 2 and therefore does not appear as a reconciling item in the 'Cash' tab.

**Note B**
The acquisition balance sheet figure is based on the position at the time of acquisition, i.e. 22nd September 2008.
The amount shown for money market funds in the exhibit is the amount that was transferred by the trustee to Barclays as at beginning of October 2008.
We have not fully reconciled the remaining difference, but there are various reasons that would explain the movement due to the difference in timing that the two sets of information were prepared based on.
These differences would include interest and other smaller redemptions.

**Reconciliation of Exhibits 1-3 with the Acquisition Balance Sheet**
**Cash**

| Cash | Exhibits $ | Acq Balance Sheet $ | Difference $ |
|---|---|---|---|
| Total per Exhibit 2 | 871,564,537.93 Note A | | |
| *Acq Balance Sheet* | | | |
| Cash | | 811,681,707.64 | |
| **Difference** | **871,564,537.93** | **811,681,707.64** | **59,882,830.29** *See below* |

| *Reconciliation of Difference* | $ | |
|---|---|---|
| Cash received between 9/19 and 9/24 (mainly from customers and domestic exc) | 29,486,443.75 | Note B |
| Trustee transfers in October 2008 | 33,062,222.85 | Note C |
| Difference between exhibit and amounts rec'd from trustee | (1,807,731.70) | Note D |
| Other differences | (858,104.61) | Note E |
| | **59,882,830.29** | |

*Note A*
The amount of cash in the exhibit is based on the amount that was transferred by the trustee to Barclays during September and October 2008.
This does not include any cash that was received directly by Barclays in relation to other receivables at the time of acquisition.
For example, the $313m that was received related to the redemption of the money market funds was received directly into a Barclays own bank account at BONY, and therefore is not included in the exhibit figure.

*Note B*
The acquisition balance sheet figure is based on the position at the time of acquisition, i.e. 22nd September 2008.
The amount of cash in the exhibit is based on the amount that was transferred by the trustee to Barclays during September and October 2008.
The initial transfers by the trustee of funds to Barclays totalled $840,310,046.78, which was based on the closing balances on the bank statements as at 24th September 2008.
The closing bank statement balances on 24th September 2008 were higher than at the point of acquisition due to cash continuing to be received into the LBI bank accounts from customers and domestic exchanges on 22nd - 24th September 2008.

*Note C*
The acquisition balance sheet figure is based on the position at the time of acquisition, i.e. 22nd September 2008.
The amount of cash in the exhibit is based on the amount that was transferred by the trustee to Barclays during September and October 2008.
Cash continued to be received into the LBI bank accounts from customers and exchanges following the initial transfers based on 24th September 2008.
The trustee made 4 further transfers of funds to Barclays for $50,000, $753,955, $12,703,777 and $19,554,491 during October 2008.

*Note D*
The amount of cash in the exhibit is based on the amount that was transferred by the trustee to Barclays during September and October 2008.
However, it has now been noted that the amount shown in the exhibit slightly disagrees with the total actual amount transferred by the trustee to Barclays.

*Note E*
The acquisition balance sheet figure was prepared starting from the amounts recorded in the ADP and RISC systems related to cash as at 9/19.
The system balances were adjusted for all significant reconciling items listed on the bank reconciliations performed by operations.
These adjustments brought the system balances significantly closer to those shown on the statements.
However, we did not investigate and pass adjustments for all differences between the system balances and the bank statements.
The $858,105 is the difference between the total cash balance in the acquisition balance sheet and the bank statements at the time of acquisition.

**Reconciliation of Exhibits 1-3 with the Acquisition Balance Sheet**
**Foreign Brokers**

| Foreign Brokers | Exhibits $ | Acq Balance Sheet $ | Difference $ |
|---|---|---|---|
| Total per Exhibit 2 | 265,986,962.50 | | |
| Total per Exhibit 3 | 99,300,047.51 | | |
| | | | |
| *Acq Balance Sheet* | | | |
| T-bills held at foreign brokers | | 154,804,198.81 | |
| Foreign brokers (Customer positions) | | 206,308,929.20 | |
| **Difference** | **365,287,010.01** | **361,113,128.01** | **4,173,882.00**  Note A |

**Note A**

The figures in the exhibit were based on the statement figures once the accounts had been closed out.

The figures in the acquisition balance sheet were based on the statement figures as at close of business 19th September 2008

We have not fully reconciled the remaining difference, but there are various reasons that would explain the movement due to the difference in timing that the two sets of information were prepared based on.

These differences would include interest on collateral and MTM movements on any open trades.

Also, the acquisition balance sheet figures for foreign brokers were prepared from the Lehman RISC system rather than directly from the statement.

Adjustments were then posted to correct significant known trade and pricing errors, however, we did not always post all the adjustments that would bring the balances fully in-line with the statements.

**Reconciliation of Exhibits 1-3 with the Acquisition Balance Sheet**
**Lehman Affiliates**

| Lehman Affiliates | Exhibits $ | Acq Balance Sheet $ | Difference $ | |
|---|---|---|---|---|
| Cash total per Exhibit 3 | 289,239,642.95 | | | |
| T-Bills total per Exhibit 3 | 95,000,000.00 | | | |
| *Acq Balance Sheet* | | | | |
| T-bills held at Lehman affiliates | | 94,654,042.00 | | |
| Lehman affiliates receivables | | 288,259,446.58 | | |
| Lehman affiliates provision | | (168,879,081.91) | | |
| **Difference** | **384,239,642.95** | **214,034,406.67** | **170,205,236.28** | *See below* |

| *Reconciliation of Difference* | $ | |
|---|---|---|
| Lehman Brothers Futures Asia | 5,955,828.87 | Note A |
| Lehman Brothers SA | 1,289,014.08 | Note A |
| Lehman Brothers International (Europe) | 157,705,652.19 | Note A |
| Other differences | 5,254,741.09 | Note B |
| | **170,205,236.23** | |

**Note A**
These items were included within the exhibits 2-3, but not included in the acquisition balance sheet.
The exhibits included amounts irrespective of any assessment of collectability.
No amounts were recorded against these Lehman affiliates in the acquisition balance sheet due to uncertainty around the ability of those entities to pay the due amounts.

**Note B**
The figures in the exhibit were based on the statement figures once the accounts had been closed out.
The figures in the acquisition balance sheet were based on the statement figures as at close of business 19th September 2008.
We have not fully reconciled the remaining difference, but there are various reasons that would explain the movement due to the difference in timing that the two sets of information were prepared based on.
These differences would include interest on collateral and MTM movements on any open trades.
Also, the acquisition balance sheet figures for Lehman affiliates were prepared from the Lehman RISC system rather than directly from the statement.
Adjustments were then posted to correct significant known trade and pricing errors, however, we did not always post all the adjustments that would bring the balances fully in-line with the statements.

## EXHIBIT D

**To:**        Lori.Gialessas@cmegroup.com[Lori.Gialessas@cmegroup.com]
**Cc:**        Tennyson, Peter A[ptennyso@lehman.com]
**From:**      Castedo, Bianca
**Sent:**      Mon 9/15/2008 9:10:35 PM
**Subject:**   Domestic and Foreign Calculation
**Categories:** urn:content-classes:message

Daily Seg.xls
30.7.xls


> Lori,
>
> Please find attached the Domestic/Foreign Calculations as of 9/12
>
>  <<Daily Seg.xls>>  <<30.7.xls>>
>
>
>
> Regards,
> Bianca
>

| Daily Segregation Report September 12, 2008 | Debit | Credit |
|---|---|---|
| Customers' Balance | 0.00 | 2,598,748,836.82 |
| Repo Balance | 0.00 | 0.00 |
| Customers' Deficits | | 2,265,777,084.02 |
| Related Deficit Offsets | 2,121,948,986.56 | |
| Deficits Secured by Notes and Bonds | 121,929,681.15 | |
| Bad Settlement Prices | | 0.00 |
| Difference Accounts | 668,587,178.58 | 0.00 |
| Customer Option Positions S / L @ Market Value | 1,142,896,228.10 | 1,178,193,610.97 |
| Customers owned U.S.T.Securities | | 2,262,177,168.09 |
| Customers with Warehouse Receipts Value | | 0.00 |
| Monex (       ) Credit Balance | | 0.00 |
| Customer Depository Cash Balance | | 0.00 |
| Regulated Swiss Franc Requirement | | 1,982,896.20 |
| Regulated Yen Requirement | | 5,640,059.08 |
| Regulated Australian Dollars Requirement | | 77,327,540.05 |
| Regulated HK Dollar Requirement | | 0.00 |
| Regulated Swedish Krona Requirement | | 779,706.42 |
| Regulated GB Pound Requirement | | 187,059.37 |
| Regulated Saudi Riyals Requirement | | 0.00 |
| Regulated S African Rand Requirement | | 364,889.17 |
| Regulated Euro Requirement | | 511,560.62 |
| Regulated New Zealand $ Requirement | | 5,357.13 |
| Regulated Czeck $ Requirement | | 27,340.86 |
| Regulated Hungarian $ Requirement | | 915.06 |
| Regulated Slovakian Krouna Requirement | | 0.00 |
| Regulated Norwegian Krone Requirement | | 527,536.53 |
| Regulated Israel Shekel Requirement | | 0.00 |
| Regulated Canadian Dollars Requirement | | 947,362.26 |
| Total Funds to be Segregated | | 4,337,836,848.26 |
| Bank Balance (Regulated US$) | 12,872,938.33 | 0.00 |
| Bank Balance / Margin Deposit (Regulated Swiss Franc) | 215,141.50 | |
| Bank Balance / Margin Dep (Regulated Yen) | 4,653,282.43 | |
| Bank Balance / Margin Dep  (Regulated Australian Dollars) | 0.00 | |
| Bank Balance / Margin Dep  (Regulated HK Dollars) | 0.00 | |
| Bank Balance / Margin Dep (Regulated Swedish Krona) | 103,880.71 | |
| Bank Balance / Margin Dep (Regulated GB Pound) | 187,059.37 | |
| Bank Balance / Margin Dep (Regulated Saudi Riyalsl) | 0.00 | |
| Bank Balance / Margin Dep (Regulated S African Rand) | 47,361.66 | |
| Bank Balance / Margin Dep (Regulated Euro) | 0.00 | |
| Bank Balance / Margin Dep (Regulated NZ$) | 5,357.13 | |
| Bank Balance / Margin Dep (Regulated CK$) | 17,453.13 | |
| Bank Balance / Margin Dep (Regulated HF$) | 915.06 | |
| Bank Balance / Margin Dep (Regulated SK) | 0.00 | |
| Bank Balance / Margin Dep (Regulated NK) | 70,156.22 | |
| Bank Balance / Margin Dep (Regulated IS) | 0.00 | |
| Bank Balance / Margin Dep (Regulated CD) | 25,673.82 | |
| Brokers' Balance | 0.00 | 5,643,636.09 |
| Mutual Funds | 1,087,744,636.99 | 0.00 |
| Clearinghouse Controls | 0.00 | 56,301,577.01 |
| Customers' Funds Invested (001-00088 and 001-00089) | 1,611,337,379.69 | |
| Customers owned U.S.T.Securities | 2,262,177,168.09 | |
| Pending Account U.S.T.Bills | 0.00 | 0.00 |
| Customer Option Positions L/S @ Market Value | 1,178,193,610.97 | 1,142,896,228.10 |
| Customers with Warehouse Receipts Value | 0.00 | |
| Letter of Credits | | |
| Total Funds in Segregation | | 4,952,810,573.91 |
| Over or (Under) Segregation | | 614,973,725.65 |

Report Date:  9/15/08

To:            All

From:          Bianca Castedo

Subject:       Foreign Secured Calculation (CFTC rule 30.7)

|  |  | | 9/12/08 |
|---|---|---|---:|
| Secured amount | A | | 1,140,798,368 |
| Customer owned Collateral | B | | 639,811,118 |
| **Adjusted Secured Amount** | | | **1,780,609,486** |

|  |  | |  |
|---|---|---|---:|
| 30.7 Cust. Fund Invested Money Market Funds  (001 01010) | C | | 1,013,484,659 |
| Collateral on Deposit (001-10003) Customer owned Securities) | B | | 639,811,118 |
| Secured Lehman Bank Account balance  (997-70001) | D | | 152,733 |
| **Sub-total Cash, Cust owned Securities & MMF on deposit** | | | **1,653,448,510** |

| **Cash & Cash Equivalent on Deposit with Clearing Brokers** | | |
|---|---|---:|
| 022-95403 | BMO Bank of Montreal | (12,958,541) |
| 022-95059 | CLSA Securities (Thailand) Ltd | |
| 022-95556 | Lehman Brothers International (Europe) | |
| 022-95558 | Polaris MF Global Futures Co., Ltd | 92,504,995 |
| 022-95565 | Kenanga Deutsche Futures Sdn Bhd | 5,246,360 |
| 022-95572 | Lehman Brothers Futures Asia Ltd | 81,179,701 |
| 022-95585 | Lehman Brothers International (Europe) | 88,936,713 |
| 022-95596 | New Edge Australia Pty Ltd | 3,036,791 |
| 022-95604 | Macquarie Bank Ltd | 49,649,744 |
| 022-95612 | Lehman Brothers Pte Ltd | 54,367,175 |
| 022-95615 | Lehman Brothers Japan Inc | 27,891,091 |
| 022-95622 | Lehman Brothers Japan Inc | 6,609,780 |
| 022-95624 | Lehman Brothers Japan Inc | 1,133,667 |
| 022-95630 | Lehman Brothers International (Europe) | (19,713,559) |
| 022-95632 | Lehman Brothers International (Europe) | (21,236,443) |
| 022-95633 | Lehman Brothers International (Europe) | 6,377,428 |
| 022-95635 | Lehman Brothers International (Europe) Seoul | 0 |
| **Sub-Total funds in separate section 30.7 accounts** | **E** | **363,024,902** |

| **Securities on Deposit with Clearing Brokers** | | |
|---|---|---:|
| 022-95403 | BMO Bank of Montreal | 144,023,984 |
| 022-95059 | CLSA Securities (Thailand) Ltd | |
| 022-95556 | Lehman Brothers International (Europe) | |
| 022-95558 | Polaris MF Global Futures Co., Ltd | |
| 022-95565 | Kenanga Deutsche Futures Sdn Bhd | |
| 022-95572 | Lehman Brothers Futures Asia Ltd | 69,700,517 |
| 022-95585 | Lehman Brothers International (Europe) | |
| 022-95596 | New Edge Australia Pty Ltd | |
| 022-95604 | Macquarie Bank Ltd | 114,687,717 |
| 022-95612 | Lehman Brothers Pte Ltd | 74,679,125 |
| 022-95615 | Lehman Brothers Japan Inc | 14,935,825 |
| 022-95622 | Lehman Brothers Japan Inc | 4,978,608 |
| 022-95624 | Lehman Brothers Japan Inc | |
| 022-95630 | Lehman Brothers International (Europe) | |
| 022-95632 | Lehman Brothers International (Europe) | |
| 022-95633 | Lehman Brothers International (Europe) | |
| 022-95635 | Lehman Brothers International (Europe) Seoul (Collateral) | |
| **Sub-Total Securities in separate section 30.7 accounts** | **F** | **423,005,776** |

| **Total funds in separate section 30.7 accounts** | | 2,439,479,188 |
|---|---|---:|
| **Total Excess:** | | 658,869,702 |

# EXHIBIT E

**To:**      Lori.Gialessas@cmegroup.com[Lori.Gialessas@cmegroup.com];
nchiacchere@nymex.com[nchiacchere@nymex.com]; rloeber@nymex.com[rloeber@nymex.com]
**Cc:**      Tennyson, Peter A[ptennyso@lehman.com]
**From:**              Castedo, Bianca
**Sent:**              Tue 9/16/2008 4:16:59 PM
**Subject:**            Domestic and Foreign Calculation
**Categories:**          urn:content-classes:message

Daily Seg.xls
30.7.xls


> Please find attached the Domestic/Foreign Calculations as of 9/15
>
>  <<Daily Seg.xls>>  <<30.7.xls>>
>
>
>
> Regards,
> Bianca
>

| Daily Segregation Report<br>September 15, 2008 | Debit | Credit |
|---|---|---|
| Customers' Balance | 0.00 | 2,525,241,597.68 |
| Repo Balance | 0.00 | 0.00 |
| Customers' Deficits | | 3,383,709,678.62 |
| Related Deficit Offsets | 2,051,198,663.47 | |
| Deficits Secured by Notes and Bonds | 724,724,017.59 | |
| Bad Settlement Prices | | 0.00 |
| Difference Accounts | 545,766,250.60 | 0.00 |
| Customer Option Positions S / L @ Market Value | 2,024,612,014.03 | 1,957,640,546.39 |
| Customers owned U.S.T.Securities | | 2,197,415,854.77 |
| Customers with Warehouse Receipts Value | | 0.00 |
| Monex (        ) Credit Balance | | 0.00 |
| Customer Depository Cash Balance | | 0.00 |
| Regulated Swiss Franc Requirement | | 1,977,000.19 |
| Regulated Yen Requirement | | 6,392,860.45 |
| Regulated Australian Dollars Requirement | | 77,324,850.45 |
| Regulated HK Dollar Requirement | | 0.00 |
| Regulated Swedish Krona Requirement | | 777,167.58 |
| Regulated GB Pound Requirement | | 181,355.53 |
| Regulated Saudi Riyals Requirement | | 0.00 |
| Regulated S African Rand Requirement | | 364,889.17 |
| Regulated Euro Requirement | | 511,677.71 |
| Regulated New Zealand $ Requirement | | 4,236.17 |
| Regulated Czeck $ Requirement | | 38,584.32 |
| Regulated Hungarian $ Requirement | | 3,606.56 |
| Regulated Slovakian Krouna Requirement | | 0.00 |
| Regulated Norwegian Krone Requirement | | 529,060.06 |
| Regulated Israel Shekel Requirement | | 0.00 |
| Regulated Canadian Dollars Requirement | | 944,179.44 |
| Total Funds to be Segregated | | 4,806,756,199.39 |
| Bank Balance (Regulated US$) | (269,431,041.05) | 0.00 |
| Bank Balance / Margin Deposit (Regulated Swiss Franc) | 215,141.50 | |
| Bank Balance / Margin Dep (Regulated Yen) | 5,614,286.08 | |
| Bank Balance / Margin Dep  (Regulated Australian Dollars) | 0.00 | |
| Bank Balance / Margin Dep  (Regulated HK Dollars) | 0.00 | |
| Bank Balance / Margin Dep (Regulated Swedish Krona) | 103,970.31 | |
| Bank Balance / Margin Dep (Regulated GB Pound) | 181,355.53 | |
| Bank Balance / Margin Dep (Regulated Saudi Riyalsl) | 0.00 | |
| Bank Balance / Margin Dep (Regulated S African Rand) | 47,361.66 | |
| Bank Balance / Margin Dep (Regulated Euro) | 0.00 | |
| Bank Balance / Margin Dep (Regulated NZ$) | 4,236.17 | |
| Bank Balance / Margin Dep (Regulated CK$) | 28,696.60 | |
| Bank Balance / Margin Dep (Regulated HF$) | 3,606.56 | |
| Bank Balance / Margin Dep (Regulated SK) | 0.00 | |
| Bank Balance / Margin Dep (Regulated NK) | 70,007.37 | |
| Bank Balance / Margin Dep (Regulated IS) | 0.00 | |
| Bank Balance / Margin Dep (Regulated CD) | 23,721.68 | |
| Brokers' Balance | 0.00 | 15,096,557.44 |
| Mutual Funds | 537,744,636.99 | 0.00 |
| Clearinghouse Controls | 784,602,857.90 | 0.00 |
| Customers' Funds Invested (001-00088 and 001-00089) | 1,657,337,379.69 | |
| Customers owned U.S.T.Securities | 2,197,415,854.77 | |
| Pending Account U.S.T.Bills | 0.00 | 0.00 |
| Customer Option Positions L/S @ Market Value | 1,957,640,546.39 | 2,024,612,014.03 |
| Customers with Warehouse Receipts Value | 0.00 | |
| Letter of Credits | | |
| Total Funds in Segregation | | 4,831,894,046.68 |
| Over or (Under) Segregation | | 25,137,847.30 |

Report Date:    9/16/08

To:    All

From:    Bianca Castedo

Subject:    Foreign Secured Calculation (CFTC rule 30.7)

|  |  | 9/15/08 |
|---|---|---|
| Secured amount | A | 1,074,946,938 |
| Customer owned Collateral | B | 640,908,571 |
| **Adjusted Secured Amount** |  | **1,715,855,509** |

| | | |
|---|---|---|
| 30.7 Cust. Fund Invested Money Market Funds   (001 01010) | C | 1,013,484,659 |
| Collateral on Deposit (001-10003) Customer owned Securities) | B | 640,908,571 |
| Secured Lehman Bank Account balance  (997-70001) | D | 152,733 |
| **Sub-total Cash, Cust owned Securities & MMF on deposit** | | **1,654,545,962** |

| | **Cash & Cash Equivalent on Deposit with Clearing Brokers** | |
|---|---|---|
| 022-95403 | BMO Bank of Montreal | (21,542,256) |
| 022-95059 | CLSA Securities (Thailand) Ltd | |
| 022-95556 | Lehman Brothers International (Europe) | |
| 022-95558 | Polaris MF Global Futures Co., Ltd | 92,267,326 |
| 022-95565 | Kenanga Deutsche Futures Sdn Bhd | 5,641,578 |
| 022-95572 | Lehman Brothers Futures Asia Ltd | 81,312,847 |
| 022-95585 | Lehman Brothers International (Europe) | 136,123,540 |
| 022-95596 | New Edge Australia Pty Ltd | 3,163,099 |
| 022-95604 | Macquarie Bank Ltd | (8,682,874) |
| 022-95612 | Lehman Brothers Pte Ltd | 60,335,526 |
| 022-95615 | Lehman Brothers Japan Inc | 28,405,780 |
| 022-95622 | Lehman Brothers Japan Inc | 6,731,753 |
| 022-95624 | Lehman Brothers Japan Inc | 1,154,588 |
| 022-95630 | Lehman Brothers International (Europe) | (48,343,839) |
| 022-95632 | Lehman Brothers International (Europe) | (20,769,173) |
| 022-95633 | Lehman Brothers International (Europe) | 10,980,084 |
| 022-95635 | Lehman Brothers International (Europe) Seoul | 0 |
| **Sub-Total funds in separate section 30.7 accounts** | | **E** | **326,777,979** |

| | **Securities on Deposit with Clearing Brokers** | |
|---|---|---|
| 022-95403 | BMO Bank of Montreal | 143,371,721 |
| 022-95059 | CLSA Securities (Thailand) Ltd | |
| 022-95556 | Lehman Brothers International (Europe) | |
| 022-95558 | Polaris MF Global Futures Co., Ltd | |
| 022-95565 | Kenanga Deutsche Futures Sdn Bhd | |
| 022-95572 | Lehman Brothers Futures Asia Ltd | 69,772,189 |
| 022-95585 | Lehman Brothers International (Europe) | |
| 022-95596 | New Edge Australia Pty Ltd | |
| 022-95604 | Macquarie Bank Ltd | 114,817,685 |
| 022-95612 | Lehman Brothers Pte Ltd | 74,755,917 |
| 022-95615 | Lehman Brothers Japan Inc | 14,951,183 |
| 022-95622 | Lehman Brothers Japan Inc | 4,983,728 |
| 022-95624 | Lehman Brothers Japan Inc | |
| 022-95630 | Lehman Brothers International (Europe) | |
| 022-95632 | Lehman Brothers International (Europe) | |
| 022-95633 | Lehman Brothers International (Europe) | |
| 022-95635 | Lehman Brothers International (Europe) Seoul (Collateral) | |
| **Sub-Total Securities in separate section 30.7 accounts** | | **F** | **422,652,423** |

| **Total funds in separate section 30.7 accounts** | **2,403,976,364** |
|---|---|
| **Total Excess:** | **688,120,856** |

# EXHIBIT F

**To:**       Lori.Gialessas@cmegroup.com[Lori.Gialessas@cmegroup.com];
nchiacchere@nymex.com[nchiacchere@nymex.com]; rloeber@nymex.com[rloeber@nymex.com]
**Cc:**      Tennyson, Peter A[ptennyso@lehman.com]
**From:**                    Castedo, Bianca
**Sent:**                    Wed 9/17/2008 3:51:58 PM
**Subject:**                 Domestic and Foreign Calculation
**Categories:**              urn:content-classes:message

Daily Seg.xls
30.7.xls


> Please find attached the Domestic/Foreign Calculations as of 9/16
>
>  <<Daily Seg.xls>>  <<30.7.xls>>
>
>
> Regards,
> Bianca
>

| Daily Segregation Report September 16, 2008 | Debit | Credit |
|---|---|---|
| Customers' Balance | 0.00 | 2,210,318,660.57 |
| Repo Balance | 0.00 | 0.00 |
| Customers' Deficits | | 1,083,790,544.89 |
| Related Deficit Offsets | 737,213,981.45 | |
| Deficits Secured by Notes and Bonds | 185,388,999.78 | |
| Bad Settlement Prices | | 0.00 |
| Difference Accounts | 1,039,274,754.68 | 0.00 |
| Customer Option Positions S / L @ Market Value | 327,315,136.17 | 291,549,934.25 |
| Customers owned U.S.T.Securities | | 1,858,484,795.63 |
| Customers with Warehouse Receipts Value | | 0.00 |
| Monex (        ) Credit Balance | | 0.00 |
| Customer Depository Cash Balance | | 0.00 |
| Regulated Swiss Franc Requirement | | 1,975,487.54 |
| Regulated Yen Requirement | | 5,108,803.39 |
| Regulated Australian Dollars Requirement | | 51,086.82 |
| Regulated HK Dollar Requirement | | 0.00 |
| Regulated Swedish Krona Requirement | | 780,139.51 |
| Regulated GB Pound Requirement | | 191,415.73 |
| Regulated Saudi Riyals Requirement | | 0.00 |
| Regulated S African Rand Requirement | | 364,889.17 |
| Regulated Euro Requirement | | 511,560.62 |
| Regulated New Zealand $ Requirement | | 2,921.70 |
| Regulated Czeck $ Requirement | | 38,584.32 |
| Regulated Hungarian $ Requirement | | 3,606.56 |
| Regulated Slovakian Krouna Requirement | | 0.00 |
| Regulated Norwegian Krone Requirement | | 528,814.90 |
| Regulated Israel Shekel Requirement | | 0.00 |
| Regulated Canadian Dollars Requirement | | 943,538.16 |
| Total Funds to be Segregated | | 3,165,451,911.68 |
| Bank Balance (Regulated US$) | 381,486,796.32 | 0.00 |
| Bank Balance / Margin Deposit (Regulated Swiss Franc) | 213,661.98 | |
| Bank Balance / Margin Dep (Regulated Yen) | 4,221,760.78 | |
| Bank Balance / Margin Dep  (Regulated Australian Dollars) | 0.00 | |
| Bank Balance / Margin Dep  (Regulated HK Dollars) | 0.00 | |
| Bank Balance / Margin Dep (Regulated Swedish Krona) | 106,598.76 | |
| Bank Balance / Margin Dep (Regulated GB Pound) | 191,415.73 | |
| Bank Balance / Margin Dep (Regulated Saudi Riyalsl) | 0.00 | |
| Bank Balance / Margin Dep (Regulated S African Rand) | 47,361.66 | |
| Bank Balance / Margin Dep (Regulated Euro) | 0.00 | |
| Bank Balance / Margin Dep (Regulated NZ$) | 2,921.70 | |
| Bank Balance / Margin Dep (Regulated CK$) | 28,696.60 | |
| Bank Balance / Margin Dep (Regulated HF$) | 3,606.56 | |
| Bank Balance / Margin Dep (Regulated SK) | 0.00 | |
| Bank Balance / Margin Dep (Regulated NK) | 68,334.99 | |
| Bank Balance / Margin Dep (Regulated IS) | 0.00 | |
| Bank Balance / Margin Dep (Regulated CD) | 24,952.38 | |
| Brokers' Balance | 1,721,523.81 | 0.00 |
| Mutual Funds | 287,744,636.99 | 0.00 |
| Clearinghouse Controls | 185,087,757.44 | 0.00 |
| Customers' Funds Invested (001-00088 and 001-00089) | 1,269,826,264.75 | |
| Customers owned U.S.T.Securities | 1,858,484,795.63 | |
| Pending Account U.S.T.Bills | 0.00 | 0.00 |
| Customer Option Positions L/S @ Market Value | 291,549,934.25 | 327,315,136.17 |
| Customers with Warehouse Receipts Value | 0.00 | |
| Letter of Credits | | |
| Total Funds in Segregation | | 3,953,495,884.16 |
| Over or (Under) Segregation | | 788,043,972.48 |

Report Date:  9/17/08

To:          All

From:        Bianca Castedo

Subject:     Foreign Secured Calculation (CFTC rule 30.7)

|  |  |  | 9/16/08 |
|---|---|---|---|
| Secured amount | A | | 1,213,708,106 |
| Customer owned Collateral | B | | 579,170,286 |
| **Adjusted Secured Amount** | | | **1,792,878,392** |

|  |  |  |  |
|---|---|---|---|
| 30.7 Cust. Fund Invested Money Market Funds  (001 01010) | C | | 1,013,484,659 |
| Collateral on Deposit (001-10003) Customer owned Securities) | B | | 579,170,286 |
| Secured Lehman Bank Account balance  (997-70001) | D | | 152,733 |
| **Sub-total Cash, Cust owned Securities & MMF on deposit** | | | **1,592,807,678** |

| | **Cash & Cash Equivalent on Deposit with Clearing Brokers** | | |
|---|---|---|---|
| 022-95403 | BMO Bank of Montreal | | 225,741 |
| 022-95059 | CLSA Securities (Thailand) Ltd | | |
| 022-95556 | Lehman Brothers International (Europe) | | |
| 022-95558 | Polaris MF Global Futures Co., Ltd | | 91,993,366 |
| 022-95565 | Kenanga Deutsche Futures Sdn Bhd | | 5,566,010 |
| 022-95572 | Lehman Brothers Futures Asia Ltd | | 62,685,591 |
| 022-95585 | Lehman Brothers International (Europe) | | 166,260,063 |
| 022-95596 | New Edge Australia Pty Ltd | | 2,198,096 |
| 022-95604 | Macquarie Bank Ltd | | 39,909,714 |
| 022-95612 | Lehman Brothers Pte Ltd | | 61,611,155 |
| 022-95615 | Lehman Brothers Japan Inc | | 49,836,806 |
| 022-95622 | Lehman Brothers Japan Inc | | (1,536,579) |
| 022-95624 | Lehman Brothers Japan Inc | | 889,005 |
| 022-95630 | Lehman Brothers International (Europe) | | (99,113,434) |
| 022-95632 | Lehman Brothers International (Europe) | | (20,543,350) |
| 022-95633 | Lehman Brothers International (Europe) | | 11,857,249 |
| 022-95635 | Lehman Brothers International (Europe) Seoul | | 0 |
| **Sub-Total funds in separate section 30.7 accounts** | | E | **371,839,432** |

| | **Securities on Deposit with Clearing Brokers** | | |
|---|---|---|---|
| 022-95403 | BMO Bank of Montreal | | 142,888,672 |
| 022-95059 | CLSA Securities (Thailand) Ltd | | |
| 022-95556 | Lehman Brothers International (Europe) | | |
| 022-95558 | Polaris MF Global Futures Co., Ltd | | |
| 022-95565 | Kenanga Deutsche Futures Sdn Bhd | | |
| 022-95572 | Lehman Brothers Futures Asia Ltd | | 119,710,000 |
| 022-95585 | Lehman Brothers International (Europe) | | |
| 022-95596 | New Edge Australia Pty Ltd | | |
| 022-95604 | Macquarie Bank Ltd | | 114,867,567 |
| 022-95612 | Lehman Brothers Pte Ltd | | 74,818,750 |
| 022-95615 | Lehman Brothers Japan Inc | | 14,963,750 |
| 022-95622 | Lehman Brothers Japan Inc | | 4,987,917 |
| 022-95624 | Lehman Brothers Japan Inc | | |
| 022-95630 | Lehman Brothers International (Europe) | | |
| 022-95632 | Lehman Brothers International (Europe) | | |
| 022-95633 | Lehman Brothers International (Europe) | | |
| 022-95635 | Lehman Brothers International (Europe) Seoul (Collateral) | | |
| **Sub-Total Securities in separate section 30.7 accounts** | | F | **472,236,655** |

| **Total funds in separate section 30.7 accounts** | 2,436,883,765 |
|---|---|
| **Total Excess:** | 644,005,372 |

# EXHIBIT G

**To:**    Lori.Gialessas@cmegroup.com[Lori.Gialessas@cmegroup.com];
nchiacchere@nymex.com[nchiacchere@nymex.com]; rloeber@nymex.com[rloeber@nymex.com]
**Cc:**    Tennyson, Peter A[ptennyso@lehman.com]
**From:**        Castedo, Bianca
**Sent:**        Thur 9/18/2008 4:02:44 PM
**Subject:**        Domestic and Foreign Calculation
**Categories:**        urn:content-classes:message

<u>Daily Seg.xls</u>
<u>30.7.xls</u>


> Please find attached the Domestic/Foreign Calculations as of 9/17
>  <<Daily Seg.xls>>  <<30.7.xls>>
>
>
>
> Regards,
> Bianca
>

| Daily Segregation Report September 17, 2008 | Debit | Credit |
|---|---|---|
| Customers' Balance | 0.00 | 1,259,477,551.14 |
| Repo Balance | 0.00 | 0.00 |
| Customers' Deficits | | 1,072,555,008.14 |
| Related Deficit Offsets | 727,782,639.63 | |
| Deficits Secured by Notes and Bonds | 249,184,696.17 | |
| Bad Settlement Prices | | 0.00 |
| Difference Accounts | 229,167,581.68 | 0.00 |
| Customer Option Positions S / L @ Market Value | 53,805,818.85 | 28,442,741.54 |
| Customers owned U.S.T.Securities | | 1,571,178,492.50 |
| Customers with Warehouse Receipts Value | | 0.00 |
| Monex (     ) Credit Balance | | 0.00 |
| Customer Depository Cash Balance | | 0.00 |
| Regulated Swiss Franc Requirement | | 1,977,552.25 |
| Regulated Yen Requirement | | 4,888,812.22 |
| Regulated Australian Dollars Requirement | | 52,171.08 |
| Regulated HK Dollar Requirement | | 0.00 |
| Regulated Swedish Krona Requirement | | 779,601.88 |
| Regulated GB Pound Requirement | | 215,797.99 |
| Regulated Saudi Riyals Requirement | | 0.00 |
| Regulated S African Rand Requirement | | 364,889.17 |
| Regulated Euro Requirement | | 511,560.62 |
| Regulated New Zealand $ Requirement | | 3,802.46 |
| Regulated Czeck $ Requirement | | 38,584.32 |
| Regulated Hungarian $ Requirement | | 3,606.56 |
| Regulated Slovakian Krouna Requirement | | 0.00 |
| Regulated Norwegian Krone Requirement | | 528,350.83 |
| Regulated Israel Shekel Requirement | | 0.00 |
| Regulated Canadian Dollars Requirement | | 947,942.24 |
| Total Funds to be Segregated | | 2,682,025,728.60 |
| Bank Balance (Regulated US$) | (409,469.53) | 0.00 |
| Bank Balance / Margin Deposit (Regulated Swiss Franc) | 213,695.10 | |
| Bank Balance / Margin Dep (Regulated Yen) | 3,769,172.26 | |
| Bank Balance / Margin Dep  (Regulated Australian Dollars) | 0.00 | |
| Bank Balance / Margin Dep  (Regulated HK Dollars) | 0.00 | |
| Bank Balance / Margin Dep (Regulated Swedish Krona) | 106,255.27 | |
| Bank Balance / Margin Dep (Regulated GB Pound) | 215,797.99 | |
| Bank Balance / Margin Dep (Regulated Saudi Riyalsl) | 0.00 | |
| Bank Balance / Margin Dep (Regulated S African Rand) | 47,361.66 | |
| Bank Balance / Margin Dep (Regulated Euro) | 0.00 | |
| Bank Balance / Margin Dep (Regulated NZ$) | 3,802.46 | |
| Bank Balance / Margin Dep (Regulated CK$) | 28,696.60 | |
| Bank Balance / Margin Dep (Regulated HF$) | 3,606.56 | |
| Bank Balance / Margin Dep (Regulated SK) | 0.00 | |
| Bank Balance / Margin Dep (Regulated NK) | 66,907.77 | |
| Bank Balance / Margin Dep (Regulated IS) | 0.00 | |
| Bank Balance / Margin Dep (Regulated CD) | 26,824.35 | |
| Brokers' Balance | 16,214,055.16 | 0.00 |
| Mutual Funds | 437,744,636.99 | 0.00 |
| Clearinghouse Controls | 431,840,786.10 | 0.00 |
| Customers' Funds Invested (001-00088 and 001-00089) | 485,361,415.28 | |
| Customers owned U.S.T.Securities | 1,571,178,492.50 | |
| Pending Account U.S.T.Bills | 0.00 | 0.00 |
| Customer Option Positions L/S @ Market Value | 28,442,741.54 | 53,805,818.85 |
| Customers with Warehouse Receipts Value | 0.00 | |
| Letter of Credits | | |
| Total Funds in Segregation | | 2,921,048,959.20 |
| Over or (Under) Segregation | | 239,023,230.60 |

Report Date:  9/18/08

To:        All

From:      Bianca Castedo

Subject:   Foreign Secured Calculation (CFTC rule 30.7)

|  |  |  | **9/17/08** |
|---|---|---|---|
| Secured amount | A | | 1,021,867,833 |
| Customer owned Collateral | B | | 576,372,978 |
| **Adjusted Secured Amount** | | | **1,598,240,811** |
| | | | |
| 30.7 Cust. Fund Invested Money Market Funds   (001 01010) | C | | 1,013,484,659 |
| Collateral on Deposit (001-10003) Customer owned Securities) | B | | 576,372,978 |
| Secured Lehman Bank Account balance  (997-70001) | D | | 152,733 |
| **Sub-total Cash, Cust owned Securities & MMF on deposit** | | | **1,590,010,370** |

| | **Cash & Cash Equivalent on Deposit with Clearing Brokers** | | |
|---|---|---|---|
| 022-95403 | BMO Bank of Montreal | | 36,984,572 |
| 022-95059 | CLSA Securities (Thailand) Ltd | | |
| 022-95556 | Lehman Brothers International (Europe) | | |
| 022-95558 | Polaris MF Global Futures Co., Ltd | | 91,984,361 |
| 022-95565 | Kenanga Deutsche Futures Sdn Bhd | | 5,702,129 |
| 022-95572 | Lehman Brothers Futures Asia Ltd | | 40,295,872 |
| 022-95585 | Lehman Brothers International (Europe) | | 252,569,414 |
| 022-95596 | New Edge Australia Pty Ltd | | 2,215,113 |
| 022-95604 | Macquarie Bank Ltd | | 64,489,020 |
| 022-95612 | Lehman Brothers Pte Ltd | | 61,805,828 |
| 022-95615 | Lehman Brothers Japan Inc | | 41,650,235 |
| 022-95622 | Lehman Brothers Japan Inc | | (5,717,588) |
| 022-95624 | Lehman Brothers Japan Inc | | 1,016,996 |
| 022-95630 | Lehman Brothers International (Europe) | | (167,550,462) |
| 022-95632 | Lehman Brothers International (Europe) | | 0 |
| 022-95633 | Lehman Brothers International (Europe) | | 19,626,260 |
| 022-95635 | Lehman Brothers International (Europe) Seoul | | 0 |
| **Sub-Total funds in separate section 30.7 accounts** | | E | **445,071,751** |

| | **Securities on Deposit with Clearing Brokers** | | |
|---|---|---|---|
| 022-95403 | BMO Bank of Montreal | | 172,087,957 |
| 022-95059 | CLSA Securities (Thailand) Ltd | | |
| 022-95556 | Lehman Brothers International (Europe) | | |
| 022-95558 | Polaris MF Global Futures Co., Ltd | | |
| 022-95565 | Kenanga Deutsche Futures Sdn Bhd | | |
| 022-95572 | Lehman Brothers Futures Asia Ltd | | 119,985,150 |
| 022-95585 | Lehman Brothers International (Europe) | | |
| 022-95596 | New Edge Australia Pty Ltd | | |
| 022-95604 | Macquarie Bank Ltd | | 114,979,469 |
| 022-95612 | Lehman Brothers Pte Ltd | | 74,990,719 |
| 022-95615 | Lehman Brothers Japan Inc | | 14,998,144 |
| 022-95622 | Lehman Brothers Japan Inc | | 4,999,381 |
| 022-95624 | Lehman Brothers Japan Inc | | |
| 022-95630 | Lehman Brothers International (Europe) | | |
| 022-95632 | Lehman Brothers International (Europe) | | |
| 022-95633 | Lehman Brothers International (Europe) | | |
| 022-95635 | Lehman Brothers International (Europe) Seoul (Collateral) | | |
| **Sub-Total Securities in separate section 30.7 accounts** | | F | **502,040,820** |

| **Total funds in separate section 30.7 accounts** | 2,537,122,940 |
|---|---|
| **Total Excess:** | 938,882,129 |

# EXHIBIT H

**Topic 1**

**_Trustee's Request:_**

   **_LBI's options positions, as of the Closing, including the value of each of (i) the long
options positions, and (ii) the short options positions at the Closing; the source and timing of
Barclays' knowledge of the same; a breakdown of the positions at each exchange attributable
to (i) LBI, (ii) Affiliate Customers, and (iii) Non-Affiliate Customers; whether, how, and the
extent to which, those options positions have been included in Barclays' purchase accounting,
including in the document marked as Exhibit 377A at the Rule 2004 depositions ("Exhibit
377A")._**

**_Barclays' Response:_**

   Barclays only acquired LBI's exchange-traded options, and has no knowledge concerning
LBI's over-the-counter option positions.  To Barclays' knowledge, the universe of exchange-
traded equities options that LBI held as of September 22, 2008, was comprised of the equities
options positions held in OCC accounts numbered 074M, 074F, 074C, and 273C.  Produced at
Bates range BCI-EX-00298012 to BCI-EX-00302791 is a report that identifies the open options
positions for each of the OCC 074 accounts as of the Closing.  Produced at Bates range BCI-EX-
00302792 to BCI-EX-00302801 is a similar report that identifies the open options positions held
in the 273C account as of the Closing.

   It is Barclays' understanding that OCC 074M contained options held by LBI solely for its
own account.  It is Barclays' understanding that OCC 074F contained some options held by LBI
solely for its own account and some options held by LBI for the benefit of a subordinated
affiliate, LBSF.  It is Barclays' understanding that OCC 074C contained options held by LBI for
the benefit of LBI affiliates LBF, LBSF, LBIE, and LOTC and/or their customers, as well as
options held by LBI for the benefit of non-affiliated customers of LBI.  And it is Barclays'
understanding that OCC 273C contained options held by LBI solely for the benefit of non-
affiliated customers of LBI.

   On November 13, 2009, Barclays produced a spreadsheet in native format reflecting
Barclays' assessment of the value of each individual long and short equity option position held in
LBI's 074F and 074M accounts as of time of the September 22, 2008 closing (the "Closing").
(The placeholder Bates Number for this spreadsheet was BCI-EX-(S)-00110231.)[1]

---

[1] The figure used to represent the value of the 074F and 074M options on Barclays' Acquisition Balance
Sheet as of the time of Closing was negative $1.027 billion.  Barclays' current assessment of the value of
these same positions as of the time of Closing is negative $1.040 billion.  (A subsequent adjustment was
made in Barclays' books and records in the amount of $13 million to correct for this.)

With regard to the exchange-traded options-related figures in the Acquisition Balance Sheet, the negative
$1.027 billion figure referenced above was aggregated with a $77M provision against receivables arising
on the close-out of affiliate OCC positions contained in the OCC 074C account to arrive at the negative

Produced contemporaneously herewith in native format (with a Bates placeholder of BCI-EX-00297437) is another spreadsheet that relates to this same universe of options – i.e. the options held as of the Closing in the OCC 074F and 074M accounts. This spreadsheet identifies which of the options in the 074F account were held by LBI for its own benefit and which were held for the benefit of LBI's subordinated affiliate, LBSF, and the corresponding values that Barclays attributed to each category of positions. This file provides the back-up for paragraph 5 of Eric Clark's January 8, 2010 declaration, which states that the LBSF options in the 074F account had a value of negative $801,390,328.00 as of September 24, 2008. *See* "Summary" tab and "LBSF, 24 Sep 2008" tab.

To Barclays' knowledge, no one from Barclays performed a valuation of the options positions that were held in LBI's 074C and 273C accounts as of the Closing and there are no acquisition date valuations relating to those positions included on Deposition Exhibit 377A, *i.e.*, Barclays' "Acquisition Balance Sheet." All options in the OCC 074C and 273C accounts constituted customer positions over which Barclays did not acquire beneficial ownership. (All that is included with respect to any of these positions on Deposition Exhibit 377A, as noted above and detailed below, is a $77 million provision against receivables arising on the close-out of affiliate options contained in the OCC 074C account.)

Produced in native format with Bates number BCI-EX-00302802 is a file identifying the options in the 074C account that were held by LBI for the benefit of affiliates, rather than non-affiliate customers, and shows the costs Barclays incurred in closing out those positions. The data in this spreadsheet provides the support for the statement reflected on page 3 of Exhibit 147 (notes prepared by Gary Romain in connection with the Trustee's January 13, 2010 30(b)(6) deposition of Barclays) – namely, that the aggregate net receivable from LBI relating to all 074C affiliate options is $80.3 million (of which $77 million was written off on Barclays' Acquisition Balance Sheet as explained above).

Prior to and at the time of the Closing, Barclays' knowledge concerning LBI's exchange-traded option positions was extremely limited. For example, Barclays did not know at the time of Closing either the value of the options positions LBI held in the various OCC accounts or the breakout of positions in any given account as between LBI positions, affiliate positions, and non-affiliate customer positions; Barclays obtained all of the above information only after the Closing. *See, e.g.*, document production at Bates range BCI-EX-(S)-55856 to -57 (email from C. Mincak to S. King, *et al.*, September 19, 2008 4:45 p.m.) (purporting to list "net long options" without specifying which OCC accounts were covered in this list, on whose behalf LBI held any such option, or what the value of any such option was) and BCI-EX-(S)-75257 to -63 (email from C. Mincak to S. King, *et al.*, September 19, 2008 5:41 p.m.) (purporting to correct earlier list of "long and short options," but again without specifying which OCC accounts were covered in this list, on whose behalf LBI held any such option, or what the value of any such option was).

---

$1.1 billion figure reflected in the "Exchange traded options – derivative MtM" line (column E, row 42) of the third page of Exhibit 377-A (produced at BCI-EX-00115845).

Please see the letter from Tricia J. Bloomer to William McGuire dated February 22, 2010, for a comprehensive account of the information to which Barclays had access prior to the Closing concerning all of LBI's exchange-traded derivatives positions (including but not limited to equities options) and any associated margin.

## Topic 2

### *Trustee's Request:*

*Collateral, including Margin, posted by LBI, whether directly at an exchange or with another broker-dealer, as of the Closing, to secure options trading, including, with respect to each exchange: the value and form (e.g., cash, securities, money market account) of that collateral at the Closing; the source and timing of Barclays' knowledge of the same; a breakdown of that collateral attributable to (i) LBI positions or accounts; (ii) Affiliate Customer positions or accounts; and (iii) Non-Affiliate Customer positions or accounts; the extent to which that collateral was in excess of the minimum Margin requirement of the exchange as at the opening and closing of business on September 19, 2008 and as of the Closing; whether, when, and the extent to which, Barclays has taken possession of that collateral; and to the extent that LBI did not post collateral directly at an exchange or clearing house, with whom, and where, was that collateral posted.*

### *Barclays' Response:*

The document produced at Bates range BCI-EX-(S)-00131303 to -18 reflects the OCC's view of the value and form of all margin posted in each of LBI's OCC accounts as of the open of business on September 22, 2008, as well as the margin requirements imposed by the OCC as of that same time with respect to each of those accounts. This report was received via email by Tim Stack of Barclays on September 21, 2008, at 4:07 p.m. The 074 series of accounts reflected on that report relate to exchange-traded equities options in particular, so the pages of that report relating to the 074 account contain the information requested by this topic.

As this report shows, the total amount of margin held with respect to *all* of LBI's OCC accounts (options and futures) at the time of Closing was $2.554 billion, including an undrawn letter of credit in the amount of $252 million. In the entries on its Acquisition Balance Sheet that relate to exchange-traded equities options, Barclays recognized all of this margin except for the undrawn letter of credit, approximately $80 million in letter of credit proceeds from September 19, 2008 drawdowns, and $48 million associated with the 084 accounts (which contained only futures positions). Barclays also recognized a $41 million upward adjustment to the current market value of certain treasuries held as margin in relation to the OCC options positions. The resulting approximately $2.29 billion was recorded on the acquisition balance sheet (it is the sum of the "OCC margin against exchange traded options" entry of $1.31 billion and the "OCC customer and clearing margin" entry of $0.98 billion provided on the third page of Exhibit 377A (produced at BCI-EX-00115845)).

All LBI-posted margin held in respect of the 074M account was "attributable" to LBI Options, since there were no affiliate options or customer options in that account to Barclays' knowledge. Margin held in respect of the 074F account was "attributable" to all options held in

3

that account, some of which were LBI options and the remainder of which were LBSF options. All of that margin was property of LBI, and Barclays is not aware of any specific allocation of particular subsets of the LBI-posted margin in those accounts to particular options, and therefore cannot provide further specificity about the "breakdown of that collateral" or how or whether it was allocated as between LBI positions and LBSF positions.

Similarly, the LBI-posted margin held in respect of the 074C account as of the Closing was all property of LBI and secured the account as a whole.  LBI held some of the positions in that account for the benefit of affiliate customers and the others for the benefit of non-affiliate customers.  Barclays is unaware of any specific allocation of particular subsets of 074C margin to particular options positions. Therefore, Barclays cannot provide any more specificity with regard to the "breakdown of that collateral" or how or whether it was attributed to individual Affiliate or Non-Affiliate customer positions.

To Barclays' knowledge, no other exchanges, clearing houses, or broker-dealers held margin relating to LBI's exchange-traded equities options, except that, as you know, JPMorgan, acting in a custodial capacity, maintained custody of the government treasuries portion of margin posted by LBI in respect of the OCC accounts.

Please see the letter from Tricia J. Bloomer to William McGuire dated February 22, 2010, for a comprehensive account of the information to which Barclays had access prior to the Closing concerning all of LBI's exchange-traded derivatives positions (including but not limited to equities options) and any associated margin.

The Declaration of Craig Jones, which was served on January 8, 2010, reflects the best of Barclays' knowledge and understanding concerning "whether, when, and the extent to which" Barclays has taken possession of the collateral referenced in this response.

## **Topic 3**

### *Trustee's Request:*

**To the extent that LBI customers deposited collateral with LBI prior to the Closing to secure their options or futures trading activity: the value, form (e.g., cash, securities, money market account) and location of that collateral at the Closing, deposited by (i) Affiliate Customers and (ii) Non-Affiliate Customers, respectively; the source and timing of Barclays' knowledge of that collateral; whether, when, and the extent to which, Barclays has taken possession of that collateral; and whether, how, and the extent to which, Barclays has booked that collateral in its puchase accounting, including in Exhibits 377A and 546A (futures only).**

### *Barclays' Response:*

As discussed between Tricia Bloomer and Neil Oxford on February 15, 2010, the requests encompassed by Topic 3 are unduly burdensome, particularly given that the Trustee has equal access to the systems from which much of this information would be derived.  Thus, Barclays' response to this Topic is limited to the following:

4

- To Barclays' understanding, the aggregate value of all collateral posted with LBI by LBI's futures customers to support their futures trading activity as of September 22, 2008 was $2.187 billion. This amount (along with other customer payables and receivables) was a component of the $2,335,276,442 figure reflected in column G, row 35 of Exhibit 546A (produced at BCI-EX-00115845).

- With respect to Private Investment Management (PIM) customers, to the extent they wished to trade in futures prior to the Closing, it is Barclays' understanding that they would have had to open a separate futures customer account with LBI through which to conduct such trades. Thus, any collateral posted by PIM customers to secure their futures trading activity would be reflected in the figure provided in the immediately preceding bullet.

- As for PIM customers who held open exchange-traded equities options through LBI as of the time of Closing, it is Barclays' understanding that LBI did not require separate margin to be deposited by PIM customers with respect to such activity; rather, LBI required that the value of assets in those customers' accounts, including any stock positions held by those customers, be sufficient to cover any margin requirements set by LBI to secure their exchange-traded options trading activity. It is Barclays' understanding that the Trustee has equal access to the LBI systems that would contain any information available to Barclays concerning these margin requirements as of the time of Closing.

- Barclays did not acquire the non-futures customer accounts of any non-PIM customers of LBI and has had no occasion to compile any information concerning collateral such customers had posted with LBI as of the time of Closing. It is Barclays' understanding that the Trustee has access to the LBI systems that may contain information in this regard.

- Barclays likewise did not acquire the accounts of any LBI affiliates that traded in exchange-traded options through LBI as of the time of Closing. Again, it is Barclays' understanding that the Trustee has access to the LBI systems that may contain information in this regard.

- Please see the letter from Tricia J. Bloomer to William McGuire dated February 22, 2010 (including the deposition testimony referenced therein) for a comprehensive account of the information to which Barclays had access prior to the Closing concerning all of LBI's exchange-traded derivatives positions and any associated margin (including but not limited to any margin posted by customers).

- Barclays has taken possession of all collateral posted by non-affiliated PIM customers and non-affiliated futures customers with LBI as of the Closing, except to the extent that collateral is among the amounts reflected on Exhibit 3 to the Declaration of Elizabeth James dated January 8, 2010. (Barclays has likewise assumed LBI's corresponding liabilities to those two sets of customers relating to such collateral.) To Barclays'

knowledge, it has not taken possession of any collateral posted by any non-PIM customer of LBI as of the closing to secure listed options trading.

**Topics 4-7**

*Trustee's Requests:*

4. *LBI's futures positions as of the Closing, including, for each exchange: the value of the positions at the Closing; the source and timing of Barclays' knowledge of the same; a breakdown of the positions attributable to (i) LBI, (ii) Affiliate Customers, and (iii) Non-Affiliate Customers; the extent to which the positions attributable to each of LBI, Affiliate Customers and Non-Affiliate Customers are reflected in the document marked as Exhibit 546A at the Rule 60(b) depositions ("Exhibit 546A"); and whether, when, and the extent to which, those positions were closed, by whom, and at what cost.*

5. *Collateral, including Margin, posted by LBI, whether directly at an exchange or with another broker-dealer, as of the Closing, to secure futures trading, including, with respect to each exchange: the value and form (e.g., cash, securities, money market account) of that collateral at the Closing; the source and timing of Barclays' knowledge of the same; a breakdown of that collateral attributable to (i) LBI positions, (ii) Affiliate Customer positions, and (iii) Non-Affiliate Customer positions; how, and the extent to which, that collateral, attributable to each of (i) LBI positions; (ii) Affiliate Customer positions; and (iii) Non-Affiliate Customer positions, is reflected on Exhibit 546A; and to the extent that LBI did not post collateral directly at an exchange or clearing house, with whom, and where, was that collateral posted.*

6. *For Exhibits 1-3 to the Declaration of Elizabeth James, dated January 8, 2010 ("James Declaration"), a reconciliation of each of the exhibits with (i) Exhibit 546A; and (ii) with the list of other assets claimed by Barclays not included in Exhibit 377A, and reflected on the document marked as Exhibit 399A at the Rule 2004 depositions; a breakdown of the collateral, including Margin, reflected on Exhibits 1-3 attributable to (i) LBI positions, (ii) Affiliate Customer positions, and (iii) Non-Affiliate Customer positions; and for each exchange or clearing house reflected on Exhibits 1-3, whether LBI, an Affiliate, or a nonaffiliated broker held membership at that exchange or clearing house.*

7. *With respect to each exchange or clearing house at which LBI traded in options or futures as of the Closing, whether, when, and the extent to which Barclays has received any assets from the exchange, clearing house or exchange member, except for positions, as a result of the Sale Transaction, including a breakdown of the assets attributable to (i) Margin, (ii) Clearing Fund deposits, (iii) proceeds from the liquidation of LBI positions, Affiliate Customer positions or Non-Affiliate Customer positions, (iv) exchange membership, or (v) any other assets; and whether, and the extent to which, Barclays has booked that collateral in its purchase accounting, including on Exhibits 546A and 377A.*

6

**_Barclays' Response:_**

In accordance with an agreement reached during above referenced February 15, 2010 telephone conversation between Tricia Bloomer and Neil Oxford, Topics 4 – 7 of the Trustee's Second Rule 30(b)(6) Deposition Notice to Barclays have been narrowed, and now call for only the following response:

First, on February 15, 2010, Barclays produced brokers' statements reflecting LBI's futures positions and collateral posted by LBI to secure futures trading as of September 19, 2008 and September 22, 2008 (BCI-EX-00297438 – 00297505), and these statements contain information responsive to Topics 4 – 7.

Second, Barclays is in the process of preparing a reconciliation between the futures customer collateral recorded on (and that omitted from) Exhibit 546A on the one hand and Exhibits 1-3 to the Declaration of Elizabeth James dated January 8, 2010 (the "James Declaration") on the other. Although we had hoped to have this reconciliation completed in time for inclusion in this submission, it is still underway, and will therefore instead be included in a supplemental submission.

Third, in that same supplemental submission, Barclays will provide a narrative description of the categories of information encompassed by Exhibit 546A and the process used in preparing that exhibit.

Although Barclays originally offered, subject to availability, to produce lists of positions held in LBI's 084F and 084C accounts at the OCC as of September 19, 2008 and September 22, 2008, Barclays has since determined that the systems to which Barclays has access do not permit Barclays to generate such lists. It is Barclays' understanding that the Trustee may have access to systems that would contain this information however.  To aid in the interpretation of such information, Barclays notes its understanding that the futures positions in the 084F account were held by LBI as of the Closing on behalf of one or more LBI affiliates, and that the futures positions in the 084C account were held by LBI as of the Closing on behalf of non-affiliate customers of LBI.

In further response to Topics 4 through 7, Barclays notes that the James Declaration, and Exhibits 1, 2 and 3 thereto, provide all information reasonably accessible to Barclays with regard to whether, when and to what extent Barclays has taken possession of any assets posted or deposited by LBI with respect to exchange-traded futures. The exhibits also provide all information in Barclays' possession about the location of all such assets (*i.e.*, the custodians).

Finally, please see the letter from Tricia J. Bloomer to William McGuire dated February 22, 2010, for a comprehensive account of the information to which Barclays had access prior to the Closing concerning all of LBI's exchange-traded derivatives positions (including but not limited to futures) and any associated collateral.

**Topic 8**

***Trustee's Request:***

     ***For each foreign broker-dealer that LBI used for options or futures trading, any assets other than those described in topics 2 and 5 above that LBI posted or deposited with that broker-dealer as of the Closing, including, for each broker-dealer: the value, form (e.g., cash, securities, money market account) and location of those assets at the Closing; the source and timing of Barclays' knowledge of the same; whether, when, and the extent to which Barclays has taken possession of those assets; and whether, and the extent to which, Barclays has booked that collateral in its purchase accounting, including on Exhibits 546A and 377A.***

***Barclays' Response:***

     Barclays has no information responsive to this request that is not already encompassed by Barclays' responses to Topics 1 through 7 above.

# EXHIBIT I

| LBI ADP 012 | | | | BCI ADP 224 | | | Notes |
|---|---|---|---|---|---|---|---|
| Account # | Debit $ | Credit $ | | Account # | Debit $ | Credit $ | |
| 057-70000-11 | | ($94,730,527.42) | | 057-70015-14 | $ 94,730,527.42 | | LBIE Customer exercise and assignment liquidations |
| 057-70001-10 | | ($513,036.77) | | 057-70016-13 | $ 513,036.77 | | LBIE Brazil Prop exercise and assignment liquidations |
| 057-70002-19 | | ($2,827,253.49) | | 057-70017-12 | $ 2,827,253.49 | | LOTC exercise and assignment liquidations |
| 057-70003-18 | | ($43,468,405.21) | | 057-70018-11 | $ 43,468,405.21 | | LBIE Customer Option liquidations |
| 057-70004-17 | $ 8,440,295.00 | | | 057-70019-10 | | ($8,440,295.00) | LBIE Equities Option liquidations |
| 057-70005-16 | $ 30,844,631.12 | | | 057-70020-17 | | ($30,844,631.12) | LBIE Brazil Prop Option liquidations |
| 057-70006-15 | $ 66,604,529.28 | | | 057-70021-16 | | ($66,604,529.28) | LOTC Option liquidations |
| 057-70007-14 | | ($53,389,890.60) | | 057-70022-15 | $ 53,389,890.60 | | LBF Option liquidations |
| 057-70008-13 | $ 22,077,490.00 | | | 057-70023-14 | | ($22,077,490.00) | LBSF Option liquidations |
| | $ 127,966,945.40 | ($194,929,113.49) | | | $ 194,929,113.49 | ($127,966,945.40) | |
| | | | | | | | |
| Total : | | $  (66,962,168.09) | | Total : | $  66,962,168.09 | | |
| | | | | | | | |
| Account # | Debit $ | Credit $ | | Account # | Debit $ | Credit $ | |
| 057-70013-16 | | ($13,311,159.00) | | 057-70028-19 | $13,311,159.00 | | LBIE Customer cash index assignments |
| | | | | | | | |
| Total : | | ($13,311,159.00) | | Total : | $13,311,159.00 | | |
| | | | | | | | |
| Account # | Debit $ | Credit $ | | Account # | Debit $ | Credit $ | |
| 057-70035-10 | | ($586,208,545.99) | | 057-70038-17 | $586,208,545.99 | | OCC 074 to OCC 255 Firm Option position net market value cost |
| 057-70036-19 | | ($999,530.82) | | 057-70039-16 | $999,530.82 | | OCC 074 to OCC 255 MM Option position net market value cost |
| | | | | | | | |
| Total : | | ($587,208,076.81) | | Total : | $587,208,076.81 | | |
| | | | | | | | |
| Account # | Debit $ | Credit $ | | Account # | Debit $ | Credit $ | |
| 057-70037-18 | | $  (25,760,592.37) | | 057-70040-13 | $  25,760,592.37 | | OCC 074 Net pay/collect from September 23 onward |
| | | | | | | | |
| Total : | | ($25,760,592.37) | | Total : | $25,760,592.37 | | |
| | | | | | | | |
| Account # | Debit $ | Credit $ | | Account # | Debit $ | Credit $ | |
| 057-70011-18 | $1,327,759,289.24 | | | 057-70026-11 | | ($1,327,759,289.24) | OCC cash received |
| 057-70012-17 | $19,000,000.00 | | | 057-70027-10 | | ($19,000,000.00) | OCC Government Collateral cash received |
| | | | | | | | |
| Total : | $1,346,759,289.24 | | | Total : | | ($1,346,759,289.24) | |
| | | | | | | | |
| | | | | Account # | Debit $ | Credit $ | |
| | | | | 057-99990-12 | $2,532,284.00 | | OCC 074 Customer cash |
| | | | | 057-99998-14 | $170,666.66 | | OCC 074 Clearing Fund cash |
| | | | | | | | |
| | | | | Total : | $2,702,950.66 | | |

| Account # | Long | Short | Debit $ | Credit $ | Notes |
|---|---|---|---|---|---|
| | | **LBI ADP 012** | | | **Notes** |
| **Account #** | **Long** | **Short** | **Debit $** | **Credit $** | |
| 057-70009-12 | 600 CSCO | | $12,000.00 | | LBI Institutional Customer exercise |
| | | | | | |
| | | | **$12,000.00** | | |
| | | | | | |
| | | | | | |
| 057-70010-19 | | -200 FNM | | ($2,000.00) | LBI Prime Services Customer assignment |
| | | -2500 LEHMQ | | ($25,000.00) | LBI Prime Services Customer assignment |
| | | -500 LEHMQ | | ($5,000.00) | LBI Prime Services Customer assignment |
| | 25000 AMR | | $175,000.00 | | LBI Prime Services Customer exercise |
| | 400 BKUNA | | $1,000.00 | | LBI Prime Services Customer exercise |
| | 900 BKUNA | | $2,250.00 | | LBI Prime Services Customer exercise |
| | 1300 BKUNA | | $3,250.00 | | LBI Prime Services Customer exercise |
| | 4300 BKUNA | | $10,750.00 | | LBI Prime Services Customer exercise |
| | 14500 BKUNA | | $36,250.00 | | LBI Prime Services Customer exercise |
| | 40000 MYL | | $600,000.00 | | LBI Prime Services Customer exercise |
| | 80000 MYL | | $1,000,000.00 | | LBI Prime Services Customer exercise |
| | 160000 MYL | | $2,400,000.00 | | LBI Prime Services Customer exercise |
| | 262000 MYL | | $3,275,000.00 | | LBI Prime Services Customer exercise |
| | 3500 RAD | | $8,750.00 | | LBI Prime Services Customer exercise |
| | 6000 RAD | | $15,000.00 | | LBI Prime Services Customer exercise |
| | 32600 RAD | | $81,500.00 | | LBI Prime Services Customer exercise |
| | 82100 RAD | | $205,250.00 | | LBI Prime Services Customer exercise |
| | | -1800 FNM | | ($18,000.00) | LBI Prime Services Customer assignment |
| | 500 RTN | | $22,500.00 | | LBI Prime Services Customer assignment |
| | 600 RTN | | $27,000.00 | | LBI Prime Services Customer assignment |
| | 1600 RTN | | $72,000.00 | | LBI Prime Services Customer assignment |
| | 2600 RTN | | $117,000.00 | | LBI Prime Services Customer assignment |
| | 8700 RTN | | $391,500.00 | | LBI Prime Services Customer assignment |
| | | -1700 FRE | | ($12,750.00) | LBI Prime Services Customer assignment |
| | | | | | |
| | | | **$8,444,000.00** | **($62,750.00)** | |
| | | | Net : | **$8,381,250.00** | |
| | | | | | |
| | | **BCI ADP 224** | | | |
| **Account #** | **Long** | **Short** | **Debit $** | **Credit $** | |
| 057-70024-13 | | -600 CSCO | | ($12,000.00) | LBI Institutional Customer exercise |
| | | | | | |
| | | | | **($12,000.00)** | |
| | | | | | |
| 057-70025-12 | 200 FNM | | $2,000.00 | | LBI Prime Services Customer assignment |
| | 2500 LEHMQ | | $25,000.00 | | LBI Prime Services Customer assignment |
| | 500 LEHMQ | | $5,000.00 | | LBI Prime Services Customer assignment |
| | | -25000 AMR | | ($175,000.00) | LBI Prime Services Customer exercise |
| | | -400 BKUNA | | ($1,000.00) | LBI Prime Services Customer exercise |
| | | -900 BKUNA | | ($2,250.00) | LBI Prime Services Customer exercise |
| | | -1300 BKUNA | | ($3,250.00) | LBI Prime Services Customer exercise |
| | | -4300 BKUNA | | ($10,750.00) | LBI Prime Services Customer exercise |
| | | -14500 BKUNA | | ($36,250.00) | LBI Prime Services Customer exercise |
| | | -40000 MYL | | ($600,000.00) | LBI Prime Services Customer exercise |
| | | -80000 MYL | | ($1,000,000.00) | LBI Prime Services Customer exercise |
| | | -160000 MYL | | ($2,400,000.00) | LBI Prime Services Customer exercise |
| | | -262000 MYL | | ($3,275,000.00) | LBI Prime Services Customer exercise |
| | | -3500 RAD | | ($8,750.00) | LBI Prime Services Customer exercise |
| | | -6000 RAD | | ($15,000.00) | LBI Prime Services Customer exercise |
| | | -32600 RAD | | ($81,500.00) | LBI Prime Services Customer exercise |
| | | -82100 RAD | | ($205,250.00) | LBI Prime Services Customer exercise |
| | 1800 FNM | | $18,000.00 | | LBI Prime Services Customer assignment |
| | | -500 RTN | | ($22,500.00) | LBI Prime Services Customer assignment |
| | | -600 RTN | | ($27,000.00) | LBI Prime Services Customer assignment |
| | | -1600 RTN | | ($72,000.00) | LBI Prime Services Customer assignment |
| | | -2600 RTN | | ($117,000.00) | LBI Prime Services Customer assignment |
| | | -8700 RTN | | ($391,500.00) | LBI Prime Services Customer assignment |
| | 1700 FRE | | $12,750.00 | | LBI Prime Services Customer assignment |
| | | | | | |
| | | | **$62,750.00** | **($8,444,000.00)** | |
| | | | | **($8,381,250.00)** | |

## Exhibit J

**Topic 3**

*Request:*

    *To the extent that LBI customers deposited collateral with LBI prior to the Closing to secure their options or futures trading activity: the value, form (e.g., cash, securities, money market account) and location of that collateral at the Closing, deposited by (i) Affiliate Customers and (ii) Non-Affiliate Customers, respectively; the source and timing of Barclays' knowledge of that collateral; whether, when, and the extent to which, Barclays has taken possession of that collateral; and whether, how, and the extent to which, Barclays has booked that collateral in its puchase accounting, including in Exhibits 377A and 546A (futures only).*

**Topic 3 as supplemented in a letter from Neil J. Oxford to Tricia J. Bloomer dated February 26, 2010:**

-  *With respect to futures trading, we need to know whether Barclays acquired the accounts of (i) LBI affiliates, and (ii) customers of LBI affiliates. If Barclays did not acquire either or both sets of accounts, whether and what obligations Barclays assumed in connection with LBI affiliates, and customers of LBI affiliates, and pursuant to what agreement(s).*

-  *Please explain whether any part of the $2.197 billion in "collateral posted with LBI by LBI's futures customers to support their futures trading activity as of September, 2008" (Response at 5) was posted by customers whose futures positions Barclays did not acquire under the sale. Please also identify the documentary support for the $2.197 billion figure.*

**Barclays' supplemental response to Topic 3, as supplemented by the February 26, 2010 letter:**

    Barclays took over customer futures accounts of all non-affiliated customers of LBI.  Barclays also took over LBIE's omnibus customer account with LBI.

    Barclays took over no affiliate accounts other than the LBIE omnibus customer account referenced above.

    Pursuant to the APA and Clarification Letter, Barclays acquired LBI's business as a futures commission merchant.  Accordingly, Barclays took over clearing responsibility for all futures positions held by LBI at the time of Closing, regardless of whether the position was held on behalf of LBI, an LBI affiliate, a non-affiliate customer of LBI, or a customer of an LBI affiliate.  Moreover, the APA provided that Barclays would acquire "all of Seller's and its applicable Subsidiaries' right, title and interest in, to and under the Purchased Assets", which pursuant to the Clarification Letter expressly included all "exchange-traded derivatives (and any property that may be held to secure obligations

under such derivatives)".  BCI Ex. 5 [Clarification Letter] at §§ 1(a)(ii).  Barclays therefore acquired all of LBI's right, title, and interest in all exchange traded derivatives.

No part of the $2.187 billion in "collateral posted with LBI by LBI's futures customers to support their futures trading activity as of September, 2008" was posted by a customer whose accounts Barclays did not acquire under the sale.

As explained in Exhibit 1 to Barclays' Supplemental Responses to Trustee's Second 30(b)(6) Deposition Notice, the data used to arrive at the $2.187 billion figure referenced in Response No. 3 of Barclays' initial Responses to Trustee's Second 30(b)(6) Deposition Notice was obtained from the RISC system.